WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>                **Debtor.**<br><br>**Tax I.D. No. 94-3234914** | Case Nos. 19 -\_\_\_\_\_ (\_\_\_)<br>          19 -\_\_\_\_\_ (\_\_\_)<br><br>Chapter 11<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507 AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO (I) PAY PREPETITION WAGES, SALARIES, WITHHOLDING OBLIGATIONS, AND OTHER COMPENSATION AND BENEFITS; (II) MAINTAIN EMPLOYEE BENEFITS PROGRAMS; AND (III) PAY RELATED ADMINISTRATIVE OBLIGATIONS** |
| In re:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                **Debtor.**<br><br>**Tax I.D. No. 94-0742640** | Date:<br>Time:<br>Place: |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 363(b), and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for interim and final authority to (i) pay, in their sole discretion, all prepetition amounts required under or related to the Debtors' Compensation Obligations, Employee Incentive and Retention Programs, Reimbursable Expenses, Withholding Obligations, Payroll Maintenance Fees, Severance Programs, Employee Benefits Programs, and Supplemental Workforce Obligations (each as defined below, and together with any Employee Program Administrative Obligations (as defined below), the "**Prepetition Employee Obligations**"); (ii) continue their prepetition compensation practices, programs, benefits, and policies for their Employees (as defined below) (collectively, the "**Employee Wage and Benefits Programs**") as such were in effect as of the date hereof and as such may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' businesses, and (iii) honor and pay any related administrative fees, costs, expenses, and obligations arising thereunder (collectively, the "**Employee Program Administrative Obligations**").

A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as <u>**Exhibit A**</u> (the "**Proposed Interim Order**").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088    Doc# 8    Filed: 01/29/19    Entered: 01/29/19 00:41:06    Page 2 of 56

# TABLE OF CONTENTS

**Page**

I.    JURISDICTION ...............................................................................................9

II.   BACKGROUND ...............................................................................................9

III.  RELIEF REQUESTED.......................................................................................9

IV.   THE DEBTORS' EMPLOYEES AND PREPETITION EMPLOYEE
      OBLIGATIONS..............................................................................................10

      A.    Compensation Obligations.................................................................12

      B.    Employee Incentive and Limited Retention Programs .....................13

            1.    Short-Term Incentive Plan....................................................14

            2.    Rewards and Recognition Program .......................................15

            3.    Temporary Assignment Program...........................................15

            4.    Service Award Program.........................................................16

            5.    Limited Retention Programs .................................................16

      C.    Reimbursable Expenses ....................................................................18

      D.    Withholding Obligations...................................................................19

      E.    Payroll Maintenance Fees .................................................................21

      F.    Severance Programs and Obligations ................................................21

      G.    Employee Benefits Programs.............................................................24

            1.    Paid Leave .............................................................................24

            2.    Health Insurance Programs ...................................................25

                  (a)    Medical Plans.............................................................26

                  (b)    Dental Plan.................................................................27

                  (c)    Vision Plan.................................................................28

                  (d)    Flexible Spending Accounts .......................................28

            3.    Retirement Programs .............................................................29

                  (a)    Qualified Defined Benefit Pension Plan....................29

                  (b)    401(k) Plan.................................................................31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

|   |   | (c) | Retiree Health Care Plans | 32 |
|   |   | (d) | Retirement Excess Benefit Plan | 33 |
|   |   | (e) | Supplemental Retirement Savings Plan | 33 |
|   |   | (f) | Postretirement Life Insurance Plan | 34 |
|   | 4. | | Life and Disability Insurance Programs | 35 |
|   |   | (a) | Short-Term Disability Plans | 36 |
|   |   | (b) | Supplemental Wage Continuation Plans | 38 |
|   |   | (c) | Long-Term Disability Plans | 39 |
|   |   | (d) | Supplemental Industrial Injury Plan | 40 |
|   |   | (e) | Life Insurance Plan | 40 |
|   |   | (f) | AD&D Insurance Plan | 41 |
|   |   | (g) | Voluntary AD&D Insurance Plan | 41 |
|   |   | (h) | Business Travel Insurance Plan | 42 |
|   | 5. | | Work/Life Benefits Programs | 42 |
|   |   | (a) | Employee Assistance Program | 42 |
|   |   | (b) | Wellness Programs | 43 |
|   |   | (c) | Compliance Programs | 43 |
|   |   | (d) | Employee Discount Program | 44 |
|   |   | (e) | Adoption Expense Reimbursement Program | 44 |
|   |   | (f) | Tuition Reimbursement Program | 45 |
|   |   | (g) | Commuter Transit Program | 45 |
|   |   | (h) | Relocation Program | 46 |
|   |   | (i) | Child Care Program | 46 |
| H. | | | Supplemental Workforce Obligations | 47 |
| V. | BASIS FOR RELIEF REQUESTED | | | 48 |
| A. | | | Certain Prepetition Employee Obligations Are Entitled to Priority Treatment or Constitute Trust Funds | 48 |
| B. | | | Payment of the Prepetition Employee Obligations Is Also Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code | 48 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

VI.   BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE PREPETITION EMPLOYEE OBLIGATIONS .......................................................54

VII.  RESERVATION OF RIGHTS ..................................................................54

VIII. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003 ..................................................................................................55

IX.   REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS ..........................................55

X.    NOTICE ....................................................................................................55

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-30088   Doc # 8   Filed 01/29/19   Entered: 01/29/19 00:41:06   Page 5 of 56

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams Apple, Inc.*,
    829 F.2d 1484 (9th Cir. 1987) ...................................................................................... 51

*In re Anchorage Nautical Tours, Inc.*,
    145 B.R. 637 (B.A.P. 9th Cir. 1992) ............................................................................ 49

*In Matter of B & W Enterprises, Inc.*,
    713 F.2d 534 (9th Cir. 1983) ........................................................................................ 50

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (2009) ..................................................................................... 49

*In re Chateaugay Corp.*,
    80 B.R. 279 (S.D.N.Y. 1987) ....................................................................................... 50

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ........................................................................... 49

*In re Curry & Sorensen, Inc.*,
    57 B.R. 824 (B.A.P. 9th Cir. 1986) .............................................................................. 49

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) .................................................................................................... 49

*In re Eagle–Picher Indus., Inc.*,
    124 B.R. 1021 (Bankr. S.D. Ohio 1991) ...................................................................... 50

*F.D.I.C. v. Castetter*,
    184 F.3d 1040 (9th Cir. 1999) ...................................................................................... 48

*In re Financial News Network, Inc.*
    134 B.R. 732 (Bankr. S.D.N.Y. 1991) ......................................................................... 50

*Gordon v. Hines (In re Hines)*,
    147 F.3d 1185 (9th Cir. 1998) ...................................................................................... 51

*In re Gulf Air*,
    112 B.R. 152 (Bankr. W.D. La. 1989) .......................................................................... 50

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ........................................................................... 48

*In re Just For Feet, Inc.*,
   242 B.R. 821 (D. Del. 1999) .................................................................................. 50

*In re LA Steel Servs., Inc.*,
   Case No. 18-15841-MH (Bankr. C.D. Cal. July 20, 2018) ................................... 51

*Miltenberger v. Logansport, C&S W.R. Co.*,
   106 U.S. 286 (1882) ............................................................................................... 50

*In re Montgomery-Sansome, LP*,
   Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) ............................... 51

*In re NVR L.P.*,
   147 B.R. 126 (Bankr. E.D. Va. 1992) .................................................................... 50

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
   147 B.R. 650 (S.D.N.Y. 1992) ............................................................................... 51

*In re Pettit Oil Co.*,
   No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ............... 51

*In re Rdio, Inc.*,
   Case No. 15-31430 (Bankr. N.D. Cal. Nov. 20, 2015) ......................................... 49

*Scouler & Co., LLC v. Schwartz*,
   No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ................. 49

*In re Structurlite Plastics Corp.*,
   86 B.R. 922 (Bankr. S.D. Ohio 1988) .................................................................... 50

**Statutes**

11 U.S.C. § 105 ......................................................................................... 48, 49, 50, 53

11 U.S.C. § 363 .............................................................................................. 9, 48, 53

11 U.S.C. § 365 ......................................................................................................... 54

11 U.S.C. § 503 ................................................................................................... 11, 22

11 U.S.C. § 507(a) ............................................................................................... 12, 48

11 U.S.C. § 1107(a) ............................................................................................... 9, 49

11 U.S.C. § 1108 ......................................................................................................... 9

26 U.S.C. § 401 ................................................................................................... 31, 33

26 U.S.C. § 415 ......................................................................................................... 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28 U.S.C. § 157(b) .................................................................................................. 9

28 U.S.C. §1334 ..................................................................................................... 9

28 U.S.C. § 1408 .................................................................................................... 8

**Other Authorities**

B.L.R. 5011-1(a) .................................................................................................... 8

Consolidated Omnibus Budget Reconciliation Act of 1985 ................................. 17

Fed. R. Bankr. P. 2002 .......................................................................................... 55

Fed. R. Bankr. P. 6003 ............................................................................... 9, 54, 55

Fed. R. Bankr. P. 6004 .......................................................................................... 55

Family and Medical Leave Act ........................................................................ 9, 55

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*,
    General Order 24 (N.D. Cal.).......................................................................... 9

Public Utilities Code Section 712.7 ...................................................................... 17

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 18-30088   Doc# 8   Filed: 01/29/19   Entered: 01/29/19 00:41:06   Page 8 of 56

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.   BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in either of the Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

## III.  RELIEF REQUESTED

By this Motion, pursuant to sections 105(a), 363(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors seek interim and final authority to (i) pay, in their discretion, all prepetition amounts required under or related to the Debtors' Prepetition Employee Obligations; (ii) continue their Employee Wage and Benefits Programs (except as otherwise provided herein) as such were in effect as of the date hereof and as such may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' businesses, and (iii) honor and pay any related Employee Program Administrative Obligations.  Further, the Debtors request that the Court authorize and direct all applicable banks and financial institutions (the "**Banks**") to receive, process, honor, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the Prepetition Employee Obligations.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

The following chart sets forth the various categories and approximate outstanding amounts of the Prepetition Employee Obligations[1] that the Debtors are seeking authority to pay pursuant to this Motion within the first thirty (30) days of the Chapter 11 Cases (the "**Interim Period**") and on a final basis. Each of the categories of Prepetition Employee Obligations, including the related Employee Program Administrative Obligations, is defined and discussed in further detail below.

| Category | Approx. Amount Seeking to Pay During Interim Period | Approx. Amount Seeking to Pay on Final Basis |
|---|---|---|
| Compensation Obligations | $61,200,000 | $61,200,000 |
| Incentive and Retention Program Obligations (excluding 2018 STIP) | $970,000 | $35,970,000 |
| Reimbursable Expenses | $3,800,000 | $3,800,000 |
| Withholding Obligations[2] | $24,330,000 | $24,330,000 |
| Payroll Maintenance Fees | $75,000 | $75,000 |
| Severance Obligations | $630,000 | $820,000 |
| Benefits Program Obligations[3] | $72,500,000 | $94,800,000 |
| Supplemental Workforce Obligations | $25,000,000 | $35,000,000 |

## IV.  THE DEBTORS' EMPLOYEES AND PREPETITION EMPLOYEE OBLIGATIONS

The Utility is one of the nation's largest utility companies, providing electric and natural gas service to approximately 16 million customers in northern and central California. Together, the Debtors employ approximately 24,000 Employees,[4] including approximately 14,300 Employees who are paid on

---

[1] Amounts related to the Employee Program Administrative Obligations are included in the relevant categories in the chart below and also described below.

[2] Substantially all of this amount represents amounts withheld from Employee compensation for withholding taxes and the Debtors' payroll tax obligations.

