WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>       **Debtor.**<br><br>**Tax I.D. No. 94-3234914** | Case Nos.  19 - _____ (___)<br>        19 - _____ (___)<br><br>Chapter 11 |
| **In re:**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>       **Debtor.**<br><br>**Tax I.D. No. 94-0742640** | **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION OBLIGATIONS OWED TO CERTAIN SAFETY AND RELIABILITY, OUTAGE, AND NUCLEAR FACILITY SUPPLIERS**<br><br>Date:<br>Time:<br>Place: |

DEBTORS' MOTION TO PAY SAFETY AND
RELIABILITY PROVIDERS

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 363(b) and 503(b)(9) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for interim and final authority to pay the prepetition claims (the "**Operational Integrity Supplier Claims**") of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to protecting the public health and safety and maintaining the going-concern value and integrity of the Debtors' businesses and operations (the "**Operational Integrity Suppliers**"). In addition, the Debtors further request that the Court authorize, but not direct, banks and financial institutions (the "**Banks**") to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Operational Integrity Supplier Claims.

A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

# TABLE OF CONTENTS

Page

I. JURISDICTION ................................................................................................ 7

II. BACKGROUND .............................................................................................. 7

III. OPERATIONAL INTEGRITY SUPPLIER CLAIMS ..................................... 7

IV. THE DEBTORS' OPERATIONAL INTEGRITY SUPPLIERS ....................... 9

    A. Safety and Reliability Vendors ............................................................ 9

    B. Outage Vendors .................................................................................. 13

    C. Nuclear Facility Vendors ................................................................... 13

V. IDENTIFICATION OF THE OPERATIONAL INTEGRITY SUPPLIERS ...... 14

    A. Proposed Conditions to Receiving Payment ..................................... 15

    B. Vendor Agreements ............................................................................ 16

VI. BASIS FOR RELIEF REQUESTED ............................................................ 18

    A. Payment of the Operational Integrity Supplier Claims Is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code .................................. 18

    B. Payment of the 503(b)(9) Claims of the Operational Integrity Suppliers is Warranted and Should be Approved ................................................ 23

VII. BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE OPERATIONAL INTEGRITY SUPPLIER CLAIMS ....................................... 24

VIII. RESERVATION OF RIGHTS ...................................................................... 24

IX. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003 ................................................................................................................. 24

X. REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS ............................ 25

XI. NOTICE ........................................................................................................ 25

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-80088 Document 12 Filed: 01/29/19 Entered: 01/29/19 01:01:30 Page 3 of 26

# **TABLE OF AUTHORITIES**

**Cases**                                                                                **Page(s)**

*In re Adams Apple, Inc.*,
    829 F.2d 1484 (9th Cir. 1987) ..................................................................... 21,

*In re Anchorage Nautical Tours, Inc.*,
    145 B.R. 637 (B.A.P. 9th Cir. 1992) ................................................................ 19

*In Matter of B & W Enterprises, Inc.*,
    713 F.2d 534 (9th Cir. 1983) ............................................................... 20, 21

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (2009) ....................................................................... 19

*F.D.I.C. v. Castetter*,
    184 F.3d 1040 (9th Cir. 1999) ....................................................................... 18

*In re Chateaugay Corp.*,
    80 B.R. 279 (S.D.N.Y. 1987) ......................................................................... 20

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ............................................................... 20

*In re Curry & Sorensen, Inc.*,
    57 B.R. 824 (B.A.P. 9th Cir. 1986) ................................................................ 19

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ................................................................................... 19

*In re Dura Auto. Sys. Inc.*,
    Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) ................................ 23

*In re Eagle–Picher Indus., Inc.*,
    124 B.R. 1021 (Bankr. S.D. Ohio 1991) .......................................................... 20

*In re Financial News Network, Inc.*
    134 B.R. 732 (Bankr. S.D.N.Y. 1991) ............................................................. 20

*In re Glob. Home Prods.*,
    LLC, Case No. 06-10340 (KG), 2006 WL 3791955 (Bankr. D. Del. Dec. 21, 2006) ................... 23

*Gordon v. Hines (In re Hines)*,
    147 F.3d 1185 (9th Cir. 1998) ....................................................................... 21

*In re Gulf Air*,
    112 B.R. 152 (Bankr. W.D. La. 1989) ............................................................. 20

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ........................................................... 18

*In re Just For Feet, Inc.*,
    242 B.R. 821 (D. Del. 1999) ........................................................................ 20

*In re Laurel Fertility Care*,
    Case No. 14-30403-DM-11 (Bankr. N.D. Cal. May 21, 2014) ........................ 21

*Miltenberger v. Logansport, C&S W.R. Co.*,
    106 U.S. 286 (1882) ..................................................................................... 20

