WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DISVISION**

**In re:**

**PG&E CORPORATION,**

**Debtor.**

**Tax I.D. No. 94-3234914**

**In re:**

**PACIFIC GAS AND ELECTRIC COMPANY,**

**Debtor.**

**Tax I.D. No. 94-0742640**

Case Nos. 19 -_____ (___)
19 -_____ (___)

Chapter 11

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507(a)(7) AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND ADMINISTER CUSTOMER PROGRAMS, INCLUDING PUBLIC PURPOSE PROGRAMS, AND (B) HONOR ANY PREPETITION OBLIGATIONS RELATING THERETO; AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

Date:
Time:
Place:

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 1 of 38

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 363(b), and 507(a)(7) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), requesting interim and final authority, in the ordinary course of business and consistent with past practices, to (a) maintain and administer their Customer Programs (as defined below) including the (i) Deposit and Reimbursement Programs (as defined below), (ii) Public Purpose Programs (as defined below), (iii) Environmental Cleanup Programs (as defined below), (iv) Third-Party Programs (as defined below), (v) GHG Credit Programs (as defined below), and (vi) Customer Support Programs (as defined below), and (b) pay and otherwise honor all obligations relating to each of the foregoing, whether arising prior to, or after, the Petition Date (as defined below), as necessary and appropriate in the Debtors' business judgment. Additionally, the Debtors seek authority to issue new postpetition checks or effect new electronic funds transfer requests on account of such obligations to replace any prepetition checks or electronic funds transfer requests that may be lost, dishonored, or rejected as a result of the commencement of these Chapter 11 Cases.

A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **<u>Exhibit A</u>** (the "**Proposed Interim Order**").

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF CONTENTS

**Page**

I. JURISDICTION ........ 10

II. BACKGROUND ........ 10

III. THE CUSTOMER PROGRAMS ........ 10

A. THE DEPOSIT AND REIMBURSEMENT PROGRAMS ........ 12

**1.** The Security Deposit Programs ........ 12

**2.** The MLX Programs ........ 13

**3.** The Underground Programs ........ 14

**4.** The Other Customer Programs ........ 15

B. THE PUBLIC PURPOSE PROGRAMS ........ 15

**1.** The Public Purpose Programs Described ........ 16

**2.** Funding and Costs of the Public Purpose Programs ........ 22

C. THE ENVIRONMENTAL CLEANUP PROGRAMS ........ 23

**1.** The Environmental Cleanup Programs Described ........ 23

**2.** Funding and Costs of the Environmental Cleanup Programs ........ 24

D. THE THIRD-PARTY PROGRAMS. ........ 25

**1.** The Third-Party Programs Described ........ 25

**2.** Funding and Costs of the Third-Party Programs ........ 25

E. THE GHG CREDIT PROGRAMS ........ 26

**1.** The GHG Credit Programs Described ........ 26

**2.** Funding and Costs of the GHG Credit Programs ........ 26

F. THE CUSTOMER SUPPORT PROGRAMS ........ 27

**1.** The Customer Support Programs Described ........ 27

**2.** Funding and Costs of the Customer Support Programs ........ 27

IV. BASIS FOR RELIEF REQUESTED ........ 28

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 3 of 38

A. The Court has Authority to Grant the Requested Relief under Sections 363(b) and 105(a) of the Bankruptcy Code ....28

B. Funds Collected for the Deposit and Reimbursement Programs, Decommissioning Trusts, and Third-Party Programs Are Not Property of the Debtors' Estates ....33

C. Honoring the Security Deposit Refunds and the MLX Deposit Refunds Will Affect Only the Timing of Payments ....34

V. BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE CUSTOMER PROGRAM OBLIGATIONS ....36

VI. RESERVATION OF RIGHTS ....36

VII. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003 ....36

VIII. REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS ....37

IX. NOTICE ....37

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 4 of 38

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*B & W Enters., Inc. v. Goodman Oil Co. (In re B & W Enters., Inc.*),
713 F.2d 534 (9th Cir. 1983) .......... 30, 31

*Berg & Berg Enters., LLC v. Boyle*,
178 Cal. App. 4th 1020 (2009) .......... 29

*Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*,
829 F.2d 1484 (9th Cir. 1987) .......... 31

*In re CEI Roofing, Inc.*,
315 B.R. 50 (Bankr. N.D. Tex. 2004) .......... 34

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986) .......... 29

*In re Cornerstone Apparel, Inc.*,
Case No. 17-17292-VZ (Bankr. C.D. Cal. Aug.11, 2017), ECF No. 110 .......... 31

*In re CoServ, L.L.C.*,
273 B.R. 487 (Bankr. N.D. Tex. 2002) .......... 35

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) .......... 29

*In re Eagle–Picher Indus., Inc.*,
124 B.R. 1021 (Bankr. S.D. Ohio 1991) .......... 30

*In re Equalnet Commc'ns Corp.*,
258 B.R. 368 (Bankr. S.D. Tex. 2000) .......... 35

*FDIC v. Castetter*,
184 F.3d 1040 (9th Cir. 1999) .......... 28

*In re Fin. News Network, Inc.*
134 B.R. 732 (Bankr. S.D.N.Y. 1991) .......... 30

*Gordon v. Hines (In re Hines)*,
147 F.3d 1185 (9th Cir. 1998) .......... 31

*In re Gulf Air, Inc.*,
112 B.R. 152 (Bankr. W.D. La. 1989) .......... 30

*Hansen v. Finn (In re Curry & Sorensen, Inc.*),
57 B.R. 824 (B.A.P. 9th Cir. 1986) .......... 29

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 5 of 38

*Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.*),
145 B.R. 637 (B.A.P. 9th Cir. 1992) ........ 29

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ........ 28

*In re Just For Feet, Inc.*,
242 B.R. 821 (D. Del. 1999) ........ 30

*In re Laurel Fertility Care*,
Case No. 14-30403-DM-11 (Bankr. N.D. Cal. May 21, 2014) ........ 31

*Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.*),
80 B.R. 279 (S.D.N.Y. 1987) ........ 30

*Miltenberger v. Logansport, C&S W.R. Co.*,
106 U.S. 286 (1882) ........ 30

*In re Montgomery-Sansome, LP*,
Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) ........ 31

*Moose v. United States*,
674 F.2d 1277 (9th Cir. 1982) ........ 34

*In re NVR L.P.*,
147 B.R. 126 (Bankr. E.D. Va. 1992) ........ 30

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),*
147 B.R. 650 (S.D.N.Y. 1992) ........ 28

*Official Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.*),
997 F.2d 1039 (3rd Cir. 1993) ........ 33, 34

*In re Pacific Gas & Elec. Co.*,
Case No. 01-30923 DM (Bankr. N.D. Cal. Apr. 6, 2001) ........ 12

*In re Pettit Oil Co.*,
No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ........ 31

*In re River Vill. Assocs.*,
161 B.R. 127 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) ........ 35

*In re Round Table Pizza Inc.*,
Case No. 11-41431-RE (Bankr. N.D. Cal. Feb. 11, 2011), ECF No. 31 ........ 32

*Scouler & Co., LLC v. Schwartz*,
No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ........ 29

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 6 of 38

*In re Shay*,
Case No. 2:12-BK-26069-RK, 2017 WL 262040 (Bankr. C.D. Cal. Jan. 18, 2017)........................ 35

*In re Sheikh Shoes, LLC*,
Case No. 17-24626-VZ (Bankr. C.D. Cal. Dec. 1, 2017), ECF No. 70.......................................... 31

*Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*,
224 F.3d 1008, 1011 (9th Cir. 2000) ............................................................................................ 35

*In re Structurlite Plastics Corp.*,
86 B.R. 922 (Bankr. S.D. Ohio 1988)............................................................................................. 30

