WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice* pending)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice* pending)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice* pending)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors and Debtors
in Possession*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>　　　　　　　　**Debtor.**<br><br>**Tax I.D. No. 94-3234914** | Case Nos. 19-30088 (DM)<br>　　　　　　19-30089 (DM)<br><br>Chapter 11<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507, AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE** |
| **In re:**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>　　　　　　　　**Debtor.** | |

| Tax I.D. No. 94-0742640 | **AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING AND (V) GRANTING RELATED RELIEF**<br><br>Date:<br>Time:<br>Place: |
| --- | --- |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" or the "**Borrower**"), as debtors and debtors-in-possession (collectively, "**PG&E**" or the "**Debtors**" and together with their non-Debtor subsidiaries, the "**Company**") in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**" or "**DIP Motion**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 4001-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Northern District of California (the "**Local Rules**"), for authorization to obtain $5.5 billion of secured, superpriority postpetition financing on the terms detailed herein. The Debtors also seek an interim order approving the immediate borrowing and use of $1.5 billion of financing on the terms described herein in order to enable them to continue operating their businesses between the Petition Date and a final hearing on this Motion (the "**Interim Period**").

A proposed form of order granting the relief requested herein on an interim basis (the "**Interim Order**") is attached hereto as **Exhibit A**.

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTORY STATEMENT .............................................................................. 1

CERTIFICATION .......................................................................................................... 5

MEMORANDUM AND POINTS OF AUTHORITIES ............................................. 6

    I.     Jurisdiction ................................................................................................ 8

    II.    Background ................................................................................................ 8

    III.   Overview of Proposed DIP Facilities ................................................ 8

    IV.   PG&E's Prepetition Financing ............................................................ 15

         A.    Revolving Credit Facilities ...................................................... 15

         B.    Term Loans ................................................................................. 16

         C.    Senior Notes ............................................................................... 16

         D.    Pollution Control Bonds .......................................................... 16

         E.    Trade Payables .......................................................................... 17

    V.    Background to the Proposed Postpetition Financing ..................... 17

         A.    The Debtors' Liquidity .......................................................... 17

         B.    PG&E's Marketing Process to Obtain the DIP Facilities ...... 19

         C.    The DIP Facilities ...................................................................... 22

         D.    PG&E's Immediate Need for Postpetition Financing .......... 23

    VI.   Basis for Relief Requested ................................................................... 24

         A.    The Court Should Approve the DIP Facilities Under Section 364(c) .................... 24

         B.    The Proposed Interim Order Should Be Granted ................ 27

         C.    The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e) .................. 30

         D.    The Scope of The Carve-out Is Appropriate ....................... 31

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

E.    The Automatic Stay Should Be Modified on a Limited Basis ...............................31

F.    Bankruptcy Rule 4001(a)(3) Should Be Waived ....................................................32

G.    Bankruptcy Rule 6003 Has Been Satisfied ..............................................................32

VII.  Request for Bankruptcy Rule 6004(a) and (h) Waivers .....................................32

VIII. Reservation of Rights .......................................................................................32

IX.  Notice ...................................................................................................................33

Case: 19-30088   Doc# 23   Filed: 01/29/19   Entered: 01/29/19 02:24:53   Page 4 of 42

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aeropostale, Inc.,*
Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 06, 2016).............................................31

*In re Ames Dep't Stores*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990)...............................................................25, 26, 31

*In re Breitburn Energy Partners LP, et al.,*
Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016).......................................29

*In re Capitol Station 65*, LLC,
No. 17-23627-B-11, 2018 WL 333863 (Bankr. E.D. Cal. Jan. 8, 2018) .....................26

*In re Eastman Kodak Co., et al.,*
Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) .....................................29

*In re Farmland Indus., Inc.*,
294 B.R. 855 (Bankr. W.D. Mo. 2003)........................................................................25

*In re Fleetwood Enterprises, Inc., et al.*,
Ch. 11 Case No. 09-14254-MJ (Bankr. C.D. Cal. Mar. 24, 2009) .........................28, 31

*In re Gardens Reg'l Hosp.*,
No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. July 28, 2017) ..............25, 29, 31

*In re Los Angeles Dodgers LLC*,
457 B.R. 308 (Bankr. D. Del. 2011) ............................................................................25

*In re Newzoom, Inc.*,
Case No. 15-31141 (Bankr. N.D. Cal. Oct. 15, 2015) .................................................27

*In re Rdio, Inc.*,
Case No. 15-31430 (Bankr. N.D. Cal. Dec. 10, 2015) .................................................27

*In re Reading Tube Indus.*,
72 B.R. 329 (Bankr. E.D. Pa. 1987) ............................................................................26

*In re Republic Airways Holdings Inc.*,
No. 16-10429(SHL), 2016 WL 2616717 (Bankr. S.D.N.Y. May 4, 2016) ...................25

iii

*In re Seriosa, Case No. 2:16-BK-14276-RK*,
2016 WL 3478953 (Bankr. C.D. Cal. June 20, 2016) ...................................................28

*In re Simasko Prod. Co.*,
47 B.R. 444 (D. Colo. 1985) ...................................................................................25

*In re Snowshoe Co.*,
789 F.2d 1085 (4th Cir. 1986) ...............................................................................26

*In re Sterling Mining Co.*,
No. 09-20178-TLM, 2009 WL 2514167 (Bankr. D. Idaho Aug. 14, 2009) ................25

*In re SunEdison, Inc.*,
Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) ............................29, 31

*In re The Great Atl. & Pac. Tea Co., Inc.*,

Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) ....................................29

*In re Toys ''R'' Us, Inc.*,
Case No. 17-34665 (Bankr. E.D. Va. Sep. 20, 2017) ...............................................25

**Statutes**

28 U.S.C. § 157 .............................................................................................................8

28 U.S.C. § 157(b) ........................................................................................................8

28 U.S.C. § 157(b)(2) ....................................................................................................8

28 U.S.C. § 1334 ...........................................................................................................8

28 U.S.C. § 1408 ...........................................................................................................8

28 U.S.C. § 1409 ...........................................................................................................8

28 U.S.C. § 1930(a) .....................................................................................................13

11 U.S.C. § 362 .............................................................................................................4

11 U.S.C. § 363(c) .......................................................................................................28

11 U.S.C. § 363(c)(2)(B) .............................................................................................15

11 U.S.C. § 364 ...........................................................................................................28

11 U.S.C. § 364(c) ..................................................................................................24, 25

11 U.S.C. § 364(c)(1) ...............................................................................................3, 24

iv

11 U.S.C. § 364(c)(2) ..................................................................................................3, 24

11 U.S.C. § 364(c)(3) ..................................................................................................3, 24

11 U.S.C. § 364(e) ....................................................................................................30, 31

11 U.S.C. § 365 ................................................................................................................32

11 U.S.C. § 506(c) ...........................................................................................................14

11 U.S.C. §§ 544, 545, 547, 548, 549, 553, 723(a) ........................................................15

11 U.S.C. § 552 ................................................................................................................14

11 U.S.C. § 552(b) ...........................................................................................................14

11 U.S.C. § 726(b) ...........................................................................................................13

11 U.S.C. § 1104 ..........................................................................................................2, 12

11 U.S.C. § 1107 ..............................................................................................................6

11 U.S.C. § 1108 ..............................................................................................................6

**Other Authorities**

Court's *Guidelines for Cash Collateral and Financing Stipulations* ..............................5, 14

Fed. R. Bankr. P. 1015(b) ..................................................................................................8

Fed. R. Bankr. P. 2002 .....................................................................................................33

Fed. R. Bankr. P. 4001 ......................................................................................................9

Fed. R. Bankr. P. 4001(a)(1) ...........................................................................................31

Fed. R. Bankr. P. 4001(a)(3) ......................................................................................31, 32

Fed. R. Bankr. P. 4001(b)(2) .....................................................................................28, 30

Fed. R. Bankr. P. 4001(c) ............................................................................................9, 27

Fed. R. Bankr. P. 4001(c)(1)(B) ...........................................................................9, 10, 11

Fed. R. Bankr. P. 4001(c)(1)(B)(i) ............................................................................11, 13

Fed. R. Bankr. P. 4001(c)(1)(B)(iv) .................................................................................13

Fed. R. Bankr. P. 4001(c)(1)(B)(vi) .................................................................................13

Fed. R. Bankr. P. 4001(c)(1)(B)(vii) ................................................................................13

Case: 19-30088    Doc# 23    Filed: 01/29/19    Entered: 01/29/19 02:24:53    Page 7 of 42

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

Fed. R. Bankr. P. 4001(c)(1)(B)(x) ..................................................................................14

Fed. R. Bankr. P. 4001(c)(1)(B)(xi) .................................................................................14

Fed. R. Bankr. P. 6003 ......................................................................................................32

Fed. R. Bankr. P. 6003(b) ............................................................................................30, 32

Fed. R. Bankr. P. 6004(a) ................................................................................................32

Fed. R. Bankr. P. 6004(h) ................................................................................................32

Fed. R. Bankr. P. 9024 ......................................................................................................5

Public Utilities Code § 854.2(d) .........................................................................................6

Senate Bill 901 ......................................................................................................4, 16, 17

vi

# INTRODUCTORY STATEMENT

By this Motion, PG&E requests entry of the Interim Order, as well as a Final Order (the "**Final Order**") granting, among other things, the following relief:

