R. Alexander Pilmer (State Bar No. 166196)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: alexander.pilmer@kirkland.com

Stephen E. Hessler, P.C. (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: stephen.hessler@kirkland.com

Marc Kieselstein, P.C. (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: marc.kieselstein@kirkland.com

Attorneys for the FEDERAL MONITOR

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re:<br><br>PG&E CORPORATION, *et al.*,[1]<br><br>Debtors. | CASE NO. 19-30088<br><br>(Joint Administration Requested)<br><br>**STATEMENT OF THE PACIFIC GAS AND ELECTRIC COMPANY FEDERAL MONITOR REGARDING SCOPE AND CONTINUATION OF MANDATE**<br><br>Judge: Honorable Dennis Montali |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are PG&E Corporation [4914] and Pacific Gas and Electric Company [2640]. The location of the Debtors' corporate headquarters is 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.

## I. INTRODUCTION

1. As described in more detail below, on January 26, 2017, the United States District Court for the Northern District of California (the "District Court") appointed a monitor (the "Federal Monitor") as a condition of the Pacific Gas and Electric Company's ("PG&E") probationary sentence for its criminal convictions in the wake of a 2010 gas pipeline explosion.

2. Consistent with the Bankruptcy Code's hallmarks of transparency and coordination, the Federal Monitor submits this summary statement to assist the Court and all stakeholders in understanding the Federal Monitor's mandate, the circumstances giving rise to his appointment, and the manner in which the Federal Monitor intends to continue to fulfill that mandate throughout these chapter 11 cases.

## II. BACKGROUND

2. On September 9, 2010, a natural gas pipeline owned and operated by PG&E ruptured in a residential neighborhood in San Bruno, California. The tragic explosion and fire that ensued caused eight deaths, 58 injuries, and the damage or destruction of 108 homes. Subsequently, the National Transportation and Safety Board (the "NTSB") and the California Public Utilities Commission (the "CPUC") launched investigations into, and both regulators ultimately identified deficiencies within, PG&E's gas pipeline integrity management program.

3. On April 1, 2014, PG&E was indicted on criminal charges related to the investigation of the 2010 pipeline explosion and fire and also for various regulatory felonies. The United States, represented by the United States Attorney's Office for the Northern District of California (the "USAO"), charged PG&E with one count of obstructing the NTSB's investigation in violation of 18 U.S.C. § 1505 and 27 counts of violating the Natural Gas Pipeline Safety Act as set forth in 49 U.S.C. 60123.

4. On August 9, 2016, after an eight-week jury trial, PG&E was convicted on one count of obstructing the NTSB's investigation and five counts of violating the Natural Gas Pipeline Safety Act.

Case: 19-30088   Doc# 53   Filed: 01/29/19   Entered: 01/29/19 12:05:04   Page 2 of 62

5.      On January 31, 2017, the District Court entered its judgment (the "Judgment")[2] on the six counts and sentenced PG&E to five years of probation, the conditions of which included a $3 million fine, requirements to publish the details of the sentence in local and national newspapers and television commercials, 10,000 hours of community service, and a number of other requirements related to future compliance with public health and safety standards.

6.      Most relevant for present purposes, the Judgment required PG&E to retain a third-party monitor, and the District Court attached to the Judgment an order outlining the goals and scope of the monitorship (the "Monitor Order"). As set forth therein:

> The goal of the Monitorship shall be to prevent the criminal conduct with respect to gas pipeline transmission safety that gave rise to the Superseding Indictment filed in this matter. To that end . . . the Monitor's goal is to help ensure [PG&E] takes reasonable and appropriate steps to maintain the safety of the gas transmission pipeline system, performs appropriate assessment testing on gas transmission pipelines, and maintains an effective ethics and compliance program and safety related incentive program.

The Monitor Order also specified the following 15 requirements on which the Federal Monitor was ordered to focus as part of the terms of PG&E's probationary sentence:

(i)      Implementation of policies and procedures sufficient to comply with CPUC Decision 16-09-055 (effective Sept. 30, 2016) relating to the handling of safety citations and timely reporting of self-identified potential violations.

(ii)     Completion of the collection and organization of the necessary pipeline strength test records and pipeline features information for validation of the Maximum Allowable Operating Pressure for PG&E's gas transmission pipeline, consistent with the NTSB's recommendations for maintaining asset records to a "traceable, verifiable, and complete" requirement, and in accordance with CPUC Resolution L-410 (Jan. 13, 2011), Decision 11-06-017, and Decision 12-12-030.

(iii)    Confirmation of satisfactory strength testing of at least 500 miles of gas transmission pipelines in 2017 and 2018.

(iv)     Upgrading and/or retrofitting approximately 300 miles of gas transmission pipelines to accommodate in-line inspection tools in 2017 and 2018.

---

[2]      *See* Judgment in a Criminal Case, dated as of January 26, 2017 and attached hereto as **Exhibit A**, to which the Monitor Order (defined below) is attached beginning on page 6; *see also* transcript of the sentencing hearing, dated as of January 26, 2017 and attached hereto as **Exhibit B**.

Case: 19-30088    Doc# 53    Filed: 01/29/19    Entered: 01/29/19 12:05:04    Page 3 of 62

(v)     Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy 4), implementation of Integrity Management procedures that ensure where data is missing, direct the Company to use conservative, supportable assumptions as required by ASME B31.8S.

(vi)    Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy 3), completion of records search to include gas transmission pipeline historical leak data into a single database of transmission leak record data.

(vii)   Consistent with CPUC Decision 15-04-024, Appx. E at 1 (San Bruno OII Remedy 2), implementation of Integrity Management procedures sufficient to ensure that the data gathering processes, the data elements collected and reviewed, and company data sources meet the requirements of 49 CFR Part 192.917(b) and ASME B31.8S.

(viii)  Consistent with NTSB Recommendation P-11-29, implementation of Integrity Management revisions to include (1) a revised risk model, reflecting actual recent data on leaks, failures, and incidents; (2) consideration of defect and leak data for the life of each pipeline; (3) revised risk methodology to ensure assessment methods are selected for each pipeline segment; and (4) improved self-assessment that adequately measures whether the program is effectively assessing and evaluating the integrity of each covered segment.

(ix)    Implementation of policies and procedures that address threats caused by vegetation and structural encroachments on gas transmission pipelines.

(x)     Implementation of processes and procedures that for each segment of gas transmission line in High-Consequence Areas, enable PG&E to calculate the expected life of the pipe using a fracture control analysis that (1) estimates maximum flaw sizes remaining after inspections and/or strength testing; (2) estimates potential crack growth rate based on the past history of and potential pressure cycles; (3) assesses the remaining life calculations; and (4) determines appropriate methods of reassessment and frequency of reassessment of each such segment.

(xi)    Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 6), implementation of policies and procedures such that relevant data is incorporated in threat identification and assessment procedures for both covered and non-covered segments, including but not limited to potential manufacturing and construction threats, and leak data.

(xii)   Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 9), implementation of threat identification and assessment procedures such that High-Consequence Areas are prioritized consistent with 49 CFR Part 192.917(e)(3)-(4).

(xiii)  Implementation of policies designed to incorporate changed circumstances into assessment methodologies and prioritization,

including Risk Management Procedure 16 ("Threat Identification"") and TD 4810B-001 ("Changes to Integrity Management Pressure Testing Requirements for Unstable Manufacturing Threats"), consistent with ASME B31.8S.

(xiv) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 8), cessation of regularly increasing pipeline pressure up to a "system MAOP" to eliminate the need to consider manufacturing and construction threats, and analysis of segments that were subjected to the planned pressure increases to determine the risk of failure from manufacturing threats under 49 CRF Part 192.917(e)(3), including review of strength-testing of all segments identified as having an unstable manufacturing threat.

(xv) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 10), implementation of threat identification and assessment policies and procedures such that cyclic fatigue and other loading conditions are incorporated into segment-specific threat assessments and risk ranking algorithm, including review of risk management procedures for appropriate treatment of cyclic fatigue and loading.

7. With the consent of PG&E and the USAO, Mark Filip, a partner at Kirkland & Ellis LLP, was engaged as the Federal Monitor on April 11, 2017.[3] The Federal Monitor has established and continues a regular cadence of meetings, field visits, interviews, and data audits with multiple lines of business at PG&E.

8. In late 2017, following the "Wine Country" wildfires, the Federal Monitor, also started to include the review and aspect of certain aspects of PG&E's electric distribution system.[4] To be clear, the Federal Monitor's role on this front is forward-looking—the Federal Monitor has not attempted to determine the cause of any wildfires or whether any federal or state laws or regulations

---

[3] Mr. Filip previously served as Acting United States Attorney General, Deputy United States Attorney General, and United States District Court Judge for the Northern District of Illinois.

[4] *See* transcript of status conference hearing, dated as of December 7, 2017 and attached hereto as **Exhibit C**, beginning at page 8; letter from the Federal Monitor to the District Court, dated as of December 31, 2018 and attached hereto as **Exhibit D**.

have been violated, issues which are the subject of extensive, ongoing civil and governmental proceedings.

9.     Most recently, on January 9, 2019, the District Court issued an order to show cause (the "<u>Show Cause Order</u>") as to why the conditions of PG&E's probation should not be modified.[5] The modified terms proposed by the District Court in the Show Cause Order could impose on PG&E additional inspection and compliance obligations related to its electric transmission system—and add corresponding oversight and assessment obligations of the Federal Monitor.  As of the filing of this Statement, the District Court has not issued a further ruling on its Show Cause Order, with a hearing scheduled for January 30, 2019.

