WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19 -30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| - and - | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| **Debtors.** | **AMENDED DECLARATION OF JASON P. WELLS IN SUPPORT OF FIRST DAY MOTIONS AND RELATED RELIEF** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>X Affects both Debtors | Date: January 31, 2019<br>Time: 10:00 a.m. (Pacific)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

I, Jason P. Wells, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

I am the Senior Vice President and Chief Financial Officer of PG&E Corporation ("**PG&E Corp.**"). In 2007, I joined PG&E Corp. as the Director of Technical Accounting and was promoted to Senior Director of Corporate Accounting and Assistant Controller in 2008. I transferred from PG&E Corp. to Pacific Gas and Electric Company (the "**Utility**") in 2009 and continued in the role of Senior Director of Corporate Accounting and Assistant Controller. I became Vice President, Finance of the Utility in October 2011, and became Vice President, Business Finance of the Utility in August 2013. I was appointed to my current position at PG&E Corp. in January 2016. I have a bachelor's degree and a master's degree in accounting from the University of Florida and I am a Certified Public Accountant in the State of Florida. The Utility is a wholly-owned subsidiary of PG&E Corp.

On January 29, 2019 (the "**Petition Date**"), PG&E Corp. and the Utility (collectively, the "**Debtors**" or "**PG&E**") each commenced with this Court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

I am knowledgeable and familiar with the Debtors' day-to-day operations, business, and financial affairs, and the circumstances leading to the commencement of the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"). I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors or the Debtors' legal, restructuring, and financial advisors, or my opinions based upon experience, knowledge, and information concerning the Debtors' operations and the electricity and natural gas industries in the State of California. If called upon to testify, I would testify to the facts set forth in this Declaration.

This Declaration is submitted for the purpose of apprising the Court and other parties in interest of the circumstances that compelled the commencement of the Chapter 11 Cases, and in support of (i)

the Debtors' chapter 11 petitions, and (ii) the motions and applications that the Debtors have filed with the Court contemporaneously with the filing of the chapter 11 petitions (the "**First Day Motions**").

### Preliminary Statement

The Debtors' decision to seek relief under chapter 11 followed a comprehensive review of a variety of factors and the issues facing the Debtors. It represents the only viable alternative under the stark circumstances with which the Debtors are faced, and is in the best interests of all of the Debtors' stakeholders, including their millions of customers, employees, wildfire claimants, other creditors, employees, and shareholders. The chapter 11 filings were necessitated by a confluence of factors resulting from the catastrophic and tragic wildfires that occurred in Northern California in 2017 and 2018, and PG&E's potential liabilities arising therefrom. The multitude of pending claims and lawsuits, and the thousands of additional claims that will be asserted, made it abundantly clear that PG&E could not continue to address those claims and potential liabilities in the California state court system, continue to deliver safe and reliable service to its 16 million customers, and remain economically viable. As noted in PG&E's Form 8-K (the "**Form 8-K**") filed on January 14, 2019 with the United States Securities Exchange Commission (the "**SEC**"), PG&E's potential liability with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, without taking into account potential punitive damages, fines and penalties or damages with respect to "future claims." Under certain circumstances, PG&E's potential liability could be substantially greater. Further, as described more fully below, PG&E's potential liability is exacerbated by the unique doctrine of "inverse condemnation," which imposes strict liability on PG&E regardless of whether it was negligent, and by the continuing uncertainty surrounding PG&E's ability to recover costs associated with inverse condemnation.

In view of the circumstances confronting PG&E, it did not have the ability to access the capital necessary to (a) address and resolve the thousands of wildfire claims that already had been asserted and would be asserted against it over the next several months and years; (b) operate its business and provide prudent and efficient electric and gas services to its millions of customers; (c) properly invest in its infrastructure and critical initiatives to provide safe and reliable service, and to mitigate future

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

wildfire risks in an environment impacted by climate change; and (d) service and, as required, refinance or satisfy its approximate $24 billion in outstanding funded debt obligations.

PG&E's decision to seek relief under chapter 11 followed a comprehensive review of all realistic alternatives and the consideration and balancing of a variety of factors, including (a) the need for an orderly, fair, and expeditious process to assess and resolve PG&E's potential liabilities resulting from the 2017 and 2018 Northern California wildfires; and (b) how to best preserve and maximize the value of PG&E's business enterprise for the benefit of all of its economic stakeholders, including wildfire claimants, PG&E's other creditors, and PG&E Corp.'s shareholders.

To be clear, the Chapter 11 Cases are not a strategy or attempt to avoid PG&E's responsibility for the heartbreaking and tragic loss of life, devastating damage and destruction to homes and businesses, and harm to the communities that has been incurred as a result of the 2017 and 2018 Northern California wildfires. Rather, the principal objectives of the Chapter 11 Cases are directly to the contrary:

- First, to establish a process for PG&E to fully address and resolve its liabilities resulting from the 2017 and 2018 Northern California wildfires and to provide compensation to those entitled to compensation from the Debtors fairly and expeditiously – indeed, more quickly and more equitably than those liabilities could be addressed and resolved in the state court system;

- Second, to restore PG&E's financial stability and assure that PG&E has access to the capital and resources necessary to sustain and support its ongoing operations and to enable PG&E to continue investing in its systems infrastructure and critical safety and wildfire prevention initiatives, including investing in PG&E's Community Wildfire Safety Program (a program to further reduce wildfire risks and help keep our customers and the communities we serve safe through enhanced real-time monitoring and intelligence, safety measures, and electrical system equipment);

- Third, to work collaboratively and constructively with State regulators and policy makers to (a) address safety, and operational and structural reforms; (b) determine the most effective

way for PG&E to provide safe and reliable electric and natural gas service to its customers and communities for the long term; and (c) address the significant increase in wildfire risk in an environment that continues to be challenged by climate change and its ongoing and future impact on California, including on PG&E and its operations; and

- Fourth, to enable PG&E to continue its extensive restoration and rebuilding efforts to assist the communities affected by the 2017 and 2018 Northern California wildfires.

Chapter 11 provides the unique opportunity for all of the wildfire claims asserted and to be asserted against the Debtors to be comprehensively addressed in one forum. It will avoid the lengthy process necessarily attendant to the state court system (including applicable statutes of limitation) and, perhaps more importantly, avoid the risk that, due to PG&E's financial condition, those having their wildfire claims dealt with earlier in the state court process will fare substantially better than other wildfire claimants. Chapter 11 mandates that all wildfire claimants be treated similarly, and provides the statutory framework and tools to accomplish that goal on an expedited basis.

PG&E could have accessed a limited amount of secured indebtedness or other alternative forms of capital to temporarily extend its liquidity runway outside of chapter 11. That alternative, however, was not a solution nor was it in the best interests of PG&E's stakeholders, including wildfire claimants (who could face subordination of their claims in certain circumstances). This course of action would not have addressed the fundamental issues facing PG&E – it was not a feasible way to address and resolve the thousands of wildfire claims and to assure PG&E would have the liquidity necessary to sustain ongoing operations, as well as service its outstanding funded debt.

It also is important to recognize that Senate Bill 901 ("**SB 901**"), which was enacted by the California legislature in September, 2018, to address a portion of the liabilities PG&E faced in connection with the 2017 Northern California wildfires (through the issuance of recovery bonds (referred to as "**securitization**")), does not address wildfires occurring in 2018. Since the 2018 Camp Fire and in view of PG&E's potential liabilities relating to the Camp Fire, PG&E has been in regular contact with representatives of the Governor's office and the relevant regulatory agencies, including

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the staff of the California Public Utilities Commission (the "**CPUC**"), and has apprised those parties as to PG&E's financial condition and its projected liquidity profile.

Although, as reported, there were initial indications that relief similar to that provided for the 2017 Northern California wildfires might be available for the 2018 Camp Fire, that relief is not available absent further legislation. As of the date hereof, there is no prospect of legislation being enacted on a timely basis, if at all, to implement the extraordinary measures necessary to stabilize PG&E's financial condition and avoid the necessity of seeking relief under chapter 11.

Additionally, on January 10, 2019, the CPUC adopted an Order Instituting Rulemaking (the "**OIR**"), which established a process to develop criteria and a methodology to determine the amount of PG&E's cost recovery related to the 2017 Northern California wildfires. Based on the OIR, PG&E believes that any recovery of costs related to the 2017 Northern California wildfires would not occur, if at all, until (a) PG&E has paid claims relating to such wildfires, (b) application for recovery of such costs has been made, and (c) the CPUC has made a determination that such costs are just and reasonable or in excess of the disallowance threshold to be established by the CPUC. Therefore, PG&E does not expect that it would be permitted to securitize costs relating to the 2017 Northern California wildfires on an expedited or emergency basis. Additionally, based on the OIR as well as prior experience and precedent, PG&E also believes that it likely would take years for it to be able to recover through securitization any amount related to the 2017 Northern California wildfires, further exacerbating the situation facing the Debtors.

As discussed more fully below, seeking relief under chapter 11, however, has enabled the Debtors to obtain a commitment for debtor in possession financing (the "**DIP Financing**") in the amount of $5.5 billion. The DIP Financing, which is subject to the Court's approval, together with cash on hand and the revenues generated from operations, will provide the Debtors with the liquidity to fund their operations, administer these Chapter 11 Cases, and to make the necessary expenditures to invest in their infrastructure, including investments to further reduce wildfire risk.

The Chapter 11 Cases represent the best means to preserve and maximize the value of the Debtors' business enterprise and are in the best interests of all of their economic stakeholders,

including wildfire claimants, the Debtors' other creditors, and PG&E Corp.'s shareholders. Chapter 11 will provide the Debtors and all parties in interest with one forum to comprehensively address and resolve the Debtors' wildfire liabilities in a fair and expeditious manner, and will assure equality of treatment among all similarly-situated creditors of the Debtors – wildfire claimants, debtholders and others. Additionally, the Chapter 11 Cases will assure that PG&E has the resources, financial and otherwise, to sustain its operations, provide critical utility services safely and reliably, and continue its efforts to rebuild and restore the communities which it serves.

## The Company's Business

PG&E Corp. was incorporated in 1995 and is a holding company whose primary operating subsidiary is the Utility, a public utility operating in northern and central California. The Utility was incorporated in 1905 and PG&E Corp. became the holding company of the Utility in 1997. The Utility provides natural gas and utility services to approximately 16 million customers. As of September 30, 2018, the Debtors, on a consolidated basis, had reported approximately $71.4 billion in assets on a book value basis and approximately $51.7 billion in liabilities on a book value basis.

**Employees**. PG&E Corp. and the Utility employ approximately 24,000 regular employees, approximately 20 of whom are employed by PG&E Corp. Of the Utility's regular employees, approximately 15,000 are covered by collective bargaining agreements with local chapters of three labor unions: (i) the International Brotherhood of Electrical Workers; (ii) the Engineers and Scientists of California; and (iii) the Service Employees International Union.

**Regulatory Environment**. The Utility's business is subject to the regulatory jurisdiction of various agencies at the federal state, and local levels, including the CPUC in the State of California, and the Federal Energy Regulatory Commission ("**FERC**") and the Nuclear Regulatory Commission (the "**NRC**") at the federal level. PG&E Corp. is a "public utility holding company" as defined in the Public Utility Holding Company Act of 2005, and is subject to regulatory oversight by FERC.

**Ratemaking**. The Utility's rates for electric and natural gas utility services are set at levels intended to allow the Utility to recover its costs of providing service and have the opportunity to earn a return on invested capital. Before setting rates, the CPUC and FERC conduct proceedings to

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 7 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

determine the annual amount that the Utility will be authorized to collect from its customers. The Utility's revenue requirements consist primarily of a base amount set to enable the Utility to recover its reasonable operating expenses (e.g., maintenance, administration and general expenses) and capital costs (e.g., depreciation, tax, and financing expenses). In addition, the CPUC authorizes the Utility to collect revenues to recover costs that the Utility is allowed to "pass-through" to customers, including its costs to procure electricity, natural gas and nuclear fuel, to administer public purpose and customer programs, and to decommission its nuclear facilities.

**Liquidity and Financial Resources**. The Utility's ability to fund operations and to finance capital expenditures depends on the levels of its operating cash flows and access to the capital and credit markets. The CPUC authorizes the Utility's capital structure, the aggregate amount of long-term and short-term debt that the Utility may issue, and the revenue requirements the Utility is able to collect to recover its cost of capital. The Utility has utilized equity contributions from PG&E Corp. and long-term senior unsecured debt issuances to maintain its CPUC-authorized capital structure consisting of 52% equity and 48% debt and preferred stock. Until recently, the Utility relied on short-term debt, including commercial paper, to fund temporary financing needs. Those funding alternatives no longer exist.

**Third-Party Monitor**. On April 12, 2017, the Utility retained a third-party monitor at the Utility's expense as part of its compliance with the sentencing terms of the Utility's January 27, 2017 federal criminal convictions in connection with the natural gas explosion that occurred in the City of San Bruno, California, on September 9, 2010. The Utility was sentenced to, among other things, a five-year corporate probation period and oversight by a third-party monitor for a period of five years, with the ability to apply for early termination after three years. The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations and maintains effective ethics, compliance, and safety-related incentive programs on a Utility-wide basis.

## Corporate and Capital Structure

PG&E Corp. and the Utility are public reporting companies under Section 12b of the Securities and Exchange Act of 1934. PG&E Corp.'s common stock is traded on the New York Stock Exchange under the symbol "PCG".

**Common Stock**. As of September 30, 2018, PG&E Corp. had 518,674,276 shares of common stock outstanding. PG&E Corp. holds all of the 264,374,809 shares of outstanding common stock of the Utility. On December 20, 2017, the Board of Directors of PG&E Corp. suspended quarterly cash dividends on PG&E Corp's common stock, beginning with the fourth quarter of 2017 due to the uncertainty related to the causes of and potential liabilities associated with the 2017 Northern California wildfires. That suspension has remained in effect through the Petition Date.

**Preferred Stock**. PG&E Corp. has authorized 75 million shares of no par value preferred stock and 5 million shares of $100 par value preferred stock. No such preferred stock is outstanding. The Utility has 75 million shares of $25 par value preferred stock and 10 million shares of $100 par value preferred stock. As of December 31, 2018, the Utility's preferred stock outstanding included $145 million of shares with interest rates between 5% and 6% designated as non-redeemable preferred stock and $113 million of shares with interest rates between 4.36% and 5% that are redeemable between $25.75 and $27.25 per share. The Utility's preferred stock outstanding is not subject to mandatory redemption. On December 20, 2017, the Boards of Directors of PG&E Corp. and the Utility determined to suspend quarterly cash dividends on the Utility's preferred stock beginning with the three-month period ending January 31, 2018, due again to the uncertainty related to the causes and potential liabilities associated with the 2017 Northern California wildfires. That suspension has remained in effect through the Petition Date.

**Prepetition Indebtedness**. The principal significant pre-Petition Date indebtedness of the Debtors consists of the following (this summary does not include any potential liabilities associated with the 2017 and 2018 Northern California wildfires, which, as stated above, could exceed $30 billion):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Revolving Credit Facilities**. Each of PG&E Corp. and the Utility are party to a separate revolving credit agreement with Bank of America, N.A., and Citibank, N.A., respectively, as administrative agents (each a "**Revolving Credit Facility**" and collectively, the "**Revolving Credit Facilities**"). The Revolving Credit Facility to which PG&E Corp. is a party permits borrowings up to an aggregate principal amount of $300 million. The Revolving Credit Facility to which the Utility is a party permits borrowings up to an aggregate amount of $3 billion. The termination date of each facility was extended in May, 2017, by one year to April 27, 2022. As of December 31, 2018, the Utility's aggregate borrowings under its Revolving Credit Facility included $2.85 billion of revolving credit loans, and approximately $80 million of letters of credit outstanding. As of December 31, 2018, PG&E Corp.'s aggregate borrowings outstanding under its Revolving Credit Facility were in the amount of $300 million.

The Revolving Credit Facilities include customary provisions regarding events of default and covenants, including covenants limiting the incurrence of secured debt as permitted under the Utility's senior notes indentures, mergers, and imposing conditions on the sale of all or substantially all assets and other fundamental changes. The Revolving Credit Facilities also have a covenant requiring that PG&E Corp. and the Utility maintain a ratio of consolidated debt to total consolidated capitalization of at most 65% as of the end of each fiscal quarter (the "**Financial Covenant**").

All obligations under the Revolving Credit Facilities are unsecured. In addition, the obligations under the Utility's Revolving Credit Facility are not guaranteed by PG&E Corp.; and the obligations under PG&E Corp.'s Revolving Credit Facility are not guaranteed by the Utility.

**Term Loans**. PG&E Corp. has an outstanding unsecured term loan in the principal amount of $350 million that matures on April 16, 2020. The Utility has an outstanding unsecured term loan in the principal amount of $250 million that matures on February 22, 2019.

**Senior Notes**. The Utility has outstanding various issues of senior notes (the "**Senior Notes**") with varying interest rates and maturities ranging from 2020 to 2047, in the aggregate outstanding principal amount of approximately $17.5 billion. The Senior Notes are unsecured obligations of the Utility and are not guaranteed by PG&E Corp. The indentures governing the Senior Notes contain a

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

provision commonly known as a "negative pledge" including an "equal and ratable" clause requiring generally that in the event the Utility incurs indebtedness secured by Principal Properties (as defined in the indentures) in excess of 10% of the Utility's Net Tangible Assets (as defined in the indentures), the Senior Notes must be simultaneously secured by the same assets on an equal and ratable basis with the newly incurred secured indebtedness.

**Pollution Control Bonds**.  The California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank have issued various series of fixed-rate and multi-modal tax-exempt pollution control bonds for the benefit of the Utility in the aggregate outstanding principal amount of approximately $860 million.  Approximately $760 million in principal amount of such pollution control bonds are backed by letters of credit.  The obligations under the reimbursement agreements entered into by the Utility in connection with the issuance of the letters of credit are unsecured obligations of the Utility and are not guaranteed by PG&E Corp.

**Trade Payables**.  As of January 28, 2019, PG&E's outstanding trade payables totaled approximately $2.1 billion.

**The Need for Chapter 11 Relief and
the Events and Circumstances Compelling
the Commencement of The Chapter 11 Cases**

**The Northern California Wildfires**

**The 2018 Camp Fire**

On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "**Camp Fire**"), located in the service territory of the Utility.  The California Department of Forestry and Fire Protection's ("**Cal Fire**") Camp Fire Incident Information Website as of January 4, 2019 (the "**Cal Fire website**"), indicated that the Camp Fire consumed 153,336 acres.  On the Cal Fire website, Cal Fire reported 86 fatalities and the destruction of 13,972 residences, 528 commercial structures and 4,293 other buildings resulting from the Camp Fire.

The cause of the Camp Fire remains under investigation and PG&E is cooperating with those investigations.  The Utility has submitted two Electric Incident Reports (the "**EIRs**") to the CPUC, one

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

on November 8, 2018 and one on November 16, 2018. On December 11, 2018, the Utility publicly released a letter to the CPUC supplementing the EIRs which stated:

- On Cal Fire's website, Cal Fire has identified coordinates for the Camp Fire near Tower :27/222 on the Utility's Caribou-Palermo 115 Kv Transmission Line and has identified the start time of the Camp Fire as 6:33 a.m. on November 8, 2018.

- On November 8, 2018, at approximately 6:15 a.m., the utility's Caribou-Palermo 115 Kv Transmission Line relayed and deenergized. At approximately 6:30 a.m. that day, a utility employee observed fire in the vicinity of Tower :27/222, and this observation was reported to 911 by Utility employees. In the afternoon of November 8, the Utility observed damage on the line at Tower :27/222. Specifically, an aerial patrol identified that a suspension insulator supporting a transposition jumper had separated from an arm on Tower :27/222.

- On November 14, 2018, the Utility observed a broken C-hook attached to the separated suspension insulator that had connected the suspension insulator to a tower arm, along with wear at the connection point. In addition, the Utility observed a flash mark on Tower :27/222 near where the transposition jumper was suspended and damage to the transposition jumper and suspension insulator.

- In addition to the events on the Caribou-Palermo 115 Kv Transmission Line, on November 8, 2018, at approximately 6:45 a.m., the Utility's Big Bend 1101 12 Kv Circuit experienced an outage. On November 9, 2018, a Utility employee on patrol arrived at the location of the pole with Line Recloser ("**LR**") 1704 on the Big Bend 1101 Circuit and observed that the pole and other equipment were on the ground with bullets and bullet holes at the break point of the pole and on the equipment. On November 12, 2018, a Utility employee was patrolling Concow Road north of LR 1704 when he observed wires down and damaged and downed poles at the intersection of Concow Road and Rim Road. At this location, the employee observed several snapped trees, with some on top of the downed wires.

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 12 of 166

**2017 Northern California Wildfires**

As has been well-reported, beginning on October 8, 2017, multiple wildfires spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Lake, Nevada, and Yuba Counties. According to a report issued by Cal Fire, dated October 30, 2017, at the peak of the 2017 Northern California wildfires, there were 21 major fires that, in total, burned over 245,000 acres and destroyed an estimated 8,900 structures. The 2017 Northern California wildfires resulted in 44 fatalities.

Cal Fire has issued its determination on the causes of 18 of the 2017 Northern California wildfires, and alleged that each of these fires involved the Utility's equipment. The remaining 2017 Northern California wildfires remain under Cal Fire's investigation, including the possible role of the Utility's power lines and other facilities. Additionally, the 2017 Northern California wildfires are under investigation by the CPUC's Safety and Equipment Divisions.

During the second quarter of 2018, Cal Fire issued news releases announcing its determination on the causes of 16 of the 2017 Northern California wildfires (the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, 37, Blue, Norrbom, Adobe, Patrick, Pythian, Nuna, Pocket and Atlas fires, located in Mendocino, Lake, Butte, Sonoma, Humboldt, Nevada and Napa counties). According to the Cal Fire news releases, the first four fires "were caused by trees coming into contact with power lines" and the remaining 12 fires "were caused by electric power and distribution lines, conductors and the failure of power poles."

On October 9, 2018, Cal Fire issued a news release announcing the results of its investigation into the Cascade fire, located in Yuba County, concluding the Cascade fire "was started by sagging power lines coming into contact during heavy winds" and that "the power line in question was owned by Pacific Gas and Electric Company." During the third quarter of 2018, Cal Fire released its investigation report related to the Point fire, concluding the Point fire was caused by the "failure of PG&E distribution line" and "could be attributed to limbs falling on the line in high winds."

On January 24, 2019, Cal Fire released the results of its investigation of the 2017 Tubbs fire, which concluded that the fire "was caused by a private electrical system adjacent to a residential

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 13 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

structure." This conclusion is consistent with PG&E's longstanding belief based on available evidence that its equipment did not cause the Tubbs fire.

Cal Fire has not publicly issued any news releases or other determinations with respect to the Maacama and Pressley wildfires. The timing and outcome of the Cal Fire investigation into the remaining fires is uncertain.

**Claims and Proceedings Related to the 2017 and 2018 Northern California Wildfires**

It is my understanding that California law includes a doctrine of "inverse condemnation" that is routinely invoked in California wildfire damages, claims and litigation. Inverse condemnation imposes strict liability (including liability for attorneys' fees) for damages as a result of the design, construction and maintenance of utility facilities, including utilities' transmission lines.

It also is my understanding that if the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the substantial cause of one or more of the 2017 and 2018 Northern California wildfires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, business interruption, interest, and attorney's fees without having been found negligent. California courts have imposed liability under the doctrine of inverse condemnation in legal actions brought by property holders against utilities on the grounds that losses borne by the person whose property was damaged through a public use undertaking should be spread across the community that benefited from such undertaking, and based on the assumption that utilities have the ability to recover these costs from their customers. Further, courts in California have determined that the doctrine of inverse condemnation is applicable regardless of whether the CPUC ultimately allows recovery by the utility for any such costs. The CPUC may decide not to authorize cost recovery even if a court decision were to determine that the Utility is liable as a result of the application of the doctrine of inverse condemnation.

It also is my understanding that in addition to such claims for property damage, business interruption, interest, and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, "future claims," and other damages under other theories of liability, including if the Utility were found to have been negligent. Further, the

Case: 19-30088 Doc# 263 Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 14 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Utility could be subject to material fines or penalties if the CPUC or any law enforcement agency brought an enforcement action, including a criminal proceeding, and determined that the Utility failed to comply with applicable laws and regulations.

As of January 11, 2019, the Debtors were aware of approximately 46 complaints on behalf of at least 2,000 plaintiffs related to the Camp Fire, six of which seek to be certified as class actions. The litigation currently pending against PG&E related to the Camp Fire includes claims under multiple theories of liability, including inverse condemnation, trespass, private nuisance, public nuisance, negligence, negligence per se, negligent interference with prospective economic advantage, negligent infliction of emotional distress, premises liability, violations of the Public Utilities Code, violations of the Health & Safety Code, malice and false advertising in violation of the California Business and Professions Code. The plaintiffs principally assert in that litigation that PG&E's alleged failure to maintain and repair its distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the Camp Fire. The plaintiffs seek damages and remedies that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, establishment of a class action medical monitoring fund, punitive damages, attorney's fees and other damages. Less than three months have elapsed since the Camp Fire, a relatively short period of time in which to assert claims. As such, PG&E expects a significant number of additional claims to be asserted with respect to the Camp Fire.

As of January 11, 2019, PG&E was aware of approximately 700 complaints on behalf of at least 3,600 plaintiffs related to the 2017 Northern California wildfires, five of which seek to be certified as class actions. These cases have been coordinated in the San Francisco County Superior Court. As of the Petition Date, the coordinated litigation is in the early stages of discovery. A trial with respect to the Atlas fire is scheduled to begin on September 23, 2019. The litigation currently pending against PG&E related to the 2017 Northern California wildfires includes claims under multiple theories of liability, including inverse condemnation, trespass, private nuisance and negligence. The claims principally assert that PG&E's alleged failure to maintain and repair its distribution and transmission lines and failure to properly maintain the vegetation surrounding such

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

lines were the causes of the 2017 Northern California wildfires. The plaintiffs seek damages that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, punitive damages, attorneys' fees and other damages.

Insurance carriers that have made payments to their insureds for property damage arising out of the 2017 Northern California wildfires have filed 41 subrogation complaints in the San Francisco County Superior Court as of January 11, 2019. These complaints allege, among other things, negligence, inverse condemnation, trespass and nuisance. The allegations are similar to the ones made by individual plaintiffs. Insurance carriers have filed three similar subrogation complaints with respect the Camp Fire in the Sacramento County Superior Court.

Various government entities, including Mendocino, Napa and Sonoma Counties and the City of Santa Rosa, also have asserted claims against PG&E based on the damages that these government entities allegedly suffered as a result of the 2017 Northern California wildfires. Such alleged damages include, among other things, loss of natural resources, loss of public parks, property damages and fire suppression costs. The causes of action and allegations are similar to the ones made by individual plaintiffs and the insurance carriers. PG&E expects similar claims to be made by various government entities with respect to the Camp Fire.

PG&E also expects to be the subject of thousands of additional claims in connection with the 2017 and 2018 Northern California wildfires.

**Potential Losses and Claims**

As noted above and as set forth in detail in the Debtors' Form 8-K, the Debtors' potential exposure with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, exclusive of potential punitive damages, fines and penalties, or damages with respect to future claims. Notably, the Debtors incurred significant fines and penalties in connection with past incidents – for example, penalties in the amount of $1.6 billion in connection with the San Bruno explosion in 2015.

PG&E has approximately $840 million of insurance coverage for liabilities, including wildfire events, for the period August 1, 2017 through July 31, 2018. During the third quarter of 2018, PG&E renewed its liability insurance coverage for wildfire events in the aggregate amount of approximately

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

$1.4 billion for the period from August 1, 2018 through July 31, 2019.  The Debtors expect that their losses with respect to the 2017 and 2018 Northern California wildfires will greatly exceed available insurance.

**SB 901**

In apparent recognition of, among other things, the severe financial strain the potential liability with respect to the 2017 Northern California wildfires would have on PG&E, on September 21, 2018, California enacted SB 901 to provide PG&E with economic relief relating to certain wildfire costs associated with the 2017 Northern California wildfires.  That relief included:

- in determining cost recovery in connection with the 2017 Northern California wildfires, directing the CPUC to consider PG&E's financial status and determine the maximum amount PG&E can pay without harming customers or materially impacting its ability to provide adequate and safe service, ensuring that the costs that are disallowed for recovery in rates assessed for the wildfires, in the aggregate do not exceed that amount; and

- authorizing the CPUC to issue a financing order that permits PG&E to recover through the issuance of recovery bonds (securitization), wildfire related costs in excess of the maximum disallowance permitted above.

The enactment of SB 901 in September, 2018, provided PG&E with the prospect that, assuming cost recovery under SB 901 was timely, PG&E would have the ability to continue to access the necessary capital on relatively customary, historical terms to address its liabilities relating to the 2017 Northern California wildfires, its other obligations, and to properly maintain and invest in its business operations.  As noted above, however, SB 901 does not address wildfires occurring in 2018 and, accordingly, provides no relief for the Camp Fire.  Moreover, again as noted above, despite the securitization relief authorized by SB 901 in connection with the 2017 Northern California wildfires, the recent rulemaking adopted by the CPUC in the OIR has made it clear that any ability of the Debtors to recover costs for the 2017 Northern California wildfires through securitization would not be available for years, if at all, and only after the Debtors have actually paid claims arising from the 2017 Northern California wildfires.

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 17 of 166

**The Debtors' Liquidity and Financial Resources**

As a result of the 2017 and 2018 Northern California wildfires, PG&E's potential liability with respect thereto, and the failure to expressly provide relief for 2018 wildfires in SB 901, PG&E's credit profile has deteriorated severely. During 2018 and 2019, the Debtors' credit ratings were subject to multiple downgrades by the credit agencies, and are currently rated below "investment grade" by all three major rating agencies. On November 13, 2018, PG&E Corp. and the Utility drew all amounts available under their respective Revolving Credit Facilities to assure access to additional liquidity. Events in recent weeks have caused significant further deterioration by reason of:

(a)    Further downgrades of the Debtors' credit ratings on January 7, 2019 and January 10, 2019, that triggered a requirement that PG&E post substantial cash collateral in connection with its power purchase and other supply arrangements;

(b)    other requests for cash collateral made by third parties, including the California State Division of Workers' Compensation, and in connection with State environmental remediation projects;

(c)    potential impending defaults under the agreements governing PG&E's existing funded debt;

(d)    significant contraction in customary trade terms;

(e)    the negative impact and uncertainty created by:

- the recent CPUC order instituting an investigation to determine whether PG&E violated legal requirements to timely locate and mark natural gas pipelines for safety purposes and falsified records;

- the recent CPUC Scoping Memo and Ruling setting forth the scope to be addressed in the next phase of its ongoing investigation into whether the organizational culture and governance of PG&E prioritizes safety and adequately directs resources to promote accountability and achieve safety goals and standards; and

- recent orders entered by the United States District Court (a) regarding whether PG&E has been in violation of its "conditions of supervision" in connection with its probation period related to the San Bruno explosion; and (b) proposing new

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1    conditions of probation.

2    In addition, to preserve liquidity, on January 15, 2019, PG&E did not make the interest payment of

3    approximately $21.6 million with respect to its outstanding 5.40% of Senior Notes due January 15,

4    2040.

5    As explained above, PG&E believed it could have accessed outside of chapter 11 limited

6    additional capital in the form of secured indebtedness or in more esoteric forms that would have been

7    expensive or dilutive. In addition, the ability to incur additional secured indebtedness would be limited

8    by covenants in PG&E's applicable loan documents, accounting accruals, as well as by "equal and

9    ratable clauses" in its indentures that, if triggered, would have had the effect of subordinating wildfire

10   claims to PG&E's existing funded debt obligations that have the benefit of such clauses and which

11   obligations currently are of the same rank and priority as wildfire claims.

12   After a comprehensive review, the Boards of both PG&E Corp. and the Utility, and

13   management determined that temporarily extending PG&E's liquidity runway was not in the best

14   interests of its economic stakeholders and would not address and, indeed would merely postpone

15   addressing, the fundamental issues facing PG&E and jeopardize its long-term viability.

16   PG&E is faced with a crisis that threatens its ability to continue to operate as a going concern

17   and to provide safe and reliable electric and gas services to its millions of customers. The Chapter 11

18   Cases are the only viable option to fairly and expeditiously resolve PG&E's wildfire liability, to restore

19   PG&E's financial health and stability, and to make sure that PG&E has the liquidity and resources to

20   fund its operations.  In connection with the administration of the Chapter 11 Cases, PG&E will

21   continue to consider all possible solutions to improve safety, reliability and service, while assuring fair

22   and equitable treatment for wildfire claimants, other creditors, its employees, customers, communities,

23   shareholders and all other parties in interest.  The Chapter 11 Cases will facilitate PG&E working with

24   these various constituencies in one centralized forum to comprehensively address and resolve its

25   liabilities, explore structural alternatives, and implement necessary changes to maximize value for all

26   of its economic stakeholders and to assure PG&E's long-term viability.

27

28

AMENDED DECLARATION OF JASON P. WELLS    19
IN SUPPORT OF FIRST DAY MOTIONS

## First Day Motions

The Debtors filed their First Day Motions on the Petition Date to ensure that the Debtors' businesses continue to function during these Chapter 11 Cases. For the reasons set forth below, I submit that (a) the relief requested in the First Day Motions is necessary to enable the Debtors to operate with minimal disruption during the pendency of their Chapter 11 Cases, and (b) approval of the First Day Motions is warranted.[1]

I. **MOTION OF DEBTORS PURSUANT TO FED. R. BANKR. P. 1015(b) FOR ENTRY OF ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES (THE "JOINT ADMINISTRATION MOTION")**

Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and request that each of their Chapter 11 Cases be administered under a consolidated caption, in the following form:

### UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-_____ (___)** |
| | § | |
| **PG&E CORPORATION** *et al.*, | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |

The Debtors further request the Court's direction that a notation substantially similar to the following language be entered on the docket maintained by the Clerk of the Court to reflect the joint administration of the Chapter 11 Cases:

> An order has been entered in accordance with Bankruptcy Rule 1015(b) directing the procedural consolidation and joint administration of the Chapter 11 Cases as set forth in the Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases, as filed on the docket in Case No. 19-[_____] ( ). The docket in Case No. 19-[_____] ( ) should be consulted for all matters affecting the case.

---

[1] Capitalized terms used in this part of the Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

Amended Declaration of Jason P. Wells 20
in Support of First Day Motions

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors. I believe that the entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow the United States Trustee for Region 17 (the "**U.S. Trustee**") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

Accordingly, I respectfully submit that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, their shareholders, and all other parties in interest, and should be granted.

II. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507, AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING AND (V) GRANTING RELATED RELIEF (THE "DIP MOTION")**

As the Senior Vice President and Chief Financial Officer of PG&E Corp., I was intimately involved in assessing the Debtors' financing needs during the course of the Chapter 11 Cases. As of the Petition Date, PG&E Corp. had approximately $370 million of cash on hand. I anticipate that amount will be more than sufficient for PG&E Corp. to meet its obligations during the course of the Chapter 11 Cases. As reported in the January 14, 2018 Form 8-K filed with the SEC, the Utility had approximately $1.1 billion in cash on hand as of that date. However, starting in early January 2019, as a consequence of supplier uncertainty, media speculation, credit downgrades, and reactions to the SB 901 15 day notice, the Utility's liquidity was depleted by an aggregate of approximately $811 million used to satisfy collateral posting needs, address accelerated payment and pre-pay demands of energy commodity suppliers, and address requests from other essential suppliers for shortened payment terms. As of the filing, the Utility had cash on hand of approximately $240 million, net of customer deposits and cash held from counterparties of approximately $250 million.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088     Doc# 263     Filed: 02/01/19     Entered: 02/01/19 18:16:49     Page 21 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Prior to the commencement of the Chapter 11 Cases, the finance team, under my direction, developed a bottoms up projection of operating cash flows and projected capital investment. The Debtors are net users of cash given the substantial capital invested in the business for routine and replenishment capital expenditures, wildfire prevention and restoration efforts; additionally, the Debtors invest in energy storage, electric vehicle initiatives and related technologies to meet California's carbon reduction goals. In addition, with the help of the Debtors' outside advisors, we developed and applied adjustments to the projections to account for the impacts of chapter 11, the working capital effect of the notice under SB 901 described above and anticipated chapter 11 expenses. That work led us to conclude that the Utility would require $5.5 billion of debtor in possession financing over a two-year period.

The Debtors project capital spending to exceed cash flow from operations by approximately $1.6 billion in each of 2019 and 2020 largely driven by projected capital spending of $6.6 billion in 2019 and $6.9 billion in 2020, as well as other investing activities of more than $300 million forecasted for 2019 and more than $125 million for 2020. This forecasted level of capital spending is in-line with historical capital spending of $5.8 billion in 2017 and $6.6 billion in 2018. Due to the regulated nature of the Utility's businesses, only a small fraction of the capital spending program is discretionary. Cash flow from operations is forecasted to be $5.3 billion in 2019 and $5.5 billion in 2020. This creates an aggregate operating cash flow deficit after capital expenditures of nearly $3.2 billion over the two-year forecast period which PG&E must finance externally.

In addition to the combined operating deficit of $3.2 billion mentioned above, the Debtors need additional funding to service the DIP Financing and pay related costs. Furthermore, the Debtors' advisors have projected that the Debtors will need to post additional collateral in 2019 of approximately $500 million to meet, among other things, environmental and other state requirements. The DIP Financing sizing also incorporates projected professional fees for estate-paid professionals to be paid during the pendency of the Chapter 11 Cases.

In the event the Chapter 11 Cases extend beyond 2020, the DIP Facility permits the Debtors, subject to Court approval and obtaining commitments from lenders, to access up to $4 billion of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

incremental DIP Financing. The incremental financing need was derived by assuming that cash flow from operations remain consistent with prior years, capital spending increases slightly from 2020 and all other costs related to the Chapter 11 Cases are extended for an additional year. I believe that the DIP Facility and incremental financing will provide adequate liquidity to the Debtors throughout the pendency of the Chapter 11 Cases, assuming emergence from chapter 11 no later than 2021.

The Debtors would experience irreparable harm if the interim order approving the DIP Motion is not entered. Access to immediate financing is essential to ensure that the Utility has sufficient working capital to continue operating. Absent authority to borrow under the DIP Facility on an emergency basis, the Debtors will not be able to continue operations on a normal basis which could potentially create public safety issues due to the inability to provide services to their customers and maintain safe operations, resulting in immediate and irreparable harm to the Debtors and their estates, creditors (including wildfire claimants), employees, customers, and PG&E Corp.'s shareholders, and jeopardize their ability to successfully administer these Chapter 11 Cases.

The Debtors enter chapter 11 with only $860 million of aggregate cash. Approximately $250 million of that cash is comprised of customer deposits that the Debtors believe should not be used to fund their operations and working capital needs. Approximately $370 million is held by PG&E Corp. for its own uses. As a result, the Utility, which is the operating entity of the Debtors, has access to only $240 million of cash as of the Petition Date, which is insufficient to meet operating expenses and address short-term working capital needs and to have sufficient additional liquidity to address both ordinary course and non-ordinary course variability in the business. The Debtors believe they need access to $1.5 billion of post-petition DIP financing during the course of the interim period to operate their businesses in an appropriate and prudent manner.

The Debtors evaluated, with the assistance of their advisors, the amount of funding that they will require during the interim borrowing period of the Chapter 11 Cases. The amount was derived from a cashflow projection developed from an analysis of the Debtors' receipts and disbursements (the "**13-Week Budget**," attached to the DIP Motion as Exhibit C). I believe the 13-Week Budget presents a reasonable estimate of the Debtors' cash sources and needs during the next thirteen weeks.

Given these estimates, access to the requested portion of the DIP Facility would provide the Debtors sufficient liquidity to stabilize their operations during the Interim Period. Specifically, the DIP Facility will allow the Debtors to: (a) acquire timely energy supply that is essential to the Debtors' ability to provide uninterrupted services to their customers; (b) provide the liquidity necessary to stabilize supply with other non-energy vendors including those performing critical safety, vegetation management, and wildfire restoration services; (c) fund approximately $260 million of payroll obligations coming due in the first month of the Chapter 11 Cases; (d) fund other essential payments to be made under first day orders; (e) fund collateral that the state has requested to backstop the Debtors' workers' compensation programs; (f) fund the near-term administrative costs of these Chapter 11 Cases; and (g) permit the Debtors to maintain a working capital reserve of $450 million to cover the intra month timing of energy supply costs. The interim DIP funding amount would also provide a reasonable liquidity buffer to the Debtors in the event they underperform their projections, or in case unexpected fluctuations occur in energy markets causing a disruption in supply or requirements to post additional collateral, which could result in the need to access several hundred million dollars within a day's time. Furthermore, the liquidity buffer provides the Utility with the necessary resources to respond to winter storms or other emergency circumstances.

By contrast, without the funding provided by the DIP Facility during the Interim Period, the Debtors' access to cash needed to operate their businesses would evaporate and energy suppliers and trade creditors would likely cease extending credit, creating a vicious cycle that would jeopardize the Debtors' ability to operate.

Moreover, ensuring that the Debtors continue to operate pending a final hearing on the DIP Motion is not merely a commercial objective. Unlike many other chapter 11 cases, here, it is especially crucial that the Debtors obtain financing to continue their operations because the Debtors provide energy to nearly 16 million people across 700,000 square miles in Northern and Central California. Given the nature of the Debtors' businesses, any interruption of the Debtors' ability to pay vendors and operate their businesses could potentially (i) cause environmental hazards or pose

significant risk to the environment, (ii) pose a threat to health and public safety, or (iii) compromise the ability to provide power to the California electrical grid.

Based upon the above, I believe the DIP Facility represents the best option for meeting the Debtors' liquidity needs, and respectfully submit that the Debtors should be authorized to access up to $1.5 billion of the DIP Facility during the Interim Period.

III. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507 AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO (I) (A) CONTINUE EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) CONTINUE INTERCOMPANY ARRANGEMENTS, (D) CONTINUE TO HONOR OBLIGATIONS RELATED TO JOINT INFRASTRUCTURE PROJECTS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b) (THE "CASH MANAGEMENT MOTION").**

Pursuant to the Cash Management Motion, the Debtors are seeking interim and final authority, in the ordinary course of business and consistent with the Debtors' prepetition practices, to (i)(a) continue operating their existing cash management system (the "**Cash Management System**"), as described herein, including the continued maintenance of existing bank accounts at the Debtors' banks (the "**Banks**"), (b) honor certain prepetition obligations related to the Cash Management System, (c) continue certain intercompany arrangements among the Debtors and certain non-Debtor affiliates and subsidiaries (the "**Non-Debtor Affiliates and Subsidiaries**"), (d) continue to honor all obligations with respect to certain Joint Infrastructure Projects (as defined below), and (e) maintain existing business forms; and (ii) waive the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Bank Accounts (as defined below). Further, pursuant to the Cash Management Motion, the Debtors request that the Court authorize, but not direct, the Banks to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent the Debtors have sufficient funds standing to their credit with such Bank, whether such checks were presented or electronic request were submitted before or after the Petition Date, and that all such Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the Cash Management Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

In the ordinary course of business, the Debtors utilize their Cash Management System, which is an integrated, centralized system designed to collect, transfer, and disburse funds generated by their electricity and natural gas operations. The Cash Management System has several main components: (i) cash collection, including the collection of payments made to the Debtors from revenue generated in the ordinary course through the sale and delivery of electricity and natural gas to customers; (ii) relatively minimal cash transfers among the Debtors and certain Non-Debtor Affiliates and Subsidiaries; and (iii) cash disbursements that fund the Debtors' business operations and related obligations. Although the Utility and PG&E Corp. each maintain separate systems, the Cash Management System is an integrated system. Pursuant to that certain *Restated Continuing Services Agreement*, dated October 15, 1999, between the Utility and PG&E Corp, (the "**PG&E Corp. CSA**"), the Utility operates the cash management system of PG&E Corp. and all transfers between accounts held by PG&E Corp. and the Utility are made pursuant to wire transfers in accordance with the PG&E Corp. CSA. It is critical that the Cash Management System remains intact during these Chapter 11 Cases to ensure the seamless continuation of transactions and the uninterrupted supply of power and electricity to the Utility's customers.

The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of the Bank Accounts located at the Banks, including, but not limited to, the accounts listed on Schedule 1 to the proposed interim order annexed to the Cash Management Motion. The Debtors maintain one-hundred eight (108) bank accounts (each, a "**Bank Account**" and, collectively, the "**Bank Accounts**") at various Banks, of which thirty (30) are actively used in the Cash Management System (such accounts, the "**Primary Bank Accounts**"). Of the Primary Bank Accounts, sixteen (16) accounts are maintained at The Bank of New York Mellon ("**BNYM**"), six (6) accounts are maintained at Bank of America, N.A. ("**BoAML**"), four (4) accounts are maintained at Citibank, N.A. ("**Citi**"), one (1) account is maintained at Royal Bank of Canada ("**RBC**"), two (2) accounts are maintained at Union Bank of California ("**Union Bank**"), and one (1) account is maintained at U.S. Bank, N.A ("**U.S. Bank**").

Case: 19-30088   First Day Motions   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 26 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Twenty-one (21) of the Primary Bank Accounts are maintained at Banks designated as authorized depositories by the U.S. Trustee pursuant to the U.S. Trustee's Guidelines (the "**UST Guidelines**").

The remaining seventy-eight (78) Bank Accounts are not utilized in the day-to-day flow of funds throughout the Cash Management System and are comprised mainly of specialized accounts, including: (a) forty-nine (49) tax-exempt bond accounts, maintained in connection with each of the Debtors' tax-exempt debt issuances, held at Deutsche Bank Trust Company Americas (the "**Deutsche Bank Bond Accounts**"), (b) six (6) escrow accounts maintained in connection with ongoing partnerships with third-parties held at U.S. Bank N.A. Global Corporate Trust Services (the "**U.S Bank Escrow Accounts**"), (c) three (3) trust accounts maintained in connection with retirement benefits - two (2) held at Wells Fargo Bank N.A. (Acct No. XX5300 and XX5400) and one (1) at Fidelity Management Trust Company (Acct No. XX0137) (the "**Retiree Benefit Trust Accounts**"), (d) one (1) account to hold certain reserve funds for employees who work with asbestos in the course of their employment required under the Asbestos Hazard Emergency Response Act held at BoAML (Acct No. XX2988) (the "**Asbestos Medical Reserve Account**"), (e) two (2) accounts for contributions to political action committees funded from voluntary deductions from employee payroll held at Bank of Marin (Acct Nos. XX0132 and XX0140) (the "**PAC Accounts**"), (f) two (2) legacy accounts established prior to the transition to payroll at BoAML (Acct No. XX7115) for employees to cash checks held at BNYM (Acct No. XX4017) and at BoAML (Acct No. XX1675) (the "**Legacy Payroll Accounts**"), (g) one (1) account that was used to hold funds from PG&E Corp.'s Commercial Paper Program held at Citi (Acct No. XX9167) (the "**CP Account**" and together with the Deutsche Bank Bond Accounts, the U.S Bank Escrow Accounts, the Retiree Benefit Trust Accounts, the Asbestos Medical Reserve Account, the PAC Accounts, and the Legacy Payroll Accounts, the "**Specialty Accounts**"), and (h) fourteen (14) dormant accounts with no activity or *de minimis* balances (the "**Dormant Accounts**").

The Debtors maintain robust controls relating to the Cash Management System. The Cash Management System is overseen by personnel working in the Banking and Money Management ("**B&MM**") division of the Utility's treasury department (the "**Treasury Department**"). B&MM

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 27 of 166

manages all aspects of the Cash Management System, providing services that include cash positioning, cash concentration, wire transfers, automated clearing house ("**ACH**") transfers, tax payments, and the issuance of short-term debt and purchase or redemption of investments, as well as managing bank accounts for certain Non-Debtor Affiliates and Subsidiaries.  On a daily basis, B&MM prepares a cash summary that reflects the cash position after incoming and outgoing payments (via cash, wire transfer, ACH, or check), including short-term debt and short-term investment purchases or redemptions.  Although certain recurring electronic payments are made automatically, disbursements by wire transfer require dual approval, and disbursements by check are reconciled before they clear.  In preparing the daily cash summary, B&MM conducts a review of cash account balances, confirms that all manual wire transfers have been properly authorized, and determines whether all investments are in line with the Debtors' short-term investment policy (the "**Short-Term Investment Policy**").  Under the oversight of each of the Debtors' Controller, corporate accounting reconciles all Bank Account balances against the Debtors' books and records on a monthly basis.  Various levels of authorizations are required for the release of disbursements, which are determined by the size and type of the disbursement.

As explained in further detail below, the Cash Management System is generally comprised of four (4) different types of accounts: (a) collection accounts into which cash and other receivables generated from the Debtors' operations are deposited (collectively, the "**Collection Accounts**"), (b) concentration accounts into which cash is automatically swept from the various Collection Accounts on a daily basis (collectively, the "**Concentration Accounts**"), (c) disbursement accounts for designated disbursements (collectively, the "**Disbursement Accounts**"), and (d) the Specialty Accounts.  An average of approximately $81.6 million in receipts and $86.0 million in disbursements flows through the Cash Management System per banking day.  A diagram illustrating the general movement of cash through the Cash Management System is annexed as <u>Exhibit B</u> to the Cash Management Motion.

Given the complexity of the Debtors' operations and the volume of transactions processed through the Cash Management System each day, maintaining the Cash Management System in its

Case 19-30088 First Day Motions Doc 263 Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 28 of 166

current state is crucial to the Debtors' continued operations. Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations, which may result in power outages or other service disruptions to the Debtors' customers, and may impede the successful administration of these Chapter 11 Cases.

### A. Collection Accounts

#### 1. Utility Collection Accounts

As part of its daily operations, the Utility collects cash, checks, wire transfers, ACH payments, and credit card and debit card payments from customers and certain third parties. As described below, these funding sources flow into the Utility Master Concentration Account (as defined below) through nine (9) depository accounts (the "**Utility Depository Accounts**"). When the Utility is in receipt of proceeds from non-recurring funding sources such as tax refunds, debt issuances, and rebates issued by regional service operators and/or independent system operators, such proceeds are deposited directly into the Utility Master Concentration Account (as defined below).

##### a) Customer Depository Accounts

The Utility maintains five (5) Utility Depository Accounts (each a "**Utility Customer Depository Account**") that process customer payments. Two (2) Utility Customer Depository Accounts (Acct Nos. XX5477 and XX7822) are held at BNYM, one (1) account (Acct No. XX1958) is held at Citi, one (1) account (Acct No. XX0817) is held at BoAML, and one (1) account (Acct No. XX5581) is held at Union Bank. The BNYM, BoAML, and Citi Utility Customer Depository Accounts only accept electronic payments posted through online and mobile payment channels and customer ACH debits. The Union Bank Utility Customer Depository Account collects cash and check payments that are either mailed to the Utility or made directly at the Utility's local offices. All of the Utility Customer Depository Accounts, except for the Union Bank Account, are zero balance accounts, meaning they do not carry a cash balance at the end of each business day. The funds in the Citi and BoAML Utility Customer Depository Accounts are swept into the Citi Utility Concentration Account and BoAML Utility Concentration Accounts (each as defined below), respectively, on a daily basis, where the funds ultimately flow into the Utility Master Concentration Account. The BNYM Utility

Case 19-30088 Doc 263 Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 29 of
166

Customer Depository Accounts are swept into the Utility Master Concentration Account on a daily basis.

### b) Utility Campground Collection Accounts

The Utility also maintains two (2) Utility Depository Accounts (the "**Utility Campground Depository Accounts**") that process payments from customers that use campgrounds owned by the Utility. One (1) Utility Campground Depository Account is held at U.S. Bank (Acct No. XX2311) and one (1) Utility Campground Depository Account is held at BoAML (Acct No. XX2302).

### c) Non-Energy Collection Account

The Utility also maintains one (1) Utility Depository Account to collect funds from certain non-energy related revenue sources held at Citi (Acct No. XX2901).

### d) Outside Collections Accounts

In the ordinary course of business, the Utility contracts with third-parties to collect on customer accounts that have fallen into delinquency. The proceeds of such activities are deposited into a Utility Customer Depository Account held at Citi (Acct No. XXX2316) (the "**Utility Outside Collection Account**"). The Utility Outside Collection Account is a zero balance account and is swept into the Citi Utility Concentration Account on a daily basis.

### 2. PG&E Corp. Collection Accounts

As PG&E Corp.'s primary asset is its equity interest in the Utility, it does not maintain any third-party collection accounts.

### B. Concentration Accounts[2]

### 1. Utility Concentration Accounts

The Utility maintains three (3) accounts where it concentrates and collects cash from its various Depository Accounts (collectively, the "**Utility Concentration Accounts**"): (a) one (1) primary concentration account with BNYM (Acct No. XX9994) (the "**Utility Master Concentration Account**"); (b) one (1) customer deposit concentration account with BoAML (Acct No. XX3212) (the

---

[2] Prior to the Petition Date, the Utility issued commercial paper in the ordinary course of business to cover short-term liquidity needs (the "**Commercial Paper Program**"). Citi served as the issuing and payment agent with respect to issuances and redemptions of commercial paper under the Commercial Paper Program. The Commercial Paper Program is not currently active and the Debtors are not currently seeking relief to continue the Commercial Paper Program at this time.

AMENDED DECLARATION OF JASON P. WELLS IN SUPPORT OF FIRST DAY MOTIONS

30

"**BoAML Utility Concentration Account**"); and (c) one (1) customer deposit concentration account with Citi (Acct No. XX0901) (the "**Citi Utility Concentration Account**"). The Utility funds its business operations and related expenditures from the revenues and funds that flow through the Utility Concentration Accounts, including payments of principal and interest on account of the Utility's prepetition debt and intercompany payments made to StanPac (as defined below), Gill Ranch (as defined below), and PG&E Corp. (pursuant to the PG&E Corp. CSA). The Utility Master Concentration Account serves as the Utility's main centralized operating account into which receipts and customer payments are ultimately deposited from the Utility Customer Depository Accounts and from which disbursements are made throughout the Cash Management System as necessary. Historically, the proceeds of financings and draws on the Utility's $3 billion prepetition unsecured revolving credit facility were deposited directly into the Utility Master Concentration Account. As of the Petition Date, such facility had approximately $35 million of undrawn capacity. Additionally, from time to time, excess funds in the Utility Master Concentration Account at the close of market may be invested by B&MM on an overnight basis until the following business day, in accordance with the Debtors' Short-Term Investment Policy, which is discussed in further detail below.

Funds in the BoAML Utility Customer Depository Account are automatically swept into the BoAML Utility Concentration Account on a daily basis. The funds in each of the Citi Utility Customer Depository Account and the Citi Utility Outside Collections Depository Account are automatically swept into the Citi Utility Concentration Account on a daily basis. Funds in the BoAML Utility Concentration Account and Citi Utility Concentration Account are manually drawn down to the Utility Master Concentration Account on a daily basis. The Utility Campground Depository Accounts are manual swept into the Utility Master Concentration Account on a periodic basis.

### 2. PG&E Corp. Concentration Accounts

PG&E Corp. concentrates and collects its cash in one primary account with BNYM (Acct No. XX9023) (the "**PG&E Corp. Master Concentration Account**"). PG&E Corp. funds its business operations and related expenditures from the revenues and funds that flow through the PG&E Corp. Master Concentration Account, including payments of principal and interest on account of PG&E's prepetition debt and intercompany payments made to the Utility pursuant to the PG&E Corp. CSA.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The PG&E Corp. Master Concentration Account serves as PG&E Corp.'s main centralized operating account into which funds are ultimately deposited from transfers from the Utility pursuant to the PG&E Corp. CSA and from which disbursements are made throughout the Cash Management System as necessary.

Historically, the proceeds of financings and draws on PG&E Corp.'s $300 million prepetition unsecured revolving credit facility were deposited directly into the PG&E Corp. Master Concentration Account. As of the Petition Date, the revolving credit facility is fully drawn. Additionally, from time to time, excess funds in the PG&E Corp. Master Concentration Account at the close of market may be invested by B&MM on an overnight basis until the following business day, in accordance with the Debtors' Short-Term Investment Policy, which is discussed in further detail below.

**C.  Disbursement Accounts**

**1.  Utility Disbursement Accounts**

The Utility uses the funds in the Utility Master Concentration Account to fund its ongoing operations through nine (9) disbursement accounts (collectively, the "**Utility Disbursement Accounts**"). All of the Utility Disbursement Accounts are zero balance accounts. On a daily basis, the Utility projects its disbursement obligations and funds the Utility Disbursement Accounts accordingly. The following is a brief summary of the various Utility Disbursement Accounts.

- **Vendor Disbursement Account.** Two (2) disbursement accounts at BNYM (Acct Nos. XX9978 and XX9990) are designated to fund nearly all operating expenses and capital expenditures related to the Utility's business operations, including all third party vendor, supplier payments and customer payments as well as employee expense reimbursements.

- **BoAML Payroll Disbursement Accounts**. One (1) disbursement account at BoAML (Acct No. XX7115) is used to fund employee payroll, which is funded from the BoAML Concentration Account.

- **Disability Disbursement Account.** The Utility maintains an account at BNYM (Acct No. XX8544) dedicated to making distributions to employee participants in the Utility's short-term disability plan.

- **Customer Refund and Rebate Accounts.** The Utility maintains two (2) additional disbursement accounts at BNYM (Acct Nos. XX3044 and XX3532) which distribute refunds, rebates, and reimbursements to the Utility's customers.

- **RBC Currency Exchange Account.** The Utility maintains a disbursement account

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 32 of 166

with RBC (Acct No. XX0446) to facilitate purchases of natural gas from Canadian entities that only accept payment in Canadian dollars.

- **Gill Ranch Operating Account.** As discussed in more detail below, the Utility maintains an operating account for the Gill Ranch natural gas storage facility at BNYM (Acct No. XX4122).

- **Land Drafts Account.** The Utility maintains a disbursement account with BNYM (Acct No. XX0143) to issue checks in connection with health care and injury claims incurred by individuals and with the Utility's land management activities.

### 2. PG&E Corp. Disbursement Accounts

PG&E Corp. uses the funds in the PG&E Corp. Master Concentration Account to fund its ongoing operations through five (5) disbursement accounts (collectively, the "**PG&E Corp. Disbursement Accounts**"). All of the PG&E Corp. Disbursement Accounts are zero balance accounts. On a daily basis, PG&E Corp. projects its disbursement obligations and funds the PG&E Corp. Disbursement Accounts accordingly. The following is a brief summary of the various PG&E Corp. Disbursement Accounts.

- **Vendor Disbursement Account.** One (1) disbursement account at BNYM (Acct No. XX4558) is designated to fund nearly all operating expenses and capital expenditures related to PG&E Corp's operations, including all third-party vendor and supplier payments.

- **Payroll Disbursement Accounts.** One (1) disbursement account at BNYM (Account No. XX9946) (the "**PG&E Corp. Payroll Funding Account**") and two (2) payroll disbursement accounts at BoAML (Acct Nos. XX7981 and XX7107), with one utilized for checks and the other for direct deposit payments, each of such accounts is funded from the PG&E Corp. Payroll Funding Account.

- **Union Bank Payroll Account.** PG&E Corp. maintains one (1) payroll account at Union Bank of California (Acct No. XX9557) to comply with certain state law requirements.

### D. Intercompany Transactions

In the ordinary course of business, the Debtors maintain business relationships among themselves and with the Non-Debtor Affiliates and Subsidiaries, which result in intercompany receivables and payables (the "**Intercompany Transactions**"). The various categories of Intercompany Transactions are summarized in further detail below. The Debtors maintain records of all transfers and, therefore, can ascertain, trace, and account for all Intercompany Transactions, and will continue to do so during these Chapter 11 Cases. If the Intercompany Transactions were to be

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and all stakeholders. Accordingly, pursuant to the Cash Management Motion, the Debtors are seeking authority to continue the Intercompany Transactions and make any prepetition payments related thereto.

### 1. The PG&E Corp. CSA

The Utility and PG&E Corp. are parties to the PG&E Corp. CSA. Under the terms of the PG&E Corp. CSA, PG&E Corp. provides certain corporate services to the Utility, including, among other things, management staffing, strategic planning, and investor relations support (the "**PG&E Corp. Affiliate Services**"). From time to time, PG&E Corp. also contributed certain equity securities to the Utility, which the Utility distributed to its employees in accordance with its share-based employee incentive plans (the "**PG&E Corp. Equity Contributions**"). The Utility and PG&E Corp. also share certain corporate services and allocate the relative costs of such services and expenses between each other, including, without limitation, accounting and audit functions, money management and investment services, payroll administration, legal, governance, and public relations (the "**Shared Services**"). Furthermore, the Utility funds certain of PG&E Corp.'s operating expenses, including, among other things, the purchase of insurance (the "**Corp. Expenses**"). The intercompany obligations and related transfers that arise under the PG&E Corp. CSA are governed by CPUC Decisions 96-11-017 and 97-12-088, as well as certain other CPUC-approved tariffs, and are generally subject to CPUC oversight. PG&E Corp. invoices the Utility on a monthly basis for reimbursement of the PG&E Corp. Affiliate Services, the Utility's allocation of the Shared Services, including the costs incurred by PG&E Corp. for the purchase of any associated goods during the preceding month, and, if applicable, the value of any PG&E Corp. Equity Contributions ultimately distributed to the Utility's employees (collectively, the "**Corp. CSA Claims**"). Likewise, the Utility invoices PG&E Corp. on a monthly basis for reimbursement of the costs of Shared Services allocated to PG&E Corp., including the costs of any associated goods, as well as PG&E Corp.'s allocated share of the Corp. Expenses that were incurred during the preceding month (collectively, the "**Utility CSA Claims**"). Corp. CSA Claims are paid via wire transfer directly out of the Utility Disbursement Account XX9978 (rather than book entry) and must be paid within 30 days of receipt of invoice. Similarly, Utility CSA Claims are paid

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 34 of
166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

via wire transfer directly out of the PG&E Corp. Disbursement Account XX4558 (rather than book entry) and must be paid within 30 days of receipt of invoice. During the 12-month period prior to the Petition Date, the monthly average of Corp. CSA Claims that the Utility owed to PG&E Corp. was approximately $13.8 million, and that PG&E Corp. owed to the Utility was approximately $1.8 million.

### 2. Non-Debtor Affiliates' and Subsidiaries' Continuing Services Agreements

The Utility is party to shared services arrangements with certain Non-Debtor Affiliates and Subsidiaries, including the following agreements: (a) that certain *Continuing Services Agreement* between the Utility and PG&E Corporation Support Services, Inc., dated Oct. 15, 1999, (b) that certain *Continuing Services Agreement* between the Utility and Pacific Energy Capital IV, LLC, dated July 27, 2010, (c) that certain *Continuing Services Agreement* between the Utility and PCG Capital, Inc., dated March 1, 2011, (d) that certain *Continuing Services Agreement* between the Utility and PG&E Corporation Support Services II, Inc., dated April 16, 2007, (e) that certain *Continuing Services Agreement* between the Utility and Certain Subsidiaries, including Eureka Energy Company, Natural Gas Corporation of California, and Pacific Energy Fuels Company, dated March 28, 2008, and (f) that certain *Continuing Services Agreement* between the Utility and Eureka Energy Company, dated February 23, 2009 (collectively, the "**Utility Non-Debtor CSAs**").

PG&E Corp. has also entered into shared services arrangements with certain Non-Debtor Affiliates and Subsidiaries, including the following agreements: (a) that certain *Continuing Services Agreement* between PG&E Corp. and PG&E Corporation Support Services, Inc., dated Oct. 13, 1999 and (b) that certain *Continuing Services Agreement* between PG&E Corp. and PG&E Corporation Support Services II, Inc., dated April 13, 2007 (collectively, the "**PG&E Corp. Non-Debtor CSAs**" and, together with the Utility Non-Debtor CSAs, the "**Non-Debtor CSAs**").

The Non-Debtor CSAs provide for the exchange of certain corporate services between the Debtors and the applicable Non-Debtor Affiliates and Subsidiaries (the "**Non-Debtor Shared Services**"). These Non-Debtor Shared Services are relatively *de minimis* and include, but are not limited to, joint purchasing of third-party services and goods as well as shared services related to joint corporate oversight, governance, support systems and personnel, to the extent such shared services

conform to requirements of CPUC Decision 97-12-088. On an annual basis, the net cash impact on the Debtors with respect to amounts owed by the Debtors to the Non-Debtor Affiliates and Subsidiaries and to the Debtors by the Non-Debtor Affiliates and Subsidiaries is effectively neutral. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of Non-Debtor Shared Services.

### 3. Standard Pacific Gas Line

The Utility holds an 86% ownership interest in Standard Pacific Gas Line, Inc. ("**StanPac**"). StanPac owns approximately 55 miles of natural gas pipelines located in Contra Costa County and the greater Sacramento area. The Utility operates StanPac and regularly incurs related operating expenses and capital costs (the "**StanPac Costs**"). Pursuant to that certain *System Management and Operating Agreement*, dated March 28, 1996, among the Utility, StanPac, and Chevron Pipeline Company (the "**StanPac Operating Agreement**"), the Utility invoices StanPac for the StanPac Costs on a monthly basis. Under the StanPac Operating Agreement, the Utility is obligated to fund its proportional, allocated share of certain non-capital expenses, including taxes (the "**StanPac Non-Capital Costs**"), on a monthly basis or at such time that such StanPac Non-Capital Costs come due. In the ordinary course of business, the Utility wires an amount equal to its allocated share of the previous month's StanPac Non-Capital Costs directly to StanPac. During the 12-month period prior to the Petition Date, the monthly average of StanPac Non-Capital Costs that the Utility paid to StanPac was approximately $400,000. To maintain its pipeline connections to the intrastate and interstate natural gas pipeline grid, it is critical that the Utility continue paying the StanPac Costs and StanPac Non-Capital Costs in the ordinary course. As of the Petition Date, the Utility estimates that it owes approximately $400,000 on account of StanPac Costs and Stanpac Non-Capital Costs. and that approximately $400,000 of that amount will become due and payable within thirty (30) days after the Petition Date.

### 4. Gill Ranch Project

The Utility owns a 25% ownership interest in an underground natural gas storage facility (the "**Gill Ranch Project**") at Gill Ranch, located near Fresno, California, with a capacity of approximately 20 billion cubic feet. The other 75% of the Gill Ranch Project is owned by Gill Ranch Storage, LLC ("**Gill Ranch LLC**"), the operator of the Gill Ranch Project, which, in turn, is owned by Norwest

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Natural Gas. The Gill Ranch Project is linked to the Utility's natural gas mainline transmission system, allowing it to serve customers throughout California. Pursuant to that certain *Joint Project Agreement*, dated January 31, 2018, between Gill Ranch LLC and the Utility, and that certain *Operator Agreement*, dated January 31, 2008, between Gill Ranch LLC and the Utility (collectively, the "**Gill Ranch Agreements**"), the Utility is obligated to fund its proportionate, allocated share of operating costs, capital expenses, and certain other non-capital expenses for the Gill Ranch Project on a monthly basis (the "**Gill Ranch Costs**"). To maintain access to its emergency natural gas reserves it is critical that the Utility continue paying the Gill Ranch Costs in the ordinary course. Pursuant to the Gill Ranch Agreements, and in the ordinary course of business, the Utility deposits an amount equal to its allocated share of the previous month's Gill Ranch Costs into an account maintained by the Utility and held at BNYM (Acct. No. XX4122). The funds in such account are used by Gill Ranch LLC, as operator, to develop, operate and manage the Gill Ranch Project in accordance with approved programs and budgets. During the 12-month period prior to the Petition Date, the monthly average of Gill Ranch Costs that the Utility owed in connection with the Gill Ranch Project was approximately $200,000. As of the Petition Date, the Utility estimates that it owes approximately $200,000 on account of Gill Ranch Costs and that approximately $200,000 of that amount will become due and payable within thirty (30) days after the Petition Date.

The Cash Management System is similar to those commonly employed by other large corporate enterprises in which transfers between related entities are tracked as Intercompany Transactions. At any point in time, there may be outstanding amounts due and owing between the Debtors themselves as well as between the Debtors and their Non-Debtor Affiliates and Subsidiaries, all of which are recorded and documented as Intercompany Transactions.

It is my understanding based upon discussions with counsel, that the Debtors do not require the Court's approval to continue entering into and performing under the Intercompany Transactions because the Debtors enter into and perform under Intercompany Transactions "in the ordinary course of business." Furthermore, as stated above, transfers that take place pursuant to the PG&E Corp. CSA are subject to CPUC oversight. The Intercompany Transactions between PG&E Corp. and the Utility

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 37 of
166

are integral to their ongoing operations and to providing reliable utility services to their customers. As previous stated, the Intercompany Transaction between the Debtors and the Non-Debtor Affiliates and Subsidiaries are relatively *de minimis*.

In addition, prepetition payments of amount owing with respect to StanPac, the Gill Ranch Project, and the Joint Infrastructure Projects will assure the ongoing operation of those ventures, that the Debtors continue to receive certain basic services on an uninterrupted basis, and allow the Debtors to maintain their investment in such ventures. The Debtors also intend to continue making all post Petition Date payments relating to those ventures in the ordinary course of business.

### E. Joint Infrastructure and Co-Ownership Projects

In the operation of its gas delivery and power distribution business, the Utility's infrastructure often interfaces with third-party equipment, including various gas pipeline and electric transmission interconnections. In some instances, certain pipelines, facilities, and transmission infrastructure are jointly owned by the Utility and one or more third-parties (the "**Joint Infrastructure Projects**") and, in some cases, are maintained to comply with regulatory and compliance requirements. The Joint Infrastructure Projects are typically governed by contractual arrangements between the Utility and the applicable third-party that provide for the scope of each party's obligations, including obligations to operate and maintain the infrastructure, contribute capital, and/or pay for services. During the 12-month period prior to the Petition Date, the monthly average that the Utility paid in connection with the Joint Infrastructure Projects was *de minimis* and the monthly average that the Utility received in connection with Joint Infrastructure Projects was approximately $600,000. As of the Petition Date, the Utility estimates that any amounts owed on account of the Joint Infrastructure Projects are *de minimis*. The Debtors seek authority to pay such amounts, including any amounts relating to the period prior to the Petition Date, as they come due in the ordinary course of business.

### F. Short-Term Investment Policy

The Short-Term Investment Policy, a copy of which is annexed as <u>Exhibit C</u> to the Cash Management Motion, provides guidance for the Debtors to sweep excess funds in the Utility Master Concentration Account and the PG&E Corp. Master Concentration Account on an overnight basis. The Debtors move excess funds from those accounts to brokerage accounts held at BNYM (Acct No.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

XX98400 for the Utility and Acct No. XX18400 for PG&E Corp). The amounts invested pursuant to the Short-Term Investment Policy vary on a daily basis. Pursuant to the Short-Term Investment Policy, (i) investments are limited to highly marketable, interest-earning securities with stable market values and maturities of 12 months or less, and (ii) the Debtors must sufficiently assess the credit rating for parent companies of entities issuing securities prior to investing in those securities.[3] The objective of the Short-Term Investment Policy is to achieve the best available yield while ensuring safety and preservation of principal and maintaining adequate liquidity to meet cash flow requirements. Investments made pursuant to the Short-Term Investment Policy are subject to multiple internal controls which require, among other things, that only designated employees may make investments pursuant to the Short-Term Investment Policy, all investments must be in compliance with the Sarbanes–Oxley Act of 2002, financial institutions must send confirmations of investment transactions directly to persons or departments responsible for recording cash transactions, and monthly investment statements must be reconciled to the Debtors' general ledger accounts. Typically, the following types of investments are approved pursuant to the Short-Term Investment Policy: (i) money market mutual funds, (ii) bank-related securities, (iii) U.S. government and government-sponsored securities, (iv) repurchase agreements, (v) corporate debt securities, and (vi) state and local government obligations. During the pendency of the Chapter 11 Cases, the Debtors will limit investments to U.S. government and government-sponsored securities that are backed by the full faith and credit of the United States.

It is my understanding based upon discussions with counsel that section 345(a) of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes such deposits or investments as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." I further understand that, tor deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the debtor obtain from the "entity with

---

[3] In addition, B&MM invests certain funds held by the Utility in the Voluntary Disability Plan Insurance ("**VPDI**") brokerage account (Acct No. XX48400 held at BNYM), which account is maintained to comply with certain state requirements relating to employee contributions to the Debtors' VPDI.

which the money is deposited or invested a bond in favor of the United States [that is] secured by the undertaking of a[n adequate] corporate surety . . . unless the court for cause orders otherwise."

It is my understanding based upon discussions with counsel that, in chapter 11 cases such as these, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of chapter 11 by unduly hampering a debtor's ability under section 345(a) to invest money such "as will yield the maximum reasonable net return on such money." It is my understanding based upon discussions with counsel that, here, the Debtors satisfy both the procedural and substantive requirements necessary to obtain a waiver of section 345(b) of the Bankruptcy Code.

First, as set forth above, twenty-one of the thirty Primary Bank Accounts are maintained at banks that have been approved by the U.S. Trustee as "authorized depositories" in accordance with the UST Guidelines. Although BNYM and RBC are not U.S. Trustee-designated authorized depositories, BNYM is a highly rated, nationally chartered bank, and both are subject to supervision by national banking regulators. BNYM is the world's largest custodian bank and asset servicing company with $1.9 trillion in assets under management and $33.3 trillion in assets under custody as of December 2017. RBC holds consolidated assets of over $832 billion, operates in 44 countries, and has been approved as a qualifying foreign banking organization by the Federal Reserve Board, thereby subjecting it to the same comprehensive regulatory regime that governs the operations of U.S. domestic banking entities. To the extent that the accounts at RBC and BNYM are not in technical compliance with the requirements of section 345, pursuant to the Cash Management Motion, the Debtors seek to have such requirements waived so as to allow BNYM and RBC to accept and hold cash in accordance with the Debtors' prepetition practices. Furthermore, the Short-Term Investment Policy, as modified by the Debtors, is in compliance with section 345(b) as the modified Short-Term Investment Policy limits investments to those that are either "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."

Case 19-30088    Doc 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 40 of
166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Moreover, there is cause to warrant a waiver of the requirements of section 345(b) of the Bankruptcy Code. It is my understanding based upon discussions with counsel, that courts consider the "totality of the circumstances" in determining whether "cause" exists, with particular regard to the following factors: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business operations; (iii) the amount of investments involved; (iv) the bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor in possession funds are held; (v) the complexity of the case; (vi) the safeguards in place within the debtor's own business of insuring the safety of the funds; (vii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the benefit to the debtor; (ix) the harm, if any, to the estate; and (x) the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

It is my understanding based upon discussions with counsel that, here, "cause" exists because, among other things: (i) all of the Banks holding significant balances are highly rated, reputable banks that are subject to supervision by national banking regulators; (ii) the Debtors retain the right to close accounts with the Banks and establish new bank accounts as needed; (iii) the cost associated with satisfying the requirements of section 345(b) is needlessly burdensome to the Debtors and their estates; and (iv) the process of satisfying such requirements would lead to needless inconvenience and inefficiencies in the management of the Debtors' business. The benefits of a waiver would far outweigh any potential harm to the estates from noncompliance with section 345(b). The complex nature of the Debtors' businesses requires numerous bank accounts. Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such a bond could be obtained at all). Furthermore, based on its experience opening new bank accounts, the Debtors estimate that it would take months to create a new suite of bank accounts to service their business. I respectfully submit that the costs of disruption to the business by having to close dozens of accounts far outweighs the risks of the Debtors continuing to maintain their historic Bank Accounts during the administration of the Chapter 11 Cases. Accordingly, I respectfully submit that the Court should waive the requirements of section 345(b) in these Chapter 11 Cases on a final basis. However, if the U.S.

Case 19-30088    Doc 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 41 of 166

Trustee needs additional time to consider the waiver, in the alternative, the Court should, on an interim basis, extend the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code for sixty (60) days while the Debtors discuss the issue with the U.S. Trustee and any statutory committees appointed in these Chapter 11 Cases.

### G. Bank and Payment Processing Fees

In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts, certain service charges, repayments on account of ordinary course ACH credit extensions (e.g., in connection with the Banks' processing of refunds or mistaken payments into Utility Depository Accounts), and other related fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**"). To the extent the balance in the applicable Bank Account decreases below a threshold amount established by the applicable Bank, the Debtors may incur additional fees for sending and receiving wire transfers, clearing checks, ACH transfers, and other transactions. In addition, the Debtors pay certain payment processing fees to third parties relating to payment support and processing for customers making payments by credit card, debit card, and ACH bank payment (collectively, the "**Payment Processing Fees**"). The Debtors currently pay approximately $140,000 per month on account of Bank Fees and approximately $200,000 per month on account of Payment Processing Fees. As of the Petition Date, the Debtors estimate that approximately $140,000 in Bank Fees and $400,000 in Payment Processing Fees are accrued and unpaid and will become due in the first thirty (30) days after the Petition Date. The Debtors seek authority to pay such amounts, including any amounts relating to the period prior to the Petition Date, as they come due in the ordinary course of business.

Payment of the Bank Fees is in the best interests of the Debtors, their estates, and all parties in interest as it will prevent any disruption to the Cash Management System. It is my understanding based upon discussion with counsel that because the Banks may have setoff rights with respect to the prepetition Bank Fees, payment of the prepetition Bank Fees should not affect other parties in interest and would merely be a matter of timing. In addition, payment of the Payment Processing Fees will prevent any disruption to the Debtors' ability to collect payments from their customers that pay utility bills via credit card, debit card, or ACH bank payment.

Case 19-30088    Doc 263    Filed 02/01/19    Entered: 02/01/19 18:16:49    Page 42 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## H.    The Debtors' Existing Business Forms and Checks

In the ordinary course of business, the Debtors issue checks from time to time and use a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders, and invoices (collectively, the "**Business Forms**").  To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms or otherwise complying with Bankruptcy Local Rule 2015-1(a), the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, pursuant to the Cash Management Motion, the Debtors seek authority to continue using their Business Forms substantially in the forms used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtor in Possession."  The Debtors do not believe that any prejudice will be suffered by any party of this relief is granted.

Strict compliance with the UST Guidelines, which require reprinting such documents, would unnecessarily increase the Debtors' expenses and would risk confusing the Debtors' customers, suppliers, and employees.  Accordingly, the Debtors believe it is appropriate to continue to use all Business Forms as such forms were in existence prior to the commencement of these Chapter 11 Cases, without any reference to the Debtors' current status as debtors in possession.

The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce borrowing costs and administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices.  The use of the Cash Management System has historically reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner.  Accordingly, the continued use of the Cash Management System without interruption is vital to the Debtors' business operations and the success of these Chapter 11 Cases.

Further, in these Chapter 11 Cases, strict enforcement of the UST Guidelines would severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  As stated, the Debtors maintain approximately 108 Bank Accounts as part of the Cash Management System.  If the Debtors were required to close these Bank

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Accounts and open new debtor-in-possession accounts, the Debtors would be forced to reconstruct the Cash Management System in its entirety. This reconstruction would be impractical and cost prohibitive in an enterprise like the Debtors. B&MM, including accounting and bookkeeping employees, would need to focus their efforts on immediately opening new bank accounts and working to establish proper cash flow controls, thereby diverting them from their daily responsibilities during this critical juncture of the Debtors' Chapter 11 Cases. Many accounts could not be replaced in time to effectively continue the Debtors' businesses. Even if possible, the opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and redirecting payments would negatively impact the Debtors' ability to operate their business while establishing these new arrangements, to the detriment of all parties in interest.

The Debtors' transition into chapter 11 will be significantly smoother and more orderly, with minimum disruption and harm to the Debtors' operations, if the Bank Accounts are continued following the Petition Date with the same account numbers. By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, customers, and creditors will be best served. The confusion that would otherwise result, absent the relief requested in the Cash Management Motion, would ill-serve the Debtors' rehabilitative efforts.

Accordingly, for the reasons set forth herein, I respectfully submit that the relief requested in the Cash Management Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

IV. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 507 AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO (I) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND BENEFITS; (II) MAINTAIN EMPLOYEE BENEFIT PROGRAMS; AND (III) PAY RELATED ADMINISTRATIVE OBLIGATIONS (THE "EMPLOYEE WAGES AND BENEFITS MOTION")**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Pursuant to the Employee Wages and Benefits Motion, the Debtors are seeking interim and final authority to (i) pay, in their sole discretion, all prepetition amounts required under or related to the Debtors' Compensation Obligations, Employee Incentive and Retention Programs, Reimbursable Expenses, Withholding Obligations, Payroll Maintenance Fees, Severance Programs, Employee Benefits Programs, and Supplemental Workforce Obligations (each as defined below, and together with any Employee Program Administrative Obligations (as defined below), the "**Prepetition Employee Obligations**"); (ii) continue their prepetition compensation practices, programs, benefits, and policies for their Employees (as defined below) (collectively, the "**Employee Wage and Benefits Programs**") as such were in effect as of the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' businesses, and (iii) honor and pay any related administrative fees, costs, expenses, and obligations arising thereunder (collectively, the "**Employee Program Administrative Obligations**").  Further, the Debtors request that the Court authorize and direct all applicable Banks to receive, process, honor, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the Prepetition Employee Obligations.

The following chart sets forth the various categories and approximate outstanding amounts of the Prepetition Employee Obligations[4] that the Debtors are seeking authority to pay pursuant to the Employee Wages and Benefits Motion within the first thirty days of the Chapter 11 Cases (the "**Interim Period**") and on a final basis.  Each of the categories of Prepetition Employee Obligations, including the related Employee Program Administrative Obligations, is defined and discussed in further detail below.

| Category | Approx. Amount Seeking to Pay During Interim Period | Approx. Amount Seeking to Pay on Final Basis |
|---|---|---|
| Compensation Obligations | $61,200,000 | $61,200,000 |
| Incentive and Retention Program Obligations (excluding 2018 STIP) | $970,000 | $35,970,000 |

---

[4] Amounts related to the Employee Program Administrative Obligations are included in the relevant categories in the chart below and also described below.

Case 19-30088   Doc 263   Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 45 of 166

| | | |
|---|---|---|
| Reimbursable Expenses | $3,800,000 | $3,800,000 |
| Withholding Obligations[5] | $24,330,000 | $24,330,000 |
| Payroll Maintenance Fees | $75,000 | $75,000 |
| Severance Obligations | $630,000 | $820,000 |
| Benefits Program Obligations[6] | $73,600,000 | $95,792,000 |
| Supplemental Workforce Obligations | $25,000,000 | $35,000,000 |

As discussed above, the Utility is one of the nation's largest utility companies, providing electric and natural gas service to approximately 16 million customers in northern and central California. Together, the Debtors employ approximately 24,000 Employees,[7] including approximately 14,300 Employees who are paid on an hourly basis and approximately 9,000 Employees who earn salaries.[8] Of the Debtors' approximately 24,300 Employees, approximately 15,200 Employees are covered under collective bargaining agreements (the "**Represented Employees**") with the local chapters of three (3) labor unions: (i) the International Brotherhood of Electrical Workers ("**IBEW**"), (ii) the Engineers and Scientists of California ("**ESC**"), and (iii) the Service Employees International Union ("**SEIU**") (collectively, the "**Unions**"). The Debtors' Employees perform a variety of critical functions, including operating and maintaining the Debtors' generation units, natural gas facilities, and distribution and transmission assets; performing customer outreach and other critical customer-facing services; collecting payments from the Debtors' customers; and ensuring the safety and reliability of the Debtors' operations. Employees are also responsible for administering PG&E's clean energy, low income and energy efficiency programs as well as administering payroll, benefits, facilities and information systems and technology required to support the operational employees.

---

[5] Substantially all of this amount represents amounts withheld from Employee compensation for withholding taxes and the Debtors' payroll tax obligations.

[6] As noted below, a significant portion of this amount (approximately $30 million) represents amounts withheld from or contributed by Employees.

[7] For purposes of the Employee Wages and Benefits Motion, "**Employees**" means all persons entitled to, as of the Petition Date, compensation, benefits, reimbursement, and any other similar payments as a consequence of their being employed by either Debtor. The term "Employees" does not include any Supplemental Workers (as defined below).

[8] The Debtors' Employees reside in nearly every county in California, as well as in thirty-six other states including, Arizona, Pennsylvania, Texas, and Virginia.

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 46 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

It is my understanding based upon discussions with counsel that the Debtors have twelve (12) Employees who constitute "insiders" for purposes of section 503 of the Bankruptcy Code (the "**Insiders**").

In addition to their Employees, the Debtors use the services of approximately 1,900 independent contractors and, through various staffing agencies (the "**Staffing Agencies**"), temporary workers to assist with their operations (each, a "**Supplemental Worker**" and, collectively, the "**Supplemental Workforce**" and, together with the Employees, the "**Personnel**"). Members of the Supplemental Workforce, who complement the efforts of the Debtors' Employees, primarily perform specialized tasks that, for various reasons, the Employees cannot perform on their own, including, for example, certain maintenance and repair work on transmission lines following weather-related events.

The Debtors' Personnel are the lifeblood of the Debtors' businesses—without them, the Debtors' operations would come to a halt. Due to the highly technical, specialized, and regulated nature of the electricity generation and energy transmission and distribution industry, the Debtors must maintain a uniquely skilled workforce, whose knowledge base is critical to the Debtors' businesses and ongoing operations and, as a result, to the success of the Chapter 11 Cases. Further, all of the Debtors' customers, located throughout an approximately 70,000-square-mile service area in northern and central California, rely on the Debtors' Personnel to receive electricity and natural gas service. Without the Debtors' Personnel, the Debtors' customers in northern and central California would not receive essential utility services.

**A.    Compensation Obligations**

The Debtors pay their Employees salaries, wages, and other compensation, including overtime pay, for the Employees' services (collectively, the "**Compensation Obligations**"). Employees who are paid wages on an hourly basis are paid bi-weekly in arrears, and the Debtors' salaried Employees receive payment on a monthly basis on approximately the 23rd day of each month for services rendered from the 1st to the 23rd of that month as well as for services yet to be rendered for the remainder of the month. Approximately 14,300 Employees are paid hourly and approximately 9,000 Employees are paid a monthly salary. Although the vast majority of the Debtors' Employees elect to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

have their compensation deposited directly into their bank accounts though an electronic funds transfer, approximately 700 Employees are paid by check.

On average, the Debtors pay approximately $297,400,000 each month on account of Compensation Obligations. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued, but unpaid, Compensation Obligations totals approximately $61,200,000, all of which will come due during the Interim Period. On a per-Employee basis, the outstanding prepetition Compensation Obligations average approximately $4,400, below the statutory caps imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors do not believe that payment of the prepetition Compensation Obligations will result in any Employee receiving more than $12,850 on account thereof. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay the Compensation Obligations in the ordinary course of business, including all prepetition amounts relating to such obligations.

## B. Employee Incentive and Limited Retention Programs

The Debtors maintain certain incentive and retention programs[9] (collectively, the "**Employee Incentive and Retention Programs**" and, all amounts required under or relating thereto, the "**Incentive and Retention Program Obligations**") to motivate and reward certain Employees. The Employee Incentive and Retention Programs include (i) the Short-Term Incentive Plan, (ii) the Rewards and Recognition Program, (iii) the Temporary Assignment Program, (iv) the Service Award Program, and (v) the Limited Retention Programs (each as defined below).[10] The Employee Incentive and Retention Programs are critical components of Employees' general compensation structure and bring substantial value to the Debtors' estates. The incentive programs align eligible Employees' interests with those of the Debtors by linking awards under the incentive programs to the overall

---

[9] Unless otherwise specified, programs and practices mentioned in Employee Wages and Benefits Motion benefit Employees of both Debtors, although they may be maintained or administered by only one of the Debtors.

[10] The Debtors also maintain an annual long-term incentive program ("**LTIP**") for certain Employees. At this time, the Debtors are not seeking authority to make any cash payments under such programs, and are not seeking authority to implement an LTIP and grant awards for 2019. Earned and previously granted equity awards under existing LTIPs will continue to be provided (but no cash payments or dividend payments thereon). In addition, the Debtors reserve the right to seek Court approval to implement a key employee retention plan, a key employee incentive plan, and a short term incentive plan for 2019.

Case 19-30088   Doc 263   Filed 02/01/19   Entered: 02/01/19 18:16:49   Page 48 of 166

performance and efficiency of the Debtors' operations. The Limited Retention Programs include a discrete program at the department level and a CPUC-approved retention program for Employees at the Debtors' Diablo Canyon Nuclear Plant.

Pursuant to the Employee Wages and Benefits Motion (except with respect to the Insiders), the Debtors seek authority to pay obligations in connection with the Employee Incentive and Retention Programs in the ordinary course of business (except as otherwise provided in the Employee Wages and Benefits Motion), including all prepetition amounts on account of such obligations, and to continue to administer the Employee Incentive and Retention Programs as set forth herein in the ordinary course of business. Each of the Employee Incentive and Retention Programs is described in further detail below. Although Insiders of the Debtors have historically been eligible to receive payments or awards under certain of the Employee Incentive and Retention Programs, the Debtors are not requesting authority at this time to make any payments under any Employee Incentive and Retention Programs to the Insiders.

### 1. Short-Term Incentive Plan

The Debtors maintain a broad-based program (the "**Short-Term Incentive Plan**") through which certain Employees are eligible for annual cash awards based on the Debtors' achievement of certain enterprise-wide performance targets and such Employees' individual performance. Awards under the Short-Term Incentive Plan (collectively, "**STIP Awards**") are based on a formula that is unique to each Employee and that takes into account each Employee's base pay rate, job position, and individual performance, as well as the Debtors' performance as a whole. The STIP Awards are an integral component of the compensation of Employees who participate in the plan and upon which they rely on an annual basis. The Debtors believe that the STIP Awards incentivize strong Employee performance and are critical to ensuring that Employees stay motivated and reach higher performance standards, which in turn maximizes the value of the Debtors' business for all parties in interest.

For fiscal year 2018, approximately 14,000 Employees were eligible to receive STIP Awards at a total aggregate expected cost to the Debtors of approximately $130,000,000 for 2018 performance, which is to be paid in March, 2019. The average individual STIP Award for 2018 is expected to be approximately $13,000, and individual STIP Awards are expected to range from approximately $5,000 to $90,000, exclusive of the Insiders. Annually, the Compensation Committee of the PG&E Corp.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Board of Directors (the "**Compensation Committee**") certifies the Debtors' level of achievement of the enterprise-wide performance targets for the applicable fiscal year, and approves the final STIP score, as well as final STIP Awards. A STIP Award is forfeited if an Employee leaves prior to December 31 of the year in which the STIP Award is earned, unless the Employee is severed without cause or is qualified as a Retiree (as defined below), in which case the person is entitled to a prorated award based on the percentage of the year they were an active Employee.

Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay Employees the STIP Awards earned for 2018, except that they are not requesting authority to pay STIP Awards to any Insiders or to any officers to the extent earned during the period they were officers. Further, the Debtors are not requesting authority to pay any STIP Awards on an interim basis. Consideration of the relief sought in the Employee Wages and Benefits Motion with respect to the STIP Awards will be deferred to the final hearing on the Employee Wages and Benefits Motion.

## 2. Rewards and Recognition Program

The Debtors maintain a program (the "**Rewards and Recognition Program**") to promote timely recognition of Employees in good standing who have gone above and beyond their normal job responsibilities, such as emergency response or participation in special initiatives outside their regular job duties. Awards under the Rewards and Recognition Program (collectively, "**R&R Awards**") may be monetary, non-monetary, or both, and are made by the Debtors on a discretionary basis and in discretionary amounts. Non-monetary awards are provided in the form of gift cards. Members of management establish and distribute guidelines for the Rewards and Recognition Program to help ensure consistency throughout the various departments, but R&R Awards are granted on a departmental basis. R&R Awards are subject to the Debtors' policies and practices, which control the amount of R&R Awards at each level that the leadership of each department may approve. On an annual basis, approximately 6,300 Employees receive R&R Awards at a total cost to the Debtors of approximately $15,200,000. In 2018, the average R&R Award was approximately $1,200. R&R Awards are processed through the Debtors' employee and leadership SAP portal, and can be submitted at any time. The Debtors disburse R&R Awards throughout the year, depending on the department. As of the Petition Date, the Debtors estimate that approximately $650,000 in value of R&R Awards are

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

outstanding on account of the Rewards and Recognition Program with respect to the prepetition period, all of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors request authority to pay all R&R Awards, including all prepetition amounts relating thereto.

### 3. Temporary Assignment Program

The Debtors maintain a program (the "**Temporary Assignment Program**") to provide awards (collectively, "**Temporary Assignment Awards**") to Employees who are temporarily transferred to positions in so-called "temporary positions" (the "**Temporary Positions**"). Awards are paid in discretionary amounts based on the eligible Employee's performance and duration of employment in the Temporary Position. On an annual basis, approximately 350 Employees receive Temporary Assignment Awards at an aggregate cost to the Debtors of approximately $2,600,000. In 2018, the average Temporary Assignment Award was approximately $5,400, and individual Temporary Assignment Awards ranged from approximately $160 to $28,650. The Debtors generally disburse Temporary Assignment Awards upon Employees' completion of their placements in Temporary Positions. As of the Petition Date, the Debtors estimate that approximately $250,000 is outstanding on account of the Temporary Assignment Program, all of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors request authority to pay all Temporary Assignment Awards, including all prepetition amounts relating thereto.

### 4. Service Award Program

The Debtors maintain a program (the "**Service Award Program**") that recognizes Employee service milestones every five years and at retirement for all Employees. Full- or part-time Employees with at least five years of service are eligible to participate and may elect to receive a non-monetary award, such as gift cards and tickets to sporting events and concerts, or to make a donation in an amount determined by the Debtors, to one of the following pre-selected nonprofit organizations: REACH Program, California State Parks Foundation, or the American Red Cross Bay Area Chapter. Eligible Employees select their service award through the Debtors' service award portal operated by BI Worldwide.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-30088  Doc 263  Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 51 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

On an annual basis, approximately 5,300 Employees and Retirees receive awards under the Service Award Program at a total cost to the Debtors of approximately $850,000. In 2018, the average award ranged from $43 for those with five years of service to $419 for those with 25 years or more of service. The Debtors disburse service awards throughout the year. As of the Petition Date, the Debtors estimate that approximately $70,000 is outstanding on account of the Service Award Program, all of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors request authority to pay all obligations arising under the Service Award Program, including any prepetition amounts.

### 5.    Limited Retention Programs

The Debtors maintain a limited retention-based awards program at the departmental level, which provides cash awards to certain key, hard-to-replace Employees to ensure that they continue their employment with the Debtors (the "**Retention Program**"). The Retention Program does not include any Insiders. To receive an award (each, a "**Retention Award**") pursuant to the Retention Program, an Employee's manager must articulate a business case explaining, among other things, the need for the award and why that need cannot be met through other means. The Retention Program awards Employees who are identified as key Employees either because they have indicated that they are planning to leave and their job function is critical, or they are identified by the Debtors as key based on a specific work assignment. On an annual basis, approximately 50 Employees receive Retention Awards at a total cost to the Debtors of approximately $1,200,000. In 2018, the average Retention Award was approximately $27,000, and Retention Awards ranged from approximately $2,583 to $150,000. The Debtors disburse Retention Awards throughout the year. As of the Petition Date, the Debtors estimate that there are no amounts outstanding on account of the Retention Program.

The Debtors also maintain a separate retention program for Employees (none of whom are Insiders) at Diablo Canyon Power Plant ("**DCPP**"), the Utility's nuclear generation facility. Approximately 1,360 Employees are currently participating in the program. The Debtors made a decision not to seek relicensing of the DCPP which will ultimately result in the plant's closure. The operation of the DCPP will, however, continue for several years and the Debtors need skilled and knowledgeable personnel to operate the plant safely and reliably. In order to incentivize Employees to

remain at DCPP, the Debtors proposed a retention plan, which was initially approved by the CPUC in January of 2018 with certain modifications. The California legislature subsequently passed legislation (Public Utilities Code Section 712.7, effective January 1, 2019) requiring the CPUC to approve full funding for the retention program and in December 2018, the CPUC issued a decision approving full funding for the retention program initially proposed (the "**Diablo Canyon Retention Program**"). Pursuant to such legislation, the retention payment percentage was raised from 15% to 25% for each retention plan participant. As a result, in April of 2019, the Debtors will be required to make retroactive payments on account of each DCPP retention plan participant. The Debtors estimate that this retroactive payment will aggregate approximately $35,000,000. Normal ongoing payments with respect to the program will be made in the Fall of 2019.

The Diablo Canyon Retention Program includes a base retention program that is provided to the Debtors' Employees who satisfy the following criteria: (i) they work in a regular active full-time status at DCPP or solely support DCPP operations, (ii) their job or job functions will be eliminated as a result of the cessation of operations at DCPP, (iii) they work during the entirety of one or both of the commitment periods, and (iv) they sign a base retention program payback agreement. The first commitment period is a four- (4) year commitment of employment which covers years 2016 through 2020. The second period is a three- (3) year commitment which covers years 2020 through 2023. Pursuant to the Diablo Canyon Retention Program, eligible Employees will receive a payment equal to 25% of the Employee's base salary plus overtime for each yearly segment of the commitment period. The Debtors make each yearly segment payment between October 1 and December 31 of each year. At the end of the Employee's assignment at DCPP, the Employee will have the option to select to remain on the payroll for six months while conducting a job search for internal employment. If the Employee is not successful in finding internal employment, their final severance payment (under the DCPP Severance Program, discussed below) will be reduced by the amount the Employee was paid during the six months. Employees who must relocate to secure an employment opportunity will be reimbursed for moving expenses to a maximum of $5,000. As stated, no amounts related to the Diablo Canyon Retention Program are payable during the Interim Period. Because, among other things, the

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 53 of
166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

CPUC has authorized full funding for this program, the Debtors intend to continue the program in the ordinary course.

### C. Reimbursable Expenses

In the ordinary course of business, the Debtors reimburse their Employees for reasonable and customary expenses incurred in the scope of their employment (collectively, the "**Employee Reimbursable Expenses**"). The Employee Reimbursable Expenses can include those expenses related to business travel, relocation, certain meals, fitness memberships, and communications (e.g., certain cell phone expenses), depending on the position, department, and seniority of the Employee.

In connection with this practice, the Debtors provide certain Employees with credit cards (the "**Employee Credit Cards**") to be used for paying certain Employee Reimbursable Expenses. The Debtors' vendor, U.S. Bank, requires that the Debtors pre-fund the accounts for the Employee Credit Cards.

Employees also use the Debtors' expense reimbursement portal operated by Concur Expense Management to seek reimbursement for expenses charged to Employee Credit Cards and for business-related purchases that are not charged to an Employee Credit Card.

In addition to the Employee Credit Cards, certain Employees are provided with purchasing cards (the "**Employee Purchasing Cards**" and, together with the Employee Credit Cards, the "**Employee Cards**") to pay for certain emergency expenses, meals for large groups of Employees, and expenses related to various operational materials and services necessary for the Debtors' operations. The Debtors' vendor, U.S. Bank, also requires that the Debtors pre-fund the accounts for the Employee Purchasing Cards. The Debtors typically fund the accounts on a bi-weekly basis and maintain approximately $20 million on account with U.S. Bank to cover obligations relating to the Employee Cards. All Employee Cards issued by the Debtors to their Employees have pre-funded account limits and detailed restrictions on permissible expenditures.

The Debtors also reimburse the members of their Boards of Directors for expenses incurred in connection with the performance of their duties as directors (collectively with the Employee Reimbursable Expenses, the "**Reimbursable Expenses**").

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 54 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Debtors estimate that Reimbursable Expenses aggregate approximately $17,200,000 per month, including the pre-funded accounts for the Employee Cards. As of the Petition Date, the Debtors estimate that approximately $3,800,000 is outstanding on account of Reimbursable Expenses, all of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to satisfy all prepetition obligations related to Reimbursable Expenses, including those incurred through the use of Employee Cards, as and when they arise and to continue in the ordinary course the usage of the Employee Cards as described herein.

Payment of the Reimbursable Expenses is an exercise of sound business judgment and necessary to facilitate a successful reorganization because any other treatment of would be highly inequitable. Employees and Directors who have incurred Reimbursable Expenses on behalf of the Debtors should not be forced to bear the cost of such expenses personally, especially because the Reimbursable Expenses were incurred for the Debtors' benefit, in the course of their employment or service, and with the understanding that they would be reimbursed. In addition, as stated, substantial obligations with respect to the Employee Cards have been pre-funded prior to the Petition Date to cover charges.

### D. Withholding Obligations

As employers, the Debtors are required by law to withhold from their Employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit them to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). The Debtors also are required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**"). In the aggregate, the Debtors' monthly Payroll Tax Obligations total approximately $95,000,000. As of the Petition Date, the Debtors estimate that they owe approximately $22,000,000 on account of Payroll Tax Obligations relating to the prepetition period, all of which will come due during the Interim Period.

Case 19-30088   Doc 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 55 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

In the ordinary course of processing payroll for the Employees, the Debtors also may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "**Garnishments**"). Each pay cycle, the Debtors withhold Garnishments from applicable Employees' paychecks and remit them to the appropriate authorities or entities. On average, the Debtors withhold approximately $1,000,000 in Garnishments per month from Employees' wages and salaries. As of the Petition Date, the Debtors estimate that they currently have withheld approximately $300,000 on account of Garnishments that have not been remitted.

Further, at Employees' request, the Debtors withhold certain amounts from Employees' wages and salaries for transmittal to third parties, including for the following categories: (i) the payment of dues that Represented Employees owe to the Unions (collectively, the "**Union Obligations**"), (ii) amounts to be transferred via a third-party non-profit administrator, YourCause LLC, to charitable organizations selected by Employees pursuant to the Campaign for the Community (collectively, the "**Community Campaign Obligations**"), (iii) amounts to be transferred to various employee-funded political action committees ("**PAC**"), as selected by the Employee (collectively, the "**PAC Obligations**"), and (iv) amounts to be transferred to the Pacific Service Employees Association, a not-for-profit mutual benefit organization for dues and other benefits ("**PSEA Obligations**" and together with Union Obligations, Community Campaign Obligations, and PAC Obligations, the "**Employee Elective Deduction Obligations**" and together with the Payroll Tax Obligations and Garnishments, the "**Withholding Obligations**").

The Debtors withhold the Employee Elective Deduction Obligations from participating Employees' paychecks and remit them to the applicable recipient as described above. On average, the Debtors withhold approximately $3,000,000 in Employee Elective Deduction Obligations each month from participating Employees' wages and salaries. As of the Petition Date, the Debtors estimate that they are currently withholding but have not yet remitted approximately $2,000,000 on account of Employee Elective Deduction Obligations. Additionally, the Debtors also pay approximately $16,000 per month in administrative fees to YourCause LLC. The Debtors estimate that, as of the Petition

Date, they owe approximately $32,000 in such administrative fees, all of which will come due during the Interim Period.

Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to continue remitting and paying the Withholding Obligations (whether pre- or postpetition) to the appropriate authorities and entities in the ordinary course of business and to pay any administrative fees with respect to the Withholding Obligations.

### E. Payroll Maintenance Fees

To manage the efficient processing and payment of the various obligations described above, the Debtors rely on the services of certain third-party vendors (collectively, the "**Payroll Maintenance Vendors**"), including, but not limited to, Concur, ADP, Inc. ("**ADP**"), and TALX Corp. ("**TALX**"). As discussed above, the Debtors rely on Concur to administer their expense reimbursement portal. The Debtors use ADP to administer wage garnishments and TALX for employment verification. The Debtors pay each of the Payroll Maintenance Vendors on a monthly basis for the aforementioned services (the "**Payroll Maintenance Fees**").

On average, the Debtors pay Payroll Maintenance Vendors approximately $75,000 in the aggregate, on a monthly basis on account of Payroll Maintenance Fees. As of the Petition Date, the Debtors estimate that they owe approximately $75,000 on account of Payroll Maintenance Fees relating to the prepetition period, all of which will come due during the Interim Period. Failure to pay the Payroll Maintenance Fees could lead to delayed disbursement of payments to the Debtors' Employees, to the detriment of the Employees and the Debtors' operations. In addition, replacing any of the Payroll Maintenance Vendors would take a significant amount of time and expense and result in a disruption to normal employee payment practices. Accordingly, pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay Payroll Maintenance Fees in the ordinary course of business, including all prepetition amounts on account of such Payroll Maintenance Fees.

### F. Severance Programs and Obligations

In the ordinary course of business, the Debtors maintain three severance programs for the benefit of all Employees except Represented Employees. Severance for Represented Employees is covered by their respective labor agreements (the "**Represented Employee Severance Obligations**").

The three programs are: (i) the DCPP Severance Program, (ii) the Senior Officer Severance Program, and (iii) the General Severance Program (each as defined below, and collectively, the "**Severance Programs**"). Although Employees are eligible to receive benefits under the Severance Programs, the level of benefits that a particular eligible Employee receives varies.

Under the Senior Officer Severance Program, the forty (40) eligible Employees are entitled, upon a qualifying termination, to receive (i) a lump-sum payment equal to one year's base pay and target STIP payout; (ii) a lump-sum payment which is the equivalent of 18-months of COBRA coverage to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period (the "**Senior Officer Severance Obligations**"). Absent further order of the Court, and, based upon discussions with counsel, consistent with section 503 of the Bankruptcy Code, the Debtors will not make any severance payments to the Insiders.

Pursuant to the General Severance Program, eligible Employees, upon termination, are entitled to receive benefits which vary based on the Employees' experience and title. Eligible Employees who are in non-director positions are eligible to receive: (i) a lump-sum payment equal to three weeks' pay per year of credited service, with a 12-week minimum and a 52-week maximum; (ii) a lump-sum payment of $9,000 to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period. Eligible Employees in director positions are entitled to receive (i) a lump-sum payment equal to three weeks' base pay per year of credited service, with a 12-week minimum and a 52-week maximum, plus a similar ratable share of their STIP Award; (ii) a lump-sum payment of $16,650 to cover transition expenses, which may include items such as medical benefits and life insurance coverage; and (iii) career counseling services, which include outplacement services for the length of their severance consideration period (collectively, the "**General Severance Obligations**").

Employees at DCPP are covered by a separate severance program (the "**DCPP Severance Program**"). The DCPP Severance Program is similar in all respects to the General Severance Program

Case 19-30088    Doc 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 58 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

except for the maximum lump-sum payment, which is 78 weeks (the "**DCPP Severance Obligations**" and together with the Senior Officer Severance Obligations and the General Severance Obligations, the "**Severance Obligations**"). The Debtors have not made any payments on account of the DCPP Severance Program in the past two years and do not anticipate making any payments under this program in 2019.

In addition to the foregoing, less than ten (10) Employees whose positions are eliminated because of automated meter reading are eligible to select a transitional leave program where they receive the same applicable General Severance Obligations but such obligations are payable on an ongoing basis for the designated time period.

The Debtors have substantial business justification for continuing the Severance Programs in the ordinary course as requested in the Employee Wages and Benefits Motion. The Debtors' ability to provide terminated Employees with their severance is critical to maintaining positive Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' reorganization efforts and their long-term viability. The Severance Programs have been designed with a specific focus on the utility industry which is highly specialized and less saturated, which may result in challenges for Employees seeking new employment in the same or other industries. Additionally, as a condition to receiving benefits under the Severance Programs, the Debtors require each severed Employee to release all potential claims against the Debtors. As stated, no authority for severance payments to Insiders is being sought pursuant to the Employee Wages and Benefits Motion.

Pursuant to the Employee Wages and Benefits Motion, the Debtors are seeking authority (except as indicated above) to continue the Severance Programs and to pay all Severance Obligations and all Represented Employee Severance Obligations in the ordinary course of business, whether arising prior to or after the Petition Date. On average, the Debtors pay approximately $500,000 each month on account of Severance Obligations. Additionally, the Debtors pay approximately $70,000 each month on account of Represented Employee Severance Obligations. As of the Petition Date, because the Severance Programs provide for largely lump sum payments, the Debtors estimate that there are no amounts outstanding under the DCPP Severance Program or the Senior Officer Severance

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 59 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Program. The Debtors also estimate that there is approximately $600,000 owed under the General Severance Program, all of which is payable during the Interim Period. Additionally, as of the Petition Date, the Debtors estimate that they owe approximately $220,000 on account of existing Represented Employee Severance Obligations, and expect that approximately $30,000 in Represented Employee Severance Obligations will be required to be paid during the Interim Period.

### G. Employee Benefits Programs

In the ordinary course of business, the Debtors maintain various employee benefits plans, policies, and programs (collectively, the "**Employee Benefits Programs**" and, all amounts required and payable under or relating thereto, the "**Benefits Program Obligations**"). These Employee Benefits Programs generally fall into the following categories: (i) Paid Leave, (ii) Health Insurance Programs, (iii) Retirement Programs, (iv) Life and Disability Insurance Programs, and (v) Work/Life Benefits (each as defined and discussed in further detail below). Pursuant to the Employee Wages and Benefits Motion, the Debtors request authority to continue the Employee Benefits Programs and to pay all Benefits Program Obligations in connection therewith in the ordinary course of business, whether related to the period prior to or after the Petition Date.

#### 1. Paid Leave

In the ordinary course of business, the Utility maintains a policy for providing Employees paid leave (collectively, "**Paid Leave**") in the form of paid vacation ("**Vacation**") and paid holidays[11] ("**Paid Holidays**") as well as certain other items, such as sick pay ("**Sick Time**"). The Utility provides Vacation to most Employees, which may be used for any reason. Vacation generally accrues at specified rates up to a maximum amount based on an Employee's length of service and whether an Employee is a Represented Employee. For most Utility Employees, the maximum yearly Vacation is thirty (30) days per year.

PG&E Corp. maintains a separate Paid Leave policy for its Employees (including all management and administrative and technical Employees, which includes paid time off ("**PTO**") and paid holidays.

---

[11] Paid holidays include twenty four (24) hours of paid leave in the form of "floating holidays" in addition to 10 specific holidays.

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 60 of 166

Although significant accrued Vacation, PTO, and Paid Holidays exist as of the Petition Date, Employees only are entitled to cash payouts for their accrued and unused Vacation, PTO and Paid Holidays upon termination of their employment or on an annual basis pursuant to a lump-sum payment each February for unused Vacation or PTO that exceeds the maximum amounts that Employees are permitted to carry over into the next calendar year. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay any "cash out" amounts due or that may come due with respect to accrued but unused Vacation, PTO, Paid Leave or Paid Holidays and to continue administering such policies and programs and making payments thereunder in the ordinary course of business.

In addition, the Debtors also provide certain other forms of Paid Leave to Employees in the form of:

(a)     leave under the Family and Medical Leave Act and other similar statutes; and

(b)     other leave for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work time in the ordinary course of business for bereavement leave, jury duty or court attendance, and time spent voting.

These other forms of Paid Leave do not involve incremental cash outlays beyond standard payroll obligations, and, therefore, no amounts are outstanding as of the Petition Date.

The Debtors' Paid Leave policies are broad-based programs upon which all Employees have come to depend and are an integral element of their compensation. Continuation of the Paid Leave policies in accordance with the Debtors' prior practice is essential to maintaining positive Employee morale during the Chapter 11 Cases and maximizing the value of the Debtors' business enterprise.

As of the Petition Date, the Debtors estimate that they owe approximately $6,200,000 on account of excess unused Vacation, all of which will be required to be paid during the Interim Period.

**2.      Health Insurance Programs**

Employees are eligible to participate in a number of health insurance programs, including the Medical Plans, the Dental Plan, the Vision Plan, the Health Account, and the Flexible Spending Accounts (each as defined below and, collectively, the "**Health Insurance Programs**"). The Debtors also subsidize or continue to provide health benefits to certain former Employees, including health benefits provided in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

("**COBRA**"). Each of the Health Insurance Programs is described in further detail below. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay all obligations in connection with the Health Insurance Programs and to pay all obligations in connection with COBRA in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer and pay all amounts payable under the Health Insurance Programs and under COBRA in the ordinary course of business.

### a) Medical Plans

The Debtors offer medical and prescription-drug insurance coverage (the "**Medical Plans**") to Employees. The Medical Plans primarily are administered by Blue Cross of California, Inc. d/b/a Anthem Blue Cross ("**Anthem**") and Kaiser Foundation Health Plan, Inc. ("**Kaiser**"). Certain prescription drug benefits are administered by Express Scripts Holding Company ("**Express Scripts**") and Willis Towers Watson ("**WTW**"), and certain mental health benefits are administered by Beacon Health Options, Inc. ("**Beacon**" and, together with Anthem, Kaiser, and Express Scripts, the "**Medical Plan Administrators**"). The coverage provided to eligible Employees under the Medical Plans differs depending on the level of coverage an Employee elects to receive, and monthly healthcare premiums differ depending on the Medical Plan in which an Employee is enrolled and whether the Employee has dependents covered by the applicable plan. The total cost of the Medical Plans is approximately $33,200,000 per month, of which approximately $2,600,000 is covered by Employee contributions.

The Debtors self-insure their portion and, after accounting for Employee contributions, spend approximately $29,400,000 per month on medical and prescription-drug claims asserted under the Medical Plans (collectively, the "**Medical Claims**"). The Debtors make payments on account of such Medical Claims on a weekly basis. Employees typically submit Medical Claims forty–six (46) days after incurring the relevant expenses, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Medical Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $53,000,000 on account of prepetition Medical Claims, approximately $32,000,000 of which will come due during the Interim Period.

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 62 of 166

The Debtors also maintain an account for each Employee who is enrolled in one of the Medical Plans (each, a "**Health Account**").  Health Accounts do not have cash values; rather, Health Accounts hold "credits" that can be redeemed to cover out-of-pocket medical expenses incurred by Employees. In essence, each credit in an Employee's Health Account represents a commitment by the Debtors to reimburse such Employee for out-of-pocket expenses up to a certain dollar amount.  On January 1 of each year, the Debtors contribute the equivalent of $500 per Employee or $1,000 per family of credits to each eligible Employee's Health Account.  If eligible Employees participate in health screenings and/or verify that they are not tobacco users, the Debtors contribute up to $500 per Employee or $1,000 per family of additional credits for each of these activities to each eligible Employee's Health Account.  The full balance of credits remaining in an Employee's Health Account is carried over into the next calendar year.  Employees redeem the credits in their Health Accounts by submitting a claim with the Debtors.  The Health Accounts for 2019 have been funded.

The Debtors also pay approximately $1,900,000 per month in administrative fees payable to the Medical Plan Administrators.  The Debtors estimate that, as of the Petition Date, they owe approximately $1,900,000 in such administrative fees, all of which will come due during the Interim Period.

Additionally, the Debtors pay monthly administrative fees of approximately $315,000 to Mercer Benefits Administration, which manages the eligibility- and enrollment-related processes for the Medical Plans, as well as the Dental Plan and the Vision Plan (as discussed below).  The Debtors estimate that, as of the Petition Date, they owe approximately $315,000 in such administrative fees, all of which will come due during the Interim Period.

### b)      Dental Plan

The Debtors offer dental insurance coverage (the "**Dental Plan**") to Employees.  The Dental Plan is administered by Delta Dental of California (the "**Dental Plan Administrator**").  The total cost of the Dental Plan is approximately $2,700,000 per month, of which approximately $80,000 is covered by Employee contributions.

The Debtors self-insure their portion and make payments on account of claims asserted under the Dental Plan (the "**Dental Claims**") on a weekly basis.  Dental Claims are typically submitted

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

approximately twenty (20) days after the relevant expense is incurred, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Dental Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $2,100,000 on account of prepetition Dental Claims, all of which will come due during the Interim Period.

In addition, the Debtors pay administrative fees of approximately $120,000 per month to the Dental Plan Administrator. The Debtors estimate that, as of the Petition Date, they owe the Dental Plan Administrator approximately $120,000 in such administrative fees, all of which will come due during the Interim Period.

### c) Vision Plan

The Debtors offer vision insurance coverage (the "**Vision Plan**") through a plan administered by Vision Service Plan, Inc. (the "**Vision Plan Administrator**"). The Debtors spend approximately $300,000 per month on claims asserted under the Vision Plan (collectively, the "**Vision Claims**"). The Debtors make payments on account of the Vision Claims on a monthly basis. Vision Claims are typically submitted approximately fifteen (15) days after the relevant expense is incurred, and, thus, the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Vision Claims. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $240,000 on account of prepetition Vision Claims, all of which will come due during the Interim Period.

The Debtors pay administrative fees of approximately $30,000 per month to the Vision Plan Administrator. The Debtors estimate that, as of the Petition Date, they owe approximately $30,000 in such administrative fees, all which will come due during the Interim Period.

### d) Flexible Spending Accounts

In addition to offering the medical benefits described above, the Debtors offer Employees the option to enroll in certain flexible spending accounts, including a healthcare flexible spending account and a dependent care flexible spending account (collectively, the "**Flexible Spending Accounts**"). Participating Employees can make pre-tax payroll contributions (the "**Flexible Spending Account Contributions**") to the Flexible Spending Accounts up to the maximum amounts permitted by the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Internal Revenue Service. Employees then may use the proceeds of Flexible Spending Accounts to cover the cost of eligible health care expenses incurred by such Employees and/or their dependents, depending on the Flexible Spending Account in which they are enrolled. Employees who participate in the Flexible Spending Accounts may use such proceeds by, among other means, utilizing a designated debit card provided to participating Employees or submitting claims for reimbursement.

The Debtors withhold approximately $1,000,000 per month from Employees' compensation on account of the Flexible Spending Account Contributions and transfer such amounts to either Wage Works, Inc. or Kaiser Foundation Health Plan Inc. SF (together, the "**Flexible Spending Account Administrators**"), depending on the Medical Plan in which an Employee is enrolled. As of the Petition Date, the Debtors estimate that they currently are withholding approximately $1,000,000 on account of Flexible Spending Account Contributions. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to transfer all withheld amounts and to continue to withhold amounts on account of the Flexible Spending Account Contributions and to transfer such amounts to the Flexible Spending Account Administrators in the ordinary course of business.

The Debtors pay administrative fees of approximately $30,000 per month to the Flexible Spending Account Administrators. The Debtors estimate that, as of the Petition Date, they owe approximately $30,000 in such administrative fees, all of which will come due during the Interim Period.

### 3.     Retirement Programs

The Debtors offer various programs to help current Employees and retired Employees ("**Retirees**") to plan for and manage their retirements (collectively, the "**Retirement Plans**"). The Retirement Plans are comprised of the Pension Plan, 401(k) Plan, Retiree Health Care Plan, the Retirement Excess Benefit Plan, the Supplemental Retirement Savings Plan, and Postretirement Life Insurance Plan (each as defined below).[12]     Participation in particular Retirement Plans is based on a number of criteria, including the nature of an Employee's job responsibilities and duties, whether an

---

[12] The Debtors offer Supplemental Executive Retirement Plans ("**SERPs**") and a Defined Contribution Executive Supplemental Retirement Plan ("**DC-ESRP**") for officers and certain key employees of the Debtors and their subsidiaries. The Debtors are not requesting authority at this time to make any payments pursuant to the SERPs and DC-ESRP.

Employee is a Represented Employee, and an Employee's date of hire and length of service. Each of the Retirement Plans is discussed in further detail below. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay all obligations in connection with the Retirement Plans in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer the Retirement Plans in the ordinary course of business.

### a) Qualified Defined Benefit Pension Plan

The Utility provides a tax-qualified defined benefit plan for the benefit of all of the Debtors' Employees and Retirees (the "**Pension Plan**"). The assets in the Pension Plan are not assets of the Debtors' estates. Participants in the Pension Plan receive a fixed pension benefit upon retirement (collectively, the "**Pension Obligations**"), in the form of a final average pay benefit or a cash balance benefit. An Employee's final average pay benefit is calculated by utilizing formulas that reflect, among other things, an Employee's length of service, pay, age upon retirement, and the date when retirement benefits begin. The cash balance benefit was added to the Pension Plan on January 1, 2013. Employees hired on or after that date participate in the cash balance benefit and Employees hired prior to that date were given a one-time opportunity to irrevocably select to switch from the final average pay benefit to the cash balance benefit on a go-forward basis. For the cash balance benefit, on the last day of each year (or on the date of benefit commencement, if earlier), an Employee's cash balance account is credited with pay credits based on a point system of age plus service and eligible pay during the year. At the end of each calendar quarter, the account is credited with interest credits, based on an average of the 30-year Treasury rates for the three months before the calendar quarter. Additionally, a cash balance participant may elect a lump-sum payout that is eligible for rollover into an Individual Retirement Account or other tax-advantaged employer plan. Cash balance participants may elect to receive their vested benefit when they leave employment, regardless of whether they have attained age 55.[13] Approximately 23,000 Employees and 4,000 former Employees are enrolled in the Pension Plan, and approximately 26,000 Retirees, previously-deferred pensioners, and beneficiaries receive benefits in connection with the Pension Plan. To fund the Pension Obligations, the Debtors

---

[13] The availability of the lump sum may be impacted by the chapter 11 filings.

Case 19-30088 First Day Motions   Doc 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 66 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

contribute, on a quarterly basis, amounts (collectively, the "**Pension Contributions**") into a trust (the "**Pension Trust**"), from which the Pension Obligations are satisfied.

On average, the Debtors make Pension Contributions to the Pension Trust in the amount of approximately $81,750,000 each fiscal quarter. In addition, the Debtors pay for certain administrative costs associated with the Pension Plan, such as actuarial studies (the "**Pension Administrative Costs**"). These costs are approximately $200,000 per year. On average, approximately $62,000,000 is paid each month from the Pension Trust on account of Pension Obligations to eligible participants. As of the Petition Date, the Debtors estimate that there will be no amounts outstanding with respect to Pension Obligations, excluding Pension Administrative Costs.

As of the Petition Date, the Debtors are current with respect to the Pension Contributions and the Debtors intend to make future quarterly Pension Contributions as and when they become payable.

The Debtors estimate that outstanding Pension Administrative Costs relating to the prepetition period are in the amount of approximately $20,000, which they seek authority to pay pursuant to the Employee Wages and Benefits Motion

**b)      401(k) Plan**

The Debtors maintain a qualified defined contribution savings plan for the benefit of most of their Employees (the "**401(k) Plan**"), which is designed to meet the requirements of sections 401(a) and 401(k) of title 26 of the United States Code. The 401(k) Plan is administered by Fidelity Management Trust Company (the "**401(k) Plan Administrator**"). Approximately 22,000 active Employees are enrolled in the 401(k) Plan. Employees who are enrolled in the 401(k) Plan contribute approximately $25,000,000 per month in the aggregate to the 401(k) Plan, which contributions are withheld by the Debtors from such Employees' compensation. The Debtors "match" Employees' contributions by contributing $0.75 per dollar that an Employee contributes, with such "matches" capped at up to either 6% or 8% of an Employee's gross pay, depending on certain characteristics of the Employee, such as an Employee's date of hire, Union membership, and their participation in the Pension Plan (the "**401(k) Matching Obligations**").

The Debtors pay approximately $9,100,000 each month on account of 401(k) Matching Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $1,400,000 on

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

account of 401(k) Matching Obligations relating to the prepetition period, all of which will come due during the Interim Period.

In addition, the Debtors pay administrative fees and independent fiduciary fees of approximately $140,000 per month to the 401(k) Plan Administrator and Gallagher Fiduciary Advisors, LLC ("**Gallagher**"). The Debtors estimate that, as of the Petition Date, they owe approximately $140,000 in such administrative fees, all of which will come due during the Interim Period. In addition, the Debtors pay an annual fee of approximately $90,000 to Financial Engines, which provide employees with access to additional financial planning tools, information, and services to better manage their 401(k) investments. The Debtors estimate that, as of the Petition Date, there will be no amounts outstanding on account of fees to the Financial Engines. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay all amounts withheld from Employees' paychecks as contributions to the 401(k) Plan, and all outstanding prepetition 401(k) Matching Obligations and administrative fees.

### c) Retiree Health Care Plans

The Debtors offer medical and prescription-drug insurance coverage (the "**Retiree Health Care Plans**") to Retirees who satisfy age and service requirements, which coverage is administered by the Medical Plan Administrators, as well as Blue Cross of California, Inc. d/b/a Anthem Blue Cross ("**Anthem**") and Kaiser Foundation Health Plan, Inc. ("**Kaiser**"), Blue Shield of California, and Health Net. Certain prescription drug benefits are administered by Express Scripts Holding Company ("**Express Scripts**"), and certain mental health benefits are administered by Beacon. Some of the Debtors' Obligations under the Retiree Health Care Plans are self-insured, while others are covered by insurance as to which the Debtors pay the premiums. The total cost of the Retiree Health Care Plans is approximately $12,500,000 per month, of which approximately $10,000,000 is covered by Retiree contributions, which is deducted from their pension benefit payments. To fund their self-insured portion of the Retiree Health Care Plans, the Debtors contribute, on an annual basis, amounts into a trust (the "**Postretirement Medical Plan Trust**"), from which the costs of the Retiree Health Care Plans are paid. In 2018, the Debtors contributed approximately $28,300,000 into the Postretirement Medical Plan Trust. The vast majority of the Debtors' contributions to the Postretirement Medical

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Plan Trust are made at the end of the calendar year. The money contributed by the Debtors to the Postretirement Medical Plan Trust, the Postretirement Life Insurance Plan Trust, and the Utility Long-Term Disability Plan Trust (as discussed and defined below), is received from ratepayers for the specific purpose of funding the trusts. It is my understanding based upon discussions with counsel that these trusts are segregated funds that do not constitute assets of the Debtors' estates.

The medical and prescription-drug claims submitted under the Retiree Health Care Plans (collectively, the "**Retiree Medical Claims**") are funded from the Postretirement Medical Plan Trust. Payments are made from the Postretirement Medical Plan Trust on account of the Retiree Medical Claims on a weekly basis. Retirees typically submit Retiree Medical Claims thirty-seven (37) days after incurring the relevant expenses, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Retiree Medical Claims. In addition, as stated, the Debtors pay insurance premiums on account of some of the Retiree Health Care Plans (collectively, the "**Retiree Health Care Premiums**"), which are also funded from the Postretirement Medical Plan Trust. Based on historical trends, the Debtors estimate that, as of the Petition Date, approximately $13,900,000 is outstanding on account of prepetition Retiree Medical Claims and the Retiree Health Care Premiums, $12,500,000 of which will come due during the Interim Period and all of which will be funded by the funds in the Postretirement Medical Plan Trust. As of the Petition Date, the Debtors' contributions to the Postretirement Medical Plan Trust and insurance premiums related thereto are current.

### d) Retirement Excess Benefit Plan

The Debtors provide certain Retirees and Employees whose pension benefit under the Pension Plan is reduced by reason of the application of Section 415 and/or Section 401(a)(17) of the Internal Revenue Code, the ability to participate in a retirement excess benefit plan (the "**Retirement Excess Benefit Plan**"). The Retirement Excess Benefit Plan provides participants with the monthly benefit which would be payable under the Pension Plan if the limitation under Section 415 and/or Section 401(a)(17) of the Internal Revenue Code had not applied. Currently, ten (10) Retirees (none of whom were officers) are receiving benefits under this plan in an aggregate monthly amount of $6,000. During the Interim Period, $6,000 will become payable to such Retirees.

Case 19-30088    Doc 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 69 of 166

#### e)     Supplemental Retirement Savings Plan

The Debtors also maintain Supplemental Retirement Savings Plans ("**SRSP**") for the benefit of officers and other key Employees. The SRSPs are unfunded deferred compensation plans, which both (1) permit participants to defer certain of their compensation and earn investment returns on those deferred amounts, and (2) allow participants to receive matching amounts that were elected under the 401(k) Plan, but were not provided due to tax code limitations.  The SRSP is funded primarily by eligible Employee contributions and by certain amounts funded by the Debtors.  The SRSP has approximately 300 active Employee participants (the "**Active Participants**"), and approximately 90 inactive participants, comprised largely of Retirees or those who have been terminated without cause (the "**Inactive Participants**").  Under the SRSP, most distributions are not made until seven months after a participant retires, although minimal distributions may be made while the participant is active. Pursuant to the Employee Wages and Benefits Motion, the Debtors are not seeking authority to make any distributions with respect to the SRSP to currently Inactive Participants.  Additionally, no further funds are being contributed to the SRSP by the Debtors.

The balances in the SRSP as to Active Participants aggregate approximately $29,000,000, of which 85% represents funds contributed directly by the Active Participants.  Under the SRSP, no amounts will be paid to Active Participants in 2019 unless any of such participants retire.  Assuming the same level of retirements of Active Employees that occurred in 2018, the Debtors estimate that an aggregate of approximately $2,000,000 would be distributed to Active Employees who retire in 2019, or an average of approximately $60,000 per person.  Based on the fact that 85% of the funds in the SRSP attributable to Active Employees constitutes their contributions, approximately $51,000 of such average distribution would be comprised of Active Employee contributions.  The Debtors seek authority pursuant to the Employee Wages and Benefits Motion to continue the SRSP only for Active Employees on the Petition Date and to make all distributions thereunder.  Because the Active Employees are an integral part of the Debtors' ongoing operations and because most of the funds to be distributed under the SRSP consist of contributions made by the Active Employees, the Debtors believe the relief requested is fair and appropriate.  In addition, the Debtors pay for certain administrative costs associated with the SRSP (the "**Retirement Plan Administrative Costs**").  These

Case 19-30088   Doc 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 70 of 166

costs are approximately $200,000 per quarter. As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of Retirement Plan Administrative Costs, all of which will come due during the Interim Period.

### f) Postretirement Life Insurance Plan

The Debtors provide life insurance coverage (the "**Postretirement Life Insurance Plan**") to Retirees who satisfy an age requirement through Metropolitan Life Insurance Company (the "**Life Insurance Administrator**"). All Employees of the Debtors and certain subsidiaries are eligible to receive a life insurance coverage benefit under the Postretirement Life Insurance Plan. For eligible Retirees who have more than fifteen (15) years of service, the Postretirement Life Insurance Plan provides coverage in an amount equal to twelve (12) months of a Retirees' base salary prior to retirement. Coverage for certain of these Retirees, due to their position at the time of their retirement or the date on which they were promoted to a management position, is capped at $50,000. Separately, coverage for a small number of these Retirees, who were eligible to make an election prior to 2005, is payable seven months after retirement as a cash lump sum, rather than as life insurance. For eligible Retirees who have less than fifteen (15) years of service, the Postretirement Life Insurance Plan provides coverage of $8,000. To fund the insurance premiums for the coverage, the Debtors contributed approximately $8,000 into a trust (the "**Postretirement Life Insurance Plan Trust**"). In addition, in 2018, the Debtors paid directly approximately $3,200,000 in costs in the form of life insurance premiums for coverage over $50,000 and life insurance coverage converted to a lump sum payment at retirement per the election of eligible Employees, and fiduciary and compliance costs. As of the Petition Date, the Debtors estimate that approximately $10,000 is owed in administrative costs with respect to the Postretirement Life Insurance Plan related to the prepetition period, all of which will come due during the Interim Period. It is my understanding based upon discussions with counsel that the Postretirement Life Insurance Plan Trust is a separate trust and is not an asset of the Debtors' estates. Absent further order of the Court, no life insurance coverage will be converted to a lump sum payment at retirement nor will any outstanding lump sum payments be made.

#### 4.      Life and Disability Insurance Programs

The Debtors offer active Employees life insurance and various programs to aid Employees during periods in which they are physically unable to perform their duties (collectively, the "**Life and Disability Insurance Programs**"), including (i) the Short-Term Disability Plans, (ii) the Supplemental Wage Continuation Plans, (iii) the Long-Term Disability Plan, (iv) the Supplemental Industrial Injury Plan, (v) the Life Insurance Plan, (vi) the AD&D Insurance Plan, (vii) the Voluntary AD&D Plan, and (viii) the Business Travel Insurance Plan (each as defined below).  Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay all obligations in connection with the Life and Disability Insurance Programs in the ordinary course of business, including all prepetition amounts due on account of such programs, and to continue to administer the Life and Disability Insurance Programs in the ordinary course of business.  Each of the Life and Disability Insurance Programs is described in further detail below.

The Utility Long-Term Disability Plan, Supplemental Wage Continuation Benefits, Voluntary Plan (each as defined below), and the leave of absence plans are administered by Sedgwick Claims Management Services, Inc. (the "**Leave of Absence and Disability Plan Administrator**").  The Debtors pay administrative fees of approximately $280,000 per month to the Leave of Absence and Disability Plan Administrator.  As of the Petition Date, the Debtors estimate that approximately $280,000 is owed to the Leave of Absence and Disability Plan Administrator related to the prepetition period, all of which will come due during the Interim Period.

#### a)      Short-Term Disability Plans

Since January 1, 2018, the Utility has provided short-term disability payments and paid family leave benefit payments to its eligible Employees located in California pursuant to the Voluntary Disability and Paid Family Leave Benefit Plan (the "**Voluntary Plan**").  The Utility's Voluntary Plan is an alternative to the assistance that would otherwise be provided to Utility Employees by the California State Disability Insurance (SDI) plan (the "**State Plan**" and together with the Voluntary Plan, the "**Short-Term Disability Plans**") and is provided to Employees in the event they become disabled due to a short-term illness or must take leave for certain familial reasons ("**Paid Family Leave**").  More than 85% of the Utility's eligible workforce has elected to be covered under the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Voluntary Plan, including both non-Represented and Represented Employees. Employees also have the option to remain covered by the State Plan. There is also an assessment fee imposed by the California Employment Development Department to be paid by employers for administrative costs arising out of the Voluntary Plan. This fee is paid quarterly and calculated based on taxable wages for Employees covered under the Voluntary Plan.

Both the Voluntary Plan and State Plan are funded by mandatory Employee contributions that are withheld from Employees' paychecks. For both of the Short-Term Disability Plans, the Debtors withhold 1% of Employees' taxable earnings, up to a specified maximum (set at $1,149.67 for 2018 and $1,183.71 for 2019). Employees of the Utility contributed approximately $25,000,000 to the Voluntary Plan in 2018. Employees covered under the State Plan contributed approximately $820,000 to the State Plan in 2018. With the exception of the case of a shortfall under the Voluntary Plan (as described below), all benefits under the Short-Term Disability Plans are funded through Employee contributions, which are deducted from Employee payroll and contributed to either the State Plan trust or the Voluntary Plan trust.

The State Plan pays disability and paid family benefits of 60-70% up to a specified maximum weekly benefit. The Voluntary Plan provides the greater of (i) 55-60% of base pay without a capped weekly benefit amount or (ii) the State Plan weekly benefit amount. Employees may be eligible for up to 52 weeks of disability benefits under the Voluntary Plan or the State Plan. For Employees of the Utility, all Sick Time must be exhausted prior to eligibility for the disability benefits under the Short-Term Disability Plans. In addition, under the State Plan, eligible Employees may receive up to six weeks of Paid Family Leave benefits within a 12-month period. Under the Voluntary Plan, eligible Employees may receive up to eight weeks of Paid Family Leave benefits within a 12-month period.

To the extent there are not sufficient amounts contributed to the Voluntary Plan from Employee contributions to compensate an Employee if they become disabled due to a short-term illness or are on Paid Family Leave or to cover the assessment fee paid to the State, the Utility will fund the shortfall. Employee contributions to the Voluntary Plan in 2018 did not fully cover the disability and Paid Family Leave benefits paid by the Voluntary Plan or the assessment fee paid to the State. The Utility

Case: 19-30088   Doc# 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 73 of 166

funded the shortfall, which to date has totaled $4,000,000. As of the Petition Date, the Debtors estimate that an additional approximately $620,000 is owed in connection with funding the shortfall for the Voluntary Plan related to the prepetition period, all of which will come due during the Interim Period.

All California PG&E Corp. Employees participate in the State Plan. PG&E Corp. also provides a separate supplemental short-term disability program (the "**Corporation Short-Term Disability Plan**") for its Employees. The Corporation Short-Term Disability Plan is insured by the Standard Insurance Company. PG&E Corp. pays the premiums on such insurance monthly. The total cost in 2018 was approximately $20,000. As of the Petition Date, the Debtors estimate that they owe approximately $1,000 on account of the Corporation Short-Term Disability Plan, all of which will come due during the Interim Period.

PG&E Corp. also provides supplemental disability benefits ("**PG&E Corp. Short-Term Supplemental Benefits**") if the Corporation Short-Term Disability Plan benefit of 66 2/3% of base pay is limited by the maximum insured benefit. These supplemental benefits are not insured benefits and are paid for by PG&E Corp directly. No payments were made on account of PG&E Corp. Short-Term Supplemental Benefits in 2018 and no amounts are currently outstanding.

In addition, the PG&E Corp. provides a supplemental paid family leave payment ("**Paid Family Leave Wage Continuation**") which increases the six weeks of State Plan benefit payments up to a total of 100% of base pay, fully taxable, within a 12-month period. Employees may be eligible for an additional two weeks of Paid Family Leave Wage Continuation benefits for up to a total of eight weeks of Paid Family Leave benefits within a 12-month period. No payments were made on account of Paid Family Leave Wage Continuation in 2018 and no amounts are currently outstanding.

Beginning on July 1, 2019, contributions to fund a new paid leave program through the District of Columbia will be withheld from Employees' paychecks who work in the District of Columbia. The contributions are made by covered employers who are required to contribute quarterly an amount equal to 0.62% of the total wages of each of its covered employees to implementation of the universal paid leave. Covered Employees become eligible for benefits starting in 2020.

### b) Supplemental Wage Continuation Plans

The Utility provides eligible Employees who are covered under the Voluntary Plan with additional benefits to increase the percentage of base pay that such Employees receive when disabled due to a short-term illness or when on Paid Family Leave.

For California non-Represented and ESC-Represented eligible Employees covered by the Voluntary Plan, the Utility provides a supplemental disability payment (the "**Supplemental Wage Continuation**") which increases the benefit payment from 60% up to a total benefit of 70% of base pay, after tax. The Utility provides eligible non-Represented and ESC-Represented Employees who do not work in California supplemental wage continuation benefits and may supplement any state disability or paid family leave program for which the Employee may be eligible. The IBEW and SEIU Represented Employees are not eligible for Supplemental Wage Continuation.

In addition, for Employees in California covered in the Voluntary Plan, the Utility provides a supplemental Paid Family Leave payment ("**Paid Family Leave Wage Continuation**" and together with the Supplemental Wage Continuation, the "**Supplemental Wage Continuation Plans**"), which increases the benefit payments from 60% up to a total of 100% of base pay for up to eight weeks within each 12-month period.

Amounts payable under the Supplemental Wage Continuation Plans are paid for by the Utility. The total annual cost of the Supplemental Wage Continuation Plans is approximately $10,400,000. As of the Petition Date, the Utility estimates that it owes approximately $860,000 on account of the Supplemental Wage Continuation Plans, all of which will come due during the Interim Period and which is included in the Compensation Obligations described above.

### c) Long-Term Disability Plans

The Debtors provide long-term disability benefits, including partial income replacement and continued medical and life insurance coverage (the "**Long-Term Disability Plans**"), to certain of their Employees in the event that they become disabled due to an accident or a long-term illness. The Utility and PG&E Corp. provide separate Long-Term Disability Plans for their Employees (respectively, the "**PG&E Corp. Long-Term Disability Plan**" and the "**Utility Long-Term Disability Plan**").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The PG&E Corp. Long-Term Disability Plan is insured and administered by The Standard Insurance Company (the "**PG&E Corp. Long-Term Disability Plan Administrator**"). PG&E Corp. pays the full cost of all premiums for the PG&E Corporation Long-Term Disability Plan monthly. The total cost in 2018 was approximately $25,000. Employees may be eligible for benefits after six (6) months of disability (the "**PG&E Corp. Long-Term Disability Contributions**"). PG&E Corp. also provides supplemental disability benefits ("**PG&E Corp. Long-Term Supplemental Benefits**") if the PG&E Corp. Long-Term Disability Plan benefit of 66 2/3% of base pay is limited by the maximum insured benefit. These supplemental benefits are not insured benefits and are paid for by PG&E Corp. As of the Petition Date, PG&E Corp. estimates that it owes approximately $2,000 on account of the PG&E Corp. Long-Term Disability Plan insurance premiums, all of which will come due during the Interim Period. Additionally, P&E Corp. estimates that there are no amounts outstanding on account of PG&E Corp. Long-Term Supplemental Benefits.

The Utility Long-Term Disability Plan provides that an eligible Employee may receive 70% of base pay during the period of disability for a maximum of two (2) years (unless the Employee qualifies for Social Security Disability Insurance). An Employee's benefit amount is offset by any benefits the Employee receives from government programs. To fund the payments made to eligible Employees under the Utility Long-Term Disability Plan, the Utility contributes an annual amount of approximately $32,000,000 into a trust, from which the benefits are paid (the "**Utility Long-Term Disability Trust**"). Payments are made out of the Utility Long-Term Disability Trust on account of claims under the Utility Long-Term Disability Plan on a weekly basis (the "**Long-Term Disability Claims**"). In 2018, approximately $45,400,000 was paid from the Long-Term Disability Trust on account of Long-Term Disability Claims, including certain administrative costs associated with the Utility Long-Term Disability Plan. Based on historical trends, the Debtors estimate that, as of the Petition Date, approximately $3,800,000 is outstanding on account of prepetition Long-Term Disability Claims, all of which will come due during the Interim Period and all of which will be paid from funds in the Utility Long-Term Disability Trust. As discussed above, the moneys contributed by the Utility to the trust are received from ratepayers for the specific purpose and the Utility has made

the entire contribution for 2018. In addition, as stated above, it is my understanding based upon discussions with counsel that the Utility Long-Term Disability Trust is a separate trust and is not an asset of the Debtors' estates.

### d) Supplemental Industrial Injury Plan

The Debtors provide supplemental insurance coverage (the "**Supplemental Industrial Injury Plan**") to Employees, which provides Employees with a source of income—above Employees' income received in connection with workers' compensation coverage—in the event that they sustain an injury or illness on the job. Depending on the Employee's job title and the date of the onset of his or her injury or illness, when combined with other benefits, an eligible Employee may receive between 50% and 85% of his or her basic weekly wage rate. The Debtors bear the entire cost of the Supplemental Industrial Injury Plan.

The Debtors spend approximately $100,000 per month on claims asserted under the Supplemental Industrial Injury Plan (collectively, the "**Supplemental Industrial Injury Claims**"). The Debtors make payments on account of the Supplemental Industrial Injury Claims on a daily basis. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $100,000 on account of prepetition Supplemental Industrial Injury Claims, all of which will come due during the Interim Period.

### e) Life Insurance Plan

The Debtors provide life insurance coverage (the "**Life Insurance Plan**") to Employees through the Life Insurance Administrator. The Life Insurance Plan provides the vast majority of Employees with $10,000 in coverage, although some Employees have selected higher coverage limits under the Life Insurance Plan, with the cost of the coverage over $10,000 paid by the Employees through payroll deductions. The Debtors withhold approximately $800,000 per month from Employee paychecks for those Employees who have selected the higher coverage limit. The total annual cost to the Debtors of the Life Insurance Plan is approximately $450,000, all of which is paid by the Debtors in the form of premiums remitted to the Life Insurance Administrator (collectively, the "**Life Insurance Obligations**"). Premiums for the Life Insurance Plan are paid monthly. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of Life Insurance

Obligations, all of which will come due during the Interim Period. The Debtors also seek by the Employee Wages and Benefits Motion to remit all amounts withheld from Employee paychecks, which have not yet been remitted.

### f) AD&D Insurance Plan

The Debtors provide accidental death and dismemberment insurance coverage (the "**AD&D Insurance Plan**") to Employees through the Life Insurance Administrator. The AD&D Insurance Plan provides the vast majority of Employees with $10,000 in coverage; certain members of the Debtors' management team receive $250,000 in coverage. The total annual cost of the AD&D Insurance Plan is approximately $80,000, all of which is paid by the Debtors in the form of premiums remitted to the Life Insurance Administrator (collectively, the "**AD&D Insurance Obligations**"). AD&D Insurance Obligations are paid monthly. As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of AD&D Insurance Obligations, all of which will come due during the Interim Period.

### g) Voluntary AD&D Insurance Plan

The Debtors provide eligible Employees with the option to purchase additional accidental death and dismemberment coverage (the **"Voluntary AD&D Insurance Plan"**) through the Life Insurance Administrator. The benefits provided pursuant to the Voluntary AD&D Insurance Plan are funded entirely by amounts withheld from Employees' paychecks and then transferred as premium payments to the Life Insurance Administrator. The Debtors withhold and transfer approximately $100,000 per month on account of the Voluntary AD&D Insurance Plan. As of the Petition Date, the Debtors estimate that they are currently withholding approximately $100,000 on account of the Voluntary AD&D Insurance Plan. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to transfer amounts withheld to the Life Insurance Administrator in the ordinary course of business, including all prepetition amounts withheld on account of the Voluntary AD&D Insurance Plan.

### h) Business Travel Insurance Plan

The Debtors provide business travel insurance coverage (the "**Business Travel Insurance Plan**") to Employees through Life Insurance Company of North America (the "**Business Travel**

Case 19-30088 Doc 263 Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 78 of 166

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**Insurance Administrator**").  In the event that an Employee suffers an injury during work-related travel, the Business Travel Insurance Plan provides an eligible Employee between $125,000 and $1,000,000 in coverage, in addition to any benefits payable from the Life Insurance Plan, the AD&D Insurance Plan, or the Voluntary AD&D Insurance Plan.  The total annual cost of the Business Travel Insurance Plan is approximately $300,000, all of which is paid by the Debtors in the form of premiums remitted to the Business Travel Insurance Administrator (the "**Business Travel Insurance Obligations**").  The Debtors pay Business Travel Insurance Obligations on an annual basis.  As of the Petition Date, the Debtors estimate that they owe no amounts on account of Business Travel Insurance Obligations relating to the prepetition period.

### 5. Work/Life Benefits Programs

The Debtors offer Employees the opportunity to participate in a number of ancillary benefits programs (collectively, the "**Work/Life Benefits Programs**"), including (i) the Employee Assistance Program, (ii) the Wellness Programs, (iii) Compliance Programs, (iv) the Employee Discount Program, (v) the Adoption Expense Reimbursement Program, (vi) the Tuition Reimbursement Program, (vii) the Commuter Transit Program, (viii) the Relocation Program, and (ix) the Child Care Program (each as defined below).  Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay all obligations in connection with the Work/Life Benefits Programs in the ordinary course of business, including all prepetition amounts on account of such obligations, and to continue to administer the Work/Life Benefits Programs in the ordinary course of business.  Each of the Work/Life Benefits Programs is described in further detail below.

### a) Employee Assistance Program

The Debtors offer three services through a program administered by Beacon (the "**Employee Assistance Program**").  The Debtors provide Employees with professional counseling, consultation, and referral services which services are intended to assist Employees to cope with issues such as family and relationship problems, workplace concerns, alcohol- and substance-abuse issues, depression and anxiety, stress, and financial or legal concerns (collectively, the "**Counseling Services**").  The Counseling Services are provided at no cost to Employees.  Additionally, the Debtors offer Employees the opportunity to speak with licensed attorneys and certified financial advisors by telephone if such a

Case 19-30088   Doc 263   Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 79 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

need arises. Employees can obtain cost-free advice relating to legal and financial topics such as alimony and child support, adoptions, living wills, powers of attorney, foreclosures, savings strategies, debt management, retirement planning, and credit scores. The Debtors also offer consultation services for Employees who need assistance locating quality child-care or elder-care services.

The Debtors pay administrative fees of approximately $200,000 per month to Beacon to administer the Employee Assistance Program, which administrative fees cover the entire cost of the Employee Assistance Program. The Debtors estimate that, as of the Petition Date, they owe approximately $200,000 in such administrative fees, all of which will come due during the Interim Period.

### b) Wellness Programs

The Debtors maintain programs to offer various services to Employees with the aim of increasing their general wellness (the "**Wellness Programs**"). Pursuant to the Wellness Programs, Employees have access to, among other things, health advocacy services, health screenings, an industrial athlete program, telephonic health coaching, onsite clinics in San Francisco, Fresno, San Carlos, and at the DCPP (the "**Onsite Clinics**"), an online health risk questionnaire, an online health and wellness portal, a tobacco cessation program, and discounted gym and health club memberships.

The Debtors pay administrative and other fees of approximately $750,000 per month in connection with the Wellness Programs. As of the Petition Date, the Debtors estimate they owe approximately $750,000 in administrative and other fees, all of which will come due during the Interim Period.

### c) Compliance Programs

As part of the Debtors' ongoing operations, the Debtors require that certain current and all prospective employees be subject to random drug screening tests (the "**Drug Screening Program**"). These tests are performed pursuant to Department of Transportation requirements and the Debtors' internal policies. Approximately 740 drug screens are conducted on a monthly basis. The Debtors pay approximately $60,000 per month to EScreen for administration of the drug screens. The Debtors estimate that, as of the Petition Date, they owe approximately $120,000 to EScreen related to the prepetition period, all of which will come due during the Interim Period. EScreen has the capacity to

provide screening throughout the Debtors' service area and its service would be extremely difficult to replicate on a timely basis to meet Department of Transportation screening requirements.

The Debtors also maintain a Department of Motor Vehicle Pull Notice Program, as required by California Vehicle Code section 1808.1 (the "**DMV Compliance Program**"). The DMV Compliance Program is administered by SambaSafety, which monitors the safety of the Debtors' approximately 3,500 commercial drivers on a daily basis. The Debtors pay SambaSafety approximately $4,000 per month. The Debtors estimate that as of the Petition Date, they owe approximately $4,000 on account of prepetition obligations under the DMV Compliance Program, all of which will come due during the Interim Period. The DMV Compliance Program is mandatory and, as a practical matter, it is not feasible to obtain another party to administer the program in a timeframe necessary for ongoing operations.

### d)       Employee Discount Program

Pursuant to tariffs adopted by the CPUC, the Utility offers its Employees and Retirees a 25% discount on Utility-supplied gas and electric service (the "**Employee Discount Program**").  Generally, discounts under the Employee Discount Program only may be applied to gas and electric service at a Utility Employee's primary residence.  Utility Employees are eligible for the Employee Discount Program after six months of continuous service.  The Employee Discount Program is not available to Employees of any subsidiary of the Utility or to Employees of PG&E Corp.

### e)       Adoption Expense Reimbursement Program

The Debtors reimburse Employees for up to $2,000 of expenses related to the adoption of a child under the age of eighteen (18), including any stepchildren (the "**Adoption Expense Reimbursement Program**").  Expenses eligible for reimbursement under the Adoption Expense Reimbursement Program include legal, court, adoption agency, and placement fees; medical expenses for the adopted child that are not covered by a health insurance plan; and transportation expenses associated with picking up the adopted child.

The Debtors spend approximately $2,000 per month on account of obligations associated with the Adoption Expense Reimbursement Program (the "**Adoption Expense Reimbursement Obligations**").  Employees have up to one year following the Decree of Final Adoption to submit an

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

application for reimbursement of eligible fees, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Adoption Expense Reimbursement Obligations.  Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $2,000 on account of prepetition Adoption Expense Reimbursement Obligations, all of which will come due during the Interim Period.

### f)      Tuition Reimbursement Program

The Debtors reimburse Employees for expenses related to their enrollment in approved educational courses that are designed to assist Employees in performing their current duties and/or provide Employees with additional skills to advance their careers within the Debtors' organizational structure (the "**Tuition Reimbursement Program**").  Under the Tuition Reimbursement Program, the Debtors reimburse Employees for 100% of their tuition, registration fees, laboratory and technology fees, program and academic fees, and the costs of textbooks associated with approved educational courses up to a maximum of between $5,250 and $8,000 per year.

The Debtors spend approximately $300,000 per month on account of the Tuition Reimbursement Program.  Employees have up to 90 days after they complete a course to submit a claim for reimbursement of relevant expenses, and thus the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Tuition Reimbursement Program.  Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $300,000 on account of prepetition obligations associated with the Tuition Reimbursement Program, all of which will come due during the Interim Period.

### g)      Commuter Transit Program

The Debtors offer Employees the opportunity to purchase transit passes and pay for certain parking expenses with pre-tax contributions (the "**Commuter Transit Program**").  Under the Commuter Transit Program, a portion of Employees' wages is withheld and contributed into accounts on a pre-tax basis.  Employees then utilize the proceeds of such accounts to purchase transit passes and pay for certain parking expenses.  Approximately 2,400 Employees participate in the Commuter Transit Program.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

AMENDED DECLARATION OF JASON P. WELLS            82
IN SUPPORT OF FIRST DAY MOTIONS

Case 19-30088   Doc 263   Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 82 of 166

The Commuter Transit Program is administered by WageWorks, Inc. (the "**Commuter Transit Program Administrator**"). The Debtors pay administrative fees of approximately $10,000 per month to the Commuter Transit Program Administrator. The Debtors estimate that, as of the Petition Date, they owe approximately $10,000 in such administrative fees, all of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors also seek authority to remit to the accounts all withheld amounts as of the Petition Date.

### h) Relocation Program

The Debtors offer a relocation program to new or transferring Employees whose work location is fifty (50) miles or greater than the distance from the Employees' former residence to the previous work location (the "**Relocation Program**"). The services that are offered under the Debtors' Relocation Program, which vary based on the level of the Employee, include temporary housing, movement of household goods, reimbursement of certain moving related expenses, assistance with the sale and purchase of a home, and in some cases a lump sum cash payment. Eligible Employees have up to twelve (12) months to complete their relocation from the time they begin their position. In 2018, the Debtors paid approximately $4,400,000 under the Relocation Program.

The Relocation Program is administered by Altair Global (the "**Relocation Program Administrator**"). The Debtors pay administrative fees of approximately $10,000 per month to the Relocation Program Administrator. The Debtors estimate that, as of the Petition Date, they owe approximately $1,400,000 on account of prepetition obligations associated with the Relocation Program, inclusive of administrative fees, approximately $100,000 of which will come due during the Interim Period.

### i) Child Care Program

The Debtors offer on-site child care services at their San Francisco corporate headquarters for a limited number of Employees' children who are between the ages of six weeks and five years (the "**Child Care Program**"). The Child Care Program is paid for in part by participating Employees and is subsidized by the Debtors and administered by Bright Horizons Family Solutions LLC (the "**Child Care Program Administrator**"). The Debtors withhold approximately $1,500,000 from Employee payroll annually in connection with the Child Care Program. The Debtors subsidy contribution is

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

approximately $1,000,000 annually. The Debtors estimate that, as of the Petition Date, they owe approximately $250,000 on account of the Child Care Program, which includes amounts withheld from payroll and the Debtors' contributions, all of which will come due during the Interim Period.

**H.     Supplemental Workforce Obligations**

As set forth above, in addition to their Employees, the Debtors use the services of approximately 3,200 Supplemental Workers. To compensate the Supplemental Workforce, the Debtors either pay members of the Supplemental Workforce directly or pay Staffing Agencies, which then make payments to the Supplemental Workforce on the Debtors' behalf (collectively, the "**Supplemental Workforce Obligations**"). It is critical that the Debtors be able to continue honoring their obligations with respect to the Supplemental Workforce Obligations. Staying current with respect to the obligations owed to the Supplemental Workforce will minimize unnecessary disruption to the Debtors' businesses. This is particularly important, given that the Debtors heavily rely on members of the Supplemental Workforce to perform specialized tasks that, for various reasons, the Employees cannot perform on their own in connection with the Debtors' operation and maintenance of their generation units, electric transmission and distribution and natural gas facilities. For example, members of the Supplemental Workforce perform tasks for which Employees otherwise lack the training or licensure, as well as tasks for which there are a shortage of Employees, including maintenance and repair work on transmission lines following weather-related events. If the Debtors fail to pay the Supplemental Workforce Obligations, members of the Supplemental Workforce may refuse to continue to perform services for the Debtors. Thus, failure to make timely payments on account of the Supplemental Workforce Obligations could interrupt the Debtors' ability to provide electric and natural gas service to their customers in northern and central California.

The Debtors average approximately $180,000,000 in annual aggregate Supplemental Workforce Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $35,000,000 on account of Supplemental Workforce Obligations relating to the prepetition period, $25,000,000 of which will come due during the Interim Period. Pursuant to the Employee Wages and Benefits Motion, the Debtors seek authority to pay the Supplemental Workforce Obligations in the ordinary course of business, including all prepetition amounts on account of such obligations.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  Accordingly, I respectfully submit that it is an exercise of sound business judgment and necessary to

2  facilitate a successful reorganization to pay the Supplemental Workforce Obligations.

3        Payment of the Prepetition Employee Obligations, including the Employee Program

4  Administrative Obligations, is an exercise of sound business judgment and necessary to facilitate a

5  successful reorganization.  The Employees—many of whom possess unique skills, licenses, or

6  certifications—are vital to the continued operation of the Debtors' businesses and vital to the success

7  of the Chapter 11 Cases.  The Debtors believe that the majority of the Employees rely exclusively on

8  their compensation and, as applicable, the benefits provided under the Employee Wage and Benefits

9  Programs to satisfy their daily living expenses and other basic needs such as access to health, dental,

10  and vision care coverage.  Consequently, Employees will be exposed to significant financial

11  difficulties if the Debtors are not permitted to honor obligations with respect to the Prepetition

12  Employee Obligations.  Moreover, honoring the Prepetition Employee Obligations and continuing the

13  Employee Wage and Benefits Programs will help maintain morale and minimize the adverse effect of

14  the commencement of these Chapter 11 Cases on the Debtors' ongoing business operations, as well as

15  their relationships with the Unions.  The failure to honor the Prepetition Employee Obligations could

16  lead to turnover, attrition, and instability at this critical time in the Chapter 11 Cases, which is a risk

17  that is especially consequential in these Chapter 11 Cases due to the highly specialized nature of many

18  of the duties that the Employees perform and the critical nature of the Debtors' business as the sole

19  utility provider to approximately 16 million customers.

20        The Debtors also believe that it is an exercise of sound business judgment and necessary to

21  facilitate a successful reorganization to pay the Employee Program Administrative Obligations,

22  including administrative costs and expenses owed to the Payroll Maintenance Vendors, which provide

23  compensation and other benefit-related services and products and which have institutional knowledge

24  of the Debtors' operations that would be difficult and costly to replace.  Absent the relief requested the

25  Debtors would be unable to maintain their Employee Wage and Benefits Programs in an efficient and

26  cost-effective manner.

27

28

AMENDED DECLARATION OF JASON P. WELLS    85
IN SUPPORT OF FIRST DAY MOTIONS

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1   The Debtors cannot risk the damage to their businesses, and the potential disruption of their

2   ability to provide essential utility service to 16 million Californians, that would follow any decline in

3   Employee morale and the resulting attrition that likely would occur if the Debtors are not granted the

4   relief requested herein. Accordingly, the Debtors respectfully request that the Court authorize them to

5   pay the Prepetition Employee Obligations including the Employee Program Administrative

6   Obligations, and continue the Employee Wage and Benefits Programs in the ordinary course of

7   business, consistent with past practice.

8   Accordingly, I respectfully submit that the relief requested in the Employee Wages and

9   Benefits Motion is necessary and appropriate, is in the best interests of their estates and all parties in

10  interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

11  **V.  MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507(a)(7)**

12  **AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND ADMINISTER CUSTOMER**

13  **PROGRAMS, INCLUDING PUBLIC PURPOSE PROGRAMS, AND (B) HONOR ANY PREPETITION OBLIGATIONS RELATING THERETO; AND (II) AUTHORIZING**

14  **FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS (THE "CUSTOMER PROGRAMS MOTION")**

15  Pursuant to the Customer Programs Motion, the Debtors request interim and final authority, in

16  the ordinary course of business and consistent with past practices, to (a) maintain and administer their

17  Customer Programs (as defined below) including the (i) Deposit and Reimbursement Programs (as

18  defined below), (ii) Public Purpose Programs (as defined below), (iii) Environmental Cleanup

19  Programs (as defined below), (iv) Third-Party Programs (as defined below), (v) GHG Credit Programs

20  (as defined below), and (vi) Customer Support Programs (as defined below), and (b) pay and otherwise

21  honor all obligations relating to each of the foregoing, whether arising prior to, or after, the Petition

22  Date, as necessary and appropriate in the Debtors' business judgment. Additionally, the Debtors seek

23  authority to issue new postpetition checks or effect new electronic funds transfer requests on account

24  of such obligations to replace any prepetition checks or electronic funds transfer requests that may be

25  lost, dishonored, or rejected as a result of the commencement of these Chapter 11 Cases.

26  As a regulated, investor-owned utility, the bulk of the Debtors' business operations are subject

27  to oversight by the CPUC. The complex regulatory and statutory framework within which the Debtors

28

operate mandates that, in the ordinary course of business, the Debtors maintain certain programs and initiatives for the benefit of a customer base that includes, in the aggregate, over 16 million residential and non-residential customers (collectively, the "**Customers**"). It is my understanding based on discussions with counsel that, as virtually all of such programs are mandated pursuant to state or local laws, federal law, regulations, tariffs, and regulatory decisions[14] the failure of the Debtors to continue to honor and maintain these programs would result in noncompliance with such laws, regulations, and tariffs, and could materially disrupt the Debtors' operations and jeopardize their ability to successfully reorganize. Additionally, applicable legislation requires that the projected costs associated with several of the programs discussed in the Customer Programs Motion be funded through various surcharges and fees collected by the Debtors through rates from Customers and earmarked to pay the costs of such programs. In other words, in many instances the Debtors act as a conduit for collected funds, which the Debtors pass through to the programs' beneficiaries and use to pay other program costs.

### A. The Customer Programs.

As set forth below, these programs include the following: (a) programs made available to and measures taken for Customers in the ordinary course of providing utility services including the Security Deposit Programs, the MLX Programs, the UG Programs, and the Other Customer Programs (each, as defined below) (collectively, the "**Deposit and Reimbursement Programs**"); (b) programs designed to advance public policy goals such as local and state energy efficiency, renewable energy, carbon reduction, and energy conservation (collectively, the "**Public Purpose Programs**"); (c) programs designed to manage the Debtors' environmental cleanup and nuclear power plant decommissioning efforts (collectively, the "**Environmental Cleanup Programs**"); (d) third-party programs pursuant to which the Debtors invoice Customers on behalf of third parties that have

---

[14] Such statutes, regulations, tariffs, and decisions include, without limitation: Cal. Pub. Util. Code §§ 379, 380.5, 381, 381.1, 382, 399.4, 399.8, 454.55, 454.56, 890-899, 2790, and 8326; Cal. Water Code § 80110a; PG&E Elec. Rules 6, 7, 9G, 15, 16, 17, 17.1, 17.2, and 20; PG&E Gas Rules 6, 7, 9G, 15, 16, 17, 17.1, and 17.2 (available at https://www.pge.com /tariffs/index.page); and California Public Utilities Commission Decision Nos. 94-05-020, 01-03-073, 06-01-024, 07-11-045, 08-10-036, 10-01-022, 14-12-024, 16-01-044, 17-12-022, 18-01-004, 18-06-027, and 18-12-015. *See also*, the California Global Warming Solutions Act of 2006, Cal. Health and Safety Code §§ 38500, *et. seq.*; Low Carbon Fuel Standard (LCFS), Cal. Code of Regs. tit. 17, §§95480-95503.

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 87 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

purchased and provide electricity or natural gas to Customers using the Debtors' transmission and distribution facilities (collectively, the "**Third-Party Programs**"); (e) greenhouse gas ("**GHG**") emissions reduction programs required by the California Air Resources Board that provide certain credits to customers (collectively, the "**GHG Credit Programs**"); and (f) customer support programs pursuant to which the Debtors support Customers by engaging contractors and other third parties to complete certain Customer projects (collectively, the "**Customer Support Programs**" and, all such programs collectively, including the Deposit and Reimbursement Programs, the Public Purpose Programs, the Environmental Cleanup Programs, the Third-Party Programs, the GHG Credit Programs, and the Customer Support Programs collectively, the "**Customer Programs,**" and any and all fees, costs, reimbursement obligations, credits, refunds, or expenses incurred, whether prior to or after the Petition Date, in connection with the Customer Programs, the "**Customer Program Obligations**"). Each of the aforementioned Customer Programs is discussed in further detail below.[15]

### 1. The Deposit and Reimbursement Programs

- *The Security Deposit Programs*. Pursuant to the Debtors' security deposit programs, which have been approved by the CPUC and, as I understand based on discussions with counsel, have the effect of state law[16] (the "**Security Deposit Programs**"), Customers must demonstrate sufficient creditworthiness before the Debtors begin providing gas and electric services. In some cases, the existence of a third-party guarantor or a demonstrable ability to pay will satisfy the Debtors' creditworthiness requirements. In many cases, however, if a potential Customer's gas and/or electric services were discontinued in the past due to non-payment, or if a Customer has no previous service history with the Debtors, the Debtors will require such Customers, pursuant to the Security Deposit Programs, to provide a security deposit to the Debtors before initiating service ("**Security Deposit**"). Certain of the Debtors' nonresidential Customers provide letters of credit to the Debtors to fulfill such creditworthiness requirements. In the ordinary course of business, upon discontinuance of service and payment of all obligations owed to the Debtors, the Debtors return the letters of credit back to such Customers. The Debtors intend to continue such practice in the ordinary course.

---

[15] The Debtors are also obligated to perform under other miscellaneous customer-benefiting programs and services, including, without limitation, certain customer-benefiting programs and obligations required in connection with settlements entered into by the Debtors and approved by the Bankruptcy Court in their prior chapter 11 case, such as the payment of certain disputed claims from escrowed funds and donation of land and land conservation easements to public agencies or non-profit conservation organizations. The Debtors intend to continue to comply with such obligations.

[16] *See* PG&E Electric Rules 6 and 7; PG&E Gas Rules 6 and 7. All tariffs applicable to the Debtors are available at https://www.pge.com/tariffs/index.page.

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 88 of
166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

In the ordinary course of business, the Debtors refund Security Deposits with accrued interest (the "**Security Deposit Refunds**") to Customers if (a) a Customer has no more than two past-due bills during the twelve-month period after commencing service and/or has not had service otherwise discontinued for non-payment during such twelve-month period; (b) a Customer voluntarily discontinues service; or (c) a Customer otherwise meets the Debtors' criteria for creditworthiness and requests the return of a Security Deposit. Once the Debtors determine that the Customer is entitled to a Security Deposit Refund, the deposit is first used to satisfy the Customer's outstanding bill or credited to the Customer's open account. The Debtors also issue Security Deposit Refunds in the form of a check or through an automated clearinghouse transfer directly into a Customer's bank account. Customers may also elect to receive a refund in the form of a credit to another account held with the Debtors.

In 2018, the Debtors issued approximately $52.3 million in Security Deposit Refunds to approximately 240,000 residential Customers (on average, approximately $220 per identified residential Customer) and approximately $41.5 million in Security Deposit Refunds to approximately 20,000 non-residential Customers. As of the Petition Date, the Debtors hold an aggregate of approximately $181.2 million in Security Deposits.

Based on historical averages, the Debtors estimate that they will be obligated to refund or credit on a monthly basis approximately $5 million in Security Deposit Refunds to approximately 20,000 residential Customers (on average $250 per identified residential Customer) and approximately $4 million in Security Deposit Refunds to approximately 1,600 non-residential Customers.

- ***The MLX Programs.*** The Debtors have mainline extension and interconnection ("**MLX**") programs (collectively, the "**MLX Programs**") approved by the CPUC that, as I understand based on discussions with counsel, are required by law. Generally speaking, an MLX is an electric line or a gas main that is typically installed to provide permanent gas and electricity service to premises that otherwise lack connection to the Debtors' extensive natural gas and electric network.[17] As used herein, an MLX may also be used to add load capacity to otherwise grid-connected premises in anticipation of increased energy usage or to interconnect customer generation facilities.[18] The MLX Programs generally work in the following manner: either the Customer builds the MLX and pays for associated construction costs, or the Debtors build the MLX and the Customer provides the Debtors with an up-front deposit corresponding to estimated construction costs. As the Debtors may benefit from an MLX through Customer revenues associated with such MLX over time, the Debtors issue (i) payments to the Customer who built the MLX, and (ii) refunds to Customers who provided the Debtors with up-front deposits (collectively, including refunds of Engineering Advances (as defined below) in excess of remaining project costs, the "**MLX Deposit Refunds**"). The Debtors also receive engineering advances when Customers apply for new line

---

[17] *See* PG&E Electric Rules 15 and 16; PG&E Gas Rules 15 and 16.

[18] *See* PG&E Electric Rule 21.

extension or relocation projects (the "**Engineering Advances**") which are applied to the cost of the project.

In 2018, the Debtors paid approximately $55 million in MLX Deposit Refunds (excluding refunds for Engineering Advances) to approximately 2,100 Customers and approximately $11.1 million in refunds of Engineering Advances to approximately 5,300 Customers. As of the Petition Date, the Debtors hold an aggregate of approximately $112.7 million in MLX deposits and Engineering Advances. Based on historical averages, the Debtors estimate that they will be obligated to refund or credit on a monthly basis approximately $4.6 million in MLX Deposit Refunds (excluding refunds for Engineering Advances) to approximately 150 Customers and $1 million in refunds of Engineering Advances to approximately 440 Customers.

- *The Underground Programs*. The Debtors undertake programs that are approved by the CPUC and are required by law to convert existing overhead electric distribution facilities to underground ("**UG Programs**").[19] In order for a project to qualify under the program, the project must meet specific criteria outlined in the Debtors' Rule 20 tariff. Under the UG Programs, the Debtors undertake projects at the request of governmental entities that cover the costs of the conversions (the "**UG Costs**"). The governmental entities have the option of covering the conversion costs either through direct payment to the Debtors or, more commonly, through the use of work credits that are allocated to communities according to a formula that is set forth in Debtors' tariffs. In 2018, the Debtors expended approximately $33 million in connection with the UG Programs. As of the Petition Date, the Debtors estimate that approximately $5.4 million in UG Costs owed to third parties in connection with the UG Programs are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

- *The Other Customer Programs*. In the ordinary course of business, the Debtors also provide credits to Customers (i) as a result of corrections in rates, metering and other charges,[20] (ii) in connection with the Debtors' budget billing plan, which is intended to normalize Customer payments over the course of a year[21] and the Debtors' solar tariffs[22] which compensate Customers for surplus energy delivery, and (iii) to address other similar Customer concerns and issues (collectively, the "**Other Customer Programs**" and the obligations related thereto, the "**OCP Costs**"). The Debtors' monthly Other Customer Program activity is irregular. In the eleven (11) month period ending November 30, 2018, the Debtors incurred monthly OCP Costs up to approximately $4 million.

---

[19] *See* PG&E Electric Rule 20.

[20] *See* PG&E Electric Rules 17, 17.1 and 17.2; PG&E Gas Rules 17, 17.1 and 17.2.

[21] *See* PG&E Electric Rule 9G; PG&E Gas Rule 9G.

[22] *See* PG&E Electric Rate Schedule NEM2.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## 2. The Public Purpose Programs.

The Debtors administer, both directly and indirectly, a host of separate Public Purpose Programs across the Debtors' service area in California pursuant to a series of statutory mandates, including those set forth in the California Public Utilities Code, and regulatory mandates and decisions issued by the CPUC and local and regulatory agencies.[23] The Public Purpose Programs are tailored to effectuate public policies supporting energy efficiency ("**EE**"), carbon reduction, renewable energy, and energy management and conservation by (a) providing direct financial incentives (including rebates) to individuals, businesses, and local governments to install, sell, or manufacture energy efficient and renewable energy equipment, (b) implementing education and outreach initiatives that promote and support the widespread adoption of EE, renewable energy, reductions in GHG emissions, and energy conservation practices, (c) supporting research and development aimed at improving existing and developing new EE, clean energy technologies, and renewable energy technologies, and (d) administering and supporting demand response programs which seek to maximize grid-wide efficiencies through targeted increases and decreases in electricity consumption. A non-exhaustive list and general description of the types of Public Purpose Programs follows.

The Debtors administer mandated programs that cover nearly every market sector and customer type, across all technology families, and use a variety of market intervention strategies, including rebates targeted at manufacturers and distributors. These programs support California's "Long-Term Energy Efficiency Strategic Plan," a framework created by the CPUC that is designed to integrate EE into the everyday activities of ratepayers, to provide a more integrated EE experience for Customers and to provide Customers with access to information and greater financing opportunities.

- Energy Efficiency. The Debtors' CPUC-mandated EE programs (collectively, the "**EE Programs**") offer incentives, services, education and tools aimed to assist residential, commercial, industrial, and agricultural Customers and local government partners in eliminating unnecessary energy use and saving money. Through strategic energy planning support, technical support services, and financial support through rebates, incentives, education, and financing options, the EE Programs empower Customers to better understand, manage, and eliminate

---

[23] Such statutes and Commission Decisions include without limitation: Cal. Pub. Util. Code §§ 380.5, 381, 381.1, 382, 399.4, 399.8, 454.55, 454.56, 890-899 and 2790; and California Public Utilities Commission Decision Nos. 01-03-073, 06-01-024, 07-11-045, 08-10-036, 10-01-022, 14-12-024, 16-01-044, 17-12-022, 18-01-004, 18-06-027, and 18-12-015.

IN SUPPORT OF FIRST DAY MOTIONS

unnecessary energy use. A general description of the types of EE Programs follows.

o *Energy Efficiency: Residential Programs.* The Debtors administer twelve (12) residential EE programs (collectively, the "**Residential Programs**") designed to achieve energy savings for residential Customers. For example, the Debtors provide rebates to residential Customers who purchase energy efficient products like washing machines, dishwashers, and water heaters. In addition, the Debtors offer incentives to Customers who work with contractors to perform home retrofits and who do air conditioning installation and maintenance. Through the Residential Programs, property owners and Customers can receive incentives to install efficient equipment in multifamily housing units, ranging from central systems like boilers to simple lighting fixtures. The Residential Programs offer incentives to manufacturers, distributors, and retailers to manufacture, stock, and sell energy efficient consumer electronics (such as televisions and computers) and lighting. In addition, the Debtors provide audit and energy savings equipment installation services to moderate income residential Customers. Through home energy management tools the Debtors provide residential Customers tools and information to help them maximize energy savings.

o *Energy Efficiency: Commercial Programs.* The Debtors administer a variety of commercial EE programs (collectively, the "**Commercial Programs**") that target Customers in new and existing facilities and in a variety of sectors including healthcare, hospitality, large office, high tech, and retail. Through the Commercial Programs, the Debtors provide incentives and financing to encourage investment in energy efficient products and services. Typical commercial EE projects focus on equipment upgrades in lighting, HVAC, food service, refrigeration, water heating, and general plug loads. The Debtors also offer strategic energy planning, technical support services, calculation or design assistance, and benchmarking tools to their commercial Customers. The Debtors deliver this suite of Commercial EE Programs through a network of trade professionals, third-party partners, and local government partnerships. The Debtors also offer in-house engineering and project development support to commercial Customers.

o *Energy Efficiency: Industrial Programs.* The Debtors administer a variety of industrial EE programs (collectively, the "**Industrial Programs**") that are designed to reduce energy consumption, lower GHG emissions, and increase Customers' profitability by lowering energy costs. The Industrial Programs include rebates, incentives, and financing for efficient equipment and systems; technical support such as facility audits and energy savings analysis; and strategic energy planning. Typical industrial EE projects focus on lighting, pumps, fans, motors, boilers, insulation, heat recovery, process heating, drip irrigation, low pressure sprinkler nozzles, and refrigeration equipment. The Industrial Programs target various facility types including oil production, lumber and paper mills, cement and quarries, metals processing, petroleum refineries, chemical industries, assembly plants, and water and wastewater treatment plants. The Debtors deliver their suite of

Industrial Programs through a network of trade professionals and third-party partners. The Debtors also offer in-house engineering and project development support to industrial Customers.

o *Energy Efficiency: Agricultural Programs.* The Debtors administer a variety of agricultural EE programs (collectively, the "**Agricultural Programs**") that help agricultural producers and processors manage energy costs and make informed investments in new energy-saving equipment. The Debtors offer a full suite of tools to position agricultural Customers to eliminate unnecessary energy use. Key offerings include rebates, incentives, and financing for efficient equipment and systems; technical support such as facility audits and energy savings analysis; and pump efficiency education. The Agricultural Programs target agricultural growers, post-harvest processors, dairies, irrigation districts/agencies, fruit and vegetable processors, agricultural service providers, wineries, and other beverage manufacturers. The Debtors deliver their suite of Agricultural Programs through a network of trade professionals and third-party partners. The Debtors also offers in-house engineering and project development support to agricultural Customers.

o *Energy Efficiency: Local, State, and Federal Government (Public Sector) Programs.* The Debtors administer a variety of EE programs focused on the public sector (collectively, the "**Public Sector Programs**"). Through Debtors' government and community partnerships, the Debtors collaborate with public entities to shape EE and sustainability at the local, regional, and statewide levels. These partnerships aim to meet the needs of local and state governments and schools and educational institutions to offer comprehensive solutions that are flexible, innovative, and a reflection of the communities' needs. The Public Sector Programs also focus on K-12 public schools and offer energy planning services for public entities interested in benchmarking their facilities and pursuing local energy reach codes and ordinances. In addition, the Debtors offer a light emitting diode ("**LED**") streetlights program serving public sector customers.

o *Energy Efficiency: Financing Programs.* The Debtors administer the on-bill financing program (the "**OBF Program**") that provides zero-interest loans to help commercial customers invest in efficient products and pay for these investments through their utility bill. The OBF Program is offered in conjunction with other EE Programs to stimulate and enable higher levels of customer participation. Additionally, the Debtors support the California Alternative Energy and Advanced Transportation Financing Authority (CAEATFA) in the development of statewide finance pilots, which include on and off-bill financing options.

o *Energy Efficiency: Codes and Standards Program.* The Debtors administer the codes and standards program (the "**C&S Program**"), which saves energy on behalf of ratepayers by influencing regulatory bodies such as the California Energy Commission and the U.S. Department of Energy to strengthen EE regulations. The C&S Program conducts efforts to increase

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

compliance with existing codes, standards, and regulations to ensure that the State of California realizes the savings from new codes and standards and support local governments that include reach codes as a climate strategy. The C&S Program also provides for planning and coordination with other California investor-owned utilities to optimize collaboration, and code readiness activities to prepare for future codes. The C&S Program advocacy and compliance improvement activities extend to virtually all buildings and appliances sold in California in support of the state's climate and energy goals.

o *Energy Efficiency: Workforce Education and Training Program.* The Debtors administer a workforce education and training program (the "**WE&T Program**"), which provides professionals who design, build, and operate buildings the relevant skills needed to help eliminate unnecessary energy use in buildings. The WE&T Program provides technical advice to local workforce development organizations, postsecondary educational institutions, and training programs for various trades. The Debtors operate three energy centers that offer courses, technical consultations, and events. The centers include the Pacific Energy Center in San Francisco, which focuses on building design, the Stockton Energy Training Center, which focuses on workforce training, and the Food Service Technology Center in San Ramon. Through the WE&T Program, the Debtors work with educational institutions, community-based organizations and state education agencies to offer energy education to K-12, community colleges, adult education, and higher education institutions.

o *Energy Efficiency: Emerging Technologies Program.* The Debtors administer an emerging technologies program (the "**ETP**"), which evaluates new and/or promising EE technologies, showcases these technologies, and facilitates the entry of such technologies to market. Through the ETP, the Debtors communicate and collaborate with entrepreneurs and technology providers to increase the supply of EE technology solutions and identify and assesses the performance of emerging EE technology solutions through lab and field testing and demonstration showcases. The ETP is focused on the following areas across all customer segments: lighting, HVAC, building shells, energy management systems, appliances, plug loads, and food services technologies.

- Statewide, Marketing and Education. The Debtors serve as the fiscal manager for a joint utility statewide marketing, education, and outreach program that is performed under contracts with third-party advertising and media firms. The statewide marketing, education, and outreach program motivates Customers to take action on EE and energy conservation measures, increases Customer awareness of such measures, and facilitates Customers' ability to act and incorporate technological advances.

- Low-Income. The Debtors serve as program administrator for programs aimed at helping income-qualified Customers pay their energy bills. Over 1.4 million

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 94 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Customers are receiving a bill discount through the California Alternative Rates for Energy (CARE) program and Family Electric Rate Assistance Program (FERA) program.

- <u>Energy Savings Assistance Program</u>. The Debtors administer the energy savings assistance program which provides income-qualified residential Customers with home energy-saving improvements at no charge. The program supports the EE and weatherization of approximately 100,000 homes per year.

- <u>Self-Generation Incentive Program</u>. The Debtors serve as program administrators for the self-generation incentive program (the "**SGIP**") and provide rebates to Customers and renewable energy providers for the installation of new qualifying technologies that meet all or a portion of the electric needs of a facility. The purpose of the SGIP is to achieve GHG emission reductions, electricity demand reductions, and reduced Customer electricity usage.

- <u>California Solar Initiative and Other Solar Programs</u>. The Debtors administer California solar initiative and other solar programs by providing financial incentives for installation of qualifying photovoltaic systems for multi-family and single-family affordable housing and solar thermal technology. These programs include without limitation, the California Solar Initiative Program; the California Solar Initiative Multifamily Affordable Solar Housing Program; the California Solar Initiative Thermal Program; the Single Family Affordable Solar Housing Program; the Multifamily Affordable Housing Solar Roofs Program; the Net Energy Metering Program; the Community Solar Green Tariff Program; the Disadvantaged Communities—Green Tariff Program, and the Disadvantaged Communities—Single Family Solar Homes Program. Under these programs, the Debtors provide financial incentives and other customer assistance including through a contract with a third-party administrator for the installation of solar energy systems on qualifying properties throughout California. The goal of the programs is to encourage the development and installation of solar systems including in California's disadvantaged communities.

- <u>Demand Response Programs</u>. The Debtors administer demand response programs designed to enable Customers to contribute to energy load reduction during peak times of demand. Demand response programs are designed to be both fiscally and environmentally responsible by responding to occasional and temporary peak demand. The programs offer incentives to businesses that volunteer and participate by temporarily reducing their energy use when demand could outpace supply.

- <u>San Joaquin Valley Disadvantaged Communities Pilot Projects</u>. In December 2018, the CPUC authorized the Debtors and other investor-owned utilities to implement and administer a variety of pilots and various support programs to provide improved utility services to disadvantaged communities in the San Joaquin Valley. The Debtors are responsible for certain of these pilots as well as providing credits and education for impacted customers. The Debtors are also responsible for facilitating the hiring of an independent administrator to oversee the pilots.

- <u>Clean Energy Transportation Programs</u>. The Debtors have been authorized to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

implement multiple electric vehicle programs, including the "Electric Vehicle Charging Network Program," which will increase access to charging for electric vehicles within the Debtors' service territory; the "Electric Vehicle Fleet Ready Program," which serves to build electric vehicle charging infrastructure for 700 sites to support medium and heavy duty vehicle fleets; the "Priority Review Projects Program," which pilots new methods and projects to promote deployment of electric vehicles; and the "Electric Vehicle Fast Charge Program," which targets transit corridors and urban areas to provide them with charging infrastructure that allows electric vehicles to fully charge quickly.[24]

- <u>Residential Rate Reform</u>. The Debtors implement residential rate plan changes and increase customer awareness of rate options in preparation for the mandated transition of approximately 2.7 million Customers to "time-of-use" rate plans starting in October 2020 under which energy costs will be directly related to the time of day energy is used. Customer awareness includes an extensive multi-media statewide campaign informing Customers of the importance of energy management and the time of day that energy is used.

- <u>Mobile Home Park Utility Upgrade Program</u>. The Debtors participate in a program to replace mobile home park ("**MHP**") operated utility systems with direct public utility natural gas and electric service for MHP residents. The goal of the program is to provide safe, reliable, and clean energy to MHP residents.

On an annual basis, the CPUC commissions studies of California's residential and commercial buildings, equipment and processes, and industrial and agricultural sectors with the objective of developing energy savings and conservation objectives and determining the annual budget for the Public Purpose Programs. Following approval by the CPUC, the projected costs associated with the Public Purpose Programs (the "**PPP Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers (the "**PPP Funds**").[25] In order to meet the objectives of the Public Purpose Programs, the CPUC has approved approximately $950 million in PPP Costs for 2019. As of the Petition Date, the Debtors estimate that approximately $131 million in PPP Costs owed to third parties are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

---

[24] These clean energy transportation programs have been authorized by Decision Nos. 16-12-065, 18-01-024 and 18-05-040 of the CPUC.

[25] For a list of examples of such balancing accounts, *see* PG&E Advice Letter 5376-E, Annual Electric True-Up Submittal – Change to PG&E's Electric Rates on January 1, 2019, filed with CPUC on September 4, 2018; PG&E Advice Letter 4053-G, Annual Gas True-Up of Gas Transportation Balancing Accounts for Rates Effective January 1, 2019, filed with CPUC on December 21, 2018.

The funds collected, allocated, and distributed by the Debtors on account of the Public Purpose Programs are typically tracked by the Debtors through regulatory "balancing accounts" required by the CPUC for legal ratemaking purposes. All costs recorded in these accounts are reserved for the payment of PPP Costs as approved by the CPUC. Surplus funds remaining in these accounts at the end of the year are either rolled over and allocated to Public Purpose Programs for the next fiscal year or refunded to Customers through rate adjustments.

### 3.    The Environmental Cleanup Programs

The Debtors' operations include or have included nuclear power plants, manufactured gas plant sites, natural gas gathering system sites, natural gas compressor station sites, electric transmission and distribution facilities, steam-electric power plant sites, and hydroelectric power plant sites. As a result of current and historical operations, that state and federal statutes and agencies such as the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), the NRC, and the CPUC nuclear safety and cost recovery regulations require the Debtors to administer and maintain the Environmental Cleanup Programs described below.[26] The Debtors operate such programs under state and federal regulatory oversight.

As a necessary part of their business, the Debtors use, or have used, a variety of different hazardous or radioactive materials in a number of their sites, the cleanup of which is an ordinary and recurring part of the Debtors' business. In connection therewith, the Debtors (a) evaluate existing and historical operating sites for potential releases of hazardous materials by performing site investigations and conducting human health and ecological assessments, and (b) design, implement, and perform remedial measures at designated sites to address ongoing or potential exposure risks. The Debtors use a number of third-party environmental contracting and consulting firms in the administration of the Environmental Cleanup Programs, as well as outside legal firms to provide guidance and direction on

---

[26] Such authorities include: Cal. Pub. Util. Code §§ 379, 8325 and 8326, and PG&E's Electric Preliminary Statement DB (Nuclear Decommissioning Adjustment Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_DB.pdf; and CPUC Decision 94-05-020, and PG&E's Electric Preliminary Statement Part S (Hazardous Substance Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_S%20(Prelim).pdf.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

legal and regulatory issues, to manage regulatory and third-party claims with respect to environmental issues, and to assist in the development of environmental policies.

Additionally, the Debtors' routine work includes active decommissioning of the Debtors' Humboldt Bay nuclear facility and decommissioning planning activities of the Debtors' DCPP. I understand based on discussion with counsel that federal law requires all operators of nuclear facilities to create and fund a nuclear decommissioning trust fund with adequate funds to decommission those facilities such that they present no risk to public health and safety or the environment when they are removed from service.[27]

The Debtors collect and recover hazardous substance clean up and litigation costs, net of related insurance recoveries, as approved by the CPUC. The CPUC allows for the recovery of eligible costs at CPUC-approved manufactured gas plant sites, federal superfund sites, and other specified sites. Additionally, I understand based on discussions with counsel that Section 8326 of the California Public Utilities Code and CPUC decisions and orders require that the Debtors periodically estimate the costs associated with the Debtors' nuclear decommissioning efforts, seek CPUC authorization for the funding of such costs, and deposit such funding into externally managed and segregated nuclear decommissioning trusts (collectively, the "**Decommissioning Trusts**").[28] The Debtors routinely seek reimbursement from the Decommissioning Trusts for prudent decommissioning expenditures approved by the CPUC.

Following approval by the CPUC, the projected costs associated with the Environmental Cleanup Programs (the "**ECP Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers (the "**ECP Funds**"). In order to meet the objectives of the Environmental Cleanup Programs, the CPUC has approved $130.8 million in ECP Costs for 2019. As of the Petition Date, the Debtors estimate that approximately $39.4 million in ECP Costs owed to third parties are accrued and unpaid, all of which the Debtors estimate will come due within thirty (30) days after the Petition Date.

---

[27] 10 CFR 50.82 and 50.75.

[28] *See* Cal. Pub. Util. Code §§ 8325-26.

AMENDED DECLARATION OF JASON P. WELLS    98

The funds collected, allocated, and distributed by the Debtors on account of the Environmental Cleanup Programs are tracked by the Debtors through regulatory "balancing accounts" or ratemaking adjustments required by the CPUC for legal ratemaking purposes. The ratemaking accounts and mechanisms which recover the costs associated with these activities include the "Hazardous Substance Mechanism's Hazardous Substance Cost Recovery Account" and the "Nuclear Decommissioning Adjustment Mechanism."[29] All costs recorded in these accounts are reserved for the payment of ECP Costs as approved by the CPUC. Surplus funds remaining in the Hazardous Substance Cost Recovery Account at the end of the year are either rolled over and allocated to Environmental Cleanup Programs for the next fiscal year or refunded to Customers through rate adjustments.

### 4. The Third-Party Programs

Under programs authorized by statute and CPUC decisions, the Debtors act as servicing and billing agents to third parties (e.g., private utility providers) that sell electricity or natural gas directly to retail customers using the Debtors' transmission and distribution facilities.[30] Under such arrangements, the Debtors send invoices to, and collect money from, Customers on behalf of the third parties and then remit such payments to the third parties.

The programs under which such third parties provide this electricity or natural gas are known as Community Choice Aggregation, Direct Access, and Core Gas Aggregation. The third-party entities providing service under these programs are known, as Community Choice Aggregators ("**CCAs**"), Energy Service Providers ("**ESPs**"), and Core Transport Agents ("**CTAs**"), respectively. In addition, the Debtors act as billing agent for the California Department of Water Resources ("**DWR**"), which has purchased energy on behalf of Customers and recovers financing costs from Customers using the Debtors' billing system and other facilities. The Third-Party Programs that deliver electricity serve over 3 million customers and are anticipated to account for approximately 40% of the electricity load in the Debtors' territory.

---

[29] PG&E's Electric Preliminary Statement Part S (Hazardous Substance Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_S%20(Prelim).pdf.; and PG&E's Electric Preliminary Statement DB (Nuclear Decommissioning Adjustment Mechanism), https://www.pge.com/tariffs/assets/pdf/tariffbook/ELEC_PRELIM_DB.pdf.

[30] Such statutes include Cal. Pub. Util. Code §§ 365.1 and 366 (direct access), 366.2 (community choice aggregation), and Cal. Water Code § 80110a.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

AMENDED DECLARATION OF JASON P. WELLS          99

1    The Debtors receive fees and revenues from Customers of the third parties to reimburse the

2    Debtors for their costs of delivering the electricity and natural gas over the Debtors' utility

3    transmission and distribution system and for acting as servicing and billing agent.  In addition to

4    amounts owed to the Debtors from such Customers, the Debtors also collect from such Customers

5    amounts owed to the third parties for the electricity and natural gas supplied by the third parties (the

6    "**TPP Funds**").  Remittance of such pass-through revenues by the Debtors to the third parties in

7    connection with the Third-Party Programs (the "**TPP Costs**") ranges from daily to weekly.

8    Failure to provide third party providers with revenue owed to them under the Third Party

9    Programs for purchases of their electricity and natural gas would improperly interfere with their

10    relationships with their Customers and could jeopardize the continued supply of electricity and natural

11    gas to their Customers who rely on the same.  With over 3 million Customers serviced with electricity

12    pursuant to the Third-Party Programs—which is anticipated to account for approximately 40% of the

13    electricity load in the Debtors' territory in 2019—the normal and uninterrupted remittance of Customer

14    payments through the Debtors to CCAs, ESPs, CTAs, and DWR is of the utmost importance in order

15    for such entities to meet their obligations to such customers and their suppliers, contractors, and

16    lenders.

17    Based on historical averages, on a monthly basis the aggregate amount of the TPP Funds

18    received by the Debtors is approximately $181.2 million.  As of the Petition Date, the Debtors estimate

19    that approximately $52.6 million in TPP Costs are payable to third parties, all of which the Debtors

20    estimate will come due during the Interim Period.

21    **5.    The GHG Credit Programs**

22    I understand based on discussion with counsel that, pursuant to statutes enacted by the

23    California Legislature and regulations issued by the California Air Resources Board,[31] California

---

[31] Such statutes and regulations include Assembly Bill (AB) 32, the California Air Resources Board regulations implementing AB 32, and the Low Carbon Fuel Standard regulation issued by the California Air Resources Board.  *See California Global Warming Solutions Act of 2006, Cal. Health & Safety Code §§ 38500*, *et. seq.*; Low Carbon Fuel Standard (LCFS), Cal. Code of Regs. tit. 17, §§ 95480- 95503. Decisions of the California Public Utilities Commission authorize PG&E to issue CC Credits (as defined below) to retail customers under AB 32, and also authorize PG&E to participate in the LCFS (as defined below) program and distribute LCFS Credits to customers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

businesses that emit GHGs, such as the Debtors, are mandated to reduce their emissions of GHGs and provide credits to Customers to give them incentives to do the same.  For example, the Debtors issue semi-annual California Climate Credits for electric Customers and annual California Climate Credits for natural gas Customers ("**CC Credits**").  In addition, the Debtors administer the Low Carbon Fuel Standard ("**LCFS**") credit program.  Pursuant to such program, the Debtors administer and distribute point of purchase rebates to Customers who switch from a gasoline-powered vehicle to an electric vehicle ("**LCFS Credits**").

Following approval by the CPUC, the projected costs associated with the CC Credits (the "**CC Costs**") are funded through various surcharges and fees collected by the Debtors through rates from Customers and revenues accrued from the monetization of credits by the Debtors.  The CPUC has approved approximately $443.1 million in CC Costs for the Debtors' issuance of CC Credits for 2019.  The LCFS Credits provided to Customers are funded by the Debtors' monetization of LCFS credits earned by the Debtors from the ARB for their GHG compliance.  The Debtors sell their LCFS credits in the open market to other GHG emitting businesses who buy them to offset their own compliance costs (the funds collected through rates and revenues from the monetization of CC Credits and LCFS credits collectively, the "**GHG Funds**" and the CC Credits and LCFS Credits provided using the GHG Funds including administrative costs, the "**GHG Costs**").  The GHG Funds are typically tracked by the Debtors through regulatory "balancing accounts" required by the CPUC for legal ratemaking purposes.  As of the Petition Date, the Debtors estimate that approximately $128.9 million in GHG Costs are accrued and unpaid.  The Debtors do not expect that any of such amounts will come due during the Interim Period.

### 6.        The Customer Support Programs

In the ordinary course of business, the Debtors support Customers through a variety of product offerings, which provide the Debtors with additional revenue to offset and reduce the rates paid by gas and electric Customers.  For example, the Debtors license and lease space on the Debtors' assets (such as towers, conduit, and fiber network), to enable Customers to install equipment to provide telecommunications services in California.  If Customers request installation of or modifications to such equipment, the Debtors engage with contractors and other vendors to perform such work for the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

benefit of the Customers.  The Debtors also support private and public sector Customers seeking sustainable solutions by acting as a general contractor for Customer projects that range from replacing heating systems for large institutional or government Customers to replacing street lights with LED lights for municipalities.  The Debtors subcontract such projects to completion.  In 2018, the Debtors estimate that they supported more than 100 Customers through their Customer Support Programs.

The subcontractors and other vendors engaged by the Debtors to complete Customer Support Program projects perform their work under work authorizations with the Debtors.  The Debtors receive invoices from the subcontractor first and then invoice the Customer for the same amount plus a markup.  If the Debtors do not remit payment to a subcontractor, the subcontractor may refuse to complete the project and may result in the imposition of liens by the contractors on Customer property.  Such refusal could jeopardize the Customer's project, the Debtors' relationship with the Customer, any financing obtained by the Customer to fund the project and, as a result, the Debtors' revenue associated therewith.  In addition, a contractor's refusal to perform could result in a breach of the Debtors' performance obligations under its agreement with the Customer.  As of the Petition Date, the Debtors estimate that they owe approximately $12.7 million to contractors and vendors pursuant to the Customer Support Programs (the "**CSP Costs**"), and that approximately $5.3 million will come due within thirty (30) days after the Petition Date.  As noted above, all of such amounts will be recovered from Customers.

As indicated above, I understand based on discussions with counsel that most of the Customer Programs are the subject of statutory or regulatory mandates.  Additionally, with respect to the Public Purpose Programs and the GHG Credit Programs, California statutes and regulations mandate that all PPP Funds and GHG Funds be set aside for the express purpose of funding public interest programs and issuing credits to Customers that are designed to benefit the broader public interests.  Failure to fund the Public Purpose Programs and the GHG Credit Programs with the proceeds specifically designated therefor, including payment of prepetition costs, would be in direct conflict with regulatory requirements and unwarranted under the circumstances.  With respect to the Environmental Cleanup Programs, any suspension or delay in administering the Environmental Cleanup Programs is contrary

1  to public health and welfare and may exacerbate not only existing circumstances but the ultimate costs

2  of cleanup as well.

3  Furthermore, because of the unique nature and scale of their business operations, the Debtors'

4  Customers will be particularly vulnerable to any suspension of the Debtors' obligations under the

5  Deposit and Reimbursement Programs, and the ripple effects of any suspension could be far reaching.

6  If lower-income residential Customers, for example, are unable to receive their Security Deposit

7  Refunds, they may be deprived of necessary funds and be subject to undue hardship.  Customers who

8  have budgeted for the use of the Security Deposit Refunds may be unable to meet their day-to-day

9  financial commitments, including, for Customers who have left the utility's service area, establishing

10 credit with another utility using the funds from their Security Deposit Refund.

11 Accordingly, I respectfully submit that honoring all Customer Program Obligations, including

12 payment of Security Deposit Refunds, MLX Deposit Refunds, UG Costs, OCP Costs, PPP Costs, ECP

13 Costs, TPP Costs, GHG Costs, and CSP Costs in the ordinary course as they come due, including all

14 prepetition amounts, is a prudent and sound exercise of the Debtors' business judgment and should be

15 approved.

16 I respectfully submit that payment of the Customer Program Obligations is necessary to avoid

17 immediate and irreparable harm because (a) failure to make such payments may cause the Debtors to

18 violate statutory and regulatory mandates, (b) failure to pay the Security Deposit Refunds, and MLX

19 Deposit Refunds, may inflict a significant hardship on the Debtors' Customers, (c) failure to pay the

20 prepetition OCP Costs, UG Costs, PPP Costs, ECP Costs, GHG Costs, and CSP Costs will threaten the

21 viability of the UG Programs, Other Customer Programs, Public Purpose Programs, Environmental

22 Cleanup Programs, GHG Credit Programs, and Customer Support Programs and undermine public

23 confidence in the Debtors, and (d) failure to pay the pass-through TPP Costs will threaten the viability

24 of certain third party entities and the continued supply of electricity and natural gas to certain

25 customers.

26 VI.  **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b) AND
27 FED. R. BANKR. P. 6003 AND 6004 (I) FOR INTERIM AND FINAL AUTHORITY TO
    PAY PREPETITION OBLIGATIONS OWED TO SHIPPERS, WAREHOUSEMEN,
28 AND OTHER LIEN CLAIMANTS, AND (II) GRANTING ADMINISTRATIVE**

**EXPENSE PRIORITY STATUS FOR CLAIMS ARISING FROM GOODS DELIVERED TO THE DEBTORS POSTPETITION (THE "LIEN CLAIMANTS MOTION")**

Pursuant to the Lien Claimants Motion, the Debtors request (i) interim and final authority to pay the prepetition claims (the "**Lien Claims**") of certain third-party shippers, warehousemen, vendors, and other service providers or contractors that may be permitted to assert statutory or possessory liens against the Debtors' property and equipment if the Debtors fail to pay the prepetition amounts owed to those parties for their various goods and services (collectively, the "**Lien Claimants**"), and (ii) granting administrative priority status to all undisputed obligations of the Debtors owing to third-party vendors and suppliers arising from the postpetition delivery of goods ordered prior to the Petition Date and authorizing the Debtors to pay such obligations in the ordinary course of business.

A.     **The Lien Claimants.**

The Debtors routinely transact business with a number of entities that provide goods and services that may be permitted to assert statutory or possessory liens against the Debtors' property and equipment if the Debtors fail to pay for those parties' various goods or services. The Lien Claimants generally fall into the following categories: (i) Shippers, (ii) Warehousemen, and (iii) Maintenance and Repairmen (each as defined below). Each of these categories of Lien Claimants is discussed in further detail below.

As of the Petition Date, the Debtors estimate that they owe approximately $65,500,000 on account of Lien Claims, of which approximately $25,800,000 will come due during the Interim Period.[32] A chart outlining the various categories and approximate amounts of the Lien Claims that the Debtors are seeking authority to pay pursuant to the Lien Claimants Motion on an interim and final basis is set forth below:

---

[32] Concurrently with the Lien Claimants Motion, the Debtors have filed the Operational Integrity Suppliers Motion (as defined below). Although the Debtors have endeavored to provide accurate figures and calculations herein, there may, in some instances, be overlap between the amounts sought to be paid pursuant to the Lien Claimants Motion and the amounts sought to be paid pursuant to the Operational Integrity Suppliers Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Categories | Approx. Amount Seeking to Pay on Interim Basis | Approx. Amount Seeking to Pay on Final Basis |
|---|---|---|
| Shippers | $1,800,000 | $6,000,000 |
| Warehouseman | $4,800,000 | $4,800,000 |
| Maintenance and Repairmen | $19,200,000 | $54,700,000 |
| **Total Approx. Lien Claims** | **$25,800,000** | **$65,500,000** |

*Shippers*.  In the ordinary course of business, the Debtors purchase natural gas (the "**Purchased Natural Gas**") from entities operating in all of the major natural gas basins in western North America, including basins in western Canada, the Rocky Mountains, and the southwestern United States. Although the Debtors own and operate over 6,400 miles of transmission pipelines, these pipelines do not connect directly to the Debtors' natural gas sources.  Therefore, it is necessary for the Debtors to rely on third-party transportation service providers (the "**Shippers**") to transport Purchased Natural Gas from their sources to the Debtors' transmission pipelines so that the Debtors may deliver natural gas to their residential, commercial, industrial, and agricultural customers and to fuel the Utility's gas-fired electric generation facilities in northern and central California.  The Debtors' ability to operate in the ordinary course, therefore, depends on their ability to take delivery of and transport Purchased Natural Gas in a timely fashion.  Additionally, the Debtors also rely on Shippers for the transportation of piping supplies, valves, replacement parts and other materials, all of which are integral to the day to day operations of their business.

It is my understanding based upon discussions with counsel that, if the Debtors fail to pay their Shippers in a timely manner, the Shippers may seek to assert statutory or possessory liens against Purchased Natural Gas or other materials and property that is in their possession with respect to any delinquent charges, potentially blocking the Debtors' access to the Purchased Natural Gas and such materials and property that is in transport.[33]  Further, in many cases, only one third-party transportation

---

[33] For example, section 7307 of California's Commercial Code provides in pertinent part that:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

service provider is capable of transporting Purchased Natural Gas or other materials from a given source, leaving the Debtors with no choice but to rely on a particular Shipper. With millions of dollars' worth of Purchased Natural Gas and other materials and property in transit at any given time, the cost of a disruption to the Debtors' operations that could be caused by the Shippers' exercising their rights likely far outweighs the prepetition amounts owed to the Shippers.

The Debtors estimate that the aggregate amount owed to Shippers for services provided during the period before the Petition Date is approximately $6,000,000, of which the Debtors are requesting authority to pay approximately $1,800,000 on an interim basis.

*Warehousemen*. In the ordinary course of business, the Debtors store natural gas that they purchase in various storage facilities (the "**Stored Natural Gas**"). The Debtors procure gas storage capacity as a tool to ensure reliability, in order to inject and withdraw gas to ensure compliance with system requirements, and to balance their position and serve load. Additionally, the Debtors store large diameter pipes used for natural gas pipelines, valves, natural gas replacement pipes and fittings, cables, wiring, and other parts for the electrical grid, and other property in certain third party warehouse facilities. Because the Debtors operate only three storage facilities of their own, all of which have limited capacity, they rely on the services of these third-party storage providers (the "**Warehousemen**").

It is my understanding based upon discussions with counsel that, if the Debtors fail to pay their Warehousemen in a timely manner, the Warehousemen may seek to assert statutory or possessory liens against the Debtors' property that is in their possession; potentially blocking the Debtors' access to the

---

A carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law.

California Code, Commercial Code – COMM § 7307.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Stored Natural Gas and other materials that are necessary for the business operations.[34]  The Debtors estimate that the aggregate amount owed to Warehousemen for services provided during the period before the Petition Date is approximately $4,800,000, all of which is estimated to come due during the Interim Period.

*Maintenance and Repairmen*.  Certain of the Lien Claimants provide maintenance and repair services on the Debtors' vast network of production, transmission, and distribution facilities, including the Debtors' generation units and gas facilities (the "**Maintenance and Repairmen**").  The Maintenance and Repairmen, among other things, maintain, repair, refurbish, and replace components of the Debtors' facilities and equipment and provide fuel and parts for the Debtors' generation units.  Many of the Maintenance and Repairmen are not under contract to perform future services, but rather perform work and related services on an order-by-order basis.  If the Debtors become delinquent in their payments for such goods provided or services rendered, the Maintenance and Repairmen may assert liens, including mechanics' liens and materialman's liens, against the Debtors' property for the amounts owed.  Additionally, those Maintenance and Repairmen that do have contracts with the Debtors may have been granted liens or other interests pursuant to such agreements to secure amounts owed to them under their relevant agreements.  The Debtors estimate that the aggregate amount owed to Maintenance and Repairmen for goods and services provided during the period before the Petition Date is approximately $54,700,000, of which the Debtors are requesting authority to pay approximately $19,200,000 on an interim basis.

In addition to having secured claims, if the Debtors are unable to satisfy the Lien Claims as requested in the Lien Claimants Motion, the Lien Claimants may refuse to provide critical ongoing goods or services to the Debtors or may seek to enforce their rights and liens on account of such claims.  Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, the Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors'

---

[34] *See* California Code, Commercial Code – COMM § 7209 ("A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.")

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

property or equipment, regardless of whether such Lien Claimants already have actually perfected their interests.

### B. The Prepetition Orders

In addition to the relief requested with respect to the Lien Claimants, as of the Petition Date, the Debtors have certain prepetition purchase orders outstanding with various third-party vendors and suppliers (the "**Vendors**") for goods ordered by the Debtors that have not yet been delivered by the Vendors to the Debtors' facilities (the "**Prepetition Orders**"). These Vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Petition Date, such obligations will be treated as general unsecured claims in the Chapter 11 Cases. Accordingly, certain Vendors may refuse to provide goods purchased (or may recall shipments thereof) pursuant to the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code.

I respectfully submit that the relief requested in the Lien Claimants Motion represents an exercise of sound business judgment and is necessary to facilitate a successful reorganization. Authorizing the Debtors to pay the Lien Claims is in the best interests of the Debtors, their estates, and all parties in interest. The Lien Claimants provide valuable shipping, warehousing, and maintenance and repair services to the Debtors, and certain of the Lien Claimants currently hold goods and property that are necessary to the Debtors' continued operations. It is my understanding based upon discussions with counsel that, if the Debtors do not pay the Lien Claims, the Shippers and Warehousemen likely will assert possessory liens on the Debtors' property and thereby prevent access to goods necessary to the Debtors' ongoing operations. Similarly, the Maintenance and Repairmen will assert mechanics' and materialman's liens on the Debtors' properties, thereby securing the outstanding amounts they are owed. Under these circumstances, I respectfully submit that having the authority to satisfy these claims not only will avoid any disruptions to their operations and the ability to provide utility service to their customers, but should not prejudice any other parties in interest by reason of the lien rights held by the Lien Claimants.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-30088 Doc 361 Filed 02/01/19 Entered: 02/01/19 18:16:49 Page 108 of 166

Accordingly, I respectfully submit that the relief requested in the Lien Claimants Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

VII. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION OBLIGATIONS OWED TO CERTAIN SAFETY AND RELIABILITY, OUTAGE, AND NUCLEAR FACILITY SUPPLIERS (THE "OPERATIONAL INTEGRITY SUPPLIERS MOTION")**

Pursuant to the Operational Integrity Suppliers Motion, the Debtors are seeking interim and final authority to pay the prepetition claims (the "**Operational Integrity Supplier Claims**") of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to protecting the public health and maintaining the going-concern value and integrity of the Debtors' businesses and operations (the "**Operational Integrity Suppliers**").

In the normal and day to day operation of their business, the Debtors rely heavily on Operational Integrity Suppliers for essential and specialized goods and services so that the Debtors can provide safe and reliable electric and natural gas service to their customers' homes and businesses, while remaining in compliance with all applicable state and federal laws and regulations.

The Debtors spend an average of approximately $1.9 billion per month on goods and services provided by third party vendors and suppliers. As of the Petition Date, the Debtors estimate that they owe approximately $116,200,000 on account of Operational Integrity Supplier Claims (the "**Operational Integrity Supplier Cap**"), of which approximately $30,100,000 will come due in the Interim Period.[35] These amounts represent approximately 5.5% of the Debtors' total outstanding trade debt as of the Petition Date. A chart outlining the representative categories and approximate amounts of the Operational Integrity Supplier Claims that the Debtors are seeking authority to pay pursuant to the Operational Integrity Suppliers Motion on an interim and final basis is set forth below. The estimated amounts of Operational Integrity Supplier Claims set forth herein and in the chart below are

---

[35] Concurrently with the Operational Integrity Suppliers Motion, the Debtors filed the Lien Claimants Motion. Although the Debtors have endeavored to provide accurate figures and calculations herein, there may, in some instances, be overlap between the amounts sought to be expended pursuant to the Operational Integrity Suppliers Motion and the amounts sought to be expended pursuant to the Lien Claimants Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

AMENDED DECLARATION OF JASON P. WELLS
IN SUPPORT OF FIRST DAY MOTIONS

109

exclusive of any amounts that may be owed to Operational Integrity Suppliers that may be entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**"). Pursuant to the Operational Integrity Suppliers Motion, the Debtors also request authority to pay the 503(b)(9) Claims of any Operational Integrity Supplier to the extent the Debtors determine it is necessary and appropriate in accordance with the procedures and protocol set forth therein; provided, however, any amounts paid by the Debtors in satisfaction of such 503(b)(9) Claims shall not be included in or subject to the Operational Integrity Supplier Cap.

| Representative Categories of Operational Integrity Suppliers | Approx. Amount Seeking to Pay on Interim Basis | Approx. Amount Seeking to Pay on Final Basis |
|---|---|---|
| Safety and Reliability Vendors and Service Providers | $28,600,000 | $110,600,000 |
| Outage Vendors and Service Providers | $1,200,000 | $4,500,000 |
| Nuclear Facility Vendors and Service Providers | $300,000 | $1,100,000 |
| **Total Estimated Operational Integrity Supplier Claims** | **$30,100,000** | **$116,200,000** |

A. **The Debtors' Operational Integrity Suppliers**

In order to fulfill their obligations to provide safe electric and natural gas service to their approximately 16 million customers in northern and central California, the Debtors rely on the goods and services provided by the Operational Integrity Suppliers to maintain and safely and reliably operate their vast network of production, transmission, and distribution facilities. Due to the complex, technical, and potentially hazardous nature of the Debtors' facilities, the Debtors often do business with a select vendor for particular goods or services and rely on such vendor as the Debtors' primary supplier or service provider (i.e., the supply source for certain complex parts and specialty equipment, specifically designed systems, and specialized labor necessary to the Debtors' operations). Additionally, certain of the Operational Integrity Suppliers have developed capabilities and expertise specific to the Debtors' needs that cannot be easily or cost-effectively replaced, if at all, and which

would be lost if the Debtors were forced to seek similar services elsewhere. Further, due to the myriad of federal and state regulations under which the Debtors operate, many of the Operational Integrity Suppliers are required to possess certain certifications, permits, or licenses in order to provide goods or services to the Debtors. The universe of vendors that possess such certifications, permits, or licenses is limited, and, thus, the Debtors are likely to encounter significant difficulty replacing such Operational Integrity Suppliers on a timely basis, if at all.

The Operational Integrity Suppliers generally fall into three primary categories: (i) entities that provide goods and services necessary for safe and reliable electric and natural gas service (the "**Safety and Reliability Vendors**"); (ii) entities that provide goods and services related to planned and unplanned outages (the "**Outage Vendors**"); and (iii) entities that provide goods and services in connection with the Debtors' operation and decommissioning of their nuclear reactor power units (the "**Nuclear Facility Vendors**"). Each of these categories of Operational Integrity Suppliers is discussed in further detail below.

### 1. Safety and Reliability Vendors

Safety is a core value for a utility company. The potentially hazardous nature of the transmission and distribution of electricity and natural gas and the generation of electricity mandates a focus on the safety of the public, the Debtors' workforce, and the Debtors' contractors. Further, reliable electric and natural gas service is of the utmost importance to the safety, health, and welfare of the Debtors' customers and their communities, as well as to the efficiency of the economy of central and northern California.

The Safety and Reliability Vendors generally fall into one or more of the following subcategories: (i) entities that provide goods and services that are highly specialized (the "**Specialized Vendors**") and/or closely integrated with the Debtor's business operations and customer relationships (the "**Integrated Vendors**" and, together with the Specialized Vendors, the "**Specialized and Integrated Vendors**"); (ii) select, pre-qualified, or geographically limited providers of critical goods (the "**Critical Goods Vendors**"); and (iii) entities that provide goods and services related to the Debtor's regulatory compliance obligations (the "**Regulatory Compliance Vendors**").

### a) Specialized and Integrated Vendors

The Debtors rely on Specialized and Integrated Vendors to provide specialized services that are closely integrated with the Debtors' transmission, distribution, generation, and retail business operations. In certain cases, the Debtors must obtain the services of a Specialized Vendor because state and federal laws and regulations require vendors to possess certain certifications, permits, licenses, particular knowledge, or technical "know-how." Consequently, certain services (*e.g.*, electrical, line-related, welding, waste-removal, earth-moving, information-technology, security, and cybersecurity services) may only be performed by Specialized Vendors due to the risks posed by the nature of the Debtors' facilities, which expose Specialized Vendors to, among other things, high-voltage electricity, high-pressure gas, high-speed rotation motors, and potentially hazardous or radioactive substances. A very limited number of vendors possess the certifications, permits, licenses, knowledge, technical "know-how," experience, or safety qualifications necessary to perform the services that are provided by the Specialized Vendors, and, therefore, such vendors cannot be easily replaced.

For example, the Debtors rely on Specialized Vendors such as wildland firefighting and rescue servicers to provide onsite fire suppression services. The Debtors also rely on Specialized Vendors to provide base camp services for the Debtors' personnel. These base camp services include providing materials to support the Debtors' fleet operations, and providing telecommunications, electrical support, housing, and meals for the Debtors' personnel on the field.

Integrated Vendors provide the Debtors with certain customer-facing services, such as customer outreach and account management (*e.g.*, establishing and disconnecting service, metering, billing, and collecting payments). These services are crucial to maintaining the Debtors' customer relationships and executing their business strategies. Even if the Debtors could identify substitute or replacement vendors in a timely fashion that possess the necessary qualifications, experience, and skill to provide these customer-facing services, the Integrated Vendors have specific knowledge of the Debtors' business operations, facilities, and customer demands, which knowledge has been developed over the course of the Debtors' longstanding relationships with the Integrated Vendors and which cannot be easily replaced. Moreover, attempting to replace the Integrated Vendors during this critical

Case 19-30088 First Day Motions Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 112 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

early period of the Chapter 11 Cases likely would cause significant disruption to the Debtors' operations and relationships with their customers, to the detriment and prejudice of all parties in interest.

### b) Critical Goods Vendors

The Debtors rely on Critical Goods Vendors to supply essential electrical and gas equipment, specialized materials and replacement parts, operations consumables, raw materials, fuels, and certain other goods required to operate the Debtors' electric and natural gas transmission and distribution systems and generation units. In some cases, there is no alternative provider for certain of these critical goods. For example, certain Critical Goods Vendors supply the Debtors with specialized electrical equipment, transformers, specially fabricated repair and replacement parts, and other equipment necessary for the Debtors' transmission, distribution, generation, and gas assets. These parts and materials are based on patented or trade-secreted designs and are available only from limited sources.

In other cases, alternative vendors cannot supply the requisite critical goods in sufficient quantity or with sufficient reliability, or such vendors are unable to supply critical goods of sufficient quality on a cost-effective or timely basis in the appropriate geographic areas. For example, the modern electrical grid relies on switch gear, transformers, and other state-of-the-art equipment to manage advanced electronic metering, communications, and control technologies. Maintaining the reliability of the electrical transmission and distribution system, therefore, requires the immediate availability of replacement parts for this critical equipment when such equipment is out of service. Similarly, certain of the Debtors' electricity generation facilities are designed to utilize bulk quantities of specialized chemicals as part of their energy-production and pollution-control activities. Due to the chemical specifications and the quantities involved, the Debtors are dependent on a few Critical Goods Vendors to keep the electricity generation facilities in operation. Certain raw materials and fuels used in the Debtors' generation facilities and gas assets are sourced locally because of the expense and inefficiency associated with transporting such materials and fuels. In many cases, there may be limited capacity to provide critical equipment, materials, or fuels within the general vicinity of a given electric or natural gas transmission or distribution asset or generation facility.

### c) Regulatory Compliance Vendors

The Debtors rely on Regulatory Compliance Vendors to assist in complying with various state and federal laws and regulations. For example, among other things, the Debtors rely on certain Regulatory Compliance Vendors to (i) manage the vegetation that grows near the Debtors' transmission and distribution lines, (ii) perform safety checks and quality-assurance monitoring on electric transmission and distribution equipment, (iii) test emissions from the Debtors' facilities to ensure compliance with environmental laws and regulations, and (iv) remove regulated waste and chemicals from the Debtors' facilities for proper disposal.

The services provided by the Regulatory Compliance Vendors are critical to maintaining the safety and compliance of the Debtors' operations. Proper vegetation management reduces the risk of creating dangerous or hazardous conditions within the Debtors' service area. Even the briefest disruption in the services provided by the Regulatory Compliance Vendors could cause significant disruption to the Debtors' operations or increase the risk to the public. In addition, proper disposal of regulated waste and chemicals not only protects the environment and benefits the public health, but also ensures the safety of the Debtors' employees. Further, absent the services provided by the Regulatory Compliance Vendors, governmental entities may attempt to take various actions that would have severe negative consequences on the Debtors' operations, including levying fines or penalties against the Debtors, disallowing cost recovery for such services, requiring that certain of the Debtors' facilities be idled or closed, or potentially revoking the Debtors' permits or licenses.

### 2. Outage Vendors

The Debtors regularly plan outages of certain of their electric transmission and distribution assets, generation units, and gas facilities. During such planned outages, Outage Vendors perform maintenance on and repair, replace, upgrade, refuel, refurbish, and stress-test the Debtors' generation and gas assets in an effort to ensure that such assets perform optimally during periods when electricity and gas consumption are at their peak. The Debtors schedule the planned outages for the least amount of time possible.

Additionally, certain unplanned outages occur, oftentimes as a result of natural hazards or mechanical failures, particularly during storm season. To restore service to their customers as quickly

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

as possible, the Debtors utilize Outage Vendors to assist their crews in repairing power lines, poles, and transmission equipment. Certain of the Outage Vendors also provide critical monitoring services during storms or periods of high wind to reduce the occurrence and/or impact of unplanned outages.

The Debtors' Outage Vendors are skilled professionals and have specialized knowledge necessary to safely and reliably perform the required tasks during both planned and unplanned outages. It would be difficult for the Debtors to replace the Outage Vendors in a quick, safe, and cost-efficient manner and, therefore, the Outage Vendors are necessary and critical to the Debtors' operations.

Any delay in obtaining goods and services from the Outage Vendors likely would extend the duration of both planned and unplanned outages, which, in addition to increasing the cost of the outages, would adversely impact the reliability of the Debtors' electric transmission and distribution assets, generation units, and gas facilities, as well as the supply of electricity and gas to the Debtors' customers.

### 3. Nuclear Facility Vendors

The Nuclear Facility Vendors provide goods and services in connection with the Debtors' operation and decommissioning of their nuclear reactor power units located at the DCPP and Humboldt Bay Power Plant. The Nuclear Facility Vendors maintain, repair, inspect, and refurbish the equipment located at these facilities and provide fuel and parts, as well as disposal, quality-control, physical-plant-security, and cybersecurity services. The Debtors' nuclear operations and decommissioning activities are subject to extensive oversight by the United States Nuclear Regulatory Commission and other regulatory bodies. The Nuclear Facility Vendors are highly skilled and have specialized knowledge in the nuclear reactor space. Replacing Nuclear Facility Vendors would be difficult, time-consuming, and expensive. Any disruption with respect to the Debtors' current nuclear assets could have significant regulatory consequences for the continued operation of those assets and adversely affect the public safety and health, as well as the reliability of the California electricity market.

The Operational Integrity Suppliers are essential to the Debtors' businesses and the lack of any of their particular goods, services, or skills, even for a short duration, could present public health and safety risks, would disrupt the Debtors' operations, and would cause irreparable harm to the Debtors

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and their reorganization efforts under chapter 11. In addition, many of the Operational Integrity Suppliers are smaller, independent, or regional operators and, given the already limited pool of such vendors and service providers in the geographic area, which pool has been further limited by the Debtors' current financial situation, it would be difficult (and at times impossible) to replace such vendors or suppliers on a timely basis.

**B.** **Identification of the Operational Integrity Suppliers**

The Debtors, with the assistance of their advisors, spent significant time prior to the Petition Date analyzing and reviewing their operations, books and records, accounts payable systems, and prepetition vendor and service provider lists to identify those vendors, suppliers, and service providers that are in fact critical to the Debtors' operations and public health and safety, the loss of which could materially harm the Debtors' businesses and/or their customers and the public, in order to determine the Operational Integrity Suppliers. Through this process, the Debtors considered the following criteria: (i) whether a particular vendor or service provider is a select supplier or service provider; (ii) whether the services provided by the vendor are so vital, or the vendors' operations are so intertwined with the Debtors' businesses, that even the briefest disruption would raise safety or reliability risks or cause significant harm to the Debtors' operations; (iii) whether the Debtors would be unable to obtain comparable goods or services from alternative sources on a cost-effective basis within a reasonable timeframe; (iv) whether the Debtors' current inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor or service provider could be located or qualified; (v) whether a vendor is party to an executory contract with the Debtors; and (vi) whether the vendor or service provider might be able to obtain (or has obtained) mechanics' liens, possessory liens, shippers' liens, or similar state-law trade liens on property necessary for the Debtors' ongoing operations.

After evaluating the information relevant to the above criteria, the Debtors have and, upon approval of the Court, will continue to designate, in their discretion, certain vendors as critical to the Debtors' operations and, therefore, as Operational Integrity Suppliers. To do so, the Debtors have designated a centralized, high-level team comprised of representatives of the Debtors' supply chain, finance, treasury, and in-house legal departments (collectively, the "**Supplier Management Committee**") to review, assess, and (if the relief requested in the Operational Integrity Suppliers

Motion is granted), authorize payment to Operational Integrity Suppliers. The Debtors and their advisors have already implemented a detailed protocol (the "**Payment Protocol**") to route all requests for Operational Integrity Supplier treatment through the Supplier Management Committee and to educate procurement, payables, and operations personnel on the process.

### 1. Proposed Conditions to Receiving Payment

To minimize the amount of payments required if the relief sought in the Operational Integrity Suppliers Motion is granted, the Debtors will utilize the Payment Protocol to identify particular Operational Integrity Suppliers and pay Operational Integrity Supplier Claims. The Debtors' Payment Protocol can be generally summarized as follows:

   i.     All aspects of any proposed payment of an Operational Integrity Supplier Claim will be scrutinized for, among other things, the amount of payment at issue, the terms offered by the particular vendor, whether the supplier is party to an executory contract, and the business need for the goods or services at issue.

   ii.     All requests for Operational Integrity Supplier treatment, or vendors refusing shipment of goods or the provision of services due to non-payment of prepetition claims, will be received and reviewed by the Debtors' Supplier Management Committee. Operational Integrity Supplier Claims will not be paid unless approved by the Supplier Management Committee. Additionally, the Supplier Management Committee will consult with the Debtors' outside legal and financial advisors, as necessary, to ensure compliance with the Payment Protocol and that only those claims that are essential to maintaining the Debtors' operations are paid pursuant to the Operational Integrity Suppliers Motion.

   iii.     In addition to approval from the Supplier Management Committee, any request for payment of an Operational Integrity Supplier Claim in excess of $5,000,000 must be approved by the Debtors' Chief Financial Officer.

   iv.     The Debtors shall endeavor to document all proposed payments pursuant to an executed Vendor Agreement (as defined below).

   v.     Payments may be executed by specifically designated members of the Debtors' Supplier Management Committee when the Payment Protocol has been completed and upon presentation of completed documentation.

Although the Debtors and their advisors have effectively "pre-screened" certain vendors that have satisfied the criteria for Operational Integrity Supplier treatment, the Debtors are keenly aware that they must be prepared to address new or additional exigencies should they emerge, particularly in light of the size and scope of the Debtors' operations. Thus, the Debtors' Payment Protocol includes specific processes by which suppliers and vendors, including suppliers and vendors that may provide

essential goods or services outside of the aforementioned representative categories, may be designated as "Operational Integrity Suppliers" on a case-by-case and ongoing basis.

### 2. Vendor Agreements

The Debtors propose to condition the payment of Operational Integrity Supplier Claims on the agreement of individual Operational Integrity Suppliers to supply goods and services to the Debtors (i) on the normal and customary trade terms, practices, and programs (including credit limits, pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs) that were in effect between such Operational Integrity Supplier and the Debtors within the twenty-four (24) month period prior to the Petition Date (the "**Customary Trade Terms**"), or (ii) such other trade terms as agreed to by the Debtors and an Operational Integrity Supplier. If the Debtors are unable to negotiate the continued supply of goods or the provision of services upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay Operational Integrity Suppliers all or a portion of their Operational Integrity Supplier Claims in return for the continued supply of critical goods or the provision of services.

To ensure that Operational Integrity Suppliers continue doing business with the Debtors on Customary Trade Terms or on such other terms as agreed to by the Debtors and an Operational Integrity Supplier, the Debtors propose (i) that a letter substantially in the form attached to the Operational Integrity Suppliers Motion as <u>Exhibit B</u> (the "**Vendor Agreement**") be delivered to, and executed by, the Operational Integrity Suppliers, along with a copy of the order granting the relief requested in the Operational Integrity Suppliers Motion, and (ii) that payment of Operational Integrity Supplier Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the order of the United States Bankruptcy Court for the Northern District of California, dated _____, 2019, in the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (Case No. 19-_____(__)), authorizing the Debtors to pay prepetition obligations of Operational Integrity Suppliers.

If the Debtors, in their discretion, determine that an Operational Integrity Supplier has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to comply with the Customary Trade Terms or such other terms that are individually agreed to by the Debtors and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

such Operational Integrity Supplier, following the date of the agreement, the Debtors may terminate a Vendor Agreement. If a Vendor Agreement is so terminated, or if an Operational Integrity Supplier that has received payment of a prepetition claim later refuses to continue to supply goods or services in compliance with the Vendor Agreement or as otherwise agreed with the Debtors, the Debtors reserve their rights to and may seek approval from this Court to (i) deem such payment to apply to postpetition amounts payable to such Operational Integrity Supplier, if applicable, or (ii) take any and all appropriate steps to cause such Operational Integrity Supplier to repay payments made to it on account of its Operational Integrity Supplier Claim to the extent that such payments exceed the postpetition amounts then owing to such Operational Integrity Supplier. The Operational Integrity Supplier Claim shall then be reinstated in such an amount so as to restore the Debtors and the Operational Integrity Supplier to their original positions as if the payment of the Operational Integrity Supplier Claim had not been made.

Some of the Operational Integrity Suppliers may also possess or have the right to assert Liens on the Debtors' assets based upon the claims held by those Operational Integrity Suppliers. As a further condition of receiving payment of an Operational Integrity Supplier Claim, the Debtors propose that an Operational Integrity Supplier must agree to take whatever action is necessary to remove the Lien at the Operational Integrity Supplier's sole expense.

Finally, the Debtors propose to maintain a matrix summarizing (i) the name of each Operational Integrity Supplier paid, (ii) the amount paid to each Operational Integrity Supplier on account of its Operational Integrity Supplier Claim (and any 503(b)(9) Claims), and (iii) the type of goods or services provided by that Operational Integrity Supplier. This matrix will be provided, upon request, to the U.S. Trustee and the professionals retained by any official committee appointed in the Chapter 11 Cases; provided, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee, without the prior written consent of the Debtors.

The Debtors have more than ample liquidity in the form of cash on hand and a commitment for approximately $5.5 billion in debtor-in-possession financing. I believe that some of the Operational

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Integrity Suppliers will demand that the Debtors satisfy their prepetition obligations as a condition of doing business on a go-forward basis as a result of the commencement of the Chapter 11 Cases. In the three weeks leading up to the Petition Date, the Debtors estimate that they have experienced approximately $811 million in trade contraction from vendors and suppliers that have demanded accelerated payment, cash-in-advance, new or additional cash collateral, or have stopped shipping altogether. Further trade contraction from additional vendors could irreparably harm the Debtors' business operations. In addition, the Utility relies on goods and services supplied by certain of the Operational Integrity Suppliers to comply with the order appointing a third-party monitor issued by the U.S. District Court for the Northern District of California as part of the Utility's compliance with the sentencing terms of its January 27, 2017 federal criminal convictions. The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to, among other things, maintain the safety of its gas and electric operations.

Failure to pay the Operational Integrity Supplier Claims would severely inhibit the Debtors' ability to acquire necessary materials and services and maintain their electric transmission and distribution system, generation units, and gas facilities in order to safely and reliably provide essential utilities to the population of northern and central California, as well as remain in compliance with state and federal laws and regulations, including the 2017 monitor order. Such failure would cause irreparable financial harm to the Debtors and may jeopardize the Debtors' ability to operate in a safe and reliable manner. Thus, I believe that the goods and services provided by the Operational Integrity Suppliers are so vital that the costs associated with even the briefest of disruption in goods and services would exceed the Operational Integrity Suppliers' prepetition claims and, therefore, that payment of the Operational Integrity Suppliers Claims as requested in the Operational Integrity Supplier Motion is plainly an exercise of sound business judgment and necessary to a successful reorganization. Moreover, as noted above, the Operational Integrity Supplier Claims are limited to approximately 5.5% of the Debtors' total outstanding trade debt as of the Petition Date.

In addition, payment of any 503(b)(9) Claims of any Operational Integrity Supplier merely accelerates the timing of payment and not the ultimate treatment of such claims, especially here where

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1   the Debtors have ample liquidity. Accordingly, the relief should be granted and the Debtors should be

2   authorized to pay the 503(b)(9) Claims of any Operational Integrity Supplier in accordance with the

3   procedures and protocols set forth herein.

4       For the reasons set forth herein, I respectfully submit that the relief requested in the Operational

5   Integrity Supplier Motion is necessary and appropriate, is in the best interests of their estates and all

6   parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be

7   granted.

8   **VIII.  MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c),
    AND 364 AND FED. R. BANKR. P. 4001, 6003, AND 6004 FOR INTERIM AND FINAL
    ORDERS (I) AUTHORIZING THE DEBTOR TO MAINTAIN INSURANCE
    POLICIES, WORKERS' COMPENSATION PROGRAM, AND SURETY BOND
    PROGRAM AND PAY ALL OBLIGATIONS WITH RESPECT THERETO; AND (II)
    GRANTING RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO
    WORKERS' COMPENSATION CLAIMS (THE "INSURANCE MOTION")**

9

10

11

12      Pursuant to the Insurance Motion, the Debtors request entry of interim and final orders

13  authorizing the Debtors to (i) (a) maintain their Insurance Policies, Workers' Compensation Program,

14  and Surety Bond Program (each as defined below) in accordance with their prepetition practices and

15  pursuant to the policies and agreements related thereto, and perform their obligations with respect to

16  the foregoing during the Chapter 11 Cases, and (b) pay any prepetition obligations arising under the

17  Insurance Policies, Workers' Compensation Program, and Surety Bond Program; (ii) modify the

18  automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims

19  they may have under the Workers' Compensation Program, and for related relief.

20      In the ordinary course of their operations, including the transmission and distribution of natural

21  gas and electricity to the Debtors' commercial and retail customers and operating and maintaining

22  power generation and storage facilities, the Debtors maintain a workers' compensation program (the

23  "**Workers' Compensation Program**") and various liability, property, and other insurance

24  arrangements (collectively, the "**Insurance Policies**," and all premiums and other obligations related

25  thereto, including any broker or advisor fees, associated federal excise taxes and state taxes, other fees,

26  and deductibles, collectively, the "**Insurance Obligations**") through several insurance carriers (each,

27  an "**Insurer**"). Certain of the Insurance Policies, including the Debtors' nuclear property liability

28

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

policies, provide unique coverage or terms and it would be difficult for the Debtors to obtain replacement policies in the market. A list of the Insurance Policies is annexed to the Insurance Motion as <u>Exhibit B</u>.[36] A description of the Workers Compensation Program and the various Insurance Policies is set forth below.

### A. The Workers' Compensation Program

California Labor Code §§ 3700-3823 mandate that the Debtors provide for payment of all injury claims suffered by the Debtors' employees arising out of the course and scope of their employment (the "**Workers' Compensation Claims**"), either by obtaining third-party insurance or obtaining a certificate to self-insure from the California Department of Industrial Relations. The Workers' Compensation Program covers, among other things, workers' compensation and employer liability for accidents, death, or disease sustained by employees. The Debtors generally self-insure Workers' Compensation Claims and the annual cost of administering the Workers' Compensation Program, including labor costs, medical payments, and costs associated with the investigation of claims, medical records, examinations and bills, is approximately $10.2 million. This does not encompass the payment of any Workers' Compensation Claims.

To maintain the Workers' Compensation Program, the Debtors are required to participate in the California Self-Insurers' Security Fund (the "**CSISF**"), which covers workers' compensation claims when self-insured companies default on their obligations. The CSISF also has the right to require that participants provide cash or other collateral (the "**Collateral**") to secure their obligations if they default. To participate in the CSISF for the period July 1, 2018 through June 30, 2019, the Debtors paid an annual fee of approximately $750,000 on July 14, 2018. The Debtors also are subject to an annual assessment of approximately $1,500,000, paid to the California State Division of Workers'

---

[36] The Debtors have made an extensive and good-faith effort to identify all of their Insurance Policies and Insurers on <u>Exhibit B</u> to the Insurance Motion. However, due to the size and complexity of the Debtors' operations, certain Insurance Policies and Insurers may not be listed therein. Accordingly, <u>Exhibit B</u> to the Insurance Motion is a non-exhaustive list of the Debtors' Insurance Policies. Further, the Debtors may, in the future, enter into new Insurance Policies. To the extent that the Debtors identify additional Insurance Policies not listed on <u>Exhibit B</u> to the Insurance Motion, or enter into new Insurance Policies, pursuant to the Insurance Motion, the Debtors seek the authority to continue such Insurance Policies uninterrupted and honor, in the Debtors' discretion, all Insurance Obligations relating thereto.

Compensation to cover costs associated with administering the CSISF. The Debtors paid this annual assessment on December 18, 2018 for the period July 1, 2018 through June 30, 2019. The Debtors' Workers' Compensation Program also includes coverage for certain employees (the "**LHW Employees**") protected under the Longshore and Harbor Workers' Compensation Act (the "**LHWCA**"), 33 U.S.C. §§ 901–950. Pursuant to the LHWCA, the Debtors posted collateral in the form of two evergreen letters of credit in the amounts of $800,000 and $300,000 (the "**LHWCA LOCs**"), respectively, with the United States Department of Labor.

Although the Debtors generally self-insure and self-administer all Workers' Compensation Claims under their Workers' Compensation Program, the Debtors also obtain third-party insurance in connection with (i) their employees working outside of California through Employers Insurance Company of Wausau, with an annual policy premium of approximately $9,000 (the "**Wausau Policy**"), and (ii) claims that exceed $10 million per occurrence through AEGIS Insurance Services, Inc., with an annual premium of approximately $230,000 (the "**AEGIS Policy**"). As of the Petition Date, there are no outstanding premiums due under the Wausau Policy or the AEGIS Policy.

In the ordinary course of business, because the Debtors are largely self-insured, the Debtors may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. As of the Petition Date, the Debtors estimate that there were approximately 7,700 open claims under the Workers' Compensation Program. The Debtors estimate that they pay an average of approximately $2.9 million per month on account of Workers' Compensation Claims. The Debtors seek authority to maintain the Workers' Compensation Program in the ordinary course of business and to pay all prepetition amounts related to the Workers' Compensation Program as well as amounts that may become due and owing with respect to the Workers' Compensation Program during these Chapter 11 Cases. Pursuant to the Insurance Motion, the Debtors also seek authority to provide Collateral to the CSISF to the extent required.

**B.     Insurance Policies**

The Debtors maintain various liability and property Insurance Policies which provide the Debtors with insurance coverage for general commercial claims, property damage, nuclear property liability claims, cyber liability claims, crime, pollution and environmental-related claims, collision and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

other liabilities arising from company-owned vehicles, claims relating to the administration of employee benefit plans and the Debtors' employment practices, directors' and officers' liability, and other property-related and general liabilities, as well as excess policies related to the same. The Debtors maintain the Insurance Policies to, among other things, help manage the various risks associated with their electricity and natural gas business. Continuation of the Insurance Policies is essential to the ongoing operation of the Debtors' business.

Pursuant to each of the Insurance Policies, the Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurer[37] in addition to covering applicable deductibles. The Insurance Policies each have an annual premium that is paid prospectively. The annual premiums for the Insurance Policies currently in effect aggregate to approximately $439,000,000. The Debtors are not aware of any outstanding premiums or other amounts owed to the various Insurers for the Insurance Policies.

### C. The Debtors' Surety Bond Program

In the ordinary course of business, the Debtors are required to provide surety bonds (each, a "**Surety Bond**") to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations (the "**Surety Bond Program**"). These include, among other things, Surety Bonds related to various construction and environmental remediation projects and related permits and/or or licenses, self-insurance obligations, lease agreements with the State of California, land maintenance obligations, and certain tax obligations. Often, statutes or ordinances require the Debtors to post the Surety Bonds. A list of Surety Bonds in

---

[37] The Debtors purchase certain of their Insurance Policies through a participation agreement with Energy Insurance Services, Inc. ("**EIS**"), a "sponsored captive insurer". Although EIS does not itself write any policies, EIS procures insurance coverage from third-party insurers, for the benefit of the Debtors, allowing the Debtors to take advantage of reinsurance markets (accessible to EIS but otherwise inaccessible to the Debtors), and thereby securing lower premiums and supplemental coverage that would otherwise be unavailable to the Debtors. With respect to Insurance Policies that are procured through EIS, the Debtors pay any related premiums directly to EIS.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the Surety Bond Program is attached as <u>Exhibit C</u> to the Insurance Motion.[38] The Surety Bonds are issued by XL Specialty Insurance Company and Liberty Mutual Insurance Company and certain of its subsidiaries (each, a "**Surety**"). The Debtors estimate that as of the Petition Date, the total face amount of all outstanding Surety Bonds is approximately $166,000,000.

As a condition to issuing the Surety Bonds, the Sureties require the Debtors to enter into indemnity agreements (collectively, the "**Surety Indemnity Agreements**"), pursuant to which the Debtors indemnify the Sureties from any loss, cost, or expense that the Sureties may incur on account of the issuance of the Surety Bonds on behalf of the Debtors (the "**Indemnity Obligations**"). Under the terms of the Surety Indemnity Agreements, the Sureties may demand cash collateral or letters of credit to secure the Indemnity Obligations at any point during the time the Surety Bonds remain outstanding. As of the Petition Date, the Debtors have not posted any cash collateral or letters of credit in connection with the Surety Indemnity Agreements. Just recently, however, Liberty Mutual, the Debtors' principal Surety Bond provider, issued a notice of cancellation of certain Surety Bonds and a demand for security in the form of a letter of credit in the amount of $50,000,000.

Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate established and billed by each Surety thereunder (collectively, the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**"). The Surety Premiums are generally determined on an annual basis and total in the aggregate approximately $820,000 per year. The Debtors remit Surety Premium payments when the bonds are issued or renewed, typically on an annual basis. The Debtors are not aware of any Surety Premiums that are outstanding as of the Petition Date. In addition, the Debtors are not aware of any Surety Bonds that have been drawn.

To continue their business operations during these Chapter 11 Cases, the Debtors must be able to continue to provide financial and other assurances to state governments, regulatory agencies, and

---

[38] The Debtors have made an extensive and good-faith effort to identify all of their Surety Bonds on <u>Exhibit C</u> to the Insurance Motion. However, due to the size and complexity of the Debtors' operations, Surety Bonds and Sureties may not be listed on <u>Exhibit C</u> to the Insurance Motion. Accordingly, <u>Exhibit C</u> to the Insurance Motion is a non-exhaustive list of the Debtors' Surety Bonds. Further, the Debtors may, in the future, obtain new Surety Bonds not listed on <u>Exhibit C</u>. To the extent that the Debtors identify additional Surety Bonds not listed on <u>Exhibit C</u> or obtain new Surety Bonds, the Debtors seek the authority to continue such Surety Bonds uninterrupted and honor, in the Debtors' discretion, all Surety Bond Obligations (as defined herein) relating thereto.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

other third parties in the form of Surety Bonds. This requires the Debtors to maintain their existing Surety Bond Program, including the payment of Surety Bond Obligations as and when they come due, providing the Sureties with collateral, if required, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business, and executing other indemnity agreements, as needed, in connection with the Surety Bond Program. Accordingly, approval of the relief requested in the Insurance Motion with respect to the Surety Bond Obligations is warranted and the Debtors should be authorized to maintain and continue their Surety Bond Program and pay all Surety Bond Obligations, including, without limitation, any Surety Bond Obligations related to the period prior to the Petition Date. It is important to note that substantially all, if not all, of the outstanding Surety Bonds were provided in connection with ongoing projects and other matters that the Debtors will continue in the ordinary course of their business and, accordingly, the Debtors do not expect that any outstanding Surety Bonds will be called upon. The Debtors also expect that if the relief sought in the Insurance Motion is granted, it should address the concerns raised by Liberty Mutual and result in a withdrawal of its notice of cancellation of the Surety Bonds.

**D.  The Debtors' Insurance Service Providers**

The Debtors employ brokers (the "**Brokers**"), including Marsh, LLC, Price Forbes & Partners, and Guy Carpenter & Company, LLC, to coordinate the procurement and negotiation of certain Insurance Policies including, but not limited to, those related to workers' compensation, directors' and officers' liability, fiduciary liability, general commercial liability, and first-party property liability policies. With respect to most of the Insurance Policies as to which the Brokers are involved, the Insurers charge the Brokers directly for all insurance premiums and other amounts due under such Insurance Policies. The Brokers then send the Debtors a statement for the payment of such insurance premiums, and, once paid by the Debtors, the Brokers submit the payments to the Insurers.[39] The Brokers receive a fee (the "**Broker Fees**") from the Debtors for administering certain of the Insurance Policies.

---

[39] With respect to Insurance Policies that are procured through EIS, the Debtors pay any related premiums directly to EIS and do not use Brokers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Debtors also employ a third-party administrator (the "**Insurance Administrator**") to investigate, administer, and pay claims arising under their Insurance Policies. The Debtors pay fees for these services on a monthly basis (such fees, together with the Brokers' Fees, the "**Service Provider Fees**"). The Service Provider Fees are budgeted based on a flat fee and total approximately $5,500,000 each year.

Because the Brokers and Insurance Administrator are intimately familiar with the Debtors and the Insurance Policies, the Debtors request authority, but not direction, to pay any prepetition Service Providers' Fees that may be owed, including as a result of any future reconciliations, and to continue to honor all of their obligations to them in the ordinary course. Based on the information currently available, the Debtors are not aware of any Service Provider Fees that are owed with respect to the period prior to the Petition Date.

In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets and operations from such risks and to provide Surety Bonds as required, it is essential that the Debtors maintain the Insurance Policies, and the Surety Bond Program and pay all Insurance Obligations, Surety Bond Obligations, and Service Provider Fees during the course of these Chapter 11 Cases. Without authority to maintain and pay amounts owing in connection with these programs, the ability of the Debtors to conduct operations in many locations could come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew or replace their existing Insurance Policies or Surety Bonds on terms more favorable than those currently offered by the Insurers and Sureties. The process of establishing new programs would also be burdensome and costly to the Debtors. Additionally, the relief sought in the Insurance Motion will avoid the risk of any potential disruption of necessary coverage and the Debtors' potential exposure to significant liability and to fines under various applicable federal and state laws and regulations.

For the reasons set forth herein, I respectfully submit that the relief requested in the Insurance Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 507(a) AND 541(d) AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO PAY CERTAIN PREPETITION TAXES AND ASSESSMENTS AND GRANTING RELATED RELIEF (THE "TAXES MOTION")**

Pursuant to the Taxes Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition taxes, assessments, fees, and other charges in the ordinary course of business, including any such taxes, assessments, fees, and charges subsequently determined upon audit, or otherwise, to be owed (collectively, the "**Taxes and Assessments**").

In the ordinary course of their businesses, the Debtors collect, withhold, and incur a variety of Taxes and Assessments that they remit periodically to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Taxing Authorities**"). A list of the Taxing Authorities is annexed to the Taxes Motion as <u>Exhibit B</u> (the "**Taxing Authorities List**").[40]

As set forth in further detail below, the Debtors generally pay the Taxes and Assessments bi-monthly, monthly, quarterly or annually, in each case, as required by applicable laws and regulations. As of the Petition Date, the Debtors estimate that an aggregate amount of approximately $139,200,000 in Taxes and Assessments are due and owing to the various Taxing Authorities, of which, approximately $11,300,000 will come due during the Interim Period. A chart outlining the various categories and approximate amounts of the Taxes and Assessments that the Debtors are seeking authority to pay pursuant to the Taxes Motion is set forth below. The amounts of the Taxes and Assessments set forth below are good faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments. As such, the Debtors also seek authority to pay any Taxes and Assessments due and owing following any such audit and adjustments.

---

[40] The Debtors have made an extensive and good-faith effort to identify all Taxing Authorities to which the Debtors owe any amount on <u>Exhibit B</u> to the Taxes Motion. However, due to the size and complexity of the Debtors' operations, certain Taxing Authorities may not be listed therein. Accordingly, <u>Exhibit B</u> to the Taxes Motion is a non-exhaustive list of Taxing Authorities to which the Debtors may owe Taxes and Assessments. To the extent that the Debtors identify additional Taxing Authorities not listed on <u>Exhibit B</u> to the Taxes Motion, the Debtors seek the authority to pay any Taxes and Assessments due and owing to such Taxing Authorities.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Categories of Taxes and Assessments | Approx. Amount Seeking Authority to Pay on Interim Basis | Approx. Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| Sales and Use Taxes | $1,100,000 | $1,100,000 |
| Property Taxes | $0 | $43,500,000 |
| Income Taxes | *De minimis* | *De minimis* |
| Excise Taxes | $200,000 | $200,000 |
| San Francisco Gross Receipts Tax and Payroll Tax | $3,200,000 | $5,500,000 |
| Pass Through Fees | $6,800,000 | $79,700,000 |
| Regulatory Fees | $0 | $9,200,000 |
| Other Taxes and Fees | *De minimis* | *De minimis* |
| **Total Taxes and Assessments:** | **$11,300,000** | **$139,200,000** |

### A.      Sales and Use Taxes

The Debtors incur sales tax on account of the purchase of tangible personal property utilized by the Debtors in the ordinary course of business (collectively, the "**Sales Taxes**"). The Debtors incur use taxes on account of the purchase of tangible personal property utilized by the Debtors in the ordinary course of business from vendors who do not collect sales tax (collectively, the "**Use Taxes**" and, together with the Sales Taxes, the "**Sales and Use Taxes**").

The Debtors pay approximately $500,000 to $4,000,000 per month in aggregate Sales and Use Taxes depending on the volume of nuclear fuel purchases, which can be seasonal. Although the Debtors believe they are current with respect to their payment of Sales and Use Taxes, the Debtors estimate that, as of the Petition Date, they owe approximately $1,100,000 in Sales and Use Taxes, all of which will become due and payable during the Interim Period.

### B.      Property Taxes

The Debtors own real and personal property located in approximately fifty (50) counties within the State of California, as well as Texas and Nevada, that are subject to state and local real and personal property taxes (the "**Property Taxes**"). The California State Board of Equalization determines the aggregate value of all real and personal property owned by the Debtors in the state and allocates that value among each of the counties where property is located. The counties then tax the Debtors based on the allocated property values. Property Taxes accrue on an annualized basis and are paid twice a year. Property Taxes with respect to real property create a statutory first priority lien on

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the taxed property to the extent not paid. In fiscal year 2018, the Debtors paid approximately $491,900,000 in aggregate Property Taxes to the relevant Taxing Authorities. The Debtors estimate that, as of the Petition Date, approximately $43,500,000 of Property Taxes have accrued or relate to the period prior to the Petition Date but have not yet been paid, none of which will become due and payable during the Interim Period.

### C.    Income Taxes

Under certain applicable laws, federal, state, and local Taxing Authorities levy taxes based on the Debtors' income (the "**Income Taxes**").[41]   The Debtors allocate income tax liability between themselves pursuant to that certain *Tax Sharing Agreement* dated as of January 1, 1997.  In California, Taxing Authorities are entitled to assert statutory liens on the Debtors' property that is located, or subject to tax, in the respective jurisdiction if these income taxes are not paid.  Moreover, in California, directors and officers may be personally liable for failure to timely pay these taxes.  The Debtors also pay a relatively minor amount of Income Taxes in several other states and in the District of Columbia. The Debtors are required to pay Income Taxes on a quarterly pre-payment basis (which is offset against amounts the Debtors are ultimately determined to owe on an annual basis).  The Debtors have substantial net operating losses and do not anticipate the need to pay any federal or California Income Taxes for the period prior to the fiscal year ending December 31, 2017.  The Debtors estimate that, as of the Petition Date, they owe a *de minimis* amount of state and local Income Taxes in jurisdictions other than California, which will come due during the Interim Period.

### D.    Excise Taxes

Under applicable laws, federal, state, and local Taxing Authorities levy taxes based on the Debtors' purchases or sales of specific goods (e.g., alternative fuel excise tax) or services (e.g., insurance premiums paid to foreign insurance companies) (collectively, the "**Excise Taxes**").  The Debtors generally pay Excise Taxes on a quarterly basis or as otherwise required by applicable laws and regulations.  The Debtors estimate that, as of the Petition Date, they owe approximately $200,000 in Excise Taxes, all of which will become due and payable during the Interim Period.

---

[41] Income Taxes includes California franchise taxes, which are calculated based on income.

Case: 19-30088    Doc# 263    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 130
of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### E. San Francisco Gross Receipts and Payroll Tax

The Debtors incur a Gross Receipts and Payroll Tax assessed by the City of San Francisco (the "**Gross Receipts Tax**") to operate their businesses in that city. The Gross Receipts Tax is generally remitted by the Debtors several times a year and is based on San Francisco gross receipts and payroll. In 2018, the Debtors' aggregate liability for the Gross Receipts Tax was approximately $13,300,000. Although the Debtors believe they are current with respect to their payment of the Gross Receipts Tax, the Debtors estimate that, as of the Petition Date, they owe approximately $5,500,000 in Gross Receipts Tax, $3,200,000 of which will become due and payable during the Interim Period.

### F. Pass Through Fees

The Debtors collect a variety of fees and taxes, including, but not limited to, utility users tax, excessive electric use tax, business license tax, and city franchise surcharges and other fees collected through customer billings and remitted to the applicable state and local municipalities (collectively, the "**Pass Through Fees**"). Pass Through Fees are generally remitted by the Debtors to the applicable Taxing Authorities several times a year. Pass Through Fees vary by county and are typically based on total revenues allocated based on public and private miles of electricity lines. Pass Through Fees paid to cities are either based on the Debtors' revenues within the city's boundaries or are calculated using the same formula that is used by the counties. In fiscal year 2018, the Debtors accrued approximately $690,500,000 in aggregate Pass Through Fees to the relevant Taxing Authorities. Although the Debtors believe that they are current with respect to their payment of Pass Through Fees, the Debtors estimate that, as of the Petition Date, they owe approximately $79,700,000 in Pass Through Fees, approximately $6,800,000 of which will become due and payable during the Interim Period.

### G. Regulatory Fees

The Debtors collect and remit various regulatory fees to commissions that regulate public utility companies, including for audit costs incurred by such commissions (the "**Regulatory Fees**"). These commissions include, without limitation, the California Energy Resources Conservation and Development Commission the Federal Energy Regulatory Commission, Nuclear Regulatory

Commission, and the California Public Utilities Commission.[42]  Regulatory Fees are generally remitted by the Debtors to the applicable Taxing Authorities quarterly.  The Debtors estimate that approximately $9,200,000 in Regulatory Fees have accrued and remain unpaid as of the Petition Date, none of which will become due and owing during the Interim Period.

### H.    Other Taxes and Fees

In addition to the foregoing, the Debtors collect, withhold, or incur certain other taxes, fees, and charges, including, but not limited to, taxes, license and registration fees, environmental permit fees, land fees, and encroachment fees paid on behalf of the Debtors and their subsidiaries (collectively, "**Other Taxes and Fees**").  Although the Debtors believe that they are current with respect to their payment of Other Taxes and Fees, the Debtors estimate that, as of the Petition Date, they owe a *de minimis* amount of Other Taxes and Fees, which will become due and payable during the Interim Period.

The Debtors must continue to pay the Taxes and Assessments to continue operating in certain jurisdictions and to avoid the incurrence of unnecessary costs during the Chapter 11 Cases.  Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Assessments may interfere with the Debtors' continued operations and restructuring, and increase the scope of secured and priority claims held by the applicable Taxing Authorities against the Debtors' estates.  I further understand, based on discussions with counsel, that certain of the Taxes and Assessments (such as certain Pass Through Fees) may constitute "trust fund" taxes, which the Debtors are required to collect or hold in trust for payment to the Taxing Authorities.  Moreover, failure to pay certain of the Taxes and Assessments may expose the Debtors' directors and officers to personal liability, which would cause further distraction and delays and negatively impact the administration of these Chapter 11 Cases.

---

[42] California Public Utilities Commission Regulatory Fees include not only direct regulatory fees, but also the costs of indirect regulatory expenses, such as directed contract costs for Commission auditors and consultants; and the costs of intervenor compensation awards pursuant to California Public Utilities Code §§ 1801-1812, which require Commission jurisdictional utilities to pay the reasonable costs of an intervenor's participation if that party makes a substantial contribution to the Commission's proceedings. The costs of these direct and indirect Regulatory Fees are recovered in the Debtors' utility rates.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Accordingly, for the reasons set forth herein, I respectfully submit that the relief requested in the Taxes Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

X. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 366 AND 105(a) REQUESTING ENTRY OF AN ORDER (I) APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY PROVIDERS, (II) ESTABLISHING PROCEDURES PROVIDING ADEQUATE ASSURANCE AND RESOLVING OBJECTIONS OF UTILITY PROVIDERS, AND (III) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICE (THE "UTILITIES MOTION")**

Pursuant to the Utilities Motion, the Debtors are seeking entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment for postpetition Utility Services (as defined below), (ii) establishing procedures for providing adequate assurance and resolving objections of Utility Providers (as defined below) relating to the adequacy of the proposed adequate assurance, and (iii) prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors because of the commencement of the Chapter 11 Cases or a debt that is owed by the Debtors for Utility Services rendered prior to the Petition Date.

A. **The Debtor's Utility Services**

1. **Utility Providers**

In the ordinary course of their businesses, the Debtors incur expenses for electricity, natural gas, oil, water, sewer, telephone, and other utility services (collectively, the "**Utility Services**"). A list (the "**Utility Service List**") of the approximately 150 utility providers (collectively, the "**Utility Providers**") that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit B.[43]

Historically, the Debtors have a good payment history with the Utility Providers. To the best of the Debtors' knowledge, there are no defaults or material arrearages for the Debtors' undisputed invoices for prepetition Utility Services other than payment interruptions that may be caused by the

---

[43] The Debtors reserve the right to amend or supplement the Utility Service List to include any Utility Provider omitted. The inclusion of any entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future. Additionally, the Debtors themselves provide significant Utility Services to their business operations. For obvious reasons those Utility Services are not included in the Utilities Motion.

AMENDED DECLARATION OF JASON P. WELLS    133

commencement of the Chapter 11 Cases. Based on the monthly average for the twelve (12) months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for the next thirty (30) days will be approximately $8,600,000.

Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of the Debtors' reorganization. The Debtors coordinate their complex businesses through their headquarters in San Francisco, California and their other facilities located in Northern California, including without limitation, their numerous power generation facilities, distribution facilities, compressor stations, and storage facilities. Any interruption of Utility Services provided at these locations would disrupt the Debtors' ability to communicate with, and provide the necessary support and services to, their employees, vendors, various regulatory authorities, and, most importantly, their customers. Should any Utility Provider alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted, which, in turn, could lead to subsequent power outages or other service disruptions for the Debtors' customers. Any disruptions, therefore, would negatively impact the Debtors' business operations, customers, and all parties in interest.

**B.      Proposed Adequate Assurance**

The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner and have sufficient funds to do so. The Debtors have a commitment for debtor in possession financing, which, together with existing cash and cash generated from operations, is more than adequate to fund their day to day expenses, including postpetition amounts for Utility Services. Notwithstanding the foregoing, to provide adequate assurance of payment to the Utility Providers pursuant to section 366(c) of the Bankruptcy Code, the Debtors propose to deposit into a segregated, interest-bearing bank account (the "**Adequate Assurance Account**") a sum equal to the cost of two (2) weeks of Utility Services, calculated based on the historical average of the Debtors' utility expenses over the twelve-month period prior to the Petition Date (the "**Adequate Assurance Deposit**"). The Adequate Assurance Deposit will not, however, include any amount on account of any Utility Provider that (a) agrees to a lesser amount, (b) already holds a deposit, letter of credit, surety bond, or other type of instrument securing the Debtors' performance equal to or greater than two weeks of Utility Services,

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088    Doc# 363    Filed: 02/01/19    Entered: 02/01/19 18:16:49    Page 134
of 166

or (c) is paid in advance for its Utility Services.[44]  Based on the foregoing calculation, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $4,800,000.

The Debtors shall, however, have the right to reduce the Adequate Assurance Deposit to the extent that any of the following occurs: (a) the Adequate Assurance Deposit includes any amount on account of a Utility Provider that the Debtors subsequently determine should be removed from the Utility Service List; (b) a Utility Provider properly serves an Additional Adequate Assurance Request (as defined below), and any settlement results in such Utility Provider's removal from the Utility Service List or in the Debtors' provision of alternate assurance to the Utility Provider; or (c) any Utility Provider has instead been provided with a letter of credit, cash deposit, or some other form of security acceptable to the Utility Provider.  The Debtors submit that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business (the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.

### C. Proposed Adequate Assurance Procedures and the Resolution of Objections

The Debtors propose that the procedures described below (the "**Adequate Assurance Procedures**") be utilized in connection with the Proposed Adequate Assurance:

a.  The Debtors will fax, e-mail, serve by overnight mail, or otherwise expeditiously send a copy of the Proposed Order (as approved by the Bankruptcy Court), which includes the proposed Adequate Assurance Procedures, to each Utility Provider on the Utility Service List within three (3) business days after entry of the Proposed Order by the Bankruptcy Court.

b.  The Debtors will deposit the Adequate Assurance Deposit in the Adequate Assurance Account within five (5) business days of entry of the Proposed Order; provided, that to the extent any Utility Provider receives any additional assurance of payment as set forth herein, the Debtors may reduce the Adequate Assurance Deposit maintained in the Adequate Assurance Account by such amount.

c.  The portion of the Adequate Assurance Deposit attributable to each Utility Provider shall be returned to the Debtors on the earlier of (i) the date on which the Debtors have terminated the service from such provider and have satisfied in full all postpetition obligations due and owing to the applicable Utility Provider and (ii) the effective date of a plan of reorganization in the Chapter 11 Cases, if not applied earlier.

---

[44] To the extent that any Utility Provider is or will hold any cash deposit from the Debtors that is in excess of two (2) weeks' worth of the average utility cost, the Debtors reserve their right to demand return of such excess amounts.

Case 19-30088    Filed 02/01/19    Entered: 02/01/19 18:16:49    Page 135 of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

d.    Any Utility Provider not satisfied with the Proposed Adequate Assurance must serve a written request for additional assurance (an "**Additional Assurance Request**") on the following parties: (i) the Debtors, 77 Beale Street, San Francisco, CA 94105 (Attn: Mari Becker and Nicholas Bijur); (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn.: Stephen Karotkin, Esq. and Lisa Lansio, Esq.); and (iii) Keller & Benvenutti, 650 California Street, Suite 1900, San Francisco, CA 94108 (Attn: Tobias S. Keller, Esq. and Jane Kim, Esq.) (collectively, the "**Adequate Assurance Notice Parties**").

e.    Any Additional Assurance Request must (i) be made in writing, (ii) set forth the location for which Utility Services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including the amounts of any security deposits, and (iv) set forth an explanation of why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

f.    Any Additional Assurance Request must be made and actually received by the Adequate Assurance Notice Parties by no later than twenty (20) days after entry of the Proposed Order by the Court, or such greater period as may be agreed to by the Debtors and the relevant Utility Provider. If a Utility Provider fails to timely file and serve an Additional Assurance Request, it shall: (i) be deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with section 366 of the Bankruptcy Code; and (ii) be forbidden to discontinue, alter, or refuse service to, or discriminate against, the Debtors on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

g.    Upon receipt by the Adequate Assurance Notice Parties of any Additional Assurance Request as set forth above, the Debtors shall have the greater of (i) twenty (20) days from the receipt of such Additional Assurance Request, and (ii) thirty (30) days from entry of the Proposed Order (the "**Resolution Period**") to negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request, or such greater period as may be agreed to by the Debtors and the relevant Utility Provider.

h.    If the Debtors, in their sole discretion, determine that an Additional Assurance Request or any consensual agreement reached in connection therewith is reasonable, the Debtors may resolve any Additional Assurance Request without further order of the Court, and may, in connection with any such agreement, in their sole discretion, provide a Utility Provider with additional adequate assurance of future payment, including but not limited to cash deposits, prepayments, or other forms of security.

i.    If the Debtors determine that the Additional Assurance Request is not reasonable and are not able to reach a resolution with the Utility Provider during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will schedule a hearing before this Court to determine the adequacy of assurances of payment with respect to such Utility Provider (the "**Determination Hearing**") pursuant to section 366(c)(3) of the Bankruptcy Code.

j.    Pending resolution of a disputed Additional Assurance Request at the Determination Hearing, the relevant Utility Provider shall be prohibited from discontinuing, altering, or refusing service to the Debtors on account of unpaid

AMENDED DECLARATION OF JASON P. WELLS    136
Case: 19-30088   Doc# 361  Filed: 02/01/19   Entered: 02/01/19 18:16:49   Page 136
of 166

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

Absent compliance by the Utility Providers with the above Adequate Assurance Procedures, the Debtors request that the Utility Providers be prohibited from altering, refusing, or discontinuing service on account of any unpaid prepetition charges and be deemed to have received adequate assurance of payment in compliance with section 366 of the Bankruptcy Code.

### D. Subsequent Modifications of Utility Service List

The Debtors have made an extensive and good-faith effort to identify all of their Utility Providers and include them on the Utility Service List. Nonetheless, to the extent that the Debtors subsequently identify additional Utility Providers, the Debtors seek authority, in their sole discretion, to amend the Utility Service List to add any Utility Provider. The Debtors further request that the Court's order approving the Utilities Motion be deemed to apply to any such subsequently identified Utility Provider, regardless of when such Utility Provider is added to the Utility Service List. The Debtors will serve a copy of the Utilities Motion and the Proposed Order on any such Utility Provider subsequently added to the Utility Service List and deposit two weeks' worth of estimated utility costs in the Adequate Assurance Account for the benefit of such Utility Provider (less any amounts already on deposit with any such subsequently added Utility Provider that exceed outstanding prepetition amounts). Subsequently added Utility Providers shall have twenty (20) days from the date of service of the Proposed Order to make an Additional Assurance Request in accordance with the Adequate Assurance Procedures.

Any Utility Provider subsequently added to the Utility Service List that objects to the Proposed Order with respect to such Utility Provider must file an objection in accordance with the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, and the Adequate Assurance Procedures.

I respectfully submit that the relief requested will ensure that the Debtors' operations will not be disrupted, which would severely impact their businesses and prospects for a successful reorganization. The relief requested provides the Utility Providers with fair and orderly procedures for determining requests for Additional Adequate Assurance, without which the Debtors could be forced to address in excess of one hundred requests by Utility Providers in a disorganized manner at a critical

period in the Chapter 11 Cases when the Debtors' efforts should be more productively focused on operations for the benefit of all parties in interest.

Accordingly, for the reasons set forth herein, I respectfully submit that the relief requested in the Utilities Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, and should be granted.

## XI. MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a) AND 362 FOR INTERIM AND FINAL ORDERS ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING RESTRICTIONS ON CERTAIN TRANSFERS OF STOCK OF, AND CLAIMS AGAINST, THE DEBTORS (THE "NOL MOTION")

Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") and other tax benefits (collectively, the "**Tax Attributes**") for use in connection with the reorganization of the Debtors. The Procedures apply to (a) common stock of PG&E Corp. (the "**Common Stock**") and preferred stock of the Utility ("**Preferred Stock**") (together with the Common Stock, the "**PG&E Stock**") and any options or similar rights (within the meaning of applicable Treasury Regulations) to acquire such stock (the "**Options**"), and (b) claims (each, as defined in section 101(5) of the Bankruptcy Code) against one or more of the Debtors (a "**Claim**"). The Debtors request relief effective *nunc pro tunc* to the Petition Date.

### A. The Debtors' Tax Attributes

The Debtors possess certain Tax Attributes, including, as of the Petition Date, estimated federal NOLs of approximately $4 billion and certain tax credits (including investment tax credits and research and development tax credits) of approximately $115 million. The Tax Attributes are valuable assets.

It is my understanding based upon discussions with counsel that Title 26 of the United States Code (the "**Tax Code**") generally permits a corporation to carry forward its NOLs to reduce future taxable income, thereby reducing, along with available tax credits, such corporation's tax liability in future periods. *See, e.g.*, 26 U.S.C. §§ 38 and 172. Accordingly, absent any intervening limitations and depending on future operating results and the consummation of taxable asset dispositions by the Debtors, the Tax Attributes could substantially reduce the Debtors' U.S. federal income tax liability for current and future periods, including during the pendency of these Chapter 11 Cases. The Tax

Attributes are available to reduce the Debtors' federal income tax liability through the taxable year that includes the effective date of a chapter 11 plan and potentially thereafter, depending on the consequences of the restructuring. The Tax Attributes, therefore, could translate into future tax savings over time, and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful reorganization.

It is my understanding based upon discussions with counsel that the Debtors' ability to utilize the Tax Attributes to reduce future tax liability is subject to certain statutory limitations. Sections 382 and 383 of the Tax Code limit a corporation's ability to utilize its NOLs, tax credits, and certain other tax benefits to offset future income once that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "**Ownership Change**"). Pursuant to section 382 of the Tax Code, an Ownership Change generally occurs when the percentage of a corporation's equity held by one or more of its "**5-percent shareholders**" (each, as that term is used in section 382 of the Tax Code, a "**5-Percent Shareholder**") increases by more than fifty (50) percentage points above the lowest percentage of the corporation's equity owned by such shareholder(s) at any time during the relevant testing period (usually three years).

The Debtors do not believe that PG&E Corp. has undergone an Ownership Change prior to the Petition Date. Accordingly, the Debtors believe that they have significant Tax Attributes that would be severely impaired by the occurrence of an Ownership Change during the pendency of these Chapter 11 Cases. Therefore, it is in the best interests of the Debtors and their stakeholders (including a customer base of over 16 million residential and non-residential customers) to restrict acquisitions of PG&E Stock that could result in an Ownership Change occurring *before* the effective date of a chapter 11 plan or any applicable bankruptcy court order. Such a restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount. In the event a pre-effective date Ownership Change occurred, the resulting limitation on the Debtors' Tax Attributes primarily depends on the value of the PG&E Stock at such time, and thus becomes increasingly severe as the value of the

PG&E Stock declines. Although (as described below) the limitations imposed by section 382 of the Tax Code may be significantly less restrictive when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or any applicable bankruptcy court order), the benefits available under section 382 of the Tax Code in connection with a confirmed chapter 11 plan (or any applicable bankruptcy court order) are not applied retroactively to reduce the limitations imposed on a corporation's ability to utilize its tax benefits resulting from a previous Ownership Change (such as an Ownership Change occurring during the pendency of a chapter 11 case).

A chapter 11 plan that contemplates a reorganization of the Debtors may involve the issuance of new common stock in the Debtors (or any successor to the Debtors) and the distribution of such stock to certain creditors in satisfaction, in whole or in part, of their respective Claims. This issuance and distribution could potentially result in an Ownership Change. In such event, it is possible that the special relief afforded by section 382(l)(5) of the Tax Code could be both available and beneficial to the Debtors; the Debtors, in that circumstance, may seek to qualify the restructuring for such relief. Such relief, however, may become unavailable to the Debtors if the trading and accumulation of certain Claims prior to the effective date of a chapter 11 plan is left unrestricted.

**B.      The Proposed Procedures Relating to PG&E Stock**

By establishing procedures for monitoring acquisitions of PG&E Stock (the "**Stock Procedures**"), the Debtors can preserve their ability to seek the necessary relief if it appears that any such acquisition(s) may impair the Debtors' ability to utilize their Tax Attributes. Therefore, the Debtors propose the following Stock Procedures:[45]

(a)      _Definitions_. For purposes of these Stock Procedures, the following terms have the following meanings:

(i)      "**Acquiring Group**" shall mean any group of persons (including any Entity) that has a plan or arrangement to acquire beneficial ownership of the stock of more than one Debtor within the meaning of Treasury Regulations section 1.1502-92(c)(3)(i).

(ii)      "**Beneficial ownership**" of PG&E Stock and Options to acquire PG&E Stock shall be determined in accordance with section 382 of the Tax Code, the regulations promulgated by the U.S. Department of the Treasury under the Tax Code (the "**Treasury Regulations**"), and rulings issued by the Internal Revenue Service (the "**IRS**"), and as described in the

---

[45] The Security Procedures delineated herein summarize the relevant portion of <u>Exhibit 1</u> to the proposed orders annexed to the NOL Motion, which sets forth the Procedures.

AMENDED DECLARATION OF JASON P. WELLS                    140

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

NOL Motion, and, thus, to the extent provided in those sources, from time to time shall include, without limitation, (A) direct and indirect ownership (but determined without regard to any rule that treats stock of an entity as to which the constructive ownership rules apply as no longer owned by that entity) e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries, (B) ownership by a holder's family members, (C) ownership by any Entity, and (D) to the extent set forth in Treasury Regulations section 1.382-4, the ownership of an Option to acquire PG&E Stock.

(iii)    "**Entity**" shall mean any "entity" as such term is defined in Treasury Regulations section 1.382-3(a), including any group of persons acting pursuant to a formal or informal understanding among themselves to make a coordinated acquisition of PG&E Stock.

(iv)    "**Substantial Stockholder**" shall mean any person (including any Entity) or Acquiring Group that beneficially owns at least 24.6 million shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock).

(b)    Notice of Substantial Ownership.    Any person (including any Entity) or Acquiring Group that beneficially owns, at any time on or after the Petition Date, PG&E Stock in an amount sufficient to qualify such person or Acquiring Group as a Substantial Stockholder shall file with this Court and serve upon (i) PG&E Corporation, 77 Beale Street, P.O. Box 770000 San Francisco, California 94177 (Attn: Mark Caron); (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.; Jessica Liou, Esq.; and Matthew Goren, Esq., as proposed counsel to the Debtors; (iii) counsel to any statutory committees appointed in the Chapter 11 Cases (each, an "**Official Committee**"); and (iv) counsel to the lenders under the Debtors' proposed debtor in possession financing facilities (the "**DIP Lenders**") (collectively, the "**Disclosure Parties**") a notice of such person's or Acquiring Group's substantial ownership (a "**Substantial Stock Ownership Notice**"), in substantially the form annexed to the proposed orders to the NOL Motion as Exhibit 2, which describes specifically and in detail such person's or Acquiring Group's ownership of PG&E Stock, on or before the date that is the later of (x) twenty (20) calendar days after the entry of the order granting the requested relief or (y) ten (10) business days after such person or Acquiring Group qualifies as a Substantial Stockholder.   At the election of the filing person or Acquiring Group, the Substantial Stockholder Ownership Notice to be filed with this Court (but not the Substantial Stock Ownership Notice that is served upon the Debtors, the attorneys for the Debtors, and the attorneys for any Official Committee) may be redacted to exclude the taxpayer identification number and the amount of PG&E Stock beneficially owned.

(c)    Acquisition of PG&E Stock.    At least twenty (20) business days prior to the proposed date of any transfer of PG&E Stock or exercise of any Option to acquire PG&E Stock that would result in an increase in the amount of PG&E Stock beneficially owned by any person (including any Entity) or Acquiring Group that currently is or, as a result of the proposed transaction, would be a Substantial Stockholder (a "**Proposed Acquisition Transaction**"), such person, Acquiring Group or Substantial Stockholder (a "**Proposed Transferee**") shall file with this Court and serve upon the Disclosure Parties a notice of such Proposed Transferee's intent to purchase, acquire, or otherwise accumulate PG&E Stock (an "**Acquisition Notice**"), in substantially the form annexed to the proposed orders to the NOL Motion as Exhibit 3, which describes specifically and in detail the Proposed Acquisition Transaction.   At the election of the filing person or Acquiring Group, the Acquisition Notice to be filed with this Court (but not the Acquisition Notice that is served upon the Debtors, the attorneys for the Debtors, and the attorneys for any Official Committee) may be redacted to exclude the taxpayer identification number and the amount of PG&E Stock beneficially owned.

(d)    Objection Procedures.    The Debtors and any Official Committee shall have fifteen (15) business days after the filing of an Acquisition Notice (the "**Objection Period**") to file with this Court and serve on a Proposed Transferee, an objection (each, an "**Objection**") to any Proposed Acquisition Transaction described in such Acquisition Notice.   If the Debtors or any Official Committee files an Objection by the expiration of the Objection Period (the "**Objection Deadline**"),

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

then the applicable Proposed Acquisition Transaction shall not be effective unless approved by a final and nonappealable order of this Court. If neither the Debtors nor any Official Committee file an Objection by the Objection Deadline or if the Debtors and any and all Official Committees provide written authorization to the Proposed Transferee, approving the Proposed Acquisition Transaction then such Proposed Acquisition Transaction may proceed solely as specifically described in the applicable Acquisition Notice. Any further Proposed Acquisition Transaction must be the subject of an additional Acquisition Notice and Objection Period.

### C. The Proposed Procedures Relating to Claims

The procedures relating to the trading of Claims (the "**Claims Procedures**"), which only will become effective upon entry of the order granting the requested relief on a final basis, permit the full trading of Claims until the Debtors or another Plan Proponent (as defined below) decides to pursue a plan of reorganization contemplating the potential utilization of section 382(l)(5) of the Tax Code, at which point, if necessary for the Debtors to utilize that provision, a purchaser of certain Claims on or after the Petition Date may be required to resell some or all of such Claims. The following are certain principal provisions of the proposed Claims Procedures:[46]

(a) <u>Disclosure of 382(*l*)(5) Plan</u>. If the proponent of a Plan (a "**Plan Proponent**") determines that the reorganized Debtors likely will benefit from the application of section 382(*l*)(5) of the Tax Code and reasonably anticipates that the reorganized Debtors (or any successors thereto) (the "**Post-Emergence PG&E**") will invoke such section (a "**382(*l*)(5) Plan**"), then the Plan Proponent shall disclose the following in its proposed disclosure statement or, in the case of items (iii) through (v) described below, a later, separate notice (collectively, the "**Proposed 382(*l*)(5) Disclosure Statement**"):

(i) Adequate information about the incremental tax benefits anticipated to be realized through the use of section 382(*l*)(5) of the Tax Code that, taking into account the Debtors' anticipated net unrealized built-in gains or net unrealized built-in losses, would not otherwise be available;

(ii) A summary of any restrictions expected to be imposed on the transferability of securities issued under the Plan in order to preserve such incremental tax benefits;

(iii) The (A) dollar amount of Claims (by class or other applicable classification) expected to result in a one-percent (1%) interest in the equity of Post-Emergence PG&E (the "**New PG&E Stock**") and (B) number of any of the specified interests (the "**Owned Interests**") in the Debtors expected to result in a one-percent (1%) interest in the New PG&E Stock, in each case based upon then-available information;

(iv) A specified date (the "**Determination Date**") that is not less than ten (10) calendar days after the service of the notice of the hearing with respect to the Proposed 382(*l*)(5) Disclosure Statement; and

(v) A specified date (the "**Reporting Deadline**") that is not less than five (5) calendar days after the Determination Date, by which persons (including Entities, which for purposes

---

[46] The complete proposed Claims Procedures are set forth in <u>Exhibit 1</u> to the Proposed Final Order to the NOL Motion (the "**Proposed Final NOL Order**"), which sets forth the Procedures.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of the Claims Procedures also includes an "entity" within the meaning of Treasury Regulations section 1.382-3(a)) must serve on various parties the Notice of Substantial Claim Ownership (as defined in paragraph B(3) of Exhibit 1 to the Proposed Final NOL Order) required by these Claims Procedures.

(b) Claims Trading Before and After the Determination Date.

(i) Any person generally may trade freely and make a market in Claims until the Determination Date.

(ii) After the Determination Date, any acquisition of Claims by a person (including any Entity) who filed or was required to file a Notice of Substantial Claim Ownership or by a person who would be required to file a Notice of Substantial Claim Ownership as a result of the consummation of the contemplated transaction if the proposed acquisition date had been the Determination Date (each such person, a "**Proposed Claims Transferee**"), shall not be effective unless consummated in compliance with the Claims Procedures.

(iii) At least ten (10) business days prior to the proposed date of any acquisition of Claims by a Proposed Claims Transferee (each acquisition, a "**Proposed Claims Acquisition Transaction**"), such Proposed Claims Transferee shall serve upon the Plan Proponent and its counsel (and the Debtors and their counsel if not the Plan Proponent), counsel to the DIP Lenders, and counsel to any Official Committee a notice of such Proposed Claims Transferee's request to purchase, acquire, or otherwise accumulate a Claim (a "**Claims Acquisition Request**"), in substantially the form annexed to the Proposed Final NOL Order as Exhibit 6, which describes specifically and in detail the Proposed Claims Acquisition Transaction, regardless of whether such transfer would be subject to the filing, notice, and hearing requirements set forth in Bankruptcy Rule 3001.

(iv) The Plan Proponent may determine, in consultation with the Debtors (if not the Plan Proponent), counsel to any Official Committee and counsel to the DIP Lenders, whether to approve a Claims Acquisition Request. If the Plan Proponent does not approve a Claims Acquisition Request in writing within eight (8) business days after the Claims Acquisition Request is filed with the Court, the Claims Acquisition Request shall be deemed rejected.

(c) Creditor Conduct and Sell-Downs

(i) Following the Determination Date, if the Plan Proponent determines that certain persons holding Claims must sell or transfer all or a portion of their beneficial ownership of Claims so that the requirements of section 382(*l*)(5) of the Tax Code will be satisfied, the Plan Proponent may request—after notice to counsel to any Official Committee, counsel to the DIP Lenders, and the relevant claimholder(s), and a hearing—that this Court enter an order approving the issuance of a notice (a "**Sell-Down Notice**") that such claimholder(s) must sell, cause to sell, or otherwise transfer a specified amount of its beneficial ownership of Claims. Notwithstanding anything to the contrary in the NOL Motion, no claimholder shall be required to sell, cause to sell, or otherwise transfer any beneficial ownership of Claims if such sale or transfer would result in the claimholder's beneficial ownership of an aggregate amount of Claims (by class or other applicable classification) that is less than such claimholder's "Protected Amount" (as defined in paragraph B(1)(p) of Exhibit 1 to the Proposed Final NOL Order).

(ii) Each Sell-Down Notice shall direct such claimholder to sell, cause to sell, or otherwise transfer its beneficial ownership of the amount of Claims specified in the Sell-Down Notice to certain permitted transferees.

(iii) Any person (including any Entity) that violates its obligations under the Claims Procedures shall be precluded from receiving, directly or indirectly, any consideration consisting of a beneficial ownership of New PG&E Stock that is attributable to the "Excess Amount of

Claims" (as defined in paragraph B(5)(b) of <u>Exhibit 1</u> to the Proposed Final NOL Order) for such person, including any consideration in lieu thereof, *provided* that such person may be entitled to receive any other consideration to which such person may be entitled by virtue of holding Claims.

The Procedures are necessary to avoid severely impairing the Debtors' ability to utilize their Tax Attributes. The Debtors' ability to preserve their Tax Attributes may be seriously impaired unless the Stock Procedures are established immediately and *nunc pro tunc* to the Petition Date to ensure that the acquisition of PG&E Stock is either precluded or closely monitored and made subject to Court approval.

The Stock Procedures must be implemented as soon as possible. Even if a transfer were to be null and void under section 362 of the Bankruptcy Code or as a result of a final order of the Court that prohibited such a transfer retroactively to the Petition Date, under federal income tax law, such transfer nevertheless may be regarded as having occurred for tax purposes, in which event the Debtors' estates could suffer an irrevocable loss of value. Accordingly, if a transfer occurs that limits the Debtors' ability to utilize their Tax Attributes under section 382 of the Tax Code, the Debtors' ability to realize the value of their Tax Attributes may be permanently lost. The relief requested, therefore, is crucial to prevent an irrevocable diminution of the value of the Debtors' estates.

The Claims Procedures permit the full trading of Claims until the Debtors or another Plan Proponent decides to pursue a Plan that contemplates the potential utilization of section 382(l)(5) of the Tax Code, at which point, if necessary for the Debtors' ability to utilize that provision, a purchaser of certain Claims on or after the Petition Date may be required to resell some or all of such Claims.

It is my understanding based upon discussions with counsel that, under the De Minimis Rule, a debtor may, for purposes of the Section 382($l$)(5) Safe Harbor, "treat indebtedness as always having been owned by the beneficial owner of the indebtedness immediately before the [O]wnership [C]hange if the beneficial owner is not, immediately after the [O]wnership [C]hange, either a 5-[P]ercent [S]hareholder or an [E]ntity through which a 5-[P]ercent [S]hareholder owns an indirect ownership interest" in the debtor. 26 C.F.R. § 1.382-9(d)(3). If a creditor is treated as having continuously owned its Claim(s) under the De Minimis Rule, such creditor will be regarded as a Qualified Creditor so long as the particular Claim(s) that it holds either (a) arose in the ordinary course of the debtor's business or (b) came into existence at least eighteen (18) months prior to the Petition Date.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1    It is my understanding based upon discussions with counsel that the requested relief will ensure

2  that the Debtors will have flexibility, if the Debtors determine it to be desirable, to structure a chapter

3  11 plan or other distributions to comply with the requirements of the Section 382(*l*)(5) Safe Harbor and

4  thus to preserve the Tax Attributes to the fullest extent possible.

5    Accordingly, for the reasons set forth herein, I respectfully submit that the relief requested in

6  the NOL Motion is necessary and appropriate, is in the best interests of their estates and all parties in

7  interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

8  **XII.   MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 521(A) AND 105(A) AND FED.
9     R. BANKR. P. 1007(C) FOR ENTRY OF ORDER (I) EXTENDING TIME TO FILE
      SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL
      AFFAIRS, AND (II) EXTENDING TIME TO FILE 2015.3 REPORTS (THE
10    "EXTENSION OF TIME TO FILE SCHEDULES AND STATEMENTS MOTION")**

11    Pursuant to the Extension of Time to File Schedules and Statements Motion, the Debtors

12  request entry of an order extending the initial fourteen (14) day period to file their schedules of assets

13  and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") by

14  sixty (60) days, to allow the Debtors a total of seventy-four (74) days after the Petition Date to file

15  their Schedules and Statements (the "**Schedules and Statements Deadline**"), without prejudice to the

16  Debtors' right to request additional time if necessary.  Additionally, the Debtors request that the Court

17  grant an extension until thirty (30) days after the meeting of creditors to be held pursuant to section

18  341 of the Bankruptcy Code for the Debtors to either file their initial reports of financial information

19  with respect to entities in which their chapter 11 estates hold a controlling or substantial interest, as set

20  forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), or file a motion with the Court seeking a

21  modification of such reporting requirements for cause.

22    The Debtors own and operate approximately 136 generating facilities, nine (9) natural gas

23  compressor stations, over 120,000 circuit miles of electric transmission and distribution lines, and

24  nearly 50,000 miles of natural gas transmission and distribution pipelines throughout California.  The

25  scope and complexity of the Debtors' businesses, coupled with the limited time available to the

26  Debtors to assemble the required information, necessitate an extension of the Schedules and

27  Statements Deadline and the deadline to file the 2015.3 Reports.  It is my understanding that collecting

28

the necessary information to prepare the Schedules and Statements and the 2015.3 Reports requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals.

In light of the foregoing, I respectfully submit that given the volume of work entailed in completing the Schedules and Statements and the 2015.3 Reports, as well as the competing demands on the Debtors' employees and professionals to stabilize the Debtors' business operations and address the other many issues that arise during the critical postpetition period, the Debtors, as a practical matter, are unable to properly and accurately complete the Schedules and Statements and 2015.3 Reports within the initial statutory period and that the requested extensions are necessary.

XIII. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 342(a) AND 521(a)(1) AND FED. R. BANKR. P. 1007 AND 2002 FOR ENTRY OF ORDER (I) WAIVING THE REQUIREMENTS TO FILE LISTS OF CREDITORS AND EQUITY HOLDERS AND GRANTING RELATED RELIEF; AND (II) AUTHORIZING AND APPROVING PROCEDURES FOR PROVIDING NOTICE OF THE COMMENCEMENT OF CHAPTER 11 CASES (THE "CREDITOR MATRIX AND NOTICE OF COMMENCEMENT MOTION")**

Pursuant to the Creditor Matrix and Notice of Commencement Motion, the Debtors request entry of an order (i) waiving the requirements that the Debtors file lists of creditors and equity holders on the Petition Date, as set forth in section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(1) and (a)(3), and Amended General Order 13 (the "**General Order**") of the United States Bankruptcy Court for the Northern District of California (collectively, the "**Notice Rules**"); and (ii) authorizing the Debtors to implement certain procedures for the mailing and publication of the notice announcing the commencement of these Chapter 11 Cases and the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**Notice of Commencement**").

It is my understanding based upon discussions with counsel that, pursuant to the Notice Rules, unless a debtor's schedules of assets and liabilities are filed simultaneously with a chapter 11 petition, a debtor must file a list of creditors as of the Petition Date (the "**List of Creditors**") with the petition. Similarly, it is my understanding based upon discussions with counsel that the Notice Rules require that unless the Court orders otherwise, the debtor must file within fourteen (14) days after entry of the order for relief a list of the debtor's equity security holders of each class (the "**List of Equity**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Holders**") showing the number and kinds of interests registered in the name of each holder, and the last known address or place of business for each holder.  I respectfully submit that waiving the requirements to file a List of Creditors and, for PG&E Corp., a List of Equity Holders is appropriate.

Contemporaneously with the Creditor Matrix and Notice of Commencement Motion, the Debtors have filed the Extension of Time to File Schedules and Statements Motion, requesting an extension of the time to file their Schedules and Statements, and, therefore, have not yet filed their Schedules and Statements with the Bankruptcy Court.  Accordingly, without the relief requested in the Creditor Matrix and Notice of Commencement Motion, the Notice Rules would require the Debtors to each file a separate List of Creditors on the Petition Date.

The Debtors have filed the Claims and Noticing Agent Retention Application (as defined below) in these Chapter 11 Cases.  It is my understanding based upon discussions with counsel that the Court is empowered to use outside facilities or services to provide notices and other administrative information to parties in interest, if the costs are paid from the assets of the estates.  Under the proposed Notice of Commencement Procedures (as defined and as set forth below), as soon as practicable after the Petition Date, the Debtors will furnish their consolidated List of Creditors to Prime Clerk, LLC ("**Prime Clerk**") so that Prime Clerk can mail the Notice of Commencement to creditors identified on the Debtors' List of Creditors.  I respectfully submit that the requirement that the List of Creditors be filed on the Petition Date should be waived.

All of the outstanding common stock of the Utility is owned by PG&E Corp.  This information is set forth in the List of Equity Holders filed as a part of the Utility's chapter 11 petition.  With respect to PG&E Corp., however, I respectfully submit that the requirement that it file a List of Equity Holders should be waived.  PG&E Corp. is a public company and, as of October 25, 2018, had 518,674,276 shares of common stock outstanding.  The ownership of these shares changes daily, if not more frequently.  I respectfully submit that preparing the List of Equity Holders with last-known addresses will be expensive for the Debtors, time consuming, and difficult to accomplish quickly and accurately.  I further submit that PG&E Corp.'s equity security holders will not be prejudiced if the List of Equity Holders is not filed.  As set forth in the Notice of Commencement Procedures, such parties will receive

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

appropriate notice of the commencement of these Chapter 11 Cases. Accordingly, the requirement that the Debtors file a List of Equity Holders for PG&E Corp. should be waived.

### A. Proposed Procedures for Service of the Notice of Commencement

The Debtors propose the following procedures (the "**Notice of Commencement Procedures**") with respect to service and publication of the Notice of Commencement:

### 1. Mailing of the Notice of Commencement

Pursuant to the Creditor Matrix and Notice of Commencement Motion, in light of the requirement to notify creditors and shareholders of the commencement of these Chapter 11 Cases and to notify creditors of the meeting of creditors under section 341 of the Bankruptcy Code (the "**Section 341 Meeting**"), the Debtors seek authority to have Prime Clerk undertake the mailing of the Notice of Commencement, substantially in the form annexed as Exhibit 1 to the proposed order filed with the Creditor Matrix and Notice of Commencement Motion, to the creditors listed on the Debtors' consolidated List of Creditors.

For purposes of the Creditor Matrix and Notice of Commencement Motion, the Debtors have not included their 16 million customers or their nearly 24,000 employees as creditors on the List of Creditors (other than any customers or employees that may otherwise be creditors (e.g., litigation claimants)) and, it is my understanding based upon discussions with counsel, that the Notice Rules do not require the Debtors to provide the Notice of Commencement to such parties. Moreover, Prime Clerk estimates that the cost of mailing the Notice of Commencement to such parties via traditional first class mail would increase the cost of preparing and mailing the Notice of Commencement by approximately $9.4 million. Nevertheless, employees will be made aware of the commencement of these Chapter 11 Cases through customary employee communication channels that the Debtors have historically utilized. Additionally, given the extensive media coverage of these Chapter 11 Cases and the proposed publication procedures described below, I believe that the Debtors' customers will also be adequately informed regarding the commencement of these Chapter 11 Cases.

As set forth above, as PG&E Corp. is a public company, the ownership of its shares changes on a daily, if not more frequent, basis. Accordingly, serving the Notice of Commencement on holders of PG&E Corp.'s equity interests by mail also would be a very costly undertaking and not necessarily

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

very effective.  Further, it is highly likely that PG&E Corp.'s equity security holders will learn of these Chapter 11 Cases through the financial press, the extensive publication proposed by the Debtors below, as well as the Debtors' reporting with the United States Securities and Exchange Commission. Accordingly, I respectfully submit that the requirement that the Debtors provide the Notice of Commencement to holders of equity interests in PG&E Corp. should be waived.

### 2. Publication of the Notice of Commencement

In addition to providing the Notice of Commencement to the Debtors' creditors as set forth above, the Debtors propose to publish, as soon as practicable, the Notice of Commencement, substantially in the form attached to the Proposed Order (i) once in the national editions of the *Wall Street Journal* and *USA Today*, and (ii) once in each of the *Los Angeles Times*, *San Francisco Chronicle*, *The Bakersfield Californian*, *The Fresno Bee*, *The Modesto Bee*, *The Sacramento Bee*, *The Santa Rosa Press Democrat*, *The San Jose Mercury News*, *The East Bay Times*, *The Stockton Record*, the *Paradise Post*, and the *Chico Enterprise-Record*.  The Debtors also propose to post the Notice of Commencement on the website to be established by Prime Clerk (as defined below) and on the Debtors' website.  Publication of the Notice of Commencement as proposed above is the most practical method by which to notify customers, employees and equity holders who do not receive the Notice of Commencement by mail and other parties in interest of the commencement of these Chapter 11 Cases. Notice by publication also will ensure an efficient use of estate resources.

Based on the foregoing, I respectfully submit that the proposed Notice of Commencement Procedures will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee, while at the same time ensuring that actual notice is provided to all of the Debtors' creditors, equity holders, and customers in an efficient and cost-effective manner.  Accordingly, I respectfully submit that the relief requested is appropriate in these Chapter 11 Cases to provide adequate notice to all parties in interest.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

XIV. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 503(b)(9) AND 105(a) FOR ENTRY OF ORDER ESTABLISHING PROCEDURES FOR THE ASSERTION, RESOLUTION, AND SATISFACTION OF CLAIMS ASSERTED PURSUANT TO 11 U.S.C. § 503(b)(9) (THE "503(b)(9) PROCEDURES MOTION")**

Pursuant to the 503(b)(9) Procedures Motion, the Debtors request entry of an order establishing procedures for the assertion, resolution, and satisfaction of unpaid 503(b)(9) Claims.

Prior to the Petition Date and in the ordinary course of their business, the Debtors purchased on credit a variety of raw materials, equipment, specially fabricated repair and replacement parts, supplies, and other goods (collectively, the "**Goods**") for use in their electric and natural gas transmission, distribution, generation and other operations.  As of the Petition Date, the Debtors were in possession of certain Goods that had been delivered to them by various Vendors, but for which the Debtors had not yet made payment.

There will be some uncertainty among Vendors over the procedures and methods they must undertake to properly assert administrative expense claims pursuant to section 503(b)(9) of the Bankruptcy Code.  This may result in numerous inquiries and demands on the Debtors' employees and professionals, as well as in the initiation of piecemeal litigation, which would divert the attention of the Debtors and their professionals from the more pressing task of administering these Chapter 11 Cases and overseeing the Debtors' operations in a safe and reliable manner.   To avoid the resulting distraction, delay, and expense that may ensue, I respectfully submit that the following Procedures should be the sole and exclusive method for the assertion, resolution, allowance, and satisfaction of 503(b)(9) Claims:

(a)       Any Vendor asserting a 503(b)(9) Claim must prepare a proof of claim (a "**Proof of 503(b)(9) Claim**"), substantially in the form annexed as Schedule 1 to the proposed order for the 503(b)(9) Procedures Motion (the "**Proof of 503(b)(9) Claim Form**") that sets forth: (i) the value of the Goods the Vendor contends the Debtors received within twenty (20) days prior to the Petition Date; (ii) documentation, including invoices, receipts, bills of lading, and the like, identifying the particular Goods for which the claim is being asserted; (iii) documentation regarding which Debtor the Goods were shipped to, the date the Goods were received by such Debtor, and the alleged value of such Goods; and (iv) a statement indicating (I) whether the value of such Goods listed in the Proof of 503(b)(9) Claim represents a combination of services and Goods, (II) the percentage of value related to services and related to Goods, and (III) whether the Vendor has filed any other claim against any Debtor regarding the Goods underlying its Proof of 503(b)(9) Claim;

(b)    All Proofs of 503(b)(9) Claims must be submitted to the Debtors' proposed claims and noticing agent, Prime Clerk, so as to be received no later than the fiftieth (50th) day after the Petition Date (the "**503(b)(9) Claim Filing Deadline**"), either (i) by mail or hand delivery at PG&E Corporation Claims Processing Center c/o Prime Clerk, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232, or (ii) electronically via the interface provided on Prime Clerk's website at http://restructuring.primeclerk.com/PGE/EPOC-index. Proofs of 503(b)(9) Claims sent by facsimile or electronic mail will not be accepted;

(c)    The Debtors shall have seventy-five (75) days (or such later date as may be approved by the Court) after the 503(b)(9) Claim Filing Deadline to file with the Court and serve any objections (the "**Objections**") to timely filed 503(b)(9) Claims (the "**Objection Deadline**"), without prejudice to the Debtors' right to set an extension to such Objection Deadline;

(d)    Vendors shall have until twenty (20) days after the filing of the applicable Objection to file with the Court and serve on the Notice Parties any replies to such Objections;

(e)    All timely filed 503(b)(9) Claims will be deemed allowed unless objected to by the Debtors on or before the Objection Deadline;

(f)    Notwithstanding and without limiting the foregoing, the Debtors are authorized, but not required, to negotiate, in their sole discretion, with any Vendor and to seek an agreement resolving any Objection to such Vendor's 503(b)(9) Claim without the need for any further order by the Court;

(g)    If the Debtors cannot reach agreement with a Vendor regarding a particular Objection to such Vendor's 503(b)(9) Claim, the Debtors will schedule the matter for a hearing by the Court;

(h)    To the extent a 503(b)(9) Claim is allowed, such 503(b)(9) Claim will be satisfied pursuant to and as set forth in, a chapter 11 plan for the Debtors as confirmed by the Court, or as otherwise ordered by the Court after notice and an opportunity for a hearing; provided, that the Debtors reserve the right to exercise any lawful right of setoff against any 503(b)(9) Claim; and

(i)    Vendors shall be forever barred, without further order of the Court, from asserting 503(b)(9) Claims after the expiration of the 503(b)(9) Claim Filing Deadline, but shall not be barred from asserting related or unrelated general unsecured claims in accordance with any unsecured claims bar date established in these Chapter 11 Cases.

Pursuant to the 503(b)(9) Procedures Motion, the Debtors propose that the Procedures be the sole and exclusive method for the assertion, resolution, allowance, and satisfaction of 503(b)(9) Claims and request that all Vendors be prohibited from invoking any other means therefor, including, without limitation, the filing of a motion for allowance, or to compel payment, of any 503(b)(9) Claims.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

It is my understanding based upon discussions with counsel that deferring litigation of claims asserted under section 503(b)(9) of the Bankruptcy Code and establishing uniform procedures for resolving such claims is a common practice in chapter 11 cases, as is the establishment of a bar date. Moreover, the Debtors believe that the Procedures will facilitate their ability to resolve claims with Vendors asserting a 503(b)(9) Claim, expediting the resolution of 503(b)(9) Claims, and assisting with the administration of these Chapter 11 Cases.

Accordingly, I respectfully submit that the relief requested in the 503(b)(9) Claims Motion should be granted.

## XV. MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 546(c) AND 105(a) AND FED. R. BANKR. P. 9019 ESTABLISHING AND IMPLEMENTING EXCLUSIVE AND GLOBAL PROCEDURES FOR THE TREATMENT OF RECLAMATION CLAIMS (THE "RECLAMATION PROCEDURES MOTION").

Pursuant to the Reclamation Procedures Motion, the Debtors are seeking entry of an order establishing procedures for the treatment of all claims that may be asserted against the Debtors seeking the reclamation of Goods pursuant to section 546(c) of the Bankruptcy Code (the "**Reclamation Claims**") and prohibiting any Seller from (as defined below) from taking any other remedial action with respect to its Goods, including any other effort to reclaim the same.

As a result of the commencement of these Chapter 11 Cases, the Debtors have received, and expect to continue to receive, Reclamation Claims from various parties (collectively, the "**Sellers**") that, in the ordinary course of business, sold and delivered a variety of Goods to the Debtors prior to the Petition Date, but for which the Debtors have not yet been invoiced or made payment to the Seller in full.[47]

To avoid potentially extensive piecemeal litigation that would interfere with the orderly administration of these Chapter 11 Cases, the Debtors seek to establish the Reclamation Procedures for the reconciliation and allowance of Reclamation Claims. The Reclamation Procedures will effectively

---

[47] Certain Sellers may receive payment on account of their prepetition claims pursuant to certain other motions filed by the Debtors on the Petition Date. To the extent a Seller receives payment on account of its prepetition claim pursuant to an order approving any such motion, the Reclamation Procedures shall not apply to such Seller.

and efficiently streamline the process of resolving any potential Reclamation Claims for the benefit of the Debtors and all other parties in interest.

The Debtors propose the following procedures (the "**Reclamation Procedures**") for processing and reconciling Reclamation Claims:

(a)     any Seller asserting a Reclamation Claim must satisfy all procedural and timing requirements entitling it to have a right to reclamation under section 546(c) of the Bankruptcy Code;

(b)     any Seller asserting a Reclamation Claim must submit a written demand asserting such Reclamation Claim (a "**Reclamation Demand**"), which must include, to the extent such information is already available or known to such Seller, (i) a description of the Goods subject to the Reclamation Demand; (ii) copies of any purchasing orders, invoices, receipts, bills of lading and the like, identifying the particular Goods for which the Reclamation Demand is being asserted; (iii) any evidence regarding the date(s) such Goods were shipped to and received by the Debtors and the alleged value of such Goods; and (iv) a statement indicating whether the Seller has filed or intends to file any other claim against the Debtors regarding the Goods underlying its Reclamation Demand (collectively, the "**Reclamation Demand Requirements**");

(c)     all Reclamation Demands must be submitted to Prime Clerk,  by the applicable deadline set forth below, either by mail or hand delivery at PG&E Corporation Reclamations Demands, c/o Prime Clerk LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232, and not filed on the Court docket;

(d)     to the extent that any Seller asserted a Reclamation Demand prior to entry of the  proposed order (the "**Reclamation Procedures Order**") granting the relief requested in the Reclamation Procedures Motion that complied with the procedures and timing requirements of section 546(c) of the Bankruptcy Code, but otherwise did not meet the Reclamation Demand Requirements, such Seller shall have twenty (20) days from the date of entry of the Reclamation Procedures Order to submit to the Debtors (via Prime Clerk as set forth in (c) above) the supplemental information or evidence required to meet the Reclamation Demand Requirements;

(e)     unless a Seller has already submitted a Reclamation Demand to the Debtors within the forty-five (45) days prior to the Petition Date, any Seller asserting a Reclamation Claim must have submitted a Reclamation Demand (subject to the Seller's right to supplement the Reclamation Demand as set forth in (d) above to meet the Reclamation Demand Requirements) so that it was received by the Debtors (via Prime Clerk as set forth in (c) above) on or before twenty (20) days after the Petition Date (the "**Reclamation Deadline**");

(f)     upon entry of the Reclamation Procedures Order, the Debtors will serve upon all Sellers who have submitted a Reclamation Demand by the Reclamation Deadline a copy of such order at the address indicated in its Reclamation Demand;

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(g)      no later than 120 days after entry of the Reclamation Procedures Order (the "**Reclamation Notice Deadline**"), the Debtors will file with the Court a notice (the "**Reclamation Notice**") listing the timely submitted Reclamation Claims and the amounts (if any) and proposed status and treatment of each such Reclamation Claim that the Debtors determine to be valid.  The Debtors will serve the Reclamation Notice on (i) the United States Trustee for Region 17; (ii) the attorneys for any statutory committees appointed in these Chapter 11 Cases; (iii) counsel to the agent(s) under the Debtors' proposed debtor-in-possession financing facilities, and (iv) each Seller listed in the Reclamation Notice, at the address indicated in the respective Seller's Reclamation Demand (collectively, the "**Notice Parties**");

(h)      if the Debtors fail to file the Reclamation Notice by the Reclamation Notice Deadline, any holder of a Reclamation Claim that submitted a timely Reclamation Demand in accordance with the Reclamation Procedures may bring a motion on its own behalf to seek relief with respect to its Reclamation Claim;

(i)      any party that wishes to object to the Reclamation Notice must file and serve an objection (a "**Reclamation Notice Objection**") on the Notice Parties, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the twentieth (20th) day after the date on which the Reclamation Notice is filed (the "**Reclamation Objection Deadline**").  Any Reclamation Notice Objection must include (i) a copy of the Reclamation Demand, with evidence of the date mailed to the Debtors; and (ii) a statement describing with specificity the objections to the Reclamation Notice and any legal and factual bases for such objections;

(j)      any Reclamation Claim listed in the Reclamation Notice for which no Reclamation Notice Objection is filed and served by the Reclamation Objection Deadline shall be deemed allowed by the Court in the amount identified by the Debtors in the Reclamation Notice, *provided* that all issues relating to the treatment of any such allowed Reclamation Claim under a chapter 11 plan for the Debtors shall be reserved;

(k)      notwithstanding and without limiting the foregoing, the Debtors will be authorized, but not required, to negotiate, with any Seller to seek an agreement resolving the Seller's Reclamation Claim.  If no agreement is reached resolving the Reclamation Notice Objection, the Debtors or the Sellers may file a motion with the Court requesting a hearing with respect to the Reclamation Notice Objection.  If the Debtors and a Seller agree on the validity, amount, or treatment of the Seller's Reclamation Claim, the Debtors will file with the Court a notice of settlement (a "**Settlement Notice**") and serve such Settlement Notice on the Notice Parties.  Each Notice Party will have ten (10) days from the date of service of such Settlement Notice to file with the Court and serve on the other Notice Parties and attorneys for the Debtors an objection thereto (a "**Settlement Objection**");

(l)      if no Settlement Objection is timely filed and served, such Reclamation Claim will be treated in accordance with the Settlement Notice without further order of the Court;

Case 19-30088 Filed 02/01/19   Entered: 02/01/19 18:16:49   Page 154 of 166

(m)     if a Settlement Objection is timely filed and served, the parties may negotiate a consensual resolution of such objection to be incorporated in a stipulation filed with the Court (a "**Settlement Stipulation**").  Upon the filing of a Settlement Stipulation, the applicable Reclamation Claim shall be allowed and treated in accordance with the terms of the Settlement Stipulation without further order of the Court;

(n)     if no consensual resolution of a Settlement Objection is reached, the Debtors may file a motion with the Court requesting a hearing with respect to the Settlement Notice;

(o)     if a Seller receives payment on account of the Seller's prepetition claims pursuant to any other motion that has been or may be filed by the Debtors, including, without limitation, (i) the 503(b)(9) Procedures Motion; and (ii) the Operational Integrity Suppliers Motion, to the extent a Seller receives payment on account of its prepetition claim pursuant to an order approving any of such motions, the Reclamation Procedures shall not apply to such Seller to the extent of any such payment; and

(p)     all Sellers shall be forever barred, without further order of the Court, from asserting a Reclamation Demand after the expiration of the Reclamation Deadline, but shall not be barred from asserting, subject to applicable deadlines, related or unrelated general unsecured claims or administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

The Debtors propose that the Reclamation Procedures shall be the sole and exclusive method for addressing and resolving Reclamation Claims.  As a result, pursuant to the Reclamation Procedures Motion, the Debtors request that all Sellers be prohibited from seeking any other means for the resolution or treatment of their Reclamation Claims, including, without limitation, the following: (a) commencing adversary proceedings or contested matters in connection with any Reclamation Claim, (b) seeking to obtain possession of any Goods except as may be permitted by the Reclamation Procedures, or (c) interfering with the delivery of any Goods to the Debtors or the retention of any Goods by the Debtors. The Reclamation Procedures will effectively and efficiently streamline the process of resolving the Reclamation Claims for the Debtors and the Sellers alike, without impacting the parties' substantive rights to pursue or contest the Reclamation Claims.

I respectfully submit that the Reclamation Procedures will effectively and efficiently streamline the process of resolving the Reclamation Claims for the Debtors and the Sellers alike, without impacting the parties' substantive rights to pursue or contest the Reclamation Claims.  Accordingly, I respectfully submit that the relief requested in the Reclamation Procedures Motion should be granted.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

XVI. **DEBTORS' APPLICATION PURSUANT TO 28 U.S.C. § 156(C) FOR APPOINTMENT OF PRIME CLERK LLC AS CLAIMS AND NOTICING AGENT (THE "SECTION 156(C) APPLICATION")**

Pursuant to the 156(c) Application, the Debtors are seeking entry of an order appointing Prime Clerk as their claims and noticing agent (the "**Claims and Noticing Agent**") for the Debtors and their Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases, as set forth in the Engagement Agreement attached as Exhibit B to the Section 156(c) Application; *provided*, *however*, the Debtors are seeking approval solely of those terms and provisions set forth in the Section 156(c) Application. By separate application, the debtors will seek authorization to retain and employ Prime Clerk as administrative advisor in the Chapter 11 Cases pursuant to section 327(a) of the Bankruptcy Code because the administration of the Chapter 11 Cases will require Prime Clerk to perform duties outside the scope of 28 U.S.C. § 156(c).

By appointing Prime Clerk as the Claims and Noticing Agent in the Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Accordingly, I respectfully submit that the Section 156(c) Application should be approved.

XVII. **MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364 AND FED. R. BANKR. P. 6003 AND 6004 TO (A) HONOR PREPETITION OBLIGATIONS TO NATURAL GAS AND ELECTRICITY EXCHANGE OPERATORS, (B) GRANT ADMINISTRATIVE EXPENSE CLAIMS AND AUTHORIZE POSTING OF COLLATERAL TO EXCHANGE OPERATORS TRADING COUNTERPARTIES, AND FUTURE COMMISSION MERCHANTS, (C) MODIFY THE AUTOMATIC STAY, AND (D) GRANT RELATED RELIEF (THE "EXCHANGE OPERATORS MOTION")**

Pursuant to the Exchange Operators Motion, the Debtors are seeking interim and final authority to (i) pay all outstanding Prepetition Exchange Obligations (as defined below) owed to ICE NGX Canada Inc. (together with certain of its affiliates and subsidiaries, "**ICE NGX**") and California Independent System Operator Corporation ("**CAISO**" and, together with ICE NGX, the "**Exchange**

AMENDED DECLARATION OF JASON P. WELLS 156
IN SUPPORT OF FIRST DAY MOTIONS

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Operators**"), under those certain Prepetition Exchange Agreements (as defined below), in the ordinary course as they come due, (ii) provide the Exchange Operators with administrative expense claims on account of all Exchange Obligations (as defined below), (iii) confirm the existing liens and security interests of the Exchange Operators in their collateral and authorize the Utility to pledge additional collateral to the Exchange Operators in the form of cash, letters of credit, and/or other forms of collateral acceptable to the parties on account of all Postpetition Exchange Obligations (as defined below), (iv) permit the Trading Counterparties (as defined below) to apply existing cash collateral to their prepetition obligations and authorize the Utility to provide cash collateral for postpetition obligations to Trading Counterparties, (v) provide cash or other collateral to the Future Commission Merchants (as defined below), and (vi) modify the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to allow the (A) Exchange Operators to exercise any valid rights of setoff or recoupment (the **"Trade Setoff"**), and to apply collateral and the proceeds thereof and settle transactions, whether undertaken with respect to collateral or obligations that arose, and whether such collateral and proceeds were posted or arose, prior to or after the Petition Date, and, upon default, exercise their rights, in each case under and in accordance with the terms of the agreements and tariffs that govern the relationship between the Exchange Operators and the Utility, and (B) Trading Counterparties to exercise any valid right to setoff, settle or recoup any mutual obligations owing by the Utility to such Trading Counterparties, and to apply cash collateral to prepetition obligations, notwithstanding any limits otherwise imposed by section 553 of the Bankruptcy Code, and (vii) grant related relief.

**A.      ICE NGX**

To clear transactions relating to the procurement of natural gas, the Utility is party to that certain contracting party agreement (the "**CPA**") with ICE NGX.  ICE NGX is a centralized exchange and clearinghouse (the "**NGX Exchange**" and the Utility's obligations thereunder, the "**NGX Exchange Obligations**") that provides electronic trading, central counterparty clearing, and data services to natural gas, crude oil, and electricity markets in North America.  Pursuant to the CPA, the Utility purchases natural gas from ICE NGX for (i) its core gas supply, which is delivered to "core"

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

customers (e.g., residential and small commercial customers), (ii) its electric gas supply, which is used to fuel the Utility's gas-fired electric generation facilities, including certain units operating under tolling agreements, and (iii) for temporary storage in both Utility-owned and third party-owned gas storage facilities. The Utility also sells excess natural gas through the NGX Exchange.

The Utility participates on the NGX Exchange primarily through the purchase of futures contracts for natural gas. The Utility typically orders natural gas supply through ICE NGX for a particular month – the month's "flow" – in the prior month, but the Utility may also enter into daily orders for the next day's "flow." For example, in January 2019, the Utility placed orders through ICE NGX on the NGX Exchange to cover its February 2019 "flow." Payment to ICE NGX is generally not due until the 25th day of the month following the month in which the natural gas is delivered to the Utility.

Given the delay between the placement of orders for natural gas, deliveries of natural gas, and the payment thereon, ICE NGX requires the Utility to post collateral and other credit support to secure payment for transactions effected through the NGX Exchange (such collateral, and all proceeds thereof, the "**NGX Collateral**"), and, in some instances, to prepay such obligations. ICE NGX is the only party with any lien or security interest on the NGX Collateral, and ICE NGX holds a first-priority lien on, and security interest in, all NGX Collateral.

Pursuant to the CPA, NGX Exchange Obligations are required to be fully-collateralized on a daily basis and the value of collateral may change on a day-to-day basis due to fluctuations in natural gas prices. The Utility's failure to post appropriate NGX Collateral can result in ICE NGX, among other things, having the right or ability under the CPA to (i) declare all NGX Exchange Obligations immediately due and payable, (ii) request additional NGX Collateral, (iii) terminate any open transactions, and/or (iv) suspend the Utility's participation in the NGX Exchange. In addition, under the CPA, ICE NGX is authorized to setoff, settle, or otherwise recoup amounts owed by the Utility to ICE NGX against amounts owed by ICE NGX to the Utility.

The Utility purchases a significant amount of its natural gas each month through the NGX Exchange, including approximately $40 million for January 2019 deliveries, representing

approximately 92% of the supply needed for its electric gas supply, and approximately 19% for its core gas supply customers. Given the Utility's current credit rating, its ability to procure natural gas from alternative suppliers is extremely limited. Should the Utility be unable to procure gas through the NGX Exchange, it may be foreclosed from participating in natural gas markets altogether. As a result, the Utility would be required to deplete its limited reserves of natural gas in an effort to delay a natural gas shortfall. Depending on weather conditions and the appetite for other natural gas suppliers to honor existing contracts, gas in storage could be exhausted in a matter of weeks, forcing the Utility to stop delivering natural gas to some customers.

Moreover, even if the Utility were able to secure alternative suppliers that may be willing to supply natural gas to the Utility, such alternative suppliers would likely charge higher prices, which may be passed on to the Utility's customers through higher bills. These alternative suppliers may also impose extremely burdensome contract terms on the Utility. Accordingly, preserving the Utility's ability to participate in the NGX Exchange is essential to accessing sufficient natural gas supplies needed to maintain uninterrupted utility services and the success of these Chapter 11 Cases.

**B. CAISO**

Due to the complexities involved in storing electricity after it is generated and transmitting it to end users, the Utility participates in energy markets operated by the CAISO (the "**CAISO Market**" and, together with the NGX Exchange, the "**Exchanges**"). CAISO settles transactions by the Utility and its other participants, including transactions in the CAISO Market, and issues charges for services related to maintaining the reliability of the grid, pursuant to the rates, terms and conditions of a tariff approved by the Federal Energy Regulatory Commission (the "**Tariff**" and, together with ICE NGX's CPA, the "**Prepetition Exchange Agreements**"). CAISO controls a competitive wholesale electricity market in California and manages access to, and the reliability of, the bulk of the transmission system in California. CAISO provides the Utility with particular channels to buy and sell electricity, which is critical to the Utility's operations, and to transmit the electricity it generates, buys and sells. The Utility also utilizes CAISO to obtain transmission congestion instruments to mitigate the Utility's risks associated with electricity generation assets. The Utility procures all of the energy needed to meet its customers' demand through the CAISO Market. The Utility sells and transmits all of the power it

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

generates and purchases under power purchase agreements to CAISO. CAISO determines which of the Utility's resources (or those controlled by other parties) to operate at which times to meet the CAISO system wide load and ensure the reliability of the grid.

Given CAISO's central role in California's electricity market, the Utility consummates transactions through CAISO that it would not otherwise be able to execute with any other party or entity. Specifically, through CAISO and the CAISO Market, the Utility: (i) sells all of the energy from its Utility owned generation units as well as those units it has under contract with third parties, (ii) purchases all of the energy in the day-ahead and real-time energy markets to meet customer demands, (iii) acts as a scheduling coordinator for the Utility's generation facilities as well as certain third-party generation facilities, (iv) transmits the power it generates, buys, and sells, (v) sells and purchases congestion revenue rights, and (vi) settles for other services as required as a load serving entity. Because the Utility buys and sells all of the electricity through CAISO that it needs to meet customer demand and to generate revenue from its generation portfolio, any disruption or the loss of access to this market would severely impact the Utility's ability to operate. In that scenario, the Utility would be unable to generate revenue from its owned and contracted resources and, likewise, would be unable to buy electricity to meet the demands of its customers.

Although the Utility is often a "net" creditor of CAISO, because it has been a net seller of energy to the CAISO Market, it may also at any given time owe money to CAISO on a net basis. To minimize credit risk, the Utility's liabilities to CAISO for the charges described in the Tariff (collectively, the "**CAISO Obligations**" and, together with the NGX Obligations, the "**Exchange Obligations**") are secured by collateral, such as cash collateral and/or letters of credit, the amount and form of which are controlled by the terms of the Tariff (the "**CAISO Collateral**" and, together with the NGX Collateral, the "**Exchange Collateral**"). In addition, CAISO is authorized under the Tariff to setoff, settle, or otherwise recoup amounts owed by the Utility to CAISO against amounts owed by CAISO to the Utility. To the extent amounts owed by the Utility to CAISO exceed amounts owed by CAISO, the Utility must pay the difference in cash. The Utility's failure to meet its obligations to CAISO can result in CAISO's refusal to continue to do business with the Utility, and/or refusal to

allow the Utility to participate in the CAISO Market.  The Utility may also be precluded from acting as a scheduling coordinator for generation facilities.

The Utility's participation on the Exchanges is currently governed by the Utility's market risk and credit policies, which establish internal policies and controls with respect to Exchange activity.  As of the Petition Date, the Utility estimates that it owes approximately $38 million to ICE NGX and approximately $13.7 million to CAISO on account of prepetition Exchange Obligations (collectively, the "**Prepetition Exchange Obligations**").  CAISO invoices its participants, including the Utility, each Wednesday (and at other times depending on the charge type) and payment is due on the fourth business day after the invoice is issued.  ICE NGX's Prepetition Exchange Obligations will become due and owing during the Interim Period.  As of the Petition Date, ICE NGX and CAISO are holding cash collateral in the amounts of $36.4 million and $40 million, respectively.

Participating in the Exchanges protects the Utility from harmful fluctuations in commodity prices and helps it to better manage the future energy demands of its customers.  Specifically, participation in the Exchanges enables the Utility to procure natural gas for the long-term, thereby fixing the Utility's exposure to pricing.  The Utility can also make short-term purchases of gas and power through the Exchanges, which enables the Utility to cover customer shortfalls quickly and efficiently, or quickly sell excess supply, thereby mitigating the Utility's losses associated therewith.

To maintain continued access to the critical gas and power markets in which the Utility operates, and to maintain the Utility's access to the power grid over which it must transmit nearly all of the power it buys, sells, and generates, the Utility requests authority for the Exchange Operators to setoff, settle, or recoup Prepetition Exchange Obligations and apply Exchange Collateral in satisfaction thereof to the extent permitted by the terms of the Prepetition Exchange Agreements, and for the Utility to pay the Prepetition Exchange Obligations in the ordinary course of business on a postpetition basis including "true-up" amounts which may be invoiced in the future for prepetition delivery dates or charges. (True-ups may result, for example, from revisions to estimated versus actual volumes and service charges and may lag behind the initial invoice by months or more).  In addition, the Utility is seeking authority to ensure payment of ongoing Prepetition Exchange Obligations and postpetition

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

obligations to the Exchange Operators under the Prepetition Exchange Agreements (collectively, the "**Postpetition Exchange Obligations**," which, together with the Prepetition Exchange Obligations, constitute Exchange Obligations) by: (i) providing the Exchange Operators with administrative expense claims on account of the Exchange Obligations under section 364(b) of the Bankruptcy Code (the "**Administrative Expense Claims**"), and (ii) confirming the first-priority liens and security interests of the Exchange Operators in the existing Exchange Collateral and seeking authority to pledge additional collateral to the Exchange Operators, as applicable, in the ordinary course of business and consistent with the Prepetition Exchange Agreements to secure postpetition obligations, including the Postpetition Exchange Obligations, on a first-priority basis in such collateral (the "**Postpetition Exchange Collateral**"). Because the Prepetition Exchange Obligations are fully secured, no other parties in interest will be prejudiced by the foregoing relief.

Additionally, the Utility participates in other gas and electricity markets and exchanges, and is concerned that certain counterparties in those markets and exchanges, such as natural gas suppliers, natural gas transportation providers, natural gas storage providers, gas fired electric generators, renewable electric generators, RPS shaping and firming providers, and buyers of the Utility's resource adequacy and renewable energy products (collectively, the "**Trading Counterparties**") may seek to terminate their agreements with the Utility or seek to liquidate the Utility's natural gas or electricity positions as a result of the commencement of these Chapter 11 Cases. The Trading Counterparties currently hold cash collateral as security for outstanding obligations. In order to avoid a termination of their agreements, pursuant to the Exchange Operators Motion, the Utility also requests that the Trading Counterparties be authorized to exercise any valid setoff rights, apply cash collateral to outstanding obligations, and, to the extent of any excess cash collateral, continue to hold the same to secure postpetition obligations to the Trading Counterparties. The Utility also requests authority to provide the Trading Counterparties with cash or other collateral in connection with ongoing postpetition transactions.

**C.    FCM**

In addition to the Exchange Operators, the Utility is party to certain agreements (the "**Prepetition FCM Agreements**") with Macquarie Futures USA LLC and BNP Paribas Securities

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Corp. (collectively, the "**Future Commission Merchants**") to buy or sell futures contracts (or options on futures contracts) and other forward contracts related to certain commodities and commodity related products. The Future Commission Merchants solicit or accept orders to buy or sell futures contracts, options on futures, retail off-exchange forex contracts or swaps, and accept money or other assets from customers to support such orders. In connection with the Prepetition FCM Agreements, the Utility is required to provide collateral, including initial margin and variation margin, from time to time in such amounts, at such times, and in such form (usually cash) as requested by each Future Commission Merchant in its discretion. The collateral amounts requested by a Future Commission Merchant may be affected by the Utility's open trading positions and the Future Commission Merchant's perception of the Utility's credit risk. Again, in order to avoid a termination of the Prepetition FCM Agreements, which provide the Utility with the ability to protect against price fluctuations, the Utility seeks authority to provide such additional cash or other collateral required by the Prepetition FCM Agreements in an amount not to exceed $15,000,000.

I respectfully submit that allowing the Utility to continue its trading and exchange practices in the ordinary course, without interruption, including the payment of any Prepetition Exchange Obligations, and the furnishing of collateral in connection therewith, is a sound exercise of its business judgment. The Utility has utilized the same, or substantially similar, exchange practices for years. Indeed, it is impossible for the Utility to operate its business without such practices. In particular, absent the ability to participate in the Exchanges, the Utility would simply be unable to effectively procure and sell its natural gas and electricity—a result that may lead to the Utility's inability to meet customer demand, risks to gas and electric system reliability in California and, with respect to the CAISO practices, to pricing volatility in the power markets or to a decrease in the reliability of the state-wide system.

Payment of the Prepetition Exchange Obligations is essential to the Utility's continued operations and the proper functioning of the California gas and power markets within which the Utility plays a crucial role. Any limitation on the Utility's ability to continue their prepetition trading and exchange practices will: (i) cause disruption to the Utility's operations and, potentially, to the

California gas and power markets; and (ii) compromise the Utility's ability to procure natural gas and power in amounts needed to satisfy customer demand and maintain system reliability. The Exchange Operators are currently in possession of significant amounts of collateral and are fully secured with respect to the Prepetition Exchange Obligations. Consequently, as stated, the relief requested in the Exchange Operators Motion will not prejudice any party in interest, including the Utility's unsecured creditors.

Accordingly, I respectfully submit that the relief requested in the Exchange Operators Motion is necessary and appropriate, is in the best interests of their estates and all parties in interest, is necessary to avoid immediate and irreparable harm to the Debtors, and should be granted.

XVIII. **MOTION OF DEBTORS PURSUANT TO BANKR. L. R. 9006-1 REQUESTING ORDER SHORTENING TIME FOR HEARING ON FIRST DAY MOTIONS (THE "MOTION TO SHORTEN")**

Pursuant to the Motion to Shorten, the Debtors are seeking entry of an order shortening time for a hearing on the following First Day Motions: (i) Joint Administration Motion; (ii) DIP Financing Motion; (iii) Cash Management Motion; (iv) Employee Wages and Benefits Motion; (v) Public Purpose Programs Motion; (vi) Operational Integrity Suppliers Motion; (vii) Lien Claimants Motion; (viii) Insurance Motion; (ix) Taxes Motion; (x) NOL Motion; (xi) Exchange Operator Motion; (xii) Extension of Time to File Schedules and Statements Motion; (xiii) Creditor Matrix and Notice of Commencement Motion; (xiv) Section 156(c) Application; and (xv) the Responsible Individual Application (collectively, the "**Emergency First Day Motions**").

Specifically, the relief requested in the Emergency First Day Motions is necessary, to among other things, protect the interests of the Debtors' employees and customers, to avoid disruption to their operations, to maintain the cash management systems, and to maintain public programs (most of which are mandated by statute or regulation) during the pendency of the Chapter 11 Cases. The relief requested in the Emergency First Day Motions is designed to prevent unnecessary disruptions in the operations of the Debtors' businesses generally, and all of such relief is necessary to preserve and maximize the value of the Debtors' estates and operations for the benefit of all parties in interest.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Accordingly, for the reasons set forth herein, I respectfully submit that the relief requested in the Motion to Shorten is necessary and appropriate, is in the best interests of their estates and all parties in interest, and should be granted.

For the reasons set forth in the Emergency First Day Motions and herein, the relief requested in the Emergency First Day Motions is essential to avoid the disruption of operations and to promote the Debtors' smooth transition into chapter 11 for the benefit of all parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct.

Dated: February 1, 2019

Respectfully submitted,

By: _/s/_ _Jason P. Wells_
Jason P. Wells

AMENDED DECLARATION OF JASON P. WELLS
IN SUPPORT OF FIRST DAY MOTIONS