Richard A. Lapping (SBN: 107496)
Trodella & Lapping LLP
540 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 399-1015
Facsimile: (415) 651-9004
*Rich@TrodellaLapping.com*

Attorneys for Valero Refining Company-California

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No.: 19-30088-DM |
| PG&E CORPORATION, | Chapter 11 |
| -and- | **DECLARATION OF JOHN COX AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR RELIEF FROM STAY BY VALERO REFINING COMPANY-CALIFORNIA** |
| PACIFIC GAS & ELECTRIC COMPANY, | |
| Debtors. | |
| □ Affects PG& Corporation | Date: February 26, 2019 |
| ■ Affects Pacific Gas and Electric Company | Time: 9:30 a.m. |
| □ Affects both Debtors | Place: Courtroom 17 |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | 450 Golden Gate Avenue, 16th Floor |
| | San Francisco, California |
| | Judge: Hon. Dennis Montali |

I, John Cox, declare as follows:

1.     I am an attorney at law, licensed to practice in the State of California and admitted to the bar of the Northern District of California. I am a partner with the firm of Law Offices of John Cox, P.C., and am one of the attorneys of record representing Valero Refining Company-California ("Valero") in VALERO REFINING COMPANY-CALIFORNIA, a Delaware corporation v. PACIFIC GAS & ELECTRIC COMPANY, a California corporation, pending as Case No. 2:17-cv-01350-TLN-EFB in United States District Court for the Eastern District of California before the

1

Honorable Troy L. Nunley, United States District Judge (the "District Court Action"). I make this declaration in that capacity and, if called upon to do so, I could and would testify of my own personal knowledge to the facts set forth herein.

2. This declaration (the "Declaration") is submitted in support of the Motion for Relief From Stay by Valero Refining Company-California (the "Motion") and in support of this Request for Judicial Notice.

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge or my review of relevant records and documents. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4. The Court is requested to take judicial notice of the First Amended Complaint in the District Court Action, a true and correct copy of which is attached hereto as Exhibit 1.

5. The Court is requested to take judicial notice of the ECF Docket maintained in the District Court Action, a true and correct copy of which is attached hereto as Exhibit 2.

6. All fact discovery, including 19 depositions, has been completed in the District Court Action, and all expert depositions (seven in all) except one (the eighth) have been taken.

7. The facts and legal issues in the District Court Action are complex and vigorously disputed. The case is complex and difficult due to the highly technical electrical engineering and refinery operations evidence and testimony expected regarding the responsibility for the outage that occurred on May 5, 2017.

7. Attached hereto as Exhibits 3 and 4 are copies of insurance policies produced to Valero by Defendant Pacific Gas & Electric Company ("PG&E") in the District Court Action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

Dated: February 5, 2019

/s/ John Cox
John Cox

Trodella & Lapping LLP
540 Pacific Avenue
San Francisco, CA 94133

2

# EXHIBIT 1

1   JOHN COX, CASB No. 197687
    NATHAN R. JASKOWIAK, CASB No. 248007
2   ALEXANDER J. BUKAC, CASB No. 305491
    KEESAL, YOUNG & LOGAN
3   A Professional Corporation
    450 Pacific Avenue
4   San Francisco, California  94133
    Telephone:     (415) 398-6000
5   Facsimile:     (415) 981-0136

6   WATTS GUERRA, L.L.P.
    MIKAL C. WATTS (admitted *pro hac vice*)
7   FRANCISCO GUERRA IV (admitted *pro hac vice*)
    MARK A. FASSOLD (admitted *pro hac vice*)
8   Four Dominion Drive
9   Bldg. 3, Suite 100
    San Antonio, Texas 78257
10  Telephone:     (210) 527-0500
    Facsimile:     (210) 527-0501
11

12  Attorneys for Plaintiff
    VALERO REFINING COMPANY -- CALIFORNIA

13

14                  **UNITED STATES DISTRICT COURT**

15                **EASTERN DISTRICT OF CALIFORNIA**

16

17  VALERO REFINING COMPANY --          )  Case No.  2:17-cv-01350-TLN-EFB
    CALIFORNIA, a Delaware corporation,  )
18                                        )  **FIRST AMENDED COMPLAINT FOR:**
                             Plaintiff,   )
19                                        )  **1. BREACH OF CONTRACT;**
                vs.                       )
20                                        )  **2. BREACH OF IMPLIED CONTRACT;**
    PACIFIC GAS & ELECTRIC COMPANY, a     )
21  California corporation;               )  **3. BREACH OF IMPLIED WARRANTY OF**
                                          )  **FITNESS FOR A PARTICULAR PURPOSE;**
22                          Defendant.    )
                                          )  **4. BREACH OF COVENANT OF GOOD**
23                                        )  **FAITH AND FAIR DEALING;**
                                          )
24                                        )  **5. NEGLIGENCE**
                                          )
25                                        )  **DEMAND FOR JURY TRIAL**
                                          )
26  _____ )

27

28

                                      - 1 -

Plaintiff VALERO REFINING COMPANY – CALIFORNIA ("Valero") states the following for its Complaint against Defendant PACIFIC GAS & ELECTRIC COMPANY ("PG&E"):

## NATURE OF THE CASE

1.     On May 5, 2017, Defendant PG&E breached its duties, contractual and otherwise, resulting in a complete power outage to Valero's Benicia refinery ("The Refinery").  The loss of power caused an emergency shutdown of the Refinery, an extended period of flaring and significant damage to the complex Refinery equipment.  The Refinery remained out of service for an extended period of time depriving Valero of revenues and causing fuel supply disruptions in Northern California.  In causing the incident PG&E, among other things, breached its contractual duty to reasonably and diligently provide reliable electric power to the Refinery and failed to exercise reasonable care or diligence in designing, constructing, maintaining and operating its electrical system, all of which resulted in substantial damage to Valero.

2.     Valero has leased the Bahia Substation from PG&E.  Valero relies on PG&E to provide power to the Bahia Substation, which in turn powers the Refinery.

3.     Valero contracted with PG&E in order to ensure that electric power would always be available to the Refinery.  The Refinery, and the sophisticated equipment operated within the Refinery, requires reliable electric power in order to function safely and efficiently.  As PG&E was well aware, the failure to provide continuous and reliable power to the Refinery presented a safety risk to the public, a safety risk to employees and contractors at the Refinery, and damage to the equipment involved in the refining process.

4.     PG&E knew or should have known that reliable electric power is critical to Refinery operations, and that Refinery equipment operates under extremely high heat and pressure conditions. PG&E further knew or should have known that an unplanned power dip or outage at the Refinery can cause damage to Refinery equipment and create hazardous conditions. Furthermore, PG&E knew or should have known that unplanned power dips or outages can present serious safety issues to Refinery employees and members of the community, including the risk of explosions, fires, and serious injury or death.

5.      PG&E and its employees engaged in the conduct alleged herein causing significant damage to Valero.  Under the principles of corporate liability and *respondeat superior*, PG&E is liable for the actions of its agents and/or employees with respect to the events alleged herein because they were acting within the scope of their agency and employment and for the benefit of PG&E.

6.      Notwithstanding PG&E's duty to provide reliable electric service to the Refinery, and its knowledge of the potentially adverse effects of its failure to do so, PG&E failed to act reasonably in the design, construction, management, maintenance and operation of its equipment and facilities, resulting in a refinery-wide electrical outage to the Refinery on May 5, 2017, and significant damage to Valero as described herein.

## THE PARTIES

7.      Plaintiff Valero is a Delaware Corporation with refining and retail operations located on the west coast and having its principal place of business and corporate headquarters located in San Antonio, Texas.  The Valero Benicia Refinery is one of the most complex refineries in the United States, and operates at a capacity of 165,000 barrels per day.  Approximately 70% of the Refinery's product slate is California Air Resources Board ("CARB") gasoline, which amounts to 10% of the clean-burning CARB gasoline used in California and twenty-five percent (25%) of the CARB gasoline used in the San Francisco Bay Area.  Valero employs approximately 480 personnel at its Refinery in Benicia California.  The Refinery is certified by Cal/OSHA as a Cal/VPP Star site, a designation that recognizes employers whose occupational safety and health programs are exemplary.  Valero is committed to operating its refineries in an environmentally responsible manner, and to promoting the health and safety of employees, customers, and the communities where it does business.

8.      Defendant PG&E is a California corporation having its principal place of business located at 77 Beale Street, San Francisco, California 94105.  PG&E is a subsidiary of PG&E Corporation, and is one of the largest regulated investor-owned electric utilities in California.  On its website (http://www.pge.com), PG&E represents that its service area covers from Eureka in the north to Bakersfield in the south, from the Pacific Ocean to the Sierra Nevada.  It claims to operate 141,215 circuit miles of electric distribution lines and 18,616 circuit miles of interconnected

- 3 -

1  transmission lines throughout this area. According to its website, PG&E maintains 5.4 million electric

2  customer accounts.

3  **JURISDICTION & VENUE**

4        9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the

5  parties are citizens of different states and the matter in controversy exceeds $75,000 exclusive of

6  interest and costs.

7        10.     This Court has personal jurisdiction over PG&E because PG&E resides in this State,

8  does business in this State, has engaged in acts or omissions within this State causing injury, and has

9  otherwise established contacts with this State making the exercise of personal jurisdiction proper.

10       11.     The claims asserted herein do not fall within the jurisdiction of the California Public

11  Utilities Commission. *See Fenholt v. So. Cal. Edison Company*, (2014) Proposed Decision (D. ) 13-

12  07-014, at 1 ("the Commission lacks jurisdiction to award compensatory damages"); *Elder v. Pacific

13  Bell Telephone Co.*, 205 Cal. App. 4th 841, 848 (2012) (Section 2106 of the Public Utilities Code

14  "confirms the full power of the courts to pass judgment on what utilities do").

15       12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because PG&E

16  resides in this District, and a substantial part of the events or omissions giving rise to the action

17  occurred in this District because the Benicia Refinery, where the outage occurred, is located in this

18  District.

19

20                                 **INTRADISTRICT ASSIGNMENT**

21       13.     Pursuant Local Rule 120(d), intradistrict assignment to Sacramento is proper because

22  the unlawful conduct that gives rise to this litigation occurred in the County of Solano.

23

24                                      **FACTUAL BACKGROUND**

25       14.     The Refinery is located in Benicia, California. The Refinery produces a variety of fuel

26  products such as propane, butane, California Air Resources Board (CARB) gasoline, ultra-low-sulfur

27  diesel (ULSD), jet fuel, fuel oil, residual oil and asphalt.

28

- 4 -

15.     A source of consistent and reliable electric power is essential to around the clock operation of the Refinery.  Proper shutdown and startup of the sophisticated mechanical equipment that drives the Refinery's operational processes can take up to a week or more.  This machinery is therefore particularly sensitive to sudden and unexpected reductions in power or power outages—all of which can result in unanticipated Refinery shutdowns.  Such service interruptions include outages caused by the failure to use reasonable diligence by the Refinery's energy provider, PG&E.  These unanticipated shutdowns pose a substantial risk of harm and damage to the Refinery's sophisticated equipment and production output, which in turn impacts the availability of end products to consumers as well as Valero's profitability.

