1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN FRANCISCO DIVISION)

4

5    In re:                          Case No. 19-30088

6    PG&E CORPORATION,               Chapter 11

7                                    San Francisco, California
                                     January 31, 2019
8                                    10:04 a.m.
            Debtor.
9    _____/

10                   TRANSCRIPT OF PROCEEDINGS
       1.  MOTION OF DEBTORS FOR ENTRY OF ORDER DIRECTING JOINT
11                 ADMINISTRATION OF CHAPTER 11 CASE
       2.  MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I)
12     AUTHORIZING THE DEBTORS TO MAINTAIN INSURANCE POLICIES,
       WORKERS' COMPENSATION PROGRAM, AND SURETY BOND PROGRAM
13      AND PAY ALL OBLIGATIONS THERETO; AND (ii) GRANTING
            RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO
14                  WORKER'S COMPENSATION CLAIMS
     3. MOTION OF DEBTORS TO (A) HONOR PRE-PETITION OBLIGATIONS
15     TO NATURAL GAS AND ELECTRICITY EXCHANGE OPERATORS;
       (B) GRANT ADMINISTRATIVE EXPENSE CLAIMS AND AUTHORIZE
16     POSTING OF COLLATERAL TO EXCHANGE OPERATORS TRADING
        COUNTER-PARTIES AND FUTURE COMMISSION MERCHANTS;
17              (C) MODIFY THE AUTOMATIC STAY; AND
                   (D) GRANTED RELATED RELIEF
18        4.  APPLICATION OF DEBTORS FOR ORDER APPOINTING
               JASON P. WELLS AS RESPONSIBLE INDIVIDUAL
19     5. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO
          (I)(A) CONTINUE EXISTING CASH MANAGEMENT SYSTEM,
20      (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED TO
           THE USE THEREOF, (C) CONTINUE INTER-COMPANY
21        ARRANGEMENTS, (D) CONTINUE TO HONOR OBLIGATIONS
               RELATED TO JOINT INFRASTRUCTURE PROJECTS, AND
22     (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS;
       AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. 345(b)[7]
23        6.  MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
           ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING
24        RESTRICTION ON CERTAIN TRANSFERS OF STOCK OF, AND
                 CLAIMS AGAINST, THE DEBTORS

25

1    7. MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
     (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND ADMINISTER
2    CUSTOMER PROGRAMS, INCLUDING PUBLIC PURPOSE PROGRAMS,
     AND (B)HONOR ANY PRE-PETITION OBLIGATIONS RELATING
3    THERETO; AND (II) AUTHORIZING FINANCIAL INSTITUTIONS
     TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS
4    8.  MOTION OF DEBTORS FOR (I) INTERIM AND FINAL AUTHORITY
     TO PAY PRE-PETITION OBLIGATIONS OWED TO SHIPPERS,
5    WAREHOUSEMEN, AND OTHER LIEN CLAIMANTS; AND (II) GRANTING
     ADMINISTRATIVE EXPENSE PRIORITY STATUS FOR CLAIMS
6    ARISING FROM GOODS DELIVERED TO THE DEBTORS POST-PETITION
     9. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO
7    (I) PAY PRE-PETITION WAGES, SALARIES, WITHHOLDING
     OBLIGATIONS, AND OTHER COMPENSATION AND BENEFITS;
8    (II) MAINTAIN EMPLOYEE BENEFITS PROGRAMS; AND
     (III) PAY RELATED ADMINISTRATIVE OBLIGATIONS
9    10. MOTION OF DEBTORS FOR ENTRY OF ORDER (I) EXTENDING
     TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES AND
10   STATEMENTS OF FINANCIAL AFFAIRS, AND (II) EXTENDING
     TIME TO FILE 2015.3 REPORTS
11   11. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO
     PAY CERTAIN PRE-PETITION TAXES AND ASSESSMENTS AND
12   GRANTING RELIEF
     12. MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
13   THE FILING UNDER SEAL OF THE PROPOSED DEBTOR IN POSSESSION
     FINANCING FEE LETTERS
14   13. MOTION OF DEBTORS FOR ENTRY OF ORDER (I) WAIVING THE
     REQUIREMENTS TO FILE LISTS OF CREDITORS AND EQUITY HOLDERS
15   AND GRANTING RELATED RELIEF; AND (II) AUTHORIZING AND
     APPROVING PROCEDURES FOR PROVIDING NOTICE OF THE
16   COMMENCEMENT OF CHAPTER 11 CASES
     14. DEBTORS' APPLICATION FOR APPOINTMENT OF PRIME CLERK LLC
17   AS CLAIMS AND NOTICING AGENT
     15. MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I)
18   AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED,
     SUPER-PRIORITY, POST-PETITION FINANCING, (II) GRANTING
19   LIENS AND SUPER-PRIORITY CLAIMS, (III) MODIFYING THE
     AUTOMATIC STAY (IV) SCHEDULING FINAL HEARING, AND
20   (V) GRANTING RELATED RELIEF
     16. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY
21   TO PAY PRE-PETITION OBLIGATIONS OWED TO CERTAIN SAFETY
     AND RELIABILITY, OUTAGE, AND NUCLEAR FACILITY SUPPLIERS
22   17. MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING
     OVERSIZE BRIEFING FOR CERTAIN FIRST-DAY MOTIONS
23

24

25

| | |
|---|---|
| PACIFIC GAS and ELECTRIC COMPANY, | Case No. 19-30089 |
| | Chapter 11 |
| Debtor. | |

_____/

TRANSCRIPT OF PROCEEDINGS

1.  MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO MAINTAIN INSURANCE POLICIES, WORKERS' COMPENSATION PROGRAM, AND SECURITY BOND PROGRAM AND PAY ALL OBLIGATIONS WITH RESPECT THERETO; AND (II) GRANTING RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS

2. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO (I) PAY PRE-PETITION WAGES, SALARIES, WITHHOLDING OBLIGATIONS, AND OTHER COMPENSATION AND BENEFITS; (II) MAINTAIN EMPLOYEE BENEFITS PROGRAM; AND (III) PAY RELATED ADMINISTRATIVE OBLIGATIONS

3. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO (I)(A) CONTINUE EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) CONTINUE INTER-COMPANY ARRANGEMENTS, (D) CONTINUE TO HONOR OBLIGATIONS RELATED TO JOINT INFRASTRUCTURE PROJECTS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. 345(b)[7]

4.  MOTION OF DEBTORS TO (A) HONOR PRE-PETITION OBLIGATIONS TO NATURAL GAS AND ELECTRICITY EXCHANGE OPERATORS, (B) GRANT ADMINISTRATIVE EXPENSE CLAIMS AND AUTHORIZE POSTING OV COLLATERAL TO EXCHANGE OPERATORS TRADING COUNTER-PARTIES, AND FUTURE COMMISSION MERCHANTS, (C) MODIFY THE AUTOMATIC STAY, AND (D) GRANT RELATED RELIEF

5.  MOTION OF DEBTORS FOR ENTRY OF ORDER (I) EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS, AND (II) EXTENDING TIME TO FILE 2015.3 REPORTS

6.  MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND ADMINISTER CUSTOMER PROGRAMS, INCLUDING PUBLIC PURPOSE PROGRAMS, AND (B) HONOR ANY PRE-PETITION OBLIGATIONS RELATING THERETO; AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

7. MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPER-PRIORITY, POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF

1   8. MOTION OF DEBTORS FOR ENTRY OF ORDER (I) WAIVING THE
        REQUIREMENTS TO FILE LISTS OF CREDITORS AND EQUITY
2   HOLDERS AND GRANTING RELATED RELIEF; AND (II) AUTHORIZING
        AND APPROVING PROCEDURES FOR PROVIDING NOTICE OF THE
3                  COMMENCEMENT OF CHAPTER 11 CASES
    9. DEBTORS' APPLICATION FOR APPOINTMENT OF PRIME CLERK LLC
4                      AS CLAIMS AND NOTICING AGENT
    10. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO
5          PAY CERTAIN PRE-PETITION TAXES AND ASSESSMENTS
                    AND GRANTING RELATED RELIEF
6   11. MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
    THE FILING UNDER SEAL OF THE PROPOSED DEBTOR IN POSSESSION
7                      FINANCING FEE LETTERS
    12. MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING
8      OVERSIZE BRIEFING FOR CERTAIN FIRST-DAY MOTIONS
    13. MOTION OF DEBTORS FOR (I) INTERIM AND FINAL AUTHORITY
9      TO PAY PRE-PETITION OBLIGATIONS OWED TO SHIPPERS,
        WAREHOUSEMEN, AND OTHER LIEN CLAIMANTS, AND (II)
10  GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS FOR
        CLAIMS ARISING FROM GOODS DELIVERED TO THE DEBTORS
11                       POST-PETITION
    14. MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY
12     TO PAY PRE-PETITION OBLIGATIONS OWED TO CERTAIN
        SAFETY AND RELIABILITY, OUTAGE, AND NUCLEAR
13                    FACILITY SUPPLIERS
    15. MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
14  ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING
        RESTRICTIONS ON CERTAIN TRANSFERS OF STOCK OF,
15             AND CLAIMS AGAINST, THE DEBTORS
    16. MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING
16     OVERSIZE BRIEFING FOR CERTAIN FIRST-DAY MOTIONS
    17. MOTION OF DEBTORS FOR ENTRY OF ORDER DIRECTING
17       JOINT ADMINISTRATION OF CHAPTER 11 CASES

18
                BEFORE THE HONORABLE DENNIS MONTALI
19              UNITED STATES BANKRUPTCY JUDGE

20
    APPEARANCES:
21
    For the Debtors:        KELLER & BENVENUTTI LLP
22                          BY: TOBIAS S. KELLER, ESQ.
                                (Not Appearing)
23                              JANE KIM, ESQ. (Appearing)
                            650 California Street, Suite 1900
24                          San Francisco, California 94108

25

```
 1   APPEARANCES (CONTINUED):

 2
     For the Debtors:          WEIL GOTSHAL & MANGES, LLP
 3                             BY: STEPHEN KAROTKIN, ESQ.
                                   THEODORE TSEKERIDES, ESQ.
 4                                 JESSICA LIOU, ESQ.
                                   MATTHEW P. GOREN, ESQ.
 5                             767 Fifth Avenue
                               New York, New York 10153
 6

 7   Proposed Counsel for      CRAVATH, SWAINE & MOORE
     Debtors:                  BY: PAUL H. ZUMBRO, ESQ.
 8

 9
     For the U.S. Trustee:     OFFICE OF THE U.S. TRUSTEE
10                             BY: LYNETTE KELLY, ESQ.
                               450 Golden Gate Avenue
11                             San Francisco, California 94102

12
     For Plaintiffs' Co-       SKIKOS, CRAWFORD, SKIKOS & JAMES
13   Liaison in State Court:   BY: STEVEN J. SKIKOS, ESQ.
                               1 Sansome Street, Suite 2830
14                             San Francisco, California 94104

15
     For Bank of America:      PILLSBURY WINTHROP SHAW PITTMAN
16                             LLP
                               BY: MALCOLM DAVID MINNICK, ESQ.
17                             P. O. Box 2824
                               San Francisco, California 94126
18

19   For creditors,           FINESTONE HAYES, LLP
     Roebbelen Contracting,    BY: JENNIFER HAYES, ESQ.
20   Aggreko, Nor-Cal, and     456 Montgomery Street, 20th Floor
     MCE Corporation:          San Francisco, California 94104
21

22   For Holt of California:   PONIATOWSKI LEDING PARIKH PC
                               BY: MARK D. PONIATOWKSI, ESQ.
23                             20980 Redwood Road, Suite 200
                               Castro Valley, California 94546
24

25
```

```
 1   APPEARANCES (CONTINUED):

 2
     For Turner Construction: SEYFARTH SHAW LLP
 3                            BY: MICHAEL RYAN PINKSTON, ESQ.
                              560 Mission Street, Suite 3100
 4                            San Francisco, California 94105

 5
     For Bondholders:         PROSKAUER ROSE, LLP
 6                            BY: STEVE Y. MA, ESQ.
                              2029 Century Park East Suite 2400
 7                            Los Angeles, California 90067

 8
     For Fire Victims:        COREY LUZAICH DeGHETALDI & RIDDLE
 9                            BY: DARIO DeGHETALDI, ESQ.
                                 AMANDA RIDDLE, ESQ.
10                            700 El Camino Real
                              Millbrae, California 94030
11
12   For the CPUC:            PAUL, WEISS, RIFKIND, WHARTON &
                              GARRISON
13                            BY: ALAN W. KORNBERG, ESQ.

14
     For Public Entities:     STUTZMAN BROMBERG ESSERMAN &
15                            PLOIFKA
                              BY: SANDER L. ESSERMAN, ESQ.
16                            2323 Bryan Street, Suite 2200
                              Dallas, Texas 75201
17
18   For Fire Victims:        WALKUP MELODIA
                              BY: KHALDOUN BAGHDADI, ESQ.
19
20                            COTCHETT PITRE & McCARTHY
                              BY: FRANK M. PITRE, ESQ.
21                            840 Malcolm Rd. Suite 200
                              Burlingame, California 94010
22
23                            MARY E. ALEXANDER & ASSOCIATES
                              BY: MARY E. ALEXANDER, ESQ.
24                            44 Montgomery Street #1303
                              San Francisco, California 94104
25
```

APPEARANCES (CONTINUED):

For Fire Victims:               VICTOR VILAPIANA, ESQ.
                                TOM TOSDAL, ESQ.

                                (Appearing Telephonically)


For Subrogation Claim           WILKIE FARR & GALLAGHER
Holders:                        BY: MATTHEW A. FELDMAN, ESQ.


For Unsecured                   MILLBANK TWEED HADLEY AND McCOY
Bondholders:                    BY: DENNIS DUNE, ESQ.


For Equity Holders:             JONES DAY
                                BY: BRUCE BENNETT, ESQ.
                                250 Vesey Street
                                New York, New York 10281


For ChargePoint, Inc.:          BINDER AND MALTER
                                BY: ROBERT HARRIS, ESQ.
                                2775 Park Avenue
                                Santa Clara, California 95050


For State Agencies:             FELDERSTEIN FITZGERALD WILLOUGHY
                                AND PASCUZZI
                                BY: PAUL J. PASCUZZI, ESQ.
                                400 Capitol Mall, Suite 1750
                                Sacramento, California 95814


For Sonoma Clean                ENGEL ADVICE, LLC
Power Authority:                BY: GEORGE LARRY ENGEL, ESQ.
                                12116 Horseshoe Lane
                                Nevada City, California 95959


For International               LOCKE LORD
Brotherhood of                  BY: BRAD KNAPP, ESQ.
Electrical Workers:

```
 1  APPEARANCES (CONTINUED):

 2
    For FERC:               UNITED STATES DEPARTMENT OF
 3                          JUSTICE
                            BY: MARCUS S. SACKS, ESQ.
 4                          P.O. Box 875
                            Benjamin Franklin Station
 5                          Washington, D.C. 20044

 6                          (Appearing Telephonically)

 7
    For Next Era:           KLEE, TUCHIN, BOGDANOFF & STERN
 8                          BY: KENNETH KLEE, ESQ.
                                DAVID STERN, ESQ.
 9                          1999 Avenue of the Stars 30th Floor
                            Los Angeles, California 90067
10
11  For Con Ed:             TROUMAN SANDERS LLP
                            BY: HUGH M. McDONALD, ESQ.
12                          875 Third Avenue
                            New York, New York 10022
13
14  For Cal Pine:           KIRKLAND AND ELLIS
                            BY: MARK McCAIN
15

16

17  For JP Morgan Chase:    STROOK and STROOK and LAVAN LLP
                            BY: KRISTOPHER M. HANSEN, ESQ.
18                          2029 Century Park East, 18th Floor
                            Los Angeles, California 90067
19
20  For California Self-    NIXON PEABODY LLP
    Insurers' Fund:         BY: RICHARD C. PEDONE, ESQ.
21                          Exchange Place
                            53 State Street
22                          Boston, Massachusetts 02107

23

24

25
```

1   APPEARANCES (CONTINUED):

2

    Court Recorder:          JANE GALVANI
3                            UNITED STATES BANKRUPTCY COURT
                             450 Golden Gate Avenue
4                            San Francisco, California 94102

5

6   Transcription Service:   Jo McCall
                             Electronic Court
7                            Recording/Transcribing
                             2868 E. Clifton Court
8                            Gilbert, Arizona 85295
                             Telephone: (480)361-3790
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       P R O C E E D I N G S

2   January 31, 2019                        10:04 a.m.

3                       −−−oOo−−−

4           COURTROOM DEPUTY: All rise.  The court is now in

5   session, The Honorable Dennis Montali presiding.

6           THE COURT: Good morning, everyone.

7           ALL COUNSEL: Good morning.

8           THE COURT: Please be seated.  Sorry about the

9   slight delay.  Let me make a couple of preliminary

10  announcements.  One announcement is, if someone in the back

11  of the room doesn't hear me because I'm close or not close

12  to the microphone, please wave your hand.  I'll try to stay

13  close.

14          I won't go through the same introductions and

15  comments that I made on Tuesday, but I will just remind

16  everyone of a couple of points, and for people who were not

17  here on Tuesday, this is a reminder of what are the rules

18  here.  We cannot record this proceeding, or you may not

19  record it by a cell phone or a laptop or any other magic,

20  and if that takes place, we'll have to ask the court

21  security officer to remove any such device.  But each day

22  during the PG&E case, we will upload an audio transcript

23  onto the public docket in the evening, so people who want

24  to follow what took place will be able to listen to that as

25  long as they have a PACER account.

1          During the course of the presentation today, I

2    want speakers to come to the center podium and identify

3    yourself and if you are, as most of the speakers I'm sure

4    will be, acting as counsel, please identify your clients,

5    and later in the morning, if I allow and when I allow

6    comments from people who are on their own, I'll certainly

7    understand that.

8          We also have been able to arrange for our

9    overflow courtroom next-door that -- (the recorder is

10   malfunctioning) -- what's happening?  Is it doing it now?

11   No.  Okay.  We've arranged in the overflow courtroom for

12   people to speak at the podium also and we have a video feed

13   on that.  So when we are going through the motions on the

14   calendar this morning -- (laughing) going through the

15   motions -- going through the matters that are here for

16   action, I will recognize counsel who want to be heard on

17   those motions, and I'll just do my best to recognize them

18   if they're either in our primary courtroom or in the

19   overflow courtroom.

20        (Recorder feedback resumes)

21   Can we do anything about that feedback?

22        (Pause.)

23        Okay.  Well -- do you think if I turn this

24   speaker off, it'll matter?  All right.  I'm going to

25   continue to hope that this isn't going to happen again.

1  All right.  Here's the agenda that I wish to follow, and

2  the counsel for the Debtors were very helpful in putting

3  forth an agenda.  I'm going to tweak it a little bit.  As I

4  said on Tuesday, I'm going to ask principal counsel for the

5  Debtors to make some kind of an opening statement, whether

6  it's short or long I'm going to let them be the judge, but

7  just an overview of where things are going.

8         Then after that, I intend to go down the more

9  formal agenda of the various motions that the Debtors have

10 filed.  You will recall the other day that I said there

11 were 17 of them.  I'm still counting 17, and I'm sure a

12 couple of them are non-controversial, but I'm sure others

13 will attract a lot of attention from people.  I'm mindful

14 that a number of parties have filed objections under the

15 tight schedule we set forth, and I and counsel for the

16 Debtors will do our best to keep track of those, but when

17 your name is called or the matter is up and you want to

18 present yourself and make your argument, please understand

19 that in some of the written objections, we just haven't had

20 a chance to absorb them all.

21        Now, even though we started only a couple minutes

22 late, my plan is to go through the motions in whatever

23 number we can get out of the way, and I'll ask counsel for

24 the Debtors to suggest -- see if there's an agreement on

25 which ones to take when.  But I'm going to plan that at

about 11:30 this morning, we'll take a personal convenience
break for a few minutes, and then after that, I will allow
people who are here and want to be heard generally to talk.
I don't have an absolute rule about how much time they'll
be allowed, but I'm going to tell you that if you're
speaking and expressing your views about things, I expect
you to be brief; I expect you to tell me what you want to
say; and I will do my best to listen, but we don't
intend –– I and I don't expect the lawyers for the Debtors
to respond in any meaningful way –– I don't mean to say
that they're going to ignore you, but anything you may have
to say is just simply not an action item for today, and I'm
very mindful –– many of you who have been following either
in the media or otherwise about what's going on upstairs in
the District Court, and that's upstairs in the District
Court.  So to the extent that any people want to express
their views on how they think the court ought to respond or
deal with those, please do not take time to repeat those
comments in this court.  This is a Bankruptcy Court dealing
with civil matters and particularly in the matters that
we're talking about.

          And then I will permit the comments from anyone
who wants to be heard until around 12:30, and then we'll
take at least an hour break for everyone's convenience, and
depending upon how many –– and, you know, I'm being overly

1  optimistic perhaps –– that maybe we'll be through the

2  motions, but maybe we won't, and when we resume, I will

3  then pick up the discussion of the motions, and when the

4  motions are done, depending upon the time if there's still

5  a need to listen to public comments, I'll be happy to let

6  them be presented.

7        For some of the motions they are routine, and

8  experienced lawyers are familiar with how these happen, and

9  to the extent that a motion either is uncontested or

10  contested but I overrule, then objection and that'll be the

11  end of it.  I will presumably grant or grant with a

12  modification the motion.  There may be some that based upon

13  the objections or comments, I will simply take them under

14  advisement, meaning I will not issue an order orally this

15  morning or this afternoon, but do my best to act as quickly

16  as necessary on any particular motions.

17        Mr. Karotkin, are you going to make the

18  presentation?

19        MR. KAROTKIN: Yes, sir.

20        THE COURT: Are you comfortable with kind of going

21  through the administrative ones that are sort of routine or

22  is it important for you to change the sequence?

23        MR. KAROTKIN: May I approach?

24        THE COURT: Oh sure, by all means.  Yeah.  I mean

25  I'm going to invite you to make your statements too, but I

1   just wanted to see if you're okay with kind of getting the

2   housekeeping out of the way.  Any problem with that?

3            MR. KAROTKIN: No, sir.

4            THE COURT: Okay.  All right.  Well then, I'm

5   going to let you make whatever statement, or if you or any

6   of the other co-counsel are going to be making any kind of

7   general -- what I'll call the Opening Statement -- I invite

8   you to do so.

9            MR. KAROTKIN: You would like me to do that before

10  we get to the --

11           THE COURT: Yeah.

12           MR. KAROTKIN: Yeah, okay.

13           THE COURT: Well, I mean again, are you okay with

14  that?

15           MR. KAROTKIN: Yes.

16           THE COURT: You know I've doing all the talking.

17           MR. KAROTKIN: I'm okay with it.

18           THE COURT: I want to let you do it now.

19           MR. KAROTKIN: I'm okay with anything you say,

20  sir.

21           THE COURT: Really?

22      (Laughter.)

23           THE COURT: All right.  I'll see you next week.

24      (Laughter.)

25           THE COURT: You can stay here where it's nice and

1   warm.  We don't want to send you back to whatever the

2   temperature is in New York City.  All right.  Please, go

3   ahead.

4                  OPENING STATEMENT

5   BY MR. KAROTKIN:

6          Thank you, Your Honor, Stephen Karotkin of Weil

7   Gotshal and Manges for the Debtors.  I thought I had some

8   influence with the Utility, Your Honor, to get the air

9   conditioning fixed, but apparently that didn't work today

10  either.

11         THE COURT: It's doing a little better.  We took

12  that with GSA, you know.  This isn't our air conditioning

13  system.

14         MR. KAROTKIN: Okay.  And thank you for scheduling

15  the hearing today.  As we mentioned the other day, we

16  appreciate seeing you on this expedited schedule.  You've

17  already been introduced to the attorneys who will be

18  appearing today on behalf of the Debtors, and I introduced

19  you to Ms. Loduca, the interim general counsel for PG&E and

20  Jason Wells, the senior vice president, both of whom are

21  here today.

22         As stated, Your Honor, in Mr. Wells' declaration

23  filed in connection with the Chapter 11 petitions, the

24  Debtors' decision to seek relief under Chapter 11 followed

25  a comprehensive review of a variety of factors in the

1 context of the circumstances facing the Debtors at the

2 time.  As a consequence of the catastrophic and tragic

3 wildfires that occurred in Northern California in 2017 and

4 2018, the Debtors were faced with a multitude of pending

5 claims and literally thousands of claims yet to be filed.

6 As of the middle of January, Your Honor, there

7 were 700 complaints filed on behalf of thirty-six hundred

8 plaintiffs as to the 2017 Northern California wildfires, 41

9 insurance subrogation complaints and a number of claims

10 filed by governmental agencies.

11 As to the recent Camp fire in November, already

12 50 complaints on behalf of 2,000 plaintiffs have been filed

13 with only three months having elapsed since that fire.  No

14 doubt thousands of claims will be asserted in view of the

15 fact that there were 86 fatalities and the destruction of

16 nearly 14,000 residences, 528 commercial buildings, and

17 nearly forty-three hundred other structures.  Under these

18 circumstances, Your Honor, with the potential liabilities

19 involved, all exacerbated by the doctrine of inverse

20 condemnation in the State of California that imposes strict

21 liability regardless of negligence and regardless of

22 whether PG&E was negligent, if its equipment caused the

23 fire, it became abundantly clear that PG&E could not access

24 the capital necessary to address and resolve the wildfires

25 already asserted and to be asserted in the State Court

1  system over the next several months and years, could not

2  access the capital necessary to continue to operate its

3  business and provide reliable utility service to 16 million

4  customers, could not access the capital necessary to

5  properly invest in its business, in its infrastructure and

6  in critical safety initiatives to mitigate future wildfire

7  risk, and could not access the necessary capital, Your

8  Honor, to service its approximately 23 billion dollars of

9  outstanding debt.

10        Simply stated, Your Honor, under those

11  circumstances, there was no feasible way for PG&E to

12  finance its way through the years of litigation and the

13  resolution of claims in the State Court system, and at the

14  same time properly invest and operate its business.

15  Chapter 11, Your Honor, is the only viable alternative to

16  restore PG&E's financial stability and to fairly address

17  the wildfire claims and assure that the company has access

18  to sufficient capital to operate its business.

19        And of course, Your Honor, everyone is aware and

20  there has been much written about Cal Fire's recent report

21  last Thursday with respect to the Tubbs fire, and Cal

22  Fire's finding that PG&E's equipment was not the cause of

23  the Tubbs fire, and that perhaps, Your Honor, because of

24  that report, we would not be here before you today.  The

25  fact is, however, the comprehensive analysis undertaken by

1  PG&E and its Board in deciding to seek relief under Chapter

2  11 fully took into account PG&E's longstanding belief that

3  its facilities did not cause the Tubbs fire.  Despite Cal

4  Fire's finding, PG&E still faces the same liquidity issues;

5  it still faces the thousands of pending claims with respect

6  to the other 2017 fires, and it will still face the

7  thousands more claims that will be asserted with respect to

8  the Camp fire.

9          Moreover, Your Honor, the plaintiff lawyers have

10  made it abundantly clear that they believe they have other

11  theories of liability to hold PG&E responsible for the

12  Tubbs fire, and there is no reason to believe that they

13  will be dropping their lawsuits with respect to those

14  claims.

15          I want to emphasize, as Mr. Wells emphasized in

16  his declaration that the filing of these cases is not a

17  strategic ploy to avoid PG&E's responsibility for the

18  devastating damage and loss of life sustained as a result

19  of the 2017 and 2018 California wildfires.  The objectives,

20  Your Honor, of these cases and what we hope to accomplish

21  is precisely the opposite.  PG&E believes the Chapter 11

22  cases will promote the fair orderly and expeditious

23  resolution of PG&E's wildfire liability, in fact, more

24  equitably and more quickly than most liabilities could be

25  addressed in the tort system.  PG&E also believes that the

1  Chapter 11 cases will restore PG&E's financial stability

2  and as I said, assure it has access to the capital

3  necessary to invest in its infrastructure and run its

4  operations.  Third, we believe the Chapter 11 cases will

5  enable PG&E to continue its extensive restoration and

6  rebuilding efforts to assist the communities affected by

7  both the 2017 and 2018 Northern California wildfires, and

8  fourth, during the administration of these cases, Your

9  Honor, the Debtors intend to work together with the CPUC

10 and State policy makers to address safety and structural

11 reforms and to build systems to provide safe and reliable

12 service to PG&E's customers for the long term.

13         I can assure you of one thing, Your Honor, that

14 unlike PG&E's prior Chapter 11 case, these Debtors are

15 committed to work collaboratively with the CPUC and achieve

16 a successful reorganization.

17         THE COURT: You don't think they were

18 collaboratively engaged 18 years ago?

19     (Laughter.)

20         MR. KAROTKIN: I wasn't here 18 years ago, but

21 from what I heard, I don't think so.

22         THE COURT: I still have the boxing gloves bronzed

23 in my chambers.

24     (Laughter.)

25         MR. KAROTKIN: I think Mr. Kornberg is too old to

1 fight this year.

2          THE COURT: I know.  I know.  I told you he was

3 one of the veterans.

4          MR. KAROTKIN: Your Honor, the Debtors also

5 believe that these cases in the Chapter 11 process will

6 provide the necessary catalyst to address the significant

7 increase in wildfire risks in an environment severely

8 challenged by climate change.

9          As we've noted, Your Honor, PG&E could have

10 accessed secured debt to temporarily extend its runway

11 outside of Chapter 11, but kicking the can down the road

12 would not have addressed the fundamental issues facing

13 PG&E.  That path, Your Honor, was a dead end in the State

14 Court system.  It was not a feasible way to address and

15 resolve the claims and maintain adequate liquidity to

16 operate the business.  In that context, Your Honor, I would

17 note that piling on secured debt that would have the effect

18 of subordinating the wildfire claims and the capital stack

19 was not a path that PG&E or its Board was willing to take.

