**Pierce Bainbridge Beck Price & Hecht LLP**
John M. Pierce (SBN 250443)
jpierce@piercebainbridge.com
Thomas D. Warren (SBN 160921)
twarren@piercebainbridge.com
Carolynn K. Beck (SBN 264703)
cbeck@piercebainbridge.com
Janine Cohen (SBN 203881)
jcohen@piercebainbridge.com
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
(213) 262-9333

**LANDAU GOTTFRIED & BERGER LLP**
MICHAEL I. GOTTFRIED (SBN 146689)
mgottfried@lgbfirm.com
ROYE ZUR (SBN 273875)
rzur@lgbfirm.com
JACK A. REITMAN (SBN 283746)
jareitman@lgbfirm.com
1801 Century Park East, Suite 700
Los Angeles, California 90067
Tel: (310) 557-0050
Fax: (310) 557-0056

Attorneys for Plaintiffs

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION,<br><br>Debtor. | Case No. 19-30088; Case No. 19-30089<br><br>Chapter 11<br><br>Adv. No. _____ |
| In re<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>Debtor. | **CLASS ACTION COMPLAINT FOR:** |
| DAVID HERDON, JULIA HERNDON, GABRIELL HERNDON, JEDIDIAH HERNDON, ESTEFANIA MIRANDA, GABRIELLA'S EATERY, CHICO RENT-A-FENCE and PONDEROSA PEST & WEED CONTROL,<br>individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PG&E CORPORATION, a California corporation, PACIFIC GAS & ELECTRIC COMPANY, a California corporation, GEISHA WILLIAMS, and DOES 1-20,<br><br>Defendants. | **(1) NEGLIGENCE;**<br>**(2) INVERSE CONDEMNATION;**<br>**(3) TRESPASS;**<br>**(4) PRIVATE NUISANCE;**<br>**(5) PUBLIC NUISANCE;**<br>**(6) PREMISES LIABILITY;**<br>**(7) VIOLATIONS OF PUBLIC UTILITIES CODE § 2106;**<br>**(8) VIOLATIONS OF HEALTH & SAFETY CODE § 13007; and**<br>**(9) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs bring this action for damages and injunctive relief against Defendants PG&E Corporation, Pacific Gas & Electric Company, Geisha Williams, and Does 1 through 20, and allege as follows:

## NATURE OF THE ACTION

1. In November 2018, a fire began near Camp Creek Road in Butte County. Now dubbed the Camp Fire (hereinafter, the "Camp Fire" or the "Fire"), it became the deadliest and most destructive wildfire in modern California history—levelling more than 150,000 acres across Butte and Plumas Counties, destroying homes, disrupting businesses, and killing dozens of people.

2. The Camp Fire began before 6:30 a.m. on November 8, 2018 near the town of Pulga, California. It then quickly moved west, essentially erasing the town of Paradise from the map, with at least 88 lives lost, innumerable others injured, and many others missing. It destroyed nearly 14,000 homes and hundreds of commercial buildings, along with everything in them.

3. Tens of thousands of people, including Plaintiffs and other victims, were then, and remain, displaced from their homes, and many have been forced to live in shelters, tent cities, or the cars in which they fled for their lives. Victims are now left not knowing when they will have a roof over their heads again, or whether they will be able to rebuild their lives.

4. The Camp Fire was caused by unsafe electrical infrastructure owned, operated, and inadequately maintained by PG&E Corporation and Pacific Gas & Electric Company (together "PG&E").

5. PG&E had a duty to properly maintain its electrical infrastructure to ensure its safe operation, including by adequately designing, constructing, monitoring, maintaining, operating, repairing, replacing, and/or improving its power lines, poles, transformers, conductors, insulators, reclosers, and/or other electrical equipment. This duty included inspecting and managing vegetation and other hazards around its power lines and/or other electrical equipment, given the eminently foreseeable risk of branches or other vegetation coming into contact with this equipment and starting fires. Although PG&E knew that its infrastructure was aging, unsafe, and vulnerable to the weather and environmental conditions prevailing when the Camp Fire was ignited, PG&E did not fulfill its duties, and failed to take preventative measures in the face of

known high-risk weather conditions, such as de-energizing its electrical equipment. PG&E's dereliction of these duties resulted in the deadliest and most destructive wildfire in California history.

6. This catastrophe was preventable. PG&E's failing infrastructure and its inadequate efforts to maintain its equipment and mitigate risk have resulted in prior tragedies, and, unsurprisingly, PG&E has been sanctioned repeatedly for misconduct that bears a striking resemblance to that pled here. Despite notice of its past failures and even public reprimand, PG&E has continued to cut corners and elevate profits over public safety, and it has continued to operate dangerous equipment without adequate risk management practices in place.

7. PG&E has caused Plaintiffs and other victims to suffer devastating property damage, economic losses, and disruption to their homes, businesses, livelihoods, and wellbeing.

## PARTIES

**A.** **PLAINTIFFS**

8. Plaintiff David Herndon is a natural person and resident of the State of California.

9. Plaintiff Julia Herndon is a natural person and a resident of the State of California.

10. Plaintiff Gabriell Herndon is also a natural person and a resident of the State of California.

11. Plaintiff Estefania Miranda is a natural person and a resident of the State of California.

12. At the time of the Fire, Plaintiffs David Herndon, Julia Herndon, Gabriell Herndon, and Estefania Miranda resided at 5893 Golden Oaks Rd, Paradise, CA 95969.

13. Plaintiff Jedidiah Herndon is also a natural person and a resident of the State of California. At the time of Fire, Plaintiff Jedidiah Herndon was living at 1508 Forest Service Road, Paradise, CA 95969.

14. Plaintiff Gabriella's Eatery is a business that is owned and operated by Plaintiff Gabriell Herndon. The address for Gabriella's Eatery was P.O. Box 1365, Paradise, CA 95967.

15. Plaintiff Chico Rent-a-Fence is a business that is owned and operated by Plaintiff Gabriell Herndon. The address for Chico Rent-a-Fence was P.O. Box 1365, Paradise, CA 95967

16. Plaintiff Ponderosa Pest & Weed Control is a business that is owned and operated by Plaintiff David Herndon. Ponderosa Pest & Weed Control was located at 5893 Golden Oaks Rd, Paradise, CA 95969.

**B.** **PG&E DEFENDANTS**

17. Defendant PG&E Corporation is a corporation existing under the laws of the State of California, with its principal place of business located at 77 Beale Street, San Francisco, California, 94105. PG&E Corporation conducts business throughout the State of California. PG&E Corporation is an energy-based holding company. It is the parent company of Pacific Gas & Electric Company. PG&E Corporation subsidiaries provide customers with public utility services, and services relating to the generation of energy, generation of electricity, transmission of electricity and natural gas, and the distribution of energy.

18. Defendant Pacific Gas & Electric Company is a corporation existing under the laws of the State of California, with its principal place of business located at 77 Beale Street, San Francisco, California 94105. Pacific Gas & Electric Company conducts business throughout the State of California.

19. Pacific Gas & Electric Company is both an "Electrical Corporation" and a "Public Utility" under, respectively, Sections 218(a) and 216(a) of the California Public Utilities Code. Pacific Gas & Electric Company is in the business of providing electricity to the residents and businesses of Northern California and, more particularly, to Plaintiffs' and other victims' residences, businesses, and properties through a network of electrical transmission and distribution lines.

20. Pacific Gas & Electric Company, based in San Francisco County, is one of the nation's largest electric utilities, serving over 5 million households within Northern California. It is wholly owned by PG&E Corporation, which has a market capitalization of over $13 billion. PG&E Corporation's assets total approximately $70 billion.

21. According to Defendants' public statements, they have at least $1.4 billion in wildfire insurance.

3

22.     Pacific Gas & Electric Company is a privately-owned public utility that enjoys a state-protected monopoly or quasi-monopoly, derived from its exclusive franchise provided by the State of California.  Pacific Gas & Electric Company's monopoly is guaranteed and safeguarded by the California Public Utilities Commission ("CPUC"), which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter the market.

23.     PG&E provides public utility services, including the generation, transmission, and distribution of electricity to millions of customers in Northern and Central California, including to residents of Butte County, where the Camp Fire originated.

24.     Plaintiffs allege that PG&E Corporation and Pacific Gas and Electric Company are jointly and severally liable for each other's wrongful acts and omissions as alleged in the Complaint based on the following:

a.  PG&E Corporation and Pacific Gas & Electric Company operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purposes of carrying out and effectuating Pacific Gas & Electric Company's business and operations and/or for the benefit of PG&E Corporation;

b.  PG&E Corporation and Pacific Gas & Electric Company do not operate as completely separate entities; rather, they integrate their resources to achieve a common business purpose;

c.  Pacific Gas & Electric Company is so organized and controlled, and its decisions, affairs and business are so conducted, to make it a mere instrumentality, agent, conduit or adjunct of PG&E Corporation;

d.  Pacific Gas & Electric Company's income results from function integration, centralization of management, and economies of scale with PG&E Corporation;

e.  PG&E Corporation's and Pacific Gas & Electric Company's officers and management are intertwined and do not act completely independently of each other;

f.  PG&E Corporation's and Pacific Gas & Electric Company's officers and managers act in the interest of PG&E Corporation as a single enterprise;

4

g.  PG&E Corporation has control and authority to choose and appoint Pacific Gas & Electric Company's board members as well as its other top officers and managers;

h.  Despite both being electric companies and public utilities, PG&E Corporation and Pacific Gas & Electric Company do not compete with one another, but have been structured, organized, and businesses effectuated to create a synergistic, integrated single enterprise where various components operate in concert with one another;

i.  PG&E Corporation maintains unified administrative control over Pacific Gas & Electric Company;

j.  PG&E Corporation and Pacific Gas & Electric Company are insured by the same carriers and provide uniform or similar pension, health, life and disability insurance plans for employees;

k.  PG&E Corporation and Pacific Gas & Electric Company have unified 401(k) plans, pensions and investment plans, bonus programs, vacation policies and paid time off from work schedules and policies;

l.  PG&E Corporation and Pacific Gas & Electric Company invest the funds in these 401(k) plans, pensions and investment plans by a consolidated and/or coordinated Benefits Committee controlled by PG&E Corporation and administered by common trustees and administrators;

m.  PG&E Corporation and Pacific Gas & Electric Company have unified personnel policies and practice and/or a consolidated personnel organization or structure;

n.  PG&E Corporation and Pacific Gas & Electric Company have unified accounting policies and practices dictated by PG&E Corporation and/or common or integrated accounting organizations or personnel;

o.  PG&E Corporation and Pacific Gas & Electric Company are represented by common legal counsel;

p.  PG&E Corporation's officers, directors, and other management make policies and decisions to be effectuated by Pacific Gas & Electric Company and/or otherwise play

5

roles in providing directions and making decisions for Pacific Gas & Electric Company;

q. PG&E Corporation's officers, directors, and other management direct certain financial decisions for Pacific Gas & Electric Company, including the amount and nature of capital outlays;

r. PG&E Corporation's written guidelines, policies, and procedures control Pacific Gas & Electric Company's employees, policies, and practices;

s. PG&E Corporation files consolidated earnings statements factoring all revenue and losses from Pacific Gas & Electric Company as well as consolidated tax returns, including those seeking tax relief; and/or, without limitation; and

t. PG&E Corporation generally directs and controls Pacific Gas & Electric Company's relationship with, requests to, and responses to inquiries from, the CPUC and uses such direction and control for the benefit of PG&E Corporation.

