OREN B. HAKER (*pro hac vice*)
DAVID B. LEVANT (*pro hac vice*)
GABRIELLE GLEMANN (*pro hac vice*)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.386.7530
Facsimile: 206.386.7500
gabrielle.glemann@stoel.com

*Attorneys for Party in Interest*
*Enel Green Power North America, Inc.*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors. | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**MOTION AND MEMORANDUM OF ENEL GREEN POWER NORTH AMERICA FOR ENTRY OF AN ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER 11 U.S.C. §§ 362(b)(6) AND 556** |
| ☐    Affects PG&E Corporation<br>☒    Affects Pacific Gas and Electric<br>        Company<br>☐    Affects both Debtors<br><br>*All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM).* | Hearing Date:    March 12, 2019<br>Time:                9:30 a.m.<br>Courtroom:      Hon. Dennis Montali<br><br>Objections Due:   March 5, 2019, 4 p.m. |

STOEL RIVES LLP
ATTORNEYS AT LAW
SEATTLE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

JURISDICTION ................................................................................................... 1

RELIEF REQUESTED ........................................................................................ 1

FACTS ................................................................................................................. 3

LEGAL ARGUMENT .......................................................................................... 6

    A.    The Safe Harbor Protections Of Sections 362(b)(6) And 556 Apply To Allow Enel to Enforce Its Contractual Rights Under The CSAs Notwithstanding PG&E's Bankruptcy ................................................................. 6

        a.    The Forward Contract Test ........................................................... 7

        b.    The CSAs are Forward Contracts ................................................. 9

        c.    The Forward Contract Merchant Test ........................................ 11

        d.    Enel is a Forward Contract Merchant ....................................... 12

        e.    The CSAs are Entitled to the Safe Harbor Protections of the Bankruptcy Code as Forward Contracts Executed by Forward Contract Merchants ................................................................... 13

NOTICE ............................................................................................................ 13

CONCLUSION ................................................................................................... 13

**TABLE OF AUTHORITIES**

Page

**Cases**

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Sols., L.L.C.* (*In re Calpine Corp.*),
No. 08-1251(BRL), 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ...................................7

*Clear Peak Energy, Inc. v. S. Cal. Edison Co.* (*In re Clear Peak Energy, Inc.*),
488 B.R. 647 (Bankr. D. Ariz. 2013) ........................................................................... passim

*In re FirstEnergy Sols. Corp.*,
No. 18-50757, 2019 WL 211807 (Bankr. N.D. Ohio Jan. 15, 2019)........................................9

*In re MBS Mgmt. Servs., Inc.*,
432 B.R. 570 (Bankr. E.D. La. 2010) .....................................................................................9

*In re Mirant Corp.*,
303 B.R. 319 (Bankr. N.D. Tex. 2003) ..........................................................................7, 11, 13

*In re Mirant Corp.*,
310 B.R. 548 (Bankr. N.D. Tex. 2004) ...............................................................................11, 12

*In re National Gas Distributors, LLC*,
556 F.3d 247 (4th Cir. 2009) ...................................................................................................8

**Statutes**

7 U.S.C. § 1(a)(9) .........................................................................................................................7

11 U.S.C. § 101(25) ..................................................................................................................7, 9

11 U.S.C. § 101(26) ...........................................................................................................11, 12, 13

11 U.S.C. § 362(b)(6) ............................................................................................................ passim

11 U.S.C. § 365(e)(1) ...................................................................................................................7

11 U.S.C. § 556 ..................................................................................................................... passim

11 U.S.C. § 761(1) .......................................................................................................................7

11 U.S.C. § 761(8) ....................................................................................................................7, 9

28 U.S.C. § 157 ...........................................................................................................................1

28 U.S.C. § 157(b) .......................................................................................................................1

28 U.S.C. § 1334 .........................................................................................................................1

Case: 19-30088    Doc# 481    Filed: 02/19/19    Entered: 02/19/19 17:37:22    Page 3 of 23

# TABLE OF AUTHORITIES
### (continued)

Page

28 U.S.C. § 1408 ................................................................................................................1

28 U.S.C. § 1409 ................................................................................................................1

Public Utilities Code Section 380 ......................................................................................2

**Rules**

Fed. R. Bankr. P. 2002 ......................................................................................................14

Fed. R. Bankr. P. 4001(a)(3) ..............................................................................................1

Fed. R. Bankr. P. 6006 ........................................................................................................1

