Sblend A. Sblendorio (SBN 109903)
HOGE, FENTON, JONES & APPEL, INC.
4309 Hacienda Drive, Suite 350
Pleasanton, California 94588-2746
Phone: 925.224.7780
Fax: 925.224.7782
Email: sblend.sblendorio@hogefenton.com

Howard M. Levine (Oregon State Bar No. 800730)
(Admitted *Pro Hac Vice* on 2/1/19)
SUSSMAN SHANK LLP
1000 S.W. Broadway, Suite 1400
Portland, OR 97205-3089
Phone: 503.227.1111
Fax: 503.248.0130
Email: hlevine@sussmanshank.com

Attorneys for Wilson Utility Construction Company

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case No. 19-30088 (DM). | Case No. 19-30088 (DM)<br>and 19-30089 (DM<br><br>Chapter 11<br><br>**WILSON UTILITY CONSTRUCTION COMPANY'S RESPONSE IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 503(B)(9) AND F.R.B.P. 6003 AND 6004 FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION OBLIGATIONS OWED TO CERTAIN SAFETY AND RELIABILITY, OUTAGE, AND NUCLEAR FACILITY SUPPLIERS (ECF NO. 12); AND THE MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 503(B), AND F.R.B.P. 6003 AND 6004 (I) FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION OBLIGATIONS OWED TO SHIPPERS, WAREHOUSEMEN, AND OTHER LIEN CLAIMANTS, AND (II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS FOR CLAIMS ARISING FROM GOODS DELIVERED TO DEBTORS' POSTPETITION (ECF NO. 13)**<br><br>Date: February 27, 2019<br>Time: 9:30 a.m.<br>Courtroom: 17 |

Wilson Utility Construction Company ("Wilson Construction") files this Response in Support of the Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) and F.R.B.P. 6003 and 6004 for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Safety and Reliability, Outage, and Nuclear Facility Suppliers (ECF No. 12) (the "Critical Vendors' Motion") and the Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b), and F.R.B.P. 6003 and 6004 (i) for Interim and Final Authority to Pay Prepetition Obligations Owed to Shippers, Warehousemen, and Other Lien Claimants, and (ii) Granting Administrative Expense Priority Status for Claims Arising from Goods Delivered to Debtors Postpetition (ECF No. 13)(the "Lien Creditors' Motion") (the foregoing are collectively the "Emergency Payment Motions"). This Response is supported by the record in this case and the Declaration of Brad Proctor filed contemporaneously herewith.

**INTRODUCTION AND BACKGROUND**

1. Wilson Construction is a major creditor of the Debtors, is one of the Debtors' Operational Integrity Suppliers as that term is defined in the Critical Vendors' Motion, and holds, as of the Chapter 11 filing date (the "Petition Date"), a claim that exceeds $12.3 million. Declaration of Brad Proctor, ¶¶ 3-4 ("Proctor Decl."). Wilson Construction's claim is unsecured, but is largely lienable as permitted by California law, and is subject to the relief sought in the Debtors' Lien Creditors' Motion.

2. Wilson Construction is also a party with PG&E Company ("PG&E") to one or more executory contracts governing the work Wilson Construction does for PG&E. Subsequent to the Petition Date, PG&E has not paid Wilson Construction on account of its prepetition claim. Proctor Decl., ¶ 4.

3. Since 2012, Wilson Construction maintained a continuous presence in California as part of PG&E's effort to replace and repair an aged infrastructure, as well as make improvements to the electrical system with respect to Reliability, Capacity, NERC requirements, and Fire Hardening projects. In the past three (3) years, Wilson Construction crews participated in most of the major Transmission reliability and NERC projects that were scheduled and awarded through the competitive bid process. In 2013, Wilson Construction bid for, and was awarded, a major portion

3190691

Case: 19-30088    Doc# 496    Filed: 02/20/19    Entered: 02/20/19 12:33:50    Page 2 of 9
WILSON UTILITY CONSTRUCTION COMPANY'S RESPONSE TO EMERGENCY PAYMENT MOTIONS

of the Electrical Distribution Performance Partnership Pole Replacement Program ("EDPP"). Wilson Construction is currently in the fifth year of that program. Wilson Construction replaced thousands of deteriorated poles in the execution of the EDPP Partnership Program. Proctor Decl., ¶ 5.

