STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Attorneys for Sam and Cathy Dorrance,
Minh and Gurdon Merchant,
Laura Hart, and Dennis Caselli*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DKT NO. 16]** |

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS
MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

Sam and Cathy Dorrance, Minh and Gurdon Merchant, Laura Hart, and Dennis Caselli (collectively, the "Contaminated Property Homeowners")—all of whom are homeowners who have pre-petition agreements with Debtors PG&E Corporation and/or Pacific Gas and Electric Company (collectively, "PG&E") that obligate PG&E to investigate and/or remediate contamination on their properties for which PG&E is legally responsible (collectively with associated formal and informal implementing agreements, the "Environmental Agreements")—hereby file this limited objection to the Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a)(7) and Fed. R. Bankr. P. 6003 and 6004 for Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Customer Programs, Including Public Purpose Programs, and (B) Honor any Prepetition Obligations Relating Thereto; and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, Doc. No. 16, (the "Motion") based on the following:[1]

## INTRODUCTION AND BACKGROUND

1. The Contaminated Property Homeowners object to the Motion on the ground that PG&E received the Interim Order (Doc. No. 216), granting PG&E the interim authority to comply with its pre-petition environmental remediation obligations under what it termed the "Environmental Cleanup Programs," based on the representation of its counsel that "Debtors intend to continue to perform in accordance with applicable law their obligations under the customer programs," of which its pre-petition environmental remediation obligations are a part. Ex. A (5/31/19 Hearing Tr.) at 104:14-16. PG&E's obligations in this regard include those memorialized in the Environmental Agreements with the Contaminated Property Homeowners. However, despite the repeated requests of the undersigned, PG&E has refused to assume or reject those agreements, placing the Contaminated Property Homeowners in an untenable position of jeopardy that threatens their health and welfare. Thus, the Contaminated Property Homeowners

---

[1] The Contaminated Property Homeowners request leave *nunc pro tunc* to file this Objection after the 4:00 p.m. deadline. The delay in filing was caused by a delay in receipt of the required retention paperwork by the undersigned. The Contaminated Property Homeowners apologize for any inconvenience caused by the tardiness of the filing.

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088   Doc# 527   Filed: 02/20/19   Entered: 02/20/19 21:29:31   Page 2 of 8

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

object to Motion on the limited basis, and to the extent, that PG&E has failed to fulfill its promise to perform its obligations under the Environmental Clean Programs, including those memorialized in the Environmental Agreements. And the Contaminated Property Homeowners respectfully request that the relief requested by PG&E in the Motion only be granted on the condition that they assume the Environmental Agreements and perform their obligations thereunder as promised.

2. The contamination at issue was caused by toxic waste left behind when PG&E abandoned two manufactured gas plants ("MGPs") that formerly operated in the Marina neighborhood (the "Marina MGPs"). Together with the Contaminated Property Homeowners, over the course of the last eight years, the undersigned represents or has represented, twenty homeowners and the San Francisco Herring Association ("SFHA") in connection with claims against PG&E arising out of this contamination.

3. In 1994, the California Public Utilities Commission ("CPUC") issued Decision No. 94-05-020, which provided PG&E the authority to shift the cost of remediating contamination caused by the MGPs for which it is responsible—including, in particular, contamination caused the two MGPs that are the cause of the contamination at issue here—to ratepayers. As described by PG&E in the Motion, pursuant to this authority, "the projected costs associated with the Environmental Cleanup Programs (the "**ECP Costs**") are funded through various surcharges fees collected by Debtors through rates from customers." Motion at 24 (emphasis added). These funds are then placed in dedicated accounts to be used only for the purpose of covering ECP Costs. *Id.* at 24-25. According to the Motion, "the CPUC has approved $130.8 million in ECP Costs for 2019."

4. As described by PG&E in the Motion, there are two basic components to its Environmental Clean Programs: "(a) evaluat[ion] [of] existing and historical operating sites for potential releases of hazardous materials by performing site investigations and conducting human health and ecological assessments, and (b) design, implement[ation], and perform[ance] [of] remedial measures at designated sites to address ongoing or potential exposure risks." *Id.* at 23.

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088    Doc# 527    Filed: 02/20/19    Entered: 02/20/19 21:29:31    Page 3 of 8

5. As applied to the contamination on the properties of homeowners caused by the Marina MGPs, the first step of this process is accomplished through the negotiation, execution, and performance of an investigation agreement by the homeowner and PG&E. The investigation agreement provides the homeowner's permission to PG&E to access the property to investigate the contamination subject to several essential conditions, including *inter alia* provisions holding the homeowners harmless if PG&E contractors injure someone on their property, and outline in detail the locations and methods of sampling and testing that will be conducted, the processes for its oversight, and the payment of expenses. Without an investigation agreement, these properties cannot be "evaluate[d] . . . for potential releases of hazardous materials by performing site investigations and conducting human health and ecological assessments," because a property owner would otherwise expose herself to too much risk.

