WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br><br>(Jointly Administered)<br><br>**MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 364 AND FED. R. BANKR. P. 4001 AND 6004 AUTHORIZING UTILITY TO (A) CONTINUE HEDGING PROGRAMS, (B) ENTER INTO AND PERFORM UNDER POSTPETITION HEDGING TRANSACTIONS, AND (C) PLEDGE COLLATERAL AND HONOR OBLIGATIONS THEREUNDER**<br><br>Date: March 27, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 363, and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order authorizing the Utility to (a) continue its Hedging Programs (as defined below); (b) enter into new postpetition Hedging Transactions (as defined below) in the ordinary course of business and to honor, pay, and/or otherwise satisfy any and all obligations thereunder, in a manner consistent with the Utility's prepetition practices; and (c) pledge cash or other collateral on account of the Utility's postpetition Hedging Transactions.

A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Order**"). In support of the Motion, the Debtors submit the declaration of Fong Wan (the "**Wan Declaration**"), Senior Vice President, Energy Policy and Procurement for the Utility, filed contemporaneously herewith.

# TABLE OF CONTENTS

| | | Page |
|---|---|---:|
| I. | JURISDICTION | 1 |
| II. | BACKGROUND | 1 |
| III. | THE HEDGING PROGRAMS | 1 |
| | A. The Retail Natural Gas Hedging Program | 4 |
| | B. The Electric Portfolio Hedging Program | 5 |
| IV. | BASIS FOR RELIEF REQUESTED | 7 |
| | A. Section 363(c) of the Bankruptcy Code Authorizes the Utility to Perform Under the Hedging Programs and Enter Into New Hedging Transactions | 7 |
| | B. Section 363(b) of the Bankruptcy Code Authorizes the Utility to Perform Under the Hedging Programs and Enter Into New Hedging Transactions | 10 |
| | C. The Utility Should Be Authorized to Pledge Hedging Collateral Pursuant to Section 364 of the Bankruptcy Code | 11 |
| V. | RESERVATION OF RIGHTS | 12 |
| VI. | REQUEST FOR BANKRUPTCY RULES 4001 and 6004 WAIVERS | 12 |
| VII. | NOTICE | 13 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aalfs v. Wirum (In re Straightline Invs.)*,
    525 F.3d 870 (9th Cir. 2008) ..................................................................................................8

*In re AbitibiBowater, Inc.*,
    418 B.R. 815 (Bankr. D. Del. 2009) ......................................................................................10

*In re Calpine Corp.*,
    No. 05¬60200 (Bankr. S.D.N.Y. Dec. 21, 2005 and Feb. 9, 2006) ...................................9, 12

*In re Chateaugay Corp.*,
    973 F.2d 141 (2d Cir. 1992) ..................................................................................................10

*In re Commercial Mortg. & Fin. Co.*,
    414 B.R. 389 (Bankr. N.D. Ill. 2009) ......................................................................................7

*Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...................................................................................7, 9

*Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*,
    293 B.R. 455 (B.A.P. 8th Cir. 2003) .....................................................................................10

*In re Curlew Valley Assocs.*,
    14 B.R. 506 (Bankr. D. Utah 1981) .......................................................................................11

*In re Dynegy Holdings, LLC*,
    No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011 and Dec. 6, 2011) ...........................................8

*In re Energy Future Holdings Corp.*,
    No. 14-10979 (Bankr. D. Del. June 6, 2014) ....................................................................8, 11

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ...............................................................................................11

*In re GenOn Energy, Inc.*,
    Case No. 17-33695 (Bankr. S. D. Tex. July 14, 2017) .........................................................11

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

*United States ex rel. Harrison v. Estate of Deutscher*,
    115 B.R. 592 (M.D. Tenn. 1990) ...................................................................................... 9

*In re L.A. Dodgers LLC*,
    457 B.R. 308 (Bankr. D. Del. 2011) .................................................................................. 11

*In re Linn Energy, LLC*,
    No. 16-60040 (Bankr. S.D. Tex.) ........................................................................................ 8

*In re Linn Energy*,
    LLC, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 17, 2016) .......................................... 11

*Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc.)*,
    184 B.R. 74 (B.A.P. 9th Cir. 1995) .................................................................................... 9

*Martino v. First Nat'l Bank (In re Garofalo's Finer Foods, Inc.)*,
    186 B.R. 414 (N.D. Ill. 1995) ............................................................................................. 9

*Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*,
    114 F.3d 379 (2d Cir. 1997) ................................................................................................ 8

*In re Mirant Corp.*,
    No. 03-46590 (Bankr. N.D. Tex. Aug. 28, 2003) ............................................................... 9

*Moore v. Brewer (In re HMH Motor Servs., Inc.)*,
    259 B.R. 440 (Bankr. S.D. Ga. 2000) ................................................................................. 7

*In re Patriot Coal Corp.*,
    No. 12-12900 (Bankr. S.D.N.Y. July 12, 2012 and September 7, 2012) ........................... 8

*In re Penn Va. Corp.*,
    No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016) .................................................... 11

*In re Robles*,
    No. 14-51812-ASW, 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ................... 11

*In re Roth Am., Inc.*,
    975 F.2d 949 (3d Cir. 1992) ................................................................................................ 8

*In re Station Casinos, Inc.*,
    No. BK-09-52477-GWZ, 2010 Bankr. LEXIS 5447 (Bankr. D. Nev. Feb. 2, 2010) ..... 10

**Statutes**

11 U.S.C. § 363 .................................................................................................................... 7, 10

11 U.S.C. § 364 ......................................................................................................................... 11

11 U.S.C. § 365 ......................................................................................................................... 12

28 U.S.C. § 157 ........................................................................................................................... 1

28 U.S.C. § 1334 ......................................................................................................................... 1

28 U.S.C. § 1408 ......................................................................................................................... 1

28 U.S.C. § 1409 ......................................................................................................................... 1

**Other Authorities**

Fed. R. Bankr. P. 1015 ................................................................................................................. 1

Fed. R. Bankr. P. 2002 ............................................................................................................... 13

Fed. R. Bankr. P. 4001 ......................................................................................................... 12, 13

Fed. R. Bankr. P. 6004 ......................................................................................................... 12, 13

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and, together with the Creditors Committee, the "**Committees**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of the First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**").

## III. THE HEDGING PROGRAMS

Prior to the Petition Date, in the ordinary course of business, the Utility entered into financial transactions (collectively, the "**Hedging Transactions**") with various counterparties to hedge the Utility's exposure to price volatility in the markets for natural gas and electricity in connection with its daily operations (as may be amended or modified in the ordinary course, respectively, the "Retail Natural Gas Hedging Program" and the "Electric Portfolio Hedging

Program" and, together, the "**Hedging Programs**"). The Hedging Programs were implemented through financial and derivative instruments entered into between the Utility and various hedging counterparties, including: (i) futures and forward contracts, which fix the price the purchaser pays for a fixed amount of natural gas or electricity at a specified location, or to fix the differential between two different locations (the "**Futures Contracts**"); (ii) call options, which provide the purchaser the financial equivalent of the right, but not the obligation, to purchase natural gas, electricity, or a Futures Contract at a predetermined fixed price or rate on or before a specific date (the "**Call Options**"); (iii) put options, which give the purchaser the right, but not the obligation, to sell a Futures Contract at a predetermined fixed price on or before a specific date (the "**Put Options**"); and (iv) swap agreements, which obligate the purchaser to pay or receive the difference between the purchase price of the agreement and certain index pricing (the "**Swaps**").

The Utility utilizes various exchanges to enter into most of its Hedging Transactions (the "**Exchanges**"), including the CME Group and the Intercontinental Exchange. The Utility transacts on the Exchanges through future commissions merchants (collectively, the "**Future Commission Merchants**"), including Macquarie Futures USA LLC. The Future Commission Merchants solicit or accept orders to buy or sell Futures Contracts, options on Futures Contracts, retail off-exchange or forex contracts or Swaps, and accept money or other assets from customers to support such orders. Transactions conducted through the Exchanges are subject to exchange agreements (the "**Exchange Agreements**"). Prior to the Petition Date, the Utility also entered into "over-the-counter" Hedging Transactions directly with third-parties, which are governed by the standard International Swaps and Derivatives Association, Edison Electric Institute, or Western Systems Power Pool Master Agreements (together with the Exchange Agreements, the "**Hedging Agreements**").

