WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF FONG WAN IN SUPPORT OF MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 364 AND FED. R. BANKR. P. 4001 AND 6004 AUTHORIZING UTILITY TO (A) CONTINUE HEDGING PROGRAMS, (B) ENTER INTO AND PERFORM UNDER POSTPETITION HEDGING TRANSACTIONS, AND (C) PLEDGE COLLATERAL AND HONOR OBLIGATIONS THEREUNDER**<br><br>Date: March 27, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

I, Fong Wan, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

I am Senior Vice President, Energy Policy and Procurement at Pacific Gas and Electric Company (the "**Utility**" and collectively with PG&E Corporation the "**Debtors**"). I joined the Utility in 1998 and have served in my current position since 2008.

I am knowledgeable and familiar with the Utility's day-to-day operations and, specifically, the Hedging Programs.[1] I am authorized to submit this Declaration on behalf of the Utility. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' other employees or the Debtors' legal, restructuring, and financial advisors, or from other members of the Energy Policy and Procurement group working under my supervision or direction. If called upon to testify, I would testify to the facts set forth in this Declaration.

I submit this Declaration in support of the *Motion Pursuant to 11 U.S.C. §§ 105, 363, and 364 and Fed. R. Bankr. P. 4001 and 6004 Authorizing Utility to (A) Continue Hedging Programs, (B) Enter Into and Perform Under Postpetition Hedging Transactions, and (C) Pledge Collateral and Honor Obligations Thereunder* (the "**Hedging Motion**").

## I. THE HEDGING PROGRAMS

Prior to the Petition Date, in the ordinary course of business, the Utility entered into financial transactions (collectively, the "**Hedging Transactions**") with various counterparties to hedge the Utility's exposure to price volatility in the markets for natural gas and electricity in connection with its daily operations (as may be amended or modified in the ordinary course, respectively, the "**Retail Natural Gas Hedging Program**" and the "**Electric Portfolio Hedging Program**" and, together, the "**Hedging Programs**"). The Hedging Programs were implemented through financial and derivative instruments entered into between the Utility and various hedging counterparties, including: (i) futures and forward contracts, which fix the price the purchaser pays for a fixed amount of natural gas or electricity at a specified location, or to fix the differential between two different locations (the "**Futures**

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Hedging Motion (as defined below).

Contracts"); (ii) call options, which provide the purchaser the financial equivalent of the right, but not the obligation, to purchase natural gas, electricity, or a Futures Contract at a predetermined fixed price or rate on or before a specific date (the "**Call Options**"); (iii) put options, which give the purchaser the right, but not the obligation, to sell a Futures Contract at a predetermined fixed price on or before a specific date (the "**Put Options**"); and (iv) swap agreements, which obligate the purchaser to pay or receive the difference between the purchase price of the agreement and certain index pricing (the "**Swaps**").

The Utility utilizes various exchanges to enter into most of its Hedging Transactions (the "**Exchanges**"), including the CME Group and the Intercontinental Exchange. The Utility transacts on the Exchanges through future commissions merchants (collectively, the "**Future Commission Merchants**"), including Macquarie Futures USA LLC. The Future Commission Merchants solicit or accept orders to buy or sell Futures Contracts, options on Futures Contracts, retail off-exchange or forex contracts or Swaps, and accept money or other assets from customers to support such orders. Transactions conducted through the Exchanges are subject to exchange agreements (the "**Exchange Agreements**"). Prior to the Petition Date, the Utility also entered into "over-the-counter" Hedging Transactions directly with third-parties, which are governed by the standard International Swaps and Derivatives Association, Edison Electric Institute, or Western Systems Power Pool Master Agreements (together with the Exchange Agreements, the "**Hedging Agreements**").

The Utility is seeking authority to enter into new Hedging Transactions in the ordinary course of business, to mitigate the Utility's risks associated with pricing volatility in the natural gas and electricity markets and to stabilize the prices paid by the Utility's customers. As discussed below, it is my understanding based upon discussions with counsel that the Debtors' debtor-in-possession financing (the "**DIP Financing**") permits the Utility to engage in such Hedging Transactions and post cash or other collateral in connection therewith. The Utility believes that prospective counterparties to the Hedging Transactions may be reluctant to trade with the Utility without specific authorization from the Court. Accordingly, pursuant to the Hedging Motion, out of an abundance of caution, the Utility requests authority, but not direction, to (a) continue the Hedging Programs, (b) enter into new postpetition Hedging Transactions in the ordinary course of business and to honor, pay, and/or otherwise satisfy any

and all obligations thereunder, in a manner consistent with the Utility's prepetition practices, and (c) pledge cash or other collateral on account of the Utility's postpetition Hedging Transactions, all as set forth below.

