Robert A. Julian
Cecily A. Dumas
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:     310.820.8800
Facsimile:      310.820.8859
Email:   rjulian@bakerlaw.com
Email:   cdumas@bakerlaw.com

Eric E. Sagerman
Lauren T. Attard
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025
Telephone:     310.820.8800
Facsimile:      310.820.8859
Email:   esagerman@bakerlaw.com
Email:   lattard@bakerlaw.com

*Proposed Counsel for Official
Committee of Tort Claimants*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| **-and-** | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| **Debtors** | |
| □  Affects PG& E Corporation  <br> □  Affects Pacific Gas and Electric Company  <br> ■  Affects both Debtors  <br> *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | **OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO DEBTORS' DIP FINANCING MOTION (ECF NO.  23)**  <br><br> Date:          March 13, 2019 <br> Time:         9:30 a.m. (Pacific Time) <br> Place:        United States Bankruptcy Court <br>                  Courtroom 17, 16 Floor <br>                  San Francisco, CA  94102 |

## <u>TABLE OF CONTENTS</u>

Page

SUMMARY OF ARGUMENT ................................................................................. 5

INTRODUCTORY STATEMENT ........................................................................ 6

JURISDICTION AND VENUE ............................................................................ 9

PROCEDURAL BACKGROUND ........................................................................ 9

FACTUAL BACKGROUND ............................................................................. 10

ARGUMENT ...................................................................................................... 14

    I.     The Bankruptcy Court Should Retain Control of, and Limit, DIP Lender Remedies. .................................................................................. 14

    II.    The DIP Lenders Seek Undue Control Over the Chapter 11 Cases. ..................... 17

    III.   The DIP Lenders Cannot Use the DIP Loans to Improve the Position of Their Prepetition Unsecured Claims. ................................................................. 20

    IV.   The Committee Objects to Additional Provisions of the DIP Facility. ................. 20

CONCLUSION ................................................................................................... 22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................................... 21

*Automatic Sprinkler Corp. v. S. Cal. Edison Co*.,
266 Cal. Rptr. 662 (Cal. Ct. App. 1989) ..................................................... 17

*In re Crouse Group, Inc*.,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ............................................................ 21

*In re Fleetwood Enters., Inc.*,
427 B.R. 852 (Bankr. C.D. Cal. 2010), *aff'd*, 471 B.R. 319 (B.A.P. 9th Cir.
2012) ................................................................................................................ 21

*Hosford v. Henry*,
238 P.2d 91 (Cal. Dist. Ct. App. 1951) ....................................................... 17

*Pac. Gas & Elec. Co.*
[D.19-01-025] ............................................................................................... 13

*Pac. Gas & Elec. Co.*
[D.19-01-026] ............................................................................................... 13

*In re Qualitech Steel Corp.*,
276 F.3d 245 (7th Cir. 2001) ....................................................................... 21

*In re Tenney Vill. Co., Inc.*,
104 B.R. 562 (Bankr. D.N.H. 1989) ............................................................ 19

**Statutes**

11 U.S.C. §§ 105(a), 363(b) ................................................................................ 8

28 U.S.C. §§ 157 and 1334 ................................................................................. 9

28 U.S.C. § 157(b)(2) ........................................................................................... 9

28 U.S.C. §§ 1408 and 1409 ............................................................................... 9

Bankruptcy Code ................................................................................. 9, 17, 19

Bankruptcy Code section 364(c) ...................................................................... 21

Bankruptcy Code §§ 503(b)(3)(D) and 503(b)(4) .......................................... 22

Bankruptcy Code section 1102(a)(1) ............................................................... 10

Case: 19-30088    Doc# 800    Filed: 03/08/19    Entered: 03/08/19 12:58:59    Page 3 of
22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Bankruptcy Code sections 1107(a) and 1108 .................................................................9

Bankruptcy Code Section 1129 .....................................................................................18

California Public Utilities Code ("**PUC**") ......................................................................13

Public Utilities Code § 851 ..............................................................................14, 15, 17

PUC ..........................................................................................................................14, 15

PUC § 362 ..............................................................................................................15, 19

PUC Section 817 ...........................................................................................................13

PUC §§ 817, 818, 823 & 851 ........................................................................................13

PUC §§ 829(c) & 853(b) ...............................................................................................13

**Rules**

Bankruptcy Rule 1015(b) .................................................................................................9

**Other Authorities**

CPUC Order No. 1 .................................................................................................13, 14

CPUC Order No. 2 .........................................................................................................13

DIP Credit Agreement—"Events of Default".................................................... *passim*

http://docs.cpuc.ca.gov/PublishedDocs/
    Published/G000/M262/K938/262938745.PDF ......................................................13

, http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M237/K661/237661308.PDF ...................13

Interim Order ¶ 3 ...........................................................................................................16

PG&E CPUC Application at § VII .................................................................................13

Section 4—"Representation and Warranties" .................................................................15

Section 6—"Affirmative Covenants" .............................................................................15

Section 7—"Negative Covenants" ..................................................................................15

Second Order to Show Cause Why PG&E's Conditions of Probation Should Not
    Be Modified, Document No. 1027 ............................................................................6

to the CPUC Order No. 1 ...............................................................................................13

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

The Official Committee of Tort Claimants (hereafter, the "**Committee**"), representing the largest group of stakeholders in these bankruptcy cases, hereby submits this objection ("Objection") to the Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing and (V) Granting Related Relief (ECF No. 23) (the "**Motion**")[1] filed by PG&E Corp. and Pacific Gas and Electric Company (collectively, the "**Debtors**" or "**PG&E**").

