| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP**<br>Stephen Karotkin (*pro hac vice*)<br>(stephen.karotkin@weil.com)<br>Jessica Liou (*pro hac vice*)<br>(jessica.liou@weil.com)<br>Matthew Goren (*pro hac vice*)<br>(matthew.goren@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: 212 310 8000<br>Fax: 212 310 8007 | **CRAVATH, SWAINE & MOORE LLP**<br>Paul H. Zumbro (*pro hac vice*)<br>(pzumbro@cravath.com)<br>Kevin J. Orsini (*pro hac vice*)<br>(korsini@cravath.com)<br>Omid H. Nasab (*pro hac vice*)<br>(onasab@cravath.com)<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212 474 1000<br>Fax: 212 474 3700 |

**KELLER & BENVENUTTI LLP**
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>     - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                    **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' OMNIBUS REPLY IN SUPPORT OF DEBTORS' DIP FINANCING MOTION (DKT. NO. 23) AND IN RESPONSE TO THE OBJECTIONS THERETO**<br><br>Date:    March 13, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>            Courtroom 17, 16th Floor<br>            450 Golden Gate Avenue<br>            San Francisco, CA 94102 |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" or the "**Borrower**"), as debtors and debtors-in-possession (collectively, "**PG&E**" or the "**Debtors**" and together with their non-Debtor subsidiaries, the "**Company**") in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**"), hereby submit this omnibus reply (the "**Reply**") in further support of *the Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507, and Fed. R. Bankr. P. 2002, 4001, 6003, 6004 and 9014 for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* (Dkt. No. 23) (the "**Motion**" or "**DIP Motion**") and in opposition to the objections filed thereto by the Official Committee of Tort Claimants [Dkt. No. 800] (the "**TCC Objection**"), the Public Entities [Dkt. No. 494] (the "**Public Entities Objection**") and the Singleton Law Firm Fire Victim Claimants [Dkt. No. 804] (the "**SLF Fire Victims Objection**").[1] For the reasons discussed below, the Debtors respectfully request that the Court overrule these objections and approve the DIP Facilities[2] on a final basis pursuant to the Proposed Final Order [Dkt. No. 709-1].

## PRELIMINARY STATEMENT

The Debtors seek approval of $5.5 billion in postpetition financing that will enable them to fund their operations, develop a restructuring plan, and emerge from chapter 11. No party disputes the need for this financing. (*See* TCC Obj. at 6 ("It is undisputed that the Debtors need this borrowing.").) Nor does any party challenge the amount of the financing or dispute that the failure to obtain approval would result in grave harm not only to the Debtors but to millions of California residents who depend on the Debtors' continued ability to provide safe and reliable gas and electric

---

[1] The SLF Fire Victims Objection was filed a full two weeks after the relevant objection deadline, with respect to which the SLF Fire Victims did not request an extension. Accordingly, it should be overruled as untimely. The SLF Fire Victims also filed a joinder to the Public Entities Objection. (*See* Dkt. No. 519.)

[2] Capitalized terms not defined herein have the same meaning ascribed in the [Proposed] Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief [Dkt. No. 709-1] (the "**Proposed Final Order**").

service. (*See id.* at 6-7 ("PG&E provides quasi-public utility services to millions of Northern Californians, the disruption of which could be catastrophic and result in the loss of lives during the administration of these bankruptcy cases."); *id.* at 7 ("the CPUC authorized PG&E to incur this debt due to the risk to the public health and safety of Californians"); *id.* at 14 (PG&E "performs critical services to the public" and "ensures that everything from hospitals to businesses to traffic signals have reliable electricity").)

Rather, the few objections that have been filed either challenge specific provisions that are customary in DIP financings or concern parochial issues that are unrelated to the DIP Motion. Many of the concerns expressed in the objections are effectively "position statements" on matters wholly unrelated to the DIP Facilities. While the Debtors are mindful of these concerns, the DIP Motion is not the proper vehicle for addressing them. None of the objections casts doubt on the Debtors' business judgment in determining that the DIP Facilities are the best financing available under the circumstances and that obtaining this financing is in the best interests of their estates. The Court should overrule the objections and approve the DIP Facilities on a final basis pursuant to the Proposed Final Order.

## ARGUMENT

**A. The Court Should Overrule the Handful of Objections to Provisions that are Common in DIP Financings and that the DIP Lenders Have Insisted Upon as a Condition of Providing Essential Financing.**

The Debtors have obtained postpetition financing on extremely favorable terms.[3] The DIP Facilities include no financial covenants or milestone requirements, and the other covenants and requirements in the agreement were negotiated to provide the Debtors with sufficient flexibility to operate. In order to obtain this financing, the Debtors agreed to provisions that are common in DIP financings and that do not unduly constrain the Debtors' ability to operate or successfully restructure. Only a handful of those provisions have been objected to. Those objections are without merit and should be overruled.

---

[3] (*See* Declaration of David Kurtz [Dkt No. 24] ¶ 30.)

*First*, the Court should reject the Tort Claimants Committee's objection to a customary provision providing that a "DIP Termination Event" under the Credit Agreement triggers an automatic lifting of the stay permitting the DIP Lenders to enforce their liens. (TCC Obj. at 14-17; *see also* Proposed Final Order ¶ 13.) This provision is customary in DIP financings. (*See, e.g.*, *In re Rdio, Inc.*, Case No. 15-31430 (DM), Final Order [Dkt. No. 122] ¶ 25 (Bankr. N.D. Cal. Dec. 10, 2015); *In re Sears Holdings Corp., et al.*, Case No. 18-23538 (RDD), Final Order [Dkt. No. 955] ¶ 34 (Bankr. S.D.N.Y. Nov. 30, 2018).) Moreover, contrary to the Tort Claimants Committee's contention, it does not "eliminate the Court's involvement" or its "authority to protect the Debtors' assets in the event of a DIP Termination Event" (TCC Obj. at 14, 15.). Rather, as the Tort Claimants Committee acknowledges (*id.* at 15), the Credit Agreement provides for a seven-day notice period during which any party may argue that a DIP Termination Event has not occurred and seek judicial resolution thereof and an injunction if appropriate. At the request of certain parties and in order to provide broad notice, in addition to the required notice to counsel to the CPUC, to counsel to each official Committee and to the U.S. Trustee, the Debtors agreed to include an atypical provision in the Interim Order and Proposed Final Order that obligates the Debtors to file a Remedies Notice on the Court docket within one business day of receipt of such notice. This will afford all parties in interest in the Chapter 11 Cases an opportunity to contest the occurrence of such DIP Termination Event and to seek judicial or regulatory intervention to implement necessary steps to prevent the DIP Lenders from exercising remedies in a manner that is inconsistent with applicable law or that would disrupt the provision of electricity or gas services to the Debtors' customers or the safety of the public. In addition, the Proposed Final Order provides that CPUC approval *must be obtained*[4] prior to any transfer to the DIP Lenders of utility assets, which provision was included by the Debtors, CPUC and DIP Lenders to

---

[4] The Court should reject the Tort Claimants Committee's false distinction between "seek[ing]" and "receiv[ing]" approval of CPUC in connection with the transfer of utility assets to the DIP Lenders. (*See* TCC Obj. at 16.) There is no distinction here.

4

ensure that there will be no disruption of utility operations in the event of a default. (*See* Proposed Final Order ¶ 35.)[5]

*Second*, the Court should reject arguments that the DIP Lenders should not be provided liens on the proceeds of avoidance actions. (*See* TCC Obj. at 21; Public Entities Obj. at 5-6 ; *see also* Proposed Final Order ¶ 3.) This provision is a customary, market term that is commonly approved in new-money DIP facilities. *See, e.g.*, *California Coastal Communities, Inc.*, Nos. 809-21712 (TA) *et al.*, 2011 WL 4072917 at 4(a)(i) (Bankr. C.D. Cal. Sept. 7, 2011); *S.B. Rest. Co.*, No. 14-13778 (ES), 2014 WL 2898556, at *6 (Bankr. C.D. Cal. June 19, 2014). In response to creditor inquiries, the Debtors pressed the DIP Lenders to modify or exclude avoidance action proceeds from the DIP Collateral, and the DIP Lenders refused. However, the Debtors did successfully negotiate a limitation on the DIP Lenders' remedies with respect to avoidance action proceeds. At the request of the Debtors and the Official Committee of Unsecured Creditors, the DIP Lenders agreed to specify that the waiver of marshaling does not apply to the proceeds of avoidance actions. (Proposed Final Order at 70 ¶ 24 (blackline).) Consequently, the DIP Lenders must exercise remedies against all DIP Collateral other than the proceeds of avoidance actions before exercising their remedies with respect to avoidance action proceeds.

*Third*, the Court should reject the Tort Claimants Committee's objection to the provisions of the Proposed Final Order that prevent the Debtors from using DIP Collateral or proceeds of the DIP Facilities to pursue claims against, or that are adverse in any material respect to the interests of, the DIP Lenders arising under, in connection with or related to the DIP orders, the DIP Facilities or the DIP Loan Documents. (*See* TCC Obj. at 20-21; *see also* Proposed Final Order ¶ 8.). The Tort Claimants Committee mischaracterizes this restriction to apply to restrict the Debtors from "pursuing sale options" or "limitations on credit bidding" (*see* TCC Obj. at 20), which is plainly not the purpose, intent or effect of this provision. Rather, this customary provision, often approved in cases in this

---

[5] This provision of the Proposed Final Order would apply notwithstanding any different requirements under state law or regulation (including those purported to be set forth in the precedents cited by the Tort Claimants Committee in footnote 9 of the TCC Objection). (*See* TCC Obj. at 16 n.9.)

District and others, prevents the Debtors from borrowing under the DIP Facilities and using the proceeds or other cash on hand to pursue claims against the DIP Lenders or their interests as DIP Lenders (*e.g.*, seeking invalidation of the DIP Liens) and does not preclude any use of proceeds or cash to pursue claims, if any, against the DIP Lenders in any other capacity. (*See, e.g.*, *In re Rdio, Inc.*, Final Order ¶ 12; *In re Sears Holdings Corp., et al.*, Final Order ¶ 40.)

*Fourth*, the Proposed Final Order does not give the DIP Lenders "undue control" over the Debtors' reorganization. (*See* TCC Obj. at 17-20.) Although the DIP Lenders have certain rights to insist on an "Acceptable Plan", an "Acceptable Plan" is defined as one that provides for the payment in full of the DIP obligations. (Credit Agreement [Dkt. No. 709-2] at 9.). Given the superpriority administrative status of the DIP Lenders' claims, any confirmable plan *must* pay the DIP Lenders in full by operation of the Bankruptcy Code. This provision, which is customary in DIP facilities, is intended simply to ensure that the Debtors do not seek to contravene the DIP Lenders' rights as superpriority claimholders and that any plan that is confirmed in the Chapter 11 Cases gives, as it must, due effect to the status of such claims. The DIP Lenders are afforded no control over the plan process other than to ensure that their superpriority administrative claims be paid in full. Indeed, these DIP Facilities afford the DIP Lenders *less* control over the Debtors' restructuring than is typical, as they contain no milestones or financial covenants. (*See* TCC Obj. at 18 ("the DIP Credit Agreement does not require 'milestones' or allow for the 'roll-up' of prepetition debt").)

Nor are the DIP Lenders given undue control by virtue of restrictions on the Debtors' ability to incur new indebtedness, which the Tort Claimants Committee incorrectly describes as a "veto right over potential exit financing". (*See* TCC Obj. at 17.) It is no such thing. A limitation on incurrence of additional indebtedness is a customary feature of DIP financing agreements (in fact, of all loan agreements). (*See, e.g.*, *In re Rdio, Inc.*, Final Order, Ex. A [Dkt. No. 122] at 48; *In re Sears Holdings Corp., et al.*, Final Order, Ex. A [Dkt. No. 955-1] at 120.) Such restriction applies only to the extent DIP obligations have not been paid in full, and any exit financing would be used exactly for that purpose—*i.e.*, to repay the DIP Lenders. In fact, the DIP Facilities provide greater flexibility to incur additional indebtedness than is typical—up to $4 billion of so-called incremental facilities that

would be *pari passu* with the DIP loans (subject to the Court's approval (*see* Proposed Final Order ¶ 2(e)).

The Tort Claimants Committee's reliance on a thirty year-old case from New Hampshire is misplaced. (*See* TCC Obj. at 19 (citing *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989).) Unlike here, the debtor in *Tenney* sought approval of financing that would prime significant prepetition secured creditors. *See* 502 B.R. at 562-63. In addition, the lender was given numerous protections not sought here by the DIP Lenders, including the rights to approve nearly all planned operations and a new CEO, receive all proceeds and rents from estate property, and cross-collateralize its prepetition and postpetition debt. *See id.* at 567-70. In contrast, the DIP Lenders here do not exert any control over the Debtors' operations or the Debtors' reorganization, and there is no cross-collateralization.

Indeed, the Tort Claimants Committee's objection regarding *potential* improved treatment of prepetition debt completely misses the mark. The Debtors have represented, and the Tort Claimants Committee concedes, that the DIP Facilities do not "roll-up" any prepetition debt. (*See* Mot. at 22; TCC Obj. at 20.) Moreover, as discussed above, the DIP Lenders do not have any control over the formulation or terms of the Debtors' plan of reorganization, so long as such plan of reorganization pays the DIP obligations in full. The DIP Lenders certainly are not able to exert any leverage over the Debtors in this respect to provide for better treatment of their unrelated, pre-petition general unsecured claims. Including the Tort Claimants Committee's proposed "avoidance of doubt" language is unnecessary and unwarranted.[6]

**B.    The Remaining Objections Concern Issues that are Unrelated to the DIP Financing and Should Be Overruled.**

The remaining objections are unrelated to the DIP financing and should be overruled.

---

[6] The Tort Claimants Committee's further contention that DIP Lenders may control the *timing* of the plan of reorganization is without merit. (TCC Obj. at 6, 7-8.) As the Tort Claimants Committee notes, the DIP Facilities do not have any "milestones". (*Id.* at 18.) The DIP Facilities are not scheduled to mature prior to December 2020, and they provide for a further 12 month extension option upon payment of a fee and satisfaction or waiver of other customary conditions. Moreover, notwithstanding any impending maturity of the DIP Facilities, the Debtors are permitted by the terms of the DIP Facilities to procure replacement financing and repay the DIP Facilities.

Most significantly, the Tort Claimants Committee objects that the DIP financing should be conditioned on using a portion of the proceeds to fund relief for people impacted by the Camp Fire. (*See* TCC Obj. at 5). As the Tort Claimants Committee's counsel knows, well prior to the filing of their objection to the DIP Facilities, the Debtors advised them of their intention to create a housing fund to support those impacted by the 2017 and 2018 wildfires, and the Debtors appreciate that the Tort Claimants Committee supports this important initiative. The Debtors intend to file a motion with the Court in the coming weeks seeking authority to create such a fund. But the approval of the DIP Facilities, which the Tort Claimants Committee acknowledges are necessary to fund the Debtors' ongoing operations (including any such fund), should not be conditioned on the establishment of that fund.

Nor should the financing be conditioned on the Debtors paying certain settlements entered into prepetition. (*See* TCC Obj. at 5; SLF Victims Obj. at 2.) The Debtors filed for Chapter 11 protection to resolve all of their potential liabilities from the wildfires in an orderly, fair and expeditious manner. Seeking the payment of one group of prepetition wildfire claimants ahead of the others is unrelated to the financing at issue in the DIP Motion, which is needed in order to fund the Debtors operations and make necessary investments in infrastructure, including to mitigate future wildfire risk.

The Court also should reject the contention that the Carve-Out should include Court-approved administrative expense claims for substantial contribution to the estates. (*See* TCC Obj. at 21-22; Public Entities Obj. at 6-7; *see also* Proposed Final Order ¶ 10.) These parties identify no precedent whereby a Carve-Out included such claims, and there is no basis in the Bankruptcy Code for elevating these claims to a priority status even higher than the superpriority claim status the Bankruptcy Code affords to DIP loans pursuant to Section 364(c). To the extent that a party makes a substantial contribution to the Chapter 11 Cases, they will be entitled to seek approval of an administrative expense claim pursuant to Section 503 of the Bankruptcy Code for their actual, necessary expenses incurred in doing so. The Carve-Out, on the other hand, is an agreement by the DIP Lenders to subordinate their superpriority administrative claims to certain specified obligations

of the Debtors following the occurrence of an event of default, and is negotiated by DIP Lenders to protect their loans while balancing the need to pay Court, U.S. Trustee and estate professional fees in a default scenario. By seeking to include substantial contribution claims in the Carve-Out, the Tort Claimants Committee, Public Entities and SLF Fire Victims are seeking to elevate the status of such claims beyond that contemplated by the Bankruptcy Code and force the DIP Lenders to be subordinated to an uncapped amount of claims. There is no basis in either the law or practice for this requested special treatment.

The Public Entities and SLF Fire Victims (by joinder) likewise object, in a footnote, that the $100,000 cap for a Chapter 7 trustee is inadequate. (*See* Public Entities Obj. at 6 n.8.) This amount is in excess of caps previously approved in this District. (*See, e.g.*, *Mi Pueblo San Jose, Inc.*, Case No. 13-53893, Final Order [Dkt. No. 665] ¶ 14 (Bankr. N.D. Cal. Mar. 6, 2014).) Further, as discussed at the first day hearing, it is highly unlikely that a Chapter 7 trustee will ever be appointed in these cases. (*See* Jan. 31, 2019 Tr. at 166:16-167:1.) Following the Court's statements at the first day hearing, the Debtors negotiated for, and obtained, a carve-out for the reasonable and documented fees and expenses of a Chapter 11 trustee. However, as with the cap for the Chapter 7 trustee, the DIP Lenders would not agree to increase the cap for a Chapter 11 trustee above $100,000. In any event, in light of the amount of the DIP financing as compared to the overall asset base of these Debtors' estates, this issue is highly unlikely to have any real world impact on creditors in the Chapter 11 Cases. It is certainly not a sufficient basis for the Court to decline to approve the DIP financing, and this "footnote objection" should be overruled.

Finally, the Court should reject the SLF Fire Victims objection that, as a condition of obtaining DIP financing, the Court should prohibit the Debtors from conducting lobbying activity during the Chapter 11 cases. (*See* SLF Victims Obj. at 3-5.) This issue has nothing to do with the DIP Motion. Moreover, as the Tort Claimants Committee rightly observes, it is crucial that PG&E continue to engage in a robust and constructive dialogue with federal, state and local government officials and entities in order to reach a successful reorganization and a fair resolution of its wildfire liabilities, while ensuring that it can invest in safety improvements and continue to provide safe and

affordable electricity and gas service during the Chapter 11 proceedings and upon emergence. (*See* TCC Obj. at 7 ("[m]any constituents will be involved in the negotiation of a successful plan in these cases, including the CPUC, the Federal Energy Regulatory Commission ('FERC'), [and] the State of California"); *id.* at 18-19 ("The plan negotiations will be full of interested and important parties, including the state of California, the U.S. Trustee's office, CPUC, FERC, and the Debtors and the unsecured creditors, whose financial interests are actually at stake.").) PG&E believes it is important to engage in substantive discussions with those officials whose decisions impact its business, and its decision to engage in these activities is a matter of business judgment. The Court should overrule this objection.

## CONCLUSION

For the foregoing reasons and the reasons stated in the Debtors' Motion [Dkt. No. 23], the Debtors respectfully request that the Court overrule all objections to the DIP Motion and approve the DIP Facilities on a final basis pursuant to the Proposed Final Order [Dkt. No. 709-1.].

Dated: March 11, 2019

CRAVATH, SWAINE & MOORE LLP
WEIL, GOTSHAL & MANGES LLP

KELLER & BENVENUTTI LLP

By: /s/ Jane Kim
      Jane Kim

*Proposed Attorneys for Debtors and Debtors in Possession*