STROOCK & STROOCK & LAVAN LLP
Frank A. Merola (#136934)
(fmerola@stroock.com)
2029 Century Park East
Los Angeles, CA 90067-3086
Tel: (310) 556-5800
Fax: (310) 556-5959

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen (*pro hac vice*)
(khansen@stroock.com)
Erez E. Gilad (*pro hac vice*)
egilad@stroock.com)
Matthew G. Garofalo (*pro hac vice*)
(mgarofalo@stroock.com)
180 Maiden Lane
New York, NY 10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

*Counsel to JPMorgan Chase Bank, N.A.,
as DIP Administrative Agent*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>– and –<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OMNIBUS REPLY OF THE DIP ADMINISTRATIVE AGENT TO THE OBJECTIONS OF (I) THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, (II) THE PUBLIC ENTITIES, AND (III) THE SLF FIRE VICTIM CLAIMANTS TO DEBTORS' MOTION SEEKING POSTPETITION FINANCING**<br><br>Date: March 13, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................................1

RELEVANT BACKGROUND .........................................................................................................4

REPLY .............................................................................................................................................4

I. The Provisions Governing the Exercise of Remedies Are Appropriate ...........................4

II. DIP Liens on Proceeds of Avoidance Actions Are Appropriate ......................................6

III. Nothing in the DIP Financing Confers Undue Control to the DIP Lenders or the Prepetition Lenders .........................................................................................................7

IV. Limitation on Use of DIP Proceeds is Standard and Appropriate ...................................9

V. The Terms of the Carve-Out Are Appropriate ...............................................................10

V. Certain Additional Arguments Made by the Objections are Not Legally Cognizable Objections to the DIP Financing ....................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Blue Earth, Inc.*,
  No. 16-30296 (DM) (Bankr. N.D. Cal. Apr. 29, 2016) ................................................................6

*In re California Coastal Communities*,
  No. 9-21712 (TA) (Bankr. C.D. Cal. Feb. 10, 2011) ...................................................................7

*In re iHeartMedia, Inc.*,
  No. 18-31274 (MI) (Bankr. S.D. Tex. June 7, 2018) ................................................................6, 7

*In re NewZoom, Inc.*,
  No. 15-31141 (HB) (Bankr. N.D. Cal. Oct. 16, 2015) ................................................................6

*In re Panda Temple Power, LLC*,
  No. 17-10839 (Bankr. D. Del. May 12, 2017) ............................................................................8

*In re Rdio, Inc.*,
  No. 15-31430 (DM) (Bankr. N.D. Cal. Dec. 11, 2015) ...............................................................6

*In re Sears Holdings Corp.*,
  No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2018) ..........................................................6, 7

*In re Tenney Village Co., Inc.*,
  104 B.R. 562 (Bankr. S.D.N.Y. 1989) .......................................................................................10

*In re Toys "R" Us, Inc.*,
  No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) ............................................................6, 8

**STATUTES**

11 U.S.C. § 1129(a)(9) ........................................................................................................................8

11 U.S.C. § 364(c)(2) .........................................................................................................................7

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

JPMorgan Chase Bank, N.A. ("**JPM**"), in its capacity as administrative agent (the "**DIP Administrative Agent**") under the DIP Facilities,[1] by and through its undersigned counsel, hereby submits this omnibus reply (this "**Reply**") to (i) the objection [Docket No. 800] (the "**Tort Claimants Committee Objection**") filed by the Official Committee of Tort Claimants (the "**Tort Claimants Committee**"); (ii) the objection [Docket No. 494] (the "**Public Entities Objection**") filed by certain California public entities (collectively, the "**Public Entities**"), and (iii) the objection [Docket No. 804] (the "**SLF Objection**" and, together with the Tort Claimants Committee Objection and the Public Entities Objection, the "**Objections**") filed by the Singleton Law Firm Fire Victim Claimants (the "**SLF Fire Victim Claimants**" and, together with the Tort Claimants Committee and the Public Entities, the "**Objectors**"),[2] to the motion [Docket No. 23] (the "**DIP Motion**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") seeking entry of a final order authorizing the Debtors to obtain post-petition financing (the "**DIP Financing**"), and in support hereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1. The DIP Administrative Agent and the DIP Lenders recognize the tragedy, loss and suffering of those impacted by the California wildfires. Due to the prospect of billions of dollars in wildfire-related liabilities, a massive $24 billion in funded debt obligations, credit downgrades and a dwindling cash balance, the Debtors determined to file these Chapter 11 Cases in order to, among other things, stabilize their operations and facilitate a fair and ratable value distribution process for creditors and equity holders.[3] As indicated in hearings before this Court, the

---

[1] Each capitalized term that is not defined herein shall have the meaning set forth in the DIP Motion or the proposed Final DIP Order (each as defined herein).

[2] Certain other parties-in-interest also filed objections to approval of the DIP Motion on an interim basis. Upon information and belief, those objections either have been resolved or are otherwise addressed in substance herein, and all rights of the DIP Administrative Agent to be heard at the hearing to consider the DIP Motion with respect to such objections is hereby expressly preserved.

[3] *See Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263], at 3–7.

Debtors anticipate that administering these Chapter 11 Cases may take two years, if not more, while the Debtors attempt to navigate the complex legal, financial, regulatory, political and human dimensions of these cases.

2. To that end, as many of the Objectors acknowledge, the Debtors require substantial post-petition financing. As detailed by the Debtors in pleadings and proffered testimony before this Court, after a competitive and robust process, and following extensive negotiations with the Debtors and their professional advisors, JPM agreed to provide one of the largest (if not the largest) fully-underwritten new-money DIP financings in U.S. history. JPM agreed to do so, and to provide the Debtors with the critical financing that the Objectors agree is necessary despite the uncertainties facing these Chapter 11 Debtors, including the as-of-yet undetermined scope of their prepetition wildfire liabilities, the prospect of post-petition wildfire liabilities, an uncertain regulatory and political environment, the prospect of significant capital expenditures and other investments in order to implement numerous public health and safety initiatives, and the need to ensure the continuation of various public programs.

3. Notwithstanding these uncertainties – indeed, in order to give the Debtors the necessary leeway to address them – JPM successfully syndicated $5.5 billion in post-petition financing upon terms and conditions that are very favorable to the Debtors, both from a pricing and covenant perspective. Significantly, the DIP Financing (i) does not contain *any* budget testing covenants, *any* financial maintenance tests or *any* case milestones, which is extraordinary for any post-petition financing, (ii) does not provide for a "no roll-up" of any pre-petition debt, (iii) provides the Debtors with flexibility regarding asset sales and reinvestments of the proceeds therefrom, (iv) provides for a non-committed $4 billion incremental facility, on a *pari passu* basis (subject to further approval by the Court) and (v) exempts the DIP Liens from numerous CPUC-mandated public

purpose programs in effect as of the Petition Date. These and other DIP provisions reflect negotiated concessions that occurred before and after JPM was selected as the lead-left arranger.

4. The DIP Financing does, however, contain a provision requiring that the Debtors file an "Acceptable Plan." All that provision does is codify the statutory requirement under the Bankruptcy Code that the super-priority administrative expense claims afforded to the DIP Lenders be paid in full in cash on the plan's effective date. There is nothing about paying a superpriority administrative expense claim in cash that confers any control over these cases to the DIP Lenders. Moreover, the DIP Facilities were syndicated to the open market, and participation in the DIP Facilities was not in any way limited to any financial institution by virtue of any claims it may or may not have had against the Debtors. In the end, the syndicate of DIP Lenders currently involves dozens of banks, financial institutions and investment firms. The notion that the DIP Financing somehow inordinately benefits certain prepetition lenders is simply meritless.

5. Ultimately, the DIP Financing, including the various points described above, is part of a carefully negotiated and integrated package, that includes, among other things, the nature, scope and relative priority of the liens securing the DIP Facilities. The Objectors cannot now seek to retain the various benefits and concessions to the Debtors' estates but renegotiate other aspects of the DIP Financing.

6. Indeed, those benefits appear to have been recognized (if not appreciated) by the Official Committee of Unsecured Creditors and the many ad hoc committees of institutional debt and equity holders, none of whom have raised objections to the DIP Financing.

7. As set forth in more detail below, the terms of the DIP Financing challenged by the Objectors are standard and reasonable under the circumstances and should be approved in any event.

## RELEVANT BACKGROUND

8. On January 29, 2019, each of the Debtors filed voluntary petitions for relief before this Court thereby commencing these Chapter 11 cases (the "**Chapter 11 Cases**"). On that same date, the Debtors filed the DIP Motion.

9. On January 31, 2019, this Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (I) Authorizing Debtors to Obtain Senior Secured Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [Docket No. 217] (the "**Interim Order**").

10. On February 28, 2019, the Debtors filed a proposed form of final order with respect to the DIP Motion [Docket No. 709-1] (the "**Final Order**"), including a clean as well as a redlined version of the Final Order to reflect all changes made to the Interim Order. Generally speaking, those changes reflect revisions necessary to, among other things, (1) conform the Interim Order to a final form of order and ratify actions taken in accordance with the Interim Order, and (2) address and resolve comments and informal objections raised by various parties in interest to the DIP Motion.

11. Rather than address each Objection *ad seriatim*, this Reply will categorically respond in omnibus fashion to the substance of the Objections.

## REPLY

**I.     The Provisions Governing the Exercise of Remedies Are Appropriate**

12. The Tort Claimants Committee objects to what are otherwise standard lien enforcement rights under any post-petition financing.[4] The proposed form of Final Order provides for a seven (7) day Remedies Notice Period prior to the enforcement of any remedies with respect to

---

[4]     *See* Tort Claimants Committee Objection at 6–7, 15–17.

4

DIP Collateral upon the occurrence of a DIP Termination Event, which is more generous than the customary three (3) or five (5) business days' notice typically required under most post-petition financing orders.[5] The DIP Secured Parties also have agreed to seek CPUC approval prior to the enforcement of any remedies with respect to any utility assets.[6] The Tort Claimants Committee, however, seeks to impose an additional hurdle upon the DIP Administrative Agent by shifting the burden of stay relief to the DIP Lenders, notwithstanding the occurrence of a DIP Termination Event.[7]

13. As a threshold matter, the Final Order expressly preserves the ability of the Debtors and other parties in interest to dispute the occurrence of the DIP Termination Event, so the Objectors will be able to be heard on the issue to the extent it ever arises.[8] Importantly, however, the lien enforcement provisions contained in the Final Order strike at the very heart of the various pricing and covenant-related concessions made by the DIP Lenders in their negotiations with the Debtors: the DIP Loans are secured and the DIP Lenders have the right to resort to DIP Collateral upon the occurrence of a DIP Termination Event if the Court does not prevent such access.[9] Indeed, such a provision is common-place in orders approving other post-petition financings of significant size. *See, e.g.*, Final Order ¶ 22, *In re Blue Earth, Inc.*, No. 16-30296 (DM) (Bankr. N.D. Cal. Apr. 29, 2016) (ECF No. 116); Final Order ¶ 25, *In re Rdio, Inc.*, No. 15-31430 (DM) (Bankr. N.D. Cal. Dec. 11,

---

[5] Final Order ¶ 14(a).

[6] *Id.* ¶ 35.

[7] *See* Tort Claimants Committee Objection at 15–16.

[8] Final Order ¶ 14(a)–(b).

[9] The Tort Claimants Committee also suggests that the Debtors failed their burden of demonstrating that unsecured credit is unavailable. Tort Claimants Committee Objection at 21. This assertion appears to ignore the Debtors' existing $24 billion in funded debt obligations, the billions of dollars in to-be-determined uncapped wildfire liabilities, and the likely incurrence of post-petition wildfire liabilities and offers no practical explanation as to what lender would agree to lend $5.5 billion of post-petition financing under the circumstances on anything less than a senior secured basis. JPM would not have considered offering the DIP Financing without the benefit of senior liens on all of the Debtors' assets.

2015) (ECF No. 122); Final Order ¶ 13, *In re NewZoom, Inc.*, No. 15-31141 (HB) (Bankr. N.D. Cal. Oct. 16, 2015) (ECF No. 153); Final Order ¶ 34, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2018) (ECF No. 952); Final Order ¶ 11, *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. June 7, 2018) (ECF No. 918); Final Order ¶ 13, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (ECF No. 711).

14. Moreover, given the quasi-public nature of the services provided by the Debtors, the DIP Lenders were sensitive to the regulatory regime under which the Debtors operate, and expressly negotiated these provisions with the CPUC and its counsel, the main regulator of the Debtors. However, shifting the lift-stay burden to the DIP Lenders would unfairly expose the DIP Lenders, who are advancing new credit on very borrower-favorable terms, to unforeseeable credit risk. The lien enforcement provisions contained in the Final Order, as presented, are fair, reasonable and are more than appropriate under the circumstances.

## II. DIP Liens on Proceeds of Avoidance Actions Are Appropriate

15. As a corollary to the foregoing principle regarding collateral security, liens on the proceeds of avoidance actions are clearly authorized under the Bankruptcy Code Specifically, section 364(c)(2) of the Bankruptcy Code expressly contemplates that a chapter 11 debtor may obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien" (11 U.S.C. § 364(c)(2)), which, as courts in the Ninth Circuit and other jurisdictions have concluded, may include proceeds of avoidance actions. *See, e.g.*, Final Order ¶ 4, *In re California Coastal Communities*, No. 9-21712 (TA) (Bankr. C.D. Cal. Feb. 10, 2011) (ECF No. 559); Final Order ¶ 13, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2018) (ECF No. 952); Final Order ¶ 6, *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. June 7, 2018) (ECF No. 918); Final Order ¶ 11, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24,

2017) (ECF No. 711); Final Order 10, *In re Panda Temple Power, LLC*, No. 17-10839 (Bankr. D. Del. May 12, 2017) (ECF No. 116).

16. In exchange for providing one of the largest DIP financings in history, the DIP Lenders have required that the DIP Liens be secured by all of the Debtors' assets. Where, as here, the DIP Lenders are providing fresh capital to the Debtors, a lien on all unencumbered assets (including the proceeds of avoidance actions) is appropriate. However, in an attempt to address unsecured creditor concerns, the DIP Lenders agreed to exempt avoidance action proceeds from the marshalling waiver in the Final Order.[10] In effect, if the DIP Lenders are able to be satisfied from proceeds of other collateral, then the issue raised by the Objectors is moot; however, in the unlikely event that such collateral is insufficient to repay the DIP Obligations in full in cash, the DIP Lenders should be entitled to seek recovery from other collateral sources before pre- and post-petition lien and claim subordinated creditors are entitled to receive a distribution.

### III. Nothing in the DIP Financing Confers Undue Control to the DIP Lenders or the Prepetition Lenders

17. The Tort Claimants Committee asserts that numerous provisions in the DIP Credit Agreement provide the DIP Lenders and certain pre-petition lenders with undue control over the administration of the Chapter 11 Cases.[11] This simply is not the case. As set forth above, the DIP Credit Agreement is borrower-friendly, both in terms of pricing and covenant protection, and provides ample flexibility for the Debtors to operate their businesses.

18. As noted above, the DIP Credit Agreement lacks any budget testing, financial maintenance tests, case milestones, roll-up, or other similar provisions that would otherwise confer administrative case controls or unduly burden the estate. The Tort Claimants Committee cites the

---

[10] Final Order ¶ 24.
[11] *See* Tort Claimants Committee Objection at 17–19.

requirement that the Debtors may only file an "Acceptable Plan" as case-administrative.[12] However, it is a fundamental tenet of bankruptcy law that the DIP Obligations are required under section 1129(a)(9) of the Bankruptcy Code to be paid in full in cash under any confirmable chapter 11 plan.[13] The "Acceptable Plan" requirement does nothing more than codify this fundamental requirement, and simply prevents the Debtors from otherwise investing time and estate resources to propose a patently unconfirmable plan. Including such a requirement in the DIP Credit Agreement is a very low hurdle and is therefore reasonable and appropriate.

19. The Tort Claimants Committee also cites various standard negative covenants, negotiated with the Debtors at arm's length, as indicative of case controls.[14] Negative covenants are a fundamental aspect of corporate finance, and the scope of the covenants have been negotiated and accepted by the Debtors, who are represented by experienced and nationally-recognized legal and financial advisors.[15] The Court should respectfully defer to the Debtors' business judgment as to the covenants in the DIP Credit Agreement.

20. The Tort Claimants Committee also points out the overlap between the DIP Lenders and certain of the Debtors' prepetition unsecured lenders. While the Lead Arrangers under the DIP Facilities are also prepetition lenders to the Debtors, as noted above, the DIP Facilities are new money facilities provided by a syndicate of dozens financial institutions. As also noted above, the opportunity to participate in the DIP Facilities was presented to the open market, and it was not restricted in any way to financial institutions with pre-petition claims against the Debtors.

---

[12] *Id.* at 18.

[13] 11 U.S.C. § 1129(a)(9).

[14] *See* Tort Claimants Committee Objection at 18–19.

[15] Contrary to the assertions in the Tort Claimant Committee Objection, these covenants do not restrict the Debtors' ability to incur exit financing under a chapter 11 plan.

8

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

Contrary to any suggestion made by the Objectors, there is no "roll up" component or other requirement to repay any unsecured prepetition debt held by any of the DIP Lenders, nor is there any provision in the loan documents or orders that would facilitate a "roll up" in the future.

21. The *Tenney Village* decision relied on by the Tort Claimants Committee is also distinguishable and has no persuasive value in light of the facts here.[16] In *Tenney Village*, the debtor sought approval of post-petition financing that would prime prepetition secured creditors (*Tenney Village*, 104 B.R. at 562–63), and the post-petition lender was given a number of protections not sought by the DIP Lenders here, including the right to approve the debtor's planned operations and a new CEO, the right to receive all proceeds and rents from estate property and cross-collateralization of its pre- and post-petition debt (*id.* at 567–70). Here, by contrast, the DIP Lenders do not exert any control over the Debtors' operations or reorganization process, and the DIP Financing contains no cross-collateralization provisions.

### IV. Limitation on Use of DIP Proceeds is Standard and Appropriate

22. Next, the Tort Claimants Committee objects to the otherwise standard prohibition against the use of proceeds of the DIP Facilities to challenge the liens and claims of the DIP Lenders in their capacity as DIP Lenders. It strains credulity to suggest that any third party providing a new money loan would, in turn, agree that such proceeds could be used to challenge the liens or claims of the lender. Such a provision is standard in nearly every DIP financing order. Any consternation about such provisions usually involves a situation where a pre-petition secured lender provides post-petition financing and seeks to insulate their *pre-petition* liens by prohibiting the use

---

[16] Tort Claimants Committee Objection at 18 (citing *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. S.D.N.Y. 1989)).

9

of the loan or cash collateral to investigate those *pre-petition* liens. None of that is relevant here. There are no pre-petition secured lenders or pre-petition liens being insulated from creditor review.

## V. The Terms of the Carve-Out Are Appropriate

23. The Tort Claimants Committee and the Public Entities have each asserted, without basis, that "substantial contribution" claims under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code should be included in the Carve-Out.[17] The DIP Lenders have agreed to subordinate the DIP Liens and the DIP Superpriority Claims to a Carve-Out that consists of (a) fees for the Clerk of the Court, (b) up to $100,000 in fees for a chapter 7 trustee, (c) allowed fees incurred by professionals retained by the Debtors and statutory committees prior to an Event of Default, without being subject to any budget or cap, and (d) allowed fees incurred by Debtor- and committee-retained professionals following the occurrence of an Event of Default, subject to a cap of $25 million in the aggregate.[18] In addition, based on feedback from this Court, the DIP Lenders have agreed to include in the Carve Out up to an additional $100,000 in fees for a chapter 11 trustee. The DIP Lenders submit that these amounts are more than appropriate under the circumstances.

24. Notwithstanding the existence of a Carve Out that could amount to tens, if not hundreds, of millions of dollars, certain of the Objectors allege that the Carve Out must also include amounts for allowed substantial contribution claims pursuant to section 503(b) of the Bankruptcy Code. The Objectors offer no legal principle for compelling such a result, and offer no precedent for such a request, particularly in a post-petition financing of comparable size or nature. In any event,

---

[17] Tort Claimants Committee Objection at 21–22; Public Entities Objection at 3, 6–7.

[18] Final Order ¶ 10(a). The Public Entities assert in a footnote, without basis or argument, that the $100,000 for a chapter 7 trustee is inadequate. The conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy, which would divest management from its control of the Debtors, constitutes an Event of Default under the DIP Credit Agreement. DIP Credit Agreement § 8(i)(i). As such, a $100,000 cap should be more than sufficient for the chapter 7 trustee to settle its affairs during the Remedies Notice Period. In any event, a higher carve-out for a chapter 7 trustee could very well create perverse incentives that would invite undue litigation in these cases, which would be counter-productive at this time.

the need for such an additional Carve-Out amount is not appropriate where the interests of unsecured creditors are already protected by the work of two official committees[19] and the CPUC, which is finely attuned to these cases, and the DIP Lenders are unwilling to subordinate their liens and claims any further. Ultimately, there is nothing in the Final Order that prevents any creditor from asserting and proving any substantial contribution claims it may have at the appropriate time or from having those claims paid by the Debtors.

## V. Certain Additional Arguments Made by the Objections are Not Legally Cognizable Objections to the DIP Financing

25. In addition to the arguments referenced above, certain of the Objectors assert that approval of the DIP Facility should be conditioned upon (a) certain prepetition settlement amounts being paid (and a constructive trust being imposed on insurance settlement proceeds to pay such settlement amounts),[20] (b) other immediate funding being made available to certain wildfire victims,[21] and (c) the Utility being enjoined from engaging in lobbying efforts during the pendency of these cases.[22] The DIP Administrative Agent respectfully submits that, insofar as the DIP Financing does not require any budget testing, such arguments do not represent legally cognizable objections to this Court's consideration of the DIP Financing and/or are procedurally improper.

---

[19] It bears noting that the Public Entities group is concurrently seeking the appointment of an official committee of public entities, and that its effort to seek a substantial contribution Carve-Out amount appears motivated by an attempt to have the estate backstop its legal fees.

[20] *See* Tort Claimants Committee Objection at 5; SLF Objection at 2.

[21] *See* Tort Claimants Committee Objection at 5.

[22] *See* SLF Objection at 3–5.

11

**WHEREFORE,** the DIP Administrative Agent respectfully requests that the Court overrule the Objections, enter the Final Order and grant such other relief consistent with foregoing.

Dated: March 11, 2019						**STROOCK & STROOCK & LAVAN LLP**

/s/ Frank A. Merola
Frank A. Merola

*Counsel to JPMorgan Chase Bank N.A.,*
*as DIP Administrative Agent*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

12