figure based on the information provided by PG&E and sets reasonable rates that may be charged to PG&E's customers.

**B. The Individual Defendants Are Responsible for Ensuring PG&E Is Complying with California and Federal Regulations**

51. Public Utilities Code § 451 mandates that "[e]very public utility shall furnish and maintain such adequate, efficient, just and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort and convenience of its patrons, employees[,] and the public."

52. These regulations were known to the Individual Defendants. As the top officers and directors of PG&E, they had the responsibility of ensuring that these regulations were met and that safety was made a top priority at PG&E, in order to protect human lives and property, and to ensure that there were no serious events that would significantly impact and harm PG&E. The Individual Defendants failed in their obligations to ensure that PG&E complied with federal and California state regulations.

53. PG&E's own website identifies a program called the "Enterprise Risk Management (ERM)" program which purportedly takes a holistic approach to managing risk. This ERM program is led by PG&E's Chief Risk and Audit Officer. As the website states:

> PG&E's Enterprise Risk Management (ERM) program . . . takes a holistic approach to managing these risks. For potentially catastrophic risks, cross-functional teams, guided by subject matter experts and experienced managers, follow a systematic method to identify the risks, evaluate the likelihood and severity of consequences as well as develop mitigation activities and controls.
>
> Oversight by senior officers helps ensure risk management activities are consistent with the company's overall corporate strategy. **Regular communication to the PG&E Corporation and Utility Boards of Directors enhances accountability and reinforces the importance of risk management at all levels of the company.**

PG&E CORPORATION, RISK MANAGEMENT AT PG&E,

- 15 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088   Doc# 894-3   Filed: 03/14/19   Entered: 03/14/19 18:50:30   Page 1 of 10

http://www.pgecorp.com/corp_responsibility/reports/2010/bu05_risk.jsp (last visited Dec. 19, 2018, at 5:51 p.m. PST) (emphasis added).

54. This indicates that the Individual Defendants knew and understood that it was their responsibility to manage risk and ensure that safety was a priority. Instead, the Individual Defendants put profits before safety, which has resulted in the significant harm to PG&E that is the subject of this lawsuit. The PG&E website goes on to state that PG&E's senior leadership, including the Individual Defendants constantly identify and evaluate the top risks facing the company in two to three-year cycles. In other words, the chronic underfunding and understaffing of PG&E's pipeline network was well known to the Individual Defendants, who would have been aware of these concerns from these periodic ERM evaluations.

55. PG&E's 2018 corporate responsibility report states that PG&E takes an integrated approach to risk management. PG&E, TOGETHER, BUILDING A BETTER CALIFORNIA—CORPORATE RESPONSIBILITY AND SUSTAINABILITY REPORT (2018) at 30–31, *available at* http://www.pgecorp.com/corp_responsibility/reports/2018/assets/PGE_CRSR_2018.pdf (pages 1–36 are attached hereto as **Exhibit 3**). This is defined to include catastrophic risks, as well as risks associated with operations and regulatory compliance. *Id.* at 34 (sidebar). **PG&E's corporate responsibility report further reassures shareholders: "Nothing is more important to PG&E than the safety of our customers, employees, and the public"** *Id.* at 33. **This will not likely convince the 88 families whose loved ones perished in the Camp Fire conflagration.** Nor does it reflect the reality of PG&E's sorry history of safety failures.

C. **PG&E Has a Long History of Safety and Maintenance Violations**

56. PG&E has an infamous history of catastrophic injury to California and its residents. From dumping toxic chemicals into the ground to setting forest fires to allowing facilities to explode, PG&E has been a woefully inadequate steward of its public responsibilities. Along the way, PG&E has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations. Despite these recurring punishments, PG&E's leadership refuses to modify its behavior, and has continued to conduct its business with a conscious disregard for the safety of the public and the well-being of the company. To understand the culture of indifference and greed that

Case: 19-30088    Doc# 894-3    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 2 of 10

PG&E's leadership has created, including Defendants, it is helpful to revisit some of the most egregious breaches of PG&E's leadership's duties.

### 1. Hinkley Groundwater Contamination (1952–1956)

57. In 1952, PG&E began dumping wastewater contaminated with chromium-6, a known carcinogen, into unlined pools in Hinkley, California. That carcinogen crept into the small town's water supply, poisoning many. Local residents experienced several symptoms associated with chromium-6 contamination, including respiratory problems and prostate, cervical, breast, and stomach cancers. After first denying any wrongdoing and even attempting to cover its tracks by buying victims properties away from them, PG&E settled with 648 victims for $333M.

### 2. Trauner Fire aka Sierra Blaze (1994)

58. In 1994, PG&E's failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California. This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a schoolhouse that was built in 1868.

59. Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that PG&E was supposed to keep trimmed. Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire. Approximately 200 of these violations involved contact between vegetation and one of PG&E's power lines. As a result, on or around June 19, 1997, PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

60. Subsequent to the trial, a 1998 CPUC report revealed that PG&E diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994. During that same time, PG&E under spent its authorized budgets for maintaining its systems by $495 million and instead, used this money to boost corporate profits. Despite this public outing, PG&E continued its corporate culture of putting profits before safety.

///

///

### 3. Mission District Substation Fire (2003)

61. In December 2003, a fire broke out at PG&E's Mission District Substation in San Francisco. Despite signs of trouble appearing at control centers, the fire burned for nearly two hours before PG&E operators showed up at the Substation, finding it full of smoke, and finally called the Fire Department. The source of the fire was not located until five hours after it began. As a result, nearly one-third of San Francisco's residents and business owners lost power, with some waiting over 24 hours for their power to be restored.

62. The CPUC report of the investigation, which was released in 2004, illustrated PG&E's careless approach to safety and apparent inability to learn from its past mistakes. An excerpt from the report describes the following:

> Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's Consumer Protection and Safety Division] discovered that another fire had occurred at Mission Substation in 1996. CPSD's investigation team conducted a thorough analysis of both fires and found strikingly similar contributing factors and root causes. CPSD's team further determined that PG&E had not implemented the recommendations resulting from its own investigation of the 1996 fire. . . . CPSD finds it quite troubling that PG&E did not implement its own recommendations from its own investigation of the 1996 fire.

STATE OF CALIFORNIA PUBLIC UTILITIES COMMISSION, INVESTIGATION REPORT ON PG&E SUBSTATION FIRE AND OUTAGE (2003), *available at* http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF. The findings related to the Mission Substation Fire should have been a wake-up call to PG&E to revamp its operating procedures to prevent future disasters. Instead, PG&E's focus remained on corporate profits, while safety was relegated to the backburner.

### 4. Rancho Cordova Explosion (2008)

63. In December 2008, a gas leak from a PG&E pipe caused an explosion in Rancho Cordova, California. This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

64. A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by PG&E's incorrect repairs in 2006, at which time PG&E installed a piece of pipe to patch up an earlier leak. The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that PG&E failed to timely send properly trained personnel to check out the leak, even though PG&E had been told several months earlier that its emergency plans fell below required standards. Specifically, the report noted the following:

> Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public.

California Public Utilities Commission, Presiding Officer's Decision Regarding Joint Motion to Approve the Stipulation of Pacific Gas and Electric Company and the Consumer Protection and Safety Division Concerning Rancho Cordova and Related Stipulation, http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm.

65. In November 2010, the CPUC filed administrative charges against PG&E in connection with the Rancho Cordova explosion, alleging that PG&E was at fault for the blast and that PG&E should have discovered the improper repair job that caused the explosion, but failed to timely do so. As a result, the CPUC required PG&E to pay a $38 million fine.

### 5. San Bruno Explosion (2010)

66. On September 9, 2010, PG&E's continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on PG&E's poor management of its pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) PG&E's inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) PG&E's inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

67. As a result, PG&E was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC slapped PG&E with a $1.6 billion fine for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted PG&E of six felony charges and ordered it to pay $3 million in fines for causing the explosion. (*U.S. v. Pacific Gas & Electric Company*, CR-14-175-THE, Indictment, attached as **Exhibit 1** and *available at* https://oag.ca.gov/system/files/attachments/press_releases/PGE%20Indictment_0.pdf.)

68. Also, due to PG&E's corporate culture which repeatedly placed profits over safety, the CPUC launched an investigation into the manner by which PG&E officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President harped on PG&E's ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into PG&E's actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, continued safety lapses at PG&E continue to occur.

President Michael Picker, California Public Utilities Commission, Further Comments and Questions After 4-9 Action on San Bruno Proceedings, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCulture andEnforcementTheory.pdf.

### 6. Cupertino Explosion (2011)

69. After the San Bruno explosion, in September 2011, PG&E caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

70. Prior to the explosion, the manufacturer of Aldyl-A and the NTSB had both issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least 2002. Despite these warnings and PG&E's knowledge of this risk, PG&E did nothing to prevent the explosion. Although some utilities around the United States have been replacing

- 20 -
SHAREHOLDER DERIVATIVE COMPLAINT

Aldyl-A pipes, PG&E did not have a replacement program to phase them out and adequately protect the public.

### 7. Carmel Explosion (2014)

71. In March 2014, a home in Carmel, California was destroyed due to a gas explosion caused by PG&E. Prior to the explosion, PG&E was attempting to replace a gas distribution line, but PG&E's records did not show that the steel pipe had a plastic insert. When crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced, allowing gas to leak through the pipe and into the residence.

72. The CPUC once again required PG&E to pay a massive fine because of their wrongdoing. In August 2016, the CPUC imposed a $25.6 million fine on PG&E. With a $10.85 million citation previously paid by PG&E in 2015 for the explosion, PG&E was require to pay a total of over $36 million in penalties for its shoddy recordkeeping and disregard of public safety.

### 8. Butte Fire (2015)

73. Tragedy struck yet again in September 2015, when PG&E's inadequate and ineffective vegetation management programs resulted in the "Butte Fire" in the Sierra foothills. The Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed 921 homes and/or structures, and charred over 70,000 acres.

74. Similar to the other disasters caused by PG&E's wrongdoing, the Butte Fire could have been prevented by PG&E. The Butte Fire was ignited by a gray pine tree that grew and came into contact with one of PG&E's power lines. PG&E knew that gray pines posed the highest risk of catastrophic wildfires but failed to identify and/or remove the dangerous tree pursuant to its vegetation management practices. Instead, PG&E removed the two trees surrounding the gray pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact with PG&E's power line.

75. PG&E made several decisions leading up to the Butte Fire that illustrate its conscious disregard of public safety. First, PG&E's Risk & Compliance Management Committee chose to not confirm their assumption that properly qualified and trained inspectors were being used by its contractors to identify hazard trees. Similarly, PG&E chose not to verify that its quality assurance audits were properly conducted. Moreover, PG&E Vegetation Management managers directed its

contractor to hire inspectors that they knew did not meet the minimum qualifications required by PG&E's own specifications. Furthermore, PG&E managing agents chose to not train inspectors on PG&E's hazardous tree rating system ("HTRS"), verify that its contractor trained inspectors on the HTRS, or require inspectors to use PG&E's HTRS. Finally, PG&E conducts annual quality assurance audits that identify a select number of hazardous trees from a small sample, but chose to not look for additional dangerous trees despite knowing that its statistical sample warned of the likelihood that thousands more hazardous trees existed in the larger population.

76. Subsequent to the Butte Fire, in April 2017, the CPUC fined PG&E a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. CalFire also sent PG&E a bill for $90 million to cover state firefighting costs. Despite these consequences, PG&E did not change, revise, or improve any of its vegetation management practices after the Butte Fire, paving the way for another massive wildfire.

9. North Bay Fires (2017)

77. The North Bay Fires comprised more than a dozen separate fires that ravaged Northern California in October 2017. The fires spread rapidly and caused extensive damage, including populated neighborhoods and sprawling vineyards. The North Bay Fires claimed the lives of at least 43 individuals, displaced a massive number of people, burned over 200,000 acres, and destroyed thousands of homes and structures.



North Bay Fire Devastation, Santa Rosa, CA

Cal Fire is still in the process of determining whether the most destructive fire – the Tubbs Fire – was started as a result of PG&E's equipment. Cal Fire has already determined that PG&E was responsible for eight of the fires and referred the cases to district attorneys in several counties for possible criminal prosecution. The North Bay Fires just last year were the most destructive fires in California's history up until the Camp Fire.

78. Unfortunately, the lessons of 2017 went unlearnt by Defendants. While their 2018 corporate responsibility report specifically extends "sympathies" to the victims of the 2017 Northern California wildfires and commits to "bolstering" precautionary measures, this so-called apology mainly shifts blame from PG&E to global warming. Defendants' inability to accept responsibility for the 2017 fires turned that year into a mere prologue for 2018, when PG&E caused the deadliest wildfire in California history.

### D. PG&E Caused the Camp Fire (2018)

79. On November 7, 2018, PG&E emailed a customer who owns property near the location where the Camp Fire is suspected of originating. The PG&E e-mail notified the customer that crews would need to access the PG&E equipment on her land because PG&E was "having problems with sparks." ASSOCIATED PRESS, Nov. 12, 2018, https://sacramento.cbslocal.com/2018/11/12/pge-sparks-power-lines-camp-fire/.

80. The following morning at 6:15 a.m., PG&E reported a power outage on its "Caribou-Palermo 115kV Transmission line" in the same area. Just eighteen minutes later, at 6:33 a.m., the Camp Fire was first reported. Later that day, PG&E conducted an aerial patrol of the area and observed damage to the transmission tower on the same Caribou-Palermo 115kV Transmission line, approximately one mile northeast of the town of Pulga, "in the area of the Camp Fire." *Id.* The fire was initially described as a vegetation fire "under the high tension power lines" near the Feather River and Poe Dam. Firefighters arrived at the scene around 6:43 a.m. and confirmed that the fire was located "underneath the transmission lines," as shown on the image below.

///
///
///

Case: 19-30088   Doc# 894-3   Filed: 03/14/19   Entered: 03/14/19 18:50:30   Page 9 of 10

[Image: dark photograph]

Ted Goldberg, *PG&E Transmission Line May Be Tied to Disastrous Butte County Fire*, KQED NEWS, Nov.9, 2018, https://www.kqed.org/news/11705306/pge-transmission-line-may-be-tied-to-disastrous-butte-county-fire.

81. The first firefighter on the scene immediately realized the danger presented by the fire. He reported to dispatch that "this has got the potential for a major incident" and requested an additional 15 engines, four bulldozers, two water tenders, four strike teams and hand crews. He further recommended the evacuation of the nearby town of Pulga and requested air support. *Id.* Shortly after arriving at the scene, another firefighter estimated the growing fire to be about 10 acres with a "really good wind on it." *Id.*

82. At 6:45 a.m. on November 8, 2018, while the fire near Pulga was already burning, PG&E reported a separate power outage at a distribution line in the nearby community of Concow in its 12kV Big Bend 1101 line. Cal Fire has reported that the Concow location is a potential "second origin" for the Camp Fire. Ryan Levi, *Power Line Near Potential Second Camp Fire Origin Would Have Been Part of PG&E's Shut-Off Program*, KQED News, Nov. 19, 2018,