would be safe and dependable for years to come left PG&E vulnerable to an increased risk of a catastrophic event such as the Camp Fire.

108. For example, according to documents released by The Utility Reform Network ("TURN"), PG&E supposedly planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, PG&E spent nearly $5 million on bonuses for six of its top executives.

109. Moreover, PG&E has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to *not* protecting public safety. Prior to the Butte Fire, PG&E chose to provide a monetary incentive to its contractors to cut fewer trees, even though PG&E was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk. Similarly, prior to the San Bruno explosion, PG&E had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, PG&E's incentive system was "training and rewarding people to do the wrong thing," emblematic of "a seriously broken process," and "explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy." Jaxon Van Derbeken, *PG&E Incentive System Blamed for Leak Oversights*, SAN FRANCISCO CHRON., Dec. 25, 2011, *available at* http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php.

6. PG&E Is Required to Safely Design, Operate, and Maintain Its Electrical Systems and Surrounding Vegetation

110. At all times prior to November 8, 2018, PG&E had a duty to properly construct, inspect, repair, maintain, manage and/or operate its power lines and/or other electrical equipment and to keep

- 35 -

SHAREHOLDER DERIVATIVE COMPLAINT

vegetation properly trimmed and maintained so as to prevent foreseeable contact with such electrical equipment. In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, PG&E had an obligation to comply with a number of statutes, regulations, and standards, including the following.

111. Pursuant to Public Utilities Code § 451, "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

112. To meet this safety mandate, PG&E is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, PG&E also must ensure that its power lines can withstand winds of up to 92 miles per hour.

113. Further, PG&E must follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code § 4292, PG&E is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower." Also, Public Resources Code § 4293 mandates PG&E to maintain clearances of four to 10 feet for all of its power lines, depending of their voltage. In addition, "Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

114. Pursuant to CPUC General Order 165, PG&E is also required to inspect its distribution facilities to maintain a safe and reliable electric system. In particular, PG&E must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. PG&E is also required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over 15 years old every 10 years.

115. The Defendants knew or should have known that such standards and regulations were minimum standards and that PG&E has a duty to identify vegetation that posed a foreseeable hazard to

- 36 -

SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-5    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 2 of 10

power lines and/or other electrical equipment and manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire. Further, PG&E has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, but not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

116.    Finally, in June of 2014, the CPUC directed PG&E, by way of Resolution ESRB-4, to take remedial measures to reduce fires since the Governor had declared a drought in January. In addition, the CPUC informed PG&E that it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, *i.e.*, the CPUC was agreeing to provide additional funding on top of vegetation management funding already authorized in order to make sure remedial measures would not go unperformed due to lack of funding.

117.    Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency, the declaration directed state agencies 'to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife.' The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown regarding the bark beetle infestation and resulting tree mortality remains in effect. The CPUC has not rescinded ESRB-4, and work by the utilities to comply with it and the Tree Mortality Emergency continues.

CPUC, Fact Sheet—PG&E Vegetation Management Spending,

http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation%20Management%20Spending.pdf.

F.    **Defendants Paid Themselves Millions of Dollars in Bonuses for Supposedly Improving Safety at PG&E**

118.    PG&E filed a Proxy Statement for fiscal year 2016 on April 18, 2017. The Proxy was personally signed by Defendants Williams, Earley, and Stavropoulos, and reviewed and approved by

- 37 -

SHAREHOLDER DERIVATIVE COMPLAINT

the other members of the Board. The Proxy disclosed lavish compensation to the Company's executives based in substantial part of supposedly achieving 84% of safety goals, and stated:

> For 2016, the Committee adopted a STIP structure that continued PG&E Corporation's and the Utility's focus on improving public and employee safety and customer satisfaction. The weights of the components - Safety, Customer Satisfaction, and Financial - were unchanged from 2015 at 50 percent, 25 percent, and 25 percent, respectively.
>
> ***The Safety component was structured to provide a strong focus on the safety of employees, customers, and communities. It was made up of four subcomponents***: (1) Nuclear Operations Safety, ***(2) Electric Operations Safety***, (3) Gas Operations Safety, and (4) Employee Safety.

119. The Proxy further stated the following with respect to how compliance with **electric safety goals** and the STIP was factored into compensation of executives:

> Each STIP measure has a threshold, target, and maximum level of performance used to arrive at a score ranging from zero to 2.0 for that measure. Performance below the minimum performance level, or threshold, results in a zero score. Performance at the threshold results in a STIP score of 0.5. ***Target performance results in a STIP score of 1.0, and performance at or above the maximum established level results in a score of 2.0. A score of 1.0 provides 100 percent of an executive's target payout.*** Performance at the threshold and maximum levels delivers 50 percent and 200 percent of targeted payout, respectively. Linear interpolation is used to determine scores for performance between threshold and target, and between target and maximum.
>
> The STIP overall performance score is the sum of the weighted cumulative average scores for performance on each of the STIP measures.

120. Significantly, notwithstanding the fact that PG&E had suffered tens of millions of dollars in damages alone in 2015 from the Butte wildfires, ***Electrical Safety was given a weight of just 5% in the overall STIP score,*** while "Financial Performance" was given five times as much weight (25%), as reflected by the following chart from the Proxy:

///

///

///

///

- 38 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-5    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 4 of 10

For 2016, the measures and related weightings, thresholds, targets, maximums, and results for calculating the STIP performance score were as follows:

| 2016 STIP Measures | Weight | Threshold | Target | Maximum | Result | Score | Weighted Average Score |
|---|---|---|---|---|---|---|---|
| **SAFETY COMPONENT (50%)** | | | | | | | |
| Nuclear Operations Safety | | | | | | | |
| Diablo Canyon Power Plant Reliability and Safety Indicator | | | | | | | |
| Unit 1 Reliability and Safety Indicator | 4% | 94.2 | 98.7 | 100.0 | 100.0 | 2.000 | 0.080 |
| Unit 2 Reliability and Safety Indicator | 4% | 94.2 | 98.7 | 100.0 | 90.0 | 0.000 | 0.000 |
| **Electric Operations Safety** | | | | | | | |
| Transmission and Distribution (T&D) Wires Down | 5% | 3,000 | 2,572 | 2,400 | 3,299 | 0.000 | 0.000 |
| 911 Emergency Response | 5% | 95.0% | 97.5% | 98.5% | 98.3% | 1.800 | 0.090 |
| Gas Operations Safety | | | | | | | |
| In-Line Inspection and Upgrade Index | 6% | 0.50 | 1.00 | 2.00 | 0.88 | 0.880 | 0.053 |
| Gas Dig-Ins Reduction | 5% | 2.18 | 2.03 | 1.96 | 2.02 | 1.143 | 0.057 |
| Gas Emergency Response | 5% | 21.5 | 21.0 | 20.0 | 20.0 | 2.000 | 0.100 |
| Employee Safety | | | | | | | |
| Lost Workday Case Rate | 6% | 0.353 | 0.320 | 0.275 | 0.402 | 0.000 | 0.000 |
| Serious Preventable Motor Vehicle Incident (SPMVI) Rate | 6% | 0.252 | 0.239 | 0.226 | 0.280 | 0.000 | 0.000 |
| Timely Reporting of Injuries | 4% | 64.0% | 67.1% | 70.2% | 67.3% | 1.065 | 0.043 |
| **CUSTOMER SATISFACTION COMPONENT (25%)** | | | | | | | |
| Customer Satisfaction Score | 15% | 75.5 | 75.7 | 76.3 | 76.1 | 1.667 | 0.250 |
| System Average Interruption Duration Index (SAIDI) | 10% | 101.1 | 96.3 | 93.9 | 109.0 | 0.000 | 0.000 |
| **FINANCIAL COMPONENT (25%)** | | | | | | | |
| Earnings from Operations (EFO) (in millions) | 25% | 95% of Budget | | 105% of Budget | $1,884.0 | 1.053 | 0.263 |
| | 100% | | | | | | 0.936 |

121. Shockingly, the Proxy claimed that PG&E had achieved 98.5% of its Electrical Safety goals. However, it also stated that it had achieved 105% of its "Financial Component" goals, and based in part on the attainment of such goals the Compensation Committee of the Board (comprised of Defendants Williams (Chair), Herringer, Miller, Parra, and Rambo) approved the following compensation:

This table summarizes the principal components of compensation paid or granted during 2016 (including cash incentives earned for corporate performance in 2016, but paid in 2017). This table also includes information disclosed in the 2016 and 2015 Joint Proxy Statements for compensation paid or granted to certain officers during 2015 and 2014, respectively.

| Name and Principal Position | Year | Salary ($)[1] | Stock Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | Total ($) |
|---|---|---|---|---|---|
| Anthony F. Earley, Jr.[a] | 2016 | 1,318,750 | 7,500,072 | 1,928,672 | 11,730,646 |
| Chairman, Chief | 2015 | 1,281,250 | 7,500,080 | 2,245,365 | 12,198,394 |
| Executive Officer, and President, PG&E Corporation | 2014 | 1,250,000 | 7,500,007 | 1,825,200 | 11,627,216 |
| Geisha J. Williams[a] | 2016 | 695,833 | 2,250,072 | 610,594 | 4,164,230 |
| President, Electric, | 2015 | 634,183 | 2,000,115 | 620,585 | 3,723,207 |

- 39 -

SHAREHOLDER DERIVATIVE COMPLAINT

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Pacific Gas and Electric Company | | | | | |
| Nickolas Stavropoulos[a] President, Gas, Pacific Gas and Electric Company | 2016 | 660,833 | 2,250,072 | 579,881 | 3,933,975 |
| | 2015 | 613,221 | 2,000,115 | 624,713 | 3,603,842 |
| | 2014 | 575,317 | 1,375,128 | 606,706 | 2,894,973 |
| Jason P. Wells Senior Vice President and Chief Financial Officer, PG&E Corporation | 2016 | 500,000 | 2,000,101 | 371,250 | 3,129,976 |
| David S. Thomason[b] Vice President, Chief Financial Officer, and Controller, Pacific Gas and Electric Company | 2016 | 257,432 | 300,206 | 87,302 | 776,177 |
| John R. Simon[c] Executive Vice President, Corporate Services and Human Resources, PG&E Corporation | 2016 | 512,500 | 1,500,102 | 419,738 | 2,843,177 |
| | 2015 | 453,393 | 1,250,149 | 405,240 | 2,326,272 |
| | 2014 | 424,994 | 750,104 | 387,756 | 1,931,282 |
| Edward D. Halpin Senior Vice President, Generation and Chief Nuclear Officer, Pacific Gas and Electric Company | 2016 | 572,000 | 1,700,119 | 325,611 | 2,876,566 |
| Dinyar B. Mistry[d] Senior Vice President, Human Resources, Pacific Gas and Electric Company | 2016 | 405,700 | 1,100,120 | 273,082 | 2,209,029 |
| | 2015 | 381,433 | 400,131 | 229,781 | 1,243,071 |
| | 2014 | 373,046 | 350,074 | 277,988 | 1,649,668 |

122. In awarding such compensation, the Compensation Committee included the following statement in the Proxy: "The Compensation Committee believes that the amount and design of executive compensation provided for 2016 to the NEOs of PG&E Corporation and the Utility are consistent with the Committee's compensation objectives and policies to (1) provide long-term incentives to align shareholders' and officers' interests and enhance total return for shareholders, (2) attract, retain, and motivate officers with the necessary mix of skills and experience for the development and successful operation of the Corporation's and the Utility's businesses, and (3) compensate NEOs in a competitive, cost-efficient, and transparent manner."

123. The Compensation Committee similarly awarded the following lavish compensation to the Company's executives in 2017, as reflected in the Proxy Statement filed with the SEC on March 26, 2018:

| Name and Principal Position | Year | Salary ($)[1] | Stock Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | Total ($) |
|---|---|---|---|---|---|
| Geisha J. Williams[a] Chief Executive Officer and President, PG&E Corporation | 2017 | 991,667 | 6,500,168 | 0 | 8,597,220 |
| | 2016 | 695,833 | 2,250,072 | 610,594 | 4,164,230 |
| | 2015 | 634,183 | 2,000,115 | 620,585 | 3,723,207 |
| Nickolas Stavropoulos[a] President and Chief Operating Officer, Pacific Gas and Electric Company | 2017 | 777,500 | 4,250,151 | 768,539 | 6,413,256 |
| | 2016 | 660,833 | 2,250,072 | 579,881 | 3,933,975 |
| | 2015 | 613,221 | 2,000,115 | 624,713 | 3,603,842 |
| Jason P. Wells | 2017 | 583,333 | 2,000,079 | 0 | 3,108,134 |

- 40 -

SHAREHOLDER DERIVATIVE COMPLAINT

| | Year | | | | |
|---|---|---|---|---|---|
| Senior Vice President and Chief Financial Officer, PG&E Corporation | 2016 | 500,000 | 2,000,101 | 371,250 | 3,129,976 |
| **David S. Thomason** <br> Vice President, Chief Financial Officer, and Controller, Pacific Gas and Electric Company | 2017 | 301,650 | 300,086 | 113,482 | 941,475 |
| | 2016 | 257,432 | 300,206 | 87,302 | 776,177 |
| **John R. Simon**[a] <br> Executive Vice President and General Counsel, PG&E Corporation | 2017 | 594,582 | 2,000,079 | 558,130 | 3,760,933 |
| | 2016 | 512,500 | 1,500,102 | 419,738 | 2,843,177 |
| | 2015 | 453,393 | 1,250,149 | 405,240 | 2,326,272 |
| **Dinyar B. Mistry** <br> Senior Vice President, Human Resources and Chief Diversity Officer, PG&E Corporation | 2017 | 471,208 | 800,162 | 360,644 | 2,408,823 |
| | 2016 | 405,700 | 1,100,120 | 273,082 | 2,209,029 |
| | 2015 | 381,433 | 400,131 | 229,781 | 1,243,071 |
| **Karen A. Austin** <br> Senior Vice President, and Chief Information Officer, Pacific Gas and Electric Company | 2017 | 555,800 | 850,131 | 432,572 | 2,228,463 |
| **Anthony F. Earley, Jr.**[b] <br> Executive Chair of the Board, PG&E Corporation | 2017 | 1,026,363 | 3,000,153 | 1,025,835 | 6,012,329 |
| | 2016 | 1,318,750 | 7,500,072 | 1,928,672 | 11,730,646 |
| | 2015 | 1,281,250 | 7,500,080 | 2,245,365 | 12,198,394 |
| **Hyun Park**[c] <br> Senior Vice President and Special Counsel to the Chairman, PG&E Corporation | 2017 | 601,069 | 1,000,074 | 267,044 | 3,513,492 |
| | 2016 | 638,800 | 1,200,091 | 385,398 | 2,702,052 |
| | 2015 | 637,132 | 1,500,071 | 503,266 | 2,915,084 |

124.    PG&E has a **Clawback Policy** pursuant to which the Company can claw back compensation to executive officers based on improper conduct during the preceding three years. However, despite the billions of dollars in liability which the Defendants' misconduct has created for PG&E – liability which has brought PG&E to the brink of bankruptcy and necessitated the passage of a state law in September 2018 (SB 901) that consumer advocates decried as a ratepayer bailout of PG&E, the Board of Directors has taken no steps whatsoever to claw back any of the millions of dollars in compensation paid to themselves and the Company's executives in recent years.

**G.    Defendants Caused PG&E To Make Materially Misleading Statements About the Company's Compliance With Laws and Safety Efforts**

125.    On April 29, 2015, PG&E held a conference call to discuss the Company's financial and operating results for the first financial quarter of 2015. During the call, Defendant Johns, then President of the Utility, misleadingly assured investors of the Company's commitment to safety:

> As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. *We're stepping up our vegetation management activities to mitigate wildfire risk* and improve access for firefighters.

SHAREHOLDER DERIVATIVE COMPLAINT

126.    This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period. Accordingly, PG&E had not meaningfully "stepp[ed] up" its vegetation management activities.[3]

127.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. This report falsely assured investors that PG&E's "vegetation management" was "in compliance with relevant laws":

**Vegetation Management**

*Each year, PG&E's Vegetation Management department*, in consultation with utility arborists and foresters, *inspects every mile of power line in our service area for public safety* and electric reliability. *We do so in compliance with relevant laws* and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 20 consecutive years for demonstrating best practices in utility arboriculture.

128.    This statement was false and misleading. Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were not "in compliance with relevant laws." According to reports released in subsequent corrective disclosures on May 25 and June 8, 2018, PG&E violated relevant California laws, including Public Resources Code section 4293, multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were

_____

[3]  PG&E also omitted that it was supposed to perform $441,192 (the total amount by which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management during 2015, but failed to do so.

- 42 -

SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-5    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 8 of 10

so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties –

therefore they cannot be explained away as an isolated lapse.

129. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, *ethics and compliance are managed by a Chief Ethics and Compliance Officer*, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. *The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors*, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
> • Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
>
> • **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

130. Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting**," and making direct reports to the Board of Directors.

131. On November 18, 2015, Defendant Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety. During that testimony, Hogan assured the public that PG&E was "just about done" implementing a program that would remotely disable the Company's recloser devices in areas that included "high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are able to *take our recloser out of service remotely*, we first *focus on the wildfire areas* and then we have about 130 some odd locations, we are going to complete about 126 of those this year, *just about done with that program*, which leaves six for next year, which will be completed.

- 43 -

SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-5    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 9 of 10

132.    This statement was materially false and/or misleading because PG&E misleadingly said that it had implemented policies and procedures to disable recloser devices from areas that were at high risk for wildfires, which includes the areas where the North Bay Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed that PG&E dangerously kept reclosers in use through at least October 2017.  Cal Fire has determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.  Thus, PG&E did not have the safety policies and procedures in place that they said they had.

133.    The State of California declared a state of emergency due to drought conditions in January 2014, which ended in April 2017. In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually. These conditions significantly increased the danger of wildfires in the North Bay region of California. PG&E knew about these conditions and its obligations to ensure safety from wildfires in light of these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: "[U]tilities . . . to the extent required by their existing responsibilities to protect the public health and safety, shall undertake efforts to remove dead or dying trees in these high hazard zones that threaten power lines. . . ."

134.    Based on information released by CPUC, PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively. Each year's spending was substantially identical to the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases – notwithstanding the state of emergency directive above. In contrast, inflation rose 5.48% over the same three-year period. Thus, PG&E's spending did not even keep pace with inflation during the relevant period. CPUC released the following chart confirming that PG&E's vegetation management spending underwent only modest increases over the relevant time period:

///

///

///

///

SHAREHOLDER DERIVATIVE COMPLAINT