*Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management*

|      | PG&E Requested | CPUC Authorized | PG&E Spent |
|------|----------------|-----------------|------------|
| 2017 | $201.0         | $201.0          | *$150.4 YTD* |
| 2016 | $198.8         | $198.8          | $198.7     |
| 2015 | $194.2         | $194.2          | $194.1     |
| 2014 | $190.0         | $190.0          | $189.7     |
| 2013 | $180.0         | $161.5          | $161.6     |
| 2012 | $180.0         | $161.5          | $161.5     |
| 2011 | $180.0         | $161.5          | $161.6     |

135. As indicated below, while Defendants falsely represented on November 2, 2017 that PG&E "doubled" vegetation management expenditures in 2016, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.

136. Meanwhile, Defendants continued to issue false statements to the public and stock market indicating that PG&E was complying with all applicable electrical safety laws.

137. On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

> **Vegetation Management**
> Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety and electric reliability. *We do so in compliance with relevant laws* and with a focus on public involvement, *including extensive "Right Tree, Right Place" outreach*. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 21 consecutive years for demonstrating best practices in energy sector arboriculture.

138. This statement was false and misleading. Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were not "in compliance with relevant laws." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code § 4293 multiple times. Further, Cal

- 45 -
SHAREHOLDER DERIVATIVE COMPLAINT

Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

139. In fact, on May 23, 2016, the Board of Directors caused PG&E to increase the Company's dividend and stated that the reason for the increase was, in substantial part, the Company's progress on safety. On that date, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at Annual Shareholder Meeting." It stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> * * *
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> * * *
>
> ***Earley and other senior executives also discussed continued progress on safety, reliability and other goals***, as well as PG&E's strategy for the future [at the annual shareholder meeting].
>
> ***Earley said, 'We've continued to demonstrate leadership and commitment on safety***. We're delivering the most reliable service in our company's history.

140. This statement was materially false and/or misleading because it attributed the increased dividend to "progress on safety" when in fact the Company was not adequately addressing safety. It was also misleading because it signaled to the market that PG&E was financially sound, and because it failed to disclose that PG&E's dividend was in fact at risk due to the Company's role in causing wildfires.

141. On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

> <u>The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.</u>
>
> *Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.* Combined with

- 46 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088   Doc# 894-6   Filed: 03/14/19   Entered: 03/14/19 18:50:30   Page 2 of 10

our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

142. On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C. Johnson to Boards of Directors." The release stated:

*PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend by 4 cents per share to 53 cents per share*, beginning with the dividend for the second quarter of 2017. On an annual basis, this action increases PG&E Corporation's dividend by 8 percent, from $1.96 per share to $2.12 per share.

\* \* \*

*Yesterday*, in remarks at the joint annual shareholders meeting of PG&E Corporation and Pacific Gas and Electric Company, *[CEO] Williams highlighted the companies' progress on safety, reliability and reducing greenhouse gas emissions, among other accomplishments. She reaffirmed PG&E's commitment to safety and operational excellence*, delivering for customers and leading the way to achieve California's clean energy goals.

143. This statement was false and misleading because it failed to disclose that PG&E was not making any material progress on wildfire safety, as confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, only one month before the statement was made, when he reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell's deposition occurred). PG&E's statement above on May 31, 2017 gave investors a false impression that concealed safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017 when PG&E eliminated its dividend altogether.

144. In July 2017, Defendant Geisha Williams testified under oath that the Company has a zero tolerance for vegetation contact wildfires. "The reality is we have zero tolerance," she said in a videotaped deposition over the company's responsibility for the Butte fires that left two dead and burned more than 70,000 acres. She also stated:

- 47 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-6    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 3 of 10

*"We aspire to having absolutely no wildfires, obviously, at all, or especially any wildfires that are somehow caused or somehow as a result of operations in forests or everything else," Williams said. "So we aspire to zero."*[4]

145. On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "*PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation.*"

146. This statement was materially false and/or misleading because PG&E did not follow "all applicable ... state vegetation clearance requirements." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. This statement concealed the sizeable risk that PG&E's numerous and widespread violations of safety regulations would worsen rather than "help to reduce . . . fires caused by trees or other vegetation."

147. On November 2, 2017, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent wildfires impacting our customers and communities, our discussion today will be different from our usual earnings call. . . .
>
> * * *
>
> Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.

---

[4] *See* Jaxon Van Derbeken, "Utility Company's Risk Assessment at Issue in NorCal Wildfires," NBC Connecticut, Nov. 14, 2017, available at https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html, last visited Dec. 20, 2018.

- 48 -
SHAREHOLDER DERIVATIVE COMPLAINT

\* \* \*

**Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

\* \* \*

**I know there's a lot of interest in our pole maintenance and vegetation management programs,** so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.

<u>*We also have one of, if not, the most comprehensive vegetation management programs in the country.*</u> Our vegetation management program manages about 123 million trees across the service territory. And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

<u>*In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year.*</u> We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

148. These statements were false and misleading because PG&E did not "double" its vegetation management spending. PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively. The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, we have not made any changes as a result of the [September 2015 Butte] fire."

- 49 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-6    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 5 of 10

149. Further, PG&E failed to comply with safety regulations – including regulations specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation management program as "one of, if not, the most comprehensive vegetation management programs in the country," she gave investors the false impression that PG&E's vegetation management did not fall short of applicable safety regulations, when in fact it did. In fact, PG&E's many safety violations related to wildfires in 2017 caused CalFire to report the violations to multiple District Attorneys.

150. Later on the same call, an analyst asked the Company for more detail about PG&E's vegetation management practices. President and COO Stavropoulos replied as follows:

> [ANALYST:] And then, I guess, *can you discuss your vegetation practices for trees that are located near power lines?* I guess we've seen sort of end reports that have come out for some of your peers that they sort of track vegetation that's within certain distances from the lines, and they basically make their decisions on what to do based on sort of updates.
>
> [Stavropoulos:] Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. *And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management.* That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. *We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.* So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

151. PG&E's Media Relations department maintained a news website named Currents, providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services.[5] Through the website, PG&E repeatedly touted the safety of its electricity lines, the Company's vegetation management programs, and its success mitigating wildfire risk.

---

[5] http://www.pgecurrents.com, last visited Dec. 20, 2018.

152. In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that *"**PG&E meets or exceeds all applicable federal and state vegetation clearance requirements**."*[6]

153. On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 Northern California wildfires to reassure investors that PG&E had met all state regulations concerning fire safety. The press release stated:

> • Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:
>
> • Increased foot and aerial patrols along power lines in high fire-risk areas;
>
> • Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;
>
> • Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;
>
> • Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and
>
> • Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.
>
> • ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

154. This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "regulatory requirements for pole integrity management." According to a report released in a subsequent corrective disclosure, PG&E violated California's safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its "investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors **and the failure of power poles**." Indeed, at least one of the North Bay

---

[6] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html.

- 51 -
SHAREHOLDER DERIVATIVE COMPLAINT

Case: 19-30088    Doc# 894-6    Filed: 03/14/19    Entered: 03/14/19 18:50:30    Page 7 of 10

Fires – the Sulphur Fire – "was caused by the failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of state law to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires.

**H. Defendants Have Inflicted Massive Damages Upon PG&E**

155. Defendants' gross mismanagement of PG&E has led to a corporate liability of at least $30 billion, which is not only a colossal amount of money in the abstract but an amount in excess of the entire market capitalization of the Company, which was approximately $12.32 billion as of December 2018. Defendants' conduct, in leading to this outcome, was a breach of their fiduciary duty to PG&E and of their duties of loyalty and care.

### 1. Share Price Decimated by Over 50%

156. In the immediate wake of the Camp Fire, PG&E's stock price plummeted by over 50%, wiping out $12 billion in market capitalization. Ciara Linnane, *PG&E Stock At Its Lowest In 15 Years On Concern Over California Utility's Wildfire Liability*, MARKETWATCH, Nov. 15, 2018, https://www.marketwatch.com/story/pge-stocks-and-bonds-hammered-on-worry-it-may-be-liable-for-california-wildfire-2018-11-14. Given PG&E's long history of corporate malfeasance, this was a foreseeable and likely consequence of any Camp-Fire-like catastrophe. Defendants should have done everything possible to prevent such a fire. Instead, they delayed necessary safety and maintenance investments and diverted money to Defendants' compensation. Thus, Defendants violated their duties of care and loyalty to PG&E by creating a loss in value of at least $12,000,000,000 USD, which was the stock market's initial estimate of PG&E's potential liability for the Camp Fire.

### 2. $15 Billion In Liability Created

157. Additionally, Defendants actions, discussed above, in creating the conditions that precipitated the Camp Fire, caused massive liabilities for PG&E, currently estimated to amount to a minimum of $15,000,000,000. Christopher Helman, *California's Electricity Giant Faces Possible $30 Billion In Damages for Fires That Have Killed 100*, FORBES.COM, Nov. 15, 2018, https://www.forbes.com/sites/christopherhelman/2018/11/15/californias-electric-giant-faces-possible-30-billion-in-damages-for-fires-that-have-killed-more-than-100/#62b99d8e38c2. Given PG&E history

of facing significant responsibility for catastrophes of its own creation, these damages were the foreseeable and likely consequence of any Camp-Fire-like conflagration. Just last year, Defendants created $15 billion in damages related to the 2017 wine country fires. *Id.* Similar liabilities for future potential fires should have been foremost in Defendants' minds, with a focus on preventing them and the injury they would inflict on PG&E. Instead, Defendants focused on their lavish and undeserved compensation. Thus, Defendants violated their duties of care and loyalty to PG&E by creating liabilities of at least $30 billion.

### 3. PG&E's Credit Rating Slashed

158. In the aftermath of the Camp Fire, Moody's slashed PG&E's credit rating to near-junk status: "PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires." Allison McNeely, *PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk*, BLOOMBERG.COM, Nov. 15, 2018, https://www.bloomberg.com/news/articles/2018-11-15/pg-e-credit-cut-to-brink-of-junk-by-moody-s-on-wildfire-risk. Pacific Gas & Electric Company's credit rating was likewise downgraded to the second-lowest level of investment grade credit. *Id.* What this means is that it will be more expensive than it was before for the Company to borrow money for the safety and maintenance improvements that are so desperately needed. Unfortunately, the higher interest rate payments PG&E will also mean that less money, in absolute terms, will be available for just those improvements. By creating this foreseeable and likely cycle of increasing costs of capital, Defendants have breached their duties to PG&E.

159. On December 13, 2018, PG&E filed a Form 8-K with the SEC, signed by Defendant David Thomason, stating that it had filed the same day its 2020 General Rate Case GRC application with the CPUC. In the SEC filing, PG&E stated that "*weakened credit conditions following the November 8, 2018 Camp Fire may impair the Utility's ability to raise new debt and equity*, which could impact the amount of work the Utility can commit to financing and require a change to the scope of work that the Utility proposes to accomplish in the 2020 GRC period."

### 4. New Criminal Liability

160. On Tuesday, November 27, 2018, Federal Judge William H. Alsup of the Northern District of California issued an order demanding that PG&E provide "an accurate and complete statement" of its role in the Camp Fire and a disclosure of any related activity that violated the company's post-San Bruno fire probation. Notice re: California Wildfires, No. C 14-00175 WHA (Dkt. No. 951), attached as **Exhibit 4**. Specifically, Judge Alsup asked whether PG&E "might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire". *Id.* This order, issued *sua sponte*, strongly indicates that PG&E may be subject to new criminal penalties, both for violating its probation and for additional acts related to the ignition of the Camp Fire. *See generally U.S. v. Pacific Gas & Electric Company*, Case No. CR-14-00175-THE, Monitorship Order (Dkt. No. 916), attached as **Exhibit 2**.

161. Additionally, PG&E faces liability for falsifying safety records submitted to the California Public Utilities Commission. Richard Gonzales, *PG&E Falsified Gas Pipeline Safety Records, Regulators Say*, NAT'L PUB. RADIO, Dec. 14, 2018, https://www.npr.org/2018/12/14/677003961/pg-e-falsified-gas-pipeline-safety-records-regulators-say. According to CPUC, PG&E:

> lacked sufficient staffing to locate and mark natural gas pipelines in compliance with law; pressured supervisors and locators to complete the work resulting in PG&E staff falsifying data so requests for pipeline locating and marking would not appear as late; had common knowledge among its supervisors that locators falsified data; and received input from external parties that there were discrepancies in its late locate and mark reporting.

*Id.* (quoting CPUC, Press Release, Dec. 14, 2018, *available at* http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M250/K897/250897740.PDF). Falsification of these "locate and mark" records would not only be grounds for a CPUC fine but would also likely put PG&E afoul of Judge Alsup and the monitorship requirements he is charged with enforcing.