SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
  James P. Hill, SBN 90478
  Christopher V. Hawkins, SBN 222961
600 B Street, Suite 1700
San Diego, California 92101
Tel:    (619) 233-4100
Email: hill@sullivanhill.com
       hawkins@sullivanhill.com

SINGLETON LAW FIRM, APC
  Gerald Singleton, SBN 208783
  Amanda W. LoCurto, SBN 265420
450 A Street, 5th Floor
San Diego, CA 92101
Tel:    (619) 771-3473
Email: gerald@slffirm.com
       amanda@slffirm.com

Attorneys for SLF Fire Victim Claimants

**Electronically Filed: 3/20/2019**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION,<br><br>    and<br><br>Affects:<br>☐ PG&E Corporation<br>☐ Pacific Gas & Electric Company<br>☒ Both Debtors | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case–Jointly Administered)<br><br>**LIMITED OPPOSITION TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) FOR AUTHORITY TO CONTINUE PERFORMANCE UNDER PREPETITION SETTLEMENT AGREEMENT WITH BUTTE COUNTY DISTRICT ATTORNEY'S OFFICE TO FUND ENHANCED FIRE PREVENTION AND COMMUNICATIONS PROGRAM [ECF 770]**<br><br>Date: March 27, 2019<br>Time: 9:30 a.m. (Pacific)<br>Place: United States Bankruptcy Court<br>         Courtroom 17, 16th Floor<br>         San Francisco, CA 94102<br><br>**Opposition Deadline: March 20, 2019, 4 p.m.** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... 3

I.   INTRODUCTION ........................................................................................................... 6

II.  ARGUMENT .................................................................................................................. 7

    A.  The 52 Settled-But-Not-Paid Fire Victims Deserve
        to Be Paid Now .................................................................................................... 7

    B.  Hundreds of Millions of Dollars in Pre-Petition Claims
        are Being Paid ...................................................................................................... 8

    C.  PG&E's Rationale for Paying Pre-Petition Claims ............................................. 9

    D.  Section 105 and Related Authority ..................................................................... 9

    E.  Payment of the Settled-But-Not-Paid Fire Victims' Claims Is Warranted Under
        Section 105(a) of the Bankruptcy Code ............................................................ 12

    F.  No Prejudice Will Result from the Payment of the
        Settled-But-Not-Paid Fire Victims ................................................................... 13

    G.  The Court Should Impose a Constructive Trust on $9,473,303
        of the Debtor's Funds to Pay the Settled-But-Not-Paid
        Victims' Claims ................................................................................................. 13

        1.  The Insurance Proceeds Arising From Payments
            From the Butte Fire are Not Property of the Estate ...................................... 13

        2.  While Insurance Policies Are Property of the Estate, Proceeds May Not
            Be ................................................................................................................ 14

        3.  The Proceeds Are Held in Trust for the Fire Victims Under California
            Law ............................................................................................................. 16

        4.  The Proceeds Have Been Sufficiently Traced .............................................. 18

III. CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744 (1999) ................................................................ 17

*Communist Party v. 522 Valencia, Inc.,* 35 Cal.App. 4th 980 (1995) ................................................. 17

*Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612 (1st Cir. 1988) ................... 17, 18

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ................................................................. 10

*Ferro v. Citizens Nat'l Tr. & Sav. Bank of Los Angeles,* 44 Cal. 2d 401 (1955) ............................... 17

*In re Adams Apple, Inc.*, 829 F.2d 1484 (9th Cir. 1987) .............................................................. 10, 11

*In re Advent Mgmt. Corp.*, 104 F.3d 293 (9th Cir. 1997) .................................................................. 18

*In re Advent Mgmt. Corp.,* 178 B.R. 480 (B.A.P. 9th Cir. 1995) ....................................................... 18

*In re Bailey,* 314 B.R. 103 (Bankr. N.D. Miss. 2004) ....................................................................... 15

*In re Benz,* 368 B.R. 861 (B.A.P. 9th Cir. 2007) ............................................................................... 19

*In re Bullion Reserve of N. Am.*, 836 F.2d 1214 (9th Cir. 1988) ....................................................... 18

*In re Chateaugay Corp.*, 80 B.R. 279 (S.D.N.Y. 1987) .................................................................... 10

*In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002) ........................................................... 11

*In re Daisy Sys. Sec. Litig.*, 132 B.R. 752 (N.D. Cal. 1991) ............................................................. 15

*In re Dameron,* 155 F.3d 718 (4th Cir. 1998) .................................................................................... 18

*In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021 (Bankr. S.D. Ohio 1991) ........................................ 10

*In re Endoscopy Ctr. of S. Nevada, LLC,* 451 B.R. 527 (Bankr. D. Nev. 2011) ............................... 15

*In re Financial News Network, Inc.* 134 B.R. 732 (Bankr. S.D.N.Y. 1991) ..................................... 10

*In re Foam Systems Co.,* 92 B.R. 406 (B.A.P. 9th Cir. 1988) ............................................................ 16

*In re Hines*, 147 F.3d 1185 (9th Cir. 1998) ........................................................................................ 11

*In re Just For Feet, Inc.*, 242 B.R. 821 (D. Del. 1999) ....................................................................... 10

*In re Markair, Inc.,* 172 B.R. 638 (B.A.P. 9th Cir 1994) .................................................................. 16

*In re Mila, Inc.*, 423 B.R. 537 (BAP 9th Cir. 2010) .......................................................................... 15

*In re Minoco Grp. of Companies, Ltd.,* 799 F.2d 517 (9th Cir. 1986) ........................................ 14, 16

*In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003) ............................................................... 11

*In re NVR L.P.*, 147 B.R. 126 (Bankr. E.D. Va. 1992) ...................................................................... 10

*In re OGA Charters, LLC,* 901 F.3d 599 (5th Cir. 2018) .................................................................. 15

*In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ........... 11

*In re R&T Roofing Structures & Commercial Framing, Inc.,* 887 F.2d 981 (9th Cir. 1999)............ 19

*In re Sfuzzi, Inc.,* 191 B.R. 664 (Bankr. N.D. Tex. 1996) ............................................................ 15, 20

*Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286 (1882) .................................................... 10

*Pacific Bell Telephone Co. v. Southern California Edison Co.* 208 Cal.App.4th 1400
    (2012) ............................................................................................................................................ 17

*True Traditions, LC v. Wu*, 552 B.R. 826 (N.D. Cal. 2015) .............................................................. 18

**Statutes**

11 U.S.C. § 105(a) ............................................................................................................... 9, 12

11 U.S.C. § 541(d) ................................................................................................................... 19

11 U.S.C. §541(b)(1) ................................................................................................................ 19

California Civil Code § 2223 .................................................................................................... 17

California Civil Code § 2224 .................................................................................................... 17

**Other Authorities**

*H.R. Rep. No. 395*, 95th Cong., 2d Sess. 368 (1978) ............................................................... 14

# I.

# INTRODUCTION

On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company (collectively, "PG&E") filed for bankruptcy. PG&E's stated reason for seeking bankruptcy protection was that it was facing $30 billion in damages from the 2015 Butte Fire, the 2017 North Bay Fires (18 fires in 10 Northern California counties) and the 2018 Camp Fire.[1] Together these fires burned nearly 500,000 acres, killed over 100 people, destroyed almost 20,000 homes, and left tens of thousands of people homeless.

The Singleton Law Firm Fire Victim Claimants ("SLF Claimants") consist of over 3,500 individuals who suffered injuries or damages in fires started by PG&E and who are represented by Singleton Law Firm, APC. The SLF Claimants consist of individuals from each of the three major fires/fire complexes involved in the bankruptcy: the 2015 Butte Fire (coordinated in Sacramento Superior Court under JCCP Number 4853), the 2017 North Bay Fires (coordinated in San Francisco Superior Court under JCCP Number 4955), and the 2018 Camp Fire (which had not been coordinated or consolidated at the time PG&E filed for bankruptcy). With respect to the 2017 North Bay Fires, SLF Claimants sustained damages in each of the 18 major fires. Accordingly, the SLF Claimants comprise a more complete representative group of fire victims than any other group.

For the reasons set forth below, the SLF Claimants object to the Motion of Debtors Pursuant to 11 U.S.C. §§ 363(B) and 105(A) for Authority to Continue Performance under Prepetition Settlement Agreement with Butte County District Attorney's Office to Fund Enhanced Fire Prevention and Communications Program [ECF No. 770] ("Butte Settlement Motion") unless the Court requires PG&E to immediately pay the 52 fire victims ("Settled-But-Not-Paid Fire Victims") whose claims were settled by PG&E prior to the petition date but whom PG&E failed to pay before filing–despite paying out millions of dollars in severance during that time to the executives at the

---

[1] "PG&E to file for Bankruptcy as Wildfire Costs hit $30 billion", *Los Angeles Times*, July 14, 2019, https://www.latimes.com/business/la-fi-pge-bankruptcy-filing-20190114-story.html. The SLF Claimants recognize that this article and the others cited are hearsay, but respectfully submit that to the extent that PG&E disputes a matter asserted in any of the articles, its fiduciary duties as a debtor-in-possession require it to investigate the matter further.

helm during the fires, including $2,500,000 to its former CEO.[2] The Official Committee of Tort Claimants ("Tort Committee") would support such a condition on approval of the Butte Settlement Motion, as it argued in its opposition to PG&E's DIP Financing Motion that approval of the financing should be conditioned on, among other things, "the Debtor's agreement to use a small portion of the proceeds to... pay the roughly $15-20 million in signed settlements with Butte County victims that the Debtors refused to pay shortly before filing the Cases." ECF No. 800, p. 5, ll. 21–25. The total amount of the settlements agreed to by PG&E for the Settled-But-Not-Paid Fire Victims is $9,473,303.00.

## II.

## ARGUMENT

**A.    The 52 Settled-But-Not-Paid Fire Victims Deserve to Be Paid Now**

By the Butte Settlement Motion, PG&E requests authority to perform under a prepetition settlement agreement with Butte County, including paying Butte County $1,000,000.[3] While the SLF Claimants support PG&E performing its prepetition settlement agreement with Butte County, the SLF Claimants respectfully submit that, given the devastation wrought on their lives and community, a more compelling argument exists for PG&E to perform its one-and-only obligation under its prepetition settlement agreements with the Settled-But-Not-Paid Fire Victims.

The majority of cases stemming from the 2015 Butte Fire have been settled. Prior to PG&E filing bankruptcy in January 2019, PG&E was settling on average of 40-60 cases per month with the Butte Fire victims. In December 2018 and January 2019, PG&E agreed to settle approximately 52 cases on behalf of Butte Fire victims. This included 30 Butte Fire cases represented by Singleton Law Firm[4] in the combined amount of $5,513,303, and 22 represented by the Corey/Danko firms[5] in

---

[2] The Settled-But-Not-Paid Fire Victims are identified and described below.

[3] For clarification, PG&E's "Butte Settlement Motion" relates to claims by Butte County from the 2017 North Bay Fires; the Settled-But-Not-Paid Fire Victims' claims are from the 2015 Butte Fire, which occurred in Calaveras and Amador Counties.

[4] The 30 SLF Claimants in this group are Suzette Baldwin; Malinda Bissell; Judy Brown; Steven Contreras; Stephanie Dewey; Kurt Dunajski; Cari Duvall; Kimberly Hie-Kosta; Emilie Houle; Darren Johnson; Dean Kelaita; Karen Klith; Douglas Lemos; Robert Lock; Randall Lorenzi; James Martin; James Marvin; Patrick Miller; David Newell; Richard Moldovan; Brock Montgomery; Bryan Montgomery; Gerald Munson; Mark Peterson; Candace Rummerfield; Ronnie L. Rummerfield, Sr.; Christian Siefert; Vera Pearson; and Christopher Wilson.

the combined amount of $3,960,000, for an aggregate of $9,473,303.00.[6] In each of these cases, PG&E and the Settled-But-Not-Paid Fire Victims agreed to a specific settlement amount. PG&E then drafted the settlement agreements, and the settlement agreements were signed by the Settled-But-Not-Paid Fire Victims and returned to PG&E. Thus, the Settled-But-Not-Paid Fire Victims complied with all of their duties and obligations under the settlement agreements. PG&E could have paid the settlement funds before filing bankruptcy, but it chose not to. It did, however, during that same time period, choose to pay out millions of dollars in severance packages to departing executives on the eve of bankruptcy, including $2,500,000 to its former CEO, Geisha Williams, as a part of her severance package. The few remaining victims of the Butte Fire are likely the only unpaid tort victims whose claims have been fully liquidated. They have been waiting for over three and one-half years, their lives forever altered, many of them still homeless. They deserve to be paid *now* as much as Butte County does, if not more. *See* the Singleton Declaration, ¶ 2.

### B. Hundreds of Millions of Dollars in Pre-Petition Claims are Being Paid

In fact, as summarized by the Tort Committee in opposition to the DIP Financing Motion, PG&E (1) has asked the Court for approval to spend up to $235 million in bonuses this year plus other programs adding to up to $350 million (STIP Motion, ECF No. 806); (2) has asked the Court for approval to pay $65,500,000 million in prepetition obligations owed to shippers, warehousemen, and other lien claimants (Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), *etc*. for Interim and Final Authority to Pay Prepetition Obligations Owed to Shippers, Warehousemen and Other Lien Claimants, *etc.*, ECF No. 13); (3) has obtained Court authority to pay prepetition employee claims in the amount of $256,000,000 (Order Granting Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), *etc*. for Interim and Final Authority to (I) Pay Prepetition Wages, Salary, Withholding Obligations, *etc*., ECF No. 705); and (4) wants to pay for "operational integrity," a/k/a critical

---

[5] The names of the 22 Settled-But-Not-Paid Fire Victims represented by the Corey/Danko firms are set forth in their Objection, Doc. No. 178. For the Court's convenience, these names are: Dawnielle Burich, Philip Charvet, Diana Eriksen, Stein Eriksen (and the two minor Eriksen children), Deborah Guyton, Nancy Kuchins, Carl Madeiros, Brian Ottinger, Jack Rodgers, Thomas Rodgers, Jillian Sandbothe, Richard Segovia, Abril Shouse, William Shouse, Hilde Solliday, Mark Wiebens, Nicole Wiebens, Peter Wiebens, Gerhard Ziemer, and Jerry Ziller.

[6] The specific amount of each settlement is not set forth herein due to the confidential nature of the mediation/settlement process; the total amount is being presented only because it is necessary for the Court to evaluate claimants' argument.

vendors, $116,000,000 (Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), *etc.* for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Safety and Reliability, *etc.*, ECF No. 12). In total, PG&E seeks authority to pay over $788,500,000 in pre-petition unsecured claims other than its fire victims–when it is the fire victims who have suffered the most from PG&E's reckless and criminal conduct. The SLF Claimants are asking the Court to require PG&E to spend a small amount of its cash on hand to pay the Settled-But-Not-Paid Fire Victims to alleviate their ongoing human suffering caused by PG&E in the first place–and they ask for such relief with the full support of the Tort Committee. *See* ECF No. 800, p. 5, ll. 21–25.

C.     **PG&E's Rationale for Paying Pre-Petition Claims**

PG&E's overarching rationale for why the Court should authorize it to pay over $788,500,000 to creditors other than its fire victims is that the payments may enhance the value of PG&E's enterprise. *See e.g.,* ECF No. 806, p. 16, l. 25–p. 17, l. 1) (PG&E seeks authority to pay STIP compensation to employees, arguing they are "critical to ongoing operations and to preserving and enhancing enterprise value" and to "ensure the success of the Debtors' restructuring efforts."); ECF No. 13, pp. 9–11 (PG&E seeks authority to pay shippers, warehousemen, and other lien claimants, arguing that if it fails to pay them in a timely manner, they may refuse to provide "critical ongoing goods and services" to PG&E or may seek to enforce their rights and liens on account of such claims); ECF No. 8, p 11, ll. 23–26 (PG&E sought (and obtained) authority to pay prepetition wage claims, arguing that employees were critical to its "businesses and ongoing operations and, as a result, to the success of the Chapter 11 Cases"); and ECF No. 12, p. 18, ll. 11–13 (PG&E seeks authority to pay vendors, arguing that they are critical to "preserving the value of the Debtors' businesses and their viability as a going-concern enterprise"). The SLF Claimants submit that this rationale would, and should, apply equally for this Court to allow PG&E to pay the deserving Settled-But-Not-Paid Fire Victims' claims.

D.     **Section 105 and Related Authority**

Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Numerous courts have acknowledged that payment of prepetition obligations, irrespective of statutory

priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process"); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that bankruptcy courts have the authority to authorize the debtor to pay certain prepetition claims).

The Ninth Circuit has noted in certain instances that prepetition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In *Adams Apple*, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Ninth Circuit noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet–rehabilitation of debtors, which may supersede the policy of equal treatment." *Id.* The Ninth Circuit further stated that "[c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts." *Id.*

/ / /

Numerous courts within the Ninth Circuit have followed the reasoning of *Adams Apple* in holding that the payment of certain prepetition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc.* for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *In re Hines*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown").

In addition, the court in *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002) noted that there are occasions when a debtor in possession's duty to preserve the business "can only be fulfilled by the preplan satisfaction of a prepetition claim." *Id*. at 497. The *CoServ* court provided an illustrative list of situations where payment of prepetition obligations by a debtor in possession may be a necessary predicate to preservation of the business. Relevant here, the list included prepetition warranty or refund claims of consumer customers because, if not honored, they "could so harm the debtor's <u>good will</u> as to destroy its going concern value." *Id (emphasis added)*. The court stated that, "like employees, the bankruptcy court cannot force consumers to deal with the debtor, nor is there a practical alternative to satisfying warranty or refund claims." *Id*. The court also noted that where "payment of a prepetition unsecured claim is the only means to effect a substantial enhancement of the estate... payment would be justified." *Id*.

Advance proof of necessity of payment is not required in every instance. *See In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003). The *Mirant* court recognized that a company operating in Chapter 11, especially early in the case, is in a "precarious position," and that serious damage could occur to a debtor's business were a court to require advance proof that each payment of a prepetition claim outside a confirmed plan of reorganization was necessary. Thus, because it "[did] not wish [the] Debtors' businesses seriously damaged by the delay required to satisfy the court that a particular creditor should be paid," the court granted the debtors general authority to pay the prepetition claims of critical vendors as necessary. *Id*. at 429–30.

/ / /

E. **Payment of the Settled-But-Not-Paid Fire Victims' Claims Is Warranted Under Section 105(a) of the Bankruptcy Code**

The cases cited above speak in terms of "serving significant Code-related objectives" (*Jevic*); "rehabilitation of debtors" (*Adams Apple*); preventing "harm to the debtor's goodwill" (*CoServ*); and the "peripheral benefits" that flow from paying certain pre-petition claims ahead off others (*Adams Apple*). The SLF Claimants submit that in this case, with a public utility that has destroyed so many lives and communities but still must serve tens of millions of customers, paying the 52 Settled-But-Not-Paid Fire Victims now is not only a necessary first step to rebuilding the communities PG&E destroyed, but also <u>rebuilding the trust</u> that PG&E so desperately needs in order to be <u>rehabilitated</u>. This is exactly the type of <u>peripheral benefit</u> of which the courts cited above wrote of the justification for early payment of certain pre-petition claims. These 52 people are likely the only tort victims with liquidated claims. They could have and should have been paid on the eve of bankruptcy, but PG&E chose to delay making the agreed settlement payments. These settlement commitments by PG&E should be honored as a first step in restoring PG&E's goodwill with its millions of customers and the general public at large. PG&E has asserted that its primary objective of its bankruptcy filing was to resolve the fire victims' claims "fairly and expeditiously–indeed, more quickly and more equitably than those liabilities could be addressed and resolved in the state court system . . ." *See* the Declaration of Jason P. Wells ISO First Day Motions, ECF No. 28, p. 4:14–16. PG&E is indisputably in desperate need of rebuilding the public's confidence in the safety and integrity of its operations, which has been seriously compromised given PG&E's reckless and criminal conduct prepetition. PG&E clearly understands that its successful rehabilitation depends on rebuilding the public's confidence after being (1) convicted by a San Francisco federal jury of intentionally and knowingly violating gas line safety requirements and intentionally and knowingly obstructing the NTSB's investigation of PG&E's culpability for the 2010 gas explosion; and (2) convicted by the Honorable William Alsup, Judge, United States District Court for the Northern District of California, of failing to report yet another criminal investigation of the company arising out of one of the 2017 Honey Fire. The public's opinion of PG&E matters. After all, PG&E is a quasi-public entity that performs critical services to the public. The health and safety of the public rests in the hands of

PG&E. Yet PG&E's actions (and inaction) prepetition have failed the public in the most egregious way. To begin its rehabilitation with its customer base, to preserve and enhances its enterprise value, and to restore at least some of the trust formerly reposed in it by the public at large, its primary and initial focus should be to make its victims whole. It can, and should, do so by immediately paying the liquidated claims of the Settled-But-Not-Paid Fire Victims.

### F. No Prejudice Will Result from the Payment of the Settled-But-Not-Paid Fire Victims

The standard arguments for a creditor not to pay under these circumstances include (1) the amount of the claim has not been determined, (2) the debtor does not have the funds, and/or (3) the payment would unfairly deplete the funds available to pay other creditors. Here, these arguments are unavailing. After PG&E's counsel and experts reviewed the Settled-But-Not-Paid Fire Victims' claims, PG&E's counsel negotiated a settlement with the victims' counsel which both sides agreed was fair. The DIP financing obtained by PG&E is over $5 billion, purportedly the largest in history. ECF No. 23. Finally, the amount sought, $9,473,303.00, is *de minimus* compared to the $30 billion in damages PG&E claims it owes fire victims, and no reasonable person could argue that this amount would substantially impact PG&E's ability to pay its other creditors. Indeed, PG&E recently asked for <u>more than 35 times this amount</u> ($350 million) in bonuses for employees. ECF 782.

The current trading price of PG&E's stock was $19.07 per share at the close of market on March 19, 2019. *See* RFJN, Ex. A. At that stock price, PG&E has a market capitalization of nearly $10,000,000,000, strongly suggesting that all creditors in the bankruptcy will be paid in full, while in PG&E's words equity values are "preserved and enhanced." The relief requested herein is nothing more than a function of timing. Accordingly, no prejudice will result from paying the few remaining <u>liquidated</u> claims in the Butte Fire now, while substantial suffering will be alleviated from a small group of people who have already suffered way too much.

### G. The Court Should Impose a Constructive Trust on $9,473,303 of the Debtor's Funds to Pay the Settled-But-Not-Paid Victims' Claims

#### 1. The Insurance Proceeds Arising From Payments From the Butte Fire Are Not Property of the Estate

At the 341(a) meeting of creditors, PG&E's representative Jason Wells testified that PG&E

has approximately $920 million in insurance proceeds in connection with the Butte Fire. *See* the Singleton Declaration, ¶ 3. Indeed, its most recent form 10K shows this figure to be $922 million. RFJN Exhibit B, page 157. The 10K is quite explicit: "Through December 31, 2018, the utility recorded $922 million for probable insurance resources in connection with losses related to the 2015 Butte Fire…. In addition, the utility has received $60 million in cumulative reimbursements from the insurance policies of its vegetation management contractors…." *Id*.

In addition, PG&E has also recovered an additional $60 million in insurance payments from two of its contractors (or their insurers) involved in the Butte Fire. *Id*. Unlike many situations, in which a tortfeasor sues third-parties and recovers settlements in tort, here, PG&E was a named insured on the third-party contractors' insurance policies. Accordingly, this additional $60 million consists of insurance proceeds to PG&E, not third-party settlement funds.

Here, there are 52 Settled-But-Not-Paid Fire Victims whose claims were settled by PG&E prior to the petition date but which PG&E failed to pay prior to filing the bankruptcy, despite having collected the settlement proceeds from insurers. The total amount of the settlements agreed to by PG&E for the Settled-But-Not-Paid Fire Victims is $9,473,303. Settlement agreements were drafted by PG&E and executed by the Settled-But-Not-Paid Fire Victims and delivered to PG&E. Significantly more than $9,473,303 is being held in trust by PG&E on behalf of the Settled-But-Not-Paid Fire Victims. That money is money which was recovered from proceeds of insurance coverage intended to protect the fire victims and not the general creditor body.

**2. While Insurance Policies Are Property of the Estate, Proceeds May Not Be**

The Ninth Circuit has recognized that while insurance policies are property of the estate, proceeds from those policies <u>are not necessarily so</u>. As recognized by the Ninth Circuit:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.

*In re Minoco Grp. of Companies, Ltd.*, 799 F.2d 517, 519–20 (9th Cir. 1986)(quoting *H.R. Rep. No. 395*, 95th Cong., 2d Sess. 368 (1978)).

"With respect to third-party liability claims-made policies, like the one in question here, case authority suggests that the proceeds are not property of the estate, or, at least, that any interest the estate has in these policies is *de minimus*." *In re Endoscopy Ctr. of S. Nevada, LLC,* 451 B.R. 527, 543 (Bankr. D. Nev. 2011); *see In re Mila, Inc.*, 423 B.R. 537, 543 (BAP 9th Cir. 2010) (noting that the applicability of §541 to proceeds of insurance policies is not settled); *In re Daisy Sys. Sec. Litig.*, 132 B.R. 752, 755 (N.D. Cal. 1991) (Noting distinction between policies and proceeds and holding proceeds of DOL policies "are not simply assets of … bankruptcy estate to be divided among creditors.")

Proceeds from this fire insurance policy are for the protection of innocent third parties, not for the reimbursement of the debtor's loss of property. There is a significant contrast between "liability policies, proceeds of which would ordinarily be payable only for the benefit of those harmed by the insured debtor under the terms of the insurance contract" with a policy whose purpose is for the insured debtor to receive funds to make it whole for its loss of property. *In re Bailey,* 314 B.R. 103, 106 (Bankr. N.D. Miss. 2004). It makes no sense for this Court to allow the proceeds of liability insurance policies that are for the benefit of third parties to be transmuted into property of the estate and subject those proceeds to the priorities set up by the Bankruptcy Code. *See, In re Sfuzzi, Inc.,* 191 B.R. 664, 668 fn. 15 (Bankr. N.D. Tex. 1996).

While it is true that recent authority from another circuit (the Fifth Circuit) has suggested that when there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants, that court confirmed the rule that policy proceeds are not property of the estate. Critically, the court wrote, "policy proceeds are not available to all creditors, and in that sense are different from other property of the estate..." *In re OGA Charters, LLC,* 901 F.3d 599, 603-04 (5th Cir. 2018).[7] The issue is one of timing and allocation. Here, equity requires the allocation of these already paid policy proceeds to be identified and paid to the Settled-But-Not-Paid Fire Victims without further delay.

---

[7] The concern expressed by the Fifth Circuit that policy proceeds are insufficient for all claimants is not relevant here. These policies covered PG&E for the Butte Fire and the proceeds from them are for injured victims of that fire; not later victims of other fires.

It has been authoritatively determined that property of the Settled-But-Not-Paid Fire Victims was damaged as a result of PG&E's negligence. That is why the liability policies protecting claimants in the Butte Fire have made the proceeds of the policies available. In effect, PG&E, through its negligence, has taken these fire victims' property, and the insurance proceeds are readily identifiable as the funds necessary to pay for that wrongful taking.[8]

### 3. The Proceeds Are Held in Trust for the Fire Victims Under California Law

The terms "constructive trust" and "resulting trust" are frequently used together and/or interchangeably, but the two concepts are distinct. "A resulting trust arises by operation of law to enforce the inferred intention of the parties to the transaction. The existence of a resulting trust is established by circumstances showing that the transferee was never intended to take beneficial interest through the transaction." *In re Markair, Inc.,* 172 B.R. 638, 641 (B.A.P. 9th Cir 1994); *In re Foam Systems Co.,* 92 B.R. 406, 409 (B.A.P. 9th Cir. 1988). Once this trust is declared, the remedy is delivery of the res by the trustee to the beneficiary. On the other hand, a constructive trust "is an equitable remedy." It is not necessarily grounded on the intention of the parties, inferred or presumed, "it is a remedial device of equity–a trust in invitum–to prevent unjust enrichment." The distinction between "resulting and constructive trusts may blur because, as an equitable remedy, a constructive trust remediates inequitable circumstances by imposing what the parties in equity should have intended." *Markair,* 641-42. Here the proceeds of the fire insurance policies are akin to the Ninth Circuit's description of the debtor holding payments on medical bills in *In re Minoco, supra,* 799 F.2d at 519. The proceeds belong to someone else – here the Fire Victims.

---

[8] The California Department of Forestry and Fire Protection ("Cal Fire") Report is available at this site: http://calfire.ca.gov/fire_protection/downloads/FireReports/Butte/(Butte)%2015-CA-AEU-024918_Redacted.pdf

The report found that the 2015 Butte Fire was started by a Gray Pine coming into contact with a PG&E powerline conductor, which ignited portions of the tree. The Gray Pine came into contact with the powerline because PG&E and/or its contractors, Trees Inc. and ACRT, negligently cut the trees on each side of the Gray Pine in the tree stand in which three trees were located. These two trees (one on either side of the Gray Pine) had been supporting the Gray Pine. When they were cut down, the Gray Pine failed and hit the line, causing the fire.

Specifically, on p. 29, lines 23-26, Cal Fire explains why PG&E was negligent: "It is known, when a stand is altered and captured interior trees are exposed to open spaces, they are prone to failure... Failing to identify the potential hazard of leaving weaker, inherently unstable trees on the edge of the stand, without conducting maintenance on them, ultimately led to the failure of the Gray Pine which contacted the powerline conductor operated by PG&E and ignited the uncontrolled wildland fire."

Indeed under California law, "It is established that insurance proceeds take the place of the insured chattel, and that the named insured holds the proceeds in trust for the owner of the chattel." *Ferro v. Citizens Nat'l Tr. & Sav. Bank of Los Angeles,* 44 Cal. 2d 401, 411 (1955). "When a debtor is in possession of property impressed by a trust–express or constructive–the bankrupt estate holds the property subject to the outstanding interest of the beneficiaries." *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 618 (1st Cir. 1988). Since the proceeds received by PG&E were to pay the claims of the fire victims of the Butte Fire, a trust relationship has been established. In essence, by the wrongful act of causing the Butte Fire, PG&E took the fire victims' property. California courts have consistently applied inverse condemnation to investor-owned utilities because of a utility's power as a state franchise and quasi-monopoly to compensate *inter alia* fire victims. *See*, e.g., *Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744, 752 (1999); *Pacific Bell Telephone Co. v. Southern California Edison Co.* 208 Cal.App.4th 1400, 1404 (2012). These insurance proceeds are taking the place of the taken property and the proceeds are held by PG&E in trust for the fire victims.[9]

To impose a constructive trust the court must find (1) "the existence of . . . property or some interest in property"; (2) "the right of the complaining party to that" property; and (3) "some wrongful acquisition or detention of the [property] by another party who is not entitled to it." *Communist Party v. 522 Valencia, Inc.,* 35 Cal.App. 4th 980, 990 (1995). *See also* Cal. Civ. Code §§2223, 2224. The essence of a constructive trust is to prevent unjust enrichment and to prevent one from taking advantage of their own wrongdoing. *Valencia*, 990. The acquisition or detention of property is "wrongful" if it is "gained by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act." Cal. Civ. Code § 2224. Here, there is no question that the fire insurance proceeds are property being held by PG&E. The Settled-But-Not-Paid Fire Victims clearly have entitlement to the insurance proceeds. The proceeds were paid to settle their claims and arose as a result of their losses – takings by PG&E. And PG&E wrongfully acquired and/or detained this

---

[9] Cases that do not involve inverse condemnation scenarios involving insurance proceeds are thus significantly distinguished.

property in two ways. First, its negligence in causing the fire which damaged or destroyed these fire victims' property was the functional equivalent of an inverse condemnation proceeding by PG&E by which it converted the property of these individual fire victims to its use or into a community asset. Thus, the acquisition of the property was wrongful. Second, the refusal and failure to turn over the proceeds prior to the filing of the bankruptcy constituted a wrongful withholding of the property of another and a breach of trust. Thus, those insurance proceeds are held for the benefit of the Settled-But-Not-Paid Fire Victims.

"State law determines whether a trust exists in federal bankruptcy proceedings." *True Traditions, LC v. Wu*, 552 B.R. 826, 840 (N.D. Cal. 2015) (*quoting In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1216 (9th Cir. 1988)). And, "'funds held by a debtor in constructive trust for another person' wherein 'the equitable interest in the trust funds belongs to the trust beneficiary, not the debtor' are not part of the bankruptcy estate." *Id.* (*quoting In re Advent Mgmt. Corp.*, 104 F.3d 293, 294 (9th Cir. 1997)). And where there is an express or constructive trust, as determined by state law, "the bankrupt estate holds the property subject to the outstanding interest of the beneficiaries." *Connecticut Gen., supra,* 838 F.2d at 618.

### 4. The Proceeds Have Been Sufficiently Traced

The second step in establishing the trust fund relationship is that the claimant "must identify the trust fund or property and, where the trust fund has been commingled with general property of the bankrupt, sufficiently trace the property or funds – the res." *Connecticut Gen., supra,* 838 F.2d at 618. "[C]ourts have consistently rejected the notion that comingling of trust property, without more, is sufficient to defeat tracing. [Citations omitted] In cases where the trust property has been comingled, courts resolve the issue with reference to the so-called 'lowest intermediate balance' rule." *In re Dameron,* 155 F.3d 718, 723-24 (4th Cir. 1998). Indeed "if a party mingles wrongfully obtained funds with its own funds, and disbursements are made from the comingled account there is a presumption that the disbursements were of the party's own money, not trust funds." *In re Advent Mgmt. Corp.,* 178 B.R. 480, 492 (B.A.P. 9th Cir. 1995), aff'd, 104 F.3d 293 (9th Cir. 1997). "Thus, the beneficiary is entitled to the lowest intermediate balance between the date of the comingling and the date of payment." *In re R&T Roofing Structures & Commercial Framing, Inc.,* 887 F.2d 981, 987

fn. 5 (9th Cir. 1999).

Here, PG&E (through its Senior Vice President and Chief Financial Officer, Jason P. Wells) has admitted that it had received approximately $922 million in insurance proceeds in connection with the Butte Fire (as well as an additional $75 million in claim settlement payments from two of its contractors (or their insurers)). *See* the Singleton Declaration, ¶¶ 3 and 4. PG&E's most recent SEC Form 10K show these figures to be $922 million and $60 million respectively. RFJN, Ex B. Mr. Wells testified that PG&E had paid out approximately $800 million in settlements to victims of the Butte Fire, leaving a surplus of approximately $180 million. Mr. Wells testified that some amount of this $180 million had been used to pay legal fees and other expenses connected with the Butte Fire litigation, but he was not able to provide an estimate as to the exact amount. The 10K suggests as much as $130 million has been spent, leaving at least $50 million in constructive trust which as funds belonging to the Fire Victims. Finally, Mr. Wells testified that on the petition date, PG&E had approximately $240 million in cash on hand -- no less than $50 million of which is for Butte Fire victims. *See* the Singleton Declaration, ¶ 4. PG&E is holding $9,473,303 that rightfully belongs to the Settled-But-Not-Paid Fire Victims as constructive trust proceeds. This amount is less than 5 percent of the amount of cash that was on hand at the time of filing–and that is *before* the DIP loan was approved. These Settled-But-Not-Paid Fire Victims were injured in 2015. Their property was taken by PG&E in 2015. PG&E has collected proceeds which were meant to pay for their losses, not to pay for PG&E's losses. These proceeds arise from the Butte Fire, not from later fires, such as the Camp Fire of 2018 or the 2017 North Bay Fires, implicating other policies. Thus, continuing oversight by the bankruptcy court is not necessary to assure an equitable distribution of the available assets to pay the victims of this fire.

It is fundamental that "the property of the estate cannot exceed whatever interests a debtor holds at the commencement of a case." *In re Benz,* 368 B.R. 861, 866 (B.A.P. 9th Cir. 2007). Here proceeds were received for the benefit of the fire victims, and thus those proceeds are excluded from the definition of property of the estate. 11 U.S.C. §541(b)(1). Similarly the debtor held those proceeds with "only legal title and not an equitable interest." The equitable interest is held by the fire victims. 11 U.S.C. § 541(d). At no time would PG&E have been entitled to keep all of the proceeds

when the insurer paid on the claim – therefore "the proceeds are not property of the estate and they cannot enhance the bankruptcy estate for other creditors." *In re Sfuzzi, Inc.,* 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996).

## III.

## CONCLUSION

Based on the foregoing, the SLF Claimants respectfully request that the Court condition approval of the Butte Settlement Motion on (1) the payment of the Settled-But-Not-Paid Fire Victims; and (2) the imposition of a constructive trust on $9,473,303 of PG&E's cash on hand for the benefit of the Settled-But-Not-Paid Fire Victims.

Respectfully submitted,

Dated: March 20, 2019           SINGLETON LAW FIRM, APC

By: _____
    Gerald Singleton

Dated: March 20, 2019           SULLIVAN HILL REZ & ENGEL
                                A Professional Law Corporation

                                By: */s/ Christopher V. Hawkins*
                                    James P. Hill
                                    Christopher V. Hawkins

                                Attorneys for the Singleton Law Firm
                                Fire Victim Claimants