WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ [Affects both Debtors]<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**DECLARATION OF ANDREW WILLIAMS IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 362, AND 363 AND FED. R. BANKR. P. 2002, 4001, AND 6004 FOR AN ORDER (I) AUTHORIZING DEBTORS TO (a) SELL, TRANSFER, LEASE OR OTHERWISE ENCUMBER REAL PROPERTY, (b) ENTER INTO ACQUISITION, LEASE, LICENSE, AND PERMIT AGREEMENTS RELATING TO THIRD-PARTY PROPERTY, AND (c) PURSUE AND BRING EMINENT DOMAIN PROCEEDINGS TO JUDGMENT OR ENTER INTO SETTLEMENTS IN LIEU THEREOF, SUBJECT TO CERTAIN PROCEDURES AND PARAMETERS, AND (II) GRANTING RELATED RELIEF** |

I, Andrew Williams, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

This Declaration is submitted in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362, and 363 and Fed. R. Bankr. P. 2002, 4001, and 6004 for an Order (I) Authorizing Debtors to (a) Sell, Transfer, Lease, or Otherwise Encumber Real Property, (b) Enter Into Acquisition, Lease, License, and Permit Agreements Relating to Third-Party Property, and (c) Pursue and Bring Eminent Domain Proceedings to Judgment or Enter Into Settlements In Lieu Thereof, Subject to Certain Procedures and Parameters, and (II) Granting Related Relief* (the "**Motion**") filed concurrently herewith.[1]

I am knowledgeable and familiar with the Debtors' day-to-day operations and, specifically, the Real Property Interest transactions the Debtors enter into in the ordinary course of operating their businesses. I am authorized to submit this Declaration on behalf of the Debtors. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors' other employees or the Debtors' legal, restructuring, and financial advisors. If called upon to testify, I would testify to the facts set forth in this Declaration.

By filing the Motion, the Debtors seek authority to sell, transfer, lease, encumber and otherwise deal with Real Property Interests as business circumstances and their needs may require. The Debtors believe that such transactions are within the ordinary course of business, and therefore, may be entered without first seeking Court approval. Nonetheless, the Debtors file the Motion and seek the described relief in order to provide comfort to counterparties in these transactions and other interest holders.

In the ordinary course of its business operations, PG&E routinely enters into various transactions involving real property, including, among others, selling or purchasing property, leasing

---

[1] Capitalized terms used but not otherwise defined in this Declaration have the meanings given in the Motion.

and licensing properties to and from third parties, selling surplus property with little or no useful value to PG&E, and pursuing and settling eminent domain actions. Many of these transactions are integral to PG&E's ability to deliver utility services to its customers and some are ancillary to PG&E's utility business and provide additional sources of revenue for PG&E. In entering into these transactions, the Debtors carefully exercise their business judgment by tailoring the terms of such transactions to the current needs of the business. It is my understanding based upon discussions with counsel that these types of transactions are ordinary course transactions for PG&E.

To provide a general overview of the dollar level of annual activity in the foregoing types of transactions based on PG&E's experience over the last several years, PG&E estimates that on an annual basis, in the ordinary course of business, it typically receives less than $6.5 million in gross revenue from the transfer of Real Property Interests and typically expends less than $13.3 million on the acquisition of Real Property Interests (exclusive of office leases).

The authority sought by this Motion will benefit the Debtors' estates by allowing PG&E to continue its ordinary business practices for handling Real Property Interests. Additionally, the authority sought by this Motion will facilitate PG&E's ability to access third-party property necessary for the safe and reliable delivery of services to PG&E customers. Subject to the procedures and parameters set forth in the Motion, PG&E will be able to enter into routine real property transactions without unnecessarily burdening this Court or incurring the costs and expenses attendant to individual requests for approval of each of these transactions, most of which are routine, ordinary course transactions.

## Sale of Real Property Interests

A. *Surplus Property Sales*

Each year, PG&E sells utility owned property it identifies as surplus property that is not necessary or useful for utility purposes. Most of these properties are vacant lands on which PG&E facilities have been decommissioned. The sale of surplus property allows PG&E to avoid the carrying costs associated with maintaining land and buildings that PG&E no longer needs to own,

including property taxes, maintenance costs, insurance payments, and other liabilities related to the respective properties. The surplus property is typically conveyed in fee, and in some cases the property is conveyed subject to PG&E reserving an easement to allow continued use of some portion of the property. For example, PG&E may determine that it is no longer necessary to retain a fee interest in a particular parcel of land, but the parcel may contain underground gas lines that remain in public service and for which PG&E must retain a land right to operate and maintain for utility purposes. In such instances, PG&E will convey the fee interest in the property and reserve an easement for the underground gas line. Because PG&E retains the necessary land rights, utility operations are not affected by the sale of surplus property. PG&E's average annual revenue received from its surplus properties sales activities for the three-year period between 2016 and 2018 was approximately $4 million per year.

### B. Grant of Easements

The grant of easements is similar to the sale of surplus properties discussed above; however, such arrangements do not involve the transfer of PG&E's fee interest in the property. PG&E conveys easements to third parties for a variety of purposes, including for general ingress and egress to adjoining parcels, the development of roads, and for public or private utility facilities, such as communication, water, and sewer line infrastructure. In some instances, the conveyances are made because the purchasing party's use of the easement will facilitate or otherwise benefit some aspect of PG&E's business operations, sometimes they are made because there are legal issues surrounding the purchaser's right to an easement under eminent domain or real property law doctrines, and sometimes they are made simply because the easement to be granted does not interfere with PG&E's use of property. PG&E estimates that in 2018, it generated gross revenue of less than $8,500 from the grant of easements.

### C. Stipulations in Eminent Domain Cases Where PG&E Is Named as a Defendant

On occasion, PG&E is named as a defendant in eminent domain actions commenced by governmental entities. These condemnation actions are the result of government projects on parcels

of land that are either owned in fee by PG&E or contain easements owned by PG&E. For parcels of land that are not owned in fee by PG&E, PG&E typically ensures that no PG&E facilities or easements will be affected as a result of the contemplated condemnation. For condemnation of a parcel of land owned by PG&E in fee, PG&E typically files a stipulated judgment agreeing to accept just compensation (generally, fair market value based on appraisal) for the property that is being condemned. On average, less than five (5) properties owned by PG&E in fee involving consideration of less than $500,000 in the aggregate are condemned annually.

**Leases, Licenses, and Permits for Use of PG&E Property**

PG&E enters into lease agreements and license agreements, and issues permits, for use by third parties of PG&E-owned land and other property when the intended use is a compatible secondary use of the property which does not interfere with utility operations. This activity may be required due to regulatory requirements, generates revenue and helps to reduce the maintenance costs associated with such properties. PG&E is the lessor, licensor, or permittor under approximately 1,800 agreements, including agriculture and grazing agreements, parking and storage agreements, day-use training permits, commercial agreements, and recreation agreements. In 2018, PG&E received less than $3 million in revenues from its leasing, licensing and permitting activities.

**Acquisition, Lease, License, and Permit Agreements Relating to Third-Party Property**

A.  *Land Rights Acquisitions*

PG&E has a group of land acquisition agents that support the electric and gas businesses by acquiring the land rights necessary for these facilities. The land acquisition agents negotiate and acquire land rights in the form of both easements and fee title, depending on the business need. In circumstances where only temporary rights are required—often in connection with construction of new facilities or re-construction of existing facilities—the land rights take the form of a temporary construction easement or license. In 2018, PG&E acquired approximately 500 temporary land rights for approximately $2.5 million and 240 permanent land rights for approximately $4.5 million.

### B. Leases, Licenses, and Permits

In addition to land rights acquisitions, the operation of PG&E's utility business requires that PG&E enter into agreements for the use of property owned by third parties, including both government and private land. In the ordinary course of its business, PG&E regularly enters into lease and license agreements for the use of land and buildings owned by third parties to support the utility business and provide adequate gas and electric service to PG&E customers. The leases and licenses generally fit within one of the following four categories: office, utility, telecommunications, or parking and storage. In 2018, PG&E entered into approximately 350 lease and license agreements for electric and gas facilities on lands of governmental agencies (such as the California State Lands Commission) and made approximately $3.1 million in payments on account of such agreements. In 2018, PG&E entered into approximately 250 agreements for electric and gas facilities on private property and made approximately $3.8 million in payments on account of such agreements.

PG&E is also currently the lessee pursuant to over 100 leases for, among other things, offices, warehouses, parking and storage yards, and data centers. In the ordinary course, leases for these properties expire at various times throughout the year. PG&E evaluates the disposition of these leases individually as notices are required to be made and/or the leases come due. Annually, the rental obligation associated with the portfolio of these leased properties is approximately $45 million, and the square footage of properties ranges from 200 square feet to approximately 250,000 square feet.

### C. Eminent Domain Acquisitions

In certain circumstances where PG&E is unable to reach an agreement for the acquisition of land rights, PG&E is permitted to commence an eminent domain action to condemn property that is required for the provision of its utility service. These actions either result in a court ruling or settlement with the third-party property owner that requires PG&E to provide just compensation for

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the property being condemned.  On average, PG&E acquires fewer than fifty (50) properties per year through eminent domain proceedings.[2]

It is my understanding that counterparties may want assurance that any potential transactions they enter into with the Debtors are not at risk of being undone by an adverse order of this Court.  In other words, they do not want to guess about what is in the ordinary course of a debtor's business.  It is my opinion that an order approving the proposed procedures set forth in the Motion will satisfy most counterparties and title companies, thus greatly minimizing the need to seek individual "comfort" orders from the Court, which would be a costly and time-consuming endeavor.  For those transactions covered by the Motion that are under the dollar threshold triggering Committee review, the counterparty (and, if one is involved, the title company) will be able to confirm objectively that the transaction is covered by the procedures set forth herein.  For those transactions covered by the Motion that are over the dollar threshold triggering Committee review but under the dollar threshold requiring Court approval, PG&E anticipates that the counterparty (and, if one is involved, the title company) will accept a certificate from PG&E and/or the Committees stating that the transaction has been reviewed by the Committees under the procedure specified herein and that the Committees have not objected to the transaction, and therefore the transaction is authorized pursuant to the order granting the relief requested herein.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct.

Dated: March 20, 2019
       San Francisco, California

                                      By:  /s/ *Andrew Williams*
                                           Andrew Williams

---

[2] In 2018, PG&E settled all actions where PG&E was seeking to acquire land by way of eminent domain and all amounts paid on account of such settlements are included in the $4.5 million amount set forth in section VI.A of the Motion.