**EXHIBIT 1-2**
**Redline Comparison**

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

*Proposed Attorneys for Debtors and Debtors
in Possession*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>**- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br><br>(Jointly Administered)<br><br>**[PROPOSED] FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING** |

| | |
|---|---|
| | **RELATED RELIEF** |
| | |
| | ~~Date:   March 13, 2019~~ |
| | ~~Time:   9:30 a.m. (Pacific Time)~~ |
| | ~~Place:   United States Bankruptcy Court~~ |
| | ~~Courtroom 17, 16th Floor~~ |
| | ~~450 Golden Gate Avenue~~ |
| | ~~San Francisco, CA 94102~~ |

~~FINAL ORDER TO OBTAIN~~
~~POSTPETITION FINANCING~~

Upon the Motion, dated January 29, 2019 (the "**Motion**"), of PG&E Corporation, a California corporation ("**PG&E Corp.**"), and Pacific Gas and Electric Company, a California corporation ("**Pacific Gas and Electric Company**"), each as debtors and debtors in possession (collectively, the "**Debtors**" and together with their non-Debtor affiliates, the "**Company**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the local rules for the United States Bankruptcy Court for the Northern District of California (the "**Local Bankruptcy Rules**"), seeking entry of the Interim Order (as defined below) and this final order (this "**Final Order**"):

> (i) authorizing the Borrower (as defined below) to obtain post-petition financing pursuant to a senior secured, superpriority debtor-in-possession new money credit facility in an aggregate principal amount of up to $5,500,000,000 on the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019 (the "**DIP Credit Agreement**")[1], by and among Pacific Gas and Electric Company (the "**Borrower**"), PG&E Corp. and the other Guarantors (the "**Guarantors**"), the several banks and other financial institutions or entities from time to time party thereto as lenders or issuing lenders (collectively, the "**DIP Lenders**"), J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Bank PLC, Citibank, N.A., BNP Paribas Securities Corp., Credit Suisse Loan Funding LLC, Goldman Sachs Bank USA, MUFG Union Bank, N.A. and Wells Fargo Securities, LLC, as joint lead arrangers and joint bookrunners (together and in such capacities, the "**DIP Arrangers**"), JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, and together with its successors and permitted assigns, the "**DIP Administrative Agent**" or "**JPMCB**"), and Citibank, N.A., as collateral agent (in such capacity, and together with its successors and permitted assigns, the "**DIP Collateral Agent**", and together with the DIP Administrative Agent, the "**DIP Agents**"), which credit facility is comprised of (a) a revolving credit facility (the "**DIP Revolving Facility**"; the loans incurred thereunder, the "**DIP Revolving Loans**") with aggregate commitments of up to $3,500,000,000, including a letter of credit sub-facility in an aggregate amount of up to $1,500,000,000 (the "**DIP L/C Sub-Facility**"), (b) a term loan facility (the "**DIP Term Loan Facility**") in an aggregate principal amount of $1,500,000,000 (the loans incurred thereunder, the "**DIP Term Loans**") and (c) a delayed draw term loan facility in an aggregate principal amount of $500,000,000 (the "**DIP Delayed Draw Term Loan Facility**") (the loans incurred thereunder, the "**DIP Delayed Draw Term Loans**"; the DIP Delayed Draw Term Loans together with the DIP Revolving Loans and the DIP Term Loans, the "**DIP Loans**"; the DIP Delayed Draw Term Loan Facility, together with the DIP Revolving Facility and the DIP Term Loan Facility, the "**DIP Facilities**");

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

(ii)   authorizing the Guarantors (together with the Borrower, the "**Loan Parties**") to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the DIP Obligations (as defined below);

(iii)  authorizing and ratifying on a final basis the Debtors' execution and delivery of the DIP Credit Agreement and other documentation, including security agreements, pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, the commitment letter, the Fee Letters (as defined below), and such other documentation which may be necessary or required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the DIP Administrative Agent, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Loan Documents**"; all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Loan Documents, collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)   granting to the DIP Agents for the benefit of the DIP Lenders (collectively, the "**DIP Secured Parties**") allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens on and security interests in all DIP Collateral (as defined below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure the DIP Obligations, in each case as and to the extent, and subject to the relative ranking and priorities (and, in any event, junior to the Carve-Out), set forth in this Final Order;

(v)    authorizing the Debtors to use proceeds of the DIP Facilities solely in accordance with this Final Order and the DIP Loan Documents;

(vi)   authorizing the Debtors to pay all fees, costs and expenses due pursuant to the DIP Credit Agreement, the other DIP Loan Documents and the Fee Letters;

(vii)  vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order; and

(viii) waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order and providing for the immediate effectiveness of this Final Order.

The Court, having considered the Motion, the terms of the DIP Facilities, the DIP Credit Agreement and the declarations of David Kurtz (the "**Kurtz Declaration**") and Jason P. Wells (the "**Wells Declaration**") filed in support of the Motion, and the evidence submitted at each of the interim

hearing held before this Court on January 31, 2019 (the "**Interim Hearing**") and the final hearing held before this Court on March 13, 2019 **and continued to March 27, 2019** (the "**Final Hearing**") to consider entry of the Interim Order and this Final Order, respectively; and in accordance with Bankruptcy Rules 4001(c)(2) and (c)(3), due and proper notice of the Motion, the Interim Hearing and the Final Hearing having been given; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; the Court having entered, on January 31, 2019, the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [Docket No. 217] (the "**Interim Order**") approving the Motion on an interim basis; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

<u>**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>[2]

**A.    Petition Date.**

On January 29, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California commencing these Chapter 11 cases (the "**Chapter 11 Cases**").

**B.    Debtors-in-Possession.**

The Debtors are continuing to operate their businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

### C. Jurisdiction and Venue.

The Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.) and Rule 5011-1(a) of the **Local** Bankruptcy ~~Local Rules for the United States District Court for the Northern District of California~~**Rules**.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and granted in this Final Order are sections 105, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

### D. Notice.

Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors to:  (a) the Office of the U.S. Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.) (the "**U.S. Trustee**"); (b) counsel to the DIP Agents; (c) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (d) counsel to the Creditors Committee (as defined below); (e) counsel to the Tort Claimants Committee (as defined below); (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) the Office of the California Attorney General on behalf of the California Public Utilities Commission; (i) the Nuclear Regulatory Commission; (j) the Federal Energy Regulatory Commission; (k) the Office of the United States Attorney for the Northern District of California; (l) all known parties asserting a lien on, or a security interest in, the assets of the Debtors to the extent reasonably known to the Debtors; and (m) those persons who have formally appeared in the Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  Under the circumstances, such notice of the Final Hearing and the final relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c), and the Local Bankruptcy Rules.

### E. Committee Formation.

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**").  On February 15, 2019, the U.S.

Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and, together with the Creditors Committee and any other statutory committee appointed in the Chapter 11 Cases, the "**Committees**").

**F.**     **Permitted Prior Liens and Senior Permitted Liens.**

Nothing herein shall constitute a finding or ruling by the Court that any alleged Permitted Prior Lien or Senior Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors or the DIP Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or Senior Permitted Lien.

**G.**     **Need for Postpetition Financing.**

The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and to maximize the return for all creditors requires the availability of the DIP Facilities. In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates, creditors and other stakeholders would occur. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facilities.

**H.**     **No Credit Available on More Favorable Terms.**

The Debtors have been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. The Debtors have been unable to obtain credit for borrowed money without granting the DIP Liens, the DIP Superpriority Claim (defined below) and certain other protections set forth herein to (or for the benefit of) the DIP Secured Parties. Moreover, the Debtors were unable to obtain financing from sources other than the DIP Lenders on more favorable terms and conditions than the terms and conditions of the DIP Facilities.

### I.     Extension of Financing.

The DIP Secured Parties have indicated a willingness to provide financing to the Loan Parties in accordance with the DIP Credit Agreement and the other DIP Loan Documents, subject to (i) the entry of this Final Order, including, among other things, approval of the benefits and protections for the DIP Secured Parties contained herein, (ii) approval and ratification of the Debtors' entry into the DIP Credit Agreement and the other DIP Loan Documents, and (iii) findings by this Court that such financing is essential to the Debtors' estates (and the continued operation of the Loan Parties and their Subsidiaries), that the DIP Secured Parties have acted in good faith and are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with this Final Order (and the Interim Order) and the DIP Facilities (including the DIP Superpriority Claim and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, the Interim Order, this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

### J.     Business Judgment and Good Faith Pursuant to Section 364(e).

(i)     The DIP Loan Documents are the result of a competitive process conducted by the Debtors, along with their advisors.  The Debtors, in consultation with their advisors, concluded that the DIP Facilities represent the best available financing under the circumstances.  The DIP Credit Agreement and the other DIP Loan Documents were negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties.  The terms and conditions of the DIP Facilities, the DIP Credit Agreement and the other DIP Loan Documents, and the fees paid and to be paid thereunder and under the Fee Letters, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and consideration.

(ii)     All obligations incurred, payments made, and transfers or grants of security set forth in the Interim Order, this Final Order, the DIP Credit Agreement and the other DIP Loan Documents by any Loan Party are granted to or for the benefit of the Loan Parties for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

(iii)     The credit to be extended under the DIP Credit Agreement, the DIP Facilities and the other DIP Loan Documents shall be deemed to be extended by the DIP Secured Parties in good faith and for valid business purposes and uses, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and each of the DIP Secured Parties (and the successors and assigns of each) are entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code whether or not the

Interim Order, this Final Order, or any provision hereof (or thereof) is vacated, reversed, stayed or modified, on appeal or otherwise.

**K.     Relief Essential; Best Interest.**

The relief requested in the Motion (and provided in this Final Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their respective assets and property.  It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Credit Agreement and the other DIP Loan Documents, incur the DIP Obligations and grant the liens and claims contemplated in the DIP Credit Agreement, in this Final Order and under the other DIP Loan Documents to the DIP Secured Parties.

**NOW, THEREFORE,** on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, the Final Hearing, the Kurtz Declaration and the Wells Declaration, and with the consent of the Debtors and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.     **Motion Granted**.  The Motion is hereby granted on a final basis in accordance with the terms and conditions set forth in this Final Order.  Any objections to the Motion with respect to entry of this Final Order to the extent not withdrawn or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.     **Authorization of DIP Facilities.**

(a)     The DIP Facilities and the DIP Loan Documents are hereby approved on a final basis.  The Debtors were, by the Interim Order, and hereby are authorized to enter into the DIP Loan Documents and to pay all DIP Obligations without further order of the Court.  The Borrower was, by the Interim Order, and hereby is authorized to borrow money and obtain letters of credit pursuant to the DIP Loan Documents, and the Guarantors were, by the Interim Order, and hereby are authorized to guarantee such borrowings and letters of credit, in each case, in accordance with and subject to the terms of this Final Order and the DIP Loan Documents.  Any DIP Loan Document entered into, and any and all actions taken, by the Debtors, the DIP Administrative Agent, the DIP Collateral Agent, the DIP Arrangers and each of the DIP Lenders as contemplated by, in accordance with and/or in

furtherance of the Interim Order and the DIP Loan Documents are hereby approved and ratified in full as if taken in accordance with this Final Order. Without limiting the foregoing, any and all actions taken by the Debtors, the DIP Administrative Agent, the DIP Collateral Agent, the DIP Arrangers and each of the DIP Lenders in connection with the syndication of the DIP Facilities are hereby approved and ratified in full as if taken in accordance with this Final Order.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor was, by the Interim Order, and hereby is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of any DIP Loan Documents), and to pay all fees, that may be required or necessary for the Debtors' performance of their obligations under the DIP Facilities, including, without limitation:

(i)     the execution, delivery and performance of the DIP Loan Documents, including, without limitation, the creation and perfection of the DIP Liens described and provided for herein;

(ii)     the execution, delivery and performance of one or more amendments to the DIP Loan Documents for the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Facilities among the DIP Lenders, in each case in such form as the Debtors, the DIP Administrative Agent and the affected DIP Lenders may agree;

(iii)     the non-refundable payment to the DIP Agents, the DIP Arrangers and/or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement, the DIP Loan Documents and in the Fee Letters (as defined in the DIP Credit Agreement) (which fees, whether paid prior to or after the date hereof, are hereby approved) and costs and expenses as may be due under the DIP Loan Documents from time to time, including, without limitation, fees and expenses of the professionals retained by the DIP Agents, the DIP Arrangers and/or the DIP Lenders as and to the extent provided for in the DIP Loan Documents without the necessity of filing retention motions or fee applications (subject to paragraph 17 hereof with respect to the procedure for the payment of such professional fees and expenses); and

(iv)    the performance of all other acts that may be necessary, required or advisable under or in connection with the DIP Loan Documents.

(c)    The DIP Credit Agreement and the other DIP Loan Documents shall represent, constitute and evidence the DIP Obligations, and the DIP Loan Documents and DIP Obligations shall be valid and binding, joint and several, obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in any of the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Chapter 11 cases (collectively, the "**Successor Cases**") in accordance with the terms thereof and this Final Order.  All obligations incurred, payments made, and transfers or grants of security set forth in the Interim Order, this Final Order, the DIP Credit Agreement or the other DIP Loan Documents by any Loan Party are granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.  No obligation incurred, payment made, transfer or grant of security set forth in the Interim Order, this Final Order, the DIP Credit Agreement or the other DIP Loan Documents, in each case whether pre- or post-petition, by any Loan Party as approved under the Interim Order or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, subordination, setoff, recoupment, counterclaim or any other challenge under the Bankruptcy Code or any applicable non-bankruptcy law, rule or regulation.

(d)    **Authorization for Borrowing**.  In order to continue to operate the Debtors' businesses, from the entry of the Interim Order through the DIP Termination Date, subject to the terms and conditions of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents, the Borrower is hereby authorized to borrow and obtain letters of credit under the DIP Facilities, and the Guarantors are authorized to guarantee such borrowings and letters of credit, incurred pursuant to, and in accordance with, this Final Order, the DIP Credit Agreement and the other DIP Loan Documents

(e)    **Incremental Facilities**.  Notwithstanding anything contained in this Final Order, the DIP Credit Agreement or the other DIP Loan Documents to the contrary, the Debtors must obtain Court approval prior to the incurrence of any Incremental Facility; *provided*, *however*, this paragraph

2(e) shall not impact the terms and conditions of the DIP Loan Documents related to Incremental Facilities (including, without limitation, the provisions of section 2.3 of the DIP Credit Agreement), which terms and conditions shall be given effect.

3.        **DIP Liens.**   Immediately upon entry of the Interim Order, and effective as of the Petition Date, in order to secure the DIP Obligations, the DIP Collateral Agent, for the benefit of the DIP Secured Parties, was granted (and such grant is hereby ratified, confirmed and approved on a final basis) valid, binding, fully and automatically perfected, continuing, enforceable and non-avoidable liens and security interests (collectively, the "**DIP Liens**") in the DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.  The term "DIP Collateral" shall mean all prepetition and postpetition assets and properties (real and personal) of the Debtors, including all "Collateral" as defined in the DIP Credit Agreement, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), whether owned or consigned by or to, or leased from or to, the Debtors, and wherever located including, without limitation, all cash and cash equivalents of the Debtors wherever located, inventory, accounts and accounts receivable, other rights to payment, contracts, instruments, documents and chattel paper, all securities (whether or not marketable), goods, equipment, inventory and fixtures, all real and leasehold property interests, general intangibles, patents, copyrights, trademarks, trade names and all other intellectual property, capital stock, investment property, all books and records, commercial tort claims (including the proceeds of all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Action Proceeds**")) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; *provided, however*, that the DIP Collateral shall not include (x) Excluded Property (as defined in the DIP Credit Agreement) or (y) any right, title and interest of the Debtors in any asset or property (or any asset or property in respect of a program) as and to the extent set forth on **Schedule A** of this Final Order (collectively, the "**CPUC Excluded Property**"); *provided, further, however*, that DIP Collateral shall include all proceeds and products of Excluded Property and CPUC Excluded Property, in each case, that are not themselves Excluded Property or CPUC Excluded Property.

4.     **Priority of DIP Liens**.

(a)     The DIP Liens shall have the following priorities (in each case subject to the Carve-Out and Senior Permitted Liens):

(i)     pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a valid, perfected, enforceable and unavoidable lien or security interest in existence as of the Petition Date or subject to a valid lien or security interest in existence as of the Petition Date that is perfected subsequent thereto as expressly permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), and

(ii)     pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all DIP Collateral that is subject to a Permitted Prior Lien, subject to such Permitted Prior Liens.

(b)     Notwithstanding any provision contained in this Final Order (including, without limitation, the provisions of Section 4(a) hereof) to the contrary, with respect to the prepetition security interests and liens asserted by the California Self-Insurers' Security Fund ("**CSISF**") or the Director of the Department of Industrial Relations for the State of California (the "**Director**") pursuant to Section 3701(k) of the California Labor Code, as amended, against the DIP Collateral (the "**Prepetition CSISF Liens**"), and for purposes of this Final Order and all amounts outstanding under the DIP Facilities and to provide CSISF and the Director adequate protection with respect to the asserted Prepetition CSISF Liens, and to provide the Debtors with the benefit of ongoing participation in the self-insurance plan of the Department of Industrial Relations for the State of California (the "**Self Insurance Program**"), in which CSISF alleges the Debtors would not otherwise be entitled to participate on an ongoing basis absent the agreement of CSISF contained herein:

(i)     Pursuant to Sections 105, 361 and 364(c)(3) of the Bankruptcy Code, CSISF and the Director are hereby granted valid, enforceable, non-avoidable and automatically perfected

"silent second" priority liens[3] (the "**Post-Petition CSISF Liens**" and, together with the Prepetition CSISF Liens, the "**CSISF Liens**") on all DIP Collateral other than the CSISF Cash Collateral (as defined below), junior in all respects to the Carve-Out, the DIP Liens, the Permitted Prior Liens and the Senior Permitted Liens to secure the Debtors' workers' compensation obligations to CSISF and the Director as participants in the Self-Insurance Program (whether arising before, on or after the Petition Date) (the "**Workers' Compensation Obligations**") in an amount not to exceed the Adjusted CSISF Cap[4].

        (ii)     CSISF and the Director shall permit the Debtors to continue to maintain, in active status, Certificate of Consent to Self-Insure No. 0012 and all affiliate or subsidiary certificates (collectively, the "**Certificates**") and shall not take any action to revoke the Certificates or omit to take any action necessary for the continued effectiveness of the Certificates, in each case so that the Debtors may continue to enjoy the economic and other benefits of their ongoing participation in the Self Insurance Program, with the terms of such

---

[3]    By "silent second," it is understood and agreed that, until the DIP Obligations have been paid in full (as defined below), the holders of Post-Petition CSISF Liens shall have no right or ability (i) to impair, delay or oppose any rights or remedies of the DIP Secured Parties with respect to the DIP Collateral (including, without limitation, their exercise of rights and remedies against DIP Collateral); (ii) to exercise any rights or remedies against DIP Collateral until the DIP Secured Parties shall have commenced, and shall have completed, the enforcement or exercise of rights or remedies against such DIP Collateral in accordance with the terms of the DIP Loan Documents and applicable law; or (iii) to have any consent right or to withhold consent to any Disposition of DIP Collateral, or other release of liens on DIP Collateral, in each case to the extent permitted by the terms of the DIP Loan Documents or otherwise consented to by the DIP Secured Parties (it being understood and agreed that any Post-Petition CSISF Liens on such DIP Collateral shall be automatically released and discharged upon the consummation of any such Disposition or other release of DIP Liens; *provided, however*, that the Post-Petition CSISF Liens shall attach to any proceeds of any such Disposition or other release of liens that are not paid to holders of senior liens, including the DIP Liens).

[4]    The "**Adjusted CSISF Cap**" shall mean the amount actuarially determined by the Debtors to be their total self-insured California workers' compensation liability, as calculated on an annual basis as of December 31 of each year and as reflected in an actuarial report and study made and submitted to the Director in accordance with 8 Cal. Code Regs. Section 15209 (the "**Total CSISF Cap**"), less any CSISF Cash Collateral then on deposit with CSISF or the Director. Notwithstanding any provision contained in this Final Order to the contrary, all rights of CSISF or its Director are reserved to object to either (a) any plan of reorganization (other than any terms of such plan of reorganization relating to the treatment of the DIP Obligations or the DIP Secured Parties) or (b) any proposed amendment or modification of the DIP Facilities that would result in an increase in the aggregate amount of Commitments thereunder to an amount in excess of $9,500,000,000.

participation to be established by CSISF reasonably and in good faith in accordance with applicable statutes and regulations; *provided, however,* if (x) the Debtors fail to make timely benefit payments under and as required by the Self Insurance Program or (y) the value of the CSISF Liens falls below the Adjusted CSISF Cap, as reasonably determined by the Director in good faith (in consultation with the Debtors), nothing herein shall prohibit the Director, acting reasonably and in good faith in accordance with applicable statutes and regulations, from (i) declaring a default with respect to the Debtors under such programs, (ii) revoking the Certificates, (iii) calling on any and all CSISF Cash Collateral posted with the Director, and/or (iv) directing CSISF to administer the Debtors' self-insured obligations arising under the Certificates (it being understood and agreed that all rights and remedies of the parties with respect thereto, including those rights and remedies arising under the Bankruptcy Code, are expressly reserved).

(iii)    The Debtors may use all cash collateral (other than the CSISF Cash Collateral) and other property and assets in which CSISF or the Director have or may have a CSISF Lien during the pendency of these Chapter 11 Cases, it being understood and agreed that CSISF has consented to such use in connection with the grant of the Post-Petition CSISF Liens. Furthermore, as additional adequate protection and to comply with the requirements of participation in the Self Insurance Program, the Debtors shall pay all reasonable, documented out-of-pocket fees, costs and expenses (including reasonable, documented out-of-pocket fees, costs and expenses of one outside legal advisor) of CSISF as well as any program fees reasonably imposed by CSISF, in each case to the extent required by applicable regulations and program requirements.

(iv)    Subject to the terms hereof, CSISF and the Director shall be entitled to retain all cash, marketable securities, surety bonds and letters of credit posted with CSISF or the Director (the "**CSISF Cash Collateral**") on or prior to the date hereof.

(v)    The CSISF Liens are, and at all times hereafter shall be, subordinate in all respects to the Carve-Out, the DIP Liens, the Permitted Prior Liens and the Senior Permitted Liens.

(vi)     The CSISF Liens shall be automatically released and discharged upon the earliest to occur of: (1) the satisfaction in full in cash of all Workers' Compensation Obligations, as confirmed in writing by CSISF to the Debtors, (2) additional CSISF Cash Collateral having been provided in an amount reasonably satisfactory to CSISF and the Director (which aggregate amount shall in no event exceed the Total CSISF Cap) and (3) subject to requirements of applicable law, the effective date of a plan of reorganization in these Chapter 11 Cases (it being understood and agreed that, except as otherwise provided by such plan of reorganization or not permitted by applicable law, CSISF and the Director shall return all CSISF Cash Collateral to the Debtors upon the effective date thereof).

The foregoing is without prejudice to the rights of all parties, including the rights of the Debtors, any Committee or any other party in interest to challenge the Prepetition CSISF Liens; *provided, however,* that (a) no party shall have the right to challenge or reverse the subordination described above or the Post-Petition CSISF Liens granted herein; (b) CSISF and the Director shall not be entitled to request any additional collateral or adequate protection in connection with the Workers' Compensation Obligations or the CSISF Liens and (c) no party shall have the right to compel the return of any CSISF Cash Collateral unless and until the Workers' Compensation Obligations shall have been satisfied in full (other than in connection with the release of the CSISF Liens contemplated by clause (vi)(3) above).

5.     **DIP Superpriority Claim.**

(a)     Upon the entry of the Interim Order, and effective as of the Petition Date, the DIP Agents, for the benefit of the DIP Secured Parties, were granted (and such grant is hereby ratified, confirmed and approved on a final basis) pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") for all DIP Obligations, (a) which shall rank junior to the Carve-Out and (b) with priority over any and all administrative expense claims, unsecured claims and all other claims asserted against the Debtors (without the need to file a proof of claim) or their estates in any of the Chapter 11 Cases or any Successor Cases at any time, now existing or hereafter arising of any kind or nature whatsoever, including all other administrative expenses of the kind specified in or ordered pursuant to sections 105,

326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code or applicable non-bankruptcy law, and over any and all other administrative expenses, unsecured or other claims arising under any other provision of the Bankruptcy Code. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense claim allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property and assets of the Debtors, including all DIP Collateral (including all Avoidance Action Proceeds). The DIP Superpriority Claim shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order or any provision hereof (or thereof) is vacated, reversed or stayed in any respect, or modified or amended in any manner, on appeal or otherwise.

(b) Except as expressly permitted herein or in the other DIP Loan Documents, the DIP Liens and the DIP Superpriority Claim, as applicable, (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate lien or claim and (D) any liens arising after the Petition Date; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

6. **Use of Proceeds of DIP Facilities**.

(a) Subject to the terms and conditions of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents, the Loan Parties are each authorized to use proceeds of the DIP Facilities only for the purposes, and upon the terms and conditions, set forth herein (a) for working capital and general corporate purposes, and (b) to pay fees, costs and expenses incurred in connection with the transactions contemplated by the DIP Loan Documents and professional and other

fees and costs of administration incurred in connection with the Chapter 11 Cases, in each case, in accordance with and subject to the terms of this Final Order and the DIP Loan Documents.

(b) **Lien Perfection**. This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the Loan Parties shall be authorized to execute and deliver to the DIP Agents all financing statements, security agreements, notices of liens and other similar documents as the DIP Agents may reasonably request to grant, preserve, protect and perfect the validity and priority of the DIP Liens; *provided*, *however*, that notwithstanding anything to the contrary in this Final Order, the DIP Credit Agreement or any other DIP Loan Document, no such filing or recordation shall be necessary or required to perfect the DIP Liens, and no Loan Party or any Subsidiary of a Loan Party shall be required to execute or deliver any mortgage, authorize any fixture filing, execute or deliver any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction or undertake any registration in respect of assets subject to a certificate of title in order to perfect the DIP Liens in any portion of the DIP Collateral, including any and all cash wherever located or held, and all such liens and security interests are nonetheless hereby deemed fully and automatically perfected. The DIP Agents may, in their sole discretion, file such financing statements, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, security agreements, notices of liens and other similar documents shall be deemed to have been filed or recorded on the Petition Date. The DIP Agents, in their sole discretion, may file a copy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Loan Party has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.

7.     **Insurance of DIP Collateral**.  Unless the DIP Administrative Agent otherwise consents in writing, until the indefeasible payment in full in cash of all DIP Obligations (other than any contingent DIP Obligations not yet due and payable), the termination of the Commitments with respect to the DIP Facilities and the expiration or termination of all outstanding Letters of Credit (or, with respect to any undrawn Letters of Credit, the establishment of a "backstop" letter of credit reasonably satisfactory to the DIP Administrative Agent and/or the applicable Issuing Lender or other Cash Collateralization thereof) ("**payment in full**" or "**paid in full**"), the Debtors shall continue to maintain all property, operational and other insurance as and to the extent required and specified in the DIP Loan Documents.  Upon entry of the Interim Order (and hereby ratified, confirmed and approved on a final basis), and to the fullest extent provided by applicable law, the DIP Agents (on behalf of the DIP Lenders) were, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

8.     **Limitations on the Use of Proceeds**.  None of the DIP Facilities, the DIP Collateral, the DIP Loans, proceeds of any of the foregoing, any portion of the Carve-Out or any other funds may be used, directly or indirectly, by any of the Debtors, any Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity to do any of the following (nor shall any professional fees, disbursements, costs or expenses be paid in connection therewith): (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP Agents' or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once a DIP Termination Event (as defined below) occurs (other than with respect to rights otherwise expressly granted herein with respect to the Remedies Notice Period (as defined below)); (b) to object to or challenge in any way the DIP Liens, the DIP Obligations or the DIP Collateral or any other claims or liens held by or on behalf of any of the DIP Agents or the DIP Lenders, in each case in their capacity as such; or (c) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse in any material respect

to the interests of, any of the DIP Secured Parties or any of their respective affiliates, subsidiaries, agents, officers, directors, shareholders, employees, agents, attorneys, advisors, professionals, predecessors in interest, successors and assigns with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to the Interim Order, this Final Order, the DIP Facilities or the DIP Loan Documents, including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claim, the DIP Liens or the DIP Loan Documents, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agents or the DIP Lenders hereunder or under any of the DIP Loan Documents (in each case, including, without limitation, claims, proceedings or actions that have the effect of preventing, hindering or delaying any of the DIP Agents' or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and this Final Order).

9. **No Further Consents**. To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent of any party or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or any other DIP Collateral is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force or effect with respect to the DIP Liens on such leasehold interests or such other DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Final Order.

10.     **Carve-Out**.

(a)     Subject to the terms and conditions contained in this paragraph 10, the DIP Liens and the DIP Superpriority Claim shall be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall comprise the following: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $100,000, incurred by a trustee appointed under section 726(b) of the Bankruptcy Code, and all reasonable and documented fees and expenses, in an aggregate amount not to exceed $100,000, incurred by a trustee appointed under section 1104 of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) all accrued and unpaid fees, costs and expenses (the "**Estate Professional Fees**") incurred by persons or firms retained by the Debtors (including for the avoidance of doubt, Cravath, Swaine & Moore LLP and Weil, Gotshal & Manges LLP) or any Committee, if any, pursuant to sections 327, 328, 330, 363 or 1103 of the Bankruptcy Code (collectively, "**Estate Professionals**") (x) at any time before or on the day of delivery by the DIP Agents of a Carve-Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (which amounts, for the avoidance of doubt, shall not be subject to the Post-Carve-Out Trigger Notice Cap), and (y) after the date (the "**Trigger Date**") on which the DIP Agents provide written notice to primary bankruptcy counsel to the Debtors (Weil, Gotshal & Manges LLP) and primary corporate and litigation counsel to the Debtors (Cravath, Swaine & Moore LLP) (together, "**Counsel to the Debtors**") stating that such notice is a "Carve-Out Trigger Notice" (the "**Carve-Out Trigger Notice**") and that a DIP Termination Event has occurred and has triggered the Carve-Out, to the extent allowed at any time, the payment of any Estate Professional Fees of Estate Professionals in an amount not exceeding $25,000,000 in the aggregate incurred after the Trigger Date (the "**Post-Carve-Out Trigger Notice Cap**").  The dollar limitation in clause (iii)(y) above on fees and expenses shall not be reduced or increased by the amount of any compensation or reimbursement of expenses paid prior to the occurrence of a DIP Termination Event in respect of which the Carve-Out is invoked.   The ability of any party to object to the fees, expenses,

Case: 19-30088    Doc# 1035-2    Filed: 03/25/19    Entered: 03/25/19 13:26:38    Page 22
of 37

reimbursement or compensation described above shall not be impaired by the terms of the Carve-Out or this Final Order.

(b)     On the day on which a Carve-Out Trigger Notice is given by the DIP Agents to Counsel to the Debtors, the Debtors shall promptly provide notice by email to all Estate Professionals, at the email addresses set forth in each Estate Professional's notice of appearance filed with the Court (or, if there is no such notice of appearance, at such Estate Professional's last known email address), informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out.

(c)     Nothing herein or in any of the DIP Loan Documents shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Committee, or of any other person or shall affect the right of the Debtors or the DIP Secured Parties to object to the allowance and payment of such fees and expenses. The DIP Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the Final Order or otherwise shall be construed to obligate the DIP Secured Parties in any way to pay compensation to or to reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     For the avoidance of doubt, the DIP Agents and the DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of a DIP Termination Event, or upon the occurrence of any act, event or condition that, with the giving of notice or the passage of time, or both, would constitute a DIP Termination Event.

(e)     For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities, and any and all other forms of liens or claims securing the DIP Obligations.

11.   **Proceeds of Subsequent Financing**.  If at any time prior to payment in full of all DIP Obligations, the Debtors, the Debtors' estates, any trustee, any examiner or any responsible officer

subsequently appointed in the Chapter 11 Cases or the Successor Cases, shall in violation of this Final Order, the DIP Credit Agreement or the other DIP Loan Documents, obtain credit or incur debt pursuant to sections 364(b), (c) or (d) of the Bankruptcy Code, and such financings are secured by any DIP Collateral, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agents for application in accordance with the DIP Credit Agreement or the other DIP Loan Documents.

12.    **Disposition of Collateral**.  The Debtors shall not sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as expressly permitted by the DIP Credit Agreement or the other DIP Loan Documents.

13.    **Termination Events**.

(a)    Each of the following occurrences or events shall constitute a termination event under this Final Order (each, a "**DIP Termination Event**", and the date upon which such DIP Termination Event occurs, the "**DIP Termination Date**"): (i) the occurrence of the scheduled maturity date of the DIP Facilities (subject to extension to the extent expressly set forth in Section 2.5 of the DIP Credit Agreement); (ii) the consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code; (iii) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no earlier than the "effective date" thereof) of any Chapter 11 plan; and (iv) the occurrence and continuation of an Event of Default (as defined in the DIP Credit Agreement).

14.    **Rights and Remedies Upon DIP Termination Event; Modification of Automatic Stay**.

(a)    Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agents, upon the occurrence and during the continuation of a DIP Termination Event, at the direction of the Required Lenders, to exercise all rights and remedies provided for in this Final Order, any of the DIP Loan Documents or applicable law, including, without limitation, (i) declare the termination, reduction

or restriction of any further commitment to the extent any such commitment remains (including provision of any letters of credit) under the DIP Facilities, (ii) declare all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, (iii) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations of any Loan Party, (iv) freeze monies or balances in the Debtors' accounts and/or set off any and all amounts in accounts maintained by the Debtors with the DIP Agents or the DIP Lenders against the DIP Obligations, (v) otherwise enforce any and all rights against the DIP Collateral under the DIP Loan Documents, and (vi) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Loan Documents or applicable law; *provided* that, prior to the exercise of any right in clause (iv) through (vi) of this paragraph, the DIP Administrative Agent, at the direction of the Required Lenders, shall provide seven (7) ~~calendar days' written notice~~**Business Days' written notice (other than with respect to a DIP Termination Event that is an Event of Default under Section 8(i)(ii) of the DIP Credit Agreement as a result of the appointment of a trustee under section 1104 of the Bankruptcy Code, in which case twenty-one (21) Business Days' written notice shall be provided)** (which may be via electronic mail or other electronic means) (the "**Remedies Notice**") to Counsel to the Debtors, lead counsel to each Committee, lead bankruptcy counsel to the CPUC and the U.S. Trustee of the occurrence of a DIP Termination Event and its intent to exercise such rights and remedies (the "**Remedies Notice Period**") (it being understood that the Carve-Out Trigger Notice may, to the extent delivered to each of the foregoing parties, include and constitute such notice). The Debtors shall file a copy of such Remedies Notice on the Court docket no later than one Business Day following receipt thereof.

(b)     Unless during such Remedies Notice Period, the Court determines that a DIP Termination Event has not occurred, the automatic stay imposed under section 105 or 362(a) of the Bankruptcy Code or otherwise as to the DIP Administrative Agent and the DIP Lenders, shall automatically be terminated immediately upon the expiration of the Remedies Notice Period, and the DIP Secured Parties, shall be permitted to exercise any and all rights and remedies set forth herein, in

the DIP Loan Documents and as otherwise available at law, at the direction of the Required Lenders, without further order of or application to the Court.

(c)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Final Order as necessary to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claim, (b) the Debtors to incur all DIP Obligations and pay all fees, costs and expenses under the DIP Credit Agreement and the other DIP Loan Documents, and (c) the implementation of all of the terms, rights, benefits, privileges and remedies of this Final Order and the DIP Loan Documents, in each case, without further notice, hearing or order of the Court.

15.     **Proofs of Claim**.  None of the DIP Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Final Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agents, on behalf of themselves and the DIP Secured Parties, are hereby authorized and entitled, in their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Final Order; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Agents or the other DIP Secured Parties.

16.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order**.  The DIP Secured Parties have acted in good faith in connection with the DIP Facilities, and their reliance upon the Interim Order and this Final Order is in good faith.  Based on the findings set forth in the Interim Order and this Final Order and the record made at the Interim Hearing and the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of the Interim Order or this Final Order are hereafter modified,

amended, vacated or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to all the protections and benefits provided by section 364(e) of the Bankruptcy Code.

17. **Expenses**. The Debtors are authorized to pay all prepetition and postpetition fees, costs, disbursement and expenses of the DIP Agents and the DIP Lenders that are payable by the Debtors in accordance with the DIP Loan Documents, the Interim Order and this Final Order. The invoice for any such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, but shall be reasonably detailed (and may be redacted for privilege or confidentiality concerns), and shall be sent to the U.S. Trustee, lead counsel for each Committee and Counsel to the Debtors (collectively, the "**Fee Notice Parties**"). If no objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "**Fee Objection Period**"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be paid by the Debtors in accordance with the terms of the DIP Credit Agreement. If an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be paid by the Debtors to the extent payable in accordance with the terms of the DIP Credit Agreement. Notwithstanding the foregoing, (a) the Debtors were authorized to pay on the Closing Date (which payment is hereby ratified, approved and confirmed on a final basis) all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Administrative Agent incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Credit Agreement, and (b) the Debtors are authorized to pay on the Full Availability Date all reasonable and documented fees, costs and out-of-pocket expenses of the DIP Administrative Agent incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Credit Agreement.

18. **Indemnification**. The Debtors are authorized to indemnify and hold harmless the DIP Agents, the DIP Lenders and each of the Indemnitees (as defined in the DIP Credit Agreement) in accordance with and subject to the terms and conditions of the DIP Credit Agreement.

19.  **Binding Effect**.  The provisions of this Final Order shall be binding upon and inure to the benefit of the Debtors, the DIP Secured Parties and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), any and all creditors of the Debtors, any Committee and any other parties in interests and each of their respective successors and assigns, whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

20.  **No Waiver by Failure to Seek Relief**.  The failure at any time of the DIP Secured Parties to require strict performance by the Debtors of any provision of this Final Order, or to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Credit Agreement or the other DIP Loan Documents or otherwise, shall not prejudice or constitute a waiver of any of the DIP Secured Parties' rights hereunder, thereunder, or otherwise.  None of the rights or remedies of any party under this Final Order shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom enforcement is sought.  No consents required hereunder by any of the DIP Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties.

21.  **Rights Reserved**.  Notwithstanding anything to the contrary in this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law against any other person or entity in any court, including without limitation, the right of the DIP Agents (i) to request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan; (iii) to request modification of the automatic stay; or (iv) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) on behalf of the DIP Secured Parties.

Case: 19-30088   Doc# 1035-2   Filed: 03/25/19   Entered: 03/25/19 13:26:38   Page 28
of 37

22.   **No Third Party Rights**.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

23.   **Section 506(c) Waiver**.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facilities, and in exchange for the DIP Agents' and the DIP Lenders' willingness to provide the DIP Facilities and their agreement to subordinate their liens and superpriority claims to the Carve-Out to the extent set forth herein (and without prejudice to the contention of the DIP Agents and the DIP Lenders that section 506(c) of the Bankruptcy Code does not apply to the DIP Facilities), no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection or enhancement of realization by the DIP Lenders upon the DIP Collateral, shall be charged against any of the DIP Agents, the DIP Lenders, the DIP Obligations or DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Administrative Agent, in its sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out), in each case, except for the Carve-Out.

24.   **No Marshalling**.  The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral other than Avoidance Action Proceeds.

25.   **Right to Credit Bid**.  Subject to the terms and conditions of the DIP Loan Documents, each of the DIP Agents (at the direction of the Required Lenders) shall have the unqualified right to "credit bid" up to the full amount of the DIP Obligations (other than any obligations in respect of Letters of Credit), as applicable, in connection with any sale or other disposition of all or any portion of the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

26. **Amendments**. Notwithstanding anything contained herein to the contrary, no amendment, modification or supplement of any of the DIP Loan Documents shall be effective unless in writing and in accordance with the applicable DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make any nonmaterial amendment, modification or supplement of any provision of the DIP Credit Agreement or the other DIP Loan Documents, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver, without further notice to or approval of the Court. In the case of any material amendment, modification or supplement to the DIP Loan Documents that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via electronic mail or other electronic means) to the Notice Parties, each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to such Material Amendment; *provided, however,* that any amendment, modification or supplement to the DIP Loan Documents for the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Facilities among the DIP Lenders as contemplated by paragraph 2(b)(ii) hereof shall not require notice to any person or entity or further order of the Court. If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material Amendment, the Debtors may proceed to execute such Material Amendment, which shall become effective immediately upon execution. If a Notice Party timely objects, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate a Material Amendment.

27. **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Interim Order, the Motion, any other order of this Court (including, without limitation, the Cash Management Order), or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Loan Documents, the terms and provisions of this Final Order shall govern.

28. **Survival of Final Order**. The provisions of this Final Order and any actions taken pursuant hereto shall survive and shall not be modified, impaired or discharged by entry of any order which may be entered (i) confirming any Chapter 11 plan in the Chapter 11 Cases, (ii) converting any

Case: 19-30088    Doc# 1035-2    Filed: 03/25/19    Entered: 03/25/19 13:26:38    Page 30
of 37

of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court. The terms and provisions of this Final Order, including the DIP Liens, DIP Superpriority Claim, and other rights, privileges, benefits and protections afforded herein and in the DIP Loan Documents to the DIP Secured Parties shall continue in full force and effect notwithstanding the entry of such order, and shall maintain their respective priorities as provided by this Final Order, the DIP Credit Agreement and the other DIP Loan Documents (as the case may be) until the payment in full of the DIP Obligations, and this Court shall retain jurisdiction, notwithstanding conversion or dismissal of any of the Chapter 11 Cases, for the purposes of enforcing the foregoing to the extent permitted by applicable law.

29. **Enforceability**. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

30. **Waiver of Any Applicable Stay**. This Final Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3), 6004 or any other Bankruptcy Rule.

31. **Discharge**. The DIP Obligations shall not be discharged by the entry of an order confirming any plan in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan, or each of the DIP Secured Parties has otherwise agreed in writing.

32. **Limitation of Liability**. In determining to ~~make any loan under~~**enter into** the DIP Loan Documents **and in making any loans prior to or as of the date of the entry of this Final Order, including the DIP Term Loans,** pursuant to this Final Order, the DIP Credit Agreement or the other DIP Loan Documents, the DIP Secured Parties in their capacity as such shall not be deemed to be

in control of the operations of the Loan Parties or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Loan Parties (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Furthermore, nothing in this Final Order, the DIP Credit Agreement or the other DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties of any liability for any claims pursuant to environmental law arising from the prepetition or postpetition activities of any of the Loan Parties. None of the DIP Secured Parties in their capacity as such or any of their Affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and none of the DIP Secured Parties or any of their Affiliates shall assume or in any way be responsible for any liability or obligation pursuant to environmental law of any of the Debtors and/or their estates. Notwithstanding the foregoing, the provisions of this paragraph 32 shall apply only to the extent that the DIP Lenders' actions do not (a) constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned, leased or operated by a Debtor, or (b) otherwise cause (i) liability to arise to the federal or state government or (ii) the status of any responsible person or the managing agent to exist, in each case under applicable law (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

33. **Cash Management Liens; Exchange Operator Liens**.

Notwithstanding anything to the contrary in this Final Order, none of the DIP Liens shall prime any properly perfected lien or security interest in cash collateral or letters of credit securing any obligations owed by any Loan Party to:

(a) to the extent existing as of the Petition Date, any Cash Management Bank under any Cash Management Agreement entered into with any Loan Party; or

(b) the Exchange Operators (as defined in the Exchange Operator Order (as defined below)) and Citigroup Energy, Inc., as a Trading Counterparty (as defined in the Exchange Operator Order) whether (i) existing as of the Petition Date or (ii) granted pursuant to paragraphs 4 and 7, as

applicable, of the *Order Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to (A) Honor Prepetition Obligations to Natural Gas and Electricity Exchange Operators, (B) Grant Administrative Expense Claims and Authorize Posting of Postpetition Collateral to Exchange Operators, Trading Counterparties, and Future Commission Merchants, (C) Modify the Automatic Stay, and (D) Grant Related Relief* (the "**Exchange Operator Order**") to secure transactions entered into in the ordinary course of the Loan Parties' businesses, which provisions of the Exchange Operator Order granting such liens shall remain in full force and effect and shall not be modified by the terms of this Final Order), and all such liens and security interests shall be deemed to be Permitted Prior Liens or Senior Permitted Liens, as applicable, hereunder and under the DIP Credit Agreement.

34. **Reclamation Claims.** Nothing within this Final Order extinguishes, impairs or prejudices the right or ability of any creditor to assert a valid reclamation claim under section 546(c) of the Bankruptcy Code, including but not limited to the right to assert an administrative expense claim to the extent goods subject to a valid reclamation claim under section 546(c) of the Bankruptcy Code are sold or used by the Debtors; *provided*, *however*, that the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the DIP Liens, and in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

35. **Limitation on Transfer of DIP Collateral**. The limited exemption that CPUC granted to the Debtors in proceedings A. 18-10-003 and A.18-11-001 (the "**CPUC DIP Proceedings**") pursuant to Public Utilities Code Sections 829(c) and 853(b) in respect of the Debtors' debtor-in-possession financing does not extend to the transfer of ownership of any utility asset that is part of the DIP Collateral pursuant to the DIP Loan Documents. Prior to any exercise of remedies by the DIP Secured Parties that would result in the transfer of any utility asset that is part of the DIP Collateral pursuant to the DIP Loan Documents, the Debtors must seek **and obtain** CPUC approval to execute such a transfer under Public Utilities Code Section ~~851~~**851 (and no such transfer shall occur prior to the date that is twenty-one (21) Business Days after the date of delivery of the applicable Remedies Notice).**

36. **Notice to CPUC**. Within three days of incurrence of an Incremental Facility, the Debtors shall file and serve a compliance filing in the CPUC DIP Proceedings, notifying CPUC of the terms thereof.

37. **Subrogation Claims**. Subject in all respects to Section 12.4 of the DIP Credit Agreement (including, without limitation, the prior payment in full of all DIP Obligations), any subrogation claims of each Contributing Party pursuant to Section 12.1(b) of the DIP Credit Agreement shall be entitled to the same claim and lien priority as the underlying DIP Loans pursuant to which any such subrogation claims arose.

38. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facilities and/or this Final Order.

**END OF ORDER**

## Schedule A[5]

Directed Contracts

Any right, title, and interest of the Debtors in respect of contracts that the Debtors have entered into as of the Petition Date pursuant to an express CPUC directive or another express Requirement of Law, as provided below:

1. The Energy Upgrade California marketing initiative, including any contracts related to the transition to time of use rate plans, as directed by D. 16-09-02 and D. 15-07-001.

2. The review of third-party solicitations in respect of energy efficiency programs by independent evaluators, as directed by D. 18-01-004.

3. Affiliate transactions audit, as directed by D. 06-12-029.

4. Rule 20A undergrounding audits, as directed by D. 18-03-022.

5. The Gridworks management of working groups in the interconnection proceeding, in relation to R. 17-07-007.

6. The CCA code of conduct audit, as directed by D. 12-12-036.

7. The catastrophic event memorandum account audit, as directed by Res. ESRB-4.

Operational Funding

1. Any fees or amounts that the Debtors are required to collect and remit to CPUC, the Energy Resources Conservation and Development Commission, or other governmental entity, each pursuant to an express CPUC directive or another express Requirement of Law as in existence as of the Petition Date.

Funds Held in Trust or Escrow

1. Any assets or property held by the Debtors in trust for, or otherwise administered for the benefit of, the public or public good, pursuant to an express CPUC directive or another express Requirement of Law, each as in existence as of the Petition Date as provided below:

   a. Settlement funds in relation to energy crisis litigation that have been deposited in escrow, and all interest earned thereon now and in the future, in each case, to the extent required by any Settlement Agreement, CPUC directive or other Requirement of Law as in effect as of the Petition Date, including any interests of the Debtors in funds held in any escrows, qualified settlement funds or accounts of the California Power Exchange established in connection with the 2000-2001 energy crisis refund proceedings pending before the Federal Energy Regulatory Commission in Dockets EL00-95 and EL00-98.

---

[5] The CPUC represents that this schedule was compiled based upon a reasonable and good faith diligence review and investigation. However, out of an abundance of caution, to the extent any directed contracts, operational funding requirements, programs requiring funds to be held in trust or escrow, billing agent programs or clean energy programs to which the Debtors were obligated pursuant to an express CPUC directive or express Requirement of Law in existence as of the Petition Date was inadvertently omitted from this schedule, it will be entitled to the same treatment afforded to the property and programs described herein.

     b.  Amounts obligated to be funded by the Debtors in respect of the decommissioning of the Diablo Canyon power plant, as directed by Pub. Util. Code Section 8325.

Sierra Stewardship Lands

1. Land identified in that certain Settlement Agreement, dated December 19, 2003, among the Debtors and CPUC, and the related Stipulation Resolving Issues Regarding the Land Conservation Commitment that has not been made subject to an easement or donated in accordance with the obligations set forth therein, which includes, for the avoidance of doubt, the Watershed Lands and the Carizzo Plains (both, as defined in and identified by the Settlement Agreement).

Billing Agent Programs

Funds collected by the Debtors as billing agent for programs pursuant to an express CPUC directive or another express Requirement of Law, each as in existence as of the Petition Date, as provided below:

1. Community choice aggregators, as directed by Cal. Pub. Util. Code Section 366.2.

2. Energy service providers, as directed by Cal. Pub. Util. Code Sections 365.1 and 366.

3. Core transportation agents, as directed by Cal. Util. Code Section 980 *et seq.*

4. Department of Water Resources bond charges, as directed by Cal. Water Code Section 80100 *et seq.*

5. The surcharge on (a) natural gas bills that funds cost-effective energy efficiency programs (as directed by Cal. Pub. Util. Code Section 890 *et seq*) and (b) electricity bills to fund public purpose revenue streams (as directed by Cal. Pub. Util. Code Section 381 *et seq*).

Clean Energy Programs

Funds required to be budgeted for, and any right, title and interest of the Debtors in, contracts and programs pursuant to an express CPUC directive or another express Requirement of Law existing as of the Petition Date, as provided below:

1. Demand response auction mechanisms, as directed by D. 14-12-024.

2. Self-generation incentive programs, as directed by D. 01-03-073.

3. Energy efficiency programs, including, but not limited to, custom projects through third-party implementers, funding to local governments for local governmental programs and funding for regional energy networks, as directed by D. 18-01-004.

4. The Community Solar Green Tariff Program, as directed by D. 18-06-027.

5. The Disadvantaged Communities – Green Tariff Program, as directed by D. 18-06-027.

6. The Disadvantaged Communities – Single-family Solar Homes Program, as directed by D. 18-06-027.

7. The California Solar Initiative Program, as directed by D. 06-01-024.

1
8.   The California Solar Initiative Thermal Program, as directed by D. 10-01-022.

9.   The CSI Multifamily Affordable Solar Housing Program, as directed by D. 08-10-036.

10. The Net Energy Metering Program, as directed by D. 16-01-044.

11. San Joaquin Valley pilot projects, as directed by D. 18-12-015.

12. The Single Family Affordable Solar Housing Program, as directed by D. 07-11-045.

13. The Multifamily Affordable Housing Solar Roofs Program, as directed by D. 17-12-022.

For the avoidance of doubt, upon the Debtors' satisfaction or completion of any contracts, programs, CPUC directives or Requirements of Law contemplated herein (each a "**Completed CPUC Program**"), any right, title and interest of the Debtors in any excess or remaining funds, fees or other amounts in respect of such Completed CPUC Program shall be deemed DIP Collateral, in each case, except to the extent constituting Excluded Property.