1  Robert A. Julian (SBN 99469)
   Cecily A. Dumas (SBN 111449)
2  BAKER & HOSTETLER LLP
   1160 Battery Street, Suite 100
3  San Francisco, CA 94111
   Telephone:    628.208.6434
4  Facsimile:    310.820.8859
   Email: rjulian@bakerlaw.com
5  Email: cdumas@bakerlaw.com

6  Eric E. Sagerman (SBN 155496)
   Lauren T. Attard (SBN 320898)
7  BAKER & HOSTETLER LLP
   11601 Wilshire Blvd., Suite 1400
8  Los Angeles, CA 90025-0509
   Telephone:    310.442.8875
9  Facsimile:    310.820.8859
   Email: esagerman@bakerlaw.com
10 Email: lattard@bakerlaw.com

11 *Proposed Counsel for Official
   Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12              **UNITED STATES BANKRUPTCY COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                 **SAN FRANCISCO DIVISION**

15 | **In re:** | Case No. 19-30088 (DM) |
16 | | Chapter 11 |
   | **PG&E CORPORATION** | (Lead Case) |
17 | | (Jointly Administered) |
   | **-and-** | |
18 | | |
   | **PACIFIC GAS AND ELECTRIC** | **OPPOSITION OF THE OFFICIAL** |
19 | **COMPANY,** | **COMMITTEE OF TORT CLAIMANTS** |
   | | **TO CORRECTED MOTION OF** |
20 | **Debtors** | **DEBTORS PURSUANT TO 11 U.S.C.** |
   | | **§§ 105(a), 363, AND 503(c) FOR ENTRY** |
21 | □ Affects PG&E Corporation | **OF AN ORDER (I) APPROVING** |
   | | **SHORT-TERM INCENTIVE PLAN AND** |
22 | □ Affects Pacific Gas and Electric Company | **(II) GRANTING RELATED RELIEF** |
   | | **(Dkt. No. 806)** |
23 | ■ Affects both Debtors | |
   | | Date:     April 9, 2019 |
24 | *All papers shall be filed in the Lead Case,* | Time:     9:30 a.m. (Pacific Time) |
   | *No. 19-30088 (DM)* | Place:    United States Bankruptcy Court |
25 | | Courtroom 17, 16 Floor |
   | | San Francisco, CA  94102 |
26

27

28

# **TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ..................................................................................... 1

PROCEDURAL HISTORY ...................................................................................... 5

STATEMENT OF FACTS ........................................................................................ 5

ISSUES PRESENTED ............................................................................................ 16

ARGUMENT .......................................................................................................... 16

I.    The Business Judgment Rule Does Not Allow Directors to Act with Impunity. . 16

    A.    The Business Judgment Rule Does Not Shield Company Decisions in Several Circumstances Present in This Case: Conflict of Interest, Failure to Investigate, Gross Negligence, and Bad Faith........................... 17

    B.    When an Exception Applies, the Director Bears the Burden of Proving that the Decision was Made with Business Judgment. ............................. 19

    C.    The Debtors' Motion Must Be Denied Under 503 If the Debtors Have Failed to Establish that all of the Employees Are not Insiders, or If the Debtors Have Failed to Establish Business Judgment. ............................. 20

II.    The Debtors' Motion Fails to Meet the Business Judgment Rule. ...................... 21

    A.    The Compensation Committee Directors and the Vice President of Human Resources Approved the STIP with a Conflict of Interest. .......... 21

    B.    The Directors Failed to Investigate Which of the STIP Employees' Work Contributed to PG&E's Crimes and Safety Violations that Caused the Fires ..................................................................................... 23

    C.    The Directors' Approval of the STIP Constituted Bad Faith and Gross Negligence Under the Circumstances. .................................................... 25

    D.    PG&E Relies on The Business Judgment Rule and Does Not Independently Show the STIP Is Entirely Fair or Reasonable Under the Circumstances of the Company's Continuing Wrongful Conduct. .......... 28

CONCLUSION ...................................................................................................... 29

APPENDIX A ........................................................................................................ 31

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Cases**

*1st Valley Credit Union v. Bland*,
  2010 WL 8757250 (C.D. Cal. Dec. 20, 2010) (unpublished) ............................................17, 18

*In re Accuray, Inc. Shareholder Derivative Litig.*,
  757 F.Supp.2d 919 (N.D. Cal. 2010) ...........................................................................................19

*In re AWTR Liquidation Inc.*,
  548 B.R. 300 (Bankr. C.D. Cal. 2016) ...........................................................................17, 19, 20

*Bader v. Anderson*,
  101 Cal. Rptr. 3d 821 (Cal. Ct. App. 2009) ..............................................................................18

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
  891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006)............................................20

*Berg & Berg Enterp. LLC v. Boyle*,
  100 Cal. Rptr. 3d 875 (Cal. Ct. App. 2009) ..............................................................................23

*Blackmore Partners, L.P. v. Link Energy LLC*,
  2005 WL 2709639 (Del. Ch. Oct. 14, 2005) (unpublished) ....................................................19

*Burt v. Irvine Co.*,
  237 Cal. App. 2d 868 (Cal. Ct. App. 1965) .......................................................................19, 20

*Calma on behalf of Citrix Sys., Inc. v. Templeton*,
  114 A.3d 563 (Del. Ch. 2015)......................................................................................................22

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)..................................................................................17, 19, 25

*In re Dana Corp.*,
  358 B.R. 567 (Bankr. S.D.N.Y. 2006) ................................................................................16, 17, 21

*Desaigoudar v. Meyercord*,
  133 Cal. Rptr. 2d. 408 ..................................................................................................................22

*Emerald Partners v. Berlin*,
  787 A.2d 85 (Del. 2001) .............................................................................................................20

*Everest Investors 8 v. McNeil Partners*,
  8 Cal. Rptr. 3d 31 (Cal. Ct. App. 2003) ................................................................17, 18, 22

*F.D.I.C. v. Castetter*,
  184 F.3d 1040 (9th Cir. 1999).............................................................................................18, 24

*In re Franklin Nat'l Bank Sec. Litig.*,
  2 B.R. 687 (E.D.N.Y. 1979), *aff'd mem. sub nom. Corbin v. Franklin Nat'l Bank*, 633 F.2d 203 (2d Cir. 1980) ......................................................................................20

*Gaillard v. Natomas*,
  256 Cal. Rptr. 702 (Cal. Ct. App. 1989) ...................................................................................19

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009) ................................................................................................18

*In re Genco Shipping & Trad. Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014) ...........................................................................19

*GT Adv. Tech. Inc. v. Harrington*,
    2015 WL 4459502 (D.N.H. Jul. 21, 2015) (unpublished) .............................................21

*Hill v. State Farm Mutual Auto. Ins. Co.*,
    83 Cal. Rptr. 3d 651 (Cal. Ct. App. 2008) ...............................................................23, 24

*Katz v. Chevron Corp.*,
    22 Cal. App. 4th 1352 (Ct. App. 1994) .........................................................................22

*Katz v. Chevron Corp.*,
    27 Cal. Rptr. 2d 681 (Cal Ct. App. 1994) .....................................................................19

*Kruss v. Booth*,
    111 Cal. Rptr. 3d 56 (Cal. Ct. App. 2010) ....................................................................18

*Lee v. Interinsurance Exchange*,
    50 Cal.App.4th 694, 57 Cal. Rptr. 2d. 798 (Cal. Ct. App. 1996) ..................................22

*McPadden v. Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008) .....................................................................................19

*Oklahoma Firefighters Pension and Retirement System v. Lewis Chew*,
    No. 3:18-cv-04698 (RS) (N.D. Cal. filed Aug. 3, 2018) .................................................4

*Palm Spring Villas II Homeowners Assn., Inc. v. Parth*,
    204 Cal. Rptr. 3d 507 (Cal. Ct. App. 2016) ..................................................................18

*In re Pilgrim's Pride Corp.*,
    401 B.R. 229 (Bankr. N.D. Tex. 2009) .........................................................................21

*Potter v. Hughes*,
    546 F.3d 1051 (9th Cir. 2008) .......................................................................................22

*In re Residential Capital, LLC*,
    491 B.R. 73 (Bankr. S.D.N.Y. 2013) ............................................................................19

*Smith v. Van Gorkom*,
    488 A.2d 868 (Del. 1986) ..............................................................................................18

*U.S. v. Pacific Gas and Electric Co.*,
    Case No. 3:14-cr-00175 (WHA) (N.D. Cal filed Feb. 14, 2019) ....................................4

*Venhill Ltd. P'ship v. Hillman*,
    2008 WL 227 2270488 (Del. Ch. June 3, 2008) (unpublished) ....................................20

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ................................................................................................20

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ..............................................................................................20

*Williams v. Earley*,
    No. 4:18-cv-07128 (RS) (N.D. Cal. filed Nov. 21, 2018) ...............................................4

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Statutes**

11 U.S.C. § 363(b)(1) ................................................................................................16

11 U.S.C. § 503(c)(3) ............................................................................................16, 21

**Other Authorities**

I Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* (6th ed. 2007) .............................................................................17, 18, 20

http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-directors.page .............................................................................................................3

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF EXHIBITS TO WOLTERING DECLARATION

| Woltering Decl. Ex. No. | Description | Abbreviation in Opposition |
|---|---|---|
| A | Deposition Transcript of Dinyar Mistry. | Mistry Tr. |
| B | Deposition Transcript of Douglas Friske | Friske Tr. |
| C-1 | Corrected Declaration of Dinyar Mistry, Dkt. No. 808 | Mistry Decl. |
| C-2 | PG&E's 2020 General Rate Case, Exhibit (PG&E-8), Human Resources, Workpapers Supporting Chapters 2-4A, dated December 13, 2018. | — |
| C-3 | PG&E's Compensation Committee Charter dated September 17, 2017. | — |
| C-4 | Trial Order, *In re Pacific Gas and Electric Co.*, Case No. 01-30923 (DM), 2001 WL 34133848 (Bankr. N.D. Cal. entered Jul. 13, 2001). | — |
| C-5 | PG&E Email dated February 26, 2014 (PGE-NBF-TAR-0000722832–33) | — |
| C-6 | *CalFire Investigators Determine Cause of Destructive Butte Fire*, CalFire News Release, April 28, 2016. | — |
| C-7 | PG&E Email and Attachment dated November 1, 2016 (PGE-NBF-TAR-0003250382) | — |
| C-8 | Judgment in a Criminal Case, *U.S. v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. entered Jan. 31, 2017), Dkt. No. 922. | — |
| C-9 | *CalFire Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties*, CalFire News Release, May 25, 2018. | — |
| C-10 | *CalFire Investigators Determine Cause of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake and Nappa Counties*, CalFire News Release, June 6, 2018. | — |
| C-11 | Order Instituting Investigation and Order to Show Cause, I.18-12-007, (CPUC issued Dec. 14, 2018). | PUC OSC |
| C-12 | Petition for Summons for Offender Under Supervision, U.S. *v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. filed Jan. 1, 2019), Dkt. No. 960. | — |
| C-13 | Order to Show Cause why PG&E's Conditions of Probation Should Not be Modified, *U.S. v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. entered Jan 9, 2019), Dkt. No. 951. | First OSC |
| C-14 | Response to Order to Show Cause why PG&E's Conditions of Probation Should Not be Modified, U.S. *v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. filed Jan, 23, 2019), Dkt. No. 976. | — |
| C-15 | Second Order to Show Cause why PG&E's Conditions of Probation Should Not be Modified, *U.S. v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. entered Mar. 5, 2019), Dkt. No. 1027. | Second OSC |
| C-16 | PG&E U.S. Securities and Exchange Commission Form 8K, filed February 2019 | February 2019 SEC Form 8-K |
| C-17 | Corrected Declaration of Friske, Dkt. No. 807. | Friske Decl. |
| C-18 | PG&E's 2020 General Rate Case, Prepared Testimony, Exhibit (PG&E-8), Human Resources, dated December 13, 2018. | — |
| C-19 | PG&E's Wildfire Mitigation Plan, R.18-10-007 (PUC filed Feb, 6, 2019). | Wildfire Mitigation Plan |
| C-20 | SoCalGas and SDG&E, 2019 General Rate Case, Direct Testimony of Debbie S. Robinson (Compensation and Benefits), Exhibit SCG-30/SDG&E-28, dated October 6, 2017. | — |
| C-21 | Decision Ordering Pacific Gas and Electric Company to Implement the Recommendations of the NorthStar Report, I-15-08-019 (PUC issued Dec.5, 2018), Dec. No. 18-11-050 | PUC NorthStar Decision |
| C-22 | Excerpt of Final Report, Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture, Prepared for the PUC, dated May 8, 2017. | NorthStar Report |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088    Doc# 1109    Filed: 03/28/19    Entered: 03/28/19 15:48:03    Page 6 of 38

| Woltering Decl. Ex. No. | Description | Abbreviation in Opposition |
|---|---|---|
| D | Verified Shareholder Derivative and Double Derivative Complaint, *Williams v. Earley*, No. 4:18-cv-07128 (RS) (N.D. Cal. filed Nov. 21, 2018), Dkt. No. 1. | Williams Derivative Action |
| E | Unredacted Verified Shareholder Derivative Complaint, *Oklahoma Firefighters Pension and Retirement Sys. v. Chew*, No. 3:18-cv-04698 (RS) (N.D. Cal. filed Aug. 3, 2018), Dkt. No. 65. | Oklahoma Derivative Action |
| F | PG&E's U.S. Securities and Exchange Commission Form 8-K, filed January 13, 2019. | — |
| G | January 30, 3019 Transcript of Proceeding, U.S. v. Pacific Gas and Electric Co., Case No. 14-cr-00175-WHA (N.D. Cal. heard Jan. 30, 2019). | — |
| H | Comments of PUC in Response to Second Order to Show Cause, *U.S. v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. filed Mar. 22, 2019), Dkt. No 1033. | — |
| I | Debtors' Response To Second Order To Show Cause Why PG&E's Conditions Of Probation Should Not Be Modified, *U.S. v. Pacific Gas and Electric Co.*, Case No. 14-cr-00175-WHA (N.D. Cal. filed Mar. 22, 2019), Dkt. No. 1032. | — |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Official Committee of Tort Claimants (hereafter, the "**TCC**") hereby objects to the Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (Dkt. No. 806) (the "**Motion**")[1] filed by PG&E Corp. and Pacific Gas and Electric Company (collectively, the "**Debtors**," "**Company**" or "**PG&E**"), and respectfully submits as follows:

## SUMMARY OF ARGUMENT

During the past decade:

1.      PG&E's employees willfully committed safety violations that killed eight people and destroyed a neighborhood in the 2010 San Bruno gas explosion;

2.      The employees obstructed the federal government's investigation of the Company's gas safety violations;

3.      PG&E's electrical equipment caused the 2015 and 2017 fires that killed dozens of people, after the employees failed to maintain the electrical lines, and failed to trim trees that fell against the electrical wires, that ignited the 2015 Butte Fire and most of the 2017 Northern California fires;

4.      PG&E's worn metal hook on electrical Tower :27/222 on the Caribou Palermo line broke and ignited the 2018 Camp Fire that killed 86 people, after PG&E's employees reported to their supervisors in 2014 that the Towers on that line had a "likelihood of failed structures happening is high"[2] and "had been compromised through corrosion";[3]

5.      PG&E's employees falsified underground utility line locate and mark records; and

6.      PG&E's managers violated the Company's criminal probation by failing to report the Butte County District Attorney's criminal investigation of the Company's responsibility for causing three of the 2017 fires in Butte County to the U.S. Probation Officer.

---

[1]  Capitalized terms used but not defined in this Opposition have the meanings given to them in the Motion.
[2] *See* Declaration of Catherine E. Woltering in Support of Opposition (hereafter, the "**Woltering Decl.**"), Ex. C-5 (2014 internal Company email about the high risk of failure of electrical towers on the Caribou Palermo line that ignited the 2018 Camp Fire, four years before the towers failed and ignited the fire).
[3] *See* Woltering Decl., Ex. C-7, at 3 (2016 internal Company email discussing a corroded tower on the failed Caribou Palermo line that ignited the 2018 Camp Fire).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

During the past three years we have witnessed unparalleled death and destruction in Northern California as a result of PG&E's equipment and corporate culture that promises "safety" every single year, but produces more and more calamity, and more and more falsifications of recordkeeping concealing managerial problems at PG&E. Throughout this period, the Company paid its employees, supervisors and managers a base salary, and bonuses that the Company calls "short term incentive pay" based on "target metrics" that supposedly incentivize "safety," "customer satisfaction," and "financial performance." The so-called short-term incentive plans (generally, a "**STIP**") and resulting "awards" of multi-million dollar bonuses have failed to keep the public safe.

For example, in 2017, the year of the devastating North Bay Fires, the Company scored its wildfire safety metric for STIP awards with a glowing "exceeded the year-end target." Woltering Decl. Ex. C-2, at WP 4-35. After the 2018 Camp Fire killed 86 people, PG&E gave itself a 1.9 score out of a target score of 1.0 for the "Electric Operations Public Safety" metric that consisted of "the effectiveness of compliance activities in the Fire Index Areas." (Woltering Decl. Ex. C-16 at Ex. 99.2, p. 19–20).

On January 9, 2019, U.S. District Judge William Alsup considered this record and entered an Order to Show Cause (the "**First OSC**") that, translated, essentially said, "no more, not on my watch." *See* Woltering Decl. Ex. C-13. Judge Alsup's First OSC decreed,

> In order to protect the public from further wrongs by the offender . . . the Court proposes to add the following new conditions of probation . . . . 1. In light of PG&E's history of falsification of inspection reports, PG&E shall, between now and the 2019 Wildfire Season, re-inspect all of its electrical grid and remove or trim all trees that could fall onto its power lines, poles or equipment in high-wind conditions; . . . shall . . . fix damaged or weakened poles, transformers, fuses and other connectors; and shall identify and fix any other condition anywhere in its grid similar to any condition that contributed to any previous wildfires. . . .
>
> These conditions of probation are intended to reduce to zero the number of wildfires caused by PG&E in the 2019 Wildfire Season.

Woltering Decl. Ex. C-13 at 1–3.

Considering this history, one would think a prudent and careful director would have: (1) investigated the Company's employees, supervisors and management and determine who did

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

what and when, so that the culpable would be held accountable within the Company and its compensation process; (2) imposed sanctions or reprimands on supervisors and management who falsified the Company's safety records or failed to repair the system when the honest employees reported a "high risk" of failure on the "corroded" system, so supervisors and management would be incentivized to do the right thing (after all, the "incentive" payments have not kept us safe; they produced widespread safety violations); and (3) implemented Judge Alsup's wildfire safety conditions of probation when he finalizes the conditions (now set for April 2, 2019).

But the four directors ("**Directors**") who make up the Company's compensation committee (the "**Compensation Committee**") [4] and their Vice President of Human Resources (the "**HR VP**") did exactly the opposite of taking those prudent measures. The Directors and the HR VP had a conflict with investigating and reprimanding the Company employees because they would have incriminated themselves in a derivative lawsuit that accused them of breaching their fiduciary duties by failing to conduct proper oversight over the culpable employees, supervisors and managers. On January 23, 2019, while the Company was arguing with Judge Alsup about how to protect the public from a 2019 Wildfire, (Woltering Decl. Ex. C-14 at 3, 49) the conflicted Directors modified the existing 2018 STIP (Woltering Decl. Ex C-1 ("**Mistry Decl.**"), at 5), on the recommendation of the conflicted HR VP, in three unprecedented ways:

(1) The Directors removed the existing STIP's long-standing requirement that reduced employee STIP payments because of employee nonperformance (Woltering Decl. Ex. B ("**Friske Tr.**"), at 89:17-25); and adopted a new 2019 STIP provision that would *automatically* pay 100% of the bonuses to the employees, supervisors and managers, if the Company *as a whole* hits its performance targets (Woltering Decl., Ex. A ("**Mistry Tr.**"), at 14:13-16)—this action avoided any finding of employee/supervisor/manager negligence that would have implicated the Directors and the HR VP in the billion-dollar derivative action;

---

[4] The Debtors' Compensation Committee is comprised of four independent directors: Forrest E. Miller, Richard C. Kelly, Rosendo G. Parra, and Barbara L. Rambo. In addition to the Compensation Committee, Miller and Kelly serve on the Audit Committee; Parra serves on the Safety and Nuclear Oversight Committee; Kelly, Parra and Rambo serve on the Nominating and Governance Committee; Kelly, Miller and Rambo serve on the Executive Committees, and Rambo serves on the Finance Committee. *See* http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-directors.page.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (2) The Directors changed the existing STIP's long-standing process of determining the

2    employees' performance and STIP bonus amount annually, *after the conclusion of each wildfire*

3    *season*, to a quarterly review and payment process for the first time ever (Mistry Tr. at 51:9-14)—

4    this action would permit employees, supervisors and managers who fail to trim trees, or fail to fix

5    or report known defects in the electrical lines and towers, in 2019, to be paid 9 months of bonuses

6    in advance, even if their work ends up causing a fire that kills and destroys in November of 2019,

7    a year after the November 8, 2018 Camp Fire (Mistry Tr. at 52:14–53:9); and

8    (3) The Directors approved the 2019 STIP after express discussions that it was consistent

9    with the Company's proposed Wildfire Mitigation Plan,[5] (*see* Mistry Tr. at 17:16–18:18); but on

10   March 5, 2019, Judge Alsup analyzed the Wildfire Mitigation Plan and found that it was fine as

11   far as it went, but was inadequate to prevent the 2019 Wildfires that he believed PG&E's

12   equipment is at risk of causing. *See* Woltering Decl. Ex. C-15, at 1–2.

13    The Motion purports to present a typical, "business as usual" compensation plan, as

14   though none of this history has occurred. But the Motion is without merit and violates

15   fundamental principles of the "business judgment rule" in several respects:

16    **First**, the Directors approved the plan with a disabling conflict of interest, and hence their

17   business judgment is not presumed as a matter of law. In two shareholder derivative suits,[6] the

18   plaintiff shareholders are suing the Directors for failing to stop the employees' misconduct that

19   caused the fires and resulting $30 billion of fire claims against the Company.[7] If the derivative

20   allegations are proven, the culpable employees are not entitled to any bonus compensation under

21   anyone's definition of good corporate governance. Hence, the Directors had a conflict of interest

22   removing the Company's responsibility to reduce an employee's bonus based on a "finding" that

23   the employee or supervisor engaged in wrongful conduct, because such a reduction finding would

24   implicate the Directors for billions of dollars of liability in the derivative actions.

25

26   [5] *See* Woltering Decl. Ex C-19 (PG&E's 2019 Wildfire Mitigation Plan); as amended *U.S. v. Pacific Gas and Electric Co.*, Case No. 3:14-cr-00175 (WHA) (N.D. Cal filed Feb. 14, 2019), Dkt. No. 1014-2.

27   [6] *Williams v. Earley*, No. 4:18-cv-07128 (RS) (N.D. Cal. filed Nov. 21, 2018); *Oklahoma Firefighters Pension and Retirement System v. Lewis Chew*, No. 3:18-cv-04698 (RS) (N.D. Cal. filed Aug. 3, 2018).

28   [7] In addition to the Directors, PG&E's HR VP is also named as a defendant in *Williams v. Earley*, No. 4:18-cv-07128 (RS) (N.D. Cal. filed Nov. 21, 2018);

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Second**, the Directors shut their eyes to the long standing and continuing wrongful conduct of the employees, supervisors, and managers, and thereby avoided any reasonable inquiry, which is the touchstone of business judgment.

**Third**, the Directors' approval of the 2019 STIP was grossly negligent and in bad faith, because they changed the existing plan in numerous ways, detailed in this Opposition, that undermine the Company's ability to promote wildfire safety and avoid claims from new wildfires, which is the liability risk that forced the Company into bankruptcy in the first place.

**And fourth**, the Directors failed to change existing systemic weaknesses in the STIP metrics that allowed the Company's management to score their 2017 and 2018 wildfire mitigation efforts as "exceeded the year-end target," despite 2017 and 2018 being the years that PG&E caused the most widespread fires in California's 170 year history, killed dozens of Californians, and destroyed an unprecedented amount of State land.

## PROCEDURAL HISTORY

On March 12, 2019, the TCC filed an initial objection to the Motion (Dkt. No. 847) and simultaneously therewith, served the Debtors with notices of depositions of their two declarants in support of the Motions:  Dinyar Mistry, Debtors' HR VP, and Douglas Friske of Willis Towers Watson PLC ("**WTW**").  On Tuesday, March 19, 2019, the TCC took the deposition of Mistry and on Thursday, March 21, 2019, the TCC took the deposition of Friske.  *See* Woltering Decl., Ex. A (Mistry Tr.), Ex. B (Friske Tr.).

## STATEMENT OF FACTS

### PG&E's Record of Death, Destruction, Falsification, and Concealment

In 2016, a federal jury in San Francisco convicted PG&E of knowingly and willfully violating gas safety laws that caused the devastating San Bruno gas explosion that killed 8 people and destroyed an entire neighborhood, and obstructing a federal investigation of these violations. *See* Woltering Decl. at Exs. C-8, C-13.  PG&E's employees, supervisors and managers committed the crimes, as a corporation has to act through its employees, supervisors and managers.  The presiding federal judge imposed conditions of probation on PG&E for the next

1   five years, including ordering PG&E not to violate state law again and to report pending criminal

2   investigations to the U.S. Probation Officer.  Woltering Decl. at Ex. C-8.

3          Thereafter, on October 8, 2017, according to California Department of Forestry and Fire

4   Protection ("**CalFire**"), the utility's equipment failed and caused dozens of fires that killed

5   dozens of people and destroyed entire communities and hundreds of thousands of acres of land.

6   Woltering Decl. Exs. C-6, C-9, C-10.  On November 8, 2018, PG&E's worn metal hook on

7   Tower :27/222, on the Caribou Palermo line, broke, causing an energized line to fall onto the

8   metal Tower.  (Woltering Decl. Ex. 16 at 4, first page of Feb. 28, 2019 Pr. Release).  PG&E's

9   Tower metal hook failure ignited the Camp Fire (*id.*) that killed 86 people and destroyed the

10  entire community of Paradise, homes, grocery stores, hospitals, and everything else.  Woltering

11  Decl. Ex. F, at 4. PG&E's employees had reported the equipment problems on that line to their

12  supervisors and managers years earlier (see fn. 2 and 3 above).  PG&E's February 28, 2019 SEC

13  Form 8-K filing reports that the Company's potential wildfire liabilities could exceed more than

14  $30 billion.  Woltering Decl. Ex. C-16, at Ex. 99.1 at 2.

15          **The Derivative Action Against the Directors and HR VP**

16          Against this history, on November 21, 2018, a shareholder filed a derivative action (the

17  "**Williams Derivative Action**") on behalf of the Debtors against all their directors and the

18  Company's HR VP for breaching their fiduciary duties to the Debtors by failing to exercise

19  internal controls and oversight over the Company's wildfire safety and misrepresenting the

20  relevant facts to the public.  *See* Woltering Decl. Ex. D.  More specifically, the Williams

21  Derivative Action alleges that the "Company is responsible for damage caused by all of the

22  Wildfires" (*id.*, ¶ 176); "Despite the Company's failure to maintain a safe electricity transmission

23  and distribution system, or remain compliant with state law, the Individual Defendants caused the

24  Company to falsely and misleadingly assert that the Company maintained adequate safety

25  standards and was addressing risks involved with vegetation management . . . ." (*id.*, ¶ 177); and

26  "the Individual Defendants failed to maintain internal controls" (*id.*, ¶ 351); and exercise

27  "oversight" over the matters (*id.*, ¶ 308).  On December 20, 2018, another derivative action was

28  filed on behalf of the Debtor against all their Directors making substantially similar allegations

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (the "**Oklahoma Derivative Action**" and together with the Williams Derivative Action, the

2   "**Derivative Actions**").  *See* Woltering Decl. Ex. E.

3       The defendants in the Derivative Actions include the four Directors on the Compensation

4   Committee who approved the Debtors' 2019 STIP, and in the Williams Action, also include the

5   HR VP who recommended the 2019 STIP to the Directors (and whose declaration supports the

6   Motion).  *Compare* Woltering Decl. Ex. D (complaint naming Directors and HR VP as

7   defendants), Woltering Decl. Ex. E (complaint naming Directors as defendants), and Mistry Tr. at

8   12:10-16 (identifying the Compensation Committee members as the same Directors).

9       The shareholder plaintiffs in the Derivative Actions must prove two allegations to recover

10  against the Compensation Committee Directors and HR VP:  that the Debtors (via their

11  employees) committed the wrongful conduct, and that the defendants misrepresented the facts

12  and/or failed to institute internal controls and/or oversee the employees who committed the

13  wrongful conduct on behalf of the Debtors.  Hence, the Directors and the HR VP have a financial

14  interest in avoiding any determination that:  (1) the Debtors (through their employees, supervisors

15  and managers) committed the wrongful conduct; (2) the Directors and HR VP falsely reported to

16  the public markets that the Debtors complied with California safety standards; (3) the Directors

17  and HR VP failed to maintain internal controls over the system and employees; and (4) the

18  Directors and HR VP failed to exercise adequate oversight over their employees.

19      **PG&E's Existing 2018 STIP Bonus Plan**

20      The STIP/bonus plans have been in effect, in one form or another, for three decades.

21  Mistry Decl. at 3; Mistry Tr. at 11:5-9.  Under the 2018 STIP, PG&E agreed to pay its 14,000

22  eligible employees, supervisors and managers annual base compensation, and an annual STIP

23  award that was contingent on the Company achieving its stated safety, customer satisfaction and

24  financial performance metrics, and not on individual employee performance metrics.  *See*

25  Woltering Decl. Ex. C-2, at WP 4-38, 39.  In 2018, the STIP award was determined in accordance

26  with three weighted performance metrics, with safety metrics comprising 50%, customer

27  satisfaction comprising 25%, and "financial performance" based on "Earnings from Operations"

28  (a non-GAAP financial measure) comprising 25%.  *Id.*, *see also* Mistry Tr. at 120:11-14.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The 2018 STIP set an annual target amount of $130 million for payments to approximately 14,000 employees. *See* Dkt. No. 8, at 14. Accordingly, the 2018 STIP, like prior STIPs, provided that at the conclusion of the calendar year, the Company would review its performance in each metric and determine if the Company, as a whole, had performed at, below, or above its stated target performance metrics in the areas of safety, customer satisfaction, and financial performance (called "Earnings from Operations"). *See* Woltering Decl. Ex. C-2, at WP 4-37 to 4-41 (explaining the 2018 STIP metrics and weighting, and application of same to determine individual awards); Mistry Tr. at 14:13-16; Dkt. No. 8, at 14.

If the Company determined at the conclusion of 2018 that the Company achieved its target performance under the STIP metrics, then it would pay the 14,000 eligible employees, as a whole, a minimum of $130 million (the target amount). Dkt. No. 8, at 14. The 2018 STIP required each employee's supervisor to reduce or increase the employee's incentive award by a factor of 0 to 1.5, with 0 representing a complete reduction of incentive pay for the employee's lack of performance, and 1.5 representing a payment of 150% of the employee's targeted incentive pay for outstanding work. Mistry Tr. at 46:14-16. Under the 2018 STIP, employees were to receive their incentive pay in March of the following the year. Dkt. No. 8, at 14.

#### The PUC Directed the Company to Effect a Wholesale Change In the STIP

On December 14, 2018, the PUC issued an Order Instituting Investigation and Order to Show Cause, finding that PG&E's employees and supervisors falsified gas records of locating and marking underground utility lines on an unprecedented scale, mirroring the federal jury's January 2017 conviction of PG&E for of obstruction of justice in the entirely different San Bruno criminal case. *See* Woltering Decl. Ex. C-11, at 2 (hereafter, the "**PUC OSC**").

Following up on that record of safety violations, on December 5, 2018, the PUC also issued its Decision Ordering Pacific Gas and Electric Company to Implement the Recommendations of the NorthStar Report (the "**PUC NorthStar Decision**"). Woltering Decl. Ex. C-21, at 9. The Final Report of NorthStar Consulting Group (the "**NorthStar Report**"): (1) criticized PG&E's commitment to safety; (2) evaluated what NorthStar called the Company's STIP as "effectively an annual bonus program" in which "[p]erformance is evaluated on the

achievement of goals, as well as how the goals are achieved;" and (3) recommended a wholly new "enterprise-wide safety plan" for the Company. Woltering Decl. Ex. C-22, at I-7–9, VII-1, VII-20.

The December 2018 PUC NorthStar Decision reviewed NorthStar's in-depth evaluation of the 2018 STIP, and ordered PG&E "to implement the recommendations set forth in the NorthStar Report no later than July 1, 2019." Woltering Decl. Ex. C-21, at 9. The NorthStar Report recommended, and the PUC NorthStar Decision thereby ordered, that PG&E revise the Company's 2018 STIP in the following ways: (1) "none of the KPIs [key performance indicators imbedded in the safety metrics] currently considered for use in measuring safety culture should be included as an incentive measure"; (2) "[r]eevaluate the appropriateness of the 'Earnings from Operations' [financial performance] component of the STIP due to its lack of transparency"; and (3) "[r]evisit all STIP metrics and targets in light of the enterprise-wide safety plan recommended by NorthStar." Woltering Decl. Ex. C-22, VII-19, 20. Notably, the 2019 STIP contains safety metrics that are virtually identical to the 2017 and 2018 STIPs, while placing even greater emphasis on the financial performance/Earnings from Operations metric that the PUC's NorthStar Report criticized. *Compare* Woltering Decl. Ex C-2, at WP 4-37–41 to Woltering Decl. Ex. C-22.

**Judge Alsup's January 9, 2019 First OSC**

Judge Alsup's First OSC advised PG&E that the District Court intended to impose on PG&E, as a condition of its criminal probation, require PG&E to "re-inspect all of its electrical grid and remove or trim all trees that could fall onto its power lines, poles or equipment in high-wind conditions; . . . fix damaged or weakened poles, transformers, fuses and other connectors; and . . . identify and fix any other condition anywhere in its grid similar to any condition that contributed to any previous wildfires." Woltering Decl. Ex. C-13, at 1–2.

**PG&E's January 23, 2019 Response to Judge Alsup's First OSC and STIP Changes**

On January 23, 2019, PG&E informed Judge Alsup that "the resources required to comply with the Proposed Modifications do not exist. PG&E does not have the necessary funds . . . . PG&E does not have, nor does it believe it could find, the qualified personnel necessary to complete the proposed work." Woltering Decl. Ex. C-14, at 48. On the same day, while the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Company's lawyers were still arguing with Judge Alsup over an appropriate wildfire mitigation plan that might avoid further death and destruction in California, the Compensation Committee approved the 2019 STIP at the recommendation of the Company's HR VP and compensation consultant, WTW. *See* Mistry Decl. at 5.

The Motion and deposition record before this Court do not establish that the Compensation Committee, HR VP, or WTW considered the PUC NorthStar Decision ordering PG&E to completely reevaluate the Company's safety and performance metrics. Mistry's declaration in support of the Motion states that "[o]ver the past several weeks, the Debtors have worked with their advisors, including Willis Towers Watson . . . , an experienced compensation consultant, to formulate necessary adjustments to the incentive-based component of their employee compensation program to address, among other things, the pending Chapter 11 Cases." Mistry Decl. at 3. In his deposition, the Debtors' HR VP Mistry testified that he recommended the 2019 STIP "based on the form of the 2019 STIP, the metrics and targets that were established" (Mistry Tr. at 10:15-18); and never testified that he considered the PUC order to delete the current safety metrics and reevaluate the financial performance/Earnings from Operations metric as ordered by the PUC. In his deposition, WTW consultant, Douglas Friske, testified that since mid-December 2018, he advised the Directors on the changes by considering the proposed 2019 STIP as well as prior STIPs, but was not provided and did not consider the criminal judgment against PG&E (Friske Tr. at 39:8-12), the CalFire Reports (*id.* at 40:8-25), the PUC Order (*id.* at 41:1-9), the PUC NorthStar Decision (*id.* at 28:1-3), the January 2019 OSC (*id.* at 41:20-42:4), or similar short-term incentive plans adopted by PG&E's principal California peers, Southern California Gas Company and San Diego Gas & Electric Company (*id.* at 89:11-16).

### The 2019 STIP

On the basis of those recommendations, on January 23, 2019, the Directors approved the proposed 2019 STIP by approving the following changes to the existing 2018 STIP:

1. The Directors changed the 2018 STIP's year-end performance review and post-review STIP payments to a quarterly review and quarterly payment, without any proof that

- 10 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     the Company has eliminated the 2019 wildfire threat that Judge Alsup is attempting to

2     force the Company to avoid.  This single change would permit the employees who

3     contribute to PG&E equipment-caused fires this November 2019 to obtain 75% of

4     their targeted STIP awards in the first three quarters of the year before a November

5     2019 fire, even though their performance during the first nine months of 2019 might

6     contribute to a fire in November 2019, on the one-year anniversary of the November

7     8, 2018 Camp Fire.  Mistry Tr. at 52:14–53:9

8    2.   The Directors eliminated the long-standing requirement in the 2018 STIP that

9       supervisors conduct individual performance reviews of each eligible employee's

10      negligent and/or criminal conduct.  Mistry Tr. at 89:17-25.  This requirement was

11      replaced in the 2019 STIP with *automatic* awards, in addition to base pay, for all

12      eligible employees *with no mechanism to reduce bonus pay for work that falls below*

13      *the employee's standard of care*, thereby shielding the employees whose past work

14      contributed to the 2017 and 2018 wildfires, and whose future work contributes to the

15      2019 wildfires, from compensation review.  *See id.*  The 2019 STIP would pay 10% of

16      the 10,000 eligible employees an award equal to 1.25 times the employees' share of

17      the targeted STIP 2019 award, and pay the remaining 90% of employees 1.0 times the

18      employees' share of the targeted STIP award, seemingly *irrespective of the*

19      *employee's individual performance*.  Mistry Tr. at 46:14-25–47:12.  In other words,

20      the Directors deleted the existing STIP's requirement that supervisors downgrade the

21      employee bonuses because of their lack of performance or misconduct.  HR VP Mistry

22      testified that the 2019 STIP is supposed to reward 2019 performance, so he would not

23      expect the 2019 STIP to permit a reduction in bonus pay by virtue of the employee's

24      or supervisor's misconduct in the 2017-2018 period that is under investigation by the

25      PUC and the tort victims.  However, Mistry also testified that the Directors on the

26      Compensation Committee would have the right to reduce 2019 STIP awards by reason

27      of employee misconduct prior to 2019, so it stands to reason that the supervisors

28      would also have had the right under the existing 2018 STIP to take away bonus

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   compensation based on prior year misconduct. At any rate, Mistry admitted that the

2   proposed 2019 STIP does not contain any metric or guide that would require the

3   conflicted Compensation Committee Directors to reduce individual STIP awards.

4   3. The Directors set the STIP's overall safety metric at 50% of the employees' 2019

5   STIP compensation, on the erroneous advice of the Debtors' compensation consultant,

6   WTW's Friske, that the 50% safety metric had been adopted by PG&E's peers. In

7   fact, the Debtors' Southern California peers, San Diego Gas & Electric Company and

8   SoCalGas, adopted a 70% safety metric for their short term incentive plans, *pursuant*

9   *to WTW's advice that a 70% safety metric was appropriate*. Woltering Decl. Ex. C-

10  20, at DSR-5-6.

11  4. There is no evidence that the Debtors complied with the PUC's December 5, 2018

12  order to adopt a wholly new "enterprise-wide safety plan" and reformulate the STIP's

13  safety and financial performance/Earnings from Operations metrics.

14  5. As in the past years, the 2018 STIP weighted wildfire safety at 10%. Woltering Decl.

15  Ex. C-2, at WP 4-38. The Directors approved keeping that weighted metric at 10%,

16  but based the metric on incentivizing the employees to implement the Company's

17  proposed 2019 Wildfire Mitigation Plan before obtaining Judge Alsup's and the

18  PUC's approval of that plan. As explained below, on March 5, 2019, Judge Alsup

19  proposed ordering PG&E to engage in vegetation management in compliance with

20  applicable regulations *in addition to* complying with the Company's new 2019

21  Wildfire Mitigation Plan. Woltering Decl. Ex. C-15 (the "**Second OSC**"). In other

22  words, the Debtors' proposed 2019 Wildfire Mitigation Plan for its STIP is incomplete

23  today when measured by Judge Alsup's current proposed conditions of probation for

24  PG&E that the District Court intends to adopt at its April 2, 2019 hearing on the

25  orders to show cause. And even then, the PUC argues the Wildfire Mitigation Plan is

26  still subject to its approval. Woltering Decl. Ex. H.

27  6. The Directors prioritized the Company's financial performance over wildfire safety

28  STIP metrics by a factor of 4 to 1, changing the financial performance metric from

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25% to 40% and keeping the electrical safety metric at its historical 10%. PG&E's decision to prioritize profits over wildfire safety was criticized in Judge Alsup's Second OSC (stating that the Company should *not* prioritize profit-making dividend payments ahead of wildfire safety) and by the PUC NorthStar Decision (ordering a complete review of the financial performance/Earnings from Operations metrics). Woltering Decl. Exs. C-15, C-21. Rather than flipping the two metrics so that electrical system fire safety would be valued higher than financial performance, the Directors increased financial performance from 25% to 40%. *Compare* Woltering Decl. Ex. C-2, at 4–39 and Mistry Decl. at 7. That has been the Company's historic, Wall Street driven, corporate culture of valuing corporate profits more than human life.

7. The Directors approved the 2019 STIP before the PUC completed its investigation of PG&E employees' widespread falsification of gas safety records. Mistry Decl. at 5 (indicating that the Compensation Committee approved the 2019 STIP on January 23, 2019). That investigation should identify which employees and supervisors falsified the Company's gas safety records repeatedly and should be disqualified from bonus compensation, and may call into question the Company's existing STIP Safety metric that involves Gas Line Inspection.

8. The Directors failed to make any modifications to the 2018 STIP to place a greater emphasis on wildfire prevention, either as a matter of practice or corporate culture. Under the electrical system safety metric in the 2017 and 2018 STIPs, which included complying with existing vegetation management laws, the Company gave itself an "exceeded the year-end target" score for wildfire prevention work during 2017 and a 1.9 score over a 1.0 target for 2018. The finding of near-perfect performance in 2017 and 2018 shows the company's STIP procedures and process for evaluating its STIP metrics are grossly negligent considering the equipment caused the fires.

The Directors did not request anyone to investigate the employee conduct that contributed to the fires and falsification of records that is presently under investigation before adopting this

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

new plan. Mistry Tr. at 76:1-25, 77:15–78:3. As a result, the 2019 STIP would award employees compensation *automatically* and without regard to their past or present negligent, improper and/or criminal conduct that has resulted in over $30 billion of liabilities against the Company.

**Judge Alsup's Second Conviction of PG&E and Second OSC**

The Debtors filed their bankruptcy cases on January 29, 2019. At a January 30, 2019 hearing, Judge Alsup found that PG&E violated its probation by failing to inform the U.S. Probation Officer about the Butte County District Attorney's Offices' criminal investigation of PG&E for causing three of the 2017 fires in Butte County that the parties settled in a Settlement Agreement. Woltering Decl. Ex. G. After making that finding, Judge Alsup considered his January 9, 2019 First OSC and why he should not impose new wildfire mitigation conditions of probation on PG&E. During the hearing, PG&E's lawyers gave evasive answers to Judge Alsup's questions, and he told PG&E's counsel: "I believe you're using the extreme case to justify doing as little as possible." Woltering Decl. Ex. G, at 38. And, "[w]hat troubles me is, see, you're saying workshops, workshops, but come June 21, I'm officially saying that's the start of the wildfire season…. And it will be dry as can be and the fire season will be on us and the emergency will be on us, and we will be seeing headlines, 'PG&E has done it again, started another fire' and some town has burned down because you didn't turn the power off or you didn't cut the trees?" *Id.* at 58. "There should be something in place by June 21 that assures the public that there will be no more crimes committed by PG&E." *Id.* at 59–60. Judge Alsup ended the hearing by telling PG&E that he would read PG&E's proposed Wildfire Mitigation Plan that the Company intended to file. *Id.* at 118.

On February 6, 2019, PG&E filed its proposed Wildfire Mitigation Plan in its criminal case. This is the same plan on which the HR VP testified the Directors ensured that "the vegetation management [metric] that is in the 2019 STIP is consistent with that plan." Mistry Tr. at 26:20-22. The following month, on March 5, 2019, Judge Alsup entered the Second OSC, stating that he would not accept PG&E's proposed Wildfire Mitigation Plan as the sole new condition of probation, and proposed imposing on April 2, 2019 a firm order directing PG&E to comply with the law in addition to complying with its proposed wildfire plan:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Having considered PG&E's wildfire mitigation plan…, the Court now proposes adding the following new conditions of probation in order to protect the public from further death and destruction resulting from PG&E caused wildfires:

1. PG&E must fully comply with all applicable laws concerning vegetation management and clearance requirements, including Sections 4292 and 4293 of the California Public Resources Code….

2. PG&E must fully comply with the specific targets and metrics set forth in its amended 2019 wildfire mitigation plan. Compliance with these targets and metrics will not excuse any failure to fully comply with the vegetation laws as required in paragraph 1."

Woltering Decl. Ex. C-15, at 5–6.

In his Second OSC, Judge Alsup noted that PG&E had paid out $1.9 billion in dividends combined in 2016 and 2017, instead of using the funds to trim trees that fell against the PG&E electrical lines that caused the 2017 and 2018 fires. Woltering Decl. Ex. C-15, at 7. Judge Alsup stated that his new conditions of probation "would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs." *Id.*

In its March 22, 2019 Response to Judge Alsup's Second OSC, PG&E stated that it "of course has no objection to complying with these . . . laws and regulations," but that, "[a] constant state of perfect compliance could therefore only be achieved by engaging in extensive clear cutting that is not required by state law . . . ." Woltering Decl. Ex. I, at 1–2. The Debtors have not modified their 2019 STIP's 40% financial performance and 10% wildfire safety metrics in response to Judge Alsup's March 5, 2019 observations about the lack of prudence in prioritizing financial performance over wildfire safety, or his proposed wildfire conditions that PG&E believes it cannot perfectly comply with.

**The Debtors Withdrew their 2018 STIP Request Because of the Wildfire Liabilities**

On February 28, 2019, the Debtors withdrew their motion for approval of their 2018 STIP awards based on the Company's 2018 performance. In his deposition, HR VP Mistry testified that meant the Debtors withdrew their request for Court approval of the 2018 STIP payments because of "the financial pressures that the potential liabilities resulting from the wildfires and the loss of liquidity" placed on the Company. Mistry Tr. at 32:5-7. In response to the obvious question, "Has PG&E's material deterioration of its financial situation changed from this decision earlier this year?" Mistry testified, "At that point in time we had issues accessing liquidity. Now

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

that we are in a Chapter 11 process, it's a different process of reorganization." Mistry Tr. at 56:19-24.

## ISSUES PRESENTED

These facts raise six fundamental issues of corporate governance that determine whether the Directors' approval of the proposed 2019 STIP is entitled to protection of the business judgment rule:

First, does the business judgment rule shield director-approved transactions where the Directors approved the transactions under a conflict of interest, a lack of inquiry, or with bad faith or gross negligence, recognized exceptions to the business judgment rule?

Second, does the Company bear the burden of proving the STIP is fair and reasonable under the entire fairness test when the exceptions to the business judgment rule exist?

Third, did the Directors approve the STIP with a conflict of interest?

Fourth, did the Directors and the HR VP fail to investigate which of the STIP employees' work contributed to PG&E's crimes, and safety violations that caused the Fires?

Fifth, did the Directors' approval of the STIP constitute bad faith and gross negligence under the circumstances?

Sixth, has PG&E produced evidence that the STIP is entirely fair and reasonable under these circumstances, including the company's failure to establish that it has established a track record of safety?

## ARGUMENT

**I.       The Business Judgment Rule Does Not Allow Directors to Act with Impunity.**

The Debtors have moved for approval of their 2019 STIP on the basis that their approval is justified under the business judgment standard utilized under both Section 363(b)(1) and Section 503(c)(3).

The Bankruptcy Code requires debtors seeking to use estate property outside of the ordinary course of business to obtain court approval through notice and a hearing.[8]  11 U.S.C.

---

[8] The Debtors do not appear to argue that payments under the STIP constitute payments made in the ordinary course of business.  To the extent they did make this argument, the TCC objects, as the STIP would not pass muster as being reasonable neither from an industry-wide perspective nor from the creditors' point of view.  *See e.g. In re Dana*

§ 363(b)(1). Courts typically apply the business judgment standard to determine whether to permit use of estate property outside of the ordinary course of business. *In re Dana Corp,* 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006). The business judgment rule generally evaluates whether the directors' decision is rational under the circumstances and sets forth a presumption that the directors "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *See* I Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* at 42–43 (6th ed. 2007) ("*The Business Judgment Rule*").

It follows that the business judgment rule and the related presumption of sound business decisions are not unlimited*:* board decisions that "cannot be attributed to any rational business purpose" will not be upheld. *Id.* at 43. The inquiry focuses on the decision-making process and whether the process was "either rational and or employed in a good faith effort to advance corporate interests." *See, e.g.*, *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (*cited with approval by In re AWTR Liquidation Inc.*, 548 B.R. 300, 315–16 (Bankr. C.D. Cal. 2016)).

### A. The Business Judgment Rule Does Not Shield Company Decisions in Several Circumstances Present in This Case: Conflict of Interest, Failure to Investigate, Gross Negligence, and Bad Faith.

California courts recognize several exceptions to the business judgment rule, including a director's (1) conflict of interest; (2) failure to make a reasonable inquiry; (3) gross negligence and (4) bad faith. *See Everest Investors 8 v. McNeil Partners*, 8 Cal. Rptr. 3d 31, 45 (Cal. Ct. App. 2003) ("The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of conflict of interest."); *1st Valley Credit Union v. Bland*, 2010 WL 8757250, at *4 (C.D. Cal. Dec. 20, 2010) (unpublished) ("It is clear that the rule does not protect a director in certain situations, such as where there is a conflict of interest, fraud, oppression, or corruption. Neither does the business judgment rule protect a director who has

---

*Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006) ("The Bankruptcy Code does not provide guidance as to whether a particular transaction was conducted 'in the ordinary course of business, but courts have applied a [] test that considers the reasonableness of the transaction from an industry-wide perspective and from the viewpoint of a creditor . . . .'").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

wholly abdicated his corporate responsibility, closing his or her eyes to corporate affairs.") (citing *F.D.I.C. v. Castetter*, 184 F.3d 1040, 1046 (9th Cir. 1999)).

Courts may not apply the business judgment presumption where the circumstances "inherently [raise] an inference of conflict of interest." *Everest Investors 8 v. McNeil Partners*, 8 Cal. Rptr. 3d 31, 45 (Cal. Ct. App. 2003) (finding that a board member was conflicted when he could receive a significant equity interest in the post-merger entity and that the benefits may conflict with the benefits of limited partners). Conflict of interest exception cases involve decisions in which the director may receive "a potential personal benefit or detriment." *Bader v. Anderson,* 101 Cal. Rptr. 3d 821, 834 (Cal. Ct. App. 2009); *Kruss v. Booth*, 111 Cal. Rptr. 3d 56, 80–81 (Cal. Ct. App. 2010) (the court found that the plaintiff had alleged circumstances that raised an inference of conflict where a reverse merger and pump and dump scheme operated to funnel money out of the company and into the hands of board-owned companies); *Gantler v. Stephens,* 965 A.2d 695, 707 (Del. 2009) (finding that directors had a disqualifying self-interest because they could structure a deal in a way that benefitted their interests differently than other stockholders).

Directors must make informed decisions and must consider "all material information reasonably available to them." Radin, The Business Judgment Rule*:* Fiduciary Duties of Corporate Directors, vol. I, at 308-9 (citing *Smith v. Van Gorkom*, 488 A.2d 868, 872 (Del. 1986)). Essentially, a director cannot "close his eyes to what is going on about him in the conduct of the business of the corporation." *Palm Spring Villas II Homeowners Assn., Inc. v. Parth*, 204 Cal. Rptr. 3d 507, 517 (Cal. Ct. App. 2016); *see also 1st Valley Credit Union v. Bland*, 2010 WL 8757250, at *4 (C.D. Cal. Dec. 20, 2010) (unpublished) (citing *F.D.I.C. v. Castetter*, 184 Cal. Rptr. 3d 1040, 1046 (9th Cir. 1999). It follows that when courts refrain from interfering in decisions deemed based in business judgment, "it is presupposed that judgment—reasonable diligence—has in fact been exercised." *Palm Springs Villas II Homeowners Assn., Inc., v. Parth*, 204 Cal. Rptr. 3d at 517. In other words, under California common law, "whether a director exercised reasonable diligence is one of the 'factual prerequisites' to application of the business judgment rule." *Id.* "Exactly what procedures the law requires varies according to the nature and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 18 -

importance of the considered transaction." *Blackmore Partners, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *8 (Del. Ch. Oct. 14, 2005) (unpublished). In any event, the directors must "in appropriate circumstances make such reasonable inquiry as an ordinarily prudent person would under similar circumstances." *Gaillard v. Natomas*, 256 Cal. Rptr. 702, 711 (Cal. Ct. App. 1989).

Courts apply the gross negligence standard to determine whether a business judgment reached by the board of directors was an informed one. *Katz v. Chevron Corp.*, 27 Cal. Rptr. 2d 681, 689 (Cal Ct. App. 1994). Generally, gross negligence is the failure to exercise "even slight care." *In re AWTR Liquidation, Inc.*, 548 B.R. 300, 336 (Bankr. C.D. Cal. 2016). Gross negligence has traditionally been defined as "a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *In re Accuray, Inc. Shareholder Derivative Litig.*, 757 F.Supp.2d 919, 934 (N.D. Cal. 2010). Diligence is also a factor in determining gross negligence. *Burt v. Irvine Co.*, 237 Cal. App. 2d 868, 852–53 (Cal. Ct. App. 1965).

Finally, Directors who make decisions in bad faith are not entitled to the deference of the business judgment rule. At the heart of bad faith conduct is the "intentional dereliction of duty or the conscious disregard for one's responsibilities." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008). In *Caremark*, the Court held that the business judgment standard was "whether there was a good faith effort to be informed and exercise judgment." 698 A.2d at 968; *see also In re Genco Shipping & Trad. Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (noting that the business judgment presumption is that the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

**B. When an Exception Applies, the Director Bears the Burden of Proving that the Decision was Made with Business Judgment.**

Once the TCC has made a *prima facie* case rebutting the business judgment presumption, the burden shifts back to the Debtors to prove that they have made the decision using sound business judgment. *In re AWTR Liquidation Inc.*, 548 B.R. 300, 317 (C.D. Cal. 2016) (citing *Caremark,* 698 A.2d at 970); *In re Residential Capital, LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y. 2013). Further, courts have held that the Debtor must "demonstrate that the challenged

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

act or transaction was entirely fair to the corporation and its shareholders." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006); *see also In re AWTR Liquidation Inc.*, 548 B.R. 300, 318 (Bank. C.D. Cal. 2016) (when an exception such as self-dealing is involved, the director holds the burden "not only to prove the *good faith* of the transaction but also to show its *inherent fairness*") (emphasis in original) (*citing Burt,* 237 Cal.App.2d at 850-51); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710, 711 (Del. 1983) (holding that directors on both sides of a transaction must demonstrate "their utmost good faith and the most scrupulous inherent fairness of the bargain"). "Fairness" becomes a relevant inquiry only if the presumption is rebutted. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 173 n.138 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

The fairness test, designed to "assess whether a self-dealing transaction should be respected or set aside in equity," considers whether, in the absence of arms-length bargaining, whether the transaction was fair and reasonable. *Venhill Ltd. P'ship v. Hillman*, 2008 WL 227 2270488, at *22 (Del. Ch. June 3, 2008) (unpublished); *In re Franklin Nat'l Bank Sec. Litig.*, 2 B.R. 687, 707 (E.D.N.Y. 1979), *aff'd mem. sub nom. Corbin v. Franklin Nat'l Bank*, 633 F.2d 203 (2d Cir. 1980). To demonstrate entire fairness, "the board must present evidence of the cumulative manner by which it discharged *all* of its fiduciary duties." *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001) (emphasis in original). The Court then uses this evidence to evaluate fair dealing and fair price, as well as other relevant considerations. *Id.*

Under the fairness test, the directors also bear the burden of persuasion; they must prove by a preponderance of the evidence that all elements of an entire fairness analysis are met. I *The Business Judgment Rule* at 71-72. Directors who fail to carry their burden under the fairness test may "be liable not simply to compensate the corporation . . . for losses sustained," but also may be required "to rescind the transaction or pay rescissory damages." *Id.* at 78.

### C. The Debtors' Motion Must Be Denied Under 503 If the Debtors Have Failed to Establish that all of the Employees Are not Insiders, Or If the Debtors Have Failed to Establish Business Judgment.

Section 503(c)(3) prohibits payments to employees or consultants made outside the ordinary course of business that are "not justified by the facts and circumstances of the case."

11 U.S.C. § 503(c)(3). "Section 503(c)(3) is intended to give the judge a greater role*: even if a good business reason can be articulated for a transaction, the court must still determine if the court must still determine that the proposed transfer or obligation is justified in the case before it.*" *GT Adv. Tech. Inc. v. Harrington*, 2015 WL 4459502, at *7 (D.N.H. Jul. 21, 2015) (unpublished) (*citing In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009)).

The courts consider certain factors to determine whether section 503(c)(3) applies*:*

- Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, *is the plan calculated to achieve the desired performance?*

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576-77.

## II.     The Debtors' Motion Fails to Meet the Business Judgment Rule.

The Debtors' Motion falls into multiple exceptions to the business judgment rule, any of which, standing alone, would be sufficient to require denial of the Motion because the Debtors' evidence does not show a compelling need to pay the STIP awards this year, in advance of any proof that the Debtors have changed their system operations that create death and destruction (to use Judge Alsup's words).

### A.     The Compensation Committee Directors and the Vice President of Human Resources Approved the STIP with a Conflict of Interest.

The shareholder Derivative Action alleges: (1) the Debtors (through their employees, supervisors and managers) committed the wrongful conduct that caused the fires; (2) the Directors and HR VP falsely reported to the public markets that the Debtors complied with California safety standards; (3) the Directors and HR VP failed to maintain internal controls over

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the system and their employees; and (4) the Directors and HR VP failed to exercise adequate oversight over their employees.

Here, the Directors removed the STIP requirements that supervisors reduce STIP awards by reason of the employee's, supervisor's and manager's negligence or misconduct. The Directors' actions personally benefit the Directors in the Derivative Actions, and the resulting conflict bars them from invoking the business judgment rule.

The Compensation Committee's actions here are similar to a special litigation committee made up of the director defendants who must review the derivative allegations. In general, all members of a special litigation committee must be independent, or "in a position to base his decision on the merits of the issue rather than being governed by extraneous influences." *Katz v. Chevron Corp.*, 22 Cal. App. 4th 1352, 1367 (Ct. App. 1994) (internal quotations omitted). A court determines independence with respect to "allegations of the claim and all extraneous influences." *Desaigoudar v. Meyercord*, 133 Cal. Rptr. 2d. 408, 419. For example, the Delaware Chancery Court has found that directors were interested, and a derivative demand on the board was futile, when the derivative suit involved an equity incentive plan. *Calma on behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 576-77 (Del. Ch. 2015); *see also Potter v. Hughes*, 546 F.3d 1051, 1057 (9th Cir. 2008) (noting that California law is identical to Delaware law with regard to derivative demand requirements). By altering the terms of the STIP, the Compensation Committee is extracting a personal benefit which puts the Committee outside of the protection of the business judgment rule.

There are multiple problems with this change, particularly given the actions of the Debtors' employees in recent years, but none as glaring as the fact that this change benefits the Directors and the HR VP personally by avoiding the creation of evidence that could be used against them in the Derivative Action. *Everest Investors 8*, 8 Cal. Rptr. 3d at 45*; see also Lee v. Interinsurance Exchange*, 50 Cal.App.4th 694, 717, 57 Cal. Rptr. 2d. 798 (Cal. Ct. App. 1996) (explaining that a conflict in interest results in the directors' ability to exert undue influence).

- 22 -

**B. The Directors Failed to Investigate Which of the STIP Employees' Work Contributed to PG&E's Crimes and Safety Violations that Caused the Fires**

The Debtors also cannot rely on the business judgment rule because they have failed "to investigate material facts." *Berg & Berg Enterp. LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 897-98 (Cal. Ct. App. 2009). This exception to the business judgment rule applies when material facts which are reasonably available indicate an investigation should be undertaken, and the company fails to do so. *Id.* at 898 (noting that the allegations must not be mere conclusions that the investigation did not occur, but rather facts that would call for an investigation); *Hill v. State Farm Mutual Auto. Ins. Co.*, 83 Cal. Rptr. 3d 651, 682–83 (Cal. Ct. App. 2008). The Directors' plan to pay employees incentive payments under the STIP even though they acted criminally or contributed to safety violations without first investigating their conduct is adverse to public interest and the Debtors' interests.

Here, the facts that should have led to an investigation are well known to anyone who has picked up a newspaper in the past two years, not just the Directors of PG&E. PG&E is the cause of severe wildfires causing incalculable damage to life and property. *See, e.g.*, Woltering Decl. Exs. C-6, C-8, C-9, C-10, C-16. PG&E is on probation for their failure to abide by safety standards that led to the San Bruno gas explosion. Woltering Decl. Exs. C-8, C-12. PG&E employees falsified gas records. Woltering Decl. Exs. C-11, C-21. PG&E's employees, supervisors and managers knew in 2014 that the towers on the Caribou Palermo line that ignited the Camp Fire had a high risk of failure and knew in 2016 that they had corroded metal parts. Woltering Decl. Exs. C-5, C-7. A worn hook is what broke and caused the Camp Fire.

Despite these facts, the Compensation Committee did not consider these safety issues when approving the 2019 STIP. For example, Mistry testified that the Compensation Committee did not even discuss the San Bruno explosion. Mistry Tr. at 54:21–66:7. Mistry also testified that he did not remember whether the Compensation Committee ever discussed the NTSB's findings regarding the San Bruno gas explosion, or the jury finding that PG&E violated gas and safety laws. *Id.* Despite the change from the prior year's policy, Mistry stated that the Compensation Committee did not discuss whether the STIP should address an individual's

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   performance issues, apparently approving this change without deliberation. Mistry Tr. at 89:8-16,

2   92:15-24. Mistry testified that he had considered bringing it up but ultimately did not discuss it

3   with any of the Directors. Mistry Tr. at 93:6-16. Thus, the Compensation Committee changed

4   the 2019 STIP in a meaningful way – from being able to deny incentive payments to a poorly

5   performing employee to paying everyone across the board – without discussion. This is not a

6   meaningful investigation and cannot be protected by the business judgment rule.

7       Paying employees without investigation into bad behavior presents a two-fold problem: it

8   ignores past criminal action and makes future criminal action more likely. Paying an incentive

9   payment to any such employee would contravene the Debtors' best interests given the egregious

10  harm these employees have caused to the Debtors and the community. Indeed, even if the 2019

11  STIP is intended to be prospective, Mistry Tr. at 61:17-24, nothing in the 2019 STIP would

12  prevent the Debtors from paying an incentive payment to an employee, supervisor or manager

13  who commits a crime or contributes to a safety violation in a quarter in which the bad act

14  occurred. *Id.* at 52:22–53:22. Such an employee would receive the bonus automatically.

15      The Debtors may point to their employment of WTW as proof that they conducted a

16  reasonable investigation. While courts tend to view consultations with experts as favorable

17  evidence that they should defer to the director's business judgment, here WTW was not given

18  sufficient information to complete the type of investigation that would favor deference. *See, e.g.*,

19  *FDIC v. Castetter*, 184 F.3d 1040, 1045 (9th Cir. 1999); *Hill v. State Farm Auto. Ins. Co.*, 83 Cal.

20  Rptr. 3d. at 682–83 (Cal. Ct. App. 2008).

21      Even WTW cannot assist management in devising a compensation plan that creates proper

22  incentives if the Directors insist that operations are business as usual. WTW was not asked to

23  prioritize rectifying PG&E's ongoing criminal conduct and fixing its deficient electric

24  transmission system. The only information that the Debtors gave to WTW about their

25  operational history was about the performance metrics in the STIP and the how they were

26  performing relative to these metrics. Friske Tr. at 17:8-13. Friske was not made aware of the

27  PUC NorthStar Decision, Judge Alsup's Orders, or the other documents. *See, e.g.*, Friske Tr. at

28  28:1-3; 39:8-12; 40:8-25; 41:1-9; 41:20–42:4. And there is no evidence the Compensation

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Committee adopted a complete new safety and financial performance metric in response to the

2  PUC NorthStar Decision.

3      The TCC asserts that the metrics in the STIP are inappropriate and that the Compensation

4  Committee did not properly investigate the STIP metrics before approving the 2019 STIP.  The

5  Debtors cannot rely on WTW here because WTW did nothing to determine whether the STIP

6  metrics or the safety goals were appropriate.  Friske Tr. at 19:10-12.  WTW's investigation was

7  limited to the *types* of metrics in the STIP, such as financial performance or safety goals, not the

8  decision about what constitutes specific metrics.  Fiske Tr. 36:20–37:15.  This myopic

9  investigation suggests that the Debtors failed to give WTW sufficient facts to conduct a

10  meaningful investigation into the decision about the metrics for this very unique company.  And

11  that shows in the results:  WTW compared the Debtor to a peer group of 19 different energy

12  companies, not one of whom is a convicted corporate felon on probation, or started wildfires that

13  burned 3% of the State of California and killed 86 people.  Friske Decl. at 8 n.2.  WTW did not

14  even consider its own report on San Diego Gas and Electric's adoption of a 70% STIP safety

15  metric as the new industry standard.  The Debtors' process is flawed, which is why it cannot meet

16  the business judgment rule.  *Caremark*, 698 A.2d at 967–68 (explaining that the business

17  judgment rule requires examination of a director's process, not the substance of the decision).

18  **C.  The Directors' Approval of the STIP Constituted Bad Faith and Gross Negligence**
19      **Under the Circumstances.**

20      In the December 5, 2018, PUC NorthStar Decision, the PUC ordered PG&E to implement

21  the seven recommendations in the NorthStar Report, including setting multi-year targets,

22  implementing a contractor safety metric, and reviewing all STIP metrics and targets in light of the

23  enterprise-wide safety plan recommended by NorthStar.  Woltering Decl. Ex. C-22 at VII-19–20.

24  There is no proof that the Directors considered the PUC NorthStar Decision to reform the STIP.

25  If the Debtors produce such evidence in Reply, the Committee would take discovery on the

26  evidence.  The following STIP defects are additional instances of gross negligence or bad faith

27  consideration of the relevant facts.

28

**1. The Directors changed the 2019 STIP from one that required individual performance review of an employee's negligent and criminal conduct to one that awards extra compensation automatically, thereby shielding the culpable employees from oversight.**

The 2019 STIP does not reduce compensation for bad performance – including criminal acts. Virtually all eligible employees will receive the same payment regardless of their performance in 2017, 2018 and 2019. Mistry Tr. at 89:17-20 (stating that the 2019 STIP does not provide for an employee's performance to drive the award down, only up). The STIP, by design, does not address an individual's failure of performance. Mistry Tr. at 90:20–91:4. The Directors established an upward adjustment but not a downward adjustment. The Debtors' proposal to pay all employees incentive payments without an ability to downgrade those payments for bad behavior is without care and grossly negligent.

**2. The Directors changed the year end performance review and STIP payment to a quarterly review and payment, thereby permitting the employees who contribute to PG&E caused fires a third year in a row to obtain 75% of their STIP compensation awards even thought their performance caused the fires.**

Similarly, the Debtors are acting without regard for the public or for their creditors when they changed from a year-end performance review to a quarterly performance review. Such a review permits an employee to be paid incentive payments for a portion of the year even if later in the year he is fired for misconduct occurring in the first nine months.

**3. The Directors approved the STIP's wildfire mitigation plan before learning if Judge Alsup orders the company to perform a different wildfire mitigation plan on April 2, 2019.**

The Debtors filed their STIP Motion knowing that Judge Alsup may require PG&E to adopt additional wildfire mitigation obligations on April 2, 2019, as he proposed in his Second OSC. Yet, the 2019 STIP, if approved by the Court, would only require compliance with the Company's current Wildfire Mitigation Plan, and could reward employees for complying with this, possibly lower, metric. This decision indicates a lack of care or respect for the District Court and its orders about safety, and by extension, the public and PG&E's victims in particular.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 26 -

**4. The Directors approved the STIP before the PUC completed its investigation of PG&E employees' widespread falsification of gas safety records.**

The PUC is in the process of completing its investigation into the employees who falsified gas safety records. This report may name individuals, and yet these individuals may receive STIP payments after the first quarter of 2019, if the STIP is approved. This decision exemplifies PG&E's lack of care for the PUC investigation and the impact of its safety violations on the public.

**5. The Directors approved a STIP that incentivizes financial performance over wildfire safety by a factor of four to one, instead of prioritizing wildfire safety over financial performance, as the district court stated the company must do to avoid further death and destruction.**

The performance metrics for the STIP are 40% for financial performance, 50% for safety metrics, but only 10% of the safety metrics is related to fire safety. Motion at 14. The 2019 STIP reflects an increase of financial weighting from 25% in 2018 to 40% in 2019. Friske Tr. at 21:8-11. Given that the Debtors' issues are with wildfire safety—which actually caused the Debtors' largest financial liability and bankruptcy filing—the Directors' decision to *increase the financial metric* and prioritize financial performance over wildfire safety by a factor of four to one is in bad faith and without care for the ratepayers and public, who will be in danger this year during wildfire season. Judge Alsup's common sense criticism of this philosophy highlights the lack of prudence in the STIP's prioritizing of financial performance over wildfire safety.

**6. The Directors ignored the industry standard of safety over financial performance.**

The imprudence in the weighting is magnified by the fact that PG&E's California utility peers established a 70% metric for safety as the industry standard, but the Directors did not consider that fact, because their consultant did not even look at his firm's own reports about their other California utility clients. Woltering Decl. Ex. C-20, at DSR-5–6.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### 7. The Directors have not modified the STIP in a way that would incentive wildfire safety.

The PUC's Order and NorthStar Report directed PG&E to assess the effectiveness of the 2017 and 2018 STIPs. Woltering Decl. Ex. C-22, at VII-17. NorthStar was right. By any meaningful measure, the 2017 and 2018 STIPs were inaccurate and a failure. The Company found that the Company's wildfire prevention work during the year of the 2017 fires "exceeded the year-end target" and the Company's wildfire work in 2018 scored a 1.9 out of perfect 1.0 score. Woltering Decl. Ex. C-16 at Ex. 99.2, p. 19–20. Yet, 2017 and 2018 were deadly years with regard to PG&E equipment-caused wildfires. Woltering Decl. Exs. C-9, C-10. CalFire's investigations found that the company's equipment caused the majority of the fires and the company's maintenance violated state law. Woltering Decl. Exs. C-9, C-10. Thus, the failure to modify the STIP in a way that avoids the mistakes in the 2017 and 2018 STIPs constitutes bad faith and gross negligence.

### D. PG&E Relies on The Business Judgment Rule and Does Not Independently Show the STIP Is Entirely Fair or Reasonable Under the Circumstances of the Company's Continuing Wrongful Conduct.

The Debtors' chapter 11 cases do not represent the average bankruptcy case – or even the typical bankruptcy of a utility. State agencies and the federal court are continually finding that the company employees are willfully violating the law and safety standards, and covering up their violations. The Company has not yet shown that it has changed its ways with a new track record. Worse yet, the Company's increase in its financial performance metric instead of placing more weight on wildfire safety after killing over a hundred Californians shows the Company's current management values financial performance over protecting human life.

The proposed STIP would continue this corporate culture and pay incentive money to employees who have not yet established a new track record that is worthy of supplemental incentive pay. The Debtors have not submitted any evidence that the employee base salaries are under market. The Debtors' Motion did not establish they complied with the PUC NorthStar Decision directing wholesale revision of the STIP. The Debtors Motion did not establish a prima facie case that the wildfire metrics will change anything. And the Compensation Committee did

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 28 -

not consider this Court's management retention decision in PG&E's first chapter 11 case that recognized the relevance of a record of "facts implicating individual or collective wrongdoing by any PG&E employees." Friske Tr. at 38:13-18; Woltering Decl. Ex. C-4. Moreover, the proposed minimum STIP award of $235 dwarfs the Company's previous 7 years of STIP award. *See* Appendix A. And the maximum STIP award of $340 million would be more than double the historical average. *Id.* Finally, the Debtors have no credible explanation for the defects in the STIP as detailed above in Section C, 1-7, above.

<u>CONCLUSION</u>

The Committee respectfully requests that the Court deny the Motion. If the Debtors submit new evidence, or testimony of deponents Mistry and Friske that they could have elicited via cross examination during their depositions, the Committee moves to strike the evidence or to continue the hearing to permit the Committee to take discovery on the new evidence.

The Committee recommends PG&E reevaluate the motion via the following eight inquiry process:

First, has PG&E incorporated whatever wildfire safety metric Judge Alsup orders on April 2, 2019 in their STIP?

Second, has PG&E reformed the STIP in the wholesale fashion that the PUC ordered on December 5, 2018?

Third, has PG&E established a track record that the Company has finally fixed its corporate culture and wildfire prevention that would serve as a fundamental requirement for even considering paying bonus money on this record?

Fourth, has PG&E prioritized wildfire safety and the protection of human life over financial performance in any new STIP?

Fifth, can PG&E establish that it has fixed the STIP evaluation process that has historically rated the Company's performance in causing the fires as above the safety target?

Sixth, has PG&E investigated which employees, supervisors and managers should be disqualified from bonus pay because of their involvement in PG&E's misdeeds?

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 29 -

1    Seventh, is the PG&E employee base compensation below market that would require

2    additional compensation in the form of bonuses?

3    Eighth, would PG&E's payment of bonus awards to its employees be fair before paying

4    PG&E's fire claim liabilities in full to the victims who are living in trailers and temporary

5    housing, which is the apparent reason the Directors withdrew PG&E's request to pay the 2018

6    STIP bonuses?

7

8    Dated:    March 28, 2019                    Respectfully submitted,

9

10                                              BAKER & HOSTETLER LLP

11

12                                   By:    */s/ Robert A. Julian*
                                            Robert A. Julian

13                                          *Proposed Attorneys for Official Committee of Tort*
                                            *Claimants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# APPENDIX A

**PG&E Annual STIP Payments (2013 to 2020)**
**(Sourced from 2020 GRC Filings and Debtors' STIP Motion)**



1) **Source**: Woltering Decl. Ex. C-2 (PG&E's 2020 General Rate Case, Exhibit (PG&E-8), Human Resources, Workpapers Supporting Chapters 2-4A, dated December 13, 2018).

2) **Source**: Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, AND 503(c) For Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (Dkt. No. 806).