# EXHIBIT A

1              UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    In re:

5    PG&E CORPORATION,

6        - and -                    No. 19-30088 (DM)

7    PACIFIC GAS AND ELECTRIC           Chapter 11

     COMPANY,

8

              Debtors.

9    _____

10

11

12

13

14              DEPOSITION OF DINYAR MISTRY

15              San Francisco, California

16              Tuesday, March 19, 2019

17                   Volume 1

18

19

20

21

22   Reported by:

     JODI L. BOSETTI

23   CSR No. 11316, RPR

24   JOB No. 3262346

25

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 2
of 154

1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    In re:

5    PG&E CORPORATION,

6        - and -                    No. 19-30088 (DM)

7    PACIFIC GAS AND ELECTRIC          Chapter 11

     COMPANY,

8

         Debtors.

9    _____

10

11

12

13

14        Deposition of DINYAR MISTRY, Volume 1, taken

15   on behalf of Committee of Tort Claimants, at Skikos

16   Crawford Skikos & Joseph LLP, One Sansome Street,

17   Suite 2800, San Francisco, California, beginning at

18   10:05 a.m. and ending at 1:40 p.m., on Tuesday, March

19   19, 2019, before JODI L. BOSETTI, Certified Shorthand

20   Reporter No. 11316.

21

22

23

24

25

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 3
of 154

```
 1   APPEARANCES:
 2
 3   For Official Committee of Tort Claimants:
 4           BAKERHOSTETLER
             BY:  ROBERT A. JULIAN
 5           BY:  CATHERINE WOLTERING
             Attorney at Law
 6           1160 Battery Street East, Suite 100
             San Francisco, California 94111
 7           (415) 806-6000
             rjulian@bakerlaw.com
 8           cwoltering@bakerlaw.com
 9
10   For Debtors and Debtors in Possession:
11           WEIL, GOTSHAL & MANGES LLP
             BY:  RICHARD W. SLACK
12           BY:  DAVID R. SINGH
             BY: JESSICA LIOU
13           Attorneys at Law
             767 Fifth Avenue
14           New York, New York 10153-0119
             (212) 310-8017
15           richard.slack@weil.com
             david.singh@weil.com
16           jessica.liou@weil.com
17
18   For Official Committee of Unsecured Creditors:
19           MILBANK
             BY:  DANIEL DENNY
20           Attorney at Law
             2029 Century Park East, 33rd Floor
21           Los Angeles, California 90067-3019
             (213) 703-9980
22           ddenny@milbank.com
23
24
25
```

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 4
of 154

```
1    APPEARANCES (Continued):

2

3    Telephonic Appearances:

4             JULIE WOLFE
              CHRIS KIM

5

6

     Also Present:

7

              BRENDAN J. MURPHY

8             Lincoln International

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         INDEX
2    WITNESS                                    EXAMINATION
3    DINYAR MISTRY
     Volume 1
4
5
6              BY MR. JULIAN                          6
7              BY MS. WOLTERING                      100
8
9              EXHIBITS FOR REFERENCE
10   Exhibit 1    Corrected Declaration of Dinyar Mistry
11   Exhibit 2    PG&E Company 2020 General Rate Case
12   Exhibit 5    E-mails (PGE-NBF-TAR-722832-722833)
13   Exhibit 6    CAL FIRE News Release dated
                  April 28, 2016
14
     Exhibit 7    E-mail with Near Hit reports
15
     Exhibit 11   PUC Order Instituting Investigation and
16                Order to Show Cause
17   Exhibit 13   Order to Show Cause Why PG&E's Conditions
                  Of Probation Should Not Be Modified
18
     Exhibit 15   Second Order to Show Cause Why PG&E's
19                Conditions of Probation Should Not Be
                  Modified
20
21
22
23
24
25

1   San Francisco, California, Tuesday, March 19, 2019

2                  10:05 a.m. - 1:40 p.m.

3

4                  DINYAR MISTRY,

5   having been administered an oath, was examined and

6   testified as follows:

7

8                  EXAMINATION

9   BY MR. JULIAN:

10       Q   State your name for the record, please.

11       A   My name is Dinyar Mistry.

12       Q   Mr. Mistry?

13       A   Yes.

14       MR. JULIAN:  Okay.  I wonder if the Unsecured

15   Creditors' Committee counsel could inform us who is on

16   the phone listening.

17       MR. DENNY:  Yes.  I was informed that Chris Kim

18   with FTI Consulting.  He's with the FA for the

19   Committee of Unsecured Creditors.  Also my colleague,

20   Julie Wolfe, at Milbank.  And it may be on a

21   listen-only line, but it's a dedicated line for

22   Milbanks, so there is no one else on the line other

23   than Milbank and FTI professionals.

24       MR. JULIAN:  They're not tape-recording?

25       MR. DENNY:  No, not tape-recording.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 7
of 154

1  BY MR. JULIAN:

2      Q   Good morning, Mr. Mistry.  I've marked

3  several exhibits that we're going to talk about today

4  in the binder to your right.  If you can take that

5  out.  We're going to talk about your Declaration,

6  Exhibit 1, first.

7          Is Exhibit 1 your corrected Declaration that

8  you filed in support of the debtors' motion for

9  approval of the short-term incentive plan of PG&E?

10     A   Yes.

11     Q   Okay.  Can we refer to the debtors' proposed

12  short-term incentive plan as the 2019 STIP today?

13     A   Yes.

14     Q   Do you have any changes to your Declaration?

15     A   No.

16     Q   Okay.  Would you please give me the dates

17  that you were acting as vice president of internal

18  audit and compliance of the debtors?

19     A   I don't remember.

20     Q   And the dates for when you served as vice

21  president of rates and regulations?

22     A   I think it was roughly 2005 to 2008, but I

23  would have to confirm.

24     Q   When did you become vice president of HR?

25     A   In 2016.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 8
of 154

1    Q    2016?

2    A    Yes.

3    Q    What did you do between '08 and '16?

4    A    I was a controller, the vice president and

5    controller.  So the positions that I have held include

6    vice president and controller, vice president of

7    regulation rates, vice president of internal audit,

8    and then I went back to being controller and then took

9    on the HR role.

10    Q    Got it.  Who do you report to as vice

11    president of HR?

12    A    When I first got the job, I reported to John

13    Simon.  And then after that I reported to Geisha

14    Williams.  And now I report again to John Simon.

15    Q    So always to the CEO?

16    A    No.  The first time I reported to John Simon,

17    he was not the CEO.

18    Q    What was he?

19    A    He was -- I don't remember his title, but --

20    Q    What are your duties as HR VP?

21    A    My duties include employee attraction,

22    retention, engagement, employee development and

23    training, labor relations, compensation, and the

24    general business operations of HR.

25    Q    What are your duties with respect to

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 9
of 154

1   compensation?

2        A    I oversee the compensation department, which

3   is a department within HR.

4        Q    Okay.  Are you a member -- by the way, PG&E

5   Corp is the holding company and PG&E Company is the

6   utility, right?

7        A    Yes.

8        Q    Is there a compensation committee, a board

9   compensation committee for each of the two companies

10  or is it one for both?

11       A    There is a compensation committee for each,

12  but they tend to meet concurrently.

13       Q    They do what?

14       A    Meet concurrently.

15       Q    I see.  And your Declaration refers to the

16  compensation committee approving the proposed 2019

17  STIP, which compensation committee is that?

18       A    It's the compensation committee -- since they

19  meet concurrently, I don't know.  I'm assuming it is

20  both.

21       Q    So if you turn to page 10 -- I'm sorry,

22  page 5 of your Declaration, Exhibit 1, lines 23 and

23  24.  You testified that the compensation committee

24  approved the 2019 STIP and the 2019 performance

25  metrics on January 23, 2019; is that right?

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 10
of 154

1      A    Yes.

2      Q    And how do you know that?

3      A    I was there and it's reflected in the

4    minutes.

5      Q    Okay.  Are you a member of the compensation

6    committee?

7      A    No.

8      Q    How do you interact with the compensation

9    committee?

10      A    I bring matters to the compensation committee

11    for their decision and discussion.

12      Q    Did you recommend the proposed 2019 STIP to

13    the compensation committee?

14      A    Yes.

15      Q    What did you base your recommendation on?

16      A    I based my recommendation on the form of the

17    2019 STIP, the metrics and targets that were

18    established.

19      Q    Anything else?

20      A    I reviewed the 2019 STIP.  It's similar in

21    many respects to a historic STIP that the company has

22    had.

23      Q    When you say it's similar in many respects to

24    the historic STIP that the company has had, how long

25    has the company had that historic STIP?

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 11
of 154

1      A    It's many years.

2      Q    Can you put a range on the years that it's

3   had the historic STIP?

4      A    I don't know.

5      Q    Your Declaration says, I think, 30 years for

6   the type of STIP?

7      A    Yes.  It's been many years, yes.

8      Q    Is it 30 years?

9      A    At least 30 years probably, yes.

10      Q    How do you know that?

11      A    I've been informed.

12      Q    By whom?

13      A    By the senior director of total rewards, who

14   has responsibility for compensation.

15      Q    Who is that?

16      A    His name is John Lowe, L-O-W-E.

17      Q    And what is his title?

18      A    Senior director total rewards.

19      Q    With which company?

20      A    Pacific Gas and Electric Company.

21      Q    The utility?

22      A    Yes.

23      Q    Are you employed by the utility or the

24   holding company?

25      A    I am a dual-added officer.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 12
of 154

1      Q    Of both?

2      A    Of both.

3      Q    Okay.  And I am sorry, I may have missed it,

4  the compensation committee that approved the 2019 STIP

5  on January 23, 2019, which compensation committee was

6  that?

7      A    I believe it was both.

8      Q    Both.  And you were there, right?

9      A    Yes.

10     Q    Who were the members of the compensation

11  committee who met on that date?

12     A    The members of the compensation committee are

13  Forest Miller, Ro Parra, Barbara Rambo, and I believe

14  Dick Kelly.

15     Q    All four of those are directors?

16     A    Yes.

17     Q    Of the holding company?

18     A    Of both, the utility and the holding company.

19     Q    They are the independent directors of the

20  holding company, right?

21     A    Yes.

22     Q    By independent, meaning they're not officers

23  or internal representatives of the utility or the

24  corporation, correct?

25     A    Yes.

1      Q    Are there any members of the compensation

2  committees other than the four independent directors?

3      A    No.

4      Q    Are you an ex officio member of the

5  compensation committee in any respect?

6      A    I don't know what that means.

7      Q    Good.  Do you attend most of the meetings?

8      A    I attend most of the meetings, yes.

9      Q    And from time to time do you advise the

10  compensation committee on your recommendations?

11      A    Yes.

12      Q    And you did on this occasion?

13      A    Yes.

14      Q    And you recommended the compensation

15  committee approve the 2019 STIP?

16      A    Yes.

17      Q    Did you also recommend the committee approve

18  the 2019 metrics?

19      A    Yes.

20      Q    So how should you and I discuss this today?

21  Should I include the 2019 metrics in the 2019 STIP or

22  are they separate from your point of view?

23      MR. SLACK:  Object to the form.

24          But go ahead and answer.

25      THE WITNESS:  The 2019 STIP is an incentive

1  program that is comprised of a set of metrics and a

2  set of targets associated with those metrics.

3  BY MR. JULIAN:

4      Q   Okay.  What are the targets for the 2019

5  STIP?

6      A   Each metric has its individual targets.  And

7  the way the targets are established is there is a

8  threshold, there is a target, and then there is a

9  maximum payout, so there is a range.

10     Q   And when you say "targets," are you referring

11  to monetary targets or performance targets?

12     A   Performance targets.

13     Q   And the performance targets to which you've

14  just referred are performance targets of the company

15  as a whole and not individual employees, right?

16     A   Yes.

17     Q   How long has the compensation committee been

18  involved in approving STIPs?

19     A   I've been in the role for three years, and

20  they have been involved in the three years that I've

21  been in the role.

22     Q   Do you know if Exhibit 3 is the compensation

23  committee charter for the PG&E Corporation

24  compensation committee?  By the way, I pulled it off

25  the Internet, so I didn't get it from your data room.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 15
of 154

1    A    I don't know.

2    Q    Okay.  If you turn to page 8 of your

3    declaration, Exhibit 1, I'm going to ask you about

4    your testimony at lines 19 through 24.  In your

5    declaration you said, "Just as with the 2018 STIP and

6    previous STIPS, the compensation committee and the

7    board undertook a rigorous process to ensure that the

8    2019 STIP is designed with the near-term operational

9    and financial objectives with the debtors in mind,

10   which resulted in the development of new, targeted

11   metrics and refinements to existing metrics," closed

12   quote.  Right?

13   A    That's right, yes.

14   Q    What process did the board undertake?

15   A    Management brings to the board a set of

16   metrics and targets in around the December time frame

17   that it has developed, and we talk about -- I am

18   sorry.  We talk about the metrics in the December time

19   frame, and then, subsequently, we bring forward the

20   targets.  The board, the compensation committee

21   reviews the material, they look at the performance

22   from prior years, and they have an independent

23   adviser.

24   Q    And is that it?

25   A    To the best of my knowledge, yes.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 16
of 154

1      Q   Were you involved in that process?

2      A   Yes.

3      Q   How were you involved?

4      A   I was involved in discussing the matters with

5  the compensation committee at the meetings and being

6  at the meeting to answer any questions.

7      Q   Were you involved in the board's discussion

8  of that process at this meeting?

9      A   To the extent that the board had questions

10  for me, yes.

11      Q   So you were present?

12      A   Yes.  The board also has executive sessions,

13  and I was not present at their executive sessions.

14      Q   And are you saying you are assuming the

15  executive sessions of the board also discuss

16  compensation?

17     MR. SLACK:  Objection to the form of the

18  question.

19     THE WITNESS:  I don't know what they discuss.

20  I'm just letting you know they have executive

21  sessions.

22  BY MR. JULIAN:

23      Q   When did you recommend the 2019 STIP and the

24  2019 metrics to the board?

25      A   It was in January.

1    Q   Before the bankruptcy filing or after?

2    A   Before.

3    Q   Did the board ask you questions about the

4    proposed 2019 STIP?

5    A   Yes.

6    Q   Do you remember any of the questions?

7    A   No.

8    Q   Did the board ask you questions about the

9    2019 metrics?

10   A   Yes.

11   Q   Did you answer them?

12   A   Yes.

13   Q   You don't happen to remember any of them, do

14   you?

15   A   I don't remember the specific questions.

16   Q   Let's talk about one of the metrics, if you

17   turn to page 7 of your Declaration.

18       One of the metrics under section 5(a)(ii) is

19   public safety index and dealing with enhanced

20   vegetation management and system hardening, right?

21   A   Yes.

22   Q   Did the board ask you any questions about

23   that?

24   A   Yes.

25   Q   What was the discussion during the board

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 18
of 154

1    meeting about that metric?

2         A    My recollection is the board asked whether

3    that metric was consistent with the regulatory filings

4    that we had made.

5         Q    And what was your response?

6         A    That it is consistent.

7         Q    What regulatory filing were you referring to?

8         A    The wildfire safety plan that either was made

9    or was going to be made.  At this point I don't recall

10   the timing.

11        Q    You're referring to the wildfire safety plan

12   that PG&E submitted to the PUC?

13        A    Yes.

14        Q    In October/November of 2018?

15        A    I don't remember when it submitted it.

16        Q    I think it may have been submitted

17   February 2019, but you don't remember, though?

18        A    No, I don't remember.

19        Q    Did the board -- by the way, which board was

20   it that you appeared at to recommend the 2019 STIP?

21        A    The committees meet concurrently.  So there

22   are two committees, they meet concurrently.

23        Q    I understand that.  You said earlier you

24   recommended to the board --

25        A    I am sorry, I recommended to the compensation

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 19
of 154

1  committee of the board.

2      Q   I see.  So when you said you recommended to

3  the board during January of 2019 the 2019 STIP and the

4  metrics, you were referring to the compensation

5  committee of the board?

6      A   Yes.

7      Q   But you also recommended the 2019 STIP to the

8  board itself, right?

9      A   No.

10     Q   You did not?

11     A   No.  The compensation committee has the

12  authority to approve the 2019 STIP.

13     Q   What makes you say that?

14     A   That's the governance as I understand it.

15     Q   Has the board itself ever approved the 2019

16  STIP?

17     A   My understanding is that the board needs to

18  approve the STIP for the CEO and the principal

19  executive officers.  Since none of them are part of

20  the 2019 STIP, I don't think it needs to go to the

21  board.

22     Q   The only approval you think that the 2019

23  STIP needs from the a governance standpoint internally

24  is from the compensation committee of the board?

25     A   Yes.

www.veritext.com                                       888-391-3376

1     Q   Let's turn to Exhibit 2, which is Pacific Gas

2  and Electric Company's 2020 general rate case exhibit.

3  If you'll turn to, at the end, page WP 34, 35, through

4  39 -- actually, 41.  I'm going to talk about all of

5  that.

6        So, Mr. Mistry, it's at the end of the

7  Exhibit 2.

8     MR. SLACK:  So, I'm sorry, is it WP and then like

9  3 dash something and 4 dash?  What is the number?

10     MR. JULIAN:  I probably misspoke.  WP 4-34.

11  BY MR. JULIAN:

12     Q   Are you on page WP 4-34 of Exhibit 2?

13     A   Yes.

14     Q   Does that page contain the metrics for the

15  2017 STIP?

16     A   Yes.

17     Q   All right.  Let's turn to page WP 4-38, 39.

18  Do those pages contain the metrics for the 2018 STIP?

19     A   Yes.

20     Q   And then the following pages, WP 4-40 and 41,

21  contain a description of the STIP calculation; do you

22  see that?

23     A   Yes.

24     Q   And does that STIP calculation explanation

25  apply to the proposed 2019 STIP also?

Case: 19-30088  Doc# 1112-1  Filed: 03/28/19  Entered: 03/28/19 16:34:16  Page 21
of 154

1        A    Yes.

2        Q    Did the compensation committee approve the

3   2018 STIP?

4        A    Yes.

5        Q    Did the board approve the 2018 STIP?

6        A    The board would have approved the 2018 STIP

7   for the CEO and the principal executive officers.

8        Q    But not for the 10,000 or so line employees

9   that are addressed by category by the 2019 STIP; is

10  that right?

11       A    I don't believe so, yes.

12       Q    All right.  Are there any differences in the

13  -- I'll strike that question.  I can read it, I get

14  it, but I am going to ask the questions nonetheless.

15            What are the differences, in your view,

16  between the 2018 STIP structure and performance

17  targets and the 2019 STIP structure and performance

18  targets?

19       A    There are different metrics in the 2019 STIP

20  than there are in the 2018 STIP.  The targets have

21  been changed to reflect 2019 performance versus

22  anticipated 2019 performance versus 2018.

23       Q    Okay.

24       A    The 2019 -- in 2018 we also had an equity

25  program for a certain number of people, which is

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 22
of 154

1    called the long-term incentive plan or the LTIP.  We

2    do not have that program in 2019.  And so 50 percent

3    of the value of that program has been added to the

4    2019 STIP.

5        Q   50 percent of the value from the long-term

6    incentive plan of the 2018 is added to the short-term

7    incentive plan of the 2019?

8        A   Yes.  And there is no long-term incentive

9    plan for 2019.

10        Q   What is the approximate dollar component of

11    the value that you just referred to?

12        MR. SLACK:  Objection to the form of the

13    question.

14        THE WITNESS:  I don't have the dollar amounts in

15    my mind.

16    BY MR. JULIAN:

17        Q   Where is the addition of the value reflected

18    in the 2019 structure and performance targets?  So, if

19    I may, Exhibit 1 contains the 2019 STIP.

20        A   It's on page 5, line 7.

21        Q   Okay.  I would like you to go back to

22    Exhibit 2, to pages WP 4-38 and 39, which is the 2018

23    STIP structure and performance targets, right?

24        A   Yes.

25        Q   Now, 50 percent of the safety metrics or

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 23
of 154

1   50 percent of the metrics are allocated to safety,

2   right?

3        A    Yes.

4        Q    And is it true that the 5 percent safety

5   factor for nuclear stays the same between 2018 to

6   2019?

7        A    Yes.

8        Q    And the public safety index of 10 percent

9   metrics stays the same, right?

10       A    The public safety, the 10 percent, but it

11  comprises of different program for 2019.

12       Q    So tell me how the 2019 public safety index

13  programs differ from the 2018 metric?

14       A    For 2019 it's equally weighted between system

15  hardening and vegetation management and enhanced

16  vegetation management in the high-fire threat areas.

17       Q    So 5 percent of the metric is to vegetation

18  management in the high-fire areas?

19       A    Yes.

20       Q    Whereas in 2018 it was as set forth on page

21  WP 4-38, right?

22       A    Yes.

23       Q    Okay.  Then the financial weighting metric is

24  25 percent in 2018, whereas in 2019 it's 40 percent,

25  right?

www.veritext.com                                          888-391-3376

1      A    Yes.

2      Q    What was the discussion of the committee

3  levels to change -- the reason for that change?

4      A    We --

5      MR. SLACK:  So let me say that you should exclude

6  from your answer, if necessary, any discussions with

7  the lawyers, but outside of the discussion with the

8  lawyers, you should answer that question.

9      THE WITNESS:  So as were putting -- as we were

10  designing the 2019 STIP, we had advice from Willis

11  Towers because we anticipated being in a restructuring

12  situation.  And we were informed that it was -- that

13  in a restructuring situation, having a higher

14  percentage of the program be weighted to its financial

15  metrics was appropriate.

16  BY MR. JULIAN:

17      Q    Who gave you that advice?

18      A    We heard that from Willis.

19      Q    Your compensation consultant?

20      A    Willis was our consultant for designing the

21  2019 STIP.  We sought their advice.

22      Q    Were they present during the compensation

23  committee meeting when you discussed this?

24      A    Yes.

25      Q    Was counsel present?

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 25
of 154

1        A    Yes.

2        Q    Which counsel?

3        A    I don't remember.

4        Q    Do you remember the law firm?

5        A    Weil, yeah.

6        Q    All right.  You confirmed for me that the

7   2019 STIP calculates the total target STIP payout in

8   2019, the same as set forth in 2018 on pages WP 4-40

9   and 41 of Exhibit 2, right?

10        MR. SLACK:  Objection to the form.

11        THE WITNESS:  Page 4-41 has the components of the

12   calculation of the STIP payment and the calculation

13   would be done similarly.

14   BY MR. JULIAN:

15        Q    Has anyone on behalf of PG&E calculated the

16   total target STIP payout for the 2019 STIP?

17        A    Yes.

18        Q    And what is that amount?

19        A    It's about $235 million.

20        Q    You're getting that from what page?

21        A    I'm getting that from page 6, line 5.

22        Q    Of your Declaration?

23        A    Yes.

24        Q    Exhibit 1?

25        A    Yes.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 26
of 154

1    Q    So turn to page 8 of your Declaration.  I'm
2  going to go back to that sentence on 19 through 24.
3  And in that testimony you stated that the committee's
4  work resulted in the development of new targeted
5  metrics and refinements to existing metrics.  I would
6  like you to take me through the 2019 metrics in your
7  Declaration and identify for me the new metrics and
8  refined metrics to which you referred.

9    A    We've talked about the public safety index in
10  2019.  It contains two items, enhanced vegetation
11  management and system hardening.  Those two are
12  different for 2019 compared to the 2018 public safety
13  index.

14    Q    Let me ask you a question about that.  How
15  does enhanced vegetation management, the metric in the
16  2019 STIP, differ from vegetation non-exempt pole
17  clearing, and routine line vegetation management and
18  tree mortality mitigation program, which is described
19  in the 2018 STIPs?

20    A    We have filed a wildfire mitigation plan with
21  the commission.  And the vegetation management that is
22  in the 2019 STIP is consistent with that plan.

23    Q    I see.  And is the vegetation pole clearing,
24  routine line vegetation management and tree mortality
25  mitigation program that PG&E had in existence in 2018

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 27
of 154

1  different in any respect from the wildfire mitigation

2  plan that you filed recently?

3      A   I don't know the details.

4      Q   Can you tell me whether you know, of your own

5  personal knowledge, the extent to which the two

6  programs are different, if any?

7      A   To the extent of my personal knowledge, the

8  2018 program was involved -- we recognized that

9  vegetation management was an important component, and

10 the 2018 program was focused on vegetation management

11 ment.  In 2019 we have an enhanced vegetation

12 management program that we filed with the commission.

13 I'm not familiar with the particulars of that program,

14 but our 2019 program is consistent with that program.

15     Q   Your 2019 program is consistent with the

16 wildfire management plan you filed recently with the

17 PUC?

18     A   Yes.

19     Q   My question is:  Can you tell me the extent

20 to which the 2019 program differs from the 2018

21 program referenced in the 2018 STIP in Exhibit 2?

22     A   I don't know the particulars.

23     Q   How is it that you know that the new metric

24 is new?

25     A   Because it has a different set of -- it is a

1    new metric.  It reflects miles of trees to be cleared.

2    And the former metric was three separate things, and

3    it involved, as I recall, a quality assurance around

4    the tree-trimming program.

5         Q    Who determined the quality assurance?

6         MR. SLACK:  Objection to the form of the

7    question.

8         THE WITNESS:  It's a program that is run by

9    electric operations.

10   BY MR. JULIAN

11        Q    Do you know whether its PG&E employees or

12   independent contractors who were supposed to determine

13   whether the quality of vegetation pole clearing,

14   routine line management, and tree mortality mitigation

15   program work had been done properly in 2018?

16        A    I don't know.

17        Q    Now, you testified that the board didn't

18   approve any awards under the 2018 STIP; is that right?

19        MR. SLACK:  Objection to the form of the

20   question.

21   BY MR. JULIAN

22        Q    In your Declaration.

23        A    The compensation committee did not approve

24   the payment for the 2018 STIP.

25        Q    Turn to page 4 of your Declaration, which is

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 29
of 154

1    Exhibit 1.  Turn to line 12 of page 4.  Do you have

2    that?

3         A    Yeah.

4         Q    In that section of your Declaration you

5    testified, "In light of the 2018 Northern California

6    wildfires and the material deterioration in the

7    debtors' financial situation, the board of directors

8    adopted senior management's recommendation and

9    exercised its discretion to forego paying to

10   approximately 11,000 of the debtors' employees the

11   2018 STIP awards, and the debtors withdrew their

12   request for authority to pay such awards?  Have I read

13   your testimony correctly?

14        A    Yes.

15        Q    Who in senior management recommended to the

16   board of directors to forego paying the 2018 STIP

17   awards?

18        A    The senior management team discussed it.  The

19   recommendation was made by the CEO.

20        Q    Which was whom at that time?

21        A    John Simon.

22        Q    What was the date of that recommendation?

23        A    It was in January.

24        Q    Before the bankruptcy?

25        A    No.  Was it in January?  I don't -- actually,

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 30
of 154

1  I don't remember.

2      Q   Oh, that's right.  Let me refresh your

3  recollection.

4      A   Yeah.

5      Q   The debtors file a motion for approval?

6      A   Yes.  So it was after the bankruptcy.

7      Q   After the bankruptcy, right?

8      A   Yeah.

9      Q   So Mr. Simon --

10     A   It must have been, yeah.

11     Q   Mr. Simon became CEO shortly before the

12  bankruptcy?

13     A   Mr. Simon became CEO, I believe, a couple of

14  weeks before bankruptcy.  He was interim CEO.  Yes,

15  you are correct, it was after we filed.

16     Q   When you say it was after we filed, what you

17  mean is after PG&E filed its bankruptcy cases?

18  Mr. Simon recommended to the board of directors of

19  both companies the board forego paying approximately

20  11,000 of the debtors' employees the 2018 STIP awards?

21     A   Mr. Simon recommended that the board exercise

22  its discretion and forego paying that amount.

23     Q   And how do you know that the board of

24  directors adopted Mr. Simon's recommendation?

25     A   I was at the compensation committee when the

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 31
of 154

1    compensation committee adopted it.  I was not at the

2    board meeting, but I'm assuming that there would be a

3    resolution or minutes or something that would explain

4    that.

5         Q    When did that compensation committee meeting

6    take place?

7         A    I don't remember the date.

8         Q    You were present?

9         A    I was present.

10        Q    Did you hear Mr. Simon's recommendation

11   yourself?

12        A    Yes.

13        Q    What reason did he give for supporting his

14   recommendation to the compensation committee?

15        A    The reason is what we have stated here, which

16   is in light of the 2018 Northern California wildfires

17   and the material deterioration in the debtors'

18   financial situation.

19        Q    Did Mr. Simon explain what he meant by that?

20        A    Possibly.  I don't remember exactly what he

21   said.

22        Q    What did you understand he meant?

23        A    I understood he meant that in light of the

24   wildfires that occurred, the financial pressures that

25   it put on the company, that he felt and management

1  felt that the board should not award the 2018 STIP.

2      Q   You said the financial pressures it placed on

3  the company.  What is the "it" that placed the

4  financial pressures on the company?

5      A   The financial pressures that the potential

6  liabilities resulting from the wildfires and the loss

7  of liquidity.

8      Q   And which wildfires are you referring to?

9      A   The 2017 and 2018 wildfires.

10      Q   Are those the fires that he referred to?

11      A   To the best of my knowledge.  I don't know

12  that we specifically talked about which set of

13  wildfires.

14      Q   Do you know whether the board of directors

15  approved a similar resolution foregoing payment of the

16  2018 STIP awards?

17      A   That's my understanding.

18      Q   And how did you get that understanding?

19      A   I was likely told.

20      Q   Do you know who?

21      A   No.

22      Q   Now that we've talked a little bit about it,

23  you think your Declaration on page 4, line 13 should

24  refer to the compensation committee instead of the

25  board of directors?

1      MR. SLACK:  Objection to the form of the
2  question.
3      THE WITNESS:  So I would like to explain my
4  understanding of the governance, which is that the
5  compensation committee approves the STIP for all of
6  the employees except the CEO and the principal
7  executive officers.  And those require approval of the
8  board.  I was not there at the board discussion.
9  BY MR. JULIAN:
10     Q   You said you were likely told that the board
11  of directors approved the or forego -- I will withdraw
12  the question.
13         You said that you were likely told that the
14  board of directors decided to forego payment of the
15  2018 award.  You don't remember who told you; is that
16  right?
17     A   For the vast majority of the employees, the
18  decision to forego the STIP was made by the
19  compensation committee.  For about four employees,
20  which is the CEO and the principal executive officers,
21  that decision is a board decision.  I was present at
22  the compensation committee when they made the decision
23  to forego the STIP for the broad range of employees.
24  I didn't focus on those four employees.
25     Q   And my only question is did someone tell you

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 34
of 154

1   that the board approved foregoing the 2018 STIP awards

2   for the senior officers?

3       A   The senior officers are part of the

4   compensation committee.  It is for the CEO and the

5   three principal executive officers who are part of the

6   board.  And I, honestly, don't recall.

7       Q   You honestly don't recall whether someone

8   told you that the board approved --

9       MR. SLACK:  Objection to the form of the

10  question.

11      THE WITNESS:  I didn't follow up on the decision

12  for those four employees.

13  BY MR. JULIAN:

14      Q   Did the company pay 100 percent of the STIP,

15  the targeted STIP in 2017?

16      A   In 2017 the company paid according to the

17  STIP results, which I don't believe was the target.

18  It was whatever the STIP result was, whatever the

19  company score was.

20      Q   Let's turn to WP 4-34.  Does that page help

21  you answer the question.

22      A   Yes.  So the score over here is .959, and

23  that was the score that was paid.

24      Q   In layman's terms, that means 95.9 percent of

25  the targeted short-term incentive payments that could

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 35
of 154

1   have been paid for 2017 were actually paid?

2        A    Yes.

3        Q    And when did the -- who approved that award?

4   The compensation committee --

5        A    The compensation committee.

6        Q    -- approved the award to the line employees?

7        A    Yes.

8        Q    In 2017?

9        A    Yes.

10       Q    When did the compensation committee approve

11  the STIP, the 2017 STIP award payments to the

12  employees?  And by that I mean year.

13       A    Oh, 2018.

14       Q    So, in other words, after 2017 is over --

15       A    Yes.

16       Q    -- the compensation committee gets together,

17  figures out what happened, and approves an award; is

18  that right?

19       A    After the year is over and the metrics are

20  validated by internal audit, the compensation

21  committee reviews the metrics and approves the

22  payment.

23       Q    And what month would that have been in 2018

24  that the compensation committee would have approved?

25       A    I believe it was February.

1    Q    February.

2    A    Also in 2018, yes, February.

3    Q    And who prepared pages WP 4-35 and 36?  By

4    who, I mean the audit department or someone else.  I

5    don't mean the name of the person.

6    A    I don't know.

7    Q    On page WP 4-35, PG&E said that the

8    performance -- under electric operations, the

9    performance addressed electric distribution infrared

10   inspections, electric distribution conductor upgrades,

11   and transmission and distribution vegetation

12   management, public safety and reliability program,

13   right?

14   A    Yes.

15   Q    And the performance that PG&E gave for its

16   2017 work was that the year-end index score exceeded

17   the year-end target, right?

18   A    Yes.

19   Q    And it says, "Performance was driven by

20   completing infrared inspection work and vegetation

21   management work ahead of plan.  Overhead conductor

22   replacement performance was below target due primarily

23   to resource reprioritization in the fourth quarter for

24   October 2017 wildfire response."  Do you see that?

25   A    Yes.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 37
of 154

1    Q   And it says, "No benchmark."  What does no

2    benchmark mean, if you know?

3    A   To the extent that any of these metrics that

4    we put in the STIP have a benchmark in the industry

5    that we are able to find, we consider that as an

6    input.

7    Q   Okay.  Did the company reduce its 2017 STIP

8    award payments by virtue of the 2017 wildfires?

9    A   The company did not award the 2017 STIP to

10   the CEO and the CFO, but did not make other

11   adjustments.

12   Q   And you said did not make other adjustments?

13   A   Yes.

14   Q   Who made the decision not to award the STIP

15   awards to the CFO and the CEO?

16   A   The compensation committee would have made

17   the decision for the CFO and the board would have made

18   the decision for the CEO.

19   Q   Do you know whether the compensation

20   committee denied STIP award payments to the CFO

21   because of the 2017 wildfires?

22   A   I do not know.

23   Q   Do you know if the board did not approve STIP

24   award payments to the CFO because of the 2017

25   wildfires?

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 38
of 154

1      A    I do not know.

2      Q    What part of the 2019 STIP performance

3  metrics is designed to promote mitigation of wildfire

4  risks?

5      A    The public safety index.

6      Q    Which paragraph?

7      A    Which is on page 7, line 6.

8      MS. WOLTERING:  Exhibit 1.

9  BY MR. JULIAN:

10     Q    You're referring to the public safety index

11 weight of 10 percent?

12     A    Yes.

13     Q    Having two new equally weighted submetrics

14 dealing with enhanced vegetation management and system

15 hardening?

16     A    Yes.

17     Q    How does the 2019 STIP promote mitigation of

18 further wildfire risks differently than the 2018 STIP?

19     A    The 2019 STIP has system hardening, which is

20 hardening measures for circuit miles within the

21 fire-designated areas, and it has the enhanced

22 vegetation management program that you see over here.

23     Q    What kind of system is targeted to be

24 hardened?

25     A    I believe it is poles and wires.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16
of 154

1     Q   How about the conductors?

2     A   That's wires.

3     Q   Sorry.  How about the insulators?

4     A   I don't know.

5     Q   How about the hooks that hold the insulators

6 onto the towers?

7     A   I don't know.

8     Q   How about the transformers?

9     A   I don't know.

10     Q   That brings up a good point.  So the system

11 hardening that is discussed in the 2019 performance

12 metrics, does that relate to just transmission lines

13 or transmission lines and distribution lines?

14     A   I don't know.

15     Q   Are there any other provisions of the 2019

16 STIP that promote mitigation of wildfire risks?

17     A   The public safety index is the one that is

18 most direct.

19     Q   That's the 10 percent public safety index on

20 page 7 of your declaration, paragraph 5(a)(ii) right?

21     A   Yes.

22     Q   The 2019 STIP assigns 40 percent of the

23 performance metrics to financial performance, correct?

24     A   Yes.

25     Q   The 2019 STIP prioritizes financial

1    performance over wildfire safety, correct?

2         MR. SLACK:  Objection to the form of the

3    question.

4         THE WITNESS:  The 2019 STIP.  So the STIP is

5    designed to look across the enterprise and be focused

6    on important matters.  So 50 percent of our STIP

7    relates to safety, as you can see.  40 percent of our

8    STIP is financial and 10 percent is customer

9    satisfaction.

10   BY MR. JULIAN:

11        Q   Do you have an opinion as to whether or not

12   the 2019 STIP prioritizes wildfire safety -- no.

13   Strike the question.

14            Do you have an opinion as to whether or not

15   the 2019 STIP prioritizes financial performance over

16   wildfire safety mitigation?

17        MR. SLACK:  Objection to the form of the

18   question.

19        THE WITNESS:  My view is that the 2019 STIP

20   prioritizes safety over financial performance.

21   BY MR. JULIAN:

22        Q   And you're referring, in that regard, to the

23   safety metric of 50 percent, correct?

24        A   Yes.

25        Q   Which allocates 10 percent to wildfire

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 41
of 154

1    safety, correct?

2         A    Yes.

3         Q    And the other 40 percent of the 50 percent

4    goes to nuclear reliability, first time miles, asset

5    records, and serious injuries and fatalities, right?

6         A    Yes.

7         Q    And none of those other ones have to do with

8    wildfire mitigation, do they?

9         MR. SLACK:  Objection to the form.

10        THE WITNESS:  They refer to other aspects of the

11   business.

12   BY MR. JULIAN:

13        Q    Is the answer to my question yes?

14        MR. SLACK:  Objection to the form.

15        THE WITNESS:  I'm not sure I understand your

16   question.

17   BY MR. JULIAN:

18        Q    Is there anything in the 5 percent of nuclear

19   reliability safety indicators that deals with wildfire

20   mitigation?

21        A    No.

22        Q    Is there anything in first-time ILI miles

23   weighted 10 percent that deals with wildfire

24   mitigation?

25        A    No.

www.veritext.com                                                888-391-3376

1     Q   Is there anything in the safety factor known
2   as asset records duration index weighted 10 percent
3   that deals with wildfire mitigation?
4     A   It is important to have accurate asset
5   records.  While it isn't directly related to system
6   hardening and vegetation management, it is an
7   important aspect of having a safe system.
8     Q   Is the 10 percent allocated to accurate
9   records different than the 2018 STIP?
10     A   I would have to look at the details, but I
11   think it's similar.
12     Q   And is there anything in the serious injuries
13   and fatalities correction actions index of 15 percent
14   that deals with wildfire mitigation?
15     A   The serious injuries and fatalities
16   corrective action deals with the safety of our
17   employees who are critical to maintaining the system.
18     Q   Have you read Judge Alsup's order to show
19   cause in which he stated that PG&E should have used
20   the money paid in dividends in 2016 and 2017 to fix
21   the electrical system?
22     A   I have not read the order.
23     Q   Did the compensation committee consider the
24   order in creating the 2019 STIP?
25     A   I don't know.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 43
of 154

1    Q   While you were present at the compensation

2  committee meetings, did the compensation committee

3  consider Judge Alsup's orders in any respect?

4    A   I don't recall.

5    Q   Does the 2019 STIP contain any performance

6  metric that would incentivize employees to file a

7  whistleblower report that PG&E employees are

8  falsifying records?

9    MR. SLACK:  Objection to the form.

10   THE WITNESS:  Could you ask the question again.

11  BY MR. JULIAN:

12   Q   Yeah.

13       Does the 2019 STIP contain any performance

14  metric that would incentivize employees to file a

15  whistleblower report that PG&E employees are

16  falsifying records?

17   MR. SLACK:  You have my objection to the form.

18   THE WITNESS:  We have a -- we have a variety of

19  programs for employees to raise concerns, including a

20  help line, a compliance and ethics help line, a

21  federal monitor line, and what we call a cap or a

22  continuous improvement program system.  So we have the

23  mechanism for employees to raise concerns.

24       I'm not understanding the connection between

25  the 2019 STIP and mechanism for employees to raise

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 44
of 154

1    concerns.

2    BY MR. JULIAN:

3        Q    Does the 2019 STIP or 2019 performance

4    metrics contain any metric that, in your view,

5    incentives an employee to be compensated by invoking

6    the whistleblower program that you just described?

7        MR. SLACK:    Objection to the form of the

8    question.

9        THE WITNESS:    These are fairly objective metrics,

10   and I'm not seeing the connection that seems to be in

11   your question.

12   BY MR. JULIAN:

13       Q    Is there any way, in your view, that the

14   performance metrics in 2019 incentivize employees to

15   do anything good for PG&E?

16       A    Yes.

17       Q    How so?

18       A    These metrics and targets are intended to

19   improve the performance of the company, which is good

20   for PG&E.  And it aligns the employees' goals with

21   advancing these measures for the company.

22       Q    After PG&E determines the total STIP awards

23   that are available for a given year, who makes the

24   decision as to the dollar amount that actually gets

25   allocated to an individual employee from the total

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 45
of 154

1   STIP award program that is approved for that year?

2       MR. SLACK:  Can you read it back for me, please.

3           (Record read.)

4       THE WITNESS:  We talked previously about the

5   calculation that is done, and that's the calculation

6   that is followed.

7   BY MR. JULIAN:

8       Q   Are you referring to the Exhibit 2, page

9   WP 4-40?

10      A   WP 4-41.

11      Q   Oh, you're right.

12          Which line of WP 4-41?

13      A   It's between lines 15 and 16.  There's a

14  series of boxes.

15      Q   Okay.  So could you tell us, in layman's

16  terms, how that all works?

17      A   Sure.

18      Q   How does PG&E calculate the actual STIP

19  payment, i.e. the bonus that an employee is going to

20  get for the year in question?

21      A   So the STIP is not a bonus.  The STIP is an

22  incentive-based compensation.  That is part of total

23  compensation.  In calculating the amount of incentive

24  compensation that an individual would get, each

25  individual has a target participation rate that is

1   based on their level in the company.  That target

2   participation rate is applied to that individual's

3   eligible earnings, which, in layman's terms, are that

4   individual's wages.

5           So, for example, if an individual had wages

6   of a hundred thousand dollars and a target

7   participation rate of 10 percent, their target STIP

8   would be $10,000.  And then onto that we apply an

9   individual performance multiplier based on that

10  individual's performance against his or her own goals

11  and then multiply that by the company performance

12  score, and that's how the individual STIP payment is

13  determined.

14      Q   What was the range of individual performance

15  modifiers available in 2018, if you recall?

16      A   It was 0 to 150 percent.

17      Q   And for 2019 what is it?

18      A   It is 125 percent for 10 percent of the

19  population.

20      Q   125 percent for 10 percent?

21      A   Yes.

22      Q   Of the employee pool?

23      A   Of the employee pool.

24      Q   And what was it for the other 90?

25      A   There is no individual performance multiplier

1  for 2019.

2      Q   Is the employee pool for 2019 of

3  approximately 10,000 employees?

4      A   Yes.

5      Q   So for 10 percent or a thousand of the

6  employees --

7      A   Up to 10 percent, yeah.

8      Q   Up to 10 percent of the employees, the

9  multiplier is 125?

10     A   1.25.

11     Q   Is that 0 to 1.25?

12     A   No.  It's just 1.25.

13     Q   What is the reason for the change between

14  0 -- well, no, before I ask you that, I have to

15  understand how the 0 to 150 works.

16         Who made the decision for -- who was supposed

17  to make the decision for 2018 as to whether an

18  employee's modifier multiplier was 0 or 1.5?

19     A   It was based on the employee's year-end

20  evaluation, which is done by the employee's leader.

21  We have a process that considers the employee's goals

22  and the employee's competencies, and every employee

23  receives a performance rating.  Based on that

24  performance rating, there could be differences in the

25  individual performance multiplier.

www.veritext.com                                                    888-391-3376

1      Q    Who was the one who was supposed to determine

2   whether the employee got 0 or 1.5 of his short-term

3   incentive payment?

4      A    Generally, the employee's supervisor.

5      Q    Supervisor, sure.

6           And for 2019, does that procedure go away?

7      A    For 2019 we are still working through how

8   that process will work, but it will generally be the

9   employee's supervisor also.

10     Q    For the 10 percent?

11     A    For the 10 percent.

12     Q    So stated another way, you don't have a

13   procedure in place yet for it, right?

14     A    Yes.

15     Q    But you're discussing with the comp committee

16   that the supervisor would have the discretion to award

17   between 0 and 1.25 percent to 10 percent of the

18   employees?

19     A    We don't need to discuss that with the

20   compensation committee.  That has been delegated to

21   management to work through.

22     Q    So what is the procedure -- correct that.

23          What you're discussing is paying out 0 to

24   1.25 percent of the available award for each employee

25   based upon the supervisor recommendation?

1      A    So let me explain.  In 2018 the individual

2  performance multiplier applied to every STIP-eligible

3  participant.  So all 10,000 could get an individual

4  performance multiplier.  It's a very broad group of

5  employees who were eligible for an individual

6  performance multiplier.  We're streamlining that for

7  2019 and saying only 10 percent of employees could get

8  an individual performance multiplier, and it is just

9  simply a 1.25 individual performance multiplier.

10     Q    No zero?

11     A    No zero.

12     Q    What about for the other 90 percent for 2019?

13     A    They will give STIP at whatever the company

14  score is based on their participation rate.

15     Q    They'll get 1.0?

16     A    If the company score is a 1.0.

17     Q    Who makes that decision for 2019?

18     A    As to the company score?

19     Q    Who makes the decision whether to pay out the

20  2019 STIP awards in 2019?

21     A    The STIP is designed with metrics and targets

22  and that determines the company's score.  And then the

23  compensation committee and the board retain the

24  discretion that they've always had, to approve the

25  payment.

www.veritext.com                                      888-391-3376

1    Q   So it's an all-or-nothing payment for the
2    board; is that right?
3        MR. SLACK:  Objection to the form.
4        THE WITNESS:  The board has full discretion, so
5    they can approve some portion, they can approve it
6    all, or they can approve none.  They have very full
7    discretion.
8    BY MR. JULIAN:
9        Q   What guides their discretion?
10       MR. SLACK:  Objection to the form of the
11   question.
12       THE WITNESS:  They have full discretion, so they
13   can use whatever they are considering at that point in
14   time.
15   BY MR. JULIAN:
16       Q   Who decides who was in the 10 percent of the
17   employees who can get up to the 1.5 percent?
18       A   As of now, the way the process -- the way
19   we're thinking of the process is it will be the
20   employee's supervisor, but it is going to be limited
21   to 10 percent of the STIP population.
22       Q   Is the 10 percent pool that can possibly get
23   the 1.5 multiplier award targeted for any type of
24   senior management or supervisors or line employees?
25       A   So a couple of thing.  One is it's a

1   1.25 percent multiplier, not 1.5, for 2019, actually.

2        Q    Thank you.

3        A    And the senior leaders of the company are not

4   part of the 2019 STIP.

5        Q    Do the employees know now whether they're in

6   the 10 percent pool or not?

7        A    No.  That will be determined each quarter

8   based on their performance.

9        Q    That brings up a good point.  One of the

10  things your Declaration does is it says that the STIP

11  award payments of the 2019 are designated to be paid

12  out quarterly rather than annually, as they were

13  designated under 2017 and 2018, right?

14       A    Yes.

15       Q    And who made that recommendation?

16       A    As we were designing the 2019 STIP, we got

17  input.  And one of the pieces of input that we got was

18  that this was a practice that is used in restructuring

19  situations.  And so we considered that a good -- it

20  was our judgment that it made sense for us and we

21  incorporated it into the 2019 STIP plan.

22       Q    Who gave that recommendation or advice to

23  you?

24       A    I believe Willis Towers Watson.

25       Q    Was it discussed at the compensation meeting

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 52
of 154

1   that you were at?

2       A    Yes.

3       Q    Was there any discussion at the compensation

4   level that one of the reasons for changing the STIP

5   awards from an annual payment to a quarterly payment

6   was because of the possibility of a fire in the latter

7   part of 2019?

8       A    No.

9       Q    It didn't come up at all?

10      A    The reason for changing from an annual to a

11  quarterly basis is to keep our employees engaged in a

12  time of considerable uncertainty with a restructuring

13  situation.

14      Q    The way it's supposed to work under 2019 is

15  if the company hits all of its metrics under the

16  performance metrics for the first six months, the

17  maximum target award could be paid out in the six

18  months, right?

19      A    For that six-month period.

20      Q    Correct.

21      A    Yes.

22      Q    And then if all of the employees fail in the

23  wildfire mitigation plan and cause a hundred deaths

24  because the electrical equipment hasn't been made safe

25  and the metrics aren't met, they can still keep the

1    compensation, short-term incentive compensation that

2    they received for this first sex months, right?

3         MR. SLACK:  Objection to the form of the

4    question.

5         THE WITNESS:  The plan is designed to be

6    quarterly, as you understand.  And each quarter is a

7    rolling -- each quarter's performance is a

8    year-to-date performance or a rolling 12-month

9    performance.

10   BY MR. JULIAN:

11        Q   Was there any discussion at the compensation

12   committee level as to whether or not the scenario that

13   I just played out was prudent?

14        MR. SLACK:  Objection to the form of the

15   question.

16        THE WITNESS:  I believe at the compensation

17   committee we talked about the quarterly payment

18   compared to the annual payment.  We talked about

19   meeting quarterly objectives, that they are -- each

20   quarter, like Q2, is a year-to-date measure or a

21   rolling 12-month measure.  Does that answer your

22   question?

23   BY MR. JULIAN:

24        Q   Sure.

25             Page 4 of your declaration says that the

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 54
of 154

1    compensation committee conducted a thorough evaluation

2    of the debtors' existing STIP for purposes of

3    formulating the 2019 STIP.

4         MR. SLACK:  You know what, you've got a question

5    pending, so I don't know if there's a natural break in

6    the next near time that we can take a short break.

7         MR. JULIAN:  It's a good time.

8         MR. SLACK:  I'm not telling you to stop now.  I'm

9    just saying if there's a natural time, let's take a

10   short break.

11        MR. JULIAN:  All right.  Let me finish this up,

12   then.

13        MR. SLACK:  My request had nothing to do with the

14   particular question.

15        MR. JULIAN:  I understand.

16        MR. KAROTKIN:  He's looking out for my well-being

17   at my age.

18   BY MR. JULIAN:

19        Q    On page 4 of your Declaration, lines 24 and

20   25 -- actually, 23 through 26, you testified that the

21   compensation committee conducted a thorough evaluation

22   of the debtors' existing STIP for the purposes of

23   formulating the 2019 STIP.  What was the thorough

24   evaluation of the 2018 STIP that the compensation

25   committee conducted?

1      A   The compensation committee reviewed the

2   measures of the 2018 STIP, the intent of the 2018

3   STIP, and talked about changes between the 2018 STIP

4   and the 2019 STIP.

5      Q   Anything else?

6      A   I think that was the big picture.

7      Q   And did the compensation committee, in that

8   regard, discuss any changes, other than the ones

9   you've already told me about in the deposition?

10     A   I think those are the main ones.

11     MR. JULIAN:  Let's take a break.

12         (Recess.)

13   BY MR. JULIAN:

14     Q   Let's turn back to your testimony in your

15   Declaration on page 4, line 12.  Did you agree with

16   Mr. Simon's recommendation?

17     A   Yes.

18     Q   That in light of the 2018 Northern California

19   wildfires and material deterioration of the debtors'

20   financial condition, the company should exercise its

21   discretion to forego paying to approximately 11,000 of

22   the debtors' employees the 2018 STIP awards?

23     MR. SLACK:  I don't know what just happened to

24   that question.  I'll object to the form.

25     THE WITNESS:  This was a difficult decision.  The

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 56
of 154

1    senior leaders all talked about it and we agreed that

2    it was the better recommendation.

3    BY MR. JULIAN:

4        Q    That it was a what?

5        A    A better recommendation.

6        Q    Better than what?

7        A    Better than paying the STIP.

8        Q    Why was it a difficult decision in your mind?

9        A    STIP is an integral component of the

10   employee's compensation.  It affects employee

11   engagement and morale to not be awarded your

12   compensation, and so we were concerned about the

13   impact on employee engagement.  We balanced that with

14   the challenges that you see over here and we felt that

15   it was the better decision.

16       Q    Which challenges?

17       A    The 2018 Northern California wildfire, the

18   deterioration of the financial situation.

19       Q    Has PG&E's material deterioration of its

20   financial situation changed from this decision earlier

21   this year?

22       A    At that point in time we had issues accessing

23   liquidity.  Now that we are in a Chapter 11 process,

24   it's a different process of reorganization.

25       Q    Does your answer turn on whether or not the

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 57
of 154

1   court approves the financing facility?

2       A   I'm not familiar with that.

3       Q   What about the Chapter 11 filing, in your

4   view, makes it a different situation that changes the

5   debtors' financial situation?

6       A   As I understand the Chapter 11, it is an

7   orderly process to address the claims against the

8   company, and prior to entering into Chapter 11, we

9   didn't have such a process.

10      Q   The committee adopted Mr. Simon's

11  recommendation to forego the 2018 STIP after the

12  bankruptcy filing occurred, right?

13      A   Yes.

14      Q   So I'm still at a loss.  If the decision was

15  made after the bankruptcy case was already on file,

16  you're already in the bankruptcy case.  What is the

17  difference between awarding STIP payments under the

18  2018 program and the 2019 program, in your mind?

19      A   So I'm going to explain that the STIP is

20  incentive compensation, which is part of a total

21  compensation for an employee, and it's an annual

22  program.  We have a 2018 STIP plan and we're proposing

23  a 2019 STIP plan.

24          In 2018 there were events that occurred, as

25  you know, and in light of those events, the board

1    determined not to make a payout for the 2018 STIP.

2         Q    Don't you mean the compensation committee --

3         A    The compensation committee.

4         Q    -- not the board?

5         A    Yes.

6         MR. SLACK:  Objection to the form of that

7    question.

8         THE WITNESS:  So, again, what I will explain to

9    you is my understanding of the governance, which is

10   that the compensation committee makes the decision for

11   the broad employee base and the board makes the

12   decision for certain key employees.

13        Q    But in this instance you don't know whether

14   the board of directors of PG&E, the utility, actually

15   voted to forego paying the line employees the 2018

16   STIP, right?

17        MR. SLACK:  Objection to the form of the

18   question.

19        THE WITNESS:  Yeah, my understanding is that's

20   not -- the board has delegated that to the

21   compensation committee.  That's my understanding of

22   the governance.

23   BY MR. JULIAN:

24        Q    And so is it true that you don't know whether

25   the board of directors of PG&E, the full board, the

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 59
of 154

1  13-member board, actually had a meeting and had a

2  resolution presented to it as to whether or not PG&E

3  utility would forego the 2018 STIP awards?

4       A   I do not know that.

5       Q   Okay.  You mentioned earlier that someone

6  from Willis was at the compensation committee meeting

7  when the decision was made to forego payments.  Do I

8  have that right?  I think you said someone from Willis

9  was there when the committee approved the 2019 STIP?

10      A   Yes.

11      Q   Who from Willis was there?

12      A   I think it was Doug Friske, and he might have

13  been on the phone.  I don't know whether he was in

14  person or on the phone.

15      Q   But it was Mr. Friske?

16      A   Yes.

17      Q   Is PG&E considering any other incentive

18  plans, bonus payment plans or awards, other than the

19  2019 STIP that is the subject of your Declaration?

20      A   So my Declaration is the 2019 STIP.  In the

21  Declaration I've said that we are considering a key

22  employee retention plan.  And our senior leaders are

23  not part of the 2019 STIP, and so we are also

24  considering what I understand is called a key employee

25  incentive plan.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 60
of 154

1      Q    Okay.  Any other plans under consideration?

2      A    Not to the best of my knowledge.

3      Q    Thank you.

4           Was there any discussion at the compensation

5    committee level about the possibility of wildfires in

6    2019?

7      A    So wildfires is a big issue for the company

8    and it's something that the company takes seriously.

9    So as you see in our 2019 STIP, we have measures

10   related to wildfires.  So yes, wildfires are part of

11   the consideration of our program.

12     Q    Other than that, was the subject of wildfires

13   in 2019 discussed at the compensation committee level?

14     MR. SLACK:  Objection to the form.

15     THE WITNESS:  The 2019 STIP has components to

16   help mitigate the risk of wildfires in 2019, so yes,

17   from that perspective.

18   BY MR. JULIAN:

19     Q    Did anyone during the compensation committee

20   meetings discuss, with you present, that wildfire

21   claims from the wildfire in 2019 could create

22   administrative claims in the bankruptcy case?

23     A    Not that I can remember, no.

24     Q    Anyone ever discuss that with you, other than

25   counsel?

1      A    No.

2      Q    Did the compensation committee discuss

3  whether problems created by a while fire caused by

4  PG&E's equipment should cause the company to increase

5  its metric weighting for wildfire mitigation from 10

6  percent to something higher?

7      A    The compensation committee reviewed the

8  metrics.  I don't remember a specific discussion about

9  that.

10      Q    Did you say the compensation company reduced?

11      A    Reviewed, reviewed all of our metrics.

12      Q    Did the compensation committee discuss

13  whether it was fair for an employee who might have

14  contributed to the fires in 2017 and 2018 receiving

15  STIP awards in 2019?

16      MR. SLACK:  Objection to the form.

17      THE WITNESS:  So the STIP is a forward-looking

18  program, and it's designed to incentivize the

19  employees for the work that they do in 2019.  It's my

20  judgment that employees should be paid for the work

21  that they do.  If there is an issue with an employee,

22  that is a separate matter that is dealt with in terms

23  of whatever that might -- whatever that event might

24  have been.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 62
of 154

1      Q   Is it true that there's no provision in the

2   2019 STIP or the 2019 metrics for reducing an

3   employees' STIP award by virtue of the employees

4   negligence in the year prior to 2019?

5      MR. SLACK:  Objection to the form of the

6   question.

7      THE WITNESS:  So, again, I will say the 2019 STIP

8   is designed for the work that is done in 2019.  If an

9   employee is found to have done something, whatever

10  that might be, there's a separate process to deal with

11  that event, including and up to termination of the

12  employee.

13  BY MR. JULIAN:

14     Q   Did anyone on the compensation committee, in

15  your presence, discuss whether the 2019 STIP awards in

16  the metrics should have a provision to reduce the

17  employee STIP awards by virtue of the employees'

18  contribution to any of the fires that have taken place

19  in the years prior to 2019?

20     MR. SLACK:  Objection to the form.

21     THE WITNESS:  I'm not aware of any findings of

22  employees.  And, again, as I'll say, the 2019 STIP is

23  designed to reward employees for the work they do in

24  2019.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 63
of 154

1      Q   That wasn't my question.  My question was:

2   Was there any discussion at the compensation committee

3   level about potentially putting a metric in there, in

4   the 2019 STIP, that would permit the company to reduce

5   the STIP award by virtue of the employees'

6   contributions to the fires in 2017 and 2018.

7          MR. SLACK:  I think it's asked and answered.

8   I'll object to the form.

9   BY MR. JULIAN:

10     Q   Go ahead.

11     A   As my counsel says, it's been answered.

12     Q   I want you to answer it again.  I don't think

13   it was answered.

14         MR. SLACK:  Okay.  So I object that that's not a

15   question.  And, you know, I object to the form of

16   whatever that was.

17         THE WITNESS:  As I understand your question, it

18   is does the 2019 STIP have a provision to reduce

19   employee pay for events that occur outside of 2019?

20   BY MR. JULIAN:

21     Q   No.

22     A   No.

23     Q   I want to make it easy on you.

24     A   Yeah.

25     Q   Let's approach it this way.  Did you attend

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 64
of 154

1   compensation committee meetings dealing with the 2019

2   STIP?

3       A   Yes.

4       Q   Were there discussions at that meeting?

5       A   Yes.

6       Q   Verbal discussions, correct?

7       A   Yes.

8       Q   Did anyone discuss, verbally, the idea of

9   reducing STIP awards in 2019 by reason of the

10  employees' contribution to wildfires in 2017 and 2018?

11      A   No.

12      MR. SLACK:  Objection to the form of the

13  question.

14      THE WITNESS:  Again, we did not talk about

15  employee conduct in prior years as part of the

16  discussion of the 2019 STIP.

17      MR. JULIAN:  Can I have the last answer read

18  back.

19          (Record read.)

20  BY MR. JULIAN:

21      Q   Did the compensation committee discuss PG&E's

22  responsibility for the San Bruno gas explosion?

23      MR. SLACK:  Objection to the form of the

24  question.

25      THE WITNESS:  When we were talking about the 2019

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 65
of 154

1  STIP, we were focused on the metrics and targets of

2  2019.

3  BY MR. JULIAN:

4      Q   Is that a no?

5      MR. SLACK:  Objection to the form of the

6  question.

7      THE WITNESS:  I do not remember us discussing the

8  San Bruno explosion when we were talking about the

9  2019 STIP.

10  BY MR. JULIAN:

11      Q   Did the compensation committee ever discuss

12  the San Bruno gas explosion at a meeting that you were

13  present at, whether or not it had to do with 2019 or

14  not?

15      A   I really don't remember.

16      Q   You really don't what?

17      A   Remember.

18      Q   At any meeting of the compensation committee

19  that you attended, did the committee discuss the

20  jury's finding that PG&E knowingly and willfully

21  violated gas safety laws?

22      MR. SLACK:  Objection to the form of the

23  question.

24      THE WITNESS:  I don't remember.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 66
of 154

1      Q   At any compensation committee meeting that

2   you attended, did the committee discuss the jury's

3   finding that PG&E obstructed the NTSB's investigation

4   of the San Bruno gas explosion?

5      MR. SLACK:  Objection to the form of the

6   question.

7      THE WITNESS:  I don't remember.

8   BY MR. JULIAN:

9      Q   Did the compensation committee discuss PG&E's

10  responsibility for the 2015 Butte fire?

11     MR. SLACK:  Objection to the form of the

12  question.

13     THE WITNESS:  I don't remember.

14  BY MR. JULIAN:

15     Q   Did the compensation committee discuss PG&E's

16  alleged responsibility for some of the 2017 Northern

17  California fires?

18     MR. SLACK:  Objection to the form of the

19  question.

20     THE WITNESS:  The compensation committee

21  considered the importance of wildfire mitigation.  And

22  the plan that we have is informed by the threat of

23  wildfire for the company.  So in that sense the

24  compensation committee has been -- has had the risk of

25  wildfire in mind.  I don't remember the specific

1    rulings that you're talking about.

2    BY MR. JULIAN:

3        Q   Okay.  Were you employed by PG&E during the

4    first bankruptcy case, PG&E in 2001?

5        A   I have been employed at PG&E since 1994.

6        Q   So that would be a yes, right?

7        A   Yes.

8        Q   In considering the 2019 STIP, did the

9    compensation committee consider Judge Montali's

10   decision with respect to the management retention

11   program that he set forth in a written decision, which

12   I've got?  But you don't have to read it if you don't

13   remember.

14       A   I don't know that.

15       Q   Okay.  Did the compensation committee discuss

16   CAL FIRE'S determination that PG&E violated

17   tree-trimming laws in the areas of the 2017 fires?

18       MR. SLACK:  Objection to the form of the

19   question.

20       THE WITNESS:  Well, the compensation committee

21   has access to the information that you have access to.

22   As I said, the threat of wildfire is a serious threat

23   for the company and it's considered as we've designed

24   our STIP.  So, again, I don't remember the specific

25   rulings that you're talking about and whether those

1   were discussed at the compensation committee.

2   BY MR. JULIAN:

3       Q   Take a look at Exhibit 6.  Exhibit 6 is dated

4   April 28, 2016.  It's entitled "CAL FIRE investigators

5   determine cause of the destructive Butte fire."  Did

6   the compensation committee consider this document?

7       MR. SLACK:  Objection to the form of the

8   question.

9       MR. KAROTKIN:  Is there like a time frame for

10  that or ever?

11      MR. JULIAN:  Ever.

12      MR. SLACK:  I object to the form of the question.

13      THE WITNESS:  I really don't remember.  Yeah, I

14  don't remember.

15  BY MR. JULIAN:

16      Q   In the compensation committee meetings that

17  you attended, do you remember anyone ever saying, hey,

18  CAL FIRE says that some of our equipment caused the

19  2017 fires?

20      MR. SLACK:  Objection to the form of the

21  question.

22      THE WITNESS:  At the compensation committee

23  meetings that I have attended, there is knowledge that

24  there are CAL FIRE reports and that the CAL FIRE

25  reports have said that PG&E equipment was involved in

1  wildfires.  That's part of our understanding of the

2  risk associated with our business, and so we've

3  designed our plan to mitigate that threat.

4  BY MR. JULIAN:

5      Q   Did the compensation committee ever discuss

6  creating a metric that would reduce an employee's

7  compensation by virtue of the employee's work

8  contributing to any of those fires?

9      MR. SLACK:  Asked and answered.  Objection to the

10  form.

11      THE WITNESS:  So if I understand your question,

12  we did not talk at the compensation committee about

13  impacting the 2019 STIP for actions that occurred in

14  prior years.

15  BY MR. JULIAN:

16      Q   Okay.  Take a look at Exhibit 11, please.

17      A   11?

18      Q   Yes.  This is the Public Utilities

19  Commission's December 14, 2018, order instituting

20  investigation and order to show cause regarding the

21  falsification of gas records dealing with the location

22  of utility lines when contractors excavate land in

23  California.  Have you ever seen this before?

24      A   I'm aware of the issue.  I'm not sure that

25  I've seen this particular OII ruling.

1    Q   When you say you're aware of the issue, what

2  issue is that?

3    A   The issue of the PUC's investigation into the

4  locate and mark practices of the gas site.

5    Q   Did the compensation committee discuss

6  delaying any consideration of paying STIP awards to

7  employees who might have falsified records that are

8  discussed in the PUC order to show cause?

9    MR. SLACK:  Objection to the form of the

10  question.

11    THE WITNESS:  Certain employees who are involved

12  with this are no longer with the company.  The STIP

13  program was not modified for the locate and mark

14  issues.

15  BY MR. JULIAN:

16    Q   How do you know that some of the employees

17  involved with this are no longer employed with the

18  company?

19    A   I don't know how to answer that question.

20    Q   How many employees were involved with the

21  alleged falsification of records that are no longer

22  with the company?

23    A   There are -- I'm trying to remember.  There

24  are certain employees who are no longer with the

25  company.  I don't really know the whole number.

1      Q   Do you know which employees are involved in

2   this issue?

3      MR. SLACK:  Objection to the form of the

4   question.

5      THE WITNESS:  I know that there was an

6   investigation done and certain employees were named in

7   that investigation.

8   BY MR. JULIAN:

9      Q   Who conducted the investigation?

10     A   It was --

11     MR. SLACK:  I'm going to instruct you not to be

12  disclosing anything that was done as a matter of

13  legal.  I don't know whether this was or wasn't.  But

14  I am going to instruct you to not answer with respect

15  to any investigation done by legal, at least without

16  taking a break and talking to me.  Now, if it had

17  nothing to do with the legal department, you know, go

18  ahead and answer if it's not a privilege issue.

19     THE WITNESS:  Yeah, there was an investigation

20  that was conducted by a group called Guidepost.  That

21  report has been filed with the Public Utilities

22  Commission.  And I don't remember the report because

23  it's been a while since I read it, but there are

24  employees named in that report.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 72
of 154

1    Q   Did PG&E do anything to independently verify

2    the employees named in that report had actually

3    falsified gas records?

4    A   I don't know.

5    Q   Turn to Exhibit 15.  This is one of Judge

6    Alsup's orders to show cause.  This one is dated

7    March 5, 2019.  Have you read this one?

8    A   No.

9    Q   Did the compensation committee consider

10   Judge Alsup's March 5, 2019 ruling, which is

11   Exhibit 15?

12   MR. SLACK:  Objection to the form of the

13   question.

14   THE WITNESS:  I don't remember us talking about

15   specific rulings as part of the discussions of the

16   compensation committee.

17   BY MR. JULIAN:

18   Q   So this one is dated March 5, 2019.  Has the

19   compensation committee even met since then?

20   A   That's a good question.  We are now at

21   March 19th.  Probably not, yeah.

22   Q   So let's go back to Exhibit 13, which is

23   Judge Alsup's January 9, 2019, Order To Show Cause Why

24   PG&E's Conditions on Probation Should Not Be Modified.

25   Did the compensation committee consider this order to

1  show cause?

2      A   Again, as I said, I don't remember the

3  compensation committee talking about particular

4  rulings.

5      Q   So in this order, Judge Alsup said he was

6  going to -- or he was considering imposing new

7  conditions of probation which would deal with wildfire

8  mitigation.  And I'll just represent that to you, that

9  that what it involves generally.

10         My question to you is did the compensation

11  committee discuss postponing adoption of the 2019 STIP

12  until the compensation committee heard what kind of

13  wildfire mitigation program Judge Alsup was going to

14  impose on PG&E in 2019?

15      MR. SLACK:  Objection to the form.

16      THE WITNESS:  So if I can understand your

17  question.  There's actually two things that happened.

18  There is having a STIP program and then there's making

19  a payment under the STIP program.  We had a STIP

20  program in 2018.  We're proposing to have a STIP

21  program in 2019.  That's part of the ongoing

22  compensation of our employees.

23         The committee retains the discretion to make

24  a payout under the program.  So they continue to have

25  that discretion for 2019.  We did not talk about not

www.veritext.com                                   888-391-3376

1  having a program because it's just an important part

2  of the overall compensation package of employees.

3  BY MR. JULIAN:

4      Q   So one of the things you just said is the

5  committee retains the discretion to not pay out the

6  STIP awards in 2019, right?

7      A   Yes.

8      Q   And how would that work, actually?  Take me

9  through the procedure of how that issue would come up

10 on a quarterly basis.

11     A   So on a quarterly basis we would determine

12 the performance compared to the targets that have been

13 set, internal audit reviews.  Then it goes to the

14 compensation committee for their consideration and

15 then they approve the payments.

16     Q   And the performance that the internal audit

17 would look at would be the performance of the company

18 as a whole and not individual employees' performances,

19 right?

20     A   Yes.

21     Q   And the performance as a whole of the company

22 would be looked at as the 2019 performance and not

23 prior years?

24     A   Correct.

25     Q   And would the audit team make a

1   recommendation to the compensation committee of,

2   qualitatively, whether to make the payment or just

3   what the performance metrics met?

4       A    The internal audit team would validate the

5   calculation of the performance metrics.

6       Q    It would be up to the compensation committee

7   to exercise its discretion whether or not to award the

8   STIP awards to the line employees, right?

9       A    Yes.

10      Q    And would the compensation committee, under

11  the 2019 STIP, have the discretion to award incentive

12  payments to some employees and not others?

13      A    Yes.

14      Q    And could they take into account whether the

15  employees contributed to fires in 2019?

16      A    The compensation committee has full

17  discretion to make an adjustment.

18      Q    Does the compensation committee have full

19  discretion to make an adjustment on 2019 STIP awards

20  based upon the employees' conduct in 2017 and 2018?

21      A    I suppose in theory since they have full

22  discretion, I would guess.

23      Q    Has that topic been discussed at the

24  compensation committee?

25      A    No.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 76
of 154

1    Q   Has the compensation committee requested that

2  the company investigate which employees, if any, were

3  responsible for the 2017 fires?

4    MR. SLACK:  Objection to the form of the

5  question.

6    THE WITNESS:  So I'm not aware of a finding of

7  fault of employees and I'm not aware of investigations

8  that are occurring or may occur.

9  BY MR. JULIAN:

10    Q   Has the compensation committee requested --

11    A   Not to my knowledge.

12    Q   Okay.  Let me start over.

13    A   I'm sorry.

14      Has the compensation committee -- you're

15  trying to be helpful, I get it.  You're fine.  Let me

16  start over.

17      Has the compensation committee requested

18  anyone at PG&E to investigate whether any PG&E

19  employees failed to properly investigate the PG&E

20  equipment that may have caused the fires in 2017?

21    MR. SLACK:  Objection to the form of the

22  question.

23  BY MR. JULIAN:

24    Q   If that's too convoluted, I'll withdraw it

25  and try again.

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 77
of 154

1      A    Yeah, could you.

2      Q    Yeah, I will.  I'm going to make this one

3  simple.

4           Has the compensation committee asked anyone

5  at PG&E to investigate whether any of the PG&E

6  employees had any responsibility for the 2017 fires?

7      MR. SLACK:  I'm still going to object to the

8  form.

9           You can answer.

10      THE WITNESS:  Yeah, what do you mean by

11  responsibility?

12  BY MR. JULIAN:

13      Q    Yeah, so let's go over it.

14      A    Yeah.

15      Q    Has the compensation committee asked anyone

16  at PG&E to determine which employees failed to

17  supervise, if any, tree trimming that may have

18  contributed to the fires?

19      MR. SLACK:  Objection to the form.

20           You can answer.

21      THE WITNESS:  The compensation committee does not

22  get into individual-level details.  The compensation

23  committee reviews the program as a whole for the

24  company, reviews the structure of the program, reviews

25  the performance of the company against the targets.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 78
of 154

1  BY MR. JULIAN:

2      Q   Got it.

3      A   So I don't remember individual conversations

4  that the compensation committee had.

5      Q   I get how your program works.  So my question

6  is:  Isn't it true that you do not anticipate the

7  compensation committee, in 2019, reducing STIP awards

8  by virtue of what employees did in 2017 and 2018?

9      MR. SLACK:  I'll object to the form of the

10  question.

11      THE WITNESS:  I guess what I would say is the

12  compensation committee has full discretion.  I don't

13  know what factors they would use to determine their

14  discretion.  Historically, the compensation committee

15  has not looked at prior performance in adjusting an

16  individual STIP.

17  BY MR. JULIAN:

18      Q   And you don't anticipate them doing that in

19  2019, do you?

20      MR. SLACK:  Objection to the form of the

21  question.

22      THE WITNESS:  That's hypothetical.  I don't know.

23  BY MR. JULIAN:

24      Q   Okay.  Who first recommended -- withdraw the

25  question.

1          Who first brought up the idea that the 2019

2     STIP should be paid quarterly rather than annually?

3          A   I don't remember who first.  I remember it

4     being part of our deliberations, but I don't remember

5     who initiated that.

6          Q   Can you say whether it was someone in the

7     company as opposed to an adviser who came up with

8     that?

9          A   Well, we have -- there is a compensation

10    group within HR that spends a lot of time thinking

11    about compensation.  They have conversations with

12    advisers that I'm not a part of.  So I don't know

13    where in that conversation process the idea emerged.

14         Q   Got it.

15             Mr. Mistry, let's go back to your

16    Declaration, Exhibit 1, page 3.  Are you on page 3?

17         A   Yes.

18         Q   Let's turn to line 22.  Your testimony says,

19    "These annual incentive plans have been successful in

20    realizing key operational objectives by aligning

21    eligible employees' interests with those of the

22    debtors and effectively linking cash awards under the

23    incentive plans to the overall safety, performance,

24    and efficiency of the debtors' obligations," correct?

25         A   Yes.

www.veritext.com                                    888-391-3376

1        Q   Was public safety a key operational objective
2   of PG&E in the past decade?
3        A   Yes.
4        Q   How did the incentive plan contribute to
5   avoiding the 2010 San Bruno gas explosion?
6        MR. SLACK:  Objection to the form of the
7   question.
8        THE WITNESS:  When we put the incentive plans
9   together, we generally think about what is important
10  for the business based on the knowledge that we have
11  at that point in time.  And we design our metrics and
12  our targets based on that.  It isn't a plan that can
13  conceive of any -- of every possible thing that could
14  happen.
15  BY MR. JULIAN:
16       Q   Did PG&E change its metrics for safety, in
17  any respect, in response to the jury's finding that
18  PG&E committed knowing and wilful gas safety
19  violations?
20       MR. SLACK:  Objection to the form of the
21  question.
22       THE WITNESS:  We learned from the San Bruno
23  explosion and we brought in a whole new gas management
24  team that brought gas expertise that changed the
25  metrics that we put in the short-term plan.  And so

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 81
of 154

1  every year we do that.  Every year we learn from

2  something that happened in the prior year or the

3  expertise that a new leader might bring to the

4  company, and we incorporate that as we design the

5  plan.

6  BY MR. JULIAN:

7      Q   What metrics were changed in response to the

8  jury finding that PG&E committed intentional safety

9  violations?

10     MR. SLACK:  Objection to the form of the

11 question.

12     THE WITNESS:  When we design the metrics, we

13 think about the safety of the gas system.  We brought

14 in a new leader.  His name was Nick Stavropoulos.  And

15 Nick talked about the importance of being able to have

16 gas pipelines be inspected with inline inspection

17 methodologies.  And so we put those metrics into our

18 STIP, and that's been part of our STIP for a period of

19 time.

20 BY MR. JULIAN:

21     Q   Which metric did you put in the STIP in that

22 regard?

23     A   It was gas, pipeline replacement, and gas

24 inline inspection.

25     Q   I don't see that on page 10.  Can you point

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 82
of 154

1   it out to me?

2       A   I'm sorry, page 10 is my signature page.

3       Q   I'm sorry, page 7.

4       A   It would be the one on line 13, first-time

5   ILI miles.

6       Q   So that metric was not in the STIP prior to

7   the jury's conviction of PG&E for gas safety

8   violations?

9       A   That metric was not in the STIP prior to the

10  San Bruno explosion.

11      Q   Which was 2010?  It came after 2010, the

12  metric?

13      A   Yes.

14      Q   Got it.

15          How was the annual incentive plan successful

16  in avoiding the 2017 Northern California fires?

17      MR. SLACK:  Objection to the form of the

18  question.

19      THE WITNESS:  Well, as I said, the annual plan is

20  designed based on our understanding of what is

21  important to run an electric and gas system.  And you

22  can see that it has a variety of measures that we

23  think are important.  Just having the plan in place

24  does not mean that an unfortunate occurrence could not

25  happen, but the plan is effective in that it aligns

www.veritext.com                                                    888-391-3376

1   the employees' incentives with the goals of the

2   company so that we are all working together to improve

3   safety and the various other measures that are here in

4   the plan.

5   BY MR. JULIAN:

6       Q   Take a look at Exhibit 5.  I take it you

7   haven't seen Exhibit 5 before?

8       A   No.

9       Q   Okay.  This is an e-mail chain among a bunch

10  of PG&E employees and --

11      MR. SLACK:  Could you identify for the record

12  what the Bates number is to this, what is this from.

13      MR. JULIAN:  This is PGE-NBF-TAR-722832 through

14  833.  It's marked "Confidential," but Kevin Persini

15  wrote to Steve Campora and said it was no longer

16  confidential.

17      MR. SLACK:  I'm just saying, what was this

18  produced in?

19      MR. JULIAN:  State quarterly issue, I'm informed.

20  I wasn't involved, so I got it from Mr. Campora.

21      MR. SLACK:  Thank you.

22  BY MR. JULIAN:

23      Q   I'll use this as an illustrative document

24  with respect to your testimony about how the STIP has

25  promoted safety.  This February 25, 2014 e-mail, on

1    the first page has a report on the Caribou Palermo

2    line, which is in the area of the Camp Fire, which the

3    PG&E employee said that they were going to give a less

4    than 200 score for the observations on this particular

5    tower.  And in the paragraph under Caribou Palermo,

6    the employee said there's "No likely public safety

7    issue with live wires down because it is in a remote

8    area.  The reliability score is not that high because

9    although the likelihood of failed structures happening

10   is high, the affected customers are likely in the

11   order of greater than 1,000."

12          First, in your job as dealing with HR, do you

13   ever have an opportunity to see, to review your PG&E

14   employees' e-mails for any purpose at all?

15       A    No.

16       Q    Got it.

17          So this e-mail purports to show, in my view,

18   that the PG&E employee knew that the likelihood of

19   failed structures on the Caribou Palermo line was

20   high, but apparently PG&E didn't do anything about it.

21          So how does the incentive plan that looks at

22   company-wide performance incentivize employees who are

23   on this very e-mail to report to someone in

24   management, hey, you've got a problem on the Caribou

25   Palermo line, that the risk of a structure failing is

1    high, do something about it?

2        MR. SLACK:  Objection to the form.

3    BY MR. JULIAN:

4        Q    How does it incentivize people on this e-mail

5    to do something about learning about this risk of harm

6    that is in this e-mail?

7        MR. SLACK:  Objection to the form of the

8    question.

9        THE WITNESS:  The 2019 STIP is designed for

10   company-wide objectives.  Individuals who are working

11   on individual issues, there are a variety of forums

12   for individuals to discuss those issues.  We promote a

13   speak-up culture.  It is important to us that

14   employees raise issues and concerns, and we have a

15   variety of mechanisms for them to do that.  We've

16   talked about that.  There is a compliance and ethics

17   help line, there is a federal monitor help line, there

18   is a cap process.  They can call human resources if it

19   is an employee relations type of issue.

20           So I don't know that there's a relationship

21   between a company-wide broad STIP program and

22   employees who are working on an individual project.

23   Employees still should be working on the individual

24   projects, but as we set our goals, our goals should be

25   aligned to what the goals that are important for the

1    company, which is we've laid out our safety financial

2    performance and customer satisfaction -- or a customer

3    view.

4    BY MR. JULIAN:

5        Q   I'll give you another example.  Let's go to

6    Exhibit 7.  This is another confidential document that

7    I saw an e-mail correspondence between Mr. Persini and

8    Mr. Campora that says it's no longer confidential.

9    It's document PGE-NBF-TAR3250382, with an Excel

10   spreadsheet that is unmarked attached to it.

11       This is a near hit report, called a weekly

12   near hit report.  Do you know what a weekly near hit

13   report is?

14       A   I know that we have been -- "we," as in the

15   operational teams, have a process where they talk

16   about near hits.  And the reason for talking about

17   near hits is to learn from events that might have

18   occurred, but did not occur, so that we become safer.

19       Q   Give me an example of a near hit, an event

20   that might have occurred but didn't occur.

21       A   An employee was backing up a truck and could

22   have hit a structure but did not, but had a

23   recognition that they came very close to the

24   structure, that would be a near hit.  Instead of just

25   moving on, they have a conversation about this event

1   occurred, it could have resulted in a hit, what

2   learning do we have from that event.

3          Q    And does PG&E have a policy that tells its

4   employees you should report near hits?

5          A    We encourage our employees to report near

6   hits.

7          Q    So you can avoid an actual hit in the future?

8          A    That's the idea.

9          Q    So in this near hit on the -- that I've

10  highlighted the last page, there's a near hit reported

11  on a transmission line on the Caribou Palermo.  That's

12  the line that had the tower that failed in the Camp

13  Fire.  You've read about that in you are AK, right?

14         A    Yes.

15         Q    And this says that the "Contractor employee

16  was working on lattice tower 011/099 on the Caribou

17  Palermo 111kV line executing work of recoating tower.

18  From working position, he reached to reposition

19  himself, grasping a piece of flat cross bracing when

20  the J hook hardware used to secure the flat bracing to

21  the tower leg failed and broke the J part of the J

22  hook hardware.  It appears as though about 20 percent

23  of the thickness of the bolt had been compromised

24  through corrosion."

25               And you have read the 8-K of PG&E that talked

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 88
of 154

1   about a C hook failing on the Caribou Palermo line

2   which may have led to the electrical wire falling down

3   on the tower and causing sparks that caused the fire?

4   You read about that, right?

5        MR. SLACK:  Objection to the form.

6        THE WITNESS:  I am aware of the C hook on the

7   Caribou Palermo line, and yes.

8   BY MR. JULIAN:

9        Q   So my question is, in light of these two

10  factors, how can you say in your Declaration, on

11  page 3, that the annual incentive plans -- I am sorry,

12  page 3, line 22, how can you say that your annual

13  incentive plans have been successful in realizing key

14  operational objectives?

15       MR. SLACK:  Objection to the form of the

16  question.

17       THE WITNESS:  We design our objectives based on

18  our knowledge of what is important for running an

19  electric and gas system.  We have been successful in

20  many instances in accomplishing what we set out to do.

21  In some instances we have not been able to accomplish

22  this, and that's reflected in the payouts.

23  BY MR. JULIAN:

24       Q   Do near hits impact compensation in any way?

25       MR. SLACK:  Objection to the form of the

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 89
of 154

1   question.

2       THE WITNESS:  Can you explain that some more.

3   BY MR. JULIAN:

4       Q   Yeah.  Does the employee who has a near hit

5   have his compensation reduced by virtue of the near

6   hit in any way?

7       A   No.

8       Q   I wouldn't expect it to.  Okay.

9           Has the compensation committee ever discussed

10  changing the metrics to be individually-based rather

11  than company-wide performance-based?

12      A   Not that I recall because our metrics have a

13  company-wide and then there's an individual

14  performance multiplier.  So both the individual's

15  performance and the company's performance are

16  considered.

17      Q   In 2019 the individual multiplier cannot be

18  used for employees to drive the STIP award down,

19  right?

20      A   That is correct.

21      Q   In 2018 and 2017, the individual multiplier

22  could be used to drive the STIP award down, right?

23      A   Yes.

24      Q   Down to zero?

25      A   Down to zero.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 90
of 154

1    Q   And that doesn't exist anymore, right?

2    A   For 2019 that does not exist.

3    Q   And the reason why you recall the

4  compensation committee changing it was because it

5  received some advice that that's what they should do

6  in bankruptcy; is that right?

7    A   So the design of the 2019 STIP, as you can

8  imagine, has evolved as we are learning more in this

9  restructuring situation that we were in.  The idea was

10  to have the 2019 STIP be metric-based and have less

11  focus on individual judgment.  But as we thought about

12  it some more, we realized that there are individuals

13  who really do perform above and beyond and we wanted

14  to have a vehicle to be able to recognize that.

15    Q   Who came up with that idea?

16    A   Again, I can't remember who initiated it, but

17  it was part of our ongoing discussions.

18    Q   Did you agree with it?

19    A   Yes.

20    Q   Did you propose that for individuals who go

21  way below and beyond and cause fires should have their

22  STIP awards reduced?

23    MR. SLACK:  Objection to the form of the

24  question.

25    THE WITNESS:  So if an individual -- if there are

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 91
of 154

1    challenges within an individual's performance, we have

2    a process to address those challenges.  The STIP is an

3    employee compensation and incentive program.  They are

4    two different things.

5    BY MR. JULIAN:

6        Q    That's not my question.  My question is not

7    what you have.  My question is what was discussed.  Do

8    you understand that?

9        A    No.

10       Q    Okay.  You said a moment ago that it was

11   discussed in committee that if individuals go above

12   and beyond what they're supposed to do, there ought to

13   be a way to increase their STIP award from the

14   baseline target, right?

15       A    I'm sorry, I didn't say that was discussed in

16   committee.  That was discussed among us who were

17   putting the plan together.

18       Q    All right.  So who was putting he plan

19   together in that regard?

20       A    A compensation group in HR, working with the

21   lines of business, with representatives of the lines

22   of business, and with our advisers, Willis.

23       Q    And you and your compensation folks who work

24   with you were discussing with the compensation

25   advisers the 2019 STIP, right?

1        A    Yes.

2        Q    And in those discussions you discussed if an

3   individual's work went above and beyond what he was

4   supposed to do, you ought to have a mechanism to

5   increase his STIP award from the baseline target?

6        A    Yes.

7        Q    Upward?

8        A    Yes.

9        Q    During those conversations, did you all

10  discuss reducing the STIP award the other way if the

11  individual's work went below the baseline target

12  performance standards?

13       MR. SLACK:  Objection to the form.  Asked and

14  answered.

15       THE WITNESS:  So our historic STIP, as I've said,

16  had that evaluation done for all of our employees.

17  It's an annual evaluation.  And in the 2019 STIP we

18  were really trying to simplify the administration of

19  the STIP.  And so we kept the individual performance

20  multiplier only up to 10 percent of people who go

21  above and beyond.  Because we feel that we are in a

22  time of challenge for the company and we want to keep

23  people motivated.  We did not talk about reducing the

24  STIP for 2019 based on individual performance.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 93
of 154

1    Q   Did you personally consider that side of the

2  coin?

3    A   Yes.

4    Q   You personally considered whether to reduce

5  it?

6    A   I personally considered whether we should

7  keep the individual performance multiplier process

8  that we had in prior years in the 2019 STIP, which had

9  an up and a down.

10   Q   And did you discuss your thoughts on that

11  with the compensation committee?

12   A   I don't remember.  I discussed it with a

13  compensation group that I work with, but I don't

14  remember if I discussed it with the committee.

15   Q   Did you discuss it with board member?

16   A   Not that I remember.

17   Q   Did the pre-2019 STIPs have any metric

18  related to the absence or number of consumer

19  complaints?

20   A   In the recent past, no, because we used a

21  different measure, which was a customer satisfaction

22  score.

23   Q   How was customer satisfaction determined in

24  the metrics for 2018?

25   A   There is a survey that is performed by a

www.veritext.com                                                      888-391-3376

1  third party of our customers, and then based on that

2  perception survey, customer satisfaction is

3  determined.

4      Q   How was customer satisfaction proposed to be

5  determined under the 2019 STIP?

6      A   Under the 2019 STIP we proposed escalated

7  customer complaints to the CPUC.

8      Q   In what regard?

9      A   There's a process for customers to escalate

10  their complaints to the CPUC, and we decided to use

11  that metric instead of the sat -- the perception

12  survey.

13      Q   Instead of the staff perception survey?

14      A   Instead of the perception survey.

15      Q   Which is a perception of employees?

16      A   I'm sorry, the customer perception survey.  A

17  customer satisfaction survey, which is a perception

18  survey.

19      Q   And how was the customer survey done in the

20  past?

21      A   The customer survey is continuing to be done.

22  It's done by a third party.

23      Q   Got it.

24      A   It is phone calls, online.  They pick a

25  segment of customers.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 95
of 154

1      Q   So in the immediate past, 2017, 2018, there
2  was a metric for the STIP awards that dealt with
3  customer satisfaction?
4      A   Yes.
5      Q   And customer satisfaction turned on your
6  independent contractor's report of the survey of the
7  customers of how they were satisfied, right?
8      A   Yes.  So there was a customer satisfaction
9  survey that's performed, and based on the results of
10 that, informed the STIP.
11     Q   And under the 2019 STIP, you proposed to have
12 customer satisfaction determined solely by escalated
13 complaints to the PUC, right?
14     A   Yes.
15     Q   Well, that's going to give you a lower number
16 of complaints, right?
17     MR. SLACK:  Objection to the form of the
18 question.
19     THE WITNESS:  I don't understand that.
20 BY MR. JULIAN:
21     Q   Oh, yes you do.
22     A   No, I don't.
23     Q   Is there --
24     MR. SLACK:  Stop, that's not appropriate.  Wait
25 for a question.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 96
of 154

1        And you shouldn't be argumentative.

2        THE WITNESS:  Sorry.

3        MR. SLACK:  Not you.  You're doing fine.

4        Can you just read that back.  I don't know

5   that that was a question.  I think that was just a

6   statement.

7        MR. JULIAN:  I'm going to withdraw it.

8        MR. SLACK:  Okay.

9   BY MR. JULIAN:

10       Q   Your counsel is right.  I'm just seeing if

11  he's awake.

12       So don't you anticipate that there will be

13  fewer customer complaints escalated to the PUC than

14  customer complaints that could be registered by a

15  survey?

16       MR. SLACK:  Objection to the form.

17       THE WITNESS:  They're are two different things.

18  The customer satisfaction survey is a perception of

19  how the customer views PG&E.  It is a survey that is

20  sent out to groups of customers.  And I don't

21  remember, I don't know the exact questions, but it's

22  designed to understand their perception of their

23  interactions with PG&E.  It isn't about their

24  complaints.  It is about the perception of their

25  interactions with PG&E.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 97
of 154

1   BY MR. JULIAN:

2        Q   Why did you change it?

3        A   We changed it because we think in a

4   restructuring environment it isn't an appropriate

5   thing to do a customer perception survey.  We think

6   the better metric is if our services are dissatisfying

7   to our customers, they will complain and we want to

8   track that.

9        Q   Do customers ever register complaints with

10  PG&E as opposed to the PUC?

11       A   The way the process works is they register

12  the complaint with PG&E.  If that is not

13  satisfactorily resolved, they escalate it to the PUC.

14       Q   Who are the "they"?

15       A   The customers.

16       Q   During the compensation committee meetings

17  that you attended, did any of the directors discuss

18  whether they were independent, sufficient to sit on

19  the compensation committee?

20       MR. SLACK:  Object to the form.  I'm just going

21  to object.

22           You can answer.

23       THE WITNESS:  Well, the board members who sit on

24  the compensation committee are independent board

25  members.  So I'm not sure I understand.  Would they

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 98
of 154

1  actually be discussing the facts that they were

2  independent?

3  BY MR. JULIAN:

4     Q   Yeah, did that ever come up?

5     A   Not that I recall.

6     Q   You said the compensation committee has the

7  discretion to not award STIP compensation in 2019,

8  right?

9     A   Yes.

10     Q   And, theoretically, they have the right to

11  take into account anything an employee did at any

12  other time, right?

13     A   Since they have full discretion, I would

14  assume so.

15     Q   Have you heard that some of the directors who

16  sit on the compensation committee have been sued in

17  state court?

18     A   I do not know that.

19     Q   Let me see if I can refresh your memory.

20         Have you heard that some of the directors who

21  sit on the compensation committee have been sued for

22  failing to exercise proper oversight over employees

23  who may have contributed to the fires?

24     A   I have not.

25     Q   Was there any discussion on the compensation

1  committee as to whether or not the members of the

2  compensation committee, the directors have a conflict

3  by virtue of being sued for failing to oversee the

4  employees that they were addressing metrics for?

5      MR. SLACK:  Objection to the form.

6      THE WITNESS:  I do not remember any conversations

7  about lawsuits against a committee as part of the

8  discussions that we had.

9      MR. JULIAN:  Why don't we take a break.

10     (Recess.)

11     MR. SLACK:  We were discussing confidentiality

12 off the record, and there had been and is with, you

13 know, the information that has been provided, an

14 agreement with the advisers that the information is --

15 you know, can be designated confidential and PEO.  We

16 don't have a confidentiality stip in the case as a

17 whole.  We are prepared to work something out with the

18 counsel for the committees.  In the meantime we're

19 going to designate this, again consistent with the way

20 things have been treated with the advisers, as

21 professional eyes only.  We are willing to consider,

22 in the interim, before the hearing, you know, working

23 on a mechanism so that it will make it easier on all

24 the parties to potentially file materials with the

25 court.  But in the interim, we're going to designate

1    it "Professional Eyes Only," consistent with the

2    advisors's stipulation.

3         MR. JULIAN:  Okay.  Well, I don't have any

4    authority to agree to anything, so I get it.

5              We're back on the record.  Ms. Woltering will

6    do the rest of the questioning.

7                          EXAMINATION

8    BY MS. WOLTERING:

9         Q    So earlier you discussed that PG&E has a

10   culture that promotes speaking up.  Do you remember

11   that?

12        A    We encourage speaking up.

13        Q    Do you encourage it financially, with

14   financial incentives?

15        MR. SLACK:  Objection to the form of the

16   question.

17        THE WITNESS:  It's part of our culture, so we

18   encourage people.  We provide a number of vehicles for

19   people to speak up.  We have a reward and recognition

20   program for spot rewards that potentially could be

21   used for that.

22   BY MS. WOLTERING:

23        Q    Is that a financial?

24        A    The reward and recognition program is a

25   monetary and nonmonetary program.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
101 of 154

1    Q   How many monetary awards are given out each

2    year for speaking up?

3    A   I don't know.

4    Q   What is the dollar value of those awards?

5    A   They range from a gift card of a small dollar

6    value to if an employee does a tremendous amount of

7    work, say, for instance, they spend time at a base

8    camp during a wildfire, then there could be a much

9    larger reward that would be a few thousand dollars.

10   Q   So when you say a small amount, do you mean

11   $5?

12   A   A gift card would usually be about $25.

13   Q   So somewhere between 25,000 and a couple of

14   thousand?

15   A   Somewhere between $25 and -- rewards and

16   recognitions could go as high as $10,000 or higher.

17   It's individual cases.

18   Q   How many, annually, of those rewards are

19   given out?

20   A   I don't know.

21   Q   Can you estimate?

22   A   I really don't know.

23   Q   Okay.

24   A   There are dispersed throughout the company.

25   People have discretion to give rewards.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
102 of 154

1       Q   Did you give any in HR last year?

2       A   Yes.

3       Q   How many?

4       A   I don't know.

5       Q   Do you know what the dollar values were?

6       A   I think -- they were similar to what I said.

7   There were people in the HR organization who were at

8   the base camp during the wildfires, so we provided

9   them with reward and recognition rewards.  People get

10  spot awards for work that they do in the moment.  It

11  is a way of having contemporaneous recognition for

12  work that people do.

13      Q   In coming up with the 2019 STIP, did you ever

14  consider holding back the STIP payments or a portion

15  of the STIP payments until the end of the year?

16      MR. SLACK:  Objection to the form of the

17  question.

18      THE WITNESS:  By the design of the STIP, as we've

19  talked about is, it's a quarterly program.

20  BY MS. WOLTERING:

21      Q   I'm asking if in coming up with that, that

22  program, did you ever consider holding back or

23  deferring payments under the 2019 STIP until the end

24  of the year?

25      MR. SLACK:  Objection to the form of the

1   question.

2       THE WITNESS:  I guess I'm confused because the

3   program is quarterly.  And so do you mean did we

4   consider it not being quarterly?

5   BY MS. WOLTERING:

6       Q   I'm saying prior to actually finalizing the

7   program, where it was determined that it would be

8   quarterly, was it ever discussed that the payout,

9   whether it was -- the metrics were met on a quarterly

10  basis or not, that the financial aspect should be

11  annual or that a portion of it should be annual?

12      A   No, we didn't talk about that.

13      Q   If an employee -- my understanding -- I'll

14  withdraw that question.

15          My understanding is that the 2019 STIP and

16  not the prior STIPs are designed for, in part,

17  employer retention purposes, correct?

18      MR. SLACK:  Objection to the form of the

19  question.

20      THE WITNESS:  The STIP in general --

21  BY MS. WOLTERING:

22      Q   Yeah.

23      A   -- it's an incentive program.  When you put

24  the STIP and an employee's base pay together, that's

25  the total compensation we target being at market.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
104 of 154

1      Q    Okay.

2      A    Obviously, if an employee feels engaged,

3  feels compensated fairly, they're going to want to

4  stay with the company.  So all good HR programs have a

5  retention component to it.  That's part of running a

6  business.  You want your employees to be engaged and

7  want to be at the company.

8      Q    So prior to the 2019 STIPS, would an employee

9  have to stay until the end of the year to receive

10  their STIP payout?

11      A    Yes.  So when it was an annual program, the

12  employee would need to be here through the end of the

13  year to receive the payout, unless they retired.  And

14  in the case of a quarterly payment, the program is

15  structured so that the employee has to be there

16  through the end of the quarter to receive the payout.

17      Q    So employees are no longer incentivized to

18  stay through the entire year, only through the

19  quarter?

20      MR. SLACK:  Objection to the form of the

21  question.

22      THE WITNESS:  Well, the employee is incentivized

23  to do their work well, to have their goals be aligned

24  with the goals of the company.  So I'm not sure I

25  understand.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
105 of 154

1    BY MS. WOLTERING:

2         Q    They get paid quarterly, so --

3         A    Under the 2019 STIP.

4         Q    Under the 2019 STIP?

5         A    Yeah.

6         Q    So they no longer have to wait until the end

7    of the year?

8         A    To get the STIP payment.

9         Q    To get a STIP payment?

10        A    Yes.

11        Q    Thank you.

12             Are you personally eligible for a payment

13   under the 2019 STIP?

14        A    No, I'm not.

15        Q    So for non long-term, incentive plan-eligible

16   employees, why did you increase the STIP payment by

17   25 percent?

18        MR. SLACK:  Objection to the form of the

19   question.

20        THE WITNESS:  Yeah, I want to clarify.  We didn't

21   increase the STIP payment by 25 percent.  We increased

22   the participation rate.  And the example I used

23   previously, if you had a 10 percent STIP participation

24   rate, for 2019 your STIP participation rate would be

25   12.5 percent.  So that's what that is.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
106 of 154

1        And we did it because we feel that given the

2    significant uncertainty that the company is facing, we

3    want our employees to feel engaged.  And in our

4    judgment, this was a feature that helped on employees'

5    engagement.

6    BY MS. WOLTERING:

7        Q    Okay.  Who at PG&E has the most knowledge

8    regarding the safety goals of the 2019 STIP?

9        MR. SLACK:  Objection to the form of the

10   question.

11       THE WITNESS:  We have a chief safety officer, but

12   safety is also the responsibility of each line of

13   business leader.  So they work together in formulating

14   the safety objectives.

15   BY MS. WOLTERING:

16       Q    So if there was one person at PG&E with the

17   most knowledge regarding the safety goals of the 2019

18   STIP, who would that be?

19       MR. SLACK:  Objection to the form of the

20   question.

21       THE WITNESS:  I find it hard to say that because

22   safety is a responsibility that is shared across the

23   organization and the operational leaders.  So I don't

24   think there's one person who owns safety.  Safety is

25   owned across the company.

1    BY MS. WOLTERING:

2        Q   Do you have a responsibility for safety with

3    respect to the 2019 STIP?

4        A   I have a responsibility for the safety --

5    personally, I have a responsibility for the safety of

6    the employees in HR.

7        Q   Are you an expert on the safety aspects

8    covered by the 2019 STIP?

9        A   I'm not.

10       Q   In the last year have you or has the

11   compensation committee undertaken any analyses or

12   caused them to be undertaken to determine if PG&E's

13   employees are compensated below market?

14       A   The analysis that we have undertaken is in

15   connection with our general rate case when we do a

16   total compensation study.  And I would say that, to

17   the best of my knowledge, that's the analysis we do as

18   a company.

19       Q   Do you believe on a whole that the

20   compensation for PG&E employees who were eligible for

21   the 2019 STIP are below, equal to, or higher than

22   market?

23       MR. SLACK:  Objection to the form.

24       THE WITNESS:  I go back to the total compensation

25   study that was done for the general rate case.  And

www.veritext.com                                                      888-391-3376

1  based on that compensation study, our employees are

2  paid, on average, at market.  We target our employee

3  compensation to be at the median of market.

4  BY MS. WOLTERING:

5      Q   Are there employees who are eligible for the

6  2019 STIP that are compensated in their base pay above

7  market?

8      A   When you do -- when a compensation study is

9  done, it is a study that is a broad -- it looks across

10 the entire employee base and it doesn't look at

11 individual employees.  Individual employee

12 compensation is based on their expertise, their

13 tenure, you know, their work experience, and so each

14 individual is going to be different.

15     Q   Is there an employee receiving the 2019

16 STIP -- eligible for the 2019 STIP who is paid above

17 market?

18     MR. SLACK:  Objection to the form of the

19 question.

20     THE WITNESS:  I wouldn't know.

21 BY MR. JULIAN:

22     Q   Is that something the compensation committee

23 ever considered?

24     MR. SLACK:  Objection to the form of the

25 question.

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
109 of 154

1      THE WITNESS:  So, again, I think the question --
2   we don't -- the studies don't go down to the
3   individual employee level.
4   BY MS. WOLTERING:
5      Q   Yes or no, did the compensation committee
6   consider whether employees were paid below, equal to,
7   or higher than market in coming up with the 2019 STIP?
8      MR. SLACK:  Objection to the form.  Asked and
9   answered.
10  BY MS. WOLTERING:
11     Q   Just yes or no it was considered?
12     MR. SLACK:  You know, that's now compound.
13  Object to the form.  There's two questions.  I don't
14  know which question -- do you want the first question
15  answered or the second question answered before he
16  answers?  I don't know which question.  You've now
17  asked two questions without an answer.
18     THE WITNESS:  Okay.  I'm a little confused.  Can
19  you just repeat the question.
20  BY MS. WOLTERING:
21     Q   Yes or no, in coming up with the 2019 STIP,
22  did the compensation committee consider whether the
23  employees eligible for the STIP were compensated at,
24  below, or above market?
25     A   The compensation committee does not talk

1    about individual employees, so by default, that would

2    have to be no, because the compensation committee does

3    not talk about individual employees.

4        Q    Did you talk about individual groups or teams

5    of employees?

6        A    No.  Again, we go back to our compensation

7    study, which is done across the company.  In looking

8    at the compensation study, we do break it up by groups

9    of employees.  And we have the total compensation by

10   level, if you will.

11       Q    And did the compensation committee consider

12   whether, by level, 2019 STIP-eligible employees were

13   paid above, below, or at market?

14       A    That has not been part of the type of

15   material that we take to the compensation committee.

16       Q    What material do you take to the compensation

17   committee?

18       A    We take the STIP program, the STIP design,

19   and the metrics and the targets.

20       Q    Do you keep a list of what material you

21   consider in getting in preparing the STIP up to the

22   point of taking it to the compensation committee?

23       A    You mean do we have drafts of materials

24   before it goes to the compensation committee?  Likely.

25       Q    Do you keep a record of documents or reports

1   or considerations used in developing the 2019 STIP?

2       A   Not to my knowledge.  They're likely are

3   drafts of the program, but we do not have a process to

4   maintain our drafts.

5       Q   To your knowledge, has anyone working under

6   your direction resigned since PG&E filed for

7   bankruptcy?

8       A   Do you mean has anybody in the HR department

9   or any of my direct reports?

10      Q   In the HR department.

11      A   Yes.

12      Q   Any of your direct reports?

13      A   No.

14      Q   To your knowledge, has anyone left PG&E due

15   to below market compensation since the bankruptcy

16   filing?

17      MR. SLACK:  Objection to the form.

18      THE WITNESS:  I think people have said that they

19   have left the company due to the uncertainty that the

20   company is facing.  I've heard, anecdotally, that not

21   paying the 2018 STIP has had an impact on people's

22   engagement.  I have haven't had somebody directly come

23   to me and say I'm leaving the company because my pay

24   is below market.

25   BY MS. WOLTERING:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
112 of 154

1     Q   As the head of HR, have you undertaken or

2   caused to have undertaken any analysis of attribution

3   since the decision not to pay out the 2018 STIP?

4     MR. SLACK:  Objection to the form.

5     THE WITNESS:  What does attribution mean?

6   BY MS. WOLTERING:

7     Q   Sorry, excuse me, attrition.

8     So have you analyzed how many people have

9   left since the 2018 STIP was not paid?

10     A   We do track attrition, and I know that we

11   have the analysis on a year-to-date basis.  I have not

12   broken it out by since the STIP was not paid, but

13   that's a very short period of time.

14     Q   Do you think the STIP, the 2019 STIP is

15   necessary to properly incentivize management to take

16   appropriate actions to reduce the risk of fires?

17     MR. SLACK:  Objection to the form of the

18   question.

19     THE WITNESS:  The 2019 STIP is a program that is

20   put in place to incentivize the employees to have

21   goals that are consistent with the company goals.

22   Wildfire is an important risk that the company faces

23   and it's included in the 2019 STIP.

24   BY MS. WOLTERING:

25     Q   So then is it your opinion that the 2019 STIP

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
113 of 154

1   is necessary to properly incentivize senior management

2   to take appropriate actions to reduce the risk of

3   wildfires?

4        MR. SLACK:  Objection to the form of the

5   question.

6        THE WITNESS:  So I don't know what you mean by

7   necessary.  I think that the 2019 STIP is an incentive

8   program.  In my judgment, it is an appropriate

9   incentive program for employees to have a fair chance

10  of earning fair compensation while aligning their

11  interests with what is important for the company.

12  BY MS. WOLTERING:

13       Q   So let me turn it around the other way.

14  Without the 2019 STIP, do you believe that PG&E

15  employees would fail to take appropriate actions to

16  reduce the risk of wildfires?

17       MR. SLACK:  Objection to the form of the

18  question.

19       THE WITNESS:  I think that's hypothetical.  What

20  I would say is without the 2019 STIP, our employees

21  would feel less engaged.

22  BY MS. WOLTERING:

23       Q   If an employee is less engaged, would they be

24  less likely to do their job and mitigate the risk of

25  wildfires?

www.veritext.com                                                 888-391-3376

1      MR. SLACK:  Objection to the form of the

2  question.

3      THE WITNESS:  Again, that's so hypothetical.

4  What I would say is when an employee is less engaged,

5  they are less focused on their job, whatever that job

6  is.

7  BY MS. WOLTERING:

8      Q   If you look at Exhibit 1, your Declaration,

9  on page 10, lines 1 through 3, you say that the STIP

10  is necessary for debtors' continued ability to deliver

11  safe and reliable electric and gas services.  Lines 1

12  through 3.

13      MR. SLACK:  Page 10 again is his signature.

14      MS. WOLTERING:  Did I have the wrong page?  I'm

15  sorry.  Page 4.

16      MR. SLACK:  Page 4, I'm sorry, line what?

17      MS. WOLTERING:  1 through 3.  Really lines 2 and

18  3.

19  BY MS. WOLTERING:

20      Q   You say the STIP is necessary for the

21  debtors' continued ability to deliver safe and

22  reliable electric and gas services.

23      MR. SLACK:  That's not what it says.

24      THE WITNESS:  No, that's not what it says.

25  BY MS. WOLTERING:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 115 of 154

1  Q   Well, the STIP I added.  So the quote begins,

2  "The STIP rate is part of a competitive package

3  designed to motivate and incentivize employees who are

4  necessary for the debtor's continued ability to

5  deliver safer and reliable gas and electric services."

6  MR. SLACK:  That's closer.

7  BY MS. WOLTERING:

8  Q   Okay.  In your opinion, in 2017 did PG&E

9  provide safe gas and electric services?

10  MR. SLACK:  Objection to the form of the

11  question.

12  THE WITNESS:  In 2017 PG&E operated a large

13  electric and gas system.  In 2017 there were some

14  devastating wildfires.  The system as a whole provided

15  safe and reliable service.

16  BY MS. WOLTERING:

17  Q   So it's your testimony that in 2017 PG&E

18  provided safe and reliable electric and gas services?

19  MR. SLACK:  Misstates his testimony.  Object to

20  the form.

21  THE WITNESS:  Yeah, I think you're taken a little

22  piece of what I'm saying and focusing in on it.  What

23  I'm trying to say is PG&E runs a large electric and

24  gas system.  We provide service to millions of

25  customers.  Safety is part of what we do every day.

1   There were terrible wildfires in 2017, but overall,

2   the system operated safely and reliably.

3   BY MS. WOLTERING:

4       Q   So yes or no --

5       A   It's not a yes or no response.

6       Q   I'm going to finish asking my question and

7   then you can answer.

8           Yes or no, overall you believe that PG&E

9   provided safe and reliable gas and electric service in

10  2017?

11      MR. SLACK:  Object to the form.  Asked and

12  answered.

13      THE WITNESS:  So, again, I'm going to tell you

14  what I said.  PG&E runs a large electric and gas

15  distribution system.  We serve millions of customers.

16  We have had the daily provision of an electric and gas

17  service in a safe and reliable manner.  There were

18  devastating wildfires in 2017.  There have been -- but

19  the company has delivered safe and reliable electric

20  and gas service.

21  BY MS. WOLTERING:

22      Q   Okay.  There was a 2017 STIP, correct?

23      A   Yes.

24      Q   And the 2017 STIP also placed a 50 percent

25  safety metric?

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
117 of 154

1          A    Yes.

2          Q    Just like the proposed 2019 STIP?

3          A    The percentage on safety is the same.

4          Q    Is anyone that reports directly to PG&E's

5    board of directors eligible to receive an award under

6    the 2019 STIP?

7          A    No.

8          Q    Is anyone that is appointed directly by the

9    PG&E board eligible to receive a payment under the

10   2019 STIP?

11         A    No.

12         Q    Is anyone that exercises managerial control

13   over PG&E's operations eligible to receive an

14   incentive award under the 2019 STIP?

15         MR. SLACK:  Objection to the form of the

16   question.

17         THE WITNESS:  So may I explain the management

18   structure of PG&E?

19   BY MS. WOLTERING:

20         Q    Sure.

21         A    We have a chief executive officer.  We have a

22   number of senior vice presidents.  And I think

23   together we number about a dozen people.  Each one of

24   the senior executives has primary responsibility for a

25   function.  So I am the senior executive who has

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
118 of 154

1   responsibility for human resources.  I have a

2   counterpart of electric operations, a counterpart of

3   gas operation, and so on.  Each of us then has stuff.

4   The CEO and the senior vice president are not part of

5   the 2019 STIP.  The rest of the employee base, all

6   10,000, approximately, are, are part of the 2019 STIP.

7       Q   Okay.  In coming up with the 2019 STIP, did

8   you determine which PG&E department's division of

9   employees or categories of employees would be eligible

10  for an award?

11      A   The 2019 STIP is available to all

12  STIP-eligible employees, which is largely -- I would

13  say largely the non-represented workforce.  It

14  excludes, as I said, the senior officers of the

15  company.  It does include a small number of

16  represented employees as well.

17      Q   Based on your understanding of the corporate

18  structure of PG&E, how many employees are directly

19  responsible for fire prevention?

20      MR. SLACK:  Objection to the form of the

21  question.

22      THE WITNESS:  I don't know how many employees and

23  what their individual job duties are.

24  BY MS. WOLTERING:

25      Q   If you had to estimate?

1          MR. SLACK:  Is that a question?

2          THE WITNESS:  I really don't know.

3     BY MS. WOLTERING:

4          Q    Okay.  Do you know if any of the 10,000

5     employees eligible to participate in the 2019 STIP are

6     facing criminal proceedings or civil proceedings due

7     to the 2017 or '18 wildfires?

8          A    I do not know.

9          Q    What is your understanding of an insider?

10         MR. KAROTKIN:  For what purpose?

11         MS. WOLTERING:  He testifies about the insiders

12    are not eligible, his declaration for the STIP.

13         THE WITNESS:  So my understanding of insiders is

14    laid out in page 5, which is the debtor's most senior

15    leaders.

16    BY MS. WOLTERING:

17         Q    And what is your understanding of

18    non-insiders?

19         A    I would guess it is those who are not

20    insiders, so everyone else.

21         Q    What analysis was performed to determine the

22    weighting of this 2019 STIP metrics?

23         MR. SLACK:  Objection to the form.

24         THE WITNESS:  Can you explain that?

25    BY MS. WOLTERING:

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
120 of 154

1       Q    Yeah.  So in your Declaration you list

2   various categories and their rates --

3       A    Yeah, so 50 percent safety.

4       Q    -- the performance metrics and weightings.

5            What analysis did you or the compensation

6   committee perform to determine the appropriate

7   weighting for each of those metrics?

8       A    So as we put the program together, we -- when

9   I say "we," I mean the senior leaders of the

10  company -- talk about what is most important to the

11  company.  And for the last few years we've had

12  50 percent of our STIP be associated with safety.

13  Historically, I think we've had 25 percent for

14  customer and 25 percent for financial.  And we have

15  felt that that is a weighting that reflects what is

16  important to the company.  So 50 percent is the most

17  important, but we also have to keep the customer in

18  mind and keep the financial health of the company in

19  mind.  So that's how we have -- it is a -- it is a

20  qualitative assessment.  It isn't a hard analytic

21  assessment.  But it's a discussion based on our view.

22      Q    So between the 2018 STIP and the 2019 STIP,

23  you used this -- you performed an assessment and

24  determined that the company's financial performance

25  should be weighted more heavily than customer

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
121 of 154

1   satisfaction?

2        A    Well, what we learned, which influenced our

3   thinking, is that in a restructuring the company's

4   financial performance is more important.  We didn't

5   want to reduce the importance of safety, and so we

6   balanced between customer and financial.

7        Q    More important to whom?

8        A    More important to the stakeholders in the

9   process.

10        Q    What is your understanding of who those

11   stakeholders are?

12        A    That we need to have a financially healthy

13   company to be able to emerge from Chapter 11, and

14   therefore the emphasis on financials is more important

15   during the restructuring process.

16        Q    More important to whom?

17        A    The various stakeholders, the people who have

18   claims, the various stakeholders in the process.

19        Q    Claims for what?

20        A    There's a variety of claims against the

21   company in the Chapter 11 process.  So all of those

22   claims, in order for them to be -- to have a

23   successful resolution of the Chapter 11, it's

24   important for the company to be financially healthy.

25        Q    For each of the performance metrics for the

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
122 of 154

1    2019 STIP, can you tell me the status of where they

2    are?  Have they been implemented or are they in the

3    process?  Have they being developed?  If we can just

4    walk through them.

5         A   Yeah, each of the metrics is in place and we

6    are -- we are performing against them.  I don't yet

7    know what the performance is because the quarter

8    hasn't closed.

9         Q   But the metrics are each in place?

10        A   Yes.

11        Q   And the process for evaluating the metrics

12   exists?

13        A   Yes.

14        Q   In coming up with the 2019 STIP, did you

15   review or consider comparable companies' incentive

16   plans?

17        A   I didn't personally.  I know that as the STIP

18   has been developed, the compensation team is aware of

19   plans at other companies, but I did not personally.

20        Q   Were comparable companies' incentive plans

21   ever discussed with the compensation committee?

22        A   Individual company's plans were not discussed

23   with the compensation committee.

24        Q   Was there a general discussion where the 2019

25   STIP fell when being compared to comparable companies?

www.veritext.com                                                    888-391-3376

1      A   I think it is part of the work that Willis

2  Towers did, and they have looked at our STIP and

3  comparable companies.  And in their view the STIP is

4  consistent with or in line with what you see in

5  comparable companies.

6      Q   Was that presented or discussed at the

7  compensation committee meeting?

8      A   Yes.

9      Q   Was that presented by Willis?

10      A   It's part of Willis's report, so I don't know

11  more than that.

12      Q   What was the discussion regarding comparable

13  companies at the compensation committee meeting?

14      A   I don't remember a specific discussion about

15  comparable companies, so much as an acknowledgement

16  that the program was consistent with industry practice

17  and general practice in the utilities.

18      Q   Were there any questions by the compensation

19  committee to see comparable programs?

20      A   Not that I recall.

21      Q   Did they ask any follow-up questions about

22  the general statement that the 2019 STIP was

23  comparable?

24      A   Not that I recall.

25      Q   Can you explain to me the difference between

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
124 of 154

1    a key employee incentive plan, a key employee

2    retention plan, and a STIP?

3          A    So we've talked about the STIP.  The STIP is

4    an incentive plan that is part of a total compensation

5    package for the broad group of our employees.  The key

6    employee incentive plan, what we think about that,

7    that is a plan for what we have called the insiders

8    previously in this conversation.  And it is similar

9    for that group of employees.  Their target

10   compensation would consist of both wages, salaries, as

11   well as incentive compensation.  So that would be the

12   component of the plan for that set of employees.

13          We learned about a key -- I learned about a

14   key employee retention plan as part of the

15   restructuring process.  It isn't a plan that we've had

16   in place before.  I understand that it is a plan that

17   is commonly used in a restructuring process, and so we

18   are considering that as well.  We do not historically

19   have that plan.

20         Q    Are you working on that?

21         A    We're still thinking about it.

22         Q    Are you part of the team considering it?

23         A    I'm not part of the team that is actively

24   considering it, but I engage as they're in their

25   considerations.  I'm not day-to-day in the

```
 1   discussions.
 2        Q    Who is responsible for developing any key
 3   employee incentive plan or key employee retention
 4   plan?
 5        A    Usually those plans are developed by the
 6   total rewards team.  And the individual who is
 7   responsible for that is John Lowe.
 8        Q    Does John Lowe report to you?
 9        A    Yes.
10        MS. WOLTERING:  Let's take a quick break and then
11   we'll be done.
12             (Recess.)
13   BY MR. JULIAN:  Pass the witness.
14        MR. SLACK:  Okay.  Anybody else have some
15   questions?
16        MR. DENNY:  Not today.
17        MR. SLACK:  It looks like we're done.
18        MR. JULIAN:  Okay.  Thank you.
19        THE WITNESS:  Thank you.
20        MS. WOLTERING:  Thank you.
21                  (TIME NOTED:  1:40 p.m.)
22
23
24
25
```

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
126 of 154

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth; that

6   any witnesses in the foregoing proceedings, prior to

7   testifying, were administered an oath; that a record

8   of the proceedings was made by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given.

12       Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review of

15  the transcript [ ] was [X] was not requested.

16       I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  March 21, 2019

23

24

                JODI L. BOSETTI

25              CSR No. 11316, RPR

www.veritext.com                                    888-391-3376

| & |
| --- |
| **&**   2:16 3:11 |

| **0** |
| --- |
| **0**   46:16 47:11,14 47:15,18 48:2,17 48:23 |
| **011/099**   87:16 |
| **08**   8:3 |

| **1** |
| --- |
| **1**   1:17 2:14 5:3,10 7:6,7 9:22 15:3 22:19 25:24 29:1 38:8 79:16 114:8 114:9,11,17 |
| **1,000**   84:11 |
| **1.0**   49:15 |
| **1.0.**   49:16 |
| **1.25**   47:11 48:17 48:24 49:9 51:1 |
| **1.25.**   47:10,12 |
| **1.5**   47:18 48:2 50:17,23 51:1 |
| **10**   9:21 23:8,10 38:11 39:19 40:8 40:25 41:23 42:2 42:8 46:7,18,20 47:5,7,8 48:10,11 48:17 49:7 50:16 50:21,22 51:6 61:5 81:25 82:2 92:20 105:23 114:9,13 |
| **10,000**   21:8 46:8 47:3 49:3 101:16 118:6 119:4 |
| **100**   3:6 5:7 34:14 |
| **10153-0119**   3:14 |
| **10:05**   2:18 6:2 |
| **11**   1:7 2:7 5:15 56:23 57:3,6,8 |

69:16,17 121:13 121:21,23

**11,000**   29:10 30:20 55:21

**111kv**   87:17

**11316**   1:23 2:20 126:25

**1160**   3:6

**12**   29:1 53:8,21 55:15

**12.5**   105:25

**125**   46:18,20 47:9

**13**   5:17 32:23 59:1 72:22 82:4

**14**   69:19

**15**   5:18 42:13 45:13 72:5,11

**150**   46:16 47:15

**16**   8:3 45:13

**18**   119:7

**19**   1:16 2:19 6:1 15:4 26:2

**19-30088**   1:6 2:6

**1994**   67:5

**19th**   72:21

**1:40**   2:18 6:2 125:21

| **2** |
| --- |
| **2**   5:11 20:1,7,12 22:22 25:9 27:21 45:8 114:17 |
| **20**   87:22 |
| **200**   84:4 |
| **2001**   67:4 |
| **2005**   7:22 |
| **2008**   7:22 |
| **2010**   80:5 82:11,11 |
| **2014**   83:25 |
| **2015**   66:10 |
| **2016**   5:13 7:25 8:1 42:20 68:4 |

**2017**   20:15 32:9 34:15,16 35:1,8,11 35:14 36:16,24 37:7,8,9,21,24 42:20 51:13 61:14 63:6 64:10 66:16 67:17 68:19 75:20 76:3,20 77:6 78:8 82:16 89:21 95:1 115:8,12,13,17 116:1,10,18,22,24 119:7

**2018**   15:5 18:14 20:18 21:3,5,6,16 21:20,22,24 22:6 22:22 23:5,13,20 23:24 25:8 26:12 26:19,25 27:8,10 27:20,21 28:15,18 28:24 29:5,11,16 30:20 31:16 32:1 32:9,16 33:15 34:1 35:13,23 36:2 38:18 42:9 46:15 47:17 49:1 51:13 54:24 55:2 55:2,3,18,22 56:17 57:11,18,22,24 58:1,15 59:3 61:14 63:6 64:10 69:19 73:20 75:20 78:8 89:21 93:24 95:1 111:21 112:3 112:9 120:22

**2019**   1:16 2:19 6:1 7:12 9:16,24,24,25 10:12,17,20 12:4,5 13:15,18,21,21,25 14:4 15:8 16:23 16:24 17:4,9 18:17,20 19:3,3,7

19:12,15,20,22 20:25 21:9,17,19 21:21,22,24 22:2,4 22:7,9,18,19 23:6 23:11,12,14,24 24:10,21 25:7,8,16 26:6,10,12,16,22 27:11,14,15,20 38:2,17,19 39:11 39:15,22,25 40:4 40:12,15,19 42:24 43:5,13,25 44:3,3 44:14 46:17 47:1 47:2 48:6,7 49:7 49:12,17,20,20 51:1,4,11,16,21 52:7,14 54:3,23 55:4 57:18,23 59:9,19,20,23 60:6 60:9,13,15,16,21 61:15,19 62:2,2,4 62:7,8,15,19,22,24 63:4,18,19 64:1,9 64:16,25 65:2,9,13 67:8 69:13 72:7 72:10,18,23 73:11 73:14,21,25 74:6 74:22 75:11,15,19 78:7,19 79:1 85:9 89:17 90:2,7,10 91:25 92:17,24 93:8,17 94:5,6 95:11 98:7 102:13 102:23 103:15 104:8 105:3,4,13 105:24 106:8,17 107:3,8,21 108:6 108:15,16 109:7 109:21 110:12 111:1 112:14,19 112:23,25 113:7

www.veritext.com                                                            888-391-3376

113:14,20 117:2,6
117:10,14 118:5,6
118:7,11 119:5,22
120:22 122:1,14
122:24 123:22
126:22
**2020**  5:11 20:2
**2029**  3:20
**21**  126:22
**212**  3:14
**213**  3:21
**22**  79:18 88:12
**23**  9:22,25 12:5
54:20
**235**  25:19
**24**  9:23 15:4 26:2
54:19
**25**  23:24 54:20
83:25 101:12,15
105:17,21 120:13
120:14
**25,000**  101:13
**26**  54:20
**28**  5:13 68:4
**2800**  2:17

---

**3**

**3**  14:22 20:9 79:16
79:16 88:11,12
114:9,12,17,18
**30**  11:5,8,9
**310-8017**  3:14
**3262346**  1:24
**33rd**  3:20
**34**  20:3
**35**  20:3
**36**  36:3
**39**  20:4,17 22:22

---

**4**

**4**  20:9 28:25 29:1
32:23 53:25 54:19

55:15 114:15,16
**4-34**  20:10,12
34:20
**4-35**  36:3,7
**4-38**  20:17 22:22
23:21
**4-40**  20:20 25:8
45:9
**4-41**  25:11 45:10
45:12
**40**  23:24 39:22
40:7 41:3
**41**  20:4,20 25:9
**415**  3:7

---

**5**

**5**  5:12 9:22 17:18
22:20 23:4,17
25:21 39:20 41:18
72:7,10,18 83:6,7
101:11 119:14
**50**  22:2,5,25 23:1
40:6,23 41:3
116:24 120:3,12
120:16

---

**6**

**6**  5:6,13 25:21
38:7 68:3,3
**6192**  126:23

---

**7**

**7**  5:14 17:17 22:20
38:7 39:20 82:3
86:6
**703-9980**  3:21
**722832**  83:13
**722832-722833**
5:12
**767**  3:13

---

**8**

**8**  15:2 26:1 87:25
**806-6000**  3:7
**833**  83:14

---

**9**

**9**  72:23
**90**  46:24 49:12
**90067-3019**  3:21
**94111**  3:6
**95.9**  34:24
**959**  34:22

---

**a**

**a.m.**  2:18 6:2
**ability**  114:10,21
115:4
**able**  37:5 81:15
88:21 90:14
121:13
**absence**  93:18
**access**  67:21,21
**accessing**  56:22
**accomplish**  88:21
**accomplishing**
88:20
**account**  75:14
98:11
**accurate**  42:4,8
**acknowledgement**
123:15
**acting**  7:17
**action**  42:16
126:17,18
**actions**  42:13
69:13 112:16
113:2,15
**actively**  124:23
**actual**  45:18 87:7
**added**  11:25 22:3
22:6 115:1

**addition**  22:17
**address**  57:7 91:2
**addressed**  21:9
36:9
**addressing**  99:4
**adjusting**  78:15
**adjustment**  75:17
75:19
**adjustments**  37:11
37:12
**administered**  6:5
126:7
**administration**
92:18
**administrative**
60:22
**adopted**  29:8
30:24 31:1 57:10
**adoption**  73:11
**advancing**  44:21
**advice**  24:10,17,21
51:22 90:5
**advise**  13:9
**adviser**  15:23 79:7
**advisers**  79:12
91:22,25 99:14,20
**advisors's**  100:2
**age**  54:17
**ago**  91:10
**agree**  55:15 90:18
100:4
**agreed**  56:1
**agreement**  99:14
**ahead**  13:24 36:21
63:10 71:18
**ak**  87:13
**aligned**  85:25
104:23
**aligning**  79:20
113:10

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
129 of 154

**aligns** 44:20 82:25
**alleged** 66:16 70:21
**allocated** 23:1 42:8 44:25
**allocates** 40:25
**alsup** 73:5,13
**alsup's** 42:18 43:3 72:6,10,23
**amount** 25:18 30:22 44:24 45:23 101:6,10
**amounts** 22:14
**analyses** 107:11
**analysis** 107:14,17 112:2,11 119:21 120:5
**analytic** 120:20
**analyzed** 112:8
**anecdotally** 111:20
**angeles** 3:21
**annual** 52:5,10 53:18 57:21 79:19 82:15,19 88:11,12 92:17 103:11,11 104:11
**annually** 51:12 79:2 101:18
**answer** 13:24 16:6 17:11 24:6,8 34:21 41:13 53:21 56:25 63:12 64:17 70:19 71:14,18 77:9,20 97:22 109:17 116:7
**answered** 63:7,11 63:13 69:9 92:14 109:9,15,15 116:12

**answers** 109:16
**anticipate** 78:6,18 96:12
**anticipated** 21:22 24:11
**anybody** 111:8 125:14
**anymore** 90:1
**apparently** 84:20
**appearances** 3:1 4:1,3
**appeared** 18:20
**appears** 87:22
**applied** 46:2 49:2
**apply** 20:25 46:8
**appointed** 117:8
**approach** 63:25
**appropriate** 24:15 95:24 97:4 112:16 113:2,8,15 120:6
**approval** 7:9 19:22 30:5 33:7
**approve** 13:15,17 19:12,18 21:2,5 28:18,23 35:10 37:23 49:24 50:5 50:5,6 74:15
**approved** 9:24 12:4 19:15 21:6 32:15 33:11 34:1 34:8 35:3,6,24 45:1 59:9
**approves** 33:5 35:17,21 57:1
**approving** 9:16 14:18
**approximate** 22:10
**approximately** 29:10 30:19 47:3 55:21 118:6

**april** 5:13 68:4
**area** 84:2,8
**areas** 23:16,18 38:21 67:17
**argumentative** 96:1
**asked** 18:2 63:7 69:9 77:4,15 92:13 109:8,17 116:11
**asking** 102:21 116:6
**aspect** 42:7 103:10
**aspects** 41:10 107:7
**assessment** 120:20 120:21,23
**asset** 41:4 42:2,4
**assigns** 39:22
**associated** 14:2 69:2 120:12
**assume** 98:14
**assuming** 9:19 16:14 31:2
**assurance** 28:3,5
**attached** 86:10
**attend** 13:7,8 63:25
**attended** 65:19 66:2 68:17,23 97:17
**attorney** 3:5,20 126:18
**attorneys** 3:13
**attraction** 8:21
**attribution** 112:2 112:5
**attrition** 112:7,10
**audit** 7:18 8:7 35:20 36:4 74:13 74:16,25 75:4

**authority** 19:12 29:12 100:4
**available** 44:23 46:15 48:24 118:11
**avenue** 3:13
**average** 108:2
**avoid** 87:7
**avoiding** 80:5 82:16
**awake** 96:11
**award** 32:1 33:15 35:3,6,11,17 37:8 37:9,14,20,24 45:1 48:16,24 50:23 51:11 52:17 62:3 63:5 75:7,11 89:18,22 91:13 92:5,10 98:7 117:5,14 118:10
**awarded** 56:11
**awarding** 57:17
**awards** 28:18 29:11,12,17 30:20 32:16 34:1 37:15 44:22 49:20 52:5 55:22 59:3,18 61:15 62:15,17 64:9 70:6 74:6 75:8,19 78:7 79:22 90:22 95:2 101:1,4 102:10
**aware** 62:21 69:24 70:1 76:6,7 88:6 122:18

**b**

**back** 8:8 22:21 26:2 45:2 55:14 64:18 72:22 79:15 96:4 100:5 102:14 102:22 107:24

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page 130 of 154

110:6
**backing** 86:21
**bakerhostetler** 3:4
**bakerlaw.com** 3:7
3:8
**balanced** 56:13
121:6
**bankruptcy** 1:1
2:1 17:1 29:24
30:6,7,12,14,17
57:12,15,16 60:22
67:4 90:6 111:7
111:15
**barbara** 12:13
**base** 10:15 58:11
101:7 102:8
103:24 108:6,10
118:5
**based** 10:16 45:22
46:1,9 47:19,23
48:25 49:14 51:8
75:20 80:10,12
82:20 88:17 89:10
89:11 90:10 92:24
94:1 95:9 108:1
108:12 118:17
120:21
**baseline** 91:14
92:5,11
**basis** 52:11 74:10
74:11 103:10
112:11
**bates** 83:12
**battery** 3:6
**beginning** 2:17
**begins** 115:1
**behalf** 2:15 25:15
**believe** 12:7,13
21:11 30:13 34:17
35:25 38:25 51:24
53:16 107:19

113:14 116:8
**benchmark** 37:1,2
37:4
**best** 15:25 32:11
60:2 107:17
**better** 56:2,5,6,7
56:15 97:6
**beyond** 90:13,21
91:12 92:3,21
**big** 55:6 60:7
**binder** 7:4
**bit** 32:22
**board** 9:8 15:7,14
15:15,20 16:9,12
16:15,24 17:3,8,22
17:25 18:2,19,19
18:24 19:1,3,5,8
19:15,17,21,24
21:5,6 28:17 29:7
29:16 30:18,19,21
30:23 31:2 32:1
32:14,25 33:8,8,10
33:14,21 34:1,6,8
37:17,23 49:23
50:2,4 57:25 58:4
58:11,14,20,25,25
59:1 93:15 97:23
97:24 117:5,9
**board's** 16:7
**bolt** 87:23
**bonus** 45:19,21
59:18
**bosetti** 1:22 2:19
126:24
**boxes** 45:14
**bracing** 87:19,20
**break** 54:5,6,10
55:11 71:16 99:9
110:8 125:10
**brendan** 4:7

**bring** 10:10 15:19
81:3
**brings** 15:15 39:10
51:9
**broad** 33:23 49:4
58:11 85:21 108:9
124:5
**broke** 87:21
**broken** 112:12
**brought** 79:1
80:23,24 81:13
**bruno** 64:22 65:8
65:12 66:4 80:5
80:22 82:10
**bunch** 83:9
**business** 8:24
41:11 69:2 80:10
91:21,22 104:6
106:13
**butte** 66:10 68:5

**c**

**c** 88:1,6
**cal** 5:13 67:16 68:4
68:18,24,24
**calculate** 45:18
**calculated** 25:15
**calculates** 25:7
**calculating** 45:23
**calculation** 20:21
20:24 25:12,12
45:5,5 75:5
**california** 1:2,15
2:2,17 3:6,21 6:1
29:5 31:16 55:18
56:17 66:17 69:23
82:16 126:2
**call** 43:21 85:18
**called** 22:1 59:24
71:20 86:11 124:7
**calls** 94:24

**camp** 84:2 87:12
101:8 102:8
**campora** 83:15,20
86:8
**cap** 43:21 85:18
**card** 101:5,12
**caribou** 84:1,5,19
84:24 87:11,16
88:1,7
**case** 5:11 20:2
57:15,16 60:22
67:4 99:16 104:14
107:15,25 126:14
**cases** 30:17 101:17
**cash** 79:22
**categories** 118:9
120:2
**category** 21:9
**catherine** 3:5
**cause** 5:16,17,18
42:19 52:23 61:4
68:5 69:20 70:8
72:6,23 73:1
90:21
**caused** 61:3 68:18
76:20 88:3 107:12
112:2
**causing** 88:3
**century** 3:20
**ceo** 8:15,17 19:18
21:7 29:19 30:11
30:13,14 33:6,20
34:4 37:10,15,18
118:4
**certain** 21:25
58:12 70:11,24
71:6
**certified** 2:19
126:1
**certify** 126:3,16

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
131 of 154

**cfo** 37:10,15,17,20
  37:24
**chain** 83:9
**challenge** 92:22
**challenges** 56:14
  56:16 91:1,2
**chance** 113:9
**change** 24:3,3
  47:13 80:16 97:2
**changed** 21:21
  56:20 80:24 81:7
  97:3
**changes** 7:14 55:3
  55:8 57:4
**changing** 52:4,10
  89:10 90:4
**chapter** 1:7 2:7
  56:23 57:3,6,8
  121:13,21,23
**charter** 14:23
**chief** 106:11
  117:21
**chris** 4:4 6:17
**circuit** 38:20
**civil** 119:6
**claimants** 2:15 3:3
**claims** 57:7 60:21
  60:22 121:18,19
  121:20,22
**clarify** 105:20
**cleared** 28:1
**clearing** 26:17,23
  28:13
**close** 86:23
**closed** 15:11 122:8
**closer** 115:6
**coin** 93:2
**colleague** 6:19
**come** 52:9 74:9
  98:4 111:22

**coming** 102:13,21
  109:7,21 118:7
  122:14
**commission** 26:21
  27:12 71:22
**commission's**
  69:19
**committed** 80:18
  81:8
**committee** 2:15
  3:3,18 6:15,19 9:8
  9:9,11,16,17,18,23
  10:6,9,10,13 12:4
  12:5,11,12 13:5,10
  13:15,17 14:17,23
  14:24 15:6,20
  16:5 19:1,5,11,24
  21:2 24:2,23
  28:23 30:25 31:1
  31:5,14 32:24
  33:5,19,22 34:4
  35:4,5,10,16,21,24
  37:16,20 42:23
  43:2,2 48:15,20
  49:23 53:12,17
  54:1,21,25 55:1,7
  57:10 58:2,3,10,21
  59:6,9 60:5,13,19
  61:2,7,12 62:14
  63:2 64:1,21
  65:11,18,19 66:1,2
  66:9,15,20,24 67:9
  67:15,20 68:1,6,16
  68:22 69:5,12
  70:5 72:9,16,19,25
  73:3,11,12,23 74:5
  74:14 75:1,6,10,16
  75:18,24 76:1,10
  76:14,17 77:4,15
  77:21,23 78:4,7,12
  78:14 89:9 90:4

91:11,16 93:11,14
97:16,19,24 98:6
98:16,21 99:1,2,7
107:11 108:22
109:5,22,25 110:2
110:11,15,17,22
110:24 120:6
122:21,23 123:7
123:13,19
**committee's** 26:3
**committees** 13:2
  18:21,22 99:18
**commonly** 124:17
**comp** 48:15
**companies** 9:9
  30:19 122:15,19
  122:20,25 123:3,5
  123:13,15
**company** 1:7 2:7
  5:11 9:5,5 10:21
  10:24,25 11:19,20
  11:24 12:17,18,20
  14:14 31:25 32:3
  32:4 34:14,16,19
  37:7,9 44:19,21
  46:1,11 49:13,16
  49:18 51:3 52:15
  55:20 57:8 60:7,8
  61:4,10 63:4
  66:23 67:23 70:12
  70:18,22,25 74:17
  74:21 76:2 77:24
  77:25 79:7 81:4
  83:2 84:22 85:10
  85:21 86:1 89:11
  89:13 92:22
  101:24 104:4,7,24
  106:2,25 107:18
  110:7 111:19,20
  111:23 112:21,22
  113:11 116:19

118:15 120:10,11
120:16,18 121:13
121:21,24
**company's** 20:2
  49:22 89:15
  120:24 121:3
  122:22
**comparable**
  122:15,20,25
  123:3,5,12,15,19
  123:23
**compared** 26:12
  53:18 74:12
  122:25
**compensated** 44:5
  104:3 107:13
  108:6 109:23
**compensation**
  8:23 9:1,2,8,9,11
  9:16,17,18,23 10:5
  10:8,10,13 11:14
  12:4,5,10,12 13:1
  13:5,10,14 14:17
  14:22,24 15:6,20
  16:5,16 18:25
  19:4,11,24 21:2
  24:19,22 28:23
  30:25 31:1,5,14
  32:24 33:5,19,22
  34:4 35:4,5,10,16
  35:20,24 37:16,19
  42:23 43:1,2
  45:22,23,24 48:20
  49:23 51:25 52:3
  53:1,1,11,16 54:1
  54:21,24 55:1,7
  56:10,12 57:20,21
  58:2,3,10,21 59:6
  60:4,13,19 61:2,7
  61:10,12 62:14
  63:2 64:1,21

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
132 of 154

65:11,18 66:1,9,15
66:20,24 67:9,15
67:20 68:1,6,16,22
69:5,7,12 70:5
72:9,16,19,25 73:3
73:10,12,22 74:2
74:14 75:1,6,10,16
75:18,24 76:1,10
76:14,17 77:4,15
77:21,22 78:4,7,12
78:14 79:9,11
88:24 89:5,9 90:4
91:3,20,23,24
93:11,13 97:16,19
97:24 98:6,7,16,21
98:25 99:2 103:25
107:11,16,20,24
108:1,3,8,12,22
109:5,22,25 110:2
110:6,8,9,11,15,16
110:22,24 111:15
113:10 120:5
122:18,21,23
123:7,13,18 124:4
124:10,11
**competencies**
47:22
**competitive** 115:2
**complain** 97:7
**complaint** 97:12
**complaints** 93:19
94:7,10 95:13,16
96:13,14,24 97:9
**completing** 36:20
**completion** 126:14
**compliance** 7:18
43:20 85:16
**component** 22:10
27:9 56:9 104:5
124:12

**components** 25:11
60:15
**compound** 109:12
**comprised** 14:1
**comprises** 23:11
**compromised**
87:23
**conceive** 80:13
**concerned** 56:12
**concerns** 43:19,23
44:1 85:14
**concurrently** 9:12
9:14,19 18:21,22
**condition** 55:20
**conditions** 5:17,19
72:24 73:7
**conduct** 64:15
75:20
**conducted** 54:1,21
54:25 71:9,20
**conductor** 36:10
36:21
**conductors** 39:1
**confidential** 83:14
83:16 86:6,8
99:15
**confidentiality**
99:11,16
**confirm** 7:23
**confirmed** 25:6
**conflict** 99:2
**confused** 103:2
109:18
**connection** 43:24
44:10 107:15
**consider** 37:5
42:23 43:3 67:9
68:6 72:9,25 93:1
99:21 102:14,22
103:4 109:6,22
110:11,21 122:15

**considerable**
52:12
**consideration** 60:1
60:11 70:6 74:14
**considerations**
111:1 124:25
**considered** 51:19
66:21 67:23 89:16
93:4,6 108:23
109:11
**considering** 50:13
59:17,21,24 67:8
73:6 124:18,22,24
**considers** 47:21
**consist** 124:10
**consistent** 18:3,6
26:22 27:14,15
99:19 100:1
112:21 123:4,16
**consultant** 24:19
24:20
**consulting** 6:18
**consumer** 93:18
**contain** 20:14,18
20:21 43:5,13
44:4
**contains** 22:19
26:10
**contemporaneous**
102:11
**continue** 73:24
**continued** 4:1
114:10,21 115:4
**continuing** 94:21
**continuous** 43:22
**contractor** 87:15
**contractor's** 95:6
**contractors** 28:12
69:22
**contribute** 80:4

**contributed** 61:14
75:15 77:18 98:23
**contributing** 69:8
**contribution**
62:18 64:10
**contributions** 63:6
**control** 117:12
**controller** 8:4,5,6
8:8
**conversation**
79:13 86:25 124:8
**conversations**
78:3 79:11 92:9
99:6
**conviction** 82:7
**convoluted** 76:24
**corp** 9:5
**corporate** 118:17
**corporation** 1:5
2:5 12:24 14:23
**correct** 12:24
30:15 39:23 40:1
40:23 41:1 48:22
52:20 64:6 74:24
79:24 89:20
103:17 116:22
**corrected** 5:10 7:7
**correction** 42:13
**corrective** 42:16
**correctly** 29:13
**correspondence**
86:7
**corrosion** 87:24
**counsel** 6:15 24:25
25:2 60:25 63:11
96:10 99:18
**counterpart** 118:2
118:2
**couple** 30:13
50:25 101:13

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
133 of 154

court 1:1 2:1 57:1
  98:17 99:25
covered 107:8
cpuc 94:7,10
crawford 2:16
create 60:21
created 61:3
creating 42:24
  69:6
creditors 3:18
  6:15,19
criminal 119:6
critical 42:17
cross 87:19
csr 1:23 126:25
culture 85:13
  100:10,17
customer 40:8
  86:2,2 93:21,23
  94:2,4,7,16,17,19
  94:21 95:3,5,8,12
  96:13,14,18,19
  97:5 120:14,17,25
  121:6
customers 84:10
  94:1,9,25 95:7
  96:20 97:7,9,15
  115:25 116:15
cwoltering 3:8

          d

daily 116:16
daniel 3:19
dash 20:9,9
data 14:25
date 12:11 29:22
  31:7 53:8,20
  112:11 126:19
dated 5:13 68:3
  72:6,18 126:22
dates 7:16,20

david 3:12
david.singh 3:15
day 115:25 124:25
  124:25
ddenny 3:22
deal 62:10 73:7
dealing 17:19
  38:14 64:1 69:21
  84:12
deals 41:19,23
  42:3,14,16
dealt 61:22 95:2
deaths 52:23
debtor's 115:4
  119:14
debtors 1:8 2:8
  3:10,10 7:8,11,18
  15:9 29:7,10,11
  30:5,20 31:17
  54:2,22 55:19,22
  57:5 79:22,24
  114:10,21
decade 80:2
december 15:16
  15:18 69:19
decided 33:14
  94:10
decides 50:16
decision 10:11
  33:18,21,21,22
  34:11 37:14,17,18
  44:24 47:16,17
  49:17,19 55:25
  56:8,15,20 57:14
  58:10,12 59:7
  67:10,11 112:3
declaration 5:10
  7:5,7,14 9:15,22
  11:5 15:3,5 17:17
  25:22 26:1,7
  28:22,25 29:4

32:23 39:20 51:10
  53:25 54:19 55:15
  59:19,20,21 79:16
  88:10 114:8
  119:12 120:1
dedicated 6:21
default 110:1
deferring 102:23
delaying 70:6
delegated 48:20
  58:20
deliberations 79:4
deliver 114:10,21
  115:5
delivered 116:19
denied 37:20
denny 3:19 6:17
  6:25 125:16
department 9:2,3
  36:4 71:17 111:8
  111:10
department's
  118:8
deposition 1:14
  2:14 55:9 126:13
described 26:18
  44:6
description 20:21
design 80:11 81:4
  81:12 88:17 90:7
  102:18 110:18
designate 99:19,25
designated 38:21
  51:11,13 99:15
designed 15:8 38:3
  40:5 49:21 53:5
  61:18 62:8,23
  67:23 69:3 82:20
  85:9 96:22 103:16
  115:3

designing 24:10
  24:20 51:16
destructive 68:5
details 27:3 42:10
  77:22
deterioration 29:6
  31:17 55:19 56:18
  56:19
determination
  67:16
determine 28:12
  48:1 68:5 74:11
  77:16 78:13
  107:12 118:8
  119:21 120:6
determined 28:5
  46:13 51:7 58:1
  93:23 94:3,5
  95:12 103:7
  120:24
determines 44:22
  49:22
devastating
  115:14 116:18
developed 15:17
  122:3,18 125:5
developing 111:1
  125:2
development 8:22
  15:10 26:4
dick 12:14
differ 23:13 26:16
difference 57:17
  123:25
differences 21:12
  21:15 47:24
different 21:19
  23:11 26:12 27:1
  27:6,25 42:9
  56:24 57:4 91:4
  93:21 96:17

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
134 of 154

108:14
**differently** 38:18
**differs** 27:20
**difficult** 55:25
  56:8
**dinyar** 1:14 2:14
  5:3,10 6:4,11
**direct** 39:18 111:9
  111:12
**direction** 111:6
  126:10
**directly** 42:5
  111:22 117:4,8
  118:18
**director** 11:13,18
**directors** 12:15,19
  13:2 29:7,16
  30:18,24 32:14,25
  33:11,14 58:14,25
  97:17 98:15,20
  99:2 117:5
**disclosing** 71:12
**discretion** 29:9
  30:22 48:16 49:24
  50:4,7,9,12 55:21
  73:23,25 74:5
  75:7,11,17,19,22
  78:12,14 98:7,13
  101:25
**discuss** 13:20
  16:15,19 48:19
  55:8 60:20,24
  61:2,12 62:15
  64:8,21 65:11,19
  66:2,9,15 67:15
  69:5 70:5 73:11
  85:12 92:10 93:10
  93:15 97:17
**discussed** 24:23
  29:18 39:11 51:25
  60:13 68:1 70:8

75:23 89:9 91:7
  91:11,15,16 92:2
  93:12,14 100:9
  103:8 122:21,22
  123:6
**discussing** 16:4
  48:15,23 65:7
  91:24 98:1 99:11
**discussion** 10:11
  16:7 17:25 24:2,7
  33:8 52:3 53:11
  60:4 61:8 63:2
  64:16 98:25
  120:21 122:24
  123:12,14
**discussions** 24:6
  64:4,6 72:15
  90:17 92:2 99:8
  125:1
**dispersed** 101:24
**dissatisfying** 97:6
**distribution** 36:9
  36:10,11 39:13
  116:15
**district** 1:2 2:2
**dividends** 42:20
**division** 118:8
**dm** 1:6 2:6
**document** 68:6
  83:23 86:6,9
**documents** 110:25
**doing** 78:18 96:3
**dollar** 22:10,14
  44:24 101:4,5
  102:5
**dollars** 46:6 101:9
**doug** 59:12
**dozen** 117:23
**drafts** 110:23
  111:3,4

**drive** 89:18,22
**driven** 36:19
**dual** 11:25
**due** 36:22 111:14
  111:19 119:6
**duration** 42:2
**duties** 8:20,21,25
  118:23

### e

**e** 5:12,14 11:16
  83:9,25 84:14,17
  84:23 85:4,6 86:7
**earlier** 18:23
  56:20 59:5 100:9
**earning** 113:10
**earnings** 46:3
**easier** 99:23
**east** 3:6,20
**easy** 63:23
**effective** 82:25
**effectively** 79:22
**efficiency** 79:24
**either** 18:8
**electric** 1:7 2:7
  11:20 20:2 28:9
  36:8,9,10 82:21
  88:19 114:11,22
  115:5,9,13,18,23
  116:9,14,16,19
  118:2
**electrical** 42:21
  52:24 88:2
**eligible** 46:3 49:2
  49:5 79:21 105:12
  105:15 107:20
  108:5,16 109:23
  110:12 117:5,9,13
  118:9,12 119:5,12
**emerge** 121:13
**emerged** 79:13

**emphasis** 121:14
**employed** 11:23
  67:3,5 70:17
**employee** 8:21,22
  44:5,25 45:19
  46:22,23 47:2,22
  48:2,24 56:10,13
  57:21 58:11 59:22
  59:24 61:13,21
  62:9,12,17 63:19
  64:15 84:3,6,18
  85:19 86:21 87:15
  89:4 91:3 98:11
  101:6 103:13
  104:2,8,12,15,22
  108:2,10,11,15
  109:3 113:23
  114:4 118:5 124:1
  124:1,6,14 125:3,3
  126:17
**employee's** 47:18
  47:19,20,21,22
  48:4,9 50:20
  56:10 69:6,7
  103:24
**employees** 14:15
  21:8 28:11 29:10
  30:20 33:6,17,19
  33:23,24 34:12
  35:6,12 42:17
  43:6,7,14,15,19,23
  43:25 44:14,20
  47:3,6,8 48:18
  49:5,7 50:17,24
  51:5 52:11,22
  55:22 58:12,15
  61:19,20 62:3,3,17
  62:22,23 63:5
  64:10 70:7,11,16
  70:20,24 71:1,6,24
  72:2 73:22 74:2

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
135 of 154

74:18 75:8,12,15
75:20 76:2,7,19
77:6,16 78:8
79:21 83:1,10
84:14,22 85:14,22
85:23 87:4,5
89:18 92:16 94:15
98:22 99:4 104:6
104:17 105:16
106:3,4 107:6,13
107:20 108:1,5,11
109:6,23 110:1,3,5
110:9,12 112:20
113:9,15,20 115:3
118:9,9,12,16,18
118:22 119:5
124:5,9,12
**employer** 103:17
**encourage** 87:5
100:12,13,18
**engage** 124:24
**engaged** 52:11
104:2,6 106:3
113:21,23 114:4
**engagement** 8:22
56:11,13 106:5
111:22
**enhanced** 17:19
23:15 26:10,15
27:11 38:14,21
**ensure** 15:7
**entering** 57:8
**enterprise** 40:5
**entire** 104:18
108:10
**entitled** 68:4
**environment** 97:4
**equal** 107:21
109:6
**equally** 23:14
38:13

**equipment** 52:24
61:4 68:18,25
76:20
**equity** 21:24
**escalate** 94:9
97:13
**escalated** 94:6
95:12 96:13
**established** 10:18
14:7
**estimate** 101:21
118:25
**ethics** 43:20 85:16
**evaluating** 122:11
**evaluation** 47:20
54:1,21,24 92:16
92:17
**event** 61:23 62:11
86:19,25 87:2
**events** 57:24,25
63:19 86:17
**evolved** 90:8
**ex** 13:4
**exact** 96:21
**exactly** 31:20
**examination** 5:2
6:8 100:7
**examined** 6:5
**example** 46:5 86:5
86:19 105:22
**excavate** 69:22
**exceeded** 36:16
**excel** 86:9
**exclude** 24:5
**excludes** 118:14
**excuse** 112:7
**executing** 87:17
**executive** 16:12,13
16:15,20 19:19
21:7 33:7,20 34:5
117:21,25

**executives** 117:24
**exempt** 26:16
**exercise** 30:21
55:20 75:7 98:22
**exercised** 29:9
**exercises** 117:12
**exhibit** 5:10,11,12
5:13,14,15,17,18
7:6,7 9:22 14:22
15:3 20:1,2,7,12
22:19,22 25:9,24
27:21 29:1 38:8
45:8 68:3,3 69:16
72:5,11,22 79:16
83:6,7 86:6 114:8
**exhibits** 5:9 7:3
**exist** 90:1,2
**existence** 26:25
**existing** 15:11
26:5 54:2,22
**exists** 122:12
**expect** 89:8
**experience** 108:13
**expert** 107:7
**expertise** 80:24
81:3 108:12
**explain** 31:3,19
33:3 49:1 57:19
58:8 89:2 117:17
119:24 123:25
**explanation** 20:24
**explosion** 64:22
65:8,12 66:4 80:5
80:23 82:10
**extent** 16:9 27:5,7
27:19 37:3
**eyes** 99:21 100:1

**f**

**fa** 6:18
**faces** 112:22

**facility** 57:1
**facing** 106:2
111:20 119:6
**factor** 23:5 42:1
**factors** 78:13
88:10
**facts** 98:1
**fail** 52:22 113:15
**failed** 76:19 77:16
84:9,19 87:12,21
**failing** 84:25 88:1
98:22 99:3
**fair** 61:13 113:9
113:10
**fairly** 44:9 104:3
**falling** 88:2
**falsification** 69:21
70:21
**falsified** 70:7 72:3
**falsifying** 43:8,16
**familiar** 27:13
57:2
**fatalities** 41:5
42:13,15
**fault** 76:7
**feature** 106:4
**february** 18:17
35:25 36:1,2
83:25
**federal** 43:21
85:17 126:13
**feel** 92:21 106:1,3
113:21
**feels** 104:2,3
**fell** 122:25
**felt** 31:25 32:1
56:14 120:15
**fewer** 96:13
**fifth** 3:13
**figures** 35:17

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
136 of 154

| | | | |
|---|---|---|---|
| **file** 30:5 43:6,14 | 112:16 | 73:15 76:4,21 | **future** 87:7 |
| 57:15 99:24 | **firm** 25:4 | 77:8,19 78:9,20 | **g** |
| **filed** 7:8 26:20 | **first** 7:6 8:12,16 | 80:6,20 81:10 | **gas** 1:7 2:7 11:20 |
| 27:2,12,16 30:15 | 41:4,22 52:16 | 82:17 85:2,7 88:5 | 20:1 64:22 65:12 |
| 30:16,17 71:21 | 53:2 67:4 78:24 | 88:15,25 90:23 | 65:21 66:4 69:21 |
| 111:6 | 79:1,3 82:4 84:1 | 92:13 95:17 96:16 | 70:4 72:3 80:5,18 |
| **filing** 17:1 18:7 | 84:12 109:14 | 97:20 99:5 100:15 | 80:23,24 81:13,16 |
| 57:3,12 111:16 | **fix** 42:20 | 102:16,25 103:18 | 81:23,23 82:7,21 |
| **filings** 18:3 | **flat** 87:19,20 | 104:20 105:18 | 88:19 114:11,22 |
| **finalizing** 103:6 | **floor** 3:20 | 106:9,19 107:23 | 115:5,9,13,18,24 |
| **financial** 15:9 | **focus** 33:24 90:11 | 108:18,24 109:8 | 116:9,14,16,20 |
| 23:23 24:14 29:7 | **focused** 27:10 40:5 | 109:13 111:17 | 118:3 |
| 31:18,24 32:2,4,5 | 65:1 114:5 | 112:4,17 113:4,17 | **geisha** 8:13 |
| 39:23,25 40:8,15 | **focusing** 115:22 | 114:1 115:10,20 | **general** 5:11 8:24 |
| 40:20 55:20 56:18 | **folks** 91:23 | 116:11 117:15 | 20:2 103:20 |
| 56:20 57:5 86:1 | **follow** 34:11 | 118:20 119:23 | 107:15,25 122:24 |
| 100:14,23 103:10 | 123:21 | **former** 28:2 | 123:17,22 |
| 120:14,18,24 | **followed** 45:6 | **formulating** 54:3 | **generally** 48:4,8 |
| 121:4,6 | **following** 20:20 | 54:23 106:13 | 73:9 80:9 |
| **financially** 100:13 | **follows** 6:6 | **forth** 23:20 25:8 | **getting** 25:20,21 |
| 121:12,24 126:16 | **forego** 29:9,16 | 67:11 126:5 | 110:21 |
| **financials** 121:14 | 30:19,22 33:11,14 | **forums** 85:11 | **gift** 101:5,12 |
| **financing** 57:1 | 33:18,23 55:21 | **forward** 15:19 | **give** 7:16 31:13 |
| **find** 37:5 106:21 | 57:11 58:15 59:3 | 61:17 | 49:13 84:3 86:5 |
| **finding** 65:20 66:3 | 59:7 | **found** 62:9 | 86:19 95:15 |
| 76:6 80:17 81:8 | **foregoing** 32:15 | **four** 12:15 13:2 | 101:25 102:1 |
| **findings** 62:21 | 34:1 126:4,6,10,12 | 33:19,24 34:12 | **given** 44:23 101:1 |
| **fine** 76:15 96:3 | **forest** 12:13 | **fourth** 36:23 | 101:19 106:1 |
| **finish** 54:11 116:6 | **form** 10:16 13:23 | **frame** 15:16,19 | 126:11 |
| **fire** 5:13 23:16,18 | 16:17 22:12 25:10 | 68:9 | **go** 13:24 19:20 |
| 38:21 52:6 61:3 | 28:6,19 33:1 34:9 | **francisco** 1:15 | 22:21 26:2 48:6 |
| 66:10 68:4,5,18,24 | 40:2,17 41:9,14 | 2:17 3:6 6:1 | 63:10 71:17 72:22 |
| 68:24 84:2 87:13 | 43:9,17 44:7 50:3 | **friske** 59:12,15 | 77:13 79:15 86:5 |
| 88:3 118:19 | 50:10 53:3,14 | **fti** 6:18,23 | 90:20 91:11 92:20 |
| **fire's** 67:16 | 55:24 58:6,17 | **full** 50:4,6,12 | 101:16 107:24 |
| **fires** 32:10 61:14 | 60:14 61:16 62:5 | 58:25 75:16,18,21 | 109:2 110:6 |
| 62:18 63:6 66:17 | 62:20 63:8,15 | 78:12 98:13 | **goals** 44:20 46:10 |
| 67:17 68:19 69:8 | 64:12,23 65:5,22 | **function** 117:25 | 47:21 83:1 85:24 |
| 75:15 76:3,20 | 66:5,11,18 67:18 | **further** 38:18 | 85:24,25 104:23 |
| 77:6,18 82:16 | 68:7,12,20 69:10 | 126:12,16 | 104:24 106:8,17 |
| 90:21 98:23 | 70:9 71:3 72:12 | | 112:21,21 |

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
137 of 154

**goes** 41:4 74:13
110:24
**going** 7:3,5 15:3
18:9 20:4 21:14
26:2 45:19 50:20
57:19 71:11,14
73:6,13 77:2,7
84:3 95:15 96:7
97:20 99:19,25
104:3 108:14
116:6,13
**good** 7:2 13:7
39:10 44:15,19
51:9,19 54:7
72:20 104:4
**gotshal** 3:11
**governance** 19:14
19:23 33:4 58:9
58:22
**grasping** 87:19
**greater** 84:11
**group** 49:4 71:20
79:10 91:20 93:13
124:5,9
**groups** 96:20
110:4,8
**guess** 75:22 78:11
103:2 119:19
**guidepost** 71:20
**guides** 50:9

**h**

**happen** 17:13
80:14 82:25
**happened** 35:17
55:23 73:17 81:2
**happening** 84:9
**hard** 106:21
120:20
**hardened** 38:24
**hardening** 17:20
23:15 26:11 38:15

38:19,20 39:11
42:6
**hardware** 87:20
87:22
**harm** 85:5
**head** 112:1
**health** 120:18
**healthy** 121:12,24
**hear** 31:10
**heard** 24:18 73:12
98:15,20 111:20
**hearing** 99:22
**heavily** 120:25
**held** 8:5
**help** 34:20 43:20
43:20 60:16 85:17
85:17
**helped** 106:4
**helpful** 76:15
**hey** 68:17 84:24
**high** 23:16,18 84:8
84:10,20 85:1
101:16
**higher** 24:13 61:6
101:16 107:21
109:7
**highlighted** 87:10
**historic** 10:21,24
10:25 11:3 92:15
**historically** 78:14
120:13 124:18
**hit** 5:14 86:11,12
86:12,19,22,24
87:1,7,9,10 89:4,6
**hits** 52:15 86:16
86:17 87:4,6
88:24
**hold** 39:5
**holding** 9:5 11:24
12:17,18,20
102:14,22

**honestly** 34:6,7
**hook** 87:20,22
88:1,6
**hooks** 39:5
**hr** 7:24 8:9,11,20
8:24 9:3 79:10
84:12 91:20 102:1
102:7 104:4 107:6
111:8,10 112:1
**human** 85:18
118:1
**hundred** 46:6
52:23
**hypothetical**
78:22 113:19
114:3

**i**

**i.e.** 45:19
**idea** 64:8 79:1,13
87:8 90:9,15
**identify** 26:7
83:11
**ii** 17:18 39:20
**ili** 41:22 82:5
**illustrative** 83:23
**imagine** 90:8
**immediate** 95:1
**impact** 56:13
88:24 111:21
**impacting** 69:13
**implemented**
122:2
**importance** 66:21
81:15 121:5
**important** 27:9
40:6 42:4,7 74:1
80:9 82:21,23
85:13,25 88:18
112:22 113:11
120:10,16,17
121:4,7,8,14,16,24

**impose** 73:14
**imposing** 73:6
**improve** 44:19
83:2
**improvement**
43:22
**incentive** 7:9,12
13:25 22:1,6,7,8
34:25 45:22,23
48:3 53:1 57:20
59:17,25 75:11
79:19,23 80:4,8
82:15 84:21 88:11
88:13 91:3 103:23
105:15 113:7,9
117:14 122:15,20
124:1,4,6,11 125:3
**incentives** 44:5
83:1 100:14
**incentivize** 43:6
43:14 44:14 61:18
84:22 85:4 112:15
112:20 113:1
115:3
**incentivized**
104:17,22
**include** 8:5,21
13:21 118:15
**included** 112:23
**including** 43:19
62:11
**incorporate** 81:4
**incorporated**
51:21
**increase** 61:4
91:13 92:5 105:16
105:21
**increased** 105:21
**independent** 12:19
12:22 13:2 15:22
28:12 95:6 97:18

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page 138 of 154

97:24 98:2
**independently**
  72:1
**index** 5:1 17:19
  23:8,12 26:9,13
  36:16 38:5,10
  39:17,19 42:2,13
**indicators** 41:19
**individual** 14:6,15
  44:25 45:24,25
  46:5,9,12,14,25
  47:25 49:1,3,5,8,9
  74:18 77:22 78:3
  78:16 85:11,22,23
  89:13,17,21 90:11
  90:25 92:19,24
  93:7 101:17
  108:11,11,14
  109:3 110:1,3,4
  118:23 122:22
  125:6
**individual's** 46:2,4
  46:10 89:14 91:1
  92:3,11
**individually** 89:10
**individuals** 85:10
  85:12 90:12,20
  91:11
**industry** 37:4
  123:16
**influenced** 121:2
**inform** 6:15
**information** 67:21
  99:13,14
**informed** 6:17
  11:11 24:12 66:22
  83:19 95:10
**infrared** 36:9,20
**initiated** 79:5
  90:16

**injuries** 41:5
  42:12,15
**inline** 81:16,24
**input** 37:6 51:17
  51:17
**insider** 119:9
**insiders** 119:11,13
  119:18,20 124:7
**inspected** 81:16
**inspection** 36:20
  81:16,24
**inspections** 36:10
**instance** 58:13
  101:7
**instances** 88:20,21
**instituting** 5:15
  69:19
**instruct** 71:11,14
**insulators** 39:3,5
**integral** 56:9
**intended** 44:18
**intent** 55:2
**intentional** 81:8
**interact** 10:8
**interactions** 96:23
  96:25
**interested** 126:17
**interests** 79:21
  113:11
**interim** 30:14
  99:22,25
**internal** 7:17 8:7
  12:23 35:20 74:13
  74:16 75:4
**internally** 19:23
**international** 4:8
**internet** 14:25
**investigate** 76:2
  76:18,19 77:5
**investigation** 5:15
  66:3 69:20 70:3

71:6,7,9,15,19
**investigations**
  76:7
**investigators** 68:4
**invoking** 44:5
**involved** 14:18,20
  16:1,3,4,7 27:8
  28:3 68:25 70:11
  70:17,20 71:1
  83:20
**involves** 73:9
**issue** 60:7 61:21
  69:24 70:1,2,3
  71:2,18 74:9
  83:19 84:7 85:19
**issues** 56:22 70:14
  85:11,12,14
**items** 26:10

## j

**j** 4:7 87:20,21,21
**january** 9:25 12:5
  16:25 19:3 29:23
  29:25 72:23
**jessica** 3:12
**jessica.liou** 3:16
**job** 1:24 8:12
  84:12 113:24
  114:5,5 118:23
**jodi** 1:22 2:19
  126:24
**john** 8:12,14,16
  11:16 29:21 125:7
  125:8
**joseph** 2:16
**judge** 42:18 43:3
  67:9 72:5,10,23
  73:5,13
**judgment** 51:20
  61:20 90:11 106:4
  113:8

**julian** 3:4 5:6 6:9
  6:14,24 7:1 14:3
  16:22 20:10,11
  22:16 24:16 25:14
  28:10,21 33:9
  34:13 38:9 40:10
  40:21 41:12,17
  43:11 44:2,12
  45:7 50:8,15
  53:10,23 54:7,11
  54:15,18 55:11,13
  56:3 58:23 60:18
  61:25 62:13,25
  63:9,20 64:17,20
  65:3,10,25 66:8,14
  67:2 68:2,11,15
  69:4,15 70:15
  71:8,25 72:17
  74:3 76:9,23
  77:12 78:1,17,23
  80:15 81:6,20
  83:5,13,19,22 85:3
  86:4 88:8,23 89:3
  91:5 92:25 95:20
  96:7,9 97:1 98:3
  99:9 100:3 108:21
  125:13,18
**julie** 4:4 6:20
**jury** 81:8
**jury's** 65:20 66:2
  80:17 82:7

## k

**k** 87:25
**karotkin** 54:16
  68:9 119:10
**keep** 52:11,25
  92:22 93:7 110:20
  110:25 120:17,18
**kelly** 12:14
**kept** 92:19

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
139 of 154

kevin 83:14
key 58:12 59:21
59:24 79:20 80:1
88:13 124:1,1,5,13
124:14 125:2,3
kim 4:4 6:17
kind 38:23 73:12
knew 84:18
know 9:19 10:2
11:4,10 13:6
14:22 15:1 16:19
16:20 27:3,4,22,23
28:11,16 30:23
32:11,14,20 36:6
37:2,19,22,23 38:1
39:4,7,9,14 42:25
51:5 54:4,5 55:23
57:25 58:13,24
59:4,13 63:15
67:14 70:16,19,25
71:1,5,13,17 72:4
78:13,22 79:12
85:20 86:12,14
96:4,21 98:18
99:13,15,22 101:3
101:20,22 102:4,5
108:13,20 109:12
109:14,16 112:10
113:6 118:22
119:2,4,8 122:7,17
123:10
knowing 80:18
knowingly 65:20
knowledge 15:25
27:5,7 32:11 60:2
68:23 76:11 80:10
88:18 106:7,17
107:17 111:2,5,14
known 42:1

**l**

l 1:22 2:19 11:16
126:24
labor 8:23
laid 86:1 119:14
land 69:22
large 115:12,23
116:14
largely 118:12,13
larger 101:9
lattice 87:16
law 3:5,13,20 25:4
laws 65:21 67:17
lawsuits 99:7
lawyers 24:7,8
layman's 34:24
45:15 46:3
leader 47:20 81:3
81:14 106:13
leaders 51:3 56:1
59:22 106:23
119:15 120:9
learn 81:1 86:17
learned 80:22
121:2 124:13,13
learning 85:5 87:2
90:8
leaving 111:23
led 88:2
left 111:14,19
112:9
leg 87:21
legal 71:13,15,17
letting 16:20
level 46:1 52:4
53:12 60:5,13
63:3 77:22 109:3
110:10,12
levels 24:3
liabilities 32:6

light 29:5 31:16,23
55:18 57:25 88:9
likelihood 84:9,18
limited 50:20
lincoln 4:8
line 6:21,21,22
21:8 22:20 25:21
26:17,24 28:14
29:1 32:23 35:6
38:7 43:20,20,21
45:12 50:24 55:15
58:15 75:8 79:18
82:4 84:2,19,25
85:17,17 87:11,12
87:17 88:1,7,12
106:12 114:16
123:4
lines 9:22 15:4
39:12,13,13 45:13
54:19 69:22 91:21
91:21 114:9,11,17
linking 79:22
liou 3:12
liquidity 32:7
56:23
list 110:20 120:1
listen 6:21
listening 6:16
little 32:22 109:18
115:21
live 84:7
llp 2:16 3:11
locate 70:4,13
location 69:21
long 10:24 14:17
22:1,5,8 105:15
longer 70:12,17,21
70:24 83:15 86:8
104:17 105:6
look 15:21 40:5
42:10 68:3 69:16

74:17 83:6 108:10
114:8
looked 74:22
78:15 123:2
looking 54:16
61:17 110:7
looks 84:21 108:9
125:17
los 3:21
loss 32:6 57:14
lot 79:10
lowe 11:16 125:7,8
lower 95:15
ltip 22:1

**m**

machine 126:8
mail 5:14 83:9,25
84:17,23 85:4,6
86:7
mails 5:12 84:14
main 55:10
maintain 111:4
maintaining 42:17
majority 33:17
making 73:18
management
15:15 17:20 23:15
23:16,18 26:11,15
26:17,21,24 27:9
27:10,12,16 28:14
29:15,18 31:25
36:12,21 38:14,22
42:6 48:21 50:24
67:10 80:23 84:24
112:15 113:1
117:17
management's
29:8
managerial
117:12

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page 140 of 154

manges 3:11
manner 116:17
march 1:16 2:18
  6:1 72:7,10,18,21
  126:22
mark 70:4,13
marked 7:2 83:14
market 103:25
  107:13,22 108:2,3
  108:7,17 109:7,24
  110:13 111:15,24
material 15:21
  29:6 31:17 55:19
  56:19 110:15,16
  110:20
materials 99:24
  110:23
matter 61:22
  71:12
matters 10:10
  16:4 40:6
maximum 14:9
  52:17
mean 30:17 35:12
  36:4,5 37:2 58:2
  77:10 82:24
  101:10 103:3
  110:23 111:8
  112:5 113:6 120:9
meaning 12:22
means 13:6 34:24
meant 31:19,22,23
measure 53:20,21
  93:21
measures 38:20
  44:21 55:2 60:9
  82:22 83:3
mechanism 43:23
  43:25 92:4 99:23
mechanisms 85:15

median 108:3
meet 9:12,14,19
  18:21,22
meeting 16:6,8
  18:1 24:23 31:2,5
  51:25 53:19 59:1
  59:6 64:4 65:12
  65:18 66:1 123:7
  123:13
meetings 13:7,8
  16:5 43:2 60:20
  64:1 68:16,23
  97:16
member 9:4 10:5
  13:4 59:1 93:15
members 12:10,12
  13:1 97:23,25
  99:1
memory 98:19
ment 27:11
mentioned 59:5
met 12:11 52:25
  72:19 75:3 103:9
methodologies
  81:17
metric 14:6 18:1,3
  23:13,17,23 26:15
  27:23 28:1,2
  40:23 43:6,14
  44:4 61:5 63:3
  69:6 81:21 82:6,9
  82:12 90:10 93:17
  94:11 95:2 97:6
  116:25
metrics 9:25 10:17
  13:18,21 14:1,2
  15:11,11,16,18
  16:24 17:9,16,18
  19:4 20:14,18
  21:19 22:25 23:1
  23:9 24:15 26:5,5

26:6,7,8 35:19,21
  37:3 38:3 39:12
  39:23 44:4,9,14,18
  49:21 52:15,16,25
  61:8,11 62:2,16
  65:1 75:3,5 80:11
  80:16,25 81:7,12
  81:17 89:10,12
  93:24 99:4 103:9
  110:19 119:22
  120:4,7 121:25
  122:5,9,11
milbank 3:19 6:20
  6:23
milbank.com 3:22
milbanks 6:22
miles 28:1 38:20
  41:4,22 82:5
miller 12:13
million 25:19
millions 115:24
  116:15
mind 15:9 22:15
  56:8 57:18 66:25
  120:18,19
minutes 10:4 31:3
missed 12:3
misspoke 20:10
misstates 115:19
mistry 1:14 2:14
  5:3,10 6:4,11,12
  7:2 20:6 79:15
mitigate 60:16
  69:3 113:24
mitigation 26:18
  26:20,25 27:1
  28:14 38:3,17
  39:16 40:16 41:8
  41:20,24 42:3,14
  52:23 61:5 66:21
  73:8,13

modified 5:17,19
  70:13 72:24
modifier 47:18
modifiers 46:15
moment 91:10
  102:10
monetary 14:11
  100:25 101:1
money 42:20
monitor 43:21
  85:17
montali's 67:9
month 35:23
  52:19 53:8,21
months 52:16,18
  53:2
morale 56:11
morning 7:2
mortality 26:18,24
  28:14
motion 7:8 30:5
motivate 115:3
motivated 92:23
moving 86:25
multiplier 46:9,25
  47:9,18,25 49:2,4
  49:6,8,9 50:23
  51:1 89:14,17,21
  92:20 93:7
multiply 46:11
murphy 4:7

## n

name 6:10,11
  11:16 36:5 81:14
  126:20
named 71:6,24
  72:2
natural 54:5,9
nbf 5:12 83:13
  86:9

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page 141 of 154

| | | | |
|---|---|---|---|
| **near** 5:14 15:8 54:6 86:11,12,12 86:16,17,19,24 87:4,5,9,10 88:24 89:4,5 | 77:7 78:9 97:20 97:21 109:13 115:19 116:11 | **occurred** 31:24 57:12,24 69:13 86:18,20 87:1 | **operations** 8:24 28:9 36:8 117:13 118:2 |
| **necessary** 24:6 112:15 113:1,7 114:10,20 115:4 | **objection** 16:17 22:12 25:10 28:6 28:19 33:1 34:9 40:2,17 41:9,14 43:9,17 44:7 50:3 50:10 53:3,14 58:6,17 60:14 61:16 62:5,20 64:12,23 65:5,22 66:5,11,18 67:18 68:7,20 69:9 70:9 71:3 72:12 73:15 76:4,21 77:19 78:20 80:6,20 81:10 82:17 85:2 85:7 88:5,15,25 90:23 92:13 95:17 96:16 99:5 100:15 102:16,25 103:18 104:20 105:18 106:9,19 107:23 108:18,24 109:8 111:17 112:4,17 113:4,17 114:1 115:10 117:15 118:20 119:23 | **occurrence** 82:24 | **opinion** 40:11,14 112:25 115:8 |
| **need** 48:19 104:12 121:12 | | **occurring** 76:8 | **opportunity** 84:13 |
| **needs** 19:17,20,23 | | **october** 18:14 36:24 | **opposed** 79:7 97:10 |
| **negligence** 62:4 | | **officer** 11:25 106:11 117:21 | **order** 5:15,16,17 5:18 42:18,22,24 69:19,20 70:8 72:23,25 73:5 84:11 121:22 |
| **neither** 126:16 | | **officers** 12:22 19:19 21:7 33:7 33:20 34:2,3,5 118:14 | |
| **new** 3:14,14 15:10 26:4,7 27:23,24 28:1 38:13 73:6 80:23 81:3,14 | | | **orderly** 57:7 |
| **news** 5:13 | | **official** 3:3,18 | **orders** 43:3 72:6 |
| **nick** 81:14,15 | | **officio** 13:4 | **organization** 102:7 106:23 |
| **non** 26:16 105:15 118:13 119:18 | | **oh** 30:2 35:13 45:11 95:21 | **original** 126:13 |
| **nonmonetary** 100:25 | | **oii** 69:25 | **ought** 91:12 92:4 |
| **northern** 1:2 2:2 29:5 31:16 55:18 56:17 66:16 82:16 | | **okay** 6:14 7:11,16 9:4 10:5 12:3 14:4 15:2 21:23 22:21 23:23 37:7 45:15 59:5 60:1 63:14 67:3,15 69:16 76:12 78:24 83:9 89:8 91:10 96:8 100:3 101:23 104:1 106:7 109:18 115:8 116:22 118:7 119:4 125:14,18 | **outside** 24:7 63:19 |
| **noted** 125:21 | | | **overall** 74:2 79:23 116:1,8 |
| **november** 18:14 | | | **overhead** 36:21 |
| **ntsb's** 66:3 | | | **oversee** 9:2 99:3 |
| **nuclear** 23:5 41:4 41:18 | | | **oversight** 98:22 |
| **number** 20:9 21:25 70:25 83:12 93:18 95:15 100:18 117:22,23 118:15 | | | **owned** 106:25 |
| | | | **owns** 106:24 |
| **o** | **objective** 44:9 80:1 | **ones** 41:7 55:8,10 | **p** |
| **o** 11:16 | **objectives** 15:9 53:19 79:20 85:10 88:14,17 106:14 | **ongoing** 73:21 90:17 | **p.m.** 2:18 6:2 125:21 |
| **oath** 6:5 126:7 | | **online** 94:24 | **pacific** 1:7 2:7 11:20 20:1 |
| **object** 13:23 55:24 63:8,14,15 68:12 | **obligations** 79:24 | **operated** 115:12 116:2 | **package** 74:2 115:2 124:5 |
| | **observations** 84:4 | **operation** 118:3 | **page** 9:21,22 15:2 17:17 20:3,12,14 20:17 22:20 23:20 25:11,20,21 26:1 28:25 29:1 32:23 34:20 36:7 38:7 39:20 45:8 53:25 |
| | **obstructed** 66:3 | **operational** 15:8 79:20 80:1 86:15 88:14 106:23 | |
| | **obviously** 104:2 | | |
| | **occasion** 13:12 | | |
| | **occur** 63:19 76:8 86:18,20 | | |

www.veritext.com                                                                888-391-3376

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 142 of 154

54:19 55:15 79:16
79:16 81:25 82:2
82:2,3 84:1 87:10
88:11,12 114:9,13
114:14,15,16
119:14
**pages** 20:18,20
22:22 25:8 36:3
**paid** 34:16,23 35:1
35:1 42:20 51:11
52:17 61:20 79:2
105:2 108:2,16
109:6 110:13
112:9,12
**palermo** 84:1,5,19
84:25 87:11,17
88:1,7
**paragraph** 38:6
39:20 84:5
**park** 3:20
**parra** 12:13
**part** 19:19 34:3,5
38:2 45:22 51:4
52:7 57:20 59:23
60:10 64:15 69:1
72:15 73:21 74:1
79:4,12 81:18
87:21 90:17 99:7
100:17 103:16
104:5 110:14
115:2,25 118:4,6
123:1,10 124:4,14
124:22,23
**participant** 49:3
**participate** 119:5
**participation**
45:25 46:2,7
49:14 105:22,23
105:24
**particular** 54:14
69:25 73:3 84:4

**particulars** 27:13
27:22
**parties** 99:24
**party** 94:1,22
126:18
**pass** 125:13
**pay** 29:12 34:14
49:19 63:19 74:5
103:24 108:6
111:23 112:3
**paying** 29:9,16
30:19,22 48:23
55:21 56:7 58:15
70:6 111:21
**payment** 25:12
28:24 32:15 33:14
35:22 45:19 46:12
48:3 49:25 50:1
52:5,5 53:17,18
59:18 73:19 75:2
104:14 105:8,9,12
105:16,21 117:9
**payments** 34:25
35:11 37:8,20,24
51:11 57:17 59:7
74:15 75:12
102:14,15,23
**payout** 14:9 25:7
25:16 58:1 73:24
103:8 104:10,13
104:16
**payouts** 88:22
**pending** 54:5
**peo** 99:15
**people** 21:25 85:4
92:20,23 100:18
100:19 101:25
102:7,9,12 111:18
112:8 117:23
121:17

**people's** 111:21
**percent** 22:2,5,25
23:1,4,8,10,17,24
23:24 34:14,24
38:11 39:19,22
40:6,7,8,23,25
41:3,3,18,23 42:2
42:8,13 46:7,16,18
46:18,20,20 47:5,7
47:8 48:10,11,17
48:17,24 49:7,12
50:16,17,21,22
51:1,6 61:6 87:22
92:20 105:17,21
105:23,25 116:24
120:3,12,13,14,16
**percentage** 24:14
117:3
**perception** 94:2
94:11,13,14,15,16
94:17 96:18,22,24
97:5
**perform** 90:13
120:6
**performance** 9:24
14:11,12,13,14
15:21 21:16,17,21
21:22 22:18,23
36:8,9,15,19,22
38:2 39:11,23,23
40:1,15,20 43:5,13
44:3,14,19 46:9,10
46:11,14,25 47:23
47:24,25 49:2,4,6
49:8,9 51:8 52:16
53:7,8,9 74:12,16
74:17,21,22 75:3,5
77:25 78:15 79:23
84:22 86:2 89:11
89:14,15,15 91:1
92:12,19,24 93:7

120:4,24 121:4,25
122:7
**performances**
74:18
**performed** 93:25
95:9 119:21
120:23
**performing** 122:6
**period** 52:19
81:18 112:13
**permit** 63:4
**persini** 83:14 86:7
**person** 36:5 59:14
106:16,24
**personal** 27:5,7
**personally** 93:1,4
93:6 105:12 107:5
122:17,19
**perspective** 60:17
**pertains** 126:12
**pg&e** 1:5 2:5 5:11
7:9 9:4,5 14:23
18:12 25:15 26:25
28:11 30:17 36:7
36:15 42:19 43:7
43:15 44:15,20,22
45:18 58:14,25
59:2,17 65:20
66:3 67:3,4,5,16
68:25 72:1 73:14
76:18,18,19 77:5,5
77:16 80:2,16,18
81:8 82:7 83:10
84:3,13,18,20 87:3
87:25 96:19,23,25
97:10,12 100:9
106:7,16 107:20
111:6,14 113:14
115:8,12,17,23
116:8,14 117:9,18
118:8,18

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
143 of 154

**pg&e's** 5:17,18
  56:19 61:4 64:21
  66:9,15 72:24
  107:12 117:4,13
**pge** 5:12 83:13
  86:9
**phone** 6:16 59:13
  59:14 94:24
**pick** 94:24
**picture** 55:6
**piece** 87:19 115:22
**pieces** 51:17
**pipeline** 81:23
**pipelines** 81:16
**place** 31:6 48:13
  62:18 82:23
  112:20 122:5,9
  124:16 126:5
**placed** 32:2,3
  116:24
**plan** 7:9,12 18:8
  18:11 22:1,6,7,9
  26:20,22 27:2,16
  36:21 51:21 52:23
  53:5 57:22,23
  59:22,25 66:22
  69:3 80:4,12,25
  81:5 82:15,19,23
  82:25 83:4 84:21
  91:17,18 105:15
  124:1,2,4,6,7,12
  124:14,15,16,19
  125:3,4
**plans** 59:18,18
  60:1 79:19,23
  80:8 88:11,13
  122:16,19,20,22
  125:5
**played** 53:13
**please** 6:10 7:16
  45:2 69:16

**point** 13:22 18:9
  39:10 50:13 51:9
  56:22 80:11 81:25
  110:22
**pole** 26:16,23
  28:13
**poles** 38:25
**policy** 87:3
**pool** 46:22,23 47:2
  50:22 51:6
**population** 46:19
  50:21
**portion** 50:5
  102:14 103:11
**position** 87:18
**positions** 8:5
**possession** 3:10
**possibility** 52:6
  60:5
**possible** 80:13
**possibly** 31:20
  50:22
**postponing** 73:11
**potential** 32:5
**potentially** 63:3
  99:24 100:20
**practice** 51:18
  123:16,17
**practices** 70:4
**pre** 93:17
**prepared** 36:3
  99:17
**preparing** 110:21
**presence** 62:15
**present** 4:6 16:11
  16:13 24:22,25
  31:8,9 33:21 43:1
  60:20 65:13
**presented** 59:2
  123:6,9

**president** 7:17,21
  7:24 8:4,6,6,7,11
  118:4
**presidents** 117:22
**pressures** 31:24
  32:2,4,5
**prevention** 118:19
**previous** 15:6
**previously** 45:4
  105:23 124:8
**primarily** 36:22
**primary** 117:24
**principal** 19:18
  21:7 33:6,20 34:5
**prior** 15:22 57:8
  62:4,19 64:15
  69:14 74:23 78:15
  81:2 82:6,9 93:8
  103:6,16 104:8
  126:6
**prioritizes** 39:25
  40:12,15,20
**privilege** 71:18
**probably** 11:9
  20:10 72:21
**probation** 5:17,19
  72:24 73:7
**problem** 84:24
**problems** 61:3
**procedure** 48:6,13
  48:22 74:9
**proceedings** 119:6
  119:6 126:4,6,8,14
**process** 15:7,14
  16:1,8 47:21 48:8
  50:18,19 56:23,24
  57:7,9 62:10
  79:13 85:18 86:15
  91:2 93:7 94:9
  97:11 111:3 121:9
  121:15,18,21

  122:3,11 124:15
  124:17
**produced** 83:18
**professional** 99:21
  100:1
**professionals** 6:23
**program** 14:1
  21:25 22:2,3
  23:11 24:14 26:18
  26:25 27:8,10,12
  27:13,14,14,15,20
  27:21 28:4,8,15
  36:12 38:22 43:22
  44:6 45:1 57:18
  57:18,22 60:11
  61:18 67:11 70:13
  73:13,18,19,20,21
  73:24 74:1 77:23
  77:24 78:5 85:21
  91:3 100:20,24,25
  102:19,22 103:3,7
  103:23 104:11,14
  110:18 111:3
  112:19 113:8,9
  120:8 123:16
**programs** 23:13
  27:6 43:19 104:4
  123:19
**project** 85:22
**projects** 85:24
**promote** 38:3,17
  39:16 85:12
**promoted** 83:25
**promotes** 100:10
**proper** 98:22
**properly** 28:15
  76:19 112:15
  113:1
**propose** 90:20
**proposed** 7:11
  9:16 10:12 17:4

Case: 19-30088   Doc# 1112-1   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
144 of 154

20:25 94:4,6
95:11 117:2
**proposing** 57:22
73:20
**provide** 100:18
115:9,24
**provided** 99:13
102:8 115:14,18
116:9
**provision** 62:1,16
63:18 116:16
**provisions** 39:15
**prudent** 53:13
**public** 17:19 23:8
23:10,12 26:9,12
36:12 38:5,10
39:17,19 69:18
71:21 80:1 84:6
**puc** 5:15 18:12
27:17 70:8 95:13
96:13 97:10,13
**puc's** 70:3
**pulled** 14:24
**purports** 84:17
**purpose** 84:14
119:10
**purposes** 54:2,22
103:17
**put** 11:2 31:25
37:4 80:8,25
81:17,21 103:23
112:20 120:8
**putting** 24:9 63:3
91:17,18

**q**

**q2** 53:20
**qualitative** 120:20
**qualitatively** 75:2
**quality** 28:3,5,13
**quarter** 36:23
51:7 53:6,20

104:16,19 122:7
**quarter's** 53:7
**quarterly** 51:12
52:5,11 53:6,17,19
74:10,11 79:2
83:19 102:19
103:3,4,8,9 104:14
105:2
**question** 16:18
21:13 22:13 24:8
26:14 27:19 28:7
28:20 33:2,12,25
34:10,21 40:3,13
40:18 41:13,16
43:10 44:8,11
45:20 50:11 53:4
53:15,22 54:4,14
55:24 58:7,18
62:6 63:1,1,15,17
64:13,24 65:6,23
66:6,12,19 67:19
68:8,12,21 69:11
70:10,19 71:4
72:13,20 73:10,17
76:5,22 78:5,10,21
78:25 80:7,21
81:11 82:18 85:8
88:9,16 89:1
90:24 91:6,6,7
95:18,25 96:5
100:16 102:17
103:1,14,19
104:21 105:19
106:10,20 108:19
108:25 109:1,14
109:14,15,16,19
112:18 113:5,18
114:2 115:11
116:6 117:16
118:21 119:1

**questioning** 100:6
**questions** 16:6,9
17:3,6,8,15,22
21:14 96:21
109:13,17 123:18
123:21 125:15
**quick** 125:10
**quote** 15:12 115:1

**r**

**r** 3:12
**raise** 43:19,23,25
85:14
**rambo** 12:13
**range** 11:2 14:9
33:23 46:14 101:5
**rate** 5:11 20:2
45:25 46:2,7
49:14 105:22,24
105:24 107:15,25
115:2
**rates** 7:21 8:7
120:2
**rating** 47:23,24
**reached** 87:18
**read** 21:13 29:12
42:18,22 45:2,3
64:17,19 67:12
71:23 72:7 87:13
87:25 88:4 96:4
**realized** 90:12
**realizing** 79:20
88:13
**really** 65:15,16
68:13 70:25 90:13
92:18 101:22
114:17 119:2
**reason** 24:3 31:13
31:15 47:13 52:10
64:9 86:16 90:3
**reasons** 52:4

**recall** 18:9 28:3
34:6,7 43:4 46:15
89:12 90:3 98:5
123:20,24
**receive** 104:9,13
104:16 117:5,9,13
**received** 53:2 90:5
**receives** 47:23
**receiving** 61:14
108:15
**recess** 55:12 99:10
125:12
**recoating** 87:17
**recognition** 86:23
100:19,24 102:9
102:11
**recognitions**
101:16
**recognize** 90:14
**recognized** 27:8
**recollection** 18:2
30:3
**recommend** 10:12
13:17 16:23 18:20
**recommendation**
10:15,16 29:8,19
29:22 30:24 31:10
31:14 48:25 51:15
51:22 55:16 56:2
56:5 57:11 75:1
**recommendations**
13:10
**recommended**
13:14 18:24,25
19:2,7 29:15
30:18,21 78:24
**record** 6:10 45:3
64:19 83:11 99:12
100:5 110:25
126:7,11

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
145 of 154

**recording** 6:24,25
**records** 41:5 42:2
42:5,9 43:8,16
69:21 70:7,21
72:3
**reduce** 37:7 62:16
63:4,18 69:6 93:4
112:16 113:2,16
121:5
**reduced** 61:10
89:5 90:22
**reducing** 62:2
64:9 78:7 92:10
92:23
**refer** 7:11 32:24
41:10
**reference** 5:9
**referenced** 27:21
**referred** 14:14
22:11 26:8 32:10
**referring** 14:10
18:7,11 19:4 32:8
38:10 40:22 45:8
**refers** 9:15
**refined** 26:8
**refinements** 15:11
26:5
**reflect** 21:21
**reflected** 10:3
22:17 88:22
**reflects** 28:1
120:15
**refresh** 30:2 98:19
**regard** 40:22 55:8
81:22 91:19 94:8
**regarding** 69:20
106:8,17 123:12
**register** 97:9,11
**registered** 96:14
**regulation** 8:7

**regulations** 7:21
**regulatory** 18:3,7
**relate** 39:12
**related** 42:5 60:10
93:18
**relates** 40:7
**relations** 8:23
85:19
**relationship** 85:20
**relative** 126:17
**release** 5:13
**reliability** 36:12
41:4,19 84:8
**reliable** 114:11,22
115:5,15,18 116:9
116:17,19
**reliably** 116:2
**remember** 7:19
8:19 17:6,13,15
18:15,17,18 25:3,4
30:1 31:7,20
33:15 60:23 61:8
65:7,15,17,24 66:7
66:13,25 67:13,24
68:13,14,17 70:23
71:22 72:14 73:2
78:3 79:3,3,4
90:16 93:12,14,16
96:21 99:6 100:10
123:14
**remote** 84:7
**reorganization**
56:24
**repeat** 109:19
**replacement** 36:22
81:23
**report** 8:10,14
43:7,15 71:21,22
71:24 72:2 84:1
84:23 86:11,12,13
87:4,5 95:6

123:10 125:8
**reported** 1:22 8:12
8:13,16 87:10
**reporter** 2:20
126:2
**reports** 5:14 68:24
68:25 110:25
111:9,12 117:4
**reposition** 87:18
**represent** 73:8
**representatives**
12:23 91:21
**represented**
118:13,16
**reprioritization**
36:23
**request** 29:12
54:13
**requested** 76:1,10
76:17 126:15
**require** 33:7
**resigned** 111:6
**resolution** 31:3
32:15 59:2 121:23
**resolved** 97:13
**resource** 36:23
**resources** 85:18
118:1
**respect** 8:25 13:5
27:1 43:3 67:10
71:14 80:17 83:24
107:3
**respects** 10:21,23
**response** 18:5
36:24 80:17 81:7
116:5
**responsibility**
11:14 64:22 66:10
66:16 77:6,11
106:12,22 107:2,4
107:5 117:24

118:1
**responsible** 76:3
118:19 125:2,7
**rest** 100:6 118:5
**restructuring**
24:11,13 51:18
52:12 90:9 97:4
121:3,15 124:15
124:17
**result** 34:18
**resulted** 15:10
26:4 87:1
**resulting** 32:6
**results** 34:17 95:9
**retain** 49:23
**retains** 73:23 74:5
**retention** 8:22
59:22 67:10
103:17 104:5
124:2,14 125:3
**retired** 104:13
**review** 84:13
122:15 126:14
**reviewed** 10:20
55:1 61:7,11,11
**reviews** 15:21
35:21 74:13 77:23
77:24,24
**reward** 62:23
100:19,24 101:9
102:9
**rewards** 11:13,18
100:20 101:15,18
101:25 102:9
125:6
**richard** 3:11
**richard.slack** 3:15
**right** 7:4 9:6,25
12:8,20 14:15
15:12,13 17:20
19:8 20:17 21:10

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
146 of 154

21:12 22:23 23:2
23:9,21,25 25:6,9
28:18 30:2,7
33:16 35:18 36:13
36:17 39:20 41:5
45:11 48:13 50:2
51:13 52:18 53:2
54:11 57:12 58:16
59:8 67:6 74:6,19
75:8 87:13 88:4
89:19,22 90:1,6
91:14,18,25 95:7
95:13,16 96:10
98:8,10,12
**rigorous** 15:7
**risk** 60:16 66:24
69:2 84:25 85:5
112:16,22 113:2
113:16,24
**risks** 38:4,18
39:16
**rjulian** 3:7
**ro** 12:13
**robert** 3:4
**role** 8:9 14:19,21
**rolling** 53:7,8,21
**room** 14:25
**roughly** 7:22
**routine** 26:17,24
28:14
**rpr** 1:23 126:25
**ruling** 69:25 72:10
**rulings** 67:1,25
72:15 73:4
**run** 28:8 82:21
**running** 88:18
104:5
**runs** 115:23
116:14

**s**

**safe** 42:7 52:24
114:11,21 115:9
115:15,18 116:9
116:17,19
**safely** 116:2
**safer** 86:18 115:5
**safety** 17:19 18:8
18:11 22:25 23:1
23:4,8,10,12 26:9
26:12 36:12 38:5
38:10 39:17,19
40:1,7,12,16,20,23
41:1,19 42:1,16
65:21 79:23 80:1
80:16,18 81:8,13
82:7 83:3,25 84:6
86:1 106:8,11,12
106:14,17,22,24
106:24 107:2,4,5,7
115:25 116:25
117:3 120:3,12
121:5
**salaries** 124:10
**san** 1:15 2:17 3:6
6:1 64:22 65:8,12
66:4 80:5,22
82:10
**sansome** 2:16
**sat** 94:11
**satisfaction** 40:9
86:2 93:21,23
94:2,4,17 95:3,5,8
95:12 96:18 121:1
**satisfactorily**
97:13
**satisfied** 95:7
**saw** 86:7
**saying** 16:14 49:7
54:9 68:17 83:17
103:6 115:22

**says** 11:5 36:19
37:1 51:10 53:25
63:11 68:18 79:18
86:8 87:15 114:23
114:24
**scenario** 53:12
**score** 34:19,22,23
36:16 46:12 49:14
49:16,18,22 84:4,8
93:22
**second** 5:18
109:15
**section** 17:18 29:4
**secure** 87:20
**see** 9:15 19:2
20:22 26:23 36:24
38:22 40:7 56:14
60:9 81:25 82:22
84:13 98:19 123:4
123:19
**seeing** 44:10 96:10
**seen** 69:23,25 83:7
**segment** 94:25
**senior** 11:13,18
29:8,15,18 34:2,3
50:24 51:3 56:1
59:22 113:1
117:22,24,25
118:4,14 119:14
120:9
**sense** 51:20 66:23
**sent** 96:20
**sentence** 26:2
**separate** 13:22
28:2 61:22 62:10
**series** 45:14
**serious** 41:5 42:12
42:15 67:22
**seriously** 60:8
**serve** 116:15

**served** 7:20
**service** 115:15,24
116:9,17,20
**services** 97:6
114:11,22 115:5,9
115:18
**sessions** 16:12,13
16:15,21
**set** 14:1,2 15:15
23:20 25:8 27:25
32:12 67:11 74:13
85:24 88:20
124:12 126:5
**sex** 53:2
**shared** 106:22
**short** 7:9,12 22:6
34:25 48:2 53:1
54:6,10 80:25
112:13
**shorthand** 2:19
126:1,9
**shortly** 30:11
**show** 5:16,17,18
42:18 69:20 70:8
72:6,23 73:1
84:17
**side** 93:1
**signature** 82:2
114:13 126:23
**significant** 106:2
**similar** 10:20,23
32:15 42:11 102:6
124:8
**similarly** 25:13
**simon** 8:13,14,16
29:21 30:9,11,13
30:18,21 31:19
**simon's** 30:24
31:10 55:16 57:10
**simple** 77:3

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
147 of 154

simplify  92:18
simply  49:9
singh  3:12
sit  97:18,23 98:16
   98:21
site  70:4
situation  24:12,13
   29:7 31:18 52:13
   56:18,20 57:4,5
   90:9
situations  51:19
six  52:16,17,19
skikos  2:15,16
slack  3:11 13:23
   16:17 20:8 22:12
   24:5 25:10 28:6
   28:19 33:1 34:9
   40:2,17 41:9,14
   43:9,17 44:7 45:2
   50:3,10 53:3,14
   54:4,8,13 55:23
   58:6,17 60:14
   61:16 62:5,20
   63:7,14 64:12,23
   65:5,22 66:5,11,18
   67:18 68:7,12,20
   69:9 70:9 71:3,11
   72:12 73:15 76:4
   76:21 77:7,19
   78:9,20 80:6,20
   81:10 82:17 83:11
   83:17,21 85:2,7
   88:5,15,25 90:23
   92:13 95:17,24
   96:3,8,16 97:20
   99:5,11 100:15
   102:16,25 103:18
   104:20 105:18
   106:9,19 107:23
   108:18,24 109:8
   109:12 111:17

112:4,17 113:4,17
114:1,13,16,23
115:6,10,19
116:11 117:15
118:20 119:1,23
125:14,17
small  101:5,10
   118:15
solely  95:12
somebody  111:22
sorry  9:21 12:3
   15:18 18:25 20:8
   39:3 76:13 82:2,3
   88:11 91:15 94:16
   96:2 112:7 114:15
   114:16
sought  24:21
sparks  88:3
speak  85:13
   100:19
speaking  100:10
   100:12 101:2
specific  17:15 61:8
   66:25 67:24 72:15
   123:14
specifically  32:12
spend  101:7
spends  79:10
spot  100:20
   102:10
spreadsheet  86:10
staff  94:13
stakeholders
   121:8,11,17,18
standards  92:12
standpoint  19:23
start  76:12,16
state  6:10 83:19
   98:17 126:2
stated  26:3 31:15
   42:19 48:12

statement  96:6
   123:22
states  1:1 2:1
status  122:1
stavropoulos
   81:14
stay  104:4,9,18
stays  23:5,9
steve  83:15
stip  7:12 9:17,24
   10:12,17,20,21,24
   10:25 11:3,6 12:4
   13:15,21,25 14:5
   15:5,8 16:23 17:4
   18:20 19:3,7,12,16
   19:18,20,23 20:15
   20:18,21,24,25
   21:3,5,6,9,16,17
   21:19,20 22:4,19
   22:23 24:10,21
   25:7,7,12,16,16
   26:16,22 27:21
   28:18,24 29:11,16
   30:20 32:1,16
   33:5,18,23 34:1,14
   34:15,17,18 35:11
   35:11 37:4,7,9,14
   37:20,23 38:2,17
   38:18,19 39:16,22
   39:25 40:4,4,6,8
   40:12,15,19 42:9
   42:24 43:5,13,25
   44:3,22 45:1,18,21
   45:21 46:7,12
   49:2,13,20,21
   50:21 51:4,10,16
   51:21 52:4 54:2,3
   54:22,23,24 55:2,3
   55:3,4,22 56:7,9
   57:11,17,19,22,23
   58:1,16 59:3,9,19

59:20,23 60:9,15
61:15,17 62:2,3,7
62:15,17,22 63:4,5
63:18 64:2,9,16
65:1,9 67:8,24
69:13 70:6,12
73:11,18,19,19,20
74:6 75:8,11,19
78:7,16 79:2
81:18,18,21 82:6,9
83:24 85:9,21
89:18,22 90:7,10
90:22 91:2,13,25
92:5,10,15,17,19
92:24 93:8 94:5,6
95:2,10,11 98:7
99:16 102:13,14
102:15,18,23
103:15,20,24
104:10 105:3,4,8,9
105:13,16,21,23
105:24 106:8,18
107:3,8,21 108:6
108:16,16 109:7
109:21,23 110:12
110:18,18,21
111:1,21 112:3,9
112:12,14,14,19
112:23,25 113:7
113:14,20 114:9
114:20 115:1,2
116:22,24 117:2,6
117:10,14 118:5,6
118:7,11,12 119:5
119:12,22 120:12
120:22,22 122:1
122:14,17,25
123:2,3,22 124:2,3
124:3
stips  14:18 15:6
26:19 93:17

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
148 of 154

103:16 104:8
**stipulation** 100:2
**stop** 54:8 95:24
**streamlining** 49:6
**street** 2:16 3:6
**strike** 21:13 40:13
**structure** 21:16,17
22:18,23 77:24
84:25 86:22,24
117:18 118:18
**structured** 104:15
**structures** 84:9,19
**studies** 109:2
**study** 107:16,25
108:1,8,9 110:7,8
**stuff** 118:3
**subject** 59:19
60:12
**submetrics** 38:13
**submitted** 18:12
18:15,16
**subscribed** 126:20
**subsequently**
15:19
**successful** 79:19
82:15 88:13,19
121:23
**sued** 98:16,21 99:3
**sufficient** 97:18
**suite** 2:17 3:6
**supervise** 77:17
**supervisor** 48:4,5
48:9,16,25 50:20
**supervisors** 50:24
**support** 7:8
**supporting** 31:13
**suppose** 75:21
**supposed** 28:12
47:16 48:1 52:14
91:12 92:4

**sure** 41:15 45:17
48:5 53:24 69:24
97:25 104:24
117:20
**survey** 93:25 94:2
94:12,13,14,16,17
94:18,19,21 95:6,9
96:15,18,19 97:5
**system** 17:20
23:14 26:11 38:14
38:19,23 39:10
42:5,7,17,21 43:22
81:13 82:21 88:19
115:13,14,24
116:2,15

**t**

**take** 7:4 26:6 31:6
54:6,9 55:11 68:3
69:16 74:8 75:14
83:6,6 98:11 99:9
110:15,16,18
112:15 113:2,15
125:10
**taken** 2:14 62:18
115:21 126:4
**takes** 60:8
**talk** 7:3,5 15:17,18
17:16 20:4 64:14
69:12 73:25 86:15
92:23 103:12
109:25 110:3,4
120:10
**talked** 26:9 32:12
32:22 45:4 53:17
53:18 55:3 56:1
81:15 85:16 87:25
102:19 124:3
**talking** 64:25 65:8
67:1,25 71:16
72:14 73:3 86:16

**tape** 6:24,25
**tar** 5:12 83:13
**tar3250382** 86:9
**target** 14:8 25:7
25:16 34:17 36:17
36:22 45:25 46:1
46:6,7 52:17
91:14 92:5,11
103:25 108:2
124:9
**targeted** 15:10
26:4 34:15,25
38:23 50:23
**targets** 10:17 14:2
14:4,6,7,10,11,11
14:12,13,14 15:16
15:20 21:17,18,20
22:18,23 44:18
49:21 65:1 74:12
77:25 80:12
110:19
**team** 29:18 74:25
75:4 80:24 122:18
124:22,23 125:6
**teams** 86:15 110:4
**telephonic** 4:3
**tell** 23:12 27:4,19
33:25 45:15
116:13 122:1
**telling** 54:8
**tells** 87:3
**tend** 9:12
**tenure** 108:13
**term** 7:9,12 15:8
22:1,5,6,8 34:25
48:2 53:1 80:25
105:15
**termination** 62:11
**terms** 34:24 45:16
46:3 61:22

**terrible** 116:1
**testified** 6:6 9:23
28:17 29:5 54:20
**testifies** 119:11
**testifying** 126:7
**testimony** 15:4
26:3 29:13 55:14
79:18 83:24
115:17,19 126:11
**thank** 51:2 60:3
83:21 105:11
125:18,19,20
**theoretically**
98:10
**theory** 75:21
**thickness** 87:23
**thing** 50:25 80:13
97:5
**things** 28:2 51:10
73:17 74:4 91:4
96:17 99:20
**think** 7:22 11:5
18:16 19:20,22
32:23 42:11 55:6
55:10 59:8,12
63:7,12 80:9
81:13 82:23 96:5
97:3,5 102:6
106:24 109:1
111:18 112:1
113:7,19 115:21
117:22 120:13
123:1 124:6
**thinking** 50:19
79:10 121:3
124:21
**third** 94:1,22
**thorough** 54:1,21
54:23
**thought** 90:11

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
149 of 154

**thoughts** 93:10
**thousand** 46:6
47:5 101:9,14
**threat** 23:16 66:22
67:22,22 69:3
**three** 14:19,20
28:2 34:5
**threshold** 14:8
**time** 8:16 13:9,9
15:16,18 29:20
41:4,22 50:14
52:12 54:6,7,9
56:22 68:9 79:10
80:11 81:19 82:4
92:22 98:12 101:7
112:13 125:21
126:5
**timing** 18:10
**title** 8:19 11:17
**today** 7:3,12 13:20
125:16
**told** 32:19 33:10
33:13,15 34:8
55:9
**topic** 75:23
**tort** 2:15 3:3
**total** 11:13,18 25:7
25:16 44:22,25
45:22 57:20
103:25 107:16,24
110:9 124:4 125:6
**tower** 84:5 87:12
87:16,17,21 88:3
**towers** 24:11 39:6
51:24 123:2
**track** 97:8 112:10
**training** 8:23
**transcribed** 126:9
**transcript** 126:10
126:13,15

**transformers** 39:8
**transmission**
36:11 39:12,13
87:11
**treated** 99:20
**tree** 26:18,24 28:4
28:14 67:17 77:17
**trees** 28:1
**tremendous** 101:6
**trimming** 28:4
67:17 77:17
**truck** 86:21
**true** 23:4 58:24
62:1 78:6 126:10
**try** 76:25
**trying** 70:23 76:15
92:18 115:23
**tuesday** 1:16 2:18
6:1
**turn** 9:21 15:2
17:17 20:1,3,17
26:1 28:25 29:1
34:20 55:14 56:25
72:5 79:18 113:13
**turned** 95:5
**two** 9:9 18:22
26:10,11 27:5
38:13 73:17 88:9
91:4 96:17 109:13
109:17
**type** 11:6 50:23
85:19 110:14

**u**

**uncertainty** 52:12
106:2 111:19
**undersigned** 126:1
**understand** 18:23
19:14 31:22 41:15
47:15 53:6 54:15
57:6 59:24 63:17
69:11 73:16 91:8

95:19 96:22 97:25
104:25 124:16
**understanding**
19:17 32:17,18
33:4 43:24 58:9
58:19,21 69:1
82:20 103:13,15
118:17 119:9,13
119:17 121:10
**understood** 31:23
**undertake** 15:14
**undertaken**
107:11,12,14
112:1,2
**undertook** 15:7
**unfortunate** 82:24
**united** 1:1 2:1
**unmarked** 86:10
**unsecured** 3:18
6:14,19
**upgrades** 36:10
**upward** 92:7
**use** 50:13 78:13
83:23 94:10
**usually** 101:12
125:5
**utilities** 69:18
71:21 123:17
**utility** 9:6 11:21
11:23 12:18,23
58:14 59:3 69:22

**v**

**validate** 75:4
**validated** 35:20
**value** 22:3,5,11,17
101:4,6
**values** 102:5
**variety** 43:18
82:22 85:11,15
121:20

**various** 83:3 120:2
121:17,18
**vast** 33:17
**vegetation** 17:20
23:15,16,17 26:10
26:15,16,17,21,23
26:24 27:9,10,11
28:13 36:11,20
38:14,22 42:6
**vehicle** 90:14
**vehicles** 100:18
**verbal** 64:6
**verbally** 64:8
**verify** 72:1
**versus** 21:21,22
**vice** 7:17,20,24 8:4
8:6,6,7,10 117:22
118:4
**view** 13:22 21:15
40:19 44:4,13
57:4 84:17 86:3
120:21 123:3
**views** 96:19
**violated** 65:21
67:16
**violations** 80:19
81:9 82:8
**virtue** 37:8 62:3
62:17 63:5 69:7
78:8 89:5 99:3
**volume** 1:17 2:14
5:3
**voted** 58:15
**vp** 8:20

**w**

**w** 3:11 11:16
**wages** 46:4,5
124:10
**wait** 95:24 105:6
**walk** 122:4

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
150 of 154

**want** 63:12,23
92:22 97:7 104:3
104:6,7 105:20
106:3 109:14
121:5
**wanted** 90:13
**watson** 51:24
**way** 9:4 14:7,24
18:19 44:13 48:12
50:18,18 52:14
63:25 88:24 89:6
90:21 91:13 92:10
97:11 99:19
102:11 113:13
**we've** 26:9 32:22
67:23 69:2 85:15
86:1 102:18
120:11,13 124:3
124:15
**weekly** 86:11,12
**weeks** 30:14
**weight** 38:11
**weighted** 23:14
24:14 38:13 41:23
42:2 120:25
**weighting** 23:23
61:5 119:22 120:7
120:15
**weightings** 120:4
**weil** 3:11 25:5
**weil.com** 3:15,15
3:16
**went** 8:8 92:3,11
**whereof** 126:19
**whistleblower**
43:7,15 44:6
**wide** 84:22 85:10
85:21 89:11,13
**wildfire** 18:8,11
26:20 27:1,16
36:24 38:3,18

39:16 40:1,12,16
40:25 41:8,19,23
42:3,14 52:23
56:17 60:20,21
61:5 66:21,23,25
67:22 73:7,13
101:8 112:22
**wildfires** 29:6
31:16,24 32:6,8,9
32:13 37:8,21,25
55:19 60:5,7,10,10
60:12,16 64:10
69:1 102:8 113:3
113:16,25 115:14
116:1,18 119:7
**wilful** 80:18
**willfully** 65:20
**williams** 8:14
**willing** 99:21
**willis** 24:10,18,20
51:24 59:6,8,11
91:22 123:1,9
**willis's** 123:10
**wire** 88:2
**wires** 38:25 39:2
84:7
**withdraw** 33:11
76:24 78:24 96:7
103:14
**withdrew** 29:11
**witness** 5:2 13:25
16:19 22:14 24:9
25:11 28:8 33:3
34:11 40:4,19
41:10,15 43:10,18
44:9 45:4 50:4,12
53:5,16 55:25
58:8,19 60:15
61:17 62:7,21
63:17 64:14,25
65:7,24 66:7,13,20

67:20 68:13,22
69:11 70:11 71:5
71:19 72:14 73:16
76:6 77:10,21
78:11,22 80:8,22
81:12 82:19 85:9
88:6,17 89:2
90:25 92:15 95:19
96:2,17 97:23
99:6 100:17
102:18 103:2,20
104:22 105:20
106:11,21 107:24
108:20 109:1,18
111:18 112:5,19
113:6,19 114:3,24
115:12,21 116:13
117:17 118:22
119:2,13,24
125:13,19 126:19
**witnesses** 126:6
**wolfe** 4:4 6:20
**woltering** 3:5 5:7
38:8 100:5,8,22
102:20 103:5,21
105:1 106:6,15
107:1 108:4 109:4
109:10,20 111:25
112:6,24 113:12
113:22 114:7,14
114:17,19,25
115:7,16 116:3,21
117:19 118:24
119:3,11,16,25
125:10,20
**wonder** 6:14
**words** 35:14
**work** 26:4 28:15
36:16,20,21 48:8
48:21 52:14 61:19
61:20 62:8,23

69:7 74:8 87:17
91:23 92:3,11
93:13 99:17 101:7
102:10,12 104:23
106:13 108:13
123:1
**workforce** 118:13
**working** 48:7 83:2
85:10,22,23 87:16
87:18 91:20 99:22
111:5 124:20
**works** 45:16 47:15
78:5 97:11
**wp** 20:3,8,10,12
20:17,20 22:22
23:21 25:8 34:20
36:3,7 45:9,10,12
**written** 67:11
**wrong** 114:14
**wrote** 83:15

**x**

**x** 126:15

**y**

**yeah** 25:5 29:3
30:4,8,10 43:12
47:7 58:19 63:24
68:13 71:19 72:21
77:1,2,10,13,14
89:4 98:4 103:22
105:5,20 115:21
120:1,3 122:5
**year** 35:12,19
36:16,17 44:23
45:1,20 47:19
53:8,20 56:21
62:4 81:1,1,2
101:2 102:1,15,24
104:9,13,18 105:7
107:10 112:11

Case: 19-30088 Doc# 1112-1 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
151 of 154

**years** 11:1,2,5,7,8
11:9 14:19,20
15:22 62:19 64:15
69:14 74:23 93:8
120:11
**york** 3:14,14

**z**

**zero** 49:10,11
89:24,25

Case: 19-30088    Doc# 1112-1    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
152 of 154

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.