# EXHIBIT B

1           UNITED STATES BANKRUPTCY COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                --oOo--

5   In re:

6   PG&E CORPORATION,          BANKRUPTCY CASE

7   -and-                Case No.19-30088(DM)

8   PACIFIC GAS AND ELECTRIC    Chapter 11

     COMPANY,              (Lead Case)

9

            Debtors.     (Jointly Administered)

10

   _____/

11

12

13

14

15

16         DEPOSITION OF DOUGLAS FRISKE

17        THURSDAY, MARCH 21, 2019

18

19

20

21

22   Reported by:

23   Anrae Wimberley

24   CSR No. 7778

25   Job No.  3264070

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 2 of 130

1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   --oOo--

5    In re:

6    PG&E CORPORATION,              BANKRUPTCY CASE

7    -and-                         Case No.19-30088(DM)

8    PACIFIC GAS AND ELECTRIC       Chapter 11

     COMPANY,                       (Lead Case)

9

                 Debtors.        (Jointly Administered)

10

     _____/

11

12

13

14

15

16

17          Transcript of deposition of DOUGLAS

18   FRISKE, taken at Skikos Crawford Skikos & Joseph

19   LLP, One Sansome Street, Suite 2800, San Francisco,

20   California 94104, beginning at 1:12 p.m. and ending

21   at 3:17 p.m. on Thursday, March 21, 2019, before

22   Anrae Wimberley, Certified Shorthand Reporter No.

23   7778.

24

25

www.veritext.com                                    888-391-3376

```
 1    APPEARANCES:

 2    For the Tort Committee:

 3              BAKER & HOSTETLER LLP

 4              BY:  ROBERT A. JULIAN, ESQ.

 5              1160 Battery Street East, Suite 100

 6              San Francisco, California 94111

 7              (628) 208-6436

 8              rjulian@bakerlaw.com

 9    -and-

10              BAKER & HOSTETLER LLP

11              BY:  CATHERINE E. WOLTERING, ESQ.

12              45 Rockefeller Plaza

13              New York, New York 10111

14              (614) 462-2677

15              cwoltering@bakerlaw.com

16

17    Financial Advisor to the Tort Committee:

18              LINCOLN INTERNATIONAL LLC

19              BY:  BRENDAN J. MURPHY, MANAGING DIRECTOR

20              500 West Madison Street, Suite 3900

21              Chicago, Illinois 60661

22              (212) 257-7751

23              bmurphy@lincolninternational.com

24

25
```

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 4
of 130

```
1    For the Official Committee of Unsecured Creditors:

2              MILLBANK LLP

3              BY:  DANIEL DENNY, ESQ.

4              JULIE WOLF, ESQ.  (VIA PHONE)

5              2029 Century Park East, 33rd Floor

6              Los Angeles, California 90067-3019

7              (213) 703-9980

8              ddenny@milbank.com

9              jwolf@milbank.com

10

11   For the Debtors PG&E Corporation and Pacific Gas And

12   Electric Company:

13             BY:  RICHARD SLACK, ESQ.

14             DAVID R. SINGH, ESQ.

15             STEPHEN KAROTKIN, ESQ.

16             JESSICA LIOU, ESQ.

17             201 Redwood Shores Parkway

18             Redwood Shores, California 94065-1134

19             (650) 802-3020

20             richard.slack@weil.com

21             david.singh@weil.com

22             stephen.karotkin@weil.com

23             jessica.liou@weil.com

24

25
```

1    Also Present:

2                MARK KAZMIEROWSKI, Managing Director for

3                Willis Towers Watson

4

5                CHRIS KIM, FIT Consulting, Financial

6                Advisor to the Tort Committee (VIA PHONE)

7                          --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    EXAMINATION BY:                                      PAGE

3    MR. JULIAN                                             8

4                            --oOo--

5                        E X H I B I T S

6

7    EXHIBIT          DESCRIPTION                         PAGE

8    Exhibit 19    Pacific Gas and Electric                81

9                  Company's Wildfire Mitigation

10                 Plan; 182 pages

11

12   Exhibit 20    SoCalGas and SDG&E, Direct              85

13                 Testimony of Debbie S. Robinson

14                 (Compensation and Benefits);

15                 261 pages

16

17   Exhibit 21    Decision Ordering Pacific Gas           27

18                 and Electric Company to Implement

19                 the Recommendations of the

20                 NorthStar Report; 9 pages

21

22   Exhibit 22    Assessment of Pacific Gas and           27

23                 Electric Corporation and Pacific

24                 Gas and Electric Company Safety

25                 Culture; 42 pages

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 7
of 130

1    QUESTION WITNESS INSTRUCTED NOT TO ANSWER:

2                        PAGE    LINE

3                         49      16

4                       --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THURSDAY, MARCH 21, 2019; SAN FRANCISCO, CALIFORNIA;

2                          1:12 P.M.

3                          - - -

4                    DOUGLAS FRISKE,

5          sworn as a witness by the Certified

6        Shorthand Reporter, testified as follows:

7                        EXAMINATION

8    BY MR. JULIAN:

9        Q.    Would you please state your full name for

10   the record.

11       A.    Douglas Friske.

12       Q.    Friske, not Friske?

13       A.    That's correct.

14       Q.    Is Exhibit 17 a copy of your corrected

15   declaration that you signed in connection with the

16   debtors' motion for approval of their short-term

17   incentive plan?

18       A.    It is.

19       Q.    And may we refer to the short-term

20   incentive plan for 2019 as the "STIP" in this case,

21   in your deposition?

22       A.    Yes.

23       Q.    Who hired you, actually?

24       A.    Weil Gotshal.

25       Q.    Who at Weil hired you?

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 9
of 130

1       A.   My contact was Steve Karotkin.

2       Q.   Did he explain the purpose of your

3   retention?

4       A.   He did.

5       Q.   What was it?

6       A.   To help the company think through

7   compensation strategies in light of ongoing

8   discussions around potential restructuring.

9       Q.   Do you have a prior relationship with

10   anyone on PG&E's board or executive team?

11       A.   No.

12       Q.   And what were the terms of Willis Towers

13   Watson's engagement with Weil on behalf of the

14   debtors?

15       A.   With respect to terms, just to be clear --

16       Q.   Compensation terms.

17       A.   So we were paid on a time-and-expense

18   basis based on the time we spent on the matter with

19   an initial retainer amount.

20       Q.   What was the retainer?

21       A.   $150,000.

22       Q.   And who's on your team?

23       A.   Myself, Mark Kazmierowski, and then I

24   don't know the other individuals.  Mark worked with

25   others on the staff to do analyses.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 10
of 130

1    Q.    About how many people on the staff?

2    A.    That worked on this engagement?

3    Q.    Yes.

4    A.    I would guess probably three to four.

5    Q.    And by "this engagement," which engagement

6    are you referring to?

7    A.    The engagement I referred to earlier with

8    PG&E through Weil.

9    Q.    Did you work on any project other than

10   formulating or assisting the compensation committee

11   to formulate the 2019 STIP?

12   A.    As I mentioned, we were working with the

13   committee on a variety of different compensation

14   matters.

15   Q.    Do you expect to provide any advice to the

16   debtors on any other employee-related bonus plan?

17        MR. SLACK:   Objection to the form.

18        MR. JULIAN:   Withdrawn.

19   BY MR. JULIAN:

20   Q.    Do you expect to provide advice to the

21   debtors on any other employee-related compensation

22   plans?

23   A.    To be determined at this point.  So I

24   think depends on what their needs are.

25   Q.    Do you have an opinion as to whether or

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 11
of 130

1    not there's a single most important compensation

2    metric for employees of a utility?

3         A.   I do not.

4         Q.   About how much time have you and your team

5    spent working on the 2019 STIP engagement?

6         A.   We were engaged in December.  And over the

7    course of that time -- just trying to estimate.

8    You're thinking in terms of hours?  Is that what --

9         Q.   If you can, sure.

10        A.   Yeah.

11             Probably in aggregate -- I'm trying to do

12   the math based on our billing hours, billing

13   rates -- couple hundred hours.

14        Q.   About how much time have you personally

15   spent on the 2019 STIP engagement?

16        A.   Thirty to forty hours.

17        Q.   Who did you work with at PG&E?

18        A.   Worked primarily with John Lowe, who is

19   the head of rewards PG&E.

20        Q.   Did you say "rewards" or "awards"?

21        A.   Rewards, r-e, reward.

22        Q.   And who did your team work with in

23   addition to Mr. Lowe?

24        A.   We've worked with Kevin O'Connell, who

25   works for John.  We've also had discussions with

www.veritext.com                                   888-391-3376

1    Dinyar Mistry and also had discussions with the

2    compensation committee.

3        Q.   Who was on the compensation committee that

4    you had discussions with?

5        A.   All of the compensation committee members

6    in terms of the meetings, so all four committee

7    members.  And then I had other discussions with

8    Forrest Miller, who was the chair of the

9    compensation committee.

10        Q.   He's also the chairman of the board?

11        A.   I don't know.  He could be.

12        Q.   The four members of the compensation

13    committee with whom you met, were they all

14    directors, as far as you understand?

15        A.   Yes.

16        Q.   And when you say "compensation committee,"

17    was the compensation committee of PG&E Corp., the

18    holding company, or Pacific Gas and Electric

19    Company, the utility?

20        A.   It's my understanding it's the Corp., the

21    corporation.

22        Q.   The holding company?

23        A.   The holding company.  Sorry.  Yes.

24        Q.   Where did you get that understanding from?

25        A.   First based on -- our engagement letter

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 13
of 130

1    talks about being with PG&E Corporation.  And also

2    looking at their proxy statement, those are the

3    individuals listed in the proxy statement of the

4    company.  So I interpret that to be in the area of

5    the holding company.

6         Q.   Did you have any understanding as to

7    whether or not the compensation committee's charter

8    was to deal with compensation of the executives

9    only?

10        A.   No.  I didn't review the charter.

11        Q.   Did you understand that the compensation

12   committee with whom you dealt had a charge to deal

13   with compensation of employees of PG&E, the utility?

14        A.   I'm not familiar with the distinction

15   between the utility versus the holding company.

16        Q.   Okay.  At any rate, did you understand

17   that the compensation committee was working on

18   compensation for employees as opposed to executives?

19        A.   Yes.

20        Q.   Who did you get that understanding from?

21        A.   From management and the committee in terms

22   of our discussions with them.

23        Q.   Let's turn to your corrected declaration,

24   Exhibit 17.  I'm just going to go through some of

25   it.  I could ask you questions without going through

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 14
of 130

1    it, but -- when was the last time you read it?

2         A.   Yesterday.

3         Q.   When did you get out here?

4         A.   This morning.

5         Q.   Good for you.

6              How was the flight?

7         A.   It was great, except I had to wait for the

8    gate.  It's classic, right.  You get here 10 minutes

9    early, and then you sit and wait for the gate for

10   45 minutes.

11        Q.   If it was raining today in San Francisco,

12   you would have been two or three hours late.

13             By the way, just out of fairness to you,

14   if you want to follow with me, I'm on page 3,

15   line 26/27.

16             How did you and your team familiarize

17   yourself with the debtors' operations?

18        A.   Several ways:  One, having discussions

19   with senior management, the individuals I referenced

20   earlier, particularly John Lowe and Kevin O'Connell;

21   to talking with their advisors, particularly the

22   individuals from Weil; and then, three, reviewing

23   documents that they sent us with respect to their

24   existing incentive plans.

25        Q.   What documents did they send to you with

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 15
of 130

1    respect to the existing incentive plans?

2         A.   Background in terms of the plans, plan

3    documents that describe the plans.

4         Q.   What was the title of the document?

5         A.   I don't know.

6         Q.   Did they send you any other documents

7    other than the plan documents?

8         A.   They could have.  I didn't review all the

9    documents.  My colleagues reviewed them.

10        Q.   Is Exhibit 2 one of the documents that

11   they gave you to review?

12             There's a section on the 2017 and 2018

13   STIPs toward the end.  Starts at page WP 4-34.

14   Mr. Friske, way at the end.

15        A.   Okay.  434; right?

16        MR. SLACK:  No.  No.  4-34.  So 4 dash 34.

17        THE WITNESS:  Oh, I see what you're saying

18   sorry.  4-34.

19             (Witness reviews document.)

20        THE WITNESS:  No.

21   BY MR. JULIAN:

22        Q.   4-35?

23        A.   I did not review this document, no.

24        Q.   4-36?

25        A.   No.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 16
of 130

1     Q.   4-37?

2     A.   No.

3     Q.   4-38?

4     A.   No.

5     Q.   4-39?

6     A.   No.

7     Q.   How about 4-40 and -41?

8     A.   No.

9     Q.   Did your team submit a formal report on

10    the 2019 STIP to the debtors?

11         MR. SLACK:  Objection to the form of the

12    question.

13         THE WITNESS:  Repeat the question.

14    BY MR. JULIAN:

15    Q.   Yeah.

16         Did you -- did your company submit a

17    formal written report to Weil or the debtors with

18    respect to the 2019 STIP?

19         MR. SLACK:  Objection to the form.

20         THE WITNESS:  We provided a report to the

21    compensation committee on the plan, yes, on the 2019

22    STIP.

23    BY MR. JULIAN:

24    Q.   Okay.  And also -- going back to your

25    declaration, Exhibit 17.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 17
of 130

1          What did you do to -- what did you and

2     your team do to familiarize yourselves with the

3     debtors' business goals?

4          A.   Reviewed documents they sent us that would

5     have the goals that were in them in the 2018 STIP.

6     Also talked to management as well in terms of the

7     goals that they had in the 2018 STIP.

8          Q.   What did the debtors and their advisors

9     tell you about the debtors' operational history?

10         A.   Just with respect to the goals themselves,

11    how they were performing relative to those goals

12    that were in the 2018 STIP.  It was really focused

13    on the goals that were in the STIP.

14         Q.   How so?

15         A.   How so -- could you -- how so --

16         Q.   What did they tell you about the goals in

17    the 2018 STIP?

18         A.   Just how they were performing relative to

19    those goals.  Okay.  Here are the goals we have in

20    the STIP, and this is the general trends of how

21    we're performing against those goals.

22         Q.   By "goals" are you referring to the

23    performance metrics?

24         A.   Yes.

25         Q.   And did they explain anything else to you

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 18
of 130

1   about the debtors' operational history other than

2   what you've just told me?

3       A.   No.

4       Q.   What did the debtors and their advisors

5   explain to you about the debtors' financial

6   performance?

7       A.   Beyond what was, again, relative to what

8   they had in the 2018 STIP --

9       Q.   Sure.

10      A.   -- not -- not anything that I recall.

11      Q.   What did the debtors and their advisors

12  explain to you about various issues about the

13  debtors' work force and employees' programs?

14      A.   Nothing that I recall.

15      Q.   On page 4, line 5, of your declaration --

16      A.   Yes.

17      Q.   -- you testified that "The debtors

18  performed significant due diligence in developing

19  the 2019 STIP."

20           What "due diligence" are you referring to

21  there?

22      A.   So with respect to the due diligence in

23  that STIP, looking at the metrics that they were

24  going to use as part of the STIP, so the performance

25  metrics with safety -- the category of safety,

1    financial and customer service.  In addition to

2    that, the goals that they were setting relative to

3    those metrics.

4            In terms of the due diligence, it's just

5    talking about whether those metrics were in line

6    with the priorities of the organization and then

7    whether the goals themselves were appropriate.

8        Q.   What did you do to determine -- withdraw

9    the question.

10           Did you do anything to determine whether

11   or not the safety goals were appropriate?

12       A.   No.

13       Q.   On page 5 of your declaration, line 4, you

14   testified that "The debtors' compensation committee

15   (with the assistance of WTW) conducted a thorough

16   evaluation of the debtors' existing STIP for

17   purposes of formulating the 2019 STIP."

18           What thorough evaluation of the debtors'

19   existing STIP did the compensation committee, with

20   your assistance, perform?

21       A.   It reviewed the metrics that were used in

22   the 2018 STIP.  It reviewed the weightings that were

23   applied to those metrics in the 2018 STIP.  It

24   reviewed the performance period, the annual -- fact

25   that it's measured over an annual performance period

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 20
of 130

1    as part of the STIP and then the range of

2    performance, the fact that somebody could earn zero

3    versus up to 200 percent of target under the plan,

4    were the primary aspects of it that I was involved

5    in, in terms of the review that I was involved in.

6        Q.   And when you conducted that evaluation,

7    was the word "the metrics" in the same form as in

8    your declaration, that is the metrics that ended up

9    being proposed to the court?

10       MR. SLACK:  Objection to the form of the

11   question.

12       THE WITNESS:  So when I reviewed -- I'm

13   sorry --

14   BY MR. JULIAN:

15       Q.   When you first reviewed the debtors'

16   proposed 2019 STIP, were the metrics in the form

17   exactly like it is on page 7 of your declaration?

18       A.   I don't recall the details under each of

19   the metrics to know whether there were any

20   modifications made to the metrics.  I know initially

21   the weights were slightly different than when we

22   first reviewed it.  Beyond that --

23       Q.   So let's go -- I appreciate it.

24            Did I cut you off?

25       A.   No.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 21
of 130

1      Q.    Let's go back to Exhibit 2 for a baseline.

2   Go to that page WP dash --

3      MR. SLACK:  WP 4 dash.

4   BY MR. JULIAN:

5      Q.    -- 38 and 39.  There you go.

6      A.    So this is the 28 -- 2018, I should say.

7      Q.    Yeah.

8            So Mr. Mistry identified this as the 2018

9   STIP structure and performance targets in his

10  deposition.

11           You'll see that, for example, the Public

12  Safety Index has 10 percent weight for three things:

13  Vegetation non-exempt pole clearing, 25 percent;

14  routine line vegetation management, 50 percent; and

15  tree mortality mitigation program, 25 percent.

16           And if you go back to your declaration,

17  you'll see that has changed in the wording to

18  "enhanced vegetation management and system

19  hardening."

20           So does that refresh your recollection as

21  whether -- withdraw the question.

22           Let me ask you, which format was the STIP

23  in when you first started working on it?

24      MR. SLACK:  Objection to the form.

25           You can answer.

www.veritext.com                                    888-391-3376

1    BY MR. JULIAN:

2         Q.   The 2018 version or the one that you have

3    in front of you, 2019?

4         MR. SLACK:  Objection to the form.

5         THE WITNESS:  I don't recall what the original

6    version of the 2019 STIP metrics were.

7    BY MR. JULIAN:

8         Q.   Okay.  Back to your declaration, page 5.

9              We left off at line 5; right?

10        A.   Um-hum.

11        Q.   You testified, "This evaluation resulted

12   in a modification of the performance metrics to put

13   a greater emphasis on safety and financial

14   performance and the timing and level of potential

15   awards to address the uncertainties associated with

16   the Chapter 11 cases in the absence of any LTIP

17   grants in 2019."

18             Let me ask you a question about the first

19   part of your answer -- or testimony.

20             What modification was made in the

21   performance metrics to put a greater emphasis on

22   safety?

23        A.   Well, I'm referring to the greater

24   emphasis on safety and financial performance.

25        Q.   So that's a question on my part.

Veritext Legal Solutions

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 23
of 130

1    Were there any modifications made between

2    the 2018 STIP and the 2019 STIP that resulted in a

3    greater emphasis on safety?

4        MR. SLACK:  Objection to the form of the

5    question.

6        THE WITNESS:  Relative to the weight that was

7    placed on safety in both the 2018 and the 2019

8    plans, both had 50 percent of the weighting under

9    the STIPs applied to them.  So from that standpoint,

10   both had equal weighting relative to safety, but in

11   both were the most significant component of the

12   STIP, in both cases.

13   BY MR. JULIAN:

14       Q.   When you say "both were," what --

15       A.   I'm sorry.  The 2018 STIP and the 2019

16   STIP both had 50 percent of the overall performance

17   weighting aligned with safety.

18       Q.   Well -- thank you.  So they both had the

19   same weighting.

20            Was there greater emphasis on safety in

21   the 2019 than the 2018 STIP, in your view, in any

22   respect?

23       MR. SLACK:  Objection to the form.

24       THE WITNESS:  Beyond the weighting being

25   equivalent, I can't speak to whether there's more

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 24
of 130

1    emphasis in terms of the underlying metrics that

2    were in them.  To me both had 50 percent tied to

3    safety.

4    BY MR. JULIAN:

5        Q.   Was there a greater emphasis on financial

6    performance in the 2019 STIP versus the 2018 STIP?

7        A.   Yes.

8        Q.   How so?

9        A.   The weighting on financial performance was

10   increased from 25 percent of the overall performance

11   score in the 2018 STIP to 40 percent of the overall

12   performance weighting in the 2019 STIP.

13       Q.   Who first proposed that?

14       A.   I first proposed increase in the weight on

15   financial performance as part of my initial guidance

16   to the committee, the compensation committee.

17       Q.   What were your reasons?

18       A.   That in a restructuring situation, in

19   particular, but in general in companies, by having a

20   strong focus on financial results can provide

21   benefits to all stakeholders, by having a viable

22   entity that -- which you can make investments in

23   safety and people across the enterprise.  So it

24   really starts with having a strong financial base in

25   which to fund all of those investments.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 25 of 130

1     Q.   So you're saying that factor is applicable

2  whether in bankruptcy or not?

3     A.   I would say arguably -- yes, to answer

4  your question.  In fact, I'd say it's actually more

5  applicable in bankruptcy given the nature of the

6  situation in terms of trying to maintain the estate

7  to maximize value for all stakeholders.

8     Q.   Did you explain that to the committee?

9     A.   I did.

10     Q.   Did anyone explain a contrary view?

11  MR. SLACK:  Objection to the form of the

12  question.

13  THE WITNESS:  In what way?  Is there --

14  BY MR. JULIAN:

15     Q.   Did anyone say that the performance factor

16  should stay at 25 percent?

17     A.   The performance factor for the financial

18  metric should stay at 25 percent?

19     Q.   Yes.

20     A.   There was discussion around the entire

21  plan, so in terms of the weightings and the

22  different metrics and how they're constructed.

23     Q.   Did anyone say to you, we think it should

24  be staying at 25 percent, the financial performance?

25     A.   I don't recall that statement, no, of

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 26 of 130

1    anybody making that statement.

2         Q.   Was it a close debate on going from 25 to

3    40?

4         MR. SLACK:  Objection to the form of the

5    question.

6         THE WITNESS:  I'm not sure how you define

7    "close," what a close debate would be.  But, yeah,

8    in fact, I think initially we had suggested a

9    35 percent weighting on financial.  And so there's

10   discussions beginning to think about it.  As the

11   committee talked about it, it was modified to

12   40 percent in subsequent discussions.

13   BY MR. JULIAN:

14        Q.   Did anyone give you any audits or reports

15   on safety to consider in making that recommendation?

16        MR. SLACK:  Objection to the form.

17        THE WITNESS:  No.

18   BY MR. JULIAN:

19        Q.   Did anyone give you any reports or orders

20   by the PUC with respect to safety?

21        A.   Not that I'm aware of, no.

22        Q.   Anyone give you any reports or orders from

23   the PUC with regard to modification of the STIP?

24        A.   No.

25        MR. JULIAN:  Show you Exhibits 21 and 22.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 27
of 130

1          (Tort Committee Exhibits 21 and 22 were

2          marked.)

3   BY MR. JULIAN:

4        Q.   I'm going to identify each one for the

5   record.

6        A.   Go ahead.

7        MR. JULIAN:  Exhibit 21 is the decision

8   ordering Pacific Gas and Electric Company to

9   implement the recommendations of the NorthStar

10  report.  Date of issuance, December 5, 2018.  Issued

11  by the Public Utilities Commission of the State of

12  California in Investigation 15-08-019.

13          And Exhibit 22, on the second page, is

14  entitled, "Assessment of Pacific Gas and Electric

15  Corporation and Pacific Gas and Electric Company

16  Safety Culture.  Prepared for California Public

17  Utilities Commission.  May 8, 2017.  Final Report,

18  By NorthStar Consulting Group."

19  BY MR. JULIAN:

20       Q.   And I'll represent to you -- this is a

21  couple hundreds pages long, but I've taken excerpts

22  out of it.

23          So let me start with Exhibit 21.

24          Have you ever seen Exhibit 21 before?

25       A.   I don't believe so, no.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 28
of 130

1          Q.    Did you and your team consider Exhibit 21

2    in connection with your STIP work for the debtors?

3          A.    Not that I'm aware of, no.

4          Q.    Have you ever seen Exhibit 22 before, a

5    Safety Culture Report by NorthStar Consulting Group?

6          A.    No, not that I'm aware of.

7          Q.    So Exhibit 21, let's look at that.

8                At the last page of this PUC order, PUC

9    has ordered Pacific Gas and Electric Company to

10   implement the recommendations set forth in the

11   NorthStar report no later than July 1, 2019; right?

12         A.    I see that, yes.

13         Q.    And then paragraph 2 of the order says,

14   "Pacific Gas and Electric Company is ordered to

15   submit quarterly reports on the status of its

16   implementation of the recommendations set forth in

17   the NorthStar report to the Commission's safety

18   enforcement division and to serve those reports to

19   the service list for this proceeding beginning the

20   fourth quarter of 2018."

21               Do you see that?

22         A.    I do.

23         Q.    Now, I understand you're not familiar with

24   this document, Exhibit 22, but I'm going to take you

25   to the last three pages, to the recommendations of

1    NorthStar to which the PUC order refers.

2            So we're looking at the third-to-the-last

3    page, which is marked VII-19, and the

4    recommendations on the bottom of that page.

5            Do you see that?

6        A.   The highlighted -- well, I see the

7    recommendations for PG&E, yes.

8        Q.   So let's start before the highlighting.

9            The first sentence of the recommendations

10   by NorthStar, which the PUC has ordered be

11   considered, are "None of the key performance

12   indicators currently considered for use in measuring

13   safety culture should be included as an incentive

14   measure," as part of the STIP or the LTIP.

15           Do you see that?

16       A.   I do.

17       Q.   Did anyone tell you that the PUC had

18   ordered PG&E to implement that recommendation?

19       A.   No.

20       Q.   The next highlighted part in that

21   paragraph says, "Most of the proposed metrics are

22   based on either employee surveys or near hit/CAP

23   reporting.  Incentives tied to employee submittals

24   will ensure targets are met and may minimize the

25   value of the submittals (for example, a sudden

1    influx of not particularly meaningful submittals

2    prior to the end of a reporting period).  Similarly,

3    an incentive tied to survey results will drive

4    positive reporting rather than true results."

5              Did you or your team look at anything

6    dealing with that subject in evaluating the metrics?

7         A.   No.

8         Q.   Paragraph 4, recommendation reads,

9    "Re-evaluate the appropriateness of the earning from

10   operations component of the STIP due to its lack of

11   transparency and the ongoing adjustments for items

12   impacting comparability."

13             Did anyone tell you that recommendation

14   had been ordered by the PUC?

15        A.   They did not.

16        Q.   Did or your team evaluate the

17   appropriateness of earning from operations component

18   of the 40 percent financial performance metric?

19        A.   We did consider an earnings from

20   operation-like measure, a profit measure.  And

21   all -- in fact, all of PG&E's peers have some form

22   of financial metric in their incentive plan, their

23   STIP equivalent.  Many companies have different

24   definitions of that.

25             So we didn't get into the exact details of

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 31
of 130

1  this particular measure, but the very fact of having

2  an earnings from operations or an operating

3  earnings-type measure is very common, and we

4  considered that in our deliberations.

5        Q.   What did you tell the compensation

6  committee about the propriety of an earning from

7  operations component of the STIP?

8        A.   That having some form of earnings metric,

9  an earnings from operation metric, would be very

10  common with companies in general.  It's common --

11  their industries peers and even more common in a

12  restructuring.  Some definition of a metric of

13  operating earnings or cash flow, which is oftentimes

14  a synonymous metric, is very common in a

15  restructuring situation.

16        Q.   Have you heard of NorthStar before?

17        A.   No.

18        Q.   Does it surprise you that some report was

19  made to the PUC that they adopted, said that the

20  current emphasis on financial performance had the

21  lack of transparency to it?

22        MR. SLACK:  Objection to the form of the

23  question.

24        THE WITNESS:  I'm not familiar with NorthStar

25  or their work, so I can't really comment on the

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 32
of 130

```
1    propriety of any of the comments in the document.
2    BY MR. JULIAN:
3        Q.   Do you think there's any lack of
4    transparency in the financial performance metric?
5        A.   Not that I'm aware of.
6        Q.   The fifth recommendation is to "Revisit
7    all STIP metrics and targets in light of the
8    enterprise-wise Safety plan recommended by
9    NorthStar."
10            Did you do that?
11       A.   We did not -- I did not.
12       Q.   Pardon me?
13       A.   I did not, no.
14       Q.   Did your team do that?
15       A.   Not that I'm aware of, no.
16       Q.   The next sentence reads, "Set multiyear
17   targets to drive performance."
18            Did your team make that recommendation?
19       A.   No, because typically in a restructuring,
20   you don't have multiyear targets.  If anything, you
21   would have shorter term targets through the
22   restructuring process.
23       Q.   You said "No, because," so does that mean
24   you knew about this recommendation?
25            MR. SLACK:  Objection to the form of the
```

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 33
of 130

1    question.

2         THE WITNESS:  No.  I'm sorry.  I thought you

3    asked me if we looked at multiyear targets, not

4    relevant to this -- to this specific -- just in

5    general, the concept of multiyear targets.

6    BY MR. JULIAN:

7         Q.   You wouldn't normally do that, is what

8    you're saying?

9         A.   We would not normally have multiyear

10   targets in an incentive plan -- a STIP-like

11   incentive plan for a company in a restructuring

12   situation.

13        Q.   The next sentence reads, "Include a

14   contractor safety metric in the STIP."

15             Did you advise the committee to include a

16   contractor safety metric in the STIP?

17        A.   No, we didn't -- no, we didn't advise any

18   specific safety metrics.

19        Q.   Does the 2019 STIP have a contractor

20   safety metric in it?

21        A.   I don't know.  I don't believe so.

22        Q.   Next sentence recommends, "Following the

23   development of the enterprise safety plan, PG&E

24   should develop STIP and BPR metrics that measure

25   plan implementation adoption and the effectiveness

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 34
of 130

1  of the various initiatives identified in the plan."

2         Do you have any idea what that means?

3     A.   Not really.  I don't know what "BPR"

4  stands for.  I think it's just saying they should

5  have these types of metrics.  But, no -- beyond

6  that, no, I don't know what it's saying.

7     Q.   Last page, on Point No. 4, highlighted

8  that.  This is a recommendation for the Commission.

9  The highlighted portion reads, "As with any

10 incentive mechanism, the potential for gaming is

11 real."

12         Did you evaluate whether there was a

13 potential for gaming in the PG&E 2019 STIP?

14     MR. SLACK:  Objection to the form of the

15 question.

16     THE WITNESS:  I'm not sure what "gaming" means

17 in the context of this point.  So, no, because I

18 don't know what they mean by "gaming."

19 BY MR. JULIAN:

20     Q.   Do you know if any -- well, let's explore

21 that.

22         Do you know if any of the 2019 metrics

23 relied upon PG&E employees' reports of the success

24 of safety measures or financial performance?

25     MR. SLACK:  Objection to the form.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 35
of 130

1          THE WITNESS:  I don't.

2     BY MR. JULIAN:

3          Q.   Do you understand my question?

4          A.   You asked me if the metrics rely on

5     employees reporting results as the basis for

6     determining performance under the 2019 STIP.

7          Q.   Yes.

8          A.   And I don't know exactly the basis for the

9     metrics.

10         Q.   What you're saying is that there could be,

11    there could not be; you just don't know?

12         A.   Correct.

13         Q.   Got it.

14              I think what they're saying about gaming

15    is if the metrics rely upon individual employee's

16    reports of their performance, they could be gaming

17    the system in order to make the performance metrics'

18    targets met?

19         MR. SLACK:  Objection to the form of the

20    question.

21         THE WITNESS:  Well, I can't speak to what

22    they're referring to because that's -- you're

23    speculating what they may be saying.

24              But I will say that in any incentive plan,

25    there is always the possibility that individuals

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 36
of 130

1    could somehow manipulate results to improve the

2    performance of the plan.  That's a function of any

3    incentive plan and whether -- whoever measures it.

4    And that's why there are systems in plan to guard

5    against that, governing systems, auditing systems,

6    so forth.

7    BY MR. JULIAN:

8         Q.   Do you have any opinion as to whether or

9    not you believe PG&E should have given you this

10   Exhibit 21 and 22 in order for you to do your job on

11   the 2019 STIP?

12        MR. SLACK:  Objection to the form.

13        THE WITNESS:  I don't believe that it was

14   necessary for us to have seen this input.  This is

15   input for them to consider in determining the

16   appropriate performance metrics.

17   BY MR. JULIAN:

18        Q.   And you did not do that?

19        A.   Do what?  I'm sorry.

20        Q.   Did you determine appropriate performance

21   metrics?

22        A.   No, we did not determine the performance

23   metrics for the plan.

24        Q.   What did you do with respect to

25   performance metrics?

Veritext Legal Solutions

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 37
of 130

1      A.   We observed the performance metrics that

2   were -- that had been used in the 2018 STIP and were

3   being proposed in the 2019 STIP and provided input

4   as to whether or not -- as a general class of

5   metrics, safety, customer satisfaction, financial,

6   whether those types of metrics are common metrics in

7   incentive plans.

8      Q.   Did you advise the committee on whether

9   those metrics in the 2019 STIP plan were reasonable?

10      A.   Again, the broad category of metrics,

11   safety, financial, customer engagement, having those

12   types of metrics in the 2019 STIP, yes, we did

13   advise them that those types of metrics in a STIP

14   plan, investment plan, are reasonable -- is

15   reasonable.

16      Q.   Don't you think you should have been given

17   an order that talks about whether those types of

18   metrics are reasonable?

19      MR. SLACK:  Asked and answered.  Objection to

20   the form.

21      THE WITNESS:  Again, what we advised on was

22   having these types of metrics.  We did not advise on

23   what specific metrics within those categories were

24   most effective at helping them achieve their

25   business objectives.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 38
of 130

1    BY MR. JULIAN:

2         Q.    Okay.   Let's go through some of the

3    documents in front of you.   We'll start with

4    Exhibit 3.

5              Were you given a copy of Exhibit 3?

6         A.    No, not that I'm aware of.

7         Q.    Exhibit 4?

8         MR. SLACK:  Can I -- sorry.

9              What do I push on this?   I'm not familiar

10   with --

11             (Discussion off the record.)

12   BY MR. JULIAN:

13        Q.    Exhibit 4 is Judge Montali's order

14   authorizing the establishment of a management

15   retention program dated July 13, 2001 in the first

16   Pacific Gas and Electric Company Chapter 11.

17             Did you and your team consider this order?

18        A.    No.

19        Q.    Exhibit 5 is an e-mail chain among Pacific

20   Gas employees about the Caribou-Palermo line.

21             I don't suppose you looked at this.

22        A.    No.

23        Q.    Exhibit 6 is CAL FIRE's April 28, 2016

24   news release determining the cause of the

25   destructive Butte fire.

1              Did your team consider that?

2         A.   No.

3         Q.   Exhibit 7 is an e-mail chain dealing with

4    near hits on the Caribou-Palermo line, among other

5    things.

6              Did your team review this?

7         A.   No.

8         Q.   Exhibit 8 is the judgment in the criminal

9    case brought against Pacific Gas arising out of the

10   San Bruno gas explosion.

11             Did your team consider that?

12        A.   No, did not review this.

13        Q.   Are you aware that Pacific Gas was

14   convicted of various counts of gas pipeline safety

15   violations in connection with the San Bruno

16   explosion?

17        MR. SLACK:  Objection to the form.

18        THE WITNESS:  I had seen reports that there had

19   been actions in the past, so I was aware of general.

20   BY MR. JULIAN:

21        Q.   Did you consider that in connection with

22   your engagement?

23        A.   No.

24        Q.   And are you aware that the jury convicted

25   Pacific Gas of obstructing the National

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 40
of 130

1   Transportation and Safety Board's investigation of

2   the San Bruno explosion?

3        MR. SLACK:  Objection to the form.

4        THE WITNESS:  No.

5   BY MR. JULIAN:

6        Q.   Did you consider that in your engagement?

7        A.   No.

8        Q.   Exhibit 9 is a CAL FIRE May 25, 2018 news

9   release about determining the cause of four

10  wildfires in Butte and Nevada counties stating,

11  among other things, in those bullet points that

12  CAL FIRE has determined the fire was caused by tree

13  branches falling onto PG&E power lines.

14        Did you consider that report in connection

15  with your engagement?

16        MR. SLACK:  Objection to the form.

17        THE WITNESS:  I did not consider this report,

18  no.

19  BY MR. JULIAN:

20        Q.   Exhibit 10 is a June 8, 2018 CAL FIRE news

21  release dealing with the determination of the causes

22  of 12 wildfires in 2017.

23        Did you consider that in connection with

24  your engagement?

25        A.   I did not consider this report, no.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 41
of 130

1    Q.   Exhibit 11 is a PUC order instituting

2    investigation and order to show cause, date of

3    issuance December 14, 2018, dealing with, among

4    other things, an allegation that PG&E's employees

5    falsified locate-and-mark records dealing with

6    underground excavations where utility lines were.

7          Did you consider that in your report?

8    MR. SLACK:  Objection to the form.

9    THE WITNESS:  I did not, no.

10   BY MR. JULIAN:

11   Q.   Exhibit 12 is a probation officer report

12   dated -- what's the date -- filed in the criminal

13   action involving PG&E on January 9, 2019 dealing

14   with whether or not the probation officer thought

15   that PG&E had reported a settlement with the Butte

16   County District Attorney's Office.

17          Did you consider that in connection with

18   your engagement?

19   A.   I did not consider this, no.

20   Q.   Exhibit 13 is in order to show cause

21   issued by Federal Judge Alsup on January 9, 2019 in

22   the criminal action involving Pacific Gas and

23   Electric, dealing with whether or not PG&E's

24   conditions of probation should be modified.

25          Did you consider that in connection with

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 42
of 130

1   your engagement?

2        MR. SLACK:  Objection to the form.

3        THE WITNESS:  No, I did not consider this

4   document.

5   BY MR. JULIAN:

6        Q.   So did anyone advise you or inform you

7   that Federal Judge Alsup was considering imposing

8   new conditions of probation dealing with imposing a

9   wildfire mitigation plan on PG&E?

10       MR. SLACK:  Objection to the form.

11       THE WITNESS:  No, not that I recall.

12  BY MR. JULIAN:

13       Q.   And were you aware that Judge Alsup has

14  issued an order stating that he is going to impose

15  the new conditions on April 2, 2019?

16       A.   No.

17       Q.   So did -- in your discussions with the

18  compensation committee, did the compensation

19  committee or you consider holding off on creating

20  the wildfire safety metric in the 2019 metrics until

21  finding out what wildfire safety metric Judge Alsup

22  was going to impose on PG&E?

23       MR. SLACK:  Objection to the form of the

24  question.

25       THE WITNESS:  No.  The discussion was all

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 43
of 130

1    around -- that I was part of was around safety and

2    importance of safety for the company and having an

3    incentive plan that reinforced that.

4    BY MR. JULIAN:

5        Q.  And if the federal judge imposes a safety

6    metric totally different than the safety metric in

7    that 10 percent in the 2019 metrics, do you think

8    you would have to re-evaluate it?

9        MR. SLACK:  Objection to the form of the

10   question.

11       THE WITNESS:  Well, the plan is a matter of the

12   design.  There is -- ultimately it's up to the

13   compensation committee's discretion in terms of how

14   the plan is adjudicated and paid over time.  So I

15   would assume that they would take any new

16   information into account as they consider the

17   payments.

18          Again, the plan is just a prospective

19   plan.  There's nothing guaranteed in the plan.  So

20   it's a matter of how the company performs against

21   the metrics over the course of the year and

22   quarters.

23   BY MR. JULIAN:

24       Q.  And if the law changes on what the metrics

25   should be, shouldn't they be changed?

www.veritext.com                                                   888-391-3376

1      MR. SLACK:  Objection to the form of the

2   question.

3      THE WITNESS:  Again, I think that -- in cases

4   that I'm -- in situations I'm involved in, the

5   compensation committee again retains the discretion,

6   as they do here, to make adjustments to the payouts

7   that would be provided under the plan as new

8   information is brought forth.

9   BY MR. JULIAN:

10     Q.   Do you remember when the compensation

11  committee approved the 2019 STIP?

12     A.   I do.

13     Q.   When?

14     A.   I believe it was at the January 23rd

15  compensation committee meeting.

16     Q.   Did you do any work for PG&E with respect

17  to the 2019 compensation STIP?  Sorry.  After

18  January 23rd?

19     A.   Other than respond to questions that were

20  posed to us, no.

21     Q.   And who posed the questions to you?

22     A.   It would have been management posing

23  questions.

24     Q.   What questions did management propose?

25     MR. SLACK:  So I'm going to instruct you to the

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 45
of 130

1 extent that there were communications that were --

2 and questions that were done in connection with

3 litigation or the bankruptcy, as opposed to advising

4 the board, I would instruct you not to answer on the

5 grounds of privilege and work product.

6         THE WITNESS:  Okay.

7         MR. SLACK:  Okay.

8         THE WITNESS:  So would you repeat the question

9 then, please.

10 BY MR. JULIAN:

11     Q.   Yes.

12         What questions did management ask you,

13 unless your counsel says counsel participated in the

14 questioning?

15         MR. SLACK:  No, that's not the instruction.

16 That's not the instruction.  The instruction is

17 whether it's coming from management.

18         But if the design was to work with the

19 lawyers in connection with the bankruptcy

20 proceeding, such as this motion, for example, that's

21 privileged and you shouldn't be discussing it.

22         THE WITNESS:  Okay.

23         So with respect to the 2019 STIP, the

24 questions that were posed post the 23rd, that I

25 recall, really had to do with two modifications that

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 46
of 130

1    were made to the STIP prior -- sorry -- following

2    the committee's approval on January 23rd.

3                    One was the inclusion of an individual

4    performance modifier, and the second was to modify

5    the target opportunities for certain individual --

6    I'm sorry -- certain participants in the 2019 STIP

7    by increasing them by 25 percent of the target

8    opportunities.

9                    And the question was simply, we're

10   contemplating doing this.  What do you think?

11   BY MR. JULIAN:

12        Q.   And then did they do it?

13        A.   They did -- it's my understanding, yes,

14   that they proceeded with those two modifications.

15        Q.   How was the individual performance

16   modifier changed after January 23rd?

17        A.   The individual performance modifier in the

18   2019 STIP -- there actually was no individual

19   performance modifier in the 2019 STIP as approved by

20   the compensation committee on January 23rd.

21        Q.   So go to Exhibit 17, your declaration.

22                    And tell me where in your declaration you

23   discuss the individual performance modifier.

24        A.   It is on page -- I think it's 10 -- or 6

25   of 10, I guess it is, in line 16.

www.veritext.com                                           888-391-3376

1          And so, again, to -- what was approved on

2     January 23rd did not have this provision.

3          Q.    Did management tell you why they made that

4     change?

5          A.    They did.

6               Historically the company had an individual

7     performance component, "historically" meaning in the

8     2018 STIP.  And, my understanding, in STIPs prior to

9     that, there was an individual performance modifier.

10               My recommendation to them is -- back in

11     early January -- January 23rd was they would not

12     have an individual performance modifier.  And so

13     subsequent to that, management recommended that --

14     they felt it was important to reinstitute the

15     individual modifier that they had historically.

16          Q.    Why did you suggest, in connection with

17     the January 23rd approval, not to have an individual

18     performance modifier?

19          A.    Because in a restructuring situation where

20     there are many changes that are going on with the

21     business, there's a significant amount of

22     uncertainty, there's a lot of -- just a lot of

23     uncertainty, what I have found is that it's much

24     simpler, much less complex -- the majority have a

25     lot of complexity happening -- to not have an

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 48
of 130

1     individual component, to say that everybody in this

2     plan for this period of time is measured on the same

3     basis; in this case, the 50 percent on safety, the

4     40 on financial, and the 10 on customer

5     satisfaction.

6              And it just provides more clarity, more

7     certainty during the restructuring period, more

8     simplicity, which is good.

9          Q.   Okay.  And where is the target opportunity

10    for 25 percent?  Same place?

11         A.   No.  Let's see.  I'm looking to see . . .

12         Q.   The 25 percent change that you referred to

13    a moment ago is not in the same paragraph, 4(b)?

14         A.   No, that was the -- for the 10 percent of

15    the population that are viewed as high performers,

16    they're eligible for an additional 25 percent award.

17             And in addition to that -- and let me see

18    if it's referenced in here.  Not recalling exactly

19    where it's at.  And I may not have actually

20    mentioned it because it's not part of what we had

21    looked at in terms of the opportunities.  So I don't

22    think it is referenced in here because, again, I

23    wasn't commenting on the opportunity levels of

24    participants.

25         Q.   I think I'll come back to that.

1      A.    Okay.

2      Q.    The debtors filed a motion for approval of

3  2018 STIP awards and then withdrew that motion in

4  February, February 28.

5          Did the debtors or Weil seek your advice

6  on asking for approval or withdrawal of the 2018

7  STIP?

8      MR. SLACK:  So to the extent -- you can answer

9  that question with respect to the company.  You

10  cannot answer that -- I would instruct you not to

11  answer with respect to Weil.

12      THE WITNESS:  So, no, the company did not seek

13  our advice on whether or not to pay the 2018 STIP

14  award.

15  BY MR. JULIAN:

16      Q.    And did you discuss that topic with Weil?

17  But don't tell me what was discussed.

18      MR. SLACK:  I'm going to instruct you not to

19  answer the question.

20  BY MR. JULIAN:

21      Q.    Have you been retained by Weil as an

22  expert witness?

23      A.    We have been retained by Weil.  I don't

24  know the designation of that only because I just

25  don't know the legal designation versus -- I don't

www.veritext.com                       888-391-3376

1    know the legal designation . . . so I don't know.

2        Q.    Okay.  Did anyone from the company explain

3    to you why the company withdrew the request for

4    bankruptcy court's approval of the 2018 STIP awards?

5        A.    It was discussed at the compensation

6    committee meeting in February, February 19th.  So

7    they didn't explain it to me, but it was discussed

8    at the compensation committee.  And management made

9    the recommendation.  My recollection is just in

10   respect to the restructuring, the management was

11   recommending to make -- to recommend that decision.

12       Q.    What was discussed as to the reason why

13   the recommendation was made?

14       A.    It was my recollection it was just that

15   going through the restructuring process, they

16   thought that was the right answer, given all that

17   goes into the restructuring process.

18       Q.    Did you have an opinion on it?

19       A.    No.

20       Q.    Did you offer any advice with respect to

21   the withdrawal?

22       MR. SLACK:  Objection to the form.

23       THE WITNESS:  No.

24   BY MR. JULIAN:

25       Q.    Did you offer any comments?

1       A.   No.

2       Q.   Did you have a view as to whether or not

3   the withdrawal of the 2018 STIP award request was

4   prudent?

5       A.   No.

6       Q.   Did you advise the compensation committee

7   whether or not they should investigate whether or

8   not employees' work contributed to the San Bruno

9   explosion?

10      A.   I did not.

11      Q.   Gas safety violations?

12      MR. SLACK:  Objection to the form.

13      THE WITNESS:  I did not.

14  BY MR. JULIAN:

15      Q.   Obstruction of justice?

16      MR. SLACK:  Objection to the form.

17      THE WITNESS:  I did not.

18  BY MR. JULIAN:

19      Q.   2015 Butte fire?

20      MR. SLACK:  Objection to the form.

21      THE WITNESS:  No.

22  BY MR. JULIAN:

23      Q.   2016 Ghost Ship fire?

24      MR. SLACK:  Objection to the form.

25      THE WITNESS:  No.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 52
of 130

1    BY MR. JULIAN:

2         Q.   2017 fires?

3         MR. SLACK:  Objection to the form.

4         THE WITNESS:  No.

5    BY MR. JULIAN:

6         Q.   2018 fires?

7         MR. SLACK:  Objection to the form.

8         THE WITNESS:  No.

9    BY MR. JULIAN:

10        Q.   Did the compensation committee change the

11   2018 STIP annual review and annual payment to a

12   quarterly review and payment?

13        A.   It did.

14        Q.   Who proposed that?

15        A.   I did.

16        Q.   And did you discuss it with the

17   compensation committee?

18        A.   I did.

19        Q.   Did you discuss the reason?

20        A.   I did.

21        Q.   What did you discuss?

22        A.   That in my experience, given the

23   uncertainty, the amount of external factors that

24   impact employees' engagement in the business and

25   making sure that they achieve the goals, which

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 53
of 130

1    ultimately we're trying to do -- that's what the

2    incentive plan is for, to try to drive the

3    performance -- that having shorter measurement

4    periods that provide more close-in line of sight,

5    i.e., quarterly, is appropriate to drive that.

6            Also the fact that in a structuring,

7    non-annual incentives, whether it's quarterly,

8    semi-annually, are common.  In fact, the majority of

9    plans in restructurings don't maintain an annual

10   measurement period.  They go to a different

11   measurement period, most often quarterly.

12       Q.   When you gave that advice, were you aware

13   that CAL FIRE had said that PG&E's equipment caused

14   the 2015 Butte fire?

15       MR. SLACK:  Objection to the form.

16       THE WITNESS:  Well, I don't know what CAL FIRE

17   said, but, no, I wasn't aware of any reports of

18   other entities.

19   BY MR. JULIAN:

20       Q.   When you gave that advice, did you know

21   that CAL FIRE's investigators determined that some

22   of PG&E's equipment caused some of the 2017 fires?

23       MR. SLACK:  Objection to the form.

24       THE WITNESS:  Again, not knowing what CAL FIRE

25   said, no.  I wouldn't have --

www.veritext.com                                          888-391-3376

1    BY MR. JULIAN:

2        Q.   When you gave that advice, were you aware

3    that PG&E's own officials believed that it was

4    probable that their equipment in the Paradise area

5    was the ignition point for the 2018 Camp fire?

6        MR. SLACK:  Objection to the form.

7        THE WITNESS:  Again, not knowing whether the

8    individuals said all that or -- no, I didn't take

9    that into account.

10   BY MR. JULIAN:

11       Q.   So here's the problem for the tort

12   committee:  In the last four years, we have three

13   fires which the officials in PG&E have said was

14   caused by PG&E's equipment.  And the tort committee

15   believes there's a chance there could be another

16   fire in 2019.  And the 2017 fire was on October 8,

17   the 2018 fire was on November 8, 2018.

18            And how do you respond to the criticism of

19   the quarterly payments --

20       MR. SLACK:  Objection to the form of the

21   question.

22   BY MR. JULIAN:

23       Q.   -- that three-fourths of the STIP awards

24   could be out the door to the employees before

25   finding out whether their work contributed to a

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 55
of 130

1    fourth fire in five years?

2         MR. SLACK:  Objection to the form of the

3    question.

4         THE WITNESS:  I think that -- again, this plan

5    is a prospective plan, and the company has the

6    ability to manage the payments throughout the

7    period, whether or not they want to, as a committee,

8    make the payments.

9              I also think there are other mechanisms to

10   address any form of issues that may come up in terms

11   of negative impacts on the company, whether that's

12   terminating employees, performance plans, holding

13   back compensation on a go-forward basis.

14             So the 2019 STIP is a single tool in the

15   company's overall portfolio to align the behaviors

16   and to reinforce the objective of the company.

17   BY MR. JULIAN:

18        Q.   In this discussion on changing the annual

19   STIP payment to a quarterly payment, was there any

20   discussion at the compensation committee meetings

21   that you attended about the wisdom or propriety of

22   paying out the money before the company found out if

23   there was going to be yet another fire in

24   October/November of 2019?

25        MR. SLACK:  Objection to the form.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 56
of 130

1    BY MR. JULIAN:

2         Q.   Any discussion at all about that?

3         MR. SLACK:  Objection to the form.

4         THE WITNESS:  There was discussion around the

5    fact that there were going to be payments made

6    throughout the year, in general, as a general

7    matter, and the notion of so-called claw-backs, the

8    phrase that people used, ability to claw back.

9              So, yes, there was discussion.  And there

10   was -- it was the balancing of providing back to --

11   certainty to employees there would be some payment

12   coming out of this program with the potential that

13   actions or outcomes could happen during the course

14   of the year that may be counter to what they were

15   trying to achieve.

16             Yes, there was discussion on that.

17   BY MR. JULIAN:

18        Q.   But my question was, did any director say

19   the words, "There might be a fire in 2019.  We

20   should rethink that"?

21             Those words -- were those words said, that

22   concept?

23        MR. SLACK:  Objection to the form of the

24   question.

25             THE WITNESS:  I don't recall any director

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 57
of 130

1    saying those exact words.

2    BY MR. JULIAN:

3        Q.   How about something like it?

4        MR. SLACK:  Objection --

5    BY MR. JULIAN:

6        Q.   Anything at all about the fires discussed?

7        MR. SLACK:  Objection to the form of the

8    question.

9        THE WITNESS:  There was significant discussion

10   around safety, and fire obviously is part of that.

11   BY MR. JULIAN:

12       Q.   Move to strike your answer.  Not

13   responsive.

14       MR. SLACK:  You can't interrupt the witness.

15            So if you're done, you're done; it's fine.

16   But just because the questioner here doesn't like

17   the answer, you're entitled to finish.  So if you're

18   finished, great; if not, you should finish.

19   BY MR. JULIAN:

20       Q.   Go ahead, Mr. Friske.

21       A.   So there -- again, there was significant

22   discussion around safety and around how fire plays a

23   role in -- fire mitigation plays in that and how

24   that interacts with the incentive plan, the

25   short-term incentive plan.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 58
of 130

1        Q.    Was there any discussion about the
2    possibility of a fire in October/November of 2019?
3        MR. SLACK:  Objection to the form.
4        THE WITNESS:  There was a discussion about the
5    possibility of fire at any point in time and the
6    desire to make sure that that risk was --
7    BY MR. JULIAN:
8        Q.    What was said about that?
9        MR. SLACK:  Objection.
10           You know what, we're not -- twice
11   you've -- I know you don't mean to, but -- because
12   you're anxious, but there's twice that you've
13   interrupted him.
14   BY MR. JULIAN:
15       Q.    Go ahead and finish.
16       MR. SLACK:  What I would like to do is --
17           Do you need where you are in your answer
18   read back?
19       THE WITNESS:  Yes, please.
20       MR. SLACK:  Can you read back where the witness
21   was in his answer.  And read back the question also.
22           (Record read by reporter as follows:
23           "Question:  Was there any discussion about
24           the possibility of a fire in
25           October/November of 2019?")

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 59
of 130

1    THE REPORTER:  There was an objection.

2         (Record read by reporter as follows:

3         "Question:  There was a discussion about

4         the possibility of fire at any point in

5         time and the desire to make sure that that

6         risk was --")

7    THE WITNESS:  Mitigated.  Period.

8    BY MR. JULIAN:

9    Q.   What was the discussion on that point?

10   A.   That there needed to be significant

11   emphasis placed on mitigating -- or safety across

12   the board, but, in particular, fire mitigation.

13   Q.   Was there discussion about increasing the

14   metric from 10 percent?

15   A.   I recall discussions around all the metric

16   weightings.  I don't recall specifically to that

17   point, whether there was discussion.

18   Q.   Was there any discussion at the

19   compensation committee level about giving greater

20   weight to fire mitigation safety than financial

21   performance?

22   MR. SLACK:  Objection to the form of the

23   question.

24   THE WITNESS:  No, I don't recall that

25   discussion of those factors.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 60 of 130

1      MR. SLACK:  So we're about an hour, and so it's
2   up to you.
3      MR. JULIAN:  Good point.
4      MR. SLACK:  Good point?  All right.  Let's do
5   it.
6          (Recess taken.)
7   BY MR. JULIAN:
8      Q.   Back on the record.
9          Mr. Friske, if you could turn to
10  Exhibit 2, to page WP 4-40 and -41, toward the end.
11     A.   Um-hum.
12     Q.   This is PG&E's description of the STIP
13  calculation for 2018.  And on page WP 4-41,
14  paragraph 4, there's a section on individual
15  employee STIP payments.
16         Do you see that?
17     A.   I do.
18     Q.   And it says that "Leaders may modify
19  employee STIP payment based on his or her individual
20  performance."
21         Is that part of the 2019 plan?
22     A.   It is for up to 10 percent of the
23  population.  So not everyone can have an adjustment.
24  Only 10 percent of the participants in the 2019
25  STIP.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 61
of 130

1     Q.   What about the other 90 percent?

2     A.   They aren't eligible for any individual

3 modifier.

4     Q.   And what's the modifier for the 10 percent

5 pool?

6     A.   25 percent adjustment to the calculated

7 award.

8     Q.   Upward?

9     A.   Correct.

10    Q.   Is there any possibility for the

11 individual personal performance modifier to go

12 downward for 2019?

13    A.   There is not.

14    Q.   And that's a change from 2018; right?

15    A.   Correct.  But it's also a change, and it's

16 only eligible for the top -- the highest performers,

17 the top 10 percent performers.

18    Q.   Under the 2018, was the individual

19 performance modifier zero to 1.5?

20    A.   I'm not sure what the individual modifier

21 was in 2018, under the 2018 STIP.

22    Q.   But under the 2018 STIP, the modifier

23 could take the employee down to zero for the entire

24 pool; right?

25    A.   I don't know.

www.veritext.com                888-391-3376

1  Q. So what did you know about the performance
2  modifier for 2018 when you recommended the 2019
3  STIP?
4  MR. SLACK: Objection to the form of the
5  question.
6  THE WITNESS: That there was an individual
7  performance modifier.
8  BY MR. JULIAN:
9  Q. Did you know that the employee could be
10  taken to zero?
11  MR. SLACK: Objection to the form of the
12  question.
13  THE WITNESS: No, I don't know. They could
14  have been.
15  BY MR. JULIAN:
16  Q. Whose idea was it to change the individual
17  performance modifier from 2018 to 2019?
18  A. In the originally proposed 2019 STIP?
19  Q. Yes.
20  A. Again, I had made that suggestion.
21  Q. Of what it should be?
22  A. That there -- initial recommendation that
23  there would not be an individual performance
24  modifier.
25  Q. I see.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 63
of 130

1          And they accepted that recommendation?

2      MR. SLACK:  Objection to the form.

3      THE WITNESS:  That was what was approved by the

4  committee at the January 23rd meeting, correct.

5  BY MR. JULIAN:

6      Q.   Subsequently, the committee changed it to

7  have an upward modification for 10 percent of the

8  pool?

9      A.   They agreed to have an upward modification

10  for 10 percent of the participants, for up to

11  10 percent of the participants.

12      Q.   And who are the 10 percent of the

13  participants?

14      A.   They're not -- it's going to be the

15  highest performing individuals over the course of

16  the period.

17      Q.   Who determines who the 10 percent of the

18  pool will be?

19      A.   My understanding, they'll be nominated by

20  their managers, and then senior management will

21  determine who those individuals are ultimately.

22      Q.   On a quarterly basis?

23      A.   Correct.

24      Q.   Was there any discussion at the

25  compensation committee level about having an

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 64
of 130

1    individual performance modifier to take into account

2    an employee's culpability for prior disasters?

3        MR. SLACK:  Objection to the form of the

4    question.

5        THE WITNESS:  At the compensation committee

6    meetings, we had talked about not having a

7    performance -- an individual performance modifier as

8    part of the plan.

9    BY MR. JULIAN:

10       Q.   Right.

11            Did anyone say that's not a good idea,

12   some of these employees might have contributed to

13   the prior disasters?

14       MR. SLACK:  Objection to the form of the

15   question.

16       THE WITNESS:  They did not.  There was a

17   general discussion, again, of how the company --

18   this is a prospective plan, so there's always the

19   ability to adjust an award at the end of a

20   performance period.

21   BY MR. JULIAN:

22       Q.   By who?

23       A.   By the compensation committee and

24   management.

25       Q.   Individual awards or classes of awards?

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 65
of 130

1        A.    As far as I know, both.

2        Q.    Is there any metric given in the 2019 STIP

3    for what the compensation committee would consider

4    in reducing or eliminating an award?

5        A.    No.  That's the purpose of discretion,

6    that they can use their judgment to assess the

7    conditions under which such a change would be made

8    and then make a determination.

9        Q.    Is there any written metric in the STIP

10    that governs the exercise of that judgment?

11        A.    No.  It's unilaterally across the entire

12    plan.

13        Q.    What do you mean by "unilaterally across

14    the entire plan"?

15        A.    There's discretion across the entirety of

16    the plan whether to pay anything out, to pay certain

17    individuals out, to pay different metrics out.  It's

18    entirely a prospective discretionary plan.  So

19    that's what I mean, "unilaterally"; it's across all

20    aspects of the plan.

21        Q.    Was there any discussion at the

22    compensation committee level about how San Francisco

23    union employees were included in the STIP plan?

24        A.    Not that I recall.

25        Q.    Was there any discussion at the

1    compensation committee level about whether there

2    should be metrics to guide the compensation

3    committee in determining whether to grant quarterly

4    STIP awards?

5          A.    Are you referring to whether they used

6    their discretion?  I'm not sure, when you say

7    "metrics to guide" whether they grant the awards --

8          Q.    Yeah.

9                Other than discretion, was there any

10   discussion at the compensation committee as to

11   whether there should be metrics to guide the

12   compensation committee members to exercise their

13   discretion as to whether to grant quarterly awards?

14         MR. SLACK:  Objection to the form.

15         THE WITNESS:  No.  Because in my experience,

16   that's the whole point of discretion.  If you had

17   metrics to guide it, then it's not discretion; it's

18   driven by the metrics.  The plan has metrics.  The

19   discretion is there to allow them to use their

20   judgment outside the metrics that existed -- or

21   exist.

22   BY MR. JULIAN:

23         Q.    The financial performance metric was

24   changed from 25 to 40 over 2019 [sic] to 2019;

25   right?

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 67 of 130

1      A.    2018 to 2019.

2      Q.    What did I say?

3      A.    I think you said 2019 to 2019.

4      Q.    Let me start over.

5           The financial performance metric weighting

6    was changed from 25 percent in 2018 to 40 percent in

7    2019; is that right?

8      A.    That's correct.

9      Q.    Was there any discussion at the

10   compensation committee about putting the 15 percent

11   on wildfire mitigation instead of financial

12   performance?

13      MR. SLACK:   Objection to the form of the

14   question.

15      THE WITNESS:   I don't recall specific

16   discussion around that.   There's, again, general

17   discussion about the various weights tied to the

18   various metrics.

19   BY MR. JULIAN:

20      Q.    Which of your other clients have you

21   recommended shifting from an annual payment to a

22   quarterly payout?

23      A.    For companies in restructuring

24   situations --

25      Q.    Sure.

1    A.    -- it would be virtually all of them.  And

2    it may not necessarily be just quarterly.  Again, it

3    depends on the circumstances.  In some restructuring

4    cases, there may be shorter time frames, so you'd

5    recommend other time periods that align with the

6    case.

7    Q.    Is one of the reasons that you're in

8    bankruptcy and you want to incentivize your

9    employees to stay, and bankruptcy creates some

10   uncertainty?

11   MR. SLACK:  Objection to the form the question.

12   THE WITNESS:  I think it's really back to my

13   point earlier, which was, in a bankruptcy, a year --

14   there's a lot of uncertainty that looks out over

15   the course -- you incur over the course of a year.

16        And people are worried about the future of

17   the organization.  They're worried about their own

18   roles.  They're worried about whether they're going

19   to get compensated or not.  So by providing an

20   incentive that has a shorter time horizon on it, you

21   give them more certainty.

22        It allows them to focus on their job and

23   achieving their objectives than whether or not they

24   are going to have to wait a year to see if this gets

25   paid.  That's the primary reason.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 69
of 130

1    BY MR. JULIAN:

2        Q.   Do you think it was prudent to consider

3    that uncertainty?

4        MR. SLACK:  Objection to the form.

5        THE WITNESS:  To consider that uncertainty of

6    what I just described in establishing the plan?

7    BY MR. JULIAN:

8        Q.   Yes.

9        A.   Yes, I do.

10       Q.   Did you similarly consider the uncertainty

11   of a fire in November of 2019 might make it

12   imprudent to kick out incentive pay until you learn

13   the employees had corrected the wildfire risk in

14   California?

15       MR. SLACK:  Objection to the form.

16       THE WITNESS:  So, again, I considered all of

17   the various potential opportunities or potential

18   issues that might happen to a company.  Like in any

19   situation, there are things that can happen, whether

20   it's wildfire, whether it's global economic

21   recession, whether it's regulatory changes.

22            In all of my restructuring work, there are

23   the possibility of things that might happen during

24   the course of the year.  And that's a trade-off that

25   I think I and companies of my clients have to make

1    in determining the balancing.

2           Do you get the positive benefits from

3    having a quarterly payment versus the potential of

4    some extraneous event happening that otherwise

5    wasn't expected?

6    BY MR. JULIAN:

7           Q.   Have you met anyone who lost their home in

8    the 2017 or 2018 fires?

9           MR. SLACK:  Objection to the form of the

10   question.

11          THE WITNESS:  I have not.

12   BY MR. JULIAN:

13          Q.   Anyone who lost their loved ones in those

14   fires?

15          MR. SLACK:  Objection to the form of the

16   question.

17          THE WITNESS:  I have not.

18   BY MR. JULIAN:

19          Q.   Were any of your clients that were in

20   bankruptcy that you gave this advice to from

21   switching from an annual payment to a quarterly

22   payment in the situation of this company where they

23   were facing the threat of massive wildfires that

24   create death and destruction in California?

25          MR. SLACK:  Objection to the form of the

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 71
of 130

1    question.

2         THE WITNESS:  Not that exact circumstance, but

3    I've worked with a number of companies restructuring

4    where there was -- again, there were potentials that

5    negative things could happen, whether that's an

6    airline that could have events that would be quite

7    catastrophic that might happen in the course of a

8    year, or a car manufacturer that might have issues

9    with its products or other situations where things,

10   again, may happen during the course of a given year

11   that are unexpected and would have an impact on the

12   business.  Yes, in those circumstances.

13   BY MR. JULIAN:

14        Q.   Did any of those companies have State

15   agency orders pending against them saying that their

16   employees had willfully falsified the records?

17        MR. SLACK:  Objection to the form of the

18   question.

19        THE WITNESS:  I'm not aware of State orders

20   relative to any of those situations or any form of

21   State orders.

22   BY MR. JULIAN:

23        Q.   Take a look at Exhibit 14.  This is PG&E's

24   response to Judge Alsup's orders that he might

25   impose conditions of probation dealing with wildfire

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 72
of 130

1    mitigation.  And turn to page 48, line 8.

2           PG&E lawyers wrote, "Simply put, the

3    resources required to comply with the proposed

4    modifications do not exist.  PG&E does not have the

5    necessary funds.  Were PG&E allowed to pass on the

6    cost, the rate increases would be impressive.

7    Qualified labor shortage is even more problematic.

8    PG&E does not have, nor does it believe it could

9    find the qualified personnel necessary to complete

10   the proposed work."

11          Did you have any discussions with anyone

12   at PG&E about PG&E's financial ability to comply

13   with Judge Alsup's proposed conditions dealing with

14   the wildfire mitigation?

15        MR. SLACK:  Objection to the form.

16        THE WITNESS:  I did not.

17   BY MR. JULIAN:

18        Q.   Did you have any understanding at all as

19   to where PG&E is going to get the money to pay the

20   STIP awards?

21        A.   I assume from their operations, but beyond

22   that, no.  Most companies, in terms of their ongoing

23   operations, should usually fund the incentive

24   awards.

25        Q.   Let's turn to Judge Alsup's order which

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 73
of 130

1    followed this PG&E brief.  It's Exhibit 15.  Turn to

2    page 7.  I would like you to read to yourself the

3    entire paragraph, lines 14 through 27, and then tell

4    me when you're finished and I'll have a couple of

5    questions for you.

6         A.   Okay.

7              (Witness reads document.)

8         A.   Okay.  I've read it.

9         Q.   And do you have any opinion as to whether

10   or not what Judge Alsup is paying there -- one of

11   the things he's saying is PG&E should not put

12   profitability before wildfire safety?

13        MR. SLACK:  Objection to the form of the

14   question.  Lack of foundation.

15        THE WITNESS:  Can you ask the question again,

16   please.

17   BY MR. JULIAN:

18        Q.   Yes.

19             You're offered up as an expert in this

20   case; right?

21        MR. SLACK:  Objection to the form of the

22   question.

23   BY MR. JULIAN:

24        Q.   If you know.  If you don't know, tell me

25   you don't know.

www.veritext.com                                        888-391-3376

1       A.   Just repeat the question.

2       Q.   Is your interpretation of this one of the

3  things Judge Alsup is saying is that PG&E should not

4  put profit-making before wildfire safety?

5       MR. SLACK:  Objection to the form of the

6  question.

7       THE WITNESS:  Yeah, I'm not, based on this

8  paragraph, in a position to say what that judge was

9  inferring.

10  BY MR. JULIAN:

11      Q.   And based upon what this judge is saying

12  here, your interpretation of it, do you believe you

13  should go back and advise the compensation committee

14  to change the metric of financial performance from

15  40 percent to something lower?

16      MR. SLACK:  Objection as to the form.

17      MR. KAROTKIN:  Are you inferring that this is

18  an order directing the company to do anything in

19  terms of its performance?  Because it's not.

20  BY MR. JULIAN:

21      Q.   Go ahead.  You may answer.

22      A.   Repeat the question again.

23      Q.   She'll repeat it.

24           (Record read by reporter as follows:

25           "Question:  And based upon what this judge

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 75
of 130

```
1              is saying here, your interpretation of it,
2              do you believe you should go back and
3              advise the compensation committee to
4              change the metric of financial performance
5              from 40 percent to something lower?")
6         MR. SLACK:  Objection.
7              And there's an objection, right, to the
8    form?
9         THE REPORTER:  Yes, there's an objection.
10        THE WITNESS:  Based on my reading of this
11   paragraph, there's nothing here that would have me
12   go back and revise my recommendation.
13   BY MR. JULIAN:
14        Q.   Okay.  Do you have any present intent to
15   submit any further declarations in connection with
16   STIP motion proceedings in the bankruptcy court?
17        A.   I do not.
18        Q.   Okay.  What's the largest incentive plan
19   that you have ever advised on?
20        A.   What is the largest incentive plan?
21        Q.   I'm sorry.
22             Yeah, dollar amount of short-term --
23        A.   How are you defining "incentive plans"?
24        Q.   Pardon me?
25        A.   How are you defining "incentive plans"?
```

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 76 of 130

1      Q.    STIPs, short-term incentive plans.

2            What's the largest dollar amount you've

3   ever advised on?

4      A.    In terms of the target opportunity that

5   was provided to people?

6      Q.    Yes.

7      A.    Be in the hundreds of millions of dollars.

8   I don't know the exact amount.

9      Q.    Have you advised on any STIP plans where a

10  target goal was larger than 235 million?

11     A.    The target payout was larger than

12  235 million?

13     Q.    Yes.

14     A.    I don't believe so in a restructuring.

15  Outside of restructuring, potentially, but in a

16  restructuring, not that I can recall.

17     Q.    Under the performance metrics and the

18  multipliers that you have in this case for the 2019

19  STIP, what's the largest the amount of the STIP

20  award could be above the $235 million target?

21     MR. SLACK:  Objection to the form of the

22  question.

23     THE WITNESS:  I believe it is 335 million

24  approximately.

25  BY MR. JULIAN:

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 77
of 130

1      Q.   Have you ever been involved in a
2    Chapter 11 case involved in that large of a dollar
3    amount of STIP awards?
4      A.   I may have been.  Not that I recall.  This
5    is also one of the largest cases that have been in
6    place -- or that has been completed.
7      Q.   How was the customer satisfaction metric
8    changed from 2018 to 2019?
9      A.   I don't know.
10     Q.   So if you go to Exhibit 2, to the 2018
11   structure, on page WP 4-39, you'll see there's this
12   description of the customer weighting of 25 percent
13   and the definition.
14     A.   Um-hum.
15          (Witness reviews document.)
16     Q.   One thing you do remember is that the
17   weighting was changed from 25 percent in 2018 to
18   10 percent in 2019; correct?
19     A.   Correct.
20     Q.   Do you know if there were any other
21   changes in how the metric is employed or gauged
22   thereafter?
23     A.   I don't recall any of those changes.
24   There may have been; I don't recall.
25     Q.   What was the discussion at the

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 78
of 130

1  compensation committee about the reason of changing

2  the customer satisfaction from 25 to 10 percent

3  weighting?

4      A.   They were looking to have an increased

5  weighting on the financial component and didn't feel

6  that -- wanted to maintain the safety at 50 percent.

7  So that meant that the customer would be the one

8  area where they would take the percentages from.

9      Q.   Was there any discussion at the

10 compensation committee about changing the weighting

11 on wildfire mitigation for electrical from

12 10 percent to a higher number and taking it from

13 some other metric?

14     MR. SLACK:  I'm going to object to the form.

15 It's asked and answered.

16         You can answer.

17     THE WITNESS:  Not that I recall.

18 BY MR. JULIAN:

19     Q.   Do you know whether or not PG&E has linked

20 its 2019 STIP compensation metric to customer

21 satisfaction in any particular way?  Or is that a

22 detail you didn't deal with?

23     MR. SLACK:  Object to the form.

24     THE WITNESS:  It was -- a customer component is

25 the 10 percent.  But beyond that, no, I didn't deal

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 79
of 130

1   with the details of exactly how the metric operated.

2   BY MR. JULIAN:

3       Q.   Did anyone tell you how the -- the

4   determination of whether the 10 percent on wildfire

5   mitigation and systems hardening is to be

6   determined?

7       A.   It may have been discussed during

8   discussions of the metrics, but wasn't discussed

9   with me.  It was between --

10      Q.   But your team didn't get involved in

11  determining whether or not that was a reasonable

12  metric in terms of the component of the metric.  Not

13  the percentage, but the component.

14      A.   Yes.

15      Q.   And in determining -- did you or your team

16  get involved at all in advising PG&E as to the

17  reasonableness of the weighting of 10 percent on the

18  wildfire mitigation and system hardening?

19      MR. SLACK:  Objection to the form.

20      THE WITNESS:  We did not.

21  BY MR. JULIAN:

22      Q.   Who did advise the committee on that --

23      A.   I don't know.

24      Q.   -- if you know?  All right.

25          How did -- let's talk about base pay.

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 80
of 130

1         Do you know how PG&E calculates its base

2    pay for its employees?

3         A.   When you say "calculate," what do you

4    mean?

5         Q.   Terrible question.

6         In other words, do they go through a peer

7    review process of whether the employees at certain

8    levels -- what they get through their peers?

9         Do you know how any of that is set?

10        MR. SLACK:  Objection to the form.

11        THE WITNESS:  I don't know.

12   BY MR. JULIAN:

13        Q.   Did your team do any evaluation of whether

14   the base pay for the 10,000 employees were set at

15   the peers?

16        A.   My team did not.

17        Q.   And do you have any opinion as to whether

18   or not the base pay of the 10,000 PG&E employees who

19   were subject to the STIP awards is at market?

20        MR. SLACK:  Objection to the form.

21        THE WITNESS:  I have not done an analysis of

22   that, no.

23   BY MR. JULIAN:

24        Q.   Did you do any analysis to determine

25   whether or not the base pay plus the target STIP

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 81
of 130

```
1    awards to the 10,000-employee pool was at market,

2    below market, above market or at market?

3         MR. SLACK:  Objection to the form.

4         THE WITNESS:  So, again, my team did not do any

5    analysis of that.

6              (Tort Committee Exhibit 19 was marked.)

7    BY MR. JULIAN:

8         Q.   Let me show you Exhibit 19.

9         MS. WOLTERING:  It's in his binder.

10        MR. JULIAN:  Not in my binder.  How about

11   counsel?  Does counsel have it?

12        MR. SLACK:  I have it.  Do you have an extra

13   copy?

14        MS. WOLTERING:  No, there's one in each of the

15   binders.

16   BY MR. JULIAN:

17        Q.   So for the record, Mr. Friske, I've handed

18   you Exhibit 19, which is a copy of Pacific Gas and

19   Electric Company's wildfire mitigation plan filed

20   with the Public Utilities Commission of the State of

21   California.  It's dated February 6, 2019.

22              Your work, as I understand it, ended

23   pretty much on January 23, 2019?

24        MR. SLACK:  Objection to the form.

25        THE WITNESS:  I wouldn't say that.  I think the
```

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 82
of 130

1    substance of our analysis was done, but as I had

2    mentioned, we provided some input.  We participated

3    in the compensation committee meeting on the 19th

4    and then the subsequent questions, et cetera.

5    BY MR. JULIAN:

6         Q.   Got it.

7              Then let me ask you:  Did you or your team

8    consider Pacific Gas' wildfire mitigation plan in a

9    written form in any draft or final version?

10        A.   We did not.

11        Q.   And Exhibit 19, you've never seen that

12   before; is that right?

13        A.   I don't believe so, no.

14        MR. JULIAN:  Do you want to take a little break

15   so I can wrap up?

16        MR. SLACK:  Sure.  Are you going to be

17   switching or not?

18        MR. JULIAN:  No.  Done all that.  Which

19   eliminated a lot of the questions, by the way.

20             (Recess taken.)

21   BY MR. JULIAN:

22        Q.   We're back on the record.

23             Mr. Friske, I would like to turn to your

24   declaration, Exhibit 17.

25             Who drafted it, your declaration?

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 83
of 130

1      A.   We worked with Weil to draft it.

2      Q.   Who did the first draft?

3      A.   Weil did, at my instructions.  Because I

4   had prepared other drafts before and I said, well,

5   rather than just create it, I would use this

6   version -- a prior version as a shell.

7      Q.   Did you revise it some?

8      A.   I'm sorry?

9      Q.   Did you revise the declaration some?

10     A.   Significantly.

11     Q.   And then you approved it before signing

12   it?

13     A.   I did.

14     Q.   So let's go to page 5, Section C, "Summary

15   of 2019 STIP."

16     A.   Okay.

17     Q.   The first section there identifies the

18   2019 STIP participants; right?

19     A.   Yes.

20     Q.   And Section 2 is "Implementation

21   Performance Period"?

22     A.   Yes.

23     Q.   Section 3 is "Total Client Costs"?

24     A.   Yes.

25     Q.   I see -- apologize.  I didn't mean to

1    mislead you.

2         A.    I'm sorry.

3         Q.    The maximum aggregate payout is

4    350 million; is that right?

5         A.    Yes.

6         Q.    Not 335 --

7         A.    Not 335.  I saw the 235 and --

8         Q.    Good guess.

9               Section 4 is "2019 STIP Awards," that's a

10   correct description of the award range, et cetera?

11        A.    Yes.

12        Q.    And Section 5 on the next page is

13   "Performance Metrics and Weighting."

14        A.    Yes.

15        Q.    That's also part of the 2019 STIP?

16        A.    Yes.

17        Q.    And then on the next page, you say that

18   your firm -- "WTW has reviewed the terms and

19   provisions of the 2019 STIP and believes that the

20   structure, performance metrics and design and range

21   of potential 2019 STIP awards are consistent with

22   the debtors' industry with the only material

23   difference in design being quarterly payments which,

24   however, are very common in companies undergoing a

25   restructure."

1          Correct?

2     A.    Yes.

3     Q.    Is that still true?

4     A.    Yes.

5     Q.    Did you advise SoCalGas, San Diego Gas and

6  Electric?

7     A.    No.

8     Q.    Did your company advise them?

9     A.    They may -- well, on what matters?  They

10 may have.  I don't know.

11    Q.    Let's look at Exhibit 19 -- no.  20.

12    A.    I don't think --

13    MS. WOLTERING:  Right here.

14          (Tort Committee Exhibit 20 was marked.)

15 BY MR. JULIAN:

16    Q.    So go to page DSR 5.

17    A.    Okay.

18    Q.    On line 16, it states that "Both SoCalGas

19 and San Diego Gas and Electric have increased the

20 weighting of their safety measurements in variable

21 pay plans over the past two years such that safety

22 measures now comprise 70 percent of the company

23 performance component."

24          Did you consider San Diego Gas' metric in

25 that regard in advising PG&E's compensation

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 86
of 130

1    committee on --

2        MR. SLACK:  Objection to the form.

3    BY MR. JULIAN:

4        Q.   -- on the weighting of the safety factor

5    for PG&E's 2019 STIP?

6        MR. SLACK:  Objection to the form.

7        THE WITNESS:  No, I did not consider SDG&E's

8    incentive plan.

9    BY MR. JULIAN:

10       Q.   If you turn the page to DSR 6, it says

11   that WTW there did the study with respect to

12   compensation.

13           Does that refresh your recollection as to

14   whether WTW was engaged by San Diego Gas and

15   Electric?

16       A.   Well, WTW is a fairly large firm.  We're

17   engaged by many organizations that I'm not familiar

18   with, but, yes, it refreshes -- it says it here, but

19   there are many companies I don't know we work with.

20       Q.   In trying to obtain comparables for PG&E's

21   safety metrics, did you ask anyone within WTW for

22   similar metrics from other utilities that WTW

23   advised?

24       MR. SLACK:  Objection to the form of the

25   question.  Foundation.

1    THE WITNESS:  I did reach out to our -- to

2    individuals who consult in the utilities space for

3    information with respect to common incentive

4    practices, but I did not specify those companies

5    being ones in which Willis Towers Watson does work.

6    BY MR. JULIAN:

7        Q.   And did you review the performance metrics

8    for reasonableness?

9        A.   Can you define "metrics."  Which are --

10       Q.   Oh, did you advise the compensation

11   committee on the reasonableness of the performance

12   metrics for PG&E's 2019 STIP?

13       A.   So I advised them on the three primary

14   categories; so the fact of safety, financial and

15   customer metrics.  And it was reasonable to have

16   those three categories and the weightings attached

17   to those categories.

18       Q.   So if you go back to page 4 of your

19   declaration --

20            Apologize.

21       A.   Um-hum.

22       Q.   -- on line 7, Mr. Friske, you testified

23   that, "Among other things, my team and I provided

24   input and advice on the design and structure of the

25   2019 STIP for reasonableness."

1         Is it true what you were referring to
2    there with respect to performance metrics was what
3    you just said and nothing more?
4         MR. SLACK:  Objection to the form.
5         THE WITNESS:  So with respect to metrics, it
6    was the reasonableness of those three categories.
7    BY MR. JULIAN:
8         Q.   And the reasonableness of those three
9    categories dealt with what?
10        A.   Whether or not it was reasonable to have,
11   as part of the 2019 STIP, a safety metric -- or
12   safety -- class of safety metrics, a financial
13   component and a customer component.  Having those as
14   the components of the incentive plan, whether or not
15   that was reasonable.
16        Q.   Okay.  Then, secondly, did you advise the
17   committee as to whether the percentages of weighting
18   for each of those three categories was reasonable?
19        A.   I did.
20        Q.   And then, third, did you advise the
21   compensation committee with respect to whether the
22   individual weightings in each subclass of safety and
23   the like were reasonable?
24        A.   I did not.
25        Q.   So, for example, is it true you did not

1　　advise the compensation committee as to whether or

2　　not the 10 percent weighting for wildfire mitigation

3　　and system hardening was reasonable?

4　　　　MR. SLACK:  Objection to the form.

5　　　　THE WITNESS:  That is correct.

6　　BY MR. JULIAN:

7　　　　Q.   What you did do is you advised the

8　　committee that 50 percent weighting for safety as a

9　　whole was reasonable?

10　　　　A.   That is correct.

11　　　　Q.   And you did not consider San Diego Gas and

12　　Electric's 70 percent weighting in that regard;

13　　correct?

14　　　　MR. SLACK:  Objection to the form of the

15　　question.

16　　　　THE WITNESS:  That is correct.

17　　BY MR. JULIAN:

18　　　　Q.   Now, the last topic I want to get to --

19　　and whenever a lawyer says "last topic," you always

20　　have to wonder whether it really is, but I'm going

21　　to try to stick to it.  I want to go back over this

22　　quarterly versus annual payment topic.  Okay.

23　　　　　　I want to understand your testimony.  And

24　　I don't want you to repeat everything, but I want to

25　　focus on something.

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 90
of 130

1        Does part of your advice switching from

2    annual to quarterly have to do with retention?

3        A.   Any incentive plan, although the primary

4    purpose of incentive is incenting, has a retentive

5    component.

6        Q.   For the laymen, you don't want people or

7    employees, while the company is in bankruptcy,

8    leaving on the spur of the moment, or at any time?

9        MR. SLACK:  Objection to the form.

10   BY MR. JULIAN:

11       Q.   Fair enough?

12       A.   I think that, in general, any entity wants

13   to retain its employees in any situation.  And so

14   there are various mechanisms to do that; incentive

15   plans, corporate culture.

16       Q.   In your opinion, is there any harm to the

17   company that would come from waiting for

18   Judge Alsup's April 2, 2019 decision about what type

19   of wildfire mitigation requirements he's going to

20   impose on PG&E vis-a-vis retaining employees?

21       MR. SLACK:  Objection to the form of the

22   question.

23       THE WITNESS:  Since I'm not familiar with

24   that -- other than what we've talked about during

25   this discussion, I'm not familiar with the judge's

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 91
of 130

1    view.

2              I will say that there is harm towards

3    continuing to have uncertainty -- I believe there's

4    harm to continuing to have uncertainty around this

5    plan and having employees unsure of whether or not

6    there's going to be an incentive plan in place for

7    them.

8              And the harm is that you have employees

9    who are disengaged, who don't feel valued, who

10   potentially could look for other opportunities.  And

11   so that, I think, is the harm of not having a plan

12   that's in place.

13   BY MR. JULIAN:

14        Q.   If you had a 2019 annual incentive plan

15   with annual payments and annual reviews, do you

16   think that would provide the employees with the

17   comfort that they need?

18        MR. SLACK:  Objection to the form.

19        THE WITNESS:  I can't speak to what comfort any

20   individual employee would need.  I can say, though,

21   there is a spectrum of -- back to my point of

22   wanting to ensure people feel that they're paid

23   appropriately, that they're incented, that they're

24   being awarded for their activities that they're

25   accomplishing and they're all aligned with the

1    company's goals.

2            And there's a spectrum of -- having no

3    plan, having nothing is I think the least helpful in

4    that regard.  I think that a quarterly plan in this

5    situation would be the most helpful in that regard.

6    I think an annual plan would be better than no plan,

7    but I don't think it would be as effective as a

8    quarterly plan.

9    BY MR. JULIAN:

10       Q.   Do you think the presence of a bankruptcy

11   court order approving some $5 billion of

12   debtor-in-possession financing could counterbalance

13   your concern that the employees might be concerned

14   about not having a quarterly payment plan in place?

15       MR. SLACK:  Objection to the form of the

16   question.

17       THE WITNESS:  In my experience, employees of --

18   the broad-based employees aren't familiar with terms

19   like "debtor-in-possession financing" and what

20   assurances that can provide them as employees.

21   They're concerned about what their paycheck is going

22   to look like in two weeks, in three weeks, in a

23   month or two.

24   BY MR. JULIAN:

25       Q.   In advising the compensation committee,

1    did you talk to any employees to find out their

2    views on the short-term incentive plan?

3        A.   Other than management employees that we

4    were discussing overall -- the overall program with,

5    no.

6        Q.   Did you look at any surveys of the PG&E

7    employees to see what they thought about the

8    bankruptcy?

9        A.   I did not.  I don't know if those exist,

10   but, no, I did not look to see if they do exist.

11       Q.   Did you look at any surveys of employee

12   views on the STIP itself?

13       A.   I did not.

14       Q.   If you could, turn to Exhibit 1.  This is

15   the corrected declaration of Dinyar Mistry.  And go

16   to page 4 of his declaration, line 12.

17           Mr. Mistry testified, "In light of the

18   2018 Northern California wildfires and the material

19   deterioration in the debtors' financial situation,

20   the board of directors adopted senior management's

21   recommendation and exercised its discretion to

22   forego paying to approximately 11,000 of the

23   debtors' employees the 2018 STIP awards, and the

24   debtors withdrew the request for authority to pay

25   such awards."

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 94
of 130

1          Do you know anything about that other than

2     what you've testified in your deposition so far

3     today?

4          A.   I do not.

5          Q.   Do you know of any change in the debtors'

6     view of its compensation plans between January 23,

7     2019, when the compensation committee approved the

8     2019 STIP, and February 28, 2019, when the debtors

9     withdrew their motion to approve the 2018 awards?

10          MR. SLACK:  Objection to the form.

11          THE WITNESS:  Could you restate the question.

12     Trying to get the dates.

13     BY MR. JULIAN:

14          Q.   So let's get something straight.

15               January 23, 2019 the comp committee

16     approves the 2019 STIP; right?

17          A.   Yes.

18          Q.   At that time, you thought the debtors were

19     going to put forward the 2018 STIP in court; right?

20          MR. SLACK:  Objection to the form.

21          THE WITNESS:  Yeah.  That's what had been

22     communicated, yes.

23     BY MR. JULIAN:

24          Q.   And then I'm told, according to my trusty

25     assistants, that on February 28, 2019, the debtors

1    withdrew their request to have the 2018 STIP
2    approved; right?
3              So roughly one month between the two.
4        A.   Yes.
5        Q.   And my question is, you probably know
6    where I'm going with this, but do you know of any
7    change in the debtors' compensation committee's
8    views on STIP awards that took place in the interim
9    period?
10       MR. SLACK:  Objection to the form of the
11   question.
12       THE WITNESS:  The only thing that I'm aware of
13   is that at the February 19th compensation committee
14   meeting, there was a discussion whereby management
15   proposed that this was -- they were recommending
16   this action.  And then the committee had relayed
17   that they understood the rationale behind that.  And
18   that was it.  That's the only additional piece of
19   information between those two dates that I'm aware
20   of.
21   BY MR. JULIAN:
22       Q.   And the management that proposed that was
23   Mr. Simon?
24       A.   That's correct.
25       Q.   The acting or interim CEO?

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 96
of 130

1        A.    That's my understanding, yes.

2        Q.    And you mentioned -- you said the

3    committee "understood the rationale," is what you

4    said.

5        A.    Correct.

6        Q.    What indicated to you that the committee

7    understood the rationale?

8        A.    I don't recall the exact words, but there

9    was general concurrence that they understood why

10   they would be recommending that.

11       Q.    And what did Mr. Simon say the rationale

12   was?

13       A.    My recollection was that it was largely

14   related to the restructuring.  I don't recall any

15   other details beyond that.

16       Q.    You didn't ask?

17       A.    I didn't ask?

18       Q.    Did you ask?

19       A.    No, I didn't ask.

20       MR. SLACK:  Objection to the form.

21   BY MR. JULIAN:

22       Q.    What was your understanding of what he

23   meant when he said it had to do with the

24   restructuring?

25       MR. SLACK:  Objection to the form of the

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 97
of 130

1    question.

2         THE WITNESS:  My understanding, as I said, was

3    that given that there was -- the company was going

4    through this restructuring process, that management

5    had made the determination that it was in the best

6    interests of all the stakeholders not to make those

7    payments.

8    BY MR. JULIAN:

9         Q.   Would the same hold true for the 2019

10   STIP?

11        MR. SLACK:  Objection to the form of the

12   question.

13        THE WITNESS:  I think the 2019 STIP is a

14   completely different situation.  We're now looking

15   on a prospective basis.  Again, the 2019 STIP does

16   not guarantee any payments.  The 2019 STIP lays out

17   a framework upon which to align the interests of all

18   the participants with those at the company and the

19   stakeholders.

20             Whether at the end of 2019 there are

21   payments that are being made, discretion that's

22   being applied, that's all to be determined.  And to

23   me it's separate from what happened in 2018.

24   BY MR. JULIAN:

25        Q.   You just said -- I want you to listen to

1    your answer when the court reporter reads it back.

2         MR. JULIAN:  Slowly.

3              (Record read by reporter as follows:

4              "Answer:  I think the 2019 STIP is a

5              completely different situation.  We're now

6              looking on a prospective basis.  Again,

7              the 2019 STIP does not guarantee any

8              payments.  The 2019 STIP lays out a

9              framework upon which to align the

10             interests of all the participants with

11             those at the company and the stakeholders.

12             "Whether at the end of 2019 there are

13             payments that are being made, discretion

14             that's being applied, that's all to be

15             determined.  And to me it's separate from

16             what happened in 2018.")

17   BY MR. JULIAN:

18        Q.   Did you mean to say 2019?

19        MR. SLACK:  Object to the form of the question.

20        THE WITNESS:  No.

21   BY MR. JULIAN:

22        Q.   So you're happy with your answer?

23        A.   I think so.

24        Q.   Okay.  One of the things you said is,

25   "Whether at the end of 2019, there are payments that

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page 99
of 130

1    are being made."

2              You're referring to an annual program

3    there; right?

4         A.    No.   I meant payments throughout the year.

5    I just meant, at the end, you'll know that over the

6    course of that year -- whether payments have been

7    made quarterly.   So, no, I wasn't referring to an

8    annual plan.

9         Q.    Freudian slip.

10             You said, "The 2019 STIP lays out a

11   framework upon which to align the interests of all

12   the interests [sic] with the company and the

13   stakeholders."

14             Do you include the tort claimants as one

15   of the stakeholders?

16        A.    I think so.   In the sense that -- look at

17   the plan.   Especially if the company continues to

18   focus on safety, continues to focus on the financial

19   performance of the company and customer -- I think

20   all of those, in my view, will lead to having the

21   strongest value for all the constituents.   So it's a

22   yes.

23        MR. JULIAN:   Thank you.   Thanks for your time

24   today.

25             I'll pass the witness.

1    MR. DENNY:  No questions today from the

2    committee.

3    MR. SLACK:  Okay.

4    MR. JULIAN:  Can you make changes to the

5    deposition transcript by next week?

6    MR. SLACK:  When you say "make changes" --

7    MR. JULIAN:  Well, if he has any changes, in

8    other words.  Can he sign it before we file our

9    brief, or are you --

10   MR. SLACK:  I doubt I'm going to have him sign

11   it before then, but I will --

12          (Discussion off the record.)

13   MR. SINGH:  Are we going to designate the

14   transcript confidential again?

15   MR. SLACK:  Yes.  Thank you.

16          We're going to designate the transcript as

17   professional eyes only under the agreement that we

18   have with both the tort committee and the UCC.  And

19   as we said the last time, we're happy to work with

20   both committees, if we need to, and we'll find a

21   mechanism for filings and the hearings.

22          So thank you.

23   MR. JULIAN:  I want to use the whole transcript

24   of both depositions and all the exhibits, so I think

25   we can't seal any of it.  So if you want to have a

1   hearing with the judge next week, let me know.

2        MR. SLACK:  I'm sorry.  I don't understand what

3   you're saying.

4        MR. JULIAN:  I'm going to use everything.  I

5   don't agree that it's confidential.  It's a

6   deposition.  I don't think the NDA's deal with

7   depositions.  But we have disagreement, so let's

8   talk about having a phone conversation with Judge

9   Montali.  Okay?

10            Is that agreeable?

11       MR. SLACK:  I don't agree with you.  We'll

12   agree to disagree right now, but we're happy to have

13   a discussion and work with you to try to work out

14   our differences.

15       MR. JULIAN:  Okay.  Thanks.

16            (Whereupon, the proceedings were concluded

17            at 3:17 p.m.)

18                      ---oOo---

19

20

21

22

23

24

25

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
102 of 130

1    CERTIFICATE OF DEPOSITION OFFICER

2         I, ANRAE WIMBERLEY, CSR NO. 7778, duly

3    authorized to administer oaths pursuant to Section

4    8211 of the California Code of Civil Procedure,

5    hereby certify that the witness in the foregoing

6    deposition was by me sworn to testify to the truth,

7    the whole truth and nothing but the truth in the

8    within-entitled cause; that said deposition was

9    taken at the time and place therein stated; that the

10   testimony of said witness was reported by me and was

11   thereafter transcribed by me or under my direction

12   by means of computer-aided transcription; that the

13   foregoing is a full, complete and true record of

14   said testimony; and that the witness was given an

15   opportunity to read and correct said deposition and

16   to subscribe same.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22        IN WITNESS WHEREOF, I have hereunto subscribed

     by my hand this 22nd day of March, 2019.

23

24

25             ANRAE WIMBERLEY

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
103 of 130

```
 1                    Veritext Legal Solutions
                        1100 Superior Ave
 2                           Suite 1820
                      Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
     March 22, 2019
 5
     To: Richard W. Slack, Esq.
 6
     Case Name: PG&E Corporation v. Pacific Gas And Electric Company
 7
     Veritext Reference Number: 3264070
 8
     Witness:  Douglas Friske       Deposition Date:  3/21/2019
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
104 of 130

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 3264070
3    CASE NAME: PG&E Corporation v. Pacific Gas And Electric Company
     DATE OF DEPOSITION: 3/21/2019
4    WITNESS' NAME: Douglas Friske
5            In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7            I have made no changes to the testimony
       as transcribed by the court reporter.
8

       _____        _____
9      Date                    Douglas Friske
10           Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12

             They have read the transcript;
13           They signed the foregoing Sworn
             Statement; and
14           Their execution of this Statement is of
             their free act and deed.
15

             I have affixed my name and official seal
16
       this _____ day of_____, 20_____.
17

                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25

Veritext Legal Solutions

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
105 of 130

```
              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3264070
CASE NAME: PG&E Corporation v. Pacific Gas And Electric Company
DATE OF DEPOSITION: 3/21/2019
WITNESS' NAME: Douglas Friske
        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
   my testimony or it has been read to me.
        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
   well as the reason(s) for the change(s).
        I request that these changes be entered
   as part of the record of my testimony.

        I have executed the Errata Sheet, as well
   as this Certificate, and request and authorize
   that both be appended to the transcript of my
   testimony and be incorporated therein.
   _____      _____
   Date                  Douglas Friske

        Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
   the referenced witness did personally appear
   and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
        in the appended Errata Sheet;
        They signed the foregoing Sworn
        Statement; and
        Their execution of this Statement is of
        their free act and deed.
        I have affixed my name and official seal
   this _____ day of_____, 20_____.
                  _____
                  Notary Public

                  _____
                  Commission Expiration Date
```

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
106 of 130

1               ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 3/21/2019
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                  Douglas Friske
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24
                    _____
25                  Commission Expiration Date

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
107 of 130

| & | 1:12   2:20 8:2 | 44:11,17 45:23 | 48:12,16 61:6 |
|---|---|---|---|

**&**   2:18 3:3,10

| **2** |
|---|

**1**

**2**   15:10 21:1 28:13
42:15 60:10 77:10
83:20 90:18

46:6,18,19 54:16
55:14,24 56:19
58:2,25 60:21,24
61:12 62:2,17,18
65:2 66:24,24
67:1,3,3,7 69:11
76:18 77:8,18
78:20 81:21,23
83:15,18 84:9,15
84:19,21 86:5
87:12,25 88:11
90:18 91:14 94:7
94:8,8,15,16,25
97:9,13,15,16,20
98:4,7,8,12,18,25
99:10 102:22
103:4

66:24 67:6 77:12
77:17 78:2

**1**   28:11 93:14
**1.5**   61:19
**10**   14:8 21:12
40:20 43:7 46:24
46:25 48:4,14
59:14 60:22,24
61:4,17 63:7,10,11
63:12,17 77:18
78:2,12,25 79:4,17
89:2
**10,000**   80:14,18
81:1
**100**   3:5
**10111**   3:13
**11**   1:8 2:8 22:16
38:16 41:1 77:2
**11,000**   93:22
**1100**   103:1
**1160**   3:5
**12**   40:22 41:11
93:16
**13**   38:15 41:20
**14**   41:3 71:23 73:3
**15**   67:10 73:1
**15-08-019**   27:12
**150,000**   9:21
**16**   7:3 46:25 85:18
**16617**   102:24
**17**   8:14 13:24
16:25 46:21 82:24
**182**   6:10
**1820**   103:2
**19**   6:8 29:3 81:6,8
81:18 82:11 85:11
**19th**   50:6 82:3
95:13

**20**   6:12 85:11,14
104:16 105:22
106:22
**200**   20:3
**2001**   38:15
**201**   4:17
**2015**   51:19 53:14
**2016**   38:23 51:23
**2017**   15:12 27:17
40:22 52:2 53:22
54:16 70:8
**2018**   15:12 17:5,7
17:12,17 18:8
19:22,23 21:6,8
22:2 23:2,7,15,21
24:6,11 27:10
28:20 37:2 40:8
40:20 41:3 47:8
49:3,6,13 50:4
51:3 52:6,11 54:5
54:17,17 60:13
61:14,18,21,21,22
62:2,17 67:1,6
70:8 77:8,10,17
93:18,23 94:9,19
95:1 97:23 98:16
**2019**   1:17 2:21 8:1
8:20 10:11 11:5
11:15 16:10,18,21
18:19 19:17 20:16
22:3,6,17 23:2,7
23:15,21 24:6,12
28:11 33:19 34:13
34:22 35:6 36:11
37:3,9,12 41:13,21
42:15,20 43:7

**2029**   4:5
**208-6436**   3:7
**21**   1:17 2:21 6:17
8:1 26:25 27:1,7
27:23,24 28:1,7
36:10
**212**   3:22
**213**   4:7
**216-523-1313**
103:3
**22**   6:22 26:25 27:1
27:13 28:4,24
36:10 103:4
**22nd**   102:22
**23**   81:23 94:6,15
**235**   76:10,12,20
84:7
**23rd**   44:14,18
45:24 46:2,16,20
47:2,11,17 63:4
**25**   21:13,15 24:10
25:16,18,24 26:2
40:8 46:7 48:10

**257-7751**   3:22
**26/27**   14:15
**261**   6:15
**27**   6:17,22 73:3
**28**   21:6 38:23 49:4
94:8,25
**2800**   2:19

| **3** |
|---|

**3**   14:14 38:4,5
83:23
**3/21/2019**   103:8
104:3 105:3 106:2
**3264070**   1:25
103:7 104:2 105:2
**335**   76:23 84:6,7
**33rd**   4:5
**34**   15:16
**35**   26:9
**350**   84:4
**38**   21:5
**39**   21:5
**3900**   3:20
**3:17**   2:21 101:17

| **4** |
|---|

**4**   15:16 18:15
19:13 21:3 30:8
34:7 38:7,13
48:13 60:14 84:9
87:18 93:16
**4-34**   15:13,16,18
**4-35**   15:22
**4-36**   15:24
**4-37**   16:1
**4-38**   16:3
**4-39**   16:5 77:11
**4-40**   16:7 60:10

Case: 19-50088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
108 of 130

**4-41** 60:13
**40** 24:11 26:3,12
  30:18 48:4 66:24
  67:6 74:15 75:5
**41** 16:7 60:10
**42** 6:25
**434** 15:15
**44114** 103:2
**45** 3:12 14:10
**462-2677** 3:14
**48** 72:1
**49** 7:3

**5**

**5** 18:15 19:13 22:8
  22:9 27:10 38:19
  83:14 84:12 85:16
  92:11
**50** 21:14 23:8,16
  24:2 48:3 78:6
  89:8
**500** 3:20

**6**

**6** 38:23 46:24
  81:21 86:10
**60661** 3:21
**614** 3:14
**628** 3:7
**650** 4:19

**7**

**7** 20:17 39:3 73:2
  87:22
**70** 85:22 89:12
**703-9980** 4:7
**7778** 1:24 2:23
  102:2

**8**

**8** 6:3 27:17 39:8
  40:20 54:16,17
  72:1

**802-3020** 4:19
**81** 6:8
**8211** 102:4
**85** 6:12

**9**

**9** 6:20 40:8 41:13
  41:21
**90** 61:1
**90067-3019** 4:6
**94065-1134** 4:18
**94104** 2:20
**94111** 3:6

**a**

**ability** 55:6 56:8
  64:19 72:12
**absence** 22:16
**accepted** 63:1
**accomplishing**
  91:25
**account** 43:16
  54:9 64:1
**achieve** 37:24
  52:25 56:15
**achieving** 68:23
**acknowledge**
  104:11 105:16
**act** 104:14 105:20
**acting** 95:25
**action** 41:13,22
  95:16
**actions** 39:19
  56:13
**activities** 91:24
**addition** 11:23
  19:1 48:17
**additional** 48:16
  95:18
**address** 22:15
  55:10 103:15

**adjudicated** 43:14
**adjust** 64:19
**adjustment** 60:23
  61:6
**adjustments** 30:11
  44:6
**administer** 102:3
**administered** 1:9
  2:9
**adopted** 31:19
  93:20
**adoption** 33:25
**advice** 10:15,20
  49:5,13 50:20
  53:12,20 54:2
  70:20 87:24 90:1
**advise** 33:15,17
  37:8,13,22 42:6
  51:6 74:13 75:3
  79:22 85:5,8
  87:10 88:16,20
  89:1
**advised** 37:21
  75:19 76:3,9
  86:23 87:13 89:7
**advising** 45:3
  79:16 85:25 92:25
**advisor** 3:17 5:6
**advisors** 14:21
  17:8 18:4,11
**affixed** 104:15
  105:21
**agency** 71:15
**aggregate** 11:11
  84:3
**ago** 48:13
**agree** 101:5,11,12
**agreeable** 101:10
**agreed** 63:9
**agreement** 100:17

**adjudicated** 43:14
**ahead** 27:6 57:20
  58:15 74:21
**aided** 102:12
**airline** 71:6
**align** 55:15 68:5
  97:17 98:9 99:11
**aligned** 23:17
  91:25
**allegation** 41:4
**allow** 66:19
**allowed** 72:5
**allows** 68:22
**alsup** 41:21 42:7
  42:13,21 73:10
  74:3
**alsup's** 71:24
  72:13,25 90:18
**amount** 9:19
  47:21 52:23 75:22
  76:2,8,19 77:3
**analyses** 9:25
**analysis** 80:21,24
  81:5 82:1
**angeles** 4:6
**annual** 19:24,25
  52:11,11 53:7,9
  55:18 67:21 70:21
  89:22 90:2 91:14
  91:15,15 92:6
  99:2,8
**annually** 53:8
**anrae** 1:23 2:22
  102:2,25
**answer** 7:1 21:25
  22:19 25:3 45:4
  49:8,10,11,19
  50:16 57:12,17
  58:17,21 74:21
  78:16 98:1,4,22
**answered** 37:19
  78:15

Case: 19-30088 Doc# 1112-2 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
109 of 130

anxious 58:12
anybody 26:1
apologize 83:25
  87:20
appear 104:11
  105:15
appearances 3:1
appended 105:11
  105:18
applicable 25:1,5
applied 19:23 23:9
  97:22 98:14
appreciate 20:23
appropriate 19:7
  19:11 36:16,20
  53:5
appropriately
  91:23
appropriateness
  30:9,17
approval 8:16
  46:2 47:17 49:2,6
  50:4
approve 94:9
approved 44:11
  46:19 47:1 63:3
  83:11 94:7 95:2
approves 94:16
approving 92:11
approximately
  76:24 93:22
april 38:23 42:15
  90:18
area 13:4 54:4
  78:8
arguably 25:3
arising 39:9
asked 33:3 35:4
  37:19 78:15
asking 49:6

aspects 20:4 65:20
assess 65:6
assessment 6:22
  27:14
assignment 104:2
  105:2 106:2
assistance 19:15
  19:20
assistants 94:25
assisting 10:10
associated 22:15
assume 43:15
  72:21
assurances 92:20
attached 87:16
  105:7
attended 55:21
attorney 102:18
attorney's 41:16
auditing 36:5
audits 26:14
authority 93:24
authorize 105:11
authorized 102:3
authorizing 38:14
ave 103:1
award 48:16 49:14
  51:3 61:7 64:19
  65:4 76:20 84:10
awarded 91:24
awards 11:20
  22:15 49:3 50:4
  54:23 64:25,25
  66:4,7,13 72:20,24
  77:3 80:19 81:1
  84:9,21 93:23,25
  94:9 95:8
aware 26:21 28:3
  28:6 32:5,15 38:6
  39:13,19,24 42:13
  53:12,17 54:2

71:19 95:12,19

**b**

b 6:5 48:13
back 16:24 21:1
  21:16 22:8 47:10
  48:25 55:13 56:8
  56:10 58:18,20,21
  60:8 68:12 74:13
  75:2,12 82:22
  87:18 89:21 91:21
  98:1 103:15
background 15:2
backs 56:7
baker 3:3,10
bakerlaw.com 3:8
  3:15
balancing 56:10
  70:1
bankruptcy 1:1,6
  2:1,6 25:2,5 45:3
  45:19 50:4 68:8,9
  68:13 70:20 75:16
  90:7 92:10 93:8
base 24:24 79:25
  80:1,14,18,25
based 9:18 11:12
  12:25 29:22 60:19
  74:7,11,25 75:10
  92:18
baseline 21:1
basis 9:18 35:5,8
  48:3 55:13 63:22
  97:15 98:6
battery 3:5
beginning 2:20
  26:10 28:19
behalf 9:13
behaviors 55:15
believe 27:25
  33:21 36:9,13
  44:14 72:8 74:12

75:2 76:14,23
  82:13 91:3
believed 54:3
believes 54:15
  84:19
benefits 6:14
  24:21 70:2
best 97:5
better 92:6
beyond 18:7 20:22
  23:24 34:5 72:21
  78:25 96:15
billing 11:12,12
billion 92:11
binder 81:9,10
binders 81:15
bmurphy 3:23
board 9:10 12:10
  45:4 59:12 93:20
board's 40:1
bonus 10:16
bottom 29:4
bpr 33:24 34:3
branches 40:13
break 82:14
brendan 3:19
brief 73:1 100:9
broad 37:10 92:18
brought 39:9 44:8
bruno 39:10,15
  40:2 51:8
bullet 40:11
business 17:3
  37:25 47:21 52:24
  71:12
butte 38:25 40:10
  41:15 51:19 53:14

**c**

c 83:14
ca 103:25

www.veritext.com                                                                888-391-3376
Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
110 of 130

**cal** 38:23 40:8,12
40:20 53:13,16,21
53:24
**calculate** 80:3
**calculated** 61:6
**calculates** 80:1
**calculation** 60:13
**california** 1:2 2:2
2:20 3:6 4:6,18
8:1 27:12,16
69:14 70:24 81:21
93:18 102:4
**called** 56:7
**camp** 54:5
**cap** 29:22
**caption** 102:19,21
**car** 71:8
**caribou** 38:20
39:4
**case** 1:6,7,8 2:6,7
2:8 8:20 39:9 48:3
68:6 73:20 76:18
77:2 103:6 104:3
105:3
**cases** 22:16 23:12
44:3 68:4 77:5
**cash** 31:13
**catastrophic** 71:7
**categories** 37:23
87:14,16,17 88:6,9
88:18
**category** 18:25
37:10
**catherine** 3:11
**cause** 38:24 40:9
41:2,20 102:8,20
**caused** 40:12
53:13,22 54:14
**causes** 40:21
**century** 4:5

**ceo** 95:25
**certain** 46:5,6
65:16 80:7
**certainty** 48:7
56:11 68:21
**certificate** 102:1
105:11
**certification** 104:1
105:1
**certified** 2:22 8:5
**certify** 102:5,17
**cetera** 82:4 84:10
**chain** 38:19 39:3
**chair** 12:8
**chairman** 12:10
**chance** 54:15
**change** 47:4 48:12
52:10 61:14,15
62:16 65:7 74:14
75:4 94:5 95:7
103:13,14 105:8
106:3
**changed** 21:17
43:25 46:16 63:6
66:24 67:6 77:8
77:17
**changes** 43:24
47:20 69:21 77:21
77:23 100:4,6,7
103:12 104:7
105:7,9
**changing** 55:18
78:1,10
**chapter** 1:8 2:8
22:16 38:16 77:2
**charge** 13:12
**charter** 13:7,10
**chicago** 3:21
**chris** 5:5
**circumstance** 71:2

**circumstances**
68:3 71:12
**civil** 102:4 104:5
105:5
**claimants** 99:14
**clarity** 48:6
**class** 37:4 88:12
**classes** 64:25
**classic** 14:8
**claw** 56:7,8
**clear** 9:15
**clearing** 21:13
**cleveland** 103:2
**client** 83:23
**clients** 67:20 69:25
70:19
**close** 26:2,7,7 53:4
**code** 102:4
**colleagues** 15:9
**come** 48:25 55:10
90:17
**comfort** 91:17,19
**coming** 45:17
56:12
**comment** 31:25
**commenting** 48:23
**comments** 32:1
50:25
**commission** 27:11
27:17 34:8 81:20
104:19 105:25
106:25
**commission's**
28:17
**committee** 3:2,17
4:1 5:6 10:10,13
12:2,3,5,6,9,13,16
12:17 13:12,17,21
16:21 19:14,19
24:16,16 25:8
26:11 27:1 31:6

33:15 37:8 42:18
42:19 44:5,11,15
46:20 50:6,8 51:6
52:10,17 54:12,14
55:7,20 59:19
63:4,6,25 64:5,23
65:3,22 66:1,3,10
66:12 67:10 74:13
75:3 78:1,10
79:22 81:6 82:3
85:14 86:1 87:11
88:17,21 89:1,8
92:25 94:7,15
95:13,16 96:3,6
100:2,18
**committee's** 13:7
43:13 46:2 95:7
**committees**
100:20
**common** 31:3,10
31:10,11,14 37:6
53:8 84:24 87:3
**communicated**
94:22
**communications**
45:1
**comp** 94:15
**companies** 24:19
30:23 31:10 67:23
69:25 71:3,14
72:22 84:24 86:19
87:4
**company** 1:8 2:8
4:12 6:18,24 9:6
12:18,19,22,23
13:4,5,15 16:16
27:8,15 28:9,14
33:11 38:16 43:2
43:20 47:6 49:9
49:12 50:2,3 55:5
55:11,16,22 64:17

Case: 19-30088 Doc# 1112-2 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page 111 of 130

69:18 70:22 74:18
85:8,22 90:7,17
97:3,18 98:11
99:12,17,19 103:6
104:3 105:3
**company's** 6:9
55:15 81:19 92:1
**comparability**
30:12
**comparables**
86:20
**compensated**
68:19
**compensation**
6:14 9:7,16 10:10
10:13,21 11:1
12:2,3,5,9,12,16
12:17 13:7,8,11,13
13:17,18 16:21
19:14,19 24:16
31:5 42:18,18
43:13 44:5,10,15
44:17 46:20 50:5
50:8 51:6 52:10
52:17 55:13,20
59:19 63:25 64:5
64:23 65:3,22
66:1,2,10,12 67:10
74:13 75:3 78:1
78:10,20 82:3
85:25 86:12 87:10
88:21 89:1 92:25
94:6,7 95:7,13
**complete** 72:9
102:13
**completed** 77:6
103:15
**completely** 97:14
98:5
**complex** 47:24

**complexity** 47:25
**comply** 72:3,12
**component** 23:11
30:10,17 31:7
47:7 48:1 78:5,24
79:12,13 85:23
88:13,13 90:5
**components** 88:14
**comprise** 85:22
**computer** 102:12
**concept** 33:5
56:22
**concern** 92:13
**concerned** 92:13
92:21
**concluded** 101:16
**concurrence** 96:9
**conditions** 41:24
42:8,15 65:7
71:25 72:13
**conducted** 19:15
20:6
**confidential**
100:14 101:5
**connection** 8:15
28:2 39:15,21
40:14,23 41:17,25
45:2,19 47:16
75:15
**consider** 26:15
28:1 30:19 36:15
38:17 39:1,11,21
40:6,14,17,23,25
41:7,17,19,25 42:3
42:19 43:16 65:3
69:2,5,10 82:8
85:24 86:7 89:11
**considered** 29:11
29:12 31:4 69:16
**considering** 42:7

**consistent** 84:21
**constituents** 99:21
**constructed** 25:22
**consult** 87:2
**consulting** 5:5
27:18 28:5
**contact** 9:1
**contemplating**
46:10
**context** 34:17
**continues** 99:17
99:18
**continuing** 91:3,4
**contractor** 33:14
33:16,19
**contrary** 25:10
**contributed** 51:8
54:25 64:12
**conversation**
101:8
**convicted** 39:14
39:24
**copy** 8:14 38:5
81:13,18
**corp** 12:17,20
**corporate** 90:15
**corporation** 1:6
2:6 4:11 6:23
12:21 13:1 27:15
103:6 104:3 105:3
**correct** 8:13 35:12
61:9,15 63:4,23
67:8 77:18,19
84:10 85:1 89:5
89:10,13,16 95:24
96:5 102:15
**corrected** 8:14
13:23 69:13 93:15
**corrections** 103:12
105:17

**cost** 72:6
**costs** 83:23
**counsel** 45:13,13
81:11,11 102:17
**counter** 56:14
**counterbalance**
92:12
**counties** 40:10
**counts** 39:14
**county** 41:16
104:10 105:15
**couple** 11:13
27:21 73:4
**course** 11:7 43:21
56:13 63:15 68:15
68:15 69:24 71:7
71:10 99:6
**court** 1:1 2:1 20:9
75:16 92:11 94:19
98:1 104:7
**court's** 50:4
**crawford** 2:18
**create** 70:24 83:5
**creates** 68:9
**creating** 42:19
**creditors** 4:1
**criminal** 39:8
41:12,22
**criticism** 54:18
**csr** 1:24 102:2
**culpability** 64:2
**culture** 6:25 27:16
28:5 29:13 90:15
**current** 31:20
**currently** 29:12
**customer** 19:1
37:5,11 48:4 77:7
77:12 78:2,7,20,24
87:15 88:13 99:19
**cut** 20:24

Case: 19-30088 Doc# 1112-2 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
112 of 130

| cwoltering 3:15 | decision 6:17 27:7 | designation 49:24 | directing 74:18 |
|---|---|---|---|
| **d** | 50:11 90:18 | 49:25 50:1 | direction 102:11 |
| **d** 6:1 | declaration 8:15 | desire 58:6 59:5 | director 3:19 5:2 |
| daniel 4:3 | 13:23 16:25 18:15 | destruction 70:24 | 56:18,25 |
| dash 15:16 21:2,3 | 19:13 20:8,17 | destructive 38:25 | directors 12:14 |
| date 27:10 41:2,12 | 21:16 22:8 46:21 | detail 78:22 | 93:20 |
| 103:8 104:3,9,19 | 46:22 82:24,25 | details 20:18 | disagree 101:12 |
| 105:3,13,25 | 83:9 87:19 93:15 | 30:25 79:1 96:15 | disagreement |
| 106:20,25 | 93:16 | deterioration | 101:7 |
| dated 38:15 41:12 | declarations 75:15 | 93:19 | disasters 64:2,13 |
| 81:21 | deed 104:14 | determination | discretion 43:13 |
| dates 94:12 95:19 | 105:20 | 40:21 65:8 79:4 | 44:5 65:5,15 66:6 |
| david 4:14 | deemed 103:19 | 97:5 | 66:9,13,16,17,19 |
| david.singh 4:21 | define 26:6 87:9 | determine 19:8,10 | 93:21 97:21 98:13 |
| day 102:22 104:16 | defining 75:23,25 | 36:20,22 63:21 | discretionary |
| 105:22 106:22 | definition 31:12 | 80:24 | 65:18 |
| days 103:18 | 77:13 | determined 10:23 | discuss 46:23 |
| ddenny 4:8 | definitions 30:24 | 40:12 53:21 79:6 | 49:16 52:16,19,21 |
| deal 13:8,12 78:22 | deliberations 31:4 | 97:22 98:15 | discussed 49:17 |
| 78:25 101:6 | denny 4:3 100:1 | determines 63:17 | 50:5,7,12 57:6 |
| dealing 30:6 39:3 | department | determining 35:6 | 79:7,8 |
| 40:21 41:3,5,13,23 | 103:22 | 36:15 38:24 40:9 | discussing 45:21 |
| 42:8 71:25 72:13 | depends 10:24 | 66:3 70:1 79:11 | 93:4 |
| dealt 13:12 88:9 | 68:3 | 79:15 | discussion 25:20 |
| dear 103:10 | deposition 1:16 | develop 33:24 | 38:11 42:25 55:18 |
| death 70:24 | 2:17 8:21 21:10 | developing 18:18 | 55:20 56:2,4,9,16 |
| debate 26:2,7 | 94:2 100:5 101:6 | development | 57:9,22 58:1,4,23 |
| debbie 6:13 | 102:1,6,8,15,19 | 33:23 | 59:3,9,13,17,18,25 |
| debtor 92:12,19 | 103:8,11 104:1,3 | diego 85:5,19,24 | 63:24 64:17 65:21 |
| debtors 1:9 2:9 | 105:1,3 | 86:14 89:11 | 65:25 66:10 67:9 |
| 4:11 8:16 9:14 | depositions 100:24 | difference 84:23 | 67:16,17 77:25 |
| 10:16,21 14:17 | 101:7 | differences 101:14 | 78:9 90:25 95:14 |
| 16:10,17 17:3,8,9 | describe 15:3 | different 10:13 | 100:12 101:13 |
| 18:1,4,5,11,13,17 | described 69:6 | 20:21 25:22 30:23 | discussions 9:8 |
| 19:14,16,18 20:15 | description 6:7 | 43:6 53:10 65:17 | 11:25 12:1,4,7 |
| 28:2 49:2,5 84:22 | 60:12 77:12 84:10 | 97:14 98:5 | 13:22 14:18 26:10 |
| 93:19,23,24 94:5,8 | design 43:12 45:18 | diligence 18:18,20 | 26:12 42:17 59:15 |
| 94:18,25 95:7 | 84:20,23 87:24 | 18:22 19:4 | 72:11 79:8 |
| december 11:6 | designate 100:13 | dinyar 12:1 93:15 | disengaged 91:9 |
| 27:10 41:3 | 100:16 | direct 6:12 | distinction 13:14 |

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
113 of 130

**district** 1:2 2:2
41:16
**division** 1:3 2:3
28:18
**dm** 1:7 2:7
**document** 15:4,19
15:23 28:24 32:1
42:4 73:7 77:15
**documents** 14:23
14:25 15:3,6,7,9
15:10 17:4 38:3
**doing** 46:10
**dollar** 75:22 76:2
77:2
**dollars** 76:7
**door** 54:24
**doubt** 100:10
**douglas** 1:16 2:17
8:4,11 103:8
104:4,9 105:4,13
106:20
**downward** 61:12
**draft** 82:9 83:1,2
**drafted** 82:25
**drafts** 83:4
**drive** 30:3 32:17
53:2,5
**driven** 66:18
**dsr** 85:16 86:10
**due** 18:18,20,22
19:4 30:10
**duly** 102:2

**e**

**e** 3:11 6:1,5 11:21
38:19 39:3
**earlier** 10:7 14:20
68:13
**early** 14:9 47:11
**earn** 20:2
**earning** 30:9,17
31:6

**earnings** 30:19
31:2,3,8,9,13
**east** 3:5 4:5
**economic** 69:20
**effective** 37:24
92:7
**effectiveness**
33:25
**either** 29:22
102:18
**electric** 1:8 2:8
4:12 6:8,18,23,24
12:18 27:8,14,15
28:9,14 38:16
41:23 81:19 85:6
85:19 86:15 103:6
104:3 105:3
**electric's** 89:12
**electrical** 78:11
**eligible** 48:16 61:2
61:16
**eliminated** 82:19
**eliminating** 65:4
**email** 103:17
**emphasis** 22:13,21
22:24 23:3,20
24:1,5 31:20
59:11
**employed** 77:21
**employee** 10:16,21
29:22,23 60:15,19
61:23 62:9 81:1
91:20 93:11
**employee's** 35:15
64:2
**employees** 11:2
13:13,18 18:13
34:23 35:5 38:20
41:4 51:8 52:24
54:24 55:12 56:11
64:12 65:23 68:9

69:13 71:16 80:2
80:7,14,18 90:7,13
90:20 91:5,8,16
92:13,17,18,20
93:1,3,7,23
**enclosed** 103:11
**ended** 20:8 81:22
**enforcement**
28:18
**engaged** 11:6
86:14,17
**engagement** 9:13
10:2,5,5,7 11:5,15
12:25 37:11 39:22
40:6,15,24 41:18
42:1 52:24
**enhanced** 21:18
**ensure** 29:24
91:22
**entered** 105:9
**enterprise** 24:23
32:8 33:23
**entire** 25:20 61:23
65:11,14 73:3
104:5 105:5
**entirely** 65:18
**entirety** 65:15
**entities** 53:18
**entitled** 27:14
57:17 102:8
**entity** 24:22 90:12
**equal** 23:10
**equipment** 53:13
53:22 54:4,14
**equivalent** 23:25
30:23
**errata** 103:13,18
105:7,10,18 106:1
**especially** 99:17
**esq** 3:4,11 4:3,4,13
4:14,15,16 103:5

**establishing** 69:6
**establishment**
38:14
**estate** 25:6
**estimate** 11:7
**et** 82:4 84:10
**evaluate** 30:9,16
34:12 43:8
**evaluating** 30:6
**evaluation** 19:16
19:18 20:6 22:11
80:13
**event** 70:4
**events** 71:6
**everybody** 48:1
**exact** 30:25 57:1
71:2 76:8 96:8
**exactly** 20:17 35:8
48:18 79:1
**examination** 6:2
8:7
**example** 21:11
29:25 45:20 88:25
**excavations** 41:6
**excerpts** 27:21
**executed** 105:10
**execution** 104:14
105:19
**executive** 9:10
**executives** 13:8,18
**exempt** 21:13
**exercise** 65:10
66:12
**exercised** 93:21
**exhibit** 6:7,8,12,17
6:22 8:14 13:24
15:10 16:25 21:1
27:7,13,23,24 28:1
28:4,7,24 36:10
38:4,5,7,13,19,23
39:3,8 40:8,20

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
114 of 130

41:1,11,20 46:21
60:10 71:23 73:1
77:10 81:6,8,18
82:11,24 85:11,14
93:14
**exhibits** 26:25
27:1 100:24
**exist** 66:21 72:4
93:9,10
**existed** 66:20
**existing** 14:24
15:1 19:16,19
**expect** 10:15,20
**expected** 70:5
**expense** 9:17
**experience** 52:22
66:15 92:17
**expert** 49:22 73:19
**expiration** 104:19
105:25 106:25
**explain** 9:2 17:25
18:5,12 25:8,10
50:2,7
**explore** 34:20
**explosion** 39:10,16
40:2 51:9
**extent** 45:1 49:8
**external** 52:23
**extra** 81:12
**extraneous** 70:4
**eyes** 100:17

**f**

**facing** 70:23
**fact** 19:24 20:2
25:4 26:8 30:21
31:1 53:6,8 56:5
87:14
**factor** 25:1,15,17
86:4
**factors** 52:23
59:25

**fair** 90:11
**fairly** 86:16
**fairness** 14:13
**falling** 40:13
**falsified** 41:5
71:16
**familiar** 13:14
28:23 31:24 38:9
86:17 90:23,25
92:18
**familiarize** 14:16
17:2
**far** 12:14 65:1
94:2
**february** 49:4,4
50:6,6 81:21 94:8
94:25 95:13
**federal** 41:21 42:7
43:5
**feel** 78:5 91:9,22
**felt** 47:14
**fifth** 32:6
**file** 100:8
**filed** 41:12 49:2
81:19
**filings** 100:21
**final** 27:17 82:9
**financial** 3:17 5:5
18:5 19:1 22:13
22:24 24:5,9,15,20
24:24 25:17,24
26:9 30:18,22
31:20 32:4 34:24
37:5,11 48:4
59:20 66:23 67:5
67:11 72:12 74:14
75:4 78:5 87:14
88:12 93:19 99:18
**financing** 92:12,19
**find** 72:9 93:1
100:20 103:11

**finding** 42:21
54:25
**fine** 57:15
**finish** 57:17,18
58:15
**finished** 57:18
73:4
**fire** 38:25 40:8,12
40:12,20 51:19,23
53:13,14,16,24
54:5,16,16,17 55:1
55:23 56:19 57:10
57:22,23 58:2,5,24
59:4,12,20 69:11
**fire's** 38:23 53:21
**fires** 52:2,6 53:22
54:13 57:6 70:8
70:14
**firm** 84:18 86:16
**first** 12:25 20:15
20:22 21:23 22:18
24:13,14 29:9
38:15 83:2,17
**fit** 5:5
**five** 55:1
**flight** 14:6
**floor** 4:5
**flow** 31:13
**focus** 24:20 68:22
89:25 99:18,18
**focused** 17:12
**follow** 14:14
**followed** 73:1
**following** 33:22
46:1
**follows** 8:6 58:22
59:2 74:24 98:3
**force** 18:13
**forego** 93:22
**foregoing** 102:5
102:13,19 104:13

105:18
**form** 10:17 16:11
16:19 20:7,10,16
21:24 22:4 23:4
23:23 25:11 26:4
26:16 30:21 31:8
31:22 32:25 34:14
34:25 35:19 36:12
37:20 39:17 40:3
40:16 41:8 42:2
42:10,23 43:9
44:1 50:22 51:12
51:16,20,24 52:3,7
53:15,23 54:6,20
55:2,10,25 56:3,23
57:7 58:3 59:22
62:4,11 63:2 64:3
64:14 66:14 67:13
68:11 69:4,15
70:9,15,25 71:17
71:20 72:15 73:13
73:21 74:5,16
75:8 76:21 78:14
78:23 79:19 80:10
80:20 81:3,24
82:9 86:2,6,24
88:4 89:4,14 90:9
90:21 91:18 92:15
94:10,20 95:10
96:20,25 97:11
98:19
**formal** 16:9,17
**format** 21:22
**formulate** 10:11
**formulating** 10:10
19:17
**forrest** 12:8
**forth** 28:10,16
36:6 44:8
**forty** 11:16

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
115 of 130

**forward** 55:13 94:19 103:15
**found** 47:23 55:22
**foundation** 73:14 86:25
**four** 10:4 12:6,12 40:9 54:12
**fourth** 28:20 55:1
**fourths** 54:23
**frames** 68:4
**framework** 97:17 98:9 99:11
**francisco** 1:3 2:3 2:19 3:6 8:1 14:11 65:22
**free** 104:14 105:20
**freudian** 99:9
**friske** 1:16 2:18 8:4,11,12,12 15:14 57:20 60:9 81:17 82:23 87:22 103:8 104:4,9 105:4,13 106:20
**front** 22:3 38:3
**full** 8:9 102:13
**function** 36:2
**fund** 24:25 72:23
**funds** 72:5
**further** 75:15 102:17
**future** 68:16

**g**

**gaming** 34:10,13 34:16,18 35:14,16
**gas** 1:8 2:8 4:11 6:8,17,22,24 12:18 27:8,14,15 28:9,14 38:16,20 39:9,10 39:13,14,25 41:22 51:11 81:18 82:8 85:5,19,24 86:14

89:11 103:6 104:3 105:3
**gate** 14:8,9
**gauged** 77:21
**general** 17:20 24:19 31:10 33:5 37:4 39:19 56:6,6 64:17 67:16 90:12 96:9
**ghost** 51:23
**give** 26:14,19,22 68:21
**given** 25:5 36:9 37:16 38:5 50:16 52:22 65:2 71:10 97:3 102:14
**giving** 59:19
**global** 69:20
**go** 13:24 20:23 21:1,2,5,16 27:6 38:2 46:21 53:10 55:13 57:20 58:15 61:11 74:13,21 75:2,12 77:10 80:6 83:14 85:16 87:18 89:21 93:15
**goal** 76:10
**goals** 17:3,5,7,10 17:11,13,16,19,19 17:21,22 19:2,7,11 52:25 92:1
**goes** 50:17
**going** 13:24,25 16:24 18:24 26:2 27:4 28:24 42:14 42:22 44:25 47:20 49:18 50:15 55:23 56:5 63:14 68:18 68:24 72:19 78:14 82:16 89:20 90:19 91:6 92:21 94:19

95:6 97:3 100:10 100:13,16 101:4
**good** 14:5 48:8 60:3,4 64:11 84:8
**gotshal** 8:24
**governing** 36:5
**governs** 65:10
**grant** 66:3,7,13
**grants** 22:17
**great** 14:7 57:18
**greater** 22:13,21 22:23 23:3,20 24:5 59:19
**grounds** 45:5
**group** 27:18 28:5
**guarantee** 97:16 98:7
**guaranteed** 43:19
**guard** 36:4
**guess** 10:4 46:25 84:8
**guidance** 24:15
**guide** 66:2,7,11,17

**h**

**h** 6:5
**hand** 102:22
**handed** 81:17
**happen** 56:13 69:18,19,23 71:5,7 71:10
**happened** 97:23 98:16
**happening** 47:25 70:4
**happy** 98:22 100:19 101:12
**hardening** 21:19 79:5,18 89:3
**harm** 90:16 91:2,4 91:8,11

**head** 11:19
**heard** 31:16
**hearing** 101:1
**hearings** 100:21
**help** 9:6
**helpful** 92:3,5
**helping** 37:24
**hereunto** 102:22
**high** 48:15
**higher** 78:12
**highest** 61:16 63:15
**highlighted** 29:6 29:20 34:7,9
**highlighting** 29:8
**hired** 8:23,25
**historically** 47:6,7 47:15
**history** 17:9 18:1
**hit** 29:22
**hits** 39:4
**hold** 97:9
**holding** 12:18,22 12:23 13:5,15 42:19 55:12
**home** 70:7
**horizon** 68:20
**hostetler** 3:3,10
**hour** 60:1
**hours** 11:8,12,13 11:16 14:12
**hum** 22:10 60:11 77:14 87:21
**hundred** 11:13
**hundreds** 27:21 76:7

**i**

**i.e.** 53:5
**idea** 34:2 62:16 64:11

www.veritext.com                                                                888-391-3376

identified 21:8
34:1
identifies 83:17
identify 27:4
ignition 54:5
illinois 3:21
impact 52:24
71:11
impacting 30:12
impacts 55:11
implement 6:18
27:9 28:10 29:18
implementation
28:16 33:25 83:20
importance 43:2
important 11:1
47:14
impose 42:14,22
71:25 90:20
imposes 43:5
imposing 42:7,8
impressive 72:6
improve 36:1
imprudent 69:12
incented 91:23
incenting 90:4
incentive 8:17,20
14:24 15:1 29:13
30:3,22 33:10,11
34:10 35:24 36:3
37:7 43:3 53:2
57:24,25 68:20
69:12 72:23 75:18
75:20,23,25 76:1
86:8 87:3 88:14
90:3,4,14 91:6,14
93:2
incentives 29:23
53:7
incentivize 68:8

include 33:13,15
99:14
included 29:13
65:23 103:13
inclusion 46:3
incorporated
105:12
increase 24:14
increased 24:10
78:4 85:19
increases 72:6
increasing 46:7
59:13
incur 68:15
index 21:12
indicated 96:6
indicating 103:13
indicators 29:12
individual 35:15
46:3,5,15,17,18,23
47:6,9,12,15,17
48:1 60:14,19
61:2,11,18,20 62:6
62:16,23 64:1,7,25
88:22 91:20
individuals 9:24
13:3 14:19,22
35:25 54:8 63:15
63:21 65:17 87:2
industries 31:11
industry 84:22
inferring 74:9,17
influx 30:1
inform 42:6
information 43:16
44:8 87:3 95:19
initial 9:19 24:15
62:22
initially 20:20
26:8

initiatives 34:1
input 36:14,15
37:3 82:2 87:24
instituting 41:1
instruct 44:25
45:4 49:10,18
instructed 7:1
instruction 45:15
45:16,16
instructions 83:3
intent 75:14
interacts 57:24
interested 102:20
interests 97:6,17
98:10 99:11,12
interim 95:8,25
international 3:18
interpret 13:4
interpretation
74:2,12 75:1
interrupt 57:14
interrupted 58:13
investigate 51:7
investigation
27:12 40:1 41:2
investigators
53:21
investment 37:14
investments 24:22
24:25
involved 20:4,5
44:4 77:1,2 79:10
79:16
involving 41:13,22
issuance 27:10
41:3
issued 27:10 41:21
42:14
issues 18:12 55:10
69:18 71:8

items 30:11

j

j 3:19
january 41:13,21
44:14,18 46:2,16
46:20 47:2,11,11
47:17 63:4 81:23
94:6,15
jessica 4:16
jessica.liou 4:23
job 1:25 36:10
68:22
john 11:18,25
14:20
jointly 1:9 2:9
joseph 2:18
judge 38:13 41:21
42:7,13,21 43:5
71:24 72:13,25
73:10 74:3,8,11,25
90:18 101:1,8
judge's 90:25
judgment 39:8
65:6,10 66:20
julian 3:4 6:3 8:8
10:18,19 15:21
16:14,23 20:14
21:4 22:1,7 23:13
24:4 25:14 26:13
26:18,25 27:3,7,19
32:2 33:6 34:19
35:2 36:7,17 38:1
38:12 39:20 40:5
40:19 41:10 42:5
42:12 43:4,23
44:9 45:10 46:11
49:15,20 50:24
51:14,18,22 52:1,5
52:9 53:19 54:1
54:10,22 55:17
56:1,17 57:2,5,11

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
117 of 130

57:19 58:7,14
59:8 60:3,7 62:8
62:15 63:5 64:9
64:21 66:22 67:19
69:1,7 70:6,12,18
71:13,22 72:17
73:17,23 74:10,20
75:13 76:25 78:18
79:2,21 80:12,23
81:7,10,16 82:5,14
82:18,21 85:15
86:3,9 87:6 88:7
89:6,17 90:10
91:13 92:9,24
94:13,23 95:21
96:21 97:8,24
98:2,17,21 99:23
100:4,7,23 101:4
101:15
**julie** 4:4
**july** 28:11 38:15
**june** 40:20
**jury** 39:24
**justice** 51:15
**jwolf** 4:9

**k**

**karotkin** 4:15 9:1
74:17
**kazmierowski** 5:2
9:23
**kevin** 11:24 14:20
**key** 29:11
**kick** 69:12
**kim** 5:5
**knew** 32:24
**know** 9:24 12:11
15:5 20:19,20
33:21 34:3,6,18,20
34:22 35:8,11
49:24,25 50:1,1
53:16,20 58:10,11

61:25 62:1,9,13
65:1 73:24,24,25
76:8 77:9,20
78:19 79:23,24
80:1,9,11 85:10
86:19 93:9 94:1,5
95:5,6 99:5 101:1
**knowing** 53:24
54:7

**l**

**labor** 72:7
**lack** 30:10 31:21
32:3 73:14
**large** 77:2 86:16
**largely** 96:13
**larger** 76:10,11
**largest** 75:18,20
76:2,19 77:5
**late** 14:12
**law** 43:24
**lawyer** 89:19
**lawyers** 45:19
72:2
**laymen** 90:6
**lays** 97:16 98:8
99:10
**lead** 1:8 2:8 99:20
**leaders** 60:18
**learn** 69:12
**leaving** 90:8
**left** 22:9
**legal** 49:25 50:1
103:1 106:1
**letter** 12:25
103:19
**level** 22:14 59:19
63:25 65:22 66:1
**levels** 48:23 80:8
**light** 9:7 32:7
93:17

**lincoln** 3:18
**lincolninternatio...**
3:23
**line** 7:2 14:15
18:15 19:5,13
21:14 22:9 38:20
39:4 46:25 53:4
72:1 85:18 87:22
93:16 103:13
105:7 106:3
**lines** 40:13 41:6
73:3
**linked** 78:19
**liou** 4:16
**list** 28:19
**listed** 13:3 105:7
105:17
**listen** 97:25
**listing** 105:7
**litigation** 45:3
**little** 82:14
**llc** 3:18
**llp** 2:19 3:3,10 4:2
**locate** 41:5
**long** 27:21
**look** 28:7 30:5
71:23 85:11 91:10
92:22 93:6,10,11
99:16
**looked** 33:3 38:21
48:21
**looking** 13:2 18:23
29:2 48:11 78:4
97:14 98:6
**looks** 68:14
**los** 4:6
**lost** 70:7,13
**lot** 47:22,22,25
68:14 82:19
**loved** 70:13

**lowe** 11:18,23
14:20
**lower** 74:15 75:5
**ltip** 22:16 29:14

**m**

**madam** 103:10
**madison** 3:20
**mail** 38:19 39:3
**maintain** 25:6
53:9 78:6
**majority** 47:24
53:8
**making** 26:1,15
52:25 74:4
**manage** 55:6
**management**
13:21 14:19 17:6
21:14,18 38:14
44:22,24 45:12,17
47:3,13 50:8,10
63:20 64:24 93:3
95:14,22 97:4
**management's**
93:20
**managers** 63:20
**managing** 3:19 5:2
**manipulate** 36:1
**manufacturer**
71:8
**march** 1:17 2:21
8:1 102:22 103:4
**mark** 5:2 9:23,24
41:5
**marked** 27:2 29:3
81:6 85:14
**market** 80:19 81:1
81:2,2,2
**massive** 70:23
**material** 84:22
93:18

www.veritext.com                                                                   888-391-3376

math 11:12
matter 9:18 43:11
  43:20 56:7
matters 10:14
  85:9
maximize 25:7
maximum 84:3
mean 32:23 34:18
  58:11 65:13,19
  80:4 83:25 98:18
meaning 47:7
meaningful 30:1
means 34:2,16
  102:12
meant 78:7 96:23
  99:4,5
measure 29:14
  30:20,20 31:1,3
  33:24
measured 19:25
  48:2
measurement 53:3
  53:10,11
measurements
  85:20
measures 34:24
  36:3 85:22
measuring 29:12
mechanism 34:10
  100:21
mechanisms 55:9
  90:14
meeting 44:15
  50:6 63:4 82:3
  95:14
meetings 12:6
  55:20 64:6
members 12:5,7
  12:12 66:12
mentioned 10:12
  48:20 82:2 96:2

met 12:13 29:24
  35:18 70:7
metric 11:2 25:18
  30:18,22 31:8,9,12
  31:14 32:4 33:14
  33:16,20 42:20,21
  43:6,6 59:14,15
  65:2,9 66:23 67:5
  74:14 75:4 77:7
  77:21 78:13,20
  79:1,12,12 85:24
  88:11
metrics 17:23
  18:23,25 19:3,5,21
  19:23 20:7,8,16,19
  20:20 22:6,12,21
  24:1 25:22 29:21
  30:6 32:7 33:18
  33:24 34:5,22
  35:4,9,15,17 36:16
  36:21,23,25 37:1,5
  37:6,6,9,10,12,13
  37:18,22,23 42:20
  43:7,21,24 65:17
  66:2,7,11,17,18,18
  66:20 67:18 76:17
  79:8 84:13,20
  86:21,22 87:7,9,12
  87:15 88:2,5,12
midwest 103:17
  106:1
milbank.com 4:8
  4:9
millbank 4:2
miller 12:8
million 76:10,12
  76:20,23 84:4
millions 76:7
minimize 29:24
minutes 14:8,10

mislead 84:1
mistry 12:1 21:8
  93:15,17
mitigated 59:7
mitigating 59:11
mitigation 6:9
  21:15 42:9 57:23
  59:12,20 67:11
  72:1,14 78:11
  79:5,18 81:19
  82:8 89:2 90:19
modification
  22:12,20 26:23
  63:7,9
modifications
  20:20 23:1 45:25
  46:14 72:4
modified 26:11
  41:24
modifier 46:4,16
  46:17,19,23 47:9
  47:12,15,18 61:3,4
  61:11,19,20,22
  62:2,7,17,24 64:1
  64:7
modify 46:4 60:18
moment 48:13
  90:8
money 55:22
  72:19
montali 101:9
montali's 38:13
month 92:23 95:3
morning 14:4
mortality 21:15
motion 8:16 45:20
  49:2,3 75:16 94:9
move 57:12
multipliers 76:18
multiyear 32:16
  32:20 33:3,5,9

mislead
murphy 3:19

**n**

n 6:1
name 8:9 103:6
  104:3,4,15 105:3,4
  105:21
named 102:19,20
national 39:25
nature 25:5
nda's 101:6
near 29:22 39:4
necessarily 68:2
necessary 36:14
  72:5,9
need 58:17 91:17
  91:20 100:20
needed 59:10
needs 10:24
negative 55:11
  71:5
nevada 40:10
never 82:11
new 3:13,13 42:8
  42:15 43:15 44:7
news 38:24 40:8
  40:20
no.19-30088 1:7
  2:7
nominated 63:19
non 21:13 53:7
normally 33:7,9
northern 1:2 2:2
  93:18
northstar 6:20
  27:9,18 28:5,11,17
  29:1,10 31:16,24
  32:9
notarized 103:14
notary 103:25
  104:10,18 105:15
  105:23 106:23

Case: 19-30088   Doc# 1112-2   Filed: 03/28/19   Entered: 03/28/19 16:34:16   Page
119 of 130

**note** 103:12
**notion** 56:7
**november** 54:17
  55:24 58:2,25
  69:11
**number** 71:3
  78:12 103:7,13
**numbers** 105:7

**o**

**o'connell** 11:24
  14:20
**oaths** 102:3
**object** 78:14,23
  98:19
**objection** 10:17
  16:11,19 20:10
  21:24 22:4 23:4
  23:23 25:11 26:4
  26:16 31:22 32:25
  34:14,25 35:19
  36:12 37:19 39:17
  40:3,16 41:8 42:2
  42:10,23 43:9
  44:1 50:22 51:12
  51:16,20,24 52:3,7
  53:15,23 54:6,20
  55:2,25 56:3,23
  57:4,7 58:3,9 59:1
  59:22 62:4,11
  63:2 64:3,14
  66:14 67:13 68:11
  69:4,15 70:9,15,25
  71:17 72:15 73:13
  73:21 74:5,16
  75:6,7,9 76:21
  79:19 80:10,20
  81:3,24 86:2,6,24
  88:4 89:4,14 90:9
  90:21 91:18 92:15
  94:10,20 95:10
  96:20,25 97:11

**objective** 55:16
**objectives** 37:25
  68:23
**observed** 37:1
**obstructing** 39:25
**obstruction** 51:15
**obtain** 86:20
**obviously** 57:10
**october** 54:16
  55:24 58:2,25
**offer** 50:20,25
**offered** 73:19
**office** 41:16
**officer** 41:11,14
  102:1
**official** 4:1 104:15
  105:21
**officials** 54:3,13
**oftentimes** 31:13
**oh** 15:17 87:10
**ohio** 103:2
**okay** 13:16 15:15
  16:24 17:19 22:8
  38:2 45:6,7,22
  48:9 49:1 50:2
  73:6,8 75:14,18
  83:16 85:17 88:16
  89:22 98:24 100:3
  101:9,15
**ones** 70:13 87:5
**ongoing** 9:7 30:11
  72:22
**ooo** 1:4 2:4 5:7 6:4
  7:4 101:18
**operated** 79:1
**operating** 31:2,13
**operation** 30:20
  31:9
**operational** 17:9
  18:1

**operations** 14:17
  30:10,17 31:2,7
  72:21,23
**opinion** 10:25 36:8
  50:18 73:9 80:17
  90:16
**opportunities** 46:5
  46:8 48:21 69:17
  91:10
**opportunity** 48:9
  48:23 76:4 102:15
**opposed** 13:18
  45:3
**order** 28:8,13 29:1
  35:17 36:10 37:17
  38:13,17 41:1,2,20
  42:14 72:25 74:18
  92:11
**ordered** 28:9,14
  29:10,18 30:14
**ordering** 6:17 27:8
**orders** 26:19,22
  71:15,19,21,24
**organization** 19:6
  68:17
**organizations**
  86:17
**original** 22:5
**originally** 62:18
**outcome** 102:20
**outcomes** 56:13
**outside** 66:20
  76:15
**overall** 23:16
  24:10,11 55:15
  93:4,4

**p**

**p.m.** 2:20,21 8:2
  101:17
**pacific** 1:8 2:8
  4:11 6:8,17,22,23

**12:18 27:8,14,15
  28:9,14 38:16,19
  39:9,13,25 41:22
  81:18 82:8 103:6
  104:3 105:3
**page** 6:2,7 7:2
  14:14 15:13 18:15
  19:13 20:17 21:2
  22:8 27:13 28:8
  29:3,4 34:7 46:24
  60:10,13 72:1
  73:2 77:11 83:14
  84:12,17 85:16
  86:10 87:18 93:16
  103:13,15 105:7
  106:3
**pages** 6:10,15,20
  6:25 27:21 28:25
**paid** 9:17 43:14
  68:25 91:22
**palermo** 38:20
  39:4
**paradise** 54:4
**paragraph** 28:13
  29:21 30:8 48:13
  60:14 73:3 74:8
  75:11
**pardon** 32:12
  75:24
**park** 4:5
**parkway** 4:17
**part** 18:24 20:1
  22:19,25 24:15
  29:14,20 43:1
  48:20 57:10 60:21
  64:8 84:15 88:11
  90:1 105:9
**participants** 46:6
  48:24 60:24 63:10
  63:11,13 83:18
  97:18 98:10

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
120 of 130

**participated** 45:13
  82:2
**particular** 24:19
  31:1 59:12 78:21
**particularly** 14:20
  14:21 30:1
**parties** 102:18
**pass** 72:5 99:25
**pay** 49:13 65:16
  65:16,17 69:12
  72:19 79:25 80:2
  80:14,18,25 85:21
  93:24
**paycheck** 92:21
**paying** 55:22
  73:10 93:22
**payment** 52:11,12
  55:19,19 56:11
  60:19 67:21 70:3
  70:21,22 89:22
  92:14
**payments** 43:17
  54:19 55:6,8 56:5
  60:15 84:23 91:15
  97:7,16,21 98:8,13
  98:25 99:4,6
**payout** 67:22
  76:11 84:3
**payouts** 44:6
**peer** 80:6
**peers** 30:21 31:11
  80:8,15
**pending** 71:15
**people** 10:1 24:23
  56:8 68:16 76:5
  90:6 91:22
**percent** 20:3 21:12
  21:13,14,15 23:8
  23:16 24:2,10,11
  25:16,18,24 26:9
  26:12 30:18 43:7

46:7 48:3,10,12,14
  48:16 59:14 60:22
  60:24 61:1,4,6,17
  63:7,10,11,12,17
  67:6,6,10 74:15
  75:5 77:12,17,18
  78:2,6,12,25 79:4
  79:17 85:22 89:2
  89:8,12
**percentage** 79:13
**percentages** 78:8
  88:17
**perform** 19:20
**performance**
  17:23 18:6,24
  19:24,25 20:2
  21:9 22:12,14,21
  22:24 23:16 24:6
  24:9,10,12,15
  25:15,17,24 29:11
  30:18 31:20 32:4
  32:17 34:24 35:6
  35:16,17 36:2,16
  36:20,22,25 37:1
  46:4,15,17,19,23
  47:7,9,12,18 53:3
  55:12 59:21 60:20
  61:11,19 62:1,7,17
  62:23 64:1,7,7,20
  66:23 67:5,12
  74:14,19 75:4
  76:17 83:21 84:13
  84:20 85:23 87:7
  87:11 88:2 99:19
**performed** 18:18
**performers** 48:15
  61:16,17
**performing** 17:11
  17:18,21 63:15
**performs** 43:20

**period** 19:24,25
  30:2 48:2,7 53:10
  53:11 55:7 59:7
  63:16 64:20 83:21
  95:9
**periods** 53:4 68:5
**personal** 61:11
**personally** 11:14
  104:11 105:15
**personnel** 72:9
**pg&e** 1:6 2:6 4:11
  10:8 11:17,19
  12:17 13:1,13
  29:7,18 33:23
  34:13,23 36:9
  40:13 41:13,15
  42:9,22 44:16
  54:13 72:2,4,5,8
  72:12,19 73:1,11
  74:3 78:19 79:16
  80:1,18 90:20
  93:6 103:6 104:3
  105:3
**pg&e's** 9:10 30:21
  41:4,23 53:13,22
  54:3,14 60:12
  71:23 72:12 85:25
  86:5,20 87:12
**phone** 4:4 5:6
  101:8 103:3
**phrase** 56:8
**piece** 95:18
**pipeline** 39:14
**place** 48:10 77:6
  91:6,12 92:14
  95:8 102:9
**placed** 23:7 59:11
**plan** 6:10 8:17,20
  10:16 15:2,7
  16:21 20:3 25:21
  30:22 32:8 33:10

33:11,23,25 34:1
  35:24 36:2,3,4,23
  37:9,14,14 42:9
  43:3,11,14,18,19
  43:19 44:7 48:2
  53:2 55:4,5 57:24
  57:25 60:21 64:8
  64:18 65:12,14,16
  65:18,20,23 66:18
  69:6 75:18,20
  81:19 82:8 86:8
  88:14 90:3 91:5,6
  91:11,14 92:3,4,6
  92:6,8,14 93:2
  99:8,17
**plans** 10:22 14:24
  15:1,2,3 23:8 37:7
  53:9 55:12 75:23
  75:25 76:1,9
  85:21 90:15 94:6
**plays** 57:22,23
**plaza** 3:12
**please** 8:9 45:9
  58:19 73:16
  103:11,11
**plus** 80:25
**point** 10:23 34:7
  34:17 54:5 58:5
  59:4,9,17 60:3,4
  66:16 68:13 91:21
**points** 40:11
**pole** 21:13
**pool** 61:5,24 63:8
  63:18 81:1
**population** 48:15
  60:23
**portfolio** 55:15
**portion** 34:9
**posed** 44:20,21
  45:24

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
121 of 130

posing 44:22
position 74:8
positive 30:4 70:2
possession 92:12
  92:19
possibility 35:25
  58:2,5,24 59:4
  61:10 69:23
post 45:24
potential 9:8
  22:14 34:10,13
  56:12 69:17,17
  70:3 84:21
potentially 76:15
  91:10
potentials 71:4
power 40:13
practices 87:4
prepared 27:16
  83:4
presence 92:10
present 5:1 75:14
pretty 81:23
primarily 11:18
primary 20:4
  68:25 87:13 90:3
prior 9:9 30:2 46:1
  47:8 64:2,13 83:6
priorities 19:6
privilege 45:5
privileged 45:21
probable 54:4
probably 10:4
  11:11 95:5
probation 41:11
  41:14,24 42:8
  71:25
problem 54:11
problematic 72:7
procedure 102:4
  104:5 105:5

proceeded 46:14
proceeding 28:19
  45:20
proceedings 75:16
  101:16
process 32:22
  50:15,17 80:7
  97:4
product 45:5
production 103:15
  103:17,22
products 71:9
professional
  100:17
profit 30:20 74:4
profitability 73:12
program 21:15
  38:15 56:12 93:4
  99:2
programs 18:13
project 10:9
propose 44:24
proposed 20:9,16
  24:13,14 29:21
  37:3 52:14 62:18
  72:3,10,13 95:15
  95:22
propriety 31:6
  32:1 55:21
prospective 43:18
  55:5 64:18 65:18
  97:15 98:6
provide 10:15,20
  24:20 53:4 91:16
  92:20
provided 16:20
  37:3 44:7 76:5
  82:2 87:23
provides 48:6
providing 56:10
  68:19

provision 47:2
provisions 84:19
proxy 13:2,3
prudent 51:4 69:2
public 21:11 27:11
  27:16 81:20
  104:10,18 105:15
  105:23 106:23
puc 26:20,23 28:8
  28:8 29:1,10,17
  30:14 31:19 41:1
purpose 9:2 65:5
  90:4
purposes 19:17
pursuant 102:3
push 38:9
put 22:12,21 72:2
  73:11 74:4 94:19
putting 67:10

**q**

qualified 72:7,9
quarter 28:20
quarterly 28:15
  52:12 53:5,7,11
  54:19 55:19 63:22
  66:3,13 67:22
  68:2 70:3,21
  84:23 89:22 90:2
  92:4,8,14 99:7
quarters 43:22
question 7:1 16:12
  16:13 19:9 20:11
  21:21 22:18,25
  23:5 25:4,12 26:5
  31:23 33:1 34:15
  35:3,20 42:24
  43:10 44:2 45:8
  46:9 49:9,19
  54:21 55:3 56:18
  56:24 57:8 58:21
  58:23 59:3,23

62:5,12 64:4,15
  67:14 68:11 70:10
  70:16 71:1,18
  73:14,15,22 74:1,6
  74:22,25 76:22
  80:5 86:25 89:15
  90:22 92:16 94:11
  95:5,11 97:1,12
  98:19
questioner 57:16
questioning 45:14
questions 13:25
  44:19,21,23,24
  45:2,12,24 73:5
  82:4,19 100:1
quite 71:6

**r**

r 4:14 11:21
raining 14:11
range 20:1 84:10
  84:20
rate 13:16 72:6
rates 11:13
rationale 95:17
  96:3,7,11
reach 87:1
read 14:1 58:18,20
  58:21,22 59:2
  73:2,8 74:24 98:3
  102:15 104:5,6,12
  105:5,6,17
reading 75:10
  103:19
reads 30:8 32:16
  33:13 34:9 73:7
  98:1
real 34:11
really 17:12 24:24
  31:25 34:3 45:25
  68:12 89:20

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
122 of 130

**reason**  50:12
52:19 68:25 78:1
103:14 105:8
106:3
**reasonable**  37:9
37:14,15,18 79:11
87:15 88:10,15,18
88:23 89:3,9
**reasonableness**
79:17 87:8,11,25
88:6,8
**reasons**  24:17 68:7
**recall**  18:10,14
20:18 22:5 25:25
42:11 45:25 56:25
59:15,16,24 65:24
67:15 76:16 77:4
77:23,24 78:17
96:8,14
**recalling**  48:18
**receipt**  103:18
**recess**  60:6 82:20
**recession**  69:21
**recollection**  21:20
50:9,14 86:13
96:13
**recommend**  50:11
68:5
**recommendation**
26:15 29:18 30:8
30:13 32:6,18,24
34:8 47:10 50:9
50:13 62:22 63:1
75:12 93:21
**recommendations**
6:19 27:9 28:10
28:16,25 29:4,7,9
**recommended**
32:8 47:13 62:2
67:21

**recommending**
50:11 95:15 96:10
**recommends**
33:22
**record**  8:10 27:5
38:11 58:22 59:2
60:8 74:24 81:17
82:22 98:3 100:12
102:13 105:9
**records**  41:5 71:16
**reducing**  65:4
**redwood**  4:17,18
**refer**  8:19
**reference**  103:7
104:2 105:2
**referenced**  14:19
48:18,22 104:11
105:15
**referred**  10:7
48:12
**referring**  10:6
17:22 18:20 22:23
35:22 66:5 88:1
99:2,7
**refers**  29:1
**refresh**  21:20
86:13
**refreshes**  86:18
**regard**  26:23
85:25 89:12 92:4
92:5
**regulatory**  69:21
**reinforce**  55:16
**reinforced**  43:3
**reinstitute**  47:14
**related**  10:16,21
96:14
**relationship**  9:9
**relative**  17:11,18
18:7 19:2 23:6,10
71:20

**relayed**  95:16
**release**  38:24 40:9
40:21
**relevant**  33:4
**relied**  34:23
**rely**  35:4,15
**remember**  44:10
77:16
**repeat**  16:13 45:8
74:1,22,23 89:24
**report**  6:20 16:9
16:17,20 27:10,17
28:5,11,17 31:18
40:14,17,25 41:7
41:11
**reported**  1:22
41:15 102:10
**reporter**  2:22 8:6
58:22 59:1,2
74:24 75:9 98:1,3
104:7
**reporting**  29:23
30:2,4 35:5
**reports**  26:14,19
26:22 28:15,18
34:23 35:16 39:18
53:17
**represent**  27:20
**request**  50:3 51:3
93:24 95:1 105:9
105:11
**required**  72:3
103:25
**requirements**
90:19
**resources**  72:3
**respect**  9:15 14:23
15:1 16:18 17:10
18:22 23:22 26:20
36:24 44:16 45:23
49:9,11 50:10,20

86:11 87:3 88:2,5
88:21
**respond**  44:19
54:18
**response**  71:24
**responsive**  57:13
**restate**  94:11
**restructure**  84:25
**restructuring**  9:8
24:18 31:12,15
32:19,22 33:11
47:19 48:7 50:10
50:15,17 67:23
68:3 69:22 71:3
76:14,15,16 96:14
96:24 97:4
**restructurings**
53:9
**resulted**  22:11
23:2
**results**  24:20 30:3
30:4 35:5 36:1
**retain**  90:13
**retained**  49:21,23
**retainer**  9:19,20
**retaining**  90:20
**retains**  44:5
**retention**  9:3
38:15 90:2
**retentive**  90:4
**rethink**  56:20
**returned**  103:18
**review**  13:10 15:8
15:11,23 20:5
39:6,12 52:11,12
80:7 87:7 103:12
104:1 105:1
**reviewed**  15:9
17:4 19:21,22,24
20:12,15,22 84:18

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
123 of 130

reviewing  14:22
reviews  15:19
  77:15 91:15
revise  75:12 83:7,9
revisit  32:6
reward  11:21
rewards  11:19,20
  11:21
richard  4:13 103:5
richard.slack  4:20
right  14:8 15:15
  22:9 28:11 50:16
  60:4 61:14,24
  64:10 66:25 67:7
  73:20 75:7 79:24
  82:12 83:18 84:4
  85:13 94:16,19
  95:2 99:3 101:12
risk  58:6 59:6
  69:13
rjulian  3:8
robert  3:4
robinson  6:13
rockefeller  3:12
role  57:23
roles  68:18
roughly  95:3
routine  21:14
rules  104:5 105:5

s

s  6:5,13 103:15
  105:8,8 106:3
safety  6:24 18:25
  18:25 19:11 21:12
  22:13,22,24 23:3,7
  23:10,17,20 24:3
  24:23 26:15,20
  27:16 28:5,17
  29:13 32:8 33:14
  33:16,18,20,23
  34:24 37:5,11

39:14 40:1 42:20
  42:21 43:1,2,5,6
  48:3 51:11 57:10
  57:22 59:11,20
  73:12 74:4 78:6
  85:20,21 86:4,21
  87:14 88:11,12,12
  88:22 89:8 99:18
san  1:3 2:3,19 3:6
  8:1 14:11 39:10
  39:15 40:2 51:8
  65:22 85:5,19,24
  86:14 89:11
sansome  2:19
satisfaction  37:5
  48:5 77:7 78:2,21
saw  84:7
saying  15:17 25:1
  33:8 34:4,6 35:10
  35:14,23 57:1
  71:15 73:11 74:3
  74:11 75:1 101:3
says  28:13 29:21
  45:13 60:18 86:10
  86:18 89:19
score  24:11
sdg&e  6:12
sdg&e's  86:7
seal  100:25 104:15
  105:21
second  27:13 46:4
secondly  88:16
section  15:12
  60:14 83:14,17,20
  83:23 84:9,12
  102:3
see  15:17 21:11,17
  28:12,21 29:5,6,15
  48:11,11,17 60:16
  62:25 68:24 77:11
  83:25 93:7,10

seek  49:5,12
seen  27:24 28:4
  36:14 39:18 82:11
semi  53:8
send  14:25 15:6
senior  14:19 63:20
  93:20
sense  99:16
sent  14:23 17:4
sentence  29:9
  32:16 33:13,22
separate  97:23
  98:15
serve  28:18
service  19:1 28:19
set  28:10,16 32:16
  80:9,14
setting  19:2
settlement  41:15
she'll  74:23
sheet  103:13 105:7
  105:10,18 106:1
shell  83:6
shifting  67:21
ship  51:23
shores  4:17,18
short  8:16,19
  57:25 75:22 76:1
  93:2
shortage  72:7
shorter  32:21 53:3
  68:4,20
shorthand  2:22
  8:6
show  26:25 41:2
  41:20 81:8
shown  103:16
sic  66:24 99:12
sight  53:4
sign  100:8,10

signature  102:24
  103:14
signed  8:15 104:13
  105:18
significant  18:18
  23:11 47:21 57:9
  57:21 59:10
significantly  83:10
signing  83:11
  103:19
similar  86:22
similarly  30:2
  69:10
simon  95:23 96:11
simpler  47:24
simplicity  48:8
simply  46:9 72:2
sincerely  103:21
singh  4:14 100:13
single  11:1 55:14
sir  103:10
sit  14:9
situation  24:18
  25:6 31:15 33:12
  47:19 69:19 70:22
  90:13 92:5 93:19
  97:14 98:5
situations  44:4
  67:24 71:9,20
skikos  2:18,18
slack  4:13 10:17
  15:16 16:11,19
  20:10 21:3,24
  22:4 23:4,23
  25:11 26:4,16
  31:22 32:25 34:14
  34:25 35:19 36:12
  37:19 38:8 39:17
  40:3,16 41:8 42:2
  42:10,23 43:9
  44:1,25 45:7,15

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
124 of 130

49:8,18 50:22
51:12,16,20,24
52:3,7 53:15,23
54:6,20 55:2,25
56:3,23 57:4,7,14
58:3,9,16,20 59:22
60:1,4 62:4,11
63:2 64:3,14
66:14 67:13 68:11
69:4,15 70:9,15,25
71:17 72:15 73:13
73:21 74:5,16
75:6 76:21 78:14
78:23 79:19 80:10
80:20 81:3,12,24
82:16 86:2,6,24
88:4 89:4,14 90:9
90:21 91:18 92:15
94:10,20 95:10
96:20,25 97:11
98:19 100:3,6,10
100:15 101:2,11
103:5
**slightly** 20:21
**slip** 99:9
**slowly** 98:2
**socalgas** 6:12 85:5
85:18
**solutions** 103:1
106:1
**somebody** 20:2
**sorry** 12:23 15:18
20:13 23:15 33:2
36:19 38:8 44:17
46:1,6 75:21 83:8
84:2 101:2
**space** 87:2
**speak** 23:25 35:21
91:19
**specific** 33:4,18
37:23 67:15

**specifically** 59:16
**specify** 87:4
**spectrum** 91:21
92:2
**speculating** 35:23
**spent** 9:18 11:5,15
**spur** 90:8
**staff** 9:25 10:1
**stakeholders**
24:21 25:7 97:6
97:19 98:11 99:13
99:15
**standpoint** 23:9
**stands** 34:4
**start** 27:23 29:8
38:3 67:4
**started** 21:23
**starts** 15:13 24:24
**state** 8:9 27:11
71:14,19,21 81:20
104:10 105:15
**stated** 102:9
**statement** 13:2,3
25:25 26:1 104:13
104:14 105:19,19
**states** 1:1 2:1
85:18
**stating** 40:10
42:14
**status** 28:15
**stay** 25:16,18 68:9
**staying** 25:24
**stephen** 4:15
**stephen.karotkin**
4:22
**steve** 9:1
**stick** 89:21
**stip** 8:20 10:11
11:5,15 16:10,18
16:22 17:5,7,12,13
17:17,20 18:8,19

18:23,24 19:16,17
19:19,22,23 20:1
20:16 21:9,22
22:6 23:2,2,12,15
23:16,21 24:6,6,11
24:12 26:23 28:2
29:14 30:10,23
31:7 32:7 33:10
33:14,16,19,24
34:13 35:6 36:11
37:2,3,9,12,13
44:11,17 45:23
46:1,6,18,19 47:8
49:3,7,13 50:4
51:3 52:11 54:23
55:14,19 60:12,15
60:19,25 61:21,22
62:3,18 65:2,9,23
66:4 72:20 75:16
76:9,19,19 77:3
78:20 80:19,25
83:15,18 84:9,15
84:19,21 86:5
87:12,25 88:11
93:12,23 94:8,16
94:19 95:1,8
97:10,13,15,16
98:4,7,8 99:10
**stips** 15:13 23:9
47:8 76:1
**straight** 94:14
**strategies** 9:7
**street** 2:19 3:5,20
**strike** 57:12
**strong** 24:20,24
**strongest** 99:21
**structure** 21:9
77:11 84:20 87:24
**structuring** 53:6
**study** 86:11

**subclass** 88:22
**subject** 30:6 80:19
**submit** 16:9,16
28:15 75:15
**submittals** 29:23
29:25 30:1
**subscribe** 102:16
**subscribed** 102:22
104:10 105:14
106:21
**subsequent** 26:12
47:13 82:4
**subsequently** 63:6
**substance** 82:1
**success** 34:23
**sudden** 29:25
**suggest** 47:16
**suggested** 26:8
**suggestion** 62:20
**suite** 2:19 3:5,20
103:2
**summary** 83:14
**superior** 103:1
**suppose** 38:21
**sure** 11:9 18:9
26:6 34:16 52:25
58:6 59:5 61:20
66:6 67:25 82:16
**surprise** 31:18
**survey** 30:3
**surveys** 29:22 93:6
93:11
**switching** 70:21
82:17 90:1
**sworn** 8:5 102:6
104:10,13 105:14
105:18 106:21
**synonymous**
31:14
**system** 21:18
35:17 79:18 89:3

Case: 19-30088 Doc# 1112-2 Filed: 03/28/19 Entered: 03/28/19 16:34:16 Page
125 of 130

**systems** 36:4,5,5
79:5

**t**

**t** 6:5
**take** 28:24 43:15
54:8 61:23 64:1
71:23 78:8 82:14
**taken** 2:18 27:21
60:6 62:10 82:20
102:9
**talk** 79:25 93:1
101:8
**talked** 17:6 26:11
64:6 90:24
**talking** 14:21 19:5
**talks** 13:1 37:17
**target** 20:3 46:5,7
48:9 76:4,10,11,20
80:25
**targets** 21:9 29:24
32:7,17,20,21 33:3
33:5,10 35:18
**team** 9:10,22 11:4
11:22 14:16 16:9
17:2 28:1 30:5,16
32:14,18 38:17
39:1,6,11 79:10,15
80:13,16 81:4
82:7 87:23
**tell** 17:9,16 29:17
30:13 31:5 46:22
47:3 49:17 73:3
73:24 79:3
**term** 8:16,19
32:21 57:25 75:22
76:1 93:2
**terminating** 55:12
**terms** 9:12,15,16
11:8 12:6 13:21
15:2 17:6 19:4
20:5 24:1 25:6,21

43:13 48:21 55:10
72:22 74:19 76:4
79:12 84:18 92:18
**terrible** 80:5
**testified** 8:6 18:17
19:14 22:11 87:22
93:17 94:2
**testify** 102:6
**testimony** 6:13
22:19 89:23
102:10,14 104:6,7
105:6,9,12
**thank** 23:18 99:23
100:15,22
**thanks** 99:23
101:15
**thing** 77:16 95:12
**things** 21:12 39:5
40:11 41:4 69:19
69:23 71:5,9
73:11 74:3 87:23
98:24
**think** 9:6 10:24
25:23 26:8,10
32:3 34:4 35:14
37:16 43:7 44:3
46:10,24 48:22,25
55:4,9 67:3 68:12
69:2,25 81:25
85:12 90:12 91:11
91:16 92:3,4,6,7
92:10 97:13 98:4
98:23 99:16,19
100:24 101:6
**thinking** 11:8
**third** 29:2 88:20
**thirty** 11:16
103:18
**thorough** 19:15,18
**thought** 33:2
41:14 50:16 93:7

94:18
**threat** 70:23
**three** 10:4 14:12
14:22 21:12 28:25
54:12,23 87:13,16
88:6,8,18 92:22
**thursday** 1:17
2:21 8:1
**tied** 24:2 29:23
30:3 67:17
**time** 9:17,18 11:4
11:7,14 14:1
43:14 48:2 58:5
59:5 68:4,5,20
90:8 94:18 99:23
100:19 102:9
**timing** 22:14
**title** 15:4
**today** 14:11 94:3
99:24 100:1
**told** 18:2 94:24
**tool** 55:14
**top** 61:16,17
**topic** 49:16 89:18
89:19,22
**tort** 3:2,17 5:6
27:1 54:11,14
81:6 85:14 99:14
100:18
**total** 83:23
**totally** 43:6
**towers** 5:3 9:12
87:5
**trade** 69:24
**transcribed**
102:11 104:7
**transcript** 2:17
100:5,14,16,23
103:11,12 104:5
104:12 105:5,11
105:17

**transcription**
102:12
**transparency**
30:11 31:21 32:4
**transportation**
40:1
**tree** 21:15 40:12
**trends** 17:20
**true** 30:4 85:3
88:1,25 97:9
102:13
**trusty** 94:24
**truth** 102:6,7,7
**try** 53:2 89:21
101:13
**trying** 11:7,11
25:6 53:1 56:15
86:20 94:12
**turn** 13:23 60:9
72:1,25 73:1
82:23 86:10 93:14
**twice** 58:10,12
**two** 14:12 45:25
46:14 85:21 92:22
92:23 95:3,19
**type** 31:3 90:18
**types** 34:5 37:6,12
37:13,17,22
**typically** 32:19

**u**

**ucc** 100:18
**ultimately** 43:12
53:1 63:21
**um** 22:10 60:11
77:14 87:21
**uncertainties**
22:15
**uncertainty** 47:22
47:23 52:23 68:10
68:14 69:3,5,10
91:3,4

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
126 of 130

**undergoing** 84:24
**underground** 41:6
**underlying** 24:1
**understand** 12:14
  13:11,16 28:23
  35:3 81:22 89:23
  101:2
**understanding**
  12:20,24 13:6,20
  46:13 47:8 63:19
  72:18 96:1,22
  97:2
**understood** 95:17
  96:3,7,9
**unexpected** 71:11
**unilaterally** 65:11
  65:13,19
**union** 65:23
**united** 1:1 2:1
**unsecured** 4:1
**unsure** 91:5
**upward** 61:8 63:7
  63:9
**use** 18:24 29:12
  65:6 66:19 83:5
  100:23 101:4
**usually** 72:23
**utilities** 27:11,17
  81:20 86:22 87:2
**utility** 11:2 12:19
  13:13,15 41:6

**v**

**v** 103:6 104:3
  105:3
**value** 25:7 29:25
  99:21
**valued** 91:9
**variable** 85:20
**variety** 10:13
**various** 18:12 34:1
  39:14 67:17,18

69:17 90:14
**vegetation** 21:13
  21:14,18
**veritext** 103:1,7
  106:1
**veritext.com.**
  103:17
**version** 22:2,6
  82:9 83:6,6
**versus** 13:15 20:3
  24:6 49:25 70:3
  89:22
**viable** 24:21
**view** 23:21 25:10
  51:2 91:1 94:6
  99:20
**viewed** 48:15
**views** 93:2,12 95:8
**vii** 29:3
**violations** 39:15
  51:11
**virtually** 68:1
**vis** 90:20,20

**w**

**w** 103:5
**wait** 14:7,9 68:24
**waiting** 90:17
**waived** 103:19
**want** 14:14 55:7
  68:8 82:14 89:18
  89:21,23,24,24
  90:6 97:25 100:23
  100:25
**wanted** 78:6
**wanting** 91:22
**wants** 90:12
**watson** 5:3 87:5
**watson's** 9:13
**way** 14:13 15:14
  25:13 78:21 82:19
  102:20

**ways** 14:18
**we've** 11:24,25
  90:24
**week** 100:5 101:1
**weeks** 92:22,22
**weight** 21:12 23:6
  24:14 59:20
**weighting** 23:8,10
  23:17,19,24 24:9
  24:12 26:9 67:5
  77:12,17 78:3,5,10
  79:17 84:13 85:20
  86:4 88:17 89:2,8
  89:12
**weightings** 19:22
  25:21 59:16 87:16
  88:22
**weights** 20:21
  67:17
**weil** 8:24,25 9:13
  10:8 14:22 16:17
  49:5,11,16,21,23
  83:1,3
**weil.com** 4:20,21
  4:22,23
**west** 3:20
**whereof** 102:22
**wildfire** 6:9 42:9
  42:20,21 67:11
  69:13,20 71:25
  72:14 73:12 74:4
  78:11 79:4,18
  81:19 82:8 89:2
  90:19
**wildfires** 40:10,22
  70:23 93:18
**willfully** 71:16
**willis** 5:3 9:12
  87:5
**wimberley** 1:23
  2:22 102:2,25

**wisdom** 55:21
**wise** 32:8
**withdraw** 19:8
  21:21
**withdrawal** 49:6
  50:21 51:3
**withdrawn** 10:18
**withdrew** 49:3
  50:3 93:24 94:9
  95:1
**witness** 7:1 8:5
  15:17,19,20 16:13
  16:20 20:12 22:5
  23:6,24 25:13
  26:6,17 31:24
  33:2 34:16 35:1
  35:21 36:13 37:21
  39:18 40:4,17
  41:9 42:3,11,25
  43:11 44:3 45:6,8
  45:22 49:12,22
  50:23 51:13,17,21
  51:25 52:4,8
  53:16,24 54:7
  55:4 56:4,25 57:9
  57:14 58:4,19,20
  59:7,24 62:6,13
  63:3 64:5,16
  66:15 67:15 68:12
  69:5,16 70:11,17
  71:2,19 72:16
  73:7,15 74:7
  75:10 76:23 77:15
  78:17,24 79:20
  80:11,21 81:4,25
  86:7 87:1 88:5
  89:5,16 90:23
  91:19 92:17 94:11
  94:21 95:12 97:2
  97:13 98:20 99:25
  102:5,10,14,22

Case: 19-30088  Doc# 1112-2  Filed: 03/28/19  Entered: 03/28/19 16:34:16

103:8,11 104:1,4
104:11 105:1,4,15
**witness'** 103:14
**wolf** 4:4
**woltering** 3:11
81:9,14 85:13
**wonder** 89:20
**word** 20:7
**wording** 21:17
**words** 56:19,21,21
57:1 80:6 96:8
100:8
**work** 10:9 11:17
11:22 18:13 28:2
31:25 44:16 45:5
45:18 51:8 54:25
69:22 72:10 81:22
86:19 87:5 100:19
101:13,13
**worked** 9:24 10:2
11:18,24 71:3
83:1
**working** 10:12
11:5 13:17 21:23
**works** 11:25
**worried** 68:16,17
68:18
**wp** 15:13 21:2,3
60:10,13 77:11
**wrap** 82:15
**written** 16:17 65:9
82:9
**wrote** 72:2
**wtw** 19:15 84:18
86:11,14,16,21,22

**x**

**x** 6:1,5

**y**

**yeah** 11:10 16:15
21:7 26:7 66:8

74:7 75:22 94:21
**year** 43:21 56:6,14
68:13,15,24 69:24
71:8,10 99:4,6
**years** 54:12 55:1
85:21
**yesterday** 14:2
**york** 3:13,13

**z**

**zero** 20:2 61:19,23
62:10

Case: 19-30088    Doc# 1112-2    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page
128 of 130

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.