# EXHIBIT C-4

2001 WL 34133840

Trial Order

Only the Westlaw citation is currently available.
United States Bankruptcy Court, N.D. California.
San Francisco

In re PACIFIC GAS AND ELECTRIC COMPANY, a CaliforniaCorporation, Debtor.

Case No. 01-30923 SFM
|
Federal I.D. No. 94-0742640
|
July 13, 2001.

Order Authorizing Establishment of Management Retention Program

Dennis Montali United States Bankruptcy Judge.

**\*1** The Court has considered the motion of debtor Pacific Gas and Electric Company ("PG&E"), filed May 25, 2001, for an order authorizing establishment of a management retention program (the "Motion"), the opposition filed by the United States Trustee ("UST"), the response filed by the Official Committee of Unsecured Creditors ("OCC") in support of the Motion, the opposition filed by the City and County of San Francisco ("San Francisco"), the arguments of counsel presented at a hearing on June 18, 2001, the post-hearing declarations of Mark K. Gordon of Hewitt Associates and Russell M. Jackson filed by PG&E on June 25, 2001, the post-hearing memorandum filed by San Francisco and the supplementary objection of the UST, each filed on July 6, 2001, and rules as follows.[1]

[1] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

In its initial opposition, San Francisco complained about the lack of evidence to support the Motion, distinguished PG&E's cited cases, and asked that the Motion be denied. Its post-hearing memorandum argues that no deference is due to PG&E's "business judgment" in favor of the management retention program and conversely that deference is due to any contrary judgment by the UST. San Francisco also argues that the management retention program should be analyzed under the standards for incurring a debt under Section 364(b),[2] that the program must constitute an "actual, necessary" cost or expense of preserving the estate under Section 503 (b) (1) (A), and that because the officers and directors who support the program are among its beneficiaries it must be "fair" to the estate and its creditors under the "rigorous scrutiny" of the court. San Francisco relies heavily upon Mark IV Properties, Inc. v. Club Development & Management Corp. (In re Club Development & Management Corp.), 27 B.R. 610 (9th Cir. BAP 1982) and In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill. 1990).

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and all rule references are to the Federal Rules of Bankruptcy Procedure.

On the evidence presented, San Francisco alleges that PG&E has not established a sufficient factual basis for its fear of attrition among those employees to be covered by the management retention program nor the reasonableness of that program. San Francisco claims that the analysis provided by Hewitt Associates does not adequately describe how the other management retention programs it considered are comparable.

**\*2** The UST argues that the declarations of Messrs. Gordon and Jackson "might have provided a basis for the relief requested" but that the Motion should be denied because those declarations were not submitted when the Motion was originally filed. It may be that the UST no longer challenges the merits of the management retention program as argued in its initial opposition, but only the procedure by which it has been presented for approval.[3]

[3] To the extent the UST does express any judgment on the merits of the management retention program, the court disagrees with San Francisco's view that such judgment is entitled to any deference. The UST is

acting as a litigant taking a position as authorized by Section 307, rather than performing a regulatory or supervisory function such as appointment of a committee under Section 1102.

The court is not persuaded by these objections. Regardless of the legal standard to be applied, the court does not believe PG&E must show exact parity with other companies, nor does the court view its role as second guessing PG&E's selection of which of its six hundred eighty-two employees should be eligible for its retention program and how much any particular employee should receive. Nor should the court review each individual employee's likelihood of leaving absent a retention bonus that is some percentage greater or less than what Hewitt Associates recommended and PG&E seeks to implement. That degree of scrutiny is uncalled for under the Club Development and Regensteiner cases and would be impracticable. In Club Development the estate was being liquidated, the debtor had no ongoing business, it sought to pay salaries to its owners who had never been employees and had never received a salary, and it presented no evidence that the salaries were necessary to accomplish anything for the benefit of its creditors. In Regensteiner the debtor, a commercial printer, had stopped accepting new orders and was only completing existing orders and collecting accounts receivable. The official committee of unsecured creditors in that case objected that the proposed employment contracts only required two more weeks of work, far short of what was needed to collect the accounts receivable. The debtor in Regensteiner presented no evidence at all in support of its program.

In contrast, PG&E has presented evidence of widespread concern among managers that they will lose their jobs;[4] other companies hiring away a number of key managers;[5] likely harm to the estate if PG&E loses more key employees;[6] use of an outside consultant to structure a program targeted at key managers across four tiers;[7] delayed vesting of the retention amounts and incentives tying those potential amounts to benefits for the estate;[8] retention payments that are consistent with other companies in difficult transitions;[9] significant shortfalls in managers' targeted compensation last year of 36% and 45% in the top two tiers, respectively;[10] and, for employees in the top tier, initial payments that might roughly compensate for this shortfall, but that will be forfeited if PG&E does not meet its goal of filing a plan of reorganization by January 1, 2002.[11]

[4]  As San Francisco pointed out, much of Mr. Jackson's original declaration was "on information and belief" with no explanation of the basis for his belief. That was insufficient and the court was not prepared to grant PG&E's Motion based on the papers it initially filed. Mr. Jackson's supplemental declaration, however, stated both his personal knowledge (e.g. through "face-to-face discussions, telephone calls and email messages" with employees) and a basis for his knowledge due to his position as Vice President of Human Resources and his regular leadership and staff meetings.

[5]  PG&E presented evidence that in the last few years the heads of four departments voluntarily resigned and accepted executive positions with other companies. Moreover, PG&E has lost a number of other key management employees, employee morale is very low, and external search firms have been active in recruiting PG&E employees. In the past legally-mandated restructuring has resulted in job losses, more legally-mandated restructuring is pending, and PG&E's bankruptcy itself has affected morale.

[6]  As San Francisco has pointed out, PG&E has not presented evidence that it has already experienced widespread attrition. As PG&E points out, however, it is no good shutting the barn door after the horses have left.

[7]  PG&E hired Hewitt Associates, and PG&E's evidence is that only about 1/3 of the management employees are eligible: 226 out of 682 management employees.

[8]  Employees are terminated from the management retention program if they are fired ("termination of employment and ineligible for rehire") or if they retire or voluntarily leave. Top employees in Tier I, at least three of whom can be expected to be heavily involved in a plan of reorganization for PG&E's bankruptcy estate (the "Plan"), forfeit the first 1/3 of their payment if PG&E fails to file a Plan by January 1, 2002, and they will not receive the remaining 2/3 until the court confirms a Plan. All other managers will not receive the first 1/2 of their payment until the earlier of either April 8, 2002, or when PG&E files a Plan (employees with less than two years of credited service will receive only 1/3 at this time), and they will not receive the remainder until the earlier of either April 7, 2003, or when a Plan is confirmed.

[9]  Hewitt Associates analyzed the retention programs of

| | |
|---|---|
| 10 | PG&E provided evidence that top management employees did not receive a substantial portion of their targeted compensation because inter alia, the employees' stock options are currently worth nothing in the wake of PG&E's Chapter 11 filing. |

| | |
|---|---|
| 11 | The court has compared the first installment for individuals in Tier I **B** i.e., 1/3 of the retention incentive listed in Exhibit 1 to Mr. Jackson's supplemental declaration **B** with the compensation listed for Tier I employees on page 31 of Exhibit A to the declaration of Irving Sulmeyer in support of San Francisco's objection to the Motion. |

**\*3** Moreover, evidence submitted by San Francisco reveals that the management retention program was structured and recommended by a committee composed entirely of individuals who are neither current nor former officers or employees of PG&E or its parent, nor consultants to PG&E or its parent. In fact, although Club Development suggests a higher level of scrutiny when a proposed payment will benefit an "officer, director or stockholder," it appears that two hundred twenty of the two hundred twenty-six potential recipients of PG&E's management retention payments are below the level of Senior Vice President, there is no evidence that any eligible participant is a director of PG&E, and there is evidence that all the stock beneficially owned by all directors and executive officers of PG&E and its parent as a group constitutes less than one percent of the outstanding shares.[12] In addition, PG&E sought and obtained approval to award bonuses to key non-management employees, which further reinforces its claim that it has targeted its requested relief to what will actually protect the estate and its creditors.

| | |
|---|---|
| 12 | See Mr. Jackson's supplemental declaration, Exhibit 1, and Mr. Sulmeyer's declaration, Exhibit A, page 10. |

In sum, the court is persuaded that PG&E has taken reasonable steps to structure a program that is necessary to avoid potentially serious harm to the estate from attrition of key management employees. In addition, PG&E has represented on the record and in Mr. Jackson's supplemental declaration that it will not seek reimbursement for the cost of the bonuses through future rate increases. If PG&E ever seeks to do so, the court is confident that parties in interest will point out PG&E's promise. PG&E has met its initial burden.

Neither San Francisco, nor the UST, nor any other party in interest has presented any evidence to overcome PG&E's showing or even suggest that PG&E's employees are over-compensated compared to companies in comparable circumstances. Thus, whether looked at solely as a mater of business judgment, or as a "necessary" expense, PG&E has met its burden. In addition, the court notes and rejects an implication underlying some opposition to the Motion: that the employees who will receive bonuses are responsible for California's energy woes and therefore should not receive typical bonuses. That notion is unsupported by any evidence whatsoever. No party has even suggested any facts implicating individual or collective wrongdoing by any PG&E employees. To the contrary, the record contains no evidence that the individuals are deficient in work skills or dedication. The record does establish that they may have legitimate concerns about their jobs, and might, absent the retention program, find more secure and rewarding employment with a company that is not going through difficult times, adverse publicity and bankruptcy. Again, there is simply no evidence to rebut PG&E's showing in favor of its management retention program.

**\*4** For the foregoing reasons, PG&E's Motion is granted and its management retention program is approved.

Dated: July 13, 2001

DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE

**All Citations**

Not Reported in B.R., 2001 WL 34133840

© 2019 Thomson Reuters. No claim to original U.S. Government Works. 3

Case: 19-30088    Doc# 1112-6    Filed: 03/28/19    Entered: 03/28/19 16:34:16    Page 4 of 5