# EXHIBIT C-17

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| - and - | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| Debtors. | **CORRECTED DECLARATION OF DOUGLAS J. FRISKE IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 503(c) FOR ENTRY OF AN ORDER (I) APPROVING SHORT-TERM INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF** |
| ☐ Affects PG&E Corporation ☐ Affects Pacific Gas and Electric Company ☒ Affects both Debtors | |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date: March 27, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

I, Douglas J. Friske, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

I am a Managing Director at Willis Towers Watson PLC ("**WTW**"). WTW has been retained by Weil, Gotshal & Manges LLP ("**Weil**") on behalf of PG&E Corp. (and, together with Pacific Gas and Electric Company, collectively, "**PG&E**" or the "**Debtors**") to provide compensation consulting services to the Debtors. I am familiar with the pre- and post-petition structure of the Debtors' compensation programs, including the Debtors' proposed 2019 short-term incentive plan (the "**2019 STIP**") as set forth in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief* (the "**Motion**").[1] I submit this Declaration (the "**Declaration**") in support of the Motion.

The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' books and records, the Debtors' employees, the Debtors' advisors and their employees, or from other members of the WTW team working under my supervision or direction. I have overseen a compensation consulting team since December 2018 that has provided various employee compensation consulting services to the Debtors. I am not being specifically compensated for this testimony other than through payments received by WTW as a professional whose retention the Debtors will seek to obtain this Court's approval of pursuant to an application to be filed with this Court at a later date. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

I received my Bachelor's degree in Finance from the University of Illinois in 1986. After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University, where I received a Master's degree in Management from Northwestern University's J.L. Kellogg

---

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

Case: 19-30088  Doc# 1112-1  Filed: 03/28/19  Entered: 03/28/19 16:34:16  Page 3 of 11
Case: 19-30088  Doc# 807-1  Filed: 03/08/19  Entered: 03/08/19 15:02:19  Page 2 of 3

Graduate School of Management in 1990. Since that time, I have been employed by WTW or its predecessor firms.

WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on four key business segments: corporate risk and brokering, human capital and benefits, exchange solutions, and investment, risk, and reinsurance.

My responsibilities at WTW have primarily involved consulting to large companies, specifically with regard to executive compensation. I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy. I am frequently retained by large companies to advise them on their employee compensation strategies, programs and pay levels.

I am highly experienced in executive, management, and employee compensation matters with more than 28 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in approximately 100 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of post-petition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among many, American Airlines, Avaya, Breitburn Energy Partners, Claire's Stores, Inc., Energy Future Holdings, GenOn, The Great Atlantic & Pacific Tea Company, Longview Power, Midstates, Orchard Brands, Orexigen, Penn Virginia, Pernix, RadioShack, Reader's Digest Association, Round Table Pizza, Sabine Oil & Gas, Samson Resources, Sbarro, Southeastern Grocers, VER Technologies, Sears Holdings Corporation, and Westmoreland Coal.

### A. WTW's Involvement with the Debtors

Since WTW was retained by Weil in December 2018, my team and I have familiarized ourselves with the Debtors' operations and business goals. At the start of our engagement, WTW discussed with the Debtors and their advisors the Debtors' operational history, financial performance,

and various issues regarding the Debtors' workforce and employee programs. WTW reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

The Debtors performed significant due diligence in developing the 2019 STIP, and my team and I collaborated closely with the Debtors' management and other outside advisors in reviewing and advising on the 2019 STIP. Among other things, my team and I provided input and advice on the design and structure of the 2019 STIP for reasonableness. My analysis of the 2019 STIP was presented to the Debtors' senior management and Compensation Committee. A primary goal in the course of these interactions was to develop an independent assessment of the Debtors' 2019 STIP that drew directly upon relevant market data and my experience in designing comparable programs for similarly-situated companies.

### B. The 2019 STIP

Over the past several weeks, the Debtors have worked with WTW to formulate necessary adjustments to the incentive-based component of their employee compensation program to address, among other things, the pending Chapter 11 Cases. As a result of these efforts, the Debtors have modified, in certain respects, their historical, short-term incentive plan for the 2019 calendar year (the "**2019 STIP**"). As with prior years, the 2019 STIP is purely incentive-based, conditioning any award granted under the plan (the "**2019 STIP Awards**") on the Debtors meeting carefully designed safety, financial, and operational metrics (collectively the "**Performance Metrics**"), which are described in further detail below.

I am informed that, historically, employee compensation for a significant portion of the Debtors' employees has been comprised of two components: base salary and a discretionary, incentive-based component which includes an annual short-term incentive plan (the "**STIP**"). It is my understanding that compensation awards under the STIP have ranged from approximately 6% to 20% of an employee's total compensation, including equity grants. I am further informed that, historically, the Debtors have also maintained an equity-based long-term incentive plan (the "**LTIP**") that covered approximately 400 more senior employees, who also participated in the annual STIP. I am further

informed that the Debtors do not plan to issue any LTIP equity grants in 2019, but, as set forth below, have incorporated a portion of the LTIP value into the proposed 2019 STIP for certain participants who are otherwise LTIP eligible.

The Debtors' Compensation Committee, with the assistance of WTW, conducted a thorough evaluation of the Debtors' existing STIP for purposes of formulating the 2019 STIP. This evaluation resulted in a modification of (i) the Performance Metrics to put a greater emphasis on safety and financial performance, and (ii) the timing and level of potential awards to address the uncertainties associated with the Chapter 11 Cases and the absence of any LTIP grants in 2019. The 2019 STIP gives substantial weight to safety performance metrics—with those metrics constituting 50% of the formula for determining a 2019 STIP Participant's incentive-based compensation eligibility. In addition, the Debtors, in consultation with their advisors, determined that the 2019 STIP should provide for quarterly rather than annual payments, and that the 2019 STIP Awards should be adjusted in the following manner:.

- To compensate for the elimination of the 2019 LTIP, 2019 STIP Awards for participants otherwise eligible for an LTIP equity grant have been adjusted to include 50% of the grant value of the LTIP award that would have been received for 2019; and
- 2019 target STIP opportunities for non-LTIP eligible employees have been increased by 25% over 2018 STIP target opportunity levels.

Although the level of potential awards changed, the 2019 STIP reduces the range of potential awards. 2019 STIP Awards can range from 0 to 150% of target levels, whereas the 2018 STIP allowed for awards to range from 0 to 200% of target (in each case, not taking into account the individual performance modifier or "IPM" referred to below).

**C. Summary of 2019 STIP**

The following is a summary of the key terms of the 2019 STIP:

1. **2019 STIP Participants**: Approximately 10,000 non-insider employees will be eligible to receive 2019 STIP Awards (the "**2019 STIP Participants**").

2. **Implementation and Performance Period**: To be implemented commencing in the first quarter of 2019. The Performance Metrics will be measured quarterly from January 1, 2019 through December 31, 2019. Following audit and certification of

performance, 2019 STIP Awards will be paid out on a quarterly basis based on cumulative year-to-date results.

3. **Total Plan Costs**: The aggregate amount of potential 2019 STIP Awards at target is approximately $235 million, with a minimum payout of $0 and an aggregate maximum payout of approximately $350 million inclusive of the IPM (as defined below).

4. **2019 STIP Awards**:

   a) **Award Range:** STIP Participants will receive (a) 100% of the applicable STIP Award if the Debtors achieve, but do not exceed target performance levels (the "**Target STIP Awards**") with respect to the Performance Metric, (b) 50% of the Target STIP Award if the Debtors meet but do not exceed the threshold performance levels (the "**Threshold STIP Awards**"), and (c) 150% of Target STIP Awards if the Debtors meet maximum performance levels ("**Maximum STIP Awards**"). STIP Awards between threshold and target and STIP Awards between target and maximum each will be interpolated on a linear basis. STIP Participants will not be eligible to receive STIP Awards if the Debtors do not meet threshold-level Performance Metrics. If a STIP Participant voluntarily terminates employment, all future awards are forfeited. If a STIP Participant is involuntarily terminated, other than for cause, the STIP Participant shall receive the next quarterly payment, but shall receive no future payments. I understand that the average target opportunity is approximately 15% of base salary per participant.

   b) **Individual Performance Modifier:** STIP Participants at the director level and below who substantially exceed certain individualized performance goals (limited to approximately 10% of such STIP Participants) will be eligible, on a quarterly basis, to receive an individual performance modifier ("**IPM**") that will entitle them to receive a supplement to their STIP Award equal to 25% of the total value of their STIP Award. At target, this is estimated not to exceed, in the aggregate, approximately $5.5 million.

   c) **Board Discretion:** Any payments of 2019 STIP Awards are ultimately subject to complete Board discretion, including a decision to reduce or forego payment entirely.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

5. **Performance Metrics and Weighting:**

   a) **Safety Metrics (inclusive of all safety-related Performance Metrics) (Weight: 50%):**

      (i) **Nuclear Reliability and Safety Indicator (Weight: 5%):** Measures nuclear power generation and safety. The metric scores are based on 11 industry-accepted performance indicators.

      (ii) **Public Safety Index (Weight: 10%):** This metric has been revised to include two new equally weighted sub-metrics:

      - **Enhanced Vegetation Management ("EVM"):** EVM measures how many circuit miles of vegetation have been cleared under the EVM program within high-fire risk areas to reduce wildfire risk.

      - **System Hardening:** System Hardening measures completed circuit miles of fire design applications within high-fire risk areas.

      (iii) **First-Time ILI Miles (Weight: 10%):** This metric measures and sets targets for completion of first-time inspections of natural gas pipelines following the introduction of in-line inspection tools.

      (iv) **Asset Records Duration Index (Weight: 10%):** Weighted evenly between natural gas and electricity transmission jobs. The metric tracks and sets targets for the average number of days required to complete the as-built process of capital and expense jobs.

      (v) **Serious Injuries and Fatalities Corrective Actions Index (15%):** Measures response to employee and contractor serious injuries and fatalities events. Consists of two equally weighted measures that measure quality of corrective actions and timely completion of corrective actions.

   b) **Customer Satisfaction (Weight: 10%):** Measures and sets targets for the number of customer complaints escalated to the CPUC. This is a new metric.

   c) **Financial Performance (Weight: 40%):** Earnings from Operations ("**EFO**"): Measures financial performance from core operations calculated as net income adjusted for income or expenses associated with events or circumstances outside of ongoing core operations. Company-wide EFO results are publicly disclosed on a quarterly basis through SEC filings.

WTW has reviewed the terms and provisions of the 2019 STIP and believes that the structure, Performance Metrics, and design and range of potential 2019 STIP Awards are consistent with the Debtors' industry, with the only material difference in design being quarterly payments, which, however, are very common in companies undergoing a restructuring. WTW's specific findings with respect to the 2019 STIP include the following:

- **Performance Period:** Quarterly or shorter than an annual performance measurement periods are common in incentive programs implemented in restructuring scenarios.

- **Performance Measures and Weighting:** The number of performance measures in the 2019 STIP are consistent with the Debtors' peer companies' practices where 90% of the Debtors' peer group used four or more performance metrics. [2] Financial performance measures were used at 100% of the Debtors' peer companies. Similarly, nonfinancial measures were also used at 100% of the peer companies, specifically, health and safety measures are common and were used at 68% of the peer companies and customer service measures were used at 47% of peer companies. Furthermore, the weightings of performance measures in the 2019 STIP are generally consistent with market practice.

- **Payouts:** It is common to have payout in alignment with the performance period for both normal course and for restructuring incentive programs. Further, cash-settlement is consistent with market practice.

- **2019 STIP Award Ranges:** Payout schedules that allow for a range of outcomes based on achieving threshold, target and maximum performance levels are common. The payout curve of the 2019 STIP is reasonable and somewhat conservative on the upside when compared to market practice (generally 50% - 200% is the common payout range for threshold to maximum). Based on WTW's consulting experience, the threshold and maximum payout funding percentages in the 2019 STIP are also consistent with "general industry" companies, and specifically, among the Debtors' peer companies:

---

[2] The Debtors' peer companies include AES Corporation, Ameren Corporation, American Electric Power Co., CenterPoint Energy, Inc., Consolidated Edison, Inc., Dominion Resources, Inc., DTE Energy Company, Duke Energy Corp., Edison International, Entergy Corporation, Eversource Energy, Exelon Corporation, FirstEnergy Corp., NextEra Energy, Inc., Public Service Enterprise Group Inc., Sempra Energy, Southern Company, WEC Energy Group, and XCEL Energy Inc.

- Threshold payout funding of 25% to 50% is common (ranged from 0% to 97.5%); and
- Maximum payout funding of 200% was common (ranged from 102.5% to 200%).

- **Individual Performance Modifier**: In WTW's experience, it is common to have an individual performance measure for broad-based (*e.g.*, below the most senior executives) employee annual incentive programs and to utilize such an individual performance modifier to adjust individual annual incentive awards based on over- or under achievement of individual objectives. The modifier is typically assigned to a range of performance (*e.g.*, "0.0" for "failed to achieve" to "1.25+" for "exceeded objectives"). It is WTW's belief that a 1.25x modifier for a company's "top 10% performers" is aligned with "exceeded objectives" and is reasonable.

### Conclusion

Based on my experience and the work I and WTW have done in these cases, I believe the structure, Performance Metrics, design, and range of potential 2019 STIP Awards are consistent with the Debtors' industry, with the only material difference in design being quarterly payments, which, however, are very common in companies undergoing a restructuring.

Pursuant to section 1746 of title 28 of the United States Code, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: March 8, 2019

Chicago, Illinois

_____

*Douglas J. Friske*

Douglas J. Friske, Managing Director
Willis Towers Watson PLC

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119