# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )          NO. CR 14-00175 WHA
                               )
PACIFIC GAS AND ELECTRIC       )
COMPANY,                       )
                               )
          Defendant.           )
_____)

San Francisco, California
Wednesday, January 30, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
               BY:  **HALLIE M. HOFFMAN**
                    **ASSISTANT UNITED STATES ATTORNEY**

                    DAVID L. ANDERSON
                    United States Attorney
                    150 Almaden Boulevard - Suite 900
                    San Jose, California  95113
               BY:  **JEFFREY B. SCHENK**
                    **ASSISTANT UNITED STATES ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Defendant:

3                          JENNER & BLOCK
                           353 North Clark Street
4                          Chicago, Illinois  60654
                      BY:  **REID J. SCHAR, ATTORNEY AT LAW**
5
                           CLARENCE, DYER & COHEN LLP
6                          899 Ellis Street
                           San Francisco, California  94109
7                     BY:  **KATE DYER**
                           **ATTORNEY AT LAW**
8
                           CRAVATH, SWAINE & MOORE LLP
9                          825 Eigth Avenue
                           New York, New York  10019
10                    BY:  **KEVIN ORSINI**
                           **ATTORNEY AT LAW**
11
     Also Present:         **John Simon, CEO, PG&E**
12                         **Sumeet Singh, Vice President Community**
                           **  Wildfire Safety Program, PG&E**
13                         **Mark Filip, Monitor**
                           **Christopher Keegan, Monitor**
14                         **Charles Kalil, Monitor**
                           **Jennifer Hutchings, U.S. Probation**
15                         **Mark Zafferano, City Attorney,**
                           **  City of San Bruno**
16                         **Connie Jackson, Former City Manager,**
                           **  City of San Bruno**
17                         **Kelly A. Welchans, Deputy Attorney**
                           **  General on behalf of Cal Fire and**
18                         **  Natural Resources Agency**
                           **Wade Crowfoot, Secretary National**
19                         **  Resources Agency**
                           **Matthew Reischman, Cal Fire, Assistant**
20                         **  Deputy Director for Resource**
                           **  Protection and Improvement**
21                         **Arocles Aguilar, General Counsel,**
                           **  California PUC**
22                         **Christine J. Hammond, Assistant General**
                           **  Counsel, California PUC**
23                         **Lee Palmer, Deputy Director Safety &**
                           **  Enforcement Division, California PUC**
24                         **Charlotte TerKeurst, Safety &**
                           **  Enforcement Division, California PUC**
25

1  **APPEARANCES**: (CONTINUED)

2  Also Present:          Raymond Cho, Safety & Enforcement
                             Division, California PUC
3                        Frank Pitre, Attorney at Law
                         Dario deGhetaldi, Attorney at Law
4                        Steven M. Campora, Attorney at Law

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Wednesday - January 30, 2019</u>**          **<u>8:56 a.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Criminal Action 14-175, |
| 5 | United States versus Pacific Gas and Electric Company. |
| 6 | Counsel, please step forward and state your appearances |
| 7 | for the record. |
| 8 | **MR. SCHAR:**  Good morning, Your Honor.  Reid Schar on |
| 9 | behalf of PG&E, and joining me for PG&E today we have several |
| 10 | members of the Compliance Department who have been here on |
| 11 | prior statuses, as well as John Simon, who's in the first row, |
| 12 | the acting CEO.  And Sumeet Singh is also with us also in the |
| 13 | first row.  He's the vice president in charge of the Community |
| 14 | Wildfire Safety Program. |
| 15 | **THE COURT:**  Thank you. |
| 16 | **MS. DYER:**  Good morning, Your Honor.  Kate Dyer here |
| 17 | on behalf of Pacific Gas and Electric Company.  I'd like to |
| 18 | introduce my colleague Kevin Orsini of the Cravath firm. |
| 19 | Mr. Orsini is lead counsel in PG&E's wildfire litigation. |
| 20 | **MR. ORSINI:**  Good morning, Your Honor.  Kevin Orsini |
| 21 | from Cravath. |
| 22 | **THE COURT:**  Thank you for coming. |
| 23 | **MR. ORSINI:**  I'm happy to be here. |
| 24 | **MS. HOFFMAN:**  Good morning, Your Honor.  Hallie |
| 25 | Hoffman for the United States. |

1          **MR. SCHENK:**  Good morning.  Jeff Schenk on behalf of

2     the United States.

3          **MR. FILIP:**  Good morning, Your Honor.  Mark Filip,

4     Court Monitor.

5          **THE COURT:**  Okay.  Everybody have a seat for a second

6     and then we have some business.

7          Welcome to members of the public.

8          This camera, I should explain, it's not being recorded.

9     Am I correct about that?

10          **THE CLERK:**  Yes.

11          **THE COURT:**  This being a criminal case, it's not

12     eligible for that program but because we may have some people

13     in Courtroom 8 in the overflow room, we have this setup for a

14     viewing in that room in case we could not accommodate everyone

15     here.

16          I have some preliminary remarks to set the stage.  Then we

17     have two items of business to deal with, but I'd like to -- is

18     that Jennifer?  Please make your appearance.  We've had our

19     appearances.

20          **THE PROBATION OFFICER:**  Oh.  Sorry, Your Honor.  We

21     were making sure the folks from San Bruno were able to come

22     down from the overflow room.

23          **THE COURT:**  Well, I would like to have them here.

24          **THE PROBATION OFFICER:**  Yes, we did.  We just brought

25     them down.

1          **THE COURT:**  Where are they now?

2          **THE PROBATION OFFICER:**  They're here in the front row,

3    Your Honor.

4          **THE COURT:**  Okay.  Raise your hand if you're from

5    San Bruno.

6          **MR. ZAFFERANO:**  Mark Zafferano, City Attorney,

7    Your Honor.

8          **THE COURT:**  All right.  Thank you for coming.

9          **MR. ZAFFERANO:**  We also have Connie Jackson, the

10   former City Manager, who was the City Manager at the time of

11   the incident that's for the Court's attention.

12         **THE COURT:**  Okay.  Thank you.

13         **THE PROBATION OFFICER:**  Good morning.  Jennifer

14   Hutchings with Federal Probation.

15         **THE COURT:**  Great.  Welcome.

16     I was just saying we have two items of business and one is

17   the Form 12, which is an accusation by Probation that PG&E has

18   violated the terms of probation, and the second is an Order to

19   Show Cause that deals with our wildfires.

20     I have some preliminary remarks.  This is a criminal case.

21     I'm sorry.  Who just appeared?

22         **MS. WELCHANS:**  Your Honor, I'm Kelly Welchans from the

23   AG's office appearing with and on behalf of representatives

24   from Cal Fire and the Natural Resources Agency as requested by

25   the Court.

**THE COURT:** Excellent. Introduce your people there.

**MS. WELCHANS:** Your Honor, this is Wade Crowfoot, the director of the Natural Resources Agency, and I have Matthew Reischman from Cal Fire.

**THE COURT:** Thank you both for coming.

Is anyone here from the CPUC?

**MS. HAMMOND:** Yes, Your Honor.

**THE COURT:** What's your name?

**MS. HAMMOND:** Good morning, Your Honor. I'm Christine Hammond from the California Public Utilities Commission, and with me are Lee Palmer, our Deputy Director of the Safety and Enforcement Division, and some of his staff, Charlotte TerKeurst and Raymond Cho.

**THE COURT:** Okay. And you are?

**MR. AGUILAR:** I'm the general counsel of the California PUC.

**THE COURT:** Thank you.

What's your name?

**MR. AGUILAR:** Arocles Aguilar, and I'll spell that for you.

**THE COURT:** Please.

**MR. AGUILAR:** A-R-O-C-L-E-S, A-G-U-I-L-A-R.

**THE COURT:** Okay. Thank you.

Anyone else want to make an appearance?

(No response.)

THE COURT: All right. I'd like to ask the CSOs, my court security officers, once -- it's distracting to have people coming in and out. So people either come in now or they go to the other courtroom until we at least get to the next break. Can you do that for me?

COURT SECURITY OFFICER: Yes. No problem.

THE COURT: All right. Unless it's somebody you know needs to come in right now, that's okay.

All right. Help me with keeping order. Thank you.

This is a criminal case. This is not a civil case. This is a criminal case arising out of the San Bruno explosion in 2010. Eight people were killed, burned alive, killed, 38 homes burned to the ground and a lot more damaged.

The United States Attorney's Office brought felony charges against Pacific Gas and Electric, convicted on six counts, felony counts, arising out of the pipeline explosion.

Now, I want to be clear, there was not a causal effect between these counts and the explosion, but it did arise out of that same explosion.

PG&E was found guilty beyond a reasonable doubt of obstructing a National Transportation Safety Board investigation. Guilty and guilty on five other counts of violating the Natural Gas Pipeline Safety Act. This was a jury trial that was heavily, very heavily contested; 50 *motions in limine* were made by the Defense. More than that

1   actually.  Judge Thelton Henderson presided over that trial.

2   When he retired from the bench, I inherited the case.  It was

3   reassigned to me.

4        As a result of the convictions, PG&E is a convicted felon

5   and is on probation.  You can't send a corporation to prison

6   but you can put them on probation so that's what happened.

7        Now, one of the violations of probation that is --

8   accusation that's being made that we've got to deal with today

9   is the accusation by Ms. Jennifer Hutchings, our probation

10  officer, that PG&E violated one of the conditions, which is

11  that if there's any investigation --

12       By the way, one of the conditions of probation is you will

13  not commit another federal, state, or local crime.  It doesn't

14  have to be a pipeline or a natural gas.  It can be any crime.

15  You cannot -- you've got to be on your absolute best behavior.

16  No more crimes.  We have this all the time on the other side

17  where we have people who, for example, sell drugs get

18  convicted.  A condition of supervised release is no more

19  crimes.  Then they're brought in because they commit some crime

20  that has nothing to do with drugs, but they're brought in any

21  way.  That's what PG&E is up against now on this Form 12.

22       All right.  Before we turn to that, though, I have a few

23  more remarks to make.

24       In 2017 -- almost everyone here in the courtroom will

25  remember that in October of 2017 there were quite a number of

1  fires started, wildfires, in California, in north California.

2  Remember the name Atlas fire?  That one -- you will probably

3  remember that one, but there were quite a number of others.

4       Thanks to Cal Fire, which is one of the finest

5  organizations I've ever had any contact with, it saves us every

6  year from these terrible fires and they lose firefighters every

7  year burned alive by fires that people start.

8       Cal Fire did an investigation, and they're continuing to

9  do investigations, and determined that in October of 2017, just

10 one month, there were 17 wildfires that were started by PG&E.

11 Just think about that.  PG&E equipment was involved in starting

12 17 wildfires.  These are all connected with the North Bay

13 wildfires.  Those fires killed 22 people burned alive in their

14 cars and homes, 22 people, destroyed 3200 buildings and burned

15 almost 200,000 acres.

16       Cal Fire referred 11 of those cases, 11 of the 17, to the

17 District Attorneys for possible prosecution for crime stating

18 that there had been violations of state law and in some cases

19 calling out specifically California Public Resources Code,

20 Section 4293, which is going to figure into this hearing today

21 because 4293 says that Cal -- not Cal Fire -- PG&E is supposed

22 to trim and remove trees that are hazards to the lines.  I'm

23 oversimplifying it a little bit, but that's what it comes down

24 to.

25       And, in fact, I've gone back to do the math.  Cal Fire

said that in 12 of the 17 cases the fires were caused by a tree
or part of a tree making contact with the PG&E power lines.
Now, mind you, I'm only talking about the October 2017 fires at
this point.

And I should also say to PG&E's credit that the Tubbs fire
recently Cal Fire said was not caused by PG&E. That was one of
the big ones. So that we're not talking about the Tubbs fire.
In fact, Cal Fire has exonerated PG&E of the Tubbs fire, but
there were 17 that PG&E did start according to Cal Fire.

So 11 referred for possible criminal prosecution, 12 of
them involved trees or parts of trees making contact with the
power lines or poles.

Now, in 14 of those 17 cases -- now, this does not come
out of the Cal Fire report but it comes out of material that I
had to compromise my eyesight reading the small print in the
thousands and thousands of pages from the PUC records, but 14
of those 17 there were wind gusts of 20 miles an hour or
higher. Some were quite higher, but at least 20 miles an hour
in at least 14 of the 17 cases.

So you can see to your ordinary U.S. district judge, and I
think to the ordinary mortal, there's quite an obvious pattern:
High winds, trees blown onto the lines.

By the way, these are uninsulated lines in almost all
cases, and some members of the public misunderstood what I was
trying to say on that. Most of these lines are uninsulated.

1    That's perfectly okay.  That's why we have Section 4293, so

2    that you get clearance from the trees.  As long as you comply

3    with that clearance law, it's okay to have an uninsulated line;

4    but if the tree falls on an uninsulated line, it sparks,

5    sparks, and the tinder dryness of the chaparral in California,

6    that's all it takes to start a fire.

7         High wind.  Trees.  Power lines.  17 wildfires.  22 people

8    killed.  One month.  October.

9         Now, I can read -- if PG&E wants me to read, I'll read the

10   language out of -- because every time I ask you to admit

11   something, you say you're still under investigation.  We're

12   going to come to that, but usually a criminal on probation is

13   forthcoming and admits what they need to admit.  You haven't

14   admitted much.  In fact, very little.  We're going -- I'm going

15   to give you some opportunities, but to my mind there is one

16   very clear-cut pattern here:  That PG&E is starting these

17   fires.

18        Now, we need to say another thing.  Climate change and

19   global warming make it a lot worse or at least worse.  You can

20   debate whether it's a lot worse or worse.  So does the drought,

21   the four-year drought, made it much drier but the drought did

22   not start the fire.  PG&E, according to Cal Fire, started the

23   fire.  Global warming did not start the fire.  According to

24   Cal Fire, PG&E started it, all 17 of them.

25        Now, as the judge on the case, back in November when

1   someone is under the judge's supervision as a criminal, in this
2   case a convicted felon six times over, part of my duty is to
3   supervise that offender and to make sure that we try to bring
4   them into compliance with the law and to protect the public
5   from further harms by that offender.

6       Usually this would be if there wasn't a criminal case
7   here, the U.S. District Court would have nothing to do with
8   this, but there was a criminal case and there was a conviction
9   and there is a probation and it's going to last till 2022.  So
10  your U.S. district judge on this case asked the question back
11  in November and raised the question:  Look at all of these
12  fires and have they -- what has been PG&E's role in these
13  fires?

14      Well, it wasn't clear when I asked that question that in
15  one month 17 of them had been started by PG&E, but it turns out
16  in all this give-and-take with the parties and thanks to the
17  excellent work of Cal Fire, which again is one of the finest
18  organizations in the state of California, we now have reports,
19  official reports, saying what the start of these fires were.

20      So that raises the question what do we do.  Does the judge
21  just turn a blind eye and say, "PG&E, continue your business as
22  usual.  Kill more people by starting more fires"?

23      I know it's not quite that simple because we've got to
24  have electricity in this state, but can't we have electricity
25  that is delivered safely in this state?  That's what I want to

1   get to here.

2       All right.  We're going to continue this part of the

3   conversation in a minute, but let's take what I hope is a

4   simpler one.  We have a Form 12 so I need somebody to stand up

5   here for PG&E and let's address the Form 12, and then we'll

6   come to the Order to Show Cause.

7       The Form 12, have you seen it?

8            **MS. DYER:**  Yes, Your Honor.

9            **THE COURT:**  All right.  You have not yet been

10   arraigned on it.  Not you but PG&E.  I'm happy to do the

11   arraignment right now unless you want to waive the arraignment.

12            **MS. DYER:**  We're happy to waive the arraignment,

13   Your Honor.

14            **THE COURT:**  All right.  Waived.

15       Just in summary what this says is that there was a

16   condition of probation that PG&E notify Probation and the

17   monitor immediately upon learning of, and one of the things is,

18   any bankruptcy proceeding, major civil litigation, criminal

19   prosecution, or administrative proceeding against PG&E or any

20   investigation or formal inquiry by governmental authorities

21   regarding the organization.

22       Now, she says, Jennifer Hutchings, our probation officer,

23   that PG&E violated this because Butte County had a -- in

24   connection with the Honey fire -- not the one last year, which

25   was even bigger, but the one in the prior year, 2017 -- that

1  those fires were -- there were fires under investigation.

2      The Honey fire was ignited on October 9, 2017, and

3  Cal Fire was able to stop the forward progress and contain it

4  to 150 acres.  Cal Fire determined that the cause of the

5  Honey fire was to be a tree branch coming in contact with the

6  PG&E transmission line.  This tree branch showed outward signs

7  of decay that would have been apparent on what should have been

8  a routine inspection.

9      On May 24, 2018, Cal Fire investigators submitted their

10  reports on the Honey fire for a possible misdemeanor

11  prosecution of PG&E based on an alleged failure to properly

12  trim a decaying branch away from its lines.

13      Now, what the Form 12 goes on to say is that that should

14  have been reported to Probation and was not reported to

15  Probation.

16      So I'm happy -- Probation is prepared to testify right now

17  and we will get to the bottom of this unless you're prepared to

18  admit this violation.

19      **MS. DYER:**  Yes, Your Honor.  First, I want to say that

20  we respect and understand the Court's comments previously.  We

21  accept the jury's verdict in this case.  We want to continue to

22  work cooperatively with the monitor and Probation and the

23  Court.

24      I would respectfully submit that there isn't actually a

25  factual dispute here, Your Honor.  Perhaps we can hear from

1   Probation and we can discuss this, but I believe that PG&E in

2   good faith notified the probation officer of Cal Fire's

3   findings and referrals on the day that those referrals were

4   released on May 25th, 2018.

5          The referrals stated exactly as Your Honor stated, that

6   the Honey fire was caused by a branch contacting a PG&E line,

7   that there was evidence of a violation, and that it had

8   referred the Honey fire to the District Attorney's Office.

9          PG&E sent that Cal Fire notification to Probation on the

10  same day.  In so doing, it believed in good faith that it had

11  met the condition to give notice, intended to convey by the

12  referral for criminal investigation that it was under criminal

13  investigation for the Honey fire.

14         There had been a regular cadence of e-mails.  I think

15  we've worked very cooperatively and had very good

16  communication.  If there were any follow-up questions, we would

17  have responded.  We didn't receive any follow-up questions.  We

18  did end up reaching resolution of the Honey fire and two others

19  with the Butte County District Attorney's Office.  We sent that

20  settlement agreement to the monitor the same day it was

21  entered.  We sent out a joint press release regarding that

22  settlement to multiple news outlets.

23         In our December 31st submission to this Court, we noted at

24  Footnote 11 that North Bay wildfires have been referred to the

25  District Attorney's Offices save for the Honey fire and the

1  other Butte County fires which were resolved through a civil

2  settlement.

3      We had no indication that we had, unfortunately, not met

4  Probation's expectations in this regard until we received the

5  Form 12 on January 9th.  And certainly, Your Honor, if the

6  Court or the Probation Office would like us to communicate any

7  differently in scope or in frequency in any respect, we are

8  more than happy to do so, Your Honor.

9      I would submit that what occurred here does not rise to

10 the level of a probation violation, and we look forward to

11 continuing to work with the Probation Department to make sure

12 that we are timely providing all necessary information in the

13 format that's desired, Your Honor.

14     **THE COURT:**  All right.  So you are contesting the

15 Form 12?

16     **MS. DYER:**  We don't believe there's a factual dispute,

17 Your Honor, so -- I don't think there is a factual dispute with

18 regard to the communication --

19     **THE COURT:**  I will tell you she's prepared to testify

20 she knew nothing about any of the investigation until later and

21 that you did not report it clearly to her.  That's what she's

22 prepared to testify to.  Now, do you want to hear that

23 testimony?

24     **MS. DYER:**  Your Honor, as long as I don't believe

25 there's a dispute as to whether our communication on May 25th

1   was sent.

2        With regard to whether that was sufficient, we defer to

3   the Court and the probation officer in that respect.

4        **THE COURT:**  All right.  So I think it's best if you

5   come up and testify, Ms. Hutchings, because PG&E will not admit

6   that they violated anything.  So please come up here and we'll

7   get started on the Form 12.  I'll give you a chance to

8   cross-examine in a moment.

9        Okay.  Stand here, raise your right hand, and take an oath

10  to tell the truth.

11               **(Probation Officer Jennifer Hutchings Sworn.)**

12           **THE PROBATION OFFICER:**  I do.

13           **THE CLERK:**  And then please be seated and speak

14  clearly into the microphone.

15           **THE COURT:**  All right.  So I'm going to just let you

16  speak in narrative form, Ms. Hutchings, but first tell us your

17  name.

18           **THE PROBATION OFFICER:**  Jennifer Hutchings.

19           **THE COURT:**  And what's your connection to this case?

20           **THE PROBATION OFFICER:**  I work for the Federal

21  Probation Department and have been the supervisory probation

22  officer for PG&E since the onset.

23           **THE COURT:**  All right.  Please summarize for us your

24  accusation in the Form 12.

25           **THE PROBATION OFFICER:**  Yes, Your Honor.

So the Probation Office, being me in this matter, does not dispute PG&E's claims that there were two items that were sent to me:  On May 25th, 2018, a Cal Fire press release and also on June 21st, nearly a month later, a United States Securities and Exchange Commission Form 8-K.

In these documents, I'll specifically refer to the press release first, the Honey fire is briefly mentioned on the last page of the document.  It does mention that there was an investigation which found evidence of a Public Resources Code 4293 violation.  It says "which requires adequate clearance between tree and power lines," that this was allegedly violated.

The following sentence also references the Honey investigation and says (reading):

> "It has been simply referred to the appropriate County District Attorney's Office for review."

At no time did it tell me that -- at no time did I receive information that the Butte County District Attorney's Office had taken up a full investigation of PG&E on that matter.

In regards to the other document, the Form 8-K received on June 21st, 2018, again there's several sections which simply talk about an investigation by the CPUC, and I quote (reading):

> "The timing and outcome for completion of these investigations are uncertain."

There is a very brief mention again of the Honey fire and

1    simply goes on to talk about the significant losses that PG&E

2    could have as a result of this, more or less related to their

3    financials.

4         THE COURT:  Is that -- let me just interrupt.  I have

5    a copy of what I think you're referring to.  Is that the one,

6    the 8-K, that says in pertinent part (reading):

7              "PG&E Corporation or the utility also could be" --

8         "could be" -- I'll repeat that, "PG&E Corporation or the

9         utility also could be the subject of investigation or

10        other actions by the County District Attorneys to whom

11        Cal Fire has referred its investigation into..."

12   Then there's a long list, and one of those is the

13   Honey fire.  Is that what you're referring to?

14        THE PROBATION OFFICER:  That is the document,

15   Your Honor.  It states that the analysis is ongoing.

16        THE COURT:  Did it say "is be" or did it say "could

17   be"?

18        THE PROBATION OFFICER:  Unfortunately I don't know

19   which paragraph Your Honor was on, but I believe --

20        THE COURT:  Okay.  I'll just read it again.  It says

21   "could be."  "PG&E Corporation or the utility also could be..."

22        All right.  Okay.  So what's the next item?

23        THE PROBATION OFFICER:  So, Your Honor, those were the

24   items that PG&E did send to me.  It was not until I had a

25   conversation -- let me look at my notes here.

1    (Examines document.)  It was not until I had a

2  conversation with the Butte County Assistant District

3  Attorney -- I would have to check on the date of that -- it was

4  not until that conversation that I discovered that there had

5  actually been an extensive investigation done by Butte County,

6  that they were fully prepared to bring criminal charges against

7  Pacific Gas and Electric; that Pacific Gas and Electric had

8  entered into a settlement agreement with them in order to avoid

9  these charges being brought.  And it was at that time that I

10  was provided a copy of that settlement agreement.

11    So it is my belief that from the brief snippets of

12  documents that I just discussed, that there is no way I could

13  have ascertained the scope of the investigation, and that I

14  should have been informed in much more detail that charges were

15  actually going to be brought against PG&E and that an agreement

16  had been worked out with the parties to enter into the

17  settlement agreement, which I actually knew nothing about until

18  that time.

19        **THE COURT:**  All right.  Any questions on

20  cross-examination?

21        **MS. DYER:**  No, Your Honor.

22        **THE COURT:**  Any evidence you wish to produce beyond

23  what you've already produced?

24        **MS. DYER:**  No, Your Honor.  I don't think there's any

25  factual dispute here at all, and we hope to work with the

1  probation officer going forward to make certain --

2         **THE PROBATION OFFICER:**  Of course.

3         **MS. DYER:**  -- that there's no misunderstanding in the

4  future and that we provide whatever you need and exactly when

5  you need it.  There's no factual dispute here, Your Honor.

6         **THE COURT:**  All right.  Is there any need for any oral

7  argument?

8         **MS. DYER:**  No, Your Honor.

9         **THE COURT:**  All right.  The Court is going to make a

10  finding.

11         **MS. DYER:**  Yes, Your Honor.

12         **THE COURT:**  The Court is going to sustain the Form 12

13  charge and find that PG&E violated the conditions of probation

14  as charged in the Form 12, and we will set a date for

15  sentencing in the future.

16         **MS. DYER:**  Thank you, Your Honor.

17         **THE COURT:**  All right.  Ms. Hutchings, you may step

18  down.  Thank you for your assistance.

19         Now we go to the Order to Show Cause, and I would like to

20  hear -- I asked for an Order to Show Cause and said here's what

21  I suggest might be done, and I asked for input and I appreciate

22  all the input.  I've spent a lot of time going through it.

23         So let's start with PG&E and give you the floor and let

24  you explain why I, as the judge, should not impose further

25  condition on PG&E to help protect the public from possible

1   further other crimes of the offender.  That's the issue.

2        All right.  Ms. Dyer, the floor is yours again.

3             **MS. DYER:**  I defer to my co-counsel.

4             **THE COURT:**  Of course.  I'm sorry.  Please.

5             **MR. SCHAR:**  Thank you, Your Honor.

6   And I'm going to speak broadly to the question.  We have

7   people here who can speak more directly to some of the factual

8   information you may want to know; but, broadly, as we've noted

9   in our brief, PG&E appreciates and very much shares the Court's

10  concern regarding wildfires and wildfire risks and fully

11  understands it too most significantly has to play a leading

12  role to implement change here to try to mitigate the risk.

13       I think our briefs set forth in detail --

14            **THE COURT:**  Okay.  When you say "mitigate," why can't

15  the risk be zero?  Why is it that PG&E should be permitted to

16  start a single wildfire?

17            **MR. SCHAR:**  Well, the answer to the first question is

18  bringing the risk to zero is an incredibly complicated series

19  of policy decisions that have to factor in reliability, cost,

20  safety, and there's a tremendous amount of analysis that goes

21  into how best to, for instance, make vegetation management

22  decisions and how aggressive vegetation management should be

23  versus the cost of --

24            **THE COURT:**  In the last five years $4.5 billion of

25  dividends have been paid out to the owners of PG&E.

1    4.5 billion, at least if I've done the math right.  Some of
2    that money could have been used to cut trees and trim trees,
3    the very trees that started these 17 fires -- or 14 of them I
4    should say.  Those trees could have been cut.  No.  The money
5    went to the shareholders.

6         So why is it PG&E says all the time "Safety is our number
7    one thing"?  I hear it all the time, "Safety.  Safety.
8    Safety," but it's not really true.  Safety is not your number
9    one thing.  You could have spent more money to cut those trees
10   and trim those trees.

11        People from Cal Fire have died out there fighting those
12   fires, not just civilians.  So more money could have been
13   spent.

14        It's not enough to just come in here and say, "Judge,
15   we're trying to mitigate it too."  That's platitudes.  What are
16   you specifically going to do to reduce this -- let's say
17   mitigate.  I'll take your word for a moment.  Let's run with
18   that.  What are you going to do in 2019 to avoid a repeat of
19   what happened in the last two years?

20        **MR. SCHAR:**  And, Your Honor, I think the person
21   probably best, because you're asking very detailed questions,
22   fair questions -- let me say, first, respectfully, it is not a
23   platitude.  Safety is the number one priority.

24        The specifics, and we've laid them out in our brief, but I
25   think Mr. Orsini is probably best situated, because of his

1  involvement in some of the details, to walk through with

2  Your Honor with some precision what is going on and what will

3  be going on in 2019, and so I would turn it over to him if

4  those are the types of questions.

5          THE COURT:  Well, you don't go far but, yes, please,

6  let's do this.  Let's get down to the nitty-gritty, and I'd

7  like to -- the question is:  Why were those trees falling on

8  the lines when they should have been cut?  I think every

9  practical person would say they should have been cut.  They

10 should have been identified.  The high winds come, knock them

11 down, go on the lines.  Isn't that true?  I mean, don't you

12 accept that analysis?

13         MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini.

14         THE COURT:  Good morning.  Please.

15         MR. ORSINI:  We absolutely accept the analysis that

16 vegetation, trees, branches, tops of trees in some instances is

17 the leading cause of wildfires in the high-fire threat

18 districts.  We readily accept the proposition that something

19 more needs to be done to address these issues.

20     With respect to the specific question Your Honor just

21 asked me, which is shouldn't these trees have been taken out

22 and why weren't they taken out, there are different facts

23 obviously that apply to each of these circumstances, but there

24 was a robust program in place to inspect and remove trees.

25     The reality is the wind event that occurred on October 8th

1    through October 10th destroyed a lot of trees that were

2    otherwise healthy, trees that historically no utility in

3    California would have removed.

4         We've been talking about the Honey fire, Your Honor, you

5    were discussing with my colleague, Ms. Dyer, earlier today.

6    The Honey fire was one where the tree at issue was inspected

7    roughly four months prior to October of 2017 when that

8    Honey fire occurred.  It was, in fact, trimmed but when a

9    high-wind event came in, it was clearly sufficient wind that it

10   broke a branch that apparently made contact with the power

11   lines.

12        We haven't had an opportunity to inspect that specific

13   branch because it's in Cal Fire's possession.  That's not a

14   criticism of Cal Fire.  I agree with Your Honor that they are a

15   tremendous organization and there are reasons why as

16   investigations are unfolding they still have the branches, but

17   there are different factors with respect to each of these

18   trees.

19        There's another fire for example, Your Honor, it was the

20   Potter-Redwood fire, which was a horrifically tragic fire.

21   There were nine lives lost in connection with that fire, some

22   of the worst stories that I've heard in the year and a half

23   that I've been working on this case.  The tree that Cal Fire

24   has identified as the tree that started that fire is a live oak

25   tree that was actually more than 20 feet away from the lines

 1   that was leaning in a direction away from the lines.  And my

 2   understanding, based upon the information we've seen from

 3   Cal Fire, is the limb that broke and made contact in these

 4   high-wind gusts with the power lines was actually a limb that

 5   was -- Mr. Schar is the power line and I'm the tree.  I'm

 6   leaning in this direction (indicating).  The branch is growing

 7   out this way (indicating), and the high winds came in and broke

 8   the branch and blew it over the tree apparently into the lines.

 9        Again, we haven't had an opportunity to inspect that tree,

10   but a lot of these were very robust, healthy trees that

11   otherwise would not have been something that in the time before

12   October 2017 any utility or any vegetation management program

13   would have taken out.

14        Now, that can't be the answer going forward.  We readily

15   acknowledge that.  Particularly in light of the climate

16   conditions, and Your Honor is dead right, that climate doesn't

17   start a fire, that if it's a vegetation that's contacting the

18   line, the climate change could impact the strength of that

19   tree; but the bigger issue that we're confronting now is that

20   whereas you may have had vegetation contacting a line 10 years

21   ago in Northern California and it emitted some sparks and you

22   had a one acre grass fire with wind, with the fuel loads, with

23   the chaparral as Your Honor noted, they spread at rates that

24   are unfathomable some of the descriptions we've heard from

25   Cal Fire.

```
 1          So with respect to the question of how do we deal with
 2     this going forward, why are we mitigating and not getting it to
 3     zero, we have an inherently dangerous product is the fact.  We
 4     have electric running through high-power lines in areas that
 5     are incredibly susceptible to wildfire conditions.
 6          And there was a fire in 2015, Your Honor, which we haven't
 7     talked a lot about.  There was the Butte fire in 2015, which
 8     was a large fire that tragically killed two people and
 9     destroyed a number of homes.  I don't have the specific number
10     so I don't want to get the number wrong.  Following that fire,
11     PG&E escalated its vegetation management programs.
12          October 2017 was a game changer.  It was a game changer
13     for California and it was certainly a game changer for my
14     client.  And what they were doing in particular in November and
15     December of 2017 and throughout 2018 -- and I'll get to the
16     Camp fire in a second, Your Honor, if I can focus on 2017 --
17     they developed a de-energization program, which has its kinks
18     and it's still being worked out because there are a lot of
19     community interests at play.
20          We activated it once last year in the Calistoga area.
21     There were tremendous complaints from people in terms of how it
22     was executed.  Some of those complaints were absolutely valid.
23     It's a process that's being worked out and improved upon.
24          More significantly, as it relates to the specific question
25     of vegetation, PG&E embarked upon an enhanced vegetation
```

1  clearance program.  There are obviously regulatory minimums;

2  right?  And I know Your Honor understands this, but what I

3  think a lot of people don't understand is that those regulatory

4  minimums, for example, would permit a branch of an oak tree to

5  hang over a power line.  We've seen it.  We've all seen it as

6  we drive around California.

7      What PG&E embarked upon and is still embarking upon --

8          **THE COURT:**  I'm not sure I agree with that.

9          **MR. ORSINI:**  Sorry, Your Honor?

10          **THE COURT:**  I'm not sure I agree with you when you say

11  it would allow a branch to overhang a power line.

12          **MR. ORSINI:**  As long as it is 4 feet away from the

13  power line, the regulations -- and it's a healthy limb, the

14  regulations absolutely permit that branch to be hanging over

15  the power line.  If it gets within the 4 feet radial clearance

16  distance, now you have a violation.

17      And there are also regulations and suggestions to maintain

18  12 feet because things obviously grow over the course of a year

19  between inspections.

20      But, Your Honor, frankly, that's looking back.  Looking

21  forward one of the --

22          **THE COURT:**  I think even a perfectly healthy tree,

23  according to 4293 as I read it, a perfectly healthy limb that

24  is overhanging or leaning toward the line or may contact the

25  line from the side or may fall on the line shall be felled,

1  cut, or trimmed so as to remove the hazard.  That's what Public

2  Resource Code 4293 says.

3      The earlier part about dead trees, old trees, rotten

4  trees, trees weakened, yes, those have got to be moved too; but

5  then it goes on to say "or may fall on the line" so that

6  doesn't -- is not -- it's not limited to dead limbs.

7          MR. ORSINI:  And respectfully, Your Honor, the way

8  that you are interpreting that language is not the way the

9  regulations have been applied, not only by PG&E but by the

10  regulator in this state, who's obviously here and can speak for

11  themselves.

12          THE COURT:  Who's the regulator?

13          MR. ORSINI:  The CPUC, Your Honor.

14          THE COURT:  I don't think they have the authority.

15  You see, only Cal Fire, according to this, can override that.

16  CPUC -- I know that that's what happened.  PG&E went and got a

17  favorable attempt to get some watered-down language in Rule 35

18  from the CPUC.  I don't think that has any -- I'm telling you

19  now, in my view, that is -- they have no authority to water

20  down 4293.  Only Cal Fire can do that.  It says so right here

21  (reading):

22          "The director or the agency that has primary

23          responsibility for fire protection of such areas may

24          permit exceptions from these requirements."

25      Now, up there in the chaparral it's Cal Fire that has that

1  primary responsibility, not CPUC.

2      MR. ORSINI:  In the SRAs, you're absolutely right,

3  Your Honor, state responsibility areas.  Respectfully,

4  Your Honor, PG&E has worked with Cal Fire for years, has had

5  inspection programs for years that have, you know, very clearly

6  permitted, and with the very clear knowledge of all the

7  regulators including Cal Fire, the overhangs.

8      But, again, Your Honor, it doesn't really matter at this

9  point because in terms of the question of how do we try to

10  prevent more wildfires from occurring going forward, what PG&E

11  has embarked upon --

12      And one thing I'll just add here, Your Honor, is I'm happy

13  to speak to these issues and I will answer your questions to

14  the best of my ability.  We also have Mr. Sumeet Singh here

15  with us today who is actually the vice president of PG&E in

16  charge of the Community Wildfire Safety Plan.  So if Your Honor

17  would like to hear from him at any point, we can do that, but

18  let me continue.

19      One of the efforts that PG&E has undertaken in order to

20  further mitigate fire risk in these Tier 2 and Tier 3 high-fire

21  districts is to now, rather than permit the overhang, to

22  effectively do what's being referred to as conductor-to-sky

23  clearance, to go out 4 feet in either direction and cut out all

24  of the overhang going up to the sky in these high-fire threat

25  districts in order to take away the possibility of the branches

1   that are overhanging the line breaking in a high-wind event.

2        Now, that is, as we've said in our papers, going to be

3   estimated to take roughly eight years.  That's too long,

4   Your Honor.  We believe it's too long.  The problem is, number

5   one, there are all the legal issues and the community issues

6   with respect to enhanced tree cutting, which I don't want to

7   diminish.  But putting those aside, it's not a dollars issue,

8   Your Honor.  It's really not.  Mr. Singh can speak to this too.

9   It's not a function of the money that's going out in dividends.

10  It's a function of the qualified tree workers.

11       This is a highly hazardous job.  There were last year by

12  my estimation, based on data I've seen, almost 100 people who

13  were killed trimming trees around the country in connection

14  with utility lines.  The work has to be done.  It has to be

15  done as quickly as possible.

16       But PG&E has been trying to find resources -- and by that

17  I don't mean money, I mean people -- to come in and do this

18  work to enhance the process to get it done sooner than eight

19  years from now, and they're just not out there.  They haven't

20  been able to find the qualified tree personnel, and there are

21  also references to that in some of the submissions from other

22  parties.

23       So that leads to the question of, okay, if it really is

24  going to take eight years -- and to be clear, as we find more

25  people capable of doing this, we're putting them on the job and

1  doing it faster if we can, but if it's going to take eight

2  years, how do we help mitigate the risk in the interim for

3  those pieces we don't get to?

4      Part of the answer is not every line mile even in the

5  high-fire threat districts is created equally.  So what the

6  company has been doing is developing and continuing to enhance

7  a sophisticated risk model, and this is also something it's

8  been working with the Public Utilities Commission on, that

9  looks at factors such as ingress and egress from communities,

10 that looks at factors about potential rate of spread in a

11 particular area to try to identify if we can't do all this this

12 year -- which we would love to be able to do, but it's just not

13 physically possible -- where do you start.

14     And it's not a function of just start at this line because

15 it's closest and work your way out.  It's a risk-based analysis

16 to try to bring it down.

17     What else are we doing?  There's the top 10 hazard tree

18 species program.  Looking at data, including some of the data

19 we've submitted to Your Honor, PG&E has done an analysis to

20 identify -- not all trees are created equal -- which trees in

21 these high-wind events after drought, with bark beetle problems

22 are more prone to failure, whether it's a branch or the full

23 tree.

24     And the data speaks pretty clearly that there are 10

25 species that are responsible for I believe the number is,

1 Your Honor, and Mr. Singh will correct me if I get this wrong,

2 but I believe those 10 species are roughly attributable for

3 70 percent of the vegetation-to-line contacts.

4         **THE COURT:**  What are those 10?

5         **MR. ORSINI:**  Sorry, Your Honor?

6         **THE COURT:**  What do you think the 10 are?

7         **MR. ORSINI:**  I have that -- eucalyptus trees, live

8 oak, Ponderosa pine, gray pine, coastal oak, and there are five

9 more.  If I can get my binder, I can list them for Your Honor

10 or Mr. Singh can give me the list.

11     Thank you.

12     No, not this one.

13     May I, Your Honor?

14                     (Pause in proceedings.)

15     **MR. ORSINI:**  What I'm looking to now, Your Honor, is

16 what's referred to as the general rate case.  This is what PG&E

17 files with the Public Utilities Commission and we attached it

18 to our submission.

19     Black oak, gray pine, tan oak, coast live oak, live oak,

20 Ponderosa pine, eucalyptus or blue gum, Douglas fir, valley

21 oak, and Monterey pine.  Those are the 10 that PG&E has

22 identified.

23     And so what PG&E is doing is it is -- again based upon

24 highest risk areas attacked first but it still expects for the

25 same people limitations it's going to take quite some time --

1   is going out in addition to the conductor-to-sky clearances,

2   it's targeting those 10 tree species and it's identifying --

3          **THE COURT:**  Can I just --

4          **MR. ORSINI:**  Sure.

5          **THE COURT:**  In theory that sounds good, but if you

6   went out and walked around the chaparral --

7          **MR. ORSINI:**  Yes, Your Honor.

8          **THE COURT:**  -- let's say elevation 2000 feet or 1500

9   to 4,000 feet, you would see Ponderosa pine, gray pine --

10         **MR. ORSINI:**  You would see a lot of them.

11         **THE COURT:**  -- blue oak, live oak, black oak.  I mean,

12  it's going to be dotted with -- every single acre is going to

13  be covered with those 10 trees.  Not all 10 trees but every

14  single acre is going to be covered by one or more of those kind

15  of trees.

16         **MR. ORSINI:**  That's absolutely true, Your Honor, and

17  that's part of the challenge.

18         **THE COURT:**  So that's not a way to prioritize.  It may

19  be that those trees are -- I don't get -- I don't see the

20  program.  It doesn't help you reduce and isolate the risk.

21         **MR. ORSINI:**  Well --

22         **THE COURT:**  The whole chaparral is full of trees like

23  that.

24         **MR. ORSINI:**  Right.  Totally agreed, Your Honor.  And

25  the issue here is, again, trying to take out as much risk as

```
 1   fast as you can.  You know, clear cutting of all of the trees
 2   just isn't feasible from --
 3            THE COURT:  Of course not.
 4            MR. ORSINI:  -- a business perspective.
 5            THE COURT:  Of course not.  How about clear cutting
 6   the ones that can fall on the line?
 7            MR. ORSINI:  Even clear cutting the ones that could
 8   fall on the lines, Your Honor, it's not feasible from a legal
 9   perspective for all the reasons we've stated in the brief --
10            THE COURT:  It could be.
11            MR. ORSINI:  -- but it's not feasible --
12            THE COURT:  Why can't you?  Why can't you get a law
13   passed?  You spend so much money on lobbying, you could go to
14   Sacramento today and get a law passed that would allow you to
15   cut those to have more clearance.
16            MR. ORSINI:  It's possible, Your Honor.  Having been
17   around a lot of the discussions that occurred with respect to
18   Senate Bill 901 and understanding and seeing the outcry that
19   we're already facing from communities for just the enhanced
20   work that we're doing, I think that would be a heavy lift; but
21   that's --
22            THE COURT:  I want to tell you one thing.
23            MR. ORSINI:  Yes, Your Honor.
24            THE COURT:  I know you don't want me to put any orders
25   in place on PG&E, but one thing you ought to consider is this:
```

1    I could help PG&E on this.

2            **MR. ORSINI:**  And, Your Honor, we --

3            **THE COURT:**  Let me finish.

4            **MR. ORSINI:**  Sure.

5            **THE COURT:**  Because if I had a strict order that you

6    had to comply with 4293, or whatever the rule was, and some

7    landowner tried to get in your way, you could apply immediately

8    to your U.S. district judge who would issue an Order to Show

9    Cause to that landowner to show up here in the

10   U.S. District Court to justify why they're trying to stand in

11   the way of protecting California from more wildfires.

12       I think that would put a stop to most of that resistance

13   if there is any such resistance.  You ought to think about

14   that.  Maybe there's a way a court order would help you as

15   opposed to -- it would be fast.  A matter of a week or two.

16           **MR. ORSINI:**  And, Your Honor, I appreciate that and I

17   understand that.  And I have to say, having spent a lot of time

18   with this company over the past year and a half, they are very

19   open to getting help from everywhere we can get to get this

20   done.

21       I've gone out there with some of the crews.  It's an

22   inherently dangerous job not just because you're climbing trees

23   but because of people armed with firearms, people who are very

24   serious about keeping you off their property; and it's a

25   complicated question that different communities are answering

1    differently, but I understand Your Honor's point.

2              THE COURT:  If someone tried to keep you off with a

3    firearm, then there's the sheriff.  Come on.  Come on.

4              MR. ORSINI:  Yes, Your Honor.

5              THE COURT:  I believe you're using the extreme case to

6    justify doing as little as possible.

7              MR. ORSINI:  Your Honor, and I do not want to give

8    that impression because that's absolutely not what I'm trying

9    to do.  It's absolutely not what we're trying to do.  Even

10   short of the extreme case, we saw in the letter that was

11   attached to the Public Utilities Commission submission from I

12   believe it was three counties and towns, including I believe

13   Sonoma and some of the ones that were impacted by these

14   wildfires, very clear, very direct concern about not what we're

15   talking about, which would be taking out and ramping up tree

16   removal on a dramatic scale, but what we're already doing.

17        And so I think it is a very complicated conversation where

18   there are going to be a lot of people who are going to have a

19   public interest in this, and there are also the other

20   environmental impact studies.

21        But if I can come back to the --

22             THE COURT:  No, I can override the environmental

23   impact problem too.  I can give you a direct order from a

24   U.S. District Court to cut that tree down; and then if somebody

25   wants to take an emergency appeal, God bless them.  But we

```
 1    could solve this problem.
 2         I think at the rate you're going -- you talk about eight
 3    years.  Do you know how much of California burned down last
 4    year?  1.6 percent burned down last year.  Not all of that's
 5    PG&E.  1.6 percent.  The year before it was 1.3.  That's almost
 6    3 percent of California burned up in two years of the entire
 7    state.  We can't sustain an eight-year delay.  This is an
 8    emergency.
 9         MR. ORSINI:  Your Honor, we completely agree this is
10    an emergency and that if we could, we needed to get all this
11    done this year.  The problem is even if I did get the help from
12    Your Honor with the orders, and I think, you know, I'm not
13    going to go into all the issues in the brief, but I think there
14    are complications with that with the regulatory scheme, but
15    let's say that's where we wound up.
16         The problem is it still can't be done and it's not
17    dollars.  I mean, dollars matter.  75 to $150 billion, which is
18    a real calculation, that's a big range; right?  And so that at
19    some level suggests maybe a lack of specificity in that
20    estimate, but part of that huge range is because we think the
21    number is most likely in the middle or to the top end of that
22    based upon actual experience of what it costs to remove trees,
23    to get people out there and do this work, but we gave the
24    bottom end because we can't be specific.  That money doesn't
25    exist.
```

But, more significantly, even if we could solve that problem, even if the State of California could find $100 billion to actually fund this enhanced work, the people don't exist. There aren't enough qualified tree trimmers in the country even if we took them -- well, maybe if we took them off every single other utility in the country there might be, but I actually don't think the numbers still work, and obviously we can't do that.

So it's -- Your Honor, we share your concerns. I've been up to these communities. I've been up to the communities that were most devastated by some of these wildfires. I've seen it. I've experienced it. I am fortunate that it's not something that affected me personally; right?

But the executives of the company, Mr. Simon, Mr. Singh who are here, have been up there. Your Honor, they are doing everything they can to try and expedite the process; and the reality of the situation is with the inherent danger associated with the power lines, we just can't get there that quickly particularly with all of the other overlays that apply to this but in particular given the absence of the resources.

So we're focusing on trying to risk weight the issues using data, using experience, take out the overhang, take out those top 10 species, put tree wire in where we can. Tree wire is difficult. It's not as simple as just going up and stringing new wire between two poles. It's a lot heavier,

```
 1    which means you have to rebuild a lot of the infrastructure
 2    putting in poles.
 3              THE COURT:  Wait.  You used a phrase I'm not familiar
 4    with.  Tree wire?
 5              MR. ORSINI:  Oh, I'm sorry, Your Honor.  Insulated
 6    wire.  It's the industry term for insulated wire.
 7              THE COURT:  All right.
 8              MR. ORSINI:  Basically what you do is you take that
 9    uninsulated copper or aluminum wire and you wrap insulation
10    around it.  What that does is add significant weight to the
11    conductor itself, which means now you either need different
12    wood poles that are higher strength, different type --
13              THE COURT:  And am I right that at least out in the
14    country as opposed to the city most of the wires are in fact
15    uninsulated?
16              MR. ORSINI:  That is true, Your Honor.
17              THE COURT:  And that's normal as long as -- it's okay
18    to do that as long as you don't have trees falling on them to
19    cause a spark.  I think, again, somebody in the press
20    misunderstood, thought that was some great revelation.  It's
21    like saying there are highways in California.  No, they're
22    uninsulated but that's normal, but you have to have the
23    clearance, otherwise your trees are going to fall on that and
24    cause a spark.
25              MR. ORSINI:  You're slightly right, Your Honor, it is
```

normal and you're absolutely right that it increases as, as the experts will tell you, as they think about it, sort of the surface area that's available for a sparking event if vegetation were to contact that line. It doesn't eliminate it. It could still break and start a fire. It doesn't eliminate sparking at the end where the energized conductors connect to the insulators.

But it's a very expensive proposition but the cost isn't the issue. It's the time that it takes to rebuild the poles to support it, but PG&E is doing that. Again, it can't do it everywhere so it's trying to identify those areas where they think it will make the biggest impact.

People talk about undergrounding. Undergrounding is absolutely an option. It would cost hundreds of billions of dollars and take decades to do that. It doesn't mean it's not being done. There are particular areas that are high risk, particularly as we're dealing more with the urban wildland interface and PG&E is running lines out there where they are using either the tree wire or undergrounding, but it's all part of a package of the risk mitigation programs that they're putting together to try to reduce it.

And, Your Honor, we're not asking the Court, or the public for that matter, to take PG&E's word for it; right? That would be an interesting approach for me to take standing at this podium in this proceeding; right? PG&E has been out there

1    talking to community leaders, talking to the PUC, talking to

2    Cal Fire about the programs it's doing.  Senate Bill 901, one

3    of the greatest aspects of that bill is the wildfire mitigation

4    plan requirement.

5         Now, every large utility in the state and a number of the

6    smaller ones have to -- I believe it's February 6, so very

7    soon -- have to submit their plan.  We've talked about some of

8    it in our rate cases and all those things, but this is a

9    statutorily required document that requires us to lay out all

10   of these issues, and that will then be workshopped with the

11   CPUC, with the other utilities.

12        We're talking to the other utilities and not just in this

13   state.  There are -- talking to a utility in Connecticut or

14   New York where I'm from, Your Honor, is helpful to an extent

15   because there are different vegetation issues that we confront

16   out there with ice and storms and things like that, but it

17   doesn't get you the same risk profile you have here.

18        The other jurisdiction where there are massive wildfires

19   and there has been a tremendous amount of work done to reduce

20   those quite effectively is Australia.  We have been meeting

21   with the Australian utilities, the Australia regulators, the

22   Australia experts.  We want to bring all of these people into

23   these conversations because, one, PG&E can't do it itself; two,

24   PG&E understands and accepts that it has a credibility problem,

25   which is why I couldn't stand up here and say to Your Honor

1    "Trust us.  We've got it."

2         And so we're open to further reporting with the monitor,

3    coming back to the Court with Your Honor.  I think one thing

4    Your Honor has done as part of this order that does help is you

5    have everybody here in the same room talking about this.  Those

6    are the types of things that we need to do so we can identify

7    where we have it wrong to the extent that what Mr. Singh is

8    doing night and day to try to reduce the risk isn't doing it as

9    quickly as possible.  And those are the types of things that

10   he's been working on with the community, with the CPUC.

11        **THE COURT:**  All right.  Let's come back in a minute to

12   trees, but you have not convinced me -- well, let me just say

13   this about the trees:

14        If I was running the company and I believed in safety and

15   I had limited resources, I would say what you're saying, which

16   is:  Let's put our money where it would do the most good.

17                         (Alarm)

18        **THE COURT:**  Don't panic.  That happens at

19   10:00 o'clock on certain days, and sometimes --

20        **MR. ORSINI:**  To make sure we're all awake?

21        **THE COURT:**  -- there's a message and sometimes there's

22   not.  It looks like this time there's not.  But don't worry.

23   It's at 10:00 o'clock exactly.  It's not a real thing.  It

24   looks like there's no message.

25        But to finish my point, I would put priority where the

1  money would do the most good.  I would concentrate on that fire

2  map that you have with the high zones mostly in the

3  chaparral --

4          **MR. ORSINI:**  Yes, Your Honor.

5          **THE COURT:**  -- in the mountain counties, also around

6  the Sonoma, all that whole corridor up 101 where you have the

7  same kind of chaparral problem, those canyons with brush.  The

8  brush is -- you know, the brush has a resin in it that is

9  called the buck brush is what I call it.  It is highly

10  flammable.  It will burn even when it's wet, the buck brush,

11  and that catches -- the grass catches the buck brush on fire.

12  It catches easily.  It burns extremely hot and that catches the

13  trees on fire.  Then it's "Katie bar the door."

14      I would try to do it but I would concentrate on getting

15  those trees down, and I think -- I think you're -- I'm very

16  worried about your interpretation of 4293, which I think is

17  totally wrong; and if that is right, you should be the first

18  one to go up to Sacramento and get the law changed to say you

19  should cut those trees down if they overhang.  That's just a

20  disaster waiting to happen.

21          **MR. ORSINI:**  And, Your Honor, we actually -- we didn't

22  want to wait for Sacramento on that.  That's why we're moving.

23  Whether or not my interpretation --

24          **THE COURT:**  If the law -- see, but you're

25  inconsistent.  If the law doesn't allow you to do it now, then

1  the homeowner would have a point.

2        **MR. ORSINI:**  No, Your Honor.  The law doesn't require

3  us to take out the overhang, but to take out the overhang

4  actually is a much easier task from a legal proposition because

5  it's in our corridor, it's in the right of way.  By definition,

6  it's coming over the line.  And so what we have done is we

7  haven't waited to change the rule.

8        **THE COURT:**  I should just order you to do that.  Then

9  you would have no problem with anybody.

10        **MR. ORSINI:**  Your Honor, I don't believe we need an

11  order because we're out there doing it right now.

12        **THE COURT:**  You haven't done it enough.  You haven't

13  finished it yet.

14        **MR. ORSINI:**  We have not finished it, Your Honor,

15  because we just don't have the people to finish it.

16        **THE COURT:**  I don't buy that there's not enough

17  people.  I believe there -- I don't believe you've exhausted

18  the supply of people who know what they're doing.

19        **MR. ORSINI:**  So, Your Honor, we had an issue related

20  to this --

21        **THE COURT:**  You know, there's a lot of people that

22  work for Cal Fire that in the wintertime they do a lot of

23  clearing.  I wonder if there's some way to get Cal Fire to

24  detail some of their troops, that in the summertime are

25  fighting the fires, to helping you cut some of those trees.  I

1   bet you they could do it.

2         **MR. ORSINI:** And speaking for my client, we would be

3   very open to those sorts of things.

4         **THE COURT:** I bet Cal Fire has got hundreds of people

5   who in the wintertime can do maintenance, fire maintenance, if

6   they're willing. And in the summertime is when they fight the

7   fires. In the winter is when we prepare to -- we ought to be

8   doing the work to avoid a fire. Maybe Cal Fire can help you;

9   but I believe in addition to Cal Fire, there are plenty of whom

10   work in this area.

11         **MR. ORSINI:** If I can just give you one example of

12   issues we've confronted in this regard. The Camp fire,

13   devastating fire, where there are two different areas of origin

14   that have been identified by Cal Fire, one of which appears to

15   have nothing to do with what vegetation, one of which may.

16   Whatever the causation issues are, there were -- obviously

17   there was massive devastation, massive loss of life.

18         Part of the devastation was incredible damage to the trees

19   in the fire perimeter. There was a tremendous amount of work

20   that needs to be done to take all of those trees out and in

21   many instances take those trees out before you can re-energize

22   the communities that are up there because you're not going to

23   re-energize with a burned-out tree sitting there as a clear and

24   present hazard.

25         As part of the efforts to get those trees taken out, PG&E

1   sent out a call to utilities and tree trimmers around the

2   country.  It wasn't able to get enough people to do it as

3   quickly as it wanted and had to reprioritize some of the other

4   work that was being done.

5       It's a -- I understand Your Honor's skepticism.  I

6   understand the concern and the need to move faster.  It's a

7   reality that we confront every day, but we are continuing to

8   look for options to do this faster.

9       Your Honor said you wanted to move to an issue other than

10  vegetation.

11          THE COURT:  Yeah, and that's de-energizing.

12          MR. ORSINI:  Yes, Your Honor.

13          THE COURT:  All right.  To me, just as an ordinary

14  mortal, if you're -- you should -- PG&E should know the safety

15  limits of its own system, and let's just think about that

16  proposition for a minute.

17      If you get on an airline, everyone expects the airline to

18  know the safety limits of its aircraft; or if you get on a

19  steamship, the steamship company is going to know the safety

20  limits of it or the seaworthiness of its vessels.  Here we have

21  PG&E sending electricity around the state, or at least around

22  Northern California.  We should -- shouldn't PG&E know the

23  safety limits of its own system, for goodness sakes?  And when

24  some wind event occurs or any other event, maybe an earthquake,

25  some event occurs that taxes the limits, safety limits, that

```
1    PG&E just turns the power off on that part of the grid?
2         Yes, I know that somebody in a hospital may have to rely
3    on backup power or maybe no power, but which is worse?  Another
4    Butte County fire or that inconvenience?  It's a terrible
5    choice.  It's a Hobson's choice, but that's what I think we --
6    if it's going to take eight years, which it shouldn't, but if
7    it's going to take more than one more season, that's the tough
8    choice that California has to make.
9         All right.  What do you say about this?
10        MR. ORSINI:  So, Your Honor, I think you're
11   100 percent right that it is a terrible choice and a Hobson's
12   choice in certain circumstances.  De-energizing is a safety
13   risk.  It's just a fact.  It's a safety risk.
14        But the question is:  How do you balance the safety risk
15   of someone not being able to get out of their -- you know, get
16   their car out of the garage because they can't open the garage
17   door or get the phone call telling them to flee a wildfire
18   versus stopping a wildfire that kills 88 people?  How do you
19   balance that?
20        THE COURT:  Well, but if -- yes, but if the fire burns
21   up the system anyway, then they're going to lose the power
22   anyhow.
23        MR. ORSINI:  Well, that may or may not be true,
24   Your Honor.  It is often the case that when these fires start,
25   they start in very isolated areas.  That is one of the most
```

fundamental challenges that Cal Fire faces, at least from what
I've heard from them, and was certainly true if you look at the
areas that they focused on with respect to the Camp fire.

There is still opportunity if the power is on to get
people out of the communities.  There is still opportunity to
notify people that the fire is moving in their direction.  And
up in those mountain towns, if you cut the power, that
opportunity disappears.

But that's not to say the choice is always keep the power
on because that's not the choice we're making, it's not the
choice that the CPUC has directed all of the California
utilities going back a number of years to consider, and it's
not the choice that the CPUC has opened up new conversations
about where you put that balance.

It's a Hobson's choice -- or maybe it's not actually,
Your Honor.  If it's a 10-mile-an-hour wind even in a
circumstance where you have dry conditions, you're not going to
turn the power off because the risk of the fire is not as
significant in that instance as the risk of turning off the
power.

In a circumstance where you have 90-mile-per-hour winds
barreling through these canyons up there with the dry
vegetation and red flags, then you're going to be in a
circumstance where it probably does make sense to turn the
power off.

1      And so what PG&E is working on, and it's not doing this

2   alone because it can't do this alone, what it's working on is

3   trying to put together a program, which it has in place now but

4   it keeps refining with the CPUC, with public community input,

5   what factors do you consider to make that choice.

6          **THE COURT:**  Tell us what -- you must know by now.  How

7   did PG&E make that decision in the Butte County fire?

8          **MR. ORSINI:**  With respect to the Camp fire,

9   Your Honor?

10         **THE COURT:**  Yeah.  Because I know that they were

11  considering turning off the power and then they decided to

12  leave it on.

13         **MR. ORSINI:**  They were, Your Honor.

14         **THE COURT:**  In retrospect, a tragic error, but maybe

15  it wasn't.  Maybe it was the right judgment.  I don't know.

16  Yet I don't know.  But if that power had been turned off, that

17  fire wouldn't have started, at least the same way.

18         **MR. ORSINI:**  So the way they made that decision was

19  based upon looking at the red flag warnings, what the ground

20  fuel conditions were, what the dew point was in terms of how

21  moist the wind was that was coming in, and what the projected

22  winds were.

23      At that time when PG&E made the decision not to

24  de-energize, the program it had developed came out to the

25  conclusion that the risk of turning off the power was too

1   significant given the risk of a fire starting to actually call

2   for the de-energization.

3         That can be criticized; right?  Hindsight we now know that

4   the fire occurred, so what has PG&E done?  It hasn't kept that

5   system.  It hasn't kept the same criteria.

6         One of the things in particular that PG&E had looked at

7   after that -- it was Mr. Singh's idea himself -- was -- you

8   heard the stories of the town of Paradise, the most tragic

9   stories you could possibly hear, and a critical issue in the

10  town of Paradise was the egress factor.  People just couldn't

11  get out fast enough.

12        It's not a criticism of the town.  It's not a criticism of

13  Cal Fire.  It's just a fact.  There are some towns in the

14  mountains that are easier to get into and out of than others.

15  That has now been added to the mix.  That has been added to the

16  criteria that are being considered because you're not only

17  thinking about what is the likelihood the fire starts because a

18  piece of equipment fails or a tree branch hits the lines,

19  you're thinking about is it going to be an acre, is it going to

20  be 50 acres.  If it's going to be 100 acres and it's going to

21  head towards Chico, which has a variety of highways leading out

22  of it and also will allow for the Cal Fire teams to get there

23  and turn the fire, that's a different risk than if the fire

24  might bear down on the town of Paradise or a town like it.

25        We've heard from towns like Monterey, not in our service

1    territory, but we've heard from towns about, you know, their

2    egress issues.  That is something that, as we have been looking

3    at this, we have added to the process of trying to decide --

4    it's not that we'll never turn the power off, and it can't be

5    that we always turn the power off.  And at its core, Your Honor

6    is absolutely right.  There has to be an analysis of given the

7    factors that are on the ground, and there are a lot of

8    different factors that play into this, is it fundamentally safe

9    to leave the system on; right?  And that's the way the CPUC has

10   looked at it for a while too.

11       And I don't think that if I put Mr. Singh or Mr. Simon up

12   here and you swore them in, they would tell you we have the

13   perfect system; and that's why we're really looking to work and

14   have been working with the communities, with the CPUC, to

15   figure out what those conditions ought to be.

16       **THE COURT:**  Let me give you the wind speeds at the

17   time -- this is from your own data if I've got it right -- of

18   the 17 that Cal Fire said in October 2017 that PG&E started.

19   These wind speeds were -- I could give you the names of the

20   Norrbom, 31 miles an hour; Atlas --

21       **MR. ORSINI:**  May I ask one question, Your Honor?

22       **THE COURT:**  Yes.

23       **MR. ORSINI:**  Are you looking at the data from PG&E's

24   own weather stations, that chart we provided?

25       **THE COURT:**  I think it is, but this is something that

1    we ourselves compiled.

2          **MR. ORSINI:**  Thank you, Your Honor.

3          **THE COURT:**  This is our own chart that I could put out

4    I guess, but it's from your data so -- we had to -- you didn't

5    give it to me in a convenient way.  We had to dig it out

6    ourselves.

7          But, all right, anyway, 31 miles an hour, 32 miles an

8    hour, 65 miles an hour, 40, 21, 29, 44, 35 -- I'm sorry, no,

9    not 35 -- 15, 6, 33, 9, and 67, and 67, 26, 58, 29, and 25.

10         So you can see that there's quite a number that started

11   even though it wasn't 90 miles an hour.  It was in the 20s.

12   According to my math, 14 of the 17 had wind gusts of 20 miles

13   an hour or higher at the time the fire ignited, and that's

14   according to your own data.

15         **MR. ORSINI:**  And, Your Honor --

16         **THE COURT:**  So to my mind, 20 miles an hour ought to

17   be a red flag based on this experience.

18         **MR. ORSINI:**  When I look at those numbers, it gives me

19   the same pause.  I think the reality is, Your Honor, we can't

20   look at those numbers to actually assess what the wind speeds

21   were at the particular locations.  There are a whole lot of

22   things that play into what the wind speed is at a particular

23   spot topography, but that's not an excuse.

24         **THE COURT:**  These were the wind speeds closest to the

25   origin of the fire, as close as your data could get so --

1    **MR. ORSINI:**  In many instances not nearly close enough

2  to tell you in a meaningful way what the gusts were.  So we

3  come back to how do we fix that; right?

4      The reality is PG&E prior to October 2017 didn't have a

5  very robust system of wind measurement devices.  We're putting

6  hundreds more in a year.  Again, risk based trying to figure

7  out where you can put the weather stations that are going to be

8  most useful in helping you have better data to make the

9  decision on the trade-off.

10     And I pushed Mr. Singh, when he and I were having a

11  conversation about this yesterday, very hard on the question of

12  why not do more; right?  There's a couple hundred this year.

13  There's a couple hundred next year.  Supply issue.  I mean,

14  it's literally a supply issue to get them out of the people who

15  are manufacturing these because all the utilities around the

16  state are doing the same thing; right?  We're trying to fix

17  that logjam, we're trying to find alternative suppliers, but we

18  need better wind data, a lot better wind data because you have

19  to make that decision based on it.

20     **THE COURT:**  Well, okay.  Good.  Get the little

21  windmills going and get better data, but this is the data you

22  have now; and because you don't like the answer, you're saying

23  it's not good enough.  The answer is 20 -- so far 20 miles an

24  hour is pretty dangerous in the month of October when the

25  Santa Ana winds are upon us and it's dry as can be.  It doesn't

1  take a rocket scientist to see that.  To me that's pretty

2  obvious that 20-mile-an-hour -- if it's 20 miles an hour, then

3  there may be a gust of 35 miles an hour nearby, a temporary

4  gust.

5       Why is that so hard to factor in and say -- and to say

6  if -- and to say if it's 20 miles an hour, or pick 25 miles an

7  hour, then you are going to look very carefully at cutting the

8  power to save that community?

9       **MR. ORSINI:**  And so, Your Honor, I'm not -- I don't

10  mean to be fighting you on that proposition.  We are looking at

11  exactly that.  The problem is, you know, where do you strike

12  that balance.  Because if you strike it at 20 miles an hour,

13  we're going to be turning the lights off a lot and in many

14  circumstances where the risk doesn't justify it.

15       So what we're doing is we are taking the wind predictions

16  but what we actually do, what we actually do is not look at,

17  you know, that 20-mile-per-hour reading.  We have very

18  sophisticated wind modelers at the company who are trying to

19  model what are the wind conditions going to be in any

20  particular location, and we are 100 percent taking that into

21  account as one of the primary factors in deciding whether or

22  not to trigger the public safety power shutoff to de-energize.

23  It's not at 20 miles an hour, but those are the types of

24  conditions that are coming in.

25       And my understanding on this is that it's not a

1   hard-and-fast rule that above 20 you do it at this.  It's a

2   sliding scale of balances; right?  It may be that if the wind

3   is over 40 miles an hour tomorrow because of the current

4   vegetative state and the ground fuel state in a particular

5   area, the risk of a wildfire is going to be quite low.

6   Whereas, if it's 40 miles per hour in July and we believe that

7   the wind that's coming in is a dry wind, not a wind coming in

8   off the coast with moisture that cuts down pushing the fire but

9   instead a dry wind coming from the east that's going to fan the

10   fire and fuel the fire -- right? -- all of those factors are

11   the factors that we're taking into account and are incredibly

12   open to hearing from not only Your Honor and everybody else in

13   this courtroom but the community in trying to arrive at what is

14   the right set of factors -- I probably shouldn't say what's the

15   right because there probably is no right -- what is the best,

16   most risk-informed way to make that decision.

17       And that's what we believe and we're very hopeful the

18   process the CPUC has just opened up will do, will provide all

19   of us the opportunity in the workshops, two of which have been

20   held already, to figure out how do we best address this.

21       Because it brings me back to where I started, where

22   Mr. Schar started, and certainly where Your Honor started,

23   which is the status quo doesn't work.  The status quo cannot

24   continue.  We cannot continue to have fires of this magnitude.

25   And so what we're trying to do, as Your Honor noted before, is

1   using risk-based metrics, because we can't do it all at once,

2   how do we balance the other safety issues, how do we balance

3   the other legal issues to do everything we can to keep the

4   state of California safe.

5          THE COURT:  What troubles me is, see, you're saying

6   workshops, workshops, but come June 21, I'm unofficially saying

7   that's the start of the wildfire season and it will run to the

8   first big rain in October, November, December, six months, and

9   it will be dry as can be and the fire season will be on us and

10  the emergency will be on us, and will we be seeing headlines

11  "PG&E has done it again, started another fire" and some other

12  town has burned down because you didn't turn the power off or

13  you didn't cut the trees?

14         MR. ORSINI:  We share that concern, Your Honor.  We're

15  not waiting for the workshops to end.  As I -- you know, with

16  the egress factors I described, we adjust it every day.

17         The CPUC, I believe, has been -- I believe they said this

18  in their submission, and, you know, far be it from me to speak

19  for them, but in understanding what they've said and seeing the

20  actions they are taking, I think that they recognize that your

21  standard regulatory process and the speed or lack thereof at

22  which that moves, that's not a criticism.  I don't want it to

23  be perceived or reported as a criticism.

24         THE COURT:  It's very slow.

25         MR. ORSINI:  Yeah.

1          THE COURT:  The CPUC, it takes years for them to

2    implement anything.

3          MR. ORSINI:  And it's not them, Your Honor.

4          THE COURT:  And it's a revolving door with PG&E over

5    there.  A lot of those people used to work at PG&E.  They

6    revolve back and forth.  It's very slow.

7          MR. ORSINI:  And any regulatory process is, which is

8    why --

9          THE COURT:  They don't work on an emergency basis.

10         MR. ORSINI:  But what we're seeing --

11         THE COURT:  Cal Fire is the one that works on an

12   emergency basis.  They get out there and risk their lives every

13   summer on account of fires and save California.  My admiration

14   for Cal Fire cannot be overstated.

15         MR. ORSINI:  And, Your Honor, I agree with that

16   completely.  I actually have, you know, people who are close

17   enough to me that I consider family members who are actually

18   members of Cal Fire.  I couldn't agree with that more.

19      My point was very simply with respect to the CPUC what

20   we're seeing is a recognition by them that this can't take two

21   years.  The process that's been put -- set up for the wildfire

22   mitigation plans --

23         THE COURT:  It should be done by June 21.

24         MR. ORSINI:  And, Your Honor --

25         THE COURT:  There should be something in place by

1  June 21 that assures the public that there will be no more

2  crimes committed by PG&E.

3       **MR. ORSINI:**  And, Your Honor, we have in place today a

4  program that we believe, based upon our assessment of the

5  risk -- forget whether or not there's a crime, and I understand

6  that's what we're here to talk about today, Your Honor; but

7  PG&E is not looking at it from the perspective of whether or

8  not it was criminal if a tree that would not have otherwise

9  been removed by any trained vegetation manager actually hit the

10  line and started a fire.

11       That's besides the point because what matters is stopping

12  the fires and mitigating the risk.  And PG&E is working night

13  and day to have a safer system tomorrow than it does today and

14  the next day will be safer than tomorrow, and we're

15  participating in and welcome the feedback of the regulators in

16  the workshops but we're not waiting for those, Your Honor.

17       **THE COURT:**  All right.  It's time to take a break.

18  I'm going to -- I want to hear from everybody else.  I'd like

19  to hear from the U.S. Attorney.  I'd like to hear from Cal Fire

20  and the Attorney General.  I'd like to hear from the CPUC.

21       Who am I leaving out here?  Somebody I'm leaving out.  No?

22       Okay.  Now -- is that okay?

23       **MS. HOFFMAN:**  Would you like to hear from San Bruno?

24       **THE COURT:**  Yeah, and San Bruno, that's right.  That's

25  who I'm leaving out.  I know it's a different problem, but you

1  went through your own agony in San Bruno so I'd like to hear

2  from you.  So we will -- yes?

3          **MR. PITRE:**  May I approach?

4          **THE COURT:**  I don't know who you are.

5          **MR. PITRE:**  If I can identify myself?

6          **THE COURT:**  Come on up here.

7          **MR. PITRE:**  Thank you, Your Honor.

8      Your Honor, my name is Frank Pitre.  I am a lawyer who

9  has --

10         **THE COURT:**  Here.  Come up here.  Now I recognize you.

11         **MR. PITRE:**  Thank you, Your Honor.

12     And I apologize for intervening, but this is a subject I

13 believe that we could provide some input for the Court to

14 consider.

15     We are lawyers who have represented victims of the

16 San Bruno calamity and tragedy, victims of the Butte fire in

17 2015, which has been discussed.  We presently represent those

18 who lost homes and all of their worldly possessions and loved

19 ones in the North Bay fires, as well as the Camp fire.

20     We have taken over 100 depositions, evaluated the risk

21 management policies and practices both on the gas side as well

22 as the vegetation management side.  We have unique insight in

23 some of the issues that this Court has been discussing with

24 PG&E.  We want to be part of the solution, and we would like

25 the opportunity to provide some guidance and insight from our

1   perspective given what we've learned.

2          **THE COURT:**  Let me ask you this:  From all that

3   discovery that you've taken, do you have any insights into the

4   vegetation problem?

5          **MR. PITRE:**  Yes, Your Honor.

6          **THE COURT:**  Do you have any insights into the

7   de-energizing issue?

8          **MR. PITRE:**  Yes, Your Honor.

9          **THE COURT:**  Well, then, when we come back, I'll let

10  you speak.  Now, I have to remind you I may make you put it

11  under oath later because they're entitled to have -- you're an

12  intervenor, so to speak -- not an intervenor but you're a

13  member of the public but it's not under oath.  I'll let you

14  more or less make an offer of proof, and then maybe you can do

15  an under-oath submission later.

16         **MR. PITRE:**  I would appreciate the opportunity.

17         **THE COURT:**  Okay.  So I'll give you at least some time

18  when we come back.

19     All right.  We are going to take a 15-minute break at this

20  time and then we will resume.

21     I will give PG&E more opportunity to speak.

22     Are you not with Mr. Pitre?

23         **MR. deGHETALDI:**  I am, Your Honor.  My name is Dario

24  deGhetaldi.

25     My firm has also represented victims from the PG&E gas

1  explosion in San Bruno, the Butte fire, the North Bay fires,

2  and the Camp fire; but, in addition, we represent one of the

3  victims of a gas explosion in Fresno at the Sheriff's Gun

4  Range.

5          **THE COURT:**  I don't want to hear about gas today.

6          **MR. deGHETALDI:**  Okay.

7          **THE COURT:**  It's enough to deal with electricity.

8  Electricity is the main focus today even though gas is what

9  started this lawsuit.

10         **MR. deGHETALDI:**  That's fine, Your Honor.

11         **THE COURT:**  One of you get to speak later on, but

12 electricity is the issue today.

13                  (Recess taken at 10:25 a.m.)

14               (Proceedings resumed at 10:39 a.m.)

15         **THE COURT:**  I want to apologize to the CPUC for saying

16 that you are a revolving door, that you were slow.  I do know

17 that you're working very hard over there to try to get some

18 improvements in place before the next fire season, and that

19 SB 901 has got some deadlines and I know you're working hard

20 over there.  I should not have said that, and I apologize to

21 you for those remarks.  I know you're an excellent

22 organization.

23      First let's hear from the U.S. Attorney.

24         **MS. HOFFMAN:**  Thank you, Your Honor.  Hallie Hoffman

25 for the Government.

1    Your Honor, as you appropriately started out the hearing

2    today, we are here because of criminal conduct by PG&E, and

3    much of that criminal conduct was based on poor decisions,

4    criminal decisions driven from bad data.  There were -- we went

5    through hundreds if not thousands of e-mails of PG&E employees

6    warning the company that they were making risk assessment

7    decisions based on bad data.

8    As we sat in this hearing today, there's a concern.  We're

9    all relying on PG&E's data, and the company just told us that

10   they themselves admit their wind data is not accurate and it's

11   based on this data that they're making risk management

12   decisions now in the electric area.

13   This is why in the Government's submission -- it's a

14   complicated question, we get that.  We don't pretend to have

15   the answers.  But the concern that the proposal of just the

16   monitor playing a sideline role and just receiving reports from

17   PG&E about what they're doing does not seem sufficient to

18   address the problem.  There needs to be an assurance for the

19   public safety that there's actually real risk management

20   analysis going on to try and come up with a solution.

21   My colleague Jeff Schenk is going to speak to some of the

22   particulars of the Court's questions.

23       **THE COURT:**  Thank you, Ms. Hoffman.

24       **MR. SCHENK:**  Good morning, Your Honor.

25   The Court proposed three conditions and asked for the

1  parties to comment on those three conditions, and I think that

2  the role that the U.S. Attorney's Office can play in that is

3  to, as we did, tell the Court the case law suggests that for

4  public safety the Court is allowed to propose broad conditions,

5  that those conditions need not be related to the underlying

6  criminal conviction, as the Court well knows, but, rather, to

7  remedy the harm of the violation.

8      The Court earlier this morning found that there was a

9  violation.  That violation had to do with communication between

10  PG&E and the Probation Office, but the underlying conduct, that

11  which they were communicating about, obviously is fires as a

12  result of their electric lines and settlements based upon

13  DA's Office investigations into those fires.

14      So the Government believes that the Court now has the

15  proper basis to make some modifications to the probation that

16  PG&E is under.  The wisdom, though, of those three conditions

17  is something that the Government -- the U.S. Attorney's Office

18  just does not have the expertise to provide the Court much

19  direction on.

20      What we proposed to the Court in our filing was that the

21  Court use the monitor in a more aggressive way in fashioning

22  conditions, ask the monitor to look into some of these issues,

23  ask the monitor to meet with the various agencies -- the CPUC,

24  the federal agency FERC that plays a role in this space,

25  Cal Fire, some of the individuals the Court will hear from

today -- and the monitor can also determine to what extent
PG&E, as Ms. Hoffman just referenced, their own data is
insufficient to make some of these conclusions, to make some of
these future decisions based upon.

     And once the monitor has done that work, the monitor and
his team can evaluate either the three conditions that the
Court has proposed or write new conditions or create a hybrid
system or maybe decide that there are no conditions that are
necessary.

     But whatever work is done by the monitor in meeting with
the interested parties in coming up with the proper set of
conditions going forward, the Government thinks that's the
place that is probably most beneficial and would be most
productive.  The U.S. Attorney's Office just does not have the
expertise to weigh in on the wisdom of those three conditions.

     **THE COURT:**  Those three conditions that I suggested
might need some modification because -- I'd say would need some
because I've studied what has been submitted and criticisms and
some good points were made, so I feel I could take that into
account.

     On the monitor, I did meet with the monitor yesterday.  I
think there is a -- I think you make a good point.  I don't
want to wait.  I want to be clear.  We have an emergency in
California that in just a few months will be back on us so we
don't have the luxury of extended studies.  I wish we did, but

1  we don't.  So we have to -- either I've got to make some

2  decision or I don't, and either I leave it up to the CPUC and

3  the State Legislature or I exercise my authority as the judge

4  in the probation to try to stop a repeat of the last two years.

5      So we don't have the luxury of time but we do have -- this

6  is January and there's a lot of good work the monitor can do

7  between now and June 21 so we can get more information.

8      I'll give you just one for instance.  A spot check, which

9  means the monitor is going to go out there with his hiking

10 boots and walk those lines, some of them, on a spot-check basis

11 to see how good a job PG&E is doing.  They won't know in

12 advance.  He'll get them to go with him, but they won't know in

13 advance which one he's going to select.  That's his idea, not

14 mine.

15     So I guess there's some more of that to come but, all

16 right, that's a well-taken point.  Anything more?

17         **MR. SCHENK:**  No, Your Honor.

18         **THE COURT:**  All right.  Let me hear from the Attorney

19 General, please.

20     I am going to have for both of you a question -- well, why

21 don't you go ahead and have a seat.  I'm sorry for interrupting

22 you.  Please.  I'll come back to my question.

23         **MS. WELCHANS:**  Well, Your Honor, I hope not to

24 disappoint you.  This is Kelly Welchans from the Attorney

25 General's Office.  I am here on behalf of Cal Fire and the

1  Natural Resources Agency.  I'm not on behalf of the Attorney

2  General in his personal capacity.

3          THE COURT:  That's fine.  Okay.  All right.

4          MS. WELCHANS:  If the Court would like someone, we can

5  probably try to get --

6          THE COURT:  But you are in the AG's Office, aren't

7  you?

8          MS. WELCHANS:  I am. I am the lawyer for Cal Fire in

9  this and other circumstances.

10         THE COURT:  Okay.  What's your last name?

11         MS. WELCHANS:  Welchans, W-E-L-C-H-A-N-S.

12         THE COURT:  All right.  Thank you.  And go ahead and

13  make your comments.

14         MS. WELCHANS:  Well, Your Honor, Cal Fire has brought

15  Matt Reischman, who is a Cal Fire Assistant Unit Chief, I

16  believe -- I'm sorry if I got his title wrong -- and Director

17  of Natural Resources Agency, Wade Crowfoot.

18         THE COURT:  Wait.  Wait.  Come on up here then.  Let's

19  hear from them too.

20     Can I ask you to submit a brief after, unless you know for

21  certain the answer now.  This is the interpretation of

22  Section 4293 of the Public Resource Code, and my reading of

23  it -- I could be wrong, that's what I'm here to find out, or

24  you can give me a brief on it -- but my reading was that if

25  there was an overhanging branch that was leaning over the wires

1 even if it was more than 4 feet away, that 4293 required that

2 to be removed.  It wasn't -- it didn't have to be dead.  It had

3 to just be overhanging.  It could be perfectly alive but if it

4 was overhanging, 4293 required it to be removed, but maybe I

5 misunderstood that.

6   What is your view of that, or do you have a view?  I don't

7 want you to guess at it.

8   **MR. CROWFOOT:**  Your Honor, my name is Wade Crowfoot

9 and I serve as Secretary of the Natural Resources Agency.  And

10 I have with me Matthew Reischman, who is an expert on

11 vegetation management, who would be able to respond to that

12 question.

13   If I might, I just wanted to share a few thoughts with you

14 before --

15   **THE COURT:**  Of course.

16   **MR. CROWFOOT:**  -- we begin to share our perspective.

17   First of all, we very much appreciate your invitation for

18 Cal Fire to provide written comments to you as you consider

19 your order as well as the invitation here today.  I can tell

20 you that my presence here as Secretary who oversees Cal Fire is

21 to indicate our priority to being supportive to your work as

22 you assess this risk and make your decisions.

23   We are intensely focused on reducing public safety risks

24 from wildfires beginning with the coming wildfire season.  And

25 if I could, I would share with you just a little bit of what

1  we're doing and then, again, happy to expand on the written

2  comments that Cal Fire provided.

3          **THE COURT:**  Good.  Please go ahead.

4          **MR. CROWFOOT:**  Okay.  So as you may know, earlier this

5  month new Governor Newsom issued an Executive Order Number

6  N-05-19, and specifically it is focused on assessing

7  communities at greatest risk to wildfire in the wake of

8  Paradise and those other tragic fires, and specifically

9  identifying projects that can be done in the coming months

10 before the wildfire season, that you indicated starts early

11 summer, to mitigate or reduce risks to those communities.

12      So as Cal Fire could tell you, we as an agency and as a

13 state government are very focused on doing what we can to

14 reduce risks in the most vulnerable communities.

15      Also, as you discussed with PG&E, the legislature has

16 mandated enhanced wildfire mitigation plans be completed by

17 each of the utilities, including PG&E.  Those submissions are

18 due a week from today, next Wednesday, February 6th; and, as

19 indicated, will be public and will be discussed publicly and by

20 law are required to be completed and essentially ready to go in

21 three months' time, by the first week of May.

22      So those are two examples of where at least we as a state

23 agency led by Cal Fire are really working to reduce risks

24 beginning with the coming fire season.

25          **THE COURT:**  All right.  Is that it?

1          MR. CROWFOOT:  It is.

2          THE COURT:  Those are -- I want you to know just as a

3     citizen, those are very important steps and I thank you for

4     taking those steps.  Time is short.  It is an emergency and it

5     won't be done exactly right, but hopefully we will get

6     something done by June that will greatly reduce this problem.

7          MR. CROWFOOT:  I agree.

8          THE COURT:  Not just mitigate it but greatly reduce

9     it.  It needs to be greatly reduced.

10     Okay.

11          MR. CROWFOOT:  Your Honor, I would just add that, you

12     know, you speak eloquently of the lives that are being put on

13     the line by the men and women of Cal Fire, and we take that

14     obviously quite seriously.  So we plan beginning next Wednesday

15     to roll up sleeves as state government and really dissect the

16     wildfire mitigation plans as they're presented by the utilities

17     and really unpack the complexity and the choices obviously that

18     the state as a regulator and the utility have to make and,

19     again, by spring actually having plans that reduce wildfire

20     safety risks as much as humanly possible.

21          THE COURT:  Excellent.  Thank you.

22     Let's hear from -- tell me your name.  You must be a

23     chief.

24          MR. REISCHMAN:  Thank you, Your Honor.  Matthew

25     Reischman.  And, yes, I am with Cal Fire.  I'm the Assistant

1  Deputy Director for Resource Protection and Improvement.

2      And I want to thank you as well for the opportunity to

3  speak before you today.  I also want to let you know that I

4  appreciate the kind words of support for our department and

5  acknowledgment of our fallen firefighters.

6      In regard to 4293, it may be best if we provide you, as

7  indicated, a written interpretation of that statute.  I can

8  say, you know, based on the voltage, there's obviously

9  different clearance requirements, be it 4, 6, 10 feet.

10     With regard to green trees and overhang, if they're

11 leaning towards -- our recommendation to any landowner,

12 including utilities, is if there's a concern, it should come

13 out.  That said, I think as I indicated, it's probably best

14 that we provide you, you know, with that written

15 interpretation.

16         **THE COURT:**  I wish you would, but my feeling, strong

17 feeling on this is that if for some reason PG&E is right and

18 the law does not require an overhang to be removed, I think --

19 that's the way I read it, but I'm not the expert on 4293 -- but

20 if for some reason 4293 just gives discretion on something

21 that's an overhang and not a requirement, then I would hope

22 that you would go to the legislature and get that fixed

23 because, as I'm reading -- am I right to read your reports that

24 trees falling on the lines is a huge problem?

25         **MR. REISCHMAN:**  Correct.

**THE COURT:**  In high winds.  In high winds.  Usually those Santa Ana winds, but any high winds in the summer, trees fall on the lines and start a fire.  Isn't that the most common scenario?

**MR. REISCHMAN:**  That's what we're seeing.

**THE COURT:**  What do you think the solution is?

**MR. REISCHMAN:**  Our responsibility here is to support, to cooperate.  We're going to provide technical expertise.  You know, we're going to continue to update our fire threat maps so that utilities and landowners can make decisions in order to manage their properties, treat their vegetation, and comply with state law.

And so my recommendation is that comply with state law; you know, utilize the guidebooks that we have, the field guides.  We're working and cooperating with CPUC, the utilities, various landowners across the state in order to provide vegetation management recommendations.

The mitigation plans that are currently being developed and are due looks like going to be turned in on February 6, we're involved in that process.

You know, I think all of those things combined are -- you know, that's our role.  We're going to continue to be here and support that.

**THE COURT:**  In that SB 901 I believe it was -- just a minute.  I got it here somewhere.

1    Effective January 1 of this year it says (reading):

2         "Notwithstanding any other law, any person who owns,

3         controls," et cetera, "electrical transmissions may

4         traverse land as necessary regardless of land ownership or

5         express permission to traverse land from the landowner

6         after providing notice and opportunity to be heard to the

7         landowner to prune trees to maintain clearances pursuant

8         to Section 4293 and to abate by pruning or removal any

9         hazardous, dead, rotten, diseased, or structurally

10        defective live trees."

11   So the word "hazardous" modifies "live trees."  Why

12   wouldn't that cover -- I want you to consider -- to my mind

13   that would cover -- "hazardous" covers an overhang.

14        Anyway, it seems to go on to say that a landowner cannot

15   get in the way and PG&E has got to cut it down if it's a

16   hazard.  So think about it.  I'd very much appreciate a brief

17   on this as soon as you can.  Maybe by next week could I get

18   that brief?

19        **MS. WELCHANS:**  Yes, Your Honor.  And that was a brief

20   on Cal Fire --

21        **THE COURT:**  The overhang issue, that whether it's

22   mandatory to cut it down; it's not just a matter of discretion.

23        **MS. WELCHANS:**  Yes, Your Honor.

24        **THE COURT:**  I have a different question for you, and

25   that is in the summertime the fire crews are just working like

1  crazy from all over the state, and what amazes me -- I have to

2  keep complimenting you -- is how well you manage that resource

3  of bringing people from, say, Monterey and Modoc County.  You

4  might send them to Yosemite to put out a fire.  And how you

5  coordinate that effort, it's a major military operation.

6  Really it's the only way to analogize it.  And those crews are

7  out there on the line all summer.

8      Now, what happens in the wintertime?  Are any of those

9  folks available to cut trees?  In other words, could there be

10  an arrangement made where PG&E could hire some of your extra

11  crew members that you get in the summertime to go in there and

12  take down trees?  Is that -- could Cal Fire help on that?

13      **MR. REISCHMAN:**  So, Your Honor, I appreciate that.

14  You know, one thing to remember here is that fire season in

15  California is a year-round event now, and so it's not uncommon

16  for us to deploy resources into Southern California due to

17  Santa Ana wind events throughout the year, and our crews are

18  busy year-round and we're working on a variety of vegetation

19  management projects across jurisdictions, you know, using

20  different authorities and agreements.

21      I don't -- I wouldn't say that we wouldn't entertain that.

22  I think that's definitely maybe an opportunity and a potential.

23  We're prioritizing vegetation treatment projects that are

24  focusing on communities and the sociodemographic conditions and

25  criteria surrounding those communities, and there's a lot of

1  work out there that we feel we can get done based on our local

2  fire plans and the way that we plan around communities, along

3  ridges, ingress, egress, addressing all those other situations

4  when we get a going fire that, you know, cause harm to those

5  communities.

6  　　　　And so it comes down to prioritization, and I think

7  certainly we would entertain something like that; but at the

8  end of the day, you know, we rely on our fire-planning process

9  and to identify those high-threat areas that we implement

10 projects in, and some of those are in conjunction with what

11 PG&E is doing.

12 　　　　Like I said, we're working cooperatively right alongside

13 them, but at the end of the day there is an extremely high

14 amount, large amount of work that needs to get done.  And I

15 guess my comment is we would potentially entertain that, but

16 there's enough work keeping our crews busy year-round.

17 　　　　**THE COURT:**  Well, I know the engine crews are

18 full-time on other things, but I had heard that there were

19 seasonal people in the summers and my thought was -- that work

20 the lines, and my thought was that the seasonal people could

21 become year-round and be detailed to assist PG&E on removing

22 trees that are a hazard to the lines.

23 　　　　**MR. REISCHMAN:**  And we have increased our staffing

24 over the last several years in order to keep up with the demand

25 for not only emergency response and fire suppression but also

1  for fuel reduction.

2      We have two opportunities when it comes to crews.  We have

3  an agreement with the California Department of Corrections to

4  utilize inmate crews to do work, which are year-round crews.

5      We also are in the process of standing up our fuel

6  reduction, our prescribed fire crews that are going to be

7  available for this.

8      And so our hope is to have those crews available this

9  spring -- later this spring.  Those are permanent year-round

10  crews that will be -- we will have available.  Currently there

11  are six of those.  In the current governor's budget there's an

12  opportunity to maybe stand up four additional.  We're uncertain

13  of that at this time, but we do have six additional fuels crews

14  that will be coming online here in the spring and those are

15  year-round permanent crews.

16      **THE COURT:**  To go back to something else you said, is

17  your agency the agency that's going to rule on the mitigation

18  plan that PG&E will come up with next Wednesday or is it -- is

19  that CPUC?

20      **MR. REISCHMAN:**  I believe that's CPUC.

21      **THE COURT:**  What will your role in that be?

22      **MR. CROWFOOT:**  Well, as I understand it, through a

23  Memorandum of Understanding, Cal Fire actually has a role

24  providing expert information and assessment of the mitigation

25  plans.  In other words, they will be right there with the CPUC

1  on assessing the sufficiency of those plans.

2      I also would mention that the law calls for an independent

3  evaluator that Cal Fire actually recommends who can further

4  provide objective assessment of the sufficiency of those plans.

5          THE COURT:  Okay.  All right.  I want to thank you

6  both, all three of you.  Please have a seat and maybe we'll

7  need you again so don't go away, please.

8      All right.  CPUC, I'd like to hear from you.  Welcome.

9          MS. HAMMOND:  Thank you, Your Honor.  Again, I'm

10 Christine Hammond for the CPUC.  This is Lee Palmer.  He's the

11 Deputy Director of the Safety and Enforcement Division.

12         THE COURT:  Right.  And you are?

13         MS. AGUILAR:  Arocles Aguilar, General Counsel of the

14 CPUC.

15         THE COURT:  All right.

16     So, please, help us.  Help us solve this problem.  What

17 would you like to say?

18         MS. HAMMOND:  Sure.  Your Honor has read our

19 comments --

20         THE COURT:  Yes.

21         MS. HAMMOND:  -- and you have heard several times

22 already this morning that the utilities, not just PG&E, will be

23 filing new wildfire mitigation plans next week, and that's

24 pursuant to Senate Bill 901.

25         THE COURT:  Correct.

1        **MS. HAMMOND:**  Now, the utilities presently have

2   wildfire mitigation plans.  These are new and improved wildfire

3   mitigation plans.  They are engaging in vegetation management

4   now.  More and improved vegetation management practices should

5   be incorporated into these wildfire mitigation plans.

6        We are statutorily obligated to approve those plans within

7   three months of their submission.  So that puts us at early

8   May.

9        What's really important, and it's required by statute and

10  it's based on our experience, is that when there have been

11  wildfires and catastrophic wildfires, the input from first

12  responders and the local communities is really critical to

13  tailoring the needs that are local to each of those local

14  jurisdictions and it is -- Cal Fire is critical.  They are a

15  partner.  We have been working with Cal Fire at every step of

16  the way.

17       We also need to hear from the county fire departments and

18  the local fire departments, the local police, and all --

19       **THE COURT:**  About what?  Give me an example of how

20  that would affect your decision on vegetation management.

21       **MS. HAMMOND:**  The local firefighters will probably

22  have better information about the characteristics and the

23  profile of the vegetation, changes in weather.  They will have

24  information about communication services to do push notices to

25  smartphones in the local communities.  They will also have

1    detailed information about ingress and egress into and out of
2    the city.  That's just some of the information that will be
3    really, really important.
4         THE COURT:  Will CPUC send people out to walk these
5    lines, distribution lines, to look at how the trees either
6    overhang or get close or close enough that they could blow into
7    the wires and cause a spark?
8         MS. HAMMOND:  The CPUC presently has a team of
9    inspectors and auditors, and they will continue to be
10   inspecting and auditing.  It's an area where --
11        THE COURT:  Let me ask you this question, though.  How
12   did it happen that so many fires occurred under your
13   regulation?  You know, 2017 in one month all those fires, and
14   they were under your supervision and it happened, and then
15   Butte County happened under your supervision.  So I know it's a
16   tough -- it sounds harsh, but that's what the people of
17   California deserve to know.  How did that happen?
18        MS. HAMMOND:  Your Honor, that is a very difficult
19   question.  I have to say that those fires, at least the 2017
20   and 2018 fires, are still under investigation.  So out of
21   respect for preserving those investigations and the possibility
22   of an investigation and penalties, I'm not able to speak to
23   that.
24        THE COURT:  All right.  But you see we have an
25   emergency upon us and we still don't know what you think about

1    fires almost two years ago.

2          **MS. HAMMOND:** I think the Commission has spoken

3    several times about how tragic and how frustrated the

4    Commission feels in the face of these challenges with the

5    utilities, with the climate, with the urban wildland interface,

6    a number of factors that are converging. These are factors

7    that continue to evolve over time.

8          Your Honor, it's an incredible challenge, and I am

9    totally --

10         **THE COURT:** I accept that. I accept the climate

11   change has made it worse but climate change doesn't start a

12   fire. Drought made it worse. Drought doesn't start a fire.

13         All these people are moving out there, yeah, that's true.

14   They should have metal roofs. We should do a lot better job on

15   thinning the forest. That's all true.

16         But none of those things are starting the fires; and if

17   I'm reading this data right, and we studied it pretty hard, 14

18   of the 17, trees falling on the lines, it's the single-worst

19   problem is the vegetation management on distribution lines, not

20   so much on transmission but on distribution.

21         That, to me, is where we've got to say this has got to

22   stop. If you don't act on this, it's going to continue, and I

23   mean act in a serious way as opposed to just more mitigation.

24   More mitigation is, like, "Okay. We'll do a 10 percent better

25   job." No, it's got to be an extremely strong surge of

1  resources going in to trying to figure out what the main

2  problem is and addressing that.

3      Now, you're the experts.  I'm just an interloper.  I would

4  have nothing to do with this except that I happen to be the

5  judge on the probation, but I feel a responsibility after two

6  years of this to step in and do something if somebody else

7  doesn't.

8      All right.  I'm sorry.  I'll give you the last word and

9  then I'm going to be quiet.

10      **MS. HAMMOND:**  Sure.

11      Your Honor, the Commission has galvanized its staff to

12  really focus on wildfire mitigation and prevention and these

13  rule makings that are mentioned in our comments.

14      Mitigation is actually action.  It could be comprised of,

15  and SB 901 lays that out and it's not a complete list, but it

16  could be comprised of, say, fire hardening, activities such as

17  installation of steel poles, covering conductor, more

18  aggressive vegetation management plans.  These are very

19  concrete actions.  What the CPUC would expect to see as well is

20  a work plan that lays it out with timelines to achieve certain

21  results.

22      And the mitigation plans are also informed by actual data.

23  This is -- these are firestorms that -- you know, they're

24  pretty -- they're unprecedented in California, and we continue

25  to get better and get more information.  We collaborate with

1   Cal Fire, the local fire chiefs, mayors, counsel members.

2       And these mitigation plans have to be updated every year

3   to build on those improvements; but in reality, the mitigation

4   plans are based on actual actions and timelines and, as

5   Cal Fire has mentioned, there will be inspections and there

6   will be audits.

7               **THE COURT:**  Okay.  Thank you.  Thank you for coming.

8               **MS. HAMMOND:**  Thank you.

9               **THE COURT:**  Did either of you two want to say

10  something?  I'm happy to hear it if you would like to add

11  anything.

12                          (No response.)

13              **THE COURT:**  Okay.  Thank you.

14      All right.  Mr. Pitre, where are you?

15      Now just one of you come up.  I don't need all three of

16  you.

17      And I want you to know I don't want you to come up here

18  and make a pitch that I somehow interfere with the bankruptcy.

19  If that's your agenda, I don't want to hear from you.  All I

20  want to hear about is what you can tell me about vegetation

21  management and de-energization; and if you have some other

22  great insight into what's causing this problem and what the

23  evidence shows, I'd love to hear that, but please don't try to

24  get me to do an end-run around the bankruptcy just because your

25  case has been stayed.  So I hate to be that blunt, but I need

1    to -- I want to make that very clear.

2       All right.  Please go ahead.

3       **MR. PITRE:**  Thank you, Your Honor.  I appreciate the

4    Court being blunt.  I intend to be blunt and I'm not going to

5    advocate.  I'm going to try to give the Court solutions because

6    we're here today for solutions.

7       **THE COURT:**  Go ahead.

8       **MR. PITRE:**  I serve as co-counsel for the North Bay

9    fires in the state court case.  I've had the benefit of a lot

10   of discovery in the Butte fire case.  That's different from

11   what we're calling the Camp fire that occurred in Butte County.

12   And there are a lot of lessons learned by having taken scores

13   of depositions and reviewing thousands of documents in both

14   cases.

15      What I say to the Court today is my good faith belief of

16   the problems at least that I have identified that may be cured

17   I think simply.  Some are short-term solutions, others are

18   long-term.

19      The first thing I would like to comment on is this Court's

20   observation that right now there are serious problems with the

21   way PG&E conducts its risk management activities in identifying

22   hazard trees.  A stopgap is needed immediately because it takes

23   some time to fix those problems.

24      What can be done in the short term is de-energization and

25   a solid policy.  We have heard that there are complexities with

so-called de-energization.  I disagree.  San Diego Gas and
Electric has had a de-energization policy since shortly after
the 2007 wildfires that they suffered.  It has been adopted and
used since 2010.  There has not been a single wildfire.
San Diego Gas and Electric and their policy and practice on
de-energization has been viewed as a gold standard.

So if we want to do something immediately without a lot of
tinkering, my opinion would be why not adopt the San Diego Gas
and Electric policy right now.  If there are improvements that
PG&E sees from the San Diego Gas and Electric policy that can
be done right now, let's do it.  That can be done to prevent
yet another wildfire while we're curing what I want to call the
real cancer, which is risk management.

**THE COURT:**  Stop.  Just a second.  How does San Diego
deal with the various problems that counsel mentioned, such as
the garage door won't open so they can't get their car out?
Just take that one.  How does San Diego deal with that problem?

**MR. PITRE:**  Sure.  Effective warning systems.

Right now from information that PG&E had provided to the
CPUC immediately after the 2017 fires, it was revealed that
PG&E has sophisticated weather monitoring stations.  That was
their description.  Those weather monitoring stations use
information from the National Weather Service together with
their own data that serve as predictive models as to when wind
is going to hit and where.

1    They began monitoring the conditions for the 2017

2    October 8th fire as early as October 5th.  They had known that

3    high winds were going to hit.  They knew exactly which counties

4    that the winds were going to hit in.

5         **THE COURT:**  When you say "they," you mean PG&E?

6         **MR. PITRE:**  PG&E, yes.

7    They have something called an Emergency Operation Center

8    that was active then, and that Emergency Operation Center

9    monitored wind conditions literally on a 24/7 basis beginning

10   on the Friday before the Monday fires.

11        So from the information that was available, warnings could

12   be issued to the public as early as three days in advance that

13   there is going to be a power shutdown and it's going to occur

14   on a certain date and it's going to occur during certain hours.

15        Now, those systems could be modified as time goes on, but

16   it gives early warning and gives people a chance to do things.

17   For example, if you're a hospital, to begin to prepare for any

18   patients that might need to be moved.  If you're in a

19   convalescent home or a retirement home and there are elderly

20   and they need to make accommodations, it gives them an ability

21   to have a plan in place so that when the power is shut down,

22   there isn't going to be all of the issues that were raised by

23   PG&E as impediments.

24        Now, certainly if things change dramatically and it's a

25   24-hour warning system, you still have an opportunity like a

1  hurricane or any other adverse event where warnings are issued,

2  they're given to areas, people vacate that area if they have to

3  vacate the area; but an effective warning system goes along

4  with weather prediction models that can be used to minimize the

5  impact on the public.  And I think that needs to be explored.

6        **THE COURT:**  Now, are you -- how do you know this stuff

7  about San Diego?  Have you gone down there and looked at their

8  system, or why do you know so much about the San Diego system?

9        **MR. PITRE:**  Well, some of the information is publicly

10 available because they went -- San Diego Gas and Electric went

11 to the CPUC, submitted their plan for how it was going to work,

12 and got approval from the CPUC back in 2010.  I could be wrong

13 on the dates, but that was the process.  So we're able to look

14 at at least the plan that was submitted.

15     What I don't know are the intimate details of their

16 weather monitoring systems and what they use as their

17 predictive models.  Those can be unique.  They may differ, but

18 the essence of the program, a system to shut off the power

19 because you get no spark if you have no power.  That's the

20 essence and warning.  Those are the component parts.

21     We, meaning the lawyers who are intimately familiar with

22 this, would be happy to meet with the CPUC, to meet with PG&E,

23 and to begin that groundwork to agree on a system that can be

24 used that would be automated.  Take out a lot of the discretion

25 that's in it.  Get it automated.  Use the most conservative

1  assumptions on what are the conditions going to be to shut down

2  the power.

3       What do you need to know?  Red flag warnings.

4       What do you need to know?  Low humidity.

5       What do you need to know?  Potential wind gusts.

6       What do you need to know?  What areas.

7       So there is a way to do it, Your Honor.  It's not rocket

8  science.  There will be imperfections, but right now what is

9  needed, in my humble view, is a system that says if we can't

10  get our risk management under control regarding tree and line

11  contact, then let's have a system that protects the public.

12  Get the risk to zero and the risk can go to zero if there is no

13  power to spark a fire.

14       **THE COURT:**  In San Diego have people complained about

15  the power turnoff?

16       **MR. PITRE:**  I'm sure they have, Your Honor.  I don't

17  have statistics on it.  I'm sure they have.

18       **THE COURT:**  How about has anyone suffered death as a

19  result of not having electricity?

20       **MR. PITRE:**  Not to my knowledge.  There has not been a

21  single incident since that policy and practice has been in

22  place.

23       **THE COURT:**  You say not to your knowledge, but

24  maybe -- how good is your knowledge is what I'm trying to get

25  at.

1    **MR. PITRE:** Pretty good, Your Honor. We've been

2    working on this for quite a while, since the beginning of when

3    the North Bay fires started in October of 2017, and we've tried

4    to scour as much information as we could that was publicly

5    available.

6           **THE COURT:** Did I hear you right, that since San Diego

7    Gas and Electric has adopted this program, there have been no

8    wildfires at all in San Diego? At least started by the

9    utility.

10          **MR. PITRE:** Not to my knowledge, Your Honor.

11          **THE COURT:** Well, but, again, not to your knowledge.

12          **MR. PITRE:** The information that I have that has been

13   gathered that is publicly available says there have been no

14   wildfires.

15       Now, they may have -- there may have been a start of a

16   wildfire that they got on right away, but the way that they

17   classify wildfires is to take a look at how much damage was

18   done. So if you have something like one acre or less, they'll

19   list it as a wildfire but it doesn't rise to the level of a

20   catastrophic wildfire. So there may have been fires but they

21   weren't wildfires.

22          **THE COURT:** Doesn't San Diego also have to submit

23   reports if they start a fire?

24          **MR. PITRE:** Yes, they do, Your Honor.

25          **THE COURT:** So have you reviewed those reports?

1          **MR. PITRE:**  I tried to review just about every report.

2   I could not find any.

3          **THE COURT:**  Find?  What do you mean?  You couldn't

4   find the reports or you couldn't find any that showed a fire?

5          **MR. PITRE:**  I could not find any that showed a fire.

6          **THE COURT:**  Let me -- would the representative of the

7   CPUC come back up here, please?

8       Thank you for coming back.  Mr. Pitre has raised an

9   interesting point.  He says that in San Diego, San Diego Gas

10  and Electric has not started any wildfires since they have the

11  de-energization program down there.  What do you have to say on

12  that subject?

13         **MS. HAMMOND:**  Your Honor, this is one of our program

14  managers in the Safety Division, Charlotte TerKeurst.

15         **THE COURT:**  Okay.  Welcome.  Please, do you know the

16  answer?

17         **MS. TERKEURST:**  I think it depends on what you -- as

18  the gentleman mentioned, what you define as a wildfire.  They

19  have certainly had fires that have started due to their

20  facilities.  None of them have escalated to the point of being

21  catastrophic.

22      I shouldn't say that categorically.  I would need some

23  time to go back and check our databases because we do have

24  incidents where they have reported that fires have begun.  I'd

25  have to make sure that there has not been significant damage,

1  first of all, to find that; but there have not been any

2  fatalities, I agree.

3      THE COURT:  Do you know how many times San Diego Gas

4  and Electric has turned off the power?

5      MS. TERKEURST:  We do know that, and all of that is on

6  our website.  I believe we could probably give you some rough

7  estimates today, but it is all publicly available information

8  on our website.

9      THE COURT:  Well, maybe you can submit a letter or

10 something to me afterwards.

11     But is it true that there have been no wildfires, say,

12 beyond one acre?  And is it true that -- how many times have

13 they actually turned off the power?  And what has been the

14 public's reaction to it?  Does the public accept it or does the

15 public growl about it?  You know, what -- and how have the

16 inconveniences -- that's maybe too mild a word, but how have

17 those inconveniences been dealt with?

18     MS. TERKEURST:  The public -- some members of the

19 public have growled about it, and we've had meetings with some

20 of them who have come to our offices and we've made field

21 trips -- some people have, I didn't go, but some people have --

22 to their areas to talk with them and the local communities

23 about the issue of balancing.  You know, that comes up a lot.

24     THE COURT:  Is there wind temperature -- not

25 temperature -- the wind speed that triggers a de-energization

1  in San Diego, what is the formula they use down there?

2         **MS. TERKEURST:**  It's a case-by-case determination

3  because there are many factors that go into play.  It's not

4  something that can be reduced to a simple formula.

5         **THE COURT:**  Well, what is the formula?

6         **MS. TERKEURST:**  Well, there is no formula.  There's a

7  number of factors that they take into account.

8         **THE COURT:**  Like what?

9         **MS. TERKEURST:**  And it's -- you may be better prepped

10  to answer that.  I'll turn this over to Lee Palmer.

11        **THE COURT:**  Sure.  What are the factors they consider

12  in San Diego?

13        **MR. PALMER:**  Your Honor, Lee Palmer, Deputy Director

14  SED.

15     So the factors they look at are going to be humidity,

16  population centers.  They're also going to be looking at

17  obviously wind speed.

18     But what San Diego Gas and Electric has, and I've been

19  down there to see it, is a very unique weather center.  They

20  have cameras throughout their entire service territory that are

21  attached to weather stations, and who has control of those

22  cameras are the local fire departments.  I might be misspeaking

23  the local fire departments.  Fire departments have control over

24  that camera.  During one of my visits down there, actually a

25  spot fire did happen and actually showed up on that camera.

1        So they have very good eyes on their actual --

2                **THE COURT:**  What did they do when they saw the spark?

3                **MR. PALMER:**  The fire department came out.

4                **THE COURT:**  And how far did the fire get?

5                **MR. PALMER:**  Not very far.  It was very small.

6                **THE COURT:**  But did it actually start the grass on

7        fire?

8                **MR. PALMER:**  Smoke.  It was just smoke at that time.

9                **THE COURT:**  Uh-huh.

10               **MR. PALMER:**  So they look at all of those factors.

11       All the utilities have had the ability to de-energize since

12       2010, I believe.  I may be off on the year.  What we came out

13       with this past year in ESRB-8 was a resolution that essentially

14       added further guidelines to the communication behind

15       de-energizing.  So when a utility decided to de-energize, what

16       they had to inform the public, when, how, et cetera.

17           With regards to your earlier question have there been

18       complaints or grumbling in the SDG&E territory, yes, in their

19       rural areas especially where when the power is turned off,

20       there's no store.  There's no refrigeration.  They're out there

21       in the middle of the desert.

22           So the train of SDG&E is obviously very different of that

23       than PG&E.  That's not to justify anything that's going.  It's

24       just there's other factors that go into de-energizing SDG&E

25       versus PG&E.

1           **THE COURT:**  How long does -- when San Diego turns off

2  the power, how long does it typically stay off?

3           **MR. PALMER:**  I'd have to get those facts for you.

4           **MS. TERKEURST:**  I can respond to that.

5    We just had one of our engineers do a tabulation, and the

6  first peak bit I will give you is for all de-energization

7  statewide.  The average outage time was -- for 2019 -- not '19,

8  we're just starting '19 -- 2017 and 2018, the average outage

9  time after a de-energization was 36 hours.  We also looked at

10  the maximum, that the longest outage was in a San Diego

11  de-energization and it was almost four days.

12           **THE COURT:**  So part of that time has to be that when

13  they turn the power off, then before they turn it back on,

14  they've got to travel the line to make sure a tree hasn't

15  fallen on it.

16           **MS. TERKEURST:**  Right.

17           **THE COURT:**  So you have to factor that in.  Even

18  though the wind may have died down, you've still got to make

19  sure the lines are safe; right?

20           **MS. TERKEURST:**  That's correct, yes.

21           **THE COURT:**  But even with that, you're saying the

22  average is 36 hours?

23           **MS. TERKEURST:**  Yes.

24           **THE COURT:**  So most refrigerators could stay cold

25  enough for 36 hours.  No?  Yes?  Right?  I mean, that's one of

1  the inconveniences, if you have to throw all of your stuff out

2  of the refrigerator because it spoiled.  But a refrigerator can

3  usually go a day and a half before you have to worry about

4  that; right?  Or do you know the answer to that?  I think you

5  can, so...

6       Okay.  You three, thank you.  You can go have a seat, but

7  I'm going to go back to Mr. Pitre.

8            **MS. HAMMOND:**  Your Honor, may I say something?

9            **THE COURT:**  Sure.  Of course.

10           **MS. HAMMOND:**  It's striking to me how much of this

11 discussion about de-energization and vegetation management are

12 precisely the things that we're talking about in our rule

13 makings, and we honor that Mr. Pitre and his clients are coming

14 forward to speak.  We also honor those voices in the CPUC rule

15 makings.

16      And we are required by law to hear not just victims'

17 voices but many, many voices; and that is a -- contained in an

18 orderly forum, to hear many, many different perspectives, all

19 of which have a right to weigh in on this really vital question

20 that has far-reaching consequences.

21      I just want to reiterate that.

22           **THE COURT:**  That's an excellent point.

23           **MS. HAMMOND:**  Yeah.

24           **THE COURT:**  But would you agree that we need a

25 strong -- we need strong medicine, is the way to put it, come

1  June 1 -- I mean, June 21?

2        MS. HAMMOND:  Absolutely.

3        THE COURT:  It has to be in place.  It can't be that

4  we're still talking about it or studying it.

5        MS. HAMMOND:  It will be.

6        THE COURT:  We've got to make a decision based on what

7  you do or I do or somebody, based on what the best evidence we

8  got, and we've got to make a decision and put some strong

9  medicine so we don't have a repeat of the last two years.

10        MS. HAMMOND:  Yes.  Yes, Your Honor.  And we do

11  believe that the strongest medicine will be this collection of

12  voices with drawing on the expertise of our sister agencies.

13        THE COURT:  Well, the two points that Mr. Pitre is

14  making, one is vegetation is a huge problem, and it may take

15  more than -- it's going to take more than one year to solve

16  that; but in the meantime he's saying de-energizing, as

17  inconvenient as it is, is better than death and destruction by

18  leaving the power on in a windstorm.

19        MS. HAMMOND:  We have --

20        THE COURT:  That's what he's saying, and to me I

21  actually agree with that.  To me that makes sense.

22        MS. HAMMOND:  It does make sense.  There's a lot of

23  truth to that.  There is also a lot of truth to many different

24  aspects of de-energization and wildfire mitigation, and all of

25  those factors have to be balanced, not just one perspective.

1    We did speak --

2         THE COURT:  But the thing about counsel said, "Oh, the

3    person can't get out of their garage"; but Mr. Pitre's answer

4    is "We give them three days' notice that the weather thing

5    looks like it's going to happen.  You better leave the garage

6    door open this time."

7         MS. HAMMOND:  So --

8         THE COURT:  So why isn't advance notification a pretty

9    good idea?

10         MS. HAMMOND:  So part of the vagaries of combating

11    these catastrophic wildfires in California is not all wildfires

12    are started by utility assets.

13    So imagine just one scenario out of many potential

14    scenarios that a utility decides to de-energize, and then some

15    of the consequences that the CPUC laid out in our comments

16    occur -- communication facilities go down, people cannot charge

17    their cell phones, water systems -- water pressure goes down at

18    the fire hydrants -- and theoretically a nonutility initiated

19    wildfire occurs, how do we get those messages out?  This is

20    just one more nuance that has to be considered.

21         THE COURT:  Yes, I agree with that, but Mr. Pitre's

22    answer would be:  Well, if you give them four days' notice,

23    they could charge up their cell phone and put it on airplane

24    mode maybe or get an alternative source of power to recharge

25    their cell phone like a battery, an extra battery.  I mean,

1 there are ways to deal with some of those things if you have

2 enough notice.

3     **MS. HAMMOND:**  I can't speak to folks who may not have

4 the resources or even cities and counties who have enough

5 resources to have enough charging stations.  We're talking

6 about impacts potentially to thousands if not tens of thousands

7 of people depending on the size of the de-energization.

8     **THE COURT:**  Yes, that's true.

9     Okay.  I thank you for your comments.

10    Mr. Pitre, I interrupted you.  I'm going to let you

11 continue.

12    **MS. HAMMOND:**  Thank you, Your Honor.

13    **MR. PITRE:**  Thank you, Your Honor.

14    And I would be pleased to submit to the Court something in

15 writing that outlines this for the Court and try to answer some

16 of the questions that the Court posed if the Court needs.  I

17 just want to make that available.

18    The second part that I'd like to talk about is the risk

19 management practices, and perhaps by illustration is the best

20 way to set up what I'm going to talk about.

21    In 2015 there was a fire that was referred to as the Butte

22 fire.  It involved a gray pine tree that grew very tall and had

23 a very narrow trunk.  Those trees are notoriously dangerous

24 because they're flimsy, skinny trunk, very tall.

25    It was among a stand of trees where the exterior trees had

1    been removed; and when you have one of these weak trees behind

2    trees that are in front of it, that tree usually doesn't get a

3    lot of sunlight. So after it grows, it grows in the direction

4    of the sun and in this particular case, it started to grow in a

5    weakened condition toward the line. The tree was tall enough

6    to hit the line.

7         The tree was amongst a class of trees, gray pines, that

8    were noted by internal memoranda of PG&E as early as 2012 that

9    they were amongst the most dangerous trees and the biggest

10    threat to their lines. By all accounts, the tree should have

11    been removed. Yet, the individuals who were hired by PG&E

12    because -- the way PG&E mitigates against the risk of a

13    wildfire is they use two forms of inspections: Ground

14    inspections, patrols, people who go out there and look at the

15    tree, assess the tree's vulnerabilities, determine if the tree

16    is a hazard, and then the inspectors identify the tree for

17    removal or trimming. Other people come in, other independent

18    contractors, to actually do the work. So we're focused right

19    now on inspections of trees.

20         **THE COURT:** Are the inspections by PG&E employees or

21    contractors?

22         **MR. PITRE:** Contractors, Your Honor.

23         So the issue is: How well do we train those people who

24    are doing the inspections? That's number one. Number two, are

25    they properly qualified?

1    In the case of the Butte fire, it was determined that the
2    several ground inspections in the area that were all done in
3    advance of the tree failure people were either unqualified to
4    do the work of inspecting the tree; two, had not been trained
5    about the hazards of gray pines; three, did not utilize the
6    tools they had available to accurately measure the height of
7    the tree and because they eyeballed it, they underestimated the
8    height of the tree as being one that could contact the line.

9        So the question becomes --

10           THE COURT:  How tall was the line and how tall was the
11   tree?

12           MR. PITRE:  The tree, I believe, was 44 feet and I
13   believe the line was 40 feet.  So an additional 4 feet.
14   Significant difference.  The difference between a spark and no
15   spark.

16           THE COURT:  Well, but was it -- how far off to the
17   side was it?

18           MR. PITRE:  I can't remember the exact distance,
19   Your Honor.  All I know is that the tree, even if it fell, was
20   tall enough to contact the line.

21           THE COURT:  All right.

22           MR. PITRE:  The point of that illustration is if you
23   have policies and practices that say you have to remove gray
24   pines because they're a hazard, you have to remove trees with a
25   narrow trunk and real tall that could hit the line and are

1  vulnerable, if you have well-known that trees that are in the

2  interior of a stand and you remove exterior trees, they're more

3  vulnerable.  For people to do their job, they've got to be

4  trained.  They've got to know that information.  Indeed, the

5  individuals were not aware of that information.  That tells me

6  the individuals who are being relied upon to do the inspections

7  aren't trained.

8      So if I have all these policies, practices, and procedures

9  that say this is the way we mitigate the risk but if in the

10  actual execution the individuals lack the training or the

11  qualifications, then you have no risk management.  You are

12  given a false sense of how good your safety program is.

13      In my view, one of the vulnerabilities of PG&E's risk

14  management system is that there is nobody who properly

15  evaluates how well PG&E is executing -- or their contractors,

16  by the way, because those duties and responsibilities to

17  inspect are not nondelegable under the law -- there is no one

18  at PG&E who has a good handle on evaluating how well the

19  mitigation risk factor inspections is being conducted.  And,

20  therefore, PG&E --

21          **THE COURT:**  Say that last sentence again.

22          **MR. PITRE:**  Sure.  There is nobody -- I should say

23  there are people who are identified that are supposed to look

24  at how well PG&E is managing the risk including inspections;

25  however, the information that they are given is inadequate to

give them a real sense of how well they're performing in
inspecting those trees. Because if they don't go out and audit
the individuals who are doing the inspections to determine
whether they're properly trained and you're relying on those
same people who aren't trained, then you don't have an
inspection process. By definition, your mitigation control
inspection doesn't exist.

And that's the problem, that in a number of areas PG&E has
policies, practices, or information that is available but it's
not passed along. So they have underestimated the risk that
exists of trees that are hazards. It's a real problem.

A second factor that goes along with that is that PG&E
purports to have two different departments, a Quality Assurance
Department, Quality Control Department. Quality Assurance uses
statistical methods to sample how many trees were missed during
an inspection.

So His Honor had asked someone earlier, "What if I got the
monitor to go out there and do a random sampling and see how
well did these folks do in identifying trees that were
hazards?" To do a proper statistical sample, which I know
His Honor has heard lots of people who are statisticians and
how you do that, you need to have a statistical model that one
tells you how many trees are in that easement, how many trees
are potential hazards, and then be able to use how well the
people who have identified trees being removed; and then when

1    you do a second audit to see whether they got it right, whether

2    you can use that statistical sample to extrapolate into a

3    larger population.

4        So if there's missed trees in your sample and that says

5    that you've missed five or six trees, if you extrapolate it and

6    you say, "My God, 5 percent of the trees were missed," well,

7    that gives me information that if I extrapolate it, there are 5

8    out of 100 trees that can contact a line.

9        If you're flying an airplane and somebody says there's 5

10   times out of 100 that plane falls to the ground, you're not

11   getting on that plane, but you're going back and you're going

12   to look at that plane to determine whether there are any

13   defects that pose a safety risk.

14       The model they use based on the statistical expert

15   consultant we used out of U.C. Berkeley says that the model

16   used by PG&E to statistically evaluate the risk of hazard trees

17   contacting lines is bad and seriously underestimates the risks.

18       When PG&E gets back the results of the risk analysis, 2 to

19   3 percent of the trees out there could potentially contact a

20   line, they don't go back out and look for the trees they

21   missed.

22       I could go on, Your Honor.  In the interest of time, all I

23   want to advise the Court is that there are issues dealing with

24   the way risk is managed.  There are individuals at

25   U.C. Berkeley and Stanford.  They can help get in and provide

1   an independent review of what those problems are so that we can

2   help PG&E better able to understand the risk while we have what

3   I want to call that stopgap, de-energizing lines, while we're

4   working through these issues, while we're providing input to

5   PG&E.

6       Instead of relying on PG&E's own self-critical analysis,

7   we need to get other people into that process, take what we've

8   learned from prior cases, the lessons learned, identify the

9   issues, and get people in place to put together an appropriate

10  risk evaluation process.

11      **THE COURT:**  What discipline in academia?  Would it be

12  civil engineering?  Would it be electric power generation

13  engineers?  What kind of discipline is the discipline that

14  would have the most skill and insight into these problems?

15      **MR. PITRE:**  Well, there's an individual actually named

16  Professor Robert Bea at U.C. Berkeley who is an individual who

17  has examined what I call mass disasters all over the world, and

18  he brings an interdisciplinary team that includes not only the

19  engineering side, the business side, the human factor side.  So

20  it's an overall evaluation that deals not only with the way the

21  risks are calculated because it's a combination of both

22  business as well as engineering.

23      **THE COURT:**  But that sounds like he's your hired

24  expert.

25      **MR. PITRE:**  He was.  He was, Your Honor.

1          (Laughter)

2          **THE COURT:**  So he's biased.  So he's already -- he's

3      been compromised by being hired by you so I would have to have

4      somebody who is independent.

5          **MR. PITRE:**  I would be happy to sit down and get a

6      list of folks who are independent, work with the CPUC to get

7      the best brains we can to do this.

8          Judge, I'm not trying to get a litigation advantage.  I

9      don't want to counsel people anymore who have lost their homes

10     or lost loved ones.  I am interested in getting it right and

11     working with PG&E, not against them, for purposes of putting

12     together an appropriate risk management plan.  I just want to

13     make that clear, and I'm happy to submit that.

14         **THE COURT:**  All right.  You submit what you said in

15     writing, and I'm going to then let PG&E and everybody else

16     comment on it.

17         Okay.

18         **MR. PITRE:**  Thank you, Your Honor.  I appreciate the

19     time.

20         **THE COURT:**  All right.  Thank you very much.

21         All right.  PG&E gets to have the last word, and then

22     we'll see where we are.

23         **MS. HOFFMAN:**  Your Honor mentioned that San Bruno

24     might be --

25         **THE COURT:**  Oh, yeah.  I'm very sorry.  Yes,

1    San Bruno.  Let's hear from San Bruno.

2         Welcome.

3              **MR. ZAFFERANO:**  Good morning, Your Honor.  I'm Mark

4    Zafferano.  I'm the City Attorney and with me is Connie

5    Jackson, the now retired City Manager of the city.

6              **THE COURT:**  Welcome to both of you.

7              **MR. ZAFFERANO:**  And she was, of course, the City

8    Manager during the 2010 gas line explosion.

9              **THE COURT:**  Correct.

10             **MR. ZAFFERANO:**  So as the Court has indicated, the

11   city suffered a gas line explosion, and we understand that the

12   Court is here primarily interested in how to mitigate or

13   eliminate the risks of fires as a result of infrastructure in

14   the electricity side of the business.

15        The city's comment would be, in addition to thanking the

16   Court on behalf of its residents for all the time and attention

17   the Court has given to this topic, to indicate that the gas

18   transmission business is also inherently dangerous just as the

19   electricity transmission business is; and CPUC has recently

20   opened a new proceeding that you might have heard about having

21   to do with the potential safety and recordkeeping of that

22   transmission system.

23        So one of the city's interests is in ensuring that what

24   happened in San Bruno doesn't happen anywhere else.  And in

25   view of that, the city is closely monitoring this proceeding,

1  Your Honor, and the ongoing proceedings at the Public Utilities

2  Commission that are looking into that.  So we definitely do not

3  want either side of PG&E's activities to be overlooked.

4       I think the City Manager has a couple of comments she'd

5  like to make.

6            **THE COURT:**  Please.  All right.

7            **MS. JACKSON:**  Thank you.  I just have a quick

8  observation.

9       Earlier this morning there was talk about a time period of

10  eight years.  I believe that was a time period over which

11  trimming appropriate mitigation of vegetation might occur and

12  that that was a very long time.

13      It strikes me that we're talking about almost exactly the

14  same amount of time since the tragic explosion in San Bruno

15  eight and a half years ago now.

16      We're here today because the issues remain, the issues of

17  an appropriate culture and focus on safety.  There's a great

18  deal of expertise that's been demonstrated in this room today

19  brought together by Your Honor in your interest to make sure

20  that the job that you've been assigned and that the monitor has

21  been assigned is as expansive as possible.

22      Clearly it's time for all of the parties to come together

23  to focus on safety, to focus on solutions, not problems.  We

24  have gigantic problems, but it's time to focus on the solutions

25  and harness that joint expertise to see if we can't come to

1    something that makes sense.  Thank you.

2           **THE COURT:**  Thank you very much.

3           **MR. ZAFFERANO:**  Thank you, Your Honor.

4           **THE COURT:**  All right.  PG&E, you've heard a lot.

5    What would you like to say?

6           **MR. ORSINI:**  Thank you, Your Honor.  Kevin Orsini

7    again for PG&E.

8        I couldn't agree more with what the City Manager just

9    said.  PG&E is facing a fundamental problem.  The state is

10   facing a fundamental problem.

11       The PG&E that exists today is different than the one that

12   existed eight years ago and is different than the one that

13   existed two years ago.  It's a tremendously challenging time.

14   We need to fundamentally change.  The company understands that.

15   The CEO is here today to express that view.

16       We need in particular, the former City Manager said it at

17   the end of her statement there, we need everybody working

18   together to do that, and we thank Your Honor for this forum to

19   do it and we think it's critical that we continue having those

20   conversations.

21       The crisis nature of what California is facing brings

22   together a lot of different groups who would otherwise have

23   adverse interests.  You know, Mr. Pitre and I have spent a long

24   time in state court disagreeing on a lot of things, but there

25   are a lot of things he said today with which I and the company

1  completely agree.

2          **THE COURT:**  Like what?

3          **MR. ORSINI:**  Well, I think he made three basic points,

4  Your Honor.  I think the first one was that San Diego Gas and

5  Electric has a robust de-energization policy in place and PG&E

6  ought to get that in place too.  I couldn't agree more.  That's

7  exactly --

8          **THE COURT:**  Why don't you just adopt the San Diego

9  program?

10          **MR. ORSINI:**  Your Honor, in large part that's exactly

11  what we're doing.  We have benchmarked with them.  We've had

12  meetings with them.  The CPUC director mentioned the

13  sophisticated weather monitoring station they have that he's

14  visited.  We have visited that.  That has what has driven us to

15  make the investments in the additional weather monitoring

16  cameras and, as Your Honor called them before, windmills;

17  right?

18      Our program was directly modeled based upon San Diego's

19  program and based upon what the CPUC has said about that.

20  We've given them some ideas as to how they can enhance their

21  program based on what we're learning.

22      So what Mr. Pitre said has to be done, it's done.  It's

23  not perfect and he's absolutely right it can't be perfect, but

24  we are working with them and with the CPUC based on their

25  experience.

1         **THE COURT:** Well, is it true that San Diego has had no

2 more wildfires started by the utility as a result of this

3 de-energization?

4         **MR. ORSINI:** I don't know the answer to that question,

5 Your Honor. I'd have to check the data on that as well, and

6 I'm happy to do so. I don't want to give an incorrect answer.

7      You know, there are, of course, differences in our service

8 territories between us and San Diego. And that just -- it

9 doesn't mean we can't be doing it and shouldn't be doing it.

10 That's why we've designed it. But we serve a lot more

11 customers, and there would be a lot more impact from a

12 de-energization event for us than it would for them. Just

13 factors that have to be considered.

14      Let me just make a footnote because I think I misspoke

15 earlier. I referenced --

16         **THE COURT:** If we get into the e-mails, are we going

17 to find that when PG&E decides to leave the power on, they

18 considered profits?

19         **MR. ORSINI:** No, Your Honor, I don't believe so. Not

20 based on anything I've ever seen. Not based on anything I've

21 ever seen.

22      We -- you know, there is -- it needs to continue to be

23 refined, the de-energization program, and we're working on it

24 with San Diego.

25         **THE COURT:** Well, you're going to have -- you're going

1    to -- it will be done by February 6; right?

2            **MR. ORSINI:**  Yes, Your Honor.

3            **THE COURT:**  You're going to describe on February 6,

4    which is only a week away, you're going to tell the world what

5    your actual decision is; right?

6            **MR. ORSINI:**  Yes, Your Honor, and we've actually

7    described it publicly multiple times as well in a variety of

8    forums over the previous months.

9        My only point is what we describe on February 6th I don't

10   expect will be the same policy that's in effect on June 21st

11   because the whole point of describing it publicly is to get

12   more insight and more input.

13       You know, there's -- going back to the, you know, can't we

14   just turn it off.  And there's a difference between having all

15   of the factors that San Diego considers, which we're now

16   considering, to allow for the decision to be made based upon

17   all available data.  We do the sophisticated wind modeling.  I

18   described that earlier; right?  We look at the ingress and

19   egress.  It's not a simple formula as the CPUC said.

20       And every time there's a potential solution to that -- so,

21   for example, you had a conversation with Mr. Pitre about

22   notice.  We send notice and notice is a great thing.  The

23   problem is if you send the notices too often, people are going

24   to stop listening to them; right?  And that's why the criteria

25   have to be set at the right spot.

1          THE COURT:  But it seems like you're stretching to

2     find excuses for leaving the power on.

3          MR. ORSINI:  Your Honor, I'm absolutely not.

4          THE COURT:  You ought to just send a notice and people

5     will leave their garage door open and they'll take the spoiled

6     stuff out of there and the people that really need electricity

7     for their breathing machine will go get a generator so that

8     they have backup power.  There are make-do solutions but

9     they're all better than another catastrophic fire.

10         MR. ORSINI:  And, Your Honor, I apologize if

11    Your Honor's perception is I'm trying to make excuses to leave

12    the power on.  I'm not.  I'm simply saying, Your Honor, that

13    deciding to turn off the power has repercussions that affect

14    the community.

15         What we are doing is we're trying to adopt the experiences

16    that San Diego and others have had to make sure that we have

17    the best policy in place that we can to deal with all of these

18    issues.

19         THE COURT:  I think you should study it very carefully

20    but -- yes; but if it's worked well for San Diego, then that's

21    an excellent model to adopt with whatever minor variations are

22    needed for the larger territory.

23         MR. ORSINI:  I could not agree more, which is exactly

24    why that's precisely where PG&E started, by bringing their

25    model on board.

           **THE COURT:**  Let me ask you a different question
about -- as I was listening to all these comments and you said
earlier that you didn't have enough people who could cut trees,
there's a solution.  It's like what the U.S. Army would do.
PG&E brings in brand new people and you train them.

           **MR. ORSINI:**  And that's actually --

           **THE COURT:**  You train them.  You train them to do it.
You train the people to do the job that you've got to do.

           **MR. ORSINI:**  And, Your Honor, that gets to the second
point that Mr. Pitre made with which I agree.  I don't agree
with all of his characterizations, but what he was describing
was a program that was in place prior to October 2017.

      Mr. Pitre referenced the fact that some of the contractors
in his view were not adequately trained.  And it gets to the
point Your Honor just made.  Even if they're not currently
contractors, whatever they may be doing, we can train them up.
We're doing both of those.  We are bringing in-house --

           **THE COURT:**  You can bring in employees, not
contractors.

           **MR. ORSINI:**  And that's a big part of what we're
doing, Your Honor.  We are moving in-house as PG&E employees
these inspectors, these tree contractors.  It can't be all of
them, but there has been a dramatic shift in terms of the
contractor-versus-employee ratio for exactly these reasons so
that we have the ability to train them directly, so that we

1   have the ability to do the quality control on them, so that we

2   have the ability to make sure that they're doing it correctly

3   out there.

4       Because Mr. Pitre said if they're not trained properly,

5   they're not going -- the inspection isn't going to be worth

6   much.  Well, that's exactly why we need to bring them in-house

7   and that's exactly why we're training them.

8       So, again, couldn't agree more on that.  There are, of

9   course, limitations to how many people you can bring in versus

10  contractors, but we are very much focused on that precise issue

11  of making sure that we can bring in the people so we control

12  them and we can train people who haven't done it ever before so

13  we can get more people out there.

14      The other piece of that is making the decision point on

15  what has to get removed easier; right?  Anytime there's

16  subjectivity -- and I believe that's the word Your Honor used

17  earlier with respect to the overhang issue -- anytime there's

18  subjectivity, you introduce a higher risk of error; and so some

19  of the enhanced programs that I was talking about before are

20  designed specifically to get at that issue of subjectivity, not

21  is the tree that's overhanging in the high-wire wildfire threat

22  district a risk based upon an analysis by an inspector out in

23  the woods looking at it.  Cut it down; right?  Just cut --

24  don't do that analysis.  Just cut it down.  That's why we have

25  the program that's being rolled out to take out that overhang.

1    Same thing with the hazard trees.  Don't leave it to

2    somebody to make a determination as to whether or not this

3    particular eucalyptus tree is a high risk.  The data shows us

4    eucalyptus trees are risks so the plan is we go take them out;

5    right?  By bringing the people in as employees, by taking the

6    subjectivity out, you help decrease the margin for error.  So

7    we completely agree on that.

8         And then I think that leads to the third point that

9    Mr. Pitre made, which I completely agree with.  We are very

10   open to their views.  We are very open to the monitors.  We're

11   open to, you know, looking at experts and having conversations

12   with experts in the field about how PG&E can do a better job of

13   this.

14        PG&E doesn't want to do it alone.  PG&E can't do it alone.

15   We want to have the conversations with the communities and the

16   experts so that we can find the best solution.  If there's a

17   better idea out there than what's been developed with respect

18   to the power safety -- the public safety power shutoff

19   de-energization, we want to hear it.  We want to hear it before

20   June 21st when we want to implement it.

21        **THE COURT:**  Not just a better idea.  It has to be one

22   that is going to work and stop the fires from the utility.

23        **MR. ORSINI:**  And, Your Honor, that's --

24        **THE COURT:**  Not just mitigate, not just make it a

25   little better, but eliminate the problem.  That's what we ought

1   to be hoping for here.

2          **MR. ORSINI:**  And that is 100 percent what we're hoping

3   for as well, Your Honor.  I don't think we need to get into the

4   legal arguments about the order and its scope.  It's in our

5   papers.  We can answer questions.

6        But ultimately we agree with Your Honor's goal.  We think

7   that Your Honor's goal of trying to eliminate the risk is

8   exactly what we all need to be working towards.  Respectfully,

9   we think that is occurring in the regulatory arena and we

10   welcome -- because this has been a useful conversation just for

11   me personally to listen to and I'm sure everybody else in this

12   room, we welcome further conversations with our monitor and the

13   Court as those processes continue.

14          **THE COURT:**  All right.  Thank you.

15          **MR. ORSINI:**  Thank you, Your Honor.

16          **THE COURT:**  Any of the other people who've spoken want

17   to say anything more?

18                  (No response.)

19          **THE COURT:**  Any other member of the public who wants

20   to say something?  Yes, sir.

21          **MR. CAMPORA:**  Your Honor, my name is Steve Campora and

22   I also represent fire victims.

23        One question, Your Honor.  Just one question I want to

24   tell you.

25          **THE COURT:**  All right.  Go ahead.

1          **MR. CAMPORA:** One way to fix this --

2          **THE COURT:** Wait. Wait. Come on up here. The court

3   reporter has to hear you.

4          **MR. CAMPORA:** I can give you a list of items we

5   discovered but one item I can tell you. In 2016 PG&E carried

6   over 6,000 hazard trees from one fire year to the next, trees

7   they had identified and didn't fix, trees they knew were a

8   threat to their line that they did not repair, did not take out

9   and carried into the 2017 fire year. There are other ones. I

10  can give you deposition testimony.

11         **THE COURT:** Were any of those the ones that caused the

12  fires?

13         **MR. CAMPORA:** They don't know the answer to that

14  question, Your Honor. I asked that question. I asked where

15  those trees were located, and I was told they didn't know by

16  the person most qualified.

17         **THE COURT:** Well, you can do this, you can submit a

18  brief too that lays out the evidence to support what you just

19  said.

20         **MR. CAMPORA:** I'm happy to do that.

21         **THE COURT:** That would be very useful.

22         **MR. CAMPORA:** Thank you, Your Honor.

23         **THE COURT:** Okay. Anyone else?

24                        (No response.)

25         **THE COURT:** All right. So I've got a few concluding

1  comments.

2      Cal Fire and the Attorney General's Office will submit the

3  brief on the meaning of 4293 for me. I think that's very

4  important to know whether overhanging trees that are hazards

5  are covered or not. To my mind, they are but I could be wrong.

6  It's a state law question.

7      The next question, just so everyone will keep in mind that

8  we are here on a probation aspect and that the judge under the

9  law has the authority, without any kind of a violation, but has

10 the authority to impose additional conditions of probation on a

11 company when necessary to ensure that changes are made within

12 the organization to reduce the likelihood of future criminal

13 conduct and/or, when necessary, to accomplish one or more of

14 the purposes of sentencing.

15     So that's what I need to decide and whether or not what

16 additional condition, if any, would fit that requirement. I'm

17 not going to make a decision on that now because of a couple of

18 things.

19     I think it's very important to wait and see what

20 February 6 brings and read the plan. I don't know if I can

21 wait all the way to May for the CPUC to make its determination,

22 but I do want to see what the mitigation plan is that PG&E

23 submits.

24     Can you submit that to me whenever you submit it to the

25 PUC?

1       MR. ORSINI:  Yes, Your Honor.

2       THE COURT:  And that ought to be a public document.  I

3  assume it's going to be a public document; is that right?  I

4  want to make it public.

5       MR. ORSINI:  I believe so, Your Honor.  I'm looking to

6  the --

7       THE COURT:  I want it to be public so that the public

8  can comment on it.

9       So it could be that after reading that plan and after

10  considering everything, I might say, "Well, look, PG&E has it

11  all well in hand and there won't be anymore PG&E started fires

12  this year."  It could be that I decide that something that

13  should -- some more conditions are in order.

14       Now, a different -- so I'm not going to impose anything

15  today but we're going to have further hearings on this yet to

16  come, and I may reformulate.  I'll give you some thoughts on

17  that.

18       One simple thing would just be to say PG&E shall not start

19  another fire.  That would be -- but maybe that's too simple.

20  Another would be to say you must comply with 4293 of the Public

21  Resource Code, fully comply.  Another would be that you need to

22  adopt the San Diego system for de-energizing.  Those are all

23  possible ideas that I'm thinking about.

24       So Mr. Pitre will file his brief in a week.  Will that

25  work?

1    **MR. PITRE:**  Yes, Your Honor.

2    **THE COURT:**  And then the AG and Cal Fire within a

3    week.  Will that work?

4    **MS. WELCHANS:**  Yes, Your Honor.

5    **THE COURT:**  Okay.  And then if anyone wants to respond

6    to that, that would be okay too.

7    And then I would appreciate comments from all parties on

8    what the mitigation plan is; and maybe two weeks after the

9    mitigation plan is filed will the U.S. Attorney's Office and

10   anyone else who wants to comment on it, please -- I know CPUC

11   cannot comment on it because you're evaluating it as the rule

12   maker so you wouldn't be able to do this, but anyone else who

13   would want to make a comment on it, I would welcome that.

14   One other thought, and this is -- you don't have to

15   respond to this, Ms. Hoffman, nor the AG's Office.  But

16   Cal Fire referred 11 of these cases for possible prosecution.

17   One possibility would be for the -- if the -- thinking out

18   loud -- for each individual County District Attorney to make a

19   decision on whether to prosecute; another would be for the

20   State Attorney General to bring one omnibus proceeding

21   somewhere; and another one would be for the U.S. Attorney's

22   Office to file a Form 12, bring in the Cal Fire witnesses.

23   They can rely on hearsay in a Form 12.  It would be pretty

24   clean maybe.  I don't know.  We'd have to see.

25   So I put those out there because I think the public ought

1   to know whether or not PG&E committed criminal acts in the way

2   it handled these 11 cases in one month in 2017.  Now, Cal Fire

3   hasn't even made its findings known on 2018, but we're just

4   talking about 2017.

5       That's for you.  That's your prosecutorial discretion, but

6   that is something that maybe you would consider.

7       You know, I know everyone in this room agrees with it,

8   even I believe the PG&E people are sincere on this, in my 50

9   years in California -- almost 50, not quite -- the last two

10  years of wildfires have been the single-worst catastrophic

11  events that I've seen and all those people died up there in

12  Butte County but a lot of other people died too under horrible

13  conditions.  In two years, 3 percent of California burned up.

14  Think about that.  3 percent of the whole state burned up.

15      We cannot continue to sustain this kind of catastrophic

16  injury to the state, death and destruction.  PG&E is not the

17  only source of these fires but it is a source, and it's really

18  to most of us unthinkable that a public utility would be out

19  there causing that kind of damage in even 10 percent of it.  We

20  have to solve that problem.

21      So that's the issue on the table for the CPUC, for

22  Cal Fire, maybe for me as the judge in the probation case.  If

23  I was writing that plan and I was PG&E, I would commit to some

24  very strong things and not just platitudes and not just use

25  words like "We're going to mitigate."  I would be writing that

1   plan to solve this problem for the good people of the state of
2   California.
3        Any other things -- any other comments or things that we
4   can take up today?  Otherwise I will let you know when the next
5   hearing is, and I will look forward to reading your briefs.
6   Anything more?
7             **MS. HOFFMAN:**  Nothing from the Government, Your Honor.
8             **MR. SCHAR:**  No, Your Honor.
9             **THE COURT:**  I want to thank -- is it Mr. Simon?
10            **MR. SIMON:**  Yes.
11            **THE COURT:**  I know it's not easy sitting there and
12   listening about all this about your company.  I know it's hard.
13   So thank you for being a good citizen and being here to hear
14   this out.  I appreciate your coming today.
15            **MR. SIMON:**  Thank you, Your Honor.  I've listened
16   carefully and I'll take your points back.
17            **THE COURT:**  Excellent.
18        Okay.  We're in recess.
19                    (Proceedings adjourned at 12:09 p.m.)
20                         ---oOo---
21
22
23
24
25

```
 1
 2
 3                    CERTIFICATE OF REPORTER

 4          I certify that the foregoing is a correct transcript

 5  from the record of proceedings in the above-entitled matter.

 6

 7  DATE:    Thursday, January 31, 2019

 8

 9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```