WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C.
(ray.schrock@weil.com) (*pro hac vice*)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>        **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11 (Lead Case)<br>(Jointly Administered)<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 365(a), FED. R. BANKR. P. 6006, AND B.L.R. 6006-1 FOR AN ORDER APPROVING THE UTILITY'S ASSUMPTION OF CERTAIN AGREEMENTS WITH QUANTA ENERGY SERVICES, LLC ("QUANTA ASSUMPTION MOTION")**<br><br>Date: April 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>    Courtroom 17, 16th Floor<br>    San Francisco, CA 94102 |

PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to section 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6006(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6006-1 of the Bankuptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), for an order approving the Utility's assumption of certain contracts with Quanta Energy Services, LLC and its affiliated companies (collectively, the "**Quanta Companies**"), pursuant to which the Quanta Companies provide critical infrastructure services that support the safety and integrity of the Utility's electric and gas systems and are essential to the timely completion of the Utility's Wildfire Safety Program (as defined below).

In support of the Motion, the Debtors submit the Declaration of Steve Coleman (the "**Coleman Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Bankruptcy Local Rule 5011-1(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and, together with the Creditors Committee, the "**Committees**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of the First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**").

## III. THE WILDFIRE SAFETY INSPECTION PROGRAM

As part of the Utility's ongoing efforts to implement additional precautionary measures, and consistent with certain legislative and judicial directives, the Utility is performing accelerated safety inspections of electrical infrastructure in high fire-threat areas. This work, which is being conducted in addition to the routine inspections and maintenance conducted by the Utility, is intended to further reduce the threat of wildfires and is being performed on an accelerated basis as part of the Utility's Wildfire Safety Inspection Program (the "**Wildfire Safety Program**"). In connection with the Wildfire Safety

Program, the Utility is conducting a comprehensive inspection of electric towers and poles in high fire-threat areas, which requires, among other things, ground inspection of electric poles by qualified linemen, climbing inspections of transmission towers by professionals, and aerial inspections using helicopters and drones to further enhance and complement visual inspections. The Utility is working diligently to complete these inspections prior to the 2019 wildfire season, an effort that requires the Utility to contract with third parties to supply a large-scale skilled labor force, including qualified electrical workers, and specialty equipment.

Since November 2018, the Utility has contracted with the Quanta Companies to provide labor and equipment in support of the Wildfire Safety Program. To perform their work under these agreements, the Quanta Companies have deployed over 1,100 skilled craft labor and almost 1,000 pieces of specialty equipment to the Utility's service region, including multiple types of bucket trucks, flatbed trucks, service trucks, pickup trucks, mechanics trucks, trailers, cranes, diggers, utility task vehicles, and other equipment necessary for the extensive work. The total value of the equipment deployed by the Quanta Companies thus far at the request of the Utility is in excess of $200 million. In addition, sixty professionals from the Quanta Companies have been working as part of the Quanta Program Management Team in support of the Wildfire Safety Program, including Project Managers, Assistant Project Managers, Field Engineers, Safety Directors, Field Coordinators and others. This team of professionals is further supported by additional employees of the Quanta Companies from across the United States and from Canada who are involved in the Wildfire Safety Program.

Through their work with the Utility, the Quanta Companies have acquired an understanding of and familiarity with the Utility's operations that enables them to perform high quality and cost-effective work in a manner that is responsive to the immediate needs of the Utility. In addition, the Quanta Companies have a strong business relationship with the Debtors' International Brotherhood of Electrical Workers ("**IBEW**") partner – Local 1245, which enables the Quanta Companies to facilitate a mass mobilization of over 900 IBEW craft labor electrical workers to the Utility's service territory to assist with critical work related to its transmission equipment and systems in response to wildfires. Based on the Utility's experience, other than the Quanta Companies, there are few, if any, companies that have the capacity and resources to invest in, mobilize, and deploy the magnitude of skilled craft

labor, professionals, and specialty equipment the Utility requires to implement the Wildfire Safety Program, especially on an accelerated basis.

## IV. THE QUANTA CONTRACTS

The Quanta Companies are party to a number of contracts with the Utility; however, the Utility is only seeking approval to assume two specific contracts pursuant to this Motion, which are of immediate consequence to the Utility's transmission systems and the work being conducted in connection with the Wildfire Safety Program: (i) the Transmission Inspection Agreement, dated as of December 20, 2018 (the "**TIA**"), and (ii) the Cross Cut Agreement, dated as of March 26, 2016 (the "**CCA**" and, together with the TIA, the "**Quanta Contracts**"). Copies of the Quanta Contracts are annexed hereto as **Exhibit B** and **Exhibit C**, respectively.[1] As of the Petition Date, the Utility owed a total of approximately $158.2 million in the aggregate for unpaid and outstanding prepetition amounts under all of its agreements with the Quanta Companies.[2] As noted above, however, the Utility is not seeking approval pursuant to this Motion to assume all of its existing contracts with the Quanta Companies; rather, the Utility is only seeking approval to assume the TIA and CCA, under which the Utility owes a total aggregate amount of $116,103,954 for unpaid prepetition amounts (the "**Cure Amount**").[3] Each of the Quanta Contracts is discussed in further detail below.

### A. The Transmission Inspection Agreement

The Utility entered into the TIA with the Quanta Companies in December 2018 to provide labor and services for the electric transmission system component of the Wildfire Safety Program, which covers both the inspection and, as necessary, the repair of approximately 50,000 electric transmission structures – roughly 35,000 poles and 15,000 lattice towers. Pursuant to the TIA, the Quanta Companies'

---

[1] Certain commercially sensitive information in the Quanta Contracts relating to overhead and cost structures has been redacted at the request of the Quanta Companies. A motion to redact has been filed contemporaneously herewith. Unredacted copies will be provided to the U.S. Trustee and counsel for each of the Committees.

[2] This estimate includes approximately $20.6 million in prepetition costs and expenses that have not yet been invoiced and approximately $12.5 million that remains subject to ongoing reconciliation by the parties.

[3] Approximately $8.5 million of the proposed Cure Amount relates to cost and expenses that have been incurred by the Quanta Companies prior to the date hereof, but for which invoices have yet to be submitted or for which the invoiced amounts are subject to ongoing reconciliation by the parties. The Debtors will continue to work with the Quanta Companies to reconcile such amounts up to and including the date of the hearing on this Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

workforce, after completing extensive training, inspects the structures for evaluation of the strength, durability, and quality of the Utility's electric transmission towers and poles. Data from all of the inspections is gathered by the Quanta Companies and analyzed by the Utility to prioritize necessary repairs based on urgency and potential risk. The TIA also covers repair work, as directed by the Debtors.

The Quanta Companies' current scope of work under the TIA for the transmission system does not authorize work beyond (i) $200 million in invoices or (ii) June 30, 2019. Because it was crucial that the inspection work be performed as quickly as possible so that necessary repairs could be initiated prior to wildfire season in California, the Utility and the Quanta Companies ramped up their efforts over the 2018 holiday season and through January 2019, moving over 800 workers into Northern California to conduct inspections and provide support. As a result of this effort, as of the Petition Date, the Utility owed $64,377,543 for unpaid and outstanding prepetition amounts under the TIA, and the invoice limit under the existing scope of work for the TIA has now been reached. The inspection process, however, is not yet complete, and the Utility also desires to expand the Quanta Companies' scope of work under the TIA to cover, among other things, the inspection of the Utility's substations, which is another crucial component of the Utility's fire safety efforts. This requested expansion would increase the work authorization cap by an additional $200 million, with the potential for additional increases in the future. The Quanta Companies, at the Utility's request, have continued to perform under the TIA; however, the Quanta Companies have indicated to the Utility that, in order to expand the scope of their work under the TIA, they need the legal certainty that the terms of this contract will be fully enforceable through assumption.

### B. The Cross Cut Agreement

The CCA consists of both a Master Service Agreement (the "**MSA**") that provides the general terms for the Quanta Companies' work and a series of Contract Work Authorizations ("**CWAs**") that contain the scope and specific terms for each project governed by the MSA. The CCA is an "Enterprise-Wide" contract between the Utility and the Quanta Companies that allows the Quanta Companies to perform crucial work for the Utility without the typical delay involved in dealing with multiple vendors. The CCA allows the Utility, in the event of future response, repair, and restoration work, to call on the full network of the Quanta Companies through additional CWAs under the CCA to

provide these critical services at the magnitude required. The CCA is critically important for the implementation of the Utility's programs that require large crews of trained electrical workers, such as the Wildfire Safety Program. To date, the Quanta Companies have worked on specific projects under the CCA regarding the safety and integrity of the Utility's electric and gas systems, including, without limitation, electric transmission inspection and repair, electric distribution engineering, underground cable replacement, gas distribution inspection and repair, high pressure regulator replacement, safety training and compliance, inspection services, and repair services. However, as with the TIA, the Quanta Companies have also requested that the Utility assume the CCA so that they can have certainty that the provisions of the CCA will be binding as they are called upon to take on new projects under that contract. The CCA is set to expire March 31, 2021. As of the Petition Date, the Utility owed $51,726,411 for unpaid and outstanding prepetition amounts under the CCA.

### C. Limitation of Liability Provisions

Both the TIA and CCA include provisions that limit the Quanta Companies' potential liability for work performed under the Quanta Contracts. Under the TIA, the Quanta Companies are required to cover the first $200 million of claims related to their work. For claims above this amount, the Quanta Companies have a right to indemnification from the Utility. Similarly, the Quanta Companies' liability is capped under the CCA at the greater of $10 million or 200% of the value of the CWA issued by the Utility for the work at issue. The Utility understands that the Quanta Companies would not have been willing to enter into either the TIA or the CCA, nor to perform the work needed for the safety and integrity and the Utility's infrastructure systems, without these critical limitation of liability provisions. Furthermore, the Quanta Companies have indicated to the Utility that, as they are called upon to significantly expand the scope of their work under the TIA and to take on new projects under the CCA, they need legal certainty their work is subject to these limitation of liability provisions for a number of business reasons, including their ability to obtain sufficient insurance coverage in connection with their work for the Utility.

## V. ASSUMPTION OF THE QUANTA CONTRACTS IS IN THE BEST INTERESTS OF THE UTILITY, ITS CREDITORS, AND ALL PARTIES IN INTEREST

The Utility seeks to assume the Quanta Contracts in order to ensure the continuation of critical infrastructure services that support both the safety and integrity of its electric and gas systems. As stated above, the work performed pursuant to the Quanta Contracts is critical to the implementation of the Wildfire Safety Programs, and consistent with legislative and judicial guidance. The Utility believes that continuation of the work under the Quanta Contracts is essential to its ongoing operations and to maintaining the integrity of its systems.

The Utility believes that the Quanta Companies are in a unique position to provide these vital services and cannot be easily replaced in a timely or cost-efficient manner. As stated, the Quanta Companies have established an integral relationship with the Utility and have acquired an understanding of and familiarity with the Utility's operations. This familiarity enables the Quanta Companies to perform high quality and cost-effective work for the Utility. Additionally, the Utility believes that few other companies have the capacity and resources that the Quanta Companies have to invest in, mobilize, and deploy the magnitude of skilled craft labor, professionals, and specialty equipment as is required in these circumstances. Not only can the Quanta Companies draw on resources from their numerous affiliated companies, but they have a good working relationship with the Utility's IBEW partner which facilitates the mass mobilization of skilled laborers that the Wildfire Safety Program work requires.

Further, as stated above, the Quanta Companies have already surpassed the dollar amount cap provided under the current scope of work provided in the TIA. The Utility needs to expand the scope of the work the Quanta Companies perform under the Quanta Contracts, and in order to perform that expanded scope of work, the Quanta Companies need the Quanta Contracts to be assumed so that they will have the certainty that their contract terms will be fully enforceable. As noted above, the Utility is not seeking to assume all of its existing contracts with the Quanta Companies at this time but rather is only seeking to assume the TIA and the CCA. The work currently performed by the Quanta Companies under these agreements, and the potential work under the contemplated expanded scope, are integral to the Utility's efforts to enhance the safety and integrity of its electrical transmission system and adhere to government regulations and directives.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## VI. BASIS FOR RELIEF REQUESTED

The Utility's assumption of the Quanta Contracts should be approved under section 365(a) of the Bankruptcy Code. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a).

The Supreme Court has defined "executory contracts" as contracts "on which performance remains due to some extent on both sides." *NLRB v Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984). The Ninth Circuit has described executory contracts in similar terms, describing them as contracts where "one party's failure to perform its obligation would excuse the other party's performance." *In re International Fibercom, Inc.,* 503 F.3d 933 (9th Cir., 2007) at 941, citing *Commercial Union Ins. Co. v. Texscan Corp. (In re Texscan Corp.)*, 976 F.2d 1269, 1272 (9th Cir.1992). The Quanta Contracts clearly fall within this definition. In each case, there remain material performance obligations of both the Debtors and the Quanta Companies under the Quanta Contracts.

Bankruptcy Courts generally "approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment." *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *Durkin v. Benedor*, 204 F.3d 1276, 1282 (9th Cir., 2000).

The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract will benefit the debtor's estate. *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014); *In re MF Glob. Holdings Ltd.*, 466 B.R. at 242; *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006)*; In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (where the debtor articulates a reasonable basis for its business decisions, courts will generally not entertain objections to the debtor's conduct). Furthermore, "[c]ourts generally will not second-guess a debtor's business judgment concerning whether an assumption or rejection benefits the debtor's estate." *In re MF Glob. Holdings Ltd.*, 466 B.R. at 242;

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Balco Equities Ltd., Inc.,* 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005). The Court should "presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir., 2007) (in the context of a motion to reject under section 365(a)). Only a decision which is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice" falls foul of the rule. *Id*.

As set forth above and in the Coleman Declaration, the Utility seeks to assume the Quanta Contracts to ensure the safe operation of their gas and electric systems and to continue to implement the Wildfire Safety Program, an effort that is consistent with judicial and legislative directives. These matters are fundamental to the continued ability of the Utility to operate its business in a safe and reliable manner, which, in turn, is fundamental to its ability to successfully reorganize. Under these circumstances and based on, among other things, the Quanta Companies' unique ability to perform these critical services, assumption of the Quanta Contracts clearly represents a sound exercise of the Utility's business judgment.

When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure these defaults. *See* 11 U.S.C. § 365(b)(1)(A); see also *Regen Capital I, Inc. v. Halperin (In re U. S. Wireless Data, Inc.)*, 547 F.3d 484, 489 (2d Cir. 2008). The Debtors, therefore, seek authority to cure any defaults under the Quanta Contracts, which the Debtors estimate to be in the aggregate amount of $116,103,954. Accordingly, for the reasons set forth herein and in the Coleman Declaration, the relief request in the Motion should be approved and the assumption of the Quanta Contracts should be approved.

**VII.  NOTICE**

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy

Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; (xii) the Quanta Companies; and (xiii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

WHEREFORE the Utility respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Utility's business judgment and in the best interests of its estate, creditors, shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: April 3, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: /s/ Jane Kim
     Jane Kim

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119