WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C.
(ray.schrock@weil.com) (*pro hac vice*)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>   - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                              **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19 -30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF STEVE COLEMAN IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 365(a), FED. R. BANKR. P. 6006, AND B.L.R. 6006-1 APPROVING THE UTILITY'S ASSUMPTION OF CERTAIN AGREEMENTS WITH QUANTA ENERGY SERVICES, LLC.**<br><br>Date: April 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102 |

I, Steve Coleman, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

I am Senior Director of Sourcing at Pacific Gas and Electric Company (the "**Utility**" and, together with PG&E Corporation, the "**Debtors**"). I joined the Utility in 1984 and held successive leadership positions in supply chain roles before becoming a Director of Corporate Real Estate. In 2007, I transitioned back to supply chain and sourcing roles and, in 2014, I was promoted to my current position. I currently lead Electronic Supply Chain and Sourcing Operations. I hold a bachelor's degree in labor studies from San Francisco State University and a master's degree in business administration and management from John F. Kennedy University.

I am knowledgeable and familiar with the Utility's day-to-day operations and, specifically, the sourcing of materials and services for the Utility's electric distribution, transmission, and generation, including the Utility's relationship and contracts with Quanta Energy Services, LLC and its affiliated companies (collectively, the "**Quanta Companies**"). I am authorized to submit this Declaration on behalf of the Debtors. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors' other employees or the Debtors' legal, restructuring, and financial advisors. If called upon to testify, I would testify to the facts set forth in this Declaration.

This Declaration is submitted in support of the *Motion of Debtors Pursuant to 11 U.S.C. § 365(a), Fed. R. Bankr. P. 6006, and B.L.R. 6006-1 Approving the Utility's Assumption of Certain Agreements with Quanta Energy Services, LLC* (the "**Motion**"), filed concurrently herewith.[1]

The Utility contracted with the Quanta Companies in November of 2018 to provide labor and equipment in support of the Utility's Wildfire Safety Program. As part of the Wildfire Safety Program, the Utility is performing accelerated safety inspections of electrical infrastructure in high fire-threat areas with the intention of further reducing the threat of wildfires, which, as I understand it, is consistent with certain legislative and judicial directives. This process involves a comprehensive inspection of electric

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

towers and poles in high fire-threat areas, which requires, among other things, ground inspection of electric poles, climbing inspections of transmission towers, and aerial inspections using helicopters, and, in some cases, drones to further enhance and complement visual inspections. In order to complete these inspections prior to the 2019 wildfire season, the Utility requires a large-scale skilled labor force, including qualified electrical workers, and specialty equipment, which cannot be resourced internally. It is my understanding that the Utility reached out to multiple strategic transmission contractors to determine which companies could perform this work on the requisite timeline and the Quanta Companies were the only ones able to mobilize the workforce required at the pace necessary. Additionally, it is my understanding that the Quanta Companies have an outstanding safety performance record, as well as a good working relationship with the Utility's IBEW partner, Local 1245, which were additional benefits.

The Utility has a number of outstanding contracts with the Quanta Companies, with a total of approximately $158.2 million in aggregate outstanding prepetition amounts owed, as of the Petition Date. Two of these contracts, the Transmission Inspection Agreement (the "**TIA**") and the Cross Cut Agreement (the "**CCA**" and, together with the TIA, the "**Quanta Contracts**"), are of immediate consequence to the Utility's transmission systems and the work being conducted in connection with the Wildfire Safety Program. I believe that the work performed pursuant the Quanta Contracts is necessary to ensure the safe operation of the Utility's gas and electric systems and to continue to implement the Wildfire Safety Program, an effort that is consistent with judicial and legislative directives. These matters are fundamental to the continued ability of the Utility to operate its business in a safe and reliable manner, which, in turn, is fundamental to its ability to successfully reorganize. Therefore, the Utility seeks to assume the Quanta Contracts.

### A. The Transmission Inspection Agreement

The Utility entered into the TIA with the Quanta Companies in December 2018 to provide labor and services for the electric transmission system component of the Wildfire Safety Program. This component of the program covers both the inspection and repair of approximately 50,000 electric transmission structures – roughly 35,000 poles and 15,000 lattice towers – and repair work, as directed by the Debtors. The data from the inspections is gathered by the Quanta Companies and analyzed by the Utility to prioritize repairs based on urgency and risk.

I understand that the current scope of work under the TIA for the transmission system inspection does not authorize work beyond (i) $200 million in invoices or (ii) June 30, 2019. Pursuant to the TIA, the Debtors and the Quanta Companies ramped up their efforts over the 2018 holiday season and through January 2019, in order to make necessary repairs prior to the 2019 wildfire season. As a result of these efforts, the maximum value limit under the current scope of work for the TIA has been reached and, as of the Petition Date, it is my understanding that the Utility owed $64.4 million for unpaid and outstanding prepetition amounts under the TIA. At the Utility's request, the Quanta Companies have continued to perform under the TIA and are working to complete the inspections.

In addition to the work currently contemplated under the TIA, the Utility desires to expand the the Quanta Companies' scope of work under the TIA to cover, among other things, the inspection of the Utility's substations — another crucial component of the Utility's fire safety efforts. The requested expansion would increase the contract value an additional $200 million, with the potential for additional increases in the future.

B.  The Cross Cut Agreement

The CCA consists of both a Master Service Agreement (the "**MSA**") that provides the general terms for the Quanta Companies' work and a series of Contract Work Authorizations ("**CWAs**") that contain the scope and specific terms for each project governed by the MSA. The CCA is set to expire March 31, 2021. It is my understanding that, as of the Petition Date, the Utility owed approximately $51.7 million for unpaid and outstanding prepetition amounts under the CCA.

The CCA is critically important for the implementation of the Utility's programs that require large crews of trained electrical workers, such as the Wildfire Safety Program. The CCA is an "Enterprise-Wide" contract that allows the Quanta Companies to call upon the full network of Quanta Companies through additional CWAs under the CCA to perform crucial work for the Utility without the typical delay involved in dealing with multiple vendors. It is my understanding that, to date, the Quanta Companies have worked on specific projects under the CCA regarding the safety and integrity of the Utility's electric and gas systems, including, without limitation, electric transmission inspection and repair, electric distribution engineering, underground cable replacement, gas distribution inspection and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

repair, high pressure regulator replacement, safety training and compliance, inspection services, and repair services.

### C. Limitation of Liability Provisions

It is my understanding that both the TIA and CCA include provisions that limit the Quanta Companies' potential liability for work performed under the Quanta Contracts. It has been explained to me that, under the TIA, the Quanta companies are required to cover the first $200 million of claims related to their work. For claims above this amount, the Quanta Companies have a right to indemnification from the Utility. Similarly, the Quanta Companies' liability is capped under the CCA at the greater of $10 million, or 200% of the value of the CWA issued by the Utility for the work at issue. It is my understanding that the Quanta Companies would not have been willing to enter into either the TIA or the CCA, nor to perform the work needed for the safety and integrity and the Utility's infrastructure systems, without these critical limitation of liability provisions. I further understand that, in order to expand the scope of their work under the TIA and continue work under the CCA, the Quanta Companies have indicated that they need the legal certainty that the terms of the Quanta Contracts, including the limitation of liability provisions, will be fully enforceable through assumption.

As stated above, the Utility seeks to assume the Quanta Contracts to ensure the safe operation of their gas and electric systems, to comply with applicable governmental regulations and requirements, and to continue to implement the Wildfire Safety Program. These matters are fundamental the Utility's ability to operate its business in a safe and reliable manner, which, in turn, is fundamental to its ability to successfully reorganize. Further, I believe that the Quanta Companies are one of a few companies, if not the only, with the capacity and resources to invest in, mobilize, and deploy the magnitude of skilled craft labor, professionals, and specialty equipment the Utility requires to implement the Wildfire Safety Program, especially on an accelerated basis. Additionally, I believe that the Quanta Companies have acquired an understanding of and familiarity with the Utility's operations that make them difficult to replace. All of these considerations weighed in to the Utility's business judgement decision to assume the Quanta Contracts.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

5
Case: 19-30088   Doc# 1219   Filed: 04/03/19   Entered: 04/03/19 21:09:58   Page 5 of 6

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct.

Dated: April 3, 2019

Respectfully submitted,

By: /s/ *Steve Coleman*
    Steve Coleman