WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251
*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                  **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF CORRECTED MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 503(c) FOR ENTRY OF AN ORDER (I) APPROVING SHORT-TERM INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF**<br><br>Related Doc: Dkt. No. 806<br><br>Date:    April 9, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>             Courtroom 17, 16th Floor<br>             San Francisco, CA  94102 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ..........................................................................2

II.  THE OBJECTORS HAVE NOT AND CANNOT REBUT THE PRESUMPTION
     OF THE BUSINESS JUDGMENT RULE.................................................................8

     A.   The TCC Fails to Show that the Compensation Committee Had a Conflict of
          Interest............................................................................................9

     B.   The TCC Fails to Show that the Compensation Committee Did Not Exercise
          Oversight...........................................................................................12

     C.   The TCC Fails to Show that the 2019 STIP Is the Product of Gross
          Negligence or Was Approved in Bad Faith ............................................14

III. THE APPROVAL OF THE 2019 STIP WAS RATIONAL AND A SOUND
     EXERCISE OF BUSINESS JUDGMENT........................................................14

IV.  THE DEBTORS HAVE COMPLIED WITH ALL RECOMMENDATIONS SET
     FORTH IN THE NORTHSTAR REPORT WITH RESPECT TO THE 2019 STIP ........18

V.   NONE OF THE EMPLOYEES ELIGIBLE FOR THE 2019 STIP ARE INSIDERS
     AND, IN ANY EVENT, THE 2019 STIP IS NOT A RETENTION PLAN ..................22

VI.  CONCLUSION..........................................................................................26

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 240 N. Brand Partners, Ltd.*,
200 B.R. 653 (B.A.P. 9th Cir. 1996)..................................................................8, 15

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362 (Del. 2006) ..........................................................................12, 13

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ...............................................................................9

*In re AWTR Liquidation Inc.*,
548 B.R. 300 (Bankr. C.D. Cal. 2016).............................................................11, 14

*Bader v. Anderson*,
179 Cal. App. 4th 775 (Ct. App. 2009)...............................................................12

*Beehan v. Lido Isle Community Assn.*,
70 Cal. App. 3d 858 (Ct. App. 1977)..................................................................10

*Berg & Berg Enterprises, LLC v. Boyle*,
178 Cal. App. 4th 1020 (Ct. App. 2009)..............................................................15

*In re Borders Grp. Inc.*,
453 B.R. 459 (Bankr. S.D.N.Y. 2011)............................................................22, 23

*Brandt v. Tabet DiVito & Rothstein, LLC (In re Longview Aluminum, LLC)*,
419 B.R. 351 (Bankr. N.D. Ill. 2009) ................................................................23

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ...........................................................................9, 14

*Calma v. Templeton*,
114 A.3d 563 (Del. Ch. 2015).........................................................................10

*In re Caremark Int'l Inc. Deriv. Litig.*,
698 A.2d 959 (Del. Ch. 1996).....................................................................11, 12

*In re Dana Corp.*,
358 B.R. 567 (Bankr. S.D.N.Y. 2006) ...............................................................15

*Everest Investors 8 v. McNeil Partners*,
8 Cal. Rptr. 3d 31 (Ct. App. 2003)....................................................................9

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Foothills Texas, Inc.*,
    408 B.R. 573 (Bankr. D. Del. 2009) ..................................................23

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009) ...............................................................8

*In re Genco Shipping & Trading Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014) ...........................................8

*In re Glob. Aviation Holdings Inc.*,
    478 B.R. 142 (Bankr. E.D.N.Y. 2012)...........................................22

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003).......................................................12

*Kruss v. Booth*,
    185 Cal. App. 4th 699 (Ct. App. 2010).................................9, 10, 12

*Lee v. Interinsurance Exchange*,
    50 Cal. App. 4th 694 (Ct. App. 1996).................................9, 11, 12

*In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983).........................................................8

*In re Mesa Air Grp., Inc.*,
    No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010)......................24

*In re Nellson Nutraceutical, Inc.*,
    369 B.R. 787 (Bankr. D. Del. 2007) ..............................................25

*Oakland Raiders v. Nat'l Football League*,
    93 Cal. App. 4th 572 (2001) ...........................................................9

*In re Pac. Gas & Elec. Co.*,
    No. 01-30923SFM, 2001 WL 34133840 (Bankr. N.D. Cal. July 13, 2001).........................17

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .......................................................12

*United States v. Bailey*,
    696 F.3d 794 (9th Cir. 2012) .....................................................5, 12

*In re Velo Holdings Inc.*,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012) ...........................................24

*In re Village of Lakeridge, LLC*,
    814 F.3d 993 (9th Cir. 2016) .......................................................23

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  **Statutes**

2  11 U.S.C. § 101(31)...................................................................................................22

3  11 U.S.C. § 105(a) ...................................................................................................5, 6

4  11 U.S.C. § 363.....................................................................................................5, 6, 8

5  11 U.S.C. § 503................................................................................................. *passim*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

The Debtors[1] submit this Reply in further support of the Corrected Motion of Debtors

3

Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term

4

Incentive Plan and (II) Granting Related Relief (the "**2019 STIP Motion**") (ECF No. 806) and in

5

response to the Objections of the Official Committee of Tort Claimants (the "**TCC**") (ECF Nos.

6

847 & 1109); James M. Eaneman, Sr. (ECF No. 886); the City and County of San Francisco

7

("**CCSF**") (ECF No. 968); the Singleton Law Firm Fire Victim Claimants (the "**SLF Claimants**")

8

(ECF No. 1040); the United States Trustee (the "**U.S. Trustee**") (ECF No. 1044); the Plaintiffs'

9

Executive Committee (ECF No. 1054) (joinder); and the *Herndon* litigants (ECF No. 1111)

10

(joinder) (collectively, the "**Objectors**").

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[1]  All capitalized terms used in this memorandum have the meanings assigned to them in the Debtors' 2019 STIP Motion, ECF No. 806, unless otherwise noted.

28

## I. PRELIMINARY STATEMENT

The Debtors have a large and complex enterprise to provide safe and reliable gas and electric service to their 16 million customers. A fundamental element of properly operating a business is providing fair, competitive, and industry-standard compensation to employees which aligns the employees' interests with those of the company and its economic stakeholders. Indeed, providing fair, competitive, and industry-standard compensation to the Debtors' employees is essential to preserve and maximize value, and is critical to the successful resolution of these Chapter 11 Cases.

The 2019 STIP is not a bonus plan or program. Rather, it is a well-established, incentive-based compensation program representing a basic and customary element of compensation for the Debtors' employees and in the utility industry. It is expressly designed to incentivize a substantial portion of the Debtors' employee base, to fully align the employees' performance with key goals of the enterprise, and to enable those employees to realize a level of compensation competitive in the Debtors' industry.

The Debtors understand and recognize the tragic loss of life and devastating damage and destruction to homes and businesses resulting from the 2017 and 2018 Northern California Wildfires. And, the Debtors reiterate that a primary objective of these Chapter 11 Cases is to address and resolve the wildfire claims equitably and expeditiously. To do this effectively, however, and to properly and fairly address the interests of all other economic stakeholders, the Debtors must continue to invest in systems, infrastructure, and wildfire prevention initiatives, restore their financial stability, and assure their access to the capital and resources necessary to sustain and support ongoing operations.

The Debtors' STIP participants—none of whom are senior management insiders—are key to this effort and to maximizing enterprise value. Withholding a critical element of customary, incentive-based, prospective compensation as a mechanism of retribution to be imposed on 10,000 employees, is inappropriate and, more importantly, antithetical to what should be the goal of all

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

parties in interest in these cases: to maximize the value of the Debtors' business enterprise for the benefit of all of the Debtors' economic stakeholders—wildfire claimants, other unsecured creditors, and equity holders. Simply stated, rather than increasing stakeholder recoveries, punishing the Debtors' 10,000 current non-senior management employees by denying them the opportunity to participate in a prospective, incentive-based, value maximizing plan, will have the direct opposite and detrimental effect.

The Official Committee of Unsecured Creditors (the "**UCC**") representing in excess of $22 billion in prepetition unsecured claims, has filed a limited objection (ECF No. 1110) in which it states that it "supports a market-based, employee incentive program" as a "value-maximizing proposition that will inure to the benefit of the Debtors' estates and all of their stakeholders." And, the UCC states that it "does not take issue with the aggregate dollars associated with the proposed STIP." UCC Limited Objection at ¶¶ 7, 8.[2] In addition, the Ad Hoc Committee of Bondholders, representing nearly $9 billion in prepetition unsecured claims, has no objection to the 2019 STIP, obviously recognizing the importance of the Debtors' employee base to the success of these Chapter 11 Cases and to the recovery on their claims.

The TCC's Objection, which is the principal objection filed to the 2019 STIP Motion, is premised on three arguments:

(1) The Compensation Committee had a conflict of interest in connection with its approval of the 2019 STIP and, therefore, should not have the benefit of the business judgment rule;

(2) The Compensation Committee was required to conduct an investigation into which of the 10,000 employees who would be participants in the 2019 STIP, if any, committed past wrongful acts which made them responsible for wildfires, and the absence of such an investigation constitutes "bad faith" conduct which takes the Compensation Committee's decision to approve the 2019 STIP outside of the business judgment rule; and

---

[2] The Debtors believe that the limited objections raised by the UCC will largely be resolved prior to the hearing on the 2019 STIP Motion.

(3) The 2019 STIP does not implement the PUC Decision Ordering Pacific Gas and Electric Company to Implement the Recommendations of the NorthStar Report (the "**CPUC NorthStar Order**").

As demonstrated below, each of these premises is fundamentally flawed.

The TCC's argument that the Compensation Committee (comprised of four independent outside directors) had a conflict of interest is misguided and is neither supported by the applicable law nor the facts. The members of the Compensation Committee are not eligible to participate in the 2019 STIP and, therefore, will receive no direct economic or other benefit from its adoption. The TCC cannot logically explain how implementation of the 2019 STIP could possibly create any actual economic or tangible benefit for those admittedly independent, non-participating, outside directors. Instead, the TCC advances the following convoluted theory: the existence of two unproven derivative lawsuits against the Debtors' directors related to alleged conduct in 2017 and 2018 somehow establishes "a conflict of interest" with respect to the Compensation Committee's approval of the 2019 STIP. This theory is nonsensical. The TCC appears to argue that removal of downward adjustments for individual performance from the 2019 STIP somehow avoids the "creation of evidence that could be used against [the directors] in the Derivative Actions." TCC Obj. at 22.

This argument is wrong as a matter of fact and law. First, the TCC fundamentally misunderstands or misstates how the individual performance modifier ("**IPM**") works and the change made to it in the 2019 STIP. The IPM in prior years only allowed supervisors to reduce awards based on the employee's performance in the applicable STIP year; it did not permit or require changes by supervisors for a participant's conduct in prior years. Thus, even if the Compensation Committee had retained the downward adjustment for individual performance in the 2019 STIP, supervisors nevertheless would not be permitted to reduce awards based on an employee's performance in prior years. As such, the "change" to the 2019 STIP did not in any respect "avoid" the creation of evidence based on an employee's conduct in prior years that could conceivably be relevant to the derivative actions. In any event, under the 2019 STIP, supervisors

must still analyze the performance of all participants in the 2019 STIP to determine who will be in the pool of up to 10% of the 2019 STIP participants.

Second, the TCC cites only to unproven allegations in the derivative complaints to support its theory. Allegations, however, are not actual evidence and are insufficient to establish that the directors have a conflict of interest.[3] A conflict cannot be established merely by asserting a hypothetical and speculative theory that supervisors *might* somehow create evidence that "could" be used in an unproven derivative action. The TCC cites no case that supports such a far-fetched theory of a conflict of interest. Further, because incentive awards under the 2019 STIP are based purely on prospective conduct, allegations regarding insufficient oversight of the Debtors' employees' conduct in prior years cannot establish a conflict of interest.

Because the TCC cannot rebut the presumption under the business judgment rule that in deciding to approve the 2019 STIP the Compensation Committee acted on an informed basis, with the advice of retained professionals, in good faith and in the honest belief that its approval was in the best interests of the Debtors, the Court should grant the Debtors' 2019 STIP Motion as long as the Compensation Committee's decision to approve the 2019 STIP was supported by *any* valid business justification. This standard is easily satisfied here because the undisputed evidence clearly establishes that the decision to approve the 2019 STIP was a reasonable exercise of business judgment:

- The decision to approve the 2019 STIP was the product of thorough diligence and deliberations spanning several meetings and reflected input and advice from two separate independent compensation consultants. *See* Corrected Declaration of Dinyar Mistry in Support of Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (the "**Mistry Decl.**") (ECF No. 808) at 3:3–12, 8:25–26; *see also* Corrected Declaration of Douglas J. Friske in Support of Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (the "**Friske Decl.**") (ECF No. 807) at 3:25–4:12.

- The 2019 STIP is a customary incentive-based plan covering approximately 10,000 of the Debtors' non-insider employees. *See* Mistry Decl. at 8:9–24; March 29, 2019

---

3   *See United States v. Bailey*, 696 F.3d 794, 801 (9th Cir. 2012).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Deposition of Dinyar Mistry (the "**Mistry Dep.**") at 45:18–46:13;[4] Friske Decl. at 5:25–26. It is a fundamental element of normal compensation to a substantial portion of the Debtors' workforce and a necessary component to enable participants to achieve compensation competitive in the industry. *See* Mistry Decl. at 3:17–19, 8:1–8; Friske Decl. at 4:22–28.

- The use of incentive based compensation as part of an employee's total compensation package is standard and customary. *See* Mistry Decl. at 3:14–21, 8:26–9:2; March 21, 2019 Deposition of Douglas Friske (the "**Friske Dep.**") at 30:19–24.[5]

- The 2019 STIP includes performance metrics and weights aligned with the Debtors' operational priorities; namely, safety (50%), financial performance (40%), and customer satisfaction (10%). The 2019 STIP aligns eligible employees' interests with these key operational priorities. *See* Mistry Decl. at 3:22–24, 4:22–5:11; Mistry Dep. at 119:21–120:21; Friske Dep. at 91:14–92:8.

- Despite the TCC's assertions to the contrary, the Compensation Committee extensively considered safety, including wildfire mitigation, in crafting the 2019 STIP, and included enhanced performance metrics for wildfire mitigation (*e.g.*, requiring enhanced vegetation management and system hardening measures within high-fire risk areas). *See* Mistry Decl. at 7:6–12; Mistry Dep. at 38:2–22; Friske Dep. at 57:21–25; 59:1–7.

- By seeking to stabilize the Debtors' employee base and to align the interests of the 2019 STIP participants with the Debtors' performance objectives, the 2019 STIP is designed to enhance and maximize enterprise value; accordingly, it is in the best interests of the Debtors and all of their economic stakeholders. *See* Mistry Decl. at 8:1–8; Mistry Dep. at 120:1–21; Friske Dep. at 24:5–25:7.

- The formulation and implementation of the 2019 STIP fully complied with the recommendations of the CPUC NorthStar Order. *See* Reply Declaration of Dinyar Mistry in Further Support of Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) For Entry of An Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (the "**Mistry Reply Decl.**") at ¶ 8.

Additionally, to suggest that the 2019 STIP provides for "automatic" payments and somehow ties the Debtors' hands from addressing misconduct or wrongdoing, past or present, is just wrong. As Mr. Mistry repeatedly testified in his deposition, the Board and the Compensation

---

[4] *See* Declaration of Catherine E. Woltering in Support of Opposition to Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (ECF No. 1112) (the "**Woltering Decl.**"), Ex. A.

[5] *See* Woltering Decl., Ex. B.

Committee retain complete and absolute discretion with respect to the 2019 STIP awards. *See* Mistry Dep. at 49:19–50:7. As to each performance period, awards can be completely eliminated for any reason, whether performance targets are met or not, and on an individual basis or otherwise. *Id*. at 74:4–74:13.

Neither the Debtors nor the Compensation Committee were required to conduct an investigation into the conduct of each of the 10,000 employees eligible to participate in the 2019 STIP before putting in place a normal, customary compensation program designed to have employees align their interests with the goals of the Debtors. The 2019 STIP is forward-looking and the independent members of the Compensation Committee determined that it is necessary to achieve the objectives of the Debtors. The Debtors have other separate tools if it is determined that an employee engaged in misconduct.

The repeated mantra by the TCC that the Debtors failed to comply with the CPUC NorthStar Order directing the Debtors to implement the STIP recommendations in the NorthStar Report[6] simply is not true. As demonstrated below, the TCC completely mischaracterizes the recommendations in the NorthStar Report and what the Debtors were ordered to do with respect to compensation-related decisions. The Debtors have complied with the STIP recommendations in the CPUC NorthStar Order. And, of course, the TCC neglects to mention that NorthStar Report states that "PG&E executive management is committed to safety," notes the "commitment to safety among [the Debtors'] field employees," and further states that the "50 percent weighting [of public safety in the STIP] is considerably higher than typical of the utility industry." *See* NorthStar Report at I-6, VII-12.

Further, as demonstrated in the 2019 STIP Motion, the 2019 STIP complies with all of the requirements of section 503 of the Bankruptcy Code. Notably, the issue of whether any participants are insiders is irrelevant because the 2019 STIP is an incentive plan. Additionally, as demonstrated in the Mistry Declaration, even if the issue of insiders were a relevant consideration,

---

[6] *See* Woltering Decl., Ex. C-22, Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture (the "**NorthStar Report**").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

under applicable authority no insiders are participating in the 2019 STIP. Lastly, in view of, among other things, the incentive-based foundation of the 2019 STIP, its design to enable the participants to achieve customary, market-based compensation, its design to align the participants' performance with the Debtors' goals to maximize safety and enterprise value, and the ultimate discretion afforded to the Compensation Committee with respect to all potential awards, the 2019 STIP clearly is justified by the facts and circumstances of these cases.

Punishing and inflicting economic harm on the Debtors' broad employee base and undermining incentives for prospective performance is not the right path in these cases. It will not enhance value, improve safety, or maximize recoveries for wildfire claimants and the Debtors' other economic stakeholders. Rather, implementation of the 2019 STIP, which fully aligns the participants' interests with the Debtors' safety and performance goals, with complete discretionary oversight by the Compensation Committee, will maximize value, appropriately incentivize employees, and provide them with the opportunity to achieve a competitive level of compensation, and perhaps most importantly, expedite the successful administration of these Chapter 11 Cases.

## II. THE OBJECTORS HAVE NOT AND CANNOT REBUT THE PRESUMPTION OF THE BUSINESS JUDGMENT RULE

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use . . . , other than in the ordinary course of business, property of the estate." When construing this and similar provisions of the Bankruptcy Code, Bankruptcy Courts generally approve the use of property of the estate under § 363(b)(1) when a debtor presents a "valid business justification." *In re 240 N. Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); *see also In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) ("The standard used for judicial approval of the use of estate property outside of the ordinary course of business is also the business judgment of the debtor.") (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)). Importantly, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v.*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Stephens*, 965 A.2d 695, 705 (Del. 2009) (citation omitted). "[T]he size and structure" of compensation in particular "are inherently matters of judgment," and "[c]ourts do not measure, weigh or quantify directors' judgments." *Brehm v. Eisner*, 746 A.2d 244, 263–64 & n.66 (Del. 2000). Thus, and as the TCC accurately notes, the initial burden in challenging the Debtors' exercise of business judgment rests with the Objectors—*not* with the Debtors. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("the burden is on the party challenging [a business] decision to establish facts rebutting the presumption.").[7]

Here, in an attempt to rebut the presumption of the business judgment rule, the TCC argues that the independent director members of the Compensation Committee (a) had a conflict of interest; (b) failed to make reasonable inquiries; (c) and that their decision to approve the 2019 STIP was a product of gross negligence or in bad faith. *See* TCC Obj. at 21–25. Rhetoric aside, the TCC has not and cannot meet its burden of rebutting the presumption of the business judgment rule.

## A. The TCC Fails to Show that the Compensation Committee Had a Conflict of Interest

The TCC asserts that the independent director members of the Compensation Committee had a conflict of interest when they approved the 2019 STIP. *See* TCC Obj. at 21–22. But this argument is devoid of any legal or factual support. The conflict of interest exception to the business judgement rule applies only in circumstances that "inherently raise an inference of conflict of interest." *Lee v. Interinsurance Exchange*, 50 Cal. App. 4th 694, 715 (Ct. App. 1996). As is apparent even in the cases the TCC cites in its Objection, this is a very high standard; such circumstances exist only where the directors would personally and *directly* benefit from their decision. *See, e.g.*, *Kruss v. Booth*, 185 Cal. App. 4th 699, 704, 728 (Ct. App. 2010) (plaintiff alleged circumstances inherently raising an inference of conflict of interest where a reverse merger

---

[7]   California courts "properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." *Oakland Raiders v. Nat'l Football League*, 93 Cal. App. 4th 572, 586 n.5 (2001).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

"pump and dump" scheme operated to funnel money out of the company and into companies owned by the directors); *Everest Investors 8 v. McNeil Partners*, 8 Cal. Rptr. 3d 31, 45–46 (Ct. App. 2003) (plaintiff alleged circumstances inherently raising an inference of conflict of interest where directors in a real estate partnership could receive a significant equity interest in a post-merger entity and their economic interest conflicted with the interest of limited partners); *see also Beehan v. Lido Isle Community Assn.*, 70 Cal. App. 3d 858, 865–66 (Ct. App. 1977) ("Interference with [board] discretion is not warranted in doubtful cases."). As explained below, the TCC has not and cannot establish "circumstances inherently rais[ing] an inference of conflict of interest." *Kruss*, 185 Cal. App. 4th at 728.

The Compensation Committee is comprised of four independent directors, none of whom is eligible to participate in the 2019 STIP. Accordingly, the TCC cannot establish any direct financial benefit to the members of the Compensation Committee because of their decision to approve the 2019 STIP. Standing alone, this is fatal to the TCC's argument that the conflict of interest exception to the business judgment rule applies. Indeed, the TCC does not cite a single case applying the conflict of interest exception to the business judgment rule in the absence of any direct financial benefit. The one case cited by the TCC that involves the adoption of an incentive plan, *Calma v. Templeton*, 114 A.3d 563 (Del. Ch. 2015), found that the compensation committee there was conflicted because the directors were recipients of the grants under the incentive plan and thus had a direct personal interest in the decision to adopt the plan. Here, there is no such interest.

Completely unable to point to any *direct* financial benefit as a result of the decision to approve the 2019 STIP, the TCC asserts an alternative theory that, because the directors have been named in two derivative actions regarding events in 2017 and 2018, the 2019 STIP's removal of downward adjustments "personally benefit[s] the Directors." TCC Obj. at 22. Because this change would supposedly prevent supervisors from determining if their employees engaged in misconduct, the TCC argues that this would avoid creating a record that could theoretically be used against the directors in the derivative suits. *See id.* Thus, the TCC argues, this removal of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

downward adjustments created a conflict that "bars [the directors] from invoking the business judgment rule." *Id.* This argument is wrong as a matter of fact and law.

First, the TCC misunderstands the basic nature of the 2019 STIP, and how the IPM works. Contrary to the TCC's suggestion, prior versions of the STIP did not allow supervisors to alter awards based on negligence or misconduct of employees in prior years. Rather, because each STIP year is forward-looking, the IPM only allowed modifications to an employee STIP award based on an evaluation of that employee's performance in that year. *See* Mistry Dep. at 61:17–24. Given that the derivative suits referred to by the TCC challenge conduct of the directors in years *prior* to 2019, even if the 2019 STIP had not been modified and allowed downward modification by supervisors, the 2019 STIP still would not have allowed such reductions under the IPM by supervisors to awards based on conduct in 2017 and 2018. As a result, this change could not and would not "avoid[] the creation of evidence that could be used against [the directors] in the Derivative Action." TCC Obj. at 22.

Second, under the 2019 STIP, even though supervisors cannot reduce certain awards because of individual performance, supervisors still have to engage in a review of an employee's current-year performance similar to that conducted in prior STIP years in order to determine the pool of up to 10% of STIP participants eligible for the IPM. Furthermore, the unsupported assertion by the TCC that the Compensation Committee removed the downward adjustment in the individual performance modifier because of the derivative suits is inconsistent with the facts. The elimination of the IPM as a whole was suggested by the Debtors' independent consultant, Doug Friske, not the Compensation Committee. *See* Friske Dep. at 47:6–48:8. This too is a fatal deficiency in the TCC's argument. *See Lee*, 50 Cal. App. 4th at 715 ("More is needed to establish an exception to the rule than conclusory allegations of improper motives and conflict of interest.").

Third, the TCC also ignores that the derivative actions against the directors are a longshot at best and do not inherently raise an inference of a conflict of interest. As the Delaware Supreme Court explained in the seminal *Caremark* decision, such oversight claims are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re*

*Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see also In re AWTR Liquidation Inc.*, 548 B.R. 300, 315 (Bankr. C.D. Cal. 2016) ("Although no reported decision under California corporate law has expressly followed *Caremark*, it has been widely accepted and this Bankruptcy Court knows of no reason why the California Supreme Court would not apply the same reasoning.").

The mere assertion of unproven allegations does not and cannot establish a conflict of interest. As recognized in the TCC's own authority, the "mere threat of personal liability for approving a questioned transaction by itself is insufficient to refute either the independence or disinterestedness of directors." *Bader v. Anderson*, 179 Cal. App. 4th 775, 792 (Ct. App. 2009) (internal quotations omitted); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (same); *Bailey*, 696 F.3d at 801 ("We risk stating the obvious here: a complaint is merely an accusation of conduct and not, of course, proof that the conduct alleged occurred.").

Fourth, the TCC's attenuated theory of conflict of interest bears no resemblance to the egregious circumstances "inherently raising an inference of conflict of interest." *Lee*, 50 Cal. App. 4th at 715; *see also Kruss*, 185 Cal. App. 4th at 704, 728 (same). The 2019 STIP is based purely on prospective performance. The conduct of individual employees in 2017 and 2018 is irrelevant to determining whether the Debtors meet performance metrics in 2019. *See* Mistry Dep. at 61:12–24.

## B. The TCC Fails to Show that the Compensation Committee Did Not Exercise Oversight

The TCC next argues that the members of the Compensation Committee breached their oversight obligations. This argument is also not supported by law or facts. To establish that the Compensation Committee's approval of the 2019 STIP is not entitled to deference for failure to exercise appropriate oversight, the TCC must show that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (citing *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003)) (applying *Caremark*).

Here, the TCC argues that by approving the 2019 STIP, the Compensation Committee is "[p]aying employees without investigation into bad behavior," which "ignores past criminal action and makes future criminal action more likely" and thus "contravene[s] the Debtors' best interests." TCC Obj. at 24. As a preliminary matter, the Debtors' decision to provide customary compensation to employees prospectively based on their performance in 2019 did not require the Compensation Committee to conduct a wholesale investigation into the conduct of each of 10,000 employees in prior years. As Mr. Mistry repeatedly noted during his deposition, the Debtors have separate channels for investigating and addressing past employee misconduct, including termination of an employee. *See, e.g.*, Mistry Dep. at 62:1–12.

Moreover, the TCC has not established that the Debtors "utterly failed" to implement any reporting or information system or control, nor has the TCC established that the Debtors "consciously failed to monitor or oversee [their] operations." *Stone,* 911 A.2d at 370. In fact, the Debtors have in place protocols encouraging whistleblowing through a compliance and ethics help line, a federal monitor line, and a continuous improvement program system. *See* Mistry Dep. at. 43:13–44:1. Nor do the TCC or the Objectors more generally argue that the directors have failed to monitor or oversee the operation of these protocols. Indeed, the NorthStar Report expressly found that "PG&E began encouraging management and employees to report safety issues and to have open dialogue regarding potential safety concerns." *See* NorthStar Report at I-6.

Additionally, and as set forth above, the 2019 STIP, including the payment of each and every amount, is subject to the complete discretion of the Compensation Committee, providing yet another mechanism to address individual conduct whenever it may have occurred. *See* Mistry Dep. at 49:19–50:7. To state as the TCC does that the 2019 STIP awards are automatic is inconsistent with the plain terms of the 2019 STIP.

**C. The TCC Fails to Show that the 2019 STIP Is the Product of Gross Negligence or Was Approved in Bad Faith**

The TCC next argues that the Compensation Committee approved the 2019 STIP as the result of gross negligence (*i.e.*, "reckless indifference" or a "deliberate disregard") or, alternatively, that the 2019 STIP was approved in bad faith (*i.e.*, "intentional dereliction of duty or the conscious disregard of one's responsibilities"). *See* TCC Obj. at 19 (acknowledging these are high standards). As an initial matter, its assertion of bad faith fails because the TCC does not and cannot point to any evidence that any members of the Compensation Committee acted in bad faith. The TCC's argument that the Compensation Committee's decision to approve the 2019 STIP was "grossly negligent" fails because "[d]ue care in the decision-making context is a *process* due care only." *Brehm*, 746 A.2d at 263–64 (emphasis in original). The substance of the Compensation Committee's decision-making is considered "inherently [a] matter[] of judgment" and challenges to it are "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Id.* at 263. The TCC cannot establish that the decision of the members of the Compensation Committee to approve the 2019 STIP was "grossly negligent" under this entirely process-focused standard. Indeed, the 2019 STIP was the product of several weeks of due diligence and deliberation, over several meetings, including input and advice from independent compensation consultants. *See* Mistry Decl. at 8:25–26. Accordingly, the TCC's final attempt to circumvent the business judgment rule also fails and this Court should not "'second-guess' the decisions of disinterested directors made with reasonable diligence in ascertaining the facts and believed to be in the corporation's best interests." *AWTR Liquidation*, 548 B.R. at 314 (citation omitted).

**III. THE APPROVAL OF THE 2019 STIP WAS RATIONAL AND A SOUND EXERCISE OF BUSINESS JUDGMENT**

Because the TCC cannot overcome the presumption of the business judgment rule, the Court should not second-guess the Compensation Committee's decision to approve the 2019 STIP as long as it is supported by "any rational business purpose." *Berg & Berg Enterprises, LLC v.*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Boyle*, 178 Cal. App. 4th 1020, 1045 (Ct. App. 2009) (internal quotations omitted); *240 N. Brand Partners*, 200 B.R. at 659 (a "valid business justification" suffices). Here, the business justifications for the 2019 STIP are more than rational; they are compelling.

First, approval and implementation of the 2019 STIP was largely within the scope of Debtors' ordinary course of business, as the evidence demonstrates. Indeed, the Debtors have used similar STIPs for decades and the 2019 STIP continues the Debtors' historical incentive compensation practices, with certain modifications to the safety metrics and to emphasize financial performance. *See* Mistry Dep. at 11:5–14; *see also In re Dana Corp*., 358 B.R. 567, 579 (Bankr. S.D.N.Y. 2006) (finding that because a debtor's postpetition incentive plan was a "refinement" of historical practices, the proposed plan was within the ordinary course). Like prior STIPs, the 2019 STIP is a broad-based, customary, industry-standard incentive plan that is an essential component of compensation to 10,000 of the Debtors' non-insider employees, and ensures that this substantial portion of the Debtors' workforce has the ability to realize fair and competitive wages in the industry. *See* Friske Dep. at 30:21–23 ("[A]ll of PG&E's peers have some form of financial metric in their incentive plan, their STIP equivalent."); Mistry Dep. at 103:23–25 ("When you put the STIP and an employee's base pay together, that's the total compensation we target being at market."). The 2019 STIP, like prior STIPs and similar incentive plans of the Debtors' peer companies, is essential to stabilize and motivate the employee base and to align the participants' performance with objectives of the Company; namely, to provide safe and reliable service to the Debtors' customers and maximize enterprise value for the benefit of the Debtors' economic stakeholders, including the Objectors.

Moreover, and as with prior STIPs, the 2019 STIP was the product of the Compensation Committee's extensive diligence process, with input and advice from compensation experts and consultants. *See* Friske Decl. at 4–5. The Debtors and their advisors "considered all of the various potential opportunities or potential issues that might happen" and the 2019 STIP represents a careful and considered calibration of competing priorities. *See* Friske Dep. at 69:16–21. And, while the 2019 STIP includes certain modifications to prior STIPs, these modifications are a

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

product of deliberate and careful consideration that took into account the Debtors' existing circumstances and needs. For example:

- The performance metrics and weighting in the 2019 STIP align with the Debtors' top operational priorities; namely safety (50%),[8] financial performance (40%), and customer satisfaction (10%). Because safety and compliance with state and federal law are fundamental to the Debtors' business, the Compensation Committee paid special heed to these concerns, with a notable focus on wildfires. *See* Mistry Dep. at 66:20–25 ("The compensation committee considered the importance of wildfire mitigation."). Altogether, the 2019 STIP "aligns the employees' incentives with the goals of the company" so that the entire organization is "working together to improve safety and the various other measures that are here in the plan." *Id.* at 82:19–83:4.

- The Debtors added more weight to the financial metric—from 25% the previous year to 40% for 2019 based on the advice of WTW—because "in a restructuring situation . . . having a strong focus on financial results can provide benefits to all stakeholders, by having a viable entity [in which] you can make investments in safety and people across the enterprise." Friske Dep. at 24:18–25. Notably, despite the TCC's contention, the increased emphasis on financial results did not come at the expense of safety. *See* Mistry Dep. 121:2–6 ("We didn't want to reduce the importance of safety, and so we balanced between customer and financial."). Indeed, and contrary to certain objections, the financial metric actively aids safety concerns because a strong financial platform supports a strong emphasis on safety. *See id.* at 121:12–15 ("we need to have a financially healthy company to emerge from Chapter 11").

- The Compensation Committee, again based on the advice of WTW, which has advised numerous other companies involved in restructurings to change annual incentive payments to quarterly payments, adopted quarterly STIP payments to address employee concerns and uncertainty about the Debtors' ongoing restructuring process. *See* Friske Dep. at 68:16–25 ("[P]eople are worried about the future of the organization. They're worried about their own roles. They're worried about whether they're going to get compensated or not. So by providing an incentive that has a shorter time horizon on it, you give them more certainty."). In fact, the majority of incentive plans in restructuring situations do not maintain an annual measurement period. Rather, they

[8] 50% of the 2019 STIP's metrics are allocated to safety, and two new metrics are keyed to wildfire mitigation that specifically address concerns about vegetation in areas with high fire risks and system hardening. Other safety metrics are directly relevant to other concerns but still intersect with wildfire mitigation in material ways. For example, the Debtors' metric for Asset Records Duration "is an important aspect of having a safe system" because accurate asset records are crucial to managing a complex gas and electrical system. Mistry Dep. at 42:1–7. Similarly, the Serious Injuries and Fatalities Corrective Actions Index applies to a wide range of safety concerns, including wildfires, the installation of new equipment, and the Debtors' nuclear power facilities. *See id.* at 42:15–17 ("The serious injuries and fatalities corrective action deals with the safety of our employees who are critical to maintaining the system.").

adopt a shorter measurement period, most often quarterly. *Id.* at 52:10–53:11; 67:20–68:6.

- The 2019 STIP maintains its complete discretionary nature. Again, despite the TCC's assertion, no 2019 STIP awards are automatic and they may be reduced or eliminated globally or individually by the Compensation Committee based on an individual's performance or conduct, in addition to all other remedies available to the Debtors to address any employee misconduct. *See* Mistry Dep. at 49:19–50:7; 62:1–12; 74:4–74:15.

- The Debtors have adopted and implemented their 2019 Wildfire Mitigation Plan, pending CPUC review, which is expected on May 12, 2019. This is consistent with Judge Alsup's rulings, including his most recent ruling on April 2, 2019, and the 2019 STIP includes a metric related to the Wildfire Mitigation Plan. Mistry Dep. at 26:14–22. If the CPUC's review process results in any modifications of the program, the Debtors will amend the corresponding 2019 STIP metric to reflect the same, again consistent with Judge Alsup's ruling.[9]

In sum, the Debtors' management and Compensation Committee, with the advice of retained professionals, considered the relevant facts and circumstances and reasonably concluded that the 2019 STIP is appropriate for the Debtors' needs and to maximizing the value of their business enterprise. As this Court noted with respect to a retention plan submitted by the Debtors in their previous chapter 11 that was subject to a similar litany of objections,

> [T]he court does not believe PG&E must show exact parity with other companies, nor does the court view its role as second guessing PG&E's selection of which of its six hundred eighty-two employees should be eligible for its retention program and how much any particular employee should receive. Nor should the court review each individual employee's likelihood of leaving absent a retention bonus

---

[9] The TCC argues that "the Debtors' proposed 2019 Wildfire Mitigation Plan for its STIP is incomplete today when measured by Judge Alsup's current proposed conditions of probation for PG&E that the District Court intends to adopt at its April 2, 2019 hearing on the orders to show cause." TCC Obj. at 12. The TCC's prediction was incorrect. At the April 2, 2019 hearing, Judge Alsup did not impose any changes to the 2019 Wildfire Mitigation Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

that is some percentage greater or less than what [PG&E's advisors] recommended and PG&E seeks to implement.

*In re Pac. Gas & Elec. Co.*, No. 01-30923SFM, 2001 WL 34133840, at *2 (Bankr. N.D. Cal. July 13, 2001) (approving management retention motion). The Court should reach a similar conclusion here and approve the 2019 STIP as a valid exercise of sound business judgment.

## IV. THE DEBTORS HAVE COMPLIED WITH ALL RECOMMENDATIONS SET FORTH IN THE NORTHSTAR REPORT WITH RESPECT TO THE 2019 STIP

As stated above, the TCC's allegations with respect to the NorthStar Report and the CPUC NorthStar Order are wrong and misleading. There is no dispute that the December 14, 2018 CPUC NorthStar Order required the Debtors to implement the NorthStar Report recommendations with respect to the Debtors' short term-incentive plan. The TCC, however, completely misrepresents the NorthStar Report recommendations themselves, all of which have been implemented by the Debtors and considered by the independent Compensation Committee of the Board, as required by the CPUC NorthStar Order.

The NorthStar Report is dated May 8, 2017. It was prepared nearly two years ago based on information provided to NorthStar concerning the Debtors' STIP considered for 2017. *See* Mistry Reply Decl. at ¶ 4. While the TCC refers to the NorthStar Report for certain matters, not surprisingly, it fails to note certain very important conclusions made by NorthStar:

- The NorthStar Report states that "PG&E made two significant changes in the early years following San Bruno to drive improvements in [its] safety culture: 1) the modification of discipline policies and 2) the emphasis on speaking up for safety." These measures included "encouraging management and employees to report safety issues and to have open dialogue regarding potential safety concerns." NorthStar Report at I-6.

- The NorthStar Report found that "PG&E executive management is committed to safety" and the Northstar Report observed a similar "commitment to safety among field employees." *Id.* at I-6.

- The NorthStar Report observed that PG&E had increased the weighting of safety measures in its STIP from 10 percent in 2011 to "the current level of 50 percent." *Id.* at VII-12.

Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153-0119

- The NorthStar Report stated that the "**50 percent weighting [of safety measures] is considerably higher than typical in the utility industry**." *Id.* at VII-12 (emphasis added).

The NorthStar Report, which is directed at "Safety Culture," has one section that addressed "Compensation and Performance Management" and set forth certain recommendations relating to that subject. These are set forth in a chart on page I-14 of the NorthStar Report. The TCC in its Objection discusses three of them and highlights those three and a fourth in its attached exhibit to the Objection. These four recommendations, however, are either inapplicable to the 2019 STIP or required only that the Compensation Committee "reevaluate" or "revisit" certain elements of the STIP, rather than ordering that the recommendations be implemented. The TCC cannot point to a single NorthStar STIP recommendation that has not been reevaluated, revisited, or implemented, or to any evidence of noncompliance in the 2019 STIP with the CPUC NorthStar Order. Quite the contrary: the Compensation Committee considered the NorthStar Report, including the recommendations made in the NorthStar Report relating to Compensation and Performance management as they pertain to the 2019 STIP. And, the Debtors have complied with all recommendations set forth in the NorthStar Report with respect to the 2019 STIP. *See* Mistry Reply Decl. at ¶ 8.

Specifically, the first NorthStar Report recommendation highlighted by the TCC, item VII-1, states that "[n]one of the [key performance indicators] currently considered for use in measuring safety culture should be included as an incentive measure . . . ." NorthStar Report at I-14. The NorthStar recommendation goes on to state: "[i]ncentives tied to employee submittals[10] will ensure targets are met and may minimize the value of the submittals." *Id.* The TCC cites to this recommendation as if it were somehow applicable to the 2019 STIP. *See* TCC Obj. at 9. However,

---

[10] "Employee submittals" include things such as self-reporting as to an injury or individual employee perception surveys which are recognized to have the potential, when included in an incentive plan, to be underreported and, therefore, considered to be an unreliable incentive plan metric. *See* Mistry Reply Decl. at ¶ 9, n.1.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

consistent with the NorthStar recommendation, the Debtors did not include any such metrics in their 2018 and 2019 STIPs. *See* Mistry Reply Decl. at ¶ 9.

The second NorthStar Report recommendation highlighted by the TCC, item VII-4, merely states that the Debtors should "[r]eevaluate the appropriateness of the Earnings from Operations component of the STIP . . . ." NorthStar Report at I-14. As is clear from the quoted language, this recommendation *does not require* that the Debtors remove the Earnings from Operations component from the STIP, but simply that the Debtors reevaluate this metric. The TCC provides no basis to assert, much less conclude, that the Debtors, including the Compensation Committee, did not reevaluate the use of Earnings from Operations in light of the NorthStar Report before using that metric in the 2019 STIP. The Debtors, including the Compensation Committee, in full compliance with the recommendation, reevaluated the use of the Earnings from Operations metric in light of the NorthStar Report before using that metric in the 2019 STIP, and, indeed, consulted with their compensation consultant, WTW, with respect to the same. *See* Mistry Reply Decl. at ¶¶ 9–10. The Debtors concluded, after the reevaluation, that the Earnings from Operations component of the 2019 STIP was appropriate because, among other things, it is the same metric used to explain the financial performance of the Debtors to investors. *See id.* at ¶ 11.

The third NorthStar Report recommendation referred to by the TCC, item VII-5, requires the Debtors to "[r]evisit all STIP metrics and targets in light of the enterprise-wide safety plan recommended by NorthStar." NorthStar Report at I-14. One specific item discussed in this recommendation is to "include a contractor safety metric in the STIP." *Id.* Although this recommendation also does not *require* the Debtors to change the metrics and targets in the 2019 STIP, in fact, since 2017, the STIP metrics have changed and now include two new metrics— namely, the Enhanced Vegetation Management and System Hardening metrics—that are designed to incentivize employees with respect to fire mitigation. *See* Mistry Reply Decl. at ¶ 12. Additionally, the Serious Injuries and Fatalities ("**SIF**") Corrective Action Index in the 2019 STIP includes contractor SIF actual events. *Id.* The TCC again provides no evidence, nor can it, that the Debtors have not revisited and reevaluated the STIP metrics in light of the NorthStar Report.

The fourth NorthStar recommendation referred to by the TCC, item VII-6, requires that the Debtors develop "a more robust and comprehensive set of BPR metrics addressing all aspects of safety . . . . " NorthStar Report at I-14. This recommendation does not relate to the 2019 STIP or compensation. Instead, it relates to the Debtors' monthly BPR or Business Plan Review by senior management that has no relationship to compensation matters. *See* Mistry Reply Decl. at ¶ 13.

The TCC's reliance in its Objection on a lack of compliance with the CPUC NorthStar Order as it relates to the 2019 STIP is completely unfounded.

In addition to these errors, the TCC also misrepresents the Direct Testimony of Debbie Robinson dated October 6, 2017, referred to in the TCC's objection. *See* TCC Obj. at 27 (citing Woltering Decl. Ex. C-20 (testimony before the California Public Utilities Commission concerning compensation and benefits programs of SOCALGAS and SDG&E) (the "**Robinson Testimony**")). While Ms. Robinson's testimony states that 70% of the company performance metric in the SOCALGAS and SDG&E incentive plans relate to safety, that testimony requires more context. The company performance metric in those programs is only half of the total STIP weighting. The other half of the metrics relates to individual performance. In fact, the safety metric is listed as only 35% of the *total* incentive plan metrics. *See* Robinson Testimony at DSR-12, DSR-13.

In addition, the metrics for SDG&E indicate that "Electric Safety" represents only 6% of the total metrics of the SDG&E plan (the SOCALGAS plan does not contain any "electric safety metric"). *See id.* at DSR-13.

Thus, when the SOCALGAS and SDG&E incentive plan metrics are properly viewed as a whole, the Debtors' metrics compare favorably on safety, especially the metric relating to electric safety. Specifically, the Debtors' safety metric, which represents 50% of the total 2019 STIP metrics, compares favorably with the 35% safety metric for the SDG&E and SOCALGAS incentive plans as a whole. Similarly, the 10% metric in the Debtors' 2019 STIP relating to electric safety also compares favorably with the 6% metric on electric safety for the SDG&E incentive plan as a whole. *See id.*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Also left unmentioned by the TCC is that Ms. Robinson's report relating to SDG&E senior executives sets forth the metrics for the executive incentive compensation plan, which are very similar to the Debtors' 2019 STIP, with 50% dedicated to safety and 35% to financial measures. *See id.* at DSR-14. And Ms. Robinson's report also reflects that SDG&E and the Debtors both determine whether their plans provide for market compensation for employees by utilizing similar General Rate Case studies. Ms. Robinson's report confirms that "Compensation professionals, including WTW, typically consider a range of plus or minus 10 percent of the average of the external market data to be competitive." *See id.* at DSR-6. This is additional confirmation that the Debtors' use of the General Rate Case study prepared by WTW was a typical method to determine whether a STIP plan as part of a compensation package is competitive in the market.[11]

## V. NONE OF THE EMPLOYEES ELIGIBLE FOR THE 2019 STIP ARE INSIDERS AND, IN ANY EVENT, THE 2019 STIP IS NOT A RETENTION PLAN

The U.S. Trustee asserts in its objection that the 2019 STIP should not be approved because it includes "insiders" by virtue of the "director," "manager" and "vice president" titles held by certain 2019 STIP Participants and is, therefore, a prohibited retention plan under section 503(c)(1) of the Bankruptcy Code because it may have retentive components. The U.S. Trustee, however, ignores the plain facts in the Debtors' 2019 STIP Motion and the Mistry Declaration that demonstrate that none of the 2019 STIP Participants exercises the degree of control over the Debtors' corporate policies and affairs required to constitute being an insider. Moreover, because the 2019 STIP is an incentive-based plan, section 503(c)(1) of the Bankruptcy Code and the insider issue are irrelevant.

As set forth in the 2019 STIP Motion, it is well established that an employee's job title alone does not make such employee an "insider" for purposes of section 503(c)(1) of the

---

[11] The TCC used the NorthStar Report only in the deposition of Doug Friske, and did not ask Mr. Mistry, the Company's senior officer in charge of Human Resources, including development of the 2019 STIP, any questions concerning the NorthStar Report in his deposition. Since Mr. Friske did not examine specific safety metrics or the specific weighting of those metrics, the consideration of the NorthStar Report was not relevant to his work.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Bankruptcy Code. Although section 101(31) of the Bankruptcy Code defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor," that is not dispositive. *See In re Borders Grp. Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders); *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("The label an employer chooses to attach to a position is not dispositive for purposes of insider analysis because [c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive." (citation and internal marks omitted)); *see also Brandt v. Tabet DiVito & Rothstein, LLC (In re Longview Aluminum, LLC)*, 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009) ("[I]t is not simply the title 'director' or 'officer' that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds.").

Cases cited by the U.S. Trustee acknowledge the foregoing—that job titles in and of themselves are not controlling. *See Borders Grp. Inc.*, 453 B.R. at 468–69 (holding that "[a]n individual's title, by itself, is insufficient to establish that an individual is a director or officer" and concluding that, notwithstanding their job title, certain "director-level" employees were not insiders); *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) (reaffirming that the "mere title of a person does not end the inquiry" and "[j]ust as there may be non-statutory insiders that fall within the definition of an insider but are outside of the enumerated categories, there may be persons that fall within the enumerated categories but do not meet the definition of the category").[12]

---

[12] *In re Village of Lakeridge, LLC*, 814 F.3d 993 (9th Cir. 2016), a case relied on by the U.S. Trustee is easily distinguishable. That case dealt with whether a creditor-claim purchaser was an insider for vote designation purposes in the context of confirmation of a plan. It had nothing to do with section 503(c) of the Bankruptcy Code.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Here, as already noted in the Debtors' 2019 STIP Motion and the Mistry Declaration, despite the titles of a few of the 2019 STIP Participants, the relevant facts confirm that none of the participants is an "insider." None of the participants report to the Board of Directors of the Debtors and none were directly appointed by the Board. *See* Mistry Decl. at 9. None of the participants direct the Debtors' overall corporate governance, control the Debtors' company policy, exercise managerial control over the Debtors' operations as a whole or has discretionary control over substantial budgetary amounts, or has the ability to determine his or her own compensation. *See id*. Moreover, none of the participants can take any significant action with respect to the Debtors' corporate policies, the disposition of significant assets, or any other action with material economic consequences, without, in each case, obtaining direction or consent from a senior company officer (which officers are not 2019 STIP Participants). *See id.* These same facts hold true for the *de minimis* number of participants (approximately 8 out of 10,000) who hold director and officer titles at the non-debtor subsidiaries, which subsidiaries, in any event, have no material assets or business operations. *See id.* at 9.

More importantly, regardless of whether any of the 2019 STIP Participants are insiders under applicable case law—which they are not—the insider analysis is wholly irrelevant because the 2019 STIP is clearly an incentive-based compensation plan. As noted by the U.S. Trustee, it is the substance of how and why payments under the 2019 STIP will be made that determine whether it is an incentive plan. *See* U.S. Trustee Obj. at 10:16–21. Here, the circumstances for when a payout is earned and why it is paid demonstrate the 2019 STIP is an incentive plan. The 2019 STIP bears the hallmark of a true incentive plan, and is comprised solely of weighted metrics for safety, financial performance, and customer satisfaction, each designed specifically to motivate employees to achieve critical safety, operational, and financial goals to maximize enterprise value. *See* Mistry Decl. at 7–8; *see also In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *2–4 (Bankr. S.D.N.Y. Sept. 24, 2010) (incentive plans are designed to motivate employees to achieve performance goals). How much of a 2019 STIP payment will be made, and whether one will be made at all, is completely dependent on whether the Debtors achieve their

company-wide goals for any given quarter as a result of their employees' efforts. *See* Mistry Decl. at 6, 8. The metrics, some of which have been updated to reflect the Debtors' 2019 priorities, are generally in line with the metrics used by the Debtors' peers. *See* Friske Dep. at 30:19–24. In short, there are no guaranteed payments; the 2019 STIP, like the STIPs for prior years, is an "at-risk" component of an employee's compensation. *See* Mistry Decl. at 8. In addition to the risk that metrics may not be met, and thus incentive payments not earned, the Compensation Committee continues to retain, as it did in prior years (including 2018), complete discretion to determine that any earned payout should not be paid for any reason whatsoever.

Finally, notwithstanding the U.S. Trustee's suggestions otherwise, the case law is abundantly clear that just because the 2019 STIP may have some retentive effect, that does not make the 2019 STIP a retention plan within the ambit of section 503(c)(1) of the Bankruptcy Code. *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (noting that although modifications made to an incentive program had some retentive effect, because the program was put in place "for the primary purpose of motivating employees . . . the limitations of section 503(c)(1) [were] not applicable").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## VI. CONCLUSION

For the reasons stated herein and in the Debtors' 2019 STIP Motion, the Court should approve the 2019 STIP.

Dated: April 3, 2019           **WEIL, GOTSHAL & MANGES LLP**

                                **KELLER & BENVENUTTI LLP**

                                By: /s/ Jane Kim
                                    Jane Kim

                                *Proposed Attorneys for Debtors*
                                *and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119