1         UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4  In Re:                        ) Case No. 19-30088
                                 ) Chapter 11
5  PG&E CORPORATION AND PACIFIC  )
   GAS AND ELECTRIC COMPANY      ) San Francisco, California
6                                ) Tuesday, April 9, 2019
                        Debtor.  ) 9:30 AM
7  _____  )
                                   MOTION OF OFFICIAL COMMITTEE
8                                  OF TORT CLAIMANTS PURSUANT TO
                                   11 U.S.C. 503(B)(3)(F) AND
9                                  105(A) TO ESTABLISH
                                   PROCEDURES FOR REIMBURSEMENT
10                                 OF EXPENSES OF TORT COMMITTEE
                                   MEMBERS [813]
11
                                   APPLICATION OF DEBTORS
12                                 PURSUANT TO 11 U.S.C. 327(A)
                                   AND FED. R. BANKR. P. 2014(A)
13                                 AND 2016 FOR AUTHORITY TO
                                   RETAIN AND EMPLOY WEIL,
14                                 GOTSHAL & MANGES LLP AS
                                   ATTORNEYS FOR THE DEBTORS
15                                 EFFECTIVE AS OF THE PETITION
                                   DATE [864]
16
                                   APPLICATION OF DEBTORS
17                                 PURSUANT TO 11 U.S.C.363(B)
                                   AND 105(A) FOR AUTHORITY TO
18                                 EMPLOY AND RETAIN AP
                                   SERVICES, LLC TO PROVIDE A
19                                 CHIEF RESTRUCTURING OFFICER,
                                   DEPUTY CHIEF RESTRUCTURING
20                                 OFFICER, AND ADDITIONAL
                                   PERSONNEL FOR THE DEBTORS
21                                 NUNC PRO TUNC TO THE PETITION
                                   DATE [867]
22
                                   APPLICATION OF DEBTORS
23                                 PURSUANT TO 11 U.S.C.327(A)
                                   AND FED. R. BANKR. P. 2014(A)
24                                 AND 2016 FOR AUTHORITY TO
                                   RETAIN AND EMPLOY KELLER &
25                                 BENVENUTTI LLP AS ATTORNEYS

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1                                      FOR THE DEBTORS NUNC PRO TUNC
                                        TO THE PETITION DATE [869]
 2
                                        APPLICATION PURSUANT TO 11
 3                                      U.S.C 327 FOR AN ORDER
                                        AUTHORIZING EMPLOYMENT AND
 4                                      RETENTION OF PRIME CLERK LLC
                                        AS ADMINISTRATIVE ADVISOR
 5                                      NUNC PRO TUNC TO THE PETITION
                                        DATE [887]
 6
                                        APPLICATION OF THE OFFICIAL
 7                                      COMMITTEE OF TORT CLAIMANTS
                                        PURSUANT TO 11 U.S.C. 1103
 8                                      AND FED. R. BANKR. P. 2014
                                        AND 5002, FOR AN ORDER
 9                                      AUTHORIZING RETENTION AND
                                        EMPLOYMENT OF BAKER AND
10                                      HOSTETLER LLP, EFFECTIVE AS
                                        OF FEBRUARY 15, 2019 [934]
11
                                        CORRECTED MOTION OF DEBTORS
12                                      PURSUANT TO 11 U.S.C. 105(A),
                                        363, AND 503(C) FOR ENTRY OF
13                                      AN ORDER (I) APPROVING SHORT-
                                        TERM INCENTIVE PLAN AND (II)
14                                      GRANTING RELATED RELIEF

15                        TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE DENNIS MONTALI
16                     UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:
     For the Debtor:            STEPHEN KAROTKIN, ESQ.
18                              Well, Gotshal & Manges LLP
                                757 Fifth Avenue
19                              New York, NY 10153
                                (212)310-8350
20
     For the Debtor:            JANE KIM, ESQ.
21                              TOBIAS KELLER, ESQ.
                                Keller Benvenutti
22                              650 California Street
                                Suite 1900
23                              San Francisco, CA 94108
                                (415)364-6793
24

25
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For Official Committee of    ROBERT A. JULIAN, ESQ.
     Tort Claimants:              LAUREN T. ATTARD, ESQ.
 2                                (Telephonically)
                                  JORAN ROSE, ESQ.
 3                                (Telephonically)
                                  ERIC E. SAGERMAN, ESQ.
 4                                (Telephonically)
                                  Baker & Hostetler LLP
 5                                1160 Battery Street East
                                  Suite 100
 6                                San Francisco, CA 94111
                                  (628)208-6436
 7
     For Official Committee of    GREGORY BRAY, ESQ.
 8   Creditors:                   Milbank LLP
                                  2029 Century Park East
 9                                33rd Floor
                                  Los Angeles, CA 90067
10                                (424)386-4470

11   For Ad Hoc Committee of      DAVID H. BOTTER, ESQ.
     Noteholders:                 Strauss Hauer & Feld LLP
12                                One Bryant Park
                                  New York, NY 10036
13                                (212)872-1000

14   For United States Trustee:   TIMOHTY S. LAFFREDI, ESQ.
                                  Office of the U.S. Trustee
15                                SF 450 Golden Gate Avenue
                                  Suite 05-0153
16                                San Francisco, CA 94102
                                  (415)705-3333
17
     For SLF Fire Victim          JAMES P. HILL, ESQ.
18   Claimants:                   CHRISTOPHER V. HAWKINS, ESQ.
                                  Sullivan Hill Rez & Engel
19                                600 B. Street
                                  Suite 1700
20                                San Diego, CA 92101
                                  (619)233-4100
21
     For City and County of San   EDWARD TREDINNICK, ESQ.
22   Francisco:                   (Telephonically)
                                  Green, Radovsky, Maloney and Share
23                                4 Embarcadero Center
                                  #4000
24                                San Francisco, CA 94111
                                  (415)981-1400
25
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

| | | |
|---|---|---|
| 1 | For Ghost Ship Warehouse: | ESTELA O. PINO, ESQ. |
| | | (Telephonically) |
| 2 | | Pino & Associates |
| | | 20 Bicentennial Circle |
| 3 | | Suite 200 |
| | | Sacramento, CA 95826 |
| 4 | | (916)641-2288 |
| 5 | For Engineers and | CAITLIN GRAY, ESQ. |
| | Scientists of California, | EMILY RICH, ESQ. |
| 6 | Local 20, IFPTE: | (Telephonically) |
| | | Weinberg, Roger & Rosenfeld |
| 7 | | 1001 Marian Village Parkway |
| | | Suite 200 |
| 8 | | Alameda, CA 94501 |
| 9 | For International | W. STEVEN BRYANT, ESQ. |
| | Brotherhood Electrical | (Telephonically) |
| 10 | Workers Local Union: | Locke Lord LLP |
| | | 600 Congress Avenue |
| 11 | | Suite 2200 |
| | | Austin, TX 78701 |
| 12 | | (512)305-4700 |
| 13 | For Itron, Inc. & Curtiss- | MICHAEL BUSENKELL, ESQ. |
| | Wright: | (Telephonically) |
| 14 | | Gellert Scali Busenkell & Brown, LLC |
| 15 | | 1201 North Orange Street |
| | | Suite 300 |
| 16 | | Wilmington, DE 19801 |
| | | (302)425-5812 |
| 17 | | |
| | For CPUC: | BRIAN S. HERMANN, ESQ. |
| 18 | | (Telephonically) |
| | | ALAN KORNBERG, ESQ. |
| 19 | | (Telephonically) |
| | | SEAN MITCHELL, ESQ. |
| 20 | | (Telephonically) |
| | | Paul, Weiss, Rifkind, Wharton & |
| 21 | | Garrison LLP |
| | | 1285 Avenue of the Americas |
| 22 | | New York, NY 10019 |
| | | (212)373-3000 |
| 23 | | |
| 24 | | |
| 25 | | |

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For California Department    PAUL J. PASCUZZI, ESQ.
     of Toxic Control:           (Telephonically)
 2                               Felderstein Fitzgerald Willoughby
                                 & Pascuzzi LLP
 3                               400 Capital Mall
                                 Suite 1750
 4                               Sacramento, CA 95814
                                 (916)329-7400
 5
     For Southern Power          HARRIS B. WINSBERG, ESQ.
 6   Company:                    (Telephonically)
                                 Troutman Sanders LLP
 7                               600 Peachtree Street NE
                                 Suite 3000
 8                               Atlanta, GA 30308
                                 (404)885-3348
 9
     For Atlas:                  THOMAS TOSDAL, ESQ.
10                               (Telephonically)
                                 Tosdal Law Firm
11                               777 South Highway 101
                                 Suite 215
12                               Solana Beach, CA 92075
                                 (858)704-4709
13
     For Jenna, et al:           NICHOLAS JP. WAGNER, ESQ.
14                               (Telephonically)
                                 Wagner, Jones, Kopfman & Artenian
15                               LLP
                                 1111 East Herndon Avenue
16                               Suite 317
                                 Fresno, CA 93720
17                               (559)449-1800

18

19

20

21

22

23

24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

Court Recorder:                     JANE GALVANI
18                                  United States Bankruptcy
                                    Court
19                                  450 Golden Gate Avenue
                                    16th Floor
20                                  San Francisco, CA 94102

21  Transcriber:                    MICHAEL DRAKE
                                    eScribers, LLC
22                                  7227 N. 16th Street
                                    Suite #207
23                                  Phoenix, AZ 85020
                                    (973)406-2250
24

Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.

PG&E Corporation, et al.

2                                -oOo-

3        (Call to order of the Court.)

4             THE CLERK:  In the matter of PG&E Corporation.

5             THE COURT:  Go ahead and just call the case out.

6             THE CLERK:  PG&E Corporation.

7             THE COURT:  Good afternoon.  Good morning, everyone.

8             One housekeeping chore.  Ms. Kim, are you here?  No,

9    don't get up.  I want to thank you, again, for the

10   comprehensive binders you've been preparing for us.  I tell

11   you, you really don't have to do them anymore.  They're very

12   voluminous and they're very helpful.  But with the way that

13   everyone has been responding to chambers copies and sometimes

14   we have to make them ourselves, frequently we're already up to

15   speed on most everything you have.

16            And I think since you're putting the agenda on the

17   docket, that's helpful.  And we can take it from there.  So

18   thank you for doing it, but you don't need to do it anymore.  I

19   appreciate it.

20            MS. KIM:  Thank you, Your Honor.

21            THE COURT:  Okay.  Going to the regular schedule --

22   oh.  Mr. Karotkin, shall we go with the -- ready for the

23   professional application?

24            MR. KAROTKIN:  Yes, sir.

25            THE COURT:  Yeah.  Well, as I said, I just had a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    couple of very quick matters.  I mean, I assume that you or no

2    one else has anything to supplement with them, right?

3            MR. KAROTKIN:  Not that I'm aware of, sir.

4            THE COURT:  Okay.  Very minor points.  I mean, they're

5    very insignificant.  Well, I did ask you what is the debtor's

6    response to the official creditors' committee's desire to be

7    treated equally like the tort claimants' committee's members?

8    No problem?

9            MR. KAROTKIN:  No, sir, none at all.

10           THE COURT:  Yeah.  I think -- again, I don't like to

11   make a big deal of a simple procedure, but counsel for the

12   creditors' committee should next time get a consent or shorten

13   time or do something so we won't get a -- into  problem.  But I

14   will go ahead and authorize the members of the two committees

15   to be reimbursed their expenses consistent with the procedures

16   that are laid out in the tort claimants' committee's papers.

17   So that takes care of that one.

18           One the other professional application -- or excuse

19   me, professional retention ones, they're very minor.  The first

20   comment is one that's addressed probably to only the Weil firm,

21   the Keller Benvenutti and -- one second -- I think that's all.

22   In those cases -- in most cases, you've made the proper

23   recitals about your firms not being -- excuse me, your firms

24   being disinterested.

25           And I just want to state what is obvious.  I'm not

PG&E Corporation, et al.

1  making a determination; I'm taking your representations.  And

2  if circumstances either develop in the future or come to either

3  firms' attention that changes that, I expect you'll have to

4  take appropriate action.  I don't want to -- I hope we don't

5  ever have to cross that bridge.  But that's just what the law

6  would require.

7          And then secondly, again, consistent with the -- I

8  think the case law on this subject, if there are conflicts --

9  not the question of whether you're disinterested or not, but

10  the question of whether there some conflicts that surface or

11  that were previously not identified, again, you all know the

12  rules.  The burdens are on -- we're paying professionals to

13  take action and do what has to be done.  So I don't want to --

14  it's not an adverse issue at the moment.  It's just a reminder.

15          And for the Keller Benvenutti application only, I

16  believe, if I read it correctly, the application there recites

17  that the firm wishes to have the option under circumstances if

18  it's necessary to withdraw from the representation.  I don't

19  anticipate that will happen.  But I need to make sure that the

20  order -- the retention order clarifies that that is subject to

21  court approval.  That's been my procedure for all retained

22  counsel for Chapter 11 debtors-in-possession.

23          So I want to make sure the order for approving the

24  retention of Keller & Benvenutti is consistent with that since

25  the recitals in there about it -- there's a -- if there's a

PG&E Corporation, et al.

1    desire to terminate the representation that it's done on a

2    court order unless -- yeah.  And let's leave it at that for

3    now.

4          So again, I don't need a response from anyone.  I'll

5    just act on it and make sure that the orders are consistent

6    with that when they're uploaded.

7          The next one I have is really a question.  And it's

8    only a question.  And that is why is Prime Clerk being employed

9    under Section 327.  I mean, I've always thought that

10   professionals -- and I'm not suggesting that they're not

11   professional.  But with a capital P, professionals who were

12   employed under Section 327, there's a lot of baggage.  There's

13   more -- or in a difficult reporting, there's filed

14   applications.  I want to -- is this a major issue for the

15   debtor or does anybody care?  I mean, if Prime Clerk wants to

16   burden itself that way, I guess I'll say fine, do it.

17         MR. KAROTKIN:  I understand that's the way Prime Clerk

18   typically does it.  And we certainly have no issues with that.

19         THE COURT:  Well, as I say, if they want to over --

20   make it more difficult, okay.  I'll accept that.  That's what

21   they did.  I mean, they know what they're doing.  And I have

22   been skeptical about indemnification procedures for retained

23   professionals.  But I think under these circumstances, it's a

24   different function.  It's not some of the other kind of

25   professionals that have that issues.  And so I'm okay with

PG&E Corporation, et al.

1    that, having reviewed the language.

2           And the Prime Clerk's retention will be approved.

3           As far as the application for the chief restructuring

4    officer to not have a problem -- wait one second -- from --

5    yeah, no problem.  So there is no questions on that.

6           So the final one has to do with counsel for the tort

7    claimants' committee, Baker & Hostetler.  Who's here today for

8    that?

9           MR. ROSE:  Good morning, Your Honor.  Jorian Rose from

10   Baker 7 Hostetler.

11          THE COURT:  Just a simple question.  This is -- I

12   mean, we're here to do other things today.  This is the one

13   application that did not make reference to the Court's

14   compensation guidelines because we have, of course, United

15   States Trustee guidelines for compensation.  But we have also

16   have, as the local practitioners know in the Northern District,

17   compensation guidelines for the professionals.

18          So I believe that the retention order for baker &

19   Hostetler on behalf of the committee, even though the

20   lawyers -- the firm is not being employed under Section 327 but

21   rather under Section 1103, that's not the point here.  The

22   point is that when it comes time for compensation allowances

23   and so on, I want to make sure that the applicants are aware of

24   the slight difference between our compensation guidelines and

25   the U.S. Trustee guidelines.  And the retention order should

PG&E Corporation, et al.

1    reflect both of those sets of guidelines.

2         So with that --

3         MR. ROSE:  Your Honor --

4         THE COURT:  Yes, sir?  Okay.

5         MR. ROSE:  -- we're happy to make that adjustment.

6         THE COURT:  Yeah.  Just pick it up in the order.  No,

7    I knew you would.  Because if you didn't -- if you weren't

8    happy to, then you wouldn't get retained.  So I just --

9         MR. ROSE:  Agreed.  Agreed.

10        THE COURT:  All right.

11        MR. ROSE:  Thank you, Your Honor.

12        THE COURT:  So unless there's someone else in court or

13   on the phone that wants to be heard, the way I follow it on our

14   agenda, the only item that we're dealing with this morning and

15   that you're all here for is the so-called STIP motion.  And as

16   I said to the parties by way of a brief docket text, I just had

17   a couple of preliminary questions.

18        So, Mr. Karotkin, I'll just address this to you unless

19   you want to pass it off on somebody else.  And that is does the

20   debtor have a position on -- specific and separate from the

21   arguments made either by the U.S. Trustee or the tort claim

22   committee on Local 20 and the position taken by Local 20 that

23   some number of their members are entitled to be compensated

24   under the procedure as a matter of the collective bargaining

25   agreement.  I saw their response.  And I didn't hear anything

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    from the debtor.  And I just needed to know what your position

2    is.

3         MR. KAROTKIN:  We've had further discussions with

4    Local 20.  And I think that -- I don't want to speak for them.

5    They're here today.  I think it's fair to say that they support

6    the motion.

7         THE COURT:  No, I know that.

8         MR. KAROTKIN:  And with respect to 2018, that would

9    remain open going forward as a dispute, whether they would be

10   entitled to it under the terms of the contract or whether it --

11   the debtor's effort to terminate that violated 1113 or those

12   provisions.

13        But insofar as going forward, they have no objection

14   subject to the reservation of rights of 2018.

15        THE COURT:  Well, but what I'm -- you're saying

16   something different.  Maybe I didn't ask the question

17   correctly.  There are several, as you know, objections to the

18   STIP motion.  And again, we'll hear at length about -- the

19   arguments for and against their position.

20        But it seemed like 1,600 or so members of Local 20

21   would fall into a different category perhaps.  And I'll let the

22   other parties when they're making their arguments say whether

23   that should be treated differently.  I mean, I suppose if I

24   overrule the objections and grant the motion with whatever

25   modifications you're going to report, that's one thing.  If I

PG&E Corporation, et al.

1  defer it or deny it, then I need to get some indication on how

2  to deal with that one subset of people to see whether they're

3  treated differently.  Again, we don't have to do more about it

4  now.

5  So the second question for you though is, when the

6  case got filed, there was a motion to go forward with the

7  STIP -- a STIP, 2018 version.  It involved 4,000 more employees

8  and substantially less money.

9  Now, my question for you, just as a preliminary, is

10 what happens to those 4,000 employees and what happens to the

11 other 14,000 employees who aren't covered by the STIP?  Are we

12 going to be getting more motions for them?  I need -- or is

13 that something that's not on the horizon?  This is really just

14 to know what's coming down the road and whether there's a

15 relationship.  Are you able to answer that, Mr. Karotkin?

16 MR. KAROTKIN:  Yes, I am.

17 THE COURT:  Okay.

18 MR. KAROTKIN:  Give me one moment.

19 THE COURT:  Okay.

20 MR. KAROTKIN:  First of all, as to your question as to

21 whether it is substantially more money, when you take into

22 account, Your Honor, the proposed STIP payments for 2019 which

23 includes the LTIP --

24 THE COURT:  Right.

25 MR. KAROTKIN:  -- for approximately 400 employees at

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  fifty percent of the normal LTIP rate, the numbers are

2  comparable.  They're about -- each about, at target, 235

3  million dollars based on target for 2018, including the LTIP

4  payment that --

5          THE COURT:  Well, that --

6          MR. KAROTKIN:  -- would have been made.

7          THE COURT:  I'll get to some questions later after the

8  arguments about trying to understand the mechanics of all of

9  this.  But the one big question that comes out is the LTIP

10  participants, at least some of them, were getting some equity

11  component.  And now they're not.  Now, again, if you're not

12  getting equity and you're getting money and you're getting more

13  money, then the question is, well, is that a good thing or a

14  bad thing.

15          For today, for the preliminary question, I just really

16  want -- I want to make sure I'm clear then what happens -- what

17  is the fate, if there was a fate, to the people who are

18  employed by the debtors that aren't within the 10,000 or so

19  people that are the beneficiaries of the 2019 STIP if indeed

20  it's approved.

21          MR. KAROTKIN:  Okay.  Again, my numbers reflect that,

22  going to back to -- you said 4,000 people, additional people

23  that for 2018, there were approximately 10,800 people in the

24  STIP.

25          THE COURT:  Okay.  Maybe I misread it then.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          MR. KAROTKIN:  Okay.

2          THE COURT:  All right.  I --

3          MR. KAROTKIN:  And for this year, there's

4    approximately 10,000.

5          THE COURT:  No.  Then if I misspoke --

6          MR. KAROTKIN:  Okay.

7          THE COURT:  -- and I misunderstood it, then I am

8    corrected.  Then --

9          MR. KAROTKIN:  And as we indicated, the STIP does not

10   cover the top twelve insiders.

11         THE COURT:  No, I understand.  I understand.

12         MR. KAROTKIN:  And there is no plan for a STIP for the

13   remaining 14,000 or so employees.

14         THE COURT:  Okay.

15         MR. KAROTKIN:  The only potential things that the

16   debtors are contemplating would be a key employee retention

17   plan for the top twelve which would be brought to the Court.

18   And perhaps, perhaps a KERP that would only encompass 400

19   employees.

20         THE COURT:  Okay.  Again, I don't want to bog you down

21   or sidetrack it with questions.  You've answered the question

22   adequately for now.  And if next week or next month or next

23   year there is a change in position, I'm not going to say you

24   committed to something else.  I'm just -- you're just giving me

25   a report.

PG&E Corporation, et al.

1    My final question is really something maybe I should

2  know the answer to.  But the Mr. Mistry's paper, his

3  declaration, and maybe the other one too but certainly his,

4  identify -- or they make reference to a compensation committee

5  made up of four independent board members.  Am I correct there

6  is no independent board of the utility?  Is that true or is

7  there a board of directors of utility as distinguished from the

8  parent company?

9    MR. KAROTKIN:  Yes.  There are two boards.

10    THE COURT:  Okay.

11    MR. KAROTKIN:  They're essentially the same people.

12    THE COURT:  Well, okay.  But wearing their utility

13  board hat, are they the ones that approved this STIP or --

14    MR. KAROTKIN:  Yes.  As I understand it, yes, sir, in

15  their capacity of members of the compensation committee

16  evaluating the utilities that -- yes, sir.

17    THE COURT:  Okay.  Those are my only preliminary

18  questions.  So I departed from the usual procedure of treating

19  the debtor as the moving party.  The debtor is the moving

20  party.  And normally the moving party is called to present its

21  case first.  But I am fully informed of this.  And I've read

22  the papers more than once.  And it's thoroughly briefed.  And I

23  really want to zero in on the challenges to it by the

24  opponents.

25    And by listing who I want to hear from, I wasn't

PG&E Corporation, et al.

1   excluding or intending to exclude any other party who has

2   stated an opposition.  I just was identifying for sequencing

3   who I'd hear from first.  And then, obviously, I will give the

4   debtor's representatives ample opportunity respond.  And I

5   somehow think I probably will have questions somewhere along

6   the line again.  So unless you have an objection, that's the

7   way I want to proceed.

8           MR. KAROTKIN:  No, no objection to the way --

9           THE COURT:  Okay.

10          MR. KAROTKIN:  -- you want to proceed.  Perhaps just a

11  housekeeping matter.

12          THE COURT:  Yes.

13          MR. KAROTKIN:  In terms of the procedures, last week

14  we spoke with Mr. Julian from the tort committee, Mr. Laffredi,

15  and Mr. Hawkins about whether they intended to take any

16  cross-examination of our declarants.  And they said that they

17  did not intend to do so.  Obviously, our declarants are here in

18  court today if anyone has any questions.

19          THE COURT:  Well, I wasn't anticipating that.

20          MR. KAROTKIN:  Okay.

21          THE COURT:  I mean, even if they had said they wanted

22  to, I wasn't going to turn this into a trial.

23          MR. KAROTKIN:  Okay.

24          THE COURT:  I mean, I may -- they may persuade me that

25  they should have a further opportunity.  They did have an

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    opportunity during the --

2          MR. KAROTKIN:  They did.

3          THE COURT:  -- the depositions, right?

4          MR. KAROTKIN:  Yes, sir.  But we would ask that the

5    three declarations be admitted into evidence for purposes of

6    the hearing.

7          THE COURT:  Well, I'll tell you what.  I'll take that

8    as a request.  And then I'll -- and when opposing counsel are

9    making their argument, they can tell me if they have any

10   objection.

11         MR. KAROTKIN:  Okay.

12         THE COURT:  I mean, to some extent, and I don't mean

13   to be critical of the two declarants, but there's a lot of

14   duplication.  I mean, the charge, the list, and the metrics and

15   the details are the same thing twice.  And so I don't know that

16   there's any harm in taking it into evidence.  I still have to

17   make the judgment call and exercise of the business judgment.

18   So --

19         MR. KAROTKIN:  Yes, sir.

20         THE COURT:  All right.  So my invitation to have

21   people speak, let's first start with the U.S. Trustee.

22         So, Mr. Laffredi, do you wish to be heard?  And

23   because I didn't -- and I asked this in part because I thought

24   you had some very interesting questions.  And I didn't see any

25   response to your questions.  And so I want you to respond to

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    the lack of response to your questions and --

2              MR. LAFFREDI:  Right.  Thank you, Your Honor.

3              THE COURT:  -- take it from there.

4              MR. LAFFREDI:  And Tim Laffredi for the U.S. Trustee.

5              Essentially, the U.S. Trustee's objection is that the

6    debtors fail to meet their burden under either 503(c)(1) or

7    503(c)(3).  With regard to 503(c)(1) --

8              THE COURT:  Well, the two declarants did say that they

9    aren't any insiders.  I mean, that is some prima facie proof

10   that they said that.  And they must have a basis for it.

11             MR. LAFFREDI:  Right.  Well, that's the problem, is

12   it's of a very conclusory statement that, no, they're not

13   insiders; yes, this is incentivizing.  How do we know that?

14   What are the metrics?

15             THE COURT:  Well, I was breaking it into parts.  I

16   mean, insider -- if you're an insider, A.  If you're not an

17   insider, you go to question B, right?

18             MR. LAFFREDI:  Right, exactly.

19             THE COURT:  Okay.  Okay.

20             MR. LAFFREDI:  So with regard to the insider question,

21   we don't know exactly -- I mean, there are some insiders who

22   technically would fall under the definition of an insider under

23   the Bankruptcy Code.  And the debtors indicate, well, that

24   doesn't mean that they're actually insiders.  How do we know

25   that?  We don't know who they are.  We don't know who they

PG&E Corporation, et al.

1    report to.  We don't know their names.  We don't know their

2    responsibilities.  We don't even know what exactly they do with

3    the company.

4           THE COURT:  Did you have an opportunity to ask Mr.

5    Mistry those questions from the deposition or did you choose

6    not to?

7           MR. LAFFREDI:  No.

8           THE COURT:  I mean, did you -- was that -- I mean, I

9    realize you wouldn't want to take the time at a deposition to

10   get the names of 10,000 people.  But some basic questions

11   perhaps could have been asked.  And that's something you chose

12   not to do.

13          MR. LAFFREDI:  Well, we did not participate in that.

14          THE COURT:  Oh, okay.  I didn't realize that.  I

15   didn't know if you were -- you weren't excluded from it?

16          MR. LAFFREDI:  No, I don't believe so.

17          THE COURT:  Okay.

18          MR. LAFFREDI:  But we did not --

19          THE COURT:  Okay.

20          MR. LAFFREDI:  But regardless, the debtors bear that

21   burden to demonstrate that these are not insiders.  Just saying

22   they're not insiders to us does not satisfy that burden.

23          THE COURT:  But that -- I mean, it's easy to identify

24   the easy ones.  But the person in control is so subjective.

25   How would you ever do it efficiently without going through

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  | 10,000 people?

2  |       MR. LAFFREDI:  Well --

3  |       THE COURT:  I mean, I suppose 8,000 of them or 9,000

4  | is pretty easy.  They aren't.  But there may be some people

5  | that are on the cusp there.

6  |       MR. LAFFREDI:  Well, and that's part of what we would

7  | prefer to see, is who are these 10,000 people and what do they

8  | do, so you could go through and say, all right, well, this

9  | person clearly does not have any control or they do not make

10 | decisions that would affect generally the operations of the

11 | debtor, but this person does.  Oh, this person is the vice

12 | president.  What exactly does that mean?  What do they do?  Who

13 | do they report to?

14 |       And some of the information that's contained in the

15 | declaration, I mean, doesn't even really address that.  So that

16 | was our concern.  And in the reply, it didn't really clear that

17 | up for us.  So those are the questions that are remaining with

18 | regard to the insiders.  With regard to the --

19 |       THE COURT:  May I assume that --

20 |       MR. LAFFREDI:  Yes.

21 |       THE COURT:  -- the U.S. Trustee -- if I really insist

22 | that the actual detail get provided, that could be done on a

23 | confidential basis to the U.S. Trustee or perhaps the other

24 | committees if they want.

25 |       MR. LAFFREDI:  I believe so, Your Honor.  But the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   issue is that it should be disclosed to the public.  If the

2   debtors wanted to protect that information from other

3   disclosure, they would have to seek relief under 107 which they

4   have not done.  And those are very strict requirements.  And

5   I'm not sure they'd be able to meet those standards.

6          And same with the incentivizing nature of the plan.

7   It's not exactly clear.  Are these metrics very easy to attain

8   or are they very difficult?  Are they layups, as the Dayna 2

9   (phonetic) indicated, or are they something that they would

10  actually have to strive for?  And so that's part of the issue

11  here too is that we don't know -- and it's the debtor's burden

12  to demonstrate that this truly is an incentivizing plan and not

13  a retentive plan.  And then finally, even if --

14         THE COURT:  Well, what if it's just a decision by

15  management to recognize that this is a tough time for the

16  company dealing with all the problems that it's -- some of

17  which it's blamed for, some of which perhaps it's not blamed

18  for but it's got to cope with them and it's bankruptcy and,

19  therefore, management says that it's going to give people a

20  slight pay raise?  That's certainly within their discretion,

21  right?

22         MR. LAFFREDI:  Right.  But does that mean that it is

23  an incentivizing plan?  Does that meet the standards of the

24  statute?  And if they are going to give everybody a pay raise,

25  I would think, no, it doesn't.  But that's part of the issue,

PG&E Corporation, et al.

1    is that they need to present this evidence.  They need to put

2    this forward.  They need to prove to the Court and to creditors

3    and parties-in-interest who might want to take a look at that

4    what are the metrics, looking at past metrics, whatever they've

5    been doing in the past, what were the incentives in the past,

6    what were the guidelines that they had to meet in the past, are

7    they just doing the exact same thing, are they making it

8    easier, what is it.  That's the problem.  We don't know what it

9    is.

10           And the general statements of, well, it's going to be

11   fifty percent of this and so many miles of vegetation clearing,

12   that's great.  But is that something that is easily attainable?

13           And then finally, even if this plan would fall under

14   the more permissive 503(c)(3), the debtors still have not

15   demonstrated that this plan would be justified under the facts

16   and circumstances.

17           THE COURT:  Again, that's the real subjective thing,

18   isn't it?

19           MR. LAFFREDI:  Right, exactly.  Yes.

20           And so -- but even with that, we don't know what the

21   targets are.  We don't know what the historical information is.

22   We don't have any frame of reference to determine, oh, we're

23   just going to throw this out there and give everybody a raise

24   just because we want to.

25           THE COURT:  Well, when you say you don't know the

PG&E Corporation, et al.

1 target, is that because when you looked at the metrics and the

2 definitions of the three levels, that you can't put any flesh

3 on the bone?  I mean, it's a structure.  But I have --

4    MR. LAFFREDI:  The general structure is there, true,

5 yes.

6    THE COURT:  All right.

7    MR. LAFFREDI:  The problem is what exactly is a

8 metric, how many miles of vegetation do you have to clear in

9 order to reach this goal.

10    THE COURT:  But this isn't a particular individual's

11 goal.  This isn't like saying to a worker you've got to do

12 fifty of X's when you used to do them forty.  This is

13 companywide.

14    MR. LAFFREDI:  Well, and even so, Your Honor, we'd

15 have to see what was it last year.  Is this goal like a layup,

16 as the Court noted?  Is it so easy that they don't even really

17 need to try, they're just going to get it anyway?  And that's

18 the problem.  Why would that be appropriate under the facts and

19 circumstances of this bankruptcy case?

20    So basically, Your Honor, that's our argument.  We've

21 already put everything in our objection.  The reply did not

22 address those issues and those concerns.  And so we do not

23 think that the debtor has met its burden in demonstrating that

24 the plan as --

25    THE COURT:  So what --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1      MR. LAFFREDI:  -- proposed is appropriate.

2      THE COURT:  -- do you think I should do?  Because I'm

3  going to ask the same question of the others.  I'm supposed to

4  use my discretion to decide whether the management has used its

5  business judgment within the limits or the parameters of what's

6  expected of the company.  Do I just deny it?  Is that what you

7  think I should do?

8      MR. LAFFREDI:  Well, I think the Court should deny it

9  until -- unless and until it provides the information that

10  would allow anybody sitting in this room or out there to make a

11  call, okay, well, this actually makes sense.  Whatever they did

12  in the past, this actually might be a difficult goal to reach.

13  Is it actually would be incentivizing, is it retentive, do they

14  just get the money for sitting around and staying with the

15  company?

16      If the debtor was able to provide the information

17  that, for example, the U.S. Trustee indicated was not available

18  and prevents this from being approved, then yeah, we might be

19  able to make a determination, okay, so these are not insiders,

20  these people who have these positions and have these

21  responsibilities, they wouldn't qualify under the Bankruptcy

22  Code's definition.  So until -- unless and until the debtors

23  provide that information, I don't believe the Court can grant

24  this motion.

25      THE COURT:  Okay.  Thank you, Mr. Laffredi.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1      MR. LAFFREDI:  Thank you, Your Honor.

2      THE COURT:  Tort claim committee, who's speaking

3  today?  You, Mr. Julian?

4      MR. JULIAN:  Good morning, Your Honor.  Robert Julian,

5  Baker & Hostetler, appearing on behalf of the official

6  committee of tort claimants.

7      THE COURT:  Yeah.  Try to focus your argument.  I

8  don't want to hear bad faith --

9      MR. JULIAN:  I got you.

10     THE COURT:  -- and conflicts.  I mean, those are

11  really buzzwords that didn't seem to have to be in your

12  argument.  So --

13     MR. JULIAN:  What I'd like to do is, before starting

14  my argument, is supplement the committee's record by handing up

15  to the Court a document that we hadn't seen until the union

16  filed it and two demonstrative charts --

17     THE COURT:  Well, the other side, they --

18     MR. JULIAN:  -- Your Honor, I have a copy for you

19  and --

20     THE COURT:  They've all seen them?  The debtor has

21  seen them?

22     MR. JULIAN:  Yes.

23     THE COURT:  Okay.

24     MR. JULIAN:  I handed them to them before the hearing.

25     Your Honor, may I approach the Court?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    THE COURT:  Sure.  Sure.  You said --

2    MR. JULIAN:  Your Honor, I have two copies.

3    THE COURT:  You said something that was filed by the

4    Local.  That's subsequent or -- subsequent to the -- I mean,

5    the Local filed its opposition.  But is there something else

6    that came from Local 20?

7    MR. JULIAN:  No.  This is attached to the Joshua

8    Sperry's declaration --

9    THE COURT:  Okay.

10   MR. JULIAN:  -- as Exhibit D.  And I wanted to start

11   with it because we spent a great deal of time on PG&E's HR VP,

12   Mistry, discussing why the 2018 STIP was withdrawn.  And the

13   actual email from the CEO explains that it has to do with the

14   2019 STIP.

15   THE COURT:  That's the message from Mr. Simon.

16   MR. JULIAN:  Yes.  And so I'd like to go over -- and,

17   Your Honor, I'm not going to read from the exhibits today

18   except for this one.  It's rather illuminating, I believe.

19   This is interim CEO John Simon's February 22, 2019 email to the

20   employees announcing the withdraw of the 2018 STIP and some

21   changes in the STIP for the 2019 period.

22   And on the first page, at the bottom of the email, CEO

23   Simon addresses the reason why he and the board withdraw the

24   STIP.  And he says, "Ultimately, we decided together that the

25   2018 STIP should not be paid because to do so would, in effect,

PG&E Corporation, et al.

1    put ourselves at the front of the line for that payment ahead

2    of thousands of others pre-petition claimants and creditors who

3    we currently cannot pay and who must await resolution of the

4    Chapter 11 process."

5            On the second page, he states, "As a starting point,

6    our STIP is at-risk compensation.  That's how it has been

7    designed.  There are no guarantees.  Our performance score,

8    based on the metrics for 2018, was a little better than 1.5.

9    That's good on paper.  But our STIP metric results do not align

10   with where we find ourselves.  In 2018, there was a significant

11   human toll from the campfire.  There were eighty-six

12   fatalities.  Some 14,000 structures were destroyed.  And the

13   time of Paradise is largely gone.  Families have been

14   disrupted, some forever.  We're facing thousands of claims from

15   campfire victims.

16           "While the cause of the campfire is still under

17   investigation, we have filed reports with the CPUC that

18   indicate our equipment have been involved.  This has created

19   wide-scale uncertainty of our business, leading to credit

20   downgrades and, in part, to our Chapter 11 filing."

21           And down below on that email, he states, "Looking at

22   the whole picture, can we say we met the spirit of our plans

23   for the year?  Considering the impacts of the wildfires, should

24   we be paying ourselves for our performance last year?  And we

25   thought the answer was no.  We recognize the hardships on our

PG&E Corporation, et al.

1   people, and we don't take that lightly.  But we believe as a

2   whole that the hardships on others are in many cases

3   significantly greater."

4           And then on the next page, in explaining the 2019

5   STIP, he explains some of the changes.  I won't go over it

6   here.  I briefed it ad nauseam for you, I think, in our brief.

7   But I focus on the very next paragraph after the bullet points

8   on the STIP.  And he says, "It is also important to remind you

9   that we recognize and appreciate the hard work so many of you

10  put in last year.  That's why we will go ahead with merit

11  increases in base pay in March."  And he's referring to last

12  month, base pay increases for the performance in 2018.

13          With that in mind, Your Honor, I'd like to discuss the

14  dollar amounts that are really involved over the past several

15  years.

16          THE COURT:  Hold on.  If I could pause you for a

17  minute.  I mean, do you believe that last highlighted sentence

18  is inconsistent with the STIP that's on the table or

19  consistent?

20          MR. JULIAN:  No, no.  I think that the fact that

21  they're --

22          THE COURT:  It's consistent with it?

23          MR. JULIAN:  -- they're adding three percent, I think,

24  is an important additive --

25          THE COURT:  Okay.

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1      MR. JULIAN:  -- that helps the employees and militates

2  against some of the arguments they're making about, well, our

3  employees are -- might be underpaid.  But I'm going to get to

4  that in a moment.

5      What I'd like to do next is summarize what I think he

6  said which is first it's performance-based.  Second, it must be

7  at risk because of non-performance.  Third, the current STIP

8  system scores the company at an above-target performance of 1.5

9  even though its equipment kills and destroys.  And --

10      THE COURT:  Where are you reading it?  You're not on

11  the same document; you're reading something else?

12      MR. JULIAN:  No.  I'm saying that when he says --

13      THE COURT:  Oh.

14      MR. JULIAN:  -- they got a 1.5 on page 2, I mean,

15  let's face it, they scored themselves a 1.5 in performance the

16  year they killed eighty-six people -- their equipment killed

17  eighty-six people.  And I think that's what Mr. Laffredi is

18  talking about when he says the metrics have -- the scoring

19  process hasn't been disclosed and hasn't been fixed.  We're

20  convinced of that.

21      THE COURT:  Well, but I have to take issue with one

22  thing.  And that's not to minimize the tragedies.  Mr. Laffredi

23  wasn't talking about tragedies; he was talking about a formula

24  that's not clear.  And he's --

25      MR. JULIAN:  That's what I'm talking about.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    THE COURT:  Okay.  And you're -- but you're focusing

2  on one of the most significant of the many tragedies and saying

3  there.  I mean, I'm just trying to follow your line of thinking

4  here.

5    MR. JULIAN:  Well, what I'm saying there, Your Honor,

6  is that is evidence.  I am offering that as evidence that, as

7  Mr. Simon, the interim CEO said, is even though they hit their

8  1.5 metric as a whole in equity, in good conscience you

9  shouldn't be paying out a performance --

10    THE COURT:  Okay.

11    MR. JULIAN:  -- bonus.  And as I'm going to mention in

12  a moment, I will give you some, by the way, recommendations at

13  the conclusion today of where I think we go with this.

14    THE COURT:  Well, you did in your papers, too.  But

15  that's fine.  I want you to do that because I want suggestions.

16    MR. JULIAN:  The next point he makes is that the

17  company should not pay out performance bonuses ahead of

18  thousands of fire claimants.  And then he talks about

19  hardship --

20    THE COURT:  That's -- now, again --

21    MR. JULIAN:  -- for employees.  And --

22    THE COURT:  -- I took issue not with what Mr. Simon

23  says.  He says what he says.  But your arguments, which are

24  emphatic and forceful, you keep putting the word bonus in

25  there.  And the words bonus -- you may call it a bonus, but the

PG&E Corporation, et al.

1   word bonus isn't in the STIP itself, right?  And --

2          MR. JULIAN:  The word bonus is -- I'm getting ahead of

3   myself.  I'm happy to answer the question.

4          THE COURT:  Well, no.  You can --

5          MR. JULIAN:  The word bonus is not.  The PE&C, in its

6   December of 2018 order, adopted the Northstar report in which

7   the Northstar report -- let's face it, one of the best

8   consultants around, said this is essentially a bonus program.

9   That's right there.  We quoted it in our brief.  And I maintain

10  that any compensation payment that's conditioned on performance

11  that could be moved up and down is a bonus.

12         But performance, incentive plan, bonus, in my view,

13  it's all the same.  It focuses upon performance.  And as CEO

14  Simon said, no matter what the metrics are, if the performance

15  is not good overall, we shouldn't be paying it.  That's my only

16  point there, Your Honor.

17         THE COURT:  Okay.

18         MR. JULIAN:  With that background, I'd like to look at

19  what they actually did.  And that relates to the two

20  demonstrative exhibits which I have handed up to Your Honor.

21  One is entitled PG&E annual STIP payments as percentage, 2019

22  plan at max, from 2013 to 2020.

23         Our financial advisor, Lincoln, has taken the 2020

24  general rate case information from our Exhibit C-18 and has

25  broken out the information on two things, Your Honor, and then

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  given a conclusion.  First, the --

2       THE COURT:  Hold on.  Just let me catch up with you

3  because I'm looking at -- I think I saw this in one of your

4  papers, but I --

5       MR. JULIAN:  So, Your Honor, we've changed it.  This

6  is a new --

7       THE COURT:  Okay.  Well, that's even more -- slow down

8  for just a second.  So --

9       MR. JULIAN:  Your Honor, may I hold out the one I'm

10  looking at?  It's the one with --

11       THE COURT:  Oh, yeah.  No.

12       MR. JULIAN:  -- the multi bars.

13       THE COURT:  I'm looking at it too.  I am.

14       MR. JULIAN:  Okay.  So --

15       THE COURT:  I'm just -- just give me one second.  So

16  I'm looking across the board.  And the blue bars are the actual

17  stuff.  And then we get to projected stuff.  And then --

18       MR. JULIAN:  So --

19       THE COURT:  -- the red one is the withdrawn program

20  for this year that just passed.  And this is -- okay.  Then the

21  green are the targets for the -- all right.  Go ahead.  I got

22  you.

23       MR. JULIAN:  So what we have here is on this first

24  chart, we show the actual STIP payments in 2013, 2014, '15,

25  '16, '17 and then some projected payments per the rate case

PG&E Corporation, et al.

1   testimony for '18, '19, and '20, and then the withdrawn STIP.

2   I'd like to stop there.

3          What I had done, Your Honor, is calculated the average

4   STIP actually paid out in 2013 through 2017 plus what they

5   would have paid out if they had not withdrawn it in 2018.  And

6   someone may correct me, but the average STIP payment was 155

7   million dollars.  That's historical.

8          THE COURT:  You're just taking the average of the

9   actual --

10          MR. JULIAN:  Those six years of payments.

11          THE COURT:  -- the actual six years of -- well, five

12   plus the red, the withdrawn one, right?

13          MR. JULIAN:  Right.

14          THE COURT:  Five actual, one withdrawn.

15          MR. JULIAN:  155 million.  That's what they actually

16   paid out or would have paid out if they had the -- paid out

17   last year.  It's about 160-, 162- if you ignore last year's

18   potential STIP.

19          THE COURT:  Okay.

20          MR. JULIAN:  And the target STIP for 2019 --

21          THE COURT:  Does the -- where are the LTIP program

22   that was on the books and was in place in these prior years?

23   It's not in place going forward.  In other words, these

24   tables -- and again, I'm -- because I'm just learning from you

25   for the first time, aren't they misleading in the sense that

PG&E Corporation, et al.

1  they're incomplete because there's 400 employees who were

2  participants in the equity-based LTIP that --

3          MR. JULIAN:  Yeah, right.

4          THE COURT:  -- that aren't going to get it but will be

5  going into the green?  So they're a part of the green for --

6          MR. JULIAN:  Right.

7          THE COURT:  -- going forward, right?  So you got to

8  either put them back into the blues or take them out of the

9  green to be apples to apples, don't you or not?

10          MR. JULIAN:  It depends whether you think that a

11  long-term incentive plan should be in a short-term STIP that's

12  movable.  I --

13          THE COURT:  Well, it's movable.  But what I'd ask --

14          MR. JULIAN:  I contend it's not.

15          THE COURT:  -- Mr. Karotkin about was that -- or just

16  musing on my own is that -- and this really -- frankly, this

17  goes back to my basic question that I should have known from a

18  bankruptcy eighteen years ago.  PG&E Corp is a public company.

19  And so when I read in a STIP that there's an equity component,

20  that suggests to me that, under the prior regime, some people

21  got some equity.  And under the new regime, no one is going to

22  get any inequity.  But instead, they're getting some -- more

23  money.  So --

24          MR. JULIAN:  May I answer that?

25          THE COURT:  Well, no.  Do I have it right?  Just tell

PG&E Corporation, et al.

1    me if I've got it right, and then of course you can answer it.

2           MR. JULIAN:  Yes and no.

3           THE COURT:  Okay.

4           MR. JULIAN:  The yes is some people are not getting

5    the long-term incentive plan.

6           THE COURT:  Correct.

7           MR. JULIAN:  So if you believe that a long-term

8    incentive plan of equity can be put into a short-term plan and

9    consistent with the objectives of a short-term plan, I guess I

10   should include -- I can tell you what it is.  It's 72 million

11   dollars.  But may I tell you our view on that, which is that --

12   calling Professors Slane (phonetic) and Kripkes (phonetic) --

13   now we're going to back to Patrick Murphy now -- view on equity

14   that when you get equity as part of a program, you bargain for

15   equity-type returns in exchange for equity losses.  And it's

16   the very antithesis of short-term monetary compensation.

17          THE COURT:  Well, I mean --

18          MR. JULIAN:  It's a long-term plan.  And I don't think

19   it belongs in the STIP.

20          THE COURT:  But it's not.  I mean, but I -- see, I

21   take a more simple analysis by saying if you have two things to

22   give to your worker force, one is called equity or share of the

23   stock and one is called cash, they're two different things.  If

24   you take away the procedure of giving equity either because

25   you're in bankruptcy or because the district court doesn't

PG&E Corporation, et al.

1    think much of dealing with dividends or for any other reasons,

2    but instead you tell the people I'm not giving you any stock

3    this year, I'm giving you money, that's just a tradeoff.  And

4    that is what it is.  That's all.

5            So you don't disagree with that; that's just the --

6            MR. JULIAN:  No.

7            THE COURT:  -- pure logic.  But what did you say the

8    72 million is?  That's your calculation of the switch of the

9    equity?

10           MR. JULIAN:  That's our FAs.  So if you --

11           THE COURT:  Yeah, okay.  Okay.

12           MR. JULIAN:  If you took the 72- -- you would take the

13   72 million out of my 235- and my 350 million.

14           THE COURT:  Okay.

15           MR. JULIAN:  But here's the --

16           THE COURT:  But that's really what I was -- so that's

17   a simple way of saying if we want to make these things more

18   comparable, maybe we have to lower those green tables a little

19   bit.  But --

20           MR. JULIAN:  I get it.

21           THE COURT:   -- go ahead with your argument.

22           MR. JULIAN:  We think that the STIP is really a

23   350-million-dollar STIP for the following reasons.  Even when

24   the company doesn't perform under a commonsense view of

25   performance, such as Mr. Simon has, they score themselves 1.5.

PG&E Corporation, et al.

1   And so these folks know when they created this 2019 STIP, that

2   under their metrics, they were going to score another 1.5 this

3   year.  And so when they say it's 235- minimum and 350- maximum,

4   what they did was they took the 235-, multiplied it by 1.5, and

5   they came up with 350 million.  That's the math.

6          And so my argument on that is that that's the real

7   number we're talking about this year.  When you look at their

8   historical performance, Your Honor -- and we cited in our brief

9   that in 2017, the year their equipment caused over a dozen

10  fires in California, they scored themselves a 1.9 on wildfire

11  safety as part of a STIP that got them upwards of it looks like

12  about 1.52.  And last year they scored themselves 1.5.

13         So historically, I think they're -- we're really

14  talking about a 350-million-dollar STIP.  That's the main point

15  of this chart.

16         THE COURT:  Okay.

17         MR. JULIAN:  The next chart is our view that, because

18  we think -- well, you may be ruling against me on this, that

19  we --

20         THE COURT:  I haven't --

21         MR. JULIAN:  -- should ignore the LTIP --

22         THE COURT:  I haven't ruled anything.  I'm just

23  learning.  This is not easy stuff.  And I want all the help I

24  can get. So --

25         MR. JULIAN:  We think what they did here was they told

PG&E Corporation, et al.

1  their employees you're not going to get the 2018, but we're

2  going to do two things for you.  We're going to give you a

3  three percent merit raise.  And second, we're going to give you

4  basically double in the STIP payments that we did last year,

5  upwards of 350 million, to compensate for the 2018.  Even if

6  you buy the 72-million-dollar reduction, that brings it down to

7  around 280-.  And last year's 130- plus 130- is 260-.  So, I

8  mean, any way you cut this thing, it looks to us --

9            THE COURT:  Well, listen.  You're doing a very

10  thorough analytical thing.  I read the brief again and again

11  myself.  And I thought last year it was 100-something million;

12  this year it could be 300 million.  How is that a bad deal?  I

13  mean, what's -- who needs the 2018 numbers if you get twice as

14  much in 2019?

15            MR. JULIAN:  That's what I think is going on.

16            THE COURT:  I mean, I'm not -- I haven't made up my

17  mind, but I -- this is why I'm struggling to understand what's

18  going on here.

19            MR. JULIAN:  And that's the purpose of that

20  presentation.

21            THE COURT:  Okay.

22            MR. JULIAN:  I turn now to our objection.  And I'm not

23  going to repeat what I said in the brief, but I will summarize

24  in two respects.

25            THE COURT:  I don't mean to deter you from making the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  argument you want to make.  I just wanted to say that I think

2  getting into a debate about whether the proponents of this plan

3  were in bad faith was a little harsh.  And to then roll it out

4  to a derivative suit and conflict seems a little bit extreme --

5          MR. JULIAN:  I get it.

6          THE COURT:  -- because if we forget all that, you

7  still got some very cogent arguments.  And perhaps you'll carry

8  the day.  I don't know.  I'm thinking about it.

9          Go ahead.

10          MR. JULIAN:  The first point I'd like to make is there

11  is no evidence in the record before you, the Mistry or the

12  Friske declaration or in anything that we put into evidence

13  with the rate case that indicate that the employees are

14  compensated below or above market.  There's just no testimony.

15          THE COURT:  Well, didn't Mr. Friske say that -- I

16  mean, I thought he touched on that.

17          MR. JULIAN:  As a whole.  The employees as a whole --

18          THE COURT:  Right.

19          MR. JULIAN:  -- versus each individual employee.

20  We're talking about -- I'm talking about individual employees.

21          Mistry admitted in this deposition, page 111 of the

22  transcript, that he didn't have to talk to a single person who

23  said his or her pay is below market.

24          THE COURT:  Well, yeah.  One of the things that's

25  difficult for me -- this is a fast-moving process.  And I get

PG&E Corporation, et al.

1    told there's 300 pages of depositions four days before the

2    hearing.  I just can't absorb that stuff so quickly.  So I did

3    not read those depositions.  And I can't process it all.

4         So he didn't -- I mean, did he even say he interviewed

5    any employees, what their pay was?

6         MR. JULIAN:  He didn't say that.

7         THE COURT:  I mean, that's right.

8         MR. JULIAN:  That's my memory.

9         THE COURT:  So I would assume he didn't -- it's not

10   surprising that no one told him it was underpaid because he

11   probably never talked to anybody and asked them in the first

12   place.

13        MR. JULIAN:  And I think the touchstone of business

14   judgment is asking questions.  That's fundamental governance

15   101.  They're basing this on -- we're concerned about the

16   employees and they told to a single employee?  I think that's

17   lack of inquiry.  And I'm not going to touch on bad faith or

18   fraud.  I'm not arguing that.  Our brief is basically one of

19   lack of inquiry in the face of astounding losses which I turn

20   to next.

21        Your Honor, I want to tell you why we're here.  We are

22   here because if there is another fire in October or November of

23   2019, this Chapter 11 case could be toast.

24        THE COURT:  Well, I have thought -- you and I and

25   their bankruptcy lawyers in the room know the law.  And a lot

PG&E Corporation, et al.

1    of people don't.  And we both know what could happen.

2          MR. JULIAN:  There are arguments that it's not

3    administrative claim.  But --

4          THE COURT:  Well, the Supreme Court about thirty,

5    forty years ago said it was --

6          MR. JULIAN:  I understand.

7          THE COURT:  -- in the Reading case.  Right?

8          MR. JULIAN:  Right.  On the first day of the

9    bankruptcy, come New York wonk in some article akin to

10   Bloomberg had a very persuasive article on the other view.  But

11   I understand there's a Supreme Court case on that.

12         THE COURT:  The last time I check, I have to follow

13   Supreme Court.

14         MR. JULIAN:  Yes, Your Honor.  And I want you to --

15   I'll withdraw that.

16         I want us to discuss what's really at stake.  I

17   watched that fire come at my house in Sonoma for twenty-six

18   hours.  I know what it's like.  And I can tell you I am

19   preparing for the fire again this year.  We are not convinced.

20   And PG&E has not convinced us in anything that they said to

21   Judge Alsup or in the depositions that they are going to fix

22   the system.  What they said at the last hearing in front of

23   Judge Alsup, at the end of the hearing, Judge Alsup said I hope

24   you make it.

25         THE COURT:  Well, we all hope.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. JULIAN:  But the point is --

2    THE COURT:  You hope too, don't you?  Of course.

3    MR. JULIAN:  I hope they make it.  But the point is

4  there's conviction that they're going to make it.  I'm shooting

5  you straight on this one, Your Honor.  There is no conviction

6  among the professionals that they're going to make it.  And we

7  need to do everything we can.  And this step is battle zone one

8  in this case to make sure --

9    THE COURT:  Well, I guess that's what you've got to

10  convince me because there could be no STIP and there's a fire

11  risk.  And we all hope that everybody survives it.  And there

12  can be the biggest STIP in the world and no fire.  So we really

13  have -- we're not here today -- as much as I wish I could

14  magically decree that there be no fires this year.  We have to

15  focus on whether this STIP is proper for the benefit of its

16  beneficiaries.

17    And a broader question that I have asked myself five

18  times in preparing for this hearing, and I probably will ask

19  the lawyers on the other side today is who's going to stand up

20  and tell me that this is more likely rather than less likely to

21  facilitate or enhance the possibility of the company we are

22  going to -- which is a broader question, by the way, than

23  dealing with the fire risk.  There are lots and lots of --

24  millions and millions of other dollars of creditors who are not

25  fire victims who are also going to have issues in this case.

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   So it's a broad question that affects every body, right?

2           MR. JULIAN:  I don't think we can reorganize, if

3   there's another fire.  And I think we have to incentivize.

4   It's called an incentive plan.  We have to incentivize the

5   employees to do what's right.

6           And I don't think you incentivize employees to do

7   what's right by telling them, in this record of falsification

8   of safety records and what they did with those trees and the

9   gas records, to say we're going to pay you nine months' of

10  quarterly payments before we learn whether or not Mr. Simon has

11  to write another letter saying, you know what, our STIP metric

12  score is 1.5.  That's why I read the letter.

13          I am seeing this play out again.  He -- we could have

14  them score themselves 1.5 under all their metrics and 1.9 on

15  wildfire safety, just like they did before.  But the records

16  are falsified.  They're not correct.

17          THE COURT:  Are they falsified presently?  The only

18  thing that I'm aware of that -- and again, I don't study the

19  news like anybody else, as thoroughly as perhaps I would.  If

20  I'm not mistaken, the falsification records led to a conviction

21  for something that happened in 2010, right?  No, what was the

22  year of the San Bruno fire?  Isn't that where the falsification

23  occurred?  Am I right?  I forgot the year.

24          MR. JULIAN:  No, no.  Those were the falsifications

25  that happened with respect to San Bruno.

PG&E Corporation, et al.

1          THE COURT:  Right.

2          MR. JULIAN:  But in December of this year, the PUC

3    started another investigation.

4          THE COURT:  But there's -- there's been no conviction.

5    Judge Alsup's --

6          MR. JULIAN:  I'm not talking about convictions.

7          MR. JULIAN:  Okay.  But Judge Alsup's role, following

8    Judge Henderson, was to preside over the criminal trial.  And

9    that is what obviously has influenced him.  Is there a

10   determination that he has made that there's been falsification

11   of records in this current year, current environment, post-San

12   Bruno?

13         MR. JULIAN:  You would have to ask him what he meant

14   by his word on January 9.  I can tell you what I think it

15   means.

16         THE COURT:  Okay.

17         MR. JULIAN:  First, on January 9, he said in light

18   of -- I'll quote it to you.  This was January 9 of this year.

19         THE COURT:  Yeah.

20         MR. JULIAN:  Judge Alsup stated in his first OSC, "In

21   light of PG&E's history of falsification of inspection reports,

22   PG&E shall, between now and the 2019 wildfire season, reinspect

23   all of its electrical grid."

24         THE COURT:  No, I understand, yes, sure.

25         MR. JULIAN:  Now may I stop and tell you about the

PG&E Corporation, et al.

1   December 2018 PUC order, which says that during the past

2   several years there has been widespread falsification of locate

3   and mark records.  You know, when USA comes along and sprays

4   the pavement in front of your house with white and yellow and

5   green to show where the utilities are?  They're supposed to do

6   that within a certain period of time.  And if they don't, the

7   employees are supposed to report it.  We screwed up.  And the

8   supervisors are supposed to tag them.

9       What that PUC order shows, based upon the report given

10  to the PUC, staring a brand new investigation -- this is new,

11  today.  They haven't even responded.  They have until June, I

12  think it is.  That the supervisors engaged in widespread

13  falsification of records, hiding the fact that the locate and

14  mark was late.  Why did they do that?  We believe, and the

15  inference is clear, for the STIP payment.

16      Let me say that again.  One of the metrics in the STIP

17  is accurate recordkeeping and timeliness, timeliness.  So if

18  the striper comes and is late striping, the metric goes down

19  and they're going to get less money.  The supervisors falsify

20  it in order to get the STIP up.  This is the honest-to-God

21  truth.  And so the STIP, in this instance -- not all instances,

22  but in this one -- that the PUC is now investigating today, not

23  ten years ago, is whether or not the STIP incentivizes

24  falsification of records.

25      So Judge Alsup says on January 9 -- and by the way, he

PG&E Corporation, et al.

1    superseded his OSC two months later -- he says in light of this

2    record of falsifications, I'm not going to rely upon you

3    anymore, PG&E, to tell me you are cutting your trees and fixing

4    the system.

5            This is exactly what Bob Julian, today, is saying to

6    His Honorable Dennis Montali.  Your Honor, we don't them today,

7    just like Judge Alsup doesn't.  So he's going to force them to

8    have a monitor on them.  Imagine that?  He's got a monitor on

9    them to tell him whether they're doing it right.  He's got a

10   probation officer to see if they are correctly reporting their

11   convictions.  He just convicted them on January 30, one day

12   after the bankruptcy was filed, for failing to report the Butte

13   District Attorney's settlement --

14           THE COURT:  Well, he didn't convict them, did he?

15           MR. JULIAN:  Well, actually, I'll tell you the truth.

16           THE COURT:  I thought he -- I thought --

17           MR. JULIAN:  He said convicted.  It's not in the

18   transcript.  He sustained the probation officers --

19           THE COURT:  Well, that's --

20           MR. JULIAN:  He sustained the probation officers --

21           THE COURT:  Let's just get it right, okay?

22           MR. JULIAN:  He called it a conviction.  It's not a

23   conviction.

24           THE COURT:  It's not a conviction.

25           MR. JULIAN:  He sustained the probation officer's

PG&E Corporation, et al.

1    allege of violation of probation and he said sentencing on the

2    sustaining of the violation of probation has not yet occurred.

3           So I come back to square one, which is this is not

4    proper governance to -- where there have been three fires of

5    the past four years.  For the fifth year coming up, to say

6    we're going to let ninety -- seventy-five percent of the money

7    go out the door before we find out if we were successful this

8    year.  It is not prudent.  It is reckless.  That is our

9    argument, Your Honor.  And I don't think anyone can say with a

10   straight face --

11          THE COURT:  Well, but you're focusing now, I guess, on

12   the quarterly temporal nature of it, rather than the annual.

13   But it's the same -- aren't you making the same argument?  I

14   mean, your argument is that there's an incentive here to

15   falsify the records.  Is there any different incentive -- if

16   that's true and this is your argument, if it's true, what

17   difference does it make if it's quarterly or annually?

18          MR. JULIAN:  I think they've got to fix the

19   falsification of records by having an investigation, which they

20   haven't done, and fire the employees who falsified records.

21          THE COURT:  Yeah, but who says they won't?  In other

22   words, you want me to -- I'm not going to use a word like

23   "indict", but you want me to make a sweeping decision that

24   affects 10,000 employees --

25          MR. JULIAN:  No.

PG&E Corporation, et al.

1    THE COURT:  -- and some number of them maybe are

2  culpable, but the rest are not.

3    MR. JULIAN:  Your Honor, for thirty years -- I have an

4  answer for that.  For thirty years, the annual payment worked

5  out pretty well.

6    THE COURT:  Okay.

7    MR. JULIAN:  They picked the quarterly payment in the

8  year, the fifth year, where we're looking at another fire.

9  What a time to change it.

10    THE COURT:  Well, I understand.  I understand.  but

11  it's also the first year in eighteen that they've been in

12  bankruptcy.  And you know that the rules change in bankruptcy,

13  even -- even for companies that don't get in fires.  You know,

14  as well as I, and any experienced bankruptcy lawyer knows that

15  it's a different environment and there's a lot of things that

16  happen and a lot of rules that are changed and a lot of

17  uncertainty.

18    So I can't forget that.  I can't -- and I'm not making

19  light of all the things you're saying.  But I'm also saying,

20  aren't we painting with a very broad brush here for a huge

21  number of people that are the guys out in the field in South

22  San Francisco, fixing short circuit breakers, just doing their

23  job like everybody else?

24    MR. JULIAN:  Those folks -- I have firsthand

25  experience with those guys.  They are doing their job.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          THE COURT:  Yeah, they are.

2          MR. JULIAN:  The supervisors and managers, there's a

3    big question mark.

4          THE COURT:  Well, okay, but how -- what am I supposed

5    to do here?

6          MR. JULIAN:  Send it back for them to fix it.

7    Don't --

8          THE COURT:  For them to fix the metrics and the --

9          MR. JULIAN:  Well --

10         THE COURT:  Judge Alsup will handle what he handles.

11   I'm not doing his job.  He's not doing mine.  So my -- do you

12   want me to, not fine-tune, rebuild the STIP.

13         MR. JULIAN:  I don't want you to rebuild it.  I

14   think --

15         THE COURT:  No, I know.  You want me to order them to

16   do it.

17         MR. JULIAN:  Yes, yes, Your Honor.  And I would like

18   to turn to Mr. Laffreti's comment, although I'm going to build

19   on it a little bit.  And that is that, look, this is a layup.

20   You don't have any evidence in front of you, other than the

21   fact that it's a layup.

22         THE COURT:  Well, we know the judge who did the layup

23   is a basketball fan.

24         MR. JULIAN:  They routinely -- well --

25         THE COURT:  Yes, it is.  I got --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1      MR. JULIAN:  There was a good game last night in

2  overtime, too.  But Your Honor, look, in 2017 they scored

3  themselves a 1.9 above perfect on a lot of fire safety.  And

4  1.5 last year overall.  They're going to get another 1.5, no

5  matter -- even if there's a fire.  And there has to be a

6  message sent to PG&E and its employees that this is serious.

7      I know some of the people are taking this serious, but

8  there's a culture there that doesn't do the right thing.  Let

9  me give an example.  It's the truth, too.  From my experience,

10  they've got a bunch of transformers out there.  They're twenty

11  or thirty years old.  Part of the problem that PG&E has is

12  cutting up trees.  And it looks like they're making progress.

13  I can tell you my own experience, 1,000 feet above the Sonoma

14  Hills.  They're cutting branches like crazy.

15      But I had a transformer blow last year.  I'll tell you

16  how it happened, actually.  A squirrel gets up -- there's two

17  terminals:  the hot and the neutral.  And if the squirrel eats

18  the one terminal rubber away and as he's eating the other one,

19  he touches the thing, he creates a bridge.  There's a spark.

20  Thing goes out --

21      THE COURT:  No squirrel.

22      MR. JULIAN:  Exactly.  They came to fix it.  They

23  said, here's what happened, Mr. Julian.  I said, is there a

24  dead squirrel up there?  They said no, but at the bottom of the

25  telephone there is.  What are you going to do about it?  We're

PG&E Corporation, et al.

1    going to give you a new transformer.  This is an old one.  They

2    were up there yesterday again, looking at the post again.

3              THE COURT:  Yeah, but we want them doing that.

4              MR. JULIAN:  Exactly.

5              THE COURT:  Let's get to the --

6              MR. JULIAN:  Next door to me is the same old

7    transformer.  They don't replace a lot of the equipment until

8    it breaks.  Violation of governance 101A.  You've got to

9    replace it at the end of its useful life, rather than waiting

10   for it to break, obsolescence.  They have a --

11             THE COURT:  But seriously, this is for the PUC.  This

12   is for the regulars.  I mean, this is not something that I can

13   believe you.  I've known you for a long time.  I've never known

14   you to falsify or exaggerate, which is what we all do.  That's

15   fine.  But I can't say to the debtor, no STIP until you replace

16   all the --

17             MR. JULIAN:  No, you can't.  And I'm not suggesting

18   that.

19             THE COURT:  -- transformers in Sonoma County.

20             MR. JULIAN:  But I am suggesting that you need

21   evidence in front of you, Your Honor.

22             THE COURT:  Okay.

23             MR. JULIAN:  As to whether or not this is a layup.

24             THE COURT:  Okay.

25             MR. JULIAN:  They have to come in with a sheet that

PG&E Corporation, et al.

1    they apparently gave to the unsecured creditors' committee and

2    have not given to me when they settled with them, that shows

3    what their scoring is --

4              THE COURT:  Well, I was going to ask --

5              MR. JULIAN:  -- and what their procedures are.

6              THE COURT:  -- because I got through --

7              MR. JULIAN:  It's not in front of you.

8              THE COURT:  I got the -- no, I know it's not in front

9    of me.  I got the report yesterday that the unsecured

10   creditors' committee reached a deal, but I did -- my question

11   was are you even aware of it?

12             MR. JULIAN:  Yeah.

13             THE COURT:  Okay.  Well, I mean, aware of what they

14   filed but no more than that?  Or are you aware of --

15             MR. JULIAN:  I am -- I am not aware of the scoring

16   process --

17             THE COURT:  Okay.

18             MR. JULIAN:  -- or the exact metrics, other than HR VP

19   Mistry testifying in his deposition that for wildfire safety

20   it's based on miles.

21             THE COURT:  Well as I said earlier, my problem is, A,

22   I can't possibly absorb the volume of stuff in the last four

23   days.  But even if so, getting it in the -- your taking of your

24   opponents experts deposition is hardly a way to get facts so

25   that I can make any sense about it or frankly, anyone else can

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    make sense about it in that timeframe.  So I share with you the

2    idea that you've gotten -- get some information, but it wasn't

3    there -- even that in the moving papers.

4         MR. JULIAN:  And I still don't have it today.  And

5    here's the point.  PG&E number one, ten years ago, incentive

6    plan, retention plan comes in front of you, is anyone going to

7    argue about this?  Probably not.  But we have had --

8         THE COURT:  No, there was some argument about it then,

9    believe me.

10        MR. JULIAN:  But now, Your Honor, we have had three

11   fires in four years.  This is a special case.

12        THE COURT:  I know.

13        MR. JULIAN:  We need to make sure that our heads

14   aren't chopped off, my head's not chopped off some day if

15   there's another fire and we have not insisted that these folks

16   show us how they are scoring their incentive program to tell

17   their employees to fix the system, especially where Judge Alsup

18   says as recently as two months ago, in light of your recent

19   falsifications -- I'm reading that in.  I think he's referring

20   to the PUC.  I don't know that for a fact, that we need new

21   inspections.

22        And I'm saying to you, Your Honor, just like Judge

23   Alsup needs them to inspect now and certify to him, I need them

24   to tell us what are their metrics for scoring?  Are they going

25   to have a layup or are they really going to have some teeth?

PG&E Corporation, et al.

1    Is it 10,000 miles?  Is it 5,000 miles?  Is it a mile?  I can

2    read the wildfire plan that they filed with the PUC.  It looks

3    pretty good to me, as far as it goes.  But I don't know what

4    their metrics are for scoring it.

5            Your Honor, the settlement with the unsecured

6    creditors' committee, they have changed the ten percent

7    wildfire safety metric to twenty-five percent.

8            THE COURT:  As I understand it, they were adjusting

9    the financial performance downward and the wildfire, particular

10   one, up.

11           MR. JULIAN:  Yes.

12           THE COURT:  That's what it does.  And then some other

13   tweaks on some things that I don't quite understand.  But I see

14   them in those papers, right?

15           MR. JULIAN:  Right, right.  It doesn't go as far as we

16   believe it should go.  I believe a prudent -- I believe Judge

17   Alsup wouldn't be a prudent director.  And if you can read

18   between the lines of what he's saying, it looks to me like they

19   should've just flipped the financial performance with the

20   wildfire safety 1040.

21           THE COURT:  Right.  That's what I read.  That's what I

22   said.  But that is a change.  I mean --

23           MR. JULIAN:  It is a change.

24           THE COURT:  You might not think it's enough.  See, Mr.

25   Julian, I can't translate this to real numbers.  I don't have

PG&E Corporation, et al.

1  any one of those 10,000 people to tell me what that means to

2  him or her.  Because to me, adjusting metrics and multipliers

3  and factors and what's that other word that was used -- I

4  forget -- in there?

5          MR. JULIAN:  Individual performance modifier?

6          THE COURT:  Yeah.  I mean, that's all fine.  It sounds

7  good.  I have no idea what it means, though.  And I guess maybe

8  you do.

9          MR. JULIAN:  That's my point.

10          THE COURT:  Maybe you do, but I don't.

11          MR. JULIAN:  No, we don't.

12          THE COURT:  Well, Mr. Mistry, I'm sure does.

13          MR. JULIAN:  I know --

14          THE COURT:  And Mr. Friske knows.  But I don't.

15          MR. JULIAN:  We know what the intent of the individual

16  performance modifier is.  I think that was one of the most

17  egregious things.  They've now fixed it, but at the end of the

18  year.  What good does it do to take an employee up or down

19  based on his performance in the first nine months if the

20  money's already out the door?  Three-fourths of this money will

21  be out the door, essentially two times -- in nine months, if

22  they make their 350 million dollar STIP amount for this year,

23  they will have paid out, in nine months, on a quarterly basis,

24  two times the 2018 STIP amount of 130 million.

25          THE COURT:  But let's have an even bigger picture.

of 180   (9755610) operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    What if there were no STIP?  All those employees who stayed

2    employed would be getting compensation at some level of X.  I

3    don't know what the X is.  Is it eighty-five percent?  Ninety

4    percent?  I don't know.  What does -- I believe in one of the

5    papers I read, there's a range that the STIP might represent

6    fifteen percent of an individual employee's compensation.  Is

7    that -- did you read that?  Did you get that right or --

8            MR. JULIAN:  Six to twenty percent.

9            THE COURT:  Six to twenty, but fifteen is an in-

10   between one.  Okay, so if there were no STIP, it means the

11   people that are on the job doing their job, hopefully

12   conscientiously, will be getting eighty to some other level

13   percentage of their pay anyway.

14           MR. JULIAN:  That's where I disagree.  And I disagree

15   because of -- we've all been snowed, in my view.

16           THE COURT:  Well, okay.

17           MR. JULIAN:  Judge, CEO Simon says -- that's why I

18   read his email.  This is a great admission.  He said it's not

19   guaranteed.

20           THE COURT:  Well --

21           MR. JULIAN:  It's totally at risk.

22           THE COURT:  Well, and you -- well, isn't that true?  I

23   mean, it might be a palace revolt if the management says, by

24   the way, we said we're going to pay you, but we're not.  But

25   look, let's base it down to basic California labor law.  If

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    your employer says your compensation is X plus an incentive

2    bonus of Y, they can't stiff you on X.  You get your pay or

3    you --

4              MR. JULIAN:  That's my point.

5              THE COURT:  They'll put them in jail.  The wage -- the

6    labor commission will put them in jail.  But if the last

7    percentage that is discretionary, that's not a snow job.

8    That's just -- you get it or they don't under certain

9    circumstances, right?

10             MR. JULIAN:  Right.  So that's why -- it all depends

11   how you sit, whether you -- when you hear their words, it's

12   part of their normal compensation.  If what that means is

13   incentive pay and base pay is part of the compensation, I agree

14   with them.  But if what it means is it's part of your normal

15   compensation, such that if we don't pay it to you, you're under

16   market according to your peers, I disagree with that.  Because

17   there's no evidence of that in front of you.

18             THE COURT:  Well, but there is evidence from your

19   chart that, for at least the last several years, the employees

20   have been getting a STIP and, or an LTIP or the equity piece.

21   So it -- and this isn't a case where the company files

22   bankruptcy and says, let's now have a new incentive plan.  This

23   is an incentive plan that's been in place for long -- I believe

24   even more than the years that are on your chart, I think.  And

25   what you're taking issue with is the context of the fires and

PG&E Corporation, et al.

1  the horrible damage --

2       MR. JULIAN:  Yes.

3       THE COURT:  -- plus the increase.  It sounds to me

4  like that -- not that you, personally -- I don't know what your

5  own personal view is, but your committee would have less to

6  complain about if it were essentially the same as the past.

7       MR. JULIAN:  If it were the same as the past, they'd

8  have less to concern (sic) about?

9       THE COURT:  I mean, obviously they'd be --

10      MR. JULIAN:  We'd be left with one issue?

11      THE COURT:  No, the issue is about safety and Judge

12 Alsup's point of view and so on are what they are.

13      MR. JULIAN:  Because this is not your typical

14 bankruptcy case.

15      THE COURT:  It's not your typical bankruptcy.

16      MR. JULIAN:  And we cannot let the debtor, in my view,

17 get away without telling us, is the process still in place that

18 permitted you to score yourself overall 1.5 last year, overall

19 company performance, and 1.9 in wildfire safety in 2017, the

20 year of total destruction in Sonoma, Napa?  I need that

21 evidence, Your Honor. And that's -- send it back.  That's what

22 I think they've got to do.  They've got to do those two things.

23      Did you change the system that allowed you to score

24 yourself so high?  That's number one.  And two, what are the

25 specific scoring metrics, specifically, for wildfire safety,

PG&E Corporation, et al.

1    recordkeeping, accurate recordkeeping and the like?  Because we

2    have this continuing problem of some supervisors and managers

3    falsifying records.  They need to fix that, too.  I don't

4    really mean to denigrate nuclear safety, but it looks like

5    nuclear safety is doing quite well in California.  Our problem

6    is, as Judge Alsup said, three percent of the state burning up

7    and over a hundred people being killed.

8         Lastly, Your Honor, the second to the last point, the

9    total dollar payout, in our view, is not appropriate in a

10   reorganization.  350 million in the history of having 155, even

11   if you add in the LTIP, which I don't think is appropriate.

12   Why not half a million?  Why not a million, I mean, a billion?

13   Where's it stop?  It's just out of sync with the historical

14   STIP program that they have and is, therefore, suspect and not

15   appropriate.

16        THE COURT:  Well, again, you're saying that you'd like

17   to see the detail behind the metrics and how does it work and

18   how does this -- your argument is that this self-scoring thing

19   is inflated and it's a laugh.  And if you had the ability to

20   draft it yourself or with your advisors to something that is

21   more traditional, I gather you're not still -- you're not

22   opposed to some kind of program like this, as long as it has

23   some safety features.  You know what I mean, built-in

24   corrections or adjustments.

25        MR. JULIAN:  We do have one concern.

PG&E Corporation, et al.

1          THE COURT:  Right.

2          MR. JULIAN:  May I get to it in a moment and finish on

3     this one point?  If you do send it back for further work, I

4     would say -- recognizing it's a bankruptcy case -- there's no

5     harm.  We're very early in this bankruptcy case.  They just

6     finished the first quarter.

7          THE COURT:  Right.

8          MR. JULIAN:  I could sit down with them and turn out

9     new STIP metrics in two weeks.  That doesn't address -- and

10    historically that shouldn't be a problem even though they're in

11    bankruptcy, because they've waited until February of the next

12    year to make the payment.  But I understand Your Honor's

13    comments about incentivizing people in a bankruptcy.

14         THE COURT:  Well, look, the timing of payment --

15    there's a certain concept that's got to be right, that's got to

16    look right.  And there is a fear that I have, and you're

17    expressing it, that some people who shouldn't be getting

18    compensated might be compensated improperly or prematurely.

19    But again, I am not prepared to put 10,000 people in this

20    basket of wrong-doers.

21         MR. JULIAN:  Neither am I.

22         THE COURT:  And so the question is, why is that bad to

23    do for the vast majority of the people that, A, have no

24    involvement in the problem and, B, even if they did, there's no

25    indication that they've done anything wrong?

PG&E Corporation, et al.

1    MR. JULIAN:  Two reasons:  first, it's improper

2  governance not to investigate when you find out that you're --

3    THE COURT:  Improper governance not to investigate, I

4  share with you.

5    MR. JULIAN:  Yeah.  And secondly, everyone involved in

6  this case, I believe, from the professionals, certainly Judge

7  Alsup is doing it, and I would ask Your Honor to do it, should

8  be sending a message, I believe, to these folks that it's not

9  business as usual.  This is serious enough -- I would ask you

10  to rule that this is serious enough, the potential fire in 2019

11  that could debilitate this case and kill another hundred

12  people, is serious enough that we're not going to do Mr. Julian

13  business as usual and approve a STIP that some people deserve

14  until they fix the systemic problem --

15    THE COURT:  Mr. Julian, I would leave the bench here

16  in thirty seconds, saying motion denied, if I could know that

17  by denying the STIP motion, I could avoid the fire in 2019.

18  That's the problem.  All the STIPs in the world aren't going to

19  prevent the fire if something is causing -- well, aren't going

20  to prevent the fire.  And your argument is persuasive that

21  maybe there's some wrongdoing and maybe the kind of conduct

22  that Judge Alsup most recently is focused on and the PUC

23  focused on and others have focused on, it needs to be deterred.

24  But there still might be a horrible fire that has nothing to do

25  with PG&E, that creates the same bankruptcy dilemma.

PG&E Corporation, et al.

1    So I've got to figure out what to do about that.  In

2  other words, if I could magically say to the debtor, you've got

3  a great STIP, just get rid of all the wrong people, the bad

4  people, they still might have a fire and we still might have --

5    MR. JULIAN:  They still might, but as Judge Alsup

6  said, we have to start here.

7    THE COURT:  Yeah, we do.  But the question is does

8  tweaking the STIP fix it?  It might send the message.  I agree

9  with you.  But does it fix it?  I don't know.  And I'm looking

10  for help.

11    MR. JULIAN:  Tweaking the STIP on wildfire safety

12  metrics, by definition, is required and so it must help.  And

13  then last, but not least, CEO Simon stated something that I

14  want to address.  He stated at the end of the second page of

15  his email that he recognizes the hardship on the people that

16  you, Your Honor, just said you were worried about, the rank and

17  file employees out there who deserve some compensation.  He

18  said, we don't take that lightly.

19    But here's the CEO talking about what is prudent in

20  corporate governance, in my view.  He says, we believe as a

21  whole that the hardships on others are, in many cases,

22  significantly greater.  He's referring to our clients, Your

23  Honor.  And I know you probably don't want to hear from me

24  about grandstanding, but I have to tell you the perspective of

25  my committee.

PG&E Corporation, et al.

1        THE COURT:  I want you to.  You're not grandstanding.

2        MR. JULIAN:  I went out there two weeks ago, well, we

3   all did.  The whole Baker team went out and spent the day with

4   our financial advisors, with the eleven victims on our

5   committee, and we toured Paradise for the day.  I was in the

6   truck of one of the committee members, whose house was burned

7   down.  He took me to it, complete devastation.  On the way up,

8   I saw a couple living in a trailer on their property, with

9   their brick chimney still there, with four-by-four vats of

10  water out front, that that's how they get their water from,

11  with the dog barking like crazy.  What a stressful way.

12  Because he can't live in the yard anymore.  This is how they

13  are living.

14        One of our victims on our committee is living in a

15  trailer -- I'm sorry, a tent down by the river, adjacent to

16  where her house burned down.  And I believe we have to send the

17  corporate message here.  The debtor -- and you've read it in

18  the news, you've heard about it, probably, about this hundred-

19  million-dollar fund for victims.  What I would've done in this

20  case is pay out the hundred million dollars to the victims

21  first, to help them with their trailers and their tents.

22        THE COURT:  I don't know what you're referring to,

23  actually.

24        MR. JULIAN:  And their food.  Well, there can be a

25  fund set up.

PG&E Corporation, et al.

1          THE COURT:  But it's not something that's come before

2    this Court, right?

3          MR. JULIAN:  Well --

4          THE COURT:  I'm not aware of it.  It's okay.  I mean,

5    if it happens, that's how it happens.  But I don't know what

6    has happened.

7          MR. JULIAN:  We need to send a message that they need

8    to do the right thing.  And CEO Simon had it correct in our

9    view, when he said we should not be paying ourselves before

10   these victims who are under different hardship.  And I talked

11   to the victims and I want to read to you one statement by a

12   victim, from a different fire, but when I read it to my clients

13   in this case, they said that encapsulates what we are living

14   with.  And this is from the legal assistant to Pat Murphy

15   (phonetic), of all people, a partner who hired me out of law

16   school, whose house burned down in another utility district.

17   But this synthesizes the same views of the clients on my

18   committee who have lived through the same things.

19          And she said, "On the day of the fire, I had never

20   been happier.  I think of myself then like a picture in sharp

21   focus.  Since the fire, I am more like a mosaic.  Day-by-day,

22   piece-by-piece, putting myself together again, attempting to

23   recover who I was on that fateful day.  But like a mosaic, the

24   fire has left cracks in my heart, soul and mind that can never

25   be erased.  And I will never be the same again."

PG&E Corporation, et al.

1    And just as CEO Simon predicted, for the thousands of

2    victims out there, to see incentive pay, bonus pay for

3    performance, before we even learn if it started another fire,

4    is an insult.  It's not right.  And I think CEO Simon said it

5    best when he said we shouldn't be doing this for 2018.  And our

6    committee and our professionals believe they shouldn't be doing

7    it for 2019 either.

8    However, if Your Honor believes that some part of this

9    case should be typical and we should incentivize some

10   employees, we believe you should send the STIP back for

11   reconfiguration so that we can be sure the metrics are

12   appropriately scored and administered.

13   THE COURT:  Before you leave, I want to put one

14   question back to you.  Again, as I said a minute ago, I wish I

15   could magically decree that there will be no fires in 2019.  I

16   can't do that.  So whether there will be a fire in 2019 or not

17   is not something that I can deal with.

18   But the question that I don't know and I can't insist

19   that the debtors' lawyers and representatives answer the

20   question yet, is when and how they're going to compensate the

21   victims and pay the creditors, who aren't victims, but who are

22   creditors.  And that's a different question.

23   And so if we could magically say no more fires, we

24   still have to decide what to do about the employees who are

25   doing their job at a time when the company needs to get itself

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    out of bankruptcy.  And if there'd never been the fires, again,

2    the same story, the company would still be told figure out a

3    way to get out of bankruptcy.  It wouldn't be as difficult, but

4    they'd still have to do it.  They did it before.  They can do

5    it again, we hope.

6              So I have to juggle the emotions that you described so

7    vividly, correctly, and impressively.  But how do I relate that

8    to the issue at hand and what we talked about?  So you made

9    your point and I'll take your comments and I'll listen to the

10   others and figure out what's the best thing to do.  Thank you

11   for a very good presentation.

12             MR. JULIAN:  I do have an answer for that, Your Honor.

13   I would need -- and I think you would need -- more information

14   on several things.  Base pay, I think I put it in my

15   conclusion --

16             THE COURT:  No, you did, you did.

17             MR. JULIAN:  What's the base pay elsewhere?  What are

18   the individual incentives?  What's it for?  It's just more

19   information.  I do understand that they've done this on a very

20   high level.  At a very high level, talking about their peers

21   and everything may be good for the typical bankruptcy case.

22   But this is not the typical bankruptcy case, Your Honor, I

23   submit.  We have to do something more in this case.  And I

24   think you need more information, as do we.

25             THE COURT:  Okay.  Thanks, Mr. Julian.

PG&E Corporation, et al.

1          MR. JULIAN:  Thank you.

2          THE COURT:  I'm going to call on counsel for the SLF

3   fire victims, if you wish to be heard.  And then I'll take a

4   short break and then call on anyone else who wants to be heard

5   in opposition to the motion.

6          MR. HAWKINS:  Good morning, Your Honor.  Chris Hawkins

7   of Sullivan Hill, on behalf of approximately 3,500 --

8          THE COURT:  Good morning, Mr. Hawkins.

9          MR. HAWKINS:  -- fire victims, known as the Singleton

10  claimants.  I'll be very brief, Your Honor.  We have joined in

11  the other oppositions.  We have our own file.

12          Part of the frustration and sensitivity on our

13  clients' parts with the STIP issue, you hinted at it just a

14  minute ago.  They face a significant weight here now, in terms

15  of getting the compensation they need to rebuild their homes

16  and their lives and their communities.  They're easily going to

17  wait a year or two, realistically, in this case before they get

18  paid.  Some of those folks have already been waiting more than

19  three years.

20          THE COURT:  No, I know.  Your one group, particularly,

21  we talked about that before.

22          MR. HAWKINS:  Correct, goes back to 2015.  And so now

23  they face another year or two of waiting on top of that.  And

24  they face a second issue and that is after that lengthy wait,

25  are they going to get paid in full?  And this is the issue you

PG&E Corporation, et al.

1   raised a moment ago.

2           We questioned the debtor at the 341 on that issue: are

3   you going to pay in full in this case?  And despite the

4   operating report showing assets, billions of dollars in excess

5   of liabilities, and despite a stock price showing essentially

6   the same thing, PG&E said they couldn't commit to that at this

7   point.  And for our clients to hear that they might not be paid

8   in full after going through all this is particular painful.

9           THE COURT:  Well, they didn't predict anything, did

10  they?

11          MR. HAWKINS:  Correct.

12          THE COURT:  Again, I wasn't privy to that.  But I know

13  from experience what it takes to figure out how to formulate a

14  plan for even the poorest and bankrupt of company, not a

15  company that on paper is solvent.

16          MR. HAWKINS:  As do I and I sympathize with debtors'

17  counsel for having -- I know what they have ahead of them

18  there, but at the same time, for our clients to have to sit

19  where they sit and hear about bonuses being paid is

20  particularly painful.  And in terms of where we are on the full

21  pay issue, we started the case with people pointing to the

22  stock price, saying looks like there's going to be assets left

23  in excess of liabilities.

24          We now have the operating report starting to hit the

25  docket showing the same thing.  If this case progresses to the

PG&E Corporation, et al.

1  point where PG&E starts putting in pleadings, we are working

2  towards a full pay case, our clients' sensitivities may shift a

3  little bit.  But from where we sit right now, that's why we

4  filed the objection to the STIP.

5      THE COURT:  But seriously, we can stipulate --

6  everybody would agree this is a horribly unusual case.  But in

7  the first bankruptcy, in the first PG&E case, not driven by any

8  major fires -- there were some tort claims, but not

9  significant -- from day one it was obvious that the company was

10  solvent.  And it was pretty obvious to me, as the presiding

11  judge, that creditors were going to get paid.  It took a long

12  time, but they got paid.

13      And that's not typical in most of the relatively small

14  bankruptcies that I handle every day and most of the bankruptcy

15  lawyers here in the room, at least locally, handle.  So I'm

16  still optimistic that the company will be able to pay its

17  creditors in full.  But I'm not going to hold them to a

18  deadline.  I'm not going to tell them they're going to have to

19  have their plan on file next week or next month.

20      But let's get back to the immediate time.  You seem to

21  be recognizing that it probably will take a while.  What do I

22  do in the short-term, from your point of view, with the 10,000

23  employees who -- most of whom had nothing to do with the

24  problem and most of whom are just trying to get -- do their

25  job?

PG&E Corporation, et al.

1    MR. HAWKINS:  We're sympathetic to the rank and file

2    workers, Your Honor.  But the reality is there's a lot of pain

3    to go around in this bankruptcy case.  And we would submit that

4    going a year --

5    THE COURT:  But what I have to be blunt about, as much

6    as I wish it weren't so, I could deny the entire STIP and that

7    doesn't put one dollar into your clients' pockets for now.  And

8    maybe it will or maybe it won't some day in the future, but

9    that's a different question.

10    MR. HAWKINS:  Understood.  But it would lessen our

11    clients' pain on this issue.

12    THE COURT:  Okay.

13    MR. HAWKINS:  Thank you, Your Honor.

14    THE COURT:  Well, I said I was going to take a break,

15    but let me ask just other counsel wanting to appear in

16    opposition to the motion.  Is there anyone left that wants to

17    be heard?  If there's only one or two, I'll do it.

18    Do you want to be heard?

19    MR. DEGHETALDI:  Yes.

20    THE COURT:  Okay.  Well, before you come to the

21    podium, is there anyone else?  All right.  I'll take --

22    MR. TREDINNICK:  Your Honor --

23    MS. PINO:  Your Honor --

24    THE COURT:  Oh, who's on the phone?

25    MR. TREDINNICK:  Edward Tredinnick --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MS. PINO:  Good morning, Your Honor.

2    MR. TREDINNICK:  -- on behalf of the City and County

3    of San Francisco.

4    THE COURT:  Okay.  And the woman?  Who's that?

5    MS. PINO:  Good morning, Your Honor.  Estela Pion on

6    behalf of the superior court-appointed executive committee for

7    the Ghost Ship plaintiff cases.

8    THE COURT:  Okay, okay.  Ms. Pino and Mr. Tredinnick,

9    I've read your papers.  I will let you speak after the

10   gentleman who came up to the podium.

11        I'm going to ask you to keep your comments relatively

12   brief.  But I will go ahead and not take a break.  I'll try to

13   see if we can get these three speakers out of the way first, so

14   yes, sir?  Gentleman at the podium?

15   MR. DEGHETALDI:  Thank you, Your Honor.

16   THE COURT:  I need a name.

17   MR. DEGHETALDI:  Name's Dario DeGhetaldi, Your Honor.

18   THE COURT:  Oh, yes.  You were here before.  I'm

19   sorry, I didn't recognize you.

20   THE COURT:  That's all right.  Your Honor, our office

21   represents over 1,600 victims of the camp fire, as well as

22   hundreds of others of disasters caused by PG&E, going back to

23   the San Bruno explosion, in 2010.

24        I have a couple of comments.  Generally, I'd like to

25   say that we support the remarks of both the U.S. Trustee and

PG&E Corporation, et al.

1    the tort claimants' committee.  There are a few factual issues

2    that I'd like to inform the Court about.  Mr. Julian touched on

3    some of them.  But I have a little bit more history.

4         I have here, Your Honor, an order from Judge Alsup

5    that was entered on April 3rd.

6         THE COURT:  I think I've seen that.  Someone else has

7    already provided me with that.  You can give me another copy,

8    but I'm aware of it.

9         MR. DEGHETALDI:  This is an order modifying conditions

10   of PG&E's probation, requiring PG&E to comply with the law,

11   requiring PG&E to comply with orders of the CPUC and other

12   issues.  After that hearing, Your Honor, further investigatory

13   authority was given to the monitor to look into other matters

14   that extend beyond the scope of Judge Henderson's original

15   order, creating the monitorship.

16        And I'd like to just make a couple of comments about

17   the locate and mark program.  That program --

18        THE COURT:  What's the name?  I'm not familiar with

19   the term.

20        MR. DEGHETALDI:  I'm sorry, locate and mark.

21   That's -- Mr. Julian talked about that, explaining --

22        THE COURT:  Oh, okay.  I thought you were referring to

23   some people's names.

24        MR. DEGHETALDI:  No, no.

25        THE COURT:  Locate and mark.

PG&E Corporation, et al.

1    MR. DEGHETALDI:  Right.  And there is a pending

2    investigation that was initiated by the CPUC in December of

3    last year, following a report by the safety enforcement

4    division of the CPUC.  And I'm just going to read a little bit

5    from the safety enforcement division's report, where their

6    preliminary investigation demonstrated instances of

7    falsification of safety records, certain leaders' knowledge

8    about PG&E's falsification of safety records, the failure to

9    eliminate practice of falsification, even though it was

10   reported repeatedly since 2009, and instances of underreporting

11   the number of violations of the excavation requirement

12   internally and to the SED.

13       The Court will recall that in February of this year,

14   there was an explosion on Geary.  And fortunately, nobody was

15   injured.  Some buildings were damaged.  But it took over an

16   hour and a half for PG&E to turn off the gas that was shooting

17   up in a towering flame.  And that was forty-five minutes longer

18   than it took them to turn off the gas after the San Bruno

19   explosion.

20       A report in the Chronicle by PG&E representatives said

21   that the reason that it took so long was that they had to

22   excavate under the asphalt to reach five -- five valves to turn

23   off the gas.  Then late last month, Your Honor, the safety

24   enforcement division issued a supplemental report that included

25   the deposition of a PG&E auditor.  And in that supplemental

PG&E Corporation, et al.

1    report, they asked the CPUC to extend the investigation --

2            MR. KAROTKIN:  Excuse me, Your Honor, is this -- is he

3    testifying?  Is this evidence?  I mean, he's referring to

4    things that are -- we haven't seen, they're not in the record.

5    I don't understand.  Is this like --

6            THE COURT:  Yeah.

7            MR. KAROTKIN:  -- is this attorney testifying?

8            THE COURT:  Well, why don't you folk give me some

9    idea.

10           MR. DEGHETALDI:  I --

11           THE COURT:  What is the purpose of this?  I understand

12   about --

13           MR. DEGHETALDI:  Your Honor --

14           THE COURT:  I didn't read the detail but I know about

15   the explosion.

16           MR. DEGHETALDI:  Your Honor --

17           THE COURT:  Therefore, what?

18           MR. DEGHETALDI:  Your Honor, I am a stranger in a

19   strange land here.  I'm just a tort lawyer.

20           THE COURT:  You're a very experienced, highly

21   respected lawyer.

22           MR. DEGHETALDI:  And I'm --

23           THE COURT:  You need to tell me what the relevance is

24   today.

25           MR. DEGHETALDI:  The relevance is, Your Honor, that

                    PG&E Corporation, et al.

1    the -- that this company -- I've been dealing with them for ten

2    years.

3              THE COURT:  I got it.

4              MR. DEGHETALDI:  And --

5              THE COURT:  What do I do?

6              MR. DEGHETALDI:  -- and --

7              THE COURT:  What do you want me to do now?

8              MR. DEGHETALDI:  If -- I'm coming to the end of my

9    little talk --

10             THE COURT:  Okay.

11             MR. DEGHETALDI:  -- about records and recordkeeping

12   and trying to update what has been going on, just within the

13   last few days and if the Court would give me latitude to do

14   that --

15             THE COURT:  Well, I --

16             MR. DEGHETALDI:  -- I'll get to the point.

17             THE COURT:  -- and I will but Mr. Julian covered a lot

18   of territory and I don't mind a little bit of repetition but I

19   am not --

20             MR. DEGHETALDI:  This is new.

21             THE COURT:  I am not Judge Alsup.  This is not a

22   criminal proceeding or a probation.  I have to figure out what

23   to do with the bankruptcy.

24             MR. DEGHETALDI:  Understood.

25             THE COURT:  So that's what I want you to focus on.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          MR. DEGHETALDI:  Understood.

2          THE COURT:  Go ahead.

3          MR. DEGHETALDI:  But I think that they're --

4          THE COURT:  Go ahead.  You got it.

5          MR. DEGHETALDI:  There is an interrelationship between

6   them that can't be avoided or ignored.

7          THE COURT:  I know but I don't want testifying, just

8   give me your pitch and I will do my best to listen to you --

9          MR. DEGHETALDI:  Okay.

10          THE COURT:  -- and consider what you're saying.

11          MR. DEGHETALDI:  Your Honor, for counsel to say that

12   PG&E is not aware of what has been going on --

13          THE COURT:  No, he didn't say that.

14          MR. DEGHETALDI:  -- with the CPUC.

15          THE COURT:  He didn't say that.  He's asking if you're

16   testifying.  I didn't -- wasn't offended by his interruption.

17   I am letting you go ahead.  Go ahead.

18          MR. DEGHETALDI:  All right.  Thank you, Your Honor.

19          The recent report within the last few days where the

20   SED asked the CPUC to extend their investigation to include the

21   located mark program for underground electrical utilities and

22   the testimony of the PG&E employee, the auditor, said in her --

23   at page 49 of her deposition, that PG&E does not have any

24   records of the location of the underground electrical system.

25          THE COURT:  But isn't that for the PUC to deal with?

PG&E Corporation, et al.

1          MR. DEGHETALDI:  It is, Your Honor, but --

2          THE COURT:  Again, what I am supposed to do with the

3    incentive plan, say you can't pay your employees because you

4    don't keep underground records?

5          MR. DEGHETALDI:  Here's the deal, Your Honor.  Here's

6    the deal.

7          THE COURT:  Go ahead.

8          MR. DEGHETALDI:  Okay.  PG&E is asking the Court to

9    approve a plan that pays quarterly incentive payments for the

10   first time in God knows how long, ahead of a serious

11   investigation by the CPUC, ahead of the performance under the

12   new conditions of probation by PG&E, ahead of possible new

13   conditions of probation that are to be imposed by Judge Alsup

14   and Your Honor, there is now a grand jury, a criminal grand

15   jury that is sitting in Butte County, investigating criminal

16   actions, possible criminal actions, by PG&E and to allow PG&E

17   to pay --

18         THE COURT:  I approved a settlement with Butte County,

19   is that --

20         MR. DEGHETALDI:  This is --

21         THE COURT:  -- different?

22         MR. DEGHETALDI:  That was for the North Bay fire --

23         THE COURT:  Okay.

24         MR. DEGHETALDI:  -- Your Honor, this is for the

25   campfire.

PG&E Corporation, et al.

1      THE COURT:  But again, I will accept -- I'll take your

2  representation that this is going on.  I don't want to hear

3  what the grand jury is doing.

4      MR. DEGHETALDI:  Right.

5      THE COURT:  I will take your word that there's an

6  investigation.

7      MR. DEGHETALDI:  And I have no --

8      THE COURT:  I got it.

9      MR. DEGHETALDI:  -- I have no --

10      THE COURT:  Okay.  So look, there are a bunch of

11  things that this company has to deal with and you've listed

12  several of them and we know what obviously the major ones are.

13  So again, your point, I take it, is that I shouldn't allow this

14  incentive.

15      MR. DEGHETALDI:  My point, Your Honor, is not that

16  radical.

17      THE COURT:  Okay.

18      MR. DEGHETALDI:  My point is that the Court should not

19  allow the incentive, any incentives to be paid on a quarterly

20  basis and should not allow any incentives to be paid until the

21  earliest, at the end of the year, that the Court should not

22  allow any incentives to be paid without full disclosure of this

23  plan.

24      THE COURT:  Well, basically what Mr. Julian said.

25      MR. DEGHETALDI:  Yes.

PG&E Corporation, et al.

1    THE COURT:  Okay.

2    MR. DEGHETALDI:  Yes, Your Honor.

3    THE COURT:  Again, I just want to --

4    MR. DEGHETALDI:  And I am just --

5    THE COURT:  That's okay, I got it.

6    MR. DEGHETALDI:  And I do not believe that the Court

7    should allow incentives to be paid without names and amounts,

8    and amounts and rationales being disclosed to the public, not

9    just to any particular committee or creditor.

10    THE COURT:  What would be the utility of having lists

11    of names and names and names and names of people that are

12    again, just the rank and file people that are doing their jobs?

13    So, Mr. X, who gets paid a base salary of 70,000 dollars might

14    get five more thousand under the STIP.  What do we accomplish

15    by putting him in the public eye?

16    MR. DEGHETALDI:  We accomplish possibly commendations

17    that might come from the public to those sorts of individuals

18    who do their job well and we recognize that there are a number

19    of them, but it will also allow us to sort through the names of

20    people who may be responsible for past acts or future acts, or

21    past violations or future violations of the law, regulations or

22    orders of the CPUC.

23    THE COURT:  Well, come on.  I don't understand that.

24    If I ordered the debtor to make available to you or to the

25    committee or to the public, the list of employees who would be

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   under the STIP and you got a spreadsheet that said Joe Smith,

2   salary 70,000, STIP 5,000, that doesn't -- I mean, what do you

3   want me to do?  Get the -- open his personnel file?

4           MR. DEGHETALDI:  No.

5           THE COURT:  I mean, but --

6           MR. DEGHETALDI:  No.

7           THE COURT:  -- that doesn't tell you or me or the

8   public whether Mr. Smith is a good employee or a bad employee.

9   The STIP and the way it's been teed up to me is the managers

10  have a way of making sure that people that are not performing

11  can be excised out of it.  Isn't that --

12          MR. DEGHETALDI:  Your Honor?

13          THE COURT:  You're grinning but the plan says it.

14  Right?

15          MR. DEGHETALDI:  Your Honor, look, I'm grinning

16  because I have a painful memory of taking Geisha Williams'

17  deposition and asking her about the Butte fire.

18          THE COURT:  But that's -- again --

19          MR. DEGHETALDI:  No, it's not, Your Honor.

20          THE COURT:  No, I --

21          MR. DEGHETALDI:  It's not.

22          THE COURT:  I am going to cut you off.  I asked you a

23  question about the rank and file and you're taking your issue

24  with the former CEO --

25          MR. DEGHETALDI:  No.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1        THE COURT:  -- and she is not on trial here today.

2        MR. DEGHETALDI:  No, Your Honor.  You said -- with

3    respect, you said the plan has provisions for a manager to say

4    that this --

5        THE COURT:  Right.

6        MR. DEGHETALDI:  -- person is --

7        THE COURT:  Yes, that's right.

8        MR. DEGHETALDI:  -- does your --

9        THE COURT:  The manager can say this guy hasn't been

10   performing, doesn't get it.

11       MR. DEGHETALDI:  And I'm saying, Your Honor, that from

12   my personal experience, that the management of PG&E has a habit

13   of denying responsibility for actions that have led to death

14   and destruction across the State of California and I was using,

15   was trying to use, the deposition of Geisha Williams that I

16   took where I asked her did PG&E do anything wrong with respect

17   to the Butte fire and she said no.

18       THE COURT:  Okay.  I understand.  I appreciate it.

19   I -- that's helpful to clarify it that way.

20       MR. DEGHETALDI:  So that's all I have to say, Your

21   Honor.

22       THE COURT:  Okay.

23       MR. DEGHETALDI:  Thank you.

24       THE COURT:  Thank you.

25       All right.  Mr. Tredinnick and then Ms. Pino.  And

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    then we'll take a break.

2           MR. TREDINNICK:  Yes, Your Honor.  Thank you.  Edward

3    Tredinnick of Greene Radovsky on behalf of the City and County

4    of San Francisco.

5           The City supports the tort claimants' committee.  We

6    filed a joinder in their opposition.

7           THE COURT:  Right, I read --

8           MR. TREDINNICK:  I'll be just --

9           THE COURT:  -- I got that.

10          MR. TREDINNICK:  I'll be very brief, Your Honor.  We

11   think that the incentives should be directed towards safety and

12   reliability, rather than financial performance and that the

13   people who are receiving those incentives are performing the

14   safety and reliability functions.

15          We agree with the U.S. Trustee that there should be

16   some transparency as to who is receiving these, so that the --

17   essentially the people with the boots on the grounds are

18   getting these benefits and not the management.  I think that

19   that should be included within this -- in the plan.

20          I was glad to see that the creditors' committee has

21   obtained some additional metrics towards safety and I think

22   that that should be even done more so.

23          THE COURT:  Well, you're aware of the adjustment

24   downward for financial and upward for safety, right?  There's

25   only --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. TREDINNICK:  I am aware of that, Your Honor, but

2   the --

3    THE COURT:  I mean, there's only so much left.

4    MR. TREDINNICK:  -- the --

5    THE COURT:  There's only so much --

6    MR. TREDINNICK:  Yeah.

7    THE COURT:  -- to go around.  So, I mean, Mr.

8   Tredinnick, I think that all I could do is tell them to do away

9   with financial or customer relations or -- I think that's all

10  that -- there are just three categories, aren't there?

11    MR. TREDINNICK:  Right.  Well, Your Honor, I think

12  that that would be consistent with what Judge Alsup had ruled

13  in denying any dividends until the safety plan is put into

14  effect.

15    THE COURT:  I would like to know how the company would

16  be paying dividends anyway.  It's in bankruptcy, so without

17  taking issue with Judge Alsup, I am not sure that paying

18  dividends while you're in bankruptcy is an option that anybody

19  had in the first place but maybe somebody was thinking about it

20  and Judge Alsup has taken that away but that's not the point.

21  Okay.  I got your message.

22    MR. TREDINNICK:  I don't want to belabor these points

23  because I think my predecessors have pretty much hit everything

24  that we were interested in.

25    THE COURT:  Okay.

PG&E Corporation, et al.

1        MR. TREDINNICK:  And we'll just -- I'll conclude

2   there.

3        THE COURT:  All right.  Thank you.

4        Ms. Pino, you're the closer here for the morning

5   session -- pre-break session.

6        MS. PINO:  Thank you, Your Honor.  I appreciate

7   that -- the opportunity to address the Court.

8        Your Honor, the Ghost Ship plaintiff fully support the

9   positions taken by the United States trustee and by the tort

10  committee.  Mr. Julian's reading into the record of the email

11  by CEO Simon is particularly illustrative.  He said this is a

12  very significant admission and it is an admission.  Nothing is

13  business as usual for a fire victim, whether they be the Ghost

14  Ship fire or the wildfires, nothing should be business as usual

15  for PG&E.

16       THE COURT:  Okay.  Anything else?

17       MS. PINO:  That's all, Your Honor.

18       THE COURT:  Okay.  Thank you very much, Ms. Pino.

19       All right.  I am going to take a fifteen-minute break

20  for everyone's personal convenience.  I'll say the persons on

21  the phone can either hang on the phone or recall through

22  CourtCall, I will let you take care of that.  For everyone in

23  the courtroom, I will resume at 11:30 and at that point, I will

24  ask for the debtor's representatives and the Local 20 and if

25  they actually -- I didn't mean to exclude the un -- excuse

PG&E Corporation, et al.

1    me -- the unsecured creditors' committee, if its counsel wants

2    to be heard, I will hear from him and then I'll see if anyone

3    else wishes to be heard.

4         So Mr. Karotkin, I don't have a sequence, if you want

5    to speak first or let the others go, it's up to you or whoever

6    is going to speak.  You guys work that out.  I will see you in

7    fifteen minutes.

8         (Recess from 11:14 a.m., until 11:42 a.m.)

9         THE CLERK:  All rise.

10        THE COURT:  Remain seated.  Sorry about the delay.  I

11   didn't get the message to come back in.  It's my fault.  All

12   right.

13        What is the debtors' pleasure, Mr. Karotkin?  All

14   right.  Committee first?

15        MR. BRAY:  Yes, sir.  Good -- good morning, Your

16   Honor -- close -- Gregory Bray, Milbank LLP, counsel for the

17   unsecured creditors' committee.

18        Your Honor, I want to start by addressing the question

19   you asked in part of your discussion today, which is will this

20   STIP help facilitate the restructuring of this company?  That's

21   the very question that the committee asked its advisors,

22   Milbank and FTI, when the motion was filed and we were tasked

23   with taking a position on it, and the answer was, we concluded,

24   yes, it will.

25        Why is that?  Well, the employees are an integral part

PG&E Corporation, et al.

1    of this company and its restructuring.  A healthy, robust,

2    satisfied, incentivized employee base is only going to ensure,

3    help ensure, the company is best in class and safety, will

4    perform well in terms of financial metrics.  The company can't

5    do these things without the proper employee base.

6         So it became clear to the committee, at least, that

7    the question of do we need to incentivize the employees or

8    should we be compensating them in this manner to assist and

9    facilitate in the restructuring, the answer was yes.

10         If you look at the peer groups for this industry and

11   this company, they have similar structures.  Our safety metric

12   is much higher than theirs are, if the Court approves the

13   stipulation but it is a common tool used to incentivize

14   employees.  And as I've said, the employees are critical to the

15   success in the restructuring of the company.

16         It's the same analysis that we employed, Your Honor,

17   when we stood before you and asked you to approve the DIP.  The

18   company is stabilized by the employee base.  Stabilization

19   preserves, if not enhances value.  That value is used to pay

20   creditors claims, preferably in full, as you've heard other

21   parties say, is their desire.  So this is one of the early

22   predicates to laying the foundation to the restructuring.

23         Having said that, the question for the committee was

24   what are the proper metrics for the STIP?  And as the Court has

25   been advised, the committee concluded that the debtor was on

PG&E Corporation, et al.

1  the right track but there needed to be some tweaks, to use

2  someone else's words.

3          And the committee is committed to having this company

4  exit as a best in class in terms of safety and you've heard

5  lots of reasons why that's important.  The committee agrees

6  with all of them but there are additional reasons.  Our

7  committee, Your Honor, is the vendors, the suppliers, such as

8  the tree trimmers, the employees, the pensioneers, the holders

9  of the counterparties to PPAs, the holders of the long-term

10 debt.

11         These claims exceed, in their current form, 20 billion

12 dollars and if you factor in the exposure on executory

13 contracts, could be double that.  So it's a very significant

14 number.

15         Not only that, these are the types of creditors who

16 will help form the backbone of this company when it exits

17 bankruptcy.  Their support will be critical to the company, so

18 it's equally critical to our constituency that the company have

19 a best in class safety program.  And our conclusion was that

20 the metrics should be adjusted to reflect that upward and we

21 have that negotiation with the debtor.  Our financial advisor,

22 FTI, was tasked with negotiating with the company on this,

23 looking at the metrics, trying to assess as best they could,

24 what appropriate adjustments should be there and you've seen

25 them:  an upward adjustment in safety, a downward adjustment in

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  financial performance, and then essentially equivalents in

2  terms of customer service, which I don't want to discount by

3  any circumstance.

4       So where we arrived was is it perfect?  Of course not.

5  I mean, nothing ever is, but on balance, the committee believes

6  that this is a STIP that makes sense for this company.  It

7  addresses the needs of the company.  It addresses the concerns

8  with respect to safety and it will facilitate the company's

9  restructuring and exit from bankruptcy as soon as possible.

10      So for those reasons, we support the STIP, Your Honor.

11      THE COURT:  Okay.  Thank you, Mr. Bray.

12      Yes, sir?

13      MR. BOTTER:  Good morning, Your Honor.  David Botter,

14  Akin Gump Strauss Hauer & Feld, on behalf of the ad hoc

15  committee of senior unsecured noteholders.

16      Your Honor, we filed a 2019 earlier in these cases,

17  showing that our collective holdings in utility debt are almost

18  nine billion dollars.  Your Honor made an important point

19  earlier today that, in fact, we are in bankruptcy, and in

20  Chapter 11, the duty of the debtors and the official committees

21  is to maximum value.

22      Your Honor, we think that this motion directed towards

23  the rank and file does just that.  It maximizes values for

24  these estates.  With the unsecured creditors' committee's

25  changes, we're supportive of the entry of the order approving

PG&E Corporation, et al.

1   the motion.  We believe the changes appropriately balance the

2   need to increase the focus on safety for all and on prevention

3   of wildfires with the duty to maximize value.

4           And with that, Your Honor, we think that with the

5   committee's changes, the order should be entered.

6           THE COURT:  What, in your mind, does maximize value

7   mean?  I mean it's a label but it does have a tangible impact

8   on the other side of the room --

9           MR. BOTTER:  Your Honor?

10          THE COURT:  - the tort victims.

11          MR. BOTTER:  Your Honor, the rank and file of these

12  companies, it's their duty to keep the lights on.

13          THE COURT:  Right.

14          MR. BOTTER:  I know it's a bad pun but that is really

15  what is, in fact, they're going to be doing here, and without

16  the people who are on the lines, who are charged with keeping

17  the power on, who are charged with cutting trees down, who are

18  charged with continued focus on safety, yes, Your Honor, we've

19  heard a lot about potential bad actors and I'm certain that the

20  company is attempting to weed out any potential bad actors but

21  the people who are doing the job, and who are necessary to

22  decrease the risks associated with what has happened in the

23  past, should be paid.

24          And we think that maximizing value, not only for the

25  financial creditors because that's who we represent, but for

PG&E Corporation, et al.

1  all creditors, including the victims of the wildfires, is what

2  these people will do and this is why we are in support of this

3  motion.

4          THE COURT:  Okay.  Thank you.

5          MR. BOTTER:  Thank you, Your Honor.

6          THE COURT:  Anyone else besides the debtor?

7          All right.  Yes, ma'am?

8          Good afternoon -- or morning still.

9          MS. GRAY:  Good morning, Your Honor.  Caitlin Gray,

10 Weinberg, Roger & Rosenfeld, appearing for ESC Local 20.

11          You asked at the beginning of the hearing today, and I

12 think the answer is, yes, the employees represented by ESC

13 Local 20 are in a different category here than the rest of the

14 employees.

15          THE COURT:  Well, 20 -- some of them.

16          MS. GRAY:  I'm sorry?

17          THE COURT:  Some of them.  I mean, because some of

18 them are not included in the STIP, right?

19          MS. GRAY:  That's correct.

20          THE COURT:  Yeah, okay.

21          MS. GRAY:  There's about 1,400 employees that are

22 included in the STIP and represented by ESC Local 20.

23          We're not taking a position on nonrepresented

24 employees, including managers, higher-level employees,

25 potential insiders, former LTIP recipients who have gotten

PG&E Corporation, et al.

1    lumped into the STIP now.  We're only talking about the

2    employees represented by the union, which are the rank-and-file

3    employees doing the important work to maintain and modernize

4    the utility.  And there is no evidence that any of them have

5    done anything wrong, which is substantiated in this very

6    declaration.  These are not the supervisors who have been

7    accused of misstating reports.  These are just the working

8    people who are keeping the utility running and doing the work

9    to modernize it and make it safer.

10            And they are in a different category than the other

11   employees in the STIP because these payments are part of the

12   compensation required in their collective bargaining agreement.

13   Their collective bargaining agreement, which is Berry

14   Declaration Exhibit A, provides that the eligible employees

15   will receive STIP payments according to the formula laid out in

16   the collective bargaining agreement.  And they gave up --

17            THE COURT:  But I didn't and couldn't comprehend the

18   collective bargaining agreement.  It's not in any particular

19   STIP, is it?  In other words, it's not the particular STIP

20   that's the subject of this motion?  It's whatever --

21            MS. GRAY:  No.

22            THE COURT:  -- the STIP is --

23            MS. GRAY:  No, no.

24            THE COURT:  -- right?

25            MS. GRAY:  The STIP that is in the collective

PG&E Corporation, et al.

1  bargaining agreement, which would have laid the basis for the

2  2018 STIP payments --

3         THE COURT:  Um-hum.

4         MS. GRAY:  -- is a different formula that the

5  employees have since negotiated with PG&E to modify.

6         Section 1113 protects wages and benefits in a

7  collective bargaining agreement and says they can't be

8  modified --

9         THE COURT:  Yeah, right.

10        MS. GRAY:  -- unless the debtors go through this

11  specific process.  Well, the debtors did negotiate with the

12  union about changing the STIP program, making various changes,

13  moving away from an annual payment to quarterly payments,

14  changing the way the individual performance modifier is

15  implemented.  And the union agreed to the plan before you with

16  the modifications required by the UCC.

17        THE COURT:  Well, what is the impact -- again, because

18  this wasn't really teed up as an issue -- kind of a sub-

19  issue --

20        MS. GRAY:  Yeah.

21        THE COURT:  -- until I read your joinder.  What if I

22  said -- and I was persuaded by the tort victims and their

23  arguments, said I simply -- I can't approve the STIP.  What

24  happens to your clients, your 1,400 people who are parties to

25  the agreement?  I mean, they're not --

PG&E Corporation, et al.

1      MS. GRAY:  So the --

2      THE COURT:  The debtor isn't moving to reject it --

3  the agreement.  The terms and conditions still apply, don't

4  they?

5      MS. GRAY:  Yeah.  And there is a pending grievance

6  about the failure to pay the 2018 payments.

7      THE COURT:  Let me rephrase my question.  In the last

8  forty-eight hours or twenty-four hours, the debtor and the

9  official unsecured creditors' committee negotiated amendments

10  to the STIP.  That doesn't impact the collective bargaining

11  agreement, does it?

12      MS. GRAY:  Well, so the UCC does not actually

13  represent the employees --

14      THE COURT:  Right, no.

15      MS. GRAY:  -- that are represented by the union.

16      THE COURT:  No, I understand.  I understand.

17      MS. GRAY:  And so our position is that the debtor

18  can't implement those changes unless --

19      THE COURT:  No, but maybe I'm not phrasing the

20  question well.

21      MS. GRAY:  So PG&E brought the changes that the UCC

22  demanded to the union and negotiated with the union to get the

23  union's approval of the new STIP program with the modifications

24  presented --

25      THE COURT:  In the last two days?

PG&E Corporation, et al.

1        MS. GRAY:  Starting on Friday and, yeah, on Monday,

2    yes.

3        THE COURT:  Okay.  All right.  So -- all right.

4        Now what happens?  What happens to your clients,

5    again, the ones who are covered -- not to ignore the ones who

6    aren't covered, but --

7        MS. GRAY:  Um-hum.

8        THE COURT:  -- they're not covered -- if I disapprove

9    this agreement?

10       MS. GRAY:  So this agreement is --

11       THE COURT:  If I disapprove it across the board, I

12   think then, clearly, that's a problem.  If I send it back for

13   tweaking, or renegotiating, or something, then I guess is it

14   correct that your clients will have to decide whether they want

15   to adjust further or allege that there's been a grievance.

16       MS. GRAY:  A breach.

17       THE COURT:  Or I mean -- that's the wrong word.  You

18   know what I mean.

19       MS. GRAY:  Right.

20       THE COURT:  Initiate a grievance.

21       MS. GRAY:  Right.  So the plan that's before you today

22   is contingent upon Bankruptcy Court approval.  And so if you

23   don't approve it, the negotiated package falls through, and

24   we're left with the collective bargaining agreement.  And yes,

25   the union would claim that the collective bargaining agreement

PG&E Corporation, et al.

1   would be breached.  And we --

2           THE COURT:  Well, yes.  Yes, but --

3           MS. GRAY:  And we would argue that it would be

4   entitled to administrative status because it's a current

5   contract that hasn't been modified or rejected.

6           THE COURT:  Well, or alternatively, if the debtor is

7   told, if you want a STIP approved, you're going to have to

8   change it, then the debtor will have to decide, vis-a-vis ESP

9   (sic) 20, whether it's willing to go along with changes.  And

10  if they're not, then what happens happens, right?

11          And it's not -- it doesn't mean the debtor files an

12  1113 motion.  It doesn't mean anything except --

13          MS. GRAY:  Well --

14          THE COURT:  -- that the parties have to be --

15          MS. GRAY:  -- absent an 1113 motion --

16          THE COURT:  Right.

17          MS. GRAY:  -- the debtor is bound to honor what's in

18  the contract, which does provide that a STIP will be paid

19  according to the formula laid out in the contract.

20          THE COURT:  Yeah.  But again, what if I don't approve

21  it?  Is that a breach of the collective bargaining agreement?

22          MS. GRAY:  So this modified version, if the Court

23  doesn't approve it and the debtor fails to pay what's required

24  by the collective bargaining agreement, which does not require

25  Court approval, then yes, the debtor will be in breach.  And we

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  argue that the damages from that breach will be entitled to

2  administrative status as contractually required wages and

3  benefits.

4       THE COURT:  Okay.  Well, if I decide to approve it,

5  it's academic.  If I decide to disapprove it across the board,

6  then I guess that means that the debtor and your client will

7  have to decide what they do next.

8       And if I tell the debtor, go back to the drawing board

9  and do better, same thing.  I mean, your client will either go

10  along with it or not go along with it, right?  I mean, those

11  are the only two choices, aren't they?

12       MS. GRAY:  Yes.

13       THE COURT:  I mean, I'm not negotiating with you.  As

14  I say, the whole thing of the STIP didn't -- there was no

15  collective bargaining 1113 issue until you filed your joinder.

16  And again, I'm glad you did, but I didn't know what I'm

17  supposed to do with it and the debtors' reply didn't say

18  anything about it, so here we are.

19       MS. GRAY:  I do think that the other -- because we are

20  dealing with a smaller portion of employees -- only 1,400

21  employees --

22       THE COURT:  Um-hum.

23       MS. GRAY:  -- and because this is part of their

24  contractual compensation -- again, they gave up base wages in

25  order to get these STIP payments in their contract.  And so

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   it's a really important part of their compensation.  It's not a

2   bonus; it's not an increase in their wages; it's not incentives

3   related to bankruptcy.  This is part of their pay that they

4   rely on, on an annual basis, to meet their cost of living.

5          And because it's in the collective bargaining

6   agreement and it is negotiated between the union and the

7   company, it does have a special status afforded to it by

8   Section 1113.  And so we would ask that the Court grant the

9   motion, at least with respect to employees represented by ESC

10  Local 20.

11         THE COURT:  Well, I don't know that I have the

12  flexibility, but I suppose if I tell the debtor, you're going

13  to have to do better across the board, they can always decide

14  whether they want to carve out ESP (sic) 20 from the STIP and

15  have a little separate STIP.  Again, I'm not going to try to

16  pretend to know what the labor law ramifications are.

17         At the moment, the debtor hasn't asked to do that.

18  The debtors have asked to have Court approval of the STIP, as

19  now modified.  And you've clarified your position.  And that's

20  helpful.  Okay.

21         MS. GRAY:  All right.

22         THE COURT:  Thanks very much.

23         MS. GRAY:  Thank you.

24         THE COURT:  Okay.  Mr. Karotkin?

25         So a first question, because this isn't something that

PG&E Corporation, et al.

1  was discussed Mr. Julian or the U.S. Trustee or anybody else.

2  And it was kind of -- I gave you a little bit of a clue when I

3  asked you about board approval.  Among all the other things

4  that are highly publicized is the significant change in the

5  board.  And I don't even know when the effective date of that

6  is.  But at least, according to the press, the new CEO and the

7  new board will be in office sometime soon.

8       MR. KAROTKIN:  Yes, sir.

9       THE COURT:  It seems to me, at the very minimum, I

10  should say let's see if the new board and the new CEO have the

11  same view as the prior management.

12       I mean, it's a broad question, and it's -- you might

13  tell me it's not part of the business judgment, but I'm the one

14  that has to approve this thing.  So what's wrong with --

15  whether I insist that there be disclosure, as the U.S. Trustee

16  asks, or participate in some sort of negotiated explanation of

17  the metrics as Mr. Julian and the others argued, why don't I

18  just say, wait a minute, this was negotiated by the prior

19  watch; things have changed dramatically.  How many times have

20  we talked about this case as different?  Well, one of the

21  things that's different is there's been a major board change

22  and a major CEO change.

23       So why don't I say, let's go see if the CEO is

24  prepared to tell me that this is a good thing for the

25  reorganization effort and for the goals of protecting the

(977) 702-9580   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  creditors, including the wildfire victims?

2  MR. KAROTKIN:  I think, Your Honor, there is actually

3  a very easy answer to this.  This is not something unusual.

4  This is a customary program that's been in place for thirty

5  years.

6  THE COURT:  I know, but you were --

7  MR. KAROTKIN:  It's been tweaked.

8  THE COURT:  -- you were here in the room.  It's

9  unusual because of what's happened with the company, and the

10 fires, and what's the real world.

11 MR. KAROTKIN:  Well, Your Honor, actually, I disagree

12 with that.

13 THE COURT:  Okay.

14 MR. KAROTKIN:  I don't think it's unusual because of

15 that.  I think that as the creditors' committee and Mr.

16 Botter's client recognize, this is something that is necessary

17 to incentivize 10,000 of the employee base to achieve the

18 company metrics.  Now, sixty-five percent safety, they've been

19 increased.  And it's critical to the ongoing operation and to

20 achieve the company's wildfire mitigation plan.

21 And Your Honor, we're not asking for something at all

22 unusual.  As you yourself recognize, this plan effectively is a

23 continuation of what the company generally did, with a few

24 changes.  We acknowledge quarterly payments.  But again, it

25 merely picks up the traditional types of awards under the prior

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  plans, the same type of discretionary judgment that the board

2  has.  Again, the new board always has the option to say, going

3  forward, don't make any quarterly payment and don't make the

4  annual payment for any reason, whether individual or otherwise.

5  Again, this is not something that, other than the compensation

6  committee, that the board would necessarily get involved with.

7  THE COURT:  Well -- but again, why are you pretending

8  this case is the same as all the other ones?  It isn't, in

9  part --

10  MR. KAROTKIN:  I agree.

11  THE COURT:  -- in part, because the last time I had

12  the PG&E case -- and every other bankruptcy case I've been

13  involved with, except a couple that have had torts -- they

14  haven't had a major constituency of creditors who are victims,

15  who didn't choose to be creditors.  So why don't I have to

16  treat it a little differently?

17  MR. KAROTKIN:  I think you can acknowledge, as we do,

18  Your Honor, the fact that there are tort claimants here.  But I

19  don't think that has anything to do with the fact that what is

20  being contemplated here is something prospectively for the good

21  of the business and in order to maximize value, preserve the

22  value, incentivize the employees to achieve the goals of the

23  company, which again, now are safety, performance --

24  THE COURT:  Um-hum.

25  MR. KAROTKIN:  -- and customer satisfaction.  That

PG&E Corporation, et al.

1   doesn't change based on the creditor constituency.

2           I think -- what we've indicated in our papers, Your

3   Honor, is that this isn't an issue for the tort claimants or

4   the other claimants of what's appropriate moving forward.  This

5   is an issue.  And what they focus on, Your Honor, is what

6   happened in the past and why should we give people what they

7   claim to be bonuses for something that happened in the past.

8           And what we say, Your Honor, that's irrelevant.  This

9   is not an issue of retribution.  This is not an issue of

10  punishment.  This is an issue of what is appropriate, under the

11  business judgement of the management and the board, to motivate

12  the employees to increase the value and to achieve the safety

13  metrics that are part of this plan and critical to this plan.

14  It's prospective.  We acknowledge that there were fires in 2017

15  and 2018.  But this company has a business to operate.  And

16  critical to the operation of that business is providing

17  certainty and the ability to its employees to achieve a

18  competitive rate of compensation, the opportunity to do that.

19          As I said, again, in the papers, Your Honor, to the

20  extent that the tort committee and the other objectors wanted

21  to extract a pound of flesh or thought that was appropriate,

22  that's been done.  The company withdrew the 2018 STIP plan.

23  It's been done.  And as a result of that, they're focused now

24  on moving forward, as Mr. Simon, by the way, indicated in his

25  email.  They are focused on moving forward and to make sure

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   that the employee base is aligned with the company going

2   forward.

3            And as you said, you can't prevent things from

4   happening.  But if you don't have an employee base aligned and

5   motivated, bad things will happen.  And we think important from

6   the standpoint of the entire creditor body, Your Honor, to

7   provide the appropriate incentives to enable them that if they

8   do their jobs, if they achieve the performance metrics, again,

9   subject to the discretion whether it's quarterly or annually,

10  for the board in its total discretion to modify those

11  payments --

12           THE COURT:  Well, I know.

13           MR. KAROTKIN:  And if --

14           THE COURT:  But in its discretion.  We know it's in

15  its discretion.  And it would -- probably wouldn't have to come

16  back and ask me for permission to exercise its discretion not

17  to make the payment.  I think I'm kind of on Mr. Julian's side

18  in the sense here that if the minimum -- I mean, if the

19  maximum -- minimum becomes a maximum or maximum becomes a

20  minimum, 350 million dollars is on the budget.  It's hard for

21  me to imagine that is not likely to happen.

22           The question is what is the impact on the company's

23  ability to get out of bankruptcy.  And I realize -- I said this

24  is not a confirmation hearing.  I'm not asking you to prove

25  that you've got a feasible Chapter 11 plan here.  But I got to

PG&E Corporation, et al.

1    have a sense that everything you say is supportable long term.

2    And that's, again, the problem I'm having. It's not -- I'm not

3    opposed to it. And you know what, the United States Trustee

4    and Mr. Julian aren't opposed to a plan. It's this plan.

5            MR. KAROTKIN: Well, let me address a couple of things

6    you mentioned.

7            THE COURT: Yes.

8            MR. KAROTKIN: First of all, find this on the

9    demonstrative, the company has never, ever, ever paid out at

10   maximum. Never in the history of the company has it paid out

11   at maximum.

12           THE COURT: Do we know what the maximum has ever been?

13           MR. KAROTKIN: The maximum has always been sort of

14   consistent with the past.

15           THE COURT: Well, okay.

16           MR. KAROTKIN: In fact, Your Honor, it was higher.

17   There was an ability in prior years to achieve a higher amount

18   of compensation because -- at the top level of performance,

19   they could achieve 200 percent of their target bonus. That's

20   been reduced to 150 percent.

21           THE COURT: No, I understand.

22           MR. KAROTKIN: Okay. And what the tort committee

23   would have you believe by looking at these charts is that there

24   is a big discrepancy as to what's available. And I think you

25   put your finger on it when you said this doesn't take into

                    PG&E Corporation, et al.

1    account the LTIP portion.

2          THE COURT:  Well, Mr. Julian acknowledged that that

3    might be about a 70-million-dollar bogey there, right?

4          MR. KAROTKIN:  It is.  And you compare it to 2018 at

5    target, including the LTIP with the 2019 STIP plan which

6    includes fifty percent of the LTIP, the numbers are precisely

7    the same, at target 235 million dollars.  And I think we've

8    noted that in our papers.

9          THE COURT:  But again, I hate to sound cynical, but

10   I'm going to be cynical.  What you're telling me, bottom line,

11   is instead of paying equity to some people, we're going to pay

12   them more money.  And despite Mr. Simon's letter of two months

13   earlier, we're going to double the amount of money that we're

14   going to commit under this plan.  How do I -- that's not a bad

15   deal.  I mean, that's like who would -- who would have not

16   turned down the 2018 plan if the 2019 plan is on the table?

17         MR. KAROTKIN:  It's not double.  I don't, frankly,

18   understand where that's coming from.

19         THE COURT:  Well, I'm just looking at --

20         MR. KAROTKIN:  Under --

21         THE COURT:  I -- well, I --

22         MR. KAROTKIN:  At target, it's precisely the same

23   dollars.  At target, it's 234 million for 2018, including the

24   LTIP.  And at target, the STIP is 234 million, including the

25   LTIP.

PG&E Corporation, et al.

1      THE COURT:  Okay.

2      MR. KAROTKIN:  It hasn't increased materially.

3      THE COURT:  But you said the company has never hit the

4  max.

5      MR. KAROTKIN:  That's at target.  I'm not talking

6  about the max.  The company has never hit the max.

7      THE COURT:  Okay.

8      MR. KAROTKIN:  So I think to look at --

9      THE COURT:   I understand.

10      MR. KAROTKIN:  -- the max --

11      THE COURT:  Okay.

12      MR. KAROTKIN:  -- is misleading.

13      THE COURT:  No.  But I -- okay.  But I'm asking you

14  what if I said tell me what the -- as the highest it's ever

15  been in the max column.  In other words, to state it

16  differently, if I'm looking at Mr. Julian's chart and I see 350

17  million dollars at max and I accept that that includes the

18  LTIP, now tell me what is the highest it ever could have been

19  if I take those two facts together historically.  And if you

20  tell me, well, at ninety-nine percent, I won't be very

21  persuaded.  But if you told me it's never been over sixty

22  percent or something, then I might say, well, let's just take

23  it a different way.  I don't know.  I don't know what's the

24  right thing to.

25      But in other words, I announced today all the times I

PG&E Corporation, et al.

1   wish I had a crystal ball.  So I'll have another crystal ball.

2   My crystal ball is that you can tell me what the maximum will

3   ever be paid under the 2019 STIP and you can't.  But what if I

4   told you it can't be more than some figure?  What would happen?

5           MR. KAROTKIN:  Your Honor, you're right.  I can't tell

6   you -- all I can tell you, the maximum will not be more than

7   350 million dollars.

8           THE COURT:  Right, I know.

9           MR. KAROTKIN:  That I can tell you.  Okay?

10          THE COURT:  Yeah.

11          MR. KAROTKIN:  And depending on performance and how

12  the targets are achieved and the metrics work, yes, if there is

13  phenomenal performance, absolutely phenomenal performance.

14  Again, it's never been done.  Beyond the wildest imagination

15  then the 350 million dollars will be paid.  I think it's fair

16  to say that based on historical application of the STIP and how

17  the metrics have been allocated and determined, that has never

18  happened.  So I think the risk of that is extremely remote.

19          THE COURT:  But one way to make sure it's not only

20  extremely remote, that it can happen, is I can just say there's

21  got a to be a cap.

22          MR. KAROTKIN:  You can say that.

23          THE COURT:  In other words, 350- is too high.

24          MR. KAROTKIN:  And --

25          THE COURT:  The cap has to be some other number.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. KAROTKIN:  You can say that.  And if, Your Honor,

2  in your judgment you believe that that was an appropriate way

3  to motivate the employees, you could make that judgment and you

4  could substitute that judgment for the judgment of management

5  that runs this company.

6    But I think, Your Honor, under the applicable law,

7  under the applicable law which you yourself recognize which is

8  the business judgment rule, deference is given to the business

9  judgment of management which makes these decisions as the input

10  of outside advisors to help it make those decision and is

11  responsible, Your Honor, for the day-to-day operation of the

12  company.

13    And I will say, Your Honor, under the applicable case

14  law which I believe we cited in our pleadings --

15    THE COURT:  You did.

16    MR. KAROTKIN:  -- particularly with respect to

17  compensation matters, that fundamentally is within the business

18  judgment of management, fundamentally.

19    THE COURT:  Well, I know that.  And I expected you to

20  say that.  And I don't know you very well, but people that have

21  seen me on this job for a long time now I think probably, I

22  predict, would say that I generally refer to the business

23  judgment.  I don't second-guess it because I don't have the

24  qualifications.

25    But you know what?  I'm the only one to make the

PG&E Corporation, et al.

1  decision here.  And so if I said to all those 10,000 people

2  would you like a lower STIP or no STIP, I think I know what

3  they'd pick.

4         MR. KAROTKIN:  I think, Your Honor there's no question

5  you could do that.

6         THE COURT:  I don't want to do that.

7         MR. KAROTKIN:  But the question is, is that the right

8  decision?

9         THE COURT:  Yeah.

10         MR. KAROTKIN:  And, again, not to be disrespectful in

11  any respect --

12         THE COURT:  You're not.

13         MR. KAROTKIN:  But again, these people who made these

14  decisions are responsible for operations.

15         THE COURT:  But listen.  You heard me say, you heard

16  Mr. Julian say, you heard Mr. Laffredi say some of us don't

17  have a clue what we really are seeing.  So I read the experts.

18  I read the chart.  And I go what does that mean.  And no one

19  has told me what it means except today --

20         MR. KAROTKIN:  Well, let me try --

21         THE COURT:  -- in the argument.

22         MR. KAROTKIN:  -- to address that.  Let me try to

23  address that.  Mr. Julian stood up before you and said --

24  essentially said that he lacked information and wasn't given

25  information.  Let me respond to that because every single piece

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    of information requested by the tort committee was provided in

2    addition to the fact, as you know, we made the declarants

3    available for deposition.

4         So let's be totally clear about that.  As to Mr.

5    Laffredi, I think he answered the question for you when you

6    said to him, well, did you ask for documents, did you

7    participate in the deposition and he said no.  And we went to

8    Mr. Laffredi and his -- one of his colleagues when they asked

9    for information and we said to them, again, consistent with

10   what you were asking, Your Honor, would you be willing to

11   accept the employee information, employee salary information,

12   employee duties on a confidential basis.  And they said no.

13   And that was that.

14        Now, contrast that, Your Honor, with what the

15   unsecured creditors' committee did with FTI, their financial

16   advisors, to describe their interaction with AlixPartners, our

17   financial advisors.  To quote what Mr. Boken just told me a few

18   minutes ago, they were crawling all over us, asking for

19   information.  And that information was supplied to them.  And

20   that information resulted in the decision where they agreed,

21   subject to certain modifications, that the STIP would be

22   modified.

23        As to the tort committee, not one communication from

24   their financial advisor asking for information.  Not one.

25        THE COURT:  But I'm not --

of 180
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. KAROTKIN:  No.  Let me just mention one more --

2    THE COURT:  I'm not allowed to ask the information.

3    I'm supposed to read these papers and understand them.  And I

4    don't have an advanced degree in employee compensation matters.

5    And I read theses matrices and targets.  And I don't know what

6    they mean.

7    MR. KAROTKIN:  Well, let me try to address that as

8    well.

9    THE COURT:  Okay.

10   MR. KAROTKIN:  Okay.  Because, again, they're

11   consistent with prior years, with certain changes to the

12   metrics to, again, address safety --

13   THE COURT:  Right.

14   MR. KAROTKIN:  -- and electric operations and to

15   increase that to sixty-five percent.  And, moreover, Your

16   Honor, the STIP metrics as to those particular factors are

17   consistent with the company's 2019 wildfire mitigation plan

18   which was filed with the CPUC.  Clearly, under those

19   circumstances, not a layup by any stretch of the imagination.

20       And they keep referring to Judge Alsup and what Judge

21   Alsup did.  Well, if you look at the order they presented to

22   you, what he did on April 3rd was he agreed with our 2019

23   wildfire mitigation plan.  And he said we should continue to

24   follow it.  That's what he said.  He didn't say change it.  The

25   only additional thing he said, Your Honor -- and again, it's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1 clear in there -- is that fi the CPUC, after it completes its

2 review of the 2019 wildfire mitigation plan, says that certain

3 modifications should be made, then we're required to make those

4 modifications.

5    THE COURT:  Right.  And I see that.

6    MR. KAROTKIN:  And consistent with that -- and I think

7 even before Judge Alsup issued that order, we agreed with the

8 unsecured creditors' committee exactly to the same thing.

9    THE COURT:  What happens if the company fails and a

10 lot of money goes out to people and Judge Alsup is told by the

11 CPUC or someone else they blew it?  So more --

12    MR. KAROTKIN:  If the --

13    THE COURT:  -- more probation, more fines, but no

14 rollback, no clawback, right?

15    MR. KAROTKIN:  If the company fails again --

16    THE COURT:  Well, what I'm saying is if the company

17 violates Judge Alsup's paragraph 2.

18    MR. KAROTKIN:  First of all, the company is not

19 proposing a plan it can't comply with, okay?  That doesn't make

20 any sense.  Okay?

21    THE COURT:  Okay.

22    MR. KAROTKIN:  So yes, we agree, Your Honor.  If

23 something happens -- if there's another fire in November, we

24 can't claw back those payments.  We agree with that.

25    THE COURT:  Right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1       MR. KAROTKIN:  Okay.  But that's a balancing factor.

2   That's a balancing factor as to what's appropriate to provide

3   in the STIP.  And again, that was discussed at length among the

4   compensation committee.  That was discussed with Willis Towers

5   Watson who, by the way, recommended the quarterly payments

6   because that's what typically happens in a Chapter 11 case.

7   And that's a balancing as to what's appropriate.

8       Yes, it's possible that there could be payments made,

9   maybe two payments because wildfire season starts in the

10  summer, maybe only two payments.  And then we can address the

11  third payment and the fourth payment.  And they can be

12  eliminated entirely.  And there are other ways to address those

13  issues as well.

14      But, again, to deny these employees -- we're not

15  talking about the senior people.  We're talking about the

16  people who operate this business, the people who make sure

17  operations go forward, that appropriate safety measures are

18  implemented and take place.  To deny these people the

19  opportunity, the opportunity, customary opportunity to realize

20  competitive compensation is just not appropriate.  And it's not

21  going to maximize value and, in fact, will be detrimental and

22  prejudicial not only to the wildfire claimants but to all other

23  stakeholders in these cases.

24      And it's not going to facilitate, Your Honor, a

25  reorganization here.  In fact, it'll have exactly the opposite

PG&E Corporation, et al.

1    effect.  And --

2            THE COURT:  Well, we don't know that.  I mean, we

3    don't know that.

4            MR. KAROTKIN:  I can assure you, Your Honor, if these

5    10,000 employees are not afforded the opportunity to get

6    competitive market-based compensation, there will be exodus of

7    people -- there's a lot of uncertainty right now at the

8    company, a lot of instability in the workforce.

9            THE COURT:  I'm sure that's true.

10           MR. KAROTKIN:  And that is something that, again, this

11   management believes it's exceedingly important to address and

12   to stabilize the workforce.  There is an expectation among the

13   employee group that they are entitled to customary

14   compensation.  That was taken away from them in 2018, Your

15   Honor.  But now we're moving forward.  We're moving forward.

16   We're trying to maximize value to expedite this company's

17   emergence from Chapter 11 on a successful basis and to maximize

18   the recovery for creditors.

19           And we submit to you, Your Honor, that not approving

20   this plan is not going to increase the pie for the wildfire

21   claimants, for the other claimants.  In fact, as I said, it

22   will have quite the opposite effect.

23           THE COURT:  Well, Mr. -- no, I understand.  Mr. Simon

24   wrote his letter to the employees on February 22nd of this

25   year.  So 2018 was behind.  And that's when he said what Mr.

PG&E Corporation, et al.

1  Julian quoted, we're not going to put ourselves at the front of

2  the line.  But then how many weeks later did the STIP motion

3  get filed, four weeks later?  I mean -- or whatever.  The

4  actual filing date isn't important.

5         I mean, I guess what I'm saying is when you're working

6  on the line and you get a letter from the CEO that says you're

7  not getting this money because -- and then four or five weeks

8  later, your lawyers file a thing that pays what appears to be

9  potentially more, it's like why is that such a bad thing.  In

10  other words, I guess what I'm missing here is maybe you're --

11  I'm missing that some people are missing their pay for 2018,

12  but they are going to get paid under your proposal right well

13  into 2019, right?

14         MR. KAROTKIN:  At a customary level.

15         THE COURT:  At a customary level.

16         MR. KAROTKIN:  This is not a -- this is not -- what

17  you're sort of inferring, Your Honor, is that this 2019 STIP is

18  a way to recoup what you didn't get in 2018.

19         THE COURT:  No.  I don't know.  I'm --

20         MR. KAROTKIN:  And it's not.

21         THE COURT:  I'm trying to read the letter from the

22  boss.

23         MR. KAROTKIN:  Okay.  But what the --

24         THE COURT:  The boss says we can't put ourselves ahead

25  of the victims.

PG&E Corporation, et al.

1      MR. KAROTKIN:  Okay.  But again, Your Honor, the 2018

2  STIP payment was a pre-petition claim.

3      THE COURT:  The letter was written post-petition.

4      MR. KAROTKIN:  It's still a pre-petition claim.

5      THE COURT:  But what would have happened if he hadn't

6  -- what would have happened if post-petition Mr. Simon hadn't

7  taken this position?

8      MR. KAROTKIN:  We wouldn't have paid it because we --

9  in order to pay it --

10      THE COURT:  Would they have a claim?  It would be a

11  claim then.

12      MR. KAROTKIN:  It would be a claim.

13      THE COURT:  The claim.  So --

14      MR. KAROTKIN:  Just like the wildfire claim inside of

15  a claim, it would be a claim that -- a pre-petition claim that

16  the employees would have just like that.  There was no ability

17  to pay that claim without court approval.

18      THE COURT:  Well, they might have -- you might have

19  asked.  But the point is take -- I'll take that as a true

20  statement, that when the chairman of the -- or the chief

21  executive officer tells the employees you're not going to be

22  paid, he might have also said and we can't pay you anyway.  But

23  he didn't.

24      MR. KAROTKIN:  Everybody knew, Your Honor --

25      THE COURT:  Yeah.

PG&E Corporation, et al.

1        MR. KAROTKIN:  -- that there was a motion pending with

2   the Court --

3        THE COURT:  Right.

4        MR. KAROTKIN:  -- to seek authority to pay that.

5        THE COURT:  Yeah, that's right.

6        MR. KAROTKIN:  It was no mystery.

7        THE COURT:  You're correct.

8        MR. KAROTKIN:  And that was withdrawn, okay?  So there

9   was no misconception, Your Honor, that that was going to be

10  paid --

11       THE COURT:  I didn't go back and look at -- the one

12  thing you don't do when you're trying to manage these cases is

13  read stuff you don't have to read.  So I didn't remember if

14  that motion that was withdrawn was couched in in a term in a

15  way of paying post-petition and pre-petition liability.  Is

16  that the way it was read?

17       MR. KAROTKIN:  Yes.  That's what it -- well,

18  otherwise, we wouldn't have come to the court.

19       THE COURT:  Well, yeah, I understand.  Okay.  That's

20  true.

21       MR. KAROTKIN:  And again, this is not a way to recoup

22  what wasn't paid in 2018.  This is a customary plan with better

23  metrics.

24       And, Your Honor, you mentioned earlier when there was

25  some discussion about insiders -- you said something like,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1   well, we could just pay a gift if we wanted to pay a gift

2   because it's not insiders.  This is better than that.  This is

3   like a KERP on steroids.  Okay?  This is an incentive-based

4   plan for rank and filed employees.  It's not a KERP.  It's much

5   better than a KERP.

6          Mr. Laffredi said it's a layup.  Why isn't it a layup?

7          MR. KAROTKIN:  Because, as I said, Your Honor, this --

8   these metrics are premised on the 2019 wildfire plan that the

9   debtors filed with the CPUC and that, again, as I mentioned

10  before, Judge Alsup said --

11         THE COURT:  Yeah, I got it.

12         MR. KAROTKIN: -- yes, continue with that.

13         THE COURT:  But again --

14         MR. KAROTKIN:  It can't be a layup --

15         THE COURT:  I got to --

16         MR. KAROTKIN:  -- under those circumstances.

17         THE COURT:  I got to remind you of what I tried to say

18  earlier.  This is all nice to hear.  I don't know how I

19  possibly know all this until I come to this hearing.

20         MR. KAROTKIN:  Okay.  But, Your Honor --

21         THE COURT:  Right?

22         MR. KAROTKIN:  Well, let me address -- let me address

23  that.  Let's assume it was a layup.  It doesn't matter.  It

24  doesn't matter because there are no insiders in this plan.  And

25  the only evidence as to insider status is Mr. Mistry's

PG&E Corporation, et al.

1  declaration which says why they're not insiders.  So by

2  definition --

3          THE COURT:  Well --

4          MR. KAROTKIN:  -- if this is a non-insider plan --

5          THE COURT:  I can stop you there.  I told Mr. Laffredi

6  right in the opening argument this morning that the Mistry

7  declaration did at least establish a prima facie --

8          MR. KAROTKIN:  Exactly.

9          THE COURT:  -- of no insider.  But what about

10  503(b)(3), whatever the other subsection is?  There's still a

11  predicate you have to establish, right?

12          MR. KAROTKIN:  The predicate of 503 --

13          THE COURT:  I've got my subsections mixed up.

14          MR. KAROTKIN:  -- 503(c) I think.

15          THE COURT:  You know what I'm talking about.

16          MR. KAROTKIN:  I think it's 503(c).  The predicate is

17  the same predicate as under -- the case law, again, is clear.

18  It's the same predicate as under Section 363 of the Bankruptcy

19  Code as to whether it's an appropriate exercise of the business

20  judgment.

21          THE COURT:  No.  I don't think that's what it says.

22  Let's look at the --

23          MR. KAROTKIN:  Well, it says justified by the facts

24  and circumstances of the case.

25          THE COURT:  Yeah, right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. KAROTKIN:  And if you read the case law, which I'm
2   sure you have -- and again, we cited that in our pleadings, the
3   case law that interprets that has said it's essentially the
4   same as an application under 363(b) to use property of the
5   estate outside the ordinary course of business.  And even if it
6   was something more than that, if you look at the Dana factors
7   that we've cited in our opening brief, we have complied with
8   all of the Dana factors.

9    And again, there's no evidence to the contrary, no
10  evidence.  Mr. Julian and the other gentleman stood up here and
11  testified for like forty-five minutes.  That's not evidence.
12  The evidence is undisputed as to the debtors' business
13  judgment, as to the rationale for the program, as to what the
14  compensation committee considered in terms of metrics, as to
15  the input from professional advisors, as to the broad base of
16  the program, as to the rationale for the incentives.  It's all
17  there.  There is no evidence to suggest otherwise.

18    All we have is colloquy from counsel about what
19  happened two years ago or a year ago or five years ago.  This
20  is a prospective plan, and this, again, Your Honor, the
21  unsecured creditors' committee represents in excess of 23
22  billion dollars of claims.  Mr. Botter's clients have eight
23  billion dollars of claims, pre-petition, unsecured claims.  The
24  same type of claims the tort claimants' committee have in terms
25  of priority under the statute.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    The ad hoc committee of subrogation claimants that

2    hold billions of dollars of claims didn't object to this

3    program.  The ad hoc committee of equity security holders

4    didn't object to this program.  They recognize, as Mr. Bray

5    pointed out, the rationale for it and why it is essential to

6    value maximization and to the success of these cases, and

7    that's all we're trying to achieve here.

8    We're very sympathetic to the wildfire claimants and

9    what they've suffered.  We're not minimizing that, but as I

10   said, Your Honor, this is not an issue of retribution and

11   punishment.  This is an issue of what's proper to operate the

12   business on a prospective basis and to motivate employees to

13   achieve the goals of the company, safety, economic performance,

14   in order to facilitate this reorganization, this reorganization

15   case and Your Honor, get a distribution to those entitled to a

16   distribution as soon as possible.

17   And again, as I said at the outset, depriving these

18   people, these 10,000 employees of the opportunity to achieve

19   market-based compensation is not going to get these people paid

20   faster.  It's not.

21   THE COURT:  No, I understand that.  I understand that.

22   MR. KAROTKIN:  Now, we have gone to great lengths to

23   satisfy every single information request here.  There is not

24   one outstanding request from the tort committee or anybody else

25   that hasn't been satisfied or they told us they wouldn't take

PG&E Corporation, et al.

1    it because it would be confidential.

2         And as I said, FTI was crawling all over us and got

3    all the information they needed.  It enabled them to make an

4    informed judgment and to suggest the changes that we agreed to.

5    And again, increasing the safety metric to sixty-five percent,

6    addressing one of Mr. Julian's points, changing the individual

7    performance modifier to make it work both up and down, up and

8    down, adjustments up and down; again, one of Mr. Julian's

9    points.

10        THE COURT:  And explain that a little more because

11   again, these are words to me when I am looking at a three-page

12   something and trying to -- and no one is sitting there

13   explaining to me.  So I read the words.  I see there's an

14   adjustment but take the creditors' committees, what you've just

15   said, and I've got their STIP from their position here.

16        MR. KAROTKIN:  Let me try to explain.

17        THE COURT:  What does it do to the IPM (ph.)?

18        MR. KAROTKIN:  Under the original proposal, the IPM,

19   which would have been applied quarterly under the original

20   proposal and only allowed upward adjustments, was changed to

21   apply annually --

22        THE COURT:  Supplement to award, their STIP'd twenty-

23   five percent of the total value of their STIP?

24        MR. KAROTKIN:  Yes, but now it can go up or down.  So

25   there could be a downward adjustment.  Before there was not --

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    a downward adjustment was not permitted.  So again, to address

2    the unsecured creditors' committee's concern that there should

3    be a downward adjustment, that has been addressed.

4            THE COURT:  Okay.  I want to -- now I am looking at

5    the stipulation.  It says, "will be applied on an annual" --

6    now, okay.  So does -- that means not paid, right?

7            MR. KAROTKIN:  Correct.

8            THE COURT:  Applied annual.  So am I correct that, if

9    I go with the adjusted plan that the committee and the debtor

10   worked out, there will be quarterly payments but not -- but

11   there will be only a lesser -- a lesser amount of quarterly

12   payments.

13           MR. KAROTKIN:  There won't be an ability to increase

14   it --

15           THE COURT:  Right, right.

16           MR. KAROTKIN:  -- for the --

17           THE COURT:  So then at the end of year, an individual

18   will know that he or she is getting something, and this is

19   where I am trying to understand it a little more carefully.  So

20   it says, "The IPM will be applied annually" -- well, it says

21   "applied on an annual", it doesn't say paid but I will

22   accept -- take your word for it.  "The IPM will be based upon

23   year-end performance, potential range from zero to 150 for

24   upward and downward", but there was a -- oh.

25           MR. KAROTKIN:  Before it was applied quarterly and --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          THE COURT:  No, no, I am sorry.  No, it -- then

2    explain the -- I didn't -- okay.  What confused me, as I was

3    trying to absorb all this, because I just got this last night,

4    was the difference between -- set forth in paragraph 3 of the

5    STIP -- of the notice, and that's the threshold maximum

6    targets.  That's different.  That's not IPM.  That's --

7          MR. KAROTKIN:  Correct.

8          THE COURT:  So explain what that means in --

9          MR. KAROTKIN:  That means --

10         THE COURT:  -- layman's terms.

11         MR. KAROTKIN:  I will try to do that.  For the

12   financial metric, which I think has been reduced to twenty-five

13   percent; is that correct?  Twenty-five percent?

14         UNIDENTIFIED SPEAKER:  Yes.

15         MR. KAROTKIN:  Yeah, twenty-five percent.

16         THE COURT:  Yes.

17         MR. KAROTKIN:  In order to receive a target payment,

18   you would have to achieve ninety percent of the metric, and in

19   order to achieve a higher payout, you would have to receive --

20   you would have to achieve 110 percent to get the maximum.  So

21   it's been increased from 105 to 100 percent -- 110 percent to

22   get the maximum payout and reduced from 95 percent to 90

23   percent, to get the minimum payout.

24         THE COURT:  See one of the things that was confusing

25   is it makes it impossible for anybody to understand this, if

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  you don't have any background, is that the STIP awards as set

2  as set forth originally has a range, and the range goes from

3  performance -- it goes from performance level to 50 percent to

4  150 percent, like -- it's kind of like --

5           MR. KAROTKIN:  Based on all of the metrics taken

6  together.

7           THE COURT:  I know, but don't you see I'm not -- I

8  don't know this stuff.  So I am reading thing, and so that

9  means that the -- what is the target is in the middle and

10  threshold is fifty percent, but I think that sounds like -- to

11  me, like it might be a layup, but I'm still trying to

12  understand the adjustments here, so have been changed from 95

13  to 105 of target.

14           See, that's what throws me off.  Where's the 95 that

15  now is 105?  The number ninety-five doesn't appear in the award

16  range language.  Do you see?  Am I misreading it, or are you --

17  or am I --

18           MR. KAROTKIN:  That's within the -- some of the

19  granularity of how it's applied.

20           THE COURT:  Yeah, right.

21           MR. KAROTKIN:  Okay?

22           THE COURT:  Yeah, like, therefore, I don't understand

23  it.  Okay.  Let me just read the words together.  But it seems

24  like it increases the threshold.  Maybe that's what I am --

25           MR. KAROTKIN:  It makes it more difficult to achieve

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  the max.

2        THE COURT:  Well, it is just more difficult to achieve

3  the threshold; isn't it?

4        MR. KAROTKIN:  No, it's a little --

5        THE COURT:  And also the max, right?

6        MR. KAROTKIN:  -- it's more difficult to achieve --

7  it's a little easier to receive the minimum, but much -- but

8  more difficult to achieve the higher levels.

9        THE COURT:  Okay.  I'm sorry, did you want to --

10       MR. KAROTKIN:  No, no.

11       THE COURT:  Were you going to tell me something?

12       MR. KAROTKIN:  I was just making sure I explained it

13  correctly.

14       THE COURT:  I will take your word for it.  Well, I --

15  as I say, it's very difficult for me to read something that is

16  in Greek and then be told that we've changed the number from

17  one number to another number, and neither number is in there to

18  begin with.  So I have to just try to understand it, and I'll

19  accept your explanation that it's granular, but that doesn't

20  make it easy.

21       MR. KAROTKIN:  And again, this was done as a result

22  of --

23       THE COURT:  Yeah.

24       MR. KAROTKIN:  -- the in-depth analysis of FTI and

25  AlixPartners together, to arrive at this compromise.

PG&E Corporation, et al.

1       Your Honor, I can't emphasize enough the importance of

2   bringing stability to this workforce.  I can't emphasize it

3   enough.  It's a very uncertain situation.  The failure to pay

4   the 2018 STIP has been a terrifically unstabilizing event in

5   the life of these employees.

6       THE COURT:  Do I have some evidence of that?

7       MR. KAROTKIN:  Hum?

8       THE COURT:  I believe you --

9       MR. KAROTKIN:  And --

10      THE COURT:  -- but is there any evidence of that?

11      MR. KAROTKIN:  Pardon me?

12      THE COURT:  Any evidence of that?  Again, you were

13  faulting the other side for lack of evidence.  Is there any

14  evidence that there's been an unstabilizing factor?

15      MR. KAROTKIN:  If you want, we can put someone on the

16  stand, and they will tell you --

17      THE COURT:  Well, no, but I --

18      MR. KAROTKIN:  -- that, yes.

19      THE COURT:  That's what I don't want to do today.

20      MR. KAROTKIN:  In fact, there's been already more

21  attrition than last year but --

22      THE COURT:  Just make me an offer of proof for now.

23      MR. KAROTKIN:  Okay.

24      THE COURT:  Like what would the offer of proof be?

25      MR. KAROTKIN:  I will -- offer of proof that there's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    been an increase in attrition from prior years at all levels of

2    the company, and I think that Mr. Mistry would attest to that.

3    He's here in court.

4          I think that, Your Honor, again, this is prospective.

5    What happened in the past is large --

6          THE COURT:  No, I got that.

7          MR. KAROTKIN:  -- is largely irrelevant, and again,

8    the unsecured creditors, Mr. Bray's clients and the others,

9    they recognize the importance of the workforce to the stability

10   of this enterprise and the maximization of value.  They realize

11   that they have to be appropriately incentivized.  It's not fair

12   to punish them and not give them the opportunity.

13         THE COURT:  No, you're repeating yourself.  I don't --

14   I understand your point.  So go ahead, and if there are other

15   points you want to get, you may do it.  If not, I'll thank you

16   for your presentation.  It's your call.

17         MR. KAROTKIN:  No, I have nothing else, but again, we

18   would urge Your Honor to approve it.

19         THE COURT:  Okay.  Well, I hadn't intended asking for

20   any reply, but I will you -- ask Mr. Julian, I will give you an

21   opportunity if you want to respond, and you're the only one I

22   am going to call on at this point.

23         And I'll come back -- now that you've heard the other

24   side's argument and probably no surprise to you, I want you to

25   be the advocate for the victims you represent but be an officer

(971) 406-6160  operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    of the Court today, telling a bankruptcy judge on what I'm

2    supposed to do in terms of what is somewhat typical or a

3    complicated Chapter 11, of having some sort of a conversation,

4    recognition, and forget all the horrible things and focus on

5    that.  What do I do about it?

6         MR. JULIAN:  That sounds like an easy thing to do and

7    so --

8         THE COURT:  Easy, right.

9         MR. JULIAN:  -- considering the points I have to make,

10   that's a tall order, but let me start at the beginning.

11        THE COURT:  Well, you're up to it.  You've always

12   been -- as long as I've known you, you've never been bashful to

13   come out making a good argument.

14        MR. JULIAN:  Let me correct the record first, Your

15   Honor.  Mr. Karotkin said that I received every single document

16   I asked for.  He's -- I don't fault him for saying that.  He's

17   not aware of what we were doing with the Cravath firm and some

18   other lawyers in his firm.

19        On March 8th, 2019, according to my email, and I say

20   this under oath under penalty of perjury, I sent an email to

21   Toby Keller, Kevin Orsini of the Cravath firm, and "On behalf

22   of the tort claimant's committee, as counsel, this email

23   requests Pacific Gas & Electric Company, and PG&E Corporation,

24   to produce to the committee's counsel within the next four

25   weeks, the following documents without a Rule 2004 examination

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    order."

2         I have thirty-two requests.  They all deal with

3    management but --

4         THE COURT:  Management.

5         MR. JULIAN:  Management issues --

6         THE COURT:  Okay.

7         MR. JULIAN:  -- in my view.  Number eight was the

8    companies' minutes and summaries of meetings, discussions, and

9    resolution of the companies' and the boards' respective

10   committees, including without limitation, the audit and

11   compensation committee meetings during the applicable period.

12        Now, the applicable period was the time leading up to

13   the present, but they stiff-armed us.  They didn't give us

14   anything.

15        THE COURT:  Well, so you say March 8th.  So that was

16   well after Mr. Simon's e-note (phonetic) --

17        MR. JULIAN:  Yeah.

18        THE COURT:  -- and well, it was around --

19        MR. JULIAN:  I mean, the point was we were in

20   litigation.

21        THE COURT:  Was it around the time or already after

22   the filed the original STIP motion?  I guess it probably was.

23        MR. JULIAN:  I think they filed it on March 6th.

24        THE COURT:  Yeah.

25        MR. JULIAN:  So -- but that's beside the point.  It's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    their burden to come forward with the metrics, and my whole

2    problem is, it's not in the declaration.  I took the

3    depositions on the declarations of Mistry and Friske, and it's

4    not in there, and I asked and the answer that I got back on the

5    metric performance scoring was they look at the miles.  And he

6    didn't have any other information.

7            I just think it's, for lack of a better term, and in

8    this case maybe it's not a good term; it's a DOA on that point

9    alone.  It doesn't satisfy the basics --

10           THE COURT:  Well, but I'm confused about something.

11   You asked for thirty-two things.  You mentioned number eight

12   was minutes of committee meetings, and then you said, when you

13   deposed Mr. Mistry, he said miles.  I mean, are you complaining

14   that you didn't get the minutes or because Mr. --

15           MR. JULIAN:  Well, I think I should have got minutes.

16           THE COURT:  Well, maybe you should have, right, and

17   maybe you should have, but you're not going back now, are you,

18   to say well, you should have -- I mean, aren't you -- your

19   point, I guess, is that Mr. Mistry's response was inadequate in

20   your --

21           MR. JULIAN:  Yes, yes.

22           THE COURT:  -- opinion.

23           MR. JULIAN:  Yes, and I didn't have any minutes to

24   evaluate.

25           Let me address the main point, which is we're judging

PG&E Corporation, et al.

1   a prospective plan by the past.  The main point I made was that

2   we are looking at the future, and the future, we can't have

3   wildfire claims, and there are no metrics in this plan to tell

4   us how they're going to score.  So there's no incentive.

5           What we're really saying to you, the U.S. Trustee and

6   we, this incentive plan doesn't incentivize people for wildfire

7   safety because the scoring is so easily.  It's a farce, in

8   essence.

9           THE COURT:  Well, but you're arguing that.  You

10  haven't --

11          MR. JULIAN:  The --

12          THE COURT:  You want me to --

13          MR. JULIAN:  It's not my burden, not my burden.

14          THE COURT:  Well, leave aside burdens, and let's talk

15  about the state of affairs.  Your view -- well, I mean, I

16  presume the other side would say it met its prima facie case,

17  and you don't think they've done sufficiently, but they have

18  made some presentation.  You just think it's a farce or it's a

19  layup.

20          MR. JULIAN:  I think I've poked holes in it enough to

21  say that they have to produce those metrics.  What should you

22  do?  May I address that?

23          THE COURT:  Well, yeah.  I mean, you talked about it

24  before and so on, but again --

25          MR. JULIAN:  I think you ought to deny this motion

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    completely.  They can come back with a different motion that is

2    key to employees that they're worried about walking out the

3    door.  And counsel wants evidence?  I would refer Your Honor to

4    page 111 of Mr. Mistry's deposition transcript where I ask:

5    "Q.  To your knowledge, has anyone left PG&E to below market

6    compensation since the bankruptcy filing?

7    "A.  I think people have said that they have left the company

8    due to the uncertainty the company is facing.  I've heard

9    anecdotally that not paying the 2018 STIP has had an impact on

10   people's engagement.  I haven't had somebody directly come to

11   me and say I'm leaving the company because my pay is below

12   market."

13          Look, I knew what you were going to wonder about in

14   this case, so I asked the question in the deposition.  I'm as

15   concerned as you are about that point, but this plan goes far

16   too broadly than what we should be concerned about, which is

17   incentivizing some employees.  What I would look at is how far

18   is their base pay out of whack with their peers?  And by peers,

19   I take issue with their point that the utility industry is

20   their peers in the fifty states.  It is not.  Only one state is

21   facing the death and destruction that this utility has wrought,

22   and it's this state, and San Diego Gas & Electric are the

23   peers.

24          And so what I would look at is what SoCal Edison and

25   San Diego Gas & Electric did with respect to their employees

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    and figure out how much --

2         THE COURT:  I mean, I don't know how I would know

3    you're right.  There've been fires in the northwest, right?

4    And fires in other parts of the country.  This isn't all about

5    fires.  They're -- I mean, how do I do that?  I mean, how do I

6    just discount some of the data but take into account the other

7    data?

8         MR. JULIAN:  I submit there have been no fires in the

9    press like we have heard in California.

10        THE COURT:  Of course, I agree.

11        MR. JULIAN:  And my point is, you're asking me what to

12   do.  I would deny it, send them back to the drawing board if

13   they want to address some of the employees, including the union

14   folks, who obviously have an issue here with their contract,

15   and first, take a look, as I mentioned in my conclusion in my

16   brief, take a look at whether the base pay is out of whack.

17   Then how much do you want to incentivize them.  But more

18   importantly, when you come back, show us how you're scoring it,

19   whether it's a layup or not, and whether it's really going to

20   incentivize wildfire safety.

21        And last but not least, it's my hope that they would

22   even raise the wildfire metric again because, as I said, it's

23   not about the past.  If we have another wildfire and our victim

24   lawyers are convinced that they're not doing everything

25   possible -- well that's not evidence, I'm just telling you the

PG&E Corporation, et al.

1  way it is -- we're going to have another fire, and we should

2  not be encouraging them through a STIP to do something that is

3  not going to ameliorate the threat.

4      THE COURT:  Wait, I have one more question for you.

5      MR. JULIAN:  And last but not least --

6      THE COURT:  Well, okay.

7      MR. JULIAN:  -- I don't criticize the bondholders or

8  the unsecured creditors' committee for saying what they do.  I

9  don't think they're as sensitized to the plight of the victims

10  as the CEO Simon was in his February 22 letter or our

11  committee.

12      THE COURT:  Well, that's what I was going to ask you.

13  How do I ignore or discount a substantial interest represented

14  by dollars, huge amounts of dollar claim?  Again, I'm not --

15  this is not like a baseball game where I'm scoring the runs by

16  saying you got more dollars -- they got more dollars than you.

17  That's not the point.  They've got effort; they've got input;

18  they've got advisors; and it isn't as though someone on the

19  debtors' side has decided just to disregard all the safety

20  factors.  So is there a way that I should decide to just ignore

21  their will here and their wishes?

22      MR. JULIAN:  No, I don't think you should, but I think

23  you're --

24      THE COURT:  Well, you want me to disapprove it and

25  start over.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    MR. JULIAN:  It's April 9.

2    THE COURT:  I mean what -- is there an in-between?  I

3    mean you talked before about -- I mean, I explained my own

4    concerns that, without you, if you had not even shown up today,

5    I still was going to say I don't understand this stuff.  And I

6    might very well have asked Mr. Mistry to take the stand, or I

7    still might ask him to come back and explain what does this

8    mean in terms that are not familiar to someone like -- without

9    the background in this.  And that might be necessary for me to

10   have a better understanding to know what I'm agreeing to, but I

11   don't know whether that will solve the problem.  Same with Mr.

12   Laffredi's suggestion:  do I go to the trouble of having 10,000

13   people's personal information disclosed to anybody, when it's

14   not even necessary?  You're not advocating that.

15   MR. JULIAN:  I'm not asking for that.

16   THE COURT:  And so you seem to be focusing mostly on

17   proving up the legitimacy of these metrics and comparing them,

18   at least, with the other California companies.  That seem to be

19   the major factors that you focused on, I think; maybe I'm

20   misstating it for you, but I -- I mean, I don't want to hear

21   about your squirrel that got killed.  I want to focus on --

22   MR. JULIAN:  I'm not going to do it.

23   THE COURT:  -- about the metrics.

24   MR. JULIAN:  It's not the metrics.  Well, the metrics

25   should be higher, but the big point is, it's the scoring that

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  allows this company to score themselves --

2          THE COURT:  Yeah, okay.

3          MR. JULIAN:  -- 1.5 or 1. -- it's the scoring --

4          THE COURT:  Well, it's a part of the function.  I

5  mean, it's --

6          MR. JULIAN:  And Mr. Mistry, call him all you want on

7  the stand; he does not have information on that, according to

8  what he testified, other than that he knows it's done by miles

9  and he doesn't know anything else.  So what we think is, you

10  didn't cause this problem; I didn't cause this problem;

11  employees didn't cause this problem.  They didn't bring us the

12  record that they should have -- number one.  Number two, the

13  dollars are just too large.  And number three, with the

14  quarterly thing, the cow gets out of the barn before we find

15  out if they really were performing.  Nine months -- the

16  campfire was not November 8th.  Nine months can go by, they get

17  their quarterly payments, and then there's an annual review --

18          THE COURT:  Okay, again, I don't want to bore

19  everybody in the room to death by my questions to you.  I'm

20  supposed to make a decision, and I will do my best to make a

21  decision.

22          MR. JULIAN:  Plus those four points.

23          THE COURT:  But my problem is this, again, and I'm

24  going to share the problem and you give me a solution.  Mr.

25  Karotkin's correct, and you know the law.  There is business

PG&E Corporation, et al.

1   judgment involved here and there are professional judgments and

2   there are highly trained and highly qualified people on both

3   sides of the fight here.  And I'm supposed to know better than

4   they that we should go back to an annual thing rather than a

5   quarterly?  I mean, that's what -- I don't know how I know what

6   the right answer is.  And I can't be Solomon-like.  I guess I

7   could; I guess I will make it semi-annual and you got a deal,

8   or change the percentages to five more percent, six more

9   percent.  That's why we have professionals and business

10  judgment, right?

11          So other than to start all over again, which is one of

12  your alternatives, what would be effective?  Would it be

13  effective to have Mr. Mistry come back and explain all these

14  details, or do we have to go back to another round of pre-trial

15  discovery and depositions and so on?

16          MR. JULIAN:  I think if they gave us the document that

17  shows how they propose to score this, and if it's honest and

18  complete, that would be the end of it.  If not, it would be a

19  deposition.

20          But I disagree that this is the product of business

21  judgment for reasons we've talked about.  Their consultant

22  spent twenty to forty hours, if I recall his deposition, on

23  this.  He never looked at the PUC -- Your Honor, I haven't

24  talked about this.  He never looked at the PUC order saying it

25  should be fully revamped.  Now, they say they looked at it,

PG&E Corporation, et al.

1    didn't give it to the consultant, but that's not a consultant

2    looking at everything.  He never looked at his own in-house

3    report on San Diego Gas.  And by the way, they've now admit I'm

4    right on that.  They upped the safety metrics to sixty-five in

5    their settlement with the UCC.

6         THE COURT:  So if I tell Mr. Karotkin that I want a

7    further hearing and I want Mr. Mistry on the stand to explain

8    the metrics and explain the scoring, is that going to be

9    something that you can listen and cross-examine?  Or is it

10   something you're going to demand that we have a further hearing

11   and further evidence and further discussions about -- discover

12   everything he's going to want?  Is this going to be something

13   that's going to be helpful to your inquiry?

14        MR. JULIAN:  No, because he testified that he doesn't

15   know anything about that other than miles.  I need the

16   fellow -- I need the witness who knows the answers to that, and

17   then the answer is yes.

18        THE COURT:  Or else there's no answer.

19        MR. JULIAN:  Yes.

20        THE COURT:  Yeah.

21        MR. JULIAN:  I need the documents, the compensation

22   committee minutes, the documents they relied upon, the WTW

23   report, the consulting report, and the scoring of the

24   documents, basically explain how they're going to implement

25   this thing, and that witness.  I need to depose that witness.

PG&E Corporation, et al.

1      THE COURT:  What I am trying to do is to see if

2  there's a way to move to a conclusion one way or the other and

3  if, in order to have the kind of proof that you want, I have to

4  start -- and we start essentially a whole pre-trial process.

5  It'll take quite a long time and a lot of information.

6  Meanwhile, we have employees; we have morale; we have the need

7  to get some finality to this issue.  And so I got your point,

8  and I'll take it into consideration here.

9      MR. JULIAN:  We'll they gave something to the

10  unsecured creditors' committee, so whatever they gave them,

11  we'd want.  But --

12      THE COURT:  Okay.

13      MR. JULIAN:  But I certainly need the documents that

14  explain how they're going to implement this, and a witness who

15  knows what he's talking about, as opposed to Mr. Mistry, who

16  was the HR guy who recommended it based upon other people's

17  advice.

18      THE COURT:  Okay.  I'm going to take another break.

19      Oh, Mr. Karotkin, you want a minute.

20      MR. KAROTKIN:  May have one minute?

21      THE COURT:  I have -- more response.

22      MR. KAROTKIN:  Again, I think, Your Honor, you put the

23  finger on it when you said that's why the case law says you are

24  to rely on the business judgment of the people who make these

25  decisions and are familiar with the business.  And this whole

PG&E Corporation, et al.

1  thing about the metrics and how the metrics work, in many

2  respects that irrelevant here because there are no insiders

3  involved in this thing.  And if thing were reasonable and

4  rational, it could have been a KERP, and incentives wouldn't

5  have mattered at all.  But as I said before, what we have now

6  is better than that.

7       THE COURT:  Well, I know you said that, but you're

8  assuming that I understand it.

9       MR. KAROTKIN:  But again, Your Honor --

10      THE COURT:  And I'm telling you I don't understand it.

11      MR. KAROTKIN:  -- this could be a pure retention plan

12  with no metrics, with no incentives.

13      THE COURT:  But I was asked to approve it.

14      MR. KAROTKIN:  Okay.

15      THE COURT:  Okay.

16      MR. KAROTKIN:  Again, but it's better than that.

17      THE COURT:  Okay, I know what you're saying.

18      MR. KAROTKIN:  And you could approve it simply on the

19  basis of it being a KERP if you wanted to because, again,

20  there's more --

21      THE COURT:  Mr. Karotkin --

22      MR. KAROTKIN:  -- more than enough justification in

23  the record for that.

24      THE COURT:  -- if I'm just getting paid to make a

25  decision, I might as well not read any brief.  I might as well

PG&E Corporation, et al.

1  just say, done.

2      MR. KAROTKIN:  No, Your Honor, I think that --

3      THE COURT:  I'm supposed to understand this, and I

4  don't understand it, and Mr. Julian is focusing on some things

5  that he'd like to dig in on, but I don't understand it.

6      MR. KAROTKIN:  Mr. Julian is focusing on delay, okay?

7      THE COURT:  Well, I don't think so.

8      MR. KAROTKIN:  That's what he's focusing on.

9      THE COURT:  Well, I know I'm not.

10     MR. KAROTKIN:  Okay.  I think that's clear, what Mr.

11  Julian is focusing on is delay and retribution, not looking out

12  for the interests of this company.  I think that's clear.

13     MR. JULIAN:  Your Honor, we'll do it in ten days.

14     THE COURT:  Okay.  Well, I don't know that that'll

15  happen.  All right.  I'm going to take a ten-minute break and

16  I'll come back and try to give you a ruling.  I will give you a

17  ruling.  I won't try; I will give you a ruling.  Ten minutes.

18     (Recess from 12:54 p.m., until 1:12 p.m.)

19     THE CLERK:  All rise.

20     THE COURT:  Please be seated.  Thank you for your

21  patience.  One second.

22     Okay, well, I didn't want to keep you waiting, so I'm

23  going to -- I may be a little disorganized, but I'll do my

24  best.  And I'm sorry if I keep coughing; I'm not going to drink

25  any more water.

PG&E Corporation, et al.

1    I appreciate the advocacy on both sides and on all

2   sides and the hard work that you've all put in, and it's a

3   difficult question to deal with.  I'm not going to grant the

4   motion today, but I'm not going to deny it.  I'm going to take

5   it in one more step, and here, I'll explain.

6    First of all, I'll tell you what I'm not going to do.

7   I'm not persuaded that there are insiders such that Bankruptcy

8   Code Section 503(c)(1) is implicated.  And I believe, at best,

9   I have to test the options being presented to me under

10  503(c)(3), which is a very subjective thing in the total

11  circumstances of the case, and I believe that the debtor and

12  its representatives have satisfied me that the circumstances of

13  the case justify some sort of relief here.  And I'm prepared to

14  do that, which is why I'm not going to deny the motion, even

15  though that's been requested by the other side.

16    But I cannot escape the fact that this case is not

17  like other cases.  It's not like the run-of-the -- not run-of-

18  the-mill; that's the wrong word -- the many cases cited in the

19  briefs about insiders, conflicts of officers, business

20  judgment, et cetera, in the context, other than in this setting

21  in a bankruptcy.  They are helpful but not dispositive.

22    The issue here, to me, is, as I explained to Mr.

23  Karotkin in the closing comments, I have to -- and I have all

24  along in my own career on the bench -- tried to defer to

25  business judgment, and only in the rare cases when I believe

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    that the judgment has not been properly carried out or complied

2    with have I overruled a decision of a debtor-in-possession.

3    And here, I am mindful -- and I believe that there has been an

4    exercise of business judgment, but I'm not prepared to approve

5    it yet for the reasons that I touched on in the prior remarks.

6    I still don't fully understand it; now, maybe I'll never fully

7    understand it, but I have to have a sense that this business

8    judgment that has been executed by the debtor has a foundation

9    and justifies what they want me to do.

10           And let me say, by my making that comment, I am

11   discounting and disregarding several things that have been said

12   by several counsel.  I am not of the opinion that there's been

13   bad faith here by the proponents of the STIP.  I don't believe

14   that there've been any disqualifying conflicts by the

15   representatives of the compensation committee who have endorsed

16   it.  But similarly, I do not attribute to the fire victims'

17   committee's counsel being vindictive.  I believe it's more --

18   it's important for him and for the other victims whose

19   representatives spoke today to come to some solution.  And

20   ultimately, that is the goal of everyone, I hope, in this case;

21   it's certainly my goal.  But I'm not going to let the employee

22   groups become, I'll say, innocent victims by -- and "innocent"

23   is not -- it's a sense that if there's a person who is

24   culpable, that person should not be rewarded.  But the vast

25   majority, clearly -- and no one has said to the contrary -- the

PG&E Corporation, et al.

1    vast majority of the employees of the company generally, and

2    the vast majority of the 10,000 or so who are the intended

3    beneficiaries of the STIP are not anything other than employees

4    doing their job and perhaps doing it under circumstances when

5    they must be, every day, be besieged by the criticisms of

6    whatever's wrong with the utility, whether it's their view of

7    the world; you know, I get a lot of letters reminding me what I

8    ought to do with this utility.  But that's not fair to the

9    individuals who are out there doing their job.  And I learned

10   from the prior PG&E case that there's a "hate the utility"

11   mentality, and there's probably modern versions of it that says

12   to hate other folks that you depend upon extensively, and you

13   hate them until you need them.

14        But anyway, I do not want to turn this into my wanting

15   to make those employees be disadvantaged or inconvenienced by

16   delays, in which case -- which is why I'm going to insist we

17   move closer and quickly to a resolution.

18        Because the case is so unusual -- everyone knows it; I

19   don't need to say it.  It has political ramifications; personal

20   ramifications for the victims; financial ramifications for the

21   creditors who aren't getting paid or for parties,

22   counterparties whose contracts might be rejected; it has

23   environmental issues; it has criminal proceedings going on

24   elsewhere.  It has more complexity than I can imagine, and the

25   employees shouldn't be treated as hostages or punished.

PG&E Corporation, et al.

1    But this thing has to not only be right; it has to

2   feel right, and it doesn't quite feel right yet, from my point

3   of view, if I don't understand it.  And so having said -- and

4   I'm repeating to some extent what I said before we took a

5   break -- I'm supposed to know what I'm doing.  And if I don't

6   know what I'm doing, I'm supposed to rely on the professionals.

7   And when I reread the 2019 STIP awards and the award ranges and

8   the individual performance modifiers, I simply don't know how

9   to translate them to apply to the case here.  And then when I

10  read all the performance metrics and weighting, again, there's

11  no specifics.  I have an outline that's completely

12  understandable and rational, but I can't apply flesh to the

13  bones, if you will, and I need to understand it more.

14    So I am not going to toss this thing in the garbage

15  can, as some might ask, and start over again.  I'm going to

16  have a continuance where I'm going to give the debtor, through

17  its representative, presumably Mr. Mistry, but whomever, an

18  opportunity to come back and take the witness stand and educate

19  me on how this thing works, and to turn specifically to a

20  couple of points that were made in the prior argument, the

21  metrics, and the scoring.  In other words, how do they work?

22  I'm not going to do what Mr. Julian says and take time for him

23  to go examine everything and the board minutes and depose

24  everybody.

25    I'm going to have a continued hearing, which I'll tell

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1    you in a minute when I think is the time to do it.  And I

2    will -- before we conclude today, I'll set aside a fixed period

3    of time, and during that time, I want the debtor's

4    representatives to put on the witness stand the individuals who

5    can best explain to me why and how this operates and how it

6    should be applied.  So whether it means explaining how many

7    miles of wild vegetation need to be cleared or how many times

8    somebody has to do the underground testing to see where the

9    power lines are, or anything else, something so when we're

10   done, I can at least understand how these metrics work and how

11   they translate to the application of the awards.

12          I do not and will not insist that there be a

13   disclosure of the individuals, their personal information and

14   so on.  In another time and another place, I might have

15   insisted that that be at least filed under seal.  I don't think

16   that's necessary.  As I say, I'm satisfied that we don't have

17   an insider issue.

18          So to summarize it, if I left you confused -- I hope

19   you're not confused -- I want to have a continued hearing where

20   representatives from the debtor will take the stand and explain

21   to me in nontechnical terms -- these are people who are experts

22   in their field of employee and executive compensation and

23   rewards, and I'm a bankruptcy judge.  So I want the witness to

24   tell me, like in a tutorial, this is how this thing works.

25          I will give Mr. Julian or other counsel a brief

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1  opportunity to cross-examine on specifically those things that

2  the witnesses tell me about.  I'm not going to turn it into, as

3  I say, a pre-trial discovery.

4       It is essentially the invitation to the debtor to tell

5  me why I can be comfortable knowing that the business judgment

6  has been executed properly or competently.  That's the wrong

7  word; I don't question the competence of the experts.  But

8  clearly so that -- to use the terms of Mr. Julian and the other

9  counsel, that this isn't a layup.  Mr. Karotkin seemed

10  confident that it's not.  And all somebody has to do is let me

11  understand it myself.  And I will listen, and I will listen to

12  the arguments, and I will make a ruling at that point.  And so

13  I'm making a ruling by saying I need a further hearing to get

14  this clarification.

15       I propose that we do it quickly.  I previously blocked

16  April 23rd for personal reasons, but those reasons, although

17  they're personal, they're only in the morning.  I can do the

18  afternoon of April 23rd, and I'm willing to do it at 1:30 on

19  that day and set aside at least a two-hour presentation by the

20  debtor through its representatives.  But again, not lawyer

21  argument; lawyer presenting, witness explaining.  They don't

22  have to take the total time if they want to.  The homework

23  assignment is to educate the judge on how the metrics and the

24  weighting work and how they're applied to the STIP awards as

25  proposed.

PG&E Corporation, et al.

1    And as I say, I am not going to make the 10,000

2  employees dangle in the wind, are we going to get our pay or

3  not -- their extra pay.  They're entitled to it if I can reach

4  that point of satisfaction of understanding what's going on.  I

5  know that's not a perfect solution, but it's the solution that

6  I need to do in order to carry out my assignment.

7    So unless somebody has some particular question or is

8  particularly inconvenienced by the date, I don't need any

9  further discussion.

10    So Mr. Karotkin, I'll put it to you.

11    MR. JULIAN:  I have a question, Your Honor.

12    THE COURT:  Yeah.

13    You can just stay there.  Well, okay; now you're up.

14    MR. JULIAN:  As I understand it, there's no cross-

15  examination by us; it's just a presentation by the debtor?

16    THE COURT:  No, no.  I said I'll give you a brief

17  opportunity to cross-examine.

18    MR. JULIAN:  Well, having deposed Mr. Mistry --

19    THE COURT:  I didn't say who the witness is.  I don't

20  care who the witness is.

21    MR. JULIAN:  Well, what I'm saying --

22    THE COURT:  I want -- it's like a tutorial.

23    MR. JULIAN:  Right, but I need the documents that

24  they're basing their testimony on.  There's no way I can cross-

25  examine them.

PG&E Corporation, et al.

1    THE COURT:  If they want me to consider documents,

2    they'll have to make them available to you.  But what I'm

3    saying is, it's going to be done quickly and --

4    MR. JULIAN:  Got it.

5    THE COURT:  -- succinctly.  Okay?

6    MR. JULIAN:  Thank you.

7    THE COURT:  Mr. Karotkin?  And if the date's no good,

8    we'll find another date.

9    MR. KAROTKIN:  No, that's fine.  April 23rd is fine;

10   we'll be ready.  I assume no depositions prior to that time?

11   THE COURT:  I'd rather not make any rules because I

12   don't want to -- I said that I'm going to move quickly, and if

13   you can bring me around third base and get me home, you'll get

14   your run scored.  And so if that means that Mr. Julian wants a

15   deposition or he wants a document or something, I encourage you

16   to cooperate so that he can't complain.  If it can't be done,

17   it can't be done.

18   MR. KAROTKIN:  Okay.

19   THE COURT:  My goal is to give you an up or down at

20   the end of that hearing, and your homework assignment and your

21   client's is to educate me on the points that I made.

22   MR. KAROTKIN:  We will do so, sir.

23   THE COURT:  And as I say, I'll say what I don't want.

24   I don't want any more briefing on the business judgment rule,

25   on the calculations under 503, on anything.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          Facts -- it's like -- again, to use the concept, it's

2    like a tutorial.  If we were on a patent case, you would have a

3    tutorial telling the judge about patent technology.  I'm not

4    clueless about employee compensation, but I need to apply it to

5    this case.  And so --

6          MR. JULIAN:  One other question, Your Honor.

7          THE COURT:  Yes, sir.

8          MR. JULIAN:  You want to use the procedure we

9    sometimes use where they've filed a declaration doing what you

10   just said?

11         THE COURT:  No.

12         MR. JULIAN:  No?  Got it.

13         THE COURT:  I want a live witness.

14         MR. JULIAN:  Got it.

15         THE COURT:  I want a live witness to tell me, and that

16   witness can sit there and tell me how I need to understand

17   this.

18         MR. JULIAN:  I'm saying, would it be helpful to have

19   the declaration and put the witness on the stand to talk about

20   the --

21         THE COURT:  I don't want the declaration in advance.

22         MR. JULIAN:  Got it.

23         MR. KAROTKIN:  We understand.

24         THE COURT:  Again, I'm making this up for my own

25   purpose.

PG&E Corporation, et al.

1          MR. JULIAN:  Got it.  We'll do it.

2          THE COURT:  Okay.

3          MR. JULIAN:  Thank you, Your Honor.

4          MR. KAROTKIN:  Thank you, sir.

5          THE COURT:  Thank you for your time, everyone.

6          MS. KIM:  Your Honor?  I'm sorry.

7          THE COURT:  Yes, Ms. Kim.

8          MS. KIM:  Just one very quick housekeeping matter.

9    The four retention applica -- actually, all the retention

10   applications, but the four in particular that the debtors filed

11   that you approved earlier this morning, ages ago, we have

12   uploaded orders on those in connection with our request for

13   entry of default.

14          The comments that you made to us about the proposed

15   orders for the Weil firm and for Keller & Benvenutti that there

16   weren't any findings of -- you weren't going to make any

17   findings regarding disinterestedness and then for --

18          THE COURT:  Well, I didn't do anything.  I mean, I

19   just -- you made your representation.  Yeah.

20          MS. KIM:  Yeah, so the orders don't have those

21   findings and don't have anything with respect to our

22   withdrawal.

23          THE COURT:  The only order I -- it seemed to me that

24   your firm's needed to be changed only on the question of

25   withdrawal if there's an issue.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1     MS. KIM:  Would you like that specified?  Because it

2  doesn't have anything in the order itself about withdrawal.

3     THE COURT:  Well, I thought the application just

4  reserved the right to it.

5     MS. KIM:  The engagement letter that was signed has a

6  reservation of --

7     THE COURT:  Well, why don't you put it in the order.

8     MS. KIM:  Okay.

9     THE COURT:  I mean, it's not a big deal.  I don't --

10     MS. KIM:  No, that's fine.  I just wanted to know if

11  the -- and for the other --

12     THE COURT:  And then the Baker & Hostettler order just

13  is going to have a --

14     MS. KIM:  That's not ours, so --

15     THE COURT:  Okay.  They're here somewhere in the room?

16     MS. KIM:  Yeah, um-hum.

17     THE COURT:  They're going to upload an order that just

18  clarifies on the guidelines.

19     MS. KIM:  So then for the three other debtor orders,

20  would you like us to reupload them or --

21     THE COURT:  No, I'll sign them.

22     MS. KIM:  Okay.

23     THE COURT:  We got them.

24     MS. KIM:  And we'll do the Keller & Benvenutti one.

25  Thank you.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1          THE COURT:  Okay.  Thank you very much.

2      (Whereupon these proceedings were concluded at 1:28 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1            C E R T I F I C A T I O N

2

3    I, Michael Drake, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHAEL DRAKE, CER-513, CET-513

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  April 10, 2019

16

17

18

19

20

21

22

23

24

25

(973)406-2250 | operations@escribers.net | www.escribers.net

## A

**ability (6)**
61:19;103:17;
104:23;105:17;117:16;
124:13
**able (5)**
14:15;23:5;26:16,19;
71:16
**above (3)**
41:14;52:3,13
**above-target (1)**
31:8
**absent (1)**
97:15
**absolutely (1)**
108:13
**absorb (3)**
42:2;54:22;125:3
**academic (1)**
98:5
**accept (6)**
10:20;80:1;107:17;
111:11;124:22;127:19
**accomplish (2)**
81:14,16
**according (6)**
59:16;93:15;97:19;
100:6;130:19;138:7
**account (3)**
14:22;106:1;135:6
**accurate (2)**
47:17;61:1
**accused (1)**
93:7
**achieve (18)**
101:17,20;102:22;
103:12,17;104:8;
105:17,19;122:7,13,18;
125:18,19,20;126:25;
127:2,6,8
**achieved (1)**
108:12
**acknowledge (3)**
101:24;102:17;
103:14
**acknowledged (1)**
106:2
**across (5)**
34:16;83:14;96:11;
98:5;99:13
**act (1)**
10:5
**action (2)**
9:4,13
**actions (3)**
79:16,16;83:13
**actors (2)**
91:19,20
**acts (2)**
81:20,20
**actual (8)**

22:22;28:13;34:16,
24;35:9,11,14;116:4
**actually (16)**
20:24;23:10;26:11,
12,13;33:19;35:4,15;
48:15;52:16;65:23;
86:25;95:12;101:2,11;
153:9
**ad (4)**
30:6;90:14;122:1,3
**add (1)**
61:11
**adding (1)**
30:23
**addition (1)**
111:2
**additional (4)**
15:22;84:21;89:6;
112:25
**additive (1)**
30:24
**address (20)**
12:18;22:15;25:22;
62:9;64:14;86:7;105:5;
110:22,23;112:7,12;
114:10,12;115:11;
119:22,22;124:1;
132:25;133:22;135:13
**addressed (2)**
8:20;124:3
**addresses (1)**
28:23;90:7,7
**addressing (2)**
87:18;123:6
**adequately (1)**
16:22
**adjacent (1)**
65:15
**adjust (1)**
96:15
**adjusted (2)**
89:20;124:9
**adjusting (2)**
56:8;57:2
**adjustment (8)**
12:5;84:23;89:25,25;
123:14,25;124:1,3
**adjustments (5)**
61:24;89:24;123:8,
20;126:12
**administered (1)**
67:12
**administrative (3)**
43:3;97:4;98:2
**admission (3)**
58:18;86:12,12
**admit (1)**
140:3
**admitted (2)**
19:5;41:21
**adopted (1)**
33:6
**advance (1)**

152:21
**advanced (1)**
112:4
**adverse (1)**
9:14
**advice (1)**
141:17
**advised (1)**
88:25
**advisor (3)**
33:23;89:21;111:24
**advisors (8)**
61:20;65:4;87:21;
109:10;111:16,17;
121:15;136:18
**advocacy (1)**
144:1
**advocate (1)**
129:25
**advocating (1)**
137:14
**affairs (1)**
133:15
**affect (1)**
22:10
**affects (2)**
45:1;49:24
**afforded (2)**
99:7;115:5
**afternoon (3)**
7:7;92:8;149:18
**again (95)**
7:9;8:10;9:7,11;
10:4;13:18;14:3;15:11,
21;16:20;18:6;24:17;
32:20;35:24;40:10,10;
43:19;45:13,18;47:16;
53:2,2;61:16;62:19;
66:22,25;67:14;68:1,5;
70:12;79:2;80:1,13;
81:3,12;82:18;94:17;
96:5;97:20;98:16,24;
99:15;101:24;102:2,5,
7,23;103:19;104:8;
105:2;106:9;108:14;
110:10,13;111:9;
112:10,12,25;113:15;
114:3,14;115:10;
117:1;118:21;119:9,
13;120:17;121:2,9,20;
122:17;123:5,8,11;
124:1;127:21;128:12;
129:4,7,17;133:24;
135:22;136:14;138:18,
23;139:11;141:22;
142:9,16,19;147:10,15;
149:20;152:1,24
**against (3)**
13:19;31:2;39:18
**agenda (2)**
7:16;12:14
**ages (1)**
153:11

**ago (14)**
36:18;43:5;47:23;
55:5,18;65:2;67:14;
69:14;70:1;111:18;
121:19,19,19;153:11
**agree (8)**
59:13;64:8;71:6;
84:15;102:10;113:22,
24;135:10
**Agreed (7)**
12:9,9;94:15;111:20;
112:22;113:7;123:4
**agreeing (1)**
137:10
**agreement (17)**
12:25;93:12,13,16,
18;94:1,7,25;95:3,11;
96:9,10,24,25;97:21,
24;99:6
**agrees (1)**
89:5
**ahead (21)**
7:5;8:14;29:1;30:10;
32:17;33:2;34:21;
38:21;41:9;70:17;
73:12;78:2,4,17,17;
79:7,10,11,12;116:24;
129:14
**akin (2)**
43:9;90:14
**align (1)**
29:9
**aligned (2)**
104:1,4
**AlixPartners (2)**
111:16;127:25
**allege (2)**
49:1;96:15
**allocated (1)**
108:17
**allow (8)**
26:10;79:16;80:13,
19,20,22;81:7,19
**allowances (1)**
11:22
**allowed (3)**
60:23;112:2;123:20
**allows (1)**
138:1
**almost (1)**
90:17
**alone (1)**
132:9
**along (6)**
18:5;47:3;97:9;
98:10,10;144:24
**Alsup (25)**
43:21,23,23;46:20;
47:25;48:7;51:10;
55:17,23;56:17;61:6;
63:7,22;64:5;74:4;
77:21;79:13;85:12,17,
20;112:20,21;113:7,

10;119:10
**Alsup's (4)**
46:5,7;60:12;113:17
**alternatively (1)**
97:6
**alternatives (1)**
139:12
**although (2)**
51:18;149:16
**always (5)**
10:9;99:13;102:2;
105:13;130:11
**ameliorate (1)**
136:3
**amendments (1)**
95:9
**among (4)**
44:6;100:3;114:3;
115:12
**amount (5)**
57:22,24;105:17;
106:13;124:11
**amounts (4)**
30:14;81:7,8;136:14
**ample (1)**
18:4
**analysis (3)**
37:21;88:16;127:24
**analytical (1)**
40:10
**anecdotally (1)**
134:9
**announced (1)**
107:25
**announcing (1)**
28:20
**annual (11)**
33:21;49:12;50:4;
94:13;99:4;102:4;
124:5,8,21;138:17;
139:4
**annually (4)**
49:17;104:9;123:21;
124:20
**answered (2)**
16:21;111:5
**anticipate (1)**
9:19
**anticipating (1)**
18:19
**antithesis (1)**
37:16
**anymore (4)**
7:11,18;48:3;65:12
**apparently (1)**
54:1
**appear (2)**
72:15;126:15
**appearing (2)**
27:5;92:10
**appears (1)**
116:8
**apples (2)**

Min-U-Script®

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 157
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(1) ability - apples

36:9,9
**applica (1)**
153:9
**applicable (5)**
109:6,7,13;131:11,
12
**applicants (1)**
11:23
**application (10)**
7:23;8:18;9:15,16;
11:3,13;108:16;121:4;
148:11;154:3
**applications (2)**
10:14;153:10
**applied (9)**
123:19;124:5,8,20,
21,25;126:19;148:6;
149:24
**apply (5)**
95:3;123:21;147:9,
12;152:4
**appreciate (5)**
7:19;30:9;83:18;
86:6;144:1
**approach (1)**
27:25
**appropriate (17)**
9:4;25:18;26:1;61:9,
11,15;89:24;103:4,10,
21;104:7;109:2;114:2,
7,17,20;120:19
**appropriately (3)**
67:12;91:1;129:11
**approval (7)**
9:21;95:23;96:22;
97:25;99:18;100:3;
117:17
**approve (13)**
63:13;79:9;88:17;
94:23;96:23;97:20,23;
98:4;100:14;129:18;
142:13,18;145:4
**approved (7)**
11:2;15:20;17:13;
26:18;79:18;97:7;
153:11
**approves (1)**
88:12
**approving (3)**
9:23;90:25;115:19
**approximately (4)**
14:25;15:23;16:4;
69:7
**APRIL (7)**
7:1;74:5;112:22;
137:1;149:16,18;151:9
**argue (3)**
55:7;97:3;98:1
**argued (1)**
100:17
**arguing (2)**
42:18;133:9
**argument (21)**

19:9;25:20;27:7,12,
14;38:21;39:6;41:1;
49:9,13,14,16;55:8;
61:18;63:20;110:21;
120:6;129:24;130:13;
147:20;149:21
**arguments (10)**
12:21;13:19,22;15:8;
31:2;32:23;41:7;43:2;
94:23;149:12
**around (8)**
26:14;33:8;40:7;
72:3;85:7;131:18,21;
151:13
**arrive (1)**
127:25
**arrived (1)**
90:4
**article (2)**
43:9,10
**aside (3)**
133:14;148:2;149:19
**asphalt (1)**
75:22
**assess (1)**
89:23
**assets (2)**
70:4,22
**assignment (3)**
149:23;150:6;151:20
**assist (1)**
88:8
**assistant (1)**
66:14
**associated (1)**
91:22
**assume (5)**
8:1;22:19;42:9;
119:23;151:10
**assuming (1)**
142:8
**assure (1)**
115:4
**astounding (1)**
42:19
**at-risk (1)**
29:6
**attached (1)**
28:7
**attain (1)**
23:7
**attainable (1)**
24:12
**attempting (2)**
66:22;91:20
**attention (1)**
9:3
**attest (1)**
129:2
**attorney (1)**
76:7
**Attorney's (1)**
48:13

**attribute (1)**
145:16
**attrition (2)**
128:21;129:1
**audit (1)**
131:10
**auditor (2)**
75:25;78:22
**authority (2)**
74:13;118:4
**authorize (1)**
8:14
**available (5)**
26:17;81:24;105:24;
111:3;151:2
**average (3)**
35:3,6,8
**avoid (1)**
63:17
**avoided (1)**
78:6
**await (1)**
29:3
**award (3)**
123:22;126:15;147:7
**awards (5)**
101:25;126:1;147:7;
148:11;149:24
**aware (13)**
8:3;11:23;45:18;
54:11,13,14,15;66:4;
74:8;78:12;84:23;85:1;
130:17
**away (7)**
37:24;52:18;60:17;
85:8,20;94:13;115:14

## B

**back (31)**
15:22;36:8,17;37:13;
49:3;51:6;60:21;62:3;
67:10,14;69:22;71:20;
73:22;87:11;96:12;
98:8;104:16;113:24;
118:11;129:23;132:4,
17;134:1;135:12,18;
137:7;139:4,13,14;
143:16;147:18
**backbone (1)**
89:16
**background (3)**
33:18;126:1;137:9
**bad (15)**
15:14;27:8;40:12;
41:3;42:17;62:22;64:3;
82:8;91:14,19,20;
104:5;106:14;116:9;
145:13
**baggage (1)**
10:12
**Baker (6)**
11:7,10,18;27:5;

65:3;154:12
**balance (2)**
90:5;91:1
**balancing (3)**
114:1,2,7
**ball (3)**
108:1,1,2
**bankrupt (1)**
70:14
**bankruptcies (1)**
71:14
**Bankruptcy (43)**
20:23;23:18;25:19;
26:21;36:18;37:25;
42:25;43:9;48:12;
50:12,12,14;59:22;
60:14,15;62:4,5,11,13;
63:25;68:1,3,21,22;
71:7,14;72:3;77:23;
85:16,18;89:17;90:9,
19;96:22;99:3;102:12;
104:23;120:18;130:1;
134:6;144:7,21;148:23
**bargain (1)**
37:14
**bargaining (14)**
12:24;93:12,13,16,
18;94:1,7;95:10;96:24,
25;97:21,24;98:15;
99:5
**barking (1)**
65:11
**barn (1)**
138:14
**bars (2)**
34:12,16
**base (18)**
30:11,12;58:25;
59:13;68:14,17;81:13;
88:2,5,18;98:24;
101:17;104:1,4;
121:15;134:18;135:16;
151:13
**baseball (1)**
136:15
**based (10)**
15:3;29:8;47:9;
54:20;57:19;103:1;
108:16;124:22;126:5;
141:16
**bashful (1)**
130:12
**basic (3)**
21:10;36:17;58:25
**basically (5)**
25:20;40:4;42:18;
80:24;140:24
**basics (1)**
132:9
**basing (2)**
42:15;150:24
**basis (10)**
20:10;22:23;57:23;

80:20;94:1;99:4;
111:12;115:17;122:12;
142:19
**basket (1)**
62:20
**basketball (1)**
51:23
**battle (1)**
44:7
**Bay (1)**
79:22
**bear (1)**
21:20
**became (1)**
88:6
**become (1)**
145:22
**becomes (2)**
104:19,19
**begin (1)**
127:18
**beginning (2)**
92:11;130:10
**behalf (8)**
11:19;27:5;69:7;
73:2,6;84:3;90:14;
130:21
**behind (2)**
61:17;115:25
**belabor (1)**
85:22
**believes (3)**
67:8;90:5;115:11
**belongs (1)**
37:19
**below (5)**
29:21;41:14,23;
134:5,11
**bench (2)**
63:15;144:24
**beneficiaries (3)**
15:19;44:16;146:3
**benefit (1)**
44:15
**benefits (3)**
84:18;94:6;98:3
**Benvenutti (5)**
8:21;9:15,24;153:15;
154:24
**Berry (1)**
93:13
**beside (1)**
131:25
**besides (1)**
92:6
**besieged (1)**
146:5
**best (12)**
33:7;67:5;68:10;
78:8;88:3;89:4,19,23;
138:20;143:24;144:8;
148:5
**better (11)**

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 158
of 180

29:8;98:9;99:13;
118:22;119:2,5;132:7;
137:10;139:3;142:6,16
**beyond (2)**
74:14;108:14
**big (6)**
8:11;15:9;51:3;
105:24;137:25;154:9
**bigger (1)**
57:25
**biggest (1)**
44:12
**billion (5)**
61:12;89:11;90:18;
121:22,23
**billions (2)**
70:4;122:2
**binders (1)**
7:10
**bit (8)**
38:19;41:4;51:19;
71:3;74:3;75:4;77:18;
100:2
**blamed (2)**
23:17,17
**blew (1)**
113:11
**blocked (1)**
149:15
**Bloomberg (1)**
43:10
**blow (1)**
52:15
**blue (1)**
34:16
**blues (1)**
36:8
**blunt (1)**
72:5
**board (22)**
17:5,6,7,13;28:23;
34:16;96:11;98:5,8;
99:13;100:3,5,7,10,21;
102:1,2,6;103:11;
104:10;135:12;147:23
**boards (1)**
17:9
**boards' (1)**
131:9
**Bob (1)**
48:5
**body (2)**
45:1;104:6
**bog (1)**
16:20
**bogey (1)**
106:3
**Boken (1)**
111:17
**bondholders (1)**
136:7
**bone (1)**
25:3

**bones (1)**
147:13
**bonus (14)**
32:11,24,25,25;33:1,
2,5,8,11,12;59:2;67:2;
99:2;105:19
**bonuses (3)**
32:17;70:19;103:7
**books (1)**
35:22
**boots (1)**
84:17
**bore (1)**
138:18
**boss (2)**
116:22,24
**both (6)**
12:1;43:1;73:25;
123:7;139:2;144:1
**BOTTER (6)**
90:13,13;91:9,11,14;
92:5
**Botter's (2)**
101:16;121:22
**bottom (3)**
28:22;52:24;106:10
**bound (1)**
97:17
**branches (1)**
52:14
**brand (1)**
47:10
**BRAY (4)**
87:15,16;90:11;
122:4
**Bray's (1)**
129:8
**breach (4)**
96:16;97:21,25;98:1
**breached (1)**
97:1
**break (9)**
53:10;69:4;72:14;
73:12;84:1;86:19;
141:18;143:15;147:5
**breakers (1)**
50:22
**breaking (1)**
20:15
**breaks (1)**
53:8
**brick (1)**
65:9
**bridge (2)**
9:5;52:19
**brief (15)**
12:16;30:6;33:9;
39:8;40:10,23;42:18;
69:10;73:12;84:10;
121:7;135:16;142:25;
148:25;150:16
**briefed (2)**
17:22;30:6

**briefing (1)**
151:24
**briefs (1)**
144:19
**bring (2)**
138:11;151:13
**bringing (1)**
128:2
**brings (1)**
40:6
**broad (4)**
45:1;50:20;100:12;
121:15
**broader (2)**
44:17,22
**broadly (1)**
134:16
**broken (1)**
33:25
**brought (2)**
16:17;95:21
**Bruno (5)**
45:22,25;46:12;
73:23;75:18
**brush (1)**
50:20
**budget (1)**
104:20
**build (1)**
51:18
**buildings (1)**
75:15
**built-in (1)**
61:23
**bullet (1)**
30:7
**bunch (2)**
52:10;80:10
**burden (9)**
10:16;20:6;21:21,22;
23:11;25:23;132:1;
133:13,13
**burdens (2)**
9:12;133:14
**burned (3)**
65:6,16;66:16
**burning (1)**
61:6
**business (33)**
19:17;26:5;29:19;
42:13;63:9,13;86:13,
14;100:13;102:21;
103:11,15,16;109:8,8,
17,22;114:16;120:19;
121:5,12;122:12;
138:25;139:9,20;
141:24,25;144:19,25;
145:4,7;149:5;151:24
**Butte (5)**
48:12;79:15,18;
82:17;83:17
**buy (1)**
40:6

**buzzwords (1)**
27:11

**C**

**C-18 (1)**
33:24
**Caitlin (1)**
92:9
**calculated (1)**
35:3
**calculation (1)**
38:8
**calculations (1)**
151:25
**CALIFORNIA (7)**
7:1;39:10;58:25;
61:5;83:14;135:9;
137:18
**Call (10)**
7:3,5;19:17;26:11;
32:25;69:2,4;129:16,
22;138:6
**called (5)**
17:20;37:22,23;45:4;
48:22
**calling (1)**
37:12
**came (4)**
28:6;39:5;52:22;
73:10
**camp (1)**
73:21
**campfire (5)**
29:11,15,16;79:25;
138:16
**can (61)**
7:17;19:9;26:23;
29:22;33:4;37:1,8,10;
39:24;43:18;44:7,12;
45:2;46:14;49:9;52:13;
53:12;54:25,25;56:1,
17;65:24;66:24;67:11,
17;68:4;71:5;73:13;
74:7;82:11;83:9;86:21;
99:13;102:17;108:2,6,
9,20,20,22;109:1;
114:10,11;115:4;
120:5;123:24;128:15;
134:1;138:16;140:9;
146:24;147:15;148:5,
10;149:5,17;150:3,13,
24;151:13;152:16
**cap (2)**
108:21,25
**capacity (1)**
17:15
**capital (1)**
10:11
**care (4)**
8:17;10:15;86:22;
150:20
**career (1)**

**144:24**
**carefully (1)**
124:19
**carried (1)**
145:1
**carry (2)**
41:7;150:6
**carve (1)**
99:14
**case (59)**
7:5;9:8;14:6;17:21;
25:19;33:24;34:25;
41:13;42:23;43:7,11;
44:8,25;55:11;59:21;
60:14;62:4,5;63:6,11;
65:20;66:13;67:9;
68:21,22,23;69:17;
70:3,21,25;71:2,6,7;
72:3;100:20;102:8,12,
12;109:13;114:6;
120:17,24;121:1,3;
122:15;132:8;133:16;
134:14;141:23;144:11,
13,16;145:20;146:10,
16,18;147:9;152:2,5
**cases (12)**
8:22,22;30:2;64:21;
73:7;90:16;114:23;
118:12;122:6;144:17,
18,25
**cash (1)**
37:23
**catch (1)**
34:2
**categories (1)**
85:10
**category (3)**
13:21;92:13;93:10
**cause (4)**
29:16;138:10,10,11
**caused (2)**
39:9;73:22
**causing (1)**
63:19
**CEO (19)**
28:13,19,22;32:7;
33:13;58:17;64:13,19;
66:8;67:1,4;82:24;
86:11;100:6,10,22,23;
116:6;136:10
**certain (8)**
47:6;59:8;62:15;
75:7;91:19;111:21;
112:11;113:2
**certainly (6)**
10:18;17:3;23:20;
63:6;141:13;145:21
**certainty (1)**
103:17
**certify (1)**
55:23
**cetera (1)**
144:20

Min-U-Script®

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 159
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) beyond - cetera

**chairman (1)**
117:20
**challenges (1)**
17:23
**chambers (1)**
7:13
**change (13)**
16:23;50:9,12;56:22,
23;60:23;97:8;100:4,
21,22;103:1;112:24;
139:8
**changed (8)**
34:5;50:16;56:6;
100:19;123:20;126:12;
127:16;153:24
**changes (13)**
9:3;28:21;30:5;
90:25;91:1,5;94:12;
95:18,21;97:9;101:24;
112:11;123:4
**changing (3)**
94:12,14;123:6
**Chapter (9)**
9:22;29:4,20;42:23;
90:20;104:25;114:6;
115:17;130:3
**charge (1)**
19:14
**charged (3)**
91:16,17,18
**chart (7)**
34:24;39:15,17;
59:19,24;107:16;
110:18
**charts (2)**
27:16;105:23
**check (1)**
43:12
**chief (2)**
11:3;117:20
**chimney (1)**
65:9
**choices (1)**
98:11
**choose (2)**
21:5;102:15
**chopped (2)**
55:14,14
**chore (1)**
7:8
**chose (1)**
21:11
**Chris (1)**
69:6
**Chronicle (1)**
75:20
**circuit (1)**
50:22
**circumstance (1)**
90:3
**circumstances (12)**
9:2,17;10:23;24:16;
25:19;59:9;112:19;

119:16;120:24;144:11,
12;146:4
**cited (5)**
39:8;109:14;121:2,7;
144:18
**City (3)**
73:2;84:3,5
**claim (12)**
12:21;27:2;43:3;
96:25;103:7;117:2,4,
10,11,12,13,14,15,15,
15,17;136:14
**claimants (12)**
27:6;29:2;32:18;
69:10;102:18;103:3,4;
114:22;115:21,21;
122:1,8
**claimants' (6)**
8:7,16;11:7;74:1;
84:5;121:24
**claimant's (1)**
130:22
**claims (10)**
29:14;71:8;88:20;
89:11;121:22,23,23,24;
122:2;133:3
**clarification (1)**
149:14
**clarified (1)**
99:19
**clarifies (2)**
9:20;154:18
**clarify (1)**
83:19
**class (3)**
88:3;89:4,19
**claw (1)**
113:24
**clawback (1)**
113:14
**clear (12)**
15:16;22:16;23:7;
25:8;31:24;47:15;88:6;
111:4;113:1;120:17;
143:10,12
**cleared (1)**
148:7
**clearing (1)**
24:11
**clearly (5)**
22:9;96:12;112:18;
145:25;149:8
**CLERK (7)**
7:4,6;10:8,15,17;
87:9;143:19
**Clerk's (1)**
11:2
**client (3)**
98:6,9;101:16
**clients (10)**
64:22;66:12,17;70:7,
18;94:24;96:4,14;
121:22;129:8

**clients' (4)**
69:13;71:2;72:7,11
**client's (1)**
151:21
**close (1)**
87:16
**closer (2)**
86:4;146:17
**closing (1)**
144:23
**clue (2)**
100:2;110:17
**clueless (1)**
152:4
**Code (3)**
20:23;120:19;144:8
**Code's (1)**
26:22
**cogent (1)**
41:7
**colleagues (1)**
111:8
**collective (15)**
12:24;90:17;93:12,
13,16,18,25;94:7;
95:10;96:24,25;97:21,
24;98:15;99:5
**colloquy (1)**
121:18
**column (1)**
107:15
**comfortable (1)**
149:5
**coming (4)**
14:14;49:5;77:8;
106:18
**commendations (1)**
81:16
**comment (3)**
8:20;51:18;145:10
**comments (7)**
62:13;68:9;73:11,24;
74:16;144:23;153:14
**commission (1)**
59:6
**commit (2)**
70:6;106:14
**committed (2)**
16:24;89:3
**committee (63)**
8:12;11:7,19;12:22;
17:4,15;18:14;27:2,6;
54:1,10;56:6;60:5;
64:25;65:5,6,14;66:18;
67:6;73:6;74:1;81:9,
25;84:5,20;86:10;87:1,
14,17,21;88:6,23,25;
89:3,5,7;90:5,15;95:9;
101:15;102:6;103:20;
105:22;111:1,15,23;
113:8;114:4;121:14,
21,24;122:1,3,24;
124:9;130:22;131:11;

132:12;136:8,11;
140:22;141:10;145:15
**committees (5)**
8:14;22:24;90:20;
123:14;131:10
**committee's (9)**
8:6,7,16;27:14;
90:24;91:5;124:2;
130:24;145:17
**common (1)**
88:13
**commonsense (1)**
38:24
**communication (1)**
111:23
**communities (1)**
69:16
**companies (3)**
50:13;91:12;137:18
**companies' (2)**
131:8,9
**company (64)**
17:8;21:3;23:16;
26:6,15;31:8;32:17;
36:18;38:24;44:21;
59:21;60:19;67:25;
68:2;70:14,15;71:9,16;
77:1;80:11;85:15;
87:20;88:1,3,4,11,15,
18;89:3,16,17,18,22;
90:6,7;91:20;99:7;
101:9,18,23;102:23;
103:15,22;104:1;
105:9,10;107:3,6;
109:5,12;113:9,15,16,
18;115:8;122:13;
129:2;130:23;134:7,8,
11;138:1;143:12;146:1
**company's (5)**
90:8;101:20;104:22;
112:17;115:16
**companywide (1)**
25:13
**comparable (2)**
15:2;38:18
**compare (1)**
106:4
**comparing (1)**
137:17
**compensate (2)**
40:5;67:20
**compensated (4)**
12:23;41:14;62:18,
18
**compensating (1)**
88:8
**compensation (38)**
11:14,15,17,22,24;
17:4,15;29:6;33:10;
37:16;58:2,6;59:1,12,
13,15;64:17;69:15;
93:12;98:24;99:1;
102:5;103:18;105:18;

109:17;112:4;114:4,
20;115:6,14;121:14;
122:19;131:11;134:6;
140:21;145:15;148:22;
152:4
**competence (1)**
149:7
**competently (1)**
149:6
**competitive (3)**
103:18;114:20;115:6
**complain (2)**
60:6;151:16
**complaining (1)**
132:13
**complete (2)**
65:7;139:18
**completely (2)**
134:1;147:11
**completes (1)**
113:1
**complexity (1)**
146:24
**complicated (1)**
130:3
**complied (2)**
121:7;145:1
**comply (3)**
74:10,11;113:19
**component (2)**
15:11;36:19
**comprehend (1)**
93:17
**comprehensive (1)**
7:10
**compromise (1)**
127:25
**concept (2)**
62:15;152:1
**concern (4)**
22:16;60:8;61:25;
124:2
**concerned (3)**
42:15;134:15,16
**concerns (3)**
25:22;90:7;137:4
**conclude (2)**
86:1;148:2
**concluded (3)**
87:23;88:25;155:2
**conclusion (6)**
32:13;34:1;68:15;
89:19;135:15;141:2
**conclusory (1)**
20:12
**conditioned (1)**
33:10
**conditions (4)**
74:9;79:12,13;95:3
**conduct (1)**
63:21
**confident (1)**
149:10

Min-U-Script®

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 160
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(4) chairman - confident
Page 160

**confidential (3)**
22:23;111:12;123:1
**confirmation (1)**
104:24
**conflict (1)**
41:4
**conflicts (5)**
9:8,10;27:10;144:19;
145:14
**confused (4)**
125:2;132:10;
148:18,19
**confusing (1)**
125:24
**connection (1)**
153:12
**conscience (1)**
32:8
**conscientiously (1)**
58:12
**consent (1)**
8:12
**consider (2)**
78:10;151:1
**consideration (1)**
141:8
**considered (1)**
121:14
**Considering (2)**
29:23;130:9
**consistent (13)**
8:15;9:7,24;10:5;
30:19,22;37:9;85:12;
105:14;111:9;112:11,
17;113:6
**constituency (3)**
89:18;102:14;103:1
**consultant (3)**
139:21;140:1,1
**consultants (1)**
33:8
**consulting (1)**
140:23
**contained (1)**
22:14
**contemplated (1)**
102:20
**contemplating (1)**
16:16
**contend (1)**
36:14
**context (2)**
59:25;144:20
**contingent (1)**
96:22
**continuance (1)**
147:16
**continuation (1)**
101:23
**continue (2)**
112:23;119:12
**continued (3)**
91:18;147:25;148:19

**continuing (1)**
61:2
**contract (6)**
13:10;97:5,18,19;
98:25;135:14
**contracts (2)**
89:13;146:22
**contractual (1)**
98:24
**contractually (1)**
98:2
**contrary (2)**
121:9;145:25
**contrast (1)**
111:14
**control (2)**
21:24;22:9
**convenience (1)**
86:20
**conversation (1)**
130:3
**convict (1)**
48:14
**convicted (2)**
48:11,17
**conviction (7)**
44:4,5;45:20;46:4;
48:22,23,24
**convictions (2)**
46:6;48:11
**convince (1)**
44:10
**convinced (4)**
31:20;43:19,20;
135:24
**cooperate (1)**
151:16
**cope (1)**
23:18
**copies (2)**
7:13;28:2
**copy (2)**
27:18;74:7
**Corp (1)**
36:18
**corporate (2)**
64:20;65:17
**Corporation (3)**
7:4,6;130:23
**corrected (1)**
16:8
**corrections (1)**
61:24
**correctly (5)**
9:16;13:17;48:10;
68:7;127:13
**cost (1)**
99:4
**couched (1)**
118:14
**coughing (1)**
143:24
**counsel (18)**

8:11;9:22;11:6;19:8;
69:2;70:17;72:15;
78:11;87:1,16;121:18;
130:22,24;134:3;
145:12,17;148:25;
149:9
**counterparties (2)**
89:9;146:22
**country (1)**
135:4
**County (5)**
53:19;73:2;79:15,18;
84:3
**couple (8)**
8:1;12:17;65:8;
73:24;74:16;102:13;
105:5;147:20
**course (6)**
11:14;37:1;44:2;
90:4;121:5;135:10
**Court (542)**
7:3,5,7,21,25;8:4,10;
9:21;10:2,19;11:11;
12:4,6,10,12,12;13:7,
15;14:17,19,24;15:5,7,
25;16:2,5,7,11,14,17,
20;17:10,12,17;18:9,
12,18,19,21,24;19:3,7,
12,20;20:3,8,15,19;
21:4,8,14,17,19,23;
22:3,19,21;23:14,24:2,
17,25;25:6,10,16,25;
26:2,8,23,25;27:2,7,10,
15,17,20,23,25;28:1,3,
9,15;30:16,22,25;
31:10,13,21;32:1,10,
14,20,22;33:4,17;34:2,
7,11,13,15,19;35:8,11,
14,19,21;36:4,7,13,15,
25;37:3,6,17,20,25;
38:7,11,14,16,21;
39:16,20,22;40:9,16,
21,25;41:6,15,18,24;
42:7,9,24;43:4,4,7,11,
12,13,25;44:2,9;45:17;
46:1,4,16,19,24;48:14,
16,19,21,24;49:11,21;
50:1,6,10;51:1,4,8,10,
15,22,25;52:21;53:3,5,
11,19,22,24;54:4,6,8,
13,17,21;55:8,12;56:8,
12,21,24;57:6,10,12,
14,25;58:9,16,20,22;
59:5,18;60:3,9,11,15;
61:16;62:1,7,14,22;
63:3,15;64:7;65:1,22;
66:1,2,4;67:13;68:16,
25;69:2,8,20;70:9,12;
71:5;72:5,12,14,20,24;
73:4,8,16,18,20;74:2,6,
18,22,25;75:13;76:6,8,
11,14,17,20,23;77:3,5,
7,10,13,15,17,21,25;

78:2,4,7,10,13,15,25;
79:2,7,8,18,21,23;80:1,
5,8,10,17,18,22,24;
81:1,3,5,6,10,23;82:5,
7,13,18,20,22;83:1,5,7,
9,18,22,24;84:7,9,23;
85:3,5,7,15,25;86:3,7,
16,18;87:10;88:12,24;
90:11;91:6,10,13;92:4,
6,15,17,20;93:17,22,
24;94:3,9,17,21;95:2,7,
14,16,19,25;96:3,8,11,
17,20,22;97:2,6,14,16,
20,22,25;98:4,13,22;
99:8,11,18,22,24;
100:9;101:6,8,13;
102:7,11,24;104:12,14;
105:7,12,15,21;106:2,
9,19,21;107:1,3,7,9,11,
13;108:8,10,19,23,25;
109:15,19;110:6,9,12,
15,21;111:25;112:2,9,
13;113:5,9,13,16,21,
25;115:2,9,23;116:15,
19,21,24;117:3,5,10,
13,17,18,25;118:2,3,5,
7,11,18,19;119:11,13,
15,17,21;120:3,5,9,13,
15,21,25;122:21;
123:10,17,22;124:4,8,
15,17;125:1,8,8,10,16,
24;126:7,20,22;127:2,
5,9,11,14,23;128:6,8,
10,12,17,19,22,24;
129:3,6,13,19;130:1,8,
11;131:4,6,15,18,21,
24;132:10,16,22;133:9,
12,14,23;135:2,10;
136:4,6,12,24;137:2,
16,23;138:2,4,18,23;
140:6,18,20;141:1,12,
18,21;142:7,10,13,15,
17,21,24;143:3,7,9,14,
20;150:12,16,19,22;
151:1,5,7,11,19,23;
152:5,7,11,13,15,21,24;
153:2,5,7,18,23;154:3,
7,9,12,15,17,21,23;
155:1
**court-appointed (1)**
73:6
**CourtCall (1)**
86:22
**courtroom (1)**
86:23
**Court's (1)**
11:13
**cover (1)**
16:10
**covered (5)**
14:11;77:17;96:5,6,8
**cow (1)**
138:14

**CPUC (13)**
29:17;74:11;75:2,4;
76:1;78:14,20;79:11;
81:22;112:18;113:1,
11;119:9
**cracks (1)**
66:24
**Cravath (2)**
130:17,21
**crawling (2)**
111:18;123:2
**crazy (2)**
52:14;65:11
**created (2)**
29:18;39:1
**creates (2)**
52:19;63:25
**creating (1)**
74:15
**credit (1)**
29:19
**creditor (3)**
81:9;103:1;104:6
**creditors (17)**
24:2;29:2;44:24;
67:21,22;71:11,17;
88:20;89:15;91:25;
92:1;101:1;102:14,15;
115:18;129:8;146:21
**creditors' (18)**
8:6,12;54:1,10;56:6;
84:20;87:1,17;90:24;
95:9;101:15;111:15;
113:8;121:21;123:14;
124:2;136:8;141:10
**criminal (6)**
46:8;77:22;79:14,15,
16;146:23
**critical (7)**
19:13;88:14;89:17,
18;101:19;103:13,16
**criticisms (1)**
146:5
**criticize (1)**
136:7
**cross (1)**
9:5
**cross- (2)**
150:14,24
**cross-examination (1)**
18:16
**cross-examine (3)**
140:9;149:1;150:17
**crystal (3)**
108:1,1,2
**culpable (2)**
50:2;145:24
**culture (1)**
52:8
**current (5)**
31:7;46:11,11;89:11;
97:4
**currently (1)**

29:3
**cusp (1)**
22:5
**customary (6)**
101:4;114:19;
115:13;116:14,15;
118:22
**customer (3)**
85:9;90:2;102:25
**cut (2)**
40:8;82:22
**cutting (4)**
48:3;52:12,14;91:17
**cynical (1)**
106:9,10

**D**

**damage (1)**
60:1
**damaged (1)**
75:15
**damages (1)**
98:1
**Dana (2)**
121:6,8
**dangle (1)**
150:2
**Dario (1)**
73:17
**data (2)**
135:6,7
**date (4)**
100:5;116:4;150:8;
151:8
**date's (1)**
151:7
**David (1)**
90:13
**day (13)**
41:8;43:8;48:11;
55:14;65:3,5;66:19,23;
71:9,14;72:8;146:5;
149:19
**Day-by-day (1)**
66:21
**Dayna (1)**
23:8
**days (6)**
42:1;54:23;77:13;
78:19;95:25;143:13
**day-to-day (1)**
109:11
**dead (1)**
52:24
**deadline (1)**
71:18
**deal (15)**
8:11;14:2;28:11;
40:12;54:10;67:17;
78:25;79:5,6;80:11;
106:15;131:2;139:7;
144:3;154:9

**dealing (6)**
12:14;23:16;38:1;
44:23;77:1;98:20
**death (3)**
83:13;134:21;138:19
**debate (1)**
41:2
**debilitate (1)**
63:11
**debt (2)**
89:10;90:17
**debtor (40)**
10:15;12:20;13:1;
17:19,19;22:11;25:23;
26:16;27:20;53:15;
60:16;64:2;65:17;70:2;
81:24;88:25;89:21;
92:6;95:2,8,17;97:6,8,
11,17,23,25;98:6,8;
99:12,17;124:9;
144:11;145:8;147:16;
148:20;149:4,20;
150:15;154:19
**debtor-in-possession (1)**
145:2
**debtors (14)**
15:18;16:16;20:6,23;
21:20;23:2;24:14;
26:22;90:20;94:10,11;
99:18;119:9;153:10
**debtors' (6)**
67:19;70:16;87:13;
98:17;121:12;136:19
**debtor's (6)**
8:5;13:11;18:4;
23:11;86:24;148:3
**debtors-in-possession (1)**
9:22
**December (4)**
33:6;46:2;47:1;75:2
**decide (9)**
26:4;67:24;96:14;
97:8;98:4,5,7;99:13;
136:20
**decided (2)**
28:24;136:19
**decision (10)**
23:14;49:23;109:10;
110:1,8;111:20;
138:20,21;142:25;
145:2
**decisions (4)**
22:10;109:9;110:14;
141:25
**declarants (5)**
18:16,17;19:13;20:8;
111:2
**declaration (12)**
17:3;22:15;28:8;
41:12;93:6,14;120:1,7;
132:2;152:9,19,21
**declarations (2)**
19:5;132:3

**decrease (1)**
91:22
**decree (2)**
44:14;67:15
**default (1)**
153:13
**defer (2)**
14:1;144:24
**deference (1)**
109:8
**definition (4)**
20:22;26:22;64:12;
120:2
**definitions (1)**
25:2
**DEGHETALDI (57)**
72:19;73:15,17,17;
74:9,20,24;75:1;76:10,
13,16,18,22,25;77:4,6,
8,11,16,20,24;78:1,3,5,
9,11,14,18;79:1,5,8,20,
22,24;80:4,7,9,15,18,
25;81:2,4,6,16;82:4,6,
12,15,19,21,25;83:2,6,
8,11,20,23
**degree (1)**
112:4
**delay (3)**
87:10;143:6,11
**delays (1)**
146:16
**demand (1)**
140:10
**demanded (1)**
95:22
**demonstrate (2)**
21:21;23:12
**demonstrated (2)**
24:15;75:6
**demonstrating (1)**
25:23
**demonstrative (3)**
27:16;33:20;105:9
**denied (1)**
63:16
**denigrate (1)**
61:4
**Dennis (1)**
48:6
**deny (10)**
14:1;26:6,8;72:6;
114:14,18;133:25;
135:12;144:4,14
**denying (3)**
63:17;83:13;85:13
**departed (1)**
17:18
**depend (1)**
146:12
**depending (1)**
108:11
**depends (2)**
36:10;59:10

**depose (2)**
140:25;147:23
**deposed (2)**
132:13;150:18
**deposition (16)**
21:5,9;41:21;54:19,
24;75:25;78:23;82:17;
83:15;111:3,7;134:4,
14;139:19,22;151:15
**depositions (7)**
19:3;42:1,3;43:21;
132:3;139:15;151:10
**depriving (1)**
122:17
**derivative (1)**
41:4
**describe (1)**
111:16
**described (1)**
68:6
**deserve (2)**
63:13;64:17
**designed (1)**
29:7
**desire (3)**
8:6;10:1;88:21
**despite (3)**
70:3,5;106:12
**destroyed (1)**
29:12
**destroys (1)**
31:9
**destruction (3)**
60:20;83:14;134:21
**detail (3)**
22:22;61:17;76:14
**details (2)**
19:15;139:14
**deter (1)**
40:25
**determination (3)**
9:1;26:19;46:10
**determine (1)**
24:22
**determined (1)**
108:17
**deterred (1)**
63:23
**detrimental (1)**
114:21
**devastation (1)**
65:7
**develop (1)**
9:2
**Diego (3)**
134:22,25;140:3
**difference (3)**
11:24;49:17;125:4
**different (19)**
10:24;13:16,21;
37:23;49:15;50:15;
66:10,12;67:22;72:9;
79:21;92:13;93:10;

94:4;100:20,21;
107:23;125:6;134:1
**differently (4)**
13:23;14:3;102:16;
107:16
**difficult (12)**
10:13,20;23:8;26:12;
41:25;68:3;126:25;
127:2,6,8,15;144:3
**dig (1)**
143:5
**dilemma (1)**
63:25
**DIP (1)**
88:17
**directed (2)**
84:11;90:22
**directly (1)**
134:10
**director (1)**
56:17
**directors (1)**
17:7
**disadvantaged (1)**
146:15
**disagree (6)**
38:5;58:14,14;59:16;
101:11;139:20
**disapprove (4)**
96:8;11;98:5;136:24
**disasters (1)**
73:22
**disclosed (4)**
23:1;31:19;81:8;
137:13
**disclosure (4)**
23:3;80:22;100:15;
148:13
**discount (3)**
90:2;135:6;136:13
**discounting (1)**
145:11
**discover (1)**
140:11
**discovery (2)**
139:15;149:3
**discrepancy (1)**
105:24
**discretion (7)**
23:20;26:4;104:9,10,
14,15,16
**discretionary (2)**
59:7;102:1
**discuss (2)**
30:13;43:16
**discussed (3)**
100:1;114:3,4
**discussing (1)**
28:12
**discussion (3)**
87:19;118:25;150:9
**discussions (3)**
13:3;131:8;140:11

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 162
of 180

**disinterested (2)**
8:24;9:9
**disinterestedness (1)**
153:17
**disorganized (1)**
143:23
**dispositive (1)**
144:21
**dispute (1)**
13:9
**disqualifying (1)**
145:14
**disregard (1)**
136:19
**disregarding (1)**
145:11
**disrespectful (1)**
110:10
**disrupted (1)**
29:14
**distinguished (1)**
17:7
**distribution (2)**
122:15,16
**District (4)**
11:16;37:25;48:13;
66:16
**dividends (4)**
38:1;85:13,16,18
**division (2)**
75:4,24
**division's (1)**
75:5
**DOA (1)**
132:8
**docket (3)**
7:17;12:16;70:25
**document (5)**
27:15;31:11;130:15;
139:16;151:15
**documents (8)**
111:6;130:25;
140:21,22,24;141:13;
150:23;151:1
**dog (1)**
65:11
**dollar (5)**
30:14;57:22;61:9;
72:7;136:14
**dollars (22)**
15:3;35:7;37:11;
44:24;65:20;70:4;
81:13;89:12;90:18;
104:20;106:7,23;
107:17;108:7,15;
121:22,23;122:2;
136:14,16,16;138:13
**done (22)**
9:13;10:1;22:22;
23:4;35:3;49:20;62:25;
65:19;68:19;84:22;
93:5;103:22,23;
108:14;127:21;133:17;

138:8;143:1;148:10;
151:3,16,17
**door (5)**
49:7;53:6;57:20,21;
134:3
**double (4)**
40:4;89:13;106:13,
17
**down (21)**
14:14;16:20;29:21;
33:11;34:7;40:6;47:18;
57:18;58:25;62:8;65:7,
15,16;66:16;91:17;
106:16;123:7,8,8,24;
151:19
**downgrades (1)**
29:20
**downward (7)**
56:9;84:24;89:25;
123:25;124:1,3,24
**dozen (1)**
39:9
**draft (1)**
61:20
**dramatically (1)**
100:19
**drawing (2)**
98:8;135:12
**drink (1)**
143:24
**driven (1)**
71:7
**due (1)**
134:8
**duplication (1)**
19:14
**during (4)**
19:1;47:1;131:11;
148:3
**duties (1)**
111:12
**duty (3)**
90:20;91:3,12

**E**

**earlier (7)**
54:21;90:16,19;
106:13;118:24;119:18;
153:11
**earliest (1)**
80:21
**early (2)**
62:5;88:21
**easier (2)**
24:8;127:7
**easily (3)**
24:12;69:16;133:7
**easy (10)**
21:23,24;22:4;23:7;
25:16;39:23;101:3;
127:20;130:6,8
**eating (1)**

52:18
**eats (1)**
52:17
**economic (1)**
122:13
**Edison (1)**
134:24
**educate (3)**
147:18;149:23;
151:21
**Edward (2)**
72:25;84:2
**effect (4)**
28:25;85:14;115:1,
22
**effective (3)**
100:5;139:12,13
**effectively (1)**
101:22
**efficiently (1)**
21:25
**effort (3)**
13:11;100:25;136:17
**egregious (1)**
57:17
**eight (3)**
121:22;131:7;132:11
**eighteen (2)**
36:18;50:11
**eighty (1)**
58:12
**eighty-five (1)**
58:3
**eighty-six (3)**
29:11;31:16,17
**either (9)**
9:2,2;12:21;20:6;
36:8;37:24;67:7;86:21;
98:9
**electric (4)**
112:14;130:23;
134:22,25
**electrical (3)**
46:23;78:21,24
**eleven (1)**
65:4
**eligible (1)**
93:14
**eliminate (1)**
75:9
**eliminated (1)**
114:12
**else (22)**
8:2;12:12,19;16:24;
28:5;31:11;45:19;
50:23;54:25;69:4;
72:21;74:6;86:16;87:3;
92:6;100:1;113:11;
122:24;129:17;138:9;
140:18;148:9
**else's (1)**
89:2
**elsewhere (2)**

68:17;146:24
**email (11)**
28:13,19,22;29:21;
58:18;64:15;86:10;
103:25;130:19,20,22
**emergence (1)**
115:17
**emotions (1)**
68:6
**emphasize (2)**
128:1,2
**emphatic (1)**
32:24
**employed (6)**
10:8,12;11:20;15:18;
58:2;88:16
**employee (21)**
16:16;41:19;42:16;
57:18;78:22;82:8,8;
88:2,5,18;101:17;
104:1,4;111:11,11,12;
112:4;115:13;145:21;
148:22;152:4
**employees (75)**
14:7,10,11,25;16:13,
19;28:20;31:1,3;32:21;
36:1;40:1;41:13,17,20;
42:5,16;45:5,6;47:7;
49:20,24;52:6;55:17;
58:1;59:19;64:17;
67:10,24;71:23;79:3;
81:25;87:25;88:7,14,
14;89:8;92:12,14,21,
24,24;93:2,3,11,14;
94:5;95:13;98:20,21;
99:9;102:22;103:12,
17;109:3;114:14;
115:5,24;117:16,21;
119:4;122:12,18;
128:5;134:2,17,25;
135:13;138:11;141:6;
146:1,3,15,25;150:2
**employee's (1)**
58:6
**employer (1)**
59:1
**enable (1)**
104:7
**enabled (1)**
123:3
**encapsulates (1)**
66:13
**encompass (1)**
16:18
**encourage (1)**
151:15
**encouraging (1)**
136:2
**end (9)**
43:23;53:9;57:17;
64:14;77:8;80:21;
124:17;139:18;151:20
**endorsed (1)**

145:15
**enforcement (3)**
75:3,5,24
**engaged (1)**
47:12
**engagement (2)**
134:10;154:5
**enhance (1)**
44:21
**enhances (1)**
88:19
**e-note (1)**
131:16
**enough (8)**
56:24;63:9,10,12;
128:1,3;133:20;142:22
**ensure (1)**
88:2,3
**entered (2)**
74:5;91:5
**enterprise (1)**
129:10
**entire (2)**
72:6;104:6
**entirely (1)**
114:12
**entitled (8)**
12:23;13:10;33:21;
97:4;98:11;115:13;
122:15;150:3
**entry (2)**
90:25;153:13
**environment (2)**
46:11;50:15
**environmental (1)**
146:23
**equally (2)**
8:7;89:18
**equipment (5)**
29:18;31:9,16;39:9;
53:7
**equity (15)**
15:10,12;32:8;36:19,
21;37:8,13,14,15,22,
24;38:9;59:20;106:11;
122:3
**equity-based (1)**
36:2
**equity-type (1)**
37:15
**equivalents (1)**
90:1
**erased (1)**
66:25
**ESC (4)**
92:10,12,22;99:9
**escape (1)**
144:16
**ESP (2)**
97:8;99:14
**especially (1)**
55:17
**essence (1)**

Min-U-Script®

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 163
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(7) disinterested - essence

133:8

**essential (1)**
122:5
**essentially (12)**
17:11;20:5;33:8;
57:21;60:6;70:5;84:17;
90:1;110:24;121:3;
141:4;149:4
**establish (2)**
120:7,11
**estate (1)**
121:5
**estates (1)**
90:24
Estela (1)
73:5
**et (1)**
144:20
**evaluate (1)**
132:24
**evaluating (1)**
17:16
**even (38)**
11:19;18:21;21:2;
22:15;23:13;24:13,20;
25:14,16;31:9;32:7;
34:7;38:23;40:5;42:4;
47:11;50:13,13;52:5;
54:11,23;55:3;57:25;
59:24;61:10;62:10,24;
67:3;70:14;75:9;84:22;
100:5;113:7;121:5;
135:22;137:4,14;
144:14
**event (1)**
128:4
**everybody (8)**
23:24;24:23;44:11;
50:23;71:6;117:24;
138:19;147:24
**everyone (9)**
7:7,13;63:5;86:22;
145:20;146:18;153:5
**everyone's (1)**
86:20
**evidence (28)**
19:5,16;24:1;32:6,6;
41:11,12;51:20;53:21;
59:17,18;60:21;76:3;
93:4;119:25;121:9,10,
11,12,17;128:6,10,12,
13,14;134:3;135:25;
140:11
**exact (2)**
24:7;54:18
**exactly (13)**
20:18,21;21:2;22:12;
23:7;24:19;25:7;48:5;
52:22;53:4;113:8;
114:25;120:8
**exaggerate (1)**
53:14
**examination (2)**

130:25;150:15

**examine (2)**
147:23;150:25
**example (2)**
26:17;52:9
**excavate (1)**
75:22
**excavation (1)**
75:11
**exceed (1)**
89:11
**exceedingly (1)**
115:11
**except (4)**
28:18;97:12;102:13;
110:19
**excess (3)**
70:4,23;121:21
**exchange (1)**
37:15
**excised (1)**
82:11
**exclude (2)**
18:1;86:25
**excluded (1)**
21:15
**excluding (1)**
18:1
**excuse (4)**
8:18,23;76:2;86:25
**executed (2)**
145:8;149:6
**executive (3)**
73:6;117:21;148:22
**executory (1)**
89:12
**exercise (4)**
19:17;104:16;
120:19;145:4
Exhibit (1)
28:10;33:24;93:14
**exhibits (2)**
28:17;33:20
**exit (2)**
89:4;90:9
**exits (1)**
89:16
**exodus (1)**
115:6
**expect (1)**
9:3
**expectation (1)**
115:12
**expected (2)**
26:6;109:19
**expedite (1)**
115:16
**expenses (1)**
8:15
**experience (5)**
50:25;52:9,13;70:13;
83:12
**experienced (2)**

50:14;76:20

**experts (4)**
54:24;110:17;
148:21;149:7
**explain (13)**
123:10,16;125:2,8;
137:7;139:13;140:7,8,
24;141:14;144:5;
148:5,20
**explained (3)**
127:12;137:3;144:22
**explaining (5)**
30:4;74:21;123:13;
148:6;149:21
**explains (2)**
28:13;30:5
**explanation (2)**
100:16;127:19
**explosion (4)**
73:23;75:14,19;
76:15
**exposure (1)**
89:12
**expressing (1)**
62:17
**extend (2)**
74:14;76:1;78:20
**extensively (1)**
146:12
**extent (3)**
19:12;103:20;147:4
**extra (1)**
150:3
**extract (1)**
103:21
**extreme (1)**
41:4
**extremely (2)**
108:18,20
**eye (1)**
81:15

---

**F**

**face (7)**
31:15;33:7;42:19;
49:10;69:14,23,24
**facie (3)**
20:9;120:7;133:16
**facilitate (6)**
44:21;87:20;88:9;
90:8;114:24;122:14
**facing (3)**
29:14;134:8,21
**fact (15)**
30:20;47:13;51:21;
55:20;90:19;91:15;
102:18,19;105:16;
111:2;114:21,25;
115:21;128:20;144:16
**factor (4)**
89:12;114:1,2;
128:14

factors (6)
57:3;112:16;121:6,8;
136:20;137:19
**facts (6)**
24:15;25:18;54:24;
107:19;120:23;152:1
**factual (1)**
74:1
**fail (1)**
20:6
**failing (1)**
48:12
**fails (3)**
97:23;113:9,15
**failure (3)**
75:8;95:6;128:3
**fair (4)**
13:5;108:15;129:11;
146:8
**faith (4)**
27:8;41:3;42:17;
145:13
**fall (3)**
13:21;20:22;24:13
**falls (1)**
96:23
**falsification (12)**
45:7,20,22;46:10,21;
47:2,13,24;49:19;75:7,
8,9
**falsifications (3)**
45:24;48:2;55:19
**falsified (3)**
45:16,17;49:20
**falsify (3)**
47:19;49:15;53:14
**falsifying (1)**
61:3
**familiar (3)**
74:18;137:8;141:25
**Families (1)**
29:13
**fan (1)**
51:23
**far (5)**
11:3;56:3,15;134:15,
17
**farce (2)**
133:7,18
**FAs (1)**
38:10
**faster (1)**
122:20
**fast-moving (1)**
41:25
**fatalities (1)**
29:12
**fate (2)**
15:17,17
**fateful (1)**
66:23
**fault (2)**
87:11;130:16

**faulting (1)**
128:13
**fear (1)**
62:16
**feasible (1)**
104:25
**features (1)**
61:23
**February (5)**
28:19;62:11;75:13;
115:24;136:10
**feel (2)**
147:2,2
**feet (1)**
52:13
**Feld (1)**
90:14
**fellow (1)**
140:16
**few (5)**
74:1;77:13;78:19;
101:23;111:17
**fi (1)**
113:1
**field (2)**
50:21;148:22
**fifteen (3)**
58:6,9;87:7
**fifteen-minute (1)**
86:19
**fifth (2)**
49:5;50:8
**fifty (6)**
15:1;24:11;25:12;
106:6;126:10;134:20
**fight (1)**
139:3
**figure (7)**
64:1;68:2,10;70:13;
77:22;108:4;135:1
**file (10)**
64:17;69:11;71:19;
72:1;81:12;82:3,23;
90:23;91:11;116:8
**filed (23)**
10:13;14:6;27:16;
28:3,5;29:17;48:12;
54:14;56:2;71:4;84:6;
87:22;90:16;98:15;
112:18;116:3;119:4,9;
131:22,23;148:15;
152:9;153:10
**files (2)**
59:21;97:11
**filing (3)**
29:20;116:4;134:6
**final (2)**
11:6;17:1
**finality (1)**
141:7
**finally (2)**
23:13;24:13
**financial (16)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) essential - financial

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 164
of 180

33:23;56:9,19;65:4;
84:12,24;85:9;88:4;
89:21;90:1;91:25;
111:15,17,24;125:12;
146:20
**find (6)**
29:10;49:7;63:2;
105:8;138:14;151:8
**findings (3)**
153:16,17,21
**fine (7)**
10:16;32:15;53:15;
57:6;151:9,9;154:10
**fines (1)**
113:13
**fine-tune (1)**
51:12
**finger (2)**
105:25;141:23
**finish (1)**
62:2
**finished (1)**
62:6
**fire (38)**
32:18;42:22;43:17,
19;44:10,12,23,25;
45:3,22;49:20;50:8;
52:3,5;55:15;63:10,17,
19,20,24;64:4;66:12,
19,21,24;67:3,16;69:3,
9;73:21;79:22;82:17;
83:17;86:13,14;
113:23;136:1;145:16
**fires (16)**
39:10;44:14;49:4;
50:13;55:11;59:25;
67:15,23;68:1;71:8;
101:10;103:14;135:3,
4,5,8
**firm (7)**
8:20;9:17;11:20;
130:17,18,21;153:15
**firms (2)**
8:23,23
**firms' (1)**
9:3
**firm's (1)**
153:24
**first (33)**
8:19;14:20;17:21;
18:3;19:21;28:22;31:6;
34:1,23;35:25;41:10;
42:11;43:8;46:17,20;
50:11;57:19;62:6;63:1;
65:21;71:7,7;73:13;
79:10;85:19;87:5,14;
99:25;105:8;113:18;
130:14;135:15;144:6
**firsthand (1)**
50:24
**five (10)**
35:11,14;44:17;
75:22,22;81:14;116:7;

121:19;123:23;139:8
**fix (10)**
43:21;49:18;51:6,8;
52:22;55:17;61:3;
63:14;64:8,9
**fixed (3)**
31:19;57:17;148:2
**fixing (2)**
48:3;50:22
**flame (1)**
75:17
**flesh (3)**
25:2;103:21;147:12
**flexibility (1)**
99:12
**flipped (1)**
56:19
**focus (10)**
27:7;30:7;44:15;
66:21;77:25;91:2,18;
103:5;130:4;137:21
**focused (6)**
63:22,23,23;103:23,
25;137:19
**focuses (1)**
33:13
**focusing (7)**
32:1;49:11;137:16;
143:4,6,8,11
**folk (1)**
76:8
**folks (7)**
39:1;50:24;55:15;
63:8;69:18;135:14;
146:12
**follow (4)**
12:13;32:3;43:12;
112:24
**following (4)**
38:23;46:7;75:3;
130:25
**food (1)**
65:24
**force (2)**
37:22;48:7
**forceful (1)**
32:24
**forever (1)**
29:14
**forget (4)**
41:6;50:18;57:4;
130:4
**forgot (1)**
45:23
**form (2)**
89:11,16
**former (2)**
82:24;92:25
**formula (4)**
31:23;93:15;94:4;
97:19
**formulate (1)**
70:13

**forth (2)**
125:4;126:2
**fortunately (1)**
75:14
**forty (3)**
25:12;43:5;139:22
**forty-eight (1)**
95:8
**forty-five (2)**
75:17;121:11
**forward (15)**
13:9,13;14:6;24:2;
35:23;36:7;102:3;
103:4,24,25;104:2;
114:17;115:15,15;
132:1
**foundation (2)**
88:22;145:8
**four (11)**
17:5;42:1;49:5;
54:22;55:11;116:3,7;
130:24;138:22;153:9,
10
**four-by-four (1)**
65:9
**fourth (1)**
114:11
**frame (1)**
24:22
**FRANCISCO (4)**
7:1;50:22;73:3;84:4
**frankly (3)**
36:16;54:25;106:17
**fraud (1)**
42:18
**frequently (1)**
7:14
**Friday (1)**
96:1
**Friske (4)**
41:12,15;57:14;
132:3
**front (11)**
29:1;43:22;47:4;
51:20;53:21;54:7,8;
55:6;59:17;65:10;
116:1
**frustration (1)**
69:12
**FTI (5)**
87:22;89:22;111:15;
123:2;127:24
**full (8)**
69:25;70:3,8,20;
71:2,17;80:22;88:20
**fully (5)**
17:21;86:8;139:25;
145:6,6
**function (2)**
10:24;138:4
**functions (1)**
84:14
**fund (2)**

65:19,25
**fundamental (1)**
42:14
**fundamentally (2)**
109:17,18
**further (11)**
13:3;18:25;62:3;
74:12;96:15;140:7,10,
11,11;149:13;150:9
**future (6)**
9:2;72:8;81:20,21;
133:2,2

**G**

**game (2)**
52:1;136:15
**garbage (1)**
147:14
**gas (8)**
45:9;75:16,18,23;
130:23;134:22,25;
140:3
**gather (1)**
61:21
**gave (7)**
54:1;93:16;98:24;
100:2;139:16;141:9,10
**Geary (1)**
75:14
**Geisha (2)**
82:16;83:15
**general (3)**
24:10;25:4;33:24
**generally (5)**
22:10;73:24;101:23;
109:22;146:1
**gentleman (3)**
73:10,14;121:10
**gets (3)**
52:16;81:13;138:14
**Ghost (3)**
73:7;86:8,13
**gift (2)**
119:1,1
**given (6)**
34:1;47:9;54:2;
74:13;109:8;110:24
**giving (4)**
16:24;37:24;38:2,3
**glad (2)**
84:20;98:16
**goal (7)**
25:9,11,15;26:12;
145:20,21;151:19
**goals (3)**
100:25;102:22;
122:13
**God (1)**
79:10
**goes (9)**
36:17;47:18;52:20;
56:3;69:22;113:10;

126:2,3;134:15
**Good (29)**
7:7,7;11:9;15:13;
27:4;29:9;32:8;33:15;
52:1;56:3;57:7,18;
68:11,21;69:6,8;73:1,
5;82:8;87:15,15;90:13;
92:8,9;100:24;102:20;
130:13;132:8;151:7
**governance (6)**
42:14;49:4;53:8;
63:2,3;64:20
**grand (3)**
79:14,14;80:3
**grandstanding (2)**
64:24;65:1
**grant (4)**
13:24;26:23;99:8;
144:3
**granular (1)**
127:19
**granularity (1)**
126:19
**Gray (33)**
92:9,9,16,19,21;
93:21,23,25;94:4,10,
20;95:1,5,12,15,17,21;
96:1,7,10,16,19,21;
97:3,13,15,17,22;
98:12,19,23;99:21,23
**great (5)**
24:12;28:11;58:18;
64:3;122:22
**greater (2)**
30:3;64:22
**Greek (1)**
127:16
**green (6)**
34:21;36:5,5,9;
38:18;47:5
**Greene (1)**
84:3
**Gregory (1)**
87:16
**grid (1)**
46:23
**grievance (3)**
95:5;96:15,20
**grinning (2)**
82:13,15
**grounds (1)**
84:17
**group (2)**
69:20;115:13
**groups (2)**
88:10;145:22
**guaranteed (1)**
58:19
**guarantees (1)**
29:7
**guess (13)**
10:16;37:9;44:9;
49:11;57:7;96:13;98:6;

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 165
of 180

116:5,10;131:22;
132:19;139:6,7
**guidelines (8)**
11:14,15,17,24,25;
12:1;24:6;154:18
**Gump (1)**
90:14
**guy (2)**
83:9;141:16
**guys (3)**
50:21,25;87:6

## H

**habit (1)**
83:12
**half (2)**
61:12;75:16
**hand (1)**
68:8
**handed (2)**
27:24;33:20
**handing (1)**
27:14
**handle (3)**
51:10;71:14,15
**handles (1)**
51:10
**hang (1)**
86:21
**happen (8)**
9:19;43:1;50:16;
104:5,21;108:4,20;
143:15
**happened (14)**
45:21,25;52:16,23;
66:6;91:22;101:9;
103:6,7;108:18;117:5,
6;121:19;129:5
**happening (1)**
104:4
**happens (13)**
14:10,10;15:16;66:5,
5;94:24;96:4,4;97:10,
10;113:9,23;114:6
**happier (1)**
66:20
**happy (3)**
12:5,8;33:3
**hard (3)**
30:9;104:20;144:2
**hardly (1)**
54:24
**hardship (3)**
32:19;64:15;66:10
**hardships (2)**
29:25;30:2;64:21
**harm (2)**
19:16;62:5
**harsh (1)**
41:3
**hat (1)**
17:13

**hate (4)**
106:9;146:10,12,13
**Hauer (1)**
90:14
**Hawkins (11)**
18:15;69:6,6,8,9,22;
70:11,16;72:1,10,13
**heads (1)**
55:13
**head's (1)**
55:14
**healthy (1)**
88:1
**hear (13)**
12:25;13:18;17:25;
18:3;27:8;59:11;64:23;
70:7,19;80:2;87:2;
119:18;137:20
**heard (18)**
12:13;19:22;65:18;
69:3,4;72:17,18;87:2,
3;88:20;89:4;91:19;
110:15,15,16;129:23;
134:8;135:9
**hearing (16)**
19:6;27:24;42:2;
43:22,23;44:18;74:12;
92:11;104:24;119:19;
140:7,10;147:25;
148:19;149:13;151:20
**heart (1)**
66:24
**help (8)**
39:23;64:10,12;
65:21;87:20;88:3;
89:16;109:10
**helpful (7)**
7:12,17;83:19;99:20;
140:13;144:21;152:18
**helps (1)**
31:1
**Henderson (1)**
46:8
**Henderson's (1)**
74:14
**here's (6)**
38:15;52:23;55:5;
64:19;79:5,5
**hiding (1)**
47:13
**high (4)**
60:24;68:20,20;
108:23
**higher (6)**
88:12;105:16,17;
125:19;127:8;137:25
**higher-level (1)**
92:24
**highest (2)**
107:14,18
**highlighted (1)**
30:17
**highly (4)**

76:20;100:4;139:2,2
**Hill (1)**
69:7
**Hills (1)**
52:14
**hinted (1)**
69:13
**hired (1)**
66:15
**historical (5)**
24:21;35:7;39:8;
61:13;108:16
**historically (3)**
39:13;62:10;107:19
**history (4)**
46:21;61:10;74:3;
105:10
**hit (5)**
32:7;70:24;85:23;
107:3,6
**hoc (3)**
90:14;122:1,3
**Hold (5)**
30:16;34:2,9;71:17;
122:2
**holders (3)**
89:8,9;122:3
**holdings (1)**
90:17
**holes (1)**
133:20
**home (1)**
151:13
**homes (1)**
69:15
**homework (2)**
149:22;151:20
**honest (1)**
139:17
**honest-to-God (1)**
47:20
**Honor (149)**
7:20;11:9;12:3,11;
14:22;20:2;22:25;
25:14,20;27:1,4,18,25;
28:2,17;30:13;32:5;
33:16,20,25;34:5,9;
35:3;39:8;42:21;43:14;
44:5;48:6;49:9;50:3;
51:17;52:2;53:21;
55:10,22;56:5;60:21;
61:8;63:7;64:16,23;
67:8;68:12,22;69:6,10;
72:2,13,22,23;73:1,5,
15,17,20;74:4,12;
75:23;76:2,13,16,18,
25;78:11,18;79:1,5,14,
24;80:15;81:2;82:12,
15,19;83:2,11,21;84:2,
10;85:1,11;86:6,8,17;
87:16,18;88:16;89:7;
90:10,13,16,18,22;
91:4,9,11,18;92:5,9;

97:17;101:2,11,21;
102:18;103:3,5,8,19;
104:6;105:16;108:5;
109:1,6,11,13;110:4;
111:10,14;112:16,25;
113:22;114:24;115:4,
15,19;116:17;117:1,
24;118:9,24;119:7,20;
121:20;122:10,15;
128:1;129:4,18;
130:15;134:3;139:23;
141:22;142:9;143:2,
13;150:11;152:6;
153:3,6
**Honorable (1)**
48:6
**Honor's (1)**
62:12
**hope (10)**
9:4;43:23,25;44:2,3,
11;68:5;135:21;
145:20;148:18
**hopefully (1)**
58:11
**horizon (1)**
14:13
**horrible (3)**
60:1;63:24;130:4
**horribly (1)**
71:6
**hostages (1)**
146:25
**Hostetler (4)**
11:7,10,19;27:5
**Hostettler (1)**
154:12
**hot (1)**
52:17
**hour (1)**
75:16
**hours (4)**
43:18;95:8,8;139:22
**house (5)**
43:17;47:4;65:6,16;
66:16
**housekeeping (3)**
7:8;18:11;153:8
**HR (3)**
28:11;54:18;141:16
**huge (2)**
50:20;136:14
**Hum (1)**
128:7
**human (1)**
29:11
**hundred (3)**
61:7;63:11;65:20
**hundred- (1)**
65:18
**hundreds (1)**
73:22

## I

**idea (3)**
55:2;57:7;76:9
**identified (1)**
9:11
**identify (2)**
17:4;21:23
**identifying (1)**
18:2
**ignore (5)**
35:17;39:21;96:5;
136:13,20
**ignored (1)**
78:6
**illuminating (1)**
28:18
**illustrative (1)**
86:11
**imagination (1)**
108:14;112:19
**Imagine (3)**
48:8;104:21;146:24
**immediate (1)**
71:20
**impact (5)**
91:7;94:17;95:10;
104:22;134:9
**impacts (1)**
29:23
**implement (3)**
95:18;140:24;141:14
**implemented (2)**
94:15;114:18
**implicated (1)**
144:8
**importance (2)**
128:1;129:9
**important (10)**
30:8,24;89:5;90:18;
93:3;99:1;104:5;
115:11;116:4;145:18
**importantly (1)**
135:18
**imposed (1)**
79:13
**impossible (1)**
125:25
**impressively (1)**
68:7
**improper (2)**
63:1,3
**improperly (1)**
62:18
**in- (1)**
58:9
**inadequate (1)**
132:19
**in-between (1)**
137:2
**incentive (20)**
33:12;36:11;37:5,8,

45:4;49:14,15;55:5,16;
59:1,13,22,23;67:2;
79:3,9;80:14,19;133:4,
6
**incentive-based (1)**
119:3
**incentives (13)**
24:5;68:18;80:19,20,
22;81:7;84:11,13;99:2;
104:7;121:16;142:4,12
**incentivize (11)**
45:3,4,6;67:9;88:7,
13;101:17;102:22;
133:6;135:17,20
**incentivized (2)**
88:2;129:11
**incentivizes (1)**
47:23
**incentivizing (7)**
20:13;23:6,12,23;
26:13;62:13;134:17
**include (2)**
37:10;78:20
**included (4)**
75:24;84:19;92:18,
22
**includes (3)**
14:23;106:6;107:17
**including (9)**
15:3;92:1,24;101:1;
106:5,23,24;131:10;
135:13
**incomplete (1)**
36:1
**inconsistent (1)**
30:18
**inconvenienced (2)**
146:15;150:8
**increase (8)**
60:3;91:2;99:2;
103:12;112:15;115:20;
124:13;129:1
**increased (1)**
101:19;107:2;125:21
**increases (3)**
30:11,12;126:24
**increasing (1)**
123:5
**indeed (1)**
15:19
**indemnification (1)**
10:22
**independent (2)**
17:5,6
**in-depth (1)**
127:24
**indicate (3)**
20:23;29:18;41:13
**indicated (5)**
16:9;23:9;26:17;
103:2,24
**indication (2)**
14:1;62:25

**indict (1)**
49:23
**individual (11)**
41:19,20;57:5,15;
58:6;68:18;94:14;
102:4;123:6;124:17;
147:8
**individuals (4)**
81:17;146:9;148:4,
13
**individual's (1)**
25:10
**industry (1)**
88:10;134:19
**inequity (1)**
36:22
**inference (1)**
47:15
**inferring (1)**
116:17
**inflated (1)**
61:19
**influenced (1)**
46:9
**inform (1)**
74:2
**information (30)**
22:14;23:2;24:21;
26:9,16,23;33:24,25;
55:2;68:13,19,24;
110:24,25;111:1,9,11,
11,19,19,20,24;112:2;
122:23;123:3;132:6;
137:13;138:7;141:5;
148:13
**informed (2)**
17:21;123:4
**in-house (1)**
140:2
**Initiate (1)**
96:20
**initiated (1)**
75:2
**injured (1)**
75:15
**innocent (1)**
145:22,22
**input (3)**
109:9;121:15;136:17
**inquiry (3)**
42:17,19;140:13
**inside (1)**
117:14
**insider (8)**
20:16,16,17,20,22;
119:25;120:9;148:17
**insiders (17)**
16:10;20:9,13,21,24;
21:21,22;22:18;26:19;
92:25;118:25;119:2,
24;120:1;142:2;144:7,
19
**insignificant (1)**

8:5
**insist (5)**
22:21;67:18;100:15;
146:16;148:12
**insisted (2)**
55:15;148:15
**insofar (1)**
13:13
**inspect (1)**
55:23
**inspection (1)**
46:21
**inspections (1)**
55:21
**instability (1)**
115:8
**instance (1)**
47:21
**instances (3)**
47:21;75:6,10
**instead (3)**
36:22;38:2;106:11
**insult (1)**
67:4
**integral (1)**
87:25
**intend (1)**
18:17
**intended (3)**
18:15;129:19;146:2
**intending (1)**
18:1
**intent (1)**
57:15
**interaction (1)**
111:16
**interest (1)**
136:13
**interested (1)**
85:24
**interesting (1)**
19:24
**interests (1)**
143:12
**interim (2)**
28:19;32:7
**internally (1)**
75:12
**interprets (1)**
121:3
**interrelationship (1)**
78:5
**interruption (1)**
78:16
**interviewed (1)**
42:4
**into (23)**
8:13;13:21;14:21;
18:22;19:5,16;20:15;
36:5,8;37:8;41:2,12;
72:7;74:13;85:13;
86:10;93:1;105:25;
116:13;135:6;141:8;

146:14;149:2
**investigate (2)**
63:2,3
**investigating (2)**
47:22;79:15
**investigation (10)**
29:17;46:3;47:10;
49:19;75:2,6;76:1;
78:20;79:11;80:6
**investigatory (1)**
74:12
**invitation (2)**
19:20;149:4
**involved (5)**
14:7;29:18;30:14;
63:5;102:6,13;139:1;
142:3
**involvement (1)**
62:24
**IPM (5)**
123:17,18;124:20,
22;125:6
**irrelevant (3)**
103:8;129:7;142:2
**issue (35)**
9:14;10:14;23:1,10,
25;31:21;32:22;59:25;
60:10,11;68:8;69:13,
24,25;70:2,21;72:11;
82:23;85:17;94:18,19;
98:15;103:3,5,9,9,10;
122:10,11;134:19;
135:14;141:7;144:22;
148:17;153:25
**issued (2)**
75:24;113:7
**issues (9)**
10:18,25;25:22;
44:25;74:1,12;114:13;
131:5;146:23
**item (1)**
12:14

**J**

**jail (2)**
59:5,6
**January (5)**
46:14,17,18;47:25;
48:11
**job (13)**
50:23,25;51:11;
58:11,11;59:7;67:25;
71:25;81:18;91:21;
109:21;146:4,9
**jobs (2)**
81:12;104:8
**Joe (1)**
82:1
**John (1)**
28:19
**joinder (3)**
84:6;94:21;98:15

**joined (1)**
69:10
**Jorian (1)**
11:9
**Joshua (1)**
28:7
**Judge (38)**
43:21,23,23;46:5,7,8,
20;47:25;48:7;51:10,
22;55:17,22;56:16;
58:17;60:11;61:6;63:6,
22;64:5;71:11;74:4,14;
77:21;79:13;85:12,17,
20;112:20,20;113:7,10,
17;119:10;130:1;
148:23;149:23;152:3
**judgement (1)**
103:11
**judging (1)**
132:25
**judgment (28)**
19:17,17;26:5;42:14;
100:13;102:1;109:2,3,
4,4,8,9,18,23;120:20;
121:13;123:4;139:1,
10,21;141:24;144:20,
25;145:1,4,8;149:5;
151:24
**judgments (1)**
139:1
**juggle (1)**
68:6
**Julian (221)**
18:14;27:3,4,4,9,13,
18,22,24;28:2,7,10,16;
30:20,23;31:1,12,14,
25;32:5,11,16,21;33:2,
5,18;34:5,9,12,14,18,
23;35:10,13,15,20;
36:3,6,10,14,24;37:2,4,
7,18;38:6,10,12,15,20,
22;39:17,21,25;40:15,
19,22;41:5,10,17,19;
42:6,8,13;43:2,6,8,14;
44:1,3;45:2,24;46:2,6,
7,13,17,20,25;48:5,15,
17,20,22,25;49:18,25;
50:3,7,24;51:2,6,9,13,
17,24;52:1,22,23;53:4,
6,17,20,23,25;54:5,7,
12,15,18;55:4,10,13;
56:11,15,23,25;57:5,9,
11,13,15;58:8,14,17,
21;59:4,10;60:2,7,10,
13,16;61:25;62:3,8,21;
63:1,5,12,15;64:5,11;
65:2,24;66:3,7;68:12,
17,25;69:1;74:2,21;
77:17;80:24;100:1,17;
105:4;106:2;110:16,
23;116:1;121:10;
129:20;130:6,9,14;
131:5,7,17,19,23,25;

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 167
of 180

132:15,21,23;133:11,
13,20,25;135:8,11;
136:5,7,22;137:1,15,
22,24;138:3,6,22;
139:16;140:14,19,21;
141:9,13;143:4,6,11,
13;147:22;148:25;
149:8;150:11,14,18,21,
23;151:4,6,14;152:6,8,
12,14,18,22;153:1,3
**Julian's (5)**
86:10;104:17;
107:16;123:6,8
**June (1)**
47:11
**jury (3)**
79:14,15;80:3
**justification (1)**
142:22
**justified (2)**
24:15;120:23
**justifies (1)**
145:9
**justify (1)**
144:13

## K

**Karotkin (174)**
7:22,24;8:3,9;10:17;
12:18;13:3,8;14:15,16,
18,20,25;15:6,21;16:1,
3,6,9,12,15;17:9,11,14;
18:8,10,13,20,23;19:2,
4,11,19;36:15;76:2,7;
87:4,13;99:24;100:8;
101:2,7,11,14;102:10,
17,25;104:13;105:5,8,
13,16,22;106:4,17,20,
22;107:2,5,8,10,12;
108:5,9,11,22,24;
109:1,16;110:4,7,10,
13,20,22;112:1,7,10,
14;113:6,12,15,18,22;
114:1;115:4,10;
116:14,16,20,23;117:1,
4,8,12,14,24;118:1,4,6,
8,17,21;119:7,12,14,
16,20,22;120:4,8,12,
14,16,23;121:1;
122:22;123:16,18,24;
124:7,13,16,25;125:7,
9,11,15,17;126:5,18,
21,25;127:4,6,10,12,
21,24;128:7,9,11,15,
18,20,23,25;129:7,17;
130:15;140:6;141:19,
20,22;142:9,11,14,16,
18,21,22;143:2,5,8,10;
144:23;149:9;150:10;
151:7,9,18,22;152:23;
153:4
**Karotkin's (1)**

138:25
**keep (7)**
32:24;73:11;79:4;
91:12;112:20;143:22,
24
**keeping (2)**
91:16;93:8
**Keller (6)**
8:21;9:15,24;130:21;
153:15;154:24
**KERP (6)**
16:18;119:3,4,5;
142:4,19
**Kevin (1)**
130:21
**key (2)**
16:16;134:2
**kill (1)**
63:11
**killed (4)**
31:16,16;61:7;
137:21
**kills (1)**
31:9
**Kim (15)**
7:8,20;153:6,7,8,20;
154:1,5,8,10,14,16,19,
22,24
**kind (8)**
10:24;61:22;63:21;
94:18;100:2;104:17;
126:4;141:3
**knew (3)**
12:7;117:24;134:13
**knowing (1)**
149:5
**knowledge (2)**
75:7;134:5
**known (5)**
36:17;53:13,13;69:9;
130:12
**knows (7)**
50:14;57:14;79:10;
138:8;140:16;141:15;
146:18
**Kripkes (1)**
37:12

## L

**label (1)**
91:7
**labor (3)**
58:25;59:6;99:16
**lack (5)**
20:1;42:17,19;
128:13;132:7
**lacked (1)**
110:24
**Laffredi (33)**
18:14;19:22;20:2,4,
4,11,18,20;21:7,13,16,
18,20;22:2,6,20,25;

23:22;24:19;25:4,7,14;
26:1,8,25;27:1;31:17,
22;110:16;111:5,8;
119:6;120:5
**Laffredi's (1)**
137:12
**Laffreti's (1)**
51:18
**laid (4)**
8:16;93:15;94:1;
97:19
**land (1)**
76:19
**language (2)**
11:1;126:16
**large (2)**
129:5;138:13
**largely (2)**
29:13;129:7
**last (34)**
18:13;25:15;29:24;
30:10,11,17;35:17,17;
39:12;40:4,7,11;43:12,
22;52:1,4,15;54:22;
59:6,19;60:18;61:8;
64:13;75:3,23;77:13;
78:19;95:7,25;102:11;
125:3;128:21;135:21;
136:5
**Lastly (1)**
61:8
**late (3)**
47:14,18;75:23
**later (5)**
15:7;48:1;116:2,3,8
**latitude (1)**
77:13
**laugh (1)**
61:19
**law (16)**
9:5,8;42:25;58:25;
66:15;74:10;81:21;
99:16;109:6,7,14;
120:17;121:1,3;
138:25;141:23
**lawyer (5)**
50:14;76:19,21;
149:20,21
**lawyers (8)**
11:20;42:25;44:19;
67:19;71:15;116:8;
130:18;135:24
**laying (1)**
88:22
**layman's (1)**
125:10
**layup (15)**
25:15;51:19,21,22;
53:23;55:25;112:19;
119:6,6,14,23;126:11;
133:19;135:19;149:9
**layups (1)**
23:8

**leaders' (1)**
75:7
**leading (2)**
29:19;131:12
**learn (2)**
45:10;67:3
**learned (1)**
146:9
**learning (2)**
35:24;39:23
**least (14)**
15:10;59:19;64:13;
71:15;88:6;99:9;100:6;
120:7;135:21;136:5;
137:18;148:10,15;
149:19
**leave (4)**
10:2;63:15;67:13;
133:14
**leaving (1)**
134:11
**led (2)**
45:20;83:13
**left (9)**
60:10;66:24;70:22;
72:16;85:3;96:24;
134:5,7;148:18
**legal (1)**
66:14
**legitimacy (1)**
137:17
**length (2)**
13:18;114:3
**lengths (1)**
122:22
**lengthy (1)**
69:24
**less (5)**
14:8;44:20;47:19;
60:5,8
**lessen (1)**
72:10
**lesser (2)**
124:11,11
**letter (9)**
45:11,12;106:12;
115:24;116:6,21;
117:3;136:10;154:5
**letters (1)**
146:7
**letting (1)**
78:17
**level (8)**
58:2,12;68:20,20;
105:18;116:14,15;
126:3
**levels (3)**
25:2;127:8;129:1
**liabilities (2)**
70:5,23
**liability (1)**
118:15
**life (2)**

53:9;128:5
**light (5)**
46:17,21;48:1;50:19;
55:18
**lightly (2)**
30:1;64:18
**lights (1)**
91:12
**likely (3)**
44:20,20;104:21
**limitation (1)**
131:10
**limits (1)**
26:5
**Lincoln (1)**
33:23
**line (6)**
18:6;29:1;32:3;
106:10;116:2,6
**lines (3)**
56:18;91:16;148:9
**list (2)**
19:14;81:25
**listed (1)**
80:11
**listen (7)**
40:9;68:9;78:8;
110:15;140:9;149:11,
11
**listing (1)**
17:25
**lists (1)**
81:10
**litigation (1)**
131:20
**little (18)**
29:8;38:18;41:3,4;
51:19;71:3;74:3;75:4;
77:9,18;99:15;100:2;
102:16;123:10;124:19;
127:4,7;143:23
**live (3)**
65:12;152:13,15
**lived (1)**
66:18
**lives (1)**
69:16
**living (5)**
65:8,13,14;66:13;
99:4
**LLP (1)**
87:16
**local (13)**
11:16;12:22,22;13:4,
20;28:4,5,6;86:24;
92:10,13,22;99:10
**locally (1)**
71:15
**locate (5)**
47:2,13;74:17,20,25
**located (1)**
78:21
**location (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(12) Julian's - location

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 168
of 180

78:24
**logic (1)**
    38:7
**long (10)**
    53:13;59:23;61:22;
    71:11;75:21;79:10;
    105:1;109:21;130:12;
    141:5
**longer (1)**
    75:17
**long-term (5)**
    36:11;37:5,7,18;89:9
**look (23)**
    24:3;33:18;39:7;
    51:19;52:2;58:25;
    62:14,16;74:13;80:10;
    82:15;88:10;107:8;
    112:21;118:11;120:22;
    121:6;132:5;134:13,
    17,24;135:15,16
**looked (5)**
    25:1;139:23,24,25;
    140:2
**looking (18)**
    24:4;29:21;34:3,10,
    13,16;50:8;53:2;64:9;
    89:23;105:23;106:19;
    107:16;123:11;124:4;
    133:2;140:2;143:11
**looks (7)**
    39:11;40:8;52:12;
    56:2,18;61:4;70:22
**losses (2)**
    37:15;42:19
**lot (16)**
    10:12;19:13;42:25;
    50:15,16,16;52:3;53:7;
    72:2;77:17;91:19;
    113:10;115:7,8;141:5;
    146:7
**lots (3)**
    44:23,23;89:5
**lower (2)**
    38:18;110:2
**LTIP (16)**
    14:23;15:1,3,9;
    35:21;36:2;39:21;
    59:20;61:11;92:25;
    106:1,5,6,24,25;107:18
**lumped (1)**
    93:1

**M**

**ma'am (1)**
    92:7
**magically (4)**
    44:14;64:2;67:15,23
**main (3)**
    39:14;132:25;133:1
**maintain (2)**
    33:9;93:3
**major (7)**

10:14;71:8;80:12;
    100:21,22;102:14;
    137:19
**majority (4)**
    62:23;145:25;146:1,
    2
**makes (6)**
    26:11;32:16;90:6;
    109:9;125:25;126:25
**making (16)**
    9:1;13:22;19:9;24:7;
    31:2;40:25;49:13;
    50:18;52:12;82:10;
    94:12;127:12;130:13;
    145:10;149:13;152:24
**manage (1)**
    118:12
**management (15)**
    23:15,19;26:4;58:23;
    83:12;84:18;100:11;
    103:11;109:4,9,18;
    115:11;131:3,4,5
**manager (2)**
    83:3,9
**managers (4)**
    51:2;61:2;82:9;
    92:24
**manner (1)**
    88:8
**many (12)**
    24:11;25:8;30:2,9;
    32:2;64:21;100:19;
    116:2;142:1;144:18;
    148:6,7
**March (4)**
    30:11;130:19;
    131:15,23
**mark (7)**
    47:3,14;51:3;74:17,
    20,25;78:21
**market (5)**
    41:14,23;59:16;
    134:5,12
**market-based (2)**
    115:6;122:19
**materially (1)**
    107:2
**math (1)**
    39:5
**matrices (1)**
    112:5
**matter (8)**
    7:4;12:24;18:11;
    33:14;52:5;119:23,24;
    153:8
**mattered (1)**
    142:5
**matters (4)**
    8:1;74:13;109:17;
    112:4
**max (9)**
    33:22;107:4,6,6,10,
    15,17;127:1,5

**maximization (2)**
    122:6;129:10
**maximize (6)**
    91:3,6;102:21;
    114:21;115:16,17
**maximizes (1)**
    90:23
**maximizing (1)**
    91:24
**maximum (14)**
    39:3;90:21;104:19,
    19,19;105:10,11,12,13;
    108:2,6;125:5,20,22
**may (20)**
    18:24,24;22:4,19;
    27:25;32:25;34:9;35:6;
    36:24;37:11;39:18;
    46:25;62:2;68:21;71:2;
    81:20;129:15;133:22;
    141:20;143:23
**Maybe (23)**
    13:16;15:25;17:1,3;
    38:18;50:1;57:7,10;
    63:21,21;72:8,8;85:19;
    95:19;114:9,10;
    116:10;126:24;132:8,
    16,17;137:19;145:6
**mean (92)**
    8:1,4;10:9,15,21;
    11:12;13:23;18:21,24;
    19:12,12,14;20:9,16,
    21,24;21:8,8,23;22:3,
    12,15;23:22;25:3;
    27:10;28:4;30:17;
    31:14;32:3;37:17,20;
    40:8,13,16,25;41:16;
    42:4,7;49:14;53:12;
    54:13;56:22;57:6;
    58:23;60:9;61:4,12,23;
    66:4;76:3;82:2,5;85:3,
    7;86:25;90:5;91:7,7;
    92:17;94:25;96:17,18;
    97:11,12;98:9,10,13;
    100:12;104:18;106:15;
    110:18;112:6;115:2;
    116:3,5;131:19;
    132:13,18;133:15,23;
    135:2,5,5;137:2,3,3,8,
    20;138:5;139:5;
    153:18;154:9
**means (14)**
    46:15;57:1,7;58:10;
    59:12,14;98:6;110:19;
    124:6;125:8,9;126:9;
    148:6;151:14
**meant (1)**
    46:13
**Meanwhile (1)**
    141:6
**measures (1)**
    114:17
**mechanics (1)**
    15:8

**meet (5)**
    20:6;23:5,23;24:6;
    99:4
**meetings (3)**
    131:8,11;132:12
**members (7)**
    8:7,14;12:23;13:20;
    17:5,15;65:6
**memory (2)**
    42:8;82:16
**mentality (1)**
    146:11
**mention (2)**
    32:11;112:1
**mentioned (5)**
    105:6;118:24;119:9;
    132:11;135:15
**merely (1)**
    101:25
**merit (2)**
    30:10;40:3
**message (8)**
    28:15;52:6;63:8;
    64:8;65:17;66:7;85:21;
    87:11
**met (3)**
    25:23;29:22;133:16
**metric (12)**
    25:8;29:9;32:8;
    45:11;47:18;56:7;
    88:11;123:5;125:12,
    18;132:5;135:22
**metrics (55)**
    19:14;20:14;23:7;
    24:4,4;25:1;29:8;
    31:18;33:14;39:2;
    45:14;47:16;51:8;
    54:18;55:24;56:4;57:2;
    60:25;61:17;62:9;
    64:12;67:11;84:21;
    88:4,24;89:20,23;
    100:17;101:18;103:13;
    104:8;108:12,17;
    112:12,16;118:23;
    119:8;121:14;126:5;
    132:1;133:3,21;
    137:17,23,24,24;140:4,
    8;142:1,1,12;147:10,
    21;148:10;149:23
**middle (1)**
    126:9
**might (31)**
    24:3;26:12,18;31:3;
    56:24;58:5,23;62:18;
    63:24;64:4,4,5,8;70:7;
    81:13,17;100:12;
    106:3;107:22;117:18,
    18,22;126:11;137:6,7,
    9;142:25,25;146:22;
    147:15;148:14
**Milbank (2)**
    87:16,22
**mile (1)**

56:1
**miles (10)**
    24:11;25:8;54:20;
    56:1,1;132:5,13;138:8;
    140:15;148:7
**militates (1)**
    31:1
**million (24)**
    15:3;35:7,15;37:10;
    38:8,13,13;39:5;40:5,
    11,12;57:22,24;61:10,
    12,12;65:20;104:20;
    106:7,23,24;107:17;
    108:7,15
**million-dollar (1)**
    65:19
**millions (2)**
    44:24,24
**mind (5)**
    30:13;40:17;66:24;
    77:18;91:6
**mindful (1)**
    145:3
**mine (1)**
    51:11
**minimize (1)**
    31:22
**minimizing (1)**
    122:9
**minimum (7)**
    39:3;100:9;104:18,
    19,20;125:23;127:7
**minor (2)**
    8:4,19
**minute (7)**
    30:17;67:14;69:14;
    100:18;141:19,20;
    148:1
**minutes (12)**
    75:17;87:7;111:18;
    121:11;131:8;132:12,
    14,15,23;140:22;
    143:17;147:23
**misconception (1)**
    118:9
**misleading (2)**
    35:25;107:12
**misread (1)**
    15:25
**misreading (1)**
    126:16
**missing (3)**
    116:10,11,11
**misspoke (1)**
    16:5
**misstating (2)**
    93:7;137:20
**mistaken (1)**
    45:20
**Mistry (17)**
    21:5;28:12;41:11,21;
    54:19;57:12;120:6;
    129:2;132:3,13;137:6;

Min-U-Script®
Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 169
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**(13) logic - Mistry**

138:6;139:13;140:7;
141:15;147:17;150:18
**Mistry's (4)**
17:2;119:25;132:19;
134:4
**misunderstood (1)**
16:7
**mitigation (4)**
101:20;112:17,23;
113:2
**mixed (1)**
120:13
**modern (1)**
146:11
**modernize (2)**
93:3,9
**modifications (6)**
13:25;94:16;95:23;
111:21;113:3,4
**modified (5)**
94:8;97:5,22;99:19;
111:22
**modifier (4)**
57:5,16;94:14;123:7
**modifiers (1)**
147:8
**modify (2)**
94:5;104:10
**modifying (1)**
74:9
**moment (7)**
9:14;14:18;31:4;
32:12;62:2;70:1;99:17
**Monday (1)**
96:1
**monetary (1)**
37:16
**money (14)**
14:8,21;15:12,13;
26:14;36:23;38:3;
47:19;49:6;57:20;
106:12,13;113:10;
116:7
**money's (1)**
57:20
**monitor (3)**
48:8,8;74:13
**monitorship (1)**
74:15
**Montali (1)**
48:6
**month (4)**
16:22;30:12;71:19;
75:23
**months (8)**
48:1;55:18;57:19,21,
23;106:12;138:15,16
**months' (1)**
45:9
**morale (1)**
141:6
**more (58)**
10:13,20;14:3,7,12,

21;15:12;17:22;24:14;
34:7;36:22;37:21;
38:17;44:20;54:14;
59:24;61:21;66:21;
67:23;68:13,18,23,24;
69:18;74:3;81:14;
84:22;106:12;108:4,6;
112:1;113:11,13,13;
116:9;121:6;123:10;
124:19;126:25;127:2,
6,8;128:20;135:17;
136:4,16,16;139:8,8;
141:21;142:20,22;
143:25;144:5;145:17;
146:24;147:13;151:24
**moreover (1)**
112:15
**morning (16)**
7:7;11:9;12:14;27:4;
69:6,8;73:1,5;86:4;
87:15;90:13;92:8,9;
120:6;149:17;153:11
**mosaic (1)**
66:21,23
**most (9)**
7:15;8:22;32:2;
57:16;63:22;71:13,14,
23,24
**mostly (1)**
137:16
**motion (26)**
12:15;13:6,18,24;
14:6;26:24;63:16,17;
69:5;72:16;87:22;
90:22;91:1;92:3;93:20;
97:12,15;99:9;116:2;
118:1,14;131:22;
133:25;134:1;144:4,14
**motions (1)**
14:12
**motivate (3)**
103:11;109:3;122:12
**motivated (1)**
104:5
**movable (2)**
36:12,13
**move (3)**
141:2;146:17;151:12
**moved (1)**
33:11
**moving (11)**
17:19,19,20;55:3;
94:13;95:2;103:4,24,
25;115:15,15
**much (15)**
38:1;40:14;44:13;
72:5;85:3,5,23;86:18;
88:12;99:22;119:4;
127:7;135:1,17;155:1
**multi (1)**
34:12
**multiplied (1)**
39:4

**multipliers (1)**
57:2
**Murphy (2)**
37:13;66:14
**musing (1)**
36:16
**must (5)**
20:10;29:3;31:6;
64:12;146:5
**myself (6)**
33:3;40:11;44:17;
66:20,22;149:11
**mystery (1)**
118:6

**N**

**name (2)**
73:16;74:18
**names (9)**
21:1,10;74:23;81:7,
11,11,11,11,19
**Name's (1)**
73:17
**Napa (1)**
60:20
**nature (2)**
23:6;49:12
**nauseam (1)**
30:6
**necessarily (1)**
102:6
**necessary (6)**
9:18;91:21;101:16;
137:9,14;148:16
**need (42)**
7:18;9:19;10:4;14:1,
12;24:1,1,2;25:17;
44:7;53:20;55:13,20,
23;60:20;61:3;66:7,7;
68:13,13,24;69:15;
73:16;76:23;88:7;91:2;
140:15,16,21,25;141:6,
13;146:13,19;147:13;
148:7;149:13;150:6,8,
23;152:4,16
**needed (4)**
13:1;89:1;123:3;
153:24
**needs (5)**
40:13;55:23;63:23;
67:25;90:7
**negotiate (1)**
94:11
**negotiated (7)**
94:5;95:9,22;96:23;
99:6;100:16,18
**negotiating (2)**
89:22;98:13
**negotiation (1)**
89:21
**Neither (2)**
62:21;127:17

**neutral (1)**
52:17
**new (18)**
34:6;36:21;43:9;
47:10,10;53:1;55:20;
59:22;62:9;77:20;
79:12,12;95:23;100:6,
7,10,10;102:2
**news (2)**
45:19;65:18
**next (17)**
8:12;10:7;16:22,22,
22;30:4,7;31:5;32:16;
39:17;42:20;53:6;
62:11;71:19,19;98:7;
130:24
**nice (1)**
119:18
**night (1)**
52:1;125:3
**nine (7)**
45:9;57:19,21,23;
90:18;138:15,16
**ninety (3)**
49:6;58:3;125:18
**ninety-five (1)**
126:15
**ninety-nine (1)**
107:20
**nobody (1)**
75:14
**none (1)**
8:9
**non-insider (1)**
120:4
**non-performance (1)**
31:7
**nonrepresented (1)**
92:23
**nontechnical (1)**
148:21
**normal (3)**
15:1;59:12,14
**normally (1)**
17:20
**North (1)**
79:22
**Northern (1)**
11:16
**Northstar (2)**
33:6,7
**northwest (1)**
135:3
**noted (2)**
25:16;106:8
**noteholders (1)**
90:15
**notice (1)**
125:5
**November (3)**
42:22;113:23;138:16
**nuclear (2)**
61:4,5

**number (20)**
12:23;39:7;50:1,21;
55:5;60:24;75:11;
81:18;89:14;108:25;
126:15;127:16,17,17,
17;131:7;132:11;
138:12,12,13
**numbers (5)**
15:1,21;40:13;56:25;
106:6

**O**

**oath (1)**
130:20
**object (2)**
122:2,4
**objection (8)**
13:13;18:6,8;19:10;
20:5;25:21;40:22;71:4
**objections (2)**
13:17,24
**objectives (1)**
37:9
**objectors (1)**
103:20
**obsolescence (1)**
53:10
**obtained (1)**
84:21
**obvious (3)**
8:25;71:9,10
**obviously (6)**
18:3,17;46:9;60:9;
80:12;135:14
**occurred (2)**
45:23;49:2
**October (1)**
42:22
**off (8)**
12:19;55:14,14;
75:16,18,23;82:22;
126:14
**offended (1)**
78:16
**offer (3)**
128:22,24,25
**offering (1)**
32:6
**office (2)**
73:20;100:7
**officer (4)**
11:4;48:10;117:21;
129:25
**officers (3)**
48:18,20;144:19
**officer's (1)**
48:25
**official (4)**
8:6;27:5;90:20;95:9
**old (3)**
52:11;53:1,6
**once (1)**

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 170
of 180

17:22
**One (90)**
7:8;8:2,17,18,20,21;
10:7;11:4,6,12;13:25;
14:2,18;15:9;17:3;
28:18;31:21;32:2;33:7,
21;34:3,9,10,15,19;
35:12,14;36:21;37:22,
23;41:24;42:10,18;
44:5,7;47:16,22;48:11;
49:3;52:18,18;53:1;
55:5;56:10;57:1,16;
58:4,10;60:10,24;
61:25;62:3;65:6,14;
66:11;67:13;69:20;
71:9;72:7,17;88:21;
100:13,20;108:19;
109:25;110:18;111:8,
23,24;112:1;118:11;
122:24;123:6,8,12;
125:24;127:17;129:21;
134:20;136:4;138:12;
139:11;141:2,20;
143:21;144:5;145:25;
152:6;153:8;154:24
**ones (7)**
8:19;17:13;21:24;
80:12;96:5,5;102:8
**ongoing (1)**
101:19
**only (34)**
8:20;9:15;10:8;
12:14;16:15,18;17:17;
33:15;45:17;72:17;
84:25;85:3,5;88:2;
89:15;91:24;93:1;
98:11,20;108:19;
109:25;112:25;114:10,
22;119:25;123:20;
124:11;129:21;134:20;
144:25;147:1;149:17;
153:23,24
**oOo- (1)**
7:2
**open (2)**
13:9;82:3
**opening (2)**
120:6;121:7
**operate (3)**
103:15;114:16;
122:11
**operates (1)**
148:5
**operating (2)**
70:4,24
**operation (3)**
101:19;103:16;
109:11
**operations (4)**
22:10;110:14;
112:14;114:17
**opinion (2)**
132:22;145:12

**opponents (2)**
17:24;54:24
**opportunity (16)**
18:4,25;19:1;21:4;
86:7;103:18;114:19,
19,19;115:5;122:18;
129:12,21;147:18;
149:1;150:17
**opposed (4)**
61:22;105:3,4;
141:15
**opposing (1)**
19:8
**opposite (2)**
114:25;115:22
**opposition (5)**
18:2;28:5;69:5;
72:16;84:6
**oppositions (1)**
69:11
**optimistic (1)**
71:16
**option (3)**
9:17;85:18;102:2
**options (1)**
144:9
**order (37)**
7:3;9:20,20,23;10:2;
11:18,25;12:6;25:9;
33:6;47:1,9,20;51:15;
74:4,9,15;90:25;91:5;
98:25;102:21;112:21;
113:7;117:9;122:14;
125:17,19;130:10;
131:1;139:24;141:3;
150:6;153:23;154:2,7,
12,17
**ordered (1)**
81:24
**orders (7)**
10:5;74:11;81:22;
153:12,15,20;154:19
**ordinary (1)**
121:5
**original (4)**
74:14;123:18,19;
131:22
**originally (1)**
126:2
**Orsini (1)**
130:21
**OSC (2)**
46:20;48:1
**others (10)**
26:3;29:2;30:2;
63:23;64:21;68:10;
73:22;87:5;100:17;
129:8
**otherwise (3)**
102:4;118:18;121:17
**ought (2)**
133:25;146:8
**ours (1)**

154:14
**ourselves (7)**
7:14;29:1,10,24;
66:9;116:1,24
**out (68)**
7:5;8:16;15:9;24:23;
26:10;32:9,17;33:25;
34:9;35:4,5,16,16,16;
36:8;38:13;41:3;45:13;
49:7,7;50:5,21;52:10,
20;57:20,21,23;61:13;
62:8;63:2;64:1,17;
65:2,3,10,20;66:15;
67:2;68:1,2,3,10;
70:13;73:13;77:22;
82:11;87:6;91:20;
93:15;97:19;99:14;
104:23;105:9,10;
113:10;122:5;124:10;
130:13;134:2,18;
135:1,16;138:14,15;
143:11;145:1;146:9;
150:6
**outline (1)**
147:11
**outset (1)**
122:17
**outside (2)**
109:10;121:5
**outstanding (1)**
122:24
**over (15)**
10:19;28:16;30:5,14;
39:9;46:8;61:7;73:21;
75:15;107:21;111:18;
123:2;136:25;139:11;
147:15
**overall (4)**
33:15;52:4;60:18,18
**overrule (1)**
13:24
**overruled (1)**
145:2
**overtime (1)**
52:2
**own (8)**
36:16;52:13;60:5;
69:11;137:3;140:2;
144:24;152:24

**P**

**Pacific (1)**
130:23
**package (1)**
96:23
**page (8)**
28:22;29:5;30:4;
31:14;41:21;64:14;
78:23;134:4
**pages (1)**
42:1
**paid (34)**

28:25;35:4,5,16,16,
16;57:23;69:18,25;
70:7,19;71:1,12;
80:19,20,22;81:7,13;
91:23;97:18;105:9,10;
108:3,15;116:12;
117:8,22;118:10,22;
122:19;124:6,21;
142:24;146:21
**pain (2)**
72:2,11
**painful (3)**
70:8;20;82:16
**painting (1)**
50:20
**palace (1)**
58:23
**paper (3)**
17:2;29:9;70:15
**papers (12)**
8:16;17:22;32:14;
34:4;55:3;56:14;58:5;
73:9;103:2,19;106:8;
112:3
**Paradise (2)**
29:13;65:5
**paragraph (3)**
30:7;113:17;125:4
**parameters (1)**
26:5
**Pardon (1)**
128:11
**parent (1)**
17:8
**part (25)**
19:23;22:6;23:10,25;
29:20;36:5;37:14;
39:11;52:11;59:12,13,
14;67:8;69:12;87:19,
25;93:11;98:23;99:1,3;
100:13;102:9,11;
103:13;138:4
**participants (2)**
15:10;36:2
**participate (3)**
21:13;100:16;111:7
**particular (9)**
25:10;56:9;70:8;
81:9;93:18,19;112:16;
150:7;153:10
**particularly (5)**
69:20;70:20;86:11;
109:16;150:8
**parties (6)**
12:16;13:22;88:21;
94:24;97:14;146:21
**parties-in-interest (1)**
24:3
**partner (1)**
66:15
**parts (3)**
20:15;69:13;135:4
**party (4)**

17:19,20,20;18:1
**pass (1)**
12:19
**passed (1)**
34:20
**past (19)**
24:4,5,5,6;26:12;
30:14;47:1;49:5;60:6,
7;81:20,21;91:23;
103:6,7;105:14;129:5;
131:1;135:23
**Pat (1)**
66:14
**patent (2)**
152:2,3
**patience (1)**
143:21
**Patrick (1)**
37:13
**pause (1)**
30:16
**pavement (1)**
47:4
**pay (45)**
23:20,24;29:3;30:11,
12;32:17;41:23;42:5;
45:9;58:13,24;59:2,13,
13,15;65:20;67:2,2,21;
68:14,17;70:3,21;71:2,
16;79:3,17;88:19;95:6;
97:23;99:3;106:11;
116:11;117:9,17,22;
118:4;119:1,1;128:3;
134:11,18;135:16;
150:2,3
**paying (10)**
9:12;29:24;32:9;
33:15;66:9;85:16,17;
106:11;118:15;134:9
**payment (17)**
15:4;29:1;33:10;
35:6;47:15;50:4,7;
62:12,14;94:13;102:3,
4;104:17;114:11,11;
117:2;125:17
**payments (24)**
14:22;33:21;34:24,
25;35:10;40:4;45:10;
79:9;93:18,19;94:2,13;
95:6;98:25;101:24;
104:11;113:24;114:5,
8,9,10;124:10,12;
138:17
**payout (4)**
61:9;125:19,22,23
**pays (2)**
79:9;116:8
**PE&C (1)**
33:5
**peer (1)**
88:10
**peers (6)**
59:16;68:20;134:18,

18,20,23
**penalty (1)**
130:20
**pending (3)**
75:1;95:5;118:1
**pensioneers (1)**
89:8
**people (67)**
14:2;15:17,19,22,22,
23;17:11;19:21;21:10;
22:1,4,7;23:19;26:20;
30:1;31:16,17;36:20;
37:4;38:2;43:1;50:21;
52:7;57:1;58:11;61:7;
62:13,17,19,23;63:12,
13;64:3,4,15;66:15;
70:21;81:11,12,20;
82:10;84:13,17;91:16,
21;92:2;93:8;94:24;
103:6;106:11;109:20;
110:1,13;113:10;
114:15,16,16,18;115:7;
116:11;122:18,19;
133:6;134:7;139:2;
141:24;148:21
**people's (4)**
74:23;134:10;
137:13;141:16
**per (1)**
34:25
**percent (35)**
15:1;24:11;30:23;
40:3;49:6;56:6,7;58:3,
4,6,8;61:6;101:18;
105:19,20;106:6;
107:20,22;112:15;
123:5,23;125:13,13,15,
18,20,21,21,22,23;
126:3,4,10;139:8,9
**percentage (3)**
33:21;58:13;59:7
**percentages (1)**
139:8
**perfect (3)**
52:3;90:4;150:5
**perform (2)**
38:24;88:4
**performance (38)**
29:7,24;30:12;31:8,
15;32:9,17;33:10,12,
13,14;38:25;39:8;56:9,
19;57:5,16,19;60:19;
67:3;79:11;84:12;90:1;
94:14;102:23;104:8;
105:18;108:11,13,13;
122:13;123:7;124:23;
126:3,3;132:5;147:8,
10
**performance-based (1)**
31:6
**performing (4)**
82:10;83:10;84:13;
138:15

**perhaps (10)**
13:21;16:18,18;
18:10;21:11;22:23;
23:17;41:7;45:19;
146:4
**period (5)**
28:21;47:6;131:11,
12;148:2
**perjury (1)**
130:20
**permission (1)**
104:16
**permissive (1)**
24:14
**permitted (2)**
60:18;124:1
**person (8)**
21:24;22:9,11,11;
41:22;83:6;145:23,24
**personal (8)**
60:5;83:12;86:20;
137:13;146:19;148:13;
149:16,17
**personally (1)**
60:4
**personnel (1)**
82:3
**persons (1)**
86:20
**perspective (1)**
64:24
**persuade (1)**
18:24
**persuaded (3)**
94:22;107:21;144:7
**persuasive (2)**
43:10;63:20
**PG&E (36)**
7:4,6;33:21;36:18;
43:20;46:22;48:3;52:6,
11;55:5;63:25;70:6;
71:1,7;73:22;74:10,11;
75:16,20,25;78:12,22,
23;79:8,12,16,16;
83:12,16;86:15;94:5;
95:21;102:12;130:23;
134:5;146:10
**PG&E's (4)**
28:11;46:21;74:10;
75:8
**ph (1)**
123:17
**phenomenal (2)**
108:13,13
**phone (4)**
12:13;72:24;86:21,
21
**phonetic (5)**
23:9;37:12,12;66:15;
131:16
**phrasing (1)**
95:19
**pick (2)**

12:6;110:3
**picked (1)**
50:7
**picks (1)**
101:25
**picture (3)**
29:22;57:25;66:20
**pie (1)**
115:20
**piece (2)**
59:20;110:25
**piece-by-piece (1)**
66:22
**PINO (9)**
72:23;73:1,5,8;
83:25;86:4,6,17,18
**Pion (1)**
73:5
**pitch (1)**
78:8
**place (9)**
35:22,23;42:12;
59:23;60:17;85:19;
101:4;114:18;148:14
**plaintiff (2)**
73:7;86:8
**plan (64)**
16:12,17;23:6,12,13,
23;24:13,15;25:24;
33:12,22;36:11;37:5,8,
8,9,18;41:2;45:4;55:6,
6;56:2;59:22,23;70:14;
71:19;79:3,9;80:23;
82:13;83:3;84:19;
85:13;94:15;96:21;
101:20,22;103:13,13,
22;104:25;105:4,4;
106:5,14,16,16;112:17,
23;113:2,19;115:20;
118:22;119:4,8,24;
120:4;121:20;124:9;
133:1,3,6;134:15;
142:11
**plans (2)**
29:22;102:1
**play (1)**
45:13
**pleadings (3)**
71:1;109:14;121:2
**Please (1)**
143:20
**pleasure (1)**
87:13
**plight (1)**
136:9
**plus (6)**
35:4,12;40:7;59:1;
60:3;138:22
**pm (3)**
143:18,18;155:2
**pockets (1)**
72:7
**podium (3)**

72:21;73:10,14
**point (44)**
11:21,22;29:5;32:16;
33:16;39:14;41:10;
44:1,3;55:5;57:9;59:4;
60:12;61:8;62:3;68:9;
70:7;71:1,22;77:16;
80:13,15,18;85:20;
86:23;90:18;117:19;
129:14,22;131:19,25;
132:8,19,25;133:1;
134:15,19;135:11;
136:17;137:25;141:7;
147:2;149:12;150:4
**pointed (1)**
122:5
**pointing (1)**
70:21
**points (10)**
8:4;30:7;85:22;
123:6,9;129:15;130:9;
138:22;147:20;151:21
**poked (1)**
133:20
**political (1)**
146:19
**poorest (1)**
70:14
**portion (2)**
98:20;106:1
**position (11)**
12:20,22;13:1,19;
16:23;87:23;92:23;
95:17;99:19;117:7;
123:15
**positions (2)**
26:20;86:9
**possibility (1)**
44:21
**possible (6)**
79:12,16;90:9;114:8;
122:16;135:25
**possibly (3)**
54:22;81:16;119:19
**post (1)**
53:2
**post-petition (3)**
117:3,6;118:15
**post-San (1)**
46:11
**potential (7)**
16:15;35:18;63:10;
91:19,20;92:25;124:23
**potentially (1)**
116:9
**pound (1)**
103:21
**power (2)**
91:17;148:9
**PPAs (1)**
89:9
**practice (1)**
75:9

**practitioners (1)**
11:16
**pre-break (1)**
86:5
**precisely (2)**
106:6,22
**predecessors (1)**
85:23
**predicate (5)**
120:11,12,16,17,18
**predicates (1)**
88:22
**predict (2)**
70:9;109:22
**predicted (1)**
67:1
**prefer (1)**
22:7
**preferably (1)**
88:20
**prejudicial (1)**
114:22
**preliminary (5)**
12:17;14:9;15:15;
17:17;75:6
**prematurely (1)**
62:18
**premised (1)**
119:8
**prepared (4)**
62:19;100:24;
144:13;145:4
**preparing (3)**
7:10;43:19;44:18
**pre-petition (6)**
29:2;117:2,4,15;
118:15;121:23
**present (3)**
17:20;24:1;131:13
**presentation (6)**
40:20;68:11;129:16;
133:18;149:19;150:15
**presented (3)**
95:24;112:21;144:9
**presenting (1)**
149:21
**presently (1)**
45:17
**preserve (1)**
102:21
**preserves (1)**
88:19
**preside (1)**
46:8
**president (1)**
22:12
**presiding (1)**
71:10
**press (2)**
100:6;135:9
**presumably (1)**
147:17
**presume (1)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(16) penalty - presume
Page 172

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 172
of 180

133:16
**pretend (1)**
99:16
**pretending (1)**
102:7
**pre-trial (3)**
139:14;141:4;149:3
**pretty (5)**
22:4;50:5;56:3;
71:10;85:23
**prevent (3)**
63:19,20;104:3
**prevention (1)**
91:2
**prevents (1)**
26:18
**previously (2)**
9:11;149:15
**price (2)**
70:5,22
**prima (3)**
20:9;120:7;133:16
**Prime (1)**
10:8,15,17;11:2
**prior (12)**
35:22;36:20;100:11,
18;101:25;105:17;
112:11;129:1;145:5;
146:10;147:20;151:10
**priority (1)**
121:25
**privy (1)**
70:12
**probably (13)**
8:20;18:5;42:11;
44:18;55:7;64:23;
65:18;71:21;104:15;
109:21;129:24;131:22;
146:11
**probation (11)**
48:10,18,20,25;49:1,
2;74:10;77:22;79:12,
13;113:13
**problem (26)**
8:8,13;11:4,5;20:11;
24:8;25:7,18;52:11;
54:21;61:2,5;62:10,24;
63:14,18;71:24;96:12;
105:2;132:2;137:11;
138:10,11,23,24
**problems (1)**
23:16
**procedure (6)**
8:11;9:21;12:24;
17:18;37:24;152:8
**procedures (4)**
8:15;10:22;18:13;
54:5
**proceed (2)**
18:7,10
**proceeding (1)**
77:22
**proceedings (2)**

146:23;155:2
**process (8)**
29:4;31:19;41:25;
42:3;54:16;60:17;
94:11;141:4
**produce (2)**
130:24;133:21
**product (1)**
139:20
**professional (6)**
7:23;8:18,19;10:11;
121:15;139:1
**professionals (11)**
9:12;10:10,11,23,25;
11:17;44:6;63:6;67:6;
139:9;147:6
**Professors (1)**
37:12
**program (18)**
33:8;34:19;35:21;
37:14;55:16;61:14,22;
74:17,17;78:21;89:19;
94:12;95:23;101:4;
121:13,16;122:3,4
**progress (1)**
52:12
**progresses (1)**
70:25
**projected (2)**
34:17,25
**proof (5)**
20:9;128:22,24,25;
141:3
**proper (6)**
8:22;44:15;49:4;
88:5,24;122:11
**properly (2)**
145:1;149:6
**property (2)**
65:8;121:4
**proponents (2)**
41:2;145:13
**proposal (3)**
116:12;123:18,20
**propose (2)**
139:17;149:15
**proposed (4)**
14:22;26:1;149:25;
153:14
**proposing (1)**
113:19
**prospective (5)**
103:14;121:20;
122:12;129:4;133:1
**prospectively (1)**
102:20
**protect (1)**
23:2
**protecting (1)**
100:25
**protects (1)**
94:6
**prove (2)**

24:2;104:24
**provide (5)**
26:16,23;97:18;
104:7;114:2
**provided (3)**
22:22;74:7;111:1
**provides (2)**
26:9;93:14
**providing (1)**
103:16
**proving (1)**
137:17
**provisions (2)**
13:12;83:3
**prudent (4)**
49:8;56:16,17;64:19
**public (7)**
23:1;36:18;81:8,15,
17,25;82:8
**publicized (1)**
100:4
**PUC (12)**
46:2;47:1,9,10,22;
53:11;55:20;56:2;
63:22;78:25;139:23,24
**pun (1)**
91:14
**punish (1)**
129:12
**punished (1)**
146:25
**punishment (2)**
103:10;122:11
**pure (2)**
38:7;142:11
**purpose (3)**
40:19;76:11;152:25
**purposes (1)**
19:5
**put (25)**
24:1;25:2,21;29:1;
30:10;36:8;37:8;41:12;
59:5,6;62:19;67:13;
68:14;72:7;85:13;
105:25;116:1,24;
128:15;141:22;144:2;
148:4;150:10;152:19;
154:7
**putting (5)**
7:16;32:24;66:22;
71:1;81:15

**Q**

**qualifications (1)**
109:24
**qualified (1)**
139:2
**qualify (1)**
26:21
**quarter (1)**
62:6
**quarterly (19)**

45:10;49:12,17;50:7;
57:23;79:9;80:19;
94:13;101:24;102:3;
104:9;114:5;123:19;
124:10,11,25;138:14,
17;139:5
**quick (2)**
8:1;153:8
**quickly (5)**
42:2;146:17;149:15;
151:3,12
**quite (5)**
56:13;61:5;115:22;
141:5;147:2
**quote (2)**
46:18;111:17
**quoted (1)**
33:9;116:1

**R**

**radical (1)**
80:16
**Radovsky (1)**
84:3
**raise (5)**
23:20,24;24:23;40:3;
135:22
**raised (1)**
70:1
**ramifications (4)**
99:16;146:19,20,20
**range (5)**
58:5;124:23;126:2,2,
16
**ranges (1)**
147:7
**rank (5)**
64:16;72:1;81:12;
82:23;90:23;91:11;
119:4
**rank-and-file (1)**
93:2
**rare (1)**
144:25
**rate (5)**
15:1;33:24;34:25;
41:13;103:18
**rather (8)**
11:21;28:18;44:20;
49:12;53:9;84:12;
139:4;151:11
**rational (2)**
142:4;147:12
**rationale (3)**
121:13,16;122:5
**rationales (1)**
81:8
**reach (4)**
25:9;26:12;75:22;
150:3
**reached (1)**
54:10

**read (35)**
9:16;17:21;28:17;
36:19;40:10;42:3;
45:12;56:2,17,21;58:5,
7,18;65:17;66:11,12;
73:9;75:4;76:14;84:7;
94:21;110:17,18;
112:3,5;116:21;
118:13,13,16;121:1;
123:13;126:23;127:15;
142:25;147:10
**reading (6)**
31:10,11;43:7;55:19;
86:10;126:8
**ready (2)**
7:22;151:10
**real (4)**
24:17;39:6;56:25;
101:10
**realistically (1)**
69:17
**reality (1)**
72:2
**realize (5)**
21:9,14;104:23;
114:19;129:10
**really (27)**
7:11;10:7;14:13;
15:15;17:1,23;22:15,
16,21;25:16;27:11;
30:14;36:16;38:16,22;
39:13;43:16;44:12;
55:25;61:4;91:14;
94:18;99:1;110:17;
133:5;135:19;138:15
**reason (3)**
28:23;75:21;102:4
**reasonable (1)**
142:3
**reasons (10)**
38:1,23;63:1;89:5,6;
90:10;139:21;145:5;
149:16,16
**rebuild (3)**
51:12,13;69:15
**recall (5)**
75:13;86:21;139:22
**receive (4)**
93:15;125:17,19;
127:7
**received (1)**
130:15
**receiving (2)**
84:13,16
**recent (2)**
55:18;78:19
**recently (2)**
55:18;63:22
**Recess (2)**
87:8;143:18
**recipients (1)**
92:25
**recitals (2)**

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 173
of 180

8:23;9:25
**recites (1)**
9:16
**reckless (1)**
49:8
**recognition (1)**
130:4
**recognize (10)**
23:15;29:25;30:9;
73:19;81:18;101:16,
22;109:7;122:4;129:9
**recognizes (1)**
64:15
**recognizing (2)**
62:4;71:21
**recommendations (1)**
32:12
**recommended (2)**
114:5;141:16
**reconfiguration (1)**
67:11
**record (9)**
27:14;41:11;45:7;
48:2;76:4;86:10;
130:14;138:12;142:23
**recordkeeping (4)**
47:17;61:1,1;77:11
**records (17)**
45:8,9,15,20;46:11;
47:3,13,24;49:15,19,
20;61:3;75:7,8;77:11;
78:24;79:4
**recoup (2)**
116:18;118:21
**recover (1)**
66:23
**recovery (1)**
115:18
**red (2)**
34:19;35:12
**reduced (3)**
105:20;125:12,22
**reduction (1)**
40:6
**refer (2)**
109:22;134:3
**reference (3)**
11:13;17:4;24:22
**referring (7)**
30:11;55:19;64:22;
65:22;74:22;76:3;
112:20
**reflect (3)**
12:1;15:21;89:20
**regard (4)**
20:7,20;22:18,18
**regarding (1)**
153:17
**regardless (1)**
21:20
**regime (2)**
36:20,21
**regular (1)**

7:21
**regulars (1)**
53:12
**regulations (1)**
81:21
**reimbursed (1)**
8:15
**reinspect (1)**
46:22
**reject (1)**
95:2
**rejected (2)**
97:5;146:22
**relate (1)**
68:7
**related (1)**
99:3
**relates (1)**
33:19
**relations (1)**
85:9
**relationship (1)**
14:15
**relatively (4)**
71:13;73:11
**relevance (2)**
76:23,25
**reliability (2)**
84:12,14
**relied (1)**
140:22
**relief (2)**
23:3;144:13
**rely (4)**
48:2;99:4;141:24;
147:6
**remain (2)**
13:9;87:10
**remaining (2)**
16:13;22:17
**remarks (2)**
73:25;145:5
**remember (1)**
118:13
**remind (2)**
30:8;119:17
**reminder (1)**
9:14
**reminding (1)**
146:7
**remote (2)**
108:18,20
**renegotiating (1)**
96:13
**reorganization (5)**
61:10;100:25;
114:25;122:14,14
**reorganize (1)**
45:2
**repeat (1)**
40:23
**repeatedly (1)**
75:10

**repeating (2)**
129:13;147:4
**repetition (1)**
77:18
**rephrase (1)**
95:7
**replace (3)**
53:7,9,15
**reply (4)**
22:16;25:21;98:17;
129:20
**report (21)**
13:25;16:25;21:1;
22:13;33:6,7;47:7,9;
48:12;54:9;70:4,24;
75:3,5,20,24;76:1;
78:19;140:3,23,23
**reported (1)**
75:10
**reporting (2)**
10:13;48:10
**reports (3)**
29:17;46:21;93:7
**represent (4)**
58:5;91:25;95:13;
129:25
**representation (4)**
9:18;10:1;80:2;
153:19
**representations (1)**
9:1
**representative (1)**
147:17
**representatives (10)**
18:4;67:19;75:20;
86:24;144:12;145:15,
19;148:4,20;149:20
**represented (6)**
92:12,22;93:2;95:15;
99:9;136:13
**represents (2)**
73:21;121:21
**request (4)**
19:8;122:23,24;
153:12
**requested (2)**
111:1;144:15
**requests (2)**
130:23;131:2
**require (2)**
9:6;97:24
**required (6)**
64:12;93:12;94:16;
97:23;98:2;113:3
**requirement (1)**
75:11
**requirements (1)**
23:4
**requiring (2)**
74:10,11
**reread (1)**
147:7
**reservation (2)**

13:14;154:6
**reserved (1)**
154:4
**resolution (3)**
29:3;131:9;146:17
**respect (10)**
13:8;45:25;83:3,16;
90:8;99:9;109:16;
110:11;134:25;153:21
**respected (1)**
76:21
**respective (1)**
131:9
**respects (2)**
40:24;142:2
**respond (4)**
18:4;19:25;110:25;
129:21
**responded (1)**
47:11
**responding (1)**
7:13
**response (7)**
8:6;10:4;12:25;
19:25;20:1;132:19;
141:21
**responsibilities (2)**
21:2;26:21
**responsibility (1)**
83:13
**responsible (3)**
81:20;109:11;110:14
**rest (2)**
50:2;92:13
**restructuring (7)**
11:3;87:20;88:1,9,
15,22;90:9
**result (2)**
103:23;127:21
**resulted (1)**
111:20
**results (1)**
29:9
**resume (1)**
86:23
**retained (3)**
9:21;10:22;12:8
**retention (11)**
8:19;9:20,24;11:2,
18,25;16:16;55:6;
142:11;153:9,9
**retentive (2)**
23:13;26:13
**retribution (3)**
103:9;122:10;143:11
**returns (1)**
37:15
**reupload (1)**
154:20
**revamped (1)**
139:25
**review (2)**
113:2;138:17

**reviewed (1)**
11:1
**revolt (1)**
58:23
**rewarded (1)**
145:24
**rewards (1)**
148:23
**rid (1)**
64:3
**right (120)**
8:2;12:10;14:24;
16:2;19:3,20;20:2,11,
17,18;22:8;23:21,22;
24:19;25:6;33:1,9;
34:21;35:12,13;36:3,6,
7,25;37:1;41:18;42:7;
43:7,8;45:1,5,7,21,23;
46:1;48:9,21;52:8;
56:14,15,15,21;58:7;
59:9;60:2;67:1,7,15,16;
66:2,8;67:4;71:3;
72:21;73:20;75:1;
78:18;80:4;82:14;83:5,
7,25;84:7,24;85:11;
86:3,19;87:12,14;89:1;
91:13;92:7,18;93:24;
94:9;95:14;96:3,3,19,
21;97:10,16;98:10;
99:21;106:3;107:24;
108:5,8;110:7;112:13;
113:5,14,25;115:7;
116:12,13;118:3,5;
119:21;120:6,11,25;
124:6,15,15;126:20;
127:5;130:8;132:16;
135:3,3;139:6,10;
140:4;143:15;147:1,2,
2;150:23;154:4
**rights (1)**
13:14
**rise (2)**
87:9;143:19
**risk (5)**
31:7;44:11,23;58:21;
108:18
**risks (1)**
91:22
**river (1)**
65:15
**road (1)**
14:14
**Robert (1)**
27:4
**robust (1)**
88:1
**Roger (1)**
92:10
**role (1)**
46:7
**roll (1)**
41:3
**rollback (1)**

113:14
**room (7)**
26:10;42:25;71:15;
91:8;101:8;138:19;
154:15
**Rose (6)**
11:9,9;12:3,5,9,11
**Rosenfeld (1)**
92:10
**round (1)**
139:14
**routinely (1)**
51:24
**rubber (1)**
52:18
**rule (4)**
63:10;109:8;130:25;
151:24
**ruled (2)**
39:22;85:12
**rules (4)**
9:12;50:12,16;
151:11
**ruling (6)**
39:18;143:16,17,17;
149:12,13
**run (1)**
151:14
**running (1)**
93:8
**run-of- (1)**
144:17
**run-of-the (1)**
144:17
**runs (2)**
109:5;136:15

**S**

**safer (1)**
93:9
**safety (43)**
39:11;45:8,15;52:3;
54:19;56:7,20;60:11,
19,25;61:4,5,23;64:11;
75:3,5,7,8,23;84:11,14,
21,24;85:13;88:3,11;
89:4,19,25;90:8;91:2,
18;101:18;102:23;
103:12;112:12;114:17;
122:13;123:5;133:7;
135:20;136:19;140:4
**salary (3)**
81:13;82:2;111:11
**same (33)**
17:11;19:15;23:6;
24:7;26:3;31:11;33:13;
49:13,13;53:6;60:6,7;
63:25;66:17,18,25;
68:2;70:6,18,25;88:16;
98:9;100:11;102:1,8;
106:7,22;113:8;
120:17,18;121:4,24;

137:11
**SAN (11)**
7:1;45:22,25;50:22;
73:3,23;75:18;84:4;
134:22,25;140:3
**satisfaction (2)**
102:25;150:4
**satisfied (4)**
88:2;122:25;144:12;
148:16
**satisfy (3)**
21:22;122:23;132:9
**saw (3)**
12:25;34:3;65:8
**saying (31)**
13:15;21:21;25:11;
31:12;32:2,5;37:21;
38:17;45:11;48:5;
50:19,19;55:22;56:18;
61:16;63:16;70:22;
78:10;83:11;113:16;
116:5;130:16;133:5;
136:8,16;139:24;
142:17;149:13;150:21;
151:3;152:18
**schedule (1)**
7:21
**school (1)**
66:16
**scope (1)**
74:14
**score (10)**
29:7;38:25;39:2;
45:12,14;60:18,23;
133:4;138:1;139:17
**scored (6)**
31:15;39:10,12;52:2;
67:12;151:14
**scores (1)**
31:8
**scoring (16)**
31:18;54:3,15;55:16,
24;56:4;60:25;132:5;
133:7;135:18;136:15;
137:25;138:3;140:8,
23;147:21
**screwed (1)**
47:7
**seal (1)**
148:15
**season (2)**
46:22;114:9
**seated (2)**
87:10;143:20
**second (12)**
8:21;11:4;14:5;29:5;
31:6;34:8,15;40:3;
61:8;64:14;69:24;
143:21
**second-guess (1)**
109:23
**secondly (2)**
9:7;63:5

**seconds (1)**
63:16
**Section (8)**
10:9,12;11:20,21;
94:6;99:8;120:18;
144:8
**security (1)**
122:3
**SED (2)**
75:12;78:20
**seeing (2)**
45:13;110:17
**seek (2)**
23:3;118:4
**seem (4)**
27:11;71:20;137:16,
18
**seemed (3)**
13:20;149:9;153:23
**seems (3)**
41:4;100:9;126:23
**self-scoring (1)**
61:18
**semi-annual (1)**
139:7
**Send (9)**
51:6;60:21;62:3;
64:8;65:16;66:7;67:10;
96:12;135:12
**sending (1)**
63:8
**senior (2)**
90:15;114:15
**sense (10)**
26:11;35:25;54:25;
55:1;90:6;104:18;
105:1;113:20;145:7,23
**sensitivities (1)**
71:2
**sensitivity (1)**
69:12
**sensitized (1)**
136:9
**sent (2)**
52:6;130:20
**sentence (1)**
30:17
**sentencing (1)**
49:1
**separate (2)**
12:20;99:15
**sequence (1)**
87:4
**sequencing (1)**
18:2
**serious (6)**
52:6,7;63:9,10,12;
79:10
**seriously (2)**
53:11;71:5
**service (1)**
90:2
**session (2)**

86:5,5
**set (6)**
65:25;125:4;126:1,2;
148:2;149:19
**sets (1)**
12:1
**setting (1)**
144:20
**settled (1)**
54:2
**settlement (4)**
48:13;56:5;79:18;
140:5
**seventy-five (1)**
49:6
**several (8)**
13:17;30:14;47:2;
59:19;68:14;80:12;
145:11,12
**shall (2)**
7:22;46:22
**share (4)**
37:22;55:1;63:4;
138:24
**sharp (1)**
66:20
**sheet (1)**
53:25
**shift (1)**
71:2
**Ship (3)**
73:7;86:8,14
**shooting (2)**
44:4;75:16
**short (2)**
50:22;69:4
**shorten (1)**
8:12
**short-term (5)**
36:11;37:8,9,16;
71:22
**show (4)**
34:24;47:5;55:16;
135:18
**showing (4)**
70:4,5,25;90:17
**shown (1)**
137:4
**shows (3)**
47:9;54:2;139:17
**sic (3)**
60:8;97:9;99:14
**side (8)**
27:17;44:19;91:8;
104:17;128:13;133:16;
136:19;144:15
**sides (3)**
139:3;144:1,2
**side's (1)**
129:24
**sidetrack (1)**
16:21
**sign (1)**

154:21
**signed (1)**
154:5
**significant (7)**
29:10;32:2;69:14;
71:9;86:12;89:13;
100:4
**significantly (2)**
30:3;64:22
**similar (1)**
88:11
**similarly (1)**
145:16
**Simon (17)**
28:15,23;32:7,22;
33:14;38:25;45:10;
58:17;64:13;66:8;67:1,
4;86:11;103:24;
115:23;117:6;136:10
**Simon's (3)**
28:19;106:12;131:16
**simple (4)**
8:11;11:11;37:21;
38:17
**simply (3)**
94:23;142:18;147:8
**single (5)**
41:22;42:16;110:25;
122:23;130:15
**Singleton (1)**
69:9
**sit (6)**
59:11;62:8;70:18,19;
71:3;152:16
**sitting (4)**
26:10,14;79:15;
123:12
**situation (1)**
128:3
**six (5)**
35:10,11;58:8,9;
139:8
**sixty (1)**
107:21
**sixty-five (4)**
101:18;112:15;
123:5;140:4
**skeptical (1)**
10:22
**Slane (1)**
37:12
**SLF (1)**
69:2
**slight (2)**
11:24;23:20
**slow (1)**
34:7
**small (1)**
71:13
**smaller (1)**
98:20
**Smith (2)**
82:1,8

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 175
of 180

**snow (1)**
59:7
**snowed (1)**
58:15
**SoCal (1)**
134:24
**so-called (1)**
12:15
**Solomon-like (1)**
139:6
**solution (4)**
138:24;145:19;
150:5,5
**solve (1)**
137:11
**solvent (2)**
70:15;71:10
**somebody (6)**
12:19;85:19;134:10;
148:8;149:10;150:7
**somehow (1)**
18:5
**someone (8)**
12:12;35:6;74:6;
89:2;113:11;128:15;
136:18;137:8
**sometime (1)**
100:7
**sometimes (2)**
7:13;152:9
**somewhat (1)**
130:2
**somewhere (2)**
18:5;154:15
**Sonoma (4)**
43:17;52:13;53:19;
60:20
**soon (3)**
90:9;100:7;122:16
**sorry (9)**
65:15;73:19;74:20;
87:10;92:16;125:1;
127:9;143:24;153:6
**sort (6)**
81:19;100:16;
105:13;116:17;130:3;
144:13
**sorts (1)**
81:17
**soul (1)**
66:24
**sound (1)**
106:9
**sounds (4)**
57:6;60:3;126:10;
130:6
**South (1)**
50:21
**spark (1)**
52:19
**speak (5)**
13:4;19:21;73:9;
87:5,6

**SPEAKER (1)**
125:14
**speakers (1)**
73:13
**speaking (1)**
27:2
**special (2)**
55:11;99:7
**specific (3)**
12:20;60:25;94:11
**specifically (2)**
60:25;147:19;149:1
**specifics (1)**
147:11
**specified (1)**
154:1
**speed (1)**
7:15
**spent (3)**
28:11;65:3;139:22
**Sperry's (1)**
28:8
**spirit (1)**
29:22
**spoke (2)**
18:14;145:19
**sprays (1)**
47:3
**spreadsheet (1)**
82:1
**square (1)**
49:3
**squirrel (5)**
52:16,17,21,24;
137:21
**stability (2)**
128:2;129:9
**Stabilization (1)**
88:18
**stabilize (1)**
115:12
**stabilized (1)**
88:18
**stake (1)**
43:16
**stakeholders (1)**
114:23
**stand (9)**
44:19;128:16;137:6;
138:7;140:7;147:18;
148:4,20;152:19
**standards (1)**
23:5,23
**standpoint (1)**
104:6
**staring (1)**
47:10
**start (10)**
19:21;28:10;64:6;
87:18;130:10;136:25;
139:11;141:4,4;147:15
**started (3)**
46:3;67:3;70:21

**starting (4)**
27:13;29:5;70:24;
96:1
**starts (2)**
71:1;114:9
**state (7)**
8:25;61:6;83:14;
107:15;133:15;134:20,
22
**stated (4)**
18:2;46:20;64:13,14
**statement (3)**
20:12;66:11;117:20
**statements (1)**
24:10
**States (6)**
11:15;29:5,21;86:9;
105:3;134:20
**status (4)**
97:4;98:2;99:7;
119:25
**statute (2)**
23:24;121:25
**stay (1)**
150:13
**stayed (1)**
58:1
**staying (1)**
26:14
**step (2)**
44:7;144:5
**steroids (1)**
119:3
**stiff (1)**
59:2
**stiff-armed (1)**
131:13
**still (24)**
19:16;24:14;29:16;
41:7;55:4;60:17;61:21;
63:24;64:4,4,5;65:9;
67:24;68:2,4;71:16;
92:8;95:3;117:4;
120:10;126:11;137:5,
7;145:6
**STIP (122)**
12:15;13:18;14:7,7,
11,22;15:19,24;16:9,
12;17:13;28:12,14,20,
21,24,25;29:6,9;30:5,8,
18;31:7;33:1,21;34:24;
35:1,4,6,18,20;36:11,
19;37:19;38:22,23;
39:1,11,14;40:4;44:10,
12,15;45:11;47:15,16,
20,21,23;51:12;53:15;
57:22,24;58:1,5,10;
59:20;61:14;62:9;
63:13,17;64:3,8,11;
67:10;69:13;71:4;72:6;
81:14;82:1,2,9;87:20;
88:24;90:6,10;92:18,
22;93:1,11,15,19,19,

22,25;94:2,12,23;
95:10,23;97:7,18;
98:14,25;99:14,15,18;
103:22;106:5,24;
108:3,16;110:2,2;
111:21;112:16;114:3;
116:2,17;117:2;
123:15,23;125:5;
126:1;128:4;131:22;
134:9;136:2;145:13;
146:3;147:7;149:24
**STIP'd (1)**
123:22
**STIPs (1)**
63:18
**stipulate (1)**
71:5
**stipulation (2)**
88:13;124:5
**stock (4)**
37:23;38:2;70:5,22
**stood (3)**
88:17;110:23;121:10
**stop (4)**
35:2;46:25;61:13;
120:5
**story (1)**
68:2
**straight (2)**
44:5;49:10
**strange (1)**
76:19
**stranger (1)**
76:18
**Strauss (1)**
90:14
**stressful (1)**
65:11
**stretch (1)**
112:19
**strict (1)**
23:4
**striper (1)**
47:18
**striping (1)**
47:18
**strive (1)**
23:10
**structure (2)**
25:3,4
**structures (2)**
29:12;88:11
**struggling (1)**
40:17
**study (1)**
45:18
**stuff (8)**
34:17,17;39:23;42:2;
54:22;118:13;126:8;
137:5
**sub- (1)**
94:18
**subject (6)**

9:8,20;13:14;93:20;
104:9;111:21
**subjective (1)**
21:24;24:17;144:10
**submit (4)**
68:23;72:3;115:19;
135:8
**subrogation (1)**
122:1
**subsection (1)**
120:10
**subsections (1)**
120:13
**subsequent (2)**
28:4,4
**subset (1)**
14:2
**substantial (1)**
136:13
**substantially (2)**
14:8,21
**substantiated (1)**
93:5
**substitute (1)**
109:4
**success (2)**
88:15;122:6
**successful (2)**
49:7;115:17
**succinctly (1)**
151:5
**suffered (1)**
122:9
**sufficiently (1)**
133:17
**suggest (2)**
121:17;123:4
**suggesting (3)**
10:10;53:17,20
**suggestion (1)**
137:12
**suggestions (1)**
32:15
**suggests (1)**
36:20
**suit (1)**
41:4
**Sullivan (1)**
69:7
**summaries (1)**
131:8
**summarize (3)**
31:5;40:23;148:18
**summer (1)**
114:10
**superior (1)**
73:6
**superseded (1)**
48:1
**supervisors (6)**
47:8,12,19;51:2;
61:2;93:6
**supplement (3)**

Min-U-Script®

Case: 19-30088   Doc# 1325   Filed: 04/10/19   Entered: 04/10/19 16:43:51   Page 176
of 180

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(20) snow - supplement

8:2;27:14;123:22
**supplemental (2)**
75:24,25
**supplied (1)**
111:19
**suppliers (1)**
89:7
**support (6)**
13:5;73:25;86:8;
89:17;90:10;92:2
**supportable (1)**
105:1
**supportive (1)**
90:25
**supports (1)**
84:5
**suppose (3)**
13:23;22:3;99:12
**supposed (14)**
26:3;47:5,7,8;51:4;
79:2;98:17;112:3;
130:2;138:20;139:3;
143:3;147:5,6
**Supreme (3)**
43:4,11,13
**sure (21)**
9:19,23;10:5;11:23;
15:16;23:5;28:1,1;
44:8;46:24;55:13;
57:12;67:11;82:10;
85:17;103:25;108:19;
114:16;115:9;121:2;
127:12
**surface (1)**
9:10
**surprise (1)**
129:24
**surprising (1)**
42:10
**survives (1)**
44:11
**suspect (1)**
61:14
**sustained (3)**
48:18,20,25
**sustaining (1)**
49:2
**sweeping (1)**
49:23
**switch (1)**
38:8
**sympathetic (2)**
72:1;122:8
**sympathize (1)**
70:16
**sync (1)**
61:13
**synthesizes (1)**
66:17
**system (6)**
31:8;43:22;48:4;
55:17;60:23;78:24
**systemic (1)**

63:14

# T

**table (2)**
30:18;106:16
**tables (2)**
35:24;38:18
**tag (1)**
47:8
**talk (4)**
41:22;77:9;133:14;
152:19
**talked (10)**
42:11;66:10;68:8;
69:21;74:21;100:20;
133:23;137:3;139:21,
24
**talking (17)**
31:18,23,23,25;39:7,
14;41:20,20;46:6;
64:19;68:20;93:1;
107:5;114:15,15;
120:15;141:15
**talks (1)**
32:18
**tall (1)**
130:10
**tangible (1)**
91:7
**target (14)**
15:2,3;25:1;35:20;
105:19;106:5,7,22,23,
24;107:5;125:17;
126:9,13
**targets (5)**
24:21;34:21;108:12;
112:5;125:6
**tasked (1)**
87:22;89:22
**team (1)**
65:3
**technically (1)**
20:22
**technology (1)**
152:3
**teed (2)**
82:9;94:18
**teeth (1)**
55:25
**telephone (1)**
52:25
**telling (7)**
45:7;60:17;106:10;
130:1;135:25;142:10;
152:3
**tells (1)**
117:21
**temporal (1)**
49:12
**ten (6)**
47:23;55:5;56:6;
77:1;143:13,17

**ten-minute (1)**
143:15
**tent (1)**
65:15
**tents (1)**
65:21
**term (5)**
74:19;105:1;118:14;
132:7,8
**terminal (1)**
52:18
**terminals (1)**
52:17
**terminate (2)**
10:1;13:11
**terms (15)**
13:10;18:13;69:14;
70:20;88:4;89:4;90:2;
95:3;121:14,24;
125:10;130:2;137:8;
148:21;149:8
**terrifically (1)**
128:4
**territory (1)**
77:18
**test (1)**
144:9
**testified (3)**
121:11;138:8;140:14
**testifying (5)**
54:19;76:3,7;78:7,16
**testimony (4)**
35:1;41:14;78:22;
150:24
**testing (1)**
148:8
**Thanks (2)**
68:25;99:22
**that'll (1)**
143:14
**theirs (1)**
88:12
**the-mill (1)**
144:18
**there'd (1)**
68:1
**therefore (4)**
23:19;61:14;76:17;
126:22
**There've (2)**
135:3;145:14
**theses (1)**
112:5
**thinking (3)**
32:3;41:8;85:19
**Third (3)**
31:7;114:11;151:13
**thirty (6)**
43:4;50:3,4;52:11;
63:16;101:4
**thirty-two (2)**
131:2;132:11
**thorough (1)**

40:10
**thoroughly (2)**
17:22;45:19
**though (9)**
11:19;14:5;31:9;
32:7;57:7;62:10;75:9;
136:18;144:15
**thought (11)**
10:9;19:23;29:25;
40:11;41:16;42:24;
48:16,16;74:22;
103:21;154:3
**thousand (1)**
81:14
**thousands (4)**
29:2,14;32:18;67:1
**threat (1)**
136:3
**three (12)**
19:5;25:2;30:23;
40:3;49:4;55:10;61:6;
69:19;73:13;85:10;
138:13;154:19
**Three-fourths (1)**
57:20
**three-page (1)**
123:11
**threshold (1)**
125:5;126:10,24;
127:3
**throw (1)**
24:23
**throws (1)**
126:14
**Tim (1)**
20:4
**timeframe (1)**
55:1
**timeliness (2)**
47:17,17
**times (6)**
44:18;57:21,24;
100:19;107:25;148:7
**timing (1)**
62:14
**toast (1)**
42:23
**Toby (1)**
130:21
**today (29)**
11:7,12;13:5;15:15;
18:18;27:3;28:17;
32:13;44:13,19;47:11,
22;48:5,6;55:4;76:24;
83:1;87:19;90:19;
92:11;96:21;107:25;
110:19;128:19;130:1;
137:4;144:4;145:19;
148:2
**together (6)**
28:24;66:22;107:19;
126:6,23;127:25
**told (14)**

39:25;42:1,10,16;
68:2;97:7;107:21;
108:4;110:19;111:17;
113:10;120:5;122:25;
127:16
**toll (1)**
29:11
**took (11)**
32:22;38:12;39:4;
65:7;71:11;75:15,18,
21;83:16;132:2;147:4
**tool (1)**
88:13
**top (4)**
16:10,17;69:23;
105:18
**tort (23)**
8:7,16;11:6;12:21;
18:14;27:2,6;71:8;
74:1;76:19;84:5;86:9;
91:10;94:22;102:18;
103:3,20;105:22;
111:1,23;121:24;
122:24;130:22
**torts (1)**
102:13
**toss (1)**
147:14
**total (6)**
60:20;61:9;104:10;
123:23;144:10;149:22
**totally (2)**
58:21;111:4
**touch (1)**
42:17
**touched (3)**
41:16;74:2;145:5
**touches (1)**
52:19
**touchstone (1)**
42:13
**tough (1)**
23:15
**toured (1)**
65:5
**towards (4)**
71:2;84:11,21;90:22
**towering (1)**
75:17
**Towers (1)**
114:4
**track (1)**
89:1
**tradeoff (1)**
38:3
**traditional (2)**
61:21;101:25
**tragedies (3)**
31:22,23;32:2
**trailer (2)**
65:8,15
**trailers (1)**
65:21

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 177
of 180

**trained (1)**
139:2
**transcript (3)**
41:22;48:18;134:4
**transformer (3)**
52:15;53:1,7
**transformers (2)**
52:10;53:19
**translate (3)**
56:25;147:9;148:11
**transparency (1)**
84:16
**treat (1)**
102:16
**treated (4)**
8:7;13:23;14:3;
146:25
**treating (1)**
17:18
**TREDINNICK (17)**
72:22,25,25;73:2,8;
83:25;84:2,3,8,10;85:1,
4,6,8,11,22;86:1
**tree (1)**
89:8
**trees (4)**
45:8;48:3;52:12;
91:17
**trial (3)**
18:22;46:8;83:1
**tried (2)**
119:17;144:24
**trimmers (1)**
89:8
**trouble (1)**
137:12
**truck (1)**
65:6
**true (8)**
17:6;25:4;49:16,16;
58:22;115:9;117:19;
118:20
**truly (1)**
23:12
**Trustee (15)**
11:15,25;12:21;
19:21;20:4;22:21,23;
26:17;73:25;84:15;
86:9;100:1,15;105:3;
133:5
**Trustee's (1)**
20:5
**truth (3)**
47:21;48:15;52:9
**try (12)**
25:17;27:7;73:12;
99:15;110:20,22;
112:7;123:16;125:11;
127:18;143:16,17
**trying (15)**
15:8;32:3;71:24;
77:12;83:15;89:23;
115:16;116:21;118:12;

122:7;123:12;124:19;
125:3;126:11;141:1
**TUESDAY (1)**
7:1
**turn (11)**
18:22;40:22;42:19;
51:18;62:8;75:16,18,
22;146:14;147:19;
149:2
**turned (1)**
106:16
**tutorial (4)**
148:24;150:22;
152:2,3
**tweaked (1)**
101:7
**tweaking (3)**
64:8,11;96:13
**tweaks (2)**
56:13;89:1
**twelve (2)**
16:10,17
**twenty (4)**
52:10;58:8,9;139:22
**twenty- (1)**
123:22
**twenty-five (4)**
56:7;125:12,13,15
**twenty-four (1)**
95:8
**twenty-six (1)**
43:17
**twice (2)**
19:15;40:13
**two (33)**
8:14;17:9;19:13;
20:8;27:16;28:2;33:19,
25;37:21,23;40:2,24;
48:1;52:16;55:18;
57:21,24;60:22,24;
62:9;63:1;65:2;69:17,
23;72:17;95:25;98:11;
106:12;107:19;114:9,
10;121:19;138:12
**two-hour (1)**
149:19
**type (2)**
102:1;121:24
**types (2)**
89:15;101:25
**typical (7)**
60:13,15;67:9;68:21,
22;71:13;130:2
**typically (2)**
10:18;114:6

**U**

**UCC (4)**
94:16;95:12,21;
140:5
**Ultimately (2)**
28:24;145:20

**Um-hum (5)**
94:3;96:7;98:22;
102:24;154:16
**un (1)**
86:25
**uncertain (1)**
128:3
**uncertainty (4)**
29:19;50:17;115:7;
134:8
**under (52)**
9:17;10:9,12,23;
11:20,21;12:24;13:10;
20:6,22,22;23:3;24:13,
15;25:18;26:21;29:16;
36:20,21;38:24;39:2;
45:14;59:8,15;66:10;
75:22;79:11;81:14;
82:1;101:25;103:10;
106:14,20;108:3;
109:6,7,13;112:18;
116:12;119:16;120:17,
18;121:4,25;123:18,
19;130:20,20;144:9;
146:4;148:15;151:25
**underground (4)**
78:21,24;79:4;148:8
**underpaid (2)**
31:3;42:10
**underreporting (1)**
75:10
**understandable (1)**
147:12
**Understood (3)**
72:10;77:24;78:1
**undisputed (1)**
121:12
**UNIDENTIFIED (1)**
125:14
**union (10)**
27:15;93:2;94:12,15;
95:15,22,22;96:25;
99:6;135:13
**union's (1)**
95:23
**United (3)**
11:14;86:9;105:3
**unless (9)**
10:2;12:12,18;18:6;
26:9,22;94:10;95:18;
150:7
**unsecured (16)**
54:1,9;56:5;87:1,17;
90:15,24;95:9;111:15;
113:8;121:21,23;
124:2;129:8;136:8;
141:10
**unstabilizing (2)**
128:4,14
**unusual (6)**
71:6;101:3,9,14,22;
146:18
**up (46)**

7:9,14;12:6;17:5;
22:17;27:14;33:11,20;
34:2;39:5;40:16;44:19;
47:7,20;49:5;52:12,16,
24;53:2;56:10;57:18;
61:6;65:7,25;73:10;
75:17;82:9;87:5;93:16;
94:18;98:24;101:25;
110:23;120:13;121:10;
123:7,7,8,24;130:11;
131:12;137:4,17;
150:13;151:19;152:24
**update (1)**
77:12
**upload (1)**
154:17
**uploaded (2)**
10:6;153:12
**upon (8)**
33:13;47:9;48:2;
96:22;124:22;140:22;
141:16;146:12
**upped (1)**
140:4
**upward (5)**
84:24;89:20,25;
123:20;124:24
**upwards (2)**
39:11;40:5
**urge (1)**
129:18
**USA (1)**
47:3
**use (9)**
26:4;49:22;83:15;
89:1;121:4;149:8;
152:1,8,9
**used (5)**
25:12;26:4;57:3;
88:13,19
**useful (1)**
53:9
**using (1)**
83:14
**usual (5)**
17:18;63:9,13;86:13,
14
**utilities (3)**
17:16;47:5;78:21
**utility (13)**
17:6,7,12;66:16;
81:10;90:17;93:4,8;
134:19,21;146:6,8,10

**V**

**value (14)**
88:19,19;90:21;91:3,
6,24;102:21,22;
103:12;114:21;115:16;
122:6;123:23;129:10
**values (1)**
90:23

**valves (1)**
75:22
**various (1)**
94:12
**vast (4)**
62:23;145:24;146:1,
2
**vats (1)**
65:9
**vegetation (3)**
24:11;25:8;148:7
**vendors (1)**
89:7
**version (2)**
14:7;97:22
**versions (1)**
146:11
**versus (1)**
41:19
**vice (1)**
22:11
**victim (3)**
66:12;86:13;135:23
**victims (25)**
29:15;44:25;65:4,14,
19,20;66:10,11;67:2,
21,21;69:3,9;73:21;
91:10;92:1;94:22;
101:1;102:14;116:25;
129:25;136:9;145:18,
22;146:20
**victims' (1)**
145:16
**view (19)**
33:12;37:11,13;
38:24;39:17;43:10;
58:15;60:5,12,16;61:9;
64:20;66:9;71:22;
100:11;131:7;133:15;
146:6;147:3
**views (1)**
66:17
**vindictive (1)**
145:17
**violated (1)**
13:11
**violates (1)**
113:17
**violation (3)**
49:1,2;53:8
**violations (3)**
75:11;81:21,21
**vis-a-vis (1)**
97:8
**vividly (1)**
68:7
**volume (1)**
54:22
**voluminous (1)**
7:12
**VP (2)**
28:11;54:18

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 178
of 180

## W

**wage (1)**
59:5
**wages (4)**
94:6;98:2,24;99:2
**wait (5)**
11:4;69:17,24;
100:18;136:4
**waited (1)**
62:11
**waiting (4)**
53:9;69:18,23;
143:22
**walking (1)**
134:2
**wants (8)**
10:15;12:13;69:4;
72:16;87:1;134:3;
151:14,15
**watch (1)**
100:19
**watched (1)**
43:17
**water (3)**
65:10,10;143:25
**Watson (1)**
114:5
**way (37)**
7:12;10:16,17;12:13,
16;18:7,8;32:12;38:17;
40:8;44:22;47:25;
54:24;58:24;65:7,11;
68:3;73:13;82:9,10;
83:19;94:14;103:24;
107:23;108:19;109:2;
114:5;116:18;118:15,
16,21;136:1,20;140:3;
141:2,2;150:24
**ways (1)**
114:12
**wearing (1)**
17:12
**weed (1)**
91:20
**week (3)**
16:22;18:13;71:19
**weeks (6)**
62:9;65:2;116:2,3,7;
130:25
**weight (1)**
69:14
**weighting (2)**
147:10;149:24
**Weil (2)**
8:20;153:15
**Weinberg (1)**
92:10
**weren't (5)**
12:7;21:15;72:6;
153:16,16
**whack (2)**
134:18;135:16
**whatever's (1)**
146:6
**what's (24)**
14:14;26:5;40:13,17;
43:16;45:5,7;57:3;
68:10,17,18;74:18;
97:17,23;100:14;
101:9,10;103:4;
105:24;107:23;114:2,
7;122:11;150:4
**Where's (2)**
61:13;126:14
**Whereupon (1)**
155:2
**white (1)**
47:4
**whole (11)**
29:22;30:2;32:8;
41:17,17;64:21;65:3;
98:14;132:1;141:4,25
**whomever (1)**
147:17
**Who's (5)**
11:7;27:2;44:19;
72:24;73:4
**whose (4)**
65:6;66:16;145:18;
146:22
**wide-scale (1)**
29:19
**widespread (2)**
47:2,12
**wild (1)**
148:7
**wildest (1)**
108:14
**wildfire (27)**
39:10;45:15;46:22;
54:19;56:2,7,9,20;
60:19,25;64:11;101:1,
20;112:17,23;113:2;
114:9,22;115:20;
117:14;119:8;122:8;
133:3,6;135:20,22,23
**wildfires (4)**
29:23;86:14;91:3;
92:1
**Williams (1)**
83:15
**Williams' (1)**
82:16
**willing (3)**
97:9;111:10;149:18
**Willis (1)**
114:4
**wind (1)**
150:2
**wish (6)**
19:22;44:13;67:14;
69:3;72:6;108:1
**wishes (3)**
9:17;87:3;136:21
**withdraw (4)**
9:18;28:20,23;43:15
**withdrawal (1)**
153:22,25;154:2
**withdrawn (8)**
28:12;34:19;35:1,5,
12,14;118:8,14
**withdrew (1)**
103:22
**within (10)**
15:18;23:20;26:5;
47:6;77:12;78:19;
84:19;109:17;126:18;
130:24
**without (12)**
21:25;60:17;80:22;
81:7;85:16;88:5;91:15;
117:17;130:25;131:10;
137:4,8
**witness (14)**
140:16,25,25;
141:14;147:18;148:4,
23;149:21;150:19,20;
152:13,15,16,19
**witnesses (1)**
149:2
**woman (1)**
73:4
**wonder (1)**
134:13
**wonk (1)**
43:9
**word (13)**
32:24;33:1,2,5;
46:14;49:22;57:3;80:5;
96:17;124:22;127:14;
144:18;149:7
**words (15)**
32:25;35:23;49:22;
59:11;64:2;89:2;93:19;
107:15,25;108:23;
116:10;123:11,13;
126:23;147:21
**work (13)**
30:9;61:17;62:3;
87:6;93:3,8;108:12;
123:7;142:1;144:2;
147:21;148:10;149:24
**worked (2)**
50:4;124:10
**worker (2)**
25:11;37:22
**workers (1)**
72:2
**workforce (4)**
115:8,12;128:2;
129:9
**working (3)**
71:1;93:7;116:5
**works (2)**
147:19;148:24
**world (4)**
44:12;63:18;101:10;
146:7
**worried (2)**
64:16;134:2
**write (1)**
45:11
**written (1)**
117:3
**wrong (9)**
62:25;64:3;83:16;
93:5;96:17;100:14;
144:18;146:6;149:6
**wrong-doers (1)**
62:20
**wrongdoing (1)**
63:21
**wrote (1)**
115:24
**wrought (1)**
134:21
**WTW (1)**
140:22

## X

**X's (1)**
25:12

## Y

**yard (1)**
65:12
**year (46)**
16:3,23;25:15;29:23,
24;30:10;31:16;34:20;
35:17;38:3;39:3,7,9,
12;40:4,11,12;43:19;
44:14;45:22,23;46:2,
11,18;49:5,8;50:8,8,11;
52:4,15;57:18,22;
60:18,20;62:12;69:17,
23;72:4;75:3,13;80:21;
115:25;121:19;124:17;
128:21
**year-end (1)**
124:23
**years (24)**
30:15;35:10,11,22;
36:18;43:5;47:2,23;
49:5;50:3,4;52:11;
55:5,11;59:19,24;
69:19;77:2;101:5;
105:17;112:11;121:19,
19;129:1
**year's (2)**
35:17;40:7
**yellow (1)**
47:4
**yesterday (2)**
53:2;54:9
**York (1)**
43:9

## Z

**zero (2)**
17:23;124:23
**zone (1)**
44:7

## 1

**1 (1)**
138:3
**1,000 (1)**
52:13
**1,400 (3)**
92:21;94:24;98:20
**1,600 (2)**
13:20;73:21
**1.5 (15)**
29:8;31:8,14,15;
32:8;38:25;39:2,4,12;
45:12,14;52:4,4;60:18;
138:3
**1.52 (1)**
39:12
**1.9 (4)**
39:10;45:14;52:3;
60:19
**1:12 (1)**
143:18
**1:28 (1)**
155:2
**1:30 (1)**
149:18
**10,000 (17)**
15:18;16:4;21:10;
22:1,7;49:24;56:1;
57:1;62:19;71:22;
101:17;110:1;115:5;
122:18;137:12;146:2;
150:1
**10,800 (1)**
15:23
**100 (1)**
125:21
**100-something (1)**
40:11
**101 (1)**
42:15
**101A (1)**
53:8
**1040 (1)**
56:20
**105 (3)**
125:21;126:13,15
**107 (1)**
23:3
**11 (9)**
9:22;29:4,20;42:23;
90:20;104:25;114:6;
115:17;130:3
**11:14 (1)**
87:8

**11:30 (1)**
86:23
**11:42 (1)**
87:8
**110 (2)**
125:20,21
**1103 (1)**
11:21
**111 (2)**
41:21;134:4
**1113 (6)**
13:11;94:6;97:12,15;
98:15;99:8
**12:54 (1)**
143:18
**130 (1)**
57:24
**130- (2)**
40:7,7
**14,000 (3)**
14:11;16:13;29:12
**15 (1)**
34:24
**150 (3)**
105:20;124:23;126:4
**155 (3)**
35:6,15;61:10
**16 (1)**
34:25
**160- (1)**
35:17
**162- (1)**
35:17
**17 (1)**
34:25
**18 (1)**
35:1
**19 (1)**
35:1

---

**2**

**2 (3)**
23:8;31:14;113:17
**20 (15)**
12:22,22;13:4,20;
28:6;35:1;86:24;89:11;
92:10,13,15,22;97:9;
99:10,14
**200 (1)**
105:19
**2004 (1)**
130:25
**2009 (1)**
75:10
**2010 (2)**
45:21;73:23
**2013 (3)**
33:22;34:24;35:4
**2014 (1)**
34:24
**2015 (1)**
69:22

**2017 (5)**
35:4;39:9;52:2;
60:19;103:14
**2018 (34)**
13:8,14;14:7;15:3,
23;28:12,20,25;29:8,
10;30:12;33:6;35:5;
40:1,5,13;47:1;57:24;
67:5;94:2;95:6;103:15,
22;106:4,16,23;115:14,
25;116:11,18;117:1;
118:22;128:4;134:9
**2019 (30)**
7:1;14:22;15:19;
28:14,19,21;30:4;
33:21;35:20;39:1;
40:14;42:23;46:22;
63:10,17;67:7,15,16;
90:16;106:5,16;108:3;
112:17,22;113:2;
116:13,17;119:8;
130:19;147:7
**2020 (2)**
33:22,23
**22 (2)**
28:19;136:10
**22nd (1)**
115:24
**23 (1)**
121:21
**234 (2)**
106:23,24
**235 (2)**
15:2;106:7
**235- (3)**
38:13;39:3,4
**23rd (3)**
149:16,18;151:9
**260- (1)**
40:7
**280- (1)**
40:7

---

**3**

**3 (1)**
125:4
**3,500 (1)**
69:7
**30 (1)**
48:11
**300 (2)**
40:12;42:1
**327 (3)**
10:9,12;11:20
**341 (1)**
70:2
**350 (9)**
38:13;39:5;40:5;
57:22;61:10;104:20;
107:16;108:7,15
**350- (2)**
39:3;108:23

**350-million-dollar (2)**
38:23;39:14
**363 (1)**
120:18
**363b (1)**
121:4
**3rd (2)**
74:5;112:22

---

**4**

**4,000 (3)**
14:7,10;15:22
**400 (3)**
14:25;16:18;36:1
**49 (1)**
78:23

---

**5**

**5,000 (2)**
56:1;82:2
**50 (1)**
126:3
**503 (2)**
120:12;151:25
**503b3 (1)**
120:10
**503c (2)**
120:14,16
**503c1 (3)**
20:6,7;144:8
**503c3 (3)**
20:7;24:14;144:10

---

**6**

**6th (1)**
131:23

---

**7**

**7 (1)**
11:10
**70,000 (2)**
81:13;82:2
**70-million-dollar (1)**
106:3
**72 (3)**
37:10;38:8,13
**72- (1)**
38:12
**72-million-dollar (1)**
40:6

---

**8**

**8,000 (1)**
22:3
**8th (3)**
130:19;131:15;
138:16

---

**9**

**9 (6)**
7:1;46:14,17,18;
47:25;137:1
**9,000 (1)**
22:3
**9:31 (1)**
7:1
**90 (1)**
125:22
**95 (3)**
125:22;126:12,14

Case: 19-30088    Doc# 1325    Filed: 04/10/19    Entered: 04/10/19 16:43:51    Page 180
of 180