
ALJ/UNC/JHE/avs/gd2                **Date of Issuance 12/28/2012**

Decision 12-12-033  December 20, 2012

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking to Address Utility Cost and Revenue Issues Associated with Greenhouse Gas Emissions. | Rulemaking 11-03-012 (Filed March 24, 2011) |

**DECISION ADOPTING CAP-AND-TRADE GREENHOUSE GAS ALLOWANCE REVENUE ALLOCATION METHODOLOGY FOR THE INVESTOR-OWNED ELECTRIC UTILITIES**

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 1 of 51



**TABLE OF CONTENTS**

**Title**                                                                 **Page**

DECISION ADOPTING CAP-AND-TRADE GREENHOUSE GAS
ALLOWANCE REVENUE ALLOCATION METHODOLOGY FOR THE
INVESTOR-OWNED ELECTRIC UTILITIES ................................................................. 1
1. Summary ......................................................................................................... 2
2. Procedural History ......................................................................................... 5
3. Background ...................................................................................................... 11
    3.1. Overview of Cap-and-Trade in California ............................................ 11
        3.1.1. Electricity Sector Compliance Obligation ................................ 13
        3.1.2. Allowances and Allocation ...................................................... 14
            3.1.2.1. Allocation for Industry Assistance .............................. 17
        3.1.3. Allowance Auctions .................................................................. 19
        3.1.4. Allowance Value ...................................................................... 19
    3.2. Guiding Legislation and Regulation ..................................................... 20
        3.2.1. California Code of Regulations, Title 17 .................................. 20
        3.2.2. Senate Bill 695 ......................................................................... 22
        3.2.3. Section 748.5 ............................................................................ 23
    3.3. Previous Commission Direction ........................................................... 25
    3.4. Impact of Cap-and-Trade on Electricity Rates .................................... 26
4. Proposals ......................................................................................................... 29
    4.1. Proposed Methodologies for Direct
         Return of Revenues to Customers .......................................................... 30
        4.1.1. Return GHG Revenues to Customers In Proportion
               to Costs Incurred (Volumetric, On- or Off-Bill) .................... 30
            4.1.1.1. DA/CCA .......................................................................... 32
        4.1.2. Return GHG Allowance Revenues On A
               Non-Volumetric Basis (On- or Off-Bill) ................................ 34
    4.2. Proposed Methodologies for Investment of GHG Allowance
         Revenues in Clean Energy and/or Energy Efficiency Programs .......... 35
        4.2.1. Investment to Overcome Market Barriers
               to Carbon Mitigation Technologies ....................................... 36
    4.3. Customer Education ............................................................................... 38
    4.4. Emissions-Intensive and Trade-Exposed (EITE) ................................. 39
    4.5. Combined Heat and Power (CHP) ........................................................ 41
        4.5.1. CHP Proposals ......................................................................... 42
            4.5.1.1. Tesoro ............................................................................. 44

Case: 19-30088     Doc# 1326-1     Filed: 04/10/19     Entered: 04/10/19 16:50:19     Page 2
of 51



## TABLE OF CONTENTS
### (Cont'd)

**Title**          **Page**

4.6. Small and Multi-Jurisdictional Utilities ................................................ 45

    4.6.1. Small and Multi-jurisdictional Companies'
        Proposals for Use of Allowance Revenue .................................... 47

4.7. BART ........................................................................................................ 48

5. Discussion ...................................................................................................... 49

5.1. Summary .................................................................................................. 49

5.2. Policy Objectives .................................................................................... 52

    5.2.1. Parties' Analysis of Policy Objectives ........................................ 55

    5.2.2. Discussion on Objectives ............................................................. 58

        5.2.2.1. Preserve the Carbon Price Signal ................................ 59

        5.2.2.2. Prevent Economic Leakage
            (and Emissions Leakage) ................................................ 65

        5.2.2.3. Reduce Adverse Outcomes
            on Low Income Households ........................................... 66

        5.2.2.4. Maintain Competitive Neutrality Across
            Load-Serving Entities. ................................................... 67

        5.2.2.5. Customer Education ...................................................... 68

        5.2.2.6. Achieve Administrative Simplicity
            and Understandability .................................................... 68

        5.2.2.7. Distribute Revenues Equitably Recognizing
            the "Public Asset" Nature of the Atmospheric
            Carbon Sink ..................................................................... 69

        5.2.2.8. Correct for Market Failures that Lead to
            Ongoing Underinvestment in Carbon
            Mitigation Activities and Technologies ....................... 69

5.3. Section 748.5 ........................................................................................... 70

    5.3.1. Section 748.5(a) ............................................................................ 72

        5.3.1.1. Authority ......................................................................... 72

        5.3.1.2. Small Business ............................................................... 73

        5.3.1.3. Emissions Intensive and Trade Exposed ................... 80

    5.3.2. § 748.5(b): Education Requirements .......................................... 88

        5.3.2.1. Maximum Feasible Public Awareness ........................ 88

        5.3.2.2. Cost Recovery ................................................................. 90

    5.3.3. § 748.5(c): Funding of Energy Efficiency or Clean Energy ........ 92

        5.3.3.1. Authority Granted ......................................................... 93

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 3
of 51


**TABLE OF CONTENTS**
**(Cont'd)**

**Title** **Page**

5.3.3.2. Established Pursuant to Statute ..................................... 94

5.3.3.3. Not Otherwise Funded...................................................... 96

5.4. GHG Allowance Revenue Distribution Methodology
for PG&E, SCE and SDG&E ................................................. 97

5.4.1. Step 1: Return Revenues to Emissions-Intensive
and Trade-Exposed Entities .......................................... 97

5.4.1.1. Tesoro...................................................................... 102

5.4.1.1.1. Timing and Mechanics of GHG
Allowance Revenue Distribution
to EITE Customers ......................................... 103

5.4.2. Step 2: Return Revenues to Small Businesses Customers ....... 104

5.4.2.1. Timing and Mechanics of GHG Revenue
Distribution to Small Businesses................................... 107

5.4.3. Steps 3 and 4: Offset GHG Costs in Residential Rates
and Return Remaining Revenues Equally
to All Residential Customers ....................................... 108

5.4.3.1. Offset Cap-and-Trade Costs in Residential Rates ....... 111

5.4.3.1.1. Mechanics of Residential Rate
GHG Cost Offset............................................. 115

5.4.3.2. Return Remaining Revenues on a
Non-Volumetric Basis........................................... 117

5.4.3.2.1 Calculating the Climate Dividend ................. 118

5.4.3.2.2. Form of Climate Dividend Return............... 119

5.4.3.2.3. Frequency of Climate Dividend Return ...... 123

5.4.4. Net-Metering and Master-Meter Customers............................... 125

5.5. GHG Allowance Revenue Distribution Methodology for
Small and Multi-Jurisdictional Utilities ................................ 126

5.6. Allocation of GHG Allowance Revenue to CCA/DA Customers ...... 128

5.7. Investment in Energy Efficiency and Clean Energy .......................... 132

5.7.1. Guidelines for Investment of GHG Revenues in
Energy Efficiency and Clean Energy Programs.......................... 135

5.8. Customer Education........................................................................ 135

5.8.1. Calendar Year 2013........................................................ 137

5.8.2. Calendar Year 2014 and Beyond ................................... 139

5.8.3. Customer Outreach and Education Budget for 2013 .............. 140

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 4
of 51


**TABLE OF CONTENTS**
**(Cont'd)**

**Title**                                                              **Page**

     5.9. Administrative Costs ........................................................142
        5.10. Additional Issues ................................................143
           5.10.1. BART ............................................143
  6. Implementation..........................................................144
    6.1. Authority to Track GHG Costs and Revenues
       and Recovery of Costs in Rates .................................144
      6.1.1. GHG Cost and Revenue Forecast and
         Reconciliation Proceeding ................................147
          6.1.1.1. Memorandum Accounts ...............................149
    6.2. Finalization of EITE and Small Business
       GHG Revenue Formulas ..........................................150
      6.2.1. ARB and Commission Working Agreement ..............151
    6.3. Implementation of GHG Revenue Allocation Methodology ..............152
    6.4. Implementation of GHG Revenue Allocation Methodology
       for Small and Multi-Jurisdictional Utilities ....................155
      6.4.1. PacifiCorp and CalPeco ...........................155
      6.4.2. Bear Valley .....................................156
    6.5. Implementation of Customer Outreach and Education....................156
  7. Outstanding Motions .....................................................157
  8. Categorization and Need for Hearing ....................................157
  9. Comments on Proposed Decision ..........................................157
  10. Assignment of Proceeding...............................................161
Findings of Fact................................................................161
Conclusions of Law .............................................................189
ORDER ..........................................................................205


**APPENDIX A –** Sample Methodologies for Calculating Allowance Value to
        Compensate EITE Customers for their Purchased Electricity
        Costs Resulting from the Cap-and-Trade Program


**APPENDIX B –** Proposed Methodology for Calculating Allowance Value to
        Compensate Small Businesses for Purchased Electricity Costs
        Resulting from the Cap-and-Trade Program

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 5
of 51



**DECISION ADOPTING CAP-AND-TRADE GREENHOUSE GAS
ALLOWANCE REVENUE ALLOCATION METHODOLOGY
FOR THE INVESTOR-OWNED ELECTRIC UTILITIES**

## 1. Summary

In accordance with California Public Utilities Code § 748.5,[1] Assembly Bill 32,[2] and other applicable statutes and regulations, this decision adopts a methodology for allocating greenhouse gas allowance revenues received by California's investor-owned utilities, including small and multi-jurisdictional utilities, as part of California's Cap-and-Trade program. The three large investor-owned utilities, Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas and Electric Company (SDG&E) are directed to allocate greenhouse gas allowance revenues, including accrued interest, in the following manner:

1. Compensate emissions-intensive and trade-exposed entities (as defined in this decision) using methodologies based upon those developed by the California Air Resources Board to address direct emissions cost exposure under the Cap-and-Trade program;

2. Offset the rate impacts of the Cap-and-Trade program in the electricity rates of small businesses, defined as entities with monthly demand not in excess of 20 kilowatts in more than three months within a twelve-month period, through a volumetrically calculated rate adjustment;

3. Given the disproportionate cost burden currently reflected in upper-tier residential rates and the limited ability to pass Cap-and-Trade costs through to residential customers on the basis of cost responsibility, neutralize the rate impacts

---

[1] Statutes of 2012, Chapter 39.

[2] Statutes of 2006, Chapter 488.

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 6 of 51


any GHG allowance revenue directed toward clean energy project be additional to previously existing activities, regardless of whether a project is new or already in existence. Shifting the funding for a program that was previously paid for by utility ratepayers to GHG allowance revenues would save money on energy efficiency or clean energy projects, but in general such a shift would not increase the availability of such projects and would violate the statute. While we envision that the majority of projects that could receive funding from GHG allowance revenues would be new or supplemental, it may be possible to fund an existing project with GHG allowance revenues so long as the general funding previously supporting that project is directed to another project within the same program (i.e. energy efficiency, Renewable Portfolio Standard, etc.).

### 5.4. GHG Allowance Revenue Distribution Methodology for PG&E, SCE and SDG&E

Below, we set forth our adopted methodology for allocating GHG revenues to the customers of the three large investor-owned utilities, PG&E, SCE, and SDG&E, inclusive of their CCA and DA customers. As discussed in later sections, we adopt a similar allocation methodology for the small and multi-jurisdictional utilities, with the exception of Bear Valley. In Section 6, we set forth a process to finalize all necessary details in order to fully implement the GHG revenue distribution methodology adopted in this decision.

### 5.4.1. Step 1: Return Revenues to Emissions-Intensive and Trade-Exposed Entities

After setting aside an appropriate portion of the GHG allowance revenues to be used for customer education and outreach and to cover administrative expenses (as described in detail later in this decision), PG&E, SCE, and SDG&E must first return GHG allowance revenues, including accrued interest, to those customers designated as EITE in Section 5.3.1.3 above. Parties offered a wide

Case: 19-30088     Doc# 1326-1     Filed: 04/10/19     Entered: 04/10/19 16:50:19     Page 7 of 51



variety of GHG allowance revenue return methodologies for our consideration, including returning revenues to EITE customers in direct proportion to their GHG electricity costs (volumetric return), allocating the allowances associated with the electricity usage of EITE customers back to ARB for distribution, allocating allowance revenues based upon various formulas that mirror ARB's allowance allocation methodology to Industrial Covered Entities qualifying for Industry Assistance, or applying other factors such as historical consumption to determine an appropriate allocation.

As described earlier in this decision, ARB, in designating certain industries as qualifying for Industry Assistance, did not opt to provide relief to those entities for the increased costs of purchased electricity due to the Cap-and-Trade program. In this decision we adopt a definition of EITE that, at this time, includes only those industries designated as qualifying for Industry Assistance, including entities within those industries that have emissions below the 25,000 $MTCO_2e$ threshold. In adopting its Industry Assistance methodology, ARB engaged in a comprehensive public process resulting in a leakage risk classification for each covered sector (high, medium and low) as well as a variety of methodologies to calculate the number of allowances each entity would be freely allocated to address their compliance obligations under the Cap-and-Trade program. The adoption of these classifications and methodologies results in the provision of assistance to reduce the risk of leakage and to provide transition assistance while sending appropriate signals to engage in carbon mitigating activities.

We find it prudent to adopt a GHG allowance revenue distribution methodology that closely mirrors, to the extent practical, the allowance allocation process adopted by ARB for Industrial Covered Entities that qualify for Industry

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 8 of 51



Assistance because, as discussed earlier in this decision, the increased price of electricity inclusive of GHG costs will contribute to the leakage risk faced by those entities if not partially offset by freely allocated allowances or allowance revenue. Therefore, our intent is that EITE entities receive GHG allowance revenue associated with their electricity purchases in a manner parallel to the way in which they receive allowances for their direct emissions under ARB's Industry Assistance program. Adoption of this approach ensures that sectors with higher leakage risk receive proportionally greater transition assistance for increased electricity costs while also ensuring that the carbon price signal of electricity is not muted for any individual entity. Furthermore, this approach ensures that Industrial Covered Entities eligible for Industry Assistance receive GHG allowance revenues for indirect emissions based upon benchmarks and calculations for each industry in a manner that supplements ARB's approach to distributing allowances for direct emissions.

Our adopted approach comports largely with that suggested by the Large Users in their Option C; however, we do not adopt the exact formulas for calculating GHG revenue return to EITE customers proposed by the Large Users because the formulas are not sufficiently developed. Further record is needed before EITE allocation formulas can be finalized. Thus, we propose, but do not adopt, preliminarily EITE distribution formulas developed by Commission staff in Appendix A and set forth a process for finalizing these formulas, following a public vetting process, in Section 6 discussing implementation. Finally, we recognize that, should the Commission expand the definition of EITE entities to include sectors or industries that are not covered under ARB's Industry Assistance methodology, allocation formulas will need to be developed to return GHG allowance revenues to these entities for their indirect emissions. To the

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 9
of 51


extent practical, we envision the allocation formulas will rely on methodologies that are similar to those ultimately adopted to return GHG revenues to EITE entities that qualify for Industry Assistance under ARB's regulation. However, we recognize that there may be practical constraints in terms of the availability and administrative ease of collecting information that would be necessary to mirror ARB's approach. Therefore, we will consider other approaches if adhering to the model provided by ARB's compensation scheme proves impractical.

As noted above, for those entities that do not belong to sectors that are designated as eligible for Industry Assistance by ARB, our intent is to develop and adopt formulas that mirror the allowance allocation process developed by ARB. We take this view in lieu of alternative approaches suggested by parties for a number of reasons. First, as discussed earlier in this decision, barring certain extenuating circumstances, we are not favorably disposed toward proposals that return revenues to any class of ratepayers on a purely volumetric basis, as proposed by the Joint Utilities and others, because doing so would mute the carbon price signal and would therefore negate the incentive this signal would create for EITE entities to engage in energy conservation measures such as energy efficiency. We reject the proposal of the Joint Parties, which suggests that revenues be returned to EITE customers based upon historical electricity consumption, leakage risk and the incremental rate impacts forecast by the utilities on the customer class to which each EITE customer belongs. We believe that the methodology we adopt here achieves the goals of the Joint Parties to preserve a carbon price signal but does so using formulas that mirror the existing ARB process, which has been thoroughly developed and publicly vetted. Finally, although intuitively appealing, we reject as infeasible the Large Users'

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 10
of 51



Option A, which would have us give allowances in proportion to the GHG emissions associated with EITE customers' electricity use back to ARB for distribution because such a process would require a change in the Cap-and-Trade regulation adopted by ARB.

ARB's Cap-and-Trade regulation provides several different ways to calculate the allocation a given covered entity is eligible to receive. For some entities, ARB has developed a Product-Based Allocation methodology under which the number of allowances entities are eligible to receive is a function of their output and a sector specific emissions-per-unit output benchmark. For other entities, ARB has adopted an Energy-Based Allocation, under which the allocation an entity is eligible to receive is based on steam and fuel use benchmarks and the covered entity's historic steam and fuel use. Furthermore, ARB applies leakage risk factors to each sector. High-risk sectors will receive assistance at the same level throughout the duration of the Cap-and-Trade program, while medium- and low-leakage risk sectors will see their free allowance allocation decrease over time.

The adoption of methodologies that mirrors the ARB allowance allocation process to Industrial Covered Entities qualifying for Industry Assistance enables us to compensate EITE ratepayers while maintaining the carbon price signal in their rates, therefore providing much needed transition assistance while sending a signal to EITE customers to conserve or otherwise reduce the emissions from electricity consumption. This occurs because the ARB allowance allocation methodologies, which we mirror here, do not return allowances as a function of current emissions or electricity consumption, thus preserving the opportunity cost associated with emitting under the Cap-and-Trade regime. Finally, we note that we adopt this parallel methodology to ensure that EITE customers are

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 11
of 51



treated similarly for both their direct and indirect emissions. We believe this will help streamline future transitions should ARB modify the Cap-and-Trade regulation to include indirect emissions associated with electricity purchases by EITE entities in their formulas for allowance distribution to Industrial Covered Entities.

### 5.4.1.1. Third-Party CHP

As described earlier in this decision, Tesoro filed comments regarding specific concerns related to its Golden Eagle Refinery. Specifically, Tesoro argues that the Commission should address the lack of Industry Assistance that the Golden Eagle Refinery will receive from ARB for the purchase of electricity from a third-party-owned CHP unit. Tesoro points out that if the Golden Eagle refinery owned the same CHP unit, the GHG costs of its electricity production would be eligible for Industry Assistance. Tesoro argues that this mere difference in ownership status should not result in substantially different level of Industry Assistance. In order to provide assistance commensurate with a facility with on-site CHP, Tesoro suggests that the utilities be directed to set aside some of the allowance revenues they receive to cover the costs faced by refineries purchasing electricity from third-party CHP providers.

We agree that, based on the facts as Tesoro presents them, the lack of Industry Assistance for GHG costs associated with electricity purchased from third-party CHP units appears to result in disparate levels of assistance across refineries even when those refineries are substantially similar in their operations. A refinery that owns its CHP facility is eligible to receive assistance that more closely reflects its emissions costs exposure than a refinery that does not.

Therefore, we agree that it is appropriate to address the GHG costs of electricity purchased by refineries from third-party CHP through the use of the

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 12 of 51


allowance revenues the utilities will receive in a manner consistent with the intent of Tesoro's request. We set forth, but do not adopt, a preliminary methodology for distribution of allowance revenue to refineries that contract with third-party owned CHP in Appendix A. This methodology will be finalized through the implementation process set forth in Section 6, below. The issue of disparate treatment extends beyond the refinery sector, and it is important to ensure that all EITE entities that purchase electricity from third-party owned CHP receive equal treatment under the EITE GHG revenue allocation formulas ultimately adopted in this proceeding. Our intent in developing compensation formulas for EITE entities in this proceeding is to compensate them for the indirect emissions costs that are currently not addressed by ARB's approach to providing Industry Assistance. These indirect emissions costs are the Cap-and-Trade program costs that will be embedded in the price of electricity these entities purchase, whether they are purchasing that electricity from the investor-owned utilities, a DA provider, or a third-party owned CHP facility.

### 5.4.1.1.1. Timing and Mechanics of GHG Allowance Revenue Distribution to EITE Customers

We lack record at this juncture to determine the exact timing of the distribution of GHG allowance revenue to EITE customers, and the timing will ultimately depend upon the final formulas adopted. However, our initial thinking is that, as a result of the need to provide allocations on a revenue, rather than an allowance, basis, it may be preferable to provide compensation after a given Cap-and-Trade budget year has passed rather than beforehand. In order to better align the amount of compensation provided with actual revenues generated from the sale of emissions allowances, providing compensation after a given Cap-and-Trade program budget year has passed is preferable inasmuch as

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 13 of 51



it allows us to rely on actual market prices rather than projections, which, given the nascent state of the allowance market, are likely to be subject to a great deal of uncertainty. The exact timing of the revenue distribution to EITE customers each year will be finalized through the implementation process discussed in Section 6, below.

In order to help facilitate transparency and understanding of our GHG allowance revenue allocation methodology, an important principle proposed by several parties, GHG allowance revenues must be returned to EITE customers either via an on-bill credit against their electricity purchases or via a separate check, to be determined during the implementation process set forth in Section 6.[73] An on-bill return, if adopted, must be designated as such via a separate line-item, and a bill credit must be applied to the delivery component of the charges to ensure that all customers within a utility's service territory, irrespective of whether they are a bundled, DA, or CCA customer, are treated equally.

### 5.4.2. Step 2: Return Revenues to Small Businesses Customers

As described previously, § 748.5(a) directs the Commission to return allowance revenue to small businesses, which, for this purpose, we define as non-residential entities on General Service or Agricultural tariffs whose electric demand does not exceed 20 kW in more than three months within the previous twelve-month period. In their August 1, 2012, comments, the Joint Parties argue that, for the majority of small businesses in California, energy related costs

---

[73] Administrative costs associated with EITE revenue returns may be small in comparison to the size of the return. Furthermore, annual returns may exceed EITE customer electricity bills for a prolonged period of time. Therefore, return of the revenues via a separate check may be preferable.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 14 of 51



represent only a small fraction of total revenue.[74] We are inclined to agree with the Joint Parties' assessment. Though we are directed to return allowance revenue to small businesses, we do not believe the presence of carbon pricing in electricity rates for small businesses will necessarily result in emissions or economic leakage, excluding those businesses that operate in industries eligible for Industry Assistance. The presence of a carbon price in electricity rates, and the reflection of that cost in the price of goods and services, provides a critical incentive to shift toward economic activities that result in fewer GHG emissions. It is our intent that small businesses should see a carbon price signal in their electricity rates. However, given the direction in § 748.5(a), it is appropriate to provide small businesses with transition assistance to ease small businesses into the Cap-and-Trade program and to provide additional time and capital to help businesses invest in strategies to reduce their exposure to GHG costs.

Aside from a recommendation to volumetrically return all GHG revenues in proportion to Cap-and-Trade program costs incurred, as proposed by the Joint Utilities and DRA, we received few alternate distribution methodology proposals for consideration. However, we find compelling a principle set forth by DRA that small business customers should be compensated in a similar manner to EITE customers. Given that we are viewing the return of revenues to small business customers through the lens of providing transition assistance, we find it appropriate to return GHG allowance revenues to small business customers in a

---

[74] Comments of the Joint Parties on the Impact of SB 1018, August 1, 2012, at 5, citing J.Weiss and M. Sarro, *The Economic Impact of AB 32 on California Small Businesses*, prepared by the Brattle Group for the Union of Concerned Scientists, December 2009 (finding that the average small business in California spends less than 1.5 percent of revenues on energy related costs).

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 15 of 51



manner that mirrors, as much as possible, the transition assistance methodology we adopt for EITE customers, and we direct the utilities to return GHG revenues to small business customers in such a manner.

Whereas our approach to compensating EITE facilities, modeled after ARB's methodology to allocate allowances to Industrial Covered Entities, takes into account each industrial facility's product output and a measure of the facility's emissions intensity, it would be impracticable to replicate and implement such a detailed methodology for each small business in California. Thus, in order to achieve administrative simplicity, and to ensure that the amount of revenue returned declines over time in a similar fashion as the return provided to EITE entities, that, in our view pose a much greater leakage risk, we propose a small business allocation methodology that discounts the amount of GHG costs present in small business electricity tariffs by ARB's low leakage risk Industry Assistance Factor. We believe that the low leakage risk classification is the most appropriate classification to apply in this circumstance given our position that small businesses pose a relatively lower leakage risk as compared to EITE entities.

We lack sufficient record at this time to adopt a specific formula to allocate GHG revenues to small business customers. Therefore, to calculate the amount of GHG allowance revenue to return to small business customers, we propose in Appendix B, but do not adopt, a formula that is a simplification of the approach we propose in Appendix A to compensate EITE facilities. This formula represents a modified volumetric return. We note that the formula relies entirely upon factors and calculations that have been established and publicly vetted in other venues, including by ARB and the utilities' ERRA proceedings. The

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 16 of 51

formula will be finalized, following a public vetting process, as set forth in Section 6 discussing implementation.

Although our proposed methodology will largely mute the carbon price signal in small business rates during the first compliance period of 2013-2014, in the second compliance period small businesses will see more than half of the carbon price signal in their rates, and in the third program period small businesses will see almost all of the carbon price signal in electricity rates. Though a modified volumetric return conflicts with our primary policy objective of preserving the carbon price signal, this conflict persists primarily during the first compliance period, after which ARB's low leakage risk Industry Assistance Factors decline steeply and small business will begin seeing the carbon price signal to increasing degrees. This approach maintains the carbon signal – albeit a muted one – while also preserving a substantial amount of allowance revenue for households, the partial purpose of which is to compensate households for increased costs of goods and services as a result of Cap-and-Trade.

### 5.4.2.1. Timing and Mechanics of GHG Revenue Distribution to Small Businesses

Given that we are proposing to return GHG revenues to small business customers on a volumetric basis based upon electricity usage, and given that we anticipate that the average amount of revenue returned to each small business will be small, we find it appropriate that revenues be returned as a monthly volumetric bill credit, as proposed by the Joint Utilities. However, the frequency of return of GHG revenues to small business customers will depend upon the formula ultimately adopted through the implementation process discussed in Section 6. Therefore, we defer a final decision on the timing of distribution of GHG revenues to small business customers to the implementation process.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 17 of 51



In keeping with our desire to facilitate customer understanding of GHG revenue return, we direct the investor-owned utilities to present the small business return as a separate line-item on electricity bills. Additionally, this return must be provided on the delivery component of customers' bills in a manner that ensures that small businesses taking service from DA or CCA receive equivalent compensation to their peers taking service from the investor-owned utilities.

### 5.4.3. Steps 3 and 4: Offset GHG Costs in Residential Rates and Return Remaining Revenues Equally to All Residential Customers

After accounting for compensation to EITE and small business customers pursuant to the methodologies described above (and setting aside an appropriate portion of GHG revenues for customer outreach and education and administrative costs as discussed later in this decision), we find that all remaining GHG allowance revenues, inclusive of interest, should be returned to residential customers. We take a bifurcated approach in allocating these revenues to residential customers in recognition of the inequities that exist among residential customers in terms of a disproportionate allocation of cost burdens that have arisen as a result of the statutorily mandated features of residential rate design.

With this in mind, we direct the investor-owned utilities to first return revenues to residential customers on a volumetric basis in an amount equivalent to, and not exceeding, the Cap-and-Trade-related program costs that are embedded in the applicable residential rates. Although this approach violates our fundamental objective of preserving the carbon price signal, we believe the specific limitations imposed by SB 695 governing the allocation of cost responsibility in residential rates requires an exception. By returning the

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 18 of 51



**EXHIBIT A**

revenues in this manner, we intend to insulate residential customers who consume electricity in the upper tiers from bearing additional costs under the Cap-and-Trade program given the disproportionate cost burden upper tier customers currently bear compared to customers on lower tier rates, a circumstance that will be exacerbated under the Cap-and-Trade program. After allocating revenues for this purpose, the remaining revenues shall be returned equally on a per residential account basis (a non-volumetric return) to help defray the indirect costs of the Cap-and-Trade program that will ultimately be borne by residential customers. Implementation details are discussed in Section 6, below.

By providing residential customers with the remaining allowance revenue, returned on a non-volumetric basis, we largely preserve the overall demand for goods and services in the economy, which could otherwise be negatively impacted as increased electricity costs due to Cap-and-Trade result in a corresponding increase in the costs of goods and services. To the extent that consumers receive the value of the GHG allowance revenue and subsequently spend these revenues, the potentially adverse impacts of the Cap-and-Trade program are substantially reduced. Total spending in the economy will be largely maintained, but will be influenced by pricing that more appropriately reflects the real costs of spending decisions on the environment.[75] As a result,

---

[75] In reaching this and subsequent conclusions, we rely heavily on the final report of the Economic and Allocation Advisory Committee: *Allocating Emissions Allowances Under a California Cap-and-Trade Program*, March 2010. The final report was incorporated into the record on July 22, 2011. See *Administrative Law Judge's Ruling Suspending Requests for Alternate Proposals and Comments, Confirming New Prehearing Conference, Confirming Workshop, Encouraging Parties to Complete Pre-Workshop Reading, and Denying Motion for Interim Decision.*

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 19 of 51


though we do not return revenue to commercial and industrial entities that are not deemed to be EITE (with the exception of small businesses), the revenue returned to households will largely, if not entirely, flow back into the economy, helping to mitigate the overall impacts of the program on demand for the goods and services those businesses provide.

Furthermore, by returning remaining GHG allowance revenue to all residential customers (and not only those that bear direct GHG costs,) we achieve our policy objective of reducing adverse impacts to low-income households. As stated earlier in this decision, low-income households' non-energy expenses will likely increase as a result of the Cap-and-Trade program as medium and large businesses pass through their own Cap-and-Trade-related costs in the price of their goods and services. The impact of these price increases will likely be proportionally greater on lower income households, as these households tend to spend a greater proportion of their incomes on basic goods and services. This reasoning is supported by TURN, among others, which states: "to focus narrowly, at least on the residential side, on the costs solely borne by customers with upper tier usage is to miss the point of greenhouse gas regulation and to ignore…[that] lower-income households will face larger cost increases due to the overall impact of AB 32 regulations as a percentage of their incomes than upper-income households."[76] More detail on each element of this bifurcated approach is described below.

---

[76] TURN Opening Proposal, October 5, 2011, at 3-4.

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 20 of 51



### 5.4.3.1. Offset Cap-and-Trade Costs in Residential Rates

Currently PG&E, SCE, and SDG&E use two basic rate volumetric structures for the majority of their customers: time-of-use (TOU) rates and tiered rates. The majority of commercial and industrial customers are on TOU rates. These rates vary by time of day, reflecting the different energy costs during peak and off-peak times. The majority of residential customers are on tiered rates. These rates increase as a customer's usage increases over the course of a billing cycle, applying higher marginal electricity rates to higher-use customers. PG&E, SCE and SDG&E's tiered rates for residential customers generally consist of 4 to 5 tiers, with each tier having a specific price per unit for all energy consumed within that tier. The volume of energy that can be consumed within a given tier is determined based on how that consumption compares to a so-called "baseline," a legislatively defined term that represents an amount of energy consumption intended to reflect 50 to 70 percent of the average energy usage of households in a given climate zone.[77] For example, PG&E's E-1 (residential) tariff consists of 4 Tiers, with Tier 1 covering energy consumption through 100% of the baseline, Tier 2 covering energy consumption through 130% of baseline, Tier 3 through 200% of baseline, and Tier 4 covering any consumption beyond that.

In 2001, in response to the energy crisis, the Legislature passed AB 1X.[78] AB 1X effectively froze Tier 1 and 2 rates; therefore, any new expenses incurred

---

[77] Each utility service territory is divided into various climate zones, each with a specific baseline amount of energy to reflect climactic differences and resulting energy needs. See http://www.cpuc.ca.gov/PUC/energy/Electric+Rates/Baseline/baselineintro.htm.

[78] Statutes of 2001, Chapter 4.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 21 of 51



(and assigned to the residential customer class) since the rate freeze are recovered entirely in upper-tier residential rates. This has resulted in a rate structure such that Tier 1 and 2 rates are well below the average residential rate while upper tier rates far exceed average rates. These differences are exacerbated by the fact that Tier 1 and 2 consumption represents the majority of energy consumed. Any new costs associated with consumption within the usage limits of Tiers 1 and 2 are spread over the relatively few kWh of energy consumed in the upper-tiers resulting in significant increases in upper tier rates. Using PG&E as an example, most Tier 3 and 4 rates effective July 1, 2012, are 59% and 81% higher than the residential average rate, respectively, while Tier 1 and 2 rates are approximately 31% and 21% below the average rate, respectively. Although SB 695 allows for modest increases in rates for Tiers 1 and 2, the annual rate of increase is capped at 5%, and as such provides limited means of mitigating the existing differences between lower and upper tier rates. As described earlier, the limitations on the Commission's ability to assign additional costs to PG&E, SCE, and SDG&E's Tier 1 and 2 rates effectively prevents any Cap-and-Trade-related costs from being reflected in those rates. Therefore, residential customers on lower-tier rates, which represent the vast majority of kWh consumed, will be effectively blind to any carbon price signal and will have no incentive to alter electricity consumption as a result of the Cap-and-Trade program, while customers on upper-tier rates will see a disproportionally strong signal.

This fact was reflected in the Joint Utilities' proposal, which recommended that GHG allowance revenue allocated to the residential sector be used to reduce all GHG costs in upper tier rates only. The Joint Utilities argued that lower tier customers will not experience a carbon price signal. However, the main justification for the Joint Utilities' proposal was the assertion that, due to the

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 22 of 51



inelastic nature of electricity demand, any carbon price signal in rates will not be significant enough to induce behavioral change among ratepayers, an argument we refuted earlier in this decision. DRA, in its revised proposal after passage of SB 1018, also advocated that GHG allowance revenues be used to reduce upper-tier residential rates; however, DRA argues that allowance revenue should only be used to reduce Tier 3-5 residential rates to the level they would reach if carbon costs could be spread across all residential ratepayers equally. That is to say, DRA supports the inclusion of the Cap-and-Trade-related costs associated with upper-tier usage in upper-tier rates rather than the elimination of all GHG costs, as proposed by the Joint Utilities. The Joint Parties, on the other hand, advocate that GHG costs remain fully present in retail electric rates in order to maintain a carbon price signal.[79]

While our decision to use allowance revenue to eliminate Cap-and-Trade-related costs from residential rates is seemingly at odds with our general preference to preserve the carbon price signal in electricity rates, we believe an exception in the residential rate class is appropriate given the differences in cost burden that exist in tiered rates. As discussed above, upper-tier residential rates are already well above the marginal costs of electricity even absent any GHG costs. To include GHG costs in upper-tier residential rates that are beyond the cost responsibility of customers in these upper tiers is not appropriate. Therefore, we agree with the Joint Utilities that it is appropriate to use GHG allowance revenues to offset all GHG costs in upper-tier residential rates. We disagree with DRA that only GHG costs associated with electricity consumption

---

[79] The Joint Parties do support the allocation of GHG allowance revenues to residential customers, but not to reduce GHG costs embedded in residential rates.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 23 of 51



in the lower tier rates should be offset in upper-tier rates. Doing so would maintain the existing inequity between lower-tier and upper-tier rates; lower-tier residential customers would still see no price signal, while upper-tier customers would experience a further price increase – an outcome that seems unfair given the strong incentive for conservation already present in upper-tier rates.

In electing to offset all Cap-and-Trade-related costs in upper-tier residential rates, however, we wish to underscore that we are only adopting this approach as a result of the disproportionate costs allocated to upper-tier customers under the current tiered residential rate structure, which would be further exacerbated by the inclusion of GHG costs. Should the differences between lower and upper-tier residential rates be substantially reduced or eliminated, it would no longer be appropriate to use allowance revenue for this purpose. In that event, the carbon price signal should be fully reflected in residential rates and all remaining revenue should be returned on a non-volumetric basis as described below. It is for this reason that we do not authorize an offset of GHG costs in residential rates by the small and multi-jurisdictional utilities (with the exception of Bear Valley); as mentioned earlier, these utilities are not bound by the limitations on cost increases of lower-tier residential rates set forth in AB 1X and SB 695. Therefore, PacifiCorp and CalPeco must skip this step in the allocation of GHG allowance revenue to residential customers. We discuss PacifiCorp and CalPeco's GHG revenue allocation methodology in more detail later in this decision.

Finally, it is important to note that not all residential customers of PG&E, SCE and SDG&E are on tiered rates. Residential customers may choose non-tiered, TOU rates in some circumstances. Importantly, TOU rates are not subject to the same cost-allocation limitations and inequities as tiered rates,

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 24 of 51


where customers on upper-tier rates must bear the costs resulting from the activities of other customers taking service on lower-tier rates. As a result, customers on residential TOU rates pay prices that more accurately reflect, and are in proportion to, the actual Cap-and-Trade-related costs they are responsible for creating. Thus, viewed only in this regard, there is no compelling policy rationale for offsetting the GHG costs that will be reflected in TOU rates. However, because residential TOU rates are not mandatory, we decline to include GHG costs in residential TOU tariffs. Doing so would require residential TOU customers to bear GHG costs while residential customers on tiered rates would not, and it is not our desire to create a perverse incentive for customers to remain on tiered rates despite the possible advantages that TOU rates would otherwise offer. Therefore, like customers on tiered rates, residential customers on TOU rates shall be compensated for all GHG costs incurred.

### 5.4.3.1.1. Mechanics of Residential Rate GHG Cost Offset

Because we seek to neutralize the presence of Cap-and-Trade-related costs in residential rates, we find it appropriate to neutralize costs at the time that they are incurred. The Joint Utilities propose returning revenues in direct proportion to costs incurred at the end of each monthly billing cycle. Under this proposal, the utility would calculate costs and apply revenues in a process that would not be spelled out via a separate line-item on bills. Before the passage of SB 1018, DRA initially proposed that revenues be returned on an annual basis to maintain some carbon price signal; however, it appears that DRA's updated proposal reflects the concept of a complete offset at the time costs are incurred. DRA, in its customer education proposal, appears to advocate for separate line-items to appear on customer bills to show GHG costs and revenues.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 25 of 51


We adopt the proposal of the Joint Utilities and direct PG&E, SCE and SDG&E to offset GHG costs in residential rates in the monthly billing cycle in which they are incurred. Furthermore, we agree with the Joint Utilities that, at this point, the volumetric GHG cost offset in residential rates should not be highlighted as a separate line-item on bills. While we agree with DRA that it is essential to facilitate customer awareness of GHG costs and the application of GHG revenues, we believe that it will cause confusion to highlight the volumetric offset of GHG costs in residential rates, especially because we mandate the return of all remaining revenues as an on-bill credit that is visible via a separate line-item.

Finally, as described in greater detail in the section discussing CCA and DA customers below, in order to ensure that residential customers of CCAs and Energy Service Providers receive their proportional share of GHG allowance revenues to offset GHG costs in residential rates, we require that allowance revenues be returned to residential customers via a delivery rate component that all residential customers pay (as proposed by the Joint Utilities). In this way, all residential customers, whether taking service as bundled customers or from a CCA or Energy Service Provider, receive a proportional share of the GHG revenue needed to offset the GHG costs allocated to the residential customer class.

In order to implement the volumetric rate offset to residential customers, the utilities will need to calculate GHG costs in residential rates. The process for approving the cost calculation methodology and other implementation details is discussed in Section 6.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 26 of 51



### 5.4.3.2. Return Remaining Revenues on a Non-Volumetric Basis

Once EITE and small business entities are compensated, GHG costs due to the Cap-and-Trade program are offset within residential rates, and allowance revenue is set aside for customer education and general administrative costs (as discussed in more detail below), we direct the utilities to return all remaining GHG allowance revenue to residential ratepayers on an equal, per-account basis. The return will be known as a "climate dividend." DRA proposed this approach,[80] and we find this method of revenue distribution to be a reasonable means of ensuring that residential customers (especially lower-income residential customers) are compensated for the likely increase in the price of goods and services as a result of GHG costs being reflected in electricity rates. This approach has the advantage of providing a greater return as a share of income to lower-income households, which, as argued by the Joint Parties, is appropriate given that energy costs in general, and the burden of the Cap-and-Trade program in particular, will fall more heavily on low-income households, as a percent of household income.

We note that the Joint Parties also advocate for the distribution of GHG allowance revenue to all residential customers; however, their recommended approach, which would allocate revenues based upon energy costs for different climate zones, is not necessary given that we are offsetting GHG costs in residential rates at this time. However, the Joint Parties' proposed methodology raises an important issue regarding the most equitable way of distributing

---

[80] Comments of DRA in Response to ALJ's Ruling on the Impact of SB 1018, August 1, 2012 at 3. TURN also supported a similar methodology (see TURN Opening Proposal, October 5, 2011, at 4).

Case: 19-30088 Doc# 1326-1 Filed: 04/10/19 Entered: 04/10/19 16:50:19 Page 27 of 51



allowance revenues among residential customers. There are many differences among residential accounts, including size of household and electricity usage (in addition to differences between climate zones, as mentioned by the Joint Parties), and there simply is no way to ensure that revenues are distributed in a manner that recognizes each of these factors. Furthermore, aside from the climate-zone approach offered by the Joint Parties, no other party offered a different distribution methodology for our consideration other than via a per account basis. At this time, we believe that the distribution of all remaining GHG allowance revenue on an equal per residential account basis, as described in more detail below, ensures the most equitable treatment of residential customers available.

### 5.4.3.2.1  Calculating the Climate Dividend

We must consider several issues that define the climate dividend return to residential customers: (1) how to calculate the amount of revenue to be returned to each residential customer, (2) how frequently revenue should be distributed, and (3) what form the revenue return should take (e.g. on-bill versus off-bill compensation). We first address the method for calculating the revenue return to residential customers.

For reasons set forth above, we find that the GHG allowance revenue amount returned to customers should be calculated on an equal per residential account basis, as proposed by DRA in their updated proposal following passage of SB 1018. The specific amount of revenues to be received by each residential account should be calculated by dividing a utility's allowance revenue (including those associated with CCA and DA customers), net of the revenue set aside to fund customer education and outreach, compensate EITE and small business entities, offset the residential rate impacts of the Cap-and-Trade program, and to

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 28 of 51


cover administrative costs, by the number of residential accounts taking distribution service from the utility. In pursuing this approach, our intent is to provide revenues on an equal basis, per household, where the number of residential accounts appears to be a reasonable proxy for the number of households. However, in some instances, a single household may have more than one account, for example if they have multiple meters. In calculating the climate dividend, the utilities will need to account for this and adjust their calculations and returns accordingly, as discussed in more detail in Section 6. We also note that this per-account approach may not sufficiently address the unique characteristics of customers taking service via a master-meter, or customers whose electricity charges are less than the GHG revenue return (such as net-metering customers). We address these unique circumstances in more detail below as best we are able given the limited record before us on these matters.

### 5.4.3.2.2. Form of Climate Dividend Return

We next consider the form of the climate dividend return to residential ratepayers. At a most basic level, there are two alternatives for returning revenues to customers: on customers' bills (on-bill) or separate from customers' bills (off-bill). An on-bill return would be presented as a credit on a customer's bill returned at a regular time interval. This bill credit would then be netted against the customer's bill for that month, with any excess value carried over into subsequent months until it is exhausted. In contrast, an off-bill return, as we use that term here, would be a cash-equivalent payment, for example a physical check sent to each customer, a direct deposit into a customer's bank account or a credit on an electronic benefit card.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 29 of 51



DRA and the Joint Parties argue that an off-bill rebate (delivered through a separate payment not included in the customer's monthly bill) is preferable because it is independent of the customer's bill and allows for increased customer understanding of the Cap-and-Trade program.  Additionally, an off-bill return avoids the risk that the return might effectively, and unintentionally, mute the carbon price signal if customers perceive an on-bill return to be an additional rate offset.  PacifiCorp, the Joint Utilities, TURN and the Agricultural Parties oppose the use of an off-bill rebate, arguing that this approach is administratively complex and costly.  PacifiCorp suggests that if the Commission were to use an off-bill rebate, it should allow utilities to use auction revenue to cover the administrative costs of providing the rebate.[81]

We share the concern of DRA and others that customers may perceive the GHG allowance revenue return, even if calculated non-volumetrically, as a rate reduction if it is returned via an on-bill credit against each customer's bill.  Therefore, from the policy standpoint of preserving the carbon price signal, it is preferable to return revenues separate from customer bills through a check or some other form of off-bill rebate.[82]  As argued by DRA, the Joint Parties, and IEP, customers would essentially receive the revenues as cash or a cash equivalent, wholly independent of their electricity bills; thus, there would be no risk that customers would interpret the refund as a reduction in electricity rates.

---

[81]  We address recovery of administrative costs generally in Section 5.9.

[82]  We note that because we are neutralizing GHG costs in residential rates, there will be no carbon price signal in rates at this time.  However, an on-bill return of GHG revenue, depending on the frequency of the return, could have the unintended consequence of dampening other conservation price signals already present in rates from programs such as energy efficiency and the Renewables Portfolio Standard.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 30 of 51



Furthermore, residential customers would be able to use the money as they see fit to mitigate the increased costs of goods and services.

However, on closer examination, there are many concerns associated with the adoption of an off-bill rebate methodology. All of the utilities have argued that there is a significant cost and administrative burden associated with the implementation of an off-bill rebate program. SDG&E, for example, offered compelling evidence that the implementation of an off-bill credit would require significant initial (upfront) and recurring costs. Furthermore, there can be significant follow-up costs associated with the issuance of a check. PG&E provides documentation to show that for each check that is not cashed by a residential customer, PG&E (and the other utilities) must engage in a costly and time consuming escheatment process that could dwarf the value of the check itself. Depending upon the percentage of checks that are not cashed, the total cost could approach upwards of $7 million per year.[83]

We share the concerns of the utilities that implementation of an off-bill rebate will likely be costly and administratively burdensome. As a matter of policy, we prefer to preserve as much of the allowance revenue value as possible for direct return to customers, and we are aware that our adopted method of return for EITE and small business customers may entail significant administrative costs. Furthermore, in the absence of reliable information on the actual allowance value available for return, (which will be wholly dependent upon allowances prices in any given year), and about the complete costs of different off-bill rebate methods, we are concerned that significant administrative

---

[83] PG&E Filing of Supplemental Information in Response to ALJs' Request, June 1, 2012 at 5.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 31 of 51



costs could substantially reduce the amount of revenues available for direct return to residential ratepayers.

Additionally, by applying the return as a credit to customers' bills, we can reduce the risk of customers not receiving the value if, for example, they fail to receive or cash a check, or otherwise use the return. While this concern was not raised by any parties in this proceeding, we find that all residential customers are entitled to their share of GHG allowance revenues, and we are concerned about hastily selecting any process that diminishes the ability of some customers to receive that revenue (for example, through the loss of a check), without further analysis. As a credit, the allowance value will be used directly to pay for electricity, but in doing so it will free up the money the customer would otherwise use to pay that bill to use for other purposes.[84] In addition, as noted by TURN, on-bill rebates do not necessarily dampen price signals in rates, including conservation price signals separate from the carbon price signal, which will be neutralized in residential rates. Whether an on-bill rebate interferes with price signals may be related to how often the rebate is paid and by what method it is calculated. By ensuring that the rebate is non-volumetric and that it is delivered relatively infrequently (as discussed below), we expect to avoid dampening any additional conservation price signals that exist in residential rates. Therefore, at least initially, we direct the utilities to return the non-volumetric portion of the residential rebate as an on-bill credit against customers' electricity bills. If, at a

---

[84] We should note that in circumstances where the credit value exceeds the energy costs of a household we do run the risk that the credit will result in additional energy consumption and/or stranded value. This might occur for some households that, due to net energy metering, have effectively zeroed-out their bills, or reduced their bills such that the annual credit amount exceeds their annual electricity costs. We address this issue below.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 32 of 51


later date, it is found that an off-bill approach achieves substantially greater customer understanding of the Cap-and-Trade program or administrative costs can be substantially reduced, we may reconsider whether an off-bill return is appropriate.

Finally, to ensure equitable treatment of residential customers irrespective of whether they are bundled customers of a utility or take service under a CCA or from an Energy Service Provider, the on-bill credit should be provided to all households taking distribution service from an investor-owned utility. To address MEA's concern that rebates returned to CCA customers (and DA customers) will be perceived as a windfall from the investor-owned utilities, rather than as a benefit of state policy, we require that the rebate be listed on utilities' bills as a separate line item, and the utilities must provide additional company-neutral information to ratepayers about the Cap-and-Trade program, as discussed in the section on customer outreach and education, below.

### 5.4.3.2.3. Frequency of Climate Dividend Return

In regard to the frequency of the return of the climate dividend to residential customers, we are guided by our desire to make the rebate meaningful and understandable while minimizing interference with the conservation price signals currently in rates. A monthly return, as proposed by the Joint Utilities, would likely be minimal and could possibly go unnoticed by customers. Furthermore, a monthly bill credit would seem to run the risk of giving individuals the false sense that electricity rates have actually decreased under the Cap-and-Trade program, potentially leading to increased electricity consumption. However, we must balance these concerns against our desire for

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 33 of 51


residential customers to receive their share of allowance revenues in a timely manner.[85]

     Weighing all of these factors together, we find it reasonable that remaining GHG allowance revenues be returned to residential customers on a per-account basis semi-annually (every six months), commencing no sooner than six months from the start of the Cap-and-Trade program (January 1, 2013). While not proposed by any party in this proceeding, we believe that a semi-annual return reflects the best balance of providing a meaningful return to residential ratepayers while not unduly burdening such customers with a prolonged exposure to the higher costs of goods and services, which could result in an unintended dampening effect on consumer spending in the economy. We acknowledge that, in certain circumstances, the climate dividend could exceed a customer's monthly bill. In this case, we envision that any remaining climate dividend in excess of that customer's monthly bill would be applied to the subsequent month's bill until the climate dividend was exhausted. This approach may require some nuanced treatment, for example if a customer moves out of the utility's service territory or the semi-annual climate dividend exceeds a customer's bill for the entire 6-month period in which the climate dividend may be applied before receipt of the next climate dividend. Therefore, we require the utilities to address this issue further as set forth in Section 6.

---

[85] This position contrasts with our position that EITE customers should receive revenues after a given Cap-and-Trade program year has passed. We believe EITE customers, as business entities, are better positioned to account for and respond to a delay in receipt of revenues than residential customers.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 34 of 51


### 5.4.4. Net-Metering and Master-Meter Customers

Our adopted GHG revenue distribution methodology has certain implications for customers who receive electricity service under a master-meter configuration and customers who participate in net energy metering. In their June 1, 2012 filings providing supplemental information, PG&E and SCE assert that GHG revenues must be distributed to master-meter customers according to the provisions of § 739.5 (a) and (b), which set forth rules on the rates at which master-meter customers must be billed and the proper methodology for dispersal of any utility credit to master-meter customers.

We agree, and we find that our adopted GHG revenue distribution methodology should allow for the equal treatment of master-meter customers. In the case of the volumetric GHG cost offset for residential rates, master-meter customers' bills will be offset in proportion to GHG costs incurred; therefore, master-meter customers will be treated equally to all other residential customers. This will also be the case for master-meter customers that qualify as small businesses under the definition adopted in this decision.

The climate dividend does pose a potential problem in terms of equitable treatment of residential master-meter customers. As explained earlier in this decision, while we cannot account for all forms of equity in our distribution methodology, and our adopted methodology allocates GHG revenues equally across residential accounts irrespective of the number of electricity users per account, a possible disparity may exist between the number of residents in the average household and the number of customers receiving service under a master-meter configuration. For example, it may be problematic to return the same amount of revenue to a residential account with, for example five electricity users as to a master-meter account with many more customers.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 35
of 51


It is our intent that residential master-meter customers receive their proportional share of the climate dividend. At this time, however, we have no record on which to address this potential inequity or to determine the number of customers on a master-meter that tips the scales toward inequitable treatment. Therefore, an additional process will be necessary to address this issue, as discussed in more detail in Section 6.

Customers that participate in net energy metering may not have any balance owed to the utility against which to apply the climate dividend. We have no record in this proceeding to assess the magnitude of this concern or on which to base a solution to address this circumstance. Nonetheless, we find it appropriate to adopt an interim cash-out provision for these customers in a similar vein to the net surplus compensation provisions adopted in D.11-06-016. However, rather than allowing for a cash-out option only when an excess of kWhs of electricity is generated over a 12-month true-up period, as provided for in D.11-06-016, we find it more appropriate to allow for a cash-out provision for instances in which the dollar value of bill credits would otherwise be stranded if the value exceeds the bills a net-energy metering customer faces over the 12-month period following the month in which the credit is applied. In Section 6, we direct the utilities to present an implementation plan for providing cash value to net-energy metering customers according to the interim methodology adopted above. The Commission may wish to update this interim methodology in the future.

### 5.5. GHG Allowance Revenue Distribution Methodology for Small and Multi-Jurisdictional Utilities

As discussed above, PacifiCorp, Bear Valley, and CalPeco (the small and multi-jurisdictional utilities) are differently situated than PG&E, SCE, and

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 36 of 51

 **EXHIBIT A**

customer outreach activities for 2013. The utilities should solicit input from CCA and DA providers prior to the filing of the advice letters.

74. The utilities, with the exception of Bear Valley, should be required to submit an application for approval of their customer education and outreach programs for 2014 and beyond, including estimated yearly budgets.

75. It is reasonable to deny any outstanding motions in Track 1 Phase 1 of this rulemaking.

76. There are no disputed issues of fact; therefore, evidentiary hearings are not necessary in Track 1 of Phase 1 of this proceeding.


# O R D E R

**IT IS ORDERED** that:

1. Pacific Gas and Electric Company, Southern California Edison Company and San Diego Gas and Electric Company are directed to distribute greenhouse gas allowance revenues, inclusive of interest, resulting from the consignment of the assigned allowances allocated to the utilities by the California Air Resources Board to auction, in the following manner (after first setting aside an appropriate amount of greenhouse gas allowance revenues to fund customer outreach and education activities and initial and on-going administrative costs):

   A. Compensate emissions-intensive and trade-exposed entities (as defined in this decision) using methodologies based upon those developed by the California Air Resources Board to address direct emissions cost exposure under the Cap-and-Trade program, as preliminarily set forth, but not adopted, in Appendix A to this decision;

   B. Offset the rate impacts of the Cap-and-Trade program in the electricity rates of small businesses, defined as entities

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 37 of 51


with monthly demand not exceeding 20 kilowatts in more than three months in a twelve-month period, through a volumetrically calculated rate adjustment, preliminarily set forth, but not adopted, in Appendix B to this decision.

C. Neutralize the rate impacts of the Cap-and-Trade program in residential electricity rates through a volumetrically calculated rate adjustment;

D. Distribute all revenues remaining after accounting for the revenues allocated pursuant to the prior three uses to residential customers on an equal per residential account basis delivered as a semi-annual, on-bill credit.

2.  PacifiCorp and California Pacific Electric Company are directed to return revenues according to the process set forth in Ordering Paragraph # 1, with one exception. PacifiCorp and California Pacific Electric Company must return all remaining greenhouse gas allowance revenues, after compensating emissions-intensive and trade-exposed entities and small business customers, directly to their residential ratepayers on an equal per residential account basis delivered semi-annually via an on-bill credit (thus skipping Step C in Ordering Paragraph # 1, above).

3.  Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are directed to allocate greenhouse gas allowance revenues to all customers in the applicable customer groups set forth in this decision inclusive of Direct Access and Community Choice Aggregation customers in a competitively neutral manner as required by the Cap-and-Trade regulation. Direct Access and Community Choice Aggregation customers must receive their proportional share of greenhouse gas revenues, and such revenues must be dispersed according to the methodology set forth in Ordering Paragraph # 1. Greenhouse gas compliance costs must be included in the generation component of customers'

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 38 of 51



rates and allocated in the same manner that other generation costs are allocated to bundled customers.

4. Bear Valley Electric Service, a division of Golden State Water Company, as a small utility receiving minimal greenhouse gas allowance revenue, is ordered to return 100% of its greenhouse gas allowance revenue in direct proportion to costs borne by its customers (a volumetric return) through its existing, annual Purchase Power Adjustment Clause proceeding.

5. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are directed to allocate an appropriate portion of greenhouse gas allowance revenues to refineries and other emissions-intensive and trade-exposed entities with third-party-owned combined heat and power units to avoid disparate treatment between third-party-owned and customer host-owned combined heat and power. A preliminary methodology is set forth, but not adopted, in Appendix A.

6. Emissions-intensive and trade-exposed customers with emissions less than 25,000 MTCO$_2$e and that operate in sectors that qualify for Industry Assistance under the California Air Resources Board Cap-and-Trade regulation must voluntarily opt-into the Cap-and-Trade program in order to be eligible to receive allowance revenue for the indirect emission costs associated with their electricity purchases, unless, in a subsequent phase of this proceeding, another method can be developed to accurately obtain the necessary information to calculate greenhouse gas allowance revenue returns for these customers.

7. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are directed to return greenhouse gas allowance revenues to small

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 39 of 51

business customers, as defined in this decision, via a volumetrically calculated on-bill credit against their electricity purchases denoted as a separate line-item on bills. This bill credit shall be applied to the delivery component of the bill to ensure that all customers within a utility's service territory, irrespective of whether they are a bundled, Direct Access, or Community Choice Aggregator customer, are treated equally.

8. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas and Electric Company are directed to neutralize greenhouse gas costs in all residential rates, including time-of-use rates, through the volumetric return of greenhouse gas allowance revenues in an amount equivalent to, and not exceeding, the Cap-and-Trade program costs that are embedded in residential rates. Greenhouse gas costs in residential rates must be offset at the same time such costs are incurred, that is the same month that residential customers experience Cap-and-Trade program costs in rates. Greenhouse gas revenues must be returned to all customers, including bundled, Direct Access, and Community Choice Aggregator customers, via a delivery rate component that all residential customers pay.

9. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are directed to allocate all remaining greenhouse gas allowance revenues to residential ratepayers on a per-residential account basis (after compensating emissions-intensive and trade-exposed entities and small business customers and neutralizing greenhouse gas costs in residential rates). An individual residential customer's return shall be calculated by dividing remaining greenhouse gas allowance revenues (inclusive of those associated with Community Choice Aggregator and Direct Access customers) net of the

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 40 of 51



revenues set aside to fund customer outreach and education and administrative costs, net of the revenues used to compensate emissions-intensive and trade-exposed entities and small businesses, and net of the revenues used to neutralize greenhouse gas costs in residential rates, by the number of residential accounts taking distribution service from the utility. This return shall be known as the climate dividend. The climate dividend must be credited via a semi-annual, on-bill credit commencing no sooner than six months from January 1, 2013. In the event that the climate dividend exceeds a customer's monthly bill, the excess must be applied to the subsequent month's bill until the climate dividend is exhausted, circumstances permitting.

10.  Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are directed to return the excess cash value of the climate dividend to residential net-energy metering customers whose climate dividend exceeds their electricity bills over the twelve-month period following the month in which a non-volumetric credit is applied.

11.  For calendar year 2013, Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company (the investor-owned utilities) are directed to develop and administer a competitively neutral customer outreach and education program on behalf of all customers receiving greenhouse gas allowance revenue, including customers of Community Choice Aggregator and Direct Access providers. Outreach efforts may extend to customers not receiving greenhouse gas revenues, budget permitting. Outreach shall occur through various channels including bill notices, websites, direct customer outreach, and various media outlets, and shall occur in advance of and concurrent with the

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 41 of 51



distribution of any greenhouse allowance revenues. Outreach efforts must ensure that hard-to-reach customers receive adequate information and education about greenhouse gas revenues. All messaging must be developed in a way that does not advantage the investor-owned utility over the Community Choice Aggregator and Direct Access providers within its service territory. Descriptions in outreach and education materials of the Cap-and-Trade program and the various greenhouse gas allowance revenue returns authorized in this decision must be attributed to the State of California or the State of California's Cap-and-Trade Program. Any communications from the investor-owned utilities to Community Choice Aggregator and Direct Access customers pertaining to the Cap-and-Trade program and the various greenhouse gas allowance revenue returns authorized in this decision must include both the logo of the investor-owned utility and the Community Choice Aggregator or Direct Access provider. The investor-owned utilities are authorized to develop the content and messaging of their general outreach and education activities in consultation with Community Choice Aggregator and Direct Access providers. The scope, timing and activities of the utilities' proposed outreach and education activities must ultimately be approved by the Commission, as set forth in Ordering Paragraph # 27. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company will, upon request from the Director of the Energy Division, distribute to their customers communications from the California Public Utilities Commission providing information about California's Greenhouse Gas Cap-and-Trade program. These communications must be absent any utility logo. The timing of such communications will be at the election of the Director of the Energy Division, and the costs of the communications will be funded through the

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 42 of 51



utilities' 2013 customer outreach budgets, set forth in Ordering Paragraphs # 14 and 15.

12.  By April 1, 2013, Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company, in consultation with Community Choice Aggregator and Direct Access providers, are directed to hire, upon approval of the Director of the California Public Utilities Commission's Energy Division, a firm with marketing and public relations expertise.  The firm must also evaluate the feasibility and benefit of the use of a third-party administrator for customer outreach and education activities going forward.  The firm will be responsible for proposing expanded customer education activities through 2015.  The final scope of work must be developed in consultation with and subject to approval by the California Public Utilities Commission's Energy Division Director in advance of the release of any documents soliciting offers.  The selected marketing firm must submit its findings and recommendations to the investor-owned utilities, Community Choice Aggregator and Direct Access providers, and to the California Public Utilities Commission's Energy Division director no later than July 1, 2013.  The report must also be served on the service list for Rulemaking 11-03-012.

13.  Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company are authorized to expend no more than $500,000, which shall be funded by greenhouse gas allowance revenues, for the marketing and public relations firm set forth in Ordering Paragraph # 12 with the costs to be borne in proportion to their percentage of retail sales.

14.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas and Electric Company are authorized to spend up to $1.7

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 43 of 51



million, $1.4 million, and $750,000, respectively, on customer outreach and education activities in 2013. These budgets do not include the costs to hire the marketing and public relations firm set forth in Ordering Paragraph # 13. Subsequent years' budgets shall be approved according to the process set forth in Ordering Paragraphs # 23 and 24.

15. PacifiCorp and California Pacific Electric Company are authorized to spend up to 1.5% of their expected greenhouse gas allowance revenue, calculated at the 2013 California Air Resources Board Floor Price, for customer outreach and education expenditures in 2013. The approximate budget for PacifiCorp is $110,000. The approximate budget for California Pacific Electric Company is $35,000. Subsequent years' budgets shall be approved according to the process set forth in Ordering Paragraphs # 23 and 24.

16. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company PacifiCorp, and California Pacific Electric Company are directed to set aside greenhouse gas revenues to cover customer outreach and education efforts in advance of distributing remaining greenhouse gas revenues to emissions-intensive and trade-exposed, small business, and residential customers. Customer outreach costs must be tracked in a memorandum account. Any remaining customer outreach and education funds at the end of a calendar year must be rolled over for use in subsequent years.

17. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company PacifiCorp, and California Pacific Electric Company are authorized to use greenhouse gas revenues to fund initial and ongoing administrative costs necessary to the implementation of the greenhouse gas revenue allocation methodology adopted in this decision. Administrative costs must be tracked in a memorandum account and are subject to

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 44 of 51



reasonableness review. Any remaining administrative funds at the end of a calendar year must be rolled over for use in subsequent years.

18. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp and California Pacific Electric Company are directed to set aside greenhouse gas revenues to cover administrative costs before distributing remaining greenhouse gas revenues to emissions-intensive and trade-exposed, small business, and residential customers.

19. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp and California Pacific Electric Company must file Tier 1 Advice Letters within 30 days of the issuance of this decision showing establishment of memorandum accounts to track customer outreach and administrative costs, as set forth in Ordering Paragraphs # 16 and 17.

20. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company are ordered to defer including in rates all GHG costs and revenues, including accrued interest, until all necessary implementation details are finalized. Greenhouse gas costs will be based upon the 2013 greenhouse gas forecast approved in each utility's Energy Resource Recovery Account or Energy Cost Adjustment Clause forecast proceeding. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company must record estimated greenhouse gas costs for subsequent recovery in rates in a new greenhouse gas sub-balancing account. Estimated greenhouse gas revenues must be recorded and deferred in a new greenhouse gas Revenue Balancing Account.

Case: 19-30088 Doc# 1326-1 Filed: 04/10/19 Entered: 04/10/19 16:50:19 Page 45 of 51

21.  Upon declaration by the California Public Utilities Commission that the greenhouse gas allocation methodology is ready for implementation, which shall occur upon the issuance and service of a letter on the service list of Rulemaking 11-03-012 by the Director of the Energy Division (following the adoption of all necessary decisions addressing implementation), Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company may simultaneously begin the prospective allocation of greenhouse gas-related costs and provide greenhouse gas revenues to eligible customer classes.  The outstanding cost and revenue balances in the greenhouse gas sub-balancing account and the greenhouse gas Revenue Balancing Account, including accrued interest, must be amortized over a reasonable period so that all deferred costs and revenues are distributed within 24 months.

22.  Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company must file a Tier 1 advice letter within 30 days of the effective date of this decision establishing greenhouse gas sub-balancing accounts and greenhouse gas Revenue Balancing Accounts to track greenhouse gas costs and revenues.

23.  For the first three years of the Cap-and-Trade program (2013-2015), Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp and California Pacific Electric Company must file an application by August 1 of 2013, 2014, and 2015 setting forth forecasted greenhouse gas costs for the subsequent year and forecasted greenhouse revenues to be distributed to eligible customer classes.  Customer outreach and administrative costs must also be forecast.  These applications may be

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 46 of 51



consolidated to facilitate consistency in policy and process and allow for the efficient participation of interested parties.

24. Beginning in 2014, the applications set forth in Ordering Paragraph # 23 must also include a detailed accounting of greenhouse gas costs incurred for the previous year as well as revenues distributed, including customer outreach and administrative costs. The methodology to calculate realized greenhouse gas costs will be finalized through a subsequent decision addressing implementation details, as set forth in Ordering Paragraphs # 27 and # 28. Customer outreach and administrative costs will be subject to reasonableness review. If, after three application cycles, the California Public Utilities Commission finds that forecasting and reconciling greenhouse gas costs and revenues becomes more ministerial, greenhouse gas costs and revenues may be evaluated and approved going forward in another appropriate proceeding.

25. Within 60 days of the issuance of this decision (with the date to be modified at the election of the Assigned Commissioner or assigned Administrative Law Judges), the California Public Utilities Commission's Energy Division is directed to initiate a public workshop process whereby interested parties may provide feedback on the proposed greenhouse gas revenue allocation formulas set forth in Appendices A and B for emissions-intensive and trade-exposed and small business customers. The workshop process must identify required input sources as well as the timing of all information and data exchanges that must occur to calculate revenue return. The workshop process must also explore possible alternative methods to the requirement to opt into the Cap-and-Trade program to obtaining necessary information to calculate the greenhouse gas revenue to emissions-intensive and trade-exposed entities designated as eligible for Industry Assistance under the California Air Resources

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 47 of 51

Board Cap-and-Trade regulation with annual emissions less than 25,000 metric tons of carbon-dioxide equivalent. The workshop process must explore the appropriate timing of greenhouse gas revenue distribution to emissions-intensive and trade-exposed and small business customers as well as the form the revenue return should take, whether on-bill or an off-bill credit. The California Public Utilities Commission's Energy Division must prepare and submit a workshop report providing recommended formulas, including all necessary information and data exchange details. The workshop report must also include recommended timing of the distribution of greenhouse gas allowances to emissions-intensive and trade-exposed and small business customers. The assigned Commissioner or assigned Administrative Law Judges may modify the date or required contents of the workshop report. Parties to this proceeding will have the opportunity to comment on the workshop report. The Commission anticipates issuing a decision adopting finalized greenhouse gas revenue distribution formulas and calculation processes. The California Public Utilities Commission's Energy Division is authorized to undertake minor updates to finalized formulas as necessary through the issuance of a resolution with opportunity for stakeholder input and comment.

26. The California Public Utilities Commission's Energy Division and Legal Division are authorized to enter into an interagency agreement with the California Air Resources Board to facilitate the exchange of all necessary data and information, including any necessary confidentiality agreements to protect market sensitive information, to calculate the greenhouse gas allowance revenue return for emissions-intensive and trade-exposed entities.

27. No later than 45 days after the effective date of this decision (with the date to be modified at the election of the assigned Commissioner or assigned

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 48 of 51



Administrative Law Judges), Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must file a joint report in Rulemaking 11-03-012 addressing implementation details for the adopted greenhouse gas revenue allocation methodology.  Formulas for distribution to emissions-intensive and trade-exposed and small business customers may not be finalized at the time of filing. If necessary, PG&E, SCE, and SDG&E may submit amended filings.  Following issuance of this decision, a ruling will issue in Rulemaking 11-03-012 finalizing the required contents of the utility reports.  The Commission anticipates issuing a decision addressing PG&E, SCE, and SDG&E's implementation plans.

28.  No later than 30 days after Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company have filed their joint implementation report, as set forth in Ordering Paragraph # 27 (with the date to be modified at the election of the assigned Commissioner or assigned Administrative Law Judges), PacifiCorp and California Pacific Electric Company must each file a report in Rulemaking (R.) 11-03-012 addressing implementation details for the adopted greenhouse gas revenue allocation methodology. Formulas for distribution to emissions-intensive and trade-exposed and small business customers may not be finalized at the time of filing.  If necessary, PacifiCorp and California Pacific Electric Company may submit amended filings. Following issuance of this decision, a ruling will issue in R.11-03-012 finalizing the required contents of the utility reports.  To the extent that PacifiCorp or California Pacific Electric Company wish to modify the greenhouse gas revenue allocation methodology adopted in this decision to keep their implementation and ongoing administrative costs relatively small in proportion to the allowance revenues they receive, these companies must describe in the report the

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 49
of 51



**EXHIBIT A**

modifications they plan to make and provide justification for these modifications. The Commission anticipates issuing a decision addressing PacifiCorp and California Pacific Electric Company's proposed implementation plans.

29. No later than 30 days after Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, PacifiCorp and California Pacific Electric Company file their implementation reports, as set forth in Ordering Paragraph # 27, each utility must file a Tier 2 Advice Letter setting forth the scope and estimated timing of proposed customer outreach activities for 2013 consistent with the requirements set forth in Ordering Paragraph # 11. The utilities must solicit input from Community Choice Aggregator and Direct Access providers prior to the submission of the Tier 2 Advice Letter. The Tier 2 Advice Letters must clearly describe, including examples if necessary, the presentation of the separate on-bill line-item for the return of the climate dividend to residential customers.

30. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, PacifiCorp, and California Pacific Electric Company must file an application by September 1, 2013 setting forth their proposed customer outreach plan for 2014 and 2015, incorporating the results of the consultant's report set forth in Ordering Paragraph # 12 and including estimated yearly budgets.

31. By July 1, 2015, Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, PacifiCorp, and California Pacific Electric Company must file an application setting forth their proposed customer outreach and education plan for 2016-2020, including estimated yearly budgets.

Case: 19-30088    Doc# 1326-1    Filed: 04/10/19    Entered: 04/10/19 16:50:19    Page 50 of 51

**EXHIBIT A**

32.  Bear Valley Electric Service, a division of Golden State Water Company is authorized to include greenhouse gas costs and revenues in rates based on annual forecasts approved by the California Public Utilities Commission in its Purchase Power Adjustment Clause proceeding, which shall be adjusted through the use of balancing accounts based on actual costs incurred and greenhouse gas allowance revenues received.

33.  Any outstanding motions in Track 1 Phase 1 of Rulemaking 11-03-012 are denied.

34.  Hearings are not needed in Track 1 Phase 1 of this proceeding.

35.  Rulemaking 11-03-012 remains open.

This order is effective today.

Dated December 20, 2012, at San Francisco, California


MICHAEL R. PEEVEY
President
TIMOTHY ALAN SIMON
MICHEL PETER FLORIO
CATHERINE J.K. SANDOVAL
MARK J. FERRON
Commissioners

.

Case: 19-30088   Doc# 1326-1   Filed: 04/10/19   Entered: 04/10/19 16:50:19   Page 51 of 51