EDWARD J. TREDINNICK (#84033)
GREENE RADOVSKY MALONEY
    SHARE & HENNIGH LLP
Four Embarcadero Center, Suite 4000
San Francisco, California 94111-4106
Telephone: (415) 981-1400
Facsimile: (415) 777-4961
E-mail: etredinnick@greeneradovsky.com

Attorneys for Creditor,
City and County of San Francisco

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No.: 19-30088-DM |
| PG&E CORPORATION, | Chapter 11 |
| -and- | |
| PACIFIC GAS & ELECTRIC COMPANY, | **DECLARATION OF BARBARA HALE IN SUPPORT OF MOTION BY THE CITY AND COUNTY OF SAN FRANCISCO FOR DETERMINATION THAT AUTOMATIC STAY DOES NOT APPLY UNDER §362(b)(4) OR IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY UNDER §362(d)(1) BY THE CITY AND COUNTY OF SAN FRANCISCO** |
| Debtors, | |
| ☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | DATE: May 9, 2019<br>TIME: 9:30 a.m.<br>PLACE: Courtroom 17<br>450 Golden Gate Avenue<br>16th Floor<br>San Francisco, California<br>JUDGE: Hon. Dennis Montali |

I, Barbara Hale, declare:

1. I am an Assistant General Manager of the San Francisco Public Utilities Commission

("SFPUC"). I have been employed in this capacity since October of 2004. I submit this declaration in support of the Motion filed by the City and County of San Francisco ("San Francisco" or "City") for a Determination that the Automatic Stay does not Apply, or in the alternative for Relief from the Automatic Stay. The City seeks leave to proceed with the complaint the City filed against Pacific Gas & Electric Company ("PG&E") with the Federal Energy Regulatory Commission ("FERC") on January 28, 2019, as well as other proceedings that concern PG&E's service to the City under PG&E's Wholesale Distribution Tariff ("WDT"). I have personal knowledge of the following facts. If called upon to testify, I could and would testify competently to the contents of this declaration.

2. As the Assistant General Manager, Power, I am responsible for the Power Enterprise, which operates San Francisco's municipal power utility, Hetch Hetchy Power. We provide electric service to municipal departments, facilities, and tenants, including hospitals, wastewater and water utilities, fire and police stations, libraries, schools, parks and playgrounds, municipal transit services, streetlights, and San Francisco International Airport. In addition, we serve the residential and commercial electric and gas customers on Treasure and Yerba Buena Islands and electric customers at The Shipyard, both of which are former military bases being redeveloped by the City. We also buy and sell electricity products in the wholesale market, offer our customers on-site generation and energy efficiency services, operate the City's retail electricity supply program (CleanPowerSF), and are responsible for the City's street light systems.

3. The purpose of my testimony is to provide an overview of the City's efforts to receive service under PG&E's WDT. In order to provide service to most of its customers, the City purchases distribution service from PG&E under the WDT. Since the SFPUC started taking service under the WDT for the bulk of its customers on July 1, 2015, we have experienced a pattern of delay from PG&E resulting in a long list of projects that did not move forward on a timely basis.[1] From the outset, PG&E has implemented the WDT in a way that has made it more expensive and time-consuming than necessary for the City to serve its customers. In particular, PG&E has required the

---

[1] *See generally* SFPUC Report to the Board of Supervisors dated January 25, 2019 ("SFPUC Report"), Att. A (attached as Exh. A).

GREENE RADOVSKY MALONEY SHARE & HENNIGH LLP
FOUR EMBARCADERO CTR, SUITE 4000
SAN FRANCISCO, CA 94111

546341.3

City's customers to take "primary" electric service even where the electric demand or "load" is small. Under normal circumstances, and as provided for in the tariff, these small customers would take "secondary" service.

4. The WDT provides for both primary and secondary service. Primary service is generally required for customers with large electric loads.[2] Primary service rates are lower than secondary rates, but the facilities are larger and much more expensive. Secondary service facilities can cost the City as little as $10,000 and take up very little space depending on the size of the service. Primary service requires facilities that can cost the City more than $500,000[3] and take up more than 700 square feet.[4] The City has applied for and is taking primary service for large loads that require primary service, including pump stations and water treatment plants.[5]

5. Most of the City's electric customers are City departments and facilities or facilities providing services in connection with the City. Most of these thousands of customers have small loads—e.g., individual schools, health clinics, libraries, affordable housing buildings, playgrounds, swimming pools, police stations, and public restrooms.[6] Many of these facilities have been receiving secondary service in the same location for decades, refurbishing and modernizing their facilities as they received the funding to do so. Now, when even small changes are made to the facilities, PG&E requires primary service, even though most of these customers' loads will still be well below the size that would typically receive primary service, and below the size for which PG&E would require primary service for its own retail customers.[7] PG&E imposes the same primary service requirement

---

[2] PG&E is requiring the City to take primary service for loads as small as 10 kilowatts. *See* SFPUC Report, Exh. A, Att. A, row 14 (park restroom). PG&E will only require its own customers to take primary service if the load is at least 3000 kilowatts. *See* Letter from SFPUC to PG&E dated July 25, 2018 (attached as Exh. B).

[3] SFPUC Report, Exh. A, Att. C, row 28.

[4] *See* Hetch Hetchy Power and Your Project, Typical Primary Switchgear Layout (attached as Exh. C). Exhibit C shows that typical primary switchgear is 8 feet high by 24 feet wide by 8 feet deep.

[5] *See* SFPUC Report, Exh. A, Att. A, rows 5, 12, 16, 17, 32, 43, 44, 51, and 52.

[6] *See id.* at rows 1-4, 5-9, 14, 15, 18-21, 24-31, 33, 35-41, 45-50 and 53.

[7] *See, e.g., id.* at row 7 (renovation of Tule Elk Elementary School); row 8 (renovation of Balboa Pool), and row 36 (renovation of Police Academy).

GREENE RADOVSKY MALONEY SHARE & HENNIGH LLP
FOUR EMBARCADERO CTR, SUITE 4000
SAN FRANCISCO, CA 94111

546341.3

on new City customers, regardless of size.[8]

6. PG&E's practice of requiring San Francisco to take primary WDT service for small loads has severely impacted San Francisco's ability to function as a utility because nearly every request for secondary service has been delayed.[9] PG&E's insistence on primary service leads to months of delay as the City works with its customers to determine whether primary service is feasible, and if it is not, to negotiate alternative service arrangements so that important City projects can move forward.

7. Often, inspection of the particular sites in question shows that there is simply no space for primary equipment in an appropriate and safe place.[10] In a dense urban setting, most small projects do not have an extra 700 square feet of space to use for unneeded electrical facilities. Several projects have involved renovations and improvements to public schools.[11] Placing large, primary switchgear near recreational spaces would be unsafe and would eliminate recreation space. Open space is required to meet building code standards, and the California Department of Education enforces certain classroom and physical education space requirements.[12]

8. For many projects, the City has offered to compromise with PG&E in order to move these projects forward. After months of negotiations, San Francisco has at times been able to reach agreement with PG&E so that certain projects can receive service. In these cases, PG&E has either agreed to provide secondary service or agreed to an alternate arrangement offered by the City.[13]

---

[8] *See, e.g.*, *id.* at rows 1-4 (new affordable housing); row 15 (new service to Golden Gate Park Tennis Center); and row 26 (new service to Ambulance Deployment Facility).

[9] *See generally*, SFPUC Report, Exh. A, Att. A.

[10] For example, at the San Francisco Police Department Traffic and Forensic Center primary switchgear would take up two parking spaces. (*See* SFPUC Report, Exh. A, Att. A, row 9). At the Mercy Housing low-income development, primary switchgear would take up space intended for a community room or for on-site supportive services. (*Id.* at row 46).

[11] *See* SFPUC Report, Exh. A, Att. A, row 7 (Tule Elk Elementary School) and row 47 (Lafayette Elementary School).

[12] *See* Letter from SFPUC to PG&E dated February 4, 2019 (attached as Exh. D).

[13] The City incurs additional of costs $75,000 to take service under this alternate arrangement. *See* SFPUC Report, Exh. A, Att. C, rows 1, 15, 18, 24-26, 30, 36-39, and 41.

GREENE RADOVSKY MALONEY SHARE & HENNIGH LLP
FOUR EMBARCADERO CTR, SUITE 4000
SAN FRANCISCO, CA 94111

546341.3

Although these alternate arrangements require San Francisco to provide equipment in excess of what the WDT specifies, San Francisco has accepted the arrangements because they allow completely stalled projects to move forward while eliminating the need for even larger and more expensive equipment.

9. These disputes have delayed service to City customers that provide essential public services. Many of the affected facilities were affordable housing or facilities providing homeless services, because like many other cities, San Francisco has inadequate affordable housing and a growing homeless population.[14] The City is working hard to improve its housing options, but PG&E's practices are hindering this effort. The housing projects included both refurbishing existing housing units and constructing new facilities. In both cases, PG&E has insisted on primary service for small facilities.

10. Some City departments and housing developers have asked the SFPUC to allow them to take retail service from PG&E, which costs more, in order to avoid the delays, costs, and space requirements that PG&E imposes when customers are served by the City. The City has reluctantly allowed some City projects and housing developments to take PG&E retail service when delays imposed by PG&E on City service became too costly and burdensome.

11. One such project was the Central Waterfront Navigation Center. This was a new facility consisting of portable modular units providing temporary housing and services for homeless people. PG&E's requirements for this project would have delayed the opening by at least 90 days. At the same time, PG&E staff represented to electrical staff at the City's Public Works Department that retail service could start in just six weeks. To expedite the service, the City was forced to request retail service from PG&E.[15] PG&E is not using primary facilities for its retail service to this site.

---

[14] *See* SFPUC Report, Exh. A, Att. A. at: (a) row 1 (157 affordable units at 1950 Mission Street); (b) row 2 (81 affordable units at 490 South Van Ness Avenue); (c) row 3 (143 affordable units at 1990 Folsom Street); (d) row 4 (127 affordable units at 2060 Folsom Street); (e) row 18 (94 affordable units at 1296 Shotwell Street): (f) row 19 (125 affordable units at 88 Broadway); (g) row 20 (53 affordable units at 735 Davis Street); (h) row 21 (200 affordable units at 838 Pacific Avenue); (i) row 22 (192 affordable units at 350 Ellis Street); (j) row 23 (98 affordable units at 2451 at Sacramento Street); and (k) row 46 (44 affordable units at 3001-3021 24th Street).

[15] Kevin Fagan, *SF's Newest Navigation Center Opens in Dogpatch Neighborhood*, SF Gate (May

12. For many projects, the City was unable to provide power for project construction due to PG&E's requirements.[16] It is common for construction power to begin before the electrical equipment for permanent service is in place. PG&E has refused to provide the City WDT service for construction power unless the City had in place the primary service facilities PG&E has demanded for small City loads. Adhering to this requirement would cause long delays at the start of a project. In order to avoid construction delays and the costs that would be owed to contractors in many cases, the City withdrew its request for construction power in several cases, allowing PG&E to provide retail power service, which required City departments to pay higher PG&E retail rates.

13. The SFPUC has received many complaints from the departments and agencies we serve about delays, changing requirements for service, increased costs, and increased space requirements. This has led to public reports[17] and inquiries from elected officials about the problems with getting service to City customers on a reasonable timeline and for a reasonable cost.

14. These inquiries led to a hearing on June 13, 2018, in the Public Safety and Neighborhood Services Committee of the Board of Supervisors.[18] The Board of Supervisors adopted a resolution addressing the problem and required SFPUC to provide quarterly updates on interconnection disputes with PG&E (Resolution No. 227-18).[19] The SFPUC submitted the first report, covering the third quarter of 2018, on November 7, 2018.[20] The SFPUC submitted the

---

24, 2017) (attached as Exh. E).

[16] *See* SFPUC Report, Exh. A, Att. A at rows 1-4, 19, and 20 (retail power for construction of housing projects).

[17] *See, e.g.*, Emily Green, *Clash Over Power Supply Holds Up Opening of SF Public Sites*, S.F. Chronicle (Apr. 13, 2017) (describing a homeless shelter, children's museum, and public plaza delayed because of PG&E's practices) (attached as Exh. F); Emily Green, *Brighter Days Ahead for SF Museum, Shelter After Power Dispute*, S.F. Chronicle (Apr. 18, 2017) (describing San Francisco and PG&E's agreement regarding service to a children's museum and homeless shelter after months of delay) (attached as Exh. G).

[18] San Francisco Government TV, *Board of Supervisors – Public Safety and Neighborhood Services Committee – Regular Meeting* (June 13, 2018), recording available at http://sanfrancisco.granicus.com/player/clip/30791?view_id=178.

[19] Resolution No. 227-18, S.F. Board of Supervisors, July 20, 2018 (attached as Exh. H).

[20] SFPUC Report to the Board of Supervisors dated November 7, 2018 (attached as Exh. I).

6

Case: 19-30088    Doc# 1537    Filed: 04/18/19    Entered: 04/18/19 08:12:56    Page 6 of 9

GREENE RADOVSKY
MALONEY SHARE &
HENNIGH LLP
FOUR EMBARCADERO
CTR, SUITE 4000
SAN FRANCISCO, CA
94111

546341.3

second report, covering the fourth quarter of 2018, in January 2019.[21]

15.     According to these reports, two-thirds of the City's projects that were pending at the end of December 2018, experienced delays due to PG&E's refusal to provide secondary service. As of December 31, 2018, nine of the 36 applications identified in the report for which PG&E had first required primary service were still pending. As of March 31, 2019, that number had increased to twelve of 39 applications.[22]

16.     These delays impact the City by preventing City facilities from operating and providing services; in some cases there are costs associated with construction delays. In addition, where a compromise is reached with PG&E, the City must pay for the more expensive equipment and costs to redesign electric service. The City estimates that the total cost impact to the City from PG&E's actions through the end of 2018 exceeds $8,000,000.[23]

17.     On January 28, 2019, San Francisco filed a complaint with FERC to require PG&E to comply with the terms and conditions of its WDT. That complaint identifies many of the disputes that delayed or prevented service to City customers. Many of the interconnection disputes addressed in the complaint remain at a standstill.[24]

18.     Since San Francisco filed its complaint and PG&E filed for bankruptcy, the delays have continued. PG&E now claims that, due to the City's complaint and the filing of its bankruptcy petition, it can longer negotiate the types of compromises with the City that it has in the past. The City's new delayed projects include an affordable housing project, a new fire boat station

---

[21] SFPUC Report, Exh. A.

[22] Some of these pending applications have been in dispute since May 2018. PG&E has failed to even respond to the City's August 2018 requests for alternate arrangements.

[23] *See* SFPUC Report, Exh. A, Att. C.

[24] These include the City's application for service to: (a) Lafayette Elementary School (renovation) (*see* SFPUC Report, Exh. A, Att. A at row 47); (b) Tule Elk Elementary School (renovation) (*id*. at row 7); (c) Southeast Community Center (new construction) (*id*. at row 6); (d) 3001-3021 24th Street (new affordable housing) (*id*. at row 46); (e) 102 Marina Boulevard (new electric vehicle charging station) (*id*. at row 49); (f) Mission Bay Ferry Landing (upgrade to existing service) (*id*. at row 53); (g) 10501 Warnerville Road (substation rehabilitation) (*id*. at row 50); and (h) San Francisco Police Department Traffic Control and Forensics facility (new construction) (*id*. at row 9).

7

GREENE RADOVSKY MALONEY SHARE & HENNIGH LLP
FOUR EMBARCADERO CTR, SUITE 4000
SAN FRANCISCO, CA 94111

546341.3

at Pier 22½, and electric vehicle charging stations in a City parking lot.

19. Last year PG&E and San Francisco agreed that PG&E would provide service to six new affordable housing developments using a compromise facilities arrangement. Recently, however, PG&E rejected this same alternative for an affordable housing project at 681 Florida Street, even though there are no technical, safety, or reliability reasons for refusing to allow this project to obtain the same service PG&E agreed to provide at the other six housing developments. During a February 21, 2019 meeting with the City and affordable housing developers, PG&E claimed that it was unable to agree to the same compromise because of the bankruptcy and FERC complaint. PG&E asserted that it could not go forward until this Court issued a "business as usual" determination, which PG&E claimed would be 30-45 days from the Chapter 11 filing.

20. PG&E declined to attend a hearing on the project delays held by the Public Safety and Neighborhood Services Committee of the Board of Supervisors on February 14, 2019.[25] PG&E's letter cited the City's January 28, 2019 complaint, and stated it would respond to the City's concerns in the FERC forum. PG&E has since refused to respond to the City's complaint before FERC, citing the automatic stay provision.

21. In another instance, PG&E seemed to suggest that it could not agree to a compromise until the FERC complaint is resolved. In a letter dated March 15, 2019, PG&E rejected the City's proposal for an alternative arrangement to provide WDT service to new electric vehicle charging stations in a parking lot owned by the City.[26] The installation of the equipment required for primary service, which PG&E has demanded that the City install, would eliminate several public parking spaces and create a traffic hazard. In light of PG&E's claim that the City's FERC complaint is subject to the automatic stay, its suggestion that the complaint must be "resolved" before it can negotiate alternate arrangements with the City suggests that PG&E intends to delay service to the City indefinitely.

22. PG&E's refusal to provide service on reasonable terms, consistent with its FERC-

---

[25] *See* Letter from PG&E to the Board of Supervisors dated February 14, 2019 (attached as Exh. J).
[26] *See* Letter from PG&E to the SFPUC dated March 15, 2019 (attached as Exh. K).

GREENE RADOVSKY MALONEY SHARE & HENNIGH LLP
FOUR EMBARCADERO CTR, SUITE 4000
SAN FRANCISCO, CA 94111

approved WDT, creates health and safety risks associated with key City services. Recently the City applied for secondary service under the WDT to the San Francisco Fire Department Fire Boat Headquarters project at Pier 22½. The project includes replacing facilities that are over 100 years old and reconstructing two deteriorated piers—one is that completely unusable and one that is in poor condition. On February 12, 2019, PG&E advised the City that primary service would be required. PG&E's insistence on primary service will require major design changes and expenses for no purpose other than to comply with PG&E's arbitrary implementation of its WDT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 17, 2019.

/s/ Barbara Hale
Barbara Hale

GREENE RADOVSKY
MALONEY SHARE &
HENNIGH LLP
FOUR EMBARCADERO
CTR, SUITE 4000
SAN FRANCISCO, CA
94111