# Mapes Declaration

# Exhibit "B" – Part 1

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION


City and County of San Francisco                    Docket No. EL19-___
                      Complainant

    v.

Pacific Gas and Electric Company
                      Respondent




**COMPLAINT OF
THE CITY AND COUNTY OF SAN FRANCISCO
CHALLENGING INTERCONNECTION PRACTICES
OF PACIFIC GAS AND ELECTRIC COMPANY
UNDER WHOLESALE DISTRIBUTION TARIFF**

## TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY ...................................................................2

II. COMMUNICATIONS ........................................................................5

III. BACKGROUND ..............................................................................5

    A. The Parties ...........................................................................5

        1. The City and County of San Francisco ........................................5

        2. Pacific Gas and Electric Company .............................................6

    B. San Francisco's and PG&E's Overlapping Service Territories.........................7

    C. PG&E's Wholesale Distribution Tariff .............................................7

    D. San Francisco's 2014 Wholesale Distribution Service Complaint
       and PG&E's Replacement Agreements...............................................8

IV. FACTUAL AND LEGAL BASIS FOR COMPLAINT...........................................10

    A. San Francisco's Recent Efforts to Connect Customers Under the
       WDT .................................................................................10

        1. PG&E Has Routinely Denied San Francisco's Applications
           for Secondary Service .......................................................12

        2. PG&E Has Likewise Not Provided Primary Plus Service.........................16

        3. San Francisco Has Been and Will Continue to Be Harmed by
           PG&E's Refusals to Provide Secondary Service or Primary
           Plus Service and Unreasonable Requirements for WDT
           Service .....................................................................17

    B. PG&E's Implementation of the WDT Violates the FPA, the
       WDT, and the WDT SA. ...........................................................20

        1. PG&E's Practice of Rejecting San Francisco's Applications
           for Secondary Service Is Improper Under the WDT..............................22

           a) PG&E's Tariff Requires It to Offer Secondary Service to
              San Francisco .............................................................23

       b)   PG&E is Obligated to Upgrade or Expand its Secondary Distribution System in Order to Provide Secondary Service under the WDT ..................................................26

    2.   PG&E's Tariff Requires PG&E to Provide Primary Plus Service to San Francisco ..........................................................27

    3.   PG&E Has Imposed Impermissible Delays on Service to San Francisco Loads..................................................................31

V.   REMEDIES ......................................................................................33

VI.  THIS CASE IS RIPE FOR ADJUDICATION......................................37

VII. OTHER INFORMATION REQUIRED BY RULE 206..........................38

   A.   Good Faith Estimate of Financial Impact or Harm (Rule 206(b)(4))..........................................................................38

   B.   Operational or Nonfinancial Impacts (Rule 206(b)(5)) ....................39

   C.   Related Matters Pending in any Other FERC Case or Other Proceeding (Rule 206(b)(6)).................................................39

   D.   Specific Relief or Remedy Requested (Rule 206(b)(7)) ...................40

   E.   Documents Supporting the Complaint (Rule 206(b)(8))...................40

   F.   Alternative Dispute Resolution (Rule 206(b)(9))............................41

   G.   Form of Notice (Rule 206(b)(10))................................................41

VIII. CONCLUSION................................................................................41

EXHIBITS

Exhibit 1: Declaration of Barbara Hale

     Exhibit 1, Attachment A: May 4, 2018 Letter from PG&E to Moser

     Exhibit 1, Attachment B: November 7, 2018 SFPUC Quarterly Report to the Board of Supervisors

Exhibit 2: Declaration of Rod Maslowski

     Exhibit 2, Attachment A: Electric Rule 2

Exhibit 3: Form of Notice of Complaint

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| City and County of San Francisco | Docket No. EL19-___ |
|          Complainant | |
|    v. | |
| Pacific Gas and Electric Company | |
|          Respondent | |

**COMPLAINT OF
THE CITY AND COUNTY OF SAN FRANCISCO
CHALLENGING INTERCONNECTION PRACTICES
OF PACIFIC GAS AND ELECTRIC COMPANY
UNDER WHOLESALE DISTRIBUTION TARIFF**

Pursuant to Sections 206, 306, and 309 of the Federal Power Act ("FPA"),
16 U.S.C. §§ 824e, 825e, 825h, and Rule 206 of the Commission's Rules of Practice and
Procedure, 18 C.F.R. § 385.206, the City and County of San Francisco ("San Francisco"
or the "City") brings this Complaint against the Pacific Gas and Electric Company
("PG&E"). San Francisco requests that the Commission find that PG&E has
unreasonably denied service to the City in violation of its open-access Wholesale
Distribution Tariff ("WDT" or "Tariff"), and that it is implementing that Tariff in an
unjust, unreasonable, and unduly discriminatory manner. As discussed below, the
Commission should: (1) direct PG&E to comply with its Tariff by offering San Francisco
the secondary and primary-plus wholesale distribution service provided for by the WDT;
(2) direct PG&E to pay refunds to San Francisco consistent with the filed rate; and
(3) take any such other actions that the Commission finds necessary or appropriate to
address PG&E's tariff violations and to assure that the WDT and PG&E's
implementation of that Tariff are just, reasonable, and not unduly discriminatory.

## I.    INTRODUCTION AND SUMMARY

PG&E and San Francisco both serve loads within the City and County of San Francisco and have done so for nearly a century. San Francisco, however, lacks a comprehensive distribution system within the City and relies on PG&E to distribute the City's electricity to its customers. As a result, PG&E has always served a dual role—both as a competitor of the City and as a provider of wholesale distribution service that the City must use to serve its customers. When PG&E imposes "unjust, unreasonable, unduly discriminatory or preferential," 16 U.S.C. § 824e(a), requirements on wholesale distribution service that prevent San Francisco from serving a customer, that customer becomes a PG&E retail customer.

For decades, San Francisco purchased transmission and distribution services from PG&E pursuant to a series of bilateral agreements that allowed it to deliver power to individual customers scattered throughout the City. The last such agreement terminated on June 30, 2015. Since then, San Francisco has relied on PG&E's WDT for service over PG&E's distribution facilities.

San Francisco has not seen the fairer, less discriminatory service the Commission intended from open access tariffs, like the WDT. Instead, the City has encountered barriers to service that are neither required by PG&E's WDT nor imposed on PG&E's other WDT customers. PG&E has imposed requirements that are contrary to the express terms of its Tariff and unnecessary from a technical standpoint, improperly burdening the City's efforts to interconnect its loads. These discriminatory requirements constitute an effective denial of service to San Francisco in violation of PG&E's Tariff.

- 3 -

The most egregious of these denials of service is PG&E's refusal to provide San Francisco with the secondary and primary plus WDT service offered by the Tariff for small City customers, and its corresponding demand that San Francisco instead take primary WDT service. Primary service connections require facilities that are substantially more expensive, take much longer to construct, and occupy more space than the facilities required for secondary connections. While primary service connections are appropriate for large loads, there is no technical, safety, or reliability purpose for requiring primary service connections for much smaller loads. Nor is there a basis for requiring primary service connections for small loads in PG&E's Tariff. Most of San Francisco's thousands of points of delivery within the City are small loads for which secondary connections are appropriate—e.g., individual schools, health clinics, libraries, affordable housing buildings, playgrounds, swimming pools, police stations, and public restrooms (indeed, these currently receive secondary service at hundreds of locations).

Moreover, PG&E does not impose this blanket requirement for primary service on other wholesale customers or on its own retail loads. PG&E is demanding primary service—and thus large, primary facilities—for City loads as small as 75 kW, and sometimes even smaller. Yet for its own retail customers, PG&E does not require this same large, expensive equipment unless the load is 3,000 kW or larger—40 times the 75-kW threshold above which PG&E routinely applies the requirement to the City's loads.

When pressed, PG&E has referred to these primary facilities as equipment that, in PG&E's view, utilities like San Francisco should own.[1] But the terms and conditions of

_____

[1] *See* May 4, 2018 Letter from PG&E to Deputy Chief Bob Moser, City and County of San Francisco Police Department, Attachment A to Exhibit 1, Declaration of Barbara Hale, to this Complaint ("May 4, 2018 Letter") ("In our view, project delays, like those being described at 350 Amber, derive directly from

Case: 19-30088    Doc# 1538-2    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 7 of 26

wholesale distribution service are defined under PG&E's Tariff on file with the Commission—not PG&E's view of what it means to be a "utility." San Francisco stands ready to comply with the requirements in PG&E's Tariff regarding eligibility for WDT service, but it should not need to install costly additional equipment that is not required by the Tariff and that is unnecessary from a technical perspective to get service under the Tariff.

At heart, PG&E's actions are predatory and anticompetitive. PG&E's blanket requirement of primary service for new loads and for existing customers whenever they modify their electric service has resulted in significant cost differences and service delays compared to what PG&E is obligated to provide under its Tariff. PG&E is using its position as administrator of an open-access tariff to inflate the costs to San Francisco of serving City customers and to delay service to the City. This leaves City customers that need service within a reasonable timeframe—i.e., the timeframe contemplated by the Tariff—or that seek to avoid exorbitant and unexpected interconnection costs, with no option but to become PG&E retail customers. This competitive harm, which open-access tariffs were intended to eliminate, is not just theoretical. San Francisco has already lost customers to PG&E as a result of these practices. Nor is it unintended; PG&E has been clear in communications to at least one San Francisco customer that it can provide PG&E retail service more quickly than San Francisco can obtain WDT service from PG&E.

---

[San Francisco Public Utilities Commission's ("SFPUC")] refusal to take on the obligations required of any other utility, in this case owning primary switchgear."); San Francisco Government TV, Board of Supervisors – Public Safety and Neighborhood Services Committee – Regular Meeting (June 13, 2018), http://sanfrancisco.granicus.com/player/clip/30791?view_id=178 ("June 13, 2018 Public Safety and Neighborhood Services Committee Hearing") at 57:35 (Testimony of Jess Brown, PG&E) ("In our view, these project delays derive from SFPUC's desire to have PG&E deliver energy to the City at lower cost wholesale rate without the SFPUC having to take on the obligations required of any other utility.").

The Commission should find that PG&E's implementation of the WDT with respect to San Francisco is unjust and unreasonable, unduly discriminatory, and anticompetitive; and it should direct PG&E to modify those practices as described herein.

## II.    COMMUNICATIONS

The names and addresses of the individuals to whom communications related to this proceeding should be addressed are as follows:[2]

| | |
|---|---|
| Thomas C. Trauger | Dennis J. Herrera, City Attorney |
| William S. Huang | Theresa L. Mueller |
| Katharine M. Mapes | Deputy City Attorney |
| Jeffrey M. Bayne | William K. Sanders |
| SPIEGEL & McDIARMID LLP | Deputy City Attorney |
| 1875 Eye Street, NW | SAN FRANCISCO CITY ATTORNEY'S OFFICE |
| Suite 700 | City Hall, Room 234 |
| Washington, DC  20006 | San Francisco, California 94102 |
| Phone: (202) 879-4000 | Phone: (415) 554-4640 |
| tom.trauger@spiegelmcd.com | theresa.mueller@sfcityatty.org |
| william.huang@spiegelmcd.com | william.sanders@sfcityatty.org |
| katharine.mapes@spiegelmcd.com | |
| jeffrey.bayne@spiegelmcd.com | Pamela M. Husing |
| | Director, Wholesale and Retail Services, Power |
| | SAN FRANCISCO PUBLIC UTILITIES COMMISSION |
| | 525 Golden Gate Avenue, 7th Floor |
| | San Francisco, California 94102 |
| | Phone: (415) 554-2469 |
| | phusing@sfwater.org |

## III.    BACKGROUND

### A.    The Parties

1.    The City and County of San Francisco

The City is a municipal corporation organized and existing under the laws of the State of California. San Francisco owns and operates an electric utility that is managed by

---

[2] To the extent necessary, San Francisco respectfully requests waiver of Rule 203(b)(3) of the Commission's regulations, 18 C.F.R. § 385.203(b)(3), so that a copy of any communications in this proceeding may be served on all persons listed.

the San Francisco Public Utilities Commission ("SFPUC"), a City department that is responsible for the construction, management, operation, and use of all City properties, assets, and facilities used to provide utility services, including water, wastewater, and power.

The Raker Act of 1913 gave the City the right and obligation to develop a water and power supply system on City-owned and federal lands in and near Yosemite National Park and the Stanislaus National Forest.[3] Pursuant to the Raker Act, San Francisco owns and operates the Hetch Hetchy system, a non-jurisdictional water and power project consisting on the power side of three reservoirs and three hydroelectric generating plants in Tuolumne County, California, as well as transmission and distribution facilities. The Raker Act requires San Francisco to use power from the system first to serve its municipal public purposes, both within and outside of San Francisco. The Raker Act also allows San Francisco to use the power generated by Hetch Hetchy facilities to serve any other end-use customers. San Francisco's customer base is largely City departments and related public entities, entities providing service on behalf of or in coordination with the City, and tenants on City property.

2.      Pacific Gas and Electric Company

PG&E is an investor-owned utility subject to the Commission's jurisdiction. It has numerous tariffs and agreements on file with the Commission, including the WDT, which is relevant to this Complaint. PG&E serves about 5.1 million electricity distribution

---

[3] H.R. 7207, 63d Cong. (2d Sess. 1913).

customers in Northern and Central California, and it reported gross electricity sales within the City of over $770 million in 2016 (the most recent year reported).[4]

## B. San Francisco's and PG&E's Overlapping Service Territories

PG&E and the City are competitors. For nearly 100 years, both have served customers within San Francisco. PG&E does so pursuant to a franchise agreement with the City. The City does so under authority granted to it in the State of California Constitution (art. XI, § 9), the Raker Act, and the San Francisco Charter (§§ 4.112, 8B.120-127, 16.101).

Since 1925, the City has purchased transmission and distribution service under various agreements with PG&E to serve its customers in San Francisco. The last of those agreements expired on June 30, 2015 ("1987 IA").[5] Since then, San Francisco has purchased transmission service under the California Independent System Operator ("CAISO") Tariff and distribution service under PG&E's WDT.

## C. PG&E's Wholesale Distribution Tariff

PG&E's WDT became effective on April 1, 1998, when the CAISO assumed operational control of PG&E's transmission facilities. According to PG&E, the WDT "was designed to provide eligible wholesale customers interconnected to PG&E's distribution system with open-access, non-discriminatory service necessary to reach the

---

[4] City & Cty. of S.F., Office of the Controller, City Services Auditor, *Pacific Gas and Electric Company Properly Paid Its Franchise Fees and Surcharges for 2015 and 2016* 7 (Dec. 21, 2018), http://openbook.sfgov.org/webreports/details3.aspx?id=2661.

[5] The 1945 Interconnection Agreement followed the United States Supreme Court's finding that a prior agreement between the City and PG&E violated the Raker Act, because it required the City to sell its electricity directly to PG&E for delivery to PG&E customers within the City. *U.S. v. City & Cty. of S.F.*, 310 U.S. 16 (1940).

CAISO-controlled grid to make wholesale sales and purchases."[6] The "WDT is based on the Commission's Order No. 888-A Open Access Transmission Tariff."[7] It provides two different distribution service rates: one rate for points connected at higher-level "primary voltage," either directly or via dedicated facilities; and a second rate for points connected at lower "secondary voltage." WDT, Schedule WD-1, Section 2. It also provides for "Cost of Ownership" charges to compensate PG&E for the costs of owning and operating any dedicated "Direct Assignment Facilities" for the specific point. *Id.* Section 3.

PG&E filed revisions to its WDT most recently in 2013, at which time it substantially revised its terms, conditions, and rates. San Francisco was a party to that proceeding and, along with other participants, reached a settlement with PG&E as to the rates and terms of the Tariff. The Commission accepted that settlement in July 2015.[8]

### D. San Francisco's 2014 Wholesale Distribution Service Complaint and PG&E's Replacement Agreements

On November 27, 2013, San Francisco applied for distribution service under the WDT for the distribution loads that were being served under the expiring 1987 IA. On October 9, 2014, after nearly a year of unsatisfactory progress in PG&E's processing of San Francisco's application for WDT service, San Francisco filed a complaint against PG&E with this Commission, alleging that PG&E had improperly failed to tender service agreements to San Francisco pursuant to its WDT ("2014 Complaint").[9] PG&E

---

[6] Pac. Gas & Elec. Co., Proposed Rate and Non-rate Changes to the Wholesale Distribution Tariff, FERC Electric Tariff Volume No. 4 and Related Service Agreements for Wholesale Distribution Service 2, *Pac. Gas & Elec. Co.*, Docket No. ER13-1188-000 (Mar. 29, 2013), eLibrary No. 20130329-5091.

[7] *Id.*

[8] *Pac. Gas & Elec. Co.*, 152 FERC ¶ 61,010 (2015).

[9] San Francisco, Formal Complaint, *City & Cty. of S.F. v. Pac. Gas & Elec. Co.*, Docket No. EL15-3-000 (Oct. 9, 2014), eLibrary No. 20141010-5047.

subsequently unilaterally filed a set of unexecuted replacement agreements, including a Wholesale Distribution Tariff Service Agreement ("WDT SA"); a Wholesale Distribution Tariff Interconnection Agreement ("WDT IA"); a Transmission Interconnection Agreement ("TIA"); and five Transmission Facilities Agreements for specific transmission-level interconnections between the PG&E and San Francisco systems.[10]

After San Francisco protested the unexecuted agreements, the Commission suspended those agreements for a nominal period to become effective July 1, 2015, subject to refund, and consolidated the unexecuted agreement dockets with San Francisco's 2014 Complaint docket.[11]

In May 2016, the Commission held a hearing in the consolidated proceedings. While numerous issues were contested, the central issue concerned San Francisco's eligibility for service under the WDT for certain loads under Section 212(h) of the FPA, 16 U.S.C. § 824k(h). PG&E and San Francisco disagreed, in particular, on which City customers are eligible for wholesale distribution service without the need for intervening facilities and on the type of intervening facilities required for other customers. The Honorable Steven L. Sterner issued an Initial Decision in the case on November 15, 2016.[12] Briefs on and opposing exceptions by San Francisco, PG&E, and Commission Trial Staff are currently pending before the Commission in Docket Nos. EL15-3, *et al.*[13]

---

[10] *Pac. Gas & Elec. Co.*, Docket Nos. ER15-704-000 and ER15-705-000.

[11] *City & Cty. of S.F. v. Pac. Gas & Elec. Co.*, 150 FERC ¶ 61,255 (2015).

[12] *City & Cty. of S.F. v. Pac. Gas & Elec. Co.*, 157 FERC ¶ 63,021 (2016).

[13] The issues identified in this complaint were not addressed in the 2014 Complaint and will not be decided by the Commission's decision in that matter. In Part VI, below, San Francisco details why this Complaint is ripe for adjudication despite the pendency of that proceeding.

## IV.     FACTUAL AND LEGAL BASIS FOR COMPLAINT

### A.     *San Francisco's Recent Efforts to Connect Customers Under the WDT*

Since July 1, 2015, when San Francisco began taking distribution service under the WDT, PG&E has delayed service and created unnecessary barriers for San Francisco to interconnect new customers and to serve existing customers when the City has requested even small modifications to their interconnections to accommodate changes to their facilities. In particular, as discussed below, PG&E has rejected a substantial portion of the City's applications for secondary service under the WDT since July 2015, and nearly *every* secondary service application since November 2017 for loads above 75 kW. In each of those cases, PG&E has taken the position that the City must apply for and agree to take primary service if it wants to serve those loads.

Primary service requires the City to install facilities that are inappropriate and disproportionately large and expensive given the size and nature of the City loads in question.[14] San Francisco has applied for primary service for large loads and has planned for and constructed the large, expensive facilities required for those City customers. But PG&E has consistently insisted that the City also take primary service for City loads over 75 kW, and for some smaller loads,[15] even though PG&E requires its own retail customers to install similar facilities only when their loads reach the neighborhood of 3,000 kW.[16]

---

[14] Declaration of Rod Maslowski, Exhibit 2 to this Complaint, PP 12-18. ("Maslowski Declaration").

[15] *See* November 7, 2018 SFPUC to the Board of Supervisors (Attachment B to Exhibit 1, Declaration of Barbara Hale, to this Complaint), Att. A, which summarizes the City's attempts to obtain WDT service ("SFPUC Report").

[16] Maslowski Declaration, PP 7-8.

For the relatively small City loads at issue, there is no technical, safety, or reliability purpose for requiring primary service.[17] PG&E does not dispute this; it testified before the San Francisco Board of Supervisors Public Safety and Neighborhood Services Committee that "it doesn't really come down to . . . a technical question . . . it's a policy question."[18] But PG&E's "policy" on how to implement WDT service to San Francisco—which appears nowhere in the WDT—imposes substantial and unjustified costs on the City and the services it provides. Secondary switchgear generally costs about $50,000, but primary switchgear generally costs about $500,000.[19] Primary service with secondary metering (which, as described below, the City has sometimes offered when PG&E has denied secondary service) requires secondary switchgear plus about $75,000 for an interrupter.[20] In addition, in San Francisco's dense, built-up urban environment, installing such costly, oversized facilities requires time-consuming and expensive redesign of the interconnection and, in many instances, the buildings intended to be served.[21] Whereas secondary facilities can be about the size of half of a parking space, primary facilities can be the size of a one-bedroom apartment.[22] In some cases it has been impossible to find space to install the equipment PG&E is demanding.[23]

---

[17] Maslowski Declaration, PP 12-13.

[18] June 13, 2018 Public Safety and Neighborhood Services Committee Hearing at 1:05:35 (Testimony of John Klavdianos, PG&E).

[19] Declaration of Barbara Hale, Exhibit 1 to this Complaint, P 5 ("Hale Declaration").

[20] *Id.*

[21] Hale Declaration, P 8.

[22] Barbara Hale, Public Safety Committee Hearing, *Affordable Access to the Power Distribution Grid* 8 (June 13, 2018), https://sfgov.legistar.com/View.ashx?M=F&ID=6317715&GUID=FB46AE21-B2F8-4B1E-AA7A-43312E7AD851 ("June 13, 2018 SFPUC Presentation").

[23] Hale Declaration, P 10.

Because of this PG&E practice, San Francisco has paid excessive and unnecessary costs and experienced extended delays in receiving WDT service. And in several cases, because the San Francisco customers at issue provide critical services—like affordable housing, public safety, and homeless services—the City could not afford to wait for resolution of disputes with PG&E. Instead, the City was forced to give up serving those customers, either temporarily or permanently allowing them to be served by PG&E to avoid the delay and costs associated with PG&E's demands if the customer were served by the City. In other instances, the City has been able to obtain WDT service from PG&E, but only because of the City's persistence and, more importantly, acceptance of burdensome terms and conditions that PG&E has demanded even though they are not required by the WDT.

1.      PG&E Has Routinely Denied San Francisco's Applications
        for Secondary Service

During the more than three years the City has been applying to connect new and modified loads under PG&E's WDT, a consistent pattern has developed. First, when the City applies for secondary service, PG&E will routinely deny the application or say it is incomplete, insisting that secondary service is not available under the WDT and/or that PG&E's existing facilities do not have sufficient capacity to provide secondary service to the new or modified loads. PG&E will demand that San Francisco take primary service instead. As discussed in the attached Declaration of Barbara Hale, this has happened for 50 out of 122 of the secondary service applications that the City has submitted to PG&E since July 2015, and an even higher percentage since November 2017.[24] Since November

---

[24] Hale Declaration, P 7. To be clear, PG&E's increasing refusal to provide WDT secondary service is not based on any change in its Tariff on file with the Commission; there have been no changes to PG&E's

2017, PG&E has consistently required primary service for all loads over 75 kW.[25] From July 2018 through October 2018, two that two-thirds of the City's active applications for new or modified WDT service fell into this category, including applications for construction or renovations of parks, schools, housing projects, water and wastewater facilities, and police and public safety facilities.[26]

Second, to avoid further delays in service, the City has sometimes modified its service request by: (1) offering to install a new transformer, which the City will own; and (2) asking PG&E to allow for the use of secondary switchgear and metering.[27] Although these modifications are not required under PG&E's Tariff, the City has offered them in attempts to move forward critical projects, including projects for public housing, public schools, public safety, and homeless services. PG&E will again reject this modified offer and insist that the City install primary switchgear and metering, in addition to a new transformer, despite the substantial increase in cost and space requirements this imposes and, in many cases, the resulting need to redesign the structures that will receive the electric service.[28]

Third, the City will inform PG&E that it has inspected the site and determined that there is no space for the primary switchgear PG&E is insisting on, or that such

---

WDT since July 2015.

[25] Hale Declaration, P 7.

[26] *See* SFPUC Report. The SFPUC Report does not address every instance of a WDT service dispute, but it details the 45 projects for the reporting period of July 2018 through October 2018 experiencing interconnection issues due to delays, arbitrary requests, or increased project costs. SFPUC Report, Attachment A, B, and D. *Id.* Att. A rows 1-4, 6, 9, 14-15, 18, 24-30, and 45 show projects where San Francisco has requested a new secondary service, and PG&E has required primary service. Rows 7-8, 21-23, 33, and 35-41 show instances where the City has sought to relocate, replace, and/or upgrade existing secondary service, and PG&E has required primary service.

[27] Hale Declaration, P 9.

[28] *Id.*

switchgear would have to be located in an inappropriate or unsafe location.[29] For example, with projects involving renovations or improvements to schools, the City has explained that the California Department of Education enforces certain classroom and physical education space requirements.[30] Open space around educational facilities is necessary to meet building code standards or is designated recreational space for students, and placing large, primary switchgear adjacent to recreational spaces would raise concerns for student safety.[31] Space concerns for the oversized equipment PG&E is demanding have also affected projects related to affordable housing,[32] healthcare,[33] and law enforcement.[34]

Ultimately, after months of delays and mounting costs, PG&E may agree either to provide secondary service using PG&E's common facilities or a secondary voltage connection using a PG&E-owned transformer dedicated to the City (as discussed below, PG&E and the City refer to the latter as "primary plus" service). Or PG&E may agree to allow the City to install its own transformer but use secondary metering and switchgear.[35] The number of instances where PG&E has agreed to provide secondary service or primary plus service is small. Of the projects covered in the SFPUC Report that involved disputes over PG&E's initial insistence on primary service, two of the disputed locations

---

[29] *Id.*, P 10.

[30] *Id.*

[31] *Id.*

[32] SFPUC Report, Att. A, rows 1-4.

[33] *Id.* Att. A, row 6.

[34] *Id.* Att. A, row 9.

[35] In such instances, the City has made it clear that it will compensate PG&E for any unmetered loses due to the use of secondary metering, so that PG&E is made whole financially.

are moving forward at secondary service.[36] More often, PG&E has agreed to allow the project to move forward with a City-owned dedicated transformer and secondary metering and switchgear, but only after lengthy and costly delays.[37]

In other cases, PG&E continues to insist on primary service and primary switchgear, and those projects remain at a standstill.[38] This is true for a variety of projects related to education, healthcare,[39] law enforcement,[40] and affordable housing,[41] where the oversized equipment PG&E demands would take up significant and unacceptable space at those locations. These concerns about space restrictions would not exist had PG&E granted San Francisco's initial request for secondary service, as is provided for under PG&E's Tariff.

In still other instances, San Francisco could no longer wait for PG&E to agree to provide WDT service, and the City therefore was forced to drop its WDT application. Those City customers will instead become PG&E retail customers.[42] Indeed, for one project, PG&E staff informed electrical staff at the City's Public Works Department that

---

[36] SFPUC Report, Att. A, rows 21, 45

[37] This happened at 14 of the disputed applications listed in the SFPUC Report. *Id.* Att. A, rows 8 (project moving forward at secondary metering); 15 (same), 18 (same), 23 (same), 25 (same), 26 (same), 30 (same), 33 (PG&E has recently indicated project can move forward at secondary metering), 35 (same), 36 (project moving forward at secondary metering), 37-41 (same).

[38] *See, e.g.*, SFPUC Report, Att. A, row 7.

[39] *See, e.g.*, *id.* Att. A, row 6 ("If required, primary switchgear will take the place of several parking spaces in an already constrained lot.").

[40] *See, e.g.*, *id.* Att. A, row 9 ("If required, primary switchgear will take the space of parking spaces for [San Francisco Police Department] vehicles.").

[41] *See, e.g.*, *id.* Att. A, row 2-4 (If required, primary switch gear would take the place of "a community room," "childcare space," and "on-site supportive services" at the three projects, respectively).

[42] *Id.* Att. A, rows 1-4, 19, 20, and 35 (showing examples where temporary construction power served by PG&E at retail). *Id.* Att. D shows that these projects have a combined $280,000 increase in costs due to PG&E's higher retail rates.

retail service could begin sooner than WDT service.[43] PG&E retail service to all of those customers has not yet commenced; but for those that are already receiving power from PG&E or for which PG&E has provided interconnection specifications, PG&E is not installing the same oversized, inappropriate interconnection facilities that it was demanding that San Francisco install to serve those loads.[44]

To date, PG&E's discriminatory primary facilities requirement has affected the City's efforts to develop new low-income housing,[45] upgrade educational facilities,[46] and affected many other types of projects as well.[47]

2.      PG&E Has Likewise Not Provided Primary Plus Service.

Even were secondary service not appropriate in a given case, the WDT provides for another option—"primary plus" service. Under that arrangement, San Francisco pays the WDT's lower *primary* service rate, *plus* Cost of Ownership charges for any Direct Assignment Facilities owned by PG&E and used only to serve San Francisco. Primary plus service would be preferable to primary in many cases in which PG&E has rejected San Francisco's secondary service applications. But, PG&E has routinely refused to construct or own the directly assigned facilities needed to provide "primary plus" tariff service to San Francisco.[48]

_____

[43] Hale Declaration, P 28.

[44] *Id.*, PP 26-28(discussing the Central Waterfront Navigation Center, which the City ultimately was forced to allow PG&E to serve as a retail customer because of the lack of progress).

[45] SFPUC Report, Att. A, rows 1-4, 18-23.

[46] *Id.* Att. A, rows 7, 34, 37-39.

[47] *Id.* Att. B (showing a map of the housing, infrastructure, health, institutional, and recreation projects facing interconnection issues).

[48] PG&E has agreed to Primary Plus service in few instances after months of negotiations. *See* Hale Declaration, P 11.

3.     San Francisco Has Been and Will Continue to Be Harmed
       by PG&E's Refusals to Provide Secondary Service or
       Primary Plus Service and Unreasonable Requirements for
       WDT Service

PG&E's requirement that San Francisco take primary service for small loads has harmed and will continue to harm San Francisco by denying it service as provided for under PG&E's Tariff. Primary service for small loads can (1) require San Francisco to incur unnecessary and excessive costs to serve its loads; (2) force San Francisco to use space for unnecessary switchgear that could be used for critical facilities and functions; (3) cause excessive delays, and related costs, in bringing service to its loads; (4) force San Francisco to allow some of its customers to take retail service from PG&E; and (5) require San Francisco to install facilities in less secure and reliable locations. Because of PG&E's unreasonable, extra-tariff requirements, San Francisco has paid excessive and unnecessary costs and experienced extended delays in receiving WDT service.[49]

PG&E's arbitrary requirements make it unduly expensive or impractical for customers to take electric service from the City. By refusing to make secondary service or primary plus service available under its WDT, PG&E has forced the City and its customers to spend time and resources to develop and propose to PG&E alternative designs in an attempt to move important projects forward (despite the fact that these alternative designs are more burdensome than what is required for secondary service under PG&E's tariff). The redesign costs alone total $372,000, and there have been close

---

[49] For the projects covered in the SFPUC Report, the SFPUC estimates total additional project costs of $4,773,000 at the time of the report. This figure does not include lost revenue to the SFPUC or the increase in carbon dioxide emissions caused by projects taking PG&E retail services rather than service from the SFPUC.

to $1 million in additional construction and project management costs due to delays.[50]

This is on top of the additional costs for equipment and construction due to PG&E's

refusal to provide WDT secondary service. At an affordable housing project at 1950

Mission Street, for example, the developer had to spend an additional $545,000 to design

and install primary equipment after PG&E rejected a reasonable request for secondary

service.[51] In addition, the developer had to use 720 square feet of space for the primary

equipment—space that the developer had planned to use for a childcare facility.[52]

PG&E's practices have also caused excessive delays, well beyond the timeline for

processing applications required under the Tariff. At least eight projects where PG&E

refuses to allow secondary service under the WDT remain at a standstill.[53] Some of these

applications have been pending for nearly a year,[54] despite the much shorter timeline

provided for under the WDT.[55] Even in the few instances where PG&E ultimately agreed

to secondary service after initially stating that primary service was required, the projects

faced substantial delays that should not have occurred in the first place. For example,

WDT service to a low-income housing project was in dispute for 20 months before

PG&E agreed to allow the project to move forward with secondary service, resulting in

delays to "[s]tructural, safety, security, and aesthetic upgrades" and $240,000 in costs

---

[50] SFPUC Report, Att. D.

[51] *Id.* Att. D, row 1.

[52] *Id.* Att. A, row 1.

[53] *Id.* Att. A, rows 2-4, 6-7, 9, 19-20.

[54] *See, e.g.*, *id.* Att. A, row 2 (a project with an initial application submittal date of January 16, 2018).

[55] *See id.* Att. D (outlining the process timeline under the WDT); WDT §§ 15.4, 15.5, 15.6, 16.1, 16.3, 16.4, 16.7.

related to redesign and delay.[56] And even where the City and PG&E have reached agreement on certain projects, PG&E has delayed providing service agreements within the time period required by the WDT.[57]

The City is also harmed when the delays and obstacles that PG&E has imposed on open-access WDT service have forced the City to withdraw its secondary service applications entirely and to allow the loads at issue to be served by PG&E as retail customers instead.[58] For example, PG&E has repeatedly denied the City's secondary service applications for temporary construction loads and demanded that the City take primary service instead. Because these construction projects are on a tight schedule, and in light of PG&E's long delays in processing the City's WDT service requests, San Francisco has dropped its WDT applications for these loads, and the City's customers will instead purchase more expensive retail electric service from PG&E.[59]

Because San Francisco's municipal public purpose loads serve critical public needs, in order to expedite service San Francisco has made substantial efforts, at substantial cost, to resolve its disagreements with PG&E regarding WDT service. The City's lengthy negotiations and delays for individual points of delivery, acceptance of

---

[56] SFPUC Report, Att. A, row 21.

[57] Hale Declaration, P 6 (discussing examples where PG&E has failed to provide service agreements in a timely manner); WDT § 15.6 (requiring PG&E to send a customer a draft Service Agreement no later than ninety days after the customer is notified that an application is complete if no System Impact Study is required); WDT § 16.1(requiring PG&E to notify a customer a draft System Impact Study Agreement within thirty days of notifying the customer that its application is deemed complete); WDT § 16.3 (requiring PG&E to send the customer a draft Service Agreement no later than thirty days after sending the customer the completed System Impact Study).

[58] *See, e.g.*, SFPUC Report, Att. A, row 35 (project taking PG&E retail service due to delays to San Francisco's WDT service request).

[59] *Id.* Att. A, rows 1-4, 19, 20, and 35 (showing examples where temporary construction power served by PG&E at retail). *Id.* Att. 4 shows that these projects have a combined $280,000 increase in costs due to PG&E's higher retail rates.

expensive and unwarranted equipment requirements,[60] and withdrawal of applications to allow customers to be served by PG&E at retail would not occur if PG&E provided secondary service or primary plus service under the terms and conditions of its Tariff. These unnecessary costs are borne either by the City, or passed onto the City's customers—schools, police stations, low-income housing, and other municipal public purpose loads.

### B.    PG&E's Implementation of the WDT Violates the FPA, the WDT, and the WDT SA.

The Commission adopted its open-access policies in order to "remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers" and to "remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce."[61] Contrary to these goals, PG&E is using its position as administrator of its open-access WDT to impose unjust, unreasonable, and unduly discriminatory requirements on San Francisco, which competes with PG&E for retail customers.

PG&E's denials of the secondary and primary plus service provided for by the WDT, and its long delays in processing San Francisco's WDT service applications, have created artificial barriers to the WDT's open-access service, significantly increasing the

---

[60] *Id.* Att. D (showing total additional project costs of $4,773,000 for the projects reported on for July 2018 to October 2018).

[61] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 75 FERC ¶ 61,078, FERC Stats. & Regs. ¶ 31,036, at 31,634, *clarified*, 76 FERC ¶ 61,009 (1996), *modified*, Order No. 888-A, 78 FERC ¶ 61,220, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) ("Order 888").

City's costs of serving its customers. And if San Francisco is unable or cannot afford to serve a particular load due to the improper, non-Tariff restrictions PG&E has imposed upon WDT service, that San Francisco retail customer will become a PG&E retail customer instead.[62] San Francisco has already lost customers to PG&E as a result of PG&E's practices.[63]

These PG&E practices are: (1) contrary to the FPA, PG&E's WDT, and the terms of the unexecuted WDT SA PG&E filed in 2014; (2) inconsistent with the requirements that PG&E imposes on itself and other customers to which it provides distribution service; (3) not justified by any engineering, safety, or reliability concerns; and (4) not reasonably related to any other legitimate Tariff objectives.[64] The Commission should reject them and direct PG&E to comply with its Tariff.[65] Further, the Commission should

---

[62] This is not accidental. PG&E does not separate functions under the WDT, so in many cases the same PG&E employees are responsible for connecting San Francisco customers under the WDT and PG&E retail customers. At the same time those employees delay or deny WDT service to San Francisco, they have reached out to San Francisco's customers promising them faster connections if the customer becomes a PG&E retail customer instead. Hale Declaration, P 28.

[63] Hale Declaration, PP 25-30.

[64] *See Mid-Continent Area Power Pool Agreement*, 58 F.P.C. 2622, 2635 (1977), in which the Commission rejected Mid-Continent Area Power Pool's ("MAPP") proposed membership criteria that provided full membership and access to certain MAPP services only to generation-owning electric systems configured with two or more interconnections to other utilities. The Commission's ruling, which the D.C. Circuit upheld, was that the two-interconnection requirement was not "reasonably related to the MAPP objectives" as Systems with only one interconnection were therefore entitled to become full MAPP members, so long as they provided compensation for the value of the transmission service they received under the MAPP Agreement. *Id.*; *Cent. Iowa Power Coop. v. FERC*, 606 F.2d 1156, 1170-1172 (D.C. Cir. 1979); *see also Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, Recovery of Stranded Costs by Public Utilities and Transmitting Utilities; Proposed Rulemaking and Supplemental Notice of Proposed Rulemaking*, 60 Fed. Reg. 17662, at 17677 (proposed Apr. 7, 1995) ("Order 888 NOPR") (noting that "allow[ing] access, but only . . . on terms and conditions that have no operational or financial basis" is a "way for transmission-owning utilities to frustrate access and competition," and adopting open access reforms to prevent such abuses).

[65] *See, e.g.*, *Transcontinental Gas Pipe Line Corp.*, 71 FERC ¶ 61,266, at 61,059 (1995); *Nine Mile Point Nuclear Station, LLC v. Niagara Mohawk Power Corp.*, 105 FERC ¶ 61,336, PP 38-39 (2003); *Am. Elec. Power Serv. Corp.*, 106 FERC ¶ 61,020, P 21 (2004) (recognizing the Commission's authority to enforce compliance with the tariffs).

ensure that PG&E's business practices, and the technical requirements it imposes as a

condition of receiving WDT service, are just and reasonable.[66]

> 1.    PG&E's Practice of Rejecting San Francisco's Applications
>        for Secondary Service Is Improper Under the WDT.

PG&E's actions described above are not based on the requirements of its Tariff.

Instead, it has characterized these actions as "deriv[ing] directly from SFPUC's refusal to

take on the obligations required of any other utility."[67] But PG&E cannot deny tariff

service on the basis of what it believes other utilities should own or the services they

ought to take; it must abide by the terms of its Tariff. PG&E's reflexive denials of San

Francisco's applications for secondary service violate the Tariff and are inconsistent with

the WDT SA, PG&E's testimony before the Commission on how PG&E would

administer the Tariff, and PG&E's practices with other WDT customers. Denying

---

[66] FPA § 206(a), 16 U.S.C. § 824e(a) provides:

> Whenever the Commission, after a hearing held upon its own motion or
> upon complaint, shall find that any rate, charge, or classification,
> demanded, observed, charged, or collected by any public utility for any
> transmission or sale subject to the jurisdiction of the Commission, or
> that any rule, regulation, practice, or contract affecting such rate,
> charge, or classification is unjust, unreasonable, unduly discriminatory
> or preferential, the Commission shall determine the just and reasonable
> rate, charge, classification, rule, regulation, practice, or contract to be
> thereafter observed and in force, and shall fix the same by order.

*See also FERC v. Elec. Power Supply Ass'n*, 136 S.Ct. 760, 767 (2016) ("*EPSA*") (the FPA obligates the Commission to ensure that practices "affecting" wholesale rates are just and reasonable); *Cal. Indep. Sys. Operator v. FERC*, 372 F.3d 395, 403 (2004) (FPA empowers the Commission to assess the justness and reasonableness of "practices" "that directly affect the rate or are closely related to the rate"). *See also*, *Merricourt Power Partners, LLC v. Midcontinent Indep. Sys. Operator, Inc.*, 153 FERC ¶ 61,082, P 35 (2015) (transmission provider must "implement its Tariff on a non-discriminatory basis" in exercising its discretion under the standard Generator Interconnection Agreement); *Puget Sound Energy, Inc.*, 143 FERC ¶ 61,157, P 36 (finding Puget Sound's business practice for curtailment of conditional firm service discriminatory and inconsistent with Order Nos. 888-A and 890, and directing change to that practice), *clarified*, 144 FERC ¶ 61,198 (2013). As the Commission ruled in Order 888, under FPA sections 205 and 206 "we must determine whether *any* rule, regulation, practice, or contract affecting [Commission-jurisdictional] rates … is unduly discriminatory or preferential, and we must disapprove those contracts and practices that do not meet this standard." Order 888, FERC Stats. & Regs. at 31,676.

[67] May 4, 2018 Letter.