# Mapes Declaration

# Exhibit "B" – Part 2

secondary service to San Francisco allows PG&E to reserve capacity on its secondary distribution system for PG&E's own use, while effectively denying San Francisco access to PG&E's distribution system unless San Francisco builds new primary and secondary facilities to serve San Francisco's load—precisely the type of monopolistic behavior open access tariffs are intended to prevent.[68]

a) PG&E's Tariff Requires It to Offer Secondary Service to San Francisco

PG&E's unsupported contentions about the type of service appropriate to a utility cannot override PG&E's open-access Tariff, which requires PG&E to offer wholesale distribution service to small loads and low-voltage facilities. As part of this, the WDT provides for distribution service at the secondary level. The Tariff states that PG&E "will provide Distribution Service pursuant to the applicable terms and conditions contained in this Tariff and Service Agreement," and that the "Tariff is applicable for the transportation of capacity and energy. . . using the Distribution Provider's Distribution System." WDT § 1.2. PG&E is the Distribution Provider (WDT § 2.14), and "PG&E's Distribution System" is expressly defined as "broadly consist[ing] of the stepdown substations, the primary distribution circuits, *and the secondary distribution system*" (WDT § 11, emphasis added).

Other portions of the Tariff further illustrate the availability of both primary and secondary service. Section 2 of "Schedule WD-1: Distribution Service" of the WDT

---

[68] Order 888, FERC Stats. & Regs. at 31,745 (limiting the transmission provider's ability to withhold capacity from wholesale transmission customers by only allowing the transmission provider to "reserve in its calculation of ATC transmission capacity necessary to accommodate native load growth *reasonably forecasted in its planning horizon*" (emphasis added) and requiring the transmission provider "to provide transmission service to others under the Final Rule *pro forma* tariff out of capacity reserved for native load growth up to the time the capacity is actually needed for such future needs"); *see also id.* at 31,693-94,

establishes specific "generic" tariff rates for both primary service and secondary service at "$5.728 and $9.813 per kW-month respectively." Section 14.2.1 of the WDT, entitled "Intervening Facilities," also identifies the types of facilities required for non-grandfathered loads to obtain service under the WDT. It provides that: "For each of the scenarios described in the chart below, there will be a rebuttable presumption that the Intervening Distribution Facilities identified and associated with each scenario are required for that type of service." The "chart below" describes the facilities required for "[o]verhead" and "[u]nderground" connections for both "primary" and "secondary" service. Provisions related to secondary service are also in San Francisco's specific agreements with PG&E.[69]

Moreover, San Francisco is not the only PG&E WDT customer that obtains secondary service under the Tariff. As of 2015, the Western Area Power Administration ("WAPA"), which like San Francisco has numerous points of delivery, took secondary service at 970 points of delivery (out of a total of 1,271).[70] Moreover, the WAPA Wholesale Distribution Tariff Service Agreement expressly provides that secondary

---

[69] *Id.* The WDT SA identifies the "Delivery Voltage" for most of San Francisco's loads as "secondary," and the "Distribution Charge" for most of those loads is the "secondary-energy based rate." And Appendix F to the WDT SA, which includes five "Sketches of Common Service Configuration," includes one entitled "Secondary" (showing "a secondary service, where there are no PG&E-owned Direct Assignment Facilities and therefore no Cost of Ownership charges") and another entitled "Secondary Plus" (showing a secondary service, where the PG&E-owned Direct Assignment Facilities are secondary facilities, such as an overhead or underground service from a shared transformer. The Direct Assignment Facilities are subject to Cost of Ownership charges.).

[70] Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER16-400-000 (Nov. 25, 2015), eLibrary No. 20151125-5324; *see also* Maslowski Declaration, P 27 (providing further details about WAPA's WDT service).

service is available at new points of delivery, even where "all secondary voltage facilities serve one customer."[71]

Because secondary service is provided for under the WDT, the filed rate doctrine requires that the rates and terms and conditions for secondary service cannot differ from those contained in the Tariff itself. "The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the [regulated entity] provides . . . the services covered by the tariff."[72] Here, PG&E has not justified its refusal to provide secondary service to San Francisco based on any provision in the WDT. The Commission has explained that tariff service cannot be denied because of requirements that are not based in the terms or conditions of the tariff.[73] Thus, PG&E's denial of secondary service to San Francisco is contrary to its WDT and violates the filed rate doctrine.

---

[71] Service Agreement No. 17 under PG&E FERC Electric Tariff Volume No. 4, Service Agreement for Wholesale Distribution Service between PG&E & WAPA, Contract No. 04-SNR-00789 & Settlement Agreement, App. F § 2.2 ("WAPA WDT SA").

[72] Although these services were reached through settlement, settlements are not immune from scrutiny when determining whether a utility is unduly discriminating among customers. *See Cities of Bethany, et al. v. FERC*, 727 F.2d 1131, 1139 (D.C. Cir. 1984) ("When a settlement is reached in good faith, by means of proper conduct by the parties, and *when the resulting rate disparity is not unduly burdensome to a customer group*, a rate difference caused by a private settlement *may* survive the anti-discrimination mandate of section 205(b).") (emphasis added).

[72] *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (quoting *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002)), *amended*, 387 F.3d 966 (9th Cir. 2004) (internal quotation marks omitted).

[73] *Wis. Pub. Power Inc. SYS. v. Wis. Pub. Serv. Corp.*, 83 FERC ¶ 61,198, at 61,855 (holding that a utility could not deny transmission service where the denial was "not on the basis of any term or condition of its open access tariff, but on its view that [the customer] could, and should, obtain the service through its existing agreement with [another utility]."), *on reh'g*, 84 FERC ¶ 61,120 (1998).

b)     PG&E is Obligated to Upgrade or Expand its Secondary Distribution System in Order to Provide Secondary Service under the WDT

In certain instances, PG&E has asserted that its existing distribution system cannot accommodate the secondary WDT service that San Francisco has requested. But even in those cases (and even if PG&E provided the City with support for such assertions, which it has not) the Tariff does not allow PG&E to summarily reject San Francisco's applications for secondary service. Instead, the Tariff requires PG&E to "use due diligence to expand or modify its Distribution System to provide the requested Distribution Service." WDT § 13.4; *see also* WDT § 12.6. As noted above, the Tariff explicitly defines PG&E's "Distribution System" to include "the secondary distribution system." WDT § 11.

PG&E's upgrade and expansion obligations under WDT Sections 12.6 and 13.4 are contingent on the wholesale distribution customer agreeing to compensate PG&E for the costs of upgrades and modifications "to the extent consistent with Commission policy." WDT § 23. PG&E, however, has immediately rejected San Francisco's secondary service applications—without attempting to determine what upgrades and expansions to its existing secondary distribution system, if any, would be necessary to provide the requested service, let alone whether San Francisco would agree to compensate PG&E for all or part of the costs for such facilities. And in instances in which PG&E has asserted that its secondary system has inadequate capacity, PG&E has

offered nothing to support those claims and has refused to provide information on capacity in the area which might enable the City to plan a work-around.[74]

      2.      PG&E's Tariff Requires PG&E to Provide Primary Plus Service to San Francisco

PG&E's refusal to make primary plus service available to San Francisco likewise violates the WDT and is unjust, unreasonable, and unduly discriminatory. Although the Tariff does not explicitly define the term "primary plus" service, it clearly anticipates that PG&E will provide that service. The WDT expressly contemplates that PG&E will own and operate directly assigned facilities to provide wholesale distribution service. The term "Direct Assignment Facilities" is defined in Section 2.11[75] and appears throughout the Tariff.[76] The Tariff authorizes PG&E to charge WDT customers like San Francisco for the costs of installing Direct Assignment Facilities and the costs of owning and operating those facilities.[77]

Schedule WD-1 of the Tariff. Section 2 of Schedule WD-1, "Distribution Service Charge," contemplates the use of Direct Assignment Facilities in the context of primary service. It states:

> Where (1) the point of interconnection of the Direct Assignment Facilities to PG&E's Distribution system is at primary voltage and (2) the PG&E-owned secondary facilities are all Direct Assignment Facilities, i.e., for the

---

[74] Maslowski Declaration, PP 19-20.

[75] WDT § 2.11 defines the term to mean: "Facilities or portions of facilities that are constructed by the Distribution Provider for the sole use/benefit of a particular Distribution Customer requesting service under this Tariff. Direct Assignment Facilities shall be specified in the Service Agreement that governs service to the Distribution Customer."

[76] *See, e.g.*, WDT §§ 12.6, 14.2.1, 15.7, 16.3, 16.4, Schedule WD-1.

[77] WDT, Schedule WD-1, Att. A §§ 3 ("Cost of Ownership Charge"), 10.1 (describing "Installation Charge").

> sole use and benefit of the Distribution Customer, the
> service shall be primary service.

Section 3 of Schedule WD-1 provides that the "Cost of Ownership reflects the

Distribution Provider's on-going cost liabilities of owning and operating Direct

Assignment Facilities. . . ."

     As discussed above, Sections 12.6 and 13.4 of PG&E's Tariff also provide that

PG&E must expand or upgrade its system if necessary to provide wholesale distribution

service. Those obligations are contingent on the distribution customer agreeing to

compensate PG&E for the costs of the upgrades and modifications, to the extent

consistent with Commission policy (WDT §§ 12.6, 13.4, 23). Since San Francisco has

consistently agreed to pay the full costs of transformers and appropriate secondary

facilities that are directly assigned to San Francisco, that contingency is satisfied.

     The Tariff also makes clear that dedicated transformers are among the Direct

Assignment Facilities that PG&E will provide under the Tariff. In describing the

Intervening Facilities required in various scenarios for primary and secondary service, for

example, a footnote in the Section 14.2.1 of the Tariff states that customer ownership of

the transformer would not be required for primary service where (emphasis added):

> *[T]he transformer is a PG&E owned Direct Assignment
> Facility* and the Distribution Customer contributes or
> contributed to the cost of such facility (typically in the case
> of a conversion from existing distribution service that is not
> provided under this Tariff to Distribution Service provided
> under this Tariff).

Many of the disputes referenced in this Complaint are precisely the sort of conversions

that are referenced in this Tariff provision.

Section 16.3 (emphasis added)—which concerns PG&E's preparation of a "System Impact Study" and a "Facilities Study"—provides that the "System Impact Study shall identify any distribution system constraints and redispatch options, *additional Direct Assignment Facilities or upgrades required to provide the requested service*." Section 16.4 provides that: "When completed, the Facilities Study will include a good faith estimate of (i) the cost of Direct Assignment Facilities to be charged to the Eligible Customer. . . ."

"Primary plus" service is also explicitly called for in the unexecuted WDT SA PG&E filed for San Francisco in December 2014. Three of the Appendix F diagrams of "Common Service Configurations" show "Primary Plus" Tariff service. In Scenario 2, "PG&E owns the transformer" and "the PG&E-owned Direct Assignment Facilities," are described as "secondary facilities," that would be "subject to Cost of Ownership charges." In Scenario 3, there is no transformer and "the PG&E-owned Direct Assignment Facilities," which are described as "primary facilities," would be "subject to Cost of Ownership charges." In Scenario 1, San Francisco would own the transformer and the "PG&E-owned Direct Assignment Facilities" are described as "primary facilities."

Likewise, other statements from PG&E belie its current position. In testimony to the Commission, PG&E stated that San Francisco has the option to convert from secondary to primary WDT service at certain locations where the "service was previously designed with what can be identified now as the equivalent of Direct Assignment

Facilities under the WDT."[78] PG&E acknowledged that such a conversion would be for "Primary plus service."[79]

PG&E claims that in denying the City's request for primary plus service PG&E is merely complying with its "obligation to treat all of our customers equitably, and to avoid providing any customer with preferential treatment"[80] According to PG&E, San Francisco's requests for "retail-type electric distribution service at a wholesale rate . . . ultimately shifts costs that should be borne by the City to the remainder of PG&E's customers."[81] Despite this rhetoric, PG&E has not—and cannot—explain how the WDT's primary plus rates—the WDT's full stated rate for primary service, plus Cost of Ownership charges for any PG&E-owned Direct Assignment Facilities—fail to recover its costs of providing WDT service to San Francisco and inappropriately shift costs to PG&E's retail customers.

Finally, there is also no evidence that the City is seeking some sort of preferential treatment by requesting primary plus service. Indeed, San Francisco understands that

---

[78] Ex. PGE-5, Prepared Answering Testimony of Yilma Hailemichael at 22:4-6, *corrected,* Ex. PGE-60, *City & Cty. of S.F. v. PG&E*, Docket Nos. EL15-3-002, *et al.* (Nov. 15, 2016), eLibrary Nos. 20161115-5061 ("Ex. PGE-5"). According to PG&E, this conversion would "require that the meter be relocated to the low-side of the PG&E-owned service transformer," and Cost of Ownership charges would be imposed for all PG&E-owned Direct Assignment Facilities below primary voltage (which would include the PG&E-owned service transformer). Ex. PGE-60, Correction to Prepared Answering Testimony of Yilma Hailemichael, *City & Cty. of S.F. v. PG&E*, Docket Nos. EL15-3-002, *et al.* (Nov. 16, 2016), eLibrary No. 20161116-5074; Ex. PGE 5 at 22:2-6.

[79] Ex. SF-165, CCSF Complaint and Replacement Agreements Data Response, *City & Cty. of S.F. v. PG&E*, Docket Nos. EL15-3-002, *et al.* (Apr. 11, 2016), eLibrary No. 20160411-5309. PG&E explained that such conversions are available to San Francisco because "[t]he WHOLESALE DISTRIBUTION TARIFF does contemplate . . . primary service where the dedicated transformer could be a Direct Assignment Facility and not an INTERVENING FACILITY." *Id.* In support of the latter statement, PG&E referred San Francisco to WDT Section 14.2.1 (PG&E Letter to SFPUC April 25, 2018) — the same section that San Francisco has identified above as a basis for primary plus service under PG&E's WDT.

[80] May 4, 2018 Letter.

[81] *Id.*

PG&E routinely uses Direct Assignment Facilities to serve other WDT customers. For example, PG&E is charging WAPA a primary plus rate at some 95 points of delivery.[82] A number of these appear large enough to require a dedicated PG&E-owned transformer.[83]

It thus appears that PG&E provides primary plus service to another WDT customer that connects to PG&E's distribution system at secondary-level voltage (i.e., connecting at primary voltage via direct assignment facilities)—WAPA.[84] PG&E's refusal to offer primary plus service in the case of San Francisco, and only in the case of San Francisco, is unduly discriminatory. *Transwestern Pipeline Co.*, 26 FERC ¶ 61,112, at 61,273 (1984); see also *San Diego Gas & Elec. Co.*, 133 FERC ¶ 61,249, P 43 (2010). PG&E has introduced precisely the type of variation in the treatment of customers that open access was intended to avoid.

3.  **PG&E Has Imposed Impermissible Delays on Service to San Francisco Loads.**

PG&E's repeated initial denials of secondary service, unreasonable metering and switchgear requirements, and lengthy site-specific negotiations have imposed undue burdens and costs on San Francisco. These actions are improper obstacles to

---

[82] PG&E, Filing to Re-file Existing Tariff Records Currently Filed Under Tariff ID 2000 to New Tariff ID 2100, *Pac. Gas & Elec. Co.*, Docket No. ER15-2246-000 (July 23, 2015), eLibrary No. 20150723-5002 (showing points of delivery as of 2015); *see also* Maslowski Declaration, P 27.

[83] Maslowski Declaration, P 27. PG&E use of Direct Assignment Facilities to provide WDT service is not unique to WAPA, although other customers do not connect at voltages or configurations that would make a Primary Plus rate appropriate. PG&E's recently terminated WDT Service Agreement with Shelter Cove listed some two miles of PG&E-owned conductor that is directly assigned to Shelter Cove. Service Agreement No. 40 under PG&E FERC Electric Tariff Volume No. 4, § 11.2 (Construction Responsibilities of Distribution Customer), as filed in *Pac. Gas & Elec. Co.*, Docket No. ER15-480-000 (Nov. 25, 2014), eLibrary No. 20141125-5204. This Service Agreement was terminated by a Letter Order issued November 21, 2017. *Pac. Gas & Elec. Co.*, Docket No. ER17-2578-000, Letter Order (Nov. 21, 2017), eLibrary No. 20171121-3074.

[84] *See* WAPA WDT SA, App. F §§ 1.2, 2.2.

San Francisco taking WDT service and, therefore, they appear to be for the primary purpose of enabling PG&E to take San Francisco's electricity customers for itself. PG&E used similar tactics to stop the City from providing electric service to a new City-owned facility providing homeless services and to stop the City from powering construction activities for new low-income housing.[85] These delays undermine the timely process for applying for and receiving WDT service required by PG&E's Tariff.

The Commission has specifically recognized that delay tactics are among the mechanisms that transmission-owning utilities use to improperly deny access (Order 888, FERC Stats. & Regs. at 31,646-49, 31,673, 31,682-84) and it ordered open access reforms to prevent those abuses (*id*. at 31,634-36, 31,669-76, 31,682-87).[86] Indeed, in Order 888, the Commission specifically cited *PG&E's* use of such delaying tactics to frustrate transmission access and avoid the commitments it made to the California owners of the California-Oregon Transmission Project, calling it a "prime example" of the ways in which "transmission-owning utilities have discriminated against others seeking transmission access in a variety of ways, most often subtly and indirectly." Order 888,

---

[85] *See* Hale Declaration, PP 12, 30.

[86] *See also* Order 888 NOPR, 60 Fed. Reg. at 17676-77 (footnote omitted):

> More often, however, discrimination is likely to be manifested more subtly and indirectly. One such way would be for transmission owners to adopt a negotiating strategy that involves a sequence of informational and other requirements over a protracted period of time. By the time all of the requirements are finally satisfied, the window for the customer's trade opportunity has closed. Another way of frustrating access is to substantially change the terms of negotiated agreements through protracted delay, including filings with regulatory agencies.

> Another way for transmission-owning utilities to frustrate access and competition is to allow access, but only on non-comparable or unsupportable terms and conditions that are inferior to the conditions under which the transmission owners themselves use or could use the transmission grid or on terms and conditions that have no operational or financial basis.

FERC Stats & Regs. at 31,683. The *pro forma* open access transmission tariff—upon which PG&E's WDT is patterned—was specifically adopted by the Commission to address such "[d]enials of access (whether they are blatant or subtle), and the potential for future denials of access." *Id.* at 31,652.

The Commission should likewise reject PG&E's adoption of similar unjust, unreasonable, and unduly discriminatory WDT implementation practices, which seek to frustrate access by San Francisco and eliminate competition.

## V.    REMEDIES

The Commission has the authority and the obligation under FPA Section 206 to ensure that rates are just, reasonable, and not unduly discriminatory.[87] It also has the authority and duty to ensure that rules or practices "affecting" wholesale rates are just and reasonable.[88] And it has exclusive authority to enforce tariffs on file with the Commission and to assure that public utilities comply with the terms of their filed rates.[89]

The Commission should exercise its authority here to direct PG&E to comply with its WDT and the unexecuted WDT SA on file with the Commission by offering San Francisco the secondary service and primary-plus service provided for by the WDT. PG&E should also be directed to modify its business practices for implementing its Tariff, so that the metering and switchgear requirements and other terms and conditions

---

[87] 16 U.S.C. § 824e.

[88] 16 U.S.C. §§ 824d(a), 824e(a); *EPSA* at 764.

[89] *See*, *e.g.*, *Cal. ex. rel. Lockyer*, 375 F.3d at 853 (recognizing the Commission's exclusive authority to enforce filed tariffs); 71 FERC at 61059; 105 FERC ¶ 61336, PP 38-39; 106 FERC ¶ 61,020, P 21 (recognizing the Commission's authority to enforce compliance with the tariffs). Section 309 of the FPA also provides that "[t]he Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions" of the FPA.

of secondary, primary plus, and primary WDT service are just and reasonable and appropriate to the size and character of the San Francisco being loads served.

To end the pattern of delays and lengthy site-specific negotiations for each San Francisco load, San Francisco proposes the following specific solutions for pending and future San Francisco requests for WDT service.[90]

For an application for service with maximum demand load less than 3000 kW, or an increase to an existing maximum demand load that is less than 3000 kW, San Francisco shall have the option of applying for secondary service, primary-plus service, or primary service under the WDT:

- If San Francisco applies for secondary service, PG&E will assess its common system in the area of the new service to determine if there are adequate facilities to serve the load, or if those facilities need to and can be upgraded to serve the load.

  - For an application for new service, PG&E will provide secondary service if it is not necessary to install a new dedicated transformer.

  - For an application to change an existing service, PG&E will provide secondary service if the existing transformer is adequate or if it can be upgraded.

- If (i) a new dedicated transformer is required for a new service, or (ii) it is not possible to serve the changed existing service from the existing transformer or by upgrading the existing transformer, then San Francisco will have the two following options:

---

[90] *See* Maslowski Declaration, PP 22-26.

- o San Francisco can install a dedicated transformer at its expense, which the City will own. San Francisco will install primary protection and be allowed, where the City determines that primary metering and switchgear is infeasible, to install secondary metering and switchgear[91] (San Francisco will compensate PG&E for un-metered losses because of the remote location of the meter). San Francisco will pay the primary service rate.

- o PG&E will install a dedicated transformer (which PG&E will own), primary protection, and secondary metering. San Francisco will receive primary plus service and pay the primary service rate and Cost of Ownership charges for Direct Assignment Facilities.

For any service with maximum demand load over 3000 kW, San Francisco shall apply for primary service under the WDT. San Francisco can chose Primary service from PG&E as set forth below:

- San Francisco will install a new dedicated transformer, if necessary, and primary, protection, switchgear and metering; or

- San Francisco will install a dedicated transformer, primary protection, and PG&E will accept secondary metering on the building switchgear if San Francisco determines that installing primary metering is not feasible.[92]

---

[91] PG&E's WDT does not require installation of metering and switchgear equipment at the types of locations where PG&E has been demanding they be installed. But even if there were such a provision for metering equipment, the WDT specifically contemplates "a variance of the standard metering requirements if the physical characteristics of a particular Point of Delivery make installation of standard metering impractical." WDT § 20.1. In the City's dense, built-up urban environment, interconnections for existing buildings qualify for such a variance.

[92] *See* WDT § 20.1.

San Francisco will compensate PG&E for unmetered losses because of the remote meter location.

PG&E should also be required to refund the excess costs the City has incurred to comply with the improper interconnection, metering, and switchgear requirements that PG&E has imposed as a condition of San Francisco receiving service. Although San Francisco has agreed to certain of these conditions to move particular projects forward, this was only because of PG&E's initial refusal to comply with the terms of its Tariff, and some of these agreements were entered into under protest.[93] The Commission has broad "remedial" authority under section 309 where the Commission finds that remedial action is "necessary or appropriate to carry out the provisions of" the FPA—which includes both "statutory and tariff" violations. *Pub. Utils. Comm'n of State of Cal. v. FERC*, 462 F.3d 1027, 1047-48 (9th Cir. 2006). *See also Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 158 (D.C. Cir. 1967) (the Commission has "broad authority to take effective action to achieve regulation in the public interest"); *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C. Cir. 1984) (the Commission has "broad authority to fashion remedies so as to do equity consistent with the public interest"); *In re Idaho Power Co*., 46 F.P.C. 384 (1971) (awarding compensation to an electric company that had overly contributed to construction of infrastructure); *In re Enron Corp.*, 2005 Bankr. LEXIS 3470, *9-10 (N.Y. Bankr. Ct. 2005) ("FERC possesses broad remedial authority to address anti-competitive behavior, specifically through profit disgorgement and refunds."). Where, as here, the evidence supports a finding that PG&E is, and has been, violating its Tariff in an effort to deny San Francisco open access

---

[93] Hale Declaration, P 11.

wholesale distribution service, PG&E should be required to pay San Francisco the difference between: (1) the costs that San Francisco has incurred as a direct result of the improper requirements that PG&E has imposed as conditions of receiving WDT service, including the costs for developing alternative designs and for the construction of oversized and redundant switchgear equipment, and (2) the costs San Francisco would have incurred if PG&E had properly compiled with its Tariff.

Finally, the Commission should take any such other actions that it finds necessary or appropriate to remedy PG&E's tariff violations, and to assure that the WDT and PG&E's implementation of the WDT is just, reasonable, and not unduly discriminatory.

## VI. THIS CASE IS RIPE FOR ADJUDICATION.

Because this Complaint references the on-going litigation in Dockets No. EL15-3, *et al.,* it is worth separately noting that the issues discussed herein were not litigated in that case and will not be decided there. In particular, nothing in the prior complaint proceeding addressed PG&E's demand that San Francisco take primary service for small loads. Only after the complaint was filed, as PG&E was implementing the WDT, did PG&E take the position that WDT secondary service would be unavailable to San Francisco in almost every case in which San Francisco requested it.

Certain topics related to this Complaint were discussed in that case. Namely, the testimony of both PG&E's and San Francisco's engineering witnesses discussed the issue of Direct Assignment Facilities. San Francisco witness Rod Maslowski argued for the availability of Primary Plus service; PG&E witness Robert Malahowski argued that Direct Assignment Facilities should be rare.

However, the Parties' Joint Statement of Issues did not include the PG&E practices at issue in this compliant. The Initial Decision issued in that proceeding did not address the issues raised in this Complaint, and neither party took exception to the fact that the Initial Decision did not address these issues.

The issue of PG&E's unreasonable metering and switchgear requirements was raised in San Francisco's protests in Docket Nos. ER17-910 and ER17-1509. However, San Francisco did not brief the issue fully in those cases. Moreover, those cases involve only the specific points of delivery included within PG&E's quarterly filings to, among other things, add new points of delivery, and PG&E only included in those filings points of delivery for which it has agreed to provide WDT service to San Francisco. This Complaint affords the Commission the opportunity to address the issue generally and not merely within the context of particular interconnections. Finally, the partial settlement filed in those dockets specifically reserved this issue for a later time.[94]

## VII.   OTHER INFORMATION REQUIRED BY RULE 206

To the extent not already provided herein, Complainant provides the following additional information required by Rule 206(b) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.206(b).

### A.   *Good Faith Estimate of Financial Impact or Harm (Rule 206(b)(4))*

As discussed above, the financial impact of PG&E's unduly burdensome requirements is on the order of several hundred thousand dollars per affected customer. The SFPUC Report estimates that the City incurred additional project costs of $4,773,000

---

[94] PG&E Joint Offer of Partial Settlement art. 13.1, *Pac. Gas & Elec. Co.*, Docket No. ER17-910-001 (Dec. 13, 2018), eLibrary No. 20181214-5000.

for the projects experiencing issues for the reporting period of July 2018 through October 2018.[95] The total financial harm is even higher, as there are more projects experiencing issues since then.

### B. Operational or Nonfinancial Impacts (Rule 206(b)(5))

San Francisco has lost and will continue to lose customers to PG&E as a result of its imposition of these requirements. In other cases, San Francisco has been able to serve the customer in question (sometimes at secondary voltages), but only after extensive delays, the City was required to incur unnecessary expenses, or the customer was required to devote significant space on its property to installing unnecessary primary service equipment.

### C. Related Matters Pending in any Other FERC Case or Other Proceeding (Rule 206(b)(6))

A number of questions about what Section 212(h) of the Federal Power Act requires for service under PG&E's Wholesale Distribution Tariff are pending in Docket Nos. EL15-3, *et al*.

Questions about the justness and reasonableness of costs associated with specific interconnections and related matters are pending in Docket Nos. ER17-910, ER17-1509, and ER17-2181, which concern quarterly filings made by PG&E to, among other things, add Points of Delivery under its Tariff. San Francisco has raised this issue briefly in its protests for Docket Nos. ER17-910 and ER17-1509. However, it did not brief the issue fully. The parties in those dockets have filed a Joint Offer of Partial Settlement that

---

[95] SFPUC Report, Att. D.

addresses other, separate issues raised in those dockets. That Joint Offer of Partial

Settlement expressly states that: [96]

> San Francisco raised issues associated with the level of
> service (primary or secondary) and PG&E's metering and
> switchgear requirements (primary or secondary) . . . . This
> Settlement does not address those issues. Neither San
> Francisco nor PG&E shall be deemed to have prejudiced in
> any way its position on these issues by joining this Offer of
> Settlement.

### D.    *Specific Relief or Remedy Requested (Rule 206(b)(7))*

San Francisco requests that the Commission find that PG&E has unreasonably

denied service to the City in contravention of the provisions of its Wholesale Distribution

Tariff and that it has imposed impermissible extra-tariff requirements on San Francisco.

San Francisco's requested remedy is discussed in greater detail above in Part V of this

Complaint.

### E.    *Documents Supporting the Complaint (Rule 206(b)(8))*

In support of this Complaint, the City submits:

- Exhibit 1: Declaration of Barbara Hale ("Hale Declaration")

- Exhibit 1, Attachment A: May 4, 2018 Letter from PG&E to Moser ("May 4,
  2018 Letter")

- Exhibit 1, Attachment B: November 7, 2018 SFPUC Quarterly Report to the
  Board of Supervisors ("SFPUC Report")

- Exhibit 2: Declaration of Rod Maslowski ("Maslowski Declaration")

- Exhibit 2, Attachment A: Electric Rule 2

- Exhibit 3: Form of Notice of Complaint

---

[96] PG&E Joint Offer of Partial Settlement art. 13.1, *Pac. Gas & Elec. Co.*, Docket No. ER17-910-001
(Dec. 13, 2018), eLibrary No. 20181214-5000.

### F. Alternative Dispute Resolution (Rule 206(b)(9))

The City has not used the Enforcement Hotline, Dispute Resolution Service, tariff-based dispute resolution procedures, or other dispute resolution procedures. It has had informal discussions with PG&E regarding these issues, but the parties have not been able to reach a mutually acceptable resolution.

Although San Francisco believes that ADR procedures can be valuable in some cases, its experience to date with respect to this dispute suggests that they would be of limited value in this instance.

### G. Form of Notice (Rule 206(b)(10))

A Form of Notice of Complaint suitable for publication in the Federal Register accompanies this Complaint as Exhibit 3.

## VIII. CONCLUSION

For the reasons set forth above, the Commission should: (1) direct PG&E to comply with its WDT and offer San Francisco secondary service and primary-plus service as provided for under its Tariff; (2) direct PG&E to pay refunds to San Francisco consistent with the filed rate; and (3) take any such other actions that the Commission finds necessary or appropriate to address PG&E's tariff violations and to assure that the WDT and PG&E's implementation of that Tariff are just, reasonable, and not unduly discriminatory.

Respectfully submitted,

/s/ Katharine M. Mapes
Thomas C. Trauger
William S. Huang
Katharine M. Mapes
Jeffrey M. Bayne

Attorneys for
City and County of San Francisco

Law Offices of:
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC 20006
(202) 879-4000

January 28, 2019

CERTIFICATE OF SERVICE

I hereby certify that I have on this 28th day of January, 2019 served the foregoing document on the following contacts listed for respondent Pacific Gas & Electric Company:

Joshua Levenberg
Attorney
PACIFIC GAS AND ELECTRIC COMPANY
PO Box 7442
San Francisco, CA 94120
Email: j3ls@pge.com

Joanne M. Myers
Manager, Electric Transmission Rates
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, Room 1351, MC-BL13L
Post Office Box 770000
San Francisco, CA 94177
Tel: 415-973-3397
Email: jmmf@pge.com

/s/ Jeffrey M. Bayne
Jeffrey M. Bayne

Law Offices of:
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC 20006
(202) 879-4000

# EXHIBIT 1

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| City and County of San Francisco | Docket No. EL19-___ |
| v. | |
| Pacific Gas and Electric Company | |

**DECLARATION OF BARBARA HALE IN SUPPORT
OF THE COMPLAINT OF THE
CITY AND COUNTY OF SAN FRANCISCO
CHALLENGING INTERCONNECTION PRACTICES
OF PACIFIC GAS AND ELECTRIC COMPANY
UNDER WHOLESALE DISTRIBUTION TARIFF**

I, Barbara Hale, declare:

1.      I am presently employed as an Assistant General Manager of the San Francisco Public Utilities Commission ("SFPUC"). The SFPUC operates San Francisco's municipal utilities that provide water, sewer, and power service. I submit this declaration in support of the complaint filed in this matter by the City and County of San Francisco ("San Francisco" or "City"). I have personal knowledge of the following facts. If called upon to testify, I could and would testify competently to the contents of this declaration.

2.      The purpose of my testimony is to provide an overview of the City's efforts to take service under Pacific Gas & Electric Company's ("PG&E") Wholesale Distribution Tariff ("WDT") since 2015. During this time, particularly since November 2017, PG&E has insisted that San Francisco take primary service, even though PG&E's WDT provides for secondary service and primary plus service. This practice has imposed on San Francisco unnecessary costs, delays, and other burdens.

## I.  QUALIFICATIONS

3.     As the Assistant General Manager, Power, I am responsible for operating San Francisco's municipal power utility, the Hetch Hetchy Power Enterprise. We provide electric service to municipal departments, facilities, and tenants, including hospitals, wastewater and water utilities, fire and police stations, municipal transit services, and SFO. We serve these customers with a portfolio of generation, dominated by the 380-MW of hydroelectric generation the City owns and operates. In addition, we serve the residential and commercial electric and gas customers on Treasure and Yerba Buena Islands; and the residential and commercial electric customers at The Shipyard, both of which are former military bases being redeveloped by the City. We also buy and sell electricity products in the wholesale market, offer our customers on-site generation and energy efficiency services, and are responsible for the City's street light systems. We also operate the City's CleanPowerSF program, a community choice aggregator for customers in the City. My staff and I represent the City's interests in state and federal electric proceedings and legislative venues. Hetch Hetchy Power Enterprise employs 120 professional and skilled craft workers with $145 million in annual operating and capital program costs. I have been employed in this capacity since October of 2004.

4.     Prior to my current position, I was employed by the California Public Utilities Commission as an Energy Analyst (1988-1990), as an Advisor to the President of the Commission (1990-1995), as an Administrative Law Judge (1995-2001), and finally, as Director of Strategic Planning for the agency (2001-2004). Though I was assigned work on all utilities regulated by the Commission, I developed my expertise in the electric industry.

2

## II.    INTERCONNECTIONS UNDER THE WDT SINCE JULY 2015

5.    Since the SFPUC started taking service under the WDT on July 1, 2015, we have experienced a pattern of delay from PG&E resulting in a long list of projects that did not move forward on a timely basis.  These delays have grown longer and PG&E's demands more burdensome as the parties continue to operate under the WDT.  PG&E has a pattern of finding San Francisco's applications "incomplete" on the ground that San Francisco applied for secondary rather than primary service.  PG&E's WDT, however, does not provide for only primary service; it also provides for secondary service and primary plus service.  There are significant cost differences in the facilities required for primary compared to secondary switchgear.  Secondary service requires secondary switchgear, which generally costs about $50,000.  Primary service requires primary switchgear, which generally costs about $500,000.  A reasonable compromise, in many cases, is primary service with secondary metering—a configuration the City has offered and agreed to in order to move some projects forward where PG&E refuses to provide secondary service.  That includes secondary switchgear and an interrupter, which generally costs about $75,000.

6.    PG&E's insistence on primary service kicks off months of delays as San Francisco attempts to negotiate reasonable service parameters.  Even if those negotiations are completed satisfactorily, San Francisco then faces long delays to get a service agreement from PG&E, in violation of the WDT's deadlines.

7.    Throughout the period that we have been taking WDT service, PG&E has regularly denied our applications for secondary service.  Out of 122 applications for secondary service, PG&E has denied 50 on the ground that the City should take primary

3