# Mapes Declaration

# Exhibit "B" – Part 3

service instead. This includes almost every application made from November 2017 to July 2018, and nearly every application for a load above 75 kW since November 2017.

8. This is not in accord with PG&E's past practices with respect to San Francisco. Most City facilities receive secondary service at locations throughout the City. Many of these facilities have been located in the same space for decades, refurbishing and modernizing their facilities as they get funding to do so. PG&E now requires such a facility that seeks to increase its load or change the service entrance to switch to primary service even if the total load is still well below the size that typically receives primary service, or which is required to do so under PG&E's rules for its own retail customers. The difference between primary and secondary service is significant and usually requires a redesign of both the electric service and other aspects of the project. Primary facilities cost substantially more and take up more space.

9. In many cases, we have spent months in discussions with PG&E trying to reach agreement so that important projects for the City can move forward. The City has sometimes offered to change its service request in an effort to move these projects forward, even though we do not believe this is required under PG&E's WDT. For certain projects the City has offered to install a new transformer, which the City will own, and requested that PG&E allow for the use of secondary switchgear and metering. PG&E, however, will often reject these offers and insist on primary switchgear and metering.

10. Often, inspection of the particular sites in question shows that there is simply no space for the primary equipment that PG&E is insisting on, or that they would need to be located in inappropriate or unsafe places. For instance, several projects have involved renovations and improvements to public schools. Placing large, primary

switchgear near recreational spaces would raise safety concerns for students and others in the community or would eliminate recreation space. Moreover, open space is required to meet building code standards, and the California Department of Education enforces certain classroom and physical education space requirements.

11. San Francisco has been able to reach agreements with PG&E so that certain projects can receive service. A number of projects were eventually able to move forward with secondary metering and switchgear. In a few instances PG&E ultimately agreed to provide secondary service or primary plus service. But although these projects are moving forward, this has come at a cost of lengthy case-by-case negotiations that force the City to choose between insisting on the service provided for under the WDT and reaching agreement with PG&E so that these projects can receive any service at all. For some of these projects, San Francisco has entered agreements under protest.

12. Many of the affected facilities were affordable housing or facilities providing homeless services, because like many other cities, San Francisco has inadequate affordable housing and a growing homeless population. The City is working hard to improve its housing options, but PG&E's practices are hindering this effort. The housing projects included both refurbishing of existing housing units and construction of new facilities. In both cases, PG&E insisted on primary service for facilities with loads well below the size for which primary service is generally required. In addition to the requirement for primary service, PG&E added requirements that seemed to serve no purpose other than delay, such as requirements that the City submit needless design packages.

13. In other instances, PG&E's actions have affected facilities related to public safety, such as the San Francisco Police Academy. PG&E has claimed that the delays are because of San Francisco's "refusal to take on the obligations required of any other utility, in this case owning primary switchgear."[1] PG&E also wrongly characterizes the City's attempt to receive service under PG&E's WDT as "San Francisco's continued desire to obtain retail-type electric distribution service at a wholesale rate."[2] In reality, San Francisco is simply seeking to receive WDT service under the terms of that Tariff.

14. The SFPUC has received many complaints from the departments and agencies we serve about delays, changing requirements for service, increased costs, and increased space requirements.[3] This has led to inquiries from elected officials about the problems with getting service to City customers on a reasonable timeline and for a reasonable cost.

15. These inquiries led to a hearing on June 13, 2018 in the Public Safety and Neighborhood Services Committee of the Board of Supervisors.[4] The Board of Supervisors adopted a resolution addressing the problem and required SFPUC to provide

---

[1] May 4, 2018 Letter from PG&E to Deputy Chief Bob Moser, City and County of San Francisco Police Department, included as Attachment A to this Declaration.

[2] *Id.*

[3] *See, e.g.*, Emily Green, *Clash Over Power Supply Holds Up Opening of SF Public Sites*, S.F. Chronicle (Apr. 13, 2017), https://www.sfchronicle.com/politics/article/Clash-over-power-supply-holds-up-opening-of-SF-11069557.php (describing a homeless shelter, children's museum, and public plaza delayed because of PG&E's practices); Emily Green, *Brighter Days Ahead for SF Museum, Shelter After Power Dispute*, S.F. Chronicle (Apr. 18, 2017), https://www.sfchronicle.com/politics/article/Brighter-days-ahead-for-SF-museum-shelter-after-11082140.php (describing San Francisco and PG&E's agreement regarding service to a children's museum and homeless shelter after months of delay).

[4] San Francisco Government TV, Board of Supervisors – Public Safety and Neighborhood Services Committee – Regular Meeting (June 13, 2018), http://sanfrancisco.granicus.com/player/clip/30791?view_id=178.

quarterly updates on interconnection disputes with PG&E (Resolution No. 227-18).[5] We submitted the first report, covering the third quarter of 2018 on Nov. 7, 2018 ("SFPUC Report," which is included as Attachment B to this Declaration). Since July 24, 2018 we have held regular meetings with PG&E to discuss delayed projects. Very few of those projects have seen progress, and PG&E is still insisting on primary service for new projects.

### III. DELAYS TO PARKS AND RECREATION FACILITIES

16. San Francisco voters recently approved a large bond measure to refurbish Recreation and Parks Department properties. A number of these projects, however, have been delayed because of PG&E's improper implementation of its WDT.

#### A. *Balboa Pool*

17. One of the projects that was substantially delayed was the Balboa Pool. The details surrounding the Balboa Pool refurbishment are a good example of how PG&E has frustrated San Francisco's attempts to connect its loads. The Balboa Pool and associated park have served the community for over 100 years. In addition to the pool, the approximately 1.1 million square foot park has multiple fields for soccer and baseball, tennis and basketball courts, a children's play area, and a skateboard park. The Recreation and Parks Department began the $7 million renovation of the Balboa Park and Pool in the fall of 2016.[6]

18. In order to accommodate the increased load from the renovation, the Recreation and Parks Department is replacing the existing switchboard and moving the

---

[5] Resolution No. 227-18, S.F. Board of Supervisors (July 20, 2018) https://sfbos.org/sites/default/files/r0227-18.pdf.

[6] *See Balboa Park Pool Improvement Project*, S.F. Recreation & Parks, http://sfrecpark.org/project/balboa-pool-improvements/ (last visited Jan. 25, 2019).

7

wet utilities further away, so as to comply with updated utility standards. To meet the new load, the City requested a new reserved capacity of 220 kW. On August 9, 2017, PG&E notified the City that the City would need a primary level connection to serve the load because PG&E did not have the capacity to serve the load from its existing secondary system.

19. On September 11, 2017, San Francisco advised PG&E that, in light of PG&E's statement that it did not have the capacity to serve the load, the City would install and own a new transformer, an interrupter, and secondary switchgear. San Francisco requested a December 2017 service date for this project to allow the project to achieve its planned completion date of March 2018.

20. In an email dated October 26, 2017, PG&E reiterated that it considered this a new service application and would require the City to take primary service. On November 20, 2017, the City sent PG&E a second request to use a City-owned dedicated transformer and secondary switchgear. On January 10, 2018, PG&E responded by denying the request and insisting that space could be found for primary switchgear, because the City "is remodeling the site."

21. Following press reports concerning the dispute,[7] on February 14, 2018 PG&E suggested that it would consider a different configuration for service to this load. On February 15, 2018, San Francisco wrote to PG&E to reiterate its prior offer to install and own a transformer and interrupter while using secondary switchgear. In March 2018, PG&E agreed to this configuration provided the load did not exceed 75 kW. While San

---

[7] Wilson Walker, *Conflict Between PG&E, SF Public Utilities Commission Bogs Down More Projects*, CBS SF Bay Area (Feb. 14, 2018), https://sanfrancisco.cbslocal.com/2018/02/14/conflict-between-pge-sf-public-utilities-commission-bogs-down-more-projects/.

8

Francisco had previously asked for a reserved capacity of 220 kW, San Francisco agreed to reduce it to 75 kW in an attempt to move the project forward. This lower reserved capacity, however, has impacts on the pool's operations.

22. PG&E's steadfast refusal to allow secondary service at the Balboa Pool caused the project to be in dispute for 18-19 months, which caused "a domino effect on [Recreation and Parks Department]'s plans to renovate a group of community pools."[8] The delay also forced the City to undertake about $20,000 in redesign costs, $670,000 in additional construction costs, and $500,000 in additional construction and project management costs due to delay.[9]

### B. Randall Museum

23. Another Recreation and Parks Department facility that experienced such delays is the Randall Museum, a City-owned museum operated by the Recreation and Parks Department. The Randall Museum had received secondary service in its existing location since 1951 with a maximum load of 55 kW. The Randall planned for a $6 million renovation of the facility funded by a State grant, City funds, and money raised by the Friends of the Randall Museum, a private non-profit. The museum closed for renovations in summer of 2015, expecting to reopen in February 2017. The reopening was delayed by one year due to the dispute over PG&E's refusal to provide secondary service. In addition to the direct cost increases due to PG&E's demand for primary service, this delay threatened the receipt of the state grant funds and affected the ability of

---

[8] SFPUC Report, Att. A, row 8.

[9] SFPUC Report, Att. D, row 8.

9

the Friends of the Randall to raise money for future projects. Planned children's day camps for the summer 2017 were curtailed, reducing revenue and angering residents.

24. San Francisco submitted an application for WDT service to the Randall in July 2016, requesting switchgear and meter replacement to serve load up to 167 kW (which was later reduced to 100 kW). PG&E denied this request, requiring primary service. On October 25, 2016, San Francisco submitted an updated application for a primary service level connection, even though it disagreed with PG&E's requirement of primary service. In February 2017 PG&E required a System Impact Study, despite the fact that the application was for a relatively small increase in load. PG&E required San Francisco to pay estimated costs of $25,000 to undertake what should have been at most a simple study (assuming engineering rates of $250, this would mean San Francisco was charged for 100 hours of engineering time). PG&E has since indicated to San Francisco that the cost of the study was actually $2,000. PG&E took 31 days to complete the study. The study report that PG&E conveyed to San Francisco had very little substance, and PG&E would not provide any back up documentation or work papers. PG&E later agreed to serve the Randall Museum using a secondary service level connection, but the disagreement jeopardized the project's timeline. In addition, San Francisco asked to own the service lateral to meet the intervening facilities requirement, but PG&E refused to permit this. PG&E has also required San Francisco to pay for conductors, an interrupter, and a transformer, which the City must deed over to PG&E and pay Cost of Ownership charges on.

### IV. CITY LOSSES TO PG&E

25. Some City departments have asked us to allow them to take retail service from PG&E in order to avoid the delays, costs, and space requirements that PG&E

imposes when customers are served by the City. The City has reluctantly agreed to allow some projects to take PG&E retail service when delays imposed by PG&E on City service became simply too costly and burdensome.

26. One such project was the Central Waterfront Navigation Center. This was a new facility consisting of portable modular units providing temporary housing and services for homeless people. In summary, PG&E's requirements for this project would have delayed the opening by at least 90 days. We initially tried to accommodate PG&E's requirements, providing diesel generators so that the project could open while we worked with PG&E. We were not able to make progress with PG&E, so the City allowed PG&E to serve this facility as a retail customer starting in June 2017.

27. This dispute began on July 25, 2016, when the City submitted a WDT application for secondary service to serve 325 kW commencing March 1, 2017. PG&E responded on September 29, 2016 that primary service was required. While disagreeing with this requirement, the City submitted an application on November 7, 2016 for primary service to begin in March 2017. On January 4, 2017 PG&E added a requirement that the City submit design packages for both fused and recloser designs so that PG&E could determine which design was required. The City submitted those designs on February 15 and 17, 2017. The City obtained all necessary equipment for both designs and was ready to commence construction upon receiving a decision from PG&E. PG&E still would not move forward, and on March 20, 2017 it informed the City that a system impact study was required, which would take 60 days followed by a design period of 30 days.

28. At the same time, PG&E staff represented to electrical staff at the City's Public Works Department that retail service could start in just six weeks. Eventually, the City withdrew its request for WDT service under protest and requested service for the Navigation Center as a PG&E retail customer. [10] PG&E is not using primary facilities for its service to this site.

29. For many projects, the City was unable to provide power for project construction due to PG&E's requirements. It is common for construction power to begin before the electrical equipment for permanent service is in place. PG&E has refused to provide the City WDT service for construction, claiming that the WDT does not allow temporary service. The City understands the WDT to allow for service terms shorter than the standard five-year term, which would accommodate service for project construction over several months or years.

30. In addition, PG&E would not agree to provide WDT service to support construction power unless the City had in place the primary service facilities PG&E has unreasonably demanded for small loads. Adhering to this requirement would cause long delays at the start of a project for design and construction of facilities not required for other, similarly-sized facilities. Even if PG&E ultimately agreed to a more reasonable outcome, the negotiations to get there would take months at best. In order to avoid construction delays and the costs that would be owed to contractors in many cases, the City withdrew its request for construction power in several cases, allowing PG&E to provide retail power service.

---

[10] Kevin Fagan, *SF's Newest Navigation Center Opens in Dogpatch Neighborhood*, SF Gate (May 24, 2017), https://www.sfgate.com/bayarea/article/SF-s-newest-Navigation-Center-open-in-Dogpatch-11171369.php#item-85307-tbla-3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 28, 2019.

_____
Barbara Hale

# EXHIBIT 1
# ATTACHMENT A



**Pacific Gas and Electric Company**

David Gabbard
Senior Director
Transmission Asset
Management

245 Market Street, Room 936
San Francisco, CA 94105

*Mailing Address:*
Mail Code N9G
P.O. Box 770000
San Francisco, CA 94177

Tel: 415.973.8996
Fax: 415.973.5228
DPG8@pge.com

May 4, 2018

Deputy Chief Bob Moser
City and County of San Francisco
Police Department
Headquarters
1245 3rd Street
San Francisco, CA 94158

Dear Deputy Chief Moser:

Thank you for your letter to Kevin Dasso, Vice President of Electric Asset Management at PG&E, dated April 27, 2018. As Senior Director of the team working on these issues, Kevin asked me to respond.

We share your concern regarding delays to the SF Police Academy at 350 Amber, and agree that the upgrades to the facility described in your letter are extremely important.

As you may know, the business arrangement between PG&E and the City falls under the auspices of the Federal Power Act. This law requires a utility such as the SFPUC to own or control its own facilities in order to receive lower cost wholesale electric service when it serves new customers. The rule exists to balance the dual goals of ensuring that all utilities have access to the existing grid infrastructure to deliver energy and making sure that each utility bears the financial and infrastructure responsibilities associated with serving its own customers.

In our view, project delays, like those being described at 350 Amber, derive directly from SFPUC's refusal to take on the obligations required of any other utility, in this case owning primary switchgear. Under both Federal and State law, PG&E has an obligation to treat all of our customers equitably, and to avoid providing any customer with preferential treatment. For this reason, PG&E cannot accommodate San Francisco's continued desire to obtain retail-type electric distribution service at a wholesale rate, because doing so ultimately shifts costs that should be borne by the City to the remainder of PG&E's customers, including those who live within San Francisco.

Representatives from PG&E and SFPUC are working hard and in good faith to try to resolve some of the concerns and issues related to delays like this. We are taking these efforts seriously.

Sincerely,

SC:ea

cc: Kevin Dasso