# Mapes Declaration

# Exhibit "B" – Part 6

**ATTACHMENT C**: Process Timeline for Projects from Application Submittal to Energization



Client organization submits service request to PUC.

PUC reviews and **submits complete application** to PG&E.

PG&E has **15** days to respond by:
1) deeming application complete or
2) providing a comprehensive list of application deficiencies with request for additional information.

Additional documentation required?

**NO**

Once application is **deemed complete**, PG&E has **30** days to determine if a System Impact Study (SIS) is needed (typically required for larger projects), and if so, to provide SIS agreement.

**YES**

*Note: In practice, PG&E restarts the 15-day timeline with each request for additional information, with no limit to the number of requests for information.*

If PG&E requests additional information due to application deficiency, PUC has **45** days to respond.

SIS required?

**NO**

**YES**

PUC has **15** days to execute SIS agreement. PG&E has **60** days to complete SIS and determine if Facility Study (FS) is needed, and if so, to provide FS agreement.

Pre-construction meeting held. Inspections begin.

Pre-construction meeting scheduled.

PUC has **15** days to **execute service agreement** and return with payment.

PG&E has **60** days to **provide a service agreement** (**30** days if SIS or FS is performed), during which PG&E begins **engineering estimation**.

FS required?

**NO**

**YES**

PG&E **starts construction**.

Energization date scheduled.

**Project energized**.

| Key | | |
|---|---|---|
| | Application and Contract Phase | |
| | Construction Phase | |
| | Energization Phase | |

PUC has **15** days to execute FS agreement. PG&E has **60** days to complete FS.

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Additional Costs to Project | | | | Other Impacts to SF | |
| | Project Location | Redesign Costs | Primary or Secondary Metering Equipment Costs | Additonal Construction Costs | Additional Costs to Project for PG&E retail service | Additional Const./Project Mgmt Costs Due to Delay | Additional Staff Time Costs | Total Additional Project Costs (B+C+D+E+F+G) | Lost gross revenue to SFPUC | CO2 Emissions (lbs) from PG&E retail service |
| | 1950 Mission Street - Affordable Housing | $ 45,000 | $ 500,000 | | $ 81,000 | | | $ 626,000 | $ 294,000 | 623,000 |
| | 490 South Van Ness Avenue - Affordable Housing | $ 15,000 | | | $ 43,000 | | | $ 58,000 | $ 145,000 | 294,000 |
| | 1990 Folsom Street - Affordable Housing | | | | $ 29,000 | | | $ 29,000 | $ 563,000 | 926,652 |
| | 2060 Folsom Street - Affordable Housing | | | | $ 8,000 | | | $ 8,000 | $ 581,000 | 922,000 |
| | 2 Rankin Street - Central Bayside Pump Station | | | | | | | $ - | | |
| | 2401 Keith Street - Southeast Health Center | | | | | | | $ - | | |
| | 2110 Greenwich Street - Tule Elk Elementary | | | | | | | $ - | | |
| | 51 Havelock Street - Balboa Pool | $ 20,000 | | $ 670,000 | | $ 500,000 | | $ 1,190,000 | $ 14,000 | |
| | 1995 Evans - Traffic Controls and Forensics | | | | | | | $ - | | |
| | Stockton btwn Ellis & O'Farrell - Central Subway Streetlight Reinstallation | | | | | | | $ - | | |
| | 1909 16th Street - Streetlights | | | | | | | $ - | | |
| | Transbay Transit Center - Transbay Joint Powers Authority | | | | | | | $ - | | |
| | Multiple Locations - Guy Wires (Franchise Issue) | | | | | | | $ - | | |
| | Lake Merced Blvd & Sunset Blvd - Restroom | | | | | | | $ - | | |
| | 50 Bowling Green Drive - GGP Tennis Center | | $ 75,000 | | | | | $ 75,000 | $ 1,000 | |
| | 1001 22nd Street - Bus Electrification Pilot | | | | | | | $ - | | |
| | 49 South Van Ness Avenue - Building Inspection Office | | | | | | | $ - | | |
| | 1296 Shotwell Street - Affordable Senior Housing | | $ 75,000 | | | | | $ 75,000 | | |
| | 88 Broadway - Affordable Housing | | | | $ 79,000 | | | $ 79,000 | $ 618,000 | 1,090,000 |
| | 735 Davis - Affordable Housing | | | | $ 18,000 | | | $ 18,000 | $ 335,000 | 584,000 |
| | 838 Pacific Avenue - Ping Yuen North Affordable Housing | | | | | $ 240,000 | | $ 240,000 | $ 186,000 | |
| | 350 Ellis Street - Affordable Housing | | | | | | | $ - | $ 110,000 | |
| | 2451 Sacramento Street - JFK Towers Affordable Housing | | | | | | | $ - | $ 15,000 | |
| | 16th & Terry Francois Blvd. - Mission Bay Ferry Landing | $ 30,000 | $ 75,000 | | | | $ 70,000 | $ 175,000 | | |
| | Ferry Terminal | $ 32,000 | $ 75,000 | | | | $ 96,000 | $ 203,000 | | |
| | 2241 Jerrold Avenue - Ambulance Deployment Facility | $ 100,000 | $ 75,000 | | | $ 250,000 | $ 100,000 | $ 525,000 | $ 110,000 | |
| | Pier 26 - Fire Boat Berthing | | | | | | | $ - | | |
| | 800 Amador Street - Pier 94 - Backlands | $ 50,000 | $ 500,000 | | | | $ 50,000 | $ 600,000 | | |
| | 801 Illinois Street - Crane Cove Park Building | $ 75,000 | | | | | $ 50,000 | $ 125,000 | | |
| | 2301 San Jose Avenue - Geneva Car Barn | $ 5,000 | $ 75,000 | | | | $ 15,000 | $ 95,000 | $ 13,000 | |
| | 45th & Lincoln - Restroom for Golden Gate Boat Park | | | | | | | $ - | | |
| | 6 Berry Street - Substation | | | | | $ 5,000 | | $ 5,000 | | |
| | 3455 Van Ness Avenue - AWSS Pump Station No. 2 | | | | | | | $ - | | |
| | 750 Brannan - Main Library Repository | | | | | | | $ - | | |
| | Illinois St. & Terry Francois - Mariposa Pump Station | | | | $ 22,000 | | | $ 22,000 | $ 588,000 | 554,000 |
| | 350 Amber Drive - Police Academy | | $ 75,000 | | | | | $ 75,000 | $ 18,000 | |
| | 3630 Divisadero - Claire Lilenthal School | | $ 75,000 | | | | | $ 75,000 | $ 3,000 | |
| | 4235 19th Street - Harvey Milk Civil Rights Academy | | $ 75,000 | | | | | $ 75,000 | $ 6,000 | |
| | 600 32nd Avenue - George Washington High School | | $ 75,000 | | | | | $ 75,000 | $ 6,000 | |
| | 1271 Treat Avenue - Garfield Pool | | $ 250,000 | | | | | $ 250,000 | | |
| | 950 Golden Gate Avenue - Margaret Hayward Park | | $ 75,000 | | | | | $ 75,000 | | |

**Attachment D: Cost Impacts**

| A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|
| | Additional Costs to Project | | | | | | | Other Impacts to SF | |
| **Project Location** | **Redesign Costs** | **Primary or Secondary Metering Equipment Costs** | **Additonal Construction Costs** | **Additional Costs to Project for PG&E retail service** | **Additional Const./Project Mgmt Costs Due to Delay** | **Additional Staff Time Costs** | **Total Additional Project Costs (B+C+D+E+F+G)** | **Lost gross revenue to SFPUC** | **CO2 Emissions (lbs) from PG&E retail service** |
| 199 Museum Way/122 State Street - Corona Heights Restroom | | | | | | | $ - | | |
| 750 Phelps - Southeast Plant | | | | | | | $ - | | |
| 1595 Davidson - Bruce Flynn Pump Station | | | | | | | $ - | | |
| 3133 Van Ness Ave. - SFMTA Restroom | | | | | | | $ - | | |
| **TOTAL** | $ 372,000 | $ 2,075,000 | $ 670,000 | $ 280,000 | $ 995,000 | $ 381,000 | **$ 4,773,000** | $ 3,606,000 | 4,993,652 |

| | |
|---|---|
| Total Additional Project Costs | $ 4,773,000.00 |
| Total Lost Gross Revenue to SFPUC | $ 3,606,000.00 |
| **Total Cost Impact to SF (Project Costs + Lost Revenue)** | **$ 8,379,000.00** |
| **Total C02 Emissions (lbs.)** | **4,993,652** |

**Note:** These represent estimates of the costs that the City is aware of at at the moment. The projects may incur additional costs going forward.

# EXHIBIT 2

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| City and County of San Francisco<br>        Complainant<br>    v.<br><br>Pacific Gas and Electric Company<br>        Respondent | Docket No. EL19-___ |

**DECLARATION OF ROD MASLOWSKI IN
SUPPORT OF THE COMPLAINT OF THE
CITY AND COUNTY OF SAN FRANCISCO
CHALLENGING INTERCONNECTION PRACTICES
OF PACIFIC GAS AND ELECTRIC COMPANY
UNDER WHOLESALE DISTRIBUTION TARIFF**

I, Rod Maslowski, declare:

1.      I am presently employed as a senior consultant with Flynn Resource Consultants Inc. I submit this declaration in support of the complaint filed in this matter by the City and County of San Francisco ("San Francisco" or "City"). I have personal knowledge of the following facts. If called upon to testify, I could and would testify competently to the contents of this declaration.

2.      The purpose of my declaration is to address the interconnection, metering, and switchgear requirements that the Pacific Gas and Electric Company ("PG&E") is imposing on San Francisco under its Wholesale Distribution Tariff ("WDT"). Specifically, PG&E has denied San Francisco's applications for secondary distribution service under the WDT and demanded that the City take primary distribution service at those locations—both at new points of delivery and at existing points of delivery currently taking secondary service that are being modified—even though the sizes of those loads do not require primary service as an engineering matter. In the process, by requiring primary service, PG&E has imposed excessive metering and switchgear

requirements on San Francisco for those loads, far in excess of what is technically necessary, thus requiring San Francisco to incur extraordinary and unnecessary expense and in some instances preventing San Francisco from providing service to its customers due to space and other limitations.

3.       As I will discuss below, lower-cost service installations, including secondary service and alternate metering locations, are valid alternatives from an engineering and technical perspective to what PG&E is demanding. These options would not require PG&E to incur any uncompensated costs. In some instances, PG&E has, after significant delay, accepted these alternatives in locations where it initially stated that primary service was required. Since nothing had changed at these locations from a technical or engineering perspective, it is clear that the primary service requirement that PG&E is attempting to impose is not driven by valid technical or engineering requirements.

## I.      QUALIFICATIONS

4.       I have a Bachelor of Science degree in Electrical Engineering from the University of California, Berkeley, and a Master of Business Administration degree from St. Mary's College. I am a Registered Electrical Engineer in California. I have more than 45 years of experience working with electric utilities, including 35 years at PG&E. I retired from PG&E in 2005.

5.       At PG&E, I worked as San Francisco division electric engineer. During this time I worked on distribution planning and engineering, as well as provided technical supervision for PG&E work in San Francisco. I later became the division superintendent for PG&E's San Francisco Division. As division superintendent, I was responsible for all matters related to the distribution of electricity in San Francisco, including customer

2

connections, planning/engineering, construction, operations, emergency response, and other functions. While employed at PG&E, in other assignments I was active in external transmission and distribution industry groups, including the Edison Electric Institute and the Western Electricity Coordinating Council, where I chaired the Operating Committee for several years.

## II. SAN FRANCISCO'S RECENT EFFORTS TO CONNECT CUSTOMERS UNDER THE WDT

6.     I have been working with San Francisco since September 2013 on matters related to the WDT and San Francisco's receipt of service from PG&E. San Francisco presently takes service from PG&E under its WDT at over 2,200 individual metered points of delivery. PG&E previously provided service to San Francisco at most of those points of delivery pursuant to the 1987 Interconnection Agreement between the parties. When that agreement expired on June 30, 2015, San Francisco began taking service under the WDT at those same points of delivery. Of these existing services, over 96% receive secondary distribution service from PG&E.

7.     Pursuant to PG&E's Electric Rule 2 on file with the California Public Utilities Commission,[1] PG&E considers a connection at 12 kilovolts ("kV") (or 12,000 volts ("V")) or 34 kV (34,000v) to be a primary service. Primary service is reserved for large distribution loads. Electric Rule 2 makes primary service optional for loads above 500 kilowatts ("kW") and required for loads above 3000 kW.[2] But this requirement is not for technical, safety, or reliability concerns; instead, it appears to be based on the

---

[1] A copy of Electric Rule 2 is attached hereto as Attachment A.

[2] San Diego Gas and Electric Company and Southern California Edison are the other large investor-owned utilities in California. They each have an Electric Rule 2 that establishes similar thresholds for primary and secondary services.

3

standard size transformers that PG&E chooses to stock. When a customer takes primary service, the customer must own the transformer and primary protection, which protects the transformer and serves to protect PG&E from faults on the downstream distribution facilities. PG&E owns the meter but the customer must provide the facilities to house the meter, typically primary switchgear. PG&E may add its own primary protection at or near the delivery point. These large loads may justify the higher expense and complexity of primary metering, protection, and transformer ownership because the customer will save money over the long term with higher electric usage at the lower primary electric service rates. In order for a customer to take primary service, however, the customer must also have space available on its property to accommodate all the primary service equipment (in addition to having a large enough load).

8.     Under Electric Rule 2, a connection below 600v (used for loads up to 3000 kW) is a secondary service. When providing secondary distribution service, PG&E will own the transformer. At PG&E's option, the transformer can be either: (1) a common transformer, which serves more than one customer, or (2) a dedicated transformer, which serves only a single customer. A dedicated transformer is usually used for loads greater than 75 kW. PG&E will also install primary protective devices ("protection"), which are typically fuses. In addition, PG&E will install secondary metering on the building's electrical switchgear.

9.     Although not available to retail customers, wholesale customers taking service under the WDT may also take "primary plus" service. A primary plus service is a secondary voltage connection in which the customer will: (1) pay PG&E to install, own, and maintain dedicated facilities connected to the PG&E primary system (e.g., primary

4

line extension, protection, and a transformer),[3] and (2) pay cost of ownership ("CoO")
charges for PG&E to maintain and also replace those dedicated facilities if needed.
PG&E will charge the customer its lower wholesale primary service rate for electrical
usage. The "plus" refers to the CoO charges the primary plus customer will incur. In
other words, primary plus service is a secondary connection with the primary rate *plus*
cost of ownership charges.

10.     Since July 2015, San Francisco has been applying for secondary
distribution service[4] under the WDT at most new points of delivery. San Francisco has
applied for secondary service about 120 locations in San Francisco. This includes
applications for both new services and for existing points of delivery where
San Francisco seeks either to increase the reserved capacity or to make changes to the
service entry to accommodate renovations to the properties being served.[5]

11.     PG&E has refused to provide secondary service to about 40 percent of
these applications, including most applications since November 2017.[6] Since November
2017, it has denied nearly every application for secondary service for a load above 75
kW, as well as some applications for smaller loads.[7] As explained in more detail in the

---

[3] With primary plus service there is generally a transformer dedicated to the customer. If PG&E owns a
dedicated transformer for the customer, the customer will have paid for the transformer and a mark-up for
ITCC Tax.

[4] As used in this Declaration, secondary service refers to service where PG&E owns the transformer and
San Francisco pays the secondary rate specified in the WDT. Primary service refers to service where San
Francisco owns the transformer and pays the primary rate specified in the WDT. Primary plus service refers
to service where PG&E owns the dedicated transformer and San Francisco pays the primary rate *plus* cost
of ownership charges for the transformer.

[5] *See* Declaration of Barbara Hale, Exhibit 1 to the Complaint ("Hale Declaration").

[6] *See* Hale Declaration.

[7] *See* Hale Declaration.

Declaration of Barbara Hale,[8] upon receipt of an application for secondary service, PG&E will typically assert that the application is incomplete and will require San Francisco to resubmit an application for primary service. At some of these locations, after protracted negotiations and delays, PG&E has eventually agreed to provide a secondary (or primary plus) service or an alternative primary service configuration with secondary metering.[9] Others, however, remain at a standstill.

## III.    PG&E'S DEMAND THAT SAN FRANCISCO TAKE PRIMARY WDT SERVICE FOR SMALL LOADS

12.    PG&E's demand that San Francisco take primary service for its smaller loads is excessive and not driven by any technical, safety, or reliability requirements. Those customer connections could readily be served with a secondary-connected service, with either a dedicated transformer or a common transformer.

13.    Indeed, the most common existing service from PG&E for San Francisco load is a secondary-connected service for a smaller load (usually below 500 kW, but in some cases larger), with PG&E owning the dedicated or common transformer and associated primary facilities and the secondary service line. The customer's load is metered at secondary, at the customer secondary switchgear in its building. More than 96% of San Francisco's existing metered service points currently receive this type of secondary service. This configuration has been, and can continue to be, used to provide safe, reliable service to the bulk of San Francisco's loads. And in most locations with an existing secondary service, PG&E should be able to provide the secondary service for

---

[8] *See* Hale Declaration.

[9] *See* Hale Declaration; *see also* November 7, 2018 SFPUC Quarterly Report to the Board of Supervisors, Attachment B to Exhibit 1, Hale Declaration, to the Complaint (detailing 45 projects in dispute during the period of July 2018 through October 2018).

6

which San Francisco has applied by using or upgrading the existing PG&E transformer at its current location and/or relocating the service as needed.

14.    The use of a secondary-connected service for these new and existing smaller San Francisco loads is also consistent with the PG&E retail electric service requirements that have been in place for many years. Those PG&E requirements have evolved to right-size the utility and customer facilities for the distribution load being served. PG&E's requiring San Francisco to take primary service for its smaller loads under the WDT is arbitrary and forces a primary service for most installations that would never be the option chosen by the customer if they were given the choice. Nor are they the installations PG&E chooses for its own similarly-sized retail customers.

15.    By requiring San Francisco to take primary service, PG&E is significantly increasing the cost of service for San Francisco service connections. To comply with that demand, San Francisco would need to install and own a dedicated distribution transformer, along with primary metering, protection, and switchgear and any other secondary voltage facilities needed for service at the location. PG&E has been requiring this even where there is already a PG&E-owned transformer that could be used as-is or upgraded or relocated, or where no dedicated transformer is needed. For dedicated services where a transformer serves only the San Francisco customer, a PG&E-owned transformer for a secondary service or primary plus service should be roughly comparable in cost to a San Francisco-owned transformer for a primary service. Costs for other secondary voltage facilities should also be roughly comparable between primary and secondary service.

Case: 19-30088   Doc# 1538-7   Filed: 04/18/19   Entered: 04/18/19 08:20:57   Page 12 of 28

16. However, a primary service also includes primary metering, switchgear, and a protection/disconnect device. The protection and disconnect device required for a primary service is more expensive and complicated than the protection for a dedicated secondary service. That is because, in addition to protecting the transformer, it also protects the upstream utility from the downstream utility's distribution facilities and acts as a disconnect point between the two utilities. This level of protection/disconnect is not required for a secondary service (served from either a common transformer or a PG&E-owned dedicated transformer) or a primary plus service.

17. Primary metering is also more expensive than secondary metering, and there are physical space concerns associated with installing primary metering for smaller loads. A significant footprint is needed to house primary metering and switchgear, but space constraints may make this infeasible for the smaller sites and facilities typically associated with smaller loads. This primary metering and switchgear requirement is especially problematic when PG&E will be providing service from its underground distribution system to a San Francisco load. Because metering cannot be located underground, it must be installed in an aboveground meter cabinet. And for a primary service, locating the meter at the point of common connection between PG&E and San Francisco often would require placing the cabinet on a public sidewalk or other outdoor location. Conversely, secondary metering is typically and routinely incorporated in the building secondary switchgear, so there no added space burden from the metering.

18. San Francisco agrees that, where feasible and cost-effective, it is appropriate to install the meter at the point of connection between the PG&E-owned facilities and City-owned facilities. Such a meter location measures all the customer's

8

usage and electrical losses beyond the point of connection. However, there is no technical reason that metering cannot be located away from the point of connection (such as in the building utility room, which is a safer and more secure location for a meter), provided a calculated loss adjustment is programmed into the meter to account for losses. PG&E's retail Electric Rule 2 recognizes that it may not be feasible for the point of delivery and the point of metering to be in close proximity to each other and explains the meter reading adjustment needed to correct for losses. PG&E's Greenbook, Electric and Gas Service requirements, in Appendix C, notes that it is not an absolute requirement for metering for a primary service to be at the POS (point of service) and indicates a 2% loss factor for low-side metering. Some existing San Francisco loads currently have metering located away from the point of connection, including the DeYoung Museum and Academy of Sciences, where the point of connection is at the low side of the transformer, but the meter is located hundreds of feet away in the building electrical room. Recently, in order to provide primary service to the City's Balboa Park and Pool following a major renovation, PG&E increased the meter values by 2 percent for billing purposes in order to account for losses between the primary point of connection and the metering. This is an appropriate solution where metering cannot safely or practically be located at the point of common connection. And in a dense, built-out urban area like San Francisco, there are many circumstances in which metering cannot be located at the point of common connection.

## IV.  PG&E'S HAS MISHANDLED SYSTEM IMPACT STUDIES.

19.     If San Francisco submits an application for a new service or to increase the load at one of its existing secondary points of delivery, PG&E must determine whether it has sufficient capacity to provide service to the load from its existing facilities.

9

In some instances, this can require a System Impact Study ("SIS"). If PG&E determines that additional or larger facilities are necessary, PG&E could consider upgrading its existing common or dedicated service facilities. What PG&E has been doing, however, is requiring the San Francisco to install its own dedicated service facilities instead (i.e., it is requiring the City to take a new primary service).

20.     It is common for PG&E to prepare an SIS, at San Francisco's expense, when evaluating a new or upgraded service request, particularly if there is a concern about primary system capacity. In several of the SIS's I have reviewed, PG&E has asserted that there is not adequate capacity in the existing system to serve the load requested by San Francisco. However, no detail is provided in the SIS to support this assertion. While the WDT states that PG&E is required to provide the work papers that support an SIS, PG&E has declined to provide its work papers or details supporting its determination in response to San Francisco's requests. In conjunction with a service request, San Francisco has also requested that PG&E provide circuit information and capacity in the area of the service. This information on PG&E facilities in the vicinity of the property being served might allow San Francisco to make adjustments to its service request to avoid triggering large upgrades. PG&E has also declined to provide this information.

## V.     PG&E SHOULD MODIFY ITS WDT IMPLEMENTATION PRACTICES

21.     To address the issues of mandated dedicated transformers and resulting primary service, San Francisco proposes the following arrangements for new services, expanded existing services, or re-located existing services. San Francisco proposes that

these options be available at the start of each project and not depend on lengthy and contested negotiations to achieve these options.

22.     For any new service over 3000 kW San Francisco will take primary service from PG&E. Secondary metering at certain locations will be accepted by PG&E if San Francisco determines that the installation of Primary Metering is not feasible.

23.     For service applications under 3000 kW, the following guidelines would apply: If San Francisco applies for secondary service, PG&E will assess its common system in the area of the new service to determine if there are adequate facilities to serve the load, or if those facilities need to and can be upgraded to serve the load.

    A.     For an application for new service, PG&E will provide secondary service if it is not necessary to install a new dedicated transformer.

    B.     For an application to change an existing service, PG&E will provide secondary service if the existing transformer is adequate or if it can be upgraded.

24.     If (i) a new dedicated transformer is required for a new service, or (ii) it is not possible to serve the changed existing service from the existing transformer or by upgrading the existing transformer, then San Francisco will have the two following options:

    A.     San Francisco can install a dedicated transformer at its expense, which the City will own.  San Francisco will install primary protection and be allowed to install secondary metering and switchgear[10] (San Francisco will

---

[10] PG&E's WDT does not require installation of metering and switchgear equipment at the types of locations where PG&E has been demanding they be installed. But even if there were such a provision for metering equipment, the WDT specifically contemplates "a variance of the standard metering requirements

compensate PG&E for un-metered losses because of the remote location of the meter). San Francisco will pay the primary service rate.

    B.    PG&E will install a dedicated transformer (which PG&E will own), primary protection, and secondary metering. San Francisco will receive primary plus service and pay the primary service rate and Cost of Ownership charges for Direct Assignment Facilities.

25.    Finally, where a physical modification of a point of connection affects an existing underground secondary service without a load increase, PG&E will relocate its service facilities as needed to maintain the secondary service.

26.    These proposals for new, upgraded, or re-located services comply with the WDT, are fair to both San Francisco and PG&E, are consistent with past practice and treatment of other wholesale customers, would provide timely and predictable service requirements to meet customer schedules for service, would fully compensate PG&E, and would allow San Francisco to serve its customers with the type of service that best suits the needs of San Francisco and its customers.

27.    These proposals would not be out of the ordinary for PG&E. For example, PG&E provides wholesale distribution service to the Western Area Power Administration ("WAPA"). In 2015, WAPA received secondary service at 970 points of delivery and primary plus service at 95 points of delivery (approximately 84% of the total 1,271 WAPA service connections).[11] Through December 2018, WAPA has added 50 and

---

if the physical characteristics of a particular Point of Delivery make installation of standard metering impractical." WDT § 20.1. In the City's dense, built-up urban environment, interconnections for existing buildings qualify for such a variance.

[11] Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER16-400-000 (Nov. 25, 2015), eLibrary

Case: 19-30088   Doc# 1538-7   Filed: 04/18/19   Entered: 04/18/19 08:20:57   Page 17 of 28

deleted 21 secondary points of delivery, and added 75 and deleted 3 primary plus points

of delivery (approximately 85% of the total 1,372 WAPA service connections at the end

of 2018).[12] For example, the additions in 2017 included 6 new secondary points of

delivery, several of which appear large enough to require a dedicated PG&E-owned

transformer.[13] Moreover, the WAPA Wholesale Distribution Tariff Service Agreement

expressly provides that secondary service is available at new points of delivery where "all

secondary voltage facilities serve one customer."[14] PG&E allows the customer to choose

the "Primary Plus Option or the Secondary Option." If the customer opts for secondary

service, the customer will not incur any cost of ownership charges but will pay the higher

---

No. 20151125-5324.

[12] Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, a filed in *Pac. Gas & Elec. Co.*, Docket No. ER16-400-000 (Nov. 25, 2017), eLibrary No. 20151125-5324; Modification Other than Rate Increase (Type of Filing Code 10): Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER16-1822-000 (May 31, 2016), eLibrary No. 20160531-5542; Modification Other than Rate Increase (Type of Filing Code 10): Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER17-432-000 (Nov. 30, 2016), eLibrary No. 20161130-5207; Modification Other than Rate Increase (Type of Filing Code 10): Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER17-1715-000 (May 31, 2017), eLibrary No. 20170531-5168 ("May 31, 2017 filing in Docket No. ER17-1715-000"); Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER18-357-000 (Nov. 30, 2017), eLibrary No. 20171130-5153 ("November 30, 2017 filing in Docket No. ER18-357-000"); Modification Other than Rate Increase (Type of Filing Code 10): Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, a filed in *Pac. Gas & Elec. Co.*, Docket No. ER18-1713-000 (May 31, 2018), eLibrary No. 20180531-5384; Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4 Modification Other than Rate Increase (Type of Filing Code 10), a filed in *Pac. Gas & Elec. Co.*, Docket No. ER19-452-000 (Nov. 30, 2018), eLibrary No. 20181130-5264.

[13] May 31, 2017 filing in Docket No. ER17-1715-000; Errata to the May 2017 Western Area Power Administration Biannual Filing, Service Agreement No. 17 under Pacific Gas and Electric Company's FERC Electric Tariff Volume No. 4, as filed in *Pac. Gas & Elec. Co.*, Docket No. ER17-1715-000 (June 15, 2017), eLibrary No. 20170615-5144; November 30, 2017 filing in Docket No. ER18-357-000.

[14] Service Agreement No. 17 under PG&E FERC Electric Tariff Volume No. 4, Service Agreement for Wholesale Distribution Service between PG&E & WAPA, Contract No. 04-SNR-00789 & Settlement Agreement, App. F § 2.2 ("WAPA WDT SA").

Case: 19-30088   Doc# 1538-7   Filed: 04/18/19   Entered: 04/18/19 08:20:57   Page 18 of 28

secondary distribution rate.[15] Where some secondary "common" facilities and some direct assigned facilities will be used to provide secondary service, PG&E includes a cost of ownership charge for "those facilities that are Direct Assigned."[16] These approaches are reasonable solutions to the problems San Francisco has raised in this complaint. Yet, PG&E has rejected every application in which San Francisco requests these types of service. PG&E will on occasion offer these types of service to San Francisco's customers, but only as accommodations after months of negotiations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 28, 2019.

Rod Maslowski

---

[15] WAPA WDT SA, App. F § 2.2.

[16] WAPA WDT SA, App. F § 2.3.

14

# EXHIBIT 2
## ATTACHMENT A

**ELECTRIC RULE NO. 2**
DESCRIPTION OF SERVICE

Sheet 1

A.  GENERAL

1.  The type of service available at any particular location should be determined by inquiry at PG&E's local office.

2.  Alternating-current service will be regularly supplied at a frequency of approximately 60 Hertz (cycles per second).

3.  In areas where a certain standard secondary voltage is presently being served to one or more customers, an applicant applying for new service in such areas may be required by PG&E to receive the same standard voltage supplied to existing customers.

4.  All electric service described in this rule is subject to the conditions in the applicable rate schedule and other pertinent rules.

5.  It is the responsibility of the applicant to ascertain and comply with the requirements of governmental authorities having jurisdiction.

6.  Service to an applicant is normally established at one delivery point, through one meter, and at one voltage class. Other arrangements for service at multiple service delivery points, or for services at more than one voltage class, are permitted only where feasible and with the approval of PG&E. For purposes of this rule, distribution service voltage classes, delta or wye connected, are described as:

    a.  0-300 volt source, single- or three-phase.

    b.  301-600 volt source, three-phase.

    c.  601-3,000 volt source, three-phase.

    d.  3,001-5,000 volt source, three-phase.

    e.  5,001-15,000 volt source, three-phase.

    f.  15,001-25,000 volt source, three-phase.

(Continued)

| _Advice_ | 1303-E | _Issued by_ | _Date Filed_ | June 21, 1990 |
| _Decision_ | | **Robert S. Kenney** | _Effective_ | July 31, 1990 |
| | | _Vice President, Regulatory Affairs_ | _Resolution_ | |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 21 of 28

**ELECTRIC RULE NO. 2**                    Sheet 2
DESCRIPTION OF SERVICE

A.    GENERAL (Cont'd.)

7.    New direct-current (d-c) or two-phase service is not available.  Direct-current service and two-phase service is supplied only to existing customers who continue to operate existing d-c or two-phase equipment.  Such service is being gradually replaced by standard alternating-current service.

B.    SERVICE DELIVERY VOLTAGES

1.    Following are the standard service voltages normally available, although not all of them are or can be made available at each service delivery point:

| Distribution Voltages | | | Transmission Voltages |
|---|---|---|---|
| Single-phase Secondary | Three-phase Secondary | Three-phase Primary | Three-phase |
| 120/240, 3-wire | 240/120, 4-wire | 2,400, 3-wire* | 60,000, 3-wire |
| 120/208, 3-wire | 240, 3-wire* | 4,160, 3-wire* | 70,000, 3-wire |
| | 208Y/120, 4-wire | 4,160Y/2,400, 4-wire* | 115,000, 3-wire |
| | 480/3-wire** | 12,000, 3-wire | 230,000, 3-wire     (T) |
| | 480/277, 4-wire | 12,000Y/6,930, 4-wire* | (T) |
| | 480Y/277, 4-wire | 17,200, 3-wire | |
| | | 20,780, 3-wire | |
| | | 20,780Y/12,000, 4-wire | |

_____

\*    Limited availability, consult PG&E.
\*\*   This service is no longer available for new or rebuilt installations.                    (N)

(Continued)

| Advice | 1393-E | *Issued by* | Date Filed | April 21, 1992 |
|---|---|---|---|---|
| Decision | | **Robert S. Kenney** | Effective | July 1, 1992 |
| | | *Vice President, Regulatory Affairs* | Resolution | E-3278 |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 22 of 28

**ELECTRIC RULE NO. 2**                    Sheet 3
DESCRIPTION OF SERVICE

B.  SERVICE DELIVERY VOLTAGES (Cont'd.)

2.  The following non-standard distribution voltages exist in certain limited areas but their use is not being expanded and they are gradually being replaced with an appropriate standard voltage listed in Section B.1:

   a.  4,800 volts, 3-wire

   b.  22,900 volts, 3-wire

   c.  44,000 volts, 3-wire

3.  All voltages referred to in this rule and appearing in some rate schedules are nominal service voltages at the service delivery point.  PG&E's facilities are designed and operated to provide sustained service voltage at the service delivery point, but the voltage at a particular service delivery point, at a particular time, will vary within fully satisfactory operating range limits established in Section C.

4.  The point of delivery and point of metering will normally be at the same voltage and within close proximity to each other.  When PG&E determines it is not feasible for the point of delivery and point of metering to be at the same voltage and within close proximity to each other, the demand and energy meter readings used in determining the charges will be adjusted to correct for transformation and line losses.    (N)

   An estimated transformer loss adjustment factor of two percent will be applied to the demand and energy meter readings for each stage of transformation between the point of delivery and the point of metering, unless PG&E and the customer agree that specific transformer manufacturer test data support a different transformer loss adjustment.

   Line losses will be calculated as a function of the current through, and the electrical characteristics of, the line between the point of delivery and point of metering.  Line loss adjustments will apply only to customers whose bills are currently adjusted for line losses or to services established after April 1, 1991.    (N)

C.  VOLTAGE AND FREQUENCY CONTROL

1.  CUSTOMER SERVICE VOLTAGES

   a.  Under all normal load conditions, PG&E's distribution circuits will be operated so as to maintain secondary service voltage levels to customers within the service voltage ranges specified below:

(Continued)

| *Advice* | 1330-E-A | *Issued by* | *Date Filed* | March 1, 1991 |
| *Decision* | | **Robert S. Kenney** | *Effective* | April 1, 1991 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 23 of 28

**ELECTRIC RULE NO. 2**     Sheet 4
DESCRIPTION OF SERVICE

C.   VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

   1.   CUSTOMER SERVICE VOLTAGES (Cont'd.)

      a.   (Cont'd.)

| Nominal Two-Wire And Multi-Wire Service Voltage | Minimum Voltage To All Services | Maximum Service Voltage On Residential And Commercial Distribution Circuits | | Maximum Service Voltage On Agricultural And Industrial Distribution Circuits |
| --- | --- | --- | --- | --- |
| | | Class A | Class B | |
| 120 | 114 | 120 | 126 | 126 |
| 208 | 197 | 208 | 218 | 218 |
| 240 | 228 | 240 | 252 | 252 |
| 277 | 263 | 277 | 291 | 291 |
| 480 | 456 | 480 | 504 | 504 |

      1)   For purposes of energy conservation, PG&E's distribution voltage will   (N)
be regulated to the extent practicable to maintain service voltage on   |
residential and commercial distribution circuits within the minimum   |
and maximum voltages specified above for Class A circuits.   |
      |
      2)   The residential and commercial distribution circuits that cannot be   |
operated within the minimum and maximum voltages for Class A   |
circuits shall be regulated to the extent practicable to maintain   |
service voltage within the minimum and maximum voltages for   |
Class B circuits and, whenever possible, within the minimum and   |
maximum voltages for Class A circuits.   (N)

(Continued)

| Advice | 1588-E | Issued by | Date Filed | July 2, 1996 |
| Decision | | **Robert S. Kenney** | Effective | August 11, 1996 |
| | | Vice President, Regulatory Affairs | Resolution | |

Case: 19-30088   Doc# 1538-7   Filed: 04/18/19   Entered: 04/18/19 08:20:57   Page 24 of 28

| | | | |
|---|---|---|---|
| | Revised | Cal. P.U.C. Sheet No. | 11261-E |
| Cancelling | Revised | Cal. P.U.C. Sheet No. | 7682-E |

**PG&E**
U 39

**Pacific Gas and Electric Company®**
San Francisco, California

**ELECTRIC RULE NO. 2**                    Sheet 5
DESCRIPTION OF SERVICE

C.   VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

1.   CUSTOMER SERVICE VOLTAGES (Cont'd.)

   b.   Exceptions to Voltage Limits

      Voltage may be outside the limits specified when the variations:

      1)   Arise from the temporary action of the elements.

      2)   Are infrequent momentary fluctuations of a short duration.

      3)   Arise from service interruptions.

      4)   Arise from temporary separation of parts of the system from the main system.

      5)   Are from causes beyond the control of PG&E.

   c.   It must be recognized that, because of conditions beyond the control of PG&E or customer, or both, there will be infrequent and limited periods when sustained voltages outside of the service voltage ranges will occur. Utilization equipment may not operate satisfactorily under these conditions, and protective devices may operate to protect the equipment.

   d.   The sustained service delivery voltages are subject to minor momentary and transient voltage excursions which may occur in the normal operation of PG&E's system.  Subject to the limitations of C.1.a. above, the voltage balance between phases will be maintained by PG&E as close as practicable to 2½ percent maximum deviation from the average voltage between the three phases.

(Continued)

| | | | |
|---|---|---|---|
| *Advice* | 1303-E | *Date Filed* | June 21, 1990 |
| *Decision* | | *Effective* | July 31, 1990 |
| | *Issued by* | *Resolution* | |
| | **Robert S. Kenney** | | |
| | *Vice President, Regulatory Affairs* | | |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 25 of 28

**ELECTRIC RULE NO. 2**
DESCRIPTION OF SERVICE

C.   VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

1.   CUSTOMER SERVICE VOLTAGES (Cont'd.)

e.   Where the operation of the applicant's equipment requires unusually stable voltage regulation or other stringent voltage control beyond that supplied by PG&E in the normal operation of its system, the applicant, at his own expense, is responsible for installing, owning, operating, and maintaining any special or auxiliary equipment on the load side of the service delivery point as deemed necessary by the applicant.

f.   The applicant shall be responsible for designing and operating his service facilities between the service delivery point and the utilization equipment to maintain proper utilization voltage at the line terminals of the utilization equipment.

2.   CUSTOMER UTILIZATION VOLTAGES

a.   All customer-owned utilization equipment must be designed and rated in accordance with the following utilization voltages specified by the American National Standard C84.1 if customer equipment is to give fully satisfactory performance:

| Nominal Utilization Voltage | Minimum Utilization Voltage | Maximum Utilization Voltage |
|:---:|:---:|:---:|
| 120 | 110 | 125 |
| 208 | 191 | 216 |
| 240 | 220 | 250 |
| 277 | 254 | 289 |
| 480 | 440 | 500 |

(Continued)

| | | | | |
|---|---|---|---|---|
| *Advice* | 1303-E | *Issued by* | *Date Filed* | June 21, 1990 |
| *Decision* | | **Robert S. Kenney** | *Effective* | July 31, 1990 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088   Doc# 1538-7   Filed: 04/18/19   Entered: 04/18/19 08:20:57   Page 26 of 28

**Pacific Gas and
Electric Company®**

San Francisco, California

U 39

**ELECTRIC RULE NO. 2**                    Sheet 7
DESCRIPTION OF SERVICE

C.   VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

   2.   CUSTOMER UTILIZATION VOLTAGES (Cont'd.)

      b.   The differences between service and utilization voltages are allowances for voltage drop in customer wiring.  The maximum allowance is 4 volts (120 volt base) for secondary service.

      c.   Minimum utilization voltages from American National Standard C84.1 are shown for customer information only as PG&E has no control over voltage drop in customer's wiring.

      d.   The minimum utilization voltages shown in a. above, apply for circuits supplying lighting loads.  The minimum secondary utilization voltages specified by American National Standard C84.1 for circuits not supplying lighting loads are 90 percent of nominal voltages (108 volts on 120 volt base) for normal service.

      e.   Motors used on 208 volt systems should be rated 200 volts or (for small single-phase motors) 115 volts.  Motors rated 230 volts will not perform satisfactorily on these systems and should not be used.  Motors rated 220 volts are no longer standard, but many of them were installed on existing 208 volt systems on the assumption that the utilization voltage would not be less than 187 volts (90 percent of 208 volts).

   3.   FREQUENCY

      PG&E will exercise reasonable diligence and care to regulate and maintain its frequency within reasonable limits but does not guarantee same.

(Continued)

| *Advice* | 1303-E | *Issued by* | *Date Filed* | June 21, 1990 |
|---|---|---|---|---|
| *Decision* | | ***Robert S. Kenney*** | *Effective* | July 31, 1990 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 27 of 28

D.   GENERAL LOAD LIMITATIONS

1.   SINGLE-PHASE SERVICE

   a.   Single-phase service normally will be three-wire, 120/240 volts (or three-wire
120/208 volts at certain locations as now or hereafter established by PG&E)
where the size of any single motor does not exceed 7.5 horsepower (larger          (T)
motors may be permitted at the option of PG&E).  For any single-phase          (T)
service, the maximum demand as determined by PG&E is limited to the
capability of a 100 kVa transformer unless otherwise approved by PG&E.  If
the load requires a transformer installation in excess of 100 kVa, the service
normally will be three-phase.

   b.   In locations where PG&E maintains a 120/208 volt secondary system, 3-wire
single-phase service normally shall be limited to that which can be supplied
by a main switch or service entrance rating of 200 amperes.  Single-phase
loads in these locations in excess of that which can be supplied by a
200 ampere main switch or service entrance rating normally will be supplied
with a 208Y/120-volt, three-phase, 4-wire service.

(Continued)

| *Advice* | 4004-E | *Issued by* | *Date Filed* | February 6, 2012 |
| *Decision* | | **Brian K. Cherry** | *Effective* | March 7, 2012 |
| | | *Vice President* | *Resolution* | |
| | | *Regulation and Rates* | | |

Case: 19-30088    Doc# 1538-7    Filed: 04/18/19    Entered: 04/18/19 08:20:57    Page 28
of 28