Thomas C. Mitchell (CA State Bar No. 124438)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5732
Facsimile: (415) 773-5759
Email: tcmitchell@orrick.com

Debra L. Felder (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8567
Facsimile: (202) 339-8500
Email: dfelder@orrick.com

*Counsel for mNOC AERS LLC*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case |
| | Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | |
| | Chapter 11 |
| - **and** - | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| | |
| **Debtors.** | **MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES OF mNOC AERS LLC FOR ENTRY OF AN ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER 11 U.S.C. §§ 362(b)(6) AND 556** |
| ☐ Affects PG&E Corporation | |
| ☒ Affects Pacific Gas and Electric Company | |
| ☐ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088-DM.* | **DATE:** May 21, 2019 <br> **TIME:** 9:30 a.m. (Pacific Time) <br> **PLACE:** United States Bankruptcy Court <br> Courtroom 17, 16th Floor <br> San Francisco, CA 94102 <br> **OBJECTION DEADLINE:** May 7, 2019 |

**REDACTED VERSION OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES OF mNOC AERS LLC FOR ENTRY OF AN ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER 11 U.S.C. §§ 362(b)(6) AND 556**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii
JURISDICTION .................................................................................................................................... 1
RELIEF REQUESTED ......................................................................................................................... 2
FACTS ................................................................................................................................................... 2
LEGAL ARGUMENT ........................................................................................................................... 5

    A.    The Safe Harbor Protections Of Sections 362(b)(6) And 556 Apply To Allow mNOC To Enforce Its Contractual Rights Under The CSA Notwithstanding PG&E's Bankruptcy ........................................................................... 6

        a.    The Forward Contract Test ................................................................................ 7
        b.    The CSA is a Forward Contract ........................................................................ 8
        c.    The Forward Contract Merchant Test ............................................................. 10
        d.    mNOC is a Forward Contract Merchant ........................................................ 122
        e.    PG&E is a Forward Contract Merchant ........................................................... 12
        f.    The CSA is Entitled to the Safe Harbor Protections of the Bankruptcy Code as a Forward Contract Executed by Forward Contract Merchants ........... 12

NOTICE ............................................................................................................................................... 13
CONCLUSION .................................................................................................................................... 13

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Sols., L.L.C. (In re Calpine Corp.)*,
    No. 08-1251(BRL), 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ...............................6

*In re Cascade Grain Prod., LLC*,
    465 B.R. 570 (Bankr. D. Or. 2011) ........................................................................................9

*Clear Peak Energy, Inc. v. S. Cal. Edison Co. (In re Clear Peak Energy, Inc.)*,
    488 B.R. 647 (Bankr. D. Ariz. 2013) ............................................................................. *passim*

*Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc.*,
    334 F. Supp. 3d 492 (D. Mass. 2018) ....................................................................................7

*In re FirstEnergy Sols. Corp.*,
    No. 18-50757, 2019 WL 211807 (Bankr. N.D. Ohio Jan. 15, 2019) .....................................9

*In re MBS Mgmt. Servs., Inc.*,
    432 B.R. 570 (Bankr. E.D. La. 2010) ....................................................................................9

*In re Mirant Corp.*,
    310 B.R. 548 (Bankr. N.D. Tex. 2004) .........................................................................11, 12

*In re National Gas Distributors, LLC*,
    556 F.3d 247 (4th Cir. 2009) .................................................................................................8

**Statutes**

7 U.S.C. § 1(a)(9) ..........................................................................................................................7, 9

11 U.S.C. § 101(25) .............................................................................................................................7

11 U.S.C. § 101(26) .............................................................................................................10, 11, 12

11 U.S.C. § 362(b)(6) ............................................................................................................ *passim*

11 U.S.C. § 365(e)(1) ........................................................................................................................6

11 U.S.C. § 556 ..................................................................................................................... *passim*

11 U.S.C. § 761(1) .............................................................................................................................7

11 U.S.C. § 761(8) ..........................................................................................................................7, 9

28 U.S.C. § 157 ..................................................................................................................................1

28 U.S.C. § 157(b) ...................................................................................................................... 1

28 U.S.C. § 1334 ......................................................................................................................... 1

28 U.S.C. § 1408 ......................................................................................................................... 1

28 U.S.C. § 1409 ......................................................................................................................... 1

Public Utilities Code Section 380 .............................................................................................. 2

**Rules**

Fed. R. Bankr. P. 2002 ............................................................................................................. 13

Fed. R. of Bankr. P. 4001(a) ...................................................................................................... 1

Local Rule 4001-1 ...................................................................................................................... 1

**Other Authorities**

California Assembly Bill 2514 ................................................................................................... 3

PG&E's Electric Rule 21 ............................................................................................................ 4

mNOC AERS LLC ("mNOC"), a California limited liability company, by and through its undersigned counsel, submits this motion and memorandum of points and authorities (the "Motion") for entry of an order confirming that the Behind the Retail Meter Capacity Storage Agreement between mNOC and Pacific Gas and Electric Company ("PG&E"), dated June 1, 2018, as amended by letter agreements dated October 11, 2018 and November 27, 2018 (collectively, the "CSA") (i) is subject to the safe harbor provisions of Sections 362(b)(6) and 556 of the United States Bankruptcy Code (the "Bankruptcy Code") and (ii) that the automatic stay does not apply to bar mNOC from exercising its contractual rights under the CSA, including its contractual right to cause the liquidation, termination or acceleration of the CSA or to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with the CSA.

This motion is supported by the declaration of Ting Chang, the Managing Director of mNoc (the "Chang Declaration"), filed contemporaneously herewith. mNoc notes that this Motion is substantially similar to the *Motion and Memorandum of Enel Green Power North America for Entry of an Order Confirming Safe Harbor Protection Under 11 U.S.C. §§ 362(b)(6) and 556* [Dkt. No. 481] and the *Motion and Memorandum of esVolta, LP for Entry of an Order Confirming Safe Harbor Protection Under 11 U.S.C. §§ 362(b)(6) and 556* [Dkt. No. 977]. Those motions concern substantially similar energy storage resource adequacy agreements and seek the same relief as requested herein.

In support hereof, mNoc respectfully represents as follows:

**JURISDICTION**

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24, and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Northern District of California.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for this Motion are 11 U.S.C. §§ 362(b)(6) and 556, Rule 4001(a) of the Federal Rules of Bankruptcy Procedure, and Bankruptcy Local Rule 4001-1.

**RELIEF REQUESTED**

5. By this Motion, mNOC requests an order confirming that the safe harbor protections under Sections 362(b)(6) and 556 of the Bankruptcy Code apply to allow mNOC to enforce its contractual rights under the CSA, including its right to terminate the CSA.

6. Pursuant to the CSA, mNOC agreed to provide to PG&E all capacity attributes, or resource adequacy capacity, from an aggregate energy storage system (the "Project").[1] In order to secure performance of its obligations under the CSA, mNOC agreed to deliver certain performance assurances to PG&E. Specifically, upon execution of the CSA, mNOC posted an initial development security. In addition, upon notification by PG&E that the California Public Utilities Commission ("CPUC") had entered a final and non-appealable order approving the CSA, mNOC posted an additional development security deposit. The Project is currently under development and mNOC is obligated to continue to expend substantial additional amounts of money in development costs to comply with its obligations under the CSA.

7. Accordingly, in order to provide clarity on whether mNOC may exercise its contractual rights to terminate the CSA without violating the automatic stay, mNOC respectfully requests that the Court enter an order in the form of the proposed order attached hereto as Exhibit A that confirms that (i) the CSA is entitled to the statutory safe harbor protections codified in Sections 362(b)(6) and 556 of the Bankruptcy Code; and (ii) the automatic stay does not apply to bar mNOC, in its capacity as a counterparty to the CSA, from exercising its contractual rights thereunder, including its right to terminate the CSA.

**FACTS**

8. mNOC is a California based project company formed for the purpose of delivering to PG&E all capacity attributes, including resource adequacy attributes, flexible resource adequacy attributes, and other capacity attributes, from the Project. The availability of such capacity attributes is necessary for the smooth operation of the electrical grid. Energy utilities like PG&E

---

[1] Public Utilities Code Section 380 requires the California Public Utilities Commission ("CPUC") to establish resource adequacy requirements for load serving entities under CPUC jurisdiction, including PG&E, in consultation with the California Independent System Operator ("CAISO"). Under the requirements of the CPUC, load serving entities must demonstrate they have procured sufficient capacity to meet resource adequacy requirements.

purchase resource adequacy capacity to ensure that they can meet future electricity demand from consumers as required by energy regulators.

9. On June 1, 2018, mNoc and PG&E executed the CSA.[2] By its terms, unless otherwise terminated, the CSA will continue for a period of ▮▮▮▮▮▮ from the initial delivery date. At the time of execution, the expected initial delivery date under the CSA is ▮▮▮▮▮▮.

10. The CSA provides that mNOC is to arrange for a total of ▮▮▮▮▮▮ of aggregated energy storage, in the form of various lithium ion battery systems placed behind customers' meters. As a condition precedent to the CSA's initial delivery date, mNOC must obtain certification of the capacity attributes in accordance with applicable CPUC requirements and the CAISO tariff. Once development and construction of the Project is complete, mNOC is contracted to provide all such certified capacity attributes to PG&E to allow PG&E to comply with its regulatory obligations and to provide grid reliability in its territory.

11. The CSA is the outcome of a competitive procurement process by which PG&E ensures compliance with CPUC Decision ("D.") 13-10-040 implementing California Assembly Bill 2514, which requires that PG&E meet certain energy storage procurement targets, and CPUC Resolution E-4909, directing PG&E to hold a competitive solicitation for energy storage and/or preferred resources to meet local reliability needs in three local sub-areas in northern California.

12. On June 29, 2018, PG&E filed Advice Letter 5322-E with CPUC requesting approval of the CSA (along with three other contracts with Dynergy, Hummingbird Energy Solutions, LLC, and Tesla, Inc.).

13. On November 8, 2018, CPUC issued Resolution E-4949, approving the CSA and the other three contracts. In approving the contracts, CPUC found that PG&E's execution of the agreements is consistent with the objectives and directives of CPUC Resolution E-4909, as well as the Energy Storage Procurement Framework and Design Program, approved by CPUC in D. 13-10-040. CPUC further found that the agreements were reasonably priced and the related costs to

---

[2] Contemporaneously with the filing of this Motion, mNOC filed a motion requesting permission to file the CSA, as well as unredacted versions of this Motion and the Chang Declaration, under seal.

PG&E were fully recoverable in the rates over the life of the CSA. On December 10, 2018, the Public Advocates Office at CPUC ("Cal Advocates") filed an Application for Rehearing of Resolution E-4949, claiming the Resolution committed a legal error.

14. Under the CSA, PG&E was required to obtain a final and non-appealable order from CPUC approving the CSA within ▓▓▓▓ from the date on which PG&E filed the CSA with CPUC.[3] While this approval was not obtained within the ▓▓▓▓ window, on March 19, 2019, the CPUC issued an order indicating that Cal Advocates' Application for Rehearing was denied, rendering CPUC's approval of the CSA final and non-appealable. Thereafter, mNOC received written notice from PG&E that CPUC's approval of the CSA had become final and non-appealable. At that time, pursuant to the CSA, mNOC posted $▓▓▓▓ in project development security (in addition to $▓▓▓▓ mNoc posted in June 2018 when it signed the CSA) for a total of $▓▓▓▓ (the "Project Development Security") to support mNOC's continuing performance in constructing the Project.[4]

15. In addition to the Project Development Security, mNOC continues to incur development costs associated with the CSA. For example, mNOC is obligated under the CSA to bear the cost of acquiring various permits and approvals from the necessary governmental authorities, arranging for agreements with customers to install energy storage units behind the customers' electrical meters, complying with the PG&E's Electric Rule 21 regarding interconnection, redeploying and reallocating assets, purchasing equipment on an accelerated basis, complying with the special requirements of the CSA, generating and compiling the necessary customer information for the CPUC, acquiring certifications and reports from retained consultants, including to meet PG&E requirements in the CSA, undergoing testing and registration requirements, and installing any necessary metering equipment.[5] mNOC's costs of financing its performance under the CSA are increasing as a result of the uncertainty as to whether or not PG&E will perform. mNOC is also incurring administrative and operational costs as a result of the specialized requirements of the CSA, costs that mNOC would not incur if its counterparty were not

---

[3] CSA § 1.3 (CPUC Approval Delayed).
[4] CSA § 11.4(a)(i) (Project Development Security).
[5] CSA § 2.1 (Conditions Precedent to the Initial Delivery Date).

PG&E. Further, the CSA requires that mNOC post $ ▓▓▓▓▓▓▓▓ in security at the time of the initial delivery date of the Project.[6]

16. mNOC must meet each of its obligations under the CSA to ensure that it does not trigger an event of default or potentially violate the automatic stay provisions of the Bankruptcy Code. These costs and obligations are highly material to mNOC, and mNOC continues to bear the risks in the face of the potential failure of PG&E to meet its obligations because of the Chapter 11 cases.

17. Post-petition, mNOC is being required by PG&E to spend significant sums of money in connection with the CSA. Yet PG&E is not willing to commit to whether or not it will perform its obligations under the CSA. This uncertainty is harmful to mNOC. mNOC does not want to spend large sums of money on the Project post-petition, only to be told by PG&E, after mNOC has spent the money, that PG&E does not want the Project. While the automatic stay is a shield to protect a debtor, it is not a sword that permits PG&E to inflict serious post-petition injury on its counterparties.

18. In sum, if mNOC is unable to obtain this Court's ruling on the applicability of the statutory safe harbor provisions to the CSA, mNOC stands to lose (i) $ ▓▓▓▓▓▓▓▓ of security that it has posted, or the $ ▓▓▓▓▓▓▓▓ in security that mNOC is required to post at the time of initial delivery date of the Project, and (ii) the additional ongoing costs described above that mNOC will continue to incur in connection with developing the Project pursuant to the CSA.

19. If the Court concludes that the safe harbor provisions apply, mNOC can either exercise its contractual right to terminate the contract or can opt to proceed with the construction with the comfort that should it opt to exercise those rights in the future, it can secure the return of the security it has posted at any time.

**LEGAL ARGUMENT**

20. mNOC submits that based upon the foregoing facts, and under applicable law as set forth below, the relief requested herein should be granted, and the Court should confirm that the CSA is protected by the safe harbor provisions of Sections 362(b)(6) and 556 of the Bankruptcy

---
[6] CSA § 11.4(a)(ii) (Delivery Term Security).

5

Code, and that the automatic stay does not apply to bar mNOC from exercising its contractual rights thereunder.

### A. The Safe Harbor Protections Of Sections 362(b)(6) And 556 Apply To Allow mNOC To Enforce Its Contractual Rights Under The CSA Notwithstanding PG&E's Bankruptcy

21. mNOC seeks an Order of this Court confirming that the safe harbor provisions of Sections 362(b)(6) and 556 of the Bankruptcy Code apply to the CSA and that the automatic stay does not prevent mNOC from enforcing its contractual rights under the CSA, including any contractual right to cause the liquidation, termination or acceleration of the CSA or to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with the CSA.

22. Section 362(b)(6) of the Bankruptcy Code provides that the automatic stay does not bar a forward contract merchant from exercising its contractual rights under any forward contract with the debtor.[7]

23. Section 556 of the Bankruptcy Code further defines the contractual rights that may be enforced under this safe harbor exception to the automatic stay, specifically allowing a forward contract merchant to enforce its contractual right to "liquidate, terminate, or accelerate" a forward contract with the debtor according to the provisions in the contract that allow termination, liquidation, or acceleration based on (i) the counterparty becoming insolvent or (ii) the counterparty filing for bankruptcy.[8]

24. In other words, under the Bankruptcy Code, a party may act on a contractual *ipso facto* clause to terminate contracts with the debtor if the party can demonstrate that it falls under one of the safe harbor exceptions to the automatic stay. A party seeking to establish its qualification for the forward contract safe harbor is required to show that (i) the contract satisfies the

---

[7] 11 U.S.C. § 362(b)(6).
[8] 11 U.S.C. §§ 556, 365(e)(1); *see also Calpine Energy Servs., L.P. v. Reliant Energy Elec. Sols., L.L.C. (In re Calpine Corp.)*, No. 08-1251(BRL), 2009 WL 1578282, at *7 (Bankr. S.D.N.Y. May 7, 2009) (holding that Section 556, by its terms, applies to those clauses that trigger termination upon the occurrence of a condition specified in Section 365(e)(1)).

6

requirements of a "forward contract," and (ii) a party to the contract falls under the definition of a "forward contract merchant" under the Bankruptcy Code.[9]

### a. The Forward Contract Test

25. Section 101(25) of the Bankruptcy Code defines a "forward contract" as a contract for the purchase, sale, or transfer of a commodity (as defined in Section 761(8)) or any similar good, service, article, right, or interest, which is presently or in the future becomes the subject of dealing in the forward contract trade, with a maturity date more than two days after the date the contract is entered into, including a repurchase or reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option or any other similar agreement.[10]

26. Section 761(8) of the Bankruptcy Code adopts the definition of "commodity" found in the Commodity Exchange Act.[11] Section 1(a)(9) of the Commodity Exchange Act defines "commodity" to include "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in."[12] The term "commodity" is expansive, and includes non-traditional goods and services.[13]

27. Relatively few cases in the Ninth Circuit have addressed the issue of whether a contract qualifies as a forward contract for the purposes of the safe harbor provisions. In the primary decision on point within the Ninth Circuit, the Bankruptcy Court for the District of Arizona determined that a renewable power purchase and sales agreement for electricity produced by a solar generating facility (a "PPA") between an electric power company (Southern California Edison, "SCE") and a chapter 11 debtor qualified as a forward contract.[14] In *Clear Peak*, the Bankruptcy Court looked to four factors in its determination, namely whether: (i) the subject of the contract was a commodity, with substantially all costs of performance attributable to the costs of the underlying commodity; (ii) the contract had a maturity date more than two days after the

---

[9] See *Clear Peak Energy, Inc. v. S. Cal. Edison Co. (In re Clear Peak Energy, Inc.)*, 488 B.R. 647, 661 (Bankr. D. Ariz. 2013) ("*Clear Peak*").
[10] 11 U.S.C. § 101(25).
[11] 11 U.S.C. § 761(1), (8).
[12] 7 U.S.C. § 1(a)(9).
[13] *See Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497 (D. Mass. 2018) (noting that Congress set forth an expansive definition of commodity in the Commodity Exchange Act).
[14] See *Clear Peak*, 488 B.R. at 663.

7

**REDACTED VERSION OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES OF mNOC AERS LLC FOR ENTRY OF AN ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER 11 U.S.C. §§ 362(b)(6) AND 556**

contracting date; (iii) the quantity and time elements were fixed at the time of contracting; and (iv) the contract had a relationship to the financial markets.[15]

28. Applying these four factors, the court in *Clear Peak* found that the SCE PPA qualified as a forward contract for purposes of the safe harbor provision. The court disposed of the first three factors easily, finding that the subject of the SCE PPA was a commodity (electricity), the timeline manifested a maturity date more than two days after the execution date, and the PPA specified a minimum amount of power to be supplied over a specific period of time.

29. On the fourth factor, the *Clear Peak* court found a substantial relationship to the financial market existed where the principal purpose of the PPA was to hedge the price SCE had to pay over the long term, even though the PPA also served the purpose of complying with a state law requirement that 33% of California's energy be sourced from renewable resources by 2020.[16] The court determined that the PPA was part of a broader price-hedging scheme, whereby SCE acquired 98% of its power through short and long-term PPAs with both renewable and conventional resources.[17] The Court also noted that all of SCE's PPAs required CPUC approval, and one of the factors the CPUC considers is the reasonableness of the price.[18] The court concluded that, based on the complex mechanism SCE had created to evaluate the contracts that supply power to its customers, the primary purpose of the PPA was to allow SCE to hedge the price over the long term, thereby satisfying the fourth prong of the forward contract test.[19]

b. **The CSA is a Forward Contract**

30. The CSA qualifies as a forward contract. In fact, the CSA itself explicitly acknowledges that it is a forward contract within the meaning of the Bankruptcy Code.[20] The parties clearly expressed their intent.

31. The parties' intent aside, the CSA qualifies as a forward contract under the *Clear Peak* test. The primary subject of the CSA, resource adequacy capacity, is a commodity for

---

[15] *Id.* at 657. The *Clear Peak* court followed the test set by the United States Court of Appeals for the Fourth Circuit in *In re National Gas Distributors, LLC*, 556 F.3d 247 (4th Cir. 2009).
[16] *Id.* at 659.
[17] *Id.* at 660.
[18] *Id.*
[19] *Id.*
[20] CSA § 21.1.

8

purposes of Section 761(8) of the Bankruptcy Code. Resource adequacy capacity is the right to receive electric capacity in the future that a utility company (such as PG&E) purchases from an energy provider (such as mNOC) to ensure that the utility is able to meet future electricity demand from consumers. The CSA thus grants PG&E a "right" to "future delivery" of electricity capacity over the ▮▮▮▮▮ delivery term and resource adequacy capacity therefore falls squarely within the Commodity Exchange Act's definition of "commodity."[21]

32. Even if the Court finds resource adequacy capacity does not itself qualify as a commodity within the definition of a forward contract under the Bankruptcy Code, the underlying commodity being stored and offered on demand is electricity, which courts have held to be a "commodity" for forward contract purposes.[22] As the definition of forward contract under the Bankruptcy Code includes not only a contract for the purchase, sale or transfer of a commodity, but also any "product or byproduct thereof," a contract for providing resource adequacy of electricity, which is indisputably a commodity, constitutes a forward contract. Thus, the first prong of the test is satisfied.

33. The CSA also satisfies the second and third prongs of *Clear Peak*, as the CSA's approximate maturity date – ▮▮▮▮▮▮▮▮▮▮ – is more than two days after the contracting date, and the quantity and time elements of the CSA – guaranteeing that mNOC will supply a minimum[23] amount of capacity over the course of a ▮▮▮▮▮ term – were fixed at the time of its execution.[24] Further, the price is set, as payment is made according to a schedule in the CSA, priced in $/kW-month.[25]

---

[21] 7 U.S.C. § 1(a)(9).
[22] *See In re MBS Mgmt. Servs., Inc.*, 432 B.R. 570, 574 (Bankr. E.D. La. 2010) (holding that contract which required company to "supply the full requirements" of electricity to debtor was a "forward contract," where the contract involved the sale of electricity, a commodity); *see also In re FirstEnergy Sols. Corp.*, No. 18-50757, 2019 WL 211807 (Bankr. N.D. Ohio Jan. 15, 2019) (in which both parties specifically stipulated that electricity is a commodity under the Bankruptcy Code, and the court agreed).
[23] *See Clear Peak*, 88 B.R. at 658-659 (finding that the fixed quantity requirement is satisfied so long as the contract anticipates the generation of a minimum quantity of power over a specified period of time).
[24] The CSA was executed on June 1, 2018, with an expected initial delivery date of ▮▮▮▮▮▮▮▮▮▮ and a ▮▮▮▮▮▮ supply period to begin on the initial delivery date. A court in the Ninth Circuit held that "maturity date" as used in the definition of forward contract "means the future date at which the commodity must be bought or sold." *See In re Cascade Grain Prod., LLC*, 465 B.R. 570, 575 (Bankr. D. Or. 2011).
[25] CSA § 3.2(a)(iii).

9

34. Finally, the CSA also satisfies the fourth factor, in that the CSA has a relationship to the financial markets. The CSA was procured in order to comply with PG&E's statutory obligations regarding resource adequacy and local area reliability and, more importantly, to make new cost-effective storage capacity viable and available for future capacity needs.[26] PG&E's long-term approach is fundamental to its strategy to hedge prices in its procurement of resource adequacy capacity. The CSA plays an integral part in PG&E's broad price-hedging plan and thus has a direct relationship to the financial markets. Like SCE in *Clear Peak*, PG&E has created a complex network of supply and capacity agreements, utilizing tools like resource adequacy in order to continuously provide power to its customers at stable rates. The CSA was executed as an essential component of that hedging strategy, to ensure availability of resources during times of peak demand and to reduce the need to purchase higher priced backstop capacity. Just as with the PPA in *Clear Peak*, the CSA must also be approved by CPUC, and the primary factor in obtaining regulatory approval is that the CSA provides reasonable terms and conditions, including price. Therefore, the CSA has a substantial connection to the financial markets and satisfies the fourth prong of the forward contract test.[27]

35. For all of the foregoing reasons, the CSA satisfies each of the four factors of the forward contract test identified by the court in *Clear Peak* and is precisely the type of contract meant to be protected under Sections 362(b)(6) and 556 of the Bankruptcy Code, so as to avoid a negative impact on the financial markets due to the imposition of the automatic stay.

    c. **The Forward Contract Merchant Test**

36. Section 101(26) of the Bankruptcy Code defines a forward contract merchant as an entity in the business of entering into forward contracts as a merchant (or with a merchant) in a

---

[26] *See* PG&E Opening Brief, Application of PG&E Company for Approval of its 2018 Energy Storage Procurement and Investment Plan (U39E), California Public Utilities Commission Docket A.18-03-001, requesting approval of its 2018 energy storage procurement and investment plan, and stating that "PG&E's 2018 ES RFO builds off of its earlier ES RFO cycles." At 13. Just as with the PPA in *Clear Peak*, this CSA must also be approved by the CPUC, and the primary factor in obtaining regulatory approval is that the CSA provides reasonable terms and conditions, including price.

[27] Additionally, the CSA contains a provision stating that the parties acknowledge that the agreement is a forward contract within the meaning of the Bankruptcy Code.

10

commodity or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

37. In *Clear Peak*, the court found that SCE qualified as a forward contact merchant because it regularly entered into contracts with short- and long-term maturity dates for the future delivery of electricity for hedging purposes.[28]

38. The *Clear Peak* court reasoned that the language of Section 101(26) requires only one party to the contract to be a merchant, and that only contracts to which neither counterparty is a merchant would fail to satisfy the statutory requirement in the definition of a forward contract merchant.[29] Finding that SCE qualified as a forward contract merchant, the *Clear Peak* court held this factor under the Section 362(b)(6) safe harbor satisfied.[30]

39. Faced with a similar issue in *In re Mirant Corp.*, the Bankruptcy Court for the Northern District of Texas looked to whether a customer who had entered into natural gas supply agreements with the Chapter 11 debtor sought to profit in the forward contract trade in determining whether the customer qualified as a forward merchant.[31] In its analysis, the court placed particular emphasis on the terms "business" and "merchant," stating that without these references, the definition of "forward contract merchant" could easily be applied to encompass anyone who enters into forward contracts.[32] The court concluded that a "merchant" is a person that buys, sells or trades in a market, but not a person who acts merely as an end-user or a producer.[33] The court further held that to be "in the business" of a particular trade means something one engages in to generate a profit.[34] Therefore, the court held that a forward contract merchant is a person that, in order to make a profit, engages in the forward contract trade as a merchant or with merchants.[35]

---

[28] See *Clear Peak*, 488 B.R. at 661.
[29] *Id.*
[30] *Id.*
[31] *In re Mirant Corp.*, 310 B.R. 548, 567 (Bankr. N.D. Tex. 2004).
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* at 569.

11

REDACTED VERSION OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES OF
mNOC AERS LLC FOR ENTRY OF AN ORDER CONFIRMING SAFE HARBOR PROTECTION UNDER
11 U.S.C. §§ 362(b)(6) AND 556

### d. mNOC is a Forward Contract Merchant

40. The CSA contains a provision expressly stating that "[e]ach Party represents and warrants to the other Party that as of the Execution Date . . . it is a "forward contract merchant" within the meaning of the United States Bankruptcy Code[.]"[36] The inclusion of this language in the CSA operates as an acknowledgement on behalf of the parties that both PG&E and mNOC operate as merchants in the business of the forward contract trade.

41. mNOC is "in the business" of entering into forward contracts, for profit, with utility companies acting as merchants, who buy, sell, or trade the resource adequacy capacity provided by mNOC. Therefore, mNOC falls squarely within both the statutory definition of a "forward contract merchant" under Section 101(26) and *Mirant*'s test that a forward contract merchant engage in the forward contract trade as a merchant or with merchants, in order to generate a profit.

### e. PG&E is a Forward Contract Merchant

42. Even were this Court to conclude that mNOC is not a forward contract merchant, Section 101(26) only requires that one party to the contract be a forward contract merchant[37] and PG&E is indisputably a forward contract merchant. Just as the *Clear Peak* court found SCE to be a forward contract merchant for safe harbor purposes, PG&E is also a utility company that is in the business of entering into forward contracts to hedge against price fluctuations in the energy market, and fits the statutory definition of a forward contract merchant under Section 101(26) and the *Mirant* test.

### f. The CSA is Entitled to the Safe Harbor Protections of the Bankruptcy Code as a Forward Contract Executed by Forward Contract Merchants

43. For the reasons described herein, because (i) the CSA is a forward contract, and (ii) mNOC and PG&E are forward contract merchants, mNOC respectfully requests that the Court enter an order in the form attached hereto that (a) grants this Motion in its entirety, (b) finds that the CSA is protected by the safe harbor provisions codified in Sections 362(b)(6) and 556 of the

---

[36] CSA § 15.1(i).
[37] *See Clear Peak*, 488 B.R. at 661 (concluding that because at least one of the parties to the PPA is clearly a Forward Contract Merchant (SCE), the requirement under Section 362(b)(6) had been met and the safe harbor applied).

12

Bankruptcy Code, and (c) determines that the automatic stay does not apply to the CSA or to mNOC as the counterparty to the CSA.

**NOTICE**

Notice of the Motion will be provided to (i) the Debtors and counsel to the Debtors; (ii) counsel to the Office of the United States Trustee for Region 17; (iii) counsel to the administrative agent under the Debtors' debtor-in-possession financing facility; (iv) counsel to the collateral agent under the Debtors' debtor-in-possession financing facility; (v) counsel to the CPUC; (vi) the U.S. Nuclear Regulatory Commission; (vii) the U.S. Department of Justice, as counsel for the United States on behalf of the Federal Energy Regulatory Commission; (viii) counsel to the Official Committee of Unsecured Creditors; (ix) counsel to the Official Committee of Tort Claimants; and (x) those parties who have requested notice pursuant to Fed. R. Bankr. P. 2002. mNOC respectfully submits that no further notice is required.

**CONCLUSION**

For the foregoing reasons, mNOC respectfully requests that the Court enter an order (i) confirming that the CSA is protected by the safe harbor provisions codified in Sections 362(b)(6) and 556 of the Bankruptcy Code, (ii) that the automatic stay does not apply to bar mNOC from exercising its contractual rights under the CSA, including its contractual right to cause the liquidation, termination or acceleration of the CSA or to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with the CSA, and (iii) granting such other and further relief as the Court may deem just and appropriate.

[Signature follows on next page]

DATED: April 22, 2019

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Thomas C. Mitchell*
Thomas C. Mitchell (CA State Bar No. 124438)
405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5732
Facsimile: (415) 773-5759
Email: tcmitchell@orrick.com

and

Debra L. Felder (admitted *pro hac vice*)
1152 15th Street, N.W.
Washington, DC 20005
Telephone: (202) 339-8567
Facsimile: (202) 339-8500
Email: dfelder@orrick.com

*Counsel for mNOC AERS LLC*