1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    -oOo-

4    In Re:                          ) Case No. 19-30088
                                     ) Chapter 11
5    PG&E CORPORATION AND PACIFIC    )
     GAS AND ELECTRIC COMPANY        ) San Francisco, California
6                                    ) Tuesday, April 23, 2019
                          Debtors.   ) 1:30 PM
7    _____ )
                                       CORRECTED MOTION OF DEBTORS
8                                      PURSUANT TO 11 U.S.C.
                                       SECTIONS 105(A), 363, AND
9                                      503(C) FOR ENTRY OF AN ORDER
                                       (I) APPROVING SHORT-TERM
10                                     INCENTIVE PLAN AND (II)
                                       GRANTING RELATED RELIEF [806]
11

12             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DENNIS MONTALI
13            UNITED STATES BANKRUPTCY JUDGE

     APPEARANCES:
14   For the Debtors:          STEPHEN KAROTKIN, ESQ.
                                RICHARD W. SLACK, ESQ.
15                             Weil, Gotshal & Manges LLP
                               767 Fifth Avenue
16                             New York, NY 10153
                               (212)310-8000
17
     For Official Committee of  ROBERT A. JULIAN, ESQ.
18   Tort Claimants:            Baker and Hostetler LLP
                                1160 Battery Street East
19                             Suite 100
                                San Francisco, CA 94111
20                              (415)806-6000

21   For United States Trustee: MARTA E. VILLACORTA, ESQ.
                                United States Department of
22                              Justice
                                Office of the U.S. Trustee
23                              450 Golden Gate Avenue
                                Suite 05-0153
24                              San Francisco, CA 94102
                                (415) 705-3333
25

```
 1   Court Recorder:              JANE GALVANI
                                  United States Bankruptcy
 2                                Court
                                  450 Golden Gate Avenue
 3                                16th Floor
                                  San Francisco, CA 94102
 4
     Transcriber:                 JENNIFER CONTAT
 5                                eScribers, LLC
                                  7227 N. 16th Street
 6                                Suite #207
                                  Phoenix, AZ 85020
 7                                (973)406-2250

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     transcript provided by transcription service.
25
```

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 2 of
94

1       SAN FRANCISCO, CALIFORNIA, TUESDAY, APRIL 23, 2019, 1:30 PM

2                                   -oOo-

3           (Call to order of the Court.)

4               THE CLERK:  All rise.  Court is now in session.  The

5       Honorable Judge Montali presiding.

6               THE COURT:  Good afternoon, everyone.  Please be

7       seated.

8               THE CLERK:  It's the Court's 1:30 calendar in the

9       matter of PG&E Corporation.

10              THE COURT:  Who's up?  Ready?

11              MR. KAROTKIN:  Yes, sir.

12              THE COURT:  You're up.  Good afternoon, Mr. Karotkin.

13              MR. KAROTKIN:  Good afternoon, Your Honor.  Steven

14      Karotkin, Weil, Gotshal & Manges for the debtors.  As you know,

15      we're here today on the continued hearing on the debtors'

16      motion seeking approval of its 2019 short-term incentive plan.

17              As you may recall, at the end of the last hearing, you

18      made it very clear that the sole purpose of the hearing today

19      is -- and to use your words, Your Honor, "to provide the Court

20      with a tutorial and to educate you on how the metrics and the

21      scoring of the 2019 STIP work, and how they are applied to STIP

22      awards."

23              THE COURT:  You got me quoted literally, huh.

24              MR. KAROTKIN:  I'm not finished.

25              THE COURT:  Okay.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 3 of
94

1       MR. KAROTKIN:  As you also mentioned, "they will not
2  be lawyers presenting, nor lawyers arguing, but simply a
3  witness explaining how it works with a brief opportunity to
4  cross-examine on those matters only" -- again, to use your
5  words.
6       And with that, Your Honor said you would make a
7  ruling, recognizing the need to move quickly and address the
8  uncertainty among the debtors' broad employee group that are
9  participants in the proposed STIP program.  We have our witness
10  ready and we are prepared to proceed.
11       THE COURT:  And now, Mr. Gapuz, do we have that screen
12  available for the audience -- is that screen going to turn
13  or --
14       THE CLERK:  I --
15       THE COURT:  Are we going to use the screen or are we
16  going use exhibits or not?
17       MR. KAROTKIN:  So we were going to both hand out
18  slides and use the screen, Your Honor.
19       THE COURT:  Okay.  Well, then we can rotate that, so
20  if you will then (indiscernible).
21       THE CLERK:  Okay.  I just --
22       THE COURT:  Well, we can -- you can wait and -- all
23  right.
24       All right, let's go ahead with your witness then.
25       MR. KAROTKIN:  I would like to introduce, Your Honor,

1    my colleague, Mr. Slack.

2              THE COURT:  Yes, Mr. Slack.  Okay.

3              Good afternoon.  You're welcome to stay at counsel

4    table, if it's more convenient with the monitor and -- whatever

5    works.

6              MR. SLACK:  It's actually more room here.

7              THE COURT:  Okay.

8              MR. SLACK:  So if you -- if that's okay with you --

9              THE COURT:  Of course it is.

10             MR. SLACK:  I'll go from here.

11             THE COURT:  Let me get the correct spelling of your

12   name.

13             MR. SLACK:  So Richard Slack, S as in Sam, L-A-C-K.

14             THE COURT:  Okay.  Mr. Slack.

15             MR. SLACK:  From Weil, Gotshal for the debtors.

16             THE COURT:  Okay.

17             MR. SLACK:  And Your Honor, our witness today is going

18   to be John Lowe.  And a couple of housekeeping matters before

19   then.  We have prepared a PowerPoint presentation.  We

20   presented that to the TCC on Friday.  They don't have any

21   objection, and so we'd ask that that be part of the record.

22             THE COURT:  All right.  No objection.

23             MR. SLACK:  Can I approach, Your Honor?

24             THE COURT:  Sure, of course.  Yeah, you don't have to

25   ask to approach, just approach.  And do we have -- will the

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 5 of
94

1   witness be using a hard copy or the screen?

2           MR. SLACK:  I'm going to put a hard copy, and then of

3   course we're putting it on the screen.

4           THE COURT:  Okay.  That's fine.  Thanks.

5           MR. SLACK:  And so with that, Your Honor, I would call

6   John Lowe.

7           THE COURT:  All right.  Mr. Lowe, would you come

8   forward, please?  And stand by the witness stand and raise your

9   right hand, please.

10          MR. LOWE:  Yes.

11      (Witness sworn.)

12          THE CLERK:  Have a seat.  State your name and spell it

13  please.

14          THE COURT:  If you bang that microphone, it will get

15  back -- bite you back so -- just state your name and address,

16  please.

17          THE WITNESS:  My name is John Lowe.  Last name is

18  spelled L-O-W-E.

19          THE COURT:  And your business address is fine.  You

20  don't need to do a home address.

21          THE WITNESS:  245 Market Street, San Francisco,

22  California 94105.

23          THE COURT:  All right.  Thank you, Mr. Lowe.

24          All right, Mr. Slack?

25  DIRECT EXAMINATION

1  BY MR. SLACK:

2  Q.    Good afternoon, Mr. Lowe.  Where do you currently work?

3  A.    Pacific Gas and Electric Company.

4  Q.    What is your current position at Pacific Gas and Electric?

5  A.    I'm the senior director of total rewards.

6  Q.    To whom do you report?

7  A.    I report to Dinyar Mistry, senior vice president, the

8  chief human resource officer, and chief diversity officer.

9  Q.    When did you first join PG&E?

10 A.    July of 2012.

11 Q.    And can you briefly walk through what your positions have

12 been at PG&E since you joined the company?

13 A.    I started as the director of executive compensation.

14 Shortly thereafter, in the fall, I was given the responsibility

15 for all compensation for all employees at the company.  And

16 then a couple of years later, I was promoted to senior director

17 and took on the responsibility for benefits as well for the

18 entire company.

19 Q.    So generally, can you describe your duties and

20 responsibilities as the senior director of total rewards?

21 A.    I have responsibility for compensation programs for all

22 employees.  That includes all base pay, short-term incentive

23 plans such as the STIP, long-term incentive plans such as the

24 LTIP, which is an equity program.  I have responsibility for

25 benefit programs that include all of our insured benefits such

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 7 of
94

1  as health insurance, life insurance, dental insurance, pension

2  plans, retiree medical, employee savings.

3  Q.   And how many employees do you manage as the senior

4  director of total rewards?

5  A.   Approximately thirty employees.

6  Q.   Now, as the senior director of total rewards, what has

7  been your role historically in developing a short-term

8  incentive plan on behalf of the company?

9  A.   It is my responsibility to work with the management team

10 to identify the objectives for the upcoming year -- work with

11 them to present to the compensation committee.  In September

12 and in the fall, we identify the different metrics that will

13 help us achieve those objectives.  After we get feedback from

14 the compensation committee, we provide information on targets,

15 and then our compensation committee then approves the targets.

16 Q.   And for how many years has the company had a short-term

17 incentive plan as part of employee compensation for the broad

18 based employee population?

19 A.   For several decades -- at least back as far as 1986, I've

20 been able to trace it, and definitely for as long as I've been

21 there for the last seven years.

22 Q.   So it's fair to say there has been some form of short-term

23 incentive plan for at least thirty years at the company; is

24 that right?

25 A.   Yes.

1  Q.   Now, how does the short-term incentive plan fit within the

2  compensation programs at the company?

3  A.   So it is one piece of total compensation provided to our

4  broad based population.  It -- the total compensation of

5  close -- of course includes base pay, which is the largest

6  portion of compensation.  And then short-term incentive for a

7  certain part of the population, long-term incentive, and then

8  all benefits that anybody is eligible for.

9  Q.   So now if the -- if the targets are met, what percentage

10  of an employee's compensation has the short-term incentive plan

11  historically been?

12  A.   Depending upon the level in the organization, six to

13  twenty percent.

14          THE COURT:  To twenty -- six to twenty?

15          THE WITNESS:  Six to twenty percent.

16  Q.   So turning more specifically to the 2019 short-term

17  incentive plan, can you tell the Court what your role has been

18  in connection with the 2019 STIP?

19  A.   Starting in summer of 2018, worked with the management

20  team to identify the objectives for the year -- for 2019.  Got

21  some direction working with the leadership team and the

22  compensation committee on those.  And then in the fall, started

23  identifying the metrics that would support those objectives.

24  When we got to the end of the year though, it was clear that we

25  were moving into a restructuring situation, so worked with a

1  outside executive consultant who is an expert on compensation

2  programs and restructuring situations, Willis Towers Watson.

3  Through December and January, worked with the management team

4  and with Willis to design the program for 2019, brought it to

5  the compensation committee, we presented it, and it was

6  approved in January of 2019.

7  Q.   Who is eligible for the 2019 STIP?

8  A.   The broad based population.  It's all non-represented

9  employees, except for our senior-most executives, and then a

10 portion of the -- a small portion of the represented employees.

11 Q.   And approximately how many employees are eligible for the

12 STIP?

13 A.   Just under 10,000.

14 Q.   So now we're going to get to the specific metrics very

15 shortly, but before we do, can you generally describe in broad

16 terms what the components of the STIP program are for 2019?

17 A.   The STIP company performance metrics are broken into three

18 components:  safety components, both customer and employee

19 safety; financial health; and customer support.

20 Q.   And have you ever heard of something called a company

21 score?

22 A.   Yes.

23 Q.   What is a company score?

24 A.   Company score is the -- it's the result of the individual

25 metrics that make up the different components that measure how

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 10
of 94

1    we performed against our targets and the objectives that we

2    had.

3    Q.   So turning to slide 1, you just talked about a number of

4    the company objectives, can you, using this --

5         THE COURT:  Hold on one second.  Do we have that on

6    this screen and on the other screen?

7         MR. SLACK:  Slide 1 is on this screen.

8         THE COURT:  Well, I see it on my staff's screen, but I

9    don't see it on mine.

10        Is it on your screen?

11        THE WITNESS:  It is on mine.

12        THE COURT:  Well, it's not on mine.  Let's see --

13   there's an on/off switch.  How about for the audience?  Is it

14   on the big screen there?

15        MR. SLACK:  It is on the big screen.

16        THE COURT:  Well, I'm the only one that doesn't get

17   the picture here.  Standby -- I mean, I see it here in hard

18   copy.  I really wanted to make sure the audience had it and the

19   other parties.  Okay, got it, go.  Thank you.

20   Q.   So using slide 1 -- and I know you had just talked about

21   some of the goals of the STIP, can you explain to the Court

22   what the -- in a big picture what the goals of the incentive

23   plan are?

24   A.   So there -- the goals of the incentive plan are to engage,

25   and incent and motivate our employees to achieve the

1  performance objectives that we have for the year.  And there --

2  the metrics are divided into, as I said, safety, financial, and

3  customer at sixty-five percent safety, twenty-five percent

4  financial, and ten percent for our customer.

5  Q.   So let's turn to page 2 of the slides.  And again, at a

6  high level, what does the chart on page 2 reflect?

7  A.   This is an extract of what we presented to the

8  compensation committee.  It provides the list of the metrics

9  that we have for 2019, the weight, and the brief description of

10  the different metrics.  The slide that I have on the screen

11  does not show the description.

12          MR. SLACK:  I think we're being very clever.  We're

13  allowing it to go one at a time, but I'm just going to put them

14  on.

15          THE COURT:  I'm getting a light show here -- yeah,

16  like a --

17          MR. SLACK:  Okay.  So we've populated the slide.

18  Q.   For what purpose was slide 2 prepared within the company?

19  A.   This was to -- for the discussion that we had with the

20  compensation committee regarding the different metrics, their

21  weights, and then the -- for them to understand what the actual

22  description was for each of the metrics and understand how the

23  metric works.

24  Q.   And how does the chart on page 2 differ from what was

25  presented to the compensation committee?

1  A.    In two ways.  The first is that the weighting that we

2  presented to the compensation committee was different.  The

3  public safety metric for electric operations was weighted at

4  ten percent at that time, and the financial metric was weighted

5  at forty percent.  Now you can see that they're both weighted

6  at twenty-five percent, and therefore sixty-five percent for

7  the safety.  The descriptions themselves are -- were a little

8  bit more detailed -- what we presented to the compensation

9  committee -- more --

10  Q.    So let's go ahead and walk through each of the metrics on

11  page 2, and let's start with the safety metrics, right at the

12  top.  Can you describe for the Court the nuclear safety metric?

13  A.    This is an industry standard metric for -- that is -- what

14  was developed by the industry of nuclear power plant operators,

15  or INPO.  It measures a powerplant's safety and reliability.

16  There are eleven factors that are measured by the --

17  Q.    And how long has the company used this metric with respect

18  to its nuclear operations?

19  A.    I'm not sure how long, but at least as long as I've been

20  here for the last seven years, it has been a part of the STIP.

21  Q.    The next metric refers to electric operations public

22  safety index.  And again, if you could describe for the Court

23  what is the metric for electric operations public safety index.

24  A.    This measure is designed to be consistent with the

25  wildfire safety plan that we have.  It is made up of two

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 13
of 94

1  submetrics:  enhanced vegetation management and system

2  hardening.  Enhanced vegetation management measures the circuit

3  miles of clearing that we have done in the high-risk -- or high

4  fire risk areas.  And system hardening is -- measures the same

5  thing -- circuit miles of where we've updated our systems in

6  the high fire risk areas.

7  Q.   So more specifically, if you could explain to the Court

8  what the company means by system hardening with respect to

9  these metrics.

10  A.   This is taking our assets -- our electric assets to change

11  them and improve them so that they're not likely to start a

12  wildfire such as maybe replacing bare wires with coated wires,

13  or taking those wires and undergrounding them, or taking a wood

14  pole and making it metal as an example.

15  Q.   Now, were the metrics under the electric operations that

16  we just looked at used in prior years?

17  A.   No.  This is a new metric for 2019.

18  Q.   And with respect to those two metrics, how are these

19  metrics selected for the 2019 STIP?

20  A.   Worked with the electric operations leadership team for

21  them to identify what were the appropriate metrics for the

22  objectives that we had.  In this particular case, we were

23  filing a wildfire safety plan, and it was determined that the

24  most important objective we had was to make sure we implemented

25  that plan.

1  Q.   Now, are you aware of whether the CPUC is reviewing the

2  company's wildfire safety program?

3  A.   It is reviewing the wildfire safety program.  And if they

4  update the plan, then we'll update the metric.

5  Q.   Okay.  Moving on to the third metric, which is the

6  electric and gas operations asset records duration index.  Once

7  again, if you can explain to the Court that metric.

8  A.   It's very important that our records are accurate in the

9  system, and this metric is designed to shorten the amount of

10 time that it takes for us to -- from when we actually complete

11 any kind of update on our assets to when that information is

12 recorded in the system.  So it measures the average number of

13 days that it takes to take the work that is completed and

14 record it in our database.

15 Q.   And why is the tracking of the average days required to

16 complete appropriate documentation of electric and gas

17 operations an important safety metric?

18 A.   When somebody is working on our assets, it's important

19 that they know what asset that they're working on.  So this is

20 both a customer and a safety metric.  We want to make sure that

21 if somebody's working on a line, they know whether -- what

22 voltage is on the line as an example.  Or if somebody is

23 working on a pipeline underground, they know what kind of gas

24 pipeline that they're working on.  It's important for people to

25 know that so we don't have a safety incident.

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 15
of 94

1   Q.   So turning to the next metric, which is the gas operations

2   metric, and once again, if you could explain that metric.

3   A.   So we're introducing tools in our inspection process for

4   our gas pipelines.  These tools are sensors that go actually

5   into the pipeline and record the quality of the pipeline.  And

6   this metric measures a number of miles that we inspect in the

7   year after we've introduced the new inspection tool.

8         THE COURT:  I need to interrupt you for a minute, Mr.

9   Slack because I'm looking at the graph here, but I'm also

10  looking at the metrics that were part of the original motion,

11  and they seem to be -- have changed.  Am I wrong on that or

12  right?

13        MR. SLACK:  I think the metrics --

14        THE COURT:  I mean the terminology, for example, there

15  were safety metrics, nuclear public safety, vegetation

16  management, system hardening -- but then I don't think there

17  was anything that I -- that said gas operation, for example.

18  So maybe I just have an out-of-date version of it, but this was

19  the corrected declaration of Mr. Mistry that was filed on March

20  8th.  Are you familiar with that?  I mean, I don't care that

21  we're up-to-date on it, I just want to make sure I'm comparing

22  something that was previously done and now something that's --

23        MR. SLACK:  So what I can tell Your Honor -- and maybe

24  Mr. Lowe has more information, I don't think the metrics

25  have -- those metrics have changed, and so I haven't gone back

1    and looked at what was in the declaration, but I don't know --

2            THE COURT:  Well, Mr. -- do you know what I'm

3    referring to?

4            THE WITNESS:  I -- I do know what you're referring to.

5    I don't know -- I do know that they haven't -- the metrics have

6    not changed.  So I'm not sure if the -- the declaration is --

7    if there's a typo --

8            THE COURT:  Well, let me -- again, not to be spurious

9    here.  The document that your counsel or the company filed some

10   time ago listed a number of metrics, and there was, A. safety;

11   B. customer satisfaction; C. financial, which is kind of the

12   way you broke it down.  But then back into A, there were five

13   subcategories:  nuclear, public safety, first-time miles, asset

14   records, and serious injuries.  But now I see, for example, gas

15   operations, ten percent, and I don't see a previous -- here,

16   you can look at the thing that --

17           THE WITNESS:  The -- the -- the first-time -- the

18   first-time --

19           MR. SLACK:  No, I think it's the first-time miles,

20   Your Honor.

21           THE WITNESS:  The first-time miles, Your Honor.

22           THE COURT:  Oh.

23           MR. SLACK:  That's the ten percent in the first-time

24   miles.

25           THE COURT:  Oh, I see.  Okay.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 17
of 94

1        MR. SLACK:  The first-time inspections of natural gas

2   pipelines found in the introduction of inline inspection tools.

3        THE COURT:  Oh, it's just the use of the words.  Okay.

4   Go ahead, counsel.  No offense.

5        THE WITNESS:  First time ILI refers to first-time

6   inline inspection miles.

7        THE COURT:  All right.  Simple enough.  Thank you.

8   Okay.  Go ahead, Mr. Slack.

9   BY MR. SLACK:

10  Q.   Okay.  Mr. Lowe, looking at the employee safety metric,

11  which is the next; can you describe for the Court that metric?

12  A.   This metric is designed to motivate us to get corrective

13  actions in place quickly after we have a -- a serious incident,

14  injury, or fatality.  So it measures the quality and the

15  timeliness of our corrective actions that are implemented in

16  response to a contractor or an employee serious injury or

17  fatality.

18  Q.   And the quality aspect of that metric is determined by an

19  independent safety expert, correct?

20  A.   The independent safety expert established the scale and

21  does the -- reviews all of our corrective actions.

22  Q.   Okay.  So turning to the next metric, which is the

23  customer metric, and the column that says, "Escalated Customer

24  Complaints", can you describe that metric for the Court,

25  please?

1  A.   This is a customer metric that is used in the utility
2  industry.  It measures the number of complaints that are filed
3  with the Public Utility Commission.  So this metric, for us,
4  measures the number of complaints escalated to the California
5  Public Utility Commission.  And it is a rate, so it's a number
6  of complaints to -- per 100,000 customers.
7  Q.   And turning to the last metric, which is the financial
8  metric, and the metric, "Earning from Operations", can you
9  describe for the Court that metric?
10  A.   This metric measures the financial performance of our
11  ongoing operations, excluding one-time events that may come in
12  the year.
13  Q.   And so the use of -- or the earnings from operations
14  metric -- was there any consideration given to changing that
15  metric to another metric?
16  A.   Yes.  The NorthStar Safety Report suggested that we should
17  review whether or not we use the earnings from operation or EFO
18  metric and that we should look at other metrics.  So through
19  the fall, in working with compensation committee, there were
20  extensive conversations around whether this was the appropriate
21  metric, looking at other metrics that we could replace it with.
22  And in the end, in January, the compensation committee decided
23  that this was the correct metric for us.
24  Q.   So Mr. Lowe, given your description of the various
25  metrics, let's next turn to the calculation of the company

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 19
of 94

1  score based on these metrics.  And maybe we should put up slide

2  4, in case it helps in your description.  But at a high level

3  first, before we get into the chart, how does the company

4  figure out what the company score is from all these different

5  metrics?

6  A.   At a high level, company performance is recorded and is

7  compared to the target for each of the individual metrics.

8  That provides us with a score for that metric that is

9  multiplied by the weight for that metric and all of those --

10 that calculation is done for each of the sub-metrics, and then

11 they are added up together to get a total company score.

12 Q.   So let's try to break that down a little bit.  Let's look

13 at slide 4.  First off, can you tell me what is slide 4?

14 A.   Slide 4 is a table with all of our metrics that we have

15 communicated to our employees.  We publish this out on our

16 intranet for all employees to see so they understand what the

17 targets are for what we're working -- the performance we need

18 to meet for 2019.

19 Q.   And are there any changes to this slide from what the

20 employees can see on the intranet?

21 A.   No.

22 Q.   So let's take a look at the metrics, and you'll see that

23 for each quarter there's a threshold target and maximum,

24 correct?

25 A.   Correct.

1  Q.   So taking the nuclear operations, can you explain -- and

2  maybe just taking the first quarter to start -- can you explain

3  how the company scores, based on the idea of having a

4  threshold, a target, and a maximum?

5  A.   So looking at the -- the Diablo reliability indicator, the

6  performance is recorded, and as an example, the performance

7  could be at target; it could be below target; it could be

8  above.  It could also be below threshold or above maximums, so

9  if the performance is below threshold, then the score for that

10  metric would be zero.  If it is at target, the score would be a

11  1.  If it's at threshold, the score would be a .5, and if it's

12  at maximum, the score would be a 1.5.  Again, taking that

13  score, multiplying it by the five percent would give you the

14  individual score for that metric, so --

15  Q.   And if the score falls between the threshold and the

16  maximum, the .5 and the 1.5, how does the company figure out

17  the score?

18  A.   So we interpolate between the threshold and the -- and the

19  target.  So if the score --

20  Q.   So it's possible, for example, you could have a 1.25 or a

21  1.3 or a .8, depending on where it fits within that range,

22  correct?

23  A.   Yes.

24  Q.   So again, taking the nuclear operations, can you give the

25  Court a sort of a sample scoring, how you would go ahead and do

1    a, let's say, a first-quarter score -- company score, based on

2    the threshold, target, and maximums that are here.

3    A.    Right.  So it's a basic math calculation.  Let's say the

4    score for the nuclear operations was a ninety-three.  That

5    would put it at the threshold.  That would mean that there

6    would be a .5 score for that individual metric.  That .5 would

7    be multiplied by five percent, and you'd get two-and-a-half

8    percent, or .025.  Just to make the math easy, let's assume the

9    rest of the metrics are all at target, so they're all at a 1.0,

10   so each of the weights would be multiplied by 1.0, and the rest

11   of the weights add up to ninety-five percent.  So you would add

12   each of the individual scores together, so 95 percent for the

13   remaining weights, 2.5 percent for the Diablo Canyon

14   reliability indicator.  That gives us 97.5 or a .975 score for

15   that quarter.

16   Q.    So I notice, Mr. Lowe, that the bottom line dealing with

17   earnings from operations doesn't have any information.  Why is

18   that?

19   A.    That would be material amount, public information, so we

20   don't publicize it.

21   Q.    But in fact the company has targets for those -- for the

22   earnings from operations, correct?

23   A.    Yes.  And we publish that information on a quarterly

24   basis.

25   Q.    Given that this is incentive compensation, what does your

 1  team do to insure that the metrics at target are not so-called

 2  lapse?

 3  A.    So as part of developing the STIP metrics and looking at

 4  the measures for the year, we work with the different

 5  leadership teams of the different owners of the metrics.  We

 6  provide them with guidance that it needs to be challenging but

 7  achievable, so that it can be an incentive program.  And

 8  there's a -- meetings that take place with the leadership team

 9  where the -- the leaders, whoever owns the metric, are then

10  going to be challenged by their peers as well as bringing

11  information to the compensation committee, who will challenge

12  and ask questions and ensure that the -- the metrics are

13  challenging, but again achievable.  It is an incentive program.

14  Q.    And how does the history of the company's having a STIP

15  plan impact its ability to set targets that are achievable but

16  challenging?

17  A.    Well, the company has been setting targets for a number of

18  years now, so we have a process that we go through to ensure

19  that we're -- we are challenging each other and -- and that the

20  compensation committee is challenging the -- the leadership

21  team, so the -- the metrics are challenging.

22  Q.    So let's turn to slide 5.

23          THE COURT:  What are we doing with our beeping here?

24  Do we know what's happening?

25          THE CLERK:  Operator, we're getting a beeping in the

1   courtroom, if you could mute that line, please?

2           THE COURT: Okay. Got that fixed. Go ahead.

3           BY MR. SLACK:

4   Q.   Mr. Lowe, do you recognize this chart?

5   A.   Yes.

6   Q.   And for what purpose was this chart prepared?

7   A.   This is an extract of a -- of materials that were provided

8   to the compensation committee so that we could discuss with

9   them the nature of the targets and they could understand them

10  and -- and approve them.

11  Q.   And so if you could briefly explain what information is

12  reflected on this chart.

13  A.   It has the lists of the different metrics and the weight

14  for each of those metrics. But then it has one of the factors

15  that are -- the compensation committee is interested in, and

16  that is, what was the performance in the previous year, or

17  historical performance, the targets that we are setting for

18  2019, and then the relative value or the relative performance

19  for 2019's target versus the 2018 performance.

20  Q.   And so then, the last column is a percentage. And what

21  does it mean if there's a positive percentage in that column?

22  A.   That the target for 2019 is achieving more or a -- a

23  higher number, or a higher value, than what the performance was

24  for 2018.

25  Q.   And so I notice, though, that there's a few negative

1  numbers.  Let's take a look at a couple of the specific
2  columns.  If we could turn to chart 6, slide 6, which is a
3  breakout of the same chart, just with the nuclear operations
4  column.  Can you explain the negative 1.4 percent, what that
5  means to the Court?
6  A.    Yes.  So for, in the nuclear operations area the -- the
7  score that can -- that one can achieve from the EFO rating, the
8  maximum score is 100.  And since the performance from 2018 is
9  really just one of the factors that's taken into consideration,
10 you have to consider what is performance going to be for the
11 year that -- in this case, 2019.

12        So in 2018, only one of our nuclear reactors had a -- had
13 a refueling outage.  In 2019, both of our reactors will have a
14 refueling outage.  And for unit 2, the refueling -- the
15 refueling outage will be longer than thirty-five days, and the
16 score -- the hundred-point score is reduced by five points if
17 your outage is longer than thirty-five days.  Our outage will
18 be longer than thirty-five days because there's maintenance
19 that will also be taking place.  So the maximum score possible
20 is 95, so even though it shows a negative 1.4 percent, a 93.7
21 score is a little bit better than -- a little bit more
22 challenging than 95 percent of 100.
23 Q.    Let's skip a page.  Let's turn to slide 8.  And slide 8 is
24 one of those examples where there's a positive score, or a
25 positive percentage.  Can you explain to the Court, going

1  through this line?

2  A.   So the average number of days that it took us to update

3  our records for any transmission-line work that was completed

4  in 2018 was eighty-one days.  The target for 2019 is, in fact,

5  sixty days, more than twenty-five percent better than the

6  amount of time it took us to update records in 2018.  So it's a

7  pretty significant stretch here.

8  Q.   And would you agree that this is a achievable but

9  challenging target?

10 A.   Yes.  We're, again, working with the electric operations

11 folks, and they're -- they're owning this, so they're saying

12 that they think they can achieve it.

13 Q.   So let's take a look at slide 9, which is the escalated

14 customer complaints, and this is a new metric, correct?

15 A.   It's a new metric in the STIP, but it's a metric that

16 has -- we have historical information on.

17 Q.   So that's the reason why that, even though it's a new

18 metric, there's actually a 2018 performance, correct?

19 A.   Correct.

20 Q.   And so can you explain to the Court, again, why there's a

21 negative fourteen percent and why, notwithstanding that, it's

22 an achievable but challenging metric?

23 A.   So for 2019, we, as part of the Wildfire Safety Plan, we

24 know that we will be implementing more public safety power

25 shut-offs.  And the number 1 complaint to the CPUC is when

1    somebody's power is shut off.  So knowing that that's going to

2    happen, we had to make a judgment on how often that would

3    happen, how -- how -- where we think -- how many complaints we

4    think we're going to get, and so that's where the 12.2

5    complaint rate was determined.

6    Q.    And so given the number of times that the company expects

7    there to be a shutdown of power as a result of the wildfire

8    safety initiatives, is this goal also achievable but

9    challenging?

10   A.    Definitely feel that it's challenging, but hopefully

11   achievable.

12   Q.    So let's turn to slide 10.  Mr. Lowe, what does this chart

13   show?

14   A.    The historical STIP payout chart is -- shows the overall

15   company score, as calculated since 2010, as well as the

16   compensation committee discretion that they exercised in any

17   given year.

18   Q.    Is there a place where someone could find this information

19   in the public domain?

20   A.    This information is reported in our proxy, so all of the

21   information here is public except for the 2018, because we

22   haven't published the 2018 proxy yet -- the 2019 proxy, pardon

23   me.

24   Q.    Can you explain how this chart helps support the

25   conclusion that the targets are not so-called lapse?

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 27
of 94

1   A.    I think what this shows is a couple of things.  One, that

2   as we set our targets, that sometimes they're achieved, and

3   sometimes they're not.  So four out of the nine years, they're

4   not achieved, while other years that they are.  The other --

5   other item that this really shows is that we've never achieved

6   a maximum score.  All of these are out of a 2.0, so clearly

7   we're challenging in -- in the metrics that we're setting

8   through the years.

9   Q.    Now, I noticed that the score for 2018 is a 1.6, which is

10  the highest on the sheet.  What response do you have to someone

11  suggesting that the 2019 STIP is a certainty to generate the

12  same high score?

13  A.    Two answers to that question, actually, or that challenge.

14  First, all of the numbers on the -- the chart are out of a 2.0

15  scale, so any result that is above target is between a 1 and a

16  2.0.  The maximum payout top score for 2019 is a 1.5, so the

17  1.6 score is sixty percent of the difference between a 1.0 and

18  2.0 score.  If we had the same score and -- and we have a

19  maximum payout of 1.5, sixty percent would actually be a 1.3.

20  Q.    Now, are there any other factors that would help make this

21  1.6 apples to apples with the 2019 STIP?

22  A.    The 1.6 represents a earnings from operations number that

23  reflects no payment for 2018 STIP.  Had there been a payment

24  for 2018 STIP, the earnings from operations score for that

25  particular metric would've been lower, which would lower this

1  overall score.

2      Also, this was the first year in several years that we

3  didn't donate any money to charity, which would also lower the

4  EFO score.  So that would bring it down lower than even the

5  1.3.

6  Q.   So if you take into account the three factors you've just

7  talked about, which is the fact that there's a different scale,

8  the 2 scale, the 1.5, and the change in the metric from

9  earnings from operation, plus the charity, if you were trying

10  to make this apples to apples, what would the score be as sort

11  of an apples-to-apples comparison with the 2019 STIP?

12  A.   I don't know the exact score, but it would be likely

13  somewhere around a 1.2.

14  Q.   Turning to a different topic, which is the topic of data

15  integrity.  How does PG&E try to ensure that the STIP metrics

16  and metric results are accurate and valid?

17  A.   We have a two-step process that we go through.  The

18  organization is performing the work, records their work that

19  they're doing.  Individual groups then have a quality control

20  step and a process.  Gas and electric operations, as an

21  example, have separate quality control groups that go back.

22  They're going to check whether or not the work was done,

23  whether it was completed, and -- and then whether or not it was

24  accurately entered into the database.

25      The second step is we have internal audits then review

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 29
of 94

1    those steps, both whether the work was done, in some cases, but

2    always in the case of whether it was recorded accurately, and

3    then whether or not the calculation was done accurately or not.

4              MR. SLACK:  So Your Honor, we have -- other than the

5    slides themselves, we have one exhibit.  So I'd like to have

6    marked the one exhibit and hand it up.

7              THE COURT:  All right.  The other side's seen that?

8    Mr. Julian seen that?

9              MR. SLACK:  Yes, we did.

10             THE COURT:  Okay.

11             MR. SLACK:  We provided it to him last week, Your

12   Honor.

13             THE COURT:  Sure.

14             UNIDENTIFIED SPEAKER:  Thank you.

15             MR. SLACK:  And we would ask, Your Honor, that this

16   document -- and I can have the witness identify it, but that

17   this document become part of the record.

18             THE COURT:  That's fine.  Let's have him identify it.

19   Q.   Mr. Lowe, are you familiar with this document?

20   A.   Yes, I am.

21   Q.   Yeah.  What is it?

22   A.   This is a -- materials that were provided to the

23   compensation committee at the February compensation committee

24   meeting in response to their request at the January

25   compensation committee meeting, when they approved the 2019

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 30
of 94

1  STIP, that we show them and give them comfort that we were, in
2  fact, reporting accurate information when we give them the STIP
3  results.
4  Q.   And did your group help prepare this?
5  A.   The internal audit prepared this, and we worked with them
6  to --
7          MR. SLACK:  So Your Honor, again I'd ask that it
8  become part of the record.
9          THE COURT:  There's no objection?
10          MR. JULIAN:  No objection.
11          THE COURT:  Okay.  Part of the record.  We never
12  really marked this as exhibits in the traditional sense.  But
13  the two folders are part of the record.
14     (Paperwork from internal audit was hereby received into
15  evidence as Debtors' Exhibit, as of this date.)
16          MR. SLACK:  Great.  Thank you, Your Honor.
17  Q.   So in past years, Mr. Lowe, has the internal audit process
18  been successful in identifying issues that lowered the STIP
19  scores?
20  A.   Yes.  A couple of examples are actually in this exhibit.
21  But two of them are in 2017, there was data that was reported
22  for infrared inspections for the electric metric that we had at
23  that time.  And the data couldn't be verified.  So the data was
24  removed, and therefore, that lowered the overall -- the actual
25  score of -- for 2017.

1      And in 2018, the internal audit department identified in
2  our safe driving rate that the data was also not accurate.  And
3  because of that, we had shared with the compensation committee,
4  we suggested it be thrown out and that the -- the metric itself
5  receive an individual score of zero.  That was all before we --
6  the compensation committee decided to zero out the 2018 STIP.
7  Q.   Well, let's turn back to the slides and turn to slide 12,
8  please.  So Mr. Lowe, once the company score, which you've
9  testified about, is determined, how are then the individual
10 employee STIP payments calculated?
11 A.   So the two components of the STIP payment are the company
12 score and then the individual's target participation value.
13 The individual's target participation value is determined by
14 multiplying their base salary by the participation rate or the
15 percentage of their base salary for them.  And that is
16 determined by the job level that they're in and not by the
17 individual; it's by job level.

18     Those are multiplied together.  They're multiplied by the
19 company score.  And for the first quarter example we have here,
20 that would be divided by four and that would be the individual
21 STIP payment that we --
22 Q.   So let's take a look at 13 and try to put some meat on
23 that bone by taking an example of an employee that makes 80,000
24 dollars.  Can you walk through for the Court how, for a first
25 quarter STIP payment, the company would calculate an individual

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 32
of 94

1   payment?

2   A.   So if the individual has an annual salary of 80,000

3   dollars, that's multiplied by their participation rate.  In

4   this particular case, we chose 12.5 percent.  So 12.5 percent

5   of 80,000 dollars is, in fact, 10,000 dollars.  The 10,000

6   dollars is multiplied by the company score.  Again, for simple

7   math, here, we have 1.0.  So the 10,000 divided by 4 would give

8   you the individual STIP payment for the first quarter of 2,500

9   dollars.

10  Q.   And if the company score, which we've talked about, let's

11  say, was a 0.9 how would that affect the scoring?

12  A.   You would multiply by 0.9 instead of 1.0 and it would

13  reduce the -- the end score.

14          THE COURT:  May I interrupt?  So this individual who's

15  got an 80,000-dollar salary, the maximum STIP payment, then, I

16  gather would be, what 4,000 dollars?

17          THE WITNESS:  Thirty --

18          THE COURT:  If 1.5 is the maximum score, right?

19          THE WITNESS:  Thirty-seven, five.

20          THE COURT:  Okay.  Yeah.  I knew you'd do the math

21  better than I do.  Okay.  Thanks.

22  Q.   And so, Mr. Lowe, let's turn to the last topic, which is

23  the individual performance modifier, which also plays a role in

24  the STIP.  What is an individual performance modifier?

25  A.   So once we've calculated the STIP amount for an individual

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 33
of 94

1    employee, then we actually look at the individual's performance

2    for the year.  The individual performance modifier for 2019 is

3    to be applied at the end of the year.  We would calculate

4    the -- I'm sorry.  The leader would look at the individual's

5    performance for the year.  They're going to evaluate how an

6    individual performed against their own individual goals.  Each

7    leader establishes goals for each individual employee.  They're

8    going to --

9    Q.    So can I stop you?  That's the 10,000 employees.  Each of

10   them is going to have their own individual goals; is that

11   right?

12   A.    That's correct.

13   Q.    I'm sorry.  Go ahead.

14   A.    So we're going to look at how they perform against their

15   goals as well, so their competencies.  And it's not just did

16   they -- did they achieve their performance, but how did they

17   perform.  Those combined would result in an employee evaluation

18   rating for that employee.

19        That leader would then determine from there how much the

20   individual performance modifier or the percentage that should

21   be multiplied by the employee's STIP payment for that

22   individual employee.

23   Q.    And what's the range in the 2019 STIP of the possible

24   individual performance modifier?

25   A.    From zero to 150 percent.

1    Q.    So if an employee was going to receive for the year a

2    10,000-dollar STIP, given the zero to 150, you could have a

3    STIP as low as zero and as high as 15,000, correct?

4    A.    Correct.

5    Q.    Now, how long has the company used an individual

6    performance modifier as part of the short-term incentive plan

7    for the broad-base employees?

8    A.    I'm not sure, but as long as I've been there for the last

9    seven years, it's been.

10   Q.    And have you had the opportunity, as part of your duties

11   and responsibilities, to review the compensation of

12   competitors, at least broadly?

13   A.    Yes.

14   Q.    What use do the peer utility companies make of individual

15   performance modifiers in connection with their short-term

16   incentive plans?

17   A.    Peer utilities and other peers, the vast majority of them,

18   have some kind of individual performance modifier.

19   Q.    Now, Mr. Lowe, if a person can obtain a multiplier of up

20   to 1.5 times their STIP payment, how does the company

21   historically ensure that the cost of the STIP program is

22   contained?

23   A.    When leaders are determining how much the individual

24   performance modifier is going to be for an individual employee,

25   they're given a budget.  And they have to stay within that

1 budget.

2 Q.   And so historically, when you look at the individual

3 performance modifier, how does the IPM historically affect the

4 total cost of the STIP?

5 A.   Just marginally.  Maybe two or three percent.

6 Q.   So let's take a look at our last slide, which is slide 14.

7 And could you explain for the Court what's reflected in this

8 slide?

9 A.   This is the distribution of individual performance

10 modifiers for the last two years in which we paid a STIP, so

11 for 2017 and 2016 STIP.

12 Q.   So what are the observations that you have, Mr. Lowe, when

13 you look at this chart, about the historic performance of the

14 individual performance modifier?

15 A.   The vast majority of employees, 8,000 are going to be

16 given a STIP that is going to be right around a hundred

17 percent.

18 Q.   And so put differently, is it common for someone to

19 receive the maximum under the STIP?

20 A.   It is not common for someone to receive the maximum under

21 the STIP.

22 Q.   And similarly, is it common for someone to receive the

23 lower and either a zero or something approaching zero in the

24 STIP?

25 A.   No.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 36
of 94

1  Q.   And so if you were going to explain that to the Court, how
2  does this chart help or show that the IPM has not historically
3  maturely increased the cost of the STIP?
4  A.   Again, the majority of the employees are paid between 90
5  and 110 percent their IPM.  So in fact, on average, it's been
6  ninety-eight, ninety-nine percent, around there because you
7  have to reduce from somebody who is a higher-performing
8  employee -- or I'm sorry.  You have to reduce from somebody
9  who's a lower-performing employee in order to provide a higher
10  IPM to a higher-performing employee.
11        MR. SLACK:  So Your Honor, I have no more questions,
12  so --
13        THE COURT:  Well, let me just clarify.  When I asked
14  you before and you corrected my math, the employee that got
15  80,000, I think you said he or she could get 3,750 at the max.
16  Then if that happens to be the bottom of the pole, that person
17  will get nothing more other than an IPM of zero.  But if he's a
18  superstar, he'll get 150 percent?
19        THE WITNESS:  150.
20        THE COURT:  In other words --
21        THE WITNESS:  Yes.  Yeah.
22        THE COURT:  -- the chart they we're just looking at is
23  specific to the employee.  So the higher achiever is going to
24  get rewarded and the lower achiever is not.  But they still get
25  the benefit of what the overall company --

1           THE WITNESS:  That is --

2           THE COURT:  -- performance is.

3           THE WITNESS:  That is correct.

4           THE COURT:  Right.

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  No, I have no questions.  Thank you

7    Mr. Lowe.

8           You want to -- Mr. Julian, do you want to question, or

9    does anyone -- does the U.S. Trustee want to question?

10          MS. VILLACORTA:  No questions.  I'll defer to Mr.

11   Julian.

12          THE COURT:  Okay.  Mr. Julian?

13          MR. JULIAN:  Yes, Your Honor.

14          THE COURT:  Thank you.  Go ahead.  Again, you're free

15   to stay at counsel table if you wish or use the podium.

16   Whatever you like.

17          Wow, you got a lot of papers there.

18   CROSS-EXAMINATION

19   BY MR. JULIAN:

20   Q.   Mr. Lowe, one of the purposes of the STIP is to align the

21   employee's performance with the company's overall goals,

22   correct?

23   A.   That is correct.

24   Q.   And that includes the company's safety goals, correct?

25   A.   Correct.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 38
of 94

1   Q.   And one of the metrics you have in your STIP is for public

2   safety, right?

3   A.   Correct.

4   Q.   Specifically as to wildfire mitigation, right?

5   A.   Yes.

6   Q.   And that's because one of the goals of the company is to

7   try to make its electrical system safe in order to avoid

8   wildfires, right?

9   A.   Correct.

10  Q.   And what your STIP does is it bases wildfire safety

11  metrics on the wildfire safety program of the company, right?

12  A.   Yes.

13  Q.   And that's been submitted to the PUC?

14  A.   Yes.

15  Q.   And Judge Alsup ordered the company to comply with the

16  wildfire safety plan as a condition of its probation, correct?

17  A.   It's my understanding.

18  Q.   Now, your public safety index for wildfire mitigation is

19  twenty-five percent of the overall STIP, correct?

20  A.   Yes.

21  Q.   And that's divided equally into two things:  one called

22  enhanced vegetation management, correct?

23  A.   Yes.

24  Q.   And the other is system hardening, right?

25  A.   Yes.

1  Q.   All right.  So I'd like to talk to you about enhanced

2  vegetation management.  And the chart that you gave the Court

3  does not explain specifically what the metric is, correct?

4  A.   It gives a high-level definition of what the metric is.

5  Q.   Right.  And what it says is that it's a new measure for

6  2019, correct?

7  A.   Yes.

8  Q.   And it follows the wildfire safety program filed with

9  Judge Alsup and the PUC?

10  A.   Yes.

11  Q.   And it says that it's made up of enhanced education

12  management measures based on circuit miles of vegetation that

13  have been cleared with high-risk areas, right?

14  A.   Yes.

15  Q.   And the goal for the company to clear its electrical lines

16  for 2019 is -- do you know how many miles?

17         THE COURT:  It was on one of the earlier charts,

18  wasn't it?

19  A.   In the STIP or in the wildfire plan?

20  Q.   In the STIP.

21  A.   It's --

22  Q.   By the way have a document to refresh your recollection if

23  you -- I can give it to you.

24  A.   It should be here so --

25         THE COURT:  It's in the -- it's one of the

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 40
of 94

1  screenshots, isn't it?  Isn't that right?

2  A.    So the enhanced veg management is 22,454.8 miles.

3  Q.    And what page are you looking at?  There it is.

4  A.    It's 5.  Yeah.

5  Q.    Okay.  And what the goal is is for PG&E to complete 2,500

6  miles of vegetation clearance in accordance with its wildfire

7  safety plan, right?

8  A.    That's my understanding, yes.

9  Q.    And the enhanced vegetation management program consists of

10  two things.  One is to clear a certain number of vertical feet

11  from the electrical wires to the sky, right?

12  A.    I under -- that's what I understand.  Yes.  I'm not an

13  expert on the specifics of the wildfire plan.

14  Q.    Right.  Well, is it true that under your STIP, your STIP

15  requires -- the STIP metric is a goal of clearing four feet

16  vertical from the conductor to the sky?

17  A.    That's what we originally submitted as the STIP and was

18  approved by the compensation committee meeting, yes.

19  Q.    Approved by who?

20  A.    Approved by the compensation committee meeting.

21  Q.    Yes.  But is it also true that the wildfire plan that you

22  told Judge Alsup you would comply with requires you to clear up

23  to twelve feet from the electrical wire?

24  A.    I'm not an expert on that.  I don't know that.

25           MR. JULIAN:  Your Honor, I'd like to hand to the

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 41
of 94

1  witness and to you Exhibit C-19, which is attached -- in

2  evidence already.

3          THE COURT:  All right.

4          MR. JULIAN:  It's Pacific Gas & Electric Company's

5  Wildfire Mitigation Plan.

6          May I approach the witness?

7          THE COURT:  Sure.  You can -- you don't have to ask.

8  Q.   Now, first of all, you see how the document I've given you

9  is marked Exhibit C-19.  On the second page, it's called

10 Pacific Gas & Electric Company's Wildfire Mitigation Plan?

11 A.   Yes.

12 Q.   And I'm going to be taking you through some of these

13 pages.  And I'd just like to say that the plan itself has a

14 page, but it also has a number stamp on the bottom that shows

15 where the page appears in the docket of this court.  For

16 example, on the second page it says page 2 next to the entered

17 date of March 28.  Do you see that?

18 A.   Yes.

19 Q.   So that's the page I'm going to use when I take you

20 through this.  So have you read Pacific Gas & Electric

21 Company's Wildfire Mitigation Plan before today?

22 A.   I have not.

23 Q.   Have you seen it at all?

24 A.   I have not seen it other than to skim it one time.

25 Q.   One of the things you testified on direct was it was your

1  job to identify the metrics, right?

2  A.    No.  It's my job to work with the organizations such as

3  the electric operations area that own the -- own the specific

4  metrics.

5  Q.    And one of your goals was to make sure that PG&E adopted

6  challenging but achievable metrics, right?

7  A.    Yes.

8  Q.    All right.  So let's turn to page 71 of the plan, which is

9  page 85 of 183 of this exhibit.  And are you there on page 85

10  of 183?

11  A.    I am there.

12  Q.    And on the bottom of the page, the last paragraph says

13  "PG&E's baseline and longstanding VM" -- vegetation management

14  "programs are multipronged with various elements all designed

15  to" -- and let's go to the next page.  You see the fourth

16  bullet there on the next page?

17  A.    Starts with "Maintain vegetation to line clearance"?

18  Q.    Yes.  The fourth bullet point says, "Maintain vegetation

19  to line clearances and radial clearances around poles pursuant

20  to Public Resources Code Sections 4292 and 4293, G.O. 95 Rule

21  35 and FAC-3-4 Federal Electric Transmission Standard".  Then

22  it says, "This includes creating the recommended radial

23  clearance of twelve feet or more at the time of trim for lines

24  in the high fire district areas for year-round compliance and

25  risk reduction?"  Do you see that?

1  A.   Yes.

2  Q.   And do you see that on the next page, page 87 of 183 of

3  this exhibit in section 4.4.1., it talks about what PG&E is

4  going to do in 2019 and beyond.  Do you see that?

5  A.   Yes

6  Q.   And then it says at the bottom, "See Figure 7 below for an

7  illustration of the routine and enhanced vegetation

8  management".  Right?

9  A.   Yes.

10  Q.   And if you go to the next page, it shows a great picture

11  of PG&E clearing the lines twelve feet to either side of the

12  electrical wire conduit, right?

13  A.   Yes.

14  Q.   It also shows PG&E clearing vertically out four feet,

15  right?

16  A.   Yes.

17         THE COURT:  I'm sorry, hold on.  Oh.  Okay.  Go ahead.

18  Q.   But the twelve foot clearance metric is not in your STIP,

19  is it?

20  A.   Not currently.  No.  If it is updated -- if the CPUC asks

21  us to update it, then we will update it.

22  Q.   But this wildfire safety plan is what PG&E filed with

23  Judge Alsup already, right?

24  A.   If that's what you say, yes.

25  Q.   Yeah.  And in this instance, PG&E is not taking the

 1  challenging but achievable target of trying to clear the lines

 2  for a length of twelve feet out as part of the STIP, is it?

 3  A.    I can't respond to that.  The electric organization would

 4  have to respond to that.

 5  Q.    Well, you've been employed by PG&E for seven years?

 6  A.    Yes.

 7  Q.    You're a concerned citizen of PG&E, right?

 8  A.    Yes.

 9  Q.    You have access to PG&E's website?

10  A.    Yes.

11  Q.    Well, let me show you what PG&E tells the public it's

12  going to do on its website.  Are you familiar with what PG&E

13  tells the public is going to clear its lines to on its website?

14  A.    I am not.

15  Q.    Are you familiar whether or not PG&E tells the public that

16  it is so concerned about fire safety in California that it's

17  going to clear its lines twelve feet from the electrical

18  conduit?

19  A.    I am not familiar with that.

20         MR. JULIAN:  Your Honor, I'd like to hand up the

21  committee's request for judicial notice filed today with two

22  documents.  One is the PG&E website page and the second is CAL

23  FIRE's submission to Judge Alsup.

24         THE COURT:  All right.  Any objection?

25         MR. SLACK:  We object to the CAL FIRE report, Your

 1  Honor.  To the extent he wants to use the website, we have no
 2  objection to him crossing with it.  But at this point, it
 3  shouldn't come into evidence.  He just gave it to us, and we
 4  didn't see it until literally five minutes before the hearing.
 5          THE COURT:  Well, what is the purpose of this?
 6          MR. JULIAN:  The purpose of it is it's a request for
 7  judicial notice --
 8          THE COURT:  Well, I understand.  But I mean --
 9          MR. JULIAN:  -- of their website page --
10          THE COURT:  -- what's the purpose of it?
11          MR. JULIAN:  -- which says --
12          THE COURT:  What do you want me to make of it?
13          MR. JULIAN:  I want you to make on it that they are
14  telling the public on their website, on page 2 of this handout,
15  in paragraph A, that "We will enhance our routine vegetation
16  management work to meet and exceed state vegetation fire safety
17  standards, which require clearances of four feet around
18  powerlines and high fire threat areas, with recommended
19  clearances of twelve feet or more at the time of the trim, to
20  ensure compliance year-round."
21          And the witness opened the door to this by saying they
22  do what is challenging instead of what's merely achievable.
23  And we contend that they have adopted a STIP measure that's a
24  layup because all they're doing is -- in the STIP metric, it's
25  the four feet, rather than what they tell the public on their

1  website and what they told Judge Alsup in the fire mitigation

2  plan that they would do in clearing it to the twelve feet.  And

3  this is a serious issue for California, and so we think their

4  STIP --

5          THE COURT:  No, I understand that.  Look, I know; I

6  understand that.  You don't need to repeat that.  I'm trying to

7  figure out what to do with this witness and what to do about

8  the STIP.  So your point is that -- is what?  The STIP only has

9  a target of four feet, when --

10         MR. JULIAN:  Yes.

11         THE COURT:  -- all these other sources say twelve is

12  the goal.  Right?

13         MR. JULIAN:  When they told Judge Alsup that as a

14  condition of their probation, they would do twelve feet.

15         MR. SLACK:  We didn't say that.

16         THE COURT:  I don't know what they said or didn't say,

17  but if they said something and it's incorrect, they can take

18  that up with Judge Alsup.  I've got to translate that to what

19  to do with the STIP for 10,000 employees.

20         So I will -- I can't decide what to do with the

21  objection, other than to hold it for now while I let you go

22  ahead with the question.  I want to go ahead with the

23  questioning of the witness, and then you can tell me what to

24  make of these two exhibits, as far as making the ultimate

25  decision here.

1          But Mr. Lowe has just been handed this document for

2     the first time, so I'm not sure I can expect him to be very

3     familiar with it or comment on it, but --

4          MR. JULIAN:  You mean the website page?

5          THE COURT:  No, C-19.  I thought he said he hadn't

6     seen C-19.

7          MR. JULIAN:  Oh, the wildfire plan.  Yes, Your Honor,

8     I don't have a witness on the wildfire plan other than --

9          THE COURT:  Right.

10          MR. JULIAN:  -- the document that has been in evidence

11     here since two weeks ago.

12          THE COURT:  No, I understand.  I got your point.  But

13     I want to use the questioning and answers of the witness and

14     then figure out from you what to do about it.

15          MR. JULIAN:  Thank you, Your Honor.

16          THE COURT:  All right.

17     BY MR. JULIAN:

18     Q.   Who made the decision on behalf of PG&E not to include the

19     twelve-foot wildfire clearance in the 2019 STIP wildfire

20     metric?

21     A.   The decision was made to recommend the definition that you

22     see in our STIP plan by the management team, senior leadership

23     team.  That would be head of all our electric operations at the

24     time and our CEO.  And the ultimate decision was made to

25     approve this metric by the compensation committee.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 48
of 94

1  Q.   Were you there at the time?

2  A.   I was.

3  Q.   Did you tell the compensation committee that the wildfire

4  plan contained a clearance of twelve feet?

5  A.   I did not.

6  Q.   Did you tell the compensation committee that PG&E's own

7  website told the public that PG&E would clear the twelve feet?

8  A.   I did not.

9  Q.   Another wildfire enhanced vegetation management safety

10 metric in your STIP is the clearance of risk species trees that

11 could fall on the lines during high winds, correct?

12 A.   I believe so.

13 Q.   In other words, when your contractors or employees, or

14 whoever it is who are clearing these lines, these 2,450 miles

15 of lines in 2019 go along and tree-trim, they're also supposed

16 to look and see if a tree adjacent to the lines could fall over

17 and hit the lines, right?

18 A.   Yes.

19 Q.   And whether the tree could fall over and hit the lines is

20 not dependent upon whether it's within four feet, twelve feet,

21 or twenty feet, right?

22 A.   There could be other factors; is that what you're

23 suggesting?

24 Q.   Right.

25 A.   That makes sense.

1  Q.   And are you aware that Judge Alsup adopted CAL FIRE -- in

2  his order -- adopted CAL FIRE's definition of what type of tree

3  could fall over and hit the lines?

4  A.   I'm not aware of that.

5  Q.   All right.  Who is it who inspects whether or not PG&E's

6  contractors or employees have figured out which tree could fall

7  on the line and has cut it down so that the tree doesn't fall

8  on the line?

9  A.   You know, you'd have to ask the operations group; I don't

10 know specifically who would be doing that.

11 Q.   Well, your metric is dependent upon a good investigation

12 to see whether or not the metric has been determined, right?

13 A.   Yes.

14 Q.   Right.  Now, are you aware that Judge Alsup ordered an

15 independent monitor to conduct independent assessments and

16 investigations to make sure PG&E has complied with its wildfire

17 mitigation plan?

18 A.   I -- that's my understanding.

19      MR. JULIAN:  And Your Honor, for the record, I'll

20 refer to Judge Alsup's order, which we filed, which we

21 supplemented the record on April 8th.  And it is attached to my

22 declaration.

23      THE COURT:  Well, again, I need to know the relevance

24 of it.  I don't question it.

25      MR. JULIAN:  Okay.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 50
of 94

1      THE COURT:  What is the relevance to today's inquiry,

2  whether I approve of a STIP or not?  You've got to connect it

3  up for me.  I understand your point, and they're not irrelevant

4  or insignificant points, but you're not linking it to what my

5  job today is, so --

6      MR. JULIAN:  Well, the witness has said that's his

7  understanding, so I'll go on that.

8  Q.   If the federal monitor concludes that PG&E's enhanced

9  vegetation management work does not comply with PG&E's wildfire

10  plan or applicable law, does the STIP require PG&E to accept

11  the monitor's conclusion?

12  Q.   The STIP does not have written in -- in the definition

13  anywhere accepting the -- a monitor's conclusion.

14  Q.   Would you agree that it would be prudent for PG&E to

15  consider the monitor's conclusions as to whether or not PG&E's

16  enhanced vegetation management complied with its own wildfire

17  plan?

18  A.   It may be a factor that the compensation committee would

19  take into consideration when they approve STIP payments.  I'm

20  not an expert on this; I just don't know how to answer that.

21      THE COURT:  Well, Mr. Julian again, help me.  What

22  would I do if the monitor reports to Judge Alsup that PG&E has

23  not made its -- not complied either with his recommendations,

24  or the CPUC, or these twelve-foot things?  What do I do about

25  the STIP, in your mind?

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 51
of 94

1          MR. JULIAN:  It's our contention -- it's argument,

2     but --

3          THE COURT:  Yeah, I understand.  I understand.

4          MR. JULIAN:  -- is that the wildfire safety plan is a

5     layup --

6          THE COURT:  Um-hum.

7          MR. JULIAN:  -- and --

8          THE COURT:  The STIP portion of it.

9          MR. JULIAN:  The STIP portion?

10          THE COURT:  The STIP portion.  In other words, let me

11     turn it back to you.  What I'm hearing you saying is the STIP

12     says we've got to hit X number of miles with this four-foot

13     clearance, but Judge Alsup and the CPUC and the monitor have

14     put a much higher burden on their goal anyway, and if they

15     don't hit that larger target, there may be consequences, right?

16          MR. JULIAN:  No.  That's not our point.

17          THE COURT:  Okay.

18          MR. JULIAN:  This is all about inspections, Your

19     Honor.

20          THE COURT:  Um-hum.

21          MR. JULIAN:  An employee can say that the line's been

22     cleared, but history tells us that unless an inspector goes out

23     there and inspects the work to make sure it's been done, we

24     don't know if it's been done.

25          THE COURT:  But that's a different question.

1          MR. JULIAN:  Yes.

2          THE COURT:  That's phony record-keeping.  If the

3    workers, who are impacted by their compensation plan, or

4    activity, hit a four-foot clearance goal which may be

5    consistent with the STIP but inconsistent with websites, or

6    Alsup's order or monitor's requirements, therefore what, vis-a-

7    vis the employee?

8          Now, the management may have to be accountable, or

9    answer to Judge Alsup, or to somebody, but what does that do,

10   in your mind, for the 10,000 employees who are just following

11   instructions to do what they're supposed to do day-to-day?  The

12   employee isn't told to hit twelve feet; he's told to hit four,

13   right?

14         MR. JULIAN:  Yes.

15         THE COURT:  So --

16         MR. JULIAN:  The STIP --

17         THE COURT:  So what do I do with it?

18         MR. JULIAN:  Well, that part of the STIP would not

19   satisfy the goal of the STIP, which is to compensate employees

20   if the company hits its goal.

21         THE COURT:  Um-hum.

22         MR. JULIAN:  And if the company is illusory, the

23   employee is being overpaid.

24         THE COURT:  I understand.  So that's -- well, if the

25   company's targets are illusory, that's part of the argument you

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 53
of 94

1  seem to be making is that I shouldn't be approving it, period.

2  Now, that has nothing -- that impacts 10,000 employees; it

3  doesn't -- it seems to me it's neutral as far as Judge Alsup's

4  orders, or the CPUC, or the monitors.

5          MR. JULIAN:  I think it depends on how you sit.  Our

6  view is --

7          THE COURT:  I mean, I only sit over the STIP here

8  today.

9          MR. JULIAN:  All right.  Our view is that a STIP that

10  contains a safety metric that is supposed to meet the goal of

11  safety to prevent fires should do just that.

12          THE COURT:  Okay.

13          MR. JULIAN:  And if it doesn't do it, it's an illusory

14  term --

15          THE COURT:  Okay.

16          MR. JULIAN:  -- that this honorable Court should not

17  be approving.

18          THE COURT:  I got you.  Go ahead and let's keep going

19  with Mr. Lowe's examination.

20  BY MR. JULIAN:

21  Q.   For example, you testified on direct that in 2017 the STIP

22  included an electric operations metric based on inspections of

23  the overhead electrical equipment, right?

24  A.   Yes.

25  Q.   And in 2018, the company's internal audit identified an

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 54
of 94

1    issue with the electrical operations metric, not being able to

2    provide complete evidence that the inspections had actually

3    occurred, right?

4    A.    No, that was 2017.

5    Q.    That was 2017.

6    A.    Yes.

7    Q.    But that happened in 2017?

8    A.    Yes.

9    Q.    To put the fine point on it, the company's auditors found

10   that the metric could not be satisfied because there was not

11   complete evidence that the inspections occurred?

12   A.    Correct.

13   Q.    All right.  And as a result, for that year, the year-end

14   payout was modified to eliminate the unsupported inspections

15   from the totals, right?

16   A.    Correct.

17   Q.    So inspections are an important part of the STIP, correct?

18   A.    Absolutely.

19   Q.    And if they're illusory, the STIP should not be paid,

20   correct?

21           MR. SLACK:  Objection to the form.

22           THE COURT:  Yeah.  You got to restate it.  I mean,

23   again, we're back to -- I'm having trouble --

24   Q.    Does the STIP --

25           THE COURT:  I'm going to sustain the objection, sir.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 55
of 94

1  Rephrase the question.

2  Q.   Does the STIP contain any inspection requirements that

3  determine if the wildfire vegetation clearing and equipment

4  hardening has been accomplished correctly?

5  A.   So the -- the results for any of the STIP metrics do

6  require that there is a quality control step and an internal

7  audit.  As part of those quality control process, if

8  inspections are appropriate, then that would be included.

9  Q.   Well, where's the teeth in the STIP that says the

10  inspections are actually going to happen to determine whether

11  or not the line has really been cleared, to protect

12  Californians from fire.

13  A.   As part of the quality control step, and then as part of

14  internal audit, testing whether or not the inspections took

15  place, if that's appropriate, but definitely whether or not the

16  quality control took place.

17  Q.   Well, turn to page 149 of 183 in the wildfire plan,

18  please.

19  A.   I'm sorry, what page?

20  Q.   Sure.  Page 149 of 183.

21  A.   Okay.

22  Q.   Are you there?

23  A.   Yes.

24  Q.   And do you see -- to help you out -- on page 134, there's

25  a section called 6.24, Vegetation Management Targets and

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 56
of 94

 1  Indicators, right?

 2          THE COURT:  You're going back to page 134.

 3          MR. JULIAN:  Right.

 4          THE COURT:  So I thought we were on page 149.  Which

 5  page are we on?

 6          MR. JULIAN:  I'm sorry.  148.

 7          THE COURT:  Okay.

 8          MR. JULIAN:  148 of 183.

 9  Q.   The title of what we're going to be looking at is called

10  Vegetation Management Targets and Indicators, right?

11  A.   Yes.

12  Q.   Then let's go to the next page that I tried to get you to.

13  Page 149, the first full bullet point there, let's see if you

14  can help me out on this.  It reads, "A circuit mile is reported

15  as complete when it is either inspected and determined clear or

16  when work identified by inspection is reported as complete."

17  Let me ask you about the second phrase, "when work identified

18  by inspection is reported as complete."  Do you know what that

19  means?

20  A.   I think it's pretty straightforward.  When the work is

21  completed and it's been recorded that it's been completed.

22  Q.   Well, here's my point.  Doesn't that permit an employee to

23  go out -- an employee of PG&E to go out and to ask the workers

24  who cleared the lines, did you finish the job, the workers who

25  cleared the lines say yes, and the inspector then records it as

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 57
of 94

1    complete without actually inspecting the trees adjacent to the

2    line himself?

3    A.    I don't -- I am not that familiar with RQC steps to know

4    that that would actually be allowed.

5    Q.    Were you aware -- no, I'll withdraw the question.

6            THE COURT:  Well, I find it not as ambiguous as you

7    would make it read.  The mile is recorded as complete when one

8    of two things happen.  It is either inspected and determined

9    clear, which means it is clear --

10            MR. JULIAN:  That's the one we like.

11            THE COURT:  -- or when it's identified by inspection

12    and is recorded as complete.  So if it's recorded as complete,

13    but it hasn't been identified by inspection, then the records

14    may be faulty.  But it seems to me, if it's identified by

15    inspection and recorded as complete, that's been accomplished.

16    So --

17            MR. JULIAN:  If what that means, and I want the record

18    clear, is that they're individually going to inspect each mile

19    to make sure the trees had been cleared, then I think that's

20    fine.  We don't read it that way.

21            THE COURT:  But I'm not the witness, and this witness

22    isn't sure.  I'm just trying to read the words.  I don't know

23    anything about inspecting these things.  I'm just reading the

24    language, and I don't find the language ambiguous.  But if the

25    records are faulty, then that's another consequence, right?

1    Another thing.  And look at the next sentence:  "An overhang

2    clearing must be recorded as complete for the mile to be

3    recorded as clear."

4           But Mr. Julian let's get, again, back to the STIP.  If

5    the records are faulty, the STIP may be -- the metric may be

6    fallacious or inaccurate, right?  And I think Mr. Lowe said,

7    there are quality control and audit processes that attempt to

8    make that true.

9           I don't know what happens in your example when

10   somebody phonies the record and so a mile that hasn't been

11   cleared is recorded as clear.  That's not a good thing, but I

12   don't know.  What do I do from a STIP point of view?

13          MR. JULIAN:  We want clarification as to whether

14   there's going to be an actual inspection of the miles to make

15   sure that the dangerous trees have been removed.  We think it's

16   an ambiguous sentence, Your Honor, in the plan, but we'll move

17   on.

18   BY MR. JULIAN:

19   Q.   Judge Alsup issued his order that the monitor should

20   assess PG&E's wildfire mitigation and wildfire safety work on

21   April 3.  Has the company since then evaluated whether the

22   company would involve the monitor's investigations in its STIP?

23   A.   Not that I'm aware of.

24   Q.   Has the company ever paid out the STIP on a quarterly

25   basis in the thirty years that it's been in place?

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 59
of 94

1  A.   I -- it has not in the seven years that I've been here.  I
2  am not sure prior to that whether it has.
3  Q.   Do you have any view as to whether the company has the
4  ability to track, test, and complete internal auditing and
5  assess the results on a quarterly basis?
6  A.   Yes.
7  Q.   Okay.  How can the internal audit team evaluate the
8  effectiveness of a quarterly STIP if they've never done it,
9  historically?
10 A.   The quarterly audit process is the same as it would be at
11 the year-end.  They have, in fact, put in place all the
12 necessary steps that they need in order to do a full quarterly
13 audit.
14 Q.   So if they can do that, couldn't the company also conduct
15 the individual personal modifier on a quarterly basis also,
16 rather than on an annual basis?
17 A.   If we needed to, we could put in a individual performance
18 modifier evaluation process on a quarterly basis.  It would be
19 a little bit -- it would be extremely burdensome
20 administratively, but we could do it if we needed to.
21 Q.   In the seven years you've been doing this, is it true that
22 there have been no STIPs paid out unless the company has first
23 done a company-wide audit and a personal modifier audit for the
24 individuals?
25 A.   I'm not sure what you mean by that question.

1  Q.   Well, let's break it up for you.

2  A.   I'm not following it.

3  Q.   Is it true that, since you've been around, doing this for

4  seven years, the company has never paid out the STIP at the end

5  of the year unless it first conducted the company audit?

6  A.   Correct.

7  Q.   All right.  Is it also true that during that seven-year

8  period, the company has also conducted its individual personal

9  modifier evaluation of the employee to see whether the

10  employee's work was up above target or below target?

11  A.   In the seven years I've been here, yes.

12  Q.   Right.

13          THE COURT:  Well, am I correct that the stipulation

14  that was done between the debtor and the committee moved that

15  individual modifier to annual, right?  It originally --

16          MR. JULIAN:  Keeps it annual.

17          THE COURT:  Huh?

18          MR. JULIAN:  Keeps the individual modifier on an

19  annual basis.

20          THE COURT:  I thought it was -- I thought they made it

21  quarterly and then switched it back to annual.

22          MR. JULIAN:  Let's ask.

23  Q.   So what you're doing now is you've taken the annual

24  payment and you've made it into a quarterly payment, right?

25          THE COURT:  Yeah, excuse me, I'm going to interrupt

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 61
of 94

1   you.  I'm reading the stipulation.  It says the individual

2   modifier will be applied on an annual, rather than quarterly,

3   basis.  That's a comparison --

4           MR. JULIAN:  Right.

5           THE COURT:  -- of the original plan with what the

6   creditors' committee negotiated by way of a change.

7           MR. JULIAN:  Right.

8           THE COURT:  So it isn't going to be done quarterly,

9   for the individual piece of it.

10  Q.   You're not going to do -- you're going to do the payments

11  quarterly, right?

12  A.   Correct.

13  Q.   But you're not going to do the individual performance

14  modifier quarterly, right?

15  A.   Correct.

16  Q.   But you could.

17  A.   We were prepared to.

18          THE COURT:  What, do you want them to?  You don't want

19  them to, do you?

20          MR. JULIAN:  Yes.  That's the whole point.

21          THE COURT:  I thought -- okay, go ahead.

22          MR. JULIAN:  No, Your Honor, we want them to make the

23  payment annually.

24          THE COURT:  That's what they've agreed to.

25          MR. JULIAN:  No, the payment is quarterly.

1          THE COURT:  There are two parts to the payment, right?

2          Right, Mr. Lowe?

3          THE WITNESS:  Correct.

4          THE COURT:  There are two pieces of it.  Originally,

5     as proposed by the company, was quarterly, both.  And the

6     debtor's representatives, and the official creditors'

7     committees negotiated moving the individual component back to

8     an annual.

9          THE WITNESS:  Correct.

10         THE COURT:  Right?

11         So I thought, Mr. Julian, you were complaining about

12    these payments being more rapid, or more frequent, and the

13    company and the committee agreed to make a portion of them

14    annual, as you urged.

15         MR. JULIAN:  Let me clear that up for you.

16         THE COURT:  Well, I mean, I'll make sure I got it

17    right.  You don't have to agree with me.

18         MR. JULIAN:  No, I don't.

19         THE COURT:  But I think that's what I understood you

20    were complaining about.

21         MR. JULIAN:  No.

22         THE COURT:  Go ahead.

23    BY MR. JULIAN:

24    Q.   The first STIP when you came in to see His Honor, there

25    was a personal modifier on a quarterly basis, correct?

1  A.    Correct.

2  Q.    But it could only go one way:  up, right?

3  A.    Correct.

4  Q.    I objected on behalf of the tort committee, right?

5  A.    I don't know.  I --

6  Q.    You then said you would put it down so that an employee

7  whose work contributed to a fire, and his performance was zero,

8  would get no compensation under the STIP, right?

9          MR. SLACK:  Objection, Your Honor.

10          THE COURT:  What's the objection?

11          MR. SLACK:  I think it assumes facts about the STIP

12  that, frankly, are not in evidence.

13          THE COURT:  Well, but what -- but who's got -- the

14  present deal, if I approve it today, Mr. Slack -- am I right?

15  Or is Mr. Julian right -- that the individual employees will

16  get their sort of basic STIP payment quarterly, but the

17  individual's portion, that's an IPM, will only be paid and

18  calculated once per year, right?

19          MR. SLACK:  That's correct, Your Honor.  Exactly the

20  way you had it.  The U.S. Trustee had asked for changes, and

21  one of the changes that they had asked for was to make the IPM

22  annual.

23          THE COURT:  Right.

24          MR. SLACK:  And so the IPM portion is only at the end

25  of the year; so you are correct.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 64
of 94

1          THE COURT:  But there was also a change of the

2    percentage range, too.

3          MR. SLACK:  It also changed the percentage range;

4    you're right, Your Honor.

5          THE COURT:  Okay.  I thought I got it right.  Okay.

6    Let's, again, go back to questioning, if you have any more.

7    BY MR. JULIAN:

8    Q.   Let's do the hypothetical, so I can make a point to His

9    Honor.  If an employee gets three-quarters of payments before a

10   fire on November 20 of this year, and his annual performance

11   review is a zero at the end of the year, is there anything in

12   the STIP that allows the company to claw back his payments that

13   he should never have got?

14         MR. SLACK:  Objection to the form.

15         THE COURT:  Well, yeah.  That question is too

16   ambiguous because you can't say that he should have never

17   gotten because payments on the basic STIP are not specific to

18   the employee.  They're specific --

19         MR. JULIAN:  Let me rephrase.

20         THE COURT:  -- across the board, on a performance

21   basis.

22         MR. JULIAN:  Let me rephrase.

23   Q.   Is there anything in the STIP that permits the company, if

24   it gives a zero performance score to an employee at the end of

25   the year, to claw back payments made on a quarterly basis to

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 65
of 94

1   the employee?

2   A.   Under California law, we cannot claw back payments made to

3   an employee.

4   Q.   Right.

5   A.   So no.

6          THE COURT:  Okay.  But Mr. Julian, I'm going to

7   interrupt you to make sure I'm clear.  If in November of the

8   year, after our hypothetical employee has received three

9   quarterly payments of sort of the base STIP, it turns out he's

10  an arsonist and torches a -- causes a fire all by himself, in

11  addition that everything else that might happen, he's not going

12  to get his IPM, right?

13         THE WITNESS:  Correct.

14         THE COURT:  Because he hasn't earned it.  He's

15  entitled to zero, plus whatever else follows, correct?

16         THE WITNESS:  Under that hypothetical, yes.

17         THE COURT:  All right.  And similarly, if it's a

18  superstar who works at the nuclear power plant and has an IPM

19  and has never been within 500 miles of a fire, will get his IPM

20  if he's a good performer and will get nothing if he's a poor

21  performer, right?

22         THE WITNESS:  Correct.

23         THE COURT:  Or a bad performer.

24         THE WITNESS:  Correct.

25         THE COURT:  Okay.

1  Q.   Let's not make it hypothetical.  Let's talk about CEO

2  Simon's actual email this year, February 22.  You read it,

3  right?  Remember it?

4  A.   I'm sure I read it, but I don't have it memorized.

5  Q.   That's when he said that he decided that -- and the board

6  decided that because of the camp fire and the financial

7  problems that arose, the company shouldn't be paying a STIP,

8  right?  Do you remember that?

9  A.   I believe he said that we were not going to pay a STIP,

10 yeah.

11 Q.   Right.  So let's just say in this year, 2019, if, God

12 forbid, there's another fire in November like there has been

13 three of the last five years, and the CEO, the new CEO, says

14 just what Mr. Simon said -- people should not have gotten a

15 STIP this year -- is there anything in the STIP that permits

16 the company to claw back the three quarters of payments that

17 had been made to the employees?

18 A.   No.  Under California law, we can't claw back.

19          MR. JULIAN:  Your Honor, I pass the witness.

20          THE COURT:  Let me get one more clarification; then

21 I'll see if anyone wants to examine you.

22          Mr. Lowe, what would happen to the STIP if the company

23 is performing consistent with the letter of the STIP, but

24 either the CPUC or Judge Alsup or the monitor determines that

25 there's been a company violation of some of these other things?

1  What is the ramification vis-a-vis the STIP and the people that
2  run the STIP?  What's your understanding of what could happen
3  or would happen?

4          THE WITNESS:  That kind of information, Your Honor,
5  would be brought forward to the compensation committee.  It
6  would be a factor that they would consider, and they would --
7  and it's in their discretion, then, to zero out the STIP,
8  regardless of what the actual score is.

9          THE COURT:  They can't claw anything back, but they
10 can turn off the faucet right then and there for every dollar
11 going forward, including the earned IPM?

12         THE WITNESS:  Correct.

13         THE COURT:  So if you're -- everything's copacetic for
14 the first eleven months and something goes off the rails on the
15 twelfth month, there may be no IPM, and there may be no
16 additional fourth quarter STIP because that's a company's
17 discretionary call, vis-a-vis their employees, those 10,000
18 employees, regardless of what Judge Alsup or the CPUC or anyone
19 else does, correct?

20         THE WITNESS:  Correct.

21         THE COURT:  Okay.  You want to -- any more questions
22 on that?

23         MR. JULIAN:  No, Your Honor.

24         THE COURT:  All right.

25         MR. JULIAN:  Thank you.  Pass the witness.

1       THE COURT:  Well, I should ask, Mr. Slack -- does

2  anyone else who has been heard, I guess the U.S. Trustee, you

3  were the only other party, you didn't want to be heard.

4       UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.

5       THE COURT:  You want to redirect, Mr. Slack, or no?

6       MR. SLACK:  Just one or two questions, Your Honor.

7  REDIRECT EXAMINATION

8  BY MR. SLACK:

9  Q.   Mr. Lowe, I know you're not the expert on this document,

10  but because you're the witness that's here and Mr. Julian asked

11  you a question, I'm going to have you turn to his Exhibit C-19

12  that he showed you, though.  The big mitigation plan.

13       And if you look at page 148 of 183 and 149, as Mr. Julian

14  said, it said Vegetation Management Targets and Indicators.

15  And then in target number 1, talking about vegetation

16  management, which Mr. Julian sort of just skipped, the first

17  bullet talks about completed distribution, circuit miles of

18  vegetation cleared under the EVM program scope within high fire

19  risk areas to reduce wildfire risks through, one, overhang

20  clearing four feet vertical from conductor, and two, high-risk

21  species mitigation; do you see that?

22  A.   Yes, I do.

23  Q.   All right.  Do you know whether or not the plan requires

24  four feet, as opposed to twelve feet?

25  A.   The plan, the --

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 69
of 94

1    Q.    Yes.

2    A.    -- the wildfire plan?  I don't know the details of the

3    plan.

4    Q.    Now, you had mentioned on your direct that the CPUC is

5    looking at the fire mitigation plan, correct?

6    A.    Correct.

7    Q.    And if the CPUC, after looking at it, decides that the

8    plan should be twelve feet, has the company committed to

9    changing the metrics to twelve feet?

10   A.    Yes.

11          MR. SLACK:  That's it, Your Honor.  No further

12   questions.

13          THE COURT:  Well, how would that happen?  So let's

14   pretend, for the moment, that the CPUC tomorrow issues a

15   ruling, or whatever it does, that turns this four feet vertical

16   into twelve, or maybe it's vertical and horizontal, if you keep

17   in mind that diagram we saw.

18          MR. SLACK:  Yeah.

19          THE COURT:  What do you, as the keeper of the STIP,

20   do?  What's your job?  Do you then amend the STIP to say four

21   is now twelve?

22          THE WITNESS:  Work with the organization that owns

23   this particular metric, which is electric operations, to

24   rewrite the definition of the STIP, and we would bring that to

25   the compensation committee for approval, and prospectively

1  going forward, that's the way we would measure it.

2          THE COURT:  But you have, in your role -- I understand

3  you are not the compensation committee -- but you have the

4  authority to at least to represent to me that the company's

5  intention would be to conform any increase height with whatever

6  that's presently written in the STIP to conform to either CPUC

7  or Judge Alsup or some other authority that makes it more

8  burdensome for the company.  Is that a commitment?

9          THE WITNESS:  That is a commitment, yes.

10          THE COURT:  Yes.

11          MR. SLACK:  And Your Honor, I point out that in the

12  agreement that we reached with the U.S. Trustee, we did commit

13  to changing the metric if the CPUC required.

14          THE COURT:  I didn't remember that and I didn't --

15  that might have not -- maybe that wasn't in the -- well, let me

16  just take a look at that.  You think that's in that short

17  stipulation that was --

18          I'm looking in paragraph -- oh, yes; paragraph 2.

19  That's what you're referring to, Mr. Slack, that wildlife --

20          MR. SLACK:  I don't have the paragraph in front of me,

21  but yes, Your Honor, I'm sure that's --

22          THE COURT:  Well, it says, "If, as a result of the

23  mitigation plan, the CPUC changes any of the safety targets in

24  the 2019 STIP, such metric will be changed to match that

25  change."  And that's consistent with what Mr. Lowe said --

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 71
of 94

1          MR. SLACK:  That's correct, Your Honor.

2          THE COURT:  -- and he knew this language better than I

3    did.  But I knew the other apparently.

4          All right.  Well, what's your pleasure?

5          Mr. Julian, do you still want to make a closing -- I

6    mean, we can take a short break perhaps, and then do you want

7    to argue that I should not approve the STIP?  Is that still

8    your desire?

9          MR. JULIAN:  Your Honor --

10          THE COURT:  And I'm not negotiating with you.  I'm not

11    asking you to back off if you feel strongly.  Is that what you

12    want to do?  Because I'll take a short break and then ask both

13    sides to make a brief argument.

14          MR. JULIAN:  You know our argument.  It's that the

15    quarterly versus annual is wrong in our view and the wildfire

16    metric doesn't match up with the Wildfire Plan.

17          THE COURT:  Well, but you heard what we just said,

18    that both the written stipulation that's filed with the Court

19    and Mr. Lowe committed to, but he wasn't -- I mean, he was

20    repeating what the company, through its counsel, and the

21    official creditors' committee have agreed to, and it's a matter

22    of record of this court.  And I'm just saying you seem to be --

23    the thing that you're most concerned about is the so-called --

24    the quarterly portion of the STIP.

25          MR. JULIAN:  Quarterly and wildfire mitigation.  If I

1  knew that PUC was going to rule tomorrow, I'd be fine with the

2  redirect.

3          THE COURT:  I just want to let you have your

4  opportunity to persuade me to disapprove it, if that's what you

5  want to do, or if you want to just withdraw.  I mean, you tell

6  me what you want to do, and I'll listen to arguments on both

7  sides and make a decision.

8          MR. JULIAN:  We have the same objection, Your Honor,

9  but I'll submit it.

10          THE COURT:  Okay.  Well, Mr. Slack, do you want to

11  make any further argument, or Mr. Karotkin, do you want to do

12  it?  You want to take over again from your partner?

13          MR. KAROTKIN:  I'll be very brief.  Your Honor, at the

14  end of the hearing last time you said --

15          THE COURT:  Excuse me.  Mr. Lowe, you can step down.

16          I said what?  You're going to quote me again.

17          MR. KAROTKIN:  I'm going to quote you again, more than

18  once I think.  You said that the business judgment has been

19  established, subject only to hearing from Mr. Lowe today.  And

20  you also said, Your Honor, these 10,000 people are just doing

21  their jobs, and they should not become innocent victims or

22  treated as hostages or punished.  And again as you said, Your

23  Honor, there is a need to address the morale and uncertainty

24  facing 10,000 employees and to bring stability to the work

25  force.

1      And that is the critical thing here:  to bring

2  stability to this work force and to give them the

3  opportunity -- the opportunity, based on achieving incentive

4  targets, to have competitive market compensation.  That's the

5  entire design of this.  And the debtors did exercise their

6  business judgment.  And Mr. Julian has presented no reason,

7  much less evidence -- he has presented no evidence that would

8  justify Mr. Julian substituting his business judgment for that

9  of the debtors that manage this company.  And we would request

10  you approve the STIP.

11      THE COURT:  Okay.

12      MR. JULIAN:  Your Honor, may I briefly be heard on

13  that?

14      THE COURT:  Yes, sir.  Yes.

15      MR. JULIAN:  Your Honor, counsel talked about what's

16  competitive.  What's competitive is an annual STIP; you heard

17  that.  No one has a quarterly STIP.  That's risky, in the

18  record of three fires in the past five years, to let the money

19  go out the door for the reasons that CEO Simon mentioned.

20      And lastly, on the wildfire metric, our view is that

21  this Court and Judge Alsup and the PUC should do everything

22  possible to make sure that wildfire metric is strong and

23  robust, and they took the easy way out in writing it the way

24  they did on the four feet.  That's our view.

25      THE COURT:  Okay.  I'm going to go ahead and overrule

1   the objections.  I appreciate, Mr. Julian, your argument and

2   your enthusiasm for your client and your representation of your

3   clients, but I'm going to go back to the point I made and that

4   Mr. Slack correctly repeated about my perception of what's fair

5   for the employees.  And we're sitting here worrying about a

6   horrible thing that could happen, and if it happens that is

7   horrible, but meanwhile there are 10,000 employees, and really,

8   therefore, 14,000 employees who are not impacted by this.  And

9   those 10,000 employees are doing their job, and whatever small

10   number of them might have something to say about management

11   decisions that impact the success or the failure of compliance

12   with wildfire mitigation plans, and Judge Alsup's rulings and

13   CPUC rulings are what they are.  But we're talking about people

14   that work at the nuclear power plant, people working in the

15   corporate offices, people dealing with customer complaints,

16   people that are fixing lines in Berkeley and in San Francisco

17   and in many other parts of northern California that are not at

18   all fire hazard areas, hopefully.

19         And so to suddenly decide, because of a tragedy of

20   such magnitude, therefore thousands of employees should not

21   have the kind of compensation arrangement that has been a

22   consistent pattern in this company seems to be the wrong way to

23   deal with the problem.  For reasons that I didn't hear today

24   and I don't need to know, the other 14,000 aren't being

25   compensated in an additional manner, and although there is a

Case: 19-30088     Doc# 1663     Filed: 04/24/19     Entered: 04/24/19 18:33:44     Page 75
of 94

1   risk -- I'll accept that there is a risk that management may

2   make a decision now, as we're in the second quarter of the

3   fiscal year or the calendar year, that there may be some

4   entitlements that, in retrospect, prove to be inappropriate

5   because of some future events, I'll leave it to the management

6   to decide to do the right thing going forward.

7           So they are obligated, as a matter of law, to change

8   the STIP going forward, if the CPUC makes decisions that are

9   directly impacted, as a matter of good management or frankly

10  good conduct of this Chapter 11.  I would think that if the

11  creditors' committee or the fire victims committee believe that

12  there should be some revisiting or some pressure put on

13  management to make a change in the STIP, they can deal with

14  that at some future date.  But to me it's the wrong way to be

15  in now just the third month, or coming at the end of the third

16  month of the first of this bankruptcy, which is so monumental

17  and affects so many interests to do something that -- I don't

18  think Mr. Julian or his committee are intending to be punitive

19  to 10,000 employees, but it has the impact of having a punitive

20  consequence.

21          And so I might personally have preferred that the STIP

22  payments be annual as they always have been, rather than

23  quarterly, but that's fine-tuning that I don't think is the

24  role of the bankruptcy court to second-guess the management.  I

25  think that for the complexity of this almost unprecedented

1  bankruptcy, that's reason enough to understand that the people

2  who are the beneficiaries of the STIP are entitled to some

3  recognition of the role that they're playing, and happily the

4  system is in place if there's some people that are misbehaving

5  and not performing, they will be -- their situation will be

6  adjusted accordingly.

7        So I'm going to just go ahead and defer to what I

8  think is my responsibility and decide that I'm persuaded by Mr.

9  Lowe's testimony of a couple of things.  One is I'm glad I

10 didn't become a HR specialist.  I think going to law school and

11 learning the Bankruptcy Code was far more of a challenge -- I

12 mean, easier by comparison.  And secondly, that it was helpful

13 for me to hear from him and to understand a little bit what was

14 somewhat mysterious -- still somewhat mysterious in terms of

15 how this all works for running a company of this size and

16 employees of so many and so many diverse interests.

17        So bottom line is I will defer to judgment of

18 management, do not believe it's an impermissible exercise of

19 business judgment.  I will overrule what's left of the

20 objections and authorize the debtors counsel to circulate to

21 Mr. Julian a standard form of order that -- consistent with

22 what's been circulated.

23        And thank you all for the time.  And for those of you

24 who are planning to be with us tomorrow, we're getting lower

25 and lower on numbers of things on the agenda for tomorrow.

Case: 19-30088   Doc# 1663   Filed: 04/24/19   Entered: 04/24/19 18:33:44   Page 77
of 94

1    We'll see you at 9:30 tomorrow.

2              IN UNISON:  Thank you, Your Honor.

3              THE COURT:  All rise.

4         (Whereupon these proceedings were concluded at 3:14 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    WITNESS              EXAMINATION BY      PAGE

3    John Lowe           Mr. Slack           6

4    John Lowe           Mr. Julian          38

5    John Lowe           Mr. Slack           69

6

7                       E X H I B I T S

8    DEBTORS'             DESCRIPTION        MARKED   ADMITTED

9                         Paperwork from              31

10                        internal audit

11

12   RULINGS:                                PAGE    LINE

13   Motion to approve STIP granted          77      19

14

15

16

17

18

19

20

21

22

23

24

25
```

1          C E R T I F I C A T I O N

2

3     I, Lori Adam, certify that the foregoing transcript is a true

4     and accurate record of the proceedings.

5

6

7

8     _____

9     /s/ LORI ADAM

10

11    eScribers

12    7227 N. 16th Street, Suite #207

13    Phoenix, AZ 85020

14

15    Date:  April 24, 2019

16

17

18

19

20

21

22

23

24

25

**A**

**ability (2)**
23:15;60:4
**able (2)**
8:20;55:1
**above (4)**
21:8,8;28:15;
61:10
**Absolutely (1)**
55:18
**accept (2)**
51:10;76:1
**accepting (1)**
51:13
**access (1)**
45:9
**accomplished (2)**
56:4;58:15
**accordance (1)**
41:6
**accordingly (1)**
77:6
**account (1)**
29:6
**accountable (1)**
53:8
**accurate (4)**
15:8;29:16;31:2;
32:2
**accurately (3)**
29:24;30:2,3
**achievable (10)**
23:7,13,15;26:8,
22;27:8,11;43:6;
45:1;46:22
**achieve (5)**
8:13;11:25;25:7;
26:12;34:16
**achieved (3)**
28:2,4,5
**achiever (2)**
37:23,24
**achieving (2)**
24:22;74:3
**across (1)**
65:20
**actions (3)**
18:13,15,21
**activity (1)**
53:4
**actual (5)**
12:21;31:24;
59:14;67:2;68:8
**actually (12)**
5:6;15:10;16:4;
26:18;28:13,19;
31:20;34:1;55:2;
56:10;58:1,4
**add (2)**
22:11,11
**added (1)**

20:11
**addition (1)**
66:11
**additional (2)**
68:16;75:25
**address (5)**
4:7;6:15,19,20;
73:23
**adjacent (2)**
49:16;58:1
**adjusted (1)**
77:6
**administratively (1)**
60:20
**adopted (4)**
43:5;46:23;50:1,2
**affect (2)**
33:11;36:3
**affects (1)**
76:17
**afternoon (5)**
3:6,12,13;5:3;7:2
**again (24)**
4:4;12:5;13:22;
15:7;16:2;17:8;
21:12,24;23:13;
26:10,20;31:7;33:6;
37:4;38:14;50:23;
51:21;55:23;59:4;
65:6;73:12,16,17,22
**against (3)**
11:1;34:6,14
**agenda (1)**
77:25
**ago (2)**
17:10;48:11
**agree (3)**
26:8;51:14;63:17
**agreed (3)**
62:24;63:13;72:21
**agreement (1)**
71:12
**ahead (16)**
4:24;13:10;18:4,8;
21:25;24:2;34:13;
38:14;44:17;47:22,
22;54:18;62:21;
63:22;74:25;77:7
**align (1)**
38:20
**allowed (1)**
58:4
**allowing (1)**
12:13
**allows (1)**
65:12
**almost (1)**
76:25
**along (1)**
49:15
**Alsup (18)**
39:15;40:9;41:22;
44:23;45:23;47:1,13,

18;50:1,14;51:22;
52:13;53:9;59:19;
67:24;68:18;71:7;
74:21
**Alsup's (4)**
50:20;53:6;54:3;
75:12
**although (1)**
75:25
**always (2)**
30:2;76:22
**ambiguous (4)**
58:6,24;59:16;
65:16
**amend (1)**
70:20
**among (1)**
4:8
**amount (4)**
15:9;22:19;26:6;
33:25
**annual (15)**
33:2;60:16;61:15,
16,19,21,23;62:2;
63:8,14;64:22;
65:10;72:15;74:16;
76:22
**annually (1)**
62:23
**apparently (1)**
72:3
**appears (1)**
42:15
**apples (4)**
28:21,21;29:10,10
**apples-to-apples (1)**
29:11
**applicable (1)**
51:10
**applied (3)**
3:21;34:3;62:2
**appreciate (1)**
75:1
**approach (4)**
5:23,25,25;42:6
**approaching (1)**
36:23
**appropriate (5)**
14:21;15:16;
19:20;56:8,15
**approval (2)**
3:16;70:25
**approve (7)**
24:10;48:25;51:2,
19;64:14;72:7;74:10
**approved (5)**
10:6;30:25;41:18,
19,20
**approves (1)**
8:15
**approving (2)**
54:1,17
**Approximately (2)**

8:5;10:11
**APRIL (3)**
3:1;50:21;59:21
**area (2)**
25:6;43:3
**areas (7)**
14:4,6;40:13;
43:24;46:18;69:19;
75:18
**argue (1)**
72:7
**arguing (1)**
4:2
**argument (6)**
52:1;53:25;72:13,
14;73:11;75:1
**arguments (1)**
73:6
**arose (1)**
67:7
**around (7)**
19:20;29:13;
36:16;37:6;43:19;
46:17;61:3
**arrangement (1)**
75:21
**arsonist (1)**
66:10
**aspect (1)**
18:18
**assess (2)**
59:20;60:5
**assessments (1)**
50:15
**asset (3)**
15:6,19;17:13
**assets (4)**
14:10,10;15:11,18
**assume (1)**
22:8
**assumes (1)**
64:11
**attached (2)**
42:1;50:21
**attempt (1)**
59:7
**audience (3)**
4:12;11:13,18
**audit (14)**
31:5,14,17;32:1;
54:25;56:7,14;59:7;
60:7,10,13,23,23;
61:5
**auditing (1)**
60:4
**auditors (1)**
55:9
**audits (1)**
29:25
**authority (2)**
71:4,7
**authorize (1)**
77:20

**available (1)**
4:12
**average (4)**
15:12,15;26:2;
37:5
**avoid (1)**
39:7
**awards (1)**
3:22
**aware (6)**
15:1;50:1,4,14;
58:5;59:23

**B**

**back (22)**
6:15,15;8:19;
16:25;17:12;29:21;
32:7;52:11;55:23;
57:2;59:4;61:21;
63:7;65:6,12,25;
66:2;67:16,18;68:9;
72:11;75:3
**bad (1)**
66:23
**bang (1)**
6:14
**bankruptcy (4)**
76:16,24;77:1,11
**bare (1)**
14:12
**base (5)**
7:22;9:5;32:14,15;
66:9
**based (9)**
8:18;9:4;10:8;
20:1;21:3;22:1;
40:12;54:22;74:3
**baseline (1)**
43:13
**bases (1)**
39:10
**basic (3)**
22:3;64:16;65:17
**basis (11)**
22:24;59:25;60:5,
15,16,18;61:19;62:3;
63:25;65:21,25
**become (4)**
30:17;31:8;73:21;
77:10
**beeping (2)**
23:23,25
**behalf (3)**
8:8;48:18;64:4
**below (2)**
21:7,8,9;44:6;
61:10
**beneficiaries (1)**
77:2
**benefit (2)**
7:25;37:25
**benefits (3)**

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 81
of 94

7:17,25;9:8
**Berkeley (1)**
75:16
**better (4)**
25:21;26:5;33:21;
72:2
**beyond (1)**
44:4
**big (4)**
11:14,15,22;69:12
**bit (6)**
13:8;20:12;25:21,
21;60:19;77:13
**bite (1)**
6:15
**board (2)**
65:20;67:5
**bone (1)**
32:23
**both (10)**
4:17;10:18;13:5;
15:20;25:13;30:1;
63:5;72:12,18;73:6
**bottom (6)**
22:16;37:16;
42:14;43:12;44:6;
77:17
**break (4)**
20:12;61:1;72:6,
12
**breakout (1)**
25:3
**brief (4)**
4:3;12:9;72:13;
73:13
**briefly (3)**
7:11;24:11;74:12
**bring (4)**
29:4;70:24;73:24;
74:1
**bringing (1)**
23:10
**broad (5)**
4:8;8:17;9:4;10:8,
15
**broad-base (1)**
35:7
**broadly (1)**
35:12
**broke (1)**
17:12
**broken (1)**
10:17
**brought (2)**
10:4;68:5
**budget (2)**
35:25;36:1
**bullet (4)**
43:16,18;57:13;
69:17
**burden (1)**
52:14
**burdensome (2)**

60:19;71:8
**business (5)**
6:19;73:18;74:6,8;
77:19

# C

**C-19 (5)**
42:1;9:48:5,6;
69:11
**CAL (1)**
45:22,25;50:1,2
**calculate (2)**
32:25;34:3
**calculated (4)**
27:15;32:10;
33:25;64:18
**calculation (4)**
19:25;20:10;22:3;
30:3
**calendar (2)**
3:8;76:3
**CALIFORNIA (8)**
3:1;6:22;19:4;
45:16;47:3;66:2;
67:18;75:17
**Californians (1)**
56:12
**Call (3)**
3:3;6:5;68:17
**called (5)**
10:20;39:21;42:9;
56:25;57:9
**came (1)**
63:24
**camp (1)**
67:6
**can (49)**
4:19,22,22;5:23;
7:11,19;9:17;10:15;
11:4,21;13:5,12;
15:7;16:23;17:16;
18:11,24;19:8;20:13,
20;21:1,2,24;23:7;
25:4,7,7,25;26:12,
20;27:24;30:16;
32:24;34:9;35:19;
40:23;42:7;47:17,
23;48:2;52:21;
57:14;60:7,14;65:8;
68:10;72:6;73:15;
76:13
**Canyon (1)**
22:13
**care (1)**
16:20
**case (5)**
14:22;20:2;25:11;
30:2;33:4
**cases (1)**
30:1
**causes (1)**
66:10

**CEO (5)**
48:24;67:1,13,13;
74:19
**certain (2)**
9:7;41:10
**certainty (1)**
28:11
**challenge (3)**
23:11;28:13;77:11
**challenged (1)**
23:10
**challenging (15)**
23:6,13,16,19,20,
21;25:22;26:9,22;
27:9,10;28:7;43:6;
45:1;46:22
**change (7)**
14:10;29:8;62:6;
65:1;71:25;76:7,13
**changed (5)**
16:11,25;17:6;
65:3;71:24
**changes (4)**
20:19;64:20,21;
71:23
**changing (3)**
19:14;70:9;71:13
**Chapter (1)**
76:10
**charity (2)**
29:3,9
**chart (16)**
12:6,24;20:3;24:4,
6,12;25:2,3;27:12,
14,24;28:14;36:13;
37:2,22;40:2
**charts (1)**
40:17
**check (1)**
29:22
**chief (2)**
7:8,8
**chose (1)**
33:4
**circuit (5)**
14:2,5;40:12;
57:14;69:17
**circulate (1)**
77:20
**circulated (1)**
77:22
**citizen (1)**
45:7
**clarification (2)**
59:13;67:20
**clarify (1)**
37:13
**claw (6)**
65:12,25;66:2;
67:16,18;68:9
**clear (17)**
3:18;9:24;40:15;
41:10,22;45:1,13,17;

49:7;57:15;58:9,9,
18;59:3,11;63:15;
66:7
**clearance (9)**
41:6;43:17,23;
44:18;48:19;49:4,
10;52:13;53:4
**clearances (4)**
43:19,19;46:17,19
**cleared (8)**
40:13;52:22;
56:11;57:24,25;
58:19;59:11;69:18
**clearing (9)**
14:3;41:15;44:11,
14;47:2;49:14;56:3;
59:2;69:20
**clearly (1)**
28:6
**CLERK (6)**
3:4,8;4:14,21;
6:12;23:25
**clever (1)**
12:12
**client (1)**
75:2
**clients (1)**
75:3
**close (1)**
9:5
**closing (1)**
72:5
**coated (1)**
14:12
**Code (2)**
43:20;77:11
**colleague (1)**
5:1
**column (4)**
18:23;24:20,21;
25:4
**columns (1)**
25:2
**combined (1)**
34:17
**comfort (1)**
31:1
**coming (1)**
76:15
**comment (1)**
48:3
**Commission (2)**
19:3,5
**commit (1)**
71:12
**commitment (2)**
71:8,9
**committed (2)**
70:8;72:19
**committee (39)**
8:11,14,15;9:22;
10:5;12:8,20,25;
13:2,9;19:19,22;

49:7;57:15;58:9,9,
18;59:3,11;63:15;
66:7
23:11,20;24:8,15;
27:16;30:23,23,25;
32:3,6;41:18,20;
48:25;49:3,6;51:18;
61:14;62:6;63:13;
64:4;68:5;70:25;
71:3;72:21;76:11,11,
18
**committees (1)**
63:7
**committee's (1)**
45:21
**common (3)**
36:18,20,22
**communicated (1)**
20:15
**companies (1)**
35:14
**Company (67)**
7:3,12,15,18;8:8,
16,23;9:2;10:17,20,
23,24;11:4;12:18;
13:17;14:8;17:9;
19:25;20:3,4,6,11;
21:3,16;22:1,21;
23:17;27:6,15;32:8,
11,19,25;33:6,10;
35:5,20;37:25;39:6,
11,15;40:15;53:20,
22;59:21,22,24;60:3,
14,22;61:4,5,8;63:5,
13;65:12,23;67:7,16,
22,25;70:8;71:8;
72:20;74:9;75:22;
77:15
**company's (12)**
15:2;23:14;38:21,
24;42:4,10,21;53:25;
54:25;55:9;68:16;
71:4
**company-wide (1)**
60:23
**compared (1)**
20:7
**comparing (1)**
16:21
**comparison (3)**
29:11;62:3;77:12
**compensate (1)**
53:19
**compensated (1)**
75:25
**compensation (47)**
7:13,15,21;8:11,
14,15,17;9:2,3,4,6,
10,22;10:1,5;12:8,
20,25;13:2,8;19:19,
22;22:25;23:11,20;
24:8,15;27:16;30:23,
23,25;32:3,6;35:11;
41:18,20;48:25;49:3,
6;51:18;53:3;64:8;
68:5;70:25;71:3;

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 82
of 94

74:4;75:21
**competencies (1)**
34:15
**competitive (3)**
74:4,16,16
**competitors (1)**
35:12
**complaining (2)**
63:11,20
**complaint (2)**
26:25;27:5
**Complaints (7)**
18:24;19:2,4,6;
26:14;27:3;75:15
**complete (15)**
15:10,16;41:5;
55:2,11;57:15,16,18;
58:1,7,12,12,15;
59:2;60:4
**completed (6)**
15:13;26:3;29:23;
57:21,21;69:17
**complexity (1)**
76:25
**compliance (3)**
43:24;46:20;75:11
**complied (3)**
50:16;51:16,23
**comply (3)**
39:15;41:22;51:9
**component (1)**
63:7
**components (5)**
10:16,18,18,25;
32:11
**concerned (3)**
45:7,16;72:23
**concluded (1)**
78:4
**concludes (1)**
51:8
**conclusion (3)**
27:25;51:11,13
**conclusions (1)**
51:15
**condition (2)**
39:16;47:14
**conduct (3)**
50:15;60:14;76:10
**conducted (2)**
61:5,8
**conductor (2)**
41:16;69:20
**conduit (2)**
44:12;45:18
**conform (2)**
71:5,6
**connect (1)**
51:2
**connection (2)**
9:18;35:15
**consequence (2)**
58:25;76:20

**consequences (1)**
52:15
**consider (3)**
25:10;51:15;68:6
**consideration (3)**
19:14;25:9;51:19
**consistent (6)**
13:24;53:5;67:23;
71:25;75:22;77:21
**consists (1)**
41:9
**consultant (1)**
10:1
**contain (1)**
56:2
**contained (2)**
35:22;49:4
**contains (1)**
54:10
**contend (1)**
46:23
**contention (1)**
52:1
**continued (1)**
3:15
**contractor (1)**
18:16
**contractors (2)**
49:13;50:6
**contributed (1)**
64:7
**control (7)**
29:19,21;56:6,7,
13,16;59:7
**convenient (1)**
5:4
**conversations (1)**
19:20
**copacetic (1)**
68:13
**copy (3)**
6:1,2;11:18
**corporate (1)**
75:15
**Corporation (1)**
3:9
**corrected (2)**
16:19;37:14
**corrective (5)**
18:12,15,21
**correctly (2)**
56:4;75:4
**cost (3)**
35:21;36:4;37:3
**counsel (7)**
5:3;17:9;18:4;
38:15;72:20;74:15;
77:20
**couple (6)**
5:18;7:16;25:1;
28:1;31:20;77:9
**course (4)**
5:9,24;6:3;9:5

**Court (175)**
3:3,4,6,10,12,19,
23,25;4:11,15,19,22;
5:2,7,9,11,14,16,22,
24;6:4,7,14,19,23;
9:14,17;11:5,8,12,
16,21;12:15;13:12,
22;14:7;15:7;16:8,
14;17:2,8,22,25;
18:3,7,11,24;19:9;
21:25;23:23;24:2;
25:5,25;26:20;30:7,
10,13,18;31:9,11;
32:24;33:14,18,20;
36:7;37:1,13,20,22;
38:2,4,6,12,14;40:2,
17,25;42:3,7,15;
44:17;45:24;46:5,8,
10,12;47:5,11,16;
48:5,9,12,16;50:23;
51:1,21;52:3,6,8,10,
17,20,25;53:2,15,17,
21,24;54:7,12,15,16,
18;55:22,25;57:2,4,
7;58:6,11,21;61:13,
17,20,25;62:5,8,18,
21,24;63:1,4,10,16,
19,22;64:10,13,23;
65:1,5,15,20;66:6,
14,17,23,25;67:20;
68:9,13,21,24;69:1,
5;70:13,19;71:2,10,
14,22;72:2,10,17,18,
22;73:3,10,15;74:11,
14,21,25;76:24;78:3
**courtroom (1)**
24:1
**Court's (1)**
3:8
**CPUC (16)**
15:1;26:25;44:20;
51:24;52:13;54:4;
67:24;68:18;70:4,7,
14;71:6,13,23;75:13;
76:8
**creating (1)**
43:22
**creditors' (4)**
62:6;63:6;72:21;
76:11
**critical (1)**
74:1
**CROSS-EXAMINATION (1)**
38:18
**cross-examine (1)**
4:4
**crossing (1)**
46:2
**current (1)**
7:4
**currently (2)**
7:2;44:20
**customer (11)**

10:18,19;12:3,4;
15:20;17:11;18:23,
23;19:1;26:14;75:15
**customers (1)**
19:6
**cut (1)**
50:7

### D

**dangerous (1)**
59:15
**data (5)**
29:14;31:21,23,
23;32:2
**database (2)**
15:14;29:24
**date (3)**
31:15;42:17;76:14
**days (8)**
15:13,15;25:15,17,
18;26:2,4,5
**day-to-day (1)**
53:11
**deal (3)**
64:14;75:23;76:13
**dealing (2)**
22:16;75:15
**debtor (1)**
61:14
**debtors (5)**
3:14;5:15;74:5,9;
77:20
**debtors' (3)**
3:15;4:8;31:15
**debtor's (1)**
63:6
**decades (1)**
8:19
**December (1)**
10:3
**decide (4)**
47:20;75:19;76:6;
77:8
**decided (4)**
19:22;32:6;67:5,6
**decides (1)**
70:7
**decision (6)**
47:25;48:18,21,
24;73:7;76:2
**decisions (2)**
75:11;76:8
**declaration (4)**
16:19;17:1,6;
50:22
**defer (3)**
38:10;77:7,17
**definitely (3)**
8:20;27:10;56:15
**definition (5)**
40:4;48:21;50:2;
51:12;70:24

**dental (1)**
8:1
**department (1)**
32:1
**dependent (2)**
49:20;50:11
**Depending (2)**
9:12;21:21
**depends (1)**
54:5
**describe (7)**
7:19;10:15;13:12,
22;18:11,24;19:9
**description (5)**
12:9,11,22;19:24;
20:2
**descriptions (1)**
13:7
**design (2)**
10:4;74:5
**designed (4)**
13:24;15:9;18:12;
43:14
**desire (1)**
72:8
**detailed (1)**
13:8
**details (1)**
70:2
**determine (3)**
34:19;56:3,10
**determined (9)**
14:23;18:18;27:5;
32:9,13,16;50:12;
57:15;58:8
**determines (1)**
67:24
**determining (1)**
35:23
**developed (1)**
13:14
**developing (2)**
8:7;23:3
**Diablo (2)**
21:5;22:13
**diagram (1)**
70:17
**differ (1)**
12:24
**difference (1)**
28:17
**different (12)**
8:12;10:25;12:10,
20;13:2;20:4;23:4,5;
24:13;29:7,14;52:25
**differently (1)**
36:18
**Dinyar (1)**
7:7
**DIRECT (4)**
6:25;42:25;54:21;
70:4
**direction (1)**

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 83
of 94

9:21
**directly (1)**
76:9
**director (6)**
7:5,13,16,20;8:4,6
**disapprove (1)**
73:4
**discretion (2)**
27:16;68:7
**discretionary (1)**
68:17
**discuss (1)**
24:8
**discussion (1)**
12:19
**distribution (2)**
36:9;69:17
**district (1)**
43:24
**diverse (1)**
77:16
**diversity (1)**
7:8
**divided (4)**
12:2;32:20;33:7;
39:21
**docket (1)**
42:15
**document (9)**
17:9;30:16,17,19;
40:22;42:8;48:1,10;
69:9
**documentation (1)**
15:16
**documents (1)**
45:22
**dollar (1)**
68:10
**dollars (7)**
32:24;33:3,5,5,6,9,
16
**domain (1)**
27:19
**donate (1)**
29:3
**done (12)**
14:3;16:22;20:10;
29:22;30:1,3;52:23,
24;60:8,23;61:14;
62:8
**door (2)**
46:21;74:19
**down (6)**
17:12;20:12;29:4;
50:7;64:6;73:15
**driving (1)**
32:2
**duration (1)**
15:6
**during (2)**
49:11;61:7
**duties (2)**
7:19;35:10

**E**

**earlier (1)**
40:17
**earned (2)**
66:14;68:11
**Earning (1)**
19:8
**earnings (7)**
19:13,17;22:17,
22;28:22,24;29:9
**easier (1)**
77:12
**easy (2)**
22:8;74:23
**educate (1)**
3:20
**education (1)**
40:11
**effectiveness (1)**
60:8
**EFO (3)**
19:17;25:7;29:4
**eighty-one (1)**
26:4
**either (7)**
36:23;44:11;
51:23;57:15;58:8;
67:24;71:6
**Electric (22)**
7:3,4;13:3,21,23;
14:10,15,20;15:6,16;
26:10;29:20;31:22;
42:4,10,20;43:3,21;
45:3;48:23;54:22;
70:23
**electrical (8)**
39:7;40:15;41:11,
23;44:12;45:17;
54:23;55:1
**elements (1)**
43:14
**eleven (2)**
13:16;68:14
**eligible (3)**
9:8;10:7,11
**eliminate (1)**
55:14
**else (4)**
66:11,15;68:19;
69:2
**email (1)**
67:2
**employed (1)**
45:5
**employee (35)**
4:8;8:2,17,18;
10:18;18:10,16;
32:10,23;34:1,7,17,
18,22;35:1,24;37:8,
9,10,14,23;52:21;
53:7,12,23;57:22,23;

61:9;64:6;65:9,18,
24;66:1,3,8
**employees (33)**
7:15,22;8:3,5;
10:9,10,11;11:25;
20:15,16,20;34:9;
35:7;36:15;37:4;
47:19;49:13;50:6;
53:10,19;54:2;
64:15;67:17;68:17,
18;73:24;75:5,7,8,9,
20;76:19;77:16
**employee's (4)**
9:10;34:21;38:21;
61:10
**end (11)**
3:17;9:24;19:22;
33:13;34:3;61:4;
64:24;65:11,24;
73:14;76:15
**engage (1)**
11:24
**enhance (1)**
46:15
**enhanced (11)**
14:1,2;39:22;40:1,
11;41:2,9;44:7;49:9;
51:8,16
**enough (2)**
18:7;77:1
**ensure (5)**
23:12,18;29:15;
35:21;46:20
**entered (2)**
29:24;42:16
**enthusiasm (1)**
75:2
**entire (2)**
7:18;74:5
**entitled (2)**
66:15;77:2
**entitlements (1)**
76:4
**equally (1)**
39:21
**equipment (2)**
54:23;56:3
**equity (1)**
7:24
**Escalated (3)**
18:23;19:4;26:13
**established (2)**
18:20;73:19
**establishes (1)**
34:7
**evaluate (2)**
34:5;60:7
**evaluated (1)**
59:21
**evaluation (3)**
34:17;60:18;61:9
**even (3)**
25:20;26:17;29:4

**events (2)**
19:11;76:5
**everyone (1)**
3:6
**everything's (1)**
68:13
**evidence (9)**
31:15;42:2;46:3;
48:10;55:2,11;
64:12;74:7,7
**EVM (1)**
69:18
**exact (1)**
29:12
**Exactly (1)**
64:19
**EXAMINATION (3)**
6:25;54:19;69:7
**examine (1)**
67:21
**example (13)**
14:14;15:22;
16:14,17;17:14;21:6,
20;29:21;32:19,23;
42:16;54:21;59:9
**examples (1)**
25:24;31:20
**exceed (1)**
46:16
**except (2)**
10:9;27:21
**excluding (1)**
19:11
**excuse (2)**
61:25;73:15
**executive (2)**
7:13;10:1
**executives (1)**
10:9
**exercise (2)**
74:5;77:18
**exercised (1)**
27:16
**exhibit (9)**
30:5,6;31:15,20;
42:1,9;43:9;44:3;
69:11
**exhibits (3)**
4:16;31:12;47:24
**expect (1)**
48:2
**expects (1)**
27:6
**expert (7)**
10:1;18:19,20;
41:13,24;51:20;69:9
**explain (14)**
11:21;14:7;15:7;
16:2;21:1,2;24:11;
25:4,25;26:20;
27:24;36:7;37:1;
40:3
**explaining (1)**

4:3
**extensive (1)**
19:20
**extent (1)**
46:1
**extract (2)**
12:7;24:7
**extremely (1)**
60:19

**F**

**FAC-3-4 (1)**
43:21
**facing (1)**
73:24
**fact (7)**
22:21;26:4;29:7;
31:2;33:5;37:5;
60:11
**factor (2)**
51:18;68:6
**factors (6)**
13:16;24:14;25:9;
28:20;29:6;49:22
**facts (1)**
64:11
**failure (1)**
75:11
**fair (2)**
8:22;75:4
**fall (10)**
7:14;8:12;9:22;
19:19;49:11,16,19;
50:3,6,7
**fallacious (1)**
59:6
**falls (1)**
21:15
**familiar (7)**
16:20;30:19;
45:12,15,19;48:3;
58:3
**far (4)**
8:19;47:24;54:3;
77:11
**fatality (2)**
18:14,17
**faucet (1)**
68:10
**faulty (3)**
58:14,25;59:5
**February (2)**
30:23;67:2
**Federal (2)**
43:21;51:8
**feedback (1)**
8:13
**feel (2)**
27:10;72:11
**feet (27)**
41:10,15,23;
43:23;44:11,14;45:2,

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 84
of 94

17;46:17,19,25;47:2,
9,14;49:4,7,20,20,
21;53:12;69:20,24,
24;70:8,9,15;74:24

**few (1)**
24:25

**figure (5)**
20:4;21:16;44:6;
47:7;48:14

**figured (1)**
50:6

**filed (8)**
16:19;17:9;19:2;
40:8;44:22;45:21;
50:20;72:18

**filing (1)**
14:23

**financial (8)**
10:19;12:2,4;13:4;
17:11;19:7,10;67:6

**find (3)**
27:18;58:6,24

**fine (6)**
6:4,19;30:18;55:9;
58:20;73:1

**fine-tuning (1)**
76:23

**finish (1)**
57:24

**finished (1)**
3:24

**fire (20)**
14:4,6;43:24;
45:16,25;46:16,18;
47:1;50:1;56:12;
64:7;65:10;66:10,
19;67:6,12;69:18;
70:5;75:18;76:11

**fires (2)**
54:11;74:18

**FIRE's (2)**
45:23;50:2

**first (20)**
7:9;13:1;18:5;
20:3,13;21:2;28:14;
29:2;32:19,24;33:8;
42:8;48:2;57:13;
60:22;61:5;63:24;
68:14;69:16;76:16

**first-quarter (1)**
22:1

**first-time (8)**
17:13,17,18,19,21,
23;18:1,5

**fiscal (1)**
76:3

**fit (1)**
9:1

**fits (1)**
21:21

**five (8)**
17:12;21:13;22:7;
25:16;33:19;46:4;

**fixed (1)**
24:2

**fixing (1)**
75:16

**folders (1)**
31:13

**folks (1)**
26:11

**following (2)**
53:10;61:2

**follows (2)**
40:8;66:15

**foot (1)**
44:18

**forbid (1)**
67:12

**force (2)**
73:25;74:2

**form (4)**
8:22;55:21;65:14;
77:21

**forty (1)**
13:5

**forward (6)**
6:8;68:5,11;71:1;
76:6,8

**found (2)**
18:2;55:9

**four (14)**
28:3;32:20;41:15;
44:14;46:17,25;
47:9;49:20;53:12;
69:20,24;70:15,20;
74:24

**four-foot (2)**
52:12;53:4

**fourteen (1)**
26:21

**fourth (3)**
43:15,18;68:16

**FRANCISCO (3)**
3:1;6:21;75:16

**frankly (2)**
64:12;76:9

**free (1)**
38:14

**frequent (1)**
63:12

**Friday (1)**
5:20

**front (1)**
71:20

**full (2)**
57:13;60:12

**further (2)**
70:11;73:11

**future (2)**
76:5,14

**G**

**Gapuz (1)**

4:11

**Gas (14)**
7:3,4;15:6,16,23;
16:1,4,17;17:14;
18:1;29:20;42:4,10,
20

**gather (1)**
33:16

**gave (2)**
40:2;46:3

**generally (2)**
7:19;10:15

**generate (1)**
28:11

**gets (1)**
65:9

**given (10)**
7:14;19:14,24;
22:25;27:6,17;35:2,
25;36:16;42:8

**gives (3)**
22:14;40:4;65:24

**glad (1)**
77:9

**goal (10)**
27:8;40:15;41:5,
15;47:12;52:14;
53:4,19,20;54:10

**goals (11)**
11:21,22,24;34:6,
7,10,15;38:21,24;
39:6;43:5

**God (1)**
67:11

**goes (2)**
52:22;68:14

**Good (10)**
3:6,12,13;5:3;7:2;
50:11;59:11;66:20;
76:9,10

**Gotshal (2)**
3:14;5:15

**graph (1)**
16:9

**Great (2)**
31:16;44:10

**group (3)**
4:8;31:4;50:9

**groups (2)**
29:19,21

**guess (1)**
69:2

**guidance (1)**
23:6

**H**

**hand (5)**
4:17;6:9;30:6;
41:25;45:20

**handed (1)**
48:1

**handout (1)**

46:14

**happen (10)**
27:2,3;56:10;58:8;
66:11;67:22;68:2,3;
70:13;75:6

**happened (1)**
55:7

**happening (1)**
23:24

**happens (3)**
37:16;59:9;75:6

**happily (1)**
77:3

**hard (3)**
6:1,2;11:17

**hardening (6)**
14:2,4,8;16:16;
39:24;56:4

**hazard (1)**
75:18

**head (1)**
48:23

**health (2)**
8:1;10:19

**hear (2)**
75:23;77:13

**heard (6)**
10:20;69:2,3;
72:17;74:12,16

**hearing (7)**
3:15,17,18;46:4;
52:11;73:14,19

**height (1)**
71:5

**help (7)**
8:13;28:20;31:4;
37:2;51:21;56:24;
57:14

**helpful (1)**
77:12

**helps (2)**
20:2;27:24

**hereby (1)**
31:14

**here's (1)**
57:22

**high (11)**
12:6;14:3,6;20:2,
6;28:12;35:3;43:24;
46:18;49:11;69:18

**higher (5)**
24:23,23;37:9,23;
52:14

**higher-performing (2)**
37:7,10

**highest (1)**
28:10

**high-level (1)**
40:4

**high-risk (3)**
14:3;40:13;69:20

**himself (2)**
58:2;66:10

**historic (1)**
36:13

**historical (3)**
24:17;26:16;27:14

**historically (7)**
8:7;9:11;35:21;
36:2,3;37:2;60:9

**history (2)**
23:14;52:22

**hit (8)**
49:17,19;50:3;
52:12,15;53:4,12,12

**hits (1)**
53:20

**Hold (3)**
11:5;44:17;47:21

**home (1)**
6:20

**Honor (49)**
3:13,19;4:6,18,25;
5:17,23;6:5;16:23;
17:20,21;30:4,12,15;
31:7,16;37:11;
38:13;41:25;45:20;
46:1;48:7,15;50:19;
52:19;59:16;62:22;
63:24;64:9,19;65:4,
9;67:19;68:4,23;
69:4,6;70:17;71:11,
21;72:1,9;73:8,13,
20,23;74:12,15;78:2

**Honorable (2)**
3:5;54:16

**hopefully (2)**
27:10;75:18

**horizontal (1)**
70:16

**horrible (2)**
75:6,7

**hostages (1)**
73:22

**housekeeping (1)**
5:18

**HR (1)**
77:10

**huh (2)**
3:23;61:17

**human (1)**
7:8

**hundred (1)**
36:16

**hundred-point (1)**
25:16

**hypothetical (4)**
65:8;66:8,16;67:1

**I**

**idea (1)**
21:3

**identified (7)**
32:1;54:25;57:16,
17;58:11,13,14

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 85
of 94

**identify (7)**
8:10,12;9:20;
14:21;30:16,18;43:1
**identifying (2)**
9:23;31:18
**ILI (1)**
18:5
**illusory (4)**
53:22,25;54:13;
55:19
**illustration (1)**
44:7
**impact (3)**
23:15;75:11;76:19
**impacted (3)**
53:3;75:8;76:9
**impacts (1)**
54:2
**impermissible (1)**
77:18
**implemented (2)**
14:24;18:15
**implementing (1)**
26:24
**important (6)**
14:24;15:8,17,18,
24;55:17
**improve (1)**
14:11
**inaccurate (1)**
59:6
**inappropriate (1)**
76:4
**incent (1)**
11:25
**incentive (19)**
3:16;7:22,23;8:8,
17,23;9:1,6,7,10,17;
11:22,24;22:25;23:7,
13;35:6,16;74:3
**incident (2)**
15:25;18:13
**include (2)**
7:25;48:18
**included (2)**
54:22;56:8
**includes (4)**
7:22;9:5;38:24;
43:22
**including (1)**
68:11
**inconsistent (1)**
53:5
**incorrect (1)**
47:17
**increase (1)**
71:5
**increased (1)**
37:3
**independent (4)**
18:19,20;50:15,15
**index (4)**
13:22,23;15:6;

**39:18
indicator (2)**
21:5;22:14
**Indicators (3)**
57:1,10;69:14
**indiscernible (1)**
4:20
**individual (43)**
10:24;20:7;21:14;
22:6,12;29:19;32:5,
9,17,20,25;33:2,8,14,
23,24,25;34:2,6,6,7,
10,20,22,24;35:5,14,
18,23,24;36:2,9,14;
60:15,17;61:8,15,18;
62:1,9,13;63:7;64:15
**individually (1)**
58:18
**individuals (1)**
60:24
**individual's (5)**
32:12,13;34:1,4;
64:17
**industry (3)**
13:13,14;19:2
**information (14)**
8:14;15:11;16:24;
22:17,19,23;23:11;
24:11;26:16;27:18,
20,21;31:2;68:4
**infrared (1)**
31:22
**initiatives (1)**
27:8
**injuries (1)**
17:14
**injury (2)**
18:14,16
**inline (2)**
18:2,6
**innocent (1)**
73:21
**INPO (1)**
13:15
**inquiry (1)**
51:1
**insignificant (1)**
51:4
**inspect (2)**
16:6;58:18
**inspected (2)**
57:15;58:8
**inspecting (2)**
58:1,23
**inspection (11)**
16:3,7;18:2,6;
56:2;57:16,18;58:11,
13,15;59:14
**inspections (11)**
18:1;31:22;52:18;
54:22;55:2,11,14,17;
56:8,10,14
**inspector (2)**

52:22;57:25
**inspects (2)**
50:5;52:23
**instance (1)**
44:25
**instead (2)**
33:12;46:22
**instructions (1)**
53:11
**insurance (3)**
8:1,1,1
**insure (1)**
23:1
**insured (1)**
7:25
**integrity (1)**
29:15
**intending (1)**
76:18
**intention (1)**
71:5
**interested (1)**
24:15
**interests (2)**
76:17;77:16
**internal (10)**
29:25;31:5,14,17;
32:1;54:25;56:6,14;
60:4,7
**interpolate (1)**
21:18
**interrupt (4)**
16:8;33:14;61:25;
66:7
**into (15)**
9:25;10:17;12:2;
16:5;17:12;20:3;
25:9;29:6,24;31:14;
39:21;46:3;51:19;
61:24;70:16
**intranet (2)**
20:16,20
**introduce (1)**
4:25
**introduced (1)**
16:7
**introducing (1)**
16:3
**introduction (1)**
18:2
**investigation (1)**
50:11
**investigations (2)**
50:16;59:22
**involve (1)**
59:22
**IPM (13)**
36:3;37:2,5,10,17;
64:17,21,24;66:12,18,
18,19;68:11,15
**irrelevant (1)**
51:3
**issue (2)**

47:3;55:1
**issued (1)**
59:19
**issues (2)**
31:18;70:14
**item (1)**
28:5

**J**

**January (4)**
10:3,6;19:22;
30:24
**job (8)**
32:16,17;43:1,2;
51:5;57:24;70:20;
75:9
**jobs (1)**
73:21
**John (3)**
5:18;6:6,17
**join (1)**
7:9
**joined (1)**
7:12
**Judge (22)**
3:5;39:15;40:9;
41:22;44:23;45:23;
47:1,13,18;50:1,14,
20;51:22;52:13;
53:9;54:3;59:19;
67:24;68:18;71:7;
74:21;75:12
**judgment (6)**
27:2;73:18;74:6,8;
77:17,19
**judicial (2)**
45:21;46:7
**Julian (86)**
30:8;31:10;38:8,
11,12,13,19;41:25;
42:4;45:20;46:6,9,
11,13;47:10,13;48:4,
7,10,15,17;50:19,25;
51:6,21;52:1,4,7,9,
16,18,21;53:1,14,16,
18,22;54:5,9,13,16,
20;57:3,6,8;58:10,
17;59:4,13,18;61:16,
18,22;62:4,7,20,22,
25;63:11,15,18,21,
23;64:15;65:7,19,22;
66:6;67:19;68:23,
25;69:10,13,16;72:5,
9,14,25;73:8;74:6,8,
12,15;75:1;76:18;
77:21
**July (1)**
7:10
**justify (1)**
74:8

**K**

**KAROTKIN (11)**
3:11,12,13,14,24;
4:1,17,25;73:11,13,
17
**keep (2)**
54:18;70:16
**keeper (1)**
70:19
**Keeps (2)**
61:16,18
**kind (6)**
15:11,23;17:11;
35:18;68:4;75:21
**knew (4)**
33:20;72:2,3;73:1
**knowing (1)**
27:1

**L**

**L-A-C-K (1)**
5:13
**language (1)**
58:24,24;72:2
**lapse (2)**
23:2;27:25
**larger (1)**
52:15
**largest (1)**
9:5
**last (14)**
3:17;6:17;8:21;
13:20;19:7;24:20;
30:11;33:22;35:8;
36:6,10;43:12;
67:13;73:14
**lastly (1)**
74:20
**later (1)**
7:16
**law (5)**
51:10;66:2;67:18;
76:7;77:10
**lawyers (2)**
4:2,2
**layup (2)**
46:24;52:5
**leader (3)**
34:4,7,19
**leaders (2)**
23:9;35:23
**leadership (6)**
9:21;14:20;23:5,8,
20;48:22
**learning (1)**
77:11
**least (5)**
8:19,23;13:19;
35:12;71:4
**leave (1)**

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 86
of 94

76:5
**left (1)**
77:19
**length (1)**
45:2
**less (1)**
74:7
**letter (1)**
67:23
**level (6)**
9:12;12:6;20:2,6;
32:16,17
**life (1)**
8:1
**light (1)**
12:15
**likely (2)**
14:11;29:12
**line (12)**
15:21,22;22:16;
24:1;26:1;43:17,19;
50:7,8;56:11;58:2;
77:17
**lines (16)**
40:15;43:23;
44:11;45:1,13,17;
49:11,14,15,16,17,
19;50:3;57:24,25;
75:16
**line's (1)**
52:21
**linking (1)**
51:4
**list (1)**
12:8
**listed (1)**
17:10
**listen (1)**
73:6
**lists (1)**
24:13
**literally (2)**
3:23;46:4
**little (6)**
13:7;20:12;25:21,
21;60:19;77:13
**long (6)**
8:20;13:17,19,19;
35:5,8
**longer (3)**
25:15,17,18
**longstanding (1)**
43:13
**long-term (2)**
7:23;9:7
**look (18)**
17:16;19:18;
20:12,22;25:1;
26:13;32:22;34:1,4,
14;36:2,6,13;47:5;
49:16;59:1;69:13;
71:16
**looked (2)**

14:16;17:1
**looking (12)**
16:9,10;18:10;
19:21;21:5;23:3;
37:22;41:3;57:9;
70:5,7;71:18
**lot (1)**
38:17
**low (1)**
35:3
**Lowe (30)**
5:18;6:6,7,10,17,
23;7:2;16:24;18:10;
19:24;22:16;24:4;
27:12;30:19;31:17;
32:8;33:22;35:19;
36:12;38:7,20;48:1;
59:6;63:2;67:22;
69:9;71:25;72:19;
73:15,19
**L-O-W-E (1)**
6:18
**lower (8)**
28:25,25;29:3,4;
36:23;37:24;77:24,
25
**lowered (2)**
31:18,24
**lower-performing (1)**
37:9
**Lowe's (2)**
54:19;77:9
**LTIP (1)**
7:24

**M**

**magnitude (1)**
75:20
**Maintain (2)**
43:17,18
**maintenance (1)**
25:18
**majority (3)**
35:17;36:15;37:4
**makes (4)**
32:23;49:25;71:7;
76:8
**making (3)**
14:14;47:24;54:1
**manage (2)**
8:3;74:9
**management (30)**
8:9;9:19;10:3;
14:1,2;16:16;39:22;
40:2,12;41:2,9;
43:13;44:8;46:16;
48:22;49:9;51:9,16;
53:8;56:25;57:10;
69:14,16;75:10;76:1,
5,9,13,24;77:18
**Manges (1)**
3:14

**manner (1)**
75:25
**many (9)**
8:3,16;10:11;27:3;
40:16;75:17;76:17;
77:16,16
**March (2)**
16:19;42:17
**marginally (1)**
36:5
**marked (3)**
30:6;31:12;42:9
**Market (2)**
6:21;74:4
**match (2)**
71:24;72:16
**material (1)**
22:19
**materials (2)**
24:7;30:22
**math (5)**
22:3,8;33:7,20;
37:14
**matter (4)**
3:9;72:21;76:7,9
**matters (2)**
4:4;5:18
**maturely (1)**
37:3
**max (1)**
37:15
**maximum (13)**
20:23;21:4,12,16;
25:8,19;28:6,16,19;
33:15,18;36:19,20
**maximums (2)**
21:8;22:2
**may (16)**
3:17;19:11;33:14;
42:6;51:18;52:15;
53:4,8;58:14;59:5,5;
68:15,15;74:12;76:1,
3
**maybe (8)**
14:12;16:18,23;
20:1;21:2;36:5;
70:16;71:15
**mean (15)**
11:17;16:14,20;
22:5;24:21;46:8;
48:4;54:7;55:22;
60:25;63:16;72:6,
19;73:5;77:12
**means (5)**
14:8;25:5;57:19;
58:9,17
**meanwhile (1)**
75:7
**measure (5)**
10:25;13:24;40:5;
46:23;71:1
**measured (1)**
13:16

**measures (11)**
13:15;14:2,4;
15:12;16:6;18:14;
19:2,4,10;23:4;40:12
**meat (1)**
32:22
**medical (1)**
8:2
**meet (3)**
20:18;46:16;54:10
**meeting (4)**
30:24,25;41:18,20
**meetings (1)**
23:8
**memorized (1)**
67:4
**mentioned (3)**
4:1;70:4;74:19
**merely (1)**
46:22
**met (1)**
9:9
**metal (1)**
14:14
**metric (76)**
12:23;13:3,4,12,
13,17,21,23;14:17;
15:4,5,7,9,17,20;
16:1,2,2,6;18:10,11,
12,18,22,23,24;19:1,
3,7,8,8,9,10,14,15,
15,18,21,23;20:8,9;
21:10,14;22:6;23:9;
26:14,15,15,18,22;
28:25;29:8,16;
31:22;32:4;40:3,4;
41:15;44:18;46:24;
48:20,25;49:10;
50:11,12;54:10,22;
55:1,10;59:5;70:23;
71:13,24;72:16;
74:20,22
**metrics (50)**
3:20;8:12;9:23;
10:14,17,25;12:2,8,
10,20,22;13:10,11;
14:9,15,18,19,21;
16:10,13,15,24,25;
17:5,10;19:18,21,25;
20:1,5,7,14,22;22:9;
23:1,3,5,12,21;
24:13,14;28:7;
29:15;39:1,11;43:1,
4,6;56:5;70:9
**microphone (1)**
6:14
**might (4)**
66:11;71:15;
75:10;76:21
**mile (5)**
57:14;58:7,18;
59:2,10
**miles (17)**

14:3,5;16:6;17:13,
19,21,24;18:6;40:12,
16;41:2,6;49:14;
52:12;59:14;66:19;
69:17
**mind (1)**
51:25;53:10;70:17
**mine (3)**
11:9,11,12
**minute (1)**
16:8
**minutes (1)**
46:4
**misbehaving (1)**
77:4
**Mistry (2)**
7:7;16:19
**mitigation (14)**
39:4,18;42:5,10,
21;47:1;50:17;
59:20;69:12,21;
70:5;71:23;72:25;
75:12
**modified (1)**
55:14
**modifier (19)**
33:23,24;34:2,20,
24;35:6,18,24;36:3,
14;60:15,18,23;61:9,
15,18;62:2,14;63:25
**modifiers (2)**
35:15;36:10
**moment (1)**
70:14
**money (2)**
29:3;74:18
**monitor (9)**
5:4;50:15;51:8,22;
52:13;59:19;67:24
**monitors (1)**
54:4
**monitor's (5)**
51:11,13,15;53:6;
59:22
**Montali (1)**
3:5
**month (3)**
68:15;76:15,16
**months (1)**
68:14
**monumental (1)**
76:16
**morale (1)**
73:23
**more (23)**
5:4,6,9;16:13,8,9;
14:7;16:24;24:22;
25:21;26:5,24;37:11,
17;43:23;46:19;
63:12,12;65:6;
67:20;68:21;71:7;
73:17;77:11
**most (2)**

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 87
of 94

14:24;72:23
**motion (2)**
3:16;16:10
**motivate (2)**
11:25;18:12
**move (2)**
4:7;59:16
**moved (1)**
61:14
**moving (3)**
9:25;15:5;63:7
**much (4)**
34:19;35:23;
52:14;74:7
**multiplied (8)**
20:9;22:7,10;
32:18,18;33:3,6;
34:21
**multiplier (1)**
35:19
**multiply (1)**
33:12
**multiplying (2)**
21:13;32:14
**multipronged (1)**
43:14
**must (1)**
59:2
**mute (1)**
24:1
**mysterious (2)**
77:14,14

## N

**name (5)**
5:12;6:12,15,17,17
**natural (1)**
18:1
**nature (1)**
24:9
**necessary (1)**
60:12
**need (9)**
4:7;6:20;16:8;
20:17;47:6;50:23;
60:12;73:23;75:24
**needed (2)**
60:17,20
**needs (1)**
23:6
**negative (4)**
24:25;25:4,20;
26:21
**negotiated (2)**
62:6;63:7
**negotiating (1)**
72:10
**neutral (1)**
54:3
**new (7)**
14:17;16:7;26:14,
15,17;40:5;67:13

**next (12)**
13:21;16:1;18:11,
22;19:25;42:16;
43:15,16;44:2,10;
57:12;59:1
**nine (1)**
28:3
**ninety-eight (1)**
37:6
**ninety-five (1)**
22:11
**ninety-nine (1)**
37:6
**ninety-three (1)**
22:4
**non-represented (1)**
10:8
**nor (1)**
4:2
**northern (1)**
75:17
**NorthStar (1)**
19:16
**notice (4)**
22:16;24:25;
45:21;46:7
**noticed (1)**
28:9
**notwithstanding (1)**
26:21
**November (3)**
65:10;66:7;67:12
**nuclear (3)**
13:12,14,18;
16:15;17:13;21:1,
24;22:4;25:3,6,12;
66:18;75:14
**number (18)**
11:3;15:12;16:6;
17:10;19:2,4,5;
23:17;24:23;26:2,
25;27:6;28:22;
41:10;42:14;52:12;
69:15;75:10
**numbers (3)**
25:1;28:14;77:25

## O

**object (1)**
45:25
**objected (1)**
64:4
**objection (13)**
5:21,22;31:9,10;
45:24;46:2;47:21;
55:21,25;64:9,10;
65:14;73:8
**objections (2)**
75:1;77:20
**objective (1)**
14:24
**objectives (8)**

8:10,13;9:20,23;
11:1,4;12:1;14:22
**obligated (1)**
76:7
**observations (1)**
36:12
**obtain (1)**
35:19
**occurred (2)**
55:3,11
**off (5)**
20:13;27:1;68:10,
14;72:11
**offense (1)**
18:4
**officer (2)**
7:8,8
**offices (1)**
75:15
**official (2)**
63:6;72:21
**often (1)**
27:2
**on/off (1)**
11:13
**Once (6)**
15:6;16:2;32:8;
33:25;64:18;73:18
**one (32)**
9:3;11:5,16;12:13;
24:14;25:7,9,12,24;
28:1;30:5,6;38:20;
39:1,6,21;40:17,25;
41:10;42:24,25;
43:5;45:22;58:7,10;
64:2,21;67:20;69:6,
19;74:17;77:9
**one-time (1)**
19:11
**ongoing (1)**
19:11
**only (10)**
4:4;11:16;25:12;
47:8;54:7;64:2,17,
24;69:3;73:19
**oOo- (1)**
3:2
**opened (1)**
46:21
**operation (3)**
16:17;19:17;29:9
**operations (30)**
13:3,18,21,23;
14:15,20;15:6,17;
16:1;17:15;19:8,11,
13;21:1,24;22:4,17,
22;25:3,6;26:10;
28:22,24;29:20;
43:3;48:23;50:9;
54:22;55:1;70:23
**Operator (1)**
23:25
**operators (1)**

13:14
**opportunity (5)**
4:3;35:10;73:4;
74:3,3
**opposed (1)**
69:24
**order (9)**
3:3;37:9;39:7;
50:2,20;53:6;59:19;
60:12;77:21
**ordered (2)**
39:15;50:14
**orders (1)**
54:4
**organization (4)**
9:12;29:18;45:3;
70:22
**organizations (1)**
43:2
**original (2)**
16:10;62:5
**originally (3)**
41:17;61:15;63:4
**out (6)**
4:17;20:4,15;
21:16;28:3,6,14;
32:4,6;44:14;45:2;
47:7;48:14;50:6;
52:22;56:24;57:14,
23,23;59:24;60:22;
61:4;66:9;68:7;
71:11;74:19,23
**outage (5)**
25:13,14,15,17,17
**out-of-date (1)**
16:18
**outside (1)**
10:1
**over (5)**
49:16,19;50:3;
54:7;73:12
**overall (6)**
27:14;29:1;31:24;
37:25;38:21;39:19
**overhang (2)**
59:1;69:19
**overhead (1)**
54:23
**overpaid (1)**
53:23
**overrule (2)**
74:25;77:19
**own (6)**
34:6,10;43:3,3;
49:6;51:16
**owners (1)**
23:5
**owning (1)**
26:11
**owns (2)**
23:9;70:22

13:14

## P

**Pacific (5)**
7:3,4;42:4,10,20
**page (35)**
12:5,6,24;13:11;
25:23;41:3;42:9,14,
15,16,16,19;43:8,9,9,
12,15,16;44:2,2,10;
45:22;46:9,14;48:4;
56:17,19,20,24;57:2,
4,5,12,13;69:13
**pages (1)**
42:13
**paid (7)**
36:10;37:4;55:19;
59:24;60:22;61:4;
64:17
**papers (1)**
38:17
**Paperwork (1)**
31:14
**paragraph (5)**
43:12;46:15;
71:18,18,20
**pardon (1)**
27:22
**part (20)**
5:21;8:17;9:7;
13:20;16:10;23:3;
26:23;30:17;31:8,11,
13;35:6,10;45:2;
53:18,25;55:17;56:7,
13,13
**participants (1)**
4:9
**participation (4)**
32:12,13,14;33:3
**particular (4)**
14:22;28:25;33:4;
70:23
**parties (1)**
11:19
**partner (1)**
73:12
**parts (2)**
63:1;75:17
**party (1)**
69:3
**pass (2)**
67:19;68:25
**past (2)**
31:17;74:18
**pattern (1)**
75:22
**pay (3)**
7:22;9:5;67:9
**paying (1)**
67:7
**payment (16)**
28:23,23;32:11,21,
25;33:1,8,15;34:21;

35:20;61:24,24;
62:23,25;63:1;64:16
**payments (12)**
32:10;51:19;
62:10;63:12;65:9,12,
17,25;66:2,9;67:16;
76:22
**payout (4)**
27:14;28:16,19;
55:14
**peer (2)**
35:14,17
**peers (2)**
23:10;35:17
**pension (1)**
8:1
**people (10)**
15:24;67:14;68:1;
73:20;75:13,14,15,
16;77:1,4
**per (2)**
19:6;64:18
**percent (33)**
9:13,15;12:3,3,4;
13:4,5,6,6;17:15,23;
21:13;22:7,8,11,12,
13;25:4,20,22;26:5,
21;28:17,19;33:4,4;
34:25;36:5,17;37:5,
6,18;39:19
**percentage (8)**
9:9;24:20,21;
25:25;32:15;34:20;
65:2,3
**perception (1)**
75:4
**perform (2)**
34:14,17
**performance (40)**
10:17;12:1;19:10;
20:6,17;21:6,6,9;
24:16,17,18,19,23;
25:8,10;26:18;33:23,
24;34:1,2,5,16,20,
24;35:6,15,18,24;
36:3,9,13,14;38:2,
21;60:17;62:13;
64:7;65:10,20,24
**performed (2)**
11:1;34:6
**performer (3)**
66:20,21,23
**performing (3)**
29:18;67:23;77:5
**perhaps (1)**
72:6
**period (2)**
54:1;61:8
**permit (1)**
57:22
**permits (2)**
65:23;67:15
**person (2)**

35:19;37:16
**personal (4)**
60:15,23;61:8;
63:25
**personally (1)**
76:21
**persuade (1)**
73:4
**persuaded (1)**
77:8
**PG&E (24)**
3:9;7:9,12;29:15;
41:5;43:5;44:3,11,
14,22,25;45:5,7,11,
12,15,22;48:18;49:7;
50:16;51:10,14,22;
57:23
**PG&E's (8)**
43:13;45:9;49:6;
50:5;51:8,9,15;59:20
**phonies (1)**
59:10
**phony (1)**
53:2
**phrase (1)**
57:17
**picture (3)**
11:17,22;44:10
**piece (2)**
9:3;62:9
**pieces (1)**
63:4
**pipeline (2)**
15:23,24;16:5,5
**pipelines (2)**
16:4;18:2
**place (9)**
18:13;23:8;25:19;
27:18;56:15,16;
59:25;60:11;77:4
**plan (49)**
3:16;8:8,17,23;
9:1,10,17;11:23,24;
13:25;14:23,25;
15:4;23:15;26:23;
35:6;39:16;40:19;
41:7,13,21;42:5,10,
13,21;43:8;44:22;
47:2;48:7,8,22;49:4;
50:17;51:10,17;
52:4;53:3;56:17;
59:16;62:5;69:12,23,
25;70:2,3,5,8;71:23;
72:16
**planning (1)**
77:24
**plans (5)**
7:23,23;8:2;35:16;
75:12
**plant (3)**
13:14;66:18;75:14
**playing (1)**
77:3

**plays (1)**
33:23
**Please (9)**
3:6;6:8,9,13,16;
18:25;24:1;32:8;
56:18
**pleasure (1)**
72:4
**plus (2)**
29:9;66:15
**PM (2)**
3:1;78:4
**podium (1)**
38:15
**point (14)**
43:18;46:2;47:8;
48:12;51:3;52:16;
55:9;57:13,22;
59:12;62:20;65:8;
71:11;75:3
**points (2)**
25:16;51:4
**pole (2)**
14:14;37:16
**poles (1)**
43:19
**poor (1)**
66:20
**populated (1)**
12:17
**population (4)**
8:18;9:4,7;10:8
**portion (10)**
9:6;10:10,10;52:8,
9,10;63:13;64:17,24;
72:24
**position (1)**
7:4
**positions (1)**
7:11
**positive (3)**
24:21;25:24,25
**possible (4)**
21:20;25:19;
34:23;74:22
**power (6)**
13:14;26:24;27:1,
7;66:18;75:14
**powerlines (1)**
46:18
**powerplant's (1)**
13:15
**PowerPoint (1)**
5:19
**preferred (1)**
76:21
**prepare (1)**
31:4
**prepared (6)**
4:10;5:19;12:18;
24:6;31:5;62:17
**present (2)**
8:11;64:14

**presentation (1)**
5:19
**presented (8)**
5:20;10:5;12:7,25;
13:2,8;74:6,7
**presenting (1)**
4:2
**presently (1)**
71:6
**president (1)**
7:7
**presiding (1)**
3:5
**pressure (1)**
76:12
**pretend (1)**
70:14
**pretty (2)**
26:7;57:20
**prevent (1)**
54:11
**previous (2)**
17:15;24:16
**previously (1)**
16:22
**prior (2)**
14:16;60:2
**probation (2)**
39:16;47:14
**problem (1)**
75:23
**problems (1)**
67:7
**proceed (1)**
4:10
**proceedings (1)**
78:4
**process (8)**
16:3;23:18;29:17,
20;31:17;56:7;
60:10,18
**processes (1)**
59:7
**program (13)**
4:9;7:24;10:4,16;
15:2,3;23:7,13;
35:21;39:11;40:8;
41:9;69:18
**programs (5)**
7:21,25;9:2;10:2;
43:14
**promoted (1)**
7:16
**proposed (2)**
4:9;63:5
**prospectively (1)**
70:25
**protect (1)**
56:11
**prove (1)**
76:4
**provide (5)**
3:19;8:14;23:6;

37:9;55:2
**provided (4)**
9:3;24:7;30:11,22
**provides (2)**
12:8;20:8
**proxy (3)**
27:20,22,22
**prudent (1)**
51:14
**public (20)**
13:3,21,23;16:15;
17:13;19:3,5;22:19;
26:24;27:19,21;39:1,
18;43:20;45:11,13,
15;46:14,25;49:7
**publicize (1)**
22:20
**publish (2)**
20:15;22:23
**published (1)**
27:22
**PUC (4)**
39:13;40:9;73:1;
74:21
**punished (1)**
73:22
**punitive (2)**
76:18,19
**purpose (6)**
3:18;12:18;24:6;
46:5,6,10
**purposes (1)**
38:20
**pursuant (1)**
43:19
**put (12)**
6:2;12:13;20:1;
22:5;32:22;36:18;
52:14;55:9;60:11,
17;64:6;76:12
**putting (1)**
6:3

## Q

**quality (10)**
16:5;18:14,18;
29:19,21;56:6,7,13,
16;59:7
**quarter (8)**
20:23;21:2;22:15;
32:19,25;33:8;
68:16;76:2
**quarterly (25)**
22:23;59:24;60:5,
8,10,12,15,18;61:21,
24;62:2,8,11,14,25;
63:5,25;64:16;
65:25;66:9;72:15,24,
25;74:17;76:23
**quarters (1)**
67:16
**quickly (2)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) payments - quickly

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 89
of 94

4:7;18:13
**quote (2)**
73:16,17
**quoted (1)**
3:23

**R**

**radial (2)**
43:19,22
**rails (1)**
68:14
**raise (1)**
6:8
**ramification (1)**
68:1
**range (4)**
21:21;34:23;65:2,
3
**rapid (1)**
63:12
**rate (5)**
19:5;27:5;32:2,14;
33:3
**rather (4)**
46:25;60:16;62:2;
76:22
**rating (2)**
25:7;34:18
**reached (1)**
71:12
**reactors (2)**
25:12,13
**read (6)**
42:20;58:7,20,22;
67:2,4
**reading (2)**
58:23;62:1
**reads (1)**
57:14
**Ready (2)**
3:10;4:10
**really (6)**
11:18;25:9;28:5;
31:12;56:11;75:7
**reason (3)**
26:17;74:6;77:1
**reasons (2)**
74:19;75:23
**recall (1)**
3:17
**receive (5)**
32:5;35:1;36:19,
20,22
**received (2)**
31:14;66:8
**recognition (1)**
77:3
**recognize (1)**
24:4
**recognizing (1)**
4:7
**recollection (1)**

40:22
**recommend (1)**
48:21
**recommendations (1)**
51:23
**recommended (2)**
43:22;46:18
**record (13)**
5:21;15:14;16:5;
30:17;31:8,11,13;
50:19,21;58:17;
59:10;72:22;74:18
**recorded (12)**
15:12;20:6;21:6;
30:2;57:21;58:7,12,
12,15;59:2,3,11
**record-keeping (1)**
53:2
**records (10)**
15:6,8;17:14;26:3,
6;29:18;57:25;
58:13,25;59:5
**redirect (3)**
69:5,7;73:2
**reduce (4)**
33:13;37:7,8;
69:19
**reduced (1)**
25:16
**reduction (1)**
43:25
**refer (1)**
50:20
**referring (3)**
17:3,4;71:19
**refers (2)**
13:21;18:5
**reflect (1)**
12:6
**reflected (2)**
24:12;36:7
**reflects (1)**
28:23
**refresh (1)**
40:22
**refueling (4)**
25:13,14,14,15
**regarding (1)**
12:20
**regardless (2)**
68:8,18
**relative (2)**
24:18,18
**relevance (2)**
50:23;51:1
**reliability (3)**
13:15;21:5;22:14
**remaining (1)**
22:13
**Remember (3)**
67:3,8;71:14
**removed (2)**
31:24;59:15

**repeat (1)**
47:6
**repeated (1)**
75:4
**repeating (1)**
72:20
**Rephrase (3)**
56:1;65:19,22
**replace (1)**
19:21
**replacing (1)**
14:12
**report (4)**
7:6,7;19:16;45:25
**reported (5)**
27:20;31:21;
57:14,16,18
**reporting (1)**
31:2
**reports (1)**
51:22
**represent (1)**
71:4
**representation (1)**
75:2
**representatives (1)**
63:6
**represented (1)**
10:10
**represents (1)**
28:22
**request (4)**
30:24;45:21;46:6;
74:9
**require (3)**
46:17;51:10;56:6
**required (2)**
15:15;71:13
**requirements (2)**
53:6;56:2
**requires (3)**
41:15,22;69:23
**resource (1)**
7:8
**Resources (1)**
43:20
**respect (3)**
13:17;14:8,18
**respond (2)**
45:3,4
**response (3)**
18:16;28:10;30:24
**responsibilities (2)**
7:20;35:11
**responsibility (6)**
7:14,17,21,24;8:9;
77:8
**rest (2)**
22:9,10
**restate (1)**
55:22
**restructuring (2)**
9:25;10:2
**room (1)**

**result (6)**
10:24;27:7;28:15;
34:17;55:13;71:22
**results (4)**
29:16;31:3;56:5;
60:5
**retiree (1)**
8:2
**retrospect (1)**
76:4
**review (4)**
19:17;29:25;
35:11;65:11
**reviewing (2)**
15:1,3
**reviews (1)**
18:21
**revisiting (1)**
76:12
**rewarded (1)**
37:24
**rewards (4)**
7:5,20;8:4,6
**rewrite (1)**
70:24
**Richard (1)**
5:13
**right (93)**
4:23;24:5;22:6;7,
9,23,24;8:24;13:11;
16:12;18:7;22:3;
30:7;33:18;34:11;
36:16;38:4;39:2,4,8,
11,24;40:1,5,13;
41:1,7,11,14;42:3;
43:1,6,8;44:8,12,15,
23;45:7,24;47:12;
48:9,16;49:17,21,24;
50:5,12,14;52:15;
53:13;54:9,23;55:3,
13,15;57:1,3,10;
58:25;59:6;61:7,12,
15,24;62:4,7,11,14;
63:1,2,10,17;64:2,4,
8,14,15,18,23;65:4,
5;66:4,12,17,21;
67:3,8,11;68:10,24;
69:23;72:4;76:6
**rise (2)**
3:4;78:3
**risk (7)**
14:4,6;43:25;
49:10;69:19;76:1,1
**risks (1)**
69:19
**risky (1)**
74:17
**robust (1)**
74:23
**role (6)**
8:7;9:17;33:23;
71:2;76:24;77:3
**room (1)**

5:6
**rotate (1)**
4:19
**routine (2)**
44:7;46:15
**RQC (1)**
58:3
**Rule (2)**
43:20;73:1
**ruling (2)**
4:7;70:15
**rulings (2)**
75:12,13
**run (1)**
68:2
**running (1)**
77:15

**S**

**safe (2)**
32:2;39:7
**safety (46)**
10:18,19;12:2,3;
13:3,7,11,12,15,22,
23,25;14:23;15:2,3,
17,20,25;16:15,15;
17:10,13;18:10,19,
20;19:16;26:23,24;
27:8;38:24;39:2,10,
11,16,18;40:8;41:7;
44:22;45:16;46:16;
49:9;52:4;54:10,11;
59:20;71:23
**salary (4)**
32:14,15;33:2,15
**Sam (1)**
5:13
**same (6)**
14:4;25:3;28:12,
18;60:10;73:8
**sample (1)**
21:25
**SAN (3)**
3:1;6:21;75:16
**satisfaction (1)**
17:11
**satisfied (1)**
55:10
**satisfy (1)**
53:19
**savings (1)**
8:2
**saw (1)**
70:17
**saying (4)**
26:11;46:21;
52:11;72:22
**scale (4)**
18:20;28:15;29:7,
8
**school (1)**
77:10

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 90
of 94

**scope (1)**
69:18
**score (52)**
10:21,23,24;20:1,
4,8,11;21:9,10,11,12,
13,14,15,17,19;22:1,
1,4,6,14;25:7,8,16,
16,19,21,24;27:15;
28:6,9,12,16,17,18,
18,24;29:1,4,10,12;
31:25;32:5,8,12,19;
33:6,10,13,18;65:24;
68:8
**scores (3)**
21:3;22:12;31:19
**scoring (3)**
3:21;21:25;33:11
**screen (14)**
4:11,12,15,18;6:1,
3;11:6,6,7,8,10,14,
15;12:10
**screenshots (1)**
41:1
**seat (1)**
6:12
**seated (1)**
3:7
**second (7)**
11:5;29:25;42:9,
16;45:22;57:17;76:2
**second-guess (1)**
76:24
**secondly (1)**
77:12
**section (2)**
44:3;56:25
**Sections (1)**
43:20
**seeking (1)**
3:16
**seem (3)**
16:11;54:1;72:22
**seems (3)**
54:3;58:14;75:22
**selected (1)**
14:19
**senior (7)**
7:5,7,16,20;8:3,6;
48:22
**senior-most (1)**
10:9
**sense (2)**
31:12;49:25
**sensors (1)**
16:4
**sentence (2)**
59:1,16
**separate (1)**
29:21
**September (1)**
8:11
**serious (4)**
17:14;18:13,16;

47:3
**session (1)**
3:4
**set (2)**
23:15;28:2
**setting (3)**
23:17;24:17;28:7
**seven (8)**
8:21;13:20;35:9;
45:5;60:1,21;61:4,11
**seven-year (1)**
61:7
**several (2)**
8:19;29:2
**shared (1)**
32:3
**sheet (1)**
28:10
**short (3)**
71:16;72:6,12
**shorten (1)**
15:9
**Shortly (2)**
7:14;10:15
**short-term (11)**
3:16;7:22;8:7,16,
22;9:1,6,10,16;35:6,
15
**show (6)**
12:11,15;27:13;
31:1;37:2;45:11
**showed (1)**
69:12
**shows (7)**
25:20;27:14;28:1,
5;42:14;44:10,14
**shut (1)**
27:1
**shutdown (1)**
27:7
**shut-offs (1)**
26:25
**side (1)**
44:11
**sides (2)**
72:13;73:7
**side's (1)**
30:7
**significant (1)**
26:7
**similarly (2)**
36:22;66:17
**Simon (2)**
67:14;74:19
**Simon's (1)**
67:2
**Simple (2)**
18:7;33:6
**simply (1)**
4:2
**sit (2)**
54:5,7
**sitting (1)**

75:5
**situation (2)**
9:25;77:5
**situations (1)**
10:2
**six (3)**
9:12,14,15
**sixty (3)**
26:5;28:17,19
**sixty-five (2)**
12:3;13:6
**size (1)**
77:15
**skim (1)**
42:24
**skip (1)**
25:23
**skipped (1)**
69:16
**sky (2)**
41:11,16
**Slack (57)**
5:1,2,6,8,10,13,13,
14,15,17,23;6:2,5,
24;7:1;11:7,15;
12:12,17;16:9,13,23;
17:19,23;18:1,8,9;
24:3;30:4,9,11,15;
31:7,16;37:11;
45:25;47:15;55:21;
64:9,11,14,19,24;
65:3,14;69:1,5,6,8;
70:11,18;71:11,19,
20;72:1;73:10;75:4
**slide (21)**
11:3,7,20;12:10,
17,18;20:1,13,13,14,
19;23:22;25:2,23,23;
26:13;27:12;32:7;
36:6,6,8
**slides (4)**
4:18;12:5;30:5;
32:7
**small (2)**
10:10;75:9
**so-called (3)**
23:1;27:25;72:23
**sole (1)**
3:18
**somebody (6)**
15:18,22;37:7,8;
53:9;59:10
**somebody's (2)**
15:21;27:1
**someone (5)**
27:18;28:10;
36:18,20,22
**sometimes (2)**
28:2,3
**somewhat (2)**
77:14,14
**somewhere (1)**
29:13

**sorry (6)**
34:4,13;37:8;
44:17;56:19;57:6
**sort (5)**
21:25;29:10;
64:16;66:9;69:16
**sources (1)**
47:11
**SPEAKER (2)**
30:14;69:4
**specialist (1)**
77:10
**species (2)**
49:10;69:21
**specific (6)**
10:14;25:1;37:23;
43:3;65:17,18
**specifically (5)**
9:16;14:7;39:4;
40:3;50:10
**specifics (1)**
41:13
**spell (1)**
6:12
**spelled (1)**
6:18
**spelling (1)**
5:11
**spurious (1)**
17:8
**stability (2)**
73:24;74:2
**staff's (1)**
11:8
**stamp (1)**
42:14
**stand (2)**
6:8,8
**standard (1)**
13:13;43:21;77:21
**standards (1)**
46:17
**Standby (1)**
11:17
**start (3)**
13:11;14:11;21:2
**started (2)**
7:13;9:22
**Starting (1)**
9:19
**Starts (1)**
43:17
**State (3)**
6:12,15;46:16
**stay (3)**
5:3;35:25;38:15
**step (5)**
29:20,25;56:6,13;
73:15
**steps (3)**
30:1;58:3;60:12
**Steven (1)**
3:13

**still (4)**
37:24;72:5,7;
77:14
**STIP (130)**
3:21,21;4:9;7:23;
9:18;10:7,12,16,17;
11:21;13:20;14:19;
23:3,14;26:15;
27:14;28:11,21,23,
24;29:11,15;31:1,2,
18;32:6,10,11,21,25;
33:8,15,24,25;34:21,
23;35:2,3,20,21;
36:4,10,11,16,19,21,
24;37:3;38:20;39:1,
10,19;40:19,20;
41:14,14,15,17;
44:18;45:2;46:23,
24;47:4,8,8,19;
48:19,22;49:10;51:2,
10,12,19,25;52:8,9,
10,11;53:5,16,18,19;
54:7,9,21;55:17,19,
24;56:2,5,9;59:4,5,
12,22,24;60:8;61:4;
63:24;64:8,11,16;
65:12,17,23;66:9;
67:7,9,15,15,22,23;
68:1,2,7,16;70:19,
20,24;71:6,24;72:7,
24;74:10,16,17;76:8,
13,21;77:2
**STIPs (1)**
60:22
**stipulation (4)**
61:13;62:1;71:17;
72:18
**stop (1)**
34:9
**straightforward (1)**
57:20
**Street (1)**
6:21
**stretch (1)**
26:7
**strong (1)**
74:22
**strongly (1)**
72:11
**subcategories (1)**
17:13
**subject (1)**
73:19
**submetrics (1)**
14:1
**sub-metrics (1)**
20:10
**submission (1)**
45:23
**submit (1)**
73:9
**submitted (2)**
39:13;41:17

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 91
of 94

**substituting (1)**
74:8
**success (1)**
75:11
**successful (1)**
31:18
**suddenly (1)**
75:19
**suggested (2)**
19:16;32:4
**suggesting (2)**
28:11;49:23
**summer (1)**
9:19
**superstar (2)**
37:18;66:18
**supplemented (1)**
50:21
**support (3)**
9:23;10:19;27:24
**supposed (3)**
49:15;53:11;54:10
**Sure (25)**
5:24;11:18;13:19;
14:24;15:20;16:21;
17:6;30:13;35:8;
42:7;43:5;48:2;
50:16;52:23;56:20;
58:19;22;59:15;60:2,
25;63:16;66:7;67:4;
71:21;74:22
**sustain (1)**
55:25
**switch (1)**
11:13
**switched (1)**
61:21
**sworn (1)**
6:11
**system (9)**
14:1,4,8;15:9,12;
16:16;39:7,24;77:4
**systems (1)**
14:5

**T**

**table (3)**
5:4;20:14;38:15
**talk (2)**
40:1;67:1
**talked (5)**
11:3,20;29:7;
33:10;74:15
**talking (2)**
69:15;75:13
**talks (2)**
44:3;69:17
**target (23)**
20:7,23;21:4,7,7,
10,19;22:2,9;23:1;
24:19,22;26:4,9;
28:15;32:12,13;

45:1;47:9;52:15;
61:10,10;69:15
**targets (18)**
8:14,15;9:9;11:1;
20:17;22:21;23:15,
17;24:9,17;27:25;
28:2;53:25;56:25;
57:10;69:14;71:23;
74:4
**TCC (1)**
5:20
**team (11)**
8:9;9:20,21;10:3;
14:20;23:1,8,21;
48:22,23;60:7
**teams (1)**
23:5
**teeth (1)**
56:9
**telling (1)**
46:14
**tells (4)**
45:11,13,15;52:22
**ten (4)**
12:4;13:4;17:15,
23
**term (1)**
54:14
**terminology (1)**
16:14
**terms (2)**
10:16;77:14
**test (1)**
60:4
**testified (3)**
32:9;42:25;54:21
**testimony (1)**
77:9
**testing (1)**
56:14
**Thanks (2)**
6:4;33:21
**thereafter (1)**
7:14
**therefore (5)**
13:6;31:24;53:6;
75:8,20
**third (3)**
15:5;76:15,15
**thirty (4)**
8:5,23;33:17;
59:25
**thirty-five (3)**
25:15,17,18
**Thirty-seven (1)**
33:19
**though (5)**
9:24;24:25;25:20;
26:17;69:12
**thought (7)**
48:5;57:4;61:20,
20;62:21;63:11;65:5
**thousands (1)**

75:20
**threat (1)**
46:18
**three (7)**
10:17;29:6;36:5;
66:8;67:13,16;74:18
**three-quarters (1)**
65:9
**threshold (9)**
20:23;21:4,8,9,11,
15,18;22:2,5
**thrown (1)**
32:4
**timeliness (1)**
18:15
**times (2)**
27:6;35:20
**title (1)**
57:9
**today (10)**
3:15,18;5:17;
42:21;45:21;51:5;
54:8;64:14;73:19;
75:23
**today's (1)**
51:1
**together (3)**
20:11;22:12;32:18
**told (6)**
41:22;47:1,13;
49:7;53:12,12
**tomorrow (5)**
70:14;73:1;77:24,
25;78:1
**took (6)**
7:17;26:2,6;56:14,
16;74:23
**tool (1)**
16:7
**tools (3)**
16:3,4;18:2
**top (2)**
13:12;28:16
**topic (3)**
29:14,14;33:22
**torches (1)**
66:10
**tort (1)**
64:4
**total (8)**
7:5,20;8:4,6;9:3,4;
20:11;36:4
**totals (1)**
55:15
**Towers (1)**
10:2
**trace (1)**
8:20
**track (1)**
60:4
**tracking (1)**
15:15
**traditional (1)**

31:12
**tragedy (1)**
75:19
**translate (1)**
47:18
**Transmission (1)**
43:21
**transmission-line (1)**
26:3
**treated (1)**
73:22
**tree (5)**
49:16,19;50:2,6,7
**trees (4)**
49:10;58:1,19;
59:15
**tree-trim (1)**
49:15
**tried (1)**
57:12
**trim (2)**
43:23;46:19
**trouble (1)**
55:23
**true (6)**
41:14,21;59:8;
60:21;61:3,7
**Trustee (4)**
38:9;64:20;69:2;
71:12
**try (4)**
20:12;29:15;
32:22;39:7
**trying (4)**
29:9;45:1;47:6;
58:22
**TUESDAY (1)**
3:1
**turn (15)**
4:12;12:5;19:25;
23:22;25:2,23;
27:12;32:7,7;33:22;
43:8;52:11;56:17;
68:10;69:11
**turning (6)**
9:16;11:3;16:1;
18:22;19:7;29:14
**turns (2)**
66:9;70:15
**tutorial (1)**
3:20
**twelfth (1)**
68:15
**twelve (19)**
41:23;43:23;
44:11,18;45:2,17;
46:19;47:2,11,14;
49:4,7,20;53:12;
69:24;70:8,9,16,21
**twelve-foot (2)**
48:19;51:24
**twenty (5)**
9:13,14,14,15;

49:21
**twenty-five (4)**
12:3;13:6;26:5;
39:19
**two (19)**
13:1,25;14:18;
28:13;31:13,21;
32:11;36:5,5,10;
39:21;41:10;45:21;
47:24;48:11;58:8;
63:1,4;69:6,20
**two-and-a-half (1)**
22:7
**two-step (1)**
29:17
**type (1)**
50:2
**typo (1)**
17:7

**U**

**ultimate (1)**
47:24;48:24
**Um-hum (3)**
52:6,20;53:21
**uncertainty (2)**
4:8;73:23
**under (11)**
10:13;14:15;
36:19,20;41:12,14;
64:8;66:2,16;67:18;
69:18
**underground (1)**
15:23
**undergrounding (1)**
14:13
**understood (1)**
63:19
**UNIDENTIFIED (2)**
30:14;69:4
**UNISON (1)**
78:2
**unit (1)**
25:14
**unless (3)**
52:22;60:22;61:5
**unprecedented (1)**
76:25
**unsupported (1)**
55:14
**up (19)**
3:10,12;10:25;
13:25;20:1,11;
22:11;30:6;35:19;
40:11;41:22;45:20;
47:18;51:3;61:1,10;
63:15;64:2;72:16
**upcoming (1)**
8:10
**update (7)**
15:4,4,11;26:2,6;
44:21,21

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 92
of 94

**updated (2)**
14:5;44:20
**upon (3)**
9:12;49:20;50:11
**up-to-date (1)**
16:21
**urged (1)**
63:14
**use (13)**
3:19;4:4,15,16,18;
18:3;19:13,17;
35:14;38:15;42:19;
46:1;48:13
**used (4)**
13:17;14:16;19:1;
35:5
**using (3)**
6:1;11:4,20
**utilities (1)**
35:17
**utility (4)**
19:1,3,5;35:14

**V**

**valid (1)**
29:16
**value (4)**
24:18,23;32:12,13
**various (2)**
19:24;43:14
**vast (2)**
35:17;36:15
**veg (1)**
41:2
**vegetation (23)**
14:1,2;16:15;
39:22;40:2,12;41:6,
9;43:13,17,18;44:7;
46:15,16;49:9;51:9,
16;56:3,25;57:10;
69:14,15,18
**verified (1)**
31:23
**version (1)**
16:18
**versus (2)**
24:19;72:15
**vertical (5)**
41:10,16;69:20;
70:15,16
**vertically (1)**
44:14
**vice (1)**
7:7
**victims (2)**
73:21;76:11
**view (7)**
54:6,9;59:12;60:3;
72:15;74:20,24
**VILLACORTA (1)**
38:10
**violation (1)**
67:25
**vis (1)**
53:7
**vis-a- (1)**
53:6
**vis-a-vis (2)**
68:1,17
**VM (1)**
43:13
**voltage (1)**
15:22

**W**

**wait (1)**
4:22
**walk (3)**
7:11;13:10;32:24
**wants (2)**
46:1;67:21
**Watson (1)**
10:2
**way (11)**
17:12;40:22;
58:20;62:6;64:2,20;
71:1;74:23,23;
75:22;76:14
**ways (1)**
13:1
**website (10)**
45:9,12,13,22;
46:1,9,14;47:1;48:4;
49:7
**websites (1)**
53:5
**week (1)**
30:11
**weeks (1)**
48:11
**weight (3)**
12:9;20:9;24:13
**weighted (3)**
13:3,4,5
**weighting (1)**
13:1
**weights (4)**
12:21;22:10,11,13
**Weil (2)**
3:14;5:15
**welcome (1)**
5:3
**what's (14)**
23:24;34:23;36:7;
46:10,22;64:10;
68:2;70:20;72:4;
74:15,16;75:4;77:19,
22
**where's (1)**
56:9
**Whereupon (1)**
78:4
**whole (1)**
62:20
**Who's (4)**
3:10;33:14;37:9;
64:13
**whose (1)**
64:7
**wildfire (43)**
13:25;14:12,23;
15:2,3;26:23;27:7;
39:4,10,11,16,18;
40:8,19;41:6,13,21;
42:5,10,21;44:22;
48:7,8,19,19;49:3,9;
50:16;51:9,16;52:4;
56:3,17;59:20,20;
69:19;70:2;72:15,16,
25;74:20,22;75:12
**wildfires (1)**
39:8
**wildlife (1)**
71:19
**Willis (1)**
10:2,4
**winds (1)**
49:11
**wire (2)**
41:23;44:12
**wires (4)**
14:12,12,13;41:11
**wish (1)**
38:15
**withdraw (2)**
58:5;73:5
**within (7)**
9:1;12:18;21:21;
35:25;49:20;66:19;
69:18
**without (1)**
58:1
**witness (47)**
4:3,9,24;5:17;6:1,
8,11,17,21;9:15;
11:11;17:4,17,21;
18:5;30:16;33:17,
19;37:19,21;38:1,3,
5;42:1,6;46:21;47:7,
23;48:8,13;51:6;
58:21,21;63:3,9;
66:13,16,22,24;
67:19;68:4,12,20,25;
69:10;70:22;71:9
**wood (1)**
14:13
**words (7)**
3:19;4:5;18:3;
37:20;49:13;52:10;
58:22
**work (25)**
3:21;7:2;8:9,10;
15:13;23:4;26:3;
29:18,18,22;30:1;
43:2;46:16;51:9;
52:23;57:16,17,20;
59:20;61:10;64:7;
70:22;73:24;74:2;
75:14
**worked (5)**
9:19,25;10:3;
14:20;31:5
**workers (3)**
53:3;57:23,24
**working (10)**
9:21;15:18,19,21,
23,24;19:19;20:17;
26:10;75:14
**works (5)**
4:3;5:5;12:23;
46:18;77:15
**worrying (1)**
75:5
**Wow (1)**
38:17
**writing (1)**
74:23
**written (3)**
51:12;71:6;72:18
**wrong (4)**
16:11;72:15;
75:22;76:14

**Y**

**year (28)**
8:10;9:20,24;12:1;
16:7;19:12;23:4;
24:16;25:11;27:17;
29:2;34:2,3,5;35:1;
55:13;61:5;64:18,
25;65:10,11,25;66:8;
67:2,11,15;76:3,3
**year-end (2)**
55:13;60:11
**year-round (2)**
43:24;46:20
**years (22)**
7:16;8:16,21,23;
13:20;14:16;23:18;
28:3,4,8;29:2;31:17;
35:9;36:10;45:5;
59:25;60:1,21;61:4,
11;67:13;74:18

**Z**

**zero (14)**
21:10;32:5,6;
34:25;35:2,3;36:23,
23;37:17;64:7;
65:11,24;66:15;68:7

**0**

**0.9 (2)**
33:11,12
**025 (1)**
22:8

**1**

**1 (7)**
11:3,7,20;21:11;
26:25;28:15;69:15
**1.0 (5)**
22:9,10;28:17;
33:7,12
**1.2 (1)**
29:13
**1.25 (1)**
21:20
**1.3 (3)**
21:21;28:19;29:5
**1.4 (2)**
25:4,20
**1.5 (7)**
21:12,16;28:16,
19;29:8;33:18;35:20
**1.6 (4)**
28:9,17,21,22
**1:30 (2)**
3:1,8
**10 (1)**
27:12
**10,000 (14)**
10:13;33:5,5,7;
34:9;47:19;53:10;
54:2;68:17;73:20,
24;75:7,9;76:19
**10,000-dollar (1)**
35:2
**100 (2)**
25:8,22
**100,000 (1)**
19:6
**11 (1)**
76:10
**110 (1)**
37:5
**12 (1)**
32:7
**12.2 (1)**
27:4
**12.5 (2)**
33:4,4
**13 (1)**
32:22
**134 (2)**
56:24;57:2
**14 (1)**
36:6
**14,000 (2)**
75:8,24
**148 (3)**
57:6,8;69:13
**149 (5)**
56:17,20;57:4,13;
69:13
**15,000 (1)**
35:3
**150 (4)**

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 93
of 94

34:25;35:2;37:18,
19
**183 (7)**
43:9,10;44:2;
56:17,20;57:8;69:13
**1986 (1)**
8:19

**2**

**2 (10)**
12:5,6,18,24;
13:11;25:14;29:8;
42:16;46:14;71:18
**2,450 (1)**
49:14
**2,500 (2)**
33:8;41:5
**2.0 (4)**
28:6,14,16,18
**2.5 (1)**
22:13
**20 (1)**
65:10
**2010 (1)**
27:15
**2012 (1)**
7:10
**2016 (1)**
36:11
**2017 (7)**
31:21,25;36:11;
54:21;55:4,5,7
**2018 (16)**
9:19;24:19,24;
25:8,12;26:4,6,18;
27:21,22;28:9,23,24;
32:1,6;54:25
**2019 (35)**
3:1,16,21;9:16,18,
20;10:4,6,7,16;12:9;
14:17,19;20:18;
24:18,22;25:11,13;
26:4,23;27:22;28:11,
16,21;29:11;30:25;
34:2,23;40:6,16;
44:4;48:19;49:15;
67:11;71:24
**2019's (1)**
24:19
**22 (1)**
67:2
**22,454.8 (1)**
41:2
**23 (1)**
3:1
**245 (1)**
6:21
**28 (1)**
42:17

**3**

**3 (1)**
59:21
**3,750 (1)**
37:15
**3:14 (1)**
78:4
**35 (1)**
43:21

**4**

**4 (5)**
20:2,13,13,14;33:7
**4,000 (1)**
33:16
**4.4.1 (1)**
44:3
**4292 (1)**
43:20
**4293 (1)**
43:20

**5**

**5 (6)**
21:11,16;22:6,6;
23:22;41:4
**500 (1)**
66:19

**6**

**6 (2)**
25:2,2
**6.24 (1)**
56:25

**7**

**7 (1)**
44:6
**71 (1)**
43:8

**8**

**8 (3)**
21:21;25:23,23
**8,000 (1)**
36:15
**80,000 (4)**
32:23;33:2,5;
37:15
**80,000-dollar (1)**
33:15
**85 (2)**
43:9,9
**87 (1)**
44:2
**8th (2)**
16:20;50:21

**9**

**9 (1)**
26:13
**9:30 (1)**
78:1
**90 (1)**
37:4
**93.7 (1)**
25:20
**94105 (1)**
6:22
**95 (4)**
22:12;25:20,22;
43:20
**97.5 (1)**
22:14
**975 (1)**
22:14

Case: 19-30088    Doc# 1663    Filed: 04/24/19    Entered: 04/24/19 18:33:44    Page 94
of 94