1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    -oOo-

4  In Re:                        ) Case No. 19-30088
                                 ) Chapter 11
5  PG&E CORPORATION AND PACIFIC  )
   GAS AND ELECTRIC COMPANY      ) San Francisco, California
6                                ) Wednesday, April 24, 2019
                     Debtor.     ) 9:30 AM
7  _____ )

8                                APPLICATION PURSUANT TO 11
                                 U.S.C. SECTION 327(E) AND
                                 FED. R. BANKR. P. 2014(A) AND
9                                2016 FOR ORDER AUTHORIZING
                                 THE DEBTORS TO RETAIN JENNER
10                               & BLOCK LLP AS SPECIAL
                                 CORPORATE DEFENSE COUNSEL
11                               NUNC PRO TUNC TO THE PETITION
                                 DATE [DKT. 911]

12
                                 APPLICATION OF DEBTORS
13                               PURSUANT TO 11 U.S.C. SECTION
                                 327(A) AND FED. R. BANKR. P.
14                               2014(A) AND 2016 FOR
                                 AUTHORITY TO RETAIN AND
15                               EMPLOY CRAVATH, SWAINE, &
                                 MOORE LLP AS CORPORATE AND
16                               LITIGATION COUNSEL FOR THE
                                 DEBTORS EFFECTIVE AS OF THE
17                               PETITION DATE [DKT. 1024]

18                               APPLICATION OF THE OFFICIAL
                                 COMMITTEE OF UNSECURED
19                               CREDITORS FOR AUTHORITY TO
                                 RETAIN AND EMPLOY EPIQ
20                               CORPORATE RESTRUCTURING, LLC
                                 AS INFORMATION AGENT FOR THE
21                               COMMITTEE, NUNC PRO TUNC TO
                                 FEBRUARY 15, 2019 [DKT. 1214]

22
                                 APPLICATION OF THE OFFICIAL
23                               COMMITTEE OF UNSECURED
                                 CREDITORS PURSUANT TO 11
24                               U.S.C. SECTIONS 328(A) AND
                                 1103(A) AND FED. R. BANKR. P.
25                               2014 AND 2016 FOR AUTHORITY

1    TO RETAIN AND EMPLOY MILBANK
     LLP AS COUNSEL, EFFECTIVE AS
2    OF FEBRUARY 12, 2019 [DKT.
     1208]
3
     APPLICATION OF THE OFFICIAL
4    COMMITTEE OF UNSECURED
     CREDITORS FOR ENTRY OF AN
5    ORDER PURSUANT TO 11 U.S.C.
     SECTIONS 328(A) AND 1103 AND
6    FED. R. BANKR. P. 2014(A) FOR
     AUTHORIZATION TO RETAIN AND
7    EMPLOY FTI CONSULTING, INC AS
     FINANCIAL ADVISOR NUNC PRO
8    TUNC TO FEBRUARY 12, 2019
     [DKT. 1212]
9
     APPLICATION OF THE OFFICIAL
10   COMMITTEE OF UNSECURED
     CREDITORS FOR AUTHORITY TO
11   RETAIN AND EMPLOY CENTERVIEW
     PARTNERS LLC AS INVESTMENT
12   BANKER, EFFECTIVE AS OF
     FEBRUARY 15, 2019 [DKT. 1213]
13
     APPLICATION OF DEBTORS
14   PURSUANT TO 11 U.S.C. SECTION
     327(E) AND FED. R. BANKR. P.
15   2014(A) AND 2016 FOR
     AUTHORITY TO RETAIN AND
16   EMPLOY MUNGER, TOLLES & OLSON
     LLP AS ATTORNEYS FOR CERTAIN
17   MATTERS FOR THE DEBTORS
     EFFECTIVE AS OF THE PETITION
18   DATE [DKT. 1167]

19   APPLICATION OF THE OFFICIAL
     COMMITTEE OF TORT CLAIMANTS
20   PURSUANT TO 11 U.S.C. SECTION
     1103 AND FED. R. BANKR. P.
21   2014 AND 5002 TO RETAIN AND
     EMPLOY LINCOLN PARTNERS
22   ADVISORS LLC, AS A FINANCIAL
     ADVISOR EFFECTIVE AS OF MARCH
23   1, 2019 [DKT. 1134]

24   MOTION OF DEBTORS PURSUANT TO
     11 U.S.C. SECTION 365(A),
25   FED. R. BANKR. P. 6006, AND

1          B.L.R. 6006-1 FOR AN ORDER
           APPROVING THE UTILITY'S
2          ASSUMPTION OF CERTAIN
           AGREEMENTS WITH QUANTA ENERGY
3          SERVICES, LLC [DKT. 1218]

4          MOTION OF OFFICIAL COMMITTEE
           OF UNSECURED CREDITORS FOR
5          ENTRY OF AN ORDER (I)
           CLARIFYING CERTAIN BANKRUPTCY
6          CODE REQUIREMENTS AND (II)
           APPROVING PROTOCOL FOR
7          PROVIDING ACCESS TO
           INFORMATION TO UNSECURED
8          CREDITORS, NUNC PRO TUNC TO
           FEBRUARY 12, 2019 [DKT. 1215]

9

10                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DENNIS MONTALI
11                  UNITED STATES BANKRUPTCY JUDGE

       APPEARANCES:
12     For the Debtor:          STEPHEN KAROTKIN, ESQ.
                                Weil, Gotshal & Manges LLP
13                              767 Fifth Avenue
                                New York, NY 10153
14                              (212)310-8000

15     For Official Committee of    JORIAN L. ROSE, ESQ.
       Tort Claimants:              BakerHostetler LLP
16                                  45 Rockefeller Plaza
                                    New York, NY 10111
17                                  (212)589-4200

18     For Office of the United    MARTA E. VILLACORTA, ESQ.
       States Trustee:             U.S. Department of Justice
19                                 450 Golden Gate Avenue
                                   5th Floor
20                                 Suite 05-0153
                                   San Francisco, CA 94102
21                                 (415)705-3333

22     For Camp Fire Victims:      MICHAEL I. GOTTFRIED, ESQ.
                                   (Telephonically)
23                                 Landau Gottfried & Berger LLP
                                   1801 Century Park East
24                                 Suite 700
                                   Los Angeles, CA 90067
25                                 (310)557-0050

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 3 of
113

| | | |
|---|---|---|
| 1 | For Centerview Partners LLC: | SAMUEL A. NEWMAN, ESQ. Gibson, Dunn & Crutcher |
| 2 | | 333 South Grand Avenue Los Angeles, CA 90071 |
| 3 | | (213)229-7000 |
| 4 | For Official Creditors' Committee: | DENNIS F. DUNNE, ESQ. Milbank LLP |
| 5 | | 55 Hudson Yards New York, NY 10001 |
| 6 | | (212)530-5770 |
| 7 | For Official Creditors' Committee: | ANDREW M. LEBLANC, ESQ. Milbank LLP |
| 8 | | 1850 K Street, NW Suite 1100 |
| 9 | | Washington, DC 20006 (202)835-7500 |
| 10 | | |
| | For FTI Consulting: | RICHARD A. CHESLEY, ESQ. |
| 11 | | DLA Piper LLP (US) 444 West Lake Street |
| 12 | | Suite 900 Chicago, IL 60606 |
| 13 | | (312)368-3430 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | Court Recorder: | JANE GALVANI United States Bankruptcy |
| 18 | | Court 450 Golden Gate Avenue |
| 19 | | San Francisco, CA 94102 |
| 20 | Transcriber: | DENA FARBMAN eScribers, LLC |
| 21 | | 7227 N. 16th Street Suite #207 |
| 22 | | Phoenix, AZ 85020 (973)406-2250 |
| 23 | | |
| 24 | Proceedings recorded by electronic sound recording; transcript provided by transcription service. | |
| 25 | | |

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 4 of 113

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, APRIL 24, 2019, 9:32 AM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  Matter of PG&E Corporation.

5            THE COURT:  So on today's calendar, we've taken care

6    of most everything except for some various retentions of

7    professionals and related motion by the creditors' committee to

8    approve a -- or clarify procedures and adopting a protocol.  Is

9    there anyone in court or on the phone that expects to be heard

10   on any other matter?  There was the debtor's motion to assume

11   the contracts with Quanta; I believe it'd been resolved.

12   Anyone want to be heard on any of those?

13           Okay.  We'll just pass on all of them and leave just

14   what's left that I said.

15           I've already issued, as counsel will be aware of,

16   preliminary thoughts on a couple of things, and from my point

17   of view, I have no comments and no need to take any time for

18   the retention applications for Jenner & Block, Cravath, Swain &

19   Moore, Munger, Tolles & Olsen, and Milbank LLP.  So unless

20   anyone wants to be heard, I'll pass on all four of those and

21   look forward to getting orders.

22           And again, if there's no -- want to be heard?

23           MR. DUNNE:  Yes, Your Honor.

24           THE COURT:  Which one?

25           MR. DUNNE:  For the record, Your Honor, Dennis Dunne

1　from Milbank LLP.

2　　　　　THE COURT:  You're not really going to argue against

3　your motion to --

4　　　　　MR. DUNNE:  Not at all.  I just wanted to -- not at

5　all.  I just wanted to make one comment with respect to Your

6　Honor's informational comments with respect to all

7　professionals that hit the docket a couple of days ago --

8　　　　　THE COURT:  Right.

9　　　　　MR. DUNNE:  -- particularly with respect to

10　disinterestedness, and less so with respect to the rates.

11　　　　　We agree with Your Honor's comments.  We're going to

12　amend the order accordingly, so there's no issue there.

13　　　　　THE COURT:  Well, you understand the purpose?  I just

14　don't want to be locked into a finding that turns out has to be

15　revisited because something went wrong.  That's all.  I mean,

16　that --

17　　　　　MR. DUNNE:  Right, and we agree a hundred percent with

18　that.

19　　　　　THE COURT:  Okay.

20　　　　　MR. DUNNE:  And the only reason I'm raising it is to

21　say the opposite of that, which is let's assume the

22　representations we made to Your Honor, which we believe are

23　true, complete, and accurate today --

24　　　　　THE COURT:  And so do I.

25　　　　　MR. DUNNE:  -- and remain throughout the case to be

1    true, complete, and accurate, that -- and nobody has objected

2    to disinterestedness or are arguing that we represent an

3    adverse interest -- that that issue's closed unless what Your

4    Honor said happens, that somebody says it was either

5    incomplete, facts have changed, or there was some kind of

6    mistake or material misrepresentation.

7          What can't happen is somebody a year from now could

8    say nothing has changed, but we're coming in and collaterally

9    attacking and challenging what should have been raised today

10    which is, if this is true and complete, we've closed the

11    record.

12          THE COURT:  Well, what would happen -- I hate

13    hypotheticals because I use them all the time, but what would

14    happen if they're just an innocent error?  What if, unbeknownst

15    to you -- that you forgot that you had ten shares of stock of

16    PG&E corporation.

17          MR. DUNNE:  I agree with you; they could raise that,

18    Your Honor.

19          THE COURT:  You'd be not disinterestedness, and your

20    firm, right?

21          MR. DUNNE:  They could raise that.

22          THE COURT:  They could raise that, and it's not res

23    judicata; it's not anything.  It's just -- it is what it is,

24    and if you say it was an error and blah, blah, blah, we'll

25    worry about it, deal with it.  Right?

1        MR. DUNNE:  Right.

2        THE COURT:  Okay.

3        MR. DUNNE:  But all I'm saying is let's assume that

4  doesn't happen --

5        THE COURT:  Um-hum.

6        MR. DUNNE:  -- but they say on page 3 of what you

7  filed on the Tom Kreller affidavit lists a representation of

8  some party who's a creditor, we think that that renders you not

9  disinterested.  That needed to be raised today because

10  nothing --

11        THE COURT:  Well, yeah, I mean, I don't disagree with

12  that.

13        MR. DUNNE:  That's all I'm saying, Your Honor.

14        THE COURT:  I mean, that's just a matter of -- but

15  that being said, if I were a pro se who didn't understand it,

16  et cetera, let's not worry about it.

17        MR. DUNNE:  That's fine.

18        THE COURT:  I'm not worried about it, and I presume --

19        MR. DUNNE:  I'm not worried about that, Your Honor.

20  Just clarifying it.

21        THE COURT:  Okay.

22        MR. DUNNE:  And the same with the res; we'll take it

23  out --

24        THE COURT:  Again, I'm not -- I don't know you that

25  well, but a number of lawyers from your firm.  I don't change

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 8 of
113

1   the rules on people, and I'm not going to talk to you six

2   months from now and say, I thought your rate was a hundred

3   dollars an hour; what's the story. I mean, on the other hand,

4   I'm not going to have some magic thing that just automatically

5   rubber stamps it. We just take it in context.

6           MR. DUNNE: I agree.

7           THE COURT: Okay.

8           MR. DUNNE: I agree.

9           THE COURT: Good. So those four will be resolved.

10   And then if -- as long as you're -- Mr. Dunne, as long as

11   you're here, do you want to talk about the --

12           MR. KAROTKIN: I'm sorry, Your Honor. Could I just

13   interrupt?

14           THE COURT: Oh, yes, Mr. Karotkin.

15           MR. KAROTKIN: Just for the record, there was a letter

16   filed by Mr. McCann that was an overall objection I assume

17   you're overruling?

18           THE COURT: I wasn't going to act on that unless Mr.

19   McCann is on the phone or in court.

20           MR. KAROTKIN: Okay, well, I assume that would be

21   overruled and --

22           THE COURT: Well, let me -- is Mr. McCann on the

23   phone?

24           Well, yes, it will be either overruled formally or

25   just disregarded. I mean, Mr. Kalotkin -- Karotkin, sorry, as

Case: 19-30088  Doc# 1741  Filed: 04/29/19  Entered: 04/29/19 07:57:00  Page 9 of
113

1    I'm sure you know probably from your experience in other cases,

2    courts get all sorts of free advice. I get letters. I get --

3    did you see the letter that he sent? He told me he was viewing

4    the sharks in the gulf off Florida. And if he wants to come

5    and be heard, fine, but I'm just not going to act on it

6    otherwise, so.

7         And besides, I would have implicitly overruled it by

8    authorizing the employment of the four firms that he --

9         MR. KAROTKIN: Thank you, sir.

10        THE COURT: -- four of the firms that he complained

11   about.

12        Do you want to go to the clarification motion for

13   which the objection has been withdrawn but then another party

14   has joined it. Do you want to take that out of order?

15        MR. DUNNE: Sure.

16        THE COURT: I mean, there's no real order, but

17   obviously, the concerns that I've expressed about the other

18   professionals, I presume somebody wants to be heard on that

19   subject.

20        So are you going -- you're in charge of that one?

21        MR. DUNNE: Yes.

22        MR. LEBLANC: Yes, Your Honor. Andrew Leblanc of

23   Milbank on behalf of the committee.

24        Your Honor, there was one objection that was received

25   and that was withdrawn --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 10
of 113

1              THE COURT:  Yeah.

2              MR. LEBLANC:  -- by SLF.

3              THE COURT:  But then it was joined by Mr. Gottfried.

4              MR. LEBLANC:  Yes, Your Honor, by certain camp fire

5      victims joined in that objection.

6              THE COURT:  Right.

7              MR. LEBLANC:  It doesn't appear on the agenda, as far

8      as I can tell, the joinder doesn't, but I think the withdrawal

9      of that objection means the joinder -- there's nothing now for

10     them to join.

11             THE COURT:  Well, as a courtesy --

12             MR. LEBLANC:  But I'm also happy to address it.

13             THE COURT:  I see Mr. Gottfried's on the phone call

14     list.

15             Mr. Gottfried, are you on the call this morning?

16             MR. GOTTFRIED:  Yes, thank you, Your Honor.  This is

17     Michael Gottfried.

18             THE COURT:  Okay.

19             MR. GOTTFRIED:  Your Honor, to the extent that the --

20             THE COURT:  The joinder was late.

21             MR. GOTTFRIED:  To the extent that the opposition

22     was --

23             THE COURT:  The joinder was late, so what do you want

24     to do about it?  Are you withdrawing it?

25             MR. GOTTFRIED:  I was going to suggest, Your Honor,

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 11
of 113

1    that as the opposition has been withdrawn, we will withdraw our

2    joinder, as well.

3                THE COURT:  Okay.

4                So Mr. Leblanc, I have a question --

5                MR. LEBLANC:  Yes, Your Honor.

6                THE COURT:  -- really probably for you but as much for

7    the U.S. Trustee, and that is -- I mean, when the U.S. Trustee

8    used her or his discretion to appoint the second committee,

9    that was proper.  But I didn't envision that we'd have two of

10   everything -- two for everything, which is partly why I've

11   raised the question of why do we need Epiq, and we'll come back

12   to Epiq in a minute.

13               MR. LEBLANC:  Yes.

14               THE COURT:  And so for here, I don't know whether I

15   should act on it or ask the U.S. Trustee to take a position or

16   not.  But there's something unnecessarily duplicative about

17   having three different websites or four different databases for

18   the same information.  And so as much as I think it's a great

19   idea to make sure that the constituents of the two committees

20   are fully informed, I don't know that we want two of

21   everything.

22               So do you have a thought --

23               MR. LEBLANC:  Sure.

24               THE COURT:  -- from the committee's point of view how

25   to do that efficiently?

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 12
of 113

1       MR. LEBLANC:  We do.  I mean, we certainly -- I know

2   the tort committee's 1102 motion has not yet been filed --

3       THE COURT:  Right.

4       MR. LEBLANC:  -- their similar clarification motion.

5   We've done this in multiple cases, and we think it's

6   appropriate.  We're certainly happy to work with them both to

7   use Epiq, if they're amenable to that so that we don't have

8   another professional, and also to put the information that they

9   want -- we can have the same website.  I don't think there'll

10  be an issue there.

11      There are certainly differences between our

12  committees, and there may be points in time where we don't

13  share a commonality of interest.

14      THE COURT:  Well, of course; I understand that.

15      MR. LEBLANC:  But as it relates to this, I think we

16  can certainly work with them.  We weren't party to the

17  discussion between SLF and the tort committee that led to them

18  withdrawing that objection.  We put in our reply why we thought

19  it wasn't well founded, and a big part of that was because they

20  have their fiduciary in the form of the tort committee.  But

21  we're happy to address that with the tort committee to try to

22  see if we can reduce that duplication of effort.

23      I'll also address the Epiq motion when we get to that.

24      THE COURT:  We'll come back to them in a minute.

25      Do you have a position, Ms. Villacorta, from the U.S.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 13
of 113

1   Trustee's point of view?  I mean, is this something you want to
2   be involved in?
3          MS. VILLACORTA:  Well, Your Honor, I just want to note
4   for the record the opposition deadline has already expired, and
5   so unless counsel is okay with me making a comment, then --
6          THE COURT:  Well, I'm okay with it because I'm asking.
7          MS. VILLACORTA:  Okay, well --
8          MR. LEBLANC:  I'm also okay with it, just to be -- I'm
9   okay with it, as well, Your Honor.
10          THE COURT:  But it's not anti-Mr. Leblanc or his firm.
11          MS. VILLACORTA:  Okay, no, so --
12          THE COURT:  It has to do with case management and how
13   many times do we all know there are thousands of people
14   impacted by this case, and the more keeping them informed, the
15   better.  I just don't want to do it for two for the price of
16   one -- or one for the price of two.
17          MS. VILLACORTA:  And so if everyone's okay with it,
18   then the U.S. Trustee does share the same concerns.  And so I
19   think the burden is on the applicant to show why two or more --
20          THE COURT:  But are you in a position -- I know, I'm
21   not going to say off the record; what I meant is not in front
22   of me in court -- are you in a position to sit at a table with
23   the representatives of the two committees and see if there's a
24   common sense as to what is the right thing to do for the
25   benefit of so many people that are tracking this case?

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 14
of 113

1          MS. VILLACORTA:  Well, I think it's up to the

2     applicant to show why they need two or more.

3          THE COURT:  Well, you mean the tort committee?

4          MS. VILLACORTA:  Right, the tort committee.

5          THE COURT:  Well, that sounds like you're not amenable

6     to trying to see if there's a consensual way to make this

7     happen efficiently.  So -- that's okay.  I'm not going to order

8     you to do it.  I'm going to take Mr. Leblanc's proposal and

9     invite him and his committee -- perhaps a committee

10    representative, as well, and same with the tort committee, to

11    do something that makes sense --

12         MR. LEBLANC:  Yup.

13         THE COURT:  -- that works.  So.

14         MR. LEBLANC:  And Your Honor, we're --

15         THE COURT:  You want to be heard on that?

16         MR. ROSE:  Yeah.

17         MR. LEBLANC:  Oh.

18         MR. ROSE:  Sorry, Your Honor.  Jorian Rose from

19    BakerHostetler on behalf of the tort committee.

20         THE COURT:  Yes.

21         MR. ROSE:  We're happy to work with the unsecured

22    creditors' committee and see if we can arrange something that

23    is not duplicative and work with the U.S. Trustee's office, as

24    well, to see if we can get there.

25         THE COURT:  Okay.  I mean, look, just a couple of free

 1   observations. I mean, I understand the notion of a FAQ page;

 2   that's fine. And if someone who's a fire victim wants to know

 3   when am I going to get paid, which is a perfectly normal

 4   question, then maybe that's the kind of thing the tort

 5   committee representatives will try to deal with it on some sort

 6   of an informational basis, and maybe that's not something that

 7   the regular committee -- the OCC would want to be involved

 8   with.

 9         On the other hand, if there's a common interest,

10   whether it's on the motion we had yesterday or if there's a

11   similar motion or something that affects both groups equally,

12   you two gentlemen and all the bankruptcy people in the room and

13   I know what the priority schemes are and how tort victims and

14   consensual creditors may fare unless there's some resolution.

15   But there are differences, of course. And I'm not second-

16   guessing the U.S. Trustee's position to appoint the second

17   committee, obviously. I just want some order to avoid, at

18   least already, as I counted in the Epiq context, perhaps three

19   websites or databases for the docket, at least.

20         Okay, so I'm going to go ahead and grant the official

21   creditors' committee's motion today because it's unopposed. I

22   did note, however, the very same law firm representing the

23   committee here represented the committee in the case that --

24   Revco where the judge followed a different procedure and

25   perhaps a more elaborate one. And I'm not going to speculate

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 16
of 113

1     on it.  If this committee thinks that to do it this way is the

2     right way to do it, fine.  If someone else later believes that

3     should be revisited and done some different way, we'll deal

4     with it some other different way.  But you didn't follow the

5     Revco procedure.

6              MR. LEBLANC:  Well, we didn't, Your Honor.  We also

7     represented committees in Lehman Brothers, Takata, FES --

8              THE COURT:  I know.  I know.

9              MR. LEBLANC:  -- and a number of other cases, and

10    those procedures, Revco was the first case that happened after

11    BAPCA --

12             THE COURT:  I know that.

13             MR. LEBLANC:  -- enacted 1102(3) (sic), the provision

14    that we're dealing with here.  And so those evolved over time.

15    In Revco, we were writing on a blank slate.

16             THE COURT:  Well, you cited it.

17             MR. LEBLANC:  We did, and because it's --

18             THE COURT:  And I read it.

19             MR. LEBLANC:  -- it's one of the only interpretations

20    of what's required under 1102(c)(3).

21             THE COURT:  I know, but it's --

22             MR. LEBLANC:  But we've determined -- doing this in

23    many of these mega cases, we've determined that the monthly

24    reporting or the monthly almost sort of updates isn't useful to

25    creditors and isn't value added for creditors.  So we --

 1          THE COURT:  No, I understand, and that's why I'm --

 2          MR. LEBLANC:  Yeah.

 3          THE COURT:  -- I'm not second-guessing it.  On the

 4  other hand, when Revco was decided, we didn't have social media

 5  and internet and God knows how fast things move in this case.

 6          MR. LEBLANC:  Yeah.

 7          THE COURT:  Look, I'm going to leave that to you.

 8  Let's move on, and I'll look forward to the (indiscernible) and

 9  order that you want to do for that --

10          MR. LEBLANC:  Yeah.

11          THE COURT:  -- that motion because the objections are

12  all withdrawn.

13          MR. LEBLANC:  Yeah, and I'll rise again when we deal

14  with the Epiq.

15          THE COURT:  Well, go to Epiq now.

16          MR. LEBLANC:  You want to do it -- okay, sure.

17          THE COURT:  I mean, the other three are -- Epiq is

18  different.

19          MR. LEBLANC:  Yes.

20          THE COURT:  And as I say, my comments about Epiq were

21  not directed at Epiq --

22          MR. LEBLANC:  Understood.

23          THE COURT:  -- as a business.

24          MR. LEBLANC:  Yup.

25          THE COURT:  It's just Epiq as do we really need three

1  sets of dockets to track.

2          MR. LEBLANC:  Yes, Your Honor.  Let me address it.

3  The website that we would contemplate establishing here and

4  what we've done in other cases doesn't actually duplicate the

5  Prime Clerk website.  It references the Prime Clerk website.

6          THE COURT:  Well, are you going to link to the court

7  docket or the Prime -- the docket, at least?

8          MR. LEBLANC:  Yeah, we'll link to both the docket and

9  to the Prime Clerk website which then contains the debtor's own

10  information.  I will tell you, Your Honor, that from our

11  perspective, the primary purpose of the website is to provide

12  people a portal to interact with the committee --

13          THE COURT:  Well, that's what I assumed.

14          MR. LEBLANC:  -- and for the FAQs and for people to

15  ask questions and to identify who they can reach out to.  And

16  the reason -- we had -- when we did this in Revco, when we

17  started back then, we didn't hire a third party to man that

18  website and to run it, the consequence of which is we had much

19  higher paid professionals having to deal with that.  And what

20  we've concluded over time is that it's a far better use of

21  estate resources to have this done by Epiq who, you can see,

22  their rates are 25 dollars to 150 dollars an hours, that's the

23  range, whereas Milbank professionals are at significantly

24  higher rates than that.

25          THE COURT:  Not a lot higher.

1          MR. LEBLANC:  Depends on one's perspective, but --

2          THE COURT:  You get what you pay for, right?

3          MR. LEBLANC:  Exactly.  Well, I -- the Epiq

4   representative's here in the courtroom, I'll say, Your Honor.

5          But Your Honor, so that's the reason.  Because I do

6   think -- I'm trying to address the Court's concern about not

7   replicating another website.

8          THE COURT:  No, I appreciate the explanation.

9          MR. LEBLANC:  It's really designed to give people that

10  opportunity to interact.  And then it allows Epiq -- so if a

11  question comes in -- if it came into us about where can I find

12  a particular docket entry, Epiq can just answer that and point

13  them to where it is --

14         THE COURT:  Right.

15         MR. LEBLANC:  -- at rates that are significantly lower

16  and --

17         THE COURT:  No, of course.

18         MR. LEBLANC:  -- most cost-effective.

19         THE COURT:  Right, I mean --

20         MR. LEBLANC:  Your Honor had asked a question about

21  the competitive bidding process.

22         THE COURT:  Well, the statement was made, so --

23         MR. LEBLANC:  No, and I'm happy to address it if Your

24  Honor would take representation from me --

25         THE COURT:  Well --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 20
of 113

1    MR. LEBLANC:  -- in light of the absence of objection.

2    We did interview four different firms for the role.  I won't

3    mention them, but they're the people that Your Honor would

4    typically see as a claims agent.

5    THE COURT:  Um-hum.

6    MR. LEBLANC:  Each of them came in with a proposal.

7    We negotiated with -- based upon the presentations, the

8    committee determined to engage with Epiq and negotiated their

9    hourly rates down by twenty percent from what was originally

10   proposed to make them the most cost-competitive and negotiated

11   the monthly hosting fee for the website down by fifty percent.

12   And to be clear, just the order of magnitude we're talking

13   about, we negotiated from 200 dollars a month to 100 dollars a

14   month.

15   THE COURT:  Well, but as I stated in my paper, nobody

16   told me any budget.  So if you told me it was -- the whole

17   thing was going to cost 5,000 dollars, that's one thing.  If

18   you told me 500,000 that's another thing.

19   MR. LEBLANC:  Right.  And the best we can say with

20   respect to a budget, because I know Your Honor asked that

21   question, is the issue is that it really depends on the volume

22   of questions that come in to Epiq that they have to respond to

23   because they bill on an hourly basis.  That's why we negotiated

24   our rates down.

25   In our experience in cases like this, and again, that

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 21
of 113

1    includes Takata where there was a mass tort situation there,

2    our experience is that in those instances, it's approximately

3    15,000 a month, just based on hourly rates.  We don't

4    anticipate anything different here, with respect to that, but

5    it's hard to put a real budget on it because they're -- by

6    definition, they're reactive to what comes in:  if a question

7    comes in and they have to then go find information; if they get

8    a thousand questions, they have to find that information or

9    pass that information along to us.

10           THE COURT:  But what if one of those questions is like

11   when am I going to get paid?  Then how -

12           MR. LEBLANC:  Well, then they would pass that along to

13   either us or the tort committee --

14           THE COURT:  Right.

15           MR. LEBLANC:  -- to the appropriate legal professional

16   to deal with that question.  But the good thing is that most of

17   the questions, in our experience, that come in through website

18   are questions that are more like what date is -- what's the bar

19   date, or what do I need to do by the bar date, and then they

20   can provide that information.

21           THE COURT:  Wouldn't those go right on an FAQ right

22   off the bat?

23           MR. LEBLANC:  They would, but obviously, people don't

24   always --

25           THE COURT:  No, I understand.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 22
of 113

1    MR. LEBLANC:  -- go to the FAQs and --

2    THE COURT:  Listen, anyone over twenty maybe doesn't

3  know how to do this at all, but most teenagers know how to do

4  this on their phones, right?

5    MR. LEBLANC:  Right.

6    THE COURT:  So I'm just trying to figure out where the

7  efficiencies are.  So if you tell me that some of the basics

8  that we all know, whether it's a big case or little case,

9  claims bar date --

10    MR. LEBLANC:  Yup.

11    THE COURT:  -- hearing dates, et cetera, et cetera --

12    MR. LEBLANC:  Right, that would go on the face of the

13  website.

14    THE COURT:  Um-hum.

15    MR. LEBLANC:  But if people still have questions --

16  where can I find this or where can I find the docket -- they

17  would respond to those questions, using their professionals at

18  their rates, which we think --

19    THE COURT:  But this --

20    MR. LEBLANC:  -- is advantageous.

21    THE COURT:  -- this kind of circles back to the same

22  question from a fire victim as from a contract claimant.

23    MR. LEBLANC:  Yeah.

24    THE COURT:  Should be dealt with once --

25    MR. LEBLANC:  And --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 23
of 113

1        THE COURT:  -- not twice.

2        MR. LEBLANC:  And again, that's why, Your Honor, we

3   had a healthy meeting with the tort committee yesterday.  We've

4   met with them and talked with them repeatedly throughout the

5   case, and we're happy to do so.  We just didn't -- we filed our

6   motion.  They had not yet, and -- but we're happy to talk to

7   them to see where we can gain efficiencies there.

8        THE COURT:  Okay.

9        MR. LEBLANC:  And then Your Honor had -- if you want

10  me to address the other questions --

11       THE COURT:  Yeah, go ahead.

12       MR. LEBLANC:  Your Honor had asked a question about

13  why should the debtors pay for errors by the committee.  And

14  that's a reference to the engagement letter.  Just to be clear,

15  it's -- Epiq is fine if Your Honor would like us to take that

16  provision out.

17       What we're trying to say there is if the client, which

18  is the committee, asks Epiq to do something, they're expecting

19  to get paid for that, even if the committee was mistaken in

20  asking them to do it.  So if we ask them to send notice to a

21  broad list of people, and it should've only gone to a narrow

22  list of people but they've actually done the work, that's the

23  only intent of it.

24       And because I think it's otherwise clear, I think it

25  was Epiq had that in their form engagement letter.  We didn't

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 24
of 113

1  have an issue with it. They're okay taking it out because the

2  understanding is they're getting paid for the work that we

3  direct them to do.

4  THE COURT: But what I was reading when I was reading

5  here is if Epiq -- excuse me. If Epiq makes a mistake, the

6  debtor pays. Now, again, Mr. Karotkin knows how to object, and

7  I don't imagine it's going to be seven-figures error. It

8  might --

9  MR. LEBLANC: Right.

10  THE COURT: -- be a three-figure error. But the point

11  is it just shouldn't --

12  MR. LEBLANC: It --

13  THE COURT: -- just shouldn't be that kind of --

14  MR. LEBLANC: Right. Your Honor, I think the -- it's

15  an issue with the defined terms, but I thought -- when I looked

16  at it yesterday, I thought it was clear is that if the client

17  makes a mistake and asks Epiq to do something that, ultimately,

18  they didn't need to do, Epiq still gets paid. It's not asking

19  for Epiq to get paid for a mistake that they made.

20  THE COURT: I might have misread it. So that's fine.

21  That's a good --

22  MR. LEBLANC: Okay.

23  THE COURT: -- clarification.

24  MR. LEBLANC: And then lastly, Your Honor, venue

25  selection for dispute resolution, other than this Court, is not

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 25
of 113

1  acceptable.  Their venue selection is this Court, Section 11.3
2  of their engagement letter.

3        THE COURT:  I read an awful lot of forms and
4  duplicates, and trying to catch up with --

5        MR. LEBLANC:  Yeah.

6        THE COURT:  -- all the different recitals --

7        MR. LEBLANC:  Yeah.

8        THE COURT:  -- we got it, so we're here.

9        MR. LEBLANC:  And we don't think -- there's nothing in
10  the order that changes that.  It is submission to this Court's
11  jurisdiction for any disputes.

12        THE COURT:  Okay.

13        MR. LEBLANC:  And only if this Court declines to
14  exercise jurisdiction or the reference is withdrawal would --
15  withdrawn would it go to a different Court.

16        THE COURT:  So I want to go back to something else,
17  though, with, again, focus -- let's forget -- not forget, but
18  let's not think about the tort victims for a moment, and let's
19  pretend we have this case without a large population of tort
20  victims.

21        There might be questions, but there generally isn't a
22  need to be communicating with the collective mass until there's
23  something like a plan or disclosure statement, right?  So why
24  would there be any kind of other communications with the
25  universe of creditors out there?

1            MR. LEBLANC:  Well, I think, Your Honor, the reason

2    for the motion -- the reason for the 1102 motion and the reason

3    we've retained Epiq is because we -- that's how we interpret

4    the statutory requirements is that we do communicate to --

5            THE COURT:  I know, but give me an example of what you

6    would -- what you tell them about.  In other words, suppose

7    next month we have -- well, we have a calendar.  There's some

8    things on the calendar next month.  There's a motion to do

9    this, a motion to do that.  Suppose, after that, we get into

10   assumptions or rejections and so on.  Are you just going to

11   keep everybody informed of everything?

12           MR. LEBLANC:  No, we're not creating work product to

13   post to this website with respect to those sort of ordinary,

14   every course -- everyday motions.  That would be -- that would

15   be covered by a docket -- the docket entries that would be --

16           THE COURT:  Right.

17           MR. LEBLANC:  -- available through -- by clicking

18   through that website.  That's --

19           THE COURT:  And if there's a plan, then there'll be --

20           MR. LEBLANC:  And if there's a plan --

21           THE COURT:  -- a notice of statutory --

22           MR. LEBLANC:  Yes.

23           THE COURT:  -- rules for noticing motions and so on.

24           MR. LEBLANC:  And then if we, obviously, in connection

25   with the plan -- we oftentimes will submit a committee letter.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 27
of 113

1    That would, obviously, be posted there.  There may be other

2    committee communications over time that we want to be -- to

3    have available to people.  It's that sort of general

4    requirement.

5            And then, obviously, any time the committee's filing a

6    notion -- I'm sorry, a motion of its own and we have notice

7    requirements, then Epiq would be handling that notice

8    requirement, to the extent that that --

9            THE COURT:  But --

10           MR. LEBLANC:  -- goes beyond --

11           THE COURT:  But then again, give me an example of who

12   you'd be noticing, other than the service list, and the debtor,

13   and the other committees.

14           MR. LEBLANC:  If it's just the service list that's

15   done through PACER, then they wouldn't have a role there.

16           THE COURT:  I mean, if we made a motion to convert, I

17   guess that gets noticed.

18           MR. LEBLANC:  There --

19           THE COURT:  But not many thing -- look, I --

20           MR. LEBLANC:  Not many things.  You're right.

21           THE COURT:  Look.  I went back and looked at the

22   services to be provided, right, in the seventh -- line 7 of

23   page 5.

24           MR. LEBLANC:  Yeah.

25           THE COURT:  "Additionally, Epiq will prepare and serve

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 28
of 113

1    required notices and pleadings on behalf of the committee".

2    And I thought, which ones are they possibly talking about?  And

3    the answer is, unless the committee files a plan, which might

4    be a good idea -- I don't know -- there shouldn't be much

5    activity under that category.

6              MR. LEBLANC:  We agree, Your Honor.

7              THE COURT:  Okay.

8              MR. LEBLANC:  It's only where notice is required of a

9    motion that isn't -- and it's not sufficient to do it through

10   the service list and through PACER that they would ever have to

11   do anything.  And because they're only paid by the hour,

12   they -- we wouldn't be incurring fees for that.

13             THE COURT:  So without pinning you down or asking you

14   to sign a personal guarantee, your representation is that the

15   committee's thinking is this ought to be in the 15,000-dollar

16   range of cost to the estate?

17             MR. LEBLANC:  Yes, Your Honor, on a -- I would say

18   that on a steady state -- I don't know if it -- if there may be

19   a little bit of a bump to set up a website.  But --

20             THE COURT:  I'm not --

21             MR. LEBLANC:  Yeah.

22             THE COURT:  -- worried about that.

23             MR. LEBLANC:  But yes, Your Honor, this is not a --

24   this is not a significant -- in the context of any case,

25   really, and, certainly, in the context of this case --

1        THE COURT:  If we have a --

2        MR. LEBLANC:  -- we don't anticipate this is --

3        THE COURT:  If we have a hearing six months from now

4   on an interim application of a million dollars, I might ask you

5   to --

6        MR. LEBLANC:  I would come and --

7        THE COURT:  I won't call it a guarantee, but I might

8   ask you to explain yourself.

9        MR. LEBLANC:  And I would be here to do so, Your

10  Honor.

11       THE COURT:  All right.  Anyone want to be heard?

12  Anyone else want to be heard on the motion regarding Epiq?

13       Okay.  I'm satisfied with Mr. Leblanc's explanation.

14  It would've been a little helpful to fill in a little bit more

15  of the background so I didn't have to ask about what was this

16  competitive stuff.  I didn't need the details, but I've got --

17  I'll take your explanation.

18       I'll grant that motion and look forward to getting the

19  order.

20       MR. LEBLANC:  Thank you, Your Honor.

21       THE COURT:  So I'll ask the United States Trustee,

22  now, on the two motions of three that are left on the calendar,

23  one for Centerview and one for FTI.

24       Are you satisfied with the explanations for the -- in

25  response to your objections to those two?  And if not, then

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 30
of 113

1  we'll pick -- we'll go to whichever one or both, if you want to

2  be heard on them.  Just --

3          MS. VILLACORTA:  Sure.  We can --

4          THE COURT:  -- focus on those questions first.

5          MS. VILLACORTA:  Yes.  So yeah, the United States

6  would like an opportunity -- United States Trustee would like

7  an opportunity to respond to the statements that were filed by

8  the debtors, the --

9          THE COURT:  Well, for both --

10          MS. VILLACORTA:  -- committee --

11          THE COURT:  For both applications?  Oh --

12          MS. VILLACORTA:  Well, with respect to the Centerview,

13  I'm not sure if the Court is aware, but they filed a motion

14  under seal --

15          THE COURT:  Yeah.

16          MS. VILLACORTA:  -- with respect to --

17          THE COURT:  You all right?  Need a drink or some --

18          MS. VILLACORTA:  Yeah, no, no, no.  I'm a little sick,

19  so -- sorry.

20          THE COURT:  Well --

21          MS. VILLACORTA:  With respect to certain

22  confidential --

23          THE COURT:  No, they did.

24          MS. VILLACORTA:  -- information --

25          THE COURT:  And I presume you saw that.  I saw it.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 31
of 113

1          MS. VILLACORTA:  Yeah, I saw that.  And so I think at

2    this time, it's kind of premature for the Court to rule on the

3    application and the motion to seal, because we need those

4    disclosures.  Those disclosures were requested by our office.

5    And as of right now, Centerview hasn't turned over the

6    information that we've requested.

7          THE COURT:  Well, I'm confused.  The motion to seal

8    was filed with redactions.  And once it's -- and then I've

9    approved the sealing, I think.  I --

10          MS. VILLACORTA:  I haven't seen an order approving the

11   sealing.

12          THE COURT:  Did we do that order?  Oh.  Well, that

13   must be a mistake, because the way our procedures work when

14   there is a motion to file under seal --

15          MS. VILLACORTA:  Um-hum.

16          THE COURT:  -- I -- in chambers, our -- my chambers,

17   not no one else, gets notice that it has been sealed.  And then

18   we can't even look at it until some -- IT magic.  And then that

19   happened, and I was able to look at it.  And so I did see the

20   contents.

21          And I thought -- and perhaps I just was not keeping

22   track of all the various orders coming through the system --

23   that I had signed that order.  If I haven't signed it yet, of

24   course, you haven't had a chance to see it.  So --

25          MS. VILLACORTA:  Right.  One, I haven't -- the order

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 32
of 113

1  hasn't been entered, so we haven't had a chance to see it.

2  THE COURT:  So your point is --

3  MS. VILLACORTA:  And we haven't received --

4  THE COURT:  -- we should --

5  MS. VILLACORTA:  -- any of this.

6  THE COURT:  -- we should put on hold for that

7  objection?

8  MS. VILLACORTA:  Yeah, I think we should --

9  THE COURT:  Okay.  You --

10  MS. VILLACORTA:  -- adjourn this.

11  THE COURT:  You are?

12  MR. NEWMAN:  Hi.  My name is Sam Newman.  I'm with the

13  law firm of Gibson, Dunn & Crutcher, and I represent Centerview

14  in connection, solely, with its --

15  THE COURT:  Mr. Newman, yes, sir.

16  MR. NEWMAN:  -- application.  So, Your Honor, I think

17  you're off the -- your chambers has not loaded up an order at

18  this point --

19  THE COURT:  Okay.

20  MR. NEWMAN:  -- affecting the sealing.

21  THE COURT:  Well, we don't.  You do.

22  MR. NEWMAN:  Well, we --

23  THE COURT:  It's your job.

24  MR. NEWMAN:  -- provided a -- we provided an order,

25  but we --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 33
of 113

1          THE COURT:  You have to upload the order.

2          MR. NEWMAN:  Okay.  So you --

3          THE COURT:  If you don't --

4          MR. NEWMAN:  You have approved --

5          THE COURT:  If you don't upload an order, you don't

6    get the order.  I mean, in an emergency case, I'll -- we do our

7    own orders.  But typically, you're supposed to upload it.

8          MR. NEWMAN:  Okay.  And I thought we had done that, so

9    if that's not been done, we will do that.

10          THE COURT:  Well, sometimes, and particularly in this

11    case, a lot of people are submitting proposed orders attached

12    to motions and so on.  But that's not the same as uploading it

13    into the system.

14          But I've reviewed the request to seal, and that seemed

15    proper to me.  And I anticipated that the order would be

16    entered, and that would allow the U.S. Trustee, and I believe

17    the two committees are allowed to see what's sealed.  Isn't

18    that your understanding?

19          MR. NEWMAN:  That is correct, Your Honor.

20          THE COURT:  Yeah, and I and my staff.  We're the only

21    ones that look at it.

22          MR. NEWMAN:  Well, I'll confirm and make sure that

23    that has been uploaded and distribute that information to the

24    U.S. Trustee.

25          THE COURT:  Okay.  But she has asked that I defer

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 34
of 113

1  until that's happened, and I can't fault the U.S. Trustee if

2  she wants to see the information and hasn't seen it yet, so --

3        MR. NEWMAN:  No, we --

4    (Alarm sounds)

5        THE COURT:  Oh, this is a 10 o'clock thing, happens

6  automatically, right?  I hope.  Well --

7        UNIDENTIFIED SPEAKER:  It is 10, yeah.

8        THE COURT:  It's 10 o'clock.  Isn't that one right?

9        THE CLERK:  But it's usually on Thursday.

10        THE COURT:  We'll stipulate that it's Tuesday.  Well,

11  I'm not going to panic if no one else in the courtroom is going

12  to panic.  Okay.

13        MR. NEWMAN:  So I --

14        THE COURT:  So Mr. Newman --

15        MR. NEWMAN:  I take it Your Honor is inclined to grant

16  the motion to seal.  We'll upload an order and make sure that

17  that gets processed.  We'll distribute the information that the

18  United States Trustee has requested, under seal, and then

19  continue the application.  We were hoping, perhaps, to move it

20  to May 9th, which was --

21        THE COURT:  Well, again, I -- for other reasons for

22  one of the other applications, for Lincoln Partner, I said I

23  was going to move that one over.  I was not -- I mean, I was

24  going to act on Centerview if necessary, but if it can wait, it

25  can wait.  Well, I still raise my own question that I want to

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 35
of 113

1 | talk and hear what everyone's saying about this indemnity
2 | question.
3 | But we'll continue Centerview until the next hearing
4 | date, until the U.S. Trustee's had an opportunity to review.
5 | But I would say if the U.S. Trustee is satisfied with the
6 | disclosures and is prepared to withdraw the objection, that
7 | would be appropriate also.
8 | MS. VILLACORTA: Right. We have an open dialogue --
9 | THE COURT: Yeah, and maybe --
10 | MS. VILLACORTA: -- with them also, so --
11 | THE COURT: -- maybe or not. I'm not trying to insist
12 | that you withdraw your objection, but maybe -- I mean, I got
13 | the information, and I was satisfied on my own that it seemed
14 | like Centerview has done what is expected of them. But you,
15 | obviously, are entitled to get it.
16 | MS. VILLACORTA: Right. And we haven't received the
17 | information, so --
18 | THE COURT: Okay.
19 | MR. NEWMAN: And then, Your Honor, that's -- we
20 | understand. We want to give them that information. We just
21 | wanted comfort that the sealing order was --
22 | THE COURT: No, of course. I --
23 | MR. NEWMAN: -- entered. And we'll make sure it
24 | gets --
25 | THE COURT: I wouldn't want it otherwise. Listen, one

1    of my fears in this case, because we have so many lawyers

2    unfamiliar with our procedure, is they -- any one of them will

3    make the mistake of docketing on the docket the very sealed

4    document that they want sealed.  And that happened in the prior

5    PG&E case.

6             MR. NEWMAN:  I went and clicked on that thing three

7    times after we --

8             THE COURT:  Yeah.

9             MR. NEWMAN:  -- sealed it, just to make --

10            THE COURT:  Yeah.

11            MR. NEWMAN:  -- sure.  But I take your fear --

12            THE COURT:  Because once the cat's out of the bag,

13   folks, it might be on your Facebook page the next day.  So

14   you've got to be very careful.  And we have these procedures in

15   place, ideally, so that won't happen.  But okay.  We'll come

16   back to the Centerview issue in a moment.  And --

17            MR. NEWMAN:  Yeah, I'll step away, but I'd like to

18   address -- get Your Honor's thoughts on the other --

19            THE COURT:  Ms. Villacorta, what about the U.S.

20   Trustee's objection to FTI and its disclosures?  Are you --

21            MS. VILLACORTA:  We're still moving forward with

22   the --

23            THE COURT:  Okay.  Well, then --

24            MS. VILLACORTA:  -- objection.

25            THE COURT:  -- why don't you go ahead and make the

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 37
of 113

1    argument, because I --

2         MS. VILLACORTA:  Okay.

3         THE COURT:  -- did review the -- your position on

4    that, and I read the moving papers.  And then I'll hear what

5    the other side has to say.

6         MS. VILLACORTA:  Okay.  Thank you, Your Honor.  So,

7    Your Honor, first, FTI is not disinterested.  There's no way

8    around this.  Prior to the petition date, Compass, an affiliate

9    of FTI, was retained by the debtors to provide, among other

10   things, consulting services in connection with the evaluation

11   of potential damages relating to the 2017 and 2018 Northern

12   California wildfires.

13        Debtors continue to use the services of FTI's

14   affiliate and intend to do so during the Chapter 11 cases.

15        THE COURT:  But didn't FTI acknowledge that it'll

16   waive any pre-petition claims?

17        MS. VILLACORTA:  I didn't see --

18        THE COURT:  Unless I've got my professionals mixed up,

19   I thought FTI specifically, in its papers, said that if it's

20   owed any money pre-petition, it will waive and --

21        MS. VILLACORTA:  No, but the issue with respect to

22   disinterestedness is that FTI's affiliate is currently advising

23   the debtors --

24        THE COURT:  I know that.

25        MS. VILLACORTA:  -- with respect to the --

1          THE COURT:  But why does that --

2          MS. VILLACORTA:  -- wildfire claims, and then now --

3          THE COURT:  But why does that make FTI disinterest --

4   not disinterested?

5          MS. VILLACORTA:  Well, because by the same token, now

6   FTI wants to also represent the committee and also -- I mean,

7   in paragraph 4-H of the Star (phonetic) declaration, I mean,

8   it's very -- it's there.  It says that the committee -- that

9   the FTI will provide, among other services, assistance in the

10  review of the claim reconciliation and estimation process,

11  including potential exposure from wildfire -- the damage

12  claims.

13         THE COURT:  No, I understand the point.  In other

14  words, let's break it down into its simple components.

15         FTI, as an entity, wants to be employed by the

16  committee, or the committee wants to employ it as its financial

17  advisor.  FTI, through another entity --

18         MS. VILLACORTA:  An affiliate of the FTI.

19         THE COURT:  Well, I was going to say another entity is

20  engaged by the debtor.  You believe that, as an affiliate, that

21  implicates the disinterested rule.

22         MS. VILLACORTA:  Yes, I do.  And it's because the -- I

23  mean, they're both representing -- I mean, the committee's

24  being represented with respect to the wildfire claims, and the

25  debtors are being represented with respect to the same issue.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 39
of 113

1    FTI can't be representing both --

2              THE COURT:  Well --

3              MS. VILLACORTA:  -- the debtors and --

4              THE COURT:  Okay.  But --

5              MS. VILLACORTA:  -- the committee simultaneously.

6              THE COURT:  Again, I'm going to pin you down so we got

7    it right, because if you're right, then FTI's entitled to at

8    least understand -- if I'm going to accept your ruling and

9    disqualify them, they -- FTI is entitled to know what the rules

10   are.  So I don't want to conflate conflicting positions with

11   the rather technical rules of being disinterested or not.

12             Now, we know that, for -- and I gave Mr. Leblanc, a

13   moment ago, or someone -- example.  If you owned one share of

14   stock of PG&E, you couldn't be disinterested, as a matter --

15   it's just the statute if you're a shareholder.  What is it --

16   and that's different from representing an adverse interest or

17   being in a potential conflict.

18             So what I'm asking you to tell me is if we start with

19   the lineup that FTI, as a corporate entity, is proposed advisor

20   to the committee, and another corporate entity within the FTI

21   family, if you will, is engaged by the debtor, what is it that

22   you think is the disqualifier?  Is it because it's an affiliate

23   or because of something else?

24             MS. VILLACORTA:  Because it's an affiliate.  And in

25   fact, this was the same situation that -- this is not new to

1  FTI.  In fact, in one of the cases that they cite in their

2  reply, paragraph 9 -- let me -- Midway Games, it's the same

3  exact scenario that was presented.

4       It's true FTI's retention application was ultimately

5  approved.  But what FTI fails to disclose is that the order

6  authorizing the committee to retain and employ FTI specifically

7  stated that the debtors' employment of the subsidiary shall

8  terminate.

9       THE COURT:  Well, but that's not the case here.

10      MS. VILLACORTA:  It's the same case, Your Honor.  It's

11 the same facts.  I mean, we --

12      THE COURT:  No, no.  There's nothing that's being

13 terminated.  We have --

14      MS. VILLACORTA:  Oh, no, no, no.  Yeah, exactly.  No,

15 they're not being terminated --

16      THE COURT:  So if I --

17      MS. VILLACORTA:  -- right now.  But that --

18      THE COURT:  So if --

19      MS. VILLACORTA:  -- would be the solution would be to

20 have -- if FTI really wants to represent the committee, that it

21 needs to withdraw its representation from the debtors.

22      THE COURT:  Okay.  So let's --

23      MS. VILLACORTA:  It can't be on both sides.

24      THE COURT:  But my question is is it because there are

25 competing sides, or because of the --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 41
of 113

1          MS. VILLACORTA:  There are competing --

2          THE COURT:  -- definition of --

3          MS. VILLACORTA:  -- sides.

4          THE COURT:  -- affiliate?  But again, I'm trying to

5    see is it because of the definition of affiliate or because of

6    the -- well, the perform -- the duties they're performing?

7          MS. VILLACORTA:  Well, I think it's both.  I think

8    it's the fact that it's an affiliate.  There are competing

9    interests.  And I'll give you an example.  When it comes time

10   to value the claims, the committee may -- they may not be of

11   the -- I'm sorry.  The committee may want to value the claims a

12   certain way, and the debtors may want to value the other -- the

13   fire wild (sic) claims in a different way.  And so I don't

14   think that FTI should be permitted to both --

15         THE COURT:  Again, I'm sorry to keep coming back to

16   it, and I'm going to make sure I understand the issue.  If

17   you're not -- even if you're not an affiliate, if you are

18   competing or you have competing positions on something, that

19   might create an adverse interest.

20         But even if you don't have an adverse interest, even

21   if PG&E hired an affiliate of FTI to do something unrelated to

22   the fire damages, and at the same time hired FTI to do

23   financial services, that might disqualify them if they are --

24   if that destroys the disinterestedness because of the

25   definition of affiliate.

1          So that, to me, is the way we have to get there.
2     So --
3          MS. VILLACORTA:  Um-hum.
4          THE COURT:  -- your view, if I've got it right, and
5     I'm looking at the definition of affiliate, that -- and I've
6     forgotten the actual name, but you know the name of the entity.
7     Your position is that FTI, who is the proposed professional
8     here, has an affiliate who is working for the debtor and
9     therefore cannot be disinterested?
10         MS. VILLACORTA:  That's correct, Your Honor.
11         THE COURT:  Okay.  So are we going to hear from the
12    committee on this, or from --
13         UNIDENTIFIED SPEAKER:  Yeah.
14         THE COURT:  -- representative from FTI?
15         UNIDENTIFIED SPEAKER:  I think both.
16         THE COURT:  Okay.  Mr. Dunne?
17         MR. DUNNE:  Good morning, Your Honor.  Dennis Dunne
18    from Milbank, on behalf of the committee.  Just let me note at
19    the outset that FTI is separately represented by Rick
20    Chesley --
21         THE COURT:  Right.
22         MR. DUNNE:  -- of the DLA firm.  He's present in court
23    this morning, and --
24         THE COURT:  Yeah, and I read his reply brief.
25         MR. DUNNE:  -- and will speak out after I do.

1          So let me just address the U.S. Trustee's objection.

2  And I think it comes down to the fact that we have -- we can't

3  lose sight of the fact -- and I think Your Honor hit precisely

4  on it -- Compass is not FTI.  Compass is a separate legal

5  entity.  Yes, FTI owns Compass.  It's a wholly owned

6  subsidiary.  But Compass is a separate legal entity, separate

7  personnel, separate physical space.

8          THE COURT:  But is it an --

9          MR. DUNNE:  None of that --

10          THE COURT:  But is it an affiliate for -- as the

11  statute defines it?  And the statute is clear.  It defines

12  affiliate, just like --

13          MR. DUNNE:  I'm --

14          THE COURT:  -- a shareholder is a shareholder with one

15  share.  So what is it about -- what is it about 101(2) that

16  tells you that Compass is not an affiliate?

17          MR. DUNNE:  Well, Compass, clearly, is related to

18  FTI --

19          THE COURT:  Right.

20          MR. DUNNE:  -- and they own -- and FTI owns the equity

21  interest in whatever form it is --

22          THE COURT:  Right.

23          MR. DUNNE:  -- of it.

24          THE COURT:  Right.

25          MR. DUNNE:  And I'm not saying that they're not

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 44
of 113

1    related or affiliated entities.

2            THE COURT:  So but as a statutory term, Compass is an

3    affiliate of FTI?

4            MR. DUNNE:  Yes.  They're a parent subsidiary, yes.

5            THE COURT:  Okay.  So does that take FTI out of the

6    disinterested role definition, the definition in the -- from

7    the statute?

8            MR. DUNNE:  We believe it does not, Your Honor, for

9    the reasons that I was saying.

10           THE COURT:  Well, then, tell me again, because it's

11   one of those things where I've got to figure out what the right

12   answer is.  And disinterested tell -- we know specifically what

13   disinterested means, don't we, in the statute?  Right?  It's at

14   101(14).  It means not a creditor or equity security holder.

15   Okay.  So that's easy.  So FTI is not a stockholder of PG&E --

16           MR. DUNNE:  Correct.

17           THE COURT:  -- where it would be disqualified.

18           MR. DUNNE:  That's an easier one, yes.

19           THE COURT:  Right.  And hasn't been, within two years,

20   a director or employee.  Does not have an interest material

21   adverse to the interest of the estate in any -- or any class of

22   creditors or equity security holders by reason of indirect --

23   excuse me, direct or indirect relationship.  Are you saying

24   that it doesn't fit that definition?

25           MR. DUNNE:  I'm just pulling it up, Your Honor, here.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 45
of 113

1      THE COURT:  It's 101(14)(C).  And by the way, this is

2  one of those anomalies, I think, if I read the statute

3  correctly.  1103, which is the section that tells us about who

4  can be employed by committees, doesn't reference disinterested.

5  But the statute, the 330, I believe it is, where you get paid,

6  says you have to be disinterested.

7      So you'll notice that 101(3), I don't think, if I read

8  it correctly, does not use the word disinterested.  So --

9      MR. DUNNE:  Correct.

10      THE COURT:  So it says that 1103 -- excuse me, 1103(a)

11  says the committee may employ accountants, attorneys, other

12  agents.  So that's who -- FTI is the designated employee that

13  the committee has represented.  And then the statute -- but

14  then we go back to 330, and that says who can get paid.  I

15  presume FTI would like to get paid for its services.  So --

16      MR. DUNNE:  You're right, Your Honor.  I was about to

17  make the distinction that you did, but I'm assuming that the

18  FTI's counsel would like to know now whether --

19      THE COURT:  Of course.

20      MR. DUNNE:  -- that is the case when we get to interim

21  fee application time.

22      THE COURT:  Yeah.  Now, and I may have read the wrong

23  section.  I've been through this a couple times before, just to

24  make sure we're clear on it.  And maybe I've got the wrong

25  section, but let me just double-check that.

1        So 330 talks about compensation.  And that talks about

2   who can be compensated, and that includes a professional

3   employed under 1103.  So then you go to limitations.  And I

4   believe that -- yeah, I think it's 328(c) that says that

5   someone who's not disinterested can't get paid.

6        So I mean, I think that if I'm correct or the U.S.

7   Trustee is correct, because I didn't raise this on my own, but

8   now that I think about it, if FTI is not disinterested, it can

9   be employed but it can't get paid, if you read the statute

10  correctly.

11       MR. DUNNE:  Because of the differences for committee

12  retention of professionals, then the debtor, under 1103 -- and

13  you're right -- you're right, Your Honor, is that you could

14  authorize the retention, and they could find out later on that

15  you decide under 327(c) or otherwise that they're not

16  disinterested and can't get paid, which is why this is an issue

17  for today, unless they tell me otherwise.

18       THE COURT:  No, the question's an issue for --

19       MR. DUNNE:  Yeah.

20       THE COURT:  -- today.  And the last thing in the world

21  I want any professional of any size to get a "gotcha", to be

22  trapped.  You got a right to get out if you're going to get

23  disqualified.

24       But I think it -- and it's one of those anomalies

25  where you've got to read two different statutes, because for

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 47
of 113

1  representation of trustees, or debtors in possession, or -- in

2  Chapter 7 or Chapter 11, you go to 327 for employment and 330

3  and 328 for compensation. And so if we had a simple case and

4  the trustee said, I want to hire so-and-so to be my lawyer, and

5  it turned out so-and-so was a shareholder of the debtor, that

6  would be an automatic disqualifier, and you couldn't do

7  anything about it.

8  But because this is a committee and we have to go to

9  1103 to find out who can be hired, FTI is eligible to be hired

10 but maybe not eligible to be paid, unless there's a

11 misunderstanding of the way the statute works. And maybe we

12 need to let FTI's lawyer speak to the issue. I don't know. I

13 mean, this gets -- this goes back to my point about does the

14 relationship of FTI, on the one hand, and its corporate

15 subsidiary Compass, does that itself create the affiliate

16 relationship that creates the disinterested relationship?

17 If the answer is yes, and FTI is not disinterested,

18 it's out of luck in terms of getting paid. Nothing I can do

19 about it.

20 MR. DUNNE: Your Honor, let me take -- let me explain

21 why we think that they are disinterested, which is we don't

22 think that in 101(14)(C) that they've actually crossed the line

23 in terms of a material adverse interest.

24 And let me just spend one minute on the scope of

25 services of FTI and then what Compass is doing. Obviously,

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 48
of 113

1  FTI --

2       THE COURT:  No, I am.  I've got it.  I mean, well, you

3  can go ahead and say --

4       MR. DUNNE:  Right.

5       THE COURT:  -- if you want.

6       MR. DUNNE:  Yeah, I mean, FTI is a broader panoply of

7  services, and you've seen their work --

8       THE COURT:  No, I know.

9       MR. DUNNE:  -- in the stip and other things.

10       THE COURT:  Yeah, I've seen FTI in other cases.  I

11  mean, FTI has been a player in this court a lot.  I know.

12       MR. DUNNE:  Right.

13       THE COURT:  I know it.

14       MR. DUNNE:  And so the one -- and what Compass does,

15  primarily, as I understand it, will be, potentially, some work

16  for the debtors, relating to estimation of claims associated

17  with the wildfires.

18       THE COURT:  Well, but it does -- it's hard to know, to

19  assume that FTI would not somehow get involved in that.  But

20  let's assume.  I mean, we know what Compass's role --

21       MR. DUNNE:  I'm saying we're not adverse on that.  I'm

22  saying we're aligned with the debtors on that.  We're not the

23  tort committee on that.

24       THE COURT:  Okay.  Fair enough.  Well, again, that's a

25  little squishy, but that -- we know what Compass is engaged to

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 49
of 113

1  do. And as I say, I don't think there's any flexibility about

2  adverse interest if the disinterested itself is a separate

3  disqualifier. But maybe I'm incorrect on that.

4          Oh, go ahead.

5          MR. DUNNE: Yeah, no, I -- the point that was saying

6  is that it -- they may be working together on aspects of the

7  estimation of various claims. They may arrive at two different

8  scenarios. But they're not the claims of the parties that we

9  represent. There may be that you will get testimony from

10  Compass on some day with respect to what they think the

11  aggregate wildfire claims are. And you may get testimony,

12  potentially, from FTI.

13          But they're not the people we're representing, in

14  terms of the adversity. We're not representing those claims in

15  terms of driving value to them as if we're across the V in a

16  complaint. We will be with the debtors, trying to figure out,

17  based on the data, where this should land in terms of those

18  claims. And hopefully, there's no disagreement. But if --

19          THE COURT: But what if the tort committee takes a

20  contrary view? How do you know what side you're going to end

21  up on? Your committee doesn't -- I mean, how can we know today

22  what side you might be on? I mean, FTI might give your

23  committee advice as to what it thinks is the proper analysis.

24  But you're telling me that it's possible that that advice might

25  be consistent with what Compass is giving the company advice

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 50
of 113

1  on, but it might be inconsistent.

2          MR. DUNNE:  Sure.

3          THE COURT:  How do we know?

4          MR. DUNNE:  No, I agree.  All I'm saying, Your Honor,

5  is that, to the point you said, we actually don't represent or

6  have fiduciary duties to the tort claimants, because they have

7  their own --

8          THE COURT:  I know.

9          MR. DUNNE:  -- fiduciary.

10          THE COURT:  I got it.

11          MR. DUNNE:  What we're trying to do is just call balls

12  and strikes, based on the data.  It may be that we land one

13  place or the other.  But it's not the linked kind of economic

14  interest that we're talking about in terms of adversity.

15          THE COURT:  But what if there's a bunch of contract

16  rejections, and the debtor is facing a bunch of claims from

17  rejected counterparties?  Who's going to advise and take a

18  position --

19          MR. DUNNE:  My understanding is I think the -- well,

20  I --

21          THE COURT:  Well --

22          MR. DUNNE:  -- I believe Compass isn't -- doesn't do

23  that work.

24          THE COURT:  No, no, no.  I'm asking from the committee

25  point of view.  So I'm not -- I didn't ask about --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 51
of 113

1          MR. DUNNE:  Okay.

2          THE COURT:  -- Compass's work because if the debtor

3    decides to reject -- and we all know it's not going to -- there

4    could be significant rejection damages.  We know that from the

5    FERC litigation.  Hasn't happened and maybe it won't happen.

6    But suppose there are significant breach claims.  It would seem

7    to me that FTI and your committee would want to know what the

8    right number of that is.

9          And so which side are you on?  Are you on the side of

10   the population of claimants or on the side of the debtor?  I

11   don't know, and I don't need you to answer.  It's just a

12   potential for tension, isn't it?  In other words, you can't

13   make the problem go away by saying the tort claimants have

14   their own counsel.  The counterparty rejectees are not tort

15   claimants.

16         MR. DUNNE:  I agree.  What I was saying is that the

17   genesis of what we're debating is the relationship on the

18   debtors' side relates, I believe, solely to the wildfire

19   claimant.

20         THE COURT:  Right.

21         MR. DUNNE:  And your hypothetical about let's assume

22   there's PPAs that get rejected, potentially, Your Honor, let's

23   hope not.  But if they do, yes, FTI would be analyzing what we

24   think the appropriate size of those rejection contract --

25         THE COURT:  But my point is that FTI's position and

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 52
of 113

1    the committee's position may be adverse to the debtor and its

2    advisor's position in that area.

3            MR. DUNNE:  Not with respect to the advisor who is

4    creating the potential adversity.  It depends how broad you

5    want to get on the adversity.  I'm saying Compass will never be

6    involved in that analysis, is my understanding.

7            THE COURT:  Okay.  But again, I -- let's hear from

8    Compass -- I mean, FTI's counsel --

9            MR. DUNNE:  Sure.

10           THE COURT:  -- to see whether he agrees with this

11   statutory interpretation, because, as I say, my own experience

12   is certain of the disqualifiers are unforgiving and immutable,

13   and some of them are more juicy and flexible.  So --

14           MR. CHESLEY:  Thank you, Your Honor.  Richard Chesley,

15   DLA Piper.  Appreciate the Court entering my order to appear

16   pro hac vice.

17           THE COURT:  Sure.

18           MR. CHESLEY:  It's good to be back in front of Your

19   Honor today.

20           If I could, let me try to untangle some of the issues

21   the Court has appropriately raised, and hopefully, these will

22   address some of the Court's concerns before turning to some of

23   the other questions the Court had raised in its notice of two

24   days ago.

25           First of all, with respect to the 1103(b) standards

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 53
of 113

1  for the retention of committee professionals, the law is clear

2  that the standards in 1103(b) are far less stringent and

3  exacting than the standards under 327.

4          THE COURT:  Agree.

5          MR. CHESLEY:  I think we've acknowledged that, Your

6  Honor.  And then we get to the issue of compensation, which

7  I'll talk about in a moment.

8          But with respect to those 1103(b) standards, I think

9  it's also important, even if we were to look at the issue of

10  disinterestedness, the phrase "affiliate" does not appear

11  within the definition of disinterested under 101(14).  And in

12  looking at these issues, Your Honor -- and I agree that this is

13  somewhat of a complex statutory issue, but we try to look at it

14  from more of a pragmatic standpoint.  And there are a couple of

15  observations I would like to make in that regard.

16          This issue has been dealt with and addressed by courts

17  before.  It's been addressed in the Puerto Rico PROMESA matters

18  where FTI is representing the committee, and Compass Lexecon

19  continues to provide litigation consulting services to the

20  putative debtor, the Commonwealth of Puerto Rico.

21          Same thing occurred with respect to the General Growth

22  case, where same cast of entities -- FTI went to court as well.

23  Well familiar with -- and Compass Lexecon doing their work on

24  behalf of the debtors.  Again, discreet litigation consulting

25  services.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 54
of 113

1            With respect to the Compass Lexecon work in this case,

2    obviously, we've talked about pre-petition matters.  On a post-

3    petition basis, Your Honor, Compass Lexecon has not been before

4    the Court to have -- to be engaged on behalf of the debtors, as

5    of yet.  So much of what we're talking about here is truly

6    hypothetical.

7            And I appreciate Mr. Dunne's comments as to what may

8    occur, but those issues are in the future.  What we're trying

9    to do is, obviously, move forward and continue to assist the

10   committee and the other stakeholders in this case with the work

11   that FTI has been doing.

12           THE COURT:  Well, I think what you're heading to is

13   you're telling me that, clearly, under 101(14)(A) and (B), FTI

14   is not in jeopardy.  But under 101(14)(C), you're saying

15   they're not in jeopardy either because they don't fit that

16   language.

17           MR. CHESLEY:  Correct, Your Honor.

18           THE COURT:  And therefore, being an affiliate is not,

19   in and of itself, a disqualifier.

20           MR. CHESLEY:  Correct, Your Honor.

21           THE COURT:  Okay.

22           MR. CHESLEY:  And I would also, Your Honor, turn to --

23   and again, this is in our papers, and I have no intention of

24   repeating what's in there, but --

25           THE COURT:  No, you can repeat it.  It's important

1  stuff.

2         MR. CHESLEY:  It is.  It's, obviously, critically

3  important for the committee and critically important for FTI.

4  But a couple of decisions on this that I think are extremely

5  relevant.

6         Judge Gonzalez in Enron, that many people here were

7  involved in, made clear that 101(3)(D) does not disqualify a

8  professional from representing a committee solely because the

9  professional holds an interest adverse to the estate.

10         He went on to note that 1103 does not require a

11  committee professional to cease representing the committee in

12  matters that are unrelated to the bankruptcy, are not adverse

13  to the committee's interest in the bankruptcy, and pre-date the

14  committee's professionals.

15         And then in terms of adverse interest, because it is

16  not defined in the Code, the courts, obviously, have to look at

17  case law.  And I think probably the best case that's come out

18  on this description is In re:  3dfx Interactive, which came out

19  from this Court over a decade ago.

20         THE COURT:  I am familiar with it.

21         MR. CHESLEY:  And the Court noted that adverse

22  interest is defined as to possess or assert any economic

23  interest that would tend to lessen the value of the bankruptcy

24  estate or that would create an actual or potential dispute in

25  which the estate is a rival claimant, or to possess a

1  predisposition under circumstances that render a bias against
2  the estate.

3          In 3dfx, the Court did find, in fact, that the counsel
4  had an adverse interest because, while they wanted to represent
5  the committee, they were also the subject of a recovery action
6  by the trustee.  They had a direct economic interest adverse to
7  the committee.

8          What we're talking about here has nothing to do with
9  that, Your Honor.  And for that reason, that's why we have set
10 up the protocols that we have set up and used time and time
11 again, both FTI and other professionals, to make sure there is
12 no ability to influence, convey information across these
13 barriers.  Compass Lexecon, there's no dispute of this -- is a
14 separate entity -- separate employees, IT systems, email
15 systems --

16         THE COURT:  No, I understand.  Everybody -- and the
17 U.S. Trustee doesn't contend otherwise.

18         MR. CHESLEY:  And no one contests that, Your Honor.
19 And so with respect to trying to come up with a pragmatic way
20 to deal with -- I would agree with the Court -- in the anomaly
21 in the Code, we have set forth these issues.  Now, obviously
22 when Compass Lexecon comes before the Court, these issues may
23 come up again; we're not here to do that today.

24         THE COURT:  Well, Compass shouldn't come before the
25 Court.  It's not an employed professional.  I mean, unless the

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 57
of 113

1  debtor needs to employ them.

2  MR. CHESLEY: And obviously, if the debtor wants to us

3  them, that will be the debtor's prerogative.

4  THE COURT: But for the fact --

5  MR. CHESLEY: But for the purposes of the committee

6  engagement today, we do not -- FTI does not meet any of the

7  thresholds under adversity as defined by this Court over a

8  decade ago. And looking at the logic that came back from Judge

9  Gonzalez and Enron, the same holds true. I think what's

10  important --

11  THE COURT: Hey, listen. I don't need my friend Judge

12  Gonzalez. I mean, to me that's a pure, straight reading of the

13  statute, and it happens all the time. Judges, bankruptcy

14  judges, are authorizing employment of people all the time, and

15  that may have adverse -- or do or don't have adverse interests.

16  It's only when we get these statutory disqualifiers --

17  MR. CHESLEY: Exactly, Your Honor.

18  THE COURT: -- like disinterest.

19  MR. CHESLEY: But again -- and that's why it's not a

20  bright line test. And the courts have made clear, under

21  1103(b), it is not. And of course, the courts also recognized

22  that the party's choice of counsel is entitled --

23  THE COURT: No.

24  MR. CHESLEY: -- to at least a certain level of

25  deference.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 58
of 113

1    THE COURT:  Not counsel.  It's not a choice of
2 counsel.

3    MR. CHESLEY:  I'm sorry, Your Honor; of a
4 professional.

5    THE COURT:  Right.  Well, of course, it is.  But it
6 also -- you can use your judgment, but you can't hire somebody
7 who is disqualified.

8    MR. CHESLEY:  Absolutely, Your Honor, and that is a
9 standard.  But again, with respect to the actual standards that
10 apply, if we're looking at adverse interests and the case law
11 that has developed under that definition, we believe that FTI
12 does not have that adverse interest and has taken painstaking
13 steps to make sure that, again, no one here, no professional
14 here, is concerned about the integrity of FTI.

15    THE COURT:  Okay, so --

16    MR. CHESLEY:  I mean, it's true -- yes, Your Honor.

17    THE COURT:  No, and I'm not concerned about the
18 integrity of FTI.  But what happens if there are lots of
19 contract rejections and there becomes a time for the official
20 committee, not the tort committee but the other committee, to
21 deal with some claims estimations?  It's not something that FTI
22 would have to be involved with or --

23    MR. CHESLEY:  Absolutely.

24    THE COURT:  -- alternatively be disqualified?

25    MR. CHESLEY:  Well, with respect to claims estimation

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 59
of 113

1   of contract rejection, that's right in the wheelhouse of what

2   FTI would be assisting with. But there's no adverse interest

3   because --

4           THE COURT: Because Compass isn't doing --

5           MR. CHESLEY: Exactly.

6           THE COURT: -- the same on the other side.

7           MR. CHESLEY: Correct, Your Honor.

8           THE COURT: Somebody else might be.

9           MR. CHESLEY: I would assume one of the other advisors

10  retained by the debtor.

11          THE COURT: Well, I'm assuming if the debtor chooses

12  to reject the contract or a group of contracts, they're going

13  to calculate what the consequences are as part of their

14  business judgment in deciding to reject in the first place.

15          MR. CHESLEY: Correct, Your Honor; that's exactly

16  right. I mean, Compass had a very specific focus on a pre-

17  petition basis relating to methodologies for calculation of

18  claims, of wildlife claims. That was the scope of their pre-

19  petition of retention. To the extent they continued to do that

20  on a post-petition basis, obviously that'll be the debtor's

21  decision to make.

22          But again, with respect to the wall that is in place,

23  the specific focus of what they're doing to cast a broad net in

24  creating an adverse interest solely based upon that and the

25  steps that have been taken here, we think is not what the law

1       counsels.

2               THE COURT:  So in summary, you believe that I simply

3       overrule the U.S. Trustee's objections because of what you just

4       said.

5               MR. CHESLEY:  Yes.  Based upon our papers, Your Honor.

6       And with respect to the other issues the Court did raise in its

7       notice, I'm happy to address those --

8               THE COURT:  Well --

9               MR. CHESLEY:  -- should the Court wish to.

10              THE COURT:  -- there's one big one that everybody

11      knows about, and so you're welcome to try to persuade me

12      otherwise.  But it's going to be tough to persuade otherwise.

13              MR. CHESLEY:  I assume that would be indemnification,

14      Your Honor.

15              THE COURT:  Well, it might be, yes.

16              MR. CHESLEY:  Your Honor, we will -- we understand

17      that, Your Honor.  With respect to that, I do want to clarify:

18      we will be retained under 330, not 328.  Your court noted that

19      and that, and that is appropriate.

20              THE COURT:  Yeah, again, there's -- everybody gets

21      confused on these things.

22              MR. CHESLEY:  And shame on me, Your Honor.

23              THE COURT:  No, it's not shame on you.

24              MR. CHESLEY:  I should know better.

25              THE COURT:  It's not shame on you.  It's not one of

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 61
of 113

 1   these things that creates a lot of confusion.  And you start

 2   with the terminology, the title of 328.

 3              MR. CHESLEY:  Is not helpful.

 4              THE COURT:  It's not helpful, right.

 5              MR. CHESLEY:  But with respect to the 330 issues, Your

 6   Honor, that also picks up a number of these issues.  The

 7   determination of the reasonableness will obviously deal with

 8   issues of potential duplication of effort, which the Court

 9   noted.  We intend, in our interim fee applications, to

10   specifically address that.

11              THE COURT:  I'm not worried about that.  You tell me

12   what your -- so you've clarified it, that the 328 is not --

13              MR. CHESLEY:  The 330?

14              THE COURT:  Your client is prepared to be compensated

15   under 330 and 331.  What are you -- are you conceding the point

16   on indemnity or still fighting that?

17              MR. CHESLEY:  I'll get to that momentarily, Your

18   Honor.

19              THE COURT:  Okay.

20              MR. CHESLEY:  I do want to also answer the Court's

21   question with respect to a budget; we will submit budgets on a

22   quarterly basis, as requested.

23              THE COURT:  Well, yeah.  I don't want you to submit it

24   to me.

25              MR. CHESLEY:  No, no.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 62
of 113

1          THE COURT:  I want the debtor and the committee there

2    to know what --

3          MR. CHESLEY:  Correct, Your Honor.

4          THE COURT:  -- they're dealing with

5          MR. CHESLEY:  We will work with the committee on that.

6          And on indemnification, Your Honor, we read the

7    original notice as the Court saying it would not consider

8    indemnification without a negligence carve-out.  We would agree

9    to a negligence carve-out as well, if that would be acceptable

10   to the Court.

11         THE COURT:  Well, that's what I said.  I mean, the

12   lawyers have to live with it, so if FTI lives with it --

13         MR. CHESLEY:  We are happy to live with the negligence

14   carve-out, Your Honor.

15         THE COURT:  Yeah.  So you're going to follow my advice

16   from the prior case, right?

17         MR. CHESLEY:  We will.

18         THE COURT:  You don't need an indemnity; just don't be

19   negligent.

20         MR. CHESLEY:  Your Honor, we will always follow your

21   advice.

22         THE COURT:  No, you won't always follow my advice.

23         MR. CHESLEY:  Yeah.  Do not make mistakes, Your Honor.

24   We --

25         THE COURT:  You'll only follow my advice when you

1    agree with it.

2            MR. CHESLEY:  This is really to address frivolous

3    claims, and that's really the intent here.

4            THE COURT:  Well, I understand.  And I don't

5    understand why it's such a big deal with some people, but there

6    are some people in other parts of the country that just think

7    we're all just crazy out here because we don't reward mischief.

8            MR. CHESLEY:  We understand, Your Honor.

9            THE COURT:  Okay.

10           MR. CHESLEY:  But we would agree to a negligence

11   claim.

12           THE COURT:  All right.  So let's summarize.  If I

13   overrule the U.S. Trustee's objections, the engagement for FTI

14   will clarify its compensation provisions.  Leave aside how it

15   comes to be engaged, its compensation's under 330 and 331 --

16           MR. CHESLEY:  Correct, Your Honor.

17           THE COURT:  -- and the language and the agreements

18   will be expanded to exclude from the indemnity, negligence

19   along with willful negligence, gross misconduct

20           MR. CHESLEY:  The standard, yes.

21           THE COURT:  -- and other bad things.  Okay.

22           So Ms. Villacorta, you've heard the argument.  What do

23   you want me --

24           MS. VILLACORTA:  Yeah, I mean, the Court has already

25   correctly -- oh, sorry.  Let me --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 64
of 113

1          THE COURT:  Well, I'm just asking if you want to be

2    heard anymore.

3          MS. VILLACORTA:  Yeah.  Just one last thing about it.

4          THE COURT:  I'd like to think about it.  I think Mr.

5    Chesley's got it right, but I want you to have an opportunity

6    to --

7          MS. VILLACORTA:  Well, this issue is, like I said

8    before, this issue isn't new for FTI.  In fact, they wanted to

9    do the same thing in Midway Games, and the court did not allow

10   it.  And the court only authorized FTI to be retained and

11   employed provided that the debtor's employment of FD/Ashton

12   Partners, a subsidiary of FTI, would terminate.

13         THE COURT:  Okay.  But which case are you --

14         MS. VILLACORTA:  This is Midway Games, and it's cited

15   in paragraph 9 of the debtor's reply.

16         THE COURT:  Of the committee's reply, right?

17         MS. VILLACORTA:  Of the committee's reply, yeah.

18         THE COURT:  Okay.  Let me -- but I mean, no.  Again,

19   as I said before, I've been reading a lot of different papers,

20   and I can't keep track of them all.  So let me just turn to

21   that for a minute.

22         MS. VILLACORTA:  Sure.  It's docket 1571.

23         THE COURT:  Yeah, no, no.  I have it.  Midway Games;

24   Judge Gross in Delaware.  Okay, so what did he hold?  Oh,

25   approving FTI's retention as financial advisor to the committee

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 65
of 113

1    where the subsidiary was also retained by one of the debtors,
2    disclosed.  That's not --
3            MS. VILLACORTA:  Yeah.  And so -- but what the
4    debtor's -- I mean, sorry, I keep on saying "debtors".
5            THE COURT:  I'm sorry, they're citing it.
6            MS. VILLACORTA:  What FTI fails to state or disclose
7    is that the employment was conditioned on the debtor's
8    employment of the subsidiary to terminate.
9            THE COURT:  Okay.  But therefore, what?  I mean, my
10   point -- one of the nice things about presiding over this case
11   is I read these briefs that tell me what's happened in the last
12   three months all around the country.  But maybe they'll hear
13   about what I'm doing.
14           MS. VILLACORTA:  And so we're going to --
15           THE COURT:  What's correct under the statute?  So you
16   heard Mr. Chesley's argument; do you concede, now, that the
17   affiliate relationship is not a disqualifier?
18           MS. VILLACORTA:  No, I do not concede to that.
19           THE COURT:  Okay.  Why is -- again, as I asked you
20   before, to break it into its parts, what is disqualifying about
21   FTI having its affiliate, Compass, working for the debtor?
22           MS. VILLACORTA:  Well, Compass is wholly owned --
23           THE COURT:  Yes.
24           MS. VILLACORTA:  -- by FTI.
25           THE COURT:  I know, it's an affiliate.

1  MS. VILLACORTA: FTI has a financial interest.

2  THE COURT: The parent is going to work for the
3  committee; the subsidiary is going to be working for the
4  debtor. Okay. But is that a disqualifier in and of itself or
5  not?

6  MS. VILLACORTA: And even though -- despite the
7  representations made by the committee saying that the debtor's
8  interests and the committee's interests may be aligned, we
9  don't know that.

10  THE COURT: No, no, but come on, answer my question.
11  Everybody agreed -- Mr. Chesley, Mr. Dunne, you, and I all
12  agree that FTI and Compass are affiliates.

13  MS. VILLACORTA: Yes.

14  THE COURT: We also can read the statute to see that
15  the word affiliate doesn't create disinterestedness. That's
16  what the statute doesn't say, right? It doesn't say you're not
17  disinterested if you're an affiliate.

18  So now we go to 1103, and it says who can work for a
19  committee. And it doesn't say -- it says you can't -- it says
20  who can do it. 1103 says that you can represent interests even
21  though you have other relationships, right?

22  MS. VILLACORTA: Right, but then you have to look at
23  328(c) that says that -- this is not an issue that we want to
24  address again at the fee application stage.

25  THE COURT: No, we don't. No. I'm the one that

1  agreed with you that -- let's test it. 328(c) tells us who can

2  get paid. Okay. So along comes a professional who's employed

3  by a committee and says, I'd like to be paid, please. And the

4  question is, all right, you can get paid, but you can't get

5  paid if you're not disinterested. Well, there's nothing that

6  tells us that FTI is not disinterested or represents or holds

7  an interest adverse to the estate with respect to the matter

8  which the professional is employed.

9       Now, how does FTI hold an interest adverse to the

10 interest of the estate in the matter with which it is being

11 employed?

12      MS. VILLACORTA: Well, because FTI is requesting that

13 it be permitted to represent both the committee and the debtors

14 simultaneously.

15      THE COURT: No, it's not.

16      MS. VILLACORTA: And it's simply not permissible.

17      THE COURT: It's not.

18      MS. VILLACORTA: But it is, Your Honor.

19      THE COURT: If we had a motion by the debtor to employ

20 Compass, we might have a different discussion here, but we

21 don't. So to state it again, so we're clear, you believe that

22 FTI could not be paid because its affiliate owns or represents

23 an interest adverse to the interest of the estate. Which one

24 is it?

25      MS. VILLACORTA: I think that FTI is both not

1  disinterested and it has a conflict.

2  THE COURT: Okay, all right. Unless somebody else

3  wants to be heard on this subject, I will just take the matter

4  under advisement and --

5  MR. KAROTKIN: Your Honor, I would like to be heard.

6  THE COURT: -- do something very quickly.

7  Yes, sir. Yes, Mr. Karotkin.

8  MR. KAROTKIN: Stephen Karotkin, Weil, Gotshal &

9  Manges for the debtors. Just so the record is clear, Your

10 Honor, and we did file a brief responsive --

11 THE COURT: Yeah.

12 MR. KAROTKIN: -- pleading.

13 THE COURT: You did.

14 MR. KAROTKIN: I think Mr. Chesley indicated that the

15 debtor's use of Compass is a hypothetical. It's not a

16 hypothetical. We used them pre-petition.

17 THE COURT: No.

18 MR. KAROTKIN: We're using them post-petition.

19 THE COURT: And intend to do so.

20 MR. KAROTKIN: And we intend to do so.

21 As we stated in our reply, we have no objection to the

22 retention of FTI based on the representations that FTI has made

23 as to the separateness of Compass.

24 THE COURT: But I mean, stated differently, you're not

25 challenging the status of FTI as a prospective employed

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 69
of 113

1    professional the way the U.S. Trustee is doing.

2              MR. KAROTKIN:  That is correct.

3              THE COURT:  Okay.

4              MR. KAROTKIN:  As I said in our response, we have no

5    objection --

6              THE COURT:  Right.

7              MR. KAROTKIN:  -- so long as it doesn't in any way

8    prejudice our ability to retain and use Compass going forward

9    and not as a basis to disqualify our use of Compass going

10   forward.  And we have proposed language to be included in the

11   order to address that.

12             THE COURT:  Do you anticipate at all having to come

13   before the Court to seek employment of Compass?

14             MR. KAROTKIN:  Yes, we may do so.

15             THE COURT:  So we might be visiting this same question

16   on the flip side.

17             MR. KAROTKIN:  Well, again, we said and we made it

18   clear to the committee when they interviewed FTI and decided to

19   retain FTI that if this in any way impacts our ability to

20   retain Compass, we would object.  We made that clear from the

21   outset.  And again, as we said in our pleadings, this cannot in

22   any way affect our ability to retain and use Compass going

23   forward in these cases.  They have been doing a lot of work

24   with respect to the wildfire claims.

25             We don't believe there's a disabling conflict on the

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 70
of 113

1   part of FTI.  But it has to be clear, Your Honor, that if FTI's

2   retained, it will not impact our ability to continue --

3           THE COURT:  Okay.

4           MR. KAROTKIN:  -- to retain Compass.

5           THE COURT:  So help me -- let's assume that I agree

6   with Mr. Chesley's argument and Mr. Dunne's, and I overrule the

7   U.S. Trustee and sign an order for FTI.  And then next month

8   you come in and ask to employee Compass and there's an

9   objection; what do I do?

10          MR. KAROTKIN:  We've asked that you would --

11          THE COURT:  I mean, do I say FTI's out?  I mean, what

12  do I do?  Excuse me.  What do I do if I'm forced to the

13  analysis that somehow Compass is disqualified at that point?

14          MR. KAROTKIN:  Well, I think you've already done that

15  analysis with respect to its relationship with FTI, and that's

16  why we've asked for that particular language to be included in

17  the order.

18          THE COURT:  Well, but don't you think that the

19  difficulty here is that I'm being asked to authorize the

20  employment of FTI under 1103; I would be being asked to

21  authorize the employment of Compass under 327, and it's a

22  different test.  I mean, I don't -- the last thing in the world

23  I want, I said it before, I don't want to be playing games with

24  professionals and saying you're in, but then you're out.  But I

25  don't know how I get to that point.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 71
of 113

1          MR. KAROTKIN:  But Your Honor, you're again addressing

2     the disinterested issue.

3          THE COURT:  Right.

4          MR. KAROTKIN:  It can't be different.  It can't be

5     different with respect to Compass than it is with FTI, that

6     analysis.

7          THE COURT:  Well --

8          MR. KAROTKIN:  It's based on the fact --

9          THE COURT:  But the statute might make it different.

10          MR. KAROTKIN:  I don't think so.

11          THE COURT:  No?

12          MR. KAROTKIN:  But again, we made it clear from the

13     outset to the committee and to FTI that if this in any way

14     impacts our ability to use and retain Compass going forward,

15     then we would have an objection.

16          THE COURT:  Yeah.  No, I understand your point.

17          MR. KAROTKIN:  And we can't be put in a position, Your

18     Honor, of coming back here when we retain Compass, and Compass

19     is disqualified because FTI was retained.

20          THE COURT:  Right.

21          MR. KAROTKIN:  That's not fair.

22          THE COURT:  Again, you and I can have a debate about

23     the difference between employment and compensation, but the

24     fact is they are important.  But the truth is that 327 talks

25     about who can be hired, and 328 talks about who can be paid.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 72
of 113

1  And so if you made a motion to authorize the employment of
2  Compass, you would have to persuade me, and you would have to
3  carry the prima facie burden to show, that Compass is not
4  disinterested.

5      MR. KAROTKIN:  And what I'm saying, Your Honor, is by
6  reason of FTI's retention today, if you were to grant that,
7  today or whenever you decided to retain them, we cannot have
8  that as a disabling factor.

9      THE COURT:  No, I --

10     MR. KAROTKIN:  And if that were a disabling factor,
11 then we would object to FTI's retention.

12     THE COURT:  No, I agree with you.  It sounds like you
13 think I'm fighting you on this; I'm not.  I'm agreeing with the
14 problem and trying to see if there's a way to --

15     MR. KAROTKIN:  Well, I think what we've included in
16 our order, in our language for the proposed order would address
17 it.  And I think it's consistent with what you were saying
18 today.

19     THE COURT:  Let me go back and find that order.  I did
20 have it out here on paper.  No, that's not it.  Okay.

21     So the proposed order says:  "The employment of FTI
22 shall in no way impact or restrict or preclude in any way
23 debtors from employing and retaining Lexecon."  And then:
24 "FTI's retention by the committee may not be used as a basis to
25 disqualify or limit Compass."  Well, the question is:  by whom?

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 73
of 113

1    By U.S. Trustee?  By me?  By some other party?  I don't know
2    the answer to that.
3            MR. KAROTKIN:  But --
4            THE COURT:  Mr.  -- wait, either one.
5            MR. CHESLEY:  Your Honor, I was just going to --
6            THE COURT:  You can both stay; both of you stay there.
7            MR. CHESLEY:  Yeah.  Well, what I was just going to
8    say, Your Honor, is this is really the same situation that was
9    addressed in the Puerto Rico PROMESA matter as well as in
10   General Growth, where we had the same -- in effect, same
11   lineup, same --
12           THE COURT:  Right, right.
13           MR. CHESLEY:  -- process.  And the courts were able to
14   effectively navigate that, based upon the same rationale Mr.
15   Karotkin has indicated.  So again, we believe there is
16   similarity.  Again, that's why we have the processes in place
17   to separate these out as we work together.
18           THE COURT:  Well, I think the walls are fine.  And no
19   one -- the U.S. Trustee hasn't questioned the wall issue.  The
20   wall issue is a wall to avoid the overlap and the risk; it
21   doesn't change the relationships.  It doesn't make an affiliate
22   not an affiliate, and it doesn't make a shareholder not a
23   shareholder.  So it's a safeguard, and it's done in lots of
24   contexts, but it may not solve the statutory problem.
25           MR. CHESLEY:  Your Honor --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 74
of 113

1          THE COURT:  That's -- I just don't know.

2          MR. CHESLEY:  Yeah, well, there are a couple of cases

3    that we did cite in our memorandum --

4          THE COURT:  Well --

5          MR. CHESLEY:  -- that, in effect, did use the wall for

6    that, but I don't think we need to get to that point, Your

7    Honor.  I think, to Mr. Karotkin's point, Mr. Dunne's point,

8    and ours is with respect to the statutory predicates, again, it

9    is a fact-intensive inquiry.  We believe, based upon Mr. Star's

10   declaration, we have set forth the facts that support the

11   retention here.  And we don't see any basis why that same

12   factual predicate would not apply when Compass is before the

13   Court.

14         THE COURT:  Mr. Karotkin, is there any usefulness in

15   trying to tee up the motion to employ Compass and have it

16   considered and fully vetted together and have these things

17   resolved together?

18         MR. KAROTKIN:  We could do that, Your Honor.

19         THE COURT:  I mean, I don't like it, but I also don't

20   want the uncertainty.

21         MR. KAROTKIN:  Nor do we.

22         THE COURT:  Yeah.

23         MR. KAROTKIN:  Nor do we.  Compass has done a lot of

24   work for us.

25         THE COURT:  Yes, I know they have.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 75
of 113

1    MR. KAROTKIN:  And we can't be in a position where
2  that is lost.
3    THE COURT:  And so has FTI.  And I really --
4    MR. KAROTKIN:  And I'm talking pre-petition as well as
5  post-petition.
6    THE COURT:  Right, I know.
7    MR. KAROTKIN:  It just cannot be lost.
8    THE COURT:  And I'm not envious of the notion of
9  disqualifying either one of them.  I raised one issue that, at
10  least from FTI's point of view, is a nonissue.  That's my
11  little pet peeve about indemnity.  And everything else seems
12  like it's okay, but I didn't fully understand these issues.
13  And I'm struggling with -- well, okay.  What if I today
14  overrule the U.S. Trustee and tomorrow sign an order that
15  authorizes FTI to be in there, and then next week you show up
16  for Compass and not I or the U.S. Trustee, somebody else makes
17  a persuasive argument.  Obviously none of you, as lawyers for
18  your clients, or your clients, don't need that uncertainty and
19  unpredictability.  That's unfair to everybody.
20    So you think that that's something that would be worth
21  doing, to --
22    MR. KAROTKIN:  I think that would be worth exploring.
23  My suggestion is that you reserve decision or put this over to
24  the next hearing and then we will consider filing on an
25  expedited basis a motion to retain Compass.

 1    THE COURT:  Yeah.  I mean, as long as you can do it.

 2  I mean, I don't know whether that's a better thing.  Now, Mr.

 3  Dunne, what do you think about this?  I mean, again, I've

 4  looked at your committee, not -- Mr. Chesley's representing his

 5  client, so you've got to represent the bigger picture here,

 6  whether you think this is the right way to take it in this way

 7  or some other way.

 8    MR. DUNNE:  Well --

 9    THE COURT:  I mean, you don't want FTI to get bounced

10  next month, either.

11    MR. DUNNE:  I'm going to sound a lot like Mr.

12  Karotkin, which is that FTI's done a lot of work.  We'd like --

13  we need them to continue to do that work.  And we believe that

14  they've met all the requirements and the statutory predicates

15  for retention.  We're fine with the language that Mr. Karotkin

16  proposed to include in the order, and we'd like to eliminate

17  any uncertainty with respect to their retention.

18    THE COURT:  But what would I do -- what would I do if

19  he comes back next month with a motion and there's a

20  disqualifier?  I mean, I can't just sort of decree in advance

21  that nobody who might object can't be heard.  I can't rule on a

22  motion that hasn't been raised yet, right?  So I'm just asking

23  you if you think that would be risky or worth taking this --

24  going two steps?  And I either have both of them in, or at

25  least we don't run this risk of what to do about what Mr.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 77
of 113

1     Karotkin doesn't want to happen with the debtor's situation?

2          MR. DUNNE:  Okay.  The people are still free to

3     object, Your Honor.  And Compass is in a different position

4     vis-a-vis FTI, right?  FTI is the parent; Compass is the sub.

5     They're affiliates, but the equity ownership -- what we talked

6     about, your hypothetical is that if FTI owns stock in PG&E that

7     would be one thing; they own stock in Compass.  Compass doesn't

8     own stock in FTI.

9          THE COURT:  Well, I don't --

10          MR. DUNNE:  Right?

11          THE COURT:  No, of course it doesn't.  And it may well

12     be that there's simply no statutory disqualifier that would

13     taint Compass.  But there's no record, there's no way to test

14     that until we test it.

15          In other words -- look, if I were smart enough to

16     anticipate this problem, I might have urged that the Compass

17     motion be brought on now, and we could have this out for good.

18     But I have a problem of wanting to have certainty but

19     recognizing that I can't today create certainty for Compass

20     because their position and the debtor's motion isn't before me.

21     And a form order reads fine; it reads fine to me, too.  But it

22     doesn't bind someone who isn't even a participant to it or

23     can't challenge it.  So --

24          MR. KAROTKIN:  Your Honor, as I said, we cannot be in

25     the position --

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 78
of 113

1          THE COURT:  Yes.

2          MR. KAROTKIN:  -- where our retention of Compass is

3     jeopardized by virtue of you --

4          THE COURT:  No, I'm with you.  I mean, I've heard it

5     three times; I've got it.

6          MR. KAROTKIN:  Okay.

7          THE COURT:  But that's the point.  Just pretend I'm

8     standing here right -- sitting here right now, and I'm saying

9     well, guess what?  It looks to me like the debtor is going to

10    lose Compass if the committee employs FTI.  I presume your

11    argument would be, then bounce FTI.

12         MR. KAROTKIN:  Yes, it is.

13         THE COURT:  And the committee's position might be,

14    well, bounce Compass, and I have to decide what to do.  But

15    Compass isn't here, I mean, in a legal sense, they're not here

16    to be tested.

17         MR. KAROTKIN:  As I said, I think based on that and

18    our position, the best thing to do would be to put this over to

19    the next hearing, and we can discuss it with the committee and

20    decide whether we could file an expedited motion to retain

21    Compass and the issues could be resolved together.  I don't

22    think that hurts anybody.

23         THE COURT:  Well, it kind of leaves FTI in limbo for a

24    couple weeks.  But I mean, even if FTI told me today, they

25    insisted on indemnity and I said, well, then you're out, I

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 79
of 113

1    wouldn't deny them their compensation between the time they

2    were hired until now.  I mean, that's unfair to them, also.

3          So Mr. Chesley, can your client live with that?  I

4    mean, it's awkward, but it seems to me that, look, this is what

5    you get for being a worldwide, multifaceted financial advisor.

6          MR. CHESLEY:  I mean, I think with the protection,

7    Your Honor, that we would not be economically harmed during

8    this interim period.  We obviously want to make this as easy on

9    everybody as possible.  We do think, again, these could be

10   dealt with separately, but if the Court wishes to do them

11   jointly --

12         THE COURT:  Well, for reasons that were discussed a

13   little bit, I think, before you were in the case, certainly Mr.

14   Karotkin and everyone else from the outset, I think early in

15   one of the first hearings I said, when are we going to get the

16   retention applications because I do feel strongly, and have

17   always felt strongly, about not leaving the professionals out

18   there hanging.

19         And sometimes, obviously, as you know, in simple

20   cases, you do the employments very quickly, sometimes even

21   without a hearing.  Here we have lots of professionals, lots of

22   money, lots of visibility, and we're at a three-month mark, and

23   today was the first day I authorized the employment of four law

24   firms that -- and that brings the total to about seven.

25         And the financial advisors are entitled to the same

1    certainty, but I'm not going to say you're out of here for some
2    other reason, and by the way, you forfeited the last three
3    months' worth of fees.  That would be unfair and punitive, and
4    I'm not interested in doing that.

5            But because we have this potential of the debtor's own
6    interests being jeopardized by whatever legal consequences of
7    not letting the debtor hire and retain Compass -- and FTI can't
8    be a pawn, either; they've either got to be in or out.  So I
9    guess that's the best thing to do.

10           And Mr. Karotkin, that means Compass, or the debtor
11   for Compass, has to jump through all the hoops to show the
12   prima facie case for eligibility so that, for example, if you
13   go back to your office and somebody tells you, by the way, I
14   forgot to tell you; Mr. Compass has a hundred shared of PG&E,
15   you're in trouble.  You're out.  And so you'd have to make the
16   proper showing to say Compass is an eligible employee and
17   professional under 327, right?

18           MR. KAROTKIN:  Yes, sir.

19           THE COURT:  Well, it's not my first choice, either,
20   but I --

21           MR. CHESLEY:  We understand, Your Honor.  But we,
22   again, we agree with Mr. Karotkin; the standards should be the
23   same, or they should line up.  The facts should line up, but --

24           THE COURT:  Well, I think -- yes, okay, what we'll do
25   is we'll put this over to the next calendar, either the 8th or

1    9th; we'll pick a date in a minute. I think, in the meantime,

2    I'm going to try to see if I can work through and agree with

3    Mr. Chesley, and I think I do. I think I agree with his legal

4    analysis and perhaps disagree with what the U.S. Trustee

5    argued, but I want to just think through those issues and look

6    at the decisions.

7          And none of these decisions, not a single one that

8    anybody's cited, is binding on anybody.

9          MR. CHESLEY: I understand, Your Honor.

10          THE COURT: But all of the judges that decide them are

11    my colleagues and I respect their views. I was actually the

12    mediator in 3dfx; that's a whole nother story. I'll tell you

13    what happened there, bizarrely, but that's for over a beer

14    someday. Okay.

15          So I will -- now, Mr. Karotkin, in thinking of the

16    calendar, we have a few things on for the 8th and a few for the

17    9th. And I'm wondering whether we should move them all to one

18    day just for everyone's convenience.

19          MR. KAROTKIN: That's probably a good idea.

20          THE COURT: Do you have a thought about that? Well,

21    again, I'm concerned about all the travel and all the

22    everything else. Isn't that right, Ms. Perrada (phonetic)? We

23    have two or three things on each of the two days, right?

24          THE CLERK: Five on each day.

25          THE COURT: Five on each day. Well, but the way you

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 82
of 113

1    were resolving things this week, maybe some of those will go

2    away.

3           MR. KAROTKIN:  I think we could do it all in one day.

4           THE COURT:  I tell you what, let's --

5           MR. KAROTKIN:  Why don't you decide what you want to

6    do?

7           THE COURT:  No, no, but I have to switch people

8    around.  So those of you that are traveling, you have your own

9    travel plans.  But I mean, some of the other people --

10          Well, let's do it on the second day, which is the 9th,

11   right?  And what I'll do is we'll send out a notice, or perhaps

12   Ms. Kim or someone from your side, Mr. Karotkin, can work with

13   my staff and we'll make sure that everything that's set for the

14   8th just gets moved over to the 9th.

15          And we'll anticipate having a motion by the debtors to

16   employ Compass on the 9th, and -- I'll tell you what.  You

17   figure out when you need to do it and talk to the U.S. Trustee.

18   And then submit an order shortening time that's consistent with

19   that.

20          MR. KAROTKIN:  Okay.

21          THE COURT:  I'll take your representation that you're

22   going to put this high on the list of priorities.  We'll

23   continue Compass and -- I'm sorry, FTI to that date.  We're

24   going to continue Centerview anyway because of the issue on the

25   confidentiality.  And I previously indicated a willingness, or

1     desire, to continue Lincoln.

2           Let me switch gears and ask Mr. Dunne, unless you know

3     already, do I need to call on counsel for both Lincoln and

4     Centerview if they like FTI or are going to accept my position

5     on the indemnity provision?

6           MR. DUNNE:  I think you do have to call on

7     Centerview's counsel.

8           MR. CHESLEY:  Your Honor, before you do that, if I

9     may, just one --

10          THE COURT:  Yes.

11          MR. CHESLEY:  -- point.  With respect to the arguments

12    today, should we be prepared to address anything new or we wait

13    for further notice from the Court?

14          THE COURT:  Well, I think if I have time, and I should

15    have time, I will attempt to just gather my thoughts and the

16    arguments of all of you and perhaps issue something, sort of a

17    tentative decision on it before the hearing so you can know.

18          MR. CHESLEY:  Thank you, Your Honor.  If the Court --

19          THE COURT:  Or maybe even -- I mean, I don't want to

20    make it a final decision because of the Compass situation, but

21    certainly I can -- let's try.  If for some reason I am

22    persuaded that FTI simply can't be allowed to serve as long as

23    Compass has a role, I guess that kind of answers the question.

24    But if I accept that FTI is not disqualified, tentatively, then

25    we'd be subject to getting the Compass thing resolved.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 84
of 113

1          MR. CHESLEY:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MR. CHESLEY:  If the Court does require any additional

4  briefing or information, I'm happy to provide it.

5          THE COURT:  Yeah, I don't think so.  The briefing's

6  fine.

7          MR. CHESLEY:  Thank you, Your honor.

8          THE COURT:  Okay.  So are you here for Centerview?

9          MR. ROSE:  Your Honor, no.  Just for the tort

10  claimants' committee.

11          THE COURT:  Oh.

12          MR. ROSE:  But your question about Lincoln, I think

13  we'll be able to talk to Lincoln, and I think it would be

14  acceptable, but I'll confirm prior to the 9th.

15          THE COURT:  On the indemnity.

16          MR. ROSE:  Yeah, on the indemnity, Your Honor.

17          THE COURT:  Yeah, okay.  And then I presume you're

18  aware that I wanted to hear from the tort committee on why it

19  needs Lincoln and DSI.

20          MR. ROSE:  Correct, Your Honor.

21          THE COURT:  And maybe there's a perfectly good

22  explanation, but that's what I want to hear.

23          MR. ROSE:  Yes, Your Honor.  We intend to.

24          THE COURT:  And who's here for the tort committee

25  today?  I can't see who's here.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 85
of 113

1          MR. DUNNE:  For the tort committee?

2          THE COURT:  The tort committee.

3          MR. ROSE:  Your honor, Jorian Rose from

4   BakerHostetler.

5          THE COURT:  Okay, sorry.

6          MR. ROSE:  Yeah.

7          THE COURT:  So you need to be prepared to tell us --

8   tell me, the issue of why you need both of those retentions.

9          MR. ROSE:  With the Court's permission, perhaps we

10  could file a short supplement --

11         THE COURT:  Yeah.

12         MR. ROSE:  -- ahead of time.

13         THE COURT:  That's fine.

14         MR. ROSE:  Thank you, Your Honor.

15         THE COURT:  Okay.  And Centerview.

16         MR. NEWMAN:  Thank you, Your Honor.  Sam Newman --

17         THE COURT:  Mr. Newman.

18         MR. NEWMAN:  -- Gibson, Dunn for Centerview.

19         THE COURT:  Yes.

20         MR. NEWMAN:  We'll talk to our clients about the

21  proposal.  Just so I understand it, I think you were --

22  proposed to approve an indemnity provision, but without the

23  negligence --

24         THE COURT:  Yeah.

25         MR. NEWMAN:  -- without it covering negligence.

1          THE COURT:  I mean, that's just been a thing for a

2   long time, obviously.  But I'm not going to rule -- if your

3   client accepts that, then I'm not a problem (sic).

4          Well, I do have the question of the budget, I think.

5   Or no, I had the questions for you about the extra bonus.  I

6   mean, your client's engagement is under 328.

7          MR. NEWMAN:  So let me just --

8          THE COURT:  Right?

9          MR. NEWMAN:  Yes, you're absolutely right, Your Honor.

10          THE COURT:  Okay.

11          MR. NEWMAN:  I can go through the comments Your Honor

12   made quickly --

13          THE COURT:  Okay.

14          MR. NEWMAN:  -- just to kind of keep it all together.

15   The first was the question about information regarding hourly

16   rates and time spent to prove out or support the 250,000

17   dollars monthly.  And I think my client will be prepared to

18   include language in the order that confirms that they will

19   provide that data to the debtors on a regular basis.

20          THE COURT:  But will they provide it as far as

21   something that the U.S. Trustee and I and everybody else can

22   see?

23          MR. NEWMAN:  Yes, Your Honor.

24          THE COURT:  I mean, like interim applications, right?

25          MR. NEWMAN:  Yes, with the exception, and we'll get to

1  that in a second, that -- and again, understanding Your Honor's
2  not --

3           THE COURT:  I'm willing to --

4           MR. NEWMAN:  -- ruling today.

5           THE COURT:  -- give you the half an hour increment.
6  Investment bankers bill in minimal increments of month, right?

7           MR. NEWMAN:  I think this goes to the 328 issue, which
8  let me grab in a second.  I think the question you asked about
9  the additional fee, I just want to comfort Your Honor --

10          THE COURT:  Right.

11          MR. NEWMAN:  -- nothing has been agreed to today.  The
12 order, as we've discussed with the United States Trustee will
13 include a provision that makes clear that any additional fee
14 will be subject to further notice and hearing.

15          So if -- the only reason we're flagging that is I
16 think the parties have agreed, Centerview and the committee,
17 that it may be appropriate to award additional compensation.
18 But that will only be done if --

19          THE COURT:  Well, I agree, it may be.

20          MR. NEWMAN:  But that will only be done if --

21          THE COURT:  I agree, it may be.  But it sounded -- I
22 was, frankly, surprised that the debtor didn't say anything
23 about this.  It sounded to me like the debtors' bank account
24 was going to be open at the whim of the committee -- the tort
25 committee deciding how much you should get paid.  I mean -- I'm

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 88
of 113

1    sorry --

2            MR. NEWMAN:  Never the intention.

3            THE COURT:  -- the -- I'm sorry not the tort

4    committee.  The general committee.

5            But that's the way it reads.  Because it said when the

6    official committee says what it -- it allows us the additional

7    fee, you'll get it and the debtor has to pay it.  Like,

8    that's --

9            MR. NEWMAN:  No, you're absolutely right.  The United

10   States Trustee made that comment, and we have proposed language

11   I think they find acceptable to clarify that.  And the final

12   order would have such language to make that clear.

13           THE COURT:  Well, let's do this.  I've been around

14   long enough to know that lawyers know when to get the message

15   and when they want to fight it.  And I'm hearing from one

16   lawyer for one of the professionals today that they accept my

17   take on the indemnity issue.

18           Two other lawyers for two of them have said they'll

19   talk to their clients.  There's a strong signal here, folks,

20   that you're in for sure with me if you accept that.  If you

21   don't, you might not get your employment approved.

22           But I will continue for Centerview so the U.S. Trustee

23   has an opportunity to be heard on the confidential issues on

24   the sealed information and that a form of order that's

25   acceptable to the U.S. Trustee and also to the committee, and

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 89
of 113

1   the debtor will be available when and if we get to that point

2   on the sealed information.

3       I am generally satisfied with what the sealed

4   information revealed and what the explanations for why

5   Centerview wanted to do it the way they did.  But I'm going to

6   let the U.S. Trustee be heard on that.

7       And as far as Lincoln's concerned, it should be --

8   it's consistent with everything we talked about.  If Lincoln

9   goes along with the indemnity, I don't know anyone else raised

10   any other objections that I'm aware of.

11       Yes?

12       MR. NEWMAN:  The only other item Your Honor raised was

13   with respect to the 328 application --

14       THE COURT:  Right.

15       MR. NEWMAN:  -- which is the way Centerview intends to

16   be employed --

17       THE COURT:  Right.

18       MR. NEWMAN:  -- question of retaining for parties

19   other than the United States Trustee a review for

20   reasonableness.

21       THE COURT:  Right.

22       MR. NEWMAN: At which -- which is -- just to be clear

23   and would take Your Honor's further thoughts -- but that is how

24   we intend to proceed, obviously, if they --

25       THE COURT:  So what's the Court's function?  What's

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 90
of 113

1    the Court's function then?  Nothing?  I just -- I mean,

2    what's --

3               MR. NEWMAN:  No --

4               THE COURT:  -- what's the U.S. Trustee's function?

5               MR. NEWMAN:  So the Court and U.S. Trustee and other

6    parties would be -- and we could brief this further if Your

7    Honor's inclined, but 328(a) would provide for retention on a

8    monthly or contingency fee basis subject only to a heightened

9    standard of review, provided for under 328(a) in the statute.

10              And that's what are intention was.  The U.S. Trustee

11   who specifically objected and requested a heightened level of

12   review for themselves, we're prepared to accommodate.  But that

13   would not be the expectation for all parties.  We would expect

14   that any party that did not want us retained under 328(a) would

15   object now, and that would be resolved now because, honestly,

16   the standard of review is different, right.  A 327 --

17              THE COURT:  Well --

18              MR. NEWMAN:  -- application would --

19              THE COURT:  Well, I -- I mean --

20              MR. NEWMAN:  -- be reviewed for reasonableness.

21              THE COURT:  I mean, is it even a standard of review

22   under 328?

23              MR. NEWMAN:  Well --

24              THE COURT:  It'd be -- the statute has this -- that's

25   convoluted language about unanticipated circumstances.  And so

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 91
of 113

1    to me, a traditional 328 is, for example, a personal injury

2    lawyer where the trustee hires a lawyer to go sue for personal

3    injury and recover a one-third contingency.  And if the lawyer

4    makes one phone call and gets a five-million-dollar fee, some

5    courts will say, we can go back and revisit that.  But other

6    courts will say, no, you can't.  Right?

7           MR. NEWMAN:  And I think that logic applies to monthly

8    and/or fixed fee arrangements because the whole point of those

9    arrangements are that it's not necessarily ascertainable in

10   advance how much effort is going to be required --

11          THE COURT:  Right.

12          MR. NEWMAN:  -- on a month-to-month basis.

13          THE COURT:  Okay.  That's --

14          MR. NEWMAN:  If we have to work harder -- we're not

15   going to ask for more money if we don't work as hard.

16          THE COURT:  Okay.  But suppose Centerview goes forward

17   and makes a substantial contribution and comes in and says, I'd

18   like my twelve million dollars, please.  You seem to be

19   conceding that the U.S. Trustee can be heard on it.

20          MR. NEWMAN:  They have requested that right and we

21   have agreed to accommodate them.

22          THE COURT:  How about the Court?

23          MR. NEWMAN:  Well, the Court, obviously, would hear

24   the objection of the U.S. Trustee.

25          THE COURT:  No, how about the Court on its own

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 92
of 113

1  deciding?  Do you think the Court is precluded from revisiting
2  that?

3  MR. NEWMAN:  Well, we would ask, Your Honor, to rule.
4  And again, we're not asking Your Honor to rule today.  And
5  again, if supplemental briefing would be helpful, we would ask
6  the Court to rule that it believes that the 328(a) standard is
7  appropriate for this engagement under the statute.

8  THE COURT:  Well, I think that's the rub on when does
9  328 operate.  It says that if current terms and conditions
10  prove to have been improvident in light of developments and not
11  capable of being anticipated at the time of fixing of the
12  terms.  How could you possibly prove advance approval of that
13  if it's circumstances that were not anticipated at the time of
14  the fixing.  That's the way the statute reads.

15  MR. NEWMAN:  Right.  Well --

16  THE COURT:  It's bad grammar.

17  MR. NEWMAN:  -- I think the statute --

18  THE COURT:  It's bad grammar, but it gets the message
19  across.

20  MR. NEWMAN:  What the statute says is when we file our
21  final fee application, the Court may allow other compensation
22  if the Court believes that conditions prove to have been --

23  THE COURT:  Right.

24  MR. NEWMAN:  -- improvident --

25  THE COURT:  Right.

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 93
of 113

1          MR. NEWMAN:  -- in light of developments.

2          THE COURT:  So -- so --

3          MR. NEWMAN:  It's not just -- to be clear, it's not a

4    review "for reasonableness" --

5          THE COURT:  No, that's right.

6          MR. NEWMAN:  -- which is 327.

7          THE COURT:  That's right.  It's not.  No, it's not

8    327.  It's 330.

9          MR. NEWMAN:  Sorry, Your Honor.  Yes.

10          THE COURT:  So again, these are why these three

11   statutes --

12          MR. NEWMAN:  Well, three --

13          THE COURT:  -- are all mixed.  But let's go back

14   again.  If I -- leave aside all the other stuff.  If I say to

15   you today, congratulations; your client is hired.  You're in

16   the game.  You now have a twelve-million-dollar potential

17   recovery out there.  And then six months later we have a final

18   hearing and you come in and say, I'd like my twelve million

19   dollars.  Don't you think the only way one could revisit that

20   twelve million is if that last sentence is operative, if there

21   were conditions -- terms and conditions were improvident in

22   light of developments not capable of being anticipated?

23          MR. NEWMAN:  I believe you're right.  If Your Honor --

24          THE COURT:  That would be the standard.

25          MR. NEWMAN:  -- enters the order under 328, that is

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 94
of 113

1    the -- the Court still has the right to review the compensation

2    under that standard.

3            THE COURT:  But under those terms.

4            MR. NEWMAN:  Under that standard.

5            THE COURT:  And I believe the Ninth Circuit -- I've

6    forgotten the case.  I thought it was Circle K, but maybe it

7    was something else -- they say you've got to be very firm.

8    You've got to put the word out there in advance.  This is the

9    rule.  This is -- you're going to get paid under 328.  You got

10   to get employed, and everybody's got to know what the rules

11   are.

12           MR. NEWMAN:  I think that's --

13           THE COURT:  Right?

14           MR. NEWMAN:  -- why I'm belaboring the point, Your

15   Honor.

16           THE COURT:  Yeah, but why -- then why does the U.S.

17   Trustee get to come back in and have a shot under 330?

18           MR. NEWMAN:  That is an accommodation that we have

19   been willing to make to the U.S. Trustee under this order

20   specifically because of their request.  That's the reason.

21           THE COURT:  Then you'd better go make nice to the U.S.

22   Trustee so they go along with the confidential disclosures so

23   your client can be in the game.

24           MR. NEWMAN:  Thank you, Your Honor.

25           THE COURT:  All right.  So I will then continue

1    Centerview, FTI, and Lincoln to May 9th at 9:30 for accounting

2    purposes, and the matters that are on our May 8th calendar will

3    be moved over to that same day, 9th; we're just going to

4    consolidate it so as to try to cut down on any unnecessary

5    travel or delays for counsel.  I will, therefore, not be

6    issuing orders on the three professions that we've talked about

7    today.

8            And I will, however, issue something in the nature of

9    a tentative ruling on the FTI matter.  And I will then get

10   final orders on the other employments and the protocol order

11   that we talked about today.

12           Have we covered all the bases?

13           MR. NEWMAN:  Thank you, Your Honor.

14           THE COURT:  All right.  Thank you for your time,

15   everyone.

16           IN UNISON:  Thank you, Your Honor.

17           THE COURT:  See you next time around.

18       (Whereupon these proceedings were concluded at 11:09 AM)

19

20

21

22

23

24

25

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 96
of 113

1                          I N D E X

2    RULINGS:                                      PAGE  LINE

3    Jenner & Block retention application approved   9    9

4    Cravath, Swaine & Moore retention application   9    9

5    approved

6    Munger Tolles retention application approved    9    9

7    UCC's Milbank retention application approved    9    9

8    UCC's 1102 information protocol motion granted  16   20

9    UCC's Epiq Retention Application granted.       30   18

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 97
of 113

1          C E R T I F I C A T I O N

2

3    I, Dena Farbman, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ DENA FARBMAN, CET-629

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  April 25, 2019

16

17

18

19

20

21

22

23

24

25

# A

**ability (6)**
57:12;70:8,19,22;
71:2;72:14
**able (3)**
32:19;74:13;85:13
**absence (1)**
21:1
**Absolutely (4)**
59:8,23;87:9;89:9
**accept (5)**
40:8;84:4,24;
89:16,20
**acceptable (5)**
26:1;63:9;85:14;
89:11,25
**accepts (1)**
87:3
**accommodate (2)**
91:12;92:21
**accommodation (1)**
95:18
**accordingly (1)**
6:12
**account (1)**
88:23
**accountants (1)**
46:11
**accounting (1)**
96:1
**accurate (2)**
6:23;7:1
**acknowledge (1)**
38:15
**acknowledged (1)**
54:5
**across (3)**
50:15;57:12;93:19
**act (4)**
9:18;10:5;12:15;
35:24
**action (1)**
57:5
**activity (1)**
29:5
**actual (3)**
43:6;56:24;59:9
**actually (5)**
19:4;24:22;48:22;
51:5;82:11
**added (1)**
17:25
**additional (5)**
85:3;88:9,13,17;
89:6
**Additionally (1)**
28:25
**address (17)**
11:12;13:21,23;
19:2;20:6,23;24:10;
37:18;44:1;53:22;

61:7;62:10;64:2;
67:24;70:11;73:16;
84:12
**addressed (3)**
54:16,17;74:9
**addressing (1)**
72:1
**adjourn (1)**
33:10
**adopting (1)**
5:8
**advance (4)**
77:20;92:10;93:12;
95:8
**advantageous (1)**
23:20
**adverse (24)**
7:3;40:16;42:19,
20;45:21;48:23;
49:21;50:2;53:1;
56:9,12,15,21;57:4,6;
58:15,15;59:10,12;
60:2,24;68:7,9,23
**adversity (5)**
50:14;51:14;53:4,
5;58:7
**advice (8)**
10:2;50:23,24,25;
63:15,21,22,25
**advise (1)**
51:17
**advisement (1)**
69:4
**advising (1)**
38:22
**advisor (5)**
39:17;40:19;53:3;
65:25;80:5
**advisors (2)**
60:9;80:25
**advisor's (1)**
53:2
**affect (1)**
70:22
**affecting (1)**
33:20
**affects (1)**
16:11
**affidavit (1)**
8:7
**affiliate (30)**
38:8,14,22;39:18,
20;40:22,24;42:4,5,8,
17,21,25;43:5,8;
44:10,12,16;45:3;
48:15;54:10;55:18;
66:17,21,25;67:15,
17;68:22;74:21,22
**affiliated (1)**
45:1
**affiliates (2)**
67:12;78:5
**again (45)**

5:22;8:24;18:13;
21:25;24:2;25:6;
26:17;28:11;35:21;
40:6;42:4,15;45:10;
49:24;53:7;54:24;
55:23;57:11,23;
58:19;59:9,13;60:22;
61:20;65:18;66:19;
67:24;68:21;70:17,
21;72:1,12,22;74:15,
16;75:8;77:3;80:9;
81:22;82:21;88:1;
93:4,5;94:10,14
**against (2)**
6:2;57:1
**agenda (1)**
11:7
**agent (1)**
21:4
**agents (1)**
46:12
**aggregate (1)**
50:11
**ago (5)**
6:7;40:13;53:24;
56:19;58:8
**agree (22)**
6:11,17;7:17;9:6,8;
29:6;51:4;52:16;
54:4,12;57:20;63:8;
64:1,10;67:12;71:5;
73:12;81:22;82:2,3;
88:19,21
**agreed (5)**
67:11;68:1;88:11,
16;92:21
**agreeing (1)**
73:13
**agreements (1)**
64:17
**agrees (1)**
53:10
**ahead (6)**
16:20;24:11;37:25;
49:3;50:4;86:12
**Alarm (1)**
35:4
**aligned (2)**
49:22;67:8
**allow (3)**
34:16;65:9;93:21
**allowed (2)**
34:17;84:22
**allows (2)**
20:10;89:6
**almost (1)**
17:24
**along (6)**
22:9,12;64:19;
68:2;90:9;95:22
**alternatively (1)**
59:24
**always (4)**

22:24;63:20,22;
80:17
**amenable (2)**
13:7;15:5
**amend (1)**
6:12
**among (2)**
38:9;39:9
**analysis (6)**
50:23;53:6;71:13,
15;72:6;82:4
**analyzing (1)**
52:23
**and/or (1)**
92:8
**Andrew (1)**
10:22
**anomalies (2)**
46:2;47:24
**anomaly (1)**
57:20
**anticipate (5)**
22:4;30:2;70:12;
78:16;83:15
**anticipated (4)**
34:15;93:11,13;
94:22
**anti-Mr (1)**
14:10
**anymore (1)**
65:2
**appear (3)**
11:7;53:15;54:10
**applicant (2)**
14:19;15:2
**application (10)**
30:4;32:3;33:16;
35:19;41:4;46:21;
67:24;90:13;91:18;
93:21
**applications (6)**
5:18;31:11;35:22;
62:9;80:16;87:24
**applies (1)**
92:7
**apply (2)**
59:10;75:12
**appoint (2)**
12:8;16:16
**appreciate (3)**
20:8;53:15;55:7
**appropriate (7)**
13:6;22:15;36:7;
52:24;61:19;88:17;
93:7
**appropriately (1)**
53:21
**approval (1)**
93:12
**approve (2)**
5:8;86:22
**approved (4)**
32:9;34:4;41:5;

89:21
**approving (2)**
32:10;65:25
**approximately (1)**
22:2
**APRIL (1)**
5:1
**area (1)**
53:2
**argue (1)**
6:2
**argued (1)**
82:5
**arguing (1)**
7:2
**argument (6)**
38:1;64:22;66:16;
71:6;76:17;79:11
**arguments (2)**
84:11,16
**around (5)**
38:8;66:12;83:8;
89:13;96:17
**arrange (1)**
15:22
**arrangements (2)**
92:8,9
**arrive (1)**
50:7
**ascertainable (1)**
92:9
**aside (2)**
64:14;94:14
**aspects (1)**
50:6
**assert (1)**
56:22
**assist (1)**
55:9
**assistance (1)**
39:9
**assisting (1)**
60:2
**associated (1)**
49:16
**assume (11)**
5:10;6:21;8:3;9:16,
20;49:19,20;52:21;
60:9;61:13;71:5
**assumed (1)**
19:13
**assuming (2)**
46:17;60:11
**assumptions (1)**
27:10
**attached (1)**
34:11
**attacking (1)**
7:9
**attempt (1)**
84:15
**attorneys (1)**
46:11

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 99
of 113

**authorize (4)**
47:14;71:19,21;
73:1
**authorized (2)**
65:10;80:23
**authorizes (1)**
76:15
**authorizing (3)**
10:8;41:6;58:14
**automatic (1)**
48:6
**automatically (2)**
9:4;35:6
**available (3)**
27:17;28:3;90:1
**avoid (2)**
16:17;74:20
**award (1)**
88:17
**aware (4)**
5:15;31:13;85:18;
90:10
**away (3)**
37:17;52:13;83:2
**awful (1)**
26:3
**awkward (1)**
80:4

**B**

**back (19)**
12:11;13:24;19:17;
23:21;26:16;28:21;
37:16;42:15;46:14;
48:13;53:18;58:8;
72:18;73:19;77:19;
81:13;92:5;94:13;
95:17
**background (1)**
30:15
**bad (3)**
64:21;93:16,18
**bag (1)**
37:12
**BakerHostetler (2)**
15:19;86:4
**balls (1)**
51:11
**bank (1)**
88:23
**bankers (1)**
88:6
**bankruptcy (5)**
16:12;56:12,13,23;
58:13
**BAPCA (1)**
17:11
**bar (3)**
22:18,19;23:9
**barriers (1)**
57:13
**based (11)**

21:7;22:3;50:17;
51:12;60:24;61:5;
69:22;72:8;74:14;
75:9;79:17
**bases (1)**
96:12
**basics (1)**
23:7
**basis (13)**
16:6;21:23;55:3;
60:17,20;62:22;70:9;
73:24;75:11;76:25;
87:19;91:8;92:12
**bat (1)**
22:22
**becomes (1)**
59:19
**beer (1)**
82:13
**behalf (6)**
10:23;15:19;29:1;
43:18;54:24;55:4
**belaboring (1)**
95:14
**believes (3)**
17:2;93:6,22
**benefit (1)**
14:25
**besides (1)**
10:7
**best (3)**
21:19;56:17;79:18;
81:9
**better (5)**
14:15;19:20;61:24;
77:2;95:21
**beyond (1)**
28:10
**bias (1)**
57:1
**bidding (1)**
20:21
**big (4)**
13:19;23:8;61:10;
64:5
**bigger (1)**
77:5
**bill (2)**
21:23;88:6
**bind (1)**
78:22
**binding (1)**
82:8
**bit (3)**
29:19;30:14;80:13
**bizarrely (1)**
82:13
**blah (3)**
7:24,24,24
**blank (1)**
17:15
**Block (1)**
5:18

**bonus (1)**
87:5
**both (20)**
13:6;16:11;19:8;
31:1,9,11;39:23;
40:1;41:23;42:7,14;
43:15;57:11;68:13,
25;74:6,6;77:24;
84:3;86:8
**bounce (2)**
79:11,14
**bounced (1)**
77:9
**breach (1)**
52:6
**break (2)**
39:14;66:20
**brief (3)**
43:24;69:10;91:6
**briefing (2)**
85:4;93:5
**briefing's (1)**
85:5
**briefs (1)**
66:11
**bright (1)**
58:20
**brings (1)**
80:24
**broad (3)**
24:21;53:4;60:23
**broader (1)**
49:6
**Brothers (1)**
17:7
**brought (1)**
78:17
**budget (5)**
21:16,20;22:5;
62:21;87:4
**budgets (1)**
62:21
**bump (1)**
29:19
**bunch (2)**
51:15,16
**burden (2)**
14:19;73:3
**business (2)**
18:23;60:14

**C**

**calculate (1)**
60:13
**calculation (1)**
60:17
**calendar (7)**
5:5;27:7,8;30:22;
81:25;82:16;96:2
**CALIFORNIA (2)**
5:1;38:12
**Call (8)**

5:3;11:13,15;30:7;
51:11;84:3,6;92:4
**came (4)**
20:11;21:6;56:18;
58:8
**camp (1)**
11:4
**can (50)**
11:8;13:9,16,22;
15:22,24;19:15,21;
20:11,12;21:19;
22:20;23:16,16;24:7;
31:3;35:24,25;46:4,
14;47:2,8;48:9,18;
49:3;50:21;55:25;
59:6;67:14,18,20,20;
68:1,4;72:22,25,25;
74:6;77:1;79:19;
80:3;82:2;83:12;
84:17,21;87:11,21;
92:5,19;95:23
**capable (1)**
93:11;94:22
**care (1)**
5:5
**careful (1)**
37:14
**carry (1)**
73:3
**carve-out (3)**
63:8,9,14
**case (33)**
6:25;14:12,14,25;
16:23;17:10;18:5;
23:8,8;24:5;26:19;
29:24,25;34:6,11;
37:1,5;41:9,10;
46:20;48:3;54:22;
55:1,10;56:17,17;
59:10;63:16;65:13;
66:10;80:13;81:12;
95:6
**cases (12)**
10:1;13:5;17:9,23;
19:4;21:25;38:14;
41:1;49:10;70:23;
75:2;80:20
**cast (1)**
54:22;60:23
**catch (1)**
26:4
**category (1)**
29:5
**cat's (1)**
37:12
**cease (1)**
56:11
**Centerview (19)**
30:23;31:12;32:5;
33:13;35:24;36:3,14;
37:16;83:24;84:4;
85:8;86:15,18;88:16;
89:22;90:5,15;92:16;

96:1
**Centerview's (1)**
84:7
**certain (5)**
11:4;31:21;42:12;
53:12;58:24
**certainly (7)**
13:1,6,11,16;
29:25;80:13;84:21
**certainty (3)**
78:18,19;81:1
**cetera (3)**
8:16;23:11,11
**challenge (1)**
78:23
**challenging (2)**
7:9;69:25
**chambers (3)**
32:16,16;33:17
**chance (2)**
32:24;33:1
**change (2)**
8:25;74:21
**changed (2)**
7:5,8
**changes (1)**
26:10
**Chapter (3)**
38:14;48:2,2
**charge (1)**
10:20
**Chesley (67)**
43:20;53:14,14,18;
54:5;55:17,20,22;
56:2,21;57:18;58:2,5,
17,19,24;59:3,8,16,
23,25;60:5,7,9,15;
61:5,9,13,16,22,24;
62:3,5,13,17,20,25;
63:3,5,13,17,20,23;
64:2,8,10,16,20;
67:11;69:14;74:5,7,
13,25;75:2,5;80:3,6;
81:21;82:3,9;84:8,11,
18;85:1,3,7
**Chesley's (1)**
65:5;66:16;71:6;
77:4
**choice (3)**
58:22;59:1;81:19
**chooses (1)**
60:11
**Circle (1)**
95:6
**circles (1)**
23:21
**Circuit (1)**
95:5
**circumstances (3)**
57:1;91:25;93:13
**cite (2)**
41:1;75:3
**cited (3)**

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 100
of 113

17:16;65:14;82:8
**citing (1)**
66:5
**claim (2)**
39:10;64:11
**claimant (3)**
23:22;52:19;56:25
**claimants (4)**
51:6;52:10,13,15
**claimants' (1)**
85:10
**claims (23)**
21:4;23:9;38:16;
39:2,12,24;42:10,11,
13;49:16;50:7,8,11,
14,18;51:16;52:6;
59:21,25;60:18,18;
64:3;70:24
**clarification (3)**
10:12;13:4;25:23
**clarified (1)**
62:12
**clarify (4)**
5:8;61:17;64:14;
89:11
**clarifying (1)**
8:20
**class (1)**
45:21
**clear (19)**
21:12;24:14,24;
25:16;44:11;46:24;
54:1;56:7;58:20;
68:21;69:9;70:18,20;
71:1;72:12;88:13;
89:12;90:22;94:3
**clearly (2)**
44:17;55:13
**CLERK (6)**
5:4;19:5,5,9;35:9;
82:24
**clicked (1)**
37:6
**clicking (1)**
27:17
**client (9)**
24:17;25:16;62:14;
77:5;80:3;87:3,17;
94:15;95:23
**clients (4)**
76:18,18;86:20;
89:19
**client's (1)**
87:6
**closed (2)**
7:3,10
**Code (2)**
56:16;57:21
**collaterally (1)**
7:8
**colleagues (1)**
82:11
**collective (1)**

26:22
**comfort (2)**
36:21;88:9
**coming (4)**
7:8;32:22;42:15;
72:18
**comment (3)**
6:5;14:5;89:10
**comments (6)**
5:17;6:6,11;18:20;
55:7;87:11
**committee (92)**
5:7;10:23;12:8;
13:17,20,21;15:3,4,9,
9,10,19,22;16:5,7,17,
23,23;17:1;19:12;
21:8;22:13;24:3,13,
18,19;27:25;28:2;
29:1,3;31:10;39:6,8,
16,16;40:5,20;41:6,
20;42:10,11;43:12,
18;46:11,13;47:11;
48:8;49:23;50:19,21,
23;51:24;52:7;54:1,
18;55:10;56:3,8,11,
11;57:5,7;58:5;
59:20,20,20;63:1,5;
65:25;67:3,7,19;68:3,
13;70:18;72:13;
73:24;77:4;79:10,19;
85:10,18,24;86:1,2;
88:16,24,25;89:4,4,6,
25
**committees (7)**
12:19;13:12;14:23;
17:7;28:13;34:17;
46:4
**committee's (13)**
12:24;13:2;16:21;
28:5;29:15;39:23;
53:1;56:13,14;65:16,
17;67:8;79:13
**common (2)**
14:24;16:9
**commonality (1)**
13:13
**Commonwealth (1)**
54:20
**communicate (1)**
27:4
**communicating (1)**
26:22
**communications (2)**
26:24;28:2
**company (1)**
50:25
**Compass (75)**
38:8;44:4,4,5,6,16,
17;45:2;48:15,25;
49:14,25;50:10,25;
51:22;53:5,8;54:18,
23;55:1,3;57:13,22,
24;60:4,16;66:21,22;

67:12;68:20;69:15,
23;70:8,9,13,20,22;
71:4,8,13,21;72:5,14,
18,18;73:2,3,25;
75:12,15,23;76:16,
25;78:3,4,7,7,13,16,
19;79:2,10,14,15,21;
81:7,10,11,14,16;
83:16,23;84:20,23,25
**Compass's (2)**
49:20;52:2
**compensated (2)**
47:2;62:14
**compensation (9)**
47:1;48:3;54:6;
64:14;72:23;80:1;
88:17;93:21;95:1
**compensation's (1)**
64:15
**competing (5)**
41:25;42:1,8,18,18
**competitive (2)**
20:21;30:16
**complained (1)**
10:10
**complaint (1)**
50:16
**complete (3)**
6:23;7:1,10
**complex (1)**
54:13
**components (1)**
39:14
**concede (2)**
66:16,18
**conceding (2)**
62:15;92:19
**concern (1)**
20:6
**concerned (4)**
59:14,17;82:21;
90:7
**concerns (3)**
10:17;14:18;53:22
**concluded (2)**
19:20;96:18
**conditioned (1)**
66:7
**conditions (4)**
93:9,22;94:21,21
**confidential (3)**
31:22;89:23;95:22
**confidentiality (1)**
83:25
**confirm (2)**
34:22;85:14
**confirms (1)**
87:18
**conflate (1)**
40:10
**conflict (3)**
40:17;69:1;70:25
**conflicting (1)**

40:10
**confused (2)**
32:7;61:21
**confusion (1)**
62:1
**congratulations (1)**
94:15
**connection (3)**
27:24;33:14;38:10
**consensual (2)**
15:6;16:14
**consequence (1)**
19:18
**consequences (2)**
60:13;81:6
**consider (2)**
63:7;76:24
**considered (1)**
75:16
**consistent (4)**
50:25;73:17;83:18;
90:8
**consolidate (1)**
96:4
**constituents (1)**
12:19
**consulting (3)**
38:10;54:19,24
**contains (1)**
19:9
**contemplate (1)**
19:3
**contend (1)**
57:17
**contents (1)**
32:20
**contests (1)**
57:18
**context (4)**
9:5;16:18;29:24,25
**contexts (1)**
74:24
**contingency (2)**
91:8;92:3
**continue (11)**
35:19;36:3;38:13;
55:9;71:2;77:13;
83:23,24;84:1;89:22;
95:25
**continued (1)**
60:19
**continues (1)**
54:19
**contract (6)**
23:22;51:15;52:24;
59:19;60:1,12
**contracts (2)**
5:11;60:12
**contrary (1)**
50:20
**contribution (1)**
92:17
**convenience (1)**

82:18
**convert (1)**
28:16
**convey (1)**
57:12
**convoluted (1)**
91:25
**corporate (1)**
40:19,20;48:14
**Corporation (2)**
5:4;7:16
**correctly (4)**
46:3,8;47:10;64:25
**cost (2)**
21:17;29:16
**cost-competitive (1)**
21:10
**cost-effective (1)**
20:18
**counsel (12)**
5:15;14:5;46:18;
52:14;53:8;57:3;
58:22;59:1,2;84:3,7;
96:5
**counsels (1)**
61:1
**counted (1)**
16:18
**counterparties (1)**
51:17
**counterparty (1)**
52:14
**country (2)**
64:6;66:12
**couple (8)**
5:16;6:7;15:25;
46:23;54:14;56:4;
75:2;79:24
**course (10)**
13:14;16:15;20:17;
27:14;32:24;36:22;
46:19;58:21;59:5;
78:11
**Court (460)**
5:3,5,9,24;6:2,8,13,
19,24;7:12,19,22;8:2,
5,11,14,18,21,24;9:7,
9,14,18,19,22;10:10,
16;11:1,3,6,11,13,18,
20,23;12:3,6,14,24;
13:3,14,24;14:6,10,
12,20,22;15:3,5,13,
15,20,25;17:8,12,16,
18,21;18:1,3,7,11,15,
17,20,23,25;19:6,6,
13,25;20:2,8,14,17,
19,22,25;21:5,15;
22:10,14,21,25;23:2,
6,11,14,19,21,24;
24:1,8,11;25:4,10,13,
20,23,25;26:1,3,6,8,
12,13,15,16;27:5,16,
19,21,23;28:9,11,16,

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 101
of 113

19,21,25;29:7,13,20,
22;30:1,3,7,11,21;
31:4,9,11,13,15,17,
20,23,25;32:2,7,12,
16;33:2,4,6,9,11,15,
19,21,23;34:1,3,5,10,
20,25;35:5,8,10,14,
21;36:9,11,18,22,25;
37:8,10,12,19,23,25;
38:3,15,18,24;39:1,3,
13,19;40:2,4,6;41:9,
12,16,18,22,24;42:2,
4,15;43:4,11,14,16,
21,22,24;44:8,10,14,
19,22,24;45:2,5,10,
17,19;46:1,10,19,22;
47:18,20;49:2,5,8,10,
11,13,18,24;50:19;
51:3,8,10,15,21,24;
52:2,20,25;53:7,10,
15,17,21,23;54:4,22;
55:4,12,18,21,25;
56:19,20,21;57:3,16,
20,22,24,25;58:4,7,
11,18,23;59:1,5,15,
17,24;60:4,6,8,11;
61:2,6,8,9,10,15,18,
20,23,25;62:4,8,11,
14,19,23;63:1,4,7,10,
11,15,18,22,25;64:4,
9,12,17,21,24;65:1,4,
9,10,13,16,18,23;
66:5,9,15,19,23,25;
67:2,10,14,25;68:15,
17,19;69:2,6,11,13,
17,19,24;70:3,6,12,
13,15;71:3,5,11,18;
72:3,7,9,11,16,20,22;
73:9,12,19;74:4,6,12,
18;75:1,4,13,14,19,
22,25;76:3,6,8;77:1,
9,18;78:9,11;79:1,4,
7,13,23;80:10,12;
81:19,24;82:10,20,
25;83:4,7,21;84:10,
13,14,18,19;85:2,3,5,
8,11,15,17,21,24;
86:2,5,7,11,13,15,17,
19,24;87:1,8,10,13,
20,24;88:3,5,10,19,
21;89:3,13;90:14,17,
21,25;91:4,5,17,19,
21,24;92:11,13,16,
22,22,23,25,25;93:1,
6,8,16,18,21,22,23,
25;94:2,5,7,10,13,24;
95:1,3,5,13,16,21,25;
96:14,17
**courtesy (1)**
11:11
**courtroom (2)**
20:4;35:11
**courts (8)**

10:2;54:16;56:16;
58:20,21;74:13;92:5,
10
**Court's (7)**
20:6;26:10;53:22;
62:20;86:9;90:25;
91:1
**covered (2)**
27:15;96:12
**covering (1)**
86:25
**Cravath (1)**
5:18
**crazy (1)**
64:7
**create (5)**
42:19;48:15;56:24;
67:15;78:19
**creates (2)**
48:16;62:1
**creating (3)**
27:12;53:4;60:24
**creditor (2)**
8:8;45:14
**creditors (5)**
16:14;17:25,25;
26:25;45:22
**creditors' (3)**
5:7;15:22;16:21
**critically (2)**
56:2,3
**crossed (1)**
48:22
**Crutcher (1)**
33:13
**current (1)**
93:9
**currently (1)**
38:22
**cut (1)**
96:4

**D**

**damage (1)**
39:11
**damages (3)**
38:11;42:22;52:4
**data (3)**
50:17;51:12;87:19
**databases (2)**
12:17;16:19
**date (8)**
22:18,19,19;23:9;
36:4;38:8;82:1;83:23
**dates (1)**
23:11
**day (9)**
37:13;50:10;80:23;
82:18,24,25;83:3,10;
96:3
**days (3)**
6:7;53:24;82:23

**deadline (1)**
14:4
**deal (10)**
7:25;16:5;17:3;
18:13;19:19;22:16;
57:20;59:21;62:7;
64:5
**dealing (2)**
17:14;63:4
**dealt (3)**
23:24;54:16;80:10
**debate (1)**
72:22
**debating (1)**
52:17
**debtor (26)**
25:6;28:12;39:20;
40:21;43:8;47:12;
48:5;51:16;52:2,10;
53:1;54:20;58:1,2;
60:10,11;63:1;66:21;
67:4;68:19;79:9;
81:7;10;88:22;89:7;
90:1
**debtors (22)**
24:13;31:8;38:9,
13,23;39:25;40:3;
41:21;42:12;48:1;
49:16,22;50:16;
54:24;55:4;66:1,4;
68:13;69:9;73:23;
83:15;87:19
**debtors' (3)**
41:7;52:18;88:23
**debtor's (13)**
5:10;19:9;58:3;
60:20;65:11,15;66:4,
7;67:7;69:15;78:1,
20;81:5
**decade (2)**
56:19;58:8
**decide (5)**
47:15;79:14,20;
82:10;83:5
**decided (3)**
18:4;70:18;73:7
**decides (1)**
52:3
**deciding (3)**
60:14;88:25;93:1
**decision (4)**
60:21;76:23;84:17,
20
**decisions (3)**
56:4;82:6,7
**declaration (2)**
39:7;75:10
**declines (1)**
26:13
**decree (1)**
77:20
**defer (1)**
34:25

**deference (1)**
58:25
**defined (4)**
25:15;56:16,22;
58:7
**defines (2)**
44:11,11
**definition (10)**
22:6;42:2,5,25;
43:5;45:6,6,24;
54:11;59:11
**Delaware (1)**
65:24
**delays (1)**
96:5
**Dennis (2)**
5:25;43:17
**deny (1)**
80:1
**Depends (3)**
20:1;21:21;53:4
**description (1)**
56:18
**designated (1)**
46:12
**designed (1)**
20:9
**desire (1)**
84:1
**despite (1)**
67:6
**destroys (1)**
42:24
**details (1)**
30:16
**determination (1)**
62:7
**determined (3)**
17:22,23;21:8
**developed (1)**
59:11
**developments (3)**
93:10;94:1,22
**dialogue (1)**
36:8
**difference (1)**
72:23
**differences (3)**
13:11;16:15;47:11
**different (22)**
12:17,17;16:24;
17:3,4;18:18;21:2;
22:4;26:6,15;40:16;
42:13;47:25;50:7;
65:19;68:20;71:22;
72:4,5,9;78:3;91:16
**differently (1)**
69:24
**difficulty (1)**
71:19
**direct (3)**
25:3;45:23;57:6
**directed (1)**

18:21
**director (1)**
45:20
**disabling (3)**
70:25;73:8,10
**disagree (2)**
8:11;82:4
**disagreement (1)**
50:18
**disclose (2)**
41:5;66:6
**disclosed (1)**
66:2
**disclosure (1)**
26:23
**disclosures (5)**
32:4,4;36:6;37:20;
95:22
**discreet (1)**
54:24
**discretion (1)**
12:8
**discuss (1)**
79:19
**discussed (2)**
80:12;88:12
**discussion (2)**
13:17;68:20
**disinterest (2)**
39:3;58:18
**disinterested (27)**
8:9;38:7;39:4,21;
40:11,14;43:9;45:6,
12,13;46:4,6,8;47:5,
8,16;48:16,17,21;
50:2;54:11;67:17;
68:5;6;69:1;72:2;
73:4
**disinterestedness (7)**
6:10;7:2,19;38:22;
42:24;54:10;67:15
**dispute (3)**
25:25;56:24;57:13
**disputes (1)**
26:11
**disqualified (7)**
45:17;47:23;59:7,
24;71:13;72:19;
84:24
**disqualifier (8)**
40:22;48:6;50:3;
55:19;66:17;67:4;
77:20;78:12
**disqualifiers (2)**
53:12;58:16
**disqualify (5)**
40:9;42:23;56:7;
70:9;73:25
**disqualifying (2)**
66:20;76:9
**disregarded (1)**
9:25
**distinction (1)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 102
of 113

46:17
**distribute (2)**
34:23;35:17
**DLA (2)**
43:22;53:15
**docket (11)**
6:7;16:19;19:7,7,8;
20:12;23:16;27:15,
15;37:3;65:22
**docketing (1)**
37:3
**dockets (1)**
19:1
**document (1)**
37:4
**dollars (10)**
9:3;19:22,22;
21:13,13,17;30:4;
87:17;92:18;94:19
**done (15)**
13:5;17:3;19:4,21;
24:22;28:15;34:8,9;
36:14;71:14;74:23;
75:23;77:12;88:18,
20
**double-check (1)**
46:25
**down (8)**
21:9,11,24;29:13;
39:14;40:6;44:2;96:4
**drink (1)**
31:17
**driving (1)**
50:15
**DSI (1)**
85:19
**Dunn (2)**
33:13;86:18
**DUNNE (71)**
5:23,25,25;6:4,9,
17,20,25;7:17,21;8:1,
3,6,13,17,19,22;9:6,8,
10;10:15,21;43:16,
17,17,22,25;44:9,13,
17,20,23,25;45:4,8,
16,18,25;46:9,16,20;
47:11,19;48:20;49:4,
6,9,12,14,21;50:5;
51:2,4,9,11,19,22;
52:1,16,21;53:3,9;
67:11;77:3,8,11;78:2,
10;84:2,6;86:1
**Dunne's (3)**
55:7;71:6;75:7
**duplicate (1)**
19:4
**duplicates (1)**
26:4
**duplication (2)**
13:22;62:8
**duplicative (2)**
12:16;15:23
**during (2)**

38:14;80:7
**duties (2)**
42:6;51:6

**E**

**early (1)**
80:14
**easier (1)**
45:18
**easy (2)**
45:15;80:8
**economic (3)**
51:13;56:22;57:6
**economically (1)**
80:7
**effect (2)**
74:10;75:5
**effectively (1)**
74:14
**efficiencies (2)**
23:7;24:7
**efficiently (2)**
12:25;15:7
**effort (3)**
13:22;62:8;92:10
**either (12)**
7:4;9:24;22:13;
55:15;74:4;76:9;
77:10,24;81:8,8,19,
25
**elaborate (1)**
16:25
**eligibility (1)**
81:12
**eligible (3)**
48:9,10;81:16
**eliminate (1)**
77:16
**else (15)**
17:2;26:16;30:12;
32:17;35:11;40:23;
60:8;69:2;76:11,16;
80:14;82:22;87:21;
90:9;95:7
**email (1)**
57:14
**emergency (1)**
34:6
**employ (7)**
39:16;41:6;46:11;
58:1;68:19;75:15;
83:16
**employed (12)**
39:15;46:4;47:3,9;
57:25;65:11;68:2,8,
11;69:25;90:16;
95:10
**employee (4)**
45:20;46:12;71:8;
81:16
**employees (1)**
57:14

**employing (1)**
73:23
**employment (15)**
10:8;41:7;48:2;
58:14;65:11;66:7,8;
70:13;71:20,21;
72:23;73:1,21;80:23;
89:21
**employments (2)**
80:20;96:10
**employs (1)**
79:10
**enacted (1)**
17:13
**end (1)**
50:20
**engage (1)**
21:8
**engaged (5)**
39:20;40:21;49:25;
55:4;64:15
**engagement (7)**
24:14,25;26:2;
58:6;64:13;87:6;93:7
**enough (3)**
49:24;78:15;89:14
**Enron (3)**
56:6;58:9
**entered (3)**
33:1;34:16;36:23
**entering (1)**
53:15
**enters (1)**
94:25
**entities (2)**
45:1;54:22
**entitled (5)**
36:15;40:7,9;
58:22;80:25
**entity (9)**
39:15,17,19;40:19,
20;43:6;44:5,6;57:14
**entries (1)**
27:15
**entry (1)**
20:12
**envious (1)**
76:8
**envision (1)**
12:9
**Epiq (29)**
12:11,12;13:7,23;
16:18;18:14,15,17,
20,21,25;19:21;20:3,
10,12;21:8,22;24:15,
18,25;25:5,5,17,18,
19;27:3;28:7,25;
30:12
**equally (1)**
16:11
**equity (4)**
44:20;45:14,22;
78:5

**error (4)**
7:14,24;25:7,10
**errors (1)**
24:13
**establishing (1)**
19:3
**estate (10)**
19:21;29:16;45:21;
56:9,24,25;57:2;68:7,
10,23
**estimation (4)**
39:10;49:16;50:7;
59:25
**estimations (1)**
59:21
**et (3)**
8:16;23:11,11
**evaluation (1)**
38:10
**even (13)**
24:19;32:18;42:17,
20,20;54:9;67:6,20;
78:22;79:24;80:20;
84:19;91:21
**everybody (8)**
27:11;57:16;61:10,
20;67:11;76:19;80:9;
87:21
**everybody's (1)**
95:10
**everyday (1)**
27:14
**everyone (2)**
80:14;96:15
**everyone's (3)**
14:17;36:1;82:18
**evolved (1)**
17:14
**exact (1)**
41:3
**exacting (1)**
54:3
**Exactly (5)**
20:3;41:14;58:17;
60:5,15
**example (6)**
27:5;28:11;40:13;
42:9;81:12;92:1
**except (1)**
5:6
**exception (1)**
87:25
**exclude (1)**
64:18
**excuse (4)**
25:5;45:23;46:10;
71:12
**exercise (1)**
26:14
**expanded (1)**
64:18
**expect (1)**
91:13

**expectation (1)**
91:13
**expected (1)**
36:14
**expecting (1)**
24:18
**expects (1)**
5:9
**expedited (2)**
76:25;79:20
**experience (5)**
10:1;21:25;22:2,
17;53:11
**expired (1)**
14:4
**explain (2)**
30:8;48:20
**explanation (4)**
20:8;30:13,17;
85:22
**explanations (1)**
30:24;90:4
**exploring (1)**
76:22
**exposure (1)**
39:11
**expressed (1)**
10:17
**extent (4)**
11:19,21;28:8;
60:19
**extra (1)**
87:5
**extremely (1)**
56:4

**F**

**face (1)**
23:12
**Facebook (1)**
37:13
**facie (2)**
73:3;81:12
**facing (1)**
51:16
**fact (10)**
40:25;41:1;42:8;
44:2,3;57:3;58:4;
65:8;72:8,24
**fact-intensive (1)**
75:9
**factor (2)**
73:8,10
**facts (4)**
7:5;41:11;75:10;
81:23
**factual (1)**
75:12
**fails (2)**
41:5;66:6
**Fair (1)**
49:24;72:21

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 103
of 113

**familiar (2)**
54:23;56:20
**family (1)**
40:21
**FAQ (2)**
16:1;22:21
**FAQs (2)**
19:14;23:1
**far (5)**
11:7;19:20;54:2;
87:20;90:7
**fare (1)**
16:14
**fast (1)**
18:5
**fault (1)**
35:1
**FD/Ashton (1)**
65:11
**fear (1)**
37:11
**fears (1)**
37:1
**fee (11)**
21:11;46:21;62:9;
67:24;88:9,13;89:7;
91:8;92:4,8;93:21
**feel (1)**
80:16
**fees (2)**
29:12;81:3
**felt (1)**
80:17
**FERC (1)**
52:5
**FES (1)**
17:7
**few (2)**
82:16,16
**fiduciary (3)**
13:20;51:6,9
**fifty (1)**
21:11
**fight (1)**
89:15
**fighting (2)**
62:16;73:13
**figure (4)**
23:6;45:11;50:16;
83:17
**file (5)**
32:14;69:10;79:20;
86:10;93:20
**filed (7)**
8:7;9:16;13:2;
24:5;31:7,13;32:8
**files (1)**
29:3
**filing (2)**
28:5;76:24
**fill (1)**
30:14
**final (5)**

84:20;89:11;93:21;
94:17;96:10
**financial (6)**
39:16;42:23;65:25;
67:1;80:5,25
**find (10)**
20:11;22:7,8;
23:16,16;47:14;48:9;
57:3;73:19;89:11
**finding (1)**
6:14
**fine (12)**
8:17;10:5;16:2;
17:2;24:15;25:20;
74:18;77:15;78:21,
21;85:6;86:13
**fire (5)**
11:4;16:2;23:22;
42:13,22
**firm (7)**
7:20;8:25;14:10;
16:22;33:13;43:22;
95:7
**firms (4)**
10:8,10;21:2;80:24
**first (9)**
17:10;31:4;38:7;
53:25;60:14;80:15,
23;81:19;87:15
**fit (2)**
45:24;55:15
**Five (2)**
82:24,25
**five-million-dollar (1)**
92:4
**fixed (1)**
92:8
**fixing (2)**
93:11,14
**flagging (1)**
88:15
**flexibility (1)**
50:1
**flexible (1)**
53:13
**flip (1)**
70:16
**Florida (1)**
10:4
**focus (4)**
26:17;31:4;60:16,
23
**folks (2)**
37:13;89:19
**follow (5)**
17:4;63:15,20,22,
25
**followed (1)**
16:24
**forced (1)**
71:12
**forfeited (1)**
81:2

**forget (2)**
26:17,17
**forgot (2)**
7:15;81:14
**forgotten (2)**
43:6;95:6
**form (5)**
13:20;24:25;44:21;
78:21;89:24
**formally (1)**
9:24
**forms (1)**
26:3
**forth (2)**
57:21;75:10
**forward (10)**
5:21;18:8;30:18;
37:21;55:9;70:8,10,
23;72:14;92:16
**founded (1)**
13:19
**four (7)**
5:20;9:9;10:8,10;
12:17;21:2;80:23
**FRANCISCO (1)**
5:1
**frankly (1)**
88:22
**free (3)**
10:2;15:25;78:2
**friend (1)**
58:11
**frivolous (1)**
64:2
**front (2)**
14:21;53:18
**FTI (107)**
30:23;37:20;38:7,
9,15,19;39:3,6,9,15,
17,18;40:1,9,19,20;
41:1,5,6,20;42:14,21,
22;43:7,14,19;44:4,5,
18,20;45:3,5,15;
46:12,15;47:8;48:9,
14,17,25;49:1,6,10,
11,19;50:12,22;52:7,
23;54:18,22;55:11,
13;56:3;57:11;58:6;
59:11,14,18,21;60:2;
63:12;64:13;65:8,10,
12;66:6,21,24;67:1,
12;68:6,9,12,22,25;
69:22,22,25;70:18,
19;71:1,7,15,20;72:5,
13,19;73:21;76:3,15;
77:9;78:4,4,6,8;
79:10,11,23,24;81:7;
83:23;84:4,22,24;
96:1,9
**FTI's (16)**
38:13,22;40:7;
41:4;46:18;48:12;
52:25;53:8;65:25;

71:1,11;73:6,11,24;
76:10;77:12
**fully (3)**
12:20;75:16;76:12
**function (3)**
90:25;91:1,4
**further (4)**
84:13;88:14;90:23;
91:6
**future (1)**
55:8

## G

**gain (1)**
24:7
**game (2)**
94:16;95:23
**Games (5)**
41:2;65:9,14,23;
71:23
**gather (1)**
84:15
**gave (1)**
40:12
**gears (1)**
84:2
**general (4)**
28:3;54:21;74:10;
89:4
**generally (1)**
26:21;90:3
**genesis (1)**
52:17
**gentlemen (1)**
16:12
**gets (10)**
25:18;28:17;32:17;
35:17;36:24;48:13;
61:20;83:14;92:4;
93:18
**Gibson (2)**
33:13;86:18
**giving (1)**
50:25
**God (1)**
18:5
**goes (5)**
28:10;48:13;88:7;
90:9;92:16
**Gonzalez (3)**
56:6;58:9,12
**Good (9)**
9:9;22:16;25:21;
29:4;43:17;53:18;
78:17;82:19;85:21
**gotcha (1)**
47:21
**Gotshal (1)**
69:8
**Gottfried (7)**
11:3,15,16,17,19,
21,25

**Gottfried's (1)**
11:13
**grab (1)**
88:8
**grammar (2)**
93:16,18
**grant (4)**
16:20;30:18;35:15;
73:6
**great (1)**
12:18
**gross (2)**
64:19;65:24
**group (1)**
60:12
**groups (1)**
16:11
**Growth (5)**
54:21;74:10
**guarantee (2)**
29:14;30:7
**guess (4)**
28:17;79:9;81:9;
84:23
**guessing (1)**
16:16
**gulf (1)**
10:4

## H

**hac (1)**
53:16
**half (1)**
88:5
**hand (4)**
9:3;16:9;18:4;
48:14
**handling (1)**
28:7
**hanging (1)**
80:18
**happen (8)**
7:7,12,14;8:4;15:7;
37:15;52:5;78:1
**happened (7)**
17:10;32:19;35:1;
37:4;52:5;66:11;
82:13
**happens (4)**
7:4;35:5;58:13;
59:18
**happy (10)**
11:12;13:6,21;
15:21;20:23;24:5,6;
61:7;63:13;85:4
**hard (3)**
22:5;49:18;92:15
**harder (1)**
92:14
**harmed (1)**
80:7
**hate (1)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 104
of 113

7:12
**heading (1)**
55:12
**healthy (1)**
24:3
**hear (8)**
36:1;38:4;43:11;
53:7;66:12;85:18,22;
92:23
**heard (20)**
5:9,12,20,22;10:5,
18;15:15;30:11,12;
31:2;64:22;65:2;
66:16;69:3,5;77:21;
79:4;89:23;90:6;
92:19
**hearing (10)**
23:11;30:3;36:3;
76:24;79:19;80:21;
84:17;88:14;89:15;
94:18
**hearings (1)**
80:15
**heightened (2)**
91:8,11
**help (1)**
71:5
**helpful (4)**
30:14;62:3,4;93:5
**Hey (1)**
58:11
**Hi (1)**
33:12
**high (1)**
83:22
**higher (3)**
19:19,24,25
**hire (4)**
19:17;48:4;59:6;
81:7
**hired (7)**
42:21,22;48:9,9;
72:25;80:2;94:15
**hires (1)**
92:2
**hit (2)**
6:7;44:3
**hold (3)**
33:6;65:24;68:9
**holder (1)**
45:14
**holders (1)**
45:22
**holds (3)**
56:9;58:9;68:6
**honestly (1)**
91:15
**Honor (128)**
5:23,25;6:22;7:4,
18;8:13,19;9:12;
10:22,24;11:4,16,19,
25;12:5;14:3,9;
15:14,18;17:6;19:2,

10;20:4,5,20,24;21:3,
20;24:2,9,12,15;
25:14,24;27:1;29:6,
17,23;30:10,20;
33:16;34:19;35:15;
36:19;38:6,7;41:10;
43:10,17;44:3;45:8,
25;46:16;47:13;
48:20;51:4;52:22;
53:14,19;54:6,12;
55:3,17,20,22;57:9,
18;58:17;59:3,8,16;
60:7,15;61:5,14,16,
17,22;62:6,18;63:3,6,
14,20,23;64:8,16;
68:18;69:5,10;71:1;
72:1,18;73:5;74:5,8,
25;75:7,18;78:3,24;
80:7;81:21;82:9;
84:8,18;85:1,7,9,16,
20,23;86:3,14,16;
87:9,11,23;88:9;
90:12;93:3,4;94:9,
23;95:15,24;96:13,16
**Honor's (6)**
6:6,11;37:18;88:1;
90:23;91:7
**hoops (1)**
81:11
**hope (2)**
35:6;52:23
**hopefully (2)**
50:18;53:21
**hoping (1)**
35:19
**hosting (1)**
21:11
**hour (3)**
9:3;29:11;88:5
**hourly (4)**
21:9,23;22:3;87:15
**hours (1)**
19:22
**hundred (3)**
6:17;9:2;81:14
**hurts (1)**
79:22
**hypothetical (5)**
52:21;55:6;69:15,
16;78:6
**hypotheticals (1)**
7:13

**I**

**idea (3)**
12:19;29:4;82:19
**ideally (1)**
37:15
**identify (1)**
19:15
**imagine (1)**
25:7

**immutable (1)**
53:12
**impact (2)**
71:2;73:22
**impacted (1)**
14:14
**impacts (2)**
70:19;72:14
**implicates (1)**
39:21
**implicitly (1)**
10:7
**important (6)**
54:9;55:25;56:3,3;
58:10;72:24
**improvident (3)**
93:10,24;94:21
**inclined (2)**
35:15;91:7
**include (3)**
77:16;87:18;88:13
**included (3)**
70:10;71:16;73:15
**includes (2)**
22:1;47:2
**including (1)**
39:11
**incomplete (1)**
7:5
**inconsistent (1)**
51:1
**incorrect (1)**
50:3
**increment (1)**
88:5
**increments (1)**
88:6
**incurring (1)**
29:12
**indemnification (3)**
61:13;63:6,8
**indemnity (12)**
36:1;62:16;63:18;
64:18;76:11;79:25;
84:5;85:15,16;86:22;
89:17;90:9
**indicated (3)**
69:14;74:15;83:25
**indirect (2)**
45:22,23
**indiscernible (1)**
18:8
**influence (1)**
57:12
**information (21)**
12:18;13:8;19:10;
22:7,8,9,20;31:24;
32:6;34:23;35:2,17;
36:13,17,20;57:12;
85:4;87:15;89:24;
90:2,4
**informational (2)**
6:6;16:6

**informed (3)**
12:20;14:14;27:11
**injury (2)**
92:1,3
**innocent (1)**
7:14
**inquiry (1)**
75:9
**insist (1)**
36:11
**insisted (1)**
79:25
**instances (1)**
22:2
**integrity (2)**
59:14,18
**intend (6)**
38:14;62:9;69:19,
20;85:23;90:24
**intends (1)**
90:15
**intent (2)**
24:23;64:3
**intention (2)**
55:23;89:2;91:10
**interact (2)**
19:12;20:10
**Interactive (1)**
56:18
**interest (28)**
7:3;13:13;16:9;
40:16;42:19,20;
44:21;45:20,21;
48:23;50:2;51:14;
56:9,13,15,22,23;
57:4,6;59:12;60:2,
24;67:1;68:7,9,10,23,
23
**interested (1)**
81:4
**interests (7)**
42:9;58:15;59:10;
67:8,8,20;81:6
**interim (5)**
30:4;46:20;62:9;
80:8;87:24
**internet (1)**
18:5
**interpret (1)**
27:3
**interpretation (1)**
53:11
**interpretations (1)**
17:19
**interrupt (1)**
9:13
**interview (1)**
21:2
**interviewed (1)**
70:18
**into (6)**
6:14;20:11;27:9;
34:13;39:14;66:20

**Investment (1)**
88:6
**invite (1)**
15:9
**involved (6)**
14:2;16:7;49:19;
53:6;56:7;59:22
**issue (29)**
6:12;13:10;21:21;
25:1,15;37:16;38:21;
39:25;42:16;47:16,
18;48:12;54:6,9,13,
16;65:7,8;67:23;
72:2;74:19,20;76:9;
83:24;84:16;86:8;
88:7;89:17;96:8
**issued (1)**
5:15
**issues (13)**
53:20;54:12;55:8;
57:21,22;61:6;62:5,6,
8;76:12;79:21;82:5;
89:23
**issue's (1)**
7:3
**issuing (1)**
96:6
**item (1)**
90:12

**J**

**Jenner (1)**
5:18
**jeopardized (2)**
79:3;81:6
**jeopardy (2)**
55:14,15
**job (1)**
33:23
**join (1)**
11:10
**joinder (5)**
11:8,9,20,23;12:2
**joined (3)**
10:14;11:3,5
**jointly (1)**
80:11
**Jorian (2)**
15:18;86:3
**judge (5)**
16:24;56:6;58:8,
11;65:24
**Judges (3)**
58:13,14;82:10
**judgment (2)**
59:6;60:14
**judicata (1)**
7:23
**juicy (1)**
53:13
**jump (1)**
81:11

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 105
of 113

**jurisdiction (2)**
26:11,14

## K

**Kalotkin (1)**
9:25
**KAROTKIN (61)**
9:12,14,15,20,25;
10:9;25:6;69:5,7,8,8,
12,14,18,20;70:2,4,7,
14,17;71:4,10,14;
72:1,4,8,10,12,17,21;
73:5,10,15;74:3,15;
75:14,18,21,23;76:1,
4,7,22;77:12,15;78:1,
24;79:2,6,12,17;
80:14;81:10,18,22;
82:15,19;83:3,5,12,
20
**Karotkin's (1)**
75:7
**keep (5)**
27:11;42:15;65:20;
66:4;87:14
**keeping (2)**
14:14;32:21
**Kim (1)**
83:12
**kind (10)**
7:5;16:4;23:21;
25:13;26:24;32:2;
51:13;79:23;84:23;
87:14
**knows (3)**
18:5;25:6;61:11
**Kreller (1)**
8:7

## L

**land (2)**
50:17;51:12
**language (10)**
55:16;64:17;70:10;
71:16;73:16;77:15;
87:18;89:10,12;
91:25
**large (1)**
26:19
**last (6)**
47:20;65:3;66:11;
71:22;81:2;94:20
**lastly (1)**
25:24
**late (2)**
11:20,23
**later (3)**
17:2;47:14;94:17
**law (7)**
16:22;33:13;54:1;
56:17;59:10;60:25;
80:23

**lawyer (6)**
48:4,12;89:16;
92:2,2,3
**lawyers (6)**
8:25;37:1;63:12;
76:17;89:14,18
**least (7)**
16:18,19;19:7;
40:8;58:24;76:10;
77:25
**leave (4)**
5:13;18:7;64:14;
94:14
**leaves (1)**
79:23
**leaving (1)**
80:17
**Leblanc (89)**
10:22,22;11:2,4,7,
12;12:4,5,13,23;13:1,
4,15;14:8,10;15:12,
14,17;17:6,9,13,17,
19,22;18:2,6,10,13,
16,19,22,24;19:2,8,
14;20:1,3,9,15,18,20,
23;21:1,6,19;22:12,
15,23;23:1,5,10,12,
15,20,23,25;24:2,9,
12;25:9,12,14,22,24;
26:5,7,9,13;27:1,12,
17,20,22,24;28:10,
14,18,20,24;29:6,8,
17,21,23;30:2,6,9,20;
40:12
**Leblanc's (2)**
15:8;30:13
**led (1)**
13:17
**left (2)**
5:14;30:22
**legal (6)**
22:15;44:4,6;
79:15;81:6;82:3
**Lehman (1)**
17:7
**less (2)**
6:10;54:2
**lessen (1)**
56:23
**letter (6)**
9:15;10:3;24:14,
25;26:2;27:25
**letters (1)**
10:2
**letting (1)**
81:7
**level (2)**
58:24;91:11
**Lexecon (7)**
54:18,23;55:1,3;
57:13,22;73:23
**light (4)**
21:1;93:10;94:1,22

**limbo (1)**
79:23
**limit (1)**
73:25
**limitations (1)**
47:3
**Lincoln (8)**
35:22;84:1,3;
85:12,13,19;90:8;
96:1
**Lincoln's (1)**
90:7
**line (5)**
28:22;48:22;58:20;
81:23,23
**lineup (2)**
40:19;74:11
**link (2)**
19:6,8
**linked (1)**
51:13
**list (7)**
11:14;24:21,22;
28:12,14;29:10;
83:22
**Listen (3)**
23:2;36:25;58:11
**lists (1)**
8:7
**litigation (3)**
52:5;54:19,24
**little (8)**
23:8;29:19;30:14,
14;31:18;49:25;
76:11;80:13
**live (3)**
63:12,13;80:3
**lives (1)**
63:12
**LLP (2)**
5:19;6:1
**loaded (1)**
33:17
**locked (1)**
6:14
**logic (2)**
58:8;92:7
**long (7)**
9:10,10;70:7;77:1;
84:22;87:2;89:14
**look (17)**
5:21;15:25;18:7,8;
28:19,21;30:18;
32:18,19;34:21;54:9,
13;56:16;67:22;
78:15;80:4;82:5
**looked (3)**
25:15;28:21;77:4
**looking (4)**
43:5;54:12;58:8;
59:10
**looks (1)**
79:9

**lose (2)**
44:3;79:10
**lost (2)**
76:2,7
**lot (10)**
19:25;26:3;34:11;
49:11;62:1;65:19;
70:23;75:23;77:11,
12
**lots (5)**
59:18;74:23;80:21,
21,22
**lower (1)**
20:15
**luck (1)**
48:18

## M

**magic (2)**
9:4;32:18
**magnitude (1)**
21:12
**makes (7)**
15:11;25:5,17;
76:16;88:13;92:4,17
**making (1)**
14:5
**man (1)**
19:17
**management (1)**
14:12
**Manges (1)**
69:9
**many (7)**
14:13,25;17:23;
28:19,20;37:1;56:6
**mark (1)**
80:22
**mass (2)**
22:1;26:22
**material (3)**
7:6;45:20;48:23
**Matter (9)**
5:4,10;8:14;40:14;
68:7,10;69:3;74:9;
96:9
**matters (4)**
54:17;55:2;56:12;
96:2
**may (32)**
13:12;16:14;28:1;
29:18;35:20;42:10,
10,11,12;46:11,22;
50:6,7,9,11;51:12;
53:1;55:7;57:22;
58:15;67:8;70:14;
73:24;74:24;78:11;
84:9;88:17,19,21;
93:21;96:1,2
**maybe (16)**
16:4;23:2;36:9,
11,12;46:24;48:10,

11;50:3;52:5;66:12;
83:1;84:19;85:21;
95:6
**McCann (3)**
9:16,19,22
**mean (66)**
6:15;8:11,14;9:3,
25;10:16;12:7;13:1;
14:1;15:3,25;16:1;
18:17;20:19;28:16;
39:6,7,23,23;41:11;
47:6;48:13;49:2,6,11,
20;50:21,22;53:8;
57:25;58:12;59:16;
60:16;63:11;64:24;
65:18;66:4,9;69:24;
71:11,11,22;75:19;
77:1,2,3,9,20;79:4,
15,24;80:2,4,6;83:9;
84:19;87:1,6,24;
88:25;91:1,19,21
**means (4)**
11:9;45:13,14;
81:10
**meant (1)**
14:21
**meantime (1)**
82:1
**media (1)**
18:4
**mediator (1)**
82:12
**meet (1)**
58:6
**meeting (1)**
24:3
**mega (1)**
17:23
**memorandum (1)**
75:3
**mention (1)**
21:3
**message (2)**
89:14;93:18
**met (2)**
24:4;77:14
**methodologies (1)**
60:17
**Michael (1)**
11:17
**Midway (4)**
41:2;65:9,14,23
**might (22)**
25:8;20:26:21;
29:3;30:4,7;37:13;
42:19,23;50:22,22,
24;51:1;60:8;61:15;
68:20;70:15;72:9;
77:21;78:16;79:13;
89:21
**Milbank (5)**
5:19;6:1;10:23;

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 106
of 113

19:23;43:18
**million (4)**
  30:4;92:18;94:18,
  20
**minimal (1)**
  88:6
**minute (5)**
  12:12;13:24;48:24;
  65:21;82:1
**mischief (1)**
  64:7
**misconduct (1)**
  64:19
**misread (1)**
  25:20
**misrepresentation (1)**
  7:6
**mistake (6)**
  7:6;25:5,17,19;
  32:13;37:3
**mistaken (1)**
  24:19
**mistakes (1)**
  63:23
**misunderstanding (1)**
  48:11
**mixed (2)**
  38:18;94:13
**moment (4)**
  26:18;37:16;40:13;
  54:7
**momentarily (1)**
  62:17
**money (3)**
  38:20;80:22;92:15
**month (9)**
  21:13,14;22:3;
  27:7,8;71:7;77:10,
  19;88:6
**monthly (6)**
  17:23,24;21:11;
  87:17;91:8;92:7
**months (4)**
  9:2;30:3;66:12;
  94:17
**months' (1)**
  81:3
**month-to-month (1)**
  92:12
**Moore (1)**
  5:19
**more (9)**
  14:14,19;15:2;
  16:25;22:18;30:14;
  53:13;54:14;92:15
**morning (3)**
  11:15;43:17,23
**most (5)**
  5:6;20:18;21:10;
  22:16;23:3
**motion (36)**
  5:7,10;6:3;10:12;
  13:2,4,23;16:10,11,

21;18:11;24:6;27:2,
  2,8,9;28:6,16;29:9;
  30:12,18;31:13;32:3,
  7,14;35:16;68:19;
  73:1;75:15;76:25;
  77:19,22;78:17,20;
  79:20;83:15
**motions (4)**
  27:14,23;30:22;
  34:12
**move (6)**
  18:5,8;35:19,23;
  55:9;82:17
**moved (2)**
  83:14;96:3
**moving (2)**
  37:21;38:4
**much (7)**
  12:6,18;19:18;
  29:4;55:5;88:25;
  92:10
**multifaceted (1)**
  80:5
**multiple (1)**
  13:5
**Munger (1)**
  5:19
**must (1)**
  32:13

# N

**name (3)**
  33:12;43:6,6
**narrow (1)**
  24:21
**nature (1)**
  96:8
**navigate (1)**
  74:14
**necessarily (1)**
  92:9
**necessary (1)**
  35:24
**need (21)**
  5:17;12:11;15:2;
  18:25;22:19;25:18;
  26:22;30:16;31:17;
  32:3;48:12;52:11;
  58:11;63:18;75:6;
  76:18;77:13;83:17;
  84:3;86:7,8
**needed (1)**
  8:9
**needs (3)**
  41:21;58:1;85:19
**negligence (8)**
  63:8,9,13;64:10,18,
  19;86:23,25
**negligent (1)**
  63:19
**negotiated (5)**
  21:7,8,10,13,23

**net (1)**
  60:23
**new (3)**
  40:25;65:8;84:12
**Newman (72)**
  33:12,12,15,16,20,
  22,24;34:2,4,8,19,22;
  35:3,13,14,15;36:19,
  23;37:6,9,11,17;
  86:16,16,17,18,20,
  25;87:7,9,11,14,23,
  25;88:4,7,11,20;89:2,
  9;90:12,15,18,22;
  91:3,5,18,20,23;92:7,
  12,14,20,23;93:3,15,
  17,20,24;94:1,3,6,9,
  12,23,25;95:4,12,14,
  18,24;96:13
**next (12)**
  27:7,8;36:3;37:13;
  71:7;76:15,24;77:10,
  19;79:19;81:25;
  96:17
**nice (2)**
  66:10;95:21
**Ninth (1)**
  95:5
**nobody (3)**
  7:1;21:15;77:21
**None (3)**
  44:9;76:17;82:7
**nonissue (1)**
  76:10
**Nor (2)**
  75:21,23
**normal (1)**
  16:3
**Northern (1)**
  38:11
**note (4)**
  14:3;16:22;43:18;
  56:10
**noted (3)**
  56:21;61:18;62:9
**nother (1)**
  82:12
**notice (13)**
  24:20;27:21;28:6,
  7;29:8;32:17;46:7;
  53:23;61:7;63:7;
  83:11;84:13;88:14
**noticed (1)**
  28:17
**notices (1)**
  29:1
**noticing (2)**
  27:23;28:12
**notion (3)**
  16:1;28:6;76:8
**number (4)**
  8:25;17:9;52:8;
  62:6

# O

**object (6)**
  25:6;70:20;73:11;
  77:21;78:3;91:15
**objected (2)**
  7:1;91:11
**objection (18)**
  9:16;10:13,24;
  11:5,9;13:18;21:1;
  33:7;36:6,12;37:20,
  24;44:1;69:21;70:5;
  71:9;72:15;92:24
**objections (5)**
  18:11;30:25;61:3;
  64:13;90:10
**observations (2)**
  16:1;54:15
**obviously (22)**
  10:17;16:17;22:23;
  27:24;28:1,5;36:15;
  48:25;55:2,9;56:2,
  16;57:21;58:2;60:20;
  62:7;76:17;80:8,19;
  87:2;90:24;92:23
**OCC (1)**
  16:7
**occur (1)**
  55:8
**occurred (1)**
  54:21
**o'clock (2)**
  35:5,8
**off (4)**
  10:4;14:21;22:22;
  33:17
**office (3)**
  15:23;32:4;81:13
**official (3)**
  16:20;59:19;89:6
**oftentimes (1)**
  27:25
**Olsen (1)**
  5:19
**once (3)**
  23:24;32:8;37:12
**one (57)**
  5:24;6:5;10:20,24;
  14:16,16;16:25;
  17:19;21:17;22:10;
  30:23,23;31:1;32:17,
  25;35:8,11,22,23;
  36:25;37:2;40:13;
  41:1;44:14;45:11,18;
  46:2;47:24;48:14,24;
  49:14;51:12;57:18;
  59:13;60:9;61:10,10,
  25;65:3;66:1,10;
  67:25;68:23;74:4,19;
  76:9,9;78:7;80:15;
  82:7,17;83:3;84:9;
  89:15,16;92:4;94:19

**ones (2)**
  29:2;34:21
**one's (1)**
  20:1
**one-third (1)**
  92:3
**only (17)**
  6:20;17:19;24:21,
  23;26:13;29:8,11;
  34:20;58:16;63:25;
  65:10;88:15,18,20;
  90:12;91:8;94:19
**oOo- (1)**
  5:2
**open (2)**
  36:8;88:24
**operate (1)**
  93:9
**operative (1)**
  94:20
**opportunity (6)**
  20:10;31:6,7;36:4;
  65:5;89:23
**opposite (1)**
  6:21
**opposition (3)**
  11:21;12:1;14:4
**order (42)**
  5:3;6:12;10:14,16;
  15:7;16:17;18:9;
  21:12;26:10;39:19;
  32:10,12,23,25;
  33:17,24;34:1,5,6,15;
  35:16;36:21;41:5;
  53:15;70:11;71:7,17;
  73:16,16,19,21;
  76:14;77:16;78:21;
  83:18;87:18;88:12;
  89:12,24;94:25;
  95:19;96:10
**orders (6)**
  5:21;32:22;34:7,
  11;96:6,10
**ordinary (1)**
  27:13
**original (1)**
  63:7
**originally (1)**
  21:9
**otherwise (8)**
  10:6;24:24;36:25;
  47:15,17;57:17;
  61:12,12
**ought (1)**
  29:15
**ours (1)**
  75:8
**out (36)**
  6:14;8:23;10:14;
  19:15;23:6;24:16;
  25:1;26:25;37:12;
  43:25;45:5,11;47:14,
  22;48:5,9,18;50:16;

Case: 19-30088   Doc# 1741   Filed: 04/29/19   Entered: 04/29/19 07:57:00   Page 107
of 113

56:17,18;64:7;71:11,
24;73:20;74:17;
78:17;79:25;80:17;
81:1,8,15;83:11,17;
87:16;94:17;95:8
**outset (4)**
43:19;70:21;72:13;
80:14
**over (15)**
17:14;19:20;23:2;
28:2;32:5;35:23;
56:19;58:7;66:10;
76:23;79:18;81:25;
82:13;83:14;96:3
**overall (1)**
9:16
**overlap (1)**
74:24
**overrule (4)**
61:3;64:13;71:6;
76:14
**overruled (3)**
9:21,24;10:7
**overruling (1)**
9:17
**owed (1)**
38:20
**own (15)**
19:9;28:6;34:7;
35:25;36:13;44:20;
47:7;51:7;52:14;
53:11;78:7,8;81:5;
83:8;92:25
**owned (3)**
40:13;44:5;66:22
**ownership (1)**
78:5
**owns (4)**
44:5,20;68:22;78:6

**P**

**PACER (2)**
28:15;29:10
**page (4)**
8:6;16:1;28:23;
37:13
**paid (24)**
16:3;19:19;22:11;
24:19;25:2,18,19;
29:11;46:5,14,15;
47:5,9,16;48:10,18;
68:2,3,4,5,22;72:25;
88:25;95:9
**painstaking (1)**
59:12
**panic (2)**
35:11,12
**panoply (1)**
49:6
**paper (2)**
21:15;73:20
**papers (5)**

38:4,19;55:23;
61:5;65:19
**paragraph (3)**
39:7;41:2;65:15
**parent (3)**
45:4;67:2;78:4
**part (3)**
13:19;60:13;71:1
**participant (1)**
78:22
**particular (2)**
20:12;71:16
**particularly (2)**
6:9;34:10
**parties (5)**
50:8;88:16;90:18;
91:6,13
**partly (1)**
12:10
**Partner (1)**
35:22
**Partners (1)**
65:12
**parts (2)**
64:6;66:20
**party (6)**
8:8;10:13;13:16;
19:17;74:1;91:14
**party's (1)**
58:22
**pass (4)**
5:13,20;22:9,12
**pawn (1)**
81:8
**pay (3)**
20:2;24:13;89:7
**pays (1)**
25:6
**peeve (1)**
76:11
**people (22)**
9:1;14:13,25;
16:12;19:12,14;20:9;
21:3;22:23;23:15;
24:21,22;28:3;34:11;
50:13;56:6;58:14;
64:5,6;78:2;83:7,9
**percent (3)**
6:17;21:9,11
**perfectly (2)**
16:3;85:21
**perform (1)**
42:6
**performing (1)**
42:6
**perhaps (9)**
15:9;16:18,25;
32:21;35:19;82:4;
83:11;84:16;86:9
**period (1)**
80:8
**permissible (1)**
68:16

**permission (1)**
86:9
**permitted (2)**
42:14;68:13
**Perrada (1)**
82:22
**personal (3)**
29:14;92:1,2
**personnel (1)**
44:7
**perspective (2)**
19:11;20:1
**persuade (3)**
61:11,12;73:2
**persuaded (1)**
84:22
**persuasive (1)**
76:17
**pet (1)**
76:11
**petition (4)**
38:8;55:3;60:17,19
**PG&E (8)**
5:4;7:16;37:5;
40:14;42:21;45:15;
78:6;81:14
**phone (5)**
5:9;9:19,23;11:13;
92:4
**phones (1)**
23:4
**phonetic (2)**
39:7;82:22
**phrase (1)**
54:10
**physical (1)**
44:7
**pick (2)**
31:1;82:1
**picks (1)**
62:6
**picture (1)**
77:5
**pin (1)**
40:6
**pinning (1)**
29:13
**Piper (1)**
53:15
**place (5)**
37:15;51:13;60:14,
22;74:16
**plan (5)**
26:23;27:19,20,25;
29:3
**plans (1)**
83:9
**player (1)**
49:11
**playing (1)**
71:23
**pleading (1)**
69:12

**pleadings (2)**
29:1;70:21
**please (2)**
68:3;92:18
**point (27)**
5:16;12:24;14:1;
20:12;25:10;33:2,18;
39:13;48:13;50:5;
51:5,25;52:25;62:15;
66:10;71:13,25;
72:16;75:6,7,7;
76:10;79:7;84:11;
90:1;92:8;95:14
**points (1)**
13:12
**population (1)**
26:19;52:10
**portal (1)**
19:12
**position (19)**
12:15;13:25;14:20,
22;16:16;38:3;43:7;
51:18;52:25;53:1,2;
72:17;76:1;78:3,20,
25;79:13,18;84:4
**positions (2)**
40:10;42:18
**possess (2)**
56:22,25
**possession (1)**
48:1
**possible (2)**
50:24;80:9
**possibly (2)**
29:2;93:12
**post (1)**
27:13
**post- (1)**
55:2
**posted (1)**
28:1
**post-petition (3)**
60:20;69:18;76:5
**potential (9)**
38:11;39:11;40:17;
52:12;53:4;56:24;
62:8;81:5;94:16
**potentially (3)**
49:15;50:12;52:22
**PPAs (1)**
52:22
**pragmatic (2)**
54:14;57:19
**pre- (2)**
60:16,18
**precisely (1)**
44:3
**preclude (1)**
73:22
**precluded (1)**
93:1
**pre-date (1)**
56:13

**predicate (1)**
75:12
**predicates (2)**
75:8;77:14
**predisposition (1)**
57:1
**prejudice (1)**
70:8
**preliminary (1)**
5:16
**premature (1)**
32:2
**prepare (1)**
28:25
**prepared (6)**
36:6;62:14;84:12;
86:7;87:17;91:12
**pre-petition (3)**
38:16,20;55:2;
69:16;76:4
**prerogative (1)**
58:3
**present (1)**
43:22
**presentations (1)**
21:7
**presented (1)**
41:3
**presiding (1)**
66:10
**presume (6)**
8:18;10:18;31:25;
46:15;79:10;85:17
**pretend (2)**
26:19;79:7
**previously (1)**
83:25
**price (2)**
14:15,16
**prima (2)**
73:3;81:12
**primarily (1)**
49:15
**primary (1)**
19:11
**Prime (4)**
19:5,5,7,9
**prior (4)**
37:4;38:8;63:16;
85:14
**priorities (1)**
83:22
**priority (1)**
16:13
**pro (2)**
8:15;53:16
**probably (4)**
10:1;12:6;56:17;
82:19
**problem (6)**
52:13;73:14;74:24;
78:16,18;87:3
**procedure (3)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 108
of 113

16:24;17:5;37:2
**procedures (4)**
5:8;17:10;32:13;
37:14
**proceed (1)**
90:24
**proceedings (1)**
96:18
**process (3)**
20:21;39:10;74:13
**processed (1)**
35:17
**processes (1)**
74:16
**product (1)**
27:12
**professional (15)**
13:8;22:15;43:7;
47:2,21;56:8,9,11;
57:25;59:4,13;68:2,
8;70:1;81:17
**professionals (15)**
5:7;6:7;10:18;
19:19,23;23:17;
38:18;47:12;54:1;
56:14;57:11;71:24;
80:17,21;89:16
**professions (1)**
96:6
**PROMESA (2)**
54:17;74:9
**proper (4)**
12:9;34:15;50:23;
81:16
**proposal (3)**
15:8;21:6;86:21
**proposed (10)**
21:10;34:11;40:19;
43:7;70:10;73:16,21;
77:16;86:22;89:10
**prospective (1)**
69:25
**protection (1)**
80:6
**protocol (2)**
5:8;96:10
**protocols (1)**
57:10
**prove (4)**
87:16;93:10,12,22
**provide (9)**
19:11;22:20;38:9;
39:9;54:19;85:4;
87:19,20;91:7
**provided (5)**
28:22;33:24,24;
65:11;91:9
**provision (5)**
17:13;24:16;84:5;
86:22;88:13
**provisions (1)**
64:14
**Puerto (3)**

54:17,20;74:9
**pulling (1)**
45:25
**punitive (1)**
81:3
**pure (1)**
58:12
**purpose (2)**
6:13;19:11
**purposes (2)**
58:5;96:2
**put (10)**
13:8,18;22:5;33:6;
72:17;76:23;79:18;
81:25;83:22;95:8
**putative (1)**
54:20

**Q**

**Quanta (1)**
5:11
**quarterly (1)**
62:22
**question's (1)**
47:18
**quickly (3)**
69:6;80:20;87:12

**R**

**raise (6)**
7:17,21,22;35:25;
47:7;61:6
**raised (9)**
7:9;8:9;12:11;
53:21,23;76:9;77:22;
90:9,12
**raising (1)**
6:20
**range (2)**
19:23;29:16
**rate (1)**
9:2
**rates (9)**
6:10;19:22,24;
20:15;21:9,24;22:3;
23:18;87:16
**rather (1)**
40:11
**rationale (1)**
74:14
**re (1)**
56:18
**reach (1)**
19:15
**reactive (1)**
22:6
**read (12)**
17:18;26:3;38:4;
43:24;46:2,7,22;47:9,
25;63:6;66:11;67:14
**reading (4)**

25:4,4;58:12;65:19
**reads (4)**
78:21,21;89:5;
93:14
**real (2)**
10:16;22:5
**really (11)**
6:2;12:6;18:25;
20:9;21:21;29:25;
41:20;64:2,3;74:8;
76:3
**reason (13)**
6:20;19:16;20:5;
27:1,2,2;45:22;57:9;
73:6;81:2;84:21;
88:15;95:20
**reasonableness (4)**
62:7;90:20;91:20;
94:4
**reasons (3)**
35:21;45:9;80:12
**received (3)**
10:24;33:3;36:16
**recitals (1)**
26:6
**recognized (1)**
58:21
**recognizing (1)**
78:19
**reconciliation (1)**
39:10
**record (7)**
5:25;7:11;9:15;
14:4,21;69:9;78:13
**recover (1)**
92:3
**recovery (2)**
57:5;94:17
**redactions (1)**
32:8
**reduce (1)**
13:22
**reference (3)**
24:14;26:14;46:4
**references (1)**
19:5
**regard (1)**
54:15
**regarding (2)**
30:12;87:15
**regular (2)**
16:7;87:19
**reject (3)**
52:3;60:12,14
**rejected (2)**
51:17;52:22
**rejectees (1)**
52:14
**rejection (3)**
52:4,24;60:1
**rejections (3)**
27:10;51:16;59:19
**related (3)**

5:7;44:17;45:1
**relates (2)**
13:15;52:18
**relating (3)**
38:11;49:16;60:17
**relationship (7)**
45:23;48:14,16,16;
52:17;66:17;71:15
**relationships (2)**
67:21;74:21
**relevant (1)**
56:5
**remain (1)**
6:25
**render (1)**
57:1
**renders (1)**
8:8
**repeat (1)**
55:25
**repeatedly (1)**
24:4
**repeating (1)**
55:24
**replicating (1)**
20:7
**reply (7)**
13:18;41:2;43:24;
65:15,16,17;69:21
**reporting (1)**
17:24
**represent (10)**
7:2;33:13;39:6;
41:20;50:9;51:5;
57:4;67:20;68:13;
77:5
**representation (6)**
8:7;20:24;29:14;
41:21;48:1;83:21
**representations (3)**
6:22;67:7;69:22
**representative (2)**
15:10;43:14
**representatives (2)**
14:23;16:5
**representative's (1)**
20:4
**represented (6)**
16:23;17:7;39:24,
25;43:19;46:13
**representing (10)**
16:22;39:23;40:1,
16;50:13,14;54:18;
56:8,11;77:4
**represents (2)**
68:6,22
**request (2)**
34:14;95:20
**requested (6)**
32:4,6;35:18;
62:22;91:11;92:20
**requesting (1)**
68:12

**require (2)**
56:10;85:3
**required (4)**
17:20;29:1,8;92:10
**requirement (2)**
28:4,8
**requirements (3)**
27:4;28:7;77:14
**res (2)**
7:22;8:22
**reserve (1)**
76:23
**resolution (2)**
16:14;25:25
**resolved (6)**
5:11;9:9;75:17;
79:21;84:25;91:15
**resolving (1)**
83:1
**resources (1)**
19:21
**respect (37)**
6:5,6,9,10;21:20;
22:4;27:13;31:12,16,
21;38:21;25;39:24,
25;50:10;53:3,25;
54:8,21;55:1;57:19;
59:9,25;60:22;61:6,
17;62:5,21;68:7;
70:24;71:15;72:5;
75:8;77:17;82:11;
84:11;90:13
**respond (3)**
21:22;23:17;31:7
**response (2)**
30:25;70:4
**responsive (1)**
69:10
**restrict (1)**
73:22
**retain (12)**
41:6;70:8,19,20,
22;71:4;72:14,18;
73:7;76:25;79:20;
81:7
**retained (9)**
27:3;38:9;60:10;
61:18;65:10;66:1;
71:2;72:19;91:14
**retaining (2)**
73:23;90:18
**retention (17)**
5:18;41:4;47:12,
14;54:1;60:19;65:25;
69:22;73:6,11,24;
75:11;77:15,17;79:2;
80:16;91:7
**retentions (2)**
5:6;86:8
**Revco (6)**
16:24;17:5,10,15;
18:4;19:16
**revealed (1)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 109
of 113

90:4
**review (10)**
36:4;38:3;39:10;
90:19;91:9,12,16,21;
94:4;95:1
**reviewed (2)**
34:14;91:20
**revisit (2)**
92:5;94:19
**revisited (2)**
6:15;17:3
**revisiting (1)**
93:1
**reward (1)**
64:7
**Richard (1)**
53:14
**Rick (1)**
43:19
**Rico (3)**
54:17,20;74:9
**Right (105)**
6:8,17;7:20,25;8:1;
11:6;13:3;14:24;
15:4;17:2;20:2,14,
19;21:19;22:14,21,
21;23:4,5,12;25:9,14;
26:23;27:16;28:20,
22;30:11;31:17;32:5,
25;35:6,8;36:8,16;
40:7,7;41:17;43:4,
21;44:19,22,24;
45:11,13,19;46:16;
47:13,13,22;49:4,12;
52:8,20;59:5;60:1,
16;62:4;63:16;64:12;
65:5,16;67:16,21,22;
68:4;69:2;70:6;72:3,
20;74:12,12;76:6;
77:6,22;78:4,10;79:8,
8;81:17;82:22,23;
83:11;87:8,9,24;88:6,
10;89:9;90:14,17,21;
91:16;92:6,11,20;
93:15,23,25;94:5,7,
23;95:1,13,25;96:14
**rise (1)**
18:13
**risk (2)**
74:20;77:25
**risky (1)**
77:23
**rival (1)**
56:25
**role (5)**
21:2;28:15;45:6;
49:20;84:23
**room (1)**
16:12
**ROSE (15)**
15:16,18,18,21;
85:9,12,16,20,23;
86:3,3,6,9,12,14

**rub (1)**
93:8
**rubber (1)**
9:5
**rule (8)**
32:2;39:21;77:21;
87:2;93:3,4,6;95:9
**rules (2)**
9:1;27:23;40:9,11;
95:10
**ruling (3)**
40:8;88:4;96:9
**run (2)**
19:18;77:25

**S**

**safeguard (1)**
74:23
**Sam (2)**
33:12;86:16
**same (30)**
8:22;12:18;13:9;
14:18;15:10;16:22;
23:21;34:12;39:5,25;
40:25;41:2,10,11;
42:22;54:21,22;58:9;
60:6;65:9;70:15;
74:8,10,10,11,14;
75:11;80:25;81:23;
96:3
**SAN (1)**
5:1
**satisfied (5)**
30:13,24;36:5,13;
90:3
**saw (3)**
31:25,25;32:1
**saying (21)**
8:3,13;36:1;44:25;
45:9,23;49:21,22;
50:5;51:4;52:13,16;
53:5;55:14;63:7;
66:4;67:7;71:24;
73:5,17;79:8
**scenario (1)**
41:3
**scenarios (1)**
50:8
**schemes (1)**
16:13
**scope (2)**
48:24;60:18
**se (1)**
8:15
**seal (7)**
31:14;32:3,7,14;
34:14;35:16,18
**sealed (8)**
32:17;34:17;37:3,
4,9;89:24;90:2,3
**sealing (4)**
32:9,11;33:20;

36:21
**second (5)**
12:8;16:16;83:10;
88:1,8
**second- (1)**
16:15
**second-guessing (1)**
18:3
**Section (4)**
26:1;46:3,23,25
**security (2)**
45:14,22
**seek (1)**
70:13
**seem (2)**
52:6;92:18
**seemed (2)**
34:14;36:13
**seems (2)**
76:11;80:4
**selection (2)**
25:25;26:1
**send (2)**
24:20;83:11
**sense (3)**
14:24;15:11;79:15
**sent (1)**
10:3
**sentence (1)**
94:20
**separate (8)**
44:4,6,6,7;50:2;
57:14,14;74:17
**separately (2)**
43:19;80:10
**separateness (1)**
69:23
**serve (2)**
28:25;84:22
**service (3)**
28:12,14;29:10
**services (10)**
28:22;38:10,13;
39:9;42:23;46:15;
48:25;49:7;54:19,25
**set (6)**
29:19;57:9,10,21;
75:10;83:13
**sets (1)**
19:1
**seven (1)**
80:24
**seven-figures (1)**
25:7
**seventh (1)**
28:22
**shall (2)**
41:7;73:22
**shame (3)**
61:22,23,25
**share (3)**
13:13;14:18;40:13;
44:15

shared (1)
81:14
**shareholder (6)**
40:15;44:14,14;
48:5;74:22,23
**shares (1)**
7:15
**sharks (1)**
10:4
**short (1)**
86:10
**shortening (1)**
83:18
**shot (1)**
95:17
**show (3)**
14:19;15:2;73:3;
76:15;81:11
**showing (1)**
81:16
**sic (3)**
17:13;42:13;87:3
**sick (1)**
31:18
**side (10)**
38:5;50:20,22;
52:9,9,10,18;60:6;
70:16;83:12
**sides (3)**
41:23,25;42:3
**sight (1)**
44:3
**sign (3)**
29:14;71:7;76:14
**signal (1)**
89:19
**signed (2)**
32:23,23
**significant (3)**
29:24;52:4,6
**significantly (2)**
19:23;20:15
**similar (2)**
13:4;16:11
**similarity (1)**
74:16
**simple (3)**
39:14;48:3;80:19
**simply (4)**
61:2;68:16;78:12;
84:22
**simultaneously (2)**
40:5;68:14
**single (1)**
82:7
**sit (1)**
14:22
**sitting (1)**
79:8
**situation (5)**
22:1;40:25;74:8;
78:1;84:20
**six (3)**

9:1;30:3;94:17
**size (2)**
47:21;52:24
**slate (1)**
17:15
**SLF (2)**
11:2;13:17
**smart (1)**
78:15
**so-and-so (2)**
48:4,5
**social (1)**
18:4
**solely (4)**
33:14;52:18;56:8;
60:24
**solution (1)**
41:19
**solve (1)**
74:24
**somebody (8)**
7:4,7;10:18;59:6;
60:8;69:2;76:16;
81:13
**someday (1)**
82:14
**somehow (2)**
49:19;71:13
**someone (6)**
16:2;17:2;40:13;
47:5;78:22;83:12
**sometimes (3)**
34:10;80:19,20
**somewhat (1)**
54:13
**sorry (16)**
9:12,25;15:18;
28:6;31:19;42:11,15;
59:3;64:25;66:4,5;
83:23;86:5;89:1,3;
94:9
**sort (6)**
16:5;17:24;27:13;
28:3;77:20;84:16
**sorts (1)**
10:2
**sound (1)**
77:11
**sounded (2)**
88:21,23
**sounds (3)**
15:5;35:4;73:12
**space (1)**
44:7
**speak (2)**
43:25;48:12
**SPEAKER (3)**
35:7;43:13,15
**specific (2)**
60:16,23
**specifically (6)**
38:19;41:6;45:12;
62:10;91:11;95:20

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00
of 113

**speculate (1)**
16:25
**spend (1)**
48:24
**spent (1)**
87:16
**squishy (1)**
49:25
**staff (2)**
34:20;83:13
**stage (1)**
67:24
**stakeholders (1)**
55:10
**stamps (1)**
9:5
**standard (9)**
59:9;64:20;91:9,
16,21;93:6;94:24;
95:2,4
**standards (6)**
53:25;54:2,3,8;
59:9;81:22
**standing (1)**
79:8
**standpoint (1)**
54:14
**Star (1)**
39:7
**Star's (1)**
75:9
**start (2)**
40:18;62:1
**started (1)**
19:17
**state (3)**
29:18;66:6;68:21
**stated (4)**
21:15;41:7;69:21,
24
**statement (2)**
20:22;26:23
**statements (1)**
31:7
**States (7)**
30:21;31:5,6;
35:18;88:12;89:10;
90:19
**status (1)**
69:25
**statute (21)**
40:15;44:11,11;
45:7,13;46:2,5,13;
47:9;48:11;58:13;
66:15;67:14,16;72:9;
91:9,24;93:7,14,17,
20
**statutes (2)**
47:25;94:11
**statutory (10)**
27:4,21;45:2;
53:11;54:13;58:16;
74:24;75:8;77:14;

78:12
**stay (2)**
74:6,6
**steady (1)**
29:18
**step (1)**
37:17
**Stephen (1)**
69:8
**steps (3)**
59:13;60:25;77:24
**still (7)**
23:15;25:18;35:25;
37:21;62:16;78:2;
95:1
**stip (1)**
49:9
**stipulate (1)**
35:10
**stock (5)**
7:15;40:14;78:6,7,
8
**stockholder (1)**
45:15
**story (2)**
9:3;82:12
**straight (1)**
58:12
**strikes (1)**
51:12
**stringent (1)**
54:2
**strong (1)**
89:19
**strongly (2)**
80:16,17
**struggling (1)**
76:13
**stuff (3)**
30:16;56:1;94:14
**sub (1)**
78:4
**subject (6)**
10:19;57:5;69:3;
84:25;88:14;91:8
**submission (1)**
26:10
**submit (4)**
27:25;62:21,23;
83:18
**submitting (1)**
34:11
**subsidiary (8)**
41:7;44:6;45:4;
48:15;65:12;66:1,8;
67:3
**substantial (1)**
92:17
**sue (1)**
92:2
**sufficient (1)**
29:9
**suggest (1)**

11:25
**suggestion (1)**
76:23
**summarize (1)**
64:12
**summary (1)**
61:2
**supplement (1)**
86:10
**supplemental (1)**
93:5
**support (2)**
75:10;87:16
**suppose (1)**
27:6,9;52:6;92:16
**supposed (1)**
34:7
**sure (21)**
10:1,15;12:19,23;
18:16;31:3,13;34:22;
35:16;36:23;37:11;
42:16;46:24;51:2;
53:9,17;57:11;59:13;
65:22;83:13;89:20
**surprised (1)**
88:22
**Swain (1)**
5:18
**switch (2)**
83:7;84:2
**system (2)**
32:22;34:13
**systems (2)**
57:14,15

**T**

**table (1)**
14:22
**taint (1)**
78:13
**Takata (2)**
17:7;22:1
**talk (9)**
9:1,11;24:6;36:1;
54:7;83:17;85:13;
86:20;89:19
**talked (6)**
24:4;55:2;78:5;
90:8;96:6,11
**talking (6)**
21:12;29:2;51:14;
55:5;57:8;76:4
**talks (4)**
47:1,1;72:24,25
**technical (1)**
40:11
**tee (1)**
75:15
**teenagers (1)**
23:3
**telling (2)**
50:24;55:13

**tells (5)**
44:16;46:3;68:1,6;
81:13
**ten (1)**
7:15
**tend (1)**
56:23
**tension (1)**
52:12
**tentative (2)**
84:17;96:9
**tentatively (1)**
84:24
**term (1)**
45:2
**terminate (3)**
41:8;65:12;66:8
**terminated (2)**
41:13,15
**terminology (1)**
62:2
**terms (12)**
25:15;48:18,23;
50:14,15,17;51:14;
56:15;93:9,12;94:21;
95:3
**test (5)**
58:20;68:1;71:22;
78:13,14
**tested (1)**
79:16
**testimony (2)**
50:9,11
**that'll (1)**
60:20
**therefore (4)**
43:9;55:18;66:9;
96:5
**there'll (2)**
13:9;27:19
**thinking (2)**
29:15;82:15
**third (1)**
19:17
**though (3)**
26:17;67:6,21
**thought (11)**
9:2;12:22;13:18;
25:15,16;29:2;32:21;
34:8;38:19;82:20;
95:6
**thoughts (4)**
5:16;37:18;84:15;
90:23
**thousand (1)**
22:8
**thousands (1)**
14:13
**three (13)**
12:17;16:18;18:17,
25;30:22;37:6;66:12;
79:5;81:2;82:23;
94:10,12;96:6

**three-figure (1)**
25:10
**three-month (1)**
80:22
**thresholds (1)**
58:7
**throughout (2)**
6:25;24:4
**Thursday (1)**
35:9
**times (4)**
14:13;37:7;46:23;
79:5
**title (1)**
62:2
**today (26)**
6:23;7:9;8:9;
16:21;47:17,20;
50:21;53:19;57:23;
58:6;73:6,7,18;
76:13;78:19;79:24;
80:23;84:12;85:25;
88:4,11;89:16;93:4;
94:15;96:7,11
**today's (1)**
5:5
**together (6)**
50:6;74:17;75:16,
17;79:21;87:14
**token (1)**
39:5
**told (5)**
10:3;21:16,16,18;
79:24
**Tolles (1)**
5:19
**Tom (1)**
8:7
**tomorrow (1)**
76:14
**tort (28)**
13:2,17,20,21;15:3,
4,10,19;16:4,13;22:1,
13;24:3;26:18,19;
49:23;50:19;51:6;
52:13,14;59:20;85:9,
18,24;86:1,2;88:24;
89:3
**total (1)**
80:24
**tough (1)**
61:12
**track (3)**
19:1;32:22;65:20
**tracking (1)**
14:25
**traditional (1)**
92:1
**trapped (1)**
47:22
**travel (3)**
82:21;83:9;96:5
**traveling (1)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 111
of 113

**83**:8

**trouble (1)**
81:15

**true (6)**
6:23;7:1,10;41:4;
58:9;59:16

**truly (1)**
55:5

**Trustee (38)**
12:7,7,15;14:18;
30:21;31:6;34:16,24;
35:1,18;36:5;47:7;
48:4;57:6,17;70:1;
71:7;74:1,19;76:14,
16;82:4;83:17;87:21;
88:12;89:10,22,25;
90:6,19;91:5,10;92:2,
19,24;95:17,19,22

**trustees (1)**
48:1

**Trustee's (9)**
14:1;15:23;16:16;
36:4;37:20;44:1;
61:3;64:13;91:4

**truth (1)**
72:24

**try (8)**
13:21;16:5;53:20;
54:13;61:11;82:2;
84:21;96:4

**trying (13)**
15:6;20:6;23:6;
24:17;26:4;36:11;
42:4;50:16;51:11;
55:8;57:19;73:14;
75:15

**Tuesday (1)**
35:10

**turn (2)**
55:22;65:20

**turned (2)**
32:5;48:5

**turning (1)**
53:22

**turns (1)**
6:14

**twelve (3)**
92:18;94:18,20

**twelve-million-dollar (1)**
94:16

**twenty (2)**
21:9;23:2

**twice (1)**
24:1

**two (22)**
12:9,10,19,20;
14:15,16,19,23;15:2;
16:12;30:22,25;
34:17;45:19;47:25;
50:7;53:23;77:24;
82:23,23;89:18,18

**typically (2)**
21:4;34:7

## U

**ultimately (2)**
25:17;41:4

**Um-hum (5)**
8:5;21:5;23:14;
32:15;43:3

**unanticipated (1)**
91:25

**unbeknownst (1)**
7:14

**uncertainty (3)**
75:20;76:18;77:17

**under (36)**
17:20;29:5;31:14;
32:14;35:18;47:3,12,
15;54:3,11;55:13,14;
57:1;58:7,20;59:11;
61:18;62:15;64:15;
66:15;69:4;71:20,21;
81:17;87:6;91:9,14,
22;93:7;94:25;95:2,
3,4,9,17,19

**Understood (1)**
18:22

**unfair (3)**
76:19;80:2;81:3

**unfamiliar (1)**
37:2

**unforgiving (1)**
53:12

**UNIDENTIFIED (3)**
35:7;43:13,15

**UNISON (1)**
96:16

**United (7)**
30:21;31:5,6;
35:18;88:12;89:9;
90:19

**universe (1)**
26:25

**unless (12)**
5:19;7:3;9:18;
14:5;16:14;29:3;
38:18;47:17;48:10;
57:25;69:2;84:2

**unnecessarily (1)**
12:16

**unnecessary (1)**
96:4

**unopposed (1)**
16:21

**unpredictability (1)**
76:19

**unrelated (2)**
42:21;56:12

**unsecured (1)**
15:21

**untangle (1)**
53:20

**up (16)**
15:1;26:4;29:19;

33:17;38:18;45:25;
50:21;57:10,10,19,
23;62:6;75:15;76:15;
81:23,23

**updates (1)**
17:24

**upload (4)**
34:1,5,7;35:16

**uploaded (1)**
34:23

**uploading (1)**
34:12

**upon (5)**
21:7;60:24;61:5;
74:14;75:9

**urged (1)**
78:16

**use (12)**
7:13;13:7;19:20;
38:13;46:8;59:6;
69:15;70:8,9,22;
72:14;75:5

**used (4)**
12:8;57:10;69:16;
73:24

**useful (1)**
17:24

**usefulness (1)**
75:14

**using (2)**
23:17;69:18

**usually (1)**
35:9

## V

**value (6)**
17:25;42:10,11,12;
50:15;56:23

**various (3)**
5:6;32:22;50:7

**venue (2)**
25:24;26:1

**vetted (1)**
75:16

**vice (1)**
53:16

**victim (2)**
16:2;23:22

**victims (4)**
11:5;16:13;26:18,
20

**view (7)**
5:17;12:24;14:1;
43:4;50:20;51:25;
76:10

**viewing (1)**
10:3

**views (1)**
82:11

**Villacorta (72)**
13:25;14:3,7,11,
17;15:1,4;31:3,5,10,

12,16,18,21,24;32:1,
10,15,25;33:3,5,8,10;
36:8,10,16;37:19,21,
24;38:2,6,17,21,25;
39:2,5,18,22;40:3,5,
24;41:10,14,17,19,
23;42:1,3,7;43:3,10;
64:22,24;65:3,7,14,
17,22;66:3,6,14,18,
22,24;67:1,6,13,22;
68:12,16,18,25

**virtue (1)**
79:3

**vis-a-vis (1)**
78:4

**visibility (1)**
80:22

**visiting (1)**
70:15

**volume (1)**
21:21

## W

**wait (4)**
35:24,25;74:4;
84:12

**waive (2)**
38:16,20

**wall (5)**
60:22;74:19,20,20;
75:5

**walls (1)**
74:18

**wants (11)**
5:20;10:4,18;16:2;
35:2;39:6,15,16;
41:20;58:2;69:3

**way (33)**
15:6;17:1,2,3,4;
32:13;38:7;42:12,13;
43:1;46:1;48:11;
57:19;70:1,7,19,22;
72:13;73:14,22,22;
77:6,6,7;78:13;81:2,
13;82:25;89:5;90:5,
15;93:14;94:19

**website (14)**
13:9;19:3,5,5,9,11,
18;20:7;21:11;22:17;
23:13;27:13,18;
29:19

**websites (2)**
12:17;16:19

**WEDNESDAY (1)**
5:1

**week (2)**
76:15;83:1

**weeks (1)**
79:24

**Weil (1)**
69:8

**welcome (1)**

12,16,18,21,24;32:1,
10,15,25;33:3,5,8,10;
36:8,10,16;37:19,21,
24;38:2,6,17,21,25;
39:2,5,18,22;40:3,5,
24;41:10,14,17,19,
23;42:1,3,7;43:3,10;
64:22,24;65:3,7,14,
17,22;66:3,6,14,18,
22,24;67:1,6,13,22;
68:12,16,18,25

**61**:11

**weren't (1)**
13:16

**what's (13)**
5:14;9:3;17:20;
22:18;34:17;55:24;
58:9;66:11,15;90:25,
25;91:2,4

**wheelhouse (1)**
60:1

**whenever (1)**
73:7

**whereas (1)**
19:23

**Whereupon (1)**
96:18

**whichever (1)**
31:1

**whim (1)**
88:24

**whole (3)**
21:16;82:12;92:8

**wholly (1)**
44:5;66:22

**who's (7)**
8:8;16:2;47:5;
51:17;68:2;85:24,25

**wild (1)**
42:13

**wildfire (6)**
39:2,11,24;50:11;
52:18;70:24

**wildfires (2)**
38:12;49:17

**wildlife (1)**
60:18

**willful (1)**
64:19

**willing (2)**
88:3;95:19

**willingness (1)**
83:25

**wish (1)**
61:9

**wishes (1)**
80:10

**withdraw (4)**
12:1;36:6,12;41:21

**withdrawal (2)**
11:8;26:14

**withdrawing (2)**
11:24;13:18

**withdrawn (5)**
10:13,25;12:1;
18:12;26:15

**within (3)**
40:20;45:19;54:11

**without (6)**
26:19;29:13;63:8;
80:21;86:22,25

**wondering (1)**
82:17

**word (3)**

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 112
of 113

46:8;67:15;95:8
**words (4)**
27:6;39:14;52:12;
78:15
**work (27)**
13:6,16;15:21,23;
24:22;25:2;27:12;
32:13;49:7,15;51:23;
52:2;54:23;55:1,10;
63:5;67:2,18;70:23;
74:17;75:24;77:12,
13;82:2;83:12;92:14,
15
**working (4)**
43:8;50:6;66:21;
67:3
**works (2)**
15:13;48:11
**world (2)**
47:20;71:22
**worldwide (1)**
80:5
**worried (4)**
8:18,19;29:22;
62:11
**worry (2)**
7:25;8:16
**worth (4)**
76:20,22;77:23;
81:3
**writing (1)**
17:15
**wrong (3)**
6:15;46:22,24

**Y**

**year (1)**
7:7
**years (1)**
45:19
**yesterday (3)**
16:10;24:3;25:16
**Yup (3)**
15:12;18:24;23:10

**1**

**10 (3)**
35:5,7,8
**100 (1)**
21:13
**10114 (2)**
45:14;54:11
**10114A (1)**
55:13
**10114C (3)**
46:1;48:22;55:14
**1012 (1)**
44:15
**1013 (1)**
46:7
**1013D (1)**

56:7
**11 (2)**
38:14;48:2
**11.3 (1)**
26:1
**11:09 (1)**
96:18
**1102 (2)**
13:2;27:2
**11023 (1)**
17:13
**1102c3 (1)**
17:20
**1103 (9)**
46:3,10;47:3,12;
48:9;56:10;67:18,20;
71:20
**1103a (1)**
46:10
**1103b (4)**
53:25;54:2,8;58:21
**15,000 (1)**
22:3
**15,000-dollar (1)**
29:15
**150 (1)**
19:22
**1571 (1)**
65:22

**2**

**200 (1)**
21:13
**2017 (1)**
38:11
**2018 (1)**
38:11
**2019 (1)**
5:1
**24 (1)**
5:1
**25 (1)**
19:22
**250,000 (1)**
87:16

**3**

**3 (1)**
8:6
**327 (8)**
48:2;54:3;71:21;
72:24;81:17;91:16;
94:6,8
**327c (1)**
47:15
**328 (13)**
48:3;61:18;62:2,
12;72:25;87:6;88:7;
90:13;91:22;92:1;
93:9;94:25;95:9
**328a (4)**

91:7,9,14;93:6
**328c (3)**
47:4;67:23;68:1
**330 (11)**
46:5,14;47:1;48:2;
61:18;62:5,13,15;
64:15;94:8;95:17
**331 (2)**
62:15;64:15
**3dfx (3)**
56:18;57:3;82:12

**4**

**4-H (1)**
39:7

**5**

**5 (1)**
28:23
**5,000 (1)**
21:17
**500,000 (1)**
21:18

**7**

**7 (2)**
28:22;48:2

**8**

**8th (4)**
81:25;82:16;83:14;
96:2

**9**

**9 (2)**
41:2;65:15
**9:30 (1)**
96:1
**9:32 (1)**
5:1
**9th (9)**
35:20;82:1,17;
83:10,14,16;85:14;
96:1,3

Case: 19-30088    Doc# 1741    Filed: 04/29/19    Entered: 04/29/19 07:57:00    Page 113
of 113