Heinz Binder (SBN 87908)
Robert G. Harris (SBN 124678)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Fax: (408) 295-1531
Email: Heinz@bindermalter.com
Email: Rob@bindermalter.com

Attorneys for TURN, The Utility Reform Network

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>PG&E CORPORATION<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>               Debtors.<br><hr>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>* All papers shall be filed in the Lead Case No. 19-30088 DM. | Case Nos. 19-30088 DM (Lead Case)<br>          19-30089 DM<br><br>Chapter 11<br>*Jointly Administered*<br><br>Date:    May 9, 2019<br>Time:   9:30 a.m.<br>Place:  Courtroom 17<br>         450 Golden Gate Avenue<br>         San Francisco, California<br><br>OBJECTION DEADLINE: April 24, 2019 |

**REPLY TO OPPOSITIONS TO MOTION BY TURN FOR
APPOINTMENT OF OFFICIAL COMMITTEE OF RATEPAYER
CLAIMANTS PURSUANT TO 11 U.S.C. §§ 1102(a)(2), 105(a)**

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     ARGUMENT ........................................................................................................ 2

        A.      TURN Has Standing ................................................................................. 2

        B.      Ratepayers are Creditors. ......................................................................... 3

        C.      The Existing Committees Do Not Offer Adequate Representation of
                Ratepayers ............................................................................................. 10

        D.      Ratepayers Having Interests Beyond Simple Payment of Their Claims Does
                Not Disqualify Them from Seeking or Serving on a Committee .......................... 13

        E.      Other Fora Are Not Adequate Substitutes for an Official Committee in These
                Cases ..................................................................................................... 14

        F.      The Ratepayers Do Not Expect to Be Represented by Any Other Entity in
                These Cases. ........................................................................................... 16

        G.      TURN Is Not Moving for Appointment of a Committee of Special Interest
                Entities .................................................................................................. 17

III.    CONCLUSION ................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Brown v. Sobczak* (*In re Sobczak*),
 369 B.R. 512 (9th Cir BAP 2007) ................................................................. 3

*Freund & Brackey LLP v. Ackerman (In re Ferry),*
 2005 Bankr. LEXIS 3387, 2005 WL 6960191 (9th Cir. BAP 2005) ................... 10

*In re Altair Airlines, Inc.,*
 727 F.2d 88 (3d Cir. 1984) ............................................................................ 15

*In re Beker Indus. Corp.,*
 55 B.R. 945 (Bankr. S.D.N.Y. 1985) ............................................................. 11

*In re Caldor, Inc.*
 193 B.R. 165 (Bankr. S.D.N.Y. 1996) ........................................................... 15

*In re Cloud Nine, Ltd.,*
 3 B.R. 202 (D.N.M. 1980) (property holders) ................................................. 13

*In re Leap Wireless Int'l, Inc.,*
 295 B.R. 135, (Bankr. S.D. Cal. 2003) .......................................................... 11

*In re McLean Industries*
 70 B.R. 852 (Bankr. S.D.N.Y. 1987) ............................................................. 15

*In re Mesta Mach. Co.,*
 67 B.R. 151 (W.D. Pa. 1986) ......................................................................... 13

*In re Nat'l Equip. & Mold Corp.,*
 60 B.R. 133 (N.D. Ohio 1986) ....................................................................... 13

*In re Nova Real Estate Inv.* Trust,
 10 B.R 90 (S.D. Fla. 1981) ............................................................................ 13

*In re Residential Capital, LLC,*
 480 B.R. 550 ................................................................................................. 13

*In re Rice,*
 462 B.R. 651 (6th Cir. BAP 2011) ................................................................... 3

*In re Subpoenas Duces Tecum Dated March 16, 1992,*
 978 F.2d 1159 (9th Cir.1992) .......................................................................... 17

*In re Texaco, Inc.,*
 73 B.R. 960 (S.D.N.Y. 1987) .......................................................................... 13

ii

*Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*,
    2003 U.S. Dist. LEXIS 18149 (S.D.N.Y. Oct. 9, 2003) ...................................................... 14

*Nationwide Sports Distributors, Inc.*,
    227 B.R. 455 (Bankr. E.D. Pa. 1998) ........................................................................... 14

*Van Arsdale v. Clemo*,
    825 F.2d 794 (4th Cir. 1987) ...................................................................................... 13

Federal Statutes

11 U.S.C. § 1103(c) ................................................................................................................ 17

11 U.S.C. § 105(a) ............................................................................................................ 17, 18

11 U.S.C. § 1102(a)(2) ...................................................................................................... 17, 18

11 U.S.C. § 2018(b) ............................................................................................................... 17

California Statutes

Pub. Util. Code § 1702.1 ......................................................................................................... 4

Pub.Util. Code § 748.5(a) ........................................................................................................ 7

Rules

F.R.B.P. 2018(b) .................................................................................................................... 17

iii

# I. INTRODUCTION

The Utility Reform Network ("TURN") hereby replies to the UST Opposition[1], the PG&E Opposition[2], and the OCC Opposition[3] (collectively, the "Oppositions") to its Motion.[4] It is argued in all of the Oppositions that PG&E's 6.15 million individual and small business ratepayers, who, at the filing of these cases were owed $428,975,630 from the pre-petition sale of GHG allowances, are not creditors. The reasons given include contentions that the amounts owed to each individual ratepayer are too small or too uncertain to matter, PG&E is obligated by law to pay whatever is owed, PG&E has authority to pay these debts and promises to do so, and that GHG allowance auction proceeds can yield only statement credits not capable of being asserted directly as claims against PG&E. All of these arguments are wrong. The ratepayer claimants hold direct rights of action to recover against PG&E. Some have the right to receive actual checks for monies owed. Ratepayers also hold claims against PG&E for misconduct with regard to its actions concerning the San Bruno gas explosion[5]. Ratepayers, other than individuals and small businesses for whom TURN advocates, may also have direct rights of recovery of millions of dollars from PG&E arising from proceedings before FERC and have joined in the Motion. Ratepayer claimants hold the requisite "right to payment" on pre-petition obligations, are creditors within the meaning of Bankruptcy Code, and are entitled to seek appointment of and serve on a committee.

Ratepayers should be allowed to participate in the Debtors' bankruptcy cases as creditors on *this* side of the regulatory divide, through an official committee in the bankruptcy court, not simply as parties to one of the many ratemaking proceedings before by the CPUC. Issues of essential

---

[1] United States Trustee's Objection to Motion by TURN for Appointment of Committee of Ratepayer Claimants Pursuant to 11 U.S.C. §§ 1102(a)(2) and 105 [Dkt #1651] (the "UST Opposition").

[2] Debtors' Objection to Motion by TURN for Appointment of Official Committee of Ratepayer Claimants [Dkt #1647] (the "PG&E Opposition").

[3] Objection by The Official Committee of Unsecured Creditors to Motion by TURN for Appointment of Official Committee of Ratepayer Claimants Pursuant to 11 U.S.C. §§ 1102(a)(2), 105(a) [Dkt #1653] (the "OCC Opposition").

[4] Motion by Turn for Appointment of Official Committee of Ratepayer Claimants Pursuant To 11 U.S.C. §§ 1102(a)(2), 105(a); Memorandum of Points & Authorities [Dkt. #1324] (the "Motion").

[5] See below at pages 5-6

1

concern to ratepayers that will come before this Court include but are not limited to: asset sales, the potential spin off of the gas utility, power contract rejection and restructuring, related damage claims, contract modification, and changes to debt and equity structures that are necessarily implicated in plan formulation. CPUC proceedings simply do not offer the same the rights and protections that parties in interest have when participating in a bankruptcy case, particularly when acting through an official committee. Only an order compelling the U.S. Trustee to appoint an additional committee can ensure that ratepayer claimant representation in these cases is adequate.

The unique character of the claims and interests of ratepayer claimants makes a separate committee mandatory under controlling law. In the 2001 PG&E bankruptcy case, ratepayers were compelled to pay over $7 billion to resolve debts they had no hand in creating, resulting in a debt burden of more than $1,500 per ratepayer that has still not been fully paid. In the case at bar, though owed over $400 million, PG&E's ratepayers will be liable to pay tens of billions more dollars. The cause, this time, is not the fallout from a distorted power purchase market but the need to compensate the victims for great harm wrought by PG&E's negligent and criminal corporate misconduct. The ratepayers must be given the opportunity to be heard as to how a case sounding in such misconduct and malfeasance should be conducted and concluded, not simply how it is funded by a future rate increase.

## II. ARGUMENT

### A. TURN Has Standing.

The Committee[6] challenges whether TURN can assert and prosecute the Motion. It asserts that "… TURN does not appear to be a 'party in interest' under section 1109(b) of the Bankruptcy Code and, as such, does not appear to have standing to bring the Motion on behalf of ratepayers in these cases."[7] The Committee's argument rests on the premise that "…TURN does not assert that it is a direct creditor of the Debtors."[8]

---

[6] The Official Committee of Unsecured Creditors (the "Committee").

[7] OCC Opposition, 2:15-17.

[8] OCC Opposition, 4:27-5:11.

2

Case law favors a broad interpretation of the term "party in interest":

> Although the term "party in interest" appears many times in the Bankruptcy Code, it is not defined in § 101. It has been described as "an expandable concept depending on the particular factual context in which it is applied." *In re River Bend-Oxford Associates,* 114 B.R. 111, 113 (Bankr. D. Md. 1990). In various contexts, a "party in interest" has been held to be one who has an actual pecuniary interest in the case, *Kapp v. Naturelle, Inc.,* 611 F.2d 703, 706 (8th Cir. 1979); anyone who has a practical stake in the outcome of a case, *In re Amatex Corporation,* 755 F.2d 1034, 1041-44 (3rd Cir. 1985); and those who will be impacted in any significant way in the case, *In re Johns-Manville Corp.,* 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984).

*Brown v. Sobczak* (*In re Sobczak*), 369 B.R. 512, 517-518 (9th Cir BAP 2007) (debtor had a pecuniary interest and practical stake in dismissal of case and was therefore found to be a party in interest in that matter).

TURN has cured any potential standing defect: it now owns an unsecured claim in these cases.[9] An assignee can "… prevail on the claims assigned by another holder, [and thereby be a 'real party in interest'] … [by] proving the existence of a valid assignment agreement …. [citation omitted]." *In re Rice,* 462 B.R. 651, 656 (6th Cir. BAP 2011).

Based on the foregoing, the Court should overrule the challenge to TURN's standing to bring the Motion.

## B. Ratepayers are Creditors.

### 1. The Ratepayer Claimants Have a Direct Right to Payment Under State Law.

The Debtor and UST argue that ratepayers cannot be creditors because they have no direct right of recovery for as yet unpaid GHG sale proceeds.[10] The UST argues that "… a minor, automatic statement adjustment that does not rise to the level of transforming all gas and electric customers into creditors of PG&E [and is] … simply a reduction in the amounts owed by

---

[9] TURN requests that the Court take judicial notice pursuant to Federal Rule of Evidence 201 of the Docket number 1810 in these cases, Notice of Transfer of Claim Other Than for Security and the Assignment of Claim and Proof of Claim attached thereto.

[10] UST Opposition, 5:15-25; PG&E Opposition, 2:19-3:4.

3

ratepayers."[11] These contentions are incorrect. The California Public Utilities Code provides a direct right of action should PG&E not pay as ordered:

> Complaint may be made by the commission of its own motion or *by any corporation or person, …* by written petition or complaint, setting forth any act or thing done or omitted to be done by any public utility, including any rule or charge heretofore established or fixed by or for any public utility *in violation or claimed to be in violation, of any provision of law or of any order or rule of the commission.*

Pub.Util. Code § 1702 (emphasis added).

This statute refers to causes of action arising from "any act or thing done or omitted to be done by any public utility, including any rule or charge heretofore established or fixed by or for any public utility." This would include any failure to provide payments, refunds, or credits, as well as any failure to act in the manner ordered by the California Public Utilities Commission (the "CPUC"). As set forth in TURN's Motion, the utility Debtor is presently obligated to pay through statement credits residential, small business, and emissions-intensive trade-exposed retail customers of the electrical corporation $324,538,000, plus another $128,975,630 to gas ratepayers.[12] It is directly liable to ratepayers if it does not do so.

Further proof that a direct right of action exists is reinforced through examination of the procedural rules for bringing actions against utilities. Rule 4.1(a)(1) of the California Public Utilities Commission Rules of Practice and Procedure references and incorporates the above provisions, Commission Rules 4.2 and 4.6 set forth the process that must be followed when filing a Complaint. For its part, Rule 4.2 has broad and general application. In contrast, Rule 4.6 sets forth the process individuals must follow when filing Complaints where the amount of money claimed does not exceed the jurisdictional limit of the small claims court. (See also Pub. Util. Code § 1702.1.)

---

[11] UST Opposition, 5:21-25

[12] See Motion by TURN for Appointment of Official Committee of Ratepayer Claimants Pursuant to 11 U.S.C. §§ 1102(a)(2), 105(a); Memorandum of Points & Authorities, 8:24-9:5, and CPUC rulings and statutory authority cited.

4

## 2. The Debtor May Be Directly Liable to Ratepayers for Other Violations of the Law.

TURN is presently involved in two CPUC investigations into PG&E's pre-petition conduct that could result in remedies owed to ratepayers. In Investigation I.15-11-015,[13] the CPUC is conducting the second phase of its investigation into PG&E's violations of the CPUC's *ex parte* rules that govern communications between interested parties and decision-makers related to open to proceedings. The conduct at issue occurred prior to November 2015.

In the first phase of I.15-11-015, the CPUC adopted a settlement agreement among the parties that included $97.5 million in financial remedies.[14] That amount included a $12 million fine paid by PG&E to the State's General Fund; a payment by PG&E of $6 million each to the City of San Bruno and the City of San Carlos; and a $73.5 million remedy provided to ratepayers as foregone collections of revenues that otherwise would have been collected through rates.[15] In the second phase of I.15-11-015, the CPUC could similarly order PG&E to pay remedies for its violations of the *ex parte* rules, including a credit to ratepayers against future revenues that would otherwise be collected through rates.

Similarly, in I.18-12-007[16] the CPUC is investigating whether PG&E's damage prevention and locate and mark programs and practices for its natural gas system have been unsafe and in violation of any provisions of state or federal law or CPUC regulations. These practices are intended to ensure that construction personnel and private persons are timely and accurately

---

[13] Order Instituting Investigation and Ordering Pacific Gas and Electric Company to Appear and Show Cause Why It Should not be Sanctioned for Violations of Article 8 and Rule 1.1 of the Rules of Practice and Procedure and Public Utilities Code Sections 1701.2 and 1701.3. Attached in its entirety as Exhibit "A" to Supplemental Request for Judicial Notice in Support of Motion by Turn for Appointment of Official Committee of Ratepayer Claimants Pursuant to 11 U.S.C. §§ 1102(a)(2), 105(a) (FRE 201, FRBP 9017).

[14] CPUC Decision 18-04-014 at 2.

[15] *Ibid.*

[16] I.18-12-007, Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. Attached in its entirety as Exhibit "B" to Supplemental Request for Judicial Notice in Support of Motion by Turn for Appointment of Official Committee of Ratepayer Claimants Pursuant to 11 U.S.C. §§ 1102(a)(2), 105(a) (FRE 201, FRBP 9017).

5

1   informed of the location of PG&E's underground pipes and other infrastructure related to the

2   transporting of natural gas before commencing excavation.  The conduct at issue in I.18-12-007

3   occurred from 2012 to 2017.  As with I.15-11-015, remedies, if ordered by the CPUC, could take

4   any form, including credits to ratepayers against revenues that would otherwise be collected in rates,

5   and could run into the tens of millions of dollars in total amount.

6          TURN contends that the obligation to pay remedies to ratepayers, based in pre-petition

7   misdeeds by PG&E, as could result from I.15-11-015 and I.18-12-007, would give ratepayers the

8   same direct rights to payment as would unpaid GHG allowances under the authority set forth above.

9   Although these claims are contingent and largely unliquidated, they all arise from pre-petition

10  conduct being assessed in current regulatory proceedings. They were both known and foreseeable to

11  the Debtors and, thus, constitute "claims" in these cases.

12         Finally, TURN would draw the Court's attention to the potential existence of other claims by

13  ratepayers which may prove even more substantial than those asserted above.   Northern California

14  Power Agency ("NCPA") has joined the Motion.[17]

### 3. The CPUC Decision Cited by the Debtors Does Not Support the Assertion that CPUC Decided to Bar Direct Claims by Ratepayers for Unpaid GHG Proceeds.

17         The Debtors assert that CPUC "… already has concluded that the GHG credits are not

18  'refunds' owed to individual customers under California utility law."[18]  The implication that the

19  GHG credits are not debts owed by PG&E is false.  The decision cited, CPUC decision 18-03-017,

20  simply found that the obligations are not "rate-refunds" – a term of art under the PUC Section 453.5.

21  Section 453.5 applies to matters such as the refund of rebates received by utilities from their

22  suppliers for past overcharges, which must then be returned to the utilities' customers.[19]

---

[17] Northern California Power Agency's Statement of Support for TURN's Motion for Appointment of Official Committee of Ratepayer Claimants; Statement of Willingness to Serve on Such Committee and Reservation of Rights [Dkt. #1660], 4:1-19.

[18] PG&E Opposition, 7:12-14.

[19] CPUC Decision 18-03-017, p. 14, *citing California Manufacturers Association v. Public Utilities Commission*, 24 Cal.3d 836 (1979).

6

PG&E's debt to ratepayers arises from PUC Section 748.5, which provides as follows:

> [T]he commission shall require revenues, including any accrued interest, received by an electrical corporation as a result of the direct allocation of greenhouse gas allowances to electric utilities ...*to be credited directly to the residential, small business, and emissions-intensive trade-exposed retail customers of the electrical corporation.*"

Pub.Util. Code § 748.5(a) (emphasis added).

The CPUC, when considering how the GHG revenues should be distributed—whether by an on-bill credit or an "off-bill" distribution such as payment by check—made clear that using a credit method was not intended to deprive customers of a right to payment. It stated instead:

> Customers that participate in net energy metering may not have any balance owed to the utility against which to apply the climate dividend. We find it appropriate . . . to allow for a cash-out provision for [such] instances. . . [W]e direct the utilities to present an implementation plan for providing cash value to net-energy metering customers according to the interim methodology adopted above.

Decision 12-12-033 at p. 126.

The very decision on which the Debtors rely to support the assertion that there is no direct right of action, therefore, confirms that PG&E's obligation to distribute GHG allowance revenues is, in fact, an obligation to pay, whether by a statement credit or a check.

**4. The Debtor Knows What It Still Owes Ratepayers.**

The Committee argues that "[b]ecause the November 2018 Auction is the only event that may have arguably given rise to prepetition claims against the Debtors, the aggregate amounts cited by TURN necessarily overstate, perhaps significantly, whatever portion of the alleged ratepayer claims are prepetition claims, as opposed to potential claims that may arise from post-petition auctions to be held in the future."[20]

The OCC notes correctly that the April and October payments by PG&E include not only the proceeds from the 2018 GHG allowance auction but also an estimate of proceeds from the GHG

---

[20] OCC Opposition, 6:2-6.

7

1  allowance auctions to occur in 2019. TURN acknowledges that the Debtors paid ratepayers
2  something through their April, 2019 statements. This payment likely included a portion of what
3  PG&E owes ratepayers from the 2018 GHG allowance auction. The Debtors add that "… a material
4  question of fact exists as to whether such claims relate to the prepetition or postpetition period[21]"
5  The Debtors, as the custodians of their own records, ought not to be the parties raising such a
6  question but the parties answering it.

7        TURN contends that the October payment will include an adjustment to account for
8  deviations between the 2018 auction estimate and actual auction proceeds received. TURN therefore
9  asserts that, because of the way the GHG allowance auctions occur, and payments of proceeds are
10  determined and paid, no credible argument can be made that 100% of the $428 million the Debtors
11  owed ratepayer claimants when these cases were filed has now been paid.

12      **5. The Debtor's Promise to Comply with the Law and This Court's Order Does Not
         Negate the Existence of a Claim Now.**
13

14        As set forth above, TURN acknowledges that the credits from the November 2018 Auction
15  are to be paid to ratepayers through adjustments on their April and October 2019 billing statements.
16  PG&E can, however, and other utilities have,[22] applied to CPUC to modify the schedule for
17  repayment of debts owed from the auction of GHG allowances. The timing of payment, given that
18  the Debtors are in bankruptcy, is not irrevocably fixed. There might be any number of reasons why a
19  debtor might seek - or be compelled as a matter of bankruptcy law or developments in the case - to
20  delay or revise the timing to make such payments. The Committee's contention that PG&E's has
21  received authority to pay the remaining portion of the hundreds of millions owed six months *in the*
22  *future*[23] simply reinforces TURN's position that ratepayers are creditors *at this time* and are not
23  precluded as a matter of law from seeking appointment of or serving on an official committee.
24  ///

25  _____
    [21] PG&E Opposition, 7:22-27, fn.7
26
    [22] *See* the Petition for Modification of D.13-12-003 of San Diego Gas & Electric Company (U 902 E)
27  Filed March 29, 2019 before the CPUC.
    [23] OCC Opposition, 6:14-20.
28

8

**6. This Court's 2001 Ruling Does Not Preclude a Different Conclusion Today.**

The UST and Debtors, relying on this Court's 2001 Memorandum Decision,[24] argue that "… this Court has specifically ruled, ratepayers — customers of PG&E who pay money to the entity for gas and electrical services — are not creditors"[25] and "… as was the case in the 2001 Decision, the ratepayers do not have prepetition claims against the estates."[26] In 2001, this Court held that "… Congress had in mind that the creditors committees appointed in Chapter 11 could consist only of holders of pre-petition claims, not post-petition claims."[27] TURN concedes that legal point, but the facts are different now, and none of the objecting parties attempted to explain how or why the 2001 ruling is binding.

In 2001, this Court was presented with three possible instances of pre-petition ratepayer claims: (1) damages from past blackouts liability for which PG&E successfully argued it was insulated; (2) future recoveries from PG&E affiliates via the avoiding powers of the Bankruptcy Code, which recoveries the Court found redounded to the benefit of the estate generally and not a class of ratepayers, (3) refunds ordered by the CPUC that would "… take the form of rate adjustments in the future."[28] The explanation for the Court's ruling on the status of potential claims proffered was as follows:

> The UST and a pro se ratepayer argue that various situations may arise giving rise to future claims, but *no one is able to articulate a particular claim of any ratepayer __qua__ ratepayer that existed on the petition date.*
> …

///

///

///

---

[24] In re Pacific Gas & Electric Company, Case No. 01-30923 DM [Dkt #599], Memorandum Decision Regarding Motion for Order Vacating Appointment of Committee of Ratepayers dated May 18, 2001 (the Memorandum Decision").

[25] UST Opposition, 5:4-5.

[26] PG&E Opposition, 72:12-13.

[27] Memorandum Decision, 5:26-6:1.

[28] Memorandum Decision, 6:7-7:10 (emphasis added).

9

No authority has been presented which indicates that any events occurring prior to the petition date give any particular ratepayer a "right to payment" (Section 101(5)) or establish that PG&E owes a "Debtor" (section 101(12)) to such ratepayer.

Memorandum Decision, 6:3-6; 7:11-15 (emphasis added).

There were no GHG allowance auctions in 2001 and, as far as the Memorandum Decision indicates, no evidence of pre-petition claims was presented. Furthermore, in 2001, there were no pending regulatory proceedings likely to generate claims arising from pre-petition acts by the Debtors. Here, the pre-petition November, 2018 GHG allowance auction, pursuant to applicable state law and CPUC regulations, generated hundreds of millions of dollars in revenue and a pre-petition debt that the utility Debtor is obligated, both by statute and regulation, to pay to ratepayers. The GHG allowance auction, and the laws and regulations requiring payment of the proceeds to ratepayers, amount to an intervening circumstance. These facts, along with the fact that this is a different case with different ratepayer claimants, renders the doctrine of law of the case (or any other kind of issue preclusion) inapplicable. *See Freund & Brackey LLP v. Ackerman (In re Ferry),* 2005 Bankr. LEXIS 3387, *19, 2005 WL 6960191 (9th Cir. BAP 2005).

**C. The Existing Committees Do Not Offer Adequate Representation of Ratepayers**

TURN's Motion sets out the seven elements to be considered when determining whether a group of creditors is adequately represented: (1) the ability of the existing committee to function, (2) the nature of the case, (3) the standing and desires of the various constituencies, (4) the ability of creditors to participate in the case without an additional committee, (5) the delay and additional cost that would result if the court grants the motion, (6) the tasks which a separate committee is to perform, and (7) other factors relevant to the adequate representation issue. *In re Leap Wireless Int'l, Inc.,* 295 B.R. 135, 137 (Bankr. S.D. Cal. 2003) (*citing In re Beker Indus. Corp.*, 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985). Neither the UST nor the Debtor contest or address these elements separately; they simply argue that the Committee will represent ratepayer claimants.

///

///

10

The Debtors claim that the Committee is "… more than capable of representing the interests of individuals and small business,"[29] contending the ratepayers to be "adequately represented," but offer no explanation beyond their conclusory statement. The Committee, having argued vigorously that ratepayers are not creditors and will be paid in the course of this case cannot credibly act as the fiduciary representative of those whose rights it professes it has and will continue to ignore.

The Committee, for its part, lists the elements of representativeness to be considered but actually addresses only the cost of and potential delay resulting from appointment of a third committee with a prediction about the multiplication of professionals likely to be hired.[30] The Committee says that "… a Ratepayer Committee would unnecessarily hinder the progress of these cases without adding any commensurate benefits to the ratepayers, as well as cause additional unnecessary costs on the estates *that will have to come from the pockets of the Creditors' Committee's constituency.*"[31]

The Committee ignores the fact that creditors are not funding this case; ratepayers are, and every cent paid to the many professionals employed by the Debtor and Committee is likely if not certain to come from bills paid by ratepayers. Evaluation of benefit is better left to this Court's sound discretion when applying section 330 of the Code to applications for compensation for professional services rendered. In terms of relative cost, TURN would expect a ratepayer claimant committee's counsel and associated professionals not to bring teams of lawyers to sit at counsel tables, incurring tens of thousands of dollars an hour during court time. TURN would also hope and expect that any ratepayer committee would hire primarily local professionals at prevailing San Francisco rates and minimize costs.

TURN respectfully submits, as it argued in its Motion, that a committee of ratepayer claimants would act as a focal point for the views of all types of ratepayers. An official committee would, rather than hindering the progress of these cases, streamline it, facilitating the generation of

---

[29] PG&E's Opposition, 9:6-8.

[30] OCC Opposition, 10:5-15.

[31] OCC Opposition, 10:6-9 (emphasis added).

11

prompt ratepayer claimant input for the Debtors, both official committees and the Court on the critical issues on which ratepayers have requested the opportunity to participate.

The Committee asserts generally that it is representing unsecured claims "to advance the interests of its diverse constituency."[32]  The Committee does not address the fact that it has to date been entirely uninterested in representing the interests of individual and small business ratepayer claimants.  The Committee does not identify which of the members, from unions, pension holders, contract claimants, vendors, and financial institutions, might represent the interests of ratepayer claimants, what steps the Committee has taken to date with regard to such interests, or what steps they might take in the future.  While not every type of creditor needs to be represented on a committee in order to have its interest protected, the Committee has not even enunciated what it believes the interests of ratepayer creditors might be— particularly in the process of framing a plan of reorganization. The issue here is not "whether the Official Committee is an exact replica of the creditor body, but whether representation of various creditor types is adequate."). *In re Residential Capital, LLC,* 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (*internal citation and quotes omitted*). Finally, the Committee claims that that a committee of ratepayer claimants should not be appointed as it would only represent a "single type of creditor."  Courts have appointed additional creditors' committees to provide adequate representation of tort claimants, retirees, industry competitors, priority creditors, subordinated noteholders, and property owners as should be the case here.  *See e.g. Van Arsdale v. Clemo*, 825 F.2d 794 (4th Cir. 1987)(tort claimants); *In re Patrick Cudahy, Inc.,* 88 B.R. 895 (E.D. Wis. 1988) (retirees); *In re Texaco, Inc*., 73 B.R. 960 (S.D.N.Y. 1987) (industry competitors); *In re Mesta Mach. Co.,* 67 B.R. 151, 156 (W.D. Pa. 1986) (employees); *In re Nat'l Equip. & Mold Corp*., 60 B.R. 133 (N.D. Ohio 1986) (priority creditors); *In re Nova Real Estate Inv.* Trust, 10 B.R 90 (S.D. Fla. 1981) (subordinated note holders); *In re Cloud Nine, Ltd.*, 3 B.R. 202 (D.N.M. 1980) (property holders).

---

[32] OCC Opposition, 7:15-18.

The Committee's citation of *Residential Capital* is distinguishable. In that case, the court denied the formation of a separate homeowner-borrowers committee where the unsecured creditors committee had gone to considerable lengths to represent the group's interests, including appointing a representative member and offering to hire special counsel with expertise in the particular area of concern of the group. *In re Residential Capital, LLC, supra,* 480 B.R. 550, 560. Here, the objecting parties do not even acknowledge that the ratepayer claimants have distinct concerns in the case.

The Committee also relies on *Mirant Ams. Energy Mktg L.P. v. Official Comm of Unsecured Creditors of Enron Corp*. There, the court denied a request for an additional committee where the committee included a representative from the group, the committee had been effective with the participation of the member, and a special examiner had been appointed who would address issues related to the group's concerns. *Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 U.S. Dist. LEXIS 18149 at p. 42 (S.D.N.Y. Oct. 9, 2003)

### D. Ratepayers Having Interests Beyond Simple Payment of Their Claims Does Not Disqualify Them from Seeking or Serving on a Committee

A central tenet of the Oppositions is the argument that it would be improper to appoint a committee for ratepayers who have interests which extend beyond simply being paid on their pre-petition unsecured claims.[33] The only authority cited is by the Debtors for this proposition is *Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998), which states that the purpose of a committee is *both* to maximize recovery *and* to "present the interests of [its members.]" *Id.* (emphasis added). If anything, this case supports the position that a committee's duties rise beyond merely maximizing financial recovery.

Other cases affirm that members of committees can and do espouse interests beyond the mere payment of general claims. *See, e.g. In re Altair Airlines, Inc.,* 727 F.2d 88 (3d Cir. 1984) (holding that union creditor espousing a plan preserving jobs and collective bargaining agreement was not disqualified from committee membership); *In re McLean Industries* 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987) (noting that an additional goal of "preserv[ing] jobs or the viability of an

---

[33] UST Opposition, 7:17-18; PG&E Opposition, 9:15-21.

13

important customer" is not reason to exclude a creditor from a committee.)  *See also In re Caldor, Inc.* 193 B.R.  165, 169 (Bankr. S.D.N.Y. 1996), citing *Bohack Corp. v. Gulf & Western Indus.,* 607 F.2d 258, 262 n. 4 (citations omitted).

**E.  Other Fora Are Not Adequate Substitutes for an Official Committee in These Cases.**

The Debtors contend that "… the ratepayers have other options available to them to safeguard and adequately represent their interests and, therefore, the extreme remedy of appointing a third official committee in these Chapter 11 Cases is not necessary or warranted."[34]  Following language from this Court's 2001 decision, the Debtors claim that "… section 1129(a)(6) of the Bankruptcy Code generally requires the Debtors receive the approval of the CPUC with respect to rate changes proposed in connection with a chapter 11 plan – and the CPUC (as well as other governmental and regulatory agencies) have been actively involved and well represented in these Chapter 11 Cases."[35]  The Debtors offer that "[t]he Debtors continue to fully support the rights and opportunities for TURN and other consumer representatives to fully participate in CPUC proceedings, including those current proceedings relating to safety and reliability that TURN and other interested parties are actively participating in currently."  The objecting parties, in summary, are asking to limit participation in these bankruptcy cases by ratepayers to (1) participating in future ratemaking decisions made by CPUC, and (2) administrative proceedings before CPUC concerning the safety and reliability of energy distribution networks.  The ratepayers have deeper and broader concerns focused on what is happening in this bankruptcy case and require a way to be heard and participate effectively on this side of the regulatory divide.

CPUC's jurisdiction is hardly coterminous with that of this Court.  Few of the Debtors' decisions on matters before this Court, seen in the thousands of docket entries, have been brought on for consideration or approval by the CPUC.  This Court will, in the course of this case, be asked to consider matters of vital interest to ratepayers including but not limited to asset sales, potential spin off of the gas utility, power contract rejection and restructuring, related damage claims, contract

---

[34] PG&E Opposition, 3:15-18.

[35] PG&E Opposition, 8:24-27.

14

modification, and changes to debt and equity structures that are necessarily implicated in plan formulation. CPUC cannot and should not be asked to oversee and second guess every decision the Debtors have to make in a bankruptcy case of this size and complexity. If the CPUC's role is so limited, then proceedings before it, instead of this Court, cannot substitute for active participation by ratepayers in the contested matters and proceedings certain to come before this Court described in this paragraph.

The Committee suggests that because TURN, the Public Advocates Office, and Federal Executive Agencies are already parties to the CPUC PG&E Test Year 2020 General Rate Case (Application 18-12-009), ratepayers have no need for a separate committee, imprecisely terming such rights to be a form of "adequate protection". This argument must be limited to the very specific point of ratemaking by the CPUC and the potentially preemptive effect of Bankruptcy Code section 1129(a)(6). As set forth above, ratepayers need to be heard given the broad scope of matters in this bankruptcy case. The citation to a single ratemaking case, only one of dozens that go into CPUC's ratemaking process, does not disprove the need for a ratepayer claimants' committee.

Finally, as the Debtors note[36], individuals or groups that participate in proceedings before the CPUC involving electric, gas, water, and telephone utilities may request compensation for the costs associated with that participation under Public Utilities Code section 1801-1812. TURN regularly receives compensation for having made a substantial contribution in proceedings before CPUC. Critically however, intervenor compensation is not available for appearing in these bankruptcy cases. State law allowing ratepayers to participate in, and receive intervenor compensation for substantial contributions made in CPUC proceedings was never intended to be used as a bludgeon to silence voices of ratepayer claimants on essential issues that arise in bankruptcy.

The purpose of a committee is to is "to advise the creditors of their rights and proper course of action *in the bankruptcy proceedin*gs." *In re Subpoenas Duces Tecum Dated March 16, 1992,* 978 F.2d 1159, 1161 (9th Cir.1992) *(emphasis added).* While setting rates may be governed by the CPUC, the statutory charge of a committee in a bankruptcy case are far broader, including

---

[36] PG&E Opposition, 1:8-11

consulting with the debtor-in-possession, investigating its business and conduct, participating the formulation of the plan, and advising those represented about such plan. 11 U.S.C. §1103(c). Such obligations and powers match precisely the issues on which ratepayers wish to participate in these cases, such as asset sales, power purchase contract rejection and damages, and plan formulation.

**F. The Ratepayers Do Not Expect to Be Represented by Any Other Entity in These Cases.**

The UST notes, as this Court did in 2001, that Bankruptcy Rule 2018(b) permits the Attorney General of the State of California to appear and be heard on behalf of consumer creditors as long as the court determines that the appearance is in the public interest.[37] TURN notes that no request for approval of such an appearance on behalf of consumers has been made, though the Attorney General has appeared a number of times in these cases on behalf of agencies of the State of California.

The Committee makes a similar argument, claiming that "… the interests of ratepayers are and will continue to be adequately represented by the State of California," referring not to the Attorney General but to Governor Newsome's "Strike Force".[38] Notwithstanding the language quoted by the Committee from the Report from the Governor about intervention, the Strike Force has not appeared in these cases. The notion that a summarily convened Strike Force, whose members have never been disclosed or publicly announced, which holds no apparent statutory basis for claiming standing, would at a minimum have to bring a formal motion to intervene in contested matters and proceedings as a party. If and when such a motion is filed, much less a formal notice of appearance, this Court can evaluate the adequacy of participation by the Strike Force in the case in lieu of activity by an official committee of ratepayer claimants.

The Committee correctly notes[39] that, at least for some purposes, participation by the State of California on behalf of ratepayers may be provided by an independent office within the CPUC: the Public Advocates Office. The Public Advocates Office has, of course, filed a joinder to TURN's Motion [Dkt. #1477] and proposes to participate in these bankruptcy cases as a member (*ex* officio

---

[37] UST Opposition, 8:4-7.

[38] OCC Opposition, 9:15-10:4.

[39] OCC Opposition, 9:24-27, fn. 8.

16

or otherwise) of any ratepayer claimants committee appointed. The Court can and should follow the suggestion by the Public Advocates Office to grant TURN's Motion and appoint a committee of ratepayers in which it can play a role.

### G. TURN Is Not Moving for Appointment of a Committee of Special Interest Entities

The Debtors state incorrectly that "… TURN suggests that such a committee should be comprised of special interest groups that are not creditors themselves and do not owe financial fiduciary duties to, or maintain agency relationships with, the ratepayers they would purport"[40] The Committee makes a similar misstatement, alleging that the "… Motion seeks appointment to the requested additional committee of employees of various consumer advocacy and special interest groups …"[41] TURN in its Motion asked only "for an order pursuant to 11 U.S.C. sections 1102(a)(2) and 105(a) directing the United States Trustee to appoint an official committee of ratepayer claimants."[42] TURN later says it "… would respectfully encourage the U.S. Trustee, were this Motion to be granted, to solicit as potential committee members to represent a broad diversity of ratepayer interests persons"[43] and offered a list of names of individuals who jobs and qualifications would create a diverse list of appointees from many of the ratepayer groups whose employees have volunteered to serve on a ratepayer claimants committee.

TURN has an expansive vision of a ratepayer claimants committee. Should its Motion be granted, TURN hopes and expects that the UST will discharge his statutory obligations and solicit and appoint the broadest scope of eligible members (individuals and eligible business entities) possible to create an official committee of ratepayer claimants that fully and adequately represents the diversity of ratepayers in this State. TURN would hope to see a committee that includes consumers, small businesses, large industrial users, farmers, and the others who are owed tens and hundreds of millions of dollars by PG&E and yet but have somehow been left voiceless in these

---

[40] PG&E Opposition, 3:7-10.

[41] OCC Opposition, 2:18-20.

[42] Motion, 1:3-5.

[43] Motion, 1:27-2:1.

17

cases to date.  TURN, for its part, offers to participate in any committee appointed as an *ex oficio* member, placing its resources and experience behind those of the appointed, voting members and professionals hired in the hope of reaching a fair, efficient, and prompt conclusion to these bankruptcy cases.

### III.CONCLUSION

For all the reasons set forth above, TURN respectfully requests that this Court grant this Motion and issue an order pursuant to 11 U.S.C. §§ 1102(a)(2) and 105(a) directing the U.S. Trustee to appoint an official committee of ratepayer claimants

Dated: May 2, 2019                                     BINDER & MALTER, LLP


                                                        By: */s/ Robert G. Harris*
                                                            Robert G. Harris

                                                        Attorneys for TURN, the Utility Reform Network

18