Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:     628.208.6434
Facsimile:      310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:     310.442.8875
Facsimile:      310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official
Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>-and-<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>Debtors.<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**SUPPLEMENT TO THE APPLICATIONS OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO RETAIN AND EMPLOY LINCOLN PARTNERS ADVISORS LLC AND DEVELOPMENT SPECIALISTS, INC. AS ITS FINANCIAL ADVISORS**<br><br>Date:     May 9, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>         Courtroom 17, 16th Floor<br>         San Francisco, CA 94102 |

The Official Committee of Tort Claimants (hereafter, the "**TCC**"), in the above-captioned chapter 11 cases ("**Chapter 11 Cases**") of PG&E Corporation and Pacific Gas and Electric Company (collectively, the "**Debtors**"), by and through its undersigned counsel, hereby submits this supplement (the "**Supplement**") to the (i) *Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Lincoln Partners Advisors LLC, as a Financial Advisor Effective as of March 1, 2019* (the "**Lincoln Application**") [Doc. No. 1134], and (ii) *Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Development Specialists, Inc., as a Financial Advisor Effective as of March 20, 2019* (the "**DSI Application**" and together with the Lincoln Application, the "**Applications**") [Doc. No. 1461], to address the Court's preliminary questions regarding the Applications as stated in the *Issues to be Addressed at the April 24 Hearing on Retention Applications* (the "**Statement of Issues**") [Doc. No. 1587]. In support of the Supplement, the TCC respectfully states as follows:

## PRELIMINARY STATEMENT

1. These Chapter 11 Cases involve one of the largest and most complicated restructurings to date. The TCC represents the largest group of stakeholders in the Chapter 11 Cases and is comprised mainly of individual tort victims. Unlike many other participants in these Chapter 11 Cases, the TCC's members are not employees or representatives of financial institutions or corporations with vast corporate and financial resources. Given the critical importance of financial advisory support for the TCC specifically, the TCC spent substantial time and resources identifying and interviewing financial advisors based on its anticipated needs.

2. Following a thorough selection process, the TCC hired two separate financial advisors, Lincoln Partners Advisors, LLC ("**Lincoln**") and Development Specialists, Inc. ("**DSI**"), to fulfill two separate roles in the Chapter 11 Cases. Lincoln's role would be to provide all financial advisory services that the TCC would need during the Chapter 11 Cases, except for those related to tort claims. Lincoln's services would include, and as outlined more completely below, assisting the TCC in evaluating the Debtors' financial affairs, potential transactions and reorganization plan, and, if necessary, serving as the TCC's expert witness on enterprise value in connection with plan

Case: 19-30088    Doc# 1837    Filed: 05/03/19    Entered: 05/03/19 16:11:34    Page 2 of 8

confirmation. DSI's distinct role would be limited to providing financial advisory services on claims-related matters, such as assisting the TCC with the administration, valuation and estimation of tort claims.

3. The TCC respectfully submits that the retention of both Lincoln and DSI is necessary for the TCC to carry out its statutory duties in an efficient and cost-effective manner. Neither the TCC, nor the advisors believe that one of the selected advisors can perform both sets of services each has been hired to provide as efficiently as the other. Moreover, no other financial advisory firms interviewed by the TCC that were, in the TCC's view, eligible to serve as the TCC's disinterested and unconflicted professionals, possessed both sets of skills critical to representing the tort claimants' interests. The TCC further submits that sharing financial advisors with the Official Committee of Unsecured Creditors (the "**UCC**") could be problematic for several reasons, including the potential for harm to the TCC's and UCC's respective constituencies when the TCC's and UCC's positions diverge and issues concerning privilege and confidentiality may arise.

4. To ensure cooperation between Lincoln and DSI and avoid the duplication of services for the TCC, the TCC, together with Lincoln and DSI, have structured the scope of services the advisors will provide so that the scope of each will be distinct. Therefore, the TCC respectfully requests that the Court grant the Applications under this scope.

## BACKGROUND

5. On January 29, 2019, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

6. On February 15, 2019, the Office of the United States Trustee ("**U.S. Trustee**") filed an Appointment of the Official Committee of Tort Claimants [Doc. No. 453]. Following the resignation of Richard Heffern from the original committee and the addition of Tommy Wehe, on February 21, 2019, the U.S. Trustee filed the Amended Appointment of the Official Committee of Tort Claimants [Doc. No. 530]. The members of the TCC are: (i) GER Hospitality, LLC, in its capacity as an individual claimant; (ii) Kirk Trostle; (iii) Tommy Wehe; (iv) Angelo Loo; (v) Karen K. Gowins; (vi) Agajanian, Inc.; (vii) Susan Slocum; (viii) Samuel Maxwell; (ix) Karen M.

1 Lockhart; (x) Wagner Family Wines-Caymus Vineyards; and (xi) Gregory Wilson. The TCC conducted a meeting on February 15, 2019, at which all members were present, and appointed Karen M. Lockhart as Chairperson.

7. On March 30, 2019, the TCC filed the Lincoln Application for approval to retain Lincoln to provide all financial advisory services that the TCC would need during the Chapter 11 Cases, except for those related to tort claims. Lincoln's proposed services would include: (i) reviewing and analyzing the Debtors' operations and businesses and financial projections, financial condition, business plan strategy, operating forecasts, cash flow projections, and budgets; (ii) analyzing the proposed sale(s) of core/non-core assets of the Debtors, the terms thereof and options and issues relating thereto, including strategic alternatives available to the Debtors; and (iii) assisting the TCC in developing, evaluating, structuring and negotiating the terms and conditions of a restructuring, plan of reorganization, disclosure statement, or sale transaction(s), including the value of the securities, if any, that may be issued to the TCC under any such restructuring, plan of reorganization, or sale transaction.[1]

8. On April 15, 2019, the TCC filed the DSI Application for approval to retain DSI to perform financial advisory services related to tort claims, which would include among the following services: (i) advising the TCC and its counsel regarding the tort claims process, filing and processing of tort claims and estimation of tort claims; and (ii) claims management including establishing procedures for claims processing and coordination with claimants.[2]

9. On April 22, 2019, the Court issued its Statement of Issues requesting further information regarding the TCC's retention of two financial advisors in light of the UCC's pending applications to retain Centerview Partners LLC and FTI Consulting, Inc.[3]

10. The Court conducted hearings on April 24, 2019, on several retention matters, including the retention applications of the UCC, which the Court also addressed in the Statement of Issues. During those hearings, the Court authorized the TCC to submit supplemental papers to respond to the Court's Statement of Issues concerning the Applications. The Court also raised the

---

[1] *See* Lincoln Application, Ex. B.
[2] *See* DSI Application, Ex. B.
[3] Statement of Issues at 4.

issue of whether it could approve provisions granting indemnity for negligence, like those requested in the Lincoln Application. Lincoln has agreed to carve out negligence from the indemnification provisions sought in the Lincoln Application.

11. The TCC received no objections to either the Lincoln Application or DSI Application.

## THE TCC'S SELECTION OF LINCOLN AND DSI

12. The TCC and its counsel identified more than fifteen (15) financial advisors for initial discussion of relevant qualifications and connections to these proceedings. The TCC ultimately interviewed seven (7) such advisors. In its selection process, the TCC focused primarily on two sets of critical skills based on its anticipated financial advisory needs. The first set relates to those typically requested by chapter 11 committees, including industry expertise, enterprise value evaluation, financial modeling, review of the Debtors' operations and cash flow, potential transaction review, and the like (collectively, "**Asset Evaluation**"). The second set of skills relates to the administration, analysis and estimation of tort claims on a scale unlike other cases ("**Claims Evaluation**"). While the TCC did interview many of the largest financial firms with both sets of skills "in-house," each of those larger firms, in the TCC's view, had connections with the Debtors or parties in interest that rendered them ineligible to serve as the TCC's disinterested or unconflicted financial advisor (or, at least, made the retention less desirable).

13. The TCC ultimately selected two sets of advisors that it believed could work cooperatively to accomplish their separate scopes of services as efficiently as one and with the requisite skills to assist the TCC in navigating the financial complexities of the Chapter 11 Cases. The TCC selected Lincoln to provide Asset Evaluation services and DSI for Claims Evaluation services. Given the complex nature of the assets and claims at issue here, neither the advisors, nor the TCC, believe that one of the selected advisors can perform both sets of services. To avoid the duplication of services and facilitate cooperation between Lincoln and DSI, the TCC limited the scope of services each was to provide in their respective engagement letters with the TCC.[4]

---

[4] See Lincoln Application, Ex. B; DSI Application, Ex. B.

Case: 19-30088    Doc# 1837    Filed: 05/03/19    Entered: 05/03/19 16:11:34    Page 5 of 8

14. To ensure that Lincoln and DSI do not perform duplicative services for the TCC and to ensure cooperation between them, Lincoln and DSI have further revised their scope of employment to cleanly divide their respective services between Asset Evaluation and Claims Evaluation (the "Revised Scope").[5]

## SUPPLEMENT TO THE APPLICATIONS

### A. The TCC Cannot Share the UCC's Financial Advisors

15. Although the TCC and the UCC share the common goal of a successful and cost-effective reorganization, the TCC believes reliance on the UCC's financial advisors or a common financial advisor would be problematic for several reasons. While the TCC's and UCC's respective positions may align on several issues, if other large cases involving multiple committees are to be a guide, the TCC and UCC may not agree on other issues that are critical to the TCC's claims. *See, e.g., Official Comm. of Equity Sec. Holders v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, 371 B.R. 660, 663 (S.D.N.Y. 2007) (affirming bankruptcy court's confirmation of the debtor's plan that was supported by the debtor and creditors' committee and contested by the equity committee).

16. Instances will arise in which the TCC's and UCC's positions will diverge. Thus, the TCC and UCC could not utilize the same financial advisor. The TCC is concerned that such a divergence could confer an unfair advantage to one constituency over the other or result in harm to both. Indeed, the TCC and UCC, as well as their advisors, owe independent fiduciary duties to their respective constituents, including the duties of honesty and loyalty. *See Vasconi & Assocs., Inc. v. Credit Manager Ass'n of California*, No. 94-52142, 1997 WL 383170, at *3 (N.D. Cal. July 1, 1997) ("As fiduciaries, counsel and committee members have obligations of fidelity, undivided loyalty and impartial service in the interest of the creditors they represent."); *In re Johns-Manville Corp.*, 26 B.R. 919, 925-26 (Bankr. S.D.N.Y. 1983) (stating that members of the official committee

---

[5] Under the Revised Scope, DSI's services will no longer include the following categories of services identified in DSI's engagement letter with the TCC: monitoring the Debtors' liquidity, including evaluation of critical vendor payments and other key payments; reviewing the Debtors' statements of financial affairs, schedules of assets and liabilities and related documents, and reporting to the TCC as appropriate; and assisting counsel with advising the TCC on tax issues relating to the Debtors. Lincoln will perform these services instead. *See* Declaration of Karen M. Lockhart in Support of the Supplement ¶8; Ex. A.

- 6 -

of asbestos claimants must be honest, loyal, trustworthy and act with undivided loyalty and allegiance to the asbestos claimants). While the interests of the TCC's and UCC's constituencies overlap in part, they do not overlap in their entirety. To the extent their interests and therefore obligations diverge, the advisors' loyalties would be split.

17. The TCC is also concerned about other practical implications to the extent the TCC and UCC share an advisor and diverge with respect to a major position. In that event, it is unclear how the committees would manage issues concerning privilege and confidentiality that are likely to arise. The TCC expects it will rely on the advice of its financial advisor on any major issue – whether that issue relates to Asset Evaluation or Claims Evaluation. To the extent conflicting financial analysis is required, this could result in the waiver of those protections, notwithstanding any joint defense agreement the two committees may negotiate. It is unclear on which position the advisor could testify or whether the financial advisor could testify in support of either position.

18. The TCC has discussed the concept of sharing advisors with the UCC. Neither committee would support sharing financial advisors, in part due to the potential for conflicts of interest.

**B.     The TCC Requires the Services of both Lincoln and DSI**

19. Due to the complexity and nature of these Chapter 11 Cases, the TCC believes it necessary to obtain financial advisory services to assist it with both Asset Evaluation and Claims Evaluation. To that end, the TCC interviewed several prospective financial advisors that could provide these essential services. After a thorough selection process, the TCC hired Lincoln and DSI because each possessed the requisite skill set and the ability to provide their respective services in a cost-effective and efficient manner.

20. While the TCC seeks the Court's approval to retain two advisors, the TCC's intention is to divide one financial advisory role into two distinct parts. The TCC has already used the services of both Lincoln and DSI and believes it will require their services throughout the Chapter 11 Cases. With respect to Lincoln, the TCC has sought and will continue to seek Lincoln's advice with respect to Asset Evaluation, including the Debtors' operations, the Debtors' employee bonus motion, the Debtors' and UCC's proposed financial advisor retentions, monthly operating

reports, wildfire mitigation, among other financial services. DSI has already commenced work assisting the TCC with Claims Evaluation. Under the Revised Scope, Lincoln and DSI have agreed that Lincoln will be performing all services related to Asset Evaluation and DSI will solely assist in Claims Evaluation.

21. The TCC respectfully believes it would be unduly prejudiced if it were unable to work with its current set of advisors.[6] The TCC further does not believe it can find a single advisor with both skills sets who has not performed work for the Debtors or major parties in interest relating to the Chapter 11 Cases or otherwise.[7]

## NOTICE

Notice of this Supplement will be provided to (i) the Debtors; (ii) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (iii) the UCC; (iv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The TCC respectfully submits that no further notice is required.

WHEREFORE the TCC respectfully requests entry of orders: (a) authorizing the TCC to retain and employ Lincoln as its financial advisor on the terms set forth in the Lincoln Application, as modified under the Revised Scope; (b) authorizing the TCC to retain and employ DSI as its financial advisor on the terms set forth in the DSI Application, as modified under the Revised Scope; and (c) granting such other and further relief as the Court may deem just and appropriate.

Dated: May 3, 2019

BAKER & HOSTETLER LLP

By: /s/ *Cecily A. Dumas*
      Cecily A. Dumas

*Attorneys for The Official Committee of Tort Claimants*

---

[6] Lockhart Decl. ¶11.
[7] *Id*.

Baker & Hostetler LLP
Attorneys at Law
San Francisco

Case: 19-30088    Doc# 1837    Filed: 05/03/19    Entered: 05/03/19 16:11:34    Page 8 of 8