1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                        ) Case No. 19-30088
                                  ) Chapter 11
5   PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY      ) San Francisco, California
6                                 ) Wednesday, May 8, 2019
                       Debtors.   ) 10:30 AM
7   _____ )
                                    DISCOVERY DISPUTE AND
8                                   STATUS CONFERENCE

9             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DENNIS MONTALI
10            UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:
    For the Debtors:            STEPHEN KAROTKIN, ESQ.
12                              RICHARD W. SLACK, ESQ.
                                Weil, Gotshal & Manges LLP
13                              767 Fifth Avenue
                                New York, NY 10153
14                              (212) 310-8000

15                              TOBIAS KELLER, ESQ.
                                PETER J. BENVENUTTI, ESQ.
16                              Keller & Benvenutti LLP
                                650 California Street
17                              Suite 1900
                                San Francisco, CA 94108
18                              (415) 364-6798

19                              OMID H. NASAB, ESQ.
                                Cravath Swaine & Moore LLP
20                              825 Eighth Avenue
                                New York, NY 10019
21                              (212) 474-1000

22  For Official Committee of   ROBERT A. JULIAN, ESQ.
    Tort Claimants:             BakerHostetler
23                              Levi's Plaza
                                1160 Battery Street East
24                              Suite 100
                                San Francisco, CA 94111
25                              (628) 208-6436

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1
      For Official Creditors'     ANDREW M. LEBLANC, ESQ.
 2    Committee:                  (Telephonically)
                                  Milbank, Tweed, Hadley & McCloy
 3                                LLP
                                  International Square Building
 4                                1850 K Street, NW
                                  Washington, DC 20006
 5                                (202) 835-7574

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18   Court Recorder:             JANE GALVANI
                                  United States Bankruptcy
19                                Court
                                  450 Golden Gate Avenue
20                                San Francisco, CA 94102

21   Transcriber:                MICHELE A. CLUTTS
                                  eScribers, LLC
22                                7227 N. 16th Street
                                  Suite #207
23                                Phoenix, AZ 85020
                                  (973)406-2250

24

      Proceedings recorded by electronic sound recording;
25    transcript provided by transcription service.
```

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, MAY 8, 2019, 10:31 AM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  Matter of PG&E Corporation.

5            THE COURT:  All right.  Who's here today for our

6    discovery dispute?  Appearances?  Nobody?  Okay.  Well, nobody

7    can appear; I'm leaving.

8            I just want to get who's going to be speaking, that's

9    all.  I see Mr. Julian, I assume he is.

10           MR. SLACK:  Well, I don't know who's should speak

11   first, Your Honor.  Let me just say what I think's on the

12   table, and --

13           THE COURT:  Just restate your name.  I know who you

14   are.

15           MR. SLACK:  Your Honor, Richard Slack from Weil,

16   Gotshal for the debtors.

17           THE COURT:  Okay, Mr. Slack.  Good morning.

18           MR. SLACK:  So good morning, Your Honor.  I think

19   there are two related applications by the tort committee --

20           THE COURT:  Right.

21           MR. SLACK:  -- for 2004 discovery.  The first is that

22   TCC's filed an application seeking agreements with third-party

23   contractors --

24           THE COURT:  Right.

25           MR. SLACK:  -- under 2004.  And the second is

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1   informal.  There was a letter --

2           THE COURT:  A letter --

3           MR. SLACK:  -- sent by --

4           THE COURT:  -- the letter.

5           MR. SLACK:  -- the TCC, and that has two pieces to it,

6   and I think it's important.  There's one piece, which I think

7   they refer to as a management piece, and it's four requests

8   that I think are all related.  It's 4, 5, 10 and 26.

9           And then there are two requests that are wildfire

10  related.  And those actually are more in the same bucket as the

11  application itself.

12          So Your Honor, since it's the TCC's application, I was

13  going to let them go, unless you would like to hear from the

14  debtor first.

15          THE COURT:  No.  I don't -- it is probably the TCC

16  first.  But let's restate it.  I mean, we're down to six topics

17  on Mr. Julian's letter that I've identified and the broad 2004

18  exam.  But I don't need to reinvent the wheel.  Just tell me

19  what you want to do on the ones that are open, assuming I've

20  got them here.

21          MR. JULIAN:  Yeah, Your Honor, it's really summarized

22  in Exhibit C to our letter to you.

23          THE COURT:  Yeah.  I got it.  I mean, I've got the --

24          MR. JULIAN:  And so --

25          THE COURT:  -- the six topics that there's a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1  disagreement about.

2  MR. JULIAN:  -- 4, 5 and 10 really come down to board

3  minutes and board packages for the three years before the

4  bankruptcy and the period during the bankruptcy.  And the

5  committee wants to review board minutes as part of its normal

6  oversight of management issues rather than having the issues

7  come up every time a contested matter comes up and we have to

8  come in and ask for a section of the board minutes that deals

9  with that contested matter.  The same --

10  THE COURT:  But I mean, do you really think you have

11  to have a board examination for every contested matter?  We're

12  not talking about --

13  MR. JULIAN:  No, I mean issues come up.

14  THE COURT:  Right.

15  MR. JULIAN:  And the second reason is, we're looking

16  at building pots in this case.  Both discovery disputes come up

17  from our desire to build pots of claims and insurance policies

18  to satisfy fire claims that might be deposited into a

19  resolution trust.

20  So the 2004 application deals with the debtor's third-

21  party claims against the contractors, maintenance people,

22  repair people, analysts who worked on the trees, the system,

23  and the hardware and campfire --

24  THE COURT:  Yeah, I know.  I think I know generally

25  the topical area.  I guess the only question I have is what are

PG&E Corp.; Pacific Gas and Electric Company

1  you going to do with that information?

2        MR. JULIAN:  Well, we're looking at issues dealing

3  with wildfire --

4        THE COURT:  Well, of course.

5        MR. JULIAN:  -- reports on the board, insider

6  transactions, dividends.

7        THE COURT:  Well, let's stick with one topic.  You'll

8  switch to the 2004.  What are you going to do with all this

9  information about all the relationships, all the agreements

10  with third-party vendors and so on?

11        MR. JULIAN:  Are you on the 2004, Your Honor?

12        THE COURT:  Yeah.

13        MR. JULIAN:  Okay.  The debtors have agreed --

14        THE COURT:  Yeah, I mean we've got to start somewhere.

15        MR. JULIAN:  The debtors have agreed to produce

16  paragraphs 1 through 24, and so we're limited to 25.

17        Let me explain the three types of things we're looking

18  for, two of which they have agreed to produce.

19        First, at the 341 meeting, the debtor's representative

20  testified that they have not evaluated claims against the

21  third-party contractors who may be liable to PG&E for the fire

22  claims against PG&E.  We estimate these claims and the

23  insurance policies that cover them could be about 700 million

24  to a billion dollars.  So it's a large asset of the estate, and

25  depending on how the -- and Your Honor, these third-party

                    PG&E Corp.; Pacific Gas and Electric Company

1    contractors who worked on the trees and the hardware on the

2    power that failed and the electrical system that failed have

3    indemnity contracts in their contracts -- we know because we

4    looked at one -- whereby they agreed to indemnify PG&E for the

5    fire claims in this case.

6           THE COURT:  Well, even if they haven't there would be

7    a common law --

8           MR. JULIAN:  There would.

9           THE COURT:  -- responsibility if the third party was

10   culpable.  Right?

11          MR. JULIAN:  There would.

12          THE COURT:  Yeah.

13          MR. JULIAN:  But the difference is in dealing with how

14   those assets come into the estate in a plan, the difference

15   between common law and contract and insurance policy.

16          THE COURT:  Okay.

17          MR. JULIAN:  Depending on how the --

18          THE COURT:  No, I know.  I understand what --

19          MR. JULIAN:  Yeah.  Well, depending on how the

20   indemnity contracts read, the money might have to be channeled

21   just to fire claims, depending on how they read.  So we need to

22   look at those.

23          So we asked -- this is a large asset in the estate

24   that's not being pursued, and so we want to look at three

25   things, Your Honor, two of which they've agreed to give us.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1 One is the contracts with the tree trimmers, the repairmen, the

2 maintenance people, the inspectors.

3 THE COURT: So if we can stick -- and I'm not trying

4 to interrupt you; I'm trying to stay with you. I'm looking at

5 paragraph 25. That's where we are, right?

6 MR. JULIAN: Well, in --

7 THE COURT: And so the tree trimmers and the

8 contractors, these are --

9 MR. JULIAN: Your Honor, may I explain the position?

10 THE COURT: -- what you're referring to? Yeah. Yeah.

11 MR. JULIAN: So they say they agree to produce those

12 types of contracts in 25, to the extent they agree to produce

13 them in 1 through 24. So I'm explaining to you what they've

14 agreed to do in 1 through 24.

15 THE COURT: Okay.

16 MR. JULIAN: So it's the contracts and the insurance

17 policies that cover them. We basically have agreement on that.

18 All right?

19 THE COURT: Um-hum.

20 MR. JULIAN: Turning to 25, because 25 focuses on the

21 tower that failed that caused the fire in camp fire, that in

22 turn caused this bankruptcy. We are looking at that more

23 closely for several reasons.

24 First, as I explained to you, we want the contracts to

25 show what the tree trimmers, the inspectors, the analysts, the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    risk assessment people agreed to do.  That will identify who

2    are the third-party defendants that the debtor -- or we may

3    pursue on behalf of the debtor.

4            The second is the insurance policies that may name the

5    debtor as an additional insured.  And I think there's agreement

6    that they will produce those things.

7            And then three, we're looking at the work product of

8    the inspectors, the risk assessment people, the repairmen, the

9    maintenance people, in order to identify the claim against

10   them.

11           So Your Honor, the contracts show the defendant, the

12   insurance policy shows the asset, the indemnity in the contract

13   shows the asset that come into the estate.

14           And then last, but not least, in order to identify the

15   type of claim that goes against them, we need to see the work

16   product, which is essentially in all those other subparagraphs

17   of paragraph 25.

18           Their argument is that deals with causation in the

19   fire claimants' lawsuits against PG&E, and they won't to start

20   discovery yet.  And I get it; we're not starting discovery yet.

21   But that's not why we're seeking it.  We're seeking it to

22   identify the name of the third-party defendant contracts,

23   insurance policy and indemnities that can cover --

24           THE COURT:  Okay, but let's stop there for a minute.

25           MR. JULIAN:  -- and the work product that shows the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1   type of claim.

2          THE COURT:  Let's say that XYZ was a contractor, and

3   XYZ did some work on this particular site, and XYZ is covered

4   by insurance from ABC insurance company.  So you've got both of

5   those.

6          MR. JULIAN:  We don't yet know the type of claim --

7          THE COURT:  But what -- explain to -- you're living

8   with this; I am not.

9          What do you mean, what type of claim?

10         MR. JULIAN:  So are --

11         THE COURT:  Just explain a little more specifically

12  what you're trying to do.

13         MR. JULIAN:  Well, we know who the defendants are, and

14  they have insurance.

15         THE COURT:  Right.

16         MR. JULIAN:  We don't know whether they did anything

17  wrong.  We don't want to identify a claim when someone hasn't

18  done anything wrong.

19         There are four reasons why we want to look at their

20  work product and their analyses.  The first is to identify the

21  type of claim, as to whether there is a claim.

22         THE COURT:  So type of claim means negligence --

23         MR. JULIAN:  Negligence, breach of contract, whether

24  there is --

25         THE COURT:  -- something like that.  Okay.

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  We want to see their analysis to see if

2 they've breached a duty so that there is a claim to pursue.

3    The second reason is, we need to identify whether PG&E

4 is subject to a 1.6 billion PUC fine for failure to follow the

5 advice in the analyst reports, just like the PUC fined PG&E for

6 in the San Bruno matter because if there's a billion dollar

7 plus fine, which is even referenced in the 10K (sic) they just

8 filed this month, on May 2, then that's a one billion dollar-

9 plus fine we're going to have to worry about in this case, and

10 we're trying to evaluate whether there's going to be a fine

11 arising out of camp fire.

12    THE COURT:  Well, that seems to be much different from

13 the first category you were describing.  I mean, I don't --

14    MR. JULIAN:  Well, it's the second reason.

15    THE COURT:  -- I'm not -- it's the second reason, but

16 it's a different conceptually --

17    MR. JULIAN:  Yes.

18    THE COURT:  -- much different thing because you could

19 have all the third-party -- parties could file bankruptcy, and

20 you still may have a right to pursue this 1.6 million (sic)

21 dollar -- or to defeat it.  What your saying is it might be a

22 liability that you're --

23    MR. JULIAN:  We're going to sit down and negotiate a

24 plan soon --

25    THE COURT:  Right, right.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  -- and we're trying to find out what pots

2  can we add to the resolution trust to pay fire claims and what

3  other liability is out there.

4    THE COURT:  You're also ahead of me.  I don't know

5  anything about a resolution trust.  I mean, I know that this

6  concept, and I know there are concepts out there, but I --

7  you've got to slow down a little bit.  No one's told me what

8  the plan is yet.

9    MR. JULIAN:  There might not be a resolution trust.

10  But the point is --

11    THE COURT:  Whatever the label is.

12    MR. JULIAN:  -- whether or not there is or not, the

13  parties need to sit down at some point soon and start

14  discussing pots of assets and liabilities.  I've told you about

15  the pot of asset we're trying to identify, and we're worried

16  about this liability.

17    There's two other reasons.

18    THE COURT:  But again, you've got to let me go at my

19  pace because you know too much, and I know too little.  Right?

20    MR. JULIAN:  All right.

21    THE COURT:  So you've identified our hypothetical

22  person who may be a cause or connection with an event that

23  caused the problem, and maybe that person is culpable, maybe

24  not.  I understand the point.

25    I don't understand the nexus between that set of facts

PG&E Corp.; Pacific Gas and Electric Company

1    and this 1.6-billion-dollar exposure on a fine.  That seems to

2    be much different.  Again, wait and see what the other side

3    says.

4              MR. JULIAN:  It is.

5              THE COURT:  Maybe it's nonissue, but I don't know.  I

6    can't connect the two.

7              MR. JULIAN:  It is.  So here's the connection.

8              THE COURT:  Okay.

9              MR. JULIAN:  Historically, when PG&E has in its

10   records documents that it indicate it knew of a safety

11   violation --

12             THE COURT:  Um-hum.

13             MR. JULIAN:  -- that is connected to a disaster, such

14   as San Bruno, the PUC fines --

15             THE COURT:  No.  I got it.

16             MR. JULIAN:  In that case it was 1.6 billion.

17             THE COURT:  But what is it that you want that the

18   discovery would uncover under that?

19             MR. JULIAN:  I'm coming to that.  If, as we believe,

20   the risk assessment reports show that PG&E knew of the problem

21   with the hardware on the tower in advance and didn't do

22   anything, there's likely going to be a large penalty in the

23   billions of dollars by the PUC, and the May 2, 10Q of PG&E even

24   predicts that this may occur.

25             Why do we think that the risk assessment is going to

PG&E Corp.; Pacific Gas and Electric Company

1   show that?  Because two documents I produced in the STIP

2   hearing show that in 2014 there was a report issued on the

3   Caribou-Palermo line tower that failed that showed that a PG&E

4   inspector stated that the towers on that line had a high risk

5   of failure, and in 2016, an employee had a near hit fall on one

6   of the towers because of a hook that was corroded twenty

7   percent.

8           THE COURT:  No.  And this is the same tower that was

9   the subject of the attempt to interfere, I mean, hold the stuff

10  being sent off to Washington, right?  The hearing that I had a

11  few weeks ago.

12          MR. JULIAN:  Yes.  Yes.  Yes.

13          THE COURT:  Okay.  But again, Mr. Julian, you've got

14  to -- I'm pleading, I'm going to beg you to be patient with me.

15  You've described in the first part of your presentation an

16  inquiry that your committee would like to pursue to determine

17  if there's some recoveries.  Now you've switched to a --

18          MR. JULIAN:  A second reason.

19          THE COURT:  -- discovery of is there is a big 800-

20  pound gorilla liability out there, and I don't understand the

21  connection.  I understand the inquiry, but it seems to me a

22  different process.

23          MR. JULIAN:  It is.

24          THE COURT:  In other words, if the PUC says, we don't

25  have any fine, that's the end of that subject, right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  Correct.

2    THE COURT:  I mean, there either will or won't be an

3    assertion of a 1.6-billion-dollar liability.  If there isn't an

4    assertion, the problem's gone.  It's a liability that isn't

5    going to dilute any recovery for creditors, right?

6    MR. JULIAN:  Right.  And so when the 10Q tells us

7    they're worried about this happening, we're trying to get some

8    information so we can evaluate it.

9    THE COURT:  So what do you want that information for

10   now, in terms of your mission, other than to determine what the

11   total universe of claims is?

12   MR. JULIAN:  It's the second reason.  The first reason

13   is to determine whether a claim exists against the third-party

14   contractors.  The second --

15   THE COURT:  I thought I've already agreed with you.  I

16   understand that.

17   MR. JULIAN:  All right.  So it's the second reason,

18   Your Honor.  If you disagree with it, then I only have one

19   reason.

20   THE COURT:  No.  No.  No.  I guess I'm either dense,

21   or you're not making yourself clear.

22   You have described an attempt on your side to learn as

23   more as you can to find a source of increasing the pot.  You've

24   now, on the second subject, described an inquiry to decrease

25   the claimants in the pot, and it seems to me they're two

PG&E Corp.; Pacific Gas and Electric Company

1    different inquiries.

2              MR. JULIAN:  They are.

3              THE COURT:  Okay.  And why is it important now, today,

4    in this phase of the case, to start to figure out if you can

5    eliminate a liability?

6              MR. JULIAN:  We're not seeking to eliminate it.

7              THE COURT:  Well, I mean, no.

8              MR. JULIAN:  We're seeking to determine with our FAs,

9    who are now meeting --

10             THE COURT:  Um-hum.

11             MR. JULIAN:  -- with the parties in the case and the

12   legislature, to gauge whether or not this penalty that the

13   debtor's warned us about in their 10Q of May 2 is a risk or

14   not.

15             THE COURT:  Okay.

16             MR. JULIAN:  They identify it as a risk.  If we see

17   the same -- if we see in that document what we think we're

18   going to see, we are going to put a number in the liability

19   problem for that.  Our FAs are going to do it --

20             THE COURT:  Okay.

21             MR. JULIAN:  -- even though the PUC's going to take a

22   year to get to it.

23             THE COURT:  And what if you don't get that answer now,

24   what's going to happen?  It's still going to be a question

25   mark.  It's going to be an unknown.

PG&E Corp.; Pacific Gas and Electric Company

1        THE COURT:  It's going to be less risk to us, as we

2   evaluate it.

3        THE COURT:  Or an unassessed piece.

4        MR. JULIAN:  Yes.

5        THE COURT:  In other words, if we can go back and

6   visualize a simple list of assets on the one side and

7   liabilities on the other, there's a big question mark for

8   whether there's a big 1.6-billion-dollar bogey there.

9        MR. JULIAN:  Correct.

10        THE COURT:  Okay.  All right.

11        MR. JULIAN:  The third --

12        THE COURT:  So third category.

13        MR. JULIAN:  The third reason to look at the documents

14   that show why the hardware failed, and whether or not people

15   knew in advance, is to identify what caused the fourteen-

16   billion-dollar minimum damage camp fire in order to avoid

17   another catastrophic event that could imperil this bankruptcy.

18        So we're not focusing on all the fires.  This one was

19   the biggest, and Your Honor, it's different.  Remember, 2017

20   was largely fires caused by trees falling --

21        THE COURT:  Um-hum.

22        MR. JULIAN:  -- some hardware problems, some

23   deenergizing problems.  But 2018 was unique in that it was

24   hardware related.  Totally different.  No trees were involved

25   that CAL FIRE has reported yet.

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp.; Pacific Gas and Electric Company

1    And as you remember the STIP hearing, they're clearing

2   something like 1,400 miles of trees but only 150 miles of

3   hardware hardening.  So to us, this is a very important thing

4   to look at in this case with our FAs to determine how to

5   prevent a catastrophic fire.

6        THE COURT:  Okay.  So again, be more specific in terms

7   of what it is you want me to order the company to do.

8        MR. JULIAN:  The same thing in paragraph 25 that I've

9   asked for everything else.  It's all the same thing, four

10  different reasons for giving it.

11       THE COURT:  Okay.

12       MR. JULIAN:  It's the risk assessment documents,

13  it's --

14       THE COURT:  All right.  I understand.

15       MR. JULIAN:  -- scope of services, describe the work,

16  the work product, inspections, and inspection reports.

17       THE COURT:  So and if there had never -- I mean, let

18  me rephrase that.  Apart from wanting to know what will

19  increase the pot, and secondly, what will decrease the

20  exposure, the third one is what is being done to avoid another?

21       MR. JULIAN:  Yes.

22       THE COURT:  Okay.  What's the fourth reason?

23       MR. JULIAN:  The fourth is, all agencies, the SEC, the

24  DA, and the PUC -- everyone else is investigating the cause of

25  the fire, and we view the tort committee, which represents some

PG&E Corp.; Pacific Gas and Electric Company

1  50,000 victims, as similarly situated with the public, we want

2  to investigate what caused this bankruptcy.

3  The debtors admit in their papers that this bankruptcy

4  was caused by -- when the camp fire liabilities arose, not when

5  2017 arose.  And this is the biggest thing that's happened in

6  the case.  They've established a twelve billion dollar charge

7  on their books for camp fire alone, and we believe that such an

8  important cause of a bankruptcy should simply be investigated

9  just like everyone else is investigating.

10  In that regard, Your Honor, if we were representing

11  the unsecured creditors' committee, we would be looking at the

12  same stuff too:  pots, fines --

13  THE COURT:  But one of the concerns that I have is

14  whether the two committees are duplicating or overlapping, and

15  that's for another day.  Today we're dealing with your request

16  for discovery.

17  MR. JULIAN:  Yeah.

18  THE COURT:  But it does -- and this comes up with all

19  the issue about employment of professionals and whether there's

20  a duplication of effort.  I mean, to me, whether you're a tort

21  claimant or a contract claimant, you're a claimant.  And if you

22  don't have a claim, you should be tossed out, and if you do

23  have a claim, you should be dealt with then.  Therefore, the

24  issues should be similar.

25  So let's come back to the other discovery and stick

PG&E Corp.; Pacific Gas and Electric Company

1  with this one, and see what Mr. Slack wants to say.  I mean,

2  all I'm trying to do today is see if there's a way to make this

3  move along.

4       So Mr. Slack, can you respond to those categories?  I

5  guess it's not what the reasons that the TC has, but rather,

6  what it is they want.  So what is it that you don't want to

7  give them?  Is it the work product?

8       MR. SLACK:  So Your Honor, Richard Slack for the

9  debtors.  As I understand it, you'd like me to respond to that

10 particular issue.

11      THE COURT:  Yeah, again, you all are loaded up with

12 the stuff.  I'm trying to do it with some very minimal kind of

13 information.  And consistent with my approach to discovery

14 disputes, I want to see if I can solve the problem with a quick

15 decision.  So what did -- so yes --

16      MR. SLACK:  So --

17      THE COURT:  And we'll come back to the other letter in

18 a -- to the letter.  But stick with the 2004 request.

19      MR. SLACK:  Okay, very good, Your Honor.  So let me

20 address the contractor requests.  So the first thing -- and I

21 think Mr. Julian had this right -- there's been a large

22 agreement on ninety-five percent of the requests, and the

23 debtors have cooperated with respect to giving information on

24 the first twenty-four.  And even with respect to the twenty-

25 fifth, has agreed to give the contractor agreements --

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT:  Contractor.

2    MR. SLACK:  -- and the insurance.

3    THE COURT:  Right.

4    MR. SLACK:  So we're only talking about --

5    THE COURT:  Work product.

6    MR. SLACK:  -- documents that go directly to the

7  liability issues, essentially the underlying claims.  What I

8  think's important, Your Honor, is that Mr. Julian specifically

9  recognized that the basis -- certainly the primary basis for

10 liability of the contractors here is an indemnity.  So think

11 about what that means.  That means that the contractors aren't

12 liable unless the company is liable in the underlying lawsuits.

13   THE COURT:  I'm not sure I follow that.

14   MR. SLACK:  So in other words --

15   THE COURT:  If I live next door --

16   MR. SLACK:  -- the contractors --

17   THE COURT:  Wait a minute.  If I live next door and a

18 careless contractor caused a fire that burned my house down,

19 why wouldn't I have a direct claim against that person or the

20 utility that hired the guy in the first place?  That's --

21   MR. SLACK:  Well --

22   THE COURT:  I mean, look, tomorrow I'm going to hear a

23 case about a personal injury of a person who fell, and she

24 claims to have tripped on a PG&E spot.  She sued the

25 restaurant, the city, and PG&E.  What's different?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. SLACK:  The point is that these contractors are

2   hired by PG&E --

3    THE COURT:  Right.

4    MR. SLACK:  -- and there's no question that in the

5   underlying litigations the argument is that PG&E is

6   responsibility for the conduct of the contractors.  And the

7   contractors have indemnification.  So if PG&E isn't found

8   responsible, liable, whatever you want to say, and there's no

9   damage that's responsible by PG&E, then the contractors --

10   because as Mr. Julian said, it's an indemnity.  They're

11   indemnifying PG&E for PG&E's losses.

12    So the key here in understanding this is that

13   everything that Mr. Julian is asking for that we haven't given

14   them goes to the liability -- directly to the liability that's

15   being litigated in the underlying claims and is therefore

16   directed like a laser at the subject matter and the liability

17   issues in the underlying claims.

18    THE COURT:  Well, but again, therefore what?  I mean I

19   still don't understand why that means you can't produce it.

20    MR. SLACK:  Okay.

21    THE COURT:  Let's -- again, bear with me --

22    MR. SLACK:  I'm --

23    THE COURT:  -- I'll say the same thing I said to Mr.

24   Julian.  I'm trying to -- I don't have the background that you

25   all have.  So let's use an example of contractor XYZ who did

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1  something faulty on the tower that caused the fire and you've

2  got insurance to cover him and you've identified him.  All Mr.

3  Julian wants to know is some causation stuff.  What's wrong

4  with that?  What's so burdensome about that inquiry?

5      MR. SLACK:  So I think there's two things that are

6  potentially problematic for that.  So let's start with the

7  first, and that is that there is, I think, a well-tested over a

8  long-time case law, that says that where you know you have a

9  claim -- where there is an underlying claim, you cannot take

10  discovery on that underlying claim under 2004.  And in our

11  letter we cite, I think, five cases, but there's --

12      THE COURT:  Yeah.  All bankruptcy level.  And no

13  controlling precedent.

14      MR. SLACK:  Well, there's certainly a couple of

15  district court cases --

16      THE COURT:  I said no controlling precedent.

17      MR. SLACK:  But the point is, is that there's -- we

18  cite five, but there's probably between ten and fifteen of

19  these cases that say specifically that where you have knowledge

20  of the claim and there's an underlying claim -- and here, Your

21  Honor, the debtor's not saying no to this information.  And

22  let's just be very clear about this.  What the debtor is saying

23  is -- and everybody knows this -- that the underlying

24  liabilities are going to be decided in this bankruptcy at the

25  appropriate time, either at an estimation hearing, by adversary

(973)-406-2250  operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    proceeding.  So at some point --

2           THE COURT:  Well, maybe not.  They may be decided in

3    another form.  How do you know how it's going to be -- where

4    it's going to be resolved?

5           MR. SLACK:  Well --

6           THE COURT:  I mean, I don't know.

7           MR. SLACK:  You may be right, Your Honor, but my point

8    is still the same, which is that there is going to be a forum

9    that these are going to be decided.

10          THE COURT:  Yeah.

11          MR. SLACK:  And what the law says is you take

12   discovery when you know there's a claim like this in that

13   other -- either in that adversary proceeding in connection with

14   the estimation hearing where the parties can look at the

15   subject matter of those and be bounded by the Federal Rules of

16   Civil Procedure and have a give and take on the discovery,

17   which is what should happen here.  And those cases --

18          THE COURT:  But what's the disadvantage to using 2004?

19          MR. SLACK:  I'm sorry?

20          THE COURT:  What's the disadvantage to using Rule

21   2004?

22          MR. SLACK:  So the disadvantage to using 2004 is that

23   2004 is a broad tool.

24          THE COURT:  I know.

25          MR. SLACK:  And it's not like a laser, it's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1 encompassing.

2          THE COURT:  But that's why we have conferences like

3 this to get -- to give them a laser, not a paintbrush.

4          MR. SLACK:  Well, I would say this, Your Honor.

5          THE COURT:  Or whatever.  My metaphor will work.

6          MR. SLACK:  When you're talking about liability for

7 the campfire, the idea that the debtors are going to have to

8 produce to the TCC broad-ranging information that -- you want

9 to make sure that you have the Federal Rules of Civil Procedure

10 that govern that because in 2004, it doesn't --

11          THE COURT:  You have to be more specific what you mean

12 by that.

13          MR. SLACK:  Well, so for example --

14          THE COURT:  See, what I can't apply to this case and

15 won't is what we do in simple cases.  When lawyers come in and

16 say the Rule 2004 is too broad, it requires an adversary

17 proceeding, I say to the other side, then file an adversary

18 proceeding.  You don't want that.  I mean, we don't -- I don't

19 want the TCC to have to start an adversary proceeding to do --

20 all we're trying to do is to get facts, get to the truth or

21 positions.

22          MR. SLACK:  So we were saying --

23          THE COURT:  So what is wrong?  You keep telling me

24 about -- I know the rules about federal procedure and

25 discovery.  But I also know why 2004 is there.  So you have to

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    tell me why this is unworkable or unfair to the utility.

2            MR. SLACK:  Well, I think it --

3            THE COURT:  Or inappropriate, I should say.

4            MR. SLACK:  I think it's the burden of going through

5    discovery today that we know is going to be, and take place at

6    an appropriate time in the bankruptcy in some form.

7            THE COURT:  But who's going to be the discoverer in

8    some other forum?  Is it going to be this committee or is it

9    going to be somebody else?  In other words, sticking with my

10   example, we got Joe.  Joe was hired to go work on tower 22227,

11   and Joe screwed up and caused the tower to go up in flames.

12   And so the plaintiff, who lived next door and lost his house,

13   has sued Joe and PG&E.  And PG&E has an insurance policy in

14   effect.  Now, why can't the plaintiff discover the work product

15   that might be the kind of stuff that Mr. Julian would like to

16   look at?

17           MR. SLACK:  I think it's a --

18           THE COURT:  Joe says I'm not liable, but an

19   investigator says, well, maybe Joe is liable.  But maybe

20   therefore there is a claim against the utility -- there

21   probably is anyway, but there is a claim for indemnity.  What's

22   so different about the analysis?

23           MR. SLACK:  Well, I -- if I understand your scenario,

24   Your Honor, we're talking about a timing issue about having

25   discovery taken by the TCC that, again, if there are parties to

PG&E Corp.; Pacific Gas and Electric Company

1  an adversary proceeding, if -- and we don't know whether it's

2  going to be an estimation, we don't know what Your Honor yet is

3  going to do in order to resolve the fire liability, right?

4  That's coming down the road.

5          THE COURT:  Okay, but here's my invitation to tell me

6  what is going to happen if I don't let Mr. Julian do what he

7  does.  In other words, you're asking me to tell him no, he'll

8  have to settle for the information that they've agreed to

9  produce.  And so my response to you then, Mr. Slack, is well,

10 then, when and how is he going to get it if I don't let him get

11 it now?  So give me some guidelines to know that there's an

12 alternative.

13         MR. SLACK:  So let me give you two suggestions here,

14 Your Honor.  The first is that I don't think any of us know

15 exactly how this is going to be resolved.  I mean --

16         THE COURT:  Add me to the list.

17         MR. SLACK:  Okay.

18         THE COURT:  Okay.

19         MR. SLACK:  But what we do know is, is that in order

20 to get the bankruptcy to the finish line, we're going to have

21 to at some point have a mechanism for dealing with it.

22         THE COURT:  Right.

23         MR. SLACK:  And the parties in interest at that

24 time -- and again, I think it'd be premature to try to tell

25 Your Honor how that's going to be, whether it's an estimation

PG&E Corp.; Pacific Gas and Electric Company

1    or adversary proceeding -- at that time, the parties to the

2    bankruptcy are likely to have discovery with respect to the

3    underlying liability and claim issues that are at issue here.

4         THE COURT:  But it's the same set of facts, right?  In

5    other words, you're making an argument that why is Julian and

6    the TCC need to do this now if they're going to do it later.

7    But what's wrong with doing it now?  Who's going to be doing it

8    later?  In other words, this is an adversarial process at the

9    moment; it's unfortunately the case, right?  So the TCC has

10   said we want to decide whether there's some culpability here.

11   We want to see if Joe was negligent or innocent.

12        MR. SLACK:  Right.

13        THE COURT:  All right?  So I'm still figuring it out

14   in my mind if I say no to Mr. Julian and we do it at some point

15   in the future, who is going to be the person or the entity

16   seeking the information?  Unless the company's going to bypass

17   all that with a plan that just pays everybody in full without

18   specifics, which I doubt is going to be the case.

19        MR. SLACK:  Well, I'm sorry I wasn't clear because I

20   think the point is going to be you're going to look at whatever

21   the mechanism is.  So let's say it's an estimation hearing.

22   You're going to look at the parties to the estimation hearing.

23   It may be a broad one or it may be a specific one with specific

24   claims.  And the parties to that are going to get discovery.

25   And almost certainly in that situation, the TCC, the UCC are

PG&E Corp.; Pacific Gas and Electric Company

1    going to be entitled to get the same discovery that the debtors

2    get in that proceeding.  And so at that time, everybody will be

3    able, whatever -- whether it's an adversary proceeding, an

4    estimation -- that's when the discovery, if any is appropriate,

5    is going to be put in place.

6         THE COURT:  I guess here's my problem.  Look, my first

7    involvement in the specifics of the fire that occurred on that

8    particular line was when we had this emergency hearing a few

9    weeks ago.  I don't know if you were on the call, but various

10   people were, about the testing that Butte county was going to

11   do, I think, on the very same tote -- pole.  And guess what I

12   was told?  That if I didn't intercept it, it might be

13   destroyed, which means it might get burned up, it might be used

14   in the process.

15        There's a concept here of preserving evidence before

16   you lose evidence.  So what's going to be different -- I mean,

17   what facts are going to be exactly as well-established or

18   establishable at some date in the future than if they're

19   established now, if I allow this discovery to go forward the

20   way he's requesting it?

21        MR. SLACK:  I think --

22        THE COURT:  It's the -- again, if Mr. Julian has

23   oversimplified, you can speak to it.  But sticking with my

24   example, fact, Joe was hired; fact, there was insurance; fact,

25   the fire caused the pole to burn; fact, the burn -- the fire

PG&E Corp.; Pacific Gas and Electric Company

1   caused the plaintiff's house to burn down.  So what's missing

2   is some expert who analyzes and says Joe was blameless, Joe was

3   at fault, PG&E was blameless, PG&E was at fault.  Those are

4   just analyses and opinions, right?  If they can be determined

5   now, why do they have to be determined later or what's the

6   disadvantage of determining it now and making it available for

7   the most likely candidate, namely the tort claimants'

8   committee?

9           MR. SLACK:  So Your Honor, I'm going to have two

10  things to say here.

11          THE COURT:  Okay.

12          MR. SLACK:  First is that the underlying question --

13  which I think before this hearing I don't think anybody

14  expected was going to come out -- was should the tort

15  committee -- because it's not even in their application.  The

16  tort committee said they wanted to look at contractor

17  information, and now what we're saying is the tort committee

18  should somehow be able to investigate causes of the fires as if

19  they're going to do an investigation that either the debtor --

20  they say themselves that there are outside agencies that are

21  doing this --

22          THE COURT:  Well, they said the FAs.  That -- I assume

23  that means that if they got their way, they'll be FTI, right?

24  Or no, that's the --

25          UNIDENTIFIED SPEAKER:  Lincoln, Lincoln.

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT:  Does -- Lincoln.  I mean, again, this gets

2  back to a different question of why do we need three sets of

3  people investigating one thing?  But that's for another day.

4    But Mr. Slack, are you saying that what Mr. Julian is

5  asking for in his comments today are broader than his written

6  requests?

7    MR. SLACK:  Yes Your Honor.  What I'm saying is when

8  you look at the request, it talks about contractors and

9  contractor liability.

10    THE COURT:  Right.  I have it in front of me.

11    MR. SLACK:  When you're focused on contractor

12  liability, what we've given them are the contracts and the

13  insurance policies --

14    THE COURT:  Okay.

15    MR. SLACK:  -- or we've committed to do that.

16    THE COURT:  Okay.  Okay, so --

17    MR. SLACK:  He's going to be able to see the type of

18  claim.  He's going to be able to see what contractually those

19  types of claims are.  Now he's said in here that what he wants

20  to do is investigate whether the contractors were negligent.

21  That's what he -- because it's all about the contractors.

22    THE COURT:  No, I understand.

23    MR. SLACK:  And so the point we were making, and I

24  think it's an important one, Your Honor, is that that limited

25  focus is totally unnecessary at this point in the proceeding.

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT: Okay. Do you have his Rule 24 -- 2004

2  request in front of you and this --

3    MR. SLACK: Yes.

4    THE COURT: -- and this paragraph 25?

5    MR. SLACK: Yes.

6    THE COURT: I mean, that's really what we're talking

7  about right? So it looks to me, if I look at 25-A and B and C,

8  seem to be factual, not analytical. D, I mean -- let's stick

9  with A, B, C, and D. I'm drawing a line there, but those first

10  four seem to just be pieces of agreements that would be in the

11  file in the old-fashioned way, right?

12    MR. SLACK: Right.

13    THE COURT: Agreements.

14    MR. SLACK: Yes.

15    THE COURT: Agreements, documents that describe scope

16  of services, documents that describe work performed. Now,

17  starting with E, it looks like there we're talking about

18  findings, summaries, analyses.

19    MR. SLACK: And again, it's focused on the third-party

20  contractors.

21    THE COURT: Yeah. I know this whole thing is. That's

22  the whole --

23    MR. SLACK: Right.

24    THE COURT: All of paragraph of 25 is a subset and --

25    MR. JULIAN: And not PG&E's conduct, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    We're only looking at the third-party contractors' conduct.

2           THE COURT:  No.  I understand.  And if we skip over to

3    E -- I mean to F.  F is insurance policies.  Those are just

4    documents.

5           MR. SLACK:  Right.

6           THE COURT:  And then G -- well, G seems -- inspection

7    reports, and H.  I mean, it looks to me like E, G, and H are

8    really what may be the difference of opinion here.

9           MR. SLACK:  Yeah.

10          THE COURT:  Is that a fair statement Mr. Julian?

11          MR. JULIAN:  I think so.

12          THE COURT:  I mean, the A, B, C, D, and F are just

13   documents sitting in a folder somewhere, right?

14          MR. JULIAN:  Right.

15          THE COURT:  Or names or Joe, Joe, the guy --

16          MR. JULIAN:  And it's not to be used -- I'm not trying

17   to get it to use in a lawsuit against PG&E.  I'm trying to use

18   it to see what the claim is against the third-party

19   contractors.

20          THE COURT:  Okay.

21          MR. JULIAN:  And those -- these requests did not ask

22   for what PG&E did --

23          THE COURT:  No.

24          MR. JULIAN:  -- right or wrong.

25          THE COURT:  No.  So Mr. Slack, again, what's the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    doomsday that you think can happen if this committee gets the

2    work product, to use that term, the work product of each of the

3    third-party contractors?

4         I mean, some -- whatever it is.  I don't know exactly

5    what he has in mind or what a document might look like, but if

6    there's something in the file that says, Joe really screwed up

7    and he caused the fire and we're going down in flames -- bad

8    term -- that would be a finding or a summary.  What's the harm

9    of letting him have it?

10        MR. SLACK:  So Your Honor, I would say that there's no

11   reason that the debtor should be put through doing the --

12   through 2004 what inevitably is going to happen in a specific

13   context.

14        THE COURT:  I know.  You said that before.  You've

15   said that about three times.

16        MR. SLACK:  Okay.

17        THE COURT:  If the debtor produces it today, what

18   difference does it make if they're going to have to produce it

19   tomorrow or next month or next year?

20        MR. SLACK:  Well, they may or may not have to produce

21   the same information because what we're going to know when you

22   have a specific proceeding is what information is relevant to

23   that specific proceeding.

24        THE COURT:  What kind of proceeding?

25        MR. SLACK:  So you're going to do it once rather

PG&E Corp.; Pacific Gas and Electric Company

1  than -- because when we have the hearing, whether it's an

2  estimation hearing, an adversary proceeding, we're going to

3  have to conduct discovery at that time, and so it's going to be

4  bounded at that time by whatever the issues are in the

5  particular cases.

6          THE COURT:  But nobody is --

7          MR. SLACK:  And so you're going to be duplicating

8  through 2004, today, when there's no need to do it at this

9  point.

10         THE COURT:  But 25-E doesn't ask the debtor to do any

11 discovery.  It asks the debtor to produce what it has.  So I

12 understand it's a burden.  I mean, listen, I compliment you,

13 both sides, for making so much progress because all these

14 requests seem very, very burdensome or --

15         MR. SLACK:  Yeah.

16         THE COURT:  -- huge, huge.  But what I'm missing here

17 is -- just again, I apologize for my simple hypothetical.  But

18 if in a PG&E folder file somewhere there is some work product

19 or impressions or recommendations of somebody at the company

20 that says, I went and interviewed Joe and I looked at the fire

21 and here's my conclusions, that is a recollection or an

22 impression that's been recorded, and if it exists today, then

23 it's going to exist in the future, and I don't see how the fact

24 that there might be an adversary proceeding or might be a

25 claims process in the future, means therefore, the committee

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

                    PG&E Corp.; Pacific Gas and Electric Company

1    shouldn't get it now.

2            The committee just wants to analyze it.  They're not

3    asking -- and I don't believe the committee would be entitled

4    to go file a suit against the contractor or to do anything.

5    They're just trying to analyze it as far as I can tell.  You're

6    getting some helper heres -- helpers.

7            MR. JULIAN:  Can I clear up one thing, Your Honor?

8            MR. SLACK:  So --

9            THE COURT:  Well --

10           MR. SLACK:  Go ahead.

11           THE COURT:  Yes, sir.

12           MR. NASAB:  I just wanted to -- I'm Omid Nasab from

13   Cravath for debtors.  I just wanted to add one clarifying

14   point.  I think Mr. Julian said he's not interested in PG&E.

15   He's interested in the contractors.  For G and H, which refer

16   to the inspections of Tower :27/222.

17           THE COURT:  Right.

18           MR. NASAB:  They were not -- inspections were not --

19   prior to the camp fire, inspections were not done by

20   contractors of those towers.  Those were done by PG&E

21   personnel.

22           THE COURT:  Well, this doesn't say, who did it.  This

23   says, what you have in your possession.

24           MR. NASAB:  I was just trying to clarify because I

25   thought that that was -- I thought that --

PG&E Corp.; Pacific Gas and Electric Company

1      THE COURT:  If I were suing for you something and I

2  said, give me everything in your file that's not privileged, I

3  might find in there something that somebody else did, I might

4  find something that you did, and I'd be entitled to it.  That's

5  what he wants.  He's entitled to it.  He's not asking you to

6  create things that don't exist or to give things that you don't

7  have.  So I don't understand what the problem is.

8      Mr. Julian, you want to clarify on this point?

9      MR. JULIAN:  I think they're -- when they talk to you

10  about me getting discovery before the lawsuit, they're talking

11  about a lawsuit where we're going to estimate the claims, the

12  fire claims in this case.

13      THE COURT:  Right, right, the --

14      MR. JULIAN:  I'm not --

15      THE COURT:  The claims.

16      MR. JULIAN:  I'm not trying it for that lawsuit.  I'm

17  trying to identify an asset between where the third-party

18  contractors owe the debtor and the fire claimants money.

19      THE COURT:  You're trying to assess that PG&E might

20  have a claim against Joe.

21      MR. JULIAN:  Which is for us only, right?

22      THE COURT:  Well, I don't know if it's for you only,

23  but --

24      MR. JULIAN:  It may be.

25      THE COURT:  -- it doesn't matter.  If it's not -- if

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    Joe files personal bankruptcy, there may be nothing there, but

2    at the moment, there may be a claim against Joe or Joe's

3    company that might be a big substantial company.  I understand.

4              MR. JULIAN:  Yeah.  Okay.

5              THE COURT:  But what do you -- but let's switch on

6    that subject.  What are you going to do when you get it?

7              MR. JULIAN:  We --

8              THE COURT:  You're going to analyze.  Somebody's going

9    to analyze, do we have a claim against Mr. -- is there a claim

10   against this third party.

11             MR. JULIAN:  There are -- I mean, I got memos written

12   on this --

13             THE COURT:  Hey, gentlemen, you can't be talking on

14   the record.  Mr. Karotkin, you've got to -- if you want a

15   break, I'll let you talk, but you can't be talking on the

16   record --

17             MR. KAROTKIN:  I'm sorry.  I apologize, Your Honor.

18             THE COURT:  -- while Mr. Julian is talking.

19             So Mr. Julian, if I authorize or direct the debtor to

20   provide the three categories here that are up for discussion,

21   other than absorb it and analyze it, you're not going to --

22   there's nothing you can do by acting on it.  You can't bring a

23   third-party action, right?

24             MR. JULIAN:  We are sitting down with our FAs and

25   politicians and talking about the pots and the liabilities in

PG&E Corp.; Pacific Gas and Electric Company

1    this case and we're adding them up.  On this pot, if the

2    indemnity contract leads a certain way, it comes directly

3    through the estate to the fire claimants and it could be a

4    billion dollars.

5         Secondly, in order to determine how good a claim that

6    is, we're going to put a percentage dollar amount on it with

7    our FA --

8              THE COURT:  Right.

9              MR. JULIAN:  -- we need to see the work product,

10   itself, to see what happened.  We're creating the claim.  We're

11   not going against them like he talks about.

12             THE COURT:  If I could turn it around, you're looking

13   to see whether a claim exists that's viable or practical

14   against a third party.

15             MR. JULIAN:  Yes.  And the point --

16             THE COURT:  The point -- but at the moment, the claim

17   belongs to the company, right?

18             MR. JULIAN:  Yeah.

19             THE COURT:  Are you of the opinion that somehow either

20   your committee or individual victims have those -- own those

21   claims?

22             MR. JULIAN:  Yes and no.

23             THE COURT:  Well --

24             MR. JULIAN:  So may --

25             THE COURT:  I mean, you're --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  May I --

2    THE COURT:  -- asking the company to produce what --

3    MR. JULIAN:  May --

4    THE COURT:  Yeah.  Explain -- or go ahead.

5    MR. JULIAN:  Okay.

6    THE COURT:  Do whatever you want to say.

7    MR. JULIAN:  Yep.  So --

8    THE COURT:  Push the microphone away.  You're a little

9    loud.  I'm low.  You're loud.  Go ahead.

10    MR. JULIAN:  We are identifying, as you know, a pot of

11    money.  Second, if the debtors stick to what they testified at

12    the 341 meeting, that they have not evaluated it, and they are

13    not, then yes.  Prior to plan confirmation or during plan

14    confirmation, the committee would file a motion for standing to

15    preserve these claims for the estate because we know they're

16    doing nothing in this case to preserve this.

17    THE COURT:  Okay.

18    MR. JULIAN:  It's a billion dollars that's being

19    frittered away.

20    THE COURT:  Well, okay.  But that's for the future.  I

21    mean --

22    MR. JULIAN:  Correct.  And I can't evaluate the motion

23    unless I first get the discovery.

24    THE COURT:  That, again, if you get -- if the

25    discovery that you're asking for equips you or your advisors

PG&E Corp.; Pacific Gas and Electric Company

1    with a theory that there is a claim against the third party,

2    you really can't do anything about that at this point.

3           MR. JULIAN:  But it's relevant to --

4           THE COURT:  To what?

5           MR. JULIAN:  -- to negotiating the consensual plan.

6    You cannot do it unless you know -- you know, Your Honor, how

7    this works, Your Honor.

8           THE COURT:  No.  I understand.  I --

9           MR. JULIAN:  The FAs sit down, they talk about the

10   cash flow, the bonds.  There's nothing being done on this by

11   these guys because they're focused only upon getting out of

12   their liability in this case and doing the traditional Chapter

13   11 stuff.

14          THE COURT:  Well, I'm not going to --

15          MR. JULIAN:  We --

16          THE COURT:  -- respond to that.  I'm going to decide

17   whether you get discovery.  That's what I do.

18          MR. JULIAN:  So we need it -- it's standard now.  We

19   do it in every case.  It's a pot of money that we have to

20   investigate that inures to our benefit because if an indemnity

21   contract says they pay us, it comes to us directly in a plan.

22          THE COURT:  So what's the problem, Mr. Slack?  You

23   still haven't persuaded me that there's a reason why I

24   shouldn't allow, at least, this exchange or this inquiry to the

25   information.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. SLACK:  So I have a suggestion, sort of a way

2    forward, Your Honor, which I think gives Mr. Julian what he's

3    asked for today at least with respect to the contractors, and

4    it would be twofold.

5    Number one, Your Honor, we didn't talk about it at the

6    argument, but in our letter to Your Honor, we made it clear

7    that we agreed to produce a production in the North Bay fire

8    litigation which concerns some of the exact same issues in

9    terms of wildfire safety that they're looking at.  And so keep

10   that in mind.  That's number one.

11   Number two, Your Honor, we would agree to give Mr.

12   Julian if there are reports about the third-party contractor

13   conduct, we would give them those because that would give them

14   the information about the contractors as opposed to what I

15   think is a different issue, a broader issue, about liability in

16   general.  And so --

17   THE COURT:  So you're in effect saying, 25, which by

18   definition is limited to third-party contractors, and then

19   you're saying you would agree then, I take it you're telling

20   me, to what E, F, and H ask for.  I mean, I think those are the

21   only ones that are up.  I mean, rather than put words in your

22   mouth, are you going to -- willing to comply with 25 without

23   debate?

24   MR. SLACK:  Well, what I'm saying is, Your Honor, I

25   want to be very clear and so there's no ambiguity when we all

PG&E Corp.; Pacific Gas and Electric Company

1    go back, that what we're willing to provide, we think it would

2    be consistent with 25 here, but it will be limited to, if there

3    are reports or findings with respect to third-party

4    contractors, we would give them those, and they have the

5    information from the North Bay fire litigation.  We would

6    suggest that they look at that information in the first

7    instance and the contractor reports, and like we've done here,

8    Your Honor, remember, ninety-five percent of this has been

9    resolved.

10            THE COURT:  You've said that --

11            MR. SLACK:  -- and the debtors are --

12            THE COURT:  You must think I don't hear you the first

13   time.  I know that.

14            MR. SLACK:  And so --

15            THE COURT:  We're only here for the five percent that

16   didn't get resolved.

17            MR. SLACK:  Right.  And so the point is it we would --

18            THE COURT:  And the question is, is it now a hundred

19   percent resolved?

20            MR. SLACK:  Right.

21            THE COURT:  2004 -- you've made your comment about

22   2004, and I don't -- and I'm granting or considering Mr.

23   Julian's 2004 request.

24            He's asked for paragraph 25.  Are you now agreeing to

25   comply with 25?  If so, move on.  There's no debate.  You're

PG&E Corp.; Pacific Gas and Electric Company

1  not being asked to provide work product or summaries of things

2  that are outside the scope of third-party contractors.  Again,

3  if you've already agreed to 1 through 24, that's fine.  I just

4  want to know what you're agreeing to.

5       MR. SLACK:  So can you give me thirty seconds to

6  consult with counsel to make sure that I understand what the --

7  Cravath firm has been dealing with the wildfire issues and this

8  request, and I'd like to be able to take thirty seconds and

9  make sure --

10       THE COURT:  Well, I'll take as long as you want.  You

11  don't have to be governed by thirty seconds, but I thought I

12  read somewhere along the line that there was a hand off that

13  the law firm had the principal responsibility here.  I don't

14  care who has it.  It's just that it seems to be back and

15  forth --

16       MR. SLACK:  So the hand off was that most of these

17  were the requests dealing with the 32, the 32 request.  There

18  was a hand off of those.

19       THE COURT:  Okay.

20       MR. SLACK:  And with respect to the contractor

21  liability that's always been in -- sort of handled by --

22       THE COURT:  Okay.  That's fine.  I'll take a break in

23  a minute.

24       What I'm telling you is that it has been the practice

25  as long as I've been on the court here to grant 2004 exams on

PG&E Corp.; Pacific Gas and Electric Company

1   an ex parte basis and then let people work it out.  This one

2   obviously because of the scope of it and the size of it, I

3   intercepted the 2004 and said I'm not going to act on it

4   because we -- I have this other discovery dispute in the

5   pipeline, and so I'm treating this all as one.

6          To me, how it came about as a 2004 request or as a

7   more informal request is much ado about nothing, and we're here

8   now to decide what the party requesting the information is

9   going to get and what he isn't going to get.  And if you'd like

10  to take a break and talk to your co-counsel, that's fine.

11         So let's do this, if there's agreement on your end by

12  counsel to comply with the balance of the 2004 request, then

13  we'll talk about the letter request after that and --

14         MR. SLACK:  Yeah.  My understanding is what I'm

15  suggesting, Your Honor, is that we all agree here sort of what

16  the request entails.  In other words, that's what I want to

17  confirm, but what I'm suggesting is that the TCC may be reading

18  it broader than what I suggested, and if they are, what we're

19  willing to do is to -- and if they're not, that's great, but

20  we're willing to provide if there are specific findings with

21  respect to third-party contractors, we'd produce them, but

22  we're not going to, as I understand it, then produce all

23  liability documents that relate to the fires generally.  It's

24  just going to be findings with respect to the third-party

25  contractors.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT:  Well, again, I'll let Mr. Julian speak for

2    himself.  I'm responding by reading the request, which --

3    MR. SLACK:  Yeah.

4    THE COURT:  -- it seems to have a narrowness to it,

5    but I'll take a longer break, if after you talk to your

6    co-counsel, you talk to Mr. Julian.

7    MR. SLACK:  Fine.

8    THE COURT:  I mean, it may well be you just need to

9    discuss -- listen, I'll break until tomorrow if you can work

10   out all these differences including the remaining six.  I'll do

11   whatever you want to do.  I'm not here to punish you.  I'm here

12   to encourage you to reach an agreement on the subject.  So let

13   Ms. Brawder (phonetic) know when you want me back.

14   MR. SLACK:  Okay.  Thank you, Your Honor.

15   THE COURT:  Okay.  We'll go off the record.

16   (Recess from 11:22 a.m., until 11:42 a.m.)

17   THE COURT:  Be seated.  Okay, Mr. Slack?  Oh, Mr.

18   Karotkin, you're coming back up?

19   MR. KAROTKIN:  I'm not here for the main event, I just

20   have one --

21   THE COURT:  Switching off, huh?

22   MR. KAROTKIN:  -- one clarification.

23   THE COURT:  Okay.

24   MR. KAROTKIN:  Mr. Julian, who actually did not attend

25   the 341 meeting, made a comment that the company -- that Mr.

PG&E Corp.; Pacific Gas and Electric Company

1  Wells testified that the company had no intention of evaluating

2  whether it had claims against third parties.  That was not his

3  testimony.  In fact, he said that the company does indeed

4  intend to make that investigation.  Just so the record's clear.

5          THE COURT:  Okay.  Thank you.

6          So are we okay on the 2004 order behind us now, or

7  not?

8          MR. NASAB:  Your Honor, I think it is.  Counsel for

9  the debtors discussed, and we discussed with Mr. Julian.  And

10 based on those conversations we're going to agree to it.  And

11 hopefully we don't have any disputes down the road about the

12 definitions, but I think we're -- we've talked about the scope

13 and we're going to agree to it and move on from here.

14         THE COURT:  I'll go ahead and sign the 2004 order

15 then, unless it needs to be revised.  Does it?

16         MR. JULIAN:  No, Your Honor.  Thank you.

17         THE COURT:  All right.  And again, for those of you

18 not familiar with the procedure here, if there's a subsequent

19 dispute about the 2004, telephone conference, maybe not ten-

20 page letters, maybe one-page letters telling me what the issue

21 is, all right?

22         So Mr. Slack, are you still in charge of the other

23 matter here?

24         MR. SLACK:  Yes.

25         THE COURT:  Or are we tag-teaming?

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1      MR. SLACK:  But I think the same way we did the other

2  matter, it sounds to me like Mr. Julian should lead off.  It's

3  his application.

4      THE COURT:  Okay.  So yeah, we have six open items?

5  Is that right?

6      MR. JULIAN:  Yes, Your Honor.

7      THE COURT:  Good.  So we're using your letter, which

8  was helpful.

9      MR. JULIAN:  Yes.  Exhibit C, items 4, 5, 10 --

10     THE COURT:  Um-hum.

11     MR. JULIAN:  -- deal with board packages, board

12  minutes, board agenda, summaries of the minutes of the board's

13  meetings for three years before the bankruptcy, and through the

14  bankruptcy case itself.

15     This is our standard management review of issues.  The

16  key issues in this case are wildfire safety, wildfire claims,

17  dividend payments that were made before the case, that Judge

18  Alsup --

19     THE COURT:  Well, okay.  Let's talk on that.  What

20  difference does that make?  I mean, we're not -- you're going

21  to want to go back and recover dividends, was the company

22  insolvent?

23     MR. JULIAN:  No.  Well, someone's asked me to do it,

24  but it's a tall order.

25     THE COURT:  I know.

PG&E Corp.; Pacific Gas and Electric Company

1          MR. JULIAN:  You know the issue.

2          THE COURT:  Well, I know.  But the question's why

3     bother?  What's the point of making the discovery request?  It

4     doesn't --

5          MR. JULIAN:  We are looking at all management

6     decisions in a case where everyone, all agencies, have

7     criticized the management decisions.  And we have to be

8     informed in order to participate in PUC hearings, the Judge

9     Alsup hearings, by looking at the board meetings.

10          THE COURT:  Well, and I have to know, I have to

11     understand why that's so.  In other words, Judge Alsup has made

12     his views known about paying dividends, but he might have

13     checked with me first.  I don't think the company could pay

14     dividends while it's in Chapter 11 anyway.

15          But if it paid dividends in the past, that's the past.

16     And unless there's some attempt to recover them, I don't know

17     what's the point of going back there.

18          MR. JULIAN:  Case in point, there's a fire victim

19     motion that's up.  I would have to go now and ask for portions

20     of board minutes over the last three years and during the case

21     to talk about that.  The STIP, compensation, I don't want to be

22     coming here every time there's a motion filed and ask for past

23     minutes and current minutes that deal with this topic.  I think

24     it's a waste of time, energy to keep coming back to court every

25     time we have a dispute.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1  Your Honor, it took from May 8th -- March 8th was my

2  first letter on this --

3  THE COURT:  No, I understand.

4  MR. JULIAN:  -- to today.

5  THE COURT:  I understand, but --

6  MR. JULIAN:  Two months.  And so if you denied us,

7  then we will do the other.  We will come back --

8  THE COURT:  Mr. Julian --

9  MR. JULIAN:  -- every time there's a motion.

10  THE COURT:  -- Mr. Julian, you act like you don't know

11  me.  I would think that if you are focused on a topic that's

12  related to a motion, if the debtors jerk you around and won't

13  cooperate, they're going to be dragged in here and told to do

14  some 'splaining (ph.), as they say.

15  So to say because you want dividend records three

16  years past is not the same as you want a relevant discovery on

17  a particular motion, a particular matter that is coming before

18  us.  Like the things we have on the calendar tomorrow and next

19  month and next month.

20  But go ahead, finish your point.  I mean, what I don't

21  understand is why, if the legislature and the PUC and anybody

22  else is already doing this, what is the tort committee going to

23  do with information about the dividend history of the company?

24  MR. JULIAN:  And wildfire safety, and wildfire

25  management.

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT:  Wildfire safety is a different subject.

2    MR. JULIAN:  So well, those are two extra subjects.  I

3 mean, we are looking at --

4    THE COURT:  Okay, then it's --

5    MR. JULIAN:  -- everything that concerns this.

6    THE COURT:  But no.  Your summary is a little broader

7 about that, about executive compensation.

8    MR. JULIAN:  There was a --

9    THE COURT:  Right?

10    MR. JULIAN:  Yes.

11    THE COURT:  Then again, I need to hear what Mr. Slack

12 or the others say about the problem, but isn't that -- when

13 I -- right?  That that's one of the subjects that's still open

14 here?

15    MR. JULIAN:  The subjects that we identified in our

16 letter were corporate governance review of management decisions

17 involving those matters that are under criticism by the PUC,

18 the federal court, and CAL FIRE, which are wildfire safety,

19 wildfire management, wildfire claims.

20    Another item that I identified was insider

21 transactions, to name one that has the committee rather

22 agitated is -- I know you've heard this before, but you've

23 asked me a question -- I'm going to give you an example, but

24 it's an example, not -- it's an illustration.

25    THE COURT:  Okay.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1          MR. JULIAN:  Three weeks before the bankruptcy -- it

2    only involves two and a half million dollars, so you'll wonder

3    why I'm focusing on it.  Three weeks before the bankruptcy --

4          THE COURT:  We run that up in the course of the

5    hearing, right?

6          MR. JULIAN:  Three weeks before the bankruptcy, there

7    were two types of contracts pending for payments:  2015 Butte

8    Fire settlement claim contracts that had already been signed,

9    and the payments were ready to be made --

10          THE COURT:  Right.

11          MR. JULIAN:  -- and the severance agreement with the

12   CEO, Geisha Williams, for 2.5 million dollars.

13          And the board met and preferred to pay their insider,

14   the CEO, 2.5 million, rather than the thirty million dollars to

15   the other contracts similarly situated.

16          THE COURT:  Okay.

17          MR. JULIAN:  I hear about this every meeting I get.

18          THE COURT:  And I'm sure you do.  I'm not making light

19   of it.  I hear about it here.  Maybe I hear about it elsewhere

20   too, but I'm not supposed to be considering that.

21          MR. JULIAN:  So there are those types of things --

22          THE COURT:  But therefore, what?

23          MR. JULIAN:  -- in the board minutes.

24          THE COURT:  In other words, again, we're not dealing

25   with a clearly insolvent company in Chapter 7.  What would you

PG&E Corp.; Pacific Gas and Electric Company

1    do if you -- I mean, you know that Ms. Williams was paid some

2    money.  Therefore, what?  Therefore, what?  There should be an

3    avoidance action, there should be a suit against her?

4              MR. JULIAN:  Someone would certainly want me to look

5    at it, and we might not pursue it, but it's a legitimate

6    area --

7              THE COURT:  But that's because the other side's paying

8    your fees, too.  The question is, is it a proper inquiry at

9    this point?

10             MR. JULIAN:  Yes, Your Honor.  Because the parties

11   want the -- I actually have talked about this.  We hear every

12   week on our weekly telephone calls about how this case must

13   move expeditiously and be resolved within six months.  I know

14   it's a tall order.  Nine months, whatever.  And so they -- yes,

15   they do want us doing everything now so that we can sit down

16   and negotiate everything in the plan and disclosure statement.

17   Yes, the answer is yes.  Because people out there are

18   suffering.  And we have alternatives to resolve this quickly.

19   And so yes, we are looking at typical plan and disclosure

20   statement issues now.  We're sitting down with the FAs and

21   doing all this work.

22             And so we are looking at -- in a case where management

23   is accused of failing to do something that caused the sixth

24   biggest bankruptcy case in our nation -- we are being asked to

25   look at management decisions as an investigation of all the

PG&E Corp.; Pacific Gas and Electric Company

1    board minutes.  And if Your Honor says, Mr. Julian, I'm not

2    going to allow that type of wide-ranging investigation in it, I

3    understand.  But I've made the request, and we will pursue it

4    another way if this way's not relevant.

5              THE COURT:  Okay.  So wildfire safety, insider

6    transactions --

7              MR. JULIAN:  Wildfire claims, I mean --

8              THE COURT:  Well, we're dealing with the wildfire

9    claims in a number of different ways.  But let's go down them

10   one-by-one.

11             So the number 4 is the first on the list, right?

12   Board packages and board meeting agendas delivered for board

13   meetings.  Okay, so the members of the board that existed in

14   the past, you're telling me at some point they were given

15   information ahead of time, like any board would get, a package

16   of stuff --

17             MR. JULIAN:  Yes.

18             THE COURT:  -- to prepare.  And so that's number 4.

19   And then number 5 records what happened at the board meeting,

20   presumably.  And number 10, I mean, they all seem to be prior,

21   early, I think, during and after board activity.

22             MR. JULIAN:  Yes.  And then -- yes, Your Honor.

23             THE COURT:  Okay.

24             MR. JULIAN:  So 4 and 5 deals with typical corporate

25   records that we believe in a fishbowl bankruptcy case the

PG&E Corp.; Pacific Gas and Electric Company

1    debtor should produce.  Not burdensome.

2            THE COURT:  Well, I don't know if they're burdensome

3    or not.  I mean, they may not be.  And --

4            MR. JULIAN:  Number --

5            THE COURT:  Okay.  So let's -- it strikes me that 4,

6    5, and 10 are -- I mean, they're one topic that we're talking

7    about.

8            MR. JULIAN:  Right, 10 is really the committees of the

9    board,  Your Honor.

10           THE COURT:  Yes, I understand.

11           MR. JULIAN:  So the committee minutes, and committee

12   packages.

13           THE COURT:  Yeah.  For example -- for example, the

14   STIP.  I mean, we heard that there were compensation committee

15   meetings that dealt with the STIP.  Again, without questioning

16   or hearing the other side, I mean, that to me is the kind of

17   category we're talking about.

18           But now, let's go to 11.

19           MR. JULIAN:  So 11 I've narrowed.  So 11 and 12 are

20   basically reports.  11 is reports by a special litigation

21   committee, or committee of the board, and 12 is by outside

22   people:  counsel, auditors and investigators.  Obviously,

23   counsel --

24           THE COURT:  But now, is there a subject matter?  Any

25   report on any subject?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  So their response was, Mr. Julian, that's

2    too broad.  And I said, you know, you're right.  So in the

3    second paragraph I narrowed it to dividends, wildfire claims,

4    insider transactions, and wildfire safety.  They agreed to

5    produce those types of reports for 11 and 12, with respect to

6    dividends, wildfire claims, and insider transactions, but not

7    wildfire safety.

8         So on these two, 11 and 12, we have narrowed it down

9    to a single issue.

10    THE COURT:  Wildfire safety.

11    MR. JULIAN:  Reports dealing with wildfire safety.

12    THE COURT:  Okay.

13    MR. JULIAN:  So we're in agreement, I've narrowed it,

14    they've narrowed theirs, and we've come together and we're

15    simply disagreeing on reports dealing with wildfire safety.

16    THE COURT:  Okay.  Again, I -- oh yeah, you did say

17    that.  I mean, I'm trying to absorb all this.

18         Oh, so they -- well, here's an interesting question.

19    If the debtor agreed to provide documents on the narrowed issue

20    of dividends, then why are we back to dividends as an open

21    issue on the first topics?

22    MR. JULIAN:  Because they're different.  Some are

23    minutes, some are reports --

24    THE COURT:  Yeah, right.

25    MR. JULIAN:  -- we'd be using them differently.  But

PG&E Corp.; Pacific Gas and Electric Company

1    on 11 and 12 --

2            THE COURT:  Okay.  Okay, got it.

3            MR. JULIAN:  -- we are willing -- we have narrowed our

4    request for investigation reports to dividends, wildfire

5    claims, insider transactions, and wildfire safety.  The debtors

6    agree with respect -- unless -- except for wildfire safety.  So

7    they're agreeing to produce reports as to the first three

8    categories, but not wildfire safety.

9            THE COURT:  Yeah, no.  I got it.  And then finally the

10    last one is number 26, right?

11            MR. JULIAN:  Number 26 was simply ratifications.  So

12    typically ratifications appear in board minutes, so it's extra.

13    So if there's a ratification resolution, we want to see it.

14            THE COURT:  So 26 really kind of is the tail end of

15    the first four?

16            MR. JULIAN:  Yes.

17            THE COURT:  So 11 and 12, well, let's talk about

18    wildfire safety.  So what would you do with that information?

19    In other words, if there's a report that came from a third

20    party, this would -- I presume if there's privileged stuff, you

21    don't get that, right?

22            MR. JULIAN:  Right.

23            THE COURT:  But if there's non-privileged information

24    that went to the board, well you --

25            MR. JULIAN:  No, that went to anybody.

PG&E Corp.; Pacific Gas and Electric Company

1        THE COURT:  Oh, I'm sorry.  Okay.

2        MR. JULIAN:  So here's what we're doing with that,

3  Your Honor.  We are --

4        THE COURT:  Go ahead.  No, I'm listening.

5        MR. JULIAN:  We are meeting with the FAs and with the

6  political realm with respect to the items raised in the

7  governor's task force.  We've recommended three types of

8  things, two of which are funds for the fire victims of this

9  case.  And we're trying to help reorganize the company.

10       And one of the issues is to increase the capital

11  strength and the safety of the company so that they can raise

12  new bonds on the market.  One of the primary elements of

13  raising bonds on the market is to increase the company's

14  wildfire safety.  It's a big part of this case.  Without

15  wildfire safety, this thing can't be reorganized.  It's one of

16  the top three issues in the case.

17       And so the company's past reports on its ability to

18  implement wildfire safety are important in our reorganization

19  efforts today, which we are doing today.  We are not -- again,

20  we are not waiting for the plan to be on file, we are doing

21  this today in negotiations with the stakeholders.

22        THE COURT:  Okay.

23        MR. JULIAN:  And it's relevant.  It's the most

24  important thing in the case.  It's the reason why the case was

25  filed.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1      THE COURT:  I understand.

2      MR. JULIAN:  The last item, Your Honor, the chair

3  asked that I make one more request, if you look at number 17.

4      THE COURT:  Oh, dispute on hold, yeah, okay.

5      MR. JULIAN:  Yeah.  The debtors have agreed to provide

6  us access to some state court litigation documents, Your Honor.

7      THE COURT:  Um-hum.

8      MR. JULIAN:  This has been pending since March 8th.  I

9  think we're down to one issue, which is getting a protective

10  order, that we've asked for since March 8th.  I think I know

11  what you're going to say, but we've been asking for this since

12  March 8th.  We want a date certain by which we will get it.  We

13  asked for next Monday, Mr. Slack asked --

14      THE COURT:  Excuse me, I'm missing the point.  You're

15  asking for the information, or asking for the protective order?

16      MR. JULIAN:  Protective order.  We simply need to

17  draft the protective order to get to the documents.  We've been

18  delayed on this for sixty days.

19      Here's the point.  Mr. Slack and I are only five days

20  apart.  I know it sounds like it's very simple, but the chair

21  says that since this has been pending for sixty days, we want

22  the protective order drafted next Monday, Mr. Slack asked till

23  the end of the week.  And I know what you're going to say about

24  that, but I was asked today to come forward --

25      THE COURT:  I say Wednesday sounds like a good day to

PG&E Corp.; Pacific Gas and Electric Company

1  me.

2  MR. JULIAN:  Yep.

3  THE COURT:  No, but what am I missing?  These are

4  complex issues, except for the drafting of a protective order?

5  MR. JULIAN:  The protective order's not.  Your Honor,

6  I have no more submissions.  Do you have any more questions for

7  me?

8  THE COURT:  No.  Mr. Slack, are you going to do the

9  duty here?  Do you agree the way Mr. Julian has --

10  MR. SLACK:  I'm sorry, Your Honor?

11  THE COURT:  -- narrowed the issue?  Do you agree with

12  his narrowing of the issues?

13  MR. SLACK:  Your Honor, yes.  The issues are -- I

14  think, are very narrow on this.  And I think you hit it on the

15  nose with a couple of points.  With respect to 4, 5, 10, and

16  26, they're all related to board minutes, et cetera, et cetera.

17  And Your Honor, the dispute is really the question of

18  whether those requests should be sort of unbounded in order --

19  give me every board package, which are quite voluminous, that

20  go to the boards and committees, or whether they should be

21  bounded by subject so that the debtors can have the same

22  conversation that Your Honor did with Mr. Julian.  Such as you

23  want the subject of dividends, why do you want that?  If it

24  makes sense, we'll give it to you.

25  We had that conversation with Mr. Julian.  So what we

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1   did in our meet and confer on these subjects -- 4, 5, 10, and

2   26 -- is we said, why do you need these?  And Mr. Julian,

3   consistent with what he said here, gave us three subjects.  He

4   said the payment to the former CEO, severance payments to other

5   senior officers, and the payment of dividends.

6           We had some discussion about that and then we went

7   back and we said, okay, if these are the subjects that you

8   want, whether -- put aside whether we agree or disagree we

9   said, you know, we'll produce to those subjects.  And Mr.

10  Julian said, no, that's not good enough.  I'm not going to give

11  you any more subjects, but we want everything.

12          And Your Honor, our view is, again, we want to be able

13  to have the same conversation with Mr. Julian about the

14  subjects that Your Honor did and that we did in the meet and

15  confer.  And what I can confirm to the Court is that if Mr.

16  Julian has other topics that he didn't give us in the meet and

17  confer, we certainly are willing to discuss them with him and

18  potentially produce other information.

19          And I'd point out one other thing, Your Honor, which I

20  think is pretty telling.  That's exactly what happened, you

21  know, with respect to requests 11 and 12.  11 and 12, putting

22  aside for a second that we're disputing one of the topics, we

23  said that's very broad.  And Mr. Julian said, okay, well, here

24  are the topics that I want.  I want those reports and

25  investigations.  We actually went subject by subject and had a

PG&E Corp.; Pacific Gas and Electric Company

1   discussion about, well, we disagreed on one.  That's the same

2   process that we think should take place with respect to 3, 4,

3   10 -- let me think about it -- 4, 5, 10, and 26.

4           And Your Honor, in our letter I think we explained why

5   that position is grounded in the law.  It just doesn't make

6   common sense to do that, but it's grounded in the law of 2004,

7   which says that you should show good cause.  And you can't just

8   get unbounded, you actually have to have a particular subject

9   or a topic in order to get the discovery.  And it's their

10  burden to come forward with it.

11          So I won't belabor that point because I think common

12  sense says the same thing the law does here, which is that we

13  really should have topics.  And that's, again, 4, 5, 10, and

14  32.

15          THE COURT:  Well, I'm losing the gist here.  Are you

16  saying the payments to the CEO and directors, other officer

17  compensation, you agreed to that, or don't agree?

18          MR. SLACK:  Yes, we do.  We've agreed to -- what we've

19  agreed to, Your Honor, very specifically is he identified, Mr.

20  Julian in our meet and confer --

21          THE COURT:  Okay.

22          MR. SLACK:  -- identified payments to the CEO, he

23  identified other severance payments to other senior officers,

24  and he identified dividends.  And with respect to all three of

25  those, after we went back and discussed it internally, we said

PG&E Corp.; Pacific Gas and Electric Company

1    yes.

2              THE COURT:  Just an aside, what's your relationship,

3    or the debtor's relationship, with the OCC for all this

4    information?  Are you exchanging similar stuff with the OCC, or

5    are they not asking for it, or what's going on that's --

6              MR. JULIAN:  You're saying the UCC?

7              THE COURT:  Well, UCC, OCC --

8              MR. SLACK:  Yeah, okay.

9              THE COURT:  Same thing.  Official or unsecured, call

10   them as you wish.

11             MR. SLACK:  Right, so there hasn't been a similar

12   request made by the UCC.  We certainly have cooperated with the

13   UCC.

14             You want to verify --

15             THE COURT:  You want to be -- would you like to be a

16   UCC, or an OCC?

17             MR. LEBLANC:  We usually would refer to ourselves as

18   the UCC.

19             THE COURT:  Okay.  Well, we call it the California

20   Commercial Code, not the Uniform Commercial Code.  The UCC.

21             MR. LEBLANC:  Andrew LeBlanc from Milbank, on behalf

22   of the Official Committee of Unsecured Creditors, Your Honor.

23             THE COURT:  Right.

24             MR. LEBLANC:  We've reached an agreement with Mr.

25   Julian and his colleagues that where there's a formal request

PG&E Corp.; Pacific Gas and Electric Company

1    made of a party, that we'll simply share that information as it

2    comes in.  It's a simple process.  We get it electronically,

3    we'll both share that.  And that will go for the whole purpose

4    of this case.

5           But we're obviously trying to pick where we spend

6    resources here.  And contrary to what Mr. Julian may have

7    suggested earlier, we are thinking about these issues.  They

8    may have made these requests before we did, but we're trying to

9    get the same information.  We're just trying to do it in a way

10   that's most efficient, which means we're not having a second

11   round of litigation here.

12          That doesn't mean we're actually going to look at all

13   the information when it comes in, it's just we'll have access

14   to it and we'll conduct the investigations that we think are

15   appropriate once we have that information.

16          THE COURT:  Well, okay.  All right.  Thanks.

17          So Mr. Slack, let's go back to the wildfire safety.

18   That's the big issue --

19          MR. SLACK:  Yeah.

20          THE COURT:  -- for the open items that Mr. Julian

21   still feels strongly about.  So what's the problem with that?

22          MR. SLACK:  Right.  So 11 and 12, Your Honor, I think

23   it's a question of when someone says a report or an

24   investigation on wildfire safety, I think it's the

25   understanding of what that means, what the scope -- what does

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    it actually mean?

2          So what we were certainly willing to do, and what

3    we're willing to do today, is if there is a specific report

4    with respect to wildfire safety, you know, then we'd produce

5    that.  But you know, there's obviously a lot of things that

6    touch on the issue of wildfire safety, that's not clear.  And

7    so we wanted some -- we would want some clarity on what that

8    means.

9          So if there is a report that says this is a report on

10   wildfire safety, we would be prepared --

11         THE COURT:  Okay.  But how does the requester --

12         MR. SLACK:  -- to agree to that.

13         THE COURT:  -- know to ask for something if he doesn't

14   even know it exists?

15         MR. SLACK:  I'm sorry, Your Honor?

16         THE COURT:  I said how does the requester -- in this

17   case Mr. Julian, know to ask if there's a report on a

18   particular topic unless he knows there's one?  Or the

19   alternative is to say any report on any subject.

20         In other words, I guess what I'm saying is if Mr.

21   Julian knew already because a little bird told him that there

22   is a folder called wildfire safety report dated such and such,

23   he'd know to ask for it.  But if he doesn't know it exists, he

24   can't ask for it specifically.  So how -- he could say give me

25   all your reports on any subject, and that would be too broad.

PG&E Corp.; Pacific Gas and Electric Company

1    So how do you solve the problem?

2           MR. SLACK:  Well, I think the problem's solved by the

3    purpose of the report, right?  In other words, it is --

4           THE COURT:  Well, I would hope so.

5           MR. SLACK:  I mean, it's a question of if you ask, for

6    example, all documents related to a bond offering, okay?  On

7    the one hand there is going to be reports that go to the board

8    with respect to bond offerings.

9           THE COURT:  Um-hum.

10          MR. SLACK:  But you want to make sure that the parties

11   don't disagree, well, because you need financial statements

12   when you go out for a bond, I not only want the bond offering,

13   but I want every piece of financial data that's gone to them,

14   gone to the board.

15          So here what we're saying is if there's a report --

16   we're not trying to be cute or clever about it, if there is a

17   report that deals with wildfire safety, then we're prepared to

18   say we'll provide it if it's not privileged.  But we want to

19   make sure that what we're talking about is that, and there's

20   not some broader aspect to what Mr. Julian is looking for.

21          THE COURT:  I'm going to wait while they're -- they're

22   talking on the mic, again I don't --

23          Okay, well look.  Let's try another test here.  If

24   Judge Alsup at the next probation hearing says I'd like to see

25   everything the company has put together on wildfire safety, I

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    suspect he'd get it.  And I suspect if someone from Sacramento

2    calls and says the governor's office would like to see what's

3    the latest on wildfire safety from the company, he'd get it.

4    So why shouldn't the committee get the same treatment?

5            MR. SLACK:  Well, so I think that when the requests

6    come in -- and I'm not the expert on this, so I'll defer to

7    some of the people who are.  But I don't think you just get,

8    give me everything on wildfire safety.  I think there are

9    very -- I think when you get to that level, they get our fire

10   mitigation plan; they get -- they're more laser-focused as to

11   exactly what they want.

12           So I don't think that you get, sort of, give me

13   everything with respect to wildfire safety.

14           THE COURT:  Well, but, I mean, would you tell Judge

15   Alsup that he'll have to narrow his request?

16           MR. SLACK:  No, but I'm suggesting that I think that

17   the requests that come in are not going to be, give me

18   everything with wildfire safety.  I think that you'd have a

19   discussion, and I think whether it's the PUC or someone else, I

20   think it's not likely that the request is going to be, give me

21   everything related to wildfire safety.

22           THE COURT:  I don't know.  Mr. Karotkin --

23           MR. JULIAN:  Can I clarify that?

24           MR. KAROTKIN:  Can I --

25           THE COURT:  Well, wait.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. KAROTKIN:  -- interject something?

2    THE COURT:  He wants to clarify --

3    MR. KAROTKIN:  I'm sorry.

4    THE COURT:  -- something here.

5    MR. JULIAN:  Yeah, sorry.  Go ahead.  Sorry.

6    THE COURT:  Yes, sir.

7    MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

8    Manges, for the debtors.  As I understand, what Mr. Julian was

9    saying is that he's concerned that in the committee's

10   discussions with the legislative people up in Sacramento and

11   with the governor's office, which we're, frankly, not even

12   aware of, that they have a concern about prospective --

13   prospective wildfire safety plans of the company, for purposes

14   of making sure that the company can get the necessary financing

15   to come out of Chapter 11.

16        I think that's what he said, prospective, or what

17   they're doing now.  Now, as he knows and as, I think, Your

18   Honor, you know, the company has filed a wildfire mitigation

19   plan with the CPUC --

20   THE COURT:  Right.

21   MR. KAROTKIN:  -- provided a copy to Judge Alsup as

22   well --

23   THE COURT:  Right.

24   MR. KAROTKIN:  -- and the CPUC is in the -- is in the

25   process of reviewing that.  He can have a copy of it.  That's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1  the prospective issue that's --

2        THE COURT:  I think he already has a copy.  It came up

3  during the STIP hearing.

4        MR. KAROTKIN:  It's public document.

5        THE COURT:  Yeah, right.

6        MR. KAROTKIN:  Okay.

7        THE COURT:  Right.

8        MR. KAROTKIN:  That's the prospective wildfire

9  mitigation plan of the company, that is relevant to what he

10  said he's concerned about, okay?  And Judge Alsup has that.

11  And as we've -- and as I think I noted at the STIP hearing,

12  Your Honor, the CPUC will be, I'm told, issuing its report --

13        THE COURT:  Yeah, no --

14        MR. KAROTKIN:  -- on its evaluation --

15        THE COURT:  -- you made -- that was very clear.

16        MR. KAROTKIN:  -- next week, I believe.  I think May

17  12th or 13th.  And that's relevant to what he's talking about.

18  Going back two years or three years and asking questions about

19  wildfire mitigation and safety is not relevant to what he said

20  he was concerned about.

21        THE COURT:  Well, I --

22        MR. KAROTKIN:  And I think that --

23        THE COURT:  I -- when --

24        MR. KAROTKIN:  -- you talking about --

25        THE COURT:  Mr. Karotkin, I may have overlooked that

PG&E Corp.; Pacific Gas and Electric Company

1   he's going back in time, but I -- when I looked at 11 and 12

2   here, I thought of it as prospective also.

3           MR. KAROTKIN:  If he's looking for prospective, that

4   is the prospective plan.  That is it.

5           THE COURT:  Well, but look at 12.  Says, all

6   investigation reports prepared by the company, et cetera, on

7   the subject.  It's not -- it --

8           MR. KAROTKIN:  Which, really, Your Honor, what he's

9   trying to get to, Your Honor, is, again -- he won't acknowledge

10  this -- is issues with respect to the potential liability of

11  the company for wildfire claims and what it did or allegedly

12  didn't do.

13          And, Your Honor, that is not the subject appropriate

14  for a 2004 examination.  Those issues will be addressed in this

15  court at the appropriate time, whether or not -- and the extent

16  of the company's liability, and whether it was negligent or not

17  negligence, and that may or may not come up in this hearing,

18  because it would be our preference, Your Honor, to negotiate a

19  settlement of those issues so you don't have to address that.

20          THE COURT:  Well, it would be my preference too,

21  but --

22          MR. KAROTKIN:  Okay.  But if and when --

23          THE COURT:  -- but that's --

24          MR. KAROTKIN:  -- it comes up --

25          THE COURT:  -- that's why you exchange information, to

PG&E Corp.; Pacific Gas and Electric Company

1  try to negotiate.

2        MR. KAROTKIN:  They don't need that information to

3  negotiate.  Has nothing to do with it, okay?

4        THE COURT:  Well, but see, when --

5        MR. KAROTKIN:  And --

6        THE COURT:  -- your other side tells you you don't

7  need something, that's an invitation to debate about.

8        MR. KAROTKIN:  But he's talking about -- he said

9  himself, prospective.  That's what --

10        THE COURT:  Right.

11        MR. KAROTKIN:  -- he said when he stood up here --

12        THE COURT:  But he did.

13        MR. KAROTKIN:  -- prospective.

14        THE COURT:  But he did.  But he also said to enhance

15  and facilitate the bond future, the future that we're --

16        MR. KAROTKIN:  All prospective, Your Honor.

17        THE COURT:  All prospective.

18        MR. KAROTKIN:  All what is this company going to

19  implement, going forward, to mitigate wildfire risk.  That's

20  what he said.  That's the wildfire mitigation plan.  It's not

21  what the company did two years ago, or a year ago, or three

22  years ago.

23        THE COURT:  Well, let me interrupt.  Let's clarify.

24        Are you willing to look forward only, or are you going

25  back in time to -- because that does seem to be, like, why go

PG&E Corp.; Pacific Gas and Electric Company

1    back, if that's going to change anything.

2              MR. JULIAN:  May I explain?

3              THE COURT:  Yes, sir.

4              MR. JULIAN:  First, I'm going to address the two

5    questions you have just been asked by these gentlemen.

6              Mr. Slack suggested that I want all documents relating

7    to wildfire.  I narrow these with terms of art used by white-

8    collar lawyers.  All reports prepared by a special litigation

9    committee, or committee of the board, or any investigation or

10   audit team, number 12, all investigation reports prepared by

11   counsel, auditors, and investigators, obviously, to the extent

12   not privileged.  Yes, we are looking for them for the past

13   three years because those inform the future.

14             Patrick Henry said, I know of no way of judging the

15   future except by the past.  And in those past reports, they say

16   what they're going to do in the future.  They are not merely

17   operating today on the basis of what they've said during the

18   last twenty-four hours or the last week.  Those investigation

19   reports identify what happened and ameliorative action for the

20   future.

21             And we are entitled to see these reports, I believe,

22   in this case, Your Honor.  It's that simple.  We are not asking

23   for all documents.  They are formal reports.

24             THE COURT:  Well, it didn't -- at least, your grid

25   here doesn't say it's formal reports.  It says, all reports,

(970) 691-2154 | operations@escribers.net | www.escribers.net

                PG&E Corp.; Pacific Gas and Electric Company

1    and it's --

2              MR. JULIAN:  Reports by litigate -- special litigation

3    committees, Your Honor.  Not going to be any --

4              THE COURT:  Well, or --

5              MR. JULIAN:  -- other type of report other than

6    reports by those committees and counsel --

7              THE COURT:  No.

8              MR. JULIAN:  -- other's investigators.

9              THE COURT:  Well, Mr. Julian, it seems like a -- like

10   broader -- the words that are on the page seem broader than

11   what you're now saying.  But let me ask you, other than quoting

12   Patrick Henry, what are you going to do with stuff in the past,

13   as distinguished from the mitigation plan or other matters that

14   are presented to the CPUC?

15             MR. JULIAN:  Two main buckets there.  The first is

16   we're going to look at what went wrong so that it isn't

17   repeated and there's not a ten-billion-dollar post-petition

18   claim in this case.  We're not potted plants in this case.  We

19   have lawyers who have been on this case for a long time, who

20   have ideas about how to make this company safe.  We are

21   entitled, as a big stakeholder in this case, to make

22   recommendations as to how to make this company safe.  And --

23             THE COURT:  True.  Okay.

24             MR. JULIAN:  -- we want to see --

25             THE COURT:  I agree.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1        MR. JULIAN:  We want to see what those reports say,

2    because we still believe, as the PUC does and Judge Alsup has

3    intimated, they're not being honest.  In Judge Alsup's order,

4    imposing conditions was, because you've falsified records in

5    the past, I'm going to make you go back now and do everything

6    anew for me.

7        We have the same interest as Judge Alsup, and we

8    believe we have -- and respectfully, because he's a district

9    judge, but we have 50,000 people who are important stakeholders

10    in this case, who get to weigh in on wildfire safety.  And what

11    they did in the past and recommended in the past for the future

12    is an important part of this case, Your Honor.  I think it's

13    fundamental.

14        THE COURT:  Okay.  But again, if there's something

15    that they've done in the past that is replaced or superseded by

16    something that they've proposed going forward, for example --

17    now, you've educated me at the prior hearing about, you know,

18    the clearances, vertical and horizontal clearances, cutting

19    back the growth near the power lines.  Pretty simple concept.

20        So what, if in the past, there was a report or there

21    was something that now has been superseded by a different

22    thinking of the subject -- wider, taller, clearer, whatever --

23    something, again, that you're more familiar with than I?

24    What's the point of going back in the past if they're

25    demonstrating what they've doing going forward?

PG&E Corp.; Pacific Gas and Electric Company

1     MR. JULIAN:  We'll take it into account, just like you

2  review everything that's happened in the past and predicts for

3  the future.  And secondly, we'll see what management did and

4  how management can be improved.

5     THE COURT:  Well, I guess, to some extent, it sounds

6  like what you're really doing is taking your shots at

7  management as a function, rather than as a -- thinking about a

8  plan.  But again, you have a right to do that.  I'm not --

9     MR. JULIAN:  Well, it --

10     THE COURT:  -- saying you can't do that.

11     MR. JULIAN:  Your Honor, they're concerned I'm going

12  to use this in estimation proceedings.  This is my standard

13  management --

14     THE COURT:  Well, standard -- you act like this is

15  what you do, these cases all the time.  I mean --

16     MR. JULIAN:  No, not mass tort.  I'm just saying in

17  Chapter 11 cases.

18     THE COURT:  Too close to the mic.

19     MR. JULIAN:  Well, I'm just saying we didn't do it for

20  the litigation.

21     THE COURT:  Too close to the microphone.  You're

22  booming.  Move the microphone away a little bit.

23     MR. JULIAN:  We didn't do it for the litigation, Your

24  Honor.

25     THE COURT:  Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1      MR. JULIAN:  We did it for a management review and to

2  help us, as I mentioned.

3      THE COURT:  Mr. Slack, were you going to say something

4  else?  I mean, it --

5      UNIDENTIFIED SPEAKER:  Do you want to say --

6      THE COURT:  I'm inclined -- whoever, tell me.  I'm

7  inclined to give them what they want.  I don't think it's a big

8  deal, but I don't know what the harm --

9      MR. KAROTKIN:  I find it a little astonishing that Mr.

10  Julian says that there are lawyers on his committee -- first of

11  all, there are no lawyers on his committee, anyway -- that are

12  experts in wildfire mitigation, and they're going to make

13  suggestions.  I find that almost incredible.

14      THE COURT:  Well, they know --

15      MR. KAROTKIN:  Okay?  And --

16      THE COURT:  I --

17      MR. KAROTKIN:  -- I think, again, Your Honor, let's

18  focus on what he said he was interested in.  And I think you

19  acknowledged the same thing.  We're talking about prospective,

20  moving forward.  The CPUC, who knows a lot more about this than

21  Mr. Julian and his committee, is reviewing the wildfire

22  mitigation plan to see if it does enough or it should be

23  changed.  And as you know, we committed to change the metrics

24  in the STIP to address that.

25      Judge Alsup -- he refers to what Judge Alsup has said.

PG&E Corp.; Pacific Gas and Electric Company

1    Judge Alsup said at the last hearing he was perfectly fine with

2    the company's wildfire mitigation plan, subject to whatever the

3    CPUC said.  And that's what's happening moving forward, and

4    that's what we'll be evaluated, moving forward, in the context

5    of getting this company out of Chapter 11 and whatever is

6    necessary to attract the financing to get it out of Chapter 11.

7            This is a fishing expedition to -- for no purpose

8    other than to impose burden on the company.  And there's no

9    reason to do it now.  There's just no reason.  As you know,

10   there are many, many, many things going on in this case, which

11   you see every day.  And to impose this burden on the company,

12   for no purpose, doesn't make any sense.  There are more

13   productive ways to move this case forward.

14           THE COURT:  Well, I guess one of the things that I

15   have to better -- get a better sense on is how much of a burden

16   is it?  If these are topics that have been addressed, relating

17   to the subject matter, how burdensome is it?

18           I understand -- I don't want a testimony from the

19   clerk, but I mean, is it really burdensome, or is it just your

20   way of fighting back to what you think they're doing is

21   burdensome?  I don't know.  I have no idea.  I don't know how

22   to measure it.

23           MR. KAROTKIN:  What is the relevance of it?

24           THE COURT:  Well, I guess it's the subject matter.  It

25   is the subject matter.  And you can't deny, if there has been a

PG&E Corp.; Pacific Gas and Electric Company

1    history of falsifying records, there is something to be said

2    for seeing how honest the debtor is these days, if the --

3    somebody who has a stake in the --

4                MR. KAROTKIN:  To what end?

5                THE COURT:  -- action questions it.

6                MR. KAROTKIN:  To what end, Your Honor?  To what end?

7                THE COURT:  Well, you know, maybe to seek to remove

8    management, if you want to take the ultimate thing.

9                MR. KAROTKIN:  Okay.  And if --

10               THE COURT:  I mean, I don't know.

11               MR. KAROTKIN:  -- Mr. Julian thinks it's appropriate

12   to move for the appointment of a trustee in this case, there

13   are appropriate procedures and appropriate --

14               THE COURT:  Right.

15               MR. KAROTKIN:  -- discovery for that.  And that's

16   exactly what we're talking about here.

17               THE COURT:  But isn't it easier just to give him the

18   information --

19               MR. KAROTKIN:  No, it's --

20               THE COURT:  -- than to fight?

21               MR. KAROTKIN:  -- not easier to -- that's not the way

22   2004 is supposed to work --

23               THE COURT:  Well --

24               MR. KAROTKIN:  -- Your Honor.

25               THE COURT:  -- we have different opinions about that.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1        MR. KAROTKIN:  Okay.

2        THE COURT:  So tell me why it's really a burden,

3   rather than anything else.  To me, it would be much more

4   burdensome to have to fend off a motion that --

5        MR. KAROTKIN:  He's asking to go back --

6        THE COURT:  -- hopefully, won't get filed.

7        MR. KAROTKIN:  -- through three years of board

8   minutes --

9        THE COURT:  Well, I mean, I think we're back to the --

10       MR. KAROTKIN:  -- all of which have to be --

11       THE COURT:  -- wildfire issue.

12       MR. KAROTKIN:  -- reviewed for privilege.  Whatever

13   these reports, all have to reviewed for privilege.

14       THE COURT:  Right.

15       MR. KAROTKIN:  Again, to what end?  I don't

16   understand.

17       THE COURT:  When --

18       MR. KAROTKIN:  Because he does it -- because he's the

19   expert, and he does it in every other case?

20       THE COURT:  Well, I don't think --

21       MR. KAROTKIN:  That's not a justification for that.

22       THE COURT:  I think he's going to share it with people

23   that are -- have more expertise.  That's what we do.  That's

24   what you do.  That's what any bankruptcy specialist would do.

25   That doesn't concern me.  It concerns this -- you say, to what

PG&E Corp.; Pacific Gas and Electric Company

1    end.  That's the whole point of getting information.  That's

2    what a 2004 --

3             MR. KAROTKIN:  No.

4             THE COURT:  -- exam is all about.  Well --

5             MR. KAROTKIN:  I think we have a disagreement --

6             THE COURT:  We do.

7             MR. KAROTKIN:  -- about that.  I think --

8             THE COURT:  We do.

9             MR. KAROTKIN:  -- a 2004 examination is supposed to be

10   a targeted examination as to specific concerns he has or

11   potential claims that may come up.

12            THE COURT:  But, Mr. Karotkin, I've heard it from his

13   mouth.  The concern is this company has falsified records in

14   the past, and it has a history of ignoring wildfire safety, and

15   it takes responsibility, to some extent, to major fire years.

16   And sure, there have been changes at the PUC and changes in the

17   district court.  But somebody with a stake in the action,

18   certainly, can see the information.

19            I'm inclined to let him look at the information.  I

20   don't know how to narrow it to make it more efficient.

21            MR. KAROTKIN:  To look at the information, again, Your

22   Honor -- I don't want to belabor -- to what end?  What is he

23   going to do with that information?

24            THE COURT:  There's an old saying about knowledge is

25   power.  Have you ever heard that expression?  And knowledge is

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1  knowledge, because every time you tell me, to what end, I'll

2  ask, what's the problem of concealing it -- I mean, of not

3  disclosing it?  I accept that it's a burden if you have to

4  filter out privilege, and he hasn't tried to break the

5  privilege, nor is he going to.

6       But I mean -- so for every, what's the purpose you

7  give me, just tell me what's the problem.  I just --

8       MR. KAROTKIN:  As I said, the -- Your Honor, we're

9  trying to move this case forward --

10      THE COURT:  I know.

11      MR. KAROTKIN:  -- and administer this case, okay?  As

12  you know, there are many, many things going on in this case.

13      THE COURT:  There are.  I --

14      MR. KAROTKIN:  This is a distraction, and this is a

15  burden to assemble these documents for no legitimate purpose.

16  There is no legitimate purpose here.  He stood up and told you

17  the reason he wanted this thing was prospective.  He didn't

18  stand up and tell you he wanted this to investigate whether

19  management had engaged in wrongdoing.

20      THE COURT:  Well, he talked about -- some of the

21  things that your colleague has agreed to was, certainly,

22  consistent --

23      MR. KAROTKIN:  Again, but --

24      THE COURT:  -- with that.

25      MR. KAROTKIN:  -- focusing on this, in his words, he

PG&E Corp.; Pacific Gas and Electric Company

1    focused on prospective activity and prospective conduct.  Those

2    are his words.  When he didn't like what I said, then he went

3    back and said he wanted it for other reasons.  But let's focus

4    on why he really wants it and what the relevance is.

5           He said, again, Your Honor, the relevance is, is this

6    company -- what is it going to look like coming out of Chapter

7    11?  Will people be able to rely on the plan coming out of

8    Chapter 11?  That's the wildfire mitigation plan.  That's what

9    everybody is focused on.  The CPUC is focused on it.  Judge

10   Alsup is focused on it.  And if that were his legitimate

11   interest, that ought to satisfy him, and that's what's relevant

12   here.

13          THE COURT:  Okay, Mr. Julian.  Tell me again why they

14   need to go back in time.

15          MR. JULIAN:  Your Honor, I'll read from page 5 of my

16   letter to you, second paragraph under requests 5 to 10.

17          THE COURT:  Okay, one second.  Page 5?

18          MR. JULIAN:  Yes.

19          THE COURT:  Okay.  I'm there.

20          MR. JULIAN:  At three paragraphs under requests 5 to

21   10.

22          THE COURT:  Yeah.

23          MR. JULIAN:  First paragraph, "These requests relate

24   to the ordinary corporate governance review of management

25   decisions in a case involving repeated criticism of management

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    decisions by the CPUC, the federal court, and CAL FIRE."

2         Second paragraph reads, "These documents are relevant

3    to explanation of management actions and the investigation of

4    management actions by the TCC, where management has a conflict

5    investigating itself, for use in the Chapter 11 case.

6    Documents are also relevant to debtors' weekly motions", et

7    cetera.

8         And I've supplemented that today by talking it -- by

9    clarifying that paragraph 1 refers to investigations by CAL

10   FIRE, with respect to, specifically, wildfire safety and

11   wildfire claims.  It's not true that we are not looking

12   backwards.  It's a fishbowl, and these are just -- they

13   could've produced them by now.  They have them in binders, Your

14   Honor.

15        THE COURT:  Well, we switched topics again.  I thought

16   we're talking about requests 11 and 12, which is the wildfire

17   safety.  So you --

18        MR. JULIAN:  No, 5 through 10 are the board minutes

19   of --

20        THE COURT:  Yeah, I know.  I know.  But we just got

21   into the discussion of 11 and 12 about wildfire safety.  And

22   then you flipped me back to 5 through 10.  So --

23        MR. JULIAN:  I thought he was talking about board

24   minutes just now in this discussion, not the investigation

25   reports.  I'm sorry.

PG&E Corp.; Pacific Gas and Electric Company

1      THE COURT:  I heard him talking about wildfire safety,

2  and the CPUC plan --

3      MR. JULIAN:  Oh, because we were just talking about --

4      THE COURT:  -- and the mitigation plan.

5      MR. JULIAN:  -- 11 and 12.

6      THE COURT:  Yeah.  Because you have put into 11

7  through 16 wrongful conduct of the debtor's officers' and

8  directors' ratification -- settlements and ratifications.

9  That's pretty broad, and that doesn't -- that's not narrow as

10  to wildfire safety.  So I mean, I'll accept your representation

11  that you've agreed to narrow it down to this one issue.  That's

12  what you said.

13      MR. JULIAN:  Well, we've narrowed 11 and 12 down to

14  dividends, wildfire claims, insider transactions, and wildfire

15  safety.  They have agreed to three of the four, not wildfire

16  safety.

17      THE COURT:  I know.  So let's narrow it down to the

18  following subject.  If we divide the world into past and

19  future, you're hearing no resistance by Mr. Karotkin and the

20  others for information prospective.  And you have the CPUC

21  report, and it seems to me you want more than that, because you

22  already got that.  That's public, right?

23      So I'll repeat again, why do you need to get to

24  wildfire safety, historical versus prospective?

25      MR. JULIAN:  When you say prospective, do you mean

PG&E Corp.; Pacific Gas and Electric Company

1    documents created from today forward, or do you mean --

2           THE COURT:  Oh, no, I don't mean -- I mean what's

3    going to -- it's exactly what you were talking about.  What is

4    going to assure your clients, and my constituents, and

5    everybody in Northern California --

6           MR. JULIAN:  Oh, I see.  Yes.

7           THE COURT:  -- about the fire?  Because it's mid-May

8    now, right?

9           MR. JULIAN:  The cause of the bankruptcy.

10          THE COURT:  You know what's going to happen in June,

11   and July, and August, when it gets dry?

12          MR. JULIAN:  We think they have not yet come clean on

13   what they knew that caused these fires.  We want to look at

14   those reports, so that we know, so that we can be a stakeholder

15   in this case and say, it shouldn't happen again in this case.

16   And so those reports of what happened are reports about the

17   most important thing that caused this bankruptcy.  We think

18   we're entitled to see them.

19          THE COURT:  Mr. Julian, the bankrupt -- the fires

20   happened, and the bankruptcy happened.  So it's like going

21   back, well, why did the bankruptcy get filed?  It got filed.

22   So the question is what to do about it.  And you've been pretty

23   adamant about what your role, and I appreciate what you're

24   doing.  You're doing it extensively, and very, very much

25   important that you do.

(979)001-004 operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    But I don't understand why you need to see what was

2  done in the past.  So I'm going to narrow the --

3    MR. JULIAN:  Let me give an example.

4    THE COURT:  Well, go ahead, because I'm going to --

5  I'm not inclined --

6    MR. JULIAN:  So --

7    THE COURT:  -- to go back now, after we --

8    MR. JULIAN:  So --

9    THE COURT:  -- think about it some more.

10    MR. JULIAN:  -- if there's a report that says, we did

11  not -- we had forty-year-old hooks on the towers, and they were

12  obsolete, and we should've replaced those on year 25 --

13    THE COURT:  Um-hum.

14    MR. JULIAN:  -- and these two investigators knew about

15  it, we want to be able to say, one, you ought to be replacing

16  obsolete stuff before it breaks, before it's time, rather than

17  waiting; and two, those types of investigators that you had

18  reviewing it should not be doing it in the future.

19    This is the typical thing that we think has to be

20  fixed.  So it caused this bankruptcy, the sixth-largest

21  bankruptcy case in the nation.

22    THE COURT:  Yeah.  Why do you keep saying that?  You

23  think I don't --

24    MR. JULIAN:  Well --

25    THE COURT:  -- know this?

PG&E Corp.; Pacific Gas and Electric Company

1    MR. JULIAN:  Well, because it's not -- Your Honor,

2  this is the key part of the case.

3        THE COURT:  You keep saying that too.

4        MR. JULIAN:  Okay.

5        THE COURT:  I'm focusing on today's dispute.

6        MR. JULIAN:  We need those documents -- we need those

7  reports to help make recommendations how to make this company

8  safe.  They explain what happened.  That's why we need them.

9        THE COURT:  Okay.  So there is a report that is

10  uncovered that shows that inspector so-and-so told us -- told

11  his management two years ago, we need to replace these towers.

12  And so now what are you going to do?  Now, are you going to ask

13  and see, well, they replace the towers?  I mean, doesn't the

14  current plan talk about what they're doing to deal with these

15  issues?

16        MR. JULIAN:  It talks about some of it, but we don't

17  think it talks about all of it, because we don't have the

18  documents.

19        THE COURT:  But again, it's very broad, the way you

20  want to do it.  So --

21        MR. JULIAN:  No, it --

22        THE COURT:  -- you want me --

23        MR. JULIAN:  Well, we tried to narrow it down to --

24        THE COURT:  Yeah.

25        MR. JULIAN:  -- very specific reports by -- you don't

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    convene a special litigation committee or a special audit

2    committee to issue a report on wildfire safety unless something

3    specific happened.

4         THE COURT:  I don't know that.  I --

5         MR. JULIAN:  And that --

6         THE COURT:  I don't know if that's true or not.

7    I'll --

8         MR. JULIAN:  So, Your Honor, I'll submit it.  Those

9    are the things we think are important to do our job in this

10   case, with respect to what caused the bankruptcy.  And we think

11   we need to look at them and evaluate them.

12        THE COURT:  So how did you come to know, to even frame

13   the question for number 11?  Again, I'm focusing on wildfire

14   safety, not on board minutes, and dividends, and so on.  So I

15   mean, why isn't this -- I mean, do you know, for example, there

16   was a special litigation committee in existence?

17        MR. JULIAN:  No.

18        THE COURT:  Or, I mean, because it's very broad.

19        MR. JULIAN:  No.  So as I mentioned -- not trying to

20   brag here -- this is a standard request.  When they said to me

21   it was too broad, I narrowed it to what I was really looking

22   for, that type of thing.  So yes, they typically do have

23   special litigation committees or committees when an event

24   happens.  And when a catastrophic event happens like Camp Fire,

25   they probably convened a committee to look at it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1        If there's no committee, then they have ought to

2   produce anything for that class of the documents.

3        THE COURT:  Then why not have a temporal cutoff to the

4   events themselves, rather than the prior to that, for now?

5   What's wrong with that?

6        MR. JULIAN:  I -- well, that --

7        THE COURT:  In other words -- in other words --

8        MR. JULIAN:  Yes, I would -- I would --

9        THE COURT:  -- reports that relate to the 2017 and

10  2018 fires forward -- and forward?

11       MR. JULIAN:  That'd be fine.

12       THE COURT:  All right.  I'll go along with that.  And

13  that's specific, then, and it's specific enough that -- so to

14  me, that 11 and 12 are relevant to the 2017 and 2018 fires --

15       MR. JULIAN:  Sure.

16       THE COURT:  -- collectively.  And that, obviously, is

17  subject to the privileges that we talked about.

18       Now, do we need -- is there still -- are we still

19  visiting the board stuff, or have we got that resolved, the

20  board minutes?  I --

21       MR. JULIAN:  So, Your Honor, I -- we want to look at

22  the board minutes, and there's an objection.

23       THE COURT:  Yeah, but I thought -- again, I'm sorry.

24  I'm jumping around, because there are too many topics here.  I

25  thought there was an agreement about dividends and payment to

PG&E Corp.; Pacific Gas and Electric Company

1  executives and insiders.

2  MR. JULIAN:  So what happened was they asked me to

3  give them some examples.

4  THE COURT:  And you did.

5  MR. JULIAN:  They took it -- my --

6  THE COURT:  Yeah, right.

7  MR. JULIAN:  -- my discussion as being the only thing

8  I was looking at.  That could've been my miscommunication.  It

9  could've been a mishearing.  Those, I identified -- I have

10  identified four types of things that I'm looking at:

11  dividends, wildfire claims, insider transactions, wildfire

12  safety.

13  They're not the only ones we're looking at.  As I

14  mentioned, we want to know, in a case involving -- my speech,

15  you know what this case involves -- the things that happened.

16  We don't trust management.  We want to look at what happened in

17  the board meetings.  They've got them in binders.  They can

18  produce the binders.

19  THE COURT:  Mr. Karotkin, can you -- any reason why

20  they can't produce the binders?

21  Or, Mr. Slack, back to you?  You guys are Huntley-

22  Brinkley here.  Just tell me any reason why they can't produce

23  those binders.

24  MR. SLACK:  It's nice that Mr. Julian somehow knows

25  that the company has binders that they just -- that's not the

PG&E Corp.; Pacific Gas and Electric Company

1    way it works, Your Honor.  And what I'll tell you is is there's

2    a number of different boards, committees.  What we would have

3    to do is look through every one of these.  And as you can

4    imagine, the board minutes and packages, in particular, have a

5    huge privilege review.

6         And so this is going to be a very labor-intense

7    project, to have to go through three years, unbounded by any

8    topic.  And so, Your Honor, the same way we dealt with 11 and

9    12 is, really, the way that both, I think, the law in 2004, as

10   well as just a practical aspect, is there -- it should be

11   bounded by topics.

12        THE COURT:  So --

13        MR. SLACK:  And --

14        THE COURT:  -- you're going -- but you're okay with

15   those four topics' payments?

16        MR. SLACK:  Well, we're okay with the three that we

17   agreed to, which was -- and we discussed.  In other words, the

18   point was we had a meet and confer.  And while --

19        THE COURT:  Right, right.

20        MR. SLACK:  -- Mr. Julian says now, they were

21   examples, what I can tell you is those were the three that he

22   gave us in the meet and confer.  He didn't say they were

23   examples.  They said, here's what -- here's why we want this.

24   And --

25        THE COURT:  CEO, other officers, and dividends?

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1    MR. SLACK:  That's right.  And we said yes to that.

2   And what we're suggesting, Your Honor, is that there -- this

3   should be topic-based.  And if Mr. Julian has other topics, he

4   should meet and confer with respect to those topics.  And it

5   may be that we agree to give him those minutes and board

6   packages, with respect to those.  But that's our position.

7    And again, it's the same way we dealt with 11 and 12.

8    THE COURT:  Okay, one second.  Let me review one thing

9   here on my own.  Yeah, when I looked at the original 2004

10   motion and decided to wait, and because we had to deal with

11   these other matters, it struck me as that I suspect that the

12   company would find that some of the requests were extremely

13   broad.

14    I'm going to stick with Mr. Slack's suggestion and

15   tell Mr. Julian and the committee that you can have the

16   topics -- the three subject matters that have been discussed

17   right now:  the CEO payment, the officer and director payments,

18   and dividends.  Again, I don't know what you're going to do

19   with the dividend information.  And we'll just keep open the

20   question on a specific topic-by-topic meet and confer.

21    If there's a particular topic and a particular

22   relevance that you believe, Mr. Julian, that you can insist on,

23   and the other side will not, I'll do my best to resolve it.

24    I'll narrow the 2004 -- this aspect of the issue, as

25   I've described, and as to the wildfire safety, the two topics

                    PG&E Corp.; Pacific Gas and Electric Company

1   of the years that we've talked about.

2           And then that -- I believe that leads us to the

3   protective order.  So what do you want me to do?  Decide when

4   the protective order can be exchanged?  By Wednesday?  Does

5   that work?  I don't know why we're debating the date that a

6   protective order has to be drafted.

7           MR. SLACK:  Your Honor, if you really think that --

8   what I told Mr. Julian was we would get it to him by next week.

9   He wanted a bounded date.  I said, Friday, but we're going to

10  endeavor to get it to you earlier.  I'm surprised that that's

11  not good enough, but we'll do whatever Your Honor says you want

12  us to do.

13          THE COURT:  But what is it -- what is it that has to

14  be done?  Is it just a question of a number of lawyers --

15          MR. SLACK:  Yes.

16          THE COURT:  -- or your client, or who's going to be --

17          MR. SLACK:  Yeah, so, Your Honor, I mean, this is a

18  protective order, obviously, that will govern the case, as a

19  whole.

20          THE COURT:  Right, right.

21          MR. SLACK:  So we're taking some time to make sure we

22  get it right, thinking about all the different aspects.  And as

23  you point out, there are a number of eyes that have to touch it

24  before we can get it out.  So we said, give us until next

25  Friday, but we'll try to get it earlier.

PG&E Corp.; Pacific Gas and Electric Company

1    THE COURT:  Okay, you know what?  You can have until

2    Friday, but you also have to work with him on an agreed form of

3    order for today's matters as well.  So it's got -- I want to --

4    I'm going to dump and scrap the proposed 2004 order.

5         And I'd like you, Mr. Slack, and Mr. Julian to work

6    together on an agreed -- we'll call it a 2004 order or call it

7    a 2004-plus informal letter discovery order, but I'd like an

8    order that clarifies and restates what we've talked about.

9         The written transcript is what it is, but a simple

10   order is a little more important and useful.

11        MR. SLACK:  Okay, Your Honor.

12        THE COURT:  Any reason why you can do that?  You can

13   do that, can't you, by the same deadline?  I mean, it seems --

14        MR. SLACK:  Work on it -- work on it -- work on an

15   order with respect to the hearing, Your Honor?

16        THE COURT:  Yeah.  What I'm getting --

17        MR. SLACK:  Yeah.

18        THE COURT:  What I'm getting --

19        MR. SLACK:  Yes.

20        THE COURT:  -- at is that what started as my way of

21   handling easy discovery disputes has turned into two-hour

22   disputed conference, which is okay.  I don't care.  I'm not mad

23   at anybody.  But out of it, we've talked about a number of

24   things.  And both sides and their clients are entitled to some

25   certainty.

PG&E Corp.; Pacific Gas and Electric Company

1     So you, Mr. Slack, you, Mr. Julian, agree on a form of

2     order.  If you can't agree on a form of order, we'll have

3     another hearing.  But I'd rather that you agreed on the order.

4          And you'll have to live with the next Friday, Mr.

5     Julian, for --

6          MR. JULIAN:  Got it.

7          THE COURT:  -- the order you're looking for.

8          MR. SLACK:  That's fine, Your Honor.  Thank you.

9          THE COURT:  Mr. Karotkin, as long as you're here --

10         MR. KAROTKIN:  Thank you, Your Honor.

11         THE COURT:  -- if you'll put -- you, and Ms. Kim, and

12    others in with you would set an agenda for tomorrow and a

13    sequence, because I know there's been some changes the last

14    little while.

15         MR. KAROTKIN:  I'm sorry.  I didn't hear your

16    question.

17         THE COURT:  Well, that there've been some changes.

18    There've been --

19         MR. KAROTKIN:  Yes.

20         THE COURT:  -- a couple things --

21         MR. KAROTKIN:  Yes, I think --

22         THE COURT:  -- that have already been put over.

23         MR. KAROTKIN:  I think the retentions of FTI and

24    Compass --

25         THE COURT:  Right.  But I haven't seen a -- an agenda

PG&E Corp.; Pacific Gas and Electric Company

1    for tomorrow the way I've seen in the past, unless it was done

2    this morning.

3              MR. KAROTKIN:  I'm not sure the --

4              THE COURT:  And so I just wanted to --

5              MR. KAROTKIN:  It may have been done --

6              THE COURT:  It's all right.  I --

7              MR. KAROTKIN:  -- while we were here.

8              THE COURT:  -- don't care that it's not done.  I just

9    want to see -- well, let's do this.  Can I ask you to suggest,

10   by the end of the day, the sequence you want to take tomorrow?

11   You can use your own judgment on where the timing's going to

12   be.

13             I'm assuming the TURN motion's going to get a lot of

14   attention and publicity.  But a couple of the other ones are

15   still hotly contested, and so I just like to make sure we use

16   the time efficiently.

17             MR. KAROTKIN:  Sure.

18             THE COURT:  I don't want to put a roomful of people

19   through awaiting discussing whether somebody's retention order

20   has to be tweaked because of some provision in it.  So just do

21   it that way.

22             Mr. Benvenutti's standing.  He must be --

23             MR. BENVENUTTI:  Your Honor --

24             THE COURT:  -- ready to do this too.

25             MR. BENVENUTTI:  -- yes, I can't speak to the specific

PG&E Corp.; Pacific Gas and Electric Company

1    provisions, but I do know that Ms. Kim has been working very

2    diligently --

3            THE COURT:  Yeah.

4            MR. BENVENUTTI:  -- on completing it.  It's gone

5    through various permutations because things have fallen --

6            THE COURT:  It changes every five minutes.

7            MR. BENVENUTTI:  -- fallen off the calendar.

8            THE COURT:  Right.

9            MR. BENVENUTTI:  But I would be very surprised if we

10   don't have it to you by midafternoon.

11           THE COURT:  I'm not worried about it for me.  I'm

12   worried about it for the public and everybody else, so when we

13   come in here tomorrow, we're all on the same page.  In the

14   past, I've tried to defer to let your side pick the sequence.

15   And so all I'm doing is, let's do it the same way and be

16   mindful of which ones are going to take time, for sure, and

17   which ones are no-brainers, for sure.

18           MR. BENVENUTTI:  I believe we're trying to do that,

19   Your Honor.

20           THE COURT:  Yeah.

21           MR. BENVENUTTI:  And I expect that everyone will have

22   that order at some point this afternoon, probably sooner rather

23   than later.

24           THE COURT:  Okay.  Thank you, all.  See you

25   tomorrow --

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp.; Pacific Gas and Electric Company

1          MR. BENVENUTTI:  Thank you very much.

2          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3          THE COURT:  -- some of you.  Bye.

4     (Whereupon these proceedings were concluded at 12:38 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          C E R T I F I C A T I O N

2

3    I, Michele A. Clutts, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHELE A. CLUTTS

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  May 9, 2019

16

17

18

19

20

21

22

23

24

25



(973) 406-2250 | operations@escribers.net | www.escribers.net

**A**

**ABC (1)**
10:4
**ability (1)**
58:17
**able (8)**
29:3;30:18;31:17,18;
44:8;61:12;82:7;86:15
**absorb (2)**
38:21;56:17
**accept (2)**
81:3;84:10
**access (2)**
59:6;64:13
**account (1)**
75:1
**accused (1)**
53:23
**acknowledge (1)**
70:9
**acknowledged (1)**
76:19
**act (3)**
45:3;50:10;75:14
**acting (1)**
38:22
**action (5)**
38:23;53:3;72:19;
78:5;80:17
**actions (2)**
83:3,4
**activity (2)**
54:21;82:1
**actually (7)**
4:10;46:24;53:11;
61:25;62:8;64:12;65:1
**adamant (1)**
85:23
**add (3)**
12:2;27:16;36:13
**adding (1)**
39:1
**additional (1)**
9:5
**address (4)**
20:20;70:19;72:4;
76:24
**addressed (2)**
70:14;77:16
**administer (1)**
81:11
**admit (1)**
19:3
**ado (1)**
45:7
**advance (2)**
13:21;17:15
**adversarial (1)**
28:8
**adversary (10)**
23:25;24:13;25:16,

17,19;27:1;28:1;29:3;
35:2,24
**advice (1)**
11:5
**advisors (1)**
40:25
**afternoon (1)**
97:22
**again (44)**
12:18;13:2;14:13;
18:6;20:11;22:18,21;
26:25;27:24;29:22;
31:1;32:19;33:25;
35:17;40:24;44:2;46:1;
47:17;51:11;52:24;
55:15;56:16;58:19;
61:12;62:13;66:22;
70:9;74:14,23;75:8;
76:17;79:15;80:21;
81:23;82:5,13;83:15;
84:23;85:15;87:19;
88:13;89:23;92:7,18
**against (20)**
5:21;6:20,22;9:9,15,
19;15:13;21:19;26:20;
33:17,18;36:4;37:20;
38:2,9,10;39:11,14;
41:1;47:2;53:3
**agencies (1)**
18:23;30:20;49:6
**agenda (3)**
48:12;95:12,25
**agendas (1)**
54:12
**agitated (1)**
51:22
**ago (6)**
14:11;29:9;71:21,21,
22;87:11
**agree (17)**
8:11,12;42:11,19;
45:15;47:10,13;57:6;
60:9,11;61:8;62:17;
65:12;73:25;92:5;95:1,
2
**agreed (25)**
6:13,15,18;7:4,25;
8:14;9:1;15:15;20:25;
27:8;42:7;44:3;56:4,
19;59:5;62:17,18,19;
81:21;84:11,15;91:17;
94:2,6;95:3
**agreeing (3)**
43:24;44:4;57:7
**agreement (9)**
8:17;9:5;20:22;
45:11;46:12;52:11;
56:13;63:24;89:25
**agreements (6)**
3:22;6:9;20:25;
32:10,13,15
**ahead (10)**
12:4;36:10;40:4,9;

17,19;27:1;28:1;29:3;
35:2,24
**allegedly (1)**
70:11
**allow (3)**
29:19;41:24;54:2
**almost (2)**
28:25;76:13
**alone (1)**
19:7
**along (3)**
20:3;44:12;89:12
**Alsup (13)**
48:18;49:9,11;66:24;
67:15;68:21;69:10;
74:2,7;76:25,25;77:1;
82:10
**Alsup's (1)**
74:3
**alternative (2)**
27:12;65:19
**alternatives (1)**
53:18
**always (1)**
44:21
**ambiguity (1)**
42:25
**ameliorative (1)**
72:19
**amount (1)**
39:6
**analyses (3)**
10:20;30:4;32:18
**analysis (2)**
11:1;26:22
**analyst (1)**
11:5
**analysts (2)**
5:22;8:25
**analytical (1)**
32:8
**analyze (5)**
36:2,5;38:8,9,21
**analyzes (1)**
30:2
**Andrew (1)**
63:21
**anew (1)**
74:6
**Apart (2)**
18:18;59:20
**apologize (2)**
35:17;38:17
**appear (2)**
3:7;57:12
**Appearances (1)**
3:6
**application (6)**
3:22;4:11,12;5:20;
30:15;48:3
**applications (1)**
3:19
**apply (1)**

25:14
**appointment (1)**
78:12
**appreciate (1)**
85:23
**approach (1)**
20:13
**appropriate (9)**
23:25;26:6;29:4;
64:15;70:13,15;78:11,
13,13
**area (2)**
5:25;53:6
**argument (4)**
9:18;22:5;28:5;42:6
**arising (1)**
11:11
**arose (2)**
19:4,5
**around (3)**
39:12;50:12;89:24
**art (1)**
72:7
**aside (3)**
61:8,22;63:2
**aspect (3)**
66:20;91:10;92:24
**aspects (1)**
93:22
**assemble (1)**
81:15
**assertion (2)**
15:3,4
**assess (1)**
37:19
**assessment (5)**
9:1,8;13:20,25;18:12
**asset (6)**
6:24;7:23;9:12,13;
12:15;37:17
**assets (3)**
7:14;12:14;17:6
**assume (2)**
3:9;30:22
**assuming (2)**
4:19;96:13
**assure (1)**
85:4
**astonishing (1)**
76:9
**attempt (3)**
14:9;15:22;49:16
**attend (1)**
46:24
**attention (1)**
96:14
**attract (1)**
77:6
**audit (2)**
72:10;88:1
**auditors (2)**
55:22;72:11
**August (1)**

85:11
**authorize (1)**
38:19
**available (1)**
30:6
**avoid (2)**
17:16;18:20
**avoidance (1)**
53:3
**awaiting (1)**
96:19
**aware (1)**
68:12
**away (3)**
40:8,19;75:22

**B**

**back (32)**
17:5;19:25;20:17;
31:2;43:1;44:14;46:13,
18;48:21;49:17,24;
50:7;56:20;61:7;62:25;
64:17;69:18;70:1;
71:25;72:1;74:5,19,24;
77:20;79:5,9;82:3,14;
83:22;85:21;86:7;
90:21
**background (1)**
22:24
**backwards (1)**
83:12
**bad (1)**
34:7
**balance (1)**
45:12
**bankrupt (1)**
85:19
**bankruptcy (29)**
5:4,4;8:22;11:19;
17:17;19:2,3,8;23:12,
24;26:6;27:20;28:2;
38:1;48:13,14;52:1,3,
6;53:24;54:25;79:24;
85:9;17,20,21;86:20,
21;88:10
**based (1)**
47:10
**basically (2)**
8:17;55:20
**basis (2)**
21:9,9;45:1;72:17
**Bay (2)**
42:7;43:5
**bear (1)**
22:21
**beg (1)**
14:14
**behalf (2)**
9:3;63:21
**behind (1)**
47:6
**belabor (2)**

Min-U-Script®

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 100
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(1) ABC - belabor

62:11;80:22
**belongs (1)**
39:17
**benefit (1)**
41:20
**BENVENUTTI (8)**
96:23,25;97:4,7,9,18,
21;98:1
**Benvenutti's (1)**
96:22
**best (1)**
92:23
**better (2)**
77:15,15
**big (8)**
14:19;17:7,8;38:3;
58:14;64:18;73:21;
76:7
**biggest (3)**
17:19;19:5;53:24
**billion (8)**
6:24;11:4,6,8;13:16;
19:6;39:4;40:18
**billion-dollar (1)**
17:16
**billions (1)**
13:23
**binders (6)**
83:13;90:17,18,20,
23,25
**bird (1)**
65:21
**bit (2)**
12:7;75:22
**blameless (2)**
30:2,3
**board (40)**
5:2,3,5,8,11;6:5;
48:11,11,12;49:9,20;
52:13,23;54:1,12,12,
12,13,15,19,21;55:9,
21;57:12,24;60:16,19;
66:7,14;72:9;79:7;
83:18,23;88:14;89:19,
20,22;90:17;91:4;92:5
**boards (2)**
60:20;91:2
**board's (1)**
48:12
**bogey (1)**
17:8
**bond (5)**
66:6,8,12,12;71:15
**bonds (3)**
41:10;58:12,13
**books (1)**
19:7
**booming (1)**
75:22
**Both (6)**
5:16;10:4;35:13;
64:3;91:9;94:24
**bother (1)**

49:3
**bounded (5)**
24:15;35:4;60:21;
91:11;93:9
**brag (1)**
88:20
**Brawder (1)**
46:13
**breach (1)**
10:23
**breached (1)**
11:2
**break (6)**
38:15;44:22;45:10;
46:5,9;81:4
**breaks (1)**
86:16
**bring (1)**
38:22
**Brinkley (1)**
90:22
**broad (12)**
4:17;24:23;25:16;
28:23;56:2;61:23;
65:25;84:9;87:19;
88:18,21;92:13
**broader (7)**
31:5;42:15;45:18;
51:6;66:20;73:10,10
**broad-ranging (1)**
25:8
**Bruno (2)**
11:6;13:14
**bucket (1)**
4:10
**buckets (1)**
73:15
**build (1)**
5:17
**building (1)**
5:16
**burden (9)**
26:4;35:12;62:10;
77:8,11,15;79:2;81:3,
15
**burdensome (6)**
23:4;35:14;55:1,2;
77:17,19,21;79:4
**burn (3)**
29:25,25;30:1
**burned (2)**
21:18;29:13
**Butte (2)**
29:10;52:7
**Bye (1)**
98:3
**bypass (1)**
28:16

**C**

**CAL (4)**
17:25;51:18;83:1,9

**calendar (2)**
50:18;97:7
**CALIFORNIA (3)**
3:1;63:19;85:5
**Call (6)**
3:3;29:9;63:9,19;
94:6,6
**called (1)**
65:22
**calls (2)**
53:12;67:2
**came (3)**
45:6;57:19;69:2
**camp (7)**
8:21;11:11;17:16;
19:4,7;36:19;88:24
**campfire (2)**
5:23;25:7
**can (43)**
3:7;8:3;9:23;12:2;
15:8,23;16:4;17:5;
20:4,14;24:14;29:23;
30:4;34:1;36:5,7;
38:22;44:5;46:9;53:15;
58:11;60:21;61:15;
67:23,24;68:14,25;
75:4;80:18;85:14;
90:17,19;91:3,21;
92:15,22;93:4,24;94:1,
12,12;96:9,11
**candidate (1)**
30:7
**capital (1)**
58:10
**care (3)**
44:14;94:22;96:8
**careless (1)**
21:18
**Caribou-Palermo (1)**
14:3
**case (59)**
5:16;7:5;11:9;13:16;
16:4,11;18:4;19:6;
21:23;23:8;25:14;28:9,
18;37:12;39:1;40:16;
41:12,19;48:14,16,17;
49:6,18,20;53:12,22,
24;54:25;58:9,14,16,
24,24;64:4;65:17;
72:22;73:18,18,19,21;
74:10,12;77:10,13;
78:12;79:19;81:9,11,
12;82:25;83:5;85:15,
15;86:21;87:2;88:10;
90:14,15;93:18
**cases (8)**
23:11,15,19;24:17;
25:15;35:5;75:15,17
**cash (1)**
41:10
**catastrophic (3)**
17:17;18:5;88:24
**categories (3)**

20:4;38:20;57:8
**category (3)**
11:13;17:12;55:17
**causation (2)**
9:18;23:3
**cause (5)**
12:22;18:24;19:8;
62:7;85:9
**caused (18)**
8:21,22;12:23;17:15,
20;19:2,4;21:18;23:1;
26:11;29:25;30:1;34:7;
53:23;85:13,17;86:20;
88:10
**causes (1)**
30:18
**CEO (7)**
52:12,14;61:4;62:16,
22;91:25;92:17
**certain (2)**
39:2;59:12
**certainly (9)**
21:9;23:14;28:25;
53:4;61:17;63:12;65:2;
80:18;81:21
**certainty (1)**
94:25
**cetera (4)**
60:16,16;70:6;83:7
**chair (2)**
59:2,20
**change (2)**
72:1;76:23
**changed (1)**
76:23
**changes (5)**
80:16,16;95:13,17;
97:6
**channeled (1)**
7:20
**Chapter (10)**
41:12;49:14;52:25;
68:15;75:17;77:5,6;
82:6,8;83:5
**charge (2)**
19:6;47:22
**checked (1)**
49:13
**cite (2)**
23:11,18
**city (1)**
21:25
**Civil (2)**
24:16;25:9
**claim (36)**
9:9,15;10:1,6,9,17,
21,21,22;11:2;15:13;
19:22,23;21:19;23:9,9,
10,20,20;24:12;26:20,
21;28:3;31:18;33:18;
37:20;38:2,9,9;39:5,10,
13,16;41:1;52:8;73:18
**claimant (3)**

19:21,21,21
**claimants (3)**
15:25;37:18;39:3
**claimants' (2)**
9:19;30:7
**claims (35)**
5:17,18,21;6:20,22,
22;7:5,21;12:2;15:11;
21:7,24;22:15,17;
28:24;31:19;35:25;
37:11,12,15;39:21;
40:15;47:2;48:16;
51:19;54:7,9;56:3,6;
57:5;70:11;80:11;
83:11;84:14;90:11
**clarification (1)**
46:22
**clarifies (1)**
94:8
**clarify (5)**
36:24;37:8;67:23;
68:2;71:23
**clarifying (2)**
36:13;83:9
**clarity (1)**
65:7
**class (1)**
89:2
**clean (1)**
85:12
**clear (9)**
15:21;23:22;28:19;
36:7;42:6,25;47:4;
65:6;69:15
**clearances (2)**
74:18,18
**clearer (1)**
74:22
**clearing (1)**
18:1
**clearly (1)**
52:25
**CLERK (2)**
3:4;77:19
**clever (1)**
66:16
**client (1)**
93:16
**clients (2)**
85:4;94:24
**close (2)**
75:18,21
**closely (1)**
8:23
**co-counsel (2)**
45:10;46:6
**Code (2)**
63:20,20
**collar (1)**
72:8
**colleague (1)**
81:21
**colleagues (1)**

Min-U-Script®

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 101
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) belongs - colleagues

63:25
**collectively (1)**
89:16
**coming (8)**
13:19;27:4;46:18;
49:22,24;50:17;82:6,7
**comment (2)**
43:21;46:25
**comments (1)**
31:5
**Commercial (2)**
63:20,20
**committed (2)**
31:15;76:23
**committee (36)**
3:19;5:5;14:16;
18:25;19:11;26:8;30:8,
15,16,17;34:1;35:25;
36:2,3;39:20;40:14;
50:22;51:21;55:11,14,
14,21,21;63:22;67:4;
72:9,9;76:10,11,21;
88:1,2,16,25;89:1;
92:15
**committees (8)**
19:14;55:8;60:20;
73:3,6;88:23,23;91:2
**committee's (1)**
68:9
**common (4)**
7:7,15;62:6,11
**company (37)**
10:4;18:7;21:12;
35:19;38:3,3;39:17;
40:2;46:25;47:1,3;
48:21;49:13;50:23;
52:25;58:9,11;66:25;
67:3;68:13,14,18;69:9;
70:6,11;71:18,21;
73:20,22;77:5,8,11;
80:13;82:6;87:7;90:25;
92:12
**company's (5)**
28:16;58:13,17;
70:16;77:2
**Compass (1)**
95:24
**compensation (4)**
49:21;51:7;55:14;
62:17
**completing (1)**
97:4
**complex (1)**
60:4
**compliment (1)**
35:12
**comply (3)**
42:22;43:25;45:12
**concealing (1)**
81:2
**concept (3)**
12:6;29:15;74:19
**concepts (1)**

12:6
**conceptually (1)**
11:16
**concern (3)**
68:12;79:25;80:13
**concerned (4)**
68:9;69:10,20;75:11
**concerns (1)**
19:13;42:8;51:5;
79:25;80:10
**concluded (1)**
98:4
**conclusions (1)**
35:21
**conditions (1)**
74:4
**conduct (8)**
22:6;32:25;33:1;
35:3;42:13;64:14;82:1;
84:7
**confer (8)**
61:1,15,17;62:20;
91:18,22;92:4,20
**conference (2)**
47:19;94:22
**conferences (1)**
25:2
**confirm (2)**
45:17;61:15
**confirmation (2)**
40:13,14
**conflict (1)**
83:4
**connect (1)**
13:6
**connected (1)**
13:13
**connection (4)**
12:22;13:7;14:21;
24:13
**consensual (1)**
41:5
**considering (2)**
43:22;52:20
**consistent (4)**
20:13;43:2;61:3;
81:22
**constituents (1)**
85:4
**consult (1)**
44:6
**contested (4)**
5:7,9,11;96:15
**context (2)**
34:13;77:4
**contract (6)**
7:15;9:12;10:23;
19:21;39:2;41:21
**contractor (13)**
10:2;20:20,25;21:1,
18;22:25;30:16;31:9,
11;36:4;42:12;43:7;
44:20

**contractors (29)**
3:23;5:21;6:21;7:1;
8:8;15:14;21:10,11,16;
22:1,6,7,9;31:8,20,21;
32:20;33:19;34:3;
36:15,20;37:18;42:3,
14,18;43:4;44:2;45:21,
25
**contractors' (1)**
33:1
**contracts (13)**
7:3,3,20;8:1,12,16,
24;9:11,22;31:12;52:7,
8,15
**contractually (1)**
31:18
**contrary (1)**
64:6
**controlling (2)**
23:13,16
**convene (1)**
88:1
**convened (1)**
88:25
**conversation (3)**
60:22,25;61:13
**conversations (1)**
47:10
**cooperate (1)**
50:13
**cooperated (2)**
20:23;63:12
**copy (3)**
68:21,25;69:2
**corporate (3)**
51:16;54:24;82:24
**Corporation (1)**
3:4
**corroded (1)**
14:6
**counsel (7)**
44:6;45:12;47:8;
55:22,23;72:11;73:6
**county (1)**
29:10
**couple (4)**
23:14;60:15;95:20;
96:14
**course (2)**
6:4;52:4
**Court (413)**
3:3,5,13,17,20,24;
4:2,4,15,23,25;5:10,14,
24;6:4,7,12,14;7:6,9,
12,16,18;8:3,7,10,15,
19;9:24;10:2,7,11,15,
22,25;11:12,15,18,25;
12:4,11,18,21;13:5,8,
12,15,17;14:8,13,19,
24;15:2,9,15,20;16:3,7,
10,15,20,23;17:1,3,5,
10,12,21;18:6,11,14,
17,22;19:13,18;20:11,

17;21:1,3,5,13,15,17,
22;22:3,18,21,23;
23:12,15,16;24:2,6,10,
18,20,24;25:2,5,11,14,
23;26:3,7,18;27:5,16,
18,22;28:4,13;29:6,22;
30:11,22;31:1,10,14,
16,22;32:1,4,6,13,15,
21,24;33:2,6,10,12,15,
20,23,25;34:14,17,24;
35:6,10,16;36:9,11,17,
22;37:1,13,15,19,22,
25;38:5,8,13,18;39:8,
12,16,19,23,25;40:2,4,
6,8,17,20,24;41:4,8,14,
16,22;42:17;43:10,12,
15,18,21;44:10,19,22,
25;46:1,4,8,15,17,21,
23;47:5,14,17,25;48:4,
7,10,19,25;49:2,10,24;
50:3,5,8,10;51:1,4,6,9,
11,18,25;52:4,10,16,
18,22,24;53:7;54:5,8,
18,23;55:2,5,10,13,24;
56:10,12,16,24;57:2,9,
14,17,23;58:1,4,22;
59:1,4,6,7,14,25;60:3,
8,11;61:15;62:15,21;
63:2,7,9,15,19,23;
64:16,20;65:11,13,16;
66:4,9,21;67:14,22,25;
68:2,4,6,20,23;69:2,5,
7,13,15,21,23,25;70:5,
15,20,23,25;71:4,6,10,
12,14,17,23;72:3,24;
73:4,7,9,23,25;74:14;
75:5,10,14,18,21,25;
76:3,6,14,16;77:14,24;
78:5,7,10,14,17,20,23,
25;79:2,6,9,11,14,17,
20,22,25;96:4,6,8,18,
24;97:3,6,8,11,20,24;
98:3
**cover (4)**
6:23;8:17;9:23;23:2
**covered (1)**
10:3
**CPUC (10)**
68:19,24;69:12;
73:14;76:20;77:3;82:9;
83:1;84:2,20
**Cravath (2)**

36:13;44:7
**create (1)**
37:6
**created (1)**
85:1
**creating (1)**
39:10
**creditors (2)**
15:5;63:22
**creditors' (1)**
19:11
**criticism (2)**
51:17;82:25
**criticized (1)**
49:7
**culpability (1)**
28:10
**culpable (2)**
7:10;12:23
**current (2)**
49:23;87:14
**cute (1)**
66:16
**cutoff (1)**
89:3
**cutting (1)**
74:18

# D

**DA (1)**
18:24
**damage (2)**
17:16;22:9
**data (1)**
66:13
**date (4)**
29:18;59:12;93:5,9
**dated (1)**
65:22
**day (5)**
19:15;31:3;59:25;
77:11;96:10
**days (4)**
59:18,19,21;78:2
**deadline (1)**
94:13
**deal (5)**
48:11;49:23;76:8;
87:14;92:10
**dealing (10)**
6:2;7:13;19:15;
27:21;44:7,17;52:24;
54:8;56:11,15
**deals (5)**
5:8,20;9:18;54:24;
66:17
**dealt (4)**
19:23;55:15;91:8;
92:7
**debate (3)**
42:23;43:25;71:7
**debating (1)**

Min-U-Script®

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 102
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) collectively - debating

93:5
**debtor (15)**
4:14;9:2,3,5;23:22;
30:19;34:11,17;35:10,
11;37:18;38:19;55:1;
56:19;78:2
**debtors (17)**
3:16;6:13,15;19:3;
20:9,23;25:7;29:1;
36:13;40:11;43:11;
47:9;50:12;57:5;59:5;
60:21;68:8
**debtors' (1)**
83:6
**debtor's (6)**
5:20;6:19;16:13;
23:21;63:3;84:7
**decide (4)**
28:10;41:16;45:8;
93:3
**decided (4)**
23:24;24:2,9;92:10
**decision (1)**
20:15
**decisions (6)**
49:6,7;51:16;53:25;
82:25;83:1
**decrease (2)**
15:24;18:19
**deenergizing (1)**
17:23
**defeat (1)**
11:21
**defendant (2)**
9:11,22
**defendants (2)**
9:2;10:13
**defer (2)**
67:6;97:14
**definition (1)**
42:18
**definitions (1)**
47:12
**delayed (1)**
59:18
**delivered (1)**
54:12
**demonstrating (1)**
74:25
**denied (1)**
50:6
**dense (1)**
15:20
**deny (1)**
77:25
**depending (4)**
6:25;7:17,19,21
**deposited (1)**
5:18
**describe (3)**
18:15;32:15,16
**described (4)**
14:15;15:22,24;

92:25
**describing (1)**
11:13
**desire (1)**
5:17
**destroyed (1)**
29:13
**determine (6)**
14:16;15:10,13;16:8;
18:4;39:5
**determined (2)**
30:4,5
**determining (1)**
30:6
**difference (5)**
7:13,14;33:8;34:18;
48:20
**differences (1)**
46:10
**different (21)**
11:12,16,18;13:2;
14:22;16:1;17:19,24;
18:10;21:25;26:22;
29:16;31:2;42:15;51:1;
54:9;56:22;74:21;
78:25;91:2;93:22
**differently (1)**
56:25
**diligently (1)**
97:2
**dilute (1)**
15:5
**direct (2)**
21:19;38:19
**directed (1)**
22:16
**directly (4)**
21:6;22:14;39:2;
41:21
**director (1)**
92:17
**directors (1)**
62:16
**directors' (1)**
84:8
**disadvantage (4)**
24:18,20,22;30:6
**disagree (3)**
15:18;61:8;66:11
**disagreed (1)**
62:1
**disagreeing (1)**
56:15
**disagreement (2)**
5:1;80:5
**disaster (1)**
13:13
**disclosing (1)**
81:3
**disclosure (2)**
53:16,19
**discover (1)**
26:14

**discoverer (1)**
26:7
**discovery (34)**
3:6,21;5:16;9:20,20;
13:18;14:19;19:16,25;
20:13;23:10;24:12,16;
25:25;26:5,25;28:2,24;
29:1,4,19;35:3,11;
37:10;40:23,25;41:17;
45:4;49:3;50:16;62:9;
78:15;94:7,21
**discuss (2)**
46:9;61:17
**discussed (5)**
47:9,9;62:25;91:17;
92:16
**discussing (2)**
12:14;96:19
**discussion (7)**
38:20;61:6;62:1;
67:19;83:21,24;90:7
**discussions (1)**
68:10
**dispute (7)**
3:6;45:4;47:19;
49:25;59:4;60:17;87:5
**disputed (1)**
94:22
**disputes (4)**
5:16;20:14;47:11;
94:21
**disputing (1)**
61:22
**distinguished (1)**
73:13
**distraction (1)**
81:14
**district (2)**
23:15;74:8;80:17
**divide (1)**
84:18
**dividend (4)**
48:17;50:15,23;
92:19
**dividends (19)**
6:6;48:21;49:12,14,
15;56:3,6,20,20;57:4;
60:23;61:5;62:24;
84:14;88:14;89:25;
90:11;91:25;92:18
**document (3)**
16:17;34:5;69:4
**documents (23)**
13:10;14:1;17:13;
18:12;21:6;32:15,16;
33:4,13;45:23;56:19;
59:6,17;66:6;72:6,23;
81:15;83:2,6;85:1;
87:6,18;89:2
**dollar (4)**
11:6,21;19:6;39:6
**dollar- (1)**
11:8

**dollars (7)**
6:24;13:23;39:4;
40:18;52:2,12,14
**done (12)**
10:18;18:20;36:19,
20;41:10;43:7;74:15;
86:2;93:14;96:1,5,8
**doomsday (1)**
34:1
**door (3)**
21:15,17;26:12
**doubt (1)**
28:18
**down (21)**
4:16;5:2;11:23;12:7,
13;21:18;27:4;30:1;
34:7;38:24;41:9;47:11;
53:15,20;54:9;56:8;
59:9;84:11,13,17;
87:23
**draft (1)**
59:17
**drafted (2)**
59:22;93:6
**drafting (1)**
60:4
**dragged (1)**
50:13
**drawing (1)**
32:9
**dry (1)**
85:11
**dump (1)**
94:4
**duplicating (2)**
19:14;35:7
**duplication (1)**
19:20
**during (6)**
5:4;40:13;49:20;
54:21;69:3;72:17
**duty (2)**
11:2;60:9

## E

**earlier (3)**
64:7;93:10,25
**early (1)**
54:21
**easier (2)**
78:17,21
**easy (1)**
94:21
**educated (1)**
74:17
**effect (2)**
26:14;42:17
**efficient (2)**
64:10;80:20
**efficiently (1)**
96:16
**effort (1)**

19:20
**efforts (1)**
58:19
**either (6)**
15:2,20;23:25;24:13;
30:19;39:19
**electrical (1)**
7:2
**electronically (1)**
64:2
**elements (1)**
58:12
**eliminate (2)**
16:5,6
**else (10)**
18:9,24;19:9;26:9;
37:3;50:22;67:19;76:4;
79:3;97:12
**elsewhere (1)**
52:19
**emergency (1)**
29:8
**employee (1)**
14:5
**employment (1)**
19:19
**encompassing (1)**
25:1
**encourage (1)**
46:12
**end (12)**
14:25;45:11;57:14;
59:23;78:4,6,6;79:15;
80:1,22;81:1;96:10
**endeavor (1)**
93:10
**energy (1)**
49:24
**engaged (1)**
81:19
**enhance (1)**
71:14
**enough (4)**
61:10;76:22;89:13;
93:11
**entails (1)**
45:16
**entitled (8)**
29:1;36:3;37:4,5;
72:21;73:21;85:18;
94:24
**entity (1)**
28:15
**equips (1)**
40:25
**essentially (2)**
9:16;21:7
**establishable (1)**
29:18
**established (2)**
19:6;29:19
**estate (6)**
6:24;7:14,23;9:13;

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 103
of 114

39:3;40:15
**estimate (2)**
6:22;37:11
**estimation (9)**
23:25;24:14;27:2,25;
28:21,22;29:4;35:2;
75:12
**et (4)**
60:16,16;70:6;83:6
**evaluate (5)**
11:10;15:8;17:2;
40:22;88:11
**evaluated (3)**
6:20;40:12;77:4
**evaluating (1)**
47:1
**evaluation (1)**
69:14
**even (9)**
7:6;11:7;13:23;
16:21;20:24;30:15;
65:14;68:11;88:12
**event (5)**
12:22;17:17;46:19;
88:23,24
**events (1)**
89:4
**everybody (6)**
23:23;28:17;29:2;
82:9;85:5;97:12
**everyone (4)**
18:24;19:9;49:6;
97:21
**evidence (2)**
29:15,16
**ex (1)**
45:1
**exact (1)**
42:8
**exactly (7)**
27:15;29:17;34:4;
61:20;67:11;78:16;
85:3
**exam (2)**
4:18;80:4
**examination (4)**
5:11;70:14;80:9,10
**example (12)**
22:25;25:13;26:10;
29:24;51:23,24;55:13,
13;66:6;74:16;86:3;
88:15
**examples (3)**
90:3;91:21,23
**exams (1)**
44:25
**except (3)**
57:6;60:4;72:15
**exchange (2)**
41:24;70:25
**exchanged (1)**
93:4
**exchanging (1)**

63:4
**Excuse (1)**
59:14
**executive (1)**
51:7
**executives (1)**
90:1
**Exhibit (2)**
4:22;48:9
**exist (2)**
35:23;37:6
**existed (1)**
54:13
**existence (1)**
88:16
**exists (5)**
15:13;35:22;39:13;
65:14,23
**expect (1)**
97:21
**expected (1)**
30:14
**expedition (1)**
77:7
**expeditiously (1)**
53:13
**expert (3)**
30:2;67:6;79:19
**expertise (1)**
79:23
**experts (1)**
76:12
**explain (7)**
6:17;8:9;10:7,11;
40:4;72:2;87:8
**explained (2)**
8:24;62:4
**explaining (1)**
8:13
**explanation (1)**
83:3
**exposure (2)**
13:1;18:20
**expression (1)**
80:25
**extensively (1)**
85:24
**extent (5)**
8:12;70:15;72:11;
75:5;80:15
**extra (2)**
51:2;57:12
**extremely (1)**
92:12
**eyes (1)**
93:23

**F**

**FA (1)**
39:7
**facilitate (1)**
71:15

**fact (6)**
29:24,24,24,25;
35:23;47:3
**facts (4)**
12:25;25:20;28:4;
29:17
**factual (1)**
32:8
**failed (5)**
7:2,2;8:21;14:3;
17:14
**failing (1)**
53:23
**failure (2)**
11:4;14:5
**fair (1)**
33:10
**fall (1)**
14:5
**fallen (2)**
97:5,7
**falling (1)**
17:20
**falsified (2)**
74:4;80:13
**falsifying (1)**
78:1
**familiar (2)**
47:18;74:23
**far (1)**
36:5
**FAs (8)**
16:8,19;18:4;30:22;
38:24;41:9;53:20;58:5
**fault (2)**
30:3,3
**faulty (1)**
23:1
**Federal (5)**
24:15;25:9,24;51:18;
83:1
**feels (1)**
64:21
**fees (1)**
53:8
**fell (1)**
21:23
**fend (1)**
79:4
**few (2)**
14:11;29:8
**fifteen (1)**
23:18
**fifth (1)**
20:25
**fight (1)**
78:20
**fighting (1)**
77:20
**figure (1)**
16:4
**figuring (1)**
28:13

**file (9)**
11:19;25:17;32:11;
34:6;35:18;36:4;37:2;
40:14;58:20
**filed (8)**
3:22;11:8;49:22;
58:25;68:18;79:6;
85:21,21
**files (1)**
38:1
**filter (1)**
81:4
**finally (1)**
57:9
**financial (2)**
66:11,13
**financing (2)**
68:14;77:6
**find (7)**
12:1;15:23;37:3,4;
76:9,13;92:12
**finding (1)**
34:8
**findings (4)**
32:18;43:3;45:20,24
**fine (13)**
11:4,7,9,10;13:1;
14:25;44:3,22;45:10;
46:7;77:1;89:11;95:8
**fined (1)**
11:5
**fines (2)**
13:14;19:12
**finish (2)**
27:20;50:20
**fire (39)**
5:18;6:21;7:5,21;
8:21,21;9:19;11:11;
12:2;17:16,25;18:5,25;
19:4,7;21:18;23:1;
27:3;29:7,25,25;34:7;
35:20;36:19;37:12,18;
39:3;42:7;43:5;49:18;
51:18;52:8;58:8;67:9;
80:15;83:1,10;85:7;
88:24
**fires (8)**
17:18,20;30:18;
45:23;85:13,19;89:10,
14
**firm (2)**
44:7,13
**first (31)**
3:11,21;4:14,16;
6:19;8:24;10:20;11:13;
14:15;15:12;20:20,24;
21:20;23:7;27:14;29:6;
30:12;32:9;40:23;43:6,
12;49:13;50:2;54:11;
56:21;57:7,15;72:4;
73:15;76:10;82:23
**fishbowl (2)**
54:25;83:12

**fishing (1)**
77:7
**five (5)**
23:11,18;43:15;
59:19;97:6
**fixed (1)**
86:20
**flames (2)**
26:11;34:7
**flipped (1)**
83:22
**flow (1)**
41:10
**focus (3)**
31:25;76:18;82:3
**focused (8)**
31:11;32:19;41:11;
50:11;82:1,9,9,10
**focuses (1)**
8:20
**focusing (1)**
17:18;52:3;81:25;
87:5;88:13
**folder (3)**
33:13;35:18;65:22
**follow (2)**
11:4;21:13
**following (1)**
84:18
**force (1)**
58:7
**form (5)**
24:3;26:6;94:2;95:1,
2
**formal (3)**
63:25;72:23,25
**former (1)**
61:4
**forth (1)**
44:15
**forty-year-old (1)**
86:11
**forum (2)**
24:8;26:8
**forward (16)**
29:19;42:2;59:24;
62:10;71:19,24;74:16,
25;76:20;77:3,4,13;
81:9;85:1;89:10,10
**found (1)**
22:7
**four (8)**
4:7;10:19;18:9;
32:10;57:15;84:15;
90:10;91:15
**fourteen- (1)**
17:15
**fourth (2)**
18:22,23
**frame (1)**
88:12
**FRANCISCO (1)**
3:1

Min-U-Script®

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 104
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) estimate - FRANCISCO

**frankly (1)**
  68:11
**Friday (1)**
  93:9;25;94:2;95:4
**frittered (1)**
  40:19
**front (2)**
  31:10;32:2
**FTI (2)**
  30:23;95:23
**full (1)**
  28:17
**function (1)**
  75:7
**fundamental (1)**
  74:13
**funds (1)**
  58:8
**future (15)**
  28:15;29:18;35:23,
  25;40:20;71:15,15;
  72:13,15,16,20;74:11;
  75:3;84:19;86:18

## G

**gauge (1)**
  16:12
**gave (2)**
  61:3;91:22
**Geisha (1)**
  52:12
**general (1)**
  42:16
**generally (2)**
  5:24;45:23
**gentlemen (2)**
  38:13;72:5
**gets (3)**
  31:1;34:1;85:11
**gist (1)**
  62:15
**given (3)**
  22:13;31:12;54:14
**gives (1)**
  42:2
**giving (2)**
  18:10;20:23
**goes (2)**
  9:15;22:14
**Good (9)**
  3:17,18;20:19;39:5;
  48:7;59:25;61:10;62:7;
  93:11
**gorilla (1)**
  14:20
**Gotshal (2)**
  3:16;68:7
**govern (2)**
  25:10;93:18
**governance (2)**
  51:16;82:24
**governed (1)**

**frankly (1)**
  44:11
**governor's (3)**
  58:7;67:2;68:11
**grant (1)**
  44:25
**granting (1)**
  43:22
**great (1)**
  45:19
**grid (1)**
  72:24
**grounded (2)**
  62:5,6
**growth (1)**
  74:19
**guess (9)**
  5:25;15:20;20:5;
  29:6,11;65:20;75:5;
  77:14,24
**guidelines (1)**
  27:11
**guy (2)**
  21:20;33:15
**guys (2)**
  41:11;90:21

## H

**half (1)**
  52:2
**hand (4)**
  44:12,16,18;66:7
**handled (1)**
  44:21
**handling (1)**
  94:21
**happen (7)**
  16:24;24:17;27:6;
  34:1,12;85:10,15
**happened (14)**
  19:5;39:10;54:19;
  61:20;72:19;75:2;
  85:16,20,20;87:8;88:3;
  90:2,15,16
**happening (2)**
  15:7;77:3
**happens (2)**
  88:24,24
**hardening (1)**
  18:3
**hardware (7)**
  5:23;7:1;13:21;
  17:14,22,24;18:3
**harm (2)**
  34:8;76:8
**hear (9)**
  4:13;21:22;43:12;
  51:11;52:17,19,19;
  53:11;95:15
**heard (5)**
  51:22;55:14;80:12,
  25;84:1
**hearing (22)**

**frankly (1)**
  14:2,10;18:1;23:25;
  24:14;28:21,22;29:8;
  30:13;35:1,2;52:5;
  55:16;66:24;69:3,11;
  70:17;74:17;77:1;
  84:19;94:15;95:3
**hearings (2)**
  49:8,9
**help (3)**
  58:9;76:2;87:7
**helper (1)**
  36:6
**helpers (1)**
  36:6
**helpful (1)**
  48:8
**Henry (2)**
  72:14;73:12
**heres (1)**
  36:6
**here's (9)**
  13:7;27:5;29:6;
  35:21;56:18;58:2;
  59:19;91:23,23
**Hey (1)**
  38:13
**high (1)**
  14:4
**himself (2)**
  46:2;71:9
**hired (4)**
  21:20;22:2;26:10;
  29:24
**historical (1)**
  84:24
**Historically (1)**
  13:9
**history (3)**
  22:5;23;78:1;80:14
**hit (2)**
  14:5;60:14
**hold (2)**
  14:9;59:4
**honest (2)**
  74:3;78:2
**Honor (100)**
  3:11,15,18;4:12,21;
  6:11,25;7:25;8:9;9:9;11;
  15:18;17:19;19:10;
  20:8,19;21:8;23:21;
  24:7;25:4;26:24;27:2,
  14,25;30:9;31:7,24;
  32:25;34:10;36:7;
  38:17;41:6,7;42:2,5,6,
  11,24;43:8;45:15;
  46:14;47:8,16;48:6;
  50:1;53:10;54:1,22;
  55:9;58:3;59:2,6;60:5,
  10,13,17,22;61:12,14,
  19;62:4,19;63:22;
  64:22;65:15;68:18;
  69:12;70:8,9,13,18;
  71:16;72:22;73:3;

**frankly (1)**
  74:12;75:11,24;76:17;
  78:6,24;80:22;81:8;
  82:5,15;83:14;87:1;
  88:8;89:21;91:1,8;
  92:2;93:7,11,17;94:11,
  15;95:8,10;96:23;
  97:19;98:2
**hook (1)**
  14:6
**hooks (1)**
  86:11
**hope (1)**
  66:4
**hopefully (2)**
  47:11;79:6
**horizontal (1)**
  74:18
**hotly (1)**
  96:15
**hours (1)**
  72:18
**house (3)**
  21:18;26:12;30:1
**huge (3)**
  35:16,16;91:5
**huh (1)**
  46:21
**hundred (1)**
  43:18
**Huntley- (1)**
  90:21
**hypothetical (2)**
  12:21;35:17

## I

**idea (2)**
  25:7;77:21
**ideas (1)**
  73:20
**identified (11)**
  4:17;12:21;23:2;
  51:15,20;62:19,22,23,
  24;90:9,10
**identify (12)**
  9:1,9,14,22;10:17,
  20;11:3;12:15;16:16;
  17:15;37:17;72:19
**identifying (1)**
  40:10
**ignoring (1)**
  80:14
**illustration (1)**
  51:24
**imagine (1)**
  91:4
**imperil (1)**
  17:17
**implement (2)**
  58:18;71:19
**important (14)**
  4:6;16:3;18:3;19:8;
  21:8;31:24;58:18,24;

**frankly (1)**
  74:9,12;85:17,25;88:9;
  94:10
**impose (2)**
  77:8,11
**imposing (1)**
  74:4
**impression (1)**
  35:22
**impressions (1)**
  35:19
**improved (1)**
  75:4
**inappropriate (1)**
  26:3
**inclined (4)**
  76:6,7;80:19;86:5
**including (1)**
  46:10
**increase (3)**
  18:19;58:10,13
**increasing (1)**
  15:23
**incredible (1)**
  76:13
**indeed (1)**
  47:3
**indemnification (1)**
  22:7
**indemnify (1)**
  7:4
**indemnifying (1)**
  22:11
**indemnities (1)**
  9:23
**indemnity (8)**
  7:3,20;9:12;21:10;
  22:10;26:21;39:2;
  41:20
**indicate (1)**
  13:10
**individual (1)**
  39:20
**inevitably (1)**
  34:12
**inform (1)**
  72:13
**informal (3)**
  4:1;45:7;94:7
**information (39)**
  6:1,9;15:8,9;20:13,
  23;23:21;25:8;27:8;
  28:16;30:17;34:21,22;
  41:25;42:14;43:5,6;
  45:8;50:23;54:15;
  57:18,23;59:15;61:18;
  63:4;64:1,9,13,15;
  70:25;71:2;78:18;80:1,
  18,19,21,23;84:20;
  92:19
**informed (1)**
  49:8
**injury (1)**
  21:23

Case: 19-30088   Doc# 1964   Filed: 05/09/19   Entered: 05/09/19 16:44:36   Page 105
of 114

**innocent (1)**
28:11
**inquiries (1)**
16:1
**inquiry (6)**
14:16,21;15:24;23:4;
41:24;53:8
**insider (7)**
6:5;51:20;52:13;
54:5;56:4,6;57:5;
84:14;90:11
**insiders (1)**
90:1
**insist (1)**
92:22
**insolvent (2)**
48:22;52:25
**inspection (2)**
18:16;33:6
**inspections (4)**
18:16;36:16,18,19
**inspector (1)**
14:4;87:10
**inspectors (3)**
8:2,25;9:8
**instance (1)**
43:7
**insurance (16)**
5:17;6:23;7:15;8:16;
9:4,12,23;10:4,4,14;
21:2;23:2;26:13;29:24;
31:13;33:3
**insured (1)**
9:5
**intend (1)**
47:4
**intention (1)**
47:1
**intercept (1)**
29:12
**intercepted (1)**
45:3
**interest (3)**
27:23;74:7;82:11
**interested (3)**
36:14,15;76:18
**interesting (1)**
56:18
**interfere (1)**
14:9
**interject (1)**
68:1
**internally (1)**
62:25
**interrupt (2)**
8:4;71:23
**interviewed (1)**
35:20
**intimated (1)**
74:3
**into (8)**
5:18;7:14;9:13;75:1;
83:21;84:6,18;94:21

**inures (1)**
41:20
**investigate (5)**
19:2;30:18;31:20;
41:20;81:18
**investigated (1)**
19:8
**investigating (4)**
18:24;19:9;31:3;
83:5
**investigation (12)**
30:19;47:4;53:25;
54:2;57:4;64:24;70:6;
72:9,10,18;83:3,24
**investigations (3)**
61:25;64:14;83:9
**investigator (1)**
26:19
**investigators (5)**
55:22;72:11;73:8;
86:14,17
**invitation (2)**
27:5;71:7
**involved (1)**
17:24
**involvement (1)**
29:7
**involves (2)**
52:2;90:15
**involving (3)**
51:17;82:25;90:14
**issue (20)**
19:19;20:10;26:24;
28:3;42:15,15;47:20;
49:1;56:9,19,21;59:9;
60:11;64:18;65:6;69:1;
79:11;84:11;88:2;
92:24
**issued (1)**
14:2
**issues (24)**
5:6,6,13;6:2;19:24;
21:7;22:17;28:3;35:4;
42:8;44:7;48:15,16;
53:20;58:10,16;60:4,
12,13;64:7;70:10,14,
19;87:15
**issuing (1)**
69:12
**item (2)**
51:20;59:2
**items (4)**
48:4,9;58:6;64:20

**J**

**jerk (1)**
50:12
**job (1)**
88:9
**Joe (17)**
26:10,10,11,13,18,
19;28:11;29:24;30:2,2;

33:15,15;34:6;35:20;
37:20;38:1,2
**Joe's (1)**
38:2
**Judge (15)**
48:17;49:8,11;66:24;
67:14;68:21;69:10;
74:2,3,7,9;76:25,25;
77:1;82:9
**judging (1)**
72:14
**judgment (1)**
96:11
**Julian (267)**
3:9;4:21,24;5:2,13,
15;6:2,5,11,13,15;7:8,
11,13,17,19;8:6,9,11,
16,20;9:25;10:6,10,13,
16,23;11:1,14,17,23;
12:1,9,12,20;13:4,7,9,
13,16,19;14:12,13,18,
23;15:1,6,12,17;16:2,6,
8,11,16,21;17:4,9,11,
13,22;18:8,12,15,21,
23;19:17;20:21;21:8;
22:10,13,24;23:3;
26:15;27:6;28:5,14;
29:22;31:4;32:25;
33:10,11,14,16,21,24;
36:7,14;37:8,9,14,16,
21,24;38:4,7,11,18,19,
24;39:9,15,18,22,24;
40:1,3,5,7,10,18,22;
41:3,5,9,15,18;42:2,12;
46:1,6,24;47:9,16;48:2,
6,9,11,23;49:1,5,18;
50:4,6,8,9,10,24;51:2,
5,8,10,15;52:1,6,11,17,
21,23;53:4,10;54:1,7,
17,22,24;55:4,8,11,19;
56:1,1,11,13,22,25;
57:3,11,16,22,25;58:2,
5,23;59:2,5,8,16;60:2,
5,9,22,25;61:2,10,13,
16,23;62:20;63:6,25;
64:6,20;65:17,21;
66:20;67:23;68:5,8;
72:2,4;73:2,5,8,9,15,
24;74:1;75:1,9,11,16,
19,23;76:1,10,21;
78:11;82:13,15,18,20,
23;83:18,23;84:3,5,13,
25;85:6,9,12,19;86:3,6,
8,10,14,24;87:1,4,6,16,
21,23,25;88:5,8,17,19;
89:6,8,11,15,21;90:2,5,
7,24;91:20;92:3,15,22;
93:8;94:5;95:1,5,6
**Julian's (1)**
4:17;43:23
**July (1)**
85:11
**jumping (1)**

89:24
**June (1)**
85:10
**justification (1)**
79:21

**K**

**Karotkin (76)**
38:14,17;46:18,19,
22,24;67:22,24;68:1,3,
7,7,21,24;69:4,6,8,14,
16,22,24,25;70:3,8,22,
24;71:2,5,8,11,13,16,
18;76:9,15,17;77:23;
78:4,6,9,11,15,19,21,
24;79:1,5,7,10,12,15,
18,21;80:3,5,7,9,12,21;
81:8,11,14,23,25;
84:19;90:19;95:9,10,
15,19,21,23;96:3,5,7,
17
**keep (6)**
25:23;42:9;49:24;
86:22;87:3;92:19
**key (3)**
22:12;48:16;87:2
**Kim (2)**
95:11;97:1
**kind (5)**
20:12;26:15;34:24;
55:16;57:14
**knew (6)**
13:10,20;17:15;
65:21;85:13;86:14
**knowledge (4)**
23:19;80:24,25;81:1
**known (1)**
49:12
**knows (5)**
23:23;65:18;68:17;
76:20;90:24

**L**

**label (1)**
12:11
**labor-intense (1)**
91:6
**large (4)**
6:24;7:23;13:22;
20:21
**largely (1)**
17:20
**laser (3)**
22:16;24:25;25:3
**laser-focused (1)**
67:10
**last (8)**
9:14;49:20;57:10;
59:2;72:18,18;77:1;
95:13
**later (4)**

28:6,8;30:5;97:23
**latest (1)**
67:3
**law (9)**
7:7,15;23:8;24:11;
44:13;62:5,6,12;91:9
**lawsuit (4)**
33:17;37:10,11,16
**lawsuits (2)**
9:19;21:12
**lawyers (6)**
25:15;72:8;73:19;
76:10,11;93:14
**lead (1)**
48:2
**leads (2)**
39:2;93:2
**learn (1)**
15:22
**least (4)**
9:14;41:24;42:3;
72:24
**leaving (1)**
3:7
**LEBLANC (4)**
63:17,21,21,24
**legislative (1)**
68:10
**legislature (2)**
16:12;50:21
**legitimate (4)**
53:5;81:15,16;82:10
**less (1)**
17:1
**letter (16)**
4:1,2,4,17,22;20:17,
18;23:11;42:6;45:13;
48:7;50:2;51:16;62:4;
82:16;94:7
**letters (2)**
47:20,20
**letting (1)**
34:9
**level (2)**
23:12;67:9
**liabilities (5)**
12:14;17:7;19:4;
23:24;38:25
**liability (24)**
11:22;12:3,3,16;14:20;
15:3,4;16:5,18;21:7,
10;22:14,14,16;25:6;
27:3;28:3;31:9,12;
41:12;42:15;44:21;
45:23;70:10,16
**liable (6)**
6:21;21:12,12;22:8;
26:18,19
**light (1)**
52:18
**likely (4)**
13:22;28:2;30:7;
67:20

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 106
of 114

**limited (4)**
6:16;31:24;42:18;
43:2
**Lincoln (3)**
30:25,25;31:1
**line (6)**
14:3,4;27:20;29:8;
32:9;44:12
**lines (1)**
74:19
**list (3)**
17:6;27:16;54:11
**listen (2)**
35:12;46:9
**listening (1)**
58:4
**litigate (1)**
73:2
**litigated (1)**
22:15
**litigation (12)**
42:8;43:5;55:20;
59:6;64:11;72:8;73:2;
75:20,23;88:1,16,23
**litigations (1)**
22:5
**little (10)**
10:11;12:7,19;40:8;
51:6;65:21;75:22;76:9;
94:10;95:14
**live (3)**
21:15,17;95:4
**lived (1)**
26:12
**living (1)**
10:7
**loaded (1)**
20:11
**long (4)**
44:10,25;73:19;95:9
**longer (1)**
46:5
**long-time (1)**
23:8
**look (33)**
7:22,24;10:19;17:13;
18:4;21:22;24:14;
26:16;28:20,22;29:6;
30:16;31:8;32:7;34:5;
43:6;53:4,25;59:3;
64:12;66:23;70:5;
71:24;73:16;80:19,21;
82:6;85:13;88:11,25;
89:21;90:16;91:3
**looked (4)**
7:4;35:20;70:1;92:9
**looking (24)**
5:15;6:2,17;8:4,22;
9:7;19:11;33:1;39:12;
42:9;49:5,9;51:3;
53:19,22;66:20;70:3;
72:12;83:11;88:21;
90:8,10,13;95:7

**looks (3)**
32:7,17;33:7
**lose (1)**
29:16
**losing (1)**
62:15
**losses (1)**
22:11
**lost (1)**
26:12
**lot (3)**
65:5;76:20;96:13
**loud (2)**
40:9,9
**low (1)**
40:9

**M**

**mad (1)**
94:22
**main (2)**
46:19;73:15
**maintenance (3)**
5:21;8:2;9:9
**major (1)**
80:15
**makes (1)**
60:24
**making (8)**
15:21;28:5;30:6;
31:23;35:13;49:3;
52:18;68:14
**management (24)**
4:7;5:6;48:15;49:5,
7;50:25;51:16,19;
53:22,25;75:3,4,7,13;
76:1;78:8;81:19;82:24,
25;83:3,4,4;87:11;
90:16
**Manges (1)**
68:8
**many (6)**
77:10,10,10;81:12,
12;89:24
**March (4)**
50:1;59:8,10,12
**mark (2)**
16:25;17:7
**market (2)**
58:12,13
**mass (1)**
75:16
**Matter (15)**
3:4;5:7,9,11;11:6;
22:16;24:15;37:25;
47:23;48:2;50:17;
55:24;77:17,24,25
**matters (5)**
51:17;73:13;92:11,
16;94:3
**MAY (38)**
3:1;6:21;8:9;9:2,4;

11:8,20;12:22;13:23,
24;16:13;24:2,7;28:23,
23;33:8;34:20,20;
37:24;38:1,2;39:24;
40:1,3;45:17;46:8;
50:1;55:3;64:6,8;
69:16,25;70:17,17;
72:2;80:11;92:5;96:5
**maybe (10)**
12:23,23;13:5;24:2;
26:19,19;47:19,20;
52:19;78:7
**mean (68)**
4:16,23;5:10,13;
6:14;10:9;11:13;12:5;
14:9;15:2;16:7;18:17;
19:20;20:1;21:22;
22:18;24:6;25:11,18;
27:15;29:16;31:1;32:6,
8;33:3,7,12;34:4;
35:12;38:11;39:25;
40:21;42:20,21;46:8;
48:20;50:20;51:3;53:1;
54:7,20;55:3,6,14,16;
56:17;64:12;65:1;66:5;
67:14;75:15;76:4;
77:19;78:10;79:9;81:2,
6;84:10,25;85:1,2,2;
87:13;88:15,15,18;
93:17;94:13
**means (10)**
10:22;21:11,11;
22:19;29:13;30:23;
35:25;64:10,25;65:8
**measure (1)**
77:22
**mechanism (2)**
27:21;28:21
**meet (8)**
61:1,14,16;62:20;
91:18,22;92:4,20
**meeting (8)**
6:19;16:9;40:12;
46:25;52:17;54:12,19;
58:5
**meetings (5)**
48:13;49:9;54:13;
55:15;90:17
**members (1)**
54:13
**memos (1)**
38:11
**mentioned (3)**
76:2;88:19;90:14
**merely (1)**
72:16
**met (1)**
52:13
**metaphor (1)**
25:5
**metrics (1)**
76:23
**mic (2)**

66:22;75:18
**microphone (3)**
40:8;75:21,22
**midafternoon (1)**
97:10
**mid-May (1)**
85:7
**might (17)**
5:18;7:20;11:21;
12:9;26:15;29:12,13,
13;34:5;35:24,24;37:3,
3,19;38:3;49:12;53:5
**Milbank (1)**
63:21
**miles (2)**
18:2,2
**million (6)**
6:23;11:20;52:2,12,
14,14
**mind (3)**
28:14;34:5;42:10
**mindful (1)**
97:16
**minimal (1)**
20:12
**minimum (1)**
17:16
**minute (3)**
9:24;21:17;44:23
**minutes (23)**
5:3,5,8;48:12,12;
49:20,23,23;52:23;
54:1;55:11;56:23;
57:12;60:16;79:8;
83:18,24;88:14;89:20,
22;91:4;92:5;97:6
**miscommunication (1)**
90:8
**mishearing (1)**
90:9
**missing (4)**
30:1;35:16;59:14;
60:3
**mission (1)**
15:10
**mitigate (1)**
71:19
**mitigation (11)**
67:10;68:18;69:9,19;
71:20;73:13;76:12,22;
77:2;82:8;84:4
**moment (3)**
28:9;38:2;39:16
**Monday (2)**
59:13,22
**money (5)**
7:20;37:18;40:11;
41:19;53:2
**month (4)**
11:8;34:19;50:19,19
**months (3)**
50:6;53:13,14
**more (21)**

4:10;8:22;10:11;
15:23;18:6;25:11;45:7;
59:3;60:6,6;61:11;
67:10;74:23;76:20;
77:12;79:3,23;80:20;
84:21;86:9;94:10
**morning (3)**
3:17,18;96:2
**most (5)**
30:7;44:16;58:23;
64:10;85:17
**motion (9)**
40:14,22;49:19,22;
50:9,12,17;79:4;92:10
**motions (1)**
83:6
**motion's (1)**
96:13
**mouth (2)**
42:22;80:13
**move (6)**
20:3;43:25;47:13;
53:13;75:22;77:13;
78:12;81:9
**moving (3)**
76:20;77:3,4
**much (10)**
11:12,18;12:19;13:2;
35:13;45:7;77:15;79:3;
85:24;98:1
**must (3)**
43:12;53:12;96:22

**N**

**name (4)**
3:13;9:4,22;51:21
**namely (1)**
30:7
**names (1)**
33:15
**narrow (10)**
60:14;67:15;72:7;
80:20;84:9,11;17;86:2;
87:23;92:24
**narrowed (10)**
55:19;56:3,8,13,14,
19;57:3;60:11;84:13;
88:21
**narrowing (1)**
60:12
**narrowness (1)**
46:4
**Nasab (5)**
36:12,12,18,24;47:8
**nation (2)**
53:24;86:21
**near (2)**
14:5;74:19
**necessary (2)**
68:14;77:6
**need (26)**
4:18;7:21;9:15;11:3;

Min-U-Script®

Case: 19-30088   Doc# 1964   Filed: 05/09/19   Entered: 05/09/19 16:44:36   Page 107
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) limited - need

12:13;28:6;31:2;35:8;
39:9;41:18;46:8;51:11;
59:16;61:2;66:11;71:2,
7;82:14;84:23;86:1;
87:6,6,8,11;88:11;
89:18
**needs (1)**
47:15
**negligence (3)**
10:22,23;70:17
**negligent (3)**
28:11;31:20;70:16
**negotiate (5)**
11:23;53:16;70:18;
71:1,3
**negotiating (1)**
41:5
**negotiations (1)**
58:21
**new (1)**
58:12
**next (14)**
21:15,17;26:12;
34:19,19;50:18,19;
59:13,22;66:24;69:16;
93:8,24;95:4
**nexus (1)**
12:25
**nice (1)**
90:24
**Nine (1)**
53:14
**ninety-five (2)**
20:22;43:8
**nobody (3)**
3:6,6;35:6
**no-brainers (1)**
97:17
**nonissue (1)**
13:5
**non-privileged (1)**
57:23
**nor (1)**
81:5
**normal (1)**
5:5
**North (2)**
42:7;43:5
**Northern (1)**
85:5
**nose (1)**
60:15
**noted (1)**
69:11
**number (19)**
16:18;42:5,10,11;
54:9,11,18,19,20;55:4;
57:10,11;59:3;72:10;
88:13;91:2;93:14,23;
94:23

**O**

**objection (1)**
89:22
**obsolete (2)**
86:12,16
**obviously (7)**
45:2;55:22;64:5;
65:5;72:11;89:16;
93:18
**OCC (4)**
63:3,4,7,16
**occur (1)**
13:24
**occurred (1)**
29:7
**off (9)**
14:10;44:12,16,18;
46:15,21;48:2;79:4;
97:7
**offering (2)**
66:6,12
**offerings (1)**
66:8
**office (1)**
67:2;68:11
**officer (2)**
62:16;92:17
**officers (3)**
61:5;62:23;91:25
**officers' (1)**
84:7
**Official (2)**
63:9,22
**old (1)**
80:24
**old-fashioned (1)**
32:11
**Omid (1)**
36:12
**once (2)**
34:25;64:15
**one (45)**
4:6,6,7;7:4;8:1;11:8;
14:5;15:18;17:6,18;
18:20;19:13;20:1;
28:23,23;31:3,24;36:7,
13;42:5,10;45:1,5;
46:20,22;51:13,21;
55:6;57:10;58:10,12,
15;59:3,9;61:19,22;
62:1;65:18;66:7;77:14;
82:17;84:11;86:15;
91:3;92:8,8
**one-by-one (1)**
54:10
**one-page (1)**
47:20
**ones (6)**
4:19;42:21;90:13;
96:14;97:16,17
**one's (1)**
12:7
**only (16)**
5:25;15:18;18:2;

21:4;33:1;37:21,22;
41:11;42:21;43:15;
52:2;59:19;66:12;
71:24;90:7,13
**oOo- (1)**
3:2
**open (6)**
4:19;48:4;51:13;
56:20;64:20;92:19
**operating (1)**
72:17
**opinion (2)**
33:8;39:19
**opinions (2)**
30:4;78:25
**opposed (1)**
42:14
**order (39)**
3:3;9:9,14;17:16;
18:7;27:3,19;39:5;
47:6,14;48:24;49:8;
53:14;59:10,15,16,17,
22;60:4,18;62:9;74:3;
93:3,4,6,18;94:3,4,6,7,
8,10,15;95:2,2,3,7;
96:19;97:22
**order's (1)**
60:5
**ordinary (1)**
82:24
**original (1)**
92:9
**others (3)**
51:12;84:20;95:12
**other's (1)**
73:8
**ought (3)**
82:11;86:15;89:1
**ourselves (1)**
63:17
**out (24)**
11:11;12:1,3,6;
14:20;16:4;19:22;
28:13;30:14;41:11;
45:1;46:10;53:17;
61:19;66:12;68:15;
77:5,6;81:4;82:6,7;
93:23,24;94:23
**outside (3)**
30:20;44:2;55:21
**over (4)**
23:7;33:2;49:20;
95:22
**overlapping (1)**
19:14
**overlooked (1)**
69:25
**oversight (1)**
5:6
**oversimplified (1)**
29:23
**owe (1)**
37:18

**own (3)**
39:20;92:9;96:11

**P**

**pace (1)**
12:19
**package (2)**
54:15;60:19
**packages (6)**
5:3;48:11;54:12;
55:12;91:4;92:6
**page (5)**
47:20;73:10;82:15,
17;97:13
**paid (2)**
49:15;53:1
**paintbrush (1)**
25:3
**papers (1)**
19:3
**paragraph (11)**
8:5;9:17;18:8;32:4,
24;43:24;56:3;82:16,
23;83:2,9
**paragraphs (2)**
6:16;82:20
**part (5)**
5:5;14:15;58:14;
74:12;87:2
**parte (1)**
45:1
**participate (1)**
49:8
**particular (11)**
10:3;20:10;29:8;
35:5;50:17,17;62:8;
65:18;91:4;92:21,21
**parties (7)**
11:19;12:13;16:11;
24:14;26:25;27:23;
28:1,22,24;47:2;53:10;
66:10
**party (8)**
5:21;7:9;38:10;
39:14;41:1;45:8;57:20;
64:1
**past (22)**
49:15,15,22;50:16;
54:14;58:17;72:12,15,
15;73:12;74:5,11,11,
15,20,24;75:2;80:14;
84:18;86:2;96:1;97:14
**patient (1)**
14:14
**Patrick (2)**
72:14;73:12
**pay (4)**
12:2;41:21;49:13;
52:13
**paying (2)**
49:12;53:7
**payment (4)**

61:4,5;89:25;92:17
**payments (9)**
48:17;52:7,9;61:4;
62:16,22,23;91:15;
92:17
**pays (1)**
28:17
**penalty (2)**
13:22;16:12
**pending (3)**
52:7;59:8,21
**people (18)**
5:21,22;8:2;9:1,8,9;
17:14;29:10;31:3;45:1;
53:17;55:22;67:7;
68:10;74:9;79:22;82:7;
96:18
**percent (5)**
14:7;20:22;43:8,15,
19
**percentage (1)**
39:6
**perfectly (1)**
77:1
**performed (1)**
32:16
**period (1)**
5:4
**permutations (1)**
97:5
**person (5)**
12:22,23;21:19,23;
28:15
**personal (2)**
21:23;38:1
**personnel (1)**
36:21
**persuaded (1)**
41:23
**PG&E (28)**
3:4;6:21,22;7:4;
9:19;11:3,5;13:9,20,
23;14:3;21:24,25;22:2,
5,7,9,11;26:13,13;30:3,
3;33:17,22;35:18;
36:14,20;37:19
**PG&E's (2)**
22:11;32:25
**ph (1)**
50:14
**phase (1)**
16:4
**phonetic (1)**
46:13
**pick (2)**
64:5;97:14
**piece (4)**
4:6,7;17:3;66:13
**pieces (2)**
4:5;32:10
**pipeline (1)**
45:5
**place (4)**

21:20;26:5;29:5;
62:2
**plaintiff (2)**
26:12,14
**plaintiff's (1)**
30:1
**plan (25)**
7:14;11:24;12:8;
28:17;40:13,13;41:5,
21;53:16,19;58:20;
67:10;68:19;69:9;70:4;
71:20;73:13;75:8;
76:22;77:2;82:7,8;
84:2,4;87:14
**plans (1)**
68:13
**plants (1)**
73:18
**pleading (1)**
14:14
**plus (2)**
11:7,9
**PM (1)**
98:4
**point (34)**
12:10,13,24;22:1;
23:17;24:1,7;27:21;
28:14,20;31:23,25;
35:9;36:14;37:8;39:15,
16;41:2;43:17;49:3,17,
18;50:20;53:9;54:14;
59:14,19;61:19;62:11;
74:24;80:1;91:18;
93:23;97:22
**points (1)**
60:15
**pole (2)**
29:11,25
**policies (6)**
5:17;6:23;8:17;9:4;
31:13;33:3
**policy (4)**
7:15;9:12,23;26:13
**political (1)**
58:6
**politicians (1)**
38:25
**portions (1)**
49:19
**position (3)**
8:9;62:5;92:6
**positions (1)**
25:21
**possession (1)**
36:23
**post-petition (1)**
73:17
**pot (7)**
12:15;15:23,25;
18:19;39:1;40:10;
41:19
**potential (2)**
70:10;80:11

**potentially (2)**
23:6;61:18
**pots (6)**
5:16,17;12:1,14;
19:12;38:25
**potted (1)**
73:18
**pound (1)**
14:20
**power (3)**
7:2;74:19;80:25
**practical (2)**
39:13;91:10
**practice (1)**
44:24
**precedent (2)**
23:13,16
**predicts (2)**
13:24;75:2
**preference (2)**
70:18,20
**preferred (1)**
52:13
**premature (1)**
27:24
**prepare (1)**
54:18
**prepared (5)**
65:10;66:17;70:6;
72:8,10
**presentation (1)**
14:15
**presented (1)**
73:14
**preserve (2)**
40:15,16
**preserving (1)**
29:15
**presumably (1)**
54:20
**presume (1)**
57:20
**pretty (4)**
61:20;74:19;84:9;
85:22
**prevent (1)**
18:5
**primary (2)**
21:9;58:12
**principal (1)**
44:13
**prior (5)**
36:19;40:13;54:20;
74:17;89:4
**privilege (5)**
79:12,13;81:4,5;91:5
**privileged (4)**
37:2;57:20;66:18;
72:12
**privileges (1)**
89:17
**probably (5)**
4:15;23:18;26:21;

88:25;97:22
**probation (1)**
66:24
**problem (12)**
12:23;13:20;16:19;
20:14;29:6;37:7;41:22;
51:12;64:21;66:1;81:2,
7
**problematic (1)**
23:6
**problems (2)**
17:22,23
**problem's (2)**
15:4;66:2
**Procedure (4)**
24:16;25:9,24;47:18
**procedures (1)**
78:13
**proceeding (15)**
24:1,13;25:17,18,19;
27:1;28:1;29:2,3;
31:25;34:22,23,24;
35:2,24
**proceedings (2)**
75:12;98:4
**process (7)**
14:22;28:8;29:14;
35:25;62:2;64:2;68:25
**produce (25)**
6:15,18;8:11,12;9:6;
22:19;25:8;27:9;34:18,
20;35:11;40:2;42:7;
45:21,22;55:1;56:5;
57:7;61:9,18;65:4;
89:2;90:18,20,22
**produced (2)**
14:1;83:13
**produces (1)**
34:17
**product (13)**
9:7,16,25;10:20;
18:16;20:7;21:5;26:14;
34:2,2;35:18;39:9;44:1
**production (1)**
42:7
**productive (1)**
77:13
**professionals (1)**
19:19
**progress (1)**
35:13
**project (1)**
91:7
**proper (1)**
53:8
**proposed (2)**
74:16;94:4
**prospective (19)**
68:12,13,16;69:1,8;
70:2,3,4;71:9,13,16,17;
76:19;81:17;82:1,1;
84:20,24,25
**protective (11)**

59:9,15,16,17,22;
60:4,5;93:3,4,6,18
**provide (7)**
38:20;43:1;44:1;
45:20;56:19;59:5;
66:18
**provided (1)**
68:21
**provision (1)**
96:20
**provisions (1)**
97:1
**public (4)**
19:1;69:4;84:22;
97:12
**publicity (1)**
96:14
**PUC (12)**
11:4,5;13:14,23;
14:24;18:24;49:8;
50:21;51:17;67:19;
74:2;80:16
**PUC's (1)**
16:21
**punish (1)**
46:11
**purpose (7)**
64:3;66:3;77:7,12;
81:6,15,16
**purposes (1)**
68:13
**pursue (6)**
9:3;11:2,20;14:16;
53:5;54:3
**pursued (1)**
7:24
**Push (1)**
40:8
**put (11)**
16:18;29:5;34:11;
39:6;42:21;61:8;66:25;
84:6;95:11,22;96:18
**putting (1)**
61:21

**Q**

**question's (1)**
49:2
**quick (1)**
20:14
**quickly (1)**
53:18
**quite (1)**
60:19
**quoting (1)**
73:11

**R**

**raise (1)**
58:11
**raised (1)**

58:6
**raising (1)**
58:13
**rather (12)**
5:6;20:5;34:25;
42:21;51:21;52:14;
75:7;79:3;86:16;89:4;
95:3;97:22
**ratification (2)**
57:13;84:8
**ratifications (1)**
57:11,12;84:8
**reach (1)**
46:12
**reached (1)**
63:24
**read (4)**
7:20,21;44:12;82:15
**reading (2)**
45:17;46:2
**reads (1)**
83:2
**ready (2)**
52:9;96:24
**really (19)**
4:21;5:2,10;32:6;
33:8;34:6;41:2;55:8;
57:14;60:17;62:13;
70:8;75:6;77:19;79:2;
82:4;88:21;91:9;93:7
**realm (1)**
58:6
**reason (20)**
5:15;11:3,14,15;
14:18;15:12,12,17,19;
17:13;18:22;34:11;
41:23;58:24;77:9,9;
81:17;90:19,22;94:12
**reasons (6)**
8:23;10:19;12:17;
18:10;20:5;82:3
**Recess (1)**
46:16
**recognized (1)**
21:9
**recollection (1)**
35:21
**recommendations (3)**
35:19;73:22;87:7
**recommended (2)**
58:7;74:11
**record (3)**
38:14,16;46:15
**recorded (1)**
35:22
**records (7)**
13:10;50:15;54:19,
25;74:4;78:1;80:13
**record's (1)**
47:4
**recover (2)**
48:21;49:16
**recoveries (1)**

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 109
of 114

14:17
**recovery (1)**
15:5
**refer (3)**
4:7;36:15;63:17
**referenced (1)**
11:7
**referring (1)**
8:10
**refers (2)**
76:25;83:9
**regard (1)**
19:10
**reinvent (1)**
4:18
**relate (3)**
45:23;82:23;89:9
**related (8)**
3:19;4:8,10;17:24;
50:12;60:16;66:6;
67:21
**relating (2)**
72:6;77:16
**relationship (2)**
63:2,3
**relationships (1)**
6:9
**relevance (4)**
77:23;82:4,5;92:22
**relevant (12)**
34:22;41:3;50:16;
54:4;58:23;69:9,17,19;
82:11;83:2,6;89:14
**rely (1)**
82:7
**remaining (1)**
46:10
**Remember (3)**
17:19;18:1;43:8
**remove (1)**
78:7
**reorganization (1)**
58:18
**reorganize (1)**
58:9
**reorganized (1)**
58:15
**repair (1)**
5:22
**repairmen (2)**
8:1;9:8
**repeat (1)**
84:23
**repeated (2)**
73:17;82:25
**rephrase (1)**
18:18
**replace (2)**
87:11,13
**replaced (2)**
74:15;86:12
**replacing (1)**
86:15

**report (20)**
14:2;55:25;57:19;
64:23;65:3,9,9,17,19,
22;66:3,15,17;69:12;
73:5;74:20;84:21;
86:10;87:9;88:2
**reported (1)**
17:25
**reports (40)**
6:5;11:5;13:20;
18:16;33:7;42:12;43:3,
7;55:20,20;56:5,11,15,
23;57:4,7;58:17;61:24;
65:25;66:7;70:6;72:8,
10,15,19,21,23,25,25;
73:2,6;74:1;79:13;
83:25;85:14,16,16;
87:7,25;89:9
**representation (1)**
84:10
**representative (1)**
6:19
**representing (1)**
19:10
**represents (1)**
18:25
**request (22)**
19:15;20:18;31:8;
32:2;43:23;44:8,17;
45:6,7,12,13,16;46:2;
49:3;54:3;57:4;59:3;
63:12,25;67:15,20;
88:20
**requester (2)**
65:11,16
**requesting (2)**
29:20;45:8
**requests (18)**
4:7,9;20:20,22;31:6;
33:21;35:14;44:17;
60:18;61:21;64:8;67:5,
17;82:16,20,23;83:16;
92:12
**requires (1)**
25:16
**resistance (1)**
84:19
**resolution (5)**
5:19;12:2,5,9;57:13
**resolve (3)**
27:3;53:18;92:23
**resolved (7)**
24:4;27:15;43:9,16,
19;53:13;89:19
**resources (1)**
64:6
**respect (24)**
20:23,24;28:2;42:3;
43:3;44:20;45:21,24;
56:5;57:6;58:6;60:15;
61:21;62:2,24;65:4;
66:8;67:13;70:10;
83:10;88:10;92:4,6;

94:15
**respectfully (1)**
74:8
**respond (3)**
20:4;9;41:16
**responding (1)**
46:2
**response (2)**
27:9;56:1
**responsibility (4)**
7:9;22:6;44:13;
80:15
**responsible (2)**
22:8,9
**restate (2)**
3:13;4:16
**restates (1)**
94:8
**restaurant (1)**
21:25
**retention (1)**
96:19
**retentions (1)**
95:23
**review (8)**
5:5;48:15;51:16;
75:2;76:1;82:24;91:5;
92:8
**reviewed (2)**
79:12,13
**reviewing (3)**
68:25;76:21;86:18
**revised (1)**
47:15
**Richard (2)**
3:15;20:8
**right (91)**
3:5,20,24;5:14;7:10;
8:5,18;10:15;11:20,25,
25;12:19,20;14:10,25;
15:5,6,17;17:10;18:14;
20:21;21:3;22:3;24:7;
27:3,22;28:4,9,12,13;
30:4,23;31:10;32:7,11,
12,23;33:5,13,14,24;
36:17;37:13,13,21;
38:23;39:8,17;43:17,
20;47:17,21;48:5;51:9,
13;52:5,10;54:11;55:8;
56:2,24;57:10,21,22;
63:11,23;64:16,22;
66:3;68:20,23;69:5,7;
71:10;75:8;78:14;
79:14;84:22;85:8;
89:12;90:6;91:19,19;
92:1,17;93:20,20,22;
95:25;96:6;97:8
**risk (10)**
9:1,8;13:20,25;14:4;
16:13,16;17:1;18:12;
71:19
**road (2)**
27:4;47:11

**role (1)**
85:23
**roomful (1)**
96:18
**round (1)**
64:11
**Rule (3)**
24:20;25:16;32:1
**Rules (3)**
24:15;25:9,24
**run (1)**
52:4

## S

**Sacramento (2)**
67:1;68:10
**safe (3)**
73:20,22;87:8
**safety (49)**
13:10;42:9;48:16;
50:24;51:1,18;54:5;
56:4,7,10,11,15;57:5,6,
8,18;58:11,14,15,18;
64:17,24;65:4,6,10,22;
66:17,25;67:3,8,13,18,
21;68:13;69:19;74:10;
80:14;83:10,17,21;
84:1,10,15,16,24;88:2,
14;90:12;92:25
**same (30)**
4:10;5:9;14:8;16:17;
18:8,9;19:12;22:23;
24:8;28:4;29:1,11;
34:21;42:8;48:1;50:16;
60:21;61:13;62:1,12;
63:9;64:9;67:4;74:7;
76:19;91:8;92:7;94:13;
97:13,15
**SAN (3)**
3:1;11:6;13:14
**satisfy (2)**
5:18;82:11
**saying (22)**
11:21;23:21,22;
25:22;30:17;31:4,7;
42:17,19,24;62:16;
63:6;65:20;66:15;68:9;
73:11;75:10,16,19;
80:24;86:22;87:3
**scenario (1)**
26:23
**scope (6)**
18:15;32:15;44:2;
45:2;47:12;64:25
**scrap (1)**
94:4
**screwed (2)**
26:11;34:6
**seated (1)**
46:17
**SEC (1)**
18:23

**second (19)**
3:25;5:15;9:4;11:3,
14,15;14:18;15:12,14,
17,24;40:11;56:3;
61:22;64:10;82:16,17;
83:2;92:8
**secondly (3)**
18:19;39:5;75:3
**seconds (3)**
44:5,8,11
**section (1)**
5:8
**seeing (1)**
78:2
**seek (1)**
78:7
**seeking (6)**
3:22;9:21,21;16:6,8;
28:16
**seem (6)**
32:8,10;35:14;54:20;
71:25;73:10
**seems (6)**
11:12;13:1;14:21;
15:25;33:6;44:14;46:4;
73:9;84:21;94:13
**senior (2)**
61:5;62:23
**sense (5)**
60:24;62:6,12;77:12,
15
**sent (2)**
4:3;14:10
**sequence (3)**
95:13;96:10;97:14
**services (2)**
18:15;32:16
**set (3)**
12:25;28:4;95:12
**sets (1)**
31:2
**settle (1)**
27:8
**settlement (2)**
52:8;70:19
**settlements (1)**
84:8
**several (1)**
8:23
**severance (3)**
52:11;61:4;62:23
**share (3)**
64:1,3;79:22
**shots (1)**
75:6
**show (7)**
8:25;9:11;13:20;
14:1,2;17:14;62:7
**showed (1)**
14:3
**shows (4)**
9:12,13,25;87:10
**sic (2)**

Min-U-Script®

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 110
of 114

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(11) recovery - sic

11:7,20
**side (8)**
  13:2;15:22;17:6;
  25:17;55:16;71:6;
  92:23;97:14
**sides (2)**
  35:13;94:24
**side's (1)**
  53:7
**sign (1)**
  47:14
**signed (1)**
  52:8
**similar (3)**
  19:24;63:4,11
**similarly (2)**
  19:1;52:15
**simple (8)**
  17:6;25:15;35:17;
  59:20;64:2;72:22;
  74:19;94:9
**simply (5)**
  19:8;56:15;57:11;
  59:16;64:1
**single (1)**
  56:9
**sit (4)**
  11:23;12:13;41:9;
  53:15
**site (1)**
  10:3
**sitting (3)**
  33:13;38:24;53:20
**situated (2)**
  19:1;52:15
**situation (1)**
  28:25
**six (5)**
  4:16,25;46:10;48:4;
  53:13
**sixth (1)**
  53:23
**sixth-largest (1)**
  86:20
**sixty (2)**
  59:18,21
**size (1)**
  45:2
**skip (1)**
  33:2
**SLACK (133)**
  3:10,15,15,17,18,21,
  25;4:3,5;20:1,4,8,8,16,
  19;21:2,4,6,14,16,21;
  22:1,4,20,22;23:5,14,
  17;24:5,7,11,19,22,25;
  25:4,6,13,22;26:2,4,17,
  23;27:9,13,17,19,23;
  28:12,19;29:21;30:9,
  12;31:4,7,11,15,17,23;
  32:3,5,12,14,19,23;
  33:5,9,25;34:10,16,20,
  25;35:7,15;36:8,10;

41:22;42:1,24;43:11,
  14,17,20;44:5,16,20;
  45:14;46:3,7,14,17;
  47:22,24;48:1;51:11;
  59:13,19,22;60:8,10,
  13;62:18,22;63:8,11;
  64:17,19,22;65:12,15;
  66:2,5,10;67:5,16;
  72:6;76:3;90:21,24;
  91:13,16,20;92:1;93:7,
  15,17,21;94:5,11,14,
  17,19;95:1,8
**Slack's (1)**
  92:14
**slow (1)**
  12:7
**so-and-so (1)**
  87:10
**solve (2)**
  20:14;66:1
**solved (1)**
  66:2
**somebody (5)**
  26:9;35:19;37:3;
  78:3;80:17
**Somebody's (2)**
  38:8;96:19
**somehow (3)**
  30:18;39:19;90:24
**someone (5)**
  10:17;53:4;64:23;
  67:1,19
**someone's (1)**
  48:23
**somewhere (4)**
  6:14;33:13;35:18;
  44:12
**soon (2)**
  11:24;12:13
**sooner (1)**
  97:22
**sorry (12)**
  24:19;28:19;38:17;
  58:1;60:10;65:15;68:3,
  5,5;83:25;89:23;95:15
**sort (5)**
  42:1;44:21;45:15;
  60:18;67:12
**sounds (4)**
  48:2;59:20,25;75:5
**source (1)**
  15:23
**speak (4)**
  3:10;29:23;46:1;
  96:25
**SPEAKER (3)**
  30:25;76:5;98:2
**speaking (1)**
  3:8
**special (7)**
  55:20;72:8;73:2;
  88:1,1,16,23
**specialist (1)**

79:24
**specific (16)**
  18:6;25:11;28:23,23;
  34:12,22,23;45:20;
  65:3;80:10;87:25;88:3;
  89:13,13;92:20;96:25
**specifically (6)**
  10:11;21:8;23:19;
  62:19;65:24;83:10
**specifics (2)**
  28:18;29:7
**speech (1)**
  90:14
**spend (1)**
  64:5
**splaining (1)**
  50:14
**spot (1)**
  21:24
**stake (2)**
  78:3;80:17
**stakeholder (2)**
  73:21;85:14
**stakeholders (2)**
  58:21;74:9
**stand (1)**
  81:18
**standard (5)**
  41:18;48:15;75:12,
  14;88:20
**standing (2)**
  40:14;96:22
**start (6)**
  6:14;9:19;12:13;
  16:4;23:6;25:19
**started (1)**
  94:20
**starting (2)**
  9:20;32:17
**state (1)**
  59:6
**stated (1)**
  14:4
**statement (3)**
  33:10;53:16,20
**statements (1)**
  66:11
**stay (1)**
  8:4
**Stephen (1)**
  68:7
**stick (7)**
  6:7;8:3;19:25;20:18;
  32:8;40:11;92:14
**sticking (2)**
  26:9;29:23
**still (13)**
  11:20;16:24;22:19;
  24:8;28:13;41:23;
  47:22;51:13;64:21;
  74:2;89:18,18;96:15
**STIP (8)**
  14:1;18:1;49:21;

55:14,15;69:3,11;
  76:24
**stood (2)**
  71:11;81:16
**stop (1)**
  9:24
**strength (1)**
  58:11
**strikes (1)**
  55:5
**strongly (1)**
  64:21
**struck (1)**
  92:11
**stuff (12)**
  14:9;19:12;20:12;
  23:3;26:15;41:13;
  54:16;57:20;63:4;
  73:12;86:16;89:19
**subject (28)**
  11:4;14:9,25;15:24;
  22:16;24:15;38:6;
  46:12;51:1;55:24,25;
  60:21,23;61:25,25;
  62:8;65:19,25;70:7,13;
  74:22;77:2,17,24,25;
  84:18;89:17;92:16
**subjects (9)**
  51:2,13,15;61:1,3,7,
  9,11,14
**submissions (1)**
  60:6
**submit (1)**
  88:8
**subparagraphs (1)**
  9:16
**subsequent (1)**
  47:18
**subset (1)**
  32:24
**substantial (1)**
  38:3
**sued (2)**
  21:24;26:13
**suffering (1)**
  53:18
**suggest (2)**
  43:6;96:9
**suggested (3)**
  45:18;64:7;72:6
**suggesting (4)**
  45:15,17;67:16;92:2
**suggestion (2)**
  42:1;92:14
**suggestions (2)**
  27:13;76:13
**suing (1)**
  37:1
**suit (2)**
  36:4;53:3
**summaries (3)**
  32:18;44:1;48:12
**summarized (1)**

4:21
**summary (2)**
  34:8;51:6
**superseded (2)**
  74:15,21
**supplemented (1)**
  83:8
**supposed (3)**
  52:20;78:22;80:9
**sure (16)**
  21:13;25:9;44:6,9;
  52:18;66:10,19;68:14;
  80:16;89:15;93:21;
  96:3,15,17;97:16,17
**surprised (2)**
  93:10;97:9
**suspect (3)**
  67:1,1;92:11
**switch (2)**
  6:8;38:5
**switched (2)**
  14:17;83:15
**Switching (1)**
  46:21
**system (2)**
  5:22;7:2

## T

**table (1)**
  3:12
**tag-teaming (1)**
  47:25
**tail (1)**
  57:14
**talk (12)**
  37:9;38:15;41:9;
  42:5;45:10,13;46:5,6;
  48:19;49:21;57:17;
  87:14
**talked (7)**
  47:12;53:11;81:20;
  89:17;93:1;94:8,23
**talking (26)**
  5:12;21:4;25:6;
  26:24;32:6,17;37:10;
  38:13,15,18,25;55:6,
  17;66:19,22;69:17,24;
  71:8;76:19;78:16;83:8,
  16,23;84:1,3;85:3
**talks (4)**
  31:8;39:11;87:16,17
**tall (2)**
  48:24;53:14
**taller (1)**
  74:22
**targeted (1)**
  80:10
**task (1)**
  58:7
**TC (1)**
  20:5
**TCC (10)**

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 111
of 114

4:5,15;25:8,19;
26:25;28:6,9,25;45:17;
83:4

**TCC's (2)**
3:22;4:12

**team (1)**
72:10

**telephone (2)**
47:19;53:12

**telling (6)**
25:23;42:19;44:24;
47:20;54:14;61:20

**tells (2)**
15:6;71:6

**temporal (1)**
89:3

**ten (1)**
23:18

**ten- (1)**
47:19

**ten-billion-dollar (1)**
73:17

**term (2)**
34:2,8

**terms (4)**
15:10;18:6;42:9;
72:7

**test (1)**
66:23

**testified (3)**
6:20;40:11;47:1

**testimony (2)**
47:3;77:18

**testing (1)**
29:10

**Thanks (1)**
64:16

**That'd (1)**
89:11

**theirs (1)**
56:14

**theory (1)**
41:1

**Therefore (8)**
19:23;22:15,18;
26:20;35:25;52:22;
53:2,2

**there've (2)**
95:17,18

**thinking (4)**
64:7;74:22;75:7;
93:22

**think's (2)**
3:11;21:8

**third (10)**
7:9;17:11,12,13;
18:20;38:10;39:14;
41:1;47:2;57:19

**third- (1)**
5:20

**third-party (20)**
3:22;6:10,21,25;9:2,
22;11:19;15:13;32:19;

33:1;18:34:3;37:17;
38:23;42:12,18;43:3;
44:2;45:21,24

**thirty (4)**
44:5,8,11;52:14

**though (1)**
16:21

**thought (9)**
15:15;36:25,25;
44:11;70:2;83:15,23;
89:23,25

**three (28)**
5:3;6:17;7:24;9:7;
31:2;34:15;38:20;
48:13;49:20;50:15;
52:1,3,6;57:7;58:7,16;
61:3;62:24;69:18;
71:21;72:13;79:7;
82:20;84:15;91:7,16,
21;92:16

**till (1)**
59:22

**times (1)**
34:15

**timing (1)**
26:24

**timing's (1)**
96:11

**today (19)**
3:5;16:3;19:15;20:2;
26:5;31:5;34:17;35:8,
22;42:3;50:4;58:19,19,
21;59:24;65:3;72:17;
83:8;85:1

**today's (2)**
87:5;94:3

**together (3)**
56:14;66:25;94:6

**told (10)**
12:7,14;29:12;50:13;
65:21;69:12;81:16;
87:10,10;93:8

**tomorrow (9)**
21:22;34:19;46:9;
50:18;95:12;96:1,10;
97:13,25

**took (2)**
50:1;90:5

**tool (1)**
24:23

**top (1)**
58:16

**topic (8)**
6:7;49:23;50:11;
55:6;62:9;65:18;91:8;
92:21

**topical (1)**
5:25

**topic-based (1)**
92:3

**topic-by-topic (1)**
92:20

**topics (15)**

4:16,25;56:21;61:16,
22,24;62:13;77:16;
83:15;89:24;91:11;
92:3,4,16,25

**topics' (1)**
91:15

**tort (9)**
3:19;18:25;19:20;
30:7,14,16,17;50:22;
75:16

**tossed (1)**
19:22

**total (1)**
15:11

**Totally (2)**
17:24;31:25

**tote (1)**
29:11

**touch (2)**
65:6;93:23

**tower (8)**
8:21;13:21;14:3,8;
23:1;26:10,11;36:16

**towers (6)**
14:4,6;36:20;86:11;
87:11,13

**traditional (1)**
41:12

**transactions (8)**
6:6;51:21;54:6;56:4,
6;57:5;84:14;90:11

**transcript (1)**
94:9

**treating (1)**
45:5

**treatment (1)**
67:4

**tree (3)**
8:1,7,25

**trees (5)**
5:22;7:1;17:20,24;
18:2

**tried (3)**
81:4;87:23;97:14

**trimmers (3)**
8:1,7,25

**tripped (1)**
21:24

**True (3)**
73:23;83:11;88:6

**trust (5)**
5:19;12:2,5,9;90:16

**trustee (1)**
78:12

**truth (1)**
25:20

**try (4)**
27:24;66:23;71:1;
93:25

**trying (28)**
8:3,4;10:12;11:10;
12:1,15;15:7;20:2,12;
22:24;25:20;33:16,17;

36:5,24;37:16,17,19;
56:17;58:9;64:5,8,9;
66:16;70:9;81:9;88:19;
97:18

**turn (3)**
8:22;39:12;96:13

**turned (1)**
94:21

**Turning (1)**
8:20

**tweaked (1)**
96:20

**twelve (1)**
19:6

**twenty (1)**
14:6

**twenty- (1)**
20:24

**twenty-four (2)**
20:24;72:18

**two (28)**
3:19;4:5,9;6:18;
7:25;12:17;13:6;14:1;
15:25;19:14;23:5;
27:13;30:9;42:11;50:6;
51:2;52:2,7;56:8;58:8;
69:18;71:21;72:4;
73:15;86:14,17;87:11;
92:25

**twofold (1)**
42:4

**two-hour (1)**
94:21

**type (10)**
9:15;10:1,6,9,21,22;
31:17;54:2;73:5;88:22

**types (9)**
6:17;8:12;31:19;
52:7,21;56:5;58:7;
86:17;90:10

**typical (3)**
53:19;54:24;86:19

**typically (2)**
57:12;88:22

## U

**UCC (8)**
28:25;63:6,7,12,13,
16,18,20

**ultimate (1)**
78:8

**Um-hum (8)**
8:19;13:12;16:10;
17:21;48:10;59:7;66:9;
86:13

**unassessed (1)**
17:3

**unbounded (3)**
60:18;62:8;91:7

**uncover (1)**
13:18

**uncovered (1)**

87:10

**under (6)**
3:25;13:18;23:10;
51:17;82:16,20

**underlying (11)**
21:7,12;22:5,15,17;
23:9,10,20,23;28:3;
30:12

**unfair (1)**
26:1

**unfortunately (1)**
28:9

**UNIDENTIFIED (3)**
30:25;76:5;98:2

**Uniform (1)**
63:20

**unique (1)**
17:23

**universe (1)**
15:11

**unknown (1)**
16:25

**unless (11)**
4:13;21:12;28:16;
40:23;41:6;47:15;
49:16;57:6;65:18;88:2;
96:1

**unnecessary (1)**
31:25

**unsecured (3)**
19:11;63:9,22

**unworkable (1)**
26:1

**up (25)**
5:7,7,13,16;19:18;
20:11;26:11,11;29:13;
34:6;36:7;38:20;39:1;
42:21;46:18;49:19;
52:4;68:10;69:2;70:17,
24;71:11;80:11;81:16,
18

**upon (1)**
41:11

**use (8)**
22:25;33:17,17;34:2;
75:12;83:5;96:11,15

**used (3)**
29:13;33:16;72:7

**useful (1)**
94:10

**using (5)**
24:18,20,22;48:7;
56:25

**usually (1)**
63:17

**utility (3)**
21:20;26:1,20

## V

**various (2)**
29:9;97:5

**vendors (1)**

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com
of 114

6:10
**verify (1)**
　63:14
**versus (1)**
　84:24
**vertical (1)**
　74:18
**viable (1)**
　39:13
**victim (1)**
　49:18
**victims (3)**
　19:1;39:20;58:8
**view (2)**
　18:25;61:12
**views (1)**
　49:12
**violation (1)**
　13:11
**visiting (1)**
　89:19
**visualize (1)**
　17:6
**voluminous (1)**
　60:19

---

**W**

---

**wait (5)**
　13:2;21:17;66:21;
　67:25;92:10
**waiting (2)**
　58:20;86:17
**wants (8)**
　5:5;20:1;23:3;31:19;
　36:2;37:5;68:2;82:4
**warned (1)**
　16:13
**Washington (1)**
　14:10
**waste (1)**
　49:24
**way (22)**
　20:2;29:20;30:23;
　32:11;39:2;42:1;48:1;
　54:4;60:9;64:9;72:14;
　77:20;78:21;87:19;
　91:1,8,9;92:7;94:20;
　96:1,21;97:15
**ways (2)**
　54:9;77:13
**way's (1)**
　54:4
**WEDNESDAY (3)**
　3:1;59:25;93:4
**week (5)**
　53:12;59:23;69:16;
　72:18;93:8
**weekly (2)**
　53:12;83:6
**weeks (5)**
　14:11;29:9;52:1,3,6
**weigh (1)**

74:10
**Weil (2)**
　3:15;68:7
**well-established (1)**
　29:17
**Wells (1)**
　47:1
**well-tested (1)**
　23:7
**what's (30)**
　16:24;18:22;21:25;
　23:3,4;24:18,20;26:21;
　28:7;29:16;30:1,5;
　33:25;34:8;41:22;49:3,
　17;63:2,5;64:21;67:2;
　74:24;77:3;81:2,6,7;
　82:11;85:2,10;89:5
**wheel (1)**
　4:18
**whereby (1)**
　7:4
**Whereupon (1)**
　98:4
**white- (1)**
　72:7
**whole (5)**
　32:21,22;64:3;80:1;
　93:19
**Who's (6)**
　3:5,8,10;26:7;28:7;
　93:16
**wider (1)**
　74:22
**wide-ranging (1)**
　54:2
**wildfire (73)**
　4:9;6:3;42:9;44:7;
　48:16,16;50:24,24;
　51:1,18,19,19;54:5,7,8;
　56:3,4,6,7,10,11,15;
　57:4,5,6,8,18;58:14,15,
　18;64:17,24;65:4,6,10,
　22;66:17,25;67:3,8,13,
　18,21;68:13,18;69:8,
　19;70:11;71:19,20;
　72:7;74:10;76:12,21;
　77:2;79:11;80:14;82:8;
　83:10,11,16,21;84:1,
　10,14,14,15,24;88:2,
　13;90:11,11;92:25
**Williams (2)**
　52:12;53:1
**willing (9)**
　42:22;43:1;45:19,20;
　57:3;61:17;65:2,3;
　71:24
**wish (1)**
　63:10
**within (1)**
　53:13
**without (4)**
　28:17;42:22;55:15;
　58:14

**wonder (1)**
　52:2
**words (20)**
　14:24;17:5;21:14;
　26:9;27:7;28:5,8;
　42:21;45:16;49:11;
　52:24;57:19;65:20;
　66:3;73:10;81:25;82:2;
　89:7,7;91:17
**work (28)**
　9:7,15,25;10:3,20;
　18:15,16;20:7;21:5;
　25:5;26:10,14;32:16;
　34:2,2;35:18;39:9;
　44:1;45:1;46:9;53:21;
　78:22;93:5;94:2,5,14,
　14,14
**worked (2)**
　5:22;7:1
**working (1)**
　97:1
**works (2)**
　41:7;91:1
**world (1)**
　84:18
**worried (4)**
　12:15;15:7;97:11,12
**worry (1)**
　11:9
**written (3)**
　31:5;38:11;94:9
**wrong (8)**
　10:17,18;23:3;25:23;
　28:7;33:24;73:16;89:5
**wrongdoing (1)**
　81:19
**wrongful (1)**
　84:7

---

**X**

---

**XYZ (4)**
　10:2,3,3;22:25

---

**Y**

---

**year (4)**
　16:22;34:19;71:21;
　86:12
**years (14)**
　5:3;48:13;49:20;
　50:16;69:18,18;71:21,
　22;72:13;79:7;80:15;
　87:11;91:7;93:1
**Yep (2)**
　40:7;60:2

---

**1**

---

**1 (5)**
　6:16;8:13,14;44:3;
　83:9
**1,400 (1)**

18:2
**1.6 (3)**
　11:4,20;13:16
**1.6-billion-dollar (3)**
　13:1;15:3;17:8
**10 (15)**
　4:8;5:2;48:9;54:20;
　55:6,8;60:15;61:1;
　62:3,3,13;82:16,21;
　83:18,22
**10K (1)**
　11:7
**10Q (3)**
　13:23;15:6;16:13
**11 (30)**
　41:13;49:14;55:18,
　19,19,20;56:5,8;57:1,
　17;61:21,21;64:22;
　68:15;70:1;75:17;77:5,
　6;82:7,8;83:5,16,21;
　84:5,6,13;88:13;89:14;
　91:8;92:7
**11:22 (1)**
　46:16
**11:42 (1)**
　46:16
**12 (19)**
　55:19,21;56:5,8;
　57:1,17;61:21,21;
　64:22;70:1,5;72:10;
　83:16,21;84:5,13;
　89:14;91:9;92:7
**12:38 (1)**
　98:4
**12th (1)**
　69:17
**13th (1)**
　69:17
**150 (1)**
　18:2
**16 (1)**
　84:7
**17 (1)**
　59:3

---

**2**

---

**2 (3)**
　11:8;13:23;16:13
**2.5 (2)**
　52:12,14
**2004 (38)**
　3:21,25;4:17;5:20;
　6:8,11;20:18;23:10;
　24:18,21,22,23;25:10,
　16,25;32:1;34:12;35:8;
　43:21,22,23;44:25;
　62:6;70:14;78:22;80:2,
　9;91:9;92:9,24;94:4,6
**2004-plus (1)**
　94:7
**2014 (1)**

14:2
**2015 (1)**
　52:7
**2016 (1)**
　14:5
**2017 (4)**
　17:19;19:5;89:9,14
**2018 (3)**
　17:23;89:10,14
**2019 (1)**
　3:1
**22227 (1)**
　26:10
**24 (5)**
　6:16;8:13,14;32:1;
　44:3
**25 (15)**
　6:16;8:5,12,20,20;
　9:17;18:8;32:4,24;
　42:17,22;43:2,24,25;
　86:12
**25-A (1)**
　32:7
**25-E (1)**
　35:10
**26 (7)**
　4:8;57:10,11,14;
　60:16;61:2;62:3
**27/222 (1)**
　36:16

---

**3**

---

**3 (1)**
　62:2
**32 (3)**
　44:17,17;62:14
**341 (3)**
　6:19;40:12;46:25

---

**4**

---

**4 (12)**
　4:8;5:2;48:9;54:11,
　18,24;55:5;60:15;61:1;
　62:2,3,13

---

**5**

---

**5 (16)**
　4:8;5:2;48:9;54:19,
　24;55:6;60:15;61:1;
　62:3,13;82:15,16,17,
　20;83:18,22
**50,000 (2)**
　19:1;74:9

---

**7**

---

**7 (1)**
　52:25
**700 (1)**
　6:23

Case: 19-30088　Doc# 1964　Filed: 05/09/19　Entered: 05/09/19 16:44:36　Page 113
of 114

## 8

**8 (1)**
  3:1
**800- (1)**
  14:19
**8th (5)**
  50:1,1;59:8,10,12

Case: 19-30088    Doc# 1964    Filed: 05/09/19    Entered: 05/09/19 16:44:36    Page 114
of 114