Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    628.208.6434
Facsimile:    310.820.8859
Email:   rjulian@bakerlaw.com
Email:   cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:  310.442.8875
Facsimile:  310.820.8859
Email:  esagerman@bakerlaw.com
Email:  lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>-and-<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>Debtors.<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OFFICIAL COMMITTEE OF TORT CLAIMANTS' LIMITED JOINDER, OBJECTION AND COUNTER MOTION TO DEBTORS' WILDFIRE ASSISTANCE PROGRAM MOTION (DKT. NO. 1777)**<br><br>Date:     May 22, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:    United States Bankruptcy Court<br>              Courtroom 17, 16th Floor<br>              San Francisco, CA 94102 |

# TABLE OF CONTENTS

| | Page |
|---|---:|
| INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| FACTS | 4 |
|     1. The Fires, Victims, Investigations, and Loss of the Public's Trust | 4 |
|     2. PG&E's Motion To Establish the Program | 6 |
|     3. The Business Justification for the Program | 7 |
|     4. PG&E's Proposed Funding Amount | 10 |
|     5. The Program Needs At Least $250 Million of Funding, Subject to Replenishment | 10 |
| ARGUMENT | 11 |
|     1. The Debtors' Establishment of the Wildfire Assistance Fund is An Appropriate and Justified Expenditure of Estate Assets, as the Debtors Have Admitted | 11 |
|     2. The Debtors' Proposed Funding of the Program with $105 Million is Not Supported by Any Business Judgment Calculation. | 12 |
|     3. The Debtors Have a Legal Duty under California Law to Fund the Program with Due Care, the $105 Million of Funding Falls Short of that Duty. | 12 |
|     4. The Debtors' Program Would Abandon the Victims in Violation of California Law. | 13 |
|     5. The Amount of Adequate Funding is At Least $250 Million, Subject to Replenishment. | 14 |
|     6. Information Submitted by Victims Should Be Prevented from Use in the Chapter 11 Cases. | 14 |
| CONCLUSION | 15 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooks v. E. J. Willig Truck Transp. Co.*,
   40 Cal. 2d 669 (1953) ............................................................................................5, 12

*Browne v. Turner Constr. Co.*,
   127 Cal. App. 4th 1334 (2005) ........................................................................................13

*Gladstone v. Hillel*,
   203 Cal. App. 3d 977 (Ct. App. 1988) ............................................................................11

*Taylor v. Meirick*,
   712 F.2d 1112 (7th Cir. 1983) .........................................................................................11

*US v. PG&E*,
   No. CR 14-0175 WHA, (N.D. Cal. Apr. 2, 2019) .............................................................5

**Other Authorities**

Restatement of Torts, § 322 ....................................................................................................5

Restatement (Second) of Torts § 323 ...................................................................................13

Restatement (Third) of Torts, Phys. & Emot. Harm § 39 (2012) ...............................5, 13

The Official Committee of Tort Claimants ("**TCC**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (collectively, "**PG&E**" or the "**Debtors**") hereby submits this limited joinder, objection and counter-motion ("**Joinder**") to the Debtors' Wildfire Assistance Program Motion (Dkt. No. 1777) ("**Motion**").[1] In support of their Motion, the Debtors rely on the Amended Declaration of Jason P. Wells in Support of the First Day Motions and Related Relief (Docket No. 263) (the "**Wells Declaration**").

In support of the Joinder, the TCC submits the declaration of Steven M. Campora (the "**Campora Declaration**"), the declaration of Kirk Trostle (the "**Trostle Declaration**"), the declaration of Brent C. Williams (the "**Williams Declaration**") and the declaration of Robert A. Julian (the "**Julian Declaration**"), to which the signed declarations or letters of victims in support of the Joinder have been attached as composite Exhibit H.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Only a year after PG&E's equipment and systems failed in 2017, causing fires in the North Bay that destroyed over 8,900 structures, PG&E's corroded and defective electrical hardware ignited the 2018 Camp Fire that destroyed 13,900 homes and the entire town of Paradise, forced an estimated 50,000 residents into immediate homelessness, and created a public relations nightmare for the Debtors. The media daily recounts stories of the thousands of uninsured and underinsured victims struggling to make ends meet because they lack the cash to pay for basic living needs they once enjoyed in their pristine mountain community. To make matters worse for PG&E, the media has focused a laser on PG&E's blatant disregard for public safety. Faced with mounting criticism, from every sector of this State—the victims, District Judge Alsup (just last week), Governor Newsom, the Legislature, unions, and the public at large—the Debtors have decided to establish a Wildfire Assistance Program ("**Program**") to gain the public and case-wide support necessary for a reorganization in this case.

The Debtors' pending Motion requests a Court Order authorizing: (1) the Debtors' establishment of a Program that would pay for "the costs of substitute or temporary housing . . . and other urgent needs" of the individuals who lost their homes in the 2017 North Bay and 2018

---

[1] All capitalized terms not defined herein shall have the meaning attributed to them in the Motion.

Camp Fires (the "**Program Objectives**"); and (2) the Debtors' payment of $105 million to fund the Program.

The TCC joins in the Debtors' Motion to establish the Program to assist the thousands of households PG&E destroyed in the fires, and requests that the Court approve the Program. The Program is long overdue, constitutes the necessary first step in this reorganization under every principle of good governance, and is authorized by Bankruptcy Code sections 105 and 363(b), for two principal reasons. First, the Program supports the Debtors' post-petition business objective of improving its reputation in the wake of the widespread failure of the Debtors' electrical system, management, and procedures that destroyed the victims' homes. Creating a responsible culture within the company is a prerequisite for the Debtors' ability to obtain the public, stakeholder, and legislative support that is necessary for any reorganization in this case. Second, the Program complies with the Debtors' post-petition duty under California law to aid the estimated 50,000-plus displaced residents that the Debtors' equipment and management have made homeless. In the Debtors' own words, "these individuals are currently undergoing significant hardship in their day to day lives and the Debtors believe it is *appropriate and a justified* expenditure of assets to address this need." Motion at 8:2-4 (emphasis added).

After months of standing by while the victims endured unbearable living conditions in trailers, tents, and cars without assistance, the Debtors have finally established the Program that can address the victims' immediate needs. Hence, there is no longer an issue about paying so called pre-petition claims. The establishment of the Program as "appropriate and justified" in this case (to use the Debtors' words) removes that issue from the case under Bankruptcy Code section 363(b). As a result, the remaining questions are: (1) what should be the amount of the funding, and (2) whether the Debtors may use the information that the victims submit to the Program Administrator for humanitarian assistance, in this case to deny the victims' claims.

As to the first question, the Debtors have proposed funding in the amount of $105 million with no explanation of how the Debtors calculated their presumption that this amount would fund the necessary Program Objectives that the Debtors admit are "appropriate and justified" in this case. Without such an evidentiary offer of proof, the Debtors' Motion to establish the amount of funding

2

lacks a business judgment determination as a matter of law, and, hence, the TCC objects to the amount of funding that the Debtors have guessed may be sufficient. The TCC contends the $105 million is insufficient to accomplish the Program Objectives, for two additional reasons.

First, upon establishing the Program, the Debtors have a legal duty under California case law to fund the Program with due care, and the unsupported funding of $105 million would create discrimination and chaos among the 20,000-plus households that may apply for the hardship funding. As the TCC's evidence establishes, more than half of eligible claimants would be turned away from the Program if it is funded with only $105 million. In short, the Debtors' proposed funding would be woefully inadequate and create division and chaos among the former neighbors who would be scrambling divisively to obtain some of the assistance. The TCC's evidence establishes the necessary funding is at least $250 million, subject to replenishment should the Administrator report that more funding is necessary. Williams Declaration at ¶ 12.

Second, under California case law, the Debtors have a legal duty not to abandon their victims once they establish the Program; however, the Debtors' proposed funding would abandon the victims who are not able to obtain the first dollars available in the Program before the Program funding would be depleted by the insufficient capitalization, thereby abandoning the unfunded victims in violation of California's victim assistance case law.

As to the second question, the records and information submitted by victims to the Program Administrator in support of their claims to Program funds should not be used by any party in the Chapter 11 Cases. To allow use of the records and information in the Chapter 11 Cases could prevent victims who are most in need of funding from seeking access to the fund for fear that it could affect their claim in the bankruptcy proceedings. The Debtors recognized this problem when they established an urgent needs fund in 2015 following the Butte Fire, and agreed not to use information submitted by victims in the pending state court litigation.

Accordingly, in support of its Joinder, the TCC cross moves for an order (1) approving funding of the Program with $250 million (subject to replenishment as requested by the Administrator to meet the Program Objectives), an amount that the TCC's financial advisors have calculated would fund the Program Objectives that the Debtors admit are "appropriate and a

3

Case: 19-30088    Doc# 2013    Filed: 05/15/19    Entered: 05/15/19 15:31:45    Page 6 of 18

justified expenditure of assets" in this case, Motion at 8:2-4; and (2) barring the Debtors' use of information submitted by victims to the Administrator unless the Debtors obtain the information from another source.

**FACTS**

**1. The Fires, Victims, Investigations, and Loss of the Public's Trust**

On September 9, 2015, the Debtors' electrical system ignited a fire in Butte County that destroyed 549 homes. *CAL FIRE investigators determine cause of destructive Butte Fire*, Cal Fire, (April 28, 2016).[2] The fire and resulting casualties were heavily reported statewide. *See, e.g.,* Shyong, Esquivel, and Branson-Potts, *More than 500 Homes are Lost in Butte Wildfire*, LA Times, Sept. 19, 2015.[3]

PG&E's May 1, 2015 testimony before the PUC stressed that such a severe event "creates outrage and trust can't be fully recovered" for PG&E's "Company brand." Pacific Gas & Electric Company Safety Model Assessment Proceeding Prepared Testimony, CPUC, May 1, 2015 at 2-AtchB-6, ("**PG&E May 1, 2015 Testimony**"), Julian Declaration at Ex. A. Accordingly, two months after the fire, on November 18, 2015, PG&E issued an "Offer of Assistance to Address Urgent Needs" of the 549 households who had been displaced by the fire (the "**2015 Butte Fire Program**"). *See* Letter, dated Nov. 18, 2019, from PG&E to Counsel, Campora Declaration at Ex. A. PG&E's 2015 Butte Fire Program made "up to $50,000 available to each uninsured property owner who resided at a destroyed property at the time of the fire, and up to $10,000 for uninsured renters who occupied such a property at the time of the fire, to be used for temporary housing, vehicle rental, content replacement or other immediate financial needs." *Id.* The 2015 Butte Fire Program also provided that "PG&E will not use [the] applications, or any information contained therein, in the litigation (unless the information is obtained independently from another source)." *Id.*

PG&E's 2015 Butte Fire Program complied with the company's duty under California law to come to the aid of the victims it had injured. *Brooks v. E. J. Willig Truck Transp. Co.*, 40 Cal.

---
[2] http://calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.
[3] https://www.latimes.com/local/lanow/la-me-ln-more-homes-lost-in-california-wildfire-20150919-story.html.

4

2d 669, 678-89 (1953) ("One who negligently injures another and renders him helpless is bound to use reasonable care to prevent any further harm which the actor realizes or should realize threatens the injured person.") *citing* Restatement of Torts, § 322; *see also* Restatement (Third) of Torts, Phys. & Emot. Harm § 39 (2012) (superseding section 322 in the previous versions of the Restatement, removing the requirement that the injured party be "helpless" and replacing that requirement with the question whether "the actor is better situated to render aid than the injured person").

On October 8, 2017, PG&E's equipment failed again and caused 18 of the fires that erupted in Northern California on that day and succeeding days, and destroyed over 8,900 structures, according to the Cal Fire reports. Wells Declaration at 13. The victims of those fires and the other fires that erupted on that day sued PG&E on numerous grounds, including the fact that PG&E did not de-energize its electrical lines that produced the ignitions of all of the 2017 fires after learning that high fire risk wind conditions would occur the night of the fires. *California North Bay Fire Cases*, Judicial Council Coordination Proceeding No. 4955, Master Complaint – Individual Plaintiffs, ¶ 196 (Cal. Super. Ct. Mar. 12, 2018), Julian Declaration at Ex. B.

One year later, on November 8, 2018, PG&E's equipment failed on the Caribou Palermo line in Butte County and caused an ignition of the Camp Fire that destroyed 13,972 homes, according to PG&E's own SEC filings. PG&E, Form 8-K (Feb. 28, 2019), Item 8.01 ("PG&E Corporation believes it is probable that the Utility's equipment will be determined to be an ignition point of the 2018 Camp Fire."), Julian Declaration at Ex. E. PG&E's Form 8-K estimated over $30 billion in wildfire claims arising from the two fires, and the company has recorded $14 billion of charges representing the lower range of its estimated liabilities. *Id.* Exhibit 99.1 at 2.

PG&E's responsibility for the fires and lack of an adequate safety culture has resulted in the United States District Court ordering PG&E to comply with California vegetation management law in order to avoid causing more fires, and investigations by the SEC, the CPUC, the Butte County District Attorney, and almost daily negative press in the international media. *See US v. PG&E*, No. CR 14-0175 WHA, Order Adopting New Conditions of Probation (Docket No. 1040) (N.D. Cal. Apr. 2, 2019), Julian Declaration at Ex. C; PG&E, Form 8-K, at 6-7 (Jan. 13, 2019),

5

Julian Declaration at Ex. D; PG&E, Form 10-Q, at 53, 98 (May 2, 2019), Julian Declaration at Ex. F. PG&E's PUC testimony states that such a catastrophic event produces "[d]evastating nationwide broad-based political pressure demanding intense long term outreach to policymakers and key stakeholders . . . . Relationships are severed and trust is completely lost." PG&E May 1, 2015 Testimony at 2-AtchB-6, Julian Declaration at Ex. A.

PG&E's rebuilding of its trust is paramount in this bankruptcy case. On May 7, 2019, just a week ago, Judge Alsup stated, "I just don't think PG&E has put safety first;" and ordered "PG&E directors and PG&E senior executive leadership to meet with "local officials in Paradise, California and San Bruno, including tours of those communities so that the leadership can see the gravity of what happened up there." *US v. PG&E*, No. CR 14-0175 WHA, Hrg. Tr. at 11-12 (N.D. Cal. May 7, 2019), Julian Declaration at Ex. G. PG&E filed its Motion in an attempt to repair those severed relationships and rebuild its lost trust.

### 2. PG&E's Motion To Establish the Program

PG&E's Motion requests that the Court authorize the Debtors' establishment of the Program described in Section IV.A of the Motion; an Administrator to administer the Program under the Program Terms described in Section IV.B of the Motion; and proposed funding of the Program with $105 million, called the Wildfire Assistance Fund, as described in Section IV.B of the Motion; and to order "such other and further relief as the Court may deem just and proper." Motion at 10:1-4.

PG&E's Motion explains that the Program would pay for the "costs of substitute or temporary housing" ("**Alternative Living Expenses**") and "other urgent needs" of the individuals who lost their homes in the 2017 North Bay and 2018 Camp Fires (the "**Program Objectives**"). Motion at 4:13-21. PG&E's Motion further explains that the Program "is intended to aid certain Wildfire Claimants who are either uninsured or still in need of assistance for Alternative Living Expenses." *Id*. at 4:21-23. Hence, the Program would fund both uninsured victims and insured victims provided they are "still in need of assistance for Alternative Living Expenses." *Id*. In that respect, the Program goes further in concept than the 2015 Butte Fire Program's financial payments only to the 500-plus uninsured homeowners involved in that program, and not insured victim who

6

are in need and may obtain payments from the 2019 Program.

### 3. The Business Justification for the Program

Section V of the Motion explains that PG&E is authorized to establish the Program pursuant to Sections 105 and 363(b) of the Bankruptcy Code, as a matter of its business judgment. The Motion is supported by the Wells Declaration that explains PG&E's culpability for the victims' losses, but not the basis for calculating the amount of the Wildfire Assistance Fund. PG&E's Motion explains the business justification for the Program as follows: (1) "Cal Fire has issued determinations that the Utility's equipment was involved with the ignition of 18 of the 2017 fires;" (2) "the Debtors believe it is probable that the Utility's equipment will be determined to be an ignition point of the 2018 Camp Fire;" (3) "the Debtors' senior management and their Boards of Directors determined that it would be appropriate to establish the Wildfire Assistance Program to provide some relief to the people who lost their homes and are currently in need of temporary housing or have other urgent needs"; and (4) "Without in any way minimizing the loss and suffering incurred by others, these individuals are currently undergoing significant hardship in their day to day lives and the Debtors believe it is appropriate and a justified expenditure of assets to address this need as provided in the Motion." Motion at 7:17-8:4.

The Debtors' business judgment is also supported by a sampling of the displaced victims' testimony, attached as composite Exhibit H to the Julian Declaration, which details the "significant hardship in their day to day lives" that Debtors believe need to be addressed. Motion at 8:3. The following are just a few examples from the displaced victims' testimony in the Julian Declaration Exhibit H:

Tracy Lynne Arnbrister and her school-age son "stayed on the floor" of a relative's home in the weeks following the 2017 North Bay Fires in which they lost their home, furniture, and all of their belongings. They now live in a smaller, but more expensive rental. Ms. Arnbrister testified: "I have given the one bed we have to my son and I sleep on the sofa or the floor" and "[a]s a result of all this immediate and unexpected loss, we are continuously under extreme financial pressure and burden and have difficulty making ends meet." Ms. Arnbrister says that she and her son are also "suffering from the emotional distress of trying to escape the fires unscathed." She believes

7

that they would both "benefit from professional guidance and/or counseling" but "cannot afford to seek out treatment or help."

Isa Jacoby lost the home she lived in for 25 years along with her catering business, her rental unit (which helped to supplement her income) and all of her possessions in the 2017 North Bay Fires. Ms. Jacoby testified: "My livelihood depended on my property, and my home was comfortable, private and stable." Ms. Jacoby now lives in a trailer on her property, but without a bathroom or shower because she still does not have running water. She testified that she must "travel between my trailer and the residence occupied by my mother in order to shower" and "feel[s] insecure, anxious and uncertain about what my future holds" "[d]ue to the loss of my home and rental income, and the substantial decline in my work and business earnings."

Rachel Marin's family was separated for months and over the holidays after she and her foster son were forced to move to Washington State "in order to stay somewhere [they] could afford" after they lost everything in the 2018 Camp Fire. Ms. Marin and her family now live in a trailer. She testified that the trailer "is very small and because of my multiple sclerosis, it is very difficult for me to move around" and "this disruption and the moves made it hard for me to get my medication."

Alex Cranstoun lost all of his possessions in the 2017 North Bay Fires, including the tools for his painting business. He has lived in multiple locations since the fire, but has struggled to pay rent because "[he] was uninsured and lost [his] ability to earn income as a result of losing [his] painting equipment and tools in the Tubbs Fire."

Elizabeth Andresen testified that she and her family, including her 85 year-old mother, escaped the 2018 Camp Fire "without any warning" after "flaming embers began dropping from the sky onto our two-acre property, setting off ground fires on impact. Within moments, a tornado-like wind, filled with burning embers, ripped through the property, setting the ground and trees on fire." Ms. Andresen describes her life since that day as a "living hell." Following the fire, she and her 85 year-old mother were forced to spend more than a month in a shelter where they both contracted the norovirus. She and her mother then moved to a "leaky, dilapidated, rat-infested motor home in the middle of a hastily-constructed refugee camp." She and her mother now live in

8

HUD housing in Chico, as it is all they can afford. Her mother, who has since been diagnosed with terminal cancer, is confined to the second floor apartment because the building does not have an elevator and her mother "puts herself in serious danger every time she has to go up or down stairs." They do not have the money to replace even basic items like her mother's prescription glasses, which burned in the fire and are not covered by Medicare, or to replace their car that burned in the fire in order to conveniently make it to multiple doctor's appointments.

Kathleen Gross lost her home in the 2017 North Bay Fires. Her home not only served as "a gathering place for family and friends," but also housed her licensed daycare business that she operated out of her home. Ms. Gross is not able to operate her daycare business out of her current rental unit.

William Goggia, in addition to losing his home and all of his possessions in the 2018 Camp Fire, also "suffered burns in the fire, including a burn to [his] left eye. [He] is now blind in [his] left eye" and "still not able to work."

Kevin Burnett testified that he "lost 30 pounds from the stress and the fact that I have been homeless for several months" following the destruction of his home, car, tools and possessions in the 2018 Camp Fire. Mr. Burnett further testified that he was "forced to move away because of the high cost of new homes in California" and "try and start over in an area [in Texas] where I know absolutely no one."

Leslie Moore testified that she was a "hands on kinda Grandma of [her] 6 grandchildren, and they spent numerous days and nights at [their] Magalia home" before it was destroyed in the 2018 Camp Fire. Since the fire, she has been living in her daughter's garage with no garage door and only a tarp between her bed and the outdoors. Her fiancé, with whom she shared her home in Magalia, lived in his car, so as not to overcrowd Ms. Moore's daughter's home. Ms. Moore "lost 70lbs with all of the stress" and her situation has had a negative effect on her relationship with her daughter.

These are just a sampling of the many similar victim stories. The victim testimony establishes that many of the victims struggle to pay rent for temporary housing and make ends meet. For countless others, loss of one's home also results in the loss of one's business, which results in

the loss of income. Many others struggle with dependent care. Those are just the financial tolls. The victims have suffered severe physical and emotional trauma in narrowly escaping death, losing loved ones, and watching homes burn. It takes a toll on all aspects of their lives, including their relationships. Many of the victims have PTSD, and their emotional and psychological needs affect not only their health, but also their ability to earn a living.

The victims need financial support, the Debtor needs to repair their broken trust, and the Program is the first step in pursuit of those two goals.

**4.    PG&E's Proposed Funding Amount**

With the Program established as a necessary part of this case, PG&E's Motion explains that the Debtors "propose depositing $105 million into the Wildfire Assistance Fund to be controlled by a third-party administrator who will disburse and administer the funds." Motion at 5:4-6. The Motion does not explain whether PG&E made any calculation that the $105 million amount would be sufficient to meet the Program Objectives for over 20,000 households. The Motion is supported only by the first day Wells Declaration, which explains PG&E's culpability for 18 of the 2017 Fires and the 2018 Camp Fire and the fact that PG&E is now facing liabilities in excess of $30 billion. Wells Declaration at 16. However, the Wells Declaration does not explain how the Debtors calculated the $105 million funding amount, or whether they just proposed a round public relations number of $100 million for assistance and $5 million for Program costs, as the Motion implies. Finally, PG&E's Motion explains that the Administrator shall disburse the funds in accordance with Program Terms that require the Administrator to prioritize the payments to "those eligible Wildfire Claimants who are most in need, including those who are currently without adequate shelter." Motion at 5:16-24.

**5.    The Program Needs At Least $250 Million of Funding, Subject to Replenishment**

As stated above, the Debtors have not produced any calculation of the amount of funds that will be necessary to achieve the Program Objectives and provide relief to the people "who lost their homes" and are currently in need of "substitute or temporary housing" and "other urgent needs." Motion at 4:13-21. The Williams Declaration provides a thorough explanation of the categories of the victims who fall into that classification, and estimates the minimum amount of the necessary

10

funding exceeds $250 million, based on the facts of this case. The Debtors have not proposed to fund the Program with an amount anywhere close to the $50,000 payments per household that the 2015 Butte Program funded. Application of the 2015 Butte Fire Program's $50,000 per household and $10,000 for renters would require $480 million of funding for the uninsured/underinsured and destroyed Camp Fire households alone. Williams Declaration at ¶ 11 i (i). The Program needs $313 million of funding to pay a selected portion of the victims' immediate living expenses (in amounts less than the 2015 Butte Program funding). *Id*. at ¶ 11 i (ii).

The Debtors' Motion requests that the Court enter an order for "such other and further relief as the Court may deem just and proper." Motion at 10:1-4. The victims' letters and declarations (attached as composite Exhibit H to the Julian Declaration) and the Williams Declaration provide ample evidence to support the Court's order approving the additional funding that is necessary to achieve the Program Objectives, as "just and proper" in this case.

## ARGUMENT

**1.    The Debtors' Establishment of the Wildfire Assistance Fund is An Appropriate and Justified Expenditure of Estate Assets, as the Debtors Have Admitted.**

The TCC joins in the Debtors' Motion to establish the Program as "appropriate and justified" for two reasons. First, California law provides that a company that injures an individual must come to the victims' aid, and the Program is designed to aid the Debtors' victims in accordance with that law. *Gladstone v. Hillel*, 203 Cal. App. 3d 977, 989-90 (Ct. App. 1988) ("A tortfeasor has a duty to come to the aid of his victim.") *citing Taylor v. Meirick,* 712 F.2d 1112, 1117 (7th Cir. 1983) (Posner, J.). Second, the Debtors' destruction of the 20,000-plus households in 2017 and 2018 have created a permanent loss of trust in the eyes of government officials and stakeholders that the Debtors must repair post-petition in order to obtain the Legislature's, Governor's and stakeholders' support of a plan of reorganization. PG&E, Form 10-Q at 89-90 (May 2, 2019) (discussing Governor's Strike Force Report legislative recommendations "could be significant" on PG&E), Julian Declaration Ex. F. The Debtors have recognized that fact by filing their Motion for authority to establish the Program, which supports both goals. Hence, we are not presented with a question as to whether the Debtors can or cannot pay a prepetition debt. That issue

is foreclosed by the Program's achievement of post-petition benefits to the Debtors and the Debtors' request for the Court to approve the Program pursuant to Sections 105 and 363(b) of the Bankruptcy Code.

**2. The Debtors' Proposed Funding of the Program with $105 Million is Not Supported by Any Business Judgment Calculation.**

Page 3 of the Debtors' Motion states the Motion is supported only by the Wells Declaration. The Wells Declaration provides the evidentiary support for the Debtor's establishment of the Program, on the basis that the Debtors are probably culpable for the 2017 and 2018 fires that turned the estimated 50,000-plus victims homeless. However, the Wells Declaration does not provide any business judgment explanation that the $105 million of "proposed funding" (Motion at 5:4) would be sufficient to fund the Program Objectives. Hence, while the Court should approve the establishment of the Program, as the Debtors requested, the amount of the funding for that Program is a litigable issue in this case.

**3. The Debtors Have a Legal Duty under California Law to Fund the Program with Due Care, the $105 Million of Funding Falls Short of that Duty.**

Under California law, a company that administers a program for a class of individuals must administer the fund with due care as a matter of basic principles of tort/negligence law. *Brooks v. E. J. Willig Truck Transp. Co.*, 40 Cal. 2d 669, 678-89 (1953) ("One who negligently injures another and renders him helpless is bound to use reasonable care to prevent any further harm which the actor realizes or should realize threatens the injured person."). The Debtors' proposal to fund the Program with $105 million falls short of that duty. The declarations and statements of dozens of victims filed in support of this Joinder establish that the victims are desperately in need of assistance. Julian Declaration at Ex. H.

Based on the minimum amount of funding necessary to achieve Program Objectives, as detailed in the Williams Declaration, more than half of eligible claimants would be turned away from the Program. The declaration of the former Chico and Oroville Chief of Police who lost his home in the Camp Fire establishes that the homeless who are turned away would suffer further injury. Trostle Declaration at ¶ 6. Hence, the limited funding of $105 million would create

12

discrimination, chaos and further injury among a significant percentage of the estimated 50,000-plus victims who may apply for the hardship funding, in violation of the Debtors' duty of care.

### 4. The Debtors' Program Would Abandon the Victims in Violation of California Law.

The Debtors have a legal duty not to abandon their victims once they establish the Program. *See* Restatement (Third) of Torts, Phys. & Emot. Harm § 39, § 42 cmt. h (2012). As a preliminary matter, the Restatement imposes on the Debtors a legal duty to "exercise reasonable care and prevent or minimize the harm" that they caused the wildfire victims because they "created a continuing risk of physical harm." *Id.* at § 39 (replacing Restatement (Second) of Torts § 323). Beyond the requirements created by their own tortious conduct to remedy that conduct, however, California law requires that the Debtors terminate any assistance responsibly. When undertaking services to another, even a good Samaritan must exercise reasonable care if the party is relying on that undertaking, and he "*may not unreasonably terminate the undertaking.*" *Id.* at § 42 cmt. h (emphasis supplied); *Browne v. Turner Constr. Co.*, 127 Cal. App. 4th 1334, 1348 (2005) (applying Restatement (Second) of Torts § 323 to reverse the Superior Court's finding of summary judgment for the defendant because, among other things, "defendants made no attempt to show that they had disengaged from their undertaking without worsening plaintiff's position or otherwise affirmatively contributing to his injuries").

PG&E is not a good Samaritan in this case. PG&E admits that its equipment likely killed 86 individuals in the 2018 Camp Fire alone, and destroyed the victims' homes; hence, PG&E is a culpable party, not a good Samaritan. At a minimum, however, PG&E must abide by the same standard that California imposes on a good Samaritan: the Debtors must exercise reasonable care in administering the Program, the *Program cannot be unreasonably terminated*, and it cannot worsen the victims' position. *See* Restatement (Third) of Torts, Phys. & Emot. Harm § 42 cmt. h; Restatement (Second) of Torts § 323.

The Debtors' proposed funding would abandon the victims who are not able to obtain the first dollars available in the Program before the Program funding would be depleted by the insufficient capitalization, thereby abandoning the unfunded victims in violation of California's victim assistance case law.

13

5. **The Amount of Adequate Funding is At Least $250 Million, Subject to Replenishment.**

The Williams Declaration establishes that the minimum amount of funding to achieve the Program Objectives is at least $250 million, provided that the amount is subject to replenishment upon Court order, if the Administrator reports to the Court that the funding has not met the Program Objectives. Williams Declaration at ¶¶ 11-12.

6. **Information Submitted by Victims Should Be Prevented from Use in the Chapter 11 Cases.**

The records and information submitted by victims to the Program Administrator in support of their claim to Program funds should not be used by any party in the Chapter 11 Cases. To allow use of the records and information in the Chapter 11 Cases could prevent victims who are most in need of funding from seeking access to the Wildfire Assistance Fund for fear that it could affect their claim in the bankruptcy proceedings. The Debtors recognized this problem when they established the 2015 Butte Fire Program and agreed that it would "not use your Clients' applications, or any information contained therein, in the litigation (unless the information is obtained independently in the litigation)." Campora Declaration at Ex. A. Despite agreeing to this condition in connection with the 2015 Butte Fire Program, the Debtors' Motion states they intend to access and use the victim applications in the Chapter 11 Cases to deny the victim claims. The Motion proposes "The Debtors and the Committees may inspect all the Wildfire Assistance Program's records upon request" (Motion at 6:16-17), and the Debtors reserved rights to use the information in any disputes: "any payment made pursuant to the Court's order is not intended to be an should not be construed as an admission as to the validity of any claim **or a waiver of the Debtors' rights to dispute such claim subsequently**." Motion at 8:25-9:1.

Taken together, the Program Terms allowing document access combined with the Debtors' reserved rights to dispute claims would permit the Debtors to use the information submitted by victims in support of their right to the Wildfire Assistance Fund as a basis to evaluate and challenge their bankruptcy claims. This would have the effect of preventing victims from coming forward to seek the emergency funds they desperately need to improve their living conditions for fear that it

14

could result in a later denial of their claims to larger amounts in the Chapter 11 Cases. The Court should bar the Debtors' access to data submitted by victims to the Administrator, provided the Administrator should report to the Debtors and the TCC the dollar amount received by each victim in order to reduce the dollar amount of the fire claims in the case.

## CONCLUSION

The Debtors destroyed over 20,000 homes and caused residents to seek shelter in tents, trailers, cars, and other temporary housing, and thereby destroyed the Debtors' trust with the public, the district court, and government officials. The Debtors have requested Court authority to establish the Program that would assist the victims and thereby rebuild some of their trust that is necessary to obtain the support of the public, government officials and stakeholders for confirmation of a reorganization plan in this case. The TCC joins in that part of the Motion. The Program is necessary and should be approved.

The question of the amount of funding is not settled, inasmuch as the Debtors have not calculated the amount that will be necessary. The TCC's financial advisors have filled the void, and have established that the amount of funding necessary to fulfill the Program Objectives exceeds $250 million.

The TCC requests the Court to approve the Debtors' request to establish the Program, and grant the TCC's cross motion to establish the necessary funding amount of at least $250 million, subject to replenishment upon proof of such need by the Administrator, and barring the Debtors' access to data submitted by victims to the Administrator, with the exception of the dollar amount received by each victim. The victims are continuing to suffer under unbearable conditions, and they deserve no less than a $250 million Wildfire Assistance Fund.

Dated: May 15, 2019

BAKER & HOSTETLER LLP

By: */s/ Robert A. Julian*
      Robert A. Julian

*Author and Counsel to the Official Committee of Tort Claimants*

15