Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    628.208.6434
Facsimile:    310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:   310.442.8875
Facsimile:   310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official
Committee of Tort Claimants*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>    **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                     **Debtors.**<br><br>□ Affects PG&E Corporation<br><br>□ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO CORRECTED MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 1121(d) TO EXTEND EXCLUSIVITY PERIODS (DKT. NO. 1797)**<br><br>Date:     May 22, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>           Courtroom 17, 16th Floor<br>           San Francisco, CA 94102<br><br>Objections Due:<br>May 15, 2019 at 4:00 p.m. (Pacific Time) |

**TABLE OF CONTENTS**

Page

I.   SUMMARY OF ARGUMENT ................................................................. 1

II.  FACTUAL BACKGROUND ................................................................. 3

     A.   PG&E's History of Callous Indifference to Safe Operations .................... 3

     San Bruno, California................................................................. 3

     Butte Fire ............................................................................ 4

     North Bay Fires ...................................................................... 5

     Camp Fire ............................................................................ 5

     B.   PG&E's Financial Mismanagement ......................................... 6

     C.   The Debtors' Bankruptcy Filings .......................................... 6

     D.   The Debtors' Post-Petition Misconduct................................. 7

     E.   The New Board Cannot be Relied Upon to Change PG&E's Corporate Culture ................................................................. 8

     F.   The Tort Claimants Are Increasingly at Risk With the Passage of Time...... 11

III. ARGUMENT ........................................................................... 11

IV.  NOTICE .............................................................................. 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re All Seasons Indus., Inc.*,
  121 B.R. 1002 (Bankr. N.D. Ind. 1990)..................................................12, 13, 14

*In re Am. Fed'n of Television & Radio Artists*,
  30 B.R. 772 (Bankr. S.D.N.Y. 1983) ............................................................12

*In re Dow Corning Corp.*,
  208 B.R. 661 (Bankr. E.D. Mich. 1997) .................................................13, 15

*In re Gen. Bearing Corp.*,
  136 B.R. 361 (Bankr. S.D.N.Y. 1992) ..........................................................12

*In re GMG Capital Partners III, L.P.*,
  503 B.R. 596 (Bankr. S.D.N.Y. 2014) .................................................11, 12, 13

*In re McLean Indus., Inc.*,
  87 B.R. 830 (Bankr. S.D.N.Y. 1987) ............................................................13

*In re Mother Hubbard, Inc.*,
  152 B.R. 189 (Bankr. W.D. Mich. 1993) .................................................12, 14

*Official Cmte. Of Unsecured Creditors v. Henry Mayo Newhall Memorial Hosp.*
  *(In re Henry Mayo Newhall Memorial Hosp.)*,
  282 B.R. 444 (9th Cir. BAP 2002)...........................................13, 14, 15

*In re R.G. Pharmacy, Inc.*,
  374 B.R. 484 (Bankr. D. Conn. 2007) ...........................................................14

*In re Sharon Steel Corp.*,
  78 B.R. 762 (Bankr. W.D. Pa. 1987) .......................................................12, 14

*In re Timbers of Inwood Forest Assoc., Ltd.*
  808 F.2d 363 (5th Cir. 1987) (en banc)..........................................................12

**Statutes**

11 U.S.C. § 1121(d) .............................................................................................11

11 U.S.C. §1121(d)(1).....................................................................................1, 11

**Rules**

Bankruptcy Rule 2002..........................................................................................16

ii

**Other Authorities**

7 Collier on Bankruptcy ¶ 1121.11[4] .......................................................................................12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Official Committee of Tort Claimants (the "**TCC**"), in the above-captioned chapter 11 cases (the "**Cases**") of PG&E Corporation ("**PG&E**") and Pacific Gas and Electric Company (the "**Utility**" and collectively with PG&E, the "**Debtors**"), by and through its undersigned counsel, hereby objects (the "**Objection**") to the Corrected Motion of Debtors Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusivity Periods (the "**Motion**"). In support of this Objection, the TCC respectfully states as follows:

## I.      SUMMARY OF ARGUMENT

1.      The Debtors have admitted that they will resist any reorganization plan that does not include reform of wildfire liability laws. What the Debtors really mean, but will not say, is that they refuse to propose a plan under which interests of equity security holder may be impaired or wiped out. The Debtors will not admit this fact because their major shareholders now have control of the boards of directors and will not propose a plan that reflects the true enterprise value of the Debtors. A feasible plan exists, one under which creditors of the Utility, including tort claimants (the "**Tort Claimants**"), may be paid in full. Since the Debtors refuse to consider any plan that does not include a bailout from the State of California and higher rates for the Utility's ratepayers instead of a reduction in market cap, they have forfeited the exclusive right to file a plan.

2.      The Debtors cannot demonstrate "cause" for an extension under Bankruptcy Code §1121(d)(1) for two reasons. First, the Debtors have no control over whether or when changes in the law will occur. The Debtors contend that all stakeholders need to support a solution, and that "it's going to require a significant amount of work by not just those in Sacramento but by all of the stakeholders" to achieve a "common outcome." Transcript of Meeting of Creditors on April 29, 2019, 79:5-9 (the "**341 Transcript**"). The Debtors have said they cannot reorganize without legislative relief, so they are not entitled to have a continued exclusive period while they wait to see if the law changes, while blocking creditors from proposing a plan that is confirmable without change in the law.

1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.      Second, the Debtors purported solvency is much in doubt.  The Debtors list the value of their assets as approximately $61.7 billion in their Summaries of Assets and Liabilities for Non-Individuals [ECF Nos. 897 & 903].  The Debtors reported in their SEC filings that the liability they face from the 2017 and 2018 wildfires may exceed $30 billion.  In Schedules E/F, filed on March 14, 2019, the Debtors list wildfire-related claims as "contingent, disputed and unliquidated," and attribute no dollar amount to the claims, thereby rendering the schedules useless as a meaningful source of information regarding the Debtors' liabilities [ECF Nos. 900 & 906].  When the amount of the DIP loans, administrative claims and undisputed prepetition claims of approximately $41.5 billion[1] are added to the Debtors' own estimate of their potential wildfire exposure of $30 billion, it becomes clear that the equity cushion is illusory.

4.      The Debtors' new boards, now controlled by nominees proposed by investors BlueMountain Capital Management, Knighthead Capital Management, Redwood Capital Management and Abrams Capital Management, are highly unlikely to propose a realistic plan of reorganization within a reasonable period of time.  In the meantime, tens of thousands of victims of the Debtors' criminal and negligent conduct await payment of their claims, many of whom will lose certain benefits under their insurance policies before the expiration of the Debtors' proposed exclusivity period.  Under the circumstances, the Debtors should not be granted the privilege of blocking any other party from filing a plan.

5.      Finally, the Debtors' despicable conduct prior to and during these Cases, as set forth in detail below, weighs heavily against the Court's exercise of its discretion to grant an extension of the Debtors' exclusive periods at all, much less the six-month period the Debtors request.

---

[1] Assumptions:  Utility Debt:  DIP fully drawn, $5.5 billion; Administrative expenses/priority claims, $1.0 billion; Utility bond and bank debt, $21.5 billion; Subrogation claims, $10 billion; Public entity claims, $2.0 billion; Trade claims, $2.0 billion.  HoldCo Debt:  Utility preferred stock, $300 million; Bank debt, $700 million.  (No rejection damages claims, which may be substantial, are included in these assumptions.)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## II. FACTUAL BACKGROUND

### A. PG&E's History of Callous Indifference to Safe Operations

#### San Bruno, California

6.      The Debtors have a long history of failing to operate safely (think Erin Brockovich), but the recent disasters the Debtors caused start with the explosion of its underground gas pipeline on September 9, 2010, in the Crestmoor residential neighborhood of San Bruno, California. The explosion and resulting fire killed eight people and damaged or destroyed 108 homes.

7.      The National Transportation Safety Board's ("**NTSB**") 135-page Accident Report dated September 9, 2010 ("**Accident Report**") (United States. National Transportation Safety Board. 2011. Pacific Gas and Electric Company, Natural Gas Transmission Pipeline Rupture and Fire, San Bruno CA, Sept. 9, 2010. Pipeline Accident Report NTSB/PAR-11/01. Washington, DC) found that the Utility's entire **organizational culture** was at fault: "*Organizational accidents have multiple contributing causes, involve people at numerous levels within a company, and are characterized by a pervasive lack of proactive measures to ensure adoption and compliance with a safety culture. Moreover, organizational accidents are catastrophic events with substantial loss of life, property, and environment; they also required complex organizational changes in order to avoid them in the future.*" Accident Report, p. 117 (emphasis added). The NTSB further pointedly noted: "*The character and quality of [the Utility's] operation, as revealed by this investigation, indicate that the San Bruno pipeline rupture was an organizational accident. [The Utility] did not effectively utilize its resources to define, implement, train, and test proactive management controls to ensure the operational and sustainable safety of its pipelines*." Accident Report, p. 117.

8.      Christopher Hart, the Debtors' newly-appointed Special Independent Safety Advisor, was Vice Chair of the NTSB and a signatory on the report. In a separate concurrence and dissent, Vice Chair Hart repeatedly referred to the San Bruno disaster that killed eight people as a "mishap," and his comments appeared calculated to let the operator off the hook. Vice Chair Hart instead blamed a lack of coordination between "safety regulators" and "economic regulators." Accident Report, pps. 136-137.

3

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9. On April 1, 2014, the Utility was indicted by a federal grand jury in the United States District Court for the Northern District of California for twelve violations of the Natural Gas Pipeline Safety Act of 1968. *United States of America v. Pacific Gas and Electric Company*, Case No. 3:14-cr-00175 (WHA) (N.D. Cal.) (the "**Criminal Action**") [Criminal Action, ECF No. 1]. According to the Indictment, the charges stemmed from the Utility's record-keeping and pipeline integrity management practices. The Indictment alleged that the Utility failed to address recordkeeping deficiencies concerning its larger natural gas pipelines knowing that their records were inaccurate or incomplete. Indictment at ¶¶ 22-22. On August 9, 2016, the jury found the Utility guilty of six of the 12 counts in the Indictment. Verdict Form [Criminal Action, ECF No. 884].

10. According to a ruling of the assigned commissioner of the California Public Utilities Commission ("**CPUC**"), "[The Utility] faced historically significant administrative penalties and fines and criminal punishment as a result of the San Bruno explosion." Assigned Commissioner's Scoping Memo and Ruling dated December 21, 2018 ("**Scoping Memo and Ruling**"), Investigation 15-08-019, p. 4. The CPUC imposed a fine and other penalties on the Utility totaling $1.6 billion. Scoping Memo and Ruling, p. 4. As part of the sentence in the Criminal Action, the Utility was required to submit to a federal monitor for compliance and ethics. In February 2017, Mark Filip was selected as the Compliance and Ethics Monitor of the Utility for a period of five years. Scoping Memo and Ruling, p. 4, n.4.

**Butte Fire**

11. The Butte Fire, which started in Calaveras County, California, on September 9, 2015, burned approximately 70,000 acres, destroyed 921 structures and killed two people. Scoping Memo and Ruling, p. 6. The CPUC's Safety and Enforcement Division (SED) issued the Utility a citation for $8 million for safety violations, and $300,000 for its failure to timely report to the CPUC that its facilities may have been linked to the ignition of the Butte Fire. Scoping Memo and Ruling, p. 7.

4

12.     The California Department of Forestry & Fire Protection ("**Cal Fire**") found that the Utility and/or its vegetation management contractors—ACRT Inc. and Trees, Inc.—failed to identify potential hazards during its vegetation management program, which led to PG&E's equipment igniting the fire.

**North Bay Fires**

13.     The North Bay Fires, which started on October 8, 2017, consisted of twenty-one (21) major fires that spread throughout Butte, Humboldt, Lake, Mendocino, Napa, Nevada, Sonoma and Yuba counties.  According to the October 30, 2017 report issued by Cal Fire, the North Bay Fires consumed more than 245,000 acres and 8,900 structures.  Forty-four (44) people perished due to the North Bay Fires.   Amended Declaration of Jason P. Wells in Support of First Day Motions at p. 13 [ECF No. 263].

14.     Cal Fire has determined that the Utility is responsible for at least eighteen (18) of the twenty-one (21) fires.  The North Bay Fires are also being investigated by CPUC's Safety and Equipment Divisions. Amended Declaration of Jason P. Wells in Support of First Day Motions at p. 11 [ECF No. 263].

**Camp Fire**

15.     According to Cal Fire's Camp Fire Incident Information Website as of January 4, 2019 ("**Cal Fire Website**"[2]), the Camp Fire began on November 8, 2018, on Pulga Road and Camp Creek Road, near Jarbo Gap in Butte County.  The Camp Fire destroyed 153,336 acres, 13,972 residences, 528 commercial buildings and 4,293 other types of buildings.  The Camp Fire took eighty-six (86) lives.  Cal Fire Website.  The Camp Fire was the deadliest and most destructive wildfire in modern California history.  On May 15, 2019, the date of this Objection, Cal Fire issued a News Release stating that the Debtors caused the Camp Fire.

16.     The Debtors' Form 8-K, filed on February 28, 2019, states in part that "PG&E Corporation believes it is probable that the Utility's equipment will be determined to be an ignition point of the 2018 Camp fire." PG&E 8K Report at p. 2

---

[2] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277

5

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### B. PG&E's Financial Mismanagement

17. PG&E has not maintained fit financial condition. In 2009, the Debtors reported $12.8 billion in total funded debt in their SEC filings. By 2018, total funded debt had increased to $22 billion, almost doubling in eight years. And, during this period of time, PG&E paid increasingly higher dividends on common stock. In 2009, PG&E paid $600 million in dividends. In 2017, it paid $1 billion in dividends. In fact, between 2009 and 2018, PG&E paid a total of $7.1 billion in dividends.

18. The Debtors borrowed to fund the payment of dividends to shareholders. The Debtors lost money on an operating basis between 2009 and 2018. During the same period of time, the Debtors reduced expenditures for maintenance and safety, and even redirected funds earmarked to safety to other uses.

### C. The Debtors' Bankruptcy Filings

19. On the Petition Date, the Debtors commenced these Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

20. The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

21. On February 15, 2019, the Office of the United States Trustee ("**U.S. Trustee**") filed an Appointment of the Official Committee of Tort Claimants [ECF No. 453]. Following the resignation of Richard Heffern from the original committee and the addition of Tommy Wehe, on February 21, 2019, the U.S. Trustee filed the Amended Appointment of the Official Committee of Tort Claimants [ECF No. 530]. The members of the TCC are: (i) GER Hospitality, LLC, in its capacity as an individual claimant; (ii) Kirk Trostle; (iii) Tommy Wehe; (iv) Angelo Loo; (v) Karen K. Gowins; (vi) Agajanian, Inc.; (vii) Susan Slocum; (viii) Samuel Maxwell; (ix) Karen M. Lockhart; (x) Wagner Family Wines-Caymus Vineyards; and (xi) Gregory Wilson. The TCC conducted a meeting on February 15, 2019, at which all members were present, and appointed Karen M. Lockhart as Chairperson.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22.     On May 1, 2019, the Debtors filed the Motion, seeking to extend the exclusivity period through and including November 29, 2019.  The Debtors have reserved their rights to seek additional extensions of the exclusivity period.

**D.     The Debtors' Post-Petition Misconduct**

23.     The Utility has violated the terms of its probation in the Criminal Action.  Judge Alsup, who presides over the Criminal Action, noted as recently as May 7, 2019 that "PG&E has been starting a lot of fires" and that "I just don't think PG&E has put safety first. The ads all say it does, but I think if you look at the record, PG&E has allowed things to slide on the safety front, particularly on the fire part…" Transcript of Proceedings, Criminal Action, May 7, 2019 ("**Transcript**"), 10:12-17.  Judge Alsup concluded the hearing by stating that "no one has started more fires than PG&E."  Transcript, 14:5.  The Utility's ongoing failure to properly redress its safety issues and violations resulted in Judge Alsup entering an Order Adopting New Conditions of Probation on May 14, 2019 (The "**New Probation Order**") [Criminal Action, ECF No. 1071]. One of the conditions of probation is that the Utility's Board of Directors, Chief Executive Officer and others will visit San Bruno and Paradise "to gain a firsthand understanding of the harm inflicted on those communities and meet with victims and other stakeholders such as fire-fighting personnel and/or city officials."  New Probation Order at p. 1.

24.     On April 29, 2019, the United States Trustee convened a meeting of creditors pursuant to Bankruptcy Code §341(a).  Jason Wells, CFO of the Debtors, testified in response to the examination of the U.S. Trustee regarding the Debtors' current plan for reorganization: "We currently don't have a plan of reorganization….Until we have a better handle on total claims exposure *as well as the legislation to reform wildfire liability laws, we are not in a position to be able to put forward a plan of reorganization*.  341 Transcript, 13:6-12 (emphasis added).  These Cases may be the first time a debtor has argued that it cannot reorganize without a change in the laws governing its operations.

7

**E.    The New Board Cannot be Relied Upon to Change PG&E's Corporate Culture**

25.    The Preliminary Proxy Statement filed by the Debtors with the Securities and Exchange Commission on April 26, 2019 (the "**Proxy Statement**") is instructive on whether the recent boards "refreshments" herald a new era of operational and safety responsibility that merits deference.   The Proxy Statement's disclosure on the refreshed Safety and Nuclear Oversight Committee (the "**Safety Committee**") is an apt starting point.   The Safety Committee now comprises six members:  Cheryl Campbell (Chair), Jeffrey Bleich, Nora Brownell, Fred Fowler, Eric Mullins and Kristine Schmidt.   Ms. Campbell, in her position as President of WestGas InterState, a subsidiary of Xcel Energy, was cited on October 12, 2017 by the Pipeline and Hazardous Materials Safety Administration for violation of pipeline safety regulations relating to the frequency of patrols of lines and the frequency of transmission line leakage surveys, and pled no contest.  *See*, Notice of Probable Violation and Proposed Compliance Order dated October 12, 2017 & Final Order dated March 8, 2019, *Matter of WestGas InterState, Inc., a Subsidiary of Xcel Energy, Inc.*, CPF No. 5-2017-1012 U.S. Dept. of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Washington, D.C. 20590.

26.    Mr. Bleich, according to the Proxy Statement, is a lawyer and former U.S. Ambassador to Australia.   The Proxy Statement does not identify any utility safety experience or expertise for Mr. Bleich.   Ms. Brownell, according to the Proxy Statement, is a former FERC Commissioner and former member of the Pennsylvania Public Utilities Commission.   The closest the Proxy Statement comes to claiming safety experience or expertise for Ms. Brownell is a statement that she "has been an advocate for consumer protection."  (Proxy Statement p. 23)

27.    The Proxy Statement says that Mr. Fowler has been a board member of the Debtors since 2012.  Notwithstanding the Debtors' abysmal safety record between 2012 and now, the Proxy Statement touts Mr. Fowler as "bring[ing] extensive knowledge and over 45 years of experience in utility company operations , including safety . . . ."  (Proxy Statement p. 24)   Mr. Mullins, who the Proxy Statement discloses is in the private equity industry and is a former investment banker at Goldman Sachs & Co., has served on the Debtors' boards since September 2016.  The Proxy

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Statement identifies no utility safety experience or expertise for Mr. Mullins. The Proxy Statement identifies Ms. Schmidt as an electric industry veteran and consultant, but does not refer to any particular safety experience or expertise that she has.

28. Moving from the Safety Committee (which as we have noted is chaired by a new board member recently cited for utility safety violations and includes two legacy board members who were on the Debtors' boards for the 2017 and 2018 wildfires), we also derive no confidence regarding more responsible utility operations from the remainder of the refreshed boards of the Debtors. These boards now include one more utility industry veteran, four hedge fund executives, a bond fund denizen, and a career U.S. State Department employee.

29. The Proxy Statement proclaims that William D. Johnson, PG&E's new Chief Executive Officer (the "**CEO**"), presided over the TVA during a period in which "the organization achieved the best safety records in its 85-year history . . . ." Correlation is not necessarily causation, however, and nothing in the Proxy Statement evidences a causal link between the refreshed boards of the Debtors and excellence in utility operations or safety performance that warrants a presumption that life for the Debtors and their stakeholders has suddenly become better.

30. Judge Alsup certainly does not believe he can simply sit back and relax now that Mr. Johnson has arrived from Tennessee. When Mr. Johnson informed the Court at a hearing on May 7, 2019, in the Criminal Action that he had come to PG&E to "help make outcomes better," the Court responded that "I don't really care how much money PG&E makes, but I do care about the safety of the people who live in California." Transcript, 10:10-11. The Court continued: "And one of the biggest problems we've had is that PG&E has been starting a lot of fires, and they had that horrible explosion in San Bruno, and I just don't think PG&E has put safety first. The ads all say that it does, but I think if you look at the record, PG&E has allowed things to slide on the safety front, particularly on the fire part...." Transcript, 10:12-17. In fact, Judge Alsup apparently has so little faith that Mr. Johnson and the new board get it, that he ordered the board and PG&E's senior executive leadership to meet with victims and local officials in Paradise and San Bruno and tour

9

those communities "so that the leadership can see the gravity of what happened up there." Transcript, 12:4-7.

31.     Additional disclosures in the Proxy Statement (for which the refreshed boards of the Debtors are responsible) underscore the low prospects for a sea change.  On page 37, the Proxy Statement posits that, contrary to the inference that might fairly be drawn from the reality of the 2017 and 2018 fires, the Debtors have long been focused on safety: "Since the San Bruno tragedy in 2010, the Boards have continuously sought to enhance the quality of oversight for risk management . . . and safety."  On page 55:  "*We believe that [the appointments of Mr. Johnson as CEO and of the refreshed boards] position us to continue to improve our safety and operational effectiveness*."  (Italics added.)  On page 65:  the Compensation "Committee adopted a STIP structure [for 2018] that continued the Debtors' focus on improving public and employee and contractor safety . . . ."  (Italics added)  On page 11, the Proxy Statement (read, each of the refreshed boards) recommends shareholder approval of the 2018 compensation paid to the Debtors' named executive officers, based on the refreshed boards' stated belief that the Debtors' "compensation policies and practices were effective in achieving the companies' goals of rewarding sustained financial and operating performance and excellence . . . ."

32.     And then, against that soothing backdrop to which the refreshed boards subscribe, one wonders what to make of this statement in their letter to the Debtors' shareholders:  "We replaced PG&E['s] CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to *redirect* our safety culture . . . ."  (Italics added)  Who knows?  But it is not an irrational fear that the refreshed boards' discordant messages are just the same old empty words on new pages, signifying the same detachment from on-the-ground reality that has brought the Debtors and their stakeholders to their current state.

33.     Certainly, the fact that one of the boards' first steps was to hire Mr. Hart does not inspire confidence.  He views the San Bruno destruction of a residential neighborhood as a mere "mishap," and appeared to blame conflicting goals of "safety regulators" and "economic regulators" as the problem, instead of PG&E as the operator.  Safety Report, Vice Chairman Hart,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

concurrence and dissent, pp. 136-139. And, his weak response was before the NTSB learned that PG&E lied to it about the pressures in its gas lines before the pipe erupted. Verdict. Mr. Hart cannot be relied upon to properly advise the boards with respect to the Debtors' abysmal safety culture.

**F.     The Tort Claimants Are Increasingly at Risk With the Passage of Time**

34.     Many of the Tort Claimants are still without homes or even safe shelter, including victims of the Butte Fire. 341 Transcript, 118:22-25, 119:1-3, 141:22-25 & 142:1-5. Even those Tort Claimants who have insurance are often underinsured, or are at risk of exhausting their benefits.

35.     Several of the Tort Claimants have been relying on alternative living expense benefits from their homeowners' policies to cover the expenses for their temporary housing. Critically, in October 2019, which will be during the exclusivity period if the Court grants the Motion, roughly 7,000 families who were impacted by the North Bay Fires will lose their alternative living expense benefits. By the end of December 2019, approximately 1,000 more families, this time from the Thomas Fire, will lose their benefits. The passage of time will only add to the number of Tort Claimants who exhaust their insurance coverage. These Tort Claimants will be forced to try to come up with the funds to cover both the expenses on their destroyed homes, including mortgage expenses, and expenses for their temporary residences. Many simply cannot afford to pay for two dwellings. As a result, Tort Claimants will face the prospect of defaulting on their obligations, with the attendant damage to their economic health and emotional well-being. Even those fortunate enough to have the means to pay for two dwellings should not be forced to do so. It is fundamentally unfair for the Tort Claimants, who have already lost too much, to be damaged any more.[3]

---

[3] The TCC is aware of the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 2002 and 6004(h) for an Order (A) Authorizing Debtors to Establish and Fund Program to Assist Wildfire Claimants with Alternative Living Expenses and Other Urgent Needs and (B) Granting Related Relief ("Wildfire Assistance Program Motion") (Dkt. No. 1777). While the TCC welcomes relief, the scope and amount of the proposed fund are woefully inadequate to meet the current needs of the Tort Claimants, let alone their needs as their insurance runs out.

11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## III. ARGUMENT

36.     Section 1121(d) of the Bankruptcy Code permits a court, upon a showing of "cause," to reduce or increase the 120-day period during which a debtor has the exclusive right to file a plan of reorganization. 11 U.S.C. § 1121(d)(1). "[C]ourts have not hesitated to deny a first motion to extend exclusivity where the circumstances warrant it." *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014), *citing*, *In re Gen. Bearing Corp.*, 136 B.R. 361 (Bankr. S.D.N.Y. 1992); *In re All Seasons Indus., Inc.*, 121 B.R. 1002 (Bankr. N.D. Ind. 1990); *In re Am. Fed'n of Television & Radio Artists*, 30 B.R. 772 (Bankr. S.D.N.Y. 1983); *see also*, *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) (Noting that the case "may be larger and more complex than other chapter 11 cases where the initial 120 day exclusivity period has been extended").

37.     "The purpose of § 1121 is twofold. First, it allows the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan. Second, it ensures creditors will not endure unreasonable delay after a debtor files chapter 11." *In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993). Thus, section 1121 reflects a balance between the interests of debtors and creditors. *In re GMG Capital Partners III, L.P.*, 503 B.R. at 600.

38.     The legislative history of section 1121 demonstrates the importance of creditors' rights in bankruptcy. *See*, *e.g.*, *In re All Seasons Indus., Inc.*, 121 B.R. at 1004. The House Committee Reports state that the then proposed Chapter 11 "recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." H.R. Rep. No. 595, 95th Cong., 2nd Sess., 231-32 (1978) *reprinted in* 1978 *U.S. Cong. & Ad.News*, 5963, 6191. As stated by the Fifth Circuit in *In re Timbers of Inwood Forest Assoc., Ltd.* 808 F.2d 363, 372 (5th Cir. 1987) (en banc) (aff'd 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)) (citations omitted):

> (W)e think that any bankruptcy court involved in an assessment of whether 'cause' exists should be mindful of the legislative goal behind Sec. 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.

In 2005, a debtor's right to extend exclusivity was further limited by the implementation of strict time limits on extensions. 7 Collier on Bankruptcy ¶ 1121.11[4] (Richard Levin & Henry J. Sommer eds., 16th ed.). Consequently, motions to extend exclusivity "should 'be granted neither routinely nor cavalierly.'" *In re All Seasons Indus., Inc.*, 121 B.R. at 1004, *quoting*, *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).

39.     "Cause" is not defined in the Bankruptcy Code. *In re GMG Capital Partners III, L.P.*, 503 B.R. at 600. However, many courts have considered a number of factors (the "**Dow Test**") in determining whether cause exists, including:

1. the size and complexity of the case; 2. the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; 3. the existence of good faith progress toward reorganization; 4. the fact that the debtor is paying its bills as they become due; 5. whether the debtor has demonstrated reasonable prospects for filing a viable plan; 6. whether the debtor has made progress in negotiations with its creditors; 7. the amount of time which has elapsed in the case; 8. whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and 9. whether an unresolved contingency exists.

*In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *see also*, *Official Cmte. Of Unsecured Creditors v. Henry Mayo Newhall Memorial Hosp. (In re Henry Mayo Newhall Memorial Hosp.)*, 282 B.R. 444, 452 (9th Cir. BAP 2002); *In re GMG Capital Partners III, L.P.*, 503 B.R. at 600-01. In addition to the factors cited above, a loss of confidence in the debtor's management may also be considered. *In re All Seasons Indus., Inc.*, 121 B.R. at 1006. Not all factors need to be addressed. *In re Dow Corning Corp.*, 208 B.R. at 664.

40.     Intra-bankruptcy litigation does not constitute an unresolved contingency under the Dow Test. *In re Dow Corning Corp.*, 208 B.R. at 666-67. Of particular importance in this case, at least one court addressing mass tort claims has found that disputes surrounding the amount of tort

13

liability and the procedures for determining the amount of tort liability do not constitute unresolved contingencies. *In re Dow Corning Corp.*, 208 B.R. at 666.

41.     The Ninth Circuit Bankruptcy Appellate Panel (the "**BAP**") has stated that "affirmative answers to a number of inquiries [listed above] do not necessarily favor extending exclusivity. Professors Epstein, Nickles, and White have cogently debunked the propositions that complex cases require extended exclusivity, negotiations are facilitated by extended exclusivity, and pending litigation warrants extended exclusivity." *In re Henry Mayo Newall Memorial Hosp.*, 282 B.R. at 452, *citing*, Epstein et al., § 11-15.  The BAP has indicated that a paramount concern is whether changing the exclusivity period will advance the case.  *Id.* at 453.

42.     The debtor has the burden of demonstrating the existence of cause.  *In re All Seasons Industries, Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990); *In re GMG Capital Partners III, L.P.*, 503 B.R. at 601.  The requisite showing must be supported by the evidence.  *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007).

43.     Courts may deny a motion to extend exclusivity even when cause exists.  *In re Sharon Steel Corp.*, 78 B.R. at 765.  "This may occur where, although a company seeking reorganization is unusually large, the debtor has delayed in arriving at an agreement or is attempting to pressure other parties to yield to a position which is necessarily prejudicial." *Id.*

44.     There is no prejudice to the Debtors from the denial of the Motion because they will still have the ability to file a plan.  *See*, *e.g.  In re Mother Hubbard, Inc.*, 152 B.R. at 195-96; *see also*, *In re All Seasons Indus., Inc.*, 121 B.R. at 1004.  "In some instances, authority to file a competing plan may additionally motivate the debtor to more earnestly negotiate an acceptable consensual plan." *In re Mother Hubbard, Inc.*, 152 B.R. at 195; *see also*, *In re Henry Mayo Newhall Memorial Hosp.*, 282 B.R. at 453.  Additionally, since courts maintain control over scheduling matters, the presence of multiple plans is not unfair to debtors.  *See*, *In re Henry Mayo Newhall Memorial Hosp.*, 282 B.R. at 453.  Indeed, the presence of competing plans permits "creditors to cast ballots for multiple plans, [and] also encourages a chapter 11 policy of 'creditor democracy'" *In re Mother Hubbard, Inc.*, 152 B.R. at 195.

14

45.     The Debtors' main arguments in support of the Motion are that (1) the size of the Cases require additional time for the Debtors to have the exclusive right to file a plan, (2) the Debtors are not using the extension to pressure creditors, (3) the Debtors need time to resolve "important contingencies" (Motion at p.15), notably the wildfire claims, and (4) that the Debtors are current on their administrative expense obligations.  None of the Debtors' arguments justify extending exclusivity in the Cases.

46.     The facts of these Cases warrant denial of the Debtors' Motion.  Notwithstanding the size or complexity of the Cases, which the BAP has already ruled does not "necessarily favor extending exclusivity," (*In re Henry Mayo Newall Memorial Hosp.*, 282 B.R. at 452), the Cases were years in the making.  As noted in multiple retention applications, the Debtors have been advised on many of the issues in the Cases for a significant period of time prior to the Petition Date. The Debtors have had the benefit of representation by experienced law firms on matters including bankruptcy, wildfire liability, insurance, and corporate governance.  Thus, the size of the Cases should not be dispositive here.

47.     The Debtors' argument that they are not using the bankruptcy process to pressure creditors is also unavailing.  The inevitable result of any further delay in the plan confirmation process will be additional harm to tens of thousands of innocent Tort Claimants, many of whom are homeless, or are at risk of exhausting their insurance benefits.  These creditors are harmed every day that they do not receive a distribution.  Approximately 7,000 families will exhaust housing related insurance benefits during the extended exclusivity period proposed by the Debtors, and will be facing housing insecurity and default under their financial obligations.  Many of the Tort Claimants will only become more vulnerable through the passage of time and will be pressured into accepting any form of relief, no matter how insufficient it may be.  That result is at odds with the purpose of section 1121, which was enacted in part to remedy the imbalance from giving debtors too much power in the bankruptcy process.

48.     The Debtors' position that they need more time to resolve "important contingencies," including wildfire claims, is not persuasive for several reasons.  First, intra-

15

Baker & Hostetler LLP
Attorneys at Law
San Francisco

bankruptcy claims are not the type of claims or litigation that warrants extending the exclusivity period. *See*, *e.g.*, *In re Dow Corning Corp.*, 208 B.R. at 666-67 (addressing mass tort claims and finding that disputes surrounding the amount of tort liability and the procedures for determining the amount of tort liability do not constitute unresolved contingencies). Second, as noted by the BAP, "a likely consequence of the denial of an extension of exclusivity is 'not that creditor plans will be proposed and approved, but that the threat of such plans will cause the debtor to come forward more quickly than he might otherwise.'" *In re Henry Mayo Newall Memorial Hosp.*, 282 B.R. at 453, *citing*, Epstein et al., § 11-15. Third, many of the wildfire claims were either resolved, close to resolution, or certain procedures had been negotiated to facilitate their resolution as of the Petition Date. The Debtors are taking another bite at the apple through the Cases.

49.     The TCC lacks knowledge regarding the Debtors' representation that they are current on all of their administrative expense obligations. Nevertheless, this factor does not supersede all of the other factors that weigh strongly in favor of denying the Motion.

50.     The Debtors have stated very plainly that they "can give absolutely no idea when [they] may have a plan." 341 Transcript 123:11-14; *see also* 341 Transcript 125:19-25, 126:24-25 & 127:1-13. Given that the Debtors have had months, and factoring in pre-petition planning and wildfire litigation, years to consider a plan, and the real certainty of further harm to thousands of creditors from any extension of the exclusivity period, the TCC submits that the Motion should be denied.

51.     The TCC reserves the right to amend or supplement this Objection, and to wholly or partially join in any other objections or responses to the Motion.

### IV.     NOTICE

Notice of this statement will be provided to (i) the Debtors and their counsel; (ii) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (iii) the UCC's counsel; (iv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; and (v) all the Standard Parties, as defined in the Court's *Second Amended* * *Order Implementing Certain Notice and Case*

16

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Management Procedures entered on May 14, 2019* [Doc. No. 1996]. The TCC respectfully submits that no further notice is required.

WHEREFORE the TCC respectfully requests that the Court: (a) deny the Motion; and (b) grant such other and further relief as the Court may deem just and appropriate.

Dated: May 15, 2019

BAKER & HOSTETLER LLP

By:      /s/ *Cecily A. Dumas*
    Cecily A. Dumas

*Attorneys for The Official Committee of Tort Claimants*

Elyssa S. Kates
Jason Blanchard
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

17

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO