Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*and*

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee
of Unsecured Creditors*

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| -and- | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| **Debtors.** | **OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 105(a) AND 363(b) AND FED. R. BANKR. P. 2002 AND 6004(h) FOR AN ORDER (A) AUTHORIZING DEBTORS TO ESTABLISH AND FUND PROGRAM TO ASSIST WILDFIRE CLAIMANTS WITH ALTERNATIVE LIVING EXPENSES AND OTHER URGENT NEEDS (B) GRANTING RELATED RELIEF** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Date: May 22, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

1
2
Re:          Docket No. 1777

3

4

### TABLE OF CONTENTS

5     PRELIMINARY STATEMENT ................................................................................................ 2

6     BACKGROUND .................................................................................................................... 5

7     ARGUMENT .......................................................................................................................... 6

8        A.    The Pre-Plan Disbursements Contemplated By The Program Conflict
              With Express And Fundamental Provisions Of The Bankruptcy Code. ................... 6

9        B.    If Authorized, The Proposed Program Must Be Modified. ..................................... 13

      CONCLUSION ..................................................................................................................... 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re B&W Enters., Inc.*,
  713 F.2d 534 (9th Cir. 1983) ..................................................................................6, 7, 9, 11

*Berg & Berg Enters., LLC v. Boyle*,
  178 Cal. App. 4th 1020 (Ct. App. 2009)..................................................................................9

*In re Berry Good, LLC*,
  400 B.R. 741 (Bankr. D. Ariz. 2008)..................................................................6, 7, 9, 11

*Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  60 B.R. 612 (Bankr. S.D.N.Y. 1986)..................................................................................9

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017)..................................................................................8, 9

*In re FCX, Inc.*,
  60 B.R. 405 (E.D.N.C. 1986)..................................................................................12

*FDIC v. Castetter*,
  184 F.3d 1040 (9th Cir. 1999) ..................................................................................9

*In re Gulf Coast Oil Corp.*,
  404 B.R. 407 (Bankr. S.D. Tex. 2009) ..................................................................................8

*Gurney v. Arizona Dep't of Revenue (In re Gurney)*,
  192 B.R. 529 (B.A.P. 9th Cir. 1996)..................................................................................10

*Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc.*
  *(In re Continental Air Lines, Inc.)*,
  780 F.2d 1223 (5th Cir. 1986) ..................................................................................8

*In re Ionosphere Clubs, Inc.*,
  98 B.R. 174 (Bankr. S.D.N.Y. 1989)..................................................................................9, 10, 11

*In re Just For Feet, Inc.*,
  242 B.R. 821 (D. Del. 1999)..................................................................................11

*In re Kmart Corp.*,
  359 F.3d 866 (7th Cir. 2004) ..................................................................................11

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992)..................................................................................9

ii

*Official Committee of Equity Security Holders v. Mabey*,
   832 F.2d 299 (4th Cir. 1987) ........................................................................................2, 11, 12

*Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983) .................................................................................................8

*In re Pioneer Health Services, Inc.*,
   570 B.R. 228 (Bankr. S.D. Miss. 2017).................................................................................11

*Scouler & Co. v. Schwartz*,
   No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ...................................9

*In re Timberhouse Post & Beam, Ltd.*,
   196 B.R. 547 (Bankr. D. Mont. 1996) ...............................................................................7, 9

**Statutes**

11 U.S.C. § 105...............................................................................................2, 7, 10, 11, 12

11 U.S.C. § 363 ............................................................................................................ *passim*

11 U.S.C. § 503.........................................................................................................................10

11 U.S.C. § 507...................................................................................................................6, 7, 8

11 U.S.C. § 510.......................................................................................................................11

11 U.S.C. § 1123.......................................................................................................................7

**Rules**

Fed. R. Bankr. P. 2002 ...........................................................................................................2

Fed. R. Bankr. P. 6003 .........................................................................................................10

Fed. R. Bankr. P. 6004 ....................................................................................................2, 10

Case: 19-30088    Doc# 2020    Filed: 05/15/19    Entered: 05/15/19 15:59:09    Page 4 of
18

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (the "Debtors"), by its attorneys, Milbank LLP, hereby submits this objection to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rules of Bankruptcy Procedure 2002 and 6004(h) for an Order (a) Authorizing the Debtors to Establish and Fund Program to Assist Wildfire Claimants with Alternative Living Expenses and Other Urgent Needs and (b) Granting Related Relief* [Docket No. 1777] (the "Motion").[1]  In support of its objection, the Committee respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1.     The 2017 and 2018 Wildfires left behind a tragic trail of devastation and destruction.  Victims of those fires continue to suffer.  The Committee is sympathetic to those victims, including the intended beneficiaries of the Motion—a group defined as "certain" wildfire victims "who have been displaced from their primary residence as a result of the 2017 and 2018 Wildfires."  The Committee also understands the Debtors' proposal to establish the fund described in the Motion (the "Fund") in order to facilitate distributions to that particular group (the "Program").  The Committee's overarching objective in these cases is to achieve confirmation of a comprehensive plan of reorganization that treats *all* creditors, including wildfire victims, fairly and equally, and in a manner that is consistent with the Bankruptcy Code.  The Program does not do this.

2.     The Program, while laudable in concept, is flawed in construction.  As presented, the Program neither satisfies longstanding legal standards nor contains appropriate safeguards to protect the equal-ranking unsecured creditors that are the Committee's constituency.  To be clear, the Committee absolutely supports the swift resolution and payment of all unsecured claims, including those of the victims of these tragedies, and will work tirelessly to achieve that goal, but the Committee cannot support the Motion as it has been crafted by the Debtors.

---

[1]     Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

3. As a statutorily appointed fiduciary, duty-bound to safeguard the interests of a broad constituency of unsecured creditors holding more than $22 billion of claims in a wide variety of capacities, the Committee cannot support the pre-plan distributions or the piecemeal approach to payment of claims proposed in the Motion, particularly when the Debtors have not yet articulated a legal basis for making such payments or constructed basic safeguards around the mechanics of and accounting for such payments.

4. The Debtors chose to file for chapter 11 protection. While that decision afforded them the unique opportunity to use certain bankruptcy tools to attempt to comprehensively address all of their wildfire claim liability, it also bound them to two fundamental chapter 11 principles: subject to certain limited exceptions that do not apply here, prepetition claims cannot be paid other than under a confirmed plan of reorganization, and all claims of equal priority must be treated equally. The distributions contemplated in the Program would violate both of these principles.

5. The proposed distributions would also reduce the estate by $105 million without assurance that these funds would be either (i) paid to claimants who the Debtors believe will have allowable claims against the estates or (ii) applied as a credit against future plan distributions on account of those claims if and when allowed. Rather, the Debtors state that "as of the date of this Motion, there has been no legal determination that the Debtors are liable for any claims associated with the 2017 and 2018 Wildfires" and that "any payment made . . . is not intended to be and should not be construed as an admission to the validity of any claim. . ." Mot. at 4, 8. At the same time, the Debtors seek appointment of an Administrator who has broad authority to determine eligibility and make payments from the Fund, with no guarantee that the recipients of these payments are creditors of the Debtors' estates or, if they are, that payments made under the Program will not be duplicated later through other assistance programs or future recoveries that may be provided to allowed wildfire claims under a confirmed plan of reorganization.

6. As a fiduciary to a broad constituency of creditors of the Debtors' estates, the Committee cannot support the Debtors' proposal to disburse these estate funds outside a confirmed plan of reorganization without a corresponding reduction in liability or other demonstrable benefit to the estates.

3

7. If the Court nonetheless is inclined to authorize the Program, the Committee respectfully submits that certain safeguards must be built into it to mitigate these problems:

- *First*, and most critically, any disbursements made under the Program must reduce dollar-for-dollar the amounts allocable, pursuant to a plan of reorganization ultimately confirmed in these cases, to the payment of allowed claims relating to the 2017 and 2018 Wildfires. While the Debtors state that distributions made under the Program "might" be made to individuals who hold legitimate claims against the estates arising from the 2017 and 2018 Wildfires and that the Debtors do not "expect[]" those individuals to seek a double recovery (*see* Mot. at 7 n.2), neither the relief requested in the Motion nor the Debtors' proposed order includes any measures to eliminate these uncertainties.

- *Second*, the Program must be modified to include verifiable criteria with respect to eligibility, including restricting eligibility to the individuals harmed by the particular wildfires for which the Debtors' liability has already been determined or for which the Debtors are likely to be held liable. As proposed, the eligibility criteria is determined by the Administrator in its sole discretion, without any relationship to the Bankruptcy Code or the Debtors' potential liability.

- *Third*, the Committee must have meaningful oversight over the implementation and administration of the Program, including with respect to the determination of the eligibility criteria and the disbursement of and accounting for the funds.

- *Fourth*, any disputes arising from the implementation of the Program must be resolved by this Court.

8. Finally, the Committee is concerned that, even if all of the proposed modifications are made, the authorization of the Program will invite additional requests for other forms of pre-plan payments on account of other prepetition claims. If the Court approves a carefully crafted program for immediate relief to certain wildfire victims, it should remain mindful that it stands atop a slippery slope that very well may lead to additional "creeping confirmation" requests from a variety of constituencies that believe they are just as worthy of preferred or accelerated treatment.

4

The Court should make clear that approval of a modified Program cannot be precedent or used as a basis for future distributions of this kind outside of a confirmed plan of reorganization.

## **BACKGROUND**

9. On January 29, 2019, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

10. On February 12, 2019, the U.S. Trustee appointed and formed the Committee. The Committee is statutorily charged with the fiduciary responsibility to represent all of the Debtors' unsecured creditors (other than those represented by the Official Committee of Tort Claimants) and is tasked to provide a reliable and independent check on, and balance to, the Debtors' actions. The individuals and companies that compose the Committee span from line-workers to key vendors and play a critical role in supporting PG&E's operations and their support is essential to preserving the operations of the restructured company.

11. The Debtors filed the Motion on May 1, 2019 seeking authorization to fund and establish the Program to aid "certain" victims who have been displaced from their primary residences with "the costs of substitute or temporary housing . . . or other urgent needs." Mot. at 4. The Debtors propose to deposit $105 million of estate funds into the Fund, to be controlled by an Administrator to be mutually selected by the Debtors and the statutorily appointed Committees. *Id.* at 5. The Administrator would have sole authority to determine (i) the "eligibility criteria for participation in and receipt of funds from the Wildfire Assistance Program" and (ii) "the types of expenses Wildfire Claimants can obtain financial assistance for and the amount of assistance to be provided to each eligible Wildfire Claimant"—subject to the broad provisos that distributions must be made in a "fair and equitable manner" with assistance "prioritized to those . . . who are most in need." *Id*. As such, the Program reserves to the Administrator virtually unfettered discretion to disburse estate funds without a clear mandate as to whom those payments will be made and for what particular needs. This broad (and unsupervised) discretion could give rise to ambiguities, confusion, and even duplication in the administration of the Program. For example, the Committee understands that when the Debtors approached FEMA about the Debtors' program—then-styled as a "Temporary Housing Assistance Fund"—FEMA informed the Debtors that the program

5

would overlap with FEMA's ongoing efforts in assisting California wildfire victims to secure temporary housing. As a consequence, the Debtors revised the program to provide the Administrator with discretion to allocate estate funds toward unspecified "other urgent needs."

12. Although the Administrator must file quarterly reports with the Court describing the number of applications submitted and processed and accounting for receipts and disbursements, as well as keep administrative and financial records for inspection by the Debtors and the Committees, the Motion does not require the Administrator to consult the Committee (or the Debtors or anyone else) in the formulation of the Eligibility Criteria or disbursement of funds, and the Committee is not expressly permitted to formally challenge any of the Administrator's decisions with respect to the Program. Mot. at 6.

13. Most critically, the Program does not require that disbursements be credited against distributions ultimately payable on account of allowed claims under the plan of reorganization to be confirmed in these cases—including claims relating to the 2017 and 2018 Wildfires. The Debtors instead note that disbursements under the Program "might" be made to those with legitimate claims against the Debtors, which implicitly recognizes that payments may also be made to some who do not.[2] In addition, the Motion states that it is the Debtors' "expectation" that those who receive assistance under the Program will not later seek a double recovery on account of any expenses already reimbursed. *Id*. at 7 n.2. But there is nothing in the Motion or the proposed order that would mandate the kind of simple crediting mechanism that would actually safeguard against any such double recovery.

## ARGUMENT

### A. The Pre-Plan Disbursements Contemplated By The Program Conflict With Express And Fundamental Provisions Of The Bankruptcy Code.

14. It is "[b]asic to bankruptcy jurisprudence" that prepetition claims "may not be paid in the absence of a confirmed reorganization plan." *In re Berry Good, LLC*, 400 B.R. 741, 744

---

[2] Indeed, the Debtors note that any payment made under the Program "is not intended to be and should not be construed as an admission to the validity of any claim…" (Mot. at 8) and that there has been "no legal determination that the Debtors are liable for any claims associated with the 2017 and 2018 Wildfires." *Id.* at 4. As a consequence, the Program allows for the payment of estate funds to those who may never be able to prove up a claim against the estates, and thus are not and will not be creditors in these cases.

6

(Bankr. D. Ariz. 2008). In Bankruptcy Code section 507, Congress established a carefully calibrated priority scheme for satisfying allowed prepetition claims with which, in the reasoned opinion of the Ninth Circuit, it is "unwise to tamper." *In re B&W Enters., Inc.,* 713 F.2d 534, 537 (9th Cir. 1983). Coupled with this priority scheme is the statutory requirement, set forth in Bankruptcy Code section 1123(a)(4), that claims with legally similar rights against a debtor's estate must receive the same treatment under a plan. *Id.* Indeed, the Bankruptcy Code does not "authorize courts to allow preferential payment of prepetition obligations in contravention of its claims priority scheme or outside of a confirmed plan of reorganization." *In re Berry Good*, 400 B.R. at 746 (denying debtors' request to pay certain prepetition claims in the absence of a confirmed reorganization plan).

15. The Debtors' Program would be funded with $105 million of estate funds, for the purpose of making pre-plan distributions to select victims of the 2017 and 2018 Wildfires. To the extent such wildfire victims are ultimately proven to have legally cognizable claims against the Debtors, such claims will be general unsecured claims entitled to *pari passu* treatment with all other general unsecured claims. Paying such claims under the Program would prioritize and elevate (or at least accelerate) them over all other unsecured claims, including other wildfire victims not selected by the Administrator for inclusion in the Program, in contravention of the priorities established by Bankruptcy Code section 507 and implemented by section 1123(a)(4).

16. The Committee is not aware of any legal precedent that would support the Program as proposed. To the contrary, as the Ninth Circuit has stated, "[t]here is no indication that Congress intended the courts to fashion their own rules of super-priorities within any given priority class." *In re B&W Enters., Inc.*, 713 F.2d at 537; *see also In re Timberhouse Post & Beam, Ltd.*, 196 B.R. 547, 550-51 (Bankr. D. Mont. 1996) (denying request to make payments on prepetition claims prior to confirmation of a plan, and noting that "[t]his Court adopts the bright line rule set forth in *B&W Enterprises* [and other cases] that a prepetition unsecured claim cannot be elevated to an administrative expense since the . . . Bankruptcy Code does not allow this Court to change the classification of claims set by Congress in the Code.").

17.     The Motion asserts that the Court has the authority to grant the requested relief under Bankruptcy Code sections 105(a) and 363(b).  That is not the case.

18.     As a preliminary point, section 363, and the exercise of business judgment thereunder, does not permit the Debtors to circumvent other provisions of the Bankruptcy Code. To the contrary, "the bankruptcy court must not authorize a § 363(b) transaction if the transaction would effectively evade the 'carefully crafted scheme' of the chapter 11 plan confirmation process." *In re Gulf Coast Oil Corp.,* 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009) (refusing to approve proposed sale because it would deprive creditors of protections they would have received if the sale was conducted as part of a chapter 11 plan confirmation process).

19.     Furthermore, courts do not allow circumvention of the chapter 11 reorganization process in order to re-shuffle section 507 priorities. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985-86 (2017).[3]  This is true even in "'rare case[s],' in which courts could find 'sufficient reasons' to disregard priority." *Id.* at 986 (alteration in original) (quoting *In re Jevic Holding Corp.*, 787 F.3d 173, 175, 186 (3d Cir. 2015)).  In *Czyzewski*, the Supreme Court held that a bankruptcy court may not approve a chapter 11 structured dismissal that alters section 507 priorities without the consent of affected creditors. *Id.* at 985-87.  In so doing, the *Czyzewski* Court concluded: "Congress did not authorize a 'rare case' exception" to the section 507 priority scheme, so "[w]e cannot 'alter the balance struck by the statute,' not even in 'rare cases.'" *Id.* at 987 (quoting *Law v. Siegel*, 571 U.S. 415, 427 (2014)).

20.     Consequently, the Program, which appears to violate fundamental bankruptcy principles—*i.e.*, the prohibition of payments on account of prepetition claims in the absence of a

---

[3]     *See also Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*" regarding sales of assets).  Furthermore, "if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditors rights under [other Bankruptcy Code sections] might become meaningless." *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1227-28 (5th Cir. 1986) (remanding motions to enter into lease agreements in response to creditor assertions they were being denied protections they would have been afforded if lease agreements were part of a reorganization plan).

8

confirmed plan of reorganization and the disparate treatment of claims of equal priority—cannot be insulated from scrutiny by appeal to section 363 and the "business judgment rule."

21.    And while some courts have used section 363 to authorize payments of certain prepetition claims under the so-called "doctrine of necessity" (a doctrine not invoked in the Motion), that doctrine is inapplicable here. To begin with, the doctrine of necessity is narrowly applied to situations in which the payment of prepetition obligations are necessary for the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See In re B&W Enters., Inc.*, 713 F.2d at 537.[4] Indeed, payments of select prepetition claims pursuant to the doctrine of necessity may only be allowed "when such payment is needed to facilitate the rehabilitation of the debtor"—*i.e.*, "where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989); *see also In re Berry Good*, 400 B.R. at 744 (denying debtor's motion to authorize pre-plan payment on prepetition claim, despite debtor's assertion that payment was "critical to the Debtors' abilities to reorganize, and . . . a proper exercise of the Debtors' business judgment"); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. at 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules where necessary to enable a successful reorganization and listing examples such as "'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims").[5]

---

[4]  *See also In re Timberhouse Post & Beam*, 196 B.R. at 549.

[5]  Other than *Ionosphere*, none of the cases cited by the Debtors involve payments on account of prepetition claims outside of a confirmed plan, and the majority do not concern section 363 at all. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (approving breakup fee and expense reimbursement, without reference to Bankruptcy Code section 363); *FDIC v. Castetter*, 184 F.3d 1040, 1041 (9th Cir. 1999) (analyzing the business judgment rule outside of the bankruptcy context, without reference to section 363); *Scouler & Co. v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012) (upholding debtor's prepetition purchase of interest in joint venture); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 618-19 (Bankr. S.D.N.Y. 1986) (finding debtor's retention of certain lobbyists was ordinary course under section 363); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020 (Ct. App. 2009) (affirming insufficient facts were pled to find directors'

9

22.     By way of example, the Debtors in these cases filed first day motions to pay prepetition obligations owed to certain critical safety and reliability, outage, and nuclear facility suppliers, shippers, and warehousemen—noting, among other things, that the failure to pay these claims "would cause irreparable financial harm to the Debtors and their reorganization efforts under chapter 11."[6]  The Committee conducted substantial due diligence in respect of these proposed payments and because the Committee's diligence supported the Debtors' representations, the Committee chose not to object to the motions.  The Court subsequently approved them, agreeing that the payments were "necessary to avoid immediate and irreparable harm to the Debtors and their estates." [Docket Nos. 213, 214].  In this case, while the Committee has compassion for the wildfire victims, the Program does not satisfy the aforementioned parameters with respect to the doctrine of necessity.

23.     Indeed, the Debtors do not claim that the proposed expenditure of $105 million outside of a confirmed plan is "needed to facilitate the[ir] rehabilitation" or "essential to the[ir] continued operation".  *In re Ionosphere Clubs*, 98 B.R. at 175-76.  And while the Committee is very sensitive to the continuing hardships faced by those who have been displaced from their homes by the 2017 and 2018 Wildfires, the payments contemplated by the Motion are not of the kind needed to forestall an existential threat, or to ensure the Debtors' ability to reorganize.  As such, they are not authorized by the Bankruptcy Code.

24.     Nor does Bankruptcy Code section 105(a) provide the Court with the necessary authority to approve the Program.  While section 105(a) endows bankruptcy courts with broad equitable powers, such powers "may be exercised only in a manner not inconsistent with the

---

actions liable under the California business judgment rule).

[6]     *See, e.g.,* Motion of Debtors Pursuant to 11 U.S.C. 105(a), 363(b), and 503(b)(9) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Safety and Reliability, Outage, and Nuclear Facility Suppliers at 14 ("Operational Integrity Motion") [Docket No. 12]; *see also* Motion of Debtors Pursuant to 11 U.S.C. 105(a), 363(b), and 503(b)(9) and Fed. R. Bankr. P. 6003 and 6004 for (I) Interim and Final Authority to Pay Prepetition Obligations Owed to Shippers, Warehousemen, and Other Lien Claimants, and (II) Granting Administrative Expense Priority Status for Claims Arising from Goods Delivered to the Debtors Postpetition ("Lien Claim Motion") [Docket No. 13].  The Debtors cited a wealth of case law in support of these motions suggesting that payment on prepetition claims "***must be*** 'necessary to avert a serious threat to the chapter 11 process.'"  Operational Integrity Mot. at 20 (citing *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (emphasis added)); Lien Claim Mot. at 13 (same).

10

provisions of the [Bankruptcy] Code." *Gurney v. Arizona Dep't of Revenue (In re Gurney)*, 192 B.R. 529, 537 (B.A.P. 9th Cir. 1996) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 199 (1988)). Consistent with this principle, "most circuit courts, including the Ninth, have held that the bankruptcy court does not have general equitable power . . . to overrule the Code's priority scheme by favoring one class of unsecured creditors over another." *In re Berry Good*, 400 B.R. at 746. Indeed, as the Ninth Circuit has observed, the only statutory provision to which a bankruptcy court might point to elevate certain claims over other, legally similar, claims would be Bankruptcy Code section 510(c), which provides for equitable subordination of claims upon the showing of inequitable conduct and resulting harm to the estate. *In re B&W Enters., Inc.*, 713 F.2d at 537. In the absence of demonstrable "misconduct on the part of all the other unsecured creditors," a single subset of unsecured claims cannot be given preferential treatment. *Id*. at 538. In any event, courts that have considered their authority with respect to authorizing payment of prepetition claims outside of a plan in the context of section 105(a) required a similar showing of exigency as required under § 363(b)—a showing the Debtors have not made.[7]

25. Indeed, the Fourth Circuit has struck down a program very similar to the Program in *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir. 1987)—even though the *Mabey* program explicitly sought to credit the pre-plan payments against the intended beneficiaries' ultimately allowed prepetition claims. The *Mabey* debtor, A.H. Robins Co. ("Robins"), "sought refuge in Chapter 11 because of a multitude of civil actions filed against it by women who alleged they were injured by use of [its] Dalkon Shield intrauterine device"— including women who asserted that the device had rendered them infertile. *Mabey*, 832 F.2d at

---

[7] *See In re Kmart Corp.*, 359 F.3d 866, 874 (7th Cir. 2004) (affirming reversal of bankruptcy court's order to pay critical vendors in absence of evidence that any vendor would cease doing business with the debtor if not paid for prepetition deliveries and thus impair the debtor's operations); *In re Pioneer Health Services, Inc.*, 570 B.R. 228, 236 (Bankr. S.D. Miss. 2017) (denying payment on prepetition claims because there was "no significant offsetting bankruptcy-related justification" for classifying the creditors as critical vendors necessary to continue the debtor's business operations); *In re Ionosphere*, 98 B.R. at 176 ("the Bankruptcy Court's equitable power may be used to effectuate the purposes of Chapter 11, which include the restructuring of a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders.") (quotations omitted)); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (authorizing payment of prepetition claims because such payment "[was] essential to the survival of the debtor during the Chapter 11 reorganization").

11

300. The debtor, along with a tort claimants' committee and others, sought, pursuant to the bankruptcy court's equitable powers and the debtor's "business judgment," to establish an "Emergency Treatment Fund" (the "Dalkon Fund") that would, through an appointed administrator, make $15 million in pre-confirmation disbursements "for tubal reconstructive surgery or in-vitro fertilization for Dalkon Shield claimants who have asserted that they have been rendered infertile as a consequence of their use of the product." *Id.* The Dalkon Fund program set forth specific eligibility requirements and provided that "[a]ny amounts paid under the Program on behalf of a participating claimant will be deducted from the amount of disbursement the claimant would otherwise receive under a confirmed Chapter 11 plan of reorganization of Robins." *Id.*

26. The Fourth Circuit reversed the District Court's authorization to establish the Dalkon Fund, cautioning that, while "the equitable powers emanating from § 105(a) are quite important . . . [they] are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules." *Id.* at 302. *See also id.* ("the fact that a proceeding[] is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be.") (citation and internal quotation marks omitted). The Fourth Circuit found that the debtors' argument under section 105(a) and their appeal to the "business judgment" standard were equally without merit, concluding that the contemplated Dalkon Fund would "violate the clear dictates of the Bankruptcy Code, by paying certain unsecured claimants before their claims have been allowed and before a confirmed plan of reorganization is in place." *Id.* at 303.

27. The Debtors have made the decision to file for bankruptcy protection and use the protections and benefits of the Bankruptcy Code as a means for resolving wildfire claims against them. That is certainly the Debtors' prerogative. But the Debtors' choice of this course of action means that their other unsecured creditors will have to go unpaid until a reorganization plan is confirmed in these cases. If implemented as proposed, the Program could infringe on the rights of those other creditors to be treated equally with all other creditors of equal priority. To structure the Program the way the Debtors are proposing would not only subvert the Bankruptcy Code's

12

priority scheme, but could potentially compromise recoveries by all other unsecured creditors in certain scenarios. *See, e.g., In re FCX, Inc.*, 60 B.R. 405, 410 (E.D.N.C. 1986) (reversing bankruptcy court order permitting pre-plan payments to subgroup of unsecured creditors and noting that "because there is always a possibility that [the debtor] will not have sufficient assets to pay all general unsecured creditors, it is legally improper to subordinate the claims of the remaining unsecured creditors absent inequitable conduct by them.").

### B. If Authorized, The Proposed Program Must Be Modified.

28. Should the Court decide that the circumstances of these cases warrant authorization of the Program, the Committee respectfully submits that it should be modified in several material respects.

29. First, the disbursements under the Program must not be purely gratuitous. The Committee is not aware of a single instance in which a court has considered, let alone authorized, *gratis* distributions of estate assets, and the Motion does not cite to any. Instead, to the extent that any given Program participant receives a payment from this Program, then that payment must reduce, on a dollar-for-dollar basis, the aggregate payout allocated on account of allowed claims relating to the 2017 and 2018 Wildfires under the plan ultimately confirmed in these cases to ensure fairness for all creditors.

30. Second, the disbursements under the Program must not be unmoored from legally cognizable prepetition claims against the Debtors. As proposed, the Program grants the Administrator broad authority to "develop[] the specific eligibility requirements and application procedures for the distribution of the Wildfire Assistance Fund to eligible Wildfire Claimants." Mot. at 5. At least two eligibility requirements must be explicit: (i) the Program should restrict eligibility for the Program payouts to the Wildfire Claimants harmed only by those fires for which the Debtors are likely to be found liable and (ii) as a condition precedent to eligibility, the Administrator must make a determination that the particular claimants' damages are likely to be in an amount substantially comparable to or greater than the payout to such claimant from the Fund.

31.     Third, the Committee should be given consultation rights or otherwise meaningful oversight with respect to the Program.  Currently, the Motion contemplates that an Administrator will have the sole authority to "determine the eligibility criteria for participating in and receipt of funds" from the Program, subject only to the requirement that the funds be distributed "in a fair and equitable manner," with a priority toward "those eligible Wildfire Claimants who are most in need . . ." Mot. at 5.  The Committee has the consent right only with respect to the selection of the Administrator—the Motion does not provide the Committee, or anyone else, with meaningful oversight over the implementation of the Program and/or administration of the Fund.  The Committee respectfully requests that, as a condition to approving the Program, the Court ensure that the Committee is given meaningful oversight with respect to the determination of the Eligibility Criteria and the disbursement of funds, the criteria for regular reporting, inspection rights and notice of actions, and a protocol for challenging actions and resolving disputes with the Court.

32.     Fourth, the Debtors must provide more specificity regarding how the Program will be implemented and administered to avoid disputes regarding who is eligible to receive funds, who has authority to make these decisions, and how the Program and any disbursements are treated in connection with a plan of reorganization.  As currently proposed, the Program affords virtually unfettered discretion to the Administrator to disburse estate funds without further court supervision and leaves unclear the criteria for eligibility, as well as the exact purposes for which these funds may be used.

33.     Finally, the order approving the Program should be clear that any disputes, questions, or issues that arise in connection with the Program will be resolved by the Court.  Given that the Program would be funded by the estates, its administration should remain within the Court's purview.

## CONCLUSION

34.     The Committee supports the swift resolution and payment of all unsecured claims, including those of the victims of these tragedies, and will work tirelessly to achieve that goal.  The Program, while laudable in concept, is flawed in construction.  As proposed by the Debtors, the

14

1  Program neither satisfies longstanding legal standards nor contains any of the appropriate

2  safeguards to protect the equal-ranking unsecured creditors that are the Committee's constituency,

3  and therefore the Motion should not be approved.

4

5  DATED:  May 15, 2019                    MILBANK LLP

6
                                          _/s/ Dennis F. Dunne_____
7                                         DENNIS F. DUNNE
                                          SAMUEL A. KHALIL
8                                         GREGORY A. BRAY
                                          THOMAS R. KRELLER
9
                                          *Counsel for the Official Committee of Unsecured*
10                                        *Creditors*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28