**EXHIBIT A**

```
                    UNITED STATES BANKRUPTCY COURT

                    NORTHERN DISTRICT OF CALIFORNIA

                              -oOo-

In Re:                          ) Case No. 19-30088
                                ) (Lead Case) (Jointly
PG&E CORPORATION AND PACIFIC    ) Administered)
GAS AND ELECTRIC COMPANY        ) Chapter 11
                                )
                      Debtors.  ) San Francisco, California
                                ) Monday, April 29, 2019
                                  10:00 AM

                                CONTINUED MEETING OF
                                CREDITORS PURSUANT TO SECTION
                                341(A) OF THE BANKRUPTCY CODE

                    TRANSCRIPT OF PROCEEDINGS
                    BEFORE TIMOTHY S LAFFREDI, AUST
            FOR THE OFFICE OF THE UNITED STATES TRUSTEE

APPEARANCES:
For the Debtor:             STEPHEN KAROTKIN, ESQ.
                            Weil, Gotshal & Manges LLP
                            767 Fifth Avenue
                            New York, NY 10153
                            (212) 310-8000

                            TOBIAS S. KELLER, ESQ.
                            Keller & Benvenutti LLP
                            650 California Street
                            Suite 1900
                            San Francisco, CA 94108
                            (415) 796-0709

                            KEVIN J. ORSINI, ESQ.
                            Cravath, Swaine & Moore LLP
                            825 Eighth Avenue
                            New York, NY 10019
                            (212) 474-1000

For the Official Committee  DANIEL B. DENNY, ESQ.
of Unsecured Creditors:     Milbank LLP
                            2029 Century Park East
                            33rd Floor
                            Los Angeles, CA 90067
                            (424) 386-4302
```

1    MR. LAFFREDI: So what are the debtors' current plans
2 for reorganization? Actually, you know what, why don't we --
3 well, is that going to be easier?
4    MR. WELLS: We can pass --
5    MR. LAFFREDI: Okay.
6    MR. WELLS: We currently don't have a plan of
7 reorganization. We are continuing to evaluate and try to
8 assess the total claims coming from the 2018, 2019 -- or,
9 sorry, 2017, 2018 fires. Until we have a better handle on the
10 total claims exposure as well as the legislation to reform
11 wildfire liability laws, we are not in a position to be able to
12 put forward a plan of reorganization.
13    MR. LAFFREDI: So at this point do you know when a
14 plan will be -- is able to filed?
15    MR. WELLS: No, I don't know when a plan is going to
16 be in a -- well, will be in a position to -- to file a plan.
17 We will be filing a motion to extend exclusivity.
18    MR. LAFFREDI: Thank you. Okay, so now I have some
19 specific questions about the global notes to the schedules and
20 amendments -- schedules and statements that apply generally.
21 First with regard to global note number 4 regarding
22 liabilities, this note indicates -- it's on page 4 of
23 document -- oh, you found it, okay. In this latter part of the
24 first paragraph, it indicates that, as additional information
25 becomes available and further research is conducted, the

to do before there's a solution that I think all stakeholders can support. But we are encouraged with respect to the sense of urgency, the ideas that were raised in that report. And we think that parties could work constructively, given those sets of ideas, to a common outcome, this legislative session. But it's going to require a significant amount of work by not just those in Sacramento but by all of the stakeholders that are impacted by these issues.

MS. DUMAS: Well, I thank you for that. And as you can imagine, the tort claimants' committee, representing thousands of victims of wildfires, want to emphasize as strongly as we can the need for speed and urgency in resolving these claims.

All right. That brings me --

MR. WELLS: We hold that as a priority. Thank you.

MS. DUMAS: Well, thank you. Appreciate that.

That brings me to my last topic. Since you were here last giving information at the 341, a number of new directors have been installed on the board, and is the board now settled, or do you anticipate further changes, if you know?

MR. WELLS: The company recognizes we've lost the trust and confidence of the communities we serve. One of a number of steps that the company intended to -- to begin steps to rebuild that trust and confidence was a refreshment of both the board and management team.

1  gave today is 900 million?

2  MR. THOMASON: So our -- our 10-Q that we'll be
3  issuing later this week will have disclosures around contingent
4  liabilities. So that -- that will have the latest information
5  in terms of where we are with respect to settlements and
6  amounts that we've paid.

7  MR. SINGLETON: All right.

8  MR. WELLS: You could look at the company's 10-K which
9  was filed with the Securities Exchange Commission at the end of
10 February; and as David indicated, when we file the first
11 quarter financial statements, that table will be updated.

12 MR. SINGLETON: Okay, thank you. And just so you
13 know, we did look at the 10-K, and we were going off the 800-
14 million testimony last time, and we thought 800 million was
15 correct. It sounds like you're saying that it's actually 880
16 or closer to 900. And that will be listed in the -- I believe
17 you said -- 10-Q?

18 MR. WELLS: The 10-Q filed with the SEC --

19 MR. SINGLETON: Okay.

20 MR. WELLS: -- this Thursday.

21 MR. SINGLETON: Okay. All right.

22 All right. Addressing a question that Mr. Campora and
23 Ms. Dumas asked about the hardship fund for the Camp fire
24 victims. And I don't want to belabor anything. Obviously you
25 are aware that there are Camp fire victims that are still

1 homeless?

2 MR. WELLS: I am, which is why we want to put that
3 motion forward.

4 MR. SINGLETON: Sure.

5 One question I had was you said something that I
6 didn't quite understand. I was wondering if you could explain
7 this, you said you were concerned about jeopardizing federal
8 funding. What did you mean by that?

9 MR. WELLS: As I understand it, the question has been
10 raised that if we were to provide specific relief to the
11 victims of the 2018 fire, that may put at risk federal funding
12 that is being administered by FEMA with respect to those same
13 victims.

14 MR. SINGLETON: I'm sorry; I just never heard of that.
15 It didn't happen in Butte.

16 MR. WELLS: I'm not aware of it. The question came up
17 with discussions with California's Office of Emergency Services
18 as well as in our outreach with FEMA to ensure that we weren't
19 complicating the current government actions that were underway.

20 MR. SINGLETON: Okay. I can just represent to you
21 that having represented several hundred folks who received the
22 emergency fund in Butte, and who also received FEMA, there was
23 absolutely no issue there. So I don't know of anything. Did
24 you have any --

25 MR. WELLS: We were asked to verify this by the

looking at having to pay both rent and a mortgage?

MR. WELLS: We're looking at the impacts that both the '17 and '18 fires have had on the communities that we serve as part of this temporary housing motion. I -- it's premature to talk about a additional motion as we've talked about throughout this hearing. And as part of my first-day declaration, we are working to expeditiously resolve all of the liabilities the company faces during this bankruptcy proceeding until we have a handle on the date that we'll have that resolution, it's premature to talk about additional emergency matters.

MR. SINGLETON: So according to your testimony in response to Mr. Campora, you can give absolutely no idea when you may have a plan?

MR. WELLS: That's right.

MR. SINGLETON: The ALE benefits are set to run out in five months, correct?

MR. WELLS: That's correct, yes. I'll take your word for that.

MR. SINGLETON: But it's premature to talk about whether or not PG&E is going to do anything for when these ALE benefits run out?

MR. WELLS: Well, I think, as I said, the fund that we are evaluating to put forward as part of this temporary relief housing motion takes into considering both the '17 and '18 fires. Anything beyond that fund is what I've said is

1    As we've been talking here for the 2015 Butte fire, we
2 have only resolved roughly, call it, two-thirds of the claims
3 the company faces, and we're now approximately three and half
4 years after the date of that fire. So it is from that
5 experience that I say that we want to more expeditiously
6 resolve the claim -- the total claims the company's facing.
7    MR. SINGLETON: So in this context, when you say
8 "expeditiously," you mean some time before that, through the
9 five year period?
10    MR. WELLS: Yes. As I indicated in my first-day
11 declaration, we want to accelerate resolution of these claims
12 in a manner that would be more expeditious than the traditional
13 path in a state court system, yes.
14    MR. SINGLETON: Okay. And again, not to belabor the
15 point, but as you understand it, that means something quicker
16 than the three to five years that you just talked about?
17    MR. WELLS: That's correct. Yes.
18    MR. SINGLETON: Okay.
19    MR. WELLS: We endeavor to resolve these as
20 expeditiously as possible as I've indicated in previous
21 comments. It will require changes of outside of the company's
22 control. We will work constructively for those changes as
23 well, but that is the -- because there are events that are
24 outside of the company's control, that is the reason why today
25 I can't give you the exact date for a plan of reorganization.

1  MR. SINGLETON: What are some of those events?
2  MR. WELLS: As we've talked about in this hearing, in
3  order to raise the required financing, there will likely need
4  to be changes in wildfire liability laws here in California to
5  attract new debt and equity investments.
6  MR. SINGLETON: And just so everybody's clear, when
7  you say "changes in wildfire liability laws, you're talking
8  about limiting the amount of the utilities liability?
9  MR. WELLS: Not necessarily. I think as the
10 Governor's report has outlined, there are multiple ways that
11 the state can bring stability to the situation that will allow
12 investors the confidence to begin reinvesting in California and
13 that can take a number of different forms.
14 MR. SINGLETON: What are some other forms other than
15 limiting liability?
16 MR. WELLS: I think some of them, those ideas don't --
17 don't speak to any limited liability. The catastrophic fund
18 that could be established similar wo what California has done
19 after the devastating earthquakes in the early '90s with the
20 California Earthquake Agency, we can look to the impact of
21 catastrophic hurricanes in Florida. And so there are a number
22 of different ideas that are being discussed some of which don't
23 speak to any limitation of liability.
24 MR. SINGLETON: Okay. In terms of plan, and I know
25 you've said you cannot give us a date, but do you expect the

1  plan to call for payment in full of allowed claims for fire
2  victims?
3            MR. KAROTKIN:  We're not going to comment on the plan
4  or potential provisions of a plan, period.
5            MR. SINGLETON:  Why not?
6            UNIDENTIFIED SPEAKER:  Because we're not, and it's
7  premature, so I suggest you move on.
8            MR. SINGLETON:  So the purpose of this is to find out
9  how the case is going to be administered, but the second time
10 we're back here it's still too early to talk about any portion
11 of a plan at all?
12           UNIDENTIFIED SPEAKER:  That's correct.  What are you
13 smirking about?
14           MR. SINGLETON:  I was just wondering -- I was actually
15 thinking about something I heard on NPR this morning.  It's
16 about a couple who lost their home in the 2017 fires --
17           UNIDENTIFIED SPEAKER:  I heard that today in the news.
18           MR. SINGLETON:  Thank you.  And they were talking
19 about how they're going to run out of ALE benefits in five
20 months, and they and their six-year-old autistic son and their
21 two other children are going to have to move into a motor home
22 because they couldn't afford to both pay the mortgage and their
23 rent, and I was just wondering about them and whether or not
24 they'd agree with you that it's premature and inappropriate to
25 talk about the plan or when PG&E might get around to

1  even more.
2  How do you -- how did some people get paid on this
3  Butte -- I'm talking the Butte fire in 2015 -- and then
4  suddenly you file bankruptcy? How did that -- how did that get
5  determined? How did that come about like that? How come some
6  people got paid but not the rest of the people?
7  MR. WELLS: Well, first of all, let me apologize for
8  the impact that this had on you and your son.
9  MR. MONTGOMERY: Well, my whole family.
10 MR. WELLS: Your whole family.
11 MR. MONTGOMERY: I lost everything. Houses, I burned
12 out -- I had no hair, no eyebrows, nothing. Literally, just --
13 anyway, regardless. I jumped in a pool --
14 MR. WELLS: You have my --
15 MR. MONTGOMERY: -- to be able to survive. I came up,
16 I didn't see a firefighter for a week, I didn't see a PG&E
17 worker. No one. CDF took off. There was no one in there but
18 squirrels falling out of trees, and a bunch of other crap that
19 I don't even want to tell you about, looters.
20 All I want is what I lost --
21 MR. WELLS: Sure.
22 MR. MONTGOMERY: -- to get back the life that I was
23 living. And you keep saying the word "premature." How is it
24 premature? It's been three and a half years. I've been living
25 on the ground for three years. I didn't have enough insurance

1  to build a house because the contractors all wanted 200 dollars
2  a square foot. So I lived on the ground for three years, and
3  so did my son. That was his choice. He didn't have to. He
4  quit a job to help me. It was -- he's got a lot out but
5  something else happened.
6  So now he lost his job, and he had a really good job
7  and he's having a hard time getting a good job right now. Can
8  he get paid? He put a claim in. I want him to move on with
9  his life. I mean, he's crying. A twenty-eight-year old kid
10 sitting there crying and I got to say no, my Brock, we'll be
11 all right, but we weren't all right.
12 I told him to get the hell out of there. I stayed,
13 though. I mean, there was literally nothing to step off here.
14 There was he screaming, crying. You guys should have been in
15 there. I wish you had been in there.
16        MR. WELLS: Well --
17        MR. MONTGOMERY: I saved your telephone poles after I
18 got up. I fixed the dredges. I pumped 2,000 gallons a minute.
19 I can out-pump their tanks. I'm a mechanic. I worked for CDF
20 for years.
21 So we got out and we fixed our stuff and we pulled up
22 all your telephone poles out on -- as far as I could reach, and
23 I saved homes. Mine, I couldn't save. That doesn't count for
24 something?
25 I'm living on nothing right now. I parked illegally