**EXHIBIT   C**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

# CR 14 175

PACIFIC GAS AND ELECTRIC
COMPANY

# TEH

DEFENDANT(S).

---

# INDICTMENT

COUNTS ONE through TWELVE: 49 U.S.C. § 60123 -- Natural Gas
Pipeline Safety Act

---

A true bill.

_____
                                    Foreman

Filed in open court this ____/____ day of
                    april 2014

_____            KAREN L. ___
JOSEPH C. SPERO                      Clerk
UNITED STATES MAGISTRATE JUDGE

                    Bail, $ _Summons_

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☑ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

FILED
APR -1 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

COUNTS ONE through TWELVE - 49 U.S.C.
§ 60123 – Natural Gas Pipeline Safety Act

☐ Petty
☐ Minor
☐ Misde-
meanor
☑ Felony

PENALTY:
$500,000.00 PER COUNT, SPECIAL ASSESSMENT $400.00
PER COUNT

**DEFENDANT - U.S.**

▶ PACIFIC GAS AND ELECTRIC COMPANY

DISTRICT COURT NUMBER

**CR   14   175**
TEH

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)

Zurvohn Maloof, Special Agent, U.S. Department of Transportation

☐ person is awaiting trial in another Federal or State
Court, give name of court

☐ this person/proceeding is transferred from another
district per (circle one) FRCrP 20, 21 or 40. Show
District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on
motion of:          SHOW
☐ U.S. Att'y ☐ Defense   DOCKET NO.
☐ this prosecution relates to a
pending case involving this same
defendant           MAGISTRATE
☐ prior proceedings or appearance(s)   CASE NO.
before U.S. Magistrate regarding
this defendant were recorded under

Name and Office of Person
Furnishing Information on   MELINDA L. HAAG
THIS FORM
☑ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
(if assigned)   STACEY P. GEIS

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☑ If not detained give date any prior summons
was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
6) ☐ Awaiting trial on other       ☐ Fed'l ☐ State
charges
If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes   If "Yes"
been filed?    ☐ No    give date
filed

**DATE OF**          Month/Day/Year
**ARREST** ▶

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED**    Month/Day/Year
**TO U.S. CUSTODY** ▶

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☑ SUMMONS ☐ NO PROCESS* ☐ WARRANT   Bail Amount:

If Summons, complete following:
☑ Arraignment ☑ Initial Appearance    *Where defendant previously apprehended on complaint, no new summons
or warrant needed, since Magistrate has scheduled arraignment
Defendant Address:

Date/Time: April 1, 2014   9 901

Before Judge: Joseph Spero

Comments:

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
3
4                                               
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
10                      SAN FRANCISCO DIVISION
11 UNITED STATES OF AMERICA,              )    N    **CR 14 175**
                                          )
12                                        )
                Plaintiff,                )    VIOLATIONS:  Failure to Gather and Integrate
13                                        )    Relevant Data to Identify All Potential Threats To a
                                          )    Gas Transmission Pipeline (49 U.S.C. § 60123 and 49
14                                        )    C.F.R. § 192.917(b)); Failure to Maintain Certain
                                          )    Repair Records for a Gas Transmission Pipeline (49
15                                        )    U.S.C. § 60123 and 49 C.F.R. § 192.709(a)); Failure
           v.                             )    to Identify and Evaluate Potential Threats to a Gas
16                                        )    Transmission Pipeline (49 U.S.C. § 60123 and 49
                                          )    C.F.R. § 192.917(a)); Failure to Include All Potential
17                                        )    Threats and to Select a Suitable Threat Assessment
   PACIFIC GAS AND ELECTRIC COMPANY,      )    Method for a Gas Transmission Pipeline (49 U.S.C.
18                                        )    § 60123 and 49 C.F.R. § 192.919); Failure to
                                          )    Prioritize a Gas Transmission Pipeline With an
19                                        )    Unstable Manufacturing Threat (49 U.S.C. § 60123
                Defendant.                )    and 49 C.F.R. § 192.917(e)(3)); and Failure to
20                                        )    Prioritize and Assess a Gas Transmission Pipeline
                                          )    With an Unstable Manufacturing Threat (49 U.S.C.
21 _____)    § 60123 and 49 C.F.R. § 192.917(e)(4))
22
23
24
25
26
27
28

1

2

3                                    I N D I C T M E N T

4    The Grand Jury charges:

5          At all times relevant to this Indictment unless otherwise indicated:

6                              INTRODUCTORY ALLEGATIONS

7          1.     PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") was a California corporation

8    headquartered in San Francisco, California, that provided natural gas and electric services to

9    approximately 15 million customers in Northern and Central California.

10         2.     PG&E was a pipeline operator that provided natural gas to customers through the use of

11   over 6,000 miles of natural gas transmission pipelines and over 40,000 miles of distribution pipelines.

12   Gas transmission pipelines are highly-pressurized, large-diameter lines that carry natural gas to smaller,

13   less pressurized distribution pipelines that bring natural gas into homes, commercial buildings, and other

14   facilities.

15         3.     Line 132 was a high-pressure gas transmission pipeline owned and operated by PG&E in

16   the Northern District of California.  Line 132 ran underground from Milpitas, California, to San

17   Francisco, California, passing through the City of San Bruno, California.

18         4.     Line 132 was originally installed in or about and between 1944 and 1948 and consisted of

19   hundreds of individual segments, the majority of which were in suburban or urban areas.

20         5.     On September 9, 2010, at approximately 6:11 p.m., a portion of Line 132 (Segment 180)

21   ruptured in a residential neighborhood of the City of San Bruno (the "San Bruno explosion"). Gas

22   escaping from the rupture ignited, causing a fire that killed eight people and injured 58 others.  The fire

23   also damaged 108 homes, 38 of which were completely destroyed.

24                            The Natural Gas Pipeline Safety Act of 1968

25         6.     The Natural Gas Pipeline Safety Act of 1968 ("PSA") established minimum safety

26   standards for pipeline transportation and for pipeline facilities.  The purpose of the PSA was to protect

27   against risks to life or property posed by pipeline transportation and pipeline facilities by improving the

28   regulatory and enforcement authority of the Secretary of Transportation.

                                                    2

1    7.    In 1970, pursuant to Chapter 601 of the PSA, the Secretary of Transportation issued

2  regulations codified in Section 192 of Title 49 of the Code of Federal Regulations, Subparts A through

3  M ("Section 192").

4    8.    In 1979, Congress amended the PSA to add criminal penalties for knowing and willful

5  violations of any regulation or order issued pursuant to Chapter 601 of the PSA.  49 U.S.C. § 60123.

6                 The Gas Transmission Integrity Management Rule and Relevant Regulations

7    9.    Congress amended the PSA by enacting the Pipeline Safety Improvement Act of 2002

8  ("PSIA").  The Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued the Gas

9  Transmission Integrity Management regulations ("IM regulations"), 49 C.F.R. Part 192, referred to as

10  Subpart O, to implement the requirements of the PSIA.  The IM regulations specified how pipeline

11  operators were required to identify, prioritize, assess, evaluate, remediate, and validate the integrity of

12  segments of gas transmission pipelines that could, in the event of leak or failure, affect high-

13  consequence areas ("HCAs").  49 C.F.R. §§ 192.901-192.949.  An HCA is a locale where a release of

14  gas could pose a significant risk of injury or death.

15    10.    The IM regulations required pipeline operators to identify threats on segments of their

16  gas transmission pipelines that operated in HCAs (hereinafter "covered segments"), rank the risk levels

17  of these identified threats, select an assessment method or technology with a proven application capable

18  of assessing the known or potential threats, create deadlines for both the initial and future assessments of

19  these covered segments, and address the threats identified and evaluated through mitigation,

20  remediation, and prevention.  49 C.F.R. §§ 192.907 and 192.921.

21                 Regulations Regarding the Identification of Potential Threats

22    11.    Under the IM regulations, pipeline operators had to identify and evaluate all potential

23  threats to a covered segment.  49 C.F.R. § 192.917(a).  The nine major threats to gas transmission

24  pipelines were:  third party damage, external corrosion, internal corrosion, stress corrosion cracking,

25  manufacturing threats, construction threats, equipment threats, external factors such as weather and

26  earthquakes, and incorrect operation.  49 C.F.R. § 192.7 (incorporating by reference American Society

27  of Mechanical Engineers ("ASME") B31.8S, 2004).

28    12.    To identify and evaluate all potential threats to each covered segment, pipeline operators

3

1 | were required to gather and integrate existing data and information on the entire pipeline that could be

2 | relevant to the covered segment. 49 C.F.R. § 192.917(b). Section 192.917(b) required pipeline

3 | operators to follow a specific industry standard - ASME B31.8S, section 4 - and, at a minimum, gather

4 | and evaluate data for each covered segment and any similar, non-covered segments found in the entire

5 | pipeline system, including, but not limited to:

- Past incident history and the root cause analysis of previous threats on the segment, including leak and failure history.

- Records regarding past and ongoing corrosion of the segment.

- Continuous surveillance records regarding any changes along the segment including failures, leaks, and earth movement as well as changes along the segment that might affect its class location.

- Patrolling records regarding third party damage and encroachment threats to the segment.

- Maintenance history including repairs on the segment (pursuant to Section 192.709(a) of Title 49 of the Code of Federal Regulations, each pipeline operator was required to maintain the date, location, and description of each repair made to pipe so long as the pipeline remained in service).

- Records of internal inspections for issues such as internal corrosion, seam welding faults or repairs, and the existence of liquids being trapped or transported in the segment.

- The thickness of the walls of the segment.

- The diameter of the segment.

- The type of seams used along the segment and the corresponding "joint factor" that was used to calculate the initial pressure-carrying capacity of the pipe.

- The manufacturer and date of manufacture of the segment.

- The "depth of cover" or the amount of clearance between the top of the segment and the surface of the ground.

- Construction techniques, including bending or joining methods.

- Material properties, such as specified minimum yield strength ("SMYS").

- The results of any pressure tests conducted on the pipeline containing the segment (pursuant to Section 192.517 of Title 49 of the Code of Federal Regulations, each pipeline operator was required to retain for the useful life of a pipeline a record of each strength pressure test performed under Section 192.505 of Title 49 of the Code of Federal Regulations for each segment of a steel pipeline that was to operate at a hoop stress of 30 percent or more of the SMYS).

4

- Any pressure fluctuations or records of "cyclic fatigue" or the weakening of a pipeline due to pressure fluctuations on the pipeline containing the segment.

- Normal maximum and minimum operating pressures for the segment.

- Any audits or reviews that identified issues for the segment or made recommendations for mitigation or prevention of those issues.

Baseline Assessment Plan and Assessment Method Regulations

13.     The IM regulations required pipeline operators to prepare, no later than December 17, 2004, a Baseline Assessment Plan ("BAP") that identified all of the pipeline operator's covered segments, the known or potential threats to each covered segment, the methods selected to assess the integrity of the pipeline for each covered segment, and deadlines for conducting an initial assessment and re-assessment. 49 C.F.R. § 192.919.

14.     Once the known and potential threats were identified on a covered segment, the IM regulations required pipeline operators to assess the integrity of the pipeline in each covered segment by using an assessment method that was capable of addressing the specific identified threats. 49 C.F.R. § 192.921(a). The four assessment methods available to assess whether a covered segment was susceptible to the identified threats were:

(1) Subpart J pressure testing: a method of testing the strength of a pipeline by pressurizing a portion of the pipeline to a specified test pressure and monitoring that portion of the pipeline for leaks or ruptures. The test had to comply with the requirements of Subpart J of Section 192. When the test was performed with a liquid, this method was also known as a "hydrotest" or a "Subpart J hydrotest." 49 C.F.R. § 192.921(a)(2).

    i.      Starting in 1970, all new gas transmission pipelines had to be pressure tested or hydrotested before being placed into service in order to ensure the pipeline's integrity. Pursuant to Section 192.619 of Title 49 of the Code of Federal Regulations, gas transmission pipelines installed before 1970 that were found to be in "satisfactory condition" were grandfathered in and did not have to be pressure tested or hydrotested unless otherwise required by law.

    ii.     A pressure test or hydrotest was the only assessment method that could test the strength of a pipeline. Performing a pressure test or hydrotest on a gas transmission pipeline necessitated the expense and inconvenience of taking the pipeline out of service temporarily.

5

1                 iii.     Pressure testing or hydrotesting assessed the integrity of a pipeline for such

2 potential threats as external damage, external corrosion, internal corrosion, stress corrosion

3 cracking, and manufacturing and construction threats, such as seam defects and seam corrosion.

4    (2) In-line inspection ("ILI"): a method of examining the internal characteristics of a pipeline by

5 sending a computerized inspection tool, often called a "pig," through the inside of the pipeline. 49

6 C.F.R. § 192.921(a)(1).

7         i.     Like pressure testing or hydrotesting, ILI assessed the integrity of the pipeline for

8 such potential threats as external damage, external corrosion, internal corrosion, stress corrosion

9 cracking, and manufacturing and construction threats. ILI, however, could not test the actual

10 strength of a pipeline.

11    (3) Direct assessment ("DA"): a process used to detect the presence of corrosion and assess the

12 potential threat to the integrity of the pipeline. 49 C.F.R. § 192.921(a)(3). The three methods of DA

13 were:

14        i.     External corrosion direct assessment or "ECDA," which tested the outside of

15 pipelines for external corrosion and third party damage using an electrical or magnetic

16 technology above ground and then following up with interspersed excavations to uncover the

17 portions of the pipelines most likely to have external corrosion. Because ECDA only assessed

18 the outside of pipelines, it could not assess the integrity of pipelines for potential internal threats

19 such as manufacturing or construction defects;

20        ii.     Internal corrosion direct assessment ("ICDA"), which tested for corrosion inside

21 the pipeline; and

22        iii.     Stress crack corrosion direct assessment ("SCCDA"), which was only applicable

23 to pipelines operating over 60% of SMYS and thus not applicable in most HCAs.

24    (4) New Technology: any technology that a pipeline operator demonstrated could provide an

25 understanding of a pipe's condition that was equivalent to the understanding that could be gained using

26 pressure tests or hydrotests, ILI, or DA. Operators could only use a new technology if PHMSA

27 approved its use. 49 C.F.R. § 192.921(a)(4).

28 //

1                    Regulations Related to the Prioritization of Manufacturing Threats

2          15.     The IM regulations required operators to prioritize the risk level of covered segments in

3   the BAP.  49 C.F.R. § 192.917(e)(3)(i)-(iii).  Operators were required to prioritize covered segments

4   with unstable manufacturing threats as "high risk."  Covered segments with manufacturing threats were

5   considered unstable if the operating pressure of the pipeline containing that segment increased above the

6   maximum operating pressure experienced by that segment in the five years before the segment was

7   identified as being in an HCA (the "5-year MOP"), the maximum allowable operating pressure

8   ("MAOP") increased, or the stresses leading to cyclic fatigue increased.  49 C.F.R. § 192.917(e)(3)(i)-

9   (iii).

10         16.     For pipelines with unstable manufacturing threats, operators had to use an assessment

11  method that was capable of evaluating manufacturing threats, such as a hydrotest.  49 C.F.R.

12  § 192.917(e)(3) and (4).  ECDA could not be used because ECDA does not assess manufacturing

13  threats.  49 C.F.R. § 192.923(a).

14         17.     Pipeline operators also had to prioritize as high risk and select an assessment method

15  capable of assessing seam integrity and seam corrosion anomalies for covered pipeline segments that

16  contained:

17              a)      low-frequency electric resistance welded ("ERW") pipe;

18              b)      lap welded pipe; or

19              c)      other pipe that satisfies the conditions specified in ASME/ANSI B31.8S, Appxs.

20                      A4.3 & A4.4;

21         and had experienced either:

22              d)      a seam failure; or

23              e)      an increase in operating pressure over the 5-year MOP.

24  49 C.F.R. § 192.917(e)(4).

25                    Regulations Related to Continuous Evaluation of Covered Pipeline Segments

26         18.     Pipeline operators were required to periodically evaluate the integrity of each covered

27  segment.  The periodic evaluation included considering and integrating past and present integrity

28  assessment results, integrating data and assessing risk of the entire pipeline, and reviewing decisions

7

1   regarding remediation, additional prevention, and mitigation actions.  Operators were required to use the

2   results from these periodic evaluations to identify the threats specific to each covered segment and the

3   risk represented by these threats.  49 C.F.R. § 192.937.

4       19.     After an initial assessment, pipeline operators had to re-assess their lines using an

5   assessment method capable of assessing a particular threat or combination of threats including new

6   threats, and within a certain time period depending on the results the periodic evaluations, but not to

7   exceed seven years.  49 C.F.R. §§ 192.937 and 192.939.

8                   PG&E's Practices Relating to Gas Transmission Pipelines

9              A.  General Recordkeeping

10      20.     Starting at a time unknown to the grand jury, and continuing until the San Bruno

11  explosion, PG&E learned that it did not have complete data for its gas transmission pipelines due to

12  missing records and errors and omissions in existing records.

13      21.     PG&E received notice of recordkeeping problems through employees, through regulatory

14  agencies including the National Transportation Safety Board and the California Public Utilities

15  Commission, and from third party auditors and consultants.

16      22.     Despite knowledge of these deficiencies, PG&E did not create a recordkeeping system

17  for gas operations that would ensure that pipeline records were accessible, traceable, verifiable, accurate,

18  and complete.  PG&E's recordkeeping deficiencies included:

- PG&E did not maintain accurate and complete leak records for its gas transmission pipelines.

- PG&E did not maintain accurate and complete records regarding encroachment of population along gas transmission pipelines.

- PG&E did not maintain repair records for its gas transmission pipelines in a traceable and accessible manner.

- PG&E did not retain or maintain weld maps and weld inspection records for its gas transmission pipelines.

- PG&E did not maintain complete records of the manufacturer of its gas transmission pipelines in service.

8

- PG&E did not retain or maintain Subpart J pressure test records for the life of all of its gas transmission pipelines.

- PG&E did not maintain accurate, complete, or accessible "job files," that contained, among other things, pipe specifications, construction records, pressure test records, and purchasing records.

## B. Integrity Management Program

23. In the late 1990s, in advance of the enactment of the IM regulations, PG&E created a computer database, called the Geographic Information System (the "GIS database"). PG&E intended that the GIS database would contain information about each natural gas transmission pipeline segment, such as pipe specifications and pressure test data, and would be used to make integrity management decisions.

24. To create the GIS database, PG&E relied on pipeline survey sheets that contained erroneous and incomplete information. In creating the GIS database, PG&E undertook no quality control or quality assurance to ensure the data taken from the pipeline survey sheets was accurate. From GIS's inception, PG&E was aware that the database contained erroneous and incomplete information.

25. PG&E relied on information in the GIS database to make integrity management decisions, including the identification of threats to each covered segment contained in the initial BAP.

## C. Threat Identification

26. In identifying and evaluating threats as required by Sections 192.917(a) and (b), PG&E failed to gather and integrate all relevant data for many of its older transmission lines, including, but not limited to:

- past incident history for both covered and non-covered segments, including leaks with unknown causes ("unknown" because PG&E either had no records, or could not or did not locate such records);

- pipeline history for covered and non-covered segments that were greater than one mile away from the covered segments being analyzed for manufacturing and construction threats;

- maintenance history, including repairs;

- accurate and complete pipeline data, including wall thickness, diameter, seam type, manufacturer, and date of manufacture;

- pressure fluctuations;

- validated normal, maximum, and minimum operating pressures;

9

1            • threats created by cyclic fatigue; and

2            • threats created by internal corrosion.

3            D. Assessment Method Selection

4       27.    PG&E relied on inaccurate and incomplete records to select assessment methods to assess

5   the integrity of covered segments for known or potential threats as required by Section 192.921(a).

6       28.    In 2004, PG&E created a written policy on compliance with the IM regulations regarding

7   data gathering that instructed PG&E employees to rely on available, verifiable information or

8   "information that c[ould] be obtained in a timely manner."

9       29.    In 2004, PG&E also created a written policy that proscribed, with certain limited

10  exceptions, the use of hydrotesting or pressure testing as an assessment method for assessing the

11  integrity of covered segments. Pursuant to this policy, the only two options (other than a PHMSA-

12  approved new technology) for assessing threats on covered segments were ILI and ECDA. PG&E

13  instituted this policy having determined that, due to economic considerations and the physical attributes

14  of its transmission lines, ILI was not a feasible assessment method for approximately 80% of its

15  transmission lines that were subject to the IM regulations.

16      30.    For the approximately 80% of the gas transmission pipelines where PG&E determined

17  that ILI was not economically or physically feasible, PG&E selected ECDA to assess threats on those

18  pipelines. PG&E chose ILI as an assessment method for the approximately 20% of its remaining natural

19  gas transmission pipelines.

20          E. Assessment Avoidance on Older Transmission Lines

21              i.    Planned Pressure Increases

22      31.    When the IM regulations went into effect, PG&E knew that thousands of miles of its gas

23  transmission pipelines had never been subjected to a Subpart J pressure test, because the pipelines were

24  installed before 1970 and were grandfathered in or because PG&E had not maintained a record of such a

25  pressure test. As PG&E knew, many of these pipelines had a known or potential manufacturing threat

26  due to their age, manufacturer, and/or history.

27      32.    In order to maintain the then-current operating pressures of these pipelines without

28  having to subject the pipelines to a Subpart J pressure test, PG&E adopted a practice in 2003 called

10

1   "planned pressure increases" ("PPIs"). To conduct a PPI, PG&E intentionally raised the pressure in
2   several old highly-pressurized gas transmission pipelines located in HCAs to the pipelines' maximum
3   allowable operating pressures (MAOP) for two hours. In so doing, PG&E at times exceeded the lines'
4   5-year MOPs and/or MAOPs. PG&E failed to review the history of the pipelines or verify the accuracy
5   of its data prior to executing the PPIs to determine whether intentionally increasing the pressure on these
6   older pipelines would affect the integrity of the pipeline. PG&E periodically conducted PPIs from 2003
7   until the San Bruno explosion.

8       33.     PG&E executed PPIs on a number of its high pressure gas transmission pipelines,
9   including lines 132, 101, and 109, all of which had covered segments with manufacturing threats that
10  had never been subject to a Subpart J pressure test or for which records of such a test were not available.
11  From 2002 until the San Bruno explosion, PG&E assessed these pipelines with ECDA.

12                          ii.     Unplanned Pressure Increases

13      34.     PG&E was aware that hundreds of covered segments totaling over 80 miles of gas
14  transmission pipelines had never been subject to a Subpart J pressure test and had manufacturing threats
15  that could be considered unstable due to unplanned pressure increases that exceeded the pipelines'
16  respective 5-year MOPs. These covered segments were found on numerous gas transmission pipelines
17  operated by PG&E, including, but not limited to, segments on Lines 132, 153, and DFM 1816-01.

18      35.     Section 192.917(e) required PG&E to prioritize the covered segments with unstable
19  manufacturing threats as high risk and assess them using an assessment method that evaluated the
20  integrity of the covered segment to determine the risk of failure from the unstable manufacturing threats,
21  such as a Subpart J pressure test. For all of these covered segments, despite knowledge of the
22  requirements of Section 192.917(e), PG&E chose not to reprioritize these pipelines as high risk and/or
23  properly assess the integrity of each segment to determine the risk of failure. Instead, PG&E continued
24  to choose ECDA to assess the integrity of these pipelines even though PG&E knew ECDA did not
25  assess unstable manufacturing threats.

26      36.     To avoid having to prioritize these pipelines as "high risk" and properly assess the
27  pipelines for the known threats, PG&E chose only to consider a manufacturing threat unstable if the
28  pressure on the pipeline exceeded the 5-year MOP by 10% or more. PG&E adopted and implemented

11

1 this approach despite knowing since 2004 that PHMSA had issued regulations and additional guidance
2 on those regulations that stated any increase in pressure that went above the 5-year MOP, regardless of
3 amount, destabilized a manufacturing threat and required PG&E to prioritize the pipeline as high risk
4 and to properly assess the pipeline. PG&E maintained this practice until 2011.

5                 F.  Line 132

6      37.    When identifying threats on Line 132, and when determining the appropriate assessment
7 technology to use in evaluating those threats, PG&E did not know the thickness of the pipeline walls for
8 approximately 42% of Line 132, either because PG&E did not have records describing wall thickness or
9 it could not or did not access records with this information.

10      38.    PG&E did not know the manufacturer for approximately 80% of the hundreds of
11 segments on Line 132 either because PG&E did not have such records, or could not or did not access
12 such records with this information.

13      39.    PG&E did not know the depth of cover for approximately 80% of Line 132 because
14 PG&E did not have such records, or could not or did not access such records with this information.

15      40.    PG&E used improper yield strength or SMYS values for several segments of pipe on
16 Line 132 with unknown yield strengths.

17               i.     Segment 180

18      41.    Segment 180, the portion of Line 132 that ruptured, was located in an HCA and ran
19 through a densely populated suburban development in the City of San Bruno. Segment 180 consisted of
20 six short lengths or "pups" of 30-inch diameter pipe along with normal lengths of pipe. The date of
21 manufacture of these pups is unknown, but the manufacture date was prior to 1956. The pups were
22 welded together and installed in approximately 1956 in a manner that violated industry standards
23 concerning fabrication of gas transmission pipelines in effect at the time. One or more of the pups had a
24 defective seam weld. The segment, in part due to the defective pup or pups, had a yield strength
25 significantly less than the yield strength that PG&E recorded and relied upon for integrity management
26 purposes.

27      42.    PG&E's records reflected the following for Segment 180:

28        •   The pipe was seamless.

12

- The SMYS was 42,000 psi.
- The depth of cover was unknown.
- The manufacturer of the pipe was unknown.
- The manufacture date of the pipe was 1956.
- A pressure test had been performed in 1961.
- The MAOP was 400 psi.

43.     In fact, the pipe in Segment 180 was seamed, not seamless. The SMYS was unknown, but measured after the San Bruno explosion at significantly less than 42,000 psi for four of the six pups. The pipe manufacturer date was unknown, but occurred well before 1956. No records of a pressure test existed showing that any pressure test, let alone a Subpart J pressure test, had been performed on Segment 180. Other records in PG&E's files also showed the MAOP for Line 132 as 375 and 390 psi.

44.     At no time between installation of the defective pup or pups and the San Bruno explosion did PG&E check or confirm whether its records accurately reflected the data relevant to assessing the integrity of Segment 180, even though PG&E knew that GIS contained incomplete and inaccurate data.

ii.     Integrity Management For Line 132

45.     PG&E identified segments of Line 132 as being in an HCA in 2002 and began conducting ECDA on Line 132 in 2002. PG&E also conducted ECDA on Line 132 in 2003, 2004, 2006, 2007, 2009, and 2010.

46.     In identifying the threats that existed on Line 132 and choosing an assessment method to assess those identified threats, PG&E knowingly relied on erroneous and incomplete information from the GIS database and failed to gather and integrate, among other things, the following data and information:

- Leak data, including the cause of over 30 prior leaks on segments of Line 132; instead PG&E adopted a practice that it would not consider leaks with "unknown" causes when deciding if ECDA was a proper assessment method;

- Industry and PG&E data that showed that double submerged arc weld "DSAW" pipe manufactured by Western Consolidated Steel, which was found on segments of Line 132, including Segment 181, had pipe body and longitudinal seam defect issues;

- A seam weld defect in DSAW pipe that was discovered on a different segment of Line 132, and was similar to pipe on both Segment 180 and Segment 181, and was repaired in

13

1988;

- Multiple longitudinal seam cracks found during radiography of girth welds on portions of Line 132 that were constructed in 1948;

- A longitudinal seam weld defect in DSAW pipe discovered on a different segment of Line 132 in 1992 when a tie-in girth weld was radiographed;

- A defective weld found on Segment 186 of Line 132 in 2009. The segment was originally fabricated by Consolidated Western using pipe similar to Segment 180 and Segment 181 and installed in 1948, at or near the time when Segment 180 was originally installed;

- A field girth weld defect found on Segment 189 in 2009. Segment 189 was also originally fabricated by Consolidated Western using DSAW pipe installed in 1948;

- Whether any salvaged or re-used pipe, for which PG&E did not keep records, including manufacturer, dates of use, and history of the pipe, had been used on Line 132;

- Documents related to the design, manufacturer, construction, or testing of Segment 180 when it was relocated in 1956, including whether any salvaged pipe was used;

- Information from the 1956 construction file related to the six pups installed on Segment 180 by PG&E;

- The potential impact of cyclic fatigue or other loading conditions on Line 132 from planned or unplanned pressure fluctuations; and

- Additional construction defects on Line 132.

47.    PG&E also knowingly failed to gather and integrate the following relevant data from similar gas transmission pipeline segments as required by 49 C.F.R. § 192.917(b):

- A seam leak in DSAW pipe found on Line 300B in 1958;

- A characterization evaluation of nearby Line 109 girth welds in 1994;

- A Subpart J pressure test failure in 1974 of a seam weld with lack of penetration on DSAW pipe found on Line 300B, and which was similar to DSAW pipe found on Segment 180 and Segment 181;

- Laboratory test reports from 1975 relating to Line 101 girth welds; and,

- Cracking of a seam weld in DSAW pipe in 1996 on Line 109 which paralleled Line 132.

48.     Relying on inaccurate and incomplete information regarding the pipeline attributes and history of Line 132, PG&E knowingly chose ECDA as the assessment method to assess the integrity of covered segments on Line 132, including Segment 180, starting in 2002 and continuing until the San Bruno explosion.

49.     In 2003 and again in 2008, as part of PG&E's PPIs, PG&E intentionally raised for a two-hour period the pressure of Line 132 at least 25 psi above the normal operating pressure the pipeline had experienced for decades in order to maintain a current MOP for Line 132 without having to conduct a Subpart J pressure test. PG&E undertook this practice without conducting any review of the pipeline's history, including past leaks and the cause of such leaks, or verification of the pipeline's specifications in order to assess whether intentionally increasing the pressure on Line 132 more than 25 pounds higher than the line had experienced in decades would affect the integrity of the pipeline.

50.     On July 23, 2009, Line 132, at a point north of Segment 180, experienced an unplanned pressure increase that exceeded that segment's 5-year MOP. That segment of Line 132 had a known manufacturing threat that was destabilized when the pipeline experienced this pressure increase. Despite knowledge of this pressure excursion and the requirement to properly assess unstable manufacturing threats, PG&E chose to assess that segment of Line 132 in 2009 using ECDA even though PG&E knew that ECDA could not assess unstable manufacturing threats.

THE CHARGES

COUNT ONE: (49 U.S.C. § 60123 – Natural Gas Pipeline Safety Act) [Line 132]

51.     The allegations set forth in paragraphs 1-12, 20-26, and 37-50 above are re-alleged and incorporated herein by reference.

52.     Starting in or about December 2003, and continuing through on or about September 9, 2010, in the Northern District of California, the defendant,

PACIFIC GAS AND ELECTRIC COMPANY,

by and through the actions of its employees, knowingly and willfully violated a minimum safety standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations, Section 192.917(b). Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly and willfully failed to gather and integrate existing data and information on a line, specifically Line

15

1  132, that could be relevant to identifying and evaluating all potential threats on covered segments

2  of that line, all in violation of Title 49, United States Code, Section 60123.

3  COUNT TWO: (49 U.S.C. § 60123 -- Natural Gas Pipeline Safety Act)

4  53.    The allegations set forth in paragraphs 1-12, 20-26, and 37-47 above are re-

5  alleged and incorporated herein by reference.

6  54.    Starting on a date unknown to the grand jury and continuing until at least on or

7  about September 9, 2010, in the Northern District of California, the defendant,

8  PACIFIC GAS AND ELECTRIC COMPANY,

9  by and through the actions of its employees, knowingly and willfully violated a minimum safety

10  standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations,

11  Section 192.709(a). Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly and

12  willfully failed to maintain records concerning the date, location, and description of each repair

13  made to a line, specifically Line 132, all in violation of Title 49, United States Code, Section

14  60123.

15  COUNTS THREE THROUGH FIVE: (49 U.S.C. § 60123 – Natural Gas Pipeline Safety Act)

16  55.    The allegations set forth in paragraphs 1-12, 18, 19-26, and 37-50 above are re-alleged

17  and incorporated herein by reference.

18  56.    Starting on a date unknown to the grand jury and continuing through on or about the

19  dates set forth in the table below, in the Northern District of California, the defendant,

20  PACIFIC GAS AND ELECTRIC COMPANY,

21  by and through the actions of its employees, knowingly and willfully violated a minimum safety

22  standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations,

23  Section 192.917(a). Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly and

24  willfully failed to identify and evaluate potential threats to covered segments on the lines set

25  forth below:

26  //

27  //

28

16

| Count | Date | Line |
|-------|------|------|
| 3 | January 22, 2010 | Line 132 |
| 4 | January 22, 2010 | Line 153 |
| 5 | January 22, 2010 | DFM 1816-01 |

All in violation of Title 49, United States Code, Section 60123.

COUNTS SIX THROUGH EIGHT: (49 U.S.C. § 60123 -- Natural Gas Pipeline Safety Act)

57.     The allegations set forth in paragraphs 1-50 above are re-alleged and incorporated herein by reference.

58.     Starting on a date unknown to the grand jury and continuing through on or about the dates set forth in the table below, in the Northern District of California, the defendant,

PACIFIC GAS AND ELECTRIC COMPANY,

by and through the actions of its employees, knowingly and willfully violated a minimum safety standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations, Section 192.919.  Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly and willfully failed to include in its annual baseline assessment plan all potential threats on a covered segment and failed to select the most suitable assessment method to assess all potential threats on covered segments on the lines set forth below:

| Count | Date | Line |
|-------|------|------|
| 6 | January 22, 2010 | Line 132 |
| 7 | January 22, 2010 | Line 153 |
| 8 | January 22, 2010 | DFM 1816-01 |

All in violation of Title 49, United States Code, Section 60123.

//

//

//

//

17

1  COUNTS NINE THROUGH ELEVEN:  (49 U.S.C. § 60123 -- Natural Gas Pipeline Safety Act)

2      59.    The allegations set forth in paragraphs 1-10, 13-19, 27-40, and 49-56 above are re-alleged

3  and incorporated herein by reference.

4      60.    Starting on a date unknown to the grand jury and continuing through on or about the

5  dates set forth in the table below, in the Northern District of California, the defendant,

6                     PACIFIC GAS AND ELECTRIC COMPANY,

7  by and through the actions of its employees, knowingly and willfully violated a minimum safety

8  standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations,

9  Section 192.917(e)(3).  Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly

10  and willfully failed to prioritize covered segments of lines as high risk segments for the baseline

11  assessment or a subsequent reassessment, after a changed circumstance rendered manufacturing

12  threats on segments of the lines set forth below unstable:

| Count | Date | Line |
|-------|------|------|
| 9 | January 22, 2010 | Line 132 |
| 10 | January 22, 2010 | Line 153 |
| 11 | January 22, 2010 | DFM 1816-01 |

17      All in violation of Title 49, United States Code, Section 60123.

18  COUNT TWELVE:  (49 U.S.C. § 60123 -- Natural Gas Pipeline Safety Act)

19      61.    The allegations set forth in paragraphs 1-10, 13-19, 27-40, and 49-56 above are re-alleged

20  and incorporated herein by reference.

21      62.    Starting on a date unknown to the grand jury, and continuing through January 22, 2010,

22  in the Northern District of California, the defendant,

23                     PACIFIC GAS AND ELECTRIC COMPANY,

24  by and through the actions of its employees, knowingly and willfully violated a minimum safety

25  standard for pipelines carrying natural gas, as set forth in Title 49, Code of Federal Regulations,

26  Section 192.917(e)(4).  Specifically, PACIFIC GAS AND ELECTRIC COMPANY, knowingly

27  and willfully failed to prioritize covered segments of a line, specifically DFM 1816-01, as high

28  risk segments for a baseline assessment or a subsequent reassessment after a changed

18

1 | circumstance rendered manufacturing threats on those segments unstable, and failed to analyze

2 | covered segments to determine the risk of failure from such manufacturing threats, all in

3 | violation of Title 49, United States Code, Section 60123.

4

5

6 | DATED:_____/_____, 2014                    _____
                                                           Foreperson
7

8 | MELINDA HAAG
   | United States Attorney
9

10 | J. DOUGLAS WILSON
    | Chief, Criminal Division
11

12 | (Approved as to form: _____
    |                        AUSA GEIS
13 |                        AUSA BERGER
    |                        SAUSA HALBERSTADT
14 |                        SAUSA MORRIS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

# United States District Court
## Northern District of California

# CRIMINAL COVER SHEET

**Instructions:** Effective January 3, 2012, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.

**Case Name:**

USA v.  PACIFIC GAS AND ELECTRIC COMPANY     CR  14    175

**Case Number:**

*TEH*

**Total Number of Defendants:**

1 [✓]     2-7 [ ]     8 or more [ ]

**Is This Case Under Seal?**

Yes [ ]     No [✓]

**Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?**

Yes [ ]     No [✓]

**Venue (Per Crim. L.R. 18-1):**

SF [✓]   OAK [ ]   SJ [ ]   EUR [ ]   MON [ ]

**Is any defendant charged with a death-penalty-eligible crime?**

Yes [ ]     No [✓]

**Assigned AUSA (Lead Attorney):**

AUSA Stacey P. Geis

**Is this a RICO Act gang case?**

Yes [ ]     No [✓]

**Date Submitted:**

April 1, 2014

**Comments:**

[ ]

[Save]   [Print]   [Clear Form]

July 2013