MACDONALD | FERNANDEZ LLP
RENO F.R. FERNANDEZ III (SBN 251934)
MATTHEW J. OLSON (SBN 265908)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Creditor,
WENDY NATHAN

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br>PG&E CORPORATION<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Co.<br>☐ Affects both Debtors<br><br>  \*   All papers shall be filed in Lead Case, No. 19-30088-DM | Case Nos. 19-30088-DM-11<br>                19-30089-DM-11<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>**DECLARATION OF SETH I. ROSENBERG RE: MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>Date:    June 11, 2019<br>Time:   9:30 a.m.<br>Place:  Courtroom 17<br>           450 Golden Gate Ave., 16th Floor<br>           San Francisco, California<br><br><u>Opposition Deadline:</u> June 6, 2019, 4 p.m. PDT<br><br>Hon. Dennis Montali |

I, Seth I. Rosenberg, declare:

1.      I am over the age of 18, an attorney licensed to practice law in the State of California, and a partner with the firm EMERGENT LLP, attorneys for Plaintiff WENDY NATHAN.  I make this Declaration in support of Creditor Wendy Nathan's Motion for Relief From the Automatic Stay, and if called upon to testify, I could testify competently to the truth of the matters set forth herein.

2.      Wendy Nathan ("<u>Creditor</u>") holds a claim against the Estate arising from certain personal injuries suffered on September 5, 2015, on the sidewalk in front of Lakeshore Natural Foods, located at 3321 Lakeshore Avenue, Oakland, California.  Specifically, Creditor was

1

injured when she fell because of, among other things, uplifted, raised, cracked, and sloped cement caused by the negligent maintenance of the sidewalk and an electrical box installed and controlled by Pacific Gas and Electric Company, the Debtor herein (the "Dangerous Condition").

3. In furtherance of those claims, on August 30, 2017, Creditor commenced an action before the Superior Court of California in and for the County of Alameda styled *Wendy Nathan v. Ann D. Grcevich, Successor Trustee of the Survivor's Trust, Grcevich Trust dated June 7, 1991; Jane Inok Hong; and Pacific Gas and Electric Company*. (Case No. RG17873549) (the "Complaint"). The First Amended Complaint, a true and correct copy of which is offered as Exhibit "A," asserts claims against the Debtor and other parties for negligence and premises liability, and seeks exemplary damages.

4. At least five personal-injury claims have been made regarding the Dangerous Condition, including Creditor's claim. The other four claims were resolved pre-petition wherein the Debtor, the other defendants, or both compensated claimants (the "Earlier Actions").

5. Based on these prior actions, liability is well established in this action and the only question is the value of Nathan's damages. Indeed, in one of the Earlier Actions, the deposition of Debtor's "person most qualified" regarding the Dangerous Condition was cross-noticed for the instant action. Thus, essentially no further discovery is necessary against Debtor (except, possibly, with respect to co-defendants). Attached as Exhibit "B" is a mediation brief by plaintiff's counsel in an Earlier Action (same counsel as Nathan's counsel) showing an extensive analysis of Debtor's liability in these actions. In the Earlier Actions, Debtor's share of the settlement funds ranged between 85% to 100%. For two of the four Earlier Actions, Debtor paid 100% of the settlements.

6. Nathan has already been seen by a medical consultant regarding her injuries and a report on such damages can be made available to Debtor and the other parties after the stay is lifted.

7. Based on the foregoing, at the time of Debtor's bankruptcy, the parties to this action were scheduling a mediation wherein this fifth and final claim would almost assuredly have been resolved, too. Indeed, more time and expenses would be incurred by attempting to

Case: 19-30088    Doc# 2048-2    Filed: 05/16/19    Entered: 05/16/19 14:01:38    Page 2 of 29

liquidate this claim through the bankruptcy process then would be incurred by the parties' anticipated mediation that can be done within 60 days of the stay being lifted in the civil action.

8.    The proceedings before the Superior Court had progressed substantially by the time Debtor filed its voluntary petition. Various cross- and counterclaims had been asserted between the parties and a new third-party defendant (the City of Oakland, California). The parties have been conducting discovery and the Court had set the case for trial. A mediation was being scheduled by all parties. Motions for summary judgment filed by defendants Hong and Grcevich were pending before the petition were pending (and subsequently continued by the Superior Court in light of the filing of this case). Despite the progress in the case before the Superior Court, the Debtor filed this petition before Creditor's claims could be liquidated. Recently, knowing that the present motion would be filed shortly, the Superior Court ordered the parties to participate in mediation before August 30, 2019, and set a new trial date for February 21, 2020.

9.    Creditor understands that the Debtor does not carry insurance for the claims asserted in the Complaint, but rather is self-insured.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct, and that this Declaration was executed on May 15, 2019, in San Francisco, California.

_____/s/ Seth I. Rosenberg_____
Seth I. Rosenberg

# EXHIBIT A

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Seth I. Rosenberg (SBN 215135)<br>Emergent LLP<br>535 Mission Street, 14th Floor<br>San Francisco, CA 94105<br>TELEPHONE NO: (415) 894-9284   FAX NO. *(Optional):* (415) 276-8929<br>E-MAIL ADDRESS *(Optional):* seth@emergent.law<br>ATTORNEY FOR *(Name):* Plaintiff Wendy Nathan | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Civil Division

PLAINTIFF: Wendy Nathan

DEFENDANT: Ann D. Grcevich, Successor Trustee of the Survivor's Trust, Grcevich Trust dated June 7, 1991; Jane Inok Hong; Pacific Gas and Electric

[✓] DOES 1 TO _50_

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**
[✓] **AMENDED** *(Number):* First
Type *(check all that apply):*
[ ] MOTOR VEHICLE  [ ] OTHER *(specify):*
  [ ] Property Damage  [ ] Wrongful Death
  [✓] Personal Injury  [✓] Other Damages *(specify):* Exemplary

Jurisdiction *(check all that apply):*
[ ] ACTION IS A LIMITED CIVIL CASE
  Amount demanded  [ ] does not exceed $10,000
    [ ] exceeds $10,000, but does not exceed $25,000
[✓] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint
  [ ] from limited to unlimited
  [ ] from unlimited to limited

CASE NUMBER:
RG17873549

*(endorsed stamp:)*
ENDORSED
FILED
ALAMEDA COUNTY

MAY 1 1 2018

CLERK OF THE SUPERIOR COURT
by CURTIYAH GANTER

1. **Plaintiff** *(name or names):* Wendy Nathan
alleges causes of action against **defendant** *(name or names):*
Ann D. Grcevich; Jane Inok Hong; Pacific Gas and Electric
2. This pleading, including attachments and exhibits, consists of the following number of pages: 6
3. Each plaintiff named above is a competent adult
  a. [ ] **except** plaintiff *(name):*
    (1) [ ] a corporation qualified to do business in California
    (2) [ ] an unincorporated entity *(describe):*
    (3) [ ] a public entity *(describe):*
    (4) [ ] a minor  [ ] an adult
      (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
      (b) [ ] other *(specify):*
    (5) [ ] other *(specify):*
  b. [ ] **except** plaintiff *(name):*
    (1) [ ] a corporation qualified to do business in California
    (2) [ ] an unincorporated entity *(describe):*
    (3) [ ] a public entity *(describe):*
    (4) [ ] a minor  [ ] an adult
      (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
      (b) [ ] other *(specify):*
    (5) [ ] other *(specify):*

[ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3.

| | |
|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>PLD-PI-001 [Rev. January 1, 2007] | **COMPLAINT—Personal Injury, Property Damage, Wrongful Death** |

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Wendy Nathan v. Ann D. Grcevich, et al. | RG17873549 |

4. ☐ Plaintiff *(name)*:
   is doing business under the fictitious name *(specify)*:

   and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person
   a. ☑ **except** defendant *(name)*: Pacific Gas & Electric
      (1) ☐ a business organization, form unknown
      (2) ☑ a corporation
      (3) ☐ an unincorporated entity *(describe)*:

      (4) ☐ a public entity *(describe)*:

      (5) ☐ other *(specify)*:

   c. ☐ **except** defendant *(name)*:
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe)*:

      (4) ☐ a public entity *(describe)*:

      (5) ☐ other *(specify)*:

   b. ☑ **except** defendant *(name)*: 1-10 and 26-35
      (1) ☑ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe)*:

      (4) ☐ a public entity *(describe)*:

      (5) ☐ other *(specify)*:

   d. ☐ **except** defendant *(name)*:
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe)*:

      (4) ☐ a public entity *(describe)*:

      (5) ☐ other *(specify)*:

   ☐ Information about additional defendants who are not natural persons is contained in Attachment 5.

6. The true names of defendants sued as Does are unknown to plaintiff.
   a. ☑ Doe defendants *(specify Doe numbers)*: 1-25                                    were the agents or employees of other
      named defendants and acted within the scope of that agency or employment.
   b. ☑ Doe defendants *(specify Doe numbers)*: 26-50                                   are persons whose capacities are unknown to
      plaintiff.

7. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names)*:

8. This court is the proper court because
   a. ☐ at least one defendant now resides in its jurisdictional area.
   b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.
   c. ☑ injury to person or damage to personal property occurred in its jurisdictional area.
   d. ☐ other *(specify)*:

9. ☑ Plaintiff is required to comply with a claims statute, **and**
   a. ☑ has complied with applicable claims statutes, **or**
   b. ☐ is excused from complying because *(specify)*:

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

| SHORT TITLE:                                  | CASE NUMBER:   |
|-----------------------------------------------|----------------|
| Wendy Nathan v. Ann D. Grcevich, et al.       | RG17873549     |

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
   a. ☐ Motor Vehicle
   b. ☑ General Negligence
   c. ☐ Intentional Tort
   d. ☐ Products Liability
   e. ☑ Premises Liability
   f. ☐ Other *(specify):*

11. Plaintiff has suffered
   a. ☑ wage loss
   b. ☐ loss of use of property
   c. ☑ hospital and medical expenses
   d. ☑ general damage
   e. ☐ property damage
   f. ☑ loss of earning capacity
   g. ☑ other damage *(specify):*

   Pain and suffering, emotional distress

12. ☐ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a. ☐ listed in Attachment 12.
   b. ☐ as follows:

13. The relief sought in this complaint is within the jurisdiction of this court.

14. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. (1) ☑ compensatory damages
      (2) ☑ punitive damages
      The amount of damages is *(in cases for personal injury or wrongful death, you must check (1)):*
      (1) ☑ according to proof
      (2) ☐ in the amount of: $

15. ☐ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers):*

Date: March 21, 2018

Seth I. Rosenberg
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Wendy Nathan v. Ann D. Grcevich, et al. | RG17873549 |

First      **CAUSE OF ACTION—General Negligence**    Page    4
_____(number)_____

ATTACHMENT TO ☑ Complaint ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name):*   Wendy Nathan

     alleges that defendant *(name):*   Ann D. Grcevich, Jane Inok Hong, and Pacific Gas & Electric

         ☑ Does   1        to   50

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff
on *(date):*   September 5, 2015
at *(place):*   on or near 3321 Lakeshore Avenue in Oakland, CA

*(description of reasons for liability):*

1. On 9/5/2015, Plaintiff was walking on the sidewalk in front of Lakeshore Natural Foods, located at 3321 Lakeshore Avenue in Oakland, CA. Plaintiff was injured when she fell because the property and area was in an unsafe condition, including but not limited to uplifted, raised, cracked, sloped cement, caused by the negligent maintenance of the sidewalk by Defendants. A PG&E electrical box is also located on the sidewalk.

2. The conditions on the property created an unreasonable risk of harm. Under California Civil Code §1714(a), Defendants also owed Plaintiff a nondelegable duty for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person.

3. Defendants and their employees negligently owned, maintained, controlled, managed, operated, occupied, leased and used the property, parking lot and area where Plaintiff fell, proximately causing the damage to Plaintiff. Defendants and their employees had actual knowledge or reasonably should have known of the unsafe and dangerous conditions that existed on the property where Plaintiff fell, and failed to warn Plaintiff of the dangerous conditions on the property. Defendants and their employees failed to inspect for the condition, repair the condition, protect against harm from the condition, or give adequate warning of the condition.

4. Defendants are vicariously liable for the negligence on the part of its employees, agents and independent contractors that provided maintenance, management, inspection and services for the property, parking lot and area where Plaintiff fell.

5. The condition was of such a nature and existed long enough those Defendants and their employees had sufficient time to discover it and, using reasonable care: repair the conditions; or protect against harm from the conditions; or adequately warn of the conditions. Defendants failed to make reasonable inspections of the property to discover unsafe conditions.

6. As the proximate and actual result of the negligence of Defendants, Plaintiff has suffered physical injuries according to proof, special damages including medical bills and related costs, and general damages in the form of pain and suffering, and emotional distress.

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2) [Rev. January 1, 2007]

**CAUSE OF ACTION—General Negligence**

Code of Civil Procedure 425.12
www.courtinfo.ca.gov

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 8 of 29

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Wendy Nathan v. Ann D. Grcevich, et al. | RG17873549 |

<u>Second</u>     **CAUSE OF ACTION—Premises Liability**    Page   <u>5</u>
   *(number)*

ATTACHMENT TO   ☑ Complaint    ☐ Cross - Complaint
*(Use a separate cause of action form for each cause of action.)*

Prem.L-1. Plaintiff *(name):* Wendy Nathan
     alleges the acts of defendants were the legal (proximate) cause of damages to plaintiff.
     On *(date):* September 5, 2015      plaintiff was injured on the following premises in the following
     fashion *(description of premises and circumstances of injury):*

> See page 4. All allegations in PLD-PI-001(2) are hereby incorporated by reference thereto.

Prem.L-2.   ☑ **Count One—Negligence** The defendants who negligently owned, maintained, managed and
     operated the described premises were *(names):*
     Ann D. Grcevich, Successor Trustee of the Survivor's Trust, Grcevich
     Trust dated June 7, 1991; Jane Inok Hong; Pacific Gas and Electric Company;
     ☑ Does <u>1</u>    to <u>50</u>

Prem.L-3.   ☐ **Count Two—Willful Failure to Warn** [Civil Code section 846] The defendant owners who willfully
     or maliciously failed to guard or warn against a dangerous condition, use, structure, or activity were
     *(names):*

     ☑ Does <u>1</u>    to <u>50</u>
     Plaintiff, a recreational user, was   ☑ an invited guest   ☐ a paying guest.

Prem.L-4.   ☑ **Count Three—Dangerous Condition of Public Property** The defendants who owned public property
     on which a dangerous condition existed were *(names):*
     Ann D. Grcevich, Successor Trustee of the Survivor's Trust, Grcevich
     Trust dated June 7, 1991; Jane Inok Hong;
     ☑ Does <u>1</u>    to <u>50</u>
     a. ☑ The defendant public entity had ☐ actual ☑ constructive notice of the existence of the
        dangerous condition in sufficient time prior to the injury to have corrected it.
     b. ☐ The condition was created by employees of the defendant public entity.

Prem.L-5. a. ☑ **Allegations about Other Defendants** The defendants who were the agents and employees of the
     other defendants and acted within the scope of the agency were *(names):*
     Ann D. Grcevich, Successor Trustee of the Survivor's Trust, Grcevich
     Trust dated June 7, 1991; Jane Inok Hong; Pacific Gas and Electric Company;
     ☑ Does <u>1</u>    to <u>50</u>
     b. ☐ The defendants who are liable to plaintiffs for other reasons and the reasons for their liability are
        ☐ described in attachment Prem.L-5.b ☐ as follows *(names):*

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(4) [Rev. January 1, 2007]
**CAUSE OF ACTION—Premises Liability**
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Nathan v. Grcevich | RG17873549 |

### Exemplary Damages Attachment

Page     6

ATTACHMENT TO  [✓] Complaint  [ ] Cross - Complaint

EX-1.  As additional damages against defendant *(name):*
    Pacific Gas & Electric and DOES 1-50

Plaintiff alleges defendant was guilty of
[✓] malice
[✓] fraud
[✓] oppression
as defined in Civil Code section 3294, and plaintiff should recover, in addition to actual damages, damages
to make an example of and to punish defendant.

EX-2.  The facts supporting plaintiff's claim are as follows:

1.  Prior to the incident at issue in this action, Defendant Pacific Gas & Electric ("PG&E) and DOES 1-50 and each of them, had prior notice and knowledge of the existence of the dangerous condition (the broken sidewalk that caused Plaintiff to trip and suffer serious injuries) and refused to take appropriate action.

2.  Defendant PG&E and DOES 1-50, compensated an individual for her injuries after falling over the dangerous condition in January 2014, agreed at that time to remedy the condition, but reneged on this agreement and did not repair the condition.

3.  Thereafter, on or around July 9, 2015, another individual tripped and fell over the dangerous condition and Defendant PG&E compensated her for her injuries. During that process, the City of Oakland asked Defendant PG&E and DOES 1-50 to fix the dangerous condition. It did not.

4.  On or around August 18, 2015, Defendant PG&E and DOES 1-50 internally agreed to fix the dangerous condition, but once more did not.

5.  On or around, September 19, 2015, Defendant PG&E and DOES 1-50 once more internally agreed to fix the dangerous condition but did not.

6.  Defendant PG&E and DOES 1-50's actual knowledge of the dangerous condition of the at issue condition, compensating individual for their injuries, agreeing to fix the condition and then not fixing the condition, was a substantial factor in Plaintiff's injuries. Accordingly, Defendant PG&E and DOES 1-50 acted with willful indifference and conscious disregard of the safety and rights of others, including Plaintiff. Based on these acts and omissions, Plaintiff is entitled to punitive damages against Defendant PG&E and DOES 1-50 and prays as such.

EX-3.  The amount of exemplary damages sought is
    a.  [✓] not shown, pursuant to Code of Civil Procedure section 425.10.
    b.  [ ] $

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(6) [Rev. January 1, 2007]

**Exemplary Damages Attachment**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

# EXHIBIT B

1 | Seth I. Rosenberg, Esq. (SBN 215135)
EMERGENT LLP
2 | 535 Mission Street, 14th Floor
San Francisco, California 94105
3 | p: 415/894-9284
f: 415/276-8929
4 | e: seth@emergent.law

5 | Attorneys for Plaintiff
MARCIA EWING

6

7 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 | IN AND FOR THE COUNTY OF ALAMEDA

9 | UNLIMITED JURISDICTION

10

11 | MARCIA EWING,                              Case No. RG16-842616

12 |              Plaintiff,                    **PLAINTIFF MARCIA EWING'S
                                               MEDIATION BRIEF**

13 |       v.

14 | PACIFIC GAS & ELECTRIC; LAKESHORE
NATURAL FOODS; IZEK SALON SPA; CITY
15 | OF OAKLAND, and DOES 1-50,

16

17 |              Defendants.

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

This case concerns a long-standing dangerous condition on a busy Oakland street - a sunken/tilted PG&E utility enclosure surrounded by cracked concrete. (Exhibit A.) On January 3, 2014, Plaintiff Marcia Ewing tripped and fell over this dangerous condition, injuring herself. When settling with PG&E at that time and on her own she thought of others, telling PG&E that she would settle for reasonable compensation and "a commitment to immediately repair the hazardous sidewalk by your equipment."

Not only did Defendant PG&E not live up to that commitment, but over the next 2 years PG&E, with Defendant City of Oakland, ignored pleadings from injured victims, citizens of Oakland, and their own employees to fix this condition. During this 2 years at least three other individuals tripped, fell and injured themselves due to this dangerous condition. Two of those injured individuals settled bodily injury claims with Defendant PG&E and one is still pending.

Two years removed from her earlier fall with a rare return to this area, Ms. Ewing found herself confronted with the unrepaired area. In walking away from the dangerous area of the sidewalk she encountered earlier, she encountered a ***different*** dangerous area of the sidewalk/secondary enclosure, tripped, fell and suffered a catastrophic left humerus fracture. Due to the injury, Marcia endured two surgeries, financial hardship from missed work, and resulting disability.

There is little Defendant PG&E can say in this case, especially after recently settling with another victim of this sidewalk, where Defendant PG&E paid the victim $120,000 on $25,000 in special damages. Ms. Ewing's special damages are more than ***8 times*** that amount. As all recognize or should recognize, Defendant PG&E's refusal to fix this condition over the years while paying claims regarding it, and employees ignoring internal directives to fix it (and then PG&E retaining these employees) shows a "conscious disregard" for the safety of individuals, thus subjecting it to punitive damages.

Defendants only possible defense argument, Ms. Ewing's comparative negligence, will fall on deaf ears in front of an Alameda jury. Putting aside that Ms. Ewing asked

Case: 19-30088    Doc# 2048-2    Filed: 05/16/19    Entered: 05/16/19 14:01:38    Page 13 of 29

EMERGENT

Defendant PG&E to fix it, which it refused, Ms. Ewing is a fantastic Plaintiff – an endearing, compassionate, self-made woman who a jury will adore.  Moreover, Plaintiff did not trip over the same dangerous condition twice; she tried to avoid the earlier dangerous condition and tripped over another dangerous condition involving the same secondary enclosure.

As will be shown, the facts of this case paint a terribly ugly picture for Defendants and Plaintiff looks forward to trying to reasonably resolve this dispute at mediation.

## II.  STATEMENT OF FACTS

### A.  PLAINTIFF MARCIA EWING

Plaintiff Marcia Ewing is an extremely pleasant and intelligent 63-year-old woman. (Exhibit B.)  Born in Panama, Marcia emigrated to the United States at 5 years old.  A self-made woman, Marcia obtained a license as a vocational nurse.  For the majority of her career, Marcia worked at Kaiser over a 17-year career, where she was a research clinic coordinator and eventually a project coordinator.  As a project manager, Marcia managed a team of Kaiser employees regarding research data collection.  Marcia took an early retirement from Kaiser, took a six-month break, and then went right back to work for UCSF as an analyst.  She has also raised two successful children one of which, her daughter, a successful attorney in New York City.

### B.  THE DANGEROUS CONDITION BEGINS

In 2008, the City of Oakland began receiving requests to repair the sidewalk outside 3321 Lakeshore.  On March 5, 2008 the following complaint was received by the City of Oakland: "3/5/08 REQUEST FOR SIDEWALK INSPECTION IT LIFTS UP WHEN YOU WALK ON IT AT 3321 LAKESHORE · SERIOUS HAZARD LOT OF CITIZENS WALK THERE FROM PARKING LOT."  On August 8, 2008, the Oakland Police Department complained as noted in this complaint:  "8/18/08 OPD IS REQUESTING THAT THIS SIDEWALK BE CHECKED AS SOON AS POSSIBLE. IT IS A BAD TRIPPING HAZARD." (Exhibit C.)

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 14 of 29

### C.   PLAINTIFF'S FIRST ENCOUNTER WITH THE DANGEROUS CONDITION

Back in and around 2013, Marcia began going to Defendant Izek Day Salon ("Izek") a couple times a month for her nails. She would normally park right in front of the store and go right in. Marcia believes that she "maybe once or twice" walked through the area where the utility enclosure in question, which is a little east of the store. One of those times, on January 3, 2014, Ms. Ewing left Izek to go to AT&T to pay a bill. When returning, traveling west (i.e., toward Izek) her foot hit the eastern side of the utility enclosure, which was substantially elevated from the adjacent sidewalk, and she launched forward with her chin bearing the brunt of her fall. (Exhibit D.) Marcia actually lacerated her chin requiring stitches. At that time an Izek employee commented to Marcia how she, too, had tripped on the area and knew others had as well.

In response to this incident, Marcia called PG&E because "it was a hazardous area and [she] hurt [herself]." Marcia also made a complaint to the City of Oakland which is documented as follows:

> By WONG, JASON: 1/3/2014 2:33:00 PM
>
> CITIZEN REPORTING A SIDEWALK DAMAGED BY TREE ROOTS, AT 3319 LAKESHORE AVE.
>
> Caller: EWING, MARCIA:
>
> Q: Is there a tree nearby with roots that may be the cause?
>
> A:YES
>
> Q: Has anyone been hurt by it?
>
> A:YES
>
> Q: Please describe the precise location (e.g., next to the bus bench)
>
> A: IN FRONT OF 3319 LAKESHORE AVE.,, IN FRONT OF IZEK SALON  (Exhibit E.)

Initially, PG&E denied the claim saying it was not their responsibility. PG&E went so far as to state in correspondence to Marcia that "***the PG&E electrical enclosure involved in your incident is level with the sidewalk and is not a hazard***."

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 15 of 29

(Exhibit F). But then PG&E changed their position, collected Marcia's medical bills, and attempted to negotiate a settlement.

Prior to the execution of the release, Marcia sent an email to PG&E employee Michael Seawell which said: "Can the settlement amount be $6980.20 that will include past and future medical and a commitment to immediately repair the hazardous sidewalk by your equipment?" (Exhibit G.) Mr. Seawell obviously received this email as the eventual Release was for precisely Marcia's requested amount. (Exhibit H.) Two terrible facts for Defendant PG&E flow from this email: (1) Defendant PG&E did not repair the condition as Marcia requested; and (2) Marcia's email, though obviously received, was not in Defendant PG&E's document production in this action. The former led to at least four more injury accidents that could have been avoided, and the latter establishes that Marcia's email was internally destroyed by Defendant PG&E.

### D. THE NEXT 2 YEARS DOCUMENT DEFENDANT PG&E AND CITY OF OAKLAND OPENLY IGNORING THE DANGEROUS CONDITION AND AT LEAST THREE MORE INJURED PEOPLE

No one disputes that Plaintiff's condition to settle her claim – repair of the dangerous condition – was ignored. Photographs of the condition from the time of Plaintiff's January 3, 2014 until its repair show a completely unchanged dangerous condition. The following also evidences the ongoing complaints received and ignored about the dangerous condition.

By CHUONG, LINDA 9/10/2014 9:25:05 AM

BUILDING OWNER IS REPORTING CITY TREE ROOT HAS DAMAGED THE SIDEWALK, AND TREE ROOT IS

AFFECTING THE SEWER PIPE LINE AND FOUNDATION TO THE BUILDING STRUCTURE AT 3321-3331

LAKESHORE AV. PER OWNER IS REQUESTING FOR AN ASSESSMENT ON THE CITY TREE.

Caller: HONG, STEVE:

Q: Is there a tree nearby with roots that may be the cause?

AYES

Q: Has anyone been hurt by it?

ANO

Q: Please describe the precise location (e.g", next to the bus bench)

A ON THE SIDEWALK

\*   \*   \*

By SMITH, GERALD D: 9/11/2014 9:05 03AM

There is an official liquidambar tree fronting this address" Some lifting by tree roots some damage not root related (attached). Spoke with property owner and explained claims process for alleged sewer and foundation issues.

Caller: DRAKE, PAMELA

Q: Is there a tree nearby with roots that may be the cause?

A: Don't Know/ No Answer

Q: Has anyone been hurt by it?

A: Don't Know/ No Answer

Q: Please describe the precise location (e.g., next to the bus bench)

A: 3321 LAKESHORE AVE.  (Exhibit I.)

Then on July 9, 2015, Cynthia Dias, encountered the dangerous condition, tripped and fell, and injured herself.  Due to her fall, Ms. Dias injured her lip and left upper extremity.  Defendant PG&E ended up settling Ms. Dias' injury claim for $750.  (Exhibit J.)  Like Marcia, Ms. Dias complained to both the City of Oakland and PG&E.  Her complaint to the City of Oakland was as follows:

Q&A &  Comments:

By WONG, JASON: 7/9/2015 2:39:30 PM

CITIZEN REPORTING AN UNEVEN UTILITY COVER, AT 3321 LAKESHORE AVE.

In response, the City of Oakland advised PG&E about their utility box:

By SIBLEY, CARL: 7/9/2015 6:41:13 PM

Sent email to PG&E supervisor C. Brown and E. Wright to investigate for safe sidewalk over the uneven PG&E electrical service box, also call PG&E call center for investigation.  (Exhibit K.)

True to his word, Mr. Sibley sent an email to PG&E  employees Chris Brown and Eric Wright on July 9, 2015 (along with Ms. Dias) where he said the following: "Hi Christen, Eric, Can you have AJW smooth out the uneven PG&E electrical SB in sidewalk

fronting 3321 Lakeshore Ave., also the citizen complaint for the slippery metal gas enclosure lid cover fronting same address?  Attached picture for your review.  Carl Sibley." Mr. Brown and Mr. Wright ignored this request.  (Exhibit L).

On August 18, 2015, Ms. Dias forwarded the just-mentioned email to Defendant PG&E Claims Investigator Ricky Harris.  (Exhibit L)  In response, Mr. Harris sent an email request to Mr. Brown (who ignored the first request) the same day and said:  "Hi Chris, I just met with the customer who tripped and fell at this location [3321 Lakeshore]. Can we get someone out asap to make this area safe? The customer made mention that she was surprised that this hasn't been fixed since someone has already been injured here. Thanks!  Ricky."  Mr. Brown responded:  "Thank you for bringing this to my attention. I will address this ASAP."  Mr. Brown did not address this ASAP or ever.  (Exhibit M.)  He ignored this email, too, thereby ignoring a **second** request to fix this dangerous condition.

On September 19, 2015, Defendant PG&E employee Kim Damico, a Supervisor in PG&E's Law Department sent an email to Mr. Harris saying:  "Working on file reviews. A little behind as you will see. Would you please follow up or swing by to confirm the area, in the above claim, has been made safe [3321 Lakeshore].  In response, Mr. Harris sent another email to Mr. Brown (who ignored the first two requests) on October 8, 2016, with "Importance:  High," stating:  "I went by this location per my Supervisor's request and noted that no repairs have been done to this location.  Can we get someone to go out to this location and take care of this asap."  (Exhibit N.)  There is no evidence of Mr. Brown ever responding to this email.  It is also undisputed that for a **third** time, Mr. Brown openly ignored a request to fix the dangerous condition at issue.

Sadly, while Defendant PG&E and the City of Oakland was doing nothing to repair this condition and, in fact, openly ignoring multiple external and internal requests to fix this condition, more people were being injured.  On September 5, 2015, Wendy Nathan was visiting Oakland for the weekend with family to attend an A's game.  She tripped and fell over the dangerous condition, suffering numerous fractured teeth requiring extensive

oral surgery and orthodontic care and treatment.[1]  On October 12, 2015, Joanne Massimo, visiting from New York, tripped and fell over the dangerous condition as well, suffering a right distal radius fracture.  These are just the victims we know about.

### E.    PLAINTIFF'S NEXT ENCOUNTER WITH THE DANGEROUS CONDITION

Shortly after her prior fall, Marcia stopped going to Izek and almost never visited Lakeshore Avenue in the following years.  She does not recall actually traversing or seeing the area of her prior fall into her later fall on December 5, 2015.  On December 5, 2015, two years after her prior fall, she went to Lakeshore Avenue to get a gift wrapped for a shower at Papyrus.  As she approached the area of her prior fall from a different direction, she realized this was the area of her prior fall.  In an attempt to be safe, she started walking away from the area where she tripped and fell.  Sadly and ironically, this led her to a different, unseen aspect of the dangerous condition – a height differential between the *recessed* southern side of the utility enclosure when compared to the adjacent sidewalk. (Exhibit O.)  Previously, she had encountered the *raised* eastern side of the utility enclosure.

She lost her footing when her foot straddled this height differential, stumbled and fell.  A witness later provided a "pictorial" progression for Plaintiff's counsel as to exactly what happened.  (Exhibit P.)

In her deposition, Ms. Ewing also gave the following testimony:

> Q. When you were walking and approaching the area where you had fallen, did you have an expectation at that time that PG & E had made the repairs that you had requested of them?
>
> A. Yes.

In her fall, Marcia landed on her left arm causing severe injuries.  She was transported via ambulance to Kaiser-Oakland not long after her fall.

### F.    PLAINTIFF'S INJURIES AND DAMAGES

---

[1] Ms. Ewing's counsel represents Ms. Nathan as well.

1   Marica arrived at the Kaiser-Oakland ER at 12:40 p.m. and it was noted: "Patient

2   tripped on uneven pavement near Lake Merritt, fell onto left arm. Instant pain and bone

3   cracking at left elbow." It was soon determined that Marcia suffered a left supracondylar

4   humeral fracture, which is a common injury suffered from falls where the individual tries

5   to break their fall with their hand. (Exhibit Q.)

6       Due to the nature and severity of the injury, Marcia was admitted to the hospital on

7   December 5, had surgery on December 6, and was discharged on December 7. The surgery

8   entailed open reduction and internal fixation ("ORIF") of the fractured humerus, which

9   required **two plates internally fixated with 15 screws.** Upon discharge, Marcia left

10  with her arm splinted and it remained that way for months. (Exhibit R.)

11      In her follow up appointments, Marcia complained of weakness in her left hand and

12  numbness in her fifth finger. Upon physical examination, decrease in sensation in her left

13  fourth and fifth fingers was confirmed. The doctors then diagnosed Marcia with nerve

14  palsy in addition to her ORIF. In addition, the doctors were concerned about the potential

15  for additional factures in the area due to osteoporosis. During this time, her worst pain

16  was documented at being 5-6 out of 10.

17      Before the fall, Marcia was taking care of her elderly mother in the home who had

18  broken her collarbone in 2014. Unfortunately, due to her injuries, Marcia could not even

19  take care of herself much less her mother. Accordingly, Marcia hired help. This help

20  actually needed to help dress and shower Marcia for months because she could not do it

21  herself. The help needed to cook meals for Marcia and her mom, now. Marcia paid this

22  help $15 an hour, for 4-5 hours a day, for six days a week. This arrangement lasted until

23  mid-March, when Marcia could at least drive to some extent. At that point the help went

24  down to 5 days a week.

25      On March 1, 2016, it was noted she had discontinued the arm brace she had been

26  using for the past three months, but that "[s]he continues to experience left 5th finger

27  numbness and decreased fine motor function to the left hand." She was unable to cross

28  her fingers at this time.

EMERGENT    Case: 19-30088    Doc# 2048-2    Filed: 05/16/19    Entered: 05/16/19 14:01:38    Page 20
of 29

On March 11, 2016, Kaiser performed a nerve conduction study on Marcia. The medical record regarding that study states:

> INTERPRETATION: Severe changes in ulnar nerve conduction noted with minimal motor response recorded over the right abductor digiti minimi and severe denervation seen in ulnar innervate hand muscles on needle EMG. Basically there is no motor unit recruitment in ulnar muscles. Overall, this is consistent with severe ulnar neuropathy, localization uncertain, but elbow most likely.
>
> A mild focal median sensory nerve conduction abnormality is also present at the left wrist. (Exhibit S.)

As is clear from Marcia's records, including her physical therapy records, after the surgery and up to this date she had limited to no fine motor function in her left hand. This lack of use of her left hand made her unable to meet the responsibilities of her job, which included consistent typing.

Due to this severe ulnar neuropathy and being symptomatic due to the hardware, Marcia underwent surgery regarding these issues on May 3, 2016. Specifically, Kaiser performed a left ulnar nerve transposition and removed her internal hardware.

After the surgery, Marcia was once again in a sling which she had just ended using two months earlier. On May 12, 2016, she was informed about the "potentially lengthy time for return of nerve function." At that time, her pain was at a 5 out of 10. She was then re-prescribed physical therapy. In fact, at her initial physical therapy post-surgery she reported more pain than she had pre-surgery and her fourth and fifth fingers in her left hand were stiff and painful.

Once more, Marcia was dependent on outside care for help. She again needed to hire help for 5 days a week, which continued until July 2016. At that time, Marcia could basically care for herself and was able to arrange with Alameda County for care for her mother.

Regardless, throughout this time, Marcia could not easily cook and could not do her housework at all. She had ongoing weakness and numbness in her left hand and could hardly carry anything more than a few pounds.

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 21 of 29

Marcia continued to present to doctors with limited left hand function throughout the rest of the year at physical therapy and doctor appointments. However, by the beginning of the year she was capable of doing her prior work at UCSF and UCSF had an opening for her starting in February 2017.

As of July 11, 2017, Marcia was still experiencing "dysesthesias into the ulnar aspect over fingers and hand [and also] has some weakness." On physical examination, decreased sensation on the digits was noted as well as a positive Tinel's sign at the elbow. At that time, the doctor noted numerous medical modalities that could be considered going forward such as "injections and re-exploration." Marcia decided to continue observation for the time. (Exhibit T.)

Possibly the most devastating aspect of this injury was that 2016 was the last year of Marcia's mother's life, who died on October 1, 2016. The final window of quality time Marcia could have spent with her mother was ruined by Marcia's injuries.

### G. TIM BEDFORD TESTIMONY

Tim Bedford ("Bedford"), Defendant PG&E's Senior Manager of Compliance, testified that secondary enclosures, such as the enclosure at issue, is "patrolled" by Defendant PG&E annually. A separate patrol of secondary enclosures (along with a more detailed inspection of other structures) occurs every three years. A patrol of secondary enclosures is to look for "obvious structural problems and hazards," which includes tripping hazards. This is an entirely subjective process where the patrolman is to consider "exposure" (i.e., in an urban vs. rural setting; in a sidewalk vs. behind a fence) and "likelihood" of harm. While those considerations are important, Defendant PG&E does not provide its patrolmen with any claims/injury history regarding enclosures to be inspected on a patrol (e.g, that there had been multiple complaints and injuries regarding the enclosure at issue). Moreover, there is no standard in how to "patrol" secondary enclosures like the one at issue. For instance, it is possible that the patrolman just drove by and looked at the secondary enclosure out a window.

When noticing a height differential between a secondary enclosure and the adjacent concrete, there is no set standard to determine a "hazard." That being said, Bedford admitted that when you get to around an inch it could be concerning. In this case, the height differential between the utility enclosure and the adjacent sidewalk on the east (first fall) and southern (second fall) were each approximately an inch.

Bedford admitted that if a patrolman held any concern about the potentially hazardous nature of a secondary enclosure, he or she had numerous options to remedy the situation, which would include: (1) applying a "cold patch" to remedy any height differential issues; (2) putting a safety cone near it; (3) spray painting the edges of the offending enclosure for higher visibility (though PG&E does not do this); (4) reporting it internally to have it repaired by others; and (5) reporting it to a third party that may be responsible, such as the City of Oakland. Bedford also admitted that patrolmen have phones and iPads to take pictures of concerning enclosures so they can show others to get advice. In fact, Bedford says PG&E employees do this daily. Moreover, Bedford admitted that upon review of photographs of the enclosure, its condition was unchanged from 2014 through 2016.

Accordingly, while the secondary enclosure was eventually repaired by Defendant PG&E in 2017, and its condition had remained unchanged for at the previous three years, Defendant PG&E's patrolmen took none of the aforementioned remedial (or even potentially remediable actions) over the annual patrols in the preceding three years.

When confronted with the various ignored internal PG&E emails asking for the area to be repaired, Bedford admitted he had no idea why these repeated requests went unheeded. Even in the face of these emails, Bedford would not say that the area should have been repaired, only that it should have been "checked out."

Eventually, after *another* complaint about the dangerous condition of the utility enclosure in May 2017, Defendant PG&E finally repaired the condition. The repair work took a total of 10 man hours. There is no evidence that Defendant PG&E needed or requested permission from the City of Oakland or others to perform the repairs. Bedford

admitted the bulk of the repairs, cold patching around the utility enclosure, cost between $0-$10,000.  Bedford then admitted the obvious:  Defendant PG&E had the financial resources to absorb this financial hit and the resources to complete the repairs in 2014, 2015, or 2016.

## III.    LIABILITY

### A.    DEFENDANT PG&E AND/OR THE CITY OF OAKLAND ARE LIABLE FOR MARCIA'S INJURIES AND DAMAGES

It is axiomatic that an entity must reasonably maintain property it owns, occupies or controls.  *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162.   More specifically, one who owns or controls land "is under a duty to exercise ordinary care in the management of such premises in order to avoid exposing persons to an unreasonable risk of harm. A failure to fulfill this duty is negligence." *Brooks v. Eugene Burger Management Corp.* (1989) 215 Cal.App.3d 1161, 1619.

Initially, Defendants PG&E and City of Oakland both control the area in question. There is no doubt that the City of Oakland owns the area of sidewalk at issue and, therefore, had an obligation to maintain it in a safe condition.[2]  However, it is also clear that Defendant PG&E had a property interest in its utility enclosure in the sidewalk. Further, Defendant PG&E obviously controlled this area of sidewalk because by all accounts it repaired the entire area in 2017 without City of Oakland approval or permission.

Moreover, it is unquestioned that not only was the area dangerous, but both entities had notice of the dangerous condition.  Without belaboring the point, at least two sides of the secondary enclosure had approximately 1-inch height differentials with the adjacent concrete, there were a multitude of citizen complaints regarding this area going back a decade, and between 2014-2016 there were at least 5 trip and fall incidents resulting in

---

[2] There is a dispute as whether the City of Oakland can or has foisted its responsibility upon the adjoining landowners, Defendants Lakeshore Natural Foods and the Grcevich Trust.  Plaintiff will leave that issue for Defendants to address.

injury with 3 resulting in over $140,000 in bodily injury settlements.  One cannot paint a better picture of a dangerous condition and actual notice.  There can be no reasonable dispute that Defendants PG&E and City of Oakland are liable to Ms. Ewing.

**B.     MARCIA EWING IS NOT COMPARATIVELY NEGLIGENT**

As a starting point, Marcia Ewing made a condition to her prior settlement that Defendant PG&E fix this condition.  It refused to do so.  In that light, Defendant PG&E claiming that Ms. Ewing is liable for Defendant PG&E failing to abide by a prior promise and its legal obligation to keep the area safe is unsympathetic to say the least.

Moreover, it is not even the case that Ms. Ewing encountered the same dangerous condition; she encountered a different dangerous condition trying to avoid the earlier dangerous condition.  Two years removed from her prior fall and with no exposure to the area in the interim, Marcia realized where she was on December 5, 2015, saw the prior dangerous condition which caused her to fall (the raised eastern edge) and she moved away from that.  Sadly, doing so led her to the unseen, raised southern edge of the secondary enclosure, which caused her to lose her footing and fall.  She did not trip and fall over the same condition but a different one.

Finally, Marcia is a self-made, successful, hard-working, sweet and kind African-American woman.  She has raised two successful children and is a long-time Oakland resident.  When she was injured on January 3, 2014, her words and actions showed that she was more worried about her fellow citizens than herself in demanding that Defendant PG&E fix the area as a condition to her settlement.  With that in mind, to the extent that Defendants claim an Alameda jury will put considerable or any comparative negligence on Ms. Ewing, there is only one response:  good luck.

**C.     DEFENDANT PG&E WILL BE HELD LIABLE FOR PUNITIVE DAMAGES**

Defendant PG&E simply cannot avoid punitive damages in this case.  As has long been the law, "conscious disregard of safety [is] an appropriate description of the *animalus malus* which may justify an exemplary damage when nondeliberate injury is

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 25
of 29

alleged." *G.D. Searle & Co. v. Sup. Ct.* (1975) 49 Cal.App.3d 22, 32; *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 895. Defendant PG&E's "conscious disregard of safety" permeates this case. Defendant PG&E knew about the dangerousness of this condition when it paid Ms. Ewing over $6,900 from her 2014 trip and fall. When demanded to fix it at that time, it refused. ***Not only that, Defendant PG&E internally destroyed Ms. Ewing's email demanding its commitment to fix the sidewalk.***

After Cynthia Dias bore the brunt of Defendant PG&E's disregard for her safety, the City of Oakland demanded Defendant PG&E (send the request PG&E employees Chris Brown and Eric Wright) fix this condition on July 9, 2015 (cc'ing Ms Dias on the email). The PG&E employees ignored this request.

Ms. Dias, like Ms. Ewing, trying to help her fellow citizens, forwarded this email to the PG&E adjuster that had worked her claim, Ricky Harris. That same day, August 18, 2015, Mr. Harris specifically asked Mr. Brown to fix the area "asap." Mr. Brown responded by saying he would do so. However, knowing that Mr. Brown had initially ignored the July 9, 2015 email to fix the area, Mr. Harris did not check to see if Mr. Brown actually followed his request. Of course, Mr. Brown ignored this request, too.

This time Wendy Nathan bore the brunt of Defendant PG&E's absolute aversion to acting reasonably when she tripped and fell over this area on September 5, 2015. She fractured multiple teeth and has incurred tens of thousands of dollars in medical care, accordingly.

Then on September 19, 2015, a Supervisor in PG&E's Law Department sent an email to Mr. Harris telling him to make sure the area was safe. On October 8, Mr. Harris once again – this time with "Importance – High" – told Mr. Brown ***again*** to fix this condition. This time the directive came from two levels above Mr. Brown. Not only did Mr. Brown ignore this request, he did not even respond. No one checked to see if the work was done and it was not. In fact, Mr. Brown (nor Mr. Harris) was not fired or even punished for his willful refusal to obey repair directives.

Four days after the October 8 email demanding immediate repair of this condition, Joanne Massimo tripped and fell over the dangerous condition and suffered a distal radius fracture. Two months after that, Ms. Ewing had her fall with absolutely catastrophic results. To put this in context, Bedford admitted that PG&E could have repaired this condition at any time for less than $10,000.00.

This is the epitome of conscious disregard for the safety of others. Beyond its corporate malfeasance, the willful disregard exhibited by Mr. Brown, Mr. Wright and Mr. Harris were ratified. Defendant PG&E knew of this conduct and took no action against any of its employees. *Ventura v. ABM Industries, Inc.* (2012) 212 Cal.App.4th 258, 272 (ratification can be shown by an employer's failure to discharge an employee after committing misconduct). While not necessary to point out in light of these facts, it is fair to say that an Alameda jury will not be giving Defendant PG&E any "benefit of the doubt" in light of Defendant PG&E's current reputation in California.

### D. THERE IS ALREADY A "BELLWETHER" SETTLEMENT IN PLACE

Recently, most of the defendants in this case mediated the case involving Joanne Massimo, who also injured herself via this sidewalk. Ms. Massimo incurred $25,000 in *Howell* specials and settled her case for $120,000 from Defendant PG&E and $15,000 from other defendants. This establishes a potential specials-to-value ratio and Defendant PG&E's liability. It also establishes Defendant PG&E's validation of the punitive damages claim. Personal-injury attorneys do not often see 4x specials in total compensatory damages on a fracture with little to no residuals. The settlement in the Massimo case thus seemingly reflects an inclusion of punitive damages.

### E. MS. EWING'S HAS SUBSTANTIAL SPECIAL DAMAGES, INCLUDING FUTURE MEDICAL COSTS

Marcia's medical care at Kaiser for her injuries is valued at **$162,827.75**[3]. (Exhibit U.) Separately, Marcia was unable to work from December 2015 to January 2017, as

---

[3] This includes the Kaiser lien plus co-pays.

documented.  As she was making $3,792.00 a month, her wage loss during that time was **$45,504.00.**  A rough calculation of the cost of home-health care Marcia needed while recovering is **$5,000.00**.

Separately, Plaintiff's consultant, Dr. Thomas Sampson, has examined Marcia, reviewed the relevant records, and provided opinions.  Dr. Sampson opines regarding two areas of concern:  (1) residual issues and disability with respect to her left hand; and (2) documented carpal tunnel in her right hand, post-injury, as a result of favoring her right hand.  (Exhibits V and W.)  The latter anticipated necessary care– a carpal tunnel release procedure – was performed by Kaiser after Dr. Sampson's most recent report lending validity to his opinions.

For the former, Dr. Sampson opines that she should undergo a revision ulnar nerve neurolysis, the cost of which is approximately **$25,000**.  Indeed, the potential need for this surgery was mentioned by Marcia's Kaiser doctor when he mentioned "re-exploration."  The last procedure kept Marcia out of work for nine months.  Assuming she has the procedure while still employed, her wage loss would be approximately **$34,128.00**.

Accordingly, Marcia's total economic harm due to this accident is between **$238,331.75 and $272,459.75** depending on whether future procedures will entail wage loss or not.

**IV.  CONCLUSION**

Based on the strength of Plaintiff's liability case, the catastrophic damages suffered, and the guarantee of punitive damages, Plaintiff demands **$1,850,000** to resolve this case.

Case: 19-30088   Doc# 2048-2   Filed: 05/16/19   Entered: 05/16/19 14:01:38   Page 28 of 29

Dated: September 25, 2018

Respectfully submitted,

By: _____

Seth I. Rosenberg

EMERGENT LLP
Attorneys for Plaintiff MARCIA EWING