1   Bruce S. Bennett (SBN 105430)
    Joshua M. Mester (SBN 194783)
2   James O. Johnston (SBN 167330)
    JONES DAY
3   555 South Flower Street
    Fiftieth Floor
4   Los Angeles, CA 90071.2300
    Telephone:   +1.213.489.3939
5   Facsimile:   +1.213.243.2539
    E-mail:      bbennett@jonesday.com
6                jmester@jonesday.com
                 jjohnston@jonesday.com
7
    *Attorneys for PG&E Shareholders*
8

9                  UNITED STATES BANKRUPTCY COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13  In re:                              Bankruptcy Case
                                        No. 19-30088 (DM)
14  PG&E CORPORATION
                                        Chapter 11
15        - and -                       (Lead Case)
                                        (Jointly Administered)
16  PACIFIC GAS AND ELECTRIC
    COMPANY,                            **RESPONSE OF CERTAIN PG&E**
17                                      **SHAREHOLDERS TO OBJECTIONS**
                                        **TO DEBTORS' MOTION TO EXTEND**
18                   Debtors.           **EXCLUSIVE PERIODS**

19  ┌─────────────────────────────────
    │ ☐ Affects PG&E Corporation       Date: May 22, 2019
20  │ ☐ Affects Pacific Gas and Electric Company   Time: 9:30 a.m. (Pacific Time)
    │ ☒ Affects both Debtors           Place: United States Bankruptcy Court
21  │                                  Courtroom 17, 16th Floor
    │ *All papers shall be filed in the Lead Case,*   450 Golden Gate Avenue
22  │ *No. 19-30088 (DM).*             San Francisco, CA 94102
23  │                                  Re: Docket No. 1797
24  └─────────────────────────────────

25

26

27

28

Certain owners of common stock of PG&E Corporation (the "PG&E Shareholders")[1] hereby respond to the objections filed with respect to the *Corrected Motion Of Debtors' Pursuant To 11 U.S.C. § 1121(d) To Extend Exclusive Periods* [ECF 1797 ("Motion")] by the Official Committee of Tort Claimants (the "Tort Claimant Committee") [ECF 2017 ("TCC Obj.")], Governor Gavin Newsom (the "Governor") [ECF 2006 ("Governor Obj.")], and the Singleton Law Firm Fire Victim Claimants ("SLF Claimants") [ECF 2019 ("SLF Obj.")].

## BACKGROUND

In the aggregate, the PG&E Shareholders own 27.5% (more than 145.4 million shares) of the outstanding common stock of PG&E Corporation. As PG&E is solvent by billions of dollars, the PG&E Shareholders are material stakeholders in this reorganization.

The PG&E Shareholders agree with the Tort Claimant Committee that "[a] feasible plan exists, one under which creditors of the Utility, including tort claimants . . . , may be paid in full," TCC Obj. ¶ 1, and we agree with the Governor that "time is of the essence." Governor Obj. ¶ 4. We wholeheartedly support and are working vigorously toward a plan of reorganization that pays wildfire victims and other creditors while ensuring that PG&E emerges as a healthy, viable entity capable of providing clean and reliable power to millions of customers in the safest and most cost-effective manner possible. This bankruptcy case will enable PG&E to achieve those twin imperatives by (1) reconciling and resolving wildfire and other claims fairly; and (2) accessing capital necessary to pay all creditors, invest in critical wildfire mitigation measures, *and* achieve the State's clean energy and climate change goals.

Various PG&E Shareholders have been involved in all facets of PG&E's restructuring efforts to date. Three of the PG&E Shareholders actively engaged in discussions leading to the appointment of eleven new directors to PG&E's board of directors in April – a critical step in

---

[1] The PG&E Shareholders are identified in the *Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019* [ECF 2071]. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 2 of 21

PG&E's effort to change its corporate culture. Representatives of other PG&E Shareholders are participating in proceedings before the California Public Utilities Commission ("CPUC") and the California Legislature's Commission on Catastrophic Wildfire Cost and Recovery, as well as engaging with members of the Governor's wildfire strike team and various members of the California Legislature, as interested stakeholders grapple with the wildfire liability issues facing all of California's investor-owned utilities.

The PG&E Shareholders appear for the first time in this case to address several misstatements and falsehoods leveled against PG&E and its shareholders in objections to PG&E's pending Motion for an extension of the plan exclusivity periods.

## THE NEW BOARD

The Tort Claimant Committee asserts that exclusivity should not be extended because PG&E appointed a new board, alleging that "major shareholders now have control of the boards of directors and will not propose a plan that reflects the true enterprise value of the Debtors." TCC Obj. ¶ 1. The Tort Claimant Committee further asserts that the "new board cannot be relied upon to change PG&E's corporate culture." *Id.* at 8. Thus, the Tort Claimant Committee argues that, in light of PG&E's prepetition missteps, exclusivity should be terminated so that all stakeholders have the ability to file competing plans of reorganization. This focus on the past is misplaced. An extension of plan exclusivity is necessary and appropriate to give PG&E's new board and new Chief Executive Officer time to effectuate the comprehensive operational and financial restructuring on which they are hard at work.

We note at the outset that the Tort Claimant Committee is the only party arguing that exclusivity should not be extended. All other stakeholders agree that an extension is warranted, with disagreements about the length of the extension. Competing plans at this very early date would impact the critical near-term focus of PG&E's new directors and management in preparing and implementing wildfire mitigation strategies and developing a comprehensive restructuring plan. The expense, delay, and distraction of competing plans serve no one's interest at this stage – certainly not the wildfire victims and tort claimants the Tort Claimant Committee is charged

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 3 of 21

with representing. The Tort Claimant Committee's objection should be seen for the tactical filing that it is.

The Tort Claimant Committee also is wrong on the law and the facts. First, no one suggests that PG&E's old board should have remained in place. The Tort Claimant Committee in particular goes out of its way to detail what it calls PG&E's "long history of failing to operate safely." TCC Obj. ¶ 6. Everyone agrees that change was imperative.

In chapter 11, as outside of it, a debtor's shareholders have the right to select its directors. *In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986) (noting "the well-settled rule that the right [of shareholders] to compel a shareholders' meeting for the purpose of electing a new board subsists during reorganization proceedings"); *see Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1500 (9th Cir. 1995) (in bankruptcy, "shareholders still have the power to elect directors of the corporation, and the directors still have the power to elect officers and to guide the corporation's business activities where director action is required by state law") (quotation omitted). This is so even when a debtor is insolvent. *Id.* It is particularly true where, as here, there are billions of dollars of equity value at stake.[2]

Thus, it was perfectly appropriate for – indeed incumbent upon – major shareholders of PG&E to participate in the director selection process. The institutions that participated (at substantial expense) and brokered a consensual resolution are to be lauded for enabling the new board and new Chief Executive Officer to be in place well before they otherwise would have

---

[2] PG&E shares closed trading on Friday, May 17, 2019, at $17.02 per share. With 529,212,562 shares outstanding, that share price equates to more than *$9 billion in equity value*. Contradicting its statement that PG&E can and should propose a plan that pays all claims "in full," the Tort Claimant Committee claims that PG&E's "solvency is much in doubt." TCC Obj. ¶ 3. While this is not the place to litigate solvency, the Tort Claimant Committee's calculation is obviously wrong. It assumes both $30 billion of wildfire claims *and* $41.5 billion of other liabilities. *Id.* But the Tort Claimant Committee includes $10 billion of wildfire subrogation claims and $2 billion of public entity wildfire claims within its assumed $41.5 billion of non-fire liabilities. *Id.* at ¶ 3 n.1. Those same claims are included in the estimate of $30 billion in wildfire claims, meaning that the Tort Claimant Committee double counted $12 billion in liabilities. PG&E therefore is solvent by several billion dollars even keeping all of the Tort Claimant Committee's other (dubious) assumptions intact. Indeed, the SLF Claimants – similarly situated to many members of the Tort Claimant Committee – argue that PG&E is solvent by more than $6 billion. SLF Obj. at 4.

been.  (Prior to the time that the new board of directors was seated, PG&E's annual shareholder's meeting was not scheduled to take place until May 21).

Contrary to the insinuations of the Tort Claimant Committee, none of the directors are employees of or affiliated in any way with any of the PG&E Shareholders.  The new directors were selected because of their independence and their extensive expertise in areas that will be critical to a successful reorganization.  Collectively, the eleven new members of the board bring decades of experience in utility service, safety, risk management, government regulation, and financial and operational restructuring.  Those with utility, regulatory, and safety experience include:

- a former Commissioner of the Federal Energy Regulatory Commission (FERC) who also served on the Safety Committee of a national electricity and natural gas company;

- a former United States Ambassador to the United Nations currently serving as a member of the Health, Safety, and Environment Committee of a global specialty chemicals company and as a director of an airline;

- a former FERC Commissioner Adviser who served as Chair of the Western Energy Imbalance Market Governing Body and as Chief Executive Officer of a leading utility service construction provider;

- a former member of the United States Department of Transportation's Gas Advisory Committee and member of the independent panel assessing enterprise risk management and overall safety of eleven gas utilities following the 2018 Merrimack Valley (Massachusetts) gas explosions;

- a former United States Ambassador to Australia who has served the State of California in multiple capacities (including as Chair of the California State University Board of Trustees, President of the California State Bar, and member of the Governor's International Trade and Investment Council, where he advised on matters of cyber-security); and

- 4 -

1         • an executive with over thirty years of experience in the energy sector, including

2         terms as Chief Executive Officer of two United States utilities.

3 Exhibit A (from PG&E's recent proxy statement) provides more detailed information on all

4 eleven new directors.

5       The new board's commitment to safety and clean energy is reflected in its hiring of Bill

6 Johnson as PG&E's Chief Executive Officer and President. Mr. Johnson recently concluded six

7 years of service as President and CEO of the Tennessee Valley Authority (TVA), the nation's

8 largest publicly owned utility serving a seven-state region. During Mr. Johnson's tenure, TVA

9 achieved the best safety records in its 85-year history and has been a perennial top decile safety

10 performer in the industry. Over that period, Mr. Johnson led the retirement of more than half of

11 TVA's coal generation and the shift to generation of more than 50% of TVA's energy from non-

12 greenhouse gas emitting sources (including almost 2,400 MWs of wind and solar and 5,800 MWs

13 of hydro capacity).

14       Several of the new directors were selected due to their extensive experience (collectively

15 over 125 years) with large-scale financial and operational restructurings. We note the Governor's

16 expressed concern about the appointment of "hedge fund financiers" and others "with little or no

17 experience in utility operations, regulation and safety," Gov Obj. ¶ 8, but the rhetoric does not

18 match the reality. As noted above, many members of the new board have the experience that the

19 authors of the Governor's brief claim to be lacking. Moreover, this is one of the largest, most

20 complex bankruptcy cases in history. Had PG&E shareholders not included on the board some

21 directors with restructuring expertise, it would have been a disservice to all stakeholders given the

22 extraordinary challenges facing the bankruptcy estate. The Court can take comfort in the fact that

23 the board now has the experience necessary to lead PG&E confidently through this restructuring.

24       If anything, the appointment of a new board and new CEO with a broad set of necessary

25 skills and expertise is cause for an extension of exclusivity, not denial of the Motion. PG&E and

26 its shareholders have done what the Tort Claimant Committee, the Governor and others have

27

28

1   urged:  they cleaned house and brought in a new regime dedicated to addressing PG&E's safety

2   culture and improving its performance.  The Court should give them the opportunity to do so.[3]

3        Finally, the Tort Claimant Committee is wrong to suggest that PG&E's *prepetition*

4   mistakes somehow are relevant to the Motion.  If prepetition errors were relevant to plan

5   exclusivity, few if any debtors would receive the exclusivity extensions contemplated by the

6   Bankruptcy Code.  *Cf. In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr.

7   S.D.N.Y. 2006) (denying motion to terminate exclusivity notwithstanding "massive prepetition

8   fraud"; noting the "wholesale departure" of prepetition management that had committed the

9   fraud) (quotations omitted).  Notably, although a subsection of its Objection is entitled "The

10  Debtors' Post-Petition Misconduct," TCC Obj. at 7, the Tort Claimant Committee does not

11  actually identify any *postpetition* misconduct by PG&E.  It merely cites to Judge Alsup's

12  probation order (relating to prepetition conduct) and to testimony at PG&E's meeting of creditors.

13  TCC Obj. ¶¶ 23-24.[4]

## LEGAL AND REGULATORY REFORM

15       The Tort Claimant Committee finds it somehow sinister that PG&E is advocating to

16  reform the wildfire liability regime in California, which it deems a "bailout from the State of

17  California."  TCC Obj. ¶¶ 1, 2, 24.  This is baffling.

18       Virtually every stakeholder other than the Tort Claimant Committee recognizes that the

19  existing legal and regulatory system for allocating wildfire liability to California utilities is

20  broken.  As the Governor's strike team recently reported:

21              [T]he current system for allocating costs associated with catastrophic
22              wildfires – often caused by utility infrastructure, but exacerbated by
                drought, climate change, land-use policies, and a lack of forest
23              management – is untenable both for utility customers and for our

---

[3]  The Governor asserts that exclusivity "[a]llow[s] PG&E to remain in chapter 11 without
24  accountability."  Governor Obj. ¶ 7.  Far from it.  In addition to remaining accountable to
    state and federal regulators (not to mention the federal district court overseeing its probation),
25  PG&E is now directly accountable *to the Court*.  If the Court determines that PG&E and its
    new board are not acting in good faith toward a reorganization that is fair to all, it remains
26  able to terminate exclusivity, appoint a trustee, or dismiss the bankruptcy case at any time.

[4]  If there were postpetition misconduct, the appropriate course of action would be to seek the
27  appointment of a chapter 11 trustee, not denial of the requested extension of exclusivity.  The
    Tort Claimant Committee, of course, has not attempted to satisfy the stringent burden
28  associated with a request for appointment of a trustee.

- 6 -

economy. Multi-billion dollar wildfire liabilities over the last several years have crippled the financial health of our privately and publicly owned electric utilities. . . . Utilities rely on credit to finance ongoing infrastructure investments, including fire mitigation. As utilities' credit ratings deteriorate, their borrowing costs increase and those costs for capital necessary to make essential safety improvements are passed directly []to customers. These downgrades, and the prospect of additional utility bankruptcy filings, directly impact Californians' access to safe, reliable and affordable electricity.

*Wildfires And Climate Change: California's Energy Future, A Report From Governor Newsom's Strike Force*, April 12, 2019 ("Strike Team Rep."), at 2-3.[5]

One root of the problem is the combination – unique to California – of (1) the judicial application of the inverse condemnation doctrine to hold investor-owned utilities strictly liable, regardless of fault, for property damages caused by a wildfire ignited, even in part, by utility equipment, with (2) the disallowance of utility recovery of wildfire liability expenses from ratepayers whenever California regulators (the CPUC) subjectively determine, years after the utilities are required to pay fire-related claims, that the utility did not act "prudently" in its conduct leading to the fire. This inconsistent regime separates inverse condemnation from its legal foundation – the assumption that the costs of wildfires will be (not may be) spread among the public that benefits from utility service – and exposes utilities to massive, unbounded liability that threatens their ability to raise enough capital to sustain safe and reliable operations and make necessary investments in the grid and wildfire mitigation.

Another part of the problem – acknowledged by the Governor – is that the fires that occur, for whatever reason, are far more destructive than they have ever been as a result of factors that no utility controls (such as climate change, governmental forest and land management, and increasing development in the wildland urban interface). At the same time, insurance costs have skyrocketed and coverage has restricted, directly increasing costs to ratepayers. Indeed, PG&E recently reported that when it renewed coverage during the third quarter of 2018 – *before* the November 2018 Camp Fire – it was only able to purchase an aggregate amount of $1.4 billion in coverage and only able to do so at a cost of $360 million.[6] This is both inadequate and

---

[5] Available at: https://www.gov.ca.gov/wp-content/uploads/2019/04/Wildfires-and-Climate-Change-California's-Energy-Future.pdf.

[6] PG&E Quarterly Report (Form 10-Q) (Nov. 5, 2018), at 49.

- 7 -

1  extraordinarily expensive insurance, and it is expected that coverage for future periods, if

2  available at all, will be even more expensive.

3       The current regime thus puts all California utilities, including PG&E, in the worst of all

4  worlds. With ever-increasing risk of catastrophic wildfires, the utilities are held strictly liable for

5  wildfires caused, even in part, by their equipment (regardless of fault and regardless of measures

6  taken to prevent and reduce harm), yet they cannot be assured of recovering damages paid to

7  wildfire victims through the rate setting mechanism, as the CPUC has recast ordinary negligence

8  (an unavoidable fact of business operations) as "imprudence." The utilities cannot obtain

9  adequate insurance, nor can they raise capital at reasonable, investment-grade rates. "This regime

10 – strict liability for wildfire damage coupled with uncertain ability to recover those damages in

11 rates – increases the risk of bankrupt utilities, which in turn drives up costs for consumers,

12 threatens fair recoveries for fire victims, undermines the state's ability to mitigate and adapt to

13 climate change, and creates uncertainty for utility employees and contractors." Strike Team Rep.

14 at 27.

15      This problem impacts all of California's investor-owned utilities, not just PG&E. The

16 SLF Claimants' assertion that PG&E alone "is leveraging its position as a massive debtor to

17 influence the state government to enact legislation," SLF Obj. at 4, is ridiculous. This is why, as

18 the Governor observes, "[t]he State is working expeditiously to fulfill its role by working to enact

19 revisions to the legal and regulatory framework applicable to electric utilities dealing with

20 catastrophic wildfires by this summer." Governor Obj. ¶ 3. Without that legislative fix, investors

21 will be unwilling to reinvest in PG&E and the State's other utilities, eliminating capital necessary

22 for safety measures, wildfire mitigation, clean energy initiatives, and plan funding.

23      To date, no specific proposals have emerged from the Governor's strike team or the

24 Legislature. As the Governor notes, the California Senate Select Committee just held its first

25 meeting on May 8, the California Assembly is in the process of "scheduling hearings to address

26 the policy issues," and the Legislature's Commission on Catastrophic Wildfire Cost and Recovery

27 is not due to issue its report and recommendation until July 1. Id. ¶ 13. Given the current

28 situation, if any legislation is passed in the current legislative session, it is most likely to be

considered near the end of the session in September, after the end of the shortened exclusivity period supported by the Governor.

These considerations strongly support PG&E's requested exclusivity extension. PG&E and its stakeholders need at least some clarity on the legal and regulatory framework in which reorganized PG&E will be expected to operate *before* they can formulate a plan. *See* Governor Obj. ¶ 19 (important to "allow[] time for development of further clarity around a potential new legal and regulatory framework that will define at least some of the parameters of a plan of reorganization"). It is unrealistic, at best, to expect investors to provide the capital for PG&E to fund a plan and continue its ongoing operations without an understanding of PG&E's exposure to wildfire liabilities. *See In re Public Service Co. of New Hampshire*, 88 B.R. 521, 537-42 (Bankr. D.N.H. 1988) (granting investor-owned utility seven-month extension of exclusivity in part due to uncertainty regarding regulatory approval of new nuclear power plant).

## **CLAIMS**

As PG&E notes in the Motion, another fundamental plan gating issue is "quantifying the aggregate amount of the Debtors' liability for the Northern California wildfire claims," a task "made even more challenging in view of the more recent Camp fire and the inability to date to obtain reliable information on the scope, extent, and types of damages that may be asserted." Motion at 14. To date, no bar date has been set, and preliminary indications are that the Tort Claimant Committee and others intend to resist PG&E's requests for supporting claim information as part of the claim submission process. Without that information, plan formulation will be impractical if not impossible.

The Tort Claimant Committee suggests that claim reconciliation is irrelevant, citing *In re Dow Corning Corp.*, 208 B.R. 661 (Bankr. E.D. Mich. 1997). TCC Obj. ¶ 48. *Dow Corning* fully supports the Debtors' requested extension of exclusivity here. In that case, the bankruptcy court had extended the exclusivity periods twice, to a period beyond two years after the petition date, specifically so that the court develop procedures to estimate the mass tort claims asserted against the debtor. *Dow Corning*, 208 B.R. at 662-63. The court then *denied* the tort claimant committee's motion to terminate an open-ended extension of exclusivity and ordered that the

debtor would retain plan exclusivity through "21 days from the date an order disposing of the estimation motions is entered." *Id.* at 670. Clearly, the court believed that determination of large unliquidated claims was an important factor in the exclusivity analysis. The same considerations apply here.

**CONCLUSION**

The PG&E Shareholders recognize the dire circumstances of the wildfire victims and support PG&E's efforts to assist those claimants in need of shelter and other assistance, including by way of the pending motion to establish a wildfire assistance program [ECF 1777]. However, terminating exclusivity now – without any credible allegation that the new board or the new CEO has made any misstep at all, as the new board members are in the process of establishing themselves as qualified stewards of PG&E and its constituents, before the California Legislature has had a chance to resolve the legal and regulatory morass that has ensnared all of the State's investor-owned utilities, and before PG&E can take any reasonable measure of its actual wildfire liabilities – would be pointless, counterproductive, and ultimately detrimental to a reorganization.

The PG&E Shareholders therefore request that the Court overrule the objections and grant PG&E the full extension of exclusivity requested in the Motion.

Dated: May 20, 2019                                JONES DAY


                                                   By: */s/ James O. Johnston*
                                                   James O. Johnston

                                                   *Attorneys for PG&E Shareholders*

**EXHIBIT A**
**(excerpted pages from PG&E Corporation's May 17, 2019 Proxy**
**Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934)**

**Back to Contents**



### Richard R. Barrera

**Age:** 47
**Director Since:** April 2019
**Current Board Committees:** Finance (Chair); Audit; Executive
**Current Position:** Founder, CEO and Portfolio Manager, Roystone Capital Management LP (an asset management firm that invests across the capital structure in both debt and equity)

**Prior Positions:**

Mr. Barrera previously was a Partner and Co-Portfolio Manager at Redwood Capital Management and Glenview Capital Management (both private investment management firms).

**Other Board Experience:**

Mr. Barrera is a member of the board of Mount Sinai Children's Center Foundation and a member of the board of Success Academy Charter Schools.

**Experience, Skills, and Expertise:**

Mr. Barrera has over 20 years of asset management and financial expertise investing in businesses undergoing transformations across a wide range of sectors. Throughout his career, Mr. Barrera has invested across the electric utility and independent power industries and has directly participated in numerous restructurings both in and out of Chapter 11. Mr. Barrera's restructuring experience includes several bankruptcies involving complex litigation and a number of telecommunication restructurings in which he actively helped companies recapitalize balance sheets to enable successful operational turnarounds.



### Jeffrey L. Bleich

**Age:** 57
**Director Since:** April 2019; independent non-executive Chair of the Board of the Utility since April 2019
**Current Board Committees:** Compliance and Public Policy; Safety and Nuclear Oversight
**Current Position:** Attorney

**Prior Positions:**

Mr. Bleich was a partner in the San Francisco, CA office of Dentons US LLP (a multinational law firm) from 2016 to April 2019. Mr. Bleich served as a member of the Senior Advisory Group to the Director of National Intelligence from 2014 to 2016. Mr. Bleich served as U.S. Ambassador to Australia from 2009 to 2013 and also as Special Counsel to President Obama in the White House from 2008 to 2009. Mr. Bleich previously was a long-time partner at the California law firm Munger, Tolles & Olson LLP, where he was recognized as one of California's leading litigators, litigated a variety of complex civil cases and handled landmark state and U.S. Supreme Court pro bono cases.

**Other Board Experience:**

Mr. Bleich is a member of the board of Nuix Pty. Ltd (from 2017 to present) and the advisory board of Amber Kinetics, Inc. (from 2017 to present). Mr. Bleich serves on several boards, including as Chair of the Fulbright Foreign Scholarship Board (appointed by President Obama).

**Experience, Skills, and Expertise:**

Mr. Bleich has over three decades of experience resolving complex domestic and international disputes and specializing in cybersecurity. In addition to his legal and public sector experience, Mr. Bleich has served on the boards of numerous private organizations, including as the Chair of the California State University Board of Trustees, President of the California State Bar, a member of the Governor's International Trade and Investment Council, and President of the Bar Association of San Francisco. Mr. Bleich is a long-time California resident.

2019 Joint Proxy Statement **21**

Case: 19-30088   Doc# 2082   Filed: 05/20/19   Entered: 05/20/19 11:27:57   Page 13 of 21

Back to Contents



### Nora Mead Brownell

**Age:** 71
**Director Since:** April 2019; independent non-executive Chair of the Board of PG&E Corporation since April 2019
**Current Board Committees:** Executive; Safety and Nuclear Oversight
**Current Position:** Co-Founder of Espy Energy Solutions LLC (an energy consulting group that provides strategic planning, marketing, business planning, and other consulting services to energy utilities, equipment manufacturers, service providers and financial institutions evaluating energy investments)

**Prior Positions:**

Ms. Brownell is a former Commissioner of the Federal Energy Regulatory Commission ("FERC"), a former member of the Pennsylvania Public Utility Commission and a former President of the National Association of Regulatory Utility Commissioners.

**Prior Public Board Service During the Past Five Years:**

National Grid (2012 to April 2019); Spectra Energy Partners (2007 to 2018); Oncor, Inc. (2007 to 2014)

**Other Board Experience:**

Ms. Brownell previously served on the boards of Tangent (2000 to April 2019) and Comverge Inc. (2007 to 2014). Ms. Brownell is also currently a director of Morgan Stanley Infrastructure Advisory Board and of Mead Family Investments (previously Times Publishing Co.) (1996 to present), and she previously served as a director of Direct Energy Advisory Board (2014 to 2017) and of New World Capital Advisory Board (2009 to 2016).

**Experience, Skills, and Expertise:**

Ms. Brownell is a former Commissioner of the FERC, a former member of the Pennsylvania Public Utility Commission and a former President of the National Association of Regulatory Utility Commissioners. During her time at FERC, Ms. Brownell oversaw the transition of the North American Electric Reliability Corporation to FERC oversight after Congress passed the Energy Policy Act of 2005, which provided for mandatory electric reliability standards. Ms. Brownell has been an advocate for consumer protection, competitive markets and national energy infrastructure development. She has worked extensively with California stakeholders to resolve market and infrastructure issues.



### Frederick W. Buckman

**Age:** 73
**Director Since:** April 2019
**Current Board Committees:** Audit; Safety and Nuclear Oversight
**Most Recent Position:** Retired President and Chief Executive Officer of Powerlink Transmission Company (transmission investment for private equity)

**Prior Positions:**

Mr. Buckman was President and CEO of Shaw Group's Power Group (engineering firm) (2009 to 2010), a managing partner for utilities at Brookfield Asset Management (alternative asset management company focusing on real estate, renewable power, infrastructure and private equity) (2007 to 2009), President and CEO of Trans-Elect (electric and gas transmission system development) (1999 to 2006), and has held various leadership positions in the utility and energy industry, including President and CEO of Pacificorp (electric energy company) (1994 to 1998) and CMS Energy (natural gas and electric energy company) (1986 to 1994). He also served on the Board of Directors of SmartWires, Inc. (transmission technology company) (2011 to 2019).

**Other Board Experience:**

Mr. Buckman currently serves as a board member of StanCorp Financial Group Incorporated (insurance and financial services company) and Solomon Corporation (sales and service of transformers and related equipment).

**Experience, Skills, and Expertise:**

Mr. Buckman brings over 30 years of experience in the utility, energy, and asset management sectors. In addition to serving as the CEO of two U.S. utilities, Mr. Buckman has extensive experience in utility operation and management, safety assessment, engineering and construction management, project development and nuclear plant design.

2019 Joint Proxy Statement    **22**

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 14

**Back to Contents**



## Cheryl F. Campbell

**Age:** 59
**Director Since:** April 2019
**Current Board Committees:** Safety and Nuclear Oversight (Chair); Compliance and Public Policy; Executive; Finance
**Current Position:** Consultant, Executive Director, Gold Shovel Standard Association (non-profit organization working to reduce damage to underground infrastructure)

**Prior Positions:**

Ms. Campbell spent 13 years at Xcel Energy, Inc. (utility supplier of electric power and natural gas service operating in eight Western and Midwestern states), most recently serving as the Senior Vice President, Gas and President and CEO of West Gas Interstate (a FERC-regulated pipeline owned by Xcel Energy) from 2011 to 2018. Prior to Xcel Energy Inc., Ms. Campbell worked for approximately 20 years at Coastal Corporation (El Paso Corporation) (provider of natural gas and related energy products) where she held various roles, including director.

**Other Board Experience:**

Ms. Campbell currently serves as a board member of Hoffman Southwest (a private equity-owned provider of water flow inspection, repair and cleaning services) (2018 to present). Ms. Campbell previously served as a member of the Engineering Advisory Committee of the University of Colorado College of Engineering, a member of the Gas Pipeline Advisory Committee to the Department of Transportation and a member of the Colorado Oil and Gas Association Board.

**Experience, Skills, and Expertise:**

Ms. Campbell has 35 years of energy experience in midstream, interstate pipelines and utilities. During her tenure at Xcel Energy, Ms. Campbell developed Xcel Energy's risk management, regulatory, environmental and operating plans for its gas assets while improving operating and financial results across the enterprise. Ms. Campbell also developed the same programs for WestGas InterState while she was serving as its President and CEO. Her experience includes strategic planning, operations, regulatory and risk management. Ms. Campbell is a champion of public and employee safety and served on the U.S. Department of Transportation's Gas Pipeline Advisory Committee from 2013 to 2018, providing guidance to the Secretary of Transportation on the safety of the nation's gas pipeline infrastructure. Ms. Campbell also served as a member of the independent panel assessing the enterprise risk management and overall safety of the 11 gas utilities in Massachusetts in the aftermath of the September 2018 explosions and fires in Merrimack Valley.

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 15

Back to Contents



### Fred J. Fowler

**Age:** 73
**Director Since:** March 2012
**Current Board Committees:** Finance; Safety and Nuclear Oversight
**Most Recent Position:** Retired Chairman of the Board, Spectra Energy Partners, LP (master limited partnership that owns natural gas transmission and storage assets)
**Other Current Public Company Boards:** Encana Corporation (natural gas producer) since 2010 (serves on corporate responsibility, environment, health and safety committee, and human resources and compensation committee); DCP Midstream Partners, LP (master limited partnership that owns, operates, acquires, and develops midstream energy assets) since 2015 (serves on audit committee)

**Prior Positions:**

In addition to serving as Chairman of the Board of Spectra Energy Partners, LP (2008 to 2013), Mr. Fowler was President and CEO of Spectra Energy Corp (natural gas gathering and processing, transmission and storage, and distribution company) (2006 to 2008) and served as a director of that company. Before that, he held various executive positions with Duke Energy Corporation (gas and electric energy company) and its subsidiaries and predecessor companies, including President and COO of Duke Energy.

**Prior Public Board Service During the Past Five Years:**

Spectra Energy Partners, LP (2008 to 2017)

**Other Board Experience:**

Mr. Fowler is the former Chairman of the Board of the Interstate Natural Gas Association of America and a former director of the Gas Research Institute, the Gas Technology Institute, and the Institute of Nuclear Power Operations.

**Experience, Skills, and Expertise:**

Mr. Fowler brings extensive knowledge and over 45 years of experience in utility company operations, including safety, natural gas and gas liquids production, transportation and marketing, and electricity generation, transmission and distribution. He brings leadership, management, and business skills developed as an executive and a director of numerous public and privately held companies.



### William D. Johnson

**Age:** 65
**Director Since:** May 2019 (Utility)
**Current Position:** CEO and President, PG&E Corporation

**Prior Positions:**

Mr. Johnson served as President and CEO of the Tennessee Valley Authority (TVA) from 2012 to April 2019. Prior to his tenure at the TVA, Mr. Johnson was the Chairman, President and CEO of Progress Energy.

**Experience, Skills, and Expertise:**

Mr. Johnson brings over 20 years of utility experience and leadership as a utility industry executive. During his six-year tenure at TVA, he was responsible for leading the nation's largest public utility in its mission of providing energy, environmental stewardship and economic development across a seven-state region. During Mr. Johnson's time at TVA, the organization achieved the best safety records in its 85-year history and has been a perennial top decile safety performer in the utility industry. In that same period, retirement of more than half of TVA's coal generation, resulting in a reduction of TVA's carbon omissions by about 50% over the last decade. He was responsible for leading the generation of more than 50% of TVA's energy from non-greenhouse gas emitting sources. He also oversaw TVA's expansion into utility scale solar in recent years, with the addition of approximately 1,000 megawatts (mWs), and pursued the modernization of its hydro assets to increase the overall amount of renewable resources. TVA's renewable portfolio includes almost 2,400 mWs of wind and 5,800 mWs of hydro capacity. Throughout his career in the electric utilities industry, Mr. Johnson has collaborated closely with elected officials and other community leaders to deliver safe and reliable electricity to millions of customers.

2019 Joint Proxy Statement    **24**

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 16

[Back to Contents](#)



### Michael J. Leffell

**Age:** 60
**Director Since:** April 2019
**Current Board Committees:** Nominating and Governance (Chair); Compliance and Public Policy; Executive
**Current Position:** Founder, Portage Partners LLC (a privately held company focused on sourcing, analyzing and monitoring non-traditional investment opportunities) and Chairman of Canoe Software (a financial technology company)

**Prior Positions:**

Prior to founding Portage Partners in 2010, Mr. Leffell was the Deputy Executive Managing Member of Davidson Kempner Capital Management, a global institutional investment management firm.

**Prior Public Board Service During the Past Five Years:**

Genco Shipping and Trading Limited (a publicly traded transportation services company) (2014 to 2016)

**Experience, Skills, and Expertise:**

Mr. Leffell has over 20 years of experience participating in the restructuring of multiple businesses under Chapter 11. In addition to serving as the Deputy Executive Managing Member of Davidson Kempner Capital Management, Mr. Leffell also co-managed the Distressed Investment strategy, including multiple positions in a broad range of large complex corporate restructuring and domestic and international bankruptcies that often implicated complex litigation.



### Kenneth Liang

**Age:** 57
**Director Since:** April 2019
**Current Board Committees:** Compensation; Finance
**Most Recent Position:** Former senior Managing Director and Head of Restructurings, Oaktree Capital Management (a global alternative investment management firm with expertise in credit strategies)

**Prior Positions:**

From Oaktree's formation in 1995 until June 2001, Mr. Liang was Oaktree's General Counsel. Before that, he served as a Senior Vice President at TCW Group.

**Prior Public Board Service During the Past Five Years:**

Tribune Media (media/entertainment/real estate company) (2013 to 2015); STORE Capital Corporation (a real estate investment trust) (2012 to 2016)

**Other Board Experience:**

Mr. Liang served as chairman of the board of Excel Maritime (dry bulk shipping company) (2014 to 2018). He also served on the boards of Chassix (automotive parts company) (2016 to 2018) and of Pulse Electronics (mobile electronics company) (2015 to 2018). Mr. Liang has also served on the board of Flintridge Preparatory School (2012 to 2018).

**Experience, Skills, and Expertise:**

Mr. Liang was a senior Managing Director and Head of Restructurings at Oaktree Capital Management's Opportunities Funds, Oaktree's largest investment strategy fund. Mr. Liang retired from Oaktree in April 2018 after being with Oaktree since its inception over 20 years ago. Mr. Liang joined Oaktree at its formation in 1995 as an original equity holder and served as Oaktree's General Counsel until June 2001. Mr. Liang has extensive U.S. and international experience as a significant stakeholder in prominent and complex restructurings of many troubled businesses inside and outside of Chapter 11 and in court-supervised reorganizations, including Enron, Energy Future Holdings, Tribune and Caesars Entertainment. Mr. Liang holds a J.D. from Georgetown University and a B.S. from the University of Southern California, has been a long-time California resident and has close family relatives who live in PG&E Corporation's service area.

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 17

**Back to Contents**



### Dominique Mielle

**Age:** 50
**Director Since:** April 2019
**Current Board Committees:** Audit (Chair); Executive
**Most Recent Position:** Former Partner and Senior Portfolio Manager, Canyon Partners LLC (an investment manager that specializes in value-oriented special situation investments for institutional investors)
**Other Current Public Company Boards:** Anworth Mortgage Asset Corporation (mortgage REIT investment firm) since 2018 (serves on the compensation committee (chair), audit committee and nominating and corporate governance committee); Studio City International since 2018 (serves on the nominating and corporate governance committee (chair), compensation committee and audit and risk committee)

#### Prior Positions:

Ms. Mielle was a partner and senior portfolio manager at Canyon Partners, where she worked from 1998 to 2017. Before 1998, she worked at various investment banks, including Libra Investments, Lehman Brothers and Credit Lyonnais.

#### Experience, Skills, and Expertise:

Ms. Mielle has played key roles in complicated bankruptcies where public safety and the economic well-being of the public were critical issues requiring extensive engagement with government entities, regulatory agencies and affected communities. Ms. Mielle was a member of the creditors' committee for the Commonwealth of Puerto Rico, and also served as a restructuring committee member of American Airlines, Continental Airlines, Delta Airlines, Northwest Airlines and United Airlines in the wake of the September 11 attacks. Ms. Mielle earned an MBA from Stanford University. She is a long-time California resident.



### Meridee A. Moore

**Age:** 61
**Director Since:** April 2019
**Current Board Committees:** Compensation (Chair); Executive; Finance; Nominating and Governance
**Current Position:** Founder, CEO and Chief Investment Officer of Watershed Asset Management (a San Francisco-based alternative asset manager)
**Other Current Public Company Boards:** Blackrock Capital Investment Corporation since 2017 (serves on the audit committee and governance & compensation committee)

#### Prior Positions:

Before founding Watershed Asset Management, Ms. Moore was a Partner and Portfolio Manager at Farallon Capital Management (a global institutional investment firm).

#### Other Board Experience:

Ms. Moore currently serves as a board member of Nextgen Climate America (NextGen Policy Center) (a California-based climate policy non-profit) (2014 to present) and as a director on the investment advisory board of Fiduciary Counselling Inc. Ms. Moore has served as a trustee of Right to Play International (2003 to 2018), Right to Play US (2004 to 2019), and Grace Cathedral (2011 to 2018). Ms. Moore also served on the boards of Morgans Hotel Group (2005 to 2007) and AMF Bowling Worldwide (2001 to 2003).

#### Experience, Skills, and Expertise:

Ms. Moore has over 25 years of investment and restructuring experience over a wide range of industries. She is the Founder, CEO and Chief Investment Officer of Watershed Asset Management, a San Francisco-based alternative asset manager. Watershed managed capital for institutional investors for 15 years. Ms. Moore has invested and participated in numerous restructurings in and out of Chapter 11, including PG&E Corporation's restructuring in 2001. Ms. Moore is a long-time California resident.

Case: 19-30088   Doc# 2082   Filed: 05/20/19   Entered: 05/20/19 11:27:57   Page 18

**Back to Contents**



### Eric D. Mullins

**Age:** 56
**Director Since:** September 2016
**Current Board Committees:** Audit; Safety and Nuclear Oversight
**Current Position:** Co-CEO of Lime Rock Resources, L.P. (private equity investment firm that acquires, operates, and improves oil and natural gas properties in the U.S.) since 2005
**Other Current Public Company Boards:** Anadarko Petroleum Company (independent oil and natural gas exploration and production company) since May 2012 (serves on audit committee (chair) and executive committee)

**Prior Positions:**

Prior to co-founding Lime Rock Resources, L.P. in 2005, Mr. Mullins worked in the investment banking division of Goldman Sachs & Co. for 15 years, most recently as managing director in the firm's Energy and Power Group, where he led numerous financing, structuring, and strategic advisory transactions for public and private oil and gas exploration and production companies.

**Other Board Experience:**

Mr. Mullins currently serves as a member of the Baylor College of Medicine Board of Trustees.

**Experience, Skills, and Expertise:**

Mr. Mullins brings operational, business development, and mergers and acquisition experience in the energy sector, as well as director and audit committee experience from his other public company board service. He also brings strategic management, leadership, and corporate financial expertise developed as an executive in the investment banking industry working with both public and private companies in the natural resources and utilities sector.

2019 Joint Proxy Statement | **27**

Case: 19-30088   Doc# 2082   Filed: 05/20/19   Entered: 05/20/19 11:27:57   Page 19
of 21

**Back to Contents**



## Kristine M. Schmidt

**Age:** 55
**Director Since:** April 2019
**Current Board Committees:** Compliance and Public Policy (Chair); Executive; Nominating and Governance; Safety and Nuclear Oversight
**Most Recent Position:** Former Chief Executive Officer of Peak Utility Services Group (utility services contractor)

**Prior Positions:**

Ms. Schmidt was the President, founder and owner of Swan Consulting Services (a consulting company that provides strategic, regulatory and advisory services to utilities and equipment and services related businesses in the electricity and natural gas utility industry) from 2015 to 2018. Before that, she was President of ITC Great Plains and Vice President at ITC Holdings (independent electric high voltage transmission owner and operator).

**Other Board Experience:**

Ms. Schmidt served as a member of the Western Energy Imbalance Market Governing Board (which has the primary governance responsibility and decisional authority for the interstate wholesale energy imbalance market in the western region). Ms. Schmidt also served on the board of Peak Utility Services Group in 2018.

**Experience, Skills, and Expertise:**

Ms. Schmidt has over 35 years of experience in the electricity industry, having worked for and consulted with some of the largest public utilities throughout the United States. Over the last 25 years, Ms. Schmidt's experience was primarily in the regional wholesale market arena and high voltage transmission development and regulatory policies. The regional wholesale markets are critical across the United States to efficiently and cost-effectively integrate large scale renewables. Ms. Schmidt has served as a FERC Commissioner Advisor, addressing national policies and reforms resulting from the California Energy Crisis and FERC's expanded authority from the Energy Policy Act, among other key policy issues. Ms. Schmidt was the Chair of the inaugural Western Energy Imbalance Market (WEIM) Governing Body, which promotes the integration of surplus renewables energy into the grid, and was a member of the board with governance responsibility over the wholesale energy imbalance market in the western region, including California. Ms. Schmidt was previously CEO of Peak Utility Services Group, a leading utility construction service provider. She was also a corporate officer with the nation's largest independent high voltage transmission company, ITC Holdings Corporation, and the President of ITC Great Plains, which has the highest percentage of utility scale wind power in the nation. Ms. Schmidt has also held various senior management responsibilities for public utilities, including Xcel Energy, and served on the board of Peak Utility Services Group.

2019 Joint Proxy Statement | **28**

Case: 19-30088   Doc# 2082   Filed: 05/20/19   Entered: 05/20/19 11:27:57   Page 20
of 121

**Back to Contents**



## Alejandro D. Wolff

**Age:** 62
**Director Since:** April 2019
**Current Board Committees:** Compensation; Compliance and Public Policy
**Previous Position:** Former Managing Director, Gryphon Partners (global advisory firm focused on emerging and frontier markets)
**Other Current Public Company Boards:** Albemarle Corporation (public specialty chemicals company) since 2015 (serves on the Health, Safety and Environment committee and as chair of the executive compensation committee); Versum Materials (public specialty chemicals company) since 2016 (serves as the lead independent director and chair of the governance and nominating committee)

**Prior Positions:**

Mr. Wolff served in the U.S. State Department for 34 years, including serving as the U.S. Ambassador to the Republic of Chile from 2010 to 2013 and the U.S. Ambassador to the United Nations from 2005 to 2010.

**Other Board Experience:**

Mr. Wolff currently serves as a board member of JetSMART Holdings Limited (private airline operating in South America) (2017 to present). Mr. Wolff is also an advisory board member of the Counter Extremism Project.

**Experience, Skills, and Expertise:**

Alejandro D. Wolff brings decades of experience in high-level political, economic, and security issues from his 34-year career in the U.S. State Department. His has experience managing natural disaster, conflict, and terrorist-response situations, and a successful negotiating record of bridging differences among numerous constituencies with competing interests. As Ambassador to the Republic of Chile, Mr. Wolff promoted U.S.-origin renewable energy alternatives for Chile, including solar power. Mr. Wolff currently serves as a director of Albemarle Corporation ("Albemarle"), a global specialty chemicals company. As a member of Albemarle's Health, Safety & Environment Committee, Mr. Wolff brings considerable knowledge of clean energy, sustainability, renewable energy and electricity storage. Mr. Wolff also serves as the Lead Independent Director and Chair of the Corporate Governance and Nominating Committee of Versum Materials, an electronic materials company with operations in California, and as a director of JetSMART Holdings, an airline in South America. Mr. Wolff was a long-term resident of California, graduated from the University of California, Los Angeles, and continues to have close ties to California.

Case: 19-30088    Doc# 2082    Filed: 05/20/19    Entered: 05/20/19 11:27:57    Page 21