Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:   628.208.6434
Facsimile:   310.820.8859
Email:   rjulian@bakerlaw.com
Email:   cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025
Telephone:   310.820.8800
Facsimile:   310.820.8859
Email:   esagerman@bakerlaw.com
Email:   lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>   -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>         **Debtors**<br><br>☐ Affects PG& E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br><br><br>**AMENDED REDACTED DECLARATION OF BRENT C. WILLIAMS IN SUPPORT OF OFFICIAL COMMITTEE OF TORT CLAIMANTS' LIMITED JOINDER, OBJECTION AND COUNTER MOTION TO DEBTORS' WILDFIRE ASSISTANCE PROGRAM MOTION (DKT. NO. 1777)**<br><br>Date:     May 22, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:    United States Bankruptcy Court<br>             Courtroom 17, 16th Floor<br>             San Francisco, CA 94102 |

1.     I, Brent C. Williams, am a Managing Director and Co-Head of Lincoln's Special Situations Group at Lincoln Partners Advisors LLC ("**Lincoln**"), which has its principal office at 500 West Madison Street, Suite 3900 Chicago, IL. I am authorized to execute this declaration on behalf of Lincoln. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.

2.     I am making this declaration in support of the Official Committee of Tort Claimants' Limited Joinder, Objection and Counter Motion ("**Joinder**") to the Debtors' Wildfire Assistance Program Motion (Dkt. No. 1777) ("**Motion**"). Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

3.     The victims who lost their homes in the 2017 and 2018 wildfires that are still in need of assistance include homeowners and renters that are either: a) uninsured or b) those that are insured but have either exhausted their insurance based on time or value, or have insufficient insurance to cover what is known as "**Alternative Living Expenses**" or other urgent needs (the "underinsured").

4.     I believe the $100 million of proposed funding ($105 million, net of $5 million administrative costs) is inconsistent with historical practice and insufficient to even make a nominal distribution to the victims of the 2017 and 2018 wildfires. For example, assuming 15,000 households asserted valid claims for this fund, that would imply only $6,667 would be provided to those families assuming they all received equal distributions. By way of reference, and pursuant to the 2015 Butte Fire, PG&E offered up to $50,000 to homeowners and up to $10,000 to renters ("**2015 Butte Fire Program**").      REDACTED

5.     In order to better understand how the $100 million was quantified, my team provided a list of questions to the Debtors on Monday May 6, 2019. On Friday May 10, 2019 the Debtors responded to our questions, attached hereto as Exhibit C. Pursuant to their responses, the Debtors

---

[1] "TCC Information Request: Wildfire Assistance Program Motion; Responses to Request Dated 5.6.19."

- 2 -

believe that the $105 million is an amount that will "provide eligible wildfire claimants a reasonable opportunity to receive meaningful assistance for temporary housing and other urgent needs . . . ." The Debtors have not quantified what the projected payout by household and/or individual is estimated to be. The Debtors have simply deferred all of these important facts and datapoints to the "to-be-determined" Administrator of the Wildfire Assistance Program.

6. In their Motion, the Debtors do not mention whether they believe that the $105 million is adequate to provide "some relief" to the victims. Motion at 4:18. In their Motion, the Debtors have not quantified nor estimated the number of households or individuals that may be covered by the Wildfire Assistance Program. As evidenced by their Motion, it seems they have disclaimed all responsibility to the Administrator, including determination of Eligibility Criteria, and, to my knowledge, did not complete meaningful analysis or calculations to support the Motion.

7. In order to properly structure the Wildfire Assistance Program and assess whether the funding will provide "some relief," it is imperative that this data (at least, on a preliminary basis) be assessed and/or quantified by the Debtors.

8. Based upon the Debtors' Motion, coupled with my independent research and calculations, I believe the Wildfire Assistance Fund is underfunded. Further, the Debtors risk not being able to accommodate all of the victims with an appropriate distribution and / or could force the administrator to turn away thousands of victims while leaving thousands of others with only a short lifeline before additional emergency assistance is needed.

9. Based upon my team's calculations, to fund a Wildfire Assistance Program that accommodates all of the Alternative Living Expenses and other immediate needs for the victims, the amount of the necessary funding would need to exceed $480 million based upon the Debtors' past practices (Exhibit A).

10. My team also ran an alternative scenario (Exhibit B), which estimated the monthly hardship living expenses for the victims. This scenario estimated the necessary funding at approximately $313 million.

11. The necessary funding estimates are based upon publicly available claimant, homeowner, and insurance statistics. Lincoln's analysis considered the following data:

a. **Households Claim Pool:** The victims include individuals who lost their homes in the 2017 North Bay Fires and the 2018 Camp Fire. Information provided by Cal Fire (JP Morgan Report)[2] and the Debtors[3] was used to determine the total number of residential households lost that could be eligible for assistance under the Wildfire Assistance Program. Cal Fire (JP Morgan Report) indicated total residential households lost in the North Bay Fires were 6,393 while the Debtors' Wildfire Assistance Program Motion reported that 13,972 households were lost in the 2018 Camp Fire, or 20,365 residences lost in total.

b. **Homeowner vs. Renter Pool:** The lost homes included both homeowners and renters, which would be covered under the Wildfire Assistance Program. However, as demonstrated in the 2015 Butte Fire Program, homeowners and renters would likely experience different levels of losses, insurance coverage, and requirements under Alternative Living Expenses. As such, 2018 Census data from Butte County[4] and Sonoma County[5] were utilized to determine the percentage of owner-occupied homes, which indicated 59.0% and 60.3% respectively.

c. **Homeowners vs Renters Claimants:** The Census and CAL fire data was used to determine the number of lost households for renters and homeowners, which estimated lost households of 12,098 for homeowners and 8,267 for renters, or 20,365 in total.

d. **Uninsured Claimants Pool**: The Wildfire Assistance Program was established to aid victims who are either uninsured or underinsured by their existing insurance policies. To determine the number of uninsured households, a 2017 survey from United Policyholders[6] was used, which indicated 4.2% of households in California were uninsured. Additionally, a 2014 press release

---

[2] JP Morgan Report: "PG&E Corp: Looking for a Grand Bargain in Bankruptcy", dated January 18, 2019
[3] Debtors' Wildfire Assistance Program Motion (Dkt. No. 1777)
[4] https://www.census.gov/quickfacts/buttecountycalifornia
[5] https://www.census.gov/quickfacts/sonomacountycalifornia
[6] http://www.uphelp.org/sites/default/files/blog/2017hosurveyca.pdf

- 4 -

from the Insurance Information Institute[7] indicated 63% of renters were uninsured. Both estimates are likely conservative given the higher cost of insurance policies in areas that are prone for natural disasters, such as wildfires in Northern California.

    e. **Uninsured Homeowners and Renters Claimants:** By utilizing the publicly available uninsured households data, Lincoln estimated that 507 homeowners and 5,208 renters were uninsured.

    f. **Underinsured Claimants Pool:** To determine the number of underinsured households, Lincoln used a United Policyholders survey from the 2017 North Bay fires[8], which indicated that "66% of survey respondents who know if they have enough insurance to cover the cost of repairing, replacing or rebuilding their home, reported being underinsured." These underinsured survey results have been cited in many publications and even referenced at a state legislative committee hearing[9]. In fact, these estimates are low as compared to a number of TCC claimants that were polled.

    g. **Underinsured Claimants:** As a result, Lincoln estimated that 7,650 homeowners and 2,019 renters were underinsured.

    h. **Total Pool of Eligible Wildfire Claimants:** In total, Lincoln estimated that 15,384 households would be eligible to receive assistance under the Wildfire Assistance Program (8,157 homeowners and 7,227 renters).

    i. **Wildfire Assistance Program Funding:** To determine the total Wildfire Assistance Program funding required, Lincoln utilized two scenarios to estimate the funding per eligible household:

        i. **Scenario 1 (Exhibit A):** Lincoln utilized the Debtors' prior practices during the 2015 Butte Fire Program of $50,000 for homeowners and $10,000 for renters. These values indicated necessary funding of $480

---

[7] https://www.iii.org/press-release/number-of-renters-is-on-the-rise-but-few-of-them-have-insurance-092214.
[8] https://www.uphelp.org/sites/default/files/attachments/north_bay_fires_12_month_survey_report_v1.pdf.
[9] http://www.ktvu.com/news/joint-hearing-addresses-insurance-concerns-from-north-bay-fire-victims.

million or $31,210 per household. Detailed calculations are provided in Exhibit A.

    **ii. Scenario 2 (Exhibit B):** Lincoln estimated the monthly living expenses for the victims by utilizing the U.S. General Service Administration ("**GSA**") 2019 per diem rates for lodging and meals in Sacramento and the broader California market. Lincoln also considered publicly available apartment and housing rental rates in the Chico, California area. The monthly GSA and rental costs were averaged and multiplied by six months, which indicated approximately $29,500 of funding per household. These estimates were only used for the homeowners, while the renter funding remained at $10,000 per household. These values indicated necessary funding of $313 million or $20,340 per household. Detailed calculations are provided in Exhibit B.

12. As established by the analysis above, the minimum amount of funding to achieve the Program Objectives is <u>at least</u> $250 million (implying, on average, only ~$16,250 per household) provided that the amount is subject to incremental replenishment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 15, 2019.

                                                     Brent C. Williams

# Exhibit A

| | Household Breakout[a],[b] | Lost Households[c],[d] | Uninsured[e],[f] % | Uninsured[e],[f] Households | Insured Households | Underinsured[g] % | Underinsured[g] Households | Total Uninsured & Underinsured Total | Total Uninsured & Underinsured % of Lost Total | Cash For Assistance[h] | Total Assisted Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2017 Fires** | | | | | | | | | | | |
| Homeowners | 60.3% | 3,855 | 4.2% | 162 | 3,693 | 66.0% | 2,438 | 2,599 | 67.4% | $ 50,000 | $ 129,960,209 |
| Renters | 39.7% | 2,538 | 63.0% | 1,599 | 939 | 66.0% | 620 | 2,219 | 87.4% | 10,000 | 22,187,380 |
| Total | 100.0% | 6,393 | 27.5% | 1,760 | 4,633 | 66.0% | 3,057 | 4,818 | 75.4% | 31,579 | 152,147,588 |
| **2018 Camp Fire** | | | | | | | | | | | |
| Homeowners | 59.0% | 8,243 | 4.2% | 345 | 7,898 | 66.0% | 5,213 | 5,558 | 67.4% | 50,000 | 277,906,671 |
| Renters | 41.0% | 5,729 | 63.0% | 3,609 | 2,120 | 66.0% | 1,399 | 5,008 | 87.4% | 10,000 | 50,078,722 |
| Total | 100.0% | 13,972 | 28.3% | 3,954 | 10,018 | 66.0% | 6,612 | 10,566 | 75.6% | 31,042 | 327,985,393 |
| **Total** | | | | | | | | | | | |
| Homeowners | 59.4% | 12,098 | 4.2% | 507 | 11,592 | 66.0% | 7,650 | 8,157 | 67.4% | 50,000 | 407,866,879 |
| Renters | 40.6% | 8,267 | 63.0% | 5,208 | 3,059 | 66.0% | 2,019 | 7,227 | 87.4% | 10,000 | 72,266,101 |
| **Total** | **100.0%** | **20,365** | **28.1%** | **5,715** | **14,650** | **66.0%** | **9,669** | **15,384** | **75.5%** | **$ 31,210** | **$ 480,132,981** |

a. Owner-occupied households for the 2017 Fires based on U.S. Census Bureau QuickFacts: Sonoma County, California V2018
b. Owner-occupied households for the 2018 Camp Fire based on U.S. Census Bureau QuickFacts: Butte County, California V2018
c. Total lost households for the 2017 Fires based on JP Morgan Report: "PG&E Corp. Looking for a Grand Bargain in Bankruptcy" January 18, 2019
d. Total lost households for the 2018 Camp Fire based on the Debtors' Wildfire Assistance Program Motion (Dkt. No. 1777)
e. Uninsured homeowners based on United Policyholders 2017 California Home Insurance Survey
f. Uninsured renters based on Insurance Information Institute press release September 22, 2014 "Number of Renters is on the Rise - But Few of Them Have Insurance"
g. Underinsured homeowners and renters based on United Policyholders 2017 North Bay Fires - 12 Month Survey
h. Cash for Assistance based on the 2015 Butte Fire PG&E assistance offer to homeowners and renters provided by the Debtors

Case: 19-30088    Doc# 2120    Filed: 05/20/19    Entered: 05/20/19 17:28:02    Page 7 of 13

# Exhibit B

| | Household Breakout[a],[b] | Lost Households[c],[d] | Uninsured[e],[f] % | Uninsured[e],[f] Households | Insured Households | Underinsured[g] % | Underinsured[g] Households | Total Uninsured & Underinsured Total | Total Uninsured & Underinsured % of Lost Total | Cash For Assistance[h] | Total Assisted Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2017 Fires** | | | | | | | | | | | |
| Homeowners | 60.3% | 3,855 | 4.2% | 162 | 3,693 | 66.0% | 2,438 | 2,599 | 67.4% | $ 29,500 | $ 76,676,523 |
| Renters | 39.7% | 2,538 | 63.0% | 1,599 | 939 | 66.0% | 620 | 2,219 | 87.4% | 10,000 | 22,187,380 |
| Total | 100.0% | 6,393 | 27.5% | 1,760 | 4,633 | 66.0% | 3,057 | 4,818 | 75.4% | 20,520 | 98,863,903 |
| **2018 Camp Fire** | | | | | | | | | | | |
| Homeowners | 59.0% | 8,243 | 4.2% | 345 | 7,898 | 66.0% | 5,213 | 5,558 | 67.4% | 29,500 | 163,964,936 |
| Renters | 41.0% | 5,729 | 63.0% | 3,609 | 2,120 | 66.0% | 1,399 | 5,008 | 87.4% | 10,000 | 50,078,722 |
| Total | 100.0% | 13,972 | 28.3% | 3,954 | 10,018 | 66.0% | 6,612 | 10,566 | 75.6% | 20,258 | 214,043,658 |
| **Total** | | | | | | | | | | | |
| Homeowners | 59.4% | 12,098 | 4.2% | 507 | 11,592 | 66.0% | 7,650 | 8,157 | 67.4% | 29,500 | 240,641,459 |
| Renters | 40.6% | 8,267 | 63.0% | 5,208 | 3,059 | 66.0% | 2,019 | 7,227 | 87.4% | 10,000 | 72,266,101 |
| **Total** | **100.0%** | **20,365** | **28.1%** | **5,715** | **14,650** | **66.0%** | **9,669** | **15,384** | **75.5%** | **$ 20,340** | **$ 312,907,560** |

a. Owner-occupied households for the 2017 Fires based on U.S. Census Bureau QuickFacts: Sonoma County, California V2018
b. Owner-occupied households for the 2018 Camp Fire based on U.S. Census Bureau QuickFacts: Butte County, California V2018
c. Total lost households for the 2017 Fires based on JP Morgan Report: "PG&E Corp. Looking for a Grand Bargain in Bankruptcy" January 18, 2019
d. Total lost households for the 2018 Camp Fire based on the Debtors' Wildfire Assistance Program Motion (Dkt. No. 1777)
e. Uninsured homeowners based on United Policyholders 2017 California Home Insurance Survey
f. Uninsured renters based on Insurance Information Institute press release September 22, 2014 "Number of Renters is on the Rise - But Few of Them Have Insurance"
g. Underinsured homeowners and renters based on United Policyholders 2017 North Bay Fires - 12 Month Survey
h. Cash for Assistance based on the local and state 2019 US GSA per diem rates in California for lodging and meals as well as publicly available home/apartment rental data for Chico, CA

Case: 19-30088    Doc# 2120    Filed: 05/20/19    Entered: 05/20/19 17:28:02    Page 8 of 13

**Exhibit C**

TCC Information Request:

Wildfire Assistance Program Motion
Responses to Request Dated 5.6.19



*This Presentation includes both public and non-public information. Information labeled "Confidential" or "Professionals' Eyes Only" are subject to the terms of each Professional Advisor's confidentiality agreement or committee by-laws, as applicable.*

# TCC Information Request
# Wildfire Assistance Program Motion Responses to Request dated 5.6.19



# TCC Information Request - Wildfire Assistance Program Motion: Request as of 5.6.19

| Request # | Diligence Request | Response |
|---|---|---|
| 1 | How was the $105 million quantified and ultimately determined for the Wildfire Assistance Fund ("Fund") (including any / all analysis)? | PG&E believes that $105 million is an amount that will provide eligible wildfire claimants a reasonable opportunity to receive meaningful assistance for temporary housing and other urgent needs and to cover the administrative costs of the Fund. |
| 2 | Provide number of household(s) and individual victim(s) (for each of the 2017 and 2018 wildfires) that are estimated to be covered under the Fund | Any estimate of the number of households and individuals that may be covered by the Wildfire Assistance Program will depend greatly on how the Administrator, in his or her discretion, determines to implement the program and address questions such as the types of expenses covered by the program and who is eligible to participate in the program. Accordingly, the Debtors do not believe it is appropriate, or possible, for the Debtors to provide an estimate. To the extent that the Official Committee of Tort Claimants seeks this information, the request should be made of the Administrator after he/she has established guidelines for how the program would be implemented. |
| 3 | What is the projected payout by household and/or by victim? Has the Debtor estimated or forecasted a minimum payout (by individual)? | Any estimate of the projected payout by household and/or by individual will depend greatly on how the Administrator, in his or her discretion, determines to implement the Wildfire Assistance Program and address questions such as the types of expenses covered by the program and who is eligible to participate in the program. Accordingly, the Debtors have not forecasted a minimum payout. |
| 4 | How does this Fund compare to prior hardship funds, such as the 2015 Butte Fire, in terms of payout(s) by household or by claimant? | As noted above, payout by household or claimant under the Wildfire Assistance Program cannot be estimated at this time. Accordingly, any comparison of payouts with prior hardship funds is not possible. The Debtors do not believe the Butte Fire and San Bruno programs, which are different in scope and design from the Wildfire Assistance Program, are relevant for purposes of analyzing the Wildfire Assistance Approval Motion. Notwithstanding this, the Debtors provide the following brief summary: With regard to the 2015 Butte Fire, PG&E offered up to $50,000 to homeowners and up to $10,000 to renters of homes destroyed in the Butte Fire who (i) were in urgent need of financial assistance to cover costs, including temporary housing, vehicle rental, or replacement of household items, and (ii) did not have insurance. The assistance was provided by PG&E's Law-Claims organization. With regard to the 2010 San Bruno accident, PG&E offered residents in the impacted area $15,000, $25,000, or $50,000 per household depending on the extent of damaged incurred. |

Case: 19-30088    Doc# 2120    Filed: 05/20/19    Entered: 05/20/19 17:28:02    Page 11 of 13
Highly Confidential – Professionals' Eyes Only

2



# TCC Information Request - Wildfire Assistance Program Motion: Request as of 5.6.19

| Request # | Diligence Request | Response |
|---|---|---|
| 5 | How was the eligibility criteria determined for the 2015 fund? Were there minimum payout(s) assumed in structuring the fund? | See the answer to question 4 above. |
| 6 | What was the total dollar amount that the Debtor's funded for the 2015 Butte Fire hardship fund? Please detail by: (1) Renters versus households, (2) Total number of renters and total number of households and (3) Total amount paid to each. Please provide detail(s) of the total funds paid. | Redacted |
| 7 | What percentage of the total structures/residences destroyed in the 2015 Butte Fires received hardship funds? | See the answer to 6 above. |
| 8 | Does the Debtor anticipate payout(s) before the proposed Bar Date? | PG&E's hope and desire is that the Wildfire Assistance Program be established and available to distribute funds as soon as possible, but the timing of both events depends on factors outside of PG&E's control, including when the Bankruptcy Court approves the motion, when an Administrator will be appointed and, once an Administrator is appointed, when the Administrator, in his or her discretion, determines to start distributing funds from the Wildfire Assistance Program. |
| 9 | What section of the DIP credit agreement and what line item of the DIP Budget do the Debtors' contend the $105 million funding complies with (confirm: operations and maintenance)? Did the DIP Lenders consent to the $105 million funding? What consent rights do they have for a Motion like this? | The wildfire assistance program is permitted by Section 7.5(k) of the DIP credit agreement, but we note that the DIP credit agreement has no budget compliance or similar covenant. The wildfire assistance program was however included in the line item "Operations and Maintenance" for the week ending 05/25/19 in the revised 13 week cash flow forecast that AlixPartners presented to Lincoln Financial on May 1. Because the wildfire assistance program is permitted under the DIP credit agreement, the DIP lenders' consent is not required for the $105 million funding. |
| 10 | Notwithstanding what is in the Motion, what is the anticipated timeline of payout(s) under the Fund? | PG&E's hope and desire is that the Wildfire Assistance Program be available to distribute funds as soon as possible, but the timing depends on factors outside of PG&E's control, including when the Bankruptcy Court approves the motion, when an Administrator will be appointed and, once an Administrator is appointed, when the Administrator, in his or her discretion, determines to start distributing funds from the Wildfire Assistance Program. |

Highly Confidential – Professionals' Eyes Only

3



# TCC Information Request - Wildfire Assistance Program Motion: Request as of 5.6.19

| Request # | Diligence Request | Response |
|---|---|---|
| 11 | Will the Debtor recommend individual(s) for the Administrator position? | PG&E has provided the names of three individuals for the Administrator position and will continue to engage counsel to the Official Committee of Tort Claimants and counsel to the Official Committee of Unsecured Creditors regarding a suitable person to be appointed as the Administrator. If there is an agreement among the parties as to the Administrator, PG&E will file a notice with the Court disclosing the identity and qualifications of the person selected to serve as Administrator. If the parties cannot agree upon an appropriate individual to serve as the Administrator, PG&E will file a motion seeking the appointment of an appropriate individual as the Administrator. |
| 12 | Will the Debtor have unfettered access to the materials / discussions / claims that the Administrator will have regarding the individual victims? | As described in the Motion seeking approval of the Wildfire Assistance Fund, the Administrator must keep adequate administrative and financial records of the program, including a record of to whom disbursements from the fund are made and in what amounts. PG&E and the Committees may inspect the program's records upon request. In addition, the Administrator shall file with the Bankruptcy Court and serve on the Debtors and the Committees quarterly reports as described in the Motion on page 10. |
| 13 | What will the Debtor's involvement be on a day-to-day basis with the Administrator? | PG&E will not be involved on a day-to-day basis with the Administrator. The Administrator will be responsible, in his or her discretion, for the day-to-day implementation of the Wildfire Assistance Program and the distribution of funds in a fair and equitable manner. |

Highly Confidential – Professionals' Eyes Only

4