1                    UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                                -oOo-

4    In Re:                      ) Case No. 19-30088
                                 ) Chapter 11
5    PG&E CORPORATION AND PACIFIC )
     GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                 ) Wednesday, May 22, 2019
                        Debtors.  ) 9:30 AM
7    _____ )
                                     MOTION OF THE UNITED STATES
8                                    TRUSTEE FOR ORDER APPOINTING
                                     FEE EXAMINER AND ESTABLISHING
9                                    PROCEDURES FOR CONSIDERATION
                                     OF REQUESTED COMPENSATION AND
10                                   REIMBURSEMENT OF EXPENSES
                                     [1370];
11
                                     DEBTORS' MOTION PURSUANT TO
12                                   FED. R. BANKR. P. 9006(B) AND
                                     9027 ENLARGING THE TIME
13                                   WITHIN WHICH TO FILE NOTICES
                                     OF REMOVAL OF RELATED
14                                   PROCEEDINGS [1738];

15                                   APPLICATION OF DEBTORS
                                     PURSUANT TO 11 U.S.C.
16                                   SECTIONS 327(A) AND 328(A)
                                     AND FED. R. BANKR. P. 2014(A)
17                                   AND 2016 FOR AUTHORITY TO
                                     RETAIN AND EMPLOY LAZARD
18                                   FRERES & CO. LLC AS
                                     INVESTMENT BANKER TO THE
19                                   DEBTORS EFFECTIVE AS OF THE
                                     PETITION DATE [891];
20
                                     MOTION PURSUANT TO 11 U.S.C.
21                                   SECTIONS 105(A) AND 363(B)
                                     AND FED. R. BANKR. P. 2002
22                                   AND 6004(H) FOR AN ORDER (A)
                                     AUTHORIZING DEBTORS TO
23                                   ESTABLISH AND FUND PROGRAM TO
                                     ASSIST WILDFIRE CLAIMANTS
24                                   WITH ALTERNATIVE LIVING
                                     EXPENSES AND OTHER URGENT
25                                   NEEDS AND (B) GRANTING

1  RELATED RELIEF ("WILDFIRE
   ASSISTANCE PROGRAM MOTION")
2  FILED BY PG&E CORPORATION
   [1777];

3

   CORRECTED MOTION OF DEBTORS
4  PURSAUNT TO 11 U.S.C. SECTION
   1121(D) TO EXTEND EXCLUSIVE
5  PERIODS ("EXCLUSIVITY
   MOTION") FILED BY PG&E
6  CORPORATION [1797];

7  MOTION OF DEBTORS FOR ENTRY
   OF ORDER PURSUANT TO 11
8  U.S.C. SECTION 365(D)(4) AND
   B.L.R. 6006-1 EXTENDING TIME
9  TO ASSUME OR REJECT UNEXPIRED
   LEASES OF NONRESIDENTIAL REAL
10 PROPERTY ("LEASE EXTENSION
   MOTION") FILED BY PG&E
11 CORPORATION [1805];

12 APPLICATION PURSUANT TO 11
   U.S.C. SECTIONS 327(A) AND
13 328(A) AND FED. R. BANKR. P.
   2014(A) AND 2016 FOR
14 AUTHORITY TO RETAIN AND
   EMPLOY PRICEWATERHOUSECOOPERS
15 LLP AS MANAGEMENT, TAX, AND
   ADVISORY CONSULTANTS TO THE
16 DEBTORS NUNC PRO TUNC TO
   PETITION DATE FILED BY PG&E
17 CORPORATION [1791];

18 APPLICATION PURSUANT TO 11
   U.S.C. SECTION 327(A) AND
19 FED. R. BANKR. P. 2014(A) AND
   2016 FOR AUTHORITY TO RETAIN
20 AND EMPLOY COMPASS LEXECON,
   LLC AS ECONOMIC CONSULTANTS
21 TO THE DEBTORS NUNC PRO TUNC
   TO THE PETITION DATE FILED BY
22 PG&E CORPORATION [1756];

23 APPLICATION OF THE OFFICIAL
   COMMITTEE OF UNSECURED
24 CREDITORS FOR ENTRY OF AN
   ORDER PURSUANT TO 11 U.S.C.
25 SECTIONS 328(A) AND 1103 AND

(973) 406-2250 | operations@escribers.net | www.escribers.net

<pre>
 1                                     FED. R. BANKR. P. 2104(A) FOR
                                       AUTHORIZATION TO RETAIN AND
 2                                     EMPLOY FTI CONSULTING, INC.
                                       AS FINANCIAL ADVISOR NUNC PRO
 3                                     TUNC TO FEBRUARY 12, 2019
                                       [1212]
 4
                          TRANSCRIPT OF PROCEEDINGS
 5                  BEFORE THE HONORABLE DENNIS MONTALI
                       UNITED STATES BANKRUPTCY JUDGE
 6
      APPEARANCES:
 7    For the Debtors:           STEPHEN KAROTKIN, ESQ.
                                  MATTHEW GOREN, ESQ.
 8                                KEVIN BOSTEL, ESQ.
                                  Weil, Gotshal & Manges LLP
 9                                767 Fifth Avenue
                                  New York, NY 10153
10                                (212)310-8000

11    For Ad Hoc Committee of     MATTHEW A. FELDMAN, ESQ.
      Subrogation Claims:         (Telephonically)
12                                Willkie Farr & Gallagher LLP
                                  787 Seventh Avenue
13                                New York, NY 10019
                                  (212)728-8000
14
      For Compass Lexecon, LLC:   ALBERT TOGUT, ESQ.
15                                Togut, Segal & Segal LLP
                                  One Penn Plaza
16                                Suite 3335
                                  New York, NY 10119
17                                (212)594-5000

18    For Official Creditors'     GREGORY BRAY, ESQ.
      Committee:                  Milbank LLP
19                                2029 Century Park East
                                  33rd Floor
20                                Los Angeles, CA 90067
                                  (424)386-4000
21
                                  DENNIS F. DUNNE, ESQ.
22                                Milbank LLP
                                  55 Hudson Yards
23                                New York, NY 10001
                                  (212)530-5000
24

25
</pre>

<pre>
1
    For Gov. Gavin Newsom and    PETER M. FRIEDMAN, ESQ.
2   the Department of Finance    O'Melveny & Myers LLP
    for the State of             1625 Eye Street, NW
3   California:                  Washington, DC 20006
                                 (202)383-5300
4
    For Professor Bruce A.       SCOTT H. MCNUTT, ESQ.
5   Markell:                     324 Warren Road
                                 San Mateo, CA 94402
6                                (415)760-5601

7   For the Ad Hoc Committee     ABID QURESHI, ESQ.
    of Senior Unsecured          Akin Gump Strauss Hauer & Feld LLP
8   Creditors of PG&E:           One Bryant Park
                                 Bank of America Tower
9                                New York, NY 10036
                                 (212)872-1000
10
    For PG&E Shareholders:       BRUCE S. BENNETT, ESQ.
11                               Jones Day
                                 555 South Flower Street
12                               Fiftieth Floor
                                 Los Angeles, CA 90071
13                               (213)489-3939

14  For Official Committee of    CECILY A. DUMAS, ESQ.
    Tort Claimants:              ROBERT A. JULIAN, ESQ.
15                               Baker & Hostetler LLP
                                 11601 Wilshire Boulevard
16                               Suite 1400
                                 Los Angeles, CA 90025
17                               (310)820-8800

18  For SLF Fire Victim          GERALD SINGLETON, ESQ.
    Claimants:                   Singleton Law Firm, APC
19                               115 West Plaza Street
                                 Solana Beach, CA 92075
20                               (760)697-1330

21  For the Office of the        MARTA E. VILLACORTA, ESQ.
    United States Trustee:       U.S. Department of Justice
22                               450 Golden Gate Avenue
                                 Suite 05-0153
23                               San Francisco, CA 94102
                                 (415)252-2062
24

25
</pre>

(973) 406-2250 | operations@escribers.net | www.escribers.net

1                                    HANNAH M. MCCOLLUM, ESQ.
                                     U.S. Department of Justice
2                                    844 King Street
                                     Suite 2207, Lockbox 35
3                                    Wilmington, DE 19801

4     For the U.S. Department of     MATTHEW J. TROY, ESQ.
      Justice, Civil Division:       U.S. Department of Justice
5                                    P.O. Box 875
                                     Washington, DC 20044
6                                    (202)514-9038

7

8

9

10

11    Court Recorder:                JANE GALVANI
                                     United States Bankruptcy
12                                   Court
                                     450 Golden Gate Avenue
13                                   16th Floor
                                     San Francisco, CA 94102

14

15    Transcriber:                   SUZANNE BALDRIDGE
                                     eScribers, LLC
16                                   7227 N. 16th Street
                                     Suite #207
17                                   Phoenix, AZ 85020
                                     (973)406-2250

18

19    Proceedings recorded by electronic sound recording;
      transcript provided by transcription service.

20

21

22

23

24

25

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, MAY 1, 2019, 9:31 AM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  All rise.  Court is now in session.  The

5    Honorable Dennis Montali presiding.

6            THE COURT:  Morning.  Did you see this?  We have

7    standing, sitting.  Most people sitting.  The people who are

8    standing, you're welcome to stand, but you're also welcome to

9    go to the overflow courtroom.  We have some housekeeping

10   matters this morning, and before we come to the motion that

11   will probably get more attention, you're free to come back in.

12   But if you want to stand, that's okay, too, but don't stand in

13   front of other people that are trying to look.  That's my only

14   request.

15           THE CLERK:  Matter of PG&E Corporation.

16           THE COURT:  Morning, Mr. Karotkin.

17           MR. KAROTKIN:  Morning, Your Honor.

18           THE COURT:  Do you mind if we take care of the

19   housekeeping matters before -- I mean, the uncontested matters?

20   Or -- is that right?

21           MR. KAROTKIN:  Correct, sir.  Yes, thank you, sir.

22           THE COURT:  I can go through the --

23           MR. KAROTKIN:  Stephen Karotkin -- sorry.

24           THE COURT:  Yeah.  Go ahead.

25           MR. KAROTKIN:  Weil -- for the record, Stephen

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    Karotkin, Weil, Gotshal & Manges for the debtors.

2    THE COURT:  So I think I can just dispose of several

3    of them --

4    MR. KAROTKIN:  Sure.

5    THE COURT:  -- right down my list unless you want to

6    do it a different way.

7    MR. KAROTKIN:  Nope.  Nope.

8    THE COURT:  I mean, not exactly on the calendar is the

9    stipulation between the unsecured creditors and the tort

10    committee on -- with Epiq.  That's fine.  I'm happy with that.

11    I appreciate the way it was worked out.

12    MR. FELDMAN:  Your Honor, I apologize for interrupting

13    so early.  This is Matthew Feldman from Willkie Farr &

14    Gallagher on behalf of the ad hoc committee of subrogation

15    claims.

16    THE COURT:  Yes, sir.

17    MR. FELDMAN:  Your Honor, we have no objection to that

18    stipulation, but we would ask that if there's going to be an

19    order approving it separate from the stipulation, that it be

20    settled, including with us.  There are some factual assertions

21    made in some of the pleadings that we wouldn't necessarily

22    share.  We didn't want to burden the record with an objection,

23    but we would not want any findings of fact to be contained in

24    any final order on that.

25    THE COURT:  Well, I'm not a fan of extra findings of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    fact.  Your term "settled" is kind of a New York term, but

2    we'll -- that's fine.  You should -- you'll get a chance to

3    look at the proposed order submitted by counsel.  So that --

4              MR. FELDMAN:  Thank you, Your Honor.

5              THE COURT:  That takes care of that one.  On the

6    following matters, we'll dispose of them without any

7    discussion.

8              There's a motion for extending the time for notices of

9    removal of related proceedings.  There was an objection by one

10   creditor.  I'm not going to take time with that objection.  I'm

11   going to overrule it.  It's not really going to the merits.  So

12   that motion will be granted.  And Mr. Karotkin, you can go

13   ahead and see to it that we get the order on that.

14             MR. KAROTKIN:  Yes, sir.  Thank you.

15             THE COURT:  Similarly, on the motion for extension of

16   leases, a similar objection by the one creditor group, the

17   Singleton Law Firm.  Again, it doesn't -- their objection is

18   noted, but it's not going to the merits.  And there's not

19   purpose to be served by taking time on it, so I'll overrule

20   that objection.  Again, I'm not overruling it in the sense that

21   I'm insensitive to it.  I'm overruling because it's simply not

22   relevant to that motion.

23             On the professionals, there appear to be no objections

24   to the Lazard Freres application, and I'm satisfied with that.

25   I'll approve that one.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      On the FTI and Compass Lexecon, I appreciate the

2  United States Trustee and the tort committees coming to a

3  resolution of that, and that's a good result.  And I will agree

4  that I have no objection if the debtor chooses to withdraw the

5  Compass Lexecon application so that -- if the employment of

6  that organization is consistent with the debtors' wishes but

7  without a formal order under Section 327.

8      But I have a request for both Compass Lexecon and FTI,

9  and I would appreciate -- and I read carefully the thoughtful

10  statements by counsel for both parties and the expressions of

11  response to the questions I raised and others.  I would like an

12  officer or a responsible person of each of those two entities

13  just to file a simple statement that, on behalf of his or her

14  respective organizations, they adopt the arguments of their

15  counsel and comply with them or agree to -- I'm not going to

16  make it formal like agree to be bound, just they acknowledge it

17  and they will act consistently with that.  That shouldn't be a

18  problem.

19      MR. KAROTKIN:  Counsel has nodded their heads.

20      THE COURT:  Fine.

21      MR. KAROTKIN:  I'll note that on the record.

22      THE COURT:  What?  Heads or head?

23      MR. DUNNE:  Heads.  For FTI --

24      MR. TOGUT:  I'll say formally.  Al Togut, Togut, Segal

25  & Segal for Compass.  That's fine with us.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      THE COURT:  Okay.  Fine.  And I'm sure that's -- if

2  FTI has an objection, they can be heard.

3      MR. DUNNE:  It's fine with FTI as well, Your Honor.

4      THE COURT:  I didn't think so.  On the motion for fee

5  examiner, is Prof. Markell either here -- I don't see him -- or

6  in the courtroom?  Oh, his counsel.

7      MR. MCNUTT:  Morning, Judge Montali.  Scott McNutt

8  appearing on behalf of Prof. Bruce A. Markell.

9      THE COURT:  So is he on the phone today?

10     MR. MCNUTT:  He's not on the phone today.  He's at the

11  ALI and is --

12     THE COURT:  I don't care where he is.  He's not here.

13  I have a couple questions for him, though.

14     MR. MCNUTT:  Okay.

15     THE COURT:  And I would -- I mean, I'm not resisting

16  the motion, and I will grant.

17     I wanted him to explain, not only for my benefit, for

18  nonlawyers or others who are monitoring this proceeding, to

19  explain in layman's terms, in a few words, what he is actually

20  going to be doing.  And Mr. McNutt, I have to then add, and why

21  does he need counsel?  So I will take it as a brief written

22  statement from him.  And again, I don't intend to deny the

23  request.  I don't intend to say that you can't act as his

24  counsel.  But I'd like an explanation of why a fee examiner

25  needs counsel.  And more importantly -- and really, I don't --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    I know Prof. Markell.  He is a scholar.  He probably could

2    knock out a fifty-page law review if I asked him to.  I'd like

3    about three paragraphs of what he envisions and how he

4    envisions carrying out his duties.  And as soon as I see that,

5    I intend to sign the order.  Okay?

6         MR. MCNUTT:  Very good, Your Honor.  May I intrude a

7    couple of questions?

8         THE COURT:  Sure.

9         MR. MCNUTT:  Or observations.  He will do that, and I

10   believe it will be to your satisfaction.  As soon as this

11   motion was filed, Prof. Markell started working.  First, he

12   hired an analytics firm.

13        THE COURT:  Well, I know that.  He made that -- I

14   mean, that's explained in his papers.

15        MR. MCNUTT:  I'm just explaining.  I don't want

16   anything from the Court.  I just want to say what we've done

17   and what we intend to do in the next few days.

18        THE COURT:  Okay.

19        MR. MCNUTT:  He's hired a data analytics firm.  I hope

20   I can tweak with the U.S. Trustee the order so that the debtor

21   can immediately pay the start-up costs Prof. Markell requires

22   to get moving.  He spent considerable time drafting the

23   protocol, which is the core controlling document --

24        THE COURT:  Uh-huh.

25        MR. MCNUTT:  -- of his employment.  The U.S. Trustee

PG&E Corporation & Pacific Gas And Electric

1  has looked at that, has made some comments.  They've been

2  incorporated.  It's Prof. Markell's hope that this can be a

3  cooperative and constructive process, and he hopes he can have

4  a meeting where he distributes the protocol and discusses it

5  with counsel, whose fees will be reviewed.  He hopes he can do

6  that in the next few days.

7          There will then follow a motion to amend the interim

8  procedures order to incorporate the protocol so that there's

9  one --

10          THE COURT:  Do you mean to amend our case procedures

11  order?

12          MR. MCNUTT:  It'd be --

13          THE COURT:  Or a separate order?

14          MR. MCNUTT:  The procedures order regarding payment of

15  interim compensation --

16          THE COURT:  Oh, okay.  Fine.  All right.

17          MR. MCNUTT:  -- so that there's one self-executing

18  document.

19          THE COURT:  You don't need to file a formal motion.

20  If the U.S. Trustee signs off on modification of that, that's

21  fine.  I mean, again, the U.S. Trustee is here, your

22  counterparty here.  So if the --

23          MR. MCNUTT:  Well, I -- I'm sorry, Your Honor.

24          THE COURT:  If the U.S. Trustee is satisfied with

25  whatever changes you and Prof. Markell wish to make and the

PG&E Corporation & Pacific Gas And Electric

1   debtors and anybody else wants to be heard on, and the U.S.

2   Trustee approves it, that's fine with me.

3           MR. MCNUTT:  And we --

4           THE COURT:  I'm just saying we don't have to wait with

5   a calendar item.  It can just be done an ex parte basis.

6           MR. MCNUTT:  And then we can submit an amended order.

7           THE COURT:  Yeah.  Yes.

8           MR. MCNUTT:  Okay, Your Honor.

9           MR. KAROTKIN:  Your Honor, we, of course, would like

10  to have a look at that.

11          THE COURT:  Right.  Absolutely.  Yeah.  The debtor --

12  obviously, the debtor but the committees, the two

13  committees should be consulted on anything like that.  And

14  that's not to say that there aren't other professionals, but we

15  can't take time to have them all.  The principal players should

16  just sign off on any revision to that order.

17          MR. MCNUTT:  I'm feeling the Court's pressure to move

18  on.

19          THE COURT:  No.

20          MR. MCNUTT:  I want to state more clearly, Prof.

21  Markell wants this to be a cooperative process.  He intends to

22  circulate this protocol to all the principal law firms and the

23  committees, solicit their input, and maybe even hold a meeting

24  or two to get their input before it becomes a final document.

25  That's his objective.

PG&E Corporation & Pacific Gas And Electric

1      THE COURT:  Okay.  But I mean, I hope it will be done

2  by telephone conference or something and not huge expense.  We

3  don't want professionals flying across the country to have a

4  meeting to talk about how to be efficient in being

5  professionals.  Right?

6      MR. MCNUTT:  Prof. Markell is acutely aware of that

7  and wants to do it in the most time-efficient and inexpensive

8  way possible.

9      THE COURT:  Okay.  Anything else?  Thank you.

10     MR. MCNUTT:  Thank you, Your Honor.

11     THE COURT:  All right.  I look forward to seeing a

12 brief statement from him and the order authorizing employment,

13 and then we'll deal with the other matter later.

14     MR. MCNUTT:  Very good, Your Honor.  Thank you.

15     THE COURT:  Okay.  The next on my list is the

16 PricewaterhouseCooper's -- I'm not -- motion.  I'm not aware of

17 any objections to that.  The only thing that I need corrected

18 in that is to make sure that the order is consistent with the

19 other orders for other professionals that does not include -- I

20 mean, it needs to exclude negligence from the indemnity

21 provision, the same way it's been done in all the other orders.

22     MR. KAROTKIN:  Yes, sir.

23     THE COURT:  I presume that's not a problem.  If it is

24 a problem, I guess I won't be signing the order.  And then the

25 last one --

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1        MR. KAROTKIN:  It's certainly not a problem for me.

2        THE COURT:  I didn't think so.  And the last thing --

3    and we've already dropped this from calendar, but in case

4    there's anyone on the phone or in court who expected to be

5    heard on the motion to remand the adversary proceeding in the

6    JH Kelly matter v. AECOM, if there's no -- we've taken that off

7    calendar, so we're done.

8        And that leaves the two remaining ones.  And Mr.

9    Karotkin, I'll leave it to you to decide and let me know how

10   you want to proceed.  We have exclusivity and the wildfire

11   assistance program.  Which way do you want to go?

12       MR. KAROTKIN:  We would start with the exclusivity

13   motion, sir.

14       THE COURT:  Okay.  Well, let's just ask -- I mean, I'm

15   familiar with it, and I presume some of you are aware of what

16   I've done with the exclusivity motion in the prior case; if

17   you're not, you should be.  But Mr. Karotkin, you don't

18   disagree, do you, that if I -- whether I grant an extension of

19   four months or seventy-five days or six months, there can

20   always be a motion to shorten that time and the debtor has a

21   right to be heard?  But I can ultimately shorten it back down

22   again if there's a reason to.  You don't disagree with that, do

23   you?

24       MR. KAROTKIN:  That is exactly what the statute says.

25       THE COURT:  Well, that's what I think.  But I -- but

PG&E Corporation & Pacific Gas And Electric

1    also, I think that way back when, when this provision went into

2    law, there was some confusion at some courts about whether you

3    could shorten it, lengthen it, lengthen again.  Of course,

4    you'll recall that the law changed and, in the 2001 PG&E case,

5    there wasn't the 180 --

6                MR. KAROTKIN:  Right.

7                THE COURT:  -- I mean the year-and-a-half deadline

8    that's on there now.  So --

9                MR. KAROTKIN:  In fact, Your Honor, the order -- the

10   proposed order that we submitted expressly provides for what

11   you just said.

12               THE COURT:  Yeah, I don't always get to the proposed

13   orders to prepare for these motions, because sometimes they

14   change so quickly.  But I appreciate that you're acknowledging

15   what I believe to be the law.

16               And so the question is, therefore, really to hear from

17   the objectors as to why it's so important to them to either

18   reduce the time or to eliminate the time.  I understand the

19   debtors' position and you don't need to explain it.  If you

20   want to make some comments or whatever, I'll certainly be happy

21   to hear from you.  And I --

22               MR. KAROTKIN:  Well --

23               THE COURT:  -- I did read your response to the --

24               MR. KAROTKIN:  And --

25               THE COURT:  -- objections.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1       MR. KAROTKIN:  I -- I'll save my time for response,

2   then, Your Honor.  I think that you really did put your finger

3   on it.  And I think that, as we said in our pleadings, there

4   are two fundamental gating items here; one is the

5   legislation -- the legislative and regulatory relief that is

6   critical to any plan process, as the governor acknowledges

7   quite explicitly in his pleading, as well as dealing with the

8   wildfire claims and the aggregate liability that has to be

9   addressed in a plan.  Two fundamental gating items to the plan

10  negotiation formulation and filing process.

11      You, Your Honor, yourself has noted -- have (sic)

12  noted, I think every time we've been in this courthouse, the

13  size and complexity of these cases.  We think that the

14  requested extension recognizes the reality of these cases.  We

15  think it's appropriate.  Again, as you noted, people are free

16  to come in at any time and file a motion to shorten that time.

17      We believe that that is a realistic time frame.  In

18  fact, if you look at what the governor said, legislation, if at

19  all, is not going to be considered until sometime this summer.

20  And I would say, if you were to look at what happened with 901,

21  that was very, very late -- SB-901, very, very late in the

22  legislative --

23      THE COURT:  Right.  Right.

24      MR. KAROTKIN:  -- process, well into September, the

25  governor suggesting an extension of seventy-five days, which

PG&E Corporation & Pacific Gas And Electric

1    doesn't really even get us there, to where we need to be to

2    really in earnest engage in the plan negotiation and

3    formulation process.

4            And with respect to the claims, as you yourself know,

5    the campfire was very recent.  The claims information has not

6    been developed with respect to not only the campfire but

7    largely with respect to the September -- I'm sorry, the fall

8    2017 fires as well.  Yes, there is a database that the

9    plaintiff lawyers have told us they prepared with respect to

10   the 2017 fires.  So far, they're not willing to give us access

11   to that.

12           We have filed a motion to establish a bar date for

13   September 19th and to get additional claims information with a

14   proposed form that we are asking the Court to consider.  The

15   tort committee and the plaintiff lawyers are resisting that as

16   well.

17           I will say, Your Honor, that we do have a meeting

18   scheduled with them after this court hearing today, to speak

19   with them about the bar date and the information necessary to

20   move forward and to get these cases to a point where a feasible

21   plan can be confirmed and proposed.  And I'm hopeful we can

22   make progress with them.  But to date, there is a total lack of

23   information sufficient to even move forward with them on the

24   negotiation process.

25           Now, I will note that we have moved forward in the

PG&E Corporation & Pacific Gas And Electric

1    mediation process with the public entities and with the

2    subrogation claimants, whose claims information is much, much

3    more advanced.  The subrogations know exactly how much -- the

4    subrogation claimants know exactly how much they have paid, so

5    we can have more substantive discussions with them.  And the

6    public entities have a much greater fix on the potential

7    liability that they believe the debtor's liable for.  That's

8    not the case with the plaintiffs, and they have acknowledged

9    that to us.

10          We want to work with them to try to get that

11   information on a consensual basis.  And again, as I said, we're

12   meeting with them this afternoon to try to make progress in

13   that regard; if not, we will be back before you.  There is a

14   hearing on the bar date, on June 11th.

15          THE COURT:  Right.

16          MR. KAROTKIN:  But again, the earliest a bar date will

17   be established in these cases is in September.  And as we said

18   in our pleadings and as I emphasize again today, we're trying

19   to be realistic here about an appropriate extension.

20   Shortening the bar date is not going to cause the legislature

21   or the CPUC to do anything; I can assure you of that.

22   Shortening the bar -- I'm sorry, not -- shortening the

23   exclusive period is not going to cause them to act more

24   quickly.  And really all that's going to result in, Your Honor,

25   is additional motion practice in this court to extend it.

PG&E Corporation & Pacific Gas And Electric

1    So I think, again, what you said is directly on point.

2 If they think we're not making progress, if they think we're

3 not acting appropriately, if they think we're bad actors during

4 the Chapter 11, they can come back before you.

5    THE COURT:  One of the things that I found frustrating

6 a long time ago as a lawyer is, when judges complained to me, I

7 haven't seen you lately, why isn't anything going on -- and I

8 was very frustrated because lots of things go on, but not in

9 front of the court.  And you just made reference to subrogation

10 claimants and public-entities claimants.  That's all going on

11 behind the scene.  There's been nothing before me; right?

12    MR. KAROTKIN:  Well, because that's being done on a --

13    THE COURT:  And that's --

14    MR. KAROTKIN:  -- that's all subject to

15 confidentiality.

16    THE COURT:  And that's the way it should be.

17    MR. KAROTKIN:  Yes.

18    THE COURT:  I'm just confirming that you just made

19 reference to two processes that are underway, that you know

20 well, and many others, but I don't and the public perhaps

21 doesn't.

22    Why don't you say one thing for me; I think I know the

23 answer, but I'd like it for the benefit of your opponents here

24 today, and the public.  And that is this:  what is the risk to

25 your clients if I terminate exclusivity or break it at this

PG&E Corporation & Pacific Gas And Electric

1    point?

2            MR. KAROTKIN:  Well --

3            THE COURT:  What -- in other words, I have the word

4    "optics", but there are optics in this case.  So what does it

5    mean to you, as principal counsel, if all of a sudden

6    exclusivity is terminated?

7            MR. KAROTKIN:  Your Honor, one thing I think you've

8    noted is that, since the inception of these cases -- and in

9    fact, we have to give two weeks' notice before we --

10           THE COURT:  I know.

11           MR. KAROTKIN:  -- file these cases.

12           THE COURT:  And FERC --

13           MR. KAROTKIN:  We had the --

14           THE COURT:  -- appreciated that; didn't it?

15           MR. KAROTKIN:  That was a unique circumstance; let's

16   put it that way.

17           We have made enormous strides in stabilizing the

18   business operations, getting the necessary financing, dealing

19   with our business partners, getting back trade credit, and

20   addressing those issues that are fundamental to ongoing

21   operations.  If you were to terminate exclusivity, that would

22   be a fundamental crisis in confidence as to where these cases

23   were going:  have the debtors lost control, what's going to

24   happen, what will happen with the DIP facility, will that cause

25   a default, will there be a run on the bank because of that

PG&E Corporation & Pacific Gas And Electric

1  uncertainty.

2        The debtors are entitled, under Section 1121, Your

3  Honor, to an opportunity to propose a plan; a reasonable

4  opportunity to do so.  Terminating exclusivity will deprive

5  them of that opportunity.

6        THE COURT:  Well, I mean --

7        MR. KAROTKIN:  But --

8        THE COURT:  -- again, I want to distinguish between

9  what will really happen and what will the perception be,

10  because --

11        MR. KAROTKIN:  And I --

12        THE COURT:  -- I can't --

13        MR. KAROTKIN:  Well, Your Honor, you know that you'll

14  be faced with a chaotic situation.  The worst thing that can

15  happen in a case is competing plans.  I don't know if you've

16  ever been involved with that.

17        THE COURT:  Did you know what I did in the first case?

18        MR. KAROTKIN:  That you -- after a while, yes, you

19  terminated and there were --

20        THE COURT:  And allowed a --

21        MR. KAROTKIN:  -- competing plans.

22        THE COURT:  -- competing plan to be filed.

23        MR. KAROTKIN:  After a while.

24        THE COURT:  Four months.  One extension.

25        MR. KAROTKIN:  Okay, well, again, people are free to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  come in at any time.

2       THE COURT:  No, I understand.

3       MR. KAROTKIN:  But I think the debtors are -- in a

4  case like this, the debtors are entitled to, at the very least,

5  an initial extension --

6       THE COURT:  No, Mr. Karotkin --

7       MR. KAROTKIN:  -- particularly --

8       THE COURT:  -- excuse me; I'm not trying to say I'm

9  just going to do what I did before.  What I'm telling you is

10  really I'm agreeing with you.  I was persuaded in the prior

11  case, only when a creditor with standing, with an outline of a

12  real plan, not some crazy pie-in-the-sky concept -- and I

13  extended -- or broke the exclusivity for that creditor.  And we

14  had a hearing when that creditor showed me why it thought its

15  plan could get past -- out of the -- out of the starting gate.

16  And that's what happened.

17       And so my question to you is, then, if we did it now,

18  wouldn't you be faced with that -- a crisis of competence and

19  perhaps the need to fend off plans that don't have a hope of

20  ever getting past the -- getting to first base?

21       MR. KAROTKIN:  Yes, well, I thank you for that because

22  I think that it's absolutely clear that nobody can file a

23  feasible plan, nobody, until -- what the governor himself

24  acknowledges is that the legislative reform and the regulatory

25  reform is enacted so that people dealing with this company know

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   the risk profile they're dealing with --

2         THE COURT:  Well, I know what you agree --

3         MR. KAROTKIN:  -- so that --

4         THE COURT:  But isn't it true, if the legislature

5   takes a term and goes off in a different direction, you just

6   have to deal with it that way?

7         MR. KAROTKIN:  Again, and then --

8         THE COURT:  That's their --

9         MR. KAROTKIN:  -- hopefully we will --

10        THE COURT:  That's the legislature's decision.

11        MR. KAROTKIN:  Exactly.  But hopefully the governor's

12  commitment to finding a solution to the problem that'll assure

13  this debtor's -- not only this debtor's long-term viability but

14  the other utilities' --

15        THE COURT:  Other debtors'.  Um-hum.

16        MR. KAROTKIN:  I think that, until we have more

17  clarity on that, nobody can propose a plan that's feasible

18  here.

19        As the governor said in the task force, it's an

20  untenable situation we're faced with -- those were his words:

21  an untenable situation -- that PG&E and the other utilities are

22  faced with, that has to be addressed if the utilities in this

23  state will be able to operate effectively and attract the

24  capital they need not only for operations but to address the

25  wildfire risk going forward.

PG&E Corporation & Pacific Gas And Electric

1        THE COURT:  Okay.  We have oppositions from the TCC,
2    from the governor's office, from official creditors' committee,
3    from, I guess, the City of San Francisco.  And Joanne (ph.),
4    why don't I go down with the people who are sort of in the
5    debtor's camp.  Is anyone from the -- counsel for the governor
6    wish to be heard?  And if you don't want to be heard, that's
7    okay, but -- here.  Good morning.
8        MR. FRIEDMAN:  Good morning, Your Honor.  Peter
9    Friedman from O'Melveny & Myers --
10       THE COURT:  Good morning, Mr. Friedman.
11       MR. FRIEDMAN:  -- on behalf of Governor Newsom's
12   office.  Your Honor, my pro hac is pending but has not been
13   granted.
14       THE COURT:  We're not worried about it.
15       MR. FRIEDMAN:  Thank you, Your Honor.  Your Honor, the
16   governor has a broad array of policy concerns that are bigger
17   than PG&E.  But as Mr. Karotkin addressed, PG&E's bankruptcy
18   obviously implicates those concerns; I think the Court knows
19   what they are:  fair treatment of victims; assuring safe and
20   reliable service; addressing climate change; meeting renewable
21   goals.  And I think everybody in the case has acknowledged that
22   in some way the government's approach to these macro issues are
23   going to define the options for PG&E.  But I think it's
24   important to be really clear that a public-policy solution does
25   not involve bailouts or letting PG&E stakeholders -- and its

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   stakeholders walk away from the damage that's already been

2   done.  Equity holders and other financial parties are going to

3   need to bear the consequences of their investment decisions and

4   the actions of the utility.

5          Mr. Karotkin also mentioned the governor is working

6   on -- with the state legislature to address a different

7   framework for how California deals with wildfire liability,

8   going forward.  It started that on day one.  Think the hope is

9   to propose legislative solutions over the summer.

10          And I think with that background, Your Honor, I

11  turn -- just want to turn specifically to the motion.  And I

12  think our concern -- we understand the issue of not terminating

13  exclusivity in its entirety today.  We don't think that's

14  warranted.  But we do think that the best approach is not to

15  force -- whether it be the governor or a creditor with a plan,

16  or some other party, to come to court to force, I think, the

17  potentially more disruptive issue of an immediate fight over

18  termination of exclusivity, but rather to have the debtors

19  continue to have to be accountable, which is why we've asked

20  for --

21          THE COURT:  Well, why -- again, I don't mean to

22  challenge you on this, but where does it follow that the

23  debtors aren't accountable just because of the exclusivity

24  issue?

25          MR. FRIEDMAN:  So --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  And you, better than I, and lots of the

2     players here know what's going on behind the scenes or outside

3     of the courtroom.

4          MR. FRIEDMAN:  Your Honor, we do think --

5          THE COURT:  Where's the lack of accountability?

6          MR. FRIEDMAN:  Your Honor, we do think part of -- part

7     of it is the issue you talked about:  public optics.

8          THE COURT:  Um-hum.

9          MR. FRIEDMAN:  And we think the debtors need to show

10    to the public more of what's going on, what's being done,

11    progress towards quantifying wildfire liability, which is as

12    much a gating issue, if not more, of a -- as a legislative

13    solution to go-forward issues.  And we need to understand the

14    nature of the economic problem.  And I think, whether it be

15    seventy-five days or ninety days, the more the Court knows and

16    the more the public knows on a specific timetable -- and

17    parties-in-interest know on a specific timetable, the more the

18    Court can assess whether it's ripe to limit the debtors'

19    exclusivity or cut off the debtors' exclusivity.

20         We're asking for a status check as opposed to, as I

21    said, the disruptive nature necessarily of seriatum motions to

22    terminate exclusivity.

23         THE COURT:  Right.

24         MR. FRIEDMAN:  That may be appropriate, but we think

25    the more appropriate manner right now is to say, okay, Debtors,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  tell us where you are in seventy-five days.

2          THE COURT:  You're aware, I take it, what I've done --

3  what I did in the prior case; right?

4          MR. FRIEDMAN:  Yes, Your Honor.

5          THE COURT:  I made it -- I made sure that there was a

6  possible viable alternative, not somebody that just decides to

7  take a run at it.  And this case doesn't need frivolous motions

8  filed by people that haven't a clue on how to make it happen.

9          MR. FRIEDMAN:  Agreed, Your Honor, and that's --

10          THE COURT:  Right?

11          MR. KAROTKIN:  -- again, why we're focused on the

12  status-check aspect of it rather than the "terminate now" --

13          THE COURT:  But when --

14          MR. FRIEDMAN:  -- or even --

15          THE COURT:  Again, when things like the state

16  legislature is a player, there's a status report called (sic)

17  their actions, one way or the other; right?  If the state

18  government chooses to change -- let's pick one example.  If

19  they choose to overrule the inverse-condemnation principle,

20  that's a major development.  If they choose not to, that's also

21  a major development; isn't it?  And those are big mileposts in

22  the road, aren't they?

23          MR. FRIEDMAN:  Absolutely, Your Honor.

24          THE COURT:  Right.

25          MR. FRIEDMAN:  And we hope that -- obviously, there're

PG&E Corporation & Pacific Gas And Electric

1    many different variables, but we hope by a seventy-five- or

2    ninety-day-extension period rather than six months, we can sync

3    up the debtors' progress.  And again, if it turns out that in

4    ninety days the facts warrant in our view an extension of

5    exclusivity, we might take a different position.

6            THE COURT:  So -- I mean, again, I'm picking you

7    because you came up first.

8            MR. FRIEDMAN:  I don't mind, Your Honor.

9            THE COURT:  I know you don't.  I'm not personal.  --

10   is that it comes down to, if I grant the governor's request or

11   the official creditors' committee's request, we might have a

12   motion in seventy-five days, or so, to extend again, versus a

13   motion to shorten, if you have a real plan.  In other words,

14   suppose there is a significant activity at the legislative

15   level or some other level.  Pick the major players:  PUC;

16   legislature; i.e., governor's decision.  Those are major

17   events.  And if Mr. Karotkin's sitting here six months from now

18   and I note that those major changes have been made -- have

19   (sic) done three months ago, I might say, what's going on, why

20   aren't you doing something?

21           But why is it better to have a fight to extend it,

22   when there's -- when it's the same unknowns, versus an

23   opportunity to shorten it if there is inaction or,

24   alternatively, if the governor, the PUC, the creditors'

25   committee have a viable option?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          MR. FRIEDMAN:  Your Honor --

2          THE COURT:  Seems to me it's a question of where do we

3     have this next fight.

4          MR. FRIEDMAN:  It is.  And Your Honor, I think -- I

5     acknowledge this is all, sort of, a very fluid situation as to

6     what the Court believes is the right path.  The governor and

7     the administration believe that it's actually less disruptive

8     to have people walking in, necessarily, with an immediate

9     motion to terminate, and frankly, optically and stability-wise,

10    better to just say, all right, in the ordinary course, Debtors,

11    you're going to come back to me in sixty or seventy-five days

12    or eighty days and say, here's what I've done to warrant --

13         THE COURT:  The --

14         MR. FRIEDMAN:  -- more time or less.

15         THE COURT:  The bankruptcy lawyers in this room know

16    the complexity --

17         MR. FRIEDMAN:  Yes.

18         THE COURT:  -- and the complications and the time

19    frame for a simple Chapter 11 plan.  It's inconceivable to me,

20    if tomorrow the governor and the legislature and the CPUC all

21    solved all these other problems --

22      (Courtroom alarm sounds.)

23         THE COURT:  That's just a 10 o'clock thing, I believe.

24         Right?

25         THE CLERK:  Yeah; I believe so.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    THE COURT:  It's usually on Tuesdays.  For some reason

2    it thinks today's Tuesday.  All right, don't panic, everyone.

3    -- that even if Mr. Karotkin wakes up Friday morning

4    and all these problems are solved, it's going to be a long time

5    before he gets the plan into the file.  It's just --

6    MR. FRIEDMAN:  Absolutely, Your Honor.  And frankly --

7    THE COURT:  -- so complicated.

8    MR. FRIEDMAN:  -- under those circumstances, it

9    actually might warrant a longer extension of exclusivity.

10   Right?  If everybody comes together and things fall into place

11   and Mr. Karotkin and the many other able people in this

12   courtroom get to that juncture, again, the governor's

13   standpoint might be quite different.  But where we are now --

14   and not having that, and the perceived lack of progress that

15   the governor sees, as we've articulated in our papers, we think

16   that at this point that kind of extension isn't warranted.

17   THE COURT:  Okay.

18   MR. FRIEDMAN:  If Your Honor has anything else, I'm

19   happy to --

20   THE COURT:  No, I don't.  Thank you --

21   MR. FRIEDMAN:  -- answer it, but I appreciate --

22   THE COURT:  -- Mr. Friedman.

23   MR. FRIEDMAN:  -- your time.  The governor appreciates

24   being heard.

25   THE COURT:  No, I appreciate your being here, too.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    Let's go to the official creditors' committee and then

2  we'll go through the -- and by the way, when I listed the

3  parties who have taken positions on this, I overlooked the

4  concerned shareholders.  So if their counsel's here today, I'll

5  certainly hear from him too.

6    Good morning --

7    MR. BRAY:  Good morning, Your Honor.

8    THE COURT:  -- Mr. Bray.

9    MR. BRAY:  Gregory Bray, Milbank LLP, counsel for the

10  official committee.

11    THE COURT:  So we're going from 75 days to 120 in your

12  papers; right?

13    MR. BRAY:  Yes, Your Honor.  Let me just begin.

14  You've asked why does it matter if I go termination versus

15  extension.  And the lawyer's answer is it's a burden-of-proof

16  issue.  Right now the burden of proof is on the debtor to

17  establish cause to extend exclusivity.  If we had to come back

18  to court, the burden is on us to establish why it should be

19  terminated.

20    THE COURT:  Yeah, but the Exhibit A to your motion

21  will be your proposed plan, because, if you don't have one, I'm

22  probably not going to waste my time with it.

23    MR. BRAY:  And I agree with you.  And I'm not saying

24  we would file a plan -- we're not asking the Court to terminate

25  exclusivity; we're very clear --

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  Right.

2          MR. BRAY:  -- about that.

3          THE COURT:  No, I know you're not

4          MR. BRAY:  And we're intimately involved with and

5     aware of the many things the debtor is involved with behind the

6     scenes and in front of the scenes.

7          THE COURT:  Right.

8          MR. BRAY:  And we're not critical, for lack of a

9     better word, of the debtors' efforts.  Nonetheless, the

10    committee urges the Court to shorten the time to four months,

11    the reason being the end of September the legislature adjourns

12    early to mid-September.  The governor, as I understand it, has

13    asked the legislature to act in July before the summer vacation

14    or recess, however you want to call it.

15         So our thinking is that by the end of September the

16    debtors should be well aware of what legislative action was

17    taken, wasn't taken, and the debtors should be able to at least

18    articulate some ideas -- a "plan" is too strong a word -- about

19    how to move this case forward.

20         THE COURT:  Term sheet?

21         MR. BRAY:  A term sheet --

22         THE COURT:  Well, that's --

23         MR. BRAY:  -- would be ideal.

24         THE COURT:  -- that's what I made the CPUC do eighteen

25    years ago, and they did it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    MR. BRAY:  And this gets -- you're maybe anticipating

2  my point, which is, we view the extension through the end of

3  September as a checkpoint.  And the Court could well decide at

4  that point it should extend exclusivity further.  In fact, the

5  committee could say, we believe that that's the right thing, as

6  well.  But there may be conditions attached.  An unfettered,

7  unconditional six-month extension of exclusivity, in the

8  committee's view, is just simply too long for a case of this

9  type.

10    I'm going to use the word that the governor used.  The

11  committee does believe there should be a higher level of

12  accountability and a desire to push this case forward.  That's

13  not, again, being critical of the debtors today.  Nonetheless,

14  the four months, to us, is the appropriate time for the Court

15  to assess where the debtor is, what progress has been made.

16  And at that time when we have a better understanding of the

17  facts, what's happened, what hasn't happened, and what's

18  reasonable, the Court can then decide if a further extension is

19  warranted or not.

20    And that's really the genesis of our argument here;

21  it's not -- we're not arguing to the Court today you should

22  terminate --

23    THE COURT:  No, I know you're not.

24    MR. BRAY:  -- exclusivity.

25    THE COURT:  I mean, others are.  I've got my box

PG&E Corporation & Pacific Gas And Electric

1    score.  I've got votes for two-and-a-half months, four months,

2    zero months.

3              MR. BRAY:  Right.

4              THE COURT:  Several zero months.

5              MR. BRAY:  Right.  And we --

6              THE COURT:  And the --

7              MR. BRAY:  -- we tried to be --

8              THE COURT:  -- shareholder --

9              MR. FRIEDMAN:  -- thoughtful about the time frame we

10   chose, bearing in mind the legislative process, when that would

11   conclude, where this process is, where the bar date is.  And to

12   us it just seemed that the beginning of the fall is the -- I

13   know I'm being repetitive here -- is the appropriate time to

14   take measure of the progress of this debtor and decide if a

15   further extension is warranted and what conditions, if any,

16   should be imposed with respect to the debtors' continuation of

17   exclusivity.  That's all we want to see; nothing more.

18             THE COURT:  Okay, thank you, Mr. Bray.

19             MR. BRAY:  Thank you, Your Honor.

20             THE COURT:  Does the ad hoc committee want to be

21   heard?  I mean, I -- yeah; good morning.

22             MR. QURESHI:  Good morning, Your Honor.  For the

23   record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, on behalf

24   of the ad hoc committee of senior unsecured noteholders.

25             Your Honor, we filed a statement.  We do not oppose

PG&E Corporation & Pacific Gas And Electric

1   the relief that the --

2           THE COURT:  Right.

3           MR. QURESHI:  -- debtors are seeking --

4           THE COURT:  Right; I know that.

5           MR. QURESHI:  -- with respect to exclusivity.  Your

6   Honor, our understanding of the statute here accords completely

7   with the Court.  We are concerned by the lack of progress that

8   has been made toward a plan in -- outside of this Court's

9   purview, outside of the courtroom.  We are concerned about

10  that.  We remain concerned about that.  And Your Honor, if

11  those circumstances don't change soon, if progress is not made

12  towards a confirmable plan of reorganization here, then it is

13  our expectation that in that circumstance a motion either to

14  shorten whatever remains of the exclusivity period that might

15  be granted today, or a motion to terminate it right away, might

16  in those circumstances be appropriate.

17          So we don't oppose the extension being sought now, but

18  we will be watching vigilantly for progress to be made --

19          THE COURT:  So if your ad hoc committee is concerned

20  about a lack of progress, there still is no way for me to know.

21  I mean, again, as I stated earlier, the fact that I haven't

22  seen something on file doesn't mean there's a lack of progress.

23          MR. QURESHI:  That is correct, Your Honor.  And I

24  think that, once there is a path towards a viable and

25  confirmable plan and we don't see the debtor making progress

PG&E Corporation & Pacific Gas And Electric

1    toward their own plan, that would be a circumstance in which

2    our group or perhaps one of the official committees might be

3    back before the Court with a motion to terminate or a motion to

4    shorten.  And I completely understand Your Honor's point, which

5    is, Your Honor can't know about that until those circumstances

6    are made clear to the Court.

7              We are here to say that, as of today, Your Honor, we

8    are concerned with the lack of progress towards a plan.

9              THE COURT:  Okay.

10             MR. QURESHI:  But given the complexities of the case,

11   we think that an extension is warranted but reserve the right

12   to come back to shorten and/or terminate if progress isn't made

13   soon.

14             THE COURT:  Okay.  Thank you very much.

15             MR. QURESHI:  Thank you, Your Honor.

16             THE COURT:  And the equity committee; do we have

17   appearance by counsel of the equity committee today?  Mr.

18   Bennett.

19             MR. BENNETT:  Yes, Your Honor.

20             THE COURT:  Good morning.  Sorry, I didn't identify

21   your group when I went through the list, but I did read your

22   papers yesterday.

23             MR. BENNETT:  Okay.  Thank you, Your Honor.  Bruce

24   Bennett, Jones Day, on behalf of a number of large PG&E

25   shareholders.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  Right.

2          MR. BENNETT:  I'm going to skip over a number of

3    things I was prepared to say.  And first of all, I support Your

4    Honor's approach to the motion.  I also was sitting there

5    thinking about objective information, from the record in this

6    case, to suggest what a reasonable extension might be --

7          (Cell phone ringing.)

8          MR. BENNETT:  -- as opposed to feelings about --

9          THE COURT:  We need phones off, please.

10         MR. BENNETT:  -- as opposed to feelings about what

11   might be appropriate or what progress is being made, when,

12   frankly, there wasn't a lot of evidence produced on that point.

13         And I stumbled upon two things, in the record in this

14   case, that people can't argue about, and one of them is

15   actually the absence of a record, and the second is actually a

16   record that was filed.  So we have a tort committee, Your

17   Honor.  The tort committee on your chart has proposed that

18   exclusivity be terminated immediately.

19         THE COURT:  Right.

20         MR. BENNETT:  And they also cite, frankly quite

21   unbelievably, the idea that there's been a lot of progress on

22   quantifying wildfire claims.  But when I looked through the

23   record in the case, what I couldn't find was a 2019 statement

24   by that committee.

25         Now, I assume that everyone in this case is doing

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1 their very best to comply with all of the rules of the court,

2 and the rules require that the 2019 had to be filed by now and

3 that the 2019, if it was at all possible to file, would

4 disclose the amounts of claims being asserted by the members of

5 the committee.  But for whatever reason, even though we're four

6 months into the case, or soon to be four months into the case,

7 and even though they say that the debtors should be prepared to

8 file a plan within a week, they still haven't managed to gather

9 up their own claims information for their own members.  I hope

10 they do, and I hope they do quickly, but it would seem hard to

11 argue that the debtors have enough information, in our

12 position, to file a plan, when they haven't managed --

13          THE COURT:  Aren't those --

14          MR. BENNETT:  -- yet --

15          THE COURT:  -- apples and oranges?  I mean, I

16 didn't --

17          MR. BENNETT:  Your Honor, it's about --

18          THE COURT:  I wasn't --

19          MR. BENNETT:  It -- it's --

20          THE COURT:  I wasn't aware of that --

21          MR. BENNETT:  It's --

22          THE COURT:  -- complaint before, but I don't know --

23          MR. BENNETT:  It's the -- it's an objective reflection

24 of the absence of one crucial piece of information, which is,

25 what claims really are.  That's what it is.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1        THE COURT:  Wait one second, please.

2        THE CLERK:  We lost the video connection.  We need to

3   place the call.  We have -- to the overflow.

4        THE COURT:  Okay.  Just short break.  Yeah, we have --

5   we lost the video to next door.  That'd just take -- she just

6   has to re-place the phone line (sic).

7        We lost the audio to next door, too, then, right?

8        Yeah.  Okay.

9        Okay, Mr. Bennett, you're back on camera with me.

10       MR. BENNETT:  I think where I left off, Your Honor, is

11  I said that I'm not seeking a sanction or complaining about the

12  absence of a 2019 statement.  I'm pointing out that it's an

13  objective indication of the state of available information, of

14  course based on the assumption, which I do think should be

15  regarded as true, that everyone's trying hard to comply with

16  their obligations and, if they had the information, they would

17  have filed it by now.

18       Secondly, Your Honor, you noted that the Singleton

19  firm has an objection and they too would seek to terminate

20  exclusivity immediately.  Well, they did file a 2019 statement,

21  but it was a list of names with no numbers.  And they reported,

22  in their 2019 statement -- and this is a few weeks ago -- that

23  of the thousands of clients that they represent, exactly thirty

24  had liquidated their claims.

25       So I am for rapid progress as much or more than

PG&E Corporation & Pacific Gas And Electric

1   anybody else in this courtroom, but we have to understand where

2   we are and where we need to go.  And I also, frankly -- it

3   would have been great if this hearing could have been held at

4   the same time as the bar-date hearing, because --

5          THE COURT:  Well, yeah, of course.  But --

6          MR. BENNETT:  -- because it would give us some

7   information about what people think is a reasonable period to

8   get claims done.  So consistently with the comments Mr.

9   Karotkin made, we have a legislative process where -- Mr.

10  Friedman was right.  The governor did ask for action by July

11  15th.  I am fervently hoping that that's exactly what happens,

12  but we all know, as Mr. Karotkin pointed out, what did happen

13  with Senate Bill 901.  It took until the very last day of the

14  session for that to get out.  And that would be September,

15  which, of course, would be after the governor's proposed date.

16         We're looking at a bar date that'll probably be, if

17  the debtor's motion is successful, in the September time frame.

18  And --

19         THE COURT:  Well, the bar date -- I mean, it --

20  whether I grant the debtor six months or cut zero, either way,

21  the bar date's a separate inquiry.

22         MR. BENNETT:  It's a separate inquiry.

23         THE COURT:  So --

24         MR. BENNETT:  It's another item on the critical path,

25  Your Honor.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    THE COURT:  No, that's right.  Of course, it is.

2    MR. BENNETT:  So there -- so my point being is,

3  there's a lot of items on the critical path that we know today,

4  absolutely, objectively are pretty far out there, whether we

5  like it or not.

6    THE COURT:  I guess I don't share with you that an

7  exclusivity deadline, in a case of this complexity, is a

8  critical path item like it would be in a construction project.

9  You have to clear a path.  You're going to put the foundation

10  before you start building the floors.  Here, it's almost

11  inconceivable that there's going to be a plan other than what

12  the debtor and/or what someone's going to put together from all

13  these other forces that have to line up.

14    MR. BENNETT:  And I agree.  And I think --

15    THE COURT:  Yeah.

16    MR. BENNETT:  -- that, Your Honor, starting with the

17  six-month period, allowing parties to shorten it if

18  circumstances change in the interim, accommodates what we know

19  about the objective events that we have today.  It's consistent

20  with what the record is showing is the state of information,

21  and it's consistent with what we are seeing progress likely to

22  be in critical areas.  So I think -- I -- this is in support of

23  your approach to be -- to -- objective information in support

24  of your approach for dealing with the motion.

25    THE COURT:  Okay.  Thanks, Mr. Bennett.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      MR. BENNETT:  We would urge that it be granted as

2   proposed by the debtors.

3      THE COURT:  All right.  All I have left from the

4   opponents are those that want to shorten.  So Ms. Dumas, are

5   you speaking today or Mr. Julian?

6      MS. DUMAS:  Yes, sir.

7      THE COURT:  Okay.  Would you take up -- start with on

8   behalf of the tort committee, please.  And you're not -- what

9   Mr. Bennett said about the 2019 statement, you cannot respond

10  to that.  It's not an action item for me today.  If you want to

11  respond, you can, but it's not relevant to today's motion.

12  So --

13     MS. DUMAS:  Well, thank you, sir.  I did not intend to

14  respond to Mr. Bennett's suggestion --

15     THE COURT:  Okay.

16     MS. DUMAS:  -- that we file a 2019 in my remarks.

17  Cecil Dumas, BakerHostetler, on behalf of the official

18  committee of tort claimants.

19     I'm here this morning with Karen Lockhart (ph.), the

20  committee chair --

21     THE COURT:  Um-hum.  Right.

22     MS. DUMAS:  -- as well as several of my colleagues.

23  And I wanted to also inform the Court that a number of

24  individuals who were affected by the fires elected to come to

25  court.  They don't want to hear about exclusivity; they want to

PG&E Corporation & Pacific Gas And Electric

1    hear about an urgent needs fund.  But --

2          THE COURT:  I understand.

3          MS. DUMAS:  -- nonetheless, many people have travelled

4    from as far as Paradise, California, getting up at 5 o'clock in

5    the morning to be here to hear what goes on in bankruptcy court

6    and what Your Honor has to say.

7          THE COURT:  Well, I'm glad they're here.  I'm glad

8    they are --

9          MS. DUMAS:  I appreciate that, and --

10         THE COURT:  -- they chose to come.

11         MS. DUMAS:  -- I know you are, Your Honor.

12         With respect to the exclusivity extension, the tort

13   committee is not misreading the law.  We are not crazy.  We

14   understand the complexity of this case, but we need to make a

15   few significant points that are not being heard by the

16   financial interests in the case about the real people being

17   affected.  So I want to just make a few introductory remarks,

18   if I may, Your Honor?

19         THE COURT:  Yes.

20         MS. DUMAS:  This case, in our view, is not PG&E-2.  It

21   is unlike the case that you heard --

22         THE COURT:  I know.

23         MS. DUMAS:  -- in 2001.

24         THE COURT:  I know that.

25         MS. DUMAS:  There is no -- there is no jack-up in the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   price of power that PG&E has to acquire.  This case is much

2   more like the mass tort bankruptcy cases that we see from the

3   examples of A.H. Robins and Manville and Dow Corning.  That

4   is --

5           THE COURT:  It's almost more like the Puerto Rico

6   hurricanes.

7           MS. DUMAS:  The debtor has --

8           THE COURT:  Right?

9           MS. DUMAS:  The debtor has caused -- according to some

10  independent investigators, has caused a number of wildfires

11  that resulted in lives being lost, billions of dollars of

12  damages, thousands of people being misplaced.  And in that

13  sense -- and that is the reason that this case was filed.

14  According to the debtor's own A case, it filed the case to have

15  one place to address billions of dollars of tort claims arising

16  in connection with the -- not only the 2017 North Bay fires,

17  but really the -- the tipping point was the 2018 Camp Fire.

18          So it elected to come into bankruptcy to resolve those

19  claims.  It came into bankruptcy as a solvent debtor.  It came

20  into bankruptcy as a debtor whose operations were fine.  It has

21  positive EBITDA.  It has a robust market cap, so it is here to

22  resolve tort claims.

23          The only difference between Robbins, Manville, Dow

24  Corning, any of the asbestos cases is the real reason that I'm

25  standing before you, and that is that this debtor is still

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   manufacturing the dangerous product.  This Court has heard on

2   many occasions and has remarked itself of the risk of a

3   wildfire during the administration of the case.  What this

4   Court hasn't heard, but may have read about, is the consequence

5   that will occur in October of this year of tens of thousands of

6   people losing the tail of their insurance benefits.  Tens of

7   thousands of people affected in the North Bay fires in October

8   2017 will be paying both rent and mortgages in October.  And

9   that is something that the California legislature, the

10  governor's office, and everyone else is acutely aware.

11        That will be a storm of fury of people who live in

12  Northern California.  Why do I say people who live in Northern

13  California?  Because we, Your Honor, are the only people who

14  matter in this case.  The tort claimants, the victims are the

15  only people who are affected by this case.  Why do I say that?

16  Because every other lawyer who is standing before you is

17  representing people who choose to be here as an investment

18  opportunity.  I have charts.  It's very interesting to see how

19  many people have traded in and out at all levels.

20        THE COURT:  I know.

21        MS. DUMAS:  I know you understand that.  It happens --

22        THE COURT:  I can see it from the docket.

23        MS. DUMAS:  -- in big cases.

24        THE COURT:  I see it constantly.

25        MS. DUMAS:  But this -- in this case, it is all the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1     more remarkable.  The debtor filed its case with approximately

2     two billion in trade debt.  It paid almost a billion of that

3     through its critical vendor or first-day employee, et cetera.

4     So trade debt and trade creditors are now being paid current.

5     Administrative expenses, they're being paid current.  So the

6     harm to trade is not financially material.  You're looking at a

7     courtroom of people who are -- I'm not going to get to the

8     emotional part of it, but there is real harm occurring outside

9     of this courtroom.

10          Now, let's talk about everybody else.  Everybody else

11    who's in this room chooses to be here.  The bonds in this case,

12    at all levels of debt, in this case, whether you're talking

13    about the DIP, the utility bonds, the segregation claims,

14    people are accumulating position.  The bonds are trading

15    sometimes at above par.  They're a little bit below par right

16    now.  But everybody who is in this case is trading into this

17    case to be here.  Why?  Because this is a regulated utility.

18    It may be an investor-owned utility, but the State of

19    California is not going to allow PG&E to cease operations.

20          The CPUC is not going to allow the DIP lenders to

21    foreclose on utility assets.  Nothing is going to happen to the

22    service being delivered to these customers and PG&E's ability

23    to collect money from those rate payers if there's no

24    bankruptcy case.  There's a single reason for the bankruptcy

25    case, and that is to resolve the tort claims.

PG&E Corporation & Pacific Gas And Electric

1        So with respect to all of the fine lawyers in the

2   courtroom, they represent distressed debt traders.  They

3   represent people who want to make money and have been making

4   money hand over fist.  And I've said this before.  When I came

5   to the Court before the DIP, I said, there is a disconnect here

6   between people being held up on claims, some that arose in 2015

7   in the Butte Fire, and the people who are trying to get a point

8   or two extra.  There's almost no place to trade in the bonds

9   anymore because so much money has been made.  The last play in

10  the case, when -- a major shareholder Baupost already holds

11  half of the segregation claims.  The only place left to trade

12  in this case and make money is the tort claims, right?  That's

13  the last place for distressed traders to try to make -- to

14  acquire the tort claims, and that's the last play.

15       These are all financial plays.  I'm saying all this

16  because you understand financial plays; I understand them.

17  Everybody at counsel table understands them, but there are real

18  people saying, my house was burned down in 2015.  My house was

19  burned down in 2017.  I am still living in a tent from 2018.  I

20  apologize for raising my voice, Your Honor.  So --

21       THE COURT:  You don't have to apologize.

22       MS. DUMAS:  So let's get to the cause standard.  What

23  the governor's office said and the debtor said and the equity

24  holders said is that we've all got to wait to see what the

25  California legislature does.  But as Your Honor pointed out,

PG&E Corporation & Pacific Gas And Electric

1    the California legislature may decide not to do anything.  It

2    may not do anything in the 2019 legislative session.  It may

3    not do anything in 2020.  So PG&E has been lobbying in

4    Sacramento, but its lobbying was before it filed for

5    bankruptcy, during bankruptcy, and it will continue outside of

6    bankruptcy.

7          The other two investor-owned utilities in the state --

8    San Diego Gas & Electric and Southern California Edison --

9    they're not in bankruptcy.  They're lobbying for the same

10    changes to the law.  We need relief, 901.  We need change to

11    inverse condemnation.  That is a strawman.  That is a strawman

12    that we need a legislative change.  A legislative change is not

13    necessary to confirm a plan that pays all of the utility's

14    creditors.  Legislative change may be helpful -- may be helpful

15    to protect the market cap, may be helpful to protect the equity

16    security holders who bought in January at six dollars and want

17    to see it go up to sixty.  But that's not necessary to confirm

18    a plan that will pay the tort claimants and the bond holders.

19          Now, Your Honor has signaled strongly, and we have

20    taken it very seriously, that if a party can come forward with

21    a plan -- a realistic, feasible plan that calls for the

22    recapitalization of this debtor but maybe doesn't -- maybe

23    equity is cancelled, maybe the bonds take a haircut.  I don't

24    know, but there is a plan.

25          THE COURT:  Well, there isn't one yet.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          MS. DUMAS:  Well, there --

2          THE COURT:  I mean, I understand.

3          MS. DUMAS:  Well --

4          THE COURT:  As you know, there was one in the prior

5     case.

6          MS. DUMAS:  And I agree with you, Your Honor.  And the

7     tort claimants committee has not been sitting like potatoes.

8     We're running financial scenarios.  We understand the

9     refinancing capabilities of this company with its EBITDA.  We

10    can run the same multiple scenarios as anybody else, and we can

11    watch the waterfall depending on those assumptions.  And at

12    some point, Your Honor may have to do an enterprise valuation

13    in a contested confirmation that pays creditors.  Remember, not

14    the creditors who are financial opportunists here, because

15    that's what everybody but the tort victims are.  But the

16    creditors who are really suffering have been waiting a long

17    time for payment.

18         THE COURT:  Look, I understand your point.  But why --

19    what will change that suffering if I break exclusivity today?

20    In other words, I understand you haven't filed a plan, and I'm

21    not --

22         MS. DUMAS:  Well, we're not allowed --

23         THE COURT:  -- surprised --

24         MS. DUMAS:  -- to file a plan because --

25         THE COURT:  No, no.  But --

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          MS. DUMAS:  -- we're within the --

2          THE COURT:  -- but --

3          MS. DUMAS:  -- exclusive period.

4          THE COURT:  But Ms. Dumas, you know as well I, I have

5    not surprised anyone with my philosophy about plan exclusivity

6    in other cases, not just the prior case but other Chapter 11

7    cases in the area.  But one thing that I won't do is waste time

8    on nonplans or tire kickers or troublemakers.  So -- and I'm

9    not accusing you or your committee of any of that.  What I'm

10   getting to is, if I break exclusivity today, what is likely to

11   happen?  Leaving aside what counsel to the governor talked

12   about, optics and the obvious reasons --

13         MS. DUMAS:  Yeah.

14         THE COURT:  -- what's going to change --

15         MS. DUMAS:  Yeah.

16         THE COURT:  -- other than --

17         MS. DUMAS:  So --

18         THE COURT:  -- confusion?

19         MS. DUMAS:  So --

20         THE COURT:  In other words, how --

21         MS. DUMAS:  It is --

22         THE COURT:  Let's suppose that, as Mr. Karotkin

23   mentioned, if I break exclusivity, it might throw confidence

24   into doubt, it might change the market --

25         MS. DUMAS:  Yes, sir.

PG&E Corporation & Pacific Gas And Electric

1      THE COURT:  -- maybe the stock market will go down,

2  but what will happen to help your constituents tomorrow and the

3  next day and the next day?

4      MS. DUMAS:  Yes, sir.  I --

5      THE COURT:  I don't know.  I --

6      MS. DUMAS:  I --

7      THE COURT:  -- have no solution.

8      MS. DUMAS:  I have a few suggestions or a --

9      THE COURT:  Okay.

10     MS. DUMAS:  -- few observations --

11     THE COURT:  Okay.

12     MS. DUMAS:  -- on that point.  The first observation

13 is from a controlling case, the BAP decision in Henry Mayo --

14     THE COURT:  The Mayo case.

15     MS. DUMAS:  -- Newall Memorial Hospital --

16     MS. DUMAS:  Um-hum.

17     MS. DUMAS:  -- where Professor Epstein and others

18 cited by the court opined -- and the court adopted their --

19 Judge Klein, in a very nice opinion, adopted their suggestion.

20 There is truth in their observation -- this is 282 B.R. 444 in

21 our papers.  There is truth in their observation backed by

22 examples from prominent cases that a likely consequence of the

23 denial of an extension of exclusivity is not that creditor

24 plans will be proposed and approved, but that the threat of

25 plans will cause the debtor to come forward more quickly than

PG&E Corporation & Pacific Gas And Electric

1    he might otherwise.

2          So statistics show, right?  That's one possible

3    consequence.  And here's why I want to say that won't happen

4    unless exclusivity is not extended.

5          Now, bear with me, because I'm going to take you back

6    to Manville.  In Manville -- I'll give you a cite because I

7    didn't put it in my papers.

8          THE COURT:  I don't need a cite.

9          MS. DUMAS:  I apologize.

10         THE COURT:  I know the history of Manville.

11         MS. DUMAS:  Well, 66 B.R. --

12         THE COURT:  Tell me what happened.

13         MS. DUMAS:  -- 517.  There were a number of opinions,

14   but this one was a challenge to the shareholders replacing the

15   board during the bankruptcy case.  And in Manville, what

16   happened -- another one of these mass tort cases -- is that the

17   debtor and the tort committee in that case formulated and

18   proposed a plan.  And that plan did not provide for equity or

19   enough for equity.  So the major shareholders got together and

20   replaced the board so that the debtor would withdraw the plan.

21         So that specific question be -- this is relevant.

22   That specific question before the court was, did that

23   constitute a clear abuse to replace the board during a

24   bankruptcy case for the purpose of getting more money for

25   equity?  And the court, of course, found, no, it's a valid use

PG&E Corporation & Pacific Gas And Electric

1    of --

2              THE COURT:  It was --

3              MS. DUMAS:  -- corporate powers to replace the board.

4              THE COURT:  -- a corporate governor -- governance.

5              MS. DUMAS:  Exactly.  Exactly.  There's not clear

6    abuse of the bankruptcy process.

7              Now, that's what happened in Manville.  What happened

8    here, as Jones Day pointed out in its papers, it was proactive.

9    The major shareholders were proactive.  They replaced the

10   board -- hopefully, depending on the vote at the shareholders

11   meeting next month, they replaced the board.  There is now a

12   board controlling PG&E that is acceptable to the holders of a

13   controlling interest in the shares.

14             THE COURT:  Well, that's true.

15             MS. DUMAS:  Okay?

16             THE COURT:  That's true.

17             MS. DUMAS:  So what that means is that this debtor --

18   we will never have that chance in Manville because this debtor

19   now will not get together with this tort committee to formulate

20   a plan that doesn't favor equity.

21             THE COURT:  Well, that -- but that assumes that this

22   Court or any other court would not be responsive to a proper

23   motion to break it because of a viable plan option.  In other

24   words, today, as I make -- if I have to make -- I have to make

25   it today.  I will make a decision.  I don't know that there is

PG&E Corporation & Pacific Gas And Electric

1    an option viable.  Tomorrow, there might be.  And if

2    tomorrow -- and I say it metaphorically -- next week, next

3    month.  If next week or next month, the TCC or some other group

4    has a viable plan, I -- why couldn't I, on an expedited basis,

5    open the doors, break exclusivity then?  What's the --

6        MS. DUMAS:  Your Honor, that could happen?  We will

7    appreciate that opportunity.  We understand that what we have

8    asked the Court to do is a massive stretch that --

9        THE COURT:  It's not --

10        MS. DUMAS:  -- could be --

11        THE COURT:  -- a massive stretch.

12        MS. DUMAS:  -- perceived as --

13        THE COURT:  It --

14        MS. DUMAS:  -- destabilizing.

15        THE COURT:  Ms. Dumas, it is not --

16        MS. DUMAS:  If the Court wishes to --

17        THE COURT:  It is not a massive stretch.  I -- again,

18   I -- you're supposed to know your judge, right?  This judge has

19   never been a fan of exclusivity, but he is a fan of practical

20   consequences.  And the risk of a frivolous plan -- again, I'll

21   say what I keep saying.  You are not somebody who I expect to

22   file a frivolous plan.  But --

23        MS. DUMAS:  Thank you, Your Honor.  I may --

24        THE COURT:  May.

25        MS. DUMAS:  -- meet your expectations in that regard.

PG&E Corporation & Pacific Gas And Electric

1    But --

2              THE COURT:  But in my -- in the prior case -- and I

3    don't want the victims of the fires to think that this judge is

4    going to decide this case the way he decided before.  But

5    the -- I don't remember if you were in the courtroom, but a

6    number of people who were in the courtroom were stunned when I

7    broke exclusivity that day because they didn't expect it.  And

8    they got themselves a competing plan that, guess what, led to,

9    I think, a consensual outcome.

10             Now, maybe I'll do it again.  But I don't have that

11   option right now because no one has presented to me.  And I --

12   and if your committee does or some other group does, I will

13   have to --

14             MS. DUMAS:  Yes, sir.

15             THE COURT:  -- be consistent with my philosophy, at

16   least, as to why I shouldn't.  So I'm down to the point of

17   what's the harm of breaking the plan exclusivity today versus

18   what's the harm of continuing it.  And I'm still back into

19   appearances more than substance.  Again, appearances are

20   important.  They're important to the victims.  They're

21   important to the market.  They're important to the political

22   process and the public.  But substantively, this is a

23   bankruptcy court, where we have these rules that are what they

24   are.

25             MS. DUMAS:  Yes, sir.  You are absolutely correct in,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    I think, your assumption.  And I will represent to the Court

2    the tort committee does not have a creditor plan that it wishes

3    to propose today.

4              THE COURT:  I think --

5              MS. DUMAS:  And --

6              THE COURT:  -- I knew that, because I -- again, I know

7    you and Mr. Julian well enough to know that if you had one, it

8    would have been Exhibit A to your opposition.

9              MS. DUMAS:  That's correct, Your Honor.  That -- yeah,

10   that's correct, Your Honor.  And we --

11             THE COURT:  And it's a formidable task even if you are

12   right, that there's a way to reorganize this company and let

13   the traders out there have their consequences.  But there isn't

14   an option yet.

15             Anyway, let -- I'm going to let you finish, and let me

16   let the other counsel -- because we do want to get to the

17   wildfire motion this morning, if possible.  So --

18             MS. DUMAS:  Well, Your Honor, I'd like to talk about

19   1121(d) for the rest of the day if --

20             THE COURT:  We'll take that after the hearing.  You

21   and I can have another discussion.

22             MS. DUMAS:  Your Honor, that's the conclusion of my

23   remarks.  We very much appreciate the Court's going out of its

24   way to explain its philosophy, to reexplain its philosophy on

25   exclusivity, the value of a concrete competing plan.  We take

PG&E Corporation & Pacific Gas And Electric

1    the Court's advisement very seriously, and the tort committee

2    and other creditor constituents will act accordingly.

3            THE COURT:  Okay.  Thank you --

4            MS. DUMAS:  Thank you so much --

5            THE COURT:  -- Ms. Dumas.

6            MS. DUMAS:  -- for your time.

7            THE COURT:  Mr. Tredinnick, are you here?  Mr.

8    Tredinnick, for the CCSF, filed a joinder with the committee.

9    Is anyone from the Singleton law firm appearing today?

10           MR. SINGLETON:  Yes.

11           THE COURT:  Do you want to be heard?

12           MR. SINGLETON:  Yes, sir.

13           THE COURT:  All right.  And that's Mr. Hawkins, right?

14           MR. SINGLETON:  No, Gerald Singleton.

15           THE COURT:  Oh, I'm sorry, Mr. Singleton.

16           MR. SINGLETON:  Yes.

17           THE COURT:  Well, Mr. Hawkins was here --

18           MR. SINGLETON:  Mr. Hawkins is our --

19           THE COURT:  -- on other matters.

20           MR. SINGLETON:  -- bankruptcy specialist.  I'm merely

21   a humble fire lawyer, so I don't know much about bankruptcy.

22           THE COURT:  You're welcome in this court.  One of the

23   things that lawyers are advised not to do is admit to the Court

24   that they don't know anything about bankruptcy.

25           MR. SINGLETON:  Well, I didn't say I don't know

PG&E Corporation & Pacific Gas And Electric

1  anything.  I've learned a little bit during this process, and I

2  suppose I should thank PG&E for that because it's a fascinating

3  area of the law.

4          What I wanted to do, Your Honor -- I'm certainly

5  mindful of what the Court has said, and I think I -- I think we

6  can all see where the Court's going.  And I understand the

7  reasons for that.  I wanted to talk a little bit about the

8  practical impact, and I appreciate the Court's stating that it

9  was concerned about the practical impact.

10          To answer the Court's question, what would ending

11  exclusivity do?

12          THE COURT:  Um-hum.

13          MR. SINGLETON:  I think the practical impact would be,

14  metaphorically speaking, to light a fire under PG&E.  And that

15  is what we're not seeing.  And it's not just me.  It's not just

16  the tort committee.  To me, the most concise statement on this

17  was from the ad hoc committee of senior unsecured noteholders.

18  That was document 2008.  And what they said, I think, is very

19  important.  And I think it bears repeating.  Specifically, they

20  said -- and this is a quote.

21          "The debtors have not, as far as the ad hoc committee

22  is aware, engaged in any substantive plan related discussions

23  with any of their primary stakeholders, including the ad hoc

24  committee, which holds a majority of the utility's

25  approximately 20.5 billion in funded debt."

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      I can represent the same is true.  I --

2      THE COURT:  Well, I --

3      MR. SINGLETON:  Go ahead.

4      THE COURT:  -- I think you did.  I think you made a --

5      MR. SINGLETON:  Yeah.

6      THE COURT:  -- point that the official tort claimants

7  committee seems to have preempted your position as that the

8  party --

9      MR. SINGLETON:  Right.

10      THE COURT:  -- that the debtors will negotiate.  I

11  can't make rules about who should be talking to whom.  You and

12  your firm have not been bashful, and you're welcome to come

13  here anytime you want.  It's not terribly helpful to have you

14  taking positions that are completely unrelated, like on the

15  motion to extend the removal.  But you're entitled to do it.

16  But --

17      MR. SINGLETON:  Understood.

18      THE COURT:  -- but I mean, what I should do?  Do you

19  think breaking exclusivity is going to invite you to the next

20  meeting with the debtor?  I mean --

21      MR. SINGLETON:  Oh, not at all, Your Honor.  But I do

22  think that breaking exclusivity would move this case forward.

23  And that was what I wanted to address there.  To me -- and

24  perhaps, this is because my background is as a wildfire lawyer.

25      THE COURT:  Um-hum.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    MR. SINGLETON:  I mean, I've settled thousands of

2   wildfire cases, so I'm very familiar with how it's done.  We've

3   settled over 700 --

4    THE COURT:  Hold on --

5    MR. SINGLETON:  -- with PG&E.

6    THE COURT:  -- Mr. Singleton.  Are we losing the feed

7   again?

8    THE CLERK:  Yes, there's a network error.

9    THE COURT:  Why does this keep happening?

10    Sorry.  I didn't --

11    MR. SINGLETON:  Oh, no problem.

12    THE COURT:  Well, I mean, it's -- I don't like the

13   delay, but we haven't had this technical problem before with

14   the other courtroom.  It just takes a second to revive it, and

15   let's do it.  There are a number of people --

16    MR. SINGLETON:  Sure.

17    THE COURT:  -- over there that are trying to listen in

18   on this.

19    MR. SINGLETON:  I was actually --

20    THE COURT:  Okay.  They're back.

21    MR. SINGLETON:  -- there before --

22    THE COURT:  Go ahead.

23    MR. SINGLETON:  -- the Court called this one.  Thank

24   you.

25    THE COURT:  Okay.

PG&E Corporation & Pacific Gas And Electric

1          MR. SINGLETON:  So this is --

2          THE COURT:  Well, let's -- go ahead, Mr. Singleton.

3    We'll --

4          MR. SINGLETON:  Thank you.  This is a perspective of

5    somebody who deals on a day-to-day basis with settling wildfire

6    cases.  What we're not seeing -- and as far as I can understand

7    from my conversations with the people on the tort committee and

8    tort committee counsel, and I understand there's certain things

9    they can't share -- but what we're not seeing is any movement

10   toward what needs to be done to resolve these cases.  And

11   again, the debtor says this in their own filing.

12         They say, we're hopeful that a consensual resolution

13   of the liability issues can occur.  But if it doesn't, we're

14   going to need the Court's intervention.

15         And that, to me, is the real problem, because there

16   are two issues you have to resolve to resolve a wildfire case.

17   Obviously, you have to resolve liability, which applies to

18   all --

19         THE COURT:  Of course.

20         MR. SINGLETON:  -- of the plaintiffs.  And then you

21   have to resolve the individual damages claims, and this was a

22   point made by counsel for one of the committees -- I forget

23   which one it was -- the Jones Day gentleman.  But he said that

24   we haven't provided him with or we haven't provided PG&E with

25   specific numbers, and that's very true.  We haven't, but that's

PG&E Corporation & Pacific Gas And Electric

1   the second step of what needs to happen.

2           So looking at it strictly from a wildfire

3   perspective -- and I concur with Ms. Dumas that that is why

4   we're here, obviously, if these fires wouldn't have happened,

5   PG&E --

6           THE COURT:  Of course.

7           MR. SINGLETON:  -- would not have declared bankruptcy.

8           THE COURT:  Of course.

9           MR. SINGLETON:  So how do you resolve them?  There are

10  twenty-one fires involved here.  We have the 2015 Butte Fire.

11          THE COURT:  No, I'm aware of them.

12          MR. SINGLETON:  Certainly.  Okay, so --

13          THE COURT:  I don't have all twenty-one of them

14  memorized, but I'm aware of them.

15          MR. SINGLETON:  Understood, Your Honor.  Of those

16  twenty-one, CAL FIRE has determined that PG&E's equipment

17  started twenty --

18          THE COURT:  Um-hum.

19          MR. SINGLETON:  -- and then there's the Tubbs Fire.

20  Well, from my perspective, the thing we need to know first and

21  foremost is what PG&E is going to do about Tubbs.  And we had

22  the opportunity at the creditors meeting -- I asked their CFO

23  on two different occasions -- the first hearing, which I

24  believe was in February or March, and then the second one,

25  which was at the end of April, April 29th -- and I said to him,

PG&E Corporation & Pacific Gas And Electric

1  what are you going to do about Tubbs and the liability?

2  Because if they're not going to admit liability, then we need

3  to start litigating that.  We need to start doing it seriously

4  right now.  And their response was, it's too early for us to

5  give you an indication as to what we're going to do about

6  Tubbs.

7       Well, Your Honor, I mean, that's hogwash.  It really

8  is ridiculous.  It's been eighteen months since the fire.  They

9  know what their contentions are, and they know what they're

10  going to do.  To me, if the Court --

11       THE COURT:  Well, but --

12       MR. SINGLETON:  Go ahead.  Certainly.

13       THE COURT:  We start on January 29th in this case, and

14  so today is May 22nd.

15       MR. SINGLETON:  Okay.

16       THE COURT:  That's the world that I live in and the

17  bankruptcy lawyers that are here behind you are living in.  So

18  I don't minimize what happened since the Tubbs Fire until

19  January 28th, but the rules changed on January 29th.  And the

20  claims process and the way the claims can be dealt with are

21  different.  I mean, look, your office is involved in the Butte

22  Fire from 2015.

23       MR. SINGLETON:  Right.

24       THE COURT:  And you know how they have progressed, and

25  I'm aware of your frustration as to why the finite number of

PG&E Corporation & Pacific Gas And Electric

1  victims there haven't been treated a little differently.  But

2  that's on the list of the debtors' counsel's to-do list.  He's

3  got them all on there.

4         MR. SINGLETON:  Your Honor, I certainly understand,

5  but the concern that I have, and I believe -- I don't want to

6  speak for her -- but I believe Ms. Dumas' concerns as well, is

7  that they haven't addressed this.

8         THE COURT:  Okay.  So what would happen in the

9  layman's term, in a non-bankruptcy person, a fire specialist

10 who you are -- what would happen in your mind if I determine

11 exclusivity?

12        MR. SINGLETON:  Well, I think what --

13        THE COURT:  What would tomorrow bring for you and your

14 clients in this bankruptcy case?

15        MR. SINGLETON:  Well, I think tomorrow obviously is

16 going to look very much like today, as the Court said.  But the

17 question is, in the next few months what's going to happen?  To

18 me, PG&E would immediately begin negotiating with the fire

19 claimants to do things:  number one, determine whether or not

20 they are going to admit liability --

21        THE COURT:  But do you --

22        MR. SINGLETON:  Go ahead.

23        THE COURT:  Do you think that breaking exclusivity,

24 which is something that exists only in the bankruptcy world --

25        MR. SINGLETON:  Um-hum.

PG&E Corporation & Pacific Gas And Electric

1        THE COURT:  -- the rest of the world has never even

2   heard of the concept -- do you think suddenly that changes

3   their need to quantify their exposure on Tubbs?

4        MR. SINGLETON:  Absolutely not, Your Honor.

5        THE COURT:  Okay.

6        MR. SINGLETON:  What I think it would lead them to do

7   is to begin having the serious discussions which they admit on

8   three separate occasions in their papers they haven't had yet.

9   One thing that I do give them credit for is in their papers,

10  several different times, they state, we have not had any

11  substantive plan discussions.

12       THE COURT:  But I can't make their counsel tell me how

13  they are planning to go about dealing with the Tubbs Fire

14  victims as distinguished from, say, the Camp Fire victims --

15       MR. SINGLETON:  Yeah, absolutely not.

16       THE COURT:  -- if there's going to be a difference.

17  Maybe there isn't.  I don't know.

18       MR. SINGLETON:  Understood, Your Honor.  What I think

19  the Court could do -- and this would just be a suggestion

20  looking at it from the outside -- is to say, if you want a

21  continuance of this exclusivity period, you're going to have to

22  show some progress.  For example, on a date certain, you have

23  to let the plaintiffs know which fires you will be contesting

24  liability on, and it could be all twenty-one.

25       But that would be something that would be very

PG&E Corporation & Pacific Gas And Electric

1    beneficial to us.  If they're allowed to have this additional

2    six months where we don't know what they're doing and they

3    don't have any requirements, then they can simply come back six

4    months from now and say again, we're not sure what we're going

5    to do.  Whereas if you end exclusivity, or as I think is much

6    more likely, the Court extends exclusivity but puts some

7    conditions on it -- to me there are two key conditions.

8          One would be to have them state by a date certain

9    which fires they are going to contest liability on so that we

10   can then decide, are we going to send those back, for example,

11   to Superior Court; are we going to have a trial in front of

12   Judge Alsup; are we going to have a trial in front of this

13   Court; how are we going to do that?  Because as I understand

14   bankruptcy law, that's something that this Court is going to

15   have to decide, and there is no formula for it.

16         THE COURT:  There are all sorts of ways to deal with

17   it.

18         MR. SINGLETON:  Certainly.  Certainly.

19         THE COURT:  And they aren't necessarily limited to the

20   choices that you gave.

21         MR. SINGLETON:  Understood.  Understood.

22         THE COURT:  Okay.  And talk to the victims -- I mean,

23   people like Ms. Dumas who are familiar with the mass tort

24   resolutions in cases like Robins (phonetic) and Manville

25   (phonetic) and other situations that are more like this case.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          MR. SINGLETON:  Understood.

2          THE COURT:  All right.

3          MR. SINGLETON:  The second thing that I think would be

4    very beneficial is for the Court to set a date by which both

5    sides -- that would be the plaintiffs and the defense -- are to

6    give their proposed plans on how we're going to resolve the

7    specific amount of each claim, because that really is the main

8    question here -- is, we know what the claims generally are, but

9    in terms of what the amount of those damages are and what we

10   need in order to liquidate the claims, obviously the plaintiffs

11   are going to say it's 10X, and PG&E is going to say it's 2X.

12         So we've got to come up with a solution.  I assume

13   that solution is not going to be that this Court would

14   entertain 14,000 civil jury trials.

15         THE COURT:  I don't think I'd be able to.

16         MR. SINGLETON:  Understood.  So I think what has to

17   happen there is there has to be a provision worked out, whether

18   it's a mediation protocol and then you would be eligible for

19   arbitration -- whatever that is.  My point is --

20         THE COURT:  Now you're --

21         MR. SINGLETON:  Sorry.

22         THE COURT:  Now you're getting down into the details.

23         MR. SINGLETON:  Understood.

24         THE COURT:  Let's stick with the question.

25         MR. SINGLETON:  Sure.

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  Do you want to have anything further on

2  the exclusivity issue?  Because that's -- I mean, sure, I could

3  condition a grant of exclusivity or extension of it on some

4  kinds of things, but I don't want to try to get down into the

5  details.  These are great, big, broad stroke brush questions

6  that I can't get down to specific --

7          MR. SINGLETON:  Understood, Your Honor.

8          THE COURT:  Okay.

9          MR. SINGLETON:  If I could just -- I'll certainly move

10  off that.

11          THE COURT:  Yes, sir.

12          MR. SINGLETON:  And I had a couple of other

13  observations --

14          THE COURT:  Okay.

15          MR. SINGLETON:  -- if the Court would indulge me.

16          THE COURT:  Yeah, I will.

17          MR. SINGLETON:  In terms of the amount of time,

18  everyone is focused on the size of it, and I completely

19  understand.  And I understand the Court when the Court says

20  January 29th was the first day.  But I know the Court is also

21  aware of some of the practical human situations here.

22          For example, many in the Butte Fire -- just to give

23  you one example, I represent a woman --

24          THE COURT:  No, I know you do.  I mean, I don't know

25  the specifics --

PG&E Corporation & Pacific Gas And Electric

1      MR. SINGLETON:  I was just --

2      THE COURT:  -- but I remember --

3      MR. SINGLETON:  Yeah.

4      THE COURT:  -- the particular number of people that

5  were there.

6      MR. SINGLETON:  Just to give you an example though,

7  there was someone who didn't have insurance.

8      THE COURT:  Um-hum.

9      MR. SINGLETON:  Her settlement was reached.  It did

10  not fund because PG&E declared bankruptcy.  So that's an

11  individual who from 2015 still doesn't have a home because she

12  was uninsured and she lost it, and PG&E did not honor its

13  commitment.

14      THE COURT:  No, I understand.

15      MR. SINGLETON:  So you look at 2017, as Ms. Dumas

16  said, there are thousands of families who are going to lose

17  their alternate living expenses, which is how rent is paid when

18  you're rebuilding in October of 2017 -- I'm sorry, 2019.  And I

19  think what all of us are concerned about is there does not seem

20  to be any urgency on the part of PG&E, and that's what I think

21  we would like to see put in.

22      And the last thing that I would say, Your Honor, is

23  that -- and this is something again Ms. Dumas touched on -- but

24  there is a difference here between PG&E the utility and PG&E

25  the company.  PG&E --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    THE COURT:  The parent, yes, I know that.

2    MR. SINGLETON:  Right.  PG&E the utility's been here a

3    long time.  They keep the lights on.  They employ tens of

4    thousands of people.  PG&E the company exists -- they're the

5    ones that paid out 4.5 billion, as Judge Alsup noted in

6    shareholder --

7    THE COURT:  No, I'm --

8    MR. SINGLETON:  -- disbursements --

9    THE COURT:  I'm aware of that.

10   MR. SINGLETON:  -- certainly -- while this was

11   happening.  So if they were to go out of business as opposed to

12   the utility, that would not necessarily be a bad thing.  And

13   one of the things that to me is the most disturbing is for PG&E

14   to come in here and say, we need two things.  One is a bailout

15   from the taxpayers, and the other is changes in the liability

16   laws in order for us to be viable.

17        That is a real concern, and the thing that I want to

18   caution the Court on is obviously no one has a crystal ball,

19   but certainly all of us do vote-counting and all of us are very

20   involved in what's going to happen in the legislature.  And I

21   would be very surprised if PG&E gets this change in liability

22   laws that they seem to be banking on.

23        So I think that, when we're talking about a plan, PG&E

24   is attempting to use this process to get those two things they

25   want, the bailout and the changes in liability laws.  I don't

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    think it's going to happen, and I think it is very important

2    that we look forward and prepare for a future where, come July

3    or whenever it is they vote on this, they don't get the votes

4    and we have to do a plan that exists under current law.

5            THE COURT:  Okay.

6            MR. SINGLETON:  So thank you.

7            THE COURT:  Thank you, Mr. Singleton.

8            All right.  By my count --

9            MR. FELDMAN:  Your --

10           THE COURT:  Yes, sir.

11           MR. FELDMAN:  Your Honor, again it's Matthew Feldman

12    from Willkie Farr.  Could I be heard very briefly?

13           THE COURT:  Well, I was just going to say -- I was

14    going to ask if there's anyone else that wanted to be heard,

15    and you're up.  Go ahead, Mr. Feldman.

16           MR. FELDMAN:  Thank you.  Your Honor, I wanted to make

17    one comment to correct the record and one other comment.  Your

18    Honor, we have in fact filed a 2019 statement with respect to

19    our group.  And while Baupost is a member of our group, I think

20    the 2019 stands for itself, and Ms. Dumas' comments are not

21    really accurate.  But I'll leave that to people who want to

22    look at the 2019.

23           With respect to Mr. Karotkin's representations with

24    respect to our group, we don't contest anything Mr. Karotkin

25    said earlier.

PG&E Corporation & Pacific Gas And Electric

1     Finally, Your Honor, we do share people's concerns

2  about the length of exclusivity and would prefer a shorter time

3  period.  But we certainly accept the Court's point that, if

4  there comes a time when we are able to put forward a viable

5  plan, notwithstanding exclusivity not being shortened or

6  terminated, we certainly plan to be back before the Court with

7  that plan and argue at that time that we ought to be entitled

8  to file it and prosecute it.

9     With that said, Your Honor, again we favor a somewhat

10  shorter time period.  We think long deadlines just fill

11  themselves, but we leave it to the Court's discretion.  Thank

12  you.

13     THE COURT:  Okay.  Thank you, Mr. Feldman.

14     Mr. Karotkin, do you wish to make any closing comment?

15     MR. KAROTKIN:  Thank you, Your Honor.  Stephen

16  Karotkin, Weil, Gotshal & Manges for the debtor.  I think that

17  you made quite a telling remark earlier when you said -- and I

18  think this is almost exactly your words -- it's inconceivable

19  that even if all of the problems were resolved tomorrow, it

20  would still be a long time before the debtor could file a

21  viable plan or get -- or reasonably --

22     THE COURT:  I'm just thinking about the book you'd

23  have to do.  That's all.

24     MR. KAROTKIN:  Okay.  But I think that sort of puts

25  where we are in perspective.  And I think with respect to Ms.

PG&E Corporation & Pacific Gas And Electric

1    Dumas' comments, we want to work with their committee to try to

2    reach a consensual resolution.  We want them to help us get the

3    information necessary to do that, and that's why we will be

4    with them this afternoon.  So far, they're resisting it.  They

5    have an entire database of information which they're not

6    willing to turn over to us.  We want to get moving.  We want to

7    get the victims paid as soon as possible.

8            The gentleman from the Singleton Law Firm is

9    suggesting that these claims should go back to the state court

10   system, where it would take years to resolve.  What we want to

11   do here is get a resolution like in other mass tort cases,

12   where we can propose a plan, perhaps fund a trust so

13   distributions can be made a lot faster than the tort system.

14   And we're hopeful that in the negotiation process, if we have

15   that opportunity, we're confident we can reach a consensual

16   plan.

17           THE COURT:  Listen.  It's not my role to tell

18   experienced lawyers how to behave, and I'm not going to tell

19   you how to behave.  But you might want to have a one-on-one

20   conversation with Mr. Singleton just to explain to him what you

21   just touched on with me, that he may think that you are going

22   to send all this stuff back to the superior courts or to Judge

23   Alsup or to me, and he may hear it from you about your outlines

24   of trusts and channeling and claims estimation in the

25   aggregate.  But that's neither here or there.  So I'm really

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    not telling you what to do, but it might be helpful just to --

2              MR. KAROTKIN:  I'm more than happy to have a

3    conversation with him.

4              THE COURT:  -- just to have a conversation with him,

5    which is not to say not to talk to the entire official

6    committee and their counsel.  Okay.  I got you --

7              MR. KAROTKIN:  Thank you.

8              THE COURT:  -- Mr. Karotkin.

9              Listen.  I'll repeat what I said early to Ms. Dumas

10   and her clients.  The fact that I happen to have been the judge

11   in the prior case is a fact, and I'm not making decisions today

12   based upon what was made in the prior case, because as she

13   said, we didn't have the fire victims.  We did have a large

14   number of tort claimants, but they were not the reason why the

15   bankruptcy was filed.  And in fact, there was a discrete

16   category of people that perhaps would have never been otherwise

17   in the state court if the other bankruptcy hadn't occurred.

18             But the point is there was a relatively large --

19   nothing by these numbers -- set of tort claimants that had to

20   be dealt with in a different way.  But in this case, I am

21   mindful of what the tort victims have been through -- not

22   personally what they're through, other than to read their

23   accounts and hear from them -- and I'm not going to sort of

24   make rules today that are based upon what happened in a case

25   that, for the most part, had nothing in common with what these

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    victims have been putting up with and exposed to.

2         But for today, it's a discrete question.  I am mindful

3    of the different points of view.  It should come down to a

4    simple matter of picking a number and a date.  I'm going to

5    stick -- my instincts were to go with the debtor this morning,

6    but I'm going to go with the recommendation of the official

7    creditors committee, because again I don't minimize the role

8    played by the tort claimants and what they want to have done.

9         The door is half open to the ad hoc committee, the

10   tort claimant committee, or any other party who believes

11   there's a way to come up with a credible, potentially

12   confirmable plan, other than what the debtors' counsel may

13   have.  And whether that may or may not involve legislative

14   change isn't for me to talk about, and the legislature will do

15   what it chooses to do or not do what it chooses not to do.

16        But the official creditors committee's position is

17   kind of a combined point of view from those expressed by

18   others.  So I'm not doing this as a mathematical compromise.

19   I'm doing it from both history and also the point of view that

20   Mr. Bray expressed, and I think it's a compromise.  It is a

21   signal to the debtor, get on with it, but the debtor's lawyer

22   said they're already on with it.  I believe them.  If Mr. Bray

23   and the official creditors committee have a way to move things

24   along, that's fine, and I will keep open about either

25   shortening the time if there's reason to do so or extending the

PG&E Corporation & Pacific Gas And Electric

1    time if there's reason to do so there.

2           So I will grant the motion by the debtor but only with

3    a four-month extension.  I will ask Mr. Karotkin and Mr. Bray

4    just to submit a simple form of order.  It's very simple.  It

5    doesn't need findings or conclusions or legal reasoning.  It

6    can be just, in my discretion based upon the matters that were

7    discussed today and the arguments of counsel and of the

8    parties, that's what I choose to do.

9           I think it would be a good idea to take a break just

10   for everyone's personal convenience, and then we'll deal with

11   the wildfire assistance.

12          Mr. Karotkin, I assume you -- and Ms. Dumas -- you

13   want to have ample time for your clients to be heard and the

14   other parties, and so we should anticipate running into the

15   noon hour.  You don't want to break until the afternoon, right,

16   because you've got your meetings planned?

17          MR. KAROTKIN:  No, sir.

18          THE COURT:  Okay.

19          MR. KAROTKIN:  We will not be very long.

20          THE COURT:  Okay.  Then we'll take a ten-minute break,

21   but every time I promise a ten-minute break it turns out to be

22   about fifteen minutes.  But I will see you in ten minutes.

23   Thank you.

24          (Recess from 10:56 a.m., until 11:03 a.m.)

25          THE COURT:  They're all paying no attention to me.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          So we bang on the gavel?

2          No, they're coming back in.

3          Okay, we're ready to resume.  And for people in the

4   overflow courtroom, the mothership in Washington is aware of

5   our problems with the hookups, and we'll do our best.  If we

6   lose the connection to the courtroom next door, we'll just hold

7   things until we can restore it.  But at least now, it's back in

8   place.

9          So we'll resume the debtor's motion for the wildfire

10  assistance program.

11         Mr. Karotkin, I've got a couple of preliminaries,

12  unless you want to make a preliminary comment or a statement.

13         MR. KAROTKIN:  I'll make a very preliminary comment.

14  Your Honor, we believe that the pleadings are self-explanatory.

15  They explain what we would like to do.  We are ready, willing,

16  and anxious to fund the assistance fund as described in the

17  pleadings.  We are willing to fund the 105 million dollars.

18         We are not willing to commit to any more than that.

19  We don't believe there is a basis to compel the debtor to fund

20  more than it is voluntarily willing to do.  To the extent that

21  the Court believes that there is some merit to Mr. Julian's

22  cross-motion, as we said in our response of pleadings, that can

23  be set for another hearing.

24         We are open to some constructive consultation rights

25  by the UCC and by the tort committee but are concerned about

PG&E Corporation & Pacific Gas And Electric

1    expense and delay in that regard, because we are anxious for

2    disbursements to be made by the administrator from the fund.

3    But again, we're happy to work with them on those consultation

4    rights if that will move it forward.

5            And as I said, we're anxious, we're ready, we're

6    willing to fund the 105 million dollars.  That is our

7    commitment.

8            THE COURT:  And what are the specifics about

9    identification of the administrator?

10           MR. KAROTKIN:  We've spoken with the unsecured

11   creditors committee and with the tort committee with respect to

12   a few potential candidates.  I believe -- and Mr. Julian can

13   correct me -- I think that the tort committee has agreed with

14   us on one potential candidate, and I don't know the status of

15   the discussions with the unsecured creditors committee.

16           THE COURT:  Okay.  Well, let me make some preliminary

17   comments, and then I'll hear from anyone who wants to be heard.

18   First of all, it's important to note that there simply has been

19   no opposition to the motion, which is a good thing, and I am

20   not opposed to it.  And therefore I think I'll be granting it

21   in some fashion.

22           I agree with Mr. Karotkin the so-called cross-motion

23   by the tort claimants committee is -- leaving aside whether it

24   was procedurally proper, I don't think there's any provision in

25   the law that permits it, so I have no discretion there.  The

PG&E Corporation & Pacific Gas And Electric

1    debtor has voluntarily chosen to come forward and offer to put

2    up in round numbers the hundred million dollars plus the five

3    million dollars to administer the fund, and I cannot under any

4    theory of the law second-guess or impose an increased amount.

5         And I do think that the comments from the various

6    creditors -- the United States Trustee, the International

7    Brotherhood, and the official creditors committee -- needs to

8    include some safeguards.  I had in mind that perhaps if I'm

9    asked to select the administrator that that would be my job,

10   but if the parties can come to an agreement on who that person

11   is, that's better.

12        What I would want to happen, unless someone thinks it

13   would be inappropriate, would be for that person to be

14   identified promptly, and that person then meet promptly with

15   perhaps a subcommittee of representatives from the two

16   committees and the debtor and the United States Trustee, if the

17   United States Trustee wishes to participate, to come up with

18   some specific rules of procedure.

19        I do agree that the debtor and the official unsecured

20   creditors committee are correct; this has to be a dollar-for-

21   dollar basis.  To me it's not -- what I mean by that is that,

22   if money is paid to a victim, there has to be some credit

23   forward at some point, and it has to be treated as on account

24   of a claim that that victim has.

25        I don't want to diminish the importance of proper

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    claims, but in my experience in lots of cases where there are

2    mass torts and compensation procedures, there are a small

3    number of claimants who aren't claimants.  So there has to be

4    some provision to make sure that the people who are asserting a

5    claim under this procedure are proper claimants rather than

6    improper ones.

7         And I simply disagree with Mr. Julian and the tort

8    committee that there has to be some sort of confidentiality of

9    the identification of who the recipient is or what the

10   recipient gets.  The fact that PG&E did this in 2015 in the

11   Butte Fire is a historical fact, but the company wasn't in

12   bankruptcy, which we spent the morning talking about whether

13   there could be a plan.  If there is a plan, people who want to

14   participate under the plan will have to have claims, claims

15   under penalty of perjury, claims subject to objections if

16   they're improper, or claims that must be reduced on account of

17   payments that were made that would necessarily as a matter of

18   law reduce the claim.

19        So I don't mind making sure it's not in the front page

20   of the newspaper that a particular person gets a certain amount

21   of money, but there has to be an accountability from the debtor

22   at least in the court records that reflects something of that

23   nature.  And so I think it'll be my hope that the administrator

24   and representative have a working group to figure out what the

25   appropriate rules of procedure be and agree with what you said,

PG&E Corporation & Pacific Gas And Electric

1  Mr. Karotkin -- get on with it.

2          The faster we can get this process moving, the better.

3  And if we had an administrator today, I would congratulate that

4  person and say, go into the conference room and sit down with

5  the committees and outline the ground rules.

6          So Mr. Karotkin, unless I've said something that

7  offends you, let me hear from the opponents here, and then I'll

8  certainly give you an opportunity to respond.  You want to --

9          MR. KAROTKIN:  No, no, I --

10          THE COURT:  Did I say the wrong thing?

11          MR. KAROTKIN:  You didn't offend me today, sir.

12          THE COURT:  Okay.  I'll do it on some other day.

13          MR. KAROTKIN:  No, we totally agree, and we're more

14  than happy to sit down -- once we have an administrator, sit

15  down and work out the details with the subcommittee as you

16  suggested.

17          THE COURT:  And I don't think it's helpful to get into

18  a bankruptcy lawyer debate about if I authorize this -- which I

19  said I will -- whether it's under 363 or whether it's under

20  some other section of the bankruptcy code or 105 or whatever.

21  It's an appropriate remedy.  There are others that will claim

22  it's not enough money, but that's not the point.

23          And certainly we don't want a situation that occurred,

24  for example, in the Robins case back so many years ago, when

25  the court on appeal was presented with a challenge because

(9706251) operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    there were objectors to that proposal for paying various

2    victims then.  Here, there don't appear to be any challenges,

3    and therefore it's important to go on with it.

4            So I wouldn't necessarily worry about a label.  I

5    would say that we're doing the right thing, and making payments

6    to persons who are entitled to be paid under the law, and

7    getting on with it as soon as we can.  And by the way, the one

8    thing that became obvious to me as I thought about this and

9    read the debtor's motion again is that there may be two victims

10   side by side, one of whom is far more needy than the other.

11   One may have insurance, one may not.  One may not have lost a

12   primary residence but in fact lost some other valuable asset,

13   and the other having lost a principal residence and no other

14   option.

15           So this is a procedure that is ad hoc in the sense

16   that it's taking care of exigent circumstances under exigent

17   conditions for the people most needy.  And therefore a next

18   door neighbor might not get a short-term remedy under this

19   proposal, because his or her situation is different.  And

20   that's for the administrator and the proponents and what I

21   would hope would be a working committee of people to make these

22   rules and put them in place and implement them.

23           So with that, I'll ask for -- Mr. Julian, are you

24   going to do the work today, or are you going to let --

25           MR. JULIAN:  Yes, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  Ms. Dumas -- you're not letting her have

2    it, right?  You want at me on your own.  All right.

3          MR. JULIAN:  Robert Julian of Baker Hostetler

4    appearing on behalf of the tort committee.  Your Honor, we have

5    never formally introduced you to the chair of the tort

6    committee.

7          THE COURT:  Actually, I have.

8          MR. JULIAN:  Ms. --

9          THE COURT:  I think she was at a prior hearing.

10         MR. JULIAN:  -- Karen Lockhart, if you would stand up.

11         THE COURT:  Thank you, Ms. Lockhart.  Appreciate your

12   coming here and all the folks with you.  I'm glad you came.

13         MR. JULIAN:  She lost her father in the Cascade Fire,

14   and we also have Angela Loo --

15         THE COURT:  Thank you for coming, Ms. Loo.

16         MR. JULIAN:  -- lost her father and brother in the

17   Camp Fire.  Also with us is a third member of the committee,

18   Greg Wilson.

19         Stand up.

20         THE COURT:  Mr. Wilson, thank you for coming.

21         MR. JULIAN:  He and his wife, Christina (phonetic),

22   survived after living in their pool in the North Bay as the

23   fire raged over them and burned them and believing they were

24   going to die.  And they're helping us with this case, Your

25   Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1        THE COURT:  Appreciate their efforts.

2        MR. JULIAN:  I would like to first clear up -- before

3    addressing the business judgment rule and two legal points that

4    I'm going to ask you to rule upon today, I would like to clear

5    up the fact that in our joinder objection and cross-motion, we

6    consented that the administrator should turn over the names and

7    the dollar amount to PG&E so that they could determine whether

8    there should be a deduct in this case on the claims.

9        What we objected to was PG&E's attempt to obtain claim

10   information and confidential information from these people on

11   the application form submitted to the administrator.

12       THE COURT:  But they'd have to do that with FEMA,

13   right?  And they'd have to do it with other governmental

14   programs.  I mean, I was recently involved in a case where a

15   woman was ripping off the State of Oregon because she falsified

16   her employment records in order to get welfare checks.  I mean,

17   it's just normal when you ask for relief, certainly from a

18   governmental agency -- this is not a governmental agency -- you

19   have to say why you're entitled to it or show what would

20   disqualify you from getting it.  What's so different about

21   that?

22       MR. JULIAN:  They will get that information in

23   discovery in this case and --

24       THE COURT:  But why in discovery?

25       MR. JULIAN:  -- it will show --

PG&E Corporation & Pacific Gas And Electric

1   THE COURT:  But why in discovery?  Why not -- listen,

2   if Ms. Dumas persuaded me to break exclusivity an hour ago and

3   I did, and the debtor filed a plan tomorrow and there was a

4   claim's deadline, every one of the victims would have to file a

5   proof of claim and be subject to whatever proper inquiry as to

6   the entitlement to the claim.

7   MR. JULIAN:  We disagree, Your Honor, and I'd like to

8   move to the next point.

9   THE COURT:  What's different about that?  But what's

10  different about that?

11  MR. JULIAN:  This is a company that today is serving

12  illegal questionnaires on our clients in the camp fire

13  attempting to find out information.

14  THE COURT:  Well, I don't know about that.

15  MR. JULIAN:  Well, Your Honor, I feel we've lost the

16  moral center of this case.  This company that's trying to

17  obtain the information is a convicted felon three floors up

18  above us.

19  THE COURT:  Mr. Julian, let's focus on today's motion.

20  The procedure is a procedure to get a hundred million dollars

21  out to your constituents.

22  MR. JULIAN:  May I turn to two the legal points --

23  THE COURT:  Let's stick with that.

24  MR. JULIAN:  -- I'm going to ask you to rule upon?

25  THE COURT:  Go ahead.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    MR. JULIAN:  The first question is, do the debtors

2  need to comply with California law once they establish a

3  program?

4    THE COURT:  I know your argument the California law

5  was persuasive.  This is a federal bankruptcy court.  And the

6  federal bankruptcy court, which is federal law, says the order

7  of distribution -- if you want me to impose an order of

8  distribution, I'll be forced to deny this motion.  You don't

9  want me to do that.

10    MR. JULIAN:  Well, then --

11    THE COURT:  I don't want to do it.  So --

12    MR. JULIAN:  May I address that, Your Honor?

13    THE COURT:  So let's not forget that the federal court

14  has a section called 507 that says how people get paid, and we

15  are going to have an anticipation -- we're going to pay a

16  hundred million dollars in anticipation of complying with 507

17  and all the priority scheme of the Bankruptcy Code.

18    MR. JULIAN:  May I address that?

19    THE COURT:  Yes, sir.

20    MR. JULIAN:  You've just raised whether the debtors'

21  business judgment permits it to do what it can under 363(b).

22    THE COURT:  Um-hum.

23    MR. JULIAN:  They are not doing this out of the

24  goodness of their heart.  As you heard Mr. Karotkin say,

25  there's a gating issue in this case with respect to obtaining

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  legislative relief.  And in their 10Q that they filed on May 2,

2  which I attached to my declaration, they identified the

3  governor's strike force recommendations for three legislative

4  proposals that they need in order to reorganize in this case.

5  The liquidity fund that can bridge Senate Bill 901 funding,

6  changes in the law with respect to inverse condemnation, and a

7  wildfire victims fund to stabilize California for future fires

8  that will help the credit rating of this company and other

9  utilities.

10        THE COURT:  Um-hum.  Right.

11        MR. JULIAN:  And it is important that they cannot

12  obtain that legislative relief in their view, which is why they

13  filed this motion, unless they get the support of our victims,

14  the legislator, and the governor.  And they are a pariah in

15  Sacramento.

16        And it's important, Your Honor, for you, I believe, to

17  hear us out on why they need this in order to reorganize and

18  why it is business judgment and it is a post-petition expense

19  for them, just like they hired a PR representative or made a

20  charitable contribution which is, if you read the declaration

21  of Mr. Williams, their answer to our interrogatory, why they're

22  doing this.  They're not doing it out of the goodness of their

23  heart.

24        They need our consent.  They need our support in

25  Sacramento.  And the reason why they need our support in

PG&E Corporation & Pacific Gas And Electric

1    Sacramento is because they admitted in their PUC testimony in

2    2015, right before the 2015 Butte Fire happened, that when a

3    catastrophic event like this happens, it produces, quote --

4    this is attached to my declaration of Exhibit A -- it produces

5    "devastating nationwide broad-based political pressure

6    demanding intense long term outreach to policymakers and key

7    stakeholders....  Relationships are severed... trust is

8    completely lost."

9         They did not file this in order to pay a pre-petition

10   claim.  They filed it as a business expense to obtain the

11   consent of the legislators and the governor who is charading

12   them or shredding them in his weekly announcements.

13        Just two weeks ago, three floors above, Judge Alsup

14   stated, quote -- this is attached to my declaration as Exhibit

15   G, the hearing transcript of the sentencing of PG&E for

16   willfully concealing the Butte County's investigation of

17   whether they committed homicide --

18        THE COURT:  Lower your voice.  Come on.  You are an

19   officer of the court.  Do not raise your voice.

20        MR. JULIAN:  Thank you, Your Honor.

21        Judge Alsup, I just -- "I just don't think PG&E has

22   put safety first."  That's today.  Then, "PG&E directors and

23   PG&E senior executive leadership were ordered to meet with

24   local officials in Paradise, California in San Bruno, including

25   tours of those communities, so the leadership can see the

PG&E Corporation & Pacific Gas And Electric

1    gravity of what happened up there."

2          I feel the professionals on this side of this podium

3    have lost sight of the moral center of this case that Judge

4    Alsup has focused on and that he is forcing the new leadership

5    of PG&E to go up there to Paradise to learn what I have, which

6    is why I feel so passionately about this case and I feel I must

7    address this issue --

8          THE COURT:  Well, I know --

9          MR. JULIAN:  -- of why this is a business expense.

10         THE COURT:  I'm not faulting you for passion.  I'm

11   going to approach you the same way I approached your colleague.

12   What do you want me to do?  I have two choices today.

13         MR. JULIAN:  Here's what I want to do --

14         THE COURT:  I have three choices.  I can't go with

15   your third choice of increasing the amount.  So I have two

16   choices today:  approve the plan or disapprove it.

17         MR. JULIAN:  May I be heard on that, Your Honor?

18         THE COURT:  Well, by all means, that's --

19         MR. JULIAN:  Well, may I be heard on the two legal

20   points I want you to rule upon?

21         THE COURT:  But I want you -- but at the end of the

22   presentation, you have to give me your recommendation for your

23   client.

24         MR. JULIAN:  I am.  I will do so, but I feel I --

25         THE COURT:  Go ahead.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      MR. JULIAN:  Your Honor, we have forty victims here

2   today.  I think we're entitled to be heard.

3      THE COURT:  Mr. Julian, if you had no victims here

4   today, I'm listening to you.

5      MR. JULIAN:  All right.

6      THE COURT:  I'm just trying to keep your focus not on

7   Judge Alsup, not on the board of directors.  On my assignment

8   today I have to go yes or no on a motion by this debtor to pay

9   a hundred million dollars to your constituents.

10     So that's the focus.  You can make your further

11  argument.  I'm not going to -- I'm not mad at you.  I enjoy

12  your advocacy.  I just don't want you to yell at me.  So make

13  your argument.

14     MR. JULIAN:  Your Honor, if the debtors asked you to

15  approve the sale of the headquarters of PG&E's office here in

16  San Francisco and build a new, cheaper office in Walnut Creek,

17  and you approved it under Section 363(b)(3), they would have to

18  comply with California State Law to get the permit.

19     THE COURT:  Correct.

20     MR. JULIAN:  And I would like this Court to rule on

21  whether on my point that the victim assistance law and the Good

22  Samaritan laws in this state are entitled the same dignity as

23  the building permit in Walnut Creek.  Once they -- their

24  motion, Your Honor, is not to fund 105 million dollars.  Their

25  motion is in two parts.  And you have the discretion to rule my

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    way and help these people today.

2          Look at their motion, the first page; it says to

3    approve a program and then to approve funding.  I am not being

4    cute when I broke that up into two parts.  It's just like

5    approving the building in Walnut Creek and then going out and

6    getting the permit.

7          THE COURT:  I'm having trouble with the analogy.  I'm

8    a great analogizer (phonetic), but I don't understand the

9    analog7.  So let's --

10          MR. JULIAN:  Here's my analogy:  once they approve the

11    program, they have stepped into the box, and again, they're

12    approving the program to get their plan approved with victim

13    assistance and legislators.  It's a post-petition operating

14    expense.  I don't even think it's outside the ordinary course

15    of business.  Heck, they did it down there in Butte for the

16    same reason.

17          THE COURT:  They weren't in bankruptcy.

18          MR. JULIAN:  But they --

19          THE COURT:  They weren't in bankruptcy.

20          MR. JULIAN:  But the point is, Your Honor, it's a

21    normal business operating expense, just like charitable

22    contributions and PR expenses are to get legislators.

23          THE COURT:  And so therefore, I should do what?

24          MR. JULIAN:  Here's the point.  Here's the point.

25          THE COURT:  By the way, I already said I don't think

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    we need to get bogged down on what section I'm relying on.

2              MR. JULIAN:  Here's the point:  once they step in the

3    door --

4              THE COURT:  I said -- Mr. Julian, you have to hear me

5    out.

6              MR. JULIAN:  All right.

7              THE COURT:  I said in my opening comment, there were

8    no objections to this plan and I -- proposal,

9              MR. JULIAN:  The creditors' committee did object.

10             THE COURT:  No, they didn't.  They have guidelines.

11   They have procedures.  So I didn't --

12             MR. JULIAN:  They objected to the hundred million.

13             THE COURT:  I'll come back to you.

14             Look, my job is to decide whether to grant this motion

15   or not.  I said that I didn't think it was necessary to decide

16   whether it's under 363 or 105 or some other section.  If you

17   think it is, then that's your point.  But what is the point?

18             MR. JULIAN:  The point is I would like you to rule on

19   my two points that --

20             THE COURT:  Yes.

21             MR. JULIAN:  -- once you establish a program, and

22   you're out there asking one of my clients to walk in the door

23   with his application, you cannot abandon him under the law if

24   you are the one who made him the victim.  And they have

25   admitted --

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  I understand.

2          MR. JULIAN:  -- they have admitted that their

3    equipment did this.  They are culpable.  The only question is

4    whether it's homicide or manslaughter with respect to camp fire

5    because they knew in advance that that tower was going to fail.

6    It's a serious issue, Your Honor.

7          And so once someone who's accused or being

8    investigated and admits culpability because their equipment

9    failed and they seek to assist the victim, under our Good

10   Samaritan laws in California and our negligence standards, they

11   may not walk away.

12         The case that I cited to you involved the truck

13   driver --

14         THE COURT:  No, I know it did.  I looked at the case.

15         MR. JULIAN:  -- who injured a person.

16         THE COURT:  I looked at the case.

17         MR. JULIAN:  He was held liable because he walked

18   away.

19         THE COURT:  It was not a bankruptcy --

20         MR. JULIAN:  They cannot walk away.

21         THE COURT:  It was not a bankruptcy case.

22         MR. JULIAN:  Correct.  And if this was a pre-petition

23   claim, I would agree.

24         THE COURT:  You don't think it's a pre-petition claim?

25         MR. JULIAN:  Not when they need to do it in order to

PG&E Corporation & Pacific Gas And Electric

1    get the legislators --

2         THE COURT:  Well, what if they don't?  What if the

3    legislature tells him, solve your own problems?  Am I to --

4    does that moot the motion?

5         MR. JULIAN:  No.  The directors -- they said in their

6    motion that the directors in senior management met and

7    determined that it would be appropriate to establish the

8    Wildfire Assistance Program to provide some relief to the

9    people who lost their homes and are currently in need of

10   temporary housing or have other urgent needs.  And I'm showing

11   you the evidence.

12        THE COURT:  So your point is then, if I understand you

13   correctly, and this is perhaps why you used your building

14   permit request, that if I grant this -- or that I should order

15   the debtor to make these payments under California law, and

16   therefore, payments made of a fixed dollar amount to a

17   particular victim on account of a particular injury is not to

18   be treated as a payment of that victim's -- a portion of that

19   victim's claim.

20        MR. JULIAN:  Not when they're doing -- yes.

21        THE COURT:  And that's what your position is.

22        MR. JULIAN:  It could be a credit, but they're doing

23   it -- the operating expense is just like paying a lobbyist.

24        THE COURT:  Well, but I'm not --

25        MR. JULIAN:  It's goodwill they're trying to generate.

PG&E Corporation & Pacific Gas And Electric

1    THE COURT:  Mr. Julian, I'm deciding -- the debtor

2   asked me for permission to make this payment, and --

3    MR. JULIAN:  Under their charity.

4    THE COURT:  -- and your position is they have an

5   obligation to do it, but you still haven't answered the

6   bankruptcy question.  Is it or isn't it a payment on account of

7   a pre-existing claim?  What's the bankruptcy answer?

8    The operative document, all the case law, all the

9   Ninth Circuit law says, the operative facts occurred.  The camp

10   fire occurred in November of 2018, so all that flows from that

11   in my mind are pre-petition claims.  Not -- they don't become

12   post-petition claims because of a legal theory, but --

13    MR. JULIAN:  No, they don't.

14    THE COURT:  You tell me, then.

15    MR. JULIAN:  They don't.

16    THE COURT:  So if I authorize the petition -- the

17   request, and I don't try to put a legal code section on it and

18   the debtor hands over a hundred million dollars through this

19   procedure, do you agree that they are credits against any

20   claims that the particular recipients have?

21    MR. JULIAN:  It depends on what the payment's for.

22    THE COURT:  Well, the motion says what it's for.

23    MR. JULIAN:  No.

24    THE COURT:  It's to -- it does indeed.

25    MR. JULIAN:  Your Honor --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    THE COURT:  The motion describes it for replenishing

2    their needs for their housing and other similar causes.

3    MR. JULIAN:  I will --

4    THE COURT:  That's what the motion says.

5    MR. JULIAN:  I will answer that hypothetical this way.

6    THE COURT:  Okay.

7    MR. JULIAN:  If the individual who receives the money

8    has in his claim that he will file here the exact same

9    humanitarian assistance request damage and it's paid, yes, it's

10    a credit.

11    THE COURT:  But what if the victim doesn't file any

12    claim?  Does the victim have a proof of -- have a shareable --

13    an allowable claim in the bankruptcy?

14    MR. JULIAN:  I would have to think about that one,

15    Your Honor.

16    THE COURT:  Well, but I don't have to think about it

17    because all these events occurred pre-petition.  We've been

18    spending time this morning talking about claims bar dates.

19    Unfortunately, the victims that you speak for don't have their

20    names and amounts on the schedules because they're claims are

21    unliquidated for the most part.

22    MR. JULIAN:  I --

23    THE COURT:  There are some exceptions.  Mr.

24    Singleton's 2015 Butte folks have quantifiable liquidated

25    claims, but the vast majority of the 2017 and 2018 victims do

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    not, and I'm not surprised.

2           But the point is, unless I'm wrong, the debtor has

3    asked for permission to make these payments and the unsecured

4    creditors' committee has said that's critical to have it be

5    that way, and I believe it is too.

6           So if you're --

7           MR. JULIAN:  So I'd like to --

8           THE COURT:  -- if you're telling me that nothing pre-

9    petition counts, then it's a whole different ball game.

10          MR. JULIAN:  No, I haven't said that.

11          THE COURT:  Okay.

12          MR. JULIAN:  What I have said it this:  if the

13   governor issued an executive order that said I'm not going to

14   propose the legislation that you want until I see you do good

15   charitable acts for the people in Paradise by paying them 250

16   million dollars, the exact amount you're paying your employees

17   for bonuses.  And the governor said, that's the type of good

18   works I want to see you do, PG&E, to restore the fact that

19   you're a convicted felon and lied about gas falsification

20   records.

21          If the governor said that, and they then pay the 250

22   million, admittedly on a pre-petition debt, would anyone here

23   dispute that that's an operating expense that they needed to

24   get to show the governor that the legislation be passed?

25          And Your Honor, that is exactly what's happening in

PG&E Corporation & Pacific Gas And Electric

1    this case.

2         THE COURT:  I don't -- look, you're mixing a bunch of

3    concepts --

4         MR. JULIAN:  It's an operating expense.

5         THE COURT:  -- that whether it's an operating expense

6    or not, it, to me, is irrelevant.  To me, my job and my

7    authority is to authorize this debtor to pay people who hold

8    potential -- or not potential -- actual claims that have not

9    yet been liquidated.  And to the extent that they are disputed

10   because there may be some people that simply don't have claims,

11   which I hope aren't many or any, that they're doing the right

12   thing.

13        Exactly what would've happened if we were sitting here

14   having a plan confirmation today, and the debtor said, the

15   plan's confirmed now and in Class A is all the victims, and

16   they are going to be paid in the following manner.  And that's

17   what would happen.  That's exactly what would happen if we got

18   to that point.

19        MR. JULIAN:  If that's the case, then why did their

20   answer to our interrogatory, which I attached to Brent

21   Williams' declaration citing that this is permitted by Section

22   4.9 of the creditor agreement which is a charitable claimant.

23        THE COURT:  I don't --

24        MR. JULIAN:  But they're not doing it for that reason.

25        THE COURT:  Mr. Julian, I don't know how to answer

PG&E Corporation & Pacific Gas And Electric

1  that question.  To me it's a bankruptcy question:  can they pay

2  it or not?  If they --

3          MR. JULIAN:  Here's the chaos it's going to create --

4          THE COURT:  If they don't have a legal obligation to

5  pay it, then they probably have no business paying it -- a

6  bankruptcy business payment.

7          MR. JULIAN:  Then you haven't --

8          THE COURT:  Let's try it a different way.  If someone

9  comes in and says, you know, I wasn't even in Northern

10  California during the fires, but I'd like to get my share of

11  this hundred million.  And Mr. Karotkin gets up and says, yeah,

12  give them the check.  That would be wrong.  That would be a

13  gift of corporate assets.  And the debtor, for giving that

14  money away to someone to whom there is no liability, would be

15  subject to very serious criticism.

16          MR. JULIAN:  Yes.

17          THE COURT:  And you know as well as I, that's exactly

18  what management would get in trouble for for giving away

19  corporate assets, particularly as a debtor-in-possession as a

20  fiduciary.

21          MR. JULIAN:  They're doing it because Judge Alsup said

22  you have to restore California's confidence in you.

23          THE COURT:  I'm not in Judge Alsup's role today.  My

24  job is my job in this motion.

25          So anyway, go ahead with --

PG&E Corporation & Pacific Gas And Electric

1          MR. JULIAN:  So may I explain the chaos --

2          THE COURT:  You wanted me to make two legal rulings.

3     What are they?

4          MR. JULIAN:  Yes.  I want to know whether you agree or

5     disagree with our point that Brooks (ph.) v. Willis (ph.) and

6     Browne v. Turner apply in this case.  Once the program is voted

7     on by the board as necessary to the reorganization of this

8     company, can they do it in a reckless way?

9          May I tell you the chaos that I think is going to

10    happen as shown by the declaration of Kirk Trostle, the former

11    police chief of Chico, who lost his home.

12         THE COURT:  I read his declaration.

13         MR. JULIAN:  And what you have, Your Honor, is you're

14    going to have the first in applications, where people get a

15    couple hundred thousand dollars --

16         THE COURT:  Well, maybe they won't get a couple

17    hundred thousand dollars.  Don't you think that's what the

18    administrator's going to do?  If the administrator gets to be

19    empowered, he or she will figure out how Mr. Victim A isn't

20    going to get the jump on Victim Z, and A through Z or 500 Z or

21    5,000 of them, is try to come a fair and equitable result,

22    which is exactly what would happen if this case were in a

23    Chapter 7 bankruptcy.

24         If this were a liquidating case and there was twenty

25    cents on the dollar to go to creditors, there would be a period

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    of time, and trustee would line up all the creditors and divide

2    the numerator by the denominator and everybody would get twenty

3    cents on the dollar.

4         The difference here is we have people, as you know --

5    I don't have to tell you; they're right here in the

6    courtroom -- who are suffering right now for what happened last

7    November.  And we have the company saying we want to pay some

8    money to those people.  And you're putting all sorts of labels

9    on, which maybe are right, but what I say is not wrong.

10        These are claims of these victims that are admittedly,

11   at the moment, unliquidated and potentially disputed, but the

12   company says, let's pay these people.

13        Now, you're saying, okay, but you get a result.  You

14   get brownie points with Judge Alsup and the governor.  Well, I

15   don't care about that.  I care about -- and the creditors'

16   committee I believe cares about letting the debtor pay a

17   hundred million dollars when there's no legal precedent for it

18   under the bankruptcy laws.

19        Read the Robins case if you don't believe me.  Look

20   what happened in Robins.

21        MR. JULIAN:  Well, I filed Robins.

22        THE COURT:  I know you did.  Tort victims.  Women who

23   were injured by the Dalkon Shield were told by the Court of

24   Appeals you don't get paid until there's a plan.

25        I don't want to impose that rule here, and I don't

PG&E Corporation & Pacific Gas And Electric

1    think you want me to impose that rule here.

2         MR. JULIAN:  I don't.

3         THE COURT:  So let's --

4         MR. JULIAN:  But I do --

5         THE COURT:  Let's just ignore Robins and the --

6         MR. JULIAN:  I would like to explain to you --

7         THE COURT:  Yeah.  Go ahead.

8         MR. JULIAN:  -- that the only evidence in front of

9    you, because I'm the only one who filed the declarations --

10        THE COURT:  Right.

11        MR. JULIAN:  -- is the declaration of Brent Williams

12   who --

13        THE COURT:  Yes, you did.

14        MR. JULIAN:  -- answered your question about the

15   administrator.  He says, there are 20,000 households that are

16   eligible.

17        THE COURT:  I know that.  And some of what he said is

18   confidential.

19        MR. JULIAN:  No --

20        THE COURT:  So don't read the confidential.

21        MR. JULIAN:  Well, actually, one --

22        THE COURT:  I can't keep track of all of them.  But

23   what I'm getting at is I read his papers.  I know what he's

24   saying.

25        MR. JULIAN:  So I'm answering your question about why

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    the administrator's not going to be able to do it.

2          THE COURT:  Well, I don't know why --

3          MR. JULIAN:  Because if --

4          THE COURT:  -- that's still not true.

5          MR. JULIAN:  Well, he explained it.

6          THE COURT:  The same way a Chapter 7 trustee would do

7    it.  If --

8          MR. JULIAN:  Your Honor, if I were to ask you to make

9    a -- to reject my proposed finding of fact or not, do you feel

10   comfortable telling me whether I have proven to you that the

11   motivation for this director and senior officer decision for

12   business judgment as an operating expense in this case was to

13   regain the good will of the people of California and the

14   legislator in order to try to confirm a plan of reorganization.

15   I think that's what the evidence shows.  And I think if you

16   make that finding of fact, you have the chance today to order

17   replenishment -- subject to replenishment or more than the 105

18   million dollars.

19         THE COURT:  And to what limit?  What's the limit?

20         MR. JULIAN:  Mr. Williams' declaration states that

21   it's around 313 million dollars or chaos will result --

22         THE COURT:  Uh-huh.

23         MR. JULIAN:  -- as people are -- neighbors are

24   fighting over this.  We can't have neighbors, Your Honor, these

25   good people, fighting amongst themselves.  They've suffered

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    enough already.

2         THE COURT:  Okay.

3         MR. JULIAN:  Some of them don't even have water to

4    live on in their trailers and tents on their property in

5    Paradise.

6         THE COURT:  And I hope the administrator can figure

7    out a way to make sure that that person gets paid because there

8    may be somebody who is a neighbor who has a house that didn't

9    burn, maybe who'd lost a trailer.  I don't know.

10        MR. JULIAN:  The administrator's going to have a very

11   hard time with a hundred million.

12        THE COURT:  I understand.  The administrator will have

13   a hard time with a hundred dollars, or a hundred million, or

14   500 hundred million.  It's not easy.

15        MR. JULIAN:  I fear we're losing a moment, Your Honor,

16   in this case, where we have an opportunity to do something

17   because of the way they framed their motion.

18        THE COURT:  Okay.  Well, let me see what the other

19   parties have to say.  Thank you, Mr. Julian.

20        Let's hear from the creditors' committee.

21        MR. DUNNE:  Good morning, Your Honor.  For the record,

22   Dennis Dunne from Milbank, LLP.

23        THE COURT:  Yeah, and Mr. Dunne, I didn't mean to call

24   you out of order.  I mean, you don't really oppose this motion,

25   do you?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    MR. DUNNE:  We -- we had filed an objection.  We filed

2  an objection because we were compelled, Judge, frankly, by our

3  kind of duties and statutory mandate to point out Robins

4  (phonetic) to you, point out essentially that -- and the pre-

5  planned issues with this.

6    THE COURT:  Yeah, I mean the document is called an

7  objection, I understand but it --

8    MR. DUNNE:  And --

9    THE COURT:  -- says what it says.

10    MR. DUNNE:  No, and we also said, and this is the part

11  that Your Honor picked up astutely on, which is that were Your

12  Honor inclined to grant the relief, we think it had to be

13  tightly tied --

14    THE COURT:  Right.

15    MR. DUNNE:  -- to claims against the estate, fires for

16  which PG&E had liability, and some sense that this wasn't going

17  to be slippery slope, which I think the tort committee's kind

18  of showing, that they want more.

19    THE COURT:  Well, I think Mr. Julian is saying I can

20  ignore all that, and just do it under 363, and call it business

21  judgment, and it's like building a building in --

22    MR. DUNNE:  Well, I am happy to have that debate all

23  day long, Your Honor.

24    THE COURT:  -- Walnut Creek.

25    MR. DUNNE:  He's basically saying the doctrine of

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    necessity isn't -- you know, you didn't even need the doctrine

2    of necessity to prove that paying pre-petition creditors

3    outside of a plan was necessary to preserve value in a going

4    concern.  You could just do it under business judgment, under

5    363, and the whole priority scheme that Congress carefully

6    crafted doesn't matter.

7              THE COURT:  Well --

8              MR. DUNNE:  But we don't have to go there.

9              THE COURT:  -- you know, the Supreme Court gave us

10   Jevic last year.

11             MR. DUNNE:  The Jevic, and they were very clear on

12   that.

13             THE COURT:  Jevic.

14             MR. DUNNE:  They were very clear on that, Your Honor.

15   So you and I see it the same way on that.  I don't have the

16   authority to withdraw the objection today but the committee was

17   cognizant of the fact that if you were inclined to do it, these

18   would be things that make it more palatable that we believe the

19   debtor should have done from the outset, and didn't in their

20   original motion.

21             THE COURT:  Well, maybe you and I, Mr. Dunne, are

22   experienced lawyers, and I used to be one, and we know how to

23   talk in a little bit of code because you said we object but,

24   you know, here's how to do it if you really want to do it, and

25   the fact is I really want to do it, and there isn't a person in

of 151
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  this courtroom who doesn't want me to do it, I don't think,

2  including you and your committee.

3        And so because if you said it's absolutely verboten,

4  cannot be done, you wouldn't give me fifteen ways to make it

5  work.  Right?  You didn't -- you won't need to.  So the

6  question is, you know -- well, anyway, you don't have to say

7  anything.

8        MR. DUNNE:  Oh, no, I know what you're -- and there's

9  a simple answer to that, Your Honor, is I don't have the

10  authority today --

11        THE COURT:  I got it.

12        MR. DUNNE:  -- to say withdrawn.  We could take a

13  break.  I could convene a committee call if that's --

14        THE COURT:  I have the authority.

15        MR. DUNNE:  You certainly have the authority, Your

16  Honor.  You certainly have the authority to overrule the

17  objection.  I believe the ad hoc committee of the bondholders

18  filed something similar, as well.

19        Your Honor, I did want to make one point while I have

20  the podium --

21        THE COURT:  Sure.

22        MR. DUNNE:  -- and this is actually addressing

23  something -- actually two comments of Ms. Dumas from earlier.

24  One is, I actually agree with her.  I think that we can make a

25  fair amount of progress on a plan, and get -- and focus on

PG&E Corporation & Pacific Gas And Electric

1    getting large distributions out to the wildfire victims who

2    have endured, you know, unspeakable horror, and dislocation and

3    pain, as a result of those fires.  And we should be focused on

4    doing that as quickly as possible, sharing the information, and

5    maybe we could do something that's not wholly dependent on

6    legislative relief.  Happy -- we want to commit all the efforts

7    and resources of the committee to try to do that.

8         The second one is a correction, Your Honor.  Counsel

9    for the tort committee also said, I believe their words were

10   that every other lawyer in the courtroom represents only

11   opportunistic, financial participants --

12        THE COURT:  Well, I think Ms. Dumas said something

13   like that, yes, but --

14        MR. DUNNE:  And I think we all know that with respect

15   to my client, the official committee of unsecured creditors,

16   that's inaccurate.  We represent the entire class of unsecured

17   creditors, other than the wildfire victims.

18        THE COURT:  I don't think she meant it literally.  I

19   am sure there may be members of your committee then --

20        MR. DUNNE:  I apologize for hearing it as uttered

21   but --

22        THE COURT:  No, but there -- I'm sure there are

23   members of your committee, there may be some who may in the

24   future change their claims, and there are some that are

25   probably in for the long haul, and that's why --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          MR. DUNNE:  And it's not all debt for borrowed money.

2          THE COURT:  Yeah, no, I understand.

3          MR. DUNNE:  We have employees, and trade creditors,

4     none --

5          THE COURT:  I know you do.

6          MR. DUNNE:  -- of whom wanted there --

7          THE COURT:  You have a counterparty to a --

8          MR. DUNNE:  -- to be a Chapter 11 or choose here --

9          THE COURT:  -- power purchase agreement, as I recall.

10         MR. DUNNE:  Exactly.

11         THE COURT:  Yes.

12         MR. DUNNE:  No, exactly.  Exactly.

13         THE COURT:  I think her point was that one thing I

14    think is absolutely correct that she said, and she said it on

15    the first day motion, virtually every creditor in this case,

16    except the victims of the many fires, were -- chose to be

17    creditors.  There may be a few that didn't but you know, there

18    was some tort -- other tort claimants that are not fire victims

19    like the two that were here for the relief from stay last

20    month.  They were involuntary creditors but I don't think -- I

21    think we know what we're talking about.  The world of two --

22    what, twenty billion dollars' worth are generally people that

23    chose to be creditors --

24         MR. DUNNE:  I understand.

25         THE COURT:  -- but none of these victims chose to be.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  We got that.

2  MR. DUNNE:  And, Your Honor, unless you have any other

3  questions for us, we're happy to just rest on the pleading.

4  THE COURT:  No, I would like your thought on --

5  without breaching confidences, how this thing will work if I

6  approve it, you know, what's going to happen?  Is my suggestion

7  doable of picking either consensual among the principal players

8  here, who the administrator is, or if not either telling me to

9  do it or the U.S. Trustee to do it, and then getting on with

10 it, with that person having a -- promptly getting -- rolling up

11 sleeves, and getting around a table, and mapping out the

12 details.

13 MR. DUNNE:  The short answer is yes, Your Honor.

14 Meaning --

15 THE COURT:  Mr. Julian says it's chaos.  I mean, I

16 would like to think an administrator will figure out a way not

17 to allow chaos.

18 MR. DUNNE:  That's their job description, and their

19 objective, Your Honor, and I think your point that it should be

20 incumbent on the debtors and the two official committees to try

21 to come up with that person as quickly as possible.

22 THE COURT:  Yeah, but you know what I don't want to

23 do?  I don't want my courtroom deputy to say one of the -- you

24 know, Mr. So-and-So wants to have a phone conference next week

25 on an emergency basis, and I'll say what's it about?  And say

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1  they can't agree on an administrator.  I'll name an

2  administrator if I have to.  I don't think that the U.S.

3  Trustee has the sole role here but I am not going to have a

4  turf battle.

5            MR. DUNNE:  Well, I think --

6            THE COURT:  The job is to get --

7            MR. DUNNE:  -- that's fair, Your Honor.

8            THE COURT:  -- an administrator selected on --

9            MR. DUNNE:  Right.

10            THE COURT:  -- and on the job.

11            MR. DUNNE:  Give us some short period of time to try

12  to do it consensually, and then we don't have to argue about

13  who it is.  Your Honor can just select.

14            THE COURT:  I mean, I will approve.  I mean, my view

15  would be if the tort committee and the unsecured committee, and

16  the debtors -- and I'm not minimizing the role of the ad hoc

17  committees or anyone else, and I will say, and the U.S.

18  Trustee, if there's a consensus that X -- Mr. X or Ms. Y would

19  be perfect as administrator, and that person is willing to do

20  it, I'm not going to second guess that.

21            If I get a slate of people and I'm supposed to pick,

22  or if I get, you know, none of us can pick -- I thought about

23  this, I don't think this is -- if we call this person an

24  examiner, I think the U.S. Trustee has to make that decision.

25  I don't think the law tells me that I can't but I rather let

PG&E Corporation & Pacific Gas And Electric

1    the parties do it consensually.

2         MR. DUNNE:  I agree.  I don't think we're going to be

3    using the word examiner.  It's more like a special master to

4    administer the fund that we've all --

5         THE COURT:  Yeah, but I can't call him a special

6    master either.

7         MR. DUNNE:  I understand.  It will be some other --

8    we'll come up with the right nomenclature, Your Honor, but it's

9    not an examiner.

10        THE COURT:  Yeah, and so you're somewhat sanguine, I

11   take it, about in short order, and this is for the victims, the

12   people that are listening, this is something, it isn't six

13   months, it's some shorter period, much shorter period of time

14   where there will be a designated person.  That person will have

15   an organizational process with the principal committees and

16   find what kind of professional help he or she needs, and get on

17   with it.

18        And the next thing that I would do perhaps would be

19   sign the order that approves it, and the next thing after that

20   was that person would have a hundred million bucks to start to

21   figure out the right way to distribute it.

22        MR. DUNNE:  And let me give the Court comfort that --

23   I mean, notwithstanding or pleading, assuming Your Honor

24   approves it today, we will commit all our efforts to get

25   everything done quickly.  We're not going to try to slow walk

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation & Pacific Gas And Electric

1   anything.  We're going to try to get dollars out as quickly as

2   possible, if Your Honor approves it today.

3           THE COURT:  Okay.

4           Ms. Villacorta, do you want to be heard for the U.S.

5   Trustee?  You also did not oppose it.  You said you want more

6   information.

7           MS. VILLACORTA:  Right.

8           THE COURT:  Have we picked everything on your list

9   there?

10          MS. VILLACORTA:  Okay.  So good morning, Your Honor.

11  Marta Villacorta for the record, on behalf of the United States

12  Trustee.

13          So the United States Trustee did file a response, just

14  requesting additional information.

15          THE COURT:  Right.

16          MS. VILLACORTA:  It's not in any way an attempt to

17  somehow -- it's not a roadblock.

18          THE COURT:  I didn't take it as one.

19          MS. VILLACORTA:  Okay, just for the record.  And in

20  response to your question about being involved with respect to

21  the plan administrator, the United States Trustee is not

22  seeking to be involved with the selection of the fund

23  administrator.

24          THE COURT:  Okay.  Because you always -- you agree,

25  it's not an examiner.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    MS. VILLACORTA:  I do agree.  I think this is

2  ultimately something that should be left up to the parties, the

3  debtors and the committees, obviously with the Court's approval

4  on how the funds will be disbursed, and et cetera.  So those

5  are my comments.

6    THE COURT:  Yeah, let me repeat what I just said.  If

7  the principal players here agree, that's fine.  I'm not going

8  to second guess it unless, you know, I know that the person is

9  a convicted felon, which I don't think is going to be the case.

10  And if they don't agree, and they say you pick one, I'll pick

11  one.  I mean, I will do it in a minute, and -- but I will make

12  sure that, again, the process goes forward quickly.

13    So you don't want to be even a party in the --

14    MS. VILLACORTA:  Right.

15    THE COURT:  How about in the --

16    MS. VILLACORTA:  Do not participate, right.

17    THE COURT:  -- how about in the discussions that,

18  let's say we get to that point where the administrator is

19  identified, do you want to have a role where there's a further

20  discussion on what the ground rules are for the eligibility and

21  payment, and so on?

22    MS. VILLACORTA:  Like I said before, Your Honor, I

23  think this is really something that should be left up to the

24  parties.

25    THE COURT:  Okay.  Okay.

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation & Pacific Gas And Electric

1          MS. VILLACORTA:  Okay.

2          THE COURT:  Thank you very much.

3          MS. VILLACORTA:  Thank you.

4          THE COURT:  All right.  I've kind of lost track of my

5    list, so I will just call counsel in order that want to be

6    heard.  Do you want to be heard?  Are you standing up to be

7    heard?

8          MR. TROY:  Thank you, Your Honor.  For the record,

9    Matthew Troy, Department of Justice, Civil Division, on behalf

10   of various federal agencies involved in this case.

11         We don't oppose the motion, Your Honor.  I just wanted

12   to make Your Honor aware, if he's not already, and all the

13   parties present, that there is already a robust assistance

14   program from the federal government for these victims.

15         THE COURT:  That's the FEMA program, right?

16         MR. TROY:  The FEMA program, and potentially, I don't

17   know for certain, SBA disaster guaranteed loans.

18         I rise only, Your Honor, to raise the issue that under

19   these programs, if there is a duplication of assistance, there

20   is a possibility of triggering a potential right of recovery --

21         THE COURT:  Yeah.

22         MR. TROY:  -- against disaster --

23         THE COURT:  No, I'm aware of that.

24         MR. TROY:  -- recipient --

25         THE COURT:  And it was very helpful what I got about

PG&E Corporation & Pacific Gas And Electric

1    that.  And that's what happened with the 2015 fire, right?

2              MR. TROY:  I don't know for certain, Your Honor, but

3    it's possible.  I can't say.  I don't know.  I didn't discuss

4    the 2015 fire with my clients.

5              But we did raise this concern before the motion was

6    filed with PG&E, and they agree as part of the proposed order

7    to have in there that the administrator would consult with

8    the -- with FEMA in developing the criteria to avoid this

9    problem.

10             So I just wanted to make everyone aware that

11   duplication is potentially an issue but we are going to make

12   efforts to avoid it.

13             THE COURT:  Okay.  Thank you very much.

14             MR. TROY:  Thank you.

15             THE COURT:  All right.  We did have some opposition or

16   some responses from others but if no one wants to be heard,

17   I'll go back to Mr. Karotkin, and see if he wants to have any

18   closing comments.

19             Mr. Karotkin?

20             MR. KAROTKIN:  Thank you, Your Honor.

21             THE COURT:  Do you care what section I --

22             MR. KAROTKIN:  No.

23             THE COURT:  -- make reference to here?

24             MR. KAROTKIN:  I don't.  I'm -- as I said, the debtor

25   is anxious, and willing, and ready to move forward with the

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   fund.  We agree with your suggestion that we work with the two

2   committees to get the administrator in place, and agree on any

3   appropriate procedures, and we will commit to do so

4   immediately.

5        I'm not sure what Mr. Julian was asking you to do.  I

6   think he was asking you to, in effect, issue some sort of a

7   declaratory judgment on his view of the law.  I don't think

8   that's appropriate.  I think maybe he was trying to get you to

9   enter an order, so he could take some sort of an appeal to

10  force us to put more money up.

11       THE COURT:  I don't know.

12       MR. KAROTKIN:  I don't think that's appropriate.  If

13  he wants declaratory relief, he should bring it by appropriate

14  procedure.  As I said, we would ask that you grant the motion

15  so we can move forward.

16       THE COURT:  Mr. Julian, I mean, again, just tell me --

17  you asked me to -- you want me to make findings.  If I don't

18  make findings, tell me what you want me to do.  Let's start

19  with the following proposition, that you're here to get me, at

20  the minimum, to get that hundred million out on the way to your

21  constituents.

22       What -- how do you want me to get there that's

23  important to you because I am not inclined to do it.  I'm

24  inclined just to use my discretion to grant the motion,

25  overrule the objections, as long as these safeguards that you,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1   and presumably your committee members will be parties to,

2   selecting -- selection, and development of criteria.  So what

3   else is there more that you want me to do?

4           MR. JULIAN:  One item, Your Honor.  We would like you

5   to order that the administrator be chosen by the parties within

6   five days or it will come back to you to pick; time is of the

7   essence.

8           And secondly, I made my request for findings and

9   rulings on the legal points --

10          THE COURT:  Yeah, but I just want to --

11          MR. JULIAN:  -- as part of my argument.

12          THE COURT:  -- I just wanted to clarify it.  I mean,

13  if I -- I mean, if you were drafting the order, what would it

14  say?  I mean, if -- look --

15          MR. JULIAN:  For the 105 million, or for what I

16  wanted?

17          THE COURT:  No, I'm overruling --

18          MR. JULIAN:  I get it.

19          THE COURT:  -- the request that you order the debtor

20  to pay more than it volunteered, and for the reasons I stated

21  at the outset, I don't know of any legal authority that would

22  allow me to do that.  Do you want me to overrule that request

23  formally, and form an order?

24          MR. JULIAN:  I think you've -- I think you've rejected

25  my legal arguments and --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1          THE COURT:  I did.

2          MR. JULIAN:  -- we request that with respect to your

3    order approving the 105-million-dollar of funding requested by

4    the debtor, that you make two rulings:  that the administrator

5    report solely the name and the dollar amount to PG&E so that it

6    can evaluate credits and offsets and not the underlying

7    information that may chill the application process.  That's --

8          THE COURT:  Well, keep in mind -- and maybe you said

9    it in your papers, and you were very thorough --

10         MR. JULIAN:  I did.

11         THE COURT:  -- and I mean, Mr. Julian, I simply can't

12   process hundreds and hundreds and hundreds of pages.  I have to

13   understand the theory.

14         And so if you were telling me that the debtor has

15   tried to get from your constituents signatures on papers that

16   you are bothered by, I got you.

17         What I was hearing is that they wouldn't even be able

18   to solicit even the kind of information that would have to be

19   on a proof of claim.  You know, a proof of claim would say who

20   you are, what your claim is, what the nature is, what credits

21   you have against it.

22         You don't have to put on a proof of claim, and by the

23   way, I hope the governor does something.  That's not --

24         MR. JULIAN:  I would phrase it this way.  That we have

25   no objection and believe it's proper for the administrator to

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    submit the name of the applicant and the amount paid from the

2    fund to PG&E and the committees.

3            And secondly, that the administrator determine, after

4    listening to our explanations of mischief with respect to

5    discovery, that if the administrator wants to submit more, the

6    administrator should take into account our considerations,

7    because we think more, in this case, creates mischief.

8            THE COURT:  Well, let's take the example of FEMA.

9    What if one of the victims who -- in your constituency,

10   believes that she's entitled to 5,000 dollars, and but she also

11   received -- because of a loss of house -- again, I don't want

12   to pretend that I can imagine what any of them have gone

13   through.  So I'm just trying to quantify it much like you were

14   quantifying the building permit in Walnut Creek.

15           Suppose this claimant has a good case for getting

16   5,000-dollar short-term entitlement here, but she got 1,000

17   dollars from FEMA.  The form should say I got 5,000 -- I mean,

18   I want 5-, but I got 1-, so I want 4-, right?  Whatever the

19   form would say.  It should reflect a credit coming from another

20   source, right?  Why wouldn't it?

21           MR. JULIAN:  Yes, the administrator should work with

22   FEMA to make sure there's no duplication of loss of benefits.

23           THE COURT:  Same with insurance benefits.  In other

24   words, Victim A has no insurance; Victim B has received from

25   her insurance company some kind of temporary housing

PG&E Corporation & Pacific Gas And Electric

1   arrangement.  Why wouldn't the administrator need to make sure

2   that there isn't overcharging, if you will?

3           MR. JULIAN:  Well, there's an interesting answer to

4   that.  I don't want to get too far afield.

5           The administrator is going to develop the criteria.

6   We trust the administrator.

7           THE COURT:  Right.

8           MR. JULIAN:  We have agreed on a similar one to the

9   debtors and we have agreed to one, but there are others in --

10          THE COURT:  Okay.

11          MR. JULIAN:  -- in consideration.

12          THE COURT:  Okay.

13          MR. JULIAN:  The technical part about your question,

14  though is that --

15          THE COURT:  That's fine.

16          MR. JULIAN:  -- under the debtors' motion, even

17  victims who are insured, if they establish other special needs,

18  can make an application.  That's their motion.  We haven't

19  objected to that.

20          What I think you're saying is the administrator should

21  look at of this; and all I'm saying, Your Honor, is the only

22  thing that should be reported to PG&E, the debtor in this case,

23  is the name of the applicant and the credit.  Everything else

24  dealing with FEMA, the administrator, and the applicants,

25  should be shared among those people.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1      THE COURT:  I guess I'm having trouble pretending

2  that -- I mean, I've having trouble figuring out why this

3  shouldn't be a mirror image of what would happen if we had a

4  confirmed plan today and we had a claims bar date tomorrow, and

5  the victims would file a claim and the victims would say I'm

6  entitled to this amount of money.  And by the way --

7      MR. JULIAN:  I see.

8      THE COURT:  -- I have these other kinds of credits.

9      MR. JULIAN:  Yes.  And our claims database that we're

10  going to be exchanging in a mutual discovery plan, we will

11  provide that information with respect to these applicants who

12  receive assistance from this program.

13      THE COURT:  But look, you could have somebody who lost

14  a home and you think well, oh.  But what if that person

15  happened to have another home on Pacific Heights?  But next

16  door is somebody who not only lost a home, but is living in a

17  trailer without running water?  I mean, it seems to me it would

18  be clearly obvious that the former should get nothing, at this

19  point, and the latter should get as much as the pot would

20  permit.

21      And there are no -- I mean, that's not a form; that's

22  just the right thing.  And they -- the claims administrator --

23  I mean, the administrator has to have --

24      MR. JULIAN:  Yes.

25      THE COURT:  -- some way of making sure that we

PG&E Corporation & Pacific Gas And Electric

1    aren't -- I'm going to use the wrong word here.  I don't mean

2    to say overcompensating, but prematurely compensating somebody

3    who is less needy than somebody who, right now, needs it in a

4    more dramatic way.

5            MR. JULIAN:  I have miscommunicated.

6            THE COURT:  Okay.

7            MR. JULIAN:  Everything that you just said is perfect

8    with me, with respect to the administrator, FEMA, and the

9    applicant sharing all that information so that all those

10   horribles don't happen.  We agree.

11           MR. KAROTKIN:  And Your Honor, why should --

12           MR. JULIAN:  And we want them to do --

13           MR. KAROTKIN:  -- why should material --

14           THE COURT:  Let --

15           MR. KAROTKIN:  -- on an application, which should be

16   factual material, why is that a secret?

17           THE COURT:  Yeah, I don't know.  I think the only

18   thing that occurred to me is maybe -- maybe there's a reason

19   not to have it showing up in the Chico newspaper that Mr. So-

20   and-So got 1,000 dollars from PG&E, under wildfire fund.

21           MR. KAROTKIN:  I will assure you the debtors will not

22   disclose it to the Chico newspaper.

23           THE COURT:  Well, I'm picking --

24           MR. JULIAN:  You have only one piece of evidence in

25   front of you that answers this question.  Everything else is

PG&E Corporation & Pacific Gas And Electric

1 speculation.

2          THE COURT:  I know.

3          MR. JULIAN:  The evidence is that I submitted what

4 good lawyers and PG&E good directors and officers did in Butte

5 2015.  They said in that notice to the victims, we will not use

6 the information in your application --

7          THE COURT:  Now, I know you said that.  And as soon as

8 I --

9          MR. JULIAN:  And there's a --

10          THE COURT:  -- as soon as I read it --

11          MR. JULIAN:  -- the answer is, it's obvious --

12          THE COURT:  -- I thought they weren't in bank -- the

13 bankruptcy rules are different.

14          MR. JULIAN:  We are going to provide that information

15 in the claims process, Your Honor.

16          THE COURT:  Okay, look, I'll tell you this way.

17          First of all, Mr. Karotkin, is it reasonable to think

18 that five days is workable to get at least an administrator

19 identified?

20          MR. KAROTKIN:  It's fine with us.  In fact, I've told

21 you, we've agreed with the tort committee.  It's just the

22 matter of speaking with --

23          THE COURT:  Mr. Dunne is that reasonable --

24          MR. KAROTKIN:  -- Dunne.

25          THE COURT:  -- I mean, because I -- listen, I'd rather

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    not put it in an order.  I'd rather say get it done and if I

2    don't get it done, I'll have an emergency motion or phone

3    conference and say what in the hell is going on.  And I'll say

4    it that way too.

5              MR. DUNNE:  That's fine, Your Honor.  We'll get it

6    done within five days.

7              MR. KAROTKIN:  Thank you, Your Honor.

8              THE COURT:  But I'm saying, I'm not making it part of

9    the order, okay?

10             MR. KAROTKIN:  Fine.

11             THE COURT:  It's not in the order.  So all right,

12   look, let's review the bidding here.

13             I'm not -- I'm not going to make findings and

14   conclusions.  I'm going to sign an order that I'll ask Mr.

15   Karotkin to circulate to the principal counsel here, that will

16   use my usual:  for the reasons stated on the record, the motion

17   and the -- use the proper term of PG&E's motion -- is granted,

18   and that the parties are to proceed forthwith to select an

19   administrator and work with that administrator to prepare

20   appropriate guidelines and procedures that the Court can

21   approve on a final basis at some point.

22             And I'm not going to -- I'm making the statement that

23   my reasons are that the bankruptcy laws -- excuse me -- that

24   the payments are being made to victims for reasons that are

25   clear to them, but they are -- they would not be paid -- how

PG&E Corporation & Pacific Gas And Electric

1    can I say this correctly?

2            The payments are to people who are entitled to payment

3    under the bankruptcy laws, not because they're entitled because

4    they've already filed a proof of claim, but because they are

5    victims of something that occurred before the bankruptcy, and

6    then for bankruptcy terminology, they are holders of pre-

7    petition claims, albeit in some cases, perhaps contested and in

8    some -- probably more cases unliquidated, and frankly probably

9    not contingent at all.

10           And those are the bankruptcy terms.  And then we'll

11   leave it to the administrator, who will then forthwith meet

12   with the principal players and come up with a procedure and get

13   it in place.

14           So I'm not -- I am expressly not authorizing the

15   debtor to make these payments because these claims arose post-

16   petition.  They arose pre-petition.  And to the extent that

17   someone gets money under this program who is not a pre-petition

18   creditor or never could be, that person is not entitled to the

19   money, and there may be a need to even have a disgorgement at

20   some point in the future.

21           These are not things that have to be in the order.

22   These are things that are just are going to work.  And so I'll

23   leave it at that.

24           With that, unless there are any questions, I'm going

25   to conclude the hearing, and I'm going to thank all counsel for

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation & Pacific Gas And Electric

1    their spirited presentation.

2            And I appreciate, for the folks that came down from

3    Paradise an everything else, I appreciate your participation in

4    our hearings, and I hope you'll feel that you got your day in

5    court, and your lawyers certainly adequately represented your

6    interests.  And I appreciate their advocacy and efforts.

7            So we'll call it a day.  Thank you.

8            IN UNISON:  Thank you, Your Honor.

9        (Whereupon these proceedings were concluded at 12:01 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1                    I N D E X

| RULINGS: | PAGE | LINE |
|---|---|---|
| Debtors' motion to enlarge time to file | 8 | 11 |
| Notices of removal of related proceedings granted | | |
| Lease extension motion granted | 8 | 22 |
| Debtors' application to employ Lazard Freres | 8 | 25 |
| approved | | |
| Debtors' application to employ Compass Lexecon | 9 | 3 |
| granted | | |
| Creditors' committee's application to employ | 9 | 3 |
| FTI granted | | |
| Motion to appoint Bruce Markell as fee | 10 | 15 |
| examiner granted | | |
| Application to employ PricewaterhouseCoopers | 15 | 2 |
| granted | | |
| Exclusivity motion is granted with a four-month | 77 | 2 |
| extension for the reasons stated on the record. | | |
| Wildfire assistance program motion is | 126 | 16 |
| granted for the reasons stated on the record. | | |

1                   C E R T I F I C A T I O N

2

3    I, Suzanne Baldridge, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ SUZANNE BALDRIDGE

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  May 23, 2019

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

# A

**abandon (1)**
93:23
**Abid (1)**
35:23
**ability (1)**
47:22
**able (7)**
24:23;31:11;33:17;
68:15;73:4;104:1;
120:17
**above (3)**
47:15;86:18;89:13
**absence (3)**
38:15;39:24;40:12
**Absolutely (10)**
13:11;23:22;28:23;
31:6;42:4;56:25;66:4,
15;108:3;110:14
**abuse (2)**
53:23;54:6
**accept (1)**
73:3
**acceptable (1)**
54:12
**access (1)**
18:10
**accommodates (1)**
42:18
**according (2)**
45:9,14
**accordingly (1)**
58:2
**accords (1)**
36:6
**account (4)**
80:23;81:16;95:17;
96:6;121:6
**accountability (1)**
27:5;34:12;81:21
**accountable (2)**
26:19,23
**accounts (1)**
75:23
**accumulating (1)**
47:14
**accurate (1)**
72:21
**accused (1)**
94:7
**accusing (1)**
51:9
**acknowledge (2)**
9:16;30:5
**acknowledged (2)**
19:8;25:21
**acknowledges (2)**
17:6;23:24
**acknowledging (1)**
16:14
**acquire (2)**

45:1;48:14
**across (1)**
14:3
**act (5)**
9:17;10:23;19:23;
33:13;58:2
**acting (1)**
20:3
**action (3)**
33:16;41:10;43:10
**actions (2)**
26:4;28:17
**activity (1)**
29:14
**actors (1)**
20:3
**acts (1)**
98:15
**actual (1)**
99:8
**actually (11)**
10:19;30:7;31:9;
38:15;15;61:19;84:7;
103:21;108:22,23,24
**acutely (1)**
14:6;46:10
**ad (11)**
7:14;35:20,24;36:19;
59:17,21,23;76:9;
83:15;108:17;112:16
**add (1)**
10:20
**additional (4)**
18:13;19:25;67:1;
114:14
**address (7)**
24:24;26:6;45:15;
60:23;87:12,18;90:7
**addressed (4)**
17:9;24:22;25:17;
65:7
**addressing (4)**
21:20;25:20;85:3;
108:22
**adequately (1)**
128:5
**adjourns (1)**
33:11
**administer (2)**
80:3;113:4
**administration (2)**
30:7;46:3
**Administrative (1)**
47:5
**administrator (43)**
79:2,9;80:9;81:23;
82:3,14;83:20;85:6,11;
101:18;103:15;105:6,
12;111:8,16;112:1,2,8,
19;114:21,23;115:18;
117:7;118:2;119:5;
120:4,25;121:3,5,6,21;
122:1,5,6,20,24;

123:22,23;124:8;
125:18;126:19,19;
127:11
**administrator's (3)**
101:18;104:1;105:10
**admit (4)**
58:23;64:2;65:20;
66:7
**admits (1)**
94:8
**admitted (3)**
89:1;93:25;94:2
**admittedly (2)**
98:22;102:10
**adopt (1)**
9:14
**adopted (2)**
52:18,19
**advance (1)**
94:5
**advanced (1)**
19:3
**adversary (1)**
15:5
**advised (1)**
58:23
**advisement (1)**
58:1
**advocacy (2)**
91:12;128:6
**AECOM (1)**
15:6
**affected (4)**
43:24;44:17;46:7,15
**afield (1)**
122:4
**afternoon (3)**
19:12;74:4;77:15
**Again (41)**
8:17,20;10:22;12:21;
15:22;16:3;17:15;
19:11,16,18;20:1;22:8,
25;24:7;26:21;28:11,
15;29:3,6,12;31:12;
34:13;36:21;55:17,20;
56:10,19;57:6;61:7;
62:11;67:4;70:23;
72:11;73:9;76:7;79:3;
83:9;92:11;115:12;
118:16;121:11
**against (4)**
96:19;106:15;
116:22;120:21
**agencies (1)**
116:10
**agency (2)**
85:18,18
**aggregate (2)**
17:8;74:25
**ago (7)**
20:6;29:19;33:25;
40:22;82:24;86:2;
89:13

**agree (25)**
9:3,15,16;24:2;
32:23;42:14;50:6;
79:22;80:19;81:25;
82:13;94:23;96:19;
101:4;108:24;112:1;
113:2;114:24;115:1,7,
10;117:6;118:1,2;
124:10
**Agreed (5)**
28:9;79:13;122:8,9;
125:21
**agreeing (1)**
23:10
**agreement (3)**
80:10;99:22;110:9
**AH (1)**
45:3
**ahead (12)**
6:24;8:13;60:3;
61:22;62:2;64:12;
65:22;72:15;86:25;
90:25;100:25;103:7
**Akin (1)**
35:23
**Al (1)**
9:24
**alarm (1)**
30:22
**albeit (1)**
127:7
**ALI (1)**
10:11
**allow (4)**
47:19,20;111:17;
119:22
**allowable (1)**
97:13
**allowed (3)**
22:20;50:22;67:1
**allowing (1)**
42:17
**almost (5)**
42:10;45:5;47:2;
48:8;73:18
**along (1)**
76:24
**Alsup (9)**
67:12;71:5;74:23;
89:13,21;90:4;91:7;
100:21;102:14
**Alsup's (1)**
100:23
**alternate (1)**
70:17
**alternative (1)**
28:6
**alternatively (1)**
29:24
**always (3)**
15:20;16:12;114:24
**amend (2)**
12:7,10

**amended (1)**
13:6
**among (2)**
111:7;122:25
**amongst (1)**
104:25
**amount (13)**
68:7,9;69:17;80:4;
81:20;85:7;90:15;
95:16;98:16;108:25;
120:5;121:1;123:6
**amounts (2)**
39:4;97:20
**ample (1)**
77:13
**analog7 (1)**
92:9
**analogizer (1)**
92:8
**analogy (2)**
92:7,10
**analytics (1)**
11:12,19
**and/or (2)**
37:12;42:12
**and-So (1)**
124:20
**Angela (1)**
84:14
**announcements (1)**
89:12
**answered (2)**
96:5;103:14
**anticipate (1)**
77:14
**anticipating (1)**
34:1
**anticipation (2)**
87:15,16
**anxious (4)**
78:16;79:1,5;117:25
**anymore (1)**
48:9
**apologize (5)**
7:12;48:20,21;53:9;
109:20
**appeal (2)**
82:25;118:9
**Appeals (1)**
102:24
**appear (2)**
8:23;83:2
**appearance (1)**
37:17
**appearances (2)**
56:19,19
**appearing (3)**
10:8;58:9;84:4
**apples (1)**
39:15
**applicant (3)**
121:1;122:23;124:9
**applicants (2)**

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 131
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(1) abandon - applicants

122:24;123:11

**application (8)**
8:24;9:5;85:11;
93:23;120:7;122:18;
124:15;125:6

**applications (1)**
101:14

**applies (1)**
62:17

**apply (1)**
101:6

**appreciate (15)**
7:11;9:1;9:16:14;
31:21,25;44:9;55:7;
57:23;59:8;84:11;85:1;
128:2,3,6

**appreciated (1)**
21:14

**appreciates (1)**
31:23

**approach (6)**
25:22;26:14;38:4;
42:23,24;90:11

**approached (1)**
90:11

**appropriate (16)**
17:15;19:19;27:24,
25;34:14;35:13;36:16;
38:11;81:25;82:21;
95:7;118:3,8,12,13;
126:20

**appropriately (1)**
20:3

**approval (1)**
115:3

**approve (9)**
8:25;90:16;91:15;
92:3,3,10;111:6;
112:14;126:21

**approved (3)**
52:24;91:17;92:12

**approves (4)**
13:2;113:19,24;
114:2

**approving (4)**
7:19;92:5,12;120:3

**approximately (2)**
47:1;59:25

**April (2)**
63:25,25

**arbitration (1)**
68:19

**area (2)**
51:7;59:3

**areas (1)**
42:22

**argue (4)**
38:14;39:11;73:7;
112:12

**arguing (1)**
34:21

**argument (5)**
34:20;87:4;91:11,13;

119:11

**arguments (3)**
9:14;77:7;119:25

**arising (1)**
45:15

**arose (3)**
48:6;127:15,16

**around (2)**
104:21;111:11

**arrangement (1)**
122:1

**array (1)**
25:16

**articulate (1)**
33:18

**articulated (1)**
31:15

**asbestos (1)**
45:24

**aside (2)**
51:11;79:23

**aspect (1)**
28:12

**asserted (1)**
39:4

**asserting (1)**
81:4

**assertions (1)**
7:20

**assess (2)**
27:18;34:15

**asset (1)**
83:12

**assets (3)**
47:21;100:13,19

**assignment (1)**
91:7

**assist (1)**
94:9

**assistance (11)**
15:11;77:11;78:10,
16;91:21;92:13;95:8;
97:9;116:13,19;123:12

**assume (3)**
38:25;68:12;77:12

**assumes (1)**
54:21

**assuming (1)**
113:23

**assumption (2)**
40:14;57:1

**assumptions (1)**
50:11

**assure (3)**
19:21;24:12;124:21

**assuring (1)**
25:19

**astutely (1)**
106:11

**attached (5)**
34:6;88:2;89:4,14;
99:20

**attempt (2)**

85:9;114:16

**attempting (2)**
71:24;86:13

**attention (2)**
6:11;77:25

**attract (1)**
24:23

**audio (1)**
40:7

**authority (7)**
99:7;107:16;108:10,
14,15,16;119:21

**authorize (3)**
82:18;96:16;99:7

**authorizing (1)**
14:12;127:14

**available (1)**
40:13

**avoid (2)**
117:8,12

**aware (18)**
14:6,16;15:15;28:2;
33:5,16;39:20;46:10;
59:22;63:11,14;64:25;
69:21;71:9;78:4;
116:12,23;117:10

**away (7)**
26:1;36:15;94:11,18,
20;100:14,18

## B

**back (25)**
6:11;15:21;16:1;
19:13;20:4;21:19;
30:11;32:17;37:3,12;
40:9;53:5;56:18;61:20;
67:3,10;73:6;74:9,22;
78:2,7;82:24;93:13;
117:17;119:6

**backed (1)**
52:21

**background (2)**
26:10;60:24

**bad (2)**
20:3;71:12

**bailout (2)**
71:14,25

**bailouts (1)**
25:25

**Baker (1)**
84:3

**BakerHostetler (1)**
43:17

**ball (2)**
71:18;98:9

**bang (1)**
78:1

**bank (2)**
21:25;125:12

**banking (1)**
71:22

**bankruptcy (51)**

25:17;30:15;44:5;
45:2,18,19,20;47:24,
24;49:5,5,6,9;53:15,24;
54:6;56:23;58:20,21,
24;63:7;64:17;65:14,
24;67:14;70:10;75:15,
17;81:12;82:18,20;
87:5,6,17;92:17,19;
94:19,21;96:6,7;97:13;
100:1,6;101:23;
102:18;125:13;126:23;
127:3,5,6,10

**BAP (1)**
52:13

**bar (12)**
18:12,19;19:14,16,
20,22;35:11;41:16,19,
21;97:18;123:4

**bar-date (1)**
41:4

**base (1)**
23:20

**based (4)**
40:14;75:12,24;77:6

**bashful (1)**
60:12

**basically (1)**
106:25

**basis (8)**
13:5;19:11;55:4;
62:5;78:19;80:21;
111:25;126:21

**battle (1)**
112:4

**Baupost (2)**
48:10;72:19

**Bay (3)**
45:16;46:7;84:22

**bear (2)**
26:3;53:5

**bearing (1)**
35:10

**bears (1)**
59:19

**became (1)**
83:8

**become (1)**
96:11

**becomes (1)**
13:24

**begin (3)**
32:13;65:18;66:7

**beginning (1)**
35:12

**behalf (11)**
7:14;9:13;10:8;
25:11;35:23;37:24;
43:8,17;84:4;114:11;
116:9

**behave (2)**
74:18,19

**behind (4)**
20:11;27:2;33:5;

64:17

**believes (4)**
30:6;76:10;78:21;
121:10

**believing (1)**
84:23

**below (1)**
47:15

**beneficial (2)**
67:1;68:4

**benefit (2)**
10:17;20:23

**benefits (3)**
46:6;121:22,23

**Bennett (24)**
37:18,19,23,24;38:2,
8,10,20;39:14,17,19,
21,23;40:9,10;41:6,22,
24;42:2,14,16,25;43:1,
9

**Bennett's (1)**
43:14

**best (3)**
26:14;39:1;78:5

**better (7)**
27:1;29:21;30:10;
33:9;34:16;80:11;82:2

**bidding (1)**
126:12

**big (3)**
28:21;46:23;69:5

**bigger (1)**
25:16

**Bill (2)**
41:13;88:5

**billion (5)**
47:2,2;59:25;71:5;
110:22

**billions (2)**
45:11,15

**bit (4)**
47:15;59:1,7;107:23

**board (9)**
53:15,20,23;54:3,10,
11,12;91:7;101:7

**bogged (1)**
93:1

**bond (1)**
49:18

**bondholders (1)**
108:17

**bonds (5)**
47:11,13,14;48:8;
49:23

**bonuses (1)**
98:17

**book (1)**
73:22

**borrowed (1)**
110:1

**both (5)**
9:8,10;46:8;68:4;
76:19

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 132
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) application - both

**bothered (1)**
120:16
**bought (1)**
49:16
**bound (1)**
9:16
**box (2)**
34:25;92:11
**BR (2)**
52:20;53:11
**BRAY (21)**
32:7,8,9,9,13,23;
33:2,4,8,21,23;34:1,24;
35:3,5,7,18,19;76:20,
22;77:3
**breaching (1)**
111:5
**break (13)**
20:25;40:4;50:19;
51:10,23;54:23;55:5;
77:9,15,20,21;86:2;
108:13
**breaking (4)**
56:17;60:19,22;
65:23
**Brent (2)**
99:20;103:11
**bridge (1)**
88:5
**brief (2)**
10:21;14:12
**briefly (1)**
72:12
**bring (2)**
65:13;118:13
**broad (2)**
25:16;69:5
**broad-based (1)**
89:5
**broke (3)**
23:13;56:7;92:4
**Brooks (1)**
101:5
**brother (1)**
84:16
**Brotherhood (1)**
80:7
**Browne (1)**
101:6
**brownie (1)**
102:14
**Bruce (2)**
10:8;37:23
**Bruno (1)**
89:24
**brush (1)**
69:5
**bucks (1)**
113:20
**build (1)**
91:16
**building (7)**
42:10;91:23;92:5;

95:13;106:21,21;
121:14
**bunch (1)**
99:2
**burden (3)**
7:22;32:16,18
**burden-of-proof (1)**
32:15
**burn (1)**
105:9
**burned (3)**
48:18,19;84:23
**business (15)**
21:18,19;71:11;85:3;
87:21;88:18;89:10;
90:9;92:15,21;100:5,6;
104:12;106:20;107:4
**Butte (10)**
48:7;63:10;64:21;
69:22;81:11;89:2,16;
92:15;97:24;125:4

**C**

**CAL (1)**
63:16
**calendar (4)**
7:8;13:5;15:3,7
**CALIFORNIA (19)**
6:1;26:7;44:4;46:9,
12,13;47:19;48:25;
49:1,8;87:2,4;88:7;
89:24;91:18;94:10;
95:15;100:10;104:13
**California's (1)**
100:22
**Call (10)**
6:3;33:14;40:3;
105:23;106:20;108:13;
112:23;113:5;116:5;
128:7
**called (4)**
28:16;61:23;87:14;
106:6
**calls (1)**
49:21
**came (6)**
29:7;45:19,19;48:4;
84:12;128:2
**camera (1)**
40:9
**camp (7)**
25:5;45:17;66:14;
84:17;86:12;94:4;96:9
**campfire (2)**
18:5,6
**can (64)**
6:22;7:2;8:12;10:2;
11:20,21;12:2,3,5;13:5,
6;15:19,21;18:21,21;
19:5,21;20:4;22:14;
23:22;24:17;27:18;
29:2;34:18;43:11;

46:22;49:20;50:10,10;
57:21;59:6;60:1;62:6,
13;64:20;67:3,10;
74:12,13,15;77:6;78:7,
22;79:12;80:10;82:2;
83:7;87:21;88:5;89:25;
91:10;100:1;101:8;
105:6;106:19;108:24;
112:13,22;118:15;
120:6;121:12;122:18;
126:20;127:1
**cancelled (1)**
49:23
**candidate (1)**
79:14
**candidates (1)**
79:12
**cap (2)**
45:21;49:15
**capabilities (1)**
50:9
**capital (1)**
24:24
**care (7)**
6:18;8:5;10:12;
83:16;102:15,15;
117:21
**carefully (2)**
9:9;107:5
**cares (1)**
102:16
**carrying (1)**
11:4
**Cascade (1)**
84:13
**case (92)**
12:10;15:3,16;16:4;
19:8;21:4;22:15,17;
23:4,11;25:21;28:3,7;
33:19;34:8,12;37:10;
38:6,14,23,25;39:6,6;
42:7;44:14,16,20,21;
45:1,13,14,14;46:3,14,
15,25;47:1,11,12,16,
17,24,25;48:10,12;
50:5;51:6;52:13,14;
53:15,17,24;56:2,4;
60:22;62:16;64:13;
65:14;67:25;75:11,12,
20,24;82:24;84:24;
85:8,14,23;86:16;
87:25;88:4;90:3,6;
94:12,14,16,21;96:8;
99:1,19;101:6,22,24;
102:19;104:12;105:16;
110:15;115:9;116:10;
121:7,15;122:22
**cases (22)**
17:13,14;18:20;
19:17;21:8,11,22;45:2,
24;46:23;51:6,7;52:22;
53:16;61:2;62:6,10;
67:24;74:11;81:1;

127:7,8
**catastrophic (1)**
89:3
**category (1)**
75:16
**cause (6)**
19:20,23;21:24;
32:17;48:22;52:25
**caused (2)**
45:9,10
**causes (1)**
97:2
**caution (1)**
71:18
**CCSF (1)**
58:8
**cease (1)**
47:19
**Cecil (1)**
43:17
**Cell (1)**
38:7
**center (2)**
86:16;90:3
**cents (2)**
101:25;102:3
**certain (6)**
62:8;66:22;67:8;
81:20;116:17;117:2
**certainly (20)**
15:1;16:20;32:5;
59:4;63:12;64:12;65:4;
67:18,18;69:9;71:10,
19;73:3,6;82:8,23;
85:17;108:15,16;128:5
**cetera (2)**
47:3;115:4
**CFO (1)**
63:22
**chair (2)**
43:20;84:5
**challenge (3)**
26:22;53:14;82:25
**challenges (1)**
83:2
**chance (3)**
8:2;54:18;104:16
**change (15)**
16:14;25:20;28:18;
36:11;42:18;49:10,12,
12,14;50:19;51:14,24;
71:21;76:14;109:24
**changed (2)**
16:4;64:19
**changes (7)**
12:25;29:18;49:10;
66:2;71:15,25;88:6
**channeling (1)**
74:24
**chaos (6)**
100:3;101:1,9;
104:21;111:15,17
**chaotic (1)**

22:14
**Chapter (6)**
20:4;30:19;51:6;
101:23;104:6;110:8
**charading (1)**
89:11
**charitable (4)**
88:20;92:21;98:15;
99:22
**charity (1)**
96:3
**chart (1)**
38:17
**charts (1)**
46:18
**cheaper (1)**
91:16
**check (2)**
27:20;100:12
**checkpoint (1)**
34:3
**checks (1)**
85:16
**Chico (3)**
101:11;124:19,22
**chief (1)**
101:11
**chill (1)**
120:7
**choice (1)**
90:15
**choices (4)**
67:20;90:12,14,16
**choose (5)**
28:19,20;46:17;77:8;
110:8
**chooses (5)**
9:4;28:18;47:11;
76:15,15
**chose (5)**
35:10;44:10;110:16,
23,25
**chosen (2)**
80:1;119:5
**Christina (1)**
84:21
**Circuit (1)**
96:9
**circulate (2)**
13:22;126:15
**circumstance (3)**
21:15;36:13;37:1
**circumstances (6)**
31:8;36:11,16;37:5;
42:18;83:16
**cite (3)**
38:20;53:6,8
**cited (2)**
52:18;94:12
**citing (1)**
99:21
**City (1)**
25:3

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 133
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) bothered - City

**civil (2)**
68:14;116:9
**claim (22)**
68:7;80:24;81:5,18;
82:21;85:9;86:5,6;
89:10;94:23,24;95:19;
96:7;97:8,12,13;
120:19,19,20,22;123:5;
127:4
**claimant (3)**
76:10;99:22;121:15
**claimants (18)**
19:2,4;20:10,10;
43:18;46:14;49:18;
50:7;60:6;65:19;75:14,
19;76:8;79:23;81:3,3,
5;110:18
**claims (51)**
7:15;17:8;18:4,5,13;
19:2;38:22;39:4,9,25;
40:24;41:8;45:15,19,
22;47:13,25;48:6,11,
12,14;62:21;64:20,20;
68:8,10;74:9,24;81:1,
14,14,15,16;85:8;
96:11,12,20;97:18,20,
25;99:8,10;102:10;
106:15;109:24;123:4,
9,22;125:15;127:7,15
**claim's (1)**
86:4
**clarify (1)**
119:12
**clarity (1)**
24:17
**Class (2)**
99:15;109:16
**clear (12)**
23:22;25:24;32:25;
37:6;42:9;53:23;54:5;
85:2,4;107:11,14;
126:25
**clearly (2)**
13:20;123:18
**CLERK (5)**
6:4,15;30:25;40:2;
61:8
**client (2)**
90:23;109:15
**clients (8)**
20:25;40:23;65:14;
75:10;77:13;86:12;
93:22;117:4
**climate (1)**
25:20
**closing (2)**
73:14;117:18
**clue (1)**
28:8
**code (4)**
82:20;87:17;96:17;
107:23
**cognizant (1)**

107:17
**colleague (1)**
90:11
**colleagues (1)**
43:22
**collect (1)**
47:23
**combined (1)**
76:17
**comfort (1)**
113:22
**comfortable (1)**
104:10
**coming (6)**
9:2;78:2;84:12,15,
20;121:19
**comment (6)**
72:17,17;73:14;
78:12,13;93:7
**comments (10)**
12:1;16:20;41:8;
72:20;74:1;79:17;80:5;
108:23;115:5;117:18
**commit (4)**
78:18;109:6;113:24;
118:3
**commitment (3)**
24:12;70:13;79:7
**committed (1)**
89:17
**committee (74)**
7:10,14;18:15;25:2;
29:25;32:1,10;33:10;
34:5,11;35:20,24;
36:19;37:16,17;38:16,
17,24;39:5;43:8,18,20;
44:13;50:7;51:9;53:17;
54:19;56:12;57:2;58:1,
8;59:16,17,21,24;60:7;
62:7,8;74:1;75:6;76:7,
9,10,23;78:25;79:11,
11,13,15,23;80:7,20;
81:8;83:21;84:4,6,17;
93:9;98:4;102:16;
105:20;107:16;108:2,
13,17;109:7,9,15,19,
23;112:15,15;119:1;
125:21
**committees (14)**
9:2;13:12,13,23;
37:2;62:22;80:16;82:5;
111:20;112:17;113:15;
115:3;118:2;121:2
**committee's (4)**
29:11;34:8;76:16;
106:17
**common (1)**
75:25
**communities (1)**
89:25
**company (13)**
23:25;50:9;57:12;
70:25;71:4;81:11;

86:11,16;88:8;101:8;
102:7,12;121:25
**Compass (4)**
9:1,5,8,25
**compel (1)**
78:19
**compelled (1)**
106:2
**compensating (1)**
124:2
**compensation (2)**
12:15;81:2
**competence (1)**
23:18
**competing (5)**
22:15,21,22;56:8;
57:25
**complained (1)**
20:6
**complaining (1)**
40:11
**complaint (1)**
39:22
**completely (5)**
36:6;37:4;60:14;
69:18;89:8
**complexities (1)**
37:10
**complexity (4)**
17:13;30:16;42:7;
44:14
**complicated (1)**
31:7
**complications (1)**
30:18
**comply (5)**
9:15;39:1;40:15;
87:2;91:18
**complying (1)**
87:16
**compromise (2)**
76:18,20
**concealing (1)**
89:16
**concept (2)**
23:12;66:2
**concepts (1)**
99:3
**concern (5)**
26:12;65:5;71:17;
107:4;117:5
**concerned (9)**
32:4;36:7,9,10,19;
37:8;59:9;70:19;78:25
**concerns (4)**
25:16,18;65:6;73:1
**concise (1)**
59:16
**conclude (2)**
35:11;127:25
**concluded (1)**
128:9
**conclusion (1)**

57:22
**conclusions (2)**
77:5;126:14
**concrete (1)**
57:25
**concur (1)**
63:3
**condemnation (2)**
49:11;88:6
**condition (1)**
69:3
**conditions (5)**
34:6;35:15;67:7,7;
83:17
**conference (4)**
14:2;82:4;111:24;
126:3
**confidence (3)**
21:22;51:23;100:22
**confidences (1)**
111:5
**confident (1)**
74:15
**confidential (3)**
85:10;103:18,20
**confidentiality (2)**
20:15;81:8
**confirm (3)**
49:13,17;104:14
**confirmable (3)**
36:12,25;76:12
**confirmation (2)**
50:13;99:14
**confirmed (3)**
18:21;99:15;123:4
**confirming (1)**
20:18
**confusion (2)**
16:2;51:18
**congratulate (1)**
82:3
**Congress (1)**
107:5
**connection (3)**
40:2;45:16;78:6
**consensual (6)**
19:11;56:9;62:12;
74:2,15;111:7
**consensually (2)**
112:12;113:1
**consensus (1)**
112:18
**consent (2)**
88:24;89:11
**consented (1)**
85:6
**consequence (3)**
46:4;52:22;53:3
**consequences (3)**
26:3;55:20;57:13
**consider (1)**
18:14
**considerable (1)**

11:22
**consideration (1)**
122:11
**considerations (1)**
121:6
**considered (1)**
17:19
**consistent (5)**
9:6;14:18;42:19,21;
56:15
**consistently (2)**
9:17;41:8
**constantly (1)**
46:24
**constituency (1)**
121:9
**constituents (6)**
52:2;58:2;86:21;
91:9;118:21;120:15
**constitute (1)**
53:23
**construction (1)**
42:8
**constructive (2)**
12:3;78:24
**consult (1)**
117:7
**consultation (2)**
78:24;79:3
**consulted (1)**
13:13
**contained (1)**
7:23
**contentions (1)**
64:9
**contest (2)**
67:9;72:24
**contested (2)**
50:13;127:7
**contesting (1)**
66:23
**contingent (1)**
127:9
**continuance (1)**
66:21
**continuation (1)**
35:16
**continue (2)**
26:19;49:5
**continuing (1)**
56:18
**contribution (1)**
88:20
**contributions (1)**
92:22
**control (1)**
21:23
**controlling (4)**
11:23;52:13;54:12,
13
**convene (1)**
108:13
**convenience (1)**

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 134
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(4) civil - convenience

77:10
**conversation (3)**
74:20;75:3,4
**conversations (1)**
62:7
**convicted (3)**
86:17;98:19;115:9
**cooperative (2)**
12:3;13:21
**core (1)**
11:23
**Corning (2)**
45:3,24
**corporate (4)**
54:3,4;100:13,19
**Corporation (1)**
6:15
**corrected (1)**
14:17
**correction (1)**
109:8
**correctly (2)**
95:13;127:1
**costs (1)**
11:21
**counsel (26)**
8:3;9:10,15,19;10:6,
21,24,25;12:5;21:5;
25:5;32:9;37:17;48:17;
51:11;57:16;62:8,22;
66:12;75:6;76:12;77:7;
109:8;116:5;126:15;
127:25
**counsel's (2)**
32:4;65:2
**count (1)**
72:8
**counterparty (2)**
12:22;110:7
**country (1)**
14:3
**counts (1)**
98:9
**County's (1)**
89:16
**couple (6)**
10:13;11:7;69:12;
78:11;101:15,16
**course (12)**
13:9;16:3;30:10;
40:14;41:5,15;42:1;
53:25;62:19;63:6,8;
92:14
**Court (523)**
6:3,4,6,16,18,22,24;
7:2,5,8,16,25;8:5,15;
9:20,22;10:1,4,9,12,15;
11:8,13,16,18,24;
12:10,13,16,19,24;
13:4,7,11,19;14:1,9,11,
15,23;15:2,4,14,25;
16:7,12,23,25;17:23;
18:14,18;19:15,25;
20:5,9,13,16,18;21:3,
10,12,14;22:6,8,12,17,
20,22,24,23:2,6,8;24:2,
4,8,10,15;25:1,10,14,
18;26:16,21;27:1,5,8,
15,18,23,28;27:2,5,8,10,13,
15,24;29:6,9;30:2,6,13,
15,18,23;31:1,7,17,20,
22,25;32:8,11,18,20,
24;33:1,3,7,10,20,22,
24;34:3,14,18,21,23,
25;35:4,6,8,18,20;36:2,
4,7,19;37:3,6,9,14,16,
20;38:1,9,19;39:1,13,
15,18,20,22;40:1,4;
41:5,19,23;42:1,6,15,
25;43:3,7,15,21,23,25;
44:2,5,7,10,19,22,24;
45:5,8;46:1,4,20,22,24;
48:5,21;49:25;50:2,4,
18,23,25;51:2,4,14,16,
18,20,22;52:1,5,7,9,11,
14,18,18;53:8,10,12,
22,25;54:2,4,14,16,21,
22,22;55:8,9,11,13,15,
16,17,24;56:2,15,23;
57:1,4,6,11,20;58:3,5,
7,11,13,15,17,19,22,22,
23;59:5,12;60:2,4,6,10,
18,25;61:4,6,9,12,17,
20,22,23,25;62:2,19;
63:6,8,11,13,18;64:10,
11,13,16,24;65:8,13,
16,21,23;66:1,5,12,16,
19;67:6,11,13,14,16,
19,22;68:2,4,13,15,20,
22,24;69:1,8,11,14,15,
16,19,19,20,24;70:2,4,
8,14;71:1,7,9,18;72:5,
7,10,13;73:6,13,22;
74:9,17;75:4,8,17;
77:18,20,25;78:21;
79:8,16;81:22;82:10,
12,17,25;84:1,7,9,11,
15,20;85:1,12,24;86:1,
9,14,19,23,25;87:4,5,6,
11,13,13,19,22;88:10;
89:18,19;90:8,10,14,
18,21,25;91:3,6,19,20;
92:7,17,19,23,25;93:4,
7,10,13,20;94:1,14,16,
19,21,24;95:2,12,21,
24;96:1,4,14,16,22,24;
97:1,4,6,11,16,23;98:8,
11;99:2,5,23,25;100:4,
8,17,23;101:2,12,16;
102:22,23;103:3,5,7,
10,13,17,20,22;104:2,
4,6,19,22;105:2,6,12,
18,23;106:6,9,14,19,
24;107:7,9,9,13,21;
108:11,14,21;109:12,
18,22;110:2,5,7,9,11,
13,25;111:4,15,22;
112:6,8,10,14;113:5,
10,22;114:3,8,15,18,
24;115:6,15,17,25;
116:2,4,15,21,23,25;
117:13,15,21,23;
118:11,16;119:10,12,
17,19;120:1,8,11;
121:8,23;122:7,10,12,
15;123:1,8,13,25;
124:6,14,17,23;125:2,
7,10,12,16,23,25;
126:8,11,20;128:5
**courthouse (1)**
17:12
**courtroom (19)**
6:9;10:6;27:3;30:22;
31:12;36:9;41:1;47:7,
9;48:2;56:5,6;61:14;
78:4,6;102:6;108:1;
109:10;111:23
**courts (2)**
16:2;74:22
**Court's (11)**
13:17;36:8;57:23;
58:1;59:6,8,10;62:14;
73:3,11;115:3
**CPUC (4)**
19:21;30:20;33:24;
47:20
**crafted (1)**
107:6
**crazy (2)**
23:12;44:13
**create (1)**
100:3
**creates (1)**
121:7
**credible (1)**
76:11
**credit (8)**
21:19;66:9;80:22;
88:8;95:22;97:10;
121:19;122:23
**creditor (12)**
8:10,16;23:11,13,14;
26:15;52:23;57:2;58:2;
99:22;110:15;127:18
**creditors (24)**
7:9;47:4;49:14;
50:13,14,16;63:22;
76:7,16,23;79:11,15;
80:6,7,20;101:25;
102:1;107:2;109:15,
17;110:3,17,20,23
**creditors' (8)**
25:2;29:11,24;32:1;
93:9;98:4;102:15;
105:20
**credits (4)**
96:19;120:6,20;
123:8
**Creek (5)**

91:16,23;92:5;
106:24;121:14
**crisis (2)**
21:22;23:18
**criteria (3)**
117:8;119:2;122:5
**critical (9)**
17:6;33:8;34:13;
41:24;42:3,8,22;47:3;
98:4
**criticism (1)**
100:15
**cross-motion (3)**
78:22;79:22;85:5
**crucial (1)**
39:24
**crystal (1)**
71:18
**culpability (1)**
94:8
**culpable (1)**
94:3
**current (3)**
47:4,5;72:4
**currently (1)**
95:9
**customers (1)**
47:22
**cut (2)**
27:19;41:20
**cute (1)**
92:4

**D**

**Dalkon (1)**
102:23
**damage (2)**
26:1;97:9
**damages (3)**
45:12;62:21;68:9
**dangerous (1)**
46:1
**data (1)**
11:19
**database (3)**
18:8;74:5;123:9
**date (15)**
18:12,19,22;19:14,
16,20;35:11;41:15,16,
19;66:22;67:8;68:4;
76:4;123:4
**dates (1)**
97:18
**date's (1)**
41:21
**day (15)**
26:8;37:24;41:13;
52:3,3;54:8;56:7;
57:19;62:23;69:20;
82:12;106:23;110:15;
128:4,7
**days (15)**

11:17;12:6;15:19;
17:25;27:15,15;28:1;
29:4,12;30:11,12;
32:11;119:6;125:18;
126:6
**day-to-day (1)**
62:5
**deadline (3)**
16:7;42:7;86:4
**deadlines (1)**
73:10
**deal (4)**
14:13;24:6;67:16;
77:10
**dealing (7)**
17:7;21:18;23:25;
24:1;42:24;66:13;
122:24
**deals (2)**
26:7;62:5
**dealt (2)**
64:20;75:20
**debate (2)**
82:18;106:22
**debt (7)**
47:2,4,12;48:2;
59:25;98:22;110:1
**debtor (54)**
9:4;11:20;13:11,12;
15:20;32:16;33:5;
34:15;35:14;36:25;
41:20;42:12;45:7,9,19,
20,25;47:1;48:23;
49:22;52:25;53:17,20;
54:17,18;60:20;62:11;
73:16,20;76:5,21;77:2;
78:19;80:1,16,19;
96:1,18;98:2;99:7,14;
100:13;102:16;107:19;
117:24;119:19;120:4,
14;122:22;127:15
**debtor-in-possession (1)**
100:19
**debtors (27)**
7:1;13:1;21:23;22:2;
23:3,4;26:18,23;27:9,
25;30:10;33:16,17;
34:13;36:3;39:7,11;
43:2;59:21;60:10;87:1;
91:14;111:20;112:16;
115:3;122:9;124:21
**debtors' (12)**
9:6;16:19;24:15;
27:18,19;29:3;33:9;
35:16;65:2;76:12;
87:20;122:16
**debtor's (9)**
19:7;24:13,13;25:5;
41:17;45:14;76:21;
78:9;83:9
**decide (10)**
15:9;34:3;18;35:14;

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 135
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) conversation - decide

49:1;56:4;67:10,15;
93:14,15
**decided (1)**
56:4
**decides (1)**
28:6
**deciding (1)**
96:1
**decision (6)**
24:10;29:16;52:13;
54:25;104:11;112:24
**decisions (2)**
26:3;75:11
**declaration (9)**
88:2,20;89:4,14;
99:21;101:10,12;
103:11;104:20
**declarations (1)**
103:9
**declaratory (2)**
118:7,13
**declared (2)**
63:7;70:10
**deduct (1)**
85:8
**default (1)**
21:25
**defense (1)**
68:5
**define (1)**
25:23
**delay (2)**
61:13;79:1
**delivered (1)**
47:22
**demanding (1)**
89:6
**denial (1)**
52:23
**Dennis (2)**
6:5;105:22
**denominator (1)**
102:2
**deny (2)**
10:22;87:8
**Department (1)**
116:9
**dependent (1)**
109:5
**depending (2)**
50:11;54:10
**depends (1)**
96:21
**deprive (1)**
22:4
**deputy (1)**
111:23
**described (1)**
78:16
**describes (1)**
97:1
**description (1)**
111:18

**designated (1)**
113:14
**desire (1)**
34:12
**destabilizing (1)**
55:14
**details (4)**
68:22;69:5;82:15;
111:12
**determine (4)**
65:10,19;85:7;121:3
**determined (2)**
63:16;95:7
**devastating (1)**
89:5
**develop (1)**
122:5
**developed (1)**
18:6
**developing (1)**
117:8
**development (3)**
28:20,21;119:2
**die (1)**
84:24
**Diego (1)**
49:8
**difference (4)**
45:23;66:16;70:24;
102:4
**different (18)**
7:6;24:5;26:6;29:1,
5;31:13;63:23;64:21;
66:10;75:20;76:3;
83:19;85:20;86:9,10;
98:9;100:8;125:13
**differently (1)**
65:1
**dignity (1)**
91:22
**diminish (1)**
80:25
**DIP (4)**
21:24;47:13,20;48:5
**direction (1)**
24:5
**directly (1)**
20:1
**director (1)**
104:11
**directors (5)**
89:22;91:7;95:5,6;
125:4
**disagree (5)**
15:18,22;81:7;86:7;
101:5
**disapprove (1)**
90:16
**disaster (2)**
116:17,22
**disbursed (1)**
115:4
**disbursements (2)**

71:8;79:2
**disclose (2)**
39:4;124:22
**disconnect (1)**
48:5
**discovery (5)**
85:23,24;86:1;121:5;
123:10
**discrete (2)**
75:15;76:2
**discretion (5)**
73:11;77:6;79:25;
91:25;118:24
**discuss (1)**
117:3
**discussed (1)**
77:7
**discusses (1)**
12:4
**discussion (3)**
8:7;57:21;115:20
**discussions (6)**
19:5;59:22;66:7,11;
79:15;115:17
**disgorgement (1)**
127:19
**dislocation (1)**
109:2
**dispose (2)**
7:2;8:6
**dispute (1)**
98:23
**disputed (2)**
99:9;102:11
**disqualify (1)**
85:20
**disruptive (3)**
26:17;27:21;30:7
**distinguish (1)**
22:8
**distinguished (1)**
66:14
**distressed (2)**
48:2,13
**distribute (1)**
113:21
**distributes (1)**
12:4
**distribution (2)**
87:7,8
**distributions (2)**
74:13;109:1
**disturbing (1)**
71:13
**divide (1)**
102:1
**Division (1)**
116:9
**doable (1)**
111:7
**docket (1)**
46:22
**doctrine (2)**

106:25;107:1
**document (6)**
11:23;12:18;13:24;
59:18;96:8;106:6
**dollar (6)**
80:21;85:7;95:16;
101:25;102:3;120:5
**dollar-for- (1)**
80:20
**dollars (23)**
45:11,15;49:16;
78:17;79:6;80:2,3;
86:20;87:16;91:9,24;
96:18;98:16;101:15,
17;102:17;104:18,21;
105:13;114:1;121:10,
17;124:20
**dollars' (1)**
110:22
**done (22)**
11:16;13:5;14:1,21;
15:7,16;20:12;26:2;
27:10;28:2;29:19;
30:12;41:8;61:2;62:10;
76:8;107:19;108:4;
113:25;126:1,2,6
**door (8)**
40:5,7;76:9;78:6;
83:18;93:3,22;123:16
**doors (1)**
55:5
**doubt (1)**
51:24
**Dow (2)**
45:3,23
**down (18)**
7:5;15:21;25:4;
29:10;48:18,19;52:1;
56:16;68:22;69:4,6;
76:3;82:4,14,15;92:15;
93:1;128:2
**drafting (2)**
11:22;119:13
**dramatic (1)**
124:4
**driver (1)**
94:13
**dropped (1)**
15:3
**Dumas (74)**
43:4,6,13,16,17,22;
44:3,9,11,20,23,25;
45:7,9;46:21,23,25;
48:22;50:1,3,6,22,24;
51:1,3,4,13,15,17,19,
21,25;52:4,6,8,10,12,
15,16,17;53:9,11,13;
54:3,5,15,17;55:6,10,
12,14,15,16,23,25;
56:14,25;57:5,9,18,22;
58:4,5,6;63:3;67:23;
70:15,23;75:9;77:12;
84:1;86:2;108:23;

109:12
**Dumas' (3)**
65:6;72:20;74:1
**DUNNE (41)**
9:23;10:3;105:21,22,
23;106:1,8,10,15,22,
25;107:8,11,14,21;
108:8,12,15,22;109:14,
20;110:1,3,6,8,10,12,
24;111:2,13,18;112:5,
7,9,11;113:2,7,22;
125:23,24;126:5
**duplication (3)**
116:19;117:11;
121:22
**during (7)**
20:3;46:3;49:5;
53:15,23;59:1;100:10
**duties (2)**
11:4;106:3

---

**E**

**earlier (4)**
36:21;72:25;73:17;
108:23
**earliest (1)**
19:16
**early (4)**
7:13;33:12;64:4;
75:9
**earnest (1)**
18:2
**easy (1)**
105:14
**EBITDA (2)**
45:21;50:9
**economic (1)**
27:14
**Edison (1)**
49:8
**effect (1)**
118:6
**effectively (1)**
24:23
**efficient (1)**
14:4
**efforts (6)**
33:9;85:1;109:6;
113:24;117:12;128:6
**eighteen (2)**
33:24;64:8
**eighty (1)**
30:12
**either (8)**
10:5;16:17;36:13;
41:20;76:24;111:7,8;
113:6
**elected (2)**
43:24;45:18
**Electric (1)**
49:8
**eligibility (1)**

115:20
**eligible (2)**
68:18;103:16
**eliminate (1)**
16:18
**else (14)**
13:1;14:9;31:18;
41:1;46:10;47:10,10;
50:10;72:14;112:17;
119:3;122:23;124:25;
128:3
**emergency (2)**
111:25;126:2
**emotional (1)**
47:8
**emphasize (1)**
19:18
**employ (1)**
71:3
**employee (1)**
47:3
**employees (2)**
98:16;110:3
**employment (4)**
9:5;11:25;14:12;
85:16
**empowered (1)**
101:19
**enacted (1)**
23:25
**end (6)**
33:11,15;34:2;63:25;
67:5;90:21
**ending (1)**
59:10
**endured (1)**
109:2
**engage (1)**
18:2
**engaged (1)**
59:22
**enjoy (1)**
91:11
**enormous (1)**
21:17
**enough (5)**
39:11;53:19;57:7;
82:22;105:1
**enter (1)**
118:9
**enterprise (1)**
50:12
**entertain (1)**
68:14
**entire (3)**
74:5;75:5;109:16
**entirety (1)**
26:13
**entities (3)**
9:12;19:1,6
**entitled (13)**
22:2;23:4;60:15;
73:7;83:6;85:19;91:2,

22;121:10;123:6;
127:2,3,18
**entitlement (2)**
86:6;121:16
**envisions (2)**
11:3,4
**Epiq (1)**
7:10
**Epstein (1)**
52:17
**equipment (3)**
63:16;94:3,8
**equitable (1)**
101:21
**Equity (10)**
26:2;37:16,17;48:23;
49:15,23;53:18,19,25;
54:20
**error (1)**
61:8
**essence (1)**
119:7
**essentially (1)**
106:4
**establish (7)**
18:12;32:17,18;87:2;
93:21;95:7;122:17
**established (1)**
19:17
**estate (1)**
106:15
**estimation (1)**
74:24
**et (2)**
47:3;115:4
**evaluate (1)**
120:6
**even (19)**
13:23;18:1,23;28:14;
31:3;39:5,7;57:11;
66:1;73:19;92:14;
100:9;105:3;107:1;
115:13;120:17,18;
122:16;127:19
**event (1)**
89:3
**events (3)**
29:17;42:19;97:17
**everybody (8)**
25:21;31:10;47:10,
10,16;48:17;50:15;
102:2
**everyone (5)**
31:2;38:25;46:10;
69:18;117:10
**everyone's (2)**
40:15;77:10
**evidence (6)**
38:12;95:11;103:8;
104:15;124:24;125:3
**ex (1)**
13:5
**exact (2)**

97:8;98:16
**exactly (18)**
7:8;15:24;19:3,4;
24:11;40:23;41:11;
54:5,5;73:18;98:25;
99:13,17;100:17;
101:22;110:10,12,12
**examiner (6)**
10:5,24;112:24;
113:3,9;114:25
**example (8)**
28:18;66:22;67:10;
69:22,23;70:6;82:24;
121:8
**examples (2)**
45:3;52:22
**except (1)**
110:16
**exceptions (1)**
97:23
**exchanging (1)**
123:10
**exclude (1)**
14:20
**exclusive (2)**
19:23;51:3
**exclusivity (53)**
15:10,12,16;20:25;
21:6,21;22:4;23:13;
26:13,18,23;27:19,19,
22;29:5;31:9;32:17,25;
34:4,7,24;35:17;36:5,
14;38:18;40:20;42:7;
43:25;44:12;50:19;
51:5,10,23;52:23;53:4;
55:5,19;56:7,17;57:25;
59:11;60:19,22;65:11,
23;66:21;67:5,6;69:2,
3;73:2,5;86:2
**excuse (2)**
23:8;126:23
**executive (2)**
89:23;98:13
**Exhibit (4)**
32:20;57:8;89:4,14
**exigent (2)**
83:16,16
**exists (3)**
65:24;71:4;72:4
**expect (2)**
55:21;56:7
**expectation (1)**
36:13
**expectations (1)**
55:25
**expected (1)**
15:4
**expedited (1)**
55:4
**expense (12)**
14:2;79:1;88:18;
89:10;90:9;92:14,21;
95:23;98:23;99:4,5;

104:12
**expenses (3)**
47:5;70:17;92:22
**experience (1)**
81:1
**experienced (2)**
74:18;107:22
**explain (8)**
10:17,19;16:19;
57:24;74:20;78:15;
101:1;103:6
**explained (2)**
11:14;104:5
**explaining (1)**
11:15
**explanation (1)**
10:24
**explanations (1)**
121:4
**explicitly (1)**
17:7
**exposed (1)**
76:1
**exposure (1)**
66:3
**expressed (1)**
76:17,20
**expressions (1)**
9:10
**expressly (2)**
16:10;127:14
**extend (6)**
19:25;29:12,21;
32:17;34:4;60:15
**extended (2)**
23:13;53:4
**extending (2)**
8:8;76:25
**extends (1)**
67:6
**extension (22)**
8:15;15:18;17:14,25;
19:19;22:24;23:5;29:4;
31:9,16;32:15;34:2,7,
18;35:15;36:17;37:11;
38:6;44:12;52:23;69:3;
77:3
**extent (3)**
78:20;99:9;127:16
**extra (2)**
7:25;48:8

---

**F**

**faced (4)**
22:14;23:18;24:20,
22
**facility (1)**
21:24
**fact (21)**
7:23;8:1;16:9;17:18;
21:9;34:4;36:21;72:18;
75:10,11,15;81:10,11;

104:12
**facts (3)**
29:4;34:17;96:9
**factual (2)**
7:20;124:16
**fail (1)**
94:5
**failed (1)**
94:9
**fair (4)**
25:19;101:21;
108:25;112:7
**fall (3)**
18:7;31:10;35:12
**falsification (1)**
98:19
**falsified (1)**
85:15
**familiar (3)**
15:15;61:2;67:23
**families (1)**
70:16
**fan (3)**
7:25;55:19,19
**far (8)**
18:10;42:4;44:4;
59:21;62:6;74:4;83:10;
122:4
**Farr (2)**
7:13;72:12
**fascinating (1)**
59:2
**fashion (1)**
79:21
**faster (2)**
74:13;82:2
**father (2)**
84:13,16
**faulting (1)**
90:10
**favor (2)**
54:20;73:9
**fear (1)**
105:15
**feasible (4)**
18:20;23:23;24:17;
49:21
**February (1)**
63:24
**federal (6)**
87:5,6,6,13;116:10,
14
**fee (2)**
10:4,24
**feed (1)**
61:6
**feel (7)**
86:15;90:2,6,6,24;
104:9;128:4
**feeling (1)**
13:17

Min-U-Script®
Case: 19-30088   Doc# 2210   Filed: 05/23/19   Entered: 05/23/19 15:44:46   Page 137
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
of 151
(7) eligible - feeling

**feelings (2)**
38:8,10
**fees (1)**
12:5
**Feld (1)**
35:23
**FELDMAN (10)**
7:12,13,17;8:4;72:9,
11,11,15,16;73:13
**felon (3)**
86:17;98:19;115:9
**FEMA (9)**
85:12;116:15,16;
117:8;121:8,17,22;
122:24;124:8
**fend (1)**
23:19
**FERC (1)**
21:12
**fervently (1)**
41:11
**few (11)**
10:19;11:17;12:6;
40:22;44:15,17;52:8,
10;65:17;79:12;110:17
**fiduciary (1)**
100:20
**fifteen (2)**
77:22;108:4
**fifty-page (1)**
11:2
**fight (3)**
26:17;29:21;30:3
**fighting (2)**
104:24,25
**figure (5)**
81:24;101:19;105:6;
111:16;113:21
**figuring (1)**
123:2
**file (23)**
9:13;12:19;17:16;
21:11;23:22;31:5;
32:24;36:22;39:3,8,12;
40:20;43:16;50:24;
55:22;73:8,20;86:4;
89:9;97:8,11;114:13;
123:5
**filed (27)**
11:11;18:12;22:22;
28:8;35:25;38:16;39:2;
40:17;45:13,14;47:1;
49:4;50:20;58:8;72:18;
75:15;86:3;88:1,13;
89:10;102:21;103:9;
106:1,1;108:18;117:6;
127:4
**filing (2)**
17:10;62:11
**fill (1)**
73:10
**final (3)**
7:24;13:24;126:21

**Finally (1)**
73:1
**financial (7)**
26:2;44:16;48:15,16;
50:8,14;109:11
**financially (1)**
47:6
**financing (1)**
21:18
**find (3)**
38:23;86:13;113:16
**finding (3)**
24:12;104:9,16
**findings (7)**
7:23,25;77:5;118:17,
18;119:8;126:13
**fine (17)**
7:10;8:2;9:20,25;
10:1,3;12:16,21;13:2;
45:20;48:1;76:24;
115:7;122:15;125:20;
126:5,10
**finger (1)**
17:2
**finish (1)**
57:15
**finite (1)**
64:25
**Fire (27)**
45:17;48:7;58:21;
59:14;63:10,16,19;
64:8,18,22;65:9,18;
66:13,14;69:22;75:13;
81:11;84:13,17,23;
86:12;89:2;94:4;96:10;
110:18;117:1,4
**fires (15)**
18:8,10;43:24;45:16;
46:7;56:3;63:4,10;
66:23;67:9;88:7;
100:10;106:15;109:3;
110:16
**Firm (7)**
8:17;11:12,19;40:19;
58:9;60:12;74:8
**firms (1)**
13:22
**First (17)**
11:11;22:17;23:20;
29:7;38:3;52:12;63:20,
23;69:20;79:18;85:2;
87:1;89:22;92:2;
101:14;110:15;125:17
**first-day (1)**
47:3
**fist (1)**
48:4
**five (4)**
80:2;119:6;125:18;
126:6
**fix (1)**
19:6
**fixed (1)**

95:16
**floors (3)**
42:10;86:17;89:13
**flows (1)**
96:10
**fluid (1)**
30:5
**flying (1)**
14:3
**focus (4)**
86:19;91:6,10;
108:25
**focused (4)**
28:11;69:18;90:4;
109:3
**folks (3)**
84:12;97:24;128:2
**follow (2)**
12:7;26:22
**following (3)**
8:6;99:16;118:19
**force (5)**
24:19;26:15,16;88:3;
118:10
**forced (1)**
87:8
**forces (1)**
42:13
**forcing (1)**
90:4
**foreclose (1)**
47:21
**foremost (1)**
63:21
**forget (2)**
62:22;87:13
**form (7)**
18:14;77:4;85:11;
119:23;121:17,19;
123:21
**formal (3)**
9:7,16;12:19
**formally (3)**
9:24;84:5;119:23
**former (2)**
101:10;123:18
**formidable (1)**
57:11
**formula (1)**
67:15
**formulate (1)**
54:19
**formulated (1)**
53:17
**formulation (2)**
17:10;18:3
**forthwith (2)**
126:18;127:11
**forty (1)**
91:1
**forward (19)**
14:11;18:20,23,25;
24:25;26:8;33:19;

34:12;49:20;52:25;
60:22;72:2;73:4;79:4;
80:1,23;115:12;
117:25;118:15
**found (2)**
20:5;53:25
**foundation (1)**
42:9
**four (7)**
15:19;22:24;33:10;
34:14;35:1;39:5,6
**four-month (1)**
77:3
**frame (4)**
17:17;30:19;35:9;
41:17
**framed (1)**
105:17
**framework (1)**
26:7
**FRANCISCO (3)**
6:1;25:3;91:16
**frankly (7)**
30:9;31:6;38:12,20;
41:2;106:2;127:8
**free (3)**
6:11;17:15;22:25
**Freres (1)**
8:24
**Friday (1)**
31:3
**FRIEDMAN (28)**
25:8,9,10,11,15;
26:25;27:4,6,9,24;28:4,
9,14,23,25;29:8;30:1,4,
14,17;31:6,8,18,21,22,
23;35:9;41:10
**frivolous (3)**
28:7;55:20,22
**front (8)**
6:13;20:9;33:6;
67:11,12;81:19;103:8;
124:25
**frustrated (1)**
20:8
**frustrating (1)**
20:5
**frustration (1)**
64:25
**FTI (5)**
9:1,8,23;10:2,3
**fund (18)**
44:1;70:10;74:12;
78:16,16,17,19;79:2,6;
80:3;88:5,7;91:24;
113:4;114:22;118:1;
121:2;124:20
**fundamental (4)**
17:4,9;21:20,22
**funded (1)**
59:25
**funding (3)**
88:5;92:3;120:3

**funds (1)**
115:4
**further (6)**
34:4,18;35:15;69:1;
91:10;115:19
**fury (1)**
46:11
**future (4)**
72:2;88:7;109:24;
127:20

**G**

**Gallagher (1)**
7:14
**game (1)**
98:9
**Gas (2)**
49:8;98:19
**gate (1)**
23:15
**gather (1)**
39:8
**gating (4)**
17:4,9;27:12;87:25
**gave (2)**
67:20;107:9
**gavel (1)**
78:1
**generally (2)**
68:8;110:22
**generate (1)**
95:25
**genesis (1)**
34:20
**gentleman (2)**
62:23;74:8
**Gerald (1)**
58:14
**gets (9)**
31:5;34:1;71:21;
81:10,20;100:11;
101:18;105:7;127:17
**gift (1)**
100:13
**given (1)**
37:10
**giving (2)**
100:13,18
**glad (3)**
44:7,7;84:12
**goals (1)**
25:21
**goes (3)**
24:5;44:5;115:12
**go-forward (1)**
27:13
**good (24)**
9:3;11:6;14:14;25:7,
8,10;32:6,7;35:21,22;
37:20;77:9;79:19;
91:21;94:9;98:14,17;
104:13,25;105:21;

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 138
of 151

114:10;121:15;125:4,4

**goodness (2)**
87:24;88:22
**goodwill (1)**
95:25
**Gotshal (2)**
7:1;73:16
**governance (1)**
54:4
**government (2)**
28:18;116:14
**governmental (3)**
85:13,18,18
**government's (1)**
25:22
**governor (28)**
17:6,18,25;23:23;
24:19;25:5,11,16;26:5,
15;29:24;30:6,20;
31:15,23;33:12;34:10;
41:10;51:11;54:4;
88:14;89:11;98:13,17,
21,24;102:14;120:23
**governor's (9)**
24:11;25:2;29:10,16;
31:12;41:15;46:10;
48:23;88:3
**grant (11)**
10:16;15:18;29:10;
41:20;69:3;77:2;93:14;
95:14;106:12;118:14,
24
**granted (5)**
8:12;25:13;36:15;
43:1;126:17
**granting (1)**
79:20
**gravity (1)**
90:1
**great (3)**
41:3;69:5;92:8
**greater (1)**
19:6
**Greg (1)**
84:18
**Gregory (1)**
32:9
**ground (2)**
82:5;115:20
**group (9)**
8:16;37:2,21;55:3;
56:12;72:19,19,24;
81:24
**guaranteed (1)**
116:17
**guess (7)**
14:24;25:3;42:6;
56:8;112:20;115:8;
123:1
**guidelines (2)**
93:10;126:20
**Gump (1)**
35:23

**H**

**hac (1)**
25:12
**haircut (1)**
49:23
**half (2)**
48:11;76:9
**hand (1)**
48:4
**hands (1)**
96:18
**happen (27)**
21:24,24;22:9,15;
28:8;41:12;47:21;
51:11;52:2;53:3;55:6;
63:1;65:8,10,17;68:17;
71:20;72:1;75:10;
80:12;99:17,17;
101:10,22;111:6;
123:3;124:10
**happened (18)**
17:20;23:16;34:17,
17;53:12,16;54:7,7;
63:4;64:18;75:24;89:2;
90:1;99:13;102:6,20;
117:1;123:15
**happening (3)**
61:9;71:11;98:25
**happens (3)**
41:11;46:21;89:3
**happy (9)**
7:10;16:20;31:19;
75:2;79:3;82:14;
106:22;109:6;111:3
**hard (4)**
39:10;40:15;105:11,
13
**harm (4)**
47:6,8;56:17,18
**Hauer (1)**
35:23
**haul (1)**
109:25
**Hawkins (3)**
58:13,17,18
**head (1)**
9:22
**headquarters (1)**
91:15
**heads (3)**
9:19,22,23
**hear (13)**
16:16,21;32:5;43:25;
44:1,5;74:23;75:23;
79:17;82:7;88:17;93:4;
105:20
**heard (27)**
10:2;13:1;15:5,21;
25:6,6;31:24;35:21;
44:15,21;46:1,4;58:11;
66:2;72:12,14;77:13;

79:17;87:24;90:17,19;
91:2;114:4;116:6,6,7;
117:16
**hearing (13)**
18:18;19:14;23:14;
41:3,4;57:20;63:23;
78:23;84:9;89:15;
109:20;120:17;127:25
**hearings (1)**
128:4
**heart (2)**
87:24;88:23
**Heck (1)**
92:15
**Heights (1)**
123:15
**held (3)**
41:3;48:6;94:17
**hell (1)**
126:3
**help (5)**
52:2;74:2;88:8;92:1;
113:16
**helpful (7)**
49:14,14,15;60:13;
75:1;82:17;116:25
**helping (1)**
84:24
**Henry (1)**
52:13
**here's (9)**
30:12;53:3;90:13;
92:10,24,24;93:2;
100:3;107:24
**higher (1)**
34:11
**himself (1)**
23:23
**hired (3)**
11:12,19;88:19
**historical (1)**
81:11
**history (2)**
53:10;76:19
**hoc (11)**
7:14;35:20,24;36:19;
59:17,21,23;76:9;
83:15;108:17;112:16
**hogwash (1)**
64:7
**hold (4)**
13:23;61:4;78:6;
99:7
**holders (6)**
26:2;48:24;49:16,18;
54:12;127:6
**holds (2)**
48:10;59:24
**home (3)**
70:11;101:11;
123:14,15,16
**homes (1)**
95:9

**homicide (2)**
89:17;94:4
**Honor (138)**
6:17;7:12,17;8:4;
10:3;11:6;12:23;13:8,
9;14:10,14,16;9;17:2,
11;18:17;19:24;21:7;
22:3,13;25:8,12,15,15;
26:10;27:4,6;28:4,9,
23;29:8;30:1,4;31:6,
18;32:7,13;35:19,22,
25;36:6,10,23;37:5,7,
15,19,23;38:17;39:17;
40:10,18;41:25;42:16;
44:6,11,18;46:13;
48:20,25;49:19;50:6,
12;55:6,23;57:9,10,18,
22;59:4;60:21;63:15;
64:7;65:4;66:4,18;
69:7;70:12,22;72:11,
16,18;73:1,9,15;78:14;
83:25;84:4,25;86:7,15;
87:12;88:16;89:20;
90:17;91:1,14,24;
92:20;94:6;96:25;
97:15;98:25;101:13;
104:8,24;105:15,21;
106:11,12,23;107:14;
108:9,16,19;109:8;
111:2,13,19;112:7,13;
113:8,23;114:2,10;
115:22;116:8,11,12,18;
117:2,20;119:4;
122:21;124:11;125:15;
126:5,7;128:8
**Honorable (1)**
6:5
**Honor's (2)**
37:4;38:4
**hookups (1)**
78:5
**hope (15)**
11:19;12:2;14:1;
23:19;26:8;28:25;29:1;
39:9,10;81:23;83:21;
99:11;105:6;120:23;
128:4
**hopeful (1)**
18:21;62:12;74:14
**hopefully (3)**
24:9,11;54:10
**hopes (2)**
12:3,5
**hoping (1)**
41:11
**horribles (1)**
124:10
**horror (1)**
109:2
**Hospital (1)**
52:15
**Hostetler (1)**
84:3

**hour (2)**
77:15;86:2
**house (4)**
48:18,18;105:8;
121:11
**households (1)**
103:15
**housekeeping (2)**
6:9,19
**housing (3)**
95:10;97:2;121:25
**huge (1)**
14:2
**human (1)**
69:21
**humanitarian (1)**
97:9
**humble (1)**
58:21
**hundred (16)**
80:2;86:20;87:16;
91:9;93:12;96:18;
100:11;101:15,17;
102:17;105:11,13,13,
14;113:20;118:20
**hundreds (3)**
120:12,12,12
**hurricanes (1)**
45:6
**hypothetical (1)**
97:5

**I**

**idea (2)**
38:21;77:9
**ideal (1)**
33:23
**ideas (1)**
33:18
**identification (2)**
79:9;81:9
**identified (4)**
80:14;88:2;115:19;
125:19
**identify (1)**
37:20
**ie (1)**
29:16
**ignore (2)**
103:5;106:20
**illegal (1)**
86:12
**image (1)**
123:3
**imagine (1)**
121:12
**immediate (2)**
26:17;30:8
**immediately (5)**
11:21;38:18;40:20;
65:18;118:4
**impact (3)**

59:8,9,13

**implement (1)**
83:22

**implicates (1)**
25:18

**importance (1)**
80:25

**important (13)**
16:17;25:24;56:20,
20,21,21;59:19;72:1;
79:18;83:3;88:11,16;
118:23

**importantly (1)**
10:25

**impose (4)**
80:4;87:7;102:25;
103:1

**imposed (1)**
35:16

**improper (2)**
81:6,16

**inaccurate (1)**
109:16

**inaction (1)**
29:23

**inappropriate (1)**
80:13

**inception (1)**
21:8

**inclined (4)**
106:12;107:17;
118:23,24

**include (2)**
14:19;80:8

**including (4)**
7:20;59:23;89:24;
108:2

**inconceivable (3)**
30:19;42:11;73:18

**incorporate (1)**
12:8

**incorporated (1)**
12:2

**increased (1)**
80:4

**increasing (1)**
90:15

**incumbent (1)**
111:20

**indeed (1)**
96:24

**indemnity (1)**
14:20

**independent (1)**
45:10

**indication (2)**
40:13;64:5

**individual (3)**
62:21;70:11;97:7

**individuals (1)**
43:24

**indulge (1)**
69:15

**inexpensive (1)**
14:7

**inform (1)**
43:23

**information (31)**
18:5,13,19,23;19:2,
11;38:5;39:9,11,24;
40:13,16;41:7;42:20,
23;74:3,5;85:10,10,22;
86:13,17;109:4;114:6,
14;120:7,18;123:11;
124:9;125:6,14

**initial (1)**
23:5

**injured (2)**
94:15;102:23

**injury (1)**
95:17

**input (2)**
13:23,24

**inquiry (3)**
41:21,22;86:5

**insensitive (1)**
8:21

**instincts (1)**
76:5

**insurance (6)**
46:6;70:7;83:11;
121:23,24,25

**insured (1)**
122:17

**intend (5)**
10:22,23;11:5,17;
43:13

**intends (1)**
13:21

**intense (1)**
89:6

**interest (1)**
54:13

**interesting (2)**
46:18;122:3

**interests (2)**
44:16;128:6

**interim (3)**
12:7,15;42:18

**International (1)**
80:6

**interrogatory (2)**
88:21;99:20

**interrupting (1)**
7:12

**intervention (1)**
62:14

**intimately (1)**
33:4

**into (20)**
16:1;17:24;31:5,10;
39:6,6;45:18,19,20;
47:16;51:24;56:18;
68:22;69:4;77:14;82:4,
17;92:4,11;121:6

**introduced (1)**

84:5

**introductory (1)**
44:17

**intrude (1)**
11:6

**inverse (2)**
49:11;88:6

**inverse-condemnation (1)**
28:19

**investigated (1)**
94:8

**investigation (1)**
89:16

**investigators (1)**
45:10

**investment (2)**
26:3;46:17

**investor-owned (2)**
47:18;49:7

**invite (1)**
60:19

**involuntary (1)**
110:20

**involve (2)**
25:25;76:13

**involved (11)**
22:16;33:4,5;63:10;
64:21;71:20;85:14;
94:12;114:20,22;
116:10

**irrelevant (1)**
99:6

**issue (13)**
26:12,17,24;27:7,12;
32:16;69:2;87:25;90:7;
94:6;116:18;117:11;
118:6

**issued (1)**
98:13

**issues (6)**
21:20;25:22;27:13;
62:13,16;106:5

**item (5)**
13:5;41:24;42:8;
43:10;119:4

**items (3)**
17:4,9;42:3

---

**J**

**jack-up (1)**
44:25

**January (5)**
49:16;64:13,19,19;
69:20

**Jevic (3)**
107:10,11,13

**JH (1)**
15:6

**Joanne (1)**
25:3

**job (8)**
80:9;93:14;99:6;

100:24,24;111:18;
112:6,10

**joinder (2)**
58:8;85:5

**Jones (3)**
37:24;54:8;62:23

**Judge (17)**
10:7;52:19;55:18,18;
56:3;67:12;71:5;74:22;
75:10;89:13,21;90:3;
91:7;100:21,23;
102:14;106:2

**judges (1)**
20:6

**judgment (7)**
85:3;87:21;88:18;
104:12;106:21;107:4;
118:7

**Julian (136)**
43:5;57:7;79:12;
81:7;83:23,25;84:3,3,8,
10,13,16,21;85:2,22,
25;86:7,11,15,19,22,
24;87:1,10,12,18,20,
23;88:11;89:20;90:9,
13,17,19,24;91:1,3,5,
14,20;92:10,18,20,24;
93:2,4,6,9,12,18,21;
94:2,15,17,20,22,25;
95:5,20,22,25;96:1,3,
13,15,21,23,25;97:3,5,
7,14,22;98:7,10,12;
99:4,19,24,25;100:3,7,
16,21;101:1,4,13;
102:21;103:2,4,6,8,11,
14,19,21,25;104:3,5,8,
20,23;105:3,10,15,19;
106:19;111:15;118:5,
16;119:4,11,15,18,24;
120:2,10,11,24;121:21;
122:3,8,11,13,16;
123:7,9,24;124:5,7,12,
24;125:3,9,11,14

**Julian's (1)**
78:21

**July (3)**
33:13;41:10;72:2

**jump (1)**
101:20

**juncture (1)**
31:12

**June (1)**
19:14

**jury (1)**
68:14

**Justice (1)**
116:9

---

**K**

**Karen (2)**
43:19;84:10

**Karotkin (98)**

6:16,17,21,23,23,25;
7:1,4,7;8:12,14;9:19,
21;13:9;14:22;15:1,9,
12,17,24;16:6,9,22,24;
17:1,24;19:16;20:12,
14,17;21:2,7,11,13,15;
22:7,11,13,18,21,23,
25;23:3,6,7,21;24:3,7,
9,11,16;25:17;26:5;
28:11;31:3,11;41:9,12;
51:22;72:24;73:14,15,
16,24;75:2,7,8;77:3,12,
17,19;78:11,13;79:10,
22;82:1,6,9,11,13;
87:24;100:11;117:17,
19,20,22,24;118:12;
124:11,13,15,21;
125:17,20,24;126:7,10,
15

**Karotkin's (2)**
29:17;72:23

**keep (7)**
55:21;61:9;71:3;
76:24;91:6;103:22;
120:8

**Kelly (1)**
15:6

**key (2)**
67:7;89:6

**kickers (1)**
51:8

**kind (9)**
8:1;31:16;76:17;
106:3,17;113:16;
116:4;120:18;121:25

**kinds (2)**
69:4;123:8

**Kirk (1)**
101:10

**Klein (1)**
52:19

**knew (2)**
57:6;94:5

**knock (1)**
11:2

**knows (3)**
25:18;27:15,16

---

**L**

**label (1)**
83:4

**labels (1)**
102:8

**lack (8)**
18:22;27:5;31:14;
33:8;36:7,20,22;37:8

**large (4)**
37:24;75:13,18;
109:1

**largely (1)**
18:7

**last (10)**

Min-U-Script®

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 140
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(10) implement - last

14:25;15:2;41:13;
48:9,13,14;70:22;
102:6;107:10;110:19
**late (2)**
17:21,21
**lately (1)**
20:7
**later (1)**
14:13
**latter (1)**
123:19
**Law (29)**
8:17;11:2;13:22;
16:2,4,15;44:13;49:10;
58:9;59:3;67:14;72:4;
74:8;79:25;80:4;81:18;
83:6;87:2,4,6;88:6;
91:18,21;93:23;95:15;
96:8,9;112:25;118:7
**laws (8)**
71:16,22,25;91:22;
94:10;102:18;126:23;
127:3
**lawyer (7)**
20:6;46:16;58:21;
60:24;76:21;82:18;
109:10
**lawyers (10)**
18:9,15;30:15;48:1;
58:23;64:17;74:18;
107:22;125:4;128:5
**lawyer's (1)**
32:15
**layman's (2)**
10:19;65:9
**Lazard (1)**
8:24
**lead (1)**
66:6
**leadership (3)**
89:23,25;90:4
**learn (1)**
90:5
**learned (1)**
59:1
**leases (1)**
8:16
**least (6)**
23:4;33:17;56:16;
78:7;81:22;125:18
**leave (6)**
15:9;72:21;73:11;
127:11,23
**leaves (1)**
15:8
**Leaving (2)**
51:11;79:23
**led (1)**
56:8
**left (5)**
40:10;43:3;48:11;
115:2,23
**legal (12)**

77:5;85:3;86:22;
90:19;96:12,17;100:4;
101:2;102:17;119:9,
21,25
**legislation (4)**
17:5,18;98:14,24
**legislative (18)**
17:5,22;23:24;26:9;
27:12;29:14;33:16;
35:10;41:9;49:2,12,12,
14;76:13;88:1,3,12;
109:6
**legislator (2)**
88:14;104:14
**legislators (4)**
89:11;92:13,22;95:1
**legislature (14)**
19:20;24:4;26:6;
28:16;29:16;30:20;
33:11,13;46:9;48:25;
49:1;71:20;76:14;95:3
**legislature's (1)**
24:10
**lenders (1)**
47:20
**length (1)**
73:2
**lengthen (2)**
16:3,3
**less (3)**
30:7,14;124:3
**letting (3)**
25:25;84:1;102:16
**level (3)**
29:15,15;34:11
**levels (2)**
46:19;47:12
**Lexecon (3)**
9:1,5,8
**liability (16)**
17:8;19:7;26:7;
27:11;62:13,17;64:1,2;
65:20;66:24;67:9;
71:15,21,25;100:14;
106:16
**liable (2)**
19:7;94:17
**lied (1)**
98:19
**light (1)**
59:14
**lights (1)**
71:3
**likely (4)**
42:21;51:10;52:22;
67:6
**limit (3)**
27:18;104:19,19
**limited (1)**
67:19
**line (3)**
40:6;42:13;102:1
**liquidate (1)**

68:10
**liquidated (3)**
40:24;97:24;99:9
**liquidating (1)**
101:24
**liquidity (1)**
88:5
**list (8)**
7:5;14:15;37:21;
40:21;65:2,2;114:8;
116:5
**listed (1)**
32:2
**listen (5)**
61:17;74:17;75:9;
86:1;125:25
**listening (3)**
91:4;113:12;121:4
**literally (1)**
109:18
**litigating (1)**
64:3
**little (5)**
47:15;59:1,7;65:1;
107:23
**live (4)**
46:11,12;64:16;
105:4
**lives (1)**
45:11
**living (5)**
48:19;64:17;70:17;
84:22;123:16
**LLP (2)**
32:9;105:22
**loans (1)**
116:17
**lobbying (3)**
49:3,4,9
**lobbyist (1)**
95:23
**local (1)**
89:24
**Lockhart (3)**
43:19;84:10,11
**long (12)**
20:6;31:4;34:8;
50:16;71:3;73:10,20;
77:19;89:6;106:23;
109:25;118:25
**longer (1)**
31:9
**long-term (1)**
24:13
**Loo (2)**
84:14,15
**look (21)**
6:13;8:3;13:10;
14:11;17:18,20;50:18;
64:21;65:16;70:15;
72:2,22;92:2;93:14;
99:2;102:19;119:14;
122:21;123:13;125:16;

126:12
**looked (4)**
12:1;38:22;94:14,16
**looking (4)**
41:16;47:6;63:2;
66:20
**lose (2)**
70:16;78:6
**losing (3)**
46:6;61:6;105:15
**loss (2)**
121:11,22
**lost (20)**
21:23;40:2,5,7;
45:11;70:12;83:11,12,
13;84:13,16;86:15;
89:8;90:3;95:9;101:11;
105:9;116:4;123:13,16
**lot (4)**
38:12,21;42:3;74:13
**lots (3)**
20:8;27:1;81:1
**Lower (1)**
89:18

## M

**macro (1)**
25:22
**mad (1)**
91:11
**main (1)**
68:7
**major (8)**
28:20,21;29:15,16,
18;48:10;53:19;54:9
**majority (2)**
59:24;97:25
**making (9)**
20:2;36:25;48:3;
75:11;81:19;83:5;
123:25;126:8,22
**managed (2)**
39:8,12
**management (2)**
95:6;100:18
**mandate (1)**
106:3
**Manges (2)**
7:1;73:16
**manner (2)**
27:25;99:16
**manslaughter (1)**
94:4
**manufacturing (1)**
46:1
**Manville (9)**
45:3,23;53:6,6,10,
15;54:7,18;67:24
**many (11)**
20:20;29:1;31:11;
33:5;44:3;46:2,19;
69:22;82:24;99:11;

110:16
**mapping (1)**
111:11
**March (1)**
63:24
**Markell (8)**
10:5,8;11:1,11,21;
12:25;13:21;14:6
**Markell's (1)**
12:2
**market (5)**
45:21;49:15;51:24;
52:1;56:21
**Marta (1)**
114:11
**mass (5)**
45:2;53:16;67:23;
74:11;81:2
**massive (3)**
55:8,11,17
**master (2)**
113:3,6
**material (5)**
47:6;124:13,16
**mathematical (1)**
76:18
**Matter (9)**
6:15;14:13;15:6;
32:14;46:14;76:4;
81:17;107:6;125:22
**matters (6)**
6:10,19,19;8:6;
58:19;77:6
**Matthew (3)**
7:13;72:11;116:9
**MAY (43)**
6:1;11:6;27:24;34:6;
44:18;46:4;47:18;49:1,
2,2,14,14,15;50:12;
55:23,24;64:14;74:21,
23;76:12,13,13;83:9,
11,11,11;86:22;87:12,
18;88:1;90:17,19;
94:11;99:10;101:1,9;
105:8;109:19,23,23;
110:17;120:7;127:19
**maybe (17)**
13:23;34:1;49:22,22,
23;52:1;56:10;66:17;
101:16;102:9;105:9;
107:21;109:5;118:8;
120:8;124:18,18
**Mayo (2)**
52:13,14
**McNutt (22)**
10:7,7,10,14,20;11:6,
9,15,19,25;12:12,14,
17,23;13:3,6,8,17,20;
14:6,10,14
**mean (53)**
6:19;7:8;10:15;
11:14;12:10,21;14:1,
20;15:14;16:7;21:5;

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 141
of 151

22:6;26:21;29:6;34:25;
35:21;36:21,22;39:15;
41:19;50:2;60:18,20;
61:1,12;64:7,21;67:22;
69:2,24;80:21;85:14,
16;105:23,24;106:6;
111:15;112:14,14;
113:23;115:11;118:16;
119:12,13,14;120:11;
121:17;123:2,17,21,23;
124:1;125:25
**Meaning (1)**
111:14
**means (2)**
54:17;90:18
**meant (1)**
109:18
**measure (1)**
35:14
**mediation (2)**
19:1;68:18
**meet (4)**
55:25;80:14;89:23;
127:11
**meeting (9)**
12:4;13:23;14:4;
18:17;19:12;25:20;
54:11;60:20;63:22
**meetings (1)**
77:16
**member (2)**
72:19;84:17
**members (5)**
39:4,9;109:19,23;
119:1
**Memorial (1)**
52:15
**memorized (1)**
63:14
**mentioned (2)**
26:5;51:23
**merely (1)**
58:20
**merit (1)**
78:21
**merits (2)**
8:11,18
**met (1)**
95:6
**metaphorically (2)**
55:2;59:14
**mid-September (1)**
33:12
**might (17)**
29:5,11,19;31:9,13;
36:14,15;37:2;38:6,11;
51:23,24;53:1;55:1;
74:19;75:1;83:18
**Milbank (2)**
32:9;105:22
**mileposts (1)**
28:21
**million (22)**

78:17;79:6;80:2,3;
86:20;87:16;91:9,24;
93:12;96:18;98:16,22;
100:11;102:17;104:18,
21;105:11,13,14;
113:20;118:20;119:15
**mind (8)**
6:18;29:8;35:10;
65:10;80:8;81:19;
96:11;120:8
**mindful (1)**
59:5;75:21;76:2
**minimize (2)**
64:18;76:7
**minimizing (1)**
112:16
**minimum (1)**
118:20
**minute (1)**
115:11
**minutes (2)**
77:22,22
**mirror (1)**
123:3
**mischief (2)**
121:4,7
**miscommunicated (1)**
124:5
**misplaced (1)**
45:12
**misreading (1)**
44:13
**mixing (1)**
99:2
**modification (1)**
12:20
**moment (2)**
102:11;105:15
**money (17)**
47:23;48:3,4,9,12;
53:24;80:22;81:21;
82:22;97:7;100:14;
102:8;110:1;118:10;
123:6;127:17,19
**monitoring (1)**
10:18
**Montali (2)**
6:5;10:7
**month (4)**
54:11;55:3,3;110:20
**months (20)**
15:19,19;22:24;29:2,
17,19;33:10;34:14;
35:1,1,2,4;39:6,6;
41:20;64:8;65:17;67:2,
4;113:13
**moot (1)**
95:4
**moral (2)**
86:16;90:3
**more (42)**
6:11;10:25;13:20;
19:3,5,23;24:16;26:17;

27:10,12,15,16,17,25;
30:14;35:17;40:25;
45:2,5;47:1;52:25;
53:24;56:19;67:6,25;
75:2;78:18,20;82:13;
83:10;104:17;106:18;
107:18;113:3;114:5;
118:10;119:3,20;
121:5,7;124:4;127:8
**Morning (22)**
6:6,10,16,17;10:7;
25:7,8,10;31:3;32:6,7;
35:21,22;37:20;43:19;
44:5;57:17;76:5;81:12;
97:18;105:21;114:10
**mortgages (1)**
46:8
**Most (7)**
6:7;14:7;59:16;
71:13;75:25;83:17;
97:21
**mothership (1)**
78:4
**motion (65)**
6:10;8:8,12,15,22;
10:4,16;11:11;12:7,19;
14:16;15:5,13,16,20;
17:16;18:12;19:25;
26:11;29:12,13;30:9;
32:20;36:13,15;37:3,3;
38:4;41:17;42:24;
43:11;54:23;57:17;
60:15;77:2;78:9;79:19;
83:9;86:19;87:8;88:13;
91:8,24,25;92:2;93:14;
95:4,6;96:22;97:1,4;
100:24;105:17,24;
107:20;110:15;116:11;
117:5;118:14,24;
122:16,18;126:2,16,17
**motions (3)**
16:13;27:21;28:7
**motivation (1)**
104:11
**move (11)**
13:17;18:20,23;
33:19;60:22;69:9;
76:23;79:4;86:8;
117:25;118:15
**moved (1)**
18:25
**movement (1)**
62:9
**moving (3)**
11:22;74:6;82:2
**much (20)**
19:2,2,3,4,6;27:12;
37:14;40:25;45:1;48:9;
57:23;58:4,21;65:16;
67:5;113:13;116:2;
117:13;121:13;123:19
**multiple (1)**
50:10

**must (2)**
81:16;90:6
**mutual (1)**
123:10
**Myers (1)**
25:9

# N

**name (4)**
112:1;120:5;121:1;
122:23
**names (3)**
40:21;85:6;97:20
**nationwide (1)**
89:5
**nature (4)**
27:14,21;81:23;
120:20
**necessarily (7)**
7:21;27:21;30:8;
67:19;71:12;81:17;
83:4
**necessary (8)**
18:19;21:18;49:13,
17;74:3;93:15;101:7;
107:3
**necessity (2)**
107:1,2
**need (40)**
10:21;12:19;14:17;
16:19;18:1;23:19;
24:24;26:3;27:9,13;
28:7;38:9;40:2;41:2;
44:14;49:10,10,12;
53:8;62:14;63:20;64:2,
3;66:3;68:10;71:14;
77:5;87:2;88:4,17,24,
24,25;93:1;94:25;95:9;
107:1;108:5;122:1;
127:19
**needed (1)**
98:23
**needs (11)**
10:25;14:20;44:1;
62:10;63:1;80:7;95:10;
97:2;113:16;122:17;
124:3
**needy (3)**
83:10,17;124:3
**negligence (2)**
14:20;94:10
**negotiate (1)**
60:10
**negotiating (1)**
65:18
**negotiation (4)**
17:10;18:2,24;74:14
**neighbor (2)**
83:18;105:8
**neighbors (2)**
104:23,24
**neither (1)**

74:25
**network (1)**
61:8
**New (3)**
8:1;90:4;91:16
**Newall (1)**
52:15
**Newsom's (1)**
25:11
**newspaper (3)**
81:20;124:19,22
**next (22)**
11:17;12:6;14:15;
30:3;40:5,7;52:3,3;
54:11;55:2,2,3,3;
60:19;65:17;78:6;
83:17;86:8;111:24;
113:18,19;123:15
**nice (1)**
52:19
**ninety (2)**
27:15;29:4
**ninety-day-extension (1)**
29:2
**Ninth (1)**
96:9
**nobody (3)**
23:22,23;24:17
**nodded (1)**
9:19
**nomenclature (1)**
113:8
**non-bankruptcy (1)**
65:9
**none (3)**
110:4,25;112:22
**Nonetheless (3)**
33:9;34:13;44:3
**nonlawyers (1)**
10:18
**nonplans (1)**
51:8
**noon (1)**
77:15
**Nope (2)**
7:7,7
**normal (2)**
85:17;92:21
**North (3)**
45:16;46:7;84:22
**Northern (1)**
46:12,12;100:9
**note (4)**
9:21;18:25;29:18;
79:18
**noted (7)**
8:18;17:11,12,15;
21:8;40:18;71:5
**noteholders (2)**
35:24;59:17
**notice (2)**
21:9;125:5
**notices (1)**

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 142
of 151

8:8
**notwithstanding (2)**
73:5;113:23
**November (2)**
96:10;102:7
**number (13)**
37:24;38:2;43:23;
45:10;53:13;56:6;
61:15;64:25;65:19;
70:4;75:14;76:4;81:3
**numbers (4)**
40:21;62:25;75:19;
80:2
**numerator (1)**
102:2

**O**

**object (2)**
93:9;107:23
**objected (3)**
85:9;93:12;122:19
**objection (17)**
7:17,22;8:9,10,16,17,
20;9:4;10:2;40:19;
85:5;106:1,2,7;107:16;
108:17;120:25
**objections (6)**
8:23;14:17;16:25;
81:15;93:8;118:25
**objective (7)**
13:25;38:5;39:23;
40:13;42:19,23;111:19
**objectively (1)**
42:4
**objectors (2)**
16:17;83:1
**obligation (2)**
96:5;100:4
**obligations (1)**
40:16
**observation (3)**
52:12,20,21
**observations (3)**
11:9;52:10;69:13
**obtain (4)**
85:9;86:17;88:12;
89:10
**obtaining (1)**
87:25
**obvious (4)**
51:12;83:8;123:18;
125:11
**obviously (9)**
13:12;25:18;28:25;
62:17;63:4;65:15;
68:10;71:18;115:3
**occasions (3)**
46:2;63:23;66:8
**occur (2)**
46:5;62:13
**occurred (7)**
75:17;82:23;96:9,10,

97:17;124:18;127:5
**occurring (1)**
47:8
**o'clock (2)**
30:23;44:4
**October (4)**
46:5,7,8;70:18
**off (10)**
12:20;13:16;15:6;
23:19;24:5;27:19;38:9;
40:10;69:10;85:15
**offend (1)**
82:11
**offends (1)**
82:7
**offer (1)**
80:1
**office (7)**
25:2,12;46:10;48:23;
64:21;91:15,16
**officer (3)**
9:12;89:19;104:11
**officers (1)**
125:4
**official (15)**
25:2;29:11;32:1,10;
37:2;43:17;60:6;75:5;
76:6,16,23;80:7,19;
109:15;111:20
**officials (1)**
89:24
**offsets (1)**
120:6
**O'Melveny (1)**
25:9
**once (9)**
36:24;82:14;87:2;
91:23;92:10;93:2,21;
94:7;101:6
**one (70)**
8:5,9,16,25;12:9,17;
14:25;17:4;20:5,22;
21:7;22:24;26:8;28:17,
18;32:21;37:2;38:14;
39:24;40:1;45:15;
49:25;50:4;51:7;53:2,
14,16;56:11;57:7;
58:22;61:23;62:22,23;
63:24;65:19;66:9;67:8;
69:23;71:13,14,18;
72:17,17;79:14;83:7,
10,11,11,11;86:4;
93:22,24;97:14;103:9,
21;107:22;108:19,24;
109:8;110:13;111:23;
114:18;115:10,11;
117:16;119:4;121:9;
122:8,9;124:24
**one-on-one (1)**
74:19
**ones (2)**
15:8;71:5;81:6
**ongoing (1)**

21:20
**only (23)**
6:13;10:17;14:17;
18:6;23:11;24:13,24;
45:16,23;46:13,15;
48:11;65:24;77:2;94:3;
103:8,9;109:10;
116:18;122:21;123:16;
124:17,24
**oOo- (1)**
6:2
**open (4)**
55:5;76:9,24;78:24
**opening (1)**
93:7
**operate (1)**
24:23
**operating (7)**
92:13,21;95:23;
98:23;99:4,5;104:12
**operations (5)**
21:18,21;24:24;
45:20;47:19
**operative (2)**
96:8,9
**opined (1)**
52:18
**opinion (1)**
52:19
**opinions (1)**
53:13
**opponents (3)**
20:23;43:4;82:7
**opportunistic (1)**
109:11
**opportunists (1)**
50:14
**opportunity (10)**
22:3,4,5;29:23;
46:18;55:7;63:22;
74:15;82:8;105:16
**oppose (5)**
35:25;36:17;105:24;
114:5;116:11
**opposed (5)**
27:20;38:8,10;71:11;
79:20
**opposition (3)**
57:8;79:19;117:15
**oppositions (1)**
25:1
**optically (1)**
30:9
**optics (4)**
21:4,4;27:7;51:12
**option (6)**
29:25;54:23;55:1;
56:11;57:14;83:14
**options (1)**
25:23
**oranges (1)**
39:15
**order (49)**

6:3;7:19,24;8:3,13;
9:7;11:5,20;12:8,11,13,
14;13:6,16;14:12,18,
24;16:9,10;68:10;
71:16;77:4;85:16;87:6,
7;88:4,17;89:9;94:25;
95:14;98:13;104:14,
16;105:24;113:11,19;
116:5;117:6;118:9;
119:5,13,19,23;120:3;
126:1,9,11,14;127:21
**ordered (1)**
89:23
**orders (3)**
14:19,21;16:13
**ordinary (1)**
30:10;92:14
**Oregon (1)**
85:15
**organization (1)**
9:6
**organizational (1)**
113:15
**organizations (1)**
9:14
**original (1)**
107:20
**others (9)**
9:11;10:18;20:20;
34:25;52:17;76:18;
82:21;117:16;122:9
**otherwise (2)**
53:1;75:16
**ought (1)**
73:7
**out (41)**
7:11;11:2,4;23:15,
15;29:3;40:12;41:12,
14;42:4;46:19;48:25;
54:8;57:13,23;68:17;
71:5,11;77:21;81:24;
82:15;86:13,21;87:23;
88:17,22;92:5;93:5,22;
101:19;105:7,24;
106:3,4;109:1;111:11,
16;113:21;114:1;
118:20;123:2
**outcome (1)**
56:9
**outline (2)**
23:11;82:5
**outlines (1)**
74:23
**outreach (1)**
89:6
**outset (2)**
107:19;119:21
**outside (8)**
27:2;36:8,9;47:8;
49:5;66:20;92:14;
107:3
**over (11)**
26:9,17;38:2;48:4;

61:3;17;74:6;84:23;
85:6;96:18;104:24
**overcharging (1)**
122:2
**overcompensating (1)**
124:2
**overflow (3)**
6:9;40:3;78:4
**overlooked (1)**
32:3
**overrule (6)**
8:11,19;28:19;
108:16;118:25;119:22
**overruling (3)**
8:20,21;119:17
**own (7)**
37:1;39:9,9;45:14;
62:11;84:2;95:3

**P**

**Pacific (1)**
123:15
**page (2)**
81:19;92:2
**pages (1)**
120:12
**paid (16)**
19:4;47:2,4,5;70:17;
71:5;74:7;80:22;83:6;
87:14;97:9;99:16;
102:24;105:7;121:1;
126:25
**pain (1)**
109:3
**palatable (1)**
107:18
**panic (1)**
31:2
**papers (12)**
11:14;31:15;32:12;
37:22;52:21;53:7;54:8;
66:8,9;103:23;120:9,
15
**par (2)**
47:15,15
**Paradise (6)**
44:4;89:24;90:5;
98:15;105:5;128:3
**paragraphs (1)**
11:3
**parent (1)**
71:1
**pariah (1)**
88:14
**part (11)**
27:6,6;47:8;70:20;
75:25;97:21;106:10;
117:6;119:11;122:13;
126:8
**parte (1)**
13:5
**participants (1)**

Min-U-Script®

Case: 19-30088   Doc# 2210   Filed: 05/23/19   Entered: 05/23/19 15:44:46   Page 145
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(13) notwithstanding - participants

109:11
**participate (3)**
80:17;81:14;115:16
**participation (1)**
128:3
**particular (5)**
70:4;81:20;95:17,17;
96:20
**particularly (2)**
23:7;100:19
**parties (15)**
9:10;26:2;32:3;
42:17;77:8,14;80:10;
105:19;113:1;115:2,
24;116:13;119:1,5;
126:18
**parties-in-interest (1)**
27:17
**partners (1)**
21:19
**parts (2)**
91:25;92:4
**party (5)**
26:16;49:20;60:8;
76:10;115:13
**passed (1)**
98:24
**passion (1)**
90:10
**passionately (1)**
90:6
**past (2)**
23:15,20
**path (6)**
30:6;36:24;41:24;
42:3,8,9
**pay (13)**
11:21;49:18;87:15;
89:9;91:8;98:21;99:7;
100:1,5;102:7,12,16;
119:20
**payers (1)**
47:23
**paying (8)**
46:8;77:25;83:1;
95:23;98:15,16;100:5;
107:2
**payment (8)**
12:14;50:17;95:18;
96:2,6;100:6;115:21;
127:2
**payments (8)**
81:17;83:5;95:15,16;
98:3;126:24;127:2,15
**payment's (1)**
96:21
**pays (2)**
49:13;50:13
**penalty (1)**
81:15
**pending (1)**
25:12
**people (61)**

6:7,7,13;17:15;
22:25;23:25;25:4;28:8;
30:8;31:11;38:14;41:7;
44:3,16;45:12;46:6,7,
11,12,13,15,17,19;
47:7,14;48:3,6,7,18;
56:6;61:15;62:7;67:23;
70:4;71:4;72:21;75:16;
78:3;81:4,13;83:17,21;
85:10;87:14;92:1;95:9;
98:15;99:7,10;101:14;
102:4,8,12;104:13,23,
25;110:22;112:21;
113:12;122:25;127:2
**people's (1)**
73:1
**perceived (2)**
31:14;55:12
**perception (1)**
22:9
**perfect (2)**
112:19;124:7
**perhaps (11)**
20:20;23:19;37:2;
60:24;74:12;75:16;
80:8,15;95:13;113:18;
127:7
**period (13)**
19:23;29:2;36:14;
41:7;42:17;51:3;66:21;
73:3,10;101:25;
112:11;113:13,13
**perjury (1)**
81:15
**permission (2)**
96:2;98:3
**permit (6)**
91:18,23;92:6;95:14;
121:14;123:20
**permits (2)**
79:25;87:21
**permitted (1)**
99:21
**person (20)**
9:12;65:9;80:10,13,
14;81:20;82:4;94:15;
105:7;107:25;111:10,
21;112:19,23;113:14,
14,20;115:8;123:14;
127:18
**personal (2)**
29:9;77:10
**personally (1)**
75:22
**persons (1)**
83:6
**perspective (4)**
62:4;63:3,20;73:25
**persuaded (2)**
23:10;86:2
**persuasive (1)**
87:5
**Peter (1)**

25:8
**petition (4)**
96:16;98:9;127:7,16
**PG&E (45)**
6:15;16:4;24:21;
25:17,23,25;37:24;
45:1;47:19;49:3;54:12;
59:2,14;61:5;62:24;
63:5,21;65:18;68:11;
70:10,12,20,24,24,25;
71:2,4,13,21,23;81:10;
85:7;89:15,21,22,23;
90:5;98:18;106:16;
117:6;120:5;121:2;
122:22;124:20;125:4
**PG&E-2 (1)**
44:20
**PG&E's (6)**
25:17;47:22;63:16;
85:9;91:15;126:17
**ph (4)**
25:3;43:19;101:5,5
**philosophy (4)**
51:5;56:15;57:24,24
**phone (7)**
10:9,10;15:4;38:7;
40:6;111:24;126:2
**phones (1)**
38:9
**phonetic (5)**
67:24,25;84:21;92:8;
106:4
**phrase (1)**
120:24
**pick (7)**
28:18;29:15;112:21,
22;115:10,10;119:6
**picked (2)**
106:11;114:8
**picking (4)**
29:6;76:4;111:7;
124:23
**piece (2)**
39:24;124:24
**pie-in-the-sky (1)**
23:12
**place (10)**
31:10;40:3;45:15;
48:8,11,13;78:8;83:22;
118:2;127:13
**plaintiff (2)**
18:9,15
**plaintiffs (5)**
19:8;62:20;66:23;
68:5,10
**plan (72)**
17:6,9,9;18:2,21;
22:3,22;23:12,15,23;
24:17;26:15;29:13;
30:19;31:5;32:21,24;
33:18;36:8,12,25;37:1,
8;39:8,12;42:11;49:13,
18,21,21,24;50:20,24;

51:5;53:18,18,20;
54:20,23;55:4,20,22;
56:8,17;57:2,25;59:22;
66:11;71:23;72:4;73:5,
6,7,21;74:12,16;76:12;
81:13,13,14;86:3;
90:16;92:12;93:8;
99:14;102:24;104:14;
107:3;108:25;114:21;
123:4,10
**planned (2)**
77:16;106:5
**planning (1)**
66:13
**plans (6)**
22:15,21;23:19;
52:24,25;68:6
**plan's (1)**
99:15
**play (2)**
48:9,14
**played (1)**
76:8
**player (1)**
28:16
**players (6)**
13:15;27:2;29:15;
111:7;115:7;127:12
**plays (2)**
48:15,16
**pleading (3)**
17:7;111:3;113:23
**pleadings (6)**
7:21;17:3;19:18;
78:14,17,22
**please (3)**
38:9;40:1;43:8
**plus (1)**
80:2
**PM (1)**
128:9
**podium (2)**
90:2;108:20
**point (46)**
18:20;20:1;21:1;
31:16;34:2,4;37:4;
38:12;42:2;45:17;48:7;
50:12,18;52:12;56:16;
60:6;62:22;68:19;73:3;
75:18;76:17,19;80:23;
82:22;86:8;91:21;
92:20,24,24;93:2,17,
17,18;95:12;98:2;
99:18;101:5;106:3,4;
108:19;110:13;111:19;
115:18;123:19;126:21;
127:20
**pointed (3)**
41:12;48:25;54:8
**pointing (1)**
40:12
**points (8)**
44:15;76:3;85:3;

86:22;90:20;93:19;
102:14;119:9
**police (1)**
101:11
**policy (1)**
25:16
**policymakers (1)**
89:6
**political (2)**
56:21;89:5
**pool (1)**
84:22
**portion (1)**
95:18
**position (8)**
16:19;29:5;39:12;
47:14;60:7;76:16;
95:21;96:4
**positions (2)**
32:3;60:14
**positive (1)**
45:21
**possibility (1)**
116:20
**possible (10)**
14:8;28:6;39:3;53:2;
57:17;74:7;109:4;
111:21;114:2;117:3
**post- (1)**
127:15
**post-petition (3)**
88:18;92:13;96:12
**pot (1)**
123:19
**potatoes (1)**
50:7
**potential (6)**
19:6;79:12,14;99:8,
8;116:20
**potentially (5)**
26:17;76:11;102:11;
116:16;117:11
**power (2)**
45:1;110:9
**powers (1)**
54:3
**PR (2)**
88:19;92:22
**practical (5)**
55:19;59:8,9,13;
69:21
**practice (1)**
19:25
**pre- (3)**
98:8;106:4;127:6
**precedent (1)**
102:17
**preempted (1)**
60:7
**pre-existing (1)**
96:7
**prefer (1)**
73:2

Min-U-Script®
Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 144
of 151
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(14) participate - prefer

**preliminaries (1)**
78:11
**preliminary (3)**
78:12,13;79:16
**prematurely (1)**
124:2
**prepare (3)**
16:13;72:2;126:19
**prepared (3)**
18:9;38:3;39:7
**pre-petition (9)**
89:9;94:22,24;96:11;
97:17;98:22;107:2;
127:16,17
**present (1)**
116:13
**presentation (2)**
90:22;128:1
**presented (2)**
56:11;82:25
**preserve (1)**
107:3
**presiding (1)**
6:5
**pressure (2)**
13:17;89:5
**presumably (1)**
119:1
**presume (2)**
14:23;15:15
**pretend (1)**
121:12
**pretending (1)**
123:1
**pretty (1)**
42:4
**price (1)**
45:1
**PricewaterhouseCooper's (1)**
14:16
**primary (2)**
59:23;83:12
**principal (9)**
13:15,22;21:5;83:13;
111:7;113:15;115:7;
126:15;127:12
**principle (1)**
28:19
**prior (9)**
15:16;23:10;28:3;
50:4;51:6;56:2;75:11,
12;84:9
**priority (2)**
87:17;107:5
**pro (1)**
25:12
**proactive (2)**
54:8,9
**probably (8)**
6:11;11:1;32:22;
41:16;100:5;109:25;
127:8,8
**problem (10)**

9:18;14:23,24;15:1;
24:12;27:14;61:11,13;
62:15;117:9
**problems (5)**
30:21;31:4;73:19;
78:5;95:3
**procedurally (1)**
79:24
**procedure (9)**
80:18;81:5,25;83:15;
86:20,20;96:19;
118:14;127:12
**procedures (7)**
12:8,10,14;81:2;
93:11;118:3;126:20
**proceed (2)**
15:10;126:18
**proceeding (2)**
10:18;15:5
**proceedings (2)**
8:9;128:9
**process (23)**
12:3;13:21;17:6,10,
24;18:3,24;19:1;35:10,
11;41:9;54:6;56:22;
59:1;64:20;71:24;
74:14;82:2;113:15;
115:12;120:7,12;
125:15
**processes (1)**
20:19
**produced (1)**
38:12
**produces (2)**
89:3,4
**product (1)**
46:1
**Prof (9)**
10:5,8;11:1,11,21;
12:2,25;13:20;14:6
**professional (1)**
113:16
**professionals (6)**
8:23;13:14;14:3,5,
19;90:2
**Professor (1)**
52:17
**profile (1)**
24:1
**program (14)**
15:11;78:10;87:3;
92:3,11,12;93:21;95:8;
101:6;116:14,15,16;
123:12;127:17
**programs (2)**
85:14;116:19
**progress (22)**
18:22;19:12;20:2;
27:11;29:3;31:14;
34:15;35:14;36:7,11,
18,20,22,25;37:8,12;
38:11,21;40:25;42:21;
66:22;108:25

**progressed (1)**
64:24
**project (1)**
42:8
**prominent (1)**
52:22
**promise (1)**
77:21
**promptly (3)**
80:14,14;111:10
**proof (7)**
32:16;86:5;97:12;
120:19,19,22;127:4
**proper (7)**
54:22;79:24;80:25;
81:5;86:5;120:25;
126:17
**property (1)**
105:4
**proponents (1)**
83:20
**proposal (3)**
83:1,19;93:8
**proposals (1)**
88:4
**propose (6)**
22:3;24:17;26:9;
57:3;74:12;98:14
**proposed (14)**
8:3;16:10,12;18:14,
21;32:21;38:17;41:15;
43:2;52:24;53:18;68:6;
104:9;117:6
**proposition (1)**
118:19
**prosecute (1)**
73:8
**protect (2)**
49:15,15
**protocol (5)**
11:23;12:4,8;13:22;
68:18
**prove (1)**
107:2
**proven (1)**
104:10
**provide (4)**
53:18;95:8;123:11;
125:14
**provided (2)**
62:24,24
**provides (1)**
16:10
**provision (5)**
14:21;16:1;68:17;
79:24;81:4
**public (8)**
19:1,6;20:20,24;
27:7,10,16;56:22
**public-entities (1)**
20:10
**public-policy (1)**
25:24

**PUC (3)**
29:15,24;89:1
**Puerto (1)**
45:5
**purchase (1)**
110:9
**purpose (2)**
8:19;53:24
**purview (1)**
36:9
**push (1)**
34:12
**put (14)**
17:2;21:16;42:9,12;
53:7;70:21;73:4;80:1;
83:22;89:22;96:17;
118:10;120:22;126:1
**puts (2)**
67:6;73:24
**putting (2)**
76:1;102:8

## Q

**quantifiable (1)**
97:24
**quantify (2)**
66:3;121:13
**quantifying (3)**
27:11;38:22;121:14
**questionnaires (1)**
86:12
**quickly (9)**
16:14;19:24;39:10;
52:25;109:4;111:21;
113:25;114:1;115:12
**quite (4)**
17:7;31:13;38:20;
73:17
**quote (3)**
59:20;89:3,14
**QURESHI (7)**
35:22,23;36:3,5,23;
37:10,15

## R

**raged (1)**
84:23
**raise (3)**
89:19;116:18;117:5
**raised (2)**
9:11;87:20
**raising (1)**
48:20
**rapid (1)**
40:25
**rate (1)**
47:23
**rather (7)**
26:18;28:12;29:2;
81:5;112:25;125:25;
126:1

**rating (1)**
88:8
**reach (2)**
74:2,15
**reached (1)**
70:9
**read (12)**
9:9;16:23;37:21;
46:4;75:22;83:9;88:20;
101:12;102:19;103:20,
23;125:10
**ready (4)**
78:3,15;79:5;117:25
**real (8)**
23:12;29:13;44:16;
45:24;47:8;48:17;
62:15;71:17
**realistic (3)**
17:17;19:19;49:21
**reality (1)**
17:14
**really (22)**
8:11;10:25;16:16;
17:2;18:1,2;19:24;
22:9;23:10;25:24;
34:20;39:25;45:17;
50:16;64:7;68:7;72:21;
74:25;105:24;107:24,
25;115:23
**reason (14)**
15:22;31:1;33:11;
39:5;45:13,24;47:24;
75:14;76:25;77:1;
88:25;92:16;99:24;
124:18
**reasonable (6)**
22:3;34:18;38:6;
41:7;125:17,23
**reasonably (1)**
73:21
**reasoning (1)**
77:5
**reasons (5)**
51:12;59:7;119:20;
126:16,23,24
**rebuilding (1)**
70:18
**recall (2)**
16:4;110:9
**recapitalization (1)**
49:22
**receive (1)**
123:12
**received (2)**
121:11,24
**receives (1)**
97:7
**recent (1)**
18:5
**recently (1)**
85:14
**recess (2)**
33:14;77:24

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 145
of 151

**recipient (3)**
81:9,10;116:24
**recipients (1)**
96:20
**reckless (1)**
101:8
**recognizes (1)**
17:14
**recommendation (2)**
76:6;90:22
**recommendations (1)**
88:3
**record (16)**
6:25;7:22;9:21;
35:23;38:5,13,15,16,
23;42:20;72:17;
105:21;114:11,19;
116:8;126:16
**records (3)**
81:22;85:16;98:20
**recovery (1)**
116:20
**reduce (2)**
16:18;81:18
**reduced (1)**
81:16
**reexplain (1)**
57:24
**reference (3)**
20:9,19;117:23
**refinancing (1)**
50:9
**reflect (1)**
121:19
**reflection (1)**
39:23
**reflects (1)**
81:22
**reform (2)**
23:24,25
**regain (1)**
104:13
**regard (3)**
19:13;55:25;79:1
**regarded (1)**
40:15
**regarding (1)**
12:14
**regulated (1)**
47:17
**regulatory (2)**
17:5;23:24
**reject (1)**
104:9
**rejected (1)**
119:24
**related (2)**
8:9;59:22
**Relationships (1)**
89:7
**relatively (1)**
75:18
**relevant (3)**

**reliable (1)**
8:22;43:11;53:21
25:20
**relief (11)**
17:5;36:1;49:10;
85:17;88:1,12;95:8;
106:12;109:6;110:19;
118:13
**relying (1)**
93:1
**remain (1)**
36:10
**remaining (1)**
15:8
**remains (1)**
36:14
**remand (1)**
15:5
**remark (1)**
73:17
**remarkable (1)**
47:1
**remarked (1)**
46:2
**remarks (3)**
43:16;44:17;57:23
**remedy (2)**
82:21;83:18
**Remember (3)**
50:13;56:5;70:2
**removal (2)**
8:9;60:15
**renewable (1)**
25:20
**rent (2)**
46:8;70:17
**reorganization (3)**
36:12;101:7;104:14
**reorganize (3)**
57:12;88:4,17
**repeat (2)**
75:9;115:6
**repeating (1)**
59:19
**repetitive (1)**
35:13
**replace (2)**
53:23;54:3
**re-place (1)**
40:6
**replaced (3)**
53:20;54:9,11
**replacing (1)**
53:14
**replenishing (1)**
97:1
**replenishment (2)**
104:17,17
**report (2)**
28:16;120:5
**reported (2)**
40:21;122:22
**represent (7)**

**reliable (1)**
40:23;48:2,3;57:1;
60:1;69:23;109:16
**representations (1)**
72:23
**representative (2)**
81:24;88:19
**representatives (1)**
80:15
**represented (1)**
128:5
**representing (1)**
46:17
**represents (1)**
109:10
**request (12)**
6:14;9:8;10:23;
29:10,11;95:14;96:17;
97:9;119:8,19,22;
120:2
**requested (2)**
17:14;120:3
**requesting (1)**
114:14
**require (1)**
39:2
**requirements (1)**
67:3
**requires (1)**
11:21
**reserve (1)**
37:11
**residence (2)**
83:12,13
**resisting (3)**
10:15;18:15;74:4
**resolution (4)**
9:3;62:12;74:2,11
**resolutions (1)**
67:24
**resolve (11)**
45:18,22;47:25;
62:10,16,16,17,21;
63:9;68:6;74:10
**resolved (1)**
73:19
**resources (1)**
109:7
**respect (22)**
18:4,6,7,9;35:16;
36:5;44:12;48:1;72:18,
23,24;73:25;79:11;
87:25;88:6;94:4;
109:14;114:20;120:2;
121:4;123:11;124:8
**respective (1)**
9:14
**respond (4)**
43:9,11,14;82:8
**response (7)**
9:11;16:23;17:1;
64:4;78:22;114:13,20
**responses (1)**
117:16

**responsible (1)**
9:12
**responsive (1)**
54:22
**rest (3)**
57:19;66:1;111:3
**restore (3)**
78:7;98:18;100:22
**result (6)**
9:3;19:24;101:21;
102:13;104:21;109:3
**resulted (1)**
45:11
**resume (2)**
78:3,9
**review (2)**
11:2;126:12
**reviewed (1)**
12:5
**revision (1)**
13:16
**revive (1)**
61:14
**Rico (1)**
45:5
**ridiculous (1)**
64:8
**right (90)**
6:20;7:5;12:16;
13:11;14:5,11;15:21;
16:6;17:23,23;19:15;
20:11;27:23,25;28:3,
10,17,24;30:6,10,24;
31:2,10;32:12,16;33:1,
7;34:5;35:3,5;36:2,4,
15;37:11;38:1,19;40:7;
41:10;42:1;43:3,21;
45:8;47:15;48:12;53:2;
55:18;56:11;57:12;
58:13,13;60:9;64:4,23;
68:2;71:2;72:8;77:15;
83:5;84:2,2;85:13;
88:10;89:2;91:5;93:6;
99:11;102:5,6,9;
103:10;106:14;108:5;
112:9;113:8,21;114:7,
15;115:14,16;116:4,15,
20;117:1,15;121:18,
20;122:7;123:22;
124:3;126:11
**rights (2)**
78:24;79:4
**ringing (1)**
38:7
**ripe (1)**
27:18
**ripping (1)**
85:15
**rise (2)**
6:4;116:18
**risk (5)**
20:24;24:1,25;46:2;
55:20

**road (1)**
28:22
**roadblock (1)**
114:17
**Robbins (1)**
45:23
**Robert (1)**
84:3
**Robins (8)**
45:3;67:24;82:24;
102:19,20,21;103:5;
106:3
**robust (2)**
45:21;116:13
**role (6)**
74:17;76:7;100:23;
112:3,16;115:19
**rolling (1)**
111:10
**room (3)**
30:15;47:11;82:4
**round (1)**
80:2
**rule (9)**
85:3,4;86:24;90:20;
91:20,25;93:18;
102:25;103:1
**rules (12)**
39:1,2;56:23;60:11;
64:19;75:24;80:18;
81:25;82:5;83:22;
115:20;125:13
**rulings (3)**
101:2;119:9;120:4
**run (3)**
21:25;28:7;50:10
**running (3)**
50:8;77:14;123:17

**S**

**Sacramento (4)**
49:4;88:15,25;89:1
**safe (1)**
25:19
**safeguards (2)**
80:8;118:25
**safety (1)**
89:22
**sale (1)**
91:15
**Samaritan (2)**
91:22;94:10
**same (13)**
14:21;29:22;41:4;
49:9;50:10;60:1;90:11;
91:22;92:16;97:8;
104:6;107:15;121:23
**SAN (2)**
6:1;25:3;49:8;89:24;
91:16
**sanction (1)**
40:11

Min-U-Script®
Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 146
of 151

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) recipient - sanction

**sanguine (1)**
113:10

**satisfaction (1)**
11:10

**satisfied (2)**
8:24;12:24

**save (1)**
17:1

**saying (13)**
13:4;32:23;48:15,18;
55:21;102:7,13;
103:24;106:19,25;
122:20,21;126:8

**SB-901 (1)**
17:21

**SBA (1)**
116:17

**scenarios (2)**
50:8,10

**scene (1)**
20:11

**scenes (3)**
27:2;33:6,6

**scheduled (1)**
18:18

**schedules (1)**
97:20

**scheme (2)**
87:17;107:5

**scholar (1)**
11:1

**score (1)**
35:1

**Scott (1)**
10:7

**second (9)**
38:15;40:1;61:14;
63:1,24;68:3;109:8;
112:20;115:8

**second-guess (1)**
80:4

**Secondly (3)**
40:18;119:8;121:3

**secret (1)**
124:16

**Section (10)**
9:7;22:2;82:20;
87:14;91:17;93:1,16;
96:17;99:21;117:21

**security (1)**
49:16

**seeing (5)**
14:11;42:21;59:15;
62:6,9

**seek (2)**
40:19;94:9

**seeking (3)**
36:3;40:11;114:22

**seem (3)**
39:10;70:19;71:22

**seemed (1)**
35:12

**Seems (3)**

**30:2;60:7;123:17**

**sees (1)**
31:15

**Segal (2)**
9:24,25

**segregation (2)**
47:13;48:11

**select (3)**
80:9;112:13;126:18

**selected (1)**
112:8

**selecting (1)**
119:2

**selection (2)**
114:22;119:2

**self-executing (1)**
12:17

**self-explanatory (1)**
78:14

**Senate (2)**
41:13;88:5

**send (2)**
67:10;74:22

**senior (3)**
35:24;59:17;89:23;
95:6;104:11

**sense (4)**
8:20;45:13;83:15;
106:16

**sentencing (1)**
89:15

**separate (5)**
7:19;12:13;41:21,22;
66:8

**September (9)**
17:24;18:7,13;19:17;
33:11,15;34:3;41:14,
17

**seriatum (1)**
27:21

**serious (3)**
66:7;94:6;100:15

**seriously (3)**
49:20;58:1;64:3

**served (1)**
8:19

**service (2)**
25:20;47:22

**serving (1)**
86:11

**session (3)**
6:4;41:14;49:2

**set (3)**
68:4;75:19;78:23

**settled (4)**
7:20;8:1;61:1,3

**settlement (1)**
70:9

**settling (1)**
62:5

**seventy-five (6)**
15:19;17:25;27:15;
28:1;29:12;30:11

**seventy-five- (1)**
29:1

**several (4)**
7:2;35:4;43:22;
66:10

**severed (1)**
89:7

**share (5)**
7:22;42:6;62:9;73:1;
100:10

**shareable (1)**
97:12

**shared (1)**
122:25

**shareholder (3)**
35:8;48:10;71:6

**shareholders (6)**
32:4;37:25;53:14,19;
54:9,10

**shares (1)**
54:13

**sharing (2)**
109:4;124:9

**sheet (2)**
33:20,21

**Shield (1)**
102:23

**short (4)**
40:4;111:13;112:11;
113:11

**shorten (12)**
15:20,21;16:3;17:16;
29:13,23;33:10;36:14;
37:4,12;42:17;43:4

**shortened (1)**
73:5

**Shortening (4)**
19:20,22,22;76:25

**shorter (4)**
73:2,10;113:13,13

**short-term (2)**
83:18;121:16

**show (6)**
27:9;53:2;66:22;
85:19,25;98:24

**showed (1)**
23:14

**showing (4)**
42:20;95:10;106:18;
124:19

**shown (1)**
101:10

**shows (1)**
104:15

**shredding (1)**
89:12

**sic (4)**
17:11;28:16;29:19;
40:6

**side (3)**
83:10,10;90:2

**sides (1)**
68:5

**sight (1)**
90:3

**sign (1)**
11:5;13:16;113:19;
126:14

**signal (1)**
76:21

**signaled (1)**
49:19

**signatures (1)**
120:15

**significant (2)**
29:14;44:15

**signing (1)**
14:24

**signs (1)**
12:20

**similar (3)**
8:16;97:2;108:18;
122:8

**Similarly (1)**
8:15

**simple (6)**
9:13;30:19;76:4;
77:4,4;108:9

**simply (7)**
8:21;34:8;67:3;
79:18;81:7;99:10;
120:11

**single (1)**
47:24

**Singleton (72)**
8:17;40:18;58:9,10,
12,14,14,15,16,18,20,
25;59:13;60:3,5,9,17,
21;61:1,5,6,11,16,19,
21,23;62:1,2,4,20;63:7,
9,12,15,19;64:12,15,
23;65:4,12,15,22,25;
66:4,6,15,18;67:18,21;
68:1,3,16,21,23,25;
69:7,9,12,15,17;70:1,3,
6,9,15;71:2,8,10;72:6,
7;74:8,20

**Singleton's (1)**
97:24

**sit (3)**
82:4,14,14

**sitting (6)**
6:7,7;29:17;38:4;
50:7;99:13

**situation (6)**
22:14;24:20,21;30:5;
82:23;83:19

**situations (2)**
67:25;69:21

**six (8)**
15:19;29:2,17;41:20;
49:16;67:2,3;113:12

**six-month (2)**
34:7;42:17

**sixty (2)**
30:11;49:17

**size (2)**
17:13;69:18

**skip (1)**
38:2

**slate (1)**
112:21

**sleeves (1)**
111:11

**slippery (1)**
106:17

**slope (1)**
106:17

**slow (1)**
113:25

**small (1)**
81:2

**So- (1)**
124:19

**So-and-So (1)**
111:24

**so-called (1)**
79:22

**sole (1)**
112:3

**solely (1)**
120:5

**solicit (1)**
13:23;120:18

**solution (6)**
24:12;25:24;27:13;
52:7;68:12,13

**solutions (1)**
26:9

**solve (1)**
95:3

**solved (2)**
30:21;31:4

**solvent (1)**
45:19

**somebody (8)**
28:6;55:21;62:5;
105:8;123:13,16;
124:2,3

**somehow (1)**
114:17

**someone (6)**
70:7;80:12;94:7;
100:8,14;127:17

**someone's (1)**
42:12

**sometime (1)**
17:19

**sometimes (2)**
16:13;47:15

**somewhat (2)**
73:9;113:10

**soon (9)**
11:4,10;36:11;37:13;
39:6;74:7;83:7;125:7,
10

**sorry (9)**
6:23;12:23;18:7;
19:22;37:20;58:15;

61:10;68:21;70:18
**sort (7)**
25:4;30:5;73:24;
75:23;81:8;118:6,9
**sorts (2)**
67:16;102:8
**sought (1)**
36:17
**sounds (1)**
30:22
**source (1)**
121:20
**Southern (1)**
49:8
**speak (3)**
18:18;65:6;97:19
**speaking (3)**
43:5;59:14;125:22
**special (3)**
113:3,5;122:17
**specialist (2)**
58:20;65:9
**specific (6)**
27:16,17;53:21,22;
62:25;68:7;69:6;80:18
**specifically (2)**
26:11;59:19
**specifics (2)**
69:25;79:8
**speculation (1)**
125:1
**spending (1)**
97:18
**spent (2)**
11:22;81:12
**spirited (1)**
128:1
**spoken (1)**
79:10
**stability-wise (1)**
30:9
**stabilize (1)**
88:7
**stabilizing (1)**
21:17
**stakeholders (4)**
25:25;26:1;59:23;
89:7
**stand (5)**
6:8,12,12;84:10,19
**standard (1)**
48:22
**standards (1)**
94:10
**standing (6)**
6:7,8;23:11;45:25;
46:16;116:6
**standpoint (1)**
31:13
**stands (1)**
72:20
**start (8)**
15:12;42:10;43:7;

64:3,3,13;113:20;
118:18
**started (3)**
11:11;26:8;63:17
**starting (2)**
23:15;42:16
**start-up (1)**
11:21
**state (16)**
13:20;24:23;26:6;
28:15,17;40:13;42:20;
47:18;49:7;66:10;67:8;
74:9;75:17;85:15;
91:18,22
**stated (4)**
36:21;89:14;119:20;
126:16
**statement (13)**
9:13;10:22;14:12;
35:25;38:23;40:12,20,
22;43:9;59:16;72:18;
78:12;126:22
**statements (1)**
9:10
**States (8)**
9:2;80:6,16,17;
104:20;114:11,13,21
**stating (1)**
59:8
**statistics (1)**
53:2
**status (3)**
27:20;28:16;79:14
**status-check (1)**
28:12
**statute (2)**
15:24;36:6
**statutory (1)**
106:3
**stay (1)**
110:19
**step (2)**
63:1;93:2
**Stephen (3)**
6:23,25;73:15
**stepped (1)**
92:11
**stick (3)**
68:24;76:5;86:23
**still (9)**
36:20;39:8;45:25;
48:19;56:18;70:11;
73:20;96:5;104:4
**stipulation (3)**
7:9,18,19
**stock (1)**
52:1
**storm (1)**
46:11
**Strauss (1)**
35:23
**strawman (2)**
49:11,11

**stretch (3)**
55:8,11,17
**strictly (1)**
63:2
**strides (1)**
21:17
**strike (1)**
88:3
**stroke (1)**
69:5
**strong (1)**
33:18
**strongly (1)**
49:19
**stuff (1)**
74:22
**stumbled (1)**
38:13
**stunned (1)**
56:6
**subcommittee (2)**
80:15;82:15
**subject (5)**
20:14;81:15;86:5;
100:15;104:17
**submit (4)**
13:6;77:4;121:1,5
**submitted (4)**
8:3;16:10;85:11;
125:3
**subrogation (4)**
7:14;19:2,4;20:9
**subrogations (1)**
19:3
**substance (1)**
56:19
**substantive (3)**
19:5;59:22;66:11
**substantively (1)**
56:22
**successful (1)**
41:17
**sudden (1)**
21:5
**suddenly (1)**
66:2
**suffered (1)**
104:25
**suffering (3)**
50:16,19;102:6
**sufficient (1)**
18:23
**suggest (1)**
38:6
**suggested (1)**
82:16
**suggesting (2)**
17:25;74:9
**suggestion (5)**
43:14;52:19;66:19;
111:6;118:1
**suggestions (1)**
52:8

**summer (3)**
17:19;26:9;33:13
**Superior (1)**
67:11;74:22
**support (6)**
38:3;42:22,23;88:13,
24,25
**suppose (4)**
29:14;51:22;59:2;
121:15
**supposed (2)**
55:18;112:21
**Supreme (1)**
107:9
**Sure (20)**
7:4;10:11;11:8;14:18;
28:5;61:16;67:4;68:25;
69:2;81:4,19;105:7;
108:21;109:19,22;
115:12;118:5;121:22;
122:1;123:25
**surprised (4)**
50:23;51:5;71:21;
98:1
**survived (1)**
84:22
**sync (1)**
29:2
**system (2)**
74:10,13

## T

**table (2)**
48:17;111:11
**tail (1)**
46:6
**talk (8)**
14:4;47:10;57:18;
59:7;67:22;75:5;76:14;
107:23
**talked (2)**
27:7;51:11
**talking (6)**
47:12;60:11;71:23;
81:12;97:18;110:21
**task (2)**
24:19;57:11
**taxpayers (1)**
71:15
**TCC (2)**
25:1;55:3
**technical (2)**
61:13;122:13
**telephone (1)**
14:2
**telling (7)**
23:9;73:17;75:1;
98:8;104:10;111:8;
120:14
**tells (2)**
95:3;112:25
**temporary (2)**

95:10;121:25
**ten (1)**
77:22
**ten-minute (2)**
77:20,21
**tens (3)**
46:5,6;71:3
**tent (1)**
48:19
**tents (1)**
105:4
**term (8)**
8:1,1;24:5;33:20,21;
65:9;89:6;126:17
**terminate (11)**
20:25;21:21;27:22;
28:12;30:9;32:24;
34:22;36:15;37:3,12;
40:19
**terminated (5)**
21:6;22:19;32:19;
38:18;73:6
**Terminating (2)**
22:4;26:12
**termination (2)**
26:18;32:14
**terminology (1)**
127:6
**terms (4)**
10:19;68:9;69:17;
127:10
**terribly (1)**
60:13
**testimony (1)**
89:1
**Thanks (1)**
42:25
**That'd (1)**
40:5
**that'll (2)**
24:12;41:16
**theory (3)**
80:4;96:12;120:13
**therefore (6)**
16:16;79:20;83:3,17;
92:23;95:16
**there're (1)**
28:25
**thinking (3)**
33:15;38:5;73:22
**third (2)**
84:17;90:15
**thirty (1)**
40:23
**thorough (1)**
120:9
**though (5)**
10:13;39:5,7;70:6;
122:14
**thought (5)**
23:14;83:8;111:4;
112:22;125:12
**thoughtful (2)**

Min-U-Script®

Case: 19-30088    Doc# 2210    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 148
of 151

(18) sort - thoughtful

9:9;35:9
**thousand (2)**
101:15,17
**thousands (7)**
40:23;45:12;46:5,7;
61:1;70:16;71:4
**threat (1)**
52:24
**three (7)**
11:3;29:19;66:8;
86:17;88:3;89:13;
90:14
**throw (1)**
51:23
**tied (1)**
106:13
**tightly (1)**
106:13
**time-efficient (1)**
14:7
**times (1)**
66:10
**timetable (2)**
27:16,17
**tipping (1)**
45:17
**tire (1)**
51:8
**today (49)**
10:9;10;18:18;19:18;
20:24;26:13;32:4;
34:13,21;36:15;37:7,
17;42:3,19;43:5,10;
50:19;51:10;54:24,25;
56:17;57:3;58:9;64:14;
65:16;75:11,24;76:2;
77:7;82:3,11;83:24;
85:4;86:11;89:22;
90:12,16;91:4,8;
92:1;99:14;100:23;
104:16;107:16;108:10;
113:24;114:2;123:4
**today's (3)**
31:2;43:11;86:19
**to-do (1)**
65:2
**together (4)**
31:10;42:12;53:19;
54:19
**Togut (3)**
9:24,24,24
**told (3)**
18:9;102:23;125:20
**tomorrow (9)**
30:20;52:2;55:1,2;
65:13,15;73:19;86:3;
123:4
**took (1)**
41:13
**tort (49)**
7:9;9:2;18:15;38:16,
17;43:8,18;44:12;45:2,
15,22;46:14;47:25;

48:12,14;49:18;50:7,
15;53:16,17;54:19;
57:2;58:1;59:16;60:6;
62:7,8;67:23;74:11,13;
75:14,19,21;76:8,10;
78:25;79:11,13,23;
81:7;84:4,5;102:22;
106:17;109:9;110:18,
18;112:15;125:21
**torts (1)**
81:2
**total (1)**
18:22
**totally (1)**
82:13
**touched (2)**
70:23;74:21
**tours (1)**
89:25
**toward (3)**
36:8;37:1;62:10
**towards (4)**
27:11;36:12,24;37:8
**tower (1)**
94:5
**track (2)**
103:22;116:4
**trade (8)**
21:19;47:2,4,4,6;
48:8,11;110:3
**traded (1)**
46:19
**traders (3)**
48:2,13;57:13
**trading (2)**
47:14,16
**trailer (2)**
105:9;123:17
**trailers (1)**
105:4
**transcript (1)**
89:15
**travelled (1)**
44:3
**treated (3)**
65:1;80:23;95:18
**treatment (1)**
25:19
**Tredinnick (2)**
58:7,8
**trial (2)**
67:11,12
**trials (1)**
68:14
**tried (2)**
35:7;120:15
**triggering (1)**
116:20
**Trostle (1)**
101:10
**trouble (4)**
92:7;100:18;123:1,2
**troublemakers (1)**

51:8
**TROY (7)**
116:8,9,16,22,24;
117:2,14
**truck (1)**
94:12
**true (7)**
24:4;40:15;54:14,16;
60:1;62:25;104:4
**trust (3)**
74:12;89:7;122:6
**Trustee (20)**
9:2;11:20,25;12:20,
21,24;13:2;80:6,16,17;
102:1;104:6;111:9;
112:3,18,24;114:5,12,
13,21
**trusts (1)**
74:24
**truth (2)**
52:20,21
**try (14)**
19:10,12;48:13;69:4;
74:1;96:17;100:8;
101:21;104:14;109:7;
111:20;112:11;113:25;
114:1
**trying (14)**
6:13;19:18;23:8;
40:15;48:7;61:17;
86:16;91:6;95:25;
118:8;121:13
**Tubbs (7)**
63:19,21;64:1,6,18;
66:3,13
**Tuesday (1)**
31:2
**Tuesdays (1)**
31:1
**turf (1)**
112:4
**turn (5)**
26:11,11;74:6;85:6;
86:22
**Turner (1)**
101:6
**turns (2)**
29:3;77:21
**tweak (1)**
11:20
**twenty (4)**
63:17;101:24;102:2;
110:22
**twenty-one (4)**
63:10,13,16;66:24
**two (35)**
9:12;13:12,24;15:8;
17:4,9;20:19;21:9;
38:13;47:2;48:8;49:7;
62:16;63:23;67:7;
71:14,24;80:15;83:9;
85:3;86:22;89:13;
90:12,15,19;91:25;

92:4;93:19;101:2;
108:23;110:19,21;
111:20;118:1;120:4
**two-and-a-half (1)**
35:1
**type (2)**
34:9;98:17

**U**

**UCC (1)**
78:25
**ultimately (2)**
15:21;115:2
**Um-hum (11)**
24:15;27:8;43:21;
52:16;59:12;60:25;
63:18;65:25;70:8;
87:22;88:10
**unbelievably (1)**
38:21
**uncertainty (1)**
22:1
**unconditional (1)**
34:7
**uncontested (1)**
6:19
**under (30)**
9:7;22:2;31:8;59:14;
72:4;80:3;81:5,14,15;
82:19,19;83:6,16,18;
87:21;91:17;93:16,23;
94:9;95:15;96:3;
102:18;106:20;107:4,
4;116:18;122:16;
124:20;127:3,17
**underlying (1)**
120:6
**understands (1)**
48:17
**Understood (9)**
60:17;63:15;66:18;
67:21,21;68:1,16,23;
69:7
**underway (1)**
20:19
**unfettered (1)**
34:6
**Unfortunately (1)**
97:19
**uninsured (1)**
70:12
**unique (1)**
21:15
**UNISON (1)**
128:8
**United (7)**
9:2;80:6,16,17;
114:11,13,21
**unknowns (1)**
29:22
**unless (10)**
7:5;53:4;78:12;

80:12;82:6;88:13;98:2;
111:2;115:8;127:24
**unlike (1)**
44:21
**unliquidated (3)**
97:21;102:11;127:8
**unrelated (1)**
60:14
**unsecured (10)**
7:9;35:24;59:17;
79:10,15;80:19;98:3;
109:15,16;112:15
**unspeakable (1)**
109:2
**untenable (2)**
24:20,21
**up (35)**
29:3;7;31:3;39:9;
42:13;43:7;44:4;48:6;
49:17;68:12;72:15;
76:1,11;80:2,17;84:10,
19;85:2,5;86:17;90:1,
5;92:4;100:11;102:1;
106:11;111:10,21;
113:8;115:2,23;116:6;
118:10;124:19;127:12
**upon (7)**
38:13;75:12,24;77:6;
85:4;86:24;90:20
**urge (1)**
43:1
**urgency (1)**
70:20
**urgent (2)**
44:1;95:10
**urges (1)**
33:10
**use (8)**
34:10;53:25;71:24;
118:24;124:1;125:5;
126:16,17
**used (3)**
34:10;95:13;107:22
**using (1)**
113:3
**usual (1)**
126:16
**usually (1)**
31:1
**utilities (4)**
24:21,22;49:7;88:9
**utilities' (1)**
24:14
**utility (7)**
26:4;47:13,17,18,21;
70:24;71:12
**utility's (3)**
49:13;59:24;71:2
**uttered (1)**
109:20

**V**

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 149
of 151

**vacation (1)**
33:13
**valid (1)**
53:25
**valuable (1)**
83:12
**valuation (1)**
50:12
**value (2)**
57:25;107:3
**variables (1)**
29:1
**various (3)**
80:5;83:1;116:10
**vast (1)**
97:25
**vendor (1)**
47:3
**verboten (1)**
108:3
**versus (4)**
29:12,22;32:14;
56:17
**viability (1)**
24:13
**viable (9)**
28:6;29:25;36:24;
54:23;55:1,4;71:16;
73:4,21
**victim (13)**
80:22,24;91:21;
92:12;93:24;94:9;
95:17;97:11,12;
101:19,20;121:24,24
**victims (39)**
25:19;46:14;50:15;
56:3,20;65:1;66:14,14;
67:22;74:7;75:13,21;
76:1;83:2,9;86:4;88:7,
13;91:1,3;97:19,25;
99:15;102:10,22;
109:1,17;110:16,18,25;
113:11;116:14;121:9;
122:17;123:5,5;125:5;
126:24;127:5
**victim's (2)**
95:18,19
**video (2)**
40:2,5
**view (10)**
29:4;34:2,8;44:20;
76:3,17,19;88:12;
112:14;118:7
**vigilantly (1)**
36:18
**Villacorta (12)**
114:4,7,10,11,16,19;
115:1,14,16,22;116:1,3
**virtually (1)**
110:15
**voice (3)**
48:20;89:18,19
**voluntarily (2)**

78:20;80:1
**volunteered (1)**
119:20
**vote (2)**
54:10;72:3
**vote-counting (1)**
71:19
**voted (1)**
101:6
**votes (2)**
35:1;72:3

**W**

**wait (3)**
13:4;40:1;48:24
**waiting (1)**
50:16
**wakes (1)**
31:3
**walk (5)**
26:1;93:22;94:11,20;
113:25
**walked (1)**
94:17
**walking (1)**
30:8
**Walnut (5)**
91:16,23;92:5;
106:24;121:14
**wants (9)**
13:1,21;14:7;79:17;
111:24;117:16,17;
118:13;121:5
**warrant (3)**
29:4;30:12;31:9
**warranted (5)**
26:14;31:16;34:19;
35:15;37:11
**Washington (1)**
78:4
**waste (2)**
32:22;51:7
**watch (1)**
50:11
**watching (1)**
36:18
**water (2)**
105:3;123:17
**waterfall (1)**
50:11
**way (44)**
7:6,11;14:8,21;
15:11;16:1;20:16;
21:16;24:6;25:22;
28:17;32:2;36:20;
41:20;56:4;57:12,24;
64:20;75:20;76:11,23;
83:7;90:11;92:1,25;
97:5;98:5;100:8;101:8;
104:6;105:7,17;
107:15;111:16;113:21;
114:16;118:20;120:23,

24;123:6,25;124:4;
125:16;126:4
**ways (2)**
67:16;108:4
**WEDNESDAY (1)**
6:1
**week (4)**
39:8;55:2,3;111:24
**weekly (1)**
89:12
**weeks (2)**
40:22;89:13
**weeks' (1)**
21:9
**Weil (3)**
6:25;7:1;73:16
**welcome (4)**
6:8,8;58:22;60:12
**welfare (1)**
85:16
**weren't (3)**
92:17,19;125:12
**what's (7)**
21:23;27:2,10,10;
29:19;34:17,17;51:14;
55:5;56:17,18;65:17;
71:20;85:20;86:9,9;
96:7;98:25;104:19;
111:6,25
**whenever (1)**
72:3
**Whereas (1)**
67:5
**Where's (1)**
27:5
**Whereupon (1)**
128:9
**who'd (1)**
105:9
**whole (2)**
98:9;107:5
**wholly (1)**
109:5
**who's (2)**
47:11;94:7
**whose (3)**
12:5;19:2;45:20
**wife (1)**
84:21
**wildfire (20)**
15:10;17:8;24:25;
26:7;27:11;38:22;46:3;
57:17;60:24;61:2;62:5,
16;63:2;77:11;78:9;
88:7;95:8;109:1,17;
124:20
**wildfires (1)**
45:10
**willfully (1)**
89:16
**Williams (2)**
88:21;103:11
**Williams' (2)**

99:21;104:20
**willing (9)**
18:10;74:6;78:15,17,
18,20;79:6;112:19;
117:25
**Willis (1)**
101:5
**Willkie (2)**
7:13;72:12
**Wilson (2)**
84:18,20
**wish (3)**
12:25;25:6;73:14
**wishes (4)**
9:6;55:16;57:2;
80:17
**withdraw (3)**
9:4;53:20;107:16
**withdrawn (1)**
108:12
**within (4)**
39:8;51:1;119:5;
126:6
**without (4)**
8:6;9:7;111:5;
123:17
**woman (2)**
69:23;85:15
**Women (1)**
102:22
**word (6)**
21:3;33:9,18;34:10;
113:3;124:1
**words (10)**
10:19;21:3;24:20;
29:13;50:20;51:20;
54:24;73:18;109:9;
121:24
**work (11)**
19:10;74:1;79:3;
82:15;83:24;108:5;
111:5;118:1;121:21;
126:19;127:22
**workable (1)**
125:18
**worked (2)**
7:11;68:17
**working (4)**
11:11;26:5;81:24;
83:21
**works (1)**
98:18
**world (4)**
64:16;65:24;66:1;
110:21
**worried (1)**
25:14
**worry (1)**
83:4
**worst (1)**
22:14
**worth (1)**
110:22

**written (1)**
10:21
**wrong (5)**
82:10;98:2;100:12;
102:9;124:1

**Y**

**year (2)**
46:5;107:10
**year-and-a-half (1)**
16:7
**years (3)**
33:25;74:10;82:24
**yell (1)**
91:12
**yesterday (1)**
37:22
**York (1)**
8:1

**Z**

**zero (3)**
35:2,4;41:20

**1**

**1 (1)**
6:1
**1- (1)**
121:18
**1,000 (2)**
121:16;124:20
**10 (1)**
30:23
**10:56 (1)**
77:24
**105 (7)**
78:17;79:6;82:20;
91:24;93:16;104:17;
119:15
**105-million-dollar (1)**
120:3
**10Q (1)**
88:1
**10X (1)**
68:11
**11 (4)**
20:4;30:19;51:6;
110:8
**11:03 (1)**
77:24
**1121 (1)**
22:2
**1121d (1)**
57:19
**11th (1)**
19:14
**12:01 (1)**
128:9
**120 (1)**
32:11

**14,000 (1)**
  68:14
**15th (1)**
  41:11
**180 (1)**
  16:5
**19th (1)**
  18:13

## 2

**2 (1)**
  88:1
**20,000 (1)**
  103:15
**20.5 (1)**
  59:25
**2001 (2)**
  16:4;44:23
**2008 (1)**
  59:18
**2015 (12)**
  48:6,18;63:10;64:22;
  70:11;81:10;89:2,2;
  97:24;117:1,4;125:5
**2017 (8)**
  18:8,10;45:16;46:8;
  48:19;70:15,18;97:25
**2018 (4)**
  45:17;48:19;96:10;
  97:25
**2019 (14)**
  6:1;38:23;39:2,3;
  40:12,20,22;43:9,16;
  49:2;70:18;72:18,20,
  22
**2020 (1)**
  49:3
**22nd (1)**
  64:14
**250 (2)**
  98:15,21
**282 (1)**
  52:20
**28th (1)**
  64:19
**29th (4)**
  63:25;64:13,19;
  69:20
**2X (1)**
  68:11

## 3

**313 (1)**
  104:21
**327 (1)**
  9:7
**363 (4)**
  82:19;93:16;106:20;
  107:5
**363b (1)**
  87:21

**363b3 (1)**
  91:17

## 4

**4- (1)**
  121:18
**4.5 (1)**
  71:5
**4.9 (1)**
  99:22
**444 (1)**
  52:20

## 5

**5 (1)**
  44:4
**5- (1)**
  121:18
**5,000 (3)**
  101:21;121:10,17
**5,000-dollar (1)**
  121:16
**500 (2)**
  101:20;105:14
**507 (2)**
  87:14,16
**517 (1)**
  53:13

## 6

**66 (1)**
  53:11

## 7

**7 (2)**
  101:23;104:6
**700 (1)**
  61:3
**75 (1)**
  32:11

## 9

**9:31 (1)**
  6:1
**901 (4)**
  17:20;41:13;49:10;
  88:5

Case: 19-30088    Doc# 2210    Filed: 05/23/19    Entered: 05/23/19 15:44:46    Page 151
of 151