Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: 628.208.6434
Facsimile: 310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.442.8875
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter Number: 11 (Lead Case) |
| -and- | (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **DECLARATION OF STEVEN WEISBROT IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. §§ 105(a), 501, AND FED R. BANKR. P. 3003(c), 5005 AND 9007 FOR ENTRY OF AN ORDER (I) APPROVING A SEPARATE BAR DATE FOR FIRE CLAIMS, (II) APPROVING THE FORM FOR NOTICE OF THE BAR DATE FOR FIRE CLAIMS AND RELATED PROCEDURES, AND (III) APPROVING SUPPLEMENTAL PROCEDURES FOR PROVIDING NOTICE OF IMPORTANT DEADLINES TO FIRE CLAIMANTS** |
| **Debtors**, | |
| □ Affects PG&E Corporation | |
| □ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Date: June 11, 2019 |
| | Time: 9:30 a.m. (Pacific Time) |
| | Place: United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco, CA 94102 |
| | Objection Deadline: June 10, 2019, 4:00 p.m. (Pacific Time) |

STEVEN WEISBROT declares as follows under penalty of perjury

1.      I am a partner at the class action notice and settlement administration firm Angeion Group, LLC ("**Angeion**").

2.      I have personal knowledge of the facts stated herein except as to matters where I indicate otherwise, and as to those matters, I believe them to be true.  If called upon to testify, I could and would competently do so.  I make this declaration in support of the (1) Objection (the "**Objection**") of the Official Committee of Tort Claimants (the "**TCC**") to the Motion of the Debtors for an Order (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing the Form and Manner of Notice Thereof, and (iii) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (Dkt. No. 1784) (the "**Motion**"), (2) Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Angeion Group, LLC as Fire Claim Bar Date Noticing Agent Effective as of May 22, 2019 (the "**Application**") in accordance with the terms and conditions set forth in the Statement of Work and Project Proposal (the **"Agreement"**) attached hereto as **Exhibit A**; and (3) the Motion of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 105(a), 501, and Fed R. Bankr. P. 3003(c), 5005 and 9007 for Entry of an Order (i) Approving a Separate Bar Date for Fire Claims, (ii) Approving the Form for Notice of the Bar Date for Fire Claims  and Related Procedures, and (iii) Approving Supplemental Procedures for Providing Notice of Important Deadlines to Fire Claimants (the "**Bar Date Motion**").  The TCC's Objection, Application, and Bar Date Motion are being filed concurrently herewith.

## BACKGROUND AND QUALIFICATIONS

3.      I have been responsible, in whole or in part, for the design and implementation of hundreds of court-approved notice and administration programs including some of the largest and most complex notice plans in recent history.  I have taught numerous accredited Continuing Legal Education courses on the Ethics of Legal Notification in Class Action Settlements, using Digital Media in Due Process Notice Programs, as well as Claims Administration, generally.  I am the author of multiple articles on Class Action Notice, Claims Administration, and Notice Design in publications such as *Bloomberg*, *BNA Class Action Litigation Report*, *Law360*, the American Bar

Association's *Class Action and Derivative Section Newsletter* and I am a frequent speaker on notice issues at conferences throughout the United States and internationally.

4.     I was certified as a professional in digital media sales by the Interactive Advertising Bureau ("**IAB**") and I am co-author of the Digital Media section of Duke Law's *Guidelines and Best Practices—Implementing 2018 Amendments to Rule 23*.

5.     I have given public comment and written testimony to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, broadcast media, digital media and print publication, in effecting Due Process notice, and I have met with representatives of the Federal Judicial Center to discuss the 2018 amendments to Federal Rule of Civil Procedure 23 and suggest an educational curriculum for the judiciary concerning notice procedures.  A copy of relevant judicial recognition of Angeion Group's notice programs is attached hereto as **Exhibit B**.

6.     Prior to joining Angeion's executive team, I was employed as the Director of Class Action services at Kurtzman Carson Consultants, an experienced notice and settlement administrator.  Prior to my notice and claims administration experience, I was employed in private law practice.

7.     My notice work comprises a wide range of settlements that include product defect, mass disasters, false advertising, employment, antitrust, tobacco, banking, firearm, insurance, and bankruptcy cases.  I have been at the forefront of infusing digital media, as well as big data and advanced targeting, into class action notice programs.  For example, the Honorable Sarah Vance stated in her December 31, 2014 Order in In Re: Pool Products Distribution Market Antitrust Litigation, MDL No. 2328:

> To make up for the lack of individual notice to the remainder of the class, the parties propose a print and web-based plan for publicizing notice.  The Court welcomes the inclusion of web-based forms of communication in the plan…. The Court finds that the proposed method of notice satisfies the requirements of Rule 23(c)(2)(B) and due process.
>
> The direct emailing of notice to those potential class members for whom Hayward and Zodiac have a valid email address, along with publication of notice in print and on the web, is reasonably calculated to apprise class members of the settlement.

8. As detailed below, courts have repeatedly recognized my work in the design of class action notice programs:

a. On February 24, 2017, The Honorable Ronald B. Rubin in *James Roy et al. v. Titeflex Corporation et al.*, No. 384003V (Md. Cir. Ct.), noted when granting preliminary approval to the settlement:

> What is impressive to me about this settlement is in addition to all the usual recitation of road racing litanies is that there is going to be a) public notice of a real nature and b) about a matter concerning not just money but public safety and then folks will have the knowledge to decide for themselves whether to take steps to protect themselves or not. And that's probably the best thing a government can do is to arm their citizens with knowledge and then the citizens can make a decision. To me that is a key piece of this deal. ***I think the notice provisions are exquisite***. (Emphasis added).

b. Likewise, on July 21, 2017, The Honorable John A. Ross in *In Re Ashley Madison Customer Data Security Breach Litigation*, MDL No. 2669 (E.D. Mo.), stated in the Court's Order granting preliminary approval of the settlement:

> The Court further finds that the method of disseminating Notice, as set forth in the Motion, the Declaration of Steven Weisbrot, Esq. on Adequacy of Notice Program, dated July 13, 2017, and the Parties' Stipulation—including an extensive and targeted publication campaign composed of both consumer magazine publications in People and Sports Illustrated, as well as serving 11,484,000 highly targeted digital banner ads to reach the prospective class members that will deliver approximately 75.3% reach with an average frequency of 3.04 — ***is the best method of notice practicable under the circumstances and satisfies all requirements provided in Rule 23(c)(2)(B) and all Constitutional requirements including those of due process***. (Emphasis added).

> The Court further finds that the Notice fully satisfies Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process; provided, that the Parties, by agreement, may revise the Notice, the Claim Form, and other exhibits to the Stipulation, in ways that are not material or ways that are appropriate to update those documents for purposes of accuracy.

c. *In the In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 17-md-02777-EMC (N.D. Cal.), in the Court's February 11, 2019 Order, the Honorable Edward M. Chen ruled:

[In addition] the Court finds that the language of the class notices (short and long-form) is appropriate and that the means of notice – which includes mail notice, electronic notice, publication notice, and social media "marketing" – is the "best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); see also Proc. Guidance for Class Action Sett. ¶¶ 3-5, 9 (addressing class notice, opt-outs, and objections). The Court notes that the means of notice has changed somewhat, as explained in the Supplemental Weisbrot Declaration filed on February 8, 2019, so that notice will be more targeted and effective. See generally Docket No. 525 (Supp. Weisbrot Decl.) (addressing, inter alia, press release to be distributed via national newswire service, digital and social media marketing designed to enhance notice, and "reminder" first-class mail notice when AEM becomes available).

d.    On June 26, 2018, in his Order granting preliminary approval of the settlement in *Mayhew v. KAS Direct, LLC, et al.*, Case No. 16-cv-6981 (VB) (S.D.N.Y.), The Honorable Vincent J. Briccetti ruled:

In connection with their motion, plaintiffs provide the declaration of Steven Weisbrot, Esq., a principal at the firm Angeion Group, LLC, which will serve as the notice and settlement administrator in this case. (Doc. #101, Ex. F: Weisbrot Decl.) According to Mr. Weisbrot, he has been responsible for the design and implementation of hundreds of class action administration plans, has taught courses on class action claims administration, and has given testimony to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, and digital media in due process notice. Mr. Weisbrot states that the internet banner advertisement campaign will be responsive to search terms relevant to "baby wipes, baby products, baby care products, detergents, sanitizers, baby lotion, [and] diapers," and will target users who are currently browsing or recently browsed categories "such as parenting, toddlers, baby care, [and] organic products." (Weisbrot Decl. ¶ 18). According to Mr. Weisbrot, the internet banner advertising campaign will reach seventy percent of the proposed class members at least three times each. (Id. ¶ 9). Accordingly, the Court approves of the manner of notice proposed by the parties as it is reasonable and the best practicable option for confirming the class members receive notice.

9.    By way of background, Angeion is an experienced class action notice and claims administration company formed by a team of executives that have had extensive tenures at five other nationally recognized claims administration companies. Collectively, the management team at Angeion has overseen more than 2,000 class action settlements and distributed over $10 billion to class members. The executive profiles as well as the company overview are available at

http://www.angeiongroup.com/meet_the_team.htm.

**DISINTERESTEDNESS**

10.     In connection with its proposed retention by the TCC in the Debtors' Cases, Angeion obtained from the TCC and/or its representatives the names of individuals and entities that may be parties in interest in the Cases (the "**Potential Parties in Interest**"). Angeion then circulated the names to all Angeion Group Partners requesting disclosure of relationships with any party included in the Potential Parties in Interest. Additionally, Angeion requested disclosure by all Angeion Group Partners to the best of their knowledge, of any claims held against, or equity interest in, any of the Debtors.

11.     Additionally, Angeion searched its client database ("**Firm Database**") for Potential Parties in Interest in the following categories: (a) Debtors; (b) Debtors' Affiliates and Subsidiaries; (c) Banks at which the Debtors hold accounts; (d) Debtors' current Officers and Directors; and (e) Debtors' Term and Revolving Loan Lenders and Administrative Agents. Because of the length of the Debtors' Potential Parties in Interest List, a search of every name thereon would have produced little meaningful information for Angeion, the Court, and parties in interest to evaluate Angeion's relationships with Potential Parties in Interest.

12.     To the extent the search of the Firm Database and the inquiries to the Angeion Group Partners indicated that Angeion presently has, or had within the last five years, a relationship with a Potential Party in Interest, the identities of such Parties and Angeion's relationships therewith are set forth on **Schedule 1**, attached hereto and incorporated herein.

13.     To the best of my knowledge and belief, Angeion's relationship with each entity listed on Schedule 1 (or their apparent affiliates or entities that Angeion believes to be affiliates, as the case may be) was or is only on matters that are unrelated to the Debtors and these Cases.

14.     In several instances, the names on the Debtors' list of Potential Parties in Interest were very common and/or generic. As such, it was not possible to identify with certainty whether Angeion has any client relationship to disclose for those specific names.

15.     Given the breadth of Angeion's client base, however, it is possible that Angeion

may now or in the future be retained by one or more of the Potential Parties in Interest in unrelated matters without my knowledge. To the extent the Debtors discover and disclose additional Potential Parties in Interest during the course of these Cases, Angeion will use reasonable efforts to identify whether a material relationship exists with any such parties. To the extent that Angeion discovers or enters into any new, material relationship with Potential Parties in Interest, it will supplement this Declaration.

16.     In addition Angeion may also have been engaged by affiliates, equity holders or sponsors of Potential Parties in Interest and Angeion may have worked with, continue to work with, have or had mutual clients with, been represented by and/or advised certain accounting and law firms that are Potential Parties in Interest (and, in the case of law firms, may have entered into engagement agreements in which the law firm was named as client although the work was performed for a mutual client of Angeion's and the applicable law firm.)

17.     Although Angeion has researched the Potential Parties in Interest list, the Debtors may have customers, creditors, competitors, and other parties with whom they maintain business relationships that are not included as Potential Parties in Interest and with whom Angeion may maintain business relationships.  It is possible that certain of Angeion's and its respective Partners and employees may have had in the past, may currently have, or may in the future have connections to (a) the Debtors, (b) Potential Parties in Interest, or (c) funds or other investment vehicles that may own debt or securities of the Debtors or Potential Parties in Interest.

18.     Other than as disclosed herein, Angeion has no relationship with the Debtors of which I am aware after due inquiry. Based on the foregoing, I believe Angeion is disinterested as defined in section 101(14) of the Bankruptcy Code and does not hold or represent an interest materially adverse to the Debtors or their estates.

19.     The compensation structure set forth in the Application and Agreement were negotiated at arms' length and are consistent with Angeion's typical compensation for work of this nature.

20.     This declaration outlines why Debtors' proposed Supplemental Notice Plan (“**Debtors' Supplemental Notice Plan**” or “**DSNP**”), which the Debtors proffer ostensibly to

attempt to provide supplemental notice of the Bar Date to unknown creditors, including Unknown Fire Claimants, is inadequate.  This declaration will also describe the notice strategy that Angeion Group and the TCC propose to use in this Litigation, (the "**TCC Notice Program**" or the "**Notice Program**") including the considerations that informed the development of the Notice Program and why it will be effective.

## CRITICAL DEFICIENCIES IN THE DEBTORS' DIRECT NOTICE PLAN

21.  From my review of the Motion and the Declaration of Benjamin P. D. Schrag, Debtors are only proposing to provide direct notice to prepetition lenders, bondholders, other financial creditors, trade creditors, parties to pending or threatened litigation (other than Wildfire Claimants and Wildfire Subrogation Claimants), current and former employees, contract and lease counterparties, and other traditional creditors and parties in interest in these Chapter 11 Cases.

22.  Under its notice procedures, PG&E proposes to provide written notice to parties it considers "Known Wildfire Claimants"—those claimants who filed pre-petition complaints and have already filed proofs of claim.  Debtors represent they will make efforts to send notice to 2017 North Bay Fire claimants identified by a GIS database, but do not indicate they will use the same GIS database to identify (or notice) 2018 Camp Fire claimants.  PG&E is not proposing to take actions to obtain updated contact information for Fire Claimants displaced by the fires beyond the forwarding information available from the U.S. Postal Service.

23.  With respect to updated address information from the BrownGreer database and insurance files, PG&E indicates (without a timeline) that it will request this information.  To the extent such information is provided to PG&E "reasonably in advance of the entry of the Proposed Order," PG&E will send notice by first class mail to any claimants identified therein.  PG&E indicates it will undertake no additional investigation or search beyond those discussed above.

24.  Based on my extensive professional experience, Debtors' unwillingness to undertake a diligent search for the current contact information of known creditors is highly unusual.  As discussed below, the TCC's proposed notice procedures remedies this critical deficiency in the Debtors' procedures by providing for a diligent investigation into the identity and current contact information for known or reasonably ascertainable Fire Claimants.

## CRITICAL DEFICIENCIES IN THE DEBTORS' SUPPLEMENTAL NOTICE PLAN

25. The media plan promulgated by the Debtor is not reasonably calculated to provide due process of law. It does not rely on established media best practices, it does not make use of contemporary media channels, nor does it provide transparency of process, including using verified third-party research to validate their suggested media placements. As discussed below, the TCC's proposed media plan provides a robust, targeted, integrated plan composed of the most advanced and targeted technology currently available, as well as time-tested techniques to truly reach and inform fire claimants of the Bar Date Notice.

26. Design, implementation, and evaluation of a notice plan are guided by due process considerations under the United States Constitution, by federal and local rules, and by case law pertaining to due process notice.

27. It is long established by Supreme Court precedent that the twin goals of a due process notice plan are that the plan must desire to *actually* inform the absentee population and that the plan must use means reasonably calculated to do so.

> "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane v. Central Hanover Trust*, 339 U.S. 306, 315 (1950).

> "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) citing *Mullane* at 314.

28. The level of process due to a party prior to the deprivation of a property interest (such as a bankruptcy discharge) is highly dependent on the context. As the Supreme Court has repeatedly emphasized, "'[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)). Thus, "process that may be constitutionally sufficient in one setting may be insufficient in another." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3rd Cir. 2008).

29. On November 1, 2018, the Northern District of California issued Procedural

Guidance for Class Action Settlements. The guidance counseled that practitioners should consider, among other methodologies, the following ways to increase notice to class members: identification of potential class members through third-party data sources; use of social media to provide notice to class members and hiring a marketing specialist. Moreover, the guidance counseled that the notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate, to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2).

30. After reviewing the Debtors' Supplemental Notice Plan (the "DSNP"), it is my opinion that the DSNP does not provide due process of law, nor has it been demonstrated that it was reasonably calculated to do so. Additionally, if this were a class action, the DSNP would not conform to the Northern District of California's 2018 Procedural Guidance for Class Action Settlements.

31. It is established "black letter law" among media planners that the starting point of any media plan must include a defined and verified Target Audience. A Target Audience, simply explicated, is the audience that the media planner is attempting to reach. Objective syndicated data sources, such as those outlined below, are used to understand the size and compositional makeup of the Target Audience.

32. Chief among the reasons that a Target Audience is a necessary element of a media plan is so that media planners can calculate the net reach and average exposure frequency among the audience. According to the Bolch Judicial Institute, Duke Law School's *Class Action Settlement Guidelines and Best Practices,* a notice program should be transparent, establishing an affected population base and citing all support and research tools used. All calculations for reach assumptions should be disclosed. The notices should reach a significant percentage of class members, and the notice program should be scaled appropriately to the circumstances. While the DSNP is not a class action notice plan, per se, its goal (informing an absentee population), methods (advertising), and importance (preserving legal rights) are virtually identical.[1] By all accounts, the

---

[1] Bankruptcy Courts have considered the holding of *Mullane*, including finding actual prejudice to the claimants when the debtor "knew or reasonably should have known about *the claims.*" *See, e.g.*, *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 159 (2d Cir. 2016) (emphasis added).

DSNP, does not meet any of the best practices identified in the Duke Best Practice Guide, does not provide adequate due process, and would not independently be approved in the class action context.

33. Reach and frequency are generally considered the great equalizers in comparing competing notice plans[2] because, when they are based on objective syndicated data tools such as those listed below, they allow courts an ability to compare notice plans on an apples-to-apples basis. However, these numbers, while objective and unequivocally important, only tell a portion of the story, as media planning is both science and art.

34. For instance, reach percentage does not measure the level of media sophistication, the nuances of advanced media strategy, or the creativity and care that a media planner puts into a plan. However, the DSNP fails on those metrics as well.

35. If a notice provider is reporting an audience reach and frequency, then third-party research consistent with advertising industry best practice must be used to accurately report that reach, and all assumptions must be transparent. In the DSNP, there is <u>no</u> defined validated target audience.[3] Therefore, it is uncertain as to what objective research, if any, was utilized to determine the best media mix to reach potential claimants, and whether the audiences were objectively verified by any media research tools.

36. Details supporting media selection and implementation are likewise vague or missing. It seems the guiding principle of the DSNP is a "little bit of this and a little bit of that." There is no lead medium. There is no anchor from which to drive responses to the action. There is no mention of dayparts. Contrast that with the TCC Notice Program, which will have a consistent broadcast presence, result in millions of impressions and yield both notably high reach and durable average frequency. Moreover, the DSNP does not make use of earned media strategy, out of home advertising or word of mouth marketing.

---

[2] The effectiveness of the means of communication is measured by reach and frequency. Reach is the number or percent of people exposed at least once to an advertising schedule over a specific period of time. Net reach excludes audience duplication across media groups.

[3] The estimated scope of the intended notice program should be defined as a validated reach statistic. Media research companies offer services to properly quantify the reach to targeted consumers. These research services provide detailed insight on consumer behaviors and media consumption habits of various populations. These services can calculate net audience reached and should disclose the percent of the class using various media, including television (network, cable, or digital), radio (terrestrial or online), online and social or mobile media.

37.     As discussed below, the TCC Notice Program uses the most state-of-the-art digital and social media currently available.  This was a deliberate decision, because we are advised that many Fire Claimants are displaced from their home and rely on their digital devices to consume news and otherwise communicate with the outside world.

38.     When utilizing electronic notice, a "class-notice expert or professional claims administrator should provide evidence demonstrating that the proposed means of electronic notice will:  (1) provide the 'best practicable' notice; (2) effectively reach a significant percentage of the class; and (3) provide the class members an adequate opportunity to exercise their rights and that those opportunities are not diminished by the structure of the plan."[4] (Judicial Institute, Duke Law School's *Class Action Settlement Guidelines and Best Practices*).  The DSNP does not identify why and whether their proposed plan would reach a significant percentage of the Fire Claimants. In fact, as previously noted, it does not identify a Target Audience at all.  Moreover, there is no information that would allow this court to assess the declarant's media experience, credentials, or training (if any) as it relates to traditional or digital media.  Omitting basic media metrics such as a validated target audience and professional advertising experience, is not merely a matter of lack of adherence to form, it signifies a flawed and erroneous approach to providing notice.

39.     Additionally, it is not just the lack of objective data that renders the DSNP virtually impotent in the face of properly notifying Fire Claimants.  The entire plan is antiquated and seems to be the very embodiment of the "mere gesture" that the Supreme Court cautioned to avoid when evaluating process in the context of reaching absentee audiences.

40.     The DSNP pays virtually no regard to modern media consumption realities and more importantly, disregards any attempt to reach the Fire Claimants, specifically.

41.     For example, the mix of media seemingly ignores over-the-top ("**OTT**") and streaming media, two mainstays in the modern media environment.   Those methods of

---

[4] In assessing the qualifications of a class-notice expert or professional claims administrator, the parties and court may consider the expert's or administrator's:  (1) experience or education with the specific types of media under consideration; (2) professional experience with respect to advertising; (3) membership in an advertising-standards committee; (4) any professional certifications; (5) any credentials or additional training with respect to advertising using both traditional forms and digital; (6) requisite skills to provide an opinion on digital advertising; (7) specific knowledge of current advertising industry, emerging trends, and technology; and (8) any prior experience testifying about class action notice.

communication are particularly relevant where, as here, a population has been displaced and may be forced to rely solely on their mobile device to receive news. Moreover, the DSNP does not utilize any Out of Home[5] media to help diffuse news of the Bar Date.

42. Out of Home advertising recognizes that the Fire Claimants may be displaced, mobile, and in vehicles for significant amounts of time, especially on main thoroughfares at or near the affected communities. To address this reality, the TCC Notice Program contemplates the use of digital and static billboard units in the key geographical regions and transit shelters.[6]

43. Also, there is no attempted use of Earned Media, or Public Relations in the DSNP. The California fires were unmistakably one of the most well reported stories in local, regional and national news outlets over the previous year.[7] For example, as recently as May 15, 2019, the wildfires made "breaking" headline news as Cal Fire announced that its investigation determined PG&E equipment caused the Camp Fire.[8] Despite this fact, the DSNP makes no serious attempt to capitalize on the media interest.

44. Contrast that with the TCC Notice Program's use of two reputable PR companies— one based in the Bay Area, and one with expertise in crisis management—to engage in direct outreach to reporters, arrange press conferences, and otherwise run a sophisticated public relations campaign, and the difference is glaring.

45. The DSNP makes no attempt to craft a publication plan that has temporal proximity to key dates. In fact, their plan is entirely silent as to when, and for how long, their ads would run. It is likewise virtually silent as to the number of units, the time of units, the reach percentage among varying audiences, and what, if anything, informed their decisions to choose certain media over other forms of media. As discussed in more detail below, the TCC Notice Program, on the other hand, is expertly designed to follow established media wisdom regarding primacy, sustainability

---

[5] Out of Home is the media term of art which encompasses billboards and other prominent structural advertisements.

[6] Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the 'traditional' methods are best may disregard contemporary communication realities." Committee Note to Amended Rule 23.

[7] A simple *Google News* search for "California Wildfires" garners about 224,000 reported stories.

[8] *See, e.g.,* Peter Eavis and Ivan Penn, N.Y. TIMES, *California Says PG&E Power Lines Caused Camp Fire That Killed 85* (May 15, 2019), https://www.nytimes.com/2019/05/15/business/energy-environment/pge-camp-fire-california.html.

and recency. It is tactically plotted to launch heavy, and consistently apply media pressure throughout the Bar Date window. In addition, the TCC Notice Program includes a strong heavy-up at the end of the campaign, to make sure to apply maximum pressure immediately prior to the Bar Date. A copy of the suggested TCC Timeline and delivery units is attached hereto as **Exhibit C**, and the corresponding reach percentage and average frequency measured against two verified audiences is discussed below.

46. For the reasons described herein, it is my opinion that the DSNP does not provide due process of law to the Fire Claimants and was not reasonably calculated to do so. To the contrary, it is a mere gesture designed to "tick a box," not to meaningfully reach and inform a displaced population of their important legal rights. A comprehensive visual comparison of both providers' supplemental media plan is attached as **Exhibit D**.

## <u>OVERVIEW OF THE TCC NOTICE PROGRAM</u>

47. The proposed Notice Program is based on objective data customarily used by advertising professionals and is designed to reach the greatest practicable number of Fire Claimants. Notice will be effectuated directly where possible, and via the use of a sophisticated, integrated, multimedia campaign, where no direct contact information exists.

48. Specifically, the Notice Program utilizes a combination of direct notice via U.S. mail and email (where both are available or can be derived from third-party data sources), coupled with robust paid and earned media campaigns. The integrated paid media campaign utilizes state-of-the-art targeted internet banner advertisements, custom social media campaigns, a bespoke broadcast radio/television campaign, a network of digital and static billboards, a combination of local, regional, and national print publications, and a nationwide, yet geographically tailored, public relations campaign. Further, the Notice Program utilizes an earned media campaign designed to take advantage of the substantial news coverage the events have already garnered and to continue to drive media to cover the story at a local, regional and national level. Moreover, we will engage in a grassroots word of mouth campaign, including experiential marketing such as hand-to-hand document disbursement across all counties affected by the fires.

49. In designing the Notice Program, Angeion Group has relied on our extensive prior

- 14 -

experience in notifying unknown, displaced and/or shell-shocked audiences of their rights and obligations in litigation settings. Further, extensive research into the notice issues specific to these Cases was undertaken, including receiving information directly from those affected by the fires, syndicated data sources relied upon by advertising and marketing professionals, the TCC and mass media reports.

50. Angeion has also received input and feedback from members of the TCC, who have unique and important insights into the best way to reach communities affected by the fires.

51. We are particularly cognizant that the Target Audience here may have been displaced and that their displacement may have led them to take shelter at or near the site of one of the fires, elsewhere in California, elsewhere on the West Coast, or elsewhere in the United States. We have designed the Notice Program to specifically account for the geographic realities of the affected population.

52. Given how little time has passed since the Camp Fire occurred, I understand the problem of displaced persons is especially acute with claimants affected by the Camp Fire. However, I am also aware that many individuals who suffered injury or loss from other fires, including the 2017 North Bay Fires and the 2015 Butte Fire, have also been displaced or have relocated. An effective notice plan will need to take this into consideration in order to provide effective notice to all Fire Claimants.

53. It is also important that the notice plan reach those affected by the tragic Ghost Ship Fire. The Debtors' proposed plan makes no reference to the Ghost Ship Fire and does not appear to have considered those claims in designing its plan (for example, the Ghost Ship Fire is not included on the Debtors' proposed proof of claim form). The plan proposed herein is designed to include and reach out to Ghost Ship claimants, many of whom reside in the same geographic areas as individuals affected by other fires. Moreover, I understand many Ghost Ship claimants are currently represented by counsel and are already aware of the ongoing bankruptcy proceedings. We anticipate our notice plan will also succeed in identifying and contacting many Ghost Ship claimants through their counsel.

54. Given the unique circumstance surrounding this notification effort, we have

carefully designed our plan to account for the realities of our target audiences' potential location(s) during the pendency of the notification efforts and we therefore suggest purchasing media in a geographically targeted, flighted format, to help achieve the most successful notice program possible. We also suggest using both "high tech" and "high touch" methods to account for the demographic diversity of our Target Audience.[9]

55.   We have divided the integrated Notice Program into four distinct yet associated categories: local, state, West Coast, and national. The "local" category covers the four Designated Media Markets[10] ("**DMAs**") closest to the fires. The "state" category encompasses the entire state of California. The "West Coast" category covers the whole of the West Coast (*see* detailed map, *infra*) of the United States, and the "national" category, as the name suggests, covers the entire United States. This provides the broadest, most inclusive national geographic coverage, as well as targeted local coverage of the Northern California area, ensuring that Fire Claimants are not excluded based on where they are currently located.

56.   The Notice Program accounts for the contemporary media landscape as well as the nuances necessary to reach a population that is largely unrepresented, often displaced, and in some cases, homeless. Specifically, as detailed below, a large majority of claimants will be reached by objectively measurable video, audio, digital, print, and out of home media (at least 95% of adults in the Northern California area and an estimated 80% of adults across the entire state of California.) We will provide frequent opportunities for the Fire Claimants to see the message through the overlapping reach of the different notice methods, including "noticeable" Publication Notices in leading consumer magazines and daily newspapers that will allow readers to have a written record and the ability to refer back to the Notice, pass it on to others, and easily respond via the Prime Clerk website or toll-free number. Fire Claimants will also be exposed to high-quality Video Notices that will allow them to be alerted to key information and to call or visit the website for

---

[9] In determining which means of communication is the most effective to send class notice, the parties and court should analyze each potential means of communication on a case-by-case (and sometimes intra-case) basis. Bolch Judicial Institute, Duke Law School, GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS, at 49.

[10] DMA or "Designated Marketing Area" is a term used by Nielsen Media Research to identify an exclusive geographic area of counties or parishes in which the home market television stations hold a dominance of total hours viewed. There are 210 DMAs in the U.S.

additional information. Audio Notices appearing on general interest radio stations and on African American, Spanish language and Cajun stations in the Northern California area will further alert claimants to the Bar Date. Reach will be extended via rotating Banner Notices through programmatic display, and social media will keep claimants abreast of important updates, including allowing an authoritative, court-authorized voice to maintain contact with the population via trusted chat rooms and Twitter accounts. The Notice Program also leverages the substantial press coverage that the fires have received by incorporating a prolonged professional earned media campaign that will generate significant local, regional and national press coverage of the Bar Date notice.

57.     Lastly, the TCC Notice Program incorporates grassroots, local, high touch, word of mouth marketing. Angeion will devote substantial resources to community outreach, including cooperating with local agencies, houses of worship and community centers, to make sure that Fire Claimants are notified not only via paid and earned media but by their own community, who they interact with and trust.

58.     As part of that effort, the TCC has indicated that its members are ready and willing to provide assistance in the notice process as appropriate, including visiting affected communities and interacting with potential claimants to inform them about the bar dates and their rights in the bankruptcy proceeding.

59.     Understanding that direct notice may be preferable to media notice under certain circumstances, if/when it can be achieved, considerable efforts have and will continue to be undertaken to compile postal and email addresses of all Fire Claimants. As described *infra*, the final mailing list will include assembling data from myriad sources, including mailing to the address for the attorney of record set forth in any Complaint filed pre-petition, as well as to any holder of a Fire Claim that has filed a Proof of Claim at the address listed in such Proof of Claim. Additionally, public records, sophisticated third-party data aggregation sources, and community resources will be identified, culled and thoroughly searched, to identify as many current postal addresses for property owners who are likely eligible to participate. However, even after these efforts, it is estimated that we will only have direct contact information for a small percentage of all eligible parties, thus underscoring the enormous need for a robust media plan to advise the Fire Claimants

- 17 -

of the Bar Date, which, given the circumstances, is of radically heightened importance to this population.

60.     Separate from the compilation of the individual notice mailing lists, we have used objective, third-party data sources and media research tools that are commonly employed by advertising experts to determine the best mix of media to reach the Fire Claimants. These objective tools are routinely employed to understand the socio-economic characteristics, interests, and practices of a Target Audience, and to guide media selection and placements. These data sources are also routinely used by courts to evaluate media plans.

61.     These time-tested tools do more than aid in the proper selection of media to reach a specified audience, as they allow the court to measure the media plan on an objective basis against competing plans and ensure that they are doing an apples-to-apples analysis. Here, the leading available tools were used to help inform the media mix to be used, as well as to analyze the reach and frequency of the media portion of this Notice Program. These tools include:

- *GfK MRI* – National syndicated research that measures media usage, demographics, psychographics and consumer behavior to provide insight into the actions and motivations of adult American consumers.

- *Scarborough* – Syndicated research that measures shopping patterns, media behaviors, lifestyle and demographic information of American consumers on a local level; all 210 Nielsen Television DMAs are included in this research.

- *Snapshots* – A compilation of local measures such as demographics, lifestyle, media, consumer, retail and general market information.

- *BUDDY (Business Demographics and Data for You)* – This tool contains demographic and household spending reports and forecasts which can be drilled down to the zip code level.

- *comScore* – Online audience measurement tool that provides insights into which websites deliver to certain demographic audiences on a national or local basis, in addition to user engagement with those websites and cross-visitation patterns. The Plan Metrix portion of this tool also combines users' actual online behaviors with detailed information about their lifestyles, interests, and buying habits – both online and offline.

- *eMarketer* – National and International syndicated online survey that reports on core media topics, industries, trending news, and other hot topics in the industry. Some research included in the extensive library includes demographic, measurement, media usage, attribution, content marketing, influencer marketing, AI updates, Big Data, and other highlights in the industry.

Planning/Buying Tools

- *Nielsen* – Provides audience measurement/ratings data for television and radio. Through this tool, we have access to data services for 17 television markets and 64 radio markets based on current buying needs with the ability to add new markets as client demands dictate.

- *SQAD* – Reports costing guidelines (Cost Per Point/CPP and Cost Per Thousand/CPM) based on actual purchased television and radio transactions for all 210 Nielsen Television DMAs and over 300 reported Nielsen Audio Radio MSAs.

- *Geopath* – Formerly known as the Traffic Audit Bureau, Geopath is a not-for-profit organization governed by a board of advertisers, agencies, and media companies. Geopath is the leader in the auditing of out of home audiences in the United States.

- *DOmedia* – DOmedia is an online portal that our buyers utilize in order to centralize the out of home (Billboard) buying process. The platform opens our buyers up to a large number of smaller scale vendors to provide additional out of home opportunities for our clients. In addition, the tool has very strong mapping and demographic functionalities that allow the buyers to overlay additional data points for a more impactful out of home campaign.

62.     Virtually all professional advertising agencies and commercial media departments use objective syndicated data tools, like the ones described above, to quantify net reach and to aid in proper audience deduplication analysis. Sources like these guarantee that advertising placements can be measured against an objective basis and confirm that reporting statistics are not overstated. They are ubiquitous tools in a media planner's arsenal and are regularly accepted by courts in evaluating the efficacy of a media plan, or its component parts. [11]

63.     A detailed description of each component part of the TCC Notice Program is outlined below. It is my professional opinion that $20,000,000.00-$25,000,000.00 should be spent on supplemental procedures designed to reach unrepresented Fire Claimants, which could be funded in large part by restructuring the customer notice procedure, as discussed in Paragraphs 77 and 78.

64.     As set out in the declaration of Jeffrey R. Dion, filed contemporaneously with my Declaration, I believe a bar date of January 31, 2020, would be appropriate to accomplish the notice program set out herein. The January 31, 2020 deadline would provide sufficient time to implement the TCC notice plan in full. The plan leverages key dates and time periods throughout the proposed

---

[11] Experts can calculate the percentage of a class that will be exposed to a notice by relying on generally accepted methodologies developed for advertising in non-litigation settings. A high percentage of class members can often reasonably be reached by a notice campaign. But if the identities of a significant percentage of class members are unknown, a campaign may require multiple types of notice (*e.g.*, direct notice, publication, digital, or broadcast).

- 19 -

timeline, including time-dependent tactics such as starting with a heavy media rollout to seed and disburse news quickly and broadly, and thereafter increasing ad frequency as the Bar Date encroaches. It is further my belief that it is important for the claimants to have a bar date that follows the holiday season, as it is my experience that persons often delay handling administrivia until after the holiday season. Simple as it sounds, things often get lost or put to the back burner as the holidays approach. Moreover, during the holiday season, many displaced persons may be travelling back to the northern California market to meet with family and/or friends and are likely to be discussing the fires and their damages. Leveraging off this momentum, the media plan works hand-in-hand with the TCC's word of mouth campaign, and in my opinion would provide fire claimants the much-needed time to be informed of, discuss, and internalize the seriousness of the impending bar date.

## I.   **DIRECT NOTICE**

65.   The TCC Notice Program contemplates a robust Direct Notice plan, which incorporates sophisticated third-party data sources, known best practices, and advanced search techniques.

66.   Specifically, Angeion will cause all notices to be mailed via the United States Postal Service ("**USPS**") first-class mail, postage prepaid. Prior to mailing, the mailing list will be processed via the USPS National Change of Address ("**NCOA**") database to identify updated address information for individuals and businesses who have moved in the last four years and who filed a change of address card with the USPS.

### A.   *Fire Claimants and Subrogation Claimants*

67.   In order to comport with Due Process, Angeion will compile a Fire Claimant mailing list that will be designed to be as fulsome and over-inclusive as possible. Broadly, the categories that will ultimately comprise this Fire Claimant list can be summarized as follows.

a.   <u>Prepetition Litigation Records</u>. The list will include all fire victims that filed prepetition suits. This includes the data gathered during the North Bay Fires litigation, which I am advised, is stored in a centralized database run by BrownGreer PLC. Angeion, working with the TCC, will also locate previously filed complaints and obtain attorney contact information for the lawyers representing the plaintiffs, including the use of litigations service lists.

b.   PG&E Customer Data. Nearly all of the victims were PG&E customers and, thus, PG&E maintained current contact information up to and including the date of the fires. The physical addresses in this database could, in some cases be outdated, since many of the customer addresses would be for homes that were destroyed by the fires. Nevertheless, PG&E customers may have updated their records with PG&E, and even if they did not, Angeion, working with both the US Postal service and reputable third-party data aggregation companies, can determine a significant amount of current addresses for some of these individuals.

c.   Geographic Information System's Data. PG&E has represented in its bar date motion that it has some "proprietary data maintained by Geographical Information Systems ("**GIS**") satellite experts retained by Debtors in connection with the prepetition litigation" that it would use to make efforts to send notice to owners of destroyed properties. Waisman Decl. at 7. I believe that it is critical to use GIS data for all fires at issue, including, without limitation, the 2018 Camp Fire.

d.   Disaster Relief and Community Organizations. I am advised that several disaster relief organizations, including but not limited to the Red Cross, FEMA and myriad local agencies have provided support to fire victims. The TCC believes they will be successful in garnering additional contact information through those organizations which can be utilized as part of the direct notice efforts.

e.   Records Garnered pursuant to Subpoena. In other court-approved notice programs that Angeion has implemented, the court has authorized the use of third-party subpoenas to help identify and contact absentee audiences. As it relates to this case, the TCC could use subpoenas to procure information from insurance carriers, governmental organizations, and/or private repair/remediation companies to gather additional US postal address information for fire victims.

f.   First Party Intelligence. Public records, third-party data sources, and community resources will be identified, culled and thoroughly searched to identify as many owners of destroyed properties. We will then use other sources of data to ascertain currently mailing addresses, particularly in circumstances where properties were completely destroyed, and notice can no longer be sent to former addresses.

g.   TCC Website. Angeion has been advised that the TCC is designing a dedicated website that will act as a hub of communication between the TCC and the fire victims. Among other functions, the website will allow those affected by the fires to enter their own contact information as well as contact information for displaced friends and family members.

68.   As stated above, in order to be certain that we are utilizing the most current mailing addresses for fire victims, prior to mailing, all addresses will be processed through the United States Postal Service ("**USPS**") National Change of Address ("**NCOA**") database. This process provides updated address information for individuals and businesses who have moved in the last four years and who filed a change of address card with the USPS.

69.   Similarly, in an effort to deliver notices to the intended recipients, the Notice

Program provides for the following: (1) notices that are returned as undeliverable by the USPS and have a forwarding address will be re-mailed to that forwarding address; and (2) notices that are returned as undeliverable by the USPS without a forwarding address will be subject to address verification searches ("**skip tracing**"), utilizing a wide variety of data sources, including public records, real estate records, electronic directory assistance listings, and so on, to locate updated addresses. Notices will then be re-mailed to updated addresses located through skip tracing.

70.    The direct mail effort will be supplemented by sending notice to all Fire Claimants that have an email address or for whom an email address can be garnered via sophisticated third-party data aggregation services described infra. It is important to note that the email effort will be in addition to, not in lieu of, the mailed notice efforts described herein.

71.    The exact total number of Fire Claimant Bar Date mailings will be reported to the Court in a supplemental declaration after Angeion has sourced, culled and deduplicated among the various data sets noted above.

### B.    *Email Append and Data Aggregation*

72.    Angeion utilizes a network of data partners to aggregate a combination of first- and third-party consumer data to append, update and/or verify email addresses. Specifically, we match email addresses to certain other data points as a validity check, such as an individual's name, U.S. postal address, and previous email address.[12] This service will be useful here, in that we anticipate having many Fire Claimants who have been dispersed from their homes, but whom still regularly monitor their email and social media.

73.    By way of example, if the debtors' records had postal address information for a particular Fire Claimant, Angeion could run that person's name and address through our data partners' databases and determine if, for example, the Fire Claimant recently opted to receive email billing communications from a car finance company or similar commercial organization. We would identify this information irrespective of whether we had an original (different) email on file from the debtors' records for this claimant. This individual's email address would be updated to reflect this change and used as part of an email campaign. Ultimately, with an eye towards creating an

---

[12]  Our data partners typically include, Acxiom, Dun & Bradstreet, Google, Nielsen, Oracle and Facebook.

over-inclusive notice campaign, Angeion will attempt to email notice to both the original email addresses, if one was contained in the debtors' records, as well as any new email addresses garnered via this data append process. The mere existence of a conflicting email address entered, for example, on a sweepstakes site, or a non-repeat e-commerce site, however, would not be enough to trigger an email update because those examples (unlike the auto finance company example just discussed) lack an imprimatur of authenticity. This accounts for the practical reality that Fire Claimants may enter one email address for a single transactional relationship, like entering an online contest, but are more likely to use a valid email address, which they check often, to receive commercial billing information.

74. Below I have outlined some of Angeion's practices to increase deliverability and readability of email notice. Specifically, Angeion will employ the following best practices regarding the email notice.

75. As an initial matter, Angeion designs the email notice to avoid common "red flags" that might otherwise cause the recipient's spam filter to block the email notice or identify it as spam. For example, Angeion will not include the Proof of Claim form as an attachment to the email notice because attachments are often interpreted by various Internet Service Providers as spam. Rather, in accordance with industry best practices, Angeion will include electronic links to all operative documents so that recipients can easily access this information on the Prime Clerk website.

76. Angeion also accounts for the reality that some emails will inevitably be blocked as a soft bounce during the initial delivery attempt. Therefore, after the initial noticing campaign is complete, Angeion, after an approximate 12-24-hour rest period, which allows any temporary block at the ISP level to expire, will direct a second round of email notice to any email addresses that were previously blocked as soft bounces. In Angeion's experience, this minimizes the number of emails that may have erroneously been blocked by sensitive servers.

### D. Standard Bar Date Notice and Customer Bar Date Notice

77. Prime Clerk estimates the cost of this mailing to be $17 million — $20 million. This is excessively and unnecessarily costly. Angeion Group estimates that it can effectuate the same

mailing for approximately $8 million — $9 million.

78.     PG&E has 16 million customers. *See* Declaration of Benjamin P.D. Schrag.  Nearly 2 million of those customers have signed up for paperless billing.[13] These customers could and should be noticed in the same email sending their monthly statements.  For the approximately 14 million customers receiving monthly statements by mail, the Customer Bar Date Notice could be accomplished by Angeion for approximately $8 million — $9 million.  By doing this, Debtors could substantially reduce the mailing costs, by approximately $9 million to $11 million, which savings could be used to fund the necessary paid and earned media campaigns, without meaningfully increasing (and perhaps even decreasing) the *overall* cost of the Debtors' notification efforts.  This would allow a substantially stronger and more effective notice program at a comparable price point.

## II.     PAID MEDIA

79.     To supplement the comprehensive direct notice efforts and effectuate notice to the Fire Claimants, the Notice Program contemplates and includes a robust paid media campaign as described herein.

### A.     *Target Audience*

80.     Data from GfK MRI was used to profile the population. The majority of the population will be located within a limited geographic area within Northern California and thus, the primary thrust of the Notice Plan will be focused there to reach adults 18+ in the four Northern California DMAs (San Francisco-Oakland-San Jose, Sacramento-Stockton-Modesto, Chico-Reading, and Eureka).  Those geographic regions were specifically analyzed to identify key demographic groups which can be used to guide the local media selection since that was the primary location of the fires.

81.     Additionally, because the affected population encompasses people who may have been displaced due to the fires and therefore could potentially reside anywhere in the United States, the Notice Program will include multiple geographic targeting strategies designed to reach potential

---

[13]  *See* https://www.pge.com/en_US/about-pge/environment/what-we-are-doing/paperless-billing/paperless-billing.page.

Claimants across varying geographies, which as noted previously, are divided into, local, state, West Coast and national campaigns. Below is an overview of the different media types that will be employed in different regions.

| Local | | | |
|---|---|---|---|
| **Media Type** | **Gross Impressions** | **Reach** | **Average Frequency** |
| TV | 77,713 | 74.92% | 10.62 |
| Radio | 200,698 | 66.42% | 30.95 |
| Print | 7,961 | 36.06% | 2.26 |
| Newspaper | 15,028 | 21.99% | 7.00 |
| OOH | 198,523,113 | 55.10% | 17.00 |
| Display | 60,000,000 | 40.97% | 15.00 |
| Resident List | 20,000,000 | 13.66% | 15.00 |
| Social | 33,000,000 | 22.50% | 1.50 |
| OTT | 6,600,000 | 5.80% | 10.00 |
| **TOTAL** | **318,424,513** | **95.00%** | **51.95** |



🔴 Northern CA DMAs
🔵 California
🔵 West Region – California, Nevada, Oregon, and Washington
🟢 National

82.   Using all adults 18+ in the four DMAs as a Target Audience definition, the potential audience size is estimated at 9,763,000. This audience is over-inclusive in that it includes all adults

in the area and not just those who were affected by the fires. This Target Audience, based on objective syndicated data, allows Angeion to report the reach and frequency to the court, with the confidence that the reach within the target audience and the number of exposure opportunities complies with due process. It also allows us to quantify the reach percentage and number of exposure opportunities within the Target Audience.

83. Here, 95% of the Target Audience would be reached approximately 51.95 times each. This reach and frequency will bolster meaningful claimant participation and would satisfy and exceed the reasonableness standard. This is the type of media campaign that a brand advertiser would actually undertake if they wanted to reach their customers and motivate them to act. This is exactly what is needed here given the harsh, and in many cases, dire, circumstances that Fire Claimants could incur should they fail to act by the Bar Date and risk having their claims discharged.

84. Since we know that many of the Fire Claimants have been displaced and now reside outside of the four key DMAs, we are also providing objective verified audience data, as to reach and frequency, measured against a second, broader, Target Audience—Adults 18+ in California.

85. Using all adults 18+ in California as the Target Audience definition, the potential audience size is estimated at 29,922,000. Again, this audience is intentionally over-inclusive and is designed to diffuse news of the Bar Date to the affected population, including where they live, work and travel. Measured against the broader Target Definition of all adults 18+ in California, we maintain an 80.36% reach and an average frequency of almost 28 times each.

| California | | | |
|---|---|---|---|
| Media Type | Impressions | Reach | Average Frequency |
| Local Impressions | 382,442,000 | 31.00% | 41.23 |
| Print | 26,723 | 36.75% | 2.43 |
| OOH | 261,092,082 | 50.20% | 14.82 |
| Video | 6,250,000 | 1.40% | 15.00 |
| Streaming Audio | 6,700,000 | 2.24% | 10.00 |
| Social | 28,000,000 | 6.24% | 15.00 |
| **TOTAL** | **684,510,805** | **80.36%** | **27.98** |

### III.    MEDIA SELECTION AND MESSAGING

86.    The TCC's comprehensive regional and national multi-media effort has been customized to effectively deliver a clear message to the Fire Claimants. The campaign includes a broad mix of media tactics based on the current media landscape, which is highly fragmented.

87.    Media tactics include Video (TV, OTT, Streaming and Programmatic Pre-Roll), Audio (Radio and Streaming), Digital (Display, Social, and Search), Magazines, Newspapers, Billboards, Transit Shelters, and Experiential tactics.

88.    The custom campaign is designed to reach all segments within the broad Target Audience. In key areas, Spanish Language creative will be utilized to extend the reach of the Notice Program to the Hispanic audience. The plan is far reaching, tailored, and will be effective in seeding and disbursing news to the Fire Claimants both locally and nationally.

### A.    VIDEO

89.    Both traditional broadcast television and OTT/Streaming opportunities are high-reach media tactics that provide exposure to affected people regardless of where they reside (*i.e.*, rural areas, urban areas, etc.). Thirty-second units will appear on local broadcast and cable television as appropriate in the 4 core DMAs.

90.    On its own, the Video Notice is estimated to reach over 74% of adults aged 18+ in the Northern California DMAs with an estimated average frequency of 10.6 times each.

91.    In practice, what this means is that approximately three quarters of the residents of the four DMAs will see a video ad, on average ten times each.

i.    <u>Dayparts</u>

92.    A variety of dayparts (morning, daytime, syndicated day/prime access/early fringe, early news, and prime/syndicated prime) will be used to increase reach among persons with different viewing habits. Daypart mixes and programming selections may change at the time the buy is authorized, based on negotiations and availabilities.

*Morning*

- Morning news programming provides an ideal environment for notification messages.

- Loyal audience builds frequency among those reached.
- Programming considered includes Good Morning America, The Today Show, CBS Early Show and Local News.

*Daytime*

- Extends reach among homemakers, retirees, night shift workers, and/or unemployed Claimants.
- Loyal audience builds frequency among those reached.
- Programming considered includes daytime dramas, game shows and/or talk shows.

*Early and Late News*

- Non-opinionated journalism provides an ideal environment for notification programs.
- Provides broad reach among Claimants.
- Programming considered includes CBS Evening News, ABC World News Tonight, NBC Nightly News and Local News.

*Late Fringe*

- Late Fringe provides additional reach for the Video Notice program.
- Loyal audience builds frequency among those reached.
- Programming considered includes The Tonight Show with Jimmy Fallon, Late Night with Seth Myers, The Late Show with Stephen Colbert, The Late Late Show with James Corden, and Jimmy Kimmel Live.

ii. TV Rating Points (TRPs)

93. Approximately 5,885 thirty-second spots will substantially run over a nine-week period in Northern California markets.

94. Ads will air on the top local stations per market and on the top cable networks per market. Sample cable networks include CNN, Fox, Discovery (Deadliest Catch), USA, History and The Weather Channel. Daypart allocation may change at the time the buy is authorized, based on negotiations and availabilities.

iii.   OTT, VOD, and Streaming

95.     Based on the current media landscape and the shift in viewing habits of consumers, OTT (Over the Top), VOD (Video On Demand), and Streaming opportunities are recommended to reach the chord cutting audience who rely on streaming services such as YouTube, Hulu and Amazon as their primary media provider.  Including OTT, VOD, and Streaming, which will allow the notice to be seen by consumers who are not watching live TV and who may not even own a TV.  Ads will be placed in non-skippable content to ensure the video is watched in full by the potential claimant.

**B.     AUDIO**

96.     Both terrestrial and streaming radio are high-frequency mediums, ideally suited for providing exposure to affected Fire Claimants where they reside (i.e. rural areas, urban areas, etc.).

97.     The Notice Program contemplates 60-second units over a twenty-one-week schedule on selected radio stations in the Northern California markets.  There are a total of six radio MSAs in the Northern California area:  Chico, Redding, San Francisco, Sacramento, Stockton, and Modesto.  There are an additional three counties that are not measured in radio metros and will be included in the consideration set.  Those counties are Lake, Mendocino, and Humboldt.

98.     We conservatively estimate that 8,712 total spots will air on the top 5-10 stations, but it is possible that additional spots will be negotiated at the time of the buy. Additionally, the audio campaign will be placed on appropriate African American and Spanish language stations. On its own, the audio is estimated to reach just under 45% of adults aged 18+ in the Northern California area with an estimated average frequency of 4 times each.

99.     The Local Radio Notice to Hispanic and African American populations is not calculated into the overall measured reach and frequency of the Notice Program.

100.    Station selection will be based on performance in the market and ensuring a strong mix of formats to ensure delivery against the entire target audience.

101.    Terrestrial radio offers the ability to provide custom added value extensions.  As part of our negotiations, we would require all stations to provide additional elements such as on-air exposure and the ability to tie-in with station events.  Some opportunities we seek to utilize include handing out flyers

at concerts and remote broadcasts.

102.    In addition to terrestrial radio, Streaming services such as Pandora and Spotify, which are reflective of A18+ current audio habits, will be purchased to enhance the reach of the campaign.

### C.    DIGITAL

103.    The Digital portion of the Notice Program will utilize a multi-pronged approach to drive potential claimants from awareness through the traditional time-tested marketing funnel, to conversions. Digital is particularly important in reaching the Fire Claimants in that many displaced persons, while not physically residing in their homes, still have access to their digital devices—in fact, many use and see them as a lifeline to the outside world.

104.    Some digital tactics that the Notice Program would feature included advanced targeting such as keyword, contextual, IP addresses, email addresses, and geography. Below is an overview of the different suggested digital tactics and their targeting capabilities.

### D.    PROGRAMMATIC DISPLAY AND VIDEO

105.    Angeion utilizes advanced targeting, machine learning, and a known and verifiable target audience profile, to ensure that members of the target audience are reached online. Through this "programmatic" approach, Angeion's focus will be on effectively reaching the prototypical Fire Claimant, rather than whitelisting specific websites. Purchasing display and video inventory programmatically provides the highest reach, allows for multiple targeting layers, and offers the most cost-efficient rates.

106.    The campaign will run across all devices including desktop, mobile, tablet, and other connected devices to ensure maximum reach. This is extremely beneficial when targeting a large audience such as this. Likewise, multiple targeting layers will be implemented into the programmatic buy to help ensure delivery to the most appropriate users, inclusive of search targeting, category contextual targeting, keyword contextual targeting, and site retargeting. Targeting users who are currently browsing or have recently browsed content in key categories will also help qualify impressions to ensure messaging is served to the most relevant audience.

107.    In addition to the previously mentioned programmatic tactics, the display campaign will include targeting around key word lists and IP addresses. Utilizing these types of lists, we can target residents in Lake, Sonoma, Napa, Mendocino, Nevada, Butte, and Humboldt counties based on their IP

addresses. In addition to residents, similar lists can be utilized to target employees or business owners in those areas.

108.     We recommend implementing a desktop and mobile campaign, utilizing standard IAB sizes (160x600, 300x250, 728x90, 300x600, 320x50, 300x50) for display, and 15-second videos for programmatic video. A frequency cap of 3x per month will be imposed to maximize reach.

## E.     MAGAZINES

109.     Two print publications will be utilized to cover the western region of the United States. This will offer a mass awareness tactic that will not only reach the main Northern California geographic region but also the surrounding states to ensure reach against most displaced parties. The two publications that were selected were People and Sports Illustrated. These were chosen due to their reach against Adults 18+ and the balanced demographic readership that the publications provide when used together.

110.     In order maximize efficiencies, the publication notice will be geo-targeted to the following states: California, Nevada, Oregon, and Washington. Over the course of the 7-month campaign timeframe, each publication will have 4 regional insertions.

- People – A print and digital publication that contains insightful and entertaining coverage into the most intriguing people from our culture. By revealing the human side to every story, People connects readers to their world.

- Sports Illustrated – A print and digital publication that reports on the world of sports through in-depth articles, photography, and stories. The magazine's philosophy and journalism covers what happened, why it happened, and what will happen next.

| Magazine | Gross Impressions |
|---|---|
| People Magazine | 26,008,000 |
| Sports Illustrated Magazine | 10,762,000 |

## F.     NEWSPAPERS

111.     This Notice Program includes newspapers targeted to two different geographic regions. A collection of 14 local newspapers targeted to the 4 key DMAs (San Francisco, Sacramento, Chico-Redding, and Eureka) were chosen to provide a campaign-long print presence in this key market. Each publication will have 14 full page insertions spread out over the 7 months. These will be included in the

- 31 -

weekday publications of each paper.  These publications are as follows:

| Newspaper | Circulation |
|---|---|
| Eureka Times Standard | 23,000 |
| Bakersfield Californian | 28,540 |
| Chico Enterprise-Record | 13,000 |
| Paradise Post | 9,400 |
| Ukiah Daily Journal | 6,795 |
| Grass Valley Union | 14,000 |
| Napa Valley Register | 11,947 |
| East Bay Times | 88,822 |
| Sacramento Bee | 93,343 |
| Santa Rosa Press Democrat | 46,295 |
| Fresno Bee | 42,093 |
| Modesto Bee | 25,240 |
| San Francisco Chronicle | 179,117 |
| San Jose Mercury News | 119,142 |

112.    In addition to the above publications, newspapers covering the remainder of the state were all selected given the intense displacement of the affected parties.  These papers will expand the print reach across the state in the remaining major metropolitan areas.  Each publication will include 7 full page insertions over the course of the 7-month campaign and will be in the weekday issues.  These publications are:

| Newspaper | Circulation |
|---|---|
| LA Times | 446,725 |
| Wall Street Journal – Northern CA & Southern CA Editions | 150,381 |
| USA Today – Los Angeles and San Francisco Editions | 62,764 |

## G.   SOCIAL MEDIA

113.   The Notice Program also contemplates a robust multi-pronged approach to using social media to seed and disburse news of the Bar Date to the Fire Claimants.

114.   I have been advised that there are strong social media communities that have risen in the wake of the fires that, along with certain chatrooms and community forums, act as a hub of information for the Fire Claimants. Angeion will actively post and moderate among the various sites, as an authoritative voice advising Fire Claimants of answers to frequently asked questions, dispelling rumors, and providing links to official documents.

115.   Additionally, a strong paid social media component will run via Facebook and Instagram. Social media will be targeted to the Northern California area and provides strong reach and frequency for the campaign.  Social tactics typically generate high impact and strong conversions for campaigns. Ad units will include standard banners as well as video placements.

116.   In addition to demographic and geotargeting, we will use Facebook and Instagram to create a custom audience, which has proved enormously effective in driving conversion in other due process notice programs that Angeion has implemented.  A custom audience in this case would be created by importing all known (and derived) Fire Claimant email addresses into the Facebook platform. Facebook can identify which of the uploaded email addresses are the primary addresses associated with unique Facebook or Instagram accounts.  Facebook then provides the ability to target those actual users via banner ad directly in the users' timeline.  We can also create lookalike models to reach people with similar characteristic to those in the email lists.

117.   Angeion also employs Lotame, a demand management platform ("**DMP**"), as well as Integral Ad Science ("**IAS**"), an online ad verification and security provider, to provide a greater quality of service to ad performance.

118.   Lotame allows Angeion to learn more about the online audiences that are being reached through pixels attached behind the scenes. Angeion will be able to create a profile for those users who are served impressions and will be able to better understand the type of user who is clicking on the banner. From this data, demographic profiles can be refined and leveraged for changes in targeting strategies to increase the overall performance of the digital campaign.

119.     Angeion also utilizes Integral Ad Science ("**IAS**"), the leading ad verification company to recognize and foil fraudulent internet activity. IAS has received the Media Rating Council ("**MRC**") accreditation for Sophisticated Invalid Traffic ("**SIVT**") detection for desktop and mobile web traffic, which adds a critical level of safety to the Notice Program.

120.     Angeion will also cause the Bar Date to be promoted on Twitter. Our methodology includes an "active listening" component wherein we monitor Twitter traffic for discussion relevant to the fires, and actively provide notice, and/or answers to frequently asked questions via Twitter as appropriate. This service is not measurable in terms of reach and frequency but provides an invaluable service to those affected individuals seeking further information.

## H.     OUT-OF-HOME

121.     The notice plan will include Out-of-Home in both the Northern California area and the entire state of California. Out-of-home is a very strong awareness tactic and efficiently drives significant reach. To focus in on the primary geography, a large portion of the Out-of-Home will be placed in the 4 DMAs mentioned previously. Out-of-Home will include a mix of digital and static units to maximize overall reach and efficiencies. The recommendation includes 54 digital units and 18 static units in the Northern California area for the first three months of the campaign. In addition to the Local focus, there will be support in both Los Angeles and San Diego. In Los Angeles, 10 digital units are recommended to reach potential claimants. In San Diego, 29 digital transit shelters and 10 digital billboards are recommended to reach potential claimants.

## I.     EARNED MEDIA

122.     A critical component of the TCC Notice Program is a sustained media presence via earned media; this is effectuated using two unified public relations partners—one on the east coast and one in the Bay Area. The fires have proved to be the ultimate public interest story and have been covered by local, national and international press. The Public Relations portion of the campaign is designed to guarantee a continued lifecycle in the press concerning the importance and timeliness of the Bar Date. Using direct media outreach, press conferences, regular news releases, content development and official spokespeople, we will generate substantial earned media. This includes personally contacting the media and leveraging standing relationships to open

conversations and ultimately secure media coverage of the Bar Date. A list of Target Media Outlets is attached hereto as **Exhibit E.**

123. Sustained media coverage is critical considering the massive displacement that many Fire Claimants are dealing with, but also because of the permanent preclusions that can occur in the event of a victim's failure to be made aware of the Bar Date.

124. The earned media strategy will commence with a campaign kick-off in northern California, expand through the state, and have the ultimate intent of generating national media coverage.

125. All news media outreach will complement digital and social media, paid advertising, and grassroots advocacy for a fully integrated campaign for maximum exposure.

126. Among other tasks, the earned media team will help draft media advisories and news releases to attract coverage, and orchestrate a media campaign "launch," including a news conference with fire victims. A professional PR staff will advise on the appropriate venues, visual cues, backdrops, order of speakers and the proper roles for spokespeople to play in the presentation.

127. Other strategies include assisting with scheduling appearances on northern California TV and radio talk programs; following up with reporters/editors in the Chico-Redding media market directly, to make sure that any outlet that desires an opportunity to directly talk with the people who have been affected will be matched with willing participant(s).

128. The earned media effort will also engage statewide media including the Associated Press as well as national media outreach, including pursuing and reacting to national media inquiries. Primary national targets include network morning shows, evening news broadcasts, cable news and CNBC.

## IV. GRASS ROOTS OUTREACH AND EXPERIENTIAL MARKETING

129. Mass media is vital to generate broad awareness, but consumers also look to friends, family members, faith groups, and co-workers to get objective unbiased opinions.

130. Given that people typically only tell others information that is relevant to that audience, word of mouth is by its own nature, is also quite targeted, allowing us to reach specific individuals that might not otherwise be reached by mass media, such as those left homeless or

displaced after the fires.

131. Our word of mouth strategy will include both grassroots outreach and experiential marketing.[14] Designing messages to generate interest and seeding those messages in the appropriate communities to drive diffusion, will help increase the credibility of our message.

132. We will utilize professional experiential marketers to hand-distribute notice forms for a total of 35 days across the seven counties affected by the fires. The team will distribute flyers both to individuals and institutions that make sense in the various communities, including leaving flyers at high traffic locations such as community centers, restaurants, and houses of worship.

133. The Notice Program also contemplates direct outreach to any remaining community centers and meeting places, notice through churches, social service agencies, support groups, online forums and other trusted community resources.

## **CONCLUSION**

134. In my opinion, the Debtors Supplemental Notice Plan will not provide full and proper notice to the Fire Claimants. It is further my opinion that it cannot be shown that DSNP was reasonably calculated to provide proper notice. It lacks essential information, fails to validate its audience, and appears to be the sort of "mere gesture" the Supreme Court rejected in *Mullane*.

135. It is my opinion that the Tort Claimant Committee's Notice Program will provide the best notice practicable under the circumstances of this case, conforms to all aspects of the applicable Federal Rules, comports with the guidance for effective notice articulated in the Northern District of California's 2018 Procedural Guidance for Class Action Settlements and the Manual for Complex Litigation 4th.

136. At the appropriate time, Angeion Group may also develop and implement subsequent notice efforts as agreed to by the parties and/or directed by the Court, including a reminder notice effort in advance of the Bar Date.

---

[14] Engagement marketing, sometimes called "experiential marketing", "event marketing", "on-ground marketing", "live marketing", "participation marketing", "Loyalty Marketing", or "special events" is a marketing strategy that directly engages consumers and invites and encourages them to participate in the evolution of a brand or a brand experience. Rather than looking at consumers as passive receivers of messages, engagement marketers believe that consumers should be actively involved in the production and co-creation of marketing programs, developing a relationship with the brand. Wikipedia, available at https://en.wikipedia.org/wiki/Engagement_marketing.

1    137.    After effectuating the Notice Program, Angeion will provide a final report verifying

2    its effective implementation.

3    138.    I hereby declare under penalty of perjury that the foregoing is true and correct.

4

5    Dated:  May 30, 2019

6

7                                              _____
                                               STEVEN WEISBROT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28