Robert A. Julian (SBN 99469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: 628.208.6434
Facsimile: 310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | |
| **-and-** | Chapter 11 (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | |
| **Debtors.** | **OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO MOTION OF THE DEBTORS FOR ORDER (I) ESTABLISHING DEADLINE FOR FILING PROOFS OF CLAIM, (II) ESTABLISHING THE FORM AND MANNER OF NOTICE THEREOF, AND (III) APPROVING PROCEDURES FOR PROVIDING NOTICE OF BAR DATE AND OTHER INFORMATION TO ALL CREDITORS AND POTENTIAL CREDITORS (DKT. NO. 1784)** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | |
| | Date: June 11, 2019 |
| | Time: 9:30 a.m. (Pacific Time) |
| | Place: United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco, CA 94102 |
| | Objection Deadline: May 31, 2019 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 2

    A.   The 2015 Butte Fire ....................................................................................... 2

    B.   The 2016 Ghost Ship Fire ............................................................................... 4

    C.   The 2017 North Bay Fires .............................................................................. 4

    D.   The 2018 Camp Fire ....................................................................................... 6

III. THE TCC'S PROPOSED TWO-STEP PROCESS ................................................ 7

IV.  PG&E'S MOTION AND PROPOSED FORMS AND PROCEDURES ........................... 7

    A.   PG&E's Wildfire Claimant Proof of Claim ................................................... 7

    B.   PG&E's Proposed Notice Procedures ............................................................ 9

    C.   Proposed September 2019 Bar Date ............................................................. 10

V.   DATA SHARING PROPOSAL ........................................................................... 10

VI.  ARGUMENT ........................................................................................................ 11

    A.   Legal Standard for Proof of Claim Form ..................................................... 11

        1.   The TCC's Form Complies with Applicable Law ................................... 12

        2.   PG&E's Form Does Not Comply with Applicable Law ........................... 13

    B.   Insurance Information Is Duplicative ............................................................ 14

    C.   PG&E's Claim Form Is Not Necessary to Advance the Chapter 11 Cases ......... 15

    D.   Legal Standard for Proper Notice ................................................................. 17

        1.   The TCC's Notice Plan Complies with Applicable Law ......................... 18

        2.   PG&E's Notice Plan Does Not Comply with Applicable Law ................ 19

        3.   Case Law Cited by PG&E Supports the TCC's Position ......................... 19

    E.   PG&E's Bar Date Should Not be Approved .................................................. 24

VII. CONCLUSION ..................................................................................................... 24

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anheuser-Busch, Inc. v. Starley*,
  170 P.2d 448 (Cal. 1946) .......................................................................................................14

*Chemetron Corp. v. Jones*
  72 F.3d 341 (3d Cir. 1995) ..............................................................................................19, 22

*In re Cluff*,
  313 B.R. 323 (Bankr. D. Utah 2004) .......................................................................11, 12, 13

*In re Daystar of California, Inc.*,
  122 B.R. 406 (Bankr. C.D. Cal. 1990) ...................................................................................13

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ................................................................................................................17

*In re G-I Holdings, Inc.*,
  323 B.R. 583 (Bankr. D.N.J. 2005) .......................................................................................15

*In re Garner*,
  246 B.R. 617 (B.A.P. 9th Cir. 2000) ...............................................................................11, 12

*In re Heath*,
  331 B.R. 424 (B.A.P. 9th Cir. 2005) ...............................................................................11, 12

*Helfend v. S. Cal. Rapid Transit Dist.*,
  2 Cal. 3d 1 (Cal. 1970) ...........................................................................................................14

*Huntsinger v. The Shaw Group, Inc.*,
  268 Fed. Appx. 518 (9th Cir. Feb. 26, 2008) ........................................................................17

*In re Jenny Lynn Mining Co.*,
  780 F.2d 585 (6th Cir. 1986) ..................................................................................................12

*In re Latin*,
  No. EC-08-1082, 2009 WL 7751424 (B.A.P. 9th Cir. Feb. 11, 2009) ..............................11, 12

ii

*In re Mansaray-Ruffin*,

    530 F.3d 230 (3d Cir. 2008)........................................................................17

*In re Maya Const. Co.*,

    78 F.3d 1395 (9th Cir. 1996)....................................................16, 19, 20, 21

*Monster Content v. Homes.com, Inc.*

    331 B.R. 438 (N.D. Cal. 2005) ................................................................21

*In re Motors Liquidation Co.*,

    829 F.3d 135 (2d Cir. 2016) ....................................................20, 21, 23

*In re Motors Liquidation Co.*,

    529 B.R. 510, 550 (Bankr. S.D.N.Y. 2015) ............................................21

*Mullane v. Cent. Hanover Bank & Trust Co.*,

    339 U.S. 306 (1950)................................................................................17

*In re North Am. Health Care, Inc.*,

    544 B.R. 684 (Bankr. C.D. Cal. 2016)....................................................15

*Pacific Gas & Electric Co. v. Superior Court*,

    33 Cal. Rptr. 4th 174 (Cal. Ct. App. 1994). ..........................................14

*PacifiCorp and Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*,

    No. 05-764, 2006 WL 2375371 (D. Del. Aug. 16, 2006)................16, 21, 22

*In re Reg'l Care Servs. Corp.*,

    No. 16–1213, 2017 WL 2871751 (B.A.P. 9th Cir. July 5, 2017) ............16

*Tan Jay Int'l., Ltd. v. Canadian Indem. Co.*,

    198 Cal. Rptr. 907 (Cal. Ct. App. 1988) ................................................11

*In re TK Holdings Inc.*,

    No. 17–11375 (Bankr. D. Del. 2017)......................................................18

*Tulsa Prof'l Collection Servs., Inc. v. Pope*,

    485 U.S. 478 (1988)................................................................................16

*Waterville Indus., Inc. v. First Hartford Corp.*,

    124 B.R. 411 (D. Me. 1991) ................................................................7, 19

Baker & Hostetler LLP
Attorneys at Law
San Francisco

iii

*Wise v. NCD Inc.*,

    No. 06-02027, 2006 WL 3051873 (D. Ariz. Oct. 25, 2006) ....................................................20

**Statutes**

11 U.S.C. § 1129(b)(2)(B)(ii) ....................................................................................................15

**Other Authorities**

17 C.F.R. § 240.10b-5 ...............................................................................................................15

Fed. R. Bankr. P. 3001(a)............................................................................................10, 11, 13

Fed. R. Bankr. P. 3001(c)........................................................................................11, 12, 13, 15

Fed. R. Bankr. P. 3001(f) ...........................................................................................................13

Fed. R. Bankr. P. 3003(c)(2) .....................................................................................................16

CACI No. 5001 (2017 edition)..................................................................................................14

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Official Committee of Tort Claimants (the "**TCC**") hereby objects to the Motion of Debtors for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (Dkt. No. 1784) (the "**Motion**")[1] filed by PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**").

## I.     INTRODUCTION

On May 3, 2019, the TCC filed a motion seeking approval of its model proof of claim form for Fire Claims. *See* Dkt. No. 1824. The TCC's form substantially conforms to Official Form 410. The modifications made by the TCC to the Official Form are intended to ensure that Fire Claimants provide information regarding the basis for their Fire Claims, the alleged harm caused by the related fire, and the damages sought. The TCC's form is designed to meet applicable legal requirements so that each Fire Claim is entitled to prima facie validity, while also making it as easy as possible for unrepresented victims to file claims so they are not excluded. This is critical here because many victims of the 2018 Camp Fire, which destroyed 13,972 residences, 528 commercial structures and 4,293 other buildings as well as documents and records contained therein, are still homeless and suffering trauma. A fair and just claim form must take this reality into account.

Contemporaneously with the filing of this Objection, the TCC is also filing an application to retain the renowned noticing firm Angeion Group, LLC ("**Angeion**") and a motion to approve the TCC's notice plan. As set forth in the Declaration of Steven Weisbrot (attached as **Exhibit 1**), the experts at Angeion, who have extensive experience in creating and administering claims and notice programs designed to maximize claimant reach and participation, have designed a notice plan to meet applicable legal requirements given the unique circumstances presented by these cases. The TCC's plan utilizes a wide range of methods to reach potential claimants, including direct notice through mail and email, paid media in the form of television, radio, newspaper and magazine publication, billboards, and social media, as well as grassroots and experimental marketing. It is critical that a robust plan be implemented, as many victims of the 2018 Camp Fire are still homeless.

---

[1] Capitalized terms used but not defined in this Objection have the meanings given to them in the Motion. The terms "**Fire Claim**" and "**Fire Claimant**" shall have the meanings given to them in the Memorandum in Support of the TCC's Motion to approve the TCC's model proof of claim form (Dkt. No. 1825).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The TCC recognizes that a gating issue in the Chapter 11 Cases is the magnitude of PG&E's liability with respect to Fire Claims. Sources of relevant data exist and retained professionals have already commenced the work necessary to estimate Fire Claims on an aggregate basis. PG&E has substantial information, although to date PG&E has been unwilling to share it with the TCC. Other parties, including subrogation insurers, also have relevant information. Data is also publicly available or can be obtained from third parties. The TCC's form and notice procedures recognize that it is not necessary to obtain discovery from thousands of victims whose records were destroyed in the fires and who are not experts. The TCC's process, however, leaves open the possibility that another phase could occur whereby victims could be required to provide more information.

PG&E wants to implement a different approach. PG&E's form for Fire Claimants does not substantially conform to Official Form 410 and requires irrelevant information and supporting documentation that is not required under the Bankruptcy Rules. PG&E also proposes a noticing plan that is embarrassing. PG&E refuses to take steps to obtain updated address information beyond the forwarding information available from the U.S. Postal Service. PG&E proposes to spend $1.5 million to $2 million on its Supplemental Notice Program. Motion at 11, 23. PG&E's approach ignores the fact that fires PG&E caused destroyed homes and displaced thousands of parties, making a standard noticing program constitutionally insufficient in this context.

Finally, PG&E proposes an early Bar Date, which, when combined with PG&E's unduly complex claim form and minimalist noticing procedures, will necessarily have the intended effect of excluding thousands of unrepresented victims. PG&E's procedures are designed to minimize PG&E's liability and arm it with tools to object to valid claims. PG&E cloaks its plan in bankruptcy jargon designed to create the impression that PG&E's plan is necessary to obtain "critical" information needed to estimate Fire Claims. But, a basic review of the events beginning with the 2015 Butte Fire through the 2018 Camp Fire shows that this narrative is not credible.

## II.     BACKGROUND

### A.     The 2015 Butte Fire

In September 2015, a wildfire ignited and spread in Amador and Calaveras Counties in Northern California (the "**Butte Fire**"). Woltering Declaration (attached as **Exhibit 2**) at Ex. A.

2

Case: 19-30088    Doc# 2306    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 7 of 30

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Butte Fire burned 70,868 acres, resulted in 2 fatalities, destroyed 965 structures including 549 homes, 368 outbuildings and 4 commercial properties, and damaged 44 structures. *Id.* at Ex. B, Part 1, p. 22. PG&E is liable. As Cal Fire found, the Utility and/or its vegetation management contractors—ACRT Inc. and Trees, Inc.—failed to identify potential hazards during its vegetation management program, which led to a tree contacting the Utility's electric line, igniting the fire. *Id.*

Following the Butte Fire, more than 3,700 individual plaintiffs representing 2,030 households and their insurance companies against PG&E and its contractors. *Id.* at Ex. C, 29. A petition was filed on November 12, 2015 asking the Judicial Council of California for a Judicial Council Coordinated Proceeding ("**JCCP**"). *See generally*, *id.* at Ex. B, 22. On December 3, 2015, the JCCP petition was granted and the actions were coordinated as the Butte Fire Cases, JCCP Number 4853. On May 23, 2016, individual plaintiffs filed a master complaint against the Utility and its two vegetation management contractors. *Id.* at 52. Subrogation insurers also filed a separate master complaint. *Id.* In 2016, PG&E estimated minimum losses for the Butte Fire at $750 million. *Id.* In 2017, PG&E revised its minimum claims estimate to $1.1 billion. *Id.* at Ex. C, 139. PG&E explained that this revision was due to additional information obtained through discovery from the plaintiffs and from ongoing mediations and settlements. *Id.*

Prior to the Petition Date, PG&E engaged in more than four years of litigation, discovery, mediations and settlements regarding the Butte Fire. During the period leading up to the bankruptcy, PG&E was settling an average of 40–60 cases per month with Butte Fire victims. *See* Singleton Decl. (Dkt. No. 770) at ¶ 2. As of December 31, 2017, PG&E had entered into "settlement agreements in connection with the Butte fire corresponding to approximately $624 million." Woltering Decl. at Ex. C, 139 n.1. In the two months leading up to the bankruptcy, PG&E settled approximately 52 cases with Butte Fire victims. *See* Singleton Decl. at ¶ 2.

PG&E has settled the majority of cases stemming from the 2015 Butte Fire. These claims are effectively liquidated. By virtue of its participation in discovery, mediations and settlements, PG&E has a vast amount of information relating to the Butte Fire and the claims arising therefrom. PG&E offers no explanation in its Motion as to what information it needs to obtain through its claim form relating to the Butte Fire that will enable it to estimate tort claims on an aggregate basis.

3

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**B.    The 2016 Ghost Ship Fire**

On December 2, 2016, a fire broke out at the "Ghost Ship" warehouse located on 31st Avenue in Oakland, California (the "**Ghost Ship Fire**").  Woltering Decl. at Ex. D, ¶ 1.  At the time the fire broke out, the Ghost Ship was hosting more than 100 individuals for an electronic dance music event.  *Id.* at ¶ 2.  With no fire-suppression system or alarms in the warehouse, the Ghost Ship Fire claimed 36 lives, all from smoke inhalation, and left many others seriously injured.  *Id.* at ¶¶ 1, 4.  In connection with the Ghost Ship Fire, 31 actions were filed, involving 47 individual plaintiffs.  In May 2017, a master complaint was filed in the Alameda Superior Court consolidating the individual actions (the "**Ghost Ship Litigation**").  *Id.* at Ex. E, 37.

The master complaint names the property owner, the master tenant, neighboring tenants, and PG&E.  *Id.*  This complaint alleges that the Utility violated the California Labor Code and various electric rules.  *Id.*  The statute of limitations for Ghost Ship Fire claims expired in December 2018.  The population of Fire Claimants is limited to known plaintiffs in the Ghost Ship Litigation.  Prior to the Petition Date, PG&E had the opportunity to engage in significant discovery related to the claims and damages alleged by the plaintiffs.  PG&E offers no explanation in its Motion as to what information it needs to obtain through its claim form relating to the Ghost Ship Fire that will enable it to estimate tort claims on an aggregate basis.

**C.    The 2017 North Bay Fires**

Beginning on October 8, 2017, multiple wildfires spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City (the "**North Bay Fires**").  *Id.* at Ex. C, 27.  At their peak, there were 21 major wildfires in California that, in total, burned over 245,000 acres, damaged or destroyed 14,700 homes, 3,600 vehicles, and 728 businesses, and resulted in 44 fatalities and hospitalized over 185 others.  *See* Debtors' Request for Judicial Notice, *Herndon v. PG&E Corp.*, Adv. Pro. No. 19-03005 (Bankr. N.D. Cal. Mar. 18, 2019), Dkt. No. 10-2, at ¶ J.  As Cal Fire found, PG&E's faulty equipment and its failure to identify hazards during its vegetation management program ignited 19 of the 21 North Bay Fires.  *Id.* at Ex. I, 43.

4

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PG&E is liable. January 2018 estimates by the California Department of Insurance announced 55,000 insurance claims had been filed for 2017 wildfire losses, including $10 billion of claimed losses for the North Bay Fires. *Id.* at 45. This amount excludes uninsured losses, interest, attorneys' fees, personal injury and wrongful death damages or other costs. *Id.* at 44. PG&E has stated that its liability for the North Bay Fires could significantly exceed the $10 billion in estimated insured property losses. *Id.* at 45. During 2018, PG&E accrued charges of more than $3.5 billion for third-party claims connected to the North Bay Fires. *Id.* at 47–48.

Motivated by the need to compensate victims and understand the magnitude of the damages, the parties to the North Bay JCCP—including individual plaintiffs, public entity plaintiffs, subrogation plaintiffs, and PG&E—worked together to develop a stipulated claims evaluation process. This process involved staged discovery. *Id.* at Ex. F, 14. The first discovery stage ("**Stage One**") related to damages discovery from individual plaintiffs, public entity plaintiffs, and subrogation plaintiffs, in addition to liability discovery. *Id.* The second discovery stage related to expert discovery on issues of liability and damages. *Id.*

Stage One provided for a categorical analysis of damage claims and exchange of information between wildfire claimants, counsel, and the insurance companies. *Id.* at 14–15. Subsequently, BrownGreer PLC ("**BrownGreer**") was appointed to manage and control the submission of data about the claimants (claimant/household names, loss address, type of loss, counsel information, insurance carrier information, identification of the fire(s) alleged to have caused their injuries); insurance claim information (name of insured, carrier name, claim number, date of loss, loss location, amount paid, open reserves, and status of any adjustment); uninsured/underinsured claims; supporting documentation for the alleged losses (videos, photographs, electronic images); and individual subrogation claim files (payments by coverage, including payments under Building, Contents/Business Personal Property, Alternative Living Expenses/Business Interruption and Auto/Specialty; a copy of the closed claim file). *Id.* at Ex. G. As of May 30, 2019, BrownGreer houses data on over 11,347 Fire Claimants whose Fire Claims arise from the North Bay Fires. *See* Strunk Declaration (attached as **Exhibit 3**) at ¶ 7.

5

At the end of 2018, the North Bay JCCP was well into Stage One of discovery, and the first bellwether trial on PG&E's liability for the Atlas fire was scheduled to begin in September 2019. Woltering Decl. at Ex. I, 44. This litigation, including the trial date with respect to the Atlas fire, is stayed due to the Chapter 11 Cases. *Id.* By virtue of the staged discovery in the North Bay JCCP, the parties, including PG&E, possess information relating to the North Bay Fires and the Fire Claims arising therefrom. PG&E offers no explanation in its Motion as to what information it needs to obtain through its claim form relating to the North Bay Fires that will enable it to estimate tort claims on an aggregate basis.

### D. The 2018 Camp Fire

Just before sunrise on November 8, 2018, the most destructive wildfire in California history started near the town of Pulga (the "**Camp Fire**"). *Id.* at Ex. H. It moved rapidly west consuming 153,336 acres, causing 85 civilian fatalities, and destroying 13,972 residences, 528 commercial structures and 4,293 other buildings. *Id.* at Ex. I, 41. The Camp Fire was caused by unsafe electrical infrastructure owned, operated, and improperly maintained by PG&E. *Id.* at Ex. H. PG&E has estimated damage claims from the Camp Fire at more than $10.5 billion. *Id.* at Ex. I, 47.

In the three-month window between the Camp Fire and the Petition Date, PG&E was named in nearly 100 actions on behalf of at least 4,200 plaintiffs related to the 2018 Camp Fire, 9 of which seek to be certified as class actions. *Id.* at 44. Plaintiffs in Camp-Fire-related actions seek damages that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, establishment of a class action medical monitoring fund, punitive damages, attorneys' fees and other damages. *Id.* Insurance carriers have filed 37 similar subrogation complaints with respect to the 2018 Camp Fire in the Sacramento County Superior Court. *Id.* at 45.

As of the Petition Date, no coordinated proceeding had been granted for the Camp Fire. Following the bankruptcy filing, all pending civil litigation against PG&E for the Camp Fire was stayed. Despite this, as of May 30, 2019, over 10,098 Fire Claimants whose Fire Claims arise from the Camp Fire have uploaded data relating to their Fire Claims using the portal maintained by BrownGreer. *See* Strunk Decl. at ¶ 7. PG&E also possesses substantial information regarding Fire Claims arising from the Camp Fire. In its March 2019 10-Q, PG&E estimates its losses with respect

6

to the Camp Fire and the North Bay Fires at $30 billion. Woltering Decl. at Ex. I, 46. Again, PG&E offers no explanation in its Motion as to what information it needs to obtain through its claim form relating to the Camp Fire that will enable it to estimate tort claims on an aggregate basis.

### III.      THE TCC'S PROPOSED TWO-STEP PROCESS

The TCC does not view the proof of claim form as a proper device to obtain discovery. Given the nature and amount of information in PG&E's possession and available from parties other than Fire Claimants, the TCC does not expect experts employed to estimate Fire Claims to pour over proofs of claim or otherwise rely on them as a source of information other than to identify Fire Claimants. But, the TCC does believe that it is essential that Fire Claimants file proofs of claim so that they are treated as creditors for purposes of voting and distribution.

To this end, the Court should *first* approve a simplified claim form for Fire Claims and mandate robust notice procedures. Over 21,500 Fire Claimants have already uploaded data about their Fire Claims into the BrownGreer database. *See* Strunk Decl. at ¶ 7. These Fire Claimants are represented by counsel. The TCC expects that these Fire Claimants will file proofs of claim. The TCC also hopes that unrepresented Fire Claimants will file proofs of claims as well. It is possible, but unlikely, that the parties could need to obtain information from Fire Claimants after the Bar Date for purposes of estimating claims on an aggregate basis.

If this occurs, and these Fire Claimants are unwilling to provide information on a voluntary basis, the Court can approve a *second* supplemental information request targeted at these Fire Claimants. This may not be necessary; however, it is plainly possible to utilize a two-step process that maximizes creditor participation and obtains information needed to confirm a plan of reorganization that results in distributions to Fire Claimants.

### IV.      PG&E'S MOTION AND PROPOSED FORMS AND PROCEDURES

PG&E offers a different approach. PG&E's Motion asks the Court to approve claim forms and notice procedures designed to minimize PG&E's liability to Fire Claimants.

#### A.      PG&E's Wildfire Claimant Proof of Claim

PG&E wants the Court to approve a form that will give it tools to defeat valid claims. Under the Proposed Order, Fire Claimants must provide "all of the information requested in the Wildfire

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Claimant Proof of Claim Form," or else face a claim objection for non-compliance with a Court order. Motion at Ex. A, ¶ 3(c). PG&E's form is confusing, requires documentation that is not required under the Bankruptcy Rules, and requires Fire Claimants to provide amounts for claims that are generally the subject of expert testimony and insurance information that is irrelevant and duplicative. PG&E also asks the Court to deem claims filed using Official Form 410 invalid.

Questionnaire. Part 3 of PG&E's form requires Fire Claimants to check a box identifying the fire giving rise to the Fire Claim. PG&E lists 23 fires using names like "Blue," "Honey," "Pocket," and "Sulphur." As set forth in the Cordova Declaration (attached as **Exhibit 4**), not all Fire Claimants even know the name of the fire that destroyed their homes, while other Fire Claimants were impacted by converging fires. Cordova Decl. at ¶ 3. Part 8 of PG&E's form requires Fire Claimants to disclose whether they intend to rebuild. As set forth in the Riddle Declaration, this question is unfair, as victims cannot have an intent to rebuild unless and until they receive the money necessary to do so. *See* Dkt. No. 2242-1 at ¶ 9. This question is designed to trap victims by limiting their damages.

Documentation. PG&E's form also requires Fire Claimants to provide documentation for any claim for property damage, personal injury, emotional distress, wrongful death, and/or business/economic loss. Motion at Ex. C-2. Exemplar documentation identified in PG&E's form includes: proof of ownership (titles, deeds); property appraisals; insurance documents or lease/rental agreements; descriptions of all personal property; information about insurance coverage, proceeds, and policies; proof of operation of business at the time of the fire; federal tax returns for two years preceding the fire; monthly/annual profit and loss statements or W-9 forms; death certificates; copies of autopsy findings; hospital records; and insurance benefit summaries.

Numerical Amounts. PG&E's form also requires Fire Claimants to provide numerical amounts for certain claims. The form asks Fire Claimants to assign a dollar amount for loss of goodwill, personal injury, and emotional distress. *Id.* In contrast, PG&E scheduled each Fire Claim in an undetermined amount and as disputed, contingent and unliquidated.

Insurance Information. PG&E's proposed form also requires Fire Claimants to identify whether their loss is covered by insurance, the insurer, the covered property, the amount of

8

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

coverage, and the amount of insurance proceeds (if any) received to date. *Id.* PG&E's form also contains multiple disclaimers and threats about insurance fraud. *Id.* The juxtaposition of the insurance fraud disclaimers and the request for insurance information creates confusion and a chilling effect and may lead to Fire Claimants understating their Fire Claims.

Requirement to Re-File Proofs of Claim. PG&E's Proposed Order requires Fire Claimants that have already filed proofs of claim using Official Form 410 to re-file claims using PG&E's form. Motion at 14. This would mean that claims filed using the Official Form would be deemed invalid under PG&E's procedures. PG&E offers no legal authority as to why claims filed using the Official Form should be considered invalid.

## B. PG&E's Proposed Notice Procedures

PG&E also seeks approval of notice procedures that are critically deficient. Not only is the form of notice unduly complex, but PG&E is not proposing to take actions necessary to locate updated address information for known claimants. PG&E's Supplemental Noticing Program fails to reflect a serious attempt to provide notice to unknown claimants.

Complex Form of Notice. PG&E asks the Court to approve an unduly complex form of notice for Fire Claims. *See* Motion at Ex. B-2. PG&E's Wildfire Claim Bar Date Notice is six pages long, uses single sentences that occupy nearly half a page, and is written in legalese. As reflected in the TCC's proposed notice, attached as **Exhibit 5**, the form of notice can be written in plain English and be no longer than one page in length.

Known Fire Claimants. Under its notice procedures, PG&E proposes to provide written notice to parties it considers "Known Wildfire Claimants." Motion at 21. "Known Wildfire Claimant" includes parties that filed complaints prepetition and are represented by counsel and parties that have already filed proofs of claim using Official Form 410. *Id.*

PG&E claims that it "will make efforts" to send written notice to parties affected by the 2017 Northern California Wildfires, but <u>not</u> the 2018 Camp Fire, using a GIS database. *Id.* at 22. PG&E claims that it will use updated address information maintained in the BrownGreer database and insurance files, but only if such information is given to PG&E "reasonably in advance" of the entry of any order granting the Motion. *Id.* PG&E is not proposing to take actions to obtain updated

9

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

contact information for Fire Claimants displaced by the fires beyond the forwarding information available from the U.S. Postal Service. PG&E asserts that it has no obligation to conduct "extended searches" "in the name of due process," and that it can simply rely on its own "books and records" when providing notice to parties it deems "Known Wildfire Claimants." *Id.* at 31–32.

Unknown Fire Claimants. For parties PG&E considers "unknown creditors," PG&E proposes to provide constructive notice. PG&E's total budget for its noticing program is $19 million to $22 million. *Id.* at 11. Of this amount, PG&E proposes to spend $1.5 million to $2.0 million on Supplemental Notice Procedures that include "newspaper publication notices," "digital advertising," "television and radio advertising," "email notice" and "claim service centers." Motion at 11, 23. In contrast, the TCC's notice plan has an estimated cost of $21.8 million, with $12.8 million allocated to its media campaign designed to reach unrepresented Fire Claimants. *See* Weisbrot at Ex. A.

## C. Proposed September 2019 Bar Date

Finally, PG&E asks the Court to establish September 16, 2019 as the Bar Date for all proofs of claim, including any claims of Fire Claimants. The Camp Fire happened in late 2018, a mere six months ago. Many survivors are still living in tents and portable trailers.

## V. DATA SHARING PROPOSAL

Since PG&E filed its Motion, the TCC has sought access to PG&E's data. The TCC does not have possession, custody or control of the BrownGreer database. This database contains information uploaded to it by over 55 different law firms, each of which represents different Fire Claimants, and each of which has retained work product and common interest privileges. The TCC has proposed that the parties engage in a voluntary, consensual, and collaborative plan to share data and documents to expedite the claims estimation process. As part of this agreement, the TCC would seek the plaintiff lawyers' agreement to provide PG&E with a secured portal so that it can access appropriate portions the BrownGreer database, which includes categories of data stipulated and agreed to by PG&E in the North Bay JCCP. PG&E, in turn, would be required to produce the substantial data that it has amassed over years of litigation. The TCC wants to have information

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

pooled and made available to professionals for the TCC, the Official Committee of Unsecured Creditors, and PG&E to create a level playing field.

## VI.  ARGUMENT

### A.  Legal Standard for Proof of Claim Form

Bankruptcy Rule 3001(a) provides that: "A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a). An important function of a proof of claim is that it provides notice. As the Ninth Circuit explained in *In re Barker*, "[t]he proof of claim plays the important role of 'alert[ing] the court, trustee, and other creditors, as well as the debtor, to claims against the estate,' and the creditor's intention to enforce the claims." 839 F.3d 1189, 1195 (9th Cir. 2016) (quoting *In re Daystar of California, Inc.*, 122 B.R. 406, 408 (Bankr. C.D. Cal. 1990)).

The evidentiary effect of a proof of claim is "similar to a verified complaint." *In re Heath*, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005) (following *In re Cluff*, 313 B.R. 323, 333 (Bankr. D. Utah 2004), *In re Garner*, 246 B.R. 617, 622 (B.A.P. 9th Cir. 2000)); *see also In re Latin*, No. EC-08-1082, 2009 WL 7751424, at *5 (B.A.P. 9th Cir. Feb. 11, 2009) ("A proof of claim is often analogized to a complaint"). It follows that a proof of claim need only set forth "enough details so as to provide a defendant and the court with a *fair idea of the basis of the complaint and the legal grounds claimed for recovery*." *Latin*, 2009 WL 7751424, at *5 (quoting *In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir. 1994)) (emphasis in original).

Under California law, a complaint need not specify an amount of damages in a personal injury or wrongful death action. *See* Cal. Civ. Pro. § 425.10 (West 2019). The amount of damages awarded for emotional distress is determined by the finder of fact, often a jury, based on the entire evidentiary record, and not an amount pled by the plaintiff. *See Tan Jay Int'l., Ltd. v. Canadian Indem. Co.*, 198 Cal. Rptr. 907, 913 (Cal. Ct. App. 1988).

When a claim is "based on a writing," Bankruptcy Rule 3001(c) requires the claimant to provide supporting documentation by filing "a copy of the writing" with the proof of claim. Fed. R. Bankr. P. 3001(c). But, when a claim is not based on a writing, such as a claim that is "created by statute" or arises "by operation of tort law," "no documentation is required to achieve *prima*

11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*facie* status." *Cluff*, 313 B.R. at 332. This principle is illustrated by the Ninth Circuit's decision in *In re Los Angeles International Airport Hotel Associates*, wherein the Circuit upheld the reversal of a bankruptcy court decision requiring a taxing authority to attach supporting documentation to a proof of claim reflecting a tax claim. 106 F.3d 1479, 1480 (9th Cir. 1997). In that case, the debtor's position missed the nature of the underlying "legal obligation[]," which was created by statute and not a contract. *Id.* The Ninth Circuit found that, "[i]n the case of a contract, the legal obligation is created by the writing itself," however, "[i]n the case of a [] tax, the obligation to pay the tax is created solely by the completion of the transaction to which the state statute applies." *Id.*

The Circuit held that the tax obligation was "ascertainable even absent such a writing" and that "Rule 3001(c) is invoked where the obligation itself" is "based upon a writing." *Id.* Thus, when "no writing is required <u>to create</u> a [] liability," "Rule 3001(c) does not apply to claims for such debt." *Id.* (emphasis added); *see In re Jenny Lynn Mining Co.*, 780 F.2d 585, 587 (6th Cir. 1986) (no documentation had to be attached to proof of claim under former Bankruptcy Rule 13-302(c) where claim was based on statute and not on writing). As the court in *Cluff* recognized, the same rationale applies equally to claims arising "by operation of tort law." 313 B.R. at 332.

### 1. The TCC's Form Complies with Applicable Law

The TCC's model claim form was designed based on the foregoing legal standard. The TCC began with Official Form 410, and then made modifications to ensure that any claim submitted using the TCC's form would provide a "fair idea" of the basis of the claim and the "legal grounds claimed for recovery." *Latin*, 2009 WL 7751424, at *5.

The TCC's form incorporates a questionnaire to elicit information regarding the basis for each Fire Claim. Fire Claimants are required to identify the specific Fire giving rise to the Fire Claim, the alleged harm caused by such Fire, and the damages being sought. The TCC's form does not use confusing names but requires Fire Claimants to check a box identifying the year of the fire giving rise to the Fire Claim and provide the location of the loss. This information can then be used to match a claim with a Fire. The TCC's form removes requests for information that are unlikely to apply—*e.g.*, secured status, cure amount, setoff rights, and priority. This will focus each Fire Claimant on providing the information that reflects the basis for the Fire Claim being asserted.

12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The TCC's form does not include unfair questions. The TCC's form does not ask Fire Claimants to include dollar amounts. Since the appropriate standard for a proof of claim is that of a "complaint," it is improper for PG&E to require dollar amounts for personal injury or emotional distress, as this does not need to be included in a complaint under California law. *See Heath*, 331 B.R. at 435; *Cluff*, 313 B.R. at 333; *Garner*, 246 B.R. at 622; *In re Latin*, 2009 WL 7751424, at *5. It is expected that expert testimony will be offered to substantiate claims for economic damages. It serves no purpose to require Fire Claimants, including those unrepresented by counsel, to specify dollar amounts for each component of their overall Fire Claim. Fire Claims do not have to be liquidated to set forth the basis for such claims and provide notice of the Fire Claimants' intent to hold PG&E liable therefor, which is the purpose of a proof of claim. *See Barker*, 839 F.3d at 1195; *Daystar of Cal.*, 122 B.R. at 408.

The TCC form does not require supporting documentation. The Fire Claimants are not voluntary creditors. PG&E's legal obligation to pay Fire Claimants is not created by a writing. No writing is required to create such liability. Under *Los Angeles International Airport*, Rule 3001(c)'s documentation requirement does not apply to Fire Claims. 106 F.3d at 1480. No documentation is necessary for a Fire Claim to be entitled to the "presumptive validity" attributed to it under Bankruptcy Rule 3001(f). *Id.* at 1480; *see Cluff*, 313 B.R. at 332.

2.  PG&E's Form Does Not Comply with Applicable Law

PG&E's form does not comply with the foregoing legal standard. As a threshold matter, the TCC points to the fact that PG&E is asking the Court to find that Fire Claimants that have filed claims using Official Form 410 must re-file their claims using PG&E's form. This is not only improper, this is an admission that PG&E's form does not conform substantially to the appropriate Official Form. But, for PG&E's form to be approved, the Court must find that it conforms "substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a). PG&E cannot logically ask the Court to find that its form conforms substantially to Official Form 410 and ask the Court to also find that Fire Claims filed using Official Form 410 are invalid and must be re-filed.

Putting this aside, PG&E's form is critically deficient. PG&E's form includes a confusing questionnaire. *See* Cordova Decl. at ¶ 3. Not all Fire Claimants even know the name of the fire

13

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

that destroyed their homes, while other Fire Claimants were impacted by converging fires. *Id.* PG&E's form requires Fire Claimants to provide specific dollar amounts for the categories of damages claimed, including personal injury and emotional distress. The PG&E form requires Fire Claimants to attach supporting documentation that is not required under Bankruptcy Rule 3001(c) and the Ninth Circuit's holding in *Los Angeles International Airport*.

PG&E's demand for supporting documentation is not only contrary to law, but it ignores the fact that fires PG&E caused destroyed the very documents at issue. PG&E wants to compel victims to file complex and confusing proofs of claim attaching documents PG&E's fires destroyed, while many victims are homeless. Under PG&E's procedures, PG&E will have the ability to object to Fire Claims on the basis that supporting documents that PG&E destroyed are not attached to proofs of claim. PG&E seeks to obtain a benefit from its destruction of property.

### B. Insurance Information Is Duplicative

PG&E's form also requests insurance information—*i.e.*, each Fire Claimant must identify whether the Fire Claim is covered by insurance, the insurer, the covered property, the amount of coverage, and the amount of insurance proceeds (if any) received to date. Motion at Ex. C-2. PG&E asserts that this is required to "value claims accurately." *Id.* at 28, 35. But, PG&E will receive this information from the insurers themselves through the Wildfire Subrogation Claimant Proof of Claim Form. It is not necessary for PG&E to also seek this information from the Fire Claimants. PG&E's request is duplicative.

PG&E also fails to explain why the requested insurance information is necessary. California's "collateral source rule" precludes consideration of amounts paid by an insurer when determining the total damages owed by a tortfeasor. *Anheuser-Busch, Inc. v. Starley*, 170 P.2d 448, 450 (Cal. 1946). Tortfeasors, like PG&E, cannot "avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." *Helfend v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 6 (Cal. 1970); *accord* CACI No. 5001 (2017 edition) ("evidence that the plaintiff was insured is not admissible under the 'collateral source rule'"). For example, as the court in *Pacific Gas & Electric Co. v. Superior Court* held, when an insurer agrees to pay on an insurance policy and waive its subrogation rights, the insured tort victim

14

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

is free to pursue the tortfeasor for the full amount of the loss.  33 Cal. Rptr. 4th 174, 184 (Cal. Ct. App. 1994).  PG&E's claim form creates confusion by potentially encouraging Fire Claimants to undervalue their claims and wrongly implying that Fire Claimants could be committing fraud if their claims reflect all damages suffered.

### C.    PG&E's Claim Form Is Not Necessary to Advance the Chapter 11 Cases

PG&E tries to justify its claim form as being necessary to advance the Chapter 11 Cases. PG&E wraps the relief it seeks in bankruptcy phrases like "gating issue," "essential to the claims estimation resolution process," and "critical importance" to progressing the Chapter 11 Cases toward plan confirmation.  Motion at 10, 13, 27 & 28.  The TCC respectfully submits that this is not what PG&E is attempting to accomplish.

The TCC agrees that a gating issue is the magnitude of PG&E's liability with respect to Fire Claims.  This is not disputed.  The Debtors filed their Chapter 11 Cases as solvent cases.  For equity to "receive or retain" any property under a plan of reorganization, Fire Claimants must consent or be paid in full.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  Case law indicates that Fire Claims may be estimated on an aggregate basis for purposes of voting and plan confirmation. *See*, *e.g.*, *In re North Am. Health Care, Inc.*, 544 B.R. 684, 692 (Bankr. C.D. Cal. 2016) (approving tort claim resolution proposal under which personal injury and wrongful death claims would be estimated on an aggregate basis for purposes of voting and plan confirmation); *In re G-I Holdings, Inc.*, 323 B.R. 583, 625 (Bankr. D.N.J. 2005) (adopting procedures to estimate tort claims on aggregate basis).

PG&E's argument is based on the false assumption that the only way to get data to estimate Fire Claims on an aggregate basis is to obtain it from tens of thousands of victims, many of whom are homeless and living in tents.  PG&E wants to convert the claim form from a notice tool into a discovery tool.  But, again, extensive documentation is not required under Bankruptcy Rule 3001(c) and the Ninth Circuit's holding in *Los Angeles International Airport*.

Moreover, claims estimation work is ongoing.  Data has been and can be obtained from sources other than the victims.  The party with the most data—PG&E—will neither produce nor fully disclose to the TCC what information it already has and, therefore, does not need to obtain from the victims.  PG&E has already valued Fire Claims through its Butte settlement process, which

15

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Fire Claims are representative of the types of losses that Fire Claimants are asserting. PG&E's valuations, if produced, could be used to estimate claims in the 2017 North Bay Fires and the 2018 Camp Fire.

The claim estimates contained in PG&E's SEC filings are not derived out of thin air but are based on the data and information PG&E has already collected. Woltering Decl. at Ex. I, 46. For example, PG&E estimated Fire Claims in its March 31, 2019 Form 10-Q SEC filing on the basis that PG&E had sufficient information to "determined that it is probable that it will incur a loss of $1.1 billion in connection with the 2015 Butte fire." *Id.* at 55. PG&E cannot include claim estimates in its SEC filings unless it has a reasonable basis for doing so. *See* 17 C.F.R. § 240.10b-5. It is unreasonable for PG&E to demand discovery from victims without first producing its data to the TCC and seeking data from subrogation insurers.[2]

But, even assuming, *arguendo*, that information must be obtained from victims, the TCC's two-step process takes this into account. The Court can approve the TCC's form now and approve a supplemental information request later, when, and if, it is shown that it is needed. The TCC disputes PG&E's contentions that the documents it seeks to obtain from victims are needed for claims estimation or plan formulation.

Nor does it make sense to seek data from Fire Claimants in the first instance. The reliability of estimation methodologies depends on the underlying data. Any estimated damages submitted by victims with no relevant qualifications would be speculative at best. If PG&E and its professionals seek to utilize self-reported data, the reliability of any resulting estimation would be questioned by various stakeholders.

Herein lies the point—the proof of claim form for Fire Claimants has little or no value as a source of information. It will identify Fire Claimants that can be treated as creditors for purposes of voting and distribution. *See* Fed. R. Bankr. P. 3003(c)(2). But, it is the data that PG&E has and the data that is available from sources other than the victims that will enable experts to perform the

---

[2] The TCC is deposing PG&E's corporate representative on PG&E's ability to estimate claims and reserves the right to supplement this Objection by filing or submitting such deposition testimony in connection with the hearing on this Objection.

16

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

work necessary to estimate Fire Claims. PG&E is not seeking to approve a claim form or procedures for purposes of gathering information to estimate tort claims but to avoid liability.

### D. Legal Standard for Proper Notice

Due process requires that known creditors receive actual written notice of a debtor's bankruptcy filing and claims bar date. *See In re Maya Const. Co.*, 78 F.3d 1395, 1399 (9th Cir. 1996) (due process requires formal notice to known contingent creditors); *In re Reg'l Care Servs. Corp.*, No. 16–1213, 2017 WL 2871751, at *6 (B.A.P. 9th Cir. July 5, 2017) ("[i]t is a fundamental principle of due process that known creditors of a debtor are entitled to actual notice of a claims bar date before their claims can be extinguished") (citation omitted).

A known creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988). Customers with whom a debtor has a "direct relationship" are generally considered known creditors. *See PacifiCorp and Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764, 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006). For unknown creditors, constructive notice by publication typically satisfies the requirements of due process. *See Huntsinger v. The Shaw Group, Inc.*, 268 Fed. Appx. 518, 521 (9th Cir. Feb. 26, 2008) (notice by publication proper for unknown creditors' claims) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)).

When actual or constructive notice is required, a "process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 315. "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974). The level of notice due to a party is "highly dependent on the context;" thus, a "process that may be constitutionally sufficient in one setting may be insufficient in another." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3d Cir. 2008).

The unique context here is that PG&E's tortious conduct creates noticing problems. Fire Claimants that are the Utility's current or former customers, and Fire Claimants once located in the region where PG&E supplied power and whose identities can be determined by PG&E from a diligent investigation of its records or other sources, are known creditors. PG&E, however, cannot

17

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

deliver a notice to a house that was destroyed. The mailbox is gone. Families were displaced. While the identity of the Fire Claimants is known or can be determined, actions must be taken here to locate known creditors. Many unknown creditors are suffering from trauma. A constitutionally sufficient notice program must take this into account. *See Mansaray-Ruffin*, 530 F.3d at 239

### 1. The TCC's Notice Plan Complies with Applicable Law

The TCC's program addresses the unique context of these Chapter 11 Cases. The TCC's notice plan includes the use of third-party subpoenas to insurers and record searches to identify contact information for all known Fire Claimants. *See* Weisbrot Decl. at ¶ 67. PG&E has retained a company that maintains a GIS database that lists properties and property owners located within the perimeter of the 2017 North Bay Fires. *See* Orsini Decl. at 3. The same can be done for the 2015 Butte Fire and the 2018 Camp Fire. PG&E's customer data, when supplemented in this manner, could be used to provide notice to known creditors.

For unknown Fire Claimants, the TCC proposes to use multiple forms of media—*e.g.*, television, radio, magazines, newspapers, and social media. The TCC's program achieves a much higher frequency. The TCC's proposed television advertising alone is estimated to reach over 74% of adults in the Northern California market with an estimated frequency of 10 times. *See* Weisbrot Decl. at ¶ 90. The TCC's paid media plan is designed to ensure that 95% of adults in Northern California receive notice approximately 51.95 times. *Id.* at ¶ 83. The TCC is not proposing to spend more, but to spend funds in the right way. Of the $22 million budgeted by PG&E, the TCC proposes to spend $21.8 million, of which $12.8 is allocated to the TCC's media campaign.

The TCC proposes to utilize a simple one-page notice. On this point, the TCC calls the Court's attention to the bar date notice filed by the Debtors' counsel in the Takata bankruptcy, a copy of which is attached as **Exhibit 6**. *See In re TK Holdings Inc.*, No. 17–11375 (Bankr. D. Del. 2017) (Dkt. No. 282-1). This two-page document was used to provide notice of the deadline for filing proofs of claim for damages relating to defective airbags *and* the deadline for objecting to the plan and disclosure statement. A one-page document can be used here to provide notice.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

### 2. PG&E's Notice Plan Does Not Comply with Applicable Law

PG&E's notice program fails to address the unique context of these Chapter 11 Cases. PG&E proposes to use a six-page notice that is confusing. PG&E refuses to go beyond its own books and records and will only provide actual notice to parties it considers "Known Wildfire Claimants." The addresses maintained in PG&E's books and records are not accurate. A letter cannot be delivered to a house that was destroyed. Families forced to relocate have new addresses. PG&E has an obligation to obtain updated addresses for all Fire Claimants. The identities of the parties harmed by fires PG&E caused are known or reasonably ascertainable. As set forth in the Declaration of Kirk Trostle, attached as **Exhibit 7** (the "**Trostle Declaration**"), an effective notice plan will require significant effort in the form of grassroots and other evidence-based strategies to reach victims of the 2018 Camp Fire. Trostle Decl. at ¶ 8.

PG&E's Supplemental Notice Program also is inadequate. PG&E is proposing to spend $2 million of its $22-million budget on media, which, if used effectively, could reach such Fire Claimants. Motion 11, 23. PG&E's television and radio advertisements have an estimated frequency of 1.5 times, whereas the TCC's estimated frequency for the television alone is 10 times. Weisbrot Decl. at Ex. D. A simple comparison of PG&E's notice plan and the TCC's notice plan shows that PG&E is offering empty rhetoric on a matter of critical importance. *Id.*

### 3. Case Law Cited by PG&E Supports the TCC's Position

In support of its notice plan, PG&E cites multiple cases for the general rule that a debtor does not have an obligation to conduct "extended searches" "in all situations" "in the name of due process," and that a debtor can generally rely on the addresses set forth in its "own books and records." *See* Motion at 31–32. But, this ignores the fact that the identity of most Fire Claimants is known or is reasonably ascertainable and that the reason PG&E's books and records do not set forth accurate addresses is due to PG&E's tortious conduct. The case law PG&E cites in its Motion supports the TCC's position that PG&E cannot rely *only* on its books and records.

*Chemetron Corp. v. Jones* involved personal injury claims arising from exposure to toxic chemicals. 72 F.3d 341 (3d Cir. 1995). The claimants—individuals who visited or occupied houses near the debtor's nuclear waste dump—relocated from the region years before the bankruptcy. The

19

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"vast majority of the claimants" were "not property owners, but guests" who visited houses near the waste dump. *Id.* at 348. The claimants sued the reorganized debtor nearly four years after the bar date and argued that the bankruptcy discharge did not apply because they were "known claimants" who did not receive actual notice of the claims bar date. *Id.* at 345.

In rejecting this argument, the Third Circuit's decision turned on whether the claimants were "known" creditors—*i.e.*, "claimants who are identifiable through a diligent search." *Id.* at 347. The Circuit rejected the position that the "'reasonably ascertainable' standard requires *only* an examination of the debtors' books and records, without an analysis of the specific facts of each case." *Id.* at 347 n.2 (emphasis in original). Examining the totality of the facts before it, the Circuit determined that the claimants were not reasonably ascertainable because: (1) the "geographic area" affected was "unclear"; and (2) all potentially relevant title searches still would not have revealed the identity of claimants, many of whom "merely visited houses in the vicinity of the sites at some point in the distant past." *Id.* at 347−48.

Here, PG&E knows the affected geographic area and a title search of that area would identify claimants whose homes were destroyed by the 2015, 2017 and 2018 Fires. *See, e.g.*, Orsini Decl. at 3. *Chemetron* supports the TCC's position that Fire Claimants whose identity can be ascertained through record searches are known creditors entitled to actual notice of the Bar Date. *See also Maya*, 78 F.3d at 1400 (distinguishing *Chemetron* because the debtor "could not identify the potential creditors"); *Waterville Indus., Inc. v. First Hartford Corp.*, 124 B.R. 411, 413 (D. Me. 1991) (successor in title to property the debtor polluted entitled to notice where the debtor "was aware of contingent liability to successor titleholders for the environmental hazards it had created").

*Wise v. NCD Inc.* involved an unlawful discrimination claim. No. 06-02027, 2006 WL 3051873 (D. Ariz. Oct. 25, 2006). Prior to the debtor's bankruptcy, the claimant filed a discrimination claim with the EEOC. *Id.* at *1. The EEOC found cause to believe that the debtor's termination of the claimant violated the ADA and provided such finding to the debtor. *Id.* The debtor later filed for bankruptcy but failed to schedule the claimant's claim or provide actual notice to the claimant of the bar date. *Id.* at *4. The debtor argued that the claim should be discharged based on the claimant's constructive knowledge of the bankruptcy proceeding. *Id.* at *2.

20

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In rejecting this argument, the court, following the Ninth Circuit's decision in *Maya*, found that "it is the debtor's knowledge of a creditor, not the creditor's knowledge of his claim, which controls whether the debtor has a duty to list that creditor" and give "formal notice." *Id.* at *3 (quoting *Maya*, 78 F.3d at 1398–99). While a debtor "need not be omnipotent or clairvoyant," it must "undertake more than a cursory review of its records and files to ascertain its known creditors." *Id.* at *3. Since the claimant in *Wise* was a known creditor who did not receive actual notice of the chapter 11 proceeding, the debtor's motion to dismiss the claim was denied. *Id.* at *4. Again, this case supports the TCC's position that PG&E must go beyond its books and records to identify known Fire Claimants, and where its diligent efforts identify specific houses destroyed by the relevant fires, it must provide those claimants with actual notice.

*In re Motors Liquidation Co.* involved product liability claims arising from GM's use of defective ignition switches. 829 F.3d 135 (2d Cir. 2016). The claimants sought to hold "New GM"—the purchaser of GM's assets—liable for the ignition switch claims. *Id.* at 143. New GM argued that the claims were barred by the "free and clear" language in the sale order. *Id.* In rejecting this argument, the Second Circuit found that the debtor's knowledge of the ignition defect in its cars necessarily meant that it knew "the identity of a significant number of affected owners." *Id.* at 159. This meant that the ignition claimants were known creditors entitled to actual notice, not mere publication notice. *Id.*

The Second Circuit likened the adoption of New GM's position to "reward[ing] debtors who conceal claims against potential creditors." *Id.* at 160. Likewise, approving notice procedures that bless PG&E's demand that it not be required to obtain updated address information would reward it for causing fires that displaced Fire Claimants. PG&E also cites to the Bankruptcy Court's decision in *Motors Liquidation* without disclosing that the Circuit reversed it "insofar as it enforced the Sale Order to enjoin claims relating to the ignition switch defect," stating that "these plaintiffs cannot be 'bound by the terms of the [Sale Order]'" because they were known claimants who had not received proper notice. *Compare* Motion at 31 (citing *In re Motors Liquidation Co.*, [5]29 B.R. 510, 550 (Bankr. S.D.N.Y. 2015)) *with Motors Liquidation*, 829 F.3d at 166.

21

*Monster Content v. Homes.com, Inc.* involved whether claims for breach of a licensing agreement were partially barred by a prior bankruptcy. 331 B.R. 438, 440 (N.D. Cal. 2005). The court held that the claimant was a known creditor because, like *Maya*, the claimant sent a demand letter during the bankruptcy. *Id.* at 442−43. The court, following the Ninth Circuit's decision in *Maya*, rejected the debtor's argument that the requirement of actual notice was satisfied based on the claimant's actual knowledge of the bankruptcy, finding that the "fact that a creditor has actual knowledge that a Chapter 11 bankruptcy proceeding is going forward involving a debtor does not obviate the need for notice." *Id.* at 443 (quoting *Maya*, 78 F.3d at 1399).

*Perez v. Safety-Kleen Systems, Inc.* involved rest break and wage statement claims based on the debtor's alleged prepetition failure to provide meal and rest breaks and accurate wage statements. 253 F.R.D. 508 (N.D. Cal. 2008). The debtor argued that claims arising prior to the confirmation of its chapter 11 plan were barred. The claimants argued that their claims were not barred since they did not receive notice of the bankruptcy proceeding. In rejecting this argument, the court reasoned that while known creditors are entitled to actual notice, the claimants "presented no evidence that they communicated their claims" to the debtor, nor did they provide "any reason why [the debtor] should be charged with knowledge of their claims." *Id.* at 518. Here, PG&E cannot claim that it has no knowledge of Fire Claims or that the identity of the Fire Claimants is not reasonably ascertainable through a diligent investigation.

*PacifiCorp and Van Cott Bagley Cornwall & McCarthy v. W.R. Grace* involved remediation of hazardous materials from a vermiculite mine site. 2006 WL 2375371, at *1. The court's decision turned on whether *Chemetron* required the debtor to conduct a title search of the site to ascertain the identities of current and prior owners. *Id.* at *5. The court found that the "the geographic and temporal dimensions found in *Chemetron*"—which made the "vast majority of late claimants" in *Chemetron* impossible to identify by a title search—were "not present in this case." *Id.* at *7, 10. The court, however, found that the late claimants were unknown due to the fact that they had "no direct relationship" with the debtor—*i.e.*, the claimants were not contract counterparties or the debtor's "customers." *Id*. at *4, 10. This made the case distinguishable from other cases where actual notice was required. *Id*. at *10.

22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In this case there is a "direct relationship"—most of the Fire Claimants are the Utility's current or former "customers." *See id.* at *4. Those who were not customers were located within the region where PG&E supplied power and PG&E can determine identities of Fire Claimants from a diligent investigation of its records and the sources identified in the Orsini Declaration. Since PG&E can reasonably identify the Fire Claimants, it has an obligation to locate them and provide actual notice to mitigate the harm it caused by starting the fires that displaced families.

PG&E also cites several cases discussing when notice by publication is appropriate. Motion at 32. These cases are inapposite because publication notice is insufficient for known creditors. PG&E quotes the following excerpt from the Seventh Circuit's decision in *Fogel v. Zell*: "Notice by publication may thus be entirely appropriate when potential claimants are numerous, unknown, or have small claims (whether nominally or … realistically)—all circumstances that singly or in combination may make the cost of ascertaining the claimants' names and addresses and mailing each one a notice of the bar date and processing the responses consume a disproportionate share of the assets of the debtor's estate." 221 F.3d 955, 963 (7th Cir. 2000).

PG&E, however, blindly ignores the next sentence in the Circuit's decision: "That isn't this case." *Id.* And, neither is this case. The general rule that "extended searches" are not required cannot apply here. To put a fine point on this issue, consider the 2018 Camp Fire. This fire destroyed the entire town of Paradise. PG&E can tell whose houses were destroyed from its own books and records, its access to GIS databases, and files maintained by insurers. These parties can be identified as easily as the customers who purchased GM cars with defective ignition switches that the Second Circuit held were "known creditors." *Motors Liquidation*, 829 F.3d at 159. PG&E knows or can reasonably ascertain their identities.

The 2018 Camp Fire destroyed homes and displaced virtually all who lived or maintained businesses in Paradise. PG&E has an obligation to ensure that they receive actual notice. PG&E created this problem by causing the fires. And, PG&E should be required to address this problem before its notice procedures are approved. Otherwise, PG&E could be rewarded for its misconduct. But beyond that, doing the right thing here—identifying and providing actual notice to Fire Claimants—should not be difficult. As the TCC's notice program shows, a notice plan can be

23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    implemented that uses third-party subpoenas to insurers and record searches to identify contact

2    information for all known Fire Claimants.  *See* Weisbrot Decl. at ¶ 67.

3               **E.       PG&E's Bar Date Should Not be Approved**

4               Finally, PG&E demands an early Bar Date.  PG&E's proposed Bar Date of September 16,

5    2019 is improper in light of the related forms and notice procedures proposed by PG&E.  The Camp

6    Fire happened in late 2018.  As set forth in the Dion Declaration (attached as **Exhibit 8**), Fire

7    Claimants that experienced the Camp Fire may exhibit signs of post-traumatic stress, particularly

8    those who were exposed to imminent risk of death.  Dion Decl. at ¶¶ 5–8.

9               Even assuming the adoption of the TCC's claim form and notice procedures, the Bar Date

10   should be set no earlier than January 31, 2020.  *Id.* at ¶ 12.  If PG&E's form is adopted, Fire

11   Claimants affected by the 2018 Camp Fire will need substantial time to comply with the onerous

12   requirements of PG&E's form.  This would mean a Bar Date in late 2020.

13              Consideration also should be given to the projected lifespan of the Chapter 11 Cases.  PG&E

14   has already moved to extend exclusivity.  *See* Dkt. No. 1797.  A plan of reorganization could require

15   a legislative solution, which may not be available this year.  The maturity date of PG&E's DIP

16   Facility is December 31, 2020, but PG&E has an option to extend the term to December 31, 2021.

17   There is no reason to impose a premature Bar Date for Fire Claimants if PG&E is not going to

18   emerge from bankruptcy until 2021.

19   **VII.   CONCLUSION**

20              The TCC comes before this Court with a problem and a solution.  The problem is the fact

21   that PG&E is trying to use the claims process to avoid liability.  PG&E attempts to accomplish this

22   goal through unduly complex forms, a deficient notice process, and an early Bar Date.  The solution

23   is the TCC's claim form which is designed to maximize creditor participation, the TCC's robust

24   notice program that achieves a more effective outreach using the same budget, and a bar date that

25   is earlier than late 2020.  The TCC has a strong interest in moving this process forward, but it must

26   be done the right way.  There is simply too much at stake for Fire Claimants who have already lost

27   more than anyone else involved in these Chapter 11 Cases.

28

Dated May 31, 2019

BAKER & HOSTETLER LLP

By:   /s/  Eric Goodman

*Attorney for The Official Committee of Tort Claimants*

25