**Level 3 Reconciliation**

The following table is a reconciliation of changes in the fair value of instruments for the pension plan that have been classified as Level 3 for the years ended December 31, 2017 and 2016:

| (in millions)<br>For the year ended December 31, 2017 | | Fixed-<br>Income |
|---|---|---|
| Balance at beginning of year | $ | 5 |
| Actual return on plan assets: | | |
| Relating to assets still held at the reporting date | | (1) |
| Relating to assets sold during the period | | - |
| Purchases, issuances, sales, and settlements: | | |
| Purchases | | 3 |
| Settlements | | (3) |
| **Balance at end of year** | **$** | **4** |

| (in millions)<br>For the year ended December 31, 2016 | | Fixed-<br>Income |
|---|---|---|
| Balance at beginning of year | $ | 3 |
| Actual return on plan assets: | | |
| Relating to assets still held at the reporting date | | 3 |
| Relating to assets sold during the period | | - |
| Purchases, issuances, sales, and settlements: | | |
| Purchases | | - |
| Settlements | | (1) |
| **Balance at end of year** | **$** | **5** |

There were no material transfers out of Level 3 in 2017 and 2016.

**Cash Flow Information**

*Employer Contributions*

PG&E Corporation and the Utility contributed $335 million to the pension benefit plans and $33 million to the other benefit plans in 2017. These contributions are consistent with PG&E Corporation's and the Utility's funding policy, which is to contribute amounts that are tax-deductible and consistent with applicable regulatory decisions and federal minimum funding requirements. None of these pension or other benefits were subject to a minimum funding requirement requiring a cash contribution in 2017. The Utility's pension benefits met all the funding requirements under the Employee Retirement Income Security Act. PG&E Corporation and the Utility expect to make total contributions of approximately $327 million and $24 million to the pension plan and other postretirement benefit plans, respectively, for 2018.

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 1
of 129

*Benefits Payments and Receipts*

As of December 31, 2017, the estimated benefits expected to be paid and the estimated federal subsidies expected to be received in each of the next five fiscal years, and in aggregate for the five fiscal years thereafter, are as follows:

| (in millions) | Pension Plan | PBOP Plans | Federal Subsidy |
|---|---|---|---|
| 2018 | $ 712 | $ 83 | $ (8) |
| 2019 | 811 | 87 | (9) |
| 2020 | 850 | 91 | (9) |
| 2021 | 886 | 95 | (10) |
| 2022 | 920 | 100 | (3) |
| Thereafter in the succeeding five years | 5,002 | 508 | (15) |

There were no material differences between the estimated benefits expected to be paid by PG&E Corporation and paid by the Utility for the years presented above. There were also no material differences between the estimated subsidies expected to be received by PG&E Corporation and received by the Utility for the years presented above.

## Retirement Savings Plan

PG&E Corporation sponsors a retirement savings plan, which qualifies as a 401(k) defined contribution benefit plan under the Internal Revenue Code 1986, as amended. This plan permits eligible employees to make pre-tax and after-tax contributions into the plan, and provide for employer contributions to be made to eligible participants. Total expenses recognized for defined contribution benefit plans reflected in PG&E Corporation's Consolidated Statements of Income were $103 million, $97 million, and $89 million in 2017, 2016, and 2015, respectively.

There were no material differences between the employer contribution expense for PG&E Corporation and the Utility for the years presented above.

## NOTE 12: RELATED PARTY AGREEMENTS AND TRANSACTIONS

The Utility and other subsidiaries provide and receive various services to and from their parent, PG&E Corporation, and among themselves. The Utility and PG&E Corporation exchange administrative and professional services in support of operations. Services provided directly to PG&E Corporation by the Utility are priced at the higher of fully loaded cost (i.e., direct cost of good or service and allocation of overhead costs) or fair market value, depending on the nature of the services. Services provided directly to the Utility by PG&E Corporation are generally priced at the lower of fully loaded cost or fair market value, depending on the nature and value of the services. PG&E Corporation also allocates various corporate administrative and general costs to the Utility and other subsidiaries using agreed-upon allocation factors, including the number of employees, operating and maintenance expenses, total assets, and other cost allocation methodologies. Management believes that the methods used to allocate expenses are reasonable and meet the reporting and accounting requirements of its regulatory agencies.

The Utility's significant related party transactions were:

| (in millions) | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Utility revenues from:** | | | |
| Administrative services provided to PG&E Corporation | $ 8 | $ 7 | $ 6 |
| **Utility expenses from:** | | | |
| Administrative services received from PG&E Corporation | $ 65 | $ 74 | $ 53 |
| Utility employee benefit due to PG&E Corporation | 73 | 91 | 82 |

At December 31, 2017 and 2016, the Utility had receivables of $20 million and $18 million, respectively, from PG&E Corporation included in accounts receivable – other and other noncurrent assets – other on the Utility's Consolidated Balance Sheets, and payables of $22 million and $22 million, respectively, to PG&E Corporation included in accounts payable – other on the Utility's Consolidated Balance Sheets.

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 2 of 129

**NOTE 13: CONTINGENCIES AND COMMITMENTS**

PG&E Corporation and the Utility have significant contingencies arising from their operations, including contingencies related to enforcement and litigation matters and environmental remediation. A provision for a loss contingency is recorded when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. PG&E Corporation and the Utility evaluate the range of reasonably estimated losses and record a provision based on the lower end of the range, unless an amount within the range is a better estimate than any other amount. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involves a series of complex judgments about future events. Loss contingencies are reviewed quarterly and estimates are adjusted to reflect the impact of all known information, such as negotiations, discovery, settlements and payments, rulings, advice of legal counsel, and other information and events pertaining to a particular matter. PG&E Corporation's and the Utility's provision for loss and expense excludes anticipated legal costs, which are expensed as incurred. The Utility also has substantial financial commitments in connection with agreements entered into to support its operating activities. See "Purchase Commitments" below. PG&E Corporation has financial commitments described in "Other Commitments" below. PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows may be materially affected by the outcome of the following matters.

**Enforcement and Litigation Matters**

*Northern California Wildfires*

Beginning on October 8, 2017, multiple wildfires spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City. According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the wildfires, there were 21 major wildfires in California that, in total, burned over 245,000 acres, resulted in 43 fatalities, and destroyed an estimated 8,900 structures. Subsequently, the number of fatalities increased to 44.

The Utility incurred $219 million in costs for service restoration and repair to the Utility's facilities (including $97 million in capital expenditures) through December 31, 2017 in connection with these fires. While the Utility believes that such costs are recoverable through CEMA, its CEMA requests are subject to CPUC approval. The Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected if the Utility is unable to recover such costs.

The fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities. The Utility expects that Cal Fire will issue a report or reports stating its conclusions as to the sources of ignition of the fires and the ways that they progressed. The CPUC's SED also is conducting investigations to assess the compliance of electric and communication companies' facilities with applicable rules and regulations in fire impacted areas. According to information made available by the CPUC, investigation topics include, but are not limited to, maintenance of facilities, vegetation management, and emergency preparedness and response. Various other entities, including fire departments, may also be investigating certain of the fires. (For example, on February 3, 2018, it was reported that investigators with the Santa Rosa Fire Department had completed their investigation of two small fires that reportedly destroyed two homes and damaged one outbuilding and had concluded that the Utility's facilities, along with high wind and other factors, contributed to those fires.) It is uncertain when the investigations will be complete and whether Cal Fire will release any preliminary findings before its investigation is complete.

As of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC associated with the Northern California wildfires where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation and the property damage associated with each incident exceeded $50,000. The information contained in these reports is factual and preliminary, and does not reflect a determination of the causes of the fires. The investigations into the fires are ongoing.

If the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, interest, and attorneys' fees without having been found negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. California courts have imposed liability under the doctrine of inverse condemnation in legal actions brought by property holders against utilities on the grounds that losses borne by the person whose property was damaged through a public use undertaking should be spread across the community that benefitted from such undertaking and based on the assumption that utilities have the ability to recover these costs from their customers. Further, courts could determine that the doctrine of inverse condemnation applies even in the absence of an open CPUC proceeding for cost recovery, or before a potential cost recovery decision is issued by the CPUC. There is no guarantee that the CPUC would authorize cost recovery even if a court decision were to determine that the doctrine of inverse condemnation applies. In addition to such claims for property damage, interest and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal

injury damages, and other damages under other theories of liability, including if the Utility were found to have been negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. Further, the Utility could be subject to material fines or penalties if the CPUC or any other law enforcement agency brought an enforcement action and determined that the Utility failed to comply with applicable laws and regulations.

Given the preliminary stages of investigations and the uncertainty as to the causes of the fires, PG&E Corporation and the Utility do not believe a loss is probable at this time. However, it is reasonably possible that facts could emerge through the course of the various investigations that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be material. PG&E Corporation and the Utility currently are unable to reasonably estimate the amount of losses (or range of amounts) that they could incur given the preliminary stages of the investigations and the uncertainty regarding the extent and magnitude of potential damages. On January 31, 2018, the California Department of Insurance issued a press release announcing an update on property losses in connection with the October and December wildfires in California, stating that, as of such date, "insurers have received nearly 45,000 insurance claims totaling more than $11.79 billion in losses," of which approximately $10 billion relates to statewide claims from the October 2017 wildfires. The remaining amount relates to claims from the Southern California December 2017 wildfires. According to the California Department of Insurance, as of the date of the press release, more than 21,000 homes, 3,200 businesses, and more than 6,100 vehicles, watercraft, farm vehicles, and other equipment were damaged or destroyed by the October 2017 wildfires. PG&E Corporation and the Utility have not independently verified these estimates. The California Department of Insurance did not state in its press release whether it intends to provide updated estimates of losses in the future.

If the Utility's facilities are determined to be the cause of one or more of the Northern California wildfires, PG&E Corporation and the Utility could be liable for the related property losses and other damages. The California Department of Insurance January 31, 2018 press release reflects insured property losses only. The press release does not account for uninsured losses, interest, attorneys' fees, fire suppression costs, evacuation costs, medical expenses, personal injury and wrongful death damages or other costs. If the Utility were to be found liable for certain or all of such other costs and expenses, the amount of PG&E Corporation's and the Utility's liability could be higher than the approximately $10 billion estimated in respect of the wildfires that occurred in October 2017, depending on the extent of the damage in connection with such fire or fires. As a result, PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected.

As of January 31, 2018, PG&E Corporation and the Utility are aware of 111 lawsuits, six of which seek to be certified as class actions, that have been filed against PG&E Corporation and the Utility in the Sonoma, Napa and San Francisco Counties Superior Courts. The lawsuits allege, among other things, negligence, inverse condemnation, trespass, and private nuisance. They principally assert that PG&E Corporation's and the Utility's alleged failure to maintain and repair their distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the fires. The plaintiffs seek damages that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, punitive damages, attorneys' fees, and other damages. In addition, insurance carriers who have made payments to their insureds for property damage arising out of the fires have filed three subrogation complaints in the San Francisco County Superior Court. These complaints allege, among other things, negligence, inverse condemnation, trespass and nuisance. The allegations are similar to the ones made by individual plaintiffs. On October 31, 2017, a group of plaintiffs submitted a petition for coordination to the Chair of the Judicial Council of California and requested coordination of the litigation in the San Francisco Superior Court. On November 9, 2017, PG&E Corporation and the Utility submitted a petition for coordination to the Chair of the Judicial Council of California, and requested separate coordination in the counties in which the fires occurred. On January 4, 2018, the coordination motion judge of the San Francisco Superior Court entered an order granting coordination of the litigation in connection with the Northern California wildfires and recommending that the coordinated proceeding take place in the San Francisco Superior Court. On January 12, 2018, the Judicial Council of California accepted the coordination motion judge's recommendation and assigned the coordinated proceeding to San Francisco. The first case management conference is scheduled for February 27, 2018.

In addition, two derivative lawsuits for breach of fiduciary duties and unjust enrichment were filed in the San Francisco County Superior Court on November 16, 2017 and November 20, 2017, respectively. The first lawsuit is filed against the members of the Board of Directors and certain officers of PG&E Corporation. PG&E Corporation is identified as a nominal defendant in that action. The second lawsuit is filed against the members of the Board of Directors, certain former members of the Board of Directors, and certain officers of both PG&E Corporation and the Utility. PG&E Corporation and the Utility are identified as nominal defendants in that action. Motions to consolidate the two lawsuits, appoint lead plaintiffs' counsel, and enter a case schedule are currently pending.

PG&E Corporation and the Utility expect to be the subject of additional lawsuits in connection with the Northern California wildfires. The wildfire litigation could take a number of years to be resolved because of the complexity of the matters, including the ongoing investigation into the causes of the fires and the growing number of parties and claims involved. The Utility has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Northern California

wildfires in an aggregate amount of approximately $800 million. If the Utility were to be found liable for one or more fires, the Utility's insurance could be insufficient to cover that liability, depending on the extent of the damage in connection with such fire or fires. Following the Northern California wildfires, PG&E Corporation reinstated its liability insurance in the amount of approximately $630 million for any potential future event.

In addition, it could take a number of years before the Utility's final liability is known and the Utility could apply for cost recovery. The Utility may be unable to recover costs in excess of insurance through regulatory mechanisms and, even if such recovery is possible, it could take a number of years to resolve and a number of years thereafter to collect. Further, SB 819, introduced in the California Senate in January 2018, if it becomes law, would prohibit utilities from recovering costs in excess of insurance resulting from damages caused by such utilities' facilities, if the CPUC determines that the utility did not reasonably construct, maintain, manage, control, or operate the facilities. PG&E Corporation and the Utility have considered certain actions that might be taken to attempt to address liquidity needs of the business in such circumstances, but the inability to recover costs in excess of insurance through increases in rates and by collecting such rates in a timely manner, or any negative assessment by the Utility of the likelihood or timeliness of such recovery and collection, could have a material adverse effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

### *Litigation and Regulatory Citations in Connection with the Butte Fire*

In September 2015, a wildfire (known as the "Butte fire") ignited and spread in Amador and Calaveras Counties in Northern California. On April 28, 2016, Cal Fire released its report of the investigation of the origin and cause of the wildfire. According to Cal Fire's report, the fire burned 70,868 acres, resulted in two fatalities, destroyed 549 homes, 368 outbuildings and four commercial properties, and damaged 44 structures. Cal Fire's report concluded that the wildfire was caused when a gray pine tree contacted the Utility's electric line which ignited portions of the tree, and determined that the failure by the Utility and/or its vegetation management contractors, ACRT Inc. and Trees, Inc., to identify certain potential hazards during its vegetation management program ultimately led to the failure of the tree.

#### *Third-Party Claims*

On May 23, 2016, individual plaintiffs filed a master complaint against the Utility and its two vegetation management contractors in the Superior Court of California for Sacramento County. Subrogation insurers also filed a separate master complaint on the same date. The California Judicial Council had previously authorized the coordination of all cases in Sacramento County. As of December 31, 2017, 77 known complaints have been filed against the Utility and its two vegetation management contractors in the Superior Court of California in the Counties of Calaveras, San Francisco, Sacramento, and Amador. The complaints involve approximately 3,770 individual plaintiffs representing approximately 2,030 households and their insurance companies. These complaints are part of or are in the process of being added to the two master complaints. Plaintiffs seek to recover damages and other costs, principally based on the doctrine of inverse condemnation and negligence theory of liability. Plaintiffs also seek punitive damages. As of December 31, 2017, several plaintiffs have dismissed the Utility's two vegetation management contractors. The number of individual complaints and plaintiffs may still increase in the future, because the statute of limitations for property damages in connection with the Butte fire has not yet expired. (The statute of limitations for personal injury in connection with the Butte fire has expired.) The Utility continues mediating and settling cases.

In addition, on April 13, 2017, Cal Fire filed a complaint with the Superior Court of the State of California, County of Calaveras, seeking to recover $87 million for its costs incurred on the theory that the Utility and its vegetation management contractors were negligent, among other claims. On July 31, 2017, Cal Fire dismissed its complaint against Tree's, Inc., one of the Utility's vegetation contractors. The Utility and Cal Fire are currently engaged in a mediation process.

Further, in May 2017, the OES indicated that it intends to bring a claim against the Utility that it estimates in the approximate amount of $190 million. This claim would include costs incurred by the OES for tree and debris removal, infrastructure damage, erosion control, and other claims related to the Butte fire. Also, in June 2017, the County of Calaveras indicated that it intends to bring a claim against the Utility that it estimates in the approximate amount of $85 million. This claim would include costs that the County of Calaveras incurred or expects to incur for infrastructure damage, erosion control, and other costs related to the Butte fire.

On April 28, 2017, the Utility moved for summary adjudication on plaintiffs' claims for punitive damages. On August 10, 2017, the Court denied the Utility's motion on the grounds that plaintiffs might be able to show conscious disregard for public safety based on the fact that the Utility relied on contractors to fulfill their contractual obligation to hire and train qualified employees. On August 16, 2017, the Utility filed a writ with the Court of Appeals challenging what the Utility believes is a novel theory of punitive damages liability. The Court of Appeals accepted the writ on September 15, 2017 and ordered the trial court and

plaintiffs to show cause why the relief requested by the Utility should not be granted. Briefing on the writ was completed as of January 2, 2018. The Utility is seeking expedited review of the motion.

On June 22, 2017, the Superior Court for the County of Sacramento ruled on a motion of several plaintiffs and found that the doctrine of inverse condemnation applies to the Utility with respect to the Butte fire. The court held, among other things, that the Utility had failed to put forth any evidence to support its contention that the CPUC would not allow the Utility to pass on its inverse condemnation liability through rate increases. While the ruling is binding only between the Utility and the plaintiffs in the coordination proceeding, others could file lawsuits and make similar claims. On January 4, 2018, the Utility filed with the court a renewed motion for a legal determination of inverse condemnation liability, citing the November 30, 2017 CPUC decision denying the San Diego Gas & Electric Company application to recover wildfire costs in excess of insurance, and the CPUC declaration that it will not automatically allow utilities to spread inverse condemnation losses through rate increases. The motion is set for hearing on March 15, 2018.

*Estimated Losses from Third-Party Claims*

In connection with this matter, the Utility may be liable for property damages, interest, and attorneys' fees without having been found negligent, through the doctrine of inverse condemnation.

In addition, the Utility may be liable for fire suppression costs, personal injury damages, and other damages if the Utility were found to have been negligent. While the Utility believes it was not negligent, there can be no assurance that a court or jury would agree with the Utility.

The Utility currently believes that it is probable that it will incur a loss of at least $1.1 billion, increased from the $750 million previously estimated as of December 31, 2016, in connection with the Butte fire. The Utility's updated estimate resulted primarily from an increase in the number of claims filed against the Utility and experience to date in resolving claims. This amount is based on updated assumptions about the number, size, and type of structures damaged or destroyed, the contents of such structures, the number and types of trees damaged or destroyed, as well as assumptions about personal injury damages, attorneys' fees, fire suppression costs, and certain other damages, but does not include punitive damages for which the Utility could be liable. In addition, while this amount includes the Utility's assumptions about fire suppression costs (including its assessment of the Cal Fire loss), it does not include any significant portion of the estimated claims from the OES and the County of Calaveras. The Utility still does not have sufficient information to reasonably estimate the probable loss it may have for these additional claims.

The Utility currently is unable to reasonably estimate the upper end of the range of losses due to the uncertainty of pending legal motions related to the applicability of inverse condemnation and punitive damages and because it has insufficient information on the claims of over 1,000 households and the claims from the OES and the County of Calaveras. The process for estimating costs associated with claims relating to the Butte fire requires management to exercise significant judgment based on a number of assumptions and subjective factors. As more information becomes known, including additional discovery from the plaintiffs, results from the ongoing mediation and settlement process, review of potential claims from the OES and the County of Calaveras, outcomes of future court or jury decisions, and information about damages, including punitive damages, that the Utility could be liable for, management estimates and assumptions regarding the financial impact of the Butte fire may result in material increases to the loss accrued.

The following table presents changes in the third-party claims liability since December 31, 2015. The balance for the third-party claims liability is included in Other current liabilities in PG&E Corporation's and the Utility's Consolidated Balance Sheets:

| Loss Accrual (in millions) | |
|---|---:|
| Balance at December 31, 2015 | $ - |
| Accrued losses | 750 |
| Payments[1] | (60) |
| **Balance at December 31, 2016** | **690** |
| Accrued losses | 350 |
| Payments[1] | (479) |
| **Balance at December 31, 2017** | **$ 561** |

[1] As of December 31, 2017 the Utility entered into settlement agreements in connection with the Butte fire corresponding to approximately $624 million of which $539 million has been paid by the Utility.

In addition to the amounts reflected in the table above, the Utility has incurred cumulative legal expenses of $87 million in connection with the Butte fire.  For the year ended December 31, 2017, the Utility has incurred legal expenses in connection with the Butte fire of $60 million.

*Loss Recoveries*

The Utility has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Butte fire in an aggregate amount of $922 million.  The Utility records insurance recoveries when it is deemed probable that a recovery will occur and the Utility can reasonably estimate the amount or its range.  Through December 31, 2017, the Utility recorded $922 million for probable insurance recoveries in connection with losses related to the Butte fire.  While the Utility plans to seek recovery of all insured losses, it is unable to predict the ultimate amount and timing of such insurance recoveries.  In addition, in the year ended December 31, 2017, the Utility received $53 million of reimbursements from the insurance policies of one of its vegetation management contractors (excluded from the table below).  Recoveries of additional amounts under the insurance policies of the Utility's vegetation management contractors, including policies where the Utility is listed as an additional insured, are uncertain.

The following table presents changes in the insurance receivable since December 31, 2015.  The balance for the insurance receivable is included in Other accounts receivable in PG&E Corporation's and the Utility's Consolidated Balance Sheets:

| **Insurance Receivable (in millions)** | | |
| --- | --- | --- |
| Balance at December 31, 2015 | $ | - |
| Accrued insurance recoveries | | 625 |
| Reimbursements | | (50) |
| **Balance at December 31, 2016** | | **575** |
| Accrued insurance recoveries | | 297 |
| Reimbursements | | (276) |
| **Balance at December 31, 2017** | **$** | **596** |

In January 2018, the Utility received another $75 million in insurance reimbursements.

If the Utility records losses in connection with claims relating to the Butte fire that materially exceed the amount the Utility accrued for these liabilities, PG&E Corporation's and the Utility's financial condition, results of operations, or cash flows could be materially affected in the reporting periods during which additional charges are recorded, depending on whether the Utility is able to record or collect insurance recoveries in amounts sufficient to offset such additional accruals.

*Regulatory Citations*

On April 25, 2017, the SED issued two citations to the Utility in connection with the Butte fire, totaling $8.3 million.  The SED's investigation found that neither the Utility nor its vegetation management contractors took appropriate steps to prevent the gray pine from leaning and contacting the Utility's electric line, which created an unsafe and dangerous condition that resulted in that tree leaning and making contact with the electric line, thus causing a fire.  The Utility paid the citations in June 2017.

**Enforcement Matters**

In 2014, both the U.S. Attorney's Office in San Francisco and the California Attorney General's office opened investigations into matters related to allegedly improper communication between the Utility and CPUC personnel.  The Utility has cooperated with those investigations.  It is uncertain whether any charges will be brought against the Utility as a result of these investigations.

**CPUC Matters**

*Order Instituting an Investigation into Compliance with Ex Parte Communication Rules*

During 2014 and 2015, the Utility filed several reports to notify the CPUC of communications that the Utility believes may have constituted or described ex parte communications that either should not have occurred or that should have been timely reported to the CPUC.  Ex parte communications include communications between a decision maker or a commissioner's advisor and interested persons concerning substantive issues in certain formal proceedings.  Certain communications are prohibited and others are permissible with proper noticing and reporting.

On November 23, 2015, the CPUC issued an OII into whether the Utility should be sanctioned for violating rules pertaining to ex parte communications and Rule 1.1 of the CPUC's Rules of Practice and Procedure governing the conduct of those appearing before the CPUC. The OII cites some of the communications the Utility reported to the CPUC. The OII also cites the ex parte violations alleged in the City of San Bruno's July 2014 motion, which it filed in CPUC investigations related to the Utility's natural gas transmission pipeline operations and practices.

On March, 28, 2017, the Cities of San Bruno and San Carlos, ORA, the SED, TURN, and the Utility jointly submitted to the CPUC a settlement agreement in connection with the OII into the Utility's compliance with the CPUC's ex parte communication rules. On September 1, 2017, the assigned administrative law judge issued a PD in this proceeding adopting, with one modification, the settlement agreement jointly submitted to the CPUC on March 28, 2017, by the Utility, the Cities of San Bruno and San Carlos, the ORA, the SED, and TURN.

If adopted, the PD would increase the payment to the California General Fund, relative to the settlement agreement, from $1 million to $12 million resulting in a total penalty of $97.5 million comprised of: (1) a $12 million payment to the California General Fund, (2) forgoing collection of $63.5 million of GT&S revenue requirements for the years 2018 ($31.75 million) and 2019 ($31.75 million), (3) a $10 million one-time revenue requirement adjustment to be amortized in equivalent annual amounts over the Utility's next GRC cycle (i.e., the GRC following the 2017 GRC), and (4) compensation payments to the Cities of San Bruno and San Carlos in a total amount of $12 million ($6 million to each city). In addition, the settlement agreement provides for certain non-financial remedies, including enhanced noticing obligations between the Utility and CPUC decision-makers, as well as certification of employee training on the CPUC ex parte communication rules. Under the terms of the settlement agreement, customers will bear no costs associated with the financial remedies set forth above.

On September 21, 2017, the Utility submitted a motion to the CPUC accepting the proposed modification of the settlement agreement to increase the Utility's payment to the California General Fund from $1 million to $12 million. Further, the Utility also reported that it has identified several communications that appear to raise issues similar to other communications that are part of this proceeding.

On November 1, 2017, the Utility filed a status report advising the CPUC that the Utility and the non-Utility parties to the settlement agreement were unable to reach an agreement with respect to how to proceed regarding the communications that the Utility reported to the CPUC on September 21, 2017. Also on November 1, 2017, the non-Utility parties to the settlement requested that the CPUC approve the settlement, as modified by the PD, and open a second phase of the OII to investigate and consider appropriate sanctions for the new communications reported by the Utility on September 21, 2017, and others that may be discovered.

On November 30, 2017, the CPUC issued a decision extending the statutory deadline to June 29, 2018 to resolve the proceeding. The CPUC stated that an extension of the statutory deadline was necessary to allow the assigned administrative law judge time to prepare the revised decision and to open and resolve a second phase of this proceeding.

The Utility is unable to predict the outcome of this proceeding.

At December 31, 2017, PG&E Corporation's and the Utility's Consolidated Balance Sheets include a $24 million accrual for the amounts payable to the California General Fund and the Cities of San Bruno and San Carlos. In accordance with accounting rules, adjustments related to revenue requirements would be recorded in the periods in which they are incurred.

*Natural Gas Transmission Pipeline Rights-of-Way*

In 2012, the Utility notified the CPUC and the SED that the Utility planned to complete a system-wide survey of its transmission pipelines in an effort to address a self-reported violation whereby the Utility did not properly identify encroachments (such as building structures and vegetation overgrowth) on the Utility's pipeline rights-of-way. The Utility also submitted a proposed compliance plan that set forth the scope and timing of remedial work to remove identified encroachments over a multi-year period and to pay penalties if the proposed milestones were not met. In March 2014, the Utility informed the SED that the survey had been completed and that remediation work, including removal of the encroachments, was expected to continue for several years. The SED has not addressed the Utility's proposed compliance plan, and it is reasonably possible that the SED will impose fines on the Utility in the future based on the Utility's failure to continuously survey its system and remove encroachments. The Utility is unable to reasonably estimate the amount or range of future charges that could be incurred given the SED's wide discretion and the number of factors that can be considered in determining penalties.

*Potential Safety Citations*

The SED periodically audits utility operating practices and conducts investigations of potential violations of laws and regulations applicable to the safety of the California utilities' electric and natural gas facilities and operations. The CPUC has delegated authority to the SED to issue citations and impose penalties for violations identified through audits, investigations, or self-reports. There are a number of audit findings, as well as other potential violations identified through various investigations and the Utility's self-reported non-compliance with laws and regulations, on which the SED has yet to act. Under both the gas and electric programs, the SED has discretion whether to issue a penalty for each violation.

The SED has discretion whether to issue a penalty for each violation, but if it assesses a penalty for a violation, it is required to impose the maximum statutory penalty of $50,000, with an administrative limit of $8 million per citation issued. The SED may, at its discretion, impose penalties on a daily basis, or on less than a daily basis, for violations that continued for more than one day. The SED also has wide discretion to determine the amount of penalties based on the totality of the circumstances, including such factors as the gravity of the violations; the type of harm caused by the violations and the number of persons affected; and the good faith of the entity charged in attempting to achieve compliance, after notification of a violation. The SED also is required to consider the appropriateness of the amount of the penalty to the size of the entity charged. Historically, the SED has exercised broad discretion in determining whether violations are continuing and the amount of penalties to be imposed. In the past, the SED has imposed fines on the Utility ranging from $50,000 to $16.8 million for violations of electric and natural gas laws and regulations. The CPUC can also open an OII and levy additional fines even after the SED has issued a citation.

The Utility is unable to reasonably estimate the amount or range of future charges as a result of SED investigations or any proceedings that could be commenced in connection with potential violations of electric and natural gas laws and regulations.

### *Other Matters*

*Other Contingencies*

PG&E Corporation and the Utility are subject to various claims, lawsuits and regulatory proceedings that separately are not considered material. Accruals for contingencies related to such matters (excluding amounts related to the contingencies discussed above under "Enforcement and Litigation Matters") totaled $86 million at December 31, 2017 and $45 million at December 31, 2016. These amounts are included in Other current liabilities in the Consolidated Balance Sheets. The resolution of these matters is not expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, or cash flows.

## Disallowance of Plant Costs

PG&E Corporation and the Utility record a charge when it is both probable that costs incurred for recently completed plant will not be recoverable through rates and the amount of disallowance can be reasonably estimated. Capital disallowances are reflected in operating and maintenance expenses in the Consolidated Statements of Income. Disallowances as a result of the CPUC's June 2016 final phase one decision and December 2016 final phase two decision in the Utility's 2015 GT&S rate case, the Utility's Pipeline Safety Enhancement Plan, and CPUC's final decision on the closure of Diablo Canyon are discussed below.

*2015 GT&S Rate Case Disallowance of Capital Expenditures*

On June 23, 2016, the CPUC approved a final phase one decision in the Utility's 2015 GT&S rate case. The phase one decision excluded from rate base $696 million of capital spending in 2011 through 2014 in excess of the amount adopted. The decision permanently disallowed $120 million of that amount and ordered that the remaining $576 million be subject to an audit overseen by the CPUC staff, with the possibility that the Utility may seek recovery in a future proceeding. The decision also established various cost caps that will increase the risk of overspend over the current rate case cycle including new one-way balancing accounts. As a result, in 2016, the Utility incurred charges of $219 million for capital expenditures that the Utility believes are probable of disallowance based on the decision. This included $134 million for 2011 through 2014 capital expenditures in excess of adopted amounts and $85 million for the Utility's estimate of 2015 through 2018 capital expenditures that are probable of exceeding authorized amounts. Additional charges may be required in the future based on the Utility's ability to manage its capital spending and on the outcome of the CPUC's audit of 2011 through 2014 capital spending.

*Capital Expenditures Relating to Pipeline Safety Enhancement Plan*

The CPUC has authorized the Utility to collect $766 million for recovery of PSEP capital costs. As of December 31, 2017, the Utility has spent $1.38 billion on PSEP-related capital costs, of which $665 million was expensed in previous years for costs that

are expected to exceed the authorized amount. The Utility expects the remaining PSEP work to continue throughout 2018. The Utility would be required to record charges in future periods to the extent PSEP-related capital costs are higher than currently expected.

*Capital Expenditures Relating to the Diablo Canyon Power Plant*

On January 11, 2018, the CPUC issued a final decision adopting the settlement agreement jointly submitted to the CPUC in May 2017 related to the recovery of license renewal costs and cancelled project costs within the Utility's application to retire Diablo Canyon. The final decision allows for recovery from customers of $18.6 million of the total license renewal project cost of $53 million evenly over an 8-year period beginning January 1, 2018. Related to cancelled project costs, the decision allows for recovery from customers of 100% of the direct costs incurred prior to June 30, 2016 and 25% recovery of direct costs incurred after June 30, 2016. During the year ended December 31, 2017, the Utility incurred charges of $47 million related to the Diablo Canyon capital expenditures settlement agreement, of which $24 million is for cancelled projects and $23 million is for disallowed license renewal costs. The Utility does not expect to incur additional charges as a result of the CPUC's final decision, other than additional project cancellation costs that the Utility does not expect to be material.

**Environmental Remediation Contingencies**

Given the complexities of the legal and regulatory environment and the inherent uncertainties involved in the early stages of a remediation project, the process for estimating remediation liabilities requires significant judgment. The Utility records an environmental remediation liability when the site assessments indicate that remediation is probable and the Utility can reasonably estimate the loss or a range of probable amounts. The Utility records an environmental remediation liability based on the lower end of the range of estimated probable costs, unless an amount within the range is a better estimate than any other amount. Key factors that inform the development of estimated costs include site feasibility studies and investigations, applicable remediation actions, operations and maintenance activities, post-remediation monitoring, and the cost of technologies that are expected to be approved to remediate the site. Amounts recorded are not discounted to their present value. The Utility's environmental remediation liability is primarily included in non-current liabilities on the Consolidated Balance Sheets and is composed of the following:

| | Balance at | | | |
|---|---|---|---|---|
| (in millions) | December 31, 2017 | | December 31, 2016 | |
| Topock natural gas compressor station | $ | 334 | $ | 299 |
| Hinkley natural gas compressor station | | 147 | | 135 |
| Former manufactured gas plant sites owned by the Utility or third parties[1] | | 320 | | 285 |
| Utility-owned generation facilities (other than fossil fuel-fired), other facilities, and third-party disposal sites[2] | | 115 | | 131 |
| Fossil fuel-fired generation facilities and sites[3] | | 123 | | 108 |
| **Total environmental remediation liability** | **$** | **1,039** | **$** | **958** |

[1] Primarily driven by the following sites: Vallejo, SF East Harbor, Napa, and SF North Beach
[2] Primarily driven by the Shell Pond site
[3] Primarily driven by the SF Potrero Power Plant site

The Utility's gas compressor stations, former manufactured gas plant sites, power plant sites, gas gathering sites, and sites used by the Utility for the storage, recycling, and disposal of potentially hazardous substances are subject to requirements issued by the state and federal regulatory agencies under the federal Resource Conservation and Recovery Act and/or other state hazardous waste laws. The Utility has a comprehensive program in place designed to comply with federal, state, and local laws and regulations related to hazardous materials, waste, remediation activities, and other environmental requirements. The Utility assesses and monitors, on an ongoing basis, measures that may be necessary to comply with these laws and regulations and implements changes to its program as deemed appropriate. The Utility's remediation activities are overseen by the DTSC, several California regional water quality control boards, and various other federal, state, and local agencies.

The Utility's environmental remediation liability at December 31, 2017 reflects its best estimate of probable future costs associated with its final remediation plan. Future costs will depend on many factors, including the extent of work to implement final remediation plans and the Utility's required time frame for remediation. The Utility may incur actual costs in the future that are materially different than this estimate and such costs could have a material impact on results of operations, financial condition and

cash flows during the period in which they are recorded. At December 31, 2017, the Utility expected to recover $725 million of its environmental remediation liability through various ratemaking mechanisms authorized by the CPUC.

### Natural Gas Compressor Station Sites

The Utility is legally responsible for remediating groundwater contamination caused by hexavalent chromium used in the past at the Utility's natural gas compressor stations. The Utility is also required to take measures to abate the effects of the contamination on the environment.

#### Topock Site

The Utility's remediation and abatement efforts at the Topock site are subject to the regulatory authority of the DTSC and the DOI. In November 2015, the Utility submitted its final remediation design to the agencies for approval. The Utility's design proposes that the Utility construct an in-situ groundwater treatment system to convert hexavalent chromium into a non-toxic and non-soluble form of chromium. On December 21, 2017 the DTSC issued its final environmental impact report. The environmental impact report includes requirements related to conditions of work that have been anticipated or previously required and are accounted for in the current environmental remediation liability. The Utility's undiscounted future costs associated with the Topock site may increase by as much as $289 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the Topock site are expected to be recovered through the HSM, where 90% of the costs are recovered in rates.

#### Hinkley Site

The Utility has been implementing interim remediation measures at the Hinkley site to reduce the mass of the chromium plume in groundwater and to monitor and control movement of the plume. The Utility's remediation and abatement efforts at the Hinkley site are subject to the regulatory authority of the California Regional Water Quality Control Board, Lahontan Region. In November 2015, the California Regional Water Quality Control Board, Lahontan Region adopted a final clean-up and abatement order to contain and remediate the underground plume of hexavalent chromium and the potential environmental impacts. The final order states that the Utility must continue and improve its remediation efforts, define the boundaries of the chromium plume, and take other action. Additionally, the final order requires setting plume capture requirements, requires establishing a monitoring and reporting program, and finalizes deadlines for the Utility to meet interim cleanup targets. The United States Geological Survey team is currently conducting a background study on the site to better define the chromium plume boundaries. The background study is expected to be finalized in 2019. The Utility's undiscounted future costs associated with the Hinkley site may increase by as much as $145 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the Hinkley site will not be recovered through rates.

### Former Manufactured Gas Plants ("MGPs")

Former manufactured gas plants used coal and oil to produce gas for use by the Utility's customers in the past. The by-products and residues of this process were often disposed at the manufactured gas plants themselves. The Utility has undertaken a program to manage the residues left behind as a result of the manufacturing process; many of the sites in the program have been addressed. The Utility's undiscounted future costs associated with MGP sites may increase by as much as $343 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the MGP sites are recovered through the HSM, where 90% of the costs are recovered in rates.

### Utility-Owned Generation Facilities and Third-Party Disposal Sites

Utility-owned generation facilities and third-party disposal sites are long-term projects that are undergoing a remediation process. The Utility's undiscounted future costs associated with Utility-owned generation facilities and third-party disposal sites may increase by as much as $145 million if the extent of contamination or necessary remediation is greater than anticipated. The environmental remediation costs associated with the Utility-owned generation facilities and third-party disposal sites are recovered through the HSM, where 90% of the costs are recovered in rates.

### Fossil Fuel-Fired Generation Sites

In 1998 the Utility divested its generation power plant business as part of generation deregulation. Although the Utility has sold its fossil-fueled power plants, the Utility has retained the environmental remediation liability associated with each site. The Utility's undiscounted future costs associated with fossil fuel-fired generation sites may increase by as much as $106 million if the extent of

contamination or necessary remediation is greater than anticipated. The environmental remediation costs associated with the fossil fuel-fired sites will not be recovered through rates.

**Nuclear Insurance**

The Utility is a member of NEIL, which is a mutual insurer owned by utilities with nuclear facilities. NEIL provides insurance coverage for property damages and business interruption losses incurred by the Utility if a nuclear event were to occur at the Utility's two nuclear generating units at Diablo Canyon and the retired Humboldt Bay Unit 3. NEIL provides property damage and business interruption coverage of up to $3.2 billion per nuclear incident and $2.6 billion per non-nuclear incident for Diablo Canyon. Humboldt Bay Unit 3 has up to $131 million of coverage for nuclear and non-nuclear property damages.

NEIL also provides coverage for damages caused by acts of terrorism at nuclear power plants. Certain acts of terrorism may be "certified" by the Secretary of the Treasury. If damages are caused by certified acts of terrorism, NEIL can obtain compensation from the federal government and will provide up to its full policy limit of $3.2 billion for each insured loss. In contrast, NEIL would treat all non-certified terrorist acts occurring within a 12-month period against one or more commercial nuclear power plants insured by NEIL as one event and the owners of the affected plants would share the $3.2 billion policy limit amount.

In addition to the nuclear insurance the Utility maintains through the NEIL, the Utility also is a member of the EMANI, which provides excess insurance coverage for property damages and business interruption losses incurred by the Utility if a nuclear or non-nuclear event were to occur at Diablo Canyon.

If NEIL losses in any policy year exceed accumulated funds, the Utility could be subject to a retrospective assessment. If NEIL were to exercise this assessment, as of December 31, 2017, the current maximum aggregate annual retrospective premium obligation for the Utility would be approximately $57 million. EMANI provides $200 million for any one accident and in the annual aggregate excess of the combined amount recoverable under the Utility's NEIL policies. If EMANI losses in any policy year exceed accumulated funds, the Utility could be subject to a retrospective assessment of approximately $3 million, as of December 31, 2017.

Under the Price-Anderson Act, public liability claims that arise from nuclear incidents that occur at Diablo Canyon, and that occur during the transportation of material to and from Diablo Canyon are limited to $13.5 billion. The Utility purchased the maximum available public liability insurance of $450 million for Diablo Canyon. The balance of the $13.5 billion of liability protection is provided under a loss-sharing program among utilities owning nuclear reactors. The Utility may be assessed up to $255 million per nuclear incident under this program, with payments in each year limited to a maximum of $38 million per incident. Both the maximum assessment and the maximum yearly assessment are adjusted for inflation at least every five years. The next scheduled adjustment is due on or before September 10, 2018.

The Price-Anderson Act does not apply to claims that arise from nuclear incidents that occur during shipping of nuclear material from the nuclear fuel enricher to a fuel fabricator or that occur at the fuel fabricator's facility. The Utility has a separate policy that provides coverage for claims arising from some of these incidents up to a maximum of $450 million per incident. In addition, the Utility has $53 million of liability insurance for Humboldt Bay Unit 3 and has a $500 million indemnification from the NRC for public liability arising from nuclear incidents, covering liabilities in excess of the liability insurance.

**Resolution of Remaining Chapter 11 Disputed Claims**

Various electricity suppliers filed claims in the Utility's proceeding filed under Chapter 11 of the U.S. Bankruptcy Code seeking payment for energy supplied to the Utility's customers between May 2000 and June 2001. While the FERC and judicial proceedings are pending, the Utility has pursued, and continues to pursue, settlements with electricity suppliers. The Utility has entered into a number of settlement agreements with various electricity suppliers to resolve some of these disputed claims and to resolve the Utility's refund claims against these electricity suppliers. Under these settlement agreements, amounts payable by the parties are, in some instances, subject to adjustment based on the outcome of the various refund offset and interest issues being considered by the FERC. Generally, any net refunds, claim offsets, or other credits that the Utility receives from electricity suppliers either through settlement or through the conclusion of the various FERC and judicial proceedings are refunded to customers through rates in future periods.

At December 31, 2017 and December 31, 2016, respectively, the Consolidated Balance Sheets reflected $243 million and $236 million in net claims within Disputed claims and customer refunds. The Utility is uncertain when or how the remaining net disputed claims liability will be resolved.

**Purchase Commitments**

The following table shows the undiscounted future expected obligations under power purchase agreements that have been approved by the CPUC and have met specified construction milestones as well as undiscounted future expected payment obligations for natural gas supplies, natural gas transportation, natural gas storage, and nuclear fuel as of December 31, 2017:

| (in millions) | Power Purchase Agreements | | | | | |
| | Renewable Energy | Conventional Energy | Other | Natural Gas | Nuclear Fuel | Total |
|---|---|---|---|---|---|---|
| 2018 | $ 2,150 | $ 718 | $ 280 | $ 388 | $ 96 | $ 3,632 |
| 2019 | 2,193 | 706 | 221 | 167 | 102 | 3,389 |
| 2020 | 2,188 | 686 | 175 | 148 | 143 | 3,340 |
| 2021 | 2,168 | 588 | 153 | 93 | 70 | 3,072 |
| 2022 | 1,975 | 512 | 143 | 93 | 60 | 2,783 |
| Thereafter | 26,005 | 657 | 526 | 357 | 151 | 27,696 |
| **Total purchase commitments** | **$ 36,679** | **$ 3,867** | **$ 1,498** | **$ 1,246** | **$ 622** | **$ 43,912** |

*Third-Party Power Purchase Agreements*

In the ordinary course of business, the Utility enters into various agreements, including renewable energy agreements, QF agreements, and other power purchase agreements to purchase power and electric capacity. The price of purchased power may be fixed or variable. Variable pricing is generally based on the current market price of either natural gas or electricity at the date of delivery.

*Renewable Energy Power Purchase Agreements.* In order to comply with California's RPS requirements, the Utility is required to deliver renewable energy to its customers at a gradually increasing rate. The Utility has entered into various agreements to purchase renewable energy to help meet California's requirement. The Utility's obligations under a significant portion of these agreements are contingent on the third party's construction of new generation facilities, which are expected to grow. As of December 31, 2017, renewable energy contracts expire at various dates between 2018 and 2043.

*Conventional Energy Power Purchase Agreements.* The Utility has entered into power purchase agreements for conventional generation resources, which include tolling agreements and resource adequacy agreements. The Utility's obligation under a portion of these agreements is contingent on the third parties' development of new generation facilities to provide capacity and energy products to the Utility. As of December 31, 2017, these power purchase agreements expire at various dates between 2018 and 2033.

*Other Power Purchase Agreements.* The Utility has entered into agreements to purchase energy and capacity with independent power producers that own generation facilities that meet the definition of a QF under federal law. Several of these agreements are treated as capital leases. At December 31, 2017 and 2016, net capital leases reflected in property, plant, and equipment on the

Consolidated Balance Sheets were $18 million and $35 million including accumulated amortization of $143 million and $148 million, respectively. The present value of the future minimum lease payments due under these agreements included $11 million and $17 million in Current Liabilities and $7 million and $18 million in Noncurrent Liabilities on the Consolidated Balance Sheet, respectively. As of December 31, 2017, QF contracts in operation expire at various dates between 2018 and 2028. In addition, the Utility has agreements with various irrigation districts and water agencies to purchase hydroelectric power.

The costs incurred for all power purchases and electric capacity amounted to $3.3 billion in 2017, $3.5 billion in 2016, and $3.5 billion in 2015.

***Natural Gas Supply, Transportation, and Storage Commitments***

The Utility purchases natural gas directly from producers and marketers in both Canada and the United States to serve its core customers and to fuel its owned-generation facilities. The Utility also contracts for natural gas transportation from the points at which the Utility takes delivery (typically in Canada, the US Rocky Mountain supply area, and the southwestern United States) to the points at which the Utility's natural gas transportation system begins. These agreements expire at various dates between 2018 and 2026. In addition, the Utility has contracted for natural gas storage services in northern California in order to more reliably meet customers' loads. Costs incurred for natural gas purchases, natural gas transportation services, and natural gas storage, which include contracts with terms of less than 1 year, amounted to $0.9 billion in 2017, $0.7 billion in 2016, and $0.9 billion in 2015.

***Nuclear Fuel Agreements***

The Utility has entered into several purchase agreements for nuclear fuel. These agreements expire at various dates between 2018 and 2025 and are intended to ensure long-term nuclear fuel supply. The Utility relies on a number of international producers of nuclear fuel in order to diversify its sources and provide security of supply. Pricing terms are also diversified, ranging from market-based prices to base prices that are escalated using published indices.

Payments for nuclear fuel amounted to $83 million in 2017, $100 million in 2016, and $128 million in 2015.

**Other Commitments**

PG&E Corporation and the Utility have other commitments related to operating leases (primarily office facilities and land), which expire at various dates between 2018 and 2052. At December 31, 2017, the future minimum payments related to these commitments were as follows:

| (in millions) | Operating Leases | |
|---|---|---|
| 2018 | $ | 44 |
| 2019 | | 41 |
| 2020 | | 40 |
| 2021 | | 36 |
| 2022 | | 27 |
| Thereafter | | 138 |
| **Total minimum lease payments** | **$** | **326** |

Payments for other commitments related to operating leases amounted to $45 million in 2017, $43 million in 2016, and $41 million in 2015. Certain leases on office facilities contain escalation clauses requiring annual increases in rent. The rentals payable under these leases may increase by a fixed amount each year, a percentage of increase over base year, or the consumer price index. Most leases contain extension operations ranging between one and five years.

## QUARTERLY CONSOLIDATED FINANCIAL DATA (UNAUDITED)

| (in millions, except per share amounts) | Quarter ended | | | |
|---|---|---|---|---|
| | December 31 | September 30 | June 30 | March 31 |
| **2017** | | | | |
| **PG&E CORPORATION** | | | | |
| Operating revenues [1] | $ 4,100 | $ 4,517 | $ 4,250 | $ 4,268 |
| Operating income | 429 | 899 | 748 | 880 |
| Income tax provision [2] | 108 | 160 | 134 | 109 |
| Net income [3] | 118 | 553 | 410 | 579 |
| Income available for common shareholders | 114 | 550 | 406 | 576 |
| Comprehensive income | 118 | 553 | 411 | 579 |
| Net earnings per common share, basic | 0.22 | 1.07 | 0.79 | 1.13 |
| Net earnings per common share, diluted | 0.22 | 1.07 | 0.79 | 1.13 |
| Common stock price per share: | | | | |
| High | 69.20 | 71.56 | 69.22 | 67.86 |
| Low | 44.45 | 65.04 | 65.33 | 60.07 |
| **UTILITY** | | | | |
| Operating revenues [1] | $ 4,101 | $ 4,516 | $ 4,250 | $ 4,271 |
| Operating income | 434 | 834 | 749 | 883 |
| Income tax provision [2] | 33 | 138 | 136 | 120 |
| Net income [3] | 200 | 513 | 409 | 569 |
| Income available for common stock | 196 | 510 | 405 | 566 |
| Comprehensive income | 203 | 513 | 409 | 570 |
| | | | | |
| **2016** | | | | |
| **PG&E CORPORATION** | | | | |
| Operating revenues [4] | $ 4,713 | $ 4,810 | $ 4,169 | $ 3,974 |
| Operating income | 1,041 | 640 | 401 | 95 |
| Income tax (benefit) provision [5] | 160 | 70 | 12 | (187) |
| Net income [6] | 696 | 391 | 210 | 110 |
| Income available for common shareholders | 692 | 388 | 206 | 107 |
| Comprehensive income | 694 | 391 | 210 | 110 |
| Net earnings per common share, basic | 1.37 | 0.77 | 0.41 | 0.22 |
| Net earnings per common share, diluted | 1.36 | 0.77 | 0.41 | 0.22 |
| Common stock price per share: | | | | |
| High | 62.12 | 65.39 | 63.92 | 59.72 |
| Low | 58.04 | 60.82 | 56.62 | 51.29 |
| **UTILITY** | | | | |
| Operating revenues [4] | $ 4,714 | $ 4,809 | $ 4,169 | $ 3,975 |
| Operating income | 1,044 | 640 | 401 | 96 |
| Income tax (benefit) provision [5] | 169 | 73 | 13 | (185) |
| Net income [6] | 696 | 389 | 209 | 108 |
| Income available for common stock | 692 | 386 | 205 | 105 |
| Comprehensive income | 694 | 389 | 210 | 108 |

[1] In the first quarter of 2017, the Utility recorded the remaining retroactive revenues related to the 2015 GT&S rate case decision authorized by the CPUC.

[2] In the fourth quarter of 2017, the Utility had lower income tax expense primarily due to lower operating income, which was partially offset by the impact of the Tax Act.

[3] In the second quarter of 2017, the Utility recorded a $47 million disallowance related to the Diablo Canyon settlement. Also, in the third quarter of 2017, the Utility recorded a $350 million charge related to Butte fire third-party claims. In the first, second, and third quarters of 2017, the Utility recorded $7 million, $14 million, and $276 million, respectively, for probable insurance recoveries in connection with recovery of losses related to the Butte fire. (See Note 13 of the Notes to the Consolidated Financial Statements in Item 8.)

[4] In the third and fourth quarters of 2016, the Utility recorded an increase in base revenues as authorized by the CPUC in the 2015 GT&S rate case decision.

[5] In the first quarter of 2016, the Utility had an income tax benefit, primarily due to net loss before income taxes and various tax audit results.

[6] In the first, second, and third quarters of 2016, the Utility recorded charges for disallowed capital spending of $87 million, $148 million, and $51 million, respectively, as a result of the San Bruno Penalty Decision. Additionally, in the second and fourth quarters of 2016, the Utility recorded charges of $190 million and $29 million for capital expenditures probable of disallowance related to the final decision in the 2015 GT&S rate case. Also, in the first quarter of 2016 the Utility recorded a $350 million charge related to Butte fire litigation. In the second quarter of 2016, the Utility recorded $260 million for probable insurance recoveries in connection with recovery of losses related to the Butte fire. In the fourth quarter of 2016, the Utility recorded a $400 million charge related to the Butte fire litigation and an insurance receivable of $365 million for probable insurance recoveries in connection with the Butte fire. (See Note 13 of the Notes to the Consolidated Financial Statements in Item 8.)

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management of PG&E Corporation and the Utility is responsible for establishing and maintaining adequate internal control over financial reporting. PG&E Corporation's and the Utility's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, or GAAP. Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of PG&E Corporation and the Utility, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that receipts and expenditures are being made only in accordance with authorizations of management and directors of PG&E Corporation and the Utility, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of internal control over financial reporting as of December 31, 2017, based on the criteria established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its assessment and those criteria, management has concluded that PG&E Corporation and the Utility maintained effective internal control over financial reporting as of December 31, 2017.

Deloitte & Touche LLP, an independent registered public accounting firm, has audited PG&E Corporation's and the Utility's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of
PG&E Corporation

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of PG&E Corporation and subsidiaries (the "Company") as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2017, of the Company and our report dated February 9, 2018, expressed an unqualified opinion on those consolidated financial statements and included an emphasis-of-matter paragraph regarding uncertainty related to possible material losses or penalties to the Company as a result of the Northern California wildfires that occurred in October 2017, as discussed in Note 13 to the consolidated financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent, or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ DELOITTE & TOUCHE LLP

San Francisco, California

February 9, 2018

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of
Pacific Gas and Electric Company

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Pacific Gas and Electric Company and subsidiaries (the "Utility")
as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the
Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Utility maintained, in all
material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in
*Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States)
(PCAOB), the consolidated financial statements as of and for the year ended December 31, 2017, of the Utility and our report
dated February 9, 2018, expressed an unqualified opinion on those consolidated financial statements and included an emphasis-of-
matter paragraph regarding uncertainty related to possible material losses or penalties to the Utility as a result of the Northern
California wildfires that occurred in October 2017, as discussed in Note 13 to the consolidated financial statements.

**Basis for Opinion**

The Utility's management is responsible for maintaining effective internal control over financial reporting, and for its assessment
of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal
Control Over Financial Reporting*. Our responsibility is to express an opinion on the Utility's internal control over financial
reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with
respect to the Utility in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities
and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the
audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material
respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a
material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed
risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a
reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the
reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally
accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that
(1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of
the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of
financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the
company are being made only in accordance with authorizations of management and directors of the company; and (3) provide
reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's
assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent, or detect misstatements. Also,
projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because
of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ DELOITTE & TOUCHE LLP

San Francisco, California

February 9, 2018

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of
PG&E Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of PG&E Corporation and subsidiaries (the "Company") as of December 31, 2017 and 2016, the Company's related consolidated statements of income, comprehensive income, equity, and cash flows, for each of the three years in the period ended December 31, 2017, and the related notes and the schedules listed in the Index at Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 9, 2018 expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Matter**

As discussed in Note 13 to the consolidated financial statements, the Northern California wildfires that occurred in October 2017 may result in material losses or penalties to the Company.

/s/ DELOITTE & TOUCHE LLP

San Francisco, California

February 9, 2018

We have served as the Company's auditor since 1999.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of
Pacific Gas and Electric Company

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Pacific Gas and Electric Company and subsidiaries (the "Utility") as of December 31, 2017 and 2016, and the Utility's related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows, for each of the three years in the period ended December 31, 2017, and the related notes and the schedule listed in the Index at Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Utility as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Utility's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 9, 2018 expressed an unqualified opinion on the Utility's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Utility's management. Our responsibility is to express an opinion on the Utility's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Utility in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Matter**

As discussed in Note 13 to the consolidated financial statements, the Northern California wildfires that occurred in October 2017 may result in material losses or penalties to the Utility.

/s/ DELOITTE & TOUCHE LLP

San Francisco, California

February 9, 2018

We have served as the Utility's auditor since 1999.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Based on an evaluation of PG&E Corporation's and the Utility's disclosure controls and procedures as of December 31, 2017, PG&E Corporation's and the Utility's respective principal executive officers and principal financial officers have concluded that such controls and procedures are effective to ensure that information required to be disclosed by PG&E Corporation and the Utility in reports that the companies file or submit under the 1934 Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms, and (ii) accumulated and communicated to PG&E Corporation's and the Utility's management, including PG&E Corporation's and the Utility's respective principal executive officers and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

### Management's Annual Report on Internal Control over Financial Reporting

Management of PG&E Corporation and the Utility have prepared an annual report on internal control over financial reporting. Management's report, together with the report of the independent registered public accounting firm, appears in Item 8 of this 2017 Form 10-K under the heading "Management's Report on Internal Control Over Financial Reporting" and "Report of Independent Registered Public Accounting Firm."

### Registered Public Accounting Firm's Report on Internal Control over Financial Reporting

Deloitte & Touche LLP, an independent registered public accounting firm, has audited PG&E Corporation's and the Utility's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

### Changes in Internal Control Over Financial Reporting

There were no changes in internal control over financial reporting that occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, PG&E Corporation's or the Utility's internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

Not applicable.

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

Information regarding executive officers of PG&E Corporation and the Utility is set forth under "Executive Officers of the Registrants" at the end of Part I of this 2017 Form 10-K. Other information regarding directors will be included under the heading "Nominees for Directors of PG&E Corporation and Pacific Gas and Electric Company" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference. Information regarding compliance with Section 16 of the Exchange Act will be included under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

*Website Availability of Code of Ethics, Corporate Governance and Other Documents*

The following documents are available both on the Corporate Governance section of PG&E Corporation's website (*www.pgecorp.com/corp/about-us/corporate-governance.page*) and on the Utility's website (*www.pge.com/en_US/about-pge/company-information/company-information.page*, under the "Visit Corporate Governance" link): (1) the PG&E Corporation's and the Utility's codes of conduct (which meet the definition of "code of ethics" of Item 406(b) of the SEC Regulation S-K) adopted by PG&E Corporation and the Utility and applicable to their directors and employees, including their respective Chief Executive Officer and President, as the case may be, Chief Financial Officers, Controllers and other executive officers, (2) PG&E Corporation's and the Utility's respective corporate governance guidelines, and (3) key Board committee charters, including charters for the companies' Audit Committees and the PG&E Corporation Nominating and Governance Committee and Compensation Committee.

If any amendments are made to, or any waivers are granted with respect to, provisions of the code of conduct adopted by PG&E Corporation and the Utility and that apply to their respective Chief Executive Officer and President, as the case may be, Chief Financial Officers, or Controllers, PG&E Corporation and the Utility will post the amended code of ethics on their websites and will disclose any waivers to the "code of ethics" in a Current Report on Form 8-K.

*Procedures for Shareholder Recommendations of Nominees to the Boards of Directors*

There were no material changes to the procedures described in PG&E Corporation's and the Utility's Joint Proxy Statement relating to the 2017 Annual Meetings of Shareholders by which security holders may recommend nominees to PG&E Corporation's or Pacific Gas and Electric Company's Boards of Directors.

*Audit Committees and Audit Committee Financial Expert*

Information regarding the Audit Committees of PG&E Corporation and the Utility and the "audit committee financial experts" as defined by the SEC will be included under the headings "Corporate Governance – Board Committee Duties – Audit Committees" and "Corporate Governance – Committee Membership, Independence, and Qualifications" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

**ITEM 11. EXECUTIVE COMPENSATION**

Information responding to Item 11, for each of PG&E Corporation and the Utility, will be included under the headings "Compensation Discussion and Analysis," "Compensation Committee Report," "Summary Compensation Table - 2017," "Grants of Plan-Based Awards in 2017," "Outstanding Equity Awards at Fiscal Year End - 2017," "Option Exercises and Stock Vested During 2017," "Pension Benefits – 2017," "Non-Qualified Deferred Compensation – 2017," "Potential Payments Upon Resignation, Retirement, Termination, Change in Control, Death, or Disability" and "Compensation of Non-Employee Directors – 2017 Director Compensation" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Information regarding the beneficial ownership of securities for each of PG&E Corporation and the Utility is set forth under the headings "Share Ownership Information – Security Ownership of Management" and "Share Ownership Information – Principal Shareholders" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

### *Equity Compensation Plan Information*

The following table provides information as of December 31, 2017 concerning shares of PG&E Corporation common stock authorized for issuance under PG&E Corporation's existing equity compensation plans.

| Plan Category | (a) | (b) | (c) |
|---|---|---|---|
| | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
| Equity compensation plans approved by shareholders | 4,969,352 [1] | $ 35.53 [2] | 14,381,959 [3] |
| Equity compensation plans not approved by shareholders | - | - | - |
| Total equity compensation plans | 4,969,352 [1] | $ 35.53 [2] | 14,381,959 [3] |

[1] Includes 14,041 phantom stock units, 1,426,371 restricted stock units and 3,524,850 performance shares. The weighted average exercise price reported in column (b) does not take these awards into account. For performance shares, amounts reflected in this table assume payout in shares at 200% of target or, for performance shares granted in 2015, reflects the actual payout percentage of 0% for performance shares using a total shareholder return metric and 15.1% for performance shares using safety and affordability metrics. The actual number of shares issued can range from 0% to 200% of target depending on achievement of performance objectives. Also, restricted stock units and performance shares are generally settled in net shares. Upon vesting, shares with a value equal to required tax withholding will be withheld and, in lieu of issuing the shares, taxes will be paid on behalf of employees. Shares not issued due to share withholding or performance achievement below maximum will be available again for issuance.

[2] This is the weighted average exercise price for the 4,090 options outstanding as of December 31, 2017.

[3] Represents the total number of shares available for issuance under all of PG&E Corporation's equity compensation plans as of December 31, 2017. Stock-based awards granted under these plans include restricted stock units, performance shares and phantom stock units. The 2014 LTIP, which became effective on May 12, 2014, authorizes up to 17 million shares to be issued pursuant to awards granted under the 2014 LTIP, less approximately 2.7 million shares for awards granted under the 2006 LTIP from January 1, 2014 through May 11, 2014. In addition, if any awards outstanding under the 2006 LTIP at December 31, 2013 are cancelled, forfeited or expire without being settled in full, shares of stock allocable to the terminated portion of such awards shall again be available for issuance under the 2014 LTIP.

For more information, see Note 5 of the Notes to the Consolidated Financial Statements in Item 8.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

Information responding to Item 13, for each of PG&E Corporation and the Utility, will be included under the headings "Related Party Transactions" and "Corporate Governance – Board and Director General Independence and Qualifications" and "Corporate Governance – Committee Membership, Independence, and Qualifications" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

Information responding to Item 14, for each of PG&E Corporation and the Utility, will be included under the heading "Information Regarding the Independent Auditor for PG&E Corporation and Pacific Gas and Electric Company" in the Joint Proxy Statement relating to the 2018 Annual Meetings of Shareholders, which information is incorporated herein by reference.

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a)        The following documents are filed as a part of this report:**

    1.   The following consolidated financial statements, supplemental information and report of independent registered public accounting firm are filed as part of this report in Item 8:

Consolidated Statements of Income for the Years Ended December 31, 2017, 2016, and 2015 for each of PG&E Corporation and Pacific Gas and Electric Company.

Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2017, 2016, and 2015 for each of PG&E Corporation and Pacific Gas and Electric Company.

Consolidated Balance Sheets at December 31, 2017 and 2016 for each of PG&E Corporation and Pacific Gas and Electric Company.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2017, 2016, and 2015 for each of PG&E Corporation and Pacific Gas and Electric Company.

Consolidated Statements of Equity for the Years Ended December 31, 2017, 2016, and 2015 for PG&E Corporation.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2017, 2016, and 2015 for Pacific Gas and Electric Company.

Notes to the Consolidated Financial Statements.

Quarterly Consolidated Financial Data (Unaudited).

Management's Report on Internal Controls

Reports of Independent Registered Public Accounting Firm (Deloitte & Touche LLP).

    2. The following financial statement schedules are filed as part of this report:

Condensed Financial Information of Parent as of December 31, 2017 and 2016 and for the Years Ended December 31, 2017, 2016, and 2015.

Consolidated Valuation and Qualifying Accounts for each of PG&E Corporation and Pacific Gas and Electric Company for the Years Ended December 31, 2017, 2016, and 2015.

    3.   Exhibits required by Item 601 of Regulation S-K

# EXHIBIT INDEX

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Restated Articles of Incorporation of PG&E Corporation effective as of May 29, 2002 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2003 (File No. 1-12609), Exhibit 3.1) |
| 3.2 | Certificate of Determination for PG&E Corporation Series A Preferred Stock filed December 22, 2000 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2000 (File No. 1-12609), Exhibit 3.2) |
| 3.3 | Bylaws of PG&E Corporation amended as of December 16, 2016 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 3.3) |
| 3.4 | Restated Articles of Incorporation of Pacific Gas and Electric Company effective as of April 12, 2004 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated April 12, 2004 (File No. 1-2348), Exhibit 3) |
| 3.5 | Bylaws of Pacific Gas and Electric Company amended as of December 16, 2016 (incorporated by reference to Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2016 (File No. 1-2348), Exhibit 3.5) |
| 4.1 | Indenture, dated as of April 22, 2005, supplementing, amending and restating the Indenture of Mortgage, dated as of March 11, 2004, as supplemented by a First Supplemental Indenture, dated as of March 23, 2004, and a Second Supplemental Indenture, dated as of April 12, 2004, between Pacific Gas and Electric Company and The Bank of New York Trust Company, N.A. (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2005 (File No. 1-2348), Exhibit 4.1) |
| 4.2 | First Supplemental Indenture, dated as of March 13, 2007, relating to the issuance of $700,000,000 principal amount of Pacific Gas and Electric Company's 5.80% Senior Notes due March 1, 2037 (incorporated by reference from Pacific Gas and Electric Company's Form 8-K dated March 14, 2007 (File No. 1-2348), Exhibit 4.1) |
| 4.3 | Third Supplemental Indenture, dated as of March 3, 2008, relating to the issuance of $400,000,000 of Pacific Gas and Electric Company's 6.35% Senior Notes due February 15, 2038 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated March 3, 2008 (File No. 1-2348), Exhibit 4.1) |
| 4.4 | Fourth Supplemental Indenture, dated as of October 21, 2008, relating to the issuance of $600,000,000 aggregate principal amount of Pacific Gas and Electric Company's 8.25% Senior Notes due October 15, 2018 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated October 21, 2008 (File No. 1-2348), Exhibit 4.1) |
| 4.5 | Fifth Supplemental Indenture, dated as of November 18, 2008, relating to the issuance of $200,000,000 principal amount of Pacific Gas and Electric Company's 8.25% Senior Notes due October 15, 2018 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 18, 2008 (File No. 1-2348), Exhibit 4.1) |
| 4.6 | Sixth Supplemental Indenture, dated as of March 6, 2009, relating to the issuance of $550,000,000 aggregate principal amount of Pacific Gas and Electric Company's 6.25% Senior Notes due March 1, 2039 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated March 6, 2009 (File No. 1-2348), Exhibit 4.1) |
| 4.7 | Seventh Supplemental Indenture, dated as of June 11, 2009, relating to the issuance of $500,000,000 aggregate principal amount of Pacific Gas and Electric Company's Floating Rate Senior Notes due June 10, 2010 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated June 11, 2009 (File No. 1-2348), Exhibit 4.1) |

| 4.8 | Eighth Supplemental Indenture, dated as of November 18, 2009, relating to the issuance of $550,000,000 aggregate principal amount of Pacific Gas and Electric Company's 5.40% Senior Notes due January 15, 2040 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 18, 2009 (File No. 1-2348), Exhibit 4.1) |
|---|---|
| 4.9 | Ninth Supplemental Indenture, dated as of April 1, 2010, relating to the issuance of $250,000,000 aggregate principal amount of its 5.80% Senior Notes due March 1, 2037 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated April 1, 2010 (File No. 1-2348), Exhibit 4.1) |
| 4.10 | Tenth Supplemental Indenture, dated as of September 15, 2010, relating to the issuance of $550,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.50% Senior Notes due October 1, 2020 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated September 15, 2010 (File No. 1-2348), Exhibit 4.1) |
| 4.11 | Twelfth Supplemental Indenture, dated as of November 18, 2010, relating to the issuance of $250,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.50% Senior Notes due October 1, 2020 and $250,000,000 aggregate principal amount of its 5.40% Senior Notes due January 15, 2040 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 18, 2010 (File No. 1-2348), Exhibit 4.1) |
| 4.12 | Thirteenth Supplemental Indenture, dated as of May 13, 2011, relating to the issuance of $300,000,000 aggregate principal amount of Pacific Gas and Electric Company's 4.25% Senior Notes due May 15, 2021 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated May 13, 2011 (File No. 1-2348), Exhibit 4.1) |
| 4.13 | Fourteenth Supplemental Indenture, dated as of September 12, 2011, relating to the issuance of $250,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.25% Senior Notes due September 15, 2021 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated September 12, 2011 (File No. 1-2348), Exhibit 4.1) |
| 4.14 | Sixteenth Supplemental Indenture, dated as of December 1, 2011, relating to the issuance of $250,000,000 aggregate principal amount of Pacific Gas and Electric Company's 4.50% Senior Notes due December 15, 2041 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated December 1, 2011 (File No. 1-2348), Exhibit 4.1) |
| 4.15 | Seventeenth Supplemental Indenture, dated as of April 16, 2012, relating to the issuance of $400,000,000 aggregate principal amount of Pacific Gas and Electric Company's 4.45% Senior Notes due April 15, 2042 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated April 16, 2012 (File No. 1-2348), Exhibit 4.1) |
| 4.16 | Eighteenth Supplemental Indenture, dated as of August 16, 2012, relating to the issuance of $400,000,000 aggregate principal amount of Pacific Gas and Electric Company's 2.45% Senior Notes due August 15, 2022 and $350,000,000 aggregate principal amount of its 3.75% Senior Notes due August 15, 2042 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated August 16, 2012 (File No. 1-2348), Exhibit 4.1) |
| 4.17 | Nineteenth Supplemental Indenture, dated as of June 14, 2013, relating to the issuance of $375,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.25% Senior Notes due June 15, 2023 and $375,000,000 aggregate principal amount of its 4.60% Senior Notes due June 15, 2043 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated June 14, 2013 (File No. 1-2348), Exhibit 4.1) |
| 4.18 | Twentieth Supplemental Indenture, dated as of November 12, 2013, relating to the issuance of $300,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.85% Senior Notes due November 15, 2023 and $500,000,000 aggregate principal amount of its 5.125% Senior Notes due November 15, 2043 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 12, 2013 (File No. 1-2348), Exhibit 4.1) |

| 4.19 | Twenty-First Supplemental Indenture, dated as of February 21, 2014, relating to the issuance of $450,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.75% Senior Notes due February 15, 2024 and $450,000,000 aggregate principal amount of its 4.75% Senior Notes due February 15, 2044 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated February 21, 2014 (File No.1 2348), Exhibit 4.1) |
|---|---|
| 4.20 | Twenty-Third Supplemental Indenture, dated as of August 18, 2014, relating to the issuance of $350,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.40% Senior Notes due August 15, 2024 and $225,000,000 aggregate principal amount of its 4.75% Senior Notes due February 15, 2044 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated August 18, 2014 (File No. 1-2348), Exhibit 4.1) |
| 4.21 | Twenty-Fourth Supplemental Indenture, dated as of November 6, 2014, relating to the issuance of $500,000,000 aggregate principal amount of Pacific Gas and Electric Company's 4.30% Senior Notes due March 15, 2045 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 6, 2014 (File No. 1-2348), Exhibit 4.1) |
| 4.22 | Twenty-Fifth Supplemental Indenture, dated as of June 12, 2015, relating to the issuance of $400,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.50% Senior Notes due June 15, 2025 and $100,000,000 aggregate principal amount of its 4.30% Senior Notes due March 15, 2045 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated June 12, 2015 (File No. 1-2348), Exhibit 4.1) |
| 4.23 | Twenty-Sixth Supplemental Indenture, dated as of November 5, 2015, relating to the issuance of $200,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.50% Senior Notes due June 15, 2025 and $450,000,000 aggregate principal amount of its 4.25% Senior Notes due March 15, 2046 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 5, 2015 (File No. 1-2348), Exhibit 4.1) |
| 4.24 | Twenty-Seventh Supplemental Indenture, dated as of March 1, 2016, relating to the issuance of $600,000,000 aggregate principal amount of Pacific Gas and Electric Company's 2.95% Senior Notes due March 1, 2026 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated March 1, 2016 (File No. 1-2348), Exhibit 4.1) |
| 4.25 | Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016, relating to the issuance of $250,000,000 aggregate principal amount of Pacific Gas and Electric Company's Floating Rate Senior Notes due November 30, 2017 and $400,000,000 aggregate principal amount of its 4.00% Senior Notes due December 1, 2046 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated December 1, 2016 (File No. 1-2348), Exhibit 4.1) |
| 4.26 | Twenty-Ninth Supplemental Indenture, dated as of March 10, 2017, relating to the issuance of $400,000,000 aggregate principal amount of Pacific Gas and Electric Company's 3.30% Senior Notes due March 15, 2027 and $200,000,000 aggregate principal amount of its 4.00% Senior Notes due December 1, 2046 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated March 10, 2017 (File No. 1-2348), Exhibit 4.1) |
| 4.27 | Indenture, dated as of November 29, 2017, relating to the issuance of $500,000,000 aggregate principal amount of by Pacific Gas and Electric Company's Floating Rate Senior Notes due 2018, $1,150,000,000 aggregate principal amount of its 3.30% Senior Notes due 2027 and $850,000,000 aggregate principal amount of its 3.95% Senior Notes due 2047 (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 29, 2017 (File No. 1-2348), Exhibit 4.1) |
| 4.28 | Senior Note Indenture, dated as of February 10, 2014, between PG&E Corporation and U.S. Bank National Association (incorporated by reference to PG&E Corporation's Form S-3 (File No. 333-193880), Exhibit 4.1) |
| 4.29 | First Supplemental Indenture, dated as of February 27, 2014, relating to the issuance of $350,000,000 aggregate principal amount of PG&E Corporation's 2.40% Senior Notes due March 1, 2019 (incorporated by reference to PG&E Corporation's Form 8-K dated February 27, 2014 (File No. 1-12609), Exhibit 4.1) |

| | | |
|---|---|---|
| 4.30 | | Registration Rights Agreement, dated as of November 29, 2017, among Pacific Gas and Electric Company and Barclays Capital Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. LLC, as representatives of the initial purchasers (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 29, 2017 (File No. 1-2348), Exhibit 4.5) |
| 10.1 | | Second Amended and Restated Credit Agreement, dated as of April 27, 2015, among (1) PG&E Corporation, as borrower, (2) Bank of America, N.A., as administrative agent and a lender, (3) Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities LLC, as joint lead arrangers and joint bookrunners, (4) Citibank N.A. and JPMorgan Chase Bank, N.A., as co-syndication agents and lenders, (5) Wells Fargo Bank, National Association, as documentation agent and lender, and (6) the following other lenders: Barclays Bank PLC, BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc., The Bank of New York Mellon, N.A., Mizuho Corporate Bank, Ltd., Royal Bank of Canada, U.S. Bank, National Association, MUFG Union Bank, N.A., TD Bank, N.A., Canadian Imperial Bank of Commerce, New York Branch, and Sumitomo Mitsui Banking Corporation (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.1) |
| 10.2 | | Second Amended and Restated Credit Agreement dated as of April 27, 2015, among (1) Pacific Gas and Electric Company, as borrower, (2) Citibank N.A., as administrative agent and a lender, (3) Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities LLC, as joint lead arrangers and joint bookrunners, (4) Bank of America, N.A. and JPMorgan Chase Bank, N.A., as co-syndication agents and lenders, (5) Wells Fargo Bank, National Association, as documentation agent and lender, and (6) the following other lenders: Barclays Bank PLC, BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc., The Bank of New York Mellon, N.A., Mizuho Corporate Bank, Ltd., Royal Bank of Canada, U.S. Bank National Association, MUFG Union Bank, N.A., TD Bank, N.A., Canadian Imperial Bank of Commerce, New York Branch, and Sumitomo Mitsui Banking Corporation (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-2348), Exhibit 10.2) |
| 10.3 | | Term Loan Agreement, dated as of March 2, 2016, between Pacific Gas and Electric Company and The Bank of Tokyo-Mitsubishi UFJ, Ltd. (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated March 2, 2016 (File No. 1-2348), Exhibit 10.1) |
| 10.4 | | Term Loan Agreement, dated as of February 23, 2017, by and among Pacific Gas and Electric Company, the several banks and other financial institutions or entities from time to time parties thereto, The Bank of Tokyo-Mitsubishi UFJ, Ltd. and U.S. Bank National Association, as joint lead arrangers and joint bookrunners and The Bank of Tokyo-Mitsubishi UFJ, Ltd, as administrative agent (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated February 23, 2017 (File No. 1-2348), Exhibit 10.1) |
| 10.5 | | Purchase Agreement, dated as of November 27, 2017, among Pacific Gas and Electric Company and Barclays Capital Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. LLC, as representatives of the initial purchasers listed on Schedules I-A, I-B and I-C thereto (incorporated by reference to Pacific Gas and Electric Company's Form 8-K dated November 29, 2017 (File No. 1-2348), Exhibit 10.1) |
| 10.6 | | Settlement Agreement among the California Public Utilities Commission, Pacific Gas and Electric Company and PG&E Corporation, dated as of December 19, 2003, together with appendices (incorporated by reference to PG&E Corporation's and Pacific Gas and Electric Company's Form 8-K dated December 22, 2003 (File No. 1-12609 and File No. 1-2348), Exhibit 99) |
| 10.7 | | Transmission Control Agreement among the California Independent System Operator (CAISO) and the Participating Transmission Owners, including Pacific Gas and Electric Company, effective as of March 31, 1998, as amended (CAISO, FERC Electric Tariff No. 7) (incorporated by reference to PG&E Corporation's and Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2004 (File No. 1-12609 and File No. 1-2348), Exhibit 10.8) |
| 10.8 | * | Letter regarding Compensation Agreement between PG&E Corporation and Anthony F. Earley, Jr. dated August 8, 2011 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2011 (File No. 1-12609), Exhibit 10.1) |

| | | |
|---|---|---|
| 10.9 | * | Restricted Stock Unit Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2017 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.04) |
| 10.10 | * | Restricted Stock Unit Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2016 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.7) |
| 10.11 | * | Restricted Stock Unit Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.7) |
| 10.12 | * | Restricted Stock Unit Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2014 grant under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2014 (File No. 1-12609), Exhibit 10.4) |
| 10.13 | * | Restricted Stock Unit Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2013 grant under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2013 (File No. 1-12609), Exhibit 10.5) |
| 10.14 | * | Performance Share Agreement subject to financial goals between Anthony F. Earley, Jr. and PG&E Corporation for 2017 grant under the PG&E Corporation 2014 Long-Term Incentive Plan  (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.05) |
| 10.15 | * | Performance Share Agreement subject to financial goals between Anthony F. Earley, Jr. and PG&E Corporation for 2016 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.12) |
| 10.16 | * | Performance Share Agreement subject to financial goals between Anthony F. Earley, Jr. and PG&E Corporation for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.8) |
| 10.17 | * | Performance Share Agreement subject to safety and customer affordability goals between Anthony F. Earley, Jr. and PG&E Corporation for 2017 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.06) |
| 10.18 | * | Performance Share Agreement subject to safety and customer affordability goals between Anthony F. Earley, Jr. and PG&E Corporation for 2016 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.14) |
| 10.19 | * | Performance Share Agreement subject to safety and customer affordability goals between Anthony F. Earley, Jr. and PG&E Corporation for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.9) |
| 10.20 | * | Performance Share Agreement between Anthony F. Earley, Jr. and PG&E Corporation for 2014 grant under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2014 (File No. 1-12609), Exhibit 10.5) |
| 10.21 | * | Restricted Stock Unit Agreement between Nickolas Stavropoulos and PG&E Corporation for additional 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2015 (File No. 1-2609), Exhibit 10.16) |
| 10.22 | * | Restricted Stock Unit Agreement between Nickolas Stavropoulos and PG&E Corporation for non-annual award under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.08) |

| 10.23 | * | Restricted Stock Unit Agreement between Geisha J. Williams and PG&E Corporation for additional 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2015 (File No. 1-2609), Exhibit 10.17) |
|---|---|---|
| 10.24 | * | Restricted Stock Unit Agreement between John R. Simon and PG&E Corporation for additional 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2015 (File No. 1-2609), Exhibit 10.18) |
| 10.25 | * | Letter regarding Compensation Agreement between PG&E Corporation and Julie M. Kane dated March 11, 2015 for employment starting May 18, 2015 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2015 (File No. 1-2348), Exhibit 10.4) |
| 10.26 | * | Restricted Stock Unit Agreement between Julie M. Kane and PG&E Corporation dated May 29, 2015 for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2015 (File No. 1-2348), Exhibit 10.5) |
| 10.27 | * | Non-Annual Restricted Stock Unit Agreement between Julie M. Kane and PG&E Corporation dated May 29, 2015 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2015 (File No. 1-2348), Exhibit 10.6) |
| 10.28 | * | Performance Share Agreement subject to financial goals between Julie M. Kane and PG&E Corporation dated May 29, 2015 for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2015 (File No. 1-2348), Exhibit 10.7) |
| 10.29 | * | Performance Share Agreement subject to safety and customer affordability goals between Julie M. Kane and PG&E Corporation dated May 29, 2015 for 2015 grant under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2015 (File No. 1-2348), Exhibit 10.8) |
| 10.30 | * | Restricted Stock Unit Agreement between Dinyar Mistry and PG&E Corporation dated February 23, 2016 (incorporated by reference to PG&E Corporation and Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2016 (File No. 1-12609 and File No. 1-2348), Exhibit 10.2) |
| 10.31 | * | Separation Agreement between PG&E Corporation and Hyun Park dated August 7, 2017 and amended as of September 1, 2017 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2017 (File No. 1-12609), Exhibit 10.1) |
| 10.32 | * | Separation Agreement between Pacific Gas and Electric Company and Desmond Bell dated January 6, 2017 and amended as of April 25, 2017 (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-2348), Exhibit 10.09) |
| 10.33 | * | Separation Agreement between Pacific Gas and Electric Company and Helen Burt dated January 5, 2017 (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2017 (File No. 1-2348), Exhibit 10.3) |
| 10.34 | * | Letter regarding Compensation Agreement between Pacific Gas and Electric Company and David Thomason dated May 24, 2016 (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended June 30, 2016 (File No. 1-2348), Exhibit 10.2) |
| 10.35 | * | Non-Annual Restricted Stock Unit Award Agreement between PG&E Corporation and David S. Thomason dated August 8, 2016 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2016 (File No. 1-2348), Exhibit 10.1) |
| 10.36 | * | Performance Share Award Agreement subject to financial goals between David S. Thomason and PG&E Corporation dated August 8, 2016 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2016 (File No. 1-12609), Exhibit 10.2) |

| 10.37 | * | Performance Share Award Agreement subject to safety and customer affordability goals between David S. Thomason and PG&E Corporation dated August 8, 2016 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2016 (File No. 1-12609), Exhibit 10.3) |
|---|---|---|
| 10.38 | * | Non-Annual Restricted Stock Unit Award Agreement between PG&E Corporation and Edward D. Halpin dated November 28, 2016 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.32) |
| 10.39 | * | PG&E Corporation Supplemental Retirement Savings Plan amended effective as of September 19, 2001, and frozen after December 31, 2004 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2004) (File No. 1-12609), Exhibit 10.10) |
| 10.40 | * | PG&E Corporation 2005 Supplemental Retirement Savings Plan, as amended effective September 15, 2015 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2015 (File No. 1-12609), Exhibit 10.3) |
| 10.41 | * | PG&E Corporation 2005 Deferred Compensation Plan for Non-Employee Directors, effective as of January 1, 2005 (as amended to comply with Internal Revenue Code Section 409A regulations effective as of January 1, 2009) (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2008 (File No. 1-12609), Exhibit 10.24) |
| 10.42 | * | PG&E Corporation Deferred Compensation Plan for Non-Employee Directors, as amended and restated effective as of July 22, 1998 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 1998 (File No. 1-12609), Exhibit 10.2) |
| 10.43 | * | Description of Short-Term Incentive Plan for Officers of PG&E Corporation and its subsidiaries, effective January 1, 2017 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2017 (File No. 1-12609), Exhibit 10.2) |
| 10.44 | * | Description of Short-Term Incentive Plan for Officers of PG&E Corporation and its subsidiaries, effective January 1, 2016 (incorporated by reference to PG&E Corporation's Form 8-K dated February 16, 2016 (File No. 1-12609) |
| 10.45 | * | Amendment to PG&E Corporation Short-Term Incentive Programs and Other Bonus Programs, effective January 1, 2009 (amendment to comply with Internal Revenue Code Section 409A regulations) (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2008 (File No. 1-12609), Exhibit 10.27) |
| 10.46 | * | Amendment to Pacific Gas and Electric Company Short-Term Incentive Programs and Other Bonus Programs, effective January 1, 2009 (amendment to comply with Internal Revenue Code Section 409A regulations) (incorporated by reference to Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2008 (File No. 1-2348), Exhibit 10.28) |
| 10.47 | * | PG&E Corporation Supplemental Executive Retirement Plan, as amended effective as of January 1, 2013 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2012 (File No. 1-12609, Exhibit 10.31) |
| 10.48 | * | PG&E Corporation Defined Contribution Executive Supplemental Retirement Plan, as amended effective September 17, 2013 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2013 (File No. 1-12609), Exhibit 10.2) |
| 10.49 | * | Pacific Gas and Electric Company Relocation Assistance Program for Officers (incorporated by reference to Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2015 (File No. 1-2348), Exhibit 10.38) |
| 10.50 | * | Amendment to the Postretirement Life Insurance Plan of the Pacific Gas and Electric Company, effective February 16, 2016 (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2016 (File No. 1-2348), Exhibit 10.4) |

| 10.51 | * | Amendment to the Postretirement Life Insurance Plan of the Pacific Gas and Electric Company, effective February 6, 2015 (incorporated by reference to Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2014) (File No. 1-2348), Exhibit 10.37) |
|---|---|---|
| 10.52 | * | Postretirement Life Insurance Plan of the Pacific Gas and Electric Company, as amended and restated on February 14, 2012 (incorporated by reference to Pacific Gas and Electric Company's Form 10-Q for the quarter ended March 31, 2012 (File No. 1-2348), Exhibit 10.7) |
| 10.53 | * | PG&E Corporation Non-Employee Director Stock Incentive Plan (a component of the PG&E Corporation Long-Term Incentive Program) as amended effective as of July 1, 2004 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2004 (File No. 1-12609), Exhibit 10.27) |
| 10.54 | * | PG&E Corporation 2014 Long-Term Incentive Plan effective May 12, 2014 and amended effective January 1, 2018 |
| 10.55 | * | PG&E Corporation 2014 Long-Term Incentive Plan effective May 12, 2014 and amended effective February 15, 2017 |
| 10.56 | * | PG&E Corporation 2014 Long-Term Incentive Plan effective May 12, 2014 and amended effective January 1, 2016 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2015 (File No. 1-12609), Exhibit 10.42) |
| 10.57 | * | PG&E Corporation 2006 Long-Term Incentive Plan, as amended effective January 1, 2013 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2012 (File No. 1-12609), Exhibit 10.40) |
| 10.58 | * | PG&E Corporation Long-Term Incentive Program (including the PG&E Corporation Stock Option Plan and Performance Unit Plan), as amended May 16, 2001, (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2001 (File No. 1-12609), Exhibit 10) |
| 10.59 | * | Form of Restricted Stock Unit Agreement for 2017 grants to non-employee directors under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.07) |
| 10.60 | * | Form of Restricted Stock Unit Agreement for 2016 grants to non-employee directors under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2016 (File No. 1-12609), Exhibit 10.1) |
| 10.61 | * | Form of Restricted Stock Unit Agreement for 2017 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.01) |
| 10.62 | * | Form of Restricted Stock Unit Agreement for 2016 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.55) |
| 10.63 | * | Form of Restricted Stock Unit Agreement for 2015 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.4) |
| 10.64 | * | Form of Restricted Stock Unit Agreement for 2014 grants under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2014 (File No. 1-12609), Exhibit 10.2) |
| 10.65 | * | Form of Restricted Stock Unit Agreement for 2013 grants under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2013 (File No. 1-12609), Exhibit 10.3) |
| 10.66 | * | Form of Non-Qualified Stock Option Agreement under the PG&E Corporation Long-Term Incentive Program (incorporated by reference to PG&E Corporation's Form 8-K dated January 6, 2005 (File No. 1-12609), Exhibit 99.1) |

| 10.67 | * | Form of Performance Share Agreement subject to financial goals for 2017 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.02) |
|---|---|---|
| 10.68 | * | Form of Performance Share Agreement subject to financial goals for 2016 grants under the PG&E Corporation 2014 Long-Term Incentive Plan  (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.61) |
| 10.69 | * | Form of Performance Share Agreement subject to financial goals for 2015 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.5) |
| 10.70 | * | Form of Performance Share Agreement subject to safety and customer affordability goals for 2017 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2017 (File No. 1-12609), Exhibit 10.03) |
| 10.71 | * | Form of Performance Share Agreement subject to safety and customer affordability goals for 2016 grants under the PG&E Corporation 2014 Long-Term Incentive Plan  (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2016 (File No. 1-12609), Exhibit 10.63) |
| 10.72 | * | Form of Performance Share Agreement subject to safety and customer affordability goals for 2015 grants under the PG&E Corporation 2014 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2015 (File No. 1-12609), Exhibit 10.6) |
| 10.73 | * | Form of Performance Share Agreement for 2014 grants under the PG&E Corporation 2006 Long-Term Incentive Plan (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2014 (File No. 1-12609), Exhibit 10.3) |
| 10.74 | * | PG&E Corporation 2010 Executive Stock Ownership Guidelines as adopted September 14, 2010, effective January 1, 2011 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2010 (File No. 1-12609), Exhibit 10.3) |
| 10.75 | * | PG&E Corporation Executive Stock Ownership Program Guidelines as amended effective September 15, 2010 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2010 (File No. 1-12609), Exhibit 10.2) |
| 10.76 | * | PG&E Corporation 2012 Officer Severance Policy, as amended effective as of May 12, 2014 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended June 30, 2014 (File No. 1-12609), Exhibit 10.2) |
| 10.77 | * | PG&E Corporation Golden Parachute Restriction Policy effective as of February 15, 2006 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2005 (File No. 1-12609), Exhibit 10.49) |
| 10.78 | * | Amendment to PG&E Corporation Golden Parachute Restriction Policy dated December 31, 2008 (amendment to comply with Internal Revenue Code Section 409A Regulations) (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2008 (File No. 1-12609), Exhibit 10.58) |
| 10.79 | * | Amended and Restated PG&E Corporation Director Grantor Trust Agreement dated October 1, 2015 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2015 (File No. 1-12609), Exhibit 10.1) |
| 10.80 | * | Amended and Restated PG&E Corporation Officer Grantor Trust Agreement dated October 1, 2015 (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended September 30, 2015 (File No. 1-12609), Exhibit 10.2) |
| 10.81 | * | PG&E Corporation and Pacific Gas and Electric Company Executive Incentive Compensation Recoupment Policy effective as of February 17, 2010 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2009 (File No. 1-12609), Exhibit 10.54) |
| 10.82 | * | Resolution of the Board of Directors of PG&E Corporation regarding indemnification of officers and directors dated December 18, 1996 (incorporated by reference to PG&E Corporation's Form 10-K for the year ended December 31, 2004 (File No. 1-12609), Exhibit 10.40) |
| 10.83 | * | Resolution of the Board of Directors of Pacific Gas and Electric Company regarding indemnification of officers and directors dated July 19, 1995 (incorporated by reference to Pacific Gas and Electric Company's Form 10-K for the year ended December 31, 2004 (File No. 1-2348), Exhibit 10.41) |

| | | |
|---|---|---|
| 12.1 | | Computation of Ratios of Earnings to Fixed Charges for Pacific Gas and Electric Company |
| 12.2 | | Computation of Ratios of Earnings to Combined Fixed Charges and Preferred Stock Dividends for Pacific Gas and Electric Company |
| 12.3 | | Computation of Ratios of Earnings to Fixed Charges for PG&E Corporation |
| 21 | | Subsidiaries of the Registrant |
| 23.1 | | PG&E Corporation Consent of Independent Registered Public Accounting Firm (Deloitte & Touche LLP) |
| 23.2 | | Pacific Gas and Electric Company Consent of Independent Registered Public Accounting Firm (Deloitte & |
| 24 | | Powers of Attorney |
| 31.1 | | Certifications of the Chief Executive Officer and the Chief Financial Officer of PG&E Corporation required by Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | | Certifications of the Chief Executive Officer and the Chief Financial Officer of Pacific Gas and Electric Company required by Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | ** | Certifications of the Chief Executive Officer and the Chief Financial Officer of PG&E Corporation required by Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | ** | Certifications of the Chief Executive Officer and the Chief Financial Officer of Pacific Gas and Electric Company required by Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | | XBRL Instance Document |
| 101.SCH | | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB | | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF | | XBRL Taxonomy Extension Definition Linkbase Document |
| * | | Management contract or compensatory agreement. |
| ** | | Pursuant to Item 601(b)(32) of SEC Regulation S-K, these exhibits are furnished rather than filed with this report. |

**ITEM 16. FORM 10-K SUMMARY**

None.

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrants have duly caused this Annual Report on Form 10-K for the year ended December 31, 2017 to be signed on their behalf by the undersigned, thereunto duly authorized.

|  | PG&E CORPORATION | | PACIFIC GAS AND ELECTRIC COMPANY |
|---|---|---|---|
|  | (Registrant) | | (Registrant) |
|  | GEISHA J. WILLIAMS | | NICKOLAS STAVROPOULOS |
|  | Geisha J. Williams | | Nickolas Stavropoulos |
| By: | Chief Executive Officer and President | By: | President and Chief Operating Officer |
| Date: | February 9, 2018 | Date: | February 9, 2018 |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrants and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **A. Principal Executive Officers** | | |
| GEISHA J. WILLIAMS | Chief Executive Officer and | February 9, 2018 |
| Geisha J. Williams | President (PG&E Corporation) | |
| NICKOLAS STAVROPOULOS | President and Chief Operating Officer | February 9, 2018 |
| Nickolas Stavropoulos | (Pacific Gas and Electric Company) | |
| **B. Principal Financial Officers** | | |
| JASON P. WELLS | Senior Vice President and Chief Financial Officer | February 9, 2018 |
| Jason P. Wells | (PG&E Corporation) | |
| DAVID S. THOMASON | Vice President, Chief Financial Officer, and | February 9, 2018 |
| David S. Thomason | Controller (Pacific Gas and Electric Company) | |
| **C. Principal Accounting Officer** | | |
| DAVID S. THOMASON | Vice President and Controller (PG&E Corporation) | February 9, 2018 |
| David S. Thomason | Vice President, Chief Financial Officer, and Controller (Pacific Gas and Electric Company) | |
| **D. Directors (PG&E Corporation and Pacific Gas and Electric Company, unless otherwise noted)** | | |
| * LEWIS CHEW | Director | February 9, 2018 |
| Lewis Chew | | |

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 37 of 129

| | | |
|---|---|---|
| *  FRED J. FOWLER | Director | February 9, 2018 |
| Fred J. Fowler | | |
| *  JEH C. JOHNSON | Director (PG&E Corporation only) | February 9, 2018 |
| Jeh C. Johnson | | |
| *  RICHARD C. KELLY | Director | February 9, 2018 |
| Richard C. Kelly | Chair of the Board (PG&E Corporation) | |
| *  ROGER H. KIMMEL | Director | February 9, 2018 |
| Roger H. Kimmel | | |
| *  RICHARD A. MESERVE | Director | February 9, 2018 |
| Richard A. Meserve | | |
| *  FORREST E. MILLER | Director | February 9, 2018 |
| Forrest E. Miller | Chair of the Board (Pacific Gas and Electric Company) | |
| *  ERIC D. MULLINS | Director | February 9, 2018 |
| Eric D. Mullins | | |
| *  ROSENDO G. PARRA | Director | February 9, 2018 |
| Rosendo G. Parra | | |
| *  BARBARA L. RAMBO | Director | February 9, 2018 |
| Barbara L. Rambo | | |
| *  ANNE SHEN SMITH | Director | February 9, 2018 |
| Anne Shen Smith | | |
| *  NICKOLAS STAVROPOULOS | Director (Pacific Gas and Electric Company only) | February 9, 2018 |
| Nickolas Stavropoulos | | |
| *  GEISHA J.WILLIAMS | Director | February 9, 2018 |
| Geisha J. Williams | | |
| *By:  JOHN R. SIMON | | February 9, 2018 |
| John R. Simon, Attorney-in-Fact | | |

# PG&E CORPORATION
## SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF PARENT
### CONDENSED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME

| (in millions, except per share amounts) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Administrative service revenue | $ | 63 | $ | 70 | $ | 51 |
| Operating expenses | | (5) | | (73) | | (53) |
| Interest income | | 1 | | 1 | | 1 |
| Interest expense | | (11) | | (10) | | (10) |
| Other income | | 4 | | 2 | | 30 |
| Equity in earnings of subsidiaries | | 1,667 | | 1,388 | | 852 |
| Income before income taxes | | 1,719 | | 1,378 | | 871 |
| Income tax provision (benefit) | | 73 | | (15) | | (3) |
| **Net income** | **$** | **1,646** | **$** | **1,393** | **$** | **874** |
| Other Comprehensive Income | | | | | | |
| Pension and other postretirement benefit plans obligations (net of taxes of $0, $1, and $0, at respective dates) | $ | 1 | $ | (2) | $ | (1) |
| Net change in investments (net of taxes of $0, $0, and $12, at respective dates) | | - | | - | | (17) |
| Total other comprehensive income (loss) | | 1 | | (2) | | (18) |
| **Comprehensive Income** | **$** | **1,647** | **$** | **1,391** | **$** | **856** |
| **Weighted Average Common Shares Outstanding, Basic** | | **512** | | **499** | | **484** |
| **Weighted Average Common Shares Outstanding, Diluted** | | **513** | | **501** | | **487** |
| **Net earnings per common share, basic** | **$** | **3.21** | **$** | **2.79** | **$** | **1.81** |
| **Net earnings per common share, diluted** | **$** | **3.21** | **$** | **2.78** | **$** | **1.79** |

Years Ended December 31,

# PG&E CORPORATION
## SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF PARENT – (Continued)
## CONDENSED BALANCE SHEETS

| (in millions) | Balance at December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2016 | |
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | $ | 2 | $ | 106 |
| Advances to affiliates | | 24 | | 24 |
| Income taxes receivable | | 27 | | 25 |
| **Total current assets** | | **53** | | **155** |
| **Noncurrent Assets** | | | | |
| Equipment | | 3 | | 2 |
| Accumulated depreciation | | (3) | | (2) |
| **Net equipment** | | **-** | | **-** |
| Investments in subsidiaries | | 19,514 | | 18,172 |
| Other investments | | 144 | | 133 |
| Intercompany receivable | | 72 | | - |
| Deferred income taxes | | 123 | | 267 |
| **Total noncurrent assets** | | **19,853** | | **18,572** |
| **Total Assets** | **$** | **19,906** | **$** | **18,727** |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **Current Liabilities** | | | | |
| Short-term borrowings | $ | 132 | $ | - |
| Accounts payable – other | | 6 | | 7 |
| Other | | 23 | | 274 |
| **Total current liabilities** | | **161** | | **281** |
| **Noncurrent Liabilities** | | | | |
| Long-term debt | | 350 | | 348 |
| Other | | 175 | | 158 |
| **Total noncurrent liabilities** | | **525** | | **506** |
| **Common Shareholders' Equity** | | | | |
| Common stock | | 12,632 | | 12,198 |
| Reinvested earnings | | 6,596 | | 5,751 |
| Accumulated other comprehensive income (loss) | | (8) | | (9) |
| **Total common shareholders' equity** | | **19,220** | | **17,940** |
| **Total Liabilities and Shareholders' Equity** | **$** | **19,906** | **$** | **18,727** |

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2017** | **2016** | **2015** |
| **Cash Flows from Operating Activities:** | | | |
| Net income | $ 1,646 | $ 1,393 | $ 874 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Stock-based compensation amortization | 20 | 74 | 66 |
| Equity in earnings of subsidiaries | (1,667) | (1,388) | (852) |
| Deferred income taxes and tax credits-net | 139 | 11 | 10 |
| Current income taxes receivable/payable | (2) | (1) | 5 |
| Other | (75) | (24) | (70) |
| **Net cash provided by operating activities** | **61** | **65** | **33** |
| **Cash Flows From Investing Activities:** | | | |
| Investment in subsidiaries | (455) | (835) | (705) |
| Dividends received from subsidiaries [1] | 784 | 911 | 716 |
| **Net cash provided by (used in) investing activities** | **329** | **76** | **11** |
| **Cash Flows From Financing Activities:** | | | |
| Borrowings (repayments) under revolving credit facilities | 132 | - | - |
| Common stock issued | 395 | 822 | 780 |
| Common stock dividends paid [2] | (1,021) | (921) | (856) |
| **Net cash provided by (used in) financing activities** | **(494)** | **(99)** | **(76)** |
| **Net change in cash and cash equivalents** | **(104)** | **42** | **(32)** |
| **Cash and cash equivalents at January 1** | **106** | **64** | **96** |
| **Cash and cash equivalents at December 31** | **$ 2** | **$ 106** | **$ 64** |
| **Supplemental disclosure of cash flow information** | | | |
| Cash received (paid) for: | | | |
| Interest, net of amounts capitalized | $ (9) | $ (9) | $ (9) |
| Income taxes, net | - | (13) | - |
| **Supplemental disclosure of noncash investing and financing activities** | | | |
| Noncash common stock issuances | $ 21 | $ 20 | $ 21 |
| Common stock dividends declared but not yet paid | - | 248 | 224 |

[1] Because of its nature as a holding company, PG&E Corporation classifies dividends received from subsidiaries as an investing cash flow.
[2] In July and October of 2017, respectively, PG&E Corporation paid quarterly common stock dividends of $0.53 per share.
In July and October of 2016 and January and April of 2017, respectively, PG&E Corporation paid quarterly common stock dividends of $0.49 per share.
In January, April, July, and October of 2015 and January and April of 2016, respectively, PG&E Corporation paid quarterly common stock dividends of $0.455 per share.

# PG&E Corporation

## SCHEDULE II – CONSOLIDATED VALUATION AND QUALIFYING ACCOUNTS
### For the Years Ended December 31, 2017, 2016, and 2015

(in millions)

| Description | Balance at Beginning of Period | Additions | | Deductions [2] | Balance at End of Period |
| | | Charged to Costs and Expenses | Charged to Other Accounts | | |
|---|---|---|---|---|---|
| **Valuation and qualifying accounts deducted from assets:** | | | | | |
| 2017: | | | | | |
| Allowance for uncollectible accounts [1] | $ 58 | $ 55 | $ - | $ 49 | $ 64 |
| 2016: | | | | | |
| Allowance for uncollectible accounts [1] | $ 54 | $ 50 | $ - | $ 46 | $ 58 |
| 2015: | | | | | |
| Allowance for uncollectible accounts [1] | $ 66 | $ 43 | $ - | $ 55 | $ 54 |

[1] Allowance for uncollectible accounts is deducted from "Accounts receivable - Customers."
[2] Deductions consist principally of write-offs, net of collections of receivables previously written off.

**Pacific Gas and Electric Company**

**SCHEDULE II – CONSOLIDATED VALUATION AND QUALIFYING ACCOUNTS**
**For the Years Ended December 31, 2017, 2016, and 2015**

(in millions)

| Description | Balance at Beginning of Period | Additions | | Deductions [2] | Balance at End of Period |
|---|---|---|---|---|---|
| | | Charged to Costs and Expenses | Charged to Other Accounts | | |
| **Valuation and qualifying accounts deducted from assets:** | | | | | |
| 2017: | | | | | |
| Allowance for uncollectible accounts [1] | $ 58 | $ 55 | $ - | $ 49 | $ 64 |
| 2016: | | | | | |
| Allowance for uncollectible accounts [1] | $ 54 | $ 50 | $ - | $ 46 | $ 58 |
| 2015: | | | | | |
| Allowance for uncollectible accounts [1] | $ 66 | $ 43 | $ - | $ 55 | $ 54 |

[1] Allowance for uncollectible accounts is deducted from "Accounts receivable - Customers."
[2] Deductions consist principally of write-offs, net of collections of receivables previously written off.

**EXHIBIT 12.1**
**PACIFIC GAS AND ELECTRIC COMPANY**
**COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES**

| (in millions) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **2017** | | **2016** | | **2015** | | **2014** | | **2013** |
| **Earnings:** | | | | | | | | | | |
| Net income | $ | 1,691 | $ | 1,402 | $ | 862 | $ | 1,433 | $ | 866 |
| Income tax provision (benefit) | | 427 | | 70 | | (19) | | 384 | | 326 |
| Fixed charges | | 1,572 | | 1,417 | | 1,260 | | 1,176 | | 971 |
| **Total earnings** | $ | **3,690** | $ | **2,889** | $ | **2,103** | $ | **2,993** | $ | **2,163** |
| **Fixed charges:** | | | | | | | | | | |
| Interest on short-term borrowings and long-term debt, net | $ | 1,532 | $ | 1,363 | $ | 1,208 | $ | 1,125 | $ | 917 |
| Interest on capital leases | | 2 | | 3 | | 4 | | 6 | | 7 |
| AFUDC debt | | 38 | | 51 | | 48 | | 45 | | 47 |
| **Total fixed charges** | $ | **1,572** | $ | **1,417** | $ | **1,260** | $ | **1,176** | $ | **971** |
| **Ratios of earnings to fixed charges** | | **2.35** | | **2.04** | | **1.67** | | **2.55** | | **2.23** |

Note:
For the purpose of computing Pacific Gas and Electric Company's ratios of earnings to fixed charges, "earnings" represent net income adjusted for the income or loss from equity investees of less than 100% owned affiliates, equity in undistributed income or losses of less than 50% owned affiliates, income taxes and fixed charges (excluding capitalized interest). "Fixed charges" include interest on long-term debt and short-term borrowings (including a representative portion of rental expense), amortization of bond premium, discount and expense, interest on capital leases, AFUDC debt, and earnings required to cover the preferred stock dividend requirements. Fixed charges exclude interest on tax liabilities.

**EXHIBIT 12.2**
**PACIFIC GAS AND ELECTRIC COMPANY**
**COMPUTATION OF RATIOS OF EARNINGS TO COMBINED**
**FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**

| (in millions) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 | | 2014 | | 2013 |
| **Earnings:** | | | | | | | | | | |
| Net income | $ | 1,691 | $ | 1,402 | $ | 862 | $ | 1,433 | $ | 866 |
| Income tax provision (benefit) | | 427 | | 70 | | (19) | | 384 | | 326 |
| Fixed charges | | 1,572 | | 1,417 | | 1,260 | | 1,176 | | 971 |
| **Total earnings** | $ | **3,690** | $ | **2,889** | $ | **2,103** | $ | **2,993** | $ | **2,163** |
| **Fixed charges:** | | | | | | | | | | |
| Interest on short-term borrowings and long-term debt, net | $ | 1,532 | $ | 1,363 | $ | 1,208 | $ | 1,125 | $ | 917 |
| Interest on capital leases | | 2 | | 3 | | 4 | | 6 | | 7 |
| AFUDC debt | | 38 | | 51 | | 48 | | 45 | | 47 |
| **Total fixed charges** | $ | **1,572** | $ | **1,417** | $ | **1,260** | $ | **1,176** | $ | **971** |
| **Preferred stock dividends:** | | | | | | | | | | |
| Tax deductible dividends | $ | 9 | $ | 9 | $ | 9 | $ | 9 | $ | 9 |
| Pre-tax earnings required to cover non-tax deductible preferred stock dividend requirements | | 7 | | 5 | | 5 | | 6 | | 7 |
| **Total preferred stock dividends** | | **16** | | **14** | | **14** | | **15** | | **16** |
| **Total combined fixed charges and preferred stock dividends** | $ | **1,588** | $ | **1,431** | $ | **1,274** | $ | **1,191** | $ | **987** |
| **Ratios of earnings to combined fixed charges and preferred stock dividends** | | **2.32** | | **2.02** | | **1.65** | | **2.51** | | **2.19** |

Note:
For the purpose of computing Pacific Gas and Electric Company's ratios of earnings to combined fixed charges and preferred stock dividends, "earnings" represent net income adjusted for the income or loss from equity investees of less than 100% owned affiliates, equity in undistributed income or losses of less than 50% owned affiliates, income taxes and fixed charges (excluding capitalized interest). "Fixed charges" include interest on long-term debt and short-term borrowings (including a representative portion of rental expense), amortization of bond premium, discount and expense, interest on capital leases, AFUDC debt, and earnings required to cover the preferred stock dividend requirements. "Preferred stock dividends" represent tax deductible dividends and pre-tax earnings that are required to pay the dividends on outstanding preferred securities. Fixed charges exclude interest on tax liabilities.

**EXHIBIT 12.3**
**PG&E CORPORATION**
**COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES**

| (in millions) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **2017** | | **2016** | | **2015** | | **2014** | | **2013** |
| **Earnings:** | | | | | | | | | | |
| Net income | $ | 1,660 | $ | 1,407 | $ | 888 | $ | 1,450 | $ | 828 |
| Income tax provision (benefit) | | 511 | | 55 | | (27) | | 345 | | 268 |
| Fixed charges | | 1,598 | | 1,440 | | 1,284 | | 1,206 | | 1,012 |
| Pre-tax earnings required to cover the preferred stock dividend of consolidated subsidiaries | | (15) | | (14) | | (14) | | (15) | | (16) |
| **Total earnings** | $ | **3,754** | $ | **2,888** | $ | **2,131** | $ | **2,986** | $ | **2,092** |
| **Fixed charges:** | | | | | | | | | | |
| Interest on short-term borrowings and long-term debt, net | $ | 1,543 | $ | 1,372 | $ | 1,218 | $ | 1,140 | $ | 942 |
| Interest on capital leases | | 2 | | 3 | | 4 | | 6 | | 7 |
| AFUDC debt | | 38 | | 51 | | 48 | | 45 | | 47 |
| Pre-tax earnings required to cover the preferred stock dividend of consolidated subsidiaries | | 15 | | 14 | | 14 | | 15 | | 16 |
| **Total fixed charges** | $ | **1,598** | $ | **1,440** | $ | **1,284** | $ | **1,206** | $ | **1,012** |
| **Ratios of earnings to fixed charges** | | **2.35** | | **2.01** | | **1.66** | | **2.48** | | **2.07** |

Note:
For the purpose of computing PG&E Corporation's ratios of earnings to fixed charges, "earnings" represent income from continuing operations adjusted for income taxes, fixed charges (excluding capitalized interest), and pre-tax earnings required to cover the preferred stock dividend of consolidated subsidiaries. "Fixed charges" include interest on long-term debt and short-term borrowings (including a representative portion of rental expense), amortization of bond premium, discount and expense, interest on capital leases, AFUDC debt, and earnings required to cover preferred stock dividends of consolidated subsidiaries. Fixed charges exclude interest on tax liabilities.

# Boards of Directors of PG&E Corporation and Pacific Gas and Electric Company

**LEWIS CHEW**
Executive Vice President and Chief Financial Officer of Dolby Laboratories, Inc.

**FRED J. FOWLER**
Retired Chairman of the Board of Spectra Energy Partners, LP

**JEH C. JOHNSON**[1]
Partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP

**RICHARD C. KELLY**[2]
Retired Chairman and Chief Executive Officer of Xcel Energy Inc.

**ROGER H. KIMMEL**
Vice Chairman of Rothschild Inc.

**RICHARD A. MESERVE**
President Emeritus, Carnegie Institution of Washington

**FORREST E. MILLER**[3]
Retired Group President-Corporate Strategy and Development of AT&T Inc.

**ERIC D. MULLINS**
Co-Chief Executive Officer of Lime Rock Resources, L.P.

**ROSENDO G. PARRA**
Retired executive of Dell Inc. and Co-Founder and Partner of Daylight Partners

**BARBARA L. RAMBO**
Chief Executive Officer of Taconic Management Services

**ANNE SHEN SMITH**
Retired Chairman and Chief Executive Officer of Southern California Gas Company

**NICKOLAS STAVROPOULOS**[4]
President and Chief Operating Officer of Pacific Gas and Electric Company

**GEISHA J. WILLIAMS**
Chief Executive Officer and President of PG&E Corporation

(1) Jeh C. Johnson is a director of PG&E Corporation only.
(2) Richard C. Kelly is the non-executive Chair of the Board of PG&E Corporation.
(3) Forrest E. Miller is the non-executive Chair of the Board of Pacific Gas and Electric Company.
(4) Nickolas Stavropoulos is a director of Pacific Gas and Electric Company only.

# PG&E Corporation Officers

**RICHARD C. KELLY**
Non-Executive Chair of the Board

**GEISHA J. WILLIAMS**
Chief Executive Officer and President

**JOHN R. SIMON**
Executive Vice President and General Counsel

**JULIE M. KANE**
Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel

**STEVEN E. MALNIGHT**
Senior Vice President, Strategy and Policy

**DINYAR B. MISTRY**
Senior Vice President, Human Resources and Chief Diversity Officer

**JASON P. WELLS**
Senior Vice President and Chief Financial Officer

**NICHOLAS M. BIJUR**
Vice President and Treasurer

**STEPHEN J. CAIRNS**
Vice President, Internal Audit and Chief Risk Officer

**MARK T. CARON**
Vice President, Tax

**LINDA Y.H. CHENG**
Vice President, Corporate Governance and Corporate Secretary

**DAVID S. THOMASON**
Vice President and Controller

# Pacific Gas and Electric Company Officers

**FORREST E. MILLER**
Non-executive Chair of the Board

**NICKOLAS STAVROPOULOS**
President and Chief Operating Officer

**KAREN A. AUSTIN**
Senior Vice President and Chief Information Officer

**LORAINE M. GIAMMONA**
Senior Vice President and Chief Customer Officer

**PATRICK M. HOGAN**
Senior Vice President, Electric Operations

**JULIE M. KANE**
Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel

**STEVEN E. MALNIGHT**
Senior Vice President, Strategy and Policy

**DINYAR B. MISTRY**
Senior Vice President, Human Resources and Chief Diversity Officer

**JESUS SOTO, JR.**
Senior Vice President, Gas Operations

**FONG WAN**
Senior Vice President, Energy Policy and Procurement

**DEBORAH T. AFFONSA**
Vice President, Customer Service

**BARRY D. ANDERSON**
Vice President, Electric Distribution

**VALERIE J. BELL**
Vice President, Information Technology Operations

**NICHOLAS M. BIJUR**
Vice President and Treasurer

**STEPHEN J. CAIRNS**
Vice President, Internal Audit and Chief Risk Officer

**MARK T. CARON**
Vice President, Tax

**LINDA Y.H. CHENG**
Vice President, Corporate Governance and Corporate Secretary

**MELVIN J. CHRISTOPHER**
Vice President, Gas Transmission and Distribution Operations

**BERNARD A. COWENS**
Vice President and Chief Security Officer

**KEVIN J. DASSO**
Vice President, Electric Asset Management

**TIMOTHY FITZPATRICK**
Vice President, Corporate Relations and Chief Communications Officer

**JON A. FRANKE**
Vice President, Power Generation

**JOHN C. HIGGINS**
Vice President, Safety and Health and Chief Safety Officer

**AARON J. JOHNSON**
Vice President, Customer Energy Solutions

**KATHLEEN B. KAY**
Vice President, Business Technology

**ROBERT S. KENNEY**
Vice President, Regulatory Affairs

**MARY K. KING**
Vice President, Human Resources

**TRAVIS T. KIYOTA**
Vice President, California External Affairs

**ROY M. KUGA**
Vice President, Grid Integration and Innovation

**GREGG L. LEMLER**
Vice President, Electric Transmission Operations

**JANET C. LODUCA**
Vice President and Deputy General Counsel

**JAMIE L. MARTIN**
Vice President, Finance and Planning

**SCOTT T. SANFORD**
Vice President, Customer Operations

**GUN S. SHIM**
Vice President, Supply Chain Management

**SUMEET SINGH**
Vice President, Gas Asset and Risk Management

**DAVID S. THOMASON**
Vice President, Chief Financial Officer, and Controller

**ROLANDO I. TREVINO**
Vice President, Gas Engineering and Design

**JAMES M. WELSCH**
Vice President, Nuclear Generation and Chief Nuclear Officer

**ANDREW K. WILLIAMS**
Vice President, Land and Environmental Management

# Shareholder Information

For financial and other information about PG&E Corporation and Pacific Gas and Electric Company, please visit our websites, *www.pgecorp.com* and *www.pge.com,* respectively. PG&E Corporation is the holder of all issued and outstanding shares of Pacific Gas and Electric Company common stock.

If you have questions about your PG&E Corporation common stock account or Pacific Gas and Electric Company preferred stock account, please contact our transfer agent, EQ Shareowner Services ("EQ").

## EQ Shareowner Services

P. O. Box 64874
St. Paul, MN 55164-0874

Toll-free telephone services: 1-888-489-4689 (Representatives are available from 7:00 a.m. CT to 7:00 p.m. CT)
Website: *www.shareowneronline.com*

## Lost or Stolen Stock Certificates

If you hold stock in your own name and your stock certificate has been lost, stolen, or in some way destroyed, you should immediately notify EQ.

## Stock Held in Brokerage Accounts ("Street Name")

When you purchase your stock and it is held for you by your broker, the shares are listed with EQ in the broker's name, or street name. EQ does not know the identity of the individual shareholders who hold their shares in this manner. If you hold your stock in a street name account, you receive all tax forms, publications, and proxy materials through your broker. If you are receiving unwanted duplicate mailings, you should contact your broker to eliminate the duplications.

## Stock Exchange Listings

PG&E Corporation's common stock is listed on the New York Stock Exchange under the symbol "PCG."

Pacific Gas and Electric Company has eight issues of first preferred cumulative stock, par value $25 per share, all of which are listed on NYSE American.

Non-Redeemable:

| Issue | Symbol |
|---|---|
| 6.00% | PCG-PA |
| 5.50% | PCG-PB |
| 5.00% | PCG-PC |

Redeemable:

| Issue | Symbol |
|---|---|
| 5.00% | PCG-PD |
| 5.00% Series A | PCG-PE |
| 4.80% | PCG-PG |
| 4.50% | PCG-PH |
| 4.36% | PCG-PI |

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 49 of 129

If you have general questions about PG&E Corporation or Pacific Gas and Electric Company, please contact the Corporate Secretary's Office.

**Vice President, Corporate Governance and Corporate Secretary**
Linda Y.H. Cheng
PG&E Corporation
Pacific Gas and Electric Company
P. O. Box 770000
San Francisco, CA 94177
415-973-8200
Fax: 415-973-8719
Email: CorporateSecretary@pge.com

Securities analysts, portfolio managers, or other representatives of the investment community should contact the Investor Relations Office.

**Senior Director, Investor Relations**
Christopher A. Foster
PG&E Corporation
P. O. Box 770000
San Francisco, CA 94177
415-972-7080
Email: invrel@pge-corp.com

**PG&E Corporation**
General Information
415-973-1000

**Pacific Gas and Electric Company**
General Information
415-973-7000

---

**PG&E CORPORATION AND PACIFIC GAS AND ELECTRIC COMPANY
ANNUAL MEETINGS OF SHAREHOLDERS**

Date: May 22, 2018

Time: 10:00 a.m.

Location: PG&E Corporation and
Pacific Gas and Electric Company Headquarters
77 Beale Street
San Francisco, CA 94105

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT D</u>**

**MASTER COMPLAINT, IN RE GHOST SHIP FIRE LITIGATION, CASE NO. RG16843631 (SUPERIOR CT. CAL. MAY 16, 2017)**

ENDORSED
FILED
ALAMEDA COUNTY

MAY 1 6 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1

2

3

4 IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5 COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

6 **IN RE GHOST SHIP FIRE LITIGATION** ) Case No.: RG16843631 (And Related Cases)

7 Plaintiffs ) **COMPLAINT FOR:**

8 vs. ) **1. NEGLIGENCE**

9 ) **2. NEGLIGENCE AGAINST PG&E**

10 CHOR NAR SIU NG, individually and as ) **DEFENDANTS**
Trustee of the CHOR NAR SIU NG )

11 REVOCABLE TRUST DATED SEPTEMBER ) **3. PREMISES LIABILITY**
28, 2007; )

12 EVA NG; ) **4. NEGLIGENT FAILURE TO EVICT**
KAI NG; )

13 DERICK ION ALMENA; ) **5. NEGLIGENT HIRING,**

14 MICAH ALLISON; ) **SUPERVISION, TRAINING AND/OR**
NICHOLAS ALEXANDER BOUCHARD; ) **RETENTION**

15 DANIEL LOPEZ; )
510 CUSTOM AUDIO; ) **6. PUBLIC NUISANCE**

16 OMAR VEGA, individually and dba CUSTOM ) **7. STRICT LIABILITY**
O'S; )

17 JOHN HRABKO aka RADAR; ) **8. SURVIVAL ACTION**

18 AMANDA BETH BROWN, individually and ) **9. NEGLIGENT INFLICTION OF**
dba 100% SILK; ) **EMOTIONAL DISTRESS**

19 BRITT BROWN, individually and dba 100% )
SILK; ) **10. INTENTIONAL INFLICTION OF**

20 100% SILK; ) **EMOTIONAL DISTRESS**

21 NOT NOT FUN RECORDS; )
JOEL SHANAHAN aka GOLDEN DONNA; )

22 RUSSELL E.L. BUTLER aka BLACK JEANS; ) **DEMAND FOR JURY TRIAL**

23 OPAL RECORDS; )
BENJAMIN CANNON; )

24 MAX OHR; )

25 PACIFIC GAS & ELECTRIC COMPANY; )
PG&E CORPORATION; )

26 and DOES 1 through 500, inclusive, )

27 Defendants. )

28 )

# TABLE OF CONTENTS

                                                                                    Page

I.     INTRODUCTION ....................................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................................... 1

III.   THE PARTIES ............................................................................................................. 2

       A.   PLAINTIFFS ..................................................................................................... 2

       B.   NAMED DEFENDANTS .................................................................................. 2

       C.   DOE DEFENDANTS ........................................................................................ 7

       D.   AGENCY AND CONCERT OF ACTION ........................................................ 8

IV.    FACTUAL BACKGROUND ...................................................................................... 8

       A.   THE OWNERS AND LESSEES OF THE GHOST SHIP AND ADJOINING
            BUILDINGS ...................................................................................................... 8

       B.   THE DANGEROUS AND UNSAFE GHOST SHIP ...................................... 10

       C.   KNOWN USE OF GHOST SHIP AS AN EVENT VENUE/CABARET .......... 17

       D.   PRIOR FIRES AT THE GHOST SHIP AND ADJOINING BUILDINGS ...... 20

       E.   THE OWNERS/MANAGERS OF THE GHOST SHIP KNEW ABOUT THE PRIOR
            FIRES AND RECEIVED PRIOR COMPLAINTS ABOUT THE DANGEROUS
            ELECTRICAL SYSTEM AND UNSAFE CONDITIONS ................................ 20

       F.   ALLEGATIONS SPECIFIC TO PG&E AND DOES 251 THROUGH 300 ...... 23

       G.   THE EVENT ON DECEMBER 2, 2016 ........................................................... 29

V.     CAUSES OF ACTION ................................................................................................ 33

            FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST ALL DEFENDANTS,
            EXCEPT PG&E DEFENDANTS AND DOES 251 THROUGH 300 .............................. 33

            SECOND CAUSE OF ACTION FOR NEGLIGENCE AGAINST THE PG&E
            DEFENDANTS AND DOES 251 THROUGH 300 ......................................................... 38

            THIRD CAUSE OF ACTION FOR PREMISES LIABILITY AGAINST ALL
            DEFENDANTS ................................................................................................................. 42

            FOURTH CAUSE OF ACTION NEGLIGENT FAILURE TO EVICT AGAINST
            DEFENDANTS CHOR NG, EVA NG, KAI NG AND DOES 1 THROUGH 50,
            INCLUSIVE ...................................................................................................................... 44

            FIFTH CAUSE OF ACTION FOR NEGLIGENT HIRING, SUPERVISION,
            TRAINING AND/OR RETENTION AGAINST ALL DEFENDANTS ........................ 46

            SIXTH CAUSE OF ACTION FOR PUBLIC NUISANCE AGAINST ALL
            DEFENDANTS ................................................................................................................. 47

|  | SEVENTH CAUSE OF ACTION FOR STRICT LIABILITY AGAINST DEFENDANTS PG&E AND DOES 251 THROUGH 300 ...................................... 47 |
|  | EIGHTH CAUSE OF ACTION – SURVIVAL ACTION AGAINST ALL DEFENDANTS ........................................................................................ 49 |
|  | NINTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS ................................................ 52 |
|  | TENTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS ................................................ 53 |
| VI. | PRAYER FOR RELIEF .................................................................................. 55 |
| VII. | JURY TRIAL DEMANDED .......................................................................... 55 |

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

Plaintiffs bring this action for damages and make the following allegations based upon information and belief.

## I.     <u>INTRODUCTION</u>

1.     This case arises from the horrific fire that occurred on December 2, 2016, at the "Ghost Ship," which is located at 1315 31st Avenue in the City of Oakland, County of Alameda, State of California. Thirty-six (36) people lost their lives and many others were seriously injured.

2.     At approximately 11:15 pm on December 2, 2016, over 100 invitees were at an electronic dance music event when the fire started inside the Ghost Ship. These invitees, along with artists performing at the event and residents, were plunged into darkness and thick, black smoke and tried to exit the unsafe structure.

3.     The interior of the 10,000 square-foot Ghost Ship was a death trap that contained a maze of makeshift rooms, alcoves and partitions. It was cluttered with carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several recreational vehicles.

4.     The Ghost Ship lacked a safe means of access between the upper floor where the music event was and the exit on the ground floor. The Ghost Ship lacked adequate and sufficient fire safety measures and was not up to fire protection and life safety codes, including, but not limited to, not having adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting, exit lights and a safe means of exit, all in violation of applicable statutes.

5.     Thirty-six (36) people were unable to exit and were trapped in the inferno inside. These victims suffered injuries from the fire, including from smoke inhalation, while trying to escape. The victims who perished were alive and feared for their safety. They were eventually overcome by the fire and smoke, and subsequently died inside the Ghost Ship. They did not die instantaneously when the fire broke out. They were injured and suffered from the injuries caused by the fire and smoke for many minutes before dying. This horrific disaster was foreseeable.

## II.     <u>JURISDICTION AND VENUE</u>

6.     The amount in controversy exceeds the jurisdictional limits of the Superior Court, Limited Jurisdiction.

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

7. Venue is proper in Alameda County Superior Court because one or more Defendants reside in the County of Alameda, is subject to the personal jurisdiction of this Court, and the injury and damage to Plaintiffs occurred within the jurisdictional area of this Court.

### III.  THE PARTIES

**A.  PLAINTIFFS**

8. Plaintiffs suffered wrongful death, personal, emotional and/or economic injures as a result of the Ghost Ship fire. Plaintiffs bring their causes of action as an heir to a victim that died as a result of the Ghost Ship fire and/or for his or her own injuries sustained as a result of the Ghost Ship fire.

**B.  NAMED DEFENDANTS**

9. Defendants CHOR NAR SIU NG, individually and as trustee of the CHOR NAR SIU NG REVOCABLE TRUST DATED SEPTEMBER 28, 2007, EVA NG, KAI NG and DOES 1 through 50, inclusive, and each of them, are and were, at all times relevant hereto, owners and/or managers of the real property upon which the Ghost Ship was located. Said Defendants are and were, at all times relevant hereto, the owners and/or managers of the real property parcels with Assessor Parcel Numbers ("APN") 25-690-11, APN 25-690-10 & APN 25-690-9, and street addresses of 1305, 1309, 1313 and 1315 31st Avenue and 3071 and 3073 International Boulevard, Oakland.

10. CHOR NAR SIU NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. CHOR NAR SIU NG is also referred to herein as CHOR NG.

11. EVA NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California.

12. KAI NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California.

13. Defendants DERICK ION ALMENA, MICAH ALLISON, NICHOLAS ALEXANDER BOUCHARD and DOES 51 through 100, inclusive, and each of them, leased, rented, promoted, marketed, controlled, secured, operated, built, constructed, developed, designed,

2

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 57 of 129

engineered, maintained, managed, inspected, repaired and/or provided services to 1305 31st Avenue and 1315 31st Avenue, including the Ghost Ship, where events open to the public were held and entertainment was provided. Said Defendants had been leasing the Ghost Ship for at least three years and had converted the Ghost Ship into residential ad hoc spaces/units and leased those spaces to others. Permits were not obtained by said Defendants for the conversion to residential or public events held at the Ghost Ship.

14. DERICK ION ALMENA is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. DERICK ION ALMENA is also referred to herein as ALMENA.

15. MICAH ALLISON is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. MICAH ALLISON is also referred to herein as ALLISON.

16. NICHOLAS ALEXANDER BOUCHARD is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. NICHOLAS ALEXANDER BOUCHARD is also referred to herein as BOUCHARD.

17. Defendants DANIEL LOPEZ, 510 CUSTOM AUDIO, OMAR VEGA, individually and dba CUSTOM O'S, and DOES 101 through 150, inclusive, and each of them, leased, rented, marketed, controlled, secured, operated, built, constructed, developed, designed, engineered, maintained, managed, inspected and/or repaired 1309 31st Avenue and 1313 31st Avenue and/or the premises located on Assessor Parcel Number, APN 25-690-10, manufactured, distributed and/or sold materials to the Ghost Ship and the adjacent and surrounding premises, and provided utilities and services to the Ghost Ship. Defendants DANIEL LOPEZ, 510 CUSTOM AUDIO, OMAR VEGA, individually and dba CUSTOM O'S, and DOES 101 through 150 supplied electricity from their premises, restrooms and event space on their premises for use by patrons and invitees during music and other events held at the Ghost Ship.

18. 510 CUSTOM AUDIO is, and at all times relevant hereto, was a California corporation organized and existing under the laws of the State of California, with its principal place of business in Oakland.

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 58 of 129

19. DANIEL LOPEZ is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. DANIEL LOPEZ is also referred to herein as LOPEZ.

20. OMAR VEGA is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. OMAR VEGA is also referred to herein as VEGA. VEGA was the owner and/or sole proprietor of CUSTOM O'S.

21. Defendants JOHN HRABKO also known as RADAR, 100% SILK, BRITT BROWN, AMANDA BETH BROWN, NOT NOT FUN RECORDS, JOEL SHANAHAN also known as GOLDEN DONNA, RUSSELL E.L. BUTLER also known as BLACK JEANS, OPAL RECORDS and DOES 151 through 200, inclusive, and each of them, promoted, marketed, sold tickets at, leased, rented, performed at, controlled, secured, operated, developed, designed, engineered, maintained, managed, inspected and/or provided services at the Ghost Ship, and the adjacent and surrounding premises, where entertainment was provided on December 2, 2016.

22. JOHN HRABKO aka RADAR is a natural person who is, and at all times relevant hereto, was a resident of Alameda County, California, and conducting substantial business in the State of California, including the County of Alameda. JOHN HRABKO is also referred to herein as HRABKO.

23. 100% SILK is and was, at all times relevant hereto, a business entity, form unknown, owned and/or operated by BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, who are also the alter egos of 100% SILK. 100% SILK "an independent record label and taste-maker in the expanding and evolving world of electronic dance music."[1] 100% SILK was founded in 2011 by BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, and is the sub-label and/or subsidiary of NOT NOT FUN RECORDS. BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, at all times relevant hereto, mentioned, dominated, influenced and controlled 100% SILK and the officers thereof as well as the business, property and affairs of each of said businesses and/or individuals.

---

[1] http://silkdocumentary.vhx.tv/.

4

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

There existed and now exists a unity of interest and ownership between 100% SILK and each of the alter egos, i.e., BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS. The individuality and separateness of said Defendants and 100% SILK have ceased. 100% SILK has been and now is a mere shell and naked framework which BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS used as a conduit for the conduct of their personal business, property and affairs.

24. BRITT BROWN is a natural person who is, and at all times relevant hereto, was a resident of the County of Los Angeles, State of California, and was conducting substantial business in the State of California, including the County of Alameda. BRITT BROWN is an owner, founder, operator, sole proprietor, alter ego, partner, joint venturer, agent, and/or officer of NOT NOT FUN RECORDS and 100% SILK.

25. AMANDA BETH BROWN is a natural person who is, and at all times relevant hereto, was a resident of the County of Los Angeles, State of California, and was conducting substantial business in the State of California, including the County of Alameda. AMANDA BETH BROWN is also referred to herein as AMANDA BROWN. AMANDA BROWN is an owner, founder, operator, sole proprietor, alter ego, partner, joint venturer, agent, and/or officer of NOT NOT FUN RECORDS and 100% SILK.

26. NOT NOT FUN RECORDS is, and at all times relevant hereto, was a California corporation organized and existing under the laws of the State of California with its principal place of business in the County of Los Angeles. NOT NOT FUN RECORDS is a Los Angeles based record label founded by BRITT BROWN and AMANDA BROWN, and is also the parent company and/or alter ego of 100% SILK.

27. JOEL SHANAHAN, also known as GOLDEN DONNA, is a natural person who is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. JOEL SHANAHAN is also referred to herein as SHANAHAN. SHANAHAN was an artist on the 100% SILK/NOT NOT FUN RECORDS label and was involved in the organization, promotion, sale, marketing, advertising, provision of security and provision of entertainment of the music event on December 2, 2016.

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 60 of 129

28. RUSSELL E.L. BUTLER, also known as BLACK JEANS, is a natural person who is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. RUSSELL E.L. BUTLER is also referred to herein as BUTLER. BUTLER was involved in the planning, organization, promotion, sale, marketing, advertising, provision of security and provision of entertainment of the event at the Ghost Ship, and is an artist who is represented, managed and/or employed by OPAL RECORDS.

29. OPAL RECORDS is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. OPAL RECORDS is a music label based in the United Kingdom, whose artists include BUTLER, and was involved in the planning, organization, promotion, sale, marketing, advertising, provision of security and provision of entertainment of the event at the Ghost Ship.

30. Defendants BENJAMIN CANNON and DOES 201 through 250, inclusive, and each of them, performed work at the Ghost Ship and the adjoining buildings, including but not limited to electrical work. Said Defendants also leased, occupied, inspected, maintained, repaired and/or controlled the Ghost Ship and/or adjoining buildings.

31. BENJAMIN CANNON is a natural person who is, and at all times relevant hereto, was a contractor, whose contractor's license with the State of California had expired. BENJAMIN CANNON is also referred to herein as CANNON. CANNON sublet space from LOPEZ, 510 CUSTOM AUDIO, VEGA and/or DOES 101 through 150.

32. Defendant MAX OHR is a natural person, who did, and at all times relevant hereto, live and work inside the Ghost Ship, operating his tattoo business, making jewelry and performing at music events. MAX OHR is also referred to herein as OHR. OHR sublet space from ALMENA, ALLISON, BOUCHARD and DOES 51 through 100. OHR was hired by ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS and/or DOES 51 through 100 and 151 through 200 to promote and work the event on December 2, 2016. The services he provided include, but are not limited to promoting the event, collecting the entrance fee and providing security. ///

33.     Defendants PACIFIC GAS & ELECTRIC COMPANY, PG&E CORPORATION and DOES 251 through 300, inclusive, and each of them, provided and/or worked on the electric service provided to the Ghost Ship and adjoining buildings.

34.     PACIFIC GAS & ELECTRIC COMPANY, a subsidiary corporation of PG&E Corporation, is incorporated in the State of California and is based in San Francisco.  PACIFIC GAS & ELECTRIC COMPANY is also referred to herein as PG&E COMPANY.  PG&E COMPANY is a combination natural gas and electric utility which provides gas and electric service to millions of customers in northern and central California.

35.     PG&E CORPORATION is an energy-based holding company incorporated in the State of California.  PG&E CORPORATION is the parent company of PG&E COMPANY.  Collectively, PACIFIC GAS & ELECTRIC COMPANY and PG&E CORPORATION are referred to herein as the "PG&E."

C.     **DOE DEFENDANTS**

36.     At all times relevant hereto, Defendants DOES 301 through 500, inclusive, and each of them, were somehow negligent or otherwise responsible for the injuries and death of the Ghost Ship fire victims and the damages alleged herein.

37.     Plaintiffs are informed and believe, and thereon allege that each of the Defendants, including DOES 301 through 500, is negligently or otherwise responsible in some manner for the events and happenings herein referred to and those Defendants negligently acted, or failed to act. Their negligence and/or failure to act and the dangerous conditions on the subject premises legally caused the injuries and damages hereinafter set forth.

38.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants DOE 1 through DOE 500, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure section 474.  Plaintiffs further allege each fictitious Defendant is in some manner responsible for the acts and occurrences set forth herein.  Plaintiffs will amend this Complaint to show their true names and capacities when the same are ascertained.

///

D. **AGENCY AND CONCERT OF ACTION**

39. At all times relevant hereto, each of the Defendants was the agent, servant, employee, partner, aider and abettor, contractor, subcontractor, co-conspirator and/or joint venturer of each of the remaining Defendants named herein and were at all times operating and acting within the purpose, course and scope of said agency, service, employment, partnership, conspiracy, contract, alter ego and/or joint venture, and with the permission and consent of their co-Defendants. Each Defendant has rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or unlawful, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

IV. **FACTUAL BACKGROUND**

A. **THE OWNERS AND LESSEES OF THE GHOST SHIP AND ADJOINING BUILDINGS**

40. 1305 31st Avenue is a structure located in an R-30 Zone, yet it is considered by Alameda County to be a "Warehouse, Portion of a Single Economic Unit." This Single Economic Unit includes APN 25-690-11 (1305 31st Ave.), APN 25-690-10 (1315 31st Ave.) and APN 25-690-9 (3703 International Blvd). The buildings sit at the corner of 31st Avenue and International Blvd., and run almost the complete length of the block on 31st Avenue between International Blvd. and East 13th Street. As part of the consolidated Single Economic Unit, there is an undeveloped yard on the south side between the structure on 1305 31st Ave. and the residence at 1301 31st Ave.: APN No 25-690-5.

41. APN 25-690-11 was commonly referred to as the "Ghost Ship" by its occupants and in various promotions of the illegal cabaret and businesses that operated there. Graffiti painted on the front of it on the 31st Avenue side said "GHOSTSHIP." The building, at various times, also went by other names including, but not limited to, the Satya Yuga Collective. At times, APN 25-690-11 has been misidentified as 1315 31st Ave. The building was covered in graffiti, and debris obstructed the sidewalk and ingress/egress creating a dangerous condition of public property for those seeking to enter or exit the building. See Photograph in Paragraph 43 below. From the outside, it was evident that the windows were blocked by debris stacked from

8

floor to ceiling and numerous metal objects were attached to the exterior of the building in a dangerous manner.

42. APN 25-690-11 is reported to have been constructed in the early 1900s. Prior to December 2, 2016, numerous unpermitted modifications to the entire Single Economic Unit had occurred on numerous occasions including, but not limited to: a new electric service; new meters and submeters; construction of illegal residential units; toilettes, kitchens and showers; inter and intra building passageways to access bathrooms, residential and event spaces and the rooftop; structural changes in the exterior and interior walls; and unpermitted and shared electrical systems.

43. Photograph showing the exterior of the Ghost Ship and side lot before the fire:[2]



44. Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, owned, leased, rented, marketed, controlled, secured, operated, built, constructed, developed, designed, engineered, maintained, managed, inspected, repaired and/or provided services to the premises. Said Defendants had mandatory and nondelegable duties to inspect and maintain APNs 25-690-11, 25-690-10 and 25-690-9 in a safe and usable condition, and to repair any dangerous or unsafe conditions.

[2]Source: "I-Team Timeline: Complaints Against Ghost Ship Warehouse Since 2014," ABC 7 News, Dan Noyes, December 5, 2016.

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

1    45.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50 leased the
2  property on APN 25 690-11, including the Ghost Ship to Defendants ALMENA, ALLISON,
3  BOUCHARD and DOES 51 through 100, and each of them.

4    46.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of
5  them, leased the property on APN 25 690-10, which had street addresses of 1309, 1313 and/or 1315
6  31 Ave. and/or 3071 International Blvd. to Defendants DANIEL LOPEZ, OMAR VEGA and DOES
7  101 through 150, and each of them.

8    **B.    THE DANGEROUS AND UNSAFE GHOST SHIP**

9    47.    Dangerous and flammable materials, including industrial and art supplies, propane
10 tanks that fueled camping stoves and recreational vehicles and their components and parts, were
11 located throughout the interior of the Ghost Ship.  Photographs of the interior of the Ghost Ship
12 show how it contained a maze of makeshift rooms, alcoves and partitions, and was cluttered with
13 carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several
14 recreational vehicle trailers.

15   48.    Photograph showing the inside of the Ghost Ship before the fire:[3]



27 ───────────────────
28 [3]Source:  "Video shows conditions inside Ghost Ship warehouse before fatal Oakland fire:  2 Investigates," KTVU,
   Simone Aponte, December 7, 2016 (updated January 30, 2017).

1    49.    The Ghost Ship did not have adequate and sufficient fire safety measures and was

2  not up to fire protection and life-safety codes.  The Ghost Ship did not have adequate and

3  sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting,

4  exit lights and a safe means of ingress and egress.  Following its investigation, the Bureau of

5  Alcohol, Tobacco, Firearms and Explosives stated that the building did not appear to have any

6  fire-suppression system or alarms.

7    50.    The main means of access between the ground floor of the Ghost Ship and the

8  second floor, where the event space was located, was a makeshift staircase made of pallets and

9  scrap wood.  The staircase was not code compliant and had irregular angles and inconsistent

10  spacing between steps, which significantly impeded the ability of the invitees trapped inside to

11  exit.  The only other means of access was a staircase hidden behind the performance stage on the

12  second floor and hidden in the corner of the ground floor.

13    51.    Photograph showing bottom portion of the makeshift staircase before the fire:[4]



24    52.    Photograph showing the top portion of the makeshift staircase and interior of the

25  Ghost Ship before the fire:[5]

26  ///

27

28
―――――――――――――――
[4]Source:  http://www.oaklandghostship.com (last visited December 22, 2016).
[5]Source:  http://www.oaklandghostship.com (last visited December 22, 2016).

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 66 of 129



53.     Photograph showing the makeshift staircase at night, which was representative of the Ghost Ship on December 2, 2016 before being plunged into darkness during the fire:[6]



---

[6]Source: @OpheliaNecro, "I am obsessed with this painting that was hanging above the staircase at Ghost Ship (The Oakland Warehouse). Any info on artist?pic.twitter.com/ByTjs9WuBv," December 6, 2016.

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 67 of 129
IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

54. A makeshift opening on the second floor of the Ghost Ship provided access to restrooms and additional residential and event space in the building next door (APN 25-690-10). See "Opening in wall" in the diagram below:[7]



[7]Source: "Warehouse in Oakland Fire Was Used Illegally," New York Times, Ford Fessenden & Anjali Singhvi, December 5, 2016.

///

///

///

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

1    55.    Photographs showing the opening in the wall between the Ghost Ship and the

2    adjoining structure:[8]

3            Looking from Ghost Ship                    Looking towards Ghost Ship




22    56.    Defendants ALMENA, ALLISON, BOUCHARD and DOES 51 through 100,

23    leased the makeshift rooms and alcoves to approximately 24 individuals and entities, including

24    OHR.  Said Defendants charged each between $300 and $700 per month, or so, per lease.

25    ALMENA and ALLISON lived on the second floor with their three minor children.

26    ///

27    _____

28    [8]Source:  "EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse
     of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.

57. Photograph showing OHR's "Deeper Magic Tattoo Studio" inside the Ghost Ship before the fire:[9]



58. The Ghost Ship lacked a safe and sufficient electrical system and supply. Power to the Ghost Ship was supplied from a meter shared with the structures on APN 25-690-10 and APN 25-690-9, and electricity was supplied through holes in the wall between the Ghost Ship and the adjacent structures. Extension cords and cables were snaked throughout the Ghost Ship, and electrical boxes were installed by unlicensed contractors, including ALMENA and CANNON.

59. PG&E was the supplier of electricity to one or more of the structures located on APNs 25-609-9, 25-609-10 and 25-609-11. The power from the high voltage transmission lines entered APN 25-609-9 into a mechanical room, in a common area, where two meters were located. One or more other meters were located throughout the structures in APN 25-609-10. No meter

---

[9]Source: http://www.oaklandghostship.com (last visited December 22, 2016).

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 70 of 129

was located in APN 25-609-11. None of the meters were labeled as required to demonstrate the parcels and/or establishments that they served.

60. Several submeters were installed throughout the buildings, which were used to determine how much electricity was used by each tenant and/or subtenant of the buildings. Photographs showing panel (circuit breaker) and submeter, located on APN 690-25-10 for electricity to the Ghost Ship taken on February 22, 2017:

Satya Yuga is written on the panel




61. Diagram showing how electricity was provided through the Ghost Ship and the adjoining buildings:[10]



HOW POWER FLOWED TO GHOST SHIP
Newly obtained emails and documents further explain how electricity traveled to the Ghost Ship warehouse. Power flowed into the property from a utility pole on the street corner, beginning at a transformer above the cellphone store. Electricity then went to a second transformer in the auto body shop. Wires running through a hole in the wall supplied the warehouse artist collective. All the properties shared one PG&E meter.

---

[10]"Exclusive: Ghost Ship owners knew of dangerous electrical system before deadly fire," The Mercury News, by Aaron Davis, Matthias Gafni, Thomas Peele & David Debolt, March 24, 2017.

62.     The electrical system was overloaded with excessive use by the dozens of people who lived and worked at the Ghost Ship, including artists, musicians and tattoo artists that used electrical equipment, as well as the musicians and groups that performed public events held at the Ghost Ship.  There were often sparks from the electrical system that smelled and circuit breakers blew out often.  Overloaded electrical lines at the rear of the Ghost Ship likely contributed to the fire.

**C.     KNOWN USE OF GHOST SHIP AS AN EVENT VENUE/CABARET**

63.     The Ghost Ship had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events.  There were numerous complaints of excessive noise and debris made to the City of Oakland Police Department when events were occurring.

64.     It was obvious that ALMENA, ALLISON and/or BOUCHARD were using the Ghost Ship, under the name "Satya Yuga," as a venue for private events.  Satya Yuga's Yelp page, which lists the Ghost Ship address as the location of the business, contains pictures dating back to February 2014 showing the second floor being used for private events.

65.     One Yelp reviewer from March 9, 2015 wrote that ALMENA "demanded more than double the original booking fee from the promoter," the promoter refused to pay, and his group was asked to leave from a "private event" and threatened with violence.[11]

///

///

///

---

[11]https://yelp.com/biz/satya-yuga-oakland.

17

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 72 of 129

66. Photographs showing the second floor performance stage/dance floor:[12]





///

---

[12]Source 1st photograph: 'It was a tinderbox': Site of Oakland warehouse fire was jammed with flammable objects," The Washington Post, Bontemps, Wang, Guerra & Scherer, December 4, 2016; photograph from Satya Yuga Facebook page. Source 2nd photograph: 2014 photograph provided by Ajesh Shah, "Oakland building where fire victims died was source of complaints," SFGATE, by Jill Tucker, Rachel Swan, Erin Allday & J.K. Dineen, December 5, 2016.

67. Photograph showing a prior event at Ghost Ship and the performance stage/dance floor:[13]





68. Defendant OHR was a routine performer/disc jockey ("DJ") at the Ghost Ship. Flyers, example depicted to the left, show that he was a "Resident DJ" and played several times a month.[14]

---

[13]Source: http://www.oaklandghostship.com (last visited December 22, 2016).
[14]Source: http://www.oaklandghostship.com (last visited December 22, 2016).

### D.  PRIOR FIRES AT THE GHOST SHIP AND ADJOINING BUILDINGS

69.  There had been fires inside the Ghost Ship and the adjoining structures prior to December 2, 2016.  The most recent fire occurred the day before, on December 1, 2016, when a refrigerator caught on fire.  That fire was put out by one or more of the persons residing there.

70.  In October 2014, a sofa caught fire outside the main entrance of the Ghost Ship on 31st Avenue and had to be put out by Oakland Fire Department firefighters, who had been hired, trained, supervised and retained by the City of Oakland.

71.  On December 3, 2014, there was a transformer fire in the structure on APN 25-690-10 that was likely caused by the overloading of the electrical power system.

72.  According to former resident, jewelry maker Shelley Mack, there were three fires when she lived there – in late 2014 and early 2015 – caused by faulty electrics.[15]

### E.  THE OWNERS/MANAGERS OF THE GHOST SHIP KNEW ABOUT THE PRIOR FIRES AND RECEIVED PRIOR COMPLAINTS ABOUT THE DANGEROUS ELECTRICAL SYSTEM AND UNSAFE CONDITIONS

73.  In late 2014, CANNON reported the transformer fire in the structure on APN 25-690-10 to KAI NG and EVA NG, and stated that it was likely caused by "catastrophically overloading" the power system.[16]

74.  On December 3, 2014, CANNON sent an invoice to KAI NG and EVA NG for $32,000 worth of electrical work to replace the burnt-out transformer.  In that invoice, CANNON stated that he found that the subpanels (also known as breaker boxes) were not properly installed with grounding and "deferred maintenance dating back decades requiring immediate intervention to avoid additional fires…every piece of wire downstream of main panel (was) improperly installed, illegal and dangerous."[17]  After that fire, CANNON had installed a 25-kilovolt-amp transformer, breakers, distribution panels, conduits and cable boxes.[18]

---

[15] "EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.
[16] "Exclusive:  Ghost Ship owners knew of dangerous electrical system before deadly fire," The Mercury News, by Aaron Davis, Matthias Gafni, Thomas Peele & David Debolt, March 24, 2017.
[17] *Id.*
[18] *Id.*

75.     In an email to KAI NG in January 2015, CANNON wrote about the dangerous electrical infrastructure in the buildings that had not yet been upgraded.  That dangerous infrastructure included the "tiny" transformer in the crawl space above the Boost mobile store because it could not handle the electrical load.  CANNON reported that the existing subpanels and wiring in the crawl space were "grossly unsafe," and recommended $15,000 in electrical upgrades to "get the whole building into a safe state."  He also stated:  "We need a second transformer because the building is split in half power wise, I've already replaced that first transformer (we had no power when it went up in flames), but the second one is too small for the loads on it as well."  KAI NG reportedly "balked" at the costs and the NGS did not do any work to make the electrical system safe.[19]

76.     On February 13, 2015, ALMENA reported to KAI NG that electricity flowed to the Ghost Ship from the adjoining businesses within the block of buildings owned by the NGS (APNs 25-690-10 and 25-690-9) through "ancient and violated lines of distribution" that were "in dire need of a total and immediate upgrade."[20]

77.     On February 15, 2015, KAI NG stated to ALMENA:  "The lack of electrical infrastructure was made very clear before your lease began."[21]

78.     In October 2016, Ghost Ship resident, Max Harris, emailed EVA NG and KAI NG, further warning of the "overexertion" on the electrical system.[22]  Mr. Harris reported to KAI NG that "it was terminal and was getting worse."  KAI NG just asked for more money.[23]

79.     Prior to the December 2, 2016 fire, Zachary "Zeke" Schultz, a former resident of the Ghost Ship and a tenant of the building adjacent to the Ghost Ship, texted and spoke extensively with the NG Defendants regarding people living in the Ghost Ship.  The NGs agreed that this was a problem, and stated that they planned to terminate the lease, which was set to expire in November 2018.

---

[19] Id.
[20] Id.
[21] Id.
[22] Id.
[23] Id.

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 76 of 129

80.     Subtenants and other individuals warned ALMENA that the Ghost Ship was a "death trap" and told him to purchase fire extinguishers.  Former resident, DeL Lee left after a few months because he thought the Ghost Ship was unsafe.  According to Lee:  "I tried to throw a party, and the power would shut off – because of the way it was set up, all the plugs were in the same sockets.  The whole place was wires and cables and wood….It would spark and smell."[24]

81.     Ms. Mack, who lived in one of the recreational vehicles parked inside, reported that she moved out in February 2015, after complaining to ALMENA about the dangerous and unsanitary conditions.[25]

82.     There were numerous complaints made to the City of Oakland, Planning and Building Department, for hazardous and unsafe conditions, including the building being used illegally for residential purposes.  The complaints include, but are not limited to the following:

- April 9, 2014 – a "blight" complaint was filed, with the description:  "Large structures built at property, not strapped down or stable."

- June 4, 2014 – a "blight" complaint was filed, with the description:  "Vacant lot, trash & debris, construction debris, vector issues."

- September 30, 2014 – a "blight" complaint was filed, with the description:  "Pallets, construction materials blocking sidewalk."

- October 7, 2014 – a "habitability" complaint was filed, with the description:  "Constructing house/structure without permits."

- October 8, 2014 – a "habitability" complaint was filed.  A building inspector went to the property and reported that a "structure" had been removed so there was no longer an actionable violation that could be cited.

- November 13, 2016 – a "blight" complaint was filed, with the description:  "There are a ton of garbage piling up on the property on 1305 31st Avenue.

---

[24]"Oakland warehouse fire:  Overloaded electrical system seen as cause," East Bay Times, Matthias Gafni & Thomas Peele, December 12, 2016.
[25]EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.

Also, a lot of items are left on the sidewalk near the property. Some trash was hazardous. This property is a storage but the owner turned it to become trash recycle site. the [sic] yard became a trash collection site and the main building was remodel for residential. The change causes our neighborhood looks very bad and creates health issue."

- November 14, 2016 – a "blight" complaint was filed, with the description: "Illegal interior building structure."

83. The notices of the violations were sent to CHOR NG. EVA NG responded to several notices.

84. The conditions of the Ghost Ship and surrounding properties constituted dangers to human safety and were in violation of local ordinances, including Oakland Municipal Code Sections: 8.24.020D (property inadequately maintained); 8.24.020C (building or structure in a state of disrepair); 8.40.170 (hallway and exit obstructions prohibited); 9.16.060 (lighting-approval of city before energy is supplied); 9.52.030 (permit required for special events); 15.08.050 (maintenance code-general standards); 15.08.190 (habitable space); 15.08.210 (room dimensions); 15.08.220 (light and ventilation); 15.08.240 (security); 15.08.260 (mechanical and electrical systems); 15.08.270 (exiting); 15.08.300 (wooden stairs); 15.08.310 (fire protection); 15.08.320 (smoke detectors); 15.08.340 (substandard and public nuisance buildings); 15.12.100 (CA Fire Code); 15.24.020 (substandard buildings); and 15.64.060 (abatement of security bars on windows).

85. The complaints and code violations unquestionably put the NGs on notice of the illegal, unsafe, residential and event space use of the Ghost Ship and adjoining buildings, dating back to at least 2014, over two years before the fire. The same is true of the Ghost Ship website, which was created over two years ago, and clearly displays the unsafe conditions of the property and its illegal use as an event space/cabaret.

F. **ALLEGATIONS SPECIFIC TO PG&E AND DOES 251 THROUGH 300**

86. When "PG&E" is referenced throughout this Complaint it shall mean to include their officers, directors, agents, employees and independent contractors and DOES 251 through

300, and each of them.

87.     The California Public Utilities Commission ("CPUC") regulates privately owned electric, natural gas, telecommunications, water, railroad, rail transit, and passenger transportation companies.  The CPUC serves the public interest by protecting consumers and ensuring the provision of safe, reliable utility service and infrastructure at just and reasonable rates.

88.     The CPUC process for regulating a franchise, such as that awarded to PG&E, includes the establishment of certain regulations encompassed within, among other things, Rules and Tariffs.  These regulations involve a complex process.  This process utilizes a formal set of procedures ultimately resulting in the issuance of Decisions by the CPUC that are then codified in Rules and obligations that both the public and utility must adhere to.  This process often starts with the CPUC receiving an "Advice Letter" from PG&E.  "Advice Letter" means (1) an informal request by a utility for Commission approval, authorization, or other relief, including an informal request for approval to furnish service under rates, charges, terms or conditions other than those contained in the utility's tariffs then in effect, and (2) a compliance filing by a load-serving entity pursuant to Public Utilities Code Section 380.  The advice letter then proceeds through a regulatory process, and a "Disposition" is reached.

89.     "Disposition" refers to the grant or rejection (including modification) of the relief requested in an advice letter. The disposition of an advice letter will be by resolution adopted by the CPUC, except for (1) an advice letter rejected without prejudice by the reviewing Industry Division pursuant to General Rule 5.3, or (2) an advice letter that is subject to disposition by Industry Division pursuant to General Rule 7.6.1.  If the disposition results in a grant or modification then a Decision is reached and the Rule is so modified and encapsulated with a Rule which is then published and posted through a CPUC Sheet, showing the Rule and revisions.

90.     PG&E owed various duties under statute, regulation and common law, including but not limited to Electric Rules, to the owners and occupants of APNs 25-609-9, 25-609-10 and 25-609-11, their employees, invitees and guests, to provide safe and sufficient power to these facilities.

///

91.     As a California employer, PG&E was required to have an injury and illness prevention program for their employees, which included identifying and evaluating workplace hazards, scheduled periodic inspections to identify unsafe conditions and work practices, and correcting unsafe and unhealthy conditions and work practices in a timely manner.  Cal. Labor Code § 6401.7; see also Section 6400 & 8 C.C.R. 3203.  PG&E's assessment under these California labor laws should have identified the unsafe conditions of its employees working at or near APNs 25-609-9, 25-609-10 and 25-609-11.  PG&E should then have corrected the unsafe conditions and/or prevented its employees from working there before the December 2, 2016 fire.

92.     Pursuant to Cal. Public Utility Code Section 702, every public utility "shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees."

93.     The various state statutes, local ordinances, rules of the CPUC, and standards of reasonable custom and practice, do impose direct and affirmative duties on operators of utilities (including PG&E) for the safety of the public and civil penalties may be assigned against the utility for failure to comply with them, including exemplary damages where warranted.

94.     California Public Utilities Code Section 2106 was in force and effect at all times relevant hereto.  Section 2016 states:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.

95.     At all times relevant hereto, PG&E, pursuant to Electric Rule 16 "Service Extensions" had the right to enter and leave the premises at APNs 25-609-9, 10 & 11 for any purpose connected with the furnishing of electric service (meter reading, inspection, testing,

routine repairs, replacement, maintenance, vegetation management, emergency work, etc.), and the exercise of any and all rights secured to it by law, or under PG&E's tariff schedules.

96.     At all times relevant hereto, Electric Rule 11 "Discontinuance and Restoration of Service" was in force and effect.  PG&E, pursuant to Rule No. 11, including Rules 11(H)(1&2) & (I), Unsafe Apparatus or Condition, had the following rights and obligations:

> H(1) PG&E may deny or terminate service to the customer immediately and without notice when:
> a. PG&E determines that the premises wiring, or other electrical equipment, or the use of either, is unsafe, or endangers PG&E's service facilities; or
> b. The customer threatens to create a hazardous condition; or
> c. Any governmental agency, authorized to enforce laws, ordinances or regulations involving electric facilities and/or the use of electricity, notifies PG&E in writing that the customer's facilities and/or use of electricity is unsafe or not in compliance with applicable laws, ordinances, or regulations
>
> H(2) When relocation or replacement of electric service by PG&E is necessary, the service, including the metering facilities, will be installed in locations mutually acceptable to PG&E and the customer and which conform to current applicable codes, regulations and standards.  If no such mutually acceptable location can be agreed upon, PG&E shall discontinue service until the customer and PG&E reach agreement.
>
> I. SERVICE DETRIMENTAL TO OTHER CUSTOMERS
> PG&E will not supply service to a customer operating equipment which is considered by PG&E to be detrimental to either the service of other PG&E customers or to PG&E.  PG&E will terminate service and refuse to restore to any customer who continues to operate such equipment after receiving notification from PG&E to cease.

97.     PG&E installed several "Smart Meters" in various parts of APNs 25-609-9 and 25-609-10 and in doing so knew or should have known with reasonable diligence that the electrical supply and distribution systems, including but not limited to plugs, wires, breakers, transformers and other power delivery systems were dangerous, defective, out-of-code compliance, and an imminent threat to the health, safety and lives of the owners, occupants, customers and invitees of those structures.  PG&E, however, failed to engage in mandatory or common law duties to demand that the consumers/customers correct, replace and/or repair the facilities, correct, replace or repair said facilities themselves or disconnect them until such time that the facilities were code compliant and/or safe.

98.     Electric Rule 16 also established a duty on behalf of PG&E to safely plan, design and engineer their service extensions.  Rule 16 states, in relevant part, the following:

A. GENERAL
(1) DESIGN. PG&E will be responsible for planning, designing, and engineering its Service Extensions using PG&E's standards for design, materials and construction.

D. RESPONSIBILITIES FOR NEW SERVICE EXTENSIONS
(2) PG&E RESPONSIBILITY
a.     SERVICE, METER, AND TRANSFORMER.  PG&E will furnish, install, own, and maintain the following Service Facilities as applicable after Applicant meets all requirements to receive service:
(4) METERING. When the meter is owned by PG&E, PG&E will be responsible for the necessary instrument transformers where required, test facilities, meters, associated metering equipment, and the metering enclosures when PG&E elects to locate metering equipment at a point that is not accessible to Applicant.
(5) TRANSFORMER. The transformer where required, including any necessary switches, capacitors, electrical protective equipment, etc. When either a pad mounted or overhead transformer is installed on Applicant's Premises, the Service Extension shall include the primary conductors from the connection point at the distribution supply line to the transformer and the secondary conductors, if any, from the transformer to the Service Delivery Point.
d.     GOVERNMENT INSPECTION. PG&E will establish electric service to Applicant following notice from the governmental authority having jurisdiction that the Applicant-owned facilities have been installed and inspected in accordance with any applicable laws, codes, ordinances, rules, or regulations, and are safe to energize.

99.     At all times relevant hereto, Electric Rule 18 "Supply to Separate Premises and Submetering of Electric Energy" was in effect, and PG&E was required to separately meter each premises/facility and or commercial enterprise.  Rule 18 reads in relevant part:

A. SEPARATE METERING
Separate premises, even though owned by the same customer, will not be supplied through the same meter, except as may be specifically provided for in the applicable rate schedule.

C. FURNISHING AND METERING OF ELECTRICITY:
1. RESIDENTIAL SERVICE
PG&E will furnish and meter electricity to each individual residential dwelling unit. . . .
2. NONRESIDENTIAL SERVICE
PG&E will furnish and meter electricity to each individual nonresidential premises or space, except:
a.     Where electricity is furnished under a rate schedule that specifically provides for resale service;

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

b. Where a customer is receiving electricity through a single meter and the cost of electricity is absorbed in the rental for the individual premises or spaces, there is no separate identifiable charge by such customer to the tenants for electricity, and the rent does not vary with electric consumption; or where all of the following conditions are met:
(1) Service is supplied to a high rise building which is owned or managed by a single entity on a single premises; and
(2) Where a master-meter customer installs, owns, and maintains electric submeters on its existing building's distribution system for cost allocation of dynamic pricing and/or conservation incentive purposes the cost of electricity allocated to the commercial building tenants will be billed at the same rate as the master meter billed by PG&E under the CPUC approved rate schedule servicing the master meter.
c. Where, in the sole opinion of PG&E, it is impractical for PG&E to meter individually each premises or space. In such a case, PG&E will meter those premises or spaces that it is practical to meter, if any.
d. Where the Commission has authorized PG&E to supply electric service through a single meter and to furnish service to nonresidential tenants on the same basis as in 1.c. above.

100.    Where submetering was authorized, PG&E had an obligation, pursuant to Rule 18, to monitor, inspect and test such submetering and, if they had done so, they would have seen, upon reasonable inspection, that improper and dangerous use, distribution and delivery of power to APNs 25-609-9, 10 & 11 was occurring.

101.    Rule 18 (D) further reads:
D. TESTING OF SUBMETERS
As a condition of service for submetering, where electric energy is furnished in accordance with Paragraphs C1., C.2., C.3, and C.4 above, customers using submeters as a basis for charges for electricity shall submit to PG&E certification by a meter testing laboratory, satisfactory to PG&E, as to the accuracy of the submeters upon initial installation of such submeters, or for existing submeters upon request of PG&E. As a further condition of service for submetering, the customer shall agree that he will be governed by PG&E's Rule 17, Meter Tests and Adjustment of Bills for Meter Error, with the exception that the word "subcustomer" be substituted for "customer" and the words "Utility's customer" be substituted for "Company." As a further condition of service for submetering, the customer shall agree that PG&E may inspect and examine customer's billing procedures from time to time to determine that such service is made in accordance with this rule or as otherwise may be authorized by the Commission.

102.    The conditions in Rule 18(C)(2)(a)-(d) were never met or applied to APNs 25-609-9, 10 & 11.  PG&E knew or should have known that improper submetering had been, or was being, utilized unlawfully, within said parcels and was, indeed, creating a hazard of fire, injury and death.

103.    In the alternative, had the conditions of Rule 18(C)(2)(a)-(d) been met, PG&E knew or should have known of the unlawful and dangerous manner in which the residents/occupants of APN 25-609-11 were obtaining power from APNs 26-609-9 & 10. PG&E failed to meet its obligations under Rule 18(D). Pursuant to Rule 18(E), PG&E should have either discontinued the service to the submetered customer or, instead, provided a separate service which would have required them to install a new meter and meet all the duties and obligations to do so as set forth elsewhere in this Complaint.

104.    Pursuant to Rule 16, in a building with two or more tenants, or where more than one meter is used on the same premises, the meters should have been grouped at one central location, with each meter position or socket being clearly and permanently marked to indicate the particular unit, occupancy or load supplied by it. The meters located within APNs 25-609-9, 10 & 11 were not marked as required. PG&E did not, with each meter position or socket clearly and permanently mark the particular unit, occupancy or load supplied by it.

105.    At all times relevant hereto, CPUC General Order 95, Section III, at 31.1, was in effect and required electricity providers, such as PG&E, to furnish safe, proper and adequate electrical service.

**G.    THE EVENT ON DECEMBER 2, 2016**

106.    Leading up to and on December 2, 2016, Defendants ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 organized and/or managed the music event at the Ghost Ship as part of "100% Silk West Coast Tour" for SHANAHAN, Chelsea Dolan, also known as Cherushi, and DJ Johnny Igaz, also known as Nackt.[26]

///

///

///

_____

[26]Chelsea Dolan and Johnny Igaz were victims of the fire.

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 84 of 129
IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

107. The music event was heavily promoted, including on social media, by HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 starting a least one month prior to the event. One of the promotional "flyers," which was posted through social media is shown below:[27]



108. Defendants ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 charged an entrance fee of $10 before 11:00 pm and $15 after 11:00 pm to enter the Ghost Ship on December 2, 2016.

109. The promotion and marketing efforts resulted in drawing a large crowd. More than 100 people were reportedly in attendance by 11:15 pm, only about two hours after the doors opened.

---

[27] http://nacktmusic.com (last visited April 12, 2017). See also https://www.evensi.us/golden-donna-100-silk-2016-west-coast-tour-oakland-rave/192392900 (last visited April 12, 2017) (the event was "saved" by 493 people who saw the promotion on this website).

110. Most of the Decedents and Plaintiffs who were injured or damaged as a result of the Ghost Ship fire, purchased a ticket and were at the Ghost Ship on the evening of the December 2, 2016, as a paying patron of the music event.

111. During the music event, one of the Ghost Ship's residents noticed smoke and flames, and called 911 at approximately 11:23 pm, after running outside.

112. After the fire started on December 2, 2016, the interior of the Ghost Ship went dark and patrons were unable to find their way to the only two means of egress: a staircase at the rear of the building, which was hidden behind the performance stage and a makeshift staircase (made of pallets and scrap wood) in the front of the building that patrons had used to access the second floor.

113. Oakland Firehouse No. 13 is within yards from the Ghost Ship – so close that the Ghost Ship is visible from the front of the fire station. Oakland firefighters arrived within four minutes of receiving the first call. At that point, flames had engulfed one wall of the building.

114. The fire and thick, black smoke spread. Many escaped, but thirty-six (36) people were trapped in the inferno inside. They were eventually overcome by the fire and smoke, and subsequently died inside. Photographs of the Ghost Ship on fire with victims trapped inside:[28]



[28]Source 1st Photograph: Allen Wedington, CNN (see http://www.ksbw.com/article/no-cause-yet-in-oakland-warehouse-fire-that-killed-36/8496186 (last visited April 14, 2017)); Source 2nd Photograph: "Photos Ghost Ship Warehouse Fire in Oakland," KGO/ABC 7 News, December 4, 2016.


Case: 19-30088 Doc# 2306-3 Filed: 05/31/19 Entered: 05/31/19 13:27:55 Page 86 of 129



115.    Photograph of the Ghost Ship, the "Death Trap" after the fire:[29]



///

///

///

[29]Source:  "10 Additional Ghost Ship Victims Identified," KGO/ABC 7 News, December 6, 2016.

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST ALL DEFENDANTS, EXCEPT PG&E DEFENDANTS AND DOES 251 THROUGH 300

116.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

117.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 85 and 106-115 of the Complaint, as though fully set forth herein.

118.    At all times mentioned herein, Defendants, and each of them, owned, operated, leased, rented, promoted, sold tickets at, patrolled, secured, built, constructed, developed, designed, engineered, maintained, inspected, repaired, managed, performed at, manufactured, distributed and/or sold materials to, provided utilities and services to, and/or otherwise controlled the Ghost Ship, and the adjacent and surrounding premises, at the time of the incident.

119.    Defendants, and each of them, had a duty to take reasonable steps to eliminate and warn of the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship. Defendants, and each of them, owed a duty to Plaintiffs and Decedents, and to others at the Ghost Ship, to undertake reasonable steps to ensure that the Ghost Ship and adjacent properties were maintained in a safe and usable condition and free of any risks and dangers, and to inspect for and warn against such risks and dangers.  Defendants, and each of them, had a duty to sublessees, renters and residents of the Ghost Ship to maintain the property in a safe and livable condition, by keeping the property free of debris and clutter, following safety procedures, and providing a proper supply of electrical power and life-safety fire prevention measures. Defendants, and each of them, had a duty to employ or contract with personnel at events such as the music show that was held on December 2, 2016, to provide security and to ensure the safety of the Ghost Ship and its visitors during such events.

120.    Defendants, and each of them, had a duty, among other things, to properly own, manage, lease, run, promote, sell tickets at, oversee and/or provide utilities and services to the Ghost Ship; to properly manufacture, distribute and/or sell materials to the Ghost Ship and the adjacent and surrounding premises; to provide adequate and safe means of egress for patrons and

33

invitees; to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; to obtain permits for construction and holding public events; to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; to provide adequate security; to keep the premises safe for patrons and invitees; to have and/or make sure the premises were safely constructed consistent with applicable building codes and construction standards; to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; to have and/or make sure the premises contained a safe and sufficient supply of electrical power; to warn about the dangerous and unsafe conditions; and/or to not falsely imprison patrons and invitees and trap them inside the Ghost Ship during the fire.

121. Defendants, and each of them, negligently and carelessly owned, operated, leased, rented, promoted, sold tickets at, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, manufactured, distributed and/or sold materials to, provided utilities and services to and/or otherwise controlled the Ghost Ship, and the surrounding and adjacent premises, and the music event on December 2, 2016, by, among other things, failing to properly own, manage, lease, run, promote, sell tickets at, oversee and/or provide utilities and services to the Ghost Ship; failing to provide adequate and safe means of egress for patrons and invitees; failing to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; failing to obtain permits for construction and holding public events; failing to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; failing to obtain permits for construction and holding public events; failing to provide adequate security; failing to keep the premises safe for patrons and invitees; failing to have and/or make sure the premises were safely constructed consistent with applicable building codes; failing to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; failing to have and/or make sure the premises contained a safe and sufficient supply of electrical power; failing to warn about the dangerous and unsafe conditions; and/or falsely imprisoning patrons and invitees and trapping them inside during the fire.

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 89 of 129

122.     At all times relevant hereto, Defendants DOES 1 through 250 and 301 through 500, inclusive, and each of them, were somehow responsible for the injuries and damages sustained by Plaintiffs and Decedents, as alleged herein.  Plaintiffs are informed and believe, and thereon allege that each of said Defendants, is negligently or otherwise responsible in some manner for the events and happenings herein referred to and those Defendants negligently acted, or failed to act.  Their negligence and/or failure to act and the dangerous conditions on the subject premises legally caused the injuries and damages hereinafter set forth.

123.     The Defendants were in violation of many codes and statutes as explained above. These violations constitute negligence per se pursuant to Cal. Evid. Code § 669, and were a substantial factor in bringing about Plaintiffs' injuries and damages, and the premature death of 36 victims.

124.     It was reasonably foreseeable that by failing to perform any or all duties set forth herein, the fire would occur during the music event on December 2, 2016.

125.     Prior to the music event on December 2, 2016, Defendants, and each of them, knew and/or had reason to know that the Ghost Ship was in disrepair and had a faulty electrical system and contained life-threatening, dangerous and/or illegal conditions, which could likely result in injury to and death to persons.

126.     The negligence of Defendants, and each of them, was a direct and proximate cause of the subject incident and the injuries and death of Decedents and damages of Plaintiffs.

127.     The acts, omissions and/or negligence of Defendants, and each of them, were a substantial factor in causing Decedents' injuries and resulting death and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

128.     As a further, proximate result of the acts, omissions and negligence of Defendants, and each of them, Plaintiffs have incurred the injuries and damages as set forth herein.

129.     With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations in paragraphs 130 through 137.

130.     Defendants, and each of them, acted with oppression, fraud and/or malice in that, among other things, they acted with a willful and conscious disregard for the rights and safety of Plaintiffs.[30]

131.     Defendants, and each of them, acted with malice, oppression and/or fraud in that, among other things, they acted with a willful and conscious disregard for the rights and safety of the Plaintiffs despite knowing the risk of serious injury or death that could likely result from the unsafe and dangerous condition of the Ghost Ship and surrounding and adjacent premises.

132.     Defendants, and each of them, knew or should have known that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, including but not limited to: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions.  Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, a safe electrical system and/or safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship. Defendants, and each of them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees. Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property.  With respect to those Defendants who presented the Ghost Ship as a music venue, in so presenting, they engaged in fraudulent conduct

---

[30]For this and other causes of action for wrongful death only, no Plaintiff is seeking punitive damages for causes of action brought pursuant to C.C.P. § 377.60, *et seq.* for wrongful death of their decedent.  Said Plaintiffs, however, do seek punitive damages on their survival causes of action brought pursuant to C.C.P. § 377.30, *et seq.*; see the Seventh Cause of Action, *infra.*

intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

133.    Defendants, by themselves and/or through their employees and/or agents, acted with malice in that their despicable conduct was carried on with a willful and conscious disregard of the rights or safety of the Plaintiffs.  The term "malice" includes conduct evincing a conscious disregard of the probability that the defendant's conduct will result in injury to others.  *See Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757.  Defendants' conduct was so vile, base or contemptible that it would be looked down on and despised by reasonable people.

134.    Defendants, by themselves and/or through their employees and/or agents, acted with oppression in that their despicable conduct subjected the Plaintiffs to cruel and unjust hardship in conscious disregard of their rights.  "Oppression" in Civil Code Section 3294 "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  "Conscious disregard" for purposes of proving "oppression" does not require "willful" actions.  Cal. Civ. Code § 3294(c)(2); CACI 3940 & 3941; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1225-1226.

135.    Defendants knew that their despicable conduct, as described herein, would likely and within a high degree of probability cause harm to the Plaintiffs.

136.    The conduct of Defendants, and each of them, as set forth herein, was fraudulent in that each of them engaged in intentional misrepresentation, deceit, or concealment of material facts known to them, including that the premises lacked sufficient and safe electrical system, fire safety measures and a safe means of egress.  That information was fraudulently withheld from the Plaintiffs and Decedents.

137.    Defendants, and each of their employees' and/or agents' egregious conduct, including malice, oppression and fraud, were substantial factors in causing the incident and the Plaintiffs' injuries and/or damages.  An officer, a director, and/or a managing agent of Defendants, and each of them, authorized the employees' or agents' wrongful conduct, and/or adopted, ratified or approved the conduct after it occurred.  An award of punitive damages in a sum according to proof at trial is, therefore, justified, warranted and appropriate under the facts

and circumstances of this case, and to punish or set an example of Defendants and deter such behavior by Defendants and others in the future.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE AGAINST THE PG&E DEFENDANTS AND DOES 251 THROUGH 300

138. Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

139. Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 through 115 of the Complaint, as though fully set forth herein.

140. PG&E and DOES 251 through 300, and each of them, at all times relevant hereto, owned, operated, controlled, managed, leased, loaned, borrowed, bailed and/or maintained electrical equipment that supplied power to the Ghost Ship and the adjoining structures.

141. Defendants had a legal duty to Plaintiffs and Decedents, as foreseeable victims, to exercise the utmost care and diligence in maintaining and operating said electrical equipment so as to not cause or contribute to a fire. Defendants breached that duty by failing to exercise care in their operation and maintenance of said electrical equipment, including, but not limited to, failing to properly monitor and inspect the electrical equipment, failing to properly repair the electrical equipment and failing to comply with applicable safety standards.

142. Defendants owed a duty to Plaintiffs and others to act reasonably in the design, construct, and maintenance of the electrical systems serving APNs 25-609-9, 10 & 11, so as to furnish safe, proper, and adequate electrical service. Pursuant to Rule 11, Defendants owed a duty to abate unsafe apparatus and conditions. Pursuant to Rule 16, Defendants owed a duty to safely plan, design and engineer its service extensions. Pursuant to Rule 18, Defendants owed a duty to supply power safely and through separate meters to APNs 25-609-9, 10 & 11. Under General Order 95, Section III, at 31.1, Defendants owed Plaintiffs a duty to design, construct and maintain the electrical systems serving APNs 25-609-9, 10 & 11, so as to furnish safe, proper and adequate electrical service.

38

143. Defendants, as part of their duty to separately monitor each facility, should have installed a meter at APN 25-609-11 and, in doing so, as part of determining the required load, amperage, phasing and other metrics, would have, pursuant to regulation, standard industry and practice, and common law duty, conducted an inspection and analysis of the facilities and their use, and determined the need for, proposed and actual use of, power and would have conducted an inspection of the existing systems to assure that they were up to code as a new service requires code compliance.

144. Additionally a reasonable utility would have undertaken calculations of power load, voltage, amperage, and other factors and examined the existing transformer, the potential requirement for a new transformer including evaluating the need for a new "vault," panels, breaker, etc.

145. Defendants in meeting their obligations to separately meter would have been required to obtain, from the owner/user, a set of electrical drawings, prepared by a licensed electrical engineer prior to initiating service through the new meter. This would have required a review of the electrical infrastructure of the facilities, enterprises, and parcels to be served which would have revealed – and corrected – the deficiencies prior to service being initiated as it would have called for a plan check, pulling of a permit, inspection, sign-off and/or issuance of a Certificate of Occupancy by the appropriate authorities within the City of Oakland.

146. Defendants, in order to fulfill their legal duties should have conducted an evaluation and analysis of the voltage and amperage, load calculation, transformer requirements, breaker panels, wiring distribution, and needs and usage of the power within APN 25-609-11. Had Defendants done so, as a reasonably prudent utility would have, they would have observed and identified the hazardous and out-of-code conditions within the electrical distribution system which led to the deadly fire, including but not limited to: the overloading of the circuitry in both parcels; the substandard and missing meters; improper submetering; and/or inadequate and defective transformers, wiring, outlets, electrical cords, junction boxes, breaker panels, breakers, and the improper umbilicus of power coming from APN 25-609-10 into APN 25-609-11.

147. The scope of Defendants' duties, if reasonably fulfilled, would have triggered the

need for a permit which, in turn, would have required a city inspector to come and specifically inspect the installation and the other factors referenced above.

148.    As a result of Defendants' failure to meet their duty to provide adequate and appropriate metering, occupants of APN 25-609-11 obtained power from APN 25-609-9 & 10 in a manner which presented a serious risk of an electrical hazard, injury and death to the residents, occupants and/or invitees of APN 25-609-11.

149.    Defendants also failed to meet their duties in the management of the exterior facilities that suppled power to APNs 25-609-9 & 10, including the high voltage overhead power lines and components that powered the buildings. The electrical system as it was delivered to foreseeable users inside the buildings was defective at the point after it passed through the customer's meter and into the buildings.

150.    Defendants breached their various duties, including but not limited to:

- Failing to provide a separate meter for each residence, customer, enterprise and/or facility within APNs 25-609-9, 10 & 11.

- Failing to adequately monitor the power that was supplied to APN 25-609-9, including spikes, surges and/or trouble tickets.

- Failing to obtain appropriate plans, calculations, permits and inspections required to install a new electric service and meter.

- Failing to locate all of the meters for APNs 25-609-9, 10 & 11 at one single location and individually marking them and, instead, locating them haphazardly through the structures in a manner which presented a risk of hazard to the residents, occupants, their guests, employees and invitees of APN 25-609-11.

- Failing to supply a safe, sufficient and reliable source of power for the occupants of APN 25-609-11, their guests, employees and invitees.

- Failing to determine the need for, amount of and distribution of the power within APNs 25-609-9, 10 & 11 in such a manner so as to reduce a risk of hazard, fire, injury and death to the residents, occupants, their guests, employees and invitees.

- Failing to determine and monitor the method and manner in which power was distributed,

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 95 of 129

delivered and consumed within APNs 25-609-9, 10 & 11, such that they failed to obtain the necessary designs, permits, inspections and approvals required before power should have been provided to said parcels.

- Failing to provide the proper transformers, including any necessary switches, capacitors, electrical protective equipment, etc. for the safe delivery and distribution of electricity within APNs 25-609-9, 10 & 11.

- Failing to identify and inspect submeters, the method and manner in which submeters were being installed and operated, and discontinuing service because of defective submeters.

- Failing to discontinue service to APNs 25-609-9, 10 & 11 until such time that the systems and equipment distributing the electricity within said parcels was rendered such that safe, reliable and appropriate electricity could be supplied.

- Failing, while being present in the buildings for the purpose of meter installation and/or reading to observe, recognize and remedy the hazardous, dangerous, and life-threatening conditions and misuse of power or, in the alternative, to disconnect power until the dangers could be rendered safe.

- Failing to discontinue supplying electricity to APNs 25-609-9 & 10 which were operating equipment to the service of other PG&E customers and or individuals who were residents, occupants, their guests, employees and invitees.

- Failing to act as a reasonable electric utility provider under any and all other statutes, regulations, ordinances, or common law.

- Failed to act as a reasonable electric utility provider in the management of the exterior facilities that suppled power to APNs 25-609-9 & 10 because the electrical system as it was delivered to foreseeable users inside the buildings was defective at the point after it passed through the customer's meter and into the buildings.

151.    At all times relevant hereto, Defendants owed the public, including Plaintiffs and Decedents, a duty to be truthful and accurate in their filings and representations made in connection with the delivery, distribution, inspection and maintenance of power to APNs 25-609-9, 10 & 11.  Defendants violated this a duty to be truthful and accurate in their filings and

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

representations made in connection with the delivery, distribution, inspection, maintenance of power to APNs 25-609-9, 10 & 11.

152.     At the time of injury to Plaintiffs and Decedents, there were in force and effect various statutes, laws, regulations, rules and ordinances which were designed to protect Plaintiffs, Decedents and others similarly situated from harm, injury and/or death.  Plaintiffs and Decedents fall within the class of persons these statutes, laws, regulations, rules and ordinances were designed to protect.

153.     Defendants did violate said statutes, laws, regulations, rules and ordinances and a result Plaintiffs and Decedents suffered injury and/or death to their detriment and as a result, the conduct of Defendants constitutes per se negligence under Cal. Evid. Code § 669.

154.     Defendants' breach of the aforementioned duties, and others, was a substantial factor in causing the fire and other conditions which led to the injuries and damages alleged herein.

155.     With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations.  The conduct of Defendants was fraudulent, oppressive and/or malicious as defined under California Civil Code 3294 and/or was ratified by the officers, directors and/or managing agents of Defendants so as to warrant the imposition of punitive damages in an amount to be determined at the time of trial.  Further, Plaintiffs incorporate the foregoing paragraphs 130 through 137 regarding punitive damages herein as though fully set forth.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## THIRD CAUSE OF ACTION FOR PREMISES LIABILITY
## AGAINST ALL DEFENDANTS

156.     Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

157.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation

contained in paragraphs 1 to 128 and 140 to 154 of the Complaint, as though fully set forth herein.

158.     At all times relevant hereto, the Ghost Ship, and adjacent and surrounding premises, were owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, serviced or otherwise controlled by said Defendants, and each of them.

159.     Defendants, and each of them, negligently and carelessly owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, provided utilities and services to and/or otherwise controlled the Ghost Ship, and adjacent and surrounding premises.

160.     Defendants, and each of them, wantonly, recklessly, negligently and carelessly owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, provided utilities and services to and/or otherwise controlled the premises by, among other things, failing to properly own, manage, lease, run, oversee and/or provide services to the Ghost Ship; failing to provide adequate and safe means of egress for patrons and invitees; failing to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; failing to obtain permits for construction and holding public events; failing to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; failing to provide adequate security; failing to keep the premises safe for patrons, invitees and residents; failing to have and/or make sure the premises were safely constructed consistent with applicable building codes; failing to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; failing to have and/or make sure the premises contained a safe and sufficient supply of electrical power; and/or falsely imprisoning patrons, invitees and residents, and trapping them inside the Ghost Ship during the fire.

161.     At all times relevant hereto, the premises contained dangerous and unsafe conditions of which Defendants, and each of them, had actual and/or constructive notice.

162.     The premises were in a dangerous and unsafe condition due to the negligent

discharge of mandatory and nondelegable duties, ownership, leasing, renting, marketing, control, securing, operation, building, construction, engineering, development, design, maintenance, management, inspection, provision of utilities and services to, and/or repair of the premises, including the lack of warnings, visibility and lighting, by said Defendants, and each of them.

163. At all times relevant hereto, Defendants, and each of them, violated state and local laws for safe design, construction, building, maintenance, inspection and repair of the premises.

164. It was reasonably foreseeable that as a result of the negligent and careless ownership, operation, leasing, renting, promoting, patrolling, securing, building, construction, development, design, maintenance, inspection, repair, management, provision of utilities and services to, and/or control of the premises that the life-threatening and dangerous conditions would occur at the Ghost Ship and surrounding and adjacent premises, and cause injury to persons inside and subsequently result in the premature death of 36 victims and injury to many others.

165. As a direct and proximate result of said dangerous and unsafe conditions of the premises, Plaintiffs were caused to sustain injuries and damages as set forth herein.

166. With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 130 through 137 and 155.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## FOURTH CAUSE OF ACTION FOR NEGLIGENT FAILURE TO EVICT
## AGAINST DEFENDANTS CHOR NG, EVA NG, KAI NG
## AND DOES 1 THROUGH 50, INCLUSIVE

167. Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

168. Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 85, 106 to 128 and 158 to 165 of the Complaint, as though fully set forth herein.

44

169.    At all times mentioned herein, Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, leased the premises where the Ghost Ship and the surrounding and adjacent premises were located to Defendants ALMENA, ALLISON, BOUCHARD, LOPEZ, VEGA, CUSTOM O'S and DOES 51 through 150, and each of them, as well as CANNON.

170.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, prior to December 2, 2016, knew and/or had reason to know that the Ghost Ship was unlawfully being used for residential and business purposes and music events, was in disrepair and had a faulty electrical system and contained life-threatening, dangerous and/or illegal conditions which could likely result in injury and death to persons, and had received numerous complaints in the years before December 2, 2016.  Said Defendants, and each of them, knew or reasonably should have known that their lessees, the managers and operators of the Ghost Ship and the surrounding and adjacent premises, were unfit in carrying out their duties and/or incompetent to safely own, operate or manage the Ghost Ship and the surrounding and adjacent premises.

171.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, had a duty to protect patrons and invitees inside the Ghost Ship from the foreseeable life-threatening and dangerous conditions, including fire.  Said Defendants had the duty and responsibility to take reasonable steps to eliminate the risks and dangers posed by the aforementioned activities in and about the premises, including but not limited to, evicting their lessees, who were the managers and operators of the Ghost Ship and surrounding and adjacent premises.  In failing to evict as alleged herein, Defendants failed to perform said duties, and were negligent.

172.    It was reasonably foreseeable that the continued leasing of the Ghost Ship and the surrounding and adjacent premises created a risk to patrons, invitees and residents of the Ghost Ship who were injured as a result of the fire.

173.    As a direct and proximate result of the conduct of said Defendants, Plaintiff suffered injuries and damages as alleged herein.

174.    With respect to the Plaintiffs claiming personal injury and/or property damage

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page
100 of 129

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 130 through 137.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## FIFTH CAUSE OF ACTION FOR NEGLIGENT HIRING, SUPERVISION, TRAINING AND/OR RETENTION AGAINST ALL DEFENDANTS

175. Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

176. Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 128, 140 to 154 and 169 to 173 of the Complaint, as though fully set forth herein.

177. Defendants, and each of them, had a duty of care in the hiring, retention, training and/or supervision of one or more of their employees, contractors or agents.

178. One or more of Defendants' employees, contractors or agents was unfit or incompetent to perform the work for which he or she was hired.

179. Defendants knew or should have known that these employees, contractors or agents were unfit or incompetent and that this unfitness or incompetence created a particular risk of harm to others, including Plaintiffs and Decedents.

180. In failing to exercise reasonable care in the hiring, supervision, training and/or retention of one or more employees, contractors or agents, Defendants, and each of them, breached a duty of care owed to Plaintiffs and Decedents.

181. As a direct and proximate result of the negligence, recklessness, carelessness and other wrongdoing of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

182. With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 130 through 137 and 155.

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 101 of 129

1  WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as
2  set forth herein.

3  **SIXTH CAUSE OF ACTION FOR PUBLIC NUISANCE AGAINST ALL DEFENDANTS**

4      183.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the
5  Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

6      184.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation
7  contained in paragraphs 1 to 128, 140 to 154, 169 to 173 and 177 to 181 of the Complaint, as
8  though fully set forth herein.

9      185.    At all times relevant hereto, Defendants, and each of them:  (1) by failing to act,
10 created a condition that was a blight, harmful to health and/or a fire and/or life-safety hazard; (2)
11 created or maintained a condition that affected a substantial number of people at the same time; (3)
12 that an ordinary person would be reasonably disturbed by the condition; (4) that the seriousness of
13 the harm outweighs the social utility of Defendants' conduct; (5) Plaintiffs and Decedents did not
14 consent to Defendants' conduct; (6) Plaintiffs and Decedents suffered harm to their health and
15 safety, personal injury and/or death, which was different from the type of harm suffered by the
16 general public; and (7) Defendants' conduct was a substantial factor in causing Plaintiffs and
17 Decedents' harm.

18      186.    With respect to the Plaintiffs claiming personal injury and/or property damage
19 associated with a living Plaintiff that was injured and/or sustained property damage as a result of
20 the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive
21 damages allegations contained in paragraphs 130 through 137 and 155.

22      WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as
23 set forth herein.

24  **SEVENTH CAUSE OF ACTION FOR STRICT LIABILITY AGAINST**
25  **DEFENDANTS PG&E AND DOES 251 THROUGH 300**

26      187.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the
27 Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

28      188.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page
102 of 129

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

contained in paragraphs 1 to 115 and 140 to 154 of the Complaint, as though fully set forth herein.

189.   Defendants supplied various products, including but not limited to the electrical system, electrical power, meters, connections, monitoring devices, wiring, etc. (hereinafter "The Products") to APNs 25-609-09 & 10.  In doing so, Defendants placed The Products into the system of commerce in exchange for compensation.

190.   The Products that were delivered to foreseeable users inside the building were defective at the point after they passed through the customer's meter and into the buildings.  The electrical system was defective at its point of delivery inside the building because it did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.  PG&E had, or should have had, knowledge that The Products would be used without inspection for defects for the purposes of obtaining and utilizing electrical power.

191.   Suppliers of electricity are subject to strict liability in tort for personal injuries and deaths caused by delivery of electricity at dangerously high voltage due to defective products, including transformers.  The electrical failure occurred as the electricity entered the meter into APN 25-690-9 and/or APN 25-690-10 where the submeters were placed to determine electrical usage by various tenants.  The Products entered the stream of commerce prior to manifestation of the defect.  Strict liability extends not only in favor of the users and consumers, but also in favor of bystanders such as the Plaintiffs and Decedents herein who were foreseeably present at a location where The Products were being delivered and consumed.

192.   The Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

193.   As a proximate result of The Products' defective condition, Plaintiffs and Decedents, and each of them, were harmed and suffered significant injuries and damages as set forth herein.

194.   The Products' failure to perform safely was a substantial factor in causing Plaintiffs and Decedents' harm.

195.    With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations.  The conduct of Defendants was fraudulent, oppressive and/or malicious as defined under California Civil Code 3294 and/or was ratified by the officers, directors and/or managing agents of Defendants so as to warrant the imposition of punitive damages in an amount to be determined at the time of trial.  Further, Plaintiffs incorporate the foregoing paragraphs 130 through 137 and 155 regarding punitive damages herein as though fully set forth.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## EIGHTH CAUSE OF ACTION – SURVIVAL ACTION
## AGAINST ALL DEFENDANTS

196.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 128, 140 to 154, 169 to 173, 177 to 181, 185 and 189 to 194 of the Complaint, as though fully set forth herein.

197.    At all times relevant hereto, Defendants, and each of them, negligently, carelessly, recklessly and/or unlawfully acted and/or failed to act so as to cause the injuries and subsequent death of the Decedent victims.

198.    Despite their best efforts, Decedents were unable to escape the inferno.  Rather, they remained alive for at least several minutes.  During this time, Decedents experienced profound fear, suffering and overwhelming despair.

199.    Causes of Action One through Seven, therefore, survive the death of Decedents and accordingly pass to the personal representatives of their estates and/or successors-in-interest pursuant to C.C.P. § 377.20.

200.    As a direct and legal result of the wrongful acts and/or omissions of the Defendants, and each of them, on December 2, 2016, and prior to the Decedents' deaths, Decedents suffered personal injuries from smoke inhalation, the roof collapsing and/or other objects burning and/or falling, as well as property damage from their clothes and other belongings

49

being partially or totally destroyed, and incurred expenses for emergency services, rescue efforts, identification and/or removal of Decedents' remains, coroner, funeral and burial expenses.

201.    It was reasonably foreseeable that as a direct and proximate result of the acts, omissions and negligence of Defendants, and each of them, and each of their breach of duties, that Decedents would be injured, then die, and caused to sustain economic damages.

202.    The acts, omissions and/or negligence of Defendants, and each of them, were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

203.    Defendants, and each of them, acted with oppression, fraud and/or malice in that, among other things, they acted with a willful and conscious disregard for the rights and safety of Decedents.

204.    Defendants, and each of them, knew or should have known that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, including, but not limited to: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions.  Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, and safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship.  Defendants, and each of them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees. Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property.  Defendants, and each of them, in presenting the Ghost Ship as a music venue,

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page
105 of 129

engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

205.     Defendants, and each of them, acted with malice, oppression and/or fraud in that, among other things, they acted with a willful and conscious disregard for the rights and safety of the Decedents despite knowing the risk of serious injury or death that could likely result from the unsafe and dangerous condition of the Ghost Ship and surrounding and adjacent premises.

206.     Defendants, by themselves and/or through their employees and/or agents, acted with malice in that their despicable conduct was carried on with a willful and conscious disregard of the rights or safety of the Ghost Ship victims.  The term "malice" includes conduct evincing a conscious disregard of the probability that a defendant's conduct will result in injury to others. *See Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757.  Defendants' conduct was so vile, base or contemptible that it would be looked down on and despised by reasonable people.

207.     Defendants, by themselves and/or through their employees and/or agents, acted with oppression in that their despicable conduct subjected the Decedents to cruel and unjust hardship in conscious disregard of their rights.  "Oppression" in Civil Code Section 3294 "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  "Conscious disregard" for purposes of proving "oppression" does not require "willful" actions.  Cal. Civ. Code § 3294(c)(2); CACI 3940 & 3941; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1225-1226.

208.     Defendants knew that their despicable conduct, as described herein, would likely and within a high degree of probability cause harm to the Decedents.

209.     The conduct of Defendants, and each of them, as set forth herein, was fraudulent in that each of them engaged in intentional misrepresentation, deceit, or concealment of material facts known to them, including that the premises lacked sufficient and safe fire safety measures and a safe means of egress.  That information was fraudulently withheld from the Decedents.

210.     Defendants, and each of their employees' and/or agents' egregious conduct, including malice, oppression and fraud, were substantial factors in causing the incident and the Decedents' injuries and untimely deaths.  An officer, a director, and/or a managing agent of

1    Defendants, and each of them, authorized the employees' or agents' wrongful conduct, and/or
2    adopted, ratified or approved the conduct after it occurred.  An award of punitive damages in a
3    sum according to proof at trial is, therefore, justified, warranted and appropriate under the facts
4    and circumstances of this case.
5          WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set
6    forth herein.

## NINTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL
## DISTRESS AGAINST ALL DEFENDANTS

9          211.    Plaintiffs bring this cause of action for his or her own injuries sustained as a result
10   of the Ghost Ship fire as a direct victim and/or bystander victim.

11         212.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation
12   contained in paragraphs 1 through 195 of the Complaint, as though fully set forth herein.

13         213.    Defendants, and each of them, had a legal duty to Plaintiffs, as foreseeable
14   victims, to exercise reasonable care as set forth herein.  Defendants' breach was the legal and
15   proximate cause of the injuries and damages suffered by Plaintiffs.

16         214.    As a result of the negligent conduct of Defendants, and each of them, Plaintiffs
17   suffered serious emotional distress.  Defendants knew or should have known that Plaintiffs
18   would be harmed and suffer serious emotional distress during and as a result of their acts,
19   omissions, conduct and/or other wrongdoing, and ensuing fire.  Defendants knew or should have
20   known that their conduct would cause serious emotional distress to Plaintiffs and that she or he
21   would be harmed by the fire, causing injuries, death and property damage.  The Defendants'
22   conduct was a substantial factor in causing his or her serious emotional distress.

23         215.    Additionally and/or alternatively, Defendants, and each of them, negligently
24   caused the deaths of Plaintiffs' Decedent as Plaintiffs watched the horrific scene in person, on
25   television or on the internet and/or received text messages or other communications from his or
26   her loved one.  Plaintiffs knew that his or her loved one was trapped inside the burning building.
27   Plaintiffs were aware that his or her loved one was being injured.  The Defendants' conduct was
28   a substantial factor in causing Plaintiffs' serious emotional distress.

216.     Because of the conduct of the Defendants, and each of them, and as a direct and proximate result thereof, Plaintiffs have sustained emotional distress, shock and injury to his or her nervous system, all of which has caused, continues to cause, and will cause physical and mental pain and suffering, all to Plaintiffs' general damage in a sum to be determined at the time of trial.  Plaintiffs suffer and continue to suffer severe emotional distress as a result of the fire, including, but not limited to, anxiety, fear, nervousness, shock, horror and worry.

217.     As a direct and legal result of Defendants' negligence, Plaintiffs were injured physically, emotionally, and/or economically, and/or were in the zone of danger of the fire, and reasonably feared for their lives as they attempted to escape the raging inferno, and/or witnessed close family members sustain serious injury and/or death as they attempted to escape the raging inferno.  As a result, Plaintiffs suffered damages as alleged herein.

218.     Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 130 through 137 and 155.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## TENTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

219.     Plaintiffs bring this cause of action for his or her own injuries sustained as a result of the Ghost Ship fire as a direct victim.

220.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 through 195 of the Complaint, as though fully set forth herein.

221.     Defendants engaged in extreme and outrageous conduct.  Specific examples of Defendants' outrageous conduct include, but are not limited to, knowing that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, Defendants had, among other things: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions. Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, and safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship. Defendants, and each of them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees. Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property. Defendants, and each of them, in presenting the Ghost Ship as a music venue, engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

222. Defendants engaged in the aforementioned outrageous conduct with reckless disregard of the probability that such conduct would result in a fire or similar disaster that would result in severe emotional distress to Plaintiffs.

223. Plaintiffs did in fact suffer severe emotional distress as a result of the fire caused by Defendants' outrageous conduct, as alleged herein.

224. Defendants' outrageous conduct, which led to the devastating fire described herein, was the actual and proximate cause of Plaintiffs' emotional distress.

225. The wrongful acts of Defendants were done maliciously, oppressively, fraudulently, and in conscious disregard of the safety and health of the Plaintiffs.

226. Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 130 through 137 and 155.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

///

///

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 109 of 129

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs generally pray judgment against Defendants:

1.    For compensatory and general damages in an amount according to proof;

2.    For special damages in an amount according to proof;

3.    For punitive damages where allowed by the law;

4.    For pre- and post-judgment interest on all damages as allowed by the law;

5.    For costs of suit incurred herein;

6.    For attorney fees under existing law; and

7.    For such other and further relief as the Court deems just and proper.

Plaintiffs specifically pray judgment against Defendants as set forth in their Notice of Adoption of Master Complaint, filed herewith.

## VII.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:  May 16, 2017                    MARY ALEXANDER & ASSOCIATES, P.C.

By: _____
        Mary E. Alexander, Esq.
        Jennifer L. Fiore, Esq.
        Sophia M. Aslami, Esq.

        *Plaintiffs' Liaison Counsel*

IN RE GHOST SHIP FIRE LITIGATION MASTER COMPLAINT

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**EXHIBIT E**

**QUARTERLY REPORT ON FORM 10-Q, PG&E CORPORATION AND PACIFIC GAS AND ELECTRIC COMPANY, SEPTEMBER 30, 2017**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C., 20549**
**FORM 10-Q**

(Mark One)

[X]   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2017

OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

| Commission File Number | Exact Name of Registrant as Specified in its Charter | State or Other Jurisdiction of Incorporation | IRS Employer Identification Number |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| 1-12609 | PG&E Corporation | California | 94-3234914 |
| 1-2348 | Pacific Gas and Electric Company | California | 94-0742640 |

| | |
|---|---|
| PG&E Corporation | Pacific Gas and Electric Company |
| 77 Beale Street | 77 Beale Street |
| P.O. Box 770000 | P.O. Box 770000 |
| San Francisco, California 94177 | San Francisco, California 94177 |
| _____ | _____ |

Address of principal executive offices, including zip code

| | |
|---|---|
| PG&E Corporation | Pacific Gas and Electric Company |
| (415) 973-1000 | (415) 973-7000 |
| _____ | _____ |

Registrant's telephone number, including area code

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

| | |
|---|---|
| PG&E Corporation: | [X] Yes [ ] No |
| Pacific Gas and Electric Company: | [X] Yes [ ] No |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

| | |
|---|---|
| PG&E Corporation: | [X] Yes [ ] No |
| Pacific Gas and Electric Company: | [X] Yes [ ] No |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| PG&E Corporation: | [X] Large accelerated filer | [ ] Accelerated filer |
| | [ ] Non-accelerated filer (Do not check if a smaller reporting company) | |
| | [ ] Smaller reporting company | [ ] Emerging growth company |
| Pacific Gas and Electric Company: | [ ] Large accelerated filer | [ ] Accelerated filer |
| | [X] Non-accelerated filer (Do not check if a smaller reporting company) | |
| | [ ] Smaller reporting company | [ ] Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

| | |
|---|---|
| PG&E Corporation: | [ ] |
| Pacific Gas and Electric Company: | [ ] |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

| | |
|---|---|
| PG&E Corporation: | [ ] Yes [X] No |

Case: 19-30088   Doc# 2306-3   Filed: 05/31/19   Entered: 05/31/19 13:27:55   Page 112 of 129

Pacific Gas and Electric Company:                                    [  ] Yes [X] No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common stock outstanding as of October 24, 2017:
PG&E Corporation:                                      514,422,806
Pacific Gas and Electric Company:                      264,374,809

**PG&E CORPORATION AND**
**PACIFIC GAS AND ELECTRIC COMPANY**
**FORM 10-Q**
**FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2017**

**TABLE OF CONTENTS**

**GLOSSARY**.................................................................................................................................................4
**PART I. FINANCIAL INFORMATION** .....................................................................................................6
  ITEM 1. CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
  PG&E CORPORATION
    CONDENSED CONSOLIDATED STATEMENTS OF INCOME................................................ 6
    CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME .............. 7
    CONDENSED CONSOLIDATED BALANCE SHEETS ............................................................ 8
    CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS .................................... 10
  PACIFIC GAS AND ELECTRIC COMPANY
    CONDENSED CONSOLIDATED STATEMENTS OF INCOME.............................................. 12
    CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME ............ 13
    CONDENSED CONSOLIDATED BALANCE SHEETS .......................................................... 14
    CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS .................................... 16
  NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)
    NOTE 1: ORGANIZATION AND BASIS OF PRESENTATION........................................... 18
    NOTE 2: SIGNIFICANT ACCOUNTING POLICIES ........................................................... 18
    NOTE 3: REGULATORY ASSETS, LIABILITIES, AND BALANCING ACCOUNTS ........... 24
    NOTE 4: DEBT......................................................................................................................... 25
    NOTE 5: EQUITY .................................................................................................................... 26
    NOTE 6: EARNINGS PER SHARE ........................................................................................ 27
    NOTE 7: DERIVATIVES ......................................................................................................... 27
    NOTE 8: FAIR VALUE MEASUREMENTS ........................................................................... 27
    NOTE 9: CONTINGENCIES AND COMMITMENTS ........................................................... 35
    NOTE 10: SUBSEQUENT EVENTS .................................................................................... 444
  ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
  RESULTS OF OPERATIONS
    OVERVIEW .............................................................................................................................. 46
    RESULTS OF OPERATIONS .................................................................................................. 51
    LIQUIDITY AND FINANCIAL RESOURCES........................................................................ 55
    ENFORCEMENT AND LITIGATION MATTERS .................................................................. 59
    REGULATORY MATTERS ...................................................................................................... 59
    FEDERAL INITIATIVES ......................................................................................................... 66
    ENVIRONMENTAL MATTERS .............................................................................................. 66
    CONTRACTUAL COMMITMENTS ........................................................................................ 67
    RISK MANAGEMENT ACTIVITIES ...................................................................................... 67
    CRITICAL ACCOUNTING POLICIES .................................................................................. 67
    ACCOUNTING STANDARDS ISSUED BUT NOT YET ADOPTED...................................... 67
    FORWARD-LOOKING STATEMENTS .................................................................................. 67
  ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
  ITEM 4. CONTROLS AND PROCEDURES
**PART II. OTHER INFORMATION**........................................................................................................73
  ITEM 1. LEGAL PROCEEDINGS
  ITEM 1A. RISK FACTORS
  ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS
  ITEM 5. OTHER INFORMATION
  ITEM 6. EXHIBITS
  SIGNATURES

# GLOSSARY

The following terms and abbreviations appearing in the text of this report have the meanings indicated below.

| | |
|---|---|
| 2016 Form 10-K | PG&E Corporation and Pacific Gas and Electric Company's combined Annual Report on Form 10-K for the year ended December 31, 2016 |
| AFUDC | allowance for funds used during construction |
| ALJ | administrative law judge |
| ARO | asset retirement obligation |
| ASU | accounting standard update issued by the FASB (see below) |
| CAISO | California Independent System Operator |
| Cal Fire | California Department of Forestry and Fire Protection |
| CARB | California Air Resources Board |
| CCA | Community Choice Aggregator |
| CEC | California Energy Resources Conservation and Development Commission |
| $CO_2$ | carbon dioxide |
| CEMA | Catastrophic Event Memorandum Account |
| CP | cathodic protection |
| CPUC | California Public Utilities Commission |
| CRRs | congestion revenue rights |
| DER | distributed energy resources |
| DIDF | Distribution Investment Deferral Framework |
| Diablo Canyon | Diablo Canyon nuclear power plant |
| DOGGR | Division of Oil, Gas, and Geothermal Resources |
| DOI | U.S. Department of the Interior |
| DRP | electric distribution resources plan |
| DTSC | Department of Toxic Substances Control |
| EDA | equity distribution agreement |
| EPS | earnings per common share |
| EV | electric vehicle |
| FASB | Financial Accounting Standards Board |
| FERC | Federal Energy Regulatory Commission |
| GAAP | U.S. Generally Accepted Accounting Principles |
| GHG | greenhouse gas |
| GRC | general rate case |
| GT&S | gas transmission and storage |
| IOU(s) | investor-owned utility(ies) |
| IRS | Internal Revenue Service |
| MD&A | Management's Discussion and Analysis of Financial Condition and Results of Operations set forth in Item 2, of this Form 10-Q |
| NAV | net asset value |
| NDCTP | Nuclear Decommissioning Cost Triennial Proceedings |
| NEIL | Nuclear Electric Insurance Limited |
| NERC | North American Electric Reliability Corporation |
| NRC | Nuclear Regulatory Commission |
| OES | State of California Office of Emergency Services |
| OII | order instituting investigation |
| OIR | order instituting rulemaking |
| ORA | Office of Ratepayer Advocates |
| PCIA | Power Charge Indifference Adjustment |
| PD | proposed decision |
| PFM | petition for modification |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |

| | |
|---|---|
| ROE | return on equity |
| SEC | U.S. Securities and Exchange Commission |
| SED | Safety and Enforcement Division of the CPUC |
| TE | transportation electrification |
| TO | transmission owner |
| TURN | The Utility Reform Network |
| Utility | Pacific Gas and Electric Company |
| VIE(s) | variable interest entity(ies) |
| WEMA | Wildfire Expense Memorandum Account |
| Westinghouse | Westinghouse Electric Company, LLC |

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**

| | (Unaudited) | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| (in millions, except per share amounts) | 2017 | 2016 | 2017 | 2016 |
| **Operating Revenues** | | | | |
| Electric | $ 3,648 | $ 3,994 | $ 10,036 | $ 10,590 |
| Natural gas | 869 | 816 | 2,999 | 2,363 |
| **Total operating revenues** | **4,517** | **4,810** | **13,035** | **12,953** |
| **Operating Expenses** | | | | |
| Cost of electricity | 1,466 | 1,613 | 3,436 | 3,719 |
| Cost of natural gas | 78 | 80 | 524 | 377 |
| Operating and maintenance | 1,364 | 1,783 | 4,414 | 5,631 |
| Depreciation, amortization, and decommissioning | 710 | 694 | 2,134 | 2,090 |
| **Total operating expenses** | **3,618** | **4,170** | **10,508** | **11,817** |
| **Operating Income** | **899** | **640** | **2,527** | **1,136** |
| Interest income | 9 | 8 | 22 | 17 |
| Interest expense | (220) | (211) | (663) | (621) |
| Other income, net | 25 | 24 | 59 | 74 |
| **Income Before Income Taxes** | **713** | **461** | **1,945** | **606** |
| Income tax provision (benefit) | 160 | 70 | 403 | (105) |
| **Net Income** | **553** | **391** | **1,542** | **711** |
| Preferred stock dividend requirement of subsidiary | 3 | 3 | 10 | 10 |
| **Income Available for Common Shareholders** | **$ 550** | **$ 388** | **$ 1,532** | **$ 701** |
| **Weighted Average Common Shares Outstanding, Basic** | **513** | **501** | **511** | **497** |
| **Weighted Average Common Shares Outstanding, Diluted** | **516** | **503** | **514** | **500** |
| **Net Earnings Per Common Share, Basic** | **$ 1.07** | **$ 0.77** | **$ 3.00** | **$ 1.41** |
| **Net Earnings Per Common Share, Diluted** | **$ 1.07** | **$ 0.77** | **$ 2.98** | **$ 1.40** |
| **Dividends Declared Per Common Share** | **$ 0.53** | **$ 0.49** | **$ 1.55** | **$ 1.44** |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | (Unaudited) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| (in millions) | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Net Income | $ 553 | $ 391 | $ 1,542 | $ 711 |
| Other Comprehensive Income | | | | |
| Pension and other postretirement benefit plans obligations | | | | |
| (net of taxes of $0, $0, $0 and $0, at respective dates) | - | - | 1 | - |
| Total other comprehensive income (loss) | - | - | 1 | - |
| Comprehensive Income | 553 | 391 | 1,543 | 711 |
| Preferred stock dividend requirement of subsidiary | 3 | 3 | 10 | 10 |
| Comprehensive Income Attributable to | | | | |
| Common Shareholders | $ 550 | $ 388 | $ 1,533 | $ 701 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| (in millions) | (Unaudited) Balance At September 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | $ | 191 | $ | 177 |
| Restricted cash | | 7 | | 7 |
| Accounts receivable: | | | | |
| Customers (net of allowance for doubtful accounts of $58 at both periods) | | 1,368 | | 1,252 |
| Accrued unbilled revenue | | 972 | | 1,098 |
| Regulatory balancing accounts | | 1,478 | | 1,500 |
| Other | | 992 | | 801 |
| Regulatory assets | | 573 | | 423 |
| Inventories: | | | | |
| Gas stored underground and fuel oil | | 138 | | 117 |
| Materials and supplies | | 360 | | 346 |
| Income taxes receivable | | 25 | | 160 |
| Other | | 279 | | 283 |
| **Total current assets** | | **6,383** | | **6,164** |
| **Property, Plant, and Equipment** | | | | |
| Electric | | 54,148 | | 52,556 |
| Gas | | 18,938 | | 17,853 |
| Construction work in progress | | 2,421 | | 2,184 |
| Other | | 2 | | 2 |
| **Total property, plant, and equipment** | | **75,509** | | **72,595** |
| Accumulated depreciation | | (22,986) | | (22,014) |
| **Net property, plant, and equipment** | | **52,523** | | **50,581** |
| **Other Noncurrent Assets** | | | | |
| Regulatory assets | | 8,546 | | 7,951 |
| Nuclear decommissioning trusts | | 2,793 | | 2,606 |
| Income taxes receivable | | 52 | | 70 |
| Other | | 1,229 | | 1,226 |
| **Total other noncurrent assets** | | **12,620** | | **11,853** |
| **TOTAL ASSETS** | $ | **71,526** | $ | **68,598** |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| (in millions, except share amounts) | (Unaudited) Balance At September 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| **LIABILITIES AND EQUITY** | | | | |
| **Current Liabilities** | | | | |
| Short-term borrowings | $ | 869 | $ | 1,516 |
| Long-term debt, classified as current | | 700 | | 700 |
| Accounts payable: | | | | |
| Trade creditors | | 1,419 | | 1,495 |
| Regulatory balancing accounts | | 1,328 | | 645 |
| Other | | 483 | | 433 |
| Disputed claims and customer refunds | | 240 | | 236 |
| Interest payable | | 163 | | 216 |
| Other | | 2,271 | | 2,323 |
| **Total current liabilities** | | **7,473** | | **7,564** |
| **Noncurrent Liabilities** | | | | |
| Long-term debt | | 16,619 | | 16,220 |
| Regulatory liabilities | | 7,265 | | 6,805 |
| Pension and other postretirement benefits | | 2,707 | | 2,641 |
| Asset retirement obligations | | 4,758 | | 4,684 |
| Deferred income taxes | | 11,085 | | 10,213 |
| Other | | 2,333 | | 2,279 |
| **Total noncurrent liabilities** | | **44,767** | | **42,842** |
| **Commitments and Contingencies (Note 9)** | | | | |
| **Equity** | | | | |
| **Shareholders' Equity** | | | | |
| Common stock, no par value, authorized 800,000,000 shares; 513,773,072 and 506,891,874 shares outstanding at respective dates | | 12,560 | | 12,198 |
| Reinvested earnings | | 6,482 | | 5,751 |
| Accumulated other comprehensive loss | | (8) | | (9) |
| **Total shareholders' equity** | | **19,034** | | **17,940** |
| **Noncontrolling Interest - Preferred Stock of Subsidiary** | | 252 | | 252 |
| **Total equity** | | **19,286** | | **18,192** |
| **TOTAL LIABILITIES AND EQUITY** | $ | **71,526** | $ | **68,598** |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | (Unaudited) | | |
|---|---|---|---|---|
| | | Nine Months Ended September 30, | | |
| (in millions) | | 2017 | | 2016 |
| **Cash Flows from Operating Activities** | | | | |
| Net income | $ | 1,542 | $ | 711 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation, amortization, and decommissioning | | 2,134 | | 2,090 |
| Allowance for equity funds used during construction | | (63) | | (84) |
| Deferred income taxes and tax credits, net | | 848 | | 644 |
| Disallowed capital expenditures | | 47 | | 517 |
| Other | | 204 | | 293 |
| Effect of changes in operating assets and liabilities: | | | | |
| Accounts receivable | | (58) | | (283) |
| Butte-related insurance receivable | | (166) | | (263) |
| Inventories | | (35) | | (38) |
| Accounts payable | | 76 | | 189 |
| Butte-related third-party claims | | 12 | | 321 |
| Income taxes receivable/payable | | 135 | | (63) |
| Other current assets and liabilities | | 23 | | (32) |
| Regulatory assets, liabilities, and balancing accounts, net | | (30) | | (634) |
| Other noncurrent assets and liabilities | | 68 | | (85) |
| **Net cash provided by operating activities** | | **4,737** | | **3,283** |
| **Cash Flows from Investing Activities** | | | | |
| Capital expenditures | | (3,938) | | (4,128) |
| Decrease in restricted cash | | - | | 66 |
| Proceeds from sales and maturities of nuclear decommissioning trust investments | | 1,043 | | 1,019 |
| Purchases of nuclear decommissioning trust investments | | (1,071) | | (1,050) |
| Other | | 16 | | 10 |
| **Net cash used in investing activities** | | **(3,950)** | | **(4,083)** |
| **Cash Flows from Financing Activities** | | | | |
| Net issuances (repayments) of commercial paper, net of discount of $4 and $5 at respective dates | | (652) | | (128) |
| Short-term debt financing | | 250 | | 250 |
| Short-term debt matured | | (250) | | - |
| Proceeds from issuance of long-term debt, net of discount and issuance costs of $11 and $6 at respective dates | | 734 | | 594 |
| Long-term debt matured or repurchased | | (345) | | - |
| Common stock issued | | 345 | | 727 |
| Common stock dividends paid | | (754) | | (678) |
| Other | | (101) | | (17) |
| **Net cash provided by (used in) financing activities** | | **(773)** | | **748** |
| **Net change in cash and cash equivalents** | | **14** | | **(52)** |
| **Cash and cash equivalents at January 1** | | **177** | | **123** |
| **Cash and cash equivalents at September 30** | $ | **191** | $ | **71** |

| | | | | |
|---|---|---:|---|---:|
| **Supplemental disclosures of cash flow information** | | | | |
| Cash received (paid) for: | | | | |
| Interest, net of amounts capitalized | $ | (644) | $ | (611) |
| Income taxes, net | | 158 | | 154 |
| **Supplemental disclosures of noncash investing and financing activities** | | | | |
| Common stock dividends declared but not yet paid | $ | 272 | $ | 248 |
| Capital expenditures financed through accounts payable | | 301 | | 325 |
| Noncash common stock issuances | | 16 | | 15 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PACIFIC GAS AND ELECTRIC COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**

| | | | | | | | | (Unaudited) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| (in millions) | 2017 | | 2016 | | 2017 | | 2016 | |
| **Operating Revenues** | | | | | | | | |
| Electric | $ | 3,647 | $ | 3,993 | $ | 10,038 | $ | 10,590 |
| Natural gas | | 869 | | 816 | | 2,999 | | 2,363 |
| **Total operating revenues** | | **4,516** | | **4,809** | | **13,037** | | **12,953** |
| **Operating Expenses** | | | | | | | | |
| Cost of electricity | | 1,466 | | 1,613 | | 3,436 | | 3,719 |
| Cost of natural gas | | 78 | | 80 | | 524 | | 377 |
| Operating and maintenance | | 1,428 | | 1,782 | | 4,477 | | 5,630 |
| Depreciation, amortization, and decommissioning | | 710 | | 694 | | 2,134 | | 2,090 |
| **Total operating expenses** | | **3,682** | | **4,169** | | **10,571** | | **11,816** |
| **Operating Income** | | **834** | | **640** | | **2,466** | | **1,137** |
| Interest income | | 10 | | 8 | | 22 | | 16 |
| Interest expense | | (217) | | (209) | | (655) | | (614) |
| Other income, net | | 24 | | 23 | | 52 | | 68 |
| **Income Before Income Taxes** | | **651** | | **462** | | **1,885** | | **607** |
| Income tax provision (benefit) | | 138 | | 73 | | 394 | | (99) |
| **Net Income** | | **513** | | **389** | | **1,491** | | **706** |
| Preferred stock dividend requirement | | 3 | | 3 | | 10 | | 10 |
| **Income Available for Common Stock** | $ | **510** | $ | **386** | $ | **1,481** | $ | **696** |

See accompanying Notes to the Condensed Consolidated Financial Statements.

Case: 19-30088    Doc# 2306-3    Filed: 05/31/19    Entered: 05/31/19 13:27:55    Page 12
123 of 129

**PACIFIC GAS AND ELECTRIC COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | (Unaudited) | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| (in millions) | 2017 | 2016 | 2017 | 2016 |
| Net Income | $ 513 | $ 389 | $ 1,491 | $ 706 |
| Other Comprehensive Income | | | | |
| Pension and other postretirement benefit plans obligations (net of taxes of $0, $0, $0 and $0, at respective dates ) | - | - | 1 | 1 |
| Total other comprehensive income (loss) | - | - | 1 | 1 |
| Comprehensive Income | $ 513 | $ 389 | $ 1,492 | $ 707 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PACIFIC GAS AND ELECTRIC COMPANY**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

|  | (Unaudited) | |
|---|---|---|
|  | Balance At | |
| (in millions) | September 30, 2017 | December 31, 2016 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 70 | $ 71 |
| Restricted cash | 7 | 7 |
| Accounts receivable: | | |
| Customers (net of allowance for doubtful accounts of $58 at both periods) | 1,368 | 1,252 |
| Accrued unbilled revenue | 972 | 1,098 |
| Regulatory balancing accounts | 1,478 | 1,500 |
| Other | 992 | 801 |
| Regulatory assets | 573 | 423 |
| Inventories: | | |
| Gas stored underground and fuel oil | 138 | 117 |
| Materials and supplies | 360 | 346 |
| Income taxes receivable | 24 | 159 |
| Other | 279 | 282 |
| **Total current assets** | **6,261** | **6,056** |
| **Property, Plant, and Equipment** | | |
| Electric | 54,148 | 52,556 |
| Gas | 18,938 | 17,853 |
| Construction work in progress | 2,421 | 2,184 |
| **Total property, plant, and equipment** | **75,507** | **72,593** |
| Accumulated depreciation | (22,984) | (22,012) |
| **Net property, plant, and equipment** | **52,523** | **50,581** |
| **Other Noncurrent Assets** | | |
| Regulatory assets | 8,546 | 7,951 |
| Nuclear decommissioning trusts | 2,793 | 2,606 |
| Income taxes receivable | 52 | 70 |
| Other | 1,104 | 1,110 |
| **Total other noncurrent assets** | **12,495** | **11,737** |
| **TOTAL ASSETS** | $ 71,279 | $ 68,374 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PACIFIC GAS AND ELECTRIC COMPANY**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | (Unaudited) | |
| | Balance At | |
| (in millions, except share amounts) | September 30, 2017 | December 31, 2016 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current Liabilities** | | |
| Short-term borrowings | $ 869 | $ 1,516 |
| Long-term debt, classified as current | 700 | 700 |
| Accounts payable: | | |
| Trade creditors | 1,419 | 1,494 |
| Regulatory balancing accounts | 1,328 | 645 |
| Other | 502 | 453 |
| Disputed claims and customer refunds | 240 | 236 |
| Interest payable | 163 | 214 |
| Other | 1,999 | 2,072 |
| **Total current liabilities** | **7,220** | **7,330** |
| **Noncurrent Liabilities** | | |
| Long-term debt | 16,270 | 15,872 |
| Regulatory liabilities | 7,265 | 6,805 |
| Pension and other postretirement benefits | 2,612 | 2,548 |
| Asset retirement obligations | 4,758 | 4,684 |
| Deferred income taxes | 11,377 | 10,510 |
| Other | 2,279 | 2,230 |
| **Total noncurrent liabilities** | **44,561** | **42,649** |
| **Commitments and Contingencies (Note 9)** | | |
| **Shareholders' Equity** | | |
| Preferred stock | 258 | 258 |
| Common stock, $5 par value, authorized 800,000,000 shares; | | |
| 264,374,809 shares outstanding at respective dates | 1,322 | 1,322 |
| Additional paid-in capital | 8,455 | 8,050 |
| Reinvested earnings | 9,460 | 8,763 |
| Accumulated other comprehensive income | 3 | 2 |
| **Total shareholders' equity** | **19,498** | **18,395** |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **$ 71,279** | **$ 68,374** |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**PACIFIC GAS AND ELECTRIC COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | (Unaudited) | |
|---|---|---|
| | Nine Months Ended September 30, | |
| (in millions) | 2017 | 2016 |
| **Cash Flows from Operating Activities** | | |
| Net income | $ 1,491 | $ 706 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation, amortization, and decommissioning | 2,134 | 2,090 |
| Allowance for equity funds used during construction | (63) | (84) |
| Deferred income taxes and tax credits, net | 848 | 648 |
| Disallowed capital expenditures | 47 | 517 |
| Other | 196 | 234 |
| Effect of changes in operating assets and liabilities: | | |
| Accounts receivable | (58) | (283) |
| Butte-related insurance receivable | (166) | (263) |
| Inventories | (35) | (38) |
| Accounts payable | 76 | 194 |
| Butte-related third-party claims | 12 | 321 |
| Income taxes receivable/payable | 135 | (64) |
| Other current assets and liabilities | 36 | (28) |
| Regulatory assets, liabilities, and balancing accounts, net | (30) | (634) |
| Other noncurrent assets and liabilities | 69 | (75) |
| **Net cash provided by operating activities** | **4,692** | **3,241** |
| **Cash Flows from Investing Activities** | | |
| Capital expenditures | (3,938) | (4,128) |
| Decrease in restricted cash | - | 66 |
| Proceeds from sales and maturities of nuclear decommissioning trust investments | 1,043 | 1,019 |
| Purchases of nuclear decommissioning trust investments | (1,071) | (1,050) |
| Other | 16 | 10 |
| **Net cash used in investing activities** | **(3,950)** | **(4,083)** |
| **Cash Flows from Financing Activities** | | |
| Net issuances (repayments) of commercial paper, net of discount of $4 and $5 at respective dates | (652) | (293) |
| Short-term debt financing | 250 | 250 |
| Short-term debt matured | (250) | - |
| Proceeds from issuance of long-term debt, net of discount and issuance costs of $11 and $6 at respective dates | 734 | 594 |
| Long-term debt matured or repurchased | (345) | - |
| Preferred stock dividends paid | (10) | (10) |
| Common stock dividends paid | (784) | (423) |
| Equity contribution from PG&E Corporation | 405 | 740 |
| Other | (91) | (7) |
| **Net cash provided by (used in) financing activities** | **(743)** | **851** |
| **Net change in cash and cash equivalents** | **(1)** | **9** |
| **Cash and cash equivalents at January 1** | **71** | **59** |
| **Cash and cash equivalents at September 30** | **$ 70** | **$ 68** |

**Supplemental disclosures of cash flow information**

| | | | | |
|---|---|---|---|---|
| Cash received (paid) for: | | | | |
| Interest, net of amounts capitalized | $ | (636) | $ | (602) |
| Income taxes, net | | 158 | | 151 |

**Supplemental disclosures of noncash investing and financing activities**

| | | | | |
|---|---|---|---|---|
| Common stock dividends declared but not yet paid | $ | - | $ | 244 |
| Capital expenditures financed through accounts payable | | 301 | | 325 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

## NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

### NOTE 1: ORGANIZATION AND BASIS OF PRESENTATION

PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company, a public utility serving northern and central California. The Utility generates revenues mainly through the sale and delivery of electricity and natural gas to customers. The Utility is primarily regulated by the CPUC and the FERC. In addition, the NRC oversees the licensing, construction, operation, and decommissioning of the Utility's nuclear generation facilities.

This quarterly report on Form 10-Q is a combined report of PG&E Corporation and the Utility. PG&E Corporation's Condensed Consolidated Financial Statements include the accounts of PG&E Corporation, the Utility, and other wholly owned and controlled subsidiaries. The Utility's Condensed Consolidated Financial Statements include the accounts of the Utility and its wholly owned and controlled subsidiaries. All intercompany transactions have been eliminated in consolidation. The Notes to the Condensed Consolidated Financial Statements apply to both PG&E Corporation and the Utility. PG&E Corporation and the Utility assess financial performance and allocate resources on a consolidated basis (i.e., the companies operate in one segment).

The accompanying Condensed Consolidated Financial Statements have been prepared in conformity with GAAP and in accordance with the interim period reporting requirements of Form 10-Q and reflect all adjustments (consisting only of normal recurring adjustments) that management believes are necessary for the fair presentation of PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows for the periods presented. The information at December 31, 2016 in the Condensed Consolidated Balance Sheets included in this quarterly report was derived from the audited Consolidated Balance Sheets in the 2016 Form 10-K. This quarterly report should be read in conjunction with the 2016 Form 10-K.

The preparation of financial statements in conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and the disclosure of contingent assets and liabilities. Some of the more significant estimates and assumptions relate to the Utility's regulatory assets and liabilities, legal and regulatory contingencies, insurance recoveries, environmental remediation liabilities, AROs, and pension and other postretirement benefit plans obligations. Management believes that its estimates and assumptions reflected in the Condensed Consolidated Financial Statements are appropriate and reasonable. A change in management's estimates or assumptions could result in an adjustment that would have a material impact on PG&E Corporation's and the Utility's financial condition and results of operations during the period in which such change occurred.

Beginning on October 8, 2017, multiple wildfires spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City (the "Northern California wildfires"). According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the wildfires, there were 21 major wildfires in California that, in total, burned over 245,000 acres, resulted in 43 fatalities, and destroyed an estimated 8,900 structures. The causes of these fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities. See Note 10 below.

### NOTE 2: SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies used by PG&E Corporation and the Utility are discussed in Note 2 of the Notes to the Consolidated Financial Statements in the 2016 Form 10-K.

#### Variable Interest Entities

A VIE is an entity that does not have sufficient equity at risk to finance its activities without additional subordinated financial support from other parties, or whose equity investors lack any characteristics of a controlling financial interest. An enterprise that has a controlling financial interest in a VIE is a primary beneficiary and is required to consolidate the VIE.