G. LARRY ENGEL (SBN 53484)
**ENGEL LAW, P.C.**
12116 Horseshoe Lane
Nevada City, CA 95959
Phone: 415.370.5943
Email: larry@engeladvice.com

MARK GORTON (SBN 099312)
THOMAS G. MOUZES (SBN 099446)
**BOUTIN JONES INC.**
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: 916.321.4444
Fax:    916.441.7597
Email: mgorton@boutinjones.com

JESSICA R. MULLAN (SBN 263435)
General Counsel
**SONOMA CLEAN POWER AUTHORITY**
50 Santa Rosa Avenue, Fifth Floor
Santa Rosa, CA 95404
Phone: 707.890.8485
Email: jmullan@sonomacleanpower.org

*Attorneys for Creditor and Party-in-Interest*
*SONOMA CLEAN POWER AUTHORITY*

*Additional Community Choice Aggregators and their counsel*
*are identified on the following pages.*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case Nos. 19-30088 DM (Lead Case) |
| | 19-30089 DM |
| PG&E CORPORATION | |
| | Chapter 11 |
| -and- | Jointly Administered |
| PACIFIC GAS AND ELECTRIC | **SONOMA CLEAN POWER AUTHORITY'S** |
| COMPANY | **LIMITED OBJECTION TO DEBTOR'S BAR** |
| Debtors. | **DATE MOTION** (Dkt. 1784) |
| ☐ Affects PG&E Corporation | Date:         June 11, 2019 |
| | Time:         9:30 a.m. |
| ☐ Affects Pacific Gas and Electric Company | Courtroom: 17 |
| | Place:        450 Golden Gate Ave., 16th Floor |
| ☑ Affects both Debtors. | San Francisco, CA 94102 |
| | Judge:        Hon. Dennis Montali |
| * All papers shall be filed in the Lead Case | Objection Deadline: May 31, 2019 |
| No. 19-30088 DM | Appearance counsel: G. Larry Engel |

1    HARRIET A. STEINER (SBN 109436)

2    **BEST BEST & KRIEGER LLP**
500 Capitol Mall, Suite 1700

3    Sacramento, CA 95814
Telephone: 916.325.4000

4    Email: harriet.steiner@bbklaw.com

5    *Attorney for Creditor and Party-in-Interest*
*VALLEY CLEAN ENERGY ALLIANCE*

6

7    NANCY DIAMOND, ESQ. (SBN 130963)
**LAW OFFICES OF NANCY DIAMOND**

8    822 G. Street, Suite 3
Arcata, CA 95521

9    Telephone: (707) 826-8540
Facsimile: (707) 826-8541

10    Email: ndiamond@ndiamondlaw.com

11    *Attorney for Creditor and Party-in-Interest*
*REDWOOD COAST ENERGY AUTHORITY*

12

13    CLIFFORD W. STEVENS (SBN 148918)
**NEUMILLER & BEARDSLEE**

14    3121 W. March Lane, Suite 100
Stockton, CA 95219

15    P.O. Box 20
Stockton, CA 95201

16    Telephone: 209.948.8200
Email: cstevens@neumiller.com

17

18    *Attorney for Creditor and Party-in-Interest*
*PIONEER COMMUNITY ENERGY*

19    JUSTIN E. RAWLINS (SBN 209915)

20    **WINSTON & STRAWN LLP**
333 S. Grand Avenue, 38th Floor

21    Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

22    Facsimile: (213) 615-1750

23    *Attorney for Creditor and Party-in-Interest*
*PENINSULA CLEAN ENERGY AUTHORITY*

24    DAVID NEIER (*admitted pro hac vice*)

25    **WINSTON & STRAWN LLP**
200 Park Avenue

26    New York, NY 10166-4193
Telephone: (212) 294-5318

27    Email: dneier@winston.com

28    *Attorney for Creditor and Party-in-Interest*
*PENINSULA CLEAN ENERGY AUTHORITY*

1  INDER KHALSA (SBN 222328)
   **RICHARDS, WATSON & GERSHON**
2  44 Montgomery Street, Suite 3800
   Telephone: (415) 421-8484
3  Email: ikhalsa@rwglaw.com

4
   *Attorney(s) for Creditor and Party-in-Interest*
5  *EAST BAY COMMUNITY ENERGY*

6
   GREGORY W. STEPANICICH (SBN 78317)
7  **RICHARDS, WATSON & GERSHON**
   44 Montgomery Street, Suite 3800
8  Telephone: (415) 421-8484
   Email: gstepanicich@rwglaw.com
9
   *Attorney(s) for Creditor and Party-in-Interest*
10 *SILICON VALLEY CLEAN ENERGY AUTHORITY*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I. SUMMARY OF LIMITED OBJECTION ..................................................................................... 1

II. BACKGROUND.......................................................................................................................... 4

    A.    The Role Of SCPA and CCAs in California Energy Markets ...................................... 4

    B.    CCA Service Agreements and Other Contracts with PG&E ........................................ 5

III. LIMITED OBJECTION ............................................................................................................ 6

    A.    The Motion Violates the Constitutional Right to Notice and Due Process of Creditors and Potential Unknown Creditors ................................................................ 7

    B.    PG&E Has a Fiduciary Duty to Provide Clarity and Notice Regarding Claim Scope and Process Concerning Requirements Not Fairly Contemplated By Creditors ....................................................................................................................... 8

    C.    PG&E's Overly-Broad Definition of Claims Does Not Facilitate a Successful, Fair and Constructive Reorganization ........................................................................ 12

    D.    PG&E's Reliance on a Mass Tort Model for Claims is Inappropriate under the Circumstances .......................................................................................................... 12

    E.    A Bar Date Can Be Established for Proofs of Known Claims, But PG&E Has Not Justified Its Bar Date for Future Harm Claims and Unknown Claims ....................... 13

    F.    The Motion Unfairly Shifts Responsibility from PG&E to Governmental Units, Including CCAs, as well as Other Potential Creditor-Victims ................................... 13

    G.    The Absolute Priority Rule Cannot Be Thwarted in Order to Preserve Equity to the Prejudice of Creditors, and the Best Interests of Creditors Test Cannot Be Satisfied if PG&E Prohibits Late Filed Claims in Debtors' Proposed Order ............. 14

    H.    Rejection Claims: Matching the Deadline on Related Claims .................................... 15

    I.    Additional Reasons for SCPA and CCA Concern with the Motion: Executory Contracts, Contingent and Unliquidated Claims, and Future Harm Claims and Unknown Claims. ..................................................................................................... 17

    J.    Proposed Conditions for any Bar Date Order ............................................................ 18

        1.    Require Debtors to Provide Adequate, Detailed Notice, with a Reasonable Definition of Claims ................................................................. 19

        2.    Direct Debtors to Affirmatively Disclaim Its Right to Assert Discharge for Future Harm Claims and Unknown Claims ............................................. 19

3. Establish an Early Deadline to Resolve "Force of Law" Contract Disputes, Such as Those Related to SCPA and CCA Service Agreements, To Match the Deadlines for Related Claims ............................. 20

4. Avoid Pre-judgment of Outcomes on the Best Interest Test and Absolute Priority Rule ...................................................................................... 20

IV. JOINDER WITH OTHER OBJECTIONS .................................................................................. 20

V. RESERVATION OF RIGHTS ...................................................................................................... 21

VI. CONCLUSION .............................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Elliott v. General Motors LLC (In Matter of Motors Liquidation Co.),*
  829 F.3d 135 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 1813 (2017)..................................... 7

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV,*
  209 F.3d 252 (3d Cir. 2000) ................................................................................................ 7

*Hassanally v. Republic Bank (In re Hassanally),*
  208 B. R. 46 (9th Cir. BAP 1997) ...................................................................................... 11

*In re Best Payphone, Inc.,*
  523 B.R. 54 (Bankr. S.D.N.Y. 2015).................................................................................. 15

*In re Cochise College Park, Inc.,*
  703 F.2d 1339 (9th Cir. 1983) ....................................................................................... 8, 15

*In re Energy Future Holdings Corp.,*
  Case No. 13-10979 (Bankr. D. Del. July 30, 2015)............................................................ 12

*In re Hexcel Corp. v. Stepan Co., (In re Hexcel Corp.),*
  239 B.R. 564 (N. D. Cal. 1999) .......................................................................................... 11

*In re Jensen,*
  995 F.2d 925 (9th Cir. 1993) .............................................................................................. 11

*In re Pac. Atl. Trading Co.,*
  33 F.3d 1064 (9th Cir. 1994) .............................................................................................. 15

*In re Rigden,*
  795 F.2d 727 (9th Cir. 1986) ................................................................................................ 8

*In re Sheehan Mem'l Hosp.,*
  507 B.R. 802 (Bankr. W.D.N.Y. 2014) ............................................................................... 15

*In re STNL Corp.,*
  571 F.3d 826 (9th Cir. 2009) .............................................................................................. 11

*In re Wash. Mut., Inc.,*
  442 B.R. 314 (Bankr. D. Del. 2011) .................................................................................... 15

*In re Zilog, Inc.,*
  450 F.3d 996 (9th Cir. 2006) .............................................................................................. 11

*Matter of Dallas Roadster Limited (Texas Capital Bank N.A. v. Dallas Roadster, Limited),*
  846 F.3d 112 (5th Cir. 2017) ................................................................................................ 7

*Mission Product Holdings, Inc. v. Tempnology, LLC,*
  578 U.S. ___, ___ S.Ct. ___, 2019 WL 2166392 (No. 17-1657, May 20, 2019) ........................... 16

*Mullane v. Central Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) ................................................................................................................. 7

*Texaco Capital Inc. v. Bd. of Cmm'rs for the LaFourche Basin Levee Dist. (In re Texaco, Inc.),*
  254 B.R. 536 (Bankr. S.D.N.Y. 2000) ....................................................................................... 7

**Statutes**

11 U.S.C.
  Section 101(5) .......................................................................................................................... 6
  Section 365 ................................................................................................................. 15, 17, 19
  Section 365(g) ...................................................................................................................... 2, 16
  Section 502(c) .................................................................................................................. 2, 6, 13
  Section 726(a) ..................................................................................................................... 15, 20
  Section 1129(a)(7) ................................................................................................................... 14

28 U.S.C.
  Section 959 .............................................................................................................................. 16

Bankruptcy Code
  Section 541(d) ........................................................................................................................... 5

**Other Authorities**

Assembly Bill 117
  adopted in 2002 ......................................................................................................................... 4

Senate Bill 790
  enacted in 2011 ......................................................................................................................... 4

1　　Sonoma Clean Power Authority, a California joint powers authority,[1] a community choice

2　aggregator ("CCA") and a governmental unit ("SCPA"), submits this limited objection ("Objection")

3　to the Debtors' Bar Date Motion[2] (the "Motion") and Reservation of Rights, together with an

4　Exhibit A suggesting an insert to the Debtors' proposed form of order. SCPA appreciates Debtor's

5　meet and confer discussions attempting to narrow differences amongst the parties, and SCPA

6　assumes that at least the agreed portion of the edits PG&E proposes to its form of order will apply.

7　SCPA's limited opposition addresses matters that remain "at risk" as SCPA awaits whatever further

8　changes the Debtors choose to make in response to the various creditor concerns and objections,

9　including those SCPA has attempted to coordinate by this common filing for like-minded creditors.

### I. SUMMARY OF LIMITED OBJECTION

11　　The Motion's procedural nature still obscures the Debtors' problematic approach to claims

12　for future harm or that are otherwise unknown (hereinafter "Future Harm Claims" or "Unknown

13　Claims," respectively)[3]. Although SCPA understands that the Debtors' revisions to the proposed

14　order would reduce the scope of the problem by excusing certain of such "property damage and

15　personal injury claims," the Motion and revised form of order still uses "claims" too broadly without

16　distinguishing between, for instance current and future claims or inchoate claims from an existing

17　problem awaiting a potential future damage, as well as those where an existing harm presently has

18　no apparent cause or is too remote to be considered "contingent." The Motion's overly broad,

19　"unmatured" mass tort-model concept of "claim" still can create an objectionable trap for creditors,

20　whether or not intended: either file wide-ranging protective claims that reserve all potential Future

---

[1] The governmental units that are members of the SCPA joint powers authority are Cloverdale, Cotati, Petaluma, Santa Rosa, Rohnert Park, Sebastopol, Sonoma, Sonoma County (unincorporated areas), Windsor, Fort Bragg, Willits, Point Arena, and Mendocino County (unincorporated areas). (Declaration of Geoffrey G. Syphers, ¶ 7, Dkt. 67)

[2] Unless otherwise defined, capitalized terms have the definitions ascribed to them in the Debtors' Bar Date Motion (Dkt. 1784).

[3] For purposes of this Objection, "Future Harm Claims" means claims arising from, caused by, or related to acts, omissions or conditions of Debtors or assets owned, controlled or operated by Debtors that have not yet caused actionable harm, injury or damage known or within the fair contemplation of the creditor as of the January 29, 2019 petition date. "Unknown Claims" means claims for harm, injury or damage known or within the fair contemplation of the creditor as of the January 29, 2019 petition date for which Debtors' liability is unknown to the creditor before the Bar Date.

Harm Claims and Unknown Claims which the creditor can imagine (beyond the order carve outs), or risk later disputes with PG&E and discharge. Especially as to such at risk Future Harms Claims and Unknown Claims, the Motion is more than a simple request to set a bar date; it also establishes grounds for Debtors to cause an excessively broad range of "claims" potentially to be disputed, limited, reduced, disallowed, and forfeited or underestimated under section 502(c), including those claims that might potentially arise for governmental units (cities, counties, special districts) that may be asked to step up once again to protect the public in the future event of another PG&E disaster or if PG&E operates its "PSPS" blackout program to excess or dangerously. Whatever PG&E's strategic objectives may be, the practical effect of the Debtors' Motion is to shift a significant amount of the risks of such at risk Future Harm Claims or Unknown Claims associated with PG&E's dangerous system and operations from PG&E to potential creditors, who are yet another class of potential victims.

Beyond SCPA's core concern that the Debtors' proposed claims process rules impermissibly reduces such claims in the Debtors' favor at the expense of potential creditor-victims, SCPA submits this Objection on the grounds that: (A) PG&E has a fiduciary duty to provide better clarity, due process, and notice regarding the scope of claims and the process concerning requirements not fairly contemplated by such creditors, especially future victims; (B) PG&E's still uncertain and overly-broad definition of "claims" does not facilitate a successful, fair and constructive reorganization, but instead provokes unhelpful speculation about the future impacts of existing PG&E problems; (C) PG&E's reliance on a mass tort model for "unmatured" claims is inappropriate under the circumstances; (D) a Bar Date can be established for proofs of known claims, but PG&E has not justified its bar date for still at risk Future Harm Claims and Unknown Claims and has not adequately briefed the underlying disputes; (E) the Motion still unfairly shifts responsibility from PG&E to governmental units, including CCAs ("CCAs"), as well as other potential creditor-victims; (F) the Absolute Priority Rule cannot be thwarted in order to preserve equity to the prejudice of creditors, and the Best Interest of Creditors test cannot be satisfied, if PG&E's order prejudices late filed claims; and (G) the Motion delays the need to file section 365(g) rejection claims (though SCPA expects the revised order would add "related claims") until after the rejection, so that

"related" at risk Future Harm Claims or Unknown Claims can be resolved together with section

365(g) damages after rejection, but SCPA seeks clarity that such claims that are related to or based

to some extent on rejection are deferred until triggered by rejection.[4] Whatever the court orders, the

rules must ensure total fiduciary due process, candor and clarity for both creditors and potential

creditors with at risk Future Harm Claims and Unknown Claims, and any remaining related

scope disputes should be briefed and argued in appropriate proceedings, rather than determined as a

surprising result of this Motion.

SCPA believes any Bar Date Order issued by the Court must establish a fair and fully

transparent claims process. This Bar Date should only apply to conventional claims, not to Future

Harm Claims and Unknown Claims, which are disputes that can and should be resolved later in a

fully transparent and briefed process, as demonstrated by PG&E's revised order now expected to

exclude such future claims for property damages and personal injury occurring after the filing. In

addition, as other objectors have correctly noted with incorporated arguments we will try not to

duplicate, any Bar Date Order should: (A) Require Debtors to provide adequate, detailed notice, with

a clear and reasonable definition of claims still to be filed now; (B) Direct Debtors to affirmatively

disclaim their disputed right to assert adverse consequences for at risk Future Harm Claims and

Unknown Claims, absent a fully litigated contrary final ruling on the merits that allows for required

claims still to be filed thereafter; and (C) Avoid pre-judgment now of outcomes on the Best Interest

Test to late filed claims and as to the Absolute Priority Rule. Although the end of bars and

injunctions expected in the revised order is helpful and SCPA appreciates the reforms contemplated

by Debtor in its revised form of order as to incorporating liberal amendment rights and reducing

burdensome and unnecessary procedural and documentation requirements, issues remain in the form

---

[4] SCPA and other joiners have had specific concerns as to how the Motion could undermine Future Harm Claims and Unknown Claims that SCPA and other CCAs may hold as a result of a later decision by PG&E to reject any CPUC mandated Service Agreement with PG&E. SCPA's prior efforts to meet and confer with PG&E on this contract rejection topic have stalled, heightening CCA's wariness of Debtors' proposed claims approach related to rejection (not just those for section 365(g) damages, but also claims arising from, related to or partly based on rejection). In addition, SCPA and other CCAs are following the potential adverse impacts that PG&E's claim strategy is likely to have on the communities CCAs serve (currently over 40% of PG&E's load) which are menaced by fire and excessive blackout risk, large numbers of which entities have elected officials who also now serve on CCA governing boards.

1   of order that SCPA looks to resolve.

2   All parties, including the Debtors, would be better served if still at risk Future Harm Claims

3   and Unknown Claims were dealt with on the merits more closely in time to the context of a fully

4   briefed process in anticipation of the plan of reorganization confirmation process, rather than now in

5   this bar date Motion. Debtors' have an understandable need to process conventional claims as a

6   "shield" in the bankruptcy process, but the Court should stop short of allowing Debtors this disputed

7   "sword" that could prejudice still at risk Future Harms Claims and Unknown Claims, particularly

8   given the nature of the governmental units and other victims likely to be asked to instead absorb the

9   full weight of the future consequences of decades of PG&E's prior problematic actions and

10  inactions.

## II. BACKGROUND

### A. The Role of SCPA and CCAs in California Energy Markets

13  SCPA is a CCA established pursuant to Assembly Bill ("AB") 117 adopted in 2002,

14  following the 2001-2002 California Energy Crisis and enhanced by Senate Bill ("SB") 790 enacted

15  in 2011, among other things, imposing a code of conduct on PG&E to prevent objectionable or anti-

16  competitive conduct. A more complete description of the history and role of CCAs is provided in

17  SCPA's Statement of Support for Debtors' Public Programs Motion and related declaration, Dkts.

18  66-67. CCA programs are administered by local governments (at present, as joint power authorities

19  created by various cities and counties, such as SCPA, or as an enterprise fund within a single city or

20  county, such as San Francisco and San Jose) with a statutory mission to provide competitive clean

21  energy alternatives to Investor-Owned Utilities ("IOU") sources, such as PG&E. (See Declaration of

22  Geoffrey G. Syphers, ¶¶ 8, 9, 12, Dkt. 67.)

23  Statewide, 18 CCAs, including SCPA, independently procure energy and provide a wide

24  array of services directly to over 8 million CCA customers (more than 2.5 million customer

25  accounts). CCAs are an essential and growing part of the State's clean energy mandates. In PG&E's

26  service territory, approximately 41% of the load will be served by CCAs in 2019. SCPA serves

27  Sonoma and Mendocino Counties, each of which (like all of PG&E's territory) can now expect to

28  face ongoing risks presented by PG&E's dangerous system and operations, as well as widespread

1  disruption in connection with PG&E's defensive blackout program, referred to by some as de-

2  energization or Public Safety Power Shutoff ("PSPS") by PG&E. SCPA, its public agency members,

3  and others are working diligently to mitigate the negative impacts of some of PG&E's operations

4  and plans, especially as to CCA customers receiving (or not during PSPS blackouts) CCA power

5  through the PG&E system.

6  **B.    CCA Service Agreements and Other Contracts with PG&E**

7      Pursuant to applicable state law, PG&E's Regulated Tariffs and other laws, regulations and

8  tariffs, PG&E is mandated to provide both (i) transmission and distribution services to deliver

9  energy procured by CCAs for CCA customers, and (ii) billing and collection services for CCAs'

10  benefit as to CCA customers using CCA energy. CCA customers here receive their energy from the

11  CCA, rather than PG&E, over the PG&E distribution system. As a result, CCAs are load-serving

12  governmental units responsible for securing sufficient electricity supplies to meet the needs of their

13  customers, but CCAs themselves cannot deliver that power to the customers without PG&E's wires

14  or during PG&E's PSPS blackouts. (Declaration of Geoffrey G. Syphers, ¶¶ 27, 28.) This

15  relationship of CCAs and PG&E arising under state law and regulation is the subject of a CPUC

16  approved CCA Service Agreement in the tariff.[5] The CCAs are mandated by state law to use the

17  IOUs, like PG&E, as their exclusive billing and collection agent/section 541(d) statutory servicer.

18  There is no provision for a "back-up" billing and collection agent – the CCAs have no choice other

19  than the IOUs.

20

21  [5] A "CCA Service Agreement" means the form force of law agreement (Standard Form 79-1029) included as
22  part of PG&E's Regulated Tariffs that applies PG&E's rules and other tariff provisions to CCA service as a
    "force of law" contract. PG&E's "Electric Sample Form No. 79-1029" states:

23          1.2 The form of this Agreement has been developed as part of the CPUC
24          regulatory process to implement Assembly Bill 117, was intended to conform to
            CPUC directions, was filed and approved by the CPUC for use between PG&E
25          and CCAs and may not be waived, altered, amended or modified, except as
            provided herein or in the applicable community choice aggregation tariff, or as
26          may otherwise be authorized by the CPUC.

27  The CCA Service Agreement, based on the sample form, is required to conform to CPUC decisions, contain
    required elements, and is filed with proposed tariffs. CCAs are required to have the Service Agreement in
28  place and include it with their registration with the CPUC. The specific CCA Service Agreement applicable to
    SCPA was approved by the CPUC in Resolution E-4624 on November 14, 2013, as a PG&E Regulated

# III. LIMITED OBJECTION

The Motion appears to use a "claim" normally under section 101(5)[6], but (absent further reforms) PG&E's references to "unmatured" claims in asbestos and other mass tort cases (pp.33-36) would expand that normal definition in ways that are subject to uncertainty and dispute. Many kinds of harms, beyond the property damages and personal injuries now expected to be excluded in the revised order, from future fires or operational wrongs (e.g., excessive PSPS blackouts) caused in part from PG&E's existing dangerous system, are circumstances distinguishable from PG&E's mass tort model. Debtors' implied definition and remote concept of contingent claims are overly-broad and could cover at risk Future Harms Claims as well as Unknown Claims. Especially as to the at risk Future Harms Claims and Unknown Claims, the PG&E Motion is more than a simple request to set a bar date; it also establishes grounds for the Debtors to cause such expansive "claims" to be disputed, limited, reduced, disallowed, and forfeited or under-estimated under section 502(c). Even with PG&E's revisions to the proposed order, the Motion still does more than set deadlines, it creates traps for the unwary, even if unintentionally.[7]

---

Tariff. (Declaration of Geoffrey G. Syphers, ¶ 17, Dkt. 67.)

[6] To be fair the law is nonuniform and unsettled as to the scope of when such future harm claims, unknown claims and contingent claims need to be filed in such bankruptcy cases to avoid prejudice. However, because most relevant potential creditors with such rights from future harms do not "fairly contemplate" the extreme scope that they may have to dispute in the ultimate plan of reorganization, it is essential that there is meaningful clarity to guide and protect them from this and other bar dates and other adverse impacts. No creditor should suffer for lack of clarity about precisely what claims need to be filed, and no proof of claim should be required to contain information or documentation that is unreasonable to expect as to such future events or as to documenting the PG&E past already known best to PG&E and from other forums.

[7] Proofs of claims for existing/conventional claims are easy. Creditors and victims know they are owed money or have been injured, and they will know to file proofs of claim. Future Harms Claims and Unknown Claims are different, and the Motion's proposed proof of claim rules and procedures are burdensome, unfair and objectionable, even with the revised order now hopefully excluding such personal injury and property damages claims. Neither PG&E nor anyone else should want to compel everyone in its territory to speculate now about all the bad things that could arise in the future from the present PG&E system or future actions or omissions. Normal causes of action involve either a wrongful or tortious act or breach of contract and resulting legally sufficient harm. Here, for example, there have been culpable PG&E acts and omissions that create a dangerous system that can start fires or make fires worse or require blackouts to prevent such fires. What is missing, for what is now an inchoate claim (i.e., an incomplete claim, as distinct from an unmatured or contingent claim) that we call a Future Harm Claim or Unknown Claim, is the occurrence now of the necessary harm, e.g., the damages resulting from such a future fire, or, as the revised PG&E order would hopefully exclude them, such as property damages and personal injuries. For such "Future Harm Claims" the potential creditor in the potential danger zone likely knows something of PG&E system's fire danger conditions, but no one yet knows where the next blackout will hit or fire will burn for which PG&E is

**A.    The Motion Violates the Constitutional Right to Notice and Due Process of Creditors and Potential Unknown Creditors**

The Bankruptcy Code "requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV,* 209 F.3d 252, 265 (3d Cir. 2000) (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)); *Texaco Capital Inc. v. Bd. of Cmm'rs for the LaFourche Basin Levee Dist.* (*In re Texaco, Inc.*), 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000). To have due process effect, the potential creditor needs to "fairly contemplate" when a claim exists that requires a proof of claim to preserve it.

The Court should not eliminate the rights of potential and unknown creditors by imposing an obligation to file claims that they do not know they have, because they have yet to accrue. *See Matter of Dallas Roadster Limited (Texas Capital Bank N.A. v. Dallas Roadster, Limited)*, 846 F.3d 112 (5th Cir. 2017); Fogel v. Zell, 221 F.3d 955 (7th Cir. 2000). The Court should not countenance the use of a Bar Date Motion as part of a strategy to deny potential and unknown creditors with unaccrued claims the constitutional right to oppose discharge or the entry of a permanent injunction preventing them from later filing claims against the Debtors or reorganized PG&E.

The seminal case on due process with respect to bankruptcy claims is *Elliott v. General Motors LLC (In Matter of Motors Liquidation Co.),* 829 F.3d 135 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 1813 (2017) ("*General Motors*"). In that case, the Second Circuit determined that the Due Process Clause in the Fifth Amendment of the U.S. Constitution required that claims "are sufficient to constitute property" and that a deprivation of the ability to file such claims due to lack of notice "would trigger due process scrutiny." *Id.* at 157 (citations omitted). The Second Circuit held that "[i]f a debtor reveals in bankruptcy the claims against it and provides potential claimants notice consistent with due process of law, then the [Bankruptcy] Code affords vast protections." *Id.* at 159. However, those protections should not protect a debtor with respect to potential claims that it may be

_____

responsible, who the victims will be, or what those victims' damages or future claims will be. Today, absent clear warning, those potential victims rarely think that they need to file proofs of claims in this case in order to preserve their right to recover from PG&E (or reorganized PG&E or its value) as to such future events,

aware of, but are unknown to creditors, because they have not yet occurred. Thus, "if a debtor does not reveal claims that it is aware of, then bankruptcy law cannot protect it. Courts must limit[ ] the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Id.* (internal quotation marks and citations omitted).

Here, as in *General Motors*, there are creditors whose claims have not yet accrued, such as, for example, the CCA customer victims of a fire that has yet to occur that was caused by prepetition conditions of inadequate clearing and faulty Utility wires and equipment. CCAs and other governmental units also may ultimately have other claims against the Utility as a result of such future events. Requiring creditors, including the CCAs, to assert alleged unliquidated and alleged contingent claims for such future events would be objectionable and violate the Due Process Clause, especially if what is "fairly contemplated" is not clearly explained.

**B.     PG&E Has a Fiduciary Duty to Provide Clarity and Notice Regarding Claim Scope and Process Concerning Requirements Not Fairly Contemplated By Creditors**

PG&E has a fiduciary duty to provide clarity and notice about the requirements relating to claims, including the extent to which the definition of claims covers at risk Future Harms Claims and Unknown Claims, that otherwise (i) would not be fairly contemplated by many creditors; or (ii) are defensive/preventative claims that more experienced creditors can be expected file in order to reserve suspected or feared harms in order to avoid the risk that PG&E will later assert discharge arguments against such claims, even where such defensive/preventative claim are not (and ordinarily should not have to be) filed. As the Ninth Circuit explained in *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983) and as in many similar cases, *see, e.g., In re Rigden*, 795 F.2d 727, 730–31 (9th Cir. 1986), debtors like PG&E are fiduciaries who are not permitted to *unfairly surprise* their creditors. In its role as a fiduciary, Debtor must also disclose in an understandable manner the rules, procedures, and the consequences for noncompliance. The best solution, as SCPA has suggested, is to revise the order to exclude for now all Future Harm Claims and Unknown claims, not just those recently contemplated for property damages and personal injury from future fires.

The PG&E Motion does not yet fairly and clearly warn creditors with at risk Future Harm

conditions, circumstances, or conduct.

Claims and Unknown Claims that they need to file such uncontemplated claims now or else forfeit recoveries, in effect potentially creating disputed immunity for PG&E and reorganized PG&E (and windfalls for its equity) in the event future fire or other harm arising in part (rarely in whole) from or based on existing PG&E dangerous conditions or conduct. At present and pending any further reforms discussed with PG&E, creditor fears are reasonable based on historical experiences and PG&E's citation in its Motion (at 33-36) to mass tort and similar cases mistreating (e.g., by under-estimation) what they call "unmatured" or "contingent" claims, but which are really "inchoate" claims and what SCPA calls at risk Future Harm Claims and Unknown Claims. The vast confusion in conflicting court decisions on this topic should not be allowed to create confusion for creditors here, who need and are entitled to specific and detailed clarity. If SCPA and other creditors misread or otherwise make incorrect assumptions with respect to the breadth of Debtors' proposed scope for claims, PG&E must formally disclaim any effect of its Motion or related order on such still at risk Future Harm Claims or Unknown Claims. PG&E should be required to convince this Court of its position, in a proper proceeding that deals openly with those disputed claim scope issues in reliance on full briefing and argument.[8]

As the Official Committee of Tort Claimants has demonstrated in its recent filings for victim relief and against the exclusivity extension (Dkts. 2013-2016, 2017, 2028), the risks are not theoretical. PG&E has created dangerous conditions in its gas and electric transmission and distribution systems and operations that predictably will cause future fires, gas explosions, excessive PSPS blackouts, property loss, or displacement and other damages. These general risks are not localized or confined, but are widely present throughout PG&E service territory. Furthermore, Debtors' conduct or omissions may also give rise to other actionable torts and wrongs related to transactions or occurrences for which the harm is yet unknown or only potential harms that are otherwise unrelated to PG&E's dangerous system and operations or to the future personal injury and

---

[8] Full briefing of the disputed scope issues at this stage of the proceedings presents its own challenges, not the least of which are insurers' and other governmental entities' informed and expert analysis that most of PG&E territory is at continuing risk of more devastating fires and problems for which PG&E may be responsible. It is unreasonable, without such clarified process and full briefing to ask other communities to be left as victims of future fires or excessive blackouts without claims or recourse and without recovery when any of them

1  property damage claims hopefully excluded in the revised order. SCPA's objections apply equally to

2  those other at risk Future Harms Claims and Unknown Claims.

3  Moreover, when and if potential creditors know they must file a proof of claim to preserve

4  such an at risk Future Harm Claim, they will be confounded as to how they could possibly comply

5  with PG&E's proposed forms and procedures, or how to defend their rights against a PG&E dispute

6  of whatever claim they had to file. However, given the probability of future fires and their severity,

7  among other future wrongs, it is necessary for this court to address this and other at risk Future Harm

8  Claim requirements and treatment in detail upfront, not afterward when (under PG&E's Motion's

9  approach) it would be too late to comply, and when such creditors would have forfeited their

10 recoveries for the benefit of PG&E and its equity. SCPA only asks for clarity now, and reserves its

11 rights for that future dispute process on the merits as to where the line should be drawn between

12 what is a prepetition claim, a post-petition claim, and a post-confirmation claim, since those issues

13 have not yet been properly framed or briefed by anyone for decision in response to this Motion or

14 fully excluded by the expected revised order.

15 Similar issues arise with respect to Unknown Claims where there is some known harm, but as

16 yet no basis to blame PG&E, unless such victims are told that they must either (i) file something

17 now in order to reserve their right to blame PG&E, just in case it turns out that PG&E is culpable, or

18 else (ii) lose their right to recover from PG&E when it is discovered to be responsible, again creating

19 a windfall for PG&E and its equity.

20 Whatever the situation is determined to be, PG&E has a fiduciary duty now to clarify both

21 the rules that apply and the consequences of noncompliance. Again, since most persons and entities

22 in PG&E territory are potential victims, one must ask whether PG&E is wise to create a situation

23 where it has to warn everyone to file a proof of claim now or later suffer the loss of their recoveries

24 from any at risk Future Harm Claim or Unknown Claim. Creditors should also consider whether the

25 electric system example SCPA has relied on thus far in this Objection applies as well to Debtors' gas

26 lines of business. The threats posed by PG&E's gas system, still under supervision in criminal court,

27 and the possibility of another San Bruno remains. *See, e.g.*, exhibits to Official Committee of Tort

28

could be the next Paradise or San Bruno.

1  Claimants' Request for Judicial Notice re Exclusivity Motion, Dkt. 2028.

2      As it stands under the Motion, the Debtors will likely spend millions to give notice of the

3  proposed bar date. SCPA hopes for more clarity to avoid future disputes about such attempted

4  disallowance of bankruptcy claims and assertions of defenses of discharge (and plan injunctions)

5  against future non-bankruptcy litigation and perhaps even bankruptcy litigation in a Chapter "33"

6  with the reorganized PG&E. But with the admittedly unusual and complex nature of this case, and

7  given the experience and confusing jurisprudence of many in asbestos, mass tort, environmental and

8  product liability bankruptcy cases (such as those mentioned in the Motion at 33-36), it seems only

9  appropriate that creditors be well informed about the nature and scope of the "claims" that they need

10  to be asserting and the breadth of the recovery bar and other defenses that Debtors (or reorganized

11  PG&E) will assert. In other words, the Debtors should be required to give the creditors fair warning

12  specifically about such claims not "fairly contemplated," and should not demand more information

13  than is reasonable to expect, especially about what is unknowable at present, such as the future.

14  Some courts consider for bankruptcy discharge and plan injunction purposes, "a claim arises when a

15  claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not

16  yet accrued under nonbankruptcy law." *In re STNL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009); *see*

17  *e.g.*, *In re Zilog, Inc.*, 450 F.3d 996, 1002 (9th Cir. 2006) (where factual dispute existed as to

18  whether sex discrimination claims arose post-discharge, bankruptcy court erred in granting summary

19  judgment and finding claims discharged); *In re Jensen*, 995 F.2d 925, 930-31 (9th Cir. 1993) (where

20  state environmental regulatory agency was aware that the groundwater at the debtors' site was

21  contaminated before the debtors filed a bankruptcy petition, a contingent claim for cleanup costs was

22  in the "fair contemplation" of the state at the time the debtors filed their chapter 7 petition); *In re*

23  *Hexcel Corp. v. Stepan Co.*, (*In re Hexcel Corp.*), 239 B.R. 564 (N. D. Cal. 1999). But see,

24  *Hassanally v. Republic Bank* (*In re Hassanally*), 208 B. R. 46 (9th Cir. BAP 1997).[9] Most lay

25  creditors would think that a possible future claim would not require filing a proof of claim now.

26

27  [9] PG&E's Motion refers to "claims" or "unmatured" claims of "Unknown Wildfire Claimants," distracting
people by asserting that the two claim categories to be addressed from the debtor's perspective in bankruptcy

28  are those of "known" and "unknown" **creditors** as opposed to the timing, nature and scope of the "**claims.**

### C. PG&E's Overly-Broad Definition Of Claims Does Not Facilitate a Successful, Fair and Constructive Reorganization

Whether or not it is possible for PG&E to require over-broad "claims" to be prematurely filed on pain of otherwise being barred, it is also unwise. Absent further reforms, PG&E essentially appears to require a broad range of potential creditors, who reasonably perceive themselves to be at risk from PG&E, to speculate on all the possible inchoate or future harms that they could suffer (beyond future personal injuries and property damage that will hopefully be excluded in the revised order) simply to reserve rights and avoid potential discharge arguments. Given these incentives, the court should ask PG&E: To what extent, if any, does the Motion and PG&E's proposed order require a broad range of creditors to file defensive/protective proofs of claims now as to future fires, future gas explosions, excessive defensive "PSPS" blackouts, displacement, and other harms later arising from existing dangerous conditions or conduct for which PG&E is responsible? Without clarity on the scope and nature of what constitutes a claim, such at risk creditors must assume the worst.

### D. PG&E's Reliance on a Mass Tort Model for Claims Is Inappropriate under the Circumstances

The disputed and overbroad concept of "unmatured claims" in cites in the Motion from a line of asbestos and other mass tort cases create potentially fatal uncertainty (pp. 33-36), as does the concept of remote "contingent" claims. This is not the place to litigate in full PG&E's incorrect analogy to such precedents. However, it is the time for clarity, not just to protect holders of still at risk Future Harm Claims and Unknown Claims from unfair forfeiture (and unjust windfalls for PG&E equity), but also to save existing claims from dilution by post-confirmation Future Harm Claims and Unknown Claims. PG&E citing an asbestos notice precedent, *In re Energy Future Holdings Corp.*, Case No. 13-10979 (Bankr. D. Del. July 30, 2015) at Motion p.36, for a proof of claim for "unmanifested asbestos related injuries" is hardly adequate warning under PG&E's circumstances. *See generally* Motion at pp. 33-36.[10]

---

[10] The asbestos/mass tort analogy is flawed for additional reasons that warrant closer scrutiny, although it is not practical to brief that now, and reforms could avoid that necessity. Most notably, such case law concerns debtors that have shut down and done no more harm. PG&E, by contrast, continues to own and operate an

**E.    A Bar Date Can Be Established for Proofs of Known Claims, But PG&E Has Not Justified Its Bar Date for Future Harm Claims and Unknown Claims**

SCPA supports establishing a bar date for filing proofs of claim, and SCPA has no objection to that date being September 19, 2019, for proofs of claim based on known claims not excluded by the expected revised order. Now is not the right time, however, for the court to require that creditors be required to file still at risk Future Harm Claims or Unknown Claims. Nothing in the Motion attempts to explain or justify Debtor's request for such an expansive claims requirement that would sweep in all such Future Harm Claims and Unknown Claims.

**F.    The Motion Unfairly Shifts Responsibility from PG&E to Governmental Units, Including CCAs, as well as Other Potential Creditor-Victims**

When PG&E seeks to bar or estimate under section 502(c) claims for damages, for instance, from future fires, gas explosions, excessive PSPS blackouts or other problems caused in part by the existing conditions or conduct for which PG&E is responsible, PG&E effectively shifts losses caused by PG&E to its future victims, including many governmental units which are no less vulnerable than areas in Sonoma, Napa and Mendocino Counties, Paradise or San Bruno and which will have to respond to widespread, emergency care for victims, replace destroyed infrastructure and cope with other massive harms. If the Motion is granted without sufficient further reforms, governmental units and other victims may not be able to recover appropriately from PG&E for their damages from some future fires or wrongs, either because they are barred from having not filed adequate protective claims or because the section 502(c) estimate of their suffering was too difficult and unconscionably low. Local and regional governmental units and victims can then be expected to turn to the State for relief, or absorb the losses themselves. To the extent that the State is considering

---

electric system that remains dangerous, even accounting for proposed fire mitigation plans. Debtors' system is substantially uninsurable and, per PG&E, must be shut down for safety in stressful weather conditions, and where PG&E continues to engage in a slower and less effective than necessary fire safety mitigation efforts (e.g., hardening, doing vegetation duties neglected for decades, and defensive PSPS blackouts) than alternatives (e.g., more undergrounding, as PG&E finally realized was necessary in Paradise) in order to preserve its equity. See exhibits to Official Committee of Tort Claimants' Request for Judicial Notice re Exclusivity Motion, Dkt. 2028. In short, unlike mass tort claims, the root cause of harm and damages remains an omnipresent, ongoing threat throughout PG&E service territory: from transmission and distribution lines and systems, in both urban and rural areas, when the power is on and (in different ways) when the power is

1  bailing out PG&E's equity for its plan of reorganization, as some have suggested, will it have

2  sufficient funds also to support such affected communities which lost their right fully to recover

3  from PG&E?

4      If PG&E does not clearly deal with at risk Future Harms Claims and Unknown Claims

5  constructively, it may impact the reorganization. PG&E itself acknowledges the interdependence of

6  its reorganization on legislative and regulatory solutions and levers. Debtors' proposal risks unhappy

7  surprises for the Legislature, the Governor, and CPUC, if the rest of such at risk claims are not

8  deferred like the future property damage and personal injury claims and many at risk parties file

9  large protective claims.

10  **G.**    **The Absolute Priority Rule Cannot Be Thwarted in Order to Preserve Equity to the Prejudice of Creditors, and the Best Interests of Creditors Test Cannot Be Satisfied if PG&E Prohibits Late Filed Claims in Debtors' Proposed Order**

11

12      All creditors and the Debtors need (and should want) a constructive and fair approach to the

13  problems posed by PG&E's unsafe electric and natural gas systems and operations, consistent with

14  the absolute priority rule and the best interest of creditors test. Absent further reforms, PG&E's

15  Motion undermines this objective. PG&E's expected revised order is an improvement, but it still

16  states (#7) that late claims cannot vote or receive distributions. As explained below, PG&E's equity

17  cannot be preserved at the expense of at risk late filed Future Harm Claims or Unknown Claims.[11]

18      Like the Motion, the expected revised form of order still requests the Court order that failure

19  to timely file a proof of claim bars the creditor from plan distribution and voting. Such a ruling is not

20

21  shutoff as part of a defensive PSPS blackout.

[11] A "fresh start" for the Debtors can come in various ways. However, the priority must be in fairly and fully paying existing creditors, and allowing future fire or other harm victims their fair and full recovery from the reorganized PG&E. Existing victims and other creditors should not have to find themselves competing with Unknown Claims and Future Harm Claims, and vice versa. Holders of at risk Unknown Claims and Future Harm Claims should not have to suffer from their inability effectively to estimate future claim damages from future fires and wrongs, while PG&E equity benefits from under-estimates. Equity assumed the risk of being last out and for the problematic management and culture at PG&E addressed in the exhibits from the other official investigations and proceedings, referenced in the exhibits to Official Committee of Tort Claimants' Request for Judicial Notice re Exclusivity Motion, Dkt. 2028, and has already enjoyed decades of dividends and benefits from money that should have been spent on safety. San Diego Gas & Electric's more proactive approach to compliance with applicable laws and adoption of best practices is an instructive counterpoint that began long ago. Equity should receive whatever is left for them as the subordinate interest to all existing and future claims in accordance with the absolute priority rule.

necessary in connection with setting a bar date. Any proposed plan that seeks to allow equity to

retain its interest will have to satisfy the best interests test of section 1129(a)(7). Testing for what

non-accepting unsecured creditors would receive in a hypothetical chapter 7 liquidation of the

Debtors will have to consider untimely filed claims, because of the distribution priorities of Section

726(a). If a bar date order excludes participation by untimely filed claimholders, the Debtors may

not be able to satisfy best interests tests, and may have created confirmation issues. *See In re*

*Sheehan Mem'l Hosp.*, 507 B.R. 802 (Bankr. W.D.N.Y. 2014); *In re Wash. Mut., Inc.*, 442 B.R. 314,

357 (Bankr. D. Del. 2011); *See also In re Best Payphone, Inc.*, 523 B.R. 54, 75 (Bankr. S.D.N.Y.

2015) (the best interests test would "require the solvent chapter 11 plan proponent to satisfy late

claims, as the trustee would have to do in a chapter 7 case, before equity can receive or retain

property"); *In re Pac. Atl. Trading Co.*, 33 F.3d 1064, 1067 (9th Cir. 1994) (discussing that

timeliness of a priority claim does not affect its entitlement to priority distribution). Indeed, if cram

down is required in a full-pay plan, the exclusion from distribution of untimely unsecured creditors

may support an absolute priority objection. The bar date order should not prejudge these issues now.

### H. Rejection Claims: Matching the Deadline on Related Claims

PG&E essentially attempts to reserve its disputed right to wait until plan filing to reject any

of the 70,000 contracts referenced by PG&E as executory with PPA counterparties, CCAs and

others. Many of these non-debtor counterparties may contend, as have the CCAs (*see* SCPA's

Statement of Support for Debtors' Public Programs Motion and related declaration, Dkts. 66-67) and

PPA counterparties in PG&E's FERC adversary proceeding, that their contracts are not subject to

rejection as executory contracts under section 365 for various reasons, including due to their force of

law status or PG&E's claimed solvency[12] or near solvency. Moreover, even if PG&E were to prevail

in those rejection disputes, PG&E generally will be unable to satisfy the fiduciary business judgment

standard for obvious reasons, since what is gained by PG&E in rejection will generally be

overwhelmed by much larger adverse claims and other adverse "morning after" consequences (to

---

[12] The Debtors' Schedules of Assets and Liabilities admit solvency and certain of the Parent's shareholders agree. See *Response of Certain Shareholders to Objections to Debtors' Motion to Extend Exclusive Periods* (Dkt. 2082) at p. 3 n. 2.

1 quote this court from the related dispute in the FERC adversary proceeding). Moreover, such

2 counterparties like CCAs may have damage claims not only for rejection under section 365(g), but

3 also for breaches of fiduciary duty (*e.g., In re Cochise College Park, supra*) and other wrongs done

4 in trying to reject such contracts and thereby needlessly scare such counterparties' lenders, suppliers,

5 customers and other supporters. Those claims beyond section 365(g) either related to or based in part

6 on rejection should be filed together. SCPA appreciates PG&E's revision in the order to match

7 "related" claims, but still believes a broader category is important as well.[13]

8       The Motion's proof of claim forms and procedures should be modified, as SCPA has

9 discussed with PG&E, so that SCPA (with respect to its Service Agreement with PG&E) and others

10 similarly situated, do not have to prematurely describe in advance (beyond section 365(g) damages

11 and "related claims") any or all of the other prepetition and post-petition related claims that could

12 possibly arise in connection with rejection, especially in advance of actual rejection.[14] In SCPA's

13

14 [13] Some of those force of law contract related claims could be substantial and complex, and all of those

15 claims' complexities need to be addressed up front, because the PG&E business judgment will often be challenged, and because the adverse consequences to the allegedly solvent estate will generally outweigh the

16 benefit imagined by PG&E from rejection. That will be true even before considering what this court in the FERC adversary hearing described as the "morning after" consequences of rejection arising from applicable

17 laws and regulations that continue in effect (e.g., 28 U.S.C. § 959) and cannot be rejected. *See Mission Product Holdings, Inc. v. Tempnology, LLC* 578 U.S. ___, ___ S.Ct. ___, 2019 WL 2166392 (No. 17-1657,

18 May 20, 2019) (rejection of an executory contract is just a breach like a prepetition breach, and not a rescission).

19 [14] Debtors have acknowledged before the CPUC and this Court, and the CPUC has recognized, that the Utility has no ownership or beneficial interest in the CCA Customer Revenue. "CCA Customer Revenue" means

20 charges applied by a CCA to its CCA customers, which charges are billed and collected by PG&E as the exclusive statutory and regulatory billing agent/servicer on behalf of a CCA for energy provided by a CCA to

21 serve its customers, whether pre- or post-petition, and any funds collected and held by PG&E on account of such charges, as further described in PG&E Electric Rule No. 23, Section Q, Subsections 1, 3 and 4, such

22 CPUC approved CCA Service Agreements, and other amounts recoverable from PG&E by any CCA thereunder, consistent with the rights of each CCA under Section 541(d) of the Bankruptcy Code and

23 applicable non-bankruptcy law and regulations, including by the CCA Service Agreements implementing those laws and regulations pursuant to PG&E Regulated Tariffs. See Public Programs Motion, pp. 25-26, 33-

24 34., Dkt. 16, and SCPA's Statement of Support for Debtors' Public Programs Motion, p. 2 at ns. 2-3, Dkt. 66. In furtherance of the universal views on CCA revenue, SCPA has repeatedly reached out to the Debtor to

25 simply resolve any rejection issues and develop an appropriate stipulation disclaiming the application of section 365 or assuming CCA Service Agreements. Despite SCPA's best meet and confer efforts beginning

26 even before this bankruptcy filing and the recent constructive discussions on other concerns, the Debtors have not yet been willing to resolve the applicable section 365 issues and to disclaim rejection and to assume the

27 CCA Service Agreement with SCPA or any of the CCAs in PG&E service territory.

28

Accordingly, the CCAs may have contingent and unliquidated rejection and/or other claims related to those

view, the Motion makes clear the need for a deadline for Debtors to assume or reject executory contracts, so that there is ample time (i) for the parties to such contracts to resolve disputes before voting on any plan, (ii) for the counterparties to contest the application of Section 365, if necessary, to dispute rejection on the merits, and (iii) for counterparties to assert their various rejection related claims and vote on the plan. If PG&E defers these issues until it files its expected plan (e.g., just before exclusivity expires) and then races to confirmation, parties can expect a process that jams all of PG&E's contract counterparties, disputed claimants, plan objectors, and other adversaries into a mad scrum for due process at the same time in that 60 day period before exclusivity is lost.

## I. Additional Reasons for SCPA and CCA Concern with the Motion: Executory Contracts, Contingent and Unliquidated Claims, and Future Harm Claims and Unknown Claims.

PG&E's electric transmission and distribution monopoly "obligation to serve" includes SCPA and its other CCA customers. CCAs and their member public agencies are subject to all of the continuing effects of the dangerous and problematic flaws and vulnerabilities in the PG&E system, such as those reported in the CPUC proceedings, the PG&E criminal proceedings, the SB 901 Fire Commission record, and this court, including those identified in the Official Committee of Tort Claimants' filings and its request for judicial notice (Dkts. 2013-2016, 2017, 2028). For example, SCPA estimates that over 6,000 of its CCA customers lost their homes or businesses in the 2017 Sonoma and Mendocino County fires. However, PG&E cannot characterize and treat all the future harms caused by its conduct and dangerous system as prepetition claims that must now be filed in response to its Motion as so called "unmatured" mass tort type or contingent claims. PG&E's actions and omissions can also create future claims that are continuous from its operations and from foreseeable natural evolution (e.g., more vegetation and other new or enhanced dangers to the

---

Service Agreement contracts. SCPA has been identified by the Utility as party to a total of three contracts, identified as EMCL Agreements (See the Utility's Schedule G, Dkt. 907-1 at pp. 259-260). And, in the absence of a beneficial post-rejection "morning after" effect (to again quote this court in the similar PPA/FERC adversary proceeding) whereby the CPUC timely requires the Utility to continue to perform its statutory and regulatory servicing and SB 790 obligations to the CCA, including to meter, bill, collect and turnover CCA Customer Revenue, SCPA and the CCAs could be deprived of their working capital and left with massive prepetition and post-petition claims. Given the Debtors' reluctance to timely resolve this issue on the merits, along with this overly-broad Motion, SCPA worries about what comes next and will need to take steps to file significant defensive/protective claims, absent further clarification.

1  vulnerable system), rather than being limited just to those claims from the existing dangerous

2  conditions themselves. Fears of excessive PG&E PSPS blackouts are just one example where a

3  future culpable act can cause future harm and create a future claim, even though connected to an

4  existing wrongfully created, dangerous condition. Such a future act/future harm/future claim can also

5  be more than just a Future Harm Claim or an Unknown Claim for personal injury or property

6  damages hopefully excluded by the revised order. Those are all best deferred.

7        In addressing the PG&E Motion, SCPA urges the court to help all creditors coping with the

8  complex and multifaceted ways PG&E claims can conceivably arise by requiring full disclosure and

9  maximum clarity by PG&E as to what claims must be filed and what claims need not to be filed. In

10  doing so and as discussed in more detail below, SCPA also urges the court to consider a

11  minimalist/reservation of rights type approach that does not require creditors to speculate on what

12  PG&E might do or have done to harm us in the future, or how many more of CCA customers, for

13  instance, will be burned out in the next fires or otherwise inappropriately denied service and

14  potentially harmed by PG&E's PSPS defensive blackouts.

15        **J.**    **Proposed Conditions for any Bar Date Order**

16        The Motion ignores and does not brief all of the difficult and important such claim/future

17  harm issues, and it provides insufficient guidance or disclosure to creditors that should be expected

18  from a fiduciary under these circumstances. While PG&E has improved its proposed order to lessen

19  the adverse effects of non-standard rules, procedures and forms increasing the burden and peril of

20  creditors, SCPA reserves the right to address any of our remaining issues that exist at the hearing.

21  However, we note that the more detail PG&E demands from creditors in proofs of claims in order to

22  preserve them from being disputed, the more detail creditors are going to seek from PG&E, if only

23  to be able better to argue for estoppel later when PG&E tries to bar claims for noncompliance after it

24  earlier resisted related discovery. We urge the court not to send us down that tortured path, at least

25  until the claim scope disputes are addressed on the merits in estimation or other processes where

26  everything is fully briefed and in play at the same time.

27        In any Bar Date Order, the Court should require as a condition to approval of the discussed

28

1  reformed order terms and the following:[15]

2  ### 1. Require Debtors to Provide Adequate, Detailed Notice, with a Reasonable
3  ### Definition of Claims

4      Debtors' notice to creditors must explain the need only to assert claims that are legally

5  deemed to arise out of transactions or occurrences prior to the petition date and that are in the "fair

6  contemplation" of the creditor, after appropriate resolution by this court of the issue as to what

7  extent a particular injury must have been sufficiently realized (e.g., past versus future fires or

8  wrongs) and causally related to the wrong. No holder of an at risk Future Harm Claim or Unknown

9  Claim should need to fear a failure to file now such a Future Harm Claim or Unknown Claim. Or, in

10  the alternative, if such a claim must be filed, a simple conceptual, reservation of rights type claim

11  should be sufficient, free of problematic terms, procedures and new forms. The allegedly solvent

12  Debtors should not be allowed to benefit from non-filing of claims without fair opportunity for all

13  creditors to participate in the distribution after meaningful due process and with normal rights for

14  any late filed claims and amendments. Regardless of intent, the effect of the Motion cannot be

15  allowed to unfairly surprise and bar future fire and other tort victims from their just claims from

16  future fires and other later discovered PG&E wrongs.

17  ### 2. Direct Debtors to Affirmatively Disclaim Its Right to Assert Discharge for
18  ### Future Harm Claims and Unknown Claims

19      A commercially reasonable and judicially efficient solution, and the preferable course of

20  action from the perspective of SCPA, would be for the Debtors simply to affirmatively disclaim the

21  right to bar voting and distribution to the post-bar date claim of any creditor whose injury manifests

22  after filing or after confirmation (e.g., a future fire or tort harm), even those which arose in part from

23  conditions, conduct, or transactions existing prior to the petition date (Motion at p.18, part (b).). The

24  expected revised order is helpful but presently insufficient.

25  / / /

26

---

27  [15] If necessary and helpful, Exhibit A is a copy of recommended changes to the Debtors' proposed order,
28  substantially all of which SCPA has proposed to Debtors' counsel.

**3.  Establish an Early Deadline to Resolve "Force of Law" Contract Disputes, Such as Those Related to SCPA and CCA Service Agreements, To Match the Deadlines for Related Claims**

The Debtors should set an earlier deadline for resolving disputes as to the applicability of section 365 to "force of law contracts" (discussed below) and, if section 365 applies, for the assumption or rejection of executory contracts. The deadline should match up for the bar date for tort claims related to (as now in the expected revised order) or based in part on the attempted rejection and should be sufficiently in advance of the deadline for voting on any proposed plan of reorganization, so that rejection claimholders will be allowed to resolve disputed issues in an appropriate process, to vote and not to be disenfranchised or jammed in the mass of disputes expected in the final confirmation process. (Motion at p. 15, part (j).) Counterparties to CPUC approved CCA Service Agreement (as described herein) and other alleged executory contracts should *not* have to file any relevant claims before the section 365(g) damage claims.

**4.  Avoid Pre-judgment of Outcomes on the Best Interest Test and Absolute Priority Rule**

This Bar Date Motion should not determine the effect/consequences of the failure to file a timely proof of claim on the creditor's right to participate in the plan distribution or vote. The normal rules should apply. Debtors' future proposed plan is expected to provide for the retention of equity, and the "best interests test" and the "absolute priority rule" may require satisfaction of the distribution priorities of section 726(a) with regard to late claims and their priority over equity. This bar date order should not prejudge that issue, which PG&E has neither identified nor briefed in its Motion.

As PG&E keeps saying, this is not a normal case. However, the unique nature of the Debtor's position demands more latitude for creditors and not less. In this situation, and in many other contexts in this case, the creditors (not the Debtor) should be allowed more flexibility and accommodations in the interest of justice, and to ensure the feasibility of any plan of reorganization.

## IV.  JOINDER WITH OTHER OBJECTIONS

SCPA supports objectives and productive reforms suggested by other creditors, consistent with this Objection, including those already filed by the Ad Hoc Subrogation Group (Dkt. 2043) and

1   what we expect from the Official Committee of Tort Claimants and the California Attorney General

2   for the state agencies.

3   <center>**V. RESERVATION OF RIGHTS**</center>

4         Except as provided above, SCPA reserves all rights as provided in its Reservation Rights

5   attached as Exhibit B to its Statement of Support for Debtors' Public Programs Motion and

6   Reservation of Rights (Dkt. 66).

7   <center>**VI. CONCLUSION**</center>

8         For these reasons, SCPA request the court to sustain its limited objection and require the

9   Debtors to satisfy the conditions described above, and for such other relief as may be proper.

10   DATED: May 31, 2019.          RESPECTFULLY SUBMITTED,

11                  ENGEL LAW, P.C.

12                  By:_____ */s/ G. Larry Engel*_____

13                           G. Larry Engel

                 -and-

14

15                  BOUTIN JONES INC.
                 Mark Gorton

16                  -and-

17                  SONOMA CLEAN POWER AUTHORITY
                 Jessica R. Mullan, General Counsel

18

19                  *Attorneys for Creditor and Party-in-Interest, SONOMA*
                 *CLEAN POWER AUTHORITY*

20

21

22

23

24

25

26

27

28

1   Valley Clean Energy Alliance, a California joint powers authority[1] and a "governmental

2   unit" (as defined in Bankruptcy Code section 101), joins this the Limited Objection to Debtors' Bar

3   Date Motion (Dkt. 1777).

4   DATED: May 28, 2019.                    RESPECTFULLY SUBMITTED,

5                                           BEST BEST & KRIEGER LLP

6                                           By:

7                                               Harriet A. Steiner

8                                           *Attorneys for Creditor, VALLEY CLEAN*
                                            *ENERGY ALLIANCE*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28   [1] The governmental units that are members of Valley Clean Energy Alliance are County of Yolo,
     City of Davis and City of Woodland.

SONOMA CLEAN POWER AUTHORITY'S LIMITED OBJECTION TO DEBTOR'S BAR
DATE MOTION

1    REDWOOD COAST ENERGY AUTHORITY, a California joint powers authority, [1] a

2  community choice aggregator and a governmental unit, joins the Limited Objection to Debtors' Bar

3  Date Motion (Dkt. 1777).

4  DATED: May 28, 2019.                    RESPECTFULLY SUBMITTED,

5                                          REDWOOD COAST ENERGY AUTHORITY
                                           Nancy Diamond, General Counsel
6

7                                          By: _____
                                                  Nancy Diamond
8                                                 General Counsel

9
                                           *Attorneys for Creditor and Party-in-Interest*
10                                         *REDWOOD COAST ENERGY AUTHORITY*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____
    [1] The governmental units that are members of the RCEA joint powers authority are the Cities of
28  Arcata, Blue Lake, Eureka, Ferndale, Fortuna, Rio Dell, Trinidad, the County of Humboldt, and the
    Humboldt Bay Municipal Water District (a special district of the State of California)

SONOMA CLEAN POWER AUTHORITY'S LIMITED OBJECTION TO DEBTOR'S BAR
DATE MOTION

Pioneer Community Energy, a California Community Choice Aggregation (CCA)[1] and a "governmental unit" (as defined in Bankruptcy Code section 101), joins the Limited Objection of Sonoma Clean Power Authority to the Debtors' Motion for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (the "Bar Date Motion").

DATED: May 31, 2019.

RESPECTFULLY SUBMITTED,

NEUMILLER & BEARDSLEE,
A PROFESSIONAL CORPORATION

By: _____
CLIFFORD W. STEVENS
Attorneys for Creditor,
PIONEER COMMUNITY ENERGY

---

[1] The governmental units that are part of the Pioneer Community Energy CCA are Placer County and the cities of Auburn, Colfax, Lincoln, Loomis and Rocklin.

PIONEER COMMUNITY ENERGY AUTHORITY'S STATEMENT OF SUPPORT
FOR BAR DATE MOTION AND RESERVATION OF RIGHTS

Peninsula Clean Energy, a community choice energy program and Joint Powers Authority, formed as a separate Public Entity by the County of San Mateo and all twenty of its cities, joins the Limited Objection of Sonoma Clean Power Authority to the Debtors' Motion for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (the "Bar Date Motion").

DATED: May 31, 2019.

RESPECTFULLY SUBMITTED,

WINSTON & STRAWN LLP

By: _/s/Justin E. Rawlins_____
    Justin E. Rawlins
    David Neier (*pro hac vice requested*)

Justin E. Rawlins (#209915)
jrawlins@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

David Neier (*admitted pro hac vice*)
dneier@winston.com
WINSTON & STRAWN LLP
200 Park Avenue, 40th Floor
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for Peninsula Clean Energy Authority*

East Bay Community Energy, a California joint powers authority, and a "governmental unit" (as defined in Bankruptcy Code section 101), joins the Limited Objection of Sonoma Clean Power Authority to the Debtors' Motion for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (the "Bar Date Motion").

DATED: May 31, 2019

RESPECTFULLY SUBMITTED,

RICHARDS, WATSON & GERSHON,
A PROFESSIONAL CORPORATION

By: _Inder Khalsa_
INDER KHALSA
Attorneys for Creditor,
EAST BAY COMMUNITY ENERGY

EAST BAY COMMUNITY ENERGY'S STATEMENT OF SUPPORT
FOR BAR DATE MOTION AND RESERVATION OF RIGHTS

Silicon Valley Clean Energy Authority, a California joint powers authority, and a "governmental unit" (as defined in Bankruptcy Code section 101), joins the Limited Objection of Sonoma Clean Power Authority to the Debtors' Motion for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors (the "Bar Date Motion").

DATED: May 31, 2019

RESPECTFULLY SUBMITTED,

RICHARDS, WATSON & GERSHON,
A PROFESSIONAL CORPORATION

By:

GREGORY W. STEPANICICH
Attorneys for Creditor,
SILICON VALLEY CLEAN ENERGY
AUTHORITY

SILICON VALLEY CLEAN ENERGY AUTHORITY'S STATEMENT OF SUPPORT
FOR BAR DATE MOTION AND RESERVATION OF RIGHTS

# EXHIBIT A

Our goal is to achieve, among other things: (i) pass through exemptions for all Future Harm Claims and Unknown Claims, not just those for personal injuries and property damage (if added in compromise reforms); (ii) protection for late filed claims from any prejudice not required by law, and recognizing the protections from the absolute priority rule and the best interest tests for distributions and voting; (iii) the deferral of section 365(g) rejection damage claims should be matched with deferral of other claims related to rejection or based in part on rejection; and (iv) the normal law, documentation, and content rules should apply absent clearly justified and compelling reasons or consensual compromises in the revised form of order.

We hope to achieve some or all of those goals, as well as a portion of what follows as we deem sufficient in a compromise, in our discussions with the Debtors. We attach the following to help clarify our desired relief, not as a rejection of the Debtors' compromises, which we hope to achieve.

1.      Notwithstanding any other provisions of this Order (or the Motion to which this Order responds) and in order to clarify what is required or not required of creditors at this time or pursuant to this Order, pending further order of this Court:

A.  A claim shall be deemed "in the fair contemplation" of a creditor when the creditor could have ascertained based on the prepetition relationship with the Debtor and the circumstances that the creditor had a claim on the January 29, 2019 petition date. A claim shall be deemed outside of a creditor's "fair contemplation" if the creditor has suffered no known injury or harm. By way of example, the fact that an old PG&E wire or pipe crosses property does not give rise to a claim "in the fair contemplation," unless the creditor has suffered known injury or harm from the wire before that date.

B.  Claims arising from, caused by, or related to acts, omissions or conditions of a Debtor or assets owned, controlled or operated by a Debtor that have not yet caused actionable harm, injury or damage known or within the fair contemplation of the creditor as of the January 29, 2019 petition date are "Future Harm Claims" to which the Bar Date shall not apply.

C.  Claims for harm, injury or damage known or within the fair contemplation of the creditor as of the January 29, 2019 petition date for which PG&E's liability is unknown to the creditor before the Bar Date are "Unknown Claims" to which the Bar Date shall not apply. Such Unknown Claims shall include claims relating to or resulting from the rejection or attempted rejection of contracts, as discussed below.

D.  Paragraph 3(o) of the Proposed Order shall be amended to add holders of Future Harm Claims and Unknown Claims as additional categories excluded from the obligation to file proofs of claim. Future Harm Claims and Unknown Claims shall not be required to be filed under the bar date order as if they were prepetition claims (or, if they are, so treated, that must be done in a separate and fully briefed proceeding, rather than being assumed as the case by such a bar date order, and any proof of claim requirement must be fully disclosed with fiduciary care, reasonableness, and clarity in warning those not fairly contemplating that requirement.)

E. Claims that are not Future Harm Claims or Unknown Claims and, to the extent that they are known or within the fair contemplation of the holder, must be filed by the Bar Date. Any such claim that is timely filed may be liberally amended by the holder without leave of Court in accordance with applicable precedents. Any untimely claim may be subordinated for distribution to timely claims as provided in section 726(a) of the Bankruptcy Code without further order of the Court.

F. Paragraph 3(j) of the Proposed Order shall be amended to provide a claim that arises from, is related to or arises as a result of, or based on account of, the rejection of an executory contract or unexpired lease shall be filed by the later of (i) the Bar Date, and (ii) the date that is thirty (30) days following the entry of the Court order approving such rejection ("Rejection Order"), provided, however, <u>Debtors shall obtain any Rejection Order no later than fourteen (14) days prior to the last day for the casting of ballots for the acceptance or rejection of any plan, or such executory contracts and unexpired leases shall be deemed to "ride through" the chapter 11 unimpaired and without rejection or assumption, absent the exercise of the non-debtor counterparty's right to object to such "ride through"</u>.

G. Near the end of the opening paragraph, where the court makes certain "determinations" and other references to the Motion, such legal and factual determinations shall be "subject to the compromises in accommodating objections."

H. Documentation supporting proofs of claim may incorporate other documents possessed or readily available to a Debtor or for which judicial notice is appropriate. Also documentation need not be referenced if it is not readily available or if the data is not reasonably knowable or obtainable.

I. Nothing contained in the Order shall constitute a waiver of any party in interest to dispute a Debtor's designation of any agreement, contract, program, policy or lease as an executory contract or lease governed by section 365.