# Exhibit 4

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Exelon Corporation ) | |
| ) | Docket No. EL19-36-000 |
| Complainant, ) | |
| ) | |
| v. ) | |
| ) | |
| Pacific Gas & Electric Co., ) | |
| ) | |
| Respondent. ) | |
| ) | |

## REQUEST FOR REHEARING OF PACIFIC GAS AND ELECTRIC COMPANY

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825l(a), and Rule 713 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("the Commission"), 18 C.F.R. § 385.713, Pacific Gas and Electric Company ("PG&E") submits this Request for Rehearing of the Commission's Order on Petition for Declaratory Order and Complaint[1] in the above-captioned docket.

## RESERVATION OF RIGHTS

On January 29, 2019, PG&E, along with PG&E Corporation, as debtors and debtors in possession, each commenced a voluntary case (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California and an adversary proceeding

---

[1] *Exelon Corporation v. Pacific Gas and Electric Company*, 166 FERC ¶ 61,053 (2019) ("Order").

1

against the Commission.[2]  In that adversary proceeding, PG&E and the Commission are litigating the issue of whether the Bankruptcy Court has exclusive jurisdiction under Section 365 of the Bankruptcy Code over debtors' decisions to assume or reject wholesale power contracts.

PG&E believes strongly that the Bankruptcy Court is the exclusive forum to resolve a legal question, such as this, that arises under the Bankruptcy Code.  PG&E has therefore moved under 11 U.S.C. § 105 to enjoin the Commission, and any other party, from taking action that would interfere with PG&E's rights as a debtor under the Bankruptcy Code.  PG&E also claims in that proceeding that the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362, prevents the Commission, or any other party, from undertaking or continuing any "action or proceeding" against PG&E as a debtor in bankruptcy.  Under section 362(a) of the Bankruptcy Code, the filing of a bankruptcy petition "operates as a stay, applicable to all entities," of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case" and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(1), (3).

On January 28, the Commission issued the Order and, under the Federal Power Act, PG&E's rehearing application is due within 30 days.  Bankruptcy Code Section 108(b), 11 U.S.C. § 108(b), however, extends the time for a debtor to file pleadings such as this to up to 60 days after

_____

[2] *PG&E Corp. v. FERC* (*In re* PG&E Corp.), Ch. 11 Case No. 19-30088, 19-30089, Adv. Pro. No. 19-03003 (Bankr. N.D. Cal. 2019).

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 3 of 25

filing of the bankruptcy petition.[3]  Accordingly, PG&E would have until 60 days after January 29, 2019 to submit this rehearing request—a conclusion shared by the Commission.[4]  Nevertheless, to avoid any argument that a failure to file a rehearing request within 30 days represents an acquiescence to the Order or otherwise waives PG&E's rights, PG&E is filing this request for rehearing today.

By filing this request, PG&E in no way waives its rights under Section 105 of the Bankruptcy Code, or its position that Section 362(a) of the Bankruptcy Code automatically stays any proceedings commenced against PG&E before the Commission, and that no further action is permitted by any party or by the Commission in such proceedings.  PG&E reserves all of its rights asserted in the adversary proceeding in the Bankruptcy Court, including its right to seek enforcement of the automatic stay.

## INTRODUCTION

The Bankruptcy Code gives debtors the right to reject "*any* executory contract" that does not fall within a category specified in the Code.[5]  The debtor's right to reject, which the Supreme

---

[3] Section 108(b) provides that the debtor may "file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act," when the fixed period for doing so "has not expired before the date of the filing of the petition."  The debtor "may only file, cure, or perform, as the case may be, before the later of (1) the end of such period, or . . . (2) 60 days after the order for relief."  The filing of a petition for bankruptcy "constitutes entry of an 'order for relief' within the meaning of the statute." *Seawinds Ltd. v. Nedlloyd Lines, B.V.*, 80 B.R. 181, 187 (N.D. Cal. 1987), *aff'd*, 846 F.2d 586 (9th Cir. 1988).

[4] On February 6, 2019, counsel for PG&E and the Commission entered a joint stipulation in *PG&E Corp. v. FERC* (*In re* PG&E Corp.)*, Ch. 11 Case Nos. 19- 30088, 19- 30089, Adv. Pr. No. 19-03003 (Bankr. N.D. Cal. Feb. 6, 2019), attached here as Exhibit A, stating that the time requirement for filing this rehearing request was controlled by 11 U.S.C. § 108(b).  PG&E is grateful to the Commission and its counsel for joining this stipulation.  Out of caution, however, PG&E has elected to comply with the shorter deadline in 16 U.S.C. § 825l(a) for the reasons stated above.

[5] 11 U.S.C. § 365(a) (emphasis added).

3

Court has described as "vital to the basic purpose of a Chapter 11 reorganization,"[6] is subject only to the approval of the bankruptcy court. Although the Commission's Order in this proceeding purports to "give effect"[7] to the Bankruptcy Code, it does no such thing. If sustained, the principle of concurrent jurisdiction announced in the Order would destroy the debtor's right to reject executory contracts and override the process Congress created for exercising that right.

The Commission's theory of concurrent jurisdiction rests on its assertion that rejection "alters the essential terms and conditions of the contract and the filed rate."[8] Nowhere in the Order does the Commission explain which "essential terms and conditions of the contract" are altered by rejection. But, whatever the Commission might have meant, it mischaracterizes the legal effect of rejection. As the Bankruptcy Code states plainly, rejection is an election to breach a contract.[9] Like any other breach, rejection does not abrogate or rescind the contract and does not release either party from the contract's terms. The "essential terms and conditions of the contract" – including the price, quantity, and period of performance – continue to be in effect in unaltered form because they are the basis for damages owed by the party in breach. As the Commission has recognized many times, where contract damages are based on the terms of the contract, there is no alteration of the filed rate.[10]

---

[6] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

[7] Order at P 25.

[8] Order at P 26.

[9] 11 U.S.C. § 365(g).

[10] *See, e.g., USGen New England, Inc.*, 118 FERC ¶ 61,172 at P 26 & n.22 (2007).

## STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR

Pursuant to Rule 713(c)(2), 18 C.F.R. § 385.713(c)(2), PG&E presents the following statement of issues and identification of errors:

1. The Commission erred by asserting jurisdiction under the Federal Power Act in a manner that directly conflicts with the debtor's right of rejection established in the plain language of the later-enacted Bankruptcy Code. 11 U.S.C. § 365(a); *In re Mirant Corp*., 378 F.3d 511 (5th Cir. 2004); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23 (1984); *Cal. Elec. Oversight Bd. v. Calpine Energy Services, L.P.*, 114 FERC ¶ 61,003 (2006).

2. The Commission erred by failing to explain its conclusion that rejection "alters the essential terms and conditions of the contract and the filed rate" or even to identify the "essential terms and conditions" to which the Commission referred. *BNP Paribas Energy Trading v. FERC*, 743 F.3d 264, 266 (D.C. Cir. 2014) (the Commission must offer an "intelligible explanation" for its decision); *NextEra Desert Center Blythe, LLC v. FERC*, 852 F.3d 1118, 1123 (D.C. Cir. 2017).

3. The Commission erred by asserting that rejection "alters the essential terms and conditions of the contract and the filed rate" when settled law establishes that rejection is no more than a breach of contract and, as such, does not alter the contract terms. Relatedly, the Commission erred by failing to reconcile its decision with its own precedent establishing that there is no alteration of the filed rate so long as damages are based on the contract terms. 11 U.S.C. § 365(g); *In re Mirant Corp*., 378 F.3d 511 (5th Cir. 2004); *USGen New England, Inc*., 118 FERC ¶ 61,172 at P 26, n.22 (2007); *Thompkins v. Lil' Joe Records, Inc*., 476 F.3d 1294 (11th Cir. 2007) ("'[r]ejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.'").

4. The Commission erred by treating rejection of an executory contract in bankruptcy, which "constitutes a breach of . . . contract," 11 U.S.C. § 365(g), differently than the Commission treats breach of contract outside the bankruptcy context. Such disparate treatment indicates discrimination against the bankruptcy debtor, which bankruptcy law forbids. *See, e.g.*, *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300-302 (2003) (applying 11 U.S.C. § 525(a)).

5. The Commission failed to explain or even acknowledge the departure from its precedent in *California Electricity Oversight Board*, 114 FERC ¶ 61,003 (2006), in which it reached a conclusion that is the opposite of the one in the order at issue here. *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 6 of 25

making.'") (quoting *Columbia Broad. Sys. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971)); *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65 (D.C. Cir. 1999).

6. The Commission erred by requiring universal approval of every proposal to reject a contract when far less disruptive means are available to protect the Commission's jurisdiction. *Allied Local and Regional Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses."); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–51 (1983).

7. The Commission erred because, as applied to purchasers of electricity, its theory of concurrent jurisdiction relies on authority the Federal Power Act does not provide: the authority to command purchasers to buy and accept physical delivery for electric power. 16 U.S.C. §§ 824d, 824e; *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("if there is no statute conferring authority, FERC has none"); *Southern Company Services*, 20 FERC ¶ 61,332 at 61,694 (1982).

## ARGUMENT

**I. The Commission's Assertion of Concurrent Jurisdiction Impermissibly Conflicts with the Bankruptcy Code.**

**a. To promote reorganization and to prevent liquidation, Congress authorized the rejection of contracts in bankruptcy proceedings.**

Although it purports to "give effect" to the Bankruptcy Code, the Order fails to confront what the Bankruptcy Code actually says, much less the goals Congress sought to achieve through the Code. The Supreme Court has summed those goals up concisely: "the policy of Chapter 11 is to permit successful rehabilitation of debtors."[11] Congress had important reasons to pursue this policy: "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[12]

---

[11] *Bildisco & Bildisco*, 465 U.S. at 527.

[12] *Id.* at 528 (citing H.R. Rep. No. 95-595, p. 220 (1977)).

The authority to reject executory contracts is an integral piece of the bankruptcy process that Congress designed and is essential to the realization of Congress's goal to steer debtors away from liquidation. As the Supreme Court explained in its most thorough examination of rejection in bankruptcy, "the authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."[13]

For a Chapter 11 reorganization to succeed, many interdependent issues must be resolved simultaneously. Chapter 11 therefore gives the debtor-in-possession the flexibility to assume or reject contracts at any time until a reorganization plan is confirmed.[14] The flexible authority to reject contracts under Chapter 11 contrasts with its less flexible counterpart under Chapter 7, leading the Supreme Court to observe that "this difference between the two types of proceedings reflects the considered judgment of Congress that a debtor-in-possession seeking to reorganize should be granted more latitude in deciding whether to reject a contract than should a trustee in liquidation."[15]

In the Code, Congress also carefully delineated which types of contracts may be rejected and which may not. Section 365(a) of the Bankruptcy Code states that, "subject to the court's approval," a debtor "may assume or reject *any* executory contract or unexpired lease of the debtor" that is not excepted by other enumerated provisions of the Code.[16] Were it not already obvious from the plain language of Section 365(a), the Supreme Court has held that the exceptions to

---

[13] *Id.*

[14] 11 U.S.C. § 365(d)(2); 11 U.S.C. § 1107(a) (extending rights of trustee to a debtor-in-possession under Chapter 11).

[15] *Bildisco & Bildisco*, 465 U.S. at 529.

[16] 11 U.S.C. § 365(a) (emphasis added).

Section 365(a) listed in the Code are the only exceptions that apply, because "Congress knew how to draft an exclusion . . . when it wanted to."[17]

### b. Wholesale power contracts may be rejected under Section 365 of the Code.

Wholesale power contracts do not fall within any category of contracts excluded from rejection by the Bankruptcy Code. This omission reflects a knowing choice by Congress.[18] Section 365 of the Code was enacted over four decades after the Federal Power Act and at a time when rate-regulated contracts prevailed across many sectors of the economy. Congress was aware of rate-regulated contracts, and referenced them elsewhere in the Code,[19] but chose not to exclude them from the debtor's right to reject.

In the Order, the Commission does not dispute that wholesale power contracts may be executory contracts capable of rejection pursuant to Section 365(a). Indeed, the Commission's assertion of concurrent jurisdiction plainly takes that fact as a premise. The Order acknowledges that such contracts can be "reject[ed]" and that, in the context of a bankruptcy, the bankruptcy court must approve such a rejection, thereby exercising its jurisdiction under Section 365.[20]

### c. The Commission's assertion of concurrent jurisdiction conflicts with the Bankruptcy Code.

The Commission's statement that its Order will "give effect" to the Bankruptcy Code rings hollow. The Commission's approval requirement effectively destroys the utility of Section 365(a) and ignores the choice Congress made regarding which types of contracts may be rejected and

---

[17] *Bildisco & Bildisco*, 465 U.S. at 522–23.

[18] *Id.*; *see also FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003) ("where Congress has intended to provide regulatory exceptions to the Bankruptcy Code, it has done so clearly and expressly.").

[19] *See, e.g.*, 11 U.S.C. § 1129(a)(6).

[20] Order at 28 ("[A] party to a Commission-jurisdictional wholesale power purchase agreement must obtain approval from both the Commission and the bankruptcy court to modify the filed rate and reject the contract, respectively.").

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 9 of 25

which may not. Most fundamentally, if the Commission withholds approval, the debtor cannot successfully reject a contract, even if the bankruptcy court approves. The debtor is thus deprived of the right granted it by Section 365 (to "reject any executory contract") and the approval process provided by Section 365 ("subject to the court's approval"). Even in cases where the Commission ultimately approves the rejection, the debtor would be deprived of the flexibility provided by Section 365 to assume or reject a contract "at any time before the confirmation of a [reorganization] plan"[21] – a flexibility described by the Supreme Court as reflecting the "considered judgment of Congress" to afford the debtor "latitude" to reject contracts in the Chapter 11 context.[22] This interference with the bankruptcy process was described well by the Bankruptcy Court in *FirstEnergy* as "at best . . . a costly procedural delay of the final determination of the treatment rejection claims will receive in the bankruptcy case," and "at worst . . . an inappropriate violation of the Bankruptcy Code's priority scheme."[23]

## II. The Bankruptcy Code and the Federal Power Act Can and Must Both Be Given Effect.

### a. The Commission creates an unnecessary conflict between the two statutes by ignoring settled law that rejection does not alter the terms of a contract.

When two Federal statutes are "capable of co-existence . . . absent a clearly expressed congressional intention to the contrary," they must be read "to regard each as effective"[24] and to avoid irreconcilable conflicts between them.[25] The Commission has created an irreconcilable

---

[21] 11 U.S.C. § 365(d)(2).

[22] *Bildisco & Bildisco*, 465 U.S. at 529.

[23] *In re FirstEnergy Solutions Corp.*, 2018 WL 2315916 at *12 (Bankr. N.D. Ohio 2018) ("*FirstEnergy*").

[24] *Morton v. Moncari*, 417 U.S. 535, 551 (1974).

[25] *Watt v. Alaska*, 451 U.S. 259, 266–67 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.").

conflict between the Federal Power Act and the Bankruptcy Code, because the Commission asserts that its authority under the Federal Power Act means that a debtor may not exercise its right to reject contracts in the manner prescribed by the Bankruptcy Code. This conflict is entirely avoidable. Indeed, the text of the Bankruptcy Code itself supplies the reading that allows the two statutes to be reconciled perfectly: rejection of a contract does not require Commission approval because it is a breach of the contract, not a change in its terms. This reading has been embraced by the only appellate court to have ruled on this issue,[26] and is also the position the Commission itself had taken from 2006 until recently.

Section 365(g) of the Code provides that rejection of an executory contract by a debtor "constitutes a breach of such contract."[27] Like any other breach, rejection does not change the terms of the contract, but relies on and continues to give effect to those terms in order to determine the amount owed in damages. As the Department of Justice explains in its Civil Resource Manual in discussing executory contracts in bankruptcy, "[r]ejection does not extinguish the contract. It merely constitutes a breach of the contract, and the terms of the contract still control the relationship of the parties."[28] Courts universally endorse the same reasoning. *See Thompkins v. Lil' Joe Records, Inc*., 476 F.3d 1294, 1306 (11th Cir. 2007) ("'[r]ejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.'") (quoting *In re Drexel Burnham Lambert Group*, 138 B.R. 687, 708 (Bankr. S.D.N.Y. 1992)); *In re Onecast Media, Inc.*, 439 F.3d 558, 563 (9th Cir. 2006) ("rejection of an executory contract in accordance with applicable provisions of the Bankruptcy

---

[26] *In re Mirant Corp*., 378 F.3d 511 (5th Cir. 2004) ("*Mirant*").

[27] 11 U.S.C. § 365(g).

[28] Department of Justice, *Civil Resource Manual* § 60, available at https://www.justice.gov/jm/civil-resource-manual-60-executory-contracts-bankruptcy.

Act is not the equivalent of rescission") (quoting *In re Murphy*, 694 F.2d 172, 174 (8th Cir. 1982));

*In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 239 n.8 (3rd Cir. 1995) ("Rejection . . . is equivalent to a nonbankruptcy breach."); *In re Mitchell*, 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000) ("[I]t now appears to be well-settled that rejection does not terminate an executory contract . . . or necessarily avoid the rights of the non-debtor party under the contract"); *In re Fitch*, 174 B.R. 96, 100 (Bankr. S.D. Ill. 1994) ("rejection of an executed contract neither adds to nor detracts from a claim for payment under the contract or the estate's liability for such payment.").

For the same reasons, rejection does not implicate the filed rate doctrine. As with any other breach, the damages owed by the debtor are calculated using the terms of the contract and so give effect to those terms. As the U.S. Court of Appeals for the Fifth Circuit explained in *Mirant*,[29] "[a] motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages."[30]

The rejection of a contract in bankruptcy is entirely different from the abrogation of a contract under Section 206 of the Federal Power Act. When the Commission abrogates a contract under Section 206, both parties are freed from their remaining obligations. The Commission has itself explained this distinction. In *California Electricity Oversight Board*,[31] the Commission embraced the Fifth Circuit's conclusion in *Mirant* and stated that the Commission would "follow that authority."[32] The Commission further explained that "rejection of an executory contract constitutes a *breach* of contract, not approval to terminate it under section 205 of the FPA."[33] The

---

[29] 378 F.3d 511 (5th Cir. 2004).

[30] *Id*. at 522.

[31] 114 FERC ¶ 61,003 (2006).

[32] *Id*. at P 11.

[33] *Id*. at P 13 (emphasis in original).

Commission contrasted "a section 205 proceeding" in which "the issue is whether a party can terminate its obligations and *thereafter have no liability to its counterparty*" with a rejection motion in which "there is no request by [the debtor] to terminate its obligations and thereafter be free of liability."[34]

When there is a material breach of contract, it is common for performance under the contract to cease and for the party in breach to pay damages. The cessation of performance after breach does not mean the contract has been abrogated or rescinded. The terms of the contract still bind the parties and provide the basis for the calculation of damages. On this point, the court in *Calpine*[35] was mistaken. In *Calpine*, the court tried to explain away the fact that rejection represents a breach of contract by distinguishing between a "run-of-the-mill contract dispute" and one that entails "a complete cessation of performance."[36] But the court failed to address the obvious fact that many "run-of-the-mill" breaches also result in a complete cessation of performance. *See, e.g.*, Restatement (Second) of Contracts § 237. The *Calpine* court also did not consider, let alone distinguish, the substantial body of bankruptcy law holding that rejection does not abrogate a contract.[37]

---

[34] *Id*. (emphasis in original).

[35] 337 B.R. 27 (S.D.N.Y. 2006).

[36] *Id.* at 36.

[37] *See* cases cited *supra* pp. 9 - 10.

b. **The Order is inconsistent with Commission precedent in breach of contract actions that arise outside of bankruptcy.**

The Commission also failed to explain why it believes the filed rate doctrine applies differently to a breach of contract that arises in the bankruptcy context than it does to a breach that arises outside bankruptcy. The court in *FirstEnergy* considered this question and aptly observed:

> If Plaintiffs were solvent and simply stopped making payments under the [agreements], the counterparties could not reasonably argue that Plaintiffs had somehow modified or abrogated those agreements; they would seek damages for the breaches of those contracts . . . under the terms of the contracts as written. Those breaches would lead to claims. If the Plaintiffs then filed bankruptcy, the claims would become claims against the estate. Treatment of those claims are governed by the Bankruptcy Code, including the confirmation of a reorganization plan in chapter 11, and the economic reality of the debtor's estate. Rejection has exactly the same effect (breach) and the same result (a claim against the estate).[38]

When a breach of contract arises outside bankruptcy, the Commission does not hold that the party in breach must seek Commission approval to cease performance and pay damages. Instead, applying the *Arkla* test,[39] the Commission routinely declines to assert jurisdiction over contract actions that center on determining breach and damages,[40] including where the breach may

---

[38] *FirstEnergy*, 2018 WL 2315916 at *17.

[39] *Ark. La. Gas Co. v. Hall*, 7 FERC ¶ 61,175, at 61,322 (1979) ("*Arkla*") (explaining that whether "the Commission should assert jurisdiction over contractual issues otherwise litigable in state courts, depends . . . on three factors . . . : (1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether there is a need for uniformity of interpretation of the type of question raised by the dispute; and, (3) whether the case is important in relation to the regulatory responsibilities of the Commission").

[40] *See Southern Md. Elec. Coop. v. J.P. Morgan Ventures Energy Corp.*, 155 FERC ¶ 61,164 at P 23 (2016) ("the Commission does not have special expertise in the area of determining damages for claimed breaches of contract, and the Commission has generally left this issue to be decided in court."); *Southwest Power Pool, Inc.*, 150 FERC ¶ 61,091 at P 10 (2015) ("in past cases, the Commission has generally left to state court proceedings the interpretation of terms and conditions of contracts that relate to contractual damages and ordering of damages for breaches of contract.").

Case: 19-30088   Doc# 2361-4   Filed: 06/03/19   Entered: 06/03/19 17:47:43   Page 14 of 25

result in complete cessation of performance under the contract.[41]   Given that rejection in bankruptcy is just another name for an election to breach a contract, the Commission has failed to explain why it treats a contract breach as implicating the filed rate doctrine in one context but not the other.

Indeed, such disparate treatment indicates exactly the kind of discrimination against debtors that bankruptcy law expressly forbids.  *See, e.g.*, *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300-02 (2003) (applying 11 U.S.C. § 525(a) and citing *Perez v. Campbell*, 402 U.S. 637 (1971)).  Regardless of "valid regulatory motive[s]," *id.* at 301, the Commission may not harm or discriminate against a party because that party is involved in bankruptcy proceedings or has not paid a debt dischargeable in bankruptcy.  Treating a breach of contract outside bankruptcy one way and a breach of contract in the context of a bankruptcy proceeding a different way does just that.

## III.   The Commission Failed to Explain its Conclusion that Rejection Alters the Essential Terms and Conditions of the Contract and the Filed Rate.

The Order devotes much of its discussion to legal principles that are not in dispute.  It is inarguable that the Commission has broad and exclusive jurisdiction over wholesale ratemaking and that the filed rate doctrine serves to protect that jurisdiction.  What the Commission leaves unexplained, however, is why it believes the filed rate doctrine applies to the rejection of contracts in bankruptcy in the first place.  The critical sentence comes in Paragraph 26 of the Order, where

---

[41] *See Portland Gen. Elec. Co*., 72 FERC ¶ 61,009, 61,020 – 61,022 (1995) (concluding that a state court action involving termination of a long-term contract did not warrant the Commission's jurisdiction so long as the case did not "challenge the reasonableness of any rate on file with FERC, or make claims based on the FPA"); *PPL Elec. Util. Corp*., 92 FERC ¶ 61,057 (2000); *Southern Cal. Edison Co*., 85 FERC ¶ 61,023 (1998), *reh'g denied* 85 FERC ¶ 61,389 (1998) (declining to assert jurisdiction in a case where one party sought to abrogate power sales agreements, explaining that "the question of whether one of the parties remains able to fulfill its contractual obligations . . . [is] . . . a contract question that does not involve the just and reasonable level of interstate wholesale power rates").

Case: 19-30088   Doc# 2361-4   Filed: 06/03/19   Entered: 06/03/19 17:47:43   Page 15 of 25

the Commission states: "We find that a rejection of a Commission-jurisdictional contract in a bankruptcy court alters the essential terms and conditions of the contract and the filed rate; thus, this Commission's jurisdiction is implicated, and our approval is required." But nowhere does the Commission identify the "essential terms and conditions of the contract" altered by rejection. Given the overwhelming body of bankruptcy law explaining that rejection is an election to breach that does *not* change the terms and conditions of a contract, the Commission's failure to explain the basis for its conclusion is reversible error.

Elsewhere in the Order, the Commission makes clear that its holding does not depend on the particular terms of any contract, including those between PG&E and the petitioners.[42] Thus, the Commission's conclusion that rejection "alters the essential terms and conditions of the contract" must refer to essential terms and conditions that the Commission believes to exist generically in any wholesale power contract. There are a finite number of possibilities: the contract price, the duration of the contract, and the quantity of energy transacted. None of these terms is altered by rejection.

Rejection does not alter the price that the parties have committed to in a contract, because the contract price is used to calculate damages. As noted above, the Commission routinely declines to assert jurisdiction over contract actions where the only issues are breach and damages,[43] which it would not do if the translation of a contract price into damages represented a change in the filed rate. The Commission has reached this conclusion even when the court must employ equitable doctrines to arrive at a figure for compensatory damages. In *USGen New England, Inc.*, for

---

[42] Order at P 26 n.58.

[43] *See supra* notes 39-41 and accompanying text.

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 16 of 25

instance, an interstate pipeline customer rejected a contract in bankruptcy.[44]  The pipeline argued that the filed rate doctrine prevented the bankruptcy court from applying certain mitigation credits to reduce the buyer's damages.  The Commission disagreed, explaining that "[m]itigation does not change the filed rate; it only changes the net amount owed as an equitable remedy for the breach of contract."[45]  Denying rehearing, the Commission re-emphasized that the filed rate doctrine did not apply, because "*damages would be calculated starting with the filed rates*."[46]

Of course, an insolvent debtor may not be able to pay the full amount of contract damages owed (a reality that could arise before bankruptcy as well).  But an insolvent debtor's inability to pay has nothing to do with the contract *rate* used to calculate damages and, therefore, also cannot logically be considered a change to the filed rate.

Rejection also neither abrogates a contract nor shortens the period of performance.  If it did, the party in breach would be left with no remaining obligations and the non-breaching party would be left without compensation, which is not the law.  Rather, the entire performance period of the contract is used, along with the price and other terms, to determine the non-breaching party's expectancy under the contract and its claim for damages against the estate.

In the Order, the Commission did not address whether it believes that rejection changes the contract term.  But in the *FirstEnergy* litigation, counsel for the Commission asserted that a debtor's rejection motion would "change the service period of a contract."[47]  On this point, the

---

[44] 116 FERC ¶ 61,285 (2006), *reh'g granted in part and denied in part*, 118 FERC ¶ 61,172 (2007).

[45] 116 FERC ¶ 61,285 at P 32.

[46] 118 FERC ¶ 61,172 at P 26 (emphasis added).

[47] Defendant's Opp. To the Plaintiff's Motion for a Preliminary Injunction at 13, *First Energy Solutions Corp. v. FERC* (*In re First Energy Solutions Corp., et. al.*), No. 18-50757 (Bankr. N.D. Ohio Apr. 30, 2018).

Case: 19-30088   Doc# 2361-4   Filed: 06/03/19   Entered: 06/03/19 17:47:43   Page 17 of 25

Commission should clarify what it believes would be the legal effect of the Commission "approval" it contemplates in Paragraph 26 of the Order.

If the Commission believes that such an approval would "change the service period of the contract" – that is, by ending it – the Commission should make that view clear and explain that its approval would remove any further obligation for either party under the contract, as well as the obligation to pay damages. If it takes that view, the Commission must also acknowledge that – in cases where the Commission grants approval – there is no longer a reason for the bankruptcy court to act, because the terminated contract would no longer be an executory contract capable of being breached. If, on the other hand, the Commission intends that the approval contemplated in Paragraph 26 would leave the party in breach subject to the contract and liable for damages calculated based on the full contractual service period, it should state that view and conclude that rejection does not "change the service period" of the contract.

Rejection also does not change the quantity of electric energy that the contract requires to be purchased and sold. The Commission did not make this argument in the Order. But, in a brief filed in the Bankruptcy Court for the Northern District of California, counsel for the Commission claimed – changing their theory yet again – that "rejection of an executory contract would change the quantity of power delivered at the filed rate."[48] Rejection does not change the quantity terms for the same reason it does not change the price term or the contract length: the quantity term would be used to calculate damages. If rejection reduced or eliminated the quantity of energy the buyer is obligated to purchase, as counsel for the Commission suggests, no damages would be owed.

---

[48] Brief of Defendant in Opp. to Motion for Preliminary Injunction and Motion to Dismiss, *supra* note 2, at *18.

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 18 of 25

**IV.    The Commission Failed to Consider that Less Disruptive Means Exist to Protect its Jurisdiction.**

The Order requires that debtors seek Commission approval to reject any "Commission jurisdictional contract."[49]  As explained above, this requirement will badly interfere with the bankruptcy process and, in some cases, could frustrate the debtor's ability to reorganize successfully.  The Commission's proposed approach is also far broader than necessary to protect the Commission's jurisdiction, as it would apply to every contract without regard to the terms of the contract or to whether the reviewing court had even arguably violated the filed rate doctrine.

In announcing this broad requirement, the Commission failed to consider that other well-established and less disruptive means exist to protect its jurisdiction.  First, if the bankruptcy court were to calculate contract damages in a manner that departed from the contract rate, the disadvantaged party could raise the filed rate doctrine in that forum.  Many litigants have protected the Commission's exclusive jurisdiction over wholesale ratemaking in this manner.[50]  Second, if a legitimate concern arose that the bankruptcy court might run afoul of the filed rate doctrine, either party could petition the Commission for a declaratory order to resolve the question.  *USGen New England Inc.* illustrates the principle.[51]  In that case, a bankrupt shipper rejected its contract with an interstate pipeline.  As the case progressed, the pipeline persuaded the bankruptcy court that the filed rate doctrine prohibited awarding certain types of mitigation credits to offset the damages owed by the shipper.  The shipper petitioned the Commission for declaratory relief, and the Commission provided guidance to the bankruptcy court that awarding the mitigation credits

---

[49] Order at P 26.

[50] *See, e.g., Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981).

[51] 116 FERC ¶ 61,285 (2006).

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 19 of 25

would not alter the filed rate. The case illustrates how, in the bankruptcy context, the Commission can appropriately police its jurisdiction without imposing a universal approval requirement before a debtor rejects any contract. Third, the Bankruptcy Code itself protects the Commission's ratemaking jurisdiction by withholding the ultimate goal of the Chapter 11 process – confirmation of the reorganization plan – unless and until any change to the debtor's rates has received the appropriate regulatory approval.[52]

## V. The Commission Failed to Explain the Departure from its Precedent in *California Electricity Oversight Board.*

The Order fails to explain its departure from precedent, or even acknowledge that such a departure has taken place.[53] The Order does not explain – or even mention – the Commission's decision in *California Electricity Oversight Board*, in which the Commission reached the opposite conclusion.[54] In that case, the Commission discussed the Fifth Circuit's decision in *Mirant* at length and announced its decision to follow it. The case did not arise in the Fifth Circuit geographically, and therefore the Commission was not bound to follow *Mirant*. But the Commission explained that it did so because it agreed with *Mirant*'s conclusions and because *Mirant* held the authority of a federal appellate decision: "a federal court of appeals has now spoken to the issue . . . and we intend to follow that authority."[55] Further, as noted above, in *California Electricity Oversight Board*, the Commission ably explained the distinction between

---

[52] 11 U.S.C. § 1129(a)(6).

[53] *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65 (D.C. Cir. 1999) ("It is . . . elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent.") (quoting *Gilbert v. NLRB*, 56 F.3d 1438, 1445 (D.C. Cir. 1995))

[54] 114 FERC ¶ 61,003 (2006).

[55] *Id*. at P 11.

Case: 19-30088   Doc# 2361-4   Filed: 06/03/19   Entered: 06/03/19 17:47:43   Page 20 of 25

abrogation of a contract (which frees the parties from further obligations) and breach (which makes the party in breach liable for damages)[56] – a distinction it no longer appears to accept.

The Commission offers no reason for the about face. In the Order, the Commission refers to the law in this area as "unsettled."[57] But the law is just as settled now as it was when the Commission decided *California Electricity Oversight Board*. There remains only one federal court of appeals to have decided this question.[58]

The District Court's decision in *Calpine*, issued three weeks after *California Electricity Oversight Board*, in no way absolves the Commission of its obligation to explain its departure from precedent. First, in *California Electricity Oversight Board*, the Commission made clear that it intended to follow the authority of the only federal court of appeals to have addressed the issue – a circumstance that has not changed. Second, the Order does not embrace the holding of *Calpine*: the Commission takes the view that it shares concurrent jurisdiction with the Bankruptcy Court and that both bodies may act on a proposed rejection, whereas *Calpine* held that the court lacked any jurisdiction over the rejection of a wholesale power contract.[59] Third, the Commission continued to embrace the logic of *California Electricity Oversight Board* even after *Calpine* was decided. As explained above, *USGen New England, Inc.*[60] involved the rejection of a contract in bankruptcy. The Commission deferred the issues of contract law to the bankruptcy court, cited *Mirant* as authority, and – in direct contradiction to *Calpine* – determined that the filed rate

---

[56] *Id*. at P 13.

[57] Order at P 23.

[58] *See In re Mirant Corp*., 378 F.3d 511 (5th Cir. 2004).

[59] *Calpine*, 337 B.R. at 29.

[60] 116 FERC ¶ 61,285 (2006), *reh'g granted in part and denied in part*, 118 FERC ¶ 61,172 (2007).

Case: 19-30088   Doc# 2361-4   Filed: 06/03/19   Entered: 06/03/19 17:47:43   Page 21 of 25

doctrine did not apply to the facts before it because "damages would be calculated starting with the filed rates."[61]

## VI. The Commission Lacks Authority to Command a Customer to Purchase Power.

The Commission's theory of concurrent jurisdiction exceeds its authority for another, independent reason: the Commission cannot order a purchaser to buy power.[62] The Commission's Order necessarily relies on this authority. For a buyer, an order from the Commission disapproving rejection would have the unavoidable consequence of forcing the buyer to take physical service under the contract. Nothing in the Federal Power Act gives the Commission this power.

Concerned with "the business of . . . *selling* electric energy,"[63] the Federal Power Act gives the Commission authority to regulate the "*sale* of electric energy at wholesale."[64] Sections 205 and 206, upon which the Commission relies here, focus exclusively on sellers and sales. Those sections require that sellers charge just and reasonable rates, that sellers refrain from undue discrimination, that sellers make certain filings and open their books and records, and so on.[65] These requirements do not apply to buyers.[66] The Federal Power Act's consistent and exclusive focus on sellers and sales[67] is no accident. It comes from the Act's purpose to prevent "abuses of

---

[61] 118 FERC ¶ 61,172 at P 26, n.22 (2007).

[62] PG&E explained this limitation on the Commission's authority in its answer. *See* Answer of PG&E at 8 - 13, Docket No. EL19-36 (filed Jan. 24, 2019). The Commission, however, did not address PG&E's argument in its Order.

[63] 16 U.S.C. § 824(a) (emphasis added).

[64] *Id*. at § 824(b)(1) (emphasis added).

[65] *Id*. at §§ 824d, 824e.

[66] *Id*.; s*ee also Southern Company Services*, 27 FERC ¶ 61,444, 61,829 (1984) (rejecting an argument based on a claim of undue "preference in a purchase, not a transmission or sale" and concluding that "the Federal Power Act does not give the Commission jurisdiction to dictate to [the buyer] who to purchase from").

[67] *See E. Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299 (D.C. Cir. 2007) (the "entire thrust of Part II [of the FPA] is toward the seller at wholesale, not the buyer") (alteration in original) (quoting *Cal. Elec. Power*

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 22 of 25

market power" in "a market historically characterized by natural monopoly."[68]  By contrast, the procurement decisions of load-serving entities, and the actions of power purchasers in general, have never been an area of federal concern, and the Federal Power Act has little to say about them. As the Commission explained in *Midwest Independent Transmission System Operator, Inc.*, "[t]he Commission is charged with regulating public utility sales for resale in interstate commerce; state commissions regulate purchases for resale to retail customers."[69]

Nothing in Sections 205 or 206 of the Federal Power Act gives the Commission authority to require a purchaser to purchase electricity,[70] much less to take physical service rather than breach and pay damages.  Neither the Commission nor any of the petitioners in these proceedings have pointed to a single example of the Commission doing so.  In one case, *Blumenthal v. NRG Power Marketing, Inc.*,[71] the Commission ordered a seller to specifically perform under a contract it had sought to reject in bankruptcy.  However, the Commission's rationale for ordering NRG to perform depended on NRG's regulatory obligations as a seller, and the Commission's mandate

---

*Co. v. FPC*, 199 F.2d 206, 209 (9th Cir. 1951)); *see also Prior Notice and Filing Requirements Under Part II of the FPA*, 64 FERC ¶ 61,139, 61,986 (1993) ("The identity of the purchaser of wholesale energy or transmission service, whether publicly-owned or privately-owned, does not affect the Commission's jurisdiction under Part II of the FPA. The identity of the seller or transmitter, however, does make a difference."); *Standards of Conduct for Transmission Providers*, 125 FERC ¶ 61,064 at P 77 (2008) (restricting scope of standards of conduct regulations "to include only sales, rather than purchases" in an effort to "more closely match[]" the language of the Federal Power Act).

[68] *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 531 (2008); *see also Market-Based Rates for Wholesale Sale of Elec. Energy*, 119 FERC ¶ 61,295 at P 6 (2007) ("The Commission's first and foremost duty is to protect customers from unjust and unreasonable rates . . . .").

[69] 113 FERC ¶ 61,081 (2005) at P 53.

[70] In *Southern Company Services*, 20 FERC ¶ 61,332, 61,694 (1982), a cooperative claimed that a utility had refused to purchase electricity from the cooperative for anti-competitive reasons.  The Commission rejected the cooperative's argument because the "gravamen of [its] complaint" was the utility's "failure to purchase" and therefore the cooperative "did not state a claim for which there is a remedy under the Federal Power Act."

[71] 103 FERC ¶ 61,344 (2003).

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 23 of 25

from "Congress to protect wholesale power customers."[72]  Thus, neither *Blumenthal* nor any other case stands for the proposition – found nowhere in the Federal Power Act – that the Commission can order a buyer to take physical service under a contract.

## VII.    Conclusion

For the foregoing reasons, if this proceeding is permitted to proceed, the Request for Rehearing should be granted.

February 25, 2019                                  Respectfully Submitted,

                                                   /s/ Samuel Walsh

William Manheim                          Harris, Wiltshire & Grannis LLP
Charles R. Middlekauff                   1919 M St. NW
PACIFIC GAS AND ELECTRIC COMPANY         Washington, D.C. 20036
77 Beale Street                          (202) 730-1306
San Francisco, CA 94105                  swalsh@hwglaw.com
(415) 973-6628
WVM3@pge.com                             *Counsel for*
CRMd@pge.com                             *Pacific Gas and Electric Company*

---

[72] *Id*. at P 53; *see also id*. at PP 58 – 59.

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused an electronic copy of this Request for Rehearing to be served upon each person designated in the official service list compiled by the Secretary in this proceeding.

Dated at Washington, D.C., February 25, 2019.

/s/ Samuel Walsh

Harris, Wiltshire & Grannis LLP
1919 M St. NW
Washington, D.C. 200036
(202) 730-1306
swalsh@hwglaw.com

Case: 19-30088    Doc# 2361-4    Filed: 06/03/19    Entered: 06/03/19 17:47:43    Page 25 of 25