# Exhibit 7

167 FERC ¶ 61,096
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
Cheryl A. LaFleur and Richard Glick,

| | |
|---|---|
| NextEra Energy, Inc. and NextEra Energy Partners, L.P. | Docket Nos.  EL19-35-001 |
| v. | |
| Pacific Gas and Electric Company | |
| Exelon Corporation | EL19-36-001 |
| v. | |
| Pacific Gas and Electric Company | (consolidated) |

ORDER DENYING REHEARING

(Issued May 1, 2019)

1.     On February 25, 2019, Pacific Gas and Electric Company (PG&E) sought rehearing of two Commission orders[1] in which the Commission held that it and bankruptcy courts have concurrent jurisdiction to review and address the disposition of wholesale power contracts sought to be rejected through bankruptcy.  In this order, we consolidate the proceedings and deny PG&E's rehearing requests.

---

[1] *NextEra Energy, Inc. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,049 (2019) (*NextEra v. PG&E*); *Exelon Corp. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,053 (2019) (*Exelon v. PG&E*).  On February 11, 2019, the Secretary of the Commission issued an errata notice in both Docket Nos. EL19-35-000 and EL19-36-000 to include parties that were inadvertently omitted from the issued orders.

# I.    Background

## A.    Procedural History

2.    On January 13, 2019, PG&E announced through a filing with the United States Securities and Exchange Commission that it would file for bankruptcy protection due to, among other reasons, liabilities relating to wildfires in California, and that it would make that filing on or about January 29, 2019.[2]  Prior to the bankruptcy filing, however, on January 18, 2019, NextEra Energy, Inc. and NextEra Energy Partners, L.P. (collectively, NextEra) filed, pursuant to sections 206 and 306 of the Federal Power Act (FPA)[3] and Rules 206 and 207 of the Commission's Rules of Practice and Procedure,[4] a petition for declaratory order and complaint (NextEra Petition) against PG&E requesting that the Commission find that, if PG&E files for bankruptcy, PG&E may not abrogate, amend, or reject in a bankruptcy proceeding any rates, terms, and conditions of its wholesale power contracts subject to the Commission's jurisdiction without first obtaining approval from the Commission under FPA sections 205 and 206.  On January 22, 2019, Exelon Corporation (Exelon) submitted a similar petition for declaratory order and complaint (Exelon Petition) pursuant to FPA sections 206 and 306 and Rules 206 and 207 of the Commission's Rules of Practice and Procedure.

3.    The Commission issued orders on the NextEra Petition and Exelon Petition on January 25, 2019 and January 28, 2019, respectively.  The *NextEra v. PG&E* and *Exelon v. PG&E* orders clarified the Commission's position with regard to its jurisdiction over the wholesale power contracts that a debtor may attempt to reject through bankruptcy. The Commission reviewed the FPA and the Bankruptcy Code, and, noting that case law interpreting the two acts together is unsettled,[5] the Commission found that to give effect to both the FPA and the Bankruptcy Code, a party to a Commission-jurisdictional wholesale power contract must obtain approval from both the bankruptcy court and the

---

[2] Pac. Gas and Elec. Corp. & PG&E, Current Report (Form 8-K) (Jan. 13, 2019).

[3] 16 U.S.C. §§ 824e, 825e (2012).

[4] 18 C.F.R. §§ 385.206, 385.207 (2018).

[5] *See In the Matter of Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) (*Mirant*); *In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006) (*Calpine*); *In re Bos. Generating, LLC*, No. 10 Civ. 6258, 2010 WL 4616243 (S.D.N.Y. Nov. 12, 2010) (*Boston Generating*); *In re FirstEnergy Solutions Corp. v. FERC*, 2018 WL 2315916 (Bankr. N.D. Ohio May 18, 2018) (*FirstEnergy*).

Commission to reject a contract and modify the filed rate, respectively.[6]  The Commission found that a rejection of a Commission-jurisdictional contract in a bankruptcy court alters the essential terms and conditions of the contract and the filed rate; such modifications implicated the Commission's exclusive jurisdiction to determine just and reasonable rates and the Supreme Court of the United States (Supreme Court) has held several times that no court may set aside or modify a Commission-jurisdictional rate except on direct review of the Commission's orders.[7]

4.      On January 29, 2019, PG&E filed a petition for bankruptcy in the United States Bankruptcy Court for the Northern District of California (California Bankruptcy Court), and initiated an adversarial proceeding against the Commission by filing a complaint for declaratory judgment and preliminary and permanent injunctive relief and a motion for a preliminary injunction against the Commission.[8]

---

[6] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at P 28; *Exelon v. PG&E*, 166 FERC ¶ 61,053 at P 25.

[7] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at P 29 (quoting *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (*Montana-Dakota Utilities*); *Exelon v. PG&E*, 166 FERC ¶ 61,053 at P 26 (same).  The Supreme Court has reiterated this principle numerous times.  *See, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (*Ark. La. Gas*) ("No court may substitute its own judgment on reasonableness for the judgment of the Commission. . . .  The authority to decide whether the rates are reasonable is vested . . . solely in the Commission . . . ." (citing *Montana-Dakota Utilities*, 341 U.S. at 251; *FPC v. Hope Natural Gas Co*., 320 U.S. 591, 611 (1944))); *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 962-64 (1986) (construing *Montana-Dakota Utilities*, *Ark. La. Gas*, and filed rate doctrine precedent in other federally-regulated industries); *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371-72 (1988) ("FERC has exclusive authority to determine the reasonableness of wholesale rates.  It is now settled that 'the right to a reasonable rate is the right to the rate which the Commission files or fixes, and, except for review of the Commission's orders, a court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.'  This principle binds both state and federal courts and is in the former respect mandated by the Supremacy Clause."  (citations and alterations omitted) (quoting *Nantahala*, 476 U.S. at 963-64 (quoting *Montana–Dakota Utilities*, 341 U.S. at 251-252))).

[8] *See generally* Complaint for Declaratory Judgment & Preliminary & Permanent Injunctive Relief, In re:  PG&E Corp., Adv. Pro. No. 19-03003 (Bankr. N.D. Cal. Jan. 29, 2019).

5.      PG&E proffers several alleged errors that the Commission made in its underlying orders, each of which are addressed below.[9]

## B.      Subsequent Interventions and Proceedings

6.      Since the Commission issued the *NextEra v. PG&E* and *Exelon v. PG&E* orders, several parties have filed motions to intervene out-of-time in both proceedings.  In Docket No. EL19-35-000, Nevada Irrigation District, Crockett Cogeneration (Crockett), and Hatchet Ridge Wind, LLC (Hatchet Ridge) sought intervention out-of-time.  Crockett states that it is not seeking to alter the existing record, the status of this proceeding, or any procedural schedule, and, as a result, granting the intervention will not result in any disruption to the proceeding or prejudice any party.  Hatchet Ridge argues that in order to protect its wholesale power contract with PG&E from modification, rejection, termination, or cancellation it must be granted intervenor status in this proceeding. Hatchet Ridge states that good cause exists for the Commission to grant its motion to intervene out-of-time because (1) its interests will not be adequately represented by other parties, (2) its participation in the proceeding will not prejudice or burden other parties as it supports and agrees with the Commission's analysis in *NextEra v. PG&E*, and (3) stakeholders were not afforded adequate time to intervene as the comment period was only four days.  In Docket No. EL19-36-000, Crockett filed a motion to intervene out-of-time arguing again that its intervention should be granted because it is not seeking to alter the existing record, the status of this proceeding, or any procedural schedule, and, as a result, its participation will not result in any disruption to the proceeding or prejudice any party.

7.      On April 10, 2019, the California Bankruptcy Court held a hearing relating to PG&E's complaint for a declaratory judgment and motion for a preliminary injunction against the Commission.  One of the many issues discussed at the hearing was whether the Commission has concurrent jurisdiction over the disposition of wholesale power contracts.

## II.     Discussion

### A.      Procedural Matters

8.      When late intervention is sought after the issuance of a dispositive order, the prejudice to other parties and burden upon the Commission of granting the late intervention may be substantial.  Thus, movants bear a higher burden to demonstrate good cause for granting such late intervention.  Nevada Irrigation District, Crockett, and

---

[9] *Infra* II.B.

Hatchet Ridge have not met this higher burden of justifying their late intervention.[10] We therefore deny these untimely motions.

9.      Because the NextEra and Exelon Petitions raise common issues of law and fact that are now the subject of PG&E's nearly identical rehearing requests, and for administrative efficiency, we will consolidate the proceedings for purposes of rehearing.

   **B.      Substantive Matters**

      **1.      Concurrent Jurisdiction As Creating A Conflict with Bankruptcy Code**

         **a.      PG&E Rehearing Request**

10.     PG&E argues that the Commission failed to give effect to the Bankruptcy Code or the goals Congress sought to achieve through it.[11] Specifically, PG&E states that, with the Bankruptcy Code, Congress intended "to permit the successful rehabilitation of debtors" and "prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[12] PG&E asserts that the authority to reject executory contracts is an integral piece of the bankruptcy process that Congress designed and is essential to the realization of Congress' goal to steer debtors away from liquidation. PG&E notes that a debtor-in-possession has the flexibility to assume or reject any executory contracts at any time until a reorganization plan is confirmed,[13] and the Bankruptcy Code does not except wholesale power contracts from the possibility of assumption or rejection.[14]

---

      [10] *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 102 FERC ¶ 61,250, at P 7 (2003).

      [11] PG&E Rehearing Request, Docket No. EL19-35-001, at 6; PG&E Rehearing Request, Docket No. EL19-36-001, at 6 (collectively, PG&E Rehearing Request). Because PG&E's arguments on rehearing and pagination are identical, we refer to both rehearing requests as simply, "PG&E Rehearing Request."

      [12] PG&E Rehearing Request at 6 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984) (*Bildisco*)).

      [13] *Id.* at 7 (citing 11 U.S.C. §§ 365(d)(2), 1107(a), 365(a)).

      [14] *Id.* at 7-8 (citing *Bildisco*, 465 U.S. at 522-23).

11.     PG&E further asserts that the Commission's approval requirement obviates the purpose of section 365(a) of the Bankruptcy Code.[15]  PG&E states that if the Commission withholds approval, the debtor will not be able to successfully reject a wholesale power contract, even if the bankruptcy court approves the rejection.  PG&E asserts that, even where the Commission ultimately approves the rejection, the debtor would still be deprived of the flexibility provided by section 365 of the Bankruptcy Code.

## b.     Commission Determination

12.     We deny rehearing.  As an initial matter, the Supreme Court has long recognized that the FPA is designed to protect consumers,[16] and the Commission's role in evaluating the rates, terms, and conditions of wholesale power contracts is to protect the public interest.[17]  By contrast, the purpose of the Bankruptcy Code, as PG&E acknowledges, is to provide a path to rehabilitate bankrupt debtors.[18]  These are two distinct, yet vitally important, roles, and we conclude that it is necessary to give effect to both.

13.     Wholesale power contracts are not simple run-of-the-mill contracts between two private parties; rather, these contracts, while privately negotiated, implicate the public's interest in the orderly production of plentiful supplies of electricity at just and

---

[15] *Id.* at 8-9.

[16] *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. FPC*, 425 U.S. 662, 670 (1976) (*NAACP v. FPC*) (stating that the primary purpose of the FPA is to protect electricity consumers through "the orderly development of plentiful supplies of electricity . . . at reasonable prices").  The Court has also held that the protection of consumers is the purpose of the similarly structured Natural Gas Act.  *See, e.g.*, *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959) (the Natural Gas Act was "framed to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges"); *FPC v. Hope Nat. Gas Co.*, 320 U.S. at 610 (primary purpose of the Natural Gas Act was to protect consumers from exploitation by natural gas companies).

[17] *See, e.g.*, *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956) (*Sierra*) ("[T]he purpose of the power given [to the Commission under the FPA] is the protection of the public interest.").

[18] *See* PG&E Rehearing Request at 6 (citing *Bildisco*, 465 U.S. at 513, 522-23).

reasonable rates[19] and, as filed rates, carry the force of law[20] binding sellers and purchasers alike.[21] Whether a wholesale rate is just and reasonable – and whether the abrogation or modification of a wholesale power contract is necessary to protect the public interest – is a question that the Commission is statutorily obligated—and exclusively authorized—to consider. Given the Commission's exclusive authority to make such determinations, as codified by Congress in the FPA and affirmed by Supreme Court and other judicial precedent,[22] we conclude that the Commission's unique role neither subsumes nor is subsumed by the Bankruptcy Code. The fact that a contract party has sought bankruptcy protection does not transform Commission-jurisdictional contracts into non-jurisdictional ones; it does not strip the public of the protection afforded to it under the FPA; and it does not divest the Commission of its statutory mandate to protect the public interest by examining the ramifications of unilateral changes to wholesale power contracts, a highly-technical analysis that the bankruptcy process is not designed to consider. Nor does the filing of a bankruptcy petition effect a transfer of the Commission's authority to the bankruptcy court. Nothing in the FPA or the Bankruptcy Code provides otherwise.

14.    We disagree with PG&E's assertion that concurrent jurisdiction creates a conflict with the Bankruptcy Code. First, as a general matter, the fact that there may be two different processes – one before the bankruptcy court and one before the Commission – does not alone presuppose that there is a conflict between these processes. As stated above, the roles of the bankruptcy court and the Commission are different; there is no direct conflict between the Bankruptcy Code's process for a debtor to emerge

---

[19] *See NAACP v. FPC*, 425 U.S. at 670.

[20] *See, e.g.*, *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004) (filed rates "are considered to be 'the law'" (citation omitted)).

[21] *See Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 548 (2008) (*Morgan Stanley*) ("The standard for a buyer's challenge [of a wholesale power contract] must be the same, generally speaking, as the standard for a seller's challenge: The contract rate must seriously harm the public interest."); *Bos. Edison Co. v. FERC*, 856 F.2d 361, 372 (1st Cir. 1988) (filed rate "is to be treated as though it were a statute, binding upon the seller and purchaser alike." (citing *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co.*, 181 F.2d 19, 22 (8th Cir. 1950))). *See also Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939) ("Until changed, tariffs bind both carriers and shippers with the force of law.").

[22] *See, e.g.*, *Montana-Dakota Utilities*, 341 U.S. at 251; *see also supra* note 7 (listing precedent discussing the Commission's authority).

from bankruptcy and the Commission's role in ensuring just and reasonable wholesale electricity rates.

15.    Second, we find no conflict within the Bankruptcy Code itself.  Section 1129(a)(6) of the Bankruptcy Code, for example, contemplates the Commission's role in a bankruptcy proceeding by providing that the bankruptcy court shall confirm a reorganization plan only if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[23]  The role of the Commission under its concurrent jurisdiction approach – executing its exclusive authority to protect the public interest outside of the bankruptcy context – is consistent with section 1129's recognition that debtors must seek regulatory approval of rate changes.

16.    To be clear, the Commission neither presumes to sit in judgment of rejection motions nor seeks to arrogate the role of adjudicating bankruptcy proceedings.  The Commission recognizes that rendering a determination on rejection motions is solely within the province of the bankruptcy court.  But a bankruptcy court's authorization to reject a wholesale power contract does not relieve a debtor of its separate regulatory obligations under the FPA.  Unlike other contracts, the duty to perform under wholesale power contracts may be required not only from the private law of contracts but also pursuant to the FPA and thus by the Commission as the agency granted exclusive authority to implement the Act.[24]  Accordingly, a bankruptcy court's authorization to reject a contract subject to this Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes.  Performance under such contracts remains subject to this Commission's review to determine whether any cessation or modification of performance is just and reasonable, and not unduly discriminatory or preferential under the FPA.

> **2.    Rejection As A Breach And Rejection As Altering Essential Terms and Conditions**

> **a.    PG&E Rehearing Request**

17.    PG&E argues that the Bankruptcy Code and court precedent establish that rejection of a contract does not require Commission approval because rejection is a

---

[23] 11 U.S.C. § 1129(a)(6) (2012).

[24] *Calpine*, 337 B.R. at 33 (citing *Pa. Water & Power Co. v. FPC*, 343 U.S. 414, 422 (1952)).

breach of contract, not a change to the terms.[25]  P&E states that, like any other breach, rejection does not change the terms of the contract, but relies on and continues to give effect to those terms in order to determine the amount owed in damages.  P&E explains that the damages owed by the debtor are calculated using the terms of the contract.[26]

18.     P&E asserts that rejection in bankruptcy is entirely different from the abrogation of a contract under FPA section 206, and thus does not implicate the filed-rate doctrine.[27]  According to P&E, abrogation of a contract frees both parties from their remaining obligations under the contract.  P&E states that when there is a material breach of contract, it is common for performance under the contract to cease and for the party in breach to pay damages.[28]  P&E asserts that the cessation of performance after breach does not mean that the contract has been abrogated or rescinded, but rather the terms of the contract still bind the parties and provide the basis for the calculation of damages.

19.     Along similar lines, P&E argues that the Commission failed to explain why the filed-rate doctrine applies differently to a breach of contract that arises in the bankruptcy context than it does to a breach that arises outside of bankruptcy.[29]  P&E notes that when a breach of contract arises outside of bankruptcy, the Commission does not hold that the party in breach must seek Commission approval to cease performance and pay damages.[30]  P&E argues that such disparate treatment indicates exactly the kind of discrimination against debtors that the Bankruptcy Code expressly forbids.[31]

---

[25] P&E Rehearing Request at 10 (citing *Mirant*, 378 F.3d 511; 11 U.S.C. § 365(g)).

[26] *Id.* at 11.

[27] *Id.*

[28] *Id.* at 12.

[29] *Id.* at 13.

[30] *Id.* at 13-14 (citing *Ark. La. Gas Co. v. Hall*, 7 FERC ¶ 61,175, at 61,322 (1979); *S. Md. Elec. Coop. v. J.P. Morgan Ventures Energy Corp.*, 155 FERC ¶ 61,164, at P 23 (2016); *Sw. Power Pool, Inc.*, 150 FERC ¶ 61,091, at P 10 (2015); *Portland Gen. Elec. Co.*, 72 FERC ¶ 61,009, at 61,020-61,022 (1995); *PPL Elec. Util. Corp.*, 92 FERC ¶ 61,057 (2000); *S. Cal. Edison Co.*, 85 FERC ¶ 61,023 (1998), *reh'g denied*, 85 FERC ¶ 61,389 (1998)).

[31] *Id.* at 14 (citing 11 U.S.C. § 525).

20.     PG&E similarly argues that the Commission erred in failing to identify the essential terms and conditions of the contract that are altered by rejection.[32]  PG&E states that it believes that the Commission must be referring to those terms and conditions that exist generically in all wholesale power contracts, including price, duration, and quantity. PG&E asserts that none of these terms are altered by a rejection.  First, PG&E argues that rejection does not alter the price, because the price is used to calculate the damages owed.[33]  PG&E notes that an insolvent debtor may not be able to pay the full amount of contract damages owed, but that inability to pay has nothing to do with the contract rate used to calculate damages, and therefore cannot be considered a change to the filed rate.[34] Second, PG&E argues that rejection neither abrogates nor shortens the period of performance; rather, it is used, along with the price, to determine the non-breaching party's expectancy under the wholesale power contract and its claim for damages against the estate.  PG&E requests that the Commission clarify what it believes would be the legal effect of the Commission's approval contemplated in its underlying orders.  Third, PG&E argues that rejection also does not change the quantity of electric energy that the contract requires to be purchased or sold.[35]

### b.     Commission Determination

21.     We clarify that the essential terms and conditions of a wholesale power contract that the Commission was referencing in the underlying orders were to the price, duration, and quantity.  Despite PG&E's attempt to minimize the stated effect of a rejection on any such rates, terms and conditions, rejection of a wholesale power contract amounts to more than a simple breach in the typical sense, in that rejection is a court-authorized breach that may result in the complete cessation of performance under contract.[36]  It would eviscerate the Commission's exclusive jurisdiction under the FPA to hold that rejection of a wholesale power contract permits the unilateral termination of a regulatory obligation by the debtor.[37]

---

[32] *Id.* at 15.

[33] *Id.*

[34] *Id.* at 16.

[35] *Id.* at 17.

[36] *Calpine*, 337 B.R. at 36.

[37] *See id.* ("This is not a run-of-the-mill contract dispute. . . . The breach here is not a dispute, nor does it require any contract interpretation, it is a complete cessation of performance under the terms and conditions of the [wholesale power contracts].").  The

22.     Wholesale power contracts are not like other contracts that petitioners may seek to reject through bankruptcy.  In enacting the FPA, Congress declared that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with the public interest."[38]  Accordingly, Congress developed a comprehensive regulatory framework for protecting that interest, which the Commission has the responsibility to administer.  And although wholesale power contracts are privately negotiated, such contracts must be filed with the Commission in accordance with its regulations to be lawful under the FPA,[39] and once filed, wholesale power contracts become the "equivalent of a federal regulation,"[40] imposing obligations on the parties that extend beyond private contract law.  Wholesale power contracts, and any changes to the rates, terms and conditions therein remain subject to review by the Commission, an administrative agency charged with protecting the "public interest," and the contracted-

---

Supreme Court has likewise rejected arguments that the filed-rate doctrine can be circumvented by recasting the modification of a contract rate as a "breach." *Ark. La. Gas*, 453 U.S. at 579 (rejecting claim that the "state court has done no more than determine the damages they have suffered as a result of Arkla's breach of the contract" because "the Commission itself has found that permitting this damages award could have an 'unsettling effect . . . on other gas purchase transactions' and would have a 'potential for disruption of natural gas markets . . . .'" (quoting *Ark. La. Gas Co. v. Hall*, 13 FERC ¶ 61,100, at 61,213 (1980))); *id.* at 580 ("Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on file.  It would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what the Commission itself may not do."); *id.* at 584 ("We hold that the filed rate doctrine prohibits the award of damages for Arkla's breach during the period that respondents were subject to Commission jurisdiction.").

[38] 16 U.S.C. § 824 (2012).  *See also Sierra*, 350 U.S. at 355 ("[T]he purpose of the power given [to the Commission under the FPA] is the protection of the public interest.").

[39] *See* 16 U.S.C. § 824d(c) ("[E]very public utility shall file with the Commission . . . all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."); *id.* § 824d(d) ("Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.").

[40] *Calpine*, 337 B.R. at 37 (citing *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004)).

for rates are recoverable from ratepayers. Thus, in many ways, wholesale power contracts are unlike other private contracts that a debtor may seek to reject through bankruptcy. And "just as regulatory action was required to transform the terms and conditions of [wholesale power contracts] into regulated duties, so also is regulatory action from [the Commission] required to eliminate those duties."[41]

23.    Since its landmark decisions in *Mobile* and *Sierra* in 1956,[42] the Supreme Court has repeatedly held that parties may not unilaterally abrogate or modify their voluntarily negotiated, arms'-length contracts subject to the Commission's jurisdiction unless the Commission first "concludes that the contract seriously harms the public interest."[43] Thus, in the absence of a contract clause permitting unilateral modification,[44] parties to such contracts would need to file a complaint under FPA section 206 to seek Commission approval before modifying its contract rates. In such a case, the Commission would review the contracts to determine whether the *Mobile-Sierra* presumption attaches to the wholesale power contracts, and if so, whether the modification of the contracts would be

---

[41] *Id.* (citing *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d at 839; *Pa. Water & Power Co. v. FPC*, 343 U.S. 414 (1952)).

[42] *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 343-44 (1956) (*Mobile*); *Sierra*, 350 U.S. at 352-55.

[43] *Morgan Stanley*, 554 U.S. at 530. *See also id.* at 534 ("As we said in a later case, '[t]he regulatory system created by the [FPA] is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity.'" (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968)); *id.* at 545-46 ("Therefore, only when the mutually agreed-upon contract rate seriously harms the consuming public may the Commission declare it not to be just and reasonable."); *id.* at 546-47 ("[T]he ordinary mode for evaluating contractually set rates is to look to whether the rates seriously harm the public interest, not to whether they are unfair to one of the parties that voluntarily assented to the contract."); *accord NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174, 175 (2010) (quoting *Morgan Stanley*, 554 U.S. at 530, 545-46).

[44] Two years after its twin decisions in *Mobile* and *Sierra*, the Supreme Court "held that parties could contract out of the *Mobile-Sierra* presumption by specifying in their contracts that a new rate filed with the Commission would supersede the contract rate." *Morgan Stanley*, 554 U.S. at 534 (describing the holding in *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.*, 358 U.S. 103, 110-13 (1958) (*Memphis*).

required by the public interest.[45]  Without performing such an analysis or prejudging the issues, as PG&E has not sought to reject or modify any wholesale power contracts, we simply note that it is the analysis that the Supreme Court has required the Commission to apply and we see no reason to apply a different analysis to entities in bankruptcy.  We therefore are not acting in a manner that discriminates against PG&E because it is in bankruptcy; rather, we are clarifying that we would treat its attempt to modify a filed rate set through a wholesale power contract as we would any entity attempting to do the same in a typical FPA section 206 proceeding.

24.     In response to PG&E's request that the Commission clarify what it believes would be the legal effect of Commission approval to modify the contracted-for price, duration, or quantity, we clarify that such approval would allow modification of a filed rate.

### 3.   Alternative and Less Disruptive Means Available to Protect the Commission's Jurisdiction

#### a.   PG&E Rehearing Request

25.     PG&E argues on rehearing that the Commission's assertion of jurisdiction over all wholesale power contracts that may be rejected in bankruptcy will interfere with the bankruptcy process, and in some cases, could frustrate the debtor's ability to reorganize successfully.[46]  PG&E further alleges that the Commission's approach is far broader than necessary as it would apply to every wholesale power contract without regard to the terms of the contract or to whether the reviewing court had even arguably violated the filed-rate doctrine.[47]

26.     PG&E claims that the Commission failed to consider that other well-established and less disruptive means exist to protect its jurisdiction.  For example, PG&E claims that if the bankruptcy court were to calculate damages in a manner that departs from the contract rate, the disadvantaged party could raise the filed-rate doctrine in that forum, or parties could petition the Commission for declaratory orders where a legitimate concern arises where the bankruptcy court may take action that runs afoul of the filed rate doctrine.[48]  Lastly, PG&E states that the Bankruptcy Code itself protects the Commission's ratemaking jurisdiction by withholding the ultimate goal of the Chapter 11

---

[45] *Morgan Stanley*, 554 U.S. at 544-51.

[46] PG&E Rehearing Request at 18.

[47] *Id.*

[48] *Id.*

process – confirmation of the reorganization plan – unless and until any change to the debtor's rates has received the appropriate regulatory approval.[49]

### b.    Commission Determination

27.    We deny PG&E's rehearing request.  PG&E argues that the Commission must exercise restraint in evaluating specific circumstances, but the question here is one of general applicability—i.e., whether the Commission has jurisdiction to review and approve the modification or abrogation of wholesale power contracts that are the subject of rejection in bankruptcy.  We find that by asserting concurrent jurisdiction with the bankruptcy court such as to require approval from both the bankruptcy court and the Commission where a debtor seeks to reject a wholesale power contract through bankruptcy, this Commission ensures that it will have an opportunity to review any attempt to modify the filed rate.

### 4.    Unexplained Departure from Precedent

### a.    PG&E Rehearing Request

28.    PG&E argues on rehearing that the Commission failed to explain its departure from Commission precedent in *California Electricity Oversight Board v. Calpine Energy Services, L.P.* (*CEOB*),[50] where, according to PG&E, the Commission announced that it would follow the rule set out in *Mirant*.  PG&E notes that *CEOB* did not arise in the United States Court of Appeals for the Fifth Circuit (Fifth Circuit), and thus, the Commission was not bound to follow *Mirant*, but PG&E alleges that the Commission chose to follow the decision because it agreed with *Mirant*'s conclusions.[51]  PG&E asserts that the Commission continued to embrace the logic of *CEOB* in *USGen New England, Inc.*[52] where the Commission deferred the issues of contract law to the bankruptcy court and determined that the filed-rate doctrine did not apply to the facts before it because damages would be calculated starting with the filed rates.

---

[49] *Id.* at 19 (citing 11 U.S.C. § 1129(a)(6)).

[50] 114 FERC ¶ 61,003 (2006).

[51] PG&E Rehearing Request at 19.

[52] 116 FERC ¶ 61,285 (2006) (*USGen*), *reh'g granted in part & denied in part*, 118 FERC ¶ 61,172 (2007).

### b.    Commission Determination

29.    We disagree with PG&E's assertion that the Commission's decision in these proceedings is an unexplained departure from Commission precedent, as the underlying orders discuss the emerging split in federal courts over the last thirteen years when interpreting the FPA and Bankruptcy Code.[53]  In *CEOB*, the Commission provided interim guidance in response to a petition seeking specific performance of a wholesale power contract that the debtor, Calpine Energy Services, LP and Calpine Corporation (together, Calpine), sought to reject through bankruptcy.  In the order, the Commission recognized that, although it had reached a different result in a previous case where the Commission required specific performance of a contract that the seller sought to reject through bankruptcy,[54] a federal court of appeals, the Fifth Circuit, had "now spoken" to the issue – the most recent federal court decision at the time, and the Commission stated that it intended follow that decision.[55]  Quoting *Mirant* at length without further explanation or commentary, *CEOB* cannot reasonably be read as an endorsement of *Mirant*'s substantive holding.

30.    On the contrary, the Commission stated that, under *Mirant*, "[a] Bankruptcy Court cannot reject a FERC-jurisdictional contract under the business judgment rule 'because it would not account for the public interest inherent in the transmission and sale of electricity.'"[56]  The Commission therefore stated that a bankruptcy court must "carefully scrutinize the impact of rejection upon the public interest and . . . ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers."[57]  The Commission then sought comment on whether rejection of the wholesale power contract at issue there would impact the public interest so that the Commission may develop a record and inform the bankruptcy court of its views regarding a potential rejection of that wholesale power contract.[58]

---

[53] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at PP 24-27; *Exelon v. PG&E*, 166 FERC ¶ 61,053 at PP 21-24.

[54] *Blumenthal v. NRG Power Mkg., Inc.*, 104 FERC ¶ 61,210, at P 2 (2003) (*Blumenthal*).

[55] *CEOB*, 114 FERC ¶ 61,003 at P 11.

[56] *Id.*

[57] *Id.*

[58] *Id.* PP 12-14.

Docket Nos. EL19-35-001 and EL19-36-001                                   - 16 -

31.     Moreover, following the issuance of *CEOB*, another federal court, the United States District Court for the Southern District of New York (District Court) issued its order in *Calpine*, regarding the exact same parties and facts at issue before the Commission in *CEOB*.  In *Calpine*, the District Court found that it lacked jurisdiction to authorize rejection of wholesale power contracts "because doing so would directly interfere with the Commission's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts."[59]  The District Court explained that the Commission had plenary jurisdiction over wholesale power contracts, including the contracts at issue there, and nothing in the Bankruptcy Code evidenced Congress' intent to limit the Commission's regulatory authority.[60]  The court held:

> Because there is nothing in the Bankruptcy Code that limits FERC's jurisdiction, Calpine cannot achieve in Bankruptcy Court what neither it, nor any other party in this case, nor any other federally regulated energy company in the country could do without seeking FERC approval:  cease performance under the rates, terms, and conditions of filed rate wholesale energy contracts in the hopes of getting a better deal.[61]

32.     The District Court further rejected arguments that tried to distinguish between a breach of a contract through rejection and termination of wholesale energy contracts, stating that a "breach" through rejection is not a typical breach where parties dispute the terms of a contract, but rather the unilateral termination of a regulatory obligation.[62]  Rather, the court distinguished between "run-of-the-mill" contract disputes, where the Commission does not exercise special expertise in determining simple interpretations of contracts and breach through rejection, which it described as "a complete cessation of performance under the terms and conditions of [a wholesale power contract]."[63]  The District Court then acknowledged that its order was in conflict with the Fifth Circuit's decision in *Mirant* and discussed its disagreement.[64]

---

[59] *Calpine*, 337 B.R. at 36.

[60] *Id.* at 32-33.

[61] *Id.* at 36.

[62] *Id.* at 36.

[63] *Id.* at 36.

[64] *Id.* at 37-39.

33.     In 2010, the District Court was again presented with a bankrupt debtor attempting to reject a wholesale agreement.[65]  There, the parties agreed that the Commission must make a public interest determination that would permit the debtor to reject the wholesale power contract.  The parties there also agreed that as long as the Commission approves terminating the contract, the bankruptcy court may determine whether the wholesale agreement can be rejected pursuant to the Bankruptcy Code.[66]  Thus, the parties' sole dispute was whether the bankruptcy court and the Commission may consider the rejection motion concurrently or the bankruptcy court must wait until the Commission has ruled.  The court dismissed this dispute, stating it was of no consequence because "[i]f either the bankruptcy court or FERC does not approve the Debtors' rejection of the [wholesale agreement], the Debtors may not reject the contract."[67]  Accordingly, the District Court found that, following parties' agreement that the Commission and bankruptcy courts have concurrent jurisdiction, it did not matter the order in which the rejection motions were considered.

34.     Additionally, as the Commission discussed in the underlying orders,[68] in *FirstEnergy*, the United States Bankruptcy Court for the Northern District of Ohio (Ohio Bankruptcy Court) recently issued a preliminary injunction, enjoining the Commission from requiring FirstEnergy Solutions Corporation (FirstEnergy), which had filed a petition for bankruptcy, to continue performing under certain wholesale power contracts that FirstEnergy sought to reject through bankruptcy.[69]  In that matter, the Ohio Bankruptcy Court found that the automatic stay provision of the Bankruptcy Code[70] and

---

[65] *Boston Generating*, 2010 WL 4616243 at *2.

[66] *Id.* at *3.

[67] *Id.*

[68] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at P 27; *Exelon v. PG&E*, 166 FERC ¶ 61,053 at P 24.

[69] *FirstEnergy*, 2018 WL 2315916 (Bankr. N.D. Ohio May 18, 2018).

[70] 11 U.S.C. § 362(a) (2012).

its power to grant equitable relief under the Bankruptcy Code[71] support its decision to issue the preliminary injunction.[72]

35.    In short, as described in the underlying orders, there is now a split among federal courts that have addressed the interaction between the Bankruptcy Code and the FPA,[73] and against this background, the Commission has had the opportunity to reevaluate its position with regard to this issue.  The Commission expressly noted that, given these conflicting decisions, the state of the law was unsettled, and analyzed the relevant precedent.[74]  Based on this analysis, the Commission concluded that the way to give effect to both the FPA and the Bankruptcy Code is for a party to a Commission-jurisdictional wholesale power contract to obtain "approval from both the Commission and the bankruptcy court to modify the filed rate and reject the contract, respectively."[75] Because of the split among federal courts in interpreting the interaction between the Bankruptcy Code and the FPA, we deny PG&E's rehearing request asserting that the Commission failed to follow existing precedent.[76]

---

[71] 11 U.S.C. § 105(a) (2012).

[72] This opinion is currently pending appeal before the United States Court of Appeals for the Sixth Circuit.

[73] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at PP 24-27; *Exelon v. PG&E*, 166 FERC ¶ 61,053 at PP 21-24.

[74] *NextEra v. PG&E*, 166 FERC ¶ 61,049 at P 25; *Exelon v. PG&E*, 166 FERC ¶ 61,053 at P 20.

[75] *See supra* P 16 (clarifying the meaning of this sentence).

[76] For similar reasons, we believe that the underlying orders here are not an unexplained departure from *USGen*.  We also note that *USGen* is distinguishable because, in that proceeding, the Commission's jurisdiction was not in dispute.  The non-debtor counterparty to the wholesale natural gas contract (i.e., the pipeline) filed a notice of termination and request for waiver regarding the relevant contracts requesting that the Commission waive its obligations under the contracts and permit it to treat the contracts as terminated upon the bankruptcy court's approval of the debtor's rejection.  *USGen*, 116 FERC ¶ 61,285 at P 4.  The Commission approved, allowing the pipeline to remarket capacity.  *Id.* (citing *Tenn. Gas Pipeline Co.*, Docket No. RP03-603-000 at 2 (Sept. 25, 2003) (delegated order)).

### 5.     Authority to Command a Customer to Purchase Power

#### a.     PG&E Rehearing Request

36.     PG&E argues on rehearing that the Commission cannot, under the FPA, order a purchaser to buy power or take physical service.[77]  PG&E asserts that FPA sections 205 and 206 focus exclusively on sellers and sales, and the FPA's purpose is to prevent abuses of market power in a market that is historically characterized by a natural monopoly.[78]  By contrast, PG&E alleges that the procurement decisions of load-serving entities, and the actions of power purchasers in general, have never been an area of federal concern.[79]  PG&E distinguishes *Blumenthal*, where the Commission ordered a seller to specifically perform under a contract that it had sought to reject in bankruptcy, on the basis that it was again the Commission asserting jurisdiction over NRG Power Marketing, Inc. in light of its regulatory obligations as a seller.

#### b.     Commission Determination

37.     PG&E is correct in that the Commission's jurisdiction over wholesale sales generally places the regulatory obligations of the FPA on the seller of wholesale power.[80]  However, PG&E mischaracterizes the action that the Commission would take here; the Commission would not command a customer to purchase power, but rather, it would enforce a wholesale power contract, i.e., the filed rate.  The FPA expressly permits rates to be set by contract,[81] and so, while the regulatory obligations of filing a contract or obtaining market-based rate authority apply to the seller, the Commission's jurisdiction over the wholesale sale attaches to the contract itself.  The Supreme Court has made clear that, in order to protect the sanctity of rate-setting contracts, "[t]he standard for a buyer's challenge to a contract must be the same, generally speaking, as the standard for a seller's

---

[77] PG&E Rehearing Request at 21-23.

[78] *Id.* at 21-22 (citing 16 U.S.C. §§ 824d, 824e; *Morgan Stanley*, 554 U.S. 527, 531; *E. Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299 (D.C. Cir. 2007) (*Eastern Kentucky Power Co-op*).

[79] *Id.* at 22 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 113 FERC ¶ 61,081, at P 53 (2005)).

[80] *See Eastern Kentucky Power Co-op*, 489 F.3d at 1306 (the "entire thrust of Part II [of the FPA] is toward the seller at wholesale, not the buyer") (alteration in original) (quoting *Cal. Elec. Power Co. v. FPC*, 199 F.2d 206, 209 (9th Cir. 1951)).

[81] 16 U.S.C. §§ 824d(c), 824e(a).

challenge: 'The contract rate must seriously harm the public interest.'"[82]  And rightfully so, because otherwise, purchasers would be free to abrogate or modify contracts without this Commission's review or approval any time market forces favored the purchaser. Because the Commission's jurisdiction attaches to wholesale power contracts, we find that the Commission has authority to enforce such contracts and order purchasers to continue to perform under the contracts, unless the purchaser is able to establish that the contract seriously harms the public interest or the *Mobile-Sierra* presumption otherwise does not attach to the contract.[83]  We therefore deny PG&E's rehearing request.

The Commission orders:

(A)     Docket Nos. EL19-35-001 and EL19-36-001 are hereby consolidated for the purposes of rehearing, as discussed in the body of this order.

(B)     The untimely motions to intervene filed by Nevada Irrigation District, Crockett, and Hatchet Ridge are hereby denied, as discussed in the body of this order.

(C)     PG&E's rehearing requests are hereby denied, as discussed in the body of this order.

By the Commission.  Commissioner McNamee is not participating.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

[82] *Morgan Stanley*, 554 U.S. at 548.

[83] *Id.*