**WEIL, GOTSHAL & MANGES LLP**
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

**KELLER & BENVENUTTI LLP**
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* All papers shall be filed in the Lead Case, No. 19-30088 (DM). | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br>(Jointly Administered)<br><br>**MOTION PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) AND FED. R. BANKR. P. 6004 AUTHORIZING DEBTORS TO PURCHASE DIRECTORS AND OFFICERS INSURANCE**<br><br>**(THE "D&O INSURANCE MOTION")**<br><br>Date: July 9, 2019<br>Time: 9:30am, Pacific Time<br>Place: United States Bankruptcy Court<br>      Courtroom 17, 16th Floor<br>      San Francisco, CA 94102<br><br>**Objection Deadline:** July 2, 2019<br>      4:00 p.m. (Pacific Time) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 363 and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for authority to purchase insurance coverage in the amount of $50 million for the benefit of the current directors and officers of the Debtors, including new officers and new directors appointed to the boards of each of the Debtors after the Petition Date (as defined below). Specifically, the Debtors seek to purchase a Side A Difference In Conditions Directors and Officers Liability Insurance Policy issued by Energy Insurance Services, Inc. (the "**EIS Policy**"), subject to a participation agreement between Energy Insurance Services, Inc. ("**EIS**") and PG&E Corp. with respect to a mutual business protected cell program, as described further herein.

In support of the Motion, the Debtors submit the Declaration of Janaize Markland (the "**Markland Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Order**").

**TABLE OF CONTENTS**

Page

I. JURISDICTION ...................................................................................................6

II. BACKGROUND ...................................................................................................6

III. THE DEBTORS' NEED FOR ADDITIONAL DIRECTORS AND OFFICERS INSURANCE ..........................................................................................................7

    a. The Debtors' Existing D&O Coverage and Pre-Bankruptcy Wildfire Claims ..............7

    b. The Current Directors and Officers May Lack Coverage Under the 2018 Policies Under Certain Circumstances ...................................8

    c. The Debtors' Efforts to Procure Additional Insurance Coverage for the New Directors and Officers ........................................................10

IV. THE EIS POLICY ...............................................................................................12

V. BASIS FOR RELIEF REQUESTED ..................................................................14

VI. REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS ..............................18

VII. NOTICE ...............................................................................................................18

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berg & Berg Enters., LLC v. Boyle*,
 178 Cal. App. 4th 1020 (2009) ...................................................................................................16

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
 60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..........................................................................................16

*In re Ernst Home Ctr., Inc.*,
 209 B.R. 974 (Bankr. W.D. Wash. 1997) ...................................................................................15

*FDIC v. Castetter*,
 184 F.3d 1040 (9th Cir. 1999) ....................................................................................................16

*Hansen v. Finn (In re Curry & Sorensen, Inc.)*,
 57 B.R. 824 (B.A.P. 9th Cir. 1986) .............................................................................................16

*Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)*,
 145 B.R. 637 (B.A.P. 9th Cir. 1992)............................................................................................16

*In re Ionosphere Clubs, Inc.*,
 98 B.R. 174 (Bankr. S.D.N.Y. 1989) ..........................................................................................15

*In re Kahuku Hosp.*,
 No. 07-00176 (Bankr. D. Haw. May 7, 2008) ............................................................................18

*Lentine v. Williams*,
 Case No. CGC-17-562553 (Cal. Super. Ct.) .................................................................................8

*In re Metro. Mortg. & Sec. Co.*,
 No. 04-00757-FPC11 (Bankr. E.D. Wash. April 16, 2004).........................................................17

*In re Nat'l R.V. Holdings, Inc.*,
 No. 6:07-bk-17941-DS (Bankr. C.D. Cal. March 26, 2008) .......................................................17

*In re New Bedford Capacitor, Inc.*,
 No. 01-14680-JNF, 2003 WL 25889620 (Bankr. D. Mass. June 27, 2003) ................................17

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
 147 B.R. 650 (S.D.N.Y. 1992) ....................................................................................................16

*In re Robles*,
 No. 14-51812-ASW, 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ...............................16

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Scouler & Co., LLC v. Schwartz*,
   No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ......................................... 16

*In re Shengdatech, Inc.*
   No. 11-52649-gwz (Bankr. D. Nev. September 13, 2011) ............................................................ 17

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*,
   502 F.3d 1086 (9th Cir. 2007) ..................................................................................................... 16

**Statutes**

11 U.S.C § 105(a) ............................................................................................................................. 16

11 U.S.C. § 363(b) ........................................................................................................................... 15

11 U.S.C. § 363(c) ........................................................................................................................... 15

11 U.S.C. § 1107(a) .................................................................................................................... 6, 16

11 U.S.C. § 1108 ................................................................................................................................ 6

28 U.S.C. § 157 .................................................................................................................................. 6

28 U.S.C. § 1334 ................................................................................................................................ 6

28 U.S.C. §§ 1408 and 1409 ............................................................................................................. 6

Bankruptcy Code chapter 11 ................................................................................................... *passim*

**Other Authorities**

B.L.R. 5011-1(a) ................................................................................................................................ 6

Fed. R. Bankr. P. 1015(b) .................................................................................................................. 6

Fed. R. Bankr. P. 2002 ..................................................................................................................... 19

Fed. R. Bankr. P. 6004 ..................................................................................................................... 18

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General
   Order 24 (N.D. Cal.) ...................................................................................................................... 6

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and, together with the Creditors Committee, the "**Committees**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of the First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**").

## III. THE DEBTORS' NEED FOR ADDITIONAL DIRECTORS AND OFFICERS INSURANCE

### a. The Debtors' Existing D&O Coverage and Pre-Bankruptcy Wildfire Claims

The Debtors recently announced the appointment of William Johnson as the new Chief Executive Officer and President of PG&E Corp., and the appointment of eleven new directors to the Board of Directors of PG&E Corp. (collectively, the "**New Directors and Officers**"). As is customary in the Debtors' industry, prior to the Petition Date, the Debtors regularly purchased and maintained primary and excess directors and officers ("**D&O**") liability insurance to cover any claims asserted against their directors and officers in connection with the exercise of such individuals' duties and responsibilities as directors and officers. The Debtors' directors and officers, including the New Directors and Officers, currently are insured under D&O insurance policies issued for the policy period May 20, 2018 to May 20, 2020 (the "**2018 Policies**").[1]

The 2018 Policies provide the Debtors and their directors and officers with $300 million in total available coverage limits. The first $200 million in D&O insurance coverage under the 2018 Policies is available to the Debtors as entities (*e.g.*, for securities claims) and the Debtors' individual directors and officers for a wide variety of claims. The next $100 million in available coverage under the 2018 Policies is dedicated to the individual directors and officers and cannot be accessed by the Debtors themselves. This D&O-dedicated insurance is referred to as Side A "DIC" (difference in conditions) coverage (the "**Side A Coverage**"). The coverage limits under the 2018 Policies are not available for claims that are found to be related to previous claims noticed during prior policy periods.

The Side A Coverage also provides for two reinstatement limits of $90 million each. If the Side A Coverage is exhausted by a claim or series of related claims, and a new and

---

[1] The policy period for the 2018 Policies initially was one year. Prior to the Petition Date, the Debtors extended the policy period to 2020.

unrelated claim is asserted against the Debtors' directors and officers, $90 million of coverage would be "reinstated" and made available to respond to the subsequent claim or series of claims. In the event another new and unrelated claim or series of claims is asserted, then a second reinstatement would be made available to provide an additional $90 million of coverage. Again, the additional coverage limits under the Side A Coverage reinstatements are not available for claims that are found to be related to previous claims. Moreover, as discussed in further detail below, the 2018 Policies and the reinstatement limits prioritize payment of new claims arising from *pre*-chapter 11 wrongful acts over payment of new claims arising from *post*-chapter 11 wrongful acts.

In addition to the 2018 Policies, the Debtors' prior D&O insurance policies issued for the period May 20, 2017 to May 20, 2018 (the "**2017 Policies**"), provide the Debtors and the directors and officers with $250 million in total coverage limits, the first $200 million of which is shared and the next $50 million in Side A DIC coverage. The 2018 Policies and 2017 Policies are "claims-made" policies, which means that they provide coverage, subject to all terms and conditions, for claims first asserted during the policy period.

Prior to the Petition Date, certain claims were brought against the Debtors' directors and officers arising from the 2017 and 2018 Northern California wildfires. *See, e.g., Lentine v. Williams,* Case No. CGC-17-562553 (Cal. Super. Ct.). The Debtors provided notice of these claims under the 2017 Policies and the 2018 Policies, as appropriate. Specifically, claims first asserted during the policy period of the 2017 Policies were noticed under the 2017 Policies. Claims first asserted during the policy period of the 2018 Policies were noticed under both the 2017 Policies and 2018 Policies.

b. **The Current Directors and Officers May Lack Coverage Under the 2018 Policies Under Certain Circumstances**

The Debtors' primary D&O insurer has acknowledged defense coverage for the claims arising from the 2017 and 2018 Northern California wildfires, subject to a reservation of rights (as is customary). Based on correspondence from and discussions with the Debtors' D&O

insurers, however, it is unclear whether the insurers ultimately will treat claims arising from the 2017 wildfires and the 2018 wildfires as a single "Claim" (as defined in the 2017 Policies), and at least one carrier has indicated an intention to do so.  If the D&O insurers take the position that claims from the 2017 and 2018 wildfires constitute a single "Claim," they may contend that all the wildfire claims trigger coverage only under the 2017 Policies.  Under these circumstances, in the unfortunate event of a postpetition wildfire, the insurers may similarly attempt to treat any new claims as part of the same single "Claim" triggering only the 2017 Policies.  Under these circumstances, the available coverage under the 2017 Policies could be exhausted as a result of the prepetition claims noticed to the insurers, which would leave no coverage under the 2017 Policies for the New Directors and Officers.[2]

Alternatively, claims arising from the 2018 wildfires may be found to be distinct from the prior claims.  Under these circumstances, coverage under the 2018 Policies would be available to respond to claims arising from the 2018 wildfires, which may significantly impair or exhaust the 2018 Policies.  If postpetition claims are asserted against the New Directors and Officers, and the 2018 Policies are impaired or exhausted, and the reinstatements are also unavailable for any reason, the New Directors and Officers could lack insurance coverage to pay for the defense and indemnification of any postpetition claims.

This potential lack of coverage is exacerbated by certain priority of payment provisions in the 2018 Policies (and the 2017 Policies).  Even in a situation where the 2018 Policies are triggered, the 2018 Policies prioritize payment of claims alleging wrongful acts by the Debtors' board and/or officers *prior* to the Petition Date.  Specifically, if the amount of Loss (defined in the 2018 Policies to include, without limitation, defense expenses, settlements, and judgments) under the 2018 Policies exceeds the available coverage limits, the 2018 Policies

---

[2] By setting forth potential positions that the insurers may assert with respect to coverage under the 2017 and 2018 Policies, the Debtors are not waiving any rights or admitting the validity of any positions that may be taken by the insurers.  The Debtors reserve all of their rights to dispute any such positions under the policies and at law in any appropriate forum.

prioritize the payment of any Loss first to claims arising from alleged wrongful acts prior to the commencement of the Chapter 11 Cases and then to any Loss for claims arising from alleged wrongful acts after the commencement of the Chapter 11 Cases. These priority-of-payment provisions create a risk to the New Directors and Officers that the $300 million in coverage limits available under the 2018 Policies may be exhausted by claims relating to the prepetition period before claims, if any, relating to the postpetition period arise or can be paid.

If the $300 million in coverage limits currently available under the 2018 Policies were to be exhausted through payment of claims arising from prepetition conduct, as stated above, the Side A Coverage would provide up to $90 million in reinstatement limits only for any new, *unrelated* claim, and then another $90 million in reinstatement limits for a second *unrelated* claim. As stated, it is not clear what position the carriers may take with respect to coverage in the unfortunate event of any subsequent, postpetition wildfires. In addition, a similar prioritization of payment risk also exits with respect to the reinstatement limits because the reinstatement limits also prioritize payment of new claims arising from prepetition wrongful acts over new claims arising from postpetition wrongful acts.

c. **The Debtors' Efforts to Procure Additional Insurance Coverage for the New Directors and Officers**

Because of the prioritization risk under the 2018 Policies, including with respect to the reinstatement limits, and the risk of exhaustion of the 2017 Policies and/or 2018 Policies on account of existing claims, the Debtors have explored ways to secure additional D&O insurance limits dedicated to claims, if any, that may be asserted against the New Directors and Officers with respect to post-chapter 11 conduct. Such coverage would be available to the extent the 2018 Policies are exhausted through the payment of claims arising from any pre-bankruptcy wrongful acts or are otherwise unavailable to pay claims asserted during the Chapter 11 Cases. The Debtors explored three potential options for securing additional coverage that would address these risks: (i) traditional insurance; (ii) an Isosceles Trust; and (iii) the EIS Policy.

The Debtors' insurance broker, Marsh USA, Inc. ("**Marsh**"), spent significant

time compiling and reviewing proposals from various insurers for additional Side A DIC coverage. The quotes Marsh received, however, were very costly. For example, as set forth in the Markland Declaration, based on the proposals obtained by Marsh, to obtain an additional $100 million in limits for the Debtors' new directors, the premium would be in the range of approximately $20 million (20% of limits), and this amount would be fully earned, which means no premium would be returned to the Debtors, even if the policies were never accessed. Furthermore, based on the Marsh proposals, to obtain an additional $100 million in limits for only the Debtors' new directors and the newly appointed CEO of PG&E Corp. (but no other officers) would be even more costly – with a premium in the range of approximately $30 million (30% of limits). Further, as set forth in the Markland Declaration, many of the traditional insurance proposals included defense cost sub-limits, which would restrict the amount of coverage available for defense expenses incurred in connection with any covered claims. The insurer-proposed terms and conditions also lacked clarity regarding coverage that would be available in the event claims were to arise from any new (post-petition) wildfire. Lastly, the proposed coverage would only be available upon exhaustion of the existing $300 million in limits under the 2018 Policies.

The Debtors also considered an Isosceles Trust. Isosceles is a Bermuda-based company that issues insurance and reinsurance policies. The Isosceles Trust would be self-funded. The full amount of the Debtors' contribution (*e.g.*, $50 million) plus premium, plus interest, and investment proceeds would be available for return to the Debtors if not accessed. The Debtors would fully collateralize the Trust through payment of: (a) a 5% premium ($2.5 million on $50 million), returnable on termination of the Trust; (b) $15,000-$25,000 one-time setup fee; and (c) $100,000 per year in Trust fees and administration. The $100,000 estimated annual fee (or $500,000 over the 5-year term of the policy) was the estimated expense of "renting" a captive cell from Isosceles. During discussions, however, Isosceles indicated that it was unable to retain any risk within the cell, and would need to obtain reinsurance. This created issues that were not present with respect to the EIS cell, and the Debtors were of the view that such reinsurance would be extremely difficult, if not impossible, to obtain, casting doubt on

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Isosceles' ability to consummate the proposed transaction. Moreover, the Debtors did not have any prior experience with Isosceles and were uncertain as to how it may operate and handle claims.

## IV. THE EIS POLICY

Ultimately, the EIS Policy was the option favored by the Debtors' risk management team and approved by the Debtors' management because it is the lowest cost of the viable options available to the Debtors and provides the Debtors and their current officers and directors with the most effective coverage.

EIS is a sponsored captive insurance facility that the Debtors would utilize via a contractual agreement to participate in a dedicated protected cell. The Debtors have an existing relationship with EIS, which facilitates the Debtors insuring other risks, including property loss. The Debtors have been securing captive insurance coverage through EIS since May 2017.

EIS is a wholly-owned stock insurance subsidiary of Energy Insurance Mutual Limited (EIM) and was formed to provide a facility that would meet the specific business requirements of EIM's members (including other utilities) for the placement and management of alternative risk related products. As described on its website, EIM's "Mission and Vision" are directed toward serving member companies like the Utility and it is committed to providing risk solutions specifically needed by its membership, including industry-focused policy language and customized risk solutions through EIS. *See* https://eimltd.com/. EIS was originally incorporated in Bermuda on May 27, 1992 under the Companies Act of 1981 as Energy Insurance (Bermuda) Ltd. *See* https://eimltd.com/eis/. Upon completing redomestication requirements and moving onshore to South Carolina, EIB was renamed EIS on December 1, 2006. *Id.*

EIS is licensed to conduct insurance operations in South Carolina and authorized to write insurance, reinsurance, or coinsurance for a Member or group of Members through the use of "Mutual Business Programs." EIS contracts with Energy Captive Management LLC (ECM), a subsidiary of EIM, as its captive manager to conduct the business of EIS and the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Mutual Business Programs.³ *Id*.

To secure the EIS Policy, upon Court approval, the Debtors would make a premium payment of $10 million (returnable as discussed below) and a capital contribution of $40 million for a total of $50 million, to the protected cell. In return, the EIS Policy would provide $50 million in Side A DIC insurance limits that would be available to the Debtors' current directors and officers, including the New Directors and Officers, for a term of five years or until cancellation at the Debtors' direction. Funds delivered to EIS would be invested, and the Debtors' representatives would be able to recommend to EIS various options with respect to the investments. Net assets of the Mutual Business Program created for this policy would be available for distribution to the Debtors upon termination of the policy and/or dissolution of the Mutual Business Program, subject to a participation agreement and South Carolina Department of Insurance approval (as is customary). If no claims arise against the insured directors and officers, then $50 million plus investment income less any tax liability or other expenses incurred would be the net assets available for distribution to the Debtors. Because the EIS protected cell structure is only available to EIM Mutual Participant Companies, including the Debtors, and is provided as a service to them, any expenses are expected to be minimal (*e.g.*, under $100,000 over the 5-year term) and would be paid first out of any available investment income. Accordingly, the terms of the EIS policy are far superior to the traditional proposals procured by Marsh that would result in $20-$30 million in estate funds being paid out to insurers. The Debtors' premium costs for the EIS Policy would be split between PG&E Corp. and the Utility, with the allocation based on the percentage of directors and officers from each entity covered by the policy.

The EIS Policy would provide coverage for any claims if, for any reason, the 2018 Policy does not provide coverage to the New Directors and Officers. For example, if the current

---

³ In 2018, the Captive Insurance Companies Association (CICA) honored EIS with the CICA 2018 Outstanding Captive Award stating "The Outstanding Captive Award is presented to a captive insurance company or risk retention group that has shown creative uses for a captive, been successful in managing the captive in terms of net results and usefulness to its owners, has prevailed over difficult times or situations, and has gained acceptance, recognition, and a positive reputation among rating agencies, regulators and colleagues in the captive industry." *Id*.

D&O insurers were to assert that the current D&O policy bars them from paying the New Directors' and Officers' any amounts, including defense costs, because the 2018 Policy prioritizes payment of claims arising from pre-chapter 11 wrongful acts, the EIS Policy would be available to provide coverage.

In terms of claims handling, EIS would not control the defense of any claims. If a claim triggering the EIS Policy were tendered, EIS would confer with the Debtors' risk management team concerning the defense of the claim. Once a defense budget is established, EIS would place a reserve on its books and issue payments upon instructions from the Debtors.

In sum, the EIS Policy provides the New Directors and Officers with appropriate insurance coverage in the event a claim is asserted against them and the 2018 Policies are not available to provide defense or indemnity for such claim. Moreover, the EIS Policy provides a mechanism whereby the Debtors' assets may be invested, and the Debtors may realize a return on this investment and a return of unearned premium to the extent the EIS Policy is not drawn down. By contrast, a traditional D&O policy would require the payment of premiums that would be lost to the Debtors irrespective of whether the policy were accessed, and the scope of coverage would be uncertain.

The Debtors respectfully submit that the EIS Policy is essential to attract and retain board members and senior officers and to provide them with adequate coverage to enable them to carry out their duties during the pendency of the Chapter 11 Cases and, therefore, the Motion should be approved.

## V. BASIS FOR RELIEF REQUESTED

Pursuant to the *Final Order Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), and 364 and Fed. R. Bankr. P. 4001, 6003, and 6004 (i) Authorizing the Debtors to (A) Maintain Insurance Policies, Workers' Compensation Program, and Surety Bond Program and (b) Pay All Obligations With Respect Thereto; and (ii) Granting Relief From the Automatic Stay With Respect to Workers' Compensation Claims* [Docket No. 695] (the "**Final Insurance Order**") the Debtors are authorized, in the ordinary course of business to extend, supplement, or

otherwise modify their insurance coverage as needed, including through the purchase of new or the renewal of existing insurance policies. The Debtors believe that the purchase of coverage for the New Directors and Officers is comparable to the coverage provided to the Debtors' directors and officers prior to the Petition Date and, therefore, is authorized under the Final Insurance Order. However, recognizing the different structure of the EIS Policy from the Debtors' existing D&O insurance, and out of an abundance of caution, the Debtors seek the Court's approval to purchase the EIS Policy.

Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions ... in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). As outlined above, the maintenance of adequate D&O insurance reflects both the Debtors' pre-petition practices and is customary in the Debtors' industry. Given this, the Debtors believe that securing the EIS Policy falls within the ordinary course of business and is therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.

To the extent that securing the EIS Policy is considered to be outside of the Debtors' ordinary course of business, section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to use estate funds where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). A debtor's "…decision to enter into [a transaction] which is outside of the normal course of its business, must be based on its reasonable business judgment. The Court may approve [a transaction] if [the debtor] has established 'some articulated business justification' for the transaction." *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997) (citations omitted). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also FDIC v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts construing California law have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045-46 (2009).

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812-ASW, 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014).

The relief sought in this Motion is necessary for the Debtors to carry out their fiduciary duties under sections 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also Hansen v. Finn (In re Curry & Sorensen, Inc.)*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

trustee for a debtor out of possession").

There are ample business justifications that support the purchase of the EIS Policy. This additional $50 million in coverage is critical and appropriate because, as discussed above, there are circumstances under which the New Directors and Officers may not have coverage for claims that may arise from alleged conduct after the Petition Date. Accordingly, in order to attract and retain board members and qualified senior management during the pendency of the Chapter 11 Cases, the Debtors respectfully submit that the EIS Policy provides a layer of protection that is essential. The Debtors' directors and officers are focused on the reorganization of the Debtors' businesses, and maximizing value for all of their economic stakeholders. As noted above, the Debtors believe that the purchase of the EIS Policy will provide the Debtors' directors and officers with appropriate coverage, indeed coverage that is customarily provided to officers and directors in similar capacities. This will inure to the benefit of all parties in interest and the value to be derived therefrom will more than offset any cost incurred in purchasing the EIS Policy. As noted above, given the structure of the EIS Policy, if no claims are made against it, the Debtors are entitled to a return (net of taxes and expenses) of the $50 million premium and the capital contributions, as well as any investment income earnt on this amount. Courts in other circumstances have authorized and approved the purchase of D&O insurance as a proper exercise of the debtor's business judgement. *See, e.g., In re New Bedford Capacitor, Inc.*, No. 01-14680-JNF, 2003 WL 25889620, at *5 (Bankr. D. Mass. June 27, 2003) (approving debtor's motion to purchase a "tail" policy extending the term of the debtor's executive protection "claims made" policy for directors and officers); *In re Nat'l R.V. Holdings, Inc.,* No. 6:07-bk-17941-DS (Bankr. C.D. Cal. March 26, 2008), [Docket No. 385] (authorizing an extension of the debtor's $10 million D&O insurance policy); *In re Shengdatech, Inc.* No. 11-52649-gwz (Bankr. D. Nev. September 13, 2011), [Docket Nos. 52 and 115] (authorizing the debtor to purchase a $5 million D&O insurance policy covering all post-petition officers and directors of the debtors); *In re Metro. Mortg. & Sec. Co.*, No. 04-00757-FPC11 (Bankr. E.D. Wash. April 16, 2004), [Docket No. 502 and 571] (authorizing the renewal of a debtor's D&O insurance policy which included

coverage for an interim CEO and CRO appointed post-petition); *In re Kahuku Hosp.*, No. 07-00176 (Bankr. D. Haw. May 7, 2008), [Docket No. 414] (approving the debtor's motion to purchase an extension of its D&O insurance).

The Debtors' directors and officers are engaged in a process designed to maximize value for the benefit of the economic stakeholders in these cases. Under the circumstances, they are entitled to have customary insurance coverage in place. As a matter of good corporate governance, this coverage is necessary and appropriate not only to ensure the ongoing service and dedication of the Debtors' directors and officers, but to ensure that their personal assets and livelihood are not exposed. Further, to the extent it is necessary for the Debtors to recruit new directors and senior officers, failing to have adequate D&O insurance available is likely to cause the Debtors' significant difficulty in recruiting qualified candidates for these roles.

For these reasons, the Debtors' decision to purchase the EIS Policy is in the best interest of their estates, creditors, and all parties in interest and represents a reasonable exercise of their business judgment.

## VI.   REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

The Debtors request of the stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to ensure that the currently-serving New Directors and Officers have adequate D&O Insurance. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

## VII.   NOTICE

Notice of this Motion will be provided to (i) the Office of the U.S. Trustee for Region 17 (Attn: Anthony R. Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the

Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; (xii) EIS; and (xiii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Debtors' business judgment and in the best interests of their estates, creditors, shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: June 10, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

*/s/ Stephen Karotkin*
Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*