WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF JANAIZE MARKLAND IN SUPPORT OF D&O INSURANCE MOTION**<br><br>Date: July 9, 2019<br>Time: 9:30am, Pacific Time<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br><br>**Objection Deadline**: July 2, 2019<br>4:00 p.m. (Pacific Time) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

I, Janaize Markland, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I hold the position of Senior Director, Enterprise and Operational Risk Management & Insurance at Pacific Gas and Electric Company, as debtor and debtor-in-possession (and together with PG&E Corporation, the "**Debtors**") in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**"). In my current role, I direct the Debtors' enterprise and operational risk management program framework and manage its $5 billion insurance portfolio. I joined the Debtors in 2000, and have held numerous roles in the compliance and risk since that time. I have a B.Sc. in chemistry from the University of British Columbia and masters' degree in environment and management from Royal Roads University.

2. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors' employees or the Debtors' legal, restructuring, and financial advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

3. This Declaration is submitted in support of the *Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 2002 and 6004(h) Authorizing Debtors to Purchase Directors and Officers Insurance* (the "**Motion**")[1] filed contemporaneously herewith.

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

**The Debtors' Existing D&O Coverage and Pre-Bankruptcy Wildfire Claims**

4. The Debtors recently announced the appointment of William Johnson as the new Chief Executive Officer and President of PG&E Corp., and the appointment of eleven new directors to the Board of Directors of PG&E Corp. (collectively, the "**New Directors and Officers**").

5. As is customary in the Debtors' industry, prior to the Petition Date, the Debtors regularly purchased and maintained primary and excess directors and officers ("**D&O**") liability insurance to cover any claims asserted against their directors and officers in connection with the exercise of such individuals' duties and responsibilities as directors and officers. The Debtors' directors and officers, including the New Directors and Officers, currently are insured under D&O insurance policies issued for the policy period May 20, 2018 to May 20, 2020 (the "**2018 Policies**").[2]

6. The 2018 Policies provide the Debtors and their directors and officers with $300 million in total available coverage limits. The first $200 million in D&O insurance coverage under the 2018 Policies is available to the Debtors as entities (*e.g.*, for securities claims) and the Debtors' individual directors and officers for a wide variety of claims. The next $100 million in available coverage under the 2018 Policies is dedicated to the individual directors and officers and cannot be accessed by the Debtors themselves. This D&O-dedicated insurance is referred to as Side A "DIC" (difference in conditions) coverage (the "**Side A Coverage**"). The coverage limits under the 2018 Policies are not available for claims that are found to be related to previous claims noticed during prior policy periods.

7. The Side A Coverage also provides for two reinstatement limits of $90 million each. If the Side A Coverage is exhausted by a claim or series of related claims, and a new and unrelated claim is asserted against the Debtors' directors and officers, $90 million of coverage would be

---

[2] The policy period for the 2018 Policies initially was one year. Prior to the Petition Date, the Debtors extended the policy period to 2020.

"reinstated" and made available to respond to the subsequent claim or series of claims. In the event another new and unrelated claim or series of claims is asserted, then a second reinstatement would be made available to provide an additional $90 million of coverage. Again, the additional coverage limits under the Side A Coverage reinstatements are not available for claims that are found to be related to previous claims. Moreover, as discussed in further detail below, the 2018 Policies and the reinstatement limits prioritize payment of new claims arising from *pre*-chapter 11 wrongful acts over payment of new claims arising from *post*-chapter 11 wrongful acts.

8. In addition to the 2018 Policies, the Debtors' prior D&O insurance policies issued for the period May 20, 2017 to May 20, 2018 (the "**2017 Policies**"), provide the Debtors and the directors and officers with $250 million in total coverage limits, the first $200 million of which is shared and the next $50 million in Side A DIC coverage. The 2018 Policies and 2017 Policies are "claims-made" policies, which means that they provide coverage, subject to all terms and conditions, for claims first asserted during the policy period.

9. Prior to the Petition Date, certain claims were brought against the Debtors' directors and officers arising from the 2017 and 2018 Northern California wildfires. *See, e.g., Lentine v. Williams,* Case No. CGC-17-562553 (Cal. Super. Ct.). The Debtors provided notice of these claims under the 2017 Policies and the 2018 Policies, as appropriate. Specifically, claims first asserted during the policy period of the 2017 Policies were noticed under the 2017 Policies. Claims first asserted during the policy period of the 2018 Policies were noticed under both the 2017 Policies and 2018 Policies.

### The Current Directors and Officers May Lack Coverage Under the 2018 Policies Under Certain Circumstances

10. The Debtors' primary D&O insurer has acknowledged defense coverage for the claims arising from the 2017 and 2018 Northern California wildfires, subject to a reservation of rights (as is customary). Based on correspondence from and discussions with the Debtors' D&O insurers, however, it is unclear whether the insurers ultimately will treat claims arising from the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

2017 wildfires and the 2018 wildfires as a single "Claim" (as defined in the 2017 Policies), and at least one carrier has indicated an intention to do so. If the D&O insurers take the position that claims from the 2017 and 2018 wildfires constitute a single "Claim," they may contend that all the wildfire claims trigger coverage only under the 2017 Policies. Under these circumstances, in the unfortunate event of a postpetition wildfire, the insurers may similarly attempt to treat any new claims as part of the same single "Claim" triggering only the 2017 Policies. Under these circumstances, the available coverage under the 2017 Policies could be exhausted as a result of the prepetition claims noticed to the insurers, which would leave no coverage under the 2017 Policies for the New Directors and Officers.[3]

11. Alternatively, claims arising from the 2018 wildfires may be found to be distinct from the prior claims. Under these circumstances, coverage under the 2018 Policies would be available to respond to claims arising from the 2018 wildfires, which may significantly impair or exhaust the 2018 Policies. If postpetition claims are asserted against the New Directors and Officers, and the 2018 Policies are impaired or exhausted, and the reinstatements are also unavailable for any reason, the New Directors and Officers could lack insurance coverage to pay for the defense and indemnification of any postpetition claims.

12. This potential lack of coverage is exacerbated by certain priority of payment provisions in the 2018 Policies (and the 2017 Policies). Even in a situation where the 2018 Policies are triggered, the 2018 Policies prioritize payment of claims alleging wrongful acts by the Debtors' board and/or officers *prior* to the Petition Date. Specifically, if the amount of Loss (defined in the 2018 Policies to include, without limitation, defense expenses, settlements, and judgments) under the 2018 Policies exceeds the available coverage limits, the 2018 Policies prioritize the payment of

---

[3] By setting forth potential positions that the insurers may assert with respect to coverage under the 2017 and 2018 Policies, the Debtors are not waiving any rights or admitting the validity of any positions that may be taken by the insurers. The Debtors reserve all of their rights to dispute any such positions under the policies and at law in any appropriate forum.

any Loss first to claims arising from alleged wrongful acts prior to the commencement of the Chapter 11 Cases and then to any Loss for claims arising from alleged wrongful acts after the commencement of the Chapter 11 Cases. These priority-of-payment provisions create a risk to the New Directors and Officers that the $300 million in coverage limits available under the 2018 Policies may be exhausted by claims relating to the prepetition period before claims, if any, relating to the postpetition period arise or can be paid.

13. If the $300 million in coverage limits currently available under the 2018 Policies were to be exhausted through payment of claims arising from prepetition conduct, as stated above, the Side A Coverage would provide up to $90 million in reinstatement limits only for any new, *unrelated* claim, and then another $90 million in reinstatement limits for a second *unrelated* claim. As stated, it is not clear what position the carriers may take with respect to coverage in the unfortunate event of any subsequent, postpetition wildfires. In addition, a similar prioritization of payment risk also exits with respect to the reinstatement limits because the reinstatement limits also prioritize payment of new claims arising from prepetition wrongful acts over new claims arising from postpetition wrongful acts.

### The Debtors' Efforts to Procure Additional Insurance Coverage for the New Directors and Officers

14. Because of the prioritization risk under the 2018 Policies, including with respect to the reinstatement limits, and the risk of exhaustion of the 2017 Policies and/or 2018 Policies on account of existing claims, the Debtors have explored ways to secure additional D&O insurance limits dedicated to claims, if any, that may be asserted against the New Directors and Officers with respect to post-chapter 11 conduct. Such coverage would be available to the extent the 2018 Policies are exhausted through the payment of claims arising from any pre-bankruptcy wrongful acts or are otherwise unavailable to pay claims asserted during the Chapter 11 Cases.

15. The Debtors explored three potential options for securing additional coverage that would address these risks: (i) traditional insurance; (ii) an Isosceles Trust; and (iii) the EIS Policy.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

16. The Debtors' insurance broker, Marsh USA, Inc. ("**Marsh**"), spent significant time compiling and reviewing proposals from various insurers for additional Side A DIC coverage. The quotes Marsh received, however, were very costly. Based on the proposals obtained by Marsh, to obtain an additional $100 million in limits for the Debtors' new directors, the premium would be in the range of approximately $20 million (20% of limits), and this amount would be fully earned, which means no premium would be returned to the Debtors, even if the policies were never accessed. Furthermore, based on the Marsh proposals, to obtain an additional $100 million in limits for only the Debtors' new directors and the newly appointed CEO of PG&E Corp. (but no other officers) would be even more costly – with a premium in the range of approximately $30 million (30% of limits). Further, many of the traditional insurance proposals included defense cost sub-limits, which would restrict the amount of coverage available for defense expenses incurred in connection with any covered claims. The insurer-proposed terms and conditions also lacked clarity regarding coverage that would be available in the event claims were to arise from any new (post-petition) wildfire. Lastly, the proposed coverage would only be available upon exhaustion of the existing $300 million in limits under the 2018 Policies.

17. The Debtors also considered an Isosceles Trust. Isosceles is a Bermuda-based company that issues insurance and reinsurance policies. The Isosceles Trust would be self-funded. The full amount of the Debtors' contribution (*e.g.*, $50 million) plus premium, plus interest, and investment proceeds would be available for return to the Debtors if not accessed. The Debtors would fully collateralize the Trust through payment of: (a) a 5% premium ($2.5 million on $50 million), returnable on termination of the Trust; (b) $15,000-$25,000 one-time setup fee; and (c) $100,000 per year in Trust fees and administration. The $100,000 estimated annual fee (or $500,000 over the 5-year term of the policy) was the estimated expense of "renting" a captive cell from Isosceles. During discussions, however, Isosceles indicated that it was unable to retain any risk within the cell, and would need to obtain reinsurance. This created issues that were not present

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

with respect to the EIS cell, and the Debtors were of the view that such reinsurance would be extremely difficult, if not impossible, to obtain, casting doubt on Isosceles' ability to consummate the proposed transaction. Moreover, the Debtors did not have any prior experience with Isosceles and were uncertain as to how it may operate and handle claims.

### **The EIS Policy**

18. In my view, the EIS Policy is the preferable option, as it is the lowest cost of the viable options available to the Debtors, and provides the Debtors and their current officers and directors with the most effective coverage.

19. EIS is a sponsored captive insurance facility that the Debtors would utilize via a contractual agreement to participate in a dedicated protected cell. The Debtors have an existing relationship with EIS, which facilitates the Debtors insuring other risks, including property loss. The Debtors have been securing captive insurance coverage through EIS since May 2017.

20. EIS is a wholly-owned stock insurance subsidiary of Energy Insurance Mutual Limited (EIM) and was formed to provide a facility that would meet the specific business requirements of EIM's members (including other utilities) for the placement and management of alternative risk related products. As described on its website (https://eimltd.com/):

    a. EIM's "Mission and Vision" are directed toward serving member companies like the Utility and it is committed to providing risk solutions specifically needed by its membership, including industry-focused policy language and customized risk solutions through EIS.

    b. EIS was originally incorporated in Bermuda on May 27, 1992 under the Companies Act of 1981 as Energy Insurance (Bermuda) Ltd. Upon completing redomestication requirements and moving onshore to South Carolina, EIB was renamed EIS on December 1, 2006.

  c. EIS is licensed to conduct insurance operations in South Carolina and authorized to write insurance, reinsurance, or coinsurance for a Member or group of Members through the use of "Mutual Business Programs." EIS contracts with Energy Captive Management LLC (ECM), a subsidiary of EIM, as its captive manager to conduct the business of EIS and the Mutual Business Programs.

  d. In 2018, the Captive Insurance Companies Association (CICA) honored EIS with the CICA 2018 Outstanding Captive Award stating "The Outstanding Captive Award is presented to a captive insurance company or risk retention group that has shown creative uses for a captive, been successful in managing the captive in terms of net results and usefulness to its owners, has prevailed over difficult times or situations, and has gained acceptance, recognition, and a positive reputation among rating agencies, regulators and colleagues in the captive industry."

21. To secure the EIS Policy, upon Court approval, the Debtors would make a premium payment of $10 million (returnable as discussed below) and a capital contribution of $40 million for a total of $50 million, to the protected cell. In return, the EIS Policy would provide $50 million in Side A DIC insurance limits that would be available to the Debtors' current directors and officers, including the New Directors and Officers, for a term of five years or until cancellation at the Debtors' direction. Funds delivered to EIS would be invested, and the Debtors' representatives would be able to recommend to EIS various options with respect to the investments. Net assets of the Mutual Business Program created for this policy would be available for distribution to the Debtors upon termination of the policy and/or dissolution of the Mutual Business Program, subject to a participation agreement and South Carolina Department of Insurance approval (as is

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

customary). If no claims arise against the insured directors and officers, then $50 million plus investment income less any tax liability or other expenses incurred would be the net assets available for distribution to the Debtors. Because the EIS protected cell structure is only available to EIM Mutual Participant Companies, including the Debtors, and is provided as a service to them, any expenses are expected to be minimal (*e.g.*, under $100,000 over the 5-year term) and would be paid first out of any available investment income. Accordingly, the terms of the EIS policy are far superior to the traditional proposals procured by Marsh that would result in $20-$30 million in estate funds being paid out to insurers. The Debtors' premium costs for the EIS Policy would be split between PG&E Corp. and the Utility, with the allocation based on the percentage of directors and officers from each entity covered by the policy.

22. The EIS Policy would provide coverage for any claims if, for any reason, the 2018 Policy does not provide coverage to the New Directors and Officers. For example, if the current D&O insurers were to assert that the current D&O policy bars them from paying the New Directors' and Officers' any amounts, including defense costs, because the 2018 Policy prioritizes payment of claims arising from pre-chapter 11 wrongful acts, the EIS Policy would be available to provide coverage.

23. In terms of claims handling, EIS would not control the defense of any claims. If a claim triggering the EIS Policy were tendered, EIS would confer with the Debtors' risk management team concerning the defense of the claim. Once a defense budget is established, EIS would place a reserve on its books and issue payments upon instructions from the Debtors.

24. I believe the EIS Policy provides the New Directors and Officers with appropriate insurance coverage in the event a claim is asserted against them and the 2018 Policies are not available to provide defense or indemnity for such claim. Moreover, the EIS Policy provides a mechanism whereby the Debtors' assets may be invested, and the Debtors may realize a return on this investment and a return of unearned premium to the extent the EIS Policy is not drawn down.

By contrast, a traditional D&O policy would require the payment of premiums that would be lost to the Debtors irrespective of whether the policy were accessed, and the scope of coverage would be uncertain.

25. It is my view that the EIS Policy is essential to attract and retain board members and senior officers and to provide them with adequate coverage to enable them to carry out their duties during the pendency of the Chapter 11 Cases.

### Rationale for Securing the EIS Policy

26. I believe there are ample business justifications that support the purchase of the EIS Policy. This additional $50 million in coverage is critical and appropriate because, as discussed above, there are circumstances under which the New Directors and Officers may not have coverage for claims that may arise from alleged conduct after the Petition Date. Accordingly, in order to attract and retain board members and qualified senior management during the pendency of the Chapter 11 Cases, the Debtors respectfully submit that the EIS Policy provides a layer of protection that is essential.

27. The Debtors' directors and officers are focused on the reorganization of the Debtors' businesses, and maximizing value for all of their economic stakeholders. As noted above, the Debtors believe that the purchase of the EIS Policy will provide the Debtors' directors and officers with appropriate coverage, indeed coverage that is customarily provided to officers and directors in similar capacities. This will inure to the benefit of all parties in interest and the value to be derived therefrom will more than offset any cost incurred in purchasing the EIS Policy. As noted above, given the structure of the EIS Policy, if no claims are made against it, the Debtors are entitled to a return (net of taxes and expenses) of the $50 million premium and the capital contributions, as well as any investment income earnt on this amount.

28. The Debtors' directors and officers are engaged in a process designed to maximize value for the benefit of the economic stakeholders in these cases. Under the circumstances they are entitled to have customary insurance coverage in place.

29. As a matter of good corporate governance, this coverage is necessary and appropriate not only to ensure the ongoing service and dedication of the Debtors' directors and officers, but to ensure that their personal assets and livelihood are not exposed. Further, to the extent it is necessary for the Debtors to recruit new directors and senior officers, failing to have adequate D&O insurance available is likely to cause the Debtors' significant difficulty in recruiting qualified candidates for these roles.

30. For these reasons, I believe that the Debtors' decision to purchase the EIS Policy is in the best interest of their estates, creditors, and all parties in interest and represents a reasonable exercise of their business judgment.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at San Francisco, California on June 10, 2019.

          /s/ *Janaize Markland*
          Janaize Markland

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119