Adam Cronin, Pro Se
101 Hannaford Ct Folsom CA 95630
916-467-6040
Ajcu88@gmail.com

**FILED**

JUN 18 2019

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re | ) Bankruptcy Case<br>) No.: 19-30089-DM<br>) |
| | ) Chapter 11 |
| Pacific Gas and Electric Company ("PG&E"), | ) **MOTION FOR RELIEF FROM**<br>) **AUTOMATIC STAY** |
| Debtor-in-Possession | )<br>) |
| | ) Hearing:<br>) |
| | )<br>) Date:<br>) |
| | ) Time:<br>) |
| | ) Courtroom: |

## MOTION FOR RELIEF FROM STAY

1. Adam Cronin, ("Movant", "Creditor") pursuant to 11 U.S.C. §§ 361, 362, 363 and Bankruptcy Rules 4001, 6007, requests an order conditioning, modifying, or dissolving the automatic stay imposed by 11 U.S.C. § 362 of the Bankruptcy Code:

### JURISDICTION

2. The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 362. This is a proceeding under 28 U.S.C § 1334(c)(2).

### DESCRIPTION OF DEBT

3. Movant filed a Proof of Claim on January 29th, 2019 (claim number 31). This claim arises out of pending litigation entitled *Cronin v. PG&E*, San Francisco Superior Court Case No. CGC-18-567919 ("State Court Action" [Exhibit A]). The complaint, filed on July 9, 2018 seeks damages for unlawful termination of Movant's employment with PG&E. The operative pleading is

Movant's Second Amended Complaint (SAC) (Exhibit A) which alleges the following causes of action:

1) Violation of FEHA/CFRA (California Family Rights Act);

2) Retaliation in Violation of FEHA (Govt. Code §12945(h));

3) Wrongful Termination in Violation of CA Labor Code 432.7;

4) Wrongful Termination in Violation of CA Labor Code 1102.5 (Whistleblower Retaliation);

5) Wrongful Termination in Violation of Public Policy; and

6) Intrusion into Private Affairs

## BASIS FOR RELIEF

4. Movant has standing to bring this Motion. Pursuant to 11 U.S.C. Section 362(d)(1), cause exists to grant Movant relief from stay to proceed with the State Court Action to final judgment. Mandatory abstention applies under 28 U.S.C. Section 1334(c)(2), and Movant agrees that the stay will remain in effect as to enforcement of any resulting judgment against the Debtor or Bankruptcy Estate, the Movant has already filed the proof of claim (Exhibit B), and the amount stated is merely an estimate upon liquidation of the claim. This claim can be most effectively resolved in the State Court Action.

5. The debtor's Chapter 11 Bankruptcy filing on 1/29/2019 was primarily motivated by the potential liability for damages arising out of the November 2018 Paradise California fire.

6. On April 29th, 2019, during PG&E's Section 341 meeting, while PG&E was under oath, the Movant asked PG&E if it would stipulate to Relief from Automatic Stay to pursue the pending State Court Action. Its representative stated that PG&E *would consider such a stipulation*. Upon PG&E's review of the State Court Action, PG&E declined to stipulate to relief from stay.

7. While hearing a motion for relief from the automatic stay under Bankruptcy Code Section 362(d), the party opposing stay relief bears the burden of proof on all issues except the debtor's equity in property. See *In re Domestic Fuel Corp.*, 70 B.R. 455, 462-63 (Bankr. S.D.N.Y. 1987); 11 U.S.C. § 362(g). If a creditor seeking relief from the automatic stay makes a prima facie case of "cause"

1  for lifting the stay, the burden of going forward shifts to the trustee pursuant to Bankruptcy Code

2  section 362(g). *See In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 756 (Bankr. S.D.N.Y. 1997).

3  8. The term "cause" is not defined in the Bankruptcy Code, and whether cause to lift the stay exists

4  is generally determined on a case-by-case basis. *See Izzarelli v. Rexene Prod. Co. (In re Rexene

5  Prod. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992); *Sonnax Indus. v. Tri Compoenent Prod.

6  Corp. (In re Sonnax Ind., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990). "Cause" for modification of

7  the automatic stay "is an intentionally broad and flexible concept that permits . . . [a] [b]ankruptcy

8  [c]ourt, as a court of equity, to respond to inherently fact-sensitive situations." *See In re Texas

9  State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995). Therefore, courts determine what

10  "cause" is based on the totality of the circumstances in each particular case. *Baldino v. Wilson (In

11  re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997) (*citing Trident Assocs. Ltd. P'ship v. Metropolitan Life

12  Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995)).

13  9. In reviewing requests for relief from stay to pursue non-bankruptcy cases, Courts have applied an

14  equitable balancing test to determine, if "cause" exists to lift the automatic stay. *In re Rexene

15  Products Co.*, 141 B.R. at 576. Under the equitable balancing test, the Court reviews three factors:

16     a.   whether prejudice will be caused to either the bankrupt estate or the debtor,

17     b.   whether the hardship to the movant by maintenance of the automatic stay outweighs the

18        hardship caused to the debtor;

19     c.   whether the movant has a reasonable probability of prevailing on the merits of the suit. *Id.*

20  10.   Application of the equitable balancing test to the present case demonstrates that relief from

21  the automatic stay is warranted here.

22  **The Debtor/Estates will not be prejudiced if Relief from the Automatic Stay is Granted**

23  11.   PG&E's primary motivating reason for filing Chapter 11 Bankruptcy was related to the

24  anticipated California wildfire liabilities, unrelated to the State Court Action which preceded the

25  Bankruptcy filing by nearly 7 months

26  12.   There is no prejudice to PG&E to lift the stay so that the State Court Action can proceed.

27  The movant has filed a proof of claim to which PG&E will no doubt object, so the dispute will

28  have to be litigated in some forum, either the State Court forum, which it originated, or as a

Motion for Relief from Automatic Stay

1  contested matter in the bankruptcy court. Since the creditor has requested, and has a
2  constitutional right to a jury trial in the State Court Action, this factor weighs heavily in favor of
3  granting relief so that the dispute can be resolved, consistent with constitutional jury trial rights.

4  **Balancing the Hardships Weighs in Favor of Modifying the Stay to Allow the Creditor to**
5  **Pursue the State Court Action.**

6  13. Movant is a prior employee of PG&E. Its actions in terminating the Movant's employment
7      violate numerous California public policies and statues, which has led to *extreme* economic and
8      emotional damages. This is due to the fact that the vast majority of the Movant's adult life was
9      spent developing specialized skills which are specific to PG&E and the industry, (since PG&E is
10     essentially a monopoly) is extremely difficult or potentially impossible to transfer to another
11     company or industry. Movant has suffered damages as a result of being wrongfully terminated
12     and for these reasons, the Movant has demanded (and is constitutionally entitled to) a jury trial.

13 14. On the other hand, this litigation is not the cause of PG&E's bankruptcy and is frankly a
14     relatively small matter for which it has already retained counsel in the State Court Action. The
15     Movant's claim must be liquidated in some forum, and the San Francisco Superior Court is the
16     appropriate forum for resolution. In addition, there have already been two iterations of the
17     complaint and PG&E's hearing of the Demurrer to two causes of action in the second amended
18     complaint was just days away when the bankruptcy was filed.

19 15. The State Court is well able to rule on PG&E's demurrer and to ultimately resolve the case
20     without sacrificing any substantive rights (like plaintiff's right to a jury trial). The Movant's
21     hardship by reason of the stay outweighs defendant's hardship by lifting it and allowing the State
22     Court Action to proceed.

23      **There is a Substantial Probability the Movant Will Succeed on the Merits**

24 16. When a party seeks to lift an automatic stay to pursue non-bankruptcy litigation, the required
25     showing for the Movant's probability of success is "very slight." *In re Rexene Products*, 141
26     B.R. at 578; *see also In re Continental Airlines, Inc.*, 152 B.R. 420, 426 (D. Del. 1993) ("Even a
27     slight probability on the merits may be sufficient to support lifting an automatic stay in an
28     appropriate case."). It "merely requires a showing that [the movant's] claim is not frivolous."

*Levitz Furniture Inc. v. T. Rowe Price Recovery Fund L.P. (In re Levitz)*, 267 B.R. 516, 523 (Bankr. D. Del. 2000).

17. As detailed in the State Court Action, the Movant's probability of success on the merits is substantially greater than "very slight". In the State Court Action, there is an email from the Movant's former manager, threatening termination of the Movant's employment, in association with the Movant's legitimate California Family Rights Act (CFRA) use (Exhibit C, item "3"). In an internal investigation, PG&E found that the manager overreached, retaliated, and was given a "slap-on-the-wrist" discipline to the retaliating manager. However, after Movant filed a FMLA retaliation action, this prompted a PG&E's Legal Department to initiate what would amount to a fishing expedition to find any reason to justify terminating Movant's employment.

18. The **pretextual reason** given by PG&E was for Movant's "misconduct" (Exhibit D[1]). The "misconduct" which PG&E alleges was for an unauthorized meter inspection the Movant made of a company meter, *almost 2 years* prior to his termination. The Movant explained in an investigation by PG&E Corporate Security that the meter inspection was prompted by voltage fluctuations causing dim lights which Movant was concerned that it may have been caused by a "Hot Socket" which a *__serious safety issue.__* "Hot Socket" is known to primarily be caused by a loose connection between the connecting points of an electric meter, and the "socket" it is plugged into.

---

1. Exhibit D: The 9th page of PG&E termination paperwork provided to the Movant at the time of termination. "Conclusion" section which states "Company Assets – Don't.. remove.. service equipment without 'proper approval or authorization'". Movant experienced various intermittent electrical issues which were occurring and included voltage problems, which the Movant reported internally to PG&E. When PG&E's "Troubleman" investigated the complaint, Movant noticed the "Troubleman" did not inspect the meter socket (for "Hot Socket") as a potential cause. Voltage problems are a potential symptom of "Hot Socket". After Movant's Troubleman failed to inspect for Hot Socket, and no other apparent causes for the voltage issues were found the Movant questioned the "Troubleman" about inspecting for "Hot Socket" to which the Troubleman implied it wasn't in his *work procedure* to do this. Since the Movant was (arguably) a "Subject matter expert" as it pertained to certain topics related to metering, (the Movant was designated by PG&E as a metering "subject matter expert" in PG&E's 2017 General Rate Case filing [to PG&E's regulator]), he conveyed to the "Troubleman" that, in those circumstances, the Meter socket should be checked, which the Troubleman ignored and left. Sometime after, because dim lights were still intermittently occurring indicating that there were voltage fluctuations, the Movant inspected the Meter Socket himself. OSHA regulations (as others) *__and__* PG&E's Code of Conduct requires that employees put safety first at all times, which, in an emergency/hazardous situation (such as voltage fluctuation problems, and attendant fire risk), **arguably mandated** Movant's inspection without "proper approval or authorization". After Movant removed and inspected the meter, (a 30-60 second procedure), the meter was remounted and plugged in without further incident. **This bears no relationship to the scurrilous allegation that Movant deliberately sabotaged his ex-partner's meter to ruin a party that she was hosting,** which false allegation prompted his arrest, and which was never pursued by the district attorney, believed to be because of a lack of evidence.

19. Electrical arcing can occur as a result of loose connection, causing heat and potentially, a fire. This "loose connection" is often associated with a meter change. At the time, the Movant knew of a meter change that had recently occurred, just prior to the voltage problems occurring. PG&E claimed that because the Movant did not have written authorization from the company to perform this inspection, (for "Hot Socket") this is a violation of their Code of Conduct.

20. Movant has alleged that PG&E's decision to terminate the Movant for allegedly violating their Code of Conduct constitutes a violation of CA Labor Code 1102.5 which protects whistleblowers or perceived whistleblowers from retaliation or preemptive retaliation by the employer. The Movant's cause of action 4 in the State Court Action alleges these facts.

21. As of the date the Automatic Stay went into effect (1/29/2019) for the State Court Action, there was a fully briefed demurrer on Movant's causes of action for (4) Violation of CA Labor Code 1102.5 (aka Whistleblower retaliation), and an (6) Intrusion into Private Affairs. PG&E did not demur to the Movant's SAC Causes of Actions 1, 2, 3, and 5. Thus, "probability of success" is at least "slight".

22. PG&E improperly obtained and utilized Movant's arrest information (which did not lead to conviction), violating causes of action 3) CA Labor Code 432.7, and 6) Intrusion into Private Affairs ("improper purpose").

23. In the interest of refraining from overburdening the court with State Court Action details, the Movant will summarize why PG&E's attempted demurrer (currently stayed) will fail.

### 4th Cause of Action (Violation of CA Labor Code 1102.5 [Whistleblower Retaliation])

24. The Movant's SAC alleges

   a. He made an internal complaint to PG&E of a safety issue (a voltage problem) in the timeframe of approximately **August – September of 2015** (which was sent to PG&E "Troublemen"). The "Decision Makers" in the Movant's termination were not ***initially unaware*** of this internal complaint.

   b. In **May of 2017**, while the Movant was under investigation by PG&E's Corporate Security for a meritless , but stated that in approx. Aug – Sept of 2015 he **1)** made an internal complaint to PG&E of a safety issue and **2)** a short time **after** that internal complaint, out of

concern of his safety and of others, the Movant performed an inspection of PG&E (metering) equipment himself (for "Hot Socket"), since the PG&E "Troubleman" at the time did not.

    c. The scurrilous allegations by the former partner took place in December of 2015, was a completely unrelated allegation to the "Hot Socket" inspection (occurring in Sept-Oct 2015), and wasn't arraigned until approximately April of 2017, which the PG&E Corporate Security Investigator confronted the Movant in May of 2017.

    d. **In that same <u>May of 2017</u>** investigation, PG&E Corporate Security **relayed the information** (to PG&E "Decision Makers" in Movant's termination) of **1)** the Movant's internal complaint and **2)** the Movant's self-performed meter inspection (occurring in Sept-Oct 2015).

    e. The PG&E "Decision Makers" decided to immediately suspend, and (within approx. 2 weeks) terminate the Movant **in <u>May of 2017</u>**.

25. The Movant alleges that these decisions by PG&E constitute a violation of CA Labor Code 1102.5 (whistleblower retaliation) because PG&E regarded [the Movant] as a whistleblower or potential whistleblower, giving rise (at least in part) to the wrongful termination.

26. It is for these reasons that this 4th Cause of Action is **highly unlikely** to be sustained in Demurrer, and a substantially greater probability of success than "slight"

<u>**6th Cause of Action in the SAC (Intrusion into Private Affairs)**</u>

27. Californians have an "inalienable right of privacy" provided by Article 1, section 1 of the California Constitution (*Britt v. Superior Court* (1978) 20 Cal. 3d 844, 855-856). PG&E violated this right because

    a. Defendants are required by law to refrain from the improper use of information properly obtained for a specific purpose as established by Labor Code 432.7 and the California Constitution Article 1 Section 1

    b. The engaging in off-duty personal activities, relationships, and holding personal information, are legally protected to be free from intrusion upon seclusion, (off-duty, unrelated to one's job duties) that (later acquired by the defendant), the defendant had no authorization

28. In the case of *Pitman vs City of Oakland et al*, the court concludes "Employers who, pursuant to section 432.7, are prohibited from considering arrests which do not result in conviction. The Court of Appeal concluded 'that the [defendant's] policy and procedures violate [plaintiffs'] right to privacy. [Plaintiffs'] right to privacy is violated as soon as arrest records containing nonconviction data are disseminated to public employers who are prohibited by law from considering a record of arrest which did not result in a conviction.' (*Central Valley Chap. 7th Step Foundation v. Younger, supra*, 95 Cal.App.3d at p. 231, 157 Cal.Rptr. 117.) ... defendants of a clear mandate to refrain from the disclosure and utilization of non-conviction data which brought about a termination of plaintiff's employment on November 15. Were these facts to stand alone we would <u>unhesitatingly hold that a prima facie case for violation of plaintiff's constitutional right to privacy had been stated.</u>"

29. In other words, when a [Plaintiff] alleges that an employer utilized an improper purpose of obtaining/gathering/utilizing arrest information (which did not lead to a conviction, violating CA Labor Code 432.7), and improperly utilizes it to terminate an employee, if alleged as such, would substantially hold a prima facie case for violation of a constitutional right to privacy.

    a. Though the Movant's SAC does not specifically articulated *in this manner*, the Movant holds he can and will affirmatively allege these facts *in this manner* (as they **are** true), if deemed as necessary to be specifically articulated as such, by the court.

    b. PG&E heavily relied upon arrest information (that did not lead to conviction of the Movant), which predicated the intrusion into private affairs, and subsequent termination.

30. It is for these reasons that this 6th Cause of Action is **highly unlikely** to be sustained in Demurrer, and a substantially greater probability of success than "slight"

31. The Movant is informed and believes that, in the **unlikely** event that PG&E's attempted Demurrer is sustained, to either the 4th or 6th causes of action, both can legitimately establish a prima facie by making simple *clarifications* in the pleading, if deemed necessary by the State Court.

**REQUEST FOR RELIEF**

32. Movant requests relief from the automatic stay pursuant to 11 U.S.C section 362(d)(1) of the Bankruptcy Code so that Movant may proceed under applicable nonbankruptcy law to enforce its remedies to proceed to final judgment in the nonbankruptcy forum (in the interest of preserving judicial resources and applying the applicable state law in the appropriate forum), provided that the stay remains in effect with respect to enforcement of any judgment against the Debtor or property of the Debtor's bankruptcy case. The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

33. For all the reasons stated herein, Movant requests that the automatic stay be lifted so that he might pursue the State Court Action, and for such other and further relief as may be just and appropriate.

Dated: June 18 2019

By Adam Cronin
Creditor

- 9 -

Motion for Relief from Automatic Stay

# Exhibit A

Second Amended Complaint,

"State Court Action"





**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

Dec-07-2018 12:13 pm

Case Number: CGC-18-567919

Filing Date: Dec-07-2018 12:11

Filed by: BOWMAN LIU

Image: 06602173

COMPLAINT

ADAM CRONIN VS. PACIFIC GAS AND ELECTRIC COMPANY ET AL

001C06602173

**Instructions:**
Please place this sheet on top of the document to be scanned.

C

F I L E D
Superior Court of California
County of San Francisco

DEC 07 2018

CLERK OF THE COURT
BY: _____
Deputy Clerk
BOWMAN LIU

1 | Adam Cronin, In Pro Per
  | 101 Hannaford Ct, Folsom CA 95630
2 | 909-283-3039
  | Ajcu88@gmail.com
3 |
4 |
5 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
6 | **FOR THE COUNTY OF SAN FRANCISCO**

7 | Adam Cronin ) Case No.: CGC-18-567919
  | )
8 | Plaintiff(s), )
  | ) **SECOND AMENDED COMPLAINT FOR**
9 | vs. ) **DAMAGES:**
  | )
10 | Pacific Gas and Electric Company and Does 1 ) **1. VIOLATION OF FEHA/CFRA**
   | to 50 ) **(California Family Rights Act); AND,**
11 | )
   | ) **2. FOR RETALIATION IN VIOLATION**
12 | Defendant(s). ) **OF FEHA (Govt. Code §12945(h));**
   | )
13 | ) **3. WRONGFUL TERMINATION IN**
   | ) **VIOLATION OF LABOR CODE 432.7**
14 | )
   | ) **4. WRONGFUL TERMINATION IN**
15 | ) **VIOLATION OF LABOR CODE 1102.5**
   | )
16 | ) **5. WRONGFUL TERMINATION IN**
   | ) **VIOLATION OF PUBLIC POLICY;**
17 | )
   | ) **6. INTRUSION INTO PRIVATE AFFAIRS**
18 | ) **(CACI 1800)**
   | )
19 | ) **DEMAND FOR A JURY TRIAL**
   | )
20 | )

21 |
22 | ## Jurisdiction
23 | 1. This action involves application of the Article 11, California Family Rights Act
24 | ("CFRA"), Government Code Section 12945.2. This court has jurisdiction of this action
25 | pursuant to California Code of Civil Procedure (CCP) Sections 392 - 403
26 | ## Venue
27 | 2. This venue is proper because the events giving rise to this complaint happened in this
28 | district

## Parties

3. Plaintiff is Adam Cronin is a citizen of the State of California, residing at 101 Hannaford Ct, Folsom CA 95630.

4. Cronin is informed and believes that the defendant, Pacific Gas and Electric Company ("PG&E") is and was at all times material hereto, a California corporation doing business in this district, headquartered in San Francisco, California.

5. Plaintiff is ignorant of the true names and capacities of "Does 1 through 50" Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of these fictitiously named Defendants is liable in some manner for the acts, occurrences and injuries described herein below.

6. The Plaintiff, Adam Cronin, is a former employee of PG&E

## Statement of Facts

7. Plaintiff Adam Cronin began working for the San Francisco, California based public utility, Pacific Gas and Electric Company ("PG&E") in the city of Sacramento in August of 2008.

8. The Employer Defendants are subject to the provisions of CFRA because they employ 50 or more persons in the State of California. Plaintiff was eligible for CFRA leave because he was employed for at least 12 months as of the date the leave should have commenced; and he worked at least 1,250 hours of service during the 12-months period immediately preceding the date the leave should have commenced.

9. The Plaintiff went on protected CFRA leave intermittently for years prior to the last position he held with the company, without any work performance issues.

10. In 2014 Cronin was offered a promotion within PG&E in a position with the Metering Services and Engineering (MS&E) department located in PG&E's headquarters building in San Francisco, California. The position of Program Manager in Meter Engineering (a

subgroup of MS&E) consisted of managing various Meter Engineering projects and programs.

11. When the Plaintiff joined MS&E in 2014, the FMLA/CFRA expired because the MS&E department did not have a strict policy against utilizing available sick time, which was in contrast to other departments the Plaintiff worked with previously.

12. After starting the new position in April of 2014, Cronin began directly reporting to Meter Engineering Senior Manager, Young Nguyen, who led the MS&E subgroup, who reported to the MS&E Director, Earle Davis. Cronin and MS&E leadership experienced a positive working relationship and received positive performance reviews for semi-annual and annual reviews in both 2014 and 2015.

13. However, towards the end of 2015 (November), Senior Manager Young Nguyen suddenly and inexplicably blocked Cronin from utilizing sick time he had available which was needed for a migraine occurrence. Without reason, in a text message response to Cronin's request to utilize his "available" sick time, Young Nguyen states, "I won't accept sick day today. Either vacation or day off without pay" Cronin then re-established his FMLA/CFRA status in approximately December of 2015, as necessary for his serious medical condition.

14. In early 2016 Young Nguyen begins to make it clear he has no tolerance for Cronin's CFRA use, and begins incessantly calling, texting, emailing, and interfering with Cronin's CFRA use, and insisting that he completes work items during CFRA use.

15. In an email to Cronin from Young Nguyen on March 3rd, 2016, Young Nguyen includes the Office Assistant, Kathy Nguyen, demanding from Cronin, "What is physically wrong with you?" And on an email on March 17th, 2016, Young Nguyen includes Engineering Supervisor, Alex Yan (who Cronin does not report to), Young Nguyen states, "Please bring me doctor appointment document… Tomorrow, Alex Yan, on my behalf, will collect the doctor appointment document…"

16. Young Nguyen continues to include Alex Yan and Kathy Nguyen in these and various subsequent communications which is in violation of California's Confidentiality of

1    Medical Information Act (CMIA) Cal. Civ. Code § 56.20. Young Nguyen also goes on to

2    retaliate against(punish) Cronin by imposing a "coaching/performance improvement

3    plan," which is disciplinary in nature and consisted of 2 mandatory meetings per day,

4    every day from Cronin. As part of these disciplinary measures, Young Nguyen forces

5    Cronin (despite protest from Cronin) to move his desk across the building to be relocated

6    right next to Young's office and directly next to Office Assistant Kathy Nguyen, to

7    surveil Cronin's daily activities and report them to Young.

8    17. These actions were on full display for the office which lead to numerous department

9    personnel to take notice and begin questioning Cronin about "What's going on", "Why

10    [is Cronin] being made to move desks and meet with Young so much." Ultimately,

11    Young's attempt to demonize Cronin and drive a wedge between him and the rest of the

12    office, was successful. Young made it clear to Cronin and the rest of the office that he is

13    being made an example of, surveilled, punished, and displayed/treated as a "bad apple" in

14    the eyes of the Engineering Senior Manager. These actions by Young exhibits conduct

15    which is pervasive, as it significantly impacted the work environment negatively (created

16    hostile work environment), by creating these negative perceptions and driving a wedge

17    between Cronin and the rest of the group, in violation of Government Code section

18    12950.1(g)(2)

19    18. In 2015 Young Nguyen contributes to and heavily influences the creation of a MS&E

20    business case in order to request funds for what became known as the "Meter Tractability

21    Project". The purpose of this project is to create an asset management system for electric

22    meters which did not exist in the department, which made tracking of the meters virtually

23    impossible once they left the shipping warehouse in Fremont CA. In an email on March

24    19th, Young goes on to perpetuate fraud against Cronin by requiring Cronin to

25    comprehensively track the location of the meters (after leaving the warehouse), in an

26    attempt to sabotage work performance, with full knowledge that this comprehensive

27    tracking is not feasible or realistic for the department, hence the reason for business case

28    to request funds by Young and others.

2nd AMMENDED COMPLAINT for Damages and Jury Trial

19. On March 30th, 2016, in a face to face meeting between Cronin and Young Nguyen about attendance & FMLA/CFRA, Young Nguyen threatens Cronin's job by stating if attendance/performance doesn't improve, that he would end up being terminated. Cronin memorializes the details of the conversation in an email, which Young confirms the details (including the termination threats) are correct, confirming the violation of CA Gov't Code § 12945.2(l) (1). These comments came just weeks after Young Nguyen provided a positive performance review (in February of 2016) for his performance in 2015.

20. In approximately April of 2016, Cronin filed a complaint with PG&E Ethics and Compliance department, with whom an investigation ensued. Cronin contends that the statements made by Young prove that adverse employment actions (moving Cronin's desk, imposing a performance improvement plan which Cronin contends, and has proof, is entirely based on fabricated circumstances, not actual performance) are retaliatory in nature, especially considering that Cronin had received positive reviews/remarks, just weeks earlier (for 2015 performance). Upon concluding findings and confirming Cronin's complaint, Ethics and Compliance/Human Resources involved Young Nguyen's boss, MS&E department Director, Earle Davis to actions, which included confirmation and revocation of the performance improvement plan, and that it was retaliatory in nature and invalid.

21. Convinced that Young successfully and severely tarnished Cronin's reputation and opportunities for advancement within the department, and uneasy demeanor perceived from department Director, Earle Davis, Cronin sought legal protections afforded under FMLA law. Cronin filed a legal complaint in May of 2016 and served it to the defendant, PG&E. Not until the defendant became aware of the filed lawsuit in June of 2016, did Department Director Earle Davis remove Cronin from the supervision of Young Nguyen. Earle moves Cronin to a different MS&E subgroup, "Smart Meter Programs", which was managed by Alan Jones, to whom Cronin began reporting to.

22. . After the Ethics and Compliance complaint was filed and upheld/substantiated by HR, and subsequent legal case, which prompted Director Earle Davis to move Cronin under the supervision of Alan Jones. At this point MS&E leadership was placed "on notice" and subsequent actions to retaliate against Cronin for protected CFRA/FMLA use became more subtle and calculated.

23. In July of 2016, shortly after beginning to work under Alan Jones, MS&E leadership elected not to provide any semi-annual performance review to Cronin, which is highly unusual for the company.

    a. At this point, Director Earle Davis became heavily involved with the entire situation and circumstances, as he was required by HR to participate in the investigation into Cronin's confirmed complaint. Davis was responsible for making the change for Cronin to report to Manager Alan Jones, therefore, Davis was ultimately responsible for withholding Cronin's semi-annual review.

    b. If there were genuine issues with Cronin's performance, Davis had every opportunity to fully investigate the situation, and provide feedback & coaching in a non-retaliatory, non-punitive manner, or apprise Alan Jones of how to proceed.

    c. Davis elected to do no such thing.

24. From June to approximately December of 2016, under Alan Jones, Cronin reports a seemingly positive working relationship between Jones and Cronin. Cronin reports and apprises Jones regularly, that the project he's responsible for, "2G Project", has many unique challenges. Some of the types of challenges included

    a. Brand new development and deployment of new technology ("SM kVar")

    b. Required new training for dozens of Electric Meter Technicians of "SM kVar"

    c. Required special handling & asset management of specific/specialized technology for the project, "SM kVar", and "4G MV90"

    d. MS&E had no comprehensive asset management method or system, as this was the first project to ever require special handling of a technology for a mass deployment project

e. The lack of asset management technology has been a known issue within the department, which the department had been attempting to address for years

25. In an email from Jones to Cronin on September 7th, 2016, after a team meeting which was addressing some of the challenges on the project, Jones asks, "How did it go?" Cronin responds to Jones, "Bumpy" and goes on in a lengthy email which describes the situation and some of the challenges the team is facing. Jones responds to Cronin's email by saying, "Please keep pushing the project forward, I feel good that the team is falling in place, there are several moving parts and contributors to coordinate"

a. At no point does Jones make any indication whatsoever that Cronin is making any mistakes or provide any indication that Cronin is having any types of performance issues. In fact, just weeks later, Jones tells Cronin (in an email) he is going to advocate for Cronin for a promotion position opening on Jones team ("Expert" Program Manager).

b. "Challenges" are not necessarily "performance issues", as one would know, are a normal part of complex part of business operations.

26. Days later, on September 19th, 2016, in an email from Jones to Cronin, after Cronin requests to be considered for the new position (a promotion) to "Expert", Jones responds "I am happy to present your qualifications to the management team and HR for consideration [for the promotion]"

27. In approximately mid-October of 2016 (just weeks later), Cronin's and PG&E's legal team meet to attempt to reach a settlement on the legal complaint filed in May, which was unsuccessful. The 4th quarter of 2016 completed with no indication of any issues with performance whatsoever from management. Additionally, Cronin's "2G Project" was successfully completed on time, and on budget (as targeted) by December 31st, 2016, which was later admitted by Alan and Earle in Cronin's 2016 performance review.

28. During the timeframe of approximately December 2016 to February 2017, Cronin begins noticing that Jones' demeanor towards him changes and begins making strange, vague, arbitrary, and immaterial comments, including (in March of 2017), "providing feedback"

which Cronin proves is falsified/fabricated to attempt to create a scenario to constructively discharge Cronin.

    a. In this timeframe, Cronin notices that in December of 2016, MS&E leadership (Alan and Earle) removes the online job posting for the "Expert" Program Manager from the online job site and forgoes the interview process for this position entirely.

    b. Cronin also notices that MS&E leadership (Alan and Earle) elect to give the position of "Expert" Program Manager to Business Analyst Mei Chen (from Young Nguyen's team), who, at the time, had very little experience with the Program/Project Management role (as an analyst), and much less experience with the company and Smart Meters in general, than Cronin.

29. In February of 2017 Jones provides Cronin with his first poor performance review in (nearly) 9 years of service to the company, without a single mention of any performance issues from Jones or Davis the entire year of 2016. The performance appraisal gives no references whatsoever about specific actions or situations which Cronin mismanaged or made a critical error. Instead, it only makes very general and vague assertions about how Cronin "doesn't communicate well", or "is always delegating his responsibilities"

    a. The generalized and unspecific nature of the statements made by management (in the performance appraisal) were designed to make the accusations (by management) indefensible (oppression) thus further supports elements of a calculated attempt to constructive discharge (creating intolerable work environment)

30. The Cronin immediately files an appeal on the performance appraisal, in which he finds the appeal process consisting of nothing more than the Human Resources department only "facilitating a conversation" about it between Department Director Earle Davis and Alan Jones.

31. During the "appeal" meeting between Alan Jones, Adam Cronin, and Earle Davis, in late February 2017, Cronin conveys (to Earle) his concerns and objections to the review including

   a. The review contains no specific examples or references which would give an opportunity to explain if there were misunderstandings or if defensible situations where difficult decisions were made which were necessary in moving the project forward (as instructed by management)

   b. That Jones was aware of and apprised of the project status and that the delegations were appropriate. Jones even encouraged Cronin to continue pushing the project forward and made no complaints about Cronin's management of the project

32. Director Earle Davis goes on to take no concern towards Cronin's valid objections and statements and proceeds to state (which is memorialized in an email on February 23rd, 2017, and confirmed by Earle and Alan in their combined response on March 7th, 2017) that "a 'perception' has developed around (Cronin's) 'presence' in the office, and that the 'perception' needs to be changed"

   a. This sudden and first poor performance review for the year of 2016 came as a complete shock to Cronin, as neither Jones, nor Davis uttered a single word about any performance issues the entire year (2016) to Cronin (and also withheld a mid-year review).

33. Earle and Alan's combined response on 3/7/17 does not deny that which is memorialized on Cronin's email of the meeting, instead Earle attempts to backpedal and deflect the statement by saying "The perception I was referring to is Adam is not doing his part as the project manager" But this statement neither denies, nor addresses how this "perception" Earle's attempted explanation is relevant to Cronin's "presence" in the office (which was discussed in the in-person meeting, and memorialized in the subsequent summary email), since the vast majority of the key players on the project team (on this project) were in other remote locations.

- 9 -

a. Earle goes on to deny Cronin's request to change the performance rating despite lack of logic, evidence, reasoning, or coaching ever being provided to Cronin by Management in 2016.

b. The performance by Jones (confirmed by Davis) review included

   i. Events that took place in 2017 (not 2016 which the review was for)

   ii. Requirements being imposed only on Cronin and not others managing similar projects (MIB & FAS system requirements)

   iii. Expectations on projects which were de-prioritized (Non-res delay)

c. These actions demonstrate very clear motives to begin constructive discharge actions against Cronin

34. In March of 2017, Alan assigns a new project to Cronin, known as the "TOU Project". The TOU Project had been initiated approximately 2-4 weeks prior to being assigned to Cronin. On March 27th, 2017, Cronin had a team meeting with the new project team, in which Alan Jones attended. After the meeting, Alan attempts to point out things Cronin "did wrong" during the meeting, in the form of "feedback". On the March 27th email Alan claims Cronin made the following mistakes

a. Claims Cronin did not distribute an action log (agenda) at the beginning of the meeting

   i. Cronin sought and attached emails from team members confirming they did, in fact receive a new/updated action logs/agendas from Cronin at the beginning of that meeting

b. Claims Cronin is responsible for the team having old/incorrect data sheets discussed during the meeting

   i. Cronin sought and attached emails from the team confirming that the data sheets they possessed were in circulation prior to Cronin taking over the project just days earlier

c. Claims Cronin is responsible for "data preparation" (data scrubbing)

i. At this phase of the project, "data preparation" (scrubbing) is a complex task which was the role and assignment of partner group, MIS&S. Cronin sought and attached emails from MIS&S (Gary Kokawa) who was already working on this task, as well as provided an ETA for completion.

35. These facts/emails/rebuttals which Cronin provides completely nullifies Jones' feedback as being valid or appropriate, and demonstrates Jones' meritless & falsified statements have injurious intent towards Cronin.

36. In Alan's performance improvement plan, Alan requires that Cronin become proficient with three new systems: Tracker, MIB, and FAS. Cronin sought and attached emails to Alan and Earle which prove that this requirement (particularly MIB and FAS) is only being imposed on Cronin, and not other Program Managers who worked/performed similar tasks under Alan (Mei Chen and Tom Draper).

37. In April of 2017, Director Earle Davis calls Cronin into his office to provide Cronin a verbal "FYI" that he feels Cronin's email communications come off as "insubordinate, unprofessional". In order to provide Cronin this feedback, Earle seems to feel that it is necessary or appropriate to bring in PG&E Corporate Security officer, Michael Biel in the room "in order to observe" Cronin.

   a. Having Corporate Security present "in order to observe" an administering of a verbal "FYI", (no discipline whatsoever) and is believed to be far from standard procedure for PG&E to have Corporate Security officers present for administering verbal "FYI's, and is suspected by the Plaintiff to be an unlawful attempt to intimidate him

38. During the discovery phase of Cronin's first legal complaint, PG&E's legal team utilized discovery powers to conduct a background check on Cronin, in which they found Cronin had a pending arrest warrant, unbeknownst to Cronin, which PG&E's legal team had directed PG&E Corporate Security to investigate.

   a. These actions constitute Abuse of Process, as the Defendant's ulterior motives were executed (terminating the Plaintiff) based on the findings of the

- 11 -

investigation, which were based on the retaliatory acts and subsequent legal complaint and

    b.  These acts are improper because they demonstrate a willful act of use of the judicial process (by the Defendant) to commit actions which are not part of the prosecution of the legal proceedings (FMLA/CFRA judicial discovery)

39.  PG&E Corporate Security conducted their investigation by first sitting in on Cronin's arraignment hearing (unbeknownst to Cronin). No information about parties involved or locations were given or made public, as court records had this information redacted for privacy reasons. When the judge clarified the address in question, the PG&E corporate security officer wrote down the address, accessed PG&E records, contacted Cronin's ex-girlfriend, and asking/recording/taking notes of intimate details about the couple's relationship, all without Cronin's knowledge or consent.

    a.  These actions violates the California Constitution, Article One, Section One (invasion of privacy)

40.  When confronted later by PG&E Corporate Security, Cronin denied the allegations which lead to the charges in December of 2015. These charges were used as part of the justification for Cronin's termination outlined in the termination paperwork.

    a.  These charges were dismissed, putting PG&E in violation of California Labor Code § 432.7

41.  Cronin did, however, admit that sometime between approximately September and November of 2015 (while in the relationship with the other party), he inspected the electric meter for a known, potentially serious safety issue, known within MS&E as "Hot Socket."

    a.  Cronin provided proof that, on multiple occasions, that Cronin contacted PG&E to attempt to locate/cure the problem prior to inspecting himself.

    b.  Cronin's name, and/or contact phone numbers were listed on 2 PG&E field orders in the months preceding (August, September of 2015)

42. Because of Cronin's position in PG&E's Metering Department (MS&E), he, as well as MS&E leadership were well aware of a metering-socket issue which could create the High/Low voltage fluctuations his girlfriend was experiencing in her home.

    a.  "Hot Sockets" have been known to catch on fire and are known within MS&E as serious potential safety issues

    b.  Young Nguyen (Cronin's former manager) wrote or oversaw writing of technical documents on the "Hot Socket" phenomenon, but never required the "Electric Operations" group to adopt a procedure for it

    c.  PG&E does not send out metering technicians when this type of situation is reported. Instead, a representative from "Electric Operations" troubleshoots the problem (but does not check the meter).

43. Since no other causes were found at the time, and Cronin was aware that the "Hot Socket" issue could have been a potential cause, as well as a potentially very serious safety issue, he felt that ensuring a loved one's physical safety was paramount and took it upon himself to check for the issue (as legal "duty of care" would require). This was explained to the Corporate Security officer when the officer questioned Cronin about the situation/circumstances. PG&E's own Code of Conduct requires that safety is always put first and placed above all else.

44. PG&E's MS&E Leadership team (Director Earle Davis, Manager Young Nguyen, and Manager Alan Jones), utilized the findings given in Cronin's termination paperwork as a pretext for justification of his termination

    a.  California Health and Safety Code Section 1799.102 stipulates "No person who in good faith, and not for compensation, renders emergency medical or nonmedical care at the scene of an emergency shall be liable for any civil damages resulting from any act or omission".

    b.  California Civil Code Section 1714 (a) stipulates "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill". In the case of Rowland v.

Christian in 1968, courts held that the duty of care is created if 1) there is a foreseeability of harm, 2) the closeness of the connection, or there is a "special relationship" between the parties, which creates a legal duty to act

c. Additionally, Labor Code 1102.5 (c) stipulates "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation"

d. The decisions executed further demonstrate that the reasons given are pretextual, and, in addition to violation of the aforementioned legal violations, also violate PG&E's own Code of Conduct ("put safety first")

e. Considering Cronin's metering safety knowledge, and position in the company, had Cronin met PG&E's Code of Conduct requirement (as stipulated in the termination paperwork), and subsequent willful negligence resulted in injury or death, could have potentially resulted in criminal liability for Cronin and/or PG&E.

## FIRST CAUSE OF ACTION

### VIOLATION OF FEHA/CFRA (California Family Rights Act)

### Against All Defendants, and DOES 1 – 50

45. The Plaintiff re-alleges and incorporates by reference each and every allegation in paragraphs 1 – 44 inclusive

46. The Employer Defendants thereafter terminated the Plaintiff for pretextual reasons.

a. The reasons given are pretextual because

i. The charges which lead to the Plaintiff's arrest (and substantially used by PG&E as part of their justification for termination) were dismissed

ii. PG&E utilized an improper purpose to discover and execute an ulterior motive unrelated to the legal proceeding

- 14 -

iii. PG&E violated the California Constitution Article 1 Section 1, invading privacy by utilizing discovery powers to acquire information about an intimate personal relationship which was used as part of the justification for termination

iv. PG&E violated Labor Code 1102.5 (c) by implying that Cronin would be required to be non-compliant with metering safety regulations (by checking for "hot-socket" after PG&E failed to do so)

b. In addition to the illegal reasons given at termination and aforementioned examples of direct threats for utilizing FMLA, constructive discharge attempts, and ongoing harassment/discrimination/retaliation perpetrated by PG&E, suddenly after 8-9 years of virtually flawless work performance, and almost immediately after the Plaintiff established CFRA/FMLA, provides substantial evidence of the FEHA/CFRA violations.

47. Such conduct, individually and collectively, violates Govt. Code §12945.2, which requires an employer to grant leave to an employee to care for their own serious health condition

48. Such conduct also constitutes interference with Plaintiff's exercise of his rights under the CFRA, which further violates Govt. Code §12945.2

49. PG&E utilized an arrest which did not lead to a conviction of the Plaintiff, as part of their justification for termination, violating CCR, title 2, section 11017.1. Labor Code section 432.7 (a)(1) prohibits employers to "seek [information] from any source whatsoever"

a. The exception in this regulation is that "Nothing.. shall prevent an employer from asking an employee.. about an arrest"

i. PG&E violates this provision by seeking and obtaining information from sources other than the employee (the Plaintiff, as described in this complaint), and subsequently utilizing that information for the pretextual justifications for the wrongful termination described in this complaint

Case: 19-30088    Doc# 2579    Filed: 06/13/19    Entered: 06/13/19 11:30    Page 26

50. As a proximate and legal result of the Employer Defendants violation of the CFRA, all as pled herein, Plaintiff lost employment benefits, including lost wages and fringe benefits, and has suffered other economic (consequential) damages in an amount in excess of the minimum jurisdiction of this court, and according to proof.

51. As a proximate and legal result of the Employer Defendants violation of the CFRA all as pled herein, Plaintiff suffered emotional distress damages in an amount in excess of the minimum jurisdiction of this court, and according to proof

52. The Plaintiff is informed and believes, and on that basis alleges that the defendant perpetrated unlawful employment practices, retaliation and interference 2 CCR § 11094 (b)

53. California law (the Fair Employment and Housing Act) Cal. Govt. Code §12940(k), prohibits discrimination, harassment, and retaliation

## SECOND CAUSE OF ACTION
### FOR RETALIATION/DISCRIMINATION
### IN VIOLATION OF FEHA/CFRA (Govt. Code §12945.2)
### Against all Defendants, and DOES 1 – 50

54. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 53 of the Complaint, as though fully set forth herein.

55. Plaintiff requested, and was entitled to take intermittent CFRA leave, as pled herein.

56. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Senior Manager, Young Nguyen by being reprimanded, working conditions altered, and being threatening with termination in an email in connection with CFRA use. (March 2016)

57. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Director Earle Davis & Manager Alan Jones by refusing to promote the Plaintiff, weeks after Jones stated in an email he would "advocate" to Director Earle Davis & HR for Cronin's promotion position to "Expert

Program Manager" (September 2016), and subsequently refusing to give the promotion to Cronin, giving it to a less qualified person (Mei Chen, December 2016), in connection with CFRA use.

58. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Manager Alan Jones by placing requirements on Cronin which were not placed on other members of Alan Jones' team.

    a. Jones required Cronin to become proficient in programs not owned or regularly used by this subgroup

    b. FAS is owned by Field Metering Operations. No one on Alan's team was ever required to become proficient with this system.

    c. MIB is owned by a sister-group, MIS&S. Alan placed utilizing functions of this program on Cronin as a requirement, and did not require others to do so.

59. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Manager Alan Jones by being given his first poor performance review in February of 2017, in nearly 9 years with the company, after zero mention of any issues with work performance coming from either Jones or Davis.

    a. Cronin's primary goal of completing the "2g Project" by the end of 2016 was completed successfully, as outlined in the goals set for Cronin at the beginning of 2016

    b. Plaintiff was further retaliated/discriminated against by Director Earle Davis by having appealed the performance rating, and having the appeal denied by Director Earle Davis. Furthermore, during the appeal meeting, Director Earle Davis stated (later memorialized in an email and undenied by Davis) "there's a 'perception' regarding (Cronin's) 'presence within the office,' and that perception needed to change" (March, 2017), subtly suggesting that he has a problem with Cronin's CFRA use.

60. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Manager Alan Jones by providing Cronin

falsified/fabricated "feedback," stating Cronin did not complete actions which were his job responsibility during a project meeting, and claimed that Cronin was responsible for old/inaccurate data circulating during the meeting (April, 2017).

    a. Cronin sought emails from the other team members who confirmed that Cronin did indeed to the things which Jones claimed he didn't, and that the old/inaccurate data sheets which Jones was referring to were circulated before Cronin took over that project, just days earlier (April, 2017).

    b. The invalidity of the "feedback" provides evidence of constructive attempts to discharge Cronin, in connection with CFRA use.

61. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, CFRA was retaliated/discriminated against by PG&E's Legal Department by proactively obtaining, investigating, and utilizing non-case related information through judicial discovery powers in order to establish a pretext for Cronin's termination, in connection with CFRA use & subsequent legal complaint.

62. Plaintiff, after giving notice of his need for a qualifying leave under the CFRA, was retaliated/discriminated against by Director Earle Davis, Manager Alan Jones, PG&E Corporate Security, and PG&E Legal for authorizing and executing termination based on

    a. An arrest which did NOT lead to a conviction

    b. Electing to terminate for a Code of Conduct violation when good faith attempts were made by Cronin to follow the Code of Conduct, and subsequent actions to inspect for a known, potentially serious safety issue ("meter hot socket")

        i. These decision makers were aware of these safety issues, yet still elected to terminate in defiance of the aforementioned legal codes, and PG&E's own Code of Conduct requiring safety to be always put first (May, 2017). These actions were perpetrated by the defendant, in connection with CFRA use.

63. Plaintiff is informed and believes that such retaliatory employment actions were taken in relation with exercising his CFRA rights. Such conduct violates Govt. Code §12945.2.

1  Alternatively such conduct constitutes discrimination against Plaintiff for exercising his

2  CFRA rights, in violation of Govt. Code §12945.2.

3  64. Decisions taken by PG&E management also violate California Health and Safety Code

4  Section 1799.102, California Civil Code Section 1714 (a), and Labor Code 1102.5 (c),

5  and, in connection with CFRA use.

6  65. As a proximate and legal result of the adverse employment actions pled herein, Plaintiff

7  lost employment benefits, including lost wages and fringe benefits, and has suffered other

8  economic (consequential) damages in an amount in excess of the minimum jurisdiction of

9  this court, and according to proof.

10  66. As a proximate and legal result of the adverse employment actions as pled herein,

11  Plaintiff suffered emotional distress damages in an amount in excess of the minimum

12  jurisdiction of this court, and according to proof.

13  67. As a further and proximate result of the adverse employments action as pled herein,

14  Plaintiff was required to and did seek medical attention, and will need medical attention

15  in the future, all to Plaintiff's damages in a sum according to proof.

16  68. As a further proximate result of the adverse employment actions as pled herein, Plaintiff

17  was required to and did retain attorneys, and is therefore entitled to an award of

18  attorney's fees according to proof.

19  69. Furthermore, the conduct of Employer Defendants pled herein, violating the CFRA and

20  retaliating against, or discriminating against Plaintiff for exercising his CFRA rights

21  constitutes oppression, fraud and malice, thereby entitling Plaintiff to an award of

22  punitive damages. Plaintiff is further informed and believes and thereon alleges that the

23  Employer Defendants are personally guilty of oppression, fraud, and malice. Plaintiff is

24  informed and believes and thereon alleges that such act of fraud and malice was

25  undertaken by a managing agent(s) (ratified/condoned/enforced by Director Earle Davis,

26  and/or Manager Alan Jones, and/or Manager Young Nguyen) acting on behalf of the

27  Employer Defendants. Plaintiff is further informed and believes that the Employer

28  Defendants authorized or ratified the wrongful conduct, and that such act of ratification

or authorization was on the part of a managing agent acting on behalf of the Employer
Defendants

70. It is believed by the Plaintiff that these managing agents willfully violated these laws
(and PG&E's own policy to put safety above all else) in connection with the Plaintiff's
CFRA use, to precipitate a pretext which demonstrates

    a. Willful disregard of these laws and rights of others, to "justify" a meritless
termination, which meets the "Malice" definition criteria stipulated in California
Civil Code CIV Section 3294 (c)(1): ""Malice" means conduct which is intended
by the defendant to cause injury to the plaintiff or despicable conduct which is
carried on by the defendant with a willful and conscious disregard of the rights or
safety of others."

        i. PG&E's MS&E department was made aware of the safety issues Cronin
was inspecting for, yet the termination justification would suggest PG&E
would require Cronin to knowingly violate metering safety regulations,
and potentially leave a loved one in danger, after making multiple attempts
to cure the "approved" way

        ii. PG&E's termination paperwork also violates aforementioned legal statues
regarding taking adverse employment decisions for 43s which do not lead
to convictions

    b. In Young Nguyen's attempt to sabotage Cronin's work performance, Young
intentionally concealed material fact that requiring Cronin to track meters with
full knowledge that this was not realistic or feasible meets the definition criteria
of "Fraud" stipulated in California Civil Code CIV Section 3294 (c)(3): ""Fraud"
means an intentional misrepresentation, deceit, or concealment of a material fact
known to the defendant with the intention on the part of the defendant of thereby
depriving a person of property or legal rights or otherwise causing injury."

    c. In Alan Jones performance review (appeal later upheld by Director Earle Davis),
Alan gives Cronin his first poor performance review in nearly 9 years with the

company, after no mention of any work performance issues in 2016. The statements made in the review make only vague and generalized statements about what Cronin did wrong, thus making explanations, or justifications virtually impossible, and indefensible.

    i. Cronin went on to ask both Jones and Davis for weeks for specific actions things Cronin did wrong in 2016 to warrant the poor performance review. Both Jones and Davis refused to give any specifics to Cronin on what specific actions Cronin did wrong, and upheld the performance review

    ii. These actions support the legal definition of "oppression"

71. Taking such extreme, presumptuous, and outrageously adverse employment actions with reckless disregard for both the safety and legal rights of others, such as these, provide substantial evidence that PG&E's decision makers willfully disregarded regulations, rights, and safety of others in order to utilize a fabricated pretext to terminate Cronin. This establishes the substantial motivating reason being utilization of protected CFRA/FMLA.

    a. Any claims by PG&E management of "honest belief" that the Plaintiff violated the Code of Conduct (as claimed by the defendant) need not look any further than PG&E's own Code of Conduct which requires that all employees put safety first, and above all else, and MS&E's own records on the "hot socket" phenomenon which demonstrate they are fully aware of the "hot socket" safety issues and the conditions in which they occur in, or cause

    b. Placing safety first is universally known and required by everyone, including those within PG&E, therefore, could not have been "honestly believed" by management to neglect these known safety issues.

### THIRD CAUSE OF ACTION
#### FOR WRONGFUL TERMINATION IN VIOLATION
#### OF LABOR CODE 432.7
#### Against all Defendants, and DOES 1 – 50

72. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71 of the Complaint, as though fully set forth herein.

73. Plaintiff is requesting the court grant Equitable Tolling on the Fourth Cause of Action's Statute of Limitations on the basis of impossibility; filing a legal complaint earlier was impossible or virtually impossible [Lewis v. Superior Court (1985) 175 Cal. App. 3d 366].

    a. The Plaintiff filed a complaint with the Department of Fair Employment and Housing, in early 2017, in which the defendant was being investigated for the actions described in this complaint. The Plaintiff received "Right-to-Sue" from the DFEH was granted on March 26, 2018

74. As described in the complaint, the Plaintiff alleges that the defendant's primary motivating reason for termination was retaliation for CFRA use. However, in the case that the defendant argues 2 reasons given in the Plaintiff's termination paperwork, "Never knowingly violate laws, regulations, policies, standards, or procedures", which the statement by PG&E's Corporate Security goes on to imply and conclude that the Plaintiff did commit the crimes alleged, by heavily relying on information regarding the arrest in order to "substantiate" this 1 of 2 reasons given for the termination.

75. As described in the complaint, the arrest which PG&E Management heavily relied upon for their termination justification, did not result in a conviction for the Plaintiff, but was heavily implied as 1 of 2 reasons given by PG&E Management for reasons of termination.

76. Schware v Bd. Of Bar Exam'rs, 353 U.S. 232, 241, (1957)("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."); United States v. Hynes, 467 F.3d 951, 957, (6th Cir. 2006) (upholding a preliminary jury instruction that stated that a "defendant is presumed to be innocent unless proven guilty. The indictment against the Defendant is only an accusation, nothing more. It's not proof of guilt or anything else."

77. In the case Pitman v. City of Oakland 197 Cal. App. 3d 1037, 1044 (Cal. Ct. App. 1988), the defendant argues that Labor Code Section 432.7 sub (a) "permits disclosure and use of arrest records while charges are still pending." The court refused to sustain this demurrer and states "While the last sentence of the statutes provides that an employer may ask an employee about an arrest for which he or she is awaiting trial, the statute cannot be read as permitting the employer to utilize the information of mere arrest for disciplinary purposes. To hold otherwise would violate the fundamental presumption of a suspect's innocence prior to the contrary being proved... we do not read the statue as authorizing the utilization of an arrest alone as a factor in determining to dismiss an employee... the complainant must affirmatively allege that the arrest did not result in conviction."

78. Additionally, in the case of Piutau v. Federal Express Corp., the Plaintiff, Piutau, was suspended without pay after being arrested for driving under the influence. The Plaintiff testified that before he was arrested, he attended a social function at his church, at which time he consumed many cups of kava tea. Courts went on to grant the Plaintiff's summary adjudication on the issue of liability for the Plaintiff's cause of action (Disciplinary action in violation of public policy), and violation of Labor Code section 432.7, after his criminal charges were dismissed

79. Plaintiff is informed and believes that such conduct, although pretextual to CFRA retaliation, still represents conduct which violates Labor Code Section 432.7

80. As a proximate and legal result of the adverse employment actions pled herein, Plaintiff lost employment benefits, including lost wages and fringe benefits, and has suffered other economic (consequential) damages in an amount in excess of the minimum jurisdiction of this court, and according to proof.

81. As a proximate and legal result of the adverse employment actions as pled herein, Plaintiff suffered emotional distress damages in an amount in excess of the minimum jurisdiction of this court, and according to proof.

82. As a further and proximate result of the adverse employments action as pled herein, Plaintiff was required to and did seek medical attention, and will need medical attention in the future, all to Plaintiff's damages in a sum according to proof.

83. As stated, this violation represents a pretextual, yet, still illegal violation of public policy, in a desperate attempt to wrongfully terminate the plaintiff. It is believed by the plaintiff, as plead herein, that the managing agents willfully violated these laws (since the legal department must have authorized the termination knowing all of the circumstances) in order the forge the pretext to CFRA retaliation.

    a. Willful disregard of these laws and the rights of others meets the legal definition of "Malice, fraud, and oppression" for which the plaintiff is requesting punitive damages

84. As a further proximate result of the adverse employment actions as pled herein, Plaintiff was required to and did retain attorneys, and is therefore entitled to an award of attorney's fees according to proof.

# FOURTH CAUSE OF ACTION

## FOR WRONGFUL TERMINATION IN VIOLATION

### OF LABOR CODE 1102.5

#### Against all Defendants, and DOES 1 – 50

85. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 84 of the Complaint, as though fully set forth herein.

86. Plaintiff is requesting the court grant Equitable Tolling on the Fourth Cause of Action's Statute of Limitations on the basis of impossibility; filing a legal complaint earlier was impossible or virtually impossible [Lewis v. Superior Court (1985) 175 Cal. App. 3d 366].

    a. The Plaintiff filed a complaint with the Department of Fair Employment and Housing, in early 2017, in which the defendant was being investigated for the actions described in this complaint. The Plaintiff received "Right-to-Sue" from the DFEH was granted on March 26, 2018

87. As described in the complaint, the Plaintiff alleges that the defendant's primary motivating reason for termination was retaliation for CFRA use. However, in the case that the defendant argues 2 reasons given in the Plaintiff's termination paperwork, "Company Assets – Don't install, rearrange, remove, or tamper with company metering or service equipment without proper approval and authorization"

88. PG&E discovered that the Plaintiff had been aware of (through the investigation conducted by PG&E Corporate Security), and this employee (the Plaintiff) had been actively looking for possible violations of the "Hot Socket" phenomenon (that PG&E was aware of) and precluded it from their inspection procedures. PG&E elected to ignore their own Code of Conduct, requiring safety to be placed first, as well as other internal policies and procedures surrounding metering safety & general public safety as a priority over all else, including numerous OSHA regulations including the "General Duty Clause":

89. OSHA Section 7 Chapter III, C (2)(c). Violations of the General Duty Clause "Section 5 (a)(1) of the act requires that 'Each employer shall furnish of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.' The general duty provisions shall be used only where there is no standards that applies to the particular hazard involved, as outlined in 29 CFR 1910.5(f).

90. Evaluation of Potential Section 5(a)(1) Situations … The following elements are necessary to prove a violation of the general duty clause:

    a.  The employer failed to keep the workplace free of a hazard to which employees of that employer were exposed;

    b.  The hazard was recognized;

    c.  The hazard was causing or was likely to cause death or serious physical harm; and

    d.  There was a feasible and useful method to correct the hazard."

91. By this standard, one can reasonably conclude a simple inspection of the metering socket can and would present a feasible method in which a recognized hazard could prevent a

1  serious hazard exposure. This also means that PG&E would be recognized by OSHA in
2  violation of the General Duty Clause.

3  92. The plaintiff had "reasonable belief" that these regulations were being violated because
4      PG&E was aware that in the given circumstances (voltage fluctuations), a metering "Hot
5      Socket" could be the source, and the company failed to check after 2 phone calls/reports
6      made to the company about the voltage problems being experienced.

7  93. One can only conclude that PG&E's management, out of fear of being exposed, either
8      internally or externally to an authority such as OSHA, CPUC, or other entity, believed
9      the employee may disclose these safety violations, therefore, PG&E diverted from the
10     laws and regulations in which they are required to operate in (as aforementioned), and
11     instead deferred to their Code of Conduct in order to attempt to generate the pretextual
12     façade given in the plaintiff's termination papers. One cannot reasonably infer that
13     PG&E's Code of Conduct overrides public and employee safety, and the aforementioned
14     statutes/regulations which govern them (as the defendant is implying).

15  94. The aforementioned policies were well established at the time of discharge.

16  95. The plaintiff pleads that the retaliation (termination) reason given was pretextual to
17      CFRA violations, however, in the case that the defendant makes claim of a "mixed
18      motive", these "other" motives (1102.5 violation), are preemptive retaliatory measures
19      taken by the defendant, upon discovering that the defendant was actively
20      searching/inspecting for a known safety hazard. Labor code 1102.5(b) and "Section 6310
21      of the labor code protects employees against preemptive relation by an employer that
22      believes an employee might file a workplace safety complaint. (Lujan, atp.1046; see
23      fn.8,ante) Similar to the public policy delineated in former section 1102.5(b), the
24      legislative intent associated with section 6310's proscription against retaliation includes
25      'encourag[ing] such [workplace safety] complaints.' The Lujan court reasoned that
26      'firing workers who are suspected of planning to file workplace safety complaints can
27      effectively discourage the filing of those complaints' (Lujan, at p. 1045.)… applying
28      Lujan's reasoning here, therefore, if an employee 'can effectively [be] discourage[d]'

- 26 -
2nd AMMENDED COMPLAINT for Damages and Jury Trial

from reporting a violation by the employer's mere belief a report might be made or has

been made, then the public policy in the former section 1102.5(b) will be violated....

When the termination is based on the employer's ... belief that the employee might

disclose... a violation of state regulations to a governmental agency, the result has a

tendency to be injurious to the public or against the public good. (Green, supra, 19 Cal.4th

at p.76.)" (Diego v. Pilgrim United Church of Christ, 231 Cal.App 4th 913 [2014]).The

plaintiff (Cronin) pleads that PG&E's termination claim of their Code of Conduct

violation (removing company assets) was for good cause and both the safety of himself

and the public (after PG&E neglected to), which is a violation of the aforementioned

statutes/regulations, and has a tendency to be injurious to the public and against public

good.

96. The employer's (defendant's) violation of this public policy injures the benefit of the

public due to the disregard for safety of the public, and the safety of the employees (by

violating OSHA regulations)

97. Claims made by PG&E Management on the Plaintiff's termination paperwork is that the

action of checking for a known safety issue is a violation of the code of conduct.

However, in reality, the employer should have known that this was a hazardous situation

that the employee was being, or potentially being exposed to, and utilized the claim that it

was "justification" for PG&E's decision was wrongful, and in violation of Labor Code

1102.5(b) (the statutory provisions on which this complaint relies) which states:

98. "An employer, or any person acting on behalf of the employer, shall not retaliate against

an employee for disclosing information, or because the employer believes that the

employee disclosed or may disclose information, to a government or law enforcement

agency, to a person with authority over the employee or another employee who has the

authority to investigate, discover, or correct the violation or noncompliance."

99. "An employee need not prove an actual violation of law; it suffices if the employer fired

him for reporting his "reasonably based suspicions" of illegal activity" (Green, supra, 19

Cal.4th at p. 87)

2nd AMMENDED COMPLAINT for Damages and Jury Trial

100. By PG&E's actions to claim that "noncompliance" with the code of conduct as stated: "Don't install, remove, rearrange … company metering…" by proceeding to terminate the Plaintiff, is of higher importance than the safety of the employee and customers is a mockery of safety laws and conveys a disregard for the legal rights and safety of others.

101. Plaintiff pleads that the defendant terminated the Plaintiff out of fear or concern that the Plaintiff had uncovered, or would uncover violations of the OSHA General Duty Clause, and/or other regulations related to violations of metering safety.

102. Furthermore, the conduct of Employer Defendants pled herein, exercising his rights to safety as an employee and of others constitutes oppression, and malice, thereby entitling Plaintiff to an award of punitive damages. Plaintiff is further informed and believes and thereon alleges that the Employer Defendants are personally guilty of oppression, and malice. Plaintiff is informed and believes and thereon alleges that such act of oppression and malice was undertaken by a managing agent(s) (ratified/condoned/enforced by Director Earle Davis, and/or Manager Alan Jones) acting on behalf of the Employer Defendant. Plaintiff is further informed and believes that the Employer Defendant authorized or ratified the wrongful conduct, and that such act of ratification or authorization was on the part of a managing agent acting on behalf of the Employer Defendants

103. It is believed by the Plaintiff that these managing agents willfully violated these laws (and PG&E's own policy to put safety above all else) in retaliation for belief that the employee may expose the employer for these violations, especially considering the environment at the time, when the employee (Plaintiff) was engaged in a legal proceeding against the Employer (defendant) for prior FMLA/CFRA retaliation.

    a. Willful disregard of these laws and rights of others, to "justify" a meritless termination, which meets the "Malice" definition criteria stipulated in California Civil Code CIV Section 3294 (c)(1): ""Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is

carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

    i. PG&E's MS&E department was made aware of the safety issues Cronin was inspecting for, yet the termination justification would suggest PG&E would require Cronin to knowingly violate metering safety regulations, OSHA regulations, and potentially place himself and others a hazardous situation which the employer was aware of and failed to check, after making multiple attempts to cure the "approved" way

   b. These actions support the legal definition of "oppression"

    i. "an unjust or cruel exercise of authority of power"

104. As a proximate and legal result of the adverse employment actions pled herein, Plaintiff lost employment benefits, including lost wages and fringe benefits, and has suffered other economic (consequential) damages in an amount in excess of the minimum jurisdiction of this court, and according to proof.

105. As a proximate and legal result of the adverse employment actions as pled herein, Plaintiff suffered emotional distress damages in an amount in excess of the minimum jurisdiction of this court, and according to proof.

106. As a further and proximate result of the adverse employments action as pled herein, Plaintiff was required to and did seek medical attention, and will need medical attention in the future, all to Plaintiff's damages in a sum according to proof.

107. As stated, this violation represents a pretextual, yet, still illegal violation of public policy, in a desperate attempt to wrongfully terminate the plaintiff. It is believed by the plaintiff, as plead herein, that the managing agents willfully violated these laws (since the legal department must have authorized the termination knowing all of the circumstances) in order the forge the pretext to CFRA retaliation.

   a. Willful disregard of these laws, rights, and safety of others meets the legal definition of "Malice, fraud, and oppression" for which the plaintiff is requesting punitive damages

1   108.   As a further proximate result of the adverse employment actions as pled herein,

2          Pursuant to CCP Section 1021.5, Plaintiff was required to and did retain attorneys, and is

3          therefore entitled to an award of attorney's fees according to proof. (Jaramillo v. County

4          of Orange (2011) 200 Cal.App. 4th 811, 829. Plaintiff argued, and the court agreed that

5          protecting whistleblowers from retaliation is a strong public interest. Doing so confers a

6          significant benefit on the general public – namely, empowering people to step forward to

7          expose fraud, corruption, and other wrongdoing.

8                          **FIFTH CAUSE OF ACTION**

9          **FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

10                      **Against all Defendants, and DOES 1 – 50**

11  109.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 104 of the

12         Complaint, as though fully set forth herein.

13  110.   Plaintiff's termination was wrongful and was in violation of the public policy of the

14         State of California, in that Govt. Code §12945.2 precludes an employer from retaliating

15         against an employee for exercising their rights under the CFRA.

16  111.   Plaintiff's termination was wrongful and was in violation of the public policy of the

17         State of California, in that Labor Code § 432.7 precludes an employer from taking

18         adverse employment action based on an arrest which does not lead to conviction

19  112.   Plaintiff's termination was wrongful and was in violation of the public policy of the

20         State of California, in that Labor Code § 1102.5 precludes an employer from retaliating

21         against an employee based on reasonable belief that the employer is violating a statute,

22         rule, or regulation

23  113.   Such public policy was basic, express, fundamental, and binding on the Employer

24         Defendants.

25  114.   Plaintiff's termination was wrongful, and against such express Public Policy because

26         a.  Plaintiff was terminated in retaliation for exercising his CFRA rights (Primary

27             motivating reason by the employer);

28

b. Plaintiff was terminated for an arrest which did not lead to a conviction (secondary motivating reason by the employer);

c. Plaintiff was terminated in retaliation because the employer "believed" that the employee disclose or may disclose information internally or externally about a violation of a known safety issue. (secondary motivating reason by the employer)

115. In addition to these violations of public policy, the defendant violated the following regulations, as described in this complaint, in order to establish the pretextual (and illegal) causes to execute the wrongful termination (for exercising his CFRA rights)

116. As a proximate result of the Defendant and each of their wrongful termination of Plaintiff in violation of Public Policy as pled herein, Plaintiff has suffered the loss of employment benefits in an amount according to proof.

117. As a further proximate result of the Employer Defendants and each of their wrongful termination of Plaintiff in violation of Public Policy, Plaintiff has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and discomfort, all to Plaintiff's damages in an amount in excess of the minimum jurisdiction of this court and according to proof.

118. As a further proximate result of the Employer Defendants and each of their wrongful termination of Plaintiff in violation of Public Policy, Plaintiff was required to and did seek medical attention and will be required to do so in the future in an amount according to proof.

119. The conduct of the Employer Defendants and each of them as pled herein, constitutes oppression, fraud, and malice. Plaintiff is further informed and believes and thereon alleges that the Employer Defendants and each of them authorized and ratified said wrongful conduct, or alternatively was personally guilty of oppression, fraud or malice. Plaintiff is further informed and believes and thereon alleges that these acts of ratification, authorization or oppression, fraud or malice, were on the part of an officer, director or managing agent of the Employer Defendants. Accordingly, Plaintiff is entitled to an award of punitive damages, according to proof

# SIXTH CAUSE OF ACTION

## INTRUSION INTO PERSONAL AFFAIRS

### Against all Defendants, and DOES 1 – 50

120.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 118 of the Complaint, as though fully set forth herein.

121.   Plaintiff is requesting the court grant Equitable Tolling on the Fourth Cause of Action's Statute of Limitations on the basis of impossibility; filing a legal complaint earlier was impossible or virtually impossible [Lewis v. Superior Court (1985) 175 Cal. App. 3d 366].

   a.   The Plaintiff filed a complaint with the Department of Fair Employment and Housing, in early 2017, in which the defendant was being investigated for the actions described in this complaint. The Plaintiff received "Right-to-Sue" from the DFEH was granted on March 26, 2018

### PREFACE:

122.   As described in paragraph 21, page 5 of this complaint, in approximately May of 2016, the Plaintiff filed his first legal action against the defendant for FMLA retaliation, discrimination, and harassment. Upon executing discovery of that case, PG&E's legal team invoked discovery powers to uncover the sequence of events which lead to the plaintiff's wrongful termination, as plead in this complaint's causes of actions.

### Causation: Substantial Factor ("but for")

123.   Plaintiff is informed and believes that defendant's conduct described in this preface, is the substantial factor in giving rise to this tort. **"But for" PG&E's unlawful retaliation/discrimination/harassment, the plaintiff would never have had a valid legal claim to give rise to the discovery powers which ultimately lead to harm suffered from an intrusion into personal affairs.**

124.   PG&E cannot reasonably claim that they would've otherwise uncovered this information about the plaintiff (about the arrest) because

a. It is not customary or usual business policy for PG&E to conduct background investigations on employees, outside of extenuating circumstances such as a legal claim.

b. PG&E had no other reason to discover these charges, aside from the legal claim and discovery powers of the court.

c. The charges against the plaintiff were dismissed (after the intrusion and subsequent termination)

### REASONABLE EXPECTATION OF PRIVACY:

125. As protected by Labor Code Sections 96 (k), 98.6, California Constitution Article one, section one, engaging in off-duty personal activities, relationships, and holding personal information, free from intrusion upon seclusion, (off-duty, unrelated to one's job duties) that (later acquired by the defendant), the defendant had no authorization (by the plaintiff) to obtain, would establish a reasonable expectation of privacy.

126. In further considering whether the reasonable expectation of privacy, the extent of which (the defendant) had access to personal off-duty relationships and personal information was virtually non-existent, without a calculated attempt to obtain it without the knowledge or consent of the plaintiff.

127. The means by which the intrusion occurred... The employer (the defendant) had to write down information obtained during the Plaintiffs arrangement hearing, then search their own company records to establish contact with the person whom the plaintiff had the personal relationship with, then subsequently pursue and acquire the plaintiff's personal details. In other words, the defendant's actions exceeded the level of access the defendant had without a calculated intent on intruding into the plaintiff's private affairs. Additionally, under the circumstances,

128. Labor Code 432.7 & 432.7(a) stipulate an employer can only *ask an employee* about an arrest (pending trial):

a. 432.7 prohibits employers to "seek [information] from any source whatsoever" about an arrest which does not lead to conviction

2nd AMMENDED COMPLAINT for Damages and Jury Trial

b. The exception in this regulation [Labor Code section 432.7 (a)(1)] is that

c. "Nothing.. shall prevent an employer from asking an employee.. about an arrest for which the employee.. is out on bail..."

129. Faria v. San Jacinto Unified School District, the court states "Because [Section 432.7] refers to decisions to promote, train, or terminate as well as those to hire, the *section clearly governs an employer's decisions involving both existing employees* and applicants for employment"

130. In the case Pitman v. City of Oakland 197 Cal. App. 3d 1037, 1044 (Cal. Ct. App. 1988), the court states "While the last sentence of the statutes provides that an employer may ask an employee about an arrest for which he or she is awaiting trial, the statute cannot be read as permitting the employer to utilize the information of mere arrest for disciplinary purposes". The court concludes that this subdivision (a) does nothing more than permit an employer inquiry [to the *employee*]. Similarly, the connection can be made that just as sub (a) only permits an employer inquiry, but the verbiage used in this subdivision also only permits the employer to ask *an employee about an arrest, and not from any other source, as implied by section 432.7*, and case law cited (Faria v. San Jacinto Unified School District).

131. In the case of Hernandez v. Hillsides Inc., 142 Cal. App. 4th 1377 (Cal. Ct. App. 2006) the court of appeal states "California courts have adopted Prosser's analysis and the Restatement formulation of intrusion: '[O]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy' (Rest. 2d Torts Section 652B; Miller, supra, 187 Cal.App.3d at p.1482, 232 Cal. Prtr. 668.) Intrusion into private places, conversations, and matters is the privacy tort that best captures the common understanding of an 'invasion of privacy' and 'is most clearly seen as an affront to individual dignity.' (Shulman v. Group W Productions, Inc. (1998) 18 Cal.4th 200, 231, 74, Cal.Rptr.2d 843, 855 P.2d 469.)

132.    Thus as applicable to the case before us, the tort of invasion of privacy, or intrusion, has two main elements: (1) intrusion into a private place, conversation, or matter, and (2) in a manner highly offensive to a reasonable person. (Shulman v. Group W Productions, Inc. (1998) 18 Cal.4th 200, 231, 74, Cal.Rptr.2d 843, 855 P.2d 469.) Tortious intrusion includes unconsented-to physical intrusion into private places... The tort of invasion of privacy based on an intrusion does not require plaintiffs to prove that private information about them has been disclosed to a third party (Miller, supra, 187 Cal.App.3d at p. 1484, 232 Cal.Rptr. 668.) a plaintiff is harmed when his or her privacy is invaded in an offensive manner without consent, not when information is gathered from the intrusion is disclosed or published... The Restatement continues: 'The invasion may be by some other form of investigation or examination into the [plaintiff's] private concerns. The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind... Thus, if unconsented-to disclosure, publication, or viewing of information about the plaintiff is harmful, then the action taken to obtain that private information itself also be harmful.'"

### DEFENDANT INTETIONALLY INTRUDED:

133.    Triggered by the plaintiff's arrest, PG&E contacted a person with whom the plaintiff held a personal relationship with, in order to question her regarding information about an arrest on the Plaintiff, and began asking/obtaining personal details about the plaintiff, details about the situation surrounding the allegations which lead to the plaintiffs arrest, as well as the nature of the relationship held with this person. In this conversation, the PG&E investigator obtained and included the following information in the Plaintiff's termination paperwork:

### INTRUSION WOULD BE HIGHLY OFFENSIVE TO A REASONABLE PERSON:

a.    PG&E asked about the nature of the personal relationship.

b. Her "side of the story" regarding the allegations which lead to the Plaintiff's arrest

c. How they met

d. How long they dated

e. Financial information about the Plaintiff

f. Medical information about the Plaintiff

g. Business dealings

h. Other personal information including various conversation details

134. In this context, in accordance with the aforementioned Labor Code 432.7, PG&E would only be legally permitted to question *the employee* about the arrest. It is the strong belief by the plaintiff that a reasonable person would consider breaking/disregarding regulations in order to intrude on one's personal affairs, to gather information which, in the context of this legal proceeding, is completely wrongful in its entirety, and in violation of numerous public policies, would be considered highly offensive to a reasonable person.

## THE PLAINTIFF WAS HARMED:

135. As result of this intrusion, PG&E utilized this unlawfully obtained information (at least in part) to "substantiate" an unlawful termination (upon the Plaintiff) in violation of public policy.

a. Approximately 70-80% of the 6 page termination paperwork the Plaintiff received from the defendant covered details about the Plaintiff's arrest (obtained from sources other than the plaintiff), and/or details about the relationship & personal details.

## THE DEFENDANT'S CONDUCT WAS A SUBSTANTIAL MOTIVATING FACTOR IN CAUSING THE HARM

136. As described in paragraphs 118 – 120 of this cause of action in this complaint (Causation: Substantial Factor), but for PG&E's unlawful retaliation/discrimination/harassment, the legal case which put the plaintiff "under the

1    microscope" never would have happened, therefore, the arrest which gave rise to the

2    intrusion never would have been discovered.

3    137.    Additionally, PG&E then initiated an investigation into an arrest, without the

4    plaintiff's knowledge, where PG&E began unlawfully collecting information about the

5    plaintiff's arrest, before asking the plaintiff, prying into personal details and the

6    plaintiff's personal relationships, then subsequently utilizing this information to

7    "substantiate" a meritless and wrongful termination.

8    138.    As a proximate and legal result of the Employer Defendants violation of the

9    California Constitution and intrusion into private affairs, the Plaintiff has suffered

10   humiliation, emotional distress, these actions play a role in supporting and enabling the

11   wrongful termination by the defendant which has led to severe economic damages as

12   plead in this complaint. Plaintiff suffered emotional distress damages in an amount in

13   excess of the minimum jurisdiction of this court, and according to proof.

14   139.    The Plaintiff is informed and believes that the multiple actions taken by PG&E in

15   defiance of the law, as described in this complaint, constitutes and meets the legal

16   definition of "malice" and "oppression". These actions demonstrate a willful and

17   conscious disregard of the rights of others, which meets the legal threshold for Punitive

18   (in addition to compensatory) damages.

19   140.    In addition to the economic damages sustained by the Plaintiff, as result of the actions

20   described in this complaint's cause of action, these actions have also caused significant

21   damages to the Plaintiff's mental/emotional state, have inflicted and lead to years of

22   ongoing emotional distress, humiliation, depression, and loss of enjoyment of life.

23                           **REQUEST FOR RELIEF**

24   141.    Wherefore the plaintiff requests, for all causes of action

25           a.   For all compensatory damages including lost wages (past and future), other

26                employment benefits, economic and consequential damages

27           b.   For emotional distress and mental injury damages

28

c. For attorney's fees incurred on the first, second, sixth, and seventh causes of action

d. For punitive damages

e. For applicable interest, and

f. For such and other further relief as the Court deems just and proper.

    i. The Plaintiff requests the Court consider that the financial/economic losses are wholly considered due to the Plaintiff's background, skillset, and expertise is industry and company specific. These skills are not readily transferrable to other companies (PG&E is essentially a monopoly), nor are they readily transferrable to other industries (electric metering is a utility-specific skill).

    ii. The Plaintiff's tenure with PG&E of nearly 9 years of service to the company, spanning almost his entire adult life, leaving virtually zero opportunity for other skill sets to "fall back" on

    iii. The position which the Plaintiff was terminated from, (Program Manager) required 5 years of metering background (entry level work), before becoming eligible. This may be used to gage a reasonable amount of time to become eligible for a similar position in another industry, and that the Plaintiff may require re-training to do so.

    iv. Additional time being needed for an equivalent of the position of "Expert Program Manager"

## Demand for Jury Trial

142. Plaintiff in this case requests a jury trial on all issues raised in this complaint

## Attachments

143. Attachment 1 – DFEH Right to Sue

DATED: November 26, 2018

Adam Cronin
In Pro Per

# Attachment 1 –

# DFEH Right to Sue



**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

March 26, 2018

**Via First Class Mail**

Adam Cronin
237 Kearny St # 119
San Francisco, CA 94108

RE: **Notice of Case Closure and Right to Sue**
    DFEH Matter Number: 759117-274484
    EEOC Number: 37A-2017 02016-C
    County of Violation: San Francisco - N
    In the Matter of: Cronin / Pacific Gas And Electric Company

Dear Adam Cronin:

The Department of Fair Employment and Housing (DFEH) has closed your case for the following reason: Investigated and Dismissed – Insufficient Evidence. Based upon its investigation, DFEH is unable to conclude that the information obtained establishes a violation of the statute. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

**This is your Right to Sue notice.** According to Government Code section 12966, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. This is also applicable to DFEH complaints that are filed under, and allege a violation of, Government Code section 12948, which incorporates Civil Code sections 51, 51.7, and 54. The civil action must be filed within one year from the date of this letter. However, if your civil complaint alleges a violation of Civil Code section 51, 51.7, or 54, you should consult an attorney about the applicable statutes of limitation.

Your complaint **is dual filed** with the United States Equal Employment Opportunity Commission (EEOC). You have a right to request EEOC to perform a substantial weight review of our findings. This request must be made within fifteen (15) days of your receipt of this notice. Pursuant to Government code section 12965, subdivision (d) (1), your right to sue may be tolled during the pendency of EEOC's review of your complaint. To secure this review, you must request it in writing to the State and Local Coordinator:

EEOC Southern California
Roybal Federal Building

255 East Temple St., 4th Floor
Los Angeles, CA
(213) [illegible]

Within 10 days of receiving this letter, you can
appeals@dfeh.ca.gov by calling our Communication
800-700-2320 (TTY), or California's Relay Service at

Appeals Unit
Department of Fair Employment and Housing
2218 Kausen Drive, Suite 100
Elk Grove, CA 95758

Your appeal should include a 1) summary as to why you disagree with the reason;
and/or, 2) any new detailed information (e.g., documents, records, witness information)
that supports your claim. If you appeal, the information you provide will be carefully
considered.

Although DFEH has concluded that the evidence and information did not support a find-
ing that a violation occurred, the allegations and conduct at issue may be in violation of
other laws. You should consult an attorney as soon as possible regarding any other op-
tions and/or recourse you may have regarding the underlying acts or conduct.

Should you decide to bring a civil action on your own behalf in court in the State of Cali-
fornia under the provisions of the California Fair Employment and Housing Act (FEHA)
against the person, employer, labor organization or employment agency named in your
complaint, below are resources for this. Please note that if a settlement agreement has
been signed resolving the complaint, you might have waived the right to file a private
lawsuit.

## Finding an Attorney
To proceed in Superior Court, you should contact an attorney. If you do not already
have an attorney, the organizations listed below may be able to assist you:

- The State Bar of California has a Lawyer Referral Services Program which can be
  accessed through its Web site at www.calbar.ca.gov or by calling (866) 442-2529
  (within California) or (415) 538-2250 (outside California).

- Your county may have a lawyer referral service. Check the Yellow Pages of your
  telephone book under "Attorneys."

## Filing in Small Claims Court
- The Department of Consumer Affairs (DCA) has a publication titled "The Small
  Claims Court: A Guide to Its Practical Use" online at of "The Small Claims Court: A
  Guide to Its Practical Use" online at http://www.dca.ca.gov/publica-
  tions/small_claims. You may also order a free copy of "The Small Claims Court: A

255 East Temple

Within 10 days of receiving the
appeal correspondence, call (916) 478-
800-700-2320 ext. 8116 and leave a message.

Appeals Unit
Department of Fair Employment and Housing
2218 Kausen Drive, Suite 100
Elk Grove, CA 95758

Your appeal should include a 1) summary as to why you disagree with the reason;
and/or, 2) any new detailed information (e.g., documents, records, witness information)
that supports your claim. If you appeal, the information you provide will be carefully
considered.

Although DFEH has concluded that the evidence and information did not support a find-
ing that a violation occurred, the allegations and conduct at issue may be in violation of
other laws. You should consult an attorney as soon as possible regarding any other op-
tions and/or recourse you may have regarding the underlying acts or conduct.

Should you decide to bring a civil action on your own behalf in court in the State of Cali-
fornia under the provisions of the California Fair Employment and Housing Act (FEHA)
against the person, employer, labor organization or employment agency named in your
complaint, below are resources for this. Please note that if a settlement agreement has
been signed resolving the complaint, you might have waived the right to file a private
lawsuit.

### Finding an Attorney
To proceed in Superior Court, you should contact an attorney. If you do not already
have an attorney, the organizations listed below may be able to assist you:

- The State Bar of California has a Lawyer Referral Services Program which can be
  accessed through its Web site at www.calbar.ca.gov or by calling (866) 442-2529
  (within California) or (415) 538-2250 (outside California).

- Your county may have a lawyer referral service. Check the Yellow Pages of your
  telephone book under "Attorneys."

### Filing in Small Claims Court
- The Department of Consumer Affairs (DCA) has a publication titled "The Small
  Claims Court: A Guide to Its Practical Use" online at http://www.dca.ca.gov/publica-
  tions/small_claims. You may also order a free copy of "The Small Claims Court: A

Guide to Its Practical Use" online, by calling the DCA Publication Hotline at (866) 320-8652, or by writing to them at: DCA, Office of Publications, Design and Editing, 1625 North Market Blvd., Suite N-112; Sacramento; CA; 95834.

- The State Bar of California has information on "Using the Small Claims Court" under the "Public Services" section of its Web site located at www.calbar.ca.gov.

Sincerely,

Jill Dale
Associate Governmental Program Analyst
213-337-4468
jill.dale@dfeh.ca.gov

cc:     Pacific Gas And Electric Company
        77 Beale St
        San Francisco, CA 94105

        Stacy Campos, Esq.
        Pacific Gas & Electric Company
        77 Beale St
        San Francisco, CA 94105

# Exhibit B

# Proof of Claim

**Fill in this information to identify the case:**

Debtor 1   Pacific Gas and Electric Company

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Northern District of California**

Case number:  **19–30089**

## Official Form 410
# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

Adam Cronin

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Adam Cronin

Name

101 Hannaford Ct
Folsom, CA 95630

Contact phone ___9164676040___

Contact email ___ajcu88@gmail.com___

Where should payments to the creditor be sent? (if different)

Name

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                                                              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                                              Proof of Claim                                              page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| **6.** Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| **7.** How much is the claim? | $ _____ 10000000.00     **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| **8.** What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Creditor/Claimant is a former employee of PG&E who was wrongfully<br>terminated in violation of numerous public polici _____ |
| **9.** Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**   $ _____<br>**Amount of the claim that is secured:**   $ _____<br>**Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br>☐ Fixed<br>☐ Variable |
| **10.** Is this claim based on a lease? | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| **11.** Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410            Proof of Claim            page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    1/29/2019

MM / DD / YYYY

/s/ Adam Cronin

Signature

Print the name of the person who is completing and signing this claim:

| Name | Adam Cronin | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 101 Hannaford Ct | | |
| | Number   Street | | |
| | Folsom, CA 95630 | | |
| | City   State   ZIP Code | | |
| Contact phone | 9164676040 | Email | ajcu88@gmail.com |

# Exhibit C

## PG&E's Termination Threat Email

### (for FMLA use)

## Cronin, Adam

| | |
|---|---|
| **From:** | Nguyen, D. Young |
| **Sent:** | Wednesday, March 30, 2016 4:36 PM |
| **To:** | Cronin, Adam |
| **Subject:** | RE: 3/30 In Person Meeting |

Adam, Please see my response with our discussion/agreement and typing at the same time.

Young

From: Cronin, Adam
Sent: Wednesday, March 30, 2016 3:04 PM
To: Nguyen, D. Young
Subject: 3/30 In Person Meeting

Hi Young,

In confirmation of our discussion today at 2:15PM, please confirm the following..

My absences on 3/21, 3/22 were not approved due to late reporting to claims administrator Sedgwick
I did send an email notification to you and Kathy Nguyen before the start of my shift on both days
No disciplinary action is being taken at this time due to these instances
Response: Correct. No disciplinary action is taken now.

A separate discussion, Adam and Young agreed that Adam will report 3/21, 3/22, and 3/23/16 as time off without pay.

My 2015 overall performance was meeting all targets as we discussed and confirmed on my annual review
My 2016 performance slipped due to a lack of presence at the office and lack of tracking of Metering Inventory for 2G
project (Response: Yes on the 2 points noted. Also, lack of project coordination, weekly calls, reporting of project
progress, addressing project issues, etc.)
No formal coaching plan is in effect at this time, but if there is, HR would be notified (Response: Correct on no formal
coaching plan. Additional information on the coaching plan and performance improvement plan is provided below)
  1. Informal coaching or performance monitoring with documentation is in place between Young and Adam. Both
     agreed that if the performance and attendance have not been improved by 4/30/16, this step will be moved to a
     formal coaching plan as described in step 2. Young's and Adam discussed and agreed at 430PM on 3/30/16 that
     both work together so Adam will improve his performance and not move to steps 2 and 3.
  2. Formal coaching plan will start and last for 90 days. If performance would not be improved at the end of the
     90th day, this step will move to Performance Improvement Plan as noted below.
  3. Performance Improvement Plan will start and last 45 days. If the performance is still not improved, the
     employment may be terminated.

Please advise/confirm

**Adam Cronin | Program Manager**
*Metering Services & Engineering - Electric*
*Pacific Gas and Electric Company*
Phone: 415-973-9017

1

# Exhibit D

PG&E's Termination Summary, Page 9

## DOCUMENTS PERTINENT TO THE INVESTIGATION:

- Solano County Superior Court Misdemeanor Complaint filed February 25, 2016
- Solano County Sheriff's Office Crime Report #CR15-7362
- Screenshots from Rassel's Customer Account for repair and inspection
- Customer Care and Billing footprint report for Adam Cronin

## MITIGATING AND AGGRAVATING FACTORS:

There was inconsistency noted between Cronin's statement provided to CSD on May 2, 2017, and what he told Solano County Deputy J. Harris on December 12, 2015. Cronin told CSD he drove to Sacramento on December 12, 2015, but when he was interviewed by Deputy Harris (the night of the crime at Rassel's residence), Cronin told the deputy he was at home and had been there all night.

## CONCLUSION:

The Employee Code of Conduct states:



- Never knowingly violate laws, regulations, policies, standards, or procedures
- Company Assets - Don't install, rearrange, remove, or tamper with company metering or service equipment without proper approval and authorization

CSD's investigation substantiated that Adam Cronin violated the above elements of the Employee Code of Conduct. Fingerprint evidence recovered by the Solano County Sheriff's Office from customer Ruth Rassel's vandalized electric meters established reasonable belief by the District Attorney's Office that Cronin was responsible for the crimes (violations of California Penal Code sections 591 and594(b)(2)) committed at Rassel's residence on December 12, 2015, and served as part of the probable cause basis for filing the current criminal complaint against him. Cronin knew Rassel was hosting a Christmas party at her residence on December 12, 2015, and she had denied Cronin's request to attend the party because their relationship had ended. Cronin told law enforcement on that date that he had been at home all night, but when CSD suggested his cell phone information might determine his location more precisely, Cronin changed his story to claim he had driven from Walnut Creek to Sacramento that day, which by his route would have caused him to pass by the City of Fairfield.

Cronin claimed to CSD that his fingerprints were found on Rassel's vandalized electric meters not because he was responsible for the crime at her residence, but because he had unofficially performed service on the meters previously (allegedly removed them to look for burn marks). Even if that claim was true, Cronin's actions would still have been a violation of the above Employee Code of Conduct admonition not to "install, rearrange, remove, or tamper" with

# Exhibit E

NTSB Press Release

Search this site…

Advanced Search

SHARE

# NTSB News Release

National Transportation Safety Board Office of Public Affairs

## NTSB cites Pacific Gas &amp; Electric (PG&amp;E) and government oversight in fatal California pipeline rupture

8/30/2011

Today the five-member National Transportation Safety Board cited a California utility operator's lax approach to pipeline safety and the inadequate oversight of two government agencies in the probable cause of the most devastating pipeline accident in a decade.

"Our investigation revealed that for years, PG&E exploited weaknesses in a lax system of oversight," said NTSB Chairman Deborah A.P. Hersman. "We also identified regulators that placed a blind trust in the companies that they were charged with overseeing to the detriment of public safety."

At about 6:11 p.m. (PDT) on September 9, 2010, a 30-inch diameter segment of a natural gas transmission pipeline, owned and operated by PG&E, ruptured in a residential neighborhood in San Bruno, California. The force of the rupture ejected a 3000-pound 28-foot-long section of pipe about 100 feet from where it had been buried four feet underground. The released natural gas ignited into a towering fire that destroyed 38 homes and damaged 70. As a result, eight people were killed, dozens were injured, and many more were evacuated from the area and displaced from their homes.

The nearly year-long NTSB investigation revealed that PG&E did not know what kind of pipe it had installed beneath the city of San Bruno in 1956. PG&E records initially provided to NTSB investigators indicated that the ruptured section of pipe was a 30" seamless pipe when in fact, at the time, no manufacturer produced seamless pipe.

Investigators also determined that the ruptured section of pipe was a collection of short pipe pieces, commonly known as "pups," joined together with welds. Further metallurgic assessment by NTSB investigators determined that some of the pipe sections did not meet minimum material specifications and that the welds were poorly constructed.

The defective welds would have been visibly detectable at the time of the installation, but, because of PG&E's inadequate quality control during the construction project and its failure to maintain accurate records, the poorly welded section of pipe went undetected for over 50 years. Failure of one of the improperly welded seams caused the Sept. 9, 2010, rupture during an increase in pressure resulting from repair work being performed at a terminal upstream of the rupture site.

The Board determined that the accident was clearly preventable stating that PG&E's inadequate pipeline integrity management program failed to identify, detect, and remove the substandard pipe segments before they ruptured.

"This tragedy began years ago with PG&E's 1956 installation of a woefully inadequate pipe," said Chairman Hersman. "It was compounded by a litany of failures - including poor recordkeeping, inadequate inspection programs, and an integrity management program without integrity."

In its examination of the history of oversight of PG&E, the NTSB found that two key regulatory decisions (one by CPUC in 1961 and one by PHMSA in 1970), which "grandfathered", or exempted, older pipelines from the testing protocols required of newly constructed ones, allowed the flawed pipe to escape detection.

The Safety Board found that CPUC, did not effectively evaluate or assess the safety of PG&E's integrity management program. On the federal side, the NTSB said that PHMSA's grandfathering of pre-1970 pipe contributed to the accident.

"For government to do its job - safeguard the public - it cannot trust alone, it must verify through effective oversight," said Hersman. "As we saw in San Bruno, when the approach to safety is lax, the consequences can be deadly."

At the meeting today, the NTSB made a total of 29 safety recommendations to PG&E, CPUC, PHMSA, the American Gas Association, the American Petroleum Institute, the Gas Technology Institute, the Interstate Natural

## Related News Releases

- October 13, 2010
  NTSB Releases Preliminary Report on Its Investigation of Pipeline Rupture Accident in California
- January 21, 2011
  NTSB Releases First of Six Factual Reports on San Bruno Pipeline Rupture Investigation
- September 10, 2010
  NTSB Launches Team to Investigate Apparent Gas Pipeline Explosion in California
- January 03, 2011
  NTSB issues urgent Safety Recommendations as a result of preliminary findings in San Bruno pipeline rupture investigation; hearing scheduled for March
- December 14, 2010
  NTSB Issues Update on Investigation into Fatal Pipeline Rupture in San Bruno, California
- June 08, 2011
  NTSB issues three safety recommendations after it finds deficiencies in emergency notification requirements of pipeline operators
- August 30, 2011
  NTSB cites Pacific Gas &amp; Electric (PG&amp;E) and government oversight in fatal California pipeline rupture
- February 24, 2011
  NTSB Announces Agenda and Witness List for Public Hearing on San Bruno, Calif., Pipeline Rupture Accident
- April 14, 2011
  NTSB Adding Interview Transcripts to Public Docket for San Bruno Pipeline Accident Investigation
- July 21, 2011
  NTSB adding documents to public docket for San Bruno pipeline investigation
- August 15, 2011
  NTSB adding documents to public docket for San Bruno pipeline accident investigation

## Related Reports

- Pipeline Accident Report PAR-11-01

Gas Association of America, the International Association of Fire Chiefs, the International Association of Firefighters, and the National Volunteer Fire Council.

During the course of the investigation, the NTSB issued 10 safety recommendations (six of them classified as urgent) to PG&E, PHMSA and CPUC to address issues in record-keeping, information sharing, pipeline testing, and emergency preparedness and notification procedures.

A synopsis of the NTSB report, including the probable cause, conclusions, and a complete list of all the safety recommendations, is available. The NTSB's full report will be available on the website in several weeks.

RELATED MATERIAL

San Bruno pipeline accident investigation webpage

### Related Events
### Related Investigations
- Pacific Gas and Electric Company Natural Gas Transmission Pipeline Rupture and Fire

### More NTSB Links
- Investigation Process
- Data & Stats
- Accident Reports
- Most Wanted List

### ###

The National Transportation Safety Board (NTSB) is an independent federal agency charged with determining the probable cause of transportation accidents, promoting transportation safety, and assisting victims of transportation accidents and their families.

## Resources
Press Releases
Speeches/Testimony
Databases
Accident Dockets
Training Center
Safety Recommendations
Strategic Plan, Performance &
Accountability Reports & More
Media Resources

## About Us
Organization
Office Locations
Investigative Process
Directions to Conference Center
Board Members
Contact Us
Employment
Web Policies & Notices
Accessibility Policy

## NTSB.gov
Site Map
Org Chart
FOIA
No Fear
Privacy Policy
Open.gov

## Publications
Accident Reports
Annual Review of Aircraft
Accident Data





https://www.ntsb.gov/news/press-releases/Pages/NTSB_cites_Pacific_Gas_Electric_(PGE)_and_government_oversight_in_fatal_California_pipeline_r...    2/2