WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>　　**- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>　　　　　　　　**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DECLARATION OF JEANNE C. FINEGAN (I) IN SUPPORT OF THE DEBTORS' BAR DATE MOTION AND (II) IN RESPONSE TO THE TORT COMMITTEE'S BAR DATE MOTION AND RELATED FILINGS**<br><br>Related Docket Nos.: 1784, 2297, 2303, 2636, and 2637<br>Date:　June 26, 2019<br>Time:　9:30 a.m. (Pacific Time)<br>Place:　United States Bankruptcy Court<br>　　　　Courtroom 17, 16th Floor<br>　　　　San Francisco, CA 94102 Judge: Hon. Dennis Montali |

Pursuant to 28 U.S.C. § 1746, I, Jeanne C. Finegan, hereby declare as follows under penalty of perjury:

## I.  <u>INTRODUCTION</u>

1.  I am President and Chief Media Officer of HF Media, LLC a division of Heffler Claims Group LLC ("**Heffler**"),[1] a class action claims and noticing agent whose headquarters are located at 1515 Market Street, Ste. 1700, Philadelphia, PA 19102. Except as otherwise noted, this Declaration is based upon my personal knowledge of the matters set forth herein, my review of relevant documents, and information provided to me by PG&E Corporation and Pacific Gas and Electric Company (collectively, the "**Debtors**") and their agents and professionals, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Cravath, Swaine & Moore LLP, AlixPartners LLP, and Prime Clerk LLC ("**Prime Clerk**"), and my prior experience in bankruptcy and class action noticing, and if called and sworn as a witness, I could and would testify competently thereto.

2.  I submit this Declaration:

A.  in support of (1) the *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 for Order (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing the Form and Manner of Notice Thereof, and (iii) Approving Procedures for Providing Notice of Bar Date and Other Information to all Creditors and Potential Creditors* [Dkt. No. 1784] (the "**Bar Date Motion**[2]") and (2) the *Debtors' Omnibus (I) Reply in Support of the Debtors' Bar Date Motion, and (II) Objection to the TCC's Bar Date Motion* (the "**Reply**"), filed contemporaneously herewith; and

B.  in response and opposition to (1) the *Motion of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 105(a), 501 and Fed. R. Bankr. P. 3001(a), 3003(c), 5005 and 9007 for Entry of an Order (i) Establishing a Bar Date for Filing Fire Claims, (ii) Approving the Form and Procedures for Notice of the Bar Date for Fire Claims, and (iii) Approving Supplemental Procedure for Notice of the Bar date to Fire Claimants* [Dkt. No. 2297] (the "**TCC Bar Date Motion**"), (2) the *Objection of the Official Committee of Tort Claimants to Motion of the Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002,*

---

[1] Heffler and Prime Clerk have been exploring a strategic transaction between the two firms for some time and, while no definitive agreement has been entered into as of the date hereof, the firms anticipate reaching agreement in the near term.

[2] Capitalized terms not otherwise defined herein have the meanings assigned to them in the Bar Date Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 for Order (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing the Form and Manner of Notice Thereof, and (iii) Approving Procedures for Providing Notice of Bar Date and Other Information to all Creditors and Potential Creditors* [Dkt. No. 2306] (the "**TCC Objection**"), and (3) the *Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Angeion Group, LLC as Fire Claim Bar Date Noticing Agent Effective as of May 22, 2019* [Dkt. No. 2303] (the "**Angeion Retention Application**").

3.      I have over thirty (30) years of experience in bankruptcy and class action noticing.  As set forth in further detail below, I am the only nationally recognized expert in the field of noticing in both bankruptcy and class actions.  I have been working with Prime Clerk and the Debtors on the comprehensive Notice Procedures set forth in the Debtors' Bar Date Motion, including the traditional procedures for providing notice of the Debtors' proposed Bar Date to all "known" creditors and the unprecedented, multi-faceted Supplemental Notice Plan to provide notice to "unknown" claimants, including Unknown Wildfire Claimants, all as more fully described below and in the Bar Date Motion.

4.      This Declaration describes and details my view regarding (i) the Debtors' robust Notice Procedures for providing notice of the Bar Date to known and unknown claimants and parties in interest, including their multi-faceted and robust Supplemental Notice Plan to provide notice of the Bar Date to unknown creditors, including the Unknown Wildfire Claimants, and (ii) the noticing plan (the "**TCC Notice Plan**") proposed by the TCC and Angeion Group, LLC ("**Angeion**"), including with respect to such plan's scope and effectiveness (or lack thereof), both independently as well as in comparison to the Debtors' Notice Procedures and Supplemental Notice Plan, as refined herein.

5.      As set forth in the Reply, the Debtors have now agreed to adopt the TCC's proposed Wildfire Proof of Claim Form and, as described in further detail below, in an effort to satisfy any concerns the TCC or any other parties may have with respect to the Supplemental Notice Plan, the Debtors have adopted certain additional measures to further refine their proposed Supplemental Notice Plan, including, as discussed in further detail below, Over the Top TV ("**OTT**"), streaming radio, and Out-of-Home advertising.  Taking into account these additional measures that the Debtors are incorporating, the Debtors' Supplemental Notice Plan is now estimated to cost approximately $2.5

million.[3]  In my opinion, the Debtors' Notice Procedures (including, the Supplemental Notice Plan), as originally proposed, are reasonable, effective, and go well-beyond the requirements of applicable law and due process.  These further refinements and adjustments now only add to what is already an exceptional noticing plan.

6.    Based on my experience, as set forth below, I believe that the Debtors' Notice Procedures, and in particular the Supplemental Notice Plan, are broad, multi-faceted, and designed to have the greatest possible reach to all creditors and parties in interest, including those who may have relocated as a result of the Northern California Wildfires.  Indeed, it is my belief that the Debtors' Supplemental Notice Plan, described and detailed below, is one of the largest and most comprehensive notice and media campaigns recommended in bankruptcy history.  Furthermore, the Debtors' Supplemental Notice Plan (as amended) encompasses an appropriate budget to achieve the optimal reach and frequency for noticing and, for the reasons stated below, any further media noticing would be wasteful, ineffective, and unnecessary.

7.    In contrast, as set forth below, the TCC Notice Plan is excessive, wasteful due, in part, to its unnecessary frequency levels, and critically flawed in several respects.  In addition, as discussed below, Angeion, who the TCC seeks to retain as its noticing agent, is not qualified to act as a noticing agent in these Chapter 11 Cases as, to the best of my knowledge, they have no prior experience serving as a noticing agent or in any other capacity in any chapter 11 cases.  I further believe Angeion's prior experience in class actions (which has little to no application here) is both overstated and misrepresented in the TCC Bar Date Motion.

## II.    NOTICE EXPERTISE AND QUALIFICATIONS

8.    I have been approved by numerous Courts to serve as an expert on notification and outreach in both the bankruptcy and class action context, including the following cases in the Northern District of California:

- *Fitzhenry- Russell et al., v Keurig Dr. Pepper Inc.*, Case No. 17-cv-00564-NC (N.D. Cal.);

---

[3] As set forth in the Bar Date Motion, the Debtors original estimate for the cost of the Supplemental Notice Procedures was approximately $1.5 million - $2.0 million.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- *Michael Allagas, et al., v. BP Solar International, Inc., et al., BP Solar Panel Settlement*, Case No. 3:14-cv-00560- SI (N.D. Cal. 2016);

- *Pettit et al., v. Procter & Gamble Co.,* Case No. 15-cv-02150-RS N.D. Cal.); and

- *In Re: TracFone Unlimited Service Plan Litigation*, No. C-13-3440 EMC (N.D. Cal.).

9.     My credentials, expertise, and experience that qualify me to provide an expert opinion and advice regarding notice in these Chapter 11 Cases include more than 30 years of communications and advertising experience, specifically in the bankruptcy and class action notice context.  I have served as an expert and have been directly responsible for the design and implementation of numerous notice programs, including some of the largest and most complex programs ever implemented in the United States as well as globally in over 140 countries and in 37 languages.  My Curriculum Vitae delineating my experience is attached hereto as **Exhibit A**.

10.     During my career, I have planned and implemented over 1,000 complex notice programs for a wide range of bankruptcy, class action, regulatory, and consumer matters.  I have been recognized as being at the forefront of modern notice practices,[4] and I was one of the first notice experts to integrate digital media[5] and social media into Court-approved legal notice programs.

11.     I have significant experience planning and implementing complex Court-approved notice programs in chapter 11 cases. This includes some of the earliest bankruptcy noticing programs:

- *In re The LTV Corp., et al.*, Case No. 86-11270 (Bankr. S.D.N.Y. 1986);

- *In re Continental Airlines, et al.*, Case No. 90-932 (Bankr. D. Del. 1990);

- *In re Eastern Air Lines, Inc.,* Case No. 89-10448 (Bankr. S.D.N.Y. 1989);

- *In re Pan Am Corp.*, Case No. 91-10080 (Bankr. S.D.N.Y 1991);

- *In re R.H. Macy & Co., Inc., et al.,* Case No. 92-40477 (Bankr. S.D.N.Y. 1992);

- *In re Schwinn Bicycle Co., et al.,* Case No. 92-22474 (Bankr. N.D. Ill. 1992);

- *In re Caldor, Inc. New York, The Caldor Corp., Caldor, Inc. CT, et al.*, Case No. 95-44080 (Bankr. S.D.N.Y (1995);

- *In re Harnischfeger Inds.*, Case No. 99-2171 (Bankr. D. Del. 1999);

---

[4] Deborah R. Hensler et al., *Class Action Dilemmas, Pursuing Public Goals For Private Gain*.  RAND (2000).

[5] First website: *In re: Louisiana-Pacific Inner-Seal Siding Litig.*, Nos. 879-JE, and 1453-JE (D.Or.).

- *In re Columbia Gas Transmission Corp.*, Case No. 91-804 (Bankr. S.D.N.Y. 1991); and

- *In re Decora Inds., Inc. and Decora, Inc.*, Case No. 00-4459 (Bankr. D. Del. 2000).

12. It also includes formulating notice and media plans for some of the largest chapter 11 matters in history:

- *In re AMR Corporation, et al.,* Case No. 11-15463 (Bankr. S.D.N.Y. 2011);

- *In re General Motors Corp. et al*, Case No. 09-50026 (Bankr. S.D.N.Y. 2009);

- *In re United Airlines, Inc.*, Case No. 02-B-48191 (Bankr. N.D. Ill. 2002);

- *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. 2001); and

- *In re Dow Corning,* Case No. 95-20512 (Bankr. E.D. Mich. 1995).

13. These are but a few examples of the numerous bankruptcy notice plans that I have designed and implemented, which are a small sampling of my thousands of notice programs overall.

14. I am the <u>only</u> notice expert regularly recognized by Courts that is accredited in Public Relations by the Universal Accreditation Board, a program administered by the Public Relations Society of America. I have provided testimony before the United States Congress on issues of notice. *See*, *e.g.*, Report on the Activities of the Committee on the Judiciary of the House of Representatives: "Notice" Provision in the *Pigford v. Glickman* Consent Decree: Hearing Before Subcommittee on the Constitution, 108th Cong. 2nd Sess. 805 (2004) (statement of Jeanne C. Finegan)[6]. I have lectured, published, and been cited extensively on various aspects of legal noticing, product recall and crisis communications. I have served the Consumer Product Safety Commission (CPSC) as an expert to determine ways in which the CPSC can increase the effectiveness of its product recall campaigns. Additionally, I have published

---

[6] I provided live testimony and was cross-examined before the United States Congress in connection with a proposed consent decree settling a class action suit against the U.S. Department of Agriculture. In the court opinion that followed, the Honorable Paul L. Friedman approved the consent decree and commended the notice program, stating;

> *"The Court concludes that class members have received more than adequate notice . . . the timing and breadth of notice of the class settlement was sufficient . . . The parties also exerted extraordinary efforts to reach class members through a massive advertising campaign in general and African American targeted publications and television stations."*

*Pigford v. Glickman and U.S. Department of Agriculture*, 185 F.R.D. 82, 102 (D. D.C. April 14, 1999).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and lectured extensively on various aspects of legal noticing and taught continuing education courses for Jurists and lawyers alike on best practice methods for providing notice in various contexts.

15.     I worked with the Special Settlement Administrator's team to assist with the outreach strategy for the historic Auto Airbag Settlement, *In re Takata Airbag Products Liability Litigation* MDL 2599.  I was extensively involved as a lead contributing author for *"Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions"* published by Duke University School of Law.  And, more recently, I have been involved with New York University School of Law and The Center on Civil Justice assisting with a class action settlement data analysis and comparative visualization tool called the *Aggregate Litigation Project*, designed to help judges make decisions in aggregate cases on the basis of data as opposed to anecdotal information.

16.     I am a member of the Board of Directors for the Alliance for Audited Media, which is the recognized advertising industry leader in cross-media verification with unparalleled expertise across all brand platforms including web, mobile, email, and print. It was founded in 1914 as the Audit Bureau of Circulations to bring order and transparency to the media industry. Today more than 4,000 publishers, advertisers, agencies, and technology vendors depend on their data-driven insights, technology certification audits, and information services to transact with trust. Its leadership consists of top performers across each discipline, including directors of ad agencies, vice presidents of major national brands, and publishers of leading newspapers and magazines.

17.     I also personally pioneered many "firsts" related to notice and media in the chapter 11 context, from designing and implementing the very first website in the bankruptcy context (which has since been adopted by the industry as the norm in the modern day) to being the first notice expert to include and utilize online media in complex restructuring cases.[7]

---

[7] *See In re Jackson Hewitt Tax Service Inc., et al.*, No 11-11587 (Bankr. D. Del.) (2011). (The *Jackson Hewitt* notice program constituted one of the first large chapter 11 cases to incorporate online advertising, with more than 350 local newspaper and television websites, online display advertising, a website notice linked to a press release and notice on eight major websites, including CNN and Yahoo). *See Foster v. ABTco Siding Litigation*, No. 95-151-M (Cir. Ct., Choctaw County, Ala. 2000) (media campaign involving broad national notice through television and print media, regional and local newspapers, and the Internet); *In re: Louisiana-Pacific Inner-Seal Siding Litig.*, Nos. 879-JE, and 1453-JE (D. Or. 1995) (first class action internet site).

### III. ANGEION IS NOT QUALIFIED TO SERVE AS A NOTICING AGENT OR OTHERWISE OPINE ON NOTICING IN THESE CHAPTER 11 MATTERS

18.     I am familiar with Angeion and its proffered notice expert Steven Weisbrot.  Angeion is a relatively new entrant to the class action administration market, having been formed in 2013.  I believe the firm has approximately twenty-five (25) employees in total (including all administrative support staff) and is believed in the industry to outsource much of its work, particularly media placement.[8]

19.     Mr. Weisbrot is a relatively new notice advisor, having developed his first plan around 2014.  To the best of my knowledge, Mr. Weisbrot does not have a background in communications or media, simply a sales certificate, which is vastly different from any certification in actual media planning.

20.     Importantly, as is made clear from his declaration, Mr. Weisbrot has never served as a notice expert in the bankruptcy context, and, to the best of my knowledge, he has never worked on a bankruptcy matter in that – or any other – context.  This is evident by his citations to inapplicable class action authorities, his failure to cite to a single section of the Bankruptcy Rules or Bankruptcy Code (other than the definition of "disinterested"), his failure to identify a single bankruptcy case in which he has served as noticing agent, and his patently inapplicable recommendations.  In fact, as confirmed by a review of its website, it appears that no one at Angeion has any experience in bankruptcy whatsoever.

21.     Even in the class action context, Mr. Weisbrot's plans and recommendations have been heavily criticized, reworked, and he even has been replaced as a notice expert.  A few examples include:

- *Pollard v. Remington* – Mr. Weisbrot was replaced by a different notice agent after his notice plan failed. Weisbrot's notice plan did not make effective use of media notice and resulted in a mere 2,327 claims being submitted out of a potential class of 7.5 million claimants.  The Court found that the "low response rate demonstrates the notice process has not been effective."  The final hearing was canceled and the Court ordered the parties to develop a notice plan that would "be effective and result in a more significant response rate".  A copy of the Court's decision criticizing Weisbrot's plan and removing him as noticing agent is attached hereto as **Exhibit B**.

- *Cronin v. EOS* –The Court declined to approve Mr. Weisbrot's notice program, finding that the direct notice plan was insufficient and did not demonstrate that "reasonable efforts" were being made to provide direct notice.  The Court also found that the indirect noticing plan was insufficient and was not designed to have the widest impact, noting that Weisbrot's declaration made clear that the form of notice was chosen not because it was calculated to reach class members but "to satisfy the notice requirements" of California's

---

[8] *See* http://www.angeiongroup.com/our_team.htm.

Case: 19-30088    Doc# 2642    Filed: 06/19/19    Entered: 06/19/19 14:39:00    Page 8 of 38

Consumer Legal Remedies Act. The Court denied the notice program and forced a rework. A copy of the Court's decision is attached hereto as **Exhibit C**.

- *Neiman Marcus* – The settling parties represented to the Court that Mr. Weisbrot's notice program would include direct and indirect notice. Instead of providing direct notice to all class members, however, direct notice was provided to less than 50% of potential class members out of a proposed class of over two million. As a result of Mr. Weisbrot's noticing plan, less than one percent (three-quarters of a percent 0.75%) of the settling class submitted claim forms. The Court expressed its "concern" given the "paltry" results of the noticing efforts and directed the parties to consider whether further attempts at notice were warranted. A copy of the Court's decision is attached hereto as **Exhibit D**.

## IV. THE DEBTORS' ORIGINAL NOTICE PLAN AND THE TCC NOTICE PLAN ARE SUBSTANTIALLY SIMILAR AND THE TCC AND ANGEION MISREPRESENT THE SCOPE AND EFFICACY OF THE DEBTORS' SUPPLEMENTAL NOTICE PLAN

22.     Putting aside Angeion and Mr. Weisbrot's lack of experience in chapter 11 cases, based upon my review of the TCC Objection, the Angeion Retention Application, and the Weisbrot Declaration, it is clear that, at best, the TCC and Angeion do not understand the size and scope of the Debtors' Notice Procedures and the Supplemental Notice Plan. Many of Mr. Weisbrot's statements in his declaration are patently wrong, internally inconsistent, and ignore the reality of what the Debtors' actually propose in their Bar Date Motion. When compared to the TCC Notice Plan, the Debtors' Noticing Procedures include virtually <u>all</u> of the same elements, including (a) direct notice via U.S. Mail and email, (b) supplemental notice via various print media publications; (c) constructive notice using the Internet and various targeted online media; (d) notice employing the use of social media; and (e) localized television and radio advertising. A chart detailing the extent of the overlap between the two plans is set forth below:

| | Debtors' Original Supplemental Notice Plan | TCC Plan |
|---|---|---|
| Dedicated Website | YES | YES |
| Toll-Free Number | YES | YES |
| **DIRECT MAIL/ EMAIL** | | |
| Known Wildfire Claimants | YES | YES |
| Debtors' Customers | YES | YES (but 2 million fewer Customers to receive notice by mail) |
| Property Owners of Destroyed Homes within the Areas affected by the 2017 Northern California Wildfires GIS Data | YES | YES |
| Additional Names of Wildfire Claimants in BrownGreer Database | YES | YES |
| **PRINT** | | |
| Magazines | NO (Now incorporated into Revised Plan) | YES |
| Newspapers | YES | YES |
| **BROADCAST** | | |
| Local Market TV – English & Spanish | YES | YES |
| Over the Top TV (OTT) | NO (Duplicative but nevertheless incorporated into Revised Plan) | YES |
| Local Market Radio – English & Spanish | YES | YES |
| Streaming Radio | NO (Duplicative but nevertheless incorporated into Revised Plan) | YES |
| **ONLINE** | | |
| Display | YES | YES |
| Search | YES | YES |
| Social Ads | YES | YES |
| **OUT OF HOME** | | |
| Digital & Static Units | NO (Unnecessary and duplicative but nevertheless incorporated into Revised Plan) | YES |
| **COMMUNITY OUTREACH** | | |
| Fire Disaster Centers/Claims Service Centers | YES | YES |
| **EARNED MEDIA** | | |
| Public Relations Outreach | YES | YES |

23.     <u>Direct Mail</u>.  As set forth in the Bar Date Motion, the Debtors are proposing to serve via

first class mail the Wildfire Claim Bar Date Notice and the applicable Wildfire Proof of Claim Form to

each Known Wildfire Claimant[9] at the address for the attorney of record set forth in the complaint initiating the prepetition action (or other document or correspondence notifying the Debtors of an intention to commence a prepetition action), and to (i) Willkie Farr & Gallagher LLP, as attorneys for the Ad Hoc Committee of Wildfire Subrogation Claimants, and (ii) Stutzman, Bromberg, Esserman & Plifka, P.C., as attorneys for the Ad Hoc Committee of Public Entity Wildfire Claimants.  Similar notice will be sent by first class mail to any holder of a Wildfire Claim that has filed a Proof of Claim on or prior to the entry of a Proposed Bar Date Order at the address listed in such Proof of Claim.  To supplement the foregoing, the Debtors will send by first class mail the foregoing notice to property owners of destroyed homes within the areas affected by the 2017 Northern California Wildfires using proprietary data maintained by Geographical Information Systems ("**GIS**") satellite experts retained by the Debtors in connection with the prepetition litigation.  The Debtors are further proposing to send actual notice of the Bar Date to each of their 16 million Customers.  Furthermore, as set forth in the Reply, to the extent the Debtors receive the names and contact information of any potential claimants from the so-called "BrownGreer" database prior to mailing, any such parties also will be included in the Debtors' list of Known Wildfire Claimants and will receive actual notice of the Bar Date by mail.

24.     Weisbrot and the TCC wrongly assert that the Debtors are proposing to provide direct notice to only a select group of parties in interest, notwithstanding the fact that the list of Known Wildfire Claimants and other parties above that the Debtors intend to serve with actual notice of the Bar Date and the procedures for filing Proofs of Claim, including Wildfire Proofs of Claim, totals nearly 18 million parties.

25.     Although the TCC Bar Date Motion lists additional broad categories of parties the TCC could potentially approach or request additional names of potential Wildfire Claimants (such as community organizations and utilizing third party subpoenas) this appears to be purely aspirational as neither the TCC nor Weisbrot include any specific plan to secure any information from such parties in any timely manner.  Accordingly, based on my review of the TCC Bar Date Motion, there is no

---

[9] For purposes of the Debtors' Bar Date Motion, "**Known Wildfire Claimants**" means holders of Wildfire Claims that, as of the Petition Date, already had commenced actions against the Debtors or had provided actual notice to the Debtors of their intention to commence actions against the Debtors.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

substantive difference between the list of parties the Debtors and the TCC intend to serve with actual notice of the Bar Date.

26. _Supplemental Notice Plan_. Contrary to the assertions of Mr. Weisbrot and the TCC, the Debtors' Supplemental Notice Plan is more than reasonably calculated to provide adequate notice of the Bar Date to known and unknown claimants and more than satisfies the requirements of due process of law. The Debtors' Supplemental Notice Plan is not only consistent with class action best practices, but, in fact, it exceeds such practices where appropriate. As described in detail below, the Debtors' Supplemental Notice Plan not only satisfies the more rigorous requirements of due process and fairness imposed under the Bankruptcy Code and Bankruptcy Rules, but exceeds those requirements and effectively targets those who need to be noticed in an appropriate and in a far more cost-efficient manner than the TCC Notice Plan. The Supplemental Notice Plan is guided by optimal frequency levels, and was prepared using a more refined demographic analysis, with the end result being a thoughtful and focused media selection and projected media delivery to appropriately reach the target audience of creditors and potential creditors.

27. In his declaration, Mr. Weisbrot asserts that the Debtors' original Noticing Procedures, and the reach analysis contemplated thereby, are "antiquated."[10] This is patently false and, as evidenced below, contradicted by Mr. Weisbrot's reliance on reach analysis in his declaration (which is incorrectly calculated) and his recommendations to other Courts. _See, e.g.,_ Weisbrot Decl. at ¶81 and ¶85. The Debtors' original Supplemental Notice Plan included many more media elements than the class action noticing campaigns that Mr. Weisbrot commonly deems "cutting edge" and "best practicable." As illustrated below, in his class action work, Mr. Weisbrot frequently employs only one or two media channels – comprising a few million internet impressions plus a magazine or newspaper – and deems that "best practicable."

---

[10] In an article published on the Angeion website, Mr. Weisbrot calls the entire concept of reach "antiquated" – yet he heavily relies on the reach analysis here – which is questionably calculated. _See A New Approach for Class Action Media Notice Programs_, available at http://www.angeiongroup.com/news-a-new-approach-for-class-action-media-notice-programs (**_"Yet, time and again, successful advertising campaigns — as opposed to class action notice campaigns — are run without clinging to the_ <u>_antiquated concept of reach analysis._</u>_")._

- *See In Re: Ashley Madison Customer Security Data Breach*, MDL No. 2669 Case No 4:15MD- 02669, "Declaration of Steven Weisbrot, Esq. on Adequacy of Notice Program," dated July 13, 2017 (Weisbrot Decl., Ex. E) (media employed included People and Sports Illustrated magazines and 11,484,000 digital banner ads to reach approximately 75.3% of the class with an average frequency of 3.04).

- Weisbrot Declaration: *Joseph v Monster, Inc.* in the Circuit Court of Cook County, Illinois, dated August 16, 2016. Weisbrot Declaration at ¶ 7: The "state of the art" program includes individual notice, banner notice and nationwide notice in one consumer magazine and one issue of USA Today; projected to reach 75% of the class three times.

- Weisbrot Declaration at ¶ 33: Weisbrot adopts a convenient position on the essential use of traditional media measurement – *i.e.* reach and frequency – which metrics he has previously referred to as "antiquated."[11]

28.    Mr. Weisbrot suggests that the Debtors' Supplemental Notice Plan, which originally did not include OTT and streaming radio, lacked certain fundamental media channels, calling OTT and streaming radio "mainstays in the modern media environment." This is a mischaracterization as such media channels are not used by a majority of the population. OTT and streaming radio are quantifiably limited in their ability to deliver additional new audiences not reached by the many robust layers of media already employed. Indeed, according to GfK Mediamark Research and Intelligence, LLC[12] ("**MRI**"), only about 40% of the population watch online videos. Thus, while OTT and streaming are certainly more recent forms of media and growing rapidly, in my opinion, adding OTT or streaming radio will not reach any new audiences not otherwise reached by the many robust layers of media already employed in the Supplemental Notice Plan due to the significant overlap in the media channels consumers use.[13] For example, 99.6% of people who use OTT and 100% of people who listen to online radio also read newspapers, watch TV, browse online or use Facebook – all of which are media channels already employed by Debtor's Supplemental Notice Program. MRI also reports that streaming radio is

---

[11] *See* Law360, *A New Approach for Class Action Media Notice Programs*, Steven Weisbrot, at http://www.angeiongroup.com/news-a-new-approach-for-class-action-media-notice-programs (Nov. 7, 2014).

[12] GfK MRI's *Survey of the American Consumer*® is the industry standard for magazine audience ratings in the U.S. and is used in the majority of media and marketing agencies in the country. MRI provides comprehensive reports on demographic, lifestyle, product usage and media exposure. http://www.mr.gfk.com/.

[13] GfK MRI Media Use Adults 18+ 2018 Doublebase

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

used by only 22% of all adults. Pandora CEO Robert Lynch has contrasted streaming radio and terrestrial radio, stating "Despite the fact that [Pandora is] the largest streaming service in the U.S., we're only 10 percent of the listening that happens on terrestrial radio[14]." Again, Mr. Weisbrot has manufactured this argument to criticize the Debtors' plan without any factual basis. Nevertheless, as discussed below, the Supplemental Notice Plan, as revised, includes OTT and streaming radio, so this is a moot issue.

## V. THE TCC NOTICE PLAN AND THE WEISBROT DECLARATION ARE FLAWED AND CONTAIN SIGNIFICANT MISSTATEMENTS OR MISREPRESENTATIONS

29. The TCC Notice Plan, as described in the Weisbrot Declaration, is critically flawed, contains numerous misstatements regarding certain aspects of its plan, and relies on inaccurate reach calculations. The following are a few of the critical errors and misstatements that I have identified from my review of the materials submitted to the Court by Mr. Weisbrot, Angeion, and the TCC. Notably, the Debtors' Supplemental Notice Plan does not contain these critical errors.

30. **Critical Error 1 – The TCC television plan does not reach all affected DMAs and is inaccurately planned.** Mr. Weisbrot identifies four (4) Designated Market Areas ("**DMAs**") in California: Chico-Reading, San Francisco-Oakland-San Jose, Sacramento-Modesto-Stockton and Eureka. Mr. Weisbrot asserts that his plan will deliver audience in each of these four markets. Weisbrot Decl. at ¶ 24. This is inaccurate as evidenced in Exhibit E to the Weisbrot Declaration, which identifies the exact media he is proposing to utilize in each DMA. Specifically, he identifies television for only two of the four DMAs (Chico and San Francisco). Further, without any supporting rationale, the TCC Notice Plan adds the Los Angeles market. Failure to provide televised notice in two of the DMAs identified by Mr. Weisbrot cuts out half of the targeted population, and providing televised notice in Los Angeles is unnecessary and a significant waste of resources.

31. **Critical Error 2 – The TCC radio plan does not reach all affected MSAs and is inaccurately planned.** Similar to its television plan, the radio plan set forth by the TCC and Mr. Weisbrot does not reach all affected Metropolitan Survey Area[15] ("**MSA**"). The radio plan does not

---

[14]    https://www.billboard.com/articles/business/8458166/spotify-pandora-ad-supported-streaming-analysis

[15] Geographical area defined by radio measurement company, Arbitron.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

include Stockton or Modesto, and again inexplicably includes Los Angeles. At best, this could make its reach calculation suspect as they are not calculating the correct radio station coverage. At worst, the TCC Notice Plan is again missing critical claimants with its flawed plan.

32. **Critical Error 3 – The TCC Notice Plan lists ":60" spots for radio and National Public Radio (NPR) stations.** NPR does not accept advertising, only sponsorships. There is no guarantee or known precedent for NPR to accept legal ads. According to NPR's website[16], "On-air messaging with NPR and public radio stations identifies and describes sponsors. All messaging on NPR must include […] the standard opening phrase: "Support for NPR comes from…" Further, sponsorship copy on NPR is unique in that it is up to 15-seconds, without the standard opening phrase, not 60-seconds as contemplated by the TCC Notice Plan. Inclusion of NPR in his media plan when it is highly unlikely that spots will actually air would have a significant adverse impact on the projected reach and frequency for radio in the TCC Notice Plan. This is basic knowledge in the industry, and the fact that Mr. Weisbrot and Angeion are unaware of it illustrates that they lack competent media experience.

33. **Critical Error 4 – Local reach for both television and radio is likely miscalculated.** Mr. Weisbrot projects that "approximately three quarters of the residents of the four DMAs will see a video ad, on average ten times each." Weisbrot at ¶ 91. In reality, as noted above, residents of two of the four TV DMAs and two of the six MSAs _may not see or hear_ commercials _at all_. Such inaccuracy in calculations should not be permitted in a case of this magnitude and, once again, demonstrates that Mr. Weisbrot and Angeion are unfit for the task they are proposing to undertake.

34. **Critical Error 5 – The TCC Notice Plan emphasizes Los Angeles and San Diego without any rationale for their inclusion.** Angeion and the TCC propose to include Out-of-Home advertising (which includes billboards and transit shelters in Los Angeles and San Diego). It should be noted that Out-of-Home is hyper local, _only_ reaching people who are physically at the posted locations of the billboards/transit stops. The TCC Notice Plan contemplates twenty-nine (29) transit shelter advertisements, ten (10) billboards in San Diego, and ten (10) billboards in Los Angeles. Los Angeles is a city with a population of 4 million and San Diego a population of 1.4 million. Without evidence to

---

[16] _See_ https://www.nationalpublicmedia.com/products/on-air/.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

suggest that people affected by the Northern California Wildfires have moved to the *exact* locations where the Out-of-Home media is visible, there is no reasonable justification for the use of out-of-home in these areas. These markets could be more effectively reached through other channels. As previously mentioned, he also includes Los Angeles in his TV and radio plans, a notably expensive market. This is not effective notice as there is no rationale for this expense, it is duplicative of other resources, and is a waste of money.

35.     **Critical Error 6** – **Angeion and Weisbrot have provided no assurances that they will actively monitor and transparently report on digital ad fraud detected in their proffered outreach**. Ad fraud, (counterfeit impressions, fake sites, domain spoofing) and bots are an ever-present reality in the digital environment, silently stealing impressions from advertising budgets. Large brands such as Procter & Gamble, Unilever, and numerous others have taken active, aggressive steps to identify it, mitigate, and reduce it.[17] The problem is so large that it is drawing the attention of legislators[18] and law enforcement[19] alike. Further, LOTAME Solution, Inc.,[20] a data management platform commonly used by Mr. Weisbrot, last year admitted to identifying over 400 million user profiles as bots. Here, left unchecked, bots may deprive Wildfire Claimants of an opportunity to see a notice, which can have a big impact on response rates and claims filed. Given his previous statements that ad fraud is nothing more than a "*Tempest in a tea-pot if there ever was one,*"[21] his notion that ad fraud is easily "*foiled,*" and the fact that I have never seen any account of identified ad fraud in his declarations, his failure to adequately

---

[17] *See* Digital Daily News, *Significant Rise in Digital Ad Fraud in Q4 2018*, Alex Weprin, available at https://www.mediapost.com/publications/article/333339/significant-rise-in-digital-ad-fraud-in-q4-2018.html (Mar. 18, 2019) ("*Pritchard has been particularly vocal about transparency issues in the digital media supply chain, including viewability, fraud, a lack of measurement and murky contracts.*").

[18] *See* https://www.warner.senate.gov/public/index.cfm/2016/7/sens-warner-schumer-call-on-ftc-to-protect-consumers-from-digital-ad-fraud; *see also* https://www.wsj.com/articles/senators-urge-ftc-to-examine-ad-fraud-1468231200.

[19] *See* Press Release: Department of Justice, U.S. Attorney's Office, Eastern District of New York, *Two International Cybercriminal Rings Dismantled and Eight Defendants Indicted for Causing Tens of Millions of Dollars in Losses in Digital Advertising Fraud"*, available at https://www.justice.gov/usao-edny/pr/two-international-cybercriminal-rings-dismantled-and-eight-defendants-indicted-causing (Nov. 27, 2018).

[20] *See* Lotame Purges Its Data Exchange After Identifying 400 Million User Profiles as Bots, Ad Age, available at *http://bit.ly/2nNFHIH* (February 9, 2018).

[21] *Joseph v Monster Inc. Best Buy Stores* Circuit Court of Cook County, Illinois, County Department – Chancery Division  No. 15 CH 13991, Supplemental Declaration of Steven Weisbrot at ¶ 21.

detect and combat fraud is of high concern, particularly for an outreach program such as the one at hand. Further, it demonstrates his lack of understanding of critical issues concerning the digital advertising environment. While Mr. Weisbrot mentions including Integral Ad Science, he makes no reference to which service through IAS he is using or the other necessary steps he should take to identify, mitigate and transparently report the ad fraud detected. *See* Weisbrot Decl. at ¶ 119.

36. **Misstatement 1 – The TCC Notice Plan falsely claims to include Spanish radio.** In paragraph 56 of the Weisbrot Declaration, and again in the chart on page 54, Mr. Weisbrot and Angeion promise traditional and terrestrial broadcasting in the Spanish language." Yet <u>none</u> of the radio stations listed in Exhibit E to the Weisbrot Declration are Spanish language stations. Failure to include media in the Spanish language is a critical misstep as 38.6% of Californians are of Spanish, Hispanic or Latino descent and 21% speak primarily Spanish at home. No qualified expert would propose a plan in California without a robust Spanish language component, which is why the Debtors intend to run ads on ten (10) Hispanic stations in connection with their Supplemental Notice Plan.

37. **Misstatement 2 – The TCC Notice Plan proposes to include Cajun radio; there is no Cajun population in Northern California.** For some inexplicable reason, the TCC Notice Plan includes Cajun radio stations in its media plan. *See* Weisbrot Decl. at ¶ 56. Putting aside the fact that there are no Cajun radio stations in California (again, something an expert in the industry would know), there is no justification for Cajun stations in this matter as there is no evidence that there is any significant Cajun population in Northern California.

38. As demonstrated above, the many examples of errors, mischaracterizations, and misstatements in Mr. Weisbrot's declaration and the TCC Notice Plan evidence lack of knowledge, lack of experience, and sloppiness. The Debtors' Notice Procedures have none of these infirmities. Further, as discussed below, the TCC Notice Plan is a waste of many millions of dollars by not targeting the audiences appropriately, missing key areas, oversaturating non-essential areas, and utilizing unprecedented and spurious frequency rates.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## VI. THE TCC NOTICE PLAN IS EXCESSIVE AND WILL RESULT IN DIMINISHING RETURNS

39.     In addition to the critical flaws and misstatement set forth above, the budget for the supplemental notice plan proposed by the TCC, Angeion, and Mr. Weisbrot is excessive and wasteful due, in part, to its unnecessary frequency levels, or opportunities to see the notice.  In advertising, the term "Reach" refers to the estimated percentage of the unduplicated audience exposed to the campaign, and "Frequency" refers to how many times, on average, the target audience had the opportunity to see the message.  These metrics are used by advertising and communications firms worldwide and, while not typically utilized in bankruptcy matters, are the bedrock for determining adequacy of notice in class actions.

40.     The Weisbrot Declaration claims that 80% of all adults residing in the State of California (approximately 39.56 million) each will see one of Angeion's notices **on average 28 times**.  *See* Weisbrot Decl. at ¶ 85.  In the targeted regions, he proposes to have approximately 95% of the target audience (9.76 million) see a notice nearly **52 times** (Weisbrot Dec. at ¶ 83). These proposed Frequencies are multiples beyond what any bankruptcy or class action case has *ever* employed.  For context, even the largest, most recent class action campaigns, which had similar local, regional and national outreach did not employ such frequency levels.

| Case Name | Reach | Frequency |
|---|---|---|
| *Takata Auto Airbag Products Liability Settlement Case No. 1:15-md-02599 FAM  District of Florida* | 95% | 4x |
| *BP Deepwater Horizon*[22] | 95% | 4x |
| *Cook et. al v. Rockwell International Corp. and the Dow Chemical Co., No. 90-cv-00181- KLK (D. Colo. 2017)., aka, Rocky Flats Nuclear Weapons Plant Contamination*[23] | 96% | 7x |
| *In re: Payment Card Interchange Fee and Merchant Discount Antitrust* | 82% | 2.7x |
| *In re Air Cargo Shipping Services Canadian Antitrust* | 77% | 2.7x |
| *Spotify Publishing Settlement* | 74% | 2.6x |

---

[22] Decl. of Cameron Azari, Rec. Doc. 7113-1, ¶¶ 5, 6.

[23] Decl. of Jeanne C. Finegan dated March 30, 2017, Doc. No. 2432, at ¶¶ 30-31.

| | | |
|---|---|---|
| *Red Bull False Advertising Class Action* | 72% | 3.9x |
| *New Balance "Made in the USA" Class Action* | 70% | 4.1x |

41.     The Frequency proposed by Mr. Weisbrot and Angeion is not only contrary to all guidance and practice and without precedent in class action and bankruptcy, but, perhaps more importantly, the enormous over-saturation proposed by Angeion and Weisbrot has also been proven to have negative results in adverting and marketing, more generally.  The primary theoretical justification for effective reach and frequency is the notion of a communication threshold.  That is, a certain level of exposure is needed to break into people's awareness and capture their attention to effectively reach them.[24]

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

---

[24] Source: *Journal of Advertising Research, November 01, 2002 - Cannon, Hugh M.; Leckenby, John D.; Abernethy, Avery*

42.    While early studies suggested that the appropriate number for frequency was three, most experts now agree that the **optimal average frequency level is between 5 to 10 times**.[25] As industry experts know and the research clearly shows, frequency levels in excess of this have enormously diminishing returns.  The ability to achieve the intended response to the notice (i.e. filing a valid claim) falls off the cliff.  As the chart below demonstrates, over-saturation results in audience wear-out, *i.e.* people stop paying attention and the dollars spent on those impressions are wasted:



*See Id.* at n.25.

43.    The TCC Notice Plan sustains these high frequency levels over a course of 7 months. This is another wasteful approach.  The same results can be accomplished over the 95 days contemplated by the Debtors' Supplemental Notice Plan. In fact, this timing is consistent with numerous, high-profile, high stakes class actions, including those mentioned above, *i.e.* Takata, Deep Water Horizon, etc.  As we know from our own experience, seeing/hearing an advertisement 25-50 times over 7 months is an annoyance, and certainly no more effective than seeing/hearing that ad 5-10 times over 2-3 months.

---

[25]    https://www.imediaconnection.com/articles/ported-articles/red-dot-articles/2005/may/the-magic-of-three-disputed/    also see:    https://www.imediaconnection.com/article/138044/what-is-optimal-frequency.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

44.     Further, the outreach contemplated by the TCC Notice Plan lacks refined audience targeting. For example, there is no need in this matter to target all adults 18 years of age and older nationwide, as they have proposed. It is more efficient to target those adults who are over the age of 18 who have moved out of California from 2015 to present, which is the affected period for the Bar Date Notices. Accordingly, once the audience targeting is refined, then the media selection becomes more efficient with less waste. This is another reason, in my opinion, the TCC Notice Plan is excessive and wasteful.

45.     The TCC Notice Plan is in part deficient (*see* above) and in other aspects excessive in a manner that would be detrimental rather than productive. Moreover, in my opinion, the budget proposed by the TCC, Angeion, and Mr. Weisbrot for supplemental noticing is wildly excessive, without precedent in bankruptcy or class action, and wasteful. Indeed, the most material differences between the TCC Notice Plan and the Debtors' Supplemental Notice Plan are cost and duration. The TCC Notice Plan is estimated to cost $12.875 million, while the cost of the Debtors' Supplemental Notice Plan (as refined) is estimated to be $2.5 million. Other than adding $10 million to the cost of noticing and an additional 5 months in duration, the TCC Notice Plan and the Debtors' Supplemental Notice Plan have the same media channels. However, in addition to the local DMA and state reach, the Debtors' nationwide outreach effort is reasonably calculated to reach nearly 80% of the target audience nationwide – which is not the case with the TCC Notice Plan – because the Debtors' Supplemental Notice Plan is tactically superior to the TCC Notice Plan in every way.

## VII.     THE DEBTORS' SUPPLEMENTAL NOTICE PLAN WAS METICULOUSLY CRAFTED USING PREEMINENT NOTICING STANDARDS

46.     The Debtors' Supplemental Notice Plan was designed utilizing well-researched methodologies and communication principles accepted by the advertising industry and embraced by courts in the United States for legal noticing and represents the most effective and comprehensive noticing plan in any bankruptcy or class action case ever. Based on these methodologies and principles, we are able to measure and report to the Court the Reach and Frequency to determine the most effective noticing methods, which have been embodied in the Supplemental Notice Plan. Moreover, in addition

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

to the noticing methods originally proposed by the Debtors and Prime Clerk, although largely duplicative and, in my view, not necessary, the Supplemental Notice Plan now includes the additional media channels proposed by the TCC: OTT, streaming radio, and Out-of-Home advertising.

## A. <u>SYNDICATED MEDIA RESEARCH DATA</u>

47.     The Debtors' Supplemental Notice Plan was formulated using a combination of well-established principles of communication and syndicated media research data provided by MRI, online measurement currency comScore [26], and Nielsen [27] among others, which provide data on media consumption habits and audience delivery verification of the potentially affected population. These data resources are used by advertising agencies nationwide as the basis to select the most appropriate media to reach specific target audiences. These research reports are instrumental in our selection of media channels and outlets for determining the estimated net audience reached through the Debtors' Supplemental Notice Plan.  Specifically, this research identifies which media channels are favored by the target audience (*i.e.*, the potential creditors) by considering browsing behaviors on the internet, social media channels that are used, which magazines creditors are reading and which television programs people are watching.

48.     While traditional media [28] is typically purchased based on both demographic (*i.e.,* age, gender, ethnicity, income, education) and psychographic (*i.e.,* lifestyle, product and brand preference, media usage, and media definition) characteristics, online media, including Internet and mobile, may be purchased through more granular target audience characteristics.  As a result, the Debtors are applying

---

[26] comScore is a global Internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet usage data.  comScore maintains a proprietary database of more than 2 million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing. This data includes and fuses 1st party, (website data), second party (data shared by websites for marketing purposes) and 3rd party data, tied to offline purchasing behavior.  www.comscore.com/.

[27] Nielsen measures and monitors television and radio audiences and media delivery. The company measures programming and advertising across all distribution points: network television, and radio among others. Nielsen's ratings are used by advertisers and networks to shape the buying and selling of advertising. www.nielsen.com/.

[28] Traditional media is a reference to pre-internet media: magazine, newspaper, terrestrial radio, and broadcast and cable television.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the most sophisticated and modern media relevant approach to audience targeting, similar to that which is used by large brands to select the most appropriate digital and social media platforms to communicate with customers and market products.

49. Further, the Debtors' Supplemental Notice Plan employs other well recognized media research tools from Standard Rates and Data, Scarborough Research, Telmar, Strata, and Cision. These tools allow us to create target audience characteristics or segments, and then select the most appropriate media communication methods to best reach them.

### B. SECONDARY POPULATION RESEARCH

50. Importantly, in addition to the media research data, my team and I studied various secondary sources to ensure that the Debtors' Supplemental Notice Plan was appropriately targeted and optimized. These sources included the U.S. Census data and California Fire Commission data for population demographics and characteristics. According to these sources, the vast majority (73%) of California residents who own homes are over the age of 35. Implementing this information, we ensured that the plan broke up target populations by age (as discussed below) and used appropriate media to properly target this population.

51. Further, my team and I examined secondary sources about the residents of the locations of the fires at issue. All relevant fires were all within six (6) counties in northern California, all of which are all located within four California DMAs. As discussed in further detail below, my team used this publically available demographic information to determine the most effective way to reach potential Wildfire Claimants.

52. In analyzing media delivery against U.S. adults 18+, we have given specific consideration to media performance within certain age clusters[29]. The chart below demonstrates significant variations in media use across the age clusters. This is central to the effectiveness of media selection for notice.

---

[29] MRI's *Survey of the American Consumer*® (MRI Doublebase 2017) is the industry standard for magazine audience ratings in the U.S. and is used in the majority of media and marketing agencies in the country. MRI provides comprehensive reports on demographics, lifestyle, product usages, and media exposure.

**Media Use by Age Group**

| Medium | Age 18 – 24 | Age 25 - 44 | Age 45+ |
|---|---|---|---|
| Watch Broadcast/Cable TV | | | √√ |
| Watch Online/Steaming Video | √√√ | √√√ | |
| Use OTT Devices | √√ | √√√ | |
| Read Magazines | | | √√ |
| Read Newspapers | | | √√√ |
| Listen to Terrestrial Radio | √ | √√ | |
| Use Streaming Radio | √√√ | √√√ | |
| Use the Internet | √√√ | √√ | |
| Use a Mobile Device/App | √√√ | √√√ | |
| Social Networking | √√√ | √√√ | |

*Index[30]* √ *100-105* √ √ *Index 105-115* √ √ √ *Index 115+*

53.   Based on media use data above, it is clear that the Debtors are appropriately employing a mix of traditional, online, social and mobile media channels, influencer outreach combined with earned media outreach to effectively reach Claimants of all age demographics using their preferred media channels.

54.   Here, we have conducted extensive research on the Wildfire Claimant population, its location and its temporal characteristics over the claim period, *i.e.*, from 2015 to 2019. This information also identifies demographic characteristics, including age, gender, income – and other relevant information such as geographic distribution. This research provides the foundation for the program scope and media selection.

## C.  TARGET AUDIENCE AND TARGETED REGIONS

55.   **Geography**: As stated, a majority of Wildfire Claimants are located in six counties in four DMAs [31] in Northern California.  Due to the impact of those fires, it can be expected that a

---

[30] Index is a media metric that describes a target audience's inclination to use a given outlet. An index over 100 suggests a target population's inclination to use a medium to a greater degree than the rest of the population. For example, an index of 157 would mean that the target is 57 percent more likely than the rest of the population to use a medium.

[31] DMA is a geographic area in the United States in which local television viewing is measured by Nielsen Co. The DMA data are essential for any marketer, researcher, or organization seeking to utilize standardized geographic areas within their business.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

percentage may have relocated to locations throughout California and even the United States. To account for that, the Debtors' Supplemental Notice Plan has three tiers. The first focuses on media in the four DMAs. The second casts a wider net to include all of California, as this is the most likely area for relocation. Finally, the third tier casts a nationwide net to the rest of the 49 states to ensure that people that have moved outside the state have an opportunity to be reached and file a claim. Thus, this geographical division not only efficiently reaches the DMAs and the broader State of California, it also appropriately reaches the entire nation.

56. **Targeted populations**: The Debtors are casting a wide net locally, reaching all adults who are 18 years of age and older and we are making thoughtful considerations in our media selection based on three demographic clusters: 18-24, 25-44, and 45+. The purpose of this is to recognize that media use changes with age, income and education levels. This allows the media program to be highly focused by effectively reaching the right populations and reducing waste. Therefore, for the purpose of selecting and calculating media, the following audiences are used:

1) Adults 18+ in the four DMAs

2) Adults 18+ and reside in California

3) Adults 18+ who live outside of California and moved within the last 4 years.

### D. TARGET AUDIENCE REACH AND FREQUENCY ESTIMATES

57. In stark contrast to the TCC Notice Plan, the reach and frequency contemplated by the Debtors' Supplemental Notice Plan are optimal to appropriately reach the affected target audience with an appropriate level of frequency of message delivery to generate awareness and action. As more fully detailed and explained in this Declaration, the Debtors' Supplemental Notice Plan is reasonably calculated to reach:

| Target | Reach | Frequency |
|---|---|---|
| Adults 18+ in the 4 DMAs | 95% | 8x |
| Adults 18+ in CA | 81% | 5x |
| Adults 18+ outside of CA and moved in the last 4 years | 78% | 2.3x |

58. The Debtors' Supplemental Notice Plan far exceeds efforts to provide notice in a typical bankruptcy proceeding where publication notice is viewed as sufficient and generally consists of one or

two generally circulated newspapers. Importantly, we have employed the best-in-class advertising industry tools and technology to ensure that the Debtors provide due process to all constituents including the Wildfire Claimants and comply with Bankruptcy Rule 2002.

59. It is worth noting that, in addition to being a gold standard plan in the bankruptcy context, the Debtors' Supplemental Notice Plan exceeds best practices in the class action context, where reach range is typically between 70% to 80% with frequency levels commonly ranging between 2 to 3 times as noted above.

## VIII. THE DEBTORS' SUPPLEMENTAL NOTICE PLAN IS THOROUGH, INNOVATIVE, AND EFFECTIVE

60. As discussed above, the Debtors' Supplemental Notice Plan was designed utilizing industry accepted and court approved methodologies and principles for legal noticing. As noted, while largely duplicative and not necessary, the Debtors' direction the Supplemental Notice Plan now includes OTT, streaming radio, and Out-of-Home advertising.

### A. PAID MEDIA OUTLETS

61. As discussed more fully below and summarized in the below chart, the Supplemental Notice Plan contemplates the use of five categories of paid media outlets: (i) television, (ii) terrestrial streaming and radio, (iii) out of home, (iv) print, (v) social media, and (vi) online:



62.     As noted earlier, after reviewing the TCC Notice Plan, the Debtors asked me to consider whether any of the TCC Notice Plan should be adopted in the Debtors' Supplemental Notice Plan. While no specific recommendation of the TCC Notice Plan needs to be adopted since, as described above, the two plans were largely overlapping to begin with, the Supplemental Notice Plan has been revised to include some additional media to bolster the reach and further optimize the frequency.

63.     Specifically, the Supplemental Notice Plan now includes the following aspects that were not originally included:

- National cable
- National OTT
- Streaming radio
- Out of Home
- Social influencers

64.     In my opinion, the Debtors' Supplemental Notice Plan is state of the art and far surpasses the TCC Notice Plan in all respects.

## 1)  <u>TELEVISION</u>

65.     **Local Broadcast and Cable.** Television is a highly effective media channel. Here, we plan to air over 3,000, 30-second television commercials over a 60-day notice campaign, saturating the four DMAs, illustrated below: San Francisco-Oakland-San Jose, Sacramento-Stockton-Modesto, Chico-Reading and Eureka.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Source: Nielsen

66. Commercials will air across approximately 12 local broadcast television stations reaching Wildfire Claimants in Lake, Sonoma, Napa, Mendocino, Nevada, Butte, and Humboldt counties. The local broadcast Supplemental Notice campaign will include a total of 370 targeted rating points ("**TRPs**"). Additionally, another 150 TRPs will be generated on local cable with commercials in both English and Spanish. Attached as **Exhibit E** is a list of all stations covering each market.

67. **National Cable and OTT.** Further, to reach those Wildfire Claimants who have moved within the last four years, nationwide cable television commercials will air across multiple networks. *See* **Exhibit E** for a list of the proposed national cable channels. The Debtors' Supplemental Notice Plan will use digital OTT video ads to match known creditors living outside of the four DMAs and serve them video ads.

68. **Timing.** A variety of dayparts[32] will be used including morning, daytime, early news, and prime/syndicated prime to reach potential Wildfire Claimants with differing television viewing habits.

---

[32] A "daypart" is a term traditionally used when buying television but is also used for radio; it is a block of time that divides the day into segments for purchase, scheduling and delivery (*e.g.*, primetime, or for radio "drive time"). The dayparting method is often used to tailor content to specific audiences throughout the day.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Given that this is an upcoming election year, certain inventory may not be available. Therefore, final programming selections may change based on negotiations and availabilities.

### 2) **TERRESTRIAL AND STREAMING RADIO**

69. Radio is a highly effective medium to generate frequency. A combination of both terrestrial radio and streaming radio will be used in the 6 MSAs. 60-second ads will air on four English and two Spanish language terrestrial radio stations per market (there are no local Hispanic stations in Redding). A total of 24 local English radio stations and 10 Hispanic stations were chosen to air approximately 540 terrestrial radio ads. Attached as **Exhibit E** is a complete list of stations, their formats, broadcast language and markets. Streaming audio ads (digital radio played via an internet connection) will run on Pandora with shorter, 15-or 30-second ads accompanied, in some cases, by a digital banner ad. The digital banner ads will appear while the audio spot is playing and allow a user to click on the banner and be taken to the dedicated case website. Approximately 1 million streaming audio impressions are planned.

### 3) **OUT OF HOME**

70. Out of home advertising (*i.e.*, billboards and transit shelters) are a hyper-localized form of advertising. Only people within visual proximity, who are physically at those locations are able to see these ads. In an effort to further integrate media channels suggested by the TCC, billboards, transit shelters, and/or other available out-of-home media will be selected within the six affected counties to ensure increased local exposure to the Debtors' Supplemental Notice ads. Recognizing that many of these areas tend to be more rural, there are limited opportunities for transit, mall, mass transit or even billboards. To the extent possible, the Debtors will employ a mix of these assets that are available at the time of purchase.

### 4) **PRINT – MAGAZINE**

71. *People Magazine* is a general circulation magazine reporting on entertainment. A one-half page, black and white Publication Notice will be published once in the national edition of this magazine. People reports a circulation of 3,031,000.

72. *Sport's Illustrated* reports on the world of sports through in-depth articles, photography and stories. A one-half page, black and white Publication Notice will be published once in the national edition of this magazine. Sports Illustrated's circulation is 2,715,000.

73. *Sunset Magazine* is the highest indexing magazine in the State of California. A one-half page, black and white Publication Notice will be published once in the national edition of this magazine. Sunset's circulation is 934,000.

74. Ads will be written in plain language with a Spanish sub-headline to direct Spanish-speaking Claimants to the website for more information in Spanish.

### 5) **PRINT NEWSPAPER**

75. The Supplemental Notice Plan will include two (2) nationally circulated newspapers and twelve (12) local newspapers in California. Newspaper ads will also feature the Spanish sub-headline. The combined circulation of these papers is 4,773,000.

76. The information included in the Standard Bar Date Notice will be published three times in *USA Today, The Los Angeles Times, San Francisco Chronicle, The Bakersfield Californian, The Fresno Bee, The Modesto Bee, The Sacramento Bee, The Santa Rosa Press Democrat, The San Jose Mercury News, The East Bay Times, The Stockton Record, The Paradise Post*, and *The Chico Enterprise-Record* and one time in *The Wall Street Journal*. These are the same publications in which the Notice of Commencement was previously published.

### 6) **SOCIAL MEDIA**

77. Social media is particularly important here to reach younger audiences. According to MRI, 96% of Adults 18-24 and 92% of Adults 25-44 use social media. We will match individual records to target custom audiences of known impacted individuals via Facebook, Instagram and Twitter. This is accomplished as follows: The Debtors will provide the list of potential Wildfire Claimants to Prime Clerk for whom email addresses or phone numbers are available. The list is then uploaded into the social media platforms' custom audience tools. If an email or phone number from the list is linked to a social media profile, that is considered a "match." Ads will then be served to matched individuals as they use social media.

78. Facebook and Instagram Pages are public profiles created for businesses, brands, causes and other organizations. Facebook and Instagram Groups are for people who share common interests. On Facebook and Instagram, we will serve ads to people who follow Northern California Fire Pages such as *Camp Fire Survivors* and *Northern California Fires*, as well as members of groups such as *California Fires Support Group* and *Northern California Fire Help*. We will also target people who have engaged with content about the fires and people who have recently changed their location information from California to another state, indicating a recent move.

79. On Twitter, we will also target people who have "tweeted", or posted, about the fires or have used hashtags such as #ParadiseStrong and #CampFire. Twitter users put hashtags in their tweets to categorize them in a way that makes it easy for other users to find and follow tweets about a specific topic.

80. Finally, on YouTube, the Debtors' Supplemental Notice Plan will target people outside of California who have recently moved, as well as keywords such as Camp Fire, North Bay Fire, and Butte Fire, among others.

### 7) **SOCIAL INFLUENCERS**

81. In effort to leverage the highest indexing media to the youngest creditors, we will engage the help of social media influencers to post and share information about the Wildfire Claim Bar Date on platforms such as Snapchat, Instagram and Facebook. We will identify key influencers who have significant following within the 18-24 age demographic who also have an affinity[33] to the topic and partner with them to post appropriate content related the matter. We will also identify a larger list of social media influencers and serve them customized ads on Facebook and Instagram to make them aware that they may virally share the information with their followers.

### 8) **ONLINE NOTICE**

82. The online component of the Debtors' Supplemental Notice Plan is designed to reach Wildfire Claimants in two ways. First, we are employing cutting-edge technology and data to

---

[33] Influencer Affinity – someone who was personally affected by the fires, lives in California, has significant followings within the affected area or has previously posted about the fires.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

specifically match potential Wildfire Claimants addresses/emails online using WIFI/IP addresses and custom audience matches. Second, we intend to provide online notice to potential Wildfire Claimants based on the target audiences' characteristics, such as having recently moved or previously lived in California. To this end, the Supplemental Notice Plan's online noticing will feature banner ads in English and Spanish across a whitelist[34] of websites, including top-tier news websites, local news websites, and Spanish language websites, among numerous others.

83. **Wildfire Claimant Matching.** In order to serve ads to these potential Wildfire Claimants, the list of WIFI/IP addresses that are successfully "matched" will be loaded into a Demand Side Platform ("**DSP**"). The DSP will allow us to bid on online advertising inventory when one of the target addresses visits a website through a process of Real Time Bidding ("**RTB**").[35] Every time a user sees an ad, that instance is considered one impression.[36]

84. **Serving Ads Online to Potential Wildfire Claimants.** The Debtors' Supplemental Notice Plan will also provide online notice to potential Wildfire Claimants through advanced digital tactics such as keyword/term, contextual, audience data from national change of address registries, and geography to residents in Lake, Sonoma, Napa, Mendocino, Nevada, Butte, and Humboldt counties.

85. The Supplemental Notice Plan will feature banner ads across a whitelist of approximately 4,000 websites. Moreover, online display ads will be served across multiple devices including desktop,

---

[34] A whitelist is a custom list of acceptable websites where ad content may be served. This way we can control the quality of advertising inventory that is served on the creditors. The creation of a whitelist helps to ensure that our ads are targeted to real websites where actual (human) creditors are likely to visit, rather than serving ads to websites and fraudsters who are attempting to fraudulently earn advertising revenue from the campaign, and thereby depriving actual creditors of their due process rights to see the Notice. Further, the Whitelist and helps to ensure that ads will not appear next to offensive or objectionable content. Our whitelist is actively maintained over the campaign with site-level reporting of brand safety during campaign, culling of improper or suspicious activity on websites. Further, as a measure of privacy, all ads feature AdChoices Icons whenever available.

[35] RTB is a method which allows advertising inventory to actually be sold and bought on an effective per-impression basis, through programmatic auctions.

[36] In the time it takes a user to load a web-page, a "bid call" goes out to a large number of DSPs asking: 1) Who would like to bid on this user, 2) How much is the bid, and 3) Is this user employing one of the identified target IPs? If so, the bid is accepted, and the ad of our choosing is delivered to that user on that page by the time the page fully loads.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

tablet and mobile devices. Whitelisting, along with multiple layers of ad fraud detection, reduces the risk of appearing on spoofed, fake, or offensive websites with counterfeit ad fraud inventory and fake audience profiles[37].

86. The online ads will provide information for visitors to self-identify as potential Wildfire Claimants, where they may "click" on the banner and then link directly to a website containing information regarding the Bar Date and Claims with a further link to the chapter 11 case website for more information regarding the important deadlines and documents, including downloadable copies of the Wildfire Proof of Claim Form, and where they may submit a Claim Form. We also will retarget users who visit the website with additional notice reminders to take action.

### 9) **SEARCH TERMS**

87. The Supplemental Notice Plan will employ Google AdWords and keyword search terms. When users search for target phrases and keywords identified for this Supplemental Notice Plan on Google's search engine, links will appear on the search result pages. Representative key terms will include but are not limited to topics including Pacific Gas bankruptcy, Pacific Gas & Electric, Camp Fire, Northern California Wildfires, Atlas fire, Butte wildfire, Lobo fire, Oakmont wildfire, Redwood fire, Fire relief, Wildfire Claims, among others.

### 10) ONLINE QUALITY CONTROL - AD FRAUD IDENTIFICATION, MITIGATION AND REPORTING

88. As set forth above, digital ad fraud, counterfeit impressions and bots are an ever-present reality in the digital environment, silently stealing impressions from advertising budgets. Most importantly, bots may deprive Wildfire Claimants of an opportunity to see a notice, which can have an impact on response rates and claims filed. Contrary to Weisbrot's notion at ¶ 119, ad fraud is not easily "*foiled*." The Association of National Advertisers reports that up to 33% of advertising inventory can be lost to bots or non-human traffic. And buying premium inventory is no guarantee. Multiple layers

---

[37] This is in contrast to a tactic *described in paragraph 105 of the Weisbrot Declaration - recommending running digital ads anywhere, anytime simply to pursue an impression.*

Case: 19-30088    Doc# 2642    Filed: 06/19/19    Entered: 06/19/19 14:39:00    Page 33 of 38

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of ad fraud detection technology as well as human eyes reviewing the logs are required to effectively mitigate ad fraud.

89.     I am the first court-approved legal notice expert to actively monitor, mitigate and cull non-human (ad fraud bot traffic) from digital notice programs[38].  In my opinion, the Supplemental Notice Plan incorporates state of the art quality control mechanisms to ensure that the Debtors' online ads will be properly targeted to real websites where actual humans are likely to visit, rather than serving ads to websites and fraudsters that attempt to fraudulently earn advertising revenue from the campaign (thereby depriving actual Wildfire Claimants of their due process rights to see the Notice).

90.     The Supplemental Notice Plan includes in-ad, log, and site level monitoring and management, utilizing one of the leading cyber security ad fraud expert service providers in the country. Ad logs are examined daily for fraudulent anomalies such as ads being called to data centers, uncommon browser sizes, outdated browser versions and other parameters that indicate non-human traffic. Importantly, this helps us identify websites generating validated human click-throughs to the settlement website and redirect traffic to those sites.

## B.  ADDITIONAL METHODS OF OUTREACH

91.     In addition to paid media outlets, the Supplemental Notice Plan employs public relations, claims service centers, dedicated websites and toll-free numbers, each of which are thoughtfully designed to achieve the greatest reach.

### 1)  PUBLIC RELATIONS

92.     **Earned Media.**  The Supplemental Notice Plan intends to leverage the substantial in-house Public Relations team of PG&E.  These outreach methodologies will be deployed in partnership with PG&E's PR team, who will conuct press conferences and issue multiple press releases that will serve as reminders and updates for creditors.

_____

[38] Finegan, "Creating a Class Notice Program that Satisfies Due Process" Law360, New York, (February 13, 2018 12:58 PM ET). Also see: CLE Webinar: "Rule 23 Changes, Are you Ready for the Digital Wild, Wild West?" https://bit.ly/2PfuGvJ

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

93.     **Community Outreach.** Importantly, the Supplemental Notice Plan will include outreach to interested third-parties who may help expand awareness of the Bar Date and claims process. Outreach will include organizations and recovery centers who have and continue to help victims of the wildfires. Here, we will send an informational letter to appropriate contacts requesting that they distribute information including social media posts and letters and informational packets to their members.

94.     A sample of the organizations include, among numerous others:

- Fire Disaster Centers/Organizations
- Butte County Recovers
- California Community Foundation- Wildfire Relief Fund
- FEMA/ American Red Cross
- California Fire Foundation
- Caring Choices
- North Valley Community Foundation
- United Way of Northern California
- Los Angeles Fire Department Foundation
- Northern California Fire Relief Fund
- California Wildfire Relief Fund
- California Governor's Office of Emergency Services
- United Way of Northern California
- Houses of Worship
- Community leaders

## 2)  CLAIM SERVICE CENTERS

95.     The Debtors intend to utilize certain of their existing customer billing service centers as claims service centers ("**Claim Service Centers**"). Prime Clerk staff will supplement existing staff at the Debtors' Chico, Marysville, Oroville, Redding, Santa Rosa, and Napa billing center locations where members of the affected communities may go to ask general questions about the claims process. Additionally, Customers will be able to hand deliver Proofs of Claim to the Claim Service Centers during normal business hours and receive a date-stamped receipt. The individuals staffing the Claim Service Centers will make clear that that no legal advice would be provided.  In addition, the Bar Date Notices will be posted in each of the Debtors' approximately seventy-five (75) billing service center locations.

## 3)  DEDICATED WEBSITE(S) AND TOLL-FREE NUMBERS.

96.     The Debtors, through Prime Clerk, have established a dedicated Case Website and toll-free numbers in connection with these Chapter 11 Cases.  The Case Website and toll-free numbers will

be prominently displayed in all printed notice documents and other paid advertising and will provide notice of the Bar Date and all requirements to comply therewith, and other relevant information relating to the Chapter 11 Cases. Included within the Case Website will be a page specifically tailored to, and designed for, the holders of Wildfire Claims, which will, among other things, inform them of certain key dates and deadlines, allow them to view certain key documents in the Chapter 11 Cases free of charge, and allow holders of Wildfire Claims and other creditors to register their email addresses and consent to e-mail service of certain notices required to be sent during the Chapter 11 Cases. In addition, Spanish, Mandarin, Tagalog, Vietnamese, and Korean language translations of the Customer Bar Date Notice will be available for download on the Case Website.

## IX.  CONCLUSION

97.  In my opinion, the robust and comprehensive outreach efforts employed for the Debtors' Notice Procedures, including the Supplemental Notice Plan, reflect a particularly appropriate, highly targeted, efficient and modern way to provide notice to Known and Unknown Wildfire Claimants. The Debtors' Notice Procedures are broad, and multi-faceted, and are designed to reach the target audiences and those who have may have relocated nationwide in a variety of different ways, including: (i) direct mail (and email) to the Debtors' 16 million Customers, (ii) direct mail to approximately 38,000 Known Wildfire Claimants, (iii) multiple newspaper publication notices, (iv) dedicated website and toll-free phone numbers, (v) digital advertising, including social media, social influencers and other paid internet search listings, (vi) television and radio advertising (vi) press releases leveraging PG&E's internal media relations team, and (vii) community outreach and dedicated claim service centers.

98.  Building on the original Supplemental Notice Plan, the revised Supplemental Notice Plan now incorporates additional layers of notice through: (i) additional magazine coverage nationwide; (ii) an increase in the number of television commercials locally on broadcast, cable and nationwide through cable television and OTT; (iii) more robust local radio coverage and streaming radio; (iv) increased impressions online; (v) online video across platforms such as YouTube; (vi) and, importantly, unlike Angeion's proposed plan, the Debtors are leveraging social influencers who have enormous followings and have had their lives affected by the fires.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

99. The reach and frequency of the Debtors' Supplemental Notice Plan is estimated as follows:

- 95% of adults 18 years and older with an average frequency of 8 times in the target 4 DMAs
- Over 81% of California residents 18 years and older with an average frequency of 5 times
- 78% of adults over the age of 18 nationwide who live outside California and moved within the last 4 years with an average frequency of 2.3 times.

100. Ultimately, when combined with the other methods of notice (not measured such as community outreach), the overall effort no doubt will achieve even greater results.

101. For all of the reasons discussed in this Declaration, it is my opinion that the Debtors' Supplemental Notice Plan as originally drafted, and certainly now with the additional refinements described above, will effectively and efficiently reach the targeted population, without the enormous waste and resulting excessive cost found in the TCC Notice Plan.

I declare under the penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed on June 19, 2019, in Tigard, Oregon.

_____
Jeanne C. Finegan