WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>               **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' CORRECTED OMNIBUS (I) REPLY IN SUPPORT OF THE DEBTORS' BAR DATE MOTION, AND (II) OBJECTION TO THE TCC'S BAR DATE MOTION**<br><br>Re: Docket Nos. 1784 and 2297<br><br>Date: June 26, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102<br>Judge: Hon. Dennis Montali |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Omnibus Reply (the "**Reply**"):

    A.   in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 for Order (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing the Form and Manner of Notice Thereof, and (iii) Approving Procedures for Providing Notice of Bar Date and Other Information to all Creditors and Potential Creditors* [Dkt. No. 1784] (the "**Bar Date Motion**[1]") and in response to the various objections filed with respect thereto (collectively, the "**Objections**" filed by the "**Objecting Parties**[2]"); and

    B.   in opposition to the *Motion of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 105(a), 501 and Fed. R. Bankr. P. 3001(a), 3003(c), 5005 and 9007 for Entry of an Order (i) Establishing a Bar Date for Filing Fire Claims, (ii) Approving the Form and Procedures for Notice of the Bar Date for Fire Claims, and (iii) Approving Supplemental Procedure for Notice of the Bar Date to Fire Claimants* [Dkt. No. 2297] (together with the supporting memorandum of law and declarations, the "**TCC Bar Date Motion**").

In further support of the Bar Date Motion and this Reply, the Debtors submit the Supplemental Declaration of Shai Y. Waisman (the "**Supplemental Waisman Declaration**") and the Declaration of Jeanne C. Finegan (the "**Finegan Declaration**" and, together with the Supplemental Waisman Declaration, the "**Supplemental Declarations**"), filed contemporaneously herewith.

---

[1] Capitalized terms used not otherwise defined herein have the meanings assigned to them in the Bar Date Motion.

[2] The Objections include, without limitation, the objections, limited objections, joinders, and other pleadings found at Dkt. Nos. 2043, 2238, 2239, 2240, 2242, 2248, 2256, 2306, 2307, 2308, 2316, 2321, 2324, 2326, 2346, and 2453.

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ...................................................................................6

II.  THE REMAINING OBJECTIONS TO THE DEBTORS'
     BAR DATE MOTION SHOULD BE OVERRULED ..................................................9

     a.   The Debtors' Proposed Bar Date is Reasonable, Appropriate, and
          Provides Claimants with More Than Adequate Time to File Claims in
          these Chapter 11 Cases ..................................................................................9

     b.   The Debtors' Proposed Confidential Treatment of Wildfire Claims is
          Reasonable and Warranted Under the Circumstances .......................................11

     c.   The Debtors' Procedures to Provide Direct Notice to Known Wildfire
          Claimants Go Above and Beyond the Requirements of Due Process
          and More than Satisfy the Requirements under the Bankruptcy Code
          and Applicable Law ......................................................................................12

     d.   The Debtors' Supplemental Notice Plan to Reach "Unknown
          Claimants" has been Meticulously Crafted by Industry Experts Using
          Preeminent Noticing Standards, is Far-Reaching, Multi-Faceted, and
          Vastly Superior to that Proposed by the TCC and Angeion ............................15

III. THE TCC'S BAR DATE MOTION SHOULD BE DENIED .......................................21

     a.   The TCC's Proposed Bar Date and Claims Submission Process are
          Inefficient and Will Unduly Delay these Chapter 11 Cases .............................21

     b.   The TCC's Direct Notice Plan Fails to Comply with Applicable Law .............22

     c.   The TCC's Supplemental Notice Plan is Critically Flawed and
          Misstates Key Aspects of their Proposal .......................................................22

     d.   The TCC Notice Plan is Excessive and Will Result in Diminishing
          Returns ......................................................................................................24

IV.  THE TCC'S EXPERTS' DECLARATIONS MUST BE STRICKEN .........................25

V.   CONCLUSION.................................................................................................26

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Cases** Page(s)

*In re Archdiocese of Milwaukee*,
Case No. 11-20059-svk (Bankr. E.D. Wisc. July 14, 2011) .................... 12

*Barber v. City of Santa Rosa*,
2010 WL 5069868 (N.D. Cal. 2010) ............................................ 11

*In re Blitz U.S.S., Inc.*,
Case No. 11-13603 (PJW) (Bankr. D. Del. 2011) ............................... 9

*In re Circuit City Stores, Inc.*,
No. 08-35653, 2010 WL 2208014 (Bankr. E.D. Va. May 28, 2010) ............. 22

*In re Commonwealth of Puerto Rico*,
No. 17-03283 (LTS) (Bankr. P.R.) ......................................... 15, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...................................................... 11

*In re Exide Techs.*,
Case No. 02-11125 (KJC) (Bankr. D. Del. 2002) [Dkt. No. 1989] .............. 9

*Feduniak v. Old Republic Nat'l Title Co.*,
2015 WL 1969369 (N.D. Cal.) ............................................. 11

*In re Freedom Commc'ns Holdings, Inc.*,
472 B.R. 257 (Bankr. D. Del. 2012) ...................................... 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...................................................... 11

*In re Roman Catholic Bishop of Great Falls Montana*,
Case No. 17-60271 (Bankr. D. MT June 6, 2016) ........................... 12

*In re Suntech Am., Inc.*,
Case No. 15-10054 (CSS) (Bankr. D. Del. 2009) ............................ 9

*In re TK Holdings Inc.*,
Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017) ............ 9, 15, 16

**Statutes**

*11 U.S.C. § 105(a)* ...................................................... 2

*11 U.S.C. § 502(b)(9)* ................................................... 2

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Other Authorities**

*Fed. R. Bankr. P. 2002* .................................................................................................................. 18, 22

*Fed. R. Bankr. P. 2002(a)(7)* ............................................................................................................... 22

*Fed. R. Bankr. P. 3003(c)* ................................................................................................................... 21

*Fed. R. Bankr. P. 3003(c)(3)* ................................................................................................................. 2

*Fed. R. Bankr. P. 5005* ......................................................................................................................... 2

*Fed. R. Bankr. P. 9007* ......................................................................................................................... 2

*Fed. R. Civ. P. 26(a)(2)(B)* ................................................................................................................. 11

*Fed. R. Civ. P. 26(b)(4)(A)* ................................................................................................................. 26

*Fed. R. Evid. 702* ................................................................................................................................ 11

GfK MRI's *Survey of the American Consumer®* ................................................................................. 17

www.comscore.com ................................................................................................................................ 17

www.deb.uscourts.gov//claims-agency-list .......................................................................................... 21

www.mr.gfk.com/ ................................................................................................................................... 17

www.nielsen.com/ .................................................................................................................................. 17

www.nysb.uscourts.gov/claims-agents .................................................................................................. 21

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# I. **PRELIMINARY STATEMENT**

In an effort to move these cases forward in an efficient and expeditious manner, the Debtors filed the Bar Date Motion on May 1, 2019, and proposed an approach, including customized Wildfire Claimant and Wildfire Subrogation Claimant Proof of Claims Forms, that allows for a single-step process to both identify the number of Wildfire Claims that exist and obtain basic documentation designed to enable all parties to assess those claims.

Since filing their Bar Date Motion, the Debtors have been working closely with the Objecting Parties and other constituencies to address their concerns. As discussed below, the Debtors believe that the overwhelming majority of the Objections have been resolved as a result of amendments to the proposed Wildfire Proof of Claim Forms and the Bar Date Order. Notably, the Debtors have resolved all issues with the Ad Hoc Subrogation Group on the proposed Wildfire Subrogation Claimant Proof of Claim Form and related issues.

Unfortunately, due in large part to the actions of the TCC, the Debtors' efforts to establish a Bar Date and otherwise move these cases forward in a timely and efficient manner have been delayed now for over a month. Rather than working constructively with the Debtors, on May 31, 2019, some thirty (30) days after the Debtors' Bar Date Motion was filed, the TCC filed their own Bar Date Motion with its own proposed noticing program (the "**TCC Notice Program**") in which the TCC seeks, in essence, to (a) delay the Bar Date to January 31, 2020; (b) usurp from the Debtors and their Court-appointed noticing agent the claims noticing and proof of claim process; and (c) install a different noticing agent with no chapter 11 experience of any kind and questionable credentials.

While the Debtors believed then—and continue to believe now—that their approach set forth in the Bar Date Motion provides the most fair and efficient mechanism to resolve the core issues of the extent and validity of all Wildfire Claims, the Debtors determined that decisive action must be taken to avoid further unnecessary delays in the administration of these Chapter 11 Cases. To that end, as the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Court is aware, the Debtors have agreed to adopt the TCC's summary Wildfire Proof of Claim Form[3] — thus rendering moot nearly all pending objections to the Debtors' Bar Date Motion and eliminating any reasonable argument that the Bar Date should be delayed until January 31, 2020.[4]

Furthermore, although the Debtors are confident that their Noticing Procedures, including the unprecedented, multi-faceted aspects of their Supplemental Notice Plan, which were developed and reviewed by industry leaders and experts in both bankruptcy and class action noticing, are reasonably calculated to provide more than adequate notice of the Bar Date to known and unknown claimants and satisfy the requirements of due process of law, the Debtors, nevertheless incorporated certain additional measures in their proposed Supplemental Notice Plan, including, as discussed in further detail below, Over the Top TV, streaming radio, and Out-of-Home advertising. The Debtors believe that the Notice Procedures (including, the Supplemental Notice Plan), as originally proposed, are reasonable, effective, and go well-beyond the requirements of applicable law. These further refinements and adjustments only add to what is already an exceptional noticing plan.

In contrast, as set forth below and in the Supplemental Declarations, the TCC Notice Plan is excessive and wasteful, due, in part, to its unnecessary frequency levels, and is critically flawed in several respects. This is not surprising since the TCC Notice Plan was developed by a firm with no prior experience serving as a noticing agent or in any other capacity in *any* chapter 11 case, much less one of

---

[3] The Debtors' willingness to adopt the TCC's Proof of Claim Form is by no means an admission or acknowledgment that the information requested in the TCC Proof of Claim Form is sufficient. Accordingly, the Debtors reserve all rights to take discovery with respect to, among other things, all Wildfire Claims that are filed. Such processes may be critical to addressing what should be a shared concern of all parties: the possibility of invalid or overstated claims, which undermines the fairness of the entire process.

[4] Due to the TCC's failure to engage in good faith discussions on the sharing of information, the Debtors understand that the UCC recently served formal discovery requests for the information set forth in the so-called BrownGreer database – which the TCC has repeatedly insisted contains or will contain all of the information parties could need to assess the Wildfire Claims, but which the TCC (and the various plaintiffs' groups it represents) has refused to share with the Debtors or the UCC to date. The Debtors support the UCC's efforts and believe the database should be made available to the Debtors and the UCC promptly.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the size and complexity of these cases.[5]

A revised form of Bar Date Order (the "**Revised Bar Date Order**"), together with corresponding notices and exhibits, is attached as __Exhibit A__ hereto. In addition, a chart summarizing the Objections, the Debtors' responses and proposed modifications for resolving the Objections, and the Debtors' position with respect to the remaining Objections is attached hereto as __Exhibit B__ (the "**Summary Chart**"). In addition to the amendments discussed above, as set forth in the Summary Chart, the Debtors have, among other things, agreed to:

(i) add language to the Revised Bar Date Order making clear that any claimant that makes a good faith effort to timely file a Proof of Claim Form in accordance with the Revised Bar Date Order will be permitted to revise, amend, and/or supplement their claim until such time as it is allowed or disallowed by the Court (*see* Rev. Bar Date Order, at ¶ 4);

(ii) remove language to the effect that any claimant that fails to timely file a Proof of Claim Form in accordance with the Bar Date Order will be forever barred, estopped, and enjoined from asserting a claim against the Debtors (*see* Rev. Bar Date Order, ¶ 7); and

(iii) eliminate the requirement that Wildfire Claimants re-file their claims using the applicable Wildfire Proof of Claim Form to the extent they have already filed claims using the Standard Form 410 (*see* Rev. Bar Date Order, at ¶¶ 3(e), (o)(6)).

The Debtors have addressed any remaining, outstanding Objections below. In addition, as set forth in the Revised Bar Date Order, the Debtors are now requesting the Court set **October 21, 2019** as the Bar Date, which, consistent with the procedures originally set forth in the Bar Date Motion, will allow Claimants at least ninety-five (95) days to file Proofs of Claim.

As is made clear in the attached Summary Chart, as well as the Debtors' adoption of the TCC Wildfire Proof of Claim Form and other efforts to resolve concerns raised by the Objecting Parties, the Debtors have made good faith efforts to move these cases forward and establish a reasonable Bar Date,

---

[5] Contemporaneously hereto, the Debtors have filed an objection to the TCC's application to retain Angeion Group, LLC ("**Angeion**"), as fire claim bar date noticing agent on the grounds that, among other things, (i) Angeion has no prior experience serving as a noticing agent or in any other capacity in *any* chapter 11 case, (ii) Angeion's notice experience in the class action arena (which, in any event, is not relevant to these Chapter 11 Cases) is overstated, (iii) Angeion is not authorized to act as a noticing agent for the Court, and (iv) Angeion's appointment in these Chapter 11 Cases would only result in duplication of efforts, unnecessary costs, further delay, and confusion.

which is fundamental to the filing of any chapter 11 plan and voting process. The Revised Bar Date Order, Notice Procedures (including, the Supplemental Notice Plan), Bar Date Notices, and Proof of Claim Forms are reasonable, narrowly tailored, comply with applicable law, and go above and beyond the legal requirement of due process. In contrast, the TCC's Bar Date Motion, its attempts to needlessly delay the Bar Date, retain its own unqualified claims agent, and its failure to engage in good-faith discussions with the Debtors and UCC to resolve any and all substantive concerns, will serve only to delay distributions to creditors, including holders of Wildfire Claims.

Accordingly, the Court should approve the Debtors' Bar Date Motion, as amended in accordance with this Reply and the Revised Bar Date Order, and should deny approval of the TCC Bar Date Motion.

## II.   THE REMAINING OBJECTIONS TO THE DEBTORS' BAR DATE MOTION SHOULD BE OVERRULED

### a.   The Debtors' Proposed Bar Date is Reasonable, Appropriate, and Provides Claimants with More Than Adequate Time to File Claims in these Chapter 11 Cases

As set forth above and in the Revised Bar Date Order, the Debtors are now seeking to establish October 21, 2019 as the Bar Date. Consistent with the procedures proposed in the Bar Date Motion, this deadline will allow claimants at least 95 days to file Proofs of Claim (assuming entry of the Revised Bar Date Order on or about June 26). The Debtors believe this period of time is more than adequate to allow individuals, including known and unknown Wildfire Claimants, to file Proofs of Claim in these Chapter 11 Cases— especially in light of the Debtors' agreement to adopt the TCC's summary Wildfire Proof of Claim Form. Moreover, as set forth in the Bar Date Motion, the Debtors' proposed notice period is actually longer than notice periods approved by Courts in other mass tort cases. *See In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017) (approving 54-day bar date notice period for personal injury and other claims); *In re Blitz U.S.S., Inc.*, Case No. 11-13603 (PJW) (Bankr. D. Del. 2011) [Dkt. No. 1619] (approving 61-day bar date notice period for personal injury claims that resulted from defective gasoline cans); *In re Exide Techs.*, Case No. 02-11125 (KJC) (Bankr. D. Del. 2002) [Dkt. No. 1989] (approving 52-day bar date for personal injury, property damage, and other claims relating to exposure to lead and other heavy metals); *In re Suntech Am., Inc.*, Case No. 15-10054 (CSS) (Bankr. D.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Del. 2009) [Dkt. No. 86] (establishing 35-day bar date notice period for creditors, including products liability, antitrust, breach of contract, and other commercial litigation claimants).

The TCC, however, argues in its Objection and in its own motion that the Bar Date should be set no earlier than January 31, 2020. *See* Memorandum of Points and Authorities in Support of TCC Bar Date Motion [Dkt. No. 2298] at 8:28; Dion Decl. [Dkt. No. 2300] at 4:18. The TCC's proposed Bar Date runs counter to the stated intentions of nearly every major constituency in these cases—namely, moving these cases forward in an expeditious manner. Indeed, at the "first day" hearing, many of the plaintiffs' attorneys that represent significant numbers of Wildfire Claimants expressed the need to resolve these Chapter 11 Cases quickly. *See* Hr'g Tr. (Jan. 31, 2019) at 79:25; 80:1-4 (Mr. Esserman: "The public entities are very interested in getting a prompt resolution of this case which would be to everyone's benefit."); 83:2-7 (Mr. Baghdadi: "Expeditious and fair orderly resolution of this process is what [the fire victims] want to be a part of."); and 84:4-11 (Mr. Pitre: "I ask that that exceptional talent, together with your stewardship, Your Honor, insure that this process moves with a sense of urgency"). Counsel for the TCC has made similar comments stating, "[w]e hear every week on our weekly [Tort Committee] telephone calls about how this case must move expeditiously and be resolved within six months." Hr'g Tr. (May 8, 2019) at 53:11-13.

Furthermore, there is no practical reason to extend the Bar Date months past what has been approved in other mass tort chapter 11 cases. The Court also should give no weight or regard to the declaration of Jeffrey Dion submitted by the TCC in support for its proposed longer Bar Date. As is plainly gleaned from his declaration, Mr. Dion has no knowledge or experience of any kind that is relevant to these proceedings or the subject of the Bar Date Motion. The entirety of his declaration is conjecture and speculation as he, admittedly, has had no contact or dealings with the victims of the Northern California Wildfires and has no knowledge, basis, or experience relevant to any of his assertions as to the proposed Bar Date. *See* Dion Decl. [Dkt. No. 2300] at 2:25-3:13.[6] Moreover, it is

---

[6] In order to further explore the experience of the individuals the TCC submitted as declarants in support of the TCC Bar Date Motion, the Debtors sought depositions of Mr. Dion and Mr. Weisbrot to take place before the June 26, 2019 hearing date. Counsel to the TCC stated that the declarants were not available prior to the hearing. As set forth below, the declarations of Mr. Dion and Mr. Weisbrot should be stricken based on their failure to provide depositions prior to the hearing upon timely notice by the Debtors.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

clear from the face of the declaration that Mr. Dion is not being proposed as a fact witness, but instead as an expert to provide his unsupported opinion that the Bar Date should not be set until January. Yet, Mr. Dion provides none of the information required by the Federal Rules of Civil Procedure for an expert. *See* Fed. R. Civ. P. 26(a)(2)(B). More critically, Mr. Dion's opinion is not supported by any study or methodology and there is no peer review of any methodology. Thus, the opinion fails the most basic requirements of reliability required under *Daubert* and should be stricken on that basis alone. *See Daubert v. Merrell Dow Pharms.*, *Inc.*, 509 U.S. 579, 590 (1993); Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 140 (1999) (holding that the *Daubert* requirements of reliability apply to all expert testimony, not just scientific testimony); *Barber v. City of Santa Rosa*, 2010 WL 5069868, 21 (N.D. Cal. 2010) (applying *Daubert* reliability standards to expert testimony by a veteran police officer regarding the effects of a taser on the human body); *Feduniak v. Old Republic Nat'l Title Co*., 2015 WL 1969369, 6-14 (N.D. Cal.) (excluding expert testimony as to diminution in property value due to lack of reliability based on inability to independently verify the methodology, the fact that the methodology was not peer reviewed, lack of evidence of error rate, lack of general acceptance of the methodology, and the fact that the methodology was developed for the purpose of litigation). Indeed, even members of the constituency the TCC represents support an earlier Bar Date. *See, e.g.,* Interested Paradise Parties Objection [Dkt. No. 2240] at 5:27-28 (The Interested Paradise Parties "do not object to the setting of a bar date in the timeframe proposed by the Debtors.").

Establishing a Bar Date as requested by the TCC will only further delay recoveries to Wildfire Claimants and other creditors in these Chapter 11 Cases. The Debtors' proposed Bar Date is reasonable, allows more than adequate time for claimants to file proofs of claims, is consistent with deadlines set by Courts in similar chapter 11 contexts, and should be approved.

### b. The Debtors' Proposed Confidential Treatment of Wildfire Claims is Reasonable and Warranted Under the Circumstances

Due to the sensitive nature of the claims to be submitted by Wildfire Claimants, the Debtors have proposed that Wildfire Claim information remain confidential and be shared only with the U.S. Trustee

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and Committees on a professionals' eyes only basis.[7] The U.S. Trustee, however, has objected to the proposed confidential treatment of Wildfire Claims arguing instead that the Debtors should eliminate personally identifiable information, which it asserts would obviate the need for any sealing or confidentiality provisions in the Bar Date Order. *See* U.S. Trustee Objection [Dkt. No. 2316] at 6:25-7:3. As stated above, the Debtors have agreed to adopt the TCC's Wildfire Proof of Claim Form, thus mooting the objection with respect to personally identifiably information. Nevertheless, the Debtors believe confidential treatment of claim information is appropriate given the sensitive nature of the claims and the damages asserted. Moreover, the Debtors believe that if such information were to be made public, it may discourage Wildfire Claimants from submitting claims or otherwise providing the Debtors with additional information or supporting documentation at a later date. Additionally, absent the confidential treatment requested by the Debtors, information on individual losses, which the Ad Hoc Subrogation Group has agreed should be provided in connection with Wildfire Subrogation Claimant Proof of Claim Forms, may not otherwise be submitted due to confidentiality concerns for the underlying claimants. Ad Hoc Subrogation Claimant Objection [Dkt. No. 2043] at 9:4-17.

As set forth in the Bar Date Motion, similar procedures have been approved in other cases. *See USA Gymnastics*, Case No. 18-09108 (Bankr. S.D. IN Feb. 25, 2019) [Dkt. No. 301]; *In re Archdiocese of Milwaukee*, Case No. 11-20059-svk (Bankr. E.D. Wisc. July 14, 2011) [Dkt. No. 331]; *In re Roman Catholic Bishop of Great Falls Montana*, Case No. 17-60271 (Bankr. D. MT June 6, 2016) [Dkt No. 121]. Accordingly, the Debtors believe that the proposed confidential treatment of Wildfire Claims is reasonable and appropriate.

### c. The Debtors' Procedures to Provide Direct Notice to Known Wildfire Claimants Go Above and Beyond the Requirements of Due Process and More than Satisfy the Requirements under the Bankruptcy Code and Applicable Law

The TCC asserts that the Debtors are proposing to provide direct notice to only a "select group of parties in interest" notwithstanding the fact that the proposed list of parties to receive actual notice as

---

[7] At the request of the Ad Hoc Subrogation Group, the Debtors have clarified that this confidentiality also extends to supplemental information submitted by the Subrogation Claimants regarding individual losses. The Debtors have also agreed to carve out Wildfire Claims filed by the United States and any California State Agency from these confidentiality restrictions, at the request of those parties. *See* Revised Bar Date Order, at ¶ 6.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

identified in Bar Date Motion, including **Known Wildfire Claimants**,[8] totals nearly 18 million parties. As set forth in the Finegan Declaration, it is clear that, at best, the TCC and Angeion do not understand the size and scope of the Debtors' Notice Procedures and the Supplemental Notice Plan. Many of the TCC's pleadings contain information that is patently wrong, internally inconsistent, and ignore the reality of what the Debtors actually propose in their Bar Date Motion. When compared to the TCC Notice Plan, the Debtors' Noticing Procedures include virtually <u>all</u> of the same elements, including (a) direct notice via U.S. Mail and email, (b) supplemental notice via various print media publications; (c) constructive notice using the Internet and various targeted online media; (d) notice employing the use of social media; and (e) localized television and radio advertising. A chart detailing the extent of the overlap between the two plans is set forth below:

| | Debtors' Original Supplemental Notice Plan | TCC Plan |
| --- | --- | --- |
| Dedicated Website | YES | YES |
| Toll-Free Number | YES | YES |
| **DIRECT MAIL/ EMAIL** | | |
| Known Wildfire Claimants | YES | YES |
| Debtors' Customers | YES | YES (but 2 million fewer Customers to receive notice by mail) |
| Property Owners of Destroyed Homes within the Areas affected by the 2017 Northern California Wildfires GIS Data | YES | YES |
| Additional Names of Wildfire Claimants in BrownGreer Database | YES | YES |
| **PRINT** | | |
| Magazines | **NO** (Now incorporated into Revised Plan) | YES |
| Newspapers | YES | YES |
| **BROADCAST** | | |
| Local Market TV – English & Spanish | YES | YES |
| Over the Top TV (OTT) | **NO** (Duplicative but nevertheless incorporated into Revised Plan) | YES |
| Local Market Radio – English & Spanish | YES | YES |

[8] As set forth in the Bar Date Motion, "**Known Wildfire Claimants**" means holders of Wildfire Claims that, as of the Petition Date, already had commenced actions against the Debtors or had provided actual notice to the Debtors of their intention to commence actions against the Debtors.

Case: 19-30088    Doc# 2646    Filed: 06/19/19    Entered: 06/19/19 15:11:15    Page 13 of 27

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

| | | |
|---|---|---|
| Streaming Radio | **NO** (Duplicative but nevertheless incorporated into Revised Plan) | YES |
| **ONLINE** | | |
| Display | YES | YES |
| Search | YES | YES |
| Social Ads | YES | YES |
| **OUT OF HOME** | | |
| Digital & Static Units | **NO** (Unnecessary and duplicative but nevertheless incorporated into Revised Plan) | YES |
| **COMMUNITY OUTREACH** | | |
| Fire Disaster Centers/Claims Service Centers | YES | YES |
| **EARNED MEDIA** | | |
| Public Relations Outreach | YES | YES |

Finegan Decl. at ¶22.

As noted above and in the Bar Date Motion, in addition to parties who have already commenced actions against the Debtors or provided the Debtors with notice of their intention to do so, the Debtors will provide actual notice by first-class mail to (i) property owners they have been able to locate utilizing sophisticated GIS satellite data, (ii) parties that have already filed claims in these Chapter 11 Cases, (iii) if made available, individuals identified in the BrownGreer database, (iv) parties with forwarding addresses identified by the U.S. Postal Service,[9] and (v) the Debtors' 16 million Customers. Although the TCC Bar Date Motion identifies additional categories of sources the TCC could potentially approach or request for additional Wildfire Claimant information (such as community organizations and utilizing third party subpoenas), this list is purely aspirational as neither the TCC nor Angeion sets forth any specific plan to secure any information from such parties in a timely manner. Furthermore, the TCC's own proposed bar date order does not expressly require them to seek out or serve any such additional parties. *See* TCC Proposed Order [Dkt. No. 2297-2]. Clearly the Debtors have gone above and beyond

---

[9] The TCC also tries to fault the Debtors for not using the U.S. Postal Service Change of Address Database and verification searches (also known as skip tracing). These are services that Prime Clerk performs in virtually all cases and would be assumed, rather than highlighted as some extraordinary measure. Prime Clerk will not only be performing regular skip tracing, but also intends to utilize additional services to perform address look-up for all mail that is returned as undeliverable with no forwarding address. *See* Supp. Waisman Decl. at ¶16.

merely searching their books and records as the TCC suggests.  *See* TCC Objection [Dkt. No. 2306] at 24:3-4.  Indeed, the only material difference between the two direct mailing proposals appears to be the TCC's intent to not provide actual notice by mail to approximately two million potential claimants in clear violation of applicable law.[10]

Accordingly, the Debtors' Notice Procedures, and the efforts to identify and serve Known Wildfire Claimants, are reasonable, far-reaching, and satisfy the requirements of due process and the Bankruptcy Code.

### d.    The Debtors' Supplemental Notice Plan to Reach "Unknown Claimants" has been Meticulously Crafted by Industry Experts Using Preeminent Noticing Standards, is Far-Reaching, Multi-Faceted, and Vastly Superior to that Proposed by the TCC and Angeion

The Debtors' Supplemental Notice Plan is reasonably calculated to provide adequate notice of the Bar Date to unknown claimants, including Unknown Wildfire Claimants,[11] and satisfies the requirements of due process.  As set forth in the Supplemental Declarations, the Debtors' Supplemental Notice Plan was developed and reviewed by professionals at Prime Clerk, with the assistance of Jeanne C. Finegan, utilizing well-researched methodologies and communication principles accepted by the advertising industry and embraced by courts in the United States for legal noticing.  Furthermore, and in contrast to Angeion's complete lack of chapter 11 experience, Prime Clerk, the Court-appointed noticing agent in these Chapter 11 Cases, has a wealth of experience in a multitude of large and complex cases, including extensive experience serving as claims and noticing agent in chapter 11 cases involving mass tort and class action claims.  *See, e.g., TK Holdings Inc.* (Takata)*, No. 17-11375 (BLS) (Bankr. D. Del.); In re Commonwealth of Puerto Rico*, No. 17-03283 (LTS) (Bankr. P.R.); *Imerys Talc America, Inc.*, No. 19-10289 (LSS) (Bankr. D. Del.); *In re Kaiser Gypsum Company, Inc.*, No. 16-31602 (JCW) (Bankr.

---

[10] Without any precedent or support, Angeion and the TCC propose to do away with the physical mailing to some two million known claimants and instead provide them with notice via electronic mail only, in clear violation of the Bankruptcy Rules and due process in chapter 11.  *See* Weisbrot Decl. at 24:2-4.  While the Debtors' Notice Procedures contemplate providing notice via email to any of their Customers that have signed up for electronic billing that notice would be in addition to, and not in lieu of, notice by mail.  *See* Debtors' Bar Date Motion at 25:6-9.

[11] As set forth in the Bar Date Motion, "**Unknown Wildfire Claimants**" means holders of Wildfire Claims that, as of the Petition Date, had not commenced actions against the Debtors or provided actual notice to the Debtors of their intention to commence actions against the Debtors

Case: 19-30088    Doc# 2646    Filed: 06/19/19    Entered: 06/19/19 15:11:15    Page 15 of 27

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

W.D.N.C.); *In re Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. D. Del); *In re Montreal Maine & Atlantic Railway, Ltd.*, No. 13-10670 (Bankr. D. ME); *Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del); *In re Old FENM Inc. (f.k.a Fresh & Easy Neighborhood Market, Inc.*, No. 13-12569 (KJC) (Bankr. D. Del.); *In re Pacific Sunwear of California, Inc.*, No. 16-10882 (LSS) (Bankr. D. Del.).  *See* Supp. Waisman Decl. at ¶3

Moreover, Prime Clerk is the single most experienced bankruptcy claims and noticing agent in the energy sector.  *See id*.  Prime Clerk has been appointed to serve in 59 bankruptcy cases in the energy field with an aggregate of nearly one million creditors and $177.4 billion in total liabilities[12] and has designed and implemented many of the largest and most complicated noticing plans in chapter 11 history.[13]

In addition, Prime Clerk's noticing efforts in these Chapter 11 Cases have been, and will continue to be, complemented by Jeanne C. Finegan, APR, who is an expert in both chapter 11 and class action noticing with more than thirty (30) years of communications and advertising experience.  Ms. Finegan is one of the only nationally recognized experts in the field of noticing in *both* bankruptcy and class actions.  *See* Finegan Decl. at ¶3.  In her declaration, Ms. Finegan confirms that the Debtors' Notice Procedures, and in particular the Supplemental Notice Plan, are broad, multi-faceted, and designed to have the greatest possible reach to all creditors and parties in interest, including those who may have relocated as a result of the Northern California Wildfires.  Ms. Finegan further attests that it is her belief

---

[12] *See, e.g., Breitburn Energy Partners* (Bankr. S.D.N.Y. May 15, 2016); *SunEdison, Inc.* (Bankr. S.D.N.Y. April 21, 2016); *SandRidge Energy, Inc.* (Bankr. S.D. Tex. May 16, 2016); *Linn Energy, LLC* (Bankr. S.D. Tex. May 11, 2016); *Seadrill Limited* (Bankr. S.D. Tex. Sept. 12, 2017); *FirstEnergy Solutions Corp.* (Bankr. N.D. Ohio March 31, 2018); *Arch Coal, Inc.* (Bankr. E.D. Mo. Jan. 11, 2016); *Vanguard Natural Resources* (Bankr. S.D. Tex. Feb. 2, 2017 and March 31, 2019); and *Patriot Coal Corporation* (Bankr. E.D. Va. May 12, 2015).

[13] For example, in *In re TK Holdings Inc.,* No. 17-11375 (BLS) (Bankr. D. Del.), Prime Clerk developed a unique noticing plan to provide 88 million parties with customized notices and developed a customized mobile-focused digital and radio advertising campaign to provide supplemental notice to potential unknown claimants in Puerto Rico and the U.S. Virgin Islands in the aftermath of Hurricane Maria.  In addition, in *In re Commonwealth of Puerto Rico*, No. 17-03283 (LTS) (Bankr. P.R.), Prime Clerk coordinated and executed multiple mailings of various legal notices in two languages to millions of potential creditors and coordinated radio advertisements with information pertaining to the bar date and extended bar date.  In addition to undertaking mass noticing efforts, Prime Clerk established multiple claim filing centers staffed with multilingual consultants outside of the continental U.S. and collected and processed over 160,000 claims. Prime Clerk's plan was specifically tailored to address claimants who had lost their homes as a result of hurricane damages. *See id.*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

that the Debtors' Supplemental Notice Plan is one of the largest and most comprehensive notice and media campaigns proposed in bankruptcy history and, furthermore, the plan, as refined, employs the appropriate budget to achieve the optimal reach and frequency for noticing. *See id.* at ¶6.

As described at length in the Finegan Declaration, the Debtors' Supplemental Notice Plan was designed utilizing methodologies and communication principles accepted by the advertising industry and embraced by courts in the United States for legal noticing and represents the most effective and comprehensive noticing plan in any bankruptcy or class action case ever. These methodologies and principles include, without limitation:

- <u>Syndicated Media Research</u>: The Debtors' Supplemental Notice Plan was formulated using a combination of well-established principles of communication and syndicated media research data provided by GfK Mediamark Research and Intelligence, LLC[14] ("**MRI**") online measurement currency comScore[15], and Nielsen[16] among others, which provide data on media consumption habits and audience delivery verification of the potentially affected population. These data resources are used by advertising agencies nationwide as the basis to select the most appropriate media to reach specific target audiences. These research reports are instrumental in the selection of media channels and outlets for determining the estimated net audience reached through the Supplemental Notice Plan.

- <u>Secondary Population Research</u>: In addition to the media research data, various secondary sources were studied to ensure that the Debtors' Supplemental Notice Plan is appropriately targeted and optimized. These sources include the U.S. Census data and California Fire Commission data for population demographics and characteristics. According to these sources, the vast majority (73%) of California residents who own homes are over the age of 35. Use of this information will ensure that the noticing plan breaks-up target populations by age (as discussed below) and appropriate media will be

---

[14] GfK MRI's *Survey of the American Consumer*® is the industry standard for magazine audience ratings in the U.S. and is used in the majority of media and marketing agencies in the country. MRI provides comprehensive reports on demographic, lifestyle, product usage and media exposure. http://www.mr.gfk.com/. *See* Finegan Decl. at n.14.

[15] comScore is a global Internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet usage data. comScore maintains a proprietary database of more than 2 million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing. This data includes and fuses 1st party, (website data), second party (data shared by websites for marketing purposes) and 3rd party data, tied to offline purchasing behavior. www.comscore.com. *See* Finegan Decl. at .28.

[16] Nielsen measures and monitors television and radio audiences and media delivery. The company measures programming and advertising across all distribution points: network television, and radio among others. Nielsen's ratings are used by advertisers and networks to shape the buying and selling of advertising. www.nielsen.com. *See* Finegan Decl. at n.29.

used to ensure this population is properly targeted.

- <u>Target Audience and Targeted Regions</u>: A majority of Wildfire Claimants are located in six counties in four Designated Marker Areas ("**DMAs**")[17] in Northern California. Due to the impact of those fires, it can be expected that a percentage may have relocated to locations throughout California to other states. To account for that, the Debtors' Supplemental Notice Plan has three tiers. The first focuses on media in the four DMAs. The second casts a wider net to include all of California as this is the most likely area for relocation. Finally, the third tier casts a nationwide net to the rest of the 49 states to ensure that people that have moved outside the state have an opportunity to be reached and file a claim. Thus, this geographical division not only efficiently reaches the DMAs and the broader State of California, it also appropriately reaches the entire nation. In addition, the Debtors are casting a wide net locally, reaching all adults who are 18 years of age and older and the Debtors are making thoughtful considerations for media selection based on three demographic clusters: 18-24, 25-44, and 45+. The purpose of this is to recognize that media use changes with age, income and education levels. This allows the media program to be highly focused by effectively reaching the right populations and reducing waste.

- <u>Target Audience Reach and Frequency Estimates</u>: In stark contrast to the TCC Notice Plan, the reach and frequency contemplated by the Debtors' Supplemental Notice Plan are optimal to appropriately reach the affected target audience with an appropriate level of frequency of message delivery to generate awareness and action. As more fully detailed and explained in the Finegan Declaration, the Debtors' Supplemental Notice Plan is reasonably calculated to reach:

| Target | Reach | Frequency |
|---|---|---|
| Adults 18+ in the 4 DMAs | 95% | 8x |
| Adults 18+ in CA | 81% | 5x |
| Adults 18+ outside of CA and moved in the last 4 years | 78% | 2.3x |

Finegan Decl. at ¶58.

The Debtors' Supplemental Notice Plan far exceeds efforts to provide notice in a typical bankruptcy proceeding where publication notice is viewed as sufficient and generally consists of one or two nationally circulated newspapers. Importantly, the Debtors' professionals have employed best-in-class advertising industry tools and technology to ensure that the Debtors' Notice Plan provides due process to all constituents, including Known and Unknown Wildfire Claimants, and complies with Bankruptcy Rule 2002. It is also worth noting that the Debtors' Supplemental Notice Plan exceeds best

---

[17] DMA is a geographic area in the United States in which local television viewing is measured by Nielsen Co. The DMA data are essential for any marketer, researcher, or organization seeking to utilize standardized geographic areas within their business.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

practices in the class action context, where reach range is typically between 70% to 80% with frequency levels commonly ranging between 2 to 3 times. *See* Finegan Decl. at ¶60.

In contrast, the TCC Notice Plan is critically deficient in certain aspects and excessive in others. Indeed, most material differences between the TCC Notice Plan and the Debtors' Supplemental Notice Plan relate to cost and duration. *See* Finegan Decl. at ¶46. However, although largely duplicative, the Debtors have no objection to adopting the following additional elements from the TCC Notice Plan.

    i.   <u>National Cable & Over the Top TV ("**OTT**")</u>: Nationwide cable television commercials will air across multiple networks to reach those Wildfire Claimants who have moved within the last four years. The Debtors' Supplemental Notice Plan will use digital OTT video ads to match known creditors living outside of the four DMAs and serve them video ads.

    ii.   <u>Streaming Radio</u>: A combination of both terrestrial radio and streaming radio will be used in the six (6) Metropolitan Survey Areas[18] ("**MSA**"). 60-second ads will air on two English and two Spanish language terrestrial radio stations per market (there are no local Hispanic stations in Redding). A total of 24 local English radio stations and 10 Hispanic stations were chosen to air approximately 540 terrestrial radio ads. Streaming audio ads (digital radio played via an internet connection) will run on Pandora with shorter, 15-or 30-second ads accompanied by a digital banner ad. The digital banner ads will appear while the audio spot is playing and allow a user to click on the banner and be taken to the dedicated case website. Approximately 1 million streaming audio impressions are planned.

    iii.   <u>Out-of-Home Advertising</u>: The Debtors will employ a mix of billboards and transit shelters. In an effort to further integrate media channels suggested by the TCC, billboards and/or transit shelters will be selected within the six affected counties to ensure increased local exposure to the Debtors' Supplemental Notice ads. Recognizing that many of these areas tend to be more rural, there are limited opportunities for transit, mall, mass transit, or even billboards.

    iv.   <u>Social Influencers</u>: In effort to leverage the highest indexing media to the youngest creditors, the Debtors will engage the help of social media influencers to post and share information about the Wildfire Claim Bar Date on platforms such as Snapchat, Instagram and Facebook. The Debtors will identify key influencers who have significant following within the 18-24 age demographic who also have an affinity to the topic and partner with them to post appropriate content related the matter. The Debtors will also identify a larger list of social media influencers and serve them customized ads on Facebook and Instagram to make them aware that they may virally share the information with their followers.

Finegan Decl. at ¶64.

---

[18] Geographical area defined by radio measurement company, Arbitron.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28

Taking into account the additional measures described above, the Debtors' Supplemental Notice Plan is now estimated to cost approximately $2.5 million.[19] *See* Finegan Decl. at ¶46. In contrast, the TCC is proposing to spend $12.8 million on a supplemental notice program. *See* Memorandum of Points and Authorities in Support of TCC Bar Date Motion [Dkt. No. 2298] at 16:23. However, the TCC fails to provide any sort of meaningful cost breakdown for its plan; rather, the Court and parties in interest are asked to rely on unsupported cost estimates from an agent that has no prior experience in chapter 11 cases.

As set forth in the Finegan Declaration, the robust and comprehensive outreach efforts employed under the Debtors' Notice Procedures, including the Supplemental Notice Plan, reflect a particularly appropriate, highly targeted, efficient and modern way to provide notice to Known and Unknown Wildfire Claimants. The reach and frequency of the Debtors' Supplemental Notice Plan is estimated as follows:

- 95% of adults 18 years and older with an average frequency of 8 times in the target 4 DMAs;

- Over 81% of California residents 18 years and older with an average frequency of 5 times; and

- 78% of adults over the age of 18 nationwide who live outside California and moved within the last 4 years with an average frequency of 2.3 times.

Finegan Decl. at ¶100.

Ultimately, when combined with other unmeasured notice methods (such as community outreach), the overall effort will undoubtedly achieve even stronger results. The Supplemental Notice Plan, with the amendments described above, will effectively and efficiently reach the targeted population, without the enormous waste and resulting excessive cost found in the TCC Notice Plan. Accordingly, the Debtors' Notice Procedures, including the Supplemental Notice Plan, should be approved.

---

[19] As set forth in the Debtors' Bar Date Motion, the Debtors original estimate for the cost of the Supplemental Notice Plan was approximately $1.5 million - $2.0 million.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## III. THE TCC'S BAR DATE MOTION SHOULD BE DENIED

### a. The TCC's Proposed Bar Date and Claims Submission Process are Inefficient and Will Unduly Delay these Chapter 11 Cases

In addition to seeking to delay the Bar Date well into next year, the TCC Bar Date Motion seeks approval of a bifurcated claims process and inappropriate procedures—a path that will significantly delay the administration of these Chapter 11 Cases, the chapter 11 plan process, and any distribution to the claimants the TCC represents.

Moreover, the TCC, in an attempt to frustrate any effort by the Debtors (or others) to seek discovery to validate or assess Wildfire Claims, has asked the Court to preclude *any and all* objections to Wildfire Claims until after the Bar Date has passed. *See* TCC Bar Date Memo. at § IV(D)(j). There is no basis for such a restriction and it should be summarily rejected.

Furthermore, as set forth in detail in the Debtors' objection filed contemporaneously herewith, the TCC's proposed retention of Angeion as its additional noticing agent will only lead to further delay, is not necessary and, in any event, Angeion is not qualified. As set forth in the Supplemental Declarations, upon information and belief, Angeion has no prior experience serving as a claims or noticing agent or in any other capacity in chapter 11 cases and its prior experience in class action cases is overstated. *See* Supp. Waisman Decl. at ¶13 and Finegan Decl. at ¶20. Furthermore, upon information and belief, unlike Prime Clerk, the Court-approved noticing agent in these Chapter 11 Cases, Angeion is not on the list of approved claims and noticing firms promulgated and published by the Clerks of the Court for the Southern District of New York and the District of Delaware, which other Bankruptcy Court jurisdictions rely on to determine whether a particular firm is qualified and trusted to serve as a claims and noticing agent.[20] *See* Supp. Waisman Decl. at ¶13. As set forth in the Supplemental Waisman Declaration, based on prior experience, the process of securing approval of the Clerks for either of these two Districts likely would take Angeion weeks, if not longer, to complete. Accordingly, Angeion is not even authorized at this time to act as a noticing agent for the parties the TCC seeks to serve and the TCC's Notice Plan will only result in further delays to the administration of these Chapter 11 Cases.

---

[20] *See* Bankr. S.D.N.Y., "Claims Agents" (http://www.nysb.uscourts.gov/claims-agents)_and Bankr. D. Del., "Delaware Bankruptcy Courts – Claims Agencies" (https://www.deb.uscourts.gov//claims-agency-list).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### b. The TCC's Direct Notice Plan Fails to Comply with Applicable Law

As set forth above, the TCC proposes to cut costs by sending notice of the Bar Date to approximately two million Utility customers via their monthly emailed statements. *See* Weisbrot Decl. at 25:3-4. Regardless of the fact that the process of preparing and approving a bill insert typically requires months of lead time from a process perspective and would result in significant delays, to do so would blatantly disregard Bankruptcy Rule 2002. It is a well-known principle and straightforward provision of the Bankruptcy Rules that direct notice—meaning notice by physical mail—must be provided to all known claimants. *See, e.g., In re Circuit City Stores, Inc.*, No. 08-35653, 2010 WL 2208014, at *7 (Bankr. E.D. Va. May 28, 2010) ("Known creditors must receive actual notice by mail of the claims bar date."); *In re Freedom Commc'ns Holdings, Inc.*, 472 B.R. 257, 261 (Bankr. D. Del. 2012) ("Known creditors must generally be provided actual written notice of a debtor's bankruptcy filing and the bar claims date in the case."). In fact, Bankruptcy Rule 2002 specifically states, "the clerk, or some other person as the court may direct, shall give . . . all creditors and indenture trustees at least 21 days' notice *by mail* of . . . the time fixed for filing proofs of claims pursuant to Rule 3003(c)". Fed. R. Bankr. P. 2002(a)(7) (emphasis provided).

Despite this well-known principle and straightforward provision of the Bankruptcy Rules, Angeion's proposed noticing plan, without any precedent or support, dispenses with any physical mailing to some two million potential known claimants. Accordingly, the TCC Bar Date Motion should be denied.

### c. The TCC's Supplemental Notice Plan is Critically Flawed and Misstates Key Aspects of their Proposal

The TCC Notice Plan, as described in the Weisbrot Declaration, is critically flawed, contains numerous misstatements regarding certain aspects of the plan, and relies on inaccurate calculations. As described in detail in the Finegan Declaration, the following are a few of the critical errors and misstatements from the TCC's Notice Plan:

    i. **The TCC television plan does not reach all affected MSAs and is inaccurately planned.** Mr. Weisbrot asserts that the TCC's Notice Plan will deliver audience in each of DMAs in California: Chico-Reading, San Francisco-Oakland-San Jose, Sacramento-Modesto-Stockton and Eureka. Weisbrot Decl. at 16:6-13. However, only two of the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

four DMAs (Chico and San Francisco) are identified for television in Exhibit E to the Weisbrot Declaration, which identifies the exact media the TCC is proposing to utilize in each DMA. Further, without any supporting rationale, the TCC Notice Plan adds the Los Angeles market. Failure to provide televised notice in two of the DMAs cuts out half of the targeted population, and providing televised notice in Los Angeles is unnecessary and a significant waste of resources. *See* Finegan Decl. at ¶30.

ii. **The TCC radio plan does not reach all affected MSAs and is inaccurately planned.** Similar to their television plan, the radio plan set forth by the TCC and Mr. Weisbrot does not reach all affected MSAs. The radio plan does not include Stockton or Modesto, and again inexplicably includes Los Angeles. *See id.* at ¶31.

iii. **The TCC Notice Plan lists ":60" spots for radio and National Public Radio (NPR) stations.** NPR does not accept advertising, only sponsorships. *See id.* at ¶32.

iv. **Local reach for both television and radio is likely miscalculated.** Mr. Weisbrot and the TCC project that "approximately three quarters of the residents of the four DMAs will see a video ad, on average ten times each." Weisbrot at 27:19-20. In reality, as noted above, residents of two of the four TV DMAs and two of the six MSAs may not see or hear commercials at all. *See* Finegan Decl. at ¶33.

v. **The TCC Notice Plan emphasizes Los Angeles and San Diego without any rationale for their inclusion.** Angeion and the TCC propose to include Out-of-Home advertising (which includes billboards and transit shelters in Los Angeles and San Diego). It should be noted that Out-of-Home is hyper local, *only* reaching people who are physically at the posted locations of the billboards/transit stops. Without evidence to suggest that people affected by the Northern California Wildfires have moved to the exact locations where the Out-of-Home media is visible, there is no reasonable justification for the use of Out-of-Home in these areas and they could be more effectively reached through other channels. *See id.* at ¶34.

vi. **Angeion and Weisbrot have provided no assurances that they will actively monitor and transparently report on ad fraud detected in their proffered outreach**. Ad fraud, (counterfeit impressions, fake sites, domain spoofing) and bots are an ever-present reality in the digital environment, silently stealing impressions from advertising budgets. While Mr. Weisbrot mentions including Integral Ad Science, he makes no reference to other necessary steps he should take to identify, mitigate and transparently report the ad fraud detected. *See* Weisbrot Decl. at 35:1-4; Finegan Decl. at ¶35

vii. **The TCC Notice Plan falsely claims to include Spanish radio.** As a part of the TCC Notice Plan, Mr. Weisbrot and Angeion promise traditional and terrestrial broadcasting in the Spanish language. Yet <u>none</u> of the radio stations listed in Exhibit E to the Weisbrot Declaration are Spanish language stations. Failure to include media in the Spanish language is a critical misstep as 38.6% of Californians are of Spanish, Hispanic or Latino descent and 21% speak primarily Spanish at home. *See* Finegan Decl. at ¶36.

viii. **The TCC Notice Plan proposes to include Cajun radio; there is no Cajun population in Northern California.** For some inexplicable reason, the TCC Notice Plan includes

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Cajun radio stations in its media plan. *See* Weisbrot Decl. at 63:2. Putting aside the fact that there are no Cajun radio stations in California, there is no justification for Cajun stations in this matter as there is no evidence that there is any significant Cajun population in Northern California. *See* Finegan Decl. at ¶37.

The many examples of errors, mischaracterizations, and misstatements in the TCC's pleadings evidence lack of knowledge and experience. Further, as discussed below, the TCC Notice Plan would waste millions of dollars of estate resources by inaccurately targeting inappropriate audiences, oversaturating non-essential noticing elements, and utilizing unprecedented and spurious noticing frequency rates.

**d.      The TCC Notice Plan is Excessive and Will Result in Diminishing Returns**

In addition to the critical flaws and misstatements set forth above, the budget for the supplemental notice plan proposed by the TCC, Angeion, and Mr. Weisbrot is excessive and wasteful due, in part, to its unnecessary frequency levels, or opportunities to see the notice. As set forth in the Finegan Declaration, in advertising, the term "Reach" refers to the estimated percentage of the unduplicated audience exposed to the campaign, and "Frequency" refers to how many times, on average, the target audience had the opportunity to see the message. These metrics are used by advertising and communications firms worldwide and, while not typically utilized in bankruptcy matters, are the bedrock for determining adequacy of notice in class actions. *See* Finegan Decl. at ¶39.

The Weisbrot Declaration claims that 80% of all adults residing in the State of California (approximately 39.56 million) will see one of Angeion's notices **on average 28 times**. *See* Weisbrot Decl. at 27:16-26. In the targeted regions, he proposes to have approximately 95% of the target audience (9.76 million) see a notice nearly **52 times**. *See* Weisbrot Decl. at 27:6-12. These proposed frequencies are unprecedented and beyond what any bankruptcy or class action case has *ever* employed. For context, even the largest, most recent class action campaigns, which had similar local, regional and national outreach did not employ such frequency levels. *See* Finegan Decl. at ¶40.

The Frequency proposed by Mr. Weisbrot and Angeion is not only contrary to all guidance and practice and without precedent in class action and bankruptcy, but, as set forth in the Finegan

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Declaration, the enormous over-saturation proposed by Angeion and Weisbrot has also been proven to have negative results in adverting and marketing, more generally. *See id.* at ¶41.

Further, the outreach contemplated by the TCC Notice Plan lacks refined audience targeting. For example, as discussed in the Finegan Declaration, there is no need in this matter to target all adults 18 years of age and older nationwide, as the TCC has proposed. It is more efficient to target those adults who are over the age of 18 who have moved out of California from 2015 to present, which is the affected period for the Bar Date Notices. Accordingly, once the audience targeting is refined, then the media selection becomes more efficient with less waste. *See id.* at ¶44. This is another reason, the TCC Notice Plan is excessive and wasteful.

The TCC Notice Plan sustains these high frequency levels over a course of 7 months. This is another wasteful approach. The same results can be accomplished over the ninety-five (95) days contemplated by the Debtors' Supplemental Notice Plan. *See id.* at ¶43. In fact, this timing is consistent with numerous, high-profile, high stakes bankruptcies and class actions, including those mentioned above and in the Finegan Declaration, *i.e.* Takata, Deep Water Horizon, etc.

The TCC Notice Plan is deficient (*see* above) in some aspects and excessive in others that may be detrimental to the principle objectives of these Chapter 11 Cases. The budget proposed by the TCC, Angeion, and Mr. Weisbrot for supplemental noticing is excessive, without precedent in bankruptcy or class action, and wasteful. However, the Debtors' nationwide outreach effort is reasonably calculated to reach nearly 80% of the target audience nationwide—which is not the case with the TCC Notice Plan—because the Debtors' Supplemental Notice Plan is tactically superior to the TCC Notice Plan in every way. As Ms. Finegan states, the use of estate funds to implement and execute the TCC's Notice Plan would be nothing short of wasteful.

## IV. THE TCC'S EXPERTS' DECLARATIONS MUST BE STRICKEN

Setting aside the substantive deficiencies of the Weisbrot and Dion Declarations (and the flawed notice plans they support), the declarations themselves must be stricken simply because the TCC failed to make Messrs. Weisbrot and Dion available for depositions prior to the hearing on the Bar Date Motion. As discussed above, Messrs. Weisbrot and Dion are not fact witnesses; they are expert witnesses

Case: 19-30088   Doc# 2646   Filed: 06/19/19   Entered: 06/19/19 15:11:15   Page 25 of 27

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

providing opinions that the Bar Date should not be set until January. As experts "whose opinions may be presented at trial," Mr. Weisbrot and Mr. Dion are subject to Rule 26(b)(4)(A) of the Federal Rules of Civil Procedure, which gives the Debtors the right to depose them prior to trial (or in this case, prior to the Bar Date Motion hearing). Fed. R. Civ. P. 26(b)(4)(A). Absent an opportunity to meaningfully explore the credentials of the proffered experts and test the testimony that will be presented at the hearing, the Debtors respectfully request that the Weisbrot and Dion Declarations be set aside.

Moreover, it should be noted that the TCC had ample opportunity to make its witnesses available for depositions prior to the Bar Date Motion hearing. As the TCC is well aware, the June 26, 2019 hearing date for the Bar Date Motion was set by this Court back on May 31, 2019 by docket text order. Shortly thereafter, on June 10, 2019, the Debtors timely sent notice for the depositions of both Messrs. Weisbrot and Dion, giving the TCC plenty of time to make its declarants available to be deposed *before* the hearing. Despite the clear and timely notice that the Debtors intended to depose the TCC's declarants, the TCC failed to make either of its declarants available for depositions until July 8 – 11, 2019 – *nearly two weeks after* the hearing for the Bar Date Motion, rendering their depositions useless for purposes of the Bar Date Motion.

Given the TCC's failure to make its expert witnesses available prior to the Bar Date Motion hearing, and the prejudice facing the Debtors who will not be able to meaningfully test the testimony of the TCC's expert witnesses prior to their presentations at trial, the Debtors respectfully seek to have the Weisbrot and Dion Declarations stricken from the record.

## V.  **CONCLUSION**

As set forth above, the Debtors are proposing robust and far-reaching Notice Procedures that provide more than adequate notice to known and unknown creditors of the deadline to file Proofs of Claim in these Chapter 11 Cases. In connection with the implementation of this unprecedented notice plan, the Debtors have retained, and Clerk of the Court has approved, a proven and established noticing firm with extensive experience implementing complex noticing plans in chapter 11 cases, including in cases involving class actions and mass torts. In contrast, the TCC Notice Plan is wasteful, duplicative, and will only result in further delays to creditor distributions, including Wildfire Claimants.

Accordingly, for the reasons set forth above and in the Bar Date Motion, the Debtors request the Court (i) approve the Bar Date Motion and overrule the Objections, (ii) deny approval of the TCC Bar Date Motion, and (iii) grant such other relief to the Debtors as is necessary and appropriate.

Dated: June 19, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: _/s/ Stephen Karotkin_
Stephen Karotkin

_Attorneys for Debtors_
_and Debtors in Possession_

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119