WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>               **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(c) FOR ENTRY OF AN ORDER (I) APPROVING DEBTORS' INCENTIVE PROGRAM FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF**<br><br>Date:    July 24, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102 |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 363(b), and 503(c) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an order (I) approving an incentive program for certain key executive officers and (II) granting related relief.  In support of this Motion, the Debtors respectfully submit the Declarations of John Lowe (the "**Lowe Declaration**") and of Douglas J. Friske (the "**Friske Declaration**"), filed contemporaneously herewith.

A proposed form of order granting the relief requested herein is annexed hereto as **<u>Exhibit A</u>** (the "**Proposed Order**").

# TABLE OF CONTENTS

I.    JURISDICTION ...................................................................................................................6

II.   BACKGROUND ...................................................................................................................6

III.  PRELIMINARY STATEMENT ...........................................................................................7

IV.   THE KEIP ............................................................................................................................9

      A.    Development of the KEIP...........................................................................................9

      B.    Summary of the KEIP ..............................................................................................11

V.    BASIS FOR RELIEF REQUESTED...................................................................................14

      A.    The KEIP is a Performance-Based Incentive Plan ..................................................15

      B.    The KEIP Satisfies Section 503(c)(3) of the Bankruptcy Code ..............................17

      C.    Implementation of the KEIP Is a Valid Exercise of the Debtors' Business
            Judgment under Section 363(b)(1) of the Bankruptcy Code ..................................21

VI.   REQUEST FOR BANKRUPTCY RULE 6004(H) WAIVER...........................................22

VII.  NOTICE...............................................................................................................................22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alpha Natural Resources, Inc.*,
546 B.R. 348 (Bankr. E.D. Va. 2016) ........................................................................ 16, 21

*Berg & Berg Enters., LLC v. Boyle*,
178 Cal. App. 4th 1020 (2009) ........................................................................................ 22

*In re Borders Grp., Inc.*,
453 B.R. .......................................................................................................................... 18

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
60 B.R. 612 (Bankr. S.D.N.Y. 1986) .............................................................................. 21

*In re Dana Corp.*,
358 B.R. 567 (Bankr. S.D.N.Y. 2006) ............................................................ 15, 16, 18, 19

*F.D.I.C. v. Castetter*,
184 F.3d 1040 (9th Cir. 1999) ........................................................................................ 21

*In re Global Home Prods., LLC*,
369 B.R. 778 (Bankr. D. Del. 2007) ................................................................................ 16

*In re Hawker Beechcraft, Inc.*,
479 B.R. 308 (Bankr. S.D.N.Y. 2012) ............................................................................. 17

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ............................................................................... 21

*In re Musicland Holding Corp.*,
No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) .................................................... 16

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*),
147 B.R. 650 (S.D.N.Y. 1992) ........................................................................................ 21

*In re Residential Capital, LLC*,
491 B.R. 73 (Bankr. S.D.N.Y. 2013) ............................................................................... 18

*Scouler & Co., LLC v. Schwartz*,
No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ........................... 22

*In re Velo Holdings Inc.*,
472 B.R. (Bankr. S.D.N.Y. 2012) .................................................................................... 18

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Statutes**

11 U.S.C. § 105 ................................................................................................................. 2

11 U.S.C. § 363 ................................................................................................. 2, 8, 18, 21

11 U.S.C. § 503 ........................................................................................ 2, 8, 15, 16, 17, 18

11 U.S.C. § 1107(a) and 1108 ............................................................................................ 7

28 U.S.C. § 157 ................................................................................................................. 7

28 U.S.C. § 1334 ............................................................................................................... 7

28 U.S.C. § 1408 ............................................................................................................... 7

28 U.S.C. § 1409 ............................................................................................................... 7

**Other Authorities**

Bankruptcy Rule 2002 ...................................................................................................... 22

Bankruptcy Rule 5011-1(a) ................................................................................................ 7

Bankruptcy Rule 6004(h) .............................................................................................. 2, 22

Bankruptcy Rule 1015(b) ................................................................................................... 7

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24* ..................................................................................................................... 7

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

PG&E Corp. was incorporated in 1995 and is a holding company whose primary operating subsidiary is the Utility, a public utility operating in northern and central California. *See Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**"). The Utility was incorporated in 1905 and PG&E Corp. became the holding company of the Utility in 1997. The Utility provides natural gas and utility services to roughly 16 million customers and the Debtors together employ approximately 24,000 regular employees, approximately 20 of whom are employed by PG&E Corp. *Id.*

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On February 12, 2019, the Acting United States Trustee for Region 3 (the "**U.S. Trustee**") appointed a nine-member Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 13, 2019, the U.S. Trustee appointed an eleven-member Official Committee of Tort Claimants (the "**Tort Claimants Committee**").

The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Wells Declaration.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## III.   PRELIMINARY STATEMENT

Critical to the Debtors' safe and reliable operation of their business and the maximization of enterprise value for all their economic stakeholders, including the wildfire claimants, is the ability to appropriately incentivize their employees, to meet and exceed safety, financial, and operational targets through the opportunity to earn market compensation.  To ensure that the key members of the Debtors' executive officer team are properly incentivized in this regard, the Debtors, with the assistance of their advisors, have developed a key employee incentive program (the "**KEIP**") whose participants currently consist of 12 senior executive officers (excluding the Chief Executive Officer) [1] (collectively, the "**KEIP Participants**").  The KEIP is designed to ensure that key members of the Debtors' executive officer team are properly incentivized to meet and exceed safety, financial, and operational targets through the opportunity to earn market compensation.  Notably, to place a greater emphasis on safety, the newly-constituted Compensation Committee of the Board of Directors of PG&E Corp. (the "**Compensation Committee**") determined that the KEIP Awards should be subject to a downward modifier if the Debtors fail to meet the threshold or target performance metric most closely aligned with wildfire safety.

The KEIP Participants are vital to the Debtors' safety, operations, and revenue generating capacity.  For that reason, providing appropriate incentives is essential not only to providing safe and reliable service, but also to maximizing value and to the success of these reorganization cases.  The Debtors established the metrics for the KEIP by considering, among other things, the Debtors' safety, financial, and operational goals, with an emphasis on safety, to ensure that the metrics are challenging and drive enhanced performance by the KEIP Participants.  In considering these objectives, the Debtors looked to the Debtors' 2019 short-term incentive program approved by this Court on April 29, 2019 (the "**2019 STIP**") to establish the appropriate metrics.[2]

---

[1]  The Debtors are seeking approval of the Chief Executive Officer's compensation arrangement in a separate motion to be filed with this Court.

[2]  See *Order Pursuant to 11 U.S.C. §§ 2015(a), 363, and 503(c) (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief* [Docket No. 1751].

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Consistent with the 2019 STIP, the KEIP is entirely incentive-based, conditioning the cash and equity portion of the awards (the equity portion being in the form of performance-based restricted stock units ("**PRSUs**")) granted under the incentive program (the "**KEIP Awards**") on the Debtors meeting carefully designed safety, financial and operational metrics (collectively the "**Performance Metrics**"), which are described in further detail below. Like the 2019 STIP, the proposed KEIP heavily prioritizes safety performance metrics by giving them a 65% weighting.

Significantly, as described below, because the KEIP applies to the Debtors' most senior officers, the KEIP places increased emphasis on the Public Safety Index metric, which is directly related to the Debtors' implementation of their Wildfire Mitigation Plan. If the Debtors do not achieve the threshold level for the Public Safety Index metric, the full KEIP Awards will be reduced by 50%. If the Debtors achieve the threshold level, but do not achieve the target level, the KEIP Awards will be reduced by 25%. And again, because the KEIP applies to the Debtors' senior officers, awards, if any, are made only at the end of the annual performance period and not quarterly as is the case with the 2019 STIP.

As with the 2019 STIP, financial performance metrics are given a 25% weighting and customer-related performance metrics are given a 10% weighting.[3] As with the 2019 STIP, the KEIP Awards can be completely eliminated for any reason, whether performance targets are met or not, in the discretion of the Board of Directors of PG&E Corp. (the "**Board**") or Compensation Committee.[4] And, as with the 2019 STIP, such discretion applies either to the entire program or on an individual participant basis. It also is important to note that implementation of the KEIP will provide the KEIP Participants with the opportunity to achieve a market rate of compensation, but only if the incentive targets are achieved. Accordingly, the Debtors believe that the KEIP's design and scope is reasonable, with a clear focus on

---

[3] For more information on the Performance Metrics and payout levels, see the testimony of John Lowe, Senior Director of Total Rewards of the Utility. Hr'g Tr. April 23, 2019; *Notice Regarding Filing of Documents Used During Oral Testimony at Hearing on STIP Motion*; *Corrected Declaration of Dinyar Mistry in support of Corrected Motion for Entry of Order Approving Short-Term Incentive Plan* [Docket No. 806]; and *Corrected Declaration of Douglas J. Friske in support of Motion for Entry of An Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief* [Docket No. 807].

[4] The Compensation Committee has the discretion to approve the payout of all KEIP Awards for the KEIP Participants that report directly to the CEO. The full Board has the discretion to approve the payout of all KEIP Awards for those KEIP Participants that report directly to the Board.

safety and other incentives that will promote a successful reorganization consistent with the intent and purpose of chapter 11, and that its implementation reflects a sound exercise of the Debtors' business judgment.

## IV.     THE KEIP

### A.     Development of the KEIP

The Debtors, together with their advisors, and the Compensation Committee of the Board consisting of three independent directors, developed and formulated the KEIP.  In selecting the pool of KEIP Participants, the Debtors identified their most senior officers whose performance would have the greatest impact on the Debtors' operations, safety, and the administration of these Chapter 11 Cases. The KEIP Participants are largely responsible for the Debtors' ongoing day-to-day operations and guiding the Debtors' overall business strategy.  The KEIP Participants, individually and collectively, have the decision-making capacity and authority to materially influence the Debtors' safety, financial, and operational performance, ensuring safe and reliable service, and that the value of the Debtors' business enterprise will be maximized for the benefit of all economic stakeholders.  More importantly, the KEIP Participants are the individuals with the ultimate responsibility for overseeing the Debtors' safety initiatives and implementation and compliance with the Debtors' Wildfire Mitigation Plan. Additionally, the KEIP Participants have the added responsibility of fulfilling chapter 11 obligations, including, satisfying additional reporting obligations, developing and implementing reorganization strategy, spear-heading the chapter 11 plan formulation and negotiation process, participating in Court hearings and meetings with stakeholders, and performing other administrative and operational obligations.

The Debtors developed and formulated the KEIP to be consistent with the Debtors' customary prepetition incentive programs, with an increased focus on safety and wildfire prevention.  The Debtors' customary incentive programs are a basic element of each executive's general market-based compensation package.  Historically, the Debtors have maintained a STIP as well as an equity-based long-term incentive plan ("**LTIP**") that covered, among certain other employees, the KEIP Participants. Since the filing of these Chapter 11 Cases, the Debtors have suspended all LTIP equity grants to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

employees under the existing LTIP and did not include KEIP Participants (other than Mr. Welsch and Mr. Christopher who were recently promoted) in the 2019 STIP.[5]  Accordingly, at this time, the KEIP Participants do not have any incentive-based element to their compensation structure, thereby resulting in their current compensation being substantially below market.  And, as the Court is aware, no STIP payments were made to any employees for the 2018 fiscal year.

In fact, as noted in the Friske Declaration, if the Debtors do not receive approval from the Court for the KEIP, total direct compensation for the KEIP Participants will only reflect current base salaries. When base salaries only (absent a KEIP opportunity) are compared to the competitive market target total direct compensation data, the aggregate target total direct compensation for the 12 KEIP Participants falls significantly below the 25th percentile and even more significantly below the 50th percentile of the market.

The target awards for the KEIP have been determined based on the historical STIP and LTIP target award values to provide the opportunity for the KEIP Participants to achieve market-based compensation for the 2019 fiscal year.  Specifically, the target awards for the KEIP are based on 100% of the 2019 target STIP percentage opportunity for each participant plus 75% of the percentage opportunity of the 2019 target LTIP award for each participant, as approved by the Compensation Committee in December 2018, in each case subject to adjustment based on the Public Safety Index ("**PSI**") modifier (as described below).[6]  The Debtors have reduced the value associated with the approved 2019 target LTIP award to account for, among other things, the cash component of the aggregate award (50%) and the shorter vesting period of the PRSU component.[7]  At the recommendation

---

[5] Mr. Welsch and Mr. Christopher, who were recently promoted to SVP and Chief Nuclear Officer and VP, Gas Operations respectively, each participated in the 2019 STIP prior to their promotions.  As a result of their promotions, they will no longer participate in the 2019 STIP and will be eligible to receive KEIP Awards on a prorated basis as of the effective date of their promotions.

[6] The targets for the 2019 STIP and 2019 LTIP programs were approved by the Compensation Committee prior to the filing of these Chapter 11 Cases. The KEIP Participants do not currently participate in the 2019 STIP, and the 2019 LTIP was not implemented.

[7] Under the 2019 LTIP plan that was not implemented, the share-based awards consisting of restricted stock units, performance shares, and stock options typically had vesting periods lasting three years and generally represented more than 50% of the value of an employee's incentive-based compensation.

of Willis Towers Watson ("**WTW**"), KEIP Awards will be paid 50% in cash and 50% in the delivery of PRSUs with the option of the Board or Compensation Committee, as applicable, to pay the value of the PRSU component in cash valued at the stock trading price at the time the award is made. In addition, the Compensation Committee consulted with Pay Governance ("**PG**"), an independent compensation consultant, to review the overall design of the awards and Performance Metrics of the KEIP.

In designing the KEIP, the Debtors worked closely with WTW, a compensation consulting firm with significant experience designing compensation programs for organizations undergoing a restructuring. WTW undertook a comprehensive analysis of the KEIP, comparing it to programs of similar companies, including those that sought relief under chapter 11, evaluating the timing of payments, incentive targets, award amounts and opportunities, total program costs and other design elements. WTW also reviewed the terms and provisions of the KEIP to confirm that its design is market-based and within the range of similar programs in the industry. As set forth in the Friske Declaration, the KEIP's design is reasonable when compared to the Debtors' peer group and consistent with market practice.

On June 14, 2019, the Compensation Committee approved the KEIP. Notably, the Compensation Committee consists exclusively of outside directors, none of whom are participants in the KEIP. The Compensation Committee determined that the KEIP was necessary to appropriately incentivize and align the KEIP Participants' goals and performance with those of the Debtors and the approximately 10,000 other employees participating in the 2019 STIP, including a particular emphasis on safety, and to provide the KEIP Participants with the opportunity to achieve a market rate of compensation, but only if the KEIP performance goals are achieved.

**B.      Summary of the KEIP**

The following is a summary of the key terms of the KEIP:

1.      **KEIP Participants**:  Twelve senior executive officers, John Simon (EVP, Law, Strategy and Policy); Jason Wells (EVP and Chief Financial Officer); Janet Loduca (SVP and General Counsel); Melvin Christopher (VP, Gas Operations); Michael Lewis (SVP, Electric Operations; Julie Kane (SVP, Chief Ethics & Compliance Officer, & Deputy General Counsel); Dinyar Mistry (SVP, Human Resources, Shared Services and Chief Diversity Officer); Loraine Giammona (SVP and Chief Customer Officer); Fong Wan

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(SVP, Energy Policy & Procurement); Kathleen Kay (SVP and Chief Information Officer); James Welsch (SVP and Chief Nuclear Officer); and David Thomason (VP, CFO Utility and Controller).

2. **Total Program Cost**: The aggregate value of the KEIP Awards at grant range from $5,465,500 at threshold performance, $10,931,000 at target performance, and $16,396,500 at maximum performance. The potential awards consist of 50% cash and 50% PRSUs, with the PRSU value at settlement subject to market fluctuation of PG&E Corp.'s common stock from the date of the grant to the date the PRSUs are settled.[8] Accordingly, the actual value of earned awards may be above or below the threshold, target or maximum specified at grant as a result of the common stock price at settlement.

3. **Performance Period**: January 1, 2019 through December 31, 2019 (the "**Performance Period**").

4. **Form of KEIP Awards:** Incentive compensation will consist of (i) 50% cash, and (ii) 50% PRSUs.

5. **Timing of KEIP Award Issuance and Payout:** Any cash component of the KEIP Awards, if earned, shall be paid in the first quarter of 2020. The PRSUs will be granted as soon as practicable after the Court's entry of an Order approving the KEIP on a date in compliance with the Debtors' Equity Grant Date Policy and, if earned and vested, will be settled in the first quarter of 2020. Any payout of cash or shares shall occur only after the certification of the Performance Metrics has occurred. The Company has the option of settling the PRSU component in cash.

6. **Performance Metrics and Weighting**:
   a) **Safety Metrics (inclusive of all safety-related Performance Metrics) (Weight: 65%)**:
      (i) **Nuclear Reliability and Safety Indicator (Weight: 5%)**: Measures nuclear power generation and safety based on performance indicators for nuclear power generation developed by the nuclear industry and applied to all U.S. nuclear power plants.
      (ii) **Public Safety Index (Weight: 25%)**: This metric includes two equally weighted sub-metrics:
         o **Enhanced Vegetation Management ("EVM")**: EVM measures how many circuit miles of vegetation have been cleared under the EVM program within high-fire risk areas.
         o **System Hardening**: System hardening measures completed circuit miles within high-fire risk areas such as the updating or undergrounding of overhead circuitry.
      (iii) **First-Time ILI Miles (Weight: 10%)**: Measures the number of miles of natural gas transmission pipelines that were successfully

---

[8] The total values do not take into account (i) any reduction that would be made as a result of the application of the PSI modifier and (ii) any awards potentially offered to Additional KEIP Participants.

inspected for the first time following the introduction of inspection tools (sensors) within the pipelines.

(iv) **Asset Records Duration Index (Weight: 10%):** Tracks the average number of days required to complete appropriate documentation of electric and gas construction projects.

(v) **Serious Injuries and Fatalities Corrective Actions Index (15%):** Measures the quality (as determined by an independent safety expert) and timeliness of corrective actions implemented in response to employee and contractor serious injuries and fatalities events.

b) **Customer Satisfaction (Weight: 10%):** Measures the number of customer complaints escalated to the CPUC.

c) **Financial Performance (Weight: 25%):** Earnings from Operations ("**EFO**"): Measures financial performance from ongoing core operations calculated as net income adjusted for income or expenses associated with events or circumstances outside of ongoing core operations.

7. **Award Payout Levels**: KEIP Participants are eligible to receive:

- *Below Threshold KEIP Performance*: If threshold performance is not achieved, there is no award.
- *Threshold KEIP Performance*: 50% of the Target KEIP Award is earned if the Debtors meet but do not exceed the threshold performance levels.
- *Target KEIP Performance*: 100% of the Target KEIP Award is earned if the Debtors achieve, but do not exceed target performance levels.
- *Maximum KEIP Performance*: 150% of Target KEIP Awards is earned if the Debtors meet maximum performance levels.

Notwithstanding the foregoing, if the aggregate score for the PSI metric (a) is below threshold level, the KEIP Awards that otherwise would be made shall be reduced by 50%; or (b) is at or above threshold level but below target level, the KEIP Awards that otherwise would be made shall be reduced by 25%.

8. **Computing Payout Levels:** KEIP Awards between (i) threshold and target and (ii) target and maximum will be interpolated on a linear basis.

9. **Public Safety Index Modifier:** As set forth above, a PSI modifier of -25% and -50% will be applied if the PSI metric does not reach target or threshold levels respectively. The PSI metric measures the electric operations safety component of the safety metric (25% of the 65% overall safety metric) and is most closely aligned with wildfire safety. Accordingly, if for the Performance Period, the aggregate score for the PSI metric is below threshold, the total payout for participant's 2019 KEIP Awards across all components will be reduced by 50% If, for the Performance Period, the aggregate score for the PSI metric is at or above threshold but below target, the total payout for the participant's 2019 KEIP Awards across all components will be reduced by 25%.

10. **Eligibility to Receive KEIP Award Payout upon Termination**: Each KEIP Participant shall only be eligible to receive a KEIP Award payout if such participant is employed by the Debtors as of the end of the Performance Period*; provided, however*, that if a KEIP Participant is terminated without cause or without "good reason" or similar standard, or upon disability, retirement or death, such KEIP Participant will remain eligible to receive a prorated share of the KEIP Award based on the percentage of time the KEIP Participant

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

remained employed during the Performance Period as if such participant was still employed at the end of the Performance Period. In addition, all KEIP Awards are subject to claw-back under PG&E Corp.'s Executive Incentive Compensation Recoupment Policy.

11. **Replacement of KEIP Participants**: In the event that a KEIP Participant's employment with the Debtors ends during the Performance Period, and the Debtors determine that an appropriate replacement should be made, either by external hire or by promotion from within, the new executive shall be eligible to receive a prorated share of the applicable KEIP Award based on the Performance Period for which they are employed; *provided, however,* that in no event shall the KEIP Award available to such new executive exceed the maximum award available to the departed executive, less any amounts paid to such departed executive.

12. **Additional KEIP Participants**: The Debtors shall have the ability to provide KEIP Awards for up to two (2) additional KEIP Participants in 2019, whether hired externally or promoted from within, whose job role and responsibilities would have qualified such executive to participate in the KEIP if they had held such position at the time of the KEIP's approval. The KEIP Awards available to such additional participants shall be determined in a manner consistent with the manner in which awards were determined for the initial KEIP Participants and shall not exceed in the aggregate a maximum value of $4,000,000.

The foregoing results in the following estimated award amounts: [9]

| | | | (All amounts are in 000s) | | |
|---|---|---|---|---|---|
| **Incumbent** | **Position** | **Base Salary** | **FY2019 Threshold KEIP $ Value** | **FY2019 Target KEIP $ Value** | **FY2019 Maximum KEIP $ Value** |
| Simon, John | EVP, Law, Strategy, & Policy | $695 | $917 | $1,834 | $2,751 |
| Wells, Jason | EVP and Chief Financial Officer | $630 | $892.5 | $1,785 | $2,678 |
| Loduca, Janet | SVP and General Counsel | $575 | $651.5 | $1,303 | $1,954 |
| Christopher, Melvin | VP, Gas Operations | $307 | $226.5 | $453 | $680 |
| Welsch, James | SVP and Chief Nuclear Officer | $545 | $407.5 | $815 | $1,222 |
| Lewis, Michael | SVP, Electric Operations | $450 | $379 | $758 | $1,136 |
| Kane, Julie | SVP, Chief Ethics & Compliance Officer & Deputy GC | $473 | $385.5 | $771 | $1,157 |
| Mistry, Dinyar | SVP, HR, Shared Services & Chief Diversity Officer | $565 | $413.5 | $827 | $1,240 |
| Giammona, Loraine | SVP and Chief Customer Officer | $505 | $395.5 | $791 | $1,186 |
| Wan, Fong | SVP, Energy Policy & Procurement | $414 | $368 | $736 | $1,104 |
| Kay, Kathleen | SVP and Chief Information Officer | $415 | $254 | $508 | $761 |
| Thomason, David | VP, CFO Utility and Controller | $325 | $176.5 | $353 | $529 |
| Total | | $5,899 | $5,466 | $10,931 | $16,397 |

## V. BASIS FOR RELIEF REQUESTED

The relief requested in this Motion should be approved for several reasons. First, the KEIP is

---

[9] These amounts are rounded and do not take into account (i) any reduction that would be made as a result of the application of the PSI modifier and (ii) any awards potentially offered to Additional KEIP Participants.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

incentive-based and aligns executive compensation with performance-based metrics previously approved in these Chapter 11 Cases and which are heavily weighted to safety. Second, the KEIP fully complies with the requirements of section 503 of the Bankruptcy Code and constitutes a sound exercise of the Debtors' business judgment. Further, the KEIP Awards are reasonable in light of market practice, and provide the KEIP Participants with the opportunity, if performance metrics are achieved, to realize a market rate of compensation.

## A. The KEIP is a Performance-Based Incentive Plan

Section 503(c)(1) of the Bankruptcy Code, which limits the Debtors' ability to award retention payments to insiders, is not applicable to the evaluation of the KEIP. By its plain language, section 503(c)(1) pertains solely to retention payments to insiders. *See, e.g.*, *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of section 503(c)(1)); *In re Musicland Holding Corp.*, No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (finding that incentive-based compensation under management incentive plan did not violate section 503(c) of the Bankruptcy Code; *In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 355-56 (Bankr. E.D. Va. 2016) ("[T]he analysis under § 503(c) changes when a debtor purports to make a payment not to retain an insider, but primarily to incentivize the insider to achieve certain goals, and] [o]n its face, § 503(c)(1) does not apply to the KEIP because the payments thereunder are incentive and not purely retentive.").

The KEIP, is incentive-based. It is expressly designed to reward KEIP Participants for performance, and not for retention purposes. *See Dana*, 358 B.R. at 575 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of section 503(c)(1) of the Bankruptcy Code). The KEIP provides for payments to certain critical executives only on the successful achievement of targeted safety, financial, and operational metrics. The KEIP has been carefully crafted to align the KEIP Participants' performance with key company goals, including wildfire

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

prevention, that will both maximize safety and enhance value for all of the Debtors' economic stakeholders.

Additionally, although the KEIP has not been designed with the goal of retaining KEIP Participants, the fact that the KEIP may encourage the KEIP Participants to remain employed with the Debtors throughout the chapter 11 cases does not bar implementation of the KEIP because it does not convert the KEIP into a retention plan. *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (noting that, "the fact that . . . all compensation has a retention element [did] not reduce the Court's conviction [that the debtor's primary goal in approving the incentive plans] was to create value by motivating performance"). Indeed, all successful incentive programs necessarily have the indirect benefit of incentivizing an employee to remain with the company. *See In re Alpha Natural Resources, Inc.*, 546 B.R. at 356 ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1)."). As set forth above, awards under the KEIP are purely performance-based and, additionally, there is no guarantee whatsoever that the KEIP Participants will receive any awards at the end of the Performance Period, even if the targets are achieved. The KEIP is plainly not a "pay to stay" plan within the purview of section 503(c)(1).

Moreover, the KEIP Performance Metrics are not easily achievable or "layups". *Cf. In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). The Performance Metrics are similar to those approved by this Court in connection with the 2019 STIP, where the Court considered the layup argument, and were carefully developed to take into account the Debtors' existing circumstances and needs, principally safety, financial performance, and customer satisfaction. The Debtors developed the Performance Metrics to incorporate certain independent benchmarks directly related to wildfire safety and regulatory compliance. For example, the Nuclear Safety and Reliability Indicator metric is based on an industry-wide standard that measures a nuclear power plant's safety and reliability. The Serious Injuries and Fatalities Corrective Actions Index metric is based on the assessment of an independent safety expert who is responsible for reviewing all corrective actions. The applicability of the PSI metric is based on the Utility's Wildfire Mitigation Plan and is subject to revision if the California Public Utilities Commission requires changes. Moreover, as indicated above, the KEIP includes an added

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

condition that automatically reduces the aggregate awards if either threshold or target performance is not achieved with respect to the PSI metric, thereby further demonstrating that achieving a KEIP award is hardly a layup.

The metrics used in the KEIP are intended to be challenging yet achievable.[10] The Debtors have only achieved their target STIP metrics in five of the past nine years and have never achieved a maximum score, providing further evidence that historically the Debtors have not established metrics that are easily achievable. By its design, the KEIP is a true incentive plan not only because of the Performance Metrics, but also because awards are not guaranteed. Rather, as with the 2019 STIP, the KEIP is an "at-risk" plan, which provides no guaranty of payment, but is comprised of weighted metrics, each designed specifically to motivate these executives to achieve the Debtors' safety, financial, and operational goals, and with complete final discretion left with the Compensation Committee and Board, as applicable.

In light of the foregoing, the Debtors submit that section 503(c)(1) of the Bankruptcy Code does not apply to the KEIP.

### B. The KEIP Satisfies Section 503(c)(3) of the Bankruptcy Code

Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the same business judgment standard utilized under section 363(b) of the Bankruptcy Code. *See In re Velo Holdings Inc.*, 472 B.R. at 209 (Bankr. S.D.N.Y. 2012) ("[The] 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Dana Corp.*, 358 B.R. at 576–77 (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, the determination of whether the KEIP is

---

[10] *See* testimony of John Lowe, Hr'g Tr. April 23, 2019, 23: 3-21; 26:8-27:8; and 43:5-7.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment under section 363(b) are the same.

Courts have generally utilized the *Dana* factors when determining if the structure of a compensation proposal and the process for its development meet the business judgment test. *See, e.g.*, *In re Residential Capital, LLC*, 491 B.R. 73, 84–85 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp., Inc.*, 453 B.R. at 473–74 (same). In *Dana*, the Bankruptcy Court set forth the following factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576–77.

As set forth below, to the extent applicable, all of these factors are satisfied as to the KEIP.

*First*, in light of the Debtors' current circumstances, the KEIP was carefully tailored to drive performance to achieve critical safety, financial, and operational objectives. The Debtors, in consultation

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

with their advisors, designed the KEIP to motivate and reward KEIP Participants who will have the greatest influence upon safety, compliance with the Debtors' Wildfire Mitigation Plan and, ultimately the successful resolution of these Chapter 11 Cases. The Performance Metrics were established as appropriate industry metrics that focus the KEIP Participants' efforts on items that are critical to the Debtors in these challenging times with a principal focus on safety. As stated, if the Debtors fail to meet the performance goals under the KEIP, the KEIP Participants will not be entitled to receive any payments.

*Second*, the KEIP falls within the range of competitive practice relative to company size and incentive structure and design of peer companies. As discussed above, WTW engaged in a benchmarking analysis to assist the Debtors with the design of the KEIP. WTW analyzed 21 companies with revenues greater than $1 billion that recently implemented KEIPs in chapter 11 (collectively, the "**Restructuring Peers**"). WTW determined that the KEIP is within the range of reasonableness when compared to KEIPs implemented by the Restructuring Peers.

In addition, as reflected in the Friske Declaration, WTW developed competitive target total direct compensation benchmarks from various data sources depending on position responsibilities that were confirmed with the Debtor's Human Resources department. Data sources used in WTW's analysis include: 1) proxy data from a sample of 19 peer companies ("**Peer Companies**") approved by the Compensation Committee, published survey compensation data for the Peer Companies, published survey data for the broader energy services industry, and published survey data for general industry companies. WTW matched the Debtors' KEIP Participants to Peer Companies' proxy data (where available), and to published survey benchmarks at the Peer Companies, companies in the energy services industry, and/or general industry companies based on its understanding of each participant's job duties and responsibilities within the Debtors' organization.

As stated in the Friske Declaration, WTW compared the Debtors' proposed target and maximum total direct compensation (reflecting base salary, target and maximum KEIP opportunities) for the KEIP Participants to market rates of pay. When compared to the market data, the aggregate target total direct compensation for the 12 KEIP Participants falls between the 25th percentile and 50th percentile of the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

market. At maximum performance, the aggregate maximum total direct compensation for the 12 KEIP Participants falls between the 50th percentile and the 75th percentile of the market. Accordingly, the costs of the KEIP are reasonable and well-justified given the size of the Debtors' businesses and the value that achievement of the Performance Metrics would bring to their estates.

*Third*, the scope of the KEIP is fair and reasonable. As noted herein, the KEIP is limited to the Debtors' 12 most senior executives, excluding the CEO, who will be the persons not only driving performance but also effectively guiding the Debtors through the chapter 11 process and to achieve their safety, financial, and operational goals. Furthermore, the Compensation Committee or the Board, as applicable, retains complete discretion to determine that any earned award should not be paid for any reason whatsoever. Additionally, the KEIP does not discriminate unfairly – the 2019 STIP applies to approximately 10,000 of the Debtors' other employees providing a similar opportunity to achieve market-based compensation.

*Fourth*, as discussed in the Friske Declaration, the KEIP comports with industry standards with respect to design and overall cost, including who is eligible to participate, the amount and type of awards, and the Performance Metrics.

*Fifth*, the KEIP was designed with the advice and in consultation with, among others, PG, the Debtors' independent compensation consultant, and WTW. As noted above, WTW engaged in industry benchmarking analyses and provided advice in the formulation of the program taking into account the Debtors' current circumstances and the ongoing administration of the Chapter 11 Cases.

*Sixth*, as referenced above, the KEIP is the product of due diligence with the input of the Debtors' professional advisors.

As noted above and in the Friske Declaration, if the Debtors do not receive approval from the Court for the KEIP, total direct compensation for the KEIP Participants will only reflect current base salaries. When base salaries only (absent a KEIP opportunity) are compared to the competitive market target total direct compensation data, the aggregate target total direct compensation for the 12 KEIP Participants falls significantly below the 25th percentile and even more significantly below the 50th percentile of the market.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The need for the KEIP is self-evident. In order to effectively operate and maximize the value of a business enterprise, appropriate incentive compensation programs must be provided. This serves to align senior management with the Debtors' key goals and motivates performance that, in this case, will ensure a keen focus on safety and drive value. It is also important to note that the KEIP will provide KEIP Participants with the opportunity, solely through performance, to achieve market-based compensation in a manner that will inure to the benefit of all of the Debtors' economic stakeholders and facilitate the successful conclusion of these Chapter 11 Cases.

### C. Implementation of the KEIP Is a Valid Exercise of the Debtors' Business Judgment under Section 363(b)(1) of the Bankruptcy Code

To the extent applicable, the KEIP should also be approved under section 363(b)(1) of the Bankruptcy Code. *See Alpha*, 546 B.R. at 356 ("Incentive payments under a KEIP are governed by the more general provisions of § 363(b)(1) . . . .").

Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a Court may authorize a debtor to enter into transactions outside the ordinary course of business where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts construing California corporate law have consistently

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

As demonstrated above, implementation of the KEIP is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors and their economic stakeholders. In addition, the KEIP utilizes similar safety, financial, and operational metrics as those provided for in the 2019 STIP, with an incremental emphasis on safety applicable to the most senior officers of the Debtors. The Debtors understand that these objectives must remain the key focus for KEIP Participants and, accordingly, have structured the KEIP to prioritize them. Accordingly, the Debtors request that the Court find that adoption of the KEIP is a sound exercise of the Debtors' business judgment and the facts and circumstances of the Chapter 11 Cases warrant approval of the KEIP.

## VI. REQUEST FOR BANKRUPTCY RULE 6004(h) WAIVER

To implement proper incentives, it is important the KEIP become effective promptly. Thus, the Debtors request a waiver of the 14-day stay (to the extent such stay applies) of an order authorizing the use, sale, or lease of property outside the ordinary course of business under Bankruptcy Rule 6004(h). Accordingly, the Debtors request that the Court find that ample cause exists to grant a waiver of Bankruptcy Rule 6004(h) and waive the stay to the extent it applies.

## VII. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) Counsel to the Engineers and Scientists of California Local 20; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the Office of the California Attorney General; (viii) the California Public Utilities Commission; (ix) the Nuclear Regulatory Commission; (x) the Federal Energy Regulatory Commission; (xi) the Office of the United States Attorney for the Northern District of California; (xii) counsel for the agent under the Debtors' debtor in possession financing facility; and (xiii) those persons who have formally appeared in

these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY  10153-0119

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Debtors' business judgment and in the best interests of their estates, creditors, shareholders, and all other parties interests, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: June 19, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: _/s/ Stephen Karotkin_____
      Stephen Karotkin

*Attorneys for Debtors*
*and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119