WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| - and - | (Lead Case)(Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** Debtors. | **DECLARATION OF DOUGLAS J. FRISKE IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(c) FOR ENTRY OF AN ORDER (I) APPROVING DEBTORS' INCENTIVE PROGRAM FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors | |
| * *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date: July 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>      Courtroom 17, 16th Floor<br>      San Francisco, CA 94102 |

I, Douglas J. Friske, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

I am a Managing Director at Willis Towers Watson PLC ("**WTW**"). WTW has been retained by Weil, Gotshal & Manges LLP ("**Weil**") on behalf of PG&E Corp. (and, together with Pacific Gas and Electric Company, "**PG&E**" or the "**Debtors**") to provide compensation consulting services to the Debtors. I am familiar with the pre- and post-petition structure of the Debtors' compensation programs, including the Debtors' proposed key employee incentive plan (the "**KEIP**") as set forth in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(c) for Entry of an Order (i) Approving Debtors' Incentive Program for Certain Key Employees and (ii) Granting Related Relief* (the "**Motion**").[1] I submit this Declaration (the "**Declaration**") in support of the Motion.

The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' books and records, the Debtors' employees, the Debtors' advisors and their employees, or from other members of the WTW team working under my supervision or direction. I have overseen a compensation consulting team since December 2018 that has provided various employee compensation consulting services to the Debtors.

My team and I have reviewed information supplied to us by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the KEIP is reasonable and generally consistent with applicable market practice for comparable utility companies as well as similarly-sized companies that have sought relief under chapter 11. Additionally, its implementation will enable the participants to potentially earn (if performance metrics are met) compensation levels within utility industry norms. I am not being specifically compensated for this testimony other than through payments received by WTW as a professional whose retention the Debtors will seek to obtain this Court's approval of pursuant to an application to be filed with this Court at a later date. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set

---

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

forth herein.

**A.  Background and Qualifications**

I received my Bachelor's degree in Finance from the University of Illinois in 1986. After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University, where I received a Master's degree in Management from Northwestern University's J.L. Kellogg Graduate School of Management in 1990. Since that time, I have been employed by WTW or its predecessor firms.

WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on four key business segments: corporate risk and brokering, human capital and benefits, exchange solutions, and investment, risk, and reinsurance.

My responsibilities at WTW have primarily involved consulting to large companies, specifically with regard to executive compensation. I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy. I am frequently retained by large companies to advise them on their employee compensation strategies, programs and pay levels, including compensation programs for new and incumbent Chief Executive Officers.

I am highly experienced in executive, management, and employee compensation matters with more than 28 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in approximately 100 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of post-petition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among many, American Airlines, Avaya, Breitburn Energy Partners, Claire's Stores, Inc., Energy Future Holdings, GenOn, The Great Atlantic & Pacific Tea Company, Longview Power, Midstates, Orchard Brands, Orexigen, Penn Virginia, Pernix, RadioShack, Reader's Digest Association, Round Table Pizza, Sabine Oil & Gas, Samson

Resources, Sbarro, Southeastern Grocers, VER Technologies, Sears Holdings Corporation, and Westmoreland Coal.

**B.  WTW's Involvement with the Debtors**

Since WTW was retained by Weil in December 2018, my team and I have familiarized ourselves with the Debtors' operations and business goals.  At the start of our engagement, WTW discussed with the Debtors and their advisors the Debtors' operational history, financial performance, and various issues regarding the Debtors' workforce and employee programs.  WTW reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

As the Court is aware, I advised the Debtors in connection with the formulation of their recently approved 2019 STIP and I submitted a Declaration in support of the Debtors' motion seeking approval and implementation of the 2019 STIP.  The Debtors performed significant due diligence in developing the KEIP, and my team and I collaborated with PG&E Corp.'s Compensation Committee of the Board of Directors (the "**Compensation Committee**"), PG&E Corp.'s Board of Directors (the "**Board**"), and the Debtors' other outside advisors in reviewing and advising on the KEIP.  Among other things, my team and I provided input and advice on the design and structure of the KEIP for reasonableness.  My analysis of the KEIP was presented to the Compensation Committee.  A primary goal in the course of these interactions was to develop an independent assessment of the Debtors' KEIP that drew directly upon relevant market data and my experience in designing comparable programs for similarly-situated companies.

**C.  KEIP Overview**

Pursuant to the Motion, the Debtors seek approval of the KEIP.  The KEIP provides 12 of the Debtors' senior executives (the "**KEIP Participants**") with the opportunity to earn annual cash and equity awards, if the Debtors achieve certain incentive-based performance goals linked to carefully designed safety, financial, and operational metrics (collectively the "**Performance Metrics**"), which are described in further detail below.  The value of the KEIP Awards (inclusive of equity portion) range from $5,465,500 at threshold performance to $16,396,500 at maximum performance at the stock

price on the date of grant. If target performance is met, the value of all KEIP Awards will be $10,931,000. The potential awards consist of 50% cash and 50% Performance Restricted Stock Units ("**PRSUs**"), with the actual value of PRSUs ultimately awarded subject to the market fluctuation of PG&E Corp.'s common stock from the date of the grant to the date the PRSUs are settled after the end of the Performance Period (as defined below). To that end, the actual value of earned awards may be above or below the threshold, target or maximum specified at grant as a result of the stock price at settlement.

I am informed that, historically, employee compensation for a significant portion of the Debtors' senior executives has been comprised of two components: base salary and a discretionary, incentive-based component which included an annual short-term incentive plan (the "**STIP**") and equity-based long-term incentive plan (the "**LTIP**"). I am further informed that as a result of the filing of these Chapter 11 Cases, the Debtors have suspended all LTIP equity grants to employees under the existing LTIP and did not include the KEIP Participants (other than Mr. Welsch and Mr. Christopher who were recently promoted) in the 2019 STIP. Accordingly, at this time, the KEIP Participants do not have any incentive-based element to their compensation structure, thereby resulting in their current compensation being substantially below market.

The target awards for the KEIP have been determined based on the historical STIP and LTIP target award values to provide the opportunity for the KEIP Participants to achieve market-based compensation for the 2019 fiscal year. Specifically, the target awards for the KEIP are based on 100% of the 2019 target STIP percentage opportunity for each participant plus 75% of the percentage opportunity of the 2019 target LTIP award for each participant, as approved by the Compensation Committee in December 2018, [2] in each case subject to adjustment based on the Public Safety Index modifier (as described below). The Debtors have reduced the value associated with the 2019 target LTIP award to account for, among other things, the cash component of the aggregate award (50%) and

---

[2] The targets for the 2019 STIP and 2019 LTIP programs were approved by the Compensation Committee prior to the filing of these Chapter 11 Cases. The KEIP Participants do not currently participate in the 2019 STIP, and the 2019 LTIP was not implemented.

the shorter vesting period of the PRSU component.[3] My team and I recommended the KEIP Awards be paid 50% in cash and 50% in the delivery of PRSUs with the option of the Board or Compensation Committee, as applicable, to pay the value of the PRSU component in cash valued at the stock trading price at the time the award is made.

The Performance Metrics and weightings for the KEIP are very similar to the performance metrics and weightings for the 2019 STIP, with certain modifications. Like the 2019 STIP, the proposed KEIP heavily prioritizes safety performance metrics by giving them a 65% weighting. Financial performance metrics are given a 25% weighting and customer-related performance metrics are given a 10% weighting.[4] In addition, the KEIP is subject to a Public Safety Index ("**PSI**") modifier of -25% and -50% if the PSI metric does not reach target or threshold levels respectively. The PSI measures the electric operations safety subcomponent of the safety metric (25% of the 65% overall safety metric) and is most closely aligned with wildfire safety. Accordingly, if for the Performance Period, the aggregate score for the PSI metric is below threshold, the total payout for participant's 2019 KEIP awards across all components will be reduced by 50%. If, for the Performance Period, the aggregate score for the PSI metric is at or above threshold but below target, the total payout for the participants' 2019 KEIP awards across all components will be reduced by 25%. Any award earned will be paid on an annual basis, after the end of the Performance Period, and is subject to the discretion of the Board of Directors and Compensation Committee. KEIP Awards can be completely eliminated for any reason, whether performance targets are met or not, and on an individual basis or otherwise.

The following is a summary of the key terms of the KEIP:

1. **KEIP Participants**: Twelve senior executive officers, John Simon (EVP, Law, Strategy and Policy); Jason Wells (EVP and Chief Financial Officer); Janet Loduca (SVP and General Counsel); Melvin Christopher (VP, Gas Operations); Michael Lewis (SVP, Electric Operations; Julie Kane (SVP, Chief Ethics & Compliance Officer, & Deputy General Counsel); Dinyar Mistry (SVP, Human Resources, Shared Services and

---

[3] Under the 2019 LTIP plan that was not implemented, the share-based awards consisting of restricted stock units, performance shares, and stock options typically had vesting periods lasting three years and generally represented more than 50% of the value of an employee's incentive-based compensation.

[4] For more information on the Performance Metrics and payout levels, see the testimony of John Lowe, Senior Director of Total Rewards of the Utility. Hr'g Tr. April 23, 2019; *Notice Regarding Filing of Documents Used During Oral Testimony at Hearing on STIP Motion*; *Corrected Declaration of Dinyar Mistry in support of Corrected Motion for Entry of Order Approving Short-Term Incentive Plan* [Docket No. 806]; and *Corrected Declaration of Douglas J. Friske in support of Motion for Entry of An Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief* [Docket No. 807].

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Chief Diversity Officer); Loraine Giammona (SVP and Chief Customer Officer); Fong Wan (SVP, Energy Policy & Procurement); Kathleen Kay (SVP and Chief Information Officer); James Welsch (SVP and Chief Nuclear Officer); and David Thomason (VP, CFO Utility and Controller).

2. **Total Program Cost**: The aggregate value of the KEIP Awards at grant range from $5,465,500 at threshold performance, $10,931,000 at target performance, and $16,396,500 at maximum performance. The potential awards consist of 50% cash and 50% PRSUs, with the PRSU value at settlement subject to market fluctuation of PG&E Corp.'s common stock from the date of the grant to the date the PRSUs are settled.[5] Accordingly, the actual value of earned awards may be above or below the threshold, target or maximum specified at grant as a result of the common stock price at settlement.

3. **Performance Period**: January 1, 2019 through December 31, 2019 (the "**Performance Period**").

4. **Form of KEIP Awards**: Incentive compensation will consist of (i) 50% cash and (ii) 50% PRSUs.

5. **Timing of KEIP Award Issuance and Payout:** Any cash component of the KEIP Awards, if earned, shall be paid in the first quarter of 2020. The PRSUs will be granted as soon as practicable after the Court's entry of an Order approving the KEIP on a date in compliance with the Debtors' Equity Grant Date Policy and, if earned and vested, will be settled in the first quarter of 2020. Any payout of cash or shares shall occur only after the certification of the Performance Metrics has occurred. The Company has the option of settling the PRSU component in cash.

6. **Performance Metrics and Weighting:**
    a) **Safety Metrics (inclusive of all safety-related Performance Metrics) (Weight: 65%):**
        (i) **Nuclear Reliability and Safety Indicator (Weight: 5%):** Measures nuclear power generation and safety based on performance indicators for nuclear power generation developed by the nuclear industry and applied to all U.S. nuclear power plants.
        (ii) **Public Safety Index (Weight: 25%):** This metric includes two equally weighted sub-metrics:
            - **Enhanced Vegetation Management ("EVM"):** EVM measures how many circuit miles of vegetation have been cleared under the EVM program within high-fire risk areas.
            - **System Hardening:** System hardening measures completed circuit miles within high-fire risk areas such as the updating or undergrounding of overhead circuitry.

---

[5] The total values do not take into account (i) any reduction that would be made as a result of the application of the PSI modifier and (ii) any awards potentially offered to Additional KEIP Participants.

     (iii) **First-Time ILI Miles (Weight: 10%):** Measures the number of miles of natural gas transmission pipelines that were successfully inspected for the first time following the introduction of inspection tools (sensors) within the pipelines.
     (iv) **Asset Records Duration Index (Weight: 10%):** Tracks the average number of days required to complete appropriate documentation of electric and gas construction projects.
     (v) **Serious Injuries and Fatalities Corrective Actions Index (15%):** Measures the quality (as determined by an independent safety expert) and timeliness of corrective actions implemented in response to employee and contractor serious injuries and fatalities events.
    b) **Customer Satisfaction (Weight: 10%):** Measures the number of customer complaints escalated to the CPUC.
    c) **Financial Performance (Weight: 25%):** Earnings from Operations ("**EFO**"): Measures financial performance from ongoing core operations calculated as net income adjusted for income or expenses associated with events or circumstances outside of ongoing core operations.

7. **Award Payout Levels**: KEIP Participants are eligible to receive:
   - *Below Threshold KEIP Performance*: If threshold performance is not achieved, there is no award.
   - *Threshold KEIP Performance*: 50% of the Target KEIP Award is earned if the Debtors meet but do not exceed the threshold performance levels.
   - *Target KEIP Performance*: 100% of the Target KEIP Award is earned if the Debtors achieve, but do not exceed target performance levels.
   - *Maximum KEIP Performance*: 150% of Target KEIP Awards is earned if the Debtors meet maximum performance levels.

Notwithstanding the foregoing, if the aggregate score for the PSI metric (a) is below threshold level, the KEIP Awards that otherwise would be made shall be reduced by 50%; or (b) is at or above threshold level but below target level, the KEIP Awards that otherwise would be made shall be reduced by 25%.

8. **Computing Payout Levels:** KEIP Awards between (i) threshold and target and (ii) target and maximum will be interpolated on a linear basis.

9. **Public Safety Index Modifier:** As set forth above, a PSI modifier of -25% and -50% will be applied if the PSI metric does not reach target or threshold levels respectively. The PSI metric measures the electric operations safety component of the safety metric (25% of the 65% overall safety metric) and is most closely aligned with wildfire safety. Accordingly, if for the Performance Period, the aggregate score for the PSI metric is below threshold, the total payout for participant's 2019 KEIP Awards across all components will be reduced by 50% If, for the Performance Period, the aggregate score for the PSI metric is at or above threshold but below target, the total payout for the participant's 2019 KEIP Awards across all components will be reduced by 25%.

10. **Eligibility to Receive KEIP Award Payout upon Termination**: Each KEIP Participant shall only be eligible to receive a KEIP Award payout if such participant is employed by the Debtors as of the end of the Performance Period*; provided, however*, that if a KEIP Participant is terminated without cause or without "good reason" or similar standard, or upon disability, retirement or death, such KEIP Participant will remain eligible to receive a prorated share of the KEIP Award based on the percentage of time the KEIP Participant remained employed during the Performance Period as if such participant was still employed at the end of the Performance Period. In addition,

all KEIP Awards are subject to claw-back under PG&E Corp.'s Executive Incentive Compensation Recoupment Policy.

11. **Replacement of KEIP Participants**: In the event that a KEIP Participant's employment with the Debtors ends during the Performance Period, and the Debtors determine that an appropriate replacement should be made, either by external hire or by promotion from within, the new executive shall be eligible to receive a prorated share of the applicable KEIP Award based on the Performance Period for which they are employed; *provided, however,* that in no event shall the KEIP Award available to such new executive exceed the maximum award available to the departed executive, less any amounts paid to such departed executive.

12. **Additional KEIP Participants**: The Debtors shall have the ability to provide KEIP Awards for up to two (2) additional KEIP Participants in 2019, whether hired externally or promoted from within, whose job role and responsibilities would have qualified such executive to participate in the KEIP if they had held such position at the time of the KEIP's approval. The KEIP Awards available to such additional participants shall be determined in a manner consistent with the manner in which awards were determined for the initial KEIP Participants and shall not exceed in the aggregate a maximum value of $4,000,000.

The foregoing results in the following estimated award amounts: [6]

| | | | | | |
|---|---|---|---|---|---|
| (All amounts are in 000s) | | | | | |
| Incumbent | Position | Base Salary | FY2019 Threshold KEIP $ Value | FY2019 Target KEIP $ Value | FY2019 Maximum KEIP $ Value |
| Simon, John | EVP, Law, Strategy, & Policy | $695 | $917 | $1,834 | $2,751 |
| Wells, Jason | EVP and Chief Financial Officer | $630 | $892.5 | $1,785 | $2,678 |
| Loduca, Janet | SVP and General Counsel | $575 | $651.5 | $1,303 | $1,954 |
| Christopher, Melvin | VP, Gas Operations | $307 | $226.5 | $453 | $680 |
| Welsch, James | SVP and Chief Nuclear Officer | $545 | $407.5 | $815 | $1,222 |
| Lewis, Michael | SVP, Electric Operations | $450 | $379 | $758 | $1,136 |
| Kane, Julie | SVP, Chief Ethics & Compliance Officer & Deputy GC | $473 | $385.5 | $771 | $1,157 |
| Mistry, Dinyar | SVP, HR, Shared Services & Chief Diversity Officer | $565 | $413.5 | $827 | $1,240 |
| Giammona, Loraine | SVP and Chief Customer Officer | $505 | $395.5 | $791 | $1,186 |
| Wan, Fong | SVP, Energy Policy & Procurement | $414 | $368 | $736 | $1,104 |
| Kay, Kathleen | SVP and Chief Information Officer | $415 | $254 | $508 | $761 |
| Thomason, David | VP, CFO Utility and Controller | $325 | $176.5 | $353 | $529 |
| Total | | $5,899 | $5,466 | $10,931 | $16,397 |

**D. Analysis of Total Direct Compensation for KEIP Participants**

In assessing the reasonableness of the KEIP, I worked with my team to analyze competitive target total direct compensation, a standard benchmark that includes base salary, short-term incentives, and long term incentives, for all KEIP Participants.

My team and I developed competitive target total direct compensation benchmarks from

---

[6] These amounts are rounded and do not take into account (i) any reduction that would be made as a result of the application of the PSI modifier and (ii) any awards potentially offered to Additional KEIP Participants.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

various data sources depending on position responsibilities that were confirmed with the Debtor's Human Resources department. Data sources used in WTW's analysis include: 1) proxy data from a sample of 19 peer companies ("**Peer Companies**") approved by the Compensation Committee[7], published survey compensation data for the Peer Companies, published survey data for the broader energy services industry, and published survey data for general industry companies. My team and I matched the Debtors' KEIP Participants to Peer Companies' proxy data (where available), and to published survey benchmarks at the Peer Companies, companies in the energy services industry, and/or general industry companies based on our understanding of each participant's job duties and responsibilities within the Debtors' organization.

I compared the Debtors' proposed target and maximum total direct compensation (reflecting base salary, target and maximum KEIP opportunities) for the KEIP Participants to market rates of pay. When compared to the market data, the aggregate target total direct compensation for – the 12 KEIP Participants falls between the 25th percentile (+7%) and 50th percentile (-16%) of the market. At maximum performance, the aggregate maximum total direct compensation for the 12 KEIP Participants falls between the 50th percentile (+11%) and the 75th percentile (-17%) of the market.

If the Debtors do not receive approval from the Court for the KEIP, total direct compensation for the KEIP Participants will only reflect current base salaries. When base salaries only (absent a KEIP opportunity) are compared to the competitive market target total direct compensation data, the aggregate target total direct compensation for the 12 KEIP Participants falls significantly below the 25th percentile (-62%) and even more significantly below the 50th percentile (-71%) of the market.

Based on the results of these benchmarking analyses, and my experience in other incentive compensation arrangements implemented in chapter 11 cases, I believe that the KEIP and the potential total direct compensation levels are reasonable in light of competitive market practice for other companies. Critically, the absence of an incentive opportunity for the KEIP Participants significantly

---

[7] The following Peer Companies were used in our proxy benchmarking analyses for select positions: The AES Corporation; Ameren Corporation; American Electric Power Company, Inc., CenterPoint Energy, Inc.; Consolidated Edison, Inc.; Dominion Energy, Inc.; DTE Energy Company; Duke Energy Corporation; Edison International; Entergy Corporation; Eversource Energy; Exelon Corporation; FirstEnergy Corp.; NextEra Energy, Inc.; Public Service Enterprise Group Incorporated; Sempra Energy; The Southern Company; WEC Energy Group, Inc.; and Xcel Energy Inc.

undermines the current competitiveness of the Debtors' compensation structure (as it would be comprised of just base salary), and, as stated, results in compensation opportunities for the KEIP Participants being substantially below market.

**E.     Analysis of the KEIP Structure and Overall Cost**

In assessing the reasonableness of the overall design of the KEIP, I worked with my team to analyze incentive practices in two relevant benchmark groups: (i) Peer Companies; and (ii) a sample of 21 companies with revenues greater than $1 billion that recently implemented KEIPs in chapter 11 (collectively, the "**Restructuring Peers**").[8]  Based on my extensive experience in general, and in working with companies to develop appropriate incentives in restructuring scenarios, in particular, I believe these benchmark groups are appropriate for assessing the reasonableness of the KEIP design and overall cost.  It should be noted that the Debtors are the largest company among the Restructuring Peers and among the largest of the Peer Companies based on revenue; and as such, costs of the KEIP should be considered in light of the Debtors' relative size, as compensation levels are typically calibrated based on the size and scope of a company's operations.

The KEIP was designed to reflect the unique circumstances of this case, taking into consideration typical market practices in both restructuring scenarios as well as normal course, utility industry practices.  Specific KEIP design features intended to recognize common restructuring practice include: (i) the use of a single incentive plan, rather than more customary pre-petition short and long-term incentive programs; (ii) shorter than normal performance and vesting periods, relative to typical long-term incentive programs, to reflect the focus on expeditiously working through the restructuring; and (iii) a greater than normal reliance on cash compensation, recognizing uncertainty associated with equity value.

Specific KEIP design features intended to recognize common design practices in the utility industry include:

- **Performance Measures and Weighting:** The number of performance measures in the KEIP are consistent with the Debtors' Peer Companies' practices where 90% of the Debtors' peer group used four or more performance metrics. Financial performance measures were used at

---

[8] The Restructuring Peers include: Alpha Natural Resources; Avaya Inc; CJ Holding Co.; Claire's Inc.; Edison Mission Energy; Energy Future Holdings Corp.; FirstEnergy Solutions Corp.; GenOn Energy; hhgregg, Inc.; iHeartMedia, Inc.; Linn Energy; NII Holdings, Inc.; Optim Energy, LLC; Patriot Coal; Peabody Energy Corporation; Quiksilver Inc.; Real Industry, Inc.; Republic Airways Holdings Inc.; SunEdison; Toys "R" Us Inc.; Westinghouse Electric Company LLC.

100% of the Debtors' Peer Companies. Similarly, nonfinancial measures were also used at 100% of the Peer Companies, specifically, health and safety measures are common and were used at 68% of the peer companies, and customer service measures were used at 47% of peer companies.

- **Payouts:** It is common to have payouts in alignment with the performance period for both normal course and for restructuring incentive programs. Further, cash-settlement is consistent with market practice for annual incentive awards and normal course long-term incentives are often settled in stock or cash.

- **Award Ranges:** Payout schedules that allow for a range of outcomes based on achieving threshold, target and maximum performance levels are common. The payout curve of the KEIP is reasonable and somewhat conservative on the upside when compared to market practice (generally 50% - 200% is the common payout range for threshold to maximum).

- **Performance Ranges**: The threshold and maximum payout funding percentages in the KEIP are also consistent with "general industry" companies, and specifically, among the Debtors' Peer Companies:
    - Threshold payout funding of 25% to 50% is common (ranged from 0% to 97.5%); and
    - Maximum payout funding of 200% was common (ranged from 102.5% to 200%).

To assess the reasonableness of the overall cost of the KEIP, my team and I reviewed the proposed cost of the KEIP expressed as a percentage of the Debtors' revenue relative to KEIPs implemented by the Restructuring Peers. My team and I determined that the target and maximum annual KEIP funding as a percentage of revenue falls below the 25th percentile of the KEIPs implemented by the Restructuring Peers. Accordingly, in my opinion, the overall costs of the KEIP are reasonable and well-justified given the size of the Debtors' businesses and the value that achievement of the Performance Metrics would bring to the estates.

For these reasons, and based on my experience with incentive-based compensation programs by companies in chapter 11 and otherwise, I believe the design, cost and individual award opportunities available under the Debtors' KEIP are reasonable and consistent with market practice.

**F.     Conclusion**

Based on my experience and the work WTW and I have done in these cases and similar cases, I believe the Performance Metrics, design, and range of potential KEIP Awards are reasonable given the facts and circumstances of these Chapter 11 Cases.

Pursuant to section 1746 of title 28 of the United States Code, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 19, 2019

Chicago, Illinois

_____
Douglas J. Friske, Managing Director
Willis Towers Watson PLC