AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
idizengoff@akingump.com
dbotter@akingump.com
aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
Email: avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION,**

**-and-**

**PACIFIC GAS AND ELECTRIC COMPANY,**

☐ Affects PG&E Corporation

☐ Affects Pacific Gas and Electric Company

☒ Affects both Debtors

**All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

Bankruptcy Case No. 19-30088 (DM)

Chapter 11

(Lead Case)

(Jointly Administered)

**MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**

**<u>Hearing</u>**
Date: July 23, 2019
Time: 9:30 a.m. (Pacific Time)
Place: Courtroom 17
450 Golden Gate Ave, 16th Floor
San Francisco, CA 94102

The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby submits this motion (the "Motion") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form attached as **Exhibit A** hereto, terminating the Debtors' exclusive periods to file and solicit acceptances of a plan of reorganization (the "Exclusive Periods"). In support of this Motion, the Ad Hoc Committee respectfully states the following:

## PRELIMINARY STATEMENT

1. The Ad Hoc Committee files this Motion to terminate the Exclusive Periods so that it may file and pursue confirmation of a plan of reorganization that it believes will allow the Debtors to emerge successfully from chapter 11 by the end of 2019 or shortly thereafter, well in advance of the 2020 California wildfire season. The need to exit bankruptcy expeditiously is paramount. It has been five months since the Petition Date, and a new wildfire season has already begun. Yet the Debtors have proposed no plan—either publicly or in any communications with the Ad Hoc Committee—to protect critical stakeholders, including customers and other residents in its service territory, employees and creditors. Progress towards a viable, confirmable plan is long overdue. The stakes have recently become substantially higher for the Debtors and all other stakeholders following the unveiling of the Governor's wildfire legislative package (the "Proposed Wildfire Safety Legislation") that will require the Debtors to exit bankruptcy by June 30, 2020 in order to access a proposed wildfire recovery fund (the "Wildfire Recovery Fund").[2]

2. Despite the obvious urgency, the Debtors have wasted crucial time needlessly overhauling its board of directors to protect and entrench the parochial interests of an aggressive new

---

[1] The Ad Hoc Committee filed a statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure on March 5, 2019 [Docket No. 744]. Members of the Ad Hoc Committee hold in excess of $10 billion of funded debt claims against the Debtors.

[2] *Catastrophic Wildfires, Climate Change and Our Energy Future: Governor Newsom's Strike Force Progress Report*, dated June 21, 2019, at 9. The progress report can be found at https://www.gov.ca.gov/wp-content/uploads/2019/06/Strike-Force-Progress-Report.pdf

subset of equity holders. The valuable time spent resolving these internal disputes and then educating new directors—the majority of whom have little or no utility and safety experience[3]—has come at the expense of making critical progress towards a successful and swift exit from Chapter 11. And worse, the composition of the reconstituted board raises critical plan process concerns regarding the Debtors' ability to prioritize a rapid and equitable exit from these cases above the economic interests of equity holders. This also has meaningful consequences for the appropriate oversight and governance of the company after it emerges from chapter 11 and its ability to meet the safety requirements of the Proposed Wildfire Safety Legislation. This is absolutely critical for PG&E to be able to provide safe, reliable, clean utility services to its customers in an affordable manner, which is after all its core mission.

3. No one can dispute that exiting these cases hinges on two critical steps. First, substantial new capital must be infused into the company to (i) resolve fairly and pay the Debtors' current wildfire liabilities, (ii) address the Debtors' potential future wildfire liabilities, (iii) fund the Debtors' implementation of substantial safety measures and "harden" their electrical grid and equipment in order to reduce the occurrence of future wildfires, and (iv) to recapitalize the Utility's balance sheet in-line with its regulatory construct. Second, consensus must be built among a diverse set of stakeholders around a confirmable plan construct. As set forth in more detail below, the Ad Hoc Committee has made progress in taking those steps. The Ad Hoc Committee is willing to fund the reorganized company with fresh equity, which will restore strong investment grade credit metrics so PG&E can once again access low cost capital going forward for all of its necessary long-term infrastructure investments. This is in stark contrast to relying on broad securitization or other financial engineering and off balance sheet debt that we believe the Debtors and equity holders are contemplating. By providing a framework to resolve the diverse interests of the numerous stakeholder constituencies, the Ad Hoc Committee's Term Sheet (as defined herein) reflects compromises that would ensure PG&E'slong-term viability without ratepayers shouldering the costs of the restructuring—another requirement under the Governor's Proposed Wildfire Safety Legislation for participation in the Wildfire Recovery Fund.

[3] Governor Newsom raised this critique in his letter to the interim CEO after the new board was announced, stating he was troubled to learn the PG&E board would be reconstituted with individuals "with little or no experience in California and inadequate expertise in utility operations, regulation and safety." Press Release, Office of Gov. Gavin Newsom, Governor Newsom Statement on PG&E Board (March 28, 2019), https://www.gov.ca.gov/2019/03/28/pge-board/.

4. In contrast, the Debtors have offered nothing that is viable to move these cases forward. While the Ad Hoc Committee is an obvious source of the fresh capital needed to exit bankruptcy, the Debtors have not approached the members of the Ad Hoc Committee about providing funding—even though the members of the Ad Hoc Committee have made it clear that they are willing to provide such capital. Nor have the Debtors sought to commence discussions with the Ad Hoc Committee regarding a plan of reorganization. Whatever their reasons for failing to engage with one of their largest creditor constituencies, the Debtors' sluggish pace endangers all stakeholders.

5. On May 22, 2019, when this Court, over the objection of a number of parties in interest, extended the Debtors' Exclusive Periods, it made clear that it would consider plan proposals from any party in interest and would terminate exclusivity if such party presented a confirmable plan of reorganization, and therefore, the Ad Hoc Committee decided to act. Taking the Court's words to heart and realizing that there must be an alternative to languishing in chapter 11, the Ad Hoc Committee worked diligently with multiple key stakeholders to develop the viable path forward set forth in the detailed term sheet, attached hereto as **Exhibit B** (the "Term Sheet"),[4] which sets forth a viable, confirmable plan of reorganization, the centerpiece of which is up to $30 billion of new money investment (the vast majority of which is equity) in the Debtors by members of the Ad Hoc Committee, an amount the Ad Hoc Committee believes will be unrivaled in any competing proposal that may be put forward. The Term Sheet provides, among other things, that $16 billion (or up to $2(+) billion more under certain circumstances) of this new investment will be used tocompensate ***all*** holders of prepetition wildfire claims. Importantly, because such wildfire claims are being paid with proceeds from the new money equity investment, the plan that the Ad Hoc Committee will file if the Exclusive Periods are terminated ***will be rate neutral to PG&E customers***. The new money investment contemplated by the Ad Hoc Committee's Term Sheet also provides substantial capital to fund critical improvements to the Debtors' electric utility infrastructure so that PG&E may provide safe and reliable electrical service to

[4] The Ad Hoc Committee attached the Term Sheet hereto based upon this Court's statements in the prior PG&E bankruptcy to demonstrate the concrete nature of its proposed plan construct. *See In re Pacific Gas and Electric Co.*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Jan. 16, 2002), Tr. Jan. 16, 2002 Hearing ("In my experience one of the most impressive ways to beat an exclusivity motion is to attach the competing plan, to show the Court, 'I've got a real plan. I'm for real.'").

Case: 19-30088 Doc# 2741 Filed: 06/25/19 Entered: 06/25/19 05:18:45 Page 4 of 47

all customers in a cost-effective manner going forward and meet California's leading renewables standards. In addition, the Term Sheet provides that a portion of the new money proceeds will be contributed to a long-term wildfire fund that the Ad Hoc Committee expects will be created as part of new California legislation to insure against utility-related wildfire liabilities across the state.

6. In short, the Term Sheet provides a viable, comprehensive and credible solution that will allow the Debtors to emerge from bankruptcy quickly, maintain an investment-grade credit rating in the future and meet the requirements of the Proposed Wildfire Safety Legislation. The plan of reorganization embodied in the Term Sheet is advantageous to virtually every key stakeholder in these chapter 11 cases. The benefits that will result from confirmation of the plan of reorganization contemplated by the Term Sheet include the following:

| KeyStakeholder | Impact |
|---|---|
| Past Wildfire Claimants | A $16 billion trust (or up to $2(+) billion more under certain circumstances) established to ensure these claimants receive timely, fair cash recovery for all resolved claims. |
| Potential Future Wildfire Claimants | PG&E to contribute $4 billion to establish a broad-based utility wildfire fund.<br><br>Representatives of wildfire fund shall receive the right to nominate one (1) member to pro forma PG&E board. |
| Customers | Rate neutral to PG&E customers.<br><br>Customers shall receive the right to nominate one (1) director to pro forma PG&E board. |
| Employees | Preserves and protects PG&E employees and pensioners. After emergence, all California utilities should have access to more abundant, low-cost capital to pursue operating and capital projects which will provide increased opportunities for employees.<br><br>PG&E employees shall receive the right to nominate one (1) director to pro forma PG&E board. |
| Renewables Standards | Current PG&E renewables agreements remain intact and all California utilities have access to capital to invest further in core transmission infrastructure to facilitate nation-leading renewables standards. |
| Ratings Agencies | PG&E fully recapitalized and its credit metricsreestablished consistent with other large U.S. investment grade-rated regulated utilities. |
| California Utilities and Investors | A long-term functioning framework with more certainty and transparency established with reasonable rates of return ensured. |
| State of California | The Term Sheet provides for more financially sound statewide |

| | utilities and does not require a legislative change to the current inverse condemnation regime. |
|---|---|

7. The Ad Hoc Committee submits that the plan of reorganization contemplated by the Term Sheet represents the best, and currently only, path forward for the Debtors and all of their stakeholders and requests that the Court terminate the Exclusive Periods so that the Ad Hoc Committee may file and solicit acceptances of a plan that is consistent with the Term Sheet.

**JURISDICTION AND VENUE**

8. The Court has jurisdiction to consider this matter pursuant to 28 U.S. C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules").

9. This is a core proceeding pursuant to 28 U.S.C. §157(b).

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory basis for the relief requested in this Motion is section 1121(d) of the Bankruptcy Code.

**BACKGROUND**

12. The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code on January 29, 2019. The Debtors have been in chapter 11 in excess of 5 months and have neither presented a plan of reorganization, nor indicated they are close to being able to do so despite already being in the 2019 wildfire season.

13. On May 1, 2019, the Debtors filed a motion requesting an extension of the exclusive period to file a plan of reorganization to November 29, 2019 and the exclusive period to solicit such a plan to January 28, 2020 [Docket No. 1797] (the "Exclusivity Extension Motion"). Objections to the Exclusivity Motion were filed by, among others, the Official Committee of Unsecured Creditors [Docket No. 2009], the Official Committee of Tort Claimants [Docket No. 2017], and a group of fire victim claimants represented by the Singleton Law Firm [Docket No. 2019]. The Ad Hoc Committee filed a joinder to the objection of the Official Committee of Unsecured Creditors [Docket No. 2058].

Case: 19-30088 Doc# 2741 Filed: 06/25/19 Entered: 06/25/19 05:18:45 Page 6 of 47

14. On May 22, 2019, the Court conducted a hearing to consider the Exclusivity Extension Motion (the "Exclusivity Hearing"). At the Exclusivity Hearing, the Court stated that while it was extending the Exclusive Periods, it would consider terminating them if a viable plan were put forward by a party in interest, noting "the door is half open to the Ad Hoc Committee, the Tort Claimant Committee, or any other party who believes there's a way to come up with a credible, potentially confirmable plan, other than what the Debtors' counsel might have." Hr'g Tr. 76:9-13, May 22, 2019.

15. On May 24, 2019, this Court entered an order extending the period during which the Debtors have the exclusive right to file a plan until September 26, 2019, and the period during which the Debtors have the exclusive right to solicit acceptances of such plan until November 26, 2019 [Docket No. 2226] (the "Exclusivity Extension Order").

**RELIEF REQUESTED**

16. By this Motion, the Ad Hoc Committee seeks entry of an order terminating the Debtors' Exclusive Periods to permit the Ad Hoc Committee to file and solicit acceptances of a plan of reorganization based on the terms set forth in the Term Sheet. A proposed form of order approving the relief requested herein is annexed hereto as Exhibit A.

**BASIS FOR RELIEF**

17. Section 1121 of the Bankruptcy Code governs who may file a chapter 11 plan of reorganization and when such plan may be filed. 11 U.S.C. § 1121. It provides that a debtor has the exclusive right to file a plan within the first 120 days after the order for relief and, if such plan is filed, the debtor is given 180 days (running concurrently) in which to obtain acceptance of the plan. 11 U.S.C. § 1121(b), (c).

18. The Bankruptcy Court "may for cause reduce or increase the 120-day period or the 180-day period" upon the request of a party in interest and after notice and a hearing. 11 U.S.C. § 1121(d)(1). After the Exclusive Periods have passed, any "party in interest" may file a plan. 11 U.S.C. § 1121(c).

19. The Bankruptcy Code does not define what constitutes "cause" for purposes of reducing or increasing the Exclusive Periods. Rather, courts have recognized that the "cause standard allows bankruptcy courts "maximum flexibility to suit various types of reorganization proceedings." *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (noting Congress's reasons for

enacting section 1121 include the intention to "cure the prior practice that gave debtors undue bargaining leverage to delay and thereby force a settlement out of otherwise unwilling creditors" (citations omitted)). Section 1121 is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (noting that one of the fundamental purposes of section 1121 of the Bankruptcy Code is "to limit the delay that makes creditors the hostages of chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988).

20. The determination of "cause" to alter the Exclusive Periods is a case-by-case inquiry which rests within the sound discretion of the bankruptcy court. *See In re New Meatco Provisions, LLC*, No. 2:13-BK-22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) ("A decision whether to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court and is fact-specific.") (quoting *In re Adelphia Comms. Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006)); *see also Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)*, 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002) (stating the question of cause in an exclusivity proceeding "is inherently fact-specific and calls for a delicate exercise of judgment about which seasoned judges could differ."). The primary consideration for a court in determining whether exclusivity should continue or terminate is whether termination "will move the case forward." *In re Adelphia Commc'ns Corp.*, 352 B.R. at 590; *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

21. In the Utility's prior chapter 11 case filed in 2001, this Court terminated the Utility's Exclusive Periods upon the filing by the California Public Utility Commission (the "CPUC") of a term sheet containing key terms of CPUC's alternative plan of reorganization. *In re Pacific Gas and Electric Company*, No. 01-30923, Hr'g Tr. at 155:15, February 27, 2002. The Court terminated exclusivity, despite noting that CPUC's proposal raised confirmation and feasibility issues, finding that for purposes of the exclusivity determination, "the Debtor has a high burden to show cause to extend exclusivity, and the creditor, in this case, the Commission, has a lower burden to demonstrate *a not legally impermissible plan*, and it has done so." *Id.*, Hr'g Tr. at 157:10-13 (emphasis added).

22. Similarly, at the Exclusivity Hearing, the Court made clear that, although it was extending the Debtors' Exclusive Periods, the Court would consider motions to terminate exclusivity by any party in interest that believes there is "a way to come up with a credible, potentially confirmable plan." Hr'g Tr. 76:10-12, May 22, 2019.

23. The plan of reorganization embodied in the Term Sheet is both credible and confirmable. The plan of reorganization contemplated by the Ad Hoc Committee provides $30 billion in new money to the Debtors funded on the effective date of the plan of reorganization. The new money investment will be raised from an investor consortium composed of the largest holders of the Utility's bonds that are members of the Ad Hoc Committee. Moreover, the entirety of the new money investment would be backstopped by highly credible and well-capitalized financial institutions that are long-term investors in the Utility, other California utilities and California generally. The proceeds of the new money investment would be used to: (i) fund the creation of a trust for the purpose of administering and paying all allowed wildfire claims in full, (ii) make the contribution consistent with the Proposed Wildfire Safety Legislation, (iii) pay in full outstanding claims under the debtor-in-possession financing facility, and (iv) pay in full all Utility bonds, term loans and revolving debt maturing prior to December 31, 2022. Pursuant to the attached Term Sheet, the holders of the Utility's longer-term bonds maturing on January 1, 2023 or later will receive replacement notes. Trade claims will be paid in full in the ordinary course of business, and the Debtors' pension-related obligations will be assumed and unaffected by the Debtors' bankruptcy.

24. The Ad Hoc Committee's construct contemplates a fresh capital commitment of unprecedented scale and should result in California statewide utilities having their credit ratings restored and once again having access to significant low cost capital. This will allow for substantial electric utility infrastructure and system hardening to further (i) enhance overall safety; (ii) increase system-wide reliability; (iii) reduce the risk of wildfires across communities statewide; (iv) rebuild infrastructure in areas impacted by wildfires; and (v) allow California to achieve its nation-leading renewable energy goals. ***Importantly, the Ad Hoc Committee believes the plan of reorganization contemplated by the Term Sheet will meet the Governor's mandate that a PG&E plan of reorganization be rate neutral to PG&E customers, without requiring any undue financial engineering***. The Ad Hoc Committee's plan

Case: 19-30088 Doc# 2741 Filed: 06/25/19 Entered: 06/25/19 05:18:45 Page 9 of 47

is advantageous to virtually every stakeholder in these cases. At the very least, the Term Sheet provides a framework that enables all stakeholders to engage in good faith negotiations immediately, as contemplated by the chapter 11 plan process, which negotiations have simply not yet taken place.

25. If the plan of reorganization contemplated by the Term Sheet is confirmed, the key benefits will include:

- Establishment of a trust to ensure that past wildfire claimants will receive timely, fair recovery for all resolved claims;
- Establishment of a well-capitalized, sustainable fund to insureagainst future utility-related wildfires;
- Electricity rates to PG&E customers will be unaffected by the restructuring and no longer subject to the negative consequences of prolonged uncertainty that drive up the cost of capital for utilities;
- Preservation and protection of PG&E employees and pensioners and their benefits;
- Continuation of, without disruption or modification, PG&E's current renewables contracts and commitment to clean energy;
- Establishment of a long-term functioning framework to ensure reasonable rates of return going forward for California statewide utility investors;
- Allowance for quicker, lower-cost system investment to enhance safety and maximize reliability; and
- Full recapitalization of PG&E and reestablishment of credit metrics consistent with other large U.S. investment grade-rated regulated utilities.

26. Other than the recent settlement to resolve the wildfire claims of 18 local public entities,[5] which the Ad Hoc Committee and, upon information and belief, other major constituents, including the Official Committee of Unsecured Creditors, learned of for the first time through the press reports

[5] The Debtors are reported to have settled $1 billion in wildfire claims with the public entities. In the context of these cases, in which the companies have more than $20 billion in outstanding funded debt as well as additional wildfire claims asserted in amounts well in excess of $14 billion, this settlement only scratches the surface in terms of addressing the Debtors' liabilities.

announcing the settlement, the Debtors have done little or nothing to move these cases forward. The Debtors' refusal to include their major constituents in discussions, or even to inform them that discussions were ongoing, regarding the settlement of a subset of wildfire claims is evidence of the Debtors' failure to build consensus for a path forward. The Ad Hoc Committee cannot sit idly by and wait for the Debtors and their new board of directors to start the process while the possibility of a substantial wildfire in the near future looms. The Ad Hoc Committee instead has acted in accordance with the Court's comments and developed the terms of a viable, confirmable plan. The Ad Hoc Committee submits that the plan framework embodied in the Term Sheet represents the best way to move these cases forward and therefore "cause" exists to terminate the Exclusive Periods. The Term Sheet provides the major pillars for a better, safer utility for all of the Debtors' key constituents, including past and potential future wildfire claimants, ratepayers, employees, regulators, and creditors. Therefore, the Exclusive Periods should be terminated to allow the Ad Hoc Committee to file and solicit acceptances of a plan of reorganization consistent with the Term Sheet.

## CONCLUSION

27.    For the foregoing reasons, the Ad Hoc Committee respectfully requests that this Court enter an order terminating the Debtors' Exclusive Periods to permit the Ad Hoc Committee to file and solicit acceptances of the plan of reorganization contemplated by the attached Term Sheet.

## NOTICE

28.    Notice of this Motion will be provided to (i) counsel to the Debtors; (ii) the Office of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (iii) counsel to the Creditors Committee; (iv) counsel to the Tort Claimants Committee; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the Office of the California Attorney General; (viii) the California Public Utilities Commission; (ix) the Nuclear Regulatory Commission; (x) the Federal Regulatory Commission; (xi) the Office of the United States Attorney for the Northern District of California; (xii) counsel for the agent under the Debtors' debtor in possession financing facility; and (xiii) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. The Ad Hoc Committee respectfully submits that no further notice is required.

**WHEREFORE** the Ad Hoc Committee respectfully requests entry of an order granting (i) the relief requested herein for cause shown and as being in the best interests of the Debtors and their estates and (ii) such other and further relief as the Court may deem just and proper.

Dated: June 25, 2019

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: ______________________________
Ashley Vinson Crawford (SBN 257246)
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

Case: 19-30088 Doc# 2741 Filed: 06/25/19 Entered: 06/25/19 05:18:45 Page 12 of 47

**Exhibit A**

Proposed Order

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
idizengoff@akingump.com
dbotter@akingump.com
aqureshi@akingump.com

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
Email: avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION,**

**-and-**

**PACIFIC GAS AND ELECTRIC COMPANY,**

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☒ Affects both Debtors

**All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

Bankruptcy Case No. 19-30088 (DM)

Chapter 11

(Lead Case)

(Jointly Administered)

**ORDER GRANTING THE MOTION OF THE AD HOC COMMITTEE TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS**

Upon consideration of the motion (the "Motion") of the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee") in the above-captioned chapter 11 cases of Pacific Gas and Electric Company and PG&E Corporation for an order, pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"), terminating the Debtors' exclusive plan filing and solicitation periods (the "Exclusive Periods"); this Court finds and concludes that the Court has jurisdiction over the subject matter of the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this is a core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; the relief requested in the Motion is in the best interests of the Debtors, their estate and their creditors; notice of the Motion was sufficient, and no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED** that:

1. The Motion is granted to the extent set forth herein.

2. With respect to the Ad Hoc Committee, the Debtors' Exclusive Periods are terminated pursuant to section 1121(d) of the Bankruptcy Code, and the Ad Hoc Committee may file and solicit a plan of reorganization.

3. The terms and conditions of this order shall be immediately effective and enforceable upon its entry.

4. The court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

** END OF ORDER **

Case: 19-30088 Doc# 2741 Filed: 06/25/19 Entered: 06/25/19 05:18:45 Page 15 of 47

**Exhibit B**

Plan Term Sheet

***THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE***

***In re PG&E Corporation* and *Pacific Gas and Electric Company***

**Term Sheet for Plan of Reorganization**

June 25, 2019

This term sheet (the "**Term Sheet**") is proposed by the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "**Ad Hoc Committee**") and sets forth certain of the principal terms and conditions for the proposed reorganization (the "**Reorganization**") of PG&E Corporation and Pacific Gas and Electric Company, each of which commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**") on January 29, 2019 (the "**Petition Date**"). The Reorganization contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization (the "**Plan**").

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE AD HOC COMMITTEE AND/OR THE PG&E CORP. NEW MONEY COMMITMENT GROUP (AS DEFINED HEREIN).**

**THIS TERM SHEET IS BASED SOLELY ON PUBLICLY AVAILABLE INFORMATION.**

***THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE***

| PLAN OVERVIEW[1] | |
|---|---|
| **Debtors** | PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., the "**Debtors**"). Following the occurrence of the effective date of the Plan (the "**Effective Date**"), PG&E Corp. and the Utility will be referred to herein as "**Reorganized PG&E Corp.**" and the "**Reorganized Utility**," respectively, and collectively as the "**Reorganized Debtors**." |
| **Transaction Overview** | As set forth in greater detail herein, the Plan shall provide for:<br>• Up to $30.0 billion[2] in new money investments in exchange for common stock of Reorganized PG&E Corp., new debt of Reorganized PG&E Corp. and new debt of the Reorganized Utility, in each case as described herein;<br>• The proceeds of the new money investments shall be used to (a) pay in full outstanding DIP Financing Facility Claims (as defined below), (b) pay in full all Utility bond, term loan and revolving debt maturing prior to December 31, 2022,[3] (c) fund the creation of a trust (the "**Wildfire Claims Trust**") for the purpose paying wildfire claims related to those Northern California wildfires listed in **Schedule 1** attached hereto, not to exceed the sum of $16 billion,[4] in the manner provided below and (d) fund the Debtors' contribution of $4 billion[5] to a long-term California statewide wildfire fund created for purposes of paying future utility-related wildfires in California (the "**Wildfire Recovery Fund**");<br>• Distributions of Long-Term Utility Replacement Notes (as defined below) to holders of the Utility notes maturing on January 1, 2023 or later; and<br>• Payment of all trade claims in the ordinary course of business and assumption and/or continuation of pension-related obligations. |

| PLAN TREATMENT OF PG&E CORP.AND UTILITY CLAIMS | |
|---|---|
| **Unclassified Claims** | |
| **Claim** | **Treatment** |
| **DIP Financing Facility Claims** | Each holder of a claim under the Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019 (the "DIP Financing Facility," and the claims arising thereunder, the "DIP Financing Facility |

[1] This document is based on publicly available information regarding the Debtors as of June 25, 2019. Certain of the terms for the Plan included herein are subject to change depending upon the Debtors' financial performance over the remainder of the Chapter 11 Cases including, but not limited, to its cash generation and borrowings under the DIP Financing Facility.

[2] Assuming full upward adjustment based upon outcome of estimation proceeding as described in footnote 4 below.

[3] Includes the Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, each as defined below.

[4] Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.

[5] The $4 billion contribution may be made either as (a) an all cash contribution or (b) $3 billion in cash and $1 billion in Reorganized PG&E Corp. Common Stock at plan value, at the election of the Wildfire Recovery Fund.

2

| | |
|---|---|
| | Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such DIP Financing Facility Claim, payment in full in cash on the Effective Date. |
| **Administrative Expense Claims** | Each holder of an allowed administrative expense claim against the Debtors under section 507(a)(2) of the Bankruptcy Code (other than DIP Financing Facility Claims) (the "**Administrative Expense Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Administrative Expense Claim, cash equal to the allowed amount of such Administrative Expense Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable, and (ii) the date such Administrative Expense Claim becomes an allowed Administrative Expense Claim or as soon thereafter as is reasonably practicable. |
| **Priority Tax Claims** | Each holder of an allowed claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the type specified in section 507(a)(8) of the Bankruptcy Code against any Debtor (the "**Priority Tax Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Priority Tax Claim, (a) cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable and (ii) the date such Priority Tax Claim becomes an allowed Priority Tax Claim or as soon thereafter as is reasonably practicable, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

**PG&E Corp. Claims**

| Claim | Classification/Treatment/Voting | Estimated Allowed Claims | Estimated % Recovery |
|---|---|---|---|
| **Class 1A: Other PG&E Corp. Priority Claims** | ***Classification***: Holders of allowed claims against PG&E Corp. entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other PG&E Corp. Priority Claims**").<br><br>***Treatment***: Each holder of an allowed Other PG&E Corp. Priority Claim against PG&E Corp. shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Priority Claim, (i) cash in an amount equal to such allowed claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 2A: Other PG&E** | ***Classification***: Holders of claims (other than DIP Financing Facility Claims) (the "**Other PG&E Corp.** | [TBD] | 100% |

| | | | |
|---|---|---|---|
| **Corp. Secured Claims** | **Secured Claims**") that are secured by valid, perfected and enforceable liens on property in which PG&E Corp. has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code.<br><br>***Treatment***: Each holder of an allowed Other PG&E Corp. Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Secured Claim, (i) retention of its Other PG&E Corp. Secured Claim and any properly perfected and valid liens; (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other PG&E Corp. Secured Claim in any other manner that renders the claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 3A: PG&E Corp. Unsecured Revolving Credit Facility Claims** | ***Classification***: Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between PG&E Corp. and Citibank, N.A., as administrative agent (the "**PG&E Corp. Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $300 million (the "**PG&E Corp. Unsecured Revolving Credit Facility Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>***Voting***: Unimpaired – deemed to accept. | Appx. $300 million | 100% |
| **Class 4A: PG&E Corp. Unsecured** | ***Classification***: Holders of claims arising under the Term Loan Agreement, dated as of April 16, 2018, by and between PG&E Corp. and Mizuho Bank, Ltd., as administrative agent (the "**PG&E Corp. Unsecured** | Appx. $350 million | 100% |

| | | | |
|---|---|---|---|
| **Term Loan Claims** | **Term Loan Credit Agreement**"), in the aggregate principal amount of $350 million (the "**PG&E Corp. Unsecured Term Loan Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Term Loan Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 5A: PG&E Corp. General Unsecured Claims** | ***Classification***: Holders of general unsecured claims (other than Other PG&E Corp. Priority Claims, PG&E Corp. Unsecured Revolving Credit Facility Claims and PG&E Corp. Unsecured Term Loan Claims) against PG&E Corp. (the "**PG&E Corp. General Unsecured Claims**")<br><br>***Treatment***: Each holder of an allowed PG&E Corp. General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. General Unsecured Claim, cash in an amount equal to the allowed PG&E Corp. General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) as soon as reasonably practicable following the date such PG&E Corp. General Unsecured Claim becomes an allowed PG&E Corp. General Unsecured Claim.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |

| | | | |
|---|---|---|---|
| **Class 6A: PG&E Corp. Intercompany Claims** | ***Classification:*** Claims held by the Utility or any non-Debtor affiliate of PG&E Corp. against PG&E Corp. (the "**PG&E Corp. Intercompany Claims**").<br><br>***Treament:*** All allowed PG&E Corp. Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the PG&E Corp. Intercompany Claims are treated in a tax-efficient manner.<br><br>***Voting*:**Unimpaired – not entitled to vote. | [TBD] | 100% |
| **Class 7A: PG&E Corp. Preferred Interests** | ***Classification*:** Holders of outstanding preferred interests in PG&E Corp. (the "**PG&E Corp. Preferred Interests**").<br><br>***Treatment*:** Holders of allowed PG&E Corp. Preferred Interests shall retain ownership of all PG&E Preferred Interests in Reorganized PG&E Corp. (including any associated liquidation preference).<br><br>***Voting*:**Unimpaired – not entitled to vote. | N/A | 100% |
| **Class 8A: PG&E Corp. Common Interests** | ***Classification*:** Holders of outstanding common interests in PG&E Corp. (the "**PG&E Corp. Common Interests**")<br><br>***Treatment*:** Holders of allowed PG&E Corp. Common Interests shall retain ownership of all PG&E Corp. Common Interests in Reorganized PG&E Corp. (the "**Reorganized PG&E Corp. Common Stock**"), subject to dilution on account of the Reorganized PG&E Corp. Common Stock issued pursuant to the New Money Reorganized PG&E Corp. Common Stock Issuance.<br><br>***Voting*:** Impaired – entitled to vote.<br><br>Each holder of a PG&E Corp. Common Interest shall have the opportunity to commit for its pro rata share of 5% of the PG&E Corp. New Money Investment (as defined herein). | N/A | [TBD]% |

| Utility Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| **Class 1B: Other Utility Priority Claims** | ***Classification*****:** Holders of allowed claims against the Utility entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other Utility Priority Claims**").<br><br>***Treatment*****:** Each holder of an allowed Other Utility Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Priority Claim, (i) cash in an amount equal to such allowed Other Utility Priority Claim on the Effective Date or as soon as practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>***Voting*****:** Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 2B: Other Utility Secured Claims** | ***Classification*****:** Holders of claims (other than DIP Financing Facility Claims) that are secured by valid, perfected and enforceable liens on property in which the Utility has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code (the "**Other Utility Secured Claims**").<br><br>***Treatment*****:** Each holder of an allowed Other Utility Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Secured Claim, (i) retention of its Other Utility Secured Claim and any properly perfected and valid liens, (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other Utility Secured Claim in any other manner that renders the Other Utility Secured Claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>***Voting*****:** Unimpaired – deemed to accept. | [TBD] | 100% |

| | | | |
|---|---|---|---|
| **Class 3B: Utility Unsecured Revolving Credit Facility Claims** | ***Classification***: Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between the Utility and Citibank, N.A., as administrative agent (the "**Utility Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $3 billion (the "**Utility Unsecured Revolving Credit Facility Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Revolving Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>***Voting***: Unimpaired – deemed to accept. | Appx. $2.885 billion | 100% |
| **Class 4B: Utility Unsecured Term Loan Claims** | ***Classification***: Holders of claims arising under the Term Loan Agreement, dated as of February 23, 2018, by and between the Utility and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent (the "**Utility Unsecured Term Loan Agreement**"), in the aggregate principal amount of $250 million (the "**Utility Unsecured Term Loan Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Term Loan Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>***Voting***: Unimpaired – deemed to accept. | Appx. $250 million | 100% |

| | | | |
|---|---|---|---|
| **Class 5B: Short-Term Utility Unsecured Notes Claims** | ***Classification***: Holders of claims arising under the notes (or the applicable indenture relating thereto) (the "**Short-Term Utility Unsecured Notes**" and the indentures, the "**Short-Term Utility Unsecured Notes Indentures**") maturing on or before December 1, 2022 (the "**Short-Term Utility Unsecured Notes Claims**"), identified in **Schedule 2**hereto. [6]<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Short-Term Utility Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Short-Term Utility Unsecured Notes Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures and (iii) any prepayment premium, makewhole or other similar call protection under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures.<br><br>***Voting***: Unimpaired – not entitled to vote. | Appx. $1.75 billion | 100% |
| **Class 6B: Long-Term Utility Unsecured Notes Claims** | ***Classification***: Holders of claims arising under any notes (or the applicable indenture relating thereto) (the "**Long-Term Utility Unsecured Notes**" and the indentures, the "**Long-Term Utility Unsecured Notes Indentures**") maturing on or after January 1, 2023 (the "**Long-Term Utility Unsecured Notes Claims**"), identified in **Schedule 3**hereto. [7]<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Long-Term Utility Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Long-Term Utility Unsecured Notes Claim, (i) cash in an amount equal to (a) accrued and unpaid interest as | Appx. $15.8 billion | 98-99% |

[6] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Short-Term Utility Unsecured Notes.

[7] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Long-Term Utility Unsecured Notes.

| | | | |
|---|---|---|---|
| | of the Petition Date at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures, (b) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures and (ii) a replacement note in the same principal amount and maturity date, and otherwise on the same terms as, the existing applicable Long-Term Utility Unsecured Note (the "**Long-Term Utility Replacement Notes**"); *provided*, that the Reorganized Utility's obligations under each Long-Term Utility Replacement Note and the applicable Long-Term Utility Unsecured Notes Indenture shall (A) be secured by a first mortgage on all "Principal Property" of the Debtors, as that term is defined in the applicable Long-Term Utility Unsecured Notes Indentures and consistent with the provisions of each of the applicable Long-Term Utility Unsecured Notes providing for "equal and ratable" liens," that is of a status/ranking consistent with utility bonds of other investor-owned California utility operating companies and (B) bear interest at a blended rate of 10 basis points less than the current interest rates (the "**Adjusted Rates**") on the applicable Long-Term Utility Unsecured Notes, as set forth in more detail in **Schedule 4** attached hereto.<br><br>***Voting***: Impaired – entitled to vote. | | |
| **Class 7B: Utility Pollution Control Bond Claims** | ***Classification:*** Holders of claims arising under the Pollution Control Bonds issued by the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank (the "**Utility Pollution Control Bonds**") and related reimbursement obligations from certain letter of credit facilities in the aggregate outstanding principal amount of $863 million (the "**Utility Pollution Control Bonds Claims**").<br><br>***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Pollution Control Bonds Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Pollution Control Bonds Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Utility Pollution Control Bonds and (ii) | $863 million | 100% |

| | | | |
|---|---|---|---|
| | accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Utility Pollution Control Bonds.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 8B: Utility Intercompany Claims** | ***Classification:*** Claims held by the PG&E Corp. or any non-Debtor affiliate of PG&E Corp. against the Utility (the "**Utility Intercompany Claims**").<br><br>***Treatment:*** All allowed Utility Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the Utility Intercompany Claims are treated in a tax-efficient manner.<br><br>***Voting***:Unimpaired – not entitled to vote. | [TBD] | 100% |
| **Class 9B: Wildfire Claims** | ***General Procedures:*** With respect to each category of prepetition unsecured claims arising out of the prepetition Northern California wildfires and the Ghost Ship fire (the "**Wildfire Claims**"), the aggregate maximum amount of allowed Wildfire Claims in each such category of Wildfire Claims (the "**Agreed Capped Amount**")[8] shall be as provided below. Funding of the Wildfire Claims Trust in the amounts of the Agreed Capped Amount for each category of Wildfire Claims shall constitute payment in full of all allowed Wildfire Claims in each such category of Wildfire Claims. Each holder of a Wildfire Claim that votes in favor of the Plan agrees to receive payment in full of the allowed amount of such Wildfire Claim as determined in accordance with the procedures of the Wildfire Claims Trust, which shall be subject to the Agreed Capped Amount and which shall constitute payment in full of such claim.<br><br>Each holder of a Wildfire Claim that does not vote to accept the Plan ("**Opt-Out Wildfire Claimant**") shall have the allowed amount of its Wildfire Claim determined in accordance with the procedures of the Wildfire Claims Trust, as outlined below. | $16 billion[9] | 100% |

[8] The Agreed Capped Amount for each category of Wildfire Claims shall be subject to downward adjustment by the Wildfire Claims Trustee to account for claim values of Opt-Out Wildfire Claimants in each category, if necessary, after the Estimated Wildfire Liability (as defined herein) is determined.

[9] Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.

| | | | |
|---|---|---|---|
| | Each category of Wildfire Claim shall constitute a subclass within Class 9B. | | |
| | **Tubbs Wildfire Claim** – A Wildfire Claim, other than an Insurance Subrogation Wildfire Claim or Public Entity Wildfire Claim (each as defined below), for which the California Department of Forestry and Fire Protection ("**Cal Fire**") has determined, following an investigation, that the Utility was not the ignition source, including the Tubbs fire.<br><br>***Agreed Capped Amount*:** $570 million | | |
| | **Non-Tubbs Wildfire Claim** – A Wildfire Claim, other than an Insurance Subrogation Wildfire Claim, Public Entity Wildfire Claim, Tubbs Wildfire Claim or Ghost Ship Fire Claim, (a "**Non-Tubbs Wildfire Claim**").<br><br>***Agreed Capped Amount***: $5.45 billion. | | |
| | **Ghost Ship Fire Claim** – A Wildfire Claim arising out of the 2016 Ghost Ship fire.<br><br>***Agreed Capped Amount:*** $25 million | | |
| | **Public Entity Wildfire Claim** – A Wildfire Claim the holder of which is a public entity (a "**Public Entity Wildfire Claim**").<br><br>***Agreed Capped Amount:*** $1.0 billion | | |
| | **Subrogation Tubbs Wildfire Claims** – A Wildfire Claim arising by way of subrogation under applicable law or contract on account of amounts incurred (paid and reserved) by an insurer under and pursuant to the terms and coverage provisions of a property & casualty policy for losses for which Cal Fire has determined, following an investigation, that the Utility was not the ignition source, including the Tubbs fire (an "**Insurance Subrogation Tubbs Wildfire Claim**").<br><br>***Agreed Capped Amount:*** $975 million | | |
| | **Subrogation Non-Tubbs Wildfire Claims** – A Wildfire Claim arising by way of subrogation under applicable law or contract on account of amounts incurred (paid and reserved) by an insurer under and pursuant to the terms and coverage provisions of a property & casualty policy for losses that is not a Subrogation Tubbs Wildfire Claim (an "**Insurance** | | |

| | | | |
|---|---|---|---|
| | **Subrogation Non-Tubbs Wildfire Claim**" and together with the Insurance Subrogation Non-Tubbs Wildfire Claim, the "**Insurance Subrogation Wildfire Claim**").<br><br>***Agreed Capped Amount***: $6.82 billion | | |
| | **Agreed Attorneys' Fees and Costs** – an agreed distribution amount for attorneys' fees and costs incurred by holders of Tubbs Wildfire Claims, Non-Tubbs Wildfire Claims and the Ghost Ship Fire Claims to be paid to their attorneys in amounts to be determined by the beneficiaries thereof (the "**Agreed Attorneys' Fees and Costs**").<br><br>***Agreed Capped Amount:*** $1.15 billion | | |
| **Class 10B: Other Utility General Unsecured Claims** | ***Classification***: Holders of general unsecured claims (other than Other Utility Priority Claims, Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, Long-Term Utility Unsecured Notes Claims, Wildfire Claims, and Utility Workers' Compensation Claims) against the Utility (the "**Other Utility General Unsecured Claims**").<br><br>***Treatment***: Each holder of an allowed Other Utility General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility General Unsecured Claim, cash in an amount equal to the allowed Other Utility General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) the date such Other Utility General Unsecured Claim becomes an allowed Other Utility General Claim or as soon thereafter as is reasonably practicable.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 11B: Utility Workers' Compensation Claims** | ***Classification***: Holders of claims against the Utility by employees of the Utility for the payment of workers' compensation benefits under applicable law (the "**Utility Workers' Compensation Claims**").<br><br>***Treatment***: Each allowed Utility Workers' Compensation Claim shall be satisfied in full in the | [TBD] | 100% |

| | | | |
|---|---|---|---|
| | ordinary course of business at such time and in such manner as the Utility is obligated to satisfy such Utility Workers' Compensation Claim under applicable law.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 12B: Utility Preferred Interests** | ***Classification***: Holders of outstanding preferred Interests in the Utility (the "**Utility Preferred Interests**")<br><br>***Treatment***: Holders of allowed Utility Preferred Interests shall retain ownership of all Utility Preferred Interests in the Reorganized Utility (including any associated liquidation preference).<br><br>***Voting***: Unimpaired – deemed to accept. | N/A | 100% |
| **Class 13B: Utility Common Interests** | ***Classification***: PG&E Corp. as holder of all outstanding common Interests in the Utility (the "**Utility Common Interests**").<br><br>***Treatment***: The Reorganized PG&E Corp., as holder of the Utility Common Interests, shall retain ownership of all Utility Common Interests in the Reorganized Utility.<br><br>***Voting***: Unimpaired – deemed to accept. | N/A | 100% |

| **MEANS FOR IMPLEMENTATION** | |
|---|---|
| **Estimation Proceeding** | Estimation proceedings will be initiated pursuant to which the Bankruptcy Court and/or the District Court will estimate the Debtors' liability on all personal injury, wrongful death, property damage, insurance subrogation, and any other Wildfire Claims for purposes of confirming the Plan and for purposes of distribution thereunder, in accordance with the Bankruptcy Code and applicable law. Such estimation proceedings shall conclude prior to the hearing on Plan confirmation. The estimated amount of the Debtors' aggregate wildfire liability as determined by Bankruptcy Court and/or District Court order is referred to herein as the "**Estimated Wildfire Liability**." A condition precedent to the Effective Date shall be the Estimated Wildfire Liability not exceeding $16 billion.[10] |

[10] Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.

| | |
|---|---|
| **Wildfire Claims Trust** | On the Effective Date, the Reorganized Debtors will establish the Wildfire Claims Trust with $16 billion of the proceeds of the PG&E Corp. New Money Investment (as defined below).[11]<br><br>The Wildfire Claims Trust shall be administered by a trustee (the "**<u>Wildfire Claims Trustee</u>**") and governed by an oversight committee (the "**<u>Wildfire Claims Trust Oversight Committee</u>**"). An agreement (the "**<u>Wildfire Claims Trust Agreement</u>**") shall establish and set forth the provisions of the Wildfire Claims Trust. The Wildfire Claims Trust Agreement shall be in form and substance acceptable to the Ad Hoc Committee.<br><br>The Wildfire Claims Trustee shall be selected by the [TBD]. The Wildfire Claims Trust Oversight Committee shall consist of three members, which shall be selected by [TBD].<br><br>The Wildfire Claims Trustee and the Wildfire Claims Trust Oversight Committee shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the Wildfire Claims Trust Agreement.<br><br>The Wildfire Claims Trust Agreement shall set forth procedures that will permit an Opt-Out Wildfire Claimant to (i) enter into a settlement with the Wildfire Claims Trust as to the allowed amount of its Wildfire Claim, (ii) submit to binding arbitration with the Wildfire Claims Trust to determine the allowed amount of its Wildfire Claim, or (iii) solely with respect to Wildfire Claims that are personal injury tort or wrongful death claims, have the allowed amount of such Wildfire Claim determined pursuant to 28 U.S.C. §157(b)(5), all of which shall be subject to the cap determined by the estimation proceeding outlined above.<br><br>In the event that the aggregate amount paid in consideration of Wildfire Claims from the Wildfire Claims Trust is less than the Estimated Wildfire Liability, the excess funds remaining in the Wildfire Claims Trust (the "**<u>Excess Wildfire Claims Trust Funds</u>**") shall be refunded to Reorganized PG&E Corp. to be utilized in the following manner:<br>1. 50% of the Excess Wildfire Claims Trust Funds shall be used to pay down the New PG&E Corp. Senior Unsecured Notes (as defined below); and<br>2. 50% of the Excess Wildfire Claims Trust Funds shall be used as a one-time charitable contribution to the Wildfire Recovery Fund. |
| **Channeling Injunction** | The Wildfire Claims Trust shall be the sole source of recovery for the Wildfire Claims against the Debtors. The Plan and order confirming the Plan (the "**<u>Confirmation Order</u>**") shall channel all Wildfire Claims against the Debtors to the Wildfire Claims Trust for payment in accordance with the terms and procedures provided therein. The Plan and the Confirmation Order shall bar and enjoin holders of Wildfire Claims from seeking to recover on account of their Wildfire Claims against the Reorganized Debtors or any assets of the Reorganized Debtors (the "**<u>Channeling Injunction</u>**"). |

[11] Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.

| | |
|---|---|
| **Contributions to the Wildfire Recovery Fund** | On the Effective Date, the Debtors will contribute $4 billion[12] to the Wildfire Recovery Fund in order to address future wildfire liability; *provided*, *however*, that the Debtors' obligation to make such contribution shall be subject to the enactment of legislation providing for the creation of the Wildfire Recovery Fund that is acceptable to the Ad Hoc Committee. |
| **SOURCES OF PLAN FUNDING** | |
| **Insurance Proceeds** | $2.2 billion in insurance proceeds owed to the Debtors in respect of 2017 and 2018 wildfire related losses. |
| **Cash on Hand** | $[●] billion of the Debtors' cash on hand on the Effective Date. |
| **New Money Investment in PG&E Corp.** | On the Effective Date, Reorganized PG&E Corp. shall issue shares of Reorganized PG&E Corp. Common Stock (the "**New Money Reorganized PG&E Corp. Common Stock Issuance**") to the new money investors identified below (the "**PG&E Corp. New Money Investor Group**"), in exchange for $18 billion in cash (the "**PG&E Corp. New Money Investment**").<br><br>The commitments for the PG&E Corp. New Money Investment shall be provided as follows:<br><br>1. 50% by the consortium of large Utility bondholders identified in **Schedule 5** attached hereto (the "**PG&E Corp. New Money Commitment Group**");<br>2. 45% by the members of the Ad Hoc Committee; and<br>3. 5% by the holders of PG&E Common Interests in Class 8A.<br><br>To the extent that the members of the Ad Hoc Committee and/or holders of PG&E Common Interests in Class 8A do not provide the commitments described above for the PG&E Corp. New Money Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New PG&E Corp. Senior Unsecured Notes** | On the Effective Date, Reorganized PG&E Corp. shall issue $4.0 billion in new senior unsecured notes (the "**New PG&E Corp. Senior Unsecured Notes**") to the new money investors identified below (the "**New PG&E Corp. Senior Unsecured Notes Investor Group**" and together with the PG&E Corp. New Money Investor Group, the "**Investor Group**") in exchange for $4.0 billion in cash (the "**New PG&E Corp. Senior Unsecured Notes Investment**"). The New PG&E Corp. Senior Unsecured Notes shall have terms materially consistent with the terms contained in the term sheet (the "**New PG&E Corp. Senior Unsecured Notes Term Sheet**") attached hereto as **Exhibit 1**.<br><br>The commitments for the New PG&E Corp. Senior Unsecured Notes Investment shall be provided as follows: |

[12] The $4 billion contribution may be made either as (a) an all cash contribution or (b) $3 billion in cash and $1 billion in Reorganized PG&E Corp. Common Stock at plan value, at the election of the Wildfire Recovery Fund.

| | |
|---|---|
| | 1. 50% by a consortium of large Utility bondholders identified in **Schedule 6** attached hereto (the "**New PG&E Corp. Senior Unsecured Notes Commitment Group**");<br>2. 50% by the members of the Ad Hoc Committee.<br><br>To the extent that the members of the Ad Hoc Committee do not provide the commitments described above for the New PG&E Corp. Senior Unsecured Notes Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New Utility Secured Notes** | On the Effective Date, the Reorganized Utility shall issue $5.5 billion in new secured notes (collectively, the "**New Utility Secured Notes**") to third party investors in exchange for $5.5 billion in cash, with the proceeds being used to pay down all existing Utility Unsecured Term Loan Claims, Utility Unsecured Revolving Credit Facility Claims and Short-Term Utility Unsecured Notes Claims. The New Utility Secured Notes shall have terms that are acceptable to the Ad Hoc Committee.<br><br>The New PG&E Corp. Senior Notes Commitment Group will use best efforts to mitigate any risk to the Utility related to the new issuances of the New Utility Secured Notes and any related fees at the Utility. |
| **Backstop Commitment Fees** | In consideration of the agreement to backstop the commitments described above, the following backstop commitment fees (the "**Backstop Commitment Fees**") shall be payable:<br><br>1. 3.0% of the PG&E Corp. New Money Investment to the PG&E Corp. New Money Commitment Group; and<br>2. 1.5% of the New PG&E Corp. Senior Unsecured Notes Investment tothe New PG&E Corp. Senior Unsecured Notes Commitment Group.<br><br>The Backstop Commitment Fees shall be payable in cash or Reorganized PG&E Corp. Common Stock at the election of each backstop commitment party. |

| **REGULATORY REQUIREMENTS** | |
|---|---|
| **FERC** | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive a final order from the Federal Energy Regulatory Commission ("**FERC**") granting authorization under Section 203 of the Federal Power Act (the "**FPA**") to implement the Plan. In addition, if the reorganization results in the transfer of FERC-jurisdictional natural gas assets or hydroelectric assets, the Debtors and Reorganized Debtors shall receive, as necessary, approval under Section 7 of the Natural Gas Act ("**NGA**") and FPA Section 8, respectively, to transfer those assets. Prior to the Effective Date, the Debtors and Reorganized Debtors shall also receive, if and to the extent necessary, a final order from FERC granting authorization under Section 204 of the FPA to issue new securities as provided under the Plan. Finally, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive FERC acceptance with respect to any new or modified service tariffs under the FPA or NGA necessary to implement the Plan, and shall receive approval or acceptance |

| | |
|---|---|
| | under FPA Section 305 with respect to the creation of any interlocking directorates. |
| **CPUC** | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive approval, if required, from the California Public Utilities Commission ("**CPUC**") under Public Utilities Code Sections 851-854. Prior to the Effective Date, the Debtors and Reorganized Debtors also shall receive the issuance of a financing order, if required, from the CPUC for the overall financing structure of the Plan, including the issuance of new securities as provided under the Plan, and shall receive final CPUC approval for all other rates, tariffs, and agreements necessary to implement the Plan. |
| **NRC** | If required, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive approval from the Nuclear Regulatory Commission ("**NRC**") for the transfer of the license for the Diablo Canyon Power Plant. |
| **OTHER TERMS** | |
| **Releases** | The Plan shall provide for customary release of all claims and causes of action against (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the Tort Claimants Committee and each of its members, (v) the Wildfire Claims Trustee, (vi) the Wildfire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons[13] (each such entity in foregoing clauses (i) through (vii), a "**Released Party**").<br><br>Releases shall be provided by (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the Tort Claimants Committee and each of its members, (v) the Wildfire Claims Trustee, (vi) the Wildfire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons, and (viii) all holders of claims and interests against the Debtors, as provided in more detail below (each such entity in foregoing clauses (i) through (viii), a "**Releasing Party**").<br><br>The releases to be set forth in the Plan shall include consensual releases from each holder of a claim or interest (as set forth in the "Plan Treatment of PG&E Corp. and Utility Claims" section above) that (i) votes to accept the Plan or (ii) is deemed to accept the Plan, of each Released Party from any claims or causes of action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or affiliates or that each other Releasing Party, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any claims or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, |

[13] "**Related Persons**" with respect to an entity shall mean that entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

| | |
|---|---|
| | the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, the disclosure statement to the Plan, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, or upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.<br><br>The Plan shall provide for consensual releases to the Released Parties of all claims and causes of action that could be asserted against, or in any way relating to, or arising out of (i) any Debtor, the Reorganized Debtors, their businesses, or their property, (ii) the Chapter 11 Cases, (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of the Plan, or (v) any other act or omission in connection with the Chapter 11 Cases. |
| **Exculpation** | The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, each of the members of the Ad Hoc Committee, the Creditors' Committee and each of its members, the Tort Claimants Committee and each of its members, and the Related Persons of all of the foregoing parties from any and all claims and causes of action arising on or after the Petition Date and any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the disclosure statement to the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or the restructuring of the Debtors, with the sole exception of willful misconduct or gross negligence. |
| **Corporate Governance** | Upon the Effective Date and for a period of two (2) years thereafter, the board of directors of Reorganized PG&E Corp. (the "**New PG&E Corp. Board**") shall consist of nine (9) members. From the second anniversary of the Effective Date through the fifth anniversary of the Effective Date, the New PG&E Board Corp. Board shall consist of at least nine (9) and no more than eleven (11) members. The chief executive officer of Reorganized PG&E Corp. (the "**New PG&E Corp. CEO**") shall be a director on the New PG&E Corp. Board. The New PG&E Corp. CEO shall not be the chairperson of the New PG&E Corp. Board. The remaining directors of the New PG&E Corp. Board shall be appointed on the Effective Date, and thereafter elected annually, in the following manner:<br><br>1. One (1) director shall be nominated by IBEW Local 1245, on behalf of the employees of Reorganized PG&E Corp.;<br>2. One (1) director shall be nominated by TURN, on behalf of ratepayers;<br>3. One (1) director shall be nominated by the Wildfire Recovery Fund; and |

| | |
|---|---|
| | 4. Each other director shall be nominated by the shareholders of Reorganized PG&E Corp.<br><br>The board of directors of the Reorganized Utility (the "**New Utility Board**" and together with the New PG&E Corp., the "**New Boards**") will consist of the same nine (9) members of the New PG&E Corp. Board. The chairperson of the New PG&E Corp. Board shall not be the chairperson of the New Utility Board.<br><br>The New Boards shall consist of a diverse set of individuals (including, among other things, complying with the requirements of California State Bill-826). The majority of the directors of each of the New Boards shall consist of Californians and individuals who have credentialed experience in the areas of utility operations, engineering, safety, regulation and/or clean energy. |
| **Renaming / Rebranding** | For the first 60 days following the Effective Date, all employees of the Reorganized Utility will have the opportunity to submit recommendations for renaming or rebranding the Reorganized Utility. If, after a period of 90 days following the Effective Date, no employee recommendation is selected for renaming or rebranding the Reorganized Utility, the Reorganized Utility shall effect a change of name to "Golden State Power Light & Gas Co.," and the Reorganized PG&E Corp. shall effect a change of name to "GSPL&G Corp." |
| **Prohibition Against Rate Increases** | The Debtors and the Reorganized Debtors will not seek to recover the contributions made to the Wildfire Claims Trust or the Wildfire Recovery Fund, either directly or indirectly, through rate increases. |
| **Utility Rates to Consumers** | The Plan shall be rate-neutral to end-market consumers in California on a net basis. The Plan will rely on securitization amounts up to similar levels of the securitization bonds issued in 2001. The proceeds of such new securitization bonds will be used for future statewide Wildfire Recovery Fund purposes. The proceeds of any new securitization bonds will not be used for the Debtors' or Reorganized Debtors' benefit for plan purposes. |
| **Utility Consumer Rate Credit** | Plan to include sale of certain key real estate assets of the Debtors to previously identified party or parties to allow for up to $1 billion rate credit for the benefit of all PG&E customers, to be applied equally over a period of 10 years from the Effective Date. |
| **Post-Effective Date Management** | The Utility will seek to enter into a long-term management, oversight, O&M or similar contract(s)/agreement(s) with a qualified management team and/or top-tier U.S.-domiciled utility/energy holding company (all previously identified) to oversee and run the Utility beginning on the Effective Date. Such entity or management team may be provided the opportunity to participate in the PG&E Corp. New Money Investment in connection therewith. |
| **Key Corporate Operating Businesses** | PG&E agrees not to sell, and will oppose any attempt to municipalize, any portion of the operating business or assets, for a period of (5) years after the Effective Date of the Plan; *provided*, however, this provision does not apply to any owned, including currently occupied real estate. For the avoidance of doubt, this restriction will not limit any change in control transaction relating to Reorganized PG&E |

| | |
|---|---|
| | Corp., including, without limitation, a merger, tender offer or similar transaction. |
| **Key Employee Matters** | All PG&E Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the Plan with new equity issuances within 90 days after the Effective Date. Such equity interests will be structured to comply with all applicable securities laws.<br><br>Subject to the support of the International Brotherhood of Electrical Workers ("**IBEW**") for the Plan, contingent upon and after confirmation of the Plan, the Reorganized Debtors shall enter into an agreement with Local Union No. 1245 of the International Brotherhood of Electrical Workers ("**Local 1245**") with such agreement to apply only to the period starting on the Effective Date, extending the two (2) Collective Bargaining Agreements currently in place between Pacific Gas and Electric Company and Local 1245 (the IBEW Physical Agreement and the IBEW Clerical Agreement, collectively the "**IBEW CBAs**"), until December 31, 2023 with such extension to include (i) a reasonable and appropriate general wage increase for each of the extension years (2022 and 2023) deemed to be appropriate, reasonable, consistent with past practice and included in go-forward allowed rates; (ii) a prohibition on any involuntary layoffs during the term of the extended IBEW CBAs; provided, however such prohibition will not limit any individual employee terminations or displacements and will not apply to contract workforce or non-bargaining unit members; and (iii) reemphasize the Reorganized Debtors' and Local 1245's commitment to maintaining a spirit of cooperation between labor and management. |
| **Other Employee Matters** | Compensation-related agreements between any of the Debtors and any directors, officers and employees of the Debtors existing as of the Effective Date, including any indemnification and severance obligations, short term incentive plan and other incentive plans, with the exception of the revisions set forth herein, existing as of the Effective Date, shall be assumed by the Reorganized Debtors.<br><br>The New Boards shall revise the long term incentive compensation programs of Reorganized PG&E Corp. and the Reorganized Utility by increasing the proportion of LTIP awards subject to performance-based vesting criteria. Performance criteria for LTIP awards will be modified by increasing/implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long term objectives. |
| **Pension Matters** | Upon the Effective Date, the Reorganized Debtors shall assume and continue to maintain the PG&E Retirement Plan under its current terms, except to the extent any amendment is required by law, and shall make any and all contributions necessary to satisfy the minimum funding requirements under ERISA Section 302 and Internal Revenue Code Section 430. |
| **Executory Contracts and Unexpired Leases** | All executory contracts and unexpired leases not expressly listed for rejection on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed assumed as of the Effective Date.<br><br>The Debtors or Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the list of assumed executory contracts and unexpired leases and the |

| | |
|---|---|
| | schedules of executory contracts and unexpired leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time, through and including 45 days after the Effective Date. |
| **Renewable Energy Power Purchase Agreements** | Notwithstanding anything to the contrary in this Term Sheet, the Debtors and Reorganized Debtors shall not reject any renewable energy powerpurchase agreement. |
| **Tax Matters** | The Debtors and the Ad Hoc Committee will work together in good faith and will use commercially reasonable efforts to structure and implement the Reorganization in a tax efficient and cost-effective manner for the Reorganized Debtors and creditors.<br><br>Post-Effective Date ownership of PG&E Corp. shall be structured to maximize the usage of go-forward tax attributes. |
| **Timing / Key Dates** | Emergence from chapter 11 is to be achieved as soon as reasonably practicable, with specific deadlines as follows:<br>1. A plan of reorganization materially consistent with the terms provided in this Term Sheet and disclosure statement corresponding to such plan to be filed no later than August 31, 2019;<br>2. Order confirming such plan of reorganization entered no later than January 31, 2020; and<br>3. Effective date of the plan of reorganization to occur no later than March 31, 2020. |
| **Conditions Precedent to Effective Date of Plan** | The following conditions must be satisfied in order for the Effective Date to occur:<br>1. the Estimated Wildfire Liability shall not exceed $16 billion.[14]<br>2. the Confirmation Order shall have been entered by the Court in form and substance acceptable to the Ad Hoc Committee, be in full force and effect and not be subject to any stay or injunction and shall have become a final order;<br>3. all definitive documents relating to the Plan shall be in form and substance acceptable to the Ad Hoc Committee;<br>4. the Wildfire Claims Trust shall be have been established in accordance with the terms provided herein;<br>5. the Wildfire Claims Trustee shall have been appointed in accordance with the terms provided herein;<br>6. the members of the Wildfire Claims Trust Oversight Committee shall have been appointed in accordance with the terms provided herein;<br>7. legislation shall have been enacted for future utility-related wildfires in California, on terms acceptable to the PG&E Corp. New Money Commitment Group, providing, at a minimum, (i) a transparent standard to define utilities' exposure for wildfire-related liabilities, (ii) a robust fund to make timely payments to claimants, and (iii) appropriate liability caps for |

[14] Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.

| | |
|---|---|
| | investor owned utilities, all of which consistent with investment grade credit ratings by S&P and Moody's;<br>8. the New PG&E Corp. Common Stock, New PG&E Corp. Senior Unsecured Notes and the New Utility Secured Notes shall have been issued in accordance with the terms provided herein;<br>9. all actions, documents, certificates and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and<br>10. all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received. |
| **Conditions Precedent to Funding** | The following conditions must be met in order for the PG&E Corp. New Money Investment and New PG&E Corp. Senior Unsecured Notes Investment to be funded:<br>1. A plan of reorganization that provides a binding cap on the Wildfire Claims equal to the Estimated Wildfire Liability, not to exceed $16.0 billion plus a maximum 15% upward adjustment, shall have been confirmed and the Effective Date shall have occurred;<br>2. Satisfactory conclusion of the Utility's 2020 general rate case and 2019 cost of capital proceeding before the CPUC or a mutually agreed three (3) year deferral;<br>3. CPUC approval, including issuance of a financing order, if required, of the overall financing structure, including issuance of new securities under the Plan;<br>4. No material wildfire claims exposure to the Debtors due to post-petition fires;<br>5. The form of all common equity documents and the plan of reorganization and confirmation order are in form and substance acceptable to the Investor Group; and<br>6. Customary closing conditions for an equity and unsecured debt financing including, but not limited to, no material adverse change to PG&E Corp.<br>7. All Conditions Precedent to the Effective Date of the Plan, as set forth above, shall have been satisfied. |

# SCHEDULE 1

List of Northern California Wildfires Covered by Wildfire Claims Trust

1. Butte Fire (2015)
2. 2017 North Bay Wildfires
    a. LaPorte (La Porte)
    b. McCourtney
    c. Lobo
    d. Honey
    e. Redwood / Potter Valley
    f. Sulphur
    g. Cherokee
    h. 37
    i. Blue
    j. Pocket
    k. Atlas
    l. Cascade
    m. Nuns
    n. Adobe
    o. Norrbom
    p. Pressley
    q. Patrick
    r. Pythian / Oakmont
    s. Maacama
    t. Tubbs
    u. Point
3. Camp Fire (2018)
4. Ghost Ship (2016)

**SCHEDULE 2**

Short-Term Utility Unsecured Notes

1. $550 million principal amount of 3.50% senior notes due October 1, 2020
2. $250 million principal amount of 3.50% senior notes due October 1, 2020
3. $300 million principal amount of 4.25% senior notes due May 15,2021
4. $250 million principal amount of 3.25% senior notes due September 15, 2021
5. $400 million principal amount of 2.45% senior notes due August 15, 2022

## SCHEDULE 3

Long-Term Utility Unsecured Notes

1. $3,000 million principal amount of 6.05% senior notes due March 1, 2034

2. $700 million principal amount of 5.80% senior notes due March 1, 2037

3. $400 million principal amount of 6.35% senior notes due Feb 15,2038

4. $550 million principal amount of 6.25% senior notes due March 1, 2039

5. $550 million principal amount of 5.40% senior notes due January 15, 2040

6. $250 million principal amount of 5.80% senior notes due March 1, 2037

7. $250 million principal amount of 5.40% senior notes due January 15, 2040

8. $250 million principal amount of 4.50% senior notes due December 15, 2041

9. $400 million principal amount of 4.45% senior notes due April 15, 2042

10. $350 million principal amount of 3.75% senior notes due August 15, 2042

11. $375 million principal amount of 3.25% senior notes due June 15, 2023

12. $375 million principal amount of 4.60% senior notes due June 15. 2043

13. $300 million principal amount of 3.85% senior notes due November 15, 2023

14. $500 million principal amount of 5.125% senior notes due November 15, 2043

15. $450 million principal amount of 3.75% senior notes due February 15, 2024

16. $450 million principal amount of 4.75% senior notes due February 15, 2044

17. $350 million principal amount of 3.40% senior notes due August 15, 2024

18. $225 million principal amount of 4.75% senior notes due February 15, 2044

19. $500 million principal amount of 4.30% senior notes due March 15, 2045

20. $400 million principal amount of 3.50% senior notes due June 15, 2025

21. $100 million principal amount of 4.30% senior notes due March 15, 2045

22. $200 million principal amount of 3.50% senior notes due June 15, 2025

23. $450 million principal amount of 4.25% senior notes due March 15, 2046

24. $600 million principal amount of 2.95% senior notes due March 1, 2026

25. $400 million principal amount of 4.00% senior notes due December 1, 2046

26. $400 million principal amount of 3.30% senior notes due March 15, 2027

27. $200 million principal amount of 4.00% senior notes due December 1, 2046

28. $1,150 million principal amount of 3.30% senior notes due December 1, 2027

29. $850 million principal amount of 3.95% of senior notes due 2047

30. $500 million principal amount of 4.25% senior notes due 2023

31. $300 million principal amount of 4.65% senior notes due 2028

## SCHEDULE 4

Adjusted Rates for the Long-Term Utility Replacement Notes

| Name | Maturity | Principal | Old Rate | New Rate | Change |
|---|---|---|---|---|---|
| Senior Unsecured Notes due Jun 2023 | 6/15/23 | $375.0 | 3.25% | 3.18% | 0.07% |
| Senior Unsecured Notes due Aug 2023 | 8/1/23 | 500.0 | 4.25% | 4.16% | 0.09% |
| Senior Unsecured Notes due Nov 2023 | 11/15/23 | 300.0 | 3.85% | 3.77% | 0.08% |
| Senior Unsecured Notes due Feb 2024 | 2/15/24 | 450.0 | 3.75% | 3.67% | 0.08% |
| Senior Unsecured Notes due Aug 2024 | 8/15/24 | 350.0 | 3.40% | 3.33% | 0.07% |
| Senior Unsecured Notes due Jun 2025 | 6/15/25 | 600.0 | 3.50% | 3.43% | 0.07% |
| Senior Unsecured Notes due Mar 2026 | 3/1/26 | 600.0 | 2.95% | 2.89% | 0.06% |
| Senior Unsecured Notes due Mar 2027 | 3/15/27 | 400.0 | 3.30% | 3.23% | 0.07% |
| Senior Unsecured Notes due Dec 2027 | 12/1/27 | 1,150.0 | 3.30% | 3.23% | 0.07% |
| Senior Unsecured Notes due Aug 2028 | 8/1/28 | 300.0 | 4.65% | 4.55% | 0.10% |
| Senior Unsecured Notes due Mar 2034 | 3/1/34 | 3,000.0 | 6.05% | 5.92% | 0.13% |
| Senior Unsecured Notes due Mar 2037 | 3/1/37 | 950.0 | 5.80% | 5.68% | 0.12% |
| Senior Unsecured Notes due Feb 2038 | 2/15/38 | 400.0 | 6.35% | 6.21% | 0.14% |
| Senior Unsecured Notes due Mar 2039 | 3/1/39 | 550.0 | 6.25% | 6.12% | 0.13% |
| Senior Unsecured Notes due Jan 2040 | 1/15/40 | 800.0 | 5.40% | 5.28% | 0.12% |
| Senior Unsecured Notes due Dec 2041 | 12/15/41 | 250.0 | 4.50% | 4.40% | 0.10% |
| Senior Unsecured Notes due Apr 2042 | 4/15/42 | 400.0 | 4.45% | 4.35% | 0.10% |
| Senior Unsecured Notes due Aug 2042 | 8/15/42 | 350.0 | 3.75% | 3.67% | 0.08% |
| Senior Unsecured Notes due Jun 2043 | 6/15/43 | 375.0 | 4.60% | 4.50% | 0.10% |
| Senior Unsecured Notes due Nov 2043 | 11/15/43 | 500.0 | 5.13% | 5.02% | 0.11% |
| Senior Unsecured Notes due Feb 2044 | 2/15/44 | 675.0 | 4.75% | 4.65% | 0.10% |
| Senior Unsecured Notes due Mar 2045 | 3/15/45 | 600.0 | 4.30% | 4.21% | 0.09% |
| Senior Unsecured Notes due Mar 2046 | 3/15/46 | 450.0 | 4.25% | 4.16% | 0.09% |
| Senior Unsecured Notes due Dec 2046 | 12/1/46 | 600.0 | 4.00% | 3.91% | 0.09% |
| Senior Unsecured Notes due Dec 2047 | 12/1/47 | 850.0 | 3.95% | 3.87% | 0.08% |
| **Total** | | **$15,775.0** | **4.67%** | **4.57%** | **0.10%** |

**SCHEDULE 5**

PG&E Corp. New Money Commitment Group

**SCHEDULE 6**

New PG&E Corp. Senior Unsecured Notes Commitment Group

**EXHIBIT 1**

New PG&E Corp. Senior Unsecured Notes Term Sheet