[3] As noted below, a significant portion of this amount (approximately $30 million) represents amounts withheld from or contributed by Employees.

[4] For purposes of this Motion, "**Employees**" means all persons entitled to, as of the Petition Date, compensation, benefits, reimbursement, and any other similar payments as a consequence of their being employed by either Debtor. The term "Employees" does not include any Supplemental Workers (as defined below).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

24,000 Employees, approximately 15,200 Employees are covered under collective bargaining agreements (the "**Represented Employees**") with the local chapters of three (3) labor unions:  (i) the International Brotherhood of Electrical Workers ("**IBEW**"), (ii) the Engineers and Scientists of California ("**ESC**"), and (iii) the Service Employees International Union ("**SEIU**") (collectively, the "**Unions**").  The Debtors' Employees perform a variety of critical functions, including operating and maintaining the Debtors' generation units, natural gas facilities, and distribution and transmission assets; performing customer outreach and other critical customer-facing services; collecting payments from the Debtors' customers; and ensuring the safety and reliability of the Debtors' operations.  Employees are also responsible for administering PG&E's clean energy, low income and energy efficiency programs as well as administering payroll, benefits, facilities and information systems and technology required to support the operational employees.

The Debtors have twelve (12) Employees who constitute "insiders" for purposes of section 503 of the Bankruptcy Code (the "**Insiders**").

In addition to their Employees, the Debtors use the services of approximately 1,900 independent contractors and, through various staffing agencies (the "**Staffing Agencies**"), temporary workers to assist with their operations (each, a "**Supplemental Worker**" and, collectively, the "**Supplemental Workforce**" and, together with the Employees, the "**Personnel**").  Members of the Supplemental Workforce, who complement the efforts of the Debtors' Employees, primarily perform specialized tasks that, for various reasons, the Employees cannot perform on their own, including, for example, certain maintenance and repair work on transmission lines following weather-related events.

The Debtors' Personnel are the lifeblood of the Debtors' businesses—without them, the Debtors' operations would come to a halt.  Due to the highly technical, specialized, and regulated nature of the electricity generation and energy transmission and distribution industry, the Debtors must maintain a uniquely skilled workforce, whose knowledge base is critical to the Debtors' businesses and ongoing operations and, as a result, to the success of the Chapter 11 Cases.  Further, all of the Debtors' customers,

---

[5] The Debtors' Employees reside in nearly every county in California, as well as in thirty-six other states including, Arizona, Pennsylvania, Texas, and Virginia.

located throughout an approximately 70,000-square-mile service area in northern and central California, rely on the Debtors' Personnel to receive electricity and natural gas service. Without the Debtors' Personnel, the Debtors' customers in northern and central California would not receive essential utility services.

### A. Compensation Obligations

The Debtors pay their Employees' salaries, wages, and other compensation, including overtime pay, for the Employees' services (collectively, the "**Compensation Obligations**"). Employees who are paid wages on an hourly basis are paid bi-weekly in arrears, and the Debtors' salaried Employees receive payment on a monthly basis on approximately the 23rd day of each month for services rendered from the 1st to the 23rd of that month as well as for services yet to be rendered for the remainder of the month. Approximately 14,300 Employees are paid hourly and approximately 9,000 Employees are paid a monthly salary. Although the vast majority of the Debtors' Employees elect to have their compensation deposited directly into their bank accounts though an electronic funds transfer, approximately 700 Employees are paid by check.

On average, the Debtors pay approximately $297,400,000 each month on account of Compensation Obligations. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued, but unpaid, Compensation Obligations totals approximately $61,200,000, all of which will come due during the Interim Period. On a per-Employee basis, the outstanding prepetition Compensation Obligations average approximately $4,400, below the statutory caps imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors do not believe that payment of the prepetition Compensation Obligations will result in any Employee receiving more than $12,850 on account thereof. Pursuant to this Motion, the Debtors seek authority to pay the Compensation Obligations in the ordinary course of business, including all prepetition amounts relating to such obligations.

Case: 19-30088    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:41:06    Page 12 of 56

### B. Employee Incentive and Limited Retention Programs

The Debtors maintain certain incentive and retention programs[6] (collectively, the "**Employee Incentive and Retention Programs**" and, all amounts required under or relating thereto, the "**Incentive and Retention Program Obligations**") to motivate and reward certain Employees. The Employee Incentive and Retention Programs include (i) the Short-Term Incentive Plan, (ii) the Rewards and Recognition Program, (iii) the Temporary Assignment Program, (iv) the Service Award Program, and (v) the Limited Retention Programs (each as defined below).[7] The Employee Incentive and Retention Programs are critical components of Employees' general compensation structure and bring substantial value to the Debtors' estates. The incentive programs align eligible Employees' interests with those of the Debtors by linking awards under the incentive programs to the overall performance and efficiency of the Debtors' operations. The Limited Retention Programs include a discrete program at the department level and a CPUC approved retention program for Employees at the Debtors' Diablo Canyon Nuclear Plant.

Pursuant to this Motion, (except with respect to the Insiders), the Debtors seek authority to pay obligations in connection with the Employee Incentive and Retention Programs in the ordinary course of business (except as otherwise provided herein), including all prepetition amounts on account of such obligations, and to continue to administer the Employee Incentive and Retention Programs as set forth herein in the ordinary course of business. Each of the Employee Incentive and Retention Programs is described in further detail below. Although Insiders of the Debtors have historically been eligible to receive payments or awards under certain of the Employee Incentive and Retention Programs, the Debtors are not requesting authority at this time to make any payments under any Employee Incentive and Retention Programs to the Insiders.

---

[6] Unless otherwise specified, programs and practices mentioned in this Motion benefit Employees of both Debtors, although they may be maintained or administered by only one of the Debtors.

[7] The Debtors also maintain an annual long-term incentive program ("LTIP") for certain Employees. At this time, the Debtors are not seeking authority to make any cash payments under such programs, and are not seeking authority to implement an LTIP and grant awards for 2019. Earned and previously granted equity awards under existing LTIPs will continue to be provided (but no cash payments or dividend payments thereon). In addition, the Debtors reserve the right to seek Court approval to implement a key employee retention plan, a key employee incentive plan, and a short term incentive plan for 2019.

### 1. Short-Term Incentive Plan

The Debtors maintain a broad-based program (the "**Short-Term Incentive Plan**") through which certain Employees are eligible for annual cash awards based on the Debtors' achievement of certain enterprise-wide performance targets and such Employees' individual performance. Awards under the Short-Term Incentive Plan (collectively, "**STIP Awards**") are based on a formula that is unique to each Employee and that takes into account each Employee's base pay rate, job position, and individual performance, as well as the Debtors' performance as a whole. The STIP Awards are an integral component of the compensation of Employees who participate in the plan and upon which they rely on an annual basis. The Debtors believe that the STIP Awards incentivize strong Employee performance and are critical to ensuring that Employees stay motivated and reach higher performance standards, which in turn maximizes the value of the Debtors' business for all parties in interest.

For fiscal year 2018, approximately 14,000 Employees were eligible to receive STIP Awards at a total aggregate expected cost to the Debtors of approximately $130,000,000 for 2018 performance, which is to be paid in March, 2019. The average individual STIP Award for 2018 is expected to be approximately $13,000, and individual STIP Awards are expected to range from approximately $5,000 to $90,000, exclusive of the Insiders. Annually, the Compensation Committee of the PG&E Corp. Board of Directors (the "**Compensation Committee**") certifies the Debtors' level of achievement of the enterprise-wide performance targets for the applicable fiscal year, and approves the final STIP score, as well as final STIP Awards. A STIP Award is forfeited if an Employee leaves prior to December 31 of the year in which the STIP Award is earned, unless the Employee is severed without cause or is qualified as a Retiree (as defined below), in which case the person is entitled to a prorated award based on the percentage of the year they were an active Employee.

Pursuant to this Motion, the Debtors seek authority to pay Employees the STIP Awards earned for 2018, except that they are not requesting authority to pay STIP Awards to any Insiders or to any officers to the extent earned during the period they were officers. Further, the Debtors are not requesting authority to pay any STIP Awards on an interim basis. Consideration of the relief sought herein with respect to the STIP Awards will be deferred to the final hearing on this Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### 2. Rewards and Recognition Program

The Debtors maintain a program (the "**Rewards and Recognition Program**") to promote timely recognition of Employees in good standing who have gone above and beyond their normal job responsibilities, such as emergency response or participation in special initiatives outside their regular job duties. Awards under the Rewards and Recognition Program (collectively, "**R&R Awards**") may be monetary, non-monetary, or both, and are made by the Debtors on a discretionary basis and in discretionary amounts. Non-monetary awards are provided in the form of gift cards. Members of management establish and distribute guidelines for the Rewards and Recognition Program to help ensure consistency throughout the various departments, but R&R Awards are granted on a departmental basis. R&R Awards are subject to the Debtors' policies and practices, which control the amount of R&R Awards at each level that the leadership of each department may approve. On an annual basis, approximately 6,300 Employees receive R&R Awards at a total cost to the Debtors of approximately $15,200,000. In 2018, the average R&R Award was approximately $1,200. R&R Awards are processed through the Debtors' employee and leadership SAP portal, and can be submitted at any time. The Debtors disburse R&R Awards throughout the year, depending on the department. As of the Petition Date, the Debtors estimate that approximately $650,000 in value of R&R Awards are outstanding on account of the Rewards and Recognition Program with respect to the prepetition period, all of which will come due during the Interim Period. By this Motion, the Debtors request authority to pay all R&R Awards, including all prepetition amounts relating thereto.

### 3. Temporary Assignment Program

The Debtors maintain a program (the "**Temporary Assignment Program**") to provide awards (collectively, "**Temporary Assignment Awards**") to Employees who are temporarily transferred to positions in so-called "temporary positions" (the "**Temporary Positions**"). Awards are paid in discretionary amounts based on the eligible Employee's performance and duration of employment in the Temporary Position. On an annual basis, approximately 350 Employees receive Temporary Assignment Awards at an aggregate cost to the Debtors of approximately $2,600,000. In 2018, the average Temporary Assignment Award was approximately $5,400, and individual Temporary Assignment Awards ranged from approximately $160 to $28,650. The Debtors generally disburse Temporary

Case 19-30088 Doc 79 Filed 01/29/19 Entered: 01/29/19 00:41:06 Page 15 of 56

Assignment Awards upon Employees' completion of their placements in Temporary Positions. As of the Petition Date, the Debtors estimate that approximately $250,000 is outstanding on account of the Temporary Assignment Program, all of which will come due during the Interim Period. By this Motion, the Debtors request authority to pay all Temporary Assignment Awards, including all prepetition amounts relating thereto.

### 4. Service Award Program

The Debtors maintain a program (the "**Service Award Program**") that recognizes Employee service milestones every five years and at retirement for all Employees. Full- or part-time Employees with at least five years of service are eligible to participate and may elect to receive a non-monetary award, such as gift cards and tickets to sporting events and concerts, or to make a donation in an amount determined by the Debtors, to one of the following pre-selected nonprofit organizations: REACH Program, California State Parks Foundation, or the American Red Cross Bay Area Chapter. Eligible Employees select their service award through the Debtors' service award portal operated by BI Worldwide.

On an annual basis, approximately 5,300 Employees and Retirees receive awards under the Service Award Program at a total cost to the Debtors of approximately $850,000. In 2018, the average award ranged from $43 for those with five years of service to $419 for those with 25 years or more of service. The Debtors disburse service awards throughout the year. As of the Petition Date, the Debtors estimate that approximately $70,000 is outstanding on account of the Service Award Program, all of which will come due during the Interim Period. By this Motion, the Debtors request authority to pay all obligations arising under the Service Award Program, including any prepetition amounts.

### 5. Limited Retention Programs

The Debtors maintain a limited retention-based awards program at the departmental level, which provides cash awards to certain key, hard-to-replace Employees to ensure that they continue their employment with the Debtors (the "**Retention Program**"). The Retention Program does not include any Insiders. To receive an award (each, a "**Retention Award**") pursuant to the Retention Program, an Employee's manager must articulate a business case explaining, among other things, the need for the award and why that need cannot be met through other means. The Retention Program awards Employees

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

who are identified as key Employees either because they have indicated that they are planning to leave and their job function is critical, or they are identified by the Debtors as key based on a specific work assignment. On an annual basis, approximately 50 Employees receive Retention Awards at a total cost to the Debtors of approximately $1,200,000. In 2018, the average Retention Award was approximately $27,000, and Retention Awards ranged from approximately $2,583 to $150,000. The Debtors disburse Retention Awards throughout the year. As of the Petition Date, the Debtors estimate that there are no amounts outstanding on account of the Retention Program.

The Debtors also maintain a separate retention program for Employees (none of whom are Insiders) at Diablo Canyon Power Plant ("**DCPP**"), the Utility's nuclear generation facility. Approximately 1,360 Employees are currently participating in the program. The Debtors made a decision not to seek relicensing of the DCPP which will ultimately result in the plant's closure. The operation of the DCPP will, however, continue for several years and the Debtors need skilled and knowledgeable personnel to operate the plant safely and reliably. In order to incentivize Employees to remain at DCPP, the Debtors proposed a retention plan, which was initially approved by the California Public Utilities Commission ("**CPUC**") in January of 2018 with certain modifications. The California legislature subsequently passed legislation (Public Utilities Code Section 712.7, effective January 1, 2019) requiring the CPUC to approve full funding for the retention program and in December 2018, the CPUC issued a decision approving full funding for the retention program initially proposed (the "**Diablo Canyon Retention Program**"). Pursuant to such legislation, the retention payment percentage was raised from 15% to 25% for each retention plan participant. As a result, in April of 2019, the Debtors will be required to make retroactive payments on account of each DCPP retention plan participant. The Debtors estimate that this retroactive payment will aggregate approximately $35,000,000. Normal ongoing payments with respect to the program will be made in the Fall of 2019.

The Diablo Canyon Retention Program includes a base retention program that is provided to the Debtors' Employees who satisfy the following criteria: (i) they work in a regular active full-time status at DCPP or solely support DCPP operations, (ii) their job or job functions will be eliminated as a result of the cessation of operations at DCPP, (iii) they work during the entirety of one or both of the commitment periods, and (iv) they sign a base retention program payback agreement. The first

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

commitment period is a four- (4) year commitment of employment which covers years 2016 through 2020. The second period is a three- (3) year commitment which covers years 2020 through 2023. Pursuant to the Diablo Canyon Retention Program, eligible Employees will receive a payment equal to 25% of the Employee's base salary plus overtime for each yearly segment of the commitment period. The Debtors make each yearly segment payment between October 1 and December 31 of each year. At the end of the Employee's assignment at DCPP, the Employee will have the option to select to remain on the payroll for six months while conducting a job search for internal employment. If the Employee is not successful in finding internal employment, their final severance payment (under the DCPP Severance Program, discussed below) will be reduced by the amount the Employee was paid during the six months. Employees who must relocate to secure an employment opportunity will be reimbursed for moving expenses to a maximum of $5,000. As stated, no amounts related to the Diablo Canyon Retention Program are payable during the Interim Period. Because, among other things, the CPUC has authorized full funding for this program, the Debtors intend to continue the program in the ordinary course.

## C.    Reimbursable Expenses

In the ordinary course of business, the Debtors reimburse their Employees for reasonable and customary expenses incurred in the scope of their employment (collectively, the "**Employee Reimbursable Expenses**"). The Employee Reimbursable Expenses can include those expenses related to business travel, relocation, certain meals, fitness memberships, and communications (e.g., certain cell phone expenses), depending on the position, department, and seniority of the Employee.

In connection with this practice, the Debtors provide certain Employees with credit cards (the "**Employee Credit Cards**") to be used for paying certain Employee Reimbursable Expenses. The Debtors' vendor, U.S. Bank, requires that the Debtors pre-fund the accounts for the Employee Credit Cards.

Employees also use the Debtors' expense reimbursement portal operated by Concur Expense Management to seek reimbursement for expenses charged to Employee Credit Cards and for business-related purchases that are not charged to an Employee Credit Card.

In addition to the Employee Credit Cards, certain Employees are provided with purchasing cards (the "**Employee Purchasing Cards**" and, together with the Employee Credit Cards, the "**Employee**

**Cards"**) to pay for certain emergency expenses, meals for large groups of Employees, and expenses related to various operational materials and services necessary for the Debtors' operations. The Debtors' vendor, U.S. Bank, also requires that the Debtors pre-fund the accounts for the Employee Purchasing Cards. The Debtors typically fund the accounts on a bi-weekly basis and maintain approximately $20 million on account with U.S. Bank to cover obligations relating to the Employee Cards. All Employee Cards issued by the Debtors to their Employees have pre-funded account limits and detailed restrictions on permissible expenditures.

The Debtors also reimburse the members of their Boards of Directors for expenses incurred in connection with the performance of their duties as directors (collectively with the Employee Reimbursable Expenses, the "**Reimbursable Expenses**").

The Debtors estimate that Reimbursable Expenses aggregate approximately $17,200,000 per month, including the pre-funded accounts for the Employee Cards. As of the Petition Date, the Debtors estimate that approximately $3,800,000 is outstanding on account of Reimbursable Expenses, all of which will come due during the Interim Period. By this Motion, the Debtors seek authority to satisfy all prepetition obligations related to Reimbursable Expenses, including those incurred through the use of Employee Cards, as and when they arise and to continue in the ordinary course the usage of the Employee Cards as described herein.

### D. Withholding Obligations

As employers, the Debtors are required by law to withhold from their Employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit them to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). The Debtors also are required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**"). In the aggregate, the Debtors' monthly Payroll Tax Obligations total approximately $95,000,000. As of the Petition Date, the Debtors estimate that they owe approximately $22,000,000 on account of Payroll

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  Tax Obligations relating to the prepetition period, all of which will come due during the Interim Period.

2  In the ordinary course of processing payroll for the Employees, the Debtors also may be required

3  by law, in certain circumstances, to withhold from certain Employees' wages amounts for various

4  garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the

5  "**Garnishments**").  Each pay cycle, the Debtors withhold Garnishments from applicable Employees'

6  paychecks and remit them to the appropriate authorities or entities.  On average, the Debtors withhold

7  approximately $1,000,000 in Garnishments per month from Employees' wages and salaries.  As of the

8  Petition Date, the Debtors estimate that they currently have withheld approximately $300,000 on account

9  of Garnishments that have not been remitted.

10  Further, at Employees' request, the Debtors withhold certain amounts from Employees' wages

11  and salaries for transmittal to third parties, including for the following categories: (i) the payment of

12  dues that Represented Employees owe to the Unions (collectively, the "**Union Obligations**"), (ii)

13  amounts to be transferred via a third-party non-profit administrator, YourCause LLC, to charitable

14  organizations selected by Employees pursuant to the Campaign for the Community (collectively, the

15  "**Community Campaign Obligations**"), (iii) amounts to be transferred to various employee-funded

16  political action committees ("**PAC**"), as selected by the Employee (collectively, the "**PAC**

17  **Obligations**"), and (iv) amounts to be transferred to the Pacific Service Employees Association, a not-

18  for-profit mutual benefit organization for dues and other benefits ("**PSEA Obligations**" and together

19  with Union Obligations, Community Campaign Obligations, and PAC Obligations, the "**Employee**

20  **Elective Deduction Obligations**" and together with the Payroll Tax Obligations and Garnishments, the

21  "**Withholding Obligations**").

22  The Debtors withhold the Employee Elective Deduction Obligations from participating

23  Employees' paychecks and remit them to the applicable recipient as described above.  On average, the

24  Debtors withhold approximately $3,000,000 in Employee Elective Deduction Obligations each month

25  from participating Employees' wages and salaries.  As of the Petition Date, the Debtors estimate that

26  they are currently withholding but have not yet remitted approximately $2,000,000 on account of

27  Employee Elective Deduction Obligations.  Additionally, the Debtors also pay approximately $16,000

28  per month in administrative fees to YourCause LLC.  The Debtors estimate that, as of the Petition Date,

they owe approximately $32,000 in such administrative fees, all of which will come due during the Interim Period.

Pursuant to this Motion, the Debtors seek authority to continue remitting and paying the Withholding Obligations (whether pre or post petition) to the appropriate authorities and entities in the ordinary course of business and to pay any administrative fees with respect to the Withholding Obligations.

### E. Payroll Maintenance Fees

To manage the efficient processing and payment of the various obligations described above, the Debtors rely on the services of certain third-party vendors (collectively, the "**Payroll Maintenance Vendors**"), including, but not limited to, Concur, ADP, Inc. ("**ADP**"), and TALX Corp. ("**TALX**"). As discussed above, the Debtors rely on Concur to administer their expense reimbursement portal. The Debtors use ADP to administer wage garnishments and TALX for employment verification. The Debtors pay each of the Payroll Maintenance Vendors on a monthly basis for the aforementioned services (the "**Payroll Maintenance Fees**").

On average, the Debtors pay Payroll Maintenance Vendors approximately $75,000 in the aggregate, on a monthly basis on account of Payroll Maintenance Fees. As of the Petition Date, the Debtors estimate that they owe approximately $75,000 on account of Payroll Maintenance Fees relating to the prepetition period, all of which will come due during the Interim Period. Failure to pay the Payroll Maintenance Fees could lead to delayed disbursement of payments to the Debtors' Employees, to the detriment of the Employees and the Debtors' operations. In addition, replacing any of the Payroll Maintenance Vendors would take a significant amount of time and expense and result in a disruption to normal employee payment practices. Accordingly, pursuant to this Motion, the Debtors seek authority to pay Payroll Maintenance Fees in the ordinary course of business, including all prepetition amounts on account of such Payroll Maintenance Fees.

### F. Severance Programs and Obligations

In the ordinary course of business, the Debtors maintain three severance programs for the benefit of all Employees except Represented Employees. Severance for Represented Employees is covered by their respective labor agreements (the "**Represented Employee Severance Obligations**"). The three

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

programs are: (i) the DCPP Severance Program, (ii) the Senior Officer Severance Program, and (iii) the General Severance Program (each as defined below, and collectively, the "**Severance Programs**"). Although Employees are eligible to receive benefits under the Severance Programs, the level of benefits that a particular eligible Employee receives varies.

Under the Senior Officer Severance Program, the forty (40) eligible Employees are entitled, upon a qualifying termination, to receive (i) a lump-sum payment equal to one year's base pay and target STIP payout; (ii) a lump-sum payment which is the equivalent of 18-months of COBRA coverage to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period (the "**Senior Officer Severance Obligations**"). Absent further order of the Court, and consistent with section 503 of the Bankruptcy Code, the Debtors will not make any severance payments to the Insiders.

Pursuant to the General Severance Program, eligible Employees, upon termination, are entitled to receive benefits which vary based on the Employees' experience and title. Eligible Employees who are in non-director positions are eligible to receive: (i) a lump-sum payment equal to three weeks' pay per year of credited service, with a 12-week minimum and a 52-week maximum; (ii) a lump-sum payment of $9,000 to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period. Eligible Employees in director positions are entitled to receive (i) a lump-sum payment equal to three weeks' base pay per year of credited service, with a 12-week minimum and a 52-week maximum, plus a similar ratable share of their STIP Award; (ii) a lump-sum payment of $16,650 to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period (collectively, the "**General Severance Obligations**").

Employees at DCPP are covered by a separate severance program (the "**DCPP Severance Program**"). The DCPP Severance Program is similar in all respects to the General Severance Program except for the maximum lump-sum payment, which is 78 weeks (the "**DCPP Severance Obligations**"

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and together with the Senior Officer Severance Obligations and the General Severance Obligations, the "**Severance Obligations**"). The Debtors have not made any payments on account of the DCPP Severance Program in the past two years and do not anticipate making any payments under this program in 2019.

In addition to the foregoing, less than ten (10) Employees whose positions are eliminated because of automated meter reading are eligible to select a transitional leave program where they receive the same applicable General Severance Obligations but such obligations are payable on an ongoing basis for the designated time period.

The Debtors' ability to provide terminated Employees with their severance is critical to maintaining positive Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' reorganization efforts and their long-term viability. The Severance Programs have been designed with a specific focus on the utility industry which is highly specialized and less saturated, which may result in challenges for Employees seeking new employment in the same or other industries. Additionally, as a condition to receiving benefits under the Severance Programs, the Debtors require each severed Employee to release all potential claims against the Debtors.

Pursuant to this Motion, the Debtors are seeking authority (except as indicated above) to continue the Severance Programs and to pay all Severance Obligations and all Represented Employee Severance Obligations in the ordinary course of business, whether arising prior to or after the Petition Date. On average, the Debtors pay approximately $500,000 each month on account of Severance Obligations. Additionally, the Debtors pay approximately $70,000 each month on account of Represented Employee Severance Obligations. As of the Petition Date, because the Severance Programs provide for largely lump sum payments, the Debtors estimate that there are no amounts outstanding under the DCPP Severance Program or the Senior Officer Severance Program. The Debtors also estimate that there is approximately $600,000 owed under the General Severance Program, all of which is payable during the Interim Period. Additionally, as of the Petition Date, the Debtors estimate that they owe approximately $220,000 on account of existing Represented Employee Severance Obligations, and expect that approximately $30,000 in Represented Employee Severance Obligations will be required to be paid during the Interim Period.

### G. Employee Benefits Programs

In the ordinary course of business, the Debtors maintain various employee benefits plans, policies, and programs (collectively, the "**Employee Benefits Programs**" and, all amounts required and payable under or relating thereto, the "**Benefits Program Obligations**"). These Employee Benefits Programs generally fall into the following categories: (i) Paid Leave, (ii) Health Insurance Programs, (iii) Retirement Programs, (iv) Life and Disability Insurance Programs, and (v) Work/Life Benefits (each as defined and discussed in further detail below). By this Motion, the Debtors request authority to continue the Employee Benefits Programs and to pay all Benefits Program Obligations in connection therewith in the ordinary course of business, whether related to the period prior to or after the Petition Date.

### 1. Paid Leave

In the ordinary course of business, the Utility maintains a policy for providing Employees paid leave (collectively, "**Paid Leave**") in the form of paid vacation ("**Vacation**") and paid holidays[8] ("**Paid Holidays**") as well as certain other items, such as sick pay ("**Sick Time**"). The Utility provides Vacation to most Employees, which may be used for any reason. Vacation generally accrues at specified rates up to a maximum amount based on an Employee's length of service and whether an Employee is a Represented Employee. For most Utility Employees, the maximum yearly Vacation is thirty (30) days per year.

PG&E Corp. maintains a separate Paid Leave policy for its Employees (including all management and administrative and technical Employees, which includes paid time off ("**PTO**") and paid holidays.

Although significant accrued Vacation, PTO, and Paid Holidays exist as of the Petition Date, Employees only are entitled to cash payouts for their accrued and unused Vacation, PTO and Paid Holidays upon termination of their employment or on an annual basis pursuant to a lump-sum payment each February for unused Vacation or PTO that exceeds the maximum amounts that Employees are permitted to carry over into the next calendar year. By this Motion, the Debtors seek authority to pay

---

[8] Paid holidays include twenty four (24) hours of paid leave in the form of "floating holidays" in addition to 10 specific holidays.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

any "cash out" amounts due or that may come due with respect to accrued but unused Vacation, PTO, Paid Leave or Paid Holidays and to continue administering such policies and programs and making payments thereunder in the ordinary course of business.

In addition, the Debtors also provide certain other forms of Paid Leave to Employees in the form of:

(a)    leave under the Family and Medical Leave Act and other similar statutes; and

(b)    other leave for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work time in the ordinary course of business for bereavement leave, jury duty or court attendance, and time spent voting.

These other forms of Paid Leave do not involve incremental cash outlays beyond standard payroll obligations, and, therefore, no amounts are outstanding as of the Petition Date.

The Debtors' Paid Leave policies are broad-based programs upon which all Employees have come to depend and are an integral element of their compensation. Continuation of the Paid Leave policies in accordance with the Debtors' prior practice is essential to maintaining positive Employee morale during the Chapter 11 Cases and maximizing the value of the Debtors' business enterprise.

As of the Petition Date, the Debtors estimate that they owe approximately $5,100,000 on account of excess unused Vacation, all of which will be required to be paid during the Interim Period.

## 2.    Health Insurance Programs

Employees are eligible to participate in a number of health insurance programs, including the Medical Plans, the Dental Plan, the Vision Plan, the Health Account, and the Flexible Spending Accounts (each as defined below and, collectively, the "**Health Insurance Programs**"). The Debtors also subsidize or continue to provide health benefits to certain former Employees, including health benefits provided in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"). Each of the Health Insurance Programs is described in further detail below. Pursuant to this Motion, the Debtors seek authority to pay all obligations in connection with the Health Insurance Programs and to pay all obligations in connection with COBRA in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer and pay all amounts payable under the Health Insurance Programs and under COBRA in the ordinary course of

Case: 19-30088    Doc# 349    Filed: 01/29/19    Entered: 01/29/19 00:41:06    Page 25 of 56

business.

(a)     Medical Plans

The Debtors offer medical and prescription-drug insurance coverage (the "**Medical Plans**") to Employees. The Medical Plans primarily are administered by Blue Cross of California, Inc. d/b/a Anthem Blue Cross ("**Anthem**") and Kaiser Foundation Health Plan, Inc. ("**Kaiser**"). Certain prescription drug benefits are administered by Express Scripts Holding Company ("**Express Scripts**") and Willis Towers Watson ("**WTW**"), and certain mental health benefits are administered by Beacon Health Options, Inc. ("**Beacon**" and, together with Anthem, Kaiser, and Express Scripts, the "**Medical Plan Administrators**"). The coverage provided to eligible Employees under the Medical Plans differs depending on the level of coverage an Employee elects to receive, and monthly healthcare premiums differ depending on the Medical Plan in which an Employee is enrolled and whether the Employee has dependents covered by the applicable plan. The total cost of the Medical Plans is approximately $33,200,000 per month, of which approximately $2,600,000 is covered by Employee contributions.

The Debtors self-insure their portion and, after accounting for Employee contributions, spend approximately $29,400,000 per month on medical and prescription-drug claims asserted under the Medical Plans (collectively, the "**Medical Claims**"). The Debtors make payments on account of such Medical Claims on a weekly basis. Employees typically submit Medical Claims forty–six (46) days after incurring the relevant expenses, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Medical Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $53,000,000 on account of prepetition Medical Claims, approximately $32,000,000 of which will come due during the Interim Period.

The Debtors also maintain an account for each Employee who is enrolled in one of the Medical Plans (each, a "**Health Account**"). Health Accounts do not have cash values; rather, Health Accounts hold "credits" that can be redeemed to cover out-of-pocket medical expenses incurred by Employees. In essence, each credit in an Employee's Health Account represents a commitment by the Debtors to reimburse such Employee for out-of-pocket expenses up to a certain dollar amount. On January 1 of each year, the Debtors contribute the equivalent of $500 per Employee or $1,000 per family of credits

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

to each eligible Employee's Health Account. If eligible Employees participate in health screenings and/or verify that they are not tobacco users, the Debtors contribute up to $500 per Employee or $1,000 per family of additional credits for each of these activities to each eligible Employee's Health Account. The full balance of credits remaining in an Employee's Health Account is carried over into the next calendar year. Employees redeem the credits in their Health Accounts by submitting a claim with the Debtors. The Health Accounts for 2019 have been funded.

The Debtors also pay approximately $1,900,000 per month in administrative fees payable to the Medical Plan Administrators. The Debtors estimate that, as of the Petition Date, they owe approximately $1,900,000 in such administrative fees, all of which will come due during the Interim Period.

Additionally, the Debtors pay monthly administrative fees of approximately $315,000 to Mercer Benefits Administration, which manages the eligibility- and enrollment-related processes for the Medical Plans, as well as the Dental Plan and the Vision Plan (as discussed below). The Debtors estimate that, as of the Petition Date, they owe approximately $315,000 in such administrative fees, all of which will come due during the Interim Period.

### (b) Dental Plan

The Debtors offer dental insurance coverage (the "**Dental Plan**") to Employees. The Dental Plan is administered by Delta Dental of California (the "**Dental Plan Administrator**"). The total cost of the Dental Plan is approximately $2,700,000 per month, of which approximately $80,000 is covered by Employee contributions.

The Debtors self-insure their portion and make payments on account of claims asserted under the Dental Plan (the "**Dental Claims**") on a weekly basis. Dental Claims are typically submitted approximately twenty (20) days after the relevant expense is incurred, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Dental Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $2,100,000 on account of prepetition Dental Claims, all of which will come due during the Interim Period.

In addition, the Debtors pay administrative fees of approximately $120,000 per month to the Dental Plan Administrator. The Debtors estimate that, as of the Petition Date, they owe the Dental Plan

Case 19-30088 Doc 79 Filed 01/29/19 Entered: 01/29/19 00:41:06 Page 27 of 56

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Administrator approximately $120,000 in such administrative fees, all of which will come due during the Interim Period.

### (c) Vision Plan

The Debtors offer vision insurance coverage (the "**Vision Plan**") through a plan administered by Vision Service Plan, Inc. (the "**Vision Plan Administrator**"). The Debtors spend approximately $300,000 per month on claims asserted under the Vision Plan (collectively, the "**Vision Claims**"). The Debtors make payments on account of the Vision Claims on a monthly basis. Vision Claims are typically submitted approximately fifteen (15) days after the relevant expense is incurred, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Vision Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $240,000 on account of prepetition Vision Claims, all of which will come due during the Interim Period.

The Debtors pay administrative fees of approximately $30,000 per month to the Vision Plan Administrator. The Debtors estimate that, as of the Petition Date, they owe approximately $30,000 in such administrative fees, all which will come due during the Interim Period.

### (d) Flexible Spending Accounts

In addition to offering the medical benefits described above, the Debtors offer Employees the option to enroll in certain flexible spending accounts, including a healthcare flexible spending account and a dependent care flexible spending account (collectively, the "**Flexible Spending Accounts**"). Participating Employees can make pre-tax payroll contributions (the "**Flexible Spending Account Contributions**") to the Flexible Spending Accounts up to the maximum amounts permitted by the Internal Revenue Service. Employees then may use the proceeds of Flexible Spending Accounts to cover the cost of eligible health care expenses incurred by such Employees and/or their dependents, depending on the Flexible Spending Account in which they are enrolled. Employees who participate in the Flexible Spending Accounts may use such proceeds by, among other means, utilizing a designated debit card provided to participating Employees or submitting claims for reimbursement.

The Debtors withhold approximately $1,000,000 per month from Employees' compensation on account of the Flexible Spending Account Contributions and transfer such amounts to either Wage

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Works, Inc. or Kaiser Foundation Health Plan Inc. SF (together, the "**Flexible Spending Account Administrators**"), depending on the Medical Plan in which an Employee is enrolled. As of the Petition Date, the Debtors estimate that they currently are withholding approximately $1,000,000 on account of Flexible Spending Account Contributions. Pursuant to this Motion, the Debtors seek authority to transfer all withheld amounts and to continue to withhold amounts on account of the Flexible Spending Account Contributions and to transfer such amounts to the Flexible Spending Account Administrators in the ordinary course of business.

The Debtors pay administrative fees of approximately $30,000 per month to the Flexible Spending Account Administrators. The Debtors estimate that, as of the Petition Date, they owe approximately $30,000 in such administrative fees, all of which will come due during the Interim Period.

### 3. Retirement Programs

The Debtors offer various programs to help current Employees and retired Employees ("**Retirees**") to plan for and manage their retirements (collectively, the "**Retirement Plans**"). The Retirement Plans are comprised of the Pension Plan, 401(k) Plan, Retiree Health Care Plan, the Retirement Excess Benefit Plan, the Supplemental Retirement Savings Plan, and Postretirement Life Insurance Plan (each as defined below).[9] Participation in particular Retirement Plans is based on a number of criteria, including the nature of an Employee's job responsibilities and duties, whether an Employee is a Represented Employee, and an Employee's date of hire and length of service. Each of the Retirement Plans is discussed in further detail below. Pursuant to this Motion, the Debtors seek authority to pay all obligations in connection with the Retirement Plans in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer the Retirement Plans in the ordinary course of business.

### (a) Qualified Defined Benefit Pension Plan

The Utility provides a tax-qualified defined benefit plan for the benefit of all of the Debtors' Employees and Retirees (the "**Pension Plan**"). The assets in the Pension Plan are not assets of the

---

[9] The Debtors offer Supplemental Executive Retirement Plans ("**SERPs**") and a Defined Contribution Executive Supplemental Retirement Plan ("**DC-ESRP**") for officers and certain key employees of the Debtors and their subsidiaries. The Debtors are not requesting authority at this time to make any payments pursuant to the SERPs and DC-ESRP.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Debtors' estates. Participants in the Pension Plan receive a fixed pension benefit upon retirement (collectively, the "**Pension Obligations**"), in the form of a final average pay benefit or a cash balance benefit. An Employee's final average pay benefit is calculated by utilizing formulas that reflect, among other things, an Employee's length of service, pay, age upon retirement, and the date when retirement benefits begin. The cash balance benefit was added to the Pension Plan on January 1, 2013. Employees hired on or after that date participate in the cash balance benefit and Employees hired prior to that date were given a one-time opportunity to irrevocably select to switch from the final average pay benefit to the cash balance benefit on a go-forward basis. For the cash balance benefit, on the last day of each year (or on the date of benefit commencement, if earlier), an Employee's cash balance account is credited with pay credits based on a point system of age plus service and eligible pay during the year. At the end of each calendar quarter, the account is credited with interest credits, based on an average of the 30-year Treasury rates for the three months before the calendar quarter. Additionally, a cash balance participant may elect a lump-sum payout that is eligible for rollover into an Individual Retirement Account or other tax-advantaged employer plan. Cash balance participants may elect to receive their vested benefit when they leave employment, regardless of whether they have attained age 55.[10] Approximately 24,000 Employees and 4,000 former Employees are enrolled in the Pension Plan, and approximately 26,000 Retirees, previously-deferred pensioners, and beneficiaries receive benefits in connection with the Pension Plan. To fund the Pension Obligations, the Debtors contribute, on a quarterly basis, amounts (collectively, the "**Pension Contributions**") into a trust (the "**Pension Trust**"), from which the Pension Obligations are satisfied.

On average, the Debtors make Pension Contributions to the Pension Trust in the amount of approximately $81,750,000 each fiscal quarter. In addition, the Debtors pay for certain administrative costs associated with the Pension Plan, such as actuarial studies (the "**Pension Administrative Costs**"). These costs are approximately $200,000 per year. On average, approximately $62,000,000 is paid each month from the Pension Trust on account of Pension Obligations to eligible participants. As of the Petition Date, the Debtors estimate that there will be no amounts outstanding with respect to the Pension Obligations, excluding Pension Administrative Costs.

---

[10] The availability of the lump sum may be impacted by the chapter 11 filings.

As of the Petition Date, the Debtors are current with respect to the Pension Contributions and the Debtors intend to make future quarterly Pension Contributions as and when they become payable.

The Debtors estimate that outstanding Pension Administrative Costs relating to the prepetition period are in the amount of approximately $20,000, which they seek authority to pay pursuant to this Motion.

### (b) 401(k) Plan

The Debtors maintain a qualified defined contribution savings plan for the benefit of most of their Employees (the "**401(k) Plan**"), which is designed to meet the requirements of sections 401(a) and 401(k) of title 26 of the United States Code. The 401(k) Plan is administered by Fidelity Management Trust Company (the "**401(k) Plan Administrator**"). Approximately 22,000 active Employees are enrolled in the 401(k) Plan. Employees who are enrolled in the 401(k) Plan contribute approximately $25,000,000 per month in the aggregate to the 401(k) Plan, which contributions are withheld by the Debtors from such Employees' compensation. The Debtors "match" Employees' contributions by contributing $0.75 per dollar that an Employee contributes, with such "matches" capped at up to either 6% or 8% of an Employee's gross pay, depending on certain characteristics of the Employee, such as an Employee's date of hire, Union membership, and their participation in the Pension Plan (the "**401(k) Matching Obligations**").

The Debtors pay approximately $9,100,000 each month on account of 401(k) Matching Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $1,400,000 on account of 401(k) Matching Obligations relating to the prepetition period, all of which will come due during the Interim Period.

In addition, the Debtors pay administrative fees and independent fiduciary fees of approximately $140,000 per month to the 401(k) Plan Administrator and Gallagher Fiduciary Advisors, LLC ("**Gallagher**"). The Debtors estimate that, as of the Petition Date, they owe approximately $140,000 in such administrative fees, all of which will come due during the Interim Period. In addition, the Debtors pay an annual fee of approximately $90,000 to Financial Engines, which provide employees with access to additional financial planning tools, information, and services to better manage their 401(k) investments. The Debtors estimate that, as of the Petition Date, there will be no amounts outstanding on

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

DEBTORS' MOTION TO PAY PREPETITION EMP. 31
OBLIGATIONS & CONTINUE WAGE BENEFITS

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

account of fees to the Financial Engines.  Pursuant hereto, the Debtors seek authority to pay all amounts withheld from Employees' paychecks as contributions to the 401(k) Plan, and all outstanding prepetition 401(k) Matching Obligations and administrative fees.

### (c)    Retiree Health Care Plans

The Debtors offer medical and prescription-drug insurance coverage (the "**Retiree Health Care Plans**") to Retirees who satisfy age and service requirements, which coverage is administered by the Medical Plan Administrators, as well as Blue Cross of California, Inc. d/b/a Anthem Blue Cross ("**Anthem**") and Kaiser Foundation Health Plan, Inc. ("**Kaiser**"), Blue Shield of California, and Health Net.  Certain prescription drug benefits are administered by Express Scripts Holding Company ("**Express Scripts**"), and certain mental health benefits are administered by Beacon.  Some of the Debtors' Obligations under the Retiree Health Care Plans are self-insured, while others are covered by insurance as to which the Debtors pay the premiums.  The total cost of the Retiree Health Care Plans is approximately $12,500,000 per month, of which approximately $10,000,000 is covered by Retiree contributions which is deducted from their pension benefit payments.  To fund their self-insured portion of the Retiree Health Care Plans, the Debtors contribute, on an annual basis, amounts into a trust (the "**Postretirement Medical Plan Trust**"), from which the costs of the Retiree Health Care Plans are paid. In 2018, the Debtors contributed approximately $28,300,000 into the Postretirement Medical Plan Trust. The vast majority of the Debtors' contributions to the Postretirement Medical Plan Trust are made at the end of the calendar year.  The money contributed by the Debtors to the Postretirement Medical Plan Trust, the Postretirement Life Insurance Plan Trust, and the Utility Long-Term Disability Plan Trust (as discussed and defined below), is received from ratepayers for the specific purpose of funding the trusts. These trusts are segregated funds that do not constitute assets of the Debtors' estates.

The medical and prescription-drug claims submitted under the Retiree Health Care Plans (collectively, the "**Retiree Medical Claims**") are funded from the Postretirement Medical Plan Trust. Payments are made from the Postretirement Medical Plan Trust on account of the Retiree Medical Claims on a weekly basis.  Retirees typically submit Retiree Medical Claims thirty-seven (37) days after incurring the relevant expenses, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Retiree Medical Claims.  In addition, as stated, the

Debtors pay insurance premiums on account of some of the Retiree Health Care Plans (collectively, the "**Retiree Health Care Premiums**"), which are also funded from the Postretirement Medical Plan Trust. Based on historical trends, the Debtors estimate that, as of the Petition Date, approximately $13,900,000 is outstanding on account of prepetition Retiree Medical Claims and the Retiree Health Care Premiums, $12,500,000 of which will come due during the Interim Period and all of which will be funded by the funds in the Postretirement Medical Plan Trust. As of the Petition Date, the Debtors' contributions to the Postretirement Medical Plan Trust and insurance premiums related thereto are current.

### (d) Retirement Excess Benefit Plan

The Debtors provide certain Retirees and Employees whose pension benefit under the Pension Plan is reduced by reason of the application of Section 415 and/or Section 401(a)(17) of the Internal Revenue Code, the ability to participate in a retirement excess benefit plan (the "**Retirement Excess Benefit Plan**"). The Retirement Excess Benefit Plan provides participants with the monthly benefit which would be payable under the Pension Plan if the limitation under Section 415 and/or Section 401(a)(17) of the Internal Revenue Code had not applied. Currently, ten (10) Retirees (none of whom were officers) are receiving benefits under this plan in an aggregate monthly amount of $6,000. During the Interim Period $6,000 will become payable to such Retirees.

### (e) Supplemental Retirement Savings Plan

The Debtors also maintain Supplemental Retirement Savings Plans ("**SRSP**") for the benefit of officers and other key Employees. The SRSPs are unfunded deferred compensation plans, which both (1) permit participants to defer certain of their compensation and earn investment returns on those deferred amounts, and (2) allow participants to receive matching amounts that were elected under the 401(k) Plan, but were not provided due to tax code limitations. The SRSP is funded primarily by eligible Employee contributions and by certain amounts funded by the Debtors. The SRSP has approximately 300 active Employee participants (the "**Active Participants**"), and approximately 90 inactive participants, comprised largely of Retirees or those who have been terminated without cause (the "**Inactive Participants**"). Under the SRSP, most distributions are not made until seven months after a participant retires, although minimal distributions may be made while the participant is active. Pursuant to this Motion, the Debtors are not seeking authority to make any distributions with respect to the SRSP

Case 19-30088 Doc 29 Filed 01/29/19 Entered: 01/29/19 00:41:06 Page 33 of 56

to currently Inactive Participants. Additionally, no further funds are being contributed to the SRSP by the Debtors.

The balances in the SRSP as to Active Participants aggregate approximately $29,000,000, of which 85% represents funds contributed directly by the Active Participants. Under the SRSP, no amounts will be paid to Active Participants in 2019 unless any of such participants retire. Assuming the same level of retirements of Active Employees that occurred in 2018, the Debtors estimate that an aggregate of approximately $2,000,000 would be distributed to Active Employees who retire in 2019, or an average of approximately $60,000 per person. Based on the fact that 85% of the funds in the SRSP attributable to Active Employees constitutes their contributions, approximately $51,000 of such average distribution would be comprised of Active Employee contributions. The Debtors seek authority pursuant hereto to continue the SRSP only for Active Employees on the Petition Date and to make all distributions thereunder. Because the Active Employees are an integral part of the Debtors' ongoing operations and because most of the funds to be distributed under the SRSP consist of contributions made by the Active Employees, the Debtors believe the relief requested is fair and appropriate. In addition, the Debtors pay for certain administrative costs associated with the SRSP (the "**Retirement Plan Administrative Costs**"). These costs are approximately $200,000 per quarter. As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of Retirement Plan Administrative Costs, all of which will come due during the Interim Period.

(f)     **Postretirement Life Insurance Plan**

The Debtors provide life insurance coverage (the "**Postretirement Life Insurance Plan**") to Retirees who satisfy an age requirement through Metropolitan Life Insurance Company (the "**Life Insurance Administrator**"). All Employees of the Debtors and certain subsidiaries are eligible to receive a life insurance coverage benefit under the Postretirement Life Insurance Plan. For eligible Retirees who have more than fifteen (15) years of service, the Postretirement Life Insurance Plan provides coverage in an amount equal to twelve (12) months of a Retirees' base salary prior to retirement. Coverage for certain of these Retirees, due to their position at the time of their retirement or the date on which they were promoted to a management position, is capped at $50,000. Separately, coverage for a small number of these Retirees, who were eligible to make an election prior to 2005, is payable seven

months after retirement as a cash lump sum, rather than as life insurance. For eligible Retirees who have less than fifteen (15) years of service, the Postretirement Life Insurance Plan provides coverage of $8,000. To fund the insurance premiums for the coverage, the Debtors contributed approximately $8,000 into a trust (the "**Postretirement Life Insurance Plan Trust**"). In addition, in 2018 the Debtors paid directly approximately $3,200,000 in costs in the form of life insurance premiums for coverage over $50,000 and life insurance coverage converted to a lump sum payment at retirement per the election of eligible Employees, and fiduciary and compliance costs. As of the Petition Date, the Debtors estimate that approximately $10,000 is owed in administrative costs with respect to the Postretirement Life Insurance Plan related to the prepetition period, all of which will come due during the Interim Period. The Postretirement Life Insurance Plan Trust is a separate trust and is not an asset of the Debtors' estates. Absent further order of the Court, no life insurance coverage will be converted to a lump sum payment at retirement nor will any outstanding lump sum payments be made.

### 4. Life and Disability Insurance Programs

The Debtors offer active Employees life insurance and various programs to aid Employees during periods in which they are physically unable to perform their duties (collectively, the "**Life and Disability Insurance Programs**"), including (i) the Short-Term Disability Plans, (ii) the Supplemental Wage Continuation Plans, (iii) the Long-Term Disability Plan, (iv) the Supplemental Industrial Injury Plan, (v) the Life Insurance Plan, (vi) the AD&D Insurance Plan, (vii) the Voluntary AD&D Plan, and (viii) the Business Travel Insurance Plan (each as defined below). Pursuant to this Motion, the Debtors seek authority to pay all obligations in connection with the Life and Disability Insurance Programs in the ordinary course of business, including all prepetition amounts due on account of such programs, and to continue to administer the Life and Disability Insurance Programs in the ordinary course of business. Each of the Life and Disability Insurance Programs is described in further detail below.

The Utility Long-Term Disability Plan, Supplemental Wage Continuation Benefits, Voluntary Plan (each as defined below), and the leave of absence plans are administered by Sedgwick Claims Management Services, Inc. (the "**Leave of Absence and Disability Plan Administrator**"). The Debtors pay administrative fees of approximately $280,000 per month to the Leave of Absence and Disability Plan Administrator. As of the Petition Date, the Debtors estimate that approximately $280,000 is owed

to the Leave of Absence and Disability Plan Administrator related to the prepetition period, all of which will come due during the Interim Period.

### (a) Short-Term Disability Plans

Since January 1, 2018, the Utility has provided short-term disability payments and paid family leave benefit payments to its eligible Employees located in California pursuant to the Voluntary Disability and Paid Family Leave Benefit Plan (the "**Voluntary Plan**"). The Utility's Voluntary Plan is an alternative to the assistance that would otherwise be provided to Utility Employees by the California State Disability Insurance (SDI) plan (the "**State Plan**" and together with the Voluntary Plan, the "**Short-Term Disability Plans**") and is provided to Employees in the event they become disabled due to a short-term illness or must take leave for certain familial reasons ("**Paid Family Leave**"). More than 85% of the Utility's eligible workforce has elected to be covered under the Voluntary Plan, including both non-Represented and Represented Employees. Employees also have the option to remain covered by the State Plan. There is also an assessment fee imposed by the California Employment Development Department to be paid by employers for administrative costs arising out of the Voluntary Plan. This fee is paid quarterly and calculated based on taxable wages for Employees covered under the Voluntary Plan.

Both the Voluntary Plan and State Plan are funded by mandatory Employee contributions that are withheld from Employees' paychecks. For both of the Short-Term Disability Plans, the Debtors withhold 1% of Employees' taxable earnings, up to a specified maximum (set at $1,149.67 for 2018 and $1,183.71 for 2019). Employees of the Utility contributed approximately $25,000,000 to the Voluntary Plan in 2018. Employees covered under the State Plan contributed approximately $820,000 to the State Plan in 2018. With the exception of the case of a shortfall under the Voluntary Plan (as described below), all benefits under the Short-Term Disability Plans are funded through Employee contributions, which are deducted from Employee payroll and contributed to either the State Plan trust or the Voluntary Plan trust.

The State Plan pays disability and paid family benefits of 60-70% up to a specified maximum weekly benefit. The Voluntary Plan provides the greater of (i) 55-60% of base pay without a capped weekly benefit amount or (ii) the State Plan weekly benefit amount. Employees may be eligible for up

to 52 weeks of disability benefits under the Voluntary Plan or the State Plan. For Employees of the Utility, all Sick Time must be exhausted prior to eligibility for the disability benefits under the Short-Term Disability Plans. In addition, under the State Plan, eligible Employees may receive up to six weeks of Paid Family Leave benefits within a 12-month period. Under the Voluntary Plan, eligible Employees may receive up to eight weeks of Paid Family Leave benefits within a 12-month period.

To the extent there are not sufficient amounts contributed to the Voluntary Plan from Employee contributions to compensate an Employee if they become disabled due to a short-term illness or are on Paid Family Leave or to cover the assessment fee paid to the State, the Utility will fund the shortfall. Employee contributions to the Voluntary Plan in 2018 did not fully cover the disability and Paid Family Leave benefits paid by the Voluntary Plan or the assessment fee paid to the State. The Utility funded the shortfall, which to date has totaled $4,000,000. As of the Petition Date, the Debtors estimate that an additional approximately $620,000 is owed in connection with funding the shortfall for the Voluntary Plan related to the prepetition period, all of which will come due during the Interim Period.

All California PG&E Corp. Employees participate in the State Plan. PG&E Corp. also provides a separate supplemental short-term disability program (the "**Corporation Short-Term Disability Plan**") for its Employees. The Corporation Short-Term Disability Plan is insured by the Standard Insurance Company. PG&E Corp. pays the premiums on such insurance monthly. The total cost in 2018 was approximately $20,000. As of the Petition Date, the Debtors estimate that they owe approximately $1,000 on account of the Corporation Short-Term Disability Plan, all of which will come due during the Interim Period.

PG&E Corp. also provides supplemental disability benefits ("**PG&E Corp. Short-Term Supplemental Benefits**") if the Corporation Short-Term Disability Plan benefit of 66 2/3% of base pay is limited by the maximum insured benefit. These supplemental benefits are not insured benefits and are paid for by PG&E Corp directly. No payments were made on account of PG&E Corp. Short-Term Supplemental Benefits in 2018 and no amounts are currently outstanding.

In addition, the PG&E Corp. provides a supplemental paid family leave payment ("**Paid Family Leave Wage Continuation**") which increases the six weeks of State Plan benefit payments up to a total of 100% of base pay, fully taxable, within a 12-month period. Employees may be eligible for an

Case: 19-30088    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:41:06    Page 37 of 56

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

additional two weeks of Paid Family Leave Wage Continuation benefits for up to a total of eight weeks of Paid Family Leave benefits within a 12-month period. No payments were made on account of Paid Family Leave Wage Continuation in 2018 and no amounts are currently outstanding.

Beginning on July 1, 2019, contributions to fund a new paid leave program through the District of Columbia will be withheld from Employees' paychecks who work in the District of Columbia. The contributions are made by covered employers who are required to contribute quarterly an amount equal to 0.62% of the total wages of each of its covered employees to implementation of the universal paid leave. Covered Employees become eligible for benefits starting in 2020.

### (b)    Supplemental Wage Continuation Plans

The Utility provides eligible Employees who are covered under the Voluntary Plan with additional benefits to increase the percentage of base pay that such Employees receive when disabled due to a short-term illness or when on Paid Family Leave.

For California non-Represented and ESC-Represented eligible Employees covered by the Voluntary Plan, the Utility provides a supplemental disability payment (the "**Supplemental Wage Continuation**") which increases the benefit payment from 60% up to a total benefit of 70% of base pay, after tax. The Utility provides eligible non-Represented and ESC-Represented Employees who do not work in California supplemental wage continuation benefits and may supplement any state disability or paid family leave program for which the Employee may be eligible. The IBEW and SEIU Represented Employees are not eligible for Supplemental Wage Continuation.

In addition, for Employees in California covered in the Voluntary Plan, the Utility provides a supplemental Paid Family Leave payment ("**Paid Family Leave Wage Continuation**" and together with the Supplemental Wage Continuation, the "**Supplemental Wage Continuation Plans**") which increases the benefit payments from 60% up to a total of 100% of base pay for up to eight weeks within each 12-month period.

Amounts payable under the Supplemental Wage Continuation Plans are paid for by the Utility. The total annual cost of the Supplemental Wage Continuation Plans is approximately $10,400,000. As of the Petition Date, the Utility estimates that it owes approximately $860,000 on account of the Supplemental Wage Continuation Plans, all of which will come due during the Interim Period and which

is included in the Compensation Obligations described above.

### (c) Long-Term Disability Plans

The Debtors provide long-term disability benefits, including partial income replacement and continued medical and life insurance coverage (the "**Long-Term Disability Plans**"), to certain of their Employees in the event that they become disabled due to an accident or a long-term illness. The Utility and PG&E Corp. provide separate Long-Term Disability Plans for their Employees (respectively, the "**PG&E Corp. Long-Term Disability Plan**" and the "**Utility Long-Term Disability Plan**").

The PG&E Corp. Long-Term Disability Plan is insured and administered by The Standard Insurance Company (the "**PG&E Corp. Long-Term Disability Plan Administrator**"). PG&E Corp. pays the full cost of all premiums for the PG&E Corp. Long-Term Disability Plan monthly. The total cost in 2018 was approximately $25,000. Employees may be eligible for benefits after six (6) months of disability (the "**PG&E Corp. Long-Term Disability Contributions**"). PG&E Corp. also provides supplemental disability benefits ("**PG&E Corp. Long-Term Supplemental Benefits**") if the PG&E Corp. Long-Term Disability Plan benefit of 66 2/3% of base pay is limited by the maximum insured benefit. These supplemental benefits are not insured benefits and are paid for by PG&E Corp. As of the Petition Date, PG&E Corp. estimates that it owes approximately $2,000 on account of the PG&E Corp. Long-Term Disability Plan insurance premiums, all of which will come due during the Interim Period. Additionally, P&E Corp. estimates that there are no amounts outstanding on account of PG&E Corp. Long-Term Supplemental Benefits.

The Utility Long-Term Disability Plan provides that an eligible Employee may receive 70% of base pay during the period of disability for a maximum of two (2) years (unless the Employee qualifies for Social Security Disability Insurance). An Employee's benefit amount is offset by any benefits the Employee receives from government programs. To fund the payments made to eligible Employees under the Utility Long-Term Disability Plan, the Utility contributes an annual amount of approximately $32,000,000 into a trust, from which the benefits are paid (the "**Utility Long-Term Disability Trust**"). Payments are made out of the Utility Long-Term Disability Trust on account of claims under the Utility Long-Term Disability Plan on a weekly basis (the "**Long-Term Disability Claims**"). In 2018, approximately $45,400,000 was paid from the Long-Term Disability Trust on account of Long-Term

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Disability Claims, including certain administrative costs associated with the Utility Long-Term Disability Plan. Based on historical trends, the Debtors estimate that, as of the Petition Date, approximately $3,800,000 is outstanding on account of prepetition Long-Term Disability Claims, all of which will come due during the Interim Period and all of which will be paid from funds in the Utility Long-Term Disability Trust. As discussed above, the moneys contributed by the Utility to the trust are received from ratepayers for the specific purpose and the Utility has made the entire contribution for 2018. In addition, as stated above, the Utility Long-Term Disability Trust is a separate trust and is not an asset of the Debtors' estates.

### (d) Supplemental Industrial Injury Plan

The Debtors provide supplemental insurance coverage (the "**Supplemental Industrial Injury Plan**") to Employees, which provides Employees with a source of income—above Employees' income received in connection with workers' compensation coverage—in the event that they sustain an injury or illness on the job. Depending on the Employee's job title and the date of the onset of his or her injury or illness, when combined with other benefits, an eligible Employee may receive between 50% and 85% of his or her basic weekly wage rate. The Debtors bear the entire cost of the Supplemental Industrial Injury Plan.

The Debtors spend approximately $100,000 per month on claims asserted under the Supplemental Industrial Injury Plan (collectively, the "**Supplemental Industrial Injury Claims**"). The Debtors make payments on account of the Supplemental Industrial Injury Claims on a daily basis. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $100,000 on account of prepetition Supplemental Industrial Injury Claims, all of which will come due during the Interim Period.

### (e) Life Insurance Plan

The Debtors provide life insurance coverage (the "**Life Insurance Plan**") to Employees through the Life Insurance Administrator. The Life Insurance Plan provides the vast majority of Employees with $10,000 in coverage, although some Employees have selected higher coverage limits under the Life Insurance Plan, with the cost of the coverage over $10,000 paid by the Employees through payroll deductions. The Debtors withhold approximately $800,000 per month from Employee paychecks for

those Employees who have selected the higher coverage limit. The total annual cost to the Debtors of the Life Insurance Plan is approximately $450,000, all of which is paid by the Debtors in the form of premiums remitted to the Life Insurance Administrator (collectively, the "**Life Insurance Obligations**"). Premiums for the Life Insurance Plan are paid monthly. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of Life Insurance Obligations, all of which will come due during the Interim Period. The Debtors also seek by this Motion to remit all amounts withheld from Employee paychecks, which have not yet been remitted.

### (f) AD&D Insurance Plan

The Debtors provide accidental death and dismemberment insurance coverage (the "**AD&D Insurance Plan**") to Employees through the Life Insurance Administrator. The AD&D Insurance Plan provides the vast majority of Employees with $10,000 in coverage; certain members of the Debtors' management team receive $250,000 in coverage. The total annual cost of the AD&D Insurance Plan is approximately $80,000, all of which is paid by the Debtors in the form of premiums remitted to the Life Insurance Administrator (collectively, the "**AD&D Insurance Obligations**"). AD&D Insurance Obligations are paid monthly. As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of AD&D Insurance Obligations, all of which will come due during the Interim Period.

### (g) Voluntary AD&D Insurance Plan

The Debtors provide eligible Employees with the option to purchase additional accidental death and dismemberment coverage (the "**Voluntary AD&D Insurance Plan**") through the Life Insurance Administrator. The benefits provided pursuant to the Voluntary AD&D Insurance Plan are funded entirely by amounts withheld from Employees' paychecks and then transferred as premium payments to the Life Insurance Administrator. The Debtors withhold and transfer approximately $100,000 per month on account of the Voluntary AD&D Insurance Plan. As of the Petition Date, the Debtors estimate that they are currently withholding approximately $100,000 on account of the Voluntary AD&D Insurance Plan. Pursuant to this Motion, the Debtors seek authority to transfer amounts withheld to the Life Insurance Administrator in the ordinary course of business, including all prepetition amounts withheld on account of the Voluntary AD&D Insurance Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**(h)     Business Travel Insurance Plan**

The Debtors provide business travel insurance coverage (the "**Business Travel Insurance Plan**") to Employees through Life Insurance Company of North America (the "**Business Travel Insurance Administrator**").  In the event that an Employee suffers an injury during work-related travel, the Business Travel Insurance Plan provides an eligible Employee between $125,000 and $1,000,000 in coverage, in addition to any benefits payable from the Life Insurance Plan, the AD&D Insurance Plan, or the Voluntary AD&D Insurance Plan.  The total annual cost of the Business Travel Insurance Plan is approximately $300,000, all of which is paid by the Debtors in the form of premiums remitted to the Business Travel Insurance Administrator (the "**Business Travel Insurance Obligations**").  The Debtors pay Business Travel Insurance Obligations on an annual basis.  As of the Petition Date, the Debtors estimate that they owe no amounts on account of Business Travel Insurance Obligations relating to the prepetition period.

**5.     Work/Life Benefits Programs**

The Debtors offer Employees the opportunity to participate in a number of ancillary benefits programs (collectively, the "**Work/Life Benefits Programs**"), including (i) the Employee Assistance Program, (ii) the Wellness Programs, (iii) Compliance Programs, (iv) the Employee Discount Program, (v) the Adoption Expense Reimbursement Program, (vi) the Tuition Reimbursement Program, (vii) the Commuter Transit Program, (viii) the Relocation Program, and (ix) the Child Care Program (each as defined below).  Pursuant to this Motion, the Debtors seek authority to pay all obligations in connection with the Work/Life Benefits Programs in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer the Work/Life Benefits Programs in the ordinary course of business.  Each of the Work/Life Benefits Programs is described in further detail below.

**(a)     Employee Assistance Program**

The Debtors offer three services through a program administered by Beacon (the "**Employee Assistance Program**").  The Debtors provide Employees with professional counseling, consultation, and referral services which services are intended to assist Employees to cope with issues such as family and relationship problems, workplace concerns, alcohol- and substance-abuse issues, depression and

anxiety, stress, and financial or legal concerns (collectively, the "**Counseling Services**"). The Counseling Services are provided at no cost to Employees. Additionally, the Debtors offer Employees the opportunity to speak with licensed attorneys and certified financial advisors by telephone if such a need arises. Employees can obtain cost-free advice relating to legal and financial topics such as alimony and child support, adoptions, living wills, powers of attorney, foreclosures, savings strategies, debt management, retirement planning, and credit scores. The Debtors also offer consultation services for Employees who need assistance locating quality child-care or elder-care services.

The Debtors pay administrative fees of approximately $200,000 per month to Beacon to administer the Employee Assistance Program, which administrative fees cover the entire cost of the Employee Assistance Program. The Debtors estimate that, as of the Petition Date, they owe approximately $200,000 in such administrative fees, all of which will come due during the Interim Period.

### (b) Wellness Programs

The Debtors maintain programs to offer various services to Employees with the aim of increasing their general wellness (the "**Wellness Programs**"). Pursuant to the Wellness Programs, Employees have access to, among other things, health advocacy services, health screenings, an industrial athlete program, telephonic health coaching, onsite clinics in San Francisco, Fresno, San Carlos, and at the DCPP (the "**Onsite Clinics**"), an online health risk questionnaire, an online health and wellness portal, a tobacco cessation program, and discounted gym and health club memberships.

The Debtors pay administrative and other fees of approximately $750,000 per month in connection with the Wellness Programs. As of the Petition Date, the Debtors estimate they owe approximately $750,000 in administrative and other fees, all of which will come due during the Interim Period.

### (c) Compliance Programs

As part of the Debtors' ongoing operations, the Debtors require that certain current and all prospective employees be subject to random drug screening tests (the "**Drug Screening Program**"). These tests are performed pursuant to Department of Transportation requirements and the Debtors' internal policies. Approximately 740 drug screens are conducted on a monthly basis. The

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Debtors pay approximately $60,000 per month to EScreen for administration of the drug screens. The Debtors estimate that, as of the Petition Date, they owe approximately $120,000 to EScreen related to the prepetition period, all of which will come due during the Interim Period. EScreen has the capacity to provide screening throughout the Debtors' service area and its service would be extremely difficult to replicate on a timely basis to meet Department of Transportation screening requirements.

The Debtors also maintain a Department of Motor Vehicle Pull Notice Program, as required by California Vehicle Code section 1808.1 (the "**DMV Compliance Program**"). The DMV Compliance Program is administered by SambaSafety, which monitors the safety of the Debtors' approximately 3,500 commercial drivers on a daily basis. The Debtors pay Samba approximately $4,000 per month. The Debtors estimate that as of the Petition Date, they owe approximately $4,000 on account of prepetition obligations under the DMV Compliance Program, all of which will come due during the Interim Period. The DMV Compliance Program is mandatory and, as a practical matter, it is not feasible to obtain another party to administer the program in a timeframe necessary for ongoing operations.

### (d) Employee Discount Program

Pursuant to tariffs adopted by the CPUC, the Utility offers its Employees and Retirees a 25% discount on Utility-supplied gas and electric service (the "**Employee Discount Program**"). Generally, discounts under the Employee Discount Program only may be applied to gas and electric service at a Utility Employee's primary residence. Utility Employees are eligible for the Employee Discount Program after six months of continuous service. The Employee Discount Program is not available to Employees of any subsidiary of the Utility or to Employees of PG&E Corp.

### (e) Adoption Expense Reimbursement Program

The Debtors reimburse Employees for up to $2,000 of expenses related to the adoption of a child under the age of eighteen (18), including any stepchildren (the "**Adoption Expense Reimbursement Program**"). Expenses eligible for reimbursement under the Adoption Expense Reimbursement Program include legal, court, adoption agency, and placement fees; medical expenses for the adopted child that are not covered by a health insurance plan; and transportation expenses associated with picking up the adopted child.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Debtors spend approximately $2,000 per month on account of obligations associated with the Adoption Expense Reimbursement Program (the "**Adoption Expense Reimbursement Obligations**"). Employees have up to one year following the Decree of Final Adoption to submit an application for reimbursement of eligible fees, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Adoption Expense Reimbursement Obligations. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $2,000 on account of prepetition Adoption Expense Reimbursement Obligations, all of which will come due during the Interim Period.

### (f)    Tuition Reimbursement Program

The Debtors reimburse Employees for expenses related to their enrollment in approved educational courses that are designed to assist Employees in performing their current duties and/or provide Employees with additional skills to advance their careers within the Debtors' organizational structure (the "**Tuition Reimbursement Program**"). Under the Tuition Reimbursement Program, the Debtors reimburse Employees for 100% of their tuition, registration fees, laboratory and technology fees, program and academic fees, and the costs of textbooks associated with approved educational courses up to a maximum of between $5,250 and $8,000 per year.

The Debtors spend approximately $300,000 per month on account of the Tuition Reimbursement Program. Employees have up to 90 days after they complete a course to submit a claim for reimbursement of relevant expenses, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Tuition Reimbursement Program. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $300,000 on account of prepetition obligations associated with the Tuition Reimbursement Program, all of which will come due during the Interim Period.

### (g)    Commuter Transit Program

The Debtors offer Employees the opportunity to purchase transit passes and pay for certain parking expenses with pre-tax contributions (the "**Commuter Transit Program**"). Under the Commuter Transit Program, a portion of Employees' wages is withheld and contributed into accounts on a pre-tax basis. Employees then utilize the proceeds of such accounts to purchase transit passes and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-30088    Doc 29    Filed 01/29/19    Entered: 01/29/19 00:41:06    Page 45 of 56

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

pay for certain parking expenses.  Approximately 2,400 Employees participate in the Commuter Transit Program.

The Commuter Transit Program is administered by WageWorks, Inc. (the "**Commuter Transit Program Administrator**").  The Debtors pay administrative fees of approximately $10,000 per month to the Commuter Transit Program Administrator.  The Debtors estimate that, as of the Petition Date, they owe approximately $10,000 in such administrative fees, all of which will come due during the Interim Period.  The Debtors also seek authority to remit to the accounts all withheld amounts as of the Petition Date.

### (h) Relocation Program

The Debtors offer a relocation program to new or transferring Employees whose work location is fifty (50) miles or greater than the distance from the Employees' former residence to the previous work location (the "**Relocation Program**").  The services that are offered under the Debtors' Relocation Program, which vary based on the level of the Employee, include temporary housing, movement of household goods, reimbursement of certain moving related expenses, assistance with the sale and purchase of a home, and in some cases a lump sum cash payment.  Eligible Employees have up to twelve (12) months to complete their relocation from the time they begin their position.  In 2018, the Debtors paid approximately $4,400,000 under the Relocation Program.

The Relocation Program is administered by Altair Global (the "**Relocation Program Administrator**").  The Debtors pay administrative fees of approximately $10,000 per month to the Relocation Program Administrator.  The Debtors estimate that, as of the Petition Date, they owe approximately $1,400,000 on account of prepetition obligations associated with the Relocation Program, inclusive of administrative fees, approximately $100,000 of which will come due during the Interim Period.

### (i) Child Care Program

The Debtors offer on-site child care services at their San Francisco corporate headquarters for a limited number of Employees' children who are between the ages of six weeks and five years (the "**Child Care Program**").  The Child Care Program is paid for in part by participating Employees and is subsidized by the Debtors and administered by Bright Horizons Family Solutions LLC (the "**Child Care**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Program Administrator**"). The Debtors withhold approximately $1,500,000 from Employee payroll annually in connection with the Child Care Program. The Debtors subsidy contribution is approximately $1,000,000 annually. The Debtors estimate that, as of the Petition Date, they owe approximately $250,000 on account of the Child Care Program, which includes amounts withheld from payroll and the Debtors' contributions, all of which will come due during the Interim Period.

### H. Supplemental Workforce Obligations

As set forth above, in addition to their Employees, the Debtors use the services of approximately 1,900 Supplemental Workers in all aspects of their operations. To compensate the Supplemental Workforce, the Debtors either pay members of the Supplemental Workforce directly or pay Staffing Agencies, which then make payments to the Supplemental Workforce on the Debtors' behalf (collectively, the "**Supplemental Workforce Obligations**"). It is critical that the Debtors be able to continue honoring their obligations with respect to the Supplemental Workforce Obligations. Staying current with respect to the obligations owed to the Supplemental Workforce will minimize unnecessary disruption to the Debtors' businesses. This is particularly important, given that the Debtors heavily rely on members of the Supplemental Workforce to perform specialized tasks in connection with, among other things, the Debtors' operation and maintenance of their generation units, electric transmission and distribution and natural gas facilities. The Supplemental Workforce provides specialized IT skills, specialized engineering skills and other skills across the entire spectrum of the Debtors' operations. The Supplemental Workforce also consists of IBEW represented employees who assist the Debtors' crews in performing routine maintenance work on the Debtors' infrastructure as well as assisting in construction projects. The Supplemental Workforce also assists in emergency outage and restoration efforts. Thus, failure to make timely payments on account of the Supplemental Workforce Obligations could interrupt the Debtors' ability to provide electric and natural gas service to their customers in northern and central California.

The Debtors average approximately $180,000,000 in annual aggregate Supplemental Workforce Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $35,000,000 on account of Supplemental Workforce Obligations relating to the prepetition period, $25,000,000 of which will come due during the Interim Period. Pursuant to this Motion, the Debtors seek authority to pay the

Supplemental Workforce Obligations in the ordinary course of business, including all prepetition amounts on account of such obligations.

## V. BASIS FOR RELIEF REQUESTED

### A. Certain Prepetition Employee Obligations Are Entitled to Priority Treatment or Constitute Trust Funds

Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" that are "earned within 180 days before" the date on which a debtors' chapter 11 cases are commenced are afforded priority status up to $12,850 per individual. Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for contributions to certain employee benefit plans are also afforded priority status to the extent of $12,850 covered by such plans on a per-employee basis, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.

The Debtors believe that a substantial portion of the Prepetition Employee Obligations, if not all, constitute priority claims under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As priority claims, such Prepetition Employee Obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Additionally, the Withholding Obligations either constitute "trust funds" or generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. Accordingly, the relief requested herein likely may affect only the timing of the payment of a substantial portion of the Prepetition Employee Obligations and should not prejudice the rights of general unsecured creditors or other parties in interest.

### B. Payment of the Prepetition Employee Obligations Is Also Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code

Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts construing California law have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, the Court may authorize the Debtors to pay the Prepetition Employee Obligations, including the Employee Program Administrative Obligations, because such relief is necessary for the Debtors to carry out their fiduciary duties under sections 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code, "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession.").

Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the

preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served and listing examples such as "first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process").

Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain pre-petition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the pre-petition payments at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy Court. *In Matter of B & W Enterprises, Inc.*, 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. See, e.g., *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-30088 Doc 29 Filed 01/29/19 Entered: 01/29/19 00:41:06 Page 50 of 56

best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that bankruptcy courts have the authority to authorize the debtor to pay certain prepetition claims).

Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain prepetition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id*. The Ninth Circuit further stated that:

> [c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Id*.

Numerous Courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain pre-petition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at \*8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing In re Adams Apple Inc. for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown"). Furthermore, several courts within this Circuit have granted relief substantially similar to that sought herein. S*ee, e.g., In re Montgomery-Sansome, LP*, Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) (approving motion for authority to pay, among other things, prepetition claims related to employee wages); *In re LA Steel Servs., Inc.*, Case No. 18-15841-MH (Bankr. C.D. Cal. July 20, 2018) (approving motion to pay certain

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

prepetition employee-related claims); *In re Rdio, Inc.*, Case No. 15-31430 (Bankr. N.D. Cal. Nov. 20, 2015) (same).

Payment of the Prepetition Employee Obligations, including the Employee Program Administrative Obligations, is an exercise of sound business judgment and necessary to facilitate a successful reorganization. The Employees—many of whom possess unique skills, licenses, or certifications—are vital to the continued operation of the Debtors' businesses and vital to the success of the Chapter 11 Cases. The Debtors believe that the majority of the Employees rely exclusively on their compensation and, as applicable, the benefits provided under the Employee Wage and Benefits Programs to satisfy their daily living expenses and other basic needs such as access to health, dental, and vision care coverage. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations with respect to the Prepetition Employee Obligations. Moreover, honoring the Prepetition Employee Obligations and continuing the Employee Wage and Benefits Programs will help maintain morale and minimize the adverse effect of the commencement of these Chapter 11 Cases on the Debtors' ongoing business operations, as well as their relationships with the Unions. The failure to honor the Prepetition Employee Obligations could lead to turnover, attrition, and instability at this critical time in the Chapter 11 Cases, which is a risk that is especially consequential in these Chapter 11 Cases due to the highly specialized nature of many of the duties that the Employees perform and the critical nature of the Debtors' business as the sole utility provider to approximately 16 million customers.

Payment of the Reimbursable Expenses is also an exercise of sound business judgment and necessary to facilitate a successful reorganization because any other treatment of would be highly inequitable. Employees and Directors who have incurred Reimbursable Expenses on behalf of the Debtors should not be forced to bear the cost of such expenses personally, especially because the Reimbursable Expenses were incurred for the Debtors' benefit, in the course of their employment or service, and with the understanding that they would be reimbursed. In addition, as stated, substantial obligations with respect to the Employee Cards have been pre-funded prior to the Petition Date to cover charges.

Further, the Debtors have substantial business justification for continuing the Severance

Case: 19-30088    Doc# 29    Filed: 01/29/19    Entered: 01/29/19 00:41:06    Page 52 of 56

Programs in the ordinary course as requested herein, including (i) maintaining Employee morale, (ii) disincentivizing Employees to pursue other employment opportunities, (iii) securing releases of severed Employees (which is a condition to receiving severance payments under the Severance Programs), and (iv) reassuring Employees that the Debtors intend to honor their obligations to their Employees—both during and after their tenure with the Debtors. As stated, no authority for severance payments to Insiders is being sought pursuant to this Motion.

The Debtors also believe that it is an exercise of sound business judgment and necessary to facilitate a successful reorganization to pay the Employee Program Administrative Obligations, including administrative costs and expenses owed to the Payroll Maintenance Vendors, which provide compensation and other benefit-related services and products and which have institutional knowledge of the Debtors' operations that would be difficult and costly to replace. Absent the relief requested, the Debtors would be unable to maintain their Employee Wage and Benefits Programs in an efficient and cost-effective manner.

Additionally, the Debtors believe that it is an exercise of sound business judgment and necessary to facilitate a successful reorganization to pay the Supplemental Workforce Obligations. As stated, the Debtors heavily rely on members of the Supplemental Workforce to perform specialized tasks that, for various reasons, the Employees cannot perform on their own and that are necessary for the Debtors to continue to operate their transmission, distribution, and generation businesses. For example, members of the Supplemental Workforce perform tasks for which Employees otherwise lack the training or licensure, as well as tasks for which there are a shortage of Employees, including maintenance and repair work on transmission lines following weather-related events. If the Debtors fail to pay the Supplemental Workforce Obligations, members of the Supplemental Workforce may refuse to continue to perform services for the Debtors. Thus, failure to make timely payments on account of the Supplemental Workforce Obligations could jeopardize the Debtors' ability to provide safe and reliable electric and natural gas service to their customers.

The Debtors do not seek at this time to alter the Employee Wage and Benefits Programs. Rather, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to honor and pay the Prepetition Employee Obligations as and when they come due and to continue their Employee

Case 19-30088 Doc 29 Filed 01/29/19 Entered: 01/29/19 00:41:06 Page 53 of 56

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Wage and Benefits Programs as those practices, programs and policies were in effect as of the Petition Date, including changes and modifications to such programs in the ordinary course of business.

The Debtors cannot risk the damage to their businesses, and the potential disruption of their ability to provide essential utility service to 16 million Californians, that would follow any decline in Employee morale and the resulting attrition that likely would occur if the Debtors are not granted the relief requested herein. Accordingly, the Debtors respectfully request that the Court authorize them to pay the Prepetition Employee Obligations including the Employee Program Administrative Obligations, and continue the Employee Wage and Benefits Programs in the ordinary course of business, consistent with past practice.

## VI. BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE PREPETITION EMPLOYEE OBLIGATIONS

The Debtors further request that the Court authorize, but not direct, the Banks to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Prepetition Employee Obligations, including the Employee Program Administrative Obligations. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or transfer requests on account of any Prepetition Employee Obligations or Employee Program Administrative Obligations dishonored or rejected as a result of the Chapter 11 Cases.

## VII. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## VIII. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. As set forth above, the Debtors cannot risk the damage to their businesses, and the potential disruption to their ability to provide essential utilities to 16 million Californians, that would follow any decline in morale and the resulting attrition that likely would occur if the Debtors fail to pay the Personnel their compensation and other benefits. Accordingly, the Debtors have satisfied the requirements for immediate entry of an order granting the relief requested herein pursuant to Bankruptcy Rule 6003.

## IX. REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## X. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; (xi) the Banks; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further

notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: _/s/ Tobias S. Keller_
 Tobias S. Keller

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119