*In re Montgomery-Sansome, LP*,
    Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) ......................... 20

*In re NVR L.P.*,
    147 B.R. 126 (Bankr. E.D. Va. 1992) ........................................................... 20

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
    147 B.R. 650 (S.D.N.Y. 1992) ...................................................................... 18

*In re Pettit Oil Co.*,
    No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ......... 21

*Scouler & Co., LLC v. Schwartz*,
    No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ........... 19

*Spartan Plastics v. Verco Indus. (In re Verco Indus.)*,
    20 B.R. 664 (B.A.P. 9th Cir. 1982) ............................................................... 23

*In re Structurlite Plastics Corp.*,
    86 B.R. 922 (Bankr. S.D. Ohio 1988) ........................................................... 20

**Statutes**

11 U.S.C. § 105 ................................................................................................ 19

11 U.S.C. § 105(a) ................................................................................ 2, 18, 19, 20

11 U.S.C. § 363 ................................................................................................ 18

11 U.S.C. § 363(b) .......................................................................................... 2, 18

11 U.S.C. § 363(b)(1) ....................................................................................... 18

11 U.S.C. § 365 ................................................................................................ 24

11 U.S.C. § 503(b)(9) ............................................................................... *passim*

11 U.S.C. § 1107(a) ...................................................................................... 7, 19

Case: 19-30088    Doc# 12    Filed: 01/29/19    Entered: 01/29/19 01:01:30    Page 5 of 26

11 U.S.C. § 1108 ...................................................................................................................... 7

11 U.S.C. § 1129(a)(9)(A) ...................................................................................................... 23

28 U.S.C. § 157 ........................................................................................................................ 7

28 U.S.C. § 157(b) ................................................................................................................... 7

28 U.S.C. § 1334 ...................................................................................................................... 7

28 U.S.C. § 1408 ...................................................................................................................... 7

28 U.S.C. § 1409 ...................................................................................................................... 7

**Other Authorities**

B.L.R. 5011-1(a) ...................................................................................................................... 7

Fed. R. Bankr. P. 2002 ........................................................................................................... 25

Fed. R. Bankr. P. 6003 ....................................................................................................... 8, 24

Fed. R. Bankr. P. 6004 ....................................................................................................... 8, 25

Fed. R. Bankr. P. 6004(a) .................................................................................................. 8, 25

Fed. R. Bankr. P. 6004(h) .................................................................................................. 8, 25

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*,
    General Order 24 (N.D. Cal.)............................................................................................ 7

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### II. BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in either of the Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

### III. OPERATIONAL INTEGRITY SUPPLIER CLAIMS

The Debtors are one of the nation's largest utility companies, providing electric and natural gas service to approximately 16 million customers throughout an approximately 70,000-square-mile service area in northern and central California. In the normal and day to day operation of their business, the Debtors rely heavily on Operational Integrity Suppliers for essential and specialized goods and services so that the Debtors can provide safe and reliable electric and natural gas service to their customers' homes and businesses, while remaining in compliance with all applicable state and federal laws and regulations.

The Debtors spend an average of approximately $1.9 billion per month on goods and services provided by third party vendors and suppliers. As of the Petition Date, the Debtors estimate that they

owe approximately $116,200,000 on account of Operational Integrity Supplier Claims (the "**Operational Integrity Supplier Cap**"), of which approximately $30,100,000 will come due in the first thirty (30) days of the Chapter 11 Cases.[1]  These amounts represent approximately 5.5% of the Debtors' total outstanding trade debt as of the Petition Date.  A chart outlining the representative categories and approximate amounts of the Operational Integrity Supplier Claims that the Debtors are seeking authority to pay pursuant to this Motion on an interim and final basis is set forth below.  The estimated amounts of Operational Integrity Supplier Claims set forth herein and in the chart below are exclusive of any amounts that may be owed to Operational Integrity Suppliers that may be entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**").  By this Motion, the Debtors also request authority to pay the 503(b)(9) Claims of any Operational Integrity Supplier to the extent the Debtors determine it is necessary and appropriate in accordance with the procedures and protocol set forth herein; provided, however, any amounts paid by the Debtors in satisfaction of such 503(b)(9) Claims shall not be included in or subject to the Operational Integrity Supplier Cap.

| Representative Categories of Operational Integrity Suppliers | Approx. Amount Seeking to Pay on Interim Basis | Approx. Amount Seeking to Pay on Final Basis |
|---|---|---|
| Safety and Reliability Vendors and Service Providers | $28,600,000 | $110,600,000 |
| Outage Vendors and Service Providers | $1,200,000 | $4,500,000 |
| Nuclear Facility Vendors and Service Providers | $300,000 | $1,100,000 |
| **Total Estimated Operational Integrity Supplier Claims** | **$30,100,000** | **$116,200,000** |

As described in further detail below and in the Wells Declaration, the Debtors have put into place detailed procedures for identifying and selecting Operational Integrity Suppliers and ensuring that only Operational Integrity Suppliers will be paid pursuant to this Motion on account of their

---

[1] Concurrently herewith, the Debtors have filed a separate Motion seeking authority to pay, among other things, the prepetition claims of certain third-party shippers, warehousemen, and other entities that could potentially assert liens against the Debtors' property on account of their prepetition claims (the "**Lien Claimants Motion**").  Although the Debtors have endeavored to provide accurate figures and calculations herein, there may, in some instances, be overlap between the amounts sought to be expended herein and the amounts sought to be expended pursuant to the Lien Claimants Motion.

prepetition claims.

**IV. THE DEBTORS' OPERATIONAL INTEGRITY SUPPLIERS**

In order to fulfill their obligations to provide safe electric and natural gas service to their approximately 16 million customers in northern and central California, the Debtors rely on the goods and services provided by the Operational Integrity Suppliers to maintain and safely and reliably operate their vast network of production, transmission, and distribution facilities. Due to the complex, technical, and potentially hazardous nature of the Debtors' facilities, the Debtors often do business with a select vendor for particular goods or services and rely on such vendor as the Debtors' primary supplier or service provider (*i.e.*, the supply source for certain complex parts and specialty equipment, specifically designed systems, and specialized labor necessary to the Debtors' operations). Additionally, certain of the Operational Integrity Suppliers have developed capabilities and expertise specific to the Debtors' needs that cannot be easily or cost-effectively replaced, if at all, and which would be lost if the Debtors were forced to seek similar services elsewhere. Further, due to the myriad of federal and state regulations under which the Debtors operate, many of the Operational Integrity Suppliers are required to possess certain certifications, permits, or licenses in order to provide goods or services to the Debtors. The universe of vendors that possess such certifications, permits, or licenses is limited, and, thus, the Debtors are likely to encounter significant difficulty replacing such Operational Integrity Suppliers on a timely basis, if at all.

As set forth in the Wells Declaration, the Operational Integrity Suppliers generally fall into three primary categories: (i) entities that provide goods and services necessary for safe and reliable electric and natural gas service (the "**Safety and Reliability Vendors**"); (ii) entities that provide goods and services related to planned and unplanned outages (the "**Outage Vendors**"); and (iii) entities that provide goods and services in connection with the Debtors' operation and decommissioning of their nuclear reactor power units (the "**Nuclear Facility Vendors**"). Each of these categories of Operational Integrity Suppliers is discussed in further detail below.

**A. Safety and Reliability Vendors**

Safety is a core value for a utility company. The potentially hazardous nature of the transmission and distribution of electricity and natural gas and the generation of electricity mandates a

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

focus on the safety of the public, the Debtors' workforce, and the Debtors' contractors. Further, reliable electric and natural gas service is of the utmost importance to the safety, health, and welfare of the Debtors' customers and their communities, as well as to the efficiency of the economy of central and northern California.

The Safety and Reliability Vendors generally fall into one or more of the following subcategories: (i) entities that provide goods and services that are highly specialized (the "**Specialized Vendors**") and/or closely integrated with the Debtor's business operations and customer relationships (the "**Integrated Vendors**" and, together with the Specialized Vendors, the "**Specialized and Integrated Vendors**"); (ii) select, pre-qualified, or geographically limited providers of critical goods (the "**Critical Goods Vendors**"); and (iii) entities that provide goods and services related to the Debtor's regulatory compliance obligations (the "**Regulatory Compliance Vendors**").

1.      Specialized and Integrated Vendors

The Debtors rely on Specialized and Integrated Vendors to provide specialized services that are closely integrated with the Debtors' transmission, distribution, generation, and retail business operations. In certain cases, the Debtors must obtain the services of a Specialized Vendor because state and federal laws and regulations require vendors to possess certain certifications, permits, licenses, particular knowledge, or technical "know-how." Consequently, certain services (*e.g.*, electrical, line-related, welding, waste-removal, earth-moving, information-technology, security, and cybersecurity services) may only be performed by Specialized Vendors due to the risks posed by the nature of the Debtors' facilities, which expose Specialized Vendors to, among other things, high-voltage electricity, high-pressure gas, high-speed rotation motors, and potentially hazardous or radioactive substances. A very limited number of vendors possess the certifications, permits, licenses, knowledge, technical "know-how," experience, or safety qualifications necessary to perform the services that are provided by the Specialized Vendors, and, therefore, such vendors cannot be easily replaced.

For example, the Debtors rely on Specialized Vendors such as wildland firefighting and rescue servicers to provide onsite fire suppression services. The Debtors also rely on Specialized Vendors to provide base camp services for the Debtors' personnel. These base camp services include providing

materials to support the Debtors' fleet operations, and providing telecommunications, electrical support, housing, and meals for the Debtors' personnel on the field.

Integrated Vendors provide the Debtors with certain customer-facing services, such as customer outreach and account management (*e.g.*, establishing and disconnecting service, metering, billing, and collecting payments).  These services are crucial to maintaining the Debtors' customer relationships and executing their business strategies.  Even if the Debtors could identify substitute or replacement vendors in a timely fashion that possess the necessary qualifications, experience, and skill to provide these customer-facing services, the Integrated Vendors have specific knowledge of the Debtors' business operations, facilities, and customer demands, which knowledge has been developed over the course of the Debtors' longstanding relationships with the Integrated Vendors and which cannot be easily replaced.  Moreover, attempting to replace the Integrated Vendors during this critical early period of the Chapter 11 Cases likely would cause significant disruption to the Debtors' operations and relationships with their customers, to the detriment and prejudice of all parties in interest.

2.    Critical Goods Vendors

The Debtors rely on Critical Goods Vendors to supply essential electrical and gas equipment, specialized materials and replacement parts, operations consumables, raw materials, fuels, and certain other goods required to operate the Debtors' electric and natural gas transmission and distribution systems and generation units.  In some cases, there is no alternative provider for certain of these critical goods.  For example, certain Critical Goods Vendors supply the Debtors with specialized electrical equipment, transformers, specially fabricated repair and replacement parts, and other equipment necessary for the Debtors' transmission, distribution, generation, and gas assets.  These parts and materials are based on patented or trade-secreted designs and are available only from limited sources.

In other cases, alternative vendors cannot supply the requisite critical goods in sufficient quantity or with sufficient reliability, or such vendors are unable to supply critical goods of sufficient quality on a cost-effective or timely basis in the appropriate geographic areas.  For example, the modern electrical grid relies on switch gear, transformers, and other state-of-the-art equipment to manage advanced electronic metering, communications, and control technologies.  Maintaining the reliability

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of the electrical transmission and distribution system, therefore, requires the immediate availability of replacement parts for this critical equipment when such equipment is out of service. Similarly, certain of the Debtors' electricity generation facilities are designed to utilize bulk quantities of specialized chemicals as part of their energy-production and pollution-control activities. Due to the chemical specifications and the quantities involved, the Debtors are dependent on a few Critical Goods Vendors to keep the electricity generation facilities in operation. Certain raw materials and fuels used in the Debtors' generation facilities and gas assets are sourced locally because of the expense and inefficiency associated with transporting such materials and fuels. In many cases, there may be limited capacity to provide critical equipment, materials, or fuels within the general vicinity of a given electric or natural gas transmission or distribution asset or generation facility.

### 3. Regulatory Compliance Vendors

The Debtors rely on Regulatory Compliance Vendors to assist in complying with various state and federal laws and regulations. For example, among other things, the Debtors rely on certain Regulatory Compliance Vendors to (i) manage the vegetation that grows near the Debtors' transmission and distribution lines, (ii) perform safety checks and quality-assurance monitoring on electric transmission and distribution equipment, (iii) test emissions from the Debtors' facilities to ensure compliance with environmental laws and regulations, and (iv) remove regulated waste and chemicals from the Debtors' facilities for proper disposal.

The services provided by the Regulatory Compliance Vendors are critical to maintaining the safety and compliance of the Debtors' operations. Proper vegetation management reduces the risk of creating dangerous or hazardous conditions within the Debtors' service area. Even the briefest disruption in the services provided by the Regulatory Compliance Vendors could cause significant disruption to the Debtors' operations or increase the risk to the public. In addition, proper disposal of regulated waste and chemicals not only protects the environment and benefits the public health, but also ensures the safety of the Debtors' employees. Further, absent the services provided by the Regulatory Compliance Vendors, governmental entities may attempt to take various actions that would have severe negative consequences on the Debtors' operations, including levying fines or penalties against the Debtors, disallowing cost recovery for such services, requiring that certain of the Debtors'

facilities be idled or closed, or potentially revoking the Debtors' permits or licenses.

**B. Outage Vendors**

The Debtors regularly plan outages of certain of their electric transmission and distribution assets, generation units, and gas facilities. During such planned outages, Outage Vendors perform maintenance on and repair, replace, upgrade, refuel, refurbish, and stress-test the Debtors' generation and gas assets in an effort to ensure that such assets perform optimally during periods when electricity and gas consumption are at their peak. The Debtors schedule the planned outages for the least amount of time possible.

Additionally, certain unplanned outages occur, oftentimes as a result of natural hazards or mechanical failures, particularly during storm season. To restore service to their customers as quickly as possible, the Debtors utilize Outage Vendors to assist their crews in repairing power lines, poles, and transmission equipment. Certain of the Outage Vendors also provide critical monitoring services during storms or periods of high wind to reduce the occurrence and/or impact of unplanned outages.

The Debtors' Outage Vendors are skilled professionals and have specialized knowledge necessary to safely and reliably perform the required tasks during both planned and unplanned outages. It would be difficult for the Debtors to replace the Outage Vendors in a quick, safe, and cost-efficient manner and, therefore, the Outage Vendors are necessary and critical to the Debtors' operations.

Any delay in obtaining goods and services from the Outage Vendors likely would extend the duration of both planned and unplanned outages, which, in addition to increasing the cost of the outages, would adversely impact the reliability of the Debtors' electric transmission and distribution assets, generation units, and gas facilities, as well as the supply of electricity and gas to the Debtors' customers.

**C. Nuclear Facility Vendors**

The Nuclear Facility Vendors provide goods and services in connection with the Debtors' operation and decommissioning of their nuclear reactor power units located at the Diablo Canyon Power Plant and Humboldt Bay Power Plant. The Nuclear Facility Vendors maintain, repair, inspect, and refurbish the equipment located at these facilities and provide fuel and parts, as well as disposal, quality-control, physical-plant-security, and cybersecurity services. The Debtors' nuclear operations

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and decommissioning activities are subject to extensive oversight by the United States Nuclear Regulatory Commission and other regulatory bodies. The Nuclear Facility Vendors are highly skilled and have specialized knowledge in the nuclear reactor space. Replacing Nuclear Facility Vendors would be difficult, time-consuming, and expensive. Any disruption with respect to the Debtors' current nuclear assets could have significant regulatory consequences for the continued operation of those assets and adversely affect the public safety and health, as well as the reliability of the California electricity market.

As demonstrated above, the Operational Integrity Suppliers are essential to the Debtors' businesses and the lack of any of their particular goods, services, or skills, even for a short duration, could present public health and safety risks, would disrupt the Debtors' operations, and would cause irreparable harm to the Debtors and their reorganization efforts under chapter 11. In addition, many of the Operational Integrity Suppliers are smaller, independent, or regional operators and, given the already limited pool of such vendors and service providers in the geographic area, which pool has been further limited by the Debtors' current financial situation, it would be difficult (and at times impossible) to replace such vendors or suppliers on a timely basis.

## V.    IDENTIFICATION OF THE OPERATIONAL INTEGRITY SUPPLIERS

The Debtors, with the assistance of their advisors, spent significant time prior to the Petition Date analyzing and reviewing their operations, books and records, accounts payable systems, and prepetition vendor and service provider lists to identify those vendors, suppliers, and service providers that are in fact critical to the Debtors' operations and public health and safety, the loss of which could materially harm the Debtors' businesses and/or their customers and the public, in order to determine the Operational Integrity Suppliers. Through this process, the Debtors considered the following criteria: (i) whether a particular vendor or service provider is a select supplier or service provider; (ii) whether the services provided by the vendor are so vital, or the vendors' operations are so intertwined with the Debtors' businesses, that even the briefest disruption would raise safety or reliability risks or cause significant harm to the Debtors' operations; (iii) whether the Debtors would be unable to obtain comparable goods or services from alternative sources on a cost-effective basis within a reasonable timeframe; (iv) whether the Debtors' current inventory levels or service coverage is sufficient to meet

customer demands while an alternative vendor or service provider could be located or qualified; (v) whether a vendor is party to an executory contract with the Debtors; and (vi) whether the vendor or service provider might be able to obtain (or has obtained) mechanics' liens, possessory liens, shippers' liens, or similar state-law trade liens on property necessary for the Debtors' ongoing operations.

After evaluating the information relevant to the above criteria, the Debtors have and, upon approval of the Court, will continue to designate, in their discretion, certain vendors as critical to the Debtors' operations and, therefore, as Operational Integrity Suppliers. To do so, the Debtors have designated a centralized, high-level team comprised of representatives of the Debtors' supply chain, finance, treasury, and in-house legal departments (collectively, the "**Supplier Management Committee**") to review, assess, and (if the relief requested herein is granted), authorize payment to Operational Integrity Suppliers. The Debtors and their advisors have already implemented a detailed protocol (the "**Payment Protocol**") to route all requests for Operational Integrity Supplier treatment through the Supplier Management Committee and to educate procurement, payables, and operations personnel on the process.

As set forth above, the Debtors estimate that the aggregate amount owed to Operational Integrity Suppliers for goods delivered or services provided during the period before the Petition Date is approximately $116,200,000. Of this amount, the Debtors are requesting authority to pay $30,100,000 of Operational Integrity Supplier Claims on an interim basis.

A.    **Proposed Conditions to Receiving Payment**

To minimize the amount of payments required if the relief sought herein is granted, the Debtors will utilize the Payment Protocol to identify particular Operational Integrity Suppliers and pay Operational Integrity Supplier Claims. The Debtors' Payment Protocol can be generally summarized as follows:

i.    All aspects of any proposed payment of an Operational Integrity Supplier Claim will be scrutinized for, among other things, the amount of payment at issue, the terms offered by the particular vendor, whether the supplier is party to an executory contract, and the business need for the goods or services at issue.

ii.   All requests for Operational Integrity Supplier treatment, or vendors refusing shipment of goods or the provision of services due to non-payment of prepetition claims, will be received and reviewed by the Debtors' Supplier Management Committee. Operational Integrity Supplier Claims will not be paid unless approved by the Supplier Management

Committee. Additionally, the Supplier Management Committee will consult with the Debtors' outside legal and financial advisors, as necessary, to ensure compliance with the Payment Protocol and that only those claims that are essential to maintaining the Debtors' operations are paid pursuant to this Motion.

iii.   In addition to approval from the Supplier Management Committee, any request for payment of an Operational Integrity Supplier Claim in excess of $5,000,000 must be approved by the Debtors' Chief Financial Officer.

iv.   The Debtors shall endeavor to document all proposed payments pursuant to an executed Vendor Agreement (as defined below).

v.   Payments may be executed by specifically designated members of the Debtors' Supplier Management Committee when the Payment Protocol has been completed and upon presentation of completed documentation.

Although the Debtors and their advisors have effectively "pre-screened" certain vendors that have satisfied the criteria for Operational Integrity Supplier treatment, the Debtors are keenly aware that they must be prepared to address new or additional exigencies should they emerge, particularly in light of the size and scope of the Debtors' operations. Thus, the Debtors' Payment Protocol includes specific processes by which suppliers and vendors, including suppliers and vendors that may provide essential goods or services outside of the aforementioned representative categories, may be designated as "Operational Integrity Suppliers" on a case-by-case and ongoing basis.

**B.  Vendor Agreements**

The Debtors propose to condition the payment of Operational Integrity Supplier Claims on the agreement of individual Operational Integrity Suppliers to supply goods and services to the Debtors (i) on the normal and customary trade terms, practices, and programs (including credit limits, pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs) that were in effect between such Operational Integrity Supplier and the Debtors within the twenty-four (24) month period prior to the Petition Date (the "**Customary Trade Terms**"), or (ii) such other trade terms as agreed to by the Debtors and an Operational Integrity Supplier. If the Debtors are unable to negotiate the continued supply of goods or the provision of services upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay Operational Integrity Suppliers all or a portion of their Operational Integrity Supplier Claims in return for the continued supply of critical goods or the provision of services.

To ensure that Operational Integrity Suppliers continue doing business with the Debtors on Customary Trade Terms or on such other terms as agreed to by the Debtors and an Operational Integrity

Supplier, the Debtors propose (i) that a letter substantially in the form attached hereto as **Exhibit B** (the "**Vendor Agreement**") be delivered to, and executed by, the Operational Integrity Suppliers, along with a copy of the order granting the relief requested herein, and (ii) that payment of Operational Integrity Supplier Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the order of the United States Bankruptcy Court for the Northern District of California, dated _____, 2019, in the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (Case No. 19-_____(__)), authorizing the Debtors to pay prepetition obligations of Operational Integrity Suppliers.

If the Debtors, in their discretion, determine that an Operational Integrity Supplier has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to comply with the Customary Trade Terms or such other terms that are individually agreed to by the Debtors and such Operational Integrity Supplier, following the date of the agreement, the Debtors may terminate a Vendor Agreement. If a Vendor Agreement is so terminated, or if an Operational Integrity Supplier that has received payment of a prepetition claim later refuses to continue to supply goods or services in compliance with the Vendor Agreement or as otherwise agreed with the Debtors, the Debtors reserve their rights to and may seek approval from this Court to (i) deem such payment to apply to postpetition amounts payable to such Operational Integrity Supplier, if applicable, or (ii) take any and all appropriate steps to cause such Operational Integrity Supplier to repay payments made to it on account of its Operational Integrity Supplier Claim to the extent that such payments exceed the postpetition amounts then owing to such Operational Integrity Supplier. The Operational Integrity Supplier Claim shall then be reinstated in such an amount so as to restore the Debtors and the Operational Integrity Supplier to their original positions as if the payment of the Operational Integrity Supplier Claim had not been made.

Some of the Operational Integrity Suppliers may also possess or have the right to assert mechanics' liens, possessory liens, or similar state-law trade liens (the "**Liens**") on the Debtors' assets based upon the claims held by those Operational Integrity Suppliers. As a further condition of receiving payment of an Operational Integrity Supplier Claim, the Debtors propose that an Operational Integrity Supplier must agree to take whatever action is necessary to remove the Lien at the Operational

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Integrity Supplier's sole expense.

Finally, the Debtors propose to maintain a matrix summarizing (i) the name of each Operational Integrity Supplier paid, (ii) the amount paid to each Operational Integrity Supplier on account of its Operational Integrity Supplier Claim (and any 503(b)(9) Claims), and (iii) the type of goods or services provided by that Operational Integrity Supplier. This matrix will be provided, upon request, to the Office of the United States Trustee and the professionals retained by any official committee appointed in the Chapter 11 Cases; provided, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee, without the prior written consent of the Debtors.

## VI. BASIS FOR RELIEF REQUESTED

As stated, pursuant to this Motion, the Debtors seek authority to pay the prepetition claims of the Operational Integrity Suppliers because they are critical to public safety and health and to preserving the value of the Debtors' businesses and their viability as a going-concern enterprise in an aggregate amount not to exceed the Operational Integrity Supplier Cap. As discussed herein, the Operational Integrity Suppliers are so essential to the Debtors' businesses that the lack of any of their particular goods or services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors and perhaps the public health and safety, as well. Accordingly, the Debtors respectfully request that the Court authorize the relief requested herein pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code.

### A. Payment of the Operational Integrity Supplier Claims Is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code

Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm.*

*of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in the Ninth Circuit have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, the Court may authorize the Debtors to pay the Operational Integrity Supplier Claims because such relief is necessary for the Debtors to carry out their fiduciary duties under sections 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code, "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession.").

Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served and listing examples such as "first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process").

Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain pre-petition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the pre-petition payments at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy Court. *In Matter of B & W Enterprises, Inc.*, 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. *See, e.g., In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1  *Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that Bankruptcy Courts have the authority to

2  authorize the debtor to pay certain prepetition claims).

3      Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain pre-petition

4  payments should be authorized regardless of whether they are priority payments under the Bankruptcy

5  Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the

6  appellants' argument that the cross-collateralization clause in a financing agreement violated the

7  "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals

8  noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental

9  tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id.* The Ninth

10  Circuit further stated that:

11      [c]ases have permitted unequal treatment of pre-petition debts when necessary for
12      rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital
       malpractice premiums incurred prior to filing; (iii) debts to providers of unique and
13      irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

14  *Id.*

15      Numerous Courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple*

16  in holding that the payment of certain pre-petition claims is not categorically barred when the payments

17  promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL

18  6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc.* for proposition that

19  it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v.*

20  *Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity"

21  to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right

22  the "entire [chapter 7] system would suffer a massive breakdown"). Furthermore, several courts within

23  this Circuit have granted relief substantially similar to that sought herein. *See, e.g., In re Laurel Fertility*

24  *Care*, Case No. 14-30403-DM-11 (Bankr. N.D. Cal. May 21, 2014) (approving motion for authority

25  to pay pre-petition critical vendor); *In re Montgomery-Sansome, LP*, Case No. 17-30515-HLB (Bankr.

26  N.D. Cal. Sept. 20, 2017) (approving motion for authority to pay pre-petition critical vendor and wage

27  claim).

28      As set forth in the Wells Declaration, the Debtors have more than ample liquidity in the form

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of cash on hand and a commitment for approximately $5.5 billion in debtor-in-possession financing. The Debtors believe that some of the Operational Integrity Suppliers will demand that the Debtors satisfy their prepetition obligations as a condition of doing business on a go-forward basis as a result of the commencement of the Chapter 11 Cases. In the three weeks leading up to the Petition Date, the Debtors estimate that they have experienced approximately $811 million in trade contraction from vendors and suppliers that have demanded accelerated payment, cash-in-advance, new or additional cash collateral, or have stopped shipping altogether. Further trade contraction from additional vendors could irreparably harm the Debtors' business operations. Because, as stated, the Operational Integrity Suppliers are select suppliers or service providers and/or provide highly specialized goods or services, replacing these suppliers is not feasible or would require significant time, expense, and resources. Moreover, as set forth above, certain of the Debtors' Operational Integrity Suppliers possess unique certifications, licenses, or specialized knowledge or experience, and the Debtors are not permitted under various state and federal regulations to unilaterally or easily replace such vendors. In addition, the Utility relies on goods and services supplied by certain of the Operational Integrity Suppliers to comply with the order appointing a third-party monitor issued by the U.S. District Court for the Northern District of California as part of the Utility's compliance with the sentencing terms of its January 27, 2017 federal criminal convictions. The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to, among other things, maintain the safety of its gas and electric operations. Failure to pay the Operational Integrity Supplier Claims would severely inhibit the Debtors' ability to acquire necessary materials and services and maintain their electric transmission and distribution system, generation units, and gas facilities in order to provide essential utilities to the population of northern and central California, as well as remain in compliance with state and federal laws and regulations, including the 2017 monitor order. Such failure would cause irreparable financial harm to the Debtors and may jeopardize the Debtors' ability to operate in a safe and reliable manner. Thus, the Debtors believe that the goods and services provided by the Operational Integrity Suppliers are so vital that the costs associated with even the briefest of disruption in goods and services would exceed the Operational Integrity Suppliers' prepetition claims and, therefore, that payment of the Operational Integrity Supplier Claims as requested in this Motion is plainly an exercise of sound

Case: 19-30088    Doc# 12    Filed: 01/29/19    Entered: 01/29/19 01:01:30    Page 22 of
26

business judgment and necessary to a successful reorganization. Moreover, as noted above, the Operational Integrity Supplier Claims are limited to approximately 5.5% of the Debtors' total outstanding trade debt as of the Petition Date. Accordingly, the Court should authorize the Debtors to pay the Operational Integrity Supplier Claims as requested herein.

**B.      Payment of the 503(b)(9) Claims of the Operational Integrity Suppliers is Warranted and Should be Approved**

Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). The Debtors will be required to pay in full all claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code to confirm any chapter 11 plan filed in the Chapter 11 Cases. See 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority in order for a chapter 11 plan to be confirmed).

Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, Bankruptcy Courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to do so. *See In re Glob. Home Prods.*, LLC, Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court."); *Spartan Plastics v. Verco Indus. (In re Verco Indus.)*; 20 B.R. 664, 665 (B.A.P. 9th Cir. 1982) ("The determination of when an administrative expense is to be paid is within the discretion of the [bankruptcy] court."). Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan. *See In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").

Due to the nature of the Debtors' businesses, certain of the Operational Integrity Suppliers may have Claims that arise from the delivery of essential electrical equipment, specialized replacement parts and supplies, operations consumables, raw materials, fuels, and certain other goods in the ordinary

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

course to the Debtors within the twenty (20) days prior to the Petition Date. As of the Petition Date, the Debtors estimate that Operational Integrity Suppliers were owed approximately $24,100,000 on account of 503(b)(9) Claims. Payment of any 503(b)(9) Claims of any Operational Integrity Supplier merely accelerates the timing of payment and not the ultimate treatment of such claims, especially here where the Debtors have ample liquidity. Accordingly, the relief should be granted and the Debtors should be authorized to pay the 503(b)(9) Claims of any Operational Integrity Supplier in accordance with the procedures and protocols set forth herein.

## VII. BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE OPERATIONAL INTEGRITY SUPPLIER CLAIMS

The Debtors further request that the Court authorize, but not direct, Banks to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Operational Integrity Supplier Claims. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or transfer requests on account of any Operational Integrity Supplier Claims dishonored or rejected as a result of the Chapter 11 Cases.

## VIII. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## IX. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1    a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the

2    petition. As set forth above and in the Wells Declaration, the Debtors believe that some of the

3    Operational Integrity Suppliers will demand that the Debtors satisfy their prepetition obligations as a

4    condition of doing business on a go-forward basis as a result of the commencement of the Chapter 11

5    Cases. The Operational Integrity Suppliers are an integral part of the Debtors' businesses, and failure

6    to pay the Operational Integrity Suppliers could subject the Debtors to a potential significant disruption

7    of operations or other material risks to the detriment of all parties in interest, including the 16 million

8    California customers that rely on the Debtors for electricity and natural gas service. Accordingly, the

9    Debtors have satisfied the requirements for immediate entry of an order granting the relief requested

10    herein pursuant to Bankruptcy Rule 6003.

11    **X.    REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS**

12    The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and

13    any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As

14    explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to

15    the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under

16    Bankruptcy Rule 6004(a) and the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent

17    such notice requirements and stay apply.

18    **XI.    NOTICE**

19    Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region

20    17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest

21    unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the

22    Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public

23    Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory

24    Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x)

25    counsel for the agent under the Debtors' proposed debtor in possession financing facilities; (xi) the

26    Banks; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested

27    service pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding

28    this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further

1   notice is required.

2        No previous request for the relief sought herein has been made by the Debtors to this or any

3   other court.

4        WHEREFORE the Debtors respectfully request entry of an order granting the relief requested

5   herein and such other and further relief as the Court may deem just and appropriate.

6   Dated: January 29, 2019

7                           **WEIL, GOTSHAL & MANGES LLP**

8                           **KELLER & BENVENUTTI LLP**

9

10                      By:  _/s/ Tobias S. Keller_
                              Tobias S. Keller

11

12                      *Proposed Attorneys for Debtors*
                      *and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119