*In re Styles for Less Inc.*,
Case No. 17-14396-MW (Bankr. C.D. Cal. Nov. 15, 2017), ECF No. 68 ..................................... 31

**Statutes**

10 C.F.R. 50.75 ........................................................................................................................ 24

10 C.F.R. 50.82 ........................................................................................................................ 24

11 U.S.C. § 105(a) ...................................................................................................................... 28, 29

11 U.S.C. § 363(b) ...................................................................................................................... 28

11 U.S.C. § 365 .......................................................................................................................... 36

11 U.S.C. § 507(a)(7)................................................................................................................... 34, 35

11 U.S.C. § 541(d) ...................................................................................................................... 33, 34

11 U.S.C. § 1107(a) .................................................................................................................... 10, 29

11 U.S.C. § 1108......................................................................................................................... 10

28 U.S.C. § 157(b) ...................................................................................................................... 10

28 U.S.C. § 1334......................................................................................................................... 10

28 U.S.C. § 1408......................................................................................................................... 10

Cal. Code of Regs. tit. 17, § 95480 - 95503................................................................................. 11, 26

Cal. Health & Safety Code § 38500............................................................................................. 11, 26

Cal. Pub. Util. Code § 365.1 ........................................................................................................ 25

Cal. Pub. Util. Code § 366 ........................................................................................................... 25

Cal. Pub. Util. Code § 366.2 ........................................................................................................ 25

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 7 of 38

Cal. Pub. Util. Code § 379 .......... 11, 23

Cal. Pub. Util. Code § 380.5 .......... 11, 15

Cal. Pub. Util. Code § 381 .......... 11, 15

Cal. Pub. Util. Code § 381.1 .......... 11, 15

Cal. Pub. Util. Code § 382 .......... 11, 15

Cal. Pub. Util. Code § 399.4 .......... 11, 15

Cal. Pub. Util. Code § 399.8 .......... 11, 15

Cal. Pub. Util. Code § 454.55 .......... 11, 15

Cal. Pub. Util. Code § 454.56 .......... 11, 15

Cal. Pub. Util. Code § 890 – 899 .......... 11, 15

Cal. Pub. Util. Code § 2790 .......... 11, 15

Cal. Pub. Util. Code § 8325 – 8326 .......... 23, 24

Cal. Water Code § 80110a .......... 11, 25

**Other Authorities**

B.L.R § 5011-1(a) .......... 10

CPUC Decision 94-05-020 .......... 11, 23

CPUC Decisions 01-03-073, 06-01-024, 07-11-045, 08-10-036, 10-01-022, 14-12-024, 16-01-044, 17-12-022, 18-01-004, 18-06-027, and 18-12-015 .......... 11, 15

Fed. R. Bankr. P. 2002 .......... 38

Fed. R. Bankr. P. 6003 .......... 36, 37

Fed. R. Bankr. P. 6004(a) .......... 37

Fed. R. Bankr. P. 6004(h) .......... 37

Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) .......... 23

H.R. Rep. No. 95–595, 95th Cong., at 368 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6324 .......... 34

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.) .......... 10

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 8 of 38

PG&E Advice Ltrs. 5376-E and 4053-G ........ 22

PG&E Elec. Rules 6 and 7 ........ 12

PG&E Elec. Rule 9G ........ 15

PG&E Elec. Rules 15 and 16 ........ 13

PG&E Elec. Rules 17, 17.1, and 17.2 ........ 11, 15

PG&E Elec. Rule 20 ........ 14

PG&E Elec. Rule 21 ........ 14

PG&E Elec. Rate Sch. NEM2 ........ 15

PG&E Elec. Preliminary Statement ........ 23, 25

PG&E's Electric Preliminary Statement Part S ........ 23, 25

PG&E Gas. Rules 6 and 7 ........ 12

PG&E Gas. Rule 9G ........ 15

PG&E Gas. Rules 15 and 16 ........ 13

PG&E Gas. Rules 17, 17.1, and 17.2 ........ 11, 15

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 9 of 38

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in either of the Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

## III. THE CUSTOMER PROGRAMS

As a regulated, investor-owned utility, the bulk of the Debtors' business operations are subject to oversight by the California Public Utilities Commission (the "**CPUC**"). The complex regulatory and statutory framework within which the Debtors operate mandates that, in the ordinary course of business, the Debtors maintain certain programs and initiatives for the benefit of a customer base that includes, in the aggregate, over 16 million residential and non-residential customers (collectively, the "**Customers**"). As virtually all of such programs are mandated pursuant to state or local laws, federal law, regulations,

tariffs, and regulatory decisions,[1] the failure of the Debtors to continue to honor and maintain these programs would result in noncompliance with such laws, regulations, and tariffs, and could materially disrupt the Debtors' operations and jeopardize their ability to successfully reorganize. Additionally, applicable legislation requires that the projected costs associated with several of the programs discussed herein be funded through various surcharges and fees collected by the Debtors through rates from Customers and earmarked to pay the costs of such programs. In other words, in many instances the Debtors act as a conduit for collected funds, which the Debtors pass through to the programs' beneficiaries and use to pay other program costs.

As set forth below and in the Wells Declaration, these programs include the following: (a) programs made available to and measures taken for Customers in the ordinary course of providing utility services including the Security Deposit Programs, the MLX Programs, the UG Programs, and the Other Customer Programs (each, as defined below) (collectively, the "**Deposit and Reimbursement Programs**"); (b) programs designed to advance public policy goals such as local and state energy efficiency, renewable energy, carbon reduction, and energy conservation (collectively, the "**Public Purpose Programs**"); (c) programs designed to manage the Debtors' environmental cleanup and nuclear power plant decommissioning efforts (collectively, the "**Environmental Cleanup Programs**"); (d) third-party programs pursuant to which the Debtors invoice Customers on behalf of third parties that have purchased and provide electricity or natural gas to Customers using the Debtors' transmission and distribution facilities (collectively, the "**Third-Party Programs**"); (e) greenhouse gas ("**GHG**") emissions reduction programs required by the California Air Resources Board that provide certain credits to customers (collectively, the "**GHG Credit Programs**"); and (f) customer support programs pursuant to which the Debtors support Customers by engaging contractors and other third parties to complete

[1] Such statutes, regulations, tariffs, and decisions include, without limitation: Cal. Pub. Util. Code §§ 379, 380.5, 381, 381.1, 382, 399.4, 399.8, 454.55, 454.56, 890-899, 2790, and 8326; Cal. Water Code § 80110a; PG&E Elec. Rules 6, 7, 9G, 15, 16, 17, 17.1, 17.2, and 20; PG&E Gas Rules 6, 7, 9G, 15, 16, 17, 17.1, and 17.2 (available at https://www.pge.com /tariffs/index.page); and California Public Utilities Commission Decision Nos. 94-05-020, 01-03-073, 06-01-024, 07-11-045, 08-10-036, 10-01-022, 14-12-024, 16-01-044, 17-12-022, 18-01-004, 18-06-027, and 18-12-015. *See also*, the California Global Warming Solutions Act of 2006, Cal. Health and Safety Code §§ 38500, *et. seq.*; Low Carbon Fuel Standard (LCFS), Cal. Code of Regs. tit. 17, §§95480-95503.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 11 of 38

certain Customer projects (collectively, the "**Customer Support Programs**" and, all such programs collectively, including the Deposit and Reimbursement Programs, the Public Purpose Programs, the Environmental Cleanup Programs, the Third-Party Programs, the GHG Credit Programs, and the Customer Support Programs collectively, the "**Customer Programs**," and any and all fees, costs, reimbursement obligations, credits, refunds, or expenses incurred, whether prior to or after the Petition Date, in connection with the Customer Programs, the "**Customer Program Obligations**"). Each of the aforementioned Customer Programs is discussed in further detail below.[2]

**A. The Deposit and Reimbursement Programs**

**1. The Security Deposit Programs**

Pursuant to the Debtors' security deposit programs, which have been approved by the CPUC and have the effect of state law[3] (the "**Security Deposit Programs**"), Customers must demonstrate sufficient creditworthiness before the Debtors begin providing gas and electric services. In some cases, the existence of a third-party guarantor or a demonstrable ability to pay will satisfy the Debtors' creditworthiness requirements.[4] In many cases, however, if a potential Customer's gas and/or electric services were discontinued in the past due to non-payment, or if a Customer has no previous service history with the Debtors, the Debtors will require such Customers, pursuant to the Security Deposit Programs, to provide a security deposit to the Debtors before initiating service ("**Security Deposit**").

[2] The Debtors are also obligated to perform under other miscellaneous customer-benefiting programs and services, including, without limitation, certain customer-benefiting programs and obligations required in connection with settlements entered into by the Debtors and approved by the Bankruptcy Court in their prior chapter 11 case, such as the payment of certain disputed claims from escrowed funds and donation of land and land conservation easements to public agencies or non-profit conservation organizations. *See In re Pacific Gas & Elec. Co.*, Case No. 01-30923 DM (Bankr. N.D. Cal. Apr. 6, 2001) (ECF No. 14272), ¶ 10(xiii) and Ex. A, § 4.15(c). The Debtors intend to continue to comply with such obligations.

[3] *See* PG&E Electric Rules 6 and 7; PG&E Gas Rules 6 and 7. All tariffs applicable to the Debtors are available at https://www.pge.com/tariffs/index.page.

[4] Certain of the Debtors' nonresidential Customers provide letters of credit to the Debtors to fulfill such creditworthiness requirements. In the ordinary course of business, upon discontinuance of service and payment of all obligations owed to the Debtors, the Debtors return the letters of credit back to such Customers. The Debtors intend to continue such practice in the ordinary course.

In the ordinary course of business, the Debtors refund Security Deposits with accrued interest (the "**Security Deposit Refunds**") to Customers if (a) a Customer has no more than two past-due bills during the twelve-month period after commencing service and/or has not had service otherwise discontinued for non-payment during such twelve-month period; (b) a Customer voluntarily discontinues service; or (c) a Customer otherwise meets the Debtors' criteria for creditworthiness and requests the return of a Security Deposit. Once the Debtors determine that the Customer is entitled to a Security Deposit Refund, the deposit is first used to satisfy the Customer's outstanding bill or credited to the Customer's open account. The Debtors also issue Security Deposit Refunds in the form of a check or through an automated clearinghouse transfer directly into a Customer's bank account. Customers may also elect to receive a refund in the form of a credit to another account held with the Debtors.

In 2018, the Debtors issued approximately $52.3 million in Security Deposit Refunds to approximately 240,000 residential Customers (on average, approximately $220 per identified residential Customer) and approximately $41.5 million in Security Deposit Refunds to approximately 20,000 non-residential Customers. As of the Petition Date, the Debtors hold an aggregate of approximately $181.2 million in Security Deposits. Based on historical averages, the Debtors estimate that they will be obligated to refund or credit on a monthly basis approximately $5 million in Security Deposit Refunds to approximately 20,000 residential Customers (on average $250 per identified residential Customer) and approximately $4 million in Security Deposit Refunds to approximately 1,600 non-residential Customers.

### 2. The MLX Programs

The Debtors have mainline extension and interconnection ("**MLX**") programs (collectively, the "**MLX Programs**") approved by the CPUC that are required by law. Generally speaking, an MLX is an electric line or a gas main that is typically installed to provide permanent gas and electricity service to premises that otherwise lack connection to the Debtors' extensive natural gas and electric network.[5] As used herein, an MLX may also be used to add load capacity to otherwise grid-connected premises in

[5] *See* PG&E Electric Rules 15 and 16; PG&E Gas Rules 15 and 16.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 13 of 38

anticipation of increased energy usage or to interconnect customer generation facilities.[6] The MLX Programs generally work in the following manner: either the Customer builds the MLX and pays for associated construction costs, or the Debtors build the MLX and the Customer provides the Debtors with an up-front deposit corresponding to estimated construction costs. As the Debtors may benefit from an MLX through Customer revenues associated with such MLX over time, the Debtors issue (i) payments to the Customer who built the MLX, and (ii) refunds to Customers who provided the Debtors with up-front deposits (collectively, including refunds of Engineering Advances (as defined below) in excess of remaining project costs, the "**MLX Deposit Refunds**").[7]

In 2018, the Debtors paid approximately $55 million in MLX Deposit Refunds (excluding refunds for Engineering Advances) to approximately 2,100 Customers and approximately $11.1 million in refunds of Engineering Advances to approximately 5,300 Customers. As of the Petition Date, the Debtors hold an aggregate of approximately $112.7 million in MLX deposits and Engineering Advances. Based on historical averages, the Debtors estimate that they will be obligated to refund or credit on a monthly basis approximately $4.6 million in MLX Deposit Refunds (excluding refunds for Engineering Advances) to approximately 150 Customers and $1 million in refunds of Engineering Advances to approximately 440 Customers.

**3. The Underground Programs**

The Debtors undertake programs that are approved by the CPUC and are required by law to convert existing overhead electric distribution facilities to underground ("**UG Programs**").[8] In order for a project to qualify under the program, the project must meet specific criteria outlined in the Debtors' Rule 20 tariff. Under the UG Programs, the Debtors undertake projects at the request of governmental entities that cover the costs of the conversions (the "**UG Costs**"). The governmental entities have the option of covering the conversion costs either through direct payment to the Debtors or, more commonly, through the use of work credits that are allocated to communities according to a formula that is set forth

---

[6] *See* PG&E Electric Rule 21.

[7] The Debtors also receive engineering advances when Customers apply for new line extension or relocation projects ("**Engineering Advances**") which are applied to the cost of the project.

[8] *See* PG&E Electric Rule 20.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 14 of 38

in Debtors' tariffs. In 2018, the Debtors expended approximately $33 million in connection with the UG Programs. As of the Petition Date, the Debtors estimate that approximately $5.4 million in UG Costs owed to third parties in connection with the UG Programs are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

### 4. The Other Customer Programs

In the ordinary course of business, the Debtors also provide credits to Customers (i) as a result of corrections in rates, metering and other charges,[9] (ii) in connection with the Debtors' budget billing plan, which is intended to normalize Customer payments over the course of a year,[10] and the Debtors' solar tariffs,[11] which compensate Customers for surplus energy delivery, and (iii) to address other similar Customer concerns and issues (collectively, the "**Other Customer Programs**" and the obligations related thereto, the "**OCP Costs**"). The Debtors' monthly Other Customer Program activity is irregular. In the eleven (11) month period ending November 30, 2018, the Debtors incurred monthly OCP Costs up to approximately $4 million.

## B. The Public Purpose Programs

The Debtors administer, both directly and indirectly, a host of separate Public Purpose Programs across the Debtors' service area in California pursuant to a series of statutory mandates, including those set forth in the California Public Utilities Code, and regulatory mandates and decisions issued by the CPUC and local and regulatory agencies.[12] The Public Purpose Programs are tailored to effectuate public policies supporting energy efficiency ("**EE**"), carbon reduction, renewable energy, and energy management and conservation by (a) providing direct financial incentives (including rebates) to individuals, businesses, and local governments to install, sell, or manufacture energy efficient and renewable energy equipment, (b) implementing education and outreach initiatives that promote and

---

[9] *See* PG&E Electric Rules 17, 17.1 and 17.2; PG&E Gas Rules 17, 17.1 and 17.2.

[10] *See* PG&E Electric Rule 9G; PG&E Gas Rule 9G.

[11] *See* PG&E Electric Rate Schedule NEM2.

[12] Such statutes and Commission Decisions include without limitation: Cal. Pub. Util. Code §§ 380.5, 381, 381.1, 382, 399.4, 399.8, 454.55, 454.56, 890-899 and 2790; and California Public Utilities Commission Decision Nos. 01-03-073, 06-01-024, 07-11-045, 08-10-036, 10-01-022, 14-12-024, 16-01-044, 17-12-022, 18-01-004, 18-06-027, and 18-12-015.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119



Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 15 of 38

support the widespread adoption of EE, renewable energy, reductions in GHG emissions, and energy conservation practices, (c) supporting research and development aimed at improving existing and developing new EE, clean energy technologies and renewable energy technologies, and (d) administering and supporting demand response programs which seek to maximize grid-wide efficiencies through targeted increases and decreases in electricity consumption. A non-exhaustive list and general description of the types of Public Purpose Programs follows.

### 1. The Public Purpose Programs Described

The Debtors administer mandated programs that cover nearly every market sector and customer type, across all technology families, and use a variety of market intervention strategies, including rebates targeted at manufacturers and distributors. These programs support California's "Long-Term Energy Efficiency Strategic Plan," a framework created by the CPUC that is designed to integrate EE into the everyday activities of ratepayers, to provide a more integrated EE experience for Customers and to provide Customers with access to information and greater financing opportunities.

Energy Efficiency. The Debtors' CPUC-mandated EE programs (collectively, the "**EE Programs**") offer incentives, services, education and tools aimed to assist residential, commercial, industrial, and agricultural Customers and local government partners in eliminating unnecessary energy use and saving money. Through strategic energy planning support, technical support services, and financial support through rebates, incentives, education, and financing options, the EE Programs empower Customers to better understand, manage, and eliminate unnecessary energy use. A general description of the types of EE Programs follows.

*Energy Efficiency: Residential Programs*. The Debtors administer twelve (12) residential EE programs (collectively, the "**Residential Programs**") designed to achieve energy savings for residential Customers. For example, the Debtors provide rebates to residential Customers who purchase energy efficient products like washing machines, dishwashers, and water heaters. In addition, the Debtors offer incentives to Customers who work with contractors to perform home retrofits and who do air conditioning installation and maintenance. Through the Residential Programs, property owners and Customers can receive incentives to install efficient equipment in multifamily housing units, ranging from central systems like boilers to simple lighting fixtures. The Residential Programs offer incentives

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 16 of 38

to manufacturers, distributors, and retailers to manufacture, stock, and sell energy efficient consumer electronics (such as televisions and computers) and lighting. In addition, the Debtors provide audit and energy savings equipment installation services to moderate income residential Customers. Through home energy management tools the Debtors provide residential Customers tools and information to help them maximize energy savings.

*Energy Efficiency: Commercial Programs*. The Debtors administer a variety of commercial EE programs (collectively, the "**Commercial Programs**") that target Customers in new and existing facilities and in a variety of sectors including healthcare, hospitality, large office, high tech, and retail. Through the Commercial Programs, the Debtors provide incentives and financing to encourage investment in energy efficient products and services. Typical commercial EE projects focus on equipment upgrades in lighting, HVAC, food service, refrigeration, water heating, and general plug loads. The Debtors also offer strategic energy planning, technical support services, calculation or design assistance, and benchmarking tools to their commercial Customers. The Debtors deliver this suite of Commercial EE Programs through a network of trade professionals, third-party partners, and local government partnerships. The Debtors also offer in-house engineering and project development support to commercial Customers.

*Energy Efficiency: Industrial Programs*. The Debtors administer a variety of industrial EE programs (collectively, the "**Industrial Programs**") that are designed to reduce energy consumption, lower GHG emissions, and increase Customers' profitability by lowering energy costs. The Industrial Programs include rebates, incentives, and financing for efficient equipment and systems; technical support such as facility audits and energy savings analysis; and strategic energy planning. Typical industrial EE projects focus on lighting, pumps, fans, motors, boilers, insulation, heat recovery, process heating, drip irrigation, low pressure sprinkler nozzles, and refrigeration equipment. The Industrial Programs target various facility types including oil production, lumber and paper mills, cement and quarries, metals processing, petroleum refineries, chemical industries, assembly plants, and water and wastewater treatment plants. The Debtors deliver their suite of Industrial Programs through a network of trade professionals and third-party partners. The Debtors also offer in-house engineering and project development support to industrial Customers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 17 of 38

*Energy Efficiency: Agricultural Programs*. The Debtors administer a variety of agricultural EE programs (collectively, the "**Agricultural Programs**") that help agricultural producers and processors manage energy costs and make informed investments in new energy-saving equipment. The Debtors offer a full suite of tools to position agricultural Customers to eliminate unnecessary energy use. Key offerings include rebates, incentives, and financing for efficient equipment and systems; technical support such as facility audits and energy savings analysis; and pump efficiency education. The Agricultural Programs target agricultural growers, post-harvest processors, dairies, irrigation districts/agencies, fruit and vegetable processors, agricultural service providers, wineries, and other beverage manufacturers. The Debtors deliver their suite of Agricultural Programs through a network of trade professionals and third-party partners. The Debtors also offers in-house engineering and project development support to agricultural Customers.

*Energy Efficiency: Local, State, and Federal Government (Public Sector) Programs*. The Debtors administer a variety of EE programs focused on the public sector (collectively, the "**Public Sector Programs**"). Through Debtors' government and community partnerships, the Debtors collaborate with public entities to shape EE and sustainability at the local, regional, and statewide levels. These partnerships aim to meet the needs of local and state governments and schools and educational institutions to offer comprehensive solutions that are flexible, innovative, and a reflection of the communities' needs. The Public Sector Programs also focus on K-12 public schools and offer energy planning services for public entities interested in benchmarking their facilities and pursuing local energy reach codes and ordinances. In addition, the Debtors offer a light emitting diode ("**LED**") streetlights program serving public sector customers.

*Energy Efficiency: Financing Programs*. The Debtors administer the on-bill financing program (the "**OBF Program**") that provides zero-interest loans to help commercial customers invest in efficient products and pay for these investments through their utility bill. The OBF Program is offered in conjunction with other EE Programs to stimulate and enable higher levels of customer participation. Additionally, the Debtors support the California Alternative Energy and Advanced Transportation Financing Authority (CAEATFA) in the development of statewide finance pilots, which include on and off-bill financing options.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 18 of 38

*Energy Efficiency: Codes and Standards Program.* The Debtors administer the codes and standards program (the "**C&S Program**"), which saves energy on behalf of ratepayers by influencing regulatory bodies such as the California Energy Commission and the U.S. Department of Energy to strengthen EE regulations. The C&S Program conducts efforts to increase compliance with existing codes, standards, and regulations to ensure that the State of California realizes the savings from new codes and standards and support local governments that include reach codes as a climate strategy. The C&S Program also provides for planning and coordination with other California investor-owned utilities to optimize collaboration, and code readiness activities to prepare for future codes. The C&S Program advocacy and compliance improvement activities extend to virtually all buildings and appliances sold in California in support of the state's climate and energy goals.

*Energy Efficiency: Workforce Education and Training Program.* The Debtors administer a workforce education and training program (the "**WE&T Program**"), which provides professionals who design, build, and operate buildings the relevant skills needed to help eliminate unnecessary energy use in buildings. The WE&T Program provides technical advice to local workforce development organizations, postsecondary educational institutions, and training programs for various trades. The Debtors operate three energy centers that offer courses, technical consultations, and events. The centers include the Pacific Energy Center in San Francisco, which focuses on building design, the Stockton Energy Training Center, which focuses on workforce training, and the Food Service Technology Center in San Ramon. Through the WE&T Program, the Debtors work with educational institutions, community-based organizations and state education agencies to offer energy education to K-12, community colleges, adult education, and higher education institutions.

*Energy Efficiency: Emerging Technologies Program.* The Debtors administer an emerging technologies program (the "**ETP**"), which evaluates new and/or promising EE technologies, showcases these technologies, and facilitates the entry of such technologies to market. Through the ETP, the Debtors communicate and collaborate with entrepreneurs and technology providers to increase the supply of EE technology solutions and identify and assesses the performance of emerging EE technology solutions through lab and field testing and demonstration showcases. The ETP is focused on the following areas across all customer segments: lighting, HVAC, building shells, energy management

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 19 of 38

systems, appliances, plug loads, and food services technologies.

Statewide, Marketing and Education. The Debtors serve as the fiscal manager for a joint utility statewide marketing, education, and outreach program that is performed under contracts with third-party advertising and media firms. The statewide marketing, education, and outreach program motivates Customers to take action on EE and energy conservation measures, increases Customer awareness of such measures, and facilitates Customers' ability to act and incorporate technological advances.

Low-Income. The Debtors serve as program administrator for programs aimed at helping income-qualified Customers pay their energy bills. Over 1.4 million Customers are receiving a bill discount through the California Alternative Rates for Energy (CARE) program and Family Electric Rate Assistance Program (FERA) program.

Energy Savings Assistance Program. The Debtors administer the energy savings assistance program which provides income-qualified residential Customers with home energy-saving improvements at no charge. The program supports the EE and weatherization of approximately 100,000 homes per year.

Self-Generation Incentive Program. The Debtors serve as program administrators for the self-generation incentive program (the "**SGIP**") and provide rebates to Customers and renewable energy providers for the installation of new qualifying technologies that meet all or a portion of the electric needs of a facility. The purpose of the SGIP is to achieve GHG emission reductions, electricity demand reductions, and reduced Customer electricity usage.

California Solar Initiative and Other Solar Programs. The Debtors administer California solar initiative and other solar programs by providing financial incentives for installation of qualifying photovoltaic systems for multi-family and single-family affordable housing and solar thermal technology. These programs include without limitation, the California Solar Initiative Program; the California Solar Initiative Multifamily Affordable Solar Housing Program; the California Solar Initiative Thermal Program; the Single Family Affordable Solar Housing Program; the Multifamily Affordable Housing Solar Roofs Program; the Net Energy Metering Program; the Community Solar Green Tariff Program; the Disadvantaged Communities—Green Tariff Program, and the Disadvantaged Communities—Single Family Solar Homes Program. Under these programs, the Debtors provide

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 20 of 38

financial incentives and other customer assistance including through a contract with a third-party administrator for the installation of solar energy systems on qualifying properties throughout California. The goal of the programs is to encourage the development and installation of solar systems including in California's disadvantaged communities.

Demand Response Programs. The Debtors administer demand response programs designed to enable Customers to contribute to energy load reduction during peak times of demand. Demand response programs are designed to be both fiscally and environmentally responsible by responding to occasional and temporary peak demand. The programs offer incentives to businesses that volunteer and participate by temporarily reducing their energy use when demand could outpace supply.

San Joaquin Valley Disadvantaged Communities Pilot Projects. In December 2018, the CPUC authorized the Debtors and other investor-owned utilities to implement and administer a variety of pilots and various support programs to provide improved utility services to disadvantaged communities in the San Joaquin Valley. The Debtors are responsible for certain of these pilots as well as providing credits and education for impacted customers. The Debtors are also responsible for facilitating the hiring of an independent administrator to oversee the pilots.

Clean Energy Transportation Programs. The Debtors have been authorized to implement multiple electric vehicle programs, including the "Electric Vehicle Charging Network Program," which will increase access to charging for electric vehicles within the Debtors' service territory; the "Electric Vehicle Fleet Ready Program," which serves to build electric vehicle charging infrastructure for 700 sites to support medium and heavy duty vehicle fleets; the "Priority Review Projects Program," which pilots new methods and projects to promote deployment of electric vehicles; and the "Electric Vehicle Fast Charge Program," which targets transit corridors and urban areas to provide them with charging infrastructure that allows electric vehicles to fully charge quickly.[13]

Residential Rate Reform. The Debtors implement residential rate plan changes and increase customer awareness of rate options in preparation for the mandated transition of approximately 2.7 million Customers to "time-of-use" rate plans starting in October 2020 under which energy costs will be

---

[13] These clean energy transportation programs have been authorized by Decision Nos. 16-12-065, 18-01-024 and 18-05-040 of the California Public Utilities Commission.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 21 of 38

directly related to the time of day energy is used. Customer awareness includes an extensive multi-media statewide campaign informing Customers of the importance of energy management and the time of day that energy is used.

Mobile Home Park Utility Upgrade Program. The Debtors participate in a program to replace mobile home park ("**MHP**") operated utility systems with direct public utility natural gas and electric service for MHP residents. The goal of the program is to provide safe, reliable, and clean energy to MHP residents.

**2. Funding and Costs of the Public Purpose Programs**

On an annual basis, the CPUC commissions studies of California's residential and commercial buildings, equipment and processes, and industrial and agricultural sectors with the objective of developing energy savings and conservation objectives and determining the annual budget for the Public Purpose Programs. Following approval by the CPUC, the projected costs associated with the Public Purpose Programs (the "**PPP Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers (the "**PPP Funds**").[14] In order to meet the objectives of the Public Purpose Programs, the CPUC has approved approximately $950 million in PPP Costs for 2019. As of the Petition Date, the Debtors estimate that approximately $131 million in PPP Costs owed to third parties are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

The funds collected, allocated, and distributed by the Debtors on account of the Public Purpose Programs are typically tracked by the Debtors through regulatory "balancing accounts" required by the CPUC for legal ratemaking purposes. All costs recorded in these accounts are reserved for the payment of PPP Costs as approved by the CPUC. Surplus funds remaining in these accounts at the end of the year are either rolled over and allocated to Public Purpose Programs for the next fiscal year or refunded to Customers through rate adjustments.

---

[14] For a list of examples of such balancing accounts, *see* PG&E Advice Letter 5376-E, Annual Electric True-Up Submittal – Change to PG&E's Electric Rates on January 1, 2019, filed with CPUC on September 4, 2018; PG&E Advice Letter 4053-G, Annual Gas True-Up of Gas Transportation Balancing Accounts for Rates Effective January 1, 2019, filed with CPUC on December 21, 2018.

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 22 of 38

### C. The Environmental Cleanup Programs

The Debtors' operations include or have included nuclear power plants, manufactured gas plant sites, natural gas gathering system sites, natural gas compressor station sites, electric transmission and distribution facilities, steam-electric power plant sites, and hydroelectric power plant sites. As a result of current and historical operations, state and federal statutes and agencies such as the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), the Nuclear Regulatory Commission, and the CPUC nuclear safety and cost recovery regulations require the Debtors to administer and maintain the Environmental Cleanup Programs described below.[15] The Debtors operate such programs under state and federal regulatory oversight.

#### 1. The Environmental Cleanup Programs Described

As a necessary part of their business, the Debtors use, or have used, a variety of different hazardous or radioactive materials in a number of their sites, the cleanup of which is an ordinary and recurring part of the Debtors' business. In connection therewith, the Debtors (a) evaluate existing and historical operating sites for potential releases of hazardous materials by performing site investigations and conducting human health and ecological assessments, and (b) design, implement, and perform remedial measures at designated sites to address ongoing or potential exposure risks. The Debtors use a number of third-party environmental contracting and consulting firms in the administration of the Environmental Cleanup Programs, as well as outside legal firms to provide guidance and direction on legal and regulatory issues, to manage regulatory and third-party claims with respect to environmental issues, and to assist in the development of environmental policies.

Additionally, the Debtors' routine work includes active decommissioning of the Debtors' Humboldt Bay nuclear facility and decommissioning planning activities of the Debtors' Diablo Canyon nuclear facility. Federal law requires all operators of nuclear facilities to create and fund a nuclear decommissioning trust fund with adequate funds to decommission those facilities such that they present

---

[15] Such authorities include: Cal. Pub. Util. Code §§ 379, 8325 and 8326, and PG&E's Electric Preliminary Statement DB (Nuclear Decommissioning Adjustment Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_DB.pdf; and CPUC Decision 94-05-020, and PG&E's Electric Preliminary Statement Part S (Hazardous Substance Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_S%20(Prelim).pdf.

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 23 of 38
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

no risk to public health and safety or the environment when they are removed from service.[16]

**2. Funding and Costs of the Environmental Cleanup Programs**

The Debtors collect and recover hazardous substance clean up and litigation costs, net of related insurance recoveries, as approved by the CPUC. The CPUC allows for the recovery of eligible costs at CPUC-approved manufactured gas plant sites, federal superfund sites, and other specified sites. Additionally, the California Public Utilities Code and CPUC decisions and orders require that the Debtors periodically estimate the costs associated with the Debtors' nuclear decommissioning efforts, seek CPUC authorization for the funding of such costs, and deposit such funding into externally managed and segregated nuclear decommissioning trusts (collectively, the "**Decommissioning Trusts**").[17] The Debtors routinely seek reimbursement from the Decommissioning Trusts for prudent decommissioning expenditures approved by the CPUC.

Following approval by the CPUC, the projected costs associated with the Environmental Cleanup Programs (the "**ECP Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers (the "**ECP Funds**"). In order to meet the objectives of the Environmental Cleanup Programs, the CPUC has approved $130.8 million in ECP Costs for 2019. As of the Petition Date, the Debtors estimate that approximately $39.4 million in ECP Costs owed to third parties are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

The funds collected, allocated, and distributed by the Debtors on account of the Environmental Cleanup Programs are tracked by the Debtors through regulatory "balancing accounts" or ratemaking adjustments required by the CPUC for legal ratemaking purposes. The ratemaking accounts and mechanisms which recover the costs associated with these activities include the "Hazardous Substance Mechanism's Hazardous Substance Cost Recovery Account" and the "Nuclear Decommissioning

[16] 10 CFR 50.82 and 50.75.

[17] *See* Cal. Pub. Util. Code §§ 8325-26.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Adjustment Mechanism."[18] All costs recorded in these accounts are reserved for the payment of ECP Costs as approved by the CPUC. Surplus funds remaining in the Hazardous Substance Cost Recovery Account at the end of the year are either rolled over and allocated to Environmental Cleanup Programs for the next fiscal year or refunded to Customers through rate adjustments.

### D. The Third-Party Programs.

#### 1. The Third-Party Programs Described

Under programs authorized by statute and CPUC decisions, the Debtors act as servicing and billing agents to third parties (*e.g.*, private utility providers) that sell electricity or natural gas directly to retail customers using the Debtors' transmission and distribution facilities.[19] Under such arrangements, the Debtors send invoices to, and collect money from, Customers on behalf of the third parties and then remit such payments to the third parties.

The programs under which such third parties provide this electricity or natural gas are known as Community Choice Aggregation, Direct Access, and Core Gas Aggregation. The third-party entities providing service under these programs are known as Community Choice Aggregators ("**CCAs**"), Energy Service Providers ("**ESPs**"), and Core Transport Agents ("**CTAs**"), respectively. In addition, the Debtors act as billing agent for the California Department of Water Resources ("**DWR**"), which has purchased energy on behalf of Customers and recovers financing costs from Customers using the Debtors' billing system and other facilities. The Third-Party Programs that deliver electricity serve over 3 million customers and are anticipated to account for approximately 40% of the electricity load in the Debtors' territory.

#### 2. Funding and Costs of the Third-Party Programs

The Debtors receive fees and revenues from Customers of the third parties to reimburse the Debtors for their costs of delivering the electricity and natural gas over the Debtors' utility transmission

[18] PG&E's Electric Preliminary Statement Part S (Hazardous Substance Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_S%20(Prelim).pdf.; and PG&E's Electric Preliminary Statement DB (Nuclear Decommissioning Adjustment Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_DB.pdf.

[19] Such statutes include Cal. Pub. Util. Code §§ 365.1 and 366 (direct access), 366.2 (community choice aggregation), and Cal. Water Code § 80110a.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 25 of 38

and distribution system and for acting as servicing and billing agent. In addition to amounts owed to the Debtors from such Customers, the Debtors also collect from such Customers amounts owed to the third parties for the electricity and natural gas supplied by the third parties (the "**TPP Funds**"). Remittance of such pass-through revenues by the Debtors to the third parties in connection with the Third-Party Programs (the "**TPP Costs**") ranges from daily to weekly. Based on historical averages, on a monthly basis the aggregate amount of the TPP Funds received by the Debtors is approximately $181.2 million. As of the Petition Date, the Debtors estimate that approximately $52.6 million in TPP Costs are payable to third parties, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

**E. The GHG Credit Programs**

**1. The GHG Credit Programs Described**

Pursuant to statutes enacted by the California Legislature and regulations issued by the California Air Resources Board,[20] California businesses that emit GHGs, such as the Debtors, are mandated to reduce their emissions of GHGs and provide credits to Customers to give them incentives to do the same. For example, the Debtors issue semi-annual California Climate Credits for electric Customers and annual California Climate Credits for natural gas Customers ("**CC Credits**"). In addition, the Debtors administer the Low Carbon Fuel Standard ("**LCFS**") credit program. Pursuant to such program, the Debtors administer and distribute point of purchase rebates to Customers who switch from a gasoline-powered vehicle to an electric vehicle ("**LCFS Credits**").

**2. Funding and Costs of the GHG Credit Programs**

Following approval by the CPUC, the projected costs associated with the CC Credits (the "**CC Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers and revenues accrued from the monetization of credits by the Debtors. The CPUC has

[20] Such statutes and regulations include Assembly Bill (AB) 32, the California Air Resources Board regulations implementing AB 32, and the Low Carbon Fuel Standard regulation issued by the California Air Resources Board. *See* California Global Warming Solutions Act of 2006, Cal. Health & Safety Code §§ 38500, *et. seq.*; Low Carbon Fuel Standard (LCFS), Cal. Code of Regs. tit. 17, §§ 95480- 95503. Decisions of the California Public Utilities Commission authorize PG&E to issue CC Credits (as defined below) to retail customers under AB 32, and also authorize PG&E to participate in the LCFS (as defined below) program and distribute LCFS Credits to customers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 26 of 38

approved approximately $443.1 million in CC Costs for the Debtors' issuance of CC Credits for 2019. The LCFS Credits provided to Customers are funded by the Debtors' monetization of LCFS credits earned by the Debtors from the ARB for their GHG compliance. The Debtors sell their LCFS credits in the open market to other GHG emitting businesses who buy them to offset their own compliance costs (the funds collected through rates and revenues from the monetization of CC Credits and LCFS credits collectively, the "**GHG Funds**" and the CC Credits and LCFS Credits provided using the GHG Funds including administrative costs, the "**GHG Costs**"). The GHG Funds are typically tracked by the Debtors through regulatory "balancing accounts" required by the CPUC for legal ratemaking purposes. As of the Petition Date, the Debtors estimate that approximately $128.9 million in GHG Costs are accrued and unpaid. The Debtors do not expect that any of such amounts will come due within thirty (30) days after the Petition Date.

**F. The Customer Support Programs**

**1. The Customer Support Programs Described**

In the ordinary course of business, the Debtors support Customers through a variety of product offerings, which provide the Debtors with additional revenue to offset and reduce the rates paid by gas and electric Customers. For example, the Debtors license and lease space on the Debtors' assets (such as towers, conduit, and fiber network), to enable Customers to install equipment to provide telecommunications services in California. If Customers request installation of or modifications to such equipment, the Debtors engage with contractors and other vendors to perform such work for the benefit of the Customers. The Debtors also support private and public sector Customers seeking sustainable solutions by acting as a general contractor for Customer projects that range from replacing heating systems for large institutional or government Customers to replacing street lights with LED lights for municipalities. The Debtors subcontract such projects to completion. In 2018, the Debtors estimate that they supported more than 100 Customers through their Customer Support Programs.

**2. Funding and Costs of the Customer Support Programs**

The subcontractors and other vendors engaged by the Debtors to complete Customer Support Program projects perform their work under work authorizations with the Debtors. The Debtors receive invoices from the subcontractor first and then invoice the Customer for the same amount plus a markup.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 27 of 38

If the Debtors do not remit payment to a subcontractor, the subcontractor may refuse to complete the project and may result in the imposition of liens by the contractor on Customer property. Such refusal could jeopardize the Customer's project, the Debtors' relationship with the Customer, any financing obtained by the Customer to fund the project and, as a result, the Debtors' revenue associated therewith. In addition, a contractor's refusal to perform could result in a breach of the Debtors' performance obligations under its agreement with the Customer. As of the Petition Date, the Debtors estimate that they owe approximately $12.7 million to contractors and vendors pursuant to the Customer Support Programs (the "**CSP Costs**"), and that approximately $5.3 million will come due within thirty (30) days after the Petition Date. As noted above, all of such amounts will be recovered from Customers.

## IV. BASIS FOR RELIEF REQUESTED

The operation of the Debtors' businesses requires the continuation of the Customer Programs, including the Deposit and Reimbursement Programs, the Public Purpose Programs, the Environmental Cleanup Programs, the Third-Party Programs, the GHG Credit Programs, and the Customer Support Programs during these Chapter 11 Cases. As set forth above, a substantial portion of the Customer Programs are mandated pursuant to various federal and state laws, regulations, and tariffs, and failure to continue to honor and maintain the Customer Programs could materially disrupt the Debtors' operations.

### A. The Court has Authority to Grant the Requested Relief under Sections 363(b) and 105(a) of the Bankruptcy Code

Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also FDIC v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 28 of 38

their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this District have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *See Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045 (2009).

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, the Court may authorize the Debtors to continue to honor and maintain the Customer Programs, as well as to pay any prepetition amounts owed with respect thereto, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.*), 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also Hansen v. Finn (In re Curry & Sorensen, Inc.*), 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession.").

Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 29 of 38

listing examples such as " 'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Fin. News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the Chapter 11 process").

Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain prepetition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the prepetition payments at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy Court. *B & W Enters., Inc. v. Goodman Oil Co. (In re B & W Enters., Inc.*), 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. *See, e.g., In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately' "); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.*), 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that Bankruptcy Courts have the authority to

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 30 of 38

authorize the debtor to pay certain prepetition claims in preplan stages of a reorganization).

Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain prepetition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id*. The Ninth Circuit further stated that:

> [c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Id*.

Numerous Courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain prepetition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc*. for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation"); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown"). Furthermore, several courts within this Circuit have granted relief substantially similar to that sought herein. *See, e.g., In re Laurel Fertility Care*, Case No. 14-30403-DM-11 (Bankr. N.D. Cal. May 21, 2014) (approving motion for authority to pay prepetition critical vendor); *In re Montgomery-Sansome, LP*, Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) (approving motion for authority to pay prepetition critical vendor and wage claim); *In re Sheikh Shoes, LLC,* Case No. 17-24626-VZ (Bankr. C.D. Cal. Dec. 1, 2017), ECF No. 70 (approving payment of prepetition customer program obligations); *In re Styles for Less Inc.*, Case No. 17-14396-MW (Bankr. C.D. Cal. Nov. 15, 2017), ECF No. 68 (same); *In re Cornerstone Apparel, Inc.,* Case No.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 31 of 38

17-17292-VZ (Bankr. C.D. Cal. Aug.11, 2017), ECF No. 110 (same); *In re Round Table Pizza Inc.*, Case No. 11-41431-RE (Bankr. N.D. Cal. Feb. 11, 2011), ECF No. 31 (same).

As indicated above, most of the Customer Programs are the subject of statutory or regulatory mandates. Additionally, with respect to the Public Purpose Programs and the GHG Credit Programs, California statutes and regulations mandate that all PPP Funds and GHG Funds be set aside for the express purpose of funding public interest programs and issuing credits to Customers that are designed to benefit the broader public interests. Failure to fund the Public Purpose Programs and the GHG Credit Programs with the proceeds specifically designated therefor, including payment of prepetition costs, would be in direct conflict with regulatory requirements and unwarranted under the circumstances. With respect to the Environmental Cleanup Programs, any suspension or delay in administering the Environmental Cleanup Programs is contrary to public health and welfare and may exacerbate not only existing circumstances but the ultimate costs of cleanup as well.

Failure to provide third party providers with revenue owed to them under the Third Party Programs for purchases of their electricity and natural gas would improperly interfere with their relationships with their customers and could jeopardize the continued supply of electricity and natural gas to their customers who rely on the same. With over 3 million customers serviced with electricity pursuant to the Third-Party Programs—which is anticipated to account for approximately 40% of the electricity load in the Debtors' territory in 2019—the normal and uninterrupted remittance of Customer payments through the Debtors to CCAs, ESPs, CTAs and DWR is of the utmost importance in order for such entities to meet their obligations to such customers and their suppliers, contractors, and lenders.

Failure to remit payments to contractors and other vendors in connection with the Customer Support Programs could result in the suspension of Customer projects and imposition of liens by the contractors on Customer property and jeopardize the Debtors' relationship with Customers and any financing obtained by Customers to fund their projects and, as a result, the Debtors' revenue associated therewith. In addition, a contractor's refusal to perform could result in a breach of the Debtors' performance obligations under their Customer agreements.

Furthermore, because of the unique nature and scale of their business operations, the Debtors' Customers will be particularly vulnerable to any suspension of the Debtors' obligations under the

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 32 of 38

Deposit and Reimbursement Programs, and the ripple effects of any suspension could be far reaching. If lower-income residential Customers, for example, are unable to receive their Security Deposit Refunds, they may be deprived of necessary funds and be subject to undue hardship. Customers who have budgeted for the use of the Security Deposit Refunds may be unable to meet their day-to-day financial commitments, including, for Customers who have left the utility's service area, establishing credit with another utility using the funds from their Security Deposit Refund.

Failure to pay the Customer Program Obligations will threaten the viability of the Customer Programs and undermine public confidence in the Debtors. Moreover, the Debtors' prospects for a successful reorganization will be significantly undermined if they are in violation of their statutory and regulatory mandates at the outset of their Chapter 11 Cases. Accordingly, honoring all Customer Program Obligations, including payment of Security Deposit Refunds, MLX Deposit Refunds, UG Costs, OCP Costs, PPP Costs, ECP Costs, TPP Costs, GHG Costs, and CSP Costs in the ordinary course as they come due, including all prepetition amounts, is a prudent and sound exercise of the Debtors' business judgment and should be approved.

### B. Funds Collected for the Deposit and Reimbursement Programs, Decommissioning Trusts, and Third-Party Programs Are Not Property of the Debtors' Estates

The funds collected for the Deposit and Reimbursement Programs, Decommissioning Trusts, and the Third-Party Programs are likely not property of the Debtors' estates as they are collected from third parties and held in trust for payments and obligations in connection with such programs for the benefit of ratepayers and third parties. Section 541(d) of the Bankruptcy Code provides, in relevant part, that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d).

Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the trust is statutory or constructive. *Official Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.*), 997 F.2d 1039, 1054 (3rd Cir. 1993). Courts have previously held that customer refunds and surcharge-related funds were held in trust by the debtor, and thus, were not

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 33 of 38

property of its bankruptcy estate. *Id*. at 1062. As noted above, a number of statutes and regulatory rulings require the Debtors to collect the funds in connection with the Deposit and Reimbursement Programs, Decommissioning Trusts, and Third-Party Programs and hold them in trust until final remittance to the third parties providing support and services in connection with the Deposit and Reimbursement Programs, Decommissioning Trusts, and to third party non-utilities in connection with the Third-Party Programs. Although the statutory and regulatory framework that confers "trust" status to the funds provided in connection with the Deposit and Reimbursement Programs, Decommissioning Trusts and the Third-Party Programs does not explicitly describe them as "trust funds," when a statute clearly manifests the intent that property be held in trust, the "explicit use of the word 'trust' or any other particular language, is not necessary." *Moose v. United States*, 674 F.2d 1277, 1281 (9th Cir. 1982). Finally, even in the absence of a "statutory" trust, the legislative history of section 541(d) of the Bankruptcy Code makes clear that when a debtor collects money on behalf of another, this money is held in constructive trust for the intended eventual recipient even absent any misconduct. *See* H.R. Rep. No. 95–595, 95th Cong., at 368 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6324. Finally, with respect to the Decommissioning Trusts, such funds are explicitly held in externally managed, segregated funds and are, therefore, not property of the Debtors' estates. *See In re Columbia Gas Sys. Inc.*, 997 F.2d at 1059 (finding the beneficiary, not the trustee, has equitable interest in trust property).

**C. Honoring the Security Deposit Refunds and the MLX Deposit Refunds Will Affect Only the Timing of Payments**

A significant portion of the Security Deposit Refunds and MLX Deposit Refunds owed to residential Customers may be entitled to priority status pursuant to section 507(a)(7) of the Bankruptcy Code, which provides for priority treatment for:

> allowed unsecured claims of individuals, to the extent of $2,850 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7).

Courts frequently authorize early payment of priority claims when such early payment is intended to prevent some harm or to procure some benefit for the estate. *See, e.g., In re CEI Roofing, Inc.*, 315

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 34 of 38

B.R. 50, 60-61 (Bankr. N.D. Tex. 2004) (finding that authorization of early payment of priority claims does not trigger concerns of either upsetting priority scheme of Bankruptcy Code or of unfair discrimination); *In re CoServ, L.L.C.*, 273 B.R. 487, 493-93 (Bankr. N.D. Tex. 2002) (implying that Bankruptcy Court may authorize early payment of prepetition priority claims in instances where nonpayment could impair debtor's ability to operate); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (stating that court may authorize pre-plan payment of priority claims because "[t]he need to pay these claims in an ordinary course of business time frame is simple common sense"). Furthermore, although the section 507(a)(7) priority applies in cases where services were otherwise "not delivered or provided," courts have held that the section 507(a)(7) priority is applicable with respect to security deposits, even when residential services related to the deposit commenced prior to the bankruptcy filing. *See In re Shay*, Case No. 2:12-BK-26069-RK, 2017 WL 262040, at *8 (Bankr. C.D. Cal. Jan. 18, 2017) (finding that 507(a)(7) priority existed with respect to a tenant's security deposit notwithstanding the fact that the tenant took possession of the property well before the petition date); *see also In re River Vill. Assocs.*, 161 B.R. 127, 133–34 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) (holding that the priority assigned to security deposits would be unnecessarily limited if only available for scenarios where a landlord-debtor filed for bankruptcy between the time the security deposit was paid, but before the tenant took possession of the rental premises).

To the extent the Security Deposit Refunds[21] and MLX Deposit Refunds are priority claims, they must be paid in full under any plan of reorganization (up to the statutory cap) before any of the Debtors' general unsecured obligations may be satisfied. For example, the Debtors estimate that they will need to refund, on average, approximately $250 in Security Deposits per residential Customer on a monthly

[21] In addition, certain of the Security Deposits are likely subject to recoupment by Customers. Recoupment is an equitable doctrine that permits creditors to "exempt[ ] a debt from the automatic stay when the debt is inextricably tied up in [a] post-petition claim." *Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.*), 224 F.3d 1008, 1011 (9th Cir. 2000) (*quoting United States v. Consumer Health Servs. of Am., Inc.* 108 F.3d 390, 395 (D.C. Cir. 1997)). Recoupment is available to creditors if the claims or rights giving rise to a creditor's recoupment claim arise from the "same transaction or occurrence" that give rise to a liability sought to be enforced by the bankruptcy estate. *TLC Hosps.*, 224 F.3d at 1011. As the Security Deposits were furnished to the Debtors for the specific purpose of mitigating the Debtors' risk with respect to satisfaction of their future claims against Customers, they may be subject to recoupment by creditors and the Court should authorize the Debtors to pay Security Deposit Refunds as they come due, in the ordinary course of business.

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 35 of 38

basis, well below the statutory cap. Accordingly, the proposed relief will affect only the timing such portion of payments and will not prejudice the rights of any general unsecured creditor or other party in interest. Therefore, the Court should grant the Debtors authority to issue the Security Deposit Refunds and MLX Deposit Refunds to Customers in the ordinary course.

For the foregoing reasons, authorizing the Debtors to continue to honor and perform under the Customer Programs and to pay all Customer Program Obligations, whether such obligations arose prior to or after the Petition Date, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these Chapter 11 Cases.

## V. BANKS SHOULD BE AUTHORIZED TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS REQUESTED TO PAY THE CUSTOMER PROGRAM OBLIGATIONS

The Debtors further request that the Court authorize, but not direct, banks and financial institutions (the "**Banks**") to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Customer Programs or Customer Program Obligations. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or transfer requests on account of any Customer Program Obligations dishonored or rejected as a result of the Chapter 11 Cases.

## VI. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VII. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 36 of 38

otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Here, payment of the Customer Program Obligations is necessary to avoid immediate and irreparable harm because (a) failure to make such payments may cause the Debtors to violate statutory and regulatory mandates, (b) failure to pay the Security Deposit Refunds, and MLX Deposit Refunds, may inflict a significant hardship on the Debtors' Customers, (c) failure to pay the prepetition OCP Costs, UG Costs, PPP Costs, ECP Costs, GHG Costs, and CSP Costs will threaten the viability of the UG Programs, Other Customer Programs, Public Purpose Programs, Environmental Cleanup Programs, GHG Credit Programs, and Customer Support Programs and undermine public confidence in the Debtors, and (d) failure to pay the pass-through TPP Costs will threaten the viability of certain third party entities and the continued supply of electricity and natural gas to certain customers. Accordingly, the Debtors have satisfied the requirements for immediate entry of an order granting the relief requested herein pursuant to Bankruptcy Rule 6003.

## VIII. REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## IX. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; (xi) the

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 37 of 38

Banks; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: /s/ Tobias S. Keller
Tobias S. Keller

*Proposed Attorneys for Debtors and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088 Doc# 16 Filed: 01/29/19 Entered: 01/29/19 01:19:20 Page 38 of 38