**(1)** **Authorization of DIP Facilities** – authorizing the Borrower to obtain postpetition financing pursuant to a senior secured, superpriority debtor-in-possession new money credit facility in an aggregate principal amount of up to $5,500,000,000 on the terms and conditions set forth in the senior secured superpriority debtor-in-possession credit, guaranty and security agreement substantially in the form attached hereto as **Exhibit B** (the "**DIP Credit Agreement**")[1], by and among the Borrower, PG&E Corp. and the other Guarantors (the "**Guarantors**"), the several banks and other financial institutions or entities from time to time party thereto as lenders or issuing lenders (collectively, the "**DIP Lenders**"), J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Bank PLC, Citibank, N.A., BNP Paribas Securities Corp., Credit Suisse Loan Funding LLC, Goldman Sachs Bank USA, MUFG Union Bank, N.A. and Wells Fargo Securities LLC, as joint lead arrangers and joint bookrunners (together and in such capacities, the "**DIP Arrangers**"), JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, and together with its successors and permitted assigns, the "**DIP Administrative Agent**" or "**JPMorgan**"), and Citibank, N.A., as collateral agent (in such capacity, and together with its successors and permitted assigns, the "**DIP Collateral Agent**", and together with the DIP Administrative Agent, the "**DIP Agents**"), which credit facility shall comprise (a) a revolving credit facility (the "**DIP Revolving Facility**"; the loans incurred thereunder, the "**DIP Revolving Loans**") with aggregate commitments of up to $3,500,000,000, including a letter of credit sub-facility in an aggregate amount of up to $1,500,000,000 (the "**DIP L/C Subfacility**"), (b) a term loan facility (the "**DIP Term Loan Facility**") in an aggregate principal amount of $1,500,000,000 (the loans incurred thereunder, the "**DIP Term Loans**") and (c) a delayed draw term loan facility in an aggregate principal amount of $500,000,000 (the "**DIP Delayed Draw Term Loan Facility**"); (the loans incurred thereunder, the "**DIP Delayed Draw Term Loans**"; the DIP Delayed Draw Term Loans together with the DIP Revolving Loans and the DIP Term Loans, the "**DIP Loans**"; the DIP Delayed Draw Term Loan Facility, together with the DIP Revolving Facility and the DIP Term Loan Facility, the "**DIP Facilities**")[2] ") and shall include the following features:

(a) <u>Interest Rates</u>: DIP Revolving Loans shall accrue interest at L+225 bps per annum and DIP Term Loans and DIP Delayed Draw Term Loans shall each accrue interest at L+250 bps per annum; default interest shall equal an additional 2% per annum;

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meaning given to them in the DIP Credit Agreement.

[2] The DIP Facilities also provide the Debtors the flexibility to obtain up to an additional $4.0 billion in incremental term loan and/or revolving commitments, subject to further approval by the Court and satisfaction or waiver of customary conditions.

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

(b)   <u>Maturity Date</u>: December 31, 2020, subject to the Borrower's option to extend the term by additional 12 months in accordance with the terms and conditions of the DIP Credit Agreement including the payment of a 25 bps extension fee on the then outstanding loans and commitments;

(c)   <u>Events of Default</u>: Material events of default include:

i.    Default in payment obligations;
ii.   Inaccuracy of representations and warranties when made or deemed made or breach of covenant;
iii.  Cross-default to other postpetition or unstayed indebtedness
iv.   Entry of unstayed judgments;
v.    Invalidity of loan documents, security interests or guarantees
vi.   Dismissal or conversion of cases to a case under chapter 7;
vii.  Appointment of a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code 1104 (other than (x) a fee examiner or (y) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code);
viii. Entry of an order (1) staying, reversing, vacating, modifying or amending the Interim Order or Final Order, (2) granting relief from stay, (3) impairing rights of Agents and Lenders or avoiding any amounts received in respect of the DIP Obligations, (4) authorizing financing or sale of substantially all assets without the repayment of DIP Loans or (5) except as permitted by the DIP Loan Documents, granting senior or pari passu liens or superpriority claims;
ix.   Filing by the Debtors or confirmation of a reorganization plan that does not require the repayment of the DIP Loans;
x.    Final Order not being entered by April 15, 2019;
xi.   Any governmental authority preventing the Debtors from conducting any material part of their business;
xii.  Loss, revocation or termination of any license, permit, lease or agreement necessary and material to Debtors' business, or the cessation of any material part of the Loan Parties' business for a material period of time; and
xiii. A material portion of the DIP Collateral, taken as a whole, shall be taken or impaired through condemnation or shall have been materially damaged, and the consideration or insurance proceeds, as applicable, received therefor shall be materially less than the fair market value thereof;

(d)   <u>Borrowing Limits</u>: The Interim Order contemplates $1.5 billion being made available under the DIP Revolving Credit Facility upon entry of the Interim Order (and the satisfaction of all other closing conditions) and the remaining $4.0 billion being made available upon entry of the Final Order (and the satisfaction of all other closing conditions);

(e)   <u>Conditions to Closing</u>: Material closing conditions include:

i.    Execution of DIP Credit Agreement;
ii.   The payment of fees and expenses set forth in the DIP Loan Documents;
iii.  The accuracy of all representations and warranties and the absence of a default or event of default;

iv.  Receipt of a valid and perfected security interest in the Collateral;

v.  Receipt of a 13-week cash flow forecast and projections through December 31, 2020;

vi.  Entry of Interim Order authorizing DIP Loans no later than five business days following the Petition Date;

vii.  Entry of all other first day orders; and

viii.  Absence of proceedings pending or, to the knowledge of the Borrower, threatened that is not stayed and that could reasonably be expected to result in a material adverse change;

**(2) Issue Guarantees** – authorizing the Guarantors[3] (together with the Borrower, the "**Loan Parties**") to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the DIP Obligations (as defined below);

**(3) Entry into DIP Loan Documents** – authorizing the Debtors to execute and deliver the DIP Credit Agreement and other documentation, including security agreements, pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, commitment letters, the Fee Letters (as defined below), and such other documentation which may be necessary or required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the DIP Administrative Agent, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Loan Documents**"); all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Loan Documents, collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

**(4) Liens and Superpriority Claims** – granting to the DIP Agents for the benefit of the DIP Lenders (collectively, the "**DIP Secured Parties**") allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens on and security interests in all DIP Collateral (as defined below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure the DIP

---

[3] As of the date hereof, only PG&E Corp. is a Guarantor under the DIP Loan Documents.

Obligations, in each case as subject to the Carve-Out set forth in the Interim Order or Final Order, as applicable;

**(5)** **<u>Payment of Fees and Expenses</u>** – authorizing the Debtors to pay all fees, costs and expenses due pursuant to the DIP Credit Agreement, the other DIP Loan Documents and the Fee Letters;

**(6)** **<u>Stay Relief</u>** – vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order or Final Order, as applicable;

**(7)** **<u>Schedule Final Hearing</u>** – scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

**(8)** **<u>Waiver of Stay</u>** – waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order or Final Order, as applicable.

In support of the relief requested herein, the Debtors submit the Declarations of Jason P. Wells in Support of First Day Motions and Related Relief (the "**Wells Declaration**") and David Kurtz in Support of Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing and (V) Granting Related Relief (the "**Kurtz Declaration**"), each filed contemporaneously herewith.

**CERTIFICATION**

The undersigned counsel for the Debtor has read the Motion; to the best of my knowledge, information, and belief, formed after reasonable inquiry, the terms of the relief sought in the Motion are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations, except as set forth herein. I understand and have advised the Debtor that the Court may grant appropriate relief under Bankruptcy Rule 9024 if the Court determines that a material element of the Motion was not adequately disclosed in the Introductory Statement.

Dated: January 29, 2019          CRAVATH, SWAINE & MOORE LLP
                                 WEIL, GOTSHAL & MANGES LLP
                                 KELLER & BENVENUTTI LLP

                                 By: /s/ *Tobias S. Keller*
                                 _____
                                 Tobias S. Keller

                                 *Proposed Attorneys for Debtors and Debtors in Possession*

## MEMORANDUM AND POINTS OF AUTHORITIES

Following a competitive marketing process, the Debtors secured a commitment from a group of lenders led by JPMorgan, Bank of America, N.A., Barclays Bank PLC, Citibank, N.A., BNP Paribas Securities Corp., Credit Suisse Loan Funding LLC, Goldman Sachs Bank USA, MUFG Union Bank, N.A. and Wells Fargo Securities, LLC to provide a $5.5 billion secured, superpriority postpetition financing facilities (the "**DIP Facilities**") that will enable the Debtors to fund their operations, develop a restructuring plan, and emerge from chapter 11, while continuing to provide safe and reliable gas and electric service to their millions of customers throughout California. By this Motion, the Debtors seek approval of the DIP Facilities. The Debtors also seek authority to access $1.5 billion of the proceeds of the DIP Facilities immediately to avoid irreparable harm to their businesses and to enable them to continue operating through the final hearing on this Motion.

PG&E initiated these Chapter 11 Cases to address extraordinary financial challenges. The Debtors face over $30 billion in potential exposure for the catastrophic wildfires that occurred in Northern California in 2017 and 2018 (the "**Wildfires**"), a figure that excludes potential punitive damages, fines and penalties and is expected to rise as additional lawsuits and claims are filed. That potential exposure has resulted in a severe deterioration of the Debtors' credit profile and liquidity position, and PG&E has drawn most available credit, leaving, as of January 29, 2019, only $35 million in aggregate undrawn commitments under their existing revolving credit facilities. In addition, recent ratings downgrades and the Company's delivery of a notice to employees pursuant to Senate Bill 901, Public Utilities Code § 854.2(d) ("**SB 901**"), "pre-announcing" the Chapter 11 Cases, have led to increased cash collateral obligations and contraction in trade terms, further deteriorating the Company's liquidity position. The Utility's liquidity was depleted by an aggregate of approximately $811 million to satisfy collateral posting needs, address accelerated payment and pre-pay demands of energy commodity suppliers, and address requests from other essential suppliers for shortened payment terms. As of the filing, Utility had cash on hand of approximately $240 million, net of customer deposits and cash held from counterparties of approximately $250 million.

On the other hand, the Debtors have a strong base of largely unencumbered assets. Accordingly, the Debtors have been able to attract substantial postpetition financing on favorable

terms.  Prior to entering into the DIP Facilities, the Debtors and their advisors engaged in a competitive marketing process that included soliciting and receiving bids from eight large financial institutions and engaging in multiple rounds of negotiations with a select group of parties submitting the most competitive bids.  In the business judgment of PG&E and its advisors, the resulting DIP Facilities represent the best credit available to the Debtors under the circumstances and the financing is in the best interests of the Debtors' estates.

PG&E and its financial advisors sized the proposed facility based on projections of PG&E's cash flow for the anticipated duration of these Chapter 11 Cases, taking into account the minimum working capital required to operate the Debtors' businesses.  PG&E and its advisors have determined that PG&E will need to access $1.5 billion of the proceeds of the DIP Facilities to enable it to operate its business in an appropriate and prudent manner through the Final Hearing.  (*See* Wells Decl. at 23.)

The DIP Facilities consist of three components:  (a) the DIP Revolving Credit Facility with aggregate commitments of $3.5 billion, including a DIP L/C Sub-Facility in an aggregate amount of $1.5 billion; (b) the DIP Term Loan Facility in an aggregate principal amount of $1.5 billion; and (c)  the DIP Delayed Draw Term Loan Facility in an aggregate principal amount of $500 million.  The DIP Facilities also provide the Debtors the flexibility to obtain up to an additional $4.0 billion in incremental term loan and/or revolving commitments, subject to further approval by the Court and satisfaction or waiver of customary conditions.

The DIP Facilities are critical to ensuring that PG&E will be able to continue providing safe and reliable gas and electric service to its millions of customers while it undergoes restructuring.  PG&E believes that it is in the best interest of all stakeholders for it to obtain the DIP Facilities.  PG&E therefore respectfully requests that the Court approve the DIP Facilities on an interim basis and permit PG&E to use up to $1.5 billion of the proceeds of the DIP Facilities as contemplated by the DIP Credit Agreement pending the Final Hearing.  This proposed postpetition financing is necessary to restore financial stability to PG&E as it undergoes reorganization and access to the interim amount is critical to avoid immediate and irreparable harm not only to the Debtors but also to the 16 million customers in the State of California who rely on the electricity and gas services provided by the Debtors.

Accordingly, PG&E respectfully requests that the relief requested herein be granted.

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

PG&E Corp. is a holding company whose primary operating subsidiary is the Utility, a public utility operating in northern and central California. The Utility provides natural gas and utility services to approximately 16 million customers in California. As of September 30, 2018, the Debtors, on a consolidated basis, had a reported book value of assets and liabilities of approximately $71.4 billion and $51.7 billion, respectively.

On the date hereof (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107 and 1108. No trustee, examiner or statutory committee of creditors has been appointed in these Chapter 11 Cases.

Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

Additional information regarding PG&E's business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the Wells Declaration, incorporated herein by reference.

## III. OVERVIEW OF PROPOSED DIP FACILITIES

The Debtors propose to enter into the DIP Facilities to fund their operations and the administration of the Debtors' Chapter 11 Cases. The DIP Facilities preserve the Debtors' operations and provide the Debtors with sufficient liquidity to fund their businesses and the administration of these cases and to pursue and consummate a successful restructuring. The DIP Facilities were negotiated in good faith and at arm's length. As discussed below and in the Kurtz Declaration, the DIP Facilities are the best postpetition financing option available to the Debtors and should be approved.

In accordance with Bankruptcy Rules 4001(c) and (d), the following table summarizes the material terms of the Interim Order and the DIP Facilities.[4]

| Material Terms | Summary | Citation |
|---|---|---|
| **Borrower** Fed. R. Bankr. P. 4001(c)(1)(B) | Pacific Gas and Electric Company (the "**Borrower**"). | *See* DIP Credit Agreement; Interim Order (preamble) |
| **Guarantors** Fed. R. Bankr. P. 4001(c)(1)(B) | PG&E Corporation, together with any of its subsidiaries (other than the Borroers) that subsequently become party to the DIP Credit Agreement (the "**Guarantors**" and, collectively with the Borrower, "**PG&E**"). | *See* DIP Credit Agreement; Interim Order (preamble) |
| **DIP Lenders** Fed. R. Bankr. P. 4001(c)(1)(B) | The several lenders from time to time party to the DIP Credit Agreement (collectively, together with the Issuing Lenders (as defined below), the "**DIP Lenders**"). JPMorgan Chase Bank, N.A., Bank of America, N.A., Barclays Bank PLC, Citibank, N.A., BNP Paribas, Credit Suisse AG, Goldman Sachs Bank USA, MUFG Union Bank, N.A. and Wells Fargo Bank, National Association, also serve as issuing lenders under the DIP L/C Sub-Facility (each, an "**Issuing Lender**"). | *See* DIP Credit Agreement; Interim Order (preamble) |
| **DIP Agents** Fed. R. Bankr. P. 4001(c)(1)(B) | JPMorgan Chase Bank, N.A. is the administrative agent (in such capacity, the "**DIP Administrative Agent**"). Citibank, N.A. is the collateral agent (in such capacity, the "**DIP Collateral Agent**" and, together with the DIP Administrative Agent, the "**DIP Agents**"). | *See* DIP Credit Agreement; Interim Order (preamble) |
| **Lead Arrangers and Bookrunners** Fed. R. Bankr. P. 4001(c)(1)(B) | J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Bank PLC, Citibank, N.A., BNP Paribas Securities Corp., Credit Suisse Loan Funding LLC, Goldman Sachs Bank USA, MUFG Union Bank, N.A. and Wells Fargo Securities, LLC. | *See* DIP Credit Agreement |
| **DIP Facilities** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Facilities provide for (a) a first lien superpriority revolving credit facility in an aggregate principal amount of $3.5 billion, which includes a $1.5 billion letter of credit sub-facility, (b) first lien superpriority term loans in an aggregate principal amount of $1.5 billion and (c) first lien superpriority delayed draw term loans in an aggregate principal amount of $500 million. | *See* DIP Credit Agreement (§ 2.1; 3); Interim Order (preamble) |
| **Borrowing Limits** Fed. R. Bankr. P. 4001(c)(1)(B) | The Interim Order contemplates $1.5 billion being made available under the DIP Revolving Credit Facility upon entry of the Interim Order (and the satisfaction of all other closing conditions) and the remaining $4.0 billion being made available upon entry of the Final Order (and the satisfaction of all other closing conditions). | *See* DIP Credit Agreement (§ 1.1); Interim Order (preamble and ¶¶ 3(d)) |

---

[4] As noted above, *see* note 1 *supra*, all capitalized terms listed in this table but not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Credit Agreement. Any summary of the terms of the Interim Order and DIP Facilities contained in this Motion is qualified in its entirety by reference to the provisions of the actual Interim Order and DIP Credit Agreement, as applicable. To the extent the Motion and the Interim Order or DIP Credit Agreement are inconsistent, the Interim Order or DIP Credit Agreement, as applicable, shall control. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 herein.

| Material Terms | Summary | Citation |
|---|---|---|
| **Incremental Availability**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Credit Agreement provides that the Borrower may seek commitments from lenders to provide, and may incur, incremental loans and commitments secured on a *pari passu* basis with the DIP Loans in an aggregate principal amount of up to $4.0 billion, subject to the terms and conditions and approval of the Bankruptcy Court. | *See* DIP Credit Agreement (§ 2.3) |
| **13-Week Forecasts**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | PG&E will provide the DIP Agents 13-week cash flow forecasts on a rolling 4-week and cumulative basis (updated at the end of each 4-week period) and monthly variance reports. | *See* DIP Credit Agreement (§ 6.2) |
| **Use of DIP Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Facilities proceeds shall be used (i) for working capital and general corporate purposes and (ii) to pay fees, costs and expenses incurred in connection with DIP Facilities and professional and other fees and costs of administration incurred in connection with the Chapter 11 Cases. | *See* DIP Credit Agreement (§ 4.12); Interim Order [¶ 6] |
| **Interest Rates**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | 1. **DIP Revolving Loans** – shall accrue interest at L+225 bps *per annum*.<br><br>2. **DIP Term Loans and DIP Delayed Draw Term Loans** – shall accrue interest at L+250 bps *per annum*.<br><br>3. **Default Interest –** additional 2% *per annum*. | *See* DIP Credit Agreement (§ 2.9) |
| **Expenses and Fees** | 1. **DIP Revolving Credit Facility Unused Fees**: 0.375% *per annum* for undrawn availability under the Revolving Credit Facility.<br><br>2. **DIP Delayed Draw Term Loan Facility Unused Fees**: (a) from (and including) the Allocation Date to (and including) the date that is 180 days after the Allocation Date, 1.25% per annum, and (b) from (and including) the date that is 181 days after the Allocation Date to (and including) the last day of the Delayed Draw Commitment Period, 2.50% per annum, in each case for undrawn Delayed Draw Term Loans.<br><br>3. **L/C Fronting Fee**: 0.125% per annum payable to the applicable Issuing Lender on the outstanding face amount of each letter of credit.<br><br>4. **L/C Participation Fee**: 2.25% *per annum* on the outstanding face amount of each letter of credit.<br><br>5. **Extension Fee**: 0.25% (12 month extension).<br><br>Other fees are set forth in the fee letters to be provided under seal to the Court and the U.S. Trustee. | *See* DIP Credit Agreement (§§ 1.1, 2.5 and 3.3) |
| **Maturity Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | December 31, 2020, subject to the Borrower's option to extend the term by additional 12 months in accordance with the terms and conditions of the DIP Credit Agreement, including the payment of a 25 bps extension fee on the then outstanding loans and unused commitments. | *See* DIP Credit Agreement (§§ 1.1, 2.5) |
| **Mandatory Prepayments** | Net cash proceeds from (i) non-ordinary course asset sales and condemnation events required to be used to prepay term loans, subject to the ability to reinvest proceeds in the business within 360 days of receipt in lieu of making such prepayment, underlined provided that (1) the first $4.0 billion of proceeds not so reinvested shall not be required to be used to prepay term loans and (2) thereafter, proceeds not so reinvested shall only be required to be used to prepay term loans once such proceeds are in excess of | *See* DIP Credit Agreement (§ 2.6(b)) |

| Material Terms | Summary | Citation |
|---|---|---|
| | $500 million or (ii) incurrence by PG&E Corp. or any of its subsidiaries of indebtedness that is not permitted to be incurred under the DIP Credit Agreement. | |
| **Collateral and Priority**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | **Collateral** – substantially all owned or hereafter acquired assets and property of the Borrower and Guarantors (the "**Collateral**").<br><br>**Priority** - the Collateral Agent shall be granted the following on the Collateral, for the benefit of the Lenders:<br><br>a) <u>**First Priority Liens**</u> - a perfected first priority security interest and lien on the Collateral to the extent such Collateral is not subject to valid, perfected and non-avoidable liens ("**First Priority Liens**"), subject to the Carve-Out and any Senior Permitted Liens;<br><br>b) <u>**Junior Liens**</u> – a junior perfected security interest and lien on the Collateral to the extent such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties that were in existence on the the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence on the Petition Date that were perfected subsequent to the Petition Date ("**Junior Liens**", collectively with the First Priority Liens, the "**DIP Liens**"), subject to such valid liens, the Carve-Out and any Senior Permitted Liens; and<br><br>d) <u>**Superpriority Expense Claims**</u> – superpriority administrative expense claims in the Chapter 11 Cases of the Debtors ("**Superpriority Expense Claims**"), subject to the Carve-Out. | *See* DIP Credit Agreement ((§ 2.19); Interim Order, ¶ 3, 4 |
| **Conditions to Closing**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Material closing conditions include:<br><br>• Execution of DIP Credit Agreement<br><br>• The payment of fees and expenses set forth in the DIP Loan Documents<br><br>• The accuracy of all representations and warranties and the absence of a default or event of default<br><br>• Receipt of a valid and perfected security interest in the Collateral<br><br>• Receipt of a 13-week cash flow forecast and projections through December 31, 2020<br><br>• Entry of Interim Order authorizing DIP Loans no later than five business days following the Petition Date<br><br>• Entry of all other first day orders<br><br>• Absence of proceedings pending or, to the knowledge of the Borrower, threatened that is not publicly disclosed, that is not stayed and that could reasonably be expected to result in a material adverse change | *See* DIP Credit Agreement (§ 5.1) |
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Material events of default include:<br><br>• Payment default<br><br>• Inaccuracy of representations and warranties when made or deemed made | *See* DIP Credit Agreement (§ 8) |

| Material Terms | Summary | Citation |
|---|---|---|
| | • Breach of covenant | |
| | • Cross-default to postpetition or unstayed indebtedness in excess of $200M | |
| | • Certain ERISA events rising to a material adverse effect | |
| | • Entry of unstayed judgments in excess of $200M | |
| | • Invalidity of loan documents, security interests or guarantees | |
| | • Dismissal of cases or conversion thereof to cases under chapter 7 | |
| | • Appointment of a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 | |
| | • Entry of an order: | |
| |    • Staying, reversing, vacating, modifying or amending the interim or final order in a manner adverse to the lenders | |
| |    • Granting relief from any stay allowing third party to proceed to foreclosure against assets in excess of $250M | |
| |    • Authorizing liens or administrative expense claims having a priority senior to or pari passu with those in favor of the DIP Obligations | |
| |    • Impairing any material rights and remedies of the lenders, impairing the liens securing the DIP Obligations or impairing the DIP Obligations themselves | |
| | • Any debtor taking action to (or failing to take action to oppose any action by a third party to) impair material rights and remedies of the lenders or impair the liens securing the DIP Obligations or impairing the DIP Obligations themselves | |
| | • Final Order not being entered prior to April 15, 2019 | |
| | • Material noncompliance with the terms of the Interim Order or the Final Order | |
| | • Action by the Debtors or their subsidiaries against the lenders regarding the DIP Loan Documents | |
| | • Filing by the Debtors of, or the entry of an order approving, a reorganization plan or a sale of substantially all assets under Section 363 that does not provide for the repayment of the DIP Loans | |
| | • Change of control | |
| | • Any governmental authority shall prevent the Debtors from conducting any material part of their business, with such prevention rising to a material adverse effect | |
| | • Loss of any license, permit, lease or agreement necessary and material to Debtors' business, or the cessation of any | |

| Material Terms | Summary | Citation |
|---|---|---|
| | material part of the Debtors' business for a material period of time<br><br>• A material portion of the DIP Collateral is taken through condemnation or materially damaged and the Debtors' receive materially less than fair market value in consideration or insurance proceeds | |
| **Milestones**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | No milestones related to assets sales or a plan of reorganization. | N/A |
| **Waiver or Modification of the Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay shall be modified as necessary to permit the granting of DIP Liens and to incur all DIP Obligations under the DIP Loan Documents and to authorize the DIP Agents to retain and apply payments and to exercise the rights and remedies set forth in the Interim Order or Final Order, as applicable. | *See* Interim Order ¶¶ 6, 14. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | The Interim Order is sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted in the Interim Order or the Final Order, as applicable. | *See* Interim Order ¶¶ 3, 4 |
| **Carve-Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | The DIP Liens and the DIP Superpriority Claim shall be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall comprise the following: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $100,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) all accrued and unpaid fees, costs and expenses (the "**Estate Professional Fees**") incurred by persons or firms retained by the Debtors (including for the avoidance of doubt, Cravath, Swaine & Moore LLP and Weil Gotshal & Manges LLP) or any Committee, if any, pursuant to sections 327, 328, 330, 363 or 1103 of the Bankruptcy Code (collectively, "**Estate Professionals**") (x) at any time before or on the day of delivery by the DIP Agents of a Carve-Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, and (y) after the date (the "**Trigger Date**") on which the DIP Agents provide written notice stating that such notice is a "Carve-Out Trigger Notice" (the "**Carve-Out Trigger Notice**") that a DIP Termination Event has occurred and has triggered the Carve-Out, to the extent allowed at any time, the payment of any Estate Professional Fees of Estate Professionals in an amount not exceeding $25,000,000 in the aggregate incurred after the Trigger Date (the "**Post-Carve-Out Trigger Notice Cap**"). | *See* Interim Order ¶ 10 |
| **Liens on Avoidance Actions** | Collateral will include proceeds of causes of action arising under Chapter 5 of the Bankruptcy Code. | *See* DIP Credit Agreement (§ 11.1), Interim Order ¶ 5 |

| Material Terms | Summary | Citation |
|---|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | | |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) | Upon entry of the Final Order, no costs or expenses which have been or may be incurred in the Cases at any time shall be charged against the DIP Administrative Agent, the DIP Lenders, the DIP Obligations or the DIP Collateral. | *See* Interim Order ¶ 23 |

Certain of the terms of the DIP Facilities are terms that are identified in the Court's *Guidelines for Cash Collateral and Financing Stipulations* (the "**Guidelines**") as provisions that the Court will not ordinarily approve. For the reasons set forth herein, the Debtors submit that such terms are necessary and appropriate in the circumstances of this case because the Lead Arrangers insisted on these provisions in return for extending $5.5 billion of credit on favorable pricing and other terms.

| | Guidelines Provision | DIP Facilities Description |
|---|---|---|
| 1 | Cross-collateralization clauses, *i.e.*, clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law. *See* Bankruptcy Code § 552. | None. |
| 2 | "Roll-ups," *i.e.*, such as provisions deeming pre-petition debt to be post-petition debt or using post-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt, other than as provided in Bankruptcy Code § 552(b), which deals with security interests in proceeds and profits. | None. |
| 3 | Provisions or findings of fact that bind the estate or all parties-in-interest with respect to the validity, perfection or amount of the prepetition secured party's lien or debt. | None. |
| 4 | Provisions or findings of fact that bind the estate or all parties-in-interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation (This would include, for example, an order approving a stipulation providing that the secured party's lien is a "first priority" lien). | None. |
| 5 | Waivers of, or grants of lien on, rights under Bankruptcy Code §506(c), unless the waiver or grant is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. (Otherwise a future trustee might be faced with a duty to care for and preserve collateral in the trustee's possession and no financial means for discharging that duty). | Paragraph 23 of the Interim Order provides that, upon entry of the Final Order, PG&E will waive its right to surcharge the DIP Secured Parties for administrative costs or expenses. |
| 6 | Provisions that operate, as a practical matter, to divest the debtor in possession or trustee of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law. | Section 8(n) of the DIP Credit Agreement provides that it is an "Event of Default" under the DIP Credit Agreement if Debtors file a Chapter 11 plan other than an "Acceptable Plan", defined in part as a Chapter 11 plan that does not provide for the indefeasible payment in full in cash of the DIP Obligations. |

| | Guidelines Provision | DIP Facilities Description |
|---|---|---|
| 7 | Releases of, or limitations on, liability for the creditor's alleged prepetition torts or breaches of contract. | None. |
| 8 | Waivers of, or liens on any of the estate's rights arising under Bankruptcy Code §§ 544, 545, 547, 548, 549, 553, 723(a), or 724(a), or the proceeds of any such rights. | Section 11.1 of the DIP Credit Agreement and paragraph 5 of the Interim Order provide for the grant, following the entry of the Final Order, to the DIP Secured Parties of DIP Liens on all proceeds of claims or causes of action arising under Chapter 5 of the Bankruptcy Code. |
| 9 | Automatic relief from the automatic stay upon default, conversion to Chapter 7, or appointment of a trustee. | Paragraph 18 of the Interim Order provides that the DIP Secured Parties are entitled to automatic relief from the automatic stay after the occurrence of a DIP Termination Event and a seven day Remedies Notice Period. During the Remedies Notice Period, the Debtors and other parties in interest may challenge such Dip Termination Event. |
| 10 | Waivers and modifications of the procedural requirements for foreclosure mandated under applicable non-bankruptcy law. | None. |
| 11 | Waivers or limitations, effective on default or expiration, of the debtor in possession's or trustee's right to move for a court order pursuant to Bankruptcy Code § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent. | None. |
| 12 | Findings of fact on matters extraneous to the approval process. (For example, in connection with an application to borrow on a secured basis, a finding that the debtor cannot obtain unsecured credit would be acceptable if supported by competent evidence, whereas a "finding" that the lender acted in good faith in declaring the prepetition loan in default would not be acceptable). | None. |
| 13 | Provisions providing unreasonable treatment with respect to fees or professionals retained by a creditors' committee compared to any carve-outs provided for professionals retained by the debtor in possession or trustee. | None. |
| 14 | Provisions that provide an inadequate carve-out for a subsequently appointed trustee in the case, whether before or after conversion. | Paragraph 10 of the Interim Order provides for a carve-out of $100,000 for a subsequently appointed trustee. |

## IV. PG&E'S PREPETITION FINANCING

PG&E's prepetition financing consists entirely of unsecured debt. (*See* Wells Decl. at 9-11.) As described in more detail below, PG&E's unsecured debt (not including any potential liabilities associated with the Wildfires) consists of revolving credit facilities, term loans, senior notes, pollution control bonds, and trade payables.

### A. Revolving Credit Facilities

Each of PG&E Corp. and the Utility is party to a separate revolving credit agreement with Bank of America, N.A., and Citibank, N.A., respectively, as administrative agents (collectively the

"**Revolving Credit Facilities**").  The Revolving Credit Facilities permit borrowing by PG&E Corp. up to aggregate principal amount of $300 million and by the Utility up to an aggregate principal amount of $3 billion.  (Wells Decl. at 9-10.)  On November 13, 2018, PG&E Corp. and the Utility drew all amounts available under their respective Revolving Credit Facilities to assure access to additional liquidity.  (*Id*. at 18)  As of January 29, 2019, PG&E Corp. and the Utility collectively had only about $35 million of aggregate undrawn commitments under the two Revolving Credit Facilities.

All obligations under the Revolving Credit Facilities are unsecured.  In addition, the obligations under the Utility's Revolving Credit Facility are not guaranteed by PG&E Corp. and the obligations under PG&E Corp.'s Revolving Credit Facility are not guaranteed by the Utility.  (*Id.* at 10.)

**B.    Term Loans**

The Debtors are also parties to unsecured term loans.  PG&E Corp. has an outstanding unsecured term loan in the principal amount of $350 million that matures on April 16, 2020.  The Utility has an outstanding unsecured term loan in the principal amount of $250 million that matures on February 22, 2019.  (*Id.*)

**C.    Senior Notes**

The Utility has outstanding various issues of senior notes (the "**Senior Notes**") with varying interest rates and maturities ranging from 2020 to 2047, in the aggregate outstanding principal amount of approximately $17.5 billion.  The Senior Notes are unsecured obligations of the Utility and are not guaranteed by PG&E Corp.  (*Id*.)

**D.    Pollution Control Bonds**

The Utility is also obligated with respect to government-issued pollution control bonds. Specifically, the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank have issued various series of fixed-rate and multi-modal tax-exempt pollution control bonds for the benefit of the Utility in the aggregate outstanding principal amount of approximately $860 million.  Approximately $760 million in principal amount of such pollution control bonds are backed by letters of credit.  The obligations under the reimbursement agreements

entered into by the Utility in connection with the issuance of the letters of credit are unsecured obligations of the Utility and are not guaranteed by PG&E Corp.  (*Id.* at 11.)

### E. Trade Payables

As of the Petition Date, PG&E's outstanding trade payables totaled approximately $2.1 billion.

## V. BACKGROUND TO THE PROPOSED POSTPETITION FINANCING

### A. The Debtors' Liquidity

As described in the Wells Declaration, PG&E's potential liability with respect to the Wildfires has resulted in a severe deterioration of the Debtors' credit profile and liquidity position.  (*See* Wells Decl. at 11-16 (describing the Wildfires and potential liabilities), *id.* 18-19 (describing the deterioration of the Debtors' credit profile and liquidity position.)  During 2018 and 2019, the Debtors' credit ratings were subject to multiple downgrades by the credit agencies, and are currently related below "investment grade" by all three major rating agencies.  (*Id.* at 18-19.)  On November 13, 2018, PG&E Corp. and the Utility drew all amounts available under their respective Revolving Credit Facilities to ensure access to additional liquidity.  (*Id*. at 18.)

In recent weeks, there has been significant further deterioration of the Debtors' liquidity position.  On January 7 and 10, 2019, the Debtors' credit rating was downgraded further, triggering a requirement that PG&E post substantial cash collateral in connection with its power purchase and other supply arrangements.  (*Id.* at 18.)  Other requests for cash collateral have been made by third parties, including the California State Division of Workers' Compensation, and in connection with State environmental remediation projects.  (*Id*.)  The Debtors' credit profile has further deteriorated due to potential impending defaults under the agreements governing PG&E's existing funded debt and a significant contraction in customary trade terms.  (*Id*.)  In addition, recent developments in ongoing government investigations and enforcement actions also have negatively affected PG&E's liquidity position.  (*Id*.)

To preserve liquidity, on January 15, 2019, PG&E did not make the interest payment of approximately $21.6 million with respect to its outstanding 5.40% of Senior Notes due January 15, 2040.  (*Id.* at 19.)

Such deterioration was further exacerbated by the Company's notice to employees on January 14, pursuant to SB 901, that PG&E Corp. and the Utility intended to make a voluntary filing under Chapter 11 on or about the Petition Date. Such intention was announced publicly by PG&E Corp. and the Utility on a Current Report on Form 8-K on the same day. The legal obligation to "pre-announce" its bankruptcy filing led to a further contraction of trade terms, placing additional pressure on the Company and its liquidity position. (*Id.* at 21.)

As detailed in the Wells Declaration, the Debtors' liquidity position has deteriorated to the point that, absent significant additional financing, the Debtors will not be able to continue to operate. As of the Petition Date, PG&E Corp. had approximately $370 million of cash on hand, which the Debtors believe is sufficient for PG&E Corp. to meet its obligations during the course of the Chapter 11 Cases. As reported in the January 14, 2018 Form 8-K filed with the Securities and Exchange Commission, the Utility had approximately $1.1 billion in cash on hand as of that date. However, starting in early January 2019, as a consequence of supplier uncertainty, media speculation, credit downgrades, and reactions to the SB-901 15-day notice, the Utility's liquidity was depleted by an aggregate of approximately $811 million to satisfy collateral posting needs, address accelerated payment and pre-pay demands of energy commodity suppliers, and address requests from other essential suppliers for shortened payment terms. As of the filing, the Utility had cash on hand of approximately $240 million, net of customer deposits and cash held from counterparties of approximately $250 million. PG&E Corp. had approximately $370 million cash on hand as of the Petition Date. (*See id.* at 22-23.)

In light of its deteriorating liquidity position, PG&E and its advisors explored the Company's options for obtaining new financing. PG&E determined that, although it could access a significant amount of capital outside of chapter 11, it could only access secured indebtedness or more esoteric forms of alternative capital that would be relatively dilutive or expensive to temporarily extend its liquidity runway. (*Id.* at 5.) PG&E concluded that that alternative was not a solution to the fundamental issues facing PG&E, nor was it in the best interest of PG&E's stakeholders, including wildfire claimants (who could face subordination of their claims in those circumstances), and was not

1  a feasible way to address and resolve the thousands of wildfire claims and to assure PG&E would have

2  the liquidity necessary to sustain ongoing operations.  (*Id.*)

3  Additionally, during this time, PG&E was in regular communication with government

4  officials, regulators and representatives, seeking a potential legislative or regulatory solutions to its

5  financial and liquidity situation.  (*See id.* at 5-6.)  SB 901, which was enacted by the California

6  legislature in September 2018, addressed a portion of the liabilities PG&E faced in connection with

7  the 2017 Wildfires.  That legislation, however, expressly excluded any similar relief for wildfires

8  occurring in 2018.  (*Id; see also id.* at 17.)  Since the 2018 wildfire (the **"Camp Fire"**) and in view of

9  PG&E's potential liabilities relating to the Camp Fire, PG&E has been in regular contact with the

10  California Public Utilities Commission ("**CPUC**") and representatives of the Governor's office, and

11  has fully apprised those parties as to PG&E's financial condition and its projected liquidity profile.

12  As of the date hereof, there is no prospect of legislation being enacted on a timely basis, if at all, to

13  implement the extraordinary measures necessary to stabilize PG&E's financial condition and avoid

14  the necessity of seeking relief under chapter 11.  (*See id.* at 6.)

15  **B.      PG&E's Marketing Process to Obtain the DIP Facilities**

16  Leading up to the Petition Date, the Debtors, with the assistance of experienced financial

17  advisors at Lazard Frères & Co. LLC ("**Lazard**"), engaged in a thorough and competitive marketing

18  process to obtain postpetition DIP financing.

19  In consultation with their financial advisors, the Debtors sized the $5.5 billion DIP Facilities

20  by assessing PG&E's projected cash needs for the anticipated duration of the chapter 11 proceedings.

21  (*See* Wells Decl. at 21-22; Kurtz Decl. ¶ 9.)  The Debtors project capital spending to exceed cash flow

22  from operations by approximately $1.6 billion in each of 2019 and 2020 largely driven by projected

23  capital spending of $6.6 billion in 2019 and $6.9 billion in 2020, as well as other investing activities

24  of more than $300 million forecasted for 2019 and more than $125 million for 2020. This forecasted

25  level of capital spending is in-line with historical capital spending of $5.8 billion in 2017 and $6.6

26  billion in 2018.  Due to the regulated nature of the Utility's businesses, only a small fraction of the

27  capital spending program is discretionary.   Cash flow from operations is forecasted to be $5.3 billion

28  in 2019 and $5.5 billion in 2020. This creates an aggregate operating cash flow deficit after capital

expenditures of nearly $3.2 billion over the two-year forecast period which PG&E must finance externally. (Wells Decl. at 21-22.)

In addition to the combined operating deficit of $3.2 billion mentioned above, the Debtors need additional funding to service the DIP Financing and pay related costs. Furthermore, the Debtors' advisors have projected that the Debtors will need to post additional collateral in 2019 of approximately $500 million to meet, among other things, environmental and other state requirements. The DIP Financing sizing also incorporates projected professional fees for estate-paid professionals to be paid during the pendency of the Chapter 11 Cases. (*Id.* at 22.)

PG&E's primary strategic considerations when marketing the financing opportunity were the identification of an economical and reliable source of financing that would (i) support PG&E's need for a sizeable loan to provide for general working capital, (ii) provide substantial revolving credit capacity (including a letter of credit facility), and (iii) provide the Company with operational and financial flexibility and time to pursue a holistic restructuring strategy to address wildfire claim resolution and other critical imperatives, and (iv) to secure committed financing at the most favorable terms to limit the debt service cost during these Cases. (Kurtz Decl. ¶ 8.) Given the size of the required financing, the Company's cash flow profile, desired flexibility to use letters of credit to secure significant collateral posting requirements, and to minimize the debt service cost of the overall financing, the Debtors sought to obtain DIP financing comprised of a $3.5 billion revolving credit facility and $2 billion of term loan debt. (*Id.* ¶ 10.)

PG&E's marketing process involved multiple rounds of bidding and was conducted at arm's length and in good faith. With the assistance of Lazard, PG&E initially contacted eight major money center banks (together, the "**Potential Lenders**"). Each of the eight Potential Lenders signed a non-disclosure agreement ("**NDA**"). (*Id.* ¶ 11.)

The Debtors and Lazard met with each of the Potential Lenders on January 9 and 10, 2019, in individual meetings and presented them with information to enable them to fully evaluate the DIP financing request, as well as an initial DIP financing term sheet describing the framework for the potential financing. (*See id.* ¶ 12.) Subsequently, Lazard provided the Potential Lenders with access to the Debtors' virtual data room for lender diligence, and the Debtors and their advisors engaged in

multiple due diligence conversations with the Potential Lenders. (*Id.* ¶ 13.) Between January 10 and 12, 2019, each of the eight Potential Lenders submitted initial, non-binding term sheets, and all but one provided a "highly confident letter" in response to the Company's request indicating the Potential Lender's belief that the Company could successfully obtain $5.5 billion of DIP financing. (*Id.*)

The Debtors and Lazard evaluated the initial proposals side-by-side to compare terms and conditions. In evaluating the proposals, the Debtors and Lazard considered each Potential Lender's indicative proposed economics, ability to fully commit and underwrite the entire facility if needed, financing structure, perceived deal risk, market flex and proposed covenants, among other factors. (*Id.* ¶ 14.) Of the eight proposals, four offered a full 100% underwriting and four offered to provide only a portion of the requested DIP facilities. (*Id.*)

Following this review, Lazard circulated a second round counter proposal to Potential Lenders on January 13, 2019, and explained that to be considered in Round 2 the Potential Lender would need to offer a fully 100% underwritten deal. Six of the Potential Lenders submitted revised proposals on Monday, January 14, 2019. The Debtors, with assistance from Lazard, then undertook similar quantitative and qualitative analyses to compare the updated proposals. (*Id.* ¶ 15.)

Based on that analysis, the Debtors determined that the revised proposal submitted by JPMorgan Chase Bank, N.A. ("**J.P. Morgan**") met each of their requirements and was the best available financing proposal. J.P. Morgan's proposal was in line with the most favorable economic terms PG&E had received, and it also offered the least restrictive covenants and the largest revolver hold position of all proposals received. (*Id.* ¶ 16.)

Accordingly, on January 15, 2019, PG&E appointed JPMorgan as the lead arranger for the DIP financing. Based on other strong and competitive offers, the Debtors chose Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Bank PLC, Citibank, N.A. (together with J.P. Morgan, the "**DIP Underwriters**"), to co-arrange and underwrite the DIP facilities, on the condition that all of these underwriters likewise agreed to the same level of revolver commitment hold position as J.P. Morgan and otherwise agreed to the other terms and conditions of the final J.P. Morgan proposal. (*Id.* ¶ 17.) Between January 15 and January 21, 2019, the Debtors, with the assistance of Lazard, counsel

and other advisors, negotiated the terms of the DIP Facilities' commitment papers. The negotiations were conducted at arm's length and were extensive and vigorous. (*Id.*)

During the marketing process and in the weeks leading up to the Petition Date, the Debtors received several additional inquiries from various lending sources. The Debtors and Lazard investigated those inquiries on behalf of the Debtors and explored whether such institutions would be willing to provide financing on more competitive terms than those being negotiated with the DIP Underwriters. Only one alternative lender offered to provide a term loan facility on competitive terms, but it was unable to provide revolving credit in a similar structure and on terms similar to the DIP Underwriters' proposal. In response to this specific inquiry, the Debtors and Lazard further negotiated with J.P. Morgan and the other DIP Underwriters and were able to further improve economic terms and reduce market flex. (*Id.* ¶ 18.)

On January 21, 2019, the Debtors and the DIP Underwriters entered into a commitment letter and DIP Term Sheet for the $5.5 billion DIP Facilities. (*Id.* ¶ 19.)

## C. The DIP Facilities

Summaries of the material terms of the DIP Facilities are set forth above and in the accompanying Kurtz declaration. (*See id.* ¶ 20.) The Debtors may use the DIP Facilities for working capital and general corporate purposes, and to pay fees, costs[5] and expenses incurred in connection with the administration of these chapter 11 cases. (*Id.* ¶ 21.)

As a result of the marketing process described above, the Debtors have obtained DIP Financing on favorable terms. The DIP Facilities also provide flexibility to PG&E to use $4 billion of asset sale and condemnation proceeds for general corporate purposes; for any proceeds above the $4 billion carve-out, the Company maintains a reinvestment right of 180 days, subject to a further 180 day extension, thereby providing significant flexibility to PG&E to finance its business. Furthermore, the DIP Facilities are structured with an extension option for a third year in order to accommodate the Company in the event that the Chapter 11 Cases extend beyond the original December 2020 maturity

---

[5] Such costs may include intervenor compensation awards pursuant to California Public Utilities Code §§ 1801-1812, which require Commission jurisdictional utilities to pay the reasonable costs of an intervenor's participation if that party makes a substantial contribution to the Commission's proceedings, and which may be recovered in the Debtor's utility rates.

Case: 19-30088    Doc# 23    Filed: 01/29/19    Entered: 01/29/19 02:24:53    Page 30 of 42

[[NYLIT:2782106v40::: 01/29/2019-04:52 AM]]

1   date of the financing.  The DIP Facilities additionally provide the Company with permission to raise

2   up to $4 billion of incremental, pari passu DIP financing to fund a third year of the Chapter 11 Cases

3   or address other financing needs that result while in Chapter 11.  The DIP Facilities do not subject

4   PG&E to any milestones related to a sale or plan process, leaving the Debtors with adequate time and

5   flexibility to develop and implement a restructuring that is in the best interests of their estates.  Further,

6   the DIP Facilities contain no budget variance or other financial covenants.  (*Id.* ¶¶ 23-24.)  This

7   flexibility is especially important for PG&E, as the unpredictability of its business (including

8   fluctuating commodity prices and demand, driven by weather and other difficult to predict factors)

9   leads to significant variability in its cash flow and working capital needs.  In sum, given the DIP

10  Facilities' competitive economic terms and flexible structure, the DIP Facilities are the best financing

11  available to PG&E.  (*See id.* ¶ 30.)

12          **D.      PG&E's Immediate Need for Postpetition Financing**

13          In addition to determining the Debtors' overall financing needs for the anticipated duration of

14  the Chapter 11 Cases, PG&E and its financial advisors assessed how much liquidity PG&E would

15  require in the Interim Period between the Petition Date and the final hearing on this Motion, which

16  under the DIP Credit Agreement could occur as late as April 15, 2019.  PG&E and its advisors

17  determined, based on thirteen-week cash flow projections, that PG&E would need to draw $1.5 billion

18  in financing to enable it to continue to operate prudently during this Interim Period.  (*See* Wells Decl.

19  at 23.)  For that reason, the Debtors are requesting entry of the Interim Order, authorizing PG&E to

20  obtain credit immediately in the amount of $1.5 billion, on the terms of the DIP Loan Documents, on

21  an interim basis.

22          The Debtors would experience irreparable harm if the Interim Order approving the DIP Motion

23  is not entered.  Access to immediate financing is essential to ensure that the Utility has sufficient

24  working capital to continue operating.  Absent authority to borrow under the DIP Facilities on an

25  emergency basis, the Debtors will not be able to continue operations on a normal basis, which could

26  potentially create public safety issues due to the inability to provide services to their customers and

27  maintain safe operations, resulting in immediate and irreparable harm to the Debtors and their estates,

28

1  creditors (including wildfire claimants), employees, customers, and PG&E Corp.'s shareholders, and

2  jeopardize their ability to successfully administer these Chapter 11 Cases. (*Id.* at 22.)

3        The Debtors enter chapter 11 with only $860 million of aggregate cash. Approximately $250

4  million of that cash is comprised of customer deposits that the Debtors believe should not be used to

5  fund their operations and working capital needs. Approximately $370 million is held by PG&E Corp.

6  for its own uses. As a result, the Utility, which is the operating entity of the Debtors, has access to

7  only $240 million of cash as of the Petition Date, which is insufficient to meet operating expenses and

8  address short-term working capital needs and to have sufficient additional liquidity to address both

9  ordinary course and non-ordinary course variability in the business. (*Id.* at 22-23.) The Utility requires

10  a minimum working capital reserve of $450 million to cover the intra month timing of energy supply

11  costs. (*Id.* at 23.)

12        The Debtors evaluated, with the assistance of their advisors, the amount of funding that they

13  will require during the Interim Period. The amount was derived from a cashflow projection developed

14  from an analysis of the Debtors' receipts and disbursements (the "**13 Week Budget**," attached to the

15  Motion as **Exhibit C**). Based on that projection, the Debtors believe they need access to $1.5 billion

16  of post-petition DIP financing during the course of the Interim Period to operate their businesses in an

17  appropriate and prudent manner. (*Id.* at 23.)

18  **VI.    BASIS FOR RELIEF REQUESTED**

19       **A.    The Court Should Approve the DIP Facilities Under Section 364(c).**

20        PG&E requests authorization under section 364(c) of the Bankruptcy Code to grant the DIP

21  Lenders three types of protections: (a) superpriority administrative claims pursuant to section

22  364(c)(1) (*See* DIP Credit Agreement § 2.19(a)); (b) senior liens on PG&E's unencumbered assets

23  pursuant to section 364(c)(2) (*id.* § 2.19(b)); and (c) junior liens on PG&Es assets that are subject to a

24  lien pursuant to section 364(c)(3) (id. § 2.19(c)). PG&E has satisfied the requirements to obtain credit

25  on these terms.

26        Under section 364(c), a debtor may grant superpriority administrative claims and incur secured

27  debt if the court determines that the debtor was "unable to obtain unsecured credit allowable under

28  section 503(b)(1) . . . as an administrative expense". 11 U.S.C. § 364(c). Courts evaluating requests

for financing under section 364(c) consider whether certain factors are met, including that: (1) the proposed financing is an exercise of the debtor's sound and reasonable business judgment; (2) the financing agreement was negotiated in good faith and at arm's length; (3) no alternative financing is available on any other basis; (4) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the borrower and the proposed lender; (5) the financing is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the preservation of their estates; and (6) the financing is in the best interests of the estate and its creditors. *See In re Gardens Reg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146, at *4 (Bankr. C.D. Cal. July 28, 2017) (approving postpetition financing under § 364(c) based on these factors); *In re Sterling Mining Co.*, No. 09-20178-TLM, 2009 WL 2514167, at *3 (Bankr. D. Idaho Aug. 14, 2009); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003) (discussing factors applied by bankruptcy courts across jurisdictions). Each of these factors is satisfied here.

### 1. The DIP Facilities Reflect PG&E's Sound Business Judgment.

In evaluating proposed DIP financing under Section 364(c), courts generally defer to the business judgment of the debtor. *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *10–11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). Courts presume that debtors make financing decisions "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("The discretion to act with regard to business planning activities is at the heart of the debtor's power.") Courts will not "second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving of the decision". *In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *see also In re Simasko Prod. Co.*, 47 B.R. at 449 ("business judgments should be left to the board room and not to this Court").

Here, PG&E has exercised the utmost level of care in selecting and entering into the DIP Facilities. As explained in the Wells Declaration and the Kurtz Declaration, the PG&E Board and management engaged in extensive deliberations regarding PG&E's liquidity and financing options, in consultation with experienced legal and financial advisors. (*See* Wells Decl. at 4; Kurtz Decl. ¶ 9.)

As described in detail above and in the Kurtz Declaration, PG&E carried out a robust and competitive marketing process, reviewing competing proposals and selecting the option offering the best terms following multiple rounds of negotiations. Accordingly, the Debtors submit that the decision to enter into the DIP Facilities are the product of their sound business judgment.

2. The DIP Facilities Were Negotiated in Good Faith and at Arm's Length, Their Terms Are Fair, Reasonable and Adequate, and PG&E Could Not Obtain Credit Available on More Favorable Terms.

A debtor is not required to seek alternative financing from every possible lender before it may grant administrative expense claims or incur secured debt. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (more favorable credit unavailable where debtor contacted lenders in the "immediate geographic area" and they would not extend unsecured credit); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, the debtor need only demonstrate that it made a "reasonable effort" to obtain unsecured credit from other lenders. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (citing cases); *In re Capitol Station 65*, LLC, No. 17-23627-B-11, 2018 WL 333863, at *12 (Bankr. E.D. Cal. Jan. 8, 2018).

PG&E engaged in a competitive and thorough marketing process to obtain the most favorable postpetition financing available. PG&E's marketing process, and the negotiations of the terms of the DIP Facilities, were carried out in good faith and at arm's length through sophisticated and experienced legal and financial advisors. (*See* Kurtz Decl. ¶¶ 7-19.) Based on an evaluation of all reasonably available options, the DIP Facilities represent the best financing available to the Debtors. (*Id.* ¶ 30.)

As noted in the Wells Declaration, given PG&E's financial circumstances and credit profile, financing was not available except for secured indebtedness or alternative forms of capital that would have been be unduly expensive or dilutive. (*See* Wells Decl. at 19.) Moreover, PG&E was unable to obtain funding through a legislative, regulatory, executive or other governmental solution. (Wells Decl. at 5-6.)

Finally, as described more fully above, PG&E was unable to obtain financing without agreeing to provide the lenders with certain terms enumerated in the Guidelines. PG&E submits that approving such terms is appropriate under the circumstances because (a) the DIP Lenders were unwilling to extend $5.5 billion in credit without such terms; and (b) the terms of the DIP Facilities are otherwise

1 favorable to the Debtors and their estates. (*See* Kurtz Decl. ¶¶ 21-23.) Notably, the DIP Facilities do

2 not subject PG&E to any milestones related to a sale or plan process, and it contains no financial

3 covenants. (*See id.* ¶ 23.) Moreover, provisions similar to the enumerated terms at issue here are

4 frequently approved in this district, *see, e.g.*, *Blue Earth, Inc. et al.*, Case No. 16-30296 (Bankr. N.D.

5 Cal. Apr. 29, 2016) [Docket No. 116]; *In re Newzoom, Inc.*, Case No. 15-31141 (Bankr. N.D. Cal.

6 Oct. 15, 2015) [Docket No. 153]; *In re Rdio, Inc.*, Case No. 15-31430 (Bankr. N.D. Cal. Dec. 10,

7 2015) [Docket No. 122], and in large chapter 11 cases elsewhere, *see, e.g., In re Toys ''R'' Us, Inc.*,

8 Case No. 17-34665 (Bankr. E.D. Va. Sep. 20, 2017) [Docket No. 98].

9      For the foregoing reasons, the Debtors submit that the DIP Facilities were negotiated at arm's

10 length and in good faith, that its terms are fair, reasonable and adequate, and that the DIP Facilities

11 represent the best financing available to PG&E under the circumstances.

12             3.    <u>The DIP Facilities are Necessary, Essential and Appropriate for the</u>
13                  <u>Continued Operation of PG&E's Businesses and the Preservation of its</u>
                 <u>Estates and are in the Best Interest of the Estate and its Creditors.</u>

14      The DIP Facilities are necessary for the continued operation of the Debtors' businesses and the

15 preservation of their estates. As discussed above and in the Kurtz Declaration, the DIP Facilities were

16 sized based upon the Debtors' projected cash flow and liquidity needs for the anticipated duration of

17 these chapter 11 proceedings. (*See* Kurtz Decl. ¶ 9.) Without access to this financing, the Debtors

18 would lack sufficient liquidity to continue operating, putting at risk not only the assets of the Debtors'

19 estates but the Debtors' ability to provide electricity and natural gas to their millions of customers.

20 (Wells Decl. at 3; *see also* Kurtz Decl. ¶ 28.) Accordingly, the DIP Facilities preserve the Debtors'

21 operations and is in the best interests of the estate and its creditors.

22     **B.**    **The Proposed Interim Order Should Be Granted**

23           1.    <u>The Court Should Conduct a Preliminary Expedited Hearing</u>

24      Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain financing may not

25 be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court

26 is authorized to conduct a preliminary expedited hearing on a motion to access the DIP Facilities to

27 the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final

28 hearing. Pursuant to Bankruptcy Rule 4001(c), PG&E requests that the Court conduct an expedited

preliminary hearing on the Motion and (i) authorize the Debtors to obtain DIP Financing in order to (a) maintain and finance their ongoing operations and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (ii) schedule a Final Hearing on the relief requested herein.

Absent authorization from the Court to access the DIP Loans on an interim basis pending a Final Hearing, the Debtors and their creditors will be immediately and irreparably harmed. As set forth above, the Debtors' ability to access the DIP Facilities on the terms described herein is critical to their ability to operate their business. Accordingly, the Interim Order should be granted.

### 2. The Debtors Require Immediate Access to the DIP Facilities

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Seriosa,* Case No. 2:16-BK-14276-RK, 2016 WL 3478953, at *1 (Bankr. C.D. Cal. June 20, 2016).

The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to access $1.5 billion under the DIP Facilities, is not granted promptly after the Petition Date. As set forth in the Wells Declaration, and as further detailed above, the Debtors have an immediate need for access to financing to continue the operation of their business, meet payroll, procure energy supply and other goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' value for the benefit of all parties in interest. (*See* Wells Decl. at 22-24.)

The importance of a debtor's ability to access debtor-in-possession financing facilities to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other circuits in similar circumstances. *See, e.g., In re Fleetwood Enterprises, Inc., et al.*, Case No. 09-14254-MJ (Bankr. C.D. Cal. Mar. 31, 2009) [Docket No. 183] (approving postpetition financing and

modifying the automatic stay where, "[w]ithout the DIP Financing, the Debtors' operations would be discontinued or severely disrupted, and the Debtors would be unable to pay operating expenses, including expenses for necessary inventory and payroll, and to operate their businesses in an orderly manner, thereby severely impairing their ability to reorganize"); *In re Gardens Reg'l Hosp.*, Case No. 2:16-bk-17463-ER, 2017 WL 7101146, at *12 (Bankr. C.D. Cal. July 28, 2017); *In re Breitburn Energy Partners LP, et al.*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016) [Docket No. 73] (order approving postpetition financing on an interim basis); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [Docket No. 87] (same)*; In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (order approving postpetition financing on an interim basis); *In re Eastman Kodak Co., et al.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) [Docket No. 54] (same).

As set forth in the Wells Declaration, access to the DIP Facilities during the Interim Period would provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases. Specifically, the DIP Facility will allow the Debtors to: (a) acquire timely energy supply that is essential to the Debtors' ability to provide uninterrupted services to its customers; (b) provide the liquidity necessary to stabilize supply with other non-energy vendors including those performing critical safety, vegetation management, and wildfire restoration services; (c) fund approximately $260 million of payroll obligations coming due in the first month of the Chapter 11 Cases; (d) fund other essential payments made under first day orders; (e) fund approximately $400 million of collateral that the state has requested to backstop the Debtors' workers' compensation plans; (f) fund the administrative costs of these Chapter 11 Cases; and (g) permit the Debtors to maintain a working capital reserve of $450 million to cover the intra month timing of energy supply costs. The interim DIP funding amount would also provide a reasonable liquidity buffer to the Debtors in the event they underperform their projections, or in case unexpected fluctuations occur in energy markets causing a disruption in supply or requirements to post additional collateral, which could result in the need to access several hundred million dollars within a day's time. Furthermore, the liquidity buffer provides the Utility with the necessary resources to respond to winter storms or other emergency circumstances. (*See* Wells Decl. at 23.)

1    Moreover, ensuring that the Debtors continue to operate pending a final hearing on the DIP

2    Motion is not merely a commercial objective.  Unlike many other chapter 11 cases, here, it is especially

3    crucial that the Debtors obtain financing to continue their operations because the Debtors provide

4    energy to nearly 16 million people across 700,000 square miles in Northern and Central California.

5    Given the nature of the Debtors' businesses, any interruption of the Debtors' ability to pay vendors

6    and operate their businesses could potentially (i) cause environmental hazards or pose significant risk

7    to the environment, (ii) pose a threat to health and public safety, or (iii) compromise the  ability to

8    provide power to the California electrical grid.  (*See* Wells Decl. at 24.)

9    Accordingly, for the reasons set forth above, entry of the Interim Order is necessary to avoid

10    immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under,

11    Bankruptcy Rules 4001(b)(2) and (c)(2) as well as Bankruptcy Rule 6003(b).

12    **C.    The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

13    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans

14    extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor

15    to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides

16    that:

17    > The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt, or
18    > of a grant under this section of a priority or a lien, does not affect the
> validity of any debt so incurred, or any priority or lien so granted, to an
19    > entity that extended such credit in good faith, whether or not such entity
> knew of the pendency of the appeal, unless such authorization and the
20    > incurring of such debt, or the granting of such priority or lien, were
21    > stayed pending appeal.

22    11 U.S.C. § 364(e).

23    As explained in detail herein and in the Kurtz Declaration, the DIP Facilities are the result of

24    PG&E's reasonable and informed determination that the DIP Lenders offered the most favorable terms

25    pursuant to which PG&E could obtain postpetition financing.  All negotiations regarding the DIP

26    Facilities were conducted in good faith and on an arm's length basis.  The terms and conditions of the

27    DIP Facilities are fair and reasonable, and the proceeds of the DIP Facilities will be used only for

28    purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided

to any party to the DIP Facilities other than as described herein or set forth in the Fee Letters which the Debtors have provided to the Court and the Office of the United States Trustee, and have sought, on the date hereof, to file under seal. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

### D. The Scope of The Carve-out Is Appropriate

The DIP Liens are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties-in-interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers. Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of Court or the Office of the United States Trustee for the Northern District of California and professional fees of the Debtors and any statutory Committee appointed in these Chapter 11 Cases.

### E. The Automatic Stay Should Be Modified on a Limited Basis

The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens and, subject to a seven day notice period, permit the DIP Agents to enforce its remedies under the DIP Credit Agreement as against the Debtors. Stay modifications of this kind are ordinary and standard features for DIP financing, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g., In re Gardens Reg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. Jul. 28, 2016); *In re Fleetwood Enterprises, Inc., et al.,* Case No. 09-14254-MJ (Bankr. C.D. Cal. Apr. 1, 2009) [Docket No. 183]; *In re SunEdison, Inc.,* Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [Docket No. 87]; *In re Aeropostale, Inc.,* Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 06, 2016) [Docket No. 99].

### F. Bankruptcy Rule 4001(a)(3) Should Be Waived

The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." As explained herein, access to the DIP Facilities is essential to prevent irreparable damage to the Debtors' estates. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

### G. Bankruptcy Rule 6003 Has Been Satisfied

Bankruptcy Rule 6003(b) states that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition. The Debtors' estates would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

## VII. REQUEST FOR BANKRUPTCY RULE 6004(a) AND (h) WAIVERS

To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Wells Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor's estates. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## VIII. RESERVATION OF RIGHTS

Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim or lien against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (iii) a

waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## IX. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; and (xi) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019       CRAVATH, SWAINE & MOORE LLP
                              WEIL, GOTSHAL & MANGES LLP
                              KELLER & BENVENUTTI LLP

                    By:  /s/ *Tobias S. Keller*
                    _____
                    Tobias S. Keller

                    *Proposed Attorneys for Debtors and Debtors in Possession*