### III.     CONTINUATION OF MANDATE DURING THESE CHAPTER 11 CASES

10.     Pursuant to the Judgment, and in continuation of the final resolution of the criminal proceeding against PG&E, the Federal Monitor intends to fulfill his duty through the remainder of PG&E's probation (*i.e.*, at least through early 2022).  To that end, since PG&E announced it would commence these chapter 11 cases, the Federal Monitor has engaged with the USAO and PG&E—and it is the Federal Monitor's understanding that the USAO and PG&E concur with the Federal Monitor's view of this continued mandate.[6]

*[Remainder of page intentionally left blank.]*

---

[5]   *See* Order to Show Cause why PG&E's Probation Should Not be Modified, dated as of January 9, 2019 and attached hereto as **Exhibit E**.

[6]   Further to this end, counsel for the Federal Monitor also has been engaging recently with the Office of the United States Trustee for the Northern District of California.

DATED: January 29, 2019

                                        */s/ R. Alexander Pilmer*
                                        R. Alexander Pilmer

                                        R. Alexander Pilmer (State Bar No. 166196)
                                        KIRKLAND & ELLIS LLP
                                        555 California Street
                                        San Francisco, CA 94104
                                        Telephone: (415) 439-1400
                                        Facsimile: (415) 439-1500
                                        Email: alexander.pilmer@kirkland.com

                                        Stephen E. Hessler, P.C. (*pro hac vice forthcoming*)
                                        KIRKLAND & ELLIS LLP
                                        601 Lexington Avenue
                                        New York, NY 10022
                                        Telephone: (212) 446-4800
                                        Facsimile: (212) 446-4900
                                        Email: stephen.hessler@kirkland.com

                                        Marc Kieselstein, P.C. (*pro hac vice forthcoming*)
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, Illinois 60654
                                        Telephone: (312) 862-2000
                                        Facsimile: (312) 862-2200
                                        Email: marc.kieselstein@kirkland.com

                                        Attorneys for the FEDERAL MONITOR

**Exhibit A**

✎AO 245E   (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 1

# UNITED STATES DISTRICT COURT

| | | | |
|---|---|---|---|
| Northern | | District of | California |

UNITED STATES OF AMERICA
**V.**

PACIFIC GAS AND ELECTRIC COMPANY

## JUDGMENT IN A CRIMINAL CASE
(For Organizational Defendants)

CASE NUMBER:   0971 3:14CR00175-001 TEH

Steven Bauer, Sean P.J. Coyle, James Scott, Reid J. Schar,

Defendant Organization's Attorney   Kate Dyer, Benjamin William Snyder, and
Adam Shearer (Retained)

## THE DEFENDANT ORGANIZATION:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 5, 6, 7, and 8 of the Superseding Indictment.
after a plea of not guilty.

The organizational defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1505 | Obstruction of a National Transportation Safety Board Investigation | 9/30/2011 | 1 |
| 49 U.S.C. § 60123 | Natural Gas Pipeline Safety Act | 9/9/2010 | 2, 5, 6, 7, 8 |
| | | | |

The defendant organization is sentenced as provided in pages 2 through ___18___ of this judgment.

☑ The defendant organization has been found not guilty on count(s)   3, 4, and 9-12

☑ Count(s)   13   ☑ is   ☐ are  dismissed on the motion of the United States.

　　　It is ordered that the defendant organization must notify the United States attorney for this district within 30 days of any change of name, principal business address, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant organization must notify the court and United States attorney of  material changes in economic circumstances.

Defendant Organization's
Federal Employer I.D. No.:   94-0742640

Defendant Organization's Principal Business Address:

77 Beale Street, P.O. Box 770000
San Francisco, CA 94177

1/26/2017
Date of Imposition of Judgment

_Signature of Judge_

The Honorable Thelton E. Henderson   Senior U.S. District Judge
Name of Judge                                      Title of Judge

1/31/2017
Date

Defendant Organization's Mailing Address:

77 Beale Street, P.O. Box 770000
San Francisco, CA 94177

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 2 — Probation

DEFENDANT ORGANIZATION:  PACIFIC GAS AND ELECTRIC COMPANY
CASE NUMBER:   0971 3:14CR00175-001 TEH

Judgment—Page    2    of    18

## PROBATION

The defendant organization is hereby sentenced to probation for a term of :

Five (5) years. This term consists of five years on each of Counts 1, 2, 5, 6, 7, and 8, all counts to run concurrent.

The defendant organization shall not commit another federal, state or local crime.

If this judgment imposes a fine or a restitution obligation, it is a condition of probation that the defendant organization pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant organization must comply with the standard conditions that have been adopted by this court as well as with   any additional conditions on the attached page (if indicated below).

## STANDARD CONDITIONS OF SUPERVISION

1)  within thirty days from the date of this judgment, the defendant organization shall designate an official of the organization to act as the organizations's representative and to be the primary contact with the probation officer;

2)  the defendant organization shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

3)  the defendant organization shall notify the probation officer ten days prior to any change in principal business or mailing address;

4)  the defendant organization shall permit a probation officer to visit the organization at any of its operating business sites;

5)  the defendant organization shall notify the probation officer within seventy-two hours of any criminal prosecution, major civil litigation, or administrative proceeding against the organization;

6)  the defendant organization shall not dissolve, change its name, or change the name under which it does business unless this judgment and all criminal monetary penalties imposed by this court are either fully satisfied or are equally enforceable against the defendant's successors or assignees; and

7)  the defendant organization shall not waste, nor without permission of the probation officer, sell, assign, or transfer its assets.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 2B — Probation

DEFENDANT ORGANIZATION:  PACIFIC GAS AND ELECTRIC COMPANY
CASE NUMBER:  0971 3:14CR00175-001 TEH

Judgment—Page   3   of   18

# SPECIAL CONDITIONS OF SUPERVISION

1. While on probation, PG&E shall not commit another Federal, State, or local crime.

2. PG&E shall comply with the separately entered order concerning a third-party monitor (see attached order on pages 6 through 18 of the judgment).

3. Within six months of the date of the judgment, PG&E shall develop and submit to the Court an effective compliance and ethics program consistent with § 8B2.1 of the Sentencing Guidelines.  The submission shall include a schedule for implementation.  PG&E shall revise the program and file updates with the Court whenever deemed appropriate by the third-party monitor.

4. Within 60 days of the date of the judgment, PG&E shall place one full-page advertisement in both the Wall Street Journal and San Francisco Chronicle publicizing the nature of the offenses committed, the convictions, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses.

5. For three months beginning no later than 60 days after sentencing, and to the greatest extent possible replicating the same channels and air times that PG&E used before and/or during trial in this case in 2016, PG&E will air television commercials which publicize the nature of the offenses committed, the convictions, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses.  PG&E will air such commercials up to the cost of $3,000,000 less the cost of the print advertisements referred to in (4) above.  The cost of advertising does not constitute a monetary penalty. PG&E estimates that this will result in approximately 12,500 commercials of approximately 60 seconds in duration across broadcast and cable outlets over the three-month period.  PG&E will not include language regarding the conviction as part of the company's public service safety announcements, including what actions the public should take in the event of wires down, gas leaks or other emergencies, and which typically run on radio and digitally given time sensitivity, because such information could cause the public to fail to take the needed safety actions in a timely fashion.

6. PG&E shall submit to: (A) a reasonable number of regular or unannounced examinations of its books and records at appropriate business premises by the probation officer or experts engaged by the Court; and (B) interrogation of knowledgeable individuals within the organization.  Compensation to and costs of any experts engaged by the Court shall be paid by the organization.  The probation officer and any Court-engaged experts shall work with the third-party monitor to minimize duplication of efforts.

7. PG&E shall perform 10,000 hours of community service.  At least 2,000 of these hours shall be performed by high-level personnel, as defined in the commentary to § 8A1.2 of the Sentencing Guidelines.  PG&E shall provide the prospective community service workers' names and titles to the probation officer to ensure compliance with this condition.  The location and type of community service must be preapproved by the probation officer and to every extent possible be in the City of San Bruno.  The intent of this condition is to require 10,000 hours of community service that PG&E would not otherwise have done, and the probation officer shall therefore consider as part of the approval process the extent to which the proposed projects can be tied to existing service initiatives by PG&E. The community service shall be geared toward giving back to communities affected by PG&E's negligence, with special emphasis on the City of San Bruno, as directed by the probation officer.

8. PG&E shall notify the probation officer and monitor immediately upon learning of (A) any material adverse change in its business or financial condition or prospects, or (B) the commencement of any bankruptcy proceeding, major civil litigation, criminal prosecution, or administrative proceeding against the organization, or any investigation or formal inquiry by governmental authorities regarding the organization.

9. PG&E shall pay the fine and special assessment in a lump sum within 60 days of the date of this judgment.  Any fines and special assessment payment is not to be passed off to the ratepayers.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
        Sheet 3 — Criminal Monetary Penalties

DEFENDANT ORGANIZATION:  PACIFIC GAS AND ELECTRIC COMPANY
CASE NUMBER:  0971 3:14CR00175-001 TEH

Judgment — Page  4  of  18

# CRIMINAL MONETARY PENALTIES

The defendant organization must pay the following total criminal monetary penalties under the schedule of payments on Sheet 4.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 2,400.00 | $ 3,000,000.00 | None |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C)  will  be entered after such determination.

☐   The defendant organization shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant organization makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $          0.00 | $          0.00 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant organization shall pay interest on restitution or a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 4 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant organization does not have the ability to pay interest, and it is ordered that:

  ☐   the interest requirement is waived for the   ☐  fine   ☐  restitution.

  ☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 4 — Schedule of Payments

DEFENDANT ORGANIZATION:  PACIFIC GAS AND ELECTRIC COMPANY
CASE NUMBER:   0971 3:14CR00175-001 TEH

Judgment — Page   5   of   18

## SCHEDULE OF PAYMENTS

Having assessed the organization's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A** ☑ Lump sum payment of $   3,002,400.00    due immediately, balance due

        ☐ not later than _____ , or
        ☑ in accordance with    ☐ C or    ☑ D below; or

**B** ☐ Payment to begin immediately (may be combined with    ☐ C or    ☐ D below); or

**C** ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☑ Special instructions regarding the payment of criminal monetary penalties:

    Any monetary penalties shall be paid within 60 days of this judgment in a lump sum payment. Payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.

All criminal monetary penalties are made to the clerk of the court.

The defendant organization shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant organization shall pay the cost of prosecution.

☐ The defendant organization shall pay the following court cost(s):

☐ The defendant organization shall forfeit the defendant organization's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  CR-14-00175-TEH |
| v. | ) | |
| | ) | |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY  ORDERED:

### I.  Goals and Scope of the Monitorship

A.  The goal of the Monitorship shall be to prevent the criminal conduct with respect to gas

pipeline transmission safety that gave rise to the Superseding Indictment filed in this matter.

To that end, and as more directly detailed in Sections I.B. and I.C. below, the Monitor's goal

is to help ensure Pacific Gas and Electric Company ("PG&E") takes reasonable and

appropriate steps to maintain the safety of the gas transmission pipeline system, performs

appropriate assessment testing on gas transmission pipelines, and maintains an effective

ethics and compliance program and safety related incentive program.  The Monitor shall seek

to assure defendant's compliance with the goals outlined in United States Sentencing

Guidelines Section 8B2.1: Effective Compliance and Ethics Program.

B.  Since the time of the pipeline explosion in San Bruno, PG&E's gas transmission pipeline

safety programs and initiatives have been reviewed by federal and state agencies, and several

independent third parties.  As a result of those reviews, PG&E has initiated numerous

1

programs and initiatives designed to improve the safety and effectiveness of its gas
transmission pipeline system.  Those programs and initiatives are subject to the review of
PG&E's primary regulator, California Public Utilities Commission ("CPUC"), which has and
continues to conduct its own reviews and direct PG&E to take certain actions.  The Monitor
does not have authority to supplant the CPUC's authority over, or decisions related to, gas
transmission operations or pipeline safety.  Nor does the Monitor have authority to take
action that would, directly or indirectly, require PG&E to take action contrary to the
directives of its regulators.  Consistent with the CPUC's primary jurisdiction over PG&E, the
Monitor shall focus his or her review on the adequacy of PG&E's completion of and
continuing adherence to the following activities and standards:

1)   Implementation of policies and procedures sufficient to comply with CPUC
     Decision 16-09-055 (effective Sept. 30, 2016) relating to the handling of safety
     citations and timely reporting of self-identified potential violations.

2)   Completion of the collection and organization of the necessary pipeline strength
     test records and pipeline features information for validation of the Maximum
     Allowable Operating Pressure for PG&E's gas transmission pipeline, consistent
     with the NTSB's recommendations for maintaining asset records to a "traceable,
     verifiable, and complete" requirement, and in accordance with CPUC Resolution
     L-410 (Jan. 13, 2011), Decision 11-06-017, and Decision 12-12-030.

3)   Confirmation of satisfactory strength testing of at least 500 miles of gas
     transmission pipelines in 2017 and 2018.

4)   Upgrading and/or retrofitting approximately 300 miles of gas transmission
     pipelines to accommodate in-line inspection tools in 2017 and 2018.

5)   Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy
     4), implementation of Integrity Management procedures that ensure where data is
     missing, direct the Company to use conservative, supportable assumptions as
     required by ASME B31.8S.

6)   Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy
     3), completion of records search to include gas transmission pipeline historical
     leak data into a single database of transmission leak record data.

7)   Consistent with CPUC Decision 15-04-024, Appx. E at 1 (San Bruno OII Remedy
     2), implementation of Integrity Management procedures sufficient to ensure that

2

the data gathering processes, the data elements collected and reviewed, and company data sources meet the requirements of 49 CFR Part 192.917(b) and ASME B31.8S.

8) Consistent with NTSB Recommendation P-11-29, implementation of Integrity Management revisions to include (1) a revised risk model, reflecting actual recent data on leaks, failures, and incidents; (2) consideration of defect and leak data for the life of each pipeline; (3) revised risk methodology to ensure assessment methods are selected for each pipeline segment; and (4) improved self-assessment that adequately measures whether the program is effectively assessing and evaluating the integrity of each covered segment.

9) Implementation of policies and procedures that address threats caused by vegetation and structural encroachments on gas transmission pipelines.

10) Implementation of processes and procedures that for each segment of gas transmission line in High-Consequence Areas, enable PG&E to calculate the expected life of the pipe using a fracture control analysis that (1) estimates maximum flaw sizes remaining after inspections and/or strength testing; (2) estimates potential crack growth rate based on the past history of and potential pressure cycles; (3) assesses the remaining life calculations; and (4) determines appropriate methods of reassessment and frequency of reassessment of each such segment.

11) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 6), implementation of policies and procedures such that relevant data is incorporated in threat identification and assessment procedures for both covered and non-covered segments, including but not limited to potential manufacturing and construction threats, and leak data.

12) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 9), implementation of threat identification and assessment procedures such that High-Consequence Areas are prioritized consistent with 49 CFR Part 192.917(e)(3)-(4).

13) Implementation of policies designed to incorporate changed circumstances into assessment methodologies and prioritization, including Risk Management Procedure 16 ("Threat Identification") and TD 4810B-001 ("Changes to Integrity Management Pressure Testing Requirements for Unstable Manufacturing Threats"), consistent with ASME B31.8S.

14) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 8), cessation of regularly increasing pipeline pressure up to a "system MAOP" to eliminate the need to consider manufacturing and construction threats, and analysis of segments that were subjected to the planned pressure increases to determine the risk of failure from manufacturing threats under 49 CRF Part 192.917(e)(3), including review of strength-testing of all segments identified as having an unstable manufacturing threat.

3

15)     Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 10), implementation of threat identification and assessment policies and procedures such that cyclic fatigue and other loading conditions are incorporated into segment-specific threat assessments and risk ranking algorithm, including review of risk management procedures for appropriate treatment of cyclic fatigue and loading.

C. If gas transmission pipeline safety issues arise during the term of the Monitorship, PG&E shall promptly bring those issues to the attention of the Monitor.  PG&E and the Monitor shall agree to the types of gas transmission pipeline safety issues that should be brought to the attention of the Monitor, with the United States Attorney's Office for the Northern District of California (the "USAO" or "Government") resolving any disagreements on the scope of such issues.  The Monitor will review and report on the adequacy of PG&E's response to any gas transmission pipeline safety issues that arise during his or her term.

## II.   Monitor

A. Retention of Monitor:

1) *Monitor:* PG&E shall retain a monitor who shall be familiar with best practices for corporate codes of conduct, including implementation, training, and enforcement thereof (hereinafter the "Monitor").  The parties shall collaborate to identify a mutually acceptable monitor within 90 calendar days after the Court imposes sentence (the "Effective Date").  In the event the parties are unable to reach agreement on a mutually acceptable monitor, each party shall submit no more than two names to the Court and the Court shall determine the monitor.  PG&E shall retain the Monitor as soon as possible, but not later than 60 calendar days after the date the parties agree on a mutually acceptable monitor or the Court determines the monitor.  If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set forth herein, a replacement Monitor shall be chosen consistent with the procedures set forth in this paragraph.

B. Monitorship Scheduling and Compensation:

1) The monitorship shall exist for a period of five years from the date of the Monitor's retention unless terminated pursuant to paragraph D(8)(a) herein.

2) The Monitor shall be authorized to employ personnel with appropriate professional qualifications, who are reasonably necessary, to assist in the proper discharge of the Monitor's duties, as specified herein.  PG&E may offer suggestions on qualified professional personnel to assist the Monitor and the Monitor shall interview any such suggested personnel to assess their qualifications and any potential conflicts of interest.  PG&E may perform routine conflict checks on individuals or entities the Monitor proposes to engage, and within two weeks of a proposed engagement, PG&E shall advise the Monitor if any conflict exists.  Disputes regarding conflicts shall be brought, in the

5

first instance, to the USAO for resolution.  If, after consideration and direction from the

USAO, either the Monitor or PG&E believes the conflict issue has not been satisfactorily

resolved, either the Monitor or PG&E may request the Court's assistance in resolving the

conflict issue.

3)  PG&E shall pay reasonable compensation and expenses of the Monitor, and any persons

hired by the Monitor pursuant to his/her authority hereunder.  The Monitor, and any

persons hired by the monitor, shall be compensated in accordance with their hourly rates

or a reasonable fee determined by the Monitor based on applicable market rates.

4)  The Monitor shall prepare annual budgets for review by PG&E and the USAO.  The

Monitor, PG&E, and the USAO shall meet at least annually to discuss improvements on

the monitorship scope and/or cost.  PG&E may raise any concerns or issues regarding the

monitorship cost and/or annual budgets either with the Monitor or the USAO, and the

Monitor and the USAO shall give reasonable consideration to defendant's concerns or

issues.  If, after consideration and direction from the USAO, either the Monitor or PG&E

believes the monitorship cost and/or annual budget issue has not been satisfactorily

resolved, either the Monitor or PG&E may request the Court's assistance in resolving the

issue.

C.  <u>Powers of the Monitor</u>:

1)  The Monitor shall take such reasonable steps as, in the Monitor's view, may be necessary

to be fully informed with respect to the Monitor's duties.

2)  PG&E shall cooperate with the Monitor to allow the Monitor to fulfill his or her duties

under this Order, including providing the Monitor with access to all non-privileged

information, documents, records, facilities and/or employees, as reasonably requested by

the Monitor.

6

3) The Monitor shall maintain as confidential all non-public information, documents, and records it receives from PG&E, subject to the Monitor's reporting requirements herein. The Monitor shall take steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all non-public information. Within thirty (30) days after the end of the Monitor's term, the Monitor shall either return anything obtained from PG&E, or certify that such information has been destroyed.

4) To the extent that the Monitor seeks access to information that is privileged or attorney work product, PG&E shall use its best efforts to provide the Monitor with comparable information without compromising the asserted privilege or protection.

5) The Monitor may ask the Court to review *in camera* any documents the Monitor believes are necessary for him or her to review, but which PG&E has refused to provide to the Monitor based upon a claim of privilege, such as the attorney-client privilege.  The Court shall then determine whether such documents are protected by the attorney-client privilege and/or work product doctrine.

D.  Monitor's Reviews and Reports:

1) The Court may meet with the Monitor to discuss aspects of the monitorship as the Court sees fit.

2) Initial Review and Report

a.  The Monitor shall conduct an initial review and prepare an initial report.  The Monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the Monitor, unless otherwise agreed among PG&E, the Monitor, and the USAO.  After consultation with PG&E and the USAO, the Monitor shall prepare an initial written work plan, which shall be submitted to PG&E and the USAO for review and comment no fewer than 60 calendar days prior to commencing

7

the initial review.  PG&E and the USAO may provide comment no later than 30 calendar days after receipt of the initial written work plan.  The Monitor's work plan for the initial review shall set forth such steps as are reasonably necessary to conduct an effective initial review, and include a proposed budget.  In developing the work plan and in carrying out the review, the Monitor is encouraged to coordinate with PG&E. Any disputes between PG&E and the Monitor with respect to the work plan shall be brought, in the first instance, to the USAO for resolution.  If, after consideration and direction from the USAO, either the Monitor or PG&E believes the issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the issue submitted to the USAO for review and consideration. The Monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the Monitor's assessment and making recommendations consistent with the goals and scope of the monitorship as set forth in Section I above. The Monitor shall provide the initial written report to PG&E, the Probation Officer, the USAO, and the Board of Directors of PG&E.

3) Semi-Annual Reports

   a. The Monitor shall prepare reports on a semi-annual basis beginning six months after completion of the initial report setting forth the Monitor's continued assessment and making recommendations consistent with the goals and scope of the monitorship as set forth in Section I above.  The Monitor shall consult with PG&E concerning the Monitor's findings and recommendations on an ongoing basis.  The Monitor shall provide the semi-annual written reports to PG&E, the Probation Officer, the USAO and the Board of Directors of PG&E.

8

4) Final Report for Public Release

    a.  At the conclusion of the monitorship, the Monitor shall prepare a final written report for public release setting forth the Monitor's assessment of the monitorship and PG&E's compliance with the goals of the monitorship as set forth in Section I above. The Monitor and PG&E shall work together to ensure the public final written report sufficiently protects PG&E's proprietary and business confidential information and does not otherwise compromise PG&E's business interests or competitive business information. The Monitor may take whatever steps the Monitor deems appropriate to protect the confidentiality of individuals, if any, mentioned in the final written report. If disagreement exists between the Monitor and PG&E concerning which portions of the report may be made public, the Court shall make the determination regarding the content of the final version of the publicly available report.

    b.  PG&E shall have the option to file its own final public written report simultaneously with the Monitor's final public written report.

5) Potential Violation of Criminal Law

    a.  If the Monitor identifies a potential violation of the criminal law, the Monitor shall promptly report the potential violation to the Probation Office, the USAO and PG&E.

6) Defendant's Adoption of Monitor's Recommendations

    a.  To the extent the Monitor's report makes recommendations, PG&E shall begin the process of adopting all recommendations in the report within 120 calendar days after receiving the Monitor's report; provided, however, that within 30 calendar days after receiving the report, PG&E shall notify the Monitor and the USAO in writing of any recommendations that PG&E

9

considers inconsistent with applicable law or regulation or otherwise inadvisable and/or unreasonable.  Should the Monitor amend its recommendation after receiving PG&E's notice, the Monitor shall extend the time period for beginning the process of adopting the recommendation.  As to any recommendation on which PG&E and the Monitor do not agree, PG&E and the Monitor shall attempt in good faith to reach an agreement within 45 calendar days after PG&E serves the written notice.  In the event PG&E and the Monitor are unable to agree on an acceptable alternative proposal, PG&E shall promptly consult with the USAO regarding the dispute.  The USAO will submit a written opinion to PG&E and Monitor as to whether PG&E should adopt the Monitor's recommendation or an alternative proposal.  If, after receiving the written opinion from the USAO, either the Monitor or PG&E believes the issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the issue.  Pending such determination, PG&E shall not be required to begin adoption of any contested recommendation(s).  With respect to any recommendation that the Monitor determines PG&E cannot reasonably begin to adopt within 120 calendar days after receiving the USAO's written opinion or the Court's assistance, the Monitor shall extend the time period for beginning adoption of the recommendation with prior written approval of the USAO or the concurrence of the Court.

7) Extensions or Cancellation of Certain Reviews and Reports

   a. After consultation with PG&E, the Monitor may extend the time period for any review or report for up to 60 calendar days with prior written approval of the USAO.  In the event that a deadline is extended, PG&E, the Monitor, and the

10

USAO may agree to eliminate the Monitor's obligation to prepare a subsequent semi-annual review and report.

8) Early Termination of Monitorship

    a. If, reasonably promptly after completing three years of the monitorship or at any time thereafter, the Monitor or PG&E believe that PG&E's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the Monitor or PG&E may apply to the USAO for permission to forego the remaining reviews and reports. If the USAO approves, then the USAO shall make a recommendation to the Probation Officer and the Court to forego any remaining reviews and reports, and, upon approval by the Court, the engagement of the monitorship shall terminate.

    b. In no event shall the total term of the monitorship exceed the term of Probation.

9) In undertaking the assessments and reviews described in Subsection II.D of this Order, the Monitor shall formulate conclusions based on, among other things: (a) inspection of documents, including PG&E's current policies and procedures regarding compliance with the relevant gas transmission pipeline safety regulations; (b) on-site observations of PG&E's procedures at various locations; (c) meetings with PG&E employees and officers at mutually convenient times and places; (d) analyses, studies, and testing of PG&E's program with respect to gas transmission pipeline safety regulations, including results of CPUC audits; and (e) attendance at leadership governance meetings (i.e., Risk and Compliance meetings), other than during privileged portions of such meetings.

10)     Should the Monitor discover that PG&E or any PG&E employee has not complied with the gas transmission pipeline safety regulations, the Monitor shall promptly report

11

such non-compliances to PG&E's Chief Ethics and Compliance Officer and Senior Vice President, Gas Operations for further action.  The Monitor shall address in his or her reports the appropriateness of PG&E's response to all uncured non-compliances, whether previously disclosed to the USAO or not.  Further, in the event that PG&E, or any entity or person working directly with PG&E, refuses to provide information necessary for the performance of the Monitor's responsibilities and PG&E refuses to cure the failure to provide the information, the Monitor shall disclose that fact and supporting documentation to the USAO.

### III.   Successors

A.  This Order shall be applicable to PG&E during PG&E's supervision by the Monitor.

B.  In the event of a sale of the gas pipeline transmission system, assignment or transfer of all of PG&E's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to PG&E and to any successor of PG&E.

C.  The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and PG&E remains responsible for complying with all applicable federal, state and local laws, orders, and permits.  PG&E may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state, or local law.  The government does not warrant that PG&E's compliance with this Order constitutes compliance with other applicable legal requirements including but not limited to CPUC, NTSB, and PHMSA requirements.

D.  Within thirty days of this Order, PG&E shall provide written assurance to the USAO that it will not employ, retain, or otherwise be affiliated with the Monitor, or professionals

12

retained by the Monitor during the monitorship, for a period of at least one year from the

date of termination of the monitorship.


SO ORDERED this ___26th___ day of January, 2017.

UNITED STATES DISTRICT JUDGE

13

**Exhibit B**

Pages 1 - 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thelton E. Henderson, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
   VS.                          )        NO. CR 14-00175 TEH
                                )
PACIFIC GAS and ELECTRIC        )
COMPANY,                        )
                                )
            Defendants.          )
_____)

San Francisco, California
Thursday, January 26, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        BRIAN J. STRETCH
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                BY:  **HALLIE HOFFMAN**
                     **HARTLEY WEST**
                     **JEFFREY BENJAMIN SCHENK**
                     **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        LATHAM & WATKINS
                        505 Montgomery Street - Suite 1900
                        San Francisco, California  94111
                BY:  **STEVEN MARK BAUER**
                     **KATE DYER**
                     **MARGARET TOUGH**
                     **SEAN COYLE**
                     **ATTORNEYS AT LAW**

Also present:  Jill Spitalieri, Probation
Reported By:  Rhonda L. Aquilina, CSR #9956, RMR, CRR
              Official Court Reporter

```
 1   Thursday - January 26, 2017                    10:07 a.m.

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4        THE CLERK:  Calling criminal action 14-175, USA versus

 5   Pacific Gas & Electric Company.

 6      Counsel, please approach the podium and state your

 7   appearances.

 8        MS. HOFFMAN:  Good morning, Your Honor.  Hallie

 9   Hoffman.

10        MS. WEST:  Hartley West.

11        MR. SCHENK:  And Jeff Schenk for the United States.

12   Good morning.

13        MR. BAUER:  Good morning, Your Honor.  Steve Bauer,

14   Kate Dyer, and Margaret Tough, and Sean Coyle for the

15   defendant.

16        THE COURT:  Good morning.

17        PROBATION OFFICER:  Good morning, Your Honor.  Jill

18   Spitalieri for Probation.

19        THE COURT:  Okay.  Good morning.  You may stand or be

20   seated.

21      Okay.  I've now had a chance to consider all of the

22   comments made at Monday's hearing, and I also consulted with

23   our probation officer in the interim, and in addition, I have

24   reviewed a letter from the Government delivered to my chambers

25   this morning, and we'll address that in a few moments.  But I'm
```

1   now ready to impose a sentence.

2       Before I do so, let me say that a lot of the victim impact

3   statements that were filed indicated a desire for PG&E's now

4   retired leaders to be held responsible, and I want to point out

5   that the Government brought this case only against PG&E, the

6   corporation, the company, and not against any particular

7   individuals, and so this proceeding is limited to determining a

8   fair and just sentence for the company as a whole, and whether

9   any specific individuals deserve punishment is not before the

10  Court and never has been.   I just want to make that

11  clarification for the victims and anyone else who may be

12  thinking about that.

13      As I stated when we were last here, I find the crimes at

14  issue to be very serious and to pose great risk to the public

15  safety, and that's why I am going to impose the maximum

16  possible fine and maximum possible probation term allowable

17  under the law.

18      Turning to the issues that we discussed last time, I find

19  that a probation condition concerning a bonus compensation

20  program would be improper, because it's not necessary to

21  file -- to fill the goal of sentencing.   The Government

22  asserted that even if PG&E's bonus structure had improved by

23  giving a greater emphasis to safety, a 2014 explosion in Carmel

24  indicates that more must be done.   But nothing in the record

25  before me for me to consider indicates that emphasizing profits

1  over safety caused that explosion.

2      In addition, I conclude that all of the other conditions

3  of probation that are being imposed are sufficient to deter

4  PG&E employees, including the executives, from putting

5  financial considerations before safety.

6      Regarding advertising, I understand that the parties have

7  reached an agreement, as described in the letter delivered this

8  morning, but let me clarify, because it was only signed by

9  Government's counsel.  Is that correct, counsel, that there is

10  an agreement?

11      MR. BAUER:  There is, and it's accurately reflected in

12  that letter.

13      THE COURT:  Okay.  Thank you.

14      Okay.  I'm delighted that you were able to reach agreement

15  on that important subject, and I'll adopt that joint request.

16      I note that the agreement doesn't include the Government's

17  proposed condition to establish a hotline to report unsafe

18  conditions.  I'm not going to add that condition, because I

19  don't find it necessary to fulfill the purposes of sentence.  I

20  nevertheless mention it here, because I just want to observe

21  that if PG&E truly wants to demonstrate a commitment to safety

22  and does not already have such a hotline in place, it would

23  seem to behoove the company to consider one very seriously.

24      I'm going to impose probation's proposed condition

25  number 6 concerning access to records and personnel by the

1    probation officer, and court experts, but I'll add a provision

2    that these individuals work with the monitor so as not to

3    duplicate efforts.  This should alleviate the concerns that

4    have been expressed by PG&E.  I don't currently anticipate the

5    need for court experts, but I want to leave that option open if

6    circumstances later warrant it.

7         Finally, on probation's proposed condition 8 concerning

8    disclosures, I'm going to leave that in with one modification,

9    that notifications be provided to both the probation officer

10   and the monitor.  PG&E argued that it already discloses such

11   information to the CPUC and the SEC, so this condition should

12   not be burdensome, and I find that it's consistent with the

13   monitoring scheme that will be established in this case.

14        So after assessing the particular facts of this case, in

15   light of the relevant section 3553(a) factors, including the

16   Sentencing Guidelines, I hereby impose the following sentence:

17        First, PG&E shall pay to the United States a fine of

18   $500,000 on each count for a total fine of $3 million.  Given

19   the dismissal of allegations under the Alternative Fines Act,

20   this is the maximum fine I'm allowed to impose by statute.

21        PG&E shall also pay to the United States a special

22   assessment in the amount of $2,400.

23        PG&E is placed on probation for a term of five years on

24   each count with all counts to run concurrently.  While on

25   probation, PG&E will be subject to the following conditions:

1    1)  PG&E shall not commit any federal, state, or local

2    crime;

3    2)  PG&E shall comply with the separately entered Order

4    concerning a third party monitor.  I will sign the party's

5    proposed order at the conclusion of this sentencing.  And the

6    only modification is that I will clarify the reference on

7    page 5, the reference to paragraph 8A as referring to paragraph

8    D(8)(a).

9    3)  Within six months of the date of the Judgment, PG&E

10   shall develop and file with the Court an Effective Compliance

11   and Ethics Program consistent with section 8B2.1 of the

12   Sentencing Guidelines.  The submission shall include a schedule

13   for implementation.  PG&E shall revise the Program and file

14   updates with the Court whenever deemed appropriate by the third

15   party monitor.

16   4)  Within 60 days of the date of Judgment, PG&E shall

17   place one full-page advertisement in both the *Wall Street*

18   *Journal* and the *San Francisco Chronicle* publicizing the nature

19   of the offenses committed, the convictions, the nature of the

20   punishment imposed, and the steps that will be taken to prevent

21   the recurrence of similar offenses.

22   5)  Beginning no later than 60 days after the date of the

23   Judgment, and to the greatest extent possible, replicating the

24   same channels and air times that PG&E used before and/or during

25   trial in this case in 2016, PG&E shall, for three months, air

1 | television commercials that publicize the nature of the
2 | offenses committed, the convictions, the nature of the
3 | punishment imposed, and the steps that will be taken to prevent
4 | the recurrence of similar offenses.  PG&E will air such
5 | commercials up to the costs of $3 million less the cost of the
6 | print advertisements referred to in the above condition.  It's
7 | PG&E's estimate that this will result in approximately 12,500
8 | commercials of approximately 60 seconds in duration across
9 | broadcast and cable outlets over this three-month period.  PG&E
10 | will not include language regarding the conviction as part of
11 | the company's public service safety announcements, including
12 | what actions it should take in the event of wires down, gas
13 | leaks, or other emergencies, and which typically run on radio
14 | and digitally, given time sensitivity, because such information
15 | could cause the public to fail to take the needed safety
16 | actions in a timely fashion.
17 | 6)  PG&E shall submit to a reasonable number of regular or
18 | unannounced examinations of its books and records at
19 | appropriate business premises by the probation officer or
20 | experts engaged by the Court and; (B) interrogation of
21 | knowledgeable individuals within the organization.
22 | Compensation to and costs of any experts engaged by the Court
23 | shall be paid by the organization.  The probation officer and
24 | any court engaged experts shall work with the third party
25 | monitor to minimize duplication of efforts.

1          7)   PG&E shall perform 10,000 hours of community service.

2     At least 2,000 of these hours shall be performed by high level

3     personnel as defined in the commentary to section 8A1.2 of the

4     Sentencing Guidelines.   PG&E shall provide the prospective

5     community service workers' names and titles to the probation

6     officer to ensure compliance with this condition.   The location

7     and type of community service must be approved -- pre-approved

8     by the probation officer.   And I strongly recommend that this

9     service be in the town of San Bruno to every extent possible.

10    The intent of this condition is to require 10,000 hours of

11    community service that PG&E would not otherwise have done, and

12    the probation officer shall therefore consider as part of the

13    approval process the extent to which the proposed projects can

14    be tied to existing service initiatives by PG&E.   The community

15    service shall be geared toward giving back to communities

16    affected by PG&E's negligence with special emphasis on the city

17    of San Bruno, as directed by the probation officer.

18         8)   PG&E shall notify the third party monitor and

19    probation officer immediately upon learning of (A) any material

20    adverse change in its business or financial condition or

21    prospects, or (B) the commencement of any bankruptcy

22    proceedings, major civil litigation, criminal prosecution, or

23    administrative proceeding against the organization, or any

24    investigation or formal inquiry by government authorities

25    regarding the organization.

1          9)   PG&E shall pay the fine and special assessment as a

2     lump sum within 60 days of the date of Judgment.

3          Those are -- that is the sentence.

4          Let me ask counsel, are there any reasons, other than

5     those already argued and on the record, as to why this sentence

6     should not be imposed as just stated?

7          **MS. WEST:**  No.  However, there is a point of

8     clarification that I would like to make with regard to the

9     advertising conditions that the Court articulated on the

10    record.

11         **THE COURT:**  Okay.

12         **MS. WEST:**  And that is, as we had explained to the

13    Court, but just to be clear, we have spoken to new counsel

14    hired by PG&E, that is attorneys from the Jenner and Block

15    firm, about reaching an agreement that satisfied all of the

16    requests by the Government and by probation with regard to this

17    condition.  PG&E did agree to those, and that is what we

18    provided to the Court in the letter.  However, there was an

19    argument made by Latham & Watkins on behalf of PG&E in the

20    Sentencing Memoranda regarding the cost of compliance with

21    advertising constituting an improper fine.  And so I have --

22         **THE COURT:**  The cost of what?

23         **MS. WEST:**  Of complying with that advertising,

24    constituting an improper fine.  And I've spoken with attorneys

25    from Jenner and Block on behalf of PG&E about that, and I want

1   to put our understanding on the record, so there is no

2   confusion subsequently.  And that is the parties both agree,

3   including PG&E agrees, that the $3 million cost of advertising

4   is not a fine.  It does not constitute a monetary penalty.  It

5   is simply just valuation of the compliance of the condition of

6   probation, which they agree is appropriate, and that PG&E

7   waives any right to appeal on that issue.

8           **THE COURT:**  Is that correct?

9           **MR. BAUER:**  It's correct that we've waived any right

10  to appeal on that issue.  We agreed, and that's why they sent

11  the letter.

12          **THE COURT:**  Okay.  Then I will adopt that

13  understanding.

14          **MS. WEST:**  Thank you.

15          **THE COURT:**  Thank you.

16          **MR. BAUER:**  And otherwise, to answer your other

17  question, Your Honor, we'll submit on the papers.  No further

18  objection.

19          **THE COURT:**  Okay.  Thank you, counsel.

20      Okay.  The sentence as stated will now be imposed, and

21  Judgment will be entered.

22      And PG&E, of course, as you know, has the right to appeal

23  its convictions, and the right to appeal any sentence it

24  believes was illegally or incorrectly imposed.  And any notice

25  of appeal must be filed within 14 days of the entry of Judgment

 1  or within 14 days of the filing of a notice of appeal by the

 2  Government.

 3       And if there are no other matters to resolve, the Court

 4  will be adjourned.

 5            MS. HOFFMAN:  Your Honor, can I just have one minute?

 6            THE COURT:  Okay.

 7                      (pause in proceedings.)

 8            MS. HOFFMAN:  Your Honor, the Government would just

 9  like to point out that the probation officer specifically asks

10  that these fines that are imposed and any costs that come out

11  of this sentence not be passed off to the ratepayers.  And

12  insomuch as that is possible to be part of the Court's

13  sentence, we would ask that the Court adopt that recommendation

14  of probation.

15            THE COURT:  I will adopt that recommendation.

16            MS. HOFFMAN:  Thank you, Your Honor.

17            THE COURT:  Okay.  Thank you, counsel.

18       Court is adjourned.

19            THE CLERK:  All rise.

20                 (Proceedings adjourned at 10:25 a.m.)

21                      ---oOo---

22

23

24

25

1

2

3                         **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, February 3, 2017

8

9

10

11    _____

12            Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                         Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit C**

Pages 1 - 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
   vs.                             )   No. CR 14-0175 WHA
                                   )
PACIFIC GAS AND ELECTRIC COMPANY,  )
                                   )   San Francisco, California
          Defendant.               )   Tuesday
                                   )   December 5, 2017
_____)   2:00 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          BRIAN STRETCH
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   **JEFFREY BENJAMIN SCHENK**
                        **ASSISTANT UNITED STATES ATTORNEY**



For Defendant:          CLARENCE DYER & COHEN, LLP
                        899 Ellis Street
                        San Francisco, California 94109
                  BY:   **KATE DYER, ESQ.**



                        JENNER & BLOCK
                        353 North Clark Street
                        Chicago, Illinois 60654
                  BY:   **REID J. SCHAR, ESQ.**

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

```
 1    APPEARANCES:  (CONTINUED)

 2

 3    For Federal Monitor:      KIRKLAND & ELLIS, LLP
                                555 California Street
                                San Francisco, California 94104
 4                          BY: CHRISTOPHER KEEGAN, ESQ.

 5

 6    Also Present:             Jennifer Hutchings
                                U.S. Probation Department
 7                                   _   _   _

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2   December 5, 2017                              2:11 p.m.

 3                        ---oOo---

 4            THE CLERK:  Calling Criminal Action 14-175.  USA

 5   versus Pacific Gas & Electric Company.

 6        Counsel, please approach the podium and state your

 7   appearances for the record.

 8            MR. SCHENK:  Good afternoon, your Honor.  Jeff Schenk

 9   on behalf of the United States.

10            THE COURT:  Welcome.

11            THE PROBATION OFFICER:  Good afternoon, your Honor.

12   Jennifer Hutchings on behalf of Probation.

13            MR. KEEGAN:  Good afternoon, your Honor. Chris Keegan

14   on behalf of the Federal Monitor, Mark Filip.

15            MR. SCHAR:  Good afternoon, your Honor.  Good

16   afternoon, your Honor.  Reid Schar on behalf of PG&E.

17            MS. DYER:  Good afternoon, your Honor.  Kate Dyer on

18   behalf of PG&E.

19            THE COURT:  All right.  Welcome to all of you.  Are

20   any PG&E representatives actually here?

21            MR. SCHAR:  Yes, your Honor.

22            THE COURT:  Why don't you introduce them?

23            MR. SCHAR:  Julie Kane and Alex Vallejo are both

24   here.  Both are in the Compliance Department.

25            THE COURT:  Good.  Sit up here at counsel table, if
```

1  you will.

2      So let's hear the report.  Let's start with Ms. Hutchings.

3          **PROBATION OFFICER:**  Yes, your Honor.

4      The report on the update for -- with regards to community

5  service is that specifically 2,271.25 hours have been

6  completed.

7          **THE COURT:**  How many?  Say that number again.

8          **PROBATION OFFICER:**  2271.25 hours have been

9  completed, of which 1,064 hours were completed by officers and

10  directors.

11      So PG&E now has an automated system, check-in/check-out

12  system that they have shown me in person.  When individuals

13  come to do the community service, they use an I.D.  They log

14  in.  They check out.  So it's very specific as to when they

15  start work and when they leave, almost like a time card.

16          **THE COURT:**  Okay.  So those hours seem like they --

17  that's big progress since the last time you were here; is that

18  right?

19          **PROBATION OFFICER:**  I would agree.  Absolutely.

20          **THE COURT:**  And if we did the extrapolation, how many

21  hours would that -- how soon would the 10,000 hours be used up?

22          **PROBATION OFFICER:**  It's my understanding that they

23  planned on being, hopefully, done within the first three years

24  of supervision is the goal.  Correct me if I'm wrong, but I

25  believe that was the goal.

 1          THE COURT:  Would that get us there?  2,000 a year?

 2          PROBATION OFFICER:  Well, it won't, but it did take

 3   some time to get rolling in the very beginning.  We had to meet

 4   with the city, find out what projects they wanted.  It look a

 5   little bit of time, but I feel like that train is rolling and

 6   now as we go into 2018, I think they will be ahead of the curve

 7   as far as --

 8          THE COURT:  Ms. Hutchings sent me some photographs

 9   yesterday, which I looked at.  Thank you for that.

10      Why don't you describe on the record what those

11   photographs were?

12          PROBATION OFFICER:  Sure.

13      PG&E graciously invited me last week to their officer and

14   director's meeting, which I went to, and I was able to view

15   firsthand the morning session, which had to do with a lot of

16   community service projects that all the individuals there were

17   working on.

18      And the photographs that I sent your Honor were of the

19   different rooms where different projects were being done for

20   various organizations in San Mateo.

21          THE COURT:  These were what level people in the

22   company?

23          PROBATION OFFICER:  Officers and directors.  All

24   levels, your Honor, even up to the very, very top.

25          THE COURT:  CEO?

Case: 19-30088   Doc# 53   Filed: 01/29/19   Entered: 01/29/19 12:05:04   Page 45 of
62

```
 1                    PROBATION OFFICER:  Yes.

 2              THE COURT:  Chairman of the Board?

 3              PROBATION OFFICER:  They were there making onesies

 4     for the shelters.  So, yes.

 5              THE COURT:  Well, good for them.

 6         Okay.  Just on the subject of community service, is there

 7     more to say on the subject of community service?

 8              PROBATION OFFICER:  I don't believe so, unless your

 9     Honor has any specific questions.

10              THE COURT:  Is a book of some sort or something that

11     would capture in one place all of the work done in place?  I

12     mean, at a school or playground, wherever it gets done.  Is

13     there some book of photographs that document the work that's

14     being done?

15              PROBATION OFFICER:  I can't speak to the photographs,

16     your Honor.  But they provide me with a summary in advance of

17     the projects that are planned for the upcoming month and any

18     post-summary report as well.

19         If the Court would like those sent to you on a monthly

20     basis, I'm more than happy to do that.

21              THE COURT:  I do want them sent to me, but what I

22     think we should do is accumulate the story in one booklet form

23     so that it will go into the archives of history.  And when

24     we're all gone and there are other people here, they can look

25     at the book and see what happened in this case.
```

1    So maybe you could work on that.  Maybe get PG&E to do

2    that, put that booklet together.

3        **PROBATION OFFICER:**  I'm sure they would be happy to.

4        **THE COURT:**  All right.  How about the United States?

5    Just on the subject of the community work, what does the United

6    States have to say?

7        **MR. SCHENK:**  We don't have anything to add.  We're

8    happy with the progress.

9        Judge Henderson's order was 10,000 hours by the end of

10   five years.  In speaking with counsel for PG&E, I do understand

11   that there was a bit of time required after the order came in

12   place in late January to get the project rolling, and it seems

13   that they are well on their way to meeting that mark and it, in

14   fact, looks like they will finish early.

15       **THE COURT:**  That's great.  On that subject, what

16   would you two like to say?

17       **MR. SCHAR:**  Your Honor, I don't think we have

18   anything to add.  The Probation Officer, I think, has done a

19   very thorough job.

20       We will work on accumulating the information that you

21   requested.

22       **THE COURT:**  Yeah.  I think it would be good for the

23   history books.

24       Okay.  What does -- let's go to what the Monitor has been

25   working on.  Give us the Monitor report.

1      **MR. KEEGAN:**  Sure, your Honor.

2          Monitorship is progressing.  There has been a lot of

3      activity since we were here before.

4          A couple of updates on some things we have ongoing.  We

5      participate in the very top level strategic discussions,

6      business discussions on a quarterly basis.  We have been

7      invited to those meetings by PG&E with a focus on gas

8      operations.

9          We have a very regular cadence of meetings in San Ramon

10     with the engineers, the Integrity Management Group and the

11     people who are responsible for the transmission planning are

12     subject matter experts, and our team members are there pretty

13     much every week for various meetings.

14         Currently we have people in the field, and that's

15     something that we've recently started.  We're sending people

16     out to the yards and going to do -- observe and monitor the

17     work that's happening by the workers in the field to try and

18     get an understanding of what their view of the company is and

19     how the different compliance and ethics and safety and training

20     and education filters down to the people who are doing the

21     work.

22         Some examples of specific numbers we're working on right

23     now -- there is a lot more than this, but just a few examples.

24     Two of our experts and other team members have been down in the

25     field on transmission integrity management projects in the

1  Mojave.

2       **THE COURT:** Is this gas transmission?

3       **MR. KEEGAN:** Yes, gas transmission. The big -- the

4  backbone transmission lines across the state. Those projects

5  in the Mojave involved hydro testing, the strength testing

6  that's included in the order, making those lines capable of

7  in-line inspection or to make piggable projects. So we have

8  some very experienced subject matter experts who are down there

9  observing and reporting back as to how that work is

10 progressing.

11      We are working with our technical experts and our team

12 members as PG&E is engaged in updating their Integrity

13 Management planning. That's an annual cycle that they do.

14      So we are meeting with the engineers to really understand

15 and evaluate the types of information that they are collecting,

16 the QC and QA of that information, what formula that

17 information gets filtered through, and what the ultimate risk

18 ranking for each segment of pipeline is, and then understanding

19 how that risk ranking turns into a forward-looking operational

20 plan.

21      So that's really a core aspect of what we're doing.

22      **THE COURT:** So your work, is it -- is it limited to

23 gas or do you also get off into electricity?

24      **MR. KEEGAN:** The specific requirements, the technical

25 requirements are focused on gas operations.

The compliance and ethics piece and the safety and the culture of the company is a little bit more overarching enterprise wide.  So we look at that as sort of across all of the specific lines of business.

**THE COURT:**  So that would include electricity?

**MR. KEEGAN:**  It does, as far as compliance and the safety culture.

**THE COURT:**  Do you have any responsibility or jurisdiction over inquiry into the North Bay fires, as to what went wrong there, if anything, by PG&E?

**MR. KEEGAN:**  Your Honor, I think responsibility and jurisdiction is a question for you, as well as anyone.

When the fires came about, we were involved in the emergency response.  We were observing the emergency response activities.  They had a camp set up to get people electricity back and get gas set up.  We participated in twice daily emergency operations calls.

But as far as what caused the fire or fire investigation, I think that's Cal Fire.  I think that's the State Attorney general, and I think that sort of cause investigation is something they would be evaluating and looking at.

**THE COURT:**  Okay.  What else would you like to add?

**MR. KEEGAN:**  I think I've gone through the full list of bullets I have here, your Honor, unless you have any questions.

```
 1                    THE COURT:  Not yet.
 2        Ms. Hutchings, do you have anything to add to what the
 3   Monitor said?
 4                    PROBATION OFFICER:  I do not, your Honor.
 5                    THE COURT:  The Government?
 6             Mr. SCHENK:  No, your Honor.  Submitted.
 7                    THE COURT:  How about you two?
 8             MR. SCHAR:  No, your Honor.  Mr. Keegan has, I think,
 9   accurately described a fairly thorough process.  The company is
10   trying to be as responsive as it can be to the Monitor's
11   requests.
12                    THE COURT:  So what other subjects should we go into
13   today in assessing the status of supervised release -- I mean,
14   probation?
15                    PROBATION OFFICER:  I don't believe there is anything
16   we need to go over today, your Honor.  Between myself
17   monitoring certain activities and the monitorship monitoring
18   other activities, all of us are in communication frequently.
19   PG&E is very communicative with me and always updating me on
20   even what's going on on the Monitor's side.  So I feel like the
21   communication is excellent.
22                    THE COURT:  Good.  How about the Government?
23             Mr. SCHENK:  Nothing further, your Honor.
24                    THE COURT:  How about you two?
25             MR. SCHAR:  No, your Honor.  Nothing else.
```

```
 1              THE COURT:  What's our next step?

 2              Mr. SCHENK:  I think we would defer to the Court.

 3    The Court, I think, set this originally to make sure that

 4    PG&E's community service hours improved and we got to a place

 5    where they --

 6              THE COURT:  It seems like that worked.  So how about

 7    six months from now, come back in six months?

 8              PROBATION OFFICER:  Sure.

 9              THE COURT:  What would that be, Angie?

10              THE CLERK:  June 12th, your Honor.

11              THE COURT:  June 12?

12              Mr. SCHENK:  Yes.  Yes, your Honor.

13              MR. KEEGAN:  Yes, your Honor.

14              THE COURT:  It will be summertime.  The flu will be

15    gone.  Leaves will be green.

16         Okay.  Thank you for the good report.  I appreciate all of

17    your cooperation and assistance.  See you then.

18              MR. KEEGAN:  Thank you, your Honor.

19              PROBATION OFFICER:  Thank you, your Honor.

20              Mr. SCHENK:  Thank you, your Honor.

21              MR. SCHAR:  Thank you, your Honor.

22         (Proceedings adjourned.)

23

24

25
```

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*

---

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, December 7, 2017

**Exhibit D**

**FILED**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

JAN - 3 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Mark Filip, P.C.
To Call Writer Directly:
+1 312 862 2192
mark.filip@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

Facsimile:
+1 312 862 2200

www.kirkland.com

December 31, 2018

**VIA EMAIL**

Honorable William Alsup
United States District Court
Northern District of California
450 Golden Gate Avenue, Courtroom 12
19th Floor
San Francisco, CA 94102

Re: Federal Monitor Submission Pursuant to November 27, 2018 Notice

Dear Judge Alsup:

Please find below the response of the federal monitor ("Federal Monitor") to the third question in the Court's November 27, 2018 Notice re: California Wildfires.

**3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?**

The Federal Monitor position, and associated team of attorneys and outside experts (the "Monitor team"), was created as a result of the guilty verdict in *United States of America v. Pacific Gas and Electric Company*, Case No. 3:14-cr-00175. The Monitor team began its work in the spring of 2017 and has been assessing and evaluating certain aspects of PG&E's operations and culture since that time. Overall, the Monitor team works to identify areas within the scope of the monitorship order associated with the guilty verdict ("Monitorship Order") where PG&E has gaps in its practices, areas that need improvement, or issues that need to be addressed. In order to discharge those responsibilities, the Monitor team has met and interacted with representatives of the Justice Department, local law enforcement, the California Public Utilities Commission ("CPUC"), and San Bruno city leaders. The Monitor team has also met and interacted with employees at all levels of PG&E. Additionally, the Monitor team has access to PG&E's documents, procedures, databases, and other requested information. The original scope of the Monitorship is set forth in the Monitorship Order and includes fifteen individual requirements, primarily focused on assessing PG&E's gas operations and gas transmission system, its corporate Compliance and Ethics program, and safety at PG&E. That is where the bulk of the Monitor team's work has focused.

Beijing   Boston   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

Honorable William Alsup
December 31, 2018
Page 2

In November 2017, after the Wine Country fires, the United States Attorney's Office, PG&E, and the Federal Monitor agreed that it would be appropriate to incorporate certain aspects of PG&E's electric distribution system—not electric transmission, which can be subject to different regulations and comprised of different infrastructure and technologies—and emergency response practices into the scope of the Monitor team's ongoing assessment. As a result, the Monitor team is also assessing PG&E's current and future vegetation management programs for its electric distribution system, its pole and equipment inspection and maintenance programs for its electric distribution system, and the emergency response programs utilized by PG&E during emergencies. The Monitor team's evaluation in these areas is forward-looking and is not attempting to identify the cause of any fire, or whether there were any violations of law or regulation related to wildfires, as those are the subject of multiple ongoing state investigations, including by the California Department of Forestry and Fire Protection ("Cal Fire") and the CPUC, as well as multiple lawsuits.

Additionally, the Monitor team is prepared to evaluate and assess how PG&E incorporates recommendations, requirements, or changes to its electric distribution operations as made by regulatory agencies as a result of their respective investigations into wildfires. For example, the Monitor team anticipates that Cal Fire, the CPUC, and other agencies may identify concerns arising from their investigations, which should be evaluated and addressed by PG&E. Those recommendations have not yet been made; when they are, the Monitor team anticipates assessing and critiquing PG&E's efforts to implement the required changes.

As an overview of the Monitor team's activities in the electric distribution space, which includes input from outside experts who are members of the Monitor team: the Monitor team has made numerous requests for documents and information from PG&E related to its electric operations within the agreed-upon focus; it has conducted numerous meetings with key office personnel about each of the three specific areas of focus regarding electrical operations; it has met with senior leadership on multiple occasions to discuss recent issues and operations; it has obtained and reviewed over 750 documents concerning PG&E's policies, practices, and procedures; and it has conducted several field and site visits, including observing emergency command operations during a simulated Public Safety Power Shut-off training exercise, two days of pole inspections, emergency command and base camp operations in response to the Camp Fire, and real-time wildfire risk monitoring at PG&E's Wildfire Safety Operations Center.

Many of PG&E's electric operations programs are in flux and undergoing changes. As such, the Monitor team's evaluation of these programs and related policies and procedures is ongoing.

Beyond the specific activities related to the electric distribution-focused work of assessing vegetation management, pole and equipment inspection and maintenance, and emergency response efforts, the Monitor team's other work streams relate to its efforts to push and drive PG&E to

# KIRKLAND & ELLIS LLP

Honorable William Alsup
December 31, 2018
Page 3

become a safer organization. In particular, the Monitor team has worked to assess the corporate Compliance and Ethics program and pushed PG&E to leverage its "Speak Up Culture" to improve its safe operations—a culture whereby all PG&E employees, leaders, and contractors need to Speak Up when they see a safety issue, regulatory issue, or an opportunity for improvement, and one where managers listen to and follow up on the issues. The Monitor team believes that a strong and robust Compliance and Ethics program is important for safe operations at PG&E. There needs to be a culture of compliance with regulations, where leaders, employees, and contractors understand the regulatory and legal requirements and comply with those obligations. Beyond the minimum regulatory obligations, it is important to have a culture at PG&E where people do the right thing, even when regulations are opaque or inadequate. The Monitor team's efforts are also aimed at evaluating these cultural components of PG&E.

Accordingly, the Monitor team and its subject matter experts have also focused on how PG&E evaluates its safety performance and its safety culture. The Monitor team has identified various metrics used by PG&E to measure its safety and has evaluated how safety incidents are discussed throughout the company. The Monitor team has pushed PG&E to continue to develop its process safety teams, and continue to develop safety metrics that are leading indicators of improvements in safety culture at PG&E.

\* \* \* \* \*

To the extent the Court has additional questions about the work completed by the Monitor team, the Monitor team is available to meet with the Court as necessary. When the monitorship was implemented by Judge Henderson, the Monitor team anticipated regular in-chambers meetings with the Court (which Judge Henderson said was his regular practice) and the Monitor team is prepared to do so, if the Court wishes. The Monitor team also is prepared to attempt to follow up on questions or inquiries from the Court, as the Court sees fit, regarding the Company's operations, and to report back in chambers to the Court.

Sincerely,

*Mark Filip, P.C.*

Mark Filip, P.C.
Federal Monitor

cc:   Hallie Hoffman, United States Attorney's Office, Northern District of California
      Jennifer Hutching, United States Probation Office, Northern District of California
      Reid J. Schar, Jenner & Block, Counsel for PG&E

**Exhibit E**

1
2
3
4
5
6             IN THE UNITED STATES DISTRICT COURT
7
8             FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10  UNITED STATES OF AMERICA,
                                              No. CR 14-0175  WHA
11              Plaintiff,
12      v.
13  PACIFIC GAS AND ELECTRIC                  **ORDER TO SHOW CAUSE**
    COMPANY,                                  **WHY PG&E'S CONDITIONS**
14                                            **OF PROBATION SHOULD**
                Defendant.                    **NOT BE MODIFIED**
15  _____/
16

17          In 2016, a jury convicted PG&E on six felony counts of knowingly and willfully

18  violating safety standards and obstructing an investigation by the National Transportation

19  Security Board arising out of the San Bruno explosion of a PG&E gas pipeline that killed eight

20  and destroyed 38 homes.  A corporation cannot go to prison, so the criminal judgment imposed

21  the largest fine allowed by law and several conditions of probation.  Recently, CAL FIRE has

22  determined that PG&E caused eighteen wildfires in 2017, twelve of which CAL FIRE referred

23  for possible criminal prosecution.  (CAL FIRE continues its investigation into the more recent

24  Camp Fire in Butte County in which 86 people lost their lives.)

25          In order to protect the public from further wrongs by the offender, to deter similar

26  wrongs by other utilities, and to promote the rehabilitation of the offender among other goals of

27  18 U.S.C. §§ 3553(a)(1) and (a)(2), the Court proposes to add the following new conditions of

28  probation pursuant to 18 U.S.C. § 3563(c):

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1

   1.  In light of PG&E's history of falsification of inspection reports,

2

PG&E shall, between now and the 2019 Wildfire Season, re-inspect all of its

3

electrical grid and remove or trim all trees that could fall onto its power lines,

4

poles or equipment in high-wind conditions, branches that might bend in high

5

wind and hit power lines, poles or equipment, and branches that could break off in

6

high wind and fall onto power lines, poles or equipment; shall identify and fix all

7

conductors that might swing together and arc due to slack and/or other

8

circumstances under high-wind conditions; shall identify and fix damaged or

9

weakened poles, transformers, fuses and other connectors; and shall identify and

10

fix any other condition anywhere in its grid similar to any condition that

11

contributed to any previous wildfires.  The trees and branches to be removed are

12

not limited to those within the distances prescribed by the California Public

13

Resources Code but extend farther to any tree or branch posing the dangers

14

described above.  As used herein, the 2019 Wildfire Season means June 21, 2019,

15

through the first region-wide rainstorm in November or December.

16

   2.  For each segment of its electrical grid, PG&E shall document the

17

foregoing inspections and the work done and shall rate each segment's safety

18

under various wind conditions (from little wind to high wind).  PG&E must

19

designate one or more qualified engineers to make these safety determinations

20

and the rating must be certified under oath by the engineer in writing.  In light of

21

PG&E's history of false reporting, PG&E may not rely upon its earlier inspection

22

reports as substitutes for the new inspections.  PG&E shall follow all

23

requirements of law as well as those in this order, shall follow all guidance

24

provided by the Monitor, and shall be complete and truthful.  If a power line

25

happens to comply with all of the requirements of state law but nevertheless poses

26

a safety issue under the circumstances, then the line may not be rated as safe until

27

the safety issue is resolved.

28

2

United States District Court
For the Northern District of California

3.      At all times during the 2019 Wildfire Season (and thereafter), PG&E may supply electricity only through those parts of its electrical grid it has determined to be safe under the wind conditions then prevailing. Conversely, PG&E must de-energize any part of its grid not yet rated as safe by PG&E for the wind conditions then prevailing until those conditions have subsided. For example, if Santa Ana winds of up to thirty miles per hour are expected in a given county and if PG&E has not yet rated those power lines as safe for such winds, then PG&E must de-energize those lines during the wind event and beforehand notify affected customers that those lines will be de-energized. In determining safety, PG&E may not take into account the need for reliability of service, the inconvenience to customers resulting from interruption in service, or its impact upon PG&E's revenues and profits. Reliability is important but safety must come first. Profits are important but safety must come first. *Only* safe operation will be allowed.

These conditions of probation are intended to reduce to zero the number of wildfires caused by PG&E in the 2019 Wildfire Season. This will likely mean having to interrupt service during high-wind events (and possibly at other times) but that inconvenience, irritating as it will be, will pale by comparison to the death and destruction that otherwise might result from PG&E-inflicted wildfires. PG&E shall promptly advise law enforcement, hospitals and other emergency personnel and the public at large in its service area to consider arranging for back-up emergency generators as a hedge against interruption of power.

The Monitor shall promptly spot-check the inspections (with field inspections of his own), promptly spot-check the safety ratings, and otherwise monitor compliance with this order, providing a monthly report to the Court that plainly and prominently identifies any weaknesses in PG&E's compliance. PG&E shall immediately notify Probation and the Monitor of any violations.

3

United States District Court

For the Northern District of California

1    By **NOON ON JANUARY 23, 2019**, all parties are **ORDERED TO SHOW CAUSE** why PG&E's

2    conditions of probation should not be modified as stated above.  A hearing on this matter will be

3    held on **JANUARY 30, 2019, AT 9:00 A.M.**

4    PG&E and the government shall transmit a copy of this order to the California Public

5    Utilities Commission.  If the CPUC (or the California legislature) comes up with a better plan for

6    insuring the safety of California before the 2019 Wildfire Season, the Court will consider

7    conforming its proposed conditions to any such plan.  The CPUC is hereby invited to comment

8    by **JANUARY 25**, and to attend the hearing on **JANUARY 30**.

9    PG&E and the government shall also transmit a copy of this order to CAL FIRE.  The

10   Court requests input from CAL FIRE concerning its investigation into the specifics of wildfires

11   caused by PG&E and on what operating restrictions going forward might be adopted by the

12   Court as a condition of probation to maximize the safety of California.  CAL FIRE is hereby

13   invited to the hearing on **JANUARY 30**, and is requested to file a public statement by **JANUARY**

14   **25**.

15

16   **IT IS SO ORDERED.**

17

18   Dated:  January 9, 2019.

19   WILLIAM ALSUP
     UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

4