16.     The consequences of unanticipated reductions in power and power outages can impact the safety of Refinery employees as well as the surrounding community.  Outages at oil refining facilities in particular can pose particularly disastrous consequences, including explosions and/or fires resulting in property damage and serious injury or death to individuals, as well as serious environ-mental hazards precipitated by the unexpected and unintended release of harmful materials.  Electric utilities, including PG&E, are well aware of these risks.

17.     PG&E provides electric service to the Refinery.  PG&E's provision of electric services to the Refinery is governed by several agreements.

18.     Under a Special Agreement for Electrical Standby Service ("Standby Agreement"), Valero receives service pursuant to Schedule S, "Standby Service," and in accordance with and subject to PG&E's applicable rates and rules as regularly established.  Term and Condition 1 of the Standby Agreement provides:

> Customer has requested PG&E to stand ready *at all times* to deliver or supply and deliver electric energy to Customer's premises on an as-needed basis.  Such standby service shall be provided to Customer in accordance with and subject to PG&E's applicable rates and rules as established from time to time by, and on file with, the California Public Utilities Commission (Commission).

*See* Exhibit A (emphasis added).

19.     Under a Generation Operating Communication Agreement ("Communication Agreement"), PG&E agreed to "give advance notice (minimum of 7 days), of plans to perform work,

1   which will affect Valero's access to the PG&E electric system.  *See* Exhibit B.  The Communication

2   Agreement also incorporates by reference the PG&E Interconnection Handbook and Electric Rules 2,

3   14, and 21.  *See id.*

4           20.     Electric Rule No. 14 "Shortage of Supply and Interruption of Delivery" provides:

5                   ***PG&E will exercise reasonable diligence and care to furnish and
                    deliver a continuous and sufficient supply of electric energy to the
6                   customer***, but does not guarantee continuity or sufficiency of supply.
                    PG&E will not be liable for interruption or shortage or insufficiency of
7                   supply, or any loss or damage of any kind of character occasioned
                    thereby, if same is caused by inevitable accident, act of God, fire,
8                   strikes, riots, war, or any other cause ***except that arising from its failure
                    to exercise reasonable diligence.***

9

10  *See* Exhibit C (emphasis added).

11          21.     PG&E provides both the primary and backup electrical power for the Refinery.  Valero

12  contracted with PG&E for the allocation of a redundant powerline, which serves as the Refinery's

13  backup power source and is intended to prevent unplanned power interruptions.  The PG&E Vaca

14  Dixon 230 kilo-volt ("KV") powerline on circuit breaker CB212 and the PG&E Moraga 230 KV

15  powerline on circuit breaker CB242 are both independent of each other so that each powerline

16  functions as a back-up power supply to the other.  Each powerline has over a 100 megawatt ("MW")

17  capacity.  A typical Refinery load is 65 MW.  Therefore, the Refinery does not require access to both

18  PG&E powerlines lines at the same time to provide full power.

19          22.     The Refinery also has a Cogeneration Unit ("Cogen") that can provide up to 47 MW of

20  power.  However, the Cogen is not the Refinery's backup power supply.  Although the Cogen is

21  connected in parallel with the PG&E powerlines, it cannot operate when the Refinery suddenly loses

22  all PG&E power because Cogen supply is rated 47 MW, or 18 MW less than the Refinery 65 MW

23  load. In this situation, the Cogen equipment becomes overloaded and the Cogen circuit breaker trips.

24          23.     PG&E failed to design, construct, maintain and operate its equipment and services in a

25  reasonably diligent manner such that sufficient power could be provided to the Refinery.  On May 5,

26  2017 when the Valero side of the Bahia Substation became isolated from the PG&E Electrical grid,

27  without notice and through no fault of Valero and solely because of PG&E's actions, the Refinery

28

- 6 -

suffered a complete loss of power. During this event, caused solely by PG&E's own actions, PG&E could no longer provide Standby service in accordance with its agreement with Valero.

### THE MAY 5, 2017 POWER OUTAGE

24.     On March 20, 2017, PG&E notified Valero that PG&E was planning three electrical line clearances, which had previously been scheduled to be performed in February of 2017.  The originally scheduled clearances were cancelled because a PG&E tower, on the PG&E Moraga line, was in danger of falling due to a mudslide.  The rescheduled line clearances were set to begin on May 1, 2017 and continue through May 12, 2017.

25.     On the evening of May 4, 2017, PG&E completed the first of the three scheduled electrical line clearances.

26.     Valero is informed and believes that sometime prior to the early morning of May 5, 2017, the PG&E Moraga line experienced a failed coupling capacitor voltage transformer ("CCVT"). A CCVT is a transformer used in power systems to step down extra high voltage signals and provide a low voltage signal, for instrumentation metering or operating protective control relays.

27.     On May 5, 2017 at approximately 6:40 a.m., while PG&E was performing the second of three scheduled electrical line clearances, the Refinery experienced a complete loss of 230 KV electrical utility power from PG&E.  The power outage occurred when the PG&E Moraga line experienced a failed CCVT, followed by PG&E de-energizing the Vaca Dixon line to perform the scheduled line clearance at the Bahia Substation.  Although the Moraga line was still energized, PG&E's failed CCVT sent a false voltage signal to simultaneously open Valero's three circuit breakers, CB476, CB486 and CB496, causing the Refinery to lose all power from both the PG&E Vaca Dixon and Moraga 230 kV powerlines, the Refinery's primary and backup power sources.  The loss of both PG&E lines also forced Valero's Cogen offline, which is designed to occur in the event of a 230 kW loss of PG&E power because the Cogen's 47 MW rating is not sufficient to power up the 65 MW average demand of the Refinery.

28.     Although PG&E was aware of the CCVT equipment failure on the Moraga line and knew or should have known that de-energizing the Vaca Dixon line to perform the scheduled

- 7 -

1    maintenance while a CCVT equipment failure existed on the Moraga line would cause a complete loss

2    of power to the Refinery, PG&E failed to notify the Refinery and failed to take preventative steps to

3    avoid a total loss of electrical power to the Refinery.

4          29.     PG&E restored power to the Bahia Substation just before 7:00 a.m., however power in

5    the Refinery was not restored until approximately 7:50 a.m., with the Refinery power distribution

6    system not being completely normalized until after 3:00 p.m.

7          30.     The complete loss of electrical power from PG&E on May 5th caused a Refinery-wide

8    emergency shutdown, a result that was foreseeable to PG&E.

9          31.     The Refinery's process units and boilers shut down and depressurized.  Due to the

10   abrupt nature of the emergency shutdown, the Refinery was unable to go through the systematic

11   process it follows for planned shutdowns that allows the Refinery to minimize emissions and ensure

12   safe operations and protect equipment.  Because the May 5th shutdown was abrupt and unforeseen to

13   Valero, substantial equipment damage and heavy flaring occurred after the Refinery lost power and

14   was forced to shut down.

15         32.     Flares are an industrial safety device designed to safely dispose of products in a

16   controlled manner to protect employees and the community.  The sudden loss of PG&E electrical

17   power caused the Refinery to flare on May 5th while emergency shutdown procedures were followed

18   to safely shut down the Refinery.  The Refinery also flared on several subsequent occasions as Valero

19   attempted to bring units back online following the power outage.  The emergency shutdown caused

20   substantial damage to the Refinery's property and equipment.

21         33.     As a result of the May 5, 2017 PG&E power loss and resulting flaring, the City of

22   Benicia issued an evacuation order for the Benicia Industrial Park and two neighboring elementary

23   schools were ordered to shelter-in-place.

24         34.     Further, as a result of the May 5, 2017 PG&E power loss, flaring, and resulting

25   emergency shutdown of the Refinery, to date Valero has received eleven (11) Notices of Violation

26   ("NOVs") from the Bay Area Quality Management District ("BAAQMD") for excess visible

27   emissions and public nuisance violations.

28

35.     Following the May 5th PG&E power loss, the Refinery began the process of evaluating and repairing the extensive damage caused by the loss of power to ensure all Refinery units could be brought safely back online and the Refinery could resume normal operations.  As a result of having to take most of the Refinery units offline to evaluate the damage and complete repairs, Valero lost a substantial amount of profits, all of which are damages proximately caused by PG&E's negligence. Due to the damage caused by PG&E's power loss, the Refinery was unable to resume normal operations until June 5th, 2017.

36.     By letter dated May 16, 2017, Valero provided PG&E notice of its potential claim and requested PG&E preserve all evidence related to the May 5th power outage in anticipation of litigation.  By letter dated May 26, 2017, Valero also provided PG&E notice that Valero has suffered substantial damages as a result of the May 5th power outage.

37.     Although Valero has repeatedly requested technical answers about the May 5th power loss and permission to participate in PG&E's incident investigation process, PG&E has not been cooperative.  Importantly, PG&E has not provided Valero with an assurance that a complete power loss to the refinery will not occur again, nor has PG&E accepted responsibility for the damage caused by the loss of PG&E power on May 5, 2017.

First cause of action

(Breach of Contract)

38.     Valero incorporates herein by reference the allegations set forth in Paragraphs 1 through 37 of this Complaint.

39.     PG&E had a contractual obligation to exercise reasonable care when supplying electricity to the Refinery.

40.     Valero and PG&E entered into a Special Agreement for Electrical Standby Service on December 31, 2002.  The Standby Agreement constitutes a binding contract between Valero and PG&E.  *See* Exhibit A.

41.     Under the Standby Agreement, Valero receives service pursuant to Schedule S, "Standby Service," and in accordance with and subject to PG&E's applicable rates and rules as

- 9 -

1    regularly established.  Term and Condition 1 of the Standby Agreement provides that PG&E will

2    "stand ready at all times to deliver or supply and deliver electric energy to [Valero's] premises on an

3    as-needed basis."  Exhibit A.

4          42.    Valero and PG&E entered into the Generation Operating Communication Agreement

5    on June 5, 2008.  The Communication Agreement constitutes a binding contract between Valero and

6    PG&E.  *See* Exhibit B.

7          43.    Under the Communication Agreement, PG&E agreed to "give advance notice

8    (minimum of 7 days), of plans to perform work, which will affect Valero's access to the PG&E

9    electric system."  *See* Exhibit B.  The Communication Agreement also incorporates by reference,

10   among others, Electric Rule 14 "Shortage of Supply and Interruption of Delivery" provides:

11           PG&E will exercise reasonable diligence and care to furnish and deliver
             a continuous and sufficient supply of electric energy to the customer, but
12           does not guarantee continuity or sufficiency of supply.  PG&E will not
             be liable for interruption or shortage or insufficiency of supply, or any
13           loss or damage of any kind of character occasioned thereby, if same is
             caused by inevitable accident, act of God, fire, strikes, riots, war, or any
14           other cause except that arising from its failure to exercise reasonable
             diligence.
15

16   *See* Exhibits B and C.

17         44.    Valero has properly performed and complied with all terms and conditions under the

18   Standby Agreement, except for any terms and conditions which have been excused, prevented,

19   waived, and/or released by PG&E.

20         45.    PG&E breached the Standby Agreement by failing to "stand ready at all times to

21   deliver or supply and deliver electric energy to [Valero's] premises on an as-needed basis."

22         46.    Valero has properly performed and complied with all terms and conditions under the

23   Communication Agreement, except for any terms and conditions which have been excused, prevented,

24   waived, and/or released by PG&E.

25         47.    PG&E breached the Communication Agreement by failing to "give advance notice

26   (minimum of 7 days), of plans to perform work, which will affect Valero's access to the PG&E

27   electric system," and by failing to "exercise reasonable diligence and care to furnish and deliver a

28   continuous and sufficient supply of electric energy to the customer."

- 10 -

48.    Valero made a reasonable effort to minimize the damage caused by PG&E's breach of the Standby Agreement and the Communication Agreement.

49.    However, as a direct, proximate and foreseeable result of PG&E's breach of the Standby Services Agreement and the Communication Agreement, Valero has suffered damages including, but not limited to the following:

    a.    Costs and expenses to restore operations at the Refinery after the shutdown that was caused by the unexpected and unplanned power outage;

    b.    Costs and expenses to repair the facilities at the Refinery after the shutdown that were damaged as a result of the unexpected and unplanned power outage;

    c.    Costs and expenses related to Valero's investigation of the unexpected and unplanned power outage;

    d.    Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the unexpected and unplanned power outage; and

    e.    Harm to Valero's reputation.

50.    The loss of power resulted in damages for Valero, as described more fully above. The exact amount of damages will be proven at trial, but is in excess of Seventy-Five Million Dollars ($75,000,000).

Second cause of action

(Breach of Implied Contract)

51.    Valero incorporates herein by reference the allegations set forth in Paragraphs 1 through 37 of this Complaint.

52.    Valero pleads this cause of action as an alternative to its cause of action for Breach of Contract, as permitted by Federal Rule of Civil Procedure 8(d)(2).

53.    Valero and PG&E engaged in a course of conduct that made PG&E aware of Valero's manifest need for a reliable source of electrical power.

///

- 11 -

54.     Valero and PG&E engaged in a course of conduct that made PG&E aware of the importance of providing Valero with notice of any plans to perform work that could affect Valero's access to the PG&E electrical system.

55.     The course of conduct between the parties was such that Valero retained a reasonable expectation that Valero would receive reliable electrical power from PG&E.

56.     The course of conduct between the parties was such that Valero retained a reasonable expectation that PG&E would provide Valero with notice of any plans to perform work that could affect Valero's access to the PG&E electrical system.

57.     An implied contract for PG&E to provide continuous and reliable power to the Refinery existed between Valero and PG&E.

58.     An implied contract for PG&E to provide notice of any plans to perform work that could affect Valero's access to the PG&E electrical system existed between Valero and PG&E.

59.     PG&E breached the implied contracts by failing to provide notice to Valero of work that could affect Valero's access to the PG&E electrical system.

60.     PG&E breached the implied contracts by failing to provide continuous and reliable electrical service to the Refinery on May 5, 2017.

61.     Valero has properly performed and complied with all terms and conditions under the implied contracts, except for any terms and conditions which have been excused, prevented, waived, and/or released by PG&E.

62.     Valero made a reasonable effort to minimize the damage caused by PG&E's breach of the implied contracts.

63.     However, as a direct, proximate and foreseeable result of PG&E's breach of contract, Valero has suffered damages including, but not limited to the following:

   a.     Costs and expenses to restore operations at the Refinery after the shutdown that was caused by the unexpected and unplanned power outage;

   b.     Costs and expenses to repair the facilities at the Refinery after the shutdown that were damaged as a result of the unexpected and unplanned power outage;

- 12 -

c.       Costs and expenses related to Valero's investigation of the unexpected and unplanned power outage;

d.       Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the unexpected and unplanned power outage; and

e.       Harm to Valero's reputation.

64.     The loss of power resulted in damages for Valero, as described more fully above. The exact amount of damages will be proven at trial, but is in excess of Seventy-Five Million Dollars ($75,000,000).

Third cause of action

(Breach of Implied Warranty of Fitness for Particular Purpose)

65.     Valero incorporates herein by reference the allegations set forth in Paragraphs 1 through 64 of this Complaint.

66.     Valero informed PG&E, both orally and in writing that it wished to secure a reliable source of electricity to its Refinery in order to power its operations for the particular purpose of safely powering Valero's complex petroleum refining and processing operations.  Valero further informed PG&E, both orally and in writing, that fluctuations or interruptions to electrical service to the Refinery would cause severe damage to Valero's equipment and operations.

67.     Valero is a unique customer of electrical power because it relies on a significant and constant supply of electrical power from PG&E in order to safely operate the Refinery.  Unlike most customers, Valero has entered into several written contracts with PG&E relating to the supply of electrical power, including but not limited to the Standby Services Agreement and the Communication Agreement.  Valero is also a unique customer because an unexpected loss of electrical power for even a small period of time can lead to a significant risk of harm and damage to the Refinery's equipment and production output, as was the case with the May 5 outage.

68.     Valero relies on PG&E's skill, judgment and representations to provide a reliable source of electric service to the Refinery in order to power its operations.

- 13 -

69.    PG&E therefore knew or should have known at the time it entered into the Standby Agreement and the Communication Agreement that Valero intended to utilize electric service for the particular purpose of safely powering its complex petroleum refining and processing operations, and that fluctuations or interruptions in electrical service to the Refinery would cause severe damage to Valero's equipment and operations.

70.    PG&E knew, prior to execution of the Standby Agreement and the Communication Agreement, that Valero had to rely on PG&E's skill, judgment and representations in furnishing electrical service suitable for Valero's particular purpose of safely powering its complex petroleum refining and processing operations.

71.    PG&E was obligated under an implied warranty of fitness for a particular purpose to provide Valero with electrical service that was fit for Valero's particular purpose of safely powering its complex petroleum refining and processing operations, which included—among other things— electrical service free from fluctuations and service interruptions.

72.    However, as a direct, proximate and foreseeable result of PG&E's breach of the implied warranty of fitness for a particular purpose, Valero has suffered damages including, but not limited to the following:

       a.    Costs and expenses to restore operations at the Refinery after the shutdown that was caused by the unexpected and unplanned power outage;

       b.    Costs and expenses to repair the facilities at the Refinery after the shutdown that were damaged as a result of the unexpected and unplanned power outage;

       c.    Costs and expenses related to Valero's investigation of the unexpected and unplanned power outage;

       d.    Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the unexpected and unplanned power outage; and

       e.    Harm to Valero's reputation.

73.    The loss of power resulted in damages for Valero, as described more fully above. The exact amount of damages will be proven at trial, but is in excess of Seventy-Five Million Dollars ($75,000,000).

- 14 -

Fourth cause of action

(Breach of Covenant of Good Faith and Fair Dealing)

74.     Valero incorporates herein by reference the allegations set forth in Paragraphs 1 through 73 of this Complaint.

75.     The Communication Agreement included an implied covenant of good faith and fair dealing.

76.     Valero has properly performed and complied with all terms and conditions under the Communication Agreement, except for any terms and conditions which have been excused, prevented, waived, and/or released by PG&E, and there were no conditions precedent relieving PG&E of its obligation to perform.

77.     The purpose of the Communication Agreement is to facilitate the exchange of information and maintenance plans that have the potential to affect Valero's access to PG&E's electrical supply.

78.     PG&E failed to inform Valero of the failed CCVT on the Moraga line and instead proceeded with the line clearance on the Vaca Dixon line as scheduled on May 5.  PG&E's failure to communicate information about the compromised CCVT prior to the Vaca Dixon line clearance was in contravention of the purpose of the Communication Agreement, and unfairly interfered with Valero's right to receive the benefits of the Communication Agreement.

79.     To the extent that PG&E argues that notice of the failed CCVT was not required pursuant to the express terms of the Communication Agreement, PG&E nevertheless breached the implied covenant of good faith and fair dealing by failing to provide notice to Valero of important information solely within PG&E's knowledge and control that PG&E knew or should have known could affect Valero's access to the PG&E electrical system.

80.     As a direct, proximate and foreseeable result of PG&E's breach of the implied covenant of good faith and fair dealing, Valero has suffered damages including, but not limited to the following:

        a.     Costs and expenses to restore operations at the Refinery after the shutdown that was caused by the unexpected and unplanned power outage;

- 15 -

b.      Costs and expenses to repair the facilities at the Refinery after the shutdown that were damaged as a result of the unexpected and unplanned power outage;

c.      Costs and expenses related to Valero's investigation of the unexpected and unplanned power outage;

d.      Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the unexpected and unplanned power outage; and

e.      Harm to Valero's reputation.

81.     The loss of power resulted in damages for Valero, as described more fully above. The exact amount of damages will be proven at trial, but is in excess of Seventy-Five Million Dollars ($75,000,000).

Fifth cause of action

(Negligence)

82.     Valero incorporates herein by reference the allegations set forth in Paragraphs 1 through 81 of this Complaint.

83.     PG&E owed a duty to Valero to exercise reasonable care and caution in the design, construction, inspection, maintenance and operation of the electrical service provided to the Refinery at a level or amount commensurate with the amount of harm that would foreseeably result from a power outage at the Refinery.  In no way can PG&E abrogate its duty to exercise reasonable care to avoid unnecessary risks of harm to Valero and the Refinery.

84.     PG&E knew or should have known, based on its ongoing relationship with Valero and its longstanding provision of electrical service to the Refinery, that a reliable supply of electricity is imperative to avoid serious damage and loss of operation to the Refinery.  PG&E assured Valero that it was committed to providing a reliable supply of power to the Refinery.  PG&E acknowledges that it is responsible for damages arising from its failure to exercise reasonable diligence and care to furnish and deliver a continuous and sufficient supply of electric energy to the customer.  PG&E further acknowledges that it is responsible for damage that results from its own negligence.

- 16 -

85.     PG&E knew or should have known that the consequences of a power outage at a refinery are much more severe than those faced by ordinary electrical customers. Sophisticated refinery machinery is particularly sensitive to loss of power and steam caused by electrical power outages or electrical service interruptions, resulting in unanticipated shutdowns. Unscheduled shutdowns can not only damage refinery equipment, but they also compromise production, which in turn affects profitability. Moreover, unplanned service interruptions that cause unanticipated shutdowns can also create significant safety and environmental issues and apprehension throughout the surrounding community, including explosions, fires, personal injury, and death.

86.     PG&E knew or should have known that Valero relies on its provision of electrical service to operate the Refinery on a continuous basis, and that carrying out maintenance or other activities in a manner that could jeopardize the availability of that supply pose a significant risk that the Refinery would experience a total loss of power under the circumstances described herein.

87.     PG&E had a duty to Valero to exercise ordinary care in providing electrical services to the Refinery.  PG&E breached its duty of care by, *inter alia*:

a.      Failing to provide notice to Valero about the CCVT equipment failure that occurred at the Bahia substation;

b.      Failing to take preventative steps to prevent the incident;

c.      Failing to design, construct, inspect, maintain and operate the sources of power supplying the Refinery in a manner to avoid unexpected power failure;

d.      Failing to provide Valero the required advance notice of maintenance on PG&E power sources;

e.      Failing to train and supervise employees in order to avoid operational and/or equipment failure;

f.      Failing to maintain and/or upgrade to current standards its existing sources of power to the Bahia Substation in order to avoid unexpected power failure in an event similar to circumstances described herein;

///

- 17 -

g.      Failing to design, construct and implement a plan that would ensure the continued provision of electric power to the Refinery in the event that transmission lines were lost and the Bahia Substation was isolated from the PG&E grid; and

h.      Actively dismantling the Refinery's primary backup power.

88.     Further, ignoring the CCVT utility equipment failure report posed an extreme risk of danger to the health and safety of the employees at the Refinery as well as the surrounding communities to the point that such failure to take preventative steps once such report was made constitutes a failure to exercise even scant care, with an indifference to human life, and extreme departure from the ordinary standard of conduct on the part of PG&E.  At all times PG&E was aware of such heightened degree of danger but still proceeded the way it did, ignoring the warning signs, and causing all of the damages claimed by Valero described herein.

89.     Valero made a reasonable effort to minimize the damage caused by PG&E's negligent provision of electrical service to the Refinery.

90.     However, as a direct, proximate and foreseeable result of PG&E's breach of duty, Valero has suffered damages including, but not limited to the following:

a.      Costs and expenses to restore operations at the Refinery after the shutdown that was caused by the unexpected and unplanned power outage;

b.      Costs and expenses to repair the facilities at the Refinery after the shutdown that were damaged as a result of the unexpected and unplanned power outage;

c.      Costs and expenses related to Valero's investigation of the unexpected and unplanned power outage;

d.      Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the unexpected and unplanned power outage; and

e.      Harm to Valero's reputation.

91.     The loss of power resulted in both general and special damages for Valero, as described more fully above. The exact amount of damages will be proven at trial, but is in excess of Seventy-Five Million Dollars ($75,000,000).

- 18 -

1     WHEREFORE, Valero prays for judgment against PG&E as follows:

2            1)     For damages according to proof;

3            2)     Restitution;

4            3)     For costs of suit incurred herein; and

5            4)     For such other relief as the Court may deem just and proper.

6

7

8 DATED:  September 11, 2017                 */s/ Nathan R. Jaskowiak*
                                        JOHN COX

9                                         NATHAN R. JASKOWIAK

10                                         ALEXANDER J. BUKAC
                                        KEESAL, YOUNG & LOGAN

11                                         MIKAL C. WATTS

12                                         FRANCISCO GUERRA IV
                                        MARK A. FASSOLD

13                                         WATTS GUERRA, L.L.P.

14                                         Attorneys for Plaintiff
                                        VALERO REFINING COMPANY --

15                                         CALIFORNIA

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**Distribution**
__ Division
__ Customer
__ Tariffs and Compliance
__ Electric Billing Solutions

QF LOG #_____
Premise #_____
Acct #_____
New Acct ID 5045536438
svc Agreemt ID 5845536005

## PACIFIC GAS AND ELECTRIC COMPANY'S
## SPECIAL AGREEMENT FOR ELECTRICAL STANDBY SERVICE

This is an agreement, between **VALERO REFINING COMPANY - CALIFORNIA**, a (Customer), and **PACIFIC GAS AND ELECTRIC COMPANY** (PG&E). This agreement will be herein referred to as "Agreement".

Customer has requested PG&E to provide standby service at Customer's premises at **3400 East Second Street, Benicia, Calfornia**, County of **Solano**, California, under one of the standby options designated below:

[ ] Option **1** - Standby service for customers whose supply requirements would otherwise be delivered through PG&E owned facilities (including Independent System Operator controlled transmission facilities), are regularly and completely supplied through facilities not owned by PG&E.

The non-utility owned generating facilities have a total rated capacity of approximately _____kVA.

All PG&E power deliveries will be made under Schedule S -- *Standby Service.*

[ ] Option **2** - Standby service for customers who regularly take electric service from another public utility but desire PG&E to reserve its generation, transmission or distribution capacity for their use:

Customer currently is supplied regular electric service from another utility's generation, transmission, or distribution system; Customer may be alternately served by PG&E by means of a double-throw switch. Both PG&E and the other utility have consented to this arrangement. Customer's maximum demand from electric equipment on his premises is _____kW.

All PG&E power deliveries will be made under Schedule S.

This option will expire the day after the Commission ends the rate freeze ordered by Assembly Bill 1890.

[ ] **Option 3** - Standby service for customers who require PG&E to reserve transmission or distribution capacity and stand ready at all times to deliver electricity on an irregular or non-continuous basis:

Customer has a) a premise which is normally, in part but not in whole, served by non-utility owned generation facilities with a total rated capacity of less than 50 percent of Customer's maximum demand for that premise, or b) a premise which qualifies for back-up service under the provisions of Special Condition 7 of Schedule

Form 79-285
Page 1 of 4
Revised October 2002

S (See Option 4) but chooses not to elect Option 4 or currently lacks the necessary on-site metering to bill Option 4 properly, or c) electrical equipment which is used on an irregular or non-continuous basis. The total rated capacity of Customer's generation facilities or irregularly utilized equipment is _____ kVA.

Customer will be billed for all PG&E power deliveries on the otherwise applicable rate schedule; however, Special Conditions 1 through 6 and 8, 9, and 10 of Schedule S will also apply to Customer's service.

**[X] Option 4** - Standby service for customers who do not meet the criteria described in Option 1 and 2 above, but elect to receive back-up and maintenance portion of their total standby requirements under the provisions of Special Condition 7 of Schedule S:

At least 50 percent of Customer's maximum electric demand is served by a non-utility owned generator, and all necessary metering has been installed (by May 1, 1994, or the effective date of the contract) by PG&E to separately measure Customers net on-site generation and on-site load requirements. Customer would otherwise, except for such generation, qualify for service under Schedule E-19 (mandatory), E-20 or E-25.

Customer will be billed for the back-up and maintenance portion of the premises' total service requirements under the provisions of Special Condition 7 of Schedule S, and for its ordinary supplemental power requirements (on-site load in excess of the capability of the customer's non-utility owned generation) under the provisions of the otherwise applicable rate schedule. All back-up and maintenance power deliveries by PG&E will be billed in accordance with Schedule S, subject to a Summer Season Operating Capacity Adjustment of **_0_** kW.

### PU Code 353 exemption:
*Standby service for customers who qualify for exemption under PU Code 353 and elect to take this exemption.*

**[ ] Customers with supplemental power requirements:**
*For customers with supplemental power requirements (on-site load in excess of the capability of the customer's non-utility owned generation) under the provisions of the otherwise applicable rate schedule, Special Conditions 1 through 7 of Schedule S will **not** apply. (Option 3)*

**[ ] Customers with excess generation:**
*For those customers who operate electric generation equipment capable of serving their entire load and elect to take this exemption, Special Condition 1 (reservation capacity) will **not** apply. All other applicable charges of Schedule S will apply. (Options 1, 2 and 4)*

### Terms and Conditions

1. Customer has requested PG&E to stand ready at all times to deliver or supply and deliver electric energy to Customer's premises on an as-needed basis. Such standby service shall be provided to Customer in accordance with and subject to

PG&E's applicable rates and rules as established from time to time by, and on file with, the California Public Utilities Commission (Commission).

2.  PG&E shall be granted, without cost to it, all necessary rights-of-way and easements, satisfactory to PG&E, in both location and form of document, to establish such service.

3.  All necessary service facilities to accommodate Customer's load shall be furnished by PG&E and Customer as specified in electric line extension and service rules or the otherwise appropriate extension agreements.  Any necessary extensions and reinforcements of PG&E's distribution and transmission facilities that are furnished by PG&E at Customer's expense in accordance with either a separate line extension or special facilities agreement, in accordance with the applicable tariffs.

4.  All facilities furnished by PG&E to provide electric service at all times shall be and remain the property of PG&E notwithstanding that they may be affixed to Customer's property.  PG&E may remove such facilities upon termination of the Agreement.

5.  During the term of this Agreement, Customer grants to PG&E the right to operate, maintain, replace, and repair PG&E's facilities on Customer's premises necessary to provide standby service hereunder and all rights necessary for access to and from such facilities at all reasonable times.

6.  All standby electric service provided shall be **three** phase, 60 hertz, alternating current at an electromotive force of approximately **230,000** volts.  Allowable variations in this frequency and voltage are specified in PG&E's electric Rule 2.  The delivery point for PG&E's standby service shall be considered the point where conductors owned, or under license by Customer, contact PG&E's conductors, or as otherwise designated by applicable rules.

7.  The initial reserved capacity for standby service shall be **40,000** kW (Reservation Capacity) and shall be billed monthly at the rate described in the "Rates" section of Schedule S

8.  If the Customer is already receiving standby service from PG&E under a preceding contract, that contracted or reserved capacity, or the amount of capacity to which that contract has been subsequently ratcheted, shall automatically become the Customer's Reservation Capacity, until the ratchet period ends unless the Reservation Capacity has been increased in accordance with the preceding paragraph.

9.  Customer elects to receive any backup and maintenance service that is to be billed under the provisions of Schedule S under the following terms: **X** Firm Service Only, _____ Nonfirm Service, or _____ Nonfirm Service with Underfrequency Relay. (See Schedule S for eligibility and definitions of these terms.)

10. If Customer has a generator and wishes to operate that generator in parallel with PG&E's system, Customer must also execute either a power purchase agreement, or parallel operation agreement, or applicable interconnection agreement with PG&E.  Interconnection and operation of all non-utility owned generation paralleling with PG&E's system will be treated in accordance with electric Rule 21.  Customers may need to meet those requirements as imposed by other governing entities having

jurisdiction including the Independent System Operator and the Western Systems Coordinating Council.

11. Customer shall pay PG&E the monthly charges for the standby service provided hereunder at any established office of PG&E.

12. The initial term of this Agreement shall be for a period of one (1) year from the date the standby service under this Agreement is first made available to Customer as such date is established in PG&E's records and shall continue thereafter from year to year.  Customer may terminate this Agreement at the expiration of the initial or any subsequent one-year term, or PG&E may terminate this Agreement in accordance with its tariffs, provided that written notice of such termination is given to the other party at least thirty (30) days prior to such termination date.

13. Customer may, with PG&E's written consent, assign this Agreement to a subsequent owner of the premises if the assignee will, in writing; agree to perform the obligations of the Agreement.

14. This Agreement shall, at all times, be subject to such changes or modifications by the Commission as it may from time to time direct in the exercise of its jurisdiction.

Dated this __31st__ day of __December__, 2002.

**VALERO REFINING COMPANY**                **PACIFIC GAS AND ELECTRIC**

BY: _____             BY: _____
(Signature)                                    (Signature)

__William H. Buckalew, Jr.__
(Type / print name)                            (Type / print name)

TITLE:__Vice President & General Manager__ TITLE:_____

Mailing Address:                            Mailing Address:

__3400 East Second Street__                 _____

__Benicia, CA  94510-1097__                 _____

# EXHIBIT B

JUN 6 2008



POSTED

# Valero Generation/Fulton Control Center

# GENERATION OPERATING
# COMMUNICATION AGREEMENT



**Pacific Gas & Electric Company**

**GENERATION OPERATING COMMUNICATION AGREEMENT**

This Agreement sets up operating responsibilities and associated procedures for communications between Valero and Fulton Control Center. The Agreement also establishes procedures for safe work on electric systems and routine test procedures.

1.     **DEFINITIONS**

        When underlined, the following terms shall have the following meanings:

"Clearance Point" -- The points that isolate equipment from possible sources of energy.  PG&E may, from time to time, request that the Valero provide a Clearance Point so that work can be safely performed on the PG&E electric system.

Fulton Control Center – The PG&E location, identified in this Agreement, with operational jurisdiction over Facility and substation.  The Fulton Control Center is staffed 24 hours a day.

"Emergency" – An actual or imminent condition or situation, which jeopardizes the PG&E Distribution System Integrity.

"Interconnection Facilities" – All   apparatus installed to interconnect and deliver power between PG&E system and Valero's substation.

Interconnection Facilities include, but are not limited to, connection, transformation, switching, metering, and communications equipment, as well as any necessary additions, modifications and reinforcements to the PG&E system necessitated as a result of interconnecting the Facility to the PG&E system.  Interconnection Facilities also include control and safety equipment to protect (1) the PG&E system and its customers from faults occurring at the Valero's Facility and substation, and (2) the Valero's Facility and substation from faults occurring on the PG&E system or on the system of others to which the PG&E system is directly or indirectly connected.

"Non-Test" -- A procedure used by PG&E in connection with work on a live line or near an energized circuit.  In a Non-Test, PG&E will request that the Valero

1

contact the Fulton Control Center before re-energizing a circuit following an automatic trip.

"PG&E Electric System Integrity" – The condition under which a Distribution System is deemed safe and can reliably perform its intended functions in accordance with the safety and reliability rules of PG&E

### OPERATION OF GENERATION FACILITY AND SUBSTATION

Valero shall maintain operating communications with Fulton Control Center. The operating communications shall include, but not be limited to, system paralleling or separation, scheduled and unscheduled shutdowns, equipment clearances, levels of operating voltage or power factors, and daily operating reports as provided below.

All oral operating communications shall be conducted through Fulton Control Center. Valero agrees to maintain a 24-hour phone contact so that PG&E can give instructions to Valero or its designated operator.

Valero will receive output voltage or power factor instructions from Fulton Control Center. Valero shall operate it's Facility to maintain the specified output voltage or power factor according to Electric Rule 21 at the point of interconnection.

In the event Valero's telemetering goes down and Valero is exporting power into PG&E system the following information shall be provided:

Valero agrees to telephone a daily operating report to the Fulton Control Center at least twice each day. At a minimum, the daily operating report shall include:

a.  Hourly readings of delivered capacity in kW since the last report. Readings shall be taken at the end of each hour.

b.  Total energy, in kWh, delivered to PG&E since the last report.

2

Valero agrees to notify <u>Fulton Control Center</u> of the following:

    a. The current names and 24-hour phone numbers of the personnel responsible for operating and maintaining the Facility.

    b. Any <u>Emergency</u> situation, or any request that PG&E de-energize a portion of the system under its control.

    c. Any changes in the mechanical or electric condition of the Facility or substation that may affect the reliability of either the Facility or the PG&E electric system.

    d. Immediately upon discovery, any misoperation or inoperable condition of a PG&E-required interconnection relay or circuit breaker.

    e. Immediately upon discovery, any circuit breaker that has operated by a PG&E-required interconnection relay, along with the relay targets that caused the circuit breaker to operate.

    f. Plans to manually parallel or separate from the PG&E system and the times of actual manual parallels and separations. <u>Emergency</u> separations shall be reported as soon as conditions permit.

Under normal conditions, Valero shall give as much advance notice as possible (minimum of 7 days) to the <u>Fulton Control Center</u> when planning to perform work that may affect PG&E's electric system. At a minimum, the notice shall include:

    a. Nature of the work to be performed.

    b. Date and time work will begin.

    c. Date and time work will be completed.

    d. Apparatus to be cleared and the <u>Clearance Points</u> required.

    e. Name and telephone number of the person in charge of the work.

    f. Whether or not protective grounds will be installed.

If Valero wishes to perform work on its own facilities which would normally be energized by PG&E-controlled source(s) of energy, Valero may request that PG&E open, lock and tag PG&E's associated

3

disconnect device to isolate Valero's facilities from PG&E source(s) of energy.   PG&E will also establish disconnect device(s) as an open Clearance Point(s) and install "Man on Line" tags (see PG&E's S-1466).

Valero agrees that any work it performs is at its own risk.  Valero shall take all necessary steps to ensure that work is conducted in compliance with all applicable federal, state and local laws and regulations.

Valero must open its interconnection disconnect switch if PG&E requests a Clearance Point.  A qualified PG&E employee will observe that the switch is open, then proceed to lock it open with a PG&E lock, and attach a filled-out "Man-on-Line" tag to indicate it is a Clearance Point.

In an Emergency, Valero agrees to expeditiously open the interconnection disconnect switch upon notification from the Fulton Control Center.

Valero agrees to the following conditions regarding a Non-Test requested by PG&E:

a.  Valero shall not re-energize the affected circuits, whether manually or automatically, without first receiving the approval of the Fulton Control Center.

Under normal conditions, PG&E will give advance notice (minimum of 7 days), of plans to perform work, which will affect Valero's access to the PG&E electric system.  PG&E reserves the right to charge Valero the additional cost for work performed during times other than normal business hours (Non-Holidays, Monday through Friday, 8:00 A.M. to 5:00 P.M.) when the schedule of such work is negotiable, as determined by PG&E. PG&E will provide Valero with an estimate of the additional cost and if Valero still desires the work to be performed during non-normal business hours and PG&E does perform the work, PG&E shall charge Valero the actual costs of the work, the amount of which shall not exceed the cost estimate.

4

The following reference materials are available for use by Valero and its operating personnel. Copies were delivered to Valero on September 16, 2002.from the Fulton Control Center:

**PG&E Standard Practice No. S1466** - A document listing all the standard operating orders followed by PG&E system operators.

**PG&E Standard Practice No. S1403** -- A document describing approved PG&E clearance procedures and instructions for obtaining clearances.

**PG&E Interconnection Handbook and Electric Rules 2, 14, and 21**

## Specific Operating Instructions:

- Prior to closing either or both Valero Tie Breaker 1-2 and Tie Breaker 2-3, Valero will contact Fulton Control Center to receive approval.

- Prior to manually opening Bahia circuit breakers 222 or 232, Fulton Control Center will notify Valero to open the respective high side Valero bank circuit switcher (476 or 496).

- Prior to manually closing Valero circuit switcher 476 or 496, Valero will notify Fulton Control Center to close the respective Bahia circuit breakers (222 or 232).

5

# EXHIBIT C



**Pacific Gas and Electric Company**
San Francisco, California
U 39

| | Revised | Cal. P.U.C. Sheet No. | 19762-E |
|---|---|---|---|
| Cancelling | Revised | Cal. P.U.C. Sheet No. | 15526-E |

## ELECTRIC RULE NO. 14
Sheet 1
### SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

END USE CUSTOMERS AND THEIR AGENTS

PG&E will exercise reasonable diligence and care to furnish and deliver a continuous and sufficient supply of electric energy to the customer, but does not guarantee continuity or sufficiency of supply.  PG&E will not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind of character occasioned thereby, if same is caused by inevitable accident, act of God, fire, strikes, riots, war, or any other cause except that arising from its failure to exercise reasonable diligence.

PG&E shall be the sole judge of whether it is operationally able to receive or deliver electric energy through its electric distribution system.  Such judgement shall be non-discriminatory and without regard to the supplier or electric service provider to the end-use customer.

Under no circumstances shall PG&E be liable to its customers or their agents for any local or system deficiencies in supply stemming from inadequate power bids or power deliveries over the Independent System Operator (ISO) grid.  Similarly, PG&E shall not be liable to any customer, or electric service provider, for damages or losses resulting from interruption due to transmission constraint, allocation of transmission or intertie capacity, or other transmission related outage, planned or unplanned.     (T)

PG&E specifically maintains the right to interrupt its service deliveries, without liability to the Customers or electric service providers (ESPs) affected, when, in PG&E's sole opinion, such interruption is necessary for reasons including, but not limited to, the following:

1.   Safety of a customer, a PG&E employee, or the public at large.

2.   Breach of code or regulation on either PG&E-owned or customer-owned facilities.

3.   Emergency affecting or likely to affect PG&E's distribution system, the ISO grid or any other system through which PG&E directly or indirectly receives power.

4.   Maintenance, improvements, repairs, or expansion of PG&E's distribution system.

(Continued)

| | | | |
|---|---|---|---|
| *Advice Letter No:* | 2328-E-B | *Date Filed* | January 23, 2003 |
| *Decision No.* | 02-12-045 | *Effective* | January 1, 2003 |
| | *Issued by* | *Resolution No.* | |
| | ***Karen A. Tomcala*** | | |
| | *Vice President* | | |
| | *Regulatory Relations* | | |


Case 2:17-cv-01350-TLN-EFB   Document 20   Filed 09/11/17   Page 34 of 39

| | | Revised | Cal. P.U.C. Sheet No. | 15527-E |
|---|---|---|---|---|
| | Cancelling | Revised | Cal. P.U.C. Sheet No. | 11326-E |

**Pacific Gas and Electric Company**
*San Francisco, California*
U 39

---

**ELECTRIC RULE NO. 14**        Sheet 2
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

When PG&E deems it necessary to make repairs or improvements to its system, PG&E will have the right to suspend temporarily the delivery of electric energy.  In all such cases, reasonable notice will be given to the affected Customers, or their agents, and the making of such repairs or improvements will proceed as rapidly as may be practicable.  If practicable, and without additional cost to PG&E, such work will be done at a time that will cause the least inconvenience to the majority of those involved.  In some instances, PG&E will be required to initiate an interruption upon order of the ISO so work may be done on the ISO transmission grid.  In those instances, PG&E will make best efforts attempt to provide affected customers, or their agents, with notice, but shall not be liable for interruption if notice cannot be provided in a timely manner.  PG&E will be responsible for answering all outage related inquiries by the customer and its ESP.        (T)

In case of shortage of supply and during the period of such shortage, PG&E will make such apportionment of its available supply of energy among its customers, consistent with transmission allocation provided by the ISO by zone, and orders or directions provided by the California Public Utilities Commission, acting either directly or by a power administrator or other official appointed by it for that purpose.  In the absence of such order or direction by the California Public Utilities Commission, PG&E will, in times of shortage, apportion its available supply of energy among all customers in the manner which it deems most fair, reasonable, and appropriate for the efficient operation of its distribution system and that of the ISO grid.        (T)

A Scheduling Coordinator or an ESP may be authorized, under a commercial contract with its customers, to apportion its available supply of energy among its customers.  PG&E will accept requests for and make delivers of these apportioned supplies as long as such deliveries do not affect PG&E's ability to deliver service to other end-use Customers, regardless of supplier, that would otherwise not be affected by the shortage or approportionment thereof.        (N)

(Continued)

| Advice Letter No: | 1737-E | *Issued by* | Date Filed | January 29, 1998 |
|---|---|---|---|---|
| Decision No. | 97-10-087 | **Thomas E. Bottorff** | Effective | March 10, 1998 |
| | | *Vice President* | Resolution No. | |
| | | *Rates Account Services* | | |

2C3

**Pacific Gas and Electric Company**
San Francisco, California
U 39

Original        Cal. P.U.C. Sheet No.        35394-E
Cancelling      Cal. P.U.C. Sheet No.

**ELECTRIC RULE NO. 14**                           Sheet 3
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

ELECTRIC EMERGENCY PLAN ROTATING BLOCK OUTAGES FOR TANSMISSION          (N)
LEVEL CUTOMERS

For the purposes of this Section only, transmission level customers are those customers
that are served from a "single customer substation" as defined in PG&E's Electric Rule 1
or without transformation at one of the standard transmission voltages specified in
PG&E's Electric Rule 2, Section B.1.

Transmission level customers, except for those customers meeting the CPUC's criteria for
essential use or those otherwise exempt from rotating outages in accordance with CPUC
Decisions, will be incorporated into PG&E's rotating outage block plan and subjected to
load interruptions when rotating block outages are ordered by the ISO. PG&E will, to the
extent practical, follow the applicable principles and procedures specified in PG&E's
Electric Rule 14, by the CPUC, and by the ISO. To the extent feasible, PG&E will
coordinate rotating outages applicable to customers who are fossil fuel producers,
pipeline operators and users to minimize disruption to public health and safety. PG&E
shall not include a transmission level customer in an applicable rotating outage block if
the customer's inclusion would jeopardize system integrity. Transmission level customers
who are not exempt from rotating outages may submit an Optional Binding Mandatory
Curtailment (OBMC) Plan to PG&E in accordance with PG&E's Electric Schedule OBMC.
If PG&E approves a customer's OBMC Plan, the customer will become exempt from
rotating outages and will be subject to the terms and conditions of PG&E's Electric
Schedule OBMC and its associated agreement.

Non-exempt transmission level customers shall be required to undergo rotating outages
applicable to the customer's assigned rotating outage block by either (1) implementing the
load reduction on their own initiative, in accordance with subsection a, below; or (2)
having PG&E implement the load reduction through PG&E-owned remote-controlled
equipment in accordance with subsection b, below. A transmission level customer shall
normally be subject to the provisions of subsection a. If PG&E approves a transmission
level customer's request to have PG&E implement the customer's load reduction, then the
customer will be subject to the provisions of subsection b, below. If a transmission level
customer subject to subsection a, below, exceeds the threshold specified in subsection c
below, then the customer will be subject to the provisions of subsection c.(i) or (ii), below.   (N)

(Continued)

Advice Letter No:   4643-E                Issued by              Date Filed      May 21, 2015
Decision No.                          **Steven Malnight**          Effective       May 21, 2015
                                    Senior Vice President        Resolution No.
                                    Regulatory Affairs

**Pacific Gas and Electric Company**
*San Francisco, California*
U 39

Original       *Cancelling*

Cal. P.U.C. Sheet No.       35395-E
Cal. P.U.C. Sheet No.

---

**ELECTRIC RULE NO. 14**                     Sheet 4
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

A.   Customer-Implemented Load Reduction                                          (N)

Notification of Required Load Reduction. When the ISO orders implementation of rotating outages, PG&E shall notify transmission level customers in an affected rotating outage block to drop their load. Within 30 minutes of such notification, the customer must drop its load down to or below its Authorized Residual Ancillary Load. Unless otherwise notified by PG&E to do so, the customer shall not return the dropped load to service until 90 minutes after PG&E sent the notification to the customer to drop its load.

Method of Notification to Drop Load. PG&E will notify transmission level customers through a call to a telephone number designated by the customer. The customer is responsible for informing PG&E, in writing, of the telephone number and contact name for purposes of receiving the notification of a rotating outage. If customer does not provide PG&E with a telephone number, PG&E will notify the customer in writing of the number to be utilized, which will be the official number for notification, unless the customer provides an alternate number to PG&E within 15 days of the customer's receipt of such written notice. The telephone number may be to a customer owned and maintained business telephone, cellular phone, or separately designated telephone line. If PG&E makes two attempts to notify the customer to drop load in conjunction with a rotating outage, and such attempts are unanswered, the 30 minutes notification period in which to drop the load will commence with the time of the second call, even if the call was unanswered.

Excess Energy Charges.  If a transmission level customer fails to drop load within 30 minutes of notification by PG&E, and/or fails to maintain the entire load drop until 90 minutes after the time notification was sent to the customer, PG&E shall assess Excess Energy Charges of $6 per kWh for all kWh usage in excess of the Authorized Residual Ancillary Load.  Such charges will be based on the total kWh usage during the applicable rotating outage penalty period, less the product of Authorized Residual Ancillary Load in kW and the applicable rotating outage penalty period in hours.  If applicable, Excess Energy Charges will be determined by PG&E following the rotating outage and applied to the customer's energy bill.  Failure to make payment within the timeframe specified in PG&E's Electric Rules 8 and 9 may result in termination of service pursuant to PG&E's Electric Rule 11.                  (N)

(Continued)

---

Advice Letter No:     4643-E
Decision No.

*Issued by*
**Steven Malnight**
*Senior Vice President*
*Regulatory Affairs*

Date Filed          May 21, 2015
Effective          May 21, 2015
Resolution No.

**Pacific Gas and Electric Company**
San Francisco, California
U 39

| | | |
|---|---|---|
| Original | Cal. P.U.C. Sheet No. | 35396-E |
| Cancelling | Cal. P.U.C. Sheet No. | |

**ELECTRIC RULE NO. 14**                                    Sheet 5
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

A.   Customer-Implemented Load Reduction (Cont'd.)                    (N)

Authorized Residual Ancillary Load. Authorized Residual Ancillary Load is load that is deemed to be equivalent to five (5) percent of the customer's recorded Maximum Demand from the customer's prior billing month. This minimum load level is used as a proxy to allow for no-load transformer losses and ancillary substation equipment loads.

For customers that are net-generators, Excess Energy Charges shall not apply during periods of pre-scheduled verifiable generator maintenance or if the customer's generator suffers a verified forced outage. The scheduled maintenance must be approved in advance by both the ISO and PG&E, but approval may not be unreasonably withheld.

B.   PG&E-Implemented Load Reduction

Non-exempt transmission level customers may seek, in writing, to have PG&E drop the customer's entire load during all applicable rotating outages. If PG&E agrees to such an arrangement, PG&E will implement the load drop by using one of the following methods:

1.   For transmission level customers whose load can be dropped by existing PG&E remote-controlled equipment, PG&E will implement the load drop during a rotating outage applicable to the customer. The customer will be responsible for dropping load in accordance with the provisions of subsection a, above, including receiving Notification and being subject to Excess Energy charge provisions, until PG&E has provided written notice to the customer of the effective date that PG&E will assume the responsibility for curtailing the customer's load. After receiving written notice from PG&E, the customer will not receive Notification or be subject to the Excess Energy Charge provisions set forth in subsection a, above. PG&E shall be the sole judge of the suitability of utilizing existing PG&E remote-controlled equipment to shed the customer's load. PG&E or the customer may terminate the arrangements under this subsection upon thirty (30) days advance written notice.                    (N)

(Continued)

| | | | | |
|---|---|---|---|---|
| Advice Letter No: | 4643-E | Issued by | Date Filed | May 21, 2015 |
| Decision No. | | **Steven Malnight** | Effective | May 21, 2015 |
| | | Senior Vice President | Resolution No. | |
| | | Regulatory Affairs | | |

**Pacific Gas and Electric Company**
San Francisco, California
U 39

Original    Cal. P.U.C. Sheet No.    35397-E
Cancelling    Cal. P.U.C. Sheet No.

---

### ELECTRIC RULE NO. 14     Sheet 6
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

B.   PG&E-Implemented Load Reduction (Cont'd.)     (N)

    2.   For transmission level customers whose load cannot be dropped by existing PG&E remote-controlled equipment, the customer must request the installation of such remote-controlled equipment at the customer's expense in accordance with PG&E's Electric Rule 2, Section I, Special Facilities. The customer will be responsible for dropping load in accordance with the provisions of subsection a, above, including receiving Notification and being subject to Excess Energy Charge provisions, until all of the following have been completed: 1) payment by the customer for the installation of such equipment, 2) installation and testing of such equipment is complete, and 3) PG&E has provided written notice to the customer of the effective date that PG&E will assume the responsibility for curtailing the customer's load. After the three (3) requirements listed above have been met, the customer will not receive Notification or be subject to the Excess Energy Charge provisions set forth in subsection a, above. PG&E or the customer may terminate their arrangements under this subsection upon thirty (30) days advance written notice.

C.   Non-compliance

    A non-exempt transmission level customer subject to subsection a, above, shall be considered non-compliant with a single rotating outage event if the customer fails to reduce its load, averaged over the applicable rotating outage penalty period, to a level equal to or less than twenty (20) percent of the customer's recorded Maximum Demand from the customer's prior billing month.

    If a customer is non-compliant during any three (3) rotating outages in a three (3) year period, then the customer will be reassigned to the manual rotating outage block that is expected to be curtailed next, and the customer will be expected to comply as required pursuant to subsection a, above, with subsequent applicable rotating outages. Further, such a customer must select, via written notice to PG&E, one of the two options below within fifteen (15) days after receiving written notice from PG&E. A customer failing to make a selection within the specified time frame will default to subsection c.(ii) below. The three (3) year period shall commence with the first failure to drop load as specified in this subsection.     (N)

(Continued)

---

| Advice Letter No: | 4643-E | *Issued by* | Date Filed | May 21, 2015 |
|---|---|---|---|---|
| Decision No. | | ***Steven Malnight*** | Effective | May 21, 2015 |
| | | Senior Vice President | Resolution No. | |
| | | Regulatory Affairs | | |

6C8    Case: 19-30088    Doc# 315-2    Filed: 02/05/19    Entered: 02/05/19 20:13:27    Page 41 of 54

**Pacific Gas and Electric Company**
San Francisco, California
U 39

Original        Cal. P.U.C. Sheet No.         35398-E
Cancelling      Cal. P.U.C. Sheet No.

**ELECTRIC RULE NO. 14**                    Sheet 7
SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

C.   Non-compliance (Cont'd.)                                              (N)

   1.   Subject to PG&E's Electric Schedule E-OBMC Optional Binding Mandatory
        Curtailment Plan. The customer shall become subject to PG&E's Electric
        Schedule OBMC. The customer shall submit an OBMC Plan, in accordance with
        PG&E's Electric Schedule E-OBMC, within thirty (30) days of receiving written
        notice from PG&E. Pending the submittal of the OBMC Plan by the customer and
        pending the review and acceptance of the OBMC Plan by PG&E, the customer
        will remain responsible for dropping load in accordance with the provisions of
        subsection a, above, including the receiving of Notification and being subject to
        Excess Energy Charge provisions. Customers subject to this subsection that in
        turn fail to meet one or more requirements specified in PG&E's Electric Schedule
        E-OBMC shall be transferred to subsection c.(ii), below.

   2.   PG&E Implemented Load Reductions. PG&E shall proceed with one of the
        following: (1) For those customers where PG&E already has load drop
        equipment with remote-control capability installed, PG&E will drop the customer's
        entire load for all applicable subsequent rotating outages in accordance with the
        provisions of subsection b, above, except the customer shall not have the option
        to terminate their obligations under subsection b. PG&E shall be the sole judge
        of the suitability of utilizing existing PG&E remote-controlled equipment to shed
        the customer's load. (2) For customers where PG&E does not have load drop
        equipment with remote-control capability installed, PG&E shall install such
        equipment at the customer's expense in accordance with PG&E's Electric Rule
        2, Section I, Special Facilities. After such equipment has been installed, PG&E
        will drop the customer's entire load for all applicable subsequent rotating outages
        in accordance with the provisions of subsection b, above, except the customer
        shall not have the option to terminate their obligations under subsection b.
        Pending the installation of such equipment, the customer will remain responsible
        for dropping load in accordance with the provisions of subsection a, above,
        including receiving the Notification and being subject to Excess Energy Charge
        provisions.                                                       (N)

---

Advice Letter No:   4643-E                  Issued by            Date Filed      May 21, 2015
Decision No.                             **Steven Malnight**      Effective       May 21, 2015
                                        Senior Vice President      Resolution No.
                                         Regulatory Affairs

| From: | caed_cmecf_helpdesk@caed.uscourts.gov |
|---|---|
| To: | CourtMail@caed.uscourts.dcn |
| Subject: | Activity in Case 2:17-cv-01350-TLN-EFB Valero Refining Company California v. Pacific Gas & Electric Company Amended Complaint. |
| Date: | Monday, September 11, 2017 3:28:10 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### Eastern District of California - Live System

### Notice of Electronic Filing

The following transaction was entered by Jaskowiak, Nathan on 9/11/2017 at 3:26 PM PDT and filed on 9/11/2017

| | |
|---|---|
| **Case Name:** | Valero Refining Company California v. Pacific Gas & Electric Company |
| **Case Number:** | 2:17-cv-01350-TLN-EFB |
| **Filer:** | Valero Refining Company California |
| **Document Number:** | 20 |

**Docket Text:**
**FIRST AMENDED COMPLAINT against Pacific Gas & Electric Company by Valero Refining Company California. Attorney Jaskowiak, Nathan Randall added.(Jaskowiak, Nathan)**

**2:17-cv-01350-TLN-EFB Notice has been electronically mailed to:**

Alexander James Bukac     alexander.bukac@kyl.com, maricel.schilt@kyl.com

Francisco Guerra, IV , PHV     fguerra@wattsguerra.com, khays@wattsguerra.com

John Cox     john.cox@kyl.com, maricel.schilt@kyl.com

Laura Joy Edelstein     ledelstein@steptoe.com

Mark Fassold , PHV     mfassold@wattsguerra.com, khays@wattsguerra.com

Michael Dockterman , PHV     mdockterman@steptoe.com

Mikal C. Watts , PHV     mcwatts@wattsguerra.com, khays@wattsguerra.com

Nathan Randall Jaskowiak     nathan.jaskowiak@kyl.com, lori.carmichael@kyl.com,
 maricel.schilt@kyl.com

**2:17-cv-01350-TLN-EFB Electronically filed documents must be served conventionally
 by the filer to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1064943537 [Date=9/11/2017] [FileNumber=8950468-0
] [3143af392b24392b83fd3b08c6bd46bc4a2a7abbfba74f406b51b60f26135ddc41a
16d021384bbd20883667411b2620d32637358889b1488e089cb5605a501d2]]

# EXHIBIT 2

CIVIL,CLOSED

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:17-cv-01350-TLN-EFB

Valero Refining Company California v. Pacific Gas & Electric Company

Assigned to: District Judge Troy L. Nunley
Referred to: Magistrate Judge Edmund F. Brennan
Demand: $75,000,000
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 06/30/2017
Date Terminated: 01/31/2019
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

## Plaintiff

**Valero Refining Company California**
*a Delaware corporation*

represented by **Francisco Guerra, IV , PHV**
Watts Guerra, L.L.P.
Four Dominion Drive, Bldg. 3
Suite 100
San Antonio, TX 78257
210-527-0500
Fax: 210-527-0501
Email: fguerra@wattsguerra.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Fassold , PHV**
Watts Guerra, L.L.P.
Four Dominion Drive, Bldg. 3
Suite 100
San Antonio, TX 78257
210-527-0500
Fax: 210-527-0501
Email: mfassold@wattsguerra.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mikal C. Watts , PHV**
Watts Guerra, L.L.P.
Four Dominion Drive, Bldg. 3
Suite 100
San Antonio, TX 78257
210-527-0500
Fax: 210-527-0501
Email: mcwatts@wattsguerra.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alexander James Bukac**
Law Offices of John Cox, P.C.

3030 Holyrood Drive
Oakland, CA 94611
814-758-8056
Email: alex.bukac@jcoxlawfirm.com
*ATTORNEY TO BE NOTICED*

**Nathan Randall Jaskowiak**
Keesal Young and Logan
450 Pacific Avenue
San Francisco, CA 94133
415-398-6000
Fax: 415-981-0136
Email: nathan.jaskowiak@kyl.com
*TERMINATED: 06/19/2018*

**John Collier Cox**
Law Offices Of John Cox, P.C.
3030 Holyrood Drive
Oakland, CA 94611
415-939-6303
Email: john.cox@jcoxlawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Pacific Gas & Electric Company**          represented by **Laura Joy Edelstein**
*a California corporation*                  Steptoe & Johnson LLP
One Market Street
Steuart Tower, Suite 1800
San Francisco, CA 94105
415-365-6770
Fax: 415-365-6670
Email: ledelstein@steptoe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Dockterman , PHV**
Steptoe & Johnson LLP
115 S. LaSalle Street, Suite 3100
Chicago, IL 60603
312-577-1243
Fax: 312-577-1370
Email: mdockterman@steptoe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E. Flynn-O'Brien**
Steptoe & Johnson LLP
1 Market Street
Suite 1800 Steuart Tower
San Francisco, CA 94105
415-365-6713

Fax: 415-365-6699
Email: mflynnobrien@steptoe.com
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Jackel**
vote.org
1270 Grove Street
# 301
San Francisco, CA 94117
917-304-0534
Fax: 917-304-0534
Email: sarah@vote.org
*TERMINATED: 05/15/2018*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2017 | 1 | COMPLAINT against Pacific Gas & Electric Company by Valero Refining Company California. Attorney Cox, John added. (Filing fee $ 400, receipt number 0972-7138524) (Attachments: # 1 Civil Cover Sheet)(Cox, John) (Entered: 06/30/2017) |
| 06/30/2017 | 2 | SUMMONS ISSUED as to *Pacific Gas & Electric Company* with answer to complaint due within *21* days. Attorney *John Cox* *Keesal, Young & Logan* *450 Pacific Avenue* *San Francisco, CA 94133*. (Washington, S) (Entered: 06/30/2017) |
| 06/30/2017 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent Form, # 2 VDRP) (Washington, S) (Entered: 06/30/2017) |
| 06/30/2017 | 4 | CORPORATE DISCLOSURE STATEMENT by Plaintiff Valero Refining Company California. (Cox, John) (Entered: 06/30/2017) |
| 07/05/2017 | 5 | SUMMONS RETURNED EXECUTED: Pacific Gas & Electric Company served on 7/3/2017. (Jaskowiak, Nathan) (Entered: 07/05/2017) |
| 07/24/2017 | 6 | CORPORATE DISCLOSURE STATEMENT by Defendant Pacific Gas & Electric Company. (Edelstein, Laura) (Entered: 07/24/2017) |
| 07/24/2017 | 7 | STIPULATION *Extending Time to Respond to Complaint* by Pacific Gas & Electric Company. Attorney Edelstein, Laura Joy added. (Edelstein, Laura) (Entered: 07/24/2017) |
| 08/03/2017 | 8 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Valero Refining Company California for attorney Mikal C. Watts to appear Pro Hac Vice. (Filing fee $ 225, receipt number 0972-7191218) (Cox, John) (Entered: 08/03/2017) |
| 08/03/2017 | 9 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Valero Refining Company California for attorney Mark Fassold to appear Pro Hac Vice. (Filing fee $ 225, receipt number 0972-7191249) (Cox, John) (Entered: 08/03/2017) |
| 08/03/2017 | 10 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Valero Refining Company California for attorney Francisco Guerra IV to appear Pro Hac Vice. (Filing fee $ 225, receipt number 0972-7191264) (Cox, John) (Entered: 08/03/2017) |
| 08/04/2017 | 11 | PRO HAC VICE ORDER signed by District Judge Troy L. Nunley on 8/3/2017 ADDING attorney Mikal C. Watts, PHV for Valero Refining Company California. (Washington, S) Modified on 8/7/2017 (Washington, S). (Entered: 08/04/2017) |
| 08/04/2017 | 12 | PRO HAC VICE ORDER signed by District Judge Troy L. Nunley on 8/3/2017 ADDING attorney Mark Fassold, PHV for Valero Refining Company California. (Washington, S) (Entered: 08/04/2017) |

| | | |
|---|---|---|
| 08/04/2017 | 13 | PRO HAC VICE ORDER signed by District Judge Troy L. Nunley on 8/3/2017 ADDING attorney Francisco Guerra, IV, PHV for Valero Refining Company California. (Washington, S) (Entered: 08/04/2017) |
| 08/16/2017 | 14 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Pacific Gas & Electric Company for attorney Michael Dockterman to appear Pro Hac Vice. (Filing fee $ 225, receipt number 0972-7213487) (Edelstein, Laura) (Entered: 08/16/2017) |
| 08/16/2017 | 15 | PRO HAC VICE ORDER adding Attorney Michael Dockterman, PHV for Pacific Gas & Electric Company, signed by District Judge Troy L. Nunley on 8/16/17. (Kastilahn, A) (Entered: 08/16/2017) |
| 08/21/2017 | 16 | STIPULATION and PROPOSED ORDER for Briefing Schedule for PG&E Motion to Dismiss by Pacific Gas & Electric Company. (Edelstein, Laura) (Entered: 08/21/2017) |
| 08/21/2017 | 17 | MOTION to DISMISS by Pacific Gas & Electric Company. Motion Hearing SET for 10/5/2017 at 02:00 PM in Courtroom 2 (TLN) before District Judge Troy L. Nunley. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order)(Edelstein, Laura) Modified on 8/23/2017 (Mena-Sanchez, L). (Entered: 08/21/2017) |
| 08/23/2017 | 18 | STIPULATION AND ORDER signed by District Judge Troy L. Nunley on 8/22/2017 ORDERING PG&E shall file and serve any motion to dismiss Valero's Complaint by 8/21/2017 and notice any motion to dismiss for hearing on 10/5/2017; Valero shall file and serve any opposition to any motion to dismiss the Complaint by 9/14/2017; PG&E shall file and serve any reply to Valero's opposition by 9/28/2017.(Reader, L) (Entered: 08/23/2017) |
| 09/11/2017 | 19 | STIPULATION re Punitive and Exemplary Damages by Valero Refining Company California. Attorney Bukac, Alexander James ADDED. (Bukac, Alexander) (Entered: 09/11/2017) |
| 09/11/2017 | 20 | FIRST AMENDED COMPLAINT, with Jury Demand, against Pacific Gas & Electric Company by Valero Refining Company California. Attorney Jaskowiak, Nathan Randall ADDED. (Jaskowiak, Nathan) (Entered: 09/11/2017) |
| 09/11/2017 | 21 | MINUTE ORDER issued by Courtroom Deputy M. Krueger for District Judge Troy L. Nunley on 9/11/2017: Pursuant to the filing of the Amended Complaint (ECF No. 20 ), Defendant's Motion to Dismiss (ECF No. 17 ) is DENIED as MOOT. Accordingly, the hearing set for 10/5/2017 is VACATED. (TEXT ONLY ENTRY) (Krueger, M) (Entered: 09/11/2017) |
| 09/12/2017 | 22 | STIPULATION FOR EXTENSION OF TIME to respond to the 20 First Amended Complaint by Pacific Gas & Electric Company. (Edelstein, Laura) (Entered: 09/12/2017) |
| 09/14/2017 | 23 | JOINT STATUS REPORT by Valero Refining Company California. (Bukac, Alexander) (Entered: 09/14/2017) |
| 10/23/2017 | 24 | ANSWER by Pacific Gas & Electric Company.(Edelstein, Laura) (Entered: 10/23/2017) |
| 10/23/2017 | 25 | DEMAND for TRIAL by JURY by Pacific Gas & Electric Company. (Edelstein, Laura) (Entered: 10/23/2017) |
| 10/26/2017 | 26 | PRETRIAL SCHEDULING ORDER signed by District Judge Troy L. Nunley on 10/25/2017: ORDERING Discovery due by 6/29/2018; Designation of Expert Witnesses due by 8/30/2018; supplemental list of expert witnesses due 20 days after the designation of expert witnesses; All dispositive motions, except motions for continuances, TROs or other emergency applications, shall be heard no later than 12/6/2018; A Joint Final Pretrial Conference Statement due by 3/28/2019; Final Pretrial Conference set for 4/4/2019 at |

| | | 02:00 PM in Courtroom 2 (TLN) before District Judge Troy L. Nunley; Trial briefs not later than 14 days before trial; Jury Trial set for 6/3/2019 at 09:00 AM in Courtroom 2 (TLN) before District Judge Troy L. Nunley. (Washington, S) (Entered: 10/26/2017) |
|---|---|---|
| 11/09/2017 | 27 | JOINT REQUEST to MODIFY 26 Pretrial Scheduling Order by Pacific Gas & Electric Company. (Edelstein, Laura) Modified on 11/13/2017 (York, M). (Entered: 11/09/2017) |
| 11/14/2017 | 28 | MINUTE ORDER issued by Courtroom Deputy M. Krueger for District Judge Troy L. Nunley on 11/14/2017 GRANTING the parties' Joint Request to Modify the Pretrial Scheduling Order (ECF No. 27 ). Accordingly, the Pretrial Scheduling Order (ECF No. 26 ) is hereby modified to extend the period of designating rebuttal experts from twenty (20) days to thirty (30) days after the designation of expert witnesses. (TEXT ONLY ENTRY) (Krueger, M) (Entered: 11/14/2017) |
| 11/16/2017 | 29 | STIPULATION and PROPOSED ORDER for Protective Order by Pacific Gas & Electric Company. (Edelstein, Laura) (Entered: 11/16/2017) |
| 02/06/2018 | 30 | STIPULATION and AMENDED PROPOSED PROTECTIVE ORDER by Pacific Gas & Electric Company. (Edelstein, Laura) Modified on 2/7/2018 (Benson, A.). (Entered: 02/06/2018) |
| 02/08/2018 | 31 | AMENDED STIPULATED PROTECTIVE ORDER signed by Magistrate Judge Edmund F. Brennan on 2/7/2018. (Becknal, R) (Entered: 02/08/2018) |
| 05/14/2018 | 32 | NOTICE of APPEARANCE by Michael E. Flynn-O'Brien on behalf of Pacific Gas & Electric Company. Attorney Flynn-O'Brien, Michael E. added. (Flynn-O'Brien, Michael) (Entered: 05/14/2018) |
| 05/15/2018 | 33 | DESIGNATION OF COUNSEL re Withdrawal of Sarah K. Jackel as Counsel by Pacific Gas & Electric Company. (Edelstein, Laura) Modified on 5/15/2018 (Benson, A.). (Entered: 05/15/2018) |
| 05/17/2018 | 34 | NOTICE of CHANGE of ADDRESS by John Collier Cox. (Cox, John) (Entered: 05/17/2018) |
| 06/14/2018 | 35 | STIPULATION and PROPOSED ORDER for amending deadlines in pretrial scheduling order re 26 Scheduling Order by Pacific Gas & Electric Company. (Flynn-O'Brien, Michael) (Entered: 06/14/2018) |
| 06/18/2018 | 36 | STIPULATION and ORDER signed by District Judge Troy L. Nunley on 6/14/18, ORDERING that the Pretrial Scheduling Order is AMENDED as follows: Close of Fact Discovery due by 8/24/18, Designation of Expert Witnesses due by 10/19/2018, supplemental expert disclosures due by 11/16/18, and the deadline for hearing on dispositive motions is 2/7/2019. (Kastilahn, A) (Entered: 06/18/2018) |
| 06/19/2018 | 37 | NOTICE of WITHDRAWAL OF COUNSEL Nathan R. Jaskowiak as Counsel for Plaintiff Valero Refining Company-California by Valero Refining Company California. (Bukac, Alexander) (Entered: 06/19/2018) |
| 07/19/2018 | 38 | NOTICE of CHANGE of ADDRESS by Alexander Bukac. (Cox, John) Modified on 7/19/2018 (Benson, A.). (Entered: 07/19/2018) |
| 10/19/2018 | 39 | MOTION to AMEND the 20 Amended Complaint by Valero Refining Company California. Motion Hearing set for 12/6/2018 at 02:00 PM in Courtroom 2 (TLN) before District Judge Troy L. Nunley. (Attachments: # 1 Points and Authorities, # 2 Declaration of John Cox, # 3 Exhibit Second Amended Complaint, # 4 Proposed Order, # 5 Proof of Service)(Cox, John) Modified on 10/22/2018 (Washington, S). (Entered: 10/19/2018) |
| 11/21/2018 | 40 | OPPOSITION by Pacific Gas & Electric Company to 39 Motion to Amend. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Declaration of L. Edelstein in Opp. to Valero's Mot. for Leave to Amend, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Edelstein, Laura) (Entered: 11/21/2018) |
| 11/29/2018 | 41 | REPLY by Valero Refining Company California re 39 Motion to Amend. (Attachments: # 1 Declaration of John Cox, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Cox, John) Modified on 11/30/2018 (Krueger, M). (Entered: 11/29/2018) |
| 11/30/2018 | 42 | MINUTE ORDER issued by Relief Courtroom Deputy J. Fabillaran for District Judge Troy L. Nunley on 11/30/2018: On the Court's own motion, Plaintiff's Motion to Amend (ECF No. 39 ) is hereby SUBMITTED without oral argument. Accordingly, the hearing set for 12/06/2018 is VACATED. If the Court determines oral argument is necessary, it will be scheduled at a later date. (TEXT ONLY ENTRY) (Fabillaran, J) (Entered: 11/30/2018) |
| 12/03/2018 | 43 | OBJECTIONS by Defendant Pacific Gas & Electric Company to 41 Reply,. (Flynn-O'Brien, Michael) (Entered: 12/03/2018) |
| 01/10/2019 | 44 | MOTION FOR PARTIAL SUMMARY JUDGMENT by Pacific Gas & Electric Company. Motion Hearing set for 2/7/2019 at 02:00 PM in Courtroom 2 (TLN) before District Judge Troy L. Nunley. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Statement of Undisputed Facts, # 3 Declaration of Laurie Edelstein, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15)(Edelstein, Laura) Modified on 1/14/2019 (Kastilahn, A). (Entered: 01/10/2019) |
| 01/10/2019 | 45 | REQUEST for JUDICIAL NOTICE by Pacific Gas & Electric Company in re 44 Motion for Partial Summary Judgment. (Attachments: # 1 Exhibit 1)(Edelstein, Laura) Modified on 1/14/2019 (Kastilahn, A). (Entered: 01/10/2019) |
| 01/18/2019 | 46 | APPLICATION for Temporary Stay of Proceedings by Pacific Gas & Electric Company. (Attachments: # 1 Declaration of Laurie Edelstein, # 2 Proposed Order)(Edelstein, Laura) (Entered: 01/18/2019) |
| 01/21/2019 | 47 | OPPOSITION by Plaintiff Valero Refining Company California to 46 Application for Temporary Stay. (Bukac, Alexander) (Entered: 01/21/2019) |
| 01/22/2019 | 48 | NOTICE of Request to Seal Document(s) pursuant to L.R. 141 by Valero Refining Company California. (Cox, John) (Entered: 01/22/2019) |
| 01/22/2019 | 49 | OPPOSITION by Valero Refining Company California to 44 Motion for Summary Judgment. (Attachments: # 1 Exhibit, # 2 Declaration, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit)(Cox, John) (Entered: 01/22/2019) |
| 01/22/2019 | 50 | REQUEST for JUDICIAL NOTICE by Valero Refining Company California in re 44 Motion for Summary Judgment. (Attachments: # 1 Exhibit, # 2 Exhibit)(Cox, John) (Entered: 01/22/2019) |
| 01/28/2019 | 51 | ORDER signed by District Judge Troy L. Nunley on 1/28/19 DENYING 46 Application for Temporary Stay. (Mena-Sanchez, L) (Entered: 01/28/2019) |
| 01/30/2019 | 52 | NOTICE of FILING BANKRUPTCY Upon the Record as to Pacific Gas & Electric Company by Pacific Gas & Electric Company (Edelstein, Laura) (Entered: 01/30/2019) |
| 01/31/2019 | 53 | MINUTE ORDER issued by Courtroom Deputy M. Krueger for District Judge Troy L. Nunley on 1/31/2019: Pursuant to the Notice of Filing Bankruptcy by Defendant Pacific Gas & Electric Company filed on 1/30/2019 (ECF No. 52 ), this action is hereby STAYED |

and is now ADMINISTRATIVELY CLOSED. The case may be reopened at the request of the parties. (TEXT ONLY ENTRY) (Krueger, M) (Entered: 01/31/2019)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/02/2019 16:56:46 | | | |
| **PACER Login:** | rlapping:4027442:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:17-cv-01350-TLN-EFB |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# EXHIBIT 3

**Subject to Motion to File Under Seal**

# EXHIBIT 4

**Subject to Motion to File Under Seal**