20          THE COURT: Am I correct, though, the proposed

21 financing does take a situation that's generally unsecured

22 and a layer of substantial secured debt on the Debtor.

23          MR. KAROTKIN: Precisely, Your Honor, but --

24          THE COURT: That's what it is, right?  I mean that

25 could happen anywhere.

1         MR. KAROTKIN: Again, but the way we saw that,

2 Your Honor, is that if we incurred additional secured debt,

3 we'd be here six or nine months from now with another five

4 and a half million piled on top of the wildfire claimants,

5 and we didn't think that was appropriate.  It's not a

6 solution.

7         THE COURT: Billion, not million.

8         MR. KAROTKIN: Billion, sorry.  Thank you, sir.

9 And the most recent financing proposals sent to the Debtors

10 by various funds were both extremely costly and not

11 surprisingly, Your Honor, quite economically attractive to

12 those making the proposals.  Unlike those entities, Your

13 Honor, the Debtors are charged with the duty to represent

14 the interests of all economic stakeholders, and that is

15 what we intend to do during this process.

16         The Chapter 11 cases provide the opportunity for

17 all wildfire claims to be addressed in one forum and to be

18 addressed comprehensively.  Their pari passu status, and

19 PG&E's other pre-petition debt including 23 billion dollars

20 approximately of funded debt is preserved, and moreover,

21 Your Honor, it avoids the real risk, outside of Chapter 11,

22 that due to PG&E's financial stress, those wildfire claims

23 dealt with earlier in the process in the State Court system

24 will fare much better than those addressed later in the

25 State Court system.  Your Honor, we know these cases are

1  large.  There are many interested parties, but we hope to

2  move through this process as expeditiously as possible.  We

3  now have a centralized forum to work with all

4  constituencies, wildfire claimants, other pre-petition

5  creditors, shareholders, the CPUC, the communities, policy

6  makers from the State to achieve a comprehensive solution

7  that treats all parties fairly and equitably while assuring

8  that this company can continue to serve its 16 million

9  customers.

10         We think, Your Honor, that the dynamics of

11  Chapter 11 will facilitate negotiations among the core

12  group of claimants and other parties for a global

13  resolution of the aggregate wildfire liabilities to be

14  addressed in a Plan of Reorganization.  Discussions, Your

15  Honor, with the core group of claimants' lawyers, the

16  subrogation claimants, the attorneys representing the

17  communities, and the attorneys representing the other

18  plaintiffs have already commenced, and at the appropriate

19  time, we would anticipate bringing the CPUC and the State

20  and other parties into the process.

21         The ultimate goal, Your Honor, in Chapter 11

22  would be to establish a trust under a Plan of

23  Reorganization to which all of the wildfire claims would be

24  channeled and resolved.  That trust could be funded in a

25  number of ways and would also include claims resolution

1  procedures to be adopted in connection with the

2  establishment of the trust under the Plan of

3  Reorganization, and that would, we expect, Your Honor,

4  create expedited payments to wildfire claimants, again,

5  much faster than most claimants would receive distributions

6  in the State Court system.  And that is our goal, and we

7  are confident that we can move forward with that in an

8  expeditious manner, and we look forward to working with all

9  the other constituencies to achieve that goal.

10        I'm happy to briefly go through the capital

11  structure of the Debtors just to give you some background,

12  if you'd like.

13        THE COURT: If you think it's helpful.  I mean you

14  can make whatever preliminary statements you want, so feel

15  free if you think it's important.  I think I'm somewhat

16  educated on all this, but --

17        MR. KAROTKIN: Let me just make a few brief

18  comments.

19        THE COURT:  -- there's a lot of people that are

20  not, and your comments are quite helpful.

21        MR. KAROTKIN: Okay.  Thank you.  A few brief

22  comments: Obviously, PG&E Corporation is the holding

23  company.  It owns all of the common stock of Pacific Gas

24  and Electric Corporation which is the operating utility.

25  The pre-petition debt, Your Honor, of the Debtors consists

1  of an unsecured revolving credit agreement at the holding

2  company which is fully drawn in the outstanding amount of

3  300 million dollars.  There is also an unsecured revolving

4  credit facility at the Utility with approximately 2.9

5  billion outstanding, again unsecured, and those obligations

6  are not cross-guaranteed.

7  　　　　　The holding company has an unsecured 350 million

8  dollar term loan, and the utility has a 250 million dollar

9  outstanding term loan, again, Your Honor, no cross-

10  guaranties.  There are approximately seventeen and a half

11  billion dollars of unsecured notes outstanding at the

12  Utility level, again not guaranteed by the parent, and the

13  Utility has various issues of tax-exempt pollution control

14  bonds in the aggregate amount of approximately 860 million

15  dollars, 760 million of which are backed by letters of

16  credit with reimbursement obligations that are unsecured.

17  As of the petition date, there's approximately 2.1 billion

18  dollars of trade debt, and of course, there are the

19  wildfire liabilities in an unliquidated amount.  And I

20  would note that, Your Honor, all of the funded debt is

21  unsecured as I mentioned.  The trade debt is largely

22  unsecured, and of course, the wildfire liabilities are

23  unsecured.

24  　　　　　THE COURT: Do your protections include claims

25  that might come out of rejection claims, rejection damages?

1  I mean you don't –- typically those aren't booked as

2  liabilities.

3          MR. KAROTKIN: No.  This does not include

4  rejection then, and if it does, our rejection damage

5  claims –-

6          THE COURT: But if there are Motions to Reject, it

7  would mean increase of the claims.

8          MR. KAROTKIN: It would, and I would note, Your

9  Honor, that despite what's been written in the newspapers,

10 there are not any motions on file at this time to reject

11 any power purchase agreements --

12         THE COURT: No, I'm aware of that.  I'm aware of

13 that.

14         MR. KAROTKIN:  -- or any other contracts and

15 there is no current intention to file any of those motions

16 in the immediate future.  Those will be evaluated as the

17 case progresses, and of course in consultation with the

18 official committees that are appointed.

19         THE COURT: Okay.

20         MR. KAROTKIN: And unless you have any

21 questions --

22         THE COURT: No.  That's fine.  And again, I'm not

23 going to turn this open for questions of you because that's

24 not the plan here today.  There will be an opportunity

25 either in the media or private consultations.  People who

1 | want to talk to you or others are free to do that. I'm not
2 | going to make it part of the agenda here. I told you I
3 | want to go through the administrative motions first, but I
4 | have one sort of overriding question that is not on the
5 | agenda, but I want to get your views on it, and that is,
6 | under our rules, which I think are somewhat different from
7 | many courts in the country, we have a very quick claims bar
8 | date automatically imbedded in the rules, and as I recall,
9 | even in PG&E One, we use a very early date. I'm more
10 | inclined to go the other way in this case, and so we don't
11 | have to have a decision on it today, but I'd like to make
12 | sure it's on your agenda to take up with the U.S. Trustee
13 | or any committee, but it would be my sense that we should
14 | be much more going the other way on a claims bar date.
15 | So --
16 | MR. KAROTKIN: Yes. We totally agree with that.
17 | THE COURT: Okay.
18 | MR. KAROTKIN: And we've already had some
19 | preliminary discussions with some of the attorneys
20 | representing the plaintiffs in order to discuss with them
21 | the most efficient way to address that process,
22 | particularly because of all the individuals involved.
23 | THE COURT: Great. That's all I need to hear on
24 | that subject. So shall we go through the motions, the
25 | formal motions? (Laughing) We can go through all kinds of

1  motions, but let's go through the formal motions.

2          MR. KAROTKIN: Sure

3          THE COURT: Does that work?

4          MR. KAROTKIN: Yes.

5          THE COURT: And I would request that we take the

6  joint administration motion first, and then I'm going to

7  let you pick whatever you want, because there are a couple

8  of tweaks that I want to raise from the Clerk's side of our

9  end of it.  You've gotten some objections from one group of

10 bond holders.  You're aware of that -- not bond holders,

11 excuse me -- yeah, Institution of Bondholders, excuse me.

12 Are you familiar with that one?

13         MR. KAROTKIN: Yeah.  I am familiar with it, and

14 as I say, that's a first for me.

15         THE COURT: Well, I wonder if that's an issue.  I

16 mean we can resolve the issue.  Well, as you know, the

17 Ninth Circuit came down with a decision that some lawyers,

18 you know, are concerned about, and as I read the objection

19 from the ad hoc group, which unless I'm not aware of what

20 else has been filed, that's the only objection.

21         MR. KAROTKIN: I think the U.S. Trustee --

22         THE COURT: Oh, did the U.S. Trustee have an

23 objection too?  Okay.  Well, on the bondholder one, it

24 seemed like it can be dealt with, with language.  I mean as

25 I understand it, they just want to -- don't get trapped in

1   some sort of a bind later down the road, and I'm of the

2   view that we should just deal with this purely

3   administratively, but do you have any contrary view?

4          MR. KAROTKIN: I don't.  If they want to reserve

5   their rights on the record or in the order to argue that

6   the Ninth Circuit law doesn't apply in this court, that's

7   fine with me.

8          (Laughter.)

9          THE COURT: Well, it does apply.  We're in the

10  Ninth Circuit.  It's home for us, you know.  Ms. Kelly, you

11  have -- I did not catch up because we've been rushed, so

12  why don't you tell me what objections the U.S. Trustee has

13  to the joint administration.

14         MS. KELLY: Thank you, Your Honor.  Lynette Kelly

15  on behalf of the U.S. Trustee.  Your Honor, the U.S.

16  Trustee does not object to most of the joint administration

17  motion, but there is one point.  It is proposed that the

18  Court decide today that monthly operating reports can be

19  combined, and we, first of all say, that is premature in

20  that it is not something that absolutely has to be done

21  today to avoid irreparable harm.  The first monthly

22  operating report is not due for some time.  And that may

23  not be appropriate.  The U.S. Trustee needs to look at this

24  case further, and any appointed committees will need to

25  look at that to decide whether that prejudices anyone.  And

1  it also can really muddy the quarterly fees that are due

2  and other issues like that.

3          THE COURT: We don't want to do that.  They're

4  paying two sets of fees now.

5          MS. KELLY: So it's an important issue that needs

6  more consideration than just today being tucked into the

7  joint administration order.

8          THE COURT: Well, I told you that I just couldn't

9  catch up with all the filings.  Does combine mean

10 consolidated or does combine mean just one report that has

11 two sets of data in them?

12         MS. KELLY: Well, it wasn't really clear.

13         MR. KAROTKIN: Perhaps I could just short circuit

14 this.

15         THE COURT: Sure.

16         MR. KAROTKIN: We're happy for the interim –- for

17 interim relief to take that paragraph out of the order that

18 says we can file jointly.  Does that –-

19         THE COURT: Okay.  I have another procedural

20 point, Mr. Karotkin.  You've got to stay here on this one.

21 The way your firm –- and by the way, your local co-counsel,

22 Mr. Keller and his colleagues and everyone working at your

23 end have been extremely helpful with just the huge volume

24 of stuff and helpful to us in chambers to just keep up with

25 it.  But there's a couple of things that I think I'd like

1 to change so that in the caption that was presented as a
2 proposal, it has the parent corporation only in the title
3 with a footnote, and then the footnote sends you down to
4 reach the boilerplate, but also that's where we find the
5 Utility. I think that's a nice format to use in
6 corporations that have lots of affiliates in bankruptcy. I
7 would prefer that a caption say both Debtors, that the
8 notion of jointly administered be there, but that it go two
9 or three steps further, that it identifies the parent as
10 lead case, and so it says something like, you know -- I'll
11 let -- if you're okay with it, we don't have to spend time
12 dealing with it on a, you know, fly speck basis, but what's
13 important is, I think there should only be filings in the
14 lead case so that already, in just two days, we've had so
15 many filings that appear to be duplicates. So my hope
16 would be that both Debtors would be named in the caption.
17 It would be identifying the parent as the lead and
18 indicating that all filings for both Debtors are in that
19 lead case, which is No. 88. And that avoids a lot of
20 duplication.

21        And then finally, there is a practice here and
22 maybe that's true in other places where you practice, that
23 just below the names of the two Debtors, there be a line
24 that the person filing any papers can indicate if it
25 affects only the parent or only the sub or both. Are you

1    familiar with that format in other cases?

2            MR. KAROTKIN: Yes.

3            THE COURT: Okay.  What I mean it's just three

4    little lines.  It'll say "Affects PG&E Corporation" or

5    "Affects Pacific Gas and Electric Company" or "Affects both

6    Debtors," and then there's a little check box.  I mean it

7    doesn't have to be any particular style, but it's helpful,

8    again, with when we're dealing with these things, and I'm

9    sure your claims agent will have to deal with it also.  I'm

10   prepared to not rule on this today, but let you discuss it

11   with others and then I want counsel who did file the

12   objection for the bondholders to say if they're comfortable

13   with something that I think will solve the problem, but if

14   conceptually you don't have a problem with what I've asked

15   for, I'd leave it to someone from your side to talk to our

16   chief deputy, Mr. Busby over there, and just work something

17   out.

18           And the substantive thing that maybe will solve

19   the problem from the objectors is that your first-day

20   motion has a proposed docket entry that would follow the

21   case, and it begins "An order has been entered in

22   accordance with Bankruptcy Rule..." such and such,

23   directing, in your words read:

24               "... directing the procedural consolidation

25               and joint administration."

1  I would simply strike the word "consolidation," so it

2  reads:

3          "... directing the procedural joint

4          administration of the cases."

5  And I personally don't think that the objectors need to

6  worry, that they're not going to get trapped here, but that

7  takes the word "substantive," or, excuse me, the word

8  "consolidation" out of the language.  Again, I'll -- we'll

9  pass on this for now unless I hear from the objectors, and

10 you or someone on your side can take it up with the Clerk,

11 and if everything works there, then we can move on to the

12 next case.  Do you want to be heard on the bondholders?

13 Just state your appearance, please.

14         MR. MA: Good morning, Your Honor, Steve Ma with

15 Proskauer Rose on behalf of the ad hoc group of

16 Institutional Bondholders for Pacific Gas and Electric

17 Company.

18         THE COURT: Good morning, Mr. Ma.

19         MR. MA: Good morning.  We agree with the Debtors'

20 agreement to include certain language addressing our issue

21 in the order, and we of course agree with your views that

22 we don't want to be trapped.

23         THE COURT: I think we can put on this record,

24 nobody is trying to trap anybody, but are you okay with my

25 striking the word "consolidation" and it will just be

1  automatic.

2        MR. MA: We would prefer the (unintelligible word)

3  proposed in our order given that --

4        THE COURT: I didn't see it.  I mean I didn't have

5  a chance to review it.

6        MR. MA:  -- given that in Transwest, the court

7  acknowledged that the cases were jointly administered but

8  not substantive and consolidated.

9        THE COURT: Yeah.  Well, the concept -- again,

10 okay with the concept?

11       MR. MA: Yes.

12       MR. KAROTKIN: I think a statement on the record

13 is more than sufficient.  I think his language really

14 overrules Transwest.  I don't think you really want to do

15 that.

16       THE COURT: (Laughing) I tell you what, I'm going

17 to grant the motion for joint administration and instruct

18 that there be language that can be worked out that deals --

19 that preserves this.  This is "angels on a pin," and we're

20 not going to make a buzz word in there that people are

21 upset about, and I'll expect Mr. Busby and someone from the

22 Debtors' counsel office will discuss the formatting of

23 putting names on the right and the bottom -- I mean on the

24 page with a box on it.  Okay?  So that'll take care of the

25 joint administration motion.

1          All right.  So now I'll leave to you to go ahead
2  and which ones you want to take in order,

3          MR. KAROTKIN: Sure, the creditor matrix.

4          THE COURT: Yeah, the creditor matrix, is there
5  anyone who objected to the motion regarding the creditor
6  matrix?

7          MR. KAROTKIN: We're not aware of anything.

8          THE COURT: And I think in that one, the only
9  comment we had on that internally is that there be some
10  discussion with Mr. Busby about it, that from his point of
11  view and our point of view, there is also no objection, but
12  it might be kind of something we might have to revisit some
13  date in the future.  So I'll grant the motion.  This is not
14  a trap; this is just paper, electronic paper.  Okay?  Are
15  you all right with that?

16         MR. KAROTKIN: Yes sir.

17         THE COURT: Okay.

18         MR. KAROTKIN: We might as well go in order.  The
19  next thing was the motion to extend time to file schedules
20  and statements.  I think the only objection was by the
21  Office of the United States Trustee.

22         THE COURT: All right.  Did you work it out or --
23  Ms. Kelly?

24         MS. KELLY: Your Honor, we filed our objection
25  this morning, and so Your Honor may not have seen it.

1          THE COURT: Right.

2          MS. KELLY: But with a 60-day extension, that

3    gives 74 days to file schedules, but the Debtors have filed

4    very extensive first-day motions.  They clearly have done a

5    lot of work on the case, gathered a lot of information.

6    They have been working on this for a while.  This isn't

7    something that just turned up yesterday when somebody tried

8    to foreclose on a property.  This is a completely different

9    kind of case, and although it's a large case, and I can

10   understand they want some kind of extension, this long of

11   an extension here could very well prejudice a number of

12   parties.  There's a meeting of creditors to be had; there

13   are -- we need to know even -- how do they know who the

14   creditors are even?  We don't even know if everybody is

15   being noticed, if they can't commit to schedules at this

16   point.

17         THE COURT: Well, you know, another -- something

18   that I've learned a long time ago is that lawyers -- again,

19   I love them; I used to be one -- I'm a recovering lawyer,

20   folks -- they tend to think in big packages.  You can dice

21   some things up a little bit, so a schedule of creditors can

22   be filed even though maybe some other schedule, executory

23   contracts, or something else, doesn't have to be filed by

24   the date.  So maybe there's an in-between where the Debtor

25   can file what you need to do the kind of things you're

1  talking about and have some more time to file other things

2  that are less time critical.  And I'd be inclined to grant

3  this motion with a slightly earlier deadline, but open to

4  extend it if there's a reason to do it.

5       MS. KELLY: Your Honor, an earlier deadline would

6  be satisfactory, and we are happy to discuss.  We had a

7  very productive conversation last night, given the short

8  time frame, and I'm sure we could have further discussions

9  with counsel regarding what is appropriate here.  But we

10  just don't want creditors to be prejudiced --

11       THE COURT: Well, on that subject, have you had a

12  chance -- and probably not -- to talk to representatives of

13  the Debtors as to where and when the 341 meeting will be --

14  even where, let alone when?

15       MS. KELLY: I think that is still even being

16  considered by the U.S. Trustee, so I don't think we yet

17  know what is appropriate with respect to that yet.

18       THE COURT: But that's a time sensitive issue also

19  for the first meeting notice going out.

20       MS. KELLY: It is, Your Honor.

21       THE COURT: And, you know, it can't be in your

22  office downstairs.  We might have to get, you know,

23  Candlestick Park, but it's not here anymore.

24     (Laughter.)

25       MS. KELLY: It is being considered right now.

1  It's one of the many urgent matters that we've had

2  underway.  We have gotten the solicitation packages out to

3  creditors for a committee formation and set a date for a

4  formation meeting on February 11th at 10:00 a.m.  So we have

5  gotten that piece underway, and I know they're focusing on

6  the date and location of the 341.

7          THE COURT: Okay.  I'll let you and the Debtors'

8  representatives work that out.  Here's what I am prepared

9  to rule on, unless, again, you or Debtors' counsel think

10 it's a miscarriage of justice, and that is, I will grant

11 the motion to extend time to file the schedules, but I'll

12 expect that the parties work out kind of a sequencing for,

13 for example, the list of creditors isn't necessarily --

14 shouldn't take as long as the list of assets, for example.

15 And while creditors and parties in interest are entitled to

16 the assets schedules, the creditor schedules drive another

17 concept and deadline, and we've already talked about a

18 claims deadline, which is going to be longer.  So make a

19 proposal, Ms. Kelly, as to when you think the liabilities

20 schedule should be filed, and I'll see if they're agreeable

21 to that.  And I'll grant the 60 days as to the other ones.

22 Do you have a proposal?  I'm negotiating with you.

23         MS. KELLY: Yes.  Thank you, Your Honor.  Well, I

24 would propose a 30-day schedule, to keep it in a round

25 number.

1        THE COURT: Mr. Karotkin, I think I'll do that and

2   recognize that if there's a good reason why the company

3   needs more time, I'll be amenable to --

4        MR. KAROTKIN: We're just trying to be realistic.

5        THE COURT: I know that, and I know that it is a

6   huge task, so why don't we treat it this way.  The motion

7   is granted as filed, except that we're setting a 30-day

8   deadline for schedules of liabilities and the Statement of

9   Financial Affairs and schedules of assets 60 days as

10  requested, and I'll just revisit at some other time a need

11  to change the earlier date.  Okay?

12       MS. KELLY: Thank you, Your Honor.

13       MR. KAROTKIN: I'm just trying -- again, I'm just

14  trying to be realistic.  We have like 50,000 creditors.

15       MS. KELLY: Yeah, I know that.

16       MR. KAROTKIN: So -- but we'll work with

17  counsel --

18       THE COURT: And you know what?  I'm not going to

19  hold your feet to the fire if you make an argument, and

20  look, Ms. Kelly has to be reasonable too, and I'm not

21  suggesting she's not.  We'll deal with it.  Okay.  Let's go

22  to the next motion.  So we'll get an order on that; upload

23  that order, and we'll take care of it.  Okay?  Next.

24       MR. KAROTKIN: The next one, Your Honor, is the

25  oversized briefing motion, and --

1        THE COURT: Sure.  Were there any objections to

2   that?  It's almost moot; don't you think?  I mean --

3        MR. KAROTKIN: Yes.

4        THE COURT: Yeah, okay.

5        MR. KAROTKIN: Just don't deny it.

6    (Laughter.)

7        THE COURT: I mean I'll grant it -- what's next?

8        MR. KAROTKIN: The responsible individual.

9        THE COURT: Is there any objection to the motion

10  for Mr. Wells to be the responsible individual under the

11  Bankruptcy Rules?  No objections.  That will be granted.

12        I think we've got one left, one more; don't we?

13  I'm going to ask that we take, before the other substantive

14  motions, but after these other administrative ones, the

15  claims agent motion, if that's all right.

16        MR. KAROTKIN: Do you want to do that now?

17        THE COURT: Well, do we have all the other ones

18  out of the way?  By my list, we do.

19        MR. KAROTKIN: I think that we do.  I think we

20  have the procedural ones out of the way, although we're

21  still in the first group on the agenda.  We also have cash

22  management, the insurance motion --

23    THE COURT: Let me -- well, since I said I'd like to

24  change the rule, let me change the rule.  Is there anyone

25  in the court, either courtroom, that wants to object to the

1  motion for the Debtors to employ the claims agent?

2  Yes, sir.  Name?

3        MR. SKIKOS: Good morning, Your Honor.  My name is

4  Steve Skikos.  I'm Plaintiffs' co-liaison in the State

5  Court action.  I don't consider this an objection to, but a

6  supplement to the claims agent motion, and I believe I'm

7  the bearer of some good news, and not that we just share an

8  undergraduate degree and hope for our future, but that

9  there has been a year of collaboration within the State

10  Court litigation between counsel for PG&E and their client,

11  counsel for subrogation and all the interests and their

12  clients, the 50 law firms who represent the fire victims,

13  and the 3,600 claimants.

14        And the point of what I want to get at is that we

15  have entered an agreement, a stipulation and order signed

16  by Judge Karnow that allows for the exchange of

17  information, including the subrogation files, the claims

18  that are actually made, the administration of the claims

19  through Brown Greer, which is a company that ran Deepwater

20  Horizon, BP, ASR, et cetera, and that agreement is embodied

21  in Case Management Order No. 5.  I brought ten copies to it

22  and --

23        THE COURT: Well, is this relevant to the actual

24  motion today on the Debtors hiring the claims agent?

25        MR. SKIKOS: I think the only reason it's relevant

1  is that in terms of claims administration, we are working

2  cooperatively with the Debtor and subrogation to deal with

3  that particular issue.  I can be heard later on that issue,

4  but I wanted to make sure that claims administration is

5  carved out for what we're doing with PG&E and subrogation.

6          THE COURT: Again, this is new to me.  What do you

7  want to do with it, Mr. Karotkin?

8          MR. KAROTKIN: Yes, Your Honor.  This morning, I

9  had -- I must have had a conversation with your co-counsel

10 about that --

11         MR. SKIKOS: Yes.

12         MR. KAROTKIN:  -- which I was going to mention,

13 and what I told her and it was agreeable to her that we

14 agree to work with her and the other lawyers on appropriate

15 notice in claims filing procedures and try to facilitate

16 the process, and that we would work with them going forward

17 to try to do that, but I don't think anyone had any

18 objection to the entry of the order approving the retention

19 of Prime Clerk.

20         THE COURT: Okay.  Well, I have just a couple of

21 questions.  Again, some of these are matters that Mr. Busby

22 for our court has been working with someone there, and they

23 are discussing and Mr. Busby, for the Clerk, would want

24 some language in the order that says something like this,

25 that the claims and noticing agent are using the proper

1   title, shall relieve the Clerk's Office of all noticing

2   under applicable Bankruptcy Rules and processing of claims,

3   kind of boilerplate, but it wasn't in there.  And I think,

4   other than that, I have a question that I've asked, but

5   that allows the details to get worked out at the Clerk's

6   level.  And -- well, I'll give you one example.  As I read

7   the moving papers, it said that the agent will maintain the

8   claims and provide access, but it didn't say what kind of

9   access, so I assume it's electronic access.  Well, it

10  didn't say that, and I didn't think we were back in the 19th

11  Century where somebody would have to go and look at a

12  claims docket.

13          Okay.  I am a little -- I want to hear your take

14  on the indemnity issues.  You may know and your colleagues

15  may know that I and others in our District have been pretty

16  concerned with indemnification, and the way I read it, the

17  claims agent does get the benefit of indemnity if it

18  engages in negligence rather than gross negligence.  Don't

19  you read the rules that way?  I mean is that the way you

20  read it, because I read the particular -- the operative

21  paragraphs to conclude that.  And if one of your other

22  colleagues wants to speak to that, that's okay, and I'm not

23  even telling you I'm going to disapprove it; I want to know

24  if you gentlemen interpret it that way.

25          MR. KAROTKIN: Yes, we've been made aware of that,

1    and from what I understand, they have agreed to waive that.

2              THE COURT: Oh.  Okay.  So --

3              MR. KAROTKIN: Not the indemnity entirely, but

4    straight negligence, yes.

5              THE COURT: No, I understand.  I understand.  No,

6    you negotiated in there what seemed fine to me that you got

7    the agent to agree to take a cap off of their exposure, but

8    that's a little different.  Okay.  Look --

9              MR. KAROTKIN: So that's been resolved.

10             THE COURT: You solved the problem.  The order

11   will then resolve it with -- so Prime is waiving its

12   protection under the negligence standard.

13             MR. KAROTKIN: The negligence standard.

14             THE COURT: Yes, okay.  That's fine.

15             MR. KAROTKIN: And I believe that -- I was advised

16   this morning that representatives of Prime have spoken with

17   Mr. Busby and resolved the other issue, and --

18             THE COURT: Yeah, we don't have to put them on the

19   record unless Prime wants it on the record, but again, we

20   want to get on with the merits here.  So there will be an

21   order -- and we don't have to put in an order all the

22   details that those folks have worked out --

23             MR. KAROTKIN: Right.

24             THE COURT:  -- except the language that I

25   mentioned.

1      MR. KAROTKIN: Yes.  I think that's already been
2  addressed.

3      THE COURT: Okay.  Great.  That's terrific.

4      MR. KAROTKIN: So we'll get you a revised order.

5      THE COURT: And then when you upload the order,
6  that's consistent with the waiver of the -- what we talked
7  about.  I don't remember the specific paragraphs.  Okay.  I
8  apologize to you for asking that we follow a sequence and
9  then jumping it, because it sounds to me -- it seemed so
10  integrally related to, you know, we're talking about the
11  captions and the language and so on.  So, okay.  Back to --
12  I guess we have the remaining ones on the insurance and --

13      MR. KAROTKIN: The cash management and insurance.

14      THE COURT: -- the cash management.

15      MR. KAROTKIN: As to cash management, Your Honor,
16  I believe the only objection was from the United States
17  Trustee as to the Section 345(b) waiver.

18      THE COURT: Right.

19      MR. KAROTKIN: Rather than try to resolve that
20  today, my suggestion is that we reserve that for the final
21  hearing, and that we get a waiver until the final hearing.
22  And then we can have some more -- we had some discussions
23  last night with the United States Trustee, and we can over
24  the next 30 days or whenever the final hearing comes, we
25  can either resolve it with the Office or we can come back

1  to Your Honor.

2  THE COURT: Ms. Kelly, are you good for that? You

3  can just remain there, if that's the answer.

4  MS. KELLY: Yes, Your Honor.

5  THE COURT: Yes? Okay, great.

6  MS. KELLY: In fact, it does seem complicated, and

7  we want to work with the Debtor to resolve it.

8  THE COURT: There's one question that the cash

9  management motion by itself doesn't trigger in my mind, but

10  your comments just now did, Mr. Karotkin, and that is, you

11  and I both know that for traditional financing motions or,

12  for example, the notion of a preliminary hearing and a

13  final hearing is well established, but I was a little

14  confused by some of the other motions today. I'll give you

15  an example, just an example, and then we'll come back to

16  the cash management. As I read the motion for payment of

17  taxes, there is a two-step process where there's a certain

18  amount to be paid on an interim basis and a larger amount

19  to be paid on a final basis. But at least one motion, I

20  believe it's the customer program, there is no two-step,

21  and so the notion of having a preliminary hearing and a

22  final hearing, it seems to me you're importing it into

23  these other kinds of motions. Right? For more time -- I'm

24  okay with that -- I just want to make sure we're on the

25  same page.

1          MR. KAROTKIN: Yes, we are.  I think the customer

2     programs motion is different than -- it doesn't really fit

3     into an interim relief type of thing.

4          THE COURT: Well, one of the motions that -- I'm

5     sorry for jumping around, but it sounded to me like all the

6     money is going to be paid on the interim motion, so what's

7     the purpose of the final motion?  But let's stick with the

8     cash management.  The record here is the cash management

9     motion is granted on an interim basis, and we'll revisit it

10    at a final hearing.  So whether it's in the rules or not,

11    we are having a final hearing at some point on the cash

12    management issue, and the U.S. Trustee is agreeable to

13    that, and so am I.  Does anyone want to be heard on that?

14         MR. KAROTKIN: Can I have one minute?

15         THE COURT: Wrong attorney, sorry.

16         MR. MINNICK: Excuse me, M. David Minnick,

17    Pillsbury, on behalf of Bank of America, and just a

18    question of --

19         THE COURT: Okay.  Mr. Minnick at the podium, the

20    first figure from the overflow room.  Mr. Minnick, welcome.

21         MR. MINNICK: Hopefully I'll do it in the proper

22    order.  Bank of America is a payroll bank, and as I

23    understand the 345(b), they have to post treasuries in

24    compliance with their obligation under their agreements

25    with the U.S. Trustee.  Is this waiver today of the

1   application of 345(b), is that to delay the compliance or
2   we should comply and then deal with it on a more long term
3   basis?

4           THE COURT: Ms. Kelly, why don't you come up to
5   the podium and answer that.

6           MR. KAROTKIN: I think it's to delay compliance,
7   delay compliance pending the final hearing when we can
8   address it.

9           THE COURT: Well, is that your agreement, your
10  understanding too?

11          MS. KELLY: Your Honor, what I would say is, we're
12  going to work toward compliance with the Debtor.  If
13  somebody can comply tomorrow, I think, you know, they
14  should comply.  We're working toward compliance, but I
15  understand it's sort of an extension of time within which
16  to comply, is the way I would conceptualize it.

17          THE COURT: But Mr. Minnick's bank client is
18  already one of the kind of depositories that does comply,
19  but --

20          MR. KAROTKIN: It does not.

21          THE COURT: It does not?

22          MS. KELLY: It does not.

23          THE COURT: I thought he just said it did.  Is
24  that right, Mr. Minnick?  It does or doesn't comply
25  normally?

1          MR. MINNICK: I was told by in-house counsel that

2    we automatically post treasuries as the case occurs, and we

3    are to comply with that -- in relation to the balances that

4    we have.

5          THE COURT: Well --

6          MS. KELLY: Okay.  So that is a new piece of

7    information actually, because I had understood from

8    conversations with the Debtor that Bank of America was not

9    in compliance, but now this is an additional piece of

10   information.  So that's very helpful.  If parties are able

11   to comply, such as it sounds like Bank of America has a

12   procedure in place for complying, then that is really what

13   we're working toward.  We're working toward finding some

14   way that the Debtor and the financial institutions can be

15   in compliance, and if there is some issue about that, then

16   we're going to try to work out how we address the substance

17   of it.  You know, if there is some way they can't

18   technically do it, we're going to try to come to some

19   resolution.

20         THE COURT: Okay.  But what that means to me is

21   that Bank of America represented by Mr. Minnick has to

22   comply because they're already complying or they're a

23   complier in some other financial institution that hasn't

24   complied, then we're waiving it on an interim basis.

25         MS. KELLY: Yes.  There may be institutions that

1   are not authorized depositories and that don't have

2   anything in place such as Bank of America does to

3   automatically start complying --

4           THE COURT: Right.

5           MS. KELLY:  -- so those we are going to have to

6   work on, is our agreement, and --

7           THE COURT: So stated again, I should tell Mr.

8   Minnick his client has to comply now.

9           MS. KELLY: Yes, Your Honor, I would say that,

10  because they're in compliance.

11          THE COURT: Mr. Minnick, got the message?

12          MR. MINNICK: Thank you.  Yes, Your Honor, I do.

13          THE COURT: Okay.  Ms. Parada, I've lost the video

14  on the overflow court.  I see all the other monitors have

15  it, but I don't have it, so -- I don't need it right now,

16  but maybe -- did something come loose or something?  All

17  right.  Maybe it's just the connection because it was on

18  there.  I don't need it right now.  Let's move on to the

19  next one.  Okay.  Does that take care of that motion?

20          MS. KELLY: I think it does, Your Honor.  Thank

21  you.

22          THE COURT: Okay.  All right.  So what's left, the

23  insurance motion?

24          MR. KAROTKIN: Can I just raise one other issue?

25          THE COURT: Yes.

1    MR. KAROTKIN: I think you had entered an order

2    with respect to the payment of State and Federal taxes,

3    which is a, I think a standard order that you enter in

4    cases.

5        THE COURT: Right.

6        MR. KAROTKIN: Which requires the Debtors to

7    segregate --

8        (Court and Mr. Busby confer.)

9        THE COURT: All right.  I can fake it.  Go ahead

10   with -- now I've got it back.  Just say that again.

11       MR. KAROTKIN: Yes.  I think it requires the

12   Debtors to segregate certain tax payments from customers.

13       THE COURT: Right. That's just a standard order

14   that we issue routinely.

15       MR. KAROTKIN: Yes, I realize that.  Under the

16   cash management system operated by the Debtors, that is

17   virtually impossible because all of those payments come in

18   from the customers in one stream, and there's, you know, 16

19   million of those coming in, and it's not practical.  So if

20   we could ask Your Honor to suspend enforcement of that

21   order until we have a chance to figure out exactly what we

22   can do and can't do, I would appreciate that.

23       THE COURT: Ms. Kelly, do you have any concern

24   about that?  I don't, but this isn't a regular case, right?

25       MS. KELLY: I'm sorry, Your Honor.  I missed --

1          THE COURT: You don't mind what he asked, that we

2    suspend that standard order that's issued in most every

3    Chapter 11 case; it doesn't have to apply to this case.

4    We're going to deal with it on this other issue.  Okay.  So

5    the answer is yes, and maybe we need a stand-alone order

6    from you that waives that compliance, okay?

7          MR. KAROTKIN: Yes.  We will do that.

8          THE COURT: Okay.  So by my count, we're down to

9    the insurance motion, which is -- I don't know if there's

10   any objection.  Was there any objection to the Debtors'

11   motion regarding insurance, which includes workers' comp

12   and a number of other things.  Anyone at all?  I didn't see

13   any; did you?

14         MR. KAROTKIN: No, sir, although we did get one

15   informal request from one of the insurers to make a

16   clarification.

17         THE COURT: Okay.  Well, let's finish -- anyone in

18   the overflow courtroom want to be heard in response to the

19   motion regarding the insurance matters?

20      (No response.)

21    Okay.  I don't either.  I'm prepared to -- just for

22   clarification, the portion of it that grants relief from

23   stay is really just to go ahead and let the workers' comp

24   processes follow their regular course, right?

25         MR. KAROTKIN: Yes, sir.

1          THE COURT: That's what I thought.  Okay.  So how
2     do you want to clarify otherwise?

3          MR. KAROTKIN: One of the insurance companies had
4     asked for a clarification in the order, in a footnote -- I
5     don't know if you have the order in front of you.

6          THE COURT: I'll take your word for it.  Yeah, I
7     do.

8          MR. KAROTKIN: It basically says that for the
9     avoidance of doubt, the term insurance policies shall
10    include all insurance policies issued or providing coverage
11    to the Debtors at any time, whether expired, current, or
12    prospective, and any agreements related thereto.  That's to
13    cover policies where the actual coverage may have
14    terminated, but there's still an opportunity to file claims
15    and to address claims.  And again, Your Honor, this does
16    not direct the Debtors to do anything.  It's within their
17    discretion; it's just authority.  And they also would like
18    another paragraph added to the order that says:

19              "Nothing herein alters or amends the terms and
20              conditions of any of the insurance policies or
21              relieves the Debtors of any of their obligations
22              under the insurance policies.

23          THE COURT: That seems fair and normal.

24          MR. KAROTKIN: Yes.  We certainly have no
25    objections to any of that.

1          THE COURT: Okay.  That's fine.

2          MR. KAROTKIN: So we'll submit a revised order.

3          THE COURT: Make sure the order that you upload is

4    consistent with that.

5          MR. KAROTKIN: Yes, we will.

6          THE COURT: Okay.  By my calculation, we've

7    clicked off all the administrative motions, including the

8    claims agent, and we're ready to go to what I call the

9    operational ones.  Right?

10          MR. KAROTKIN: Yes, sir.

11          THE COURT: Okay.

12          MR. KAROTKIN: I think the first one is the

13   Exchange Operator Motion.

14          THE COURT: Are you aware of any objections to

15   that?

16          MR. KAROTKIN: The only thing that we've been

17   asked to do is to make a representation that with respect

18   to collateral being posted with the Exchange Operators and

19   the Trading Counter-Parties, that that will be done in the

20   ordinary course of business, and we certainly can make that

21   representation.

22          THE COURT: Okay.  There's no one up, no

23   opposition.  That motion will be granted.

24          MR. KAROTKIN: Thank you.  Can I turn the podium

25   over to my colleague, Mr. Goren?

1      THE COURT: Sure.  Mr. Goren.  Welcome to the

2  Court again.  Ready to go?

3      MR. GOREN: Good morning, Your Honor, Matthew

4  Goren from Weil Gotshal Manges on behalf of the Debtors.

5  The next agenda item is Item No. 10, Your Honor, the

6  Operational Integrity Suppliers Motion.

7      THE COURT: Right.

8      MR. GOREN: And, Your Honor, pursuant to this

9  motion, the Debtors are seeking authority to pay the claims

10  of certain vendors and suppliers that are essential to

11  protecting public health and safety and maintaining the

12  safety and reliability of the Debtors' operations.

13      THE COURT: Were there any -- did you receive any

14  objections?

15      MR. GOREN: Your Honor, we did receive six

16  specific objections to this motion.  Notably, none of the

17  objectors objected to the basis of the relief essentially

18  itself that these Operational Integrity Suppliers are

19  essential, and the Debtors need the discretion to be able

20  to pay them to maintain the operations and they're

21  necessary for the success of the reorganization.  The

22  nature of the objections themselves was really that these

23  vendors wanted confirmation that they were covered by this

24  motion, and Your Honor, simply put, the process set forth

25  in the motion is exactly why we don't necessarily publish

1 vendor lists, why we don't do this publicly.  There's a

2 protocol set forth in the motion, and should the Judge --

3 should Your Honor be willing to grant the motion, the

4 Debtors would review every request for a critical vendor,

5 Operational Integrity Supplier status, defer to that

6 protocol that is in place, and make a determination in

7 accordance with their business judgment, whether such a

8 vendor is necessary to maintain the operations of that

9 supplier.  That's the only rationale; that's the only thing

10 that is important to make that decision, and it shouldn't

11 be made here on the record in public, which is exactly why

12 we don't necessarily publish these lists of potential

13 Operational Integrity Vendors.

14             THE COURT: Okay.

15             MR. GOREN: But I can defer to the parties if they

16 want to come up and speak, but that was the nature of the

17 objections themselves.

18             THE COURT: Well, there are a number of people

19 behind you, so I assume they want to be heard on that.

20             MR. GOREN: Sure.

21             THE COURT: So why don't we take them in order.

22 Ms. Hayes, you filed a number of objections.

23             MS. HAYES: I did.  Good morning, Your Honor.

24 Jennifer Hayes from Finestone Hayes LLP appearing on behalf

25 of creditors Roebbelen Contracting, Inc., Aggreko, Nor-Cal

1  Pipeline Services and the last one is M, as in Mary, CE

2  Corporation.

3          THE COURT: And what do you want me to do?

4          MS. HAYES: I could jump right to what I'd like

5  you to do.  If you want me to give you a little context, I

6  can do that as well.

7          THE COURT: Well, I read your papers, but go

8  ahead.  There are a lot of people here that probably

9  haven't, no let's do it.

10          MS. HAYES: Okay.  Well, let me go through it just

11  quickly.  So these four creditors filed responses, and they

12  each contain kind of reservations of rights and weren't

13  sure whether to object because they couldn't tell really

14  what the two key motions, the Lien Claimants' Motion, and

15  the Operational Integrity Suppliers Motion were really --

16          THE COURT: Well, let me interrupt you.  It struck

17  me as one of these oppositions that says, I oppose it

18  unless I'm in the classes getting paid.

19          MS. HAYES: We didn't know what else to say. I

20  mean --

21          THE COURT: I got you, but if --

22          MS. HAYES: Right.  There's no Creditors'

23  Committee.

24          THE COURT:  -- if they pay you, you don't have a

25  problem with it, right?

1          MS. HAYES: Well, I mean it's hard to complain

2    about getting paid in full.  You know, Roebbelen is owed

3    somewhere in the neighborhood of 38 million dollars.

4          THE COURT: It's a very large number.  No, I saw

5    that.

6          MS. HAYES: It is a large number.

7          THE COURT: I saw that.

8          MS. HAYES: Yes.  And the other three creditors

9    are owed between one and a half and almost three million,

10   and they're smaller companies, and this is a lot of money.

11   And so it's hard to object if the creditors -- if they say,

12   hey, we'll pay you, they fall within these buckets which

13   they believe they do --

14         THE COURT: No, I understand.  Ms. Hayes, I'm

15   sympathetic to you.  We're all dealing under tight --

16         MS. HAYES: Right.  Absolutely.

17         THE COURT: But you heard Mr. Goren's comments.  I

18   mean it seems to me that if the company says it's critical,

19   they pay it, and if the company says no, you don't get paid

20   right away, but you certainly have a right to revisit the

21   issue.

22         MS. HAYES: Right.  And you point out -- you can

23   piecemeal this, and you can make, you know, to a smaller --

24   it doesn't have to be all or nothing, and I guess what I'd

25   ask is, to win it -- I don't see any necessity with respect

1    to the lien claimants' motion for any kind of critical

2    vendor issue there, and that's the numbers -- I think total

3    between the two for the interim payment that's requested --

4    and again, without any historical, financials or future

5    projections, without any evidence in support, because the

6    declaration that was filed by Mr. Wells doesn't appear to

7    be signed under penalty of perjury and doesn't even set

8    forth with any kind of urgency with the -- you know, it

9    speculates that these certain vendors may not deliver

10   services or goods, and that's not -- it's not -- you don't

11   get the sense that there are conversations and you had

12   X, Y and Z say, look, I'm cutting you off unless I'm paid.

13   And so without the benefit of historical and future

14   projections to see what is really necessary, it's hard to

15   say, sure, write a blank check without a Creditors'

16   Committee being appointed for 180 million dollars, because

17   that's what they're asking on a final basis.

18          And so what we would like, and that's what I will

19   jump to, is to limit whatever the interim payment is to

20   that which is critical, you know -- it's hard for me to say

21   what that is without any numbers, right, but that which is

22   necessary to keep the gas and electricity supplies coming,

23   whatever is critical to the business.

24          THE COURT: But critical might be in the eye of

25   the beholder, right?  And so --

1    MS. HAYES: Of the beholder, and that's the issue.

2  So it's hard to say a number but the point is, I don't see

3  the need for any interim relief with respect to the Trade

4  Creditors' Motion, and I would like the Court to set a

5  briefing schedule and to require additional, you know,

6  competent evidence in support of the motion that

7  establishes kind of what is under B & w and K-Mart, kind of

8  the evidence here to support this need to -- because you're

9  subverting the priorities in the Bankruptcy Code without

10  any evidence.  And that's -- that may be appropriate; I'm

11  not -- you know, but it's hard to know with the requisites

12  here, which is devoid of evidence.  It's allegations

13  that -- what do you make of them?

14    THE COURT: I didn't notice that Mr. Wells'

15  declaration was not under penalty of perjury, but let me

16  hear from the other --

17    MS. HAYES: He might sign it if he's here.

18    THE COURT: He might.  Let's hear from the other

19  objectors, and then we'll figure out what to do about it.

20    MS. HAYES: Thank you, Your Honor.

21    MR. PONIATOWSKI: Thank you, Your Honor, Mark

22  Poniatowski, Poniatowski, Leding, Parikh.  I represent Holt

23  of California.  Holt of California filed an objection.

24  Holt is the Caterpillar Equipment Dealer in Northern and

25  Central California, and essentially what we have here is,

1  you know, the Debtor is asking for authority to determine

2  who is a critical vendor, and from what way I read the

3  papers, they're going to appoint a Committee and --

4         THE COURT: Well, it's an internal committee,

5  though, right?  It's not a Creditors' Committee; it's --

6         MR. PONIATOWSKI: No, no, it's not a Creditors'

7  Committee.

8         THE COURT: It's the Debtors' own committee,

9  right?

10        MR. PONIATOWSKI: The Debtors' committee, right.

11        THE COURT: Right.  Right.

12        MR. PONIATOWSKI: Although it's unclear what the

13  procedures are that they're going to follow.

14        THE COURT: Well, but what I glean from it, and

15  again, trying to absorb it all, some group of human beings

16  who were the on the payroll for the company will figure out

17  A is critical and pay them; and B is not critical and not

18  pay them, and so on.  But as I said to Ms. Hayes, if she

19  can come in or you can come in and show that B is in the

20  same category as A, then maybe it's appropriate to pay.

21        MR. PONIATOWSKI: Well, right now -- and I

22  understand that, Your Honor, and, you know, typically when

23  I flipped through the motion, I was looking for the list,

24  the list of the critical vendors, you know, which we don't

25  have here, which is a little bit unusual -- which is quite

1   a bit unusual.  But, you know, here my client has --

2   supplies, critical equipment for the specific requirements

3   enumerated in the motion, for safety, for fire cleanup, and

4   for support.  This is the earthmoving equipment that Holt

5   had on site within five hours of the fire, which is

6   critical to the staging of the disaster.  And right now,

7   there are ten units that -- we have a master rental

8   agreement since 2015, and right now there are ten units,

9   ten earthmoving units that PG&E has in its possession that

10  it wants to keep.  My client is owed half a million

11  dollars, 150,000 of that within the past 21 days.  It's not

12  the large numbers that we hear being thrown around with

13  these other creditors --

14          THE COURT: Well, it might be large to your

15  client.

16          MR. PONIATOWSKI: And that's why I'm here.  And,

17  yes, it seems to me that we put forth in this motion -- I

18  don't see why -- we tried to stipulate in advance that Holt

19  would be a critical vendor.  We put forth sufficient

20  evidence to meet all the requirements of what a critical

21  vendor is by virtue of what the Debtor has said in their

22  papers.  We meet all those requirements.  I don't see why

23  they can't be named a critical vendor right now in

24  connection with this motion.

25          THE COURT: Okay.

1          MR. PONIATOWSKI: And it seems to me that the

2 procedure that the Debtor put forth is somewhat shrouded in

3 some kind of secrecy. I mean what's going to happen --

4 what's going to happen; how are we determining who are

5 critical vendors --

6          THE COURT: Well, you know, I understand your

7 point but we've got authorities cited in the briefs that in

8 some part of our Circuit, some people don't believe that

9 critical vendors should even be paid at all. So here we

10 have a Debtor who's saying, I want to pay some critical

11 vendors, so I --

12          MR. PONIATOWSKI: Well, the motion said that

13 they've already identified a whole handful of them --

14          THE COURT: Right.

15          MR. BONIATOWSKI: -- but why don't they tell us

16 who they are. Not that I care. I mean my client thinks

17 that it's a critical vendor.

18   (Laughter.)

19          THE COURT: I know. We'll have an auction here

20 for who wants to be a critical vendor. No. Look, I want

21 to give Mr. Goren a chance to respond, but there's another

22 counsel behind you, so I suspect he's in the same boat.

23 Right?

24          MR. PINKSTON: Close, Your Honor. Ryan Pinkston,

25 Seyfarth Shaw on behalf of Turner Construction. We too

1  believe that we're critical.  However, the impetus for our

2  preliminary injunction of reservations of rights was to

3  spur the Debtor to provide more information.  When we asked

4  Debtors' counsel for information, they said it's going to

5  be handled by the Supplier Management Committee, which is

6  business folks.  When my business folks and my client

7  talked to their business folks, they said you need to talk

8  to the Debtor's counsel; we're not sure, so we're stuck in

9  a box here without any information about what exactly is

10  going on here.  Turner would not object to granting of the

11  motion on an interim basis, and we just would like to

12  reserve all of our rights --

13          THE COURT: But what does that mean?  What does it

14  mean "interim"?  Does it mean your client gets paid or not?

15          MR. PINKSTON: I don't know.

16          THE COURT: Okay.

17          MR. PINKSTON: But the amounts that were specified

18  in the Lien Claimants' Motion and the Operational Integrity

19  Motion, the more modest amounts that were going to become

20  due in the next 30 days, we don't have an issue with those

21  being paid, but we wanted to reserve our rights for the

22  much larger sums going out after a final hearing to

23  determine -- so we can get more information from the

24  Debtors and the business folks.

25          THE COURT: Mr. Goren, is there any expectation

1  that this committee that makes the call is going to be --

2  is going to have some creditor representatives in it too?

3          MR. GOREN: Your Honor, what this is, is an

4  internal committee made up of --

5          THE COURT: Right.  I know that.

6          MR. GOREN:  -- a cross section of representatives

7  from in-house counsel, purchasing, suppliers, but obviously

8  once committees are appointed, official committees, we will

9  be consulting with them.

10          THE COURT: No, but I'll rephrase the question.

11  What you're telling me in a very complex case is, somebody

12  on the debtor's side will decide whether A gets paid and B

13  doesn't, and I'm just asking if it's reasonable to assume

14  that maybe somebody at the table ought to be a creditor

15  representative.  Now, I understand we don't have a

16  Creditors' Committee yet, but just imagine we had a

17  Creditors' Committee and they --

18          MR. GOREN: Once a Creditors' Committee is

19  appointed, Your Honor, the Debtors would obviously consult

20  with them about these payments that are going to be --

21          THE COURT: So let's assume that in the near

22  term --

23          MR. GOREN: -- and report to them on them.

24          THE COURT: Let's assume in the near term -- and,

25  you know, I don't know when the term will be, there will be

1   a Committee.  What I'm unclear about is what we should do

2   right now in terms of decision making and whether I should

3   defer it.

4           MR. GOREN: Well, I think, Your Honor, we are

5   limited the relief that we're looking for here to be that

6   which is absolutely critical, and if the Debtors in their

7   business judgment know what is critical to them --

8   unfortunately, when you bring other creditors into this,

9   they're going to be looking for their own interests, and we

10  get into a public auction.

11          THE COURT: But what do I do when someone like Mr.

12  Poniatowski says, you know, we've got ten big earthmoving

13  things out there dealing with the fire.  He wants to be

14  labeled critical, but what if he isn't.  Then what do we

15  do?

16          MR. GOREN: Of course he wants to be -- every

17  vendor wants to be critical, which is why this is the

18  Debtors' business judgment.  It's who is critical at this

19  point, Your Honor, and that's why we have a protocol in

20  place, Your Honor, to insure that only those vendors that

21  are critical -- and which is why we're seeking here this

22  very limited relief at this hearing, limited to 30.1

23  million dollars, before a Creditors' Committee is appointed

24  for larger dollar amounts to go out the door.  Again, this

25  is in the Debtors' business judgment.  If we open this up

 1   to other creditors, every one of them thinks they're

 2   critical, Your Honor.

 3           THE COURT: Okay.  I said several times, I just

 4   haven't been able to absorb every line of every motion

 5   that's been filed.

 6           MR. GOREN: Sure.  Of course, Your Honor.

 7           THE COURT: So are you now telling me that -- and

 8   I'm looking at it here on the Interim Order Motion portion

 9   of it, you are -- it's a 30 million dollar interim thing.

10           MR. GOREN: Interim cap, yes, Your Honor.

11           THE COURT: So if I grant the motion, that means

12   some time in the next period of time, between now and that

13   final hearing, someone on the Debtors' side, that

14   Committee, will make decisions that might lead to payment

15   of up to 30 million dollars.

16           MR. GOREN: That's correct, Your Honor, in

17   accordance with that protocol, which is only paying those

18   that are naturally necessary.  Yes.

19           THE COURT: Okay.  Right.  No, I got it.  I got

20   it.  So if Creditor A gets paid, that's fine.  If Creditor

21   B doesn't, at least -- we're not going to unring the bell

22   and make A disgorge.

23           MR. GOREN: No.

24           THE COURT:  We're just going to do it little --

25   you know, little steps, right?

1          MR. GOREN: Well, this is little steps, right,

2    interim relief.  But what I would say is, who's critical

3    today -- may be not critical today -- but they may be

4    critical tomorrow.  So the fact that somebody isn't paid

5    now as a critical Operational Integrity Vendor doesn't mean

6    circumstances -- don't get paid later on, and they perhaps

7    could.  So nobody's rights are prejudiced here, Your Honor.

8    The fact that we're not stipulating on the record that

9    somebody is or is not a critical vendor today at this very

10   moment, they're free to demonstrate to the Debtors the

11   criticality of the services that they're providing.

12          THE COURT: The Lien Claimants Motion doesn't have

13   that step though, right?

14          MR. GOREN: Well, the Lien Claimants is slightly

15   different, Your Honor, in that obviously those creditors

16   are ones who have the ability to assert possessory or

17   statutory liens.

18          THE COURT: Yeah.  No, I understand.  I

19   understand.

20          MR. GOREN: So technically none of those vendors,

21   because of the secured nature of their claims are being

22   preferred to other general unsecured creditors.  It's just

23   the matter of timing with respect to their payment.

24          THE COURT: Yeah, so again, it's hard to

25   compartmentalize everything that's on the table today, but

1  taking those two together, if I say "Granted," then 30

2  million will be available to go out the door to the 30

3  million dollars worth of people that are in the Operational

4  Integrity category.  But all the dollars will go out to the

5  lien claimants because the Debtor says those are the ones

6  who have liens.

7          MR. GOREN: Your Honor, just -- again, we're

8  taking it in baby steps.  The Lien Holders' Motion also has

9  an interim cap of 25.8 million dollars during the --

10          THE COURT: Well, that's what I'm afraid I didn't

11  understand, and you're right.  Okay.  I understand.

12          MR. GOREN: And again, you know, those

13  creditors -- and due to the secured nature of their claims,

14  they're not being preferred to any other unsecured

15  creditors.

16          THE COURT: No, I know.  I know.  I didn't

17  remember what you now remind me, and I'm looking at the

18  summary of it and --

19          MR. GOREN: Only about 10,000 pages of documents

20  that we dumped on you, so perfectly understandable.

21          THE COURT: All right.

22          MR. PINKSTON: Your Honor, if I can make one --

23          THE COURT: Mr. Pinkston, yes.

24          MR. PINKSTON: One final point and maybe this is a

25  housekeeping issue, but Mr. Goren is referring to a payment

1 protocol that's going to be utilized by the committee of

2 Debtors' personnel; we don't even know what the payment

3 protocol is, and it's described in the motion, but the

4 actual protocol is the not listed.

5      THE COURT: Well, I understand but think about it

6 this way, the Debtor who is a fiduciary and in a complex

7 bankruptcy, on the second full day of the case says, I want

8 to pay 30 million dollars of the creditors that I owe, and

9 that's a good thing, and it's even better if you're in the

10 30 million class. If you're not in the 30 million class,

11 that doesn't mean you're not going to get paid; it means

12 that, you know, we've got to work through it. So I'm

13 inclined to think that for all of you counsel who are here

14 representing your clients, it's a good thing if I grant the

15 motion and you get some payment. It's not as good as it

16 might be if I say, okay, we'll cross that bridge at the

17 next step, but I don't know what else to do. So if I deny

18 the motion, it means I cut off the pipeline for -- in these

19 two categories -- 55 million dollars of creditors that they

20 want to pay.

21      MR. PINKSTON: I think it's more than that, Your

22 Honor --

23      THE COURT: Well, I just took those two.

24      MR. PINKSTON: No, it's not just the dollar

25 amount; if the payments aren't made, then there's the risk

1  that operations have to come to a stop.

2        THE COURT: I know, but I'm just talking about the

3  notion of a debtor in possession paying a creditor who

4  might otherwise stand in line.

5        MR. PINKSTON: I understand.  Ryan Pinkston on

6  behalf of Turner.  I understand your comments, Your Honor,

7  and that's why I said Turner doesn't oppose the interim

8  relief.  We would just like to reserve our rights for the

9  final hearing so that we can try to get more information

10  from --

11        THE COURT: And Ms. Hayes, you're in the same

12  boat, right?  I mean nothing that you have argued would say

13  that I should not let the Debtor pay some creditors, and if

14  the Debtor pays your client, that's even better, but it

15  doesn't mean if your client doesn't get paid, it doesn't

16  mean anything except somebody else got paid.  And then the

17  Debtor has got your client or got the issue framed and if

18  at the end of the day, you can't convince them or me, then

19  you have to stand in line.  But --

20        MS. HAYES: Your Honor, a couple of things.  One,

21  I think that that's a fair summary.  I would like an

22  opportunity for the final hearing to not be rushed and for

23  there to be additional evidence in support of -- in the

24  nature discussed --

25        THE COURT: Well, again, I'm going to give you a

1 freebie here by saying you can do that, but maybe if they

2 pay you ahead of time, it's not going to be a problem.

3       MS. HAYES: Right. Right. Correct, Your Honor,

4 and --

5       THE COURT: Because I don't want to -- what I

6 don't want to do this morning is hand out a briefing

7 schedule with -- to people, to lawyers who maybe don't have

8 to do it. So we have to come up -- and I'll ask Debtors'

9 counsel to put on their agenda, you know, a way to deal

10 more fully to get around two of these two motions.

11       MS. HAYES: Yes, Your Honor, and if --

12       THE COURT: Okay? Or a final hearing, whatever.

13       MS. HAYES: And one final point, all four of the

14 clients whose names I've identified in the record have

15 filed declarations that establish their critical vendor

16 status under both the Operational Integrity Suppliers

17 Motion and the Lien Claimants Motion, and I did want to

18 point that out in case you hadn't seen it.

19       THE COURT: And that's good, and you obviously

20 turned around a lot of work product in a short time and

21 then maybe others that are in the same category, so my

22 suggestion is if I grant the motion for these two, that I

23 am inclined to do, persuade Mr. Goren and his clients to

24 get your client paid, and if not, we will deal with it the

25 next time around.

1          MS. HAYES: Fair enough.

2          THE COURT: But I'm going to respect the Debtors'

3   wish of not to publicly name the list of all the vendors.

4          MS. HAYES: I understand.  That makes sense, yes.

5          THE COURT: Okay.  There doesn't appear to be

6   anyone at the podium in the courtroom or the other

7   courtroom, so have we covered everybody?

8          MS. HAYES: Thank you, Your Honor.

9          THE COURT: Yes, sir.

10         MR. GOREN: Just one point.  We're perfectly happy

11  to discuss with each one of these vendors the critical

12  nature of their services or goods that they perform.

13         THE COURT: Right.

14         MR. GOREN: Which is consistent with exactly what

15  we were proposing in the motion.  The one thing I would

16  add, though, Your Honor, is, we do think there is

17  sufficient evidence to support both the interim and the

18  final relief the Debtors are putting forth, and the fact

19  that, you know, some counsel are coming up and saying, the

20  evidence would be fine if I was getting paid, is really

21  quite an interesting standard, but as set forth --

22         THE COURT: But it's also true; isn't it?

23         MR. GOREN:  -- as set forth in Mr. Wells'

24  declaration, these are necessary to maintain safety and

25  public --

1       THE COURT: Just clarify one point that Ms. Hayes

2   said.

3       MR. GOREN: Yes, sure.

4       THE COURT: Is in fact Mr. Wells' declaration not

5   signed under penalty of perjury?

6       MR. GOREN: It is sworn to.

7       THE COURT: I mean I could look at it; it's only

8   140 pages long.

9       MR. GOREN: It is sworn to, Your Honor.  Yes, it's

10  sworn to under the corporate aspects of the statute.

11      THE COURT: Okay.  There's another gentleman that

12  wants to be heard.

13      MR. GOREN: Exactly.  But again, there's -- due to

14  the -- just to put this on the record -- 811 million

15  dollars of trade contraction in the time leading up to the

16  petition date.  All of these are safety, critical for

17  maintaining the Debtors' operations for keeping the lights

18  on, not just for the Debtors, but for, you know, for 16.1

19  million people, and all of this is set forth in the

20  declaration, Your Honor, which again it was 167 pages, but

21  it's all in there.  We do believe that there is more than

22  adequate evidentiary record to support both the interim and

23  the final --

24      THE COURT: Okay.  Do you want to be heard again,

25  or no, the first time.  I'm sorry; I'm just trying to keep

1　everybody straight.

2　　　　　　MR. DE GHETALDI: Thank you, Your Honor.  My name

3　is Dario de Ghetaldi from Corey, Luzaich, De Ghetaldi &

4　Riddle, and I am a member of the executive committees that

5　were appointed by the courts in the Butte fire cases --

6　　　　　　THE COURT: In the State Court.

7　　　　　　MR. DE GHETALDI:  -- in Sacramento, and the North

8　Bay fire cases in San Francisco.  Our firm represents as of

9　Monday over fifteen hundred victims, and of those fires in

10　addition or included in that number, we represent

11　approximately half of the plaintiffs who have filed in the

12　Camp fire cases.

13　　　　　　THE COURT: What's the relevance to this motion?

14　　　　　　MR. DE GHETALDI: I'm getting to it, Your Honor.

15　　　　　　THE COURT: Okay.

16　　　　　　MR. DE GHETALDI: I'm getting to it.  I would like

17　right now to crank open the chest of a patient briefly and

18　expose the heart of the case which is the victim --

19　　　　　　THE COURT: Well, but I'm really more interested

20　in having general comments, but --

21　　　　　　MR. DE GHETALDI: I'm getting to it, Your Honor.

22　　　　　　THE COURT: Okay.

23　　　　　　MR. DE GHETALDI: I'm getting to it.  And those

24　are the victims of the case.

25　　　　　　THE COURT: I understand.

1      MR. DE GHETALDI: And in particular, I filed an

2  objection this morning.  I apologize; it was not -- I

3  wasn't able to --

4      THE COURT: That's okay.  What's the name -- just

5  focus the objection for me.

6      MR. DE GHETALDI: We represent a group of

7  plaintiffs in the Butte County --

8      THE COURT: I understand that.  You've got to

9  focus on this motion.

10      MR. DE GHETALDI: I'm trying, Your Honor.

11      THE COURT: You can do it with one creditor.  Just

12  tell me what you want me to do on this motion.

13      MR. DE GHETALDI: I don't want you to give

14  priority to payments over payments to a group of 22 of our

15  plaintiffs who have executed pre-petition settlement

16  agreements with PG&E, some of which came due before the

17  petition was filed and some of which came due immediately

18  after the petition was filed.

19      THE COURT: Okay.  Got you.

20      MR. DE GHETALDI: And there are other firms who

21  have other Butte fire plaintiffs in the same position.  And

22  I represent, I think, their views as well.

23      THE COURT: I apologize for trying to cut you off.

24  I was trying to get to the merits of the objection, and you

25  did, and there will be time later for further general

1   comments, if you want.  Mr. Goren, do you want to respond

2   to that?  This is essentially –– this counsel is not acting

3   or speaking the way Ms. Hayes and the other two gentlemen

4   did.  He's not representing a lien claimant or an Integrity

5   Supplier; he's representing a tort victim who doesn't

6   think –– well, doesn't think they should be paid when these

7   other folks ––

8           MR. GOREN: Of course, Your Honor, and we are

9   obviously very sympathetic to his clients and the victims

10  of these wildfires, and we understand their concerns, but

11  we don't think it's prudent to risk the operations right

12  now and risk potential recoveries for them going forward,

13  which is why we think this is absolutely critical to

14  maintain the Debtors' operations and sustain them going

15  forward.

16          THE COURT: Okay.  I'm going to note the comments

17  from counsel, and I'm sorry I didn't get his name

18  correctly, but they are serious comments.  They are not

19  responsive to the question of whether as a matter of

20  bankruptcy law and practice, the two categories of

21  creditors which we're conveniently calling Lien Claimants

22  and Operational Integrity Suppliers, which covers a

23  multitude of sub paragraphs, to be sympathetic to fire

24  victims and hope that they get paid some day, is not

25  legally relevant to whether these other creditors can be

1  paid.  And so I'm going to note the objection by one

2  attorney on behalf of a small number -- a larger number of

3  victims, but 22 specific parties that have executed

4  settlement agreements and understand that they are going to

5  be treated at some fashion in some way, but today, there's

6  nothing for me to act on, and I'm going to stick with

7  the -- and overrule the objection just with that notion

8  that the motion will be granted as I've stated.  Now, Mr.

9  Poniatowski, you have another --

10      MR. PONIATOWSKI: Just a quick point of

11  clarification.  Thank you, Your Honor.  So the idea is that

12  we will try to negotiate with Debtors' counsel.  If they

13  happen to reject our assertion that we're a critical

14  vendor, we will have a chance then to bring that issue up

15  to the Court that we will reject it and seek review of that

16  decision?

17      THE COURT: Well, let's try it a different way.

18  Again, I'm going to simplify a complex matter, but from my

19  point of view, the Debtor has said we owe A, B and C and we

20  believe under the circumstances, under the doctrines of

21  critical vendor or 506(b)(9) or call it whatever label, we

22  think we should pay A but not B and C.  And we will visit

23  this matter again and we will pay A, and there are dollar

24  limits that we're imposing for the two categories, and

25  between now and the next hearing, we will try to articulate

1   and formulate, you know, the rationale, but to respond to

2   the objecting party, if you think your B or C belongs in

3   the same category as A and is critical, and they don't

4   agree as a matter of negotiation, it'll be revisited on a

5   final hearing where the Debtors will be seeking -- and what

6   I'm hearing and they both made it clear, both counsel, that

7   they're going to be seeking authority on a final hearing

8   basis to pay some more people.  And that's where we are.

9   So my point is, all of your objections, for all of you --

10  the three of you that are standing there and Ms. Hayes, are

11  noted, but I'm granting the Debtors' motions, the two

12  categories under the circumstances that we've said.  So I

13  think we've preserved it on the record and certainly the

14  Debtors have preserved in the motion -- the two parts of

15  the motion -- what they want granted.  Is that clear?

16          MR. PONIATOWSKI: Thank you, Your Honor.

17          THE COURT: Okay.

18          MR. GOREN: Thank you.

19          THE COURT: All right.  Thank you all.  Now I've

20  kept my own time limit here, and look at that, it's 11:30.

21  So what I'm going to do, unless there's a strong objection

22  from any counsel, is I'm going to take about a ten to

23  fifteen-minute break for everyone's personal convenience,

24  and then I will resume and we will change from discussion

25  of the motions to simply I will listen to comments from

1  lawyers or non-lawyers in response basically to what the
2  Debtors' opening comments to Mr. Karotkin were.  I'm not
3  going to turn it into a, you know -- well, I'm just going
4  to let people speak and then when we're done with that,
5  after the lunch break, I'll go to the next motion, Mr.
6  Goren, unless there's something you really want to handle
7  right now.

8          MR. GOREN: No.  That schedule makes sense, Your
9  Honor.  Thank you very much.

10         THE COURT: Okay.  So again, all right, then we
11 will reconvene here in both courtrooms by that official
12 clock over there.  I'm going to add a few more minutes, so
13 it'll be 11:45 on that clock, and I will take comments up
14 to around 12:30.  All right?  Thank you all for your
15 attention.

16    (Whereupon, a recess is taken at 11:32 a.m., and the
17 court is reconvened at 11:52 a.m.)

18         THE COURT: All right.  Please be seated.  Okay.
19 Al right.  Consistent with my comments earlier, we're going
20 to take an intermission from the scheduled motions, and I'm
21 just going to allow creditors or representatives of
22 creditors to be heard, and I'll take anyone who wants to
23 come to the podium and identify him or herself, either in
24 the courtroom or in the overflow courtroom.  And the first
25 person up?  Yes, sir.

1          MR. KORNBERG: Your Honor, Alan Kornberg, and I'm

2     here with Brian Hermann and Sean Mitchell.

3          THE COURT: I didn't recognize you and when I

4     looked closer, Mr. Kornberg, I know who you are.  Nice to

5     see you.

6          MR. KORNBERG: Good to see you, Your Honor.  We're

7     from Paul Weiss Rifkind Wharton & Garrison, and we do not

8     represent a creditor.  As Your Honor is probably aware, we

9     represent the California Public Utilities Commission, which

10    I know is no stranger to this courtroom.  Your Honor, based

11    on your prior experience, it will not surprise you to know

12    that the CPUC intends to be an active participant in these

13    cases.

14         THE COURT: Well, that's two of us then.

15         MR. KORNBERG: Your Honor, the Commission is here

16    because it needs to be vigilant in insuring that no matter

17    what happens in these Chapter 11 cases, there will be no

18    impediments to the CPUC fulfilling its constitutional and

19    statutory duties to the people of California.  At their

20    core, the CPUC's duties are to make sure that Californians

21    get safe and reliable utility service at just and

22    reasonable rates.  A specific relevance to these cases,

23    Your Honor, the PUC administers public purpose programs

24    which involve billions of dollars, much of which flows

25    through PG&E.  The Commission directs initiatives critical

1  to achieving California's clean energy goals and climate
2  mandates and assures that PG&E and other utilities have the
3  necessary infrastructure and financing to operate properly
4  and to operate safely.

5        So our objectives here are to make sure that
6  nothing in these cases frustrates the critically important
7  goals of the Commission or harms rate payers, and you will
8  hear from us as necessary when those issues are implicated.
9  Thank you, Your Honor.

10       THE COURT: Thank you, Mr. Kornberg.  Yes, sir.
11  No one in the overflow courtroom?  I'm going to alternate,
12  but nobody wants to speak to me over there.

13       SPEAKER: Your Honor, there are some people on the
14  phone.  Will we have a chance afterwards?

15       THE COURT: Oh, okay.  Yes, sir, of course.  I'm
16  sorry, your name again?

17       MR. ESSERMAN: Sandy Esserman, E-s-s-e-r-m-a-n,
18  and I'm with the firm of Stutzman Bromberg Esserman &
19  Ploifkia in Dallas, and my co-counsel is John Fiske and
20  Scott Sonley (Phonetic) of Baron and Bud, as well as Chris
21  Hart, and we represent the following cities: the town of
22  Paradise, the City of Santa Rosa, the City of Clear Lake,
23  the City of Napa; the following counties: Napa County,
24  Mendocino County, Lake County, Nevada County, Yuba County,
25  Sonoma County, Butte County, as well as the Calaveras

1 County Water District, Sonoma County Agricultural

2 Preservation and Open Space District, the Sonoma County

3 Community Development Commission, the Sonoma County Water

4 Agency and the Sonoma County Sanitation District. We're

5 basically known in the litigation as the public entities

6 affected by the wildfires.

7        The public entities are committed to a fair and

8 prompt process. The damages that these public entities

9 have suffered is a matter of some public knowledge and

10 quite extensive. The public entities are very interested

11 in getting a prompt resolution of this case which would be

12 to everyone's benefit, the communities' benefit in

13 particular, and the Court knows the damages suffered by

14 these public entities is significant. We're talking about

15 damages of infrastructure, public works projects, roads,

16 bridges, sidewalks, water systems, stop signs, stop lights,

17 the works, all of which are necessary for a functioning

18 county and city and district, and the reverberation effect

19 is very traumatic, as Your Honor no doubt knows because

20 when your population decreases, your tax base decreases, et

21 cetera, et cetera.

22        So we're very committed to a prompt and fair

23 process. We'd love to see this case end quickly if

24 possible. I've known Mr. Karotkin for many years. He's a

25 fair lawyer, and he's committed to a prompt process. We

know that there will be diversions.  We hope that they will
be minimal, but we do commit to you to a fair and prompt
process, and we're willing to engage in discussions to
solve the issues and try and reach prompt agreements which
can be approved by the Court.

Just so Your Honor knows, we have an ad hoc
public entities committee consisting of those 16 counties
and municipalities and districts.  We act as an ad hoc
committee.  We have sought recognition of such by the U.S.
Trustee.  If the U.S. Trustee does not recognize us, we are
still going to be here before Your Honor acting as such,
but we have sought official recognition.  I just wanted you
to know that.

THE COURT: Okay.

MR. ESSERMAN: Thank you.

THE COURT: Thank you, Mr. Esserman.  Welcome to
the court and we appreciate your comments.

MR. ESSERMAN: Thank you.

THE COURT: All right.  Yes, sir.  Good morning.

MR. BAGHDADI: Good morning for another 30
seconds, Your Honor.

THE COURT: All right.

MR. BAGHDADI: My name is Khaldoun Baghdadi.  I'm
an attorney at Walkup Melodia in San Francisco, Your Honor.
I am the court-appointed liaison counsel, one of three in

1  the North Bay fire coordinated proceedings in California
2  Superior Court before Judge Karnow.  I, among several other
3  attorneys, represent those who are closest to the emotional
4  harms and losses that brought us here today, Your Honor,
5  and we represent several thousand individuals who are now
6  being told they are creditors, and I've actually had some
7  client say, I don't remember applying for credit.
8          So they are here through no choice of their own,
9  through no voluntary decision to invest or not, but by
10 simply paying their bills, going to work, and being a
11 parent or a loved one.  Mr. Karotkin stated when he stood
12 before you the commitment to fair, orderly and expeditious
13 resolution of claims, Your Honor, and we could not agree
14 more.  The work that we've already done in our capacity as
15 leadership in the State Court cases provides a foundation
16 which we hope to build upon, which is the exchange of
17 information to get our hands around the extent of these
18 harms and losses caused -- not just by North Bay but in
19 Camp as well.  Even though there has been no coordinated
20 proceeding determined for Camp; it was stayed, we
21 voluntarily have undertaken as the leadership group of
22 Plaintiffs' attorneys to get our hands around and assess
23 and learn what is the extent of harms and losses that seem
24 to be the center of this case.
25          We have relayed our request in writing to the

1  +.S. Trustee's Office that we be recognized as a separate,

2  stand-alone fire claimant committee because we feel that

3  the voice that our clients represent is unique and central

4  to the resolution of these claims, and with respect to the

5  expeditious resolution, I'll just point to the Court,

6  October of 2017 when several thousand people lost their

7  homes and loved ones, nearly every one of their homeowner

8  insurance policies provided for two years of alternative

9  living expenses, which means in October of this year,

10 several thousand people are going to have a serious problem

11 in finding a place to live.

12         Expeditious and fair orderly resolution of this

13 process is what we want to be a part of, and we feel that

14 we would play a vital role working in collaboration with

15 the Debtor and providing this Court with any information we

16 can to navigate through this path to bring this Chapter to

17 a close for our clients, sir.

18         THE COURT: Thank you for your comments, Mr.

19 Baghhdadi.  They're noted.

20         MR. BAGHDADI: Thank you.

21         THE COURT: I appreciate your time.  Yes, sir.

22         MR. PITRE: Good afternoon, Your Honor, Frank

23 Pitre of Cotchett Pitre & McCarthy.  I serve as co-lead

24 counsel –- I have that privilege –- on behalf of all the

25 victims of the North Bay fires.  I also hold leadership

1  positions in the Butte fires, and also have an informal

2  leadership role with respect to the Camp fires.  We have

3  asked the U.S. Trustee to consider our group, the

4  leadership group, as a separate committee for the reasons

5  Mr. Baghdadi has already said.  The only comment I would

6  make in addition to his is that as opposed to the word

7  "expeditious," I would substitute the word "urgent."

8          Right now, there are thousands who are living in

9  trailers.  There are elderly individuals who had

10  preferences in getting their cases to trial in the State

11  Courts.  A State Court case was set for trial for one of

12  those cases which we hoped would be a benchmark for the

13  resolution of all cases for September.  There's a lot of

14  exceptional talent in this room.  I ask that that

15  exceptional talent, together with your stewardship, Your

16  Honor, insure that this process moves with a sense of

17  urgency on behalf of all those individuals who are going to

18  either be homeless or will continue to live in trailers and

19  search for food out of garbage cans, and there's got to be

20  a way in this process to provide for urgent relief for

21  those individuals.

22          Those are my comments, and I appreciate the

23  Court's time.

24          THE COURT: Thank you, Mr. Pitre.  I appreciate

25  your comments.  Yes, ma'am.  Good afternoon.

1          MS. ALEXANDER: Good afternoon, Your Honor, Mary

2   Alexander, Mary Alexander and Associates here in San

3   Francisco, and I am the liaison counsel appointed by Judge

4   Fillman (Phonetic) in the Ghost Ship case. I also have

5   another hat of leadership in the wildfires cases.

6          THE COURT: Well the Ghost Ship case isn't

7   relevant to this case; is it?

8          MS. ALEXANDER: Yes, it is.

9          THE COURT: It is? Okay.

10          MS. ALEXANDER: We're suing PG&E in that case,

11   Your Honor.

12          THE COURT: Okay. I wasn't aware of that. I'm

13   aware of the Ghost Ship fire; I wasn't aware that there

14   was a --

15          MS. ALEXANDER: Right. They are a Defendant. And

16   so, Your Honor, I stand before you with regard to the --

17   it's about 34 of the wrongful deaths that came forward and

18   also personal injury, and you just granted the insurance

19   motion brought by the Debtor. I would ask, Your Honor,

20   that we look at and ask the Debtors to turn over the

21   information regarding their insurance. The Ghost Ship fire

22   is a different year, and as I understand it, a different

23   year policy from the other fires, but I think it would be

24   very relevant to these proceedings if the Debtors do

25   disclose what policies will cover personal injury.

1          THE COURT: Well, I assume you're familiar with

2    the Bankruptcy Rules for discovery.  I mean many of us in

3    the bankruptcy world skip the rules and do it on an

4    informal basis, but if you're unable to do it on an

5    informal basis, there are formal ways.  I'm not saying

6    you're going to get them or you're not going to get them,

7    but it's a different environment, and I hope you'll at

8    least try to -- see what the Debtor has to say as far as

9    what you're looking for.  Okay?

10          MS. ALEXANDER: I will do that, Your Honor.  Thank

11   you very much.

12          THE COURT: Thank you, Ms. Alexander.  Yes, sir.

13   Oh wait -- well, I tell you what.  We'll get to this

14   gentleman at the podium and then I'll take someone on the

15   phone just to be -- divide the load here.

16          MR. FELDMAN: Good morning, Your Honor.  For the

17   record, Matthew Feldman from the law firm of Wilkie Farr &

18   Gallagher.  I am here, Your Honor, on behalf of the ad hoc

19   group of subrogation claim holders.  I'm joined today, Your

20   Honor, by Craig Simon from Berger Khan.  Mr. Simon is one

21   of the lead lawyers appointed by the State Court in the

22   North Bay fire litigation.

23          Your Honor, we are also here committed to tell

24   the Court that we do believe an expeditious and fair

25   resolution of these cases is possible, and it's going to be

1  possible, Your Honor, we think, working collectively with

2  ourselves, with the municipalities, as well as with the

3  individual plaintiffs.  We have been engaged, Your Honor,

4  with the company for many, many months -- I would actually

5  caution years -- over mediation regarding claim amounts.

6  We are continuing to discuss with the company whether we

7  can come to resolution with respect to claim amounts.  Our

8  clients, Your Honor, have paid and reserved many billions

9  of dollars in connection with these fires.

10       THE COURT: Your clients -- the subrogation claims

11  are essentially insurance carriers, right?

12       MR. FELDMAN: They are essentially the insurance

13  companies who have paid out and have reserved on claims.

14       THE COURT: No, I'm aware of how it works.  The

15  terminology and the way you were just referring to the

16  groups, I just don't know them by name, but I got it.

17       MR. FELDMAN: Understood, Your Honor.  We will

18  continue to be and want to be a positive presence in these

19  cases.  We do support the relief requested by the Debtors

20  today.  There is a critical point that I don't believe is

21  lost on the Court, but I do want to emphasize, the success

22  of this case really depends in large part upon the value of

23  these companies going forward.

24       THE COURT: I'm aware of that.

25       MR. FELDMAN: So the orders that you're entering,

1  Your Honor, today to preserve that value are not just

2  critical for the individual critical vendors who may get

3  paid; they're critical for all of us, if in fact we expect

4  these cases to be successful.  Thank you, Your Honor.

5          THE COURT: Got it.  Thank you, Mr. Feldman, and

6  welcome to the court.  I appreciate your comments.  Yes,

7  sir.  Oh, you know what?  I said -- someone on the phone,

8  first up on the phone.  Go ahead.  Name?

9          MR. VILAPIANA: Thank you, Your Honor.  Victor

10 Vilapiana in San Diego.

11         THE COURT: Good morning, Mr. Vilapiana.

12         MR. VILPIANA: I'm here with Mr. Tom Tosval.

13         MR. TOSVAL: Good morning, Judge, good to talk to

14 you.

15         MR. VILAPIANA: I'm here with Mr. Tom Tosdal who

16 is one of the lead litigators for the fire victims, and

17 Mr. Tosdal would like to address the Court.

18         THE COURT: All right.

19         MR. TOSVAL: Good morning, Your Honor.

20         THE COURT: Good morning.  Yes, sir.  Just restate

21 your name for the court reporter.  Go ahead.

22         MR. TOSDAL: Tom Tosdal, T-o-s-d-a-l.

23         THE COURT: Okay, thank you.

24         MR. TOSDAL: I represent many but by no means all

25 of the fire victims in the PG&E fires, and we look forward

1    to having an actual functional fire victim creditors'

2    committee that can play an integral role in this bankruptcy

3    proceeding.  The interests of the fire victims are both

4    unified in terms of obtaining full and fair compensation as

5    well as the interests are diverse in terms of the nature of

6    the loss and other factors affecting ultimate compensation

7    should that occur in this proceeding or some other.  I echo

8    the comments of my colleagues, Mr. Baghdadi and Mr. Petri

9    that the harm caused by these fires goes far beyond a money

10   transaction.  There's no decision made by these people to

11   invest or play the stock market with PG&E, and they should

12   be put as far up front as the law allows.  Thank you very

13   much.

14              THE COURT: All right.  Appreciate your comments.

15   Thank you.  All right.  Back to the court appearances.  Yes

16   sir.

17              MR. DUNNE: Good afternoon, Your Honor, for the

18   record Dennis Dunne from Millbank Tweed Hadley and McCloy

19   on behalf of an ad hoc committee of certain institutions

20   that hold in excess of seven billion dollars of the

21   unsecured bonds against -- or issued by Pacific Gas and

22   Electric.  Both that group and that number are growing, so

23   I expect as I reappear, I will have different information

24   for the Court.

25              I rise to do two things.  One is to introduce

1  myself and the group to Your Honor.  I suspect that we will

2  be a repeat presence at these hearings.

3          THE COURT: I suspect.

4          MR. DUNNE: And also to -- and I'm echoing some of

5  the comments that Mr. Feldman had who immediately preceded

6  me in the courtroom to underscore the need for a seamless

7  transition into Chapter 11 and to have no disruption to

8  operations and service.  That, I submit, is in everybody's

9  best interest today.  We expect going forward to work

10  daily, closely,collaboratively with not just the Debtors

11  whom we've had a good working relationship with thus far,

12  but with all the parties in the case so that we can get to

13  a just, fair, lawful and expeditious outcome.

14          I'm sure I'll have our disagreements with the

15  Debtors at some point in the case potentially but our

16  working relationship has been such that we'll try to deal

17  with those outside the courtroom and bring as few

18  disagreements to Your Honor as possible.  And so to just

19  sum up, we think that the Court should grant the relief

20  requested today.  We didn't object to any of them.  There's

21  some that we may be back to you when they expand some of

22  the first-day relief, for instance, on the NOL trading

23  order, but that's not for today, because it only applies to

24  the equity today.

25          THE COURT: Right.

1          MR. DUNNE: And we urge the Court to enter the
2     appropriate orders today.  Thank you.
3          THE COURT: Okay, thank you, Mr. Dunne.  Welcome
4     to the Court.
5          MR. DUNNE: Thank you.
6          THE COURT: All right.  I'll go to the next --
7     anyone on the phone?  Is there another speaker on the
8     phone?
9        (No response.)
10    All right.  No.  All right.  Yes, ma'am, good morning or
11    good afternoon, excuse me.
12         MR. RIDDLE: Good afternoon, Your Honor, Amanda
13    Riddle from Corey, Luzaich, De Ghetaldi & Riddle.  I am
14    court-appointed liaison counsel in the 2015 Butte fire
15    cases.  I also represent several hundred North Bay fire
16    case clients, victims, and I also represent over half of
17    the Plaintiffs who have -- or the claimants who have filed
18    cases so far in the Camp fire.  I'm also counsel for
19    victims of the 2015 PG&E gas line explosion in Fresno.  I
20    wanted to join in the comments of my colleagues. Mr.
21    Baghdadi and Mr. Petri, but draw your attention to the
22    Butte fire cases which those victims have started referring
23    to themselves as the "forgotten victims," unfortunately.
24    PG&E never mentions them even though there are over a
25    thousand Butte fire 2015 Butte fire plaintiffs, victims,

1   whose cases are still waiting to be resolved.  That

2   includes 48 household whose cases have been settled, but

3   PG&E has not satisfied those settlements.  A number of

4   those settlements came due before the petition was filed,

5   and PG&E chose to default on those settlements.

6          We also had an April 1st trial date, a benchmark

7   trial, for the Butte fire cases for nine households, and

8   that was going to be used to set benchmarks for the

9   remainder of the Plaintiffs in the litigation.  So when

10  PG&E talks about this process being expeditious and best

11  for wildfire victims, I think it's purposeful that they

12  forget to mention the ones who have been waiting for three

13  and a half years for resolution.  We have clients who are

14  still living in trailers on burnt-out property on

15  generators because they did not have insurance to rebuild.

16  And they were supposed to get their trial date, and PG&E

17  chose instead to file bankruptcy instead of accelerating a

18  resolution with them and getting them out of harm's way.

19  So I would just ask that the Court give as much priority to

20  the wildfire victims as available under the law.  Thank

21  you.

22         THE COURT: Thank you, Ms. Riddle.  I appreciate

23  your comments.  Yes, sir.

24         MR. BENNETT: I guess it's good afternoon, Your

25  Honor.

1          THE COURT: Oh yeah, it is somewhere.  I mean in

2    Hawaii it's still good morning.  I need a name from you.

3          MR. BENNETT: I'm Bruce Bennett of Jones Day.

4          THE COURT: I know you, Mr. Bennett, but I need it

5    for the record.

6          MR. BENNETT: The clients of Jones Day, Your

7    Honor, hold more than 20 percent of the issued and

8    outstanding equity of PG&E Corporation, and I want to

9    emphasize that the holders of the equity, while they

10   include a number of institutions, also include large mutual

11   funds that are also -- hold for individual investors, moms

12   and pops and retirees, and many other retail participants

13   in the case.

14         We too have been in consultation with the Debtors

15   concerning the relief requested today.  We've had some

16   input to some of the orders, in particular the order

17   relating to the claims trading and equity trading

18   provisions which you'll hear about later today.  For all

19   the reasons expressed by Mr. Dunne, we are very supportive

20   of the Debtors' efforts to enter Chapter 11 smoothly, to

21   continue to perform all of its obligations to its customers

22   and other stakeholders, and to assure that the value of the

23   businesses is maximized because after all that's what

24   everyone in this case ought to be interested in.  Thank

25   you, Your Honor.

1     THE COURT: Thank you, Mr. Bennett.  Anyone else

2 on the phone want to be heard?

3     (No response.)

4     All right.  Anyone else?  Well then, I think

5 rather than go back to our agenda, I'll call our midday

6 recess, and resume at 1:30.  Does that work for you, Mr.

7 Karotkin and everyone on your side?  I mean I'd make it

8 shorter, but we have a lot of people, and in and out, and

9 let's double check on --

10     MR. KAROTKIN: The only thing, if I may, I just

11 think it's essential that we get through all of the motions

12 today.  We don't have that many left.

13     THE COURT: I do too.  You know, unfortunately

14 there's some big ticket items though, right?  We've got the

15 taxes and the customer programs and the wages and the DIP,

16 right?

17     MR. KAROTKIN: Yes, and I can tell you that as

18 to --

19     THE COURT: And the NOL one also.

20     MR. KAROTKIN: As to most of those, there are few,

21 if any, objections --

22     THE COURT: Yes, I know that.

23     MR. KAROTKIN: -- remaining, so I think that --

24     THE COURT: Well, I mean if you thought we could

25 wrap this up in, you know, 45 minutes, I'd just go straight

1   through, but -- I mean I'm not trying to punish people.

2              MR. KAROTKIN: I think it's possible.

3              THE COURT: Well, but -- even for the DIP motion?

4              MR. KAROTKIN: I do.  I think Mr. Zumbro is going

5   to be handling that.  I think most of the DIP -- many of

6   the issues relating to the DIP have been resolved.

7              THE COURT: You haven't heard from me.

8         (Laughter.)

9              I'm going to reserve three hours.

10             MR. KAROTKIN: If you had filed your objection on

11  time, Your Honor, maybe --

12        (Laughter.)

13             THE COURT: We're kind of easy on the rules here.

14  Well, all right.  I'll take your suggestion and, you know,

15  we will have a starvation world here, and we will not take

16  a lunch break.  I guess I'll revisit it if we get bogged

17  down.  So I'm going to let you go ahead and take the

18  sequence for what's left and as I say --

19             MR. KAROTKIN: Sure.  I think according to the

20  agenda, the next one is taxes.  Is that what you have, sir?

21             THE COURT: That's right.

22             MR. KAROTKIN: Okay.  My colleague, Ms. Liou, will

23  handle the next two motions.

24             THE COURT: Okay.

25             MR. KAROTKIN: Thank you.

1          THE COURT: Ms. Liou, good afternoon.

2          MR. LIOU: Good afternoon, Your Honor, Jessica

3   Liou from Weil Gotshal and Manges, here on behalf of the

4   Debtors.  The next item on the agenda is Docket Entry No.

5   11, Agenda Item 12, which is the Debtors' motion seeking

6   approval to pay certain pre-petition taxes and assessments

7   and granting related relief.

8          THE COURT: And the way I read it, you get interim

9   authority, temporary -- I mean remedial authority for

10  around 11 million dollars to pay and then at the final

11  hearing 139 million.  Some are priority claims; some are

12  post-petition, a variety of things.

13         MS. LIOU: That's correct.

14         THE COURT: Are there any objections that you

15  received?

16         MS. LIOU: Absolutely none that I'm aware of.

17         THE COURT: Anyone either in the court or the

18  overflow or on the phone want to be heard on the tax

19  motion?

20      (No response.)

21         I have no objections.  I reviewed it, understand

22  it.  That motion will be granted.

23         MR. LIOU: Thank you very much, Your Honor.

24         Next on the agenda is Item No. 13.  It's Docket

25  Entry No. 16.  It's what the Debtors have termed their

1    Public Programs and Customer Programs Motion.  As Your

2    Honor may be aware, we did receive a couple of filed

3    statements in response to the Customer Program Motion.  I'd

4    like to take a moment to go through those on the record

5    with Your Honor and indicate where we have resolved certain

6    of the statements.  I also do want to note that we have

7    been working extensively with the staff of the CPUC

8    regarding the motion itself and the provisions of the

9    order, and that the U.S. Trustee's office has not objected

10   to this requested relief.

11          THE COURT: Okay.

12          MR. LIOU: At Docket No. 66, Sonoma Clean Power

13   Authority filed a statement in support and reservation of

14   rights.  We have communicated with their attorneys and

15   confirmed that their issues are all resolved.  They have

16   filed a separate statement in connection with entry of the

17   DIP order and given that there were some proposed changes

18   to the DIP order, that is fully resolved -- their issues

19   with respect to not only the DIP, but also this Customer

20   Programs Motion.

21          THE COURT: Okay.  That's good to hear.

22          MS. LIOU: At Docket No. 147, that's ChargePoint,

23   Inc.'s conditional non-opposition that was filed.  We have

24   worked out some language with them that I believe fully

25   resolves their conditional non-opposition, and they now

1  support the relief requested.  I will go through those

2  interlineated edits in the order in a moment because I

3  believe that those edits also resolve Docket Item No. 158

4  which is the preliminary objection filed on behalf of

5  various California State Agencies.

6           THE COURT: Well again, as you heard me speak

7  earlier this morning, I just have not been able to keep up

8  with the pace.  So you summarized what's there, and to the

9  extent that you or the Debtor has resolved them, we will

10  make that on the record and go from there and get

11  confirmation from any counsel.

12           MS. LIOU: Correct.

13           THE COURT: And I did look over the ChargePoint

14  one because that was one that came in a little earlier, and

15  I understand it.  So that's fine.

16           MS. LIOU: Yes.  And there are two other remaining

17  statements.  That's Docket Entry No. 156 filed on behalf of

18  Marin Clean Energy.  We confirmed with counsel that that is

19  also fully resolved.  We confirmed with Marin Clean Energy

20  that their program is part of the customer programs

21  included in the motion.

22           THE COURT: Okay.  Well, that's it.  That's the

23  easy way to get people to come around is to get them on the

24  program.

25           MS. LIOU: That's right.  And then the last one is

1    Docket No. 170.  That's Air (could be Area) Petroleum

2    Reservation of Rights that was filed.  I do not believe

3    that there's any action required as a result of that

4    reservation of rights being filed at this point in time.

5           THE COURT: So you probably heard me have some

6    conversation earlier in the day with your colleague, and

7    this one is the one that is teed up as a two-step motion,

8    but if I grant the motion, there's nothing to do really at

9    the final hearing other than to ratify it, right?

10          MS. LIOU: That's correct.

11          THE COURT: Yeah.  I mean I guess what I want –- I

12   just want to make sure we're clear that –- I'm sure in your

13   experience and in my experience and in a lot of the

14   bankruptcy lawyers' experience, as I said earlier, this

15   concept of a preliminary hearing and a certain amount of

16   things happening, whether it be money borrowed or payments

17   made, followed by more, gives people an opportunity

18   particularly when we're operating under this enormously

19   tight time schedule, but this one looked like, okay,

20   there's a lot of money being spent and there's going to be

21   a final hearing, but by the time of the final hearing, the

22   money is either all spent or committed.

23          MR. LIOU: Well, I think that there's actually a

24   significant portion of the relief that is reserved for the

25   final hearing.  We do provide an estimate in the motion of

1  what we anticipate we will spend during the interim period
2  which is about approximately 215 million dollars plus any
3  additional CPUC costs on top of that.  But I share your
4  concern.  Your Honor, I would just say that, you know, this
5  motion is critically important to many constituencies for
6  many reasons.

7          THE COURT: Oh, I know it is.  I mean I'm
8  absolutely convinced.  And that was my point, and maybe I
9  missed it, but think in one or two of the other similar
10 motions --

11         MR. LIOU: There is no interim cap if that's the
12 question that you're asking.

13         THE COURT: Well, I think, for example, in a
14 couple of the other ones, I had a table with "X" dollars to
15 be spent now; "Y" dollars to be spent later, and I just
16 wanted to get a sense.  I'm not opposing this; I'm not
17 going to impose anything on my own, and the people that
18 have had a chance to weigh in on it, including some counsel
19 behind you, that's fine.  And we don't need to dwell on it
20 now.  In fact, why don't I shut up and see what the
21 gentlemen behind you want to say.

22         MS. LIOU: Sure.  But, Your Honor, if I may, at
23 least go through the changes to the proposed order that we
24 had agreed to with two of the parties that have filed
25 statements.

1          THE COURT: All right.  Okay.

2          MS. LIOU: If you have a copy of the order in

3    front of you.

4          THE COURT: I do.  Yes, I do.

5          MS. LIOU: All right.  The only changes are with

6    respect to paragraph 2, and if you go about halfway down

7    into that paragraph, there's a Romanette ii.

8          THE COURT: Yes.

9          MS. LIOU: The original language read: "Continue,

10   comma, renew, comma, replace, comma, implement, new, comma

11   and/or terminate one or more of the customer programs.

12   There were certain parties who raised concerns about the

13   termination language and so we have agreed to modify that

14   language to make clear that the Debtors intend to continue

15   to perform in accordance with applicable law their

16   obligations under the customer programs.  So we have now

17   revised that language to Romanette ii:

18               "... continue to perform in accordance with

19               applicable law one or more of the customer

20               programs."

21          THE COURT: Okay.

22          MS. LIOU: And then if you go three lines down,

23   there's language that reads "as they deem appropriate."

24   We've agreed to strike that language.  The Debtors will

25   obviously perform their obligations in the ordinary course

1  of business in accordance with what Federal, State and

2  other regulations require.

3        THE COURT: Okay.  I appreciate that, Ms. Liou.

4  Those are the only changes?

5        MR. LIOU: Yes.

6        THE COURT: All right.  Counsel?  Mr. Harris?

7        MR. HARRIS: Good afternoon, Your Honor, Robert

8  Harris of Binder and Malter appearing for ChargePoint, Inc.

9  Ms. Liou has accurately represented our agreed changes to

10  the order, and we withdraw our objection.

11        THE COURT: Okay.  Thank you, Mr. Harris.  Yes,

12  sir.

13        MR. PASCUZZI: Good afternoon, Your Honor, Paul

14  Pascuzzi, Felderstein, Fitzgerald, Willoughby & Pascuzzi.

15  We are co-counsel with the California Attorney General's

16  Office for various State agencies, the ones --

17        THE COURT: I expected you here.  You're a

18  regular.

19        MR. PASCUZZI: Thank you, Your Honor.  The State

20  agencies on our pleading in this particular matter are the

21  California Department of Toxic Substances Control,

22  California Department of Water Resources, State Water

23  Resources Control Board, Regional Water Quality Control

24  Boards and State Energy Resources Conservation and

25  Development Commission.  Your Honor, we do support the

1  purpose of this motion to be able for the Debtors to

2  continue these programs and pay pre-petition obligations in

3  connection with the programs.  But we did have an issue

4  with paragraph 2.  Of course, a lot of these clients

5  regulate PG&E, and our main concern is that nothing in the

6  Bankruptcy Court's order is supplanting any non-bankruptcy

7  laws, orders, et cetera, that PG&E and the Debtors would

8  otherwise have to comply with.  So you'll hear me appearing

9  on those types of issues throughout the case.

10        THE COURT: But is there any other change you want

11  to paragraph 2 that you --

12        MR. PASCUZZI: No, Your Honor.  The one thing was

13  in accordance with applicable laws, I didn't know if

14  counsel said "law" or "laws."  So I requested it say

15  "laws," Your Honor, and then --

16        THE COURT: Well, you can just pick one.

17     (Laughter.)

18        MR. PASCUZZI: And then, Your Honor, as I

19  understand it, this is an interim motion.  There will be a

20  final hearing on it, and, you know, we do have other

21  potential State agencies that will be clients that will be

22  weighing in, and we'll be talking to about this motion in

23  lines of the concern I mentioned, so we do want to reserve

24  our rights as to the final hearing on this motion and the

25  other motions to file further oppositions or whatever and

1    identify additional clients that may have issues.

2              THE COURT: Okay.  Well, that's noted on the

3    record.  I don't think anybody is trying to pull a "got

4    you" on you here, so --

5              MR. PASCUZZI: Understood, Your Honor.

6              THE COURT: Okay.

7              MR. PASCUZZI: Thank you.

8              THE COURT: Thank you, Mr. Pascuzzi.

9              MR. ENGEL: Good morning, Your Honor.

10             THE COURT: Good afternoon.

11             MR. ENGEL: I guess it's afternoon now.  Larry

12   Engel for Sonoma Clean Power Authority.  We are a

13   governmental unit, also a joint power authority, a

14   community choice aggregator, what they call a CCA. We filed

15   statements and then also talked to the folks at PG&E and

16   some of the DIP lenders and others and had very

17   constructive conversations, and we've resolved our issues

18   and thank them for their cooperation.  I just wanted to

19   address one point for you in your questioning, that perhaps

20   would be useful to you, which is just to emphasize that

21   PG&E as to the CCA's and there are eleven of them in this

22   territory, we're going to be 40 percent of the entire PG&E

23   grid power for this coming year, 2019.  And so it's a

24   significant amount of involvement here.  And the point

25   we're making is that PG&E is a billing and collection

1  agent, a conduit for us.  It's actually our money that

2  they're giving us back, so we're actually expecting things

3  to continue in the ordinary course, and that's really the

4  purpose as it relates to us of this motion.

5          So as between an interim hearing and a final

6  hearing, I don't think -- we're certainly hoping there's

7  nothing going to happen between us because we actually

8  would like our money on a regular basis because it's

9  essentially all our money.

10          THE COURT: But there's nothing that suggests

11  otherwise.

12          MR. ENGEL: No, only Your Honor seemed to be

13  concerned about something happening in that interim period

14  between the interim and the final hearing, and I --

15          THE COURT: No.  I think what I was trying to

16  explain to you, again trying to absorb all these different

17  motions in short order, a couple of them had steps with

18  real dollar signs, and they were big dollars.

19          MR. ENGEL: Right.

20          THE COURT: And some didn't.  So I just needed to

21  understand that.

22          MR. ENGEL: Well, I think the reason there is no

23  dollar amount for us is that they're just giving us back

24  our own money.

25          THE COURT: Well, maybe that's the reason.  I

1  understand the point.

2              MR. ENGEL: Okay.

3              THE COURT: But it looks to me, Mr. Engel, like

4  the Debtors' position, vis-a-vis your clients, is this

5  usual?

6              MR. ENGEL: Yes.  Exactly.

7              THE COURT: Yeah.  Right.  Okay.  And if they try

8  to keep the money that they're –- I'll hear from you.

9              MR. ENGEL: We've gotten very reasonable

10 assurances from them that that won't happen, and we're

11 looking forward to cooperation, Thank you.

12             THE COURT: Thank you for coming.  Anyone on the

13 phone want to be heard on the issues raised by Ms. Liou and

14 were discussed?

15      (No response.)

16             Okay.  Well, I'm prepared to approve then the

17 Customer Program Motion with the changes that you have made

18 and the order that you submit and upload.

19             MS. LIOU: Thank you, Your Honor.

20             THE COURT: Thank you very much.

21             MS. LIOU: I will now give the podium back to Mr.

22 Karotkin.

23             THE COURT: Mr. Karotkin, where do we go next?

24 You're the guy that said everybody gets a lunch break at

25 1:00 o'clock, so you're going to do that DIP motion at two

1  minutes to 1:00?

2          MR. KAROTKIN: I'm not doing that one, Your Honor.

3      (Laughter.)

4          You can hold them accountable for that one.  I

5  think the next one is the Employee Wage and Benefit Motion.

6          THE COURT: Okay.

7          MR. KAROTKIN: I know it's a long motion and it

8  covers a lot of different programs and benefits, but I

9  think it's fairly conventional.  Obviously the employees --

10 there are 24,000 of them -- they make this operation run

11 and it's essential that we pay them their compensation to

12 the extent there are some pre-petition amounts outstanding,

13 and I will say that that is principally related to the

14 hourly paid employees.  The number appears fairly large,

15 but there are like 14,000 of them, I believe, and as to all

16 of those, Your Honor, they are under the cap with respect

17 to the compensation.  As I mentioned, I believe, on

18 Tuesday, we are not seeking any authority to pay severance

19 to insiders.

20         THE COURT: You did mention that.

21         MR. KAROTKIN: And we are also not seeking

22 authority to pay any CERP (Phonetic) supplemental pension

23 payments to any retirees, and there was some confusion,

24 Your Honor, in some of the newspaper articles at least, and

25 I think that the Office of the United States Trustee raised

1  it with us last night, as to the -- what we call the 2018

2  Stip, which is a broad-based, by the way, program.  It

3  covers about 12 to 14,000 employees.

4         THE COURT: Right.  I saw that.

5         MR. KAROTKIN: We are not seeking any approval of

6  that today.  That's reserved for the final hearing, and

7  again, to clarify what was inaccurately reported in the

8  newspapers, in addition to not covering any insiders, that

9  authority we are seeking does not cover any officers.

10         THE COURT: Well, did I read correctly there are

11 12 specific people -- maybe they're not identified by name,

12 but they mention that they are not -- I mean just the

13 number, 12 people, are not --

14         MR. KAROTKIN: Well, in addition to about 26 other

15 people, so about 38 people, who we're not seeking approval

16 for anything that's under the stip.  So it goes beyond the

17 insiders.

18         THE COURT: But those 38 people are not identified

19 by name anywhere in the documents.

20         MR. KAROTKIN: That's correct.

21         THE COURT: Okay.

22         MR KAROTKIN: That is correct.

23         THE COURT: Okay.

24         MR. KAROTKIN: But those are the officer group.

25 Okay?

1           THE COURT: Understood.  So this is the one

2   that -- this is in that same category that I raised before.

3   If I approve this, and I'll hear from anybody that wants to

4   be heard, but if I approve it, what happens at the final

5   hearing?  I mean it's a done deal; isn't it, for all the

6   people that are the beneficiaries of this motion?

7           MR. KAROTKIN: No, it's not a done deal because

8   if you look on page -- I believe it's page 10 -- there is

9   an amount related to the interim period and an amount

10  related to the final period.

11          THE COURT: Okay.  Again, I stand corrected.  It's

12  another ten million dollars.  I got it.  No, I'm sorry, no,

13  no, it's more than that.

14          MR. KAROTKIN: Yes, it's more than that.

15          THE COURT: One of your table had totals, and this

16  one did not.  No, it's significantly more.

17          MR. KAROTKIN: Yes.  But again, if you were --

18          THE COURT: But several of them are not affected

19  at all.  They're just across the board.

20          MR. KAROTKIN: Right.  Yes.  But as to the

21  compensation obligations, Your Honor, that's two weeks pay.

22          THE COURT: I understand.

23          MR. KAROTKIN: Okay.  So obviously they'd all be

24  paid, and if you look at the next one, it's significantly

25  less than what we're seeking on a final basis.

1   THE COURT: Actually, the incentive and retention

2   program, the stip, is the big one that is the final

3   hearing.

4   MR. KAROTKIN: Yes, being deferred, yes.

5   THE COURT: And it's a relatively small increase

6   for the other line items.

7   MR. KAROTKIN: Yes, it is, but --

8   THE COURT: Again, I'm not here negotiating it or

9   even taking it -- being opposed to it.  I just want to

10  understand it, and I misspoke earlier when I said this

11  motion was going to be a done deal, because you corrected

12  me; it was not.

13  MR. KAROTKIN: And I will note, Your Honor, on

14  withholding obligations, if you look at Footnote 2,

15  substantially all of that is withholding from employees'

16  paychecks, and the rest of it is the employer's

17  contribution, pretty much trust fund taxes.  Severance

18  obligations are very small.  The benefit obligations, a lot

19  of those are paid by either employee or retiree

20  contributions.  And again, these are conventional health

21  and welfare programs.  We've been very careful to narrowly

22  tailor this motion not to encompass, as I mentioned,

23  supplemental retiree benefits or deferred compensation for

24  retirees.

25  THE COURT: Right.  Well, let's talk about

1  objections.  There was at least one objection; wasn't

2  there, or two that were filed?

3          MR. KAROTKIN: I think there was only one.

4          THE COURT: Okay.

5          MR. KAROTKIN: I'm sorry, two?

6          THE COURT: Well, let's -- if you think there's

7  only, tell me how you're responding, and if there's another

8  one, we'll --

9          MR. KAROTKIN: This gentleman said he filed an

10  objection.  I will stand corrected.

11          THE COURT: Okay.  Let's just -- what I want to

12  hear from you is how you're responding to any objections

13  because again, this is in that same category where I have

14  to rely on you to tell me what the Debtors' position is.

15          MR. KAROTKIN: I think the U.S. Trustee's

16  objection was solely related to the statutory cap.

17          THE COURT: And there is some cap -- there are

18  some --

19          MR. KAROTKIN: Yes.  As to the compensation, it's

20  clearly within the cap, Your Honor.  As to some of the

21  other benefits, such as medical benefits, those are normal.

22  They are paid over time, and again, they cover 24,000

23  employees.  It's really impossible to calculate in any

24  manner how much each employee is entitled to.  We certainly

25  don't want to be in a position to not being able to pay

1  normal medical benefits to our employees.  We think that

2  will send -- that will be disastrous for the operation of

3  this business.  These are routine health claims

4  essentially.  That's where the big number comes in, and

5  there is really no way of determining whether or not that

6  is over the cap by individual because literally thousands

7  of claims are handled on a monthly basis.

8       THE COURT: Okay.  Well, Ms. Kelly can respond if

9  she wants to.  Hang on to that objection.  Did you want to

10  go to another one?

11       MR. KAROTKIN: Yeah.  The other objection I think

12  that was raised by the United States Trustee and I think I

13  mentioned it earlier, was the stip payment, and that's

14  again reserved for the final hearing.  So I don't think

15  there's any need to get into that today.

16       THE COURT: Ms. Kelly, do you want to be heard on

17  this, to the extent that the motion exceeds the statutory

18  cap for anyone?

19       MS. KELLY: Your Honor, with respect to the

20  statutory cap, we wanted clarification because it was

21  unclear in the motion.  It referred to them being below,

22  but it was unclear what part of that was wages and some

23  mentioned benefits.  So now counsel is saying it's

24  impossible to tell.  Obviously we're not saying that people

25  shouldn't have their medical benefits.  However, it is

1  troubling that there are elements of compensation that the

2  Debtor is saying are impossible to calculate at this point.

3  So I will --

4          THE COURT: Well, maybe what they're saying is

5  it's impossible to sort of draw the line where the cap is

6  for each and every one of the 24,000 employees, because

7  somebody who is paid, you know, minimum wage is probably

8  under the cap no matter what.  Somebody who is paid a

9  significant pay because he or she does more valuable --

10 more highly compensated work, is going to be over the cap.

11 And that's what I think he's saying.  And really the

12 question as I see it is, the Debtor has this work force,

13 business as usual, and you're interposing possibly an

14 objection as to those who are over the cap.

15         MS. KELLY: Your Honor, what I would say on that

16 is, of course, it is the job of the U.S. Trustee to argue

17 that the law, the Code, and the Rules, should be enforced

18 as written, so --

19         THE COURT: I'm not quarreling with you.

20         MS. KELLY: On this issue, those are the facts

21 that have been presented today, and so at this point, I

22 would just maintain our objection, and I defer to Your

23 Honor to rule on it.

24         THE COURT: Right.  Okay.  I got it.  All right.

25 Now the gentleman behind you.  Let's get the -- there are

1  objections, I think.  I think you interposed an objection

2  earlier, right?

3         MR. DE GHETALDI: I did, Your Honor.  I was

4  speaking -- I did file one this morning.

5         THE COURT: Right.  And I've got your name right

6  now, but I need to have you state your name again, just

7  because to state your appearance.

8         MR. DE GHETALDI: Right.  I'm sorry, Your Honor.

9  Dario De Ghetaldi, once again.

10        THE COURT: And I have it noted so I wouldn't say

11 it wrong.  Okay. I got you.

12        MR. DE GHETALDI: I'm sure you didn't misspell it

13 either, right?

14        THE COURT: No.  I misspell my name occasionally

15 too.  Mr. De Gethaldi, thank you, and I'm sorry I got your

16 name mixed up before, but anyway, what do you want to say?

17        MR. DE GHETALDI: That's okay, Your Honor.  Our

18 objection here is -- well, the motion with respect to

19 payment of bonuses is not clear.  It does not identify the

20 employees that PG&E is planning on giving the short-term

21 incentive program bonuses to or the amounts.  And we have

22 specifically -- our written objection specifically objects

23 to payment to those individuals in the vegetation

24 management division and in the risk evaluation division and

25 to executives such as Geisha Williams. (Phonetic)  To give

1   those bonuses priority over the claims of our clients and
2   those other parties who have final written executed and
3   effective settlements with PG&E that are unfunded, we would
4   like to see more detail from PG&E on the identities and the
5   amounts of those bonuses that they're seeking to pay to the
6   individuals in those programs.

7          THE COURT: Well, you did hear, and the papers do
8   say officers and directors, right?

9          MR. DE GHETALDI: Officers and directors and what
10  is or is not an officer in PG&E is not exactly clear
11  because they have directors who are not on the Board of
12  Directors, and their management structure is a little
13  opaque in that respect.  So names, amounts, to allow us to
14  make more specific objections.

15         THE COURT: But I gather you're zeroing in
16  specifically on two other categories of employees because
17  of what they've done, risk evaluation and I think you said
18  vegetation management.

19         MR. DE GHETALDI: Yes.

20         THE COURT: I mean I realize that both of those
21  labels or titles suggest why you're saying that, but how do
22  I do anything about that?  I mean what about somebody that
23  was doing the line repair job in, you know, Berkeley,
24  California is in the same legal category as somebody who is
25  an employee in either of those divisions.  So how do I draw

1 the line for that? I'm not talking about senior

2 management.

3       MR. DE GHETALDI: Okay. Your Honor, the reason we

4 would like the names, and we can work with the division --

5 with PG&E with respect to the divisions where these

6 employees would be assigned during the 2012 to 2015 time

7 period leading up to the Butte fire, but we want to be able

8 to make specific objections to those employees that we

9 believe had a part in the fault of creating the Butte fire.

10       THE COURT: Are those individuals named as

11 defendants in State Court actions?

12       MR. DE GHETALDI: No, Your Honor.

13       THE COURT: I mean then how do I -- I understand,

14 but how do I parse through a huge payroll and I or you say,

15 you know, Joe, who happened to work in the vegetation

16 management doesn't get a pay and it turned out Joe was on

17 medical leave at the time, I mean, and Sally was at work

18 that day. I mean we can't do that.

19       MR. DE GHETALDI: Your Honor, I've participated in

20 over a hundred depositions. I know the names of the people

21 that we're interested in, not seeing getting bonuses in

22 priority of payments to the persons, the victims, who have

23 enforceable settlement agreements that are unfunded.

24       THE COURT: Okay. Well, I didn't know the

25 background, so you've identified people, and I

1 | understand -- certainly understand what your concerns are.

2 | My question is what to do about it.  So -- I got it.  Okay.

3 | MR. DE GHETALDI: Thank you.

4 | THE COURT:  Other counsel?

5 | MR. KNAPP: Good afternoon, Your Honor, Brad Knapp

6 | of Locke Ford on behalf of the International Brotherhood of

7 | Electrical Workers, No. 1245.  With me are my partners,

8 | Steven Bryant and Meaghan Tom.  We'd like to underscore the

9 | importance of the entry of this interim order for PG&E's

10 | work force.  The IBW has about 12,000 PG&E employees as

11 | members and this goes a long way to assuring them that

12 | their continued employment, continued hard work on behalf

13 | of  Californians will go compensated.  We filed our

14 | reservation of rights because we have a few questions we

15 | want to work through before the final hearing, but

16 | otherwise, we urge that the Court grant the motion on an

17 | interim basis.

18 | THE COURT: Okay.  I got it.  Anyone else on the

19 | phone want to be heard on this?

20 | (No response.)

21 | All right.  No one in the court --

22 | MR. KAROTKIN: Just to respond briefly to counsel

23 | for the Butte claimants.  Number one, as I said, this is

24 | being deferred until the final hearing.  In any event,

25 | we're not asking for any authority on the stip payment.  To

1 | make clear what I said --

2 | THE COURT: Well, but you are for some other kinds
3 | of payment.

4 | MR. KAROTKIN: Yes, all the other things, yes.

5 | THE COURT: So if there are people who are in
6 | either of those two divisions that counsel complained
7 | about --

8 | MR. KAROTKIN: I thought he was only complaining
9 | about them getting a bonus.

10 | THE COURT: Well, maybe. Maybe again, I didn't
11 | understand it.

12 | MR. KAROTKIN: I didn't think he was
13 | complaining --

14 | THE COURT: Is that the case, only about bonuses?

15 | MR. DE GHETALDI: I was talking about pre-petition
16 | obligations to --

17 | MR. KAROTKIN: Including wages and compensation --

18 | THE COURT: So, wait. I mean just everyday run-
19 | of-the-mill type payments. So he is talking about more
20 | than bonuses.

21 | MR. DE GHETALDI: Not including wages.

22 | THE COURT: I mean I'll make a ruling. I just
23 | want to hear the arguments, one way or the other, what to
24 | do about it.

25 | MR. KAROTKIN: I was going to point out just so

1 the record is clear, the stip does not include officers; it

2 also does not include members of the Board of Directors.

3          THE COURT: How about former officers?

4          MR. KAROTKIN: It doesn't include former officers.

5          THE COURT: Okay. Well, again, there seems to be

6 some --

7          MR. KAROTKIN: Ms. Williams is not in. We're not

8 seeking --

9          THE COURT: She's not in this class of people.

10          MR. KAROTKIN: Not in the stip, no. No. No. No.

11          THE COURT: Okay.

12          MR. KAROTKIN: And just to mention one last thing,

13 counsel was talking about what happened in 2013, and not to

14 minimize that at all, but the 2018 stip is with respect to

15 2018 performance, not 2013.

16          THE COURT: So even if he has a quarrel with

17 somebody who is in vegetation management or risk

18 evaluation, you're telling me for the current period, that

19 person is doing his or her job and --

20          MR. KAROTKIN: And either warrants a bonus under

21 the program or does not.

22          THE COURT: And if there was fault or carelessness

23 or error by an individual several years ago, that's for the

24 employer to deal with under the current claims and whether

25 there are judgments or pending matters or State matters or

1  unfiled matters.

2        MR. KAROTKIN: Exactly, Your Honor.

3        THE COURT: All right.  I think I understand, and

4  I understand what the objections were by counsel on behalf

5  of his clients, Mr. De Ghetaldi, and again, I'm sympathetic

6  to the fate of his clients under these circumstances, but

7  I'm going to overrule those objections and grant the

8  Debtors' motion to grant their motion for –– what I'll call

9  for convenience the wages and benefits motion, recognizing

10 that there has been the various carve-outs, both the –– as

11 counsel explained without naming individuals, but rather

12 quantifying them by role of officer and/or director and

13 then also the stip –– I mean it's an awkward word "stip"

14 because we're used to using the word "stip" to do something

15 else, but if it's an employee benefit term, stip, that's

16 being deferred and not resolved –– or not dealt with today.

17 So for all those reasons, the objections will be overruled.

18 The motion will be granted and the orders to be entered

19 will be consistent with that, and I did –– I do acknowledge

20 that I misinterpreted the breakdown of what's to be paid in

21 the interim period versus later, and although there's a

22 substantial amount of money onto the so-called stip

23 terminology for later, there are others that are also being

24 deferred in lesser amounts and will be taken up at the

25 final hearing.

1          And let me make an aside, also we're covering a

2     lot of territory today.  Before we conclude, we'll talk

3     about when those final hearings are going to be, and they

4     may be at different times.

5          MR. KAROTKIN: Yes, sir.

6          THE COURT: All right.

7          MR. KAROTKIN: Just for a matter of housekeeping,

8     with respect to Mr. Wells' declaration, he's here in the

9     court and available for cross-examination.

10          THE COURT: No.  We're not going to have a trial

11     today.

12          MR. KAROTKIN: But I'm saying, we would ask that

13     that be moved into evidence.

14          THE COURT: Well, I mean it's in the document.  I

15     mean we're not treating the -- it's in the record, so --

16          MR. KAROTKIN: If it's in the record, that's fine

17     with us.

18          THE COURT: Well, you filed it.

19          MR. KAROTKIN: Yes, sir.  Okay.

20          THE COURT: Yeah.  Yeah.

21          MR. KAROTKIN: I think the last one before --

22          THE COURT: But let me comment on that.  Ms. Hayes

23     said that when she was complaining a little bit -- a little

24     bit, that it wasn't signed under penalty of perjury.  Well,

25     if she's correct, then maybe it should be signed under

1  penalty of perjury.  If she was incorrect, that it

2  wasn't –- I mean that it already was, then no harm, no

3  foul.  We don't have to deal with it today.

4       MR. KAROTKIN: I think if there are any questions,

5  Mr. Wells is here today, and he can attest to the fact that

6  the statements therein are truthful.

7       THE COURT: I don't want to do that.  I want to

8  make it simple.  If, as a matter of form, it was not

9  technical compliance with the normal attestation to a

10  declaration, he can do it after the fact.  I'm not going to

11  put him on the witness stand and turn him over for cross-

12  examination.

13       MR. KAROTKIN: Okay.  Thank you, sir.

14       THE COURT: Okay.

15       MR. KAROTKIN: So the last one before the DIP is

16  the NOL motion.

17       THE COURT: And did you get objections to that?

18       MR. KAROTKIN: No objections, just there were some

19  discussions with Mr. Bennett and his colleagues about

20  making certain revisions to the proposed order, that I was

21  asked to read into the record, and they will be included in

22  the order.

23       THE COURT: Okay.  I'll let you come to that in a

24  moment.  Is there anyone on the phone who wants to be heard

25  on what the Debtor has called the NOL Motion, but it's

1  really a little broader than that.

2       (No response.)

3            Okay.  There's no one there.  There's no one in

4  either courtroom.  I have no objections.  I have reviewed

5  it, and I'm prepared to approve it, as long as you're just

6  making some additional changes that you want to make on the

7  record.

8            MR. KAROTKIN: Yes.  We will submit a revised

9  order, Your Honor, where we will agree that confidential

10 information provided by people who may be subject to the

11 restrictions in the Notice of Provisions will be kept

12 confidential and will not be disclosed as to their holdings

13 and their identification.

14           THE COURT: Okay.

15           MR. KAROTKIN: There was a 20-business day notice

16 in the procedures before the acquisition could be effected,

17 and we've agreed to shorten that to 15 business days.

18           THE COURT: Well, does 20 days ever get the same

19 length as 15 business -- I mean --

20           MR. KAROTKIN: I'm sorry, it was 20 business days.

21 Sorry.

22           THE COURT: Business.

23           MR. KAROTKIN: Yes, business and business.

24           THE COURT: Apples and apples, not apples and

25 oranges.

1          MR. KAROTKIN: Yes, sir.  Yes.  Thank you.  Thank

2   you.

3          THE COURT: Okay.  I just want to make sure it

4   wasn't a slight of hand here with -- you know, we might

5   have a three-day holiday in there.

6      (Laughter.)

7          MR. KAROTKIN: And the objection period was also

8   shortened from 15 business days to ten business days.

9          THE COURT: Okay.

10          MR. KAROTKIN: The other provision in the order is

11   that in an effort perhaps to resolve any notices -- if any

12   confidential information is given to an attorney for a

13   purchaser or a proposed purchaser, it's agreed that that

14   information will not be transmitted to their client.

15          THE COURT: Okay.

16          MR. KAROTKIN: And that's to facilitate resolution

17   of any potential issues.

18          THE COURT: Mr. Bennett, did you want to be heard

19   on this?

20          MR. BENNETT: There's one more change that --

21          MR. KAROTKIN: There's one more.  I knew Mr.

22   Bennett would keep me honest here, Your Honor.  We agreed

23   that we would state on the record that we would reasonably

24   consider any request to acquire stock outside the formal

25   process, and again, that would be subject to our consent,

1  and if there was no agreement, they would have to follow

2  the procedures.

3       THE COURT: All right.  Does that take care of it,

4  Mr. Bennett, or is there something else?

5       MR. BENNETT: No.  With respect to the

6  confidentiality provision that Mr. Karotkin mentioned, the

7  requirement that there be a filing on the docket of the

8  Notice has been eliminated, so the reports go directly to

9  the Debtor.

10       MR. KAROTKIN: That's correct.

11       THE COURT: Okay.  So the order will reflect that.

12       MR. KAROTKIN: Yes, sir.

13       THE COURT: Okay.  And, you know, we didn't talk

14  about it procedurally, but anybody who interposes an

15  objection to anything today, you're going to give them a

16  copy of the form order, and you know my procedure is, we

17  will do orders that need to get signed quickly, quickly,

18  but orders that can wait a little bit, you make sure

19  anybody who complained about it or objected has an

20  opportunity to review it.  You're familiar with that

21  procedure, right?

22       MR. KAROTKIN: Yes, sir.

23       THE COURT: And I will tell you, I'm guilty of one

24  sin in this area, I sign the orders rather quickly, rather

25  than the seven-day rule, and if there is an order that

1   uploaded and somebody wants to be heard, they need to act

2   quickly.  Another point there.

3          MR. KAROTKIN: And I think for purposes of today's

4   relief, it is important that they get entered as soon as

5   possible.

6          THE COURT: Well, I mean like the NOL motion, is

7   that really time sensitive?

8          MR. KAROTKIN: Yes, it is, because with the stock

9   increasing in value, yes, it is important that they get

10  entered right away.

11         THE COURT: Have you checked with your broker in

12  the last couple of hours?  I haven't.

13         MR. KAROTKIN: I haven't, no.  I can't buy it, so

14  it doesn't matter.

15         THE COURT: Neither can I.  So -- but, okay.  Then

16  look, most of the lawyers who -- I mean, they're either

17  here or on the record.  They're also known to you, and we

18  just move quickly on it; that's all.  I want to move

19  quickly.

20         MR. KAROTKIN: Yes.

21         THE COURT: All right.  So we're down to just two

22  motions left?

23         MR. KAROTKIN: I think one.  Oh, two, the sealing

24  motion --

25         THE COURT: Well, no, the sealing motion --

1          MR. KAROTKIN: Yes, and the DIP.

2          THE COURT: -- I think I was told earlier, Ms.

3   Kelly, you had an objection to the sealing motion.

4          MS. KELLY: I do, Your Honor.

5          THE COURT: Mr. Klee?

6          MR. KLEE: Your Honor, may I interrupt for just a

7   second?

8          THE COURT: Yes.  Identify yourself.

9          MR. KLEE: Kenneth Klee of Klee, Tuchin, Bogdanoff

10  & Stern LLP for Next Era.

11         THE COURT: Good afternoon, Mr. Klee.

12         MR. KLEE:  We have an agreement we'd like to put

13  on the record, and we have the Department of Justice on the

14  phone, and we may lose them if we don't place it on the

15  record.

16         THE COURT: Okay.

17         MR. TSEKERIDES: Good afternoon, Your Honor, Ted

18  Tsekerides from Weil Gotshal on behalf of the Debtors.  So

19  we spent the morning going over the adversary proceeding

20  schedule that we talked about the other day.

21         THE COURT: Right.

22         MR. TSEKERIDES: I'm pleased to announce that

23  we've reached a deal that we want to put on the record with

24  respect to the scheduling and another related matter.  So

25  Your Honor may have seen, there were two, I think,

1 intervention motions filed.

2        THE COURT: I saw one, and I saw the motion to

3 withdraw the reference, and I saw the motion for the

4 summary judgment, but it'll come as no surprise, I didn't

5 sit down and read them all.

6        MR. TSEKERIDES: Fair enough.  I just want to let

7 you know what's required, and so Next Era is the one you

8 just heard from Mr. Klee, and Con Ed also had submitted

9 one.  So the three of us with FERC this morning worked out

10 a schedule that we think would satisfy everyone's needs and

11 hopefully the Court's as well.  So on the intervention,

12 there is a slightly accelerated schedule there, but the

13 parties are in agreement on it.  The intervention motion

14 would be heard on the 13th which is one of our days.

15        THE COURT: I guess that means you're going to

16 oppose it, right?

17        MR. TSEKERIDES: Yes, we are going to oppose it,

18 but the schedule is fine.

19        THE COURT: Yeah, no, I understand, but my first

20 reaction was, would they really be opposing it, but okay,

21 you're going to oppose it.

22        MR. TSEKERIDES: Well, we have an argument that we

23 think will be successful, but we'll see.  You'll decide.

24        THE COURT: So you're putting that on on our

25 February 13th calendar.

1           MR. TSEKERIDES: Right.  And we were going to put

2   that in the afternoon.  I don't know if that's something we

3   would do later as far as the timing.

4           THE COURT: Well, let's just get the rest of your

5   stip.

6           MR. TSEKERIDES: Okay.

7           THE COURT: I mean, you know, when we set these

8   dates the other day, it's only been two days ago, right; I

9   don't think we filled up any of our dance card yet.  It

10  will fill up quickly, however.  So you want it on the

11  afternoon of the 13th.

12          MR. TSEKERIDES: Correct.

13          THE COURT: Ms. Parada, we have the day clear,

14  right?

15          COURTROOM DEPUTY: Yes.

16          THE COURT: Yes.  Okay.

17          MR. TSEKERIDES: Our opposition would be on the

18  11th.  We were going to put a 4:00 p.m. Pacific --

19          THE COURT: Do I have to read the opposition?

20          MR. TSEKERIDES: It'll be short.

21      (Laughter.)

22          THE COURT: I signed an oversized brief order.

23  I'm going to sign an undersized brief order now.

24          MR. TSEKERIDES: That's on the main case.  We're

25  just the adversary proceeding.

1          THE COURT: What if I told you it's limited to two

2     pages?  Okay.  Opposition when, on the 11th.

3          MR. TSEKERIDES: On the 11th.

4          THE COURT: What time?

5          MR. TSEKERIDES: 4:00 p.m.

6          THE COURT: Thanks a lot.  San Francisco or New

7     York?

8          MR. TSEKERIDES: San Francisco.

9          THE COURT: Okay.

10         MR. TSEKERIDES:  And 2/12 for the reply for the

11    intervenors.

12         THE COURT: I'm not going to read them anyway.

13         MR. TSEKERIDES: You're not going to read them.

14         THE COURT: Unfortunately, I have a bad habit of

15    reading these things, so I will.

16         MR. TSEKERIDES: I'm sure theirs will be short

17    too.

18         THE COURT: Yeah, I'm sure.

19         MR. TSEKERIDES: So that's on the intervention.

20    Then on the Debtors' preliminary injunction motion, the

21    hearing date, frankly, it's already on, that we had filed

22    our --

23         THE COURT: I think you put it on --

24         MR. TSEKERIDES: 2/27.

25         THE COURT: The 27th.

1          MR. TSEKERIDES: That stays.

2          THE COURT: Yeah.  But doesn't that conflict with

3   your -- the drop dead from the government?  Oh --

4          MR. TSEKERIDES: We're going to address that.

5          THE COURT: Okay

6          MR. TSEKERIDES: So 2/27 for the PI hearing.

7          THE COURT: And we didn't set a time for that; or

8   did we?

9          MR. TSEKERIDES: That'll be in the afternoon as

10  well.

11         COURTROOM DEPUTY: Well, currently, we have it at

12  9:30.

13         MR. TSEKERIDES: Can we move that to 4:00 on your

14  schedule?

15         COURTROOM DEPUTY: The hearing?

16         MR. TSEKERIDES: Or the afternoon.

17         THE COURT: Well, yeah.  I mean we can accommodate

18  you.  Let me just look at one thing.  Wait one second.

19  Well, do you really want it on a late Friday afternoon?  I

20  mean, just as a matter of convenience -- I mean I live

21  here, but you don't.

22         MR. TSEKERIDES: The 27th.

23         THE COURT: Oh, I'm sorry.  I'm sorry.  I'm

24  looking at -- I'm sorry.  My error.

25         MR. TSEKERIDES: That's a Wednesday.

```
1              THE COURT: Yeah, yeah, okay.  Overload.  Okay.
2   What time?
3              MR. TSEKERIDES: So at 1:30?
4              THE COURT: All right.
5              MR. TSEKERIDES: And the opposition to that would
6   be on the 15th, so it's slightly different from the 14-7.
7   So again, it'll be on the 15th.
8              THE COURT: From both parties.  Well, all three.
9              MR. TSEKERIDES: Yeah, so for all three, even
10  though --
11             THE COURT: You've got three parties.
12             MR. TSEKERIDES: Right.
13             THE COURT: Okay.
14             MR. TSEKERIDES: So 4:00 p.m.
15             THE COURT: Can I get the three parties to get
16  together on their opposition, so I don't read the same
17  thing three times?  I mean I don't want to get the primer
18  on basic issues three times.
19             MR. TSEKERIDES: We would prefer that.
20             THE COURT: Well, let's finish the schedule and
21  then we'll talk about it.
22             MR. TSEKERIDES: We'll go through the schedules.
23  So that's the 15th at 4:00 p.m.
24             THE COURT: And reply?
25             MR. TSEKERIDES: 2/22 at 4:00 p.m.  And then as
```

1  relates to the FERC piece of that, we had further

2  discussions with the DOJ counsel and they have a similar

3  view now as we did on the 108's impact, and so we're going

4  to work out a stipulation that we would submit to the Court

5  to be so ordered that would lay that out, but we wanted to

6  at least put on the record today that both we and FERC,

7  through their DOJ counsel agree that 108 would allow the

8  Debtors to file a petition for re-hearing 60 days from the

9  filing of the Chapter 11 case, and we would prefer to have

10  that in a stip that gets so ordered.

11        THE COURT: Okay.  So the FERC drop dead deadline

12  that you talked about the other day has been extended by

13  stipulation.

14        MR. TSEKERIDES: Right.

15        THE COURT: Okay.

16        MR. TSEKERIDES: I mean -- right, exactly.

17        THE COURT: Put that please in a separate stand-

18  alone order, so we can deal with that.  Now what do I do

19  with all this if the motion to withdraw the reference is

20  acted on?

21        MR. TSEKERIDES: Well, I mean, you know, if's out

22  there; we'll oppose it, but it doesn't stay the --

23        THE COURT: I mean it goes, right?  But the point

24  is, as I understand the rules and remember them, you can

25  have the world's greatest motion to withdraw the reference

1  but I'm supposed to act on anything that's pending before
2  me, right?

3           MR. TSEKERIDES: Right.

4           THE COURT: Okay.

5           MR. TSEKERIDES: And we would think that in one of
6  the -- not the preview things, but that the District Court
7  would be informed by your rulings on some of these issues.

8           THE COURT: I would hope so, assuming the judge
9  reads them.

10          MR. TSEKERIDES: Right. So I will just make sure
11 counsel agrees with what I just said.

12          THE COURT: I know, but I'm not being facetious.
13 If somehow the motion to withdraw the reference is acted on
14 by the District Judge, and he or she withdraws it, then I'm
15 out of a job on this one, right? And right, Mr. Klee is
16 saying yes, it sounds right to me, but --

17          MR. TSEKERIDES: I mean if the reference is
18 withdrawn, yeah, I mean --

19          THE COURT: Yeah. I mean -- and I'm not -- it's
20 none of my business and I have no knowledge and probably
21 won't have any knowledge on what happens to it. All I'm
22 getting at is that if it's withdrawn; it's withdrawn, and
23 there's nothing before me, if the judge hasn't acted on it
24 or it's opposed or whatever, then my job is to do what I'm
25 supposed to do. So you guys just told me what I'm supposed

1  to do.  I got it.

2        MR. TSEKERIDES: Well, we suggested what we'd like

3  you to do.

4        THE COURT: No, no, no.  You gave me one day to

5  read all these things.

6     (Laughter.)

7        MR. TSEKERIDES: Why don't we do –– since the

8  counsel is on the phone and he has to go –– the DOJ lawyer

9  is on the phone ––

10       THE COURT: On the phone for the DOJ?  Just

11  restate your name and tell me if you're on board with the

12  stip?

13       MR. SACKS: Thank you, Your Honor.  This is Marc

14  Sacks, Department of Justice, on behalf of FERC and we are

15  on board with the stip.  We'll work out the language of

16  course, but we're comfortable and FERC is comfortable that

17  it will not treat a petition for re-hearing filed later

18  than 30 days under its rules, but prior to the 60 days

19  granted by 108 as a late-filed petition.  We will not treat

20  it as such.

21       THE COURT: Okay.  And do you want to get

22  everyone's agreement on that?  Thank you, on the phone,

23  counsel on the phone.

24       MR. STERN: Your Honor, David Stern also on behalf

25  of Next Era.  Good to see you.  On the briefing, just so

1  you know, FERC will probably file its own briefs.  We will

2  do our best to coordinate with Con Ed on briefing so that

3  you're not overloaded.

4         THE COURT: Well, it might come as no surprise to

5  you that I've got a lot of things to do these days, and as

6  much as I love good lawyering and know many of you, and I

7  put you in that category, if each of you reinvents the

8  wheel and I get 150 pages of briefs that could be done in

9  25, it's a little more difficult.  That's all.

10        MR. STERN: No, we will follow Mark Twain's adage

11 and not write you a long letter.

12        THE COURT: Yeah.  Sorry, my brief is so long; I

13 didn't have enough time, right?

14        MR. STERN: Right.  No, we'll do it.  And all of

15 this is acceptable to Next Era, and we're pleased that we

16 were able to work out a schedule.

17        THE COURT: You're here for Con Ed, right?

18        MR. McDONALD: Yes, Your Honor.  Hugh MacDonald,

19 on behalf of Con Edison.  I echo Mr. Stern's sentiments.

20 We are going to coordinate to try and obviously present to

21 the Court a concise brief.  We will explore other ways to

22 make sure that it is not duplicate in any way.  We will

23 streamline the briefing.

24        THE COURT: Well, I'm certainly not inviting you

25 to short change or shortcut anything but you're all

1  experienced.  You've all worked together on countless

2  cases.  You all at least have a common set of preliminaries

3  or whatevers and then just make it easier for me, because

4  I've got my hands full.  And I'm going to try to agree with

5  your schedule, and I will agree with it.

6          MR. McDONALD: As the Court is aware from the

7  first PG&E, these issues are very complex, and so we will

8  try and deal with it.

9          THE COURT: Piece of cake.

10         MR. McDONALD: Piece of cake, right?

11         THE COURT: Piece of cake.

12         MR. McDONALD: Like the intervention.

13         THE COURT: I love preemption questions.

14     (Laughter.)

15         MR. McDONALD: Thank you, Your Honor.

16         THE COURT: Thank you for working that out.

17         MR. STERN: Your Honor?

18         THE COURT: Yes.

19         MR. STERN: Do you want a scheduling order from

20  us?

21         THE COURT: Well, I think it would be helpful --

22  not a scheduling order, but just memorialize the stip so

23  that it has these deadlines in them.  It's a good way to

24  keep track -- for all of us to keep track of what we're

25  doing and the public.  I mean everybody is entitled to

1 | know.

2 | MR. STERN: We'll circulate something and get it
3 | filed.

4 | THE COURT: Yeah, but I don't need any kind of
5 | pre-trial order. I mean, look, unless I'm missing
6 | something, I've got a very discreet question, and the issue
7 | of, well, other courts have dealt with it or not, and if
8 | I've got enough out of it -- Mr. Stern, your side believes
9 | that PG&E took a contrary position in the past, and, you
10 | know, so there I've going to have to see what to do about
11 | that.

12 | MR. STERN: Agreed.

13 | THE COURT: That was in the prior case. No, it
14 | wasn't in the prior case.

15 | MR. STERN: That was 12 years ago.

16 | MR. McCAIN: Your Honor?

17 | THE COURT: Yes.

18 | MR. McCAIN: From the overflow room.

19 | THE COURT: Oh, I'm sorry, yes. Who is that?

20 | MR. McCAIN: Thank you. It's Mark McCain of
21 | Kirkland and Ellis on behalf of Cal Pine Corporation. We
22 | are a contract on a party and believe -- we're parties to
23 | the FERC orders as well. If there's going to be a
24 | stipulation with this type of schedule, is the Court going
25 | to set a date by which other parties should intervene? For

1   example, to the extent that we're going to be all doing

2   this in the next month or so, would that include a date by

3   Monday for other parties to intervene, so that they could

4   coordinate together with Ms. Serra (Phonetic) and kind

5   of --

6           THE COURT: Well, I mean that's a two-part

7   question.  I should let the lawyers answer instead of

8   myself, but it's one thing to move to intervene; it's

9   another thing to coordinate on briefing.  So what's --

10          MR. McCAIN: Yeah.  We will coordinate on the

11  briefing, Your Honor.  We just want to make certain that

12  we're not excluded from our opportunity to intervene based

13  on a stipulation on how this is going to be addressed in

14  the next --

15          THE COURT: Well, I'm going to try it a different

16  way, and I'll ask Debtors' counsel, would you be agreeable

17  to -- by giving a deadline for people like Cal Pine to make

18  its motion to intervene?

19          MR. TSEKERIDES: Well, I wouldn't be agreeable.  I

20  mean they had an opportunity to file motions.  We have a

21  schedule, and this is exactly -- one of the arguments we're

22  going to be making; I'm not giving anything away is that we

23  don't think every single counter-party to the Debtors'

24  contracts has a right to be in the one case against FERC

25  that's going to deal with jurisdiction.  So we have a

1  schedule.  If they want to work with the other parties to
2  submit something, we're not going to -- I don't think it's
3  appropriate to ask the Debtor to respond to 150 or whatever
4  other intervention motions.

5      THE COURT: No, it's not appropriate for the Judge
6  to respond to that many either.

7      MR. TSEKERIDES: Exactly.

8      THE COURT: But on the other hand, if it's a "me
9  to" and somebody says I want to be at the table at least on
10 the argument that's presented, that's not so --

11     MR. TSEKERIDES: If it's like that and you want to
12 set a date so that we know who we're dealing with, but
13 they're not filing a brief, I'd be open to something like
14 that.  But I don't think we should have to be responding to
15 other briefs.  I mean they should at most be given the
16 opportunity to say, yes, we're joining in that, and you can
17 deal with that, because I assume the arguments are going to
18 be the same, because I can tell you that pretty much right
19 now.

20     THE COURT: Well, that's what I'm assuming.  So
21 that's why if the argument is the same, it seems to me the
22 pros and cons of the preliminary argument, can they
23 intervene -- can anybody intervene, and then if the answer
24 to that question is no, then we kick them out.  If the
25 answer is yes, then they're at the table on the --

1  essentially the preemption argument, right?

2          MR. TSEKERIDES: I mean so since we have the 11th,

3  I think we would like to know that by the 4th at the latest.

4          THE COURT: So would you please -- counsel on the

5  phone -- I mean in the courtroom across the way, I just

6  didn't get your last name.

7          MR. McCAIN: I apologize, Your Honor.  It's Mark

8  McCain for Cal Pine.

9          THE COURT: So what's your --

10          MR. McCAIN: And I certainly know the law firm and

11  I've worked with all the folks as well.

12          THE COURT: No, of course you do.  But what's your

13  suggestion on the timing here?

14          MR. McCAIN: My suggestion is that there be -- to

15  the extent there's going to be a stip accelerating their

16  motion for intervention, that there be a date that all

17  motions to intervene be set by 4:00 o'clock on the 4th.  I

18  don't think that's a problem.

19          THE COURT: Okay.  But you understand my concern

20  and I think that Debtors' counsel --

21          MR. McCAIN: I do, Your Honor.

22          THE COURT: I don't want 20 briefs.  I can't

23  handle them.

24          MR. McCAIN: Absolutely, Your Honor.  In fact,

25  Your Honor, I was counsel on the first energy case and

1  coordinated with similar counter-parties for joint briefing

2  and was also working with FERC on those issues.

3      MR. TSEKERIDES: Just so we're clear, we're not

4  talking -- I mean he said "motions."  I mean if they want

5  to say yes, we're going to be joining in what other people

6  are doing, that's fine, but again, we're not inviting, you

7  know, 50, 100, a lot of counter-parties.

8      THE COURT: I know you're not.  I mean it's now

9  after 1:00 o'clock and we're not even at the DIP motion.

10  So now we got sidetracked here.  I mean I know this is a

11  very important issue, and in the little time I've had to

12  learn everything, I took time to at least understand what's

13  at stake here, and I know how serious it is.  But I didn't

14  have a deadline for filing motions to intervene, and now if

15  Mr. McCain or somebody else wants to intervene, if you

16  don't want to even agree to let them be there arguing to

17  intervene, then what do I do?  Then they file a separate

18  motion to intervene and a motion to shorten time, and we

19  have a hearing on whether they can intervene.

20      MR. TSEKERIDES: Well, to be clear, I'm not saying

21  that, Your Honor.

22      THE COURT: Okay.

23      MR. TSEKERIDES: When he said "motions" is what

24  set me off a bit.  But if we have a 4:00 p.m. Monday, this

25  coming Monday, 4:00 p.m., that they have to file some

1  thing, and then we'll deal with that after that, that

2  they're going to be seeking to intervene in that motion

3  that we just sequenced, then I think that's what we should

4  do.

5        THE COURT: Okay.  So Mr. McCain, I'll go along

6  with that, and then any other similarly situated party,

7  it's the same deal, but the price of this -- my consent

8  here is that you coordinate so we don't have overwhelming

9  numbers of arguments and briefs and so on, that rather you

10 work with the principal lawyers and these two, Mr. Klee and

11 Mr. Stern, and Con Ed's lawyers, they are sort of like the

12 lead issue -- I mean arguers on this issue.  I'm not

13 stating it very well, but I hope you get the message.  Do

14 you?

15        MR. McCAIN: I understand, Your Honor.

16        THE COURT: Okay.  All right.

17        MR. TSEKERIDES: Okay.

18        MR. McCAIN: Thank you.

19        THE COURT: I look forward to the stipulation.

20        MR. TSEKERIDES: Thank you, Your Honor.

21        THE COURT: So Mr. Karotkin, I think we're going

22 to take a break.  I mean this is not a torture -- I know

23 what you wanted to get done, but I just -- unless everybody

24 has rolled over and the DIP motion is stipulated to --

25        MR. TSEKERIDES: If you don't let them each lunch,

1  they'll roll over.

2        THE COURT: Yeah, I know.

3     (Laughter.)

4        MR. TSEKERIDES: No, that's fine, whatever you

5  want.

6        THE COURT: But if the cafeteria closes, they're

7  in worse trouble.  Okay.  Well, again, we'll do our best to

8  get out of here within a reasonable time, but I'm going to

9  take a break now until -- I'll make it 2:15 on that clock,

10 so if you want to have lunch, go for it.

11       ALL COUNSEL: Thank you, Your Honor.

12       THE COURT: Thank you.

13    (Whereupon, the luncheon recess is taken at 1:11 p.m.,

14 and the court is reconvened at 2:16 p.m.)

15       COURTROOM DEPUTY: All rise.

16       THE COURT: Good afternoon again.  Please be

17 seated.  All right.  So how are we coming on our agenda

18 here?  Mr. Karotkin, as I recall, from what you said

19 before, we've got the Motion to Seal and the DID motion,

20 and that's it, right?

21       MR. KAROTKIN: That's it, sir.

22       THE COURT: Yeah.  And then after that, for

23 anybody who is hanging around, we'll schedule what we're

24 going to pencil in for the coming --

25       MR. KAROTKIN: Mr. Zumbro from the Cravath firm is

1  going to handle the DIP.

2          THE COURT: And the sealing motion also?

3          MR KAROTKIN: Yes, sir.

4          THE COURT: Mr. Zumbro, good afternoon.

5          MR. ZUMBRO: Good afternoon, Your Honor.

6          THE COURT: Welcome to the court.

7          MR. ZUMBRO: Thank you, sir.  Paul Zumbro from

8  Cravath Swaine & Moore, proposed counsel for the Debtors.

9          THE COURT: I understand we had one objection on

10 the sealing motion; is that right?

11         MR. ZUMBRO: Yes, sir.  There's one objection on

12 the sealing motion, and I believe, Your Honor, there's only

13 one live objection as well on the DIP motion itself.  All

14 the other either objections or reservations of rights have

15 been addressed through language changes which I'm happy to

16 walk the Court through.

17         THE COURT: Well, I do have some questions too for

18 you on that one, but --

19         MR. ZUMBRO: Certainly.

20         THE COURT: Do you mind, can we just do the

21 sealing motion first?

22         MR. ZUMBRO: Sure, Your Honor, if that's how the

23 Court would prefer to proceed.

24         THE COURT: Well, it's discreet and Ms. Kelly, I

25 presume you're going to tell me that I should unseal it and

1   Mr. Zumbro is going to tell you, you shouldn't, and guess

2   what?  What else is there to talk about?

3       (Laughter.)

4           MR. ZUMBRO: Well, perhaps I let Ms. Kelly tell

5   the Court --

6           THE COURT: Why didn't we do this before lunch,

7   right?

8           MR. ZUMBRO: Perhaps, Your Honor, I can just share

9   the Debtors' thoughts briefly on that motion before turning

10  the podium over to the U.S. Trustee.  Your Honor, I think

11  the main thrust of Ms. Kelly's objection is that the U.S.

12  Trustee asserts that the public needs to know how much the

13  DIP financing will cost the Debtors.  And, Your Honor, we

14  agree with that basic predicate.  In our moving papers, and

15  the Kurtz declaration that supports those papers in

16  particular, we disclose the aggregate financing fees.  I

17  would point Your Honor to Docket No. 24 at paragraph 25.

18          THE COURT: I'm not sure that I got a copy of Mr.

19  Kurtz' declaration in the binder.  Maybe I did, but I --

20          MR. ZUMBRO: It was filed in connection with the

21  DIP financing motion.

22          THE COURT: No.  I know there was.  I was

23  reviewing it, and there was a reference to the Kurtz

24  declaration, and of course I can go to the docket also, but

25  I was using the big binder, and so --

1    MR. ZUMBRO: If I could have permission to

2    approach, I would happy to hand -- it's just one paragraph,

3    one sentence I'd like to point the Court to.

4    THE COURT: Okay.

5    MR. ZUMBRO: Thank you, Your Honor.

6    THE COURT: What's the docket number?

7    MR. ZUMBRO: Docket No. 24.

8    THE COURT: 24, okay.  Yeah.  I think in fact it

9    was just in passing; it was a reference in the DIP motion

10   and it just said, you know, Kurtz, not declaration of Mr.

11   Kurtz, but Kurtz, paragraph subsection, and I thought,

12   well, what are they --

13   MR. ZUMBRO: There may have been some confusion,

14   sir, because there were two Kurtz declarations, one which

15   was filed in support of the DIP motion to talk about the

16   marketing process we underwent, and the second one filed in

17   support of the sealing motion, which talks about normal

18   practices with fees.  I was actually referring to the Kurtz

19   declaration which was filed in connection with the DIP

20   motion itself.

21   THE COURT: Well, what I think is -- unless I

22   overlooked it in this great big binder, I don't think I was

23   given a hard copy, and so I knew what it was going to say

24   and I went to make sure I knew his affiliation, because he

25   was saying what he was saying about it and I didn't want

1  him to be lined up as one of the Debtors, and he's not.

2  So, okay.  Well, let's get back to the sealing motion.  So

3  what do you think -- what is the disclosure --

4          MR. ZUMBRO: Well, the point I was trying to make,

5  sir, is that I think that the U.S. Trustee and the public

6  at large has an interest in knowing what the aggregate

7  financing fees were for the DIP motion that we'll propose

8  pursuant to the separate motion.  And we have disclosed

9  that in the declaration that I reference at Docket No. 24,

10  which was 95.25 million dollars, which sounds like a lot of

11  money but it's all relative.  It's approximately 1.7

12  percent of the aggregate 5.5 billion --

13          THE COURT: But you're just showing me the -- oh,

14  wait one second.  Yeah, I just have the page 11.  I have

15  the last phrase.  Here we go.  All I have is a half a

16  sentence, but --

17          MR. ZUMBRO: I'm sorry, sir.

18          THE COURT: So I had the 1.7 percent.

19          MR. ZUMBRO: Right.  And the prior page I think is

20  confusing; it's double-sided printing.

21          THE COURT: No, that's all right.

22          MR. ZUMBRO: It just talks about how the aggregate

23  fees are 95.25 million dollars.

24          THE COURT: So Ms. Kelly, I understand you might

25  want more than that, but at least you've had a chance to

1  see that that's there, and perhaps the media or the public

2  can see that figure, right?  Beyond that, what do you want

3  to say?  I mean why should I do more than that?  I have the

4  advantage and maybe you also -- did you actually read what

5  was in the sealed document?

6        MS. KELLY: I believe that we do have the

7  unredacted version, yes.

8        THE COURT: Yeah.  Well, you're supposed to.  And

9  I did and I understand what it says, and I'm not going to

10 repeat it here, but I also understand why there's a request

11 to seal it.  So --

12       MS. KELLY: Okay.  Well, Your Honor, where we

13 start from is that normally in bankruptcy, of course, most

14 things, even financial information, is disclosed and is

15 transparent, unless it meets the very stringent

16 requirements with respect to sealing, and even if it does,

17 even if there is some commercially sensitive information,

18 it is looked at in the most narrow sense.  In other words,

19 if there is some piece of information -- I understand

20 there's something called "market flex" or "flex market"

21 information.

22       THE COURT: Well, try not to disclose what you're

23 talking about because the three of us have read the

24 document, so --

25       MS. KELLY: Yeah.  Well, I mean I think it's in

1   the papers.  Yes, but I believe that term has been used,

2   and, you know, that perhaps that is a sensitive piece of

3   information, but that doesn't necessarily encompass the

4   entirety of the letters that we're talking about.  So I

5   think if the Court were to find that there is commercially

6   sensitive information and that those particular numbers

7   should not be shared, I think we should look at whether

8   that could be a matter of redaction rather than disclose --

9   sealing the entire documents.  So I would just propose

10  that.

11          THE COURT: Is that feasible, Mr. Zumbro?

12          MR. ZUMBRO: Your Honor, we have no objection to

13  redaction in concept, as long as -- our DIP lender is

14  sensitive because it is a very competitive business.

15          THE COURT: No, I understand that.

16          MR. ZUMBRO: Our DIP lender is sensitive to

17  having -- the way the fees are sliced and diced is

18  commercially sensitive information, and we think they're

19  entitled to the protection of 107.  So we are perfectly

20  happy if Your Honor would --

21          THE COURT: Well, wait a minute.  Is the lender

22  happy?

23          MR. ZUMBRO: The lender I believe will be happy as

24  long as all of the economic terms, fee related terms, are

25  redacted.

1          THE COURT: Well, okay, but let's pretend in

2    hypothetical because I'm not going to disclose what I've

3    learned --

4          MR. ZUMBRO: Yes, sir.

5          THE COURT: -- but let's do it -- you know, as a

6    beauty contest, to hire a lawyer, and the lawyer says to

7    the client, I'll take this case for a fraction of my hourly

8    rate, and my billing rate will only be, you know, $200 an

9    hour.  But he doesn't want that to get out because other

10   clients might complain or, you know -- you know all the

11   reasons.  So is it sufficient in your view and to the

12   lender's view that we just redact out the amounts and

13   percentages and not sort of the whole environment of the,

14   you know, what took place between the lenders and the

15   company.

16         MR. ZUMBRO: Well, let me -- I think lender's

17   counsel is in the courtroom, so I'll let them speak for

18   themselves.

19         THE COURT: He's right behind you.

20         MR. ZUMBRO: From the Debtors' perspective, the

21   market flex terms that Ms. Kelly referred to are very

22   important to the Debtor.  The reason for that is because

23   they sort of show what pricing we would have been willing

24   to pay if JP Morgan hadn't been successful in syndicating

25   it, so it's very important because it could potentially

1  make future financings more expensive --

2         THE COURT: No, I understand.

3         MR. ZUMBRO:  -- so the Debtor would propose that

4  the market flex provisions be redacted in their entirety,

5  and whether it would be sufficient just to redact out the

6  specific numbers would suffice for JP Morgan's purposes.

7  I'll cede the podium to my colleague.

8         THE COURT: Let's see what the lender wants to

9  say.

10         MR. HANSEN: Good afternoon, Your Honor, Kris

11  Hansen with Strook, Strook & Lavan on behalf of JP Morgan

12  Chase as administrative agent on the DIP loan.  Your Honor,

13  so there's more than just the dollar amounts in the letter.

14  I know you've seen them from a --

15         THE COURT: That's what I'm wondering.

16         MR. HANSEN: There's architecture to this that is

17  sensitive and banks compete not only in the DIP market but

18  outside of the DIP market.  We have other customers as well

19  and that architecture isn't simply, to your example, $200

20  an hour.  There also might be -- I might structure a

21  portion of it as a contingency fee if I was a lawyer, and I

22  might talk about what I might collect out in the future,

23  and I might talk about when the timing of payment was --

24  just to use your example from a lawyer's perspective.

25         THE COURT: Well, I used to be one.

1          MR. HANSEN: And so everything from that

2    perspective in our view is commercially sensitive

3    information.  It's competitive because that's how we at JP

4    Morgan price our loans and that's how in this one, we've

5    gone out to say, we want to prevail here.  And from the

6    Debtors' perspective, we're in a very competitive process,

7    and we were selected not only on the dollars but also upon

8    the way we structured it.  And so from a redaction

9    standpoint, the letters get very, very heavily redacted

10   when you take into account those types of things.

11         THE COURT: Well, if you watch CNN, you'll see

12   they're always publishing the latest strata of a special

13   prosecutor and you get the entire document redacted.

14         MR. HANSEN: Right.  And so --

15         THE COURT: I could get one of those for this

16   case.

17         MR. HANSEN: So our -- obviously JP Morgan's very

18   strong preference is to seal them because when you think

19   about the public interest, the public really doesn't have

20   an interest in how JPM assembles the fees and the

21   structures associated with how it charges those fees.

22         THE COURT: Well, but don't you concede, though,

23   the public does have an interest in knowing how much the

24   Debtor is going to be paying for this whole deal.

25         MR. HANSEN: Which has been publicly disclosed,

1  and we have no problem publicly disclosing that, and that

2  number that Mr. Zumbro cited is an all-in number, so that

3  number includes many different components that appear

4  within those letters.

5          THE COURT: No, I understand.  So your suggestion

6  really -- it's the Debtors' motion but JP Morgan would like

7  the entire document to stay redacted.

8          MR. HANSEN: Yes, Your Honor, and there's ample

9  precedent for that --

10          THE COURT: No, I know there is.

11          MR. HANSEN: -- which we can cite to you as well.

12          THE COURT: I should tell you, those of you that

13  worked in the first PG&E case, we had early in the case, we

14  had a lawyer who was not as well informed as you are.  He

15  filed a motion to redact a document that he attached to the

16  public motion --

17      (Laughter.)

18  -- and I granted the motion.

19      (Laughter.)

20  But it was all over the Internet.  I'm going to go with the

21  more cautious point of view here, and I do appreciate Ms.

22  Kelly's point of view and the public's point of view, and I

23  know the U.S. Trustee guards carefully the issue and hear

24  her or that office's views on what should or shouldn't be

25  redacted.  To me it's just -- it's insufficient just to

1 block out a number and if we start to get more than that,

2 I'll be here all afternoon trying to figure out what to

3 redact or not, and, you know, I tell you -- you know, tell

4 me what CNN says about it or something else. It's really

5 that's what it would amount to. It would be nothing of any

6 benefit. So Ms. Kelly, I appreciate your comments and

7 contribution, but I'm going to overrule your objection and

8 go ahead and grant the sealing motion as is.

9          MR. HANSEN: Thank you, Your Honor.

10          THE COURT: And if there's some reason or somebody

11 in the future to feel that that needs to be disclosed, then

12 they can make the proper motion and notice to JP Morgan and

13 the Debtor, and we'll decide it then.

14          MR. ZUMBRO: We thank you, sir.

15          THE COURT: Mr. Zumbro, do you want me -- these

16 are extra copies for you? I mean do you want me to toss

17 them or -- I'm not going to keep them.

18          MR. ZUMBRO: I'll take them back. Thank you.

19          THE COURT: Okay. So you're doing the -- you got

20 the watch on the DIP motion.

21          MR. ZUMBRO: Well, now that we've got the

22 difficult issue of the sealing motion out of the way, we

23 can turn back to the easier task at hand, which is the DIP

24 financing motion. As I said, I'm Paul Zumbro from Cravath

25 Swaine & Moore, propose counsel for the Debtors. I just

1 | wanted to reiterate what Mr. Karotkin said this morning.

2 | We wanted to thank the Court for making itself available

3 | again this week to commence these important Chapter 11

4 | cases.

5 | THE COURT: Don't thank me. I live here. Thanks

6 | for putting it all together on my -- I think all the

7 | lawyers and all the parties have just done a terrific job

8 | and the same with the people that are responding to it.

9 | It's been a challenge for everybody. But that's enough of

10 | handing out thanks. Let's see if we get to the merits

11 | here.

12 | MR. ZUMBRO: Yes, sir.

13 | THE COURT: I've been through most of it.

14 | MR. ZUMBRO: Okay. Your Honor referred to the DIP

15 | Motion --

16 | THE COURT: I have a couple of questions.

17 | MR. ZUMBRO: -- as a big ticket item, and we

18 | agree, and I have a summary of the material terms of the

19 | order as well as the DIP credit facility which I'm happy to

20 | walk through, but if Your Honor would prefer to just jump

21 | to specific questions, I'm happy to do that or if you'd

22 | like me to address the U.S. Trustee's objection, which

23 | seems to me really principally focused on the question of

24 | whether the Debtor really needs the 1.5 billion dollars of

25 | availability that we're requesting authorization for today.

1 I'd be happy to hop right into that.

2 THE COURT: well, let me take a different approach
3 for you.

4 MR. ZUMBRO: Sure.

5 THE COURT: I have -- I won't tell you that I read
6 all 160 pages of the document including the exhibits or
7 whatever, but I'm one of the proponents way back when the
8 rules were changed a few years ago for the introductory
9 statement and why it needs to be helpful to the Court and
10 to others, and I think that the lawyers who put together
11 this portion of all these papers did a wonderful job and
12 then going and matching up and cross-referencing the
13 material terms with a citation to something such as our
14 guidelines. And again, for those of you who are not
15 regulars here in Northern California, we've had our cash
16 collateral guidelines in place before Delaware even stole
17 our versions of them.

18 (Laughter.)

19 And, you know, we did it on purpose because we
20 can see when there was a typo. We put it in there to -- if
21 they got a typo, it means they stole ours.

22 MR. ZUMBRO: Exactly.

23 THE COURT: But that being said, there are a
24 couple of things that jumped out at somebody who has been
25 living with the Northern District guidelines for a while,

1  and one is perhaps more technical in nature, but I don't

2  think that the counsel whom I know and respect, local

3  counsel, signed -- made the certification the way it's

4  supposed to be made because I don't think there was a

5  highlighting of where there might be a departure from the

6  guidelines.  But I'm not here to dump on Mr. Keller.  I'm

7  really focusing on the summary that I don't hear a good

8  explanation as to why at this point or even on a

9  preliminary hearing basis I should be allowing the Debtor

10 to waive the 506(c) and waiving the avoidance claims.  This

11 is a Debtor who, by everybody's expectation, before the

12 financing -- well, obviously before the financing -- has

13 lots of unencumbered assets, but even after the financing,

14 will have lots of unencumbered assets, and I wasn't

15 comfortable with just kind of on the fly saying, you can

16 waive your avoidance actions, and you can waive your 506(c)

17 recoveries, and you can have a nice generous carve-out for

18 the Chapter 7 trustee who will never come into existence.

19        So my question is, why don't we have a more

20 realistic carve-out for professionals if they are appointed

21 in this case, adverse to the Debtor.  Look, I'm not naive.

22 It's inconceivable that this Debtor in its present

23 situation could end up in Chapter 7, but what if there's a

24 motion for a trustee considered and granted?  What happens

25 to the trustee's professionals?  Why isn't the carve-out

1 there for all professionals?  That's the one question.  And

2 maybe -- maybe, this Debtor will never have the kind of

3 insolvency outcome that might happen, and so therefore it

4 doesn't have to concern itself with avoidance actions.  But

5 why on the third day of the case should I even allow those

6 to be done?  Okay?  That's a long way of saying I'm not

7 comfortable until somebody makes me really comfortable with

8 the Debtor giving up avoidance actions, 506(c) not as

9 important, and really having no realistic ability to

10 protect what might be, say, a trustee appointed, if there

11 ever was a trustee.  Unless I misread it, it looks like

12 there's a $100,000 carve-out for only a Chapter 7 trustee.

13 Am I right?  Did I read it correctly?

14          MR. ZUMBRO: You are correct on that number, yes,

15 sir.

16          THE COURT: It's meaningless in a case like this,

17 right?  I mean you don't have to agree with me.  I think

18 it's meaningless in a case like this.  So you've got to

19 persuade me otherwise.

20          MR. ZUMBRO: Well, perhaps I could start first

21 with the avoidance actions.  I think that one might be

22 easier.  That one, just to clarify, because I think the

23 U.S. Trustee had raised this in its objection as well.  I

24 just want to be clear that the DIP loan doesn't purport to

25 grant a lien on the avoidance actions themselves, but

1    rather on just the proceeds.

2              THE COURT: What does that mean?

3              MR. ZUMBRO: In other words, the DIP lender

4    couldn't control the prosecution of the action, but rather

5    it would be part of any proceeds received from such an

6    action.

7              THE COURT: Well, but I mean as a practical

8    matter, it's the same thing.

9              MR. ZUMBRO: In any event, it's not going to be

10   until the final hearing, so that's -- after a committee has

11   been formed.  The relief we're seeking today does not allow

12   the lien to attach to any avoidance action proceeds.

13             THE COURT: Well, I didn't remember that

14   specifically, but certainly the carve-out survives the

15   final, right?

16             MR. ZUMBRO: That is true.

17             THE COURT: And I would hope that a Creditors'

18   Committee might say, what about me?  And you know that'll

19   happen.  So this kind of goes back to the certification.  I

20   mean I appreciate this great big long thing, and it was

21   helpful to work through it, but those are the kinds of

22   things that should be flagged.  So look, Mr. Zumbro, if I

23   approve it today on an interim basis and say, okay, we're

24   going to revisit the avoidance actions at the final

25   hearing, then we'll be facing it at the final hearing,

1    unless the lenders or the Debtors just capitulate and

2    extend the carve-out to all the people that get their

3    compensation --

4           MR. ZUMBRO: Just to make sure that we're speaking

5    about the same thing.  The hundred thousand dollars that

6    you referenced earlier was for a Chapter 7 trustee, but the

7    estate professional fee carve-out also is drafted to pick

8    up the Committee's counsel once it's formed.  So --

9           THE COURT: Well, maybe I missed it then.  Let me

10   look at it.  I'm looking at --

11          MR. ZUMBRO: It's further down.  I'm looking at --

12   I guess I'm looking at the "as-filed" version of the

13   proposed order in paragraph 10.

14          THE COURT: Well, but I was looking at the

15   motions.

16          MR. ZUMBRO: Okay.

17          THE COURT: You know, you can't -- so -- all

18   right.  Let me try to get my way through them.  Well, you

19   know what, I've got to find the proposed order.  Here's the

20   motion.  Okay.  No, you know, I said before that I didn't

21   have Mr. Kurtz' declaration, but indeed I do have it.  Just

22   a second.  Okay.  I don't see it unless I'm just -- my eyes

23   are glazing over, so --

24          MR. ZUMBRO: I was looking at Docket No. 23-1

25   which is the form of the proposed order that was filed with

1   the petitions, and the carve-out there consists of a couple

2   of different components as well as --

3         THE COURT: All right.  I'm going to catch up with

4   you.  What page?

5         MR. ZUMBRO: That's page No. 20 of 37 of Docket

6   No. 23-1.

7         THE COURT: I do have it now.  It was hiding

8   behind one of the blue pages.  Page 27?

9         MR. ZUMBRO 20, 20 of 37 of Docket No. 23-1.

10        THE COURT: Got it.  Okay, carve-out.

11        MR. ZUMBRO: And so the carve-out as is typical is

12  composed of a couple of different components including the

13  U.S. Trustee's fees, but it's also the estate

14  professionals, an the estate professionals is defined not

15  only to mean the Debtors' professionals but the

16  professionals of any committee.  So there is a number, the

17  25 million dollars, is the number that would apply post --

18  the carve-out trigger notice for all estate professionals.

19        THE COURT: Again, I'm sorry to be nitpicking

20  about forms of orders, but I look at motions and not form

21  of orders and I don't think it was clear, so let me just

22  take one second and read it in the proposed order.

23        MR. ZUMBRO: Sure.

24        THE COURT:  We've got the Clerk; that's easy.

25  We've got the U.S. Trustee.  There's the Chapter 7 trustee.

1   Okay.  All right.  There's the committee.

2            MR. ZUMBRO: I think it's on line 17.

3            THE COURT: Yeah, I've got it.  So the committee

4   there -- all right -- so -- but do you agree with me, if

5   somebody persuaded the Court to replace the debtor in

6   possession with a trustee -- you know, I understand that

7   might trigger all sorts of things, but in such a case, that

8   trustee and professionals are not beneficiaries of the

9   carve-out.

10           MR. ZUMBRO: I don't disagree with that really.  I

11  do think it's unlikely that this particular Debtor will end

12  up in Chapter 7.  I just think it's --

13           THE COURT: No.  That isn't what I said -- Chapter

14  11 trustee.

15           MR. ZUMBRO: Chapter 11 trustee.

16           THE COURT: I agree with you.  Look, I live here

17  in Northern California.  I don't think this Debtor can go

18  into Chapter 7 any more than anybody else can.  But there

19  are public complaints about management.  You've heard it.

20  I said this morning, it's not my job in this case right

21  now; it's another court that's carrying all these

22  complaints about the Debtor.  But what if under whatever

23  circumstance a party persuaded the Bankruptcy Court to

24  appoint a Chapter 11 trustee?  That trustee as I read it

25  would not have the benefit of a carve-out.  That's all.

1  Right?

2          MR. ZUMBRO: That's correct.

3          THE COURT: Okay.  What do I do about it?

4          MR. ZUMBRO: Well, I think if we got to that place

5  where a Chapter 11 trustee were appointed, I think as part

6  of the -- whoever moved for that, and we don't think that a

7  Chapter 11 trustee is appropriate in this case --

8          THE COURT: I understand.

9          MR. ZUMBRO:  -- but if someone were to move for

10 it, I think as part of that process, a fee structure would

11 be put in place and professionals would be agreed to.

12         THE COURT: But the lenders wouldn't --

13         MR. ZUMBRO: We would have to get the lenders to

14 agree to that.

15         THE COURT: Well, and it gets back to what I said,

16 if I read it correctly, appointment of a trustee, a Chapter

17 11 trustee would be an event of default.

18         MR. ZUMBRO: Correct.  That's where I was about to

19 go.

20         THE COURT: So the lenders -- you're right, maybe

21 the lenders would waive and the problem is solved, but

22 maybe not.

23         MR. ZUMBRO: That's correct.  I think we have

24 bigger problems because our whole financing structure would

25 go into default if a Chapter 11 trustee were appointed.  So

1 I guess we hadn't focused on the Chapter 11 trustee's fees

2 as such because we would sort of have bigger problems at

3 that point.

4          THE COURT: If I missed in the motion what you've

5 just pointed out in the proposed order, I apologize. As I

6 said more than once today, I'm trying to absorb an awful

7 lot of stuff, but I look at motions before I study proposed

8 orders, and I didn't see it. So the question then comes

9 down to, should there be a carve-out for this hypothetical

10 entity that nobody -- at least the Debtor doesn't ever want

11 to have there. I guess the question is, why don't I defer

12 that to the final hearing?

13          MR. ZUMBRO: That would be --

14          THE COURT: I mean again, I'm not -- the last

15 thing in the world I want to do is have the lenders think,

16 what is this crazy judge doing; he's screwing up

17 everything. I'm not. I just want to make sure I

18 understand what the rules are here. So if the lenders are

19 willing to simply let that matter be visited by the final

20 hearing, then maybe we can just go there. Do you want to

21 talk to them or --

22          MR. ZUMBRO: I'm happy to talk with them or --

23          THE COURT: -- or see what they have to say.

24          MR. ZUMBRO: -- if they would have an issue with

25 expanding the carve-out again.

1        THE COURT: No, I didn't even say expand the

2   carve-out.  That would be great if they did that.  No, just

3   deferring it until the final hearing.

4        MR. ZUMBRO: Deferring the question of whether the

5   carve-out would include that -- to the final hearing.  That

6   would be fine with us.

7        THE COURT: Well, I know.  The Debtor would always

8   agree to that.

9     (Laughter.)

10       MR. HANSEN: Yes, Your Honor.  Again, it's Kris

11  Hansen with Strook, Strook & Lavan.

12       THE COURT: Well, Mr. Hansen, you know, debtors

13  always agree to things, but the judge started thinking it

14  was a good idea --

15       MR. HANSEN: No, I was going to make that

16  suggestion, Your Honor.  Certainly no one is going to be

17  appointing a Chapter 11 trustee between now and the final

18  hearing --

19       THE COURT: Well, if somebody files a motion --

20       MR. HANSEN: I would hope not, so -- yeah, so I

21  think from our perspective --

22       THE COURT: Didn't you get one this afternoon --

23       MR. HANSEN: I think from our perspective, that's

24  a discussion that we should take up at the final hearing.

25       THE COURT: Okay.  That's solved then.  All right.

1  I would like the benefit of committee input and Mr. Zumbro,

2  straighten me out, the committee or committees, the

3  statutory ones, are protected, and, you know, there's more

4  people to express themselves, and I'm just not on my own

5  going to make crazy rulings, and so I won't. We'll just

6  defer that. And so, Mr. Zumbro, you pointed out that the

7  avoidance action issue is also a deferred issue.

8      MR. ZUMBRO: Yes, sir. Again, I apologize. I was

9  looking at the order again, but in paragraph 3 of the

10  order, it says --

11      THE COURT: See, when I was a baby judge, I was

12  taught always to read these great big long DIP motions that

13  the lawyers present to you, and I did. Now it turns out

14  they're sticking the zingers in the orders. I read the

15  orders too, but I haven't read it yet because I haven't

16  decided to grant one. So I'll take your representation

17  that my reading of the motion and my concern about the

18  avoidance actions is a final hearing issue as well --

19      MR. ZUMBRO: Correct.

20      THE COURT: -- and this isn't a hypothetical

21  about a Chapter 11 trustee; it's what do the creditors

22  think about it.

23      MR. ZUMBRO: Correct.

24      THE COURT: And they have a right to be heard on

25  the subject, and I mean -- is the 506(c) --

1          MR. ZUMBRO: The 506(c) was also expressed to be

2    only a matter at the final hearing, as the proposed order

3    was drafted.

4          THE COURT: Okay.  Again, for the same reason, it

5    looked like to me as -- well, all right.  Well then, with

6    that, Ms. Kelly, did you have other DIP motion issues?

7    Because I in effect got on the record that the substantive

8    ones that I mentioned are going to be deferred for

9    further -- is there anything that you want dealt with on an

10   action item today?

11         MS. KELLY: Your Honor, I just wanted to clarify

12   with respect to the items that Your Honor raised, which

13   were also in our objection, about the avoidance actions and

14   the 506(c), I also can't find these things in the order at

15   the moment, but I had thought that I saw those things in

16   the interim order, but then it was saying it was simply

17   interim.  Are they -- I guess my point of clarification is

18   just -- I guess where does it say that they are not -- or

19   does it say --

20         THE COUR: Well, maybe we need to make it more

21   clear in the orders; that's all.  I mean, again, there are

22   a lot of talented lawyers that have put together these

23   various orders, but we need input --

24         THE COURT: I think, Your Honor, that would be

25   very helpful because, yeah, several people in my office

1  looked at it, and we all thought that those were somehow --

2  or perhaps implicated.  Even if they were going to be

3  finally considered at the final hearing, they seemed to be

4  somewhere in the interim.  So I would like it to be

5  clarified.

6       THE COURT: Well, let me Mr. Zumbro and his

7  colleagues to accept the invitation to make sure that we

8  just state that there's no 506(c) waiver and no avoidance

9  action lien issue in the interim order.

10       MR. ZUMBRO: And I can certainly commit to that on

11  the record, Your Honor.  I think it's consistent with the

12  motion as well, which makes it clear in the chart that

13  talks about the guidelines, that both of those issues are

14  subject to the entry of a final order.  So I'm happy to

15  represent on the record as well.

16       THE COURT: And there's no zinger in here or

17  anywhere, like a waiver of normal statutory deadlines on

18  things like avoidance actions and other actions.  Again,

19  that happened in Case No. One where right on day one, I was

20  asked to approve a rather short deadline for, you know,

21  statute of limitations to be tolled.  You know, Congress --

22  at the starting point, people were telling me, we'll have

23  it all done in 30 days or 60 days.  That's just not -- it's

24  not here.

25       MR. ZUMBRO: No, sir.  I don't think there are any

1 other zingers in here.

2          THE COURT: All right.  I have a "no-zinger" rule.

3          MR. ZUMBRO: No zingers.

4          THE COURT: Okay.  Ms. Kelly, are you okay?  Are

5 you on board?

6          MS. KELLY: Your Honor, would you like me to step

7 to the podium to make further --

8          THE COURT: Well, I said before you have to, but

9 here I've been talking to you back and forth, so go ahead.

10          MS. KELLY: Okay.  We did have another issue which

11 we raised in our objection, and in fact, it was sort of the

12 preliminary issue to all this, and I think -- I did, as I

13 say, have a conversation last night with counsel, but I

14 think to the extent that the information is not in the

15 motion papers, it would be useful to put it on the record

16 so that Your Honor can consider whether there is sufficient

17 evidence on the record on this issue.  And it is really the

18 basis for the Debtor saying it needs, as an urgent matter

19 under Rule 6003 at this stage the ability to borrow the 1.5

20 or 1.6 --

21          THE COURT: It's one and a half billion --

22          MS. KELLY: It's one and a half billion at this

23 stage, particularly given that the budget is showing cash

24 flow positive as of week four, and we thought that that was

25 something, just as a preliminary matter, that should really

1  be -- I understand the Debtor has some things to say about
2  that, but that that should really be on the record in this
3  preliminary hearing before the Court would rule on that.
4          MR. ZUMBRO: I'm happy to address that, Your
5  Honor.
6          THE COURT: Okay.
7          MR. ZUMBRO: If I could.
8          THE COURT: Yeah.  Again, this is not -- in my
9  mind, I kind of saw the way you broke it down, the 1.5, and
10 the three -- and then the tail end of the -- the half a
11 billion for the draw.  So how do we need to have this whole
12 one and a half right now?
13         MR. ZUMBRO: I think the evidence -- I would like
14 to point Your Honor to the 13-week budget, which is
15 attached as Exhibit C to the DIP motion, which is Docket
16 No. 23-3.  And just to walk through it --
17         THE COURT: Wait a second.  I'm catching up with
18 you.
19         MR. ZUMBRO: The numbers are very small, so --
20         THE COURT: Yeah, they are, but, you know, they
21 ought to have an elder abuse section here for older judges
22 that have to read these things.
23         MR. ZUMBRO: -- I apologize.  We should supply
24 magnifying glasses for older lawyers too, so --
25         THE COURT: Yeah, too.  It is pretty microscopic.

1  All right.  Go ahead.

2         MR. ZUMBRO: So the U.S. Trustee raises in their

3  objection the -- and this is all in the Wells declaration,

4  but Forecast Week Four, they say that the Debtors have an

5  ending cash balance of approximately 1.6 billion as of

6  February 23, 2019.  And that is true; that's the number at

7  the very bottom of the fourth column --

8         THE COURT: Yeah, I see it.

9         MR. ZUMBRO: 1.6 billion.  So we agree with that,

10 but the real point is, what you have to do is you have to

11 back out -- that 1.6 billion assumes -- if you go to the

12 first column on the far left side -- it assumes 750 million

13 dollars of borrowings on week one in order -- that's this

14 week, right?  So you reduce the 1.6 billion, if we aren't

15 given any authority to borrow today, you reduce the 1.6

16 billion by that 750 million.

17        THE COURT: No, it's 1.5 billion.

18        MR. ZUMBRO: That leaves you with --

19        THE COURT: No, it's 1.5 billion.

20        MR. ZUMBRO: No, I'm sorry.  This is the cash

21 balance number.

22        THE COURT: Oh, the cash.  Okay.  So if the Debtor

23 doesn't borrow the 750 --

24        THE COURT: If they don't borrow the 750 in Column

25 One this week, that leaves you with 850 million dollars.

1  And if I could point Your Honor to the next page of the

2  exhibit, you need to take out from the 850 approximately

3  370 million dollars which is corporate cash.  In other

4  words, we have two different Debtors here; we have the

5  Utility and Corp.  So the 370 on the first number of the

6  first column --

7         THE COURT: I'm not seeing -- oh, the first

8  number.  Oh, yeah, okay, cash balance Corp.

9         MR. ZUMBRO: Cash balance Corp., correct.  So

10  that's the cash which is up at the parent corporation,

11  which is, as Your Honor knows, is a separate Debtor.  So

12  that cash is to be used for Corp.'s purposes, and then you

13  need to take out -- without that 370, you're down to 480.

14  And then you need to take out customer deposits, which is

15  two lines down, another 250 million dollars.  So from 480,

16  with minus 250, you're down to 230 million dollars, which,

17  Your Honor, is less than the petition date net cash amount

18  of 240 million dollars.

19         THE COURT: Well, it's that 670, right, available

20  cash?  Utility - 670?

21         MR. ZUMBRO: Well, it's the 670, but you need to

22  back out the -- it's 670, assuming you borrowed the 750 at

23  the beginning, right.  So you need to back that out, and

24  then you back out the 250 and the 370 and you're down to

25  230 million.

1    THE COURT: Yeah.  I'm not quite reading it that

2    way because I'm looking at -- you're talking about week

3    one, right?

4    MR. ZUMBRO: Correct.

5    THE COURT: Okay.  Just look at the last three

6    lines, available cash 670; DIP availability 750, and

7    therefore ending Utility is 1.4, but if you just don't have

8    any DIP -- if DIP availability is zero, then the ending

9    Utility is 670.  That's the net number.  I didn't take

10   these other numbers out.

11   MR. ZUMBRO: The other component of that, which is

12   reflected as the 450 -- the overall point, Your Honor, is

13   that there is massive liquidity swings in this company

14   including in the month of January, those referred to in the

15   Wells declaration, there was almost a billion dollars of

16   liquidity swing.  And so the overall point I'm trying to

17   convey is, we actually do need the money.  There is

18   sufficient cushion if we assume we borrow 750 million

19   dollars, but there's not sufficient cushion to cover all of

20   the exigencies that could occur between now and week four.

21   And so there is a certain amount of cushion built into the

22   liquidity analysis, but the point I was trying to make to

23   the U.S. Trustee's objection is, you can't just look at the

24   1.6 billion of closing cash in isolation; you have to look

25   at the components of it, the main one being the 750 of

1  borrowing and the 250 of other people's money effectively

2  deposited.

3      THE COURT: Well, let me rephrase it, a simple

4  question.  If the Debtor has the 1.5 billion revolving

5  approved and doesn't draw some of it, it still has to pay

6  some carrying costs, but if it draws it, it goes up, right?

7  Am I right or wrong?

8      MR. ZUMBRO: You're right.  I'm glad you asked

9  that question.

10      THE COURT: Okay. So if the Debtor draws down a

11  half a billion dollars, it's interest carrying –- or the

12  carrying costs will go up accordingly.

13      MR. ZUMBRO: Correct.  I'm glad you asked that

14  question because that's another important –-

15      THE COURT: Okay.  So it's another way of saying

16  if you leave a half a billion in the bank and you don't

17  draw it, you might be paying some carrying charges but not

18  large amounts.

19      MR. ZUMBRO: Correct.  And that's why we

20  structured it as a revolving credit facility.  So what

21  we're seeking today is the approval to borrow up to 1.5

22  billion.  We don't intend to draw it down unless we

23  actually need it, because it's more expensive to draw it

24  down.  It's relatively much less expensive to just have the

25  undrawn commitment.

1          THE COURT: So if I were completely stupid and

2  said, well, why don't we just, you know, do this on a

3  weekly basis and I allow half a billion and then another

4  half a billion.  I mean it's crazy, but think about it, in

5  an operating company, but that essentially is what would

6  happen, right?  You would be back here every time I needed

7  you to come back to tell me you need more money.

8          MR. ZUMBRO: Correct, and just given the nature of

9  the operations, we don't have the luxury of -- you know,

10  even if we were to do something on an emergency hearing

11  basis, there are times when there's hundreds of millions of

12  dollars of swing --

13          THE COURT: No, I understand.  Of course, I do,

14  but then, again, because these numbers are so hard to

15  follow, and if your client, the principals, want to help

16  you, that's okay, what week in the forecast are you

17  anticipating the final hearing?  I mean I didn't talk to

18  Mr. Karotkin about that earlier, but I mean, is the final

19  hearing going to be 20 days from now or 60 days from now?

20  What do you folks have in mind?

21          MR. ZUMBRO: Well, we would like to get it as

22  early as possible within the Court's schedule that we've

23  set.

24          THE COURT: No, my schedule is good, whatever.

25  Well, no, but I mean we can do it -- what's the rule?  The

1 rule is at least 15 days, right?

2         MR. ZUMBRO: Correct.

3         THE COURT: And we probably ought to build in a

4 little more than that.

5         MR. ZUMBRO: Correct, so we were thinking 30 days-

6 ish, but we have to do it by April 15th under the terms of

7 our proposed DIP credit agreement.  The final order needs

8 to be entered by April 15th.  So we need to work on it.

9         THE COURT: Well, but you don't have to draw the

10 money all by then, right?  I mean you obviously don't have

11 to draw the money by then.

12         MR. ZUMBRO: The overall final approval needs to

13 have been obtained by that date.

14         THE COURT: No, I got it.  In other words, if on

15 April 14th, I sign a final DIP order, then the Debtor hasn't

16 defaulted that condition, but you haven't necessarily drawn

17 the money down.

18         MR. ZUMBRO: Correct.  We will only draw the money

19 that you approve today as and when needed.

20         THE COURT: We're back to the Bank versus Straw

21 *(Phonetic)* Yeah.  Okay.  Well, I mean this is turning into

22 my trying to speculate on when will this final hearing be,

23 and what to do about this cash flow.  Ms. Kelly, I think

24 the Debtor has made a point here.  I mean it's not as

25 though -- well, I'd like to be a glass half full person

1  here -- if I authorize the 1.5 billion, they're not going

2  to spend it all next week.  They're going to have it

3  available, but if they're prudently managing their

4  finances, then it makes no sense to have to go back every

5  time you have to get a draw-down, and it does sound like an

6  awful lot of money.  But if I approve it on an interim

7  basis, then they're free to operate.  They can't pay claims

8  they can't pay.  They can't give the money away.  They

9  can't upstream dividends to the parent.  So what are you

10  worried about if there's a little bit of a -- you know, a

11  little bit of room in this, and this condition doesn't

12  happen?

13         MS. KELLY: Well, Your Honor, I don't think we

14  were looking at it that -- in sort of that close of a

15  fashion as far as we're worried about, you know, having ten

16  dollars versus five dollars.  I think the point was simply

17  that in looking at the budget and looking at the motion,

18  and there was a lot of paper here too, but we didn't see

19  the reasons, you know, what would happen if we didn't get

20  this, you know, from the starting gate and why we needed

21  this money when we already had some money and were showing

22  money would be there.  So we wanted to see further evidence

23  on the record, and obviously it's up to Your Honor whether

24  that evidence is sufficient to issue the --

25         THE COURT: Well, again, it's trying to absorb a

1 very complex subject that a lot of very professional

2 financial people have worked on.  I think what I have to do

3 is stick more with the business as usual model.  If, God

4 forbid, two weeks from now there was some additional

5 catastrophe that caused a huge draw or drain on cash, we'd

6 have to be back here anyway.  It seems like a huge amount

7 of money relative to the total.  So it's -- if I read it

8 correctly, if you forget for a moment the portion of the

9 credit facility that's dedicated to letters of credit type

10 things, it's a fund of money that the Debtors can draw on

11 that at least -- it's five billion or four a half billion;

12 I've forgotten, but the point is your goal here is to draw

13 down an amount for the first time and then we look at it

14 again, and we have to hope that the managers of the company

15 are not drawing down more money than they need to, to run

16 up the costs.

17         MR. ZUMBRO: Exactly, Your Honor.  I mean that's

18 why one of the fundamental important structures of the DIP

19 facility was to have as big of a revolving facility

20 component, which is --

21         THE COURT: Yeah.  No, I know how it works.

22         MR. ZUMBRO: Right.  So that was important.

23         THE COURT: Okay.  Is there another -- did you --

24 who's back there?  Is that Mr. Pascuzzi?  Yeah.

25         MR. PASCUZZI: I didn't mean to interrupt, Your

1  Honor, but – Paul Pascuzzi for –- co-counsel with the

2  Attorney General's Office for the Department of Water

3  Resources.  We had filed a preliminary objection.  Our

4  concern was insuring that the California Energy Crisis

5  refunds escrow money and interest that goes to rate payers

6  is not part of the DIP collateral.  And it was already

7  carved out, but the language basically we were going back

8  and forth on, and I just wanted to confirm and have counsel

9  confirm that the revision to Schedule A for that

10 carve-out --

11         THE COURT: Just explain it again for me and the

12 rest of you that might not understand.

13         MR. ZUMBRO: Sure.  If I could, Your Honor, there

14 are several categories of –- what's referred to as excluded

15 property --

16         THE COURT: Right.

17         MR. ZUMBRO:  –- which was largely –- we had

18 several constructive discussions with counsel for the CPUC.

19 We wanted to make sure a lot of the CPUC directed programs

20 got those funds which are used for those who are not going

21 to be part of the DIP collateral.  We worked with that to

22 carve out, and one of the –- there's a schedule that sort

23 of goes through all of the different statutory and directed

24 programs, and then this gentleman's client wanted to have

25 certain language to clarify on behalf of the California

1 Department of Water Resources. That was carved out and
2 there was language which we believe satisfied the
3 objection.

4          THE COURT: No, I understand that, but just for my
5 purpose, and Mr. Pascuzzi, you help me too, but for this
6 carve-out, this is Debtors' asset, right? This would be
7 subject to a lien; this isn't like somebody else's
8 property, or is it?

9          MR. ZUMBRO: There's a mixture, sir. There's some
10 that the Debtor collects. I think one of the counsel who
11 was talking earlier for the CA's, there are certain things
12 that the Debtor bills and collects on behalf of others.

13          THE COURT: So they wouldn't be on it in the first
14 place.

15          MR. ZUMBRO: Correct.

16          THE COURT: You can't lien what you don't own,
17 right?

18          MR. ZUMBRO: I don't disagree with that, but
19 people like to have comfort sometimes on those types of
20 issues. So there are certain things that fall into that
21 category. There are certain things that are held in trust
22 for others.

23          THE COURT: No, I understand.

24          MR. ZUMBRO: And this particular issue is a trust
25 asset, and so we will just clarify the language.

1          THE COURT: So are you okay with the clarifying

2   language?

3          MR. PASCUZZI: Yes, Your Honor.  I just want to

4   confirm on the record that we did agree to language and

5   revise the scheduling.

6          THE COURT: No, that's good.  All right.

7          MR. PASCUZZI: And this is for the interim

8   hearing.  We're reserving rights as to the final hearing.

9          THE COURT: No, everybody is.  Anyone else in the

10  courtroom or on the phone that wants to be heard on the DIP

11  motion?

12     (No response.)

13         Okay.  Well, I'm satisfied with -- oh, wait a

14  minute --

15         MR. ZUMBRO: Sure.  There was one other issue,

16  Your Honor, that we have also tweaked some language to

17  address the California Workers' Compensation Fund where

18  there were some issues where they were asserting a

19  statutory lien, and we had put some language in it that was

20  satisfactory to both them and the DIP lenders, and it was

21  further revised slightly this morning, but I can't seem to

22  find that black line, but I believe the language was

23  satisfactory to both.

24         THE COURT: Well, if you want to state it on the

25  record, you can, but if you want to just take care of it

1  and have an agreed -- you know, counsel to sign off on the

2  form of order, I'm going to go either way. I don't need

3  you to put it on our record because it'll be on the order

4  that we sign, but if you or counsel want it put on the

5  record, we'll do it.

6          MR. ZUMBRO: I can represent that the language

7  that we discussed earlier will be reflected in the final

8  order.

9          THE COURT: And do I have your name on the record?

10         MR. PIDONI: You do not yet, Your Honor, Richard

11  Pedoni with Nixon Peabody on behalf of the California Self

12  Insurance Fund. And the two points were, in addition to

13  what's in the revised order that was submitted very early

14  this morning by the Debtors, we had two additional

15  requested changes. One would cap the amount of

16  subordination of what we believe is a valid lien at 1.6

17  billion, and the other matter is concerning timing, and

18  we'll make sure that those are in the final order. And we

19  appreciate the Debtors working with us on these issues.

20  They are very cooperative.

21         THE COURT: Well, I appreciate your coming

22  together, all of you working together on these complicated

23  matters. All right. Well then, I'm going to -- again

24  hearing no more complaints by anyone, I'm going to grant

25  the Debtors' motion on the DIP financing as modified with

1  all of these comments, and again, Mr. Karotkin told me

2  earlier that, you know, there's a desire to get these

3  orders in a hurry, but you've got to do your homework too,

4  to get them agreed, but because when I get an order

5  uploaded, you know, later today, I just have to trust that

6  you've done it, and I do trust you, but that's what you've

7  got to do.  And, you know, I'm not going to say, let's do

8  it differently next time because hopefully, there won't be

9  a next time.  But I did rely on a very, very complicated

10 motion, and it's not helpful to then find them in a form of

11 order.  In fact, under our procedures, you're not even

12 supposed to submit proposed orders, but obviously we needed

13 it in this case, and finally it was a helpful exercise.

14        So unless there's something else that anyone

15 thinks we're supposed to take up, I want to take up with

16 Mr. Karotkin or whoever else wants to do it, the scheduling

17 of various things coming up down the road.

18        MR. ZUMBRO: Thank you, Your Honor.

19        THE COURT: Thank you, Mr. Zumbro.  So we have

20 several final hearings.  We have our regular calendars.

21 We've already talked about the one adversary proceeding.

22 Why don't you tell me -- you know our open dates, and if

23 those don't fit, we'll make them fit.

24        MR. KAROTKIN: You reserved February 26th and

25 February 27th?

1                THE COURT: Right.

2                MR. KAROTKIN: Next month, so my suggestion would

3    be, if we could have the final hearing on all of the first

4    days on February 27th.

5                THE COURT: You prefer the second of the days, the

6    Wednesday?

7                MR. KAROTKIN: Yes.

8                THE COURT: Shall we do it in the morning, though,

9    just so we have time?

10               MR. KAROTKIN: Yes.  Sure.

11               THE COURT: So for all of the final -- all --

12   everything that we covered today.

13               MR. KAROTIKIN: All of them, yes, sir.

14               THE COURT: And is there sufficient time to give

15   notice?

16               MR. KAROTKIN: Yes, sir.

17               THE COURT: I guess so.

18               MR. KAROTKIN: Yes.

19               THE COURT: Well the rules, as we talked about,

20   for things like DIP financing, we have a rule that says

21   what you have to do.  Some of the others are kind of, you

22   know home made, but I think -- I don't want to have one of

23   these last-minute, night-before 8:00 o'clock in the

24   morning, so we need to get a deadline for the Debtor to

25   give notice of the final hearing, and then that notice I

1 think should state when objections should be filed.  So

2 make me a proposal.

3          MR. KAROTKIN: Can we give notice by Monday?

4          THE COURT: That's one of the things you get to do

5 as lead counsel, is you get somebody else to --

6          MR. KAROTKIN: I've got to speak to my attorney.

7     (Laughter)

8          THE COURT: No, no, you get somebody else to

9 commit to when you're going to do something by a deadline.

10          (Counsel confer.)

11          MR. KAROTKIN: Your Honor, I think we can serve

12 everything by Monday, close of business Monday.

13          THE COURT: So Monday is --

14          MR. KAROTKIN: The 4th.

15          THE COURT: The 4th.  The day after the Super Bowl,

16 right?

17          MR. KAROTKIN: Yes.

18          THE COURT: Okay.

19          MR. KAROTKIN: If we have the objection deadline

20 on the 20th?

21          THE COURT: Okay, that's fine.  Oh, again, I tell

22 you what.  If anybody in the courtroom or on the phone

23 wants to suggest something is wrong or something you don't

24 like about that suggestion, I'll take his suggestion and we

25 will say that the Debtor gives notice of all the various

1   final hearings that we've talked about no later than this

2   coming Monday, February 4, and that objections need to be

3   filed by February 20th.  And we'll have a hearing on

4   February 27th at -- well, let's do it like we did --

5          (Court and Clerk confer.)

6          Do you want to do it as early as 9:30?  That's

7   okay with me.

8          MR. KAROTKIN: Sure.

9          THE COURT: Okay.  9:30.  So do we have all the

10  dates?  I mean I'm just thinking; did we cover them all?

11         MR. KAROTKIN: I think we did.

12         THE COURT: Well, that's also the day we're

13  doing -- no -- yes, that's the day we're doing the

14  adversary proceeding, right?

15         COURTROOM DEPUTY: Yes, at 1:30.

16         THE COURT: Yeah.  I'm just -- I mean I realize

17  there are a lot of things that you can't know are going to

18  be coming up.

19         MR. KAROTKIN: Would you prefer to do it the day

20  before?

21         THE COURT: No, no, no.  I'm asking a different

22  question.  You and all your colleagues have had your hands

23  full with all these things, but, you know, there might be

24  several more things coming down the pike.  Do you

25  anticipate or do you know now what might be coming in the

1    first few coming weeks that we should anticipate, or --

2            MR. KAROTKIN: No.

3            THE COURT: I mean you could get 15 motions to do

4    something tomorrow, but you also might know if there's one

5    that's coming up, because frankly what that means to me is

6    to think that well, you know, we gave you two days early in

7    the month, and there's hardly anything there.  That's not

8    to say there won't be more things under shortened time.

9            MR. KAROTKIN: But I think that would be too quick

10   for -- to give notice.

11           THE COURT: No, it would be generally, but all I'm

12   saying is if -- well, never mind.  I'm -- experienced

13   lawyers know how to get shortened time.  We've made the

14   regular PG&E special calendar dates available.  If we

15   haven't yet got them posted on our website, it's because my

16   staff and I have been working here, but we will have the

17   dates there for any matter that's PG&E related that any

18   lawyer believes should be heard, and if it's to be heard on

19   an expedited basis, that lawyer needs to comply with the

20   procedures for shortening time or get a stipulation from

21   the other side, and I'm just asking you, if you know of

22   anything -- well, I'll give you an example that we both

23   know now.  It was about 24 hours ago when I learned that --

24   that the motion for summary judgment -- I mean, sorry, for

25   preliminary injunction was filed.  So, okay, it's something

1  to think about.  So I think about preparing for it and

2  using our resources internally to deal with it, and if you

3  tell me well, there's a great big monster motion coming

4  from somebody that will probably be set on that same date,

5  it's helpful to know, but --

6  MR. KAROTKIN: I'm not aware of anything, sir.

7  THE COURT: Okay.  Well then I'm prepared to

8  conclude the formal part of the hearing, but I did --

9  MR. KAROTKIN: Before you do so, can --

10  THE COURT: Yeah, sure.  You go.

11  MR. KAROTKIN: I would just like, if we could, to

12  review the motions and the orders that were submitted today

13  and the status of where there will be modifications made,

14  so we're all on the same page.

15  THE COURT: Okay.  Well, I hope so.

16  MR. KAROTKIN: Okay.  We're modifying the joint

17  administration order in accordance with your request.

18  We've done it and we've furnished a copy to the U.S.

19  Trustee already and to --

20  THE COURT: And Mr. Busby has already met with

21  someone and is talking to some people.  I think we've got

22  that under control.

23  MR. KAROTKIN: Yes, so I think that's pretty much

24  finished.  The creditor matrix --

25  THE COURT: And by the way, there's no further

1  hearing on that.

2          MR. KAROTKIN: Correct.  The creditor matrix,

3  there were no objections.

4          THE COURT: Correct.

5          MR. KAROTKIN: The motion to extend time to file

6  schedules we've revised in accordance with your ruling and

7  have given a copy of that revised order to the U.S.

8  Trustee.

9          THE COURT: And that will come -- that is not the

10  kind of order that's I need this afternoon.

11          MR. KAROTKIN: No.  But that should be finished.

12          THE COURT: Ms. Kelly has signed off on it and

13  we're done with that, right, I agree.  Okay.

14          MR. KAROTKIN: The oversized -- I'm skipping the

15  oversized briefing.  The responsible individual, no

16  changes.  Cash management, we're addressing the 345(b)

17  waiver deferring that, deferring consideration and granting

18  the waiver until the final hearing.

19          THE COURT: Right.

20          MR. KAROTKIN: And we've given a copy -- we've

21  revised that and given a copy to the United States

22  Trustee's Office.  The insurance motion, I read into the

23  record, there's a couple of changes.  No one else has to

24  see that, so that should be ready to go and uploaded.

25          THE COURT: And that's done.  There's no further

1  hearing on that.

2          MR. KAROTKIN: Right.  The claims agent, I believe

3  Mr. Busby is handling that.

4          THE COURT: Well, he's already talked to the

5  agent.

6          MR. KAROTKIN: Exactly.

7          THE COURT: And I think there was a question that

8  was presented to me by Mr. Busby for the Court during the

9  break, that had to do with the indemnity language --

10          MR. KAROTKIN: Yes.

11          THE COURT:  -- but you and I talked about it.

12  The claims agent has agreed to a change.

13          MR. KAROTKIN: Yes, sir.

14          THE COURT: So that will be reflected and

15  uploaded.

16          MR. KAROTKIN: Okay.  Good.

17          THE COURT: And that order should be signed

18  promptly too for the benefit of the claims agent.

19          MR. KAROTKIN: Okay.  The Exchange Operator

20  Motion, there were no changes.  The Operational Integrity

21  Motion, there were no changes.  The Lien Claimants' Motion,

22  there were no changes.  The taxes motion, there were no

23  changes.  The Customer Programs Motion, there were a couple

24  of changes, and we can represent that counsel for the

25  parties who raised those changes have agreed to the form of

1  order that we can upload.

2          THE COURT: But, stop there for a minute.  Even

3  the taxes motion, that is the subject of a further hearing,

4  and --

5          MR. KAROTKIN: Yes.

6          THE COURT:  -- and so is the customer --

7          MR. KAROTKIN: Yes.

8          THE COURT: Yeah, okay.  Well, I mean we were

9  identifying some that were done.  Now these are -- we're

10  identifying some that are going to come back to visit us

11  next time.

12          MR. KAROTKIN: Exactly.  Employee wages, No. 14,

13  no changes.  The NOL Motion, the changes that we discussed

14  on the record have already been made.

15          THE COURT: All right.

16          MR. KAROTKIN: Then the DIP financing motion --

17          THE COURT: And you -- it was your suggestion that

18  the NOL Motion should get -- should move quickly.  We

19  should go on that quickly.  Again, keep in mind, when we

20  break today, some of us have to figure out, now what do we

21  do, and one of the things that I need to do with my staff

22  is to make sure we can turn these orders around -- not that

23  we can't do it; we want to be ready for you to do it.

24          MR. KAROTKIN: Yes.

25          THE COURT: And that's -- for reasons that are not

1   clear to me, but I'll trust you, that's a high  priority

2   item.

3           MR. KAROTKIN: Yes.

4           THE COURT:  That's a quick front burner order.

5   Fair enough?

6           MR. KAROTKIN: Yes, sir.

7           THE COURT: Okay.  What's next?

8           MR. KAROTKIN: I think that covers it.

9           MR. ZUMBRO: I think it's just the DIP Motion,

10  which we will upload.

11          THE COURT: Oh, the DIP.  Well, the sealing, we --

12  I mean other than the fact that Ms. Kelly objected, that's

13  a done deal.  No further hearing.  And the DIP Motion,

14  we've talked about the schedule.  Okay.  And that needs to

15  be approved too.  Please make sure that you are able to get

16  sign-off, if you can, by the principal players who have

17  been heard on this.  You know, I'm going to take your word

18  on relatively minor things, but these are big ticket items

19  that I want to make sure -- and, you know, when my Clerk

20  and I look at our uploaded order, we like to see the name

21  of, you know, somebody who was on the other side, and we're

22  good to go; we will sign off on it.

23          MR. KAROTKIN: But I just want to make clear, on

24  the DIP order, for example, there are no changes and

25  everyone is finished with it.

1           THE COURT: Yes, that's true.

2           MR. KAROTKIN: Yeah.

3           THE COURT: Well, I mean there are -- I mean if

4    you -- well, I mean --

5           MR. PEDONE: Richard Pedone.  I do need to need to

6    see the final changes.  I can respond within 15 to 20

7    minutes this afternoon.

8           THE COURT: So just sign off on the form.

9           MR. PEDONE: Yes, I will.  I'm available.

10          MR. KAROTKIN: Oh, Your Honor, in connection with

11   the second-day hearing, if there are objections filed, can

12   we submit responses by the 25th?

13          THE COURT: (Laughing).  Do I have to read them?

14          MR. KAROTKIN: I think you'll enjoy them.

15          THE COURT: I'm sure.  Oh, I'm sure I will.

16       (Laughter.)

17          All right.  Yes, okay, the 25th response.

18          MR. KAROTKIN: Okay.

19          THE COURT: What do you have for me today, Ms.

20   Kim?

21          MS. KIM: Good afternoon, Your Honor.  Jane Kim,

22   Keller and Benvenutti.

23          THE COURT: Yeah, I know your home, but I want

24   you to say it again.  What do you have?

25          MS. KIM: On behalf of the Debtors.  I spoke with

1  Ms. Parada briefly yesterday, and she had mentioned that

2  Your Honor might want to discuss as housekeeping the manner

3  of things like notices of hearings and hearing binders.

4  And I tried to -- I was hoping that we would be able to

5  just do that for a couple of minutes and then I don't want

6  to keep you --

7          THE COURT: Well, I tell you what.  I don't want

8  to keep all the counsel here.  I'll ask Ms. Parada to be in

9  touch with you.

10          MS. KIM: That would be fine.

11          THE COURT: It's not a big deal.

12          MS. KIM: No.

13          THE COURT: But again, I've already said, thanks

14  to a lot of people and to you too Ms. Kim, and everybody in

15  your office.  Everybody must have been doing a very

16  horribly difficult job because the little piece of it we

17  get is enough to be mind boggling, and you all did a very

18  excellent job of laying it all out and presenting it for

19  me.  So thank you to everybody.

20          MS. KIM: Thank you, Your Honor.

21          THE COURT: Now the last thing on my agenda is

22  this morning I said at the end of the work time on the

23  motions, I'd see if anyone else wants to be heard, just

24  general comments.  So I don't -- I'll take a pause.  Is

25  there anyone particularly representing a creditor or an

1  individual person who is in the courtroom or in the

2  overflow courtroom that wants to be heard?  Just make a

3  statement on the record.

4       (No response.)

5            How about on the phone, anyone on the phone?

6       (No response.)

7            All right.  Well, thank you everyone for putting

8  in a long day and we appreciate your time and I look

9  forward to seeing the orders.

10            ALL COUNSEL: Thank you, Your Honor.

11            THE COURT: Have a good day.  Thank you.

12       (Whereupon, the proceedings are concluded at 3:17

13  p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6          I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10   DATED: February 5, 2019

11

12                        By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25