## C. <u>DEFENDANT WILLIAMS</u>

25. Defendant Geisha Williams was the Chief Executive Officer of Pacific Gas & Electric Company from March 2017 until she resigned from her role as CEO on January 13, 2019. During this time, Defendant Williams was directly involved in the management of PG&E and exercised control over PG&E.

## D. <u>DOE DEFENDANTS</u>

26. The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 20 are currently unknown to Plaintiffs. As a result, Plaintiffs sue these Defendants as Doe Defendants under California Code of Civil Procedure § 474.

27. Plaintiffs further allege that each Doe Defendant is in some manner responsible for the acts and occurrences set forth in this Complaint. Plaintiffs may amend or seek to amend this Complaint to allege the true names, capacities, and responsibility of these Doe Defendants once they are ascertained, and to add additional facts and/or legal theories. Plaintiffs make all allegations contained in this Complaint against all Defendants, including Does 1 through 20.

6

E. **AGENCY AND CONCERT OF ACTION**

28.     At all times referenced herein, each Defendant was the agent, servant, employee, partner, aider and abettor, co-conspirator, and/or joint venturer of the other Defendants and was at all times operating and acting within the purpose and scope of such agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining Defendants.  Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs as alleged herein.  In aiding and abetting, and substantially assisting the commission of these and other wrongful acts, each Defendant acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## JURISDICTION AND VENUE

29.     On January 29, 2019, Pacific Gas & Electric Company and PG&E Corporation (the "Debtors") filed voluntary Chapter 11 bankruptcy petitions, commencing the above-captioned Chapter 11 bankruptcy cases (the "Chapter 11 Cases").

30.     This adversary proceeding relates to the Chapter 11 Cases.  The Court has jurisdiction to consider this adversary proceeding and over the claims against the Defendants pursuant to 28 U.S.C. §§ 157 and 1334.  Plaintiffs consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

31.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

I. **PG&E HAD A DUTY TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS**

32.     PG&E is the leading supplier of electricity in Northern California.  It owns, installs, constructs, operates, and maintains overhead power lines and/or electrical equipment throughout Northern and Central California for transmitting and distributing energy to the general

7

public. PG&E's lines and equipment were located at and around the origin points of the Camp Fire.

33.     Electrical infrastructure is inherently dangerous and hazardous, and PG&E is aware of this obvious fact.  The transmission and distribution of electricity require PG&E to exercise an increased level of care in line with the danger necessarily occasioned by its business operations.

34.     At all relevant times, PG&E had, and continues to have, a non-transferable, non-delegable duty to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment and to keep vegetation properly trimmed at a safe distance to prevent foreseeable contact with its electrical equipment.

35.     In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, PG&E had an obligation to comply with a number of statutes, regulations, and standards, including, but not limited to: Code of Civil Procedure § 733; Public Resource Code §§ 4292, 4293, and 4435; Public Utilities Code § 451; and General Order Numbers 95 and 165.

36.     As just one example, Public Resources Code § 4293 requires PG&E to maintain a clearance of four to 10 feet around all its power lines, depending on their voltage.  In addition, it provides that "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

37.     PG&E was aware of the risks posed by its electrical delivery system, including the importance of proper vegetation management.

38.     For example, in June 2014, the CPUC directed PG&E and all investor-owned utilities to take remedial measures to reduce the likelihood of fires started by or threatening utility facilities.[1]  CPUC told PG&E that it could seek to recover incremental costs associated with these

---

[1] Cal. Pub. Utils. Comm'n, Resolution ESRB-4, (June 16, 2014)
http://docs.cpuc.ca.gov/Pub1ishedDocs/Published/GOOO/M096/K415/96415169.pdf.

Case: 19-30088    Doc# 441    Filed: 02/13/19    Entered: 02/13/19 21:16:26    Page 9 of 50

1    remedial measures outside of the general ratemaking process.  This represented a separate,

2    additional provision for funding on top of already available vegetation-management funding, to

3    ensure the implementation of appropriate remedial measures.

4            39.    Following a series of destructive fires in Northern California in 2017 (hereinafter,

5    the "North Bay Fires"), the CPUC adopted new vegetation and fire safety standards to protect

6    certain high-threat fire areas.[2]

7            40.    PG&E knew or should have known that such standards and regulations were

8    minimum standards and that PG&E has an independent duty to identify vegetation that posed a

9    foreseeable hazard to power lines and/or other electrical equipment, and to manage the growth of

10   vegetation near its power lines and equipment to prevent the foreseeable danger of contact

11   between vegetation and power lines, or contact between the lines themselves, starting a fire.

12           41.    Further, at all relevant times, PG&E had, and continues to have, a duty to manage,

13   maintain, repair, and/or replace its aging infrastructure to protect public safety.  These objectives

14   could have and should have been accomplished in any number of ways, including, but not limited

15   to, putting power lines and/or other electrical equipment underground in wildfire-prone areas,

16   increasing the frequency and/or rigor of inspections, developing and implementing protocols to

17   shut down electrical operations in emergency situations, modernizing infrastructure, and/or

18   obtaining an independent audit of its risk management programs to ensure effectiveness.

19           42.    Defendants were aware that they had a duty to maintain equipment and the

20   surrounding vegetation in compliance with state regulations and either knew or should have

21   known that failing to do so would expose Plaintiffs, class members, and the general public to a

22   serious risk of a catastrophic event resulting in loss of life, bodily injury, damage to property, and

23   other losses.  Yet as set forth below, Defendants have, time and time again, abdicated their

24   responsibilities and exposed the public to unacceptable and unnecessary risk.

25

26

27   _____

     [2] Press Release, CPUC, CPUC Adopts New Fire Safety Regulations (Dec. 14, 2017),
28        http://docs.cpuc.ca.gov/PublishedDocs/Published/GOOO/M201/K352/201352402.pdf.

9

## II. PG&E'S LONG HISTORY OF SAFETY VIOLATIONS

43.    The Camp Fire is the most recent, most destructive, and deadliest wildfire PG&E has caused.  Yet it is far from the first.

44.    PG&E knew about the significant risk of wildfires from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the Camp Fire began, and has been repeatedly fined and/or convicted of crimes for failing to mitigate these risks:

a.   In 1994, PG&E's failure to trim trees near its power lines caused the Trauner Fire in Nevada County, California.  Three years later, in 1997, a jury found PG&E liable for 739 counts of criminal negligence for causing that fire.  After the trial, a report authored by the CPUC revealed that from 1987 through 1994, PG&E diverted $495 million from its budgets for maintaining its systems to increase corporate profits.[3]

b.   In 2003, PG&E caused a fire at its Mission District Substation in San Francisco.  The CPUC investigated the fire and concluded in 2004 that it was "quite troubling that PG&E did not implement its own recommendations" after a previous fire at the same facility.[4]

c.   In 2008, PG&E's inadequate repairs and infrastructure caused a deadly explosion in Rancho Cordova, California.  In 2010, the CPUC fined PG&E $38 million for causing and failing to prevent the explosion.[5]

d.   In 2010, PG&E's decrepit infrastructure caused a gas explosion in San Bruno, California that killed eight people and razed dozens of homes.[6]

---

[3] Kenneth Howe, *et al., Tree Trimming Pact Lowers PG&E Fine to $29 Million,* SFGate (Apr. 3, 1999), http://www.sfgate.com/news/article/Tree-Trimming-Pact-Lowers-PG-E-Fine-to-    29-Million-2938340.php.

[4] Richard W. Clark, Investigation Report on PG&E Mission Substance Fire and Outage (Oct. 20, 2004),  http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF.

[5] Associated Press, *PG&E to Pay $38 Million Fine in 2008 Explosion,* San Diego Tribune (Dec. 1, 2011), http://www.sandiegouniontribune.com/sdut-pge-to-pay-38-million-fine-in-2008-explosion-2011dec0I-story.html.

[6] George Avalos, *PG&E Loses Ruling in San Bruno Explosion Trial,* San Jose Mercury News (Nov. 18,

Case: 19-30088    Doc# 441    Filed: 02/13/19    Entered: 02/13/19 21:16:26    Page 11 of 50

1        e.    In 2011, PG&E caused an explosion in Cupertino when it failed to replace a plastic pipe that it had known was unsafe since at least 2002. PG&E ignored warnings about the dangerous nature of the pipe.[7]

f.    In 2014, PG&E's disregard for public safety and inadequate recordkeeping caused an explosion in Carmel. As a result, the CPUC required PG&E to pay over $36 million in fines.[8]

g.    Since 2014, PG&E has been fined $9.65 million by the CPUC for incidents related to its electrical distribution systems.[9]

h.    In 2015, PG&E was responsible for causing the massive Butte Fire, which destroyed hundreds of homes and killed two people in Calaveras and Amador Counties. The fire resulted from PG&E's inadequate and unlawful vegetation management practices and lack of regard for public safety. In 2017, the CPUC fined PG&E a total of $8.3 million for violating multiple safety laws in connection with that inferno.[10]

i.    On April 9, 2015, the CPUC imposed a record $1.6 billion fine on PG&E for safety violations that resulted in deaths, injuries, and destroyed homes related to the 2010 San

---

2016 3:42 P.M.), http://www.mercurynews.com/2016/11/17/pge-loses-ruling-in-san-bruno-explosion-trial/.

[7] Paul Rogers, *PG&E Pipe that Exploded in Cupertino Was Made of Material Connected with Numerous Other Fires,* San Jose Mercury News (Aug. 13, 2016 2:34 P.M.), http://www.mercurynews.com/2011/09/02/pge-pipe-that-exploded-in-cupertino-was-made-of-material-connected-with-numerous-other-fires/.

[8] Tom Leyde, *CPUC Fines PG&E $24.3 Million in Case Related to 2014 Carmel House Explosion,* http://www.montereyherald.com/article/NF/20160601/NEWS/160609989 (noting that PG&E was fined $10.8 M by the CPUC and $24.3 by an Administrative Law Judge). PG&E also paid $1.6 M to the city of Carmel in penalties. *See* Rachel Swan, *PG&E to Pay $1.6 Million To Settle Suit Over Carmel Blast,* SFGate (June 9, 2017), http://www.sfgate.com/bayarea/article/PG- E-to-pay-1-6-million-to-settle-suit-over-11209644.php.

[9] "Electric Safety Citations Issued," Cal. Pub. Utils. Comm'n, http://www.cpuc.ca.gov/General.aspx?id=1965.

[10] *PG&E Issued Citations and Fined $8.3M For Violations Related to Butte Fire,* CBS Sacramento (Apr. 25, 2017 9:28 P.M.), http://sacramento.cbslocal.com/2017/04/25/pge-issued-citations-and-fined-8-3m-for-violations-related-to-butte-fire/.

11

Bruno gas explosion.  One of the stated purposes of the CPUC rendering such a record fine against PG&E was to "ensure that nothing like this happens again."

j.  Yet PG&E refused to change its ways, and the people of California paid the price.  In October 2017, fires ravaged communities across Northern California—including Butte County again—causing extensive death and destruction.  44 people died in the North Bay Fires and dozens of others were hospitalized.  The fires displaced about 100,000 residents from their homes and are estimated to have burned more than 245,000 acres and damaged or destroyed 14,700 homes, 3,600 vehicles, and 728 businesses.

k.  The North Bay Fires had different points of origin but shared a common underlying cause: they were sparked by unsafe electrical infrastructure owned, operated and (improperly) maintained by PG&E.  Investigation into the fires revealed a pattern of missteps, mismanagement, and misconduct by PG&E, including its failure to properly maintain its electrical infrastructure, its failure to inspect, manage, and/or control vegetation growth around its power lines and/or other electrical equipment, and its failure to adequately construct, manage, monitor, maintain, operate, repair, replace, and/or improve its power lines, poles, transformers, conductors, insulators, reclosers, and/or other electrical equipment in a safe manner, despite knowledge that its infrastructure was aging, unsafe, and vulnerable to weather and environmental conditions.

l.  Investigation and litigation relating to the North Bay Fires remain ongoing, but state agencies have identified PG&E's equipment as the cause of the fires.  Investigators from the California Department of Forestry and Fire Protection ("Cal Fire") have determined that PG&E's electrical equipment was responsible for a number of these blazes, including four fires that were alone responsible for half of the North Bay Fire deaths (the Redwood Valley Fire in Mendocino County, the Atlas Fire in Napa County, originating fires contributing to the Nuns Fire in Sonoma County and the Cascade Fire in Yuba County), and the Cherokee Fire in Butte County.

12

45.     Additionally, Cal Fire has determined in 11 of the fires so far that PG&E violated California state law and referred those investigations to district attorneys for possible criminal prosecution of PG&E.  On November 8, 2018, the Camp Fire became the latest tragedy caused by PG&E that could have been prevented.

## III.     THE CAMP FIRE

46.     On November 8, 2018, at or about 6:29 a.m., a fire sparked by faulty PG&E equipment ignited in Pulga, California near Pulga Road and Camp Creek Road, near Jarbo Gap.

47.     Approximately 15 minutes later, another fire ignited near Concow, also sparked by faulty PG&E equipment.

48.     Upon information and belief, these fires combined shortly thereafter to become what would become known as the Camp Fire.

49.     Stoked by high winds in the Feather River Canyon, the Camp Fire roared west toward the town of Paradise, a community of about 27,000 in the foothills of the Sierra Nevada. The Camp Fire left Paradise in ruins, and did catastrophic damage to the neighboring communities of Concow, Magalia, and Parkhill as well.  The fire swept through these communities faster than many could evacuate, killing many residents in their homes.  Those who were fortunate enough to be alerted in time fled for their lives, yet even fleeing was not enough, as some residents died in their vehicles as they tried to escape.  The Fire has resulted in 88 deaths so far, and others remain missing.

50.     Many who managed to survive lost everything they had been forced to leave behind.

51.     The Camp Fire is the deadliest and most destructive fire in California history.  The blaze was so massive that NASA satellites could see the smoke from the Camp Fire from space.[11]

---

[11] Kasha Patel, *Camp Fire Rages in California,* NASA Earth Observatory, https://earthobservatory.nasa.gov/images/144225/camp-fire-rages-in-califomia. NASA Earth Observatory image by Joshua Stevens.

52.     For those who witnessed the destruction firsthand, the Camp Fire was an almost incomprehensible sight.  As one resident of Paradise put it: "It looked like the gates of hell opened up."[12]

53.     The Camp Fire burned for more than two weeks and destroyed more than 18,000·structures, including nearly 14,000 homes.  Tens of thousands of residents were displaced.  Scores were forced to flee amidst chaos in early morning hours, as the Fire spread at a rate of approximately 80 football fields each minute.[13]  Many residents were forced to leave without their belongings, and now have nothing to which to return.

54.     The Camp Fire poured thick smoke into the atmosphere, creating hazardous air quality conditions throughout the region.  For more than two weeks, Chico was smothered in a haze.  As far away as Sacramento and the Bay Area, schools and offices closed in response to the hazardous conditions of the polluted air.

55.     By every conceivable measure, the Camp Fire has been devastating.  Sadly, it was also avoidable.  As set forth below, the cause of Camp Fire fits a familiar narrative: PG&E disregarded public safety by improperly operating and maintaining its electrical infrastructure and equipment, as it had numerous times before.

56.     PG&E was only too aware of these dangers and risks.  It knew its infrastructure was aging and inadequately maintained.  It has long had a corporate policy of allowing equipment to "run to failure."  It knew trees and vegetation were too close to the poles and lines.  It was acutely aware of seasonal, then-current weather in Northern California that created a high risk of fire.  It knew where and how fires had ignited before in these areas, and it knew its own failures had caused fires and the attendant destruction many times before.

---

[12] Mike Chapman, *Camp Fire Evacuee: "It Looked Like the Gates of Hell Opened Up",* Record Searchlight, https://www.redding.com/story/news/2018/11/10/camp-fire-paradise-evacuee-story-description/1958280002/.

[13] CNN Wire, *A Northern California Fire is Growing at a Rate of About 80 Football Fields per Minute,* WGNO ABC News, https://wgno.com/2018/11/09/a-northern-california-fire-1s-growing-at-a-rate-of-about-80-football-fields-per-minute/.

14

57.     PG&E failed to adequately act on this knowledge.

58.     Plaintiffs and others like them have had their lives decimated by PG&E because of the Camp Fire: their homes and businesses have been damaged or destroyed, they have lost money and business, and they will spend years trying to rebuild their lives and livelihoods in the Camp Fire's wake.

## IV.     PG&E'S FAILED INFRASTRUCTURE AND NEGLIGENT PRACTICES CAUSED THE CAMP FIRE

59.     To supply electricity to the public, PG&E installed, constructed, built, maintained, and operated overhead power lines and/or other electrical equipment, for the purpose of delivering power to homes and businesses in and around the communities where the Camp Fire occurred.

60.     At dawn on Thursday, November 8, 2018, emergency responders were dispatched to a vegetation fire "under the high tension power lines" across the Feather River and Poe Dam.[14]

61.     Ten minutes after the initial call, at 6:43 a.m., the first firefighters on the scene reported that the Fire was "on the west side of the river underneath the transmission lines."  And as fire trucks arrived throughout the day, and the flames engulfed the town of Paradise, each truck relayed a similar message: "power lines down."[15]

62.     As more calls followed and firefighters began to arrive, the cause of the Camp Fire came into sharp relief:  the power lines and/or electrical equipment owned, operated, and improperly maintained by PG&E had failed again.

63.     That afternoon, PG&E filed an Electric Incident Report with the CPUC (Incident No: 181108-9002) that stated that minutes before Camp Fire began, PG&E had experienced a problem on the Caribou-Palermo 115,000 volt transmission line, a high-voltage transmission line

---

[14] Tribune News Service, *PG&E Power Lines May Have Sparked Deadly Camp Fire,* San Francisco Examiner, (Nov. 10, 2018 12:11 A.M.)  http://www.sfexaminer.com/pge-power-lines-may-sparked-deadly-camp-fire/.

[15] *Id.*

15

at the Poe Dam site.[16]  It further acknowledged that an aerial patrol later that day showed "damage" to that same transmission tower.[17]

64.     This damage to the transmission tower, and the devastating fire that resulted, came only one day after PG&E emailed a Pulga resident to inform her that the company was, in the resident's words, "having problems with sparks"[18] and that a nearby transmission tower would be fixed.[19]

65.     The fire also ignited only two days after PG&E notified residents that it was considering shutting down power in Butte County because of forecasts of high wind and low humidity.[20]  In a November 6, 2018 press release, PG&E pointed to "expected extreme fire danger conditions" as the reason it might "proactively" implement these measures.[21]  PG&E never did so.

66.     PG&E has also disclosed a second incident on the morning the Camp Fire started, also involving a failure of its faulty equipment, and which likely produced a second origin source for the Camp Fire.

---

[16] Associated Press, *Pacific Gas & Electric Reports Power Line Problem Near Camp Fire,* ABC10news, (Nov. 9, 2018 7:55 P.M.) https://www.lOnews.com/news/pacific-gas-electric-reports-power-line-problem-near-camp-fire .

[17] *Electric Safety Incident Reported-Pacific Gas & Electric Incident No.: 181108-9002,* CPUC, (Nov. 8, 2018 4:09 P.M.), https://assets.documentcloud.org/documents/5032723/Electric- Safety-Incident-Reported-Pacific-Gas.pdf.

[18] Associated Press, *PG&E Emailed Woman About Sparks Problems Before Butte County Camp Fire,* Kron 4(Nov. 12, 2018 7:14 P.M.) https://www.kron4.com/news/califomia/pg-e- emailed-woman-about-sparks-problems-before-butte-county-camp-fire/1591965591.

[19] Matthias Gafui, *Pulga Woman: PG&E Told Her It Needed To Fix Transmission Tower Problem Day Before Camp Fire Started,* Chico Enterprise-Record (Nov. 13, 2018 10:21 A.M.),

https://www.chicoer.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/.

[20] Matthias Gafui, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According to Radio Transmissions,* The Mercury News (Nov. 12, 2018 12:03 P.M.), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[21] Press Release, PG&E, PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff(Nov. 6, 2018),

https://www.pge.com/en/about/newsroom/newsdetails/index.page?WT.pgeac=PSPS_CurrentAlertRelease&title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff

Case: 19-30088    Doc# 441    Filed: 02/13/19    Entered: 02/13/19 21:16:26    Page 17 of 50

67.     On November 16, 2018, more than a week after the incident occurred and the Camp Fire began, PG&E filed a second Electric Incident Report, No. 181116-9015, with the CPUC, which reported an outage in Concow on November 8, 2018, at 6:45 a.m. on the Big Bend 1101 circuit—a mere 15 minutes after the first ignition of the Camp Fire.  PG&E reported to the CPUC that Cal Fire had "collected PG&E equipment on that circuit" and "secured a location near PG&E facilities on that circuit."[22]

68.     In addition to direct fire damage, the Camp Fire also created air quality issues in the surrounding regions.  By November 9, 2018, the smoke from the wildfires had spread hundreds of miles, and extremely unhealthy air quality indices were registered in the cities of San Francisco and Fremont, among others.[23]  In Ukiah, California, 90 miles southwest of the fire's origins, smoke was so thick that its residents were inhaling the equivalent of more than a dozen cigarettes a day.[24]

69.     Due to the poor air quality, dozens of Bay Area schools canceled classes[25] and Sacramento canceled its Veterans' Day Parade.  Many other cities across Northern California were forced to cancel outdoor activities.[26]

---

[22] *Electric Safety Incident Reported-Pacific Gas & Electric Incident No.: 181116-9015,* CPUC (Nov. 16, 2018 4:00 P.M.), http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/EIR_IncidentNo181116-9015.pdf.

[23] Reggie Aqui, *Air Quality in Bay Area Worse Than Beijing Due To Camp Fire in Butte County,* ABC 7 News (Nov. 9, 2018), https://abc7news.com/weather/air-quality-in-bay-area-worse-than-beijing-due-to-camp-fire-in-butte-co/4655634/.

[24] Zoe Schlanger, *In Parts of California, Breathing Is Like Smoking Half a Pack of Cigarettes a Day,* Quartz (Nov. 9, 2018), https://qz.com/1458615/the-camp-fire-is-making-california-air-quality-as-bad-as-smoking-half-a-pack-of-cigarettes-a-day/.

[25] Amy Hollyfield, *Poor Air Quality Triggers Dozens of School Closures in Bay Area,* ABC 7 News (Nov. 9, 2018), https://abc7news.com/weather/poor-air-quality-triggers-dozens-of-school-closures-in-bay-area/4653739/.

[26] Kerry Benefield, *Poor Air Quality Prompts Rescheduling of High School, SRJC Contests,* The Press Democrat (Nov. 9, 2018), https://www.pressdemocrat.com/sports/8934275-181/poor-air-quality-prompts-change.

70.     Because of visibility issues caused by smoke from the Fire, one quarter of all flights scheduled to depart or land at San Francisco International Airport were delayed, and at least 19 were canceled.[27]

## V.     PG&E KNEW ITS INFRASTRUCTURE WAS A DANGER TO NORTHERN CALIFORNIA

71.     Long before the Camp Fire began, PG&E knew that its aging infrastructure, inadequate maintenance, and deficient risk management practices posed a serious threat of wildfires in the region.

72.     Five years ago, Liberty Consulting Group, which had been tasked with conducting an independent review of PG&E's proposed capital and operations and maintenance expenditures, concluded that "several aspects of the PG&E [electrical] distribution system present significant safety issues."[28]

73.     Liberty Consulting Group's report detailed a dire situation, in which "system safety risks from aging infrastructure" pervaded PG&E's operations and "today's infrastructure problems will contribute to tomorrow's safety problems."  The authors were so concerned about the state of PG&E's aging infrastructure that they recommended treating it as "an enterprise-level risk."

74.     The report further warned that more than half of PG&E's systems had obsolete and unsafe small-size wiring ("conductors") that should have long ago been replaced with larger-size wires, because small-size conductors are more susceptible to breaking as they age, particularly in certain weather conditions.

75.     Even though PG&E knew most of its distribution system was obsolete, it failed to take the necessary steps to update the system and/or mitigate the risks it posed.

---

[27] Melia Russell, *Hundreds of Flights Delayed at SFO Due To Camp Fire Smoke,* San Francisco Chronicle, https://www.sfchronicle.com/business/article/Hundreds-of-flights-delayed-at-SFO-due-to-Camp-13379115.php.

[28] The Liberty Consulting Group, Study of Risk Assessment and PG&E's GRC, Presented to: The California Public Utilities Commission Group, Safety and Enforcement Division, (May 6, 2013), http://docs.cpuc.ca.gov/PublishedDocs/Efile/GOOO/M065/K394/65394210.PDF.

18

76.     For example, in a December 31, 2015 letter to PG&E regarding an audit of PG&E's Sonoma Division, Fayi Daye, a supervising electric safety regulator CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of PG&E electrical distribution equipment.  Daye's letter stated the following:

> PG&E's records indicated that from August 2010 to September 21, 2015, a total of 3,527 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards. Late work orders included overhead and underground facilities.[29]

The letter concluded that these delays violated CPUC General Order No. 128, Rule 17.1, which sets forth the CPUC's design, construction, and maintenance rules for electrical systems.

77.     According to State Senator Jerry Hill, these findings were "shocking" because "[PG&E is] getting the money for these, they are getting the funds to do the work in a timely manner."[30]  That is to say, PG&E had taken money from ratepayers for the purpose of repairing its infrastructure but failed to correct known problems.

78.     Rather than allocate sufficient funds to infrastructure maintenance and safety, PG&E has funneled money into other areas to enhance its corporate profits and its executives' compensation.  This pattern and practice of elevating profits over a solid and well-maintained infrastructure that would be safe and dependable for years to come exposed the citizens of Northern California, such as the Plaintiffs and class members, to an increased risk of a devastating event such as the Camp Fire.

79.     For example, according to documents released by the Utility Reform Network, PG&E planned to replace a segment of the San Bruno pipeline in 2007 that has been identified as one of the riskiest pipelines in PG&E's system.  PG&E collected $5 million from its customers to

---

[29] Letter from Eric Back, Director of Compliance and Risk Management, PG&E, to Charlotte TerKeurst, Program Manager, CPUC, ESRB, (Feb. 1, 2016), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/EA2015- 018%20Sonoma%20PGE%20Response%20Letter.pdf.

[30] Jaxon Van Derbeken, *State Audit Shows PG&E Had Repair Job Backlog in Sonoma, Santa Rosa*, NBC Bay Area (Oct. 20, 2017 7:31 P.M.), https://www.nbcbayarea.com/news/locaVState-Audit-Shows-PGE-Had-Repair-Job-Backlog-in-Sonoma-Santa-Rosa-45l 996923.html.

1   complete the project by 2009, but instead deferred the project and repurposed the money.  That

2   same year, PG&E spent nearly $5 million on bonuses for six of its top executives.[31]

3          80.    Moreover, PG&E has previously implemented multiple programs that, in practice,

4   provide monetary incentives for its employees, agents, and/or contractors to ignore known safety

5   problems.  Prior to the 2015 Butte Fire, PG&E chose to provide bonuses to its contractors to

6   minimize the number of trees cut, even though PG&E was required to have an inspection program

7   in place that removed all dangerous trees to reduce the risk of wildfires.  Robert Urban, a regional

8   officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his

9   employees to not do their job, but PG&E chose to keep this program despite this known and

10  obvious risk.

11         81.    Similarly, prior to the San Bruno explosion, PG&E had a program that provided

12  bonuses to employees to not report or fix gas leaks, to keep repair costs down.  This program

13  resulted in the failure to detect a significant number of gas leaks, many of which were considered

14  serious.  According to Richard Kuprewicz, an independent pipeline safety expert, PG&E's

15  incentive system was "training and rewarding people to do the wrong thing," emblematic of "a

16  seriously broken process," and "explains many of the systemic problems in this operation that

17  contributed to the [San Bruno] tragedy."[32]

18  **VI.    PG&E WAS AWARE OF FORESEEABLE AND EXPECTED WEATHER,**

19         **CLIMATE, AND FIRE CONDITIONS**

20         A.    **PG&E Was Aware that Butte County Was a High-Risk Wildfire Region**

21         82.    PG&E was aware that the State of California, including the area of the Camp Fire,

22  had been in an extended period of intermittent drought conditions and that the danger of fire was

23

24  ───────────────────────

25  [31] Steve Johnson, *et al., PG&E Accused of Delaying Crucial Repair Work,* San Jose Mercury News
       (Sept. 15, 2010 1:58 P.M.),
       http://www.mercurynews.com/2010/09/15/pgeaccusedofdelayingcrucialrepairwork/.

26  [32] Jaxon Van Derbeken, *PG&E Incentive System Blamed for Leak Oversights,* SFGate (Dec. 25, 2011
       4:00 A.M.) https://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-
       2424430.php

27

28

at an extraordinarily high level, particularly given the increased amount of flammable vegetation and hot, dry winds.

83.     PG&E knew that if its power lines or other equipment came into contact with, or caused electricity to come into contact with vegetation, it was probable that a fire would result and that, given the dry conditions, such a fire would spread rapidly and likely result in the loss of life, significant damage to real and personal property, and economic losses to members of the general public, including to Plaintiffs and class members.

84.     The catastrophic wildfires that burned throughout the North Bay area in 2017 put PG&E on additional notice that Northern California was a high-risk area, and of the severe consequences were of failing to act appropriately under the circumstances.

85.     Despite this knowledge, PG&E failed to take reasonable, preventative measures in the face of known risks.

86.     In January 2018, CPUC published a Fire-Threat Map (Figure 1) in order "to enhance the fire safety of overhead electric power lines and communication lines located in high fire-threat areas." The CPUC Fire-Threat Map shows "where (1) there is a heightened risk for destructive power-line fires, and (2) where stricter fire-safety regulations should apply."[33]



(**Fig. 1.**)

---

[33] *Id.* at 7.

87.     On the Map, the area in and around the origin of the Camp Fire is primarily described as Tier 2 and Tier 3.  Tier 2 describes areas "where there is an elevated risk (including likelihood and potential impacts on people and property) from wildfires associated with overhead utility power lines or overhead utility power-line facilities also supporting communication facilities."  Tier 3 describes areas "where there is an extreme risk (including likelihood and potential impacts on people and property) from wildfires associated with overhead utility power lines or overhead utility power-line facilities also supporting communication facilities."  Tier 3 has the "highest likelihood of utility-associated fire initiation and growth that would impact people or property, and where the most restrictive utility regulations are necessary to reduce utility fire risk."[34]

88.     PG&E was put on direct notice of this map in January 2018, and therefore knew of the elevated fire risk for the region well in advance of the Camp Fire.  In addition, PG&E was aware of the prior version of the Map—known as Fire Map 1—which had been in development since 2012 and which the CPUC had adopted in May 2016.[35]  Fire Map 1 "depict[ed] areas of California where there is an elevated hazard for the ignition and rapid spread of power-line fires due to strong winds, abundant dry vegetation, and other environmental conditions."  Fire Map 1 also showed the areas of origin of the Camp Fire as primarily red and orange, indicating the highest level of elevated hazard for the "ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and/or other environmental conditions."

B.     **PG&E Failed to De-Energize Its Power Lines Despite Its Own Policies and Industry Best Practices**

89.     In the wake of the devastating 2017 North Bay Fires, also caused by PG&E, PG&E pledged to use de-energizing strategies to respond to severe weather conditions that pose a foreseeably high wildfire risk.

---

[34] *Id.* at 10.

[35] Decision Adopting Fire Map 1, at A-1, Cal Pub. Utils. Comm'n (May 27, 2016), http://docs.cpuc.ca.gov/PublishedDocs/Published/GOOO/M162/K550/162550016.PDF.

Case: 19-30088    Doc# 441    Filed: 02/13/19    Entered: 02/13/19 21:16:26    Page 23 of 50

90.     De-energizing involves preemptively shutting off power in specific circuits for a period of time in response to an elevated wildfire risk.  Because no electricity is flowing through de-energized equipment, that equipment cannot spark and ignite a fire.

91.     Sections 451 and 399.2(a) of the California Public Utilities Code authorize utilities to shut off electric power to protect public safety, including to prevent fires caused by strong winds.

92.     As the CPUC has explained, "[d]e-energization of electric facilities could save lives, protect property, and prevent fires."[36]

93.     Other utilities in California, such as San Diego Gas & Electric, have used de-energization for years to reduce wildfire risk during severe weather conditions.  For reasons unknown, before 2018, PG&E had no policy to de-energize lines as a fire prevention measure.[37]

94.     In March 2018, following widespread criticism about its role in causing the 2017 North Bay Fires, PG&E finally announced it would develop a program to de-energize power lines as a fire prevention measure.

95.     Six months later, in September 2018, PG&E published its "Public Safety Power Shutoff Policies and Procedures."[38]  Those procedures explained that a Public Safety Power Shutoff would occur "during the most extreme fire danger conditions."  PG&E would determine when to perform a shutoff based on a number of criteria, including:

   a.  "extreme" fire danger threat level, as classified by the National Fire Danger Rating System;

   b.  a Red Flag Warning declared by the National Weather Service;

   c.  low humidity levels, generally 20 percent and below;

---

[36] Resolution ESRB-8, CPUC (July, 12, 2018), http://docs.cpuc.ca.gov/PublishedDocs/Published/GOOO/M217/K801/217801749.PDF.

[37] *Id.*

[38] *Public Safety Power Shutoff Policies and Procedures,* PG&E (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

23

d. sustained winds above approximately 25 mph and wind gusts above approximately 45 mph;

e. site-specific conditions such as temperature, terrain and local climate;

f. critically dry vegetation that could serve as fuel for a wildfire; and

g. on-the-ground, real-time observations from PG&E field crews.

96.     Shortly thereafter, PG&E began to implement its new safety program.  For example, on October 14, 2018, PG&E "proactively turned off the power in extreme fire-risk areas of Lake, Napa, and Sonoma Counties impacting approximately 17,500 customers" as well as "extreme fire-risk areas of the Sierra Foothills in Amador, El Dorado and Calaveras counties, impacting approximately 42,000 customers."[39]

97.     In the days before the Camp Fire began, the National Weather Service issued a "Red Flag Warning" for Butte County, including the communities of Berry Creek, Chico, Forest Ranch, Magalia, Oroville, and Paradise.[40]

98.     A Red Flag Warning alerts residents, emergency responders, and utilities such as PG&E of the onset, or potential onset, of critical weather and dry conditions that could lead to rapid or dramatic increases in wildfires.  According to Cal Fire, a Red Flag Warning is "the highest alert."  During a Red Flag Warning, "extreme caution" is necessary "because a simple spark can cause a major wildfire."[41]

99.     Weather data shows that conditions on the morning of November 8, 2018 near the origin points of the fire met other of PG&E's shutdown criteria.  For example, wind gusts were

---

[39] *Public Safety Power Shutoff Event,* PG&E, https://www.pge.com/en_US/safety/emergency-preparedness/natural-disaster/wildfires/public-safety-event.page.

[40] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning,* CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/

[41] Drew Tuma, *Fire Danger in the Bay Area to Increase Sunday, Extreme Caution Advised,* ABC7 News (Oct. 13, 2018), https://abc7news.com/weather/fire-danger-in-the-bay-area-to-increase-sunday-extreme-caution-advised/4478430/.

24

1    reaching speeds of more than 50 miles per hour and the mean humidity was hovering around 20

2    percent in the hours before the fire.[42]

3        100.    In anticipation of these conditions, PG&E began issuing announcements two days

4    before the Camp Fire started that it might shut off power to parts of Butte County, including the

5    cities of Paradise and Magalia, due to "expected extreme fire danger conditions."[43]  Multiple such

6    alerts were issued over the next two days, but PG&E never de-energized its lines.

7        101.    Instead, on November 8, 2018, at 3:14 p.m., while Butte County was being

8    consumed by the Camp Fire, PG&E sent a tweet on its official account, @PGE4ME, announcing

9    that it had "determined that it will not proceed with plans today for a Public Safety Power Shutoff

10   in portions of 8 Northern CA counties, as weather conditions did not warrant this safety

11   measure."[44]

12       102.    Had PG&E de-energized its equipment near the origin points of the Camp Fire, the

13   Camp Fire would have been averted.

14   **VII.    PG&E PUTS PROFITS ABOVE SAFETY**

15       103.    PG&E's failure to use due care in maintaining its power lines and its disregard for

16   the requirements of vegetation management caused the Camp Fire, which was foreseeable and

17   preventable.

18       104.    PG&E knew that its systems created a fire risk.

19       105.    PG&E has a long history of disregarding safety regulations to maximize corporate

20   profits.  For example, an audit by the CPUC showed that PG&E violated electricity-grid safety

21   regulations more than ten times in the North Bay in the years prior to the Camp Fire.  CPUC also

22

23   _____

     [42] Jarbo Gap California Monthly Summary for November 2018, Western Regional Climate Center,
24   https://raws.dri.edu/cgi-bin/rawMAIN.pl?caCJAR.

25   [43] PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and
          Potential for Public Safety Power Shutoff, PG&E (Nov. 6, 2018),
26        https://www.pge.com/en/about/newsroom/newsdetails/index.page?WT.pgeac=PSPS_CurrentAlertR
          elease&title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_
27        weather_forecasts_and_potential_for_public_safety_power_shutoff.

     [44] PG&E (@PGE4Me), Twitter (Nov. 8, 2018 3:14 P.M.)
28        https://twitter.com/PGE4Me/status/1060672000929267713

1  said that PG&E had failed in thousands of instances over a five-year period to conduct timely

2  inspections and to complete work orders required by the state regulator.

3      106.    During the same time period, PG&E took in about $1 billion in profits each year.

4      107.    PG&E also regularly fails to comply with safety rules set by regulators.  Regulators

5  who audit PG&E's work in the field cite the company for late repairs and maintenance jobs far

6  more frequently than any other electric utility in the state.

7      108.    This pattern of repeated failures and a dismissive attitude towards its safety

8  obligations arises from PG&E's well-documented history of implementing a "run to failure"

9  approach with its aging infrastructure, whereby it ignores necessary maintenance in order to

10  increase profits.  According to a filing made in March 2013 in a CPUC Investigation:

11          [T]he Overland Audit explains how PG&E systematically underfunded [Gas
            Transmission & Storage ("GT&S")] integrity management and maintenance
12          operations for the years 2008 through 2010.  PG&E engaged in a "run to
            failure" strategy whereby it deferred needed maintenance projects and
13          changed the assessment method for several pipelines . . . all to increase its
            profits even further beyond its already generous authorized rate of return,
14          which averaged 11.2% between 1996 and 2010.

15          Given PG&E's excessive profits over the period of the Overland Audit,
            there is no reason to believe that Overland's example regarding GT&S
16          operations between 2008 and 2010 was unique. The [Integrated Resource
            Planning] Report supplements the Overland Audit findings with additional
17          examples of PG&E management's commitment to profits over safety.  Thus,
            it is evident that while the example of GT&S underfunding between 2008
18          and 2010 might be extreme, it was not an isolated incident; rather, it
            represents the culmination of PG&E management's long-standing policy to
19          squeeze every nickel it could from PG&E gas operations and maintenance,
            regardless of the long term "run to failure" impacts. And PG&E has offered
20          no evidence to the contrary.[45]

21  **VIII.  THE CATASTROPHIC DAMAGE CAUSED BY PG&E'S MISCONDUCT**

22      109.    The full extent of the damage from the Camp Fire has not yet been quantified.  All

23  told, the Camp Fire burned for 17 days, and burned over 150,000 acres (approximately 240 square

24  miles) of Northern California, destroying homes, businesses, and lives.

25

26

27

_____
[45] Opening Brief of the Division of Ratepayer Advocates, Investigation 12-01-007, Cal. Pub. Utils.
28      Comm'n (Mar. 11, 2013), https://tinyurl.com/yapf4al6.

26

110. More than 14,000 homes were damaged or destroyed, often along with everything inside them.

111. So far, 88 deaths have been reported, and others are still reported missing. Many of those who escaped suffered serious bodily injury and emotional trauma, and many lost family pets or livestock.

112. Because the Camp Fire spread so quickly, individuals and businesses could not protect their properties and structures or even remove personal possessions, including irreplaceable heirlooms and pictures, and valuable inventories of products, crops, materials, and records.

113. The fire damage and destruction also has negatively impacted the value of property in the area, even undeveloped property, and will continue to affect resale values and development potential for an as-yet-unknown period of time.

114. In addition to damage and destruction of real and personal property, the Camp Fire caused widespread economic losses to individuals and businesses throughout the region and will continue to do so into the future.

115. Individuals who were displaced have incurred and will continue to incur costs related to lodging while being displaced.

116. Businesses have incurred and will continue to incur economic losses due to inability to operate their businesses, loss of access to their business locations, and inability of staff and employees to reach the business. These conditions are ongoing and will continue for an unknown time into the future.

117. Individual employees of affected businesses also have incurred and will continue to incur economic losses due to the inability of those businesses to operate, be accessed, or attract or service customers due to the Fire.

IX. **PLAINTIFFS' EXPERIENCES**

118. Julia Herndon has lived in Paradise, California since she was seven years old. David and Julia Herndon's children, Gabriell, Jedidiah, and Elizabeth Herndon have lived in Paradise all their lives.

119. At the time of the Camp Fire, David Herndon, Julia Herndon, Gabriell Herndon, and Estefania Miranda all resided at 5893 Golden Oaks Rd., Paradise, CA 95969. David, Julia, Gabriell, and Elizabeth Herndon lived at 5893 Golden Oaks Rd. for approximately four and a half years before the Camp Fire.

120. Jedidiah Herndon resided at 1508 Forest Service Rd., Paradise, CA 95969 at the time of the Camp Fire.

121. On the morning of November 8, 2018, Plaintiffs David and Julia Herndon woke up to ash falling through the sky like rain. After seeing a burning ember float to the earth, they realized the fire was dangerously close and agreed to quickly pack what they could and evacuate their home.

122. As David, Julia, Gabriell, and Estefania stood in the living room, they heard a propane tank explode. Julia saw a wall of smoke in the backyard and glowing red over the vines. No one could find the family cat.

123. David, Julia, Gabriell, and Estefania all left 5893 Golden Oaks Rd. in separate cars at approximately 9 a.m. on November 8, 2018. Their home was fully engulfed by the fire approximately 30 minutes after the family left.

124. Traffic was stalled as the community tried to escape. There were lines of cars and David, Julia, Gabriell, and Estefania had to wait. From here, Julia Herndon and Estenfania Miranda were split up from both David Herndon and Gabriell Herndon.

125. Plaintiffs lost their possessions and their homes when they were destroyed in the Camp Fire.

126. Plaintiff David Herndon's company, Ponderosa Pest & Weed Control, was interrupted and damaged by the fire. He lost specialized equipment as well as suffered a downturn in business as a result of the fire. The number of customers that needed pest control dramatically dropped after the community's homes were destroyed in the Camp Fire.

127. Similarly, companies owned and operated by Plaintiff Gabriel Herndon – Gabriella's Eatery, and Chico Rent-a-Fence – were interrupted and damaged by the Fire. The

number of customers needing dining options or fence rentals dropped dramatically after the community's homes were destroyed in the Camp Fire.

## CLASS ALLEGATIONS

128.    Plaintiffs bring this class action individually and on behalf of all others similarly situated under California Code of Civil Procedure § 382.

A.    **Class Definition**

129.    Plaintiffs seek certification of the following Class:

All individuals residing in California who, as of November 8, 2018, lived in, worked in, were offered and accepted work in, or owned or leased real or personal property located within, the California counties of Butte and Plumas (the "Fire Area"); and

All California entities that:

1.  owned, operated, or leased a physical facility in the Fire Area and (A) sold products (i) directly to consumers or end users of those products or (ii) to another entity, or (B) regularly purchased products from the Fire Area in order to produce goods for resale;

2.  provided services while physically present in the Fire Area; or

3.  owned or leased real property in the Fire Area;

    Provided that any such individual or entity suffered any of the following damages:

1.  **Economic Damage**: losses of income, earnings, and/or profits.

2.  **Real Property Damage**: losses suffered by owners and lessees of real property located in the Fire Area.

3.  **Personal Property Damage**: losses suffered by owners and lessees of personal property located in the Fire Area.

4.  **Evacuation Damage**: losses suffered by those evacuated pursuant to voluntary or mandatory evacuation orders arising from the Camp Fire.

130.    Notwithstanding the above, the following individuals and entities are excluded from the Class:

29

1. Any Class Member who or which timely electing exclusion under any opt-out procedure directed by the Court.

2. Defendants, and individuals who are current employees of Defendants.

3. All judges of this Court, their law clerks serving during the pendency of this action, and members of any such judge's or current law clerk's immediate family.

4. Any companies that insure any parties or Class members against the losses alleged in this complaint.

131.     Numerosity.  The members of the Class are so numerous that joinder of all members would be impracticable.  Based on public information, the Class of those with Camp Fire-related damages includes tens of thousands of potential claimants.

132.     Ascertainability.  The Class is ascertainable.  The Class definition identifies groups of Class Members by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description.

133.     Commonality and Predominance.  A well-defined community of interest in questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members.  This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the Class.  The most significant questions of law and fact that will decide the Camp Fire litigation are questions common to the Class, or to definable categories or subclass thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to the Plaintiffs and Class members, include, among others, the following:

134.     Whether Defendants were negligent in their construction, maintenance, and operation of electrical infrastructure, high voltage power lines, transformers, and/or other equipment;

135.     Whether Defendants owed any duties to Plaintiffs and Class members;

136. Whether Defendants breached these duties to Plaintiffs and Class members;

137. Whether Defendants' actions or inactions were a substantial factor in causing harm to Plaintiffs and Class members;

138. Whether the Camp Fire caused physical injury to Plaintiffs and Class members' properties;

139. Whether the Camp Fire interfered with or continues to interfere with the Plaintiffs' and Class members' comfortable enjoyment of their lives or property;

140. Whether Defendants have created a public nuisance;

141. Whether the nuisance Defendants created is temporary or permanent;

142. Whether the Defendants have taken or have damaged the property of Plaintiffs and Class members;

143. Whether Defendants have provided just compensation for having taken or having damaged the property of Plaintiffs and Class members;

144. Whether Defendants violated any California statutes, including California Civil Code §§ 3479, 3480, Public Utilities Code § 2106, and California Health & Safety Code § 13007;

145. What remedies and structural mechanisms best ensure the equitable treatment of claims against the Defendants arising from the Fire; and

146. What is the proper measure of damages and what are the formulae of allocation to each category of Class damages and losses.

147. **Typicality.** Plaintiffs' claims are typical of the members of the Class. The evidence and the legal theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiffs and all of the Class members.

148. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously.

149. **Superiority.** The class action provides for the fair and efficient adjudication of this case or controversy. Even if any individual persons or group(s) of Class members can afford

31

individual litigation, individual litigation of all claims would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device provides the benefits of unitary and inclusive adjudication, economies of scale, and comprehensive adjudication by a single court.

150. Prosecution of separate actions by all individual Class members may create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class, lead to the underinclusive, inconsistent or otherwise inequitable allocation of Defendants' available assets and insurance among similarly situated claimants, and/or lead to repetitious trials of numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## **FIRST CAUSE OF ACTION**

### **Negligence**

### **(Brought By All Plaintiffs And The Class Against All Defendants)**

151. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

152. Defendants have a non-transferable, non-delegable duty to apply a level of care commensurate with and proportionate to the danger of designing, engineering, constructing, operating, and maintaining electrical transmission and distribution systems, including vegetation clearance.

153. Defendants have a non-transferable, non-delegable duty of vigilant oversight in the maintenance, use, operation, repair, and inspection appropriate to the changing conditions and circumstances of their electrical transmission and distribution systems.

154. Defendants have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair, and maintenance of electrical lines, infrastructure, equipment, and vegetation in order to assure safety under all the local conditions in their service area, including but not limited to, those conditions identified herein.

155. Defendants negligently breached those duties by, among other things:

156. Failing to conduct reasonably prompt, proper, and frequent inspections of the electrical transmission lines, wires, and associated equipment;

157. Failing to design, construct, monitor, and maintain high voltage transmission and distribution lines in a manner that would avoid igniting and/or spreading fire during foreseeable and expected long, dry seasons;

158. Failing to design, construct, operate, and maintain high voltage transmission and distribution lines and equipment to withstand foreseeable conditions and avoid igniting and/or spreading fires;

159. Failing to maintain and monitor high voltage transmission and distribution lines in known fire-prone areas to avoid igniting and/or spreading fires;

160. Failing to keep equipment in a safe condition at all times to prevent fires;

161. Failing to inspect vegetation within proximity to energized transmission and distribution lines and maintain at a safe distance to avoid igniting and/or spreading fires;

162. Failing to de-energize power lines during foreseeable and expected fire-prone conditions;

163. Failing to de-energize power lines after the Fire's ignitions;

164. Failing to properly investigate, vet, hire, train, and supervise employees and agents responsible for maintenance and inspection of the power lines and/or electrical equipment and proximate vegetation;

165. Failing to implement and follow regulations and reasonably prudent practices to avoid igniting and/or spreading fires; and

166. Failing to properly investigate, monitor, and maintain vegetation sufficient to mitigate the risk of fire.

167. The Camp Fire was a direct, legal, and proximate result of Defendants' negligence. As a direct, proximate, and legal result of Defendants' negligence, Plaintiffs and members of the Class suffered damages as alleged herein.

168. At all times described herein, Defendants failed to properly inspect and maintain electrical infrastructure and equipment which they knew, given the then existing and known

33

weather, climate, and fire-risk conditions, posed a risk of harm to Plaintiffs and the Class, and to their real and/or personal property.  Defendants were aware that if the subject electrical infrastructure sparked, arced, or came in contact with vegetation, that a fire would likely result. Defendants also knew that, given the existing and known weather, climate, and fire-risk conditions, said fire was likely to pose a risk of property damage, economic loss, personal injury, and/or death to the general public, including to Plaintiffs and Class members.

169.    Over the past decade, Defendants have been subject to numerous fines and penalties as a result of their ongoing failures to abide by safety rules and regulations.

170.    The property damage and economic losses caused by the Camp Fire is the result of the ongoing custom and practice of Defendants of consciously disregarding statutes, regulations, standards, and rules designed to safeguard the public.  Despite having caused death and injury to numerous people and extensive property damage and economic loss, Defendants have continued to act in conscious disregard for the safety of others, and have ratified the unsafe conduct of their employees.  Upon information and belief, no employee has been disciplined or discharged as a result of failing and/or refusing to comply with the regulations and/or as a result of the deaths of members of the public.

171.    Defendants, in order to cut costs, failed to properly inspect and maintain the subject electrical infrastructure with full knowledge that any incident was likely to result in a fire that would injure or kill people, damage or destroy property, and cause harm to the general public, including Plaintiffs and Class members.

172.    Defendants' actions resulted in damages to Plaintiffs and members of the Class. Defendants failed to make the proper inspections, failed to properly maintain the lines, failed to properly trim vegetation, failed to properly and timely remove vegetation, failed to preventively de-energize, and failed to safely operate their electrical infrastructure, in order to increase corporate profits.

173.    Defendants' negligence was a substantial factor in causing Plaintiffs and the Class' damages.

174. Defendants' failure to comply with their duties of care proximately caused damage to Plaintiffs and Class members.

175. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members suffered damages including, but not limited to property damage, loss of cherished possessions, economic loss, business loss, emotional distress, annoyance, disturbance, inconvenience, mental anguish, loss of quiet enjoyment of their property, and costs related to evacuation and/or relocation.

176. The Camp Fire physically damaged and destroyed properties upon which Plaintiffs depended to make their living. The types of property damaged include homes, offices, and other facilities where Plaintiffs worked, homes, offices, and other facilities where Plaintiffs' patrons lived and worked, in addition to the roads and highways, which enabled Plaintiffs to access and conduct their businesses, and their patrons to access their businesses.

177. Defendants were and are in a special relationship to Plaintiffs and Class members. As a supplier of electrical power to Plaintiffs and Class members, Defendants' operation of their electrical equipment was intended to and did directly affect the Class.

178. Defendants operated their electrical infrastructure in close geographic proximity to Plaintiffs and Class members, and with the knowledge that there were homes and businesses in close proximity to PG&E's power lines and/or electrical equipment. As a result, Defendants' operation of their power lines and/or electrical equipment was plainly intended to affect Plaintiff and the Class.

179. The harm to Plaintiffs and the Class from the Defendants' failure to properly inspect, repair, and maintain power lines and/or electrical equipment was foreseeable. It was foreseeable that such conduct would cause a massive wildfire, and that such a wildfire would destroy personal and real property near Defendants' infrastructure, force residents and visitors in the region to evacuate, and deter those who would have visited from visiting the area, resulting in fewer customers to patronize area businesses and fewer economic opportunities for Plaintiffs and the Class.

Case: 19-30088    Doc# 441    Filed: 02/13/19    Entered: 02/13/19 21:16:26    Page 36 of 50

180.     Plaintiffs and the Class suffered injuries which were clearly and certainly caused by the Fire, resulting evacuation and/or relocation and economic losses, and the remedial measures they are forced to take to restore their properties and businesses.

181.     Public policy supports finding a duty of care in this circumstance due to Defendants' violation of California Civil Code §§ 3479, 3480, Public Utilities Code § 2106, and California Health & Safety Code § 13007.

182.     Defendants, large billion-dollar corporations with tens of billions of total assets, are better placed to absorb the cost of this disaster than Plaintiffs or the Class, who are individual property owners, tenants, independent contractors, and small business owners.

183.     A finding of a duty of care on Defendants will also deter public utilities from failing to properly inspect, repair, and maintain their power lines and/or electrical equipment in the future, whereas burdening the Plaintiffs and the Class with the cost of this disaster will not have any deterrent value, as Plaintiffs and the Class are victims through no fault of their own.

184.     Wildfire insurance, corporate liability insurance, and reinsurance are widely available and prevalent in the industry, and Defendants maintain a substantial amount of wildfire insurance to pay for precisely these kinds of incidents.

185.     Further, the conduct alleged against Defendants is despicable and subjected Plaintiffs and Class members to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount to be determined at trial.  Defendants' conduct evinces a conscious disregard for the safety of others, including Plaintiffs and Class members.  Defendants' conduct was and constitutes malice as defined by Civil Code § 3294.  An officer, director, or managing agent of PG&E personally committed, authorized, and/or ratified the wrongful conduct alleged in this complaint.  Plaintiffs and Class members are entitled to an award of punitive damages sufficient to punish Defendants and deter future wrongdoing.

## SECOND CAUSE OF ACTION

### Inverse Condemnation

### (Brought By All Plaintiffs And The Class Against All Defendants)

36

186.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

187.     PG&E is a public entity for the purposes of the doctrine of inverse condemnation.

188.     On or about November 8, 2018, Plaintiffs and Class members were owners of real property and personal property located within Northern California.

189.     Prior to and on November 8, 2018, Defendants deliberately designed, installed, owned, operated, used, controlled, and/or maintained power lines and/or electrical distribution infrastructure in Northern California for the purpose of providing electricity to the public.

190.     Providing electricity to the public using power lines and/or electrical distribution infrastructure is a public improvement made to benefit the community as a whole.

191.     On or about November 8, 2018, as a direct, necessary, and legal result of Defendants' deliberate installation, ownership, operation, use, control, and/or maintenance for a public use of power lines and/or electrical distribution infrastructure, Defendants' power lines and/or electrical distribution infrastructure came in contact with vegetation and caused the Camp Fire, which burned in excess of 150,000 acres, including property owned or occupied by Plaintiffs and Class members.  The fire took and/or damaged and/or destroyed Plaintiffs' and Class members' real and/or personal property.

192.     The taking of and/or damage to Plaintiffs' and the Class' property was proximately and substantially caused by Defendants' deliberate actions.  Defendants deliberately installed, owned, operated, used, controlled, and/or maintained power lines and equipment for public use that caused the Camp Fire.

193.     The taking of and/or damage to Plaintiffs' and the Class Members' property arose out of the functioning of PG&E's power lines and/or electrical distribution infrastructure as deliberately designed, constructed, altered, and maintained.

194.     Plaintiffs and Class members have not received adequate compensation for the taking of and/or damage to and/or destruction of their property, thus constituting a taking or damaging of Plaintiffs' and Class members' property by Defendants without just compensation.

195.     As a direct and legal result of the above-described takings of and/or damages to Plaintiffs' and the Class' property, including loss of use and interference with access, enjoyment

37

and marketability of real property, and taking/damage/destruction of personal property, Plaintiffs and Class members have been damaged in amounts to be determined at trial.

196.    Plaintiffs and Class members have incurred and will continue to incur attorneys', appraisal, and engineering fees and costs because of Defendants' conduct, in amounts that cannot yet be ascertained, but which are recoverable in this action under Code of Civil Procedure § 1036.

197.    The damage to Plaintiffs' and Class members' property is disproportionate to the risks from the public improvements made to benefit the community as a whole. Justice, fairness, and the California Constitution require that Plaintiffs and Class members be compensated for their injuries by PG&E rather than allowing those injuries to remain disproportionately concentrated on them.

<u>**THIRD CAUSE OF ACTION**</u>

<u>**Trespass**</u>

<u>**(Brought By All Plaintiffs And The Class Against All Defendants)**</u>

198.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

199.    During the relevant time, Plaintiffs and Class members were the owners and/or lawful occupiers of real property damaged by the Camp Fire.

200.    Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class members' real properties. Defendants negligently allowed the Camp Fire to ignite and/or spread out of control, causing injury to Plaintiffs and Class members. The spread of a negligently caused fire to wrongfully occupy the land of another constitutes a trespass.

201.    Plaintiffs and Class members did not grant permission for Defendants to cause the Camp Fire to enter their properties.

202.    As a direct, proximate, and substantial result of the trespass, Plaintiffs and Class members have suffered and will continue to suffer damages, including but not limited to damage to property, discomfort, annoyance, and emotional distress in an amount to be proved at the time of trial.

203.    As a further direct and proximate result of the conduct of Defendants, Plaintiffs have hired and retained counsel to recover compensation for loss and damage and are entitled to

38

recover all attorneys' fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under California Code of Civil Procedure § 1021.9 for lands under cultivation or intended or used for the raising of livestock.

204.   As a further direct and proximate result of the conduct of Defendants, Plaintiffs and Class Members seek treble or double damages for wrongful injuries to timber, trees, or underwood on their property, as allowed under California Civil Code § 3346.

205.   As a further direct and proximate result of the conduct of Defendants, Plaintiffs and Class Members seek the reasonable cost of repair or restoration of the property to its original condition and/or loss-of-use damages, as allowed under California Civil Code § 3334.

206.   Defendants' conduct was willful and wanton, and with a conscious contempt and disdain for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct.  Accordingly, Defendants acted with malice towards Plaintiffs and Class members, which is an appropriate predicate fact for an award of exemplary/punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Private Nuisance

### (Brought By All Plaintiffs And The Class Against All Defendants)

207.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

208.   Plaintiffs and Class members own and/or occupy property at or near the site of the Camp Fire.  At all relevant times herein, Plaintiffs and Class members had a right to occupy, enjoy, and/or use their property without interference by Defendants.

209.   Defendants' actions, conduct, omissions, negligence, trespass, and failure to act resulted in a fire hazard and a foreseeable obstruction to the free use of Plaintiffs' and the Class' property, invaded the right of Plaintiffs and Class members to use their property, and interfered with Plaintiffs'  and the Class' enjoyment  of their property, causing Plaintiffs and Class members' unreasonable harm and substantial actual damages constituting a nuisance pursuant to California Civil Code § 3479.

39

1    210.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class

2    members sustained loss and damage, including but not limited to damage to property, discomfort,

3    annoyance, and emotional distress, the amount of which will be proven at trial.

4    211.    As a further direct and proximate result of the conduct of Defendants, Plaintiffs

5    seek the reasonable cost of repair or restoration of the property to its original condition and/or

6    loss-of-use damages, as allowed under California Civil Code § 3334.

7    212.    Defendants' conduct was willful and wanton, and with a conscious contempt and

8    disdain for the disastrous consequences that Defendants knew could occur as a result of their

9    dangerous conduct.  Accordingly, Defendants acted with malice towards Plaintiffs, which is an

10   appropriate predicate fact for an award of exemplary/punitive damages in an amount to be

11   determined a trial.

12                            **FIFTH CAUSE OF ACTION**

13                                **Public Nuisance**

14       **(Brought By All Plaintiffs And The Class Against All Defendants)**

15   213.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

16   214.    Defendants owed a non-transferable, non-delegable duty to the public, including

17   Plaintiffs and Class members, to conduct their business, in particular the maintenance and/or

18   operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent

19   vegetation in proximity to their electrical infrastructure in Northern California, in a manner that

20   did not threaten harm or injury to the public welfare.

21   215.    Defendants, by acting and/or failing to act, as alleged hereinabove, created a

22   condition that was harmful to the health of the public, including Plaintiffs and Class members, and

23   created a fire hazard and other potentially dangerous conditions to Plaintiffs' and the Class'

24   property, which interfered with the comfortable occupancy, use, and/or enjoyment of Plaintiffs'

25   and the Class' property. This interference is both substantial and unreasonable.

26   216.    Plaintiffs and Class members did not consent, expressly or impliedly, to the

27   wrongful conduct of Defendants.

28

217.     The hazardous condition which was created by and/or permitted to exist by Defendants affected a substantial number of people at the same time within the general public, including Plaintiffs and Class members, and constituted a public nuisance under Civil Code §§ 3479 and 3480 and Public Resources Code § 4171.  Further, the Camp Fire constituted a public nuisance under Public Resources Code § 4170.

218.     The damaging effects of Defendants' creation of a fire hazard and the ensuing Camp Fire is ongoing and affects the public at large.  As a result of the Camp Fire's location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the burned areas.  This can further cause significant post-fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment-laden flow hazards, and hillside erosion.

219.     As a direct and legal result of the conduct of Defendants, Plaintiffs and Class members suffered harm that is different from the type of harm suffered by the general public.  Specifically, Plaintiffs and Class members have lost the occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to: a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the ability to sell their property; soils that have become hydrophobic; risk of future harm due to mudslides and/or debris flows, exposure to an array of toxic substances on their land; the presence of "special waste" on their property that requires special management and disposal; a lingering smell of smoke, and/or soot, ash, and/or dust in the air; and economic losses.

220.     As a further direct and legal result of the conduct of Defendants, Plaintiffs and Class members have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with Plaintiffs' occupancy, possession, use and/or enjoyment of their property.

221.     A reasonable, ordinary person would be annoyed or disturbed by the condition created by Defendants, and the resulting Camp Fire.

222.     Defendants' conduct is unreasonable and the seriousness of the harm to the public, including Plaintiffs and Class members, outweighs the social utility of Defendants' conduct.

41

There is little or no social utility associated with causing wildfires to destroy one of the most beautiful and beloved regions of Northern California.

223. The individual and/or collective conduct of Defendants set forth above resulting in the Camp Fire is not an isolated incident, but is ongoing and/or a repeated course of conduct, and Defendants' prior conduct and/or failures have resulted in other fires and damage to the public.

224. The unreasonable conduct of Defendants is a direct and legal cause of the harm, injury, and/or damage to the public, including Plaintiffs and Class members.

225. Defendants have individually and/or collectively failed to and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in order to ensure the safe delivery of electricity to residents and businesses through the operation of power lines in the affected area, and Defendants' individual and/or collective failure to do so exposed every member of  the public to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

226. Defendants' conduct set forth above constitutes a public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code §§ 4104 and 4170, and Code of Civil Procedure § 731.  Under Civil Code § 3493, Plaintiffs have standing to maintain an action for public nuisance because the nuisance is especially injurious to Plaintiffs and Class members because, as described above, it is injurious and/or offensive to the senses of Plaintiffs, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of their properties.

227. Plaintiffs seek a permanent injunction ordering that Defendants stop continued violation of Public Resource Code §§ 4292 and 4293 and CPUC General Order 95.  Plaintiffs also seek an order directing Defendants to abate the existing and continuing nuisance described above.

## SIXTH CAUSE OF ACTION

### Premises Liability

### (Brought By All Plaintiffs And The Class Against All Defendants)

228. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

229.     Defendants were the owners of an easement and/or real property in the area of origin of the Camp Fire, and/or were the owners of the electrical infrastructure upon said easement and/or right of way.

230.     Defendants acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near their electrical infrastructure along the real property and easement, allowing an unsafe condition presenting a foreseeable risk of fire danger to exist in said areas.

231.     As a direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs and Class members suffered, and continue to suffer, the injuries and damages as set forth above.

232.     As a further direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs and Class Members seek the recovery of punitive and exemplary damages against Defendants in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Violation Of Public Utilities Code § 2106

### (Brought By All Plaintiffs And The Class Against All Defendants)

233.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

234.     As Public Utilities, Defendants are legally required to comply with the rules and orders promulgated by the CPUC pursuant to Public Utilities Code § 702.

235.     Public Utilities whose failure to perform or inadequate performance of duties required by the California Constitution, a law of the State, or a regulation or order of the Public Utilities Commission, leads to loss or injury, are liable for that loss or injury, pursuant to Public Utilities Code § 2106.

236.     As Public Utilities, Defendants are required to provide and maintain service, equipment, and facilities in a manner adequate to maintain the safety, health, and convenience of their customers and the public, pursuant to Public Utilities Code § 451.

237.     Defendants are required to design, engineer, construct, operate, and maintain electrical supply lines and associated equipment in a manner consonant with their use, taking into

43

consideration local conditions and other circumstances, so as to provide safe and adequate electric service, pursuant to CPUC General Order 95, and CPUC General Order 165.

238. Defendants are required to maintain vegetation in compliance with California Public Resources Code §§ 4293, 4294, 4435 and Health & Safety Code § 13001.

239. Through their conduct alleged herein, Defendants violated Public Utilities Code §§ 702, 451 and/or CPUC General Order 95, thereby making them liable for losses, damages, and injuries sustained by Plaintiffs and Class members pursuant to Public Utilities Code § 2106.

## EIGHTH CAUSE OF ACTION

### Violation Of Health & Safety Code § 13007

### (Brought By All Plaintiffs And The Class Against All Defendants)

240. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

241. By engaging in the acts and omissions alleged in this Complaint, Defendants willfully, negligently, and in violation of law, allowed fire to ignite on or spread to the property of another in violation of California Health & Safety Code § 13007.

242. As a legal result of Defendants' violation of California Health & Safety Code § 13007, Plaintiffs suffered recoverable damages to property under California Health & Safety Code §§ 13008 and 13009.1.

243. As a further legal result of the violation of California Health & Safety Code § 13007 by Defendants, Plaintiffs are entitled to reasonable attorneys' fees under California Code of Civil Procedure § 1021.9 for the prosecution of this cause of action.

244. Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs and Class Members to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount to be determined at trial. Defendants' conduct was carried on with a willful and conscious disregard of the rights and safety of Plaintiffs and Class Members, constituting malice, for which Defendants must be punished by punitive and exemplary damages to be determined at trial. An officer, director, or managing agent of PG&E personally committed, authorized, and/or ratified the despicable and wrongful conduct alleged in this complaint.

44

# NINTH CAUSE OF ACTION

## Negligent Interference With Prospective Economic Advantage

### (Brought By Plaintiffs Gabriella's Eatery, Chico Rent-a-Fence, and Ponderosa Pest & Weed Control And Similarly Situated Class Members Against All Defendants)

245.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

246.    Plaintiffs and Class members have existing or prospective economic relationships with citizens of the region impacted by the Camp Fire, visitors to the region, and other individuals and organizations in and related to the region.

247.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and Class members.

248.    Defendants knew or should have known of these existing and prospective economic relationships.

249.    Defendants owed a duty to Plaintiffs and Class members to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and Class members.

250.    Defendants breached that duty to Plaintiffs and Class members by, among other things, failing to install and/or maintain reasonable safety equipment to prevent fires, failing to properly maintain their electrical infrastructure in a safe condition, and failing to manage the vegetation surrounding their equipment.

251.    Defendants knew or should have known that, if they failed to act with reasonable care, the existing or prospective economic relationships of Plaintiffs and Class members would be interfered with and disrupted.

252.    Defendants were negligent and failed to act with reasonable care as set forth above.

253.    Defendants engaged in wrongful acts and/or omissions as set forth above, including but not limited to their violations of laws that require Defendants to operate their equipment in a manner that does not damage public health or safety.

254. As a direct and proximate result of Defendants' wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and Class members.

255. As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and Class members have suffered and will suffer economic harm, injury, and losses in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. Costs of repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2. Loss of use, benefit, goodwill, and enjoyment of Plaintiffs' and Class Members' real and/or personal property, and/or alternative living expenses;

3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

4. Attorneys' fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under California Code of Civil Procedure § 1021.9;

5. Treble or double damages for wrongful injuries to timber, trees, or underwood on their property, as allowed under California Civil Code § 3346;

6. Punitive/exemplary damages;

7. All costs of suit;

8. Prejudgment interest, according to proof;

9. General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, and loss of quiet enjoyment of property; and proof;

10. A permanent injunction ordering that Defendants stop continued violation of Public Resource Code §§ 4292 and 4293 and CPUC General Order 95;

11. An order directing Defendants to abate the existing and continuing nuisance described herein; and

1    12. For such other and further relief as the Court shall deem proper, all according to proof.

2                                    **JURY TRIAL**

3    Plaintiffs demand a trial by jury for all issues so triable.

4

5    Dated: February 13, 2019
6            Los Angeles, CA              **Pierce Bainbridge Beck Price & Hecht LLP**
                                           John M. Pierce (SBN 250443)
7                                          jpierce@piercebainbridge.com
                                           Thomas D. Warren (SBN 160921)
8                                          twarren@piercebainbridge.com
                                           Carolynn K. Beck (SBN 264703)
9                                          cbeck@piercebainbridge.com
                                           Janine Cohen (SBN 203881)
10                                         jcohen@piercebainbridge.com
                                           355 South Grand Avenue, Suite 4400
11                                         Los Angeles, California 90071
                                           (213) 262-9333
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

47

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>David Herndon, Julia Herndon, Gabriell Herndon, Jedidiah Herndon, Estefania Miranda, Gabriella's Eatery, Chico Rent-A-Fence and Ponderosa Pest & Weed Control | DEFENDANTS<br>PG&E Corporation, Pacific Gas & Electric Company, Geisha Williams |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Pierce Bainbridge Beck Price & Hecht LLP<br>355 South Grand Avenue, Suite 4400,<br>Los Angeles, California 90071 (213) 262-9333 | ATTORNEYS (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) Negligence; (2) Inverse Condemnation; (3) Trespass; (4) Private Nuisance; (5) Public Nuisance (6) Premises Liability (7) Violation of Public Utilities Code § 2106 (8) Violations of Health & Safety Code § 13007; (10) Negligent Interference with Prospective Economic Advantage

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☑ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>PG&E Corporation; Pacific Gas & Electric Company | BANKRUPTCY CASE NO.<br>19-30088; 19-30089 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of California | DIVISION OFFICE<br>San Francisco | NAME OF JUDGE<br>Dennis Montali |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>2/13/2019 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Tom Warren | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.