Local Rule 4001-1 ..............................................................................................................1

**Other Authorities**

California Assembly Bill 2514 ............................................................................................4

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

Enel's Motion To Confirm Safe Harbor Protection - Case No. 19-30088 (DM)

iii

Case: 19-30088    Doc# 481    Filed: 02/19/19    Entered: 02/19/19 17:37:22    Page 4 of
23

Enel Green Power North America, Inc. ("Enel") by and through its undersigned counsel, submits this motion and memorandum of points and authorities for entry of an order confirming that the Capacity Storage Agreements (the "CSAs," *as defined below*) are protected by the safe harbor provisions codified in Sections 362(b)(6) and 556 of title 11 of the United States Code (the "Bankruptcy Code") and that the automatic stay does not apply to bar Enel from exercising its contractual rights under the CSAs, including its contractual right to cause the liquidation, termination or acceleration of the CSAs or to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with the CSAs. This motion is supported by the declaration of Giovanni Bertolino (the "Bertolino Declaration") filed contemporaneously herewith and the files and records referenced herein. Enel respectfully represents the following in support of this motion:

## JURISDICTION

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules").

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for this Motion are 11 U.S.C. §§ 362(b)(6) and 556, Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Bankruptcy Local Rule 4001-1.

## RELIEF REQUESTED

5. By this motion (the "Safe Harbor Motion"), Enel requests an order confirming that the safe harbor protections under Sections 362(b)(6) and 556 of the Bankruptcy Code apply to allow Enel to enforce its contractual rights under the CSAs.

6. Pursuant to the CSAs, Enel is contracted to construct three energy storage facilities and provide all capacity attributes, or resource adequacy capacity, from each facility to Pacific

Gas & Electric Company ("PG&E," and together with PG&E Corporation, the "Debtors").[1]  Each of the CSAs is currently in the development phase and Enel continues to incur additional development costs on an ongoing basis.  Enel faces imminent requirements to post security in the amount of $███████ (the "Project Development Security") to secure Enel's obligations under the CSAs.  Enel's deadline to post the Project Development Security depends upon the CPUC's approval of the CSAs becoming final and non-appealable, which may occur at any time in the coming days or weeks.

7.     Additionally, in reliance on the CSAs, Enel has entered into two interconnection agreements with PG&E and the CAISO, with a third interconnection agreement expected to be executed in December 2020 (the "Interconnection Agreements," *as defined below*).[2]  Under the two executed Interconnection Agreements, Enel is required to post security to fund the interconnection facilities and network upgrades required for interconnecting each facility (the "Interconnection Financial Security").  Enel's deadline to post the Interconnection Financial Security would have been February 28, 2019 and March 1, 2019, respectively.  However, as outlined below, Enel has been in discussions with the CAISO and PG&E regarding a possible extension to the deadlines, which would permit Enel the time to gain clarity as to its rights under the safe harbor provisions and PG&E the time to determine whether construction of these projects should proceed.  At this point, it is unclear whether that extension will be granted.

8.     Enel respectfully represents that an order from this Court that the CSAs are entitled to the safe harbor protections codified in Sections 362(b)(6) and 556 of the Bankruptcy Code is necessary to provide clarity on whether Enel may exercise its contractual rights to

---

[1] Public Utilities Code Section 380 requires the California Public Utilities Commission ("CPUC") to establish resource adequacy requirements for load serving entities under CPUC jurisdiction, including PG&E, in consultation with the California Independent System Operator ("CAISO").  Under the requirements of the CPUC, load serving entities must demonstrate they have procured sufficient capacity to meet resource adequacy requirements.

[2] The CAISO tariff provides for a limited interconnection agreement negotiation period of 120 days, subject to an extension agreed to by all parties (CAISO Tariff, Appendix DD, Generator Interconnection and Deliverability Allocation Procedures ("GIDAP"). The remaining unexecuted Interconnection Agreement is in the CAISO Cluster 11 process and expected to execute by December 2020.

terminate the CSAs without violating the automatic stay. Accordingly, Enel respectfully requests that the Court enter an order in the form of the proposed order filed herewith that confirms (i) the CSAs are entitled to the statutory safe harbor protections codified in Sections 362(b)(6) and 556 of the Bankruptcy Code; and (ii) the automatic stay does not apply to bar Enel, in its capacity as counterparty to the CSAs, from exercising its contractual rights thereunder.

## FACTS

9.      Enel is one of the largest owners and operators of renewable energy plants in North America, with projects operating and under development in twenty-four U.S. states and two Canadian provinces. In North America, Enel operates more than one hundred power plants with a total managed capacity of nearly 5 GW powered by renewable hydropower, wind, geothermal and solar energy.

10.      PG&E is currently party to three Capacity Storage Agreements (the "CSAs") with three special purpose entities, two of which are wholly-owned by Enel, with the third being owned 51% by Enel as managing member.[3]

11.      The CSAs were executed on November 8, 2017, and by their terms, unless otherwise terminated, will continue for a period of ten to twenty years from the initial delivery date, depending on the project. At the time of execution, the expected initial delivery date under each CSA was set between December 1, 2022 and December 1, 2023, depending on the project.

12.      Each CSA between Enel and PG&E encompasses two phases: (i) development of an energy storage facility (each a "Facility," and together the "Facilities"), and (ii) a delivery term, during which each Facility provides resource adequacy capacity to PG&E.

13.      Under the CSAs, after development and construction of the Facilities is complete, Enel is contracted to provide all resource adequacy capacity to PG&E from each Facility to allow PG&E to comply with its regulatory obligations and to provide grid reliability in its territory.

---

[3] As the CSAs and Interconnection Agreements contain confidential commercial information, Enel has filed concurrently herewith a motion requesting permission to file the CSAs and Interconnection Agreements, as well as unredacted versions of this Safe Harbor Motion and the Bertolino Declaration, under seal.

14.     The CSAs are the outcome of a competitive procurement process by which PG&E ensures compliance with CPUC Decision ("D.") 13-10-040 implementing California Assembly Bill 2514, which requires that PG&E meet certain energy storage procurement targets.

15.     Under the CSAs, PG&E is required to obtain a final and non-appealable order from the CPUC approving the CSAs, including payments made thereunder, and confirming that the CSAs count toward PG&E's energy storage procurement obligations established in D.13-10-040. Once the CPUC decision on approval becomes final and non-appealable, Enel is required under the CSAs to post Project Development Security in the total amount of $███████ to ensure Enel's continuing performance in constructing the energy storage facilities.

16.     This Project Development Security is in addition to $███████ that Enel has already posted as security following execution of the CSAs.

17.     On December 1, 2017, PG&E filed an application with the CPUC for approval of the CSAs. On October 9, 2018, the CPUC issued D.18-10-009 approving the CSAs, along with other agreements resulting from PG&E's 2016-2017 energy storage solicitation, and finding that the CSAs counted towards PG&E's energy storage procurement targets established by D.13-10-040. On November 19, 2018, the California Public Advocates Office (the "Public Advocates") filed an Application for Rehearing of D.18-10-009. The CPUC has not yet acted upon the Public Advocates' Application for Rehearing. If the CPUC denies the Public Advocates' Application for Rehearing, D.18-10-003 will become final and non-appealable, and Enel will be required to post the Project Development Security. In the interim, Enel continues to incur mounting development costs associated with the CSA projects.

18.     In reliance on the CSAs, Enel, through special purpose entities, has entered into two interconnection agreements, executed December 3 and 4, 2018, with a third interconnection agreement expected to be executed in December 2020 (the "Interconnection Agreements," and together with the CSAs, the "Contracts"). The Interconnection Agreements allow Enel to interconnect the relevant Facility to PG&E's transmission system, controlled by the CAISO, and guarantee the ability of Enel to deliver the Facility's output to PG&E.

19.     The Interconnection Agreements include a schedule for posting Interconnection Financial Security that covers the costs of constructing interconnection facilities and network upgrades to ensure the each Facility will have deliverability.[4]  Under two of the Interconnection Agreements, Enel was initially instructed by the CAISO that it was required to post Interconnection Financial Security in the amount of $███████ on February 28, 2019 and $███████ on March 1, 2019.  Under the third Interconnection Agreement, Enel will be required to post an additional Interconnection Financial Security in the amount of $███████ to $███████ by April 15, 2019, depending on which process Enel chooses for the project.

20.     Largely due to uncertainty regarding whether the CSAs will be terminated in connection with PG&E's bankruptcy, Enel has made requests to the CAISO and PG&E to assess whether extending the commercial operation date on the corresponding Interconnection Agreement, and thus delaying the posting of the Interconnection Financial Security, would be possible.  This process is currently underway and it is uncertain whether the extension will be granted.

21.     Enel's exposure is not limited to the Project Development Security and Interconnection Financial Security.  Enel continues to incur others costs in connection with the development of the projects, including third party engineering, permitting, and other consulting fees and ongoing land lease option payments.

22.     In sum, if Enel is unable to obtain this Court's ruling on the applicability of the statutory safe harbor provisions to the CSAs, Enel stands to lose (i) $███████ if required to post the Interconnection Financial Security; (ii) $███████ if required to post the Project Development Security; plus (iii) additional ongoing costs that Enel continues to incur in the development of the Facilities, as required under the Contracts.  If the Court concludes that the safe harbor provisions apply, Enel can either exercise its contractual right to terminate the contracts, or can opt to proceed with the construction with the comfort that should it opt to

---

[4] Deliverability, or the ability to delivery energy during peak load conditions, is required in order to be eligible to provide resource adequacy capacity.

Stoel Rives LLP
Attorneys At Law
Portland

Enel's Motion To Confirm Safe Harbor Protection - Case No. 19-30088 (DM)
5
Case: 19-30088    Doc# 481    Filed: 02/19/19    Entered: 02/19/19 17:37:22    Page 9 of 23

exercise those rights in the future, it can forestall the posting of additional security or secure the return of its Project Development Security at any time.

## LEGAL ARGUMENT

23.     Enel submits that based upon the foregoing facts, and under applicable law as set forth below, the relief requested herein should be granted, and the Court should confirm that the CSAs are protected by the safe harbor provisions of Sections 362(b)(6) and 556 of the Bankruptcy Code, and that the automatic stay does not apply to bar Enel from exercising its contractual rights thereunder.

### A.     The Safe Harbor Protections Of Sections 362(b)(6) And 556 Apply To Allow Enel to Enforce Its Contractual Rights Under The CSAs Notwithstanding PG&E's Bankruptcy

24.     Enel seeks an Order of this Court confirming that the safe harbor provisions of Sections 362(b)(6) and 556 of the Bankruptcy Code apply to the CSAs and that the automatic stay does not prevent Enel from enforcing its contractual rights under the CSAs, including any contractual right to cause the liquidation, termination or acceleration of the CSAs or to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with the CSAs.

25.     Section 362(b)(6) of the Bankruptcy Code provides that the automatic stay does not bar a forward contract merchant from exercising its contractual rights under any forward contract with the debtor entity.[5]

26.     Section 556 of the Bankruptcy Code further defines the contractual rights that may be enforced under this safe harbor exception to the automatic stay, specifically allowing a forward contract merchant to enforce its contractual right to "liquidate, terminate, or accelerate" a forward contract with the debtor according to the provisions in the contract that allow termination, liquidation, or acceleration based on (i) the counterparty becoming insolvent or (ii) the counterparty filing for bankruptcy under Chapter 11.[6]

---

[5] 11 U.S.C. § 362(b)(6).
[6] 11 U.S.C. §§ 556, 365(e)(1); *see also Calpine Energy Servs., L.P. v. Reliant Energy Elec. Sols., L.L.C.* (*In re Calpine Corp.*), No. 08-1251(BRL), 2009 WL 1578282, at *7 (Bankr.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

27.     In other words, under the Bankruptcy Code, a party may act on a contractual *ipso*
*facto* clause to terminate contracts with the debtor if the party can demonstrate that it falls under
one of the safe harbor exceptions to the automatic stay.[7]  A party seeking to establish its
qualification for the forward contract safe harbor is required to show that (i) the contract satisfies
the requirements of a "forward contract," and (ii) a party to the contract falls under the definition
of a "forward contract merchant" under the Bankruptcy Code.[8]

### a.     The Forward Contract Test

28.     Section 101(25) of the Bankruptcy Code defines a "forward contract" as a contract
for the purchase, sale, or transfer of a commodity (as defined in Section 761(8)) or any similar
good, service, article, right, or interest, which is presently or in the future becomes the subject of
dealing in the forward contract trade, with a maturity date more than two days after the date the
contract is entered into, including a repurchase or reverse repurchase transaction, consignment,
lease, swap, hedge transaction, deposit, loan, option or any other similar agreement.[9]

29.     Section 761(8) of the Bankruptcy Code adopts the definition of "commodity"
found in the Commodity Exchange Act.[10]  Section 1(a)(9) of the Commodity Exchange Act
defines "commodity" to include "all services, rights, and interests . . . in which contracts for
future delivery are presently or in the future dealt in."[11]

30.     Relatively few cases in the Ninth Circuit have addressed the issue of whether a
contract qualifies as a forward contract for the purposes of the safe harbor provisions.  In the
primary decision on point within the Ninth Circuit, the Bankruptcy Court for the District of
Arizona determined that a renewable power purchase and sales agreement for electricity produced

---

S.D.N.Y. May 7, 2009) (holding that Section 556, by its terms, limits its reach to those clauses
that trigger termination upon the occurrence of a condition specified in Section 365(e)(1)).
      [7] *See In re Mirant Corp.*, 303 B.R. 319, 327 (Bankr. N.D. Tex. 2003) (holding that even if
a contract contains a valid *ipso facto* clause, the automatic stay still applies to prevent unilateral
termination of the contract, and the counterparty must seek court's approval to modify the stay
before the *ipso facto* clause may be invoked).
      [8] *See Clear Peak Energy, Inc. v. S. Cal. Edison Co. (In re Clear Peak Energy, Inc.)*, 488
B.R. 647, 661 (Bankr. D. Ariz. 2013).
      [9] 11 U.S.C. § 101(25).
      [10] 11 U.S.C. § 761(1), (8).
      [11] 7 U.S.C. § 1(a)(9).

Stoel Rives LLP
Attorneys At Law
Portland

Enel's Motion To Confirm Safe Harbor Protection - Case No. 19-30088 (DM)

7

by a solar generating facility (a "PPA") between an electric power company (Southern California Edison, "SCE") and a chapter 11 debtor qualified as a forward contract.[12] In *Clear Peak*, the Bankruptcy Court looked to four factors in its determination, namely whether: (i) the subject of the contract was a commodity, with substantially all costs of performance attributable to the costs of the underlying commodity; (ii) the contract had a maturity date more than two days after the contracting date; (iii) the quantity and time elements were fixed at the time of contracting; and (iv) the contract had a relationship to the financial markets.[13]

31. Applying these four factors, the court in *Clear Peak* found the subject of the PPA was a commodity (electricity), the timeline manifested a maturity date more than two days after the execution date, and the PPA specified a minimum amount of power to be supplied over a specific period of time.

32. On the fourth factor, the *Clear Peak* court found a substantial relationship to the financial market existed where the principal purpose of the PPA was to hedge the price SCE had to pay over the long term, even though the PPA also served the purpose of complying with a state law requirement that 33% of California's energy be sourced from renewable resources by 2020.[14] The court determined that the PPA is part of a broader price-hedging scheme, whereby SCE acquires 98% of its power through short- and long-term PPAs with both renewable and conventional resources.[15] The Court also noted that all of SCE's PPAs required CPUC approval, and one of the factors the CPUC considers is the reasonableness of the price.[16] The court concluded that, based on the complex mechanism SCE had created to evaluate the contracts that supply power to its customers, the primary purpose of the PPA was to allow SCE to hedge the price over the long term, thereby satisfying the fourth prong of the forward contract test.[17]

---

[12] *See Clear Peak*, 488 B.R. at 663.

[13] *Id*. at 657. The *Clear Peak* court followed the test set by the Fourth Circuit Court of Appeals in *In re National Gas Distributors, LLC*, 556 F.3d 247 (4th Cir. 2009).

[14] *Id*. at 659.

[15] *Id*. at 660.

[16] *Id*.

[17] *Id*.

b. **The CSAs are Forward Contracts**

33.    In this case, the primary subject of the CSAs between Enel and PG&E is also a commodity, resource adequacy capacity, which is the primary product of the regulated resource adequacy framework in the California electricity market. Capacity is a product traded in various capacity markets in parallel with electricity markets throughout other independent system operator and regional transmission operator areas. Although courts in the Ninth Circuit have not yet considered whether resource adequacy capacity is a commodity within the definition of a forward contract under the Bankruptcy Code, resource adequacy capacity falls within the statutory definition under Section 761(8) as a service, right, or interest in which contracts for future delivery are presently or in the future dealt in, and that is not subject to the rules of a contract market or board of trade.

34.    Even if the Court finds resource adequacy capacity does not itself qualify as a commodity within the definition of a forward contract under the Bankruptcy Code, the underlying commodity being stored and offered on demand is electricity, which numerous courts have held to be a "commodity" for forward contract purposes.[18] As the definition of forward contract under the Bankruptcy Code includes not only a contract for the purchase, sale or transfer of a commodity, but also any "product or byproduct thereof," a contract for providing resource adequacy of electricity, which is indisputably a commodity, clearly qualifies. 11 U.S.C. § 101(25). Thus, the first prong of the test is satisfied.

35.    The CSAs also satisfy the second and third prongs of *Clear Peak*, as each CSA has a maturity date more than two days after the contracting date, and the quantity and time elements of each CSA was fixed at the time of their execution. The CSAs were executed in 2017, with the initial delivery date set for dates in 2022 and 2023 and a ten to twenty-year supply period to begin

---

[18] *See In re MBS Mgmt. Servs., Inc.*, 432 B.R. 570, 574 (Bankr. E.D. La. 2010) (holding that contract which required company to "supply the full requirements" of electricity to debtor was a "forward contract," where the contract involved the sale of electricity, a commodity); *see also In re FirstEnergy Sols. Corp.*, No. 18-50757, 2019 WL 211807 (Bankr. N.D. Ohio Jan. 15, 2019) (in which both parties specifically stipulated that electricity is a commodity under the Bankruptcy Code, and the court agreed).

on the initial delivery date. The CSAs specify a certain minimum quantity of resource adequacy capacity to be supplied over a set period of time. The CSAs each define a specific Resource Adequacy Attributes capacity and Flexible Resource Adequacy Attributes capacity, in MW. This number may fluctuate, but the CSAs guarantee a minimum percentage of these capacity numbers. Payment is made over the twenty years of the contract term using an escalating schedule, priced per kW.

36.    Finally, the CSAs also satisfy the fourth factor, in that each CSA has a relationship to the financial markets. In procuring the CSAs, PG&E used long-term procurement of resource adequacy capacity as a way to both comply with its statutory obligations regarding resource adequacy and, more importantly, to make new storage capacity viable and available for future capacity needs.[19] PG&E's long-term approach is fundamental to its strategy to hedge prices in its procurement of resource adequacy capacity. Because the CSAs play an integral part in PG&E's broad price-hedging scheme, they therefore have a direct relationship to the financial markets. Like SCE in *Clear Peak*, PG&E has created a complex network of supply and capacity agreements, utilizing tools like resource adequacy in order to continuously provide power to its customers at stable rates. The CSAs were executed as an essential component of that hedging network, to ensure availability of resources during times of peak demand and to reduce the need to purchase higher priced backstop capacity. Just as with the PPA in *Cleak Peak*, the CSAs must also be approved by the CPUC, and the primary factor in obtaining regulatory approval is that the CSAs provide reasonable terms and conditions, including price. Therefore, the CSAs have a substantial connection to the financial markets and satisfy the fourth prong of the forward contract test.[20]

---

[19] PG&E Opening Brief, Application of PG&E Company (U39E) for Authorization to Procure Energy Storage Systems During The 2016-2017 Biennial Procurement Period Pursuant to Decision 13-10-040, California Public Utilities Commission Docket A.16-03-001, requesting approval of its 2016 energy storage procurement plan, stating that "PG&E's 2016 ES RFO builds off of its earlier ES RFO cycle" by allowing for specific resource adequacy-only contracts. At 9.

[20] Additionally, the CSAs each contain a provision stating that the parties acknowledge that the agreement is a forward contract within the meaning of the Bankruptcy Code.

Stoel Rives LLP
Attorneys At Law
Portland

37.     For all of the foregoing reasons, the CSAs satisfy each of the four factors of the forward contract test identified by the court in *Clear Peak*, and are precisely the type of contracts meant to be protected under Sections 362(b)(6) and 556 of the Bankruptcy Code so as to avoid a negative impact on the financial markets due to the imposition of the automatic stay.

c.     **The Forward Contract Merchant Test**

38.     Section 101(26) of the Bankruptcy Code defines a forward contract merchant as an entity in the business of entering into forward contracts as a merchant (or with a merchant) in a commodity or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

39.     In *Clear Peak*, the court found that SCE qualified as a forward contact merchant because it regularly entered into contracts with short- and long-term maturity dates for the future delivery of electricity for hedging purposes.[21]

40.     The *Clear Peak* court reasoned that the language of Section 101(26) requires only one party to the contract to be a merchant, and that only contracts to which neither counterparty is a merchant would fail to satisfy the statutory requirement in the definition of a forward contract merchant.[22] Finding that SCE qualified as a forward contract merchant, the *Clear Peak* court held this factor under the 362(b)(6) safe harbor satisfied.[23]

41.     Faced with a similar issue in *In re Mirant Corp.*, the Bankruptcy Court for the Northern District of Texas looked to whether a customer who had entered into natural gas supply agreements with the Chapter 11 debtor sought to profit in the forward contract trade in determining whether the customer qualified as a forward merchant.[24] In its analysis, the court placed particular emphasis on the terms "business" and "merchant," stating that without these references, the definition of "forward contract merchant" could easily be applied to encompass anyone who enters into forward contracts.[25] The court concluded that a "merchant" is a person

---

[21] *See Clear Peak*, 488 B.R. at 661.
[22] *Id.*
[23] *Id.*
[24] *In re Mirant Corp.*, 310 B.R. 548, 567 (Bankr. N.D. Tex. 2004).
[25] *Id.*

Case: 19-30088    Doc# 481    Filed: 02/19/19    Entered: 02/19/19 17:37:22    Page 15 of
23

that buys, sells or trades in a market, but not a person who acts merely as an end-user or a producer.[26]  The court further held that to be "in the business" of a particular trade means something one engages in to generate a profit.[27]  Therefore, the court held that a forward contract merchant is a person that, in order to make a profit, engages in the forward contract trade as a merchant or with merchants.[28]

>    **d.**    **Enel is a Forward Contract Merchant**

42.    The CSAs each contain a provision expressly stating that "[e]ach Party represents and warrants to the other Party that as of the Execution Date … it is a "forward contract merchant" within the meaning of the United States Bankruptcy Code[.]"  The inclusion of this language in the CSAs operates as an acknowledgement on behalf of the parties that both PG&E and Enel operate as merchants in the business of the forward contract trade.

43.    In addition to entering into the three CSAs with PG&E, Enel operates a vast network of more than one hundred power plants in North America and is party to numerous power purchase and capacity storage agreements with utility companies across the country that rely upon Enel's network to maintain stability through price hedging.

44.    Operating as an integral part of a nationwide price hedging scheme, Enel is "in the business" of regularly entering into forward contracts, for profit, with utility companies acting as merchants, who buy, sell, or trade the energy supplied and stored by Enel's facilities.  Therefore, Enel falls squarely within both the statutory definition of a "forward contract merchant" under Section 101(26) and *Mirant*'s test that a forward contract merchant engage in the forward contract trade as a merchant or with merchants, in order to generate a profit.

45.    Even were this Court to conclude that Enel is not a forward contract merchant, Section 101(26) only requires that one party to the contract be so designated[29] and PG&E is

---

[26] *Id.*
[27] *Id.*
[28] *Id.* at 569.
[29] *See Clear Peak*, 488 B.R. at 661 (concluding that because at least one of the parties to the PPA is clearly a Forward Contract Merchant (SCE), the requirement under Section 362(b)(6) had been met and the safe harbor applied).

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

indisputably a forward contract merchant.  Just as the *Clear Peak* court found SCE to be a forward contract merchant for safe harbor purposes, PG&E is also a utility company that is in the business of entering into forward contracts to hedge against price fluctuations in the energy market, and fits the statutory definition of a forward contract merchant under Section 101(26) and the *Mirant* test.

**e.  The CSAs are Entitled to the Safe Harbor Protections of the Bankruptcy Code as Forward Contracts Executed by Forward Contract Merchants**

46.     Because (i) the CSAs are forward contracts, and (ii) Enel and PG&E are forward contract merchants, Enel respectfully requests that the Safe Harbor Motion be granted and the Court enter an order in the form attached hereto that finds the CSAs are protected by the safe harbor provisions codified in Sections 362(b)(6) and 556 of the Bankruptcy Code and determines that the automatic stay does not apply to the CSAs or to Enel as counterparty to the CSAs.

### NOTICE

Notice of the Safe Harbor Motion will be provided to (i) the Debtors and counsel to the Debtors; (ii) counsel to the Office of the United States Trustee for Region 17; (iii) counsel to the administrative agent under the Debtors' debtor-in-possession financing facility; (iv) counsel to the collateral agent under the Debtors' debtor-in-possession financing facility; (v) counsel to the CPUC; (vi) the U.S. Nuclear Regulatory Commission; (vii) the U.S. Department of Justice, as counsel for the United States on behalf of the Federal Energy Regulatory Commission; (viii) each member of the Official Committee of Unsecured Creditors specified in the Notice of Appointment of the Official Committee of Unsecured Creditors [Docket 409]; (ix) each member of the Official Committee of Tort Claimants specified in the Notice of Appointment of the Official Committee of Tort Claimants [Docket 453]; and (x) those parties who have requested notice pursuant to Fed. R. Bankr. P. 2002.  Enel respectfully submits that no further notice is required.

### CONCLUSION

For the foregoing reasons, the Court should issue an order confirming that the CSAs are protected by the safe harbor provisions codified in Sections 362(b)(6) and 556 of the Bankruptcy

1  Code and that the automatic stay does not apply to bar Enel from exercising its rights under the

2  CSAs, and for such other and further relief as the Court may deem just and appropriate.

3       DATED:  February 19, 2019

4                                              STOEL RIVES LLP

5                                               */s/ Gabrielle Glemann*
                                               Oren Buchanan Haker (*pro hac vice*)
6                                              David B. Levant (*pro hac vice*)
                                               Gabrielle Glemann (*pro hac vice*)
7                                              Stoel Rives LLP
                                               600 University Street, Suite 3600
8                                              Seattle, WA 98101
                                               (206) 386-7530
9                                              gabrielle.glemann@stoel.com

10                                             *Attorneys for Party in Interest*
                                               *Enel Green Power North America, Inc.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case: 19-30088    Doc# 481    Filed: 02/19/19    Entered: 02/19/19 17:37:22    Page 18 of
23

1

**EXHIBIT A**

2

**Proposed Order**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stoel Rives LLP
Attorneys At Law
Portland

Enel's Motion To Confirm Safe Harbor Protection - Case No. 19-30088 (DM)

1

1  OREN B. HAKER (*pro hac vice*)
   DAVID B. LEVANT (*pro hac vice*)
2  GABRIELLE GLEMANN (*pro hac vice*)
   STOEL RIVES LLP
3  600 University Street, Suite 3600
   Seattle, WA  98101
4  Telephone:  206.386.7530
   Facsimile:  206.386.7500
5  gabrielle.glemann@stoel.com

6  *Attorneys for Party in Interest*
   *Enel Green Power North America, Inc.*
7

8

9                    UNITED STATES BANKRUPTCY COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19‑30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 (Lead Case) |
| - and - | (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **[PROPOSED] ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER 11 U.S.C. §§ 362(b)(6) AND 556** |
| Debtors. | |

| | |
|---|---|
| ☐     Affects PG&E Corporation | Hearing Date:   March 12, 2019 |
| ✕     Affects Pacific Gas and Electric Company | Time:   9:30 a.m. <br> Courtroom:   Hon. Dennis Montali |
| ☐     Affects both Debtors | Objections Due:   March 5, 2019, 4 p.m. |
| *All papers shall be filed in the Lead Case, No. 19‑30088 (DM).* | |

Upon the Motion, dated February 19, 2019, of Enel Green Power North America, Inc. ("Enel"), for Entry of an Order Confirming Safe Harbor Protection Under 11 U.S.C. §§ 362(b)(6) and 556 (the "Safe Harbor Motion," Dkt. [__]);

[1] and this Court having jurisdiction to consider the Safe Harbor Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.) and Bankruptcy Local Rule 5011-1(a); and consideration of the Safe Harbor Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found and determined that notice of the Safe Harbor Motion as provided to the parties listed therein is reasonable and sufficient under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Safe Harbor Motion and the Bertolino Declaration; and this Court having determined that Enel is a forward contract merchant and the CSAs are forward contracts, as required under 11 U.S.C. §§ 362(b)(6) and 556 and that the forward contract safe harbor protection applies to except the CSAs and Enel as counterparty thereto from the imposition of the automatic stay; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Safe Harbor Motion is granted.

2.      Enel is hereby authorized to exercise any of it contractual rights pursuant to, in connection with and in accordance with the CSAs and 11 U.S.C. § 556.

3.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**\*\*END OF ORDER\*\***

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Safe Harbor Motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**EXHIBIT B**</u>

**The CSAs**
**[redacted in full]**

1

<u>**EXHIBIT C**</u>

2
**The Interconnection Agreements**
[redacted in full]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28