4.      In 2018, Wilson Construction's line crews participated in an extensive program aimed at making corrections to identified EC Tag Corrections. Wilson Construction's crews were successful in completing approximately 8,000 tags within the CPUC mandated time frame, and within PG&E's budget. It is these very same types of EC Tag Corrections that PG&E is currently attempting to identify through the ongoing Inspection Program on both its Distribution and Transmission line infrastructures. Proctor Decl., ¶ 6.

5.      Throughout this period of ongoing service to PG&E, Wilson Construction was regularly called upon to provide emergency relief and restoration efforts for unscheduled outages resulting from wind, rain, snow, and fire. When necessary, and when requested to do so, Wilson Construction imported line crews from outside the PG&E's service territories to supplement its California line crews and operational personnel. In addition to providing aid and support during these major calamities, Wilson Construction crews and personnel often responded to PG&E's request for help on Routine Wire Down calls resulting from car hit poles, and similar disruptions to electrical service. Most recently, Wilson Construction crews worked on emergency storm restoration. Since January 1, 2019, Wilson Construction crews were deployed to respond to emergency storm restoration continually from as recently as January 4-8, and January 17-20, 2019. Wilson Construction's crews and field leadership are still working at restoration as of the time of this filing. Proctor Decl., ¶ 7.

6.      Wilson Construction's work for PG&E is often supported by select subcontractors who are predominately Disadvantaged Business Entities ("DBE"), who demonstrated consistent ability to work on short notice, especially during storm work. Each DBE is heavily dependent on revenue from working for Wilson Construction, and each is directly and adversely impacted by the bankruptcy petition. Proctor Decl., ¶ 8.

7.      Due to Wilson Construction's extensive knowledge of PG&E's system, and its cadre

of seasoned field leaders and crews, Wilson Construction was recently summoned to a meeting held by PG&E personnel to advise it on constructability and scheduling protocols as PG&E prepares to undertake various fire hardening projects. Wilson Construction's personnel includes many local California residents, some of whom were personally affected by the recent wildfires. Wilson Construction's team knows PG&E's expectations regarding safety, quality, and construction standards, and also understands the importance of affordability. Proctor Decl., ¶ 9.

8.      As explained above, Wilson Construction provided years of consistent, critical, and reliable service to PG&E and is best positioned to do so in the future. By any definition, Wilson Construction is a critical vendor –an Operational Integrity Supplier -- a critical and indispensable vendor to PG&E that believes strongly its prepetition claims must be addressed as the Emergency Payment Motions contemplate. Moreover, due to the nature of the work Wilson Construction performed prepetition, Wilson is entitled to assert liens as security for payment of Wilson Construction's prepetition claims ("Lien Creditor"), an action that Wilson Construction has not yet taken but is in the process of implementing.

**ARGUMENT**

**A.      Wilson Construction Would Benefit from Granting the Emergency Payment Motions.**

It is imperative that the Court grant the Emergency Payment Motions. Certainly Wilson Construction would potentially benefit if the Court granted the Emergency Prepayment Motions, whether as an Operational Integrity Supplier or as a potential Lien Creditor. Wilson Construction is a family business manifestly hurt by this Chapter 11 filing and has significant obligations to subcontractors, vendors, suppliers, and employees. Wilson Construction requests the payments from PG&E for its prepetition work to facilitate Wilson Construction's ongoing postpetition operations to assist PG&E. As an Operational Integrity Supplier or potential Lien Creditor, Wilson is entitled to be paid for its prepetition claim in order to continue to do the critical work PG&E needs performed postpetition.[1]

---

[1] During the hearing held on January 31, 2019, the Court suggested that it would entertain a process by which any creditor who believes it to be an Operational Integrity Supplier or Lien Creditor who is not paid as a critical vendor should be entitled to present to the Court evidence to seek an order to require PG&E to pay such vendor in the same manner as other equally situated creditors.

WILSON UTILITY CONSTRUCTION COMPANY'S RESPONSE TO EMERGENCY PAYMENT MOTIONS

**B.    The Estate Must Be Protected from an Administrative Claim Caused by a Postpetition Fire.**

As a major unsecured trade creditor, Wilson Construction wants the estate (and Wilson Construction's prepetition claim) to be protected from the risk of a catastrophic postpetition fire. Such a fire could leave the estate with an enormous unliquidated administrative expense claim that could undermine the rights of all prepetition creditors, massively complicate already complex cases, and delay resolution of these cases. If past is prologue, and if aggressive fire mitigation efforts are not undertaken, then the estate runs a substantial risk that such a postpetition catastrophic fire could occur. The risk of such an event can be mitigated by permitting PG&E, indeed requiring PG&E, to use its resources to pay Operational Integrity Suppliers and Lien Creditors so that those vendors will be best positioned, and properly funded, staffed, and incentivized to provide the urgently needed services necessary to protect the estate from such an avoidable destructive event.[2]

A fundamental Chapter 11 principle is that the debtors have an obligation to protect estate assets, and, especially, to limit administrative claims. As explained in *Burlington Northern Railroad Co. v. Dant & Russell, Inc.*, 853 F2d 700, 706 (9th Cir. 1988):

> The statute [11 U.S.C. 503(b)(1)(A)] is explicit. Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors. *Matter of Baldwin-United Corporation*, 43 B.R. 443, 451 (S.D. Ohio 1984). The terms "actual" and "necessary" are construed narrowly so as "to keep fees and administrative costs at a minimum." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982).
>
> ***
>
> Additionally, keeping costs to a minimum serves the overwhelming concern of the Code: Preservation of the estate. [Citations omitted.] This limitation is necessary to protect the limited assets of the estate for the benefit of the unsecured creditors' interests and is particularly important in a Chapter 11 case where a partial liquidation is necessary to facilitate reorganization.
>
> Paying the prepetition claims of the Operational Integrity Suppliers and Lien Creditors

---

[2] Whether a postpetition fire occurs and if it does, whether it will rise to the level of an administrative expense with priority over prepetition unsecured claims, are open questions that only the future will answer. However, the risk that such a fire could be an administrative expense is real and that risk must be minimized by PG&E proactively paying for aggressive fire mitigation efforts. See *Reading v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) where the Court determined that an award of tort damages to victims of a fire caused by the Chapter XI receiver's negligence was entitled to administrative expense priority, despite the fact that victims did not transact with the receiver, and the estate did not benefit from the event. *Reading,* 391 U.S. at 485, 88 S.Ct. 1759.

WILSON UTILITY CONSTRUCTION COMPANY'S RESPONSE TO EMERGENCY PAYMENT MOTIONS

1  allows them to work for PG&E to provide <u>advance</u> protection from fire, and serves to protect the

2  estate from an unnecessary administrative expense. Additionally, doing so could protect property

3  and save lives. PG&E should aggressively carry out and pay for the necessary mitigation work and

4  encourage its vendors to work for PG&E postpetition by paying their prepetition claims, because

5  creditors such as Wilson Construction are genuinely critical, if not indispensable to PG&E and its

6  hopefully successful exit from Chapter 11.

7  All prepetition creditors should support the Emergency Payment Motions and the goal of

8  protecting their potential recovery from dilution or elimination that could result from a catastrophic

9  postpetition fire. Creditors who oppose the Emergency Payment Motions are working against their

10  own interests. They should want their prepetition claims protected to the extent possible. PG&E's

11  projected cost to help mitigate fire risk by paying Operational Integrity Suppliers and Lien Creditors

12  on the prepetition claims is modest compared to the total amount of the prepetition unsecured claims

13  (whether they be bond, subrogation, trade, property damage, or death claims) that could be

14  protected, and the size of the potential postpetition fire loss claims that could be paid ahead of all of

15  those prepetition unsecured claims.

16  **C.    Granting the Emergency Payment Motions and Paying Operational Integrity**
    **Suppliers and Lien Creditors is Consistent with PG&E's Statements in *United States***
17  ***of America v. Pacific Gas and Electric Company.***

18  Granting the Emergency Payment Motion would be consistent with the goals PG&E argued

19  in the criminal case against it captioned *United States of America v. Pacific Gas and Electric*

20  *Company* (U.S. District Court for the Northern District of California, Case No. 14-cr-00175). In

21  PG&E's Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be

22  Modified filed on January 23, 2019 (Dkt. No. 976), PG&E represented, among other things, to Judge

23  Alsup, that:

24      PG&E understands and shares the Court's concern about the human and financial
        cost of the wildfires and the death and destruction they have wrought. And PG&E
25      recognizes its fundamental obligations to the State of California and its residents and
        businesses to operate its electric and gas system safely, a task that has taken on
26      increasing urgency and complexity in light of the effects of climate change, which
        then-Governor Brown described as the "new abnormal." <u>The problems are grave;</u>
27      <u>they are substantial—PG&E has nearly 100,000 miles of overhead lines across</u>
        <u>Northern California; and they need to be solved as quickly as possible. PG&E is</u>
28      <u>committed to making that happen. PG&E knows that it must play a leading role to</u>

implement changes to substantially mitigate the risk of wildfire, and PG&E is embracing that role. **(**Emphasis added)(at 1**).**

\*\*\*

But far more importantly, and less publicly, PG&E has focused substantial resources and efforts since the October 2017 North Bay Wildfires to help prevent catastrophic wildfires from occurring. Working closely with regulators, state and federal officials, communities, and interest groups, PG&E has developed a risk based approach to identifying the highest risk portions of its system so that it can engage in enhanced vegetation management and system hardening (such as installing insulated wire), and it has developed a comprehensive de-energization plan that it continues to update and refine. And since the Camp Fire, PG&E has embarked upon an enhanced process to inspect and repair (where necessary) more than 700,000 structures (distribution and transmission towers and poles) across nearly 30,500 miles of the Company's electric system in areas with the greatest potential risk of fire. This process was developed late last year and was implemented immediately with a focus on getting as much work done in high risk areas as possible by the end of May 2019. (Emphasis added) (at 1-2).

\*\*\*

In short, PG&E agrees with the Court that the status quo is unacceptable, and PG&E is committed to working aggressively and expeditiously with state and federal officials on system maintenance and upgrades and on wildfire mitigation efforts. (Emphasis added)(at 6).

PG&E is asking this Court to facilitate, in part, what it told the U.S. District Court judge it is going to do, work aggressively on upgrades and wildfire mitigation—a goal shared by Wilson Construction, both as an unsecured creditor whose claim is at risk, and as an Operational Integrity Supplier and potential Lien Creditor that stands to benefit if the Emergency Payment Motions are granted. Much of the work PG&E told the District Court it is doing and must do, is work Wilson Construction performed for PG&E in the past, and is continuing to perform.

**D.     The Facts and Urgency Requires the Emergency Payment Motions Be Granted.**

None of the court decisions PG&E cites in its Emergency Payment Motions where critical vendor payments were permitted, involved the risk of a catastrophic human, property, and economic disaster that a postpetition fire could cause in these cases. If critical vendor payments had been allowed under such relatively benign circumstances as they were in the cases PG&E relies upon, critical vendor payments should certainly be authorized, if not mandated in these cases to protect this estate, property, and human life.

By authorizing critical vendor payments to the Debtors' Operational Integrity Suppliers and

Lien Creditors, the Court will advance at least three important goals—all of which are consistent with the principles of Chapter 11 and goals of restructuring and rehabilitating the Debtors:

(a)     Mitigate future fire risk and the saving of life and property;

(b)     Help protect the estate from a potentially disastrously large administrative claim to ensure creditors' prepetition claims are protected; and

(c)     Help protect California, the fifth largest economy in the world, from a possible economic disaster.[3]

If there were ever cases where the "doctrine of necessity" applied, these are the cases. These cases present exponentially more compelling needs than cases where purchasing inventory or even paying wages were found to be "critical." The need to preserve this estate and to protect its creditors is self-evident; the need to protect human life and property is undeniable and irrefutable; and the need to facilitate the Debtors' rehabilitation and reorganization is fundamental to Chapter 11, all of which make for the most compelling argument of any cases cited for the application of the "doctrine of necessity."

///
///
///
///
///
///
///
///
///
///

---

[3] "The Pleasure and Pain of Being California, the World's 5th-Largest Economy." New York Times, May 7, 2018.

WHEREFORE, for the foregoing reasons, the Court should grant the Emergency Payment Motions, and the Court should include a procedure for any creditor who believes it to be an Operational Integrity Supplier or Lien Creditor who is not paid as a critical vendor to move the Court for a hearing at which it could present evidence to support an order to require the Debtors to pay such vendor in the same manner as other equally situated creditors.

DATED:  February 20, 2019

HOGE, FENTON, JONES & APPEL, INC.

By:    /s/ Sblend A. Sblendorio
       Sblend A. Sblendorio
       Attorneys for Wilson Utility Construction
       Company

DATED:  February 20, 2019

SUSSMAN SHANK LLP

By:        /s/ Howard M. Levine
       Howard M. Levine (Oregon State Bar No. 800730)
       (Admitted *Pro Hac Vice* on 2/1/19)
       Attorneys for Wilson Utility Construction
       Company

WILSON UTILITY CONSTRUCTION COMPANY'S RESPONSE TO EMERGENCY PAYMENT MOTIONS