6. The second step of this process, if the matter does not get resolved through litigation and/or PG&E's purchase of the property, is accomplished through the negotiation, execution, and performance of a set of agreements by which the homeowner and PG&E agree on the details of the remediation and restoration of the property and the allocation of various responsibilities therefor and risks attendant therewith. The agreements further address details such as PG&E's lease of the property during the remediation and restoration, long-term consequences of the contamination on the property's value, and the release of the homeowner's claims against PG&E, and PG&E responsibilities for injuries suffered by third parties as a result of the remedial activities. Again, the "design, implement[ation], and perform[ance] [of] remedial measures at [these] sites to address ongoing or potential exposure risks" cannot be accomplished in the absence of these agreements, because a property owner would otherwise expose herself to too much risk.

7. Furthermore, during both stages of the process, numerous other smaller but essential *ad hoc* implementing agreements are reached between the homeowner and PG&E that facilitate the process.

8. In the case of the Dorrances, there is currently an active remediation of their home by PG&E contractors underway. Their property on Marina Blvd., at the moment, has no

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088    Doc# 527    Filed: 02/20/19    Entered: 02/20/19 21:29:31    Page 4 of 8

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

foundation, and PG&E contractors are working on the Dorrances' property with heavy equipment that could cause an injury to a third person or their property. However, PG&E refuses to state whether it will honor the agreements under which this remediation is supposed to be conducted. This places the Dorrances in an impossible dilemma between ordering the work stopped with their home partially destroyed or allowing it to continue with no guarantees that it will be done in accordance with their agreements with PG&E or that they will receive the protections from risks that those agreements provide.

9. In the case of the other Contaminated Property Homeowners, such as the Merchants and Ms. Hart, after over a year's worth of negotiation, an investigation agreement between them and PG&E was reached, but PG&E refuses to state whether it will assume the investigation agreements and is taking no action to perform them. As a result, all progress in addressing the contamination of their properties has stopped, leaving them with unaddressed toxic contamination on their properties and no apparent path to its remediation.

10. The Merchants have two very small children, who, every day that the contamination of their property goes unremediated, are potentially exposed to toxins that could result in significant increases in their long-term cancer risks and harm to their neurological development. PG&E, by refusing to either (a) assume its investigation agreement with the Merchants and begin the process of addressing the contamination of their home; or (b) reject the agreement and free the Merchants to pursue a judicially compelled remediation has indefinitely lengthened that period of exposure.

**ARGUMENT**

11. Section 105(a) of the Bankruptcy Code provides the court with the authority to take any action "necessary or appropriate to . . . prevent an abuse of the process." 11 U.S.C. § 105(a). More generally, "'[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.'" *Pewer v. Litton*, 308 U.S. 295, 304 (1939) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934); *see also Young v. Higbee Co.*, 324 U.S. 204, 214 (1945). "[T]he bankruptcy court has the power to sift the circumstances

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088   Doc# 527   Filed: 02/20/19   Entered: 02/20/19 21:29:31   Page 5 of 8

surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper*, 308 U.S. at 308.

12. PG&E received an interim order granting it the authority to make payments to cover the costs of Environmental Cleanup Programs based on the representation of its counsel that "Debtors intend to continue to perform in accordance with applicable law their obligations under the customer programs." Ex. A (5/31/19 Hearing Tr.) at 104:14-16.

13. It further argued for the relief on the basis that "any suspension or delay in administering the Environmental Cleanup Programs is contrary to public health and welfare and may exacerbate not only existing circumstances but the ultimate costs of cleanup as well." Doc. No. 16 at 32:9-12.

14. Nonetheless, PG&E has refused to indicate to the Contaminated Property Homeowners whether it intends to assume and perform the Environmental Agreements, which define PG&E's legal obligations as to the contamination on these people's properties, and, in the case of the Merchants, Ms. Hart, and Mr. Caselli has halted all progress in addressing the contamination.

15. This not only directly conflicts the representation by PG&E's counsel to the Court quoted above, it places the Contaminated Property Homeowners' health and welfare at risk.

16. It is untenable that PG&E be allowed, on the one hand, to ask for relief from the Court based on its stated intention to comply with its legal obligations to clean up the contamination for which it is responsible and on the ground that doing otherwise would be contrary to public health and welfare, and then turn around and ignore those obligations and put at risk the health and welfare of people most threatened by that contamination.

17. Such duplicity, moreover, cannot be justified on the ground that by doing so, PG&E is protecting the interests of other creditors. As PG&E indicated in its motion, "any suspension or delay in administering the Environmental Cleanup Programs . . . may exacerbate not only existing circumstances but the ultimate costs of cleanup as well." Doc. No. 16 at 32:9-12. As discussed in the Background Section, the Environmental Cleanup Programs cannot be administered, as to the properties of the Contaminated Property Homeowners, in the absence of

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088    Doc# 527    Filed: 02/20/19    Entered: 02/20/19 21:29:31    Page 6 of 8

1  PG&E's assumption of the Environmental Agreements. Furthermore, as PG&E acknowledged in
2  its Motion, the funds to be used for this purpose do not come from funds of the estate, but rather
3  dedicated trust funds that PG&E collects from ratepayers pursuant to California Public Utilities
4  Commission Decision No. 94-05-020.

5      18.    A single day before PG&E's counsel represented to this Court that "Debtors intend
6  to continue to perform in accordance with applicable law their obligations under the customer
7  programs," PG&E appeared before the Honorable Judge William Alsup who is presiding over its
8  criminal probation arising out of the San Bruno gas pipeline explosion (criminal probation that
9  arose, in part, out of charges that PG&E lied to federal investigators of that tragedy). In that
10  hearing, Judge Alsup observed: "Why is it PG&E says, 'Safety is our No. 1 thing' – I heard it all
11  the time, 'safety, safety, safety,' but it's not really true." Ex. B. The acts and omissions that gave
12  rise to Judge Alsup's observation of PG&E's dishonesty resulted in the death of many dozens in
13  Sonoma, Napa, and Butte Counties and are the cause of the situation from which PG&E seeks
14  protection from this Court.

15      19.    At some point, PG&E needs to be held to its word. In this case, that requires
16  PG&E be ordered to assume the Environmental Agreements with the Contaminated Property
17  Homeowners and perform its legal obligations thereunder as promised to the Court, as a condition
18  of its receipt of the relief sought in the Motion.

### CONCLUSION AND RESERVATION OF RIGHTS

20      20.    For the foregoing reasons, the Contaminated Property Homeowners object to the
21  relief requested in the Motion on the limited ground that PG&E is not complying with its legal
22  obligations associated with the Environmental Programs in contradiction of the representations it
23  made to this Court in seeking the relief and request that the Court modify PG&E's Proposed Final
24  Customer Programs Order, attached as Exhibit 7 to Doc. No. 491-6, to require, as a condition of
25  the relief it seeks, that it assume the Environmental Agreements it has made with the
26  Contaminated Property Homeowners and perform its obligations thereunder.

27      21.    This limited objection is without prejudice to, and does not waive and expressly
28  reserves: (1) each Contaminated Property Homeowner's rights, remedies, claims, actions,

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088   Doc# 527   Filed: 02/20/19   Entered: 02/20/19 21:29:31   Page 7 of 8

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

defenses, setoffs, or recoupments, in law or in equity, against the above-captioned debtor and any other person either in this case or in any other action; (2) any objection which may be made to the jurisdiction of the Court; (3) each Contaminated Property Homeowner's right to have final orders in non-core matters entered only after de novo review by a district judge; (4) each Contaminated Property Homeowner's right to trial by jury in any proceedings or trial, in any state or federal court, so triable herein or in any case, controversy or proceeding relating hereto; and (5) each Contaminated Property Homeowner's right to have and reference withdrawn in any matter subject to mandatory or discretionary withdrawal.

22. This limited objection is not, shall not be deemed or construed as, a submission of any each Contaminated Property Homeowner to the jurisdiction of the Court concerning any claim or the waiver of any rights of any Contaminated Property Homeowner to pursue any claims against any person in any other forum, state or federal, including without limitation, the jurisdiction of the Court to adjudicate non-core matters, all of which rights are reserved without prejudice.

Dated: February 20, 2019

GROSS & KLEIN LLP

By: */s/ Stuart G. Gross*
STUART G. GROSS

*Attorneys for Sam and Cathy Dorrance, Minh and Gurdon Merchant, Laura Hart, and Dennis Caselli*

LIMITED OBJECTION BY HOMEOWNERS OF CONTAMINATED PROPERTIES TO CUSTOMER PROGRAMS MOTION [DOCKET NO. 16]; Case Nos. 19-30088, 19-30089

Case: 19-30088    Doc# 527    Filed: 02/20/19    Entered: 02/20/19 21:29:31    Page 8 of 8