The Utility is seeking authority to enter into new Hedging Transactions in the ordinary course of business, to mitigate the Utility's risks associated with pricing volatility in the natural gas and electricity markets and to stabilize the prices paid by the Utility's customers. As discussed below, the Debtors' debtor-in-possession financing (the "**DIP Financing**") permits the Utility to engage in such Hedging Transactions and post cash or other collateral in connection therewith. The

Utility believes that prospective counterparties to the Hedging Transactions may be reluctant to trade with the Utility without specific authorization from the Court. Accordingly, out of an abundance of caution, the Utility requests authority, but not direction, to (a) continue the Hedging Programs, (b) enter into new postpetition Hedging Transactions in the ordinary course of business and to honor, pay, and/or otherwise satisfy any and all obligations thereunder, in a manner consistent with the Utility's prepetition practices, and (c) pledge cash or other collateral on account of the Utility's postpetition Hedging Transactions, all as set forth below.

Earlier in these Chapter 11 Cases, the Court authorized the Utility to continue its trading and exchange practices in the ordinary course with respect to contracts for the physical supply and delivery of natural gas and electricity.[1] In connection therewith, the Court also granted limited relief with respect to Future Commission Merchants, and authorized the Utility to pay prepetition amounts, or post funds to, the Future Commission Merchants in accordance with their agreements with the Utility in the ordinary course of business, in an amount not to exceed $15 million.[2] This relief was necessary to protect the Utility from the possibility that the Future Commission Merchants would liquidate their prepetition financial transactions with the Utility as a result of the commencement of the Chapter 11 Cases. By this Motion, the Utility is not seeking further relief with respect to those prepetition financial transactions or contracts for the physical delivery or supply of natural gas and electricity. Rather, the Utility seeks authority to continue the Hedging Programs pursuant to which the Utility enters into financial and derivative transactions to hedge its exposure to fluctuations in the prices of natural gas and electricity.

---

[1] *See Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to (A) Honor Prepetition Obligations to Natural Gas and Electricity Exchange Operators, (B) Grant Administrative Expense Claims and Authorize Posting of Collateral to Exchange Operators, Trading Counterparties, and Future Commission Merchants, (C) Modify the Automatic Stay, and (D) Grant Related Relief* [Docket No. 696] (the "**Exchange Operators Order**").

[2] *See id.* ¶ 9.

Each of the Retail Natural Gas Hedging Program and the Electric Portfolio Hedging Programs is discussed in further detail below.

### A. The Retail Natural Gas Hedging Program

Prior to the Petition Date, in the ordinary course of business, the Utility entered into various Hedging Transactions to hedge the exposure of its retail gas customers (e.g., residential and commercial end-use customers) to fluctuations in natural gas pricing (the "**Retail Natural Gas Hedging Transactions**"). Although the Utility entered into a variety of Retail Natural Gas Hedging Transactions, historically the Utility has primarily purchased Call Options (the "**Natural Gas Call Options**") and entered into Futures Contracts or Swaps for natural gas. Most of the Retail Natural Gas Hedging Transactions are utilized to cover the Utility's exposure to pricing volatility during the winter months. Prior to the Petition Date, the Utility also entered into a limited amount of Retail Natural Gas Hedging Transactions to, among other things, hedge an occasional price exposure from natural gas pipeline and natural gas storage capacity.

The Retail Natural Gas Hedging Program is governed by a hedging plan (the "**Retail Natural Gas Hedging Plan**"), which was approved by the California Public Utilities Commission (the "**CPUC**") pursuant to its *Decision for an Incentive Framework to Motivate Optimal Use of Natural Gas Hedging*, dated January 25, 2010. As mandated by the CPUC, the Retail Natural Gas Hedging Plan requires, among other things, the Utility to secure hedges covering at least a specified percentage of its average customer load for the winter months. The Retail Natural Gas Hedging Plan also dictates the time horizon over which Retail Natural Gas Hedging Transactions may be entered into, and imposes certain reporting requirements on the Utility, including reporting to the Utility Reform Network (TURN) and the Public Advocates Office (Cal PA), consumer advocacy organizations that advocate for affordable and dependable utility services.

In accordance with the terms of the applicable Hedging Agreement, the Utility may be required to post cash or other collateral (the "**Natural Gas Collateral**") to secure the Utility's obligations under a Hedging Agreement. Failure to post Natural Gas Collateral may trigger a default under the applicable Hedging Agreement, which may, among other things, allow the Hedging Transaction counterparty and/or the Future Commission Merchant to terminate or

liquidate the applicable Retail Natural Gas Hedging Transaction and may result in such Hedging Transaction counterparty ceasing to transact with the Utility going forward. The DIP Financing permits the Utility to post Natural Gas Collateral on account of Retail Natural Gas Hedging Transactions entered into in the ordinary course of business.

As of the Petition Date, the Utility's outstanding Retail Natural Gas Hedging Transactions consisted of Natural Gas Call Options and Swaps (together, the "**Prepetition Retail Natural Gas Hedging Transactions**"). The prepetition Call Options do not obligate the Utility to purchase natural gas, and, consequently, the Utility does not anticipate the need to post any collateral on account thereof. Additionally, as set forth above, the Court previously authorized the Utility to pay prepetition amounts, or post funds to, the Future Commission Merchants in accordance with their prepetition transactions with the Utility, in the ordinary course of business, in an amount not to exceed $15 million.[3] Accordingly, the Utility is not seeking any further relief with respect to the Prepetition Retail Natural Gas Hedging Transactions. Rather, the Utility is seeking authority to continue the Retail Natural Gas Hedging Program on a postpetition basis and to satisfy any obligations thereunder, including posting cash or other collateral on account thereof.

### B. The Electric Portfolio Hedging Program

Prior to the Petition Date, in the ordinary course of business, the Utility entered into Hedging Transactions to hedge its exposure to price fluctuations in natural gas, electricity, and greenhouse compliance instruments (the "**Electric Portfolio Hedging Transactions**"). The Electric Portfolio Hedging Program is governed by the Utility's *Bundled Procurement Plan*, which establishes guidelines for Electric Portfolio Hedging Transactions (as amended, the "**Electric Portfolio Hedging Plan**"). Prior to the Petition Date, in the ordinary course of business, the Utility primarily purchased Call Options and Futures Contracts.

---

[3] *See* Exchange Operator Order ¶ 9.

The Electric Portfolio Hedging Plan was most recently approved by the CPUC in 2015.[4] The Electric Portfolio Hedging Plan contains comprehensive stipulations for the Electric Portfolio Hedging Program and dictates, among other things, hedging targets and limits, a product mix, and the Utility's hedging execution strategy. The Electric Portfolio Hedging Plan also establishes procedures to be implemented by the Utility upon the occurrence of unusual events, market dislocations, and emergencies. The Utility is considering updating the Electric Portfolio Hedging Plan and, if applicable, will submit a revised plan to the CPUC for approval.

Similar to the Retail Natural Gas Hedging Transactions, the Utility may be required to post cash or other collateral (the "**Electricity Collateral**" and, together with the Natural Gas Collateral, the "**Hedging Collateral**") to secure the Utility's obligations under a Hedging Agreement. Failure to post Electricity Collateral similarly may trigger a default under the applicable Hedging Agreement, which may, among other things, allow the Hedging Transaction counterparty to terminate or liquidate the applicable Electric Portfolio Hedging Transaction and may result in such counterparty ceasing to transact with the Utility going forward. The DIP Financing permits the Utility to post Electricity Collateral on account of Electric Portfolio Hedging Transactions entered into in the ordinary course of business.

As of the Petition Date, the Utility was party to certain Electric Portfolio Hedging Transactions (the "**Prepetition Electric Portfolio Hedging Transactions**"), consisting of Call Options and Futures Contracts. Similar to the relief discussed above with respect to the Retail Natural Gas Hedging Portfolio, the Utility is not seeking any further relief with respect to the Prepetition Electric Portfolio Hedging Transactions. By this Motion, the Utility is seeking authority to continue the Electric Portfolio Hedging Program on a postpetition basis and honor any obligations arising thereunder, including authority to post cash or other collateral on account thereof.

---

[4] *See CPUC Decision 15-10-031, Decision Approving 2014 Bundled Procurement Plan; and Pacific Gas and Electric Company, Bundled Procurement Plan, Appendix E, Electric Portfolio Hedging Plan*, effective as of June 15, 2016.

## IV. BASIS FOR RELIEF REQUESTED

By this Motion, the Utility seeks entry of an order authorizing the Utility to (a) continue its Hedging Programs; (b) enter into new postpetition Hedging Transactions in the ordinary course of business and to honor, pay, and/or otherwise satisfy any and all obligations thereunder, in a manner consistent with the Utility's prepetition practices; and (c) pledge cash and other collateral on account of the Utility's postpetition Hedging Transactions.

### A. Section 363(c) of the Bankruptcy Code Authorizes the Utility to Perform Under the Hedging Programs and Enter Into New Hedging Transactions.

Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions ... in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). To maximize the value of its estate, the Utility should be permitted to enter into Hedging Transactions in the ordinary course of business, and to perform its obligations thereunder.

Section 363(c)(1)'s ordinary course of business standard was intended to allow a debtor in possession the flexibility to run its business. *See Moore v. Brewer (In re HMH Motor Servs., Inc.),* 259 B.R. 440, 448-49 (Bankr. S.D. Ga. 2000). A debtor in possession may therefore use, sell, or lease property of the estate without the need for prior court approval if the transaction is in the ordinary course of business. *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing); *James A. Phillips,* 29 B.R. at 394 (holding that "[w]here [a] debtor in possession is merely exercising the privileges of its [status], there is no general right to notice and [a] hearing concerning particular transactions..." conducted in the ordinary course of business).

The Bankruptcy Code does not define "ordinary course of business." *In re Commercial Mortg. & Fin. Co.,* 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009). "Two tests have emerged for determining whether a transaction is within the ordinary course of business for purposes of § 363(c) -- the vertical dimension, or creditor's expectation, test, and the horizontal dimension test. If both

tests are satisfied, the court must conclude that the challenged transaction occurred in the debtor's ordinary course of business." *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 879 (9th Cir. 2008). "The vertical dimension, or creditor's expectation test, views the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* (internal quotations and citations omitted). "Under the horizontal dimension test, the question is whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* at 880-81 (internal quotations and citations omitted).

Under both the horizontal test and the vertical test, the Hedging Programs conducted through the use of the Hedging Transactions are in the ordinary course of the Utility's businesses. *See Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne),* 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business.") (quoting *Watford v. S. Cent. Farm Credit, ACA (In re Watford),* 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth Am., Inc.,* 975 F.2d 949, 952 (3d Cir. 1992) (stating that section 363 of the Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary . . . oversight.").

Under the horizontal test, hedging programs are typical among natural gas and electric utilities to hedge their exposure to pricing volatility and preserve the value of their businesses. Utilities routinely enter into hedging transactions similar to those contemplated by the Hedging Programs, and courts in various jurisdictions and others routinely authorize chapter 11 debtors-in-possession to continue their hedging arrangements. *See, e.g., In re Linn Energy, LLC,* No. 16-60040 (DRJ) (Bankr. S.D. Tex.) [Docket No. 820] (granting authority to enter into and perform under non-proprietary hedging agreements); *In re Energy Future Holdings Corp.,* No. 14-10979 (CSS) (Bankr. D. Del. June 6, 2014) [Docket Nos. 860, 861] (granting authority to enter into and perform under non-proprietary hedging agreements); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. July 12, 2012 and Sept. 7, 2012) [Docket Nos. 56, 530] (granting authority to enter into and perform under coal sales contracts); *In re Dynegy Holdings, LLC,* No. 11-38111

(CGM) (Bankr. S.D.N.Y. Nov. 9, 2011 and Dec. 6, 2011) [Docket Nos. 38, 136] (granting authority to enter into and perform under derivative contracts); *In re Calpine Corp.,* No. 05¬60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005 and Feb. 9, 2006) [Docket Nos. 28, 763] (granting authority to enter into and perform under its derivative contracts, including forward, futures, and options contracts); and *In re Mirant Corp.,* No. 03-46590 (DML) (Bankr. N.D. Tex. Aug. 28, 2003) [Docket No. 556] (same).[5]

Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the "debtor's specific prepetition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession." *Martino v. First Nat'l Bank (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 425 (N.D. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc.),* 184 B.R. 74, 79 (B.A.P. 9th Cir. 1995). The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary. *United States ex rel. Harrison v. Estate of Deutscher,* 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.,* 60 B.R. at 617. "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's,* 186 B.R. at 426. As set forth above, the Utility has regularly and routinely employed Hedging Transactions to hedge its exposure to price volatility in the markets for natural gas and electricity in connection with its daily operations.

---

[5] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

Accordingly, the Utility respectfully submits that performance under the Hedging Programs is within the ordinary course of its business and the relief requested herein is authorized pursuant to section 363(c) of the Bankruptcy Code.

### B. Section 363(b) of the Bankruptcy Code Authorizes the Utility to Perform Under the Hedging Programs and Enter Into New Hedging Transactions.

Although the Utility believes that it may continue the Hedging Programs in the ordinary course of business without Court approval, out of an abundance of caution, and to provide comfort to the Utility's hedging counterparties, to the extent the Court deems the Hedging Programs to be outside the ordinary course of business, the relief requested in the Motion should be authorized under section 363(b)(1) of the Bankruptcy Code.

Section 363(b)(1) of the Bankruptcy Code authorizes the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Station Casinos, Inc.*, No. BK-09-52477-GWZ, 2010 Bankr. LEXIS 5447, at *7 (Bankr. D. Nev. Feb. 2, 2010); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application). Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); *see also In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy").

Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812-ASW, 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014).

Continuing the Hedging Programs on a postpetition basis represents an appropriate exercise of the Utility's business judgment. Absent such authority, the Utility will be unable to manage its exposure to pricing volatility in the markets for natural gas and electricity, which may hamper the Utility's ability to provide affordable service to its customers. Additionally, as noted above, the Hedging Programs must comply with the CPUC-approved hedging plans and the Utility's inability to engage in Hedging Transactions may result in the Utility being non-compliant with CPUC requirements. Moreover, the inability to hedge fluctuating costs may result in significant additional expenses and adversely affect the Utility's restructuring efforts. Accordingly, the Utility respectfully submits that the relief requested herein is a sound exercise of the Utility's business judgment and should be approved.

### C. The Utility Should Be Authorized to Pledge Hedging Collateral Pursuant to Section 364 of the Bankruptcy Code.

Section 364 of the Bankruptcy Code authorizes a debtor to obtain "credit" on a superpriority or senior secured basis when obtaining such credit on other terms is unavailable. 11 U.S.C. §§ 364(c), (d). Courts generally afford debtors considerable deference to determine, in their business judgment, the terms under which they obtain postpetition secured credit. *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981).

To provide the necessary comfort to Hedging Transactions counterparties that the Utility will be able to honor commitments under the Hedging Agreements, the Utility seeks authority to pledge cash or other collateral in the ordinary course of business and in accordance with Hedging Agreements on a first-priority basis. Courts in other jurisdictions have approved similar relief. *See, e.g., In re GenOn Energy, Inc.*, Case No. 17-33695 (Bankr. S. D. Tex. July 14, 2017) [Docket No. 66]; *In re Linn Energy*, LLC, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 17, 2016) [Docket No. 128]; *In re Penn Va. Corp.,* No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016) [Docket No. 65]; *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 30, 2014) [Docket

No. 315]; *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) [Docket No. 28].

The continuation of the Hedging Programs is critical to the Utility's ability to mitigate risks associated with pricing volatility in natural gas and electricity markets and is essential both to the stability of the Utility's businesses and to its ability to provide affordable service to customers. The Utility has more than ample liquidity, with cash on hand, including the proceeds of the DIP Financing, to post the requisite Hedging Collateral. Moreover, the DIP Facility permits the pledging of Hedging Collateral. In light of the foregoing, the Utility believes that authorizing it to pledge the Hedging Collateral on account of postpetition Hedging Transactions is appropriate and should be authorized and approved.

## V. RESERVATION OF RIGHTS

Notwithstanding anything contained in the Motion, the Debtors shall reserve: (i) all rights to object to a claim or assertion by any party that any of the Hedging Transactions are governed by section 546, 555, 556, and/or 559 of the Bankruptcy Code or that such provisions in any way apply to such agreements; and (ii) all rights (including, without limitation, any right of setoff, settlement, or recoupment), claims, counterclaims, and defenses in any way relating to Hedging Transactions.

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VI. REQUEST FOR BANKRUPTCY RULES 4001 AND 6004 WAIVERS

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As discussed above, the Utility must resume the Hedging Programs in order to hedge its exposure properly and provide affordable service to customers. Accordingly, ample cause exists to justify

the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply. The Debtors request a waiver of the requirements of Bankruptcy Rule 4001(d).

## VII. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara., Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the DIP Financing; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Utility respectfully requests entry of an order, substantially in the form of the Order attached as Exhibit A hereto, granting (i) the relief requested herein as a sound exercise of the Utility's business judgment and in the best interests of its estate, creditors, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: March 6, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

/s/ Tobias S. Keller
Tobias S. Keller

*Proposed Attorneys for Debtors and Debtors in Possession*