Earlier in these Chapter 11 Cases, the Court authorized the Utility to continue its trading and exchange practices in the ordinary course with respect to contracts for the physical supply and delivery of natural gas and electricity. In connection therewith, the Court also granted limited relief with respect to Future Commission Merchants, and authorized the Utility to pay prepetition amounts, or post funds to, the Future Commission Merchants in accordance with their agreements with the Utility in the ordinary course of business, in an amount not to exceed $15 million. This relief was necessary to protect the Utility from the possibility that the Future Commission Merchants would liquidate their prepetition financial transactions with the Utility as a result of the commencement of the Chapter 11 Cases. Pursuant to the Hedging Motion, the Utility is not seeking further relief with respect to those prepetition financial transactions or contracts for the physical delivery or supply of natural gas and electricity. Rather, the Utility seeks authority to continue the Hedging Programs pursuant to which the Utility enters into financial and derivative transactions to hedge its exposure to fluctuations in the prices of natural gas and electricity.

Each of the Retail Natural Gas Hedging Program and the Electric Portfolio Hedging Programs is discussed in further detail below.

### A. The Retail Natural Gas Hedging Program

Prior to the Petition Date, in the ordinary course of business, the Utility entered into various Hedging Transactions to hedge the exposure of its retail gas customers (e.g., residential and commercial end-use customers) to fluctuations in natural gas pricing (the "**Retail Natural Gas Hedging Transactions**"). Although the Utility entered into a variety of Retail Natural Gas Hedging Transactions, historically the Utility has primarily purchased Call Options (the "**Natural Gas Call Options**") and entered into Futures Contracts or Swaps for natural gas. Most of the Retail Natural Gas Hedging Transactions are utilized to cover the Utility's exposure to pricing volatility during the winter months. Prior to the Petition Date, the Utility also entered into a limited amount of Retail Natural Gas Hedging

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Transactions to, among other things, hedge an occasional price exposure from natural gas pipeline and natural gas storage capacity.

The Retail Natural Gas Hedging Program is governed by a hedging plan (the "**Retail Natural Gas Hedging Plan**"), which was approved by the California Public Utilities Commission (the "**CPUC**") pursuant to its *Decision for an Incentive Framework to Motivate Optimal Use of Natural Gas Hedging*, dated January 25, 2010. As mandated by the CPUC, the Retail Natural Gas Hedging Plan requires, among other things, the Utility to secure hedges covering at least a specified percentage of its average customer load for the winter months. The Retail Natural Gas Hedging Plan also dictates the time horizon over which Retail Natural Gas Hedging Transactions may be entered into, and imposes certain reporting requirements on the Utility, including reporting to the Utility Reform Network (TURN) and the Public Advocates Office (Cal PA), consumer advocacy organizations that advocate for affordable and dependable utility services.

In accordance with the terms of the applicable Hedging Agreement, the Utility may be required to post cash or other collateral (the "**Natural Gas Collateral**") to secure the Utility's obligations under a Hedging Agreement. Failure to post Natural Gas Collateral may trigger a default under the applicable Hedging Agreement, which may, among other things, allow the Hedging Transaction counterparty and/or the Future Commission Merchant to terminate or liquidate the applicable Retail Natural Gas Hedging Transaction and may result in such Hedging Transaction counterparty ceasing to transact with the Utility going forward. It is my understanding based upon discussions with counsel that the DIP Financing permits the Utility to post Natural Gas Collateral on account of Retail Natural Gas Hedging Transactions entered into in the ordinary course of business.

As of the Petition Date, the Utility's outstanding Retail Natural Gas Hedging Transactions consisted of Natural Gas Call Options and Swaps (together, the "**Prepetition Retail Natural Gas Hedging Transactions**"). The prepetition Call Options do not obligate the Utility to purchase natural gas, and, consequently, the Utility does not anticipate the need to post any collateral on account thereof. Additionally, as set forth above, the Court previously authorized the Utility to pay prepetition amounts, or post funds to, the Future Commission Merchants in accordance with their prepetition transactions

with the Utility, in the ordinary course of business, in an amount not to exceed $15 million.[2] Accordingly, the Utility is not seeking any further relief with respect to the Prepetition Retail Natural Gas Hedging Transactions. Rather, the Utility is seeking authority to continue the Retail Natural Gas Hedging Program on a postpetition basis and to satisfy any obligations thereunder, including posting cash or other collateral on account thereof.

### B. The Electric Portfolio Hedging Program

Prior to the Petition Date, in the ordinary course of business, the Utility entered into Hedging Transactions to hedge its exposure to price fluctuations in natural gas, electricity, and greenhouse compliance instruments (the "**Electric Portfolio Hedging Transactions**"). The Electric Portfolio Hedging Program is governed by the Utility's *Bundled Procurement Plan*, which establishes guidelines for Electric Portfolio Hedging Transactions (as amended, the "**Electric Portfolio Hedging Plan**"). Prior to the Petition Date, in the ordinary course of business, the Utility primarily purchased Call Options and Futures Contracts.

The Electric Portfolio Hedging Plan was most recently approved by the CPUC in 2015.[3] The Electric Portfolio Hedging Plan contains comprehensive stipulations for the Electric Portfolio Hedging Program and dictates, among other things, hedging targets and limits, a product mix, and the Utility's hedging execution strategy. The Electric Portfolio Hedging Plan also establishes procedures to be implemented by the Utility upon the occurrence of unusual events, market dislocations, and emergencies. The Utility is considering updating the Electric Portfolio Hedging Plan and, if applicable, will submit a revised plan to the CPUC for approval.

Similar to the Retail Natural Gas Hedging Transactions, the Utility may be required to post cash or other collateral (the "**Electricity Collateral**" and, together with the Natural Gas Collateral, the "**Hedging Collateral**") to secure the Utility's obligations under a Hedging Agreement. Failure to post Electricity Collateral similarly may trigger a default under the applicable Hedging Agreement, which

---

[2] *See* Exchange Operator Order ¶ 9.

[3] *See CPUC Decision 15-10-031, Decision Approving 2014 Bundled Procurement Plan; and Pacific Gas and Electric Company, Bundled Procurement Plan, Appendix E, Electric Portfolio Hedging Plan*, effective as of June 15, 2016.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

may, among other things, allow the Hedging Transaction counterparty to terminate or liquidate the applicable Electric Portfolio Hedging Transaction and may result in such counterparty ceasing to transact with the Utility going forward. It is my understanding based upon discussions with counsel that the DIP Financing permits the Utility to post Electricity Collateral on account of Electric Portfolio Hedging Transactions entered into in the ordinary course of business.

As of the Petition Date, the Utility was party to certain Electric Portfolio Hedging Transactions (the "**Prepetition Electric Portfolio Hedging Transactions**"), consisting of Call Options and Futures Contracts. Similar to the relief discussed above with respect to the Retail Natural Gas Hedging Portfolio, the Utility is not seeking any further relief with respect to the Prepetition Electric Portfolio Hedging Transactions. Pursuant to the Hedging Motion, the Utility is seeking authority to continue the Electric Portfolio Hedging Program on a postpetition basis and honor any obligations arising thereunder, including authority to post cash or other collateral on account thereof.

In my experience, hedging programs are typical among natural gas and electric utilities to hedge their exposure to pricing volatility and preserve the value of their businesses. I believe that Utilities routinely enter into hedging transactions similar to those contemplated by the Hedging Programs. The Utility has regularly and routinely employed Hedging Transactions to hedge its exposure to price volatility in the markets for natural gas and electricity in connection with its daily operations.

I respectfully submit that continuing the Hedging Programs on a postpetition basis represents an appropriate exercise of the Utility's business judgment. Absent such authority, the Utility will be unable to manage its exposure to pricing volatility in the markets for natural gas and electricity, which may hamper the Utility's ability to provide affordable service to its customers. Additionally, as noted above, the Hedging Programs must comply with the CPUC-approved hedging plans and the Utility's inability to engage in Hedging Transactions may result in the Utility being non-compliant with CPUC requirements. Moreover, the inability to hedge fluctuating costs may result in significant additional expenses and adversely affect the Utility's restructuring efforts. Accordingly, I respectfully submit that the relief requested in the Hedging Motion is a sound exercise of the Utility's business judgment and should be approved.

The Utility has more than ample liquidity, with cash on hand, including the proceeds of the DIP Financing, to post the requisite Hedging Collateral. Moreover, the DIP Facility permits the pledging of Hedging Collateral. In light of the foregoing, I respectfully submit that authorizing the Utility to pledge the Hedging Collateral on account of postpetition Hedging Transactions is appropriate and should be authorized and approved.

Accordingly, for the reasons set forth herein, I believe that the relief requested in the Hedging Motion is in the best interest of the Debtors, their estates, creditors, shareholders, and all other parties in interest and should be approved.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Pursuant to section 1746 of title 28 of the United States Code, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: March 6, 2019

By: _____
Fong Wan