## SUMMARY OF ARGUMENT

The protections granted to the DIP Lenders under the proposed order bear no relationship to the actual risk to the DIP Lenders of nonpayment in these Cases. Eight of nine DIP Lenders also hold prepetition *unsecured* claims against both the utility and the holding company. Any control over the Debtors' plan process or their assets through the provisions of the DIP Loans will give these unsecured creditors an unfair advantage in negotiations over other claimants holding claims of the same priority. Approval of the Motion should be conditioned on the following terms:

- Eliminate the automatic stay relief upon the Court finding that a "Termination Event" has occurred.

- Limit any stay relief that is granted by the Court to enforcement of liens on the Debtors' assets that do not constitute "utility assets," and allow further relief only upon a showing by the DIP Lenders that amounts remain owing after all non-utility asset collateral has been liquidated.

- Condition the borrowing on the Debtors' agreement to use a small portion of the proceeds to (1) fund a program for housing, food and other necessities for Camp fire victims who are still living in tents or trailers or sleeping on friends' couches, and (2) pay the roughly $15-20 million in signed settlements with Butte County victims that the Debtors refused to pay shortly before filing the Cases.

---

[1] Capitalized terms used but not defined in this Objection have the meanings given to them in the Motion.

Case: 19-30088   Doc# 800   Filed: 03/08/19   Entered: 03/08/19 12:58:59   Page 5 of 22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**INTRODUCTORY STATEMENT**

The Debtors and the DIP Lenders propose financing terms that may constitute "market" terms on Wall Street or in a standard business bankruptcy case, but the terms are by no means justifiable in this case given the essential public service the Debtors provide to millions of Californians. It is not acceptable for the DIP Lenders to reserve for themselves the unilateral right to foreclose on utility assets, nor control the timing or terms of the plan of reorganization. DIP Lenders should not be able to procure a seat at the table in these Cases in any meaningful respect where the collateral for the proposed DIP Loans is worth many times the amount of the loans and the DIP Lenders have no meaningful risk of nonpayment.

It is undisputed that the Debtors need this borrowing. They currently lack sufficient cash to operate the utility and comply with laws and regulations governing system maintenance, vegetation management and safety, which they have repeatedly violated over the years. The reasons why the Debtors lack sufficient cash is appalling: As noted by the United States District Court on March 5, 2019, the utility paid out immense sums in dividends--$798 million and $925 million in 2017 and 2016 respectively,[2] while knowingly failing to properly inspect and maintain its electrical system, in part resulting in the most catastrophic loss of life from a single fire in the Camp fire in November 2018. In addition to binging on dividends—almost $2 billion in 2016 and 2017—the Debtors misspent their cash in countless other ways. In the context of this discussion, however, the Debtors' reckless spending is not the point. The Debtors need the cash and DIP Lenders are willing to finance operations and a reorganization. The point is what the DIP Lenders should or should not be able to obtain in exchange for making relatively riskless loans.

In broad strokes, the Committee objects to the following aspects of the relief sought by the Motion:

- **<u>Lien Enforcement Upon Default</u>**. PG&E's business operations are different from the typical business bankruptcy in which a DIP lender is permitted to seize control of the assets following defaults under a DIP loan. PG&E provides quasi-public utility services to

---

[2] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, Document No. 1027, dated March 5, 2019, in United States v. Pacific Gas and Electric Company, United States District Court for the Northern District of California, Case No. CR 14-0175 WHA.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

millions of Northern Californians, the disruption of which could be catastrophic and result in the loss of lives during the administration of these bankruptcy cases. PG&E received authorization from the CPUC to grant liens securing the DIP Loans, but the CPUC Orders (as defined below) do not address the enforcement of the liens. Under the Interim Order, the stay is automatically lifted, and the DIP Lenders may enforce their liens, upon the occurrence of a DIP Termination Event, as defined term in the Interim Order. In closed proceedings, the CPUC authorized PG&E to incur this debt due to the risk to the public health and safety of Californians. The Court should not relinquish its authority to independently determine whether the stay should be lifted, or what remedies the DIP Lenders may be permitted to exercise. At the very minimum, lien enforcement should be permitted only upon a showing that the DIP Lenders' exercise of remedies will not create a risk of disruption of the provision of electricity and gas to PG&E's customers or the safety of the public.

- **Undue Control of the DIP Lenders Over Administration of the Cases**. PG&E filed these cases as solvent cases, reflecting in their voluntary petitions $71.4 billion in assets and $51.7 billion in liabilities. The shares of PG&E Corp., the holding company, are currently trading on the New York Stock Exchange in the range of $18/share. PG&E proposes to incur DIP Financing in an amount not to exceed $5.5 billion. Under the Interim Order, the Court authorized liens on substantially all of PG&E's assets. Based on PG&E's estimated asset value, the collateral securing the DIP Loans has a value over ten times the amount of aggregate DIP borrowing. Many constituents will be involved in the negotiation of a successful plan in these cases, including the CPUC, the Federal Energy Regulatory Commission ("**FERC**"), the State of California, the Debtors, their unsecured creditors, equity security holders, ratepayers, and most importantly, the thousands of victims of the Debtors' negligent, reckless, and criminal conduct who are represented in these cases by the Committee. The DIP Lenders should not be granted any rights whatsoever under the Final Order that may have the effect of allowing them to disrupt or unduly influence the plan process. This Court must not allow a handful of banks pushing their own parochial

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

interests in protecting their prepetition unsecured claims to interfere with, delay, accelerate, or disrupt in any way plan formulation and timing in these cases.

- **Use of Proceeds**.  The Debtors propose to borrow up to $5.5 billion.  They have already asked the Court for approval to spend up to **$235 million in bonuses** this year plus other programs adding to up to **$350 million** (STIP Motion, ECF No. 782), and **$1 million** to fund its obligations under a prepetition agreement with Butte County (Corrected Motion to Continue Performance Under Prepetition Settlement Agreement with Butte County, etc., ECF No. 770).  They also asked the Court to allow them to pay **$65,500,000 million** to pay prepetition obligations owed to shippers, warehousemen and other lien claimants (Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), etc. for Interim and Final Authority to Pay Prepetition Obligations Owed to Shippers, Warehousemen and Other Lien Claimants, etc., ECF No. 13).  They obtained authority under a first day motion to pay **prepetition employee claims $256,000,000** (Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), etc. for Interim and Final Authority to (I) Pay Prepetition Wages, Salary, Withholding Obligations, etc., ECF No. 7).  Debtors also want to pay for "operational integrity," a/k/a **critical vendors, $116,000,000** (Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), etc. for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Safety and Reliability, etc., ECF No. 12).  ***These special items that the Debtor is seeking authority to pay total over $788,500,000.***  The Committee is asking that the Court require PG&E to spend a small fraction of the foregoing amount to alleviate ongoing human suffering PG&E caused in the first place.  The total amount of agreed Butte settlement payments is unknown to the Committee, but is estimated to not exceed the sum of $20 million.  Similarly, the Committee does not know the cost of food and housing support for residents of Paradise, California, a town that PG&E incinerated, but insists that caring for these victims MUST be a top priority of the Debtors.

- **Improvement in Position of the DIP Lenders' Prepetition Unsecured Claims**.  Eight of the nine DIP Lenders also made prepetition unsecured loans to the Utility and PG&E Corp.  Nothing in the DIP Credit Agreement or the Final Order should permit the facilitation of

the early payment of the amounts due under these prepetition loans. This is particularly important with respect to the $650 million unsecured debt of PG&E Corp., since creditors of PG&E Corp. are subordinate to the payment in full of all claims against the Utility, including the claims of all tort victims.

**JURISDICTION AND VENUE**

The United States Bankruptcy Court for the Northern District of California ("**Bankruptcy Court**") has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges* of the United States District Court of the Northern District of California, dated February 22, 2016. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**PROCEDURAL BACKGROUND**

On January 29, 2019, the Debtors commenced their Chapter 11 Cases by filing voluntary petitions for relief under the Bankruptcy Code. On that same day, the Debtors filed the Motion seeking to enter into the DIP Credit Agreement. The Debtors presently operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

The factual background relating to the Debtors' commencement of the Chapter 11 Cases is set forth in detail in the Wells Declaration (ECF Nos. 28 & 263). The Debtors also rely upon the Declaration of David Kurtz (ECF No. 24) in support of the Motion. Mr. Kurtz advised the Debtors with respect to postpetition financing.

On January 31, 2019, the Court entered an order (ECF No. 207) directing the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). And, the Court also entered the Interim Order (ECF No. 217) granting the Motion on an interim basis.

On February 1, 2019, the Court entered an order (ECF No. 228) extending the deadlines for the Debtors to file their schedules of assets and liabilities until March 14, 2019, and statements of financial affairs until April 15, 2019.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

On February 15, 2019, the U.S. Trustee appointed eleven tort claimants as an official committee pursuant to section 1102(a)(1) of the Bankruptcy Code. The identity of each current TCC member, the fires in which they suffered losses, and the nature of their losses is described below:

| Committee Member | Fire | Nature of Losses |
|---|---|---|
| GER Hospitality, LLC c/o Adolfo Veronese | Nuns | Business Loss |
| Angela Loo | Camp | Wrongful Death |
| Kirk Trostle | Camp | Business and Home Loss |
| Tom Wehe | Camp | Wrongful Death |
| Karen Gowins | Camp | Home Loss |
| Agajanian, Inc. c/o Gary Agajanian | North Bay | Business Loss |
| Susan Slocum | Ghost Ship | Wrongful Death |
| Samuel Maxwell | Ghost Ship | Personal Injury |
| Wagner Family Wines- Caymus Vineyards c/o Michael Carlson | Atlas | Business Loss |
| Greg Wilson | Tubbs | Personal Injury |
| Karen Lockhart | Cascade | Wrongful Death |

Each of these victims suffered devastating personal losses at the hands of PG&E. In the aggregate, the victims whose interests they represent in these Chapter 11 Cases have suffered damages in the staggering aggregate amount of over $30 billion, by PG&E's own estimates.

## FACTUAL BACKGROUND

### The Fire Claims

The Committee represents the victims of PG&E equipment-related disasters that killed 166 individuals, burned up three percent (3%) of the State, decimated three entire communities, destroyed over 32,000 structures, and produced over $30 billion of PG&E damage claims that forced the company into bankruptcy: 2015 Butte Fire (921 homes destroyed); 2016 Ghost Ship Fire (36 deaths); 2017 North Bay Fire Siege (44 deaths, 14,700 structures destroyed); and the 2018 Camp Fire (86 deaths, 18,000 structures destroyed).

The State of California has repeatedly fined PG&E for its safety violations. The California Department of Forestry and Fire Protection has referred over a dozen criminal citations to the State's local district attorneys for PG&E's safety violations involved in the 2017 fires. A San Francisco federal jury convicted PG&E of intentionally and knowingly violating gas line safety

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  requirements and intentionally and knowingly obstructing the NTSB's investigation of PG&E's

2  culpability for the 2010 gas explosion.  And, finally, on the second day of PG&E's case, the

3  Honorable William Alsup, Judge, United States District Court for the Northern District of

4  California, convicted PG&E of failing to report yet another criminal investigation of the company

5  arising out of one of the 2017 fires (the Honey Fire).

6      At the end of the conviction hearing four weeks ago, Judge Alsup asked PG&E why he

7  should not just order PG&E to stop killing people as a condition of its criminal probation.  With

8  that record in place, PG&E served a copy of the Motion on every major creditor in these cases

9  except for the PG&E victims whose claims forced PG&E to file for bankruptcy in the first place.

10  **The Debtors' Prepetition Bank Debt**

11      Although the Debtors have yet to file their Statement of Financial Affairs and Schedules,

12  the Motion, together with the Debtors' filings with the Securities and Exchange Commission

13  discloses the following bank debt:

| Debt Capital Structure | Amount | Lenders |
|---|---|---|
| DIP Facilities | $5.5 billion | **JPMorgan Chase Bank, N.A.**<br>**Bank of America, N.A.**<br>**Citibank, N.A.**<br>**Wells Fargo Bank, N.A**<br>**Barclays Bank PLC**<br>**BNP Paribas**<br>**Goldman Sachs Bank USA**<br>**MUFG Union Bank, N.A.**<br>Credit Suisse AG |
| Unsecured Revolving Credit Facilities to Pacific Gas and Electric Company (Utility) dated April 27, 2015[3] | $3 billion | **JPMorgan Chase Bank, N.A.**<br>**Bank of America, N.A**<br>**Citibank, N.A.**<br>**Wells Fargo Bank, N.A.**<br>**Barclays Bank PLC**<br>**BNP Paribas**<br>**Goldman Sachs Bank USA**<br>**MUFG Union Bank, N.A.**<br>Morgan Stanley Bank, N.A.<br>Morgan Stanley Senior Funding, Inc.<br>The Bank of New York Mellon, N.A.<br>Mizuho Corporate Bank, Ltd.<br>Royal Bank of Canada<br>U.S. Bank N.A.<br>TD Bank, N.A.<br>Canadian Imperial Bank of Commerce<br>Sumitomo Mitsui Banking Corporation |

28

---

[3]  PG&E, Form 10-Q (Mar. 31, 2015), Exhibit 10.2.  This information is current according to PG&E, Form 8-K

| Debt Capital Structure | Amount | Lenders |
|---|---|---|
| Unsecured Revolving Loan to PG&E Corp. (Holding Company) dated April 27, 2015[4] | $300 million | **JPMorgan Chase Bank, N.A.** **Bank of America, N.A.** **Citibank, N.A.** **Wells Fargo Bank, N.A.** **Barclays Bank PLC** **BNP Paribas** **Goldman Sachs Bank USA** **MUFG Union Bank, N.A.** Morgan Stanley Bank, N.A. Morgan Stanley Senior Funding, Inc. The Bank of New York Mellon, N.A. Mizuho Corporate Bank, Ltd. Royal Bank of Canada U.S. Bank N.A. TD Bank, N.A. Canadian Imperial Bank of Commerce Sumitomo Mitsui Banking Corporation |
| Unsecured Term Loan to PG&E Corp. (Holding Company) dated April 16, 2018[5] | $350 million | Mizuho Bank, Ltd. Royal Bank of Canada Sumitomo Mitsui Banking Corporation |
| Unsecured Term Loan to Pacific Gas and Electric Company (Utility) dated February 23, 2018[6] | $250 million | **MUFG Union Bank, N.A.** U.S. Bank N.A. |

Eight of the nine DIP Lenders—JPMorgan Chase, Bank of America, Citibank, Wells Fargo, Barclays, BNP Paribas, Goldman Sachs and MUFG Union Bank—hold prepetition loans to the Utility and PG&E Corp. These prepetition loans are all unsecured.

**CPUC Approval of Postpetition Secured Financing**

The California Public Utilities Code ("**PUC**") requires a public utility to obtain CPUC approval to issue short-term and long-term debt. PUC §§ 817, 818, 823 & 851. The CPUC may exempt a utility from these requirements if it finds that the application thereof with respect to the utility is not necessary in the public interest. PUC §§ 829(c) & 853(b). In closed proceedings A.18-10-003 and A.18-11-001, the CPUC granted the Debtors' requests to enter orders exempting the DIP Financing from PUC §§ 817, 818, 823 & 851.[7]

_____

(Nov. 13, 2018).
[4] PG&E, Form 10-Q (Mar. 31, 2015), Exhibit 10.1. This information is current according to PG&E, Form 8-K (Nov. 13, 2018).
[5] PG&E Corp., Form 8-K (Apr. 16, 2018).
[6] PG&E Corp., Form 8-K (Feb. 23, 2018).
[7] The CPUC issued two decisions simultaneously, one authorizing long-term debt and another authorizing short-term

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

In PG&E's original application to the CPUC,[8] PG&E stated that it would use the DIP Financing for the purposes permitted by PUC Section 817: not more than $4.72 billion for "construction expenditures and acquisition of property"; $1.35 billion "for the retirement, refunding or reissuance of securities previously issued"; $1.35 billion for "expected refinancing in 2020 and 2021"; and $600 million for "contingency purposes." PG&E CPUC Application at § VII.

The CPUC also discussed the purposes of the DIP Financing: "PG&E stated that one purpose of the DIP Financing is to support its ongoing operations and a basic principle of utility law is that reliable gas and electric service is of the utmost importance to the safety, health, and welfare of Californians." CPUC Order No. 1 at p. 7. Despite PG&E's representations, the DIP Credit Agreement goes further than its previously stated purposes and broadly authorizes the use of the DIP Loans for "general corporate purposes." DIP Credit Agreement at § 4.12. General corporate purposes certainly encompass the relatively small payments sought by the Committee to fund relief for victims still homeless in Paradise, California, as a result of PG&Es reckless and criminal conduct and payments to Butte fire claimants who have been waiting over three years for payment of their claims.

While the CPUC authorized the DIP Financing, the decisions did not address the foreclosure or transfer of ownership of the assets in the event of a default. CPUC Order No. 1 at p. 3 ("This exemption does not extend to the transfer of ownership of any utility asset which is secured as part of the Debtor-in-Possession financing…. Pacific Gas and Electric Company must seek [CPUC] approval to execute such a transfer under Public Utilities Code § 851"). The CPUC stated that this limitation is responsive to a commentator's request that the utility assets remain in service in the event of a forfeiture. *Id.* at p. 9.

---

debt. *See Pac. Gas & Elec. Co.* [D.19-01-026] (Jan. 30, 2019) (slip op.) http://docs.cpuc.ca.gov/PublishedDocs/ Published/G000/M262/K938/262938745.PDF ("**CPUC Order No. 1**") (regarding long-term debt); *Pac. Gas & Elec. Co.* [D.19-01-025] (Jan. 30, 2019) (slip op.) (authorizing short-term debt) ("**CPUC Order No. 2**," and together, the "**CPUC Orders**"). Since the decisions are identical in all aspects relevant to this Response, all citations herein will be to the CPUC Order No. 1.

[8] *See Pac. Gas & Elec. Co.'s Application for Debt & Preferred Stock Authorization*, [A.18-11-001] (Nov. 5, 2018), at pp. 14-15, http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M237/K661/237661308.PDF (the "**PG&E CPUC Application**").

**ARGUMENT**

**I.      The Bankruptcy Court Should Retain Control of, and Limit, DIP Lender Remedies.**

The Committee first objects to the Motion to the extent it seeks to eliminate the Court's involvement should a "DIP Termination Event" occur under the DIP Credit Agreement. *See* Interim Order at ¶ 14.  Given the nature of the Debtors' business, the amount of the DIP Loans, and the size of the Debtors' estate, the Court must retain authority to grant targeted relief from the automatic stay if a DIP Termination Event occurs.  Regardless of how the Lenders determine to foreclose on the Debtors' assets, whether with or without the CPUC's approval, it may do so in a way that harms the interests of the Committee's constituency, the many thousands of innocent victims, without the ultimate oversight of Court as to the best path forward for all stakeholders.

PG&E is a quasi-public entity that performs critical services to the public.  The health and safety of the public rest in the hands of PG&E—it ensures that everything from hospitals to businesses to traffic signals have reliable electricity, and yet it also must take safety precautions and make upgrades to protect the public from the dangers of the transmission of electricity.

Because of this critical function, the CPUC regulates PG&E by enforcing provisions of the PUC.  These regulations include safety requirements as well as financial regulations to ensure reliability of service.  *See*, *e.g.*, PUC § 851 (requiring that the CPUC approve a utility's disposition or encumbrance of an asset that is "necessary or useful in the performance of its duties").  In a Section 851 proceeding, the CPUC must "ensure that facilities needed to maintain the reliability of the electric supply remain available and operational…."  PUC § 362.

After the CPUC approved the creation of the DIP Liens, and after the Interim Order was entered, the DIP Lenders obtained liens on the Debtors' assets, which were unencumbered prior to bankruptcy.  This all occurred before the Committee was formed.

The Committee now vigorously asserts that the DIP Lenders should be limited to foreclosure of their liens against assets of the Debtors that do not constitute utility assets within the meaning of the Public Utilities Code.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## The DIP Lenders Should Not Have Unfettered Authority Following a DIP Termination Event

The Committee is concerned because, by all accounts, the Debtors' assets are critical to the proper operation of the Utility, and yet, under the Interim Order, the Court has no authority to protect the Debtors' assets in the event of a DIP Termination Event. *See* Interim Order at ¶ 14.

DIP Termination Events include numerous triggers, including all "Events of Default" under the DIP Credit Agreement. Interim Order at ¶ 13. Section 8 of the DIP Credit Agreement—"Events of Default"—standing alone is 4 pages and has 19 subsections, which subsections cross-reference other sections of the DIP Credit Agreement, including Section 4—"Representation and Warranties"—and all of Section 7—"Negative Covenants"—and part of Section 6—"Affirmative Covenants"—plus definitions. The Debtors and their non-debtor subsidiaries must walk on tightrope to avoid tripping any of these provisions.

For example, an Event of Default could occur by something as remote as a subsidiary failing to comply with a condition relating to its own indebtedness. Credit Agreement § 8(e). Or, an Event of Default could occur if a material portion of the DIP Collateral is damaged, for any reason, and the insurance proceeds are materially less than the fair market value of the property. *Id.* at § 8(r). Or, more likely, this Court could order the appointment of a trustee or examiner. *Id.* at § 8(i).

The Debtors could trip a Negative Covenant, such as the agreement not to loan or advance in the aggregate more than $25 million at one time to Debtors and to non-debtor subsidiaries for customary business purposes, including payroll advances, business related travel, and relocation expenses. *Id* at § 7.4(j), 8(c). The Debtors could trip an Affirmative Covenant by failing to provide notice of "any event that would reasonably be expected to result in a Material Adverse Effect." *Id.* at §§ 6.7(a) & 8(c). The list goes on and on and on.

And, importantly, any DIP Termination Event triggers an automatic lifting of the stay after seven days' written notice by the DIP Lenders. Interim Order at ¶ 14 ("Unless during [the] Remedies Notice Period, the Court determines that a DIP Termination Event has not occurred, the automatic stay … shall be automatically terminated immediately upon the expiration of the Remedies Notice Period"). The Court's only involvement would be to adjudicate a dispute over

1  whether a DIP Termination Event occurred, assuming it is even contested.  *Id.*  Otherwise, the
2  Court's hands would be tied.

3       Therein lies the Committee's concern:  the DIP Termination Events are so numerous, and
4  at times outside the Debtors' control, and the ramifications of a DIP Termination Event are extreme
5  for the Debtors and for the creditors.  To protect the Debtors and the creditors, the Court must
6  examine the DIP Lenders' actions before the stay is lifted and foreclosure is a foregone conclusion.

7            **CPUC Review May Not Protect the Debtors' Utility Assets**

8       The Debtors will be quick to point out that if a DIP Termination Event occurs and the DIP
9  Lenders seek to exercise their rights and remedies, the Debtors must seek CPUC approval before
10 the Lenders can foreclose on certain assets.  The CPUC provided a limited grant of authority that
11 does not extend to the transfer of ownership of any "utility asset" secured by the DIP financing.
12 Interim Order at ¶ 34.  The Interim Order requires the Debtors to seek CPUC approval before
13 transferring assets to the DIP Lenders.  *Id.*  This does not eliminate the Committee's concerns.

14      The law does not clearly define the limits of the CPUC's authority, particularly regarding
15 the DIP Collateral.  DIP Collateral comprises substantially all of the Debtors' prepetition and
16 postpetition assets.  Interim Order ¶ 3.  Yet, following a DIP Termination Event, the only
17 speedbump before the DIP Lenders can execute on the DIP Liens is the requirement that the Debtors
18 "seek" CPUC approval.  *Id.* at ¶ 34.  But, need to "seek" approval, and not "receive" approval, is
19 not a review.  To comply with the Interim Order, the Debtors need only file an application for
20 approval with the CPUC.  Regardless of the CPUC's approval or disapproval, the Debtors will have
21 satisfied the Interim Order's requirements.

22      Even with that requirement to "seek" approval, the DIP Lenders may not be hampered by
23 the CPUC at all.  Cases that have discussed PUC Section 851 assume that once a utility has granted
24 a lien with CPUC approval, the secured party may initiate foreclosure as appropriate.[9]  The Debtors
25 will point out that the CPUC Orders require that the Debtors seek CPUC approval before any

---

[9] *See, e.g.*, *Automatic Sprinkler Corp. v. S. Cal. Edison Co.*, 266 Cal. Rptr. 662, 666-67 (Cal. Ct. App. 1989) (discussing foreclosure of a lien and not discussing whether CPUC would have to approve the foreclosure, just the encumbrance); *Hosford v. Henry*, 238 P.2d 91, 99 (Cal. Dist. Ct. App. 1951) (finding that the lower court could not reform a contract to enhance the lien; however, if CPUC declined to approve the additional liens, "then the court may proceed to foreclose the deed of trust as written").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

foreclosure.  But, the DIP Lenders may not have to comply with the CPUC Orders, particularly given precedent that lenders can foreclose on CPUC-approved liens.

Based on this precedent and a plain reading of the statute, the CPUC and the Utility may not have the authority to revoke or stay the DIP Liens.  And, even if the CPUC wanted to contest the DIP Lenders' foreclosure of the CPUC-approved DIP Liens, the CPUC may not have standing against the DIP Lenders, who are banks not in its jurisdiction.  The law, the CPUC Orders and the Interim Order do not clearly state that the DIP Lenders would have to abide by any CPUC ruling, particularly now that they have perfected DIP Liens.

The Court provides a valuable service in overseeing this bankruptcy.  At a minimum, the Committee requests that the Court retain authority to tailor stay relief to specific assets.  The DIP Lenders should not be in a position where they can put $71.4 billion of assets in jeopardy under these circumstances without further involvement of the Court.  The Committee submits that Paragraph 14 of the Final Order should be modified so that the DIP Lenders must seek relief from the automatic stay prior to enforcing any of their rights and remedies upon the occurrence of any DIP Termination Event.[10]

## II.    The DIP Lenders Seek Undue Control Over the Chapter 11 Cases.

Second, the Committee objects to the Motion to the extent it affords the DIP Lenders undue influence over these cases.  The DIP Lenders' true position in these cases does not warrant the level of control they seek.  The DIP Lenders are vastly oversecured, they have a superpriority claim, and the amount of their claim is not nearly the largest claim in these cases.  Yet, they seek to dictate plan terms and exercise a veto right over potential exit financing.  This level of control is simply not warranted here.

---

[10]  Paragraph 14 should be stricken and replaced with the following language:

The filing of a Remedies Notice on the Court docket shall be treated as a motion for relief from the automatic stay imposed under section 105 or 362(a) of the Bankruptcy Code.  Unless and until the Court rules on such motion, the automatic stay shall remain in place as to the DIP Administrative Agent and the DIP Lenders, and the DIP Administrative Agent and the DIP Lenders shall not be permitted to exercise any rights and remedies set forth herein, in the DIP Loan Documents or as otherwise available at law without further order from the Court.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

This bankruptcy began as a solvent case, with over $71.4 billion in assets and approximately $51.7 billion in liabilities. Wells Declaration (ECF No. 28) at p. 7. The DIP Lenders' $5.5 billion in DIP Loans are significant. However, $5.5 billion is just 7.7% of $71.4 billion. The DIP Lenders are oversecured by a factor of thirteen in a solvent case. The DIP Lenders are the only secured creditor in addition to the California Self-Insurers' Security Fund. On the other hand, the Committee's unsecured claims are valued by the Debtors at approximately $30 billion, which is 42% of the assets in these cases. *Id.* at p. 16.

Nonetheless, the DIP Lenders' attempts to control are significant. The Debtors point out that the DIP Credit Agreement does not require "milestones" or allow for the "roll-up" of prepetition debt. Nor should it. But, the DIP Lenders seek control in other ways.

For example, the DIP Credit Agreement created the concept of an "Acceptable Plan," which is a plan that provides for indefeasible payment in full of the DIP Obligations. DIP Credit Agreement §§ 1.1 & 8.1(n). This provides the DIP Lenders with a seat at the table for plan negotiations, even though the details of the plan will not affect the amount that the DIP Lenders receive. Section 1129 of the Bankruptcy Code requires that the DIP Lenders be paid in full—the extra assurance called for in the DIP Credit Agreement is not a meaningful attempt to mitigate risk, but a veiled attempt to control aspects of the case that otherwise do not concern the repayment of the DIP Obligations.

Another example of the DIP Lenders impermissibly asserting control is over the issuance of debt. The DIP Credit Agreement restricts the Debtors' ability to issue new indebtedness. DIP Credit Agreement § 7.1. This broad restriction is unnecessary because the Debtors would need to obtain Court approval before issuing new debt, at which time the DIP Lenders could object. But, even putting that aside, this restriction provides the DIP Lenders with a veto right over potential exit financing and, at a minimum, a seat at the table. They could potentially keep California from working with the Debtors to issue bonds to pay fire victims as part of a plan of reorganization.

The plan negotiations will be full of interested and important parties, including the state of California, the U.S. Trustee's office, CPUC, FERC, and the Debtors and the unsecured creditors,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

whose financial interests are actually at stake. The DIP Lenders will only add a loud but largely irrelevant voice to already crowded and potentially contentious negotiations.

As one court found when faced with a similar DIP order, which included similar termination events and an automatic lifting of the stay with no court oversight after a termination event:

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways. The Financing Agreement would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt. It runs roughshod over numerous sections of the Bankruptcy Code. Under its rights of approval and supervision, the Bank would in effect operate the Debtor's business. The Code permits this to be done only by a debtor or trustee. § 1108. All proceeds and rents would go to the Bank or to a collateral account it controls. The bankruptcy estate is supposed to receive all proceeds and rents from estate property, subject to cash collateral rights of secured parties. §§ 541(a)(6), 363. And the Bank would have the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization. No longer could a plan be confirmed over the Bank's objection under the cram-down provisions of § 1129(b)(2)(A). Such a confirmation is a "termination event" which gives the Bank the right to foreclose upon all the Debtor's property without further order of court, assuming "no material change in circumstances," whatever that means. The automatic stay against foreclosure, and all questions concerning the Bank's adequate protection, become irrelevant despite the strictures of § 362.

*In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989).

The Committee submits that all provisions in the DIP Credit Agreement and the Final Order that directly or indirectly give the DIP Lenders control over the plan process should be removed.[11]

---

[11] The following provisions in the DIP Credit Agreement should be modified as follows: DIP Credit Agreement § 1.1 (delete definition of "Acceptable Plan"); DIP Credit Agreement § 2.20 (delete in its entirety); DIP Credit Agreement § 7.1 (delete "and" in Section 7.1(m), add ";and" at the end of Section 7.1(n), and add as new Section 7.1(o): "Indebtedness of the Loan Parties and their respective Subsidiaries necessary to confirm a chapter 11 plan in the Cases, irrespective of whether Lenders support the confirmation of such chapter 11 plan"); DIP Credit Agreement § 7.2 (delete "and" in Section 7.2(v), add ";and" at the end of Section 7.2(w), and add as new Section 7.2(x): "Liens to secure any Indebtedness necessary for the Loan Parties to confirm a chapter 11 plan in the Cases, irrespective of whether Lenders support the confirmation of such chapter 11 plan"); DIP Credit Agreement § 7.8 ("Notwithstanding any other provisions hereof, ~~except as otherwise contemplated in an Acceptable Plan,~~ engage at any time in any business or business activity …"); DIP Credit Agreement § 8.1(n) ("Events of Default" include "~~(i) a Chapter 11 Plan shall be filed by any of the Debtors or confirmed in any of the Cases that is not an Acceptable Plan or (ii)~~").

Case: 19-30088    Doc# 800    Filed: 03/08/19    Entered: 03/08/19 12:58:59    Page 19 of 22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

-19-

## III. The DIP Lenders Cannot Use the DIP Loans to Improve the Position of Their Prepetition Unsecured Claims.

Third, the Committee objects to the Motion to the extent that the DIP Lenders seek to use their position as DIP Lenders to improve the treatment of their prepetition unsecured claims. Eight of the nine DIP Lenders made prepetition loans to the Utility and PG&E Corp. as part of two revolving credit facilities, with a total outstanding amount of approximately $3.1 billion. Chart, *supra* at pp. 6-7. These revolving credit facilities are unsecured.

The Debtors state that the DIP Credit Agreement contains no "roll-up" of the prepetition debt. Based on the Committee's review of DIP Loan Documents, the Committee has not identified any provision which appears to improve the DIP Lenders' prepetition unsecured claims.

Nonetheless, the Committee is concerned that a DIP lender may seek to improve its position on its unsecured debt by virtue of funding the DIP Loans. Any such attempt would be a *de facto* roll-up provision and an attempt to squeeze the Committee. The Committee seeks clarifying language on this point. Language should be added to the Final Order stating that "for the avoidance of doubt, nothing in the Final Order, the Interim Order, or the DIP Credit Agreement shall permit the payment of any obligations owed on account of the prepetition debt held by the DIP Lenders, or permit new guarantees to be executed regarding such debt, and the DIP Lenders are otherwise enjoined from using their status as DIP Lenders to improve the treatment of their prepetition debt."

## IV. The Committee Objects to Additional Provisions of the DIP Facility.

Fourth, the Interim Order and the DIP Credit Agreement contain multiple red flags. The Committee requests that the Court reform or eliminate the following provisions:

<u>Limitations on the Use of Proceeds</u>. The Interim Order limits the use any of the Debtors' assets that in any way offends the DIP Lenders, including any investigation of anything "adverse in any material respect" to the interests of the DIP Lenders or challenging the DIP Liens. Interim Order at ¶ 8.

This provision could prevent estate professionals from being paid for pursuing sale options that would create competition for a credit bid by the DIP Lenders, or for pursuing limitations on credit bidding to maximize the value of asset sales, which may happen here because the DIP

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Lenders are overcollateralized. This limitation also contravenes this Court's Guidelines for Cash Collateral & Financing Motions & Stipulations, effective Jan. 1, 2016 ("**DIP Guidelines**"), which state that the Court ordinarily will not approve lender releases or waivers or limitations of the debtor's right to use cash collateral in the absence of the secured party's consent. DIP Guidelines §§ E.6 & E.10. This provision should be modified to allow estate professionals to conduct activity in the best interests of the estate, not the DIP Lenders.

DIP Lien on Proceeds of Avoidance Actions. The DIP Credit Agreement also grants a DIP Lien on the proceeds of avoidance actions. This is inappropriate. *See* DIP Guidelines § E.7 (court will not ordinarily approve liens on proceeds of Chapter 5 actions); *In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001) (holding that "courts do not favor using § 364 to give pre-petition lenders security interests in the proceeds of avoidance actions"). No lien or superpriority interest should be granted on avoidance actions or their proceeds, and the DIP Lenders should not have any control over such actions or the settling of such actions.

Ability to Obtain Unsecured Credit. The Debtors cannot meet the requirement for approval of the DIP Credit Agreement under section 364(c) of the Bankruptcy Code without showing that the Debtors were "unable to obtain unsecured credit" before seeking to encumber estate property and provide superpriority liens.[12] To state the obvious—the Debtors have no prepetition secured bank debt. Granting an administrative claim under section 364(b), or even a superpriority claim under section 364(c)(1), should itself be sufficient to ensure that the DIP Loans are paid in full in cases where the Debtors purport to be solvent. The Debtors offer no explanation to the contrary.

Ability to Pay Administrative Expense Claims. The DIP Credit Agreement provides that the DIP Liens and DIP Superpriority Claims are only subordinate the Carve-Out, which includes payments to estate professionals, but is missing claims for substantial contribution to the estate pursuant to Bankruptcy Code §§ 503(b)(3)(D) and 503(b)(4). Court-approved administrative

---

[12] *In re Fleetwood Enters., Inc.*, 427 B.R. 852, 858 (Bankr. C.D. Cal. 2010), *aff'd*, 471 B.R. 319 (B.A.P. 9th Cir. 2012) ("The language of § 364(c)(1) is clear enough—a debtor's authority to obtain unsecured credit under that subsection is expressly premised on its inability to obtain credit . . . as an allowable administrative expense under § 364(b)."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (holding that a court may not approve any credit transaction under 11 U.S.C. § 364(c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit); *In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (concluding Debtors had not "made the requisite exhaustive unsuccessful efforts to obtain credit on terms in accordance with § 364(b)").

expense claims for substantial contribution to the estate should have the same priority as the other claims in the Carve-Out.

## **CONCLUSION**

The Committee requests that the Court enter relief consistent with this Response as it deems just and proper.

Dated:   March 8, 2019                    Respectfully submitted,


                                          BAKER & HOSTETLER LLP


                                          By:    */s/ Cecily A. Dumas*
                                                 Cecily A. Dumas

                                          Proposed Attorneys for Official Committee of Tort
                                          Claimants

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES