UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| In Re: | ) Case No. 19-30088 |
| | ) Chapter 11 |
| PG&E CORPORATION AND PACIFIC GAS AND ELECTRIC COMPANY | ) |
| | ) San Francisco, California |
| | ) Wednesday, June 26, 2019 |
| Debtors. | ) 9:30 AM |
| ______________________________ | ) |

MOTION OF DEBTORS PURSUANT TO 11 U.S.C. SECTIONS 502(b)(9) AND 105(a), FED, R. BANKR. P. 2002, 3003(c)(3), 5005, AND 9007, AND L.B.R. 3003-1 FOR ORDER (I) ESTABLISHING DEADLINE FOR FILING PROOFS OF CLAIM, (II) ESTABLISHING THE FORM AND MANNER OF NOTICE THEREOF, AND (III) APPROVING PROCEDURES FOR PROVIDING NOTICE OF BAR DATE AND OTHER INFORMATION TO ALL CREDITORS AND POTENTIAL CREDITORS BY PG&E CORPORATION [1784]

MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS PURSUANT TO 11 U.S.C. 105(a), 107(b), AND 501 AND FRBP 3001(a) ABD 9018 FOR ENTRY OF AN ORDER APPROVING PROPOSED MODEL OMNIBUS INSURANCE SUBROGATION PROOF OF CLAIM FORM FOR SUBROGATION CLAIMS AND RELATED PROCEDURES FILED BY AD HOC GROUP OF SUBROGATION CLAIM HOLDERS [2044]

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. SECTION 105(a) AND 501 AND FED. R. BANKR. P. 3001(a) FOR ENTRY OF AN ORDER APPROVING PROPOSED MODEL POLICE OFFICER FORM FOR FIRE CLAIMS AND RELATED PROCEDURES FILED BY OFFICIAL COMMITTEE OF TORT CLAIMANTS [1824]

MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. SECTION 105(a) AND 501 AND FED. R. BANKR. P. 3001(a) FOR ENTRY OF AN ORDER (I) ESTABLISHING A BAR DATE FOR FILINGS FIRE CLAIMS, (II) APPROVING A FORM AND PROCEDURES FOR NOTICE OF THE BAR DATE FOR FILING FIRE CLAIMS, AND (III) APPROVING SUPPLEMENTAL PROCEDURES FOR NOTICE OF THE BAR DATE TO FIRE CLAIMANTS [2297]

APPLICATION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. SECTION 1103 AND FED. R. BANKR. P 2014 AND 5002 TO RETAIN AND EMPLOY ANGEION GROUP, LLC AS FIRE CLAIM BAR DATE NOTICING AGENT EFFECTIVE AS OF MAY 22, 2019 [2303]

MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR ENTRY OF A PROTECTIVE ORDER [2419]

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

APPLICATION PURSUANT TO 11 U.S.C. SECTIONS 327 AND 328 FOR AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP AS INDEPENDENT AUDITOR AND ADVISOR TO THE DEBTORS NUNC PRO TUNC TO THE PETITION DATE [2197]

MOTION FOR ENTRY OF PROTECTIVE ORDER PS TO FED. R. BANKR. P. 7026 AND 9014(c) AND 11 U.S.C. SECTION 105(a) GOVERNING DISCOVERY MATERIALS AND OTHER INFORMATION FILED BY PG&E CORPORATION [2459]

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENNIS MONTALI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:

STEPHEN KAROTKIN, ESQ.
MATTHEW GOREN, ESQ.
RICHARD W. SLACK, ESQ.
THEODORE TSEKERIDES, ESQ.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

TOBIAS S. KELLER
Keller & Benvenutti LLP
650 California Street
Suite 1900
San Francisco, CA 94108

For Official creditors' committee:

ANDREW M. LEBLANC, ESQ.
GREGORY BRAY, ESQ.
Millbank LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

For California Public Utilities Commission: ALAN W. KORNBERG
SEAN MITCHELL
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

For State Farm: ALLAN S. BRILLIANT
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

For Ad Hoc Bondholder Committee: DAVID H. BOTTER
MICHAEL STAMER
Akin Gump Strauss Hauer & Feld LLP
One Bryany Park
New York, NY 10036

For Mia Nash: FRANK DAVID BLOKSBERG
142 E McKnight Way
Grass Valley, CA 95949

For NextEra Energy Inc., et al.: SAMUEL MORGAN KIDDER
Klee Tuchin Bogdanoff & Stern LLP
1999 Avenue Of The Stars
Floor 39
Los Angeles, CA 90067

For Consolidated Edison Development, Inc.: GABRIEL OZEL
Troutman Sanders LLP
11682 El Camino Real
Suite 400
San Diego, CA 92130

For Ad Hoc Group of Subrogation Claim Holders: ALEXANDER JAMES DEMITRO LEWICKI
Diemer & Wei, LLP
100 W San Fernando Street
Suite 555
San Jose, CA 95113

For Calpine: MICHAEL P. ESSER
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

For Interested Party: PAUL JOSEPH PASCUZZI
Felderstein et al. LLP
400 Capitol Mall
Suite 1750
Sacramento, CA 95814

For Interested Party: JOHN CARL LEMON
Law Offices of John C Lemon APC
1350 Columbia Street
Unit 600
San Diego, CA 92101

For Interested Party: LARS TERENCE FULLER
The Fuller Law Firm
60 North Keeble Avenue
San Jose, CA 95126

For Official Committee of Tort Claimants: ERIC EVAN SAGERMAN
16060 Ventura Blvd
Suite 110-125
Encino, CA 91436

For Interested Party: DARIO D'GHATALI

Also Present: Jeanne Finegan
President and Chief Media Officer of HF Media, LLC

Shai Waisman
Chief Executive Office of Prime Clerk

Court Recorder: MONICA TARTAGLIA
United States Bankruptcy Court
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102

Transcriber: JENNIFER HAMILTON
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(973)406-2250

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 5 of 233

PG&E Corporation; Pacific Gas and Electric Co.

SAN FRANCISCO, CALIFORNIA, WEDNESDAY, JUNE 26, 2019, 9:54 AM

-oOo-

(Call to order of the Court.)

THE CLERK: Matter of PG&E Corporation.

THE COURT: Mr. Karotkin, good morning. Are you okay with the sequence that --

MR. KAROTKIN: Good morning, sir.

THE COURT: -- I asked that we follow today? Do you have any problem with that?

MR. KAROTKIN: No, sir.

THE COURT: Okay. All right, let's do it, then. Do you want -- do you want to make some opening comments? I mean, tell me how you want to.

MR. KAROTKIN: Yeah, if you don't mind, sir.

THE COURT: Yeah, sure.

MR. KAROTKIN: Stephen Karotkin, Weil, Gotshal & Manges, for the debtors.

We, of course, have out declarants here in court today. And if I could introduce them, we have Ms. Finegan, president and chief media officer of HF Media, a division of Heffler Claims Group.

If she would stand up?

THE COURT: Good morning. Thank you for coming.

MR. KAROTKIN: And Mr. Waisman, chief executive officer of Prime Clerk.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

THE COURT: Guardian, Mr. Waisman. Thank you.

MR. KAROTKIN: Your Honor, I'm more than happy to address the questions that you raised in your hearing order that you issued yesterday. And I think, in view of where things stand today, and I think, as you noted in that order, The issues before the Court today are fairly limited. I think that we have resolved most of the issues with respect to the bar date. With respect to the wildfire proof of claim form, there are only a couple of open items that I can go through with you --

THE COURT: Well, you know what might --

MR. KAROTKIN: -- in a few minutes.

THE COURT: -- be helpful? And whether I -- whether I make my comment through the order or the form, I mean, to some extent, the proposed order that you submitted mirrors much of the proof of claim form. And much like -- that I've done in other matters where I have to review something in advance, it's just helpful for me to jot down questions and then just present them to you. And some of them, you might say it's a nonissue or you've resolved it. Others, you might tell me that I'm crazy. And another one, you might say that's a good idea, we'll do it. So I mean, I can go through just a series of questions. And they're really to you, but they're also to the TCC counsel. And it doesn't -- you know, there are questions that are common to both versions of the proof of claim form. I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    didn't even have time, with the flush -- flood of activities in the last few days, to even review the proposed order from the TCC. But again, the kind of comments I have are --

MR. KAROTKIN: Um-hum.

THE COURT: -- common to anywhere.

So for example, I have your proposed order with questions right down the line. And I'm more comfortable just running through that way if you're okay.

MR. KAROTKIN: I'm okay, but if I could just make a couple of remarks before --

THE COURT: Sure.

MR. KAROTKIN: -- before we get to that?

THE COURT: Sure.

MR. KAROTKIN: As we reference in our -- in our reply pleadings, we have reached an agreement with the subrogation claimants --

THE COURT: Right.

MR. KAROTKIN: -- and their proof of claim form. And to the extent that there are any objections, those have -- those have been resolved. And although I know you have questions with respect to the proposed order, we have filed a revised -- a revised order on the bar date. We believe that has resolved --

THE COURT: Is that another -- after the one you filed on the 19th?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

MR. KAROTKIN: No, no. No. No.

THE COURT: Okay, no, that's --

MR. KAROTKIN: The one --

THE COURT: -- the one I --

MR. KAROTKIN: The one that --

THE COURT: -- in the markup.

MR. KAROTKIN: -- you have before you. And I know you have questions.

THE COURT: Yeah.

MR. KAROTKIN: I think that, in our view, that has resolved the outstanding objections, particularly, Your Honor, in view of the comments you made in the order yesterday with respect to potential claims based on post-petition events. So I think that you have disposed of that issue by saying that you're not going to address this. So I think it's fair to say --

THE COURT: By the way, it's not like a huge can of worms to start speculating about the future.

MR. KAROTKIN: I think that your approach is absolutely correct.

THE COURT: Okay.

MR. KAROTKIN: So I think it's fair to say -- and we'll get to this -- that the only remaining issues relate to the extent and the adequacy of the supplemental notice. And again, as I'll explain further, we have agreed to further

PG&E Corporation; Pacific Gas and Electric Co.

supplement it since what we filed last week. And the second issue is what is the appropriate bar date?

THE COURT: Well, I'm kind of treating that as a -- as a discrete question that I want to hear from --

MR. KAROTKIN: Yes.

THE COURT: -- both sides and anyone else.

MR. KAROTKIN: Yeah, we --

THE COURT: But I think, again, going back to the way it helps me, some of my points on the form order are really almost nitpicks, but they're nitpicks in the sense that I'm afraid they might be creating confusion --

MR. KAROTKIN: Sure.

THE COURT: -- in the minds of people that aren't under -- familiar with this. And it -- and therefore, there are comments that are consistent for either or more, whatever we come to.

MR. KAROTKIN: Right, we have -- we understand that --

THE COURT: Okay.

MR. KAROTKIN: -- and, as I said, we're happy to go through that with you.

THE COURT: Okay. Should we do that now or do you want to make some more --

MR. KAROTKIN: I want to make a couple of more remarks.

THE COURT: Okay. Okay.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: If you don't mind?

THE COURT: No, go ahead. Go ahead.

MR. KAROTKIN: You seem anxious to get to that order.

THE COURT: No. No.

MR. KAROTKIN: I want to make it clear, Your Honor, that the original notice that we proposed, in our view, more than satisfied due process. And we now, as you will see, have made two rounds of supplements to that in order to address some of the issues raised by the -- by the tort claimants committee. And I would like to reference, Your Honor, Ms. Finegan's declaration, again, which was filed after the first supplemental notice, which states, in paragraph 6, that the notice plan is one of the largest and most comprehensive notice and media campaigns recommended in bankruptcy history. And that statement, as I said, Your Honor, was made before the additional modifications that I'll go through with you shortly.

As the debtors have stated clearly and consistently, Your Honor, since these cases were commenced, a principal goal is to move forward with the administration of these cases as expeditiously as possible so that distributions can be made to the holders of wildfire claims as soon as possible and, in fact, more quickly than distributions would be made in the tort system. Your Honor, we thought that the tort committee shared that goal. It has fiduciary duties to all claimants. We thought they shared that goal and that would be of paramount

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 11 of 233

interest to them. For reasons that completely mystify us, and I think mystify other parties who are here today, including the unsecured creditors committee, the tort committee apparently doesn't share the goal of moving this case forward --

THE COURT: Well, I -- you know, I --

MR. KAROTKIN: -- expeditiously.

THE COURT: -- what I'd -- what I'd like to do is focus on the issue. And I'll ask the tort committee if they're adamant about January 31st. If they say no, we want it to be February 28th, I might ask for further clarification.

But to me, as I tried to say, my decision points today are between October 21st and January 31st. I'm not going to -- I'm not going to go outside that range. So that's really -- I'd rather not talk about motive, but talk about reason, why one date is better than the other.

MR. KAROTKIN: And we'll get to that.

THE COURT: Okay.

MR. KAROTKIN: But I'd like to point out one other thing. That what actually concerned me the most, Your Honor, and perhaps I find most troubling is that why didn't the tort committee come to us after we filed our motion and say: we have issues with your noticing?

Instead, they waited three weeks and they filed their motion, and here we are today with additional motion practice, additional cost and expense, and frankly, if they wanted to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

          move constructive -- these cases forward constructively, they would have called us. But let me go through, Your Honor, the --

THE COURT: Yeah, again --

MR. KAROTKIN: -- changes that --

THE COURT: -- those are the kinds of questions that are fair to ask, but I'm not going to try to answer them, I'm not going to ask the other side to answer them.

MR. KAROTKIN: But I think it puts things in perspective, Your Honor --

THE COURT: I got the --

MR. KAROTKIN: -- as to --

THE COURT: I got the message.

MR. KAROTKIN: -- as to what's going on here today. So I -- if I could, I would like to go through, with you, the additional noticing that we are proposing, again, in addition to what we have --

THE COURT: Well, I mean, I've --

MR. KAROTKIN: -- already proposed --

THE COURT: -- read Ms. Finegan's papers and your -- everything else. I mean, I -- it's --

MR. KAROTKIN: And there's more --

THE COURT: -- it's overwhelming.

MR. KAROTKIN: But there --

THE COURT: If you want --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: But there's --

THE COURT: -- to add more things --

MR. KAROTKIN: -- there's more --

THE COURT: Okay.

MR. KAROTKIN: There is now more.

THE COURT: More -- more was --

MR. KAROTKIN: In order to address --

THE COURT: Okay. Go ahead.

MR. KAROTKIN: -- some additional concerns. And if I could approach?

THE COURT: Sure.

MR. KAROTKIN: Okay.

THE COURT: Do we -- is it something we can put on the screen for other people? Or --

MR. KAROTKIN: No, we have copies for them.

THE COURT: Well, we also have people in the other courtroom, as well. Okay.

MR. KAROTKIN: So if you -- if you look at this chart, Your Honor, this sets forth, with respect to the supplemental noticing program, our original plan and the debtor's current proposed notice plan, which now includes what we supplemented last week, in addition to what we've -- the additional provisions that we've made and added in the last day or so.

THE COURT: Okay.

MR. KAROTKIN: And it's relatively self-explanatory.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                And if you -- if you look at the frequency and reach, you will see that the original -- the original proposal was estimated to reach approximately ninety-five percent of adults eighteen years an older in the four designated market areas. And those DMAs -- the designated market areas, Your Honor, are the four areas --

THE COURT: I know -- I know what they are. I read about them.

MR. KAROTKIN: -- in which the wildfires occurred. That covers six counties.

THE COURT: Um-hum.

MR. KAROTKIN: And if not -- if you now look at the comments on the right-hand side, you'll see that it has been increased from 5.8 times reach with, now, the reach increased and designed to cover 95 percent of the target audience an average of ten times. That means they would see it -- a notice ten times.

With respect to magazines and print, we have -- we have added national distribution in People Magazine, Sports Illustrated, and Sunset Magazine. I would note that the -- that the tort committee requested only that we use People Magazine and Sports Illustrated. We went beyond that.

With respect to the newspapers, we added fifteen additional newspapers in Northern California, as requested by the tort committee. And if you look at the right-hand side,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

there are now twenty-nine total publications which will run print notices three times in each, other -- in each publication, other than the Wall Street Journal, which will be published once.

THE COURT: By the way, I saw this before about publication sequence. What you didn't say or I don't recall was intervals. Is there going to be an interval between each of the publications?

MR. KAROTKIN: There will be intervals.

THE COURT: But I mean, not like each day. Every week or something, a larger period of time?

MR. KAROTKIN: Yes, sir.

THE COURT: Okay. And --

MR. KAROTKIN: With the first ones starting --

THE COURT: That's okay. I don't need to go into the detail.

MR. KAROTKIN: Okay.

THE COURT: But we have timing as to when that will initially start.

With respect to television, there's some term called "TRPs", which I won't try to explain to you because that's beyond my capabilities. But we have increase TRPs to 1,300, and I will note that the tort committee, in its request, had only requested 500, so we've gone above and beyond that.

With respect to local radio -- with respect to radio,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that's been increased to add streaming radio. Again, I believe at the tort committee's request, we've added Pandora. And as noted in the comments on the right, there will be ads purchased in four English-speaking and two Spanish-speaking radio stations in each market for a total of thirty-four stations.

And then there is a whole host of online -- of online noticing with specific ability to target websites that people in the wildfire areas would frequent, with specific abilities to obtain addresses of people who lived in the area and the ability to track -- and don't ask me how this is done -- the websites that they visit, both in search ads -- both in news -- in news streaming types of facilities --

THE COURT: It's kind of scary, when you think about it.

MR. KAROTKIN: It is very scary.

THE COURT: Yeah.

MR. KAROTKIN: As well as people who have left the area, where they can track them and find sites they visit on YouTube, Facebook, Instagram, and assure that they get notice that way, as well.

And with those -- all of those modifications, we believe -- and our experts can confirm, and they are here today, Your Honor -- that this plan goes well above and beyond what is necessary and addresses any legitimate concerns that the tort committee could have. And Your Honor, I would refer

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

you -- refer you to Ms. Finegan's declaration -- again, prepared before we added this additional notice -- at paragraph 98, where she says: building on the original supplemental notice plan, the revised supplemental notice plan now incorporates additional layers of notice through additional magazine coverage nationwide; an increase in the number of television commercials locally on broadcast, cable, and nationwide through cable television and OTT; more robust local radio coverage and streaming radio; increased impressions online; online video cross-platforms, such as YouTube; and importantly -- and I won't refer to Angeion -- the debtors are leveraging social influencers who have enormous followings and have had their lives affected by the fires.

She goes on to say, Your Honor, in paragraph 99, that the reach and frequency of the debtors' supplemental notice plan is estimated as follows. It will reach ninety-five percent of adults age eighteen years and older with an average frequency of eight times in the target four DMAs, the designated market areas, those six counties in which the fires occurred. It will reach over eighty-one percent of California residents eighteen years and older with an average frequency of five times. It will reach seventy-eight percent of adults over the age of eighteen nationwide who live outside of California and moved within the last four years with an average frequency of 2.3 times.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

And then she says: when that is combined with the other methods of notice not measured, such as community outreach, the overall effort, no doubt, will achieve -- will achieve greater results.

And if you want to hear from Ms. Finegan, she is in --

THE COURT: No, I don't.

MR. KAROTKIN: -- court today.

THE COURT: I read about her background and her explana -- her explanation --

MR. KAROTKIN: and I'll further --

THE COURT: -- and it's helped.

MR. KAROTKIN: -- note, Your Honor -- and again, Ms. Finegan will confirm -- that the typical notice in a class action case reaches only seventy to eighty percent -- seventy to eighty percent, not ninety-five percent -- of the target audience approximately two to three times with a very limited amount of online and other means of notice outreach that our plan includes. Our plan, Your Honor, goes well beyond what is done in any class action, well beyond, Your Honor, what's been done in any Chapter 11 case.

THE COURT: We have -- we have bankruptcy principles and we have Mullane, and its progeny, and we have reasonable efforts to give due process. It's not a certainty, it's not positively. And unlike a class action, if I'm not mistaken, if, despite all the efforts in a class action, someone never,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

never, ever had notice, that person doesn't suffer a discharge. In bankruptcy, of course, there's the risk of discharge. Although even the case law says certain people don't get a discharge if they never had notice. So --

MR. KAROTKIN: Correct --

THE COURT: -- this really comes down to the bankruptcy principles of reasonable under the circumstances. It's a judgment call, right?

MR. KAROTKIN: Absolutely, and --

THE COURT: Okay.

MR. KAROTKIN: -- and what I'm saying to Your Honor is this goes beyond reasonable.

THE COURT: Yeah. I understand.

MR. KAROTKIN: This is the most robust plan that has ever been done.

THE COURT: It certainly seems to be that way. And I'll listen to TCC and anyone else who wants to say -- speak against it. But again, I am going to talk about my comments on the order at some point.

MR. KAROTKIN: Would you like to do that now or would you like to talk about it?

THE COURT: Well, no, and I'm not -- I'm not -- excuse me, I'm not making light of this. My point is that I read Ms. Finegan's declarations, I've read the reports, I was amazed at how complex it is. And this is not -- again, this is not

playing Ms. Finegan and Prime versus Angeion. This is new territory for a lot of us. And just the technology and the -- and the thought that goes into all these alternative plans is almost incomprehensible. But we start with the principle that I mentioned is that what the Mullane court taught us whatever hundreds of years ago was and everything since then. So I'm going to listen to anybody that wants to say why I should disapprove this or this proposal, but not now. I'll come back to that when we come to that.

MR. KAROTKIN: So --

THE COURT: Okay?

MR. KAROTKIN: -- would you --

THE COURT: Yeah.

MR. KAROTKIN: -- like me to address the October 21st date or would you like to --

THE COURT: No, I'd rather go --

MR. KAROTKIN: -- go through the order?

THE COURT: -- on the comments because this is -- I -- there may be some back-and-forth, as I said. Unless I'm missing something, it's a simple question of letting the lawyers tell me why I should pick one date or the other or something in between. I'm not going to go earlier than your date, I'm not going to go beyond their date. This is --

MR. KAROTKIN: Okay.

THE COURT: This is my call to figure out, well,

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

              what's the right thing to do? But let's -- I mean -- I mean, as I said to you before, I -- in my little summary for today, that seems to be what I -- my choices are at the moment.

MR. KAROTKIN: Yes.

THE COURT: And well, you -- I'll tell you what. As long as you're there, give me what response to the question that I raised about is it really a ninety-five date when you think about it? Because --

MR. KAROTKIN: Yes.

THE COURT: -- I'm not going to be signing an order today, best case. You know I'm not. And the question is, so let's assume I assign something on your side on July 1. When do the first things start to happen --

MR. KAROTKIN: Okay.

THE COURT: -- versus when the most untechnical assisted claimant has to drop something in the mail in, you know, Paradise, California to go to New York city. It's --

MR. KAROTKIN: May --

THE COURT: Tt's a shorter number of days, right?

MR. KAROTKIN: It is. May I approach?

THE COURT: Yeah, of course.

MR. KAROTKIN: So what you have before you, sir, is, assuming you enter -- I think you mentioned in your order --

THE COURT: I just picked it. I mean, look, today's Wednesday, and --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: Okay, so assume July 1.

THE COURT: -- it's going to take time to do it, yeah. Yeah.

MR. KAROTKIN: So if you assume July 1, the mailing to all known creditors other than customers, including the mailing to all known -- all known wildfire claimants will be completed by July 8th.

THE COURT: And if Prime is going to do it, they're the principal source of putting it all together, stuffing the envelopes, or however they do it --

MR. KAROTKIN: And --

THE COURT: -- and out they go?

MR. KAROTKIN: Exactly.

THE COURT: Okay.

MR. KAROTKIN: And moreover, Your Honor, these will be all customized --

THE COURT: Right.

MR. KAROTKIN: -- claim forms for creditors, wildfire claimants, with their names, addresses, to the extent they're scheduled, they'll be referenced to the schedules. Completely customized --

THE COURT: Okay,22

MR. KAROTKIN: -- to make it easy.

THE COURT: -- yeah, I mean, I've -- particularly if they're non -- they're nontort claimants.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 23 of 233

PG&E Corporation; Pacific Gas and Electric Co.

MR. KAROTKIN: Correct.

THE COURT: That's another question. But that's a different question.

MR. KAROTKIN: All right. The mailing to all customers, which is about seven million pieces, will be completed by July 16th. That leaves ninety-seven days.

THE COURT: Okay.

MR. KAROTKIN: Until October 21st.

THE COURT: Okay. But again, back to -- let's just stick with an individual, not represented by counsel, not tech-savvy, so that they've seen it seventy-five times on their satellite radio. Somebody ideally will get it no earlier than around July 8th, and then there's a deadline if they drop it in the mail rather than going to one of the service centers. It will be mailed, and it has to get there by --

MR. KAROTKIN: October 21.

THE COURT: Well, it would have to get there by October 21st. So presumably it has to be mailed a few days prior. That's all.

MR. KAROTKIN: Okay. So that a hundred days. Let's say a hundred days.

THE COURT: So you're saying a hundred days, okay.

MR. KAROTKIN: Okay.

THE COURT: All right.

MR. KAROTKIN: The customers would all be completed by

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    July 16th. So ninety-seven days to October 21st. So if you wanted to say ninety-two days, that's fine. The first newspaper --

THE COURT: I think -- by the way, I think it is the tort victims who we're really focusing on the need to do this kind of notice, right? I mean, they are the ones who -- it's not to say that a contractual claimant isn't entitled to due process either, but contractual claimants typically are on schedules, maybe don't have to file claims at all, and there's a much less pressure in terms affording due process, right?

MR. KAROTKIN: Correct.

THE COURT: Okay.

MR. KAROTKIN: And again, I think that we took that into account.

THE COURT: Right.

MR. KAROTKIN: This is more than adequate time. And I think, Your Honor, you will know from the pleadings that other parties here representing tort claimants certainly are comfortable with the date we've selected.

THE COURT: Yes.

MR. KAROTKIN: I think, Your Honor, the tort committee is the lone wolf out there asking for an extended bar date. Newspaper publication recommends within seven days after entry of the order.

THE COURT: Again, when I asked you before about on

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the newspapers, I asked you what the frequency was, and it's going to vary with publication, but it seemed to me there should be a publication no later than a date also because --

MR. KAROTKIN: Yes, yes.

THE COURT: -- if you publish something on October 20, that's not very helpful.

MR. KAROTKIN: No. It will be --

THE COURT: Right?

MR. KAROTKIN: Yeah. I think if it's not in the proposed order we will certainly include in the proposed order that publication shall be no later than a certain date the first time, the first publication.

THE COURT: Well, no, the last publication, also. I mean, again --

MR. KAROTKIN: Oh, yeah.

THE COURT: What good is a mailing on October 20th do?

MR. KAROTKIN: We can put in the sequencing of --

THE COURT: Okay.

MR. KAROTKIN: -- all of it if you'd like. The TV and radio spots we commence within two weeks of entry of the order, again assuming July 1st, that would be July 15th and --

THE COURT: Okay. I've got all the points right here.

MR. KAROTKIN: Okay. So again --

THE COURT: And --

MR. KAROTKIN: -- with that type of a timetable, we

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

believe that there is again --

THE COURT: And when is the drop centers -- when are they staffed and open for business, the four or five places?

MR. KAROTKIN: July 15th.

THE COURT: The 15th. So they will be physically manned by --

MR. KAROTKIN: Yes.

THE COURT: -- human beings during at least business hours?

MR. KAROTKIN: Yes.

THE COURT: Beginning on July 15th?

MR. KAROTKIN: Yes.

THE COURT: Okay.

MR. KAROTKIN: And again, Your Honor, we've agreed to a pretty simple claim form.

THE COURT: I know.

MR. KAROTKIN: Okay. So it's not burdensome for someone to complete the claim form.

THE COURT: Well, that's easy for you and me to know, but it might be really very burdensome for someone who is traumatized and intimidated by the legal system and doesn't understand what a bar date means, you know --

MR. KAROTKIN: And we've tried to make --

THE COURT: -- et cetera.

MR. KAROTKIN: -- abundantly clear.

THE COURT: Okay.

MR. KAROTKIN: Okay.

THE COURT: All right.

MR. KAROTKIN: So I think that again with this timetable and the amount of notice we clearly believe we satisfied all the requirements of due process under Mullane, and I'm happy to go through the order if you'd like to do that.

THE COURT: Okay. If you're more comfortable back at counsel table just to --

MR. KAROTKIN: No. I'm fine up here.

THE COURT: Okay. Well, I mean look, I just went through it as much as I would do if I were reviewing a disclosure statement. I'd just say, well, wait a minute. What does this mean? Why is this here? So I'll start with page 3 of the proposed order which is the ordering paragraph.

MR. KAROTKIN: Can I just ask a question?

THE COURT: Yeah.

MR. KAROTKIN: Are you looking at the claim or the mark?

THE COURT: The claim.

MR. KAROTKIN: Can you give me one second?

THE COURT: Sure. Yeah. Again, that's why if you're ready -- if you're more comfortable at counsel table, that's fine with me.

MR. KAROTKIN: Okay.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, my first comment is on paragraph 3, which is page 3 of the proposed order, your proposed order, and it's a simple question, you and I are bankruptcy professionals as are a lot of people from the room here, but the capitalized term, bar date, isn't defined anywhere. Where does someone reading this know what a bar date is?

So in my mind, there should be, this means a deadline by which you have to do something. And I'm not unwilling to either back off of this or have some other alternative, but I'm worried about people that are overwhelmed by the complexity of something like a notice like this. So I don't think bar date is a defined term in this document. Maybe I missed it.

MR. KAROTKIN: It's on the next page, Your Honor.

THE COURT: Well, where is it because I didn't see it, but I went through -- I went through these things carefully, and I might have missed it.

MR. KAROTKIN: We can certainly clarify it, but on the next page, it's clear what the date is.

THE COURT: Just tell me what line to --

MR. KAROTKIN: It's on line --

THE COURT: No. Not the date. The term. What does the term bar date mean to a layperson? You and I know what it means.

MR. KAROTKIN: I understand.

THE COURT: What does it mean?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

MR. KAROTKIN: We can clarify that.

THE COURT: What, but what -- give me the simple answer. You are --

MR. KAROTKIN: The bar date means the last --

THE COURT: -- an uneducated victim of a fire who lives in the woods somewhere. What does it mean when, oh, my God. There's a bar date? What does it mean? He says, I keep hearing it on the radio and I keep reading on my newspaper and I keep getting it on the TV. What does bar date mean to me? So can't we just say, this means the date of October bland or whatever date that your claim must be filed?

MR. KAROTKIN: Yes.

THE COURT: Just that simple.

MR. KAROTKIN: Sure.

THE COURT: In bold letters.

MR. KAROTKIN: And in the notice, the summary notice, I believe it does say that, but yes, we can certainly clarify that.

THE COURT: The next question, again, is one of those things like, why am I even asking this question, and that's in footnote 2, the term, Northern California wildfires is a defined term to exclude the fire that happened in 2016. The Ghost Ship fire happened in 2016. And so when you read the definition of Northern California wildfire, it's not in there. It wasn't a wildfire in a traditional sense like a forest fire.

It was a tragedy at a building where a lot of people died, but everybody in the Bay area and in Northern California knows about the Ghost Ship fire. So it's just a definition thing.

MR. KAROTKIN: Okay.

THE COURT: And I don't -- again, I don't care how you solve it. I want to make sure we're not inconsistent with the documentation. That's all.

MR. KAROTKIN: Okay. We can include that.

THE COURT: Okay. So in the standard form -- now, this is the -- the next question on the next page on page 4 on the standard claim, not the wildfire claim, where in the small print, little i, and this is in 7-B, standard claim, little ii, be denominated in lawful currency.

Well, it seems to me, he aught to say, if known, because we are allowing, and your forms allow people to file a claim without quantifying their claim, right? And a lot of the tort victims don't have to quantity their claim at this point.

MR. KAROTKIN: Okay.

THE COURT: So do you have a problem just saying -- and this would show up in several cases. Again --

MR. KAROTKIN: Sure.

THE COURT: Mr. Karotkin, I don't want to put you on the spot. These are comments that I have, and if you have sober reflection in conferring with your colleagues and clients and others and say, wait a minute. There's a problem. I don't

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

want you to feel that these are nonnegotiable for me or anything, but this is why we're having this conversation. And sorry I was taking so much time with everyone listening, but I think it's important to me that a person who doesn't know how to quantify the claim isn't -- is not cut out because he or she hasn't done it. And it's the same question that shows up for the wildfire claims, and I just happened to think of it on the standard claim form first. You follow me?

MR. KAROTKIN: Yes.

THE COURT: Okay. And then again, a question that's pertinent to each of these paragraphs, why does the language say that if the claimant is not an individual, it has to be signed by an authorized agent? Why can't an agent for an individual sign as well like they do all the time?

In other words, it says, the documentation must be signed by the claimant or if the claimant is not an individual -- well, individual claimants can have their agent sign for them, too. Lawyers do it all the time, right, unless there's a particular reason why you are insisting that the claimant --

MR. KAROTKIN: No. We can fix that.

THE COURT: Well again, I just want to -- I don't want a trap. I don't to have a situation six months from now where we have a claim objection. Wait a minute, attorney so and so signed for Ms. Smith in the forms that Ms. Smith had to sign.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 32 of 233

PG&E Corporation; Pacific Gas and Electric Co.

Again, you decide whether this is a substantive issue. If not, let's --

MR. KAROTKIN: We can fix that. It certainly wasn't designed to be a trap. That I can assure you.

THE COURT: I didn't suggest it. Okay. Here's a broader question that's a bankruptcy lawyer question. And this has to do with -- still on page 4, subparagraph C. And the language is there, really, for the standard -- or my question is for the standard proof of claim as well as the wildfire claim.

But the standard proof of claim, generally, is for people that chose to be creditors, and they know what it means. And that is this, Mr. Karotkin. I'm inclined to say, where you put in there -- states that, as of the petition date what your claim is, is adding something like, even if calculated later, because again, you and I know that the petition date is a critical date for proofs of claim. But we also know that, particularly with torts, lots of times the calculation occurs much later.

And so it seems to me the proper way for a claim form to assert the claimant's entitlement is the best judgment, as of the -- as of the -- I mean, as of the time you're preparing a claim, what your claim was, as of the petition date, or would be, even if you had to calculate it. You follow me?

MR. KAROTKIN: Yes, sir.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: So why don't I ask that you make sure you're comfortable with that? And don't decide it right now. If you conclude that something like that is okay, then fine. If it's not okay, I'm not going to make an issue of it.

MR. KAROTKIN: Okay.

THE COURT: All right. Next question -- well, the next question is on page 5, and it's the same question for the several claims, the same as before, about if known. And so I won't repeat those.

MR. KAROTKIN: Okay.

THE COURT: On subparagraph E -- let's see. One second. Oh, yeah. What happens, in your mind -- if there is a class suit, or class action, or class proof of claim, what happens to an individual debtor who doesn't file a claim?

MR. KAROTKIN: Individual claimant?

THE COURT: In other words, I'm looking at subparagraph E on page 5. And so what I wrote in the margin for that is, "What if not separately filed", in other words, what your -- the language says that the holder of the claim must file a claim, even if it's done by class action suit, class -- adversary, et cetera. And my question to you is if Mr. Jones has five counsel representing him in five different class actions, but he doesn't file his own claim, is he out or not?

MR. KAROTKIN: The way this is written, yes.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: And is that the way the law would require it? In other words, is that the way you understand --

MR. KAROTKIN: I -- I --

THE COURT: -- is the outcome?

MR. KAROTKIN: I believe, Your Honor, you have the authority to do that.

THE COURT: Well, but if I -- again, we're back to the question of agent. If I sign up with a group of people, who -- again, I don't want to go back to the merits of the motion that I heard this morning, but at least until I make a ruling, there is, nominally, a group of people who believe they're in a class called the Herndon class. And if someone in that class has, through counsel for the class, asserted something, if your position is that the law means the individual is out of luck no matter what, I guess we'd better clarify that. And --

MR. KAROTKIN: I think that, Your Honor, to the extent that the attorney representing the class sets forth the information with respect to each claimant, as required by the form, that would be sufficient. But filing a blanket claim on behalf of a class of unknown people with no names, I don't think that works.

THE COURT: So if one of the --

MR. KAROTKIN: I'm not saying that they don't -- they could have power of attorney to file the claim, like any other power of attorney, if they're representing a claimant --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Um-hum.

MR. KAROTKIN: -- to file an appropriate claim and sign that claim. But to file a class claim on behalf of John Doe and a group of unknown claimants, to me, that's inappropriate.

THE COURT: Okay. But going back to the power of attorney, so again, let's use the Herndon class today. If I toss that adversary proceeding, but Mr. Gottfried or his colleague, if they file something under a traditional power of attorney for the known people, then it seems to me you're conceding that that would be okay.

MR. KAROTKIN: If it includes the information --

THE COURT: Right.

MR. KAROTKIN: -- with respect to those people --

THE COURT: Right.

MR. KAROTKIN: -- in the claim form.

THE COURT: Got it.

MR. KAROTKIN: Yes, sir.

THE COURT: Got it. But then, therefore, you see, it's not consistent with --

MR. KAROTKIN: Okay.

THE COURT: -- subparagraph E. So again --

MR. KAROTKIN: We can clarify that.

THE COURT: -- it's clarification. Then yeah, now, again, on subparagraph F, it's just a point of -- I'm just

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

going to make sure I got it right, Mr. Karotkin.

The second sentence of paragraph F says that the wildfire claimants are deemed to have filed one claim in both debtors -- against both debtors. But if you're a contractual claimant, you have to -- you have to name one or both of your debtors, specifically.

MR. KAROTKIN: Yes, sir.

THE COURT: So on the claim form -- and I notice that on the actual claim form, the -- what we'll call the general or the normal claim, it does have the box for the two debtors. But for the wildfire and the several claims, it does not. And that's consistent with your understanding there; that right?

MR. KAROTKIN: Yes, sir.

THE COURT: That's right?

MR. KAROTKIN: Yes.

THE COURT: Okay. I mean, I -- my point is that it was one of those things where the first sentence raised the question in my mind. The second sentence answered it, but I wanted to make sure you confirm and so I have no question.

Now, next question, and this is a question about Prime Clerk, as much as anything else. What happens when a person files the claim electronically, Prime Clerk? There is a electronic claim form. What do they get back? They get a receipt? They get something? In other words, they get something that shows they're on file or not?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: May I ask Mr. Weissmann to answer --

THE COURT: Yeah.

MR. KAROTKIN: -- that question?

THE COURT: Yeah, because, look. It's really critical. Think about it when you file something electronically in our court. You get an NEF back.

MR. KAROTKIN: Yeah.

THE COURT: So Mr. Weissmann, just answer that. What does the claimant who files electronically get, to know that he or she has filed a claim?

MR. WEISSMANN: As soon as they hit submit, they are emailed a receipt with a full copy of the claim that was submitted, an actual copy.

THE COURT: Okay. I think it would be helpful to say that, because here's my point. And I'm glad that's the answer that you gave me, because if it weren't, I'd probably tell you it has to be the answer. No, but the reason why is, elsewhere in the form, it makes a big deal, saying if you want a copy by mail, send us -- make sure you send one back. If you go to the claim processing center in Chico, bring a extra copy. Well, that's fine. And that's the way -- that's okay.

But in this electronic world, because Prime Clerk is going to allow and it has the ability to let a lot of people file electronically, all I want is they get something back. And I think it should say that in here --



eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: We'll say that.

THE COURT: -- that something -- again, and I don't want to clutter up a very complicated form.

And Mr. Karotkin, I don't -- the fact that I'm making these comments, in the context of the order, is really -- it's really a claim form point. I mean, I don't care where we take care of it, but I think you and Mr. Weissmann have answered the question. Okay.

So okay. On page 6, you've already told me that the service centers will be staffed, beginning on July 15th. So there's a blank there. I mean it needs to be blank. Yeah. All right. This is where I -- it's on this page where I had made the notation of the question about how do you know your claim got filed electronically. So you're going to answer that.

MR. KAROTKIN: Yes, sir.

THE COURT: Yeah. This might be a nitpick again. On page 7, the paragraph L, you've got interests in there. And I think it should be -- hold to the claims. I mean --

MR. KAROTKIN: Yes, it's a mistake.

THE COURT: Yeah, okay. So okay. Again, a lesser point, and that's subparagraph N. You make reference to what the 503(b)(9) claim deadline was. I thought it would be useful just to put it in there. That was just a -- as I recall, it was just a date about twenty days after the petition date,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

wasn't it?

MR. KAROTKIN: I believe it was.

THE COURT: Yeah. Well, let's just put it in there.

MR. KAROTKIN: Sure.

THE COURT: Okay. So then on paragraph O, still on page 7, there are two other references to interests, that I think don't belong here. But again, I'll leave it to you to make sure. You take it out if you agree with me that it should be out. I don't need further --

MR. KAROTKIN: I'll take a look. I'm not sure I necessarily agree, but I'll take a look.

THE COURT: Well, I went back and looked at the rules. Remember, I think we have -- I don't think we have anything in any form order that orders people to file proofs of interest.

MR. KAROTKIN: No, no. I think that --

THE COURT: And the national rules don't, either.

MR. KAROTKIN: I totally agree. I think --

THE COURT: Okay.

MR. KAROTKIN: -- that this may reflect that, to the extent you have a claim -- to the extent you're a stockholder and you have a claim -- a dollar claim --

THE COURT: No, it's a claim.

MR. KAROTKIN: -- this would require you to file.

THE COURT: No. No, you don't. If you're a stockholder, you're a stockholder.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    MR. KAROTKIN: No, no. But if you had --

THE COURT: You mean like a --

MR. KAROTKIN: -- a dol --

THE COURT: -- preferred stock?

MR. KAROTKIN: -- a rescission claim. Let's assume something like that.

THE COURT: Look. We --

MR. KAROTKIN: Yeah. I'll look --

THE COURT: Move on.

MR. KAROTKIN: -- at that.

THE COURT: I don't need anything back. The next time I see this, hopefully, I'll be signing an order, and the word interests will be there or not, as you've chosen. I'm not going to second-guess you on this one.

MR. KAROTKIN: Okay.

THE COURT: Okay. Page 9.

MR. KAROTKIN: 9?

THE COURT: Yes. One second. Oh, yeah. This is the -- this is the provision on page 9 in paragraph 12, where I believe you agreed with, perhaps, the TCC that you are cutting out post-petition claims. Because you're saying you don't file a claim -- remember, there are twelve paragraphs of people who don't file claims, right?

MR. KAROTKIN: Right.

THE COURT: And in paragraph 12, it's a person who

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

holds a claim for personal injury. And I think you should add, or wrongful death, because that's -- those two always go together. But the question, then, is shouldn't that also be expanded to contractual claims? In other words, a simple contractual claim, you and I can know that a contractual claim that arose on January 30th is not a subject of a proof of claim. Do you have a problem with expanding?

MR. KAROTKIN: But Your Honor, this was added to address a particular objection, not -- I don't even think from the TCC -- frankly, an objection we didn't really understand, but we accommodated people.

THE COURT: Okay.

MR. KAROTKIN: I think this is an extremely unusual provision.

THE COURT: Okay. Then I'll withdraw my comment.

MR. KAROTKIN: I mean, I would prefer to just eliminate it, entirely.

THE COURT: Well, but you've agreed to put it in, so --

MR. KAROTKIN: But so I would prefer to leave it the way it is.

THE COURT: Then how about at least add, though, or wrongful death?

MR. KAROTKIN: Yeah, yeah, of course.

THE COURT: Okay. Now, here, the next comment is on

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

paragraph 4 of page 9. I think one thing that I think you're just ignoring, perhaps, and not to be deceit -- to be tricky is the fact we have a very, very liberal principle in Ninth Circuit about informal proofs of claim. And you can send a postcard to the trustee in bankruptcy, and the Ninth Circuit has said, if it's timely and it asserts a right, it's an informal proof of claim that will survive.

And I think that that is -- this paragraph 4 has to, at least, acknowledge that the law, at least in this Circuit, does permit timely, informal proofs of claim. So tell me how you want to do it, because, I mean, I can -- I won't bore you, but I can think half a dozen different instances where the Ninth Circuit has let an untimely claim survive because it was informal but timely.

MR. KAROTKIN: I don't think this paragraph, in any way, precludes this. This paragraph was added at the request of a couple of parties, to clarify that, to the extent you timely file something and you amend it, that's not a problem.

THE COURT: Right. But if I -- if somebody listens to this hearing and sends you a letter next week that says, Dear Mr. Karotkin, I'm owed 5,000 dollars because my car got burned --

MR. KAROTKIN: Yeah.

THE COURT: -- you might not agree that that's good enough. But the Ninth Circuit might say, that's a timely

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

informal proof of claim.

MR. KAROTKIN: Well, Your Honor --

THE COURT: So I --

MR. KAROTKIN: -- I --

THE COURT: All I want to do is keep the -- is not mess with the law. That's all.

MR. KAROTKIN: But I think that particular piece of paper that I got, whether or not that is a good informal proof of claim, I think, would be subject to analysis on a case-by-case basis, okay?

THE COURT: I agree. I agree.

MR. KAROTKIN: So I don't think that this language is at all inappropriate. I mean, an informal proof of claim is either good or not good, and it'll be determined at the appropriate time.

THE COURT: So you think --

MR. KAROTKIN: This was here just to address the situation that people had asked, please make clear that if we file a claim and we amend it, it's still --

THE COURT: Do you think that line --

MR. KAROTKIN: -- be --

THE COURT: -- 22, the phrase, "Extent permitted by applicable law", includes controlling Ninth Circuit authority?

MR. KAROTKIN: I don't think this order, in this paragraph, implicates or tries to overrule controlling Ninth

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Circuit law on informal proof of claim, in any respect. I don't think --

THE COURT: Okay. Again, I will accept your argument. When I hear from other counsel, if they want to make the pitch, I'll listen to them. If they don't make the pitch, I won't revisit again.

MR. KAROTKIN: And again, this was actual language requested by some objecting parties --

THE COURT: No, I --

MR. KAROTKIN: -- which we included.

THE COURT: I already said I'm not --

MR. KAROTKIN: Okay.

THE COURT: -- I'm not going to do anything more.

Next page, and that's the top of page 10, and it has to do with the exception for the various California agencies. It says the agency -- "No California agency shall be included in the wildfire claimant, and the claims of any California State agency may be submitted utilizing the standard claim". Is maybe rather than must be? Is there a difference, or do you care?

MR. KAROTKIN: No, I don't care.

THE COURT: Well, I mean, the fact is "must be" seems to be more --

MR. KAROTKIN: I know.

THE COURT: -- consistent with what we're requiring.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    But that doesn't mean it wouldn't -- maybe -- I don't feel strongly. I just want your opinion on it.

MR. KAROTKIN: This, again, was language they requested and --

THE COURT: Okay.

MR. KAROTKIN: -- we've accommodated them.

THE COURT: Then I'll withdraw my comment.

On paragraph 6, you say, except for a wildfire proof of claim submitted by the U.S. or any agency, the supporting documentation submitted in connection with wildfire proof of claim, et cetera, is treated as -- shall remain confidential. But is that true? In other words, what -- wait one second. Let me just -- let me make sure I'm clear on this.

Yeah, I think you're excepting the California and State and U.S. government, so you're saying, for any wildfire proof of claim, supporting documentation shall remain confidential. But it won't be confidential if it's supporting a claim. So how will it be confidential if a --

MR. KAROTKIN: It would --

THE COURT: -- claimant includes it?

MR. KAROTKIN: Well, what we've provided is to the extent, for an example, that a wildfire proof of claimant submits medical records or things like that. We thought it would be appropriate to maintain the confidentiality --

THE COURT: Yeah, but --

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: -- of that.

THE COURT: -- but how do you -- how do you assure it? In other words, suppose --

MR. KAROTKIN: Well, Prime Clerk would have that information.

THE COURT: I know, but what if a claimant takes the standard wildfire proof of claim and attaches something that is personal and files it? What happens? How does it --

MR. KAROTKIN: That will be filed with Prime Clerk.

THE COURT: Well, maybe. Maybe it'll be filed in Chico at the --

MR. KAROTKIN: But ultimately, it will get to Prime Clerk.

THE COURT: Okay. So what does Prime Clerk do with the attachment to the proof of claim? In other words -- in other words, look. I understand the issue. And you, in your original form, wanted more stuff, and TCC wanted less stuff. And the U.S. Trustee weighed in on it, and we are where we are. My point is when you say, "Shall remain confidential", invites, well, what if it's not confidential to begin with?

So again, I'll take the hypothetical. Here's my proof of claim. Rightly or wrongly, I attached my medical records, and I hand it over to Prime Clerk. Does Prime Clerk extract it out of the proof of claim? I mean, I'm not so sure that's a good practice. So what is the -- what's the result?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

MR. KAROTKIN: I think they could do that. But Your Honor, look. As far as we're concerned, we're happy to eliminate this.

THE COURT: Again, like so many of the other things, I just want you to think about it and figure --

MR. KAROTKIN: Okay.

THE COURT: -- out what the better thing to do is. I don't want, any more than you want, individuals to be spreading on the public record things that they don't need to do. And it has nothing to do with whether somebody will have an objection to claim or whether the -- if the phony claim. I mean, the fact of the matter is we know there might be phony claims in this case. But even phony claims, the question is what's confidential; what isn't.

So it seems to me that, perhaps, the more correct thing to do is to warn the claimant not to include confidential things, so we don't require it. So again, if I'm the victim, and I was at the Camp Fire, and I lost my home, and I say, well, I'm a victim of the Camp Fire, and I lost my home, and I suffered damages of a million dollars; here's my proof of claim, that seems like it's proper.

But if I attach my medical records, it's part of the proof of claim. And I don't believe that we can suddenly make them unconfidential. I --

MR. KAROTKIN: Well, the other way to address it is

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

just to notify people, to the extent they include information, it will not be maintained confidential.

THE COURT: Right. In other words, something in this language or in the proof of claim form --

MR. KAROTKIN: Right.

THE COURT: -- or perhaps more. So whatever we talk about that, okay.

Again, in this same language, in same paragraph 6, you say that the information will be provided on a confidential and professionalized-only basis to counsel for the debtors. And don't you think that should also include financial advisors and --

MR. KAROTKIN: Well, I think the --

THE COURT: -- like we've done elsewhere? I mean, I think that language shows up elsewhere for --

MR. KAROTKIN: Okay. I think that based on your prior comment we'll probably eliminate this anyway.

THE COURT: Okay. The last comment, and on this page it's at the end of page 7, I think this might be wishful thinking, but what's stated in here is that: "Failure to comply shall not be treated by the creditor", et cetera, et cetera. Wait a minute. Let me rephrase that.

Oh, yes. The phrase, "for purposes of voting and distribution with respect to any Chapter 11 plan or plans that may be filed", I think you mean confirmed.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

MR. KAROTKIN: Yes.

THE COURT: Not filed, because somebody might be filing a claim. All right. Whatever.

MR. KAROTKIN: Yes, sir.

THE COURT: Now, maybe -- all right. I have a comment on page 11. And I must have missed something here, so please tell me if I missed it, and that has to do on paragraph 9 at the bottom of page 11, it says: "The Wildfire Claim Bar Date Notice.", "ninety-five days prior", et cetera, "debtor will cause to be mailed to Known Wildfire Claimants at the address for their attorney of record".

And where is it that they will also be filed and mailed to the claimants? Did I miss that, that the claimant who has an attorney of record isn't going to get the claim? And I thought you said earlier they are going to. So maybe I missed it or maybe there's just a drafting glitch.

MR. KAROTKIN: They will get it.

THE COURT: Well, that's what I thought.

MR. KAROTKIN: Yes.

THE COURT: So, I mean, think of the attorneys who have been active in the case. You know who the individual attorneys for certain claimants are. They are going to get them, but their clients are going to get the notice also, right? This is clarified?

MR. KAROTKIN: No, no.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Let's take Mr. Singleton as an example.

MR. KAROTKIN: Mr. Singleton will get the notice.

THE COURT: He represents a lot of the victims.

MR. KAROTKIN: Yes.

THE COURT: But aren't those victims also getting the notice?

MR. KAROTKIN: That was not the intent, no.

THE COURT: No?

MR. KAROTKIN: No.

THE COURT: Why not?

MR. KAROTKIN: Because he's the attorney of record.

THE COURT: I know.

MR. KAROTKIN: He's representing them.

THE COURT: But what if the day before one of his clients discharges him?

MR. KAROTKIN: But that's the address we -- that's, I believe, the address we have for those people. Hum?

THE COURT: But if you have addresses --

MR. KAROTKIN: No, no. The address we have for those people is through their attorney.

THE COURT: If you have an address for a claimant who has an attorney --

MR. KAROTKIN: Yes. If they have it -- if we have an address, they will get it. And we can clarify that.

THE COURT: Well, are you clarifying that? Because --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: Yes.

THE COURT: Just -- well, the gentleman -- I can't keep track of your names. Just say who you are.

MR. GOREN: Matthew Goren, Weil, Gotshal & Manges.

THE COURT: Oh, Mr. Goren, sure. Well, so Claimant Smith, represented by Attorney Jones, both will get the notice, right?

MR. GOREN: Correct, Your Honor. If we have a known address, both will get it, but for many of them we only have the attorney of record. That would go to the attorney of record.

THE COURT: Okay. But I don't think the language --

MR. GOREN: We can clarify that language.

THE COURT: I don't think the order, the way it reads, is clear.

MR. KAROTKIN: We'll clarify that.

THE COURT: Okay. Thank you.

Okay. Okay. In paragraph 13 I had a number of questions about the frequency, but we've already talked about that. You've clarified that, so I don't need to go through that again.

There seemed to be a slight inconsistency in some terminology. Let me just make sure. I mean, I hate to be nitpicking, but I guess I am being. One second.

Yes. Look on page 12. Lines 18 and 19 make reference

PG&E Corporation; Pacific Gas and Electric Co.

again to the "Bar Date" in capitalized terms, but on line 26 it makes reference to the "Bar Date Notice". And I wanted to make sure we're consistent with the -- the title of paragraph 9 on page 11 is the "Wildfire Claim Bar Date Notice", and then I see the phrase, "Bar Date Notice". And again, just be -- I just ask that you be consistent with the terminology on that.

MR. KAROTKIN: Sure.

THE COURT: I don't need anything further from you now.

So at the risk of belaboring this, I'm going to make a few more comments about forms, and you can tell me that they've been resolved.

MR. KAROTKIN: Sure.

THE COURT: First of all, am I correct, Form A-1, which is what we call the official form, except for putting in the name and the case numbers, this is the actual official form, right? The text of the official form.

MR. KAROTKIN: Yes, sir.

THE COURT: Okay. So what would you consider about putting a footer on A-1 to say, "not to be used for wildfire claims or wildfire subrogation"?

MR. KAROTKIN: I'm sorry. I'm not -- where are you?

THE COURT: I'm on page 1 of official form 410, which is your Exhibit A-1, which is what we're calling the general claim form. I'm asking you if you think it would be

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

constructive to have a footer, at least on the first page if not every page, that not to be used for wildfire claims or wildfire subrogation claims?

MR. KAROTKIN: Sure.

THE COURT: And I'm not adamant about it. I want your thoughts on it. So putting it into this category of you think about it, talk to whomever you want to talk about it, and if you do it, fine.

MR. KAROTKIN: Okay.

THE COURT: I won't give you any brownie points, but if you don't do it, I won't criticize you either. I just raise the question.

MR. KAROTKIN: Okay.

THE COURT: And then -- okay. So I didn't have any other questions about that form.

On the wildfire related form, did you and the TCC agree on what the title is going to be? Because I raised the question in my order of yesterday that says that you're using two different forms, right?

MR. KAROTKIN: May I approach?

THE COURT: Yes. Wildfire related.

MR. KAROTKIN: So I think that --

THE COURT: Yes, okay.

MR. KAROTKIN: The only outstanding issues between the debtors and the TCC with respect to the form, if you look at

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the first page, which is highlighted in yellow --

THE COURT: Right. The title.

MR. KAROTKIN: The title. And then if you turn, Your Honor, to page -- in the instructions, the first page of the instructions, it's highlighted in yellow for you as well.

THE COURT: Okay.

MR. KAROTKIN: Okay. So the only issue is on the first page whether it's fire claim -- fire related -- fire --

THE COURT: Fire --

MR. KAROTKIN: Fire claim.

THE COURT: Fire claim --

MR. KAROTKIN: -- or wildfire related.

THE COURT: -- or wildfire related. It doesn't matter to me. But have you agreed to call it wildfire related?

MR. KAROTKIN: No.

THE COURT: Oh. Do I have to decide?

MR. KAROTKIN: I think we're requesting "wildfire related", and they want "fire claim".

THE COURT: Do I have to make this decision?

MR. KAROTKIN: No. You don't have to make that decision. We can resolve that, okay?

THE COURT: Okay.

MR. KAROTKIN: And then the only other issue is again, as on page 1 of the instructions, we didn't think it would be appropriate for the editorializing in that paragraph, so our

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

language is the language that has not been stricken.

THE COURT: In the instructions?

MR. KAROTKIN: Correct.

THE COURT: Okay. Let's stick with the form for a minute.

MR. KAROTKIN: Sure.

THE COURT: Did you resolve the question that was still open about the TCC's question number 2 in part 1, which I said I thought was okay, was proper? In other words, that was where they put in the box for are you filing on behalf of your family?

MR. KAROTKIN: We've included that.

THE COURT: Oh, you did? Okay. Well, that was my question.

MR. KAROTKIN: Yes.

THE COURT: Okay.

MR. KAROTKIN: No. What I'm saying is we've -- this, what you're looking at, has been agreed to except for the two highlighted sections.

THE COURT: Yes, but I haven't looked at them. You just handed them to me.

MR. KAROTKIN: Okay.

THE COURT: So it was on my question, so --

MR. KAROTKIN: So yes, we included that.

THE COURT: Okay. All right. So are there other

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

changes in the form of the proof of claim so -- that you've made they agreed to that I --

MR. KAROTKIN: I don't --

THE COURT: Well, I raise -- I raise the question. This is really actually on the form. Part 3 is where there was reference to the Ghost Ship fire in 2016, which raises that questions that I raised before about --

MR. KAROTKIN: I believe that's in here.

THE COURT: -- terminology. And that was in there. It's in there all along, but that was the point that --

MR. KAROTKIN: Yes.

THE COURT: -- needed to be clarified in terms of the language, and I had a little bit of a thought about it is -- never mind. I won't tell you what my thought was.

MR. KAROTKIN: I don't think there are any substantive changes.

THE COURT: Okay. Let me look at the --

MR. KAROTKIN: Is that --

Eric, you -- right?

MR. GOREN: No, actually there's one at 11.

THE COURT: Which question?

(Counsel confer.)

THE COURT: What's the question?

MR. GOODMAN: I can wait, or I can come up now if you want.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, it's just a question about this form?

MR. GOODMAN: Yes.

THE COURT: Just tell me what it is.

MR. GOODMAN: Oh, sure. Can you hear me from here?

THE COURT: Yes.

MR. GOODMAN: Does it work?

THE COURT: Just stand in my corner.

MR. GOODMAN: If you go to paragraph --

THE COURT: You're Mr. Goodman, right?

MR. GOODMAN: Eric Goodman, yes.

THE COURT: Okay.

MR. GOODMAN: Baker & Hostetler, here on behalf of the --

THE COURT: Never mind. Okay.

MR. GOODMAN: -- official committee of tort claimants. Paragraph 11, there's a reference here to how much is the claim.

THE COURT: Yes. Right. And what's the -- did you both --

MR. GOODMAN: We had agreed to include a line with the dollar amount so that our claimants would have the option.

THE COURT: I think I picked that up also? Didn't I see I agreed with you on that?

MR. GOODMAN: Yes. And the only difference, I think,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

is our boxes, first you would check the to be determined amount according to proof, or if you felt that you could put a claim amount down, that you would, in the line, put in the amount as optional. I can't tell from this redline exactly what the clean version looks like.

MR. KAROTKIN: It's two boxes.

THE COURT: It's two boxes?

MR. GOODMAN: Yes. I think the -- this is a very technical issue, but --

THE COURT: I understand.

MR. GOODMAN: -- they're using the language unknown, to be determined at a later date. They had originally used the term or the word unknown, which to me is ambiguous. It could mean incapable of being known or unknown at this time, which is why we preferred the language that, sort of, had the future context that it would be determined in the future.

THE COURT: Well, but then the question is who does the determining? So again, let's say I'm the claimant. I don't have a lawyer. I'm just reeling from all this, and I write down a million dollars, because I don't know. What are you -- I mean, who's going to determine it?

And people, you know, under traditional pleadings you don't have to put in an exact amount. Obviously if you're a claimant who has already settled with the company but have not been paid that's easy, because they've got a finite liquidated

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

number. If you're a victim who hasn't even figured out how to protect your interest, you don't know.

So I mean, to me the difference between "unknown" and "unknown, to be determined at a later date", it's six of one, half a dozen of the other.

MR. GOODMAN: No, I think that the language here, I just can't tell from this redline document that I was just handed, is the option --

If you guys can clarify the record that you're either checking "unknown, to be determined at a later date", you would check that box, or the other option would be you would list a dollar amount.

MR. KAROTKIN: Yes.

THE COURT: Well, Mr. Karotkin, do you care? I mean, can --

MR. KAROTKIN: I thought that we had agreed that this language was fine.

THE COURT: Which language?

MR. KAROTKIN: It says --

THE COURT: Just the word "unknown" or the "unknown, to be determined at a later -- "

MR. KAROTKIN: "Unknown, to be determined at a later date". I don't care if you want to just say "unknown". Whatever you --

THE COURT: Well, unknown is fairly standard language

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

--

MR. KAROTKIN: That's fine.

THE COURT: -- to use on schedules and statements and --

MR. GOODMAN: Look, Your Honor, we just tried to accommodate the TCC.

THE COURT: Are you okay with this then, though?

MR. GOODMAN: My preference, actually, is for "unknown, to be determined at a later date".

THE COURT: But again, I'll ask the question then. Who is going to determine it? The claimant? The Court? The debtor on an objection? I mean, all I'm asking is to make this user friendly You and I know what it means. What does it mean to an unsophisticated victim of a fire?

MR. GOODMAN: Again, I think that's why having the "to be determined at a later date" is more helpful to an unrepresented fire victim, because they would know by checking the box that it's something that would be determined in the future.

THE COURT: Okay.

MR. GOODMAN: That's all.

THE COURT: All right. Give it to them, Mr. Karotkin.

MR. KAROTKIN: No, we already did.

THE COURT: Okay. Give it again.

MR. GOODMAN: Okay.

THE COURT: Okay. On the instructions I had a question for you more than an a -- more than something. Yes. So you have gone the round. You've accepted, I take it, the TCC suggestion in the instruction, the very first bullet point, fill in the information as of the date the claim form is filed. That changes what you previously had in there as January 29th. Am I accept --Do I read this correctly? You have agreed to the latter?

MR. KAROTKIN: Yes.

THE COURT: I mean, to the former, their language?

MR. KAROTKIN: Yes. Yes.

THE COURT: Okay. I think that's the right result.

And okay. So you want me to look at -- let me read this.

Well, Mr. Karotkin, I'm a little confused by the yellow that you showed me on this form.

MR. KAROTKIN: Okay.

THE COURT: Because I don't know what I'm --

MR. KAROTKIN: Okay.

THE COURT: -- what you want and what's in.

MR. KAROTKIN: Let me explain --

THE COURT: Yes.

MR. KAROTKIN: -- the way we think this should read. Okay?

THE COURT: Yes. Okay.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 62 of 233

MR. KAROTKIN: The first sentence: "You may, but are not required, to attach supporting documents to this form".

THE COURT: Right.

MR. KAROTKIN: Period. Then if you drop down below the redline language, it says:

"Supporting documents will be gathered, maintained, and provided at a later date as instructed by the Court. If you do attach documents, you should attach redacted documents. See the definition of redaction of information below. Do not attach original documents, because attachments may be destroyed after scanning."

That's what we are suggesting, rather than the stricken language.

THE COURT: Well, but remember, though, that I hadn't exactly indicated if it's confidential, it may not stay confidential.

MR. KAROTKIN: Well, I know that. I realize that.

THE COURT: Okay. Okay.

Mr. Goodman, is it important to you to keep this other language in there?

MR. GOODMAN: Yes, it is, Your Honor. Again, it is --

THE COURT: And why is that?

MR. GOODMAN: Coming at it from the perspective of an unrepresented fire victim looking at this sentence, we wanted to, sort of, give them comfort that, you know, by not including

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                supporting documentation with the form that was, you know, acceptable at this stage of the case, and to provide them, sort of, a reason or a rationale as to why that would not be the expectation at this point in time.

THE COURT: No, I --

MR. GOODMAN: We're just trying to make it more reader friendly and less bankruptcy-esque.

MR. KAROTKIN: Your Honor, we tried to make it short and simple. The first sentence is pretty clear.

THE COURT: I mean, I think the debtors' got the more persuasive argument here. I think it's got to be short and simple. And there's nothing wrong with community outreach, or the committee, or committee members, or individual people spinning all sorts of things. But to me, this is not relevant to the function of this form, so I'm going to stick with the debtors' view on that one language.

MR. KAROTKIN: Okay. So --

THE COURT: And then, on the same form now, you're going to make a clarification on the confirmation that a claim's been filed. So this is the thing that --

MR. KAROTKIN: Yeah, yes.

THE COURT: -- you talked before --

MR. KAROTKIN: Yes.

THE COURT: -- so that needs to be changed.

MR. KAROTKIN: Of course.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: And then, in the same page where it says understand the terms used in this form, this is where I'm back to -- remember, I asked you either to find the bar date but in the alternative, where it says claim it says a creditor's right to receive payments that are owed on the date the debtor filed for bankruptcy. Stick in January 29th, 2019.

MR. KAROTKIN: Yes, sir.

THE COURT: Okay?

MR. KAROTKIN: Yep.

THE COURT: Okay. Let me see if I got any other questions. Okay. Well, I had -- okay, I had just a couple of minor questions on the subrogation claim I'll leave to -- you know, all the things that we've talked about before to the extent that they have any conforming changes, and that is simply the -- right in the proof claim for the subrogation insurers in the second sentence, in the little shaded box. It says include the aggregate total estimated amount of all insurance subrogation claims, and then the words across all individual policies. I just don't know quite what that phrase means, across all individual policies. If the lawyers representing insurance companies --

MR. KAROTKIN: Where?

THE COURT: -- are comfortable with that, I guess I should be, but I don't know what it means.

MR. KAROTKIN: Yeah. This is -- this form was heavily

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

negotiated with the subro claimants.

THE COURT: Okay.

MR. KAROTKIN: So I think this is what everyone was looking for, and I think everyone understands it.

THE COURT: Except me. That's okay. No, I kind of know.

MR. KAROTKIN: Except me.

THE COURT: That's fine. I can take your --

MR. KAROTKIN: Okay.

THE COURT: There are no changes necessary.

MR. KAROTKIN: Okay.

THE COURT: And I'll accept your statement. Okay, hold on. I'm almost done.

Okay. I have a couple of questions on the bar date notice. And again, Mr. Karotkin, if there's already been a resolution of some of these things, I apologize for beating it to death, but here are my few questions. We've already talked about the bar date and we'll -- I'll make a decision before the end of the hearing on what the date's got to be.

MR. KAROTKIN: Okay.

THE COURT: Yeah. On page 3 of the bar date notice, this again, goes to the discussion of the general claims, the standard claims. And you said before that there -- that the standard proof of claim being sent out to the claimants is going to be personalized, but the form doesn't tell me where

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

it's going to be. So the -- on page 3, it says the standard proof of claim also sets forth the amount of your claim as listed in the schedules. But I didn't see where that's going to be. Can you show me where that will be in the official form -- I mean, claims form, Form 401?

Again, if you don't know exactly, that's okay. But I don't -- I didn't see where the recipient would find it.

MR. KAROTKIN: I think -- and Mr. Weissmann can probably answer this question. I think when they customized the form, there is a box which would reflect the scheduled amount.

THE COURT: Can you answer that for me, Mr. Weissberg (sic)? Is that right? The form is going to say -- so if John Smith is, not a tort victim, but he's a contractual counterparty to a PPA -- well, that's a poor example. That's a poor example. He is somebody who is owed money for goods and services. It's going to say it on the top or what?

MR. WEISSMANN: There will be an insert, Schedule D, E, and F. It will say their name, their address, and the scheduled claim amount so they have that information and they can submit it. For Schedule G, it will say you are contract counterparty. If you believe you are owed money, file the claim.

THE COURT: Okay. But leave out the counterparty. If Mr. Smith gets a thing from you that says he's owed 1,000

dollars, then he doesn't have to do anything, right?

MR. WEISSMANN: Right.

THE COURT: For his 1,000 dollars. Does it say that?

MR. WEISSMANN: Yes. If you disagree, you must submit --

THE COURT: Okay. So -- but it -- so we're clear, he's getting this information on the proof of claim form. So the proof of claim form, in a sense, says if you agree with this you can throw this in the garbage can.

MR. WEISSMANN: Yes.

THE COURT: If you don't agree with it, you got to complete it and send it back.

MR. WEISSMANN: That's correct.

THE COURT: It says something to that effect?

MR. WEISSMANN: That is correct.

THE COURT: Okay. All right. One second, please.

MR. KAROTKIN: We'll obviously make conforming changes to this to the extent of other items you had raised.

THE COURT: Yeah, it may -- the proof of claim form -- I mean, excuse me, the notice for the wildfire claimant, I just had that same comment that I mentioned before about not listing the Ghost Ship fire in 2016 just to make sure that that's in there, because again, I realize the Ghost Ship fire is a discrete and perhaps some much smaller population of claimants. But they have been treated separately so -- I mean, treated

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    frequently and often in this form. So the legal notice needs to make sure --

MR. KAROTKIN: Yep.

THE COURT: -- that they're mentioned in there. Again --

MR. KAROTKIN: I believe it's already in there.

MR. WEISSMANN: Ghost Ship, yeah. It's in there.

THE COURT: Yeah.

MR. KAROTKIN: But we'll make sure.

THE COURT: Okay. So, again, on the wildfire proof of claim -- I'm sorry, the wildfire notice -- not proof of claim, the notice -- at page 4, we have that same -- yeah, we have that same question that I raised before at line 16 about it must be signed by the claimant.

MR. KAROTKIN: Yes. We'll make the same conformity.

THE COURT: Yeah, okay. Well, just being -- to use one of the phrases that a number of you are using, to avoid all doubt. Isn't that the phrase that some of you --

MR. KAROTKIN: For the avoidance of doubt, yeah.

THE COURT: Yeah. The avoidance of doubt. That's going to be the watch word here. The avoidance of doubt. Okay. Final question, just for my information, the notice going to the customer, is that intentionally not going to have a caption? It's just going to be just a form? I mean, we probably have a lot of customers here in the room.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: This would be on PG&E letterhead, in addition to --

THE COURT: Oh, okay. So they're going to get it to the customer --

MR. KAROTKIN: This is just for the customers, which will be on PG&E letterhead.

THE COURT: I mean, a customer who is a tort victim, or a customer who is a contractual party in contract, they're going to be treated a number of different ways.

MR. KAROTKIN: Correct.

THE COURT: But a customer who is just a customer, is going to get not a legal pleading, but rather this --

MR. KAROTKIN: Correct.

THE COURT: -- notice that says here we're telling you this, and if you have a proof of claim -- I mean, if you have a claim, then you have to do it, right?

MR. KAROTKIN: Correct.

THE COURT: Okay. Again, I'm not going to second guess you on that. Okay. That concludes my comments about the forms and the orders. I don't know whether you would like to take a break, or want to hear from other counsel now, or what would you prefer to do?

You know, we do have to talk about some other big issues, and it's ten after 11. We've been going for almost two hours. We can take a break or we can --



eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: Whatever your pleasure.

THE COURT: No, your pleasure. I'm --

MR. KAROTKIN: I'm happy to --

THE COURT: I just live here.

MR. KAROTKIN: I feel like I do, too.

THE COURT: Well, in that case, I have to point out something my courtroom deputy said. Don't say anything to him. I hope you notice the --

MR. KAROTKIN: I noticed.

THE COURT: -- the memorial glass.

MR. KAROTKIN: I did.

THE COURT: All --

MR. KAROTKIN: I pointed it out to several people when I walked in.

THE COURT: All right. If any of you go out the door today and you bash your nose on the door out there with the seal on it, that's the Karotkin memorial seal --

MR. KAROTKIN: I appreciate that.

THE COURT: -- etched in blood.

MR. KAROTKIN: I do. Yes. And black and blue. Black and blue for, like, a week and a half.

THE COURT: Yeah. You did sign the release, though, didn't you?

MR. KAROTKIN: Yes. Your courtroom deputy made me do that as I left the courtroom that day.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: What's your pleasure?

MR. KAROTKIN: Okay. I think the subro lawyers want to say something. But we're happy to continue.

THE COURT: Okay. Subro. Subro lawyers.

MR. FOREMAN: Good morning, Your Honor.

THE COURT: Thank you for your time and effort, Mr. Karotkin, and everybody that worked on all these details again. I understand they are getting so stringent about certain things, but it's a lot of work and I appreciate it. Yes?

MR. FOREMAN: Good morning, Your Honor. Daniel Foreman, Willke, Farr and Gallagher on behalf of the ad hoc of the subrogation claims. Very quickly, there was a back and forth about the ability to submit supporting documentation on a confidential basis, specifically to our claimants. There's an attachment contemplated in our proof of claim form that the debtors have agreed to receive on a confidential basis, so however that language is changed in the order, we don't want to override that process.

THE COURT: Well, what do you think about it? Don't you think it should -- therefore, should not be on the proof of claim, should it?

MR. FOREMAN: Well, I don't think it would be attached to the proof of claim. I think it would be -- there's a thirty day period after the proof of claim is submitted where --

THE COURT: Okay.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 72 of 233

MR. FOREMAN: -- the debtors want more information from us. We're willing to give it, but the way we're willing to give it is through this confidential professional --

THE COURT: No, that's fine. And I agree with you.

MR. FOREMAN: Okay.

THE COURT: I think -- my concern is I don't want to have somebody misled and think they have to disclose confidential stuff and then it's, kind of, hard to unring the bell.

MR. FOREMAN: Understood, Your Honor.

THE COURT: And Prime Clerk shouldn't be charged with that duty. That's all.

MR. FOREMAN: Understood, Your Honor. And we'll make sure that's done very carefully --

THE COURT: Okay.

MR. FOREMAN: -- on our --

THE COURT: Okay. Thank you.

MR. FOREMAN: Thank you.

THE COURT: Anyone else want to be heard now? Mr. Pascuzzi?

MR. PASCUZZI: Yes, Your Honor.

THE COURT: Morning.

MR. PASCUZZI: Thank you. Paul Pascuzzi, Felderstein, Fitzgerald, Willoughby & Pascuzzi, co-counsel with the California Attorney General's Office. We represent numerous

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    state agencies, California state agencies.

THE COURT: I know who they are.

MR. PASCUZZI: They're on our pleading. They change depending on the pleading, just to --

THE COURT: They change their names now and then, too.

MR. PASCUZZI: Your Honor, just going through -- since you went through your comments, we have a few comments based on your comments and now might be the good time to raise them.

THE COURT: Okay.

MR. PASCUZZI: Your Honor, with regard to footnote 2 in the order, you mentioned adding 2016 to the definition of Northern California wildfires and we had requested that as well. So we agree with that. But also, there were fires in 2014, so --

THE COURT: And that's what I didn't remember, that.

MR. PASCUZZI: Yeah. We had asked for that and we didn't hear back from the debtors. I don't know why there would be any opposition to that, so that's an additional request.

THE COURT: Is that -- I mean, I wonder if we're getting into a slippery slope, if it would be better just to take the years out and let the forms speak for themselves. What do you think, Mr. Karotkin, or Mr. Goren?

MR. KAROTKIN: It says including without limitation, so I'm not sure I understand the concern. But I'm not aware of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the 2014 fires that --

THE COURT: Well --

MR. PASCUZZI: Your Honor, there are 2014 CAL FIRE as part of our client list, so they know. Your Honor, the problem is there's two definitions of Northern California wildfires in footnote 2. So, the first one says 2015, '17, and '18 and it'll be added '16. But then on the back, you've got Northern California wildfires include, and they -- you know, there's some 2016 fires --

THE COURT: And where is the other place you're looking?

MR. PASCUZZI: It's in the same footnote.

THE COURT: Oh.

MR. PASCUZZI: There's just two different references.

THE COURT: Yeah. Yeah, I mean, I think that obviously, the major fires that teased so much attention were the ones that were ignored.

MR. KAROTKIN: Your Honor, we can just say --

THE COURT: The Ghost fire is separate.

MR. KAROTKIN: -- any pre-petition wildfires. Okay?

THE COURT: Again, I want you guys to put your heads together and come up with the right thing to do for the people that we're doing this for, because the -- we all know what we're dealing with. Definitions are important, and I don't want the perception to be that somehow the Court or the process

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                is excluding a category of victims. Even if there's only one victim, that victim is a victim and should be treated accordingly. So, Mr. Pascuzzi, that's fine that you raised it and they'll -- Mr. Karotkin and his colleagues will fix it in some way.

And then this is going to change the forms, too. I mean, there's going to be some conforming changes to be consistent.

MR. PASCUZZI: The second one, Your Honor, was in paragraph 3(O)(12).

THE COURT: This is on which, the form or the order, or what?

MR. PASCUZZI: Of the order.

THE COURT: Okay.

MR. PASCUZZI: Your Honor, you had mentioned -- this was the exclusion --

THE COURT: Yeah.

MR. PASCUZZI: -- from needing to file a claim --

THE COURT: Right, right.

MR. PASCUZZI: -- for a personal injury or property damages to the extent they arise from an event that occurred after the petition date of January 29.

THE COURT: Right.

MR. PASCUZZI: We had raised in our pleading that state agencies like CAL FIRE, who have reimbursement costs for

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

dealing with the fires, don't have property damage or personal injury type claims. So you had suggested contractual. Our issue is statutory. They're statutory based, so --

THE COURT: But they're pre-petition claims, right?

MR. PASCUZZI: They are pre-petition claims, but the point of this paragraph is to say that if there's a fire after the petition date, these deadlines don't apply to that type of claim.

THE COURT: Well, what do you want to do? I mean, what --

MR. PASCUZZI: Well, I would like -- you had suggested adding contract claims, and we would suggest adding contract claims and statutory claims.

THE COURT: Well, Mr. Karotkin, you were adamant about not expanding it, but it seems to me there's no harm here.

MR. KAROTKIN: Your Honor, I thought you addressed in your order yesterday you weren't going to get into whether there are future claims or not future claims, or what happens with --

THE COURT: No.

MR. KAROTKIN: -- it post-petition --

THE COURT: I wasn't. I wasn't. And if there is another fire in 2019, everybody has to figure out what does that mean. But I don't think Mr. Pascuzzi is asking that.

MR. KAROTKIN: I think he is.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, do you?

MR. PASCUZZI: Your Honor, I'm asking for clarification so that we know what we need to file our claims for. And it should be clear.

MR. KAROTKIN: I think Mr. --

MR. PASCUZZI: There should be a clear line.

MR. KAROTKIN: I think he should answer your question.

THE COURT: Wait. One at a time.

MR. PASCUZZI: There should be a clear line, Your Honor, and if there is a fire or something that happens after the petition date, we'll deal with it. But as far as having to file a proof of claim for something, it should only be dealing with events that happened prior to the petition.

THE COURT: Well, let's pretend we have a run-of-the-mill every day type case. We wouldn't have a discussion. We'd have a bar date and the bar date would say what it says. And if there was an accident by -- a PG&E truck ran over somebody on Golden Gate Avenue on the day after bankruptcy, that would not be a pre-petition claim. The issue, I think -- and this goes back to something that Mr. Gilliam and others were raising before is what if the events have occurred, but it hasn't given actual fire? What if the utility has done something negligently that sets the stage for a fire?

The Court and the cases have told us fair contemplation, what is and what isn't pre-petition. But I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

think if we -- I mean, you're also making a good argument that Mr. Karotkin made of taking out paragraph 12 and letting the law solve the problem for us, right?

MR. PASCUZZI: Well, I am but I'm not, because I think there needs to be fair notice to the parties. And I think this was a good start. And I think we like the fact that it would be limited to things -- events that happened pre-petition, but just limiting it to property damage or personal injury was the issue. You had indicated wrongful death. I'm just indicating --

THE COURT: Well, but I mean, I used wrongful death because wrongful death and personal injury always get linked together, you know? It really was the broader question of something else. Well, again, let's come up with a solution. What do you recommend? And then I'll see if --

MR. PASCUZZI: Adding contract and statutory to personal injury and property damages.

THE COURT: So that is a statement of the law. But what happens if you have a claim that, in fact, arose prepetition but you don't know about it, or you don't -- you had the fair contemplation -- let me try a different way. If we don't have anything in here, the law tells us that the petition date is the pivotal date anyway. The courts have talked about fair contemplation. If you couldn't have anticipated that you had a claim, you wouldn't be affected.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

In fact, if the company really is solvent, as many people say and really survives, having a post-petition claim is probably a better thing to do, right? So the point is if we took paragraph 12 out and just said -- or we changed it to say this only pertains to claims that arose pre-January 29 --

MR. KAROTKIN: It already says that.

THE COURT: -- it solves the problem, doesn't it, right?

MR. PASCUZZI: It does, Your Honor. I mean, we were looking for some sort of bright line. It affects issues like discharge and plan treatment, and things like that. And if --

THE COURT: Well, I --

MR. PASCUZZI: We were trying to get the debtors to agree to draw that line now --

THE COURT: No, but I'm --

MR. PASCUZZI: -- so that we don't have that issue.

THE COURT: I understand you are. And -- but Mr. Karotkin didn't like the suggestion that I include contract, and I'm saying to you, what if we take 12 out?

MR. PASCUZZI: I'd prefer it be in because then there's clarity.

THE COURT: Then, what if we say any person who holds a claim to the extent that it arises from an event that occurred after January 29?

MR. PASCUZZI: That would be fine, too.

THE COURT: Without any -- what kind of claim.

MR. PASCUZZI: That would be fine.

THE COURT: Live with that?

MR. PASCUZZI: We actually proposed that to the debtors.

THE COURT: Can you live with that?

MR. KAROTKIN: No.

THE COURT: And why not? I mean --

MR. KAROTKIN: Your Honor?

THE COURT: I mean, we do have --

MR. KAROTKIN: Paragraph 12, as you said, is unusual. Okay?

THE COURT: Yeah. Right.

MR. KAROTKIN: The law is the law and that's how, as you said, it should be addressed. If you -- this already says you have to file the claim if it's a pre-petition claim. Let's not decide that now. The notice is clear. You file a pre-petition claim. We don't need to clarify anything. The law is what it is. This is not an effort for people to bootstrap their positions.

THE COURT: No, it's not.

MR. KAROTKIN: I suggest we take it out.

THE COURT: But if you put in there that says this is not -- you do not file a proof of claim if it arose after January 29th --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: Right. We can say you do not have to file the claim if it is a post-petition claim. I'm happy to say that. Whatever that means, I'm happy to say that. But let's not try to parse through every single possibility --

THE COURT: I --

MR. KAROTKIN: -- that could happen.

THE COURT: I just said arose on or after -- I mean, after January 29th. In other words, I think you're agreeing with me. If 12 reads any person or entity who holds a claim that arises from an event that occurred after January 29th --

MR. KAROTKIN: No, that arises after --

THE COURT: Yeah.

MR. KAROTKIN: -- January 29th.

THE COURT: Yeah.

MR. KAROTKIN: Not from an event, but arises after January 29th.

THE COURT: Yeah. Well, okay.

MR. KAROTKIN: Or --

THE COURT: All right. And so --

MR. KAROTKIN: Actually, what is more appropriate, Your Honor, is either to say nothing, or to say any person who has a post-petition claim is not required to file a proof of claim by the bar date.

THE COURT: Mr. Pascuzzi?

MR. KAROTKIN: That's what is correct.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. PASCUZZI: That doesn't say anything, Your Honor.

MR. KAROTKIN: Then don't say anything --

MR. PASCUZZI: No, I --

MR. KAROTKIN: -- and don't pre-judge it. They're trying to bootstrap their position here and it's not appropriate.

THE COURT: Well, I mean, I -- see, I don't think they are trying to bootstrap their position.

MR. ENGEL: Oh, yeah, but I'm on the same --

THE COURT: One second, Mr. Engel.

Why are they bootstrapping it if they are better off having a post-petition claim? I mean, it seems to me --

MR. KAROTKIN: Then my language is perfect.

THE COURT: Well, no, but why -- I'm just asking why do you call that bootstrapping? To me, a claim that's post-petition is a good thing to have if you have to have one.

MR. KAROTKIN: Because they're trying to make clear it's post-petition today.

MR. ENGEL: Your Honor? If I may --

THE COURT: Yeah, Mr. Engel?

MR. ENGEL: -- join in this debate? This is one of my core concerns.

THE COURT: Okay.

MR. ENGEL: And --

THE COURT: Join the --

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. ENGEL: -- the answer to the question -- that should be asked here is what you said earlier, which is how about the ordinary person who doesn't understand what postpetition means, right?

THE COURT: Right.

MR. ENGEL: And I can tell you, because I get these questions, there are lots of nonbankruptcy lawyers who have no idea about where to draw the line on these issues as to --

THE COURT: There are probably a few bankruptcy lawyers that don't either.

MR. ENGEL: -- remoteness and contingency. And, in fact, Judge Posner and Zell said that there is total confusion as to what the law is and where you draw --

THE COURT: So what do you suggest?

MR. ENGEL: I'm sorry?

THE COURT: What do you suggest?

MR. ENGEL: Exactly what you proposed. Just say events arising after the petition date. That's all we wanted, right, Paul?

MR. PASCUZZI: Yes, yes.

MR. ENGEL: And I think that's understandable to people. Now, that doesn't mean that he can't make all the arguments that he wants to make in the future about, you know, what's pre-petition and what's post-petition. What it tells people is they don't have to file a proof of claim now on

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    account of that. We're not prejudging the legal issue. We're simply telling people they're not going to get screwed, pardon my French, because they didn't file a proof of claim. Right?

THE COURT: Well, but in effect, they are going to get screwed, pardon your French, if they should've filed a proof of claim and this tells them that they shouldn't.

MR. ENGEL: Well, but then they've got more time to deal with the issue.

THE COURT: No. No, on the contrary, they have October --

MR. ENGEL: Well, arises after is an event.

THE COURT: But that's -- again, that assumes that they know what that means. The person who suffered the fire doesn't know, you know, I have a right to pursue a claim.

MR. ENGEL: You're --

THE COURT: Think about the people that suffer torts or classic nonpersonal injury type case, or people that suffer racial or employment discrimination, and they have no idea that it's even happening until years later.

MR. ENGEL: And there's a fair contemplation case on that, great point.

THE COURT: Fair contemplation case, right.

MR. ENGEL: Yes, there is.

THE COURT: So --

MR. ENGEL: But we can only do the best we can do and

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                    you're making an improvement, and taking it out would not be an improvement. It would be a detriment and I think many, on my side --

THE COURT: Anyone else want to be heard --

MR. ENGEL: -- join in that.

THE COURT: -- on the subject? I mean, I'm going to make a decision, but I'm not going to let it go -- the subject go if anyone else wants to weigh in on it, not okay?

Okay, Mr. Karotkin, I'm going to stick with Mr. Engel and Mr. Pascuzzi's suggestion and make it consistent with what they say, and not worry about it. And I think that it's not going to bootstrap anything. It might make it clear, so just please make that language consistent with what we just talked about.

MR. KAROTKIN: I'm sorry. What is the language?

THE COURT: Say it again, Mr. Engel.

MR. PASCUZZI: Well, it's --

THE COURT: Go ahead.

MR. PASCUZZI: This is Paul Pascuzzi. It's deleting for personal injury or property damage. So any person or entity who --

THE COURT: Well, we don't need the solely, right? To the extent such claim arises from an event that occurred after --

MR. KAROTKIN: It should be solely.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. PASCUZZI: Solely is fine with us, Your Honor.

THE COURT: All right. Solely to the extent that such claim arises from an event that occurred -- well, we don't have to say event that occurred. Arises after January 29th.

MR. PASCUZZI: No. The --

MR. KAROTKIN: Well, that's fine.

MR. ENGEL: That's fine, Your Honor. People need to know there's an event, a trigger, right? That's what they're looking for. The --

MR. KAROTKIN: Your Honor, we're fine with your language.

THE COURT: Compromise. We got it.

MR. PASCUZZI: Is event in there or not? No?

THE COURT: Huh?

MR. PASCUZZI: No event or event?

THE COURT: No, event.

MR. ENGEL: Event, good.

MR. PASCUZZI: Okay.

MR. ENGEL: Thank you.

MR. PASCUZZI: Your Honor, just two other points. You mentioned on the standard proof of claim form to have a footnote that says it doesn't apply to the wildfire --

THE COURT: In the official -- in form -- the --

MR. PASCUZZI: -- in the form itself, yeah.

(Counsel confer.)

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

THE COURT: Wait. Mr. Engel, if you want to have a sidebar, we got to wait. I just can't pick it up on the record here. That's all.

MR. ENGEL: Forgive me, Your Honor. I'm sorry.

THE COURT: Okay. Mr. Pascuzzi?

MR. PASCUZZI: Yes. You had made a comment on the form.

THE COURT: I'd suggested a footer, that's all.

MR. PASCUZZI: Yeah, a footnote that says don't use this for a wildfire --

THE COURT: No, not a footnote. A footer.

MR. PASCUZZI: Oh.

THE COURT: Yeah.

MR. PASCUZZI: That says don't use --

THE COURT: Yeah.

MR. PASCUZZI: -- for a wildfire. So in the order, in paragraph 5, they're carving out agencies -- governmental units of the State of California. So that could be confusing to some state agencies. As long as the order governs, that's fine. But it would cause a little bit of confusion. You could put in there except as otherwise provided in the order --

THE COURT: Well, I don't want the footer on the form to look like a legal document. I want a victim to say, wait a minute, I'm not supposed to file this one. I'm supposed to file this one. And if the victim happens to hold a contract

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

claim, he or she will have to file two proofs of claim; one for the fire, and one for the contract, right? But the agencies can figure out what to do. Right?

MR. PASCUZZI: Okay, Your Honor.

THE COURT: I mean, the agencies aren't asserting proofs of claim for wildfire claims, right?

MR. PASCUZZI: They'll be using the regular proof of claim form.

THE COURT: Okay.

MR. PASCUZZI: And so, adding that in there, there are a couple that we know of that do have actual fire type claims, but we wanted to use the standard proof of claim form. So that's what might cause the confusion. But we'll deal with it, Your Honor.

THE COURT: Okay.

MR. PASCUZZI: The last point, Your Honor, was there are a couple of paragraphs that reserve rights regarding executory contracts in the order; paragraphs 15 and 16. I'm not really sure why they're in there, but we had -- we have looked at Schedule G that the debtors had filed, and there are a lot of things on there that are actual orders, and covenants that run with the land, things that state agencies deal with that are not executory contracts. And we had asked for a reservation since they brought it up by adding these paragraphs that basically -- that nothing in the order is a waiver of the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

right to object to any designation that a matter is an executory contract. There's similar language in there, Your Honor, but they've got, you know, specific things in there; contract, program, policy, lease. There's all kinds of things listed on Schedule G.

And so we just want it to say matter. In any event, we're reserving our rights to object to any designation on the schedules, or in a motion to assume or object.

THE COURT: Well, I mean, but that's what the law lets you do, right? And the --

MR. PASCUZZI: It does. But I'm not sure why this order even deals with that. If they think it does do something with regard to executory contracts, I need to reserve my rights.

THE COURT: Mr. --

MR. GOREN: Your Honor, again, we're happy to take this language out. We added it, again, at Mr. Pascuzzi's request. So if he wants it out now, we're fine with that.

THE COURT: So you would take 15 and 16 out?

MR. ENGEL: Well, wait a minute. We asked for that as well, Your Honor.

THE COURT: So if we don't want this to sound like a legal document where everybody is reserving everything for avoidance of doubt --

MR. PASCUZZI: Your Honor? Specifically, 16 they did

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                  put in but we did not ask for that language. We raised the issue and they put that language in there to address it. But it -- we are reserving our rights to object to any designation that a matter on Schedule G or in a motion is -- it's actually --

THE COURT: But, Mr. Pascuzzi, my question for you is can't you reserve your rights just like you just did?

MR. PASCUZZI: I am reserving our rights right now, Your Honor.

THE COURT: You are reserving your rights?

MR. PASCUZZI: Yes, Your Honor.

THE COURT: And nobody is going to -- oh I got you -- on you if you come in next year and say hey, this is sudden -- no, I'm sorry, you didn't object to paragraph 15 or 16.

MR. PASCUZZI: Understood, Your Honor. Thank you.

THE COURT: And the same with Mr. Engel. Same with everybody.

MR. ENGEL: Okay. Thank you. Your Honor, Larry Engel, Sonoma Clean Power Authority and various others that signed on to our pleadings or joined in it; mostly CCAs but some other governmental units. And that brings me to a quick question that comes up in your discussion on the form of order. We have an apparent difference between the TCC form of order and the PG&E form of order, on a paragraph that you addressed, which --

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, I never -- I told you earlier. I said I never even got to the TCC form.

MR. ENGEL: Yeah.

THE COURT: I mean, I just couldn't --

MR. ENGEL: Understand and --

THE COURT: I couldn't keep up with it.

MR. ENGEL: The issue is governmental unit of the State of California. That's the language that's in paragraph 5 for PG&E which is defined as a California state agency. The TCC form, which goes to the question of the fire proof of claim which was adopted by PG&E from TCC, which fits into their order, includes local government agencies. So our view is that a governmental unit of the State of California includes cities, it includes counties, it includes joint power authorities, like CCAs, as well as the state agencies --

THE COURT: Yeah.

MR. ENGEL: -- that Mr. Pascuzzi represents.

THE COURT: Right, it does.

MR. ENGEL: There's an argument that --

THE COURT: I mean, I think it's consistent with -- it's consistent with the code definition. Right, yeah.

MR. ENGEL: Exactly consistent, but limited to people located in California. That's what should be -- and that's what we understand and hope the scope of this wording is, that it does not exclude cities and counties and is simply -- and

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

joint power authorities. It's simply not limited to state agencies represented by Mr. Pascuzzi, and there's been a lot of debate outside the courtroom over what this means, and I think it should be clear that governmental unit means governmental unit, and it's located in California. That's all that we need there.

THE COURT: Well -- but so you would tweak paragraph 5, right?

MR. ENGEL: Yeah. And just -- yeah. Say, including cities, counties, joint power authorities, and other local agencies located in the State of California.

THE COURT: Mr. Goren?

MR. GOREN: Look, the defined term, Your Honor, of governmental unit is defined as the term used in the Bankruptcy Code. So I don't know that there's a need to go further to give color what that definition is.

MR. ENGEL: I'm just look --

MR. GOREN: But if --

THE COURT: Well compare --

MR. ENGEL: It --

MR. GOREN: -- that will resolve this issue, then fine.

MR. ENGEL: If he tells me that's what it means --

MR. GOREN: Yes.

MR. ENGEL: -- I accept his word.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. GOREN: That is -- exactly. That's how --

MR. ENGEL: That's great.

MR. GOREN: -- it's defined in the motion, that's how it's incorporated into the --

MR. ENGEL: Okay.

MR. GOREN: -- order --

MR. ENGEL: Then --

MR. GOREN: -- and we will make that abundantly clear.

MR. ENGEL: Great.

THE COURT: But I'm unclear. Does that mean you'd change paragraph 5 to say governmental units?

MR. GOREN: It does say governmental units -- capital G, capital U.

MR. ENGEL: If he interprets it that way, I'm fine.

MR. GOREN: But we will define -- we'll make clear that that --

MR. ENGEL: I accept this stipulation on the record --

MR. GOREN: -- is the defined term.

MR. ENGEL: -- that that's what it means. No more changes are needed.

THE COURT: Okay. We'll take it.

MR. ENGEL: I can accommodate that. I'll take that. And that's sufficient.

The last point I wanted to raise, Your Honor, and I appreciate your indulgence here, and this won't just take a

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

second. We -- although it's not noted in Exhibit B, we did object on the late filed claim issue. It's very much like your informal proof of claim. We did put a big section in our papers on this. We believe that the law and late filed claims should be what it is. It shouldn't be pre-judged in the paragraph that you went through before. And so --

THE COURT: Well, but again, that was paragraph 4, right?

MR. ENGEL: Yeah. If you're --

THE COURT: But it did say "to the extent permitted by applicable law".

MR. ENGEL: And --

THE COURT: And Mr. Karotkin did --

MR. ENGEL: So --

THE COURT: -- point that out.

MR. ENGEL: It does, but the language -- I'm looking at their Exhibit B. It says "for the purposes of voting" -- they're cut out for purposes of voting and distribution. Now, that --

THE COURT: You're going too fast for me.

MR. ENGEL: I'm sorry.

THE COURT: I'm looking at paragraph 4 of the PG&E proposed order. If you want me to look at the exhibit --

MR. ENGEL: No. It -- paragraph 4. Okay. We'll go there, Your Honor.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, the language is very similar. It's just that can I only think about one at a time, and so --

MR. ENGEL: I certainly understand the --

THE COURT: And I've made the comment to Mr. Karotkin, don't we have to deal with the Ninth Circuit informal proof of claim law, and he spoke to -- in response. And I believe that I was satisfied that "to the extent permitted by applicable law" works.

MR. ENGEL: Well --

THE COURT: Now, if you think that --

MR. ENGEL: They're two different paragraphs we're looking at, Your Honor.

THE COURT: Okay.

MR. ENGEL: That's my confusion. And what I've led you into confusion on. If you look at paragraph 7, Your Honor.

THE COURT: Okay.

MR. ENGEL: That's the paragraph. You were discussing paragraph 4 for the informal proofs of claim. I'm talking about late claims, which I believe are dealt with in paragraph 7. And what that says is that there shall not be treated as a creditor, line 17, for purposes of voting and distribution. That, in effect, pre-judges the late claim law, and we think that the law should be what it is, as you said earlier on the informal proofs of claim.

THE COURT: Well, maybe, could we answer it this way

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

then? 4 and 7 ought to be consistent.

MR. ENGEL: Yes.

THE COURT: And they're not. And there's a slight delta there.

MR. ENGEL: Yes.

THE COURT: Mr. Karotkin, can you solve this problem us that paragraph 4 reserves applicable law for what you file by a bar date? And I think Mr. Engel is saying it should be if it's good enough to get you past the bar date, it ought to be good enough to do what you get to do with an informal proof of claim.

MR. ENGEL: Exactly.

THE COURT: So again --

MR. KAROTKIN: Your Honor --

THE COURT: -- be consistent with the two, that's all.

MR. KAROTKIN: I understand. First of all, that's what the rule says. We're just quoting the rule in paragraph 7, but paragraph 7 also says, "pursuant to Bankruptcy Rule 3003(c)(2), but subject to paragraph 4 of this order".

THE COURT: Well, then paragraph -- then maybe that saves it with the reference to paragraph --

MR. ENGEL: You can --

MR. KAROTKIN: I mean, this -- can I finish?

MR. ENGEL: Please.

MR. KAROTKIN: Okay. This is a standard form of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

paragraph in a bar date order consistent with the Bankruptcy Rule, and I think we've clarified it by saying "subject to paragraph 4", which I think is overkill in any event.

THE COURT: Well, a lot of people think it's overkill, but the Ninth Circuit has a long list of cases that couldn't be clearer. And maybe it's not necessarily the law in other circuits, but it's very much ingrained in the process here. So -- and some of us have been around for a while, lived through them as counsel in the early days, so we know it the hard way or the successful way.

But Mr. Engel, I think he's right. I think that it -- the reference in 7 to 4 saves it.

MR. ENGEL: Okay.

THE COURT: And -- I mean, again, I -- make sure that you don't have any late claims.

MR. ENGEL: Well, someone will have late claims, I'm sure. But you know, I appreciate the opportunity --

THE COURT: Okay.

MR. ENGEL: -- as with Mr. Pascuzzi, to reserve our rights with respect to this --

THE COURT: Everybody's rights are reserved.

MR. ENGEL: Thank you.

THE COURT: Now, Mr. Karotkin, do you want to take a break or keep going?

MR. KAROTKIN: It's up to you, sir. I'm happy to keep

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

going.

THE COURT: What do you what to do?

MR. EGGENBERGER: If I could just indulge two minutes of Your Honor's time? Michael Eggenberger on behalf of the Herndon plaintiffs. You had talked before about paragraph 3(e) in the debtor's proposed order. And we had objected to this and will, of course, refer to our objections.

THE COURT: Wait. Let me catch up with 3(e), please.

MR. EGGENBERGER: Absolutely.

THE COURT: Again, I can't keep track of all these things. We're doing 3(e)? What page?

MR. EGGENBERGER: It is page 5 of docket number 2646-1.

THE COURT: Again, I can't keep track of all of the objections. So what's your problem with the paragraph?

MR. EGGENBERGER: So paragraph 3(e) combined with paragraph 7 would basically not allow class proofs of claim in this bankruptcy. And while we appreciate it, Your Honor could later address that through a Rule 9014 motion and decide if class proofs of claims do or do not apply. What this order says here is that if you do not apply with this procedure, including having a form -- file an individual proof of claim, notwithstanding that you're covered by a class proof of claim, that you are not allowed to be -- to receive distributions or entitled to vote in this bankruptcy.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, I don't think that's what it says. Paragraph E says who has to file something. And the issue is, well, what if you don't file one, are you out of luck or are you protected by being a member of a class.

MR. EGGENBERGER: Absolutely, Your Honor. And what -- our argument is just that it's premature to decide whether or not class proofs of claim will be allowed in this bankruptcy. So this language is unnecessary. And I believe -- you know, Mr. Goodman can correct me if I'm wrong, but I believe the tort claimants committee proposed order does not have similar language. And as we pointed out in our brief, other orders that the debtors referred to do not have similar language pre-judging class proofs of claim.

THE COURT: Well, what do you want me to do? I mean --

MR. EGGENBERGER: I would strike the language "class proof of claim" out of paragraph 3(e), and we can address the issue of whether or not people who are covered by class proofs of claim are entitled to act as creditors in this bankruptcy at the appropriate time, which would be through a Rule 9014 motion.

THE COURT: But see you're not focusing on the paragraph that talks about entitled to a distribution.

MR. EGGENBERGER: Well, Your Honor, the way I read this is if you don't file these, which requires you to file an

PG&E Corporation; Pacific Gas and Electric Co.

individual proof of claim --

THE COURT: Right.

MR. EGGENBERGER: -- even if you're covered by a class proof of claim, then you're not entitled to distributions and voting rights. And to the extent Your Honor reads it as, you know, not addressing class proofs of claim at this time, that's fine by us. We just want to make sure that class proofs of claim will be addressed at the appropriate time.

THE COURT: But didn't I raise the question what if somebody doesn't do it? And then there was -- let's use you as an example.

MR. EGGENBERGER: Yeah.

THE COURT: Let's suppose you file a class proof of claim and one of the members of your class doesn't. What's the outcome? What's the consequence?

MR. EGGENBERGER: Right. And Your Honor, the way we read it is that those people would be not entitled to be creditors because they haven't followed the procedures laid out here. And paragraph 7 says if you haven't followed these procedures, then you're not entitled to be a -- to receive distributions or vote as a creditor.

THE COURT: Well, I'm not sure what you want me to do.

Mr. Karotkin, what do you want me to do in response there? I'm just losing the picture here, because we had -- distribution is different from having to file proof of claim.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: First of all, this does not pre-judge whether or not a class proof of claim can be filed.

THE COURT: Right.

MR. KAROTKIN: They want to file a class proof of claim, they can file it, and you can determine whether --

THE COURT: Right.

MR. KAROTKIN: -- it's appropriate or not. All this requires is that individuals must file a claim regardless of whether they're included as John Does 1 through 5,000 in a class proof of claim so we can get information as to each individual member of that class. So as I said before, each individual member of a purported class, if the attorneys want to file it, fine, but they have to file that summary proof of claim form. Whether or not that ultimately they want to proceed as a class claim, you can decide. It's not pre-judging that. All this is saying is you must have an individual proof of claim on file.

THE COURT: Well, and --

MR. KAROTKIN: And if the attorneys want to file it, fine.

THE COURT: But to follow up on that, and using an example, if they -- this counsel files a class proof of claim and an individual who believes he's in that class doesn't file proof of claim, there may be consequences. And -- but we're not deciding it today.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: That's correct.

THE COURT: We're saying, Mr. Jones, you didn't file a claim, therefore, what follows -- well, what follows. And if the answer is, well, you're in a class that's participant, you're home free. If you're not or the class isn't allowed, you're out of luck. The bottom line here is file proof of claim. Be on the safe side. Why was there any risk here? I mean, why not? Why take the risk?

MR. EGGENBERGER: Your Honor, we don't believe that -- it is good advice, of course, to file an individual class proof of claim. We're not disputing that. We're just concerned that the way this order is read, those people would not be covered. They would not be entitled to distributions because they didn't file individual class proof of claim, notwithstanding that later you --

THE COURT: But what I'm trying to say -- I guess I'm not making myself clear. We have -- whether it's October or January, we're coming up on a bar date soon, right?

MR. EGGENBERGER: Yes.

THE COURT: Maybe we'll have a plan confirmed next month, but maybe it'll be next year. I don't know when there will be a confirmed plan. But until there's a confirmed plan, we don't have anything to distribute, right? And so at some point, when there's a confirmed plan and there's a distribution entitlement, then if you have -- you or anyone else has

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

protected the interests of the individuals that you're arguing for by a proof of claim or a class proof of claim, an agent's claim, a something-else claim, you've done it. If you haven't, you haven't, and we can't say what will happen. But the law says -- and if we just -- like in any other case, it's so black and white. You file a proof of claim or you're out. Period. So I think what the debtor's saying is file proof of claim. And --

MR. EGGENBERGER: Your Honor, as long as it isn't determined to be a pre-judgment of the viability of class proof of claims --

THE COURT: It is not.

MR. EGGENBERGER: -- I guess we'll take that on your word.

THE COURT: It is not. It's a -- that's an open question.

All right. I am going to take a fifteen-minute break. And if the rest of you want to stay here, you can stay here, but my courtroom staff is going to take a fifteen-minute break. And let me -- before I do, let me look at my agenda, see if I'm still following it.

Okay. Well, I guess that -- it seems to me is we then should talk about the bar date, just the pros and cons of the bar date.

Mr. Goodman, did you want to do it a different way?

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

MR. GOODMAN: I -- actually, I was going to make the same suggestion, Your Honor, that we do a -- take a break. Just one issue before we move on to the bar date. Back on the claim form, as the Court noted, perception matters. It is -- we have two members on our committee who were victims of the 2016 Ghost Ship fire.

THE COURT: Right. Yes, I know that.

MR. GOODMAN: That is not a wildfire. That was a fire that occurred in a warehouse in Oakland.

THE COURT: I know that, too.

MR. GOODMAN: So using the term wildfire -- I know the Court indicated in your order of notice yesterday that you were indifferent, but for the purpose of our committee, the term fire claim does have very real meaning and significance to us because we don't want anyone impacted by the Ghost Ship fire to see the heading on that form and reach the conclusion that that form can't be used. I know Ghost Ship is one of the boxes, but I do believe that if we can get that issue resolved, I think the claim form is done at this point.

THE COURT: So this is -- I mean, this is an argument for fire-related -- fire --

MR. GOODMAN: Yes.

THE COURT: Yeah. I know. I --

MR. GOODMAN: Using fire-related again, and this has been --

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

THE COURT: But even -- and again --

MR. GOODMAN: -- given to us by our committee.

THE COURT: And this is by no means to minimize the tragedy of the Ghost Ship fire, the frays about the wildfires have been floating around for months. It's all over. It's in the press; it's in a lot of the documents. So we need to make it right, particularly for purposes of the victims of the Ghost Ship fire being able to know what they're -- what they have to do.

MR. GOODMAN: And --

THE COURT: So to the extent -- well, Mr. Karotkin, do you care on this, really?

MR. KAROTKIN: Your Honor --

THE COURT: I mean, don't -- can't we just call it fire-related?

MR. KAROTKIN: Yeah, that's fine. We said -- and we've raised this before. We said we'd work it out with Mr. Goodman.

THE COURT: Yeah, that's what I thought.

MR. KAROTKIN: That's fine. That's fine.

MR. GOODMAN: Okay.

THE COURT: That's what I thought.

MR. KAROTKIN: I don't -- I'm not -- I'm curious why he's raising it now.

THE COURT: Well, okay, maybe just to avoid all -- a

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 106 of 233

month to avoid doubt.

MR. GOODMAN: I just wanted clarity on that issue. And with that, Your Honor, I would really appreciate if we could take a break.

THE COURT: I'll see you all at 12 o'clock, everyone.

(Recess from 11:44 a.m., until 12:01 p.m.)

THE CLERK: All rise.

THE COURT: Please remain seated.

Okay. Mr. Karotkin, what's next? Bar date?

MR. KAROTKIN: Yes, sir. I think that, Your Honor, I pretty much addressed that. I think that based on the notice program, the number of days, the fact that the proposed form -- and really this is the issue for the fire claimants -- is relatively quite simple to prepare, based on the notice program and the timing, there's more than enough time to prepare it.

As Your Honor knows, the proof of claim and the bar date is fundamental to the plan process, fundamental to -- there's an estimation hearing in this case. Hopefully that may not be necessary, but if there is one, it'll be fundamental to that, fundamental to plan distributions. I don't have to explain to you how important a bar date is to getting these companies out of Chapter 11.

And I will note, Your Honor, that with the recent announcement by Judge Newsom, that -- I'm sorry; Judge Newsom. I mean Governor Newsom --

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 107 of 233

                THE COURT: We had a Judge Newsom. You might get him later anyway.

MR. KAROTKIN: I do know -- actually --

THE COURT: Yeah, but he was --

MR. KAROTKIN: Actually, I had a case --

THE COURT: He was a --

MR. KAROTKIN: I've had a case -- two cases before Judge Newsom.

THE COURT: But you know that he mediated PG&E 1?

MR. KAROTKIN: I know he mediates in San Francisco. Yes, I do.

THE COURT: He mediated the first PG&E case.

MR. KAROTKIN: How about that?

THE COURT: Did you know that?

MR. KAROTKIN: I didn't know that, but I knew he was a mediator over at Gems (ph.).

But with Governor Newsom's --

THE COURT: Governor Newsom.

MR. KAROTKIN: -- Governor Newsom -- no relationship -- recent announcement that if PG&E wishes to participate in the Wildfire Fund that the legislature is currently contemplating creating, they will be unable to do so unless they exit Chapter 11 by June 30th of next year.

THE COURT: Oh, I was going to say, which year did he mention?

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: He mentioned June 30th of 2020. And I think, Your Honor, taking that into account, a January 31 bar date is completely impractical and really puts that at severe risk.

But more importantly, Your Honor, it's not necessary. As I said, there's plenty of time -- we want to move these cases forward. Other parties want to move these cases forward.

I will point out a couple of other things. Number one, certainly by agreeing to the tort committee's summary proof of claim form, we by no means agree that that form provides sufficient information, and we reserve all of our rights --

THE COURT: I don't think anybody would think that.

MR. KAROTKIN: -- as to discovery.

THE COURT: I mean, even in the simplest of cases it just isn't --

MR. KAROTKIN: Right. But I just wanted to make that clear.

THE COURT: -- isn't the test.

MR. KAROTKIN: And I know the other thing you wanted to address, Your Honor, as mentioned in your order, the TCC has requested that no objections to claims be permitted prior to the bar date. That to me would be unprecedented. I think it's -- in their own pleadings, they didn't cite any authority for that type of relief. We think that's completely

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

                inappropriate.

And, look, we're interested in getting out of Chapter 11. They suggest in their papers that this case will go on until 2021. We don't think so. We don't want that to happen. Other parties don't want that to happen.

(Phone ringing)

MR. KAROTKIN: Even that party doesn't want it to happen.

THE COURT: Let's wait.

Did that go off?

THE CLERK: That's someone on the line.

THE COURT: My question, though, is -- and I touched on this in the order that I issued yesterday. What's going to happen from your point of view as principal counsel for the debtor, whether -- at the moment the debtor hasn't filed a plan, one group has filed the motion to extend the -- shorten exclusivity, as you know. But what could happen before your bar date that would make even the bar date too late? Or in other -- or I'll try a different way.

What if I move the bar date a month? How is that going to negatively impact; certainly not going to impact distribution, is it? I mean --

MR. KAROTKIN: Your Honor, we may need to have an estimation hearing --

THE COURT: Um-hum.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: -- before Your Honor. It's critical to get those claims in for that process. And again, we're focused on getting out before June 30th.

THE COURT: No, I understand.

MR. KAROTKIN: And --

THE COURT: And I'm not --

MR. KAROTKIN: -- the more you push that out, the more that jeopardizes our ability to do that.

THE COURT: No, but focus on the question of, if we were going to have an estimation hearing, it wouldn't be per claimant. Wouldn't it just be on a broad sort of macro level about the estimation? Isn't that what a lot of the experts have been retained to talk about and to anticipate?

MR. KAROTKIN: Yes, but it would also involve, at the very least, Your Honor, an analysis of a sampling of proofs of claim that were filed as to their validity, as to the types of claims they're asserting, the basis for those claims, how they demonstrated their losses; so that would be essential to that process to get that moving. And again, there's no burden here. I mean --

THE COURT: No, I understand. I understand.

MR. KAROTKIN: So --

THE COURT: Look, we have a --

MR. KAROTKIN: And for purposes of planned voting --

THE COURT: -- culture here that -- with very early

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

bar dates. I mean, we had a -- I mean, even in the first PG&E case, we even shortened it to even a shorter time.

I realize that things are different with the tort claims and the thousands of victims, but no, there is a culture of doing it more quickly. I'm not -- you're preaching to the choir on that one.

MR. KAROTKIN: Okay.

THE COURT: But I'm really focusing on the difference between the October 21 date and some later date and how that might make a difference. And I realize that January 31 is four months, right? November, December, January. Three months. Three months difference.

But I guess I'm trying to -- from your --

MR. KAROTKIN: Three and a half.

THE COURT: Three and a half, yeah. I'm trying to think about, well, what is the practical value here? Your estimation perhaps is one of them. I understand. But I mean, on a best --

MR. KAROTKIN: I think the estimation part --

THE COURT: -- on a best-case basis, if you file a plan today, it would be several months before it would be up for confirmation, right?

MR. KAROTKIN: It would be, but again, Your Honor, claimants have to vote on a plan.

THE COURT: No, I -- of course.

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

MR. KAROTKIN: And we need to get those claims in, at the very least for purposes of that, as well as an estimation hearing. And --

THE COURT: Unless they're unimpaired, in which case they don't have to vote. Well, they don't --

MR. KAROTKIN: It's hard for me to conceive how tort claimants can't be unimpaired. Not saying we don't pay hundreds --

THE COURT: You just pay them in full --

MR. KAROTKIN: I'm not saying we don't pay them in full --

THE COURT: -- on the effective date.

MR. KAROTKIN: -- but I'm not sure that's unimpairment in the technical sense.

THE COURT: Pay it in full on the --

MR. KAROTKIN: And that they wouldn't be able to vote on a plan.

THE COURT: Let's not --

MR. KAROTKIN: But we can address that later.

THE COURT: We can do that later.

MR. KAROTKIN: Yes.

THE COURT: But if you're paid in full on the effective date, you don't get to vote last time I checked.

MR. KAROTKIN: Yes, that's -- I --

THE COURT: Okay.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 113 of 233

MR. KAROTKIN: I would --

THE COURT: Okay.

MR. KAROTKIN: -- certainly agree with that. We certainly -- Your Honor, look, I've been very sensitive to the fact that there are wildfire claimants here, and if they have sufficient time -- in view of all the traumatic events that they've experienced -- sufficient time to file a claim, and we've tailored the notice specifically to address that. We've made it much longer than any other bar date in a conventional case as you, yourself, recognize.

And we have state-of-the-art, robust noticing procedures, which we think are fully compliant with due process and, more importantly, give people enough time --

THE COURT: Well --

MR. KAROTKIN: -- to do that.

THE COURT: Let me -- we're kind of digressing to the bigger question.

Unless the TCC persuades me not to approve the proposal you have for the promulgation of the bar date, that's the only option at the moment. I'm not going to second-guess it.

So the question is, whether the TCC is going to persuade me to put that on hold and consider the alternative one. But that's related to the bar date, but it's a discrete, separate question, right? Right?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

In other words, I mean, I understand, Ms. Finegan and her team and your team have said -- and you've made a strong case for your program, but the bar date is a separate question, right?

MR. KAROTKIN: The date of the bar date --

THE COURT: Yes.

MR. KAROTKIN: -- is a separate question.

THE COURT: The deadline for the proof of claim. In other words, if I --

MR. KAROTKIN: But it's not --

THE COURT: -- if I said --

MR. KAROTKIN: I would say it's not completely separate. I mean, I think the issue is, Your Honor, does that program appropriate disseminate timely notice so people can file claims by October 21st, the day we settle. So I don't think they're completely unlinked, but --

THE COURT: Of course not. And of course, I know the obvious.

Look, if you said we got this great program and we're going to have a bar date of July 15th --

MR. KAROTKIN: Right.

THE COURT: -- I would think you were crazy. And the question is whether October is enough.

But my point is, if I tell you that I believe it should be slightly later, I don't imagine you're going to fall

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

on your sword. You're just going to say, well, we'll have to deal with it later. And that you're making the pitch for the earlier date, and I respect that.

Why don't I just -- let's go for opposition. The debtors' proposal at the moment is, go with the debtors' plan, go with the October 21 bar date, and implicit in the debtors' plan are the start dates that we talked about this morning.

MR. KAROTKIN: Right.

THE COURT: And let's see what anybody says about it.

MR. KAROTKIN: Okay. Thank you.

THE COURT: All right. So Mr. Goodman, are you going to make the pitch today or is someone else from your side? And do address the question of why you're adamant or it's important to even tell the debtor they can't object to claims. That's a separate issue, but it seems like a --

MR. GOODMAN: Yeah, on a housekeeping matter, Your Honor, we actually struck that language from our proposed order on June 19th.

THE COURT: Oh, okay. Okay.

MR. GOODMAN: So that's, in our view, a nonissue.

THE COURT: I can't keep up with that.

MR. GOODMAN: Okay.

THE COURT: Okay. So the debtors' free to object to a claim tomorrow if they want, right?

MR. GOODMAN: They are free, in our view; that's

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

correct, Your Honor.

THE COURT: Okay.

MR. GOODMAN: And again, we're sorry for the confusion. We should've made it more clear that we were withdrawing that request.

THE COURT: Okay. That's fine.

MR. GOODMAN: Okay. Thank you.

THE COURT: Get that out of the way.

MR. GOODMAN: Okay. And in terms of the presentation today, we do have a slight division of labor.

Again, Eric Goodman, BakerHostetler, here on behalf of the official committee of tort claimants. I'm going to be addressing issues primarily related to the bar date.

With me also is Ms. Elizabeth Cabraser.

THE COURT: All right. Good morning, Ms. Cabraser.

MR. GOODMAN: She represents a member of the creditors' committee and was also specifically tasked by the TCC of overseeing the development of our notice plan, so she'll be speaking to those issues.

THE COURT: Okay.

MR. GOODMAN: Okay. On the bar date, Your Honor, this is a unique case, right? I mean, the debtors filed as purportedly solvent entities. One of their first acts was to get approval of a DIP financing facility that would give them the ability to remain in bankruptcy for three years. We,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

obviously, don't want them to remain in bankruptcy for three years, but that's -- the terms of their financing would permit it.

Given the financial condition of the debtor, what would be our expectation, obviously, the tort claims would be paid in full. Otherwise, equity, of course, would have to be cancelled in order for the plan to be confirmed.

So we're in a situation -- and also note that the Court has already seen that there has been one party that has already filed a motion to terminate exclusivity; that would be the bond holders --

THE COURT: I understand.

MR. GOODMAN: -- who filed a plan term sheet -- plan negotiations --

THE COURT: It'll come as no a surprise I haven't reviewed those papers. I've been a little busy. I'm sure you haven't either.

MR. GOODMAN: That's not for today, Your Honor, obviously.

But again, I would point out, I mean, the idea that plan negotiations can't proceed until the bar date has come and gone is obviously defeated by the fact that parties are already standing before the Court suggesting that they're prepared to go forward with a plan.

So we don't view a later bar date between October or

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                January as really an obstacle to getting a plan confirmed on a timely basis.

THE COURT: Well, you would agree, wouldn't you, that it would be kind bizarre to think, we're ready to confirm a plan except we have to wait for the bar date. That would be real bizarre.

MR. GOODMAN: That would be a luxury, Your Honor.

THE COURT: And not -- well, it'd be a luxury, but it'd be -- why should that even be a risk even thinking about it?

MR. GOODMAN: Again, it --

THE COURT: I mean, it is almost unheard of.

MR. GOODMAN: Yeah, and again, I think it's probably going to be unheard of in the context of this case.

THE COURT: Well.

MR. GOODMAN: On the estimation point, Mr. Karotkin did bring up that aspect, and again, I would note, PG&E did file an estimation motion in their prior bankruptcy before this court and before Your Honor in which they went forward with an estimation of their tort claims based on the historic data in PG&E's own claims database. And that information was obviously used to provide as estimation on an aggregate basis.

I've not saying that that necessarily has to be done here. I don't really take a position today, but I'm just saying, I think Your Honor understands that it's possible to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

move forward with those types of proceedings.

THE COURT: Well, something tells me that if the debtor did that, there would be some opposition.

MR. GOODMAN: I'm sure there would.

THE COURT: Because -- and the leader of the opposition would be you and your colleague, Mr. Julian.

And so, I mean, who are we kidding? The debtor -- I mean, the day of reckoning may be the Court fixing an estimation if that's necessary.

MR. GOODMAN: Well --

THE COURT: And it may not be necessary.

MR. GOODMAN: Well, let me clarify. You raise a very good point.

I think -- and from our perspective, it is the work that needs to be done to get to the point where the parties can have an intelligent discussion about estimation, and that work is ongoing. It has begun, and that's kind of the point that I was trying to make.

THE COURT: Well, I understand, but you have to understand too that whatever the -- not the -- the parallel was in the prior case doesn't fit. I mean, we had some tort claims, but they were nothing like here. But --

MR. GOODMAN: Different, yet --

THE COURT: But when I think about all the cases I've either been involved with as a lawyer -- whenever that was in

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

my memory -- and as a judge, it almost is always given what the claims bar date is, and it's always in the past or imminent.

And this has got this thing reversed. That just -- it's hard for to understand why there's a good reason for it and for delaying it. So that's really what I need you to tell me.

MR. GOODMAN: Okay.

THE COURT: Not the complexity of the estimation or what's going to happen in a competing plan and anything else. Why should it be January instead of October or anywhere in between? I don't know why, so you need to tell me why.

MR. GOODMAN: I will answer your question directly. I think the main concern for us are the unrepresented victims of the Camp Fire. That's the issue that we are struggling to address.

Now, the Court brought everyone's attention to the Mullane decision, which I read again last night and again this morning. And there's very key language -- because obviously notice and the bar date are somewhat related to each other -- about notice being reasonably calculated under all of the circumstances to apprise parties of their rights.

And here we have a situation where we have a fire, a disaster, that has displaced tens of thousands of people. Notice, in this case, is going to be far more difficult; it's going to be far more complicated than in your normal

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co. bankruptcy.

For that reason, we believe that if necessary --

THE COURT: Well, let me pause you there.

MR. GOODMAN: Sure.

THE COURT: It's going to be far more difficult for an unknown quantity of victims. It's going to be a no-brainer for a vast quantity of victims, right?

MR. GOODMAN: Right. That --

THE COURT: So --

MR. GOODMAN: That is --

THE COURT: So whether it's the Dalkon Shield case that Mr. Julian had involvement with thirty years ago or sex abuse cases for the clergy or Gulf meltdowns of whatever the Gulfstream Horizon -- whatever the thing -- the Gulf; they're all going to be different, but you can't have a magic wand to get everybody to say okay because there's people that either will never know or will know and will do nothing about it. You can't change that, right?

MR. GOODMAN: I agree. But --

THE COURT: All the experts in the world, all the TV plugs, all the everything, there are going to be some people who aren't going to respond, and we can't change -- we don't hold up the train for the last holdout.

MR. GOODMAN: But I think we need to try.

THE COURT: Well, so do I.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. GOODMAN: And that's --

THE COURT: And so does the debtor.

MR. GOODMAN: That's the key. That's the key. Because if the question is -- we need to try. We need to do our best. We need to make sure that we take -- put forward a reasonable program --

THE COURT: Reasonable.

MR. GOODMAN: Reasonable. Yes.

THE COURT: Reasonable under the circumstances.

MR. GOODMAN: Reasonable under the circumstances, reasonable given the economic situation of the case, reasonable given the reality of the 2018 Camp Fire, which is why my first response to Your Honor was -- you said, tell me why? And the answer is: it's the unrepresented victims of the 2018 Camp Fire.

There's also a seasonality concern that we have. We actually think that the response rate will be higher if we take advantage of the holidays when people are off work and have time to prepare claims. If we could get a bar date after Thanksgiving --

THE COURT: But again, I don't want to minimize it, how much preparation is there? You've made a very constructive suggestion on simplifying the claim form. So I --

MR. GOODMAN: It's also explaining the significance, though, of the bar date and getting the word out to victims

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

affected by the fire as to the consequence of not filing the claim.

And again, Judge, I noted getting a bar date at a time when people who are suffering from trauma might have an opportunity to spend the time off from work after Thanksgiving or the December holidays we think would make a meaningful difference.

So that actually concludes my remarks. At this time, I would like to turn the podium over to Ms. Cabraser.

THE COURT: But I thought she was going to talk about the procedure specifically.

MR. GOODMAN: Well --

THE COURT: But no, I'm not going to say I'm not going to listen to her; of course, I am.

But my question to you, still -- and it goes back to this question of what I tried to say in my order of yesterday -- the committee, through you today, is changing your position slightly, right, by clamoring and pushing and pushing, and now saying, but let's slow down? And there may be a good reason, but there are also appearances and optics. And if all these efforts are to let that small number of people have a chance at the cost and the delay of a large number of people, then it's not a good thing, is it?

And again, reasonable under the circumstances. So I could say, fine, you've really persuaded me. Let's have a bar

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 124 of 233

date of late 2020. I mean, obviously, that's crazy, but that's the logical conclusion, right.

MR. GOODMAN: Well, again, we're trying to strike a balance.

THE COURT: Right.

MR. GOODMAN: And proposing January 31st, just so the Court knows, the TCC sought input from the plaintiffs' counsel in the North Bay JCCP who also represented a substantial number of Camp Fire victims.

THE COURT: Right.

MR. GOODMAN: And we said to them given your experience working with people who have been affected by the 2018 Camp Fire, what do you think an acceptable bar date would be? And the answer that we got back was January of 2020. That was the time period they believed would be sufficient and adequate under all of the circumstances of this case to provide for proper notice, to explain to victims who have been traumatized, very real and meaningful ways, by the reality of the 2018 Camp Fire that they would need to file a proof of claim with this bankruptcy court in order to participate in the plan for voting and distribution purposes.

So it is not a number that became plucked out of thin air. It was a number or a date that we believed was appropriate given the circumstances of the case.

And again, I just want to make clear to Your Honor the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

debtor, in their pleadings, quoted from Frank Petrie, Calhoun Bidotti (phonetic), other lawyers who appeared at the hearing. They are members who participate in our meetings. They were in the room when we picked January 31st, 2020. The notion that the victims in this case somehow are at odds with the TCC, I think, is somewhat of a bit of a fantasy. The folks who seem to think that are not the ones who are interacting with them on a daily basis.

THE COURT: Listen, if I knew from a crystal ball that there's no way on earth there's going to be a distribution for some horrible, long period of time, that would be one thing but I don't know that. And there certainly seems to be pressures -- not internally here, coming from outside, from lots of sources that the last thing in the world would want to do for the benefit of the victims, and frankly the contract parties. I'm not forgetting the fact that there are thousands and thousands of creditors who aren't fire victims who are getting delayed also.

So it seems like it's -- I've got to have a real sense that slowing it down has -- I've got to have a reason, and it is a -- if at the end of the day, there never is a plan to discuss until middle of next year, then who cares? I mean, the victims care, and the creditors care, but the system has worked the way it works, right or wrong.

But on the other hand, if we have a -- whether it be

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the political forces, the governor or the PUC, legislature, the last thing in the world that I think would be regrettable would be if the bankruptcy system is slowing them down. The bankruptcy system, in my mind, needs to be out in front, and we've got to have all sorts of other regulatory concerns, CPUC, FERC, others -- legislature. Anyway, I'm repeating myself. Go ahead.

MR. GOODMAN: Well, but again, I think the January bar date does fit within that timeline. I think the -- again, we're trying to balance a lot of competing interests. We're not unmindful of all of the concerns that Your Honor has just raised. However, we also are confronted daily with the reality of people who are homeless, people who ran for their lives, people who lost family members, daughters, husbands. This is a different a case for that reason.

And we have a debtor here who is purportedly solvent. If you had a plan filed tomorrow that said tort claims are reinstated or paid in full, again, just setting a later bar date to ensure that more people are able to participate in that process --

THE COURT: Something tells me if we had that kind of a plan, we'd figure out a way to make it happen faster.

MR. GOODMAN: I'm sure we would.

THE COURT: Well, I'm not --

MR. GOODMAN: Or not.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: -- being --

MR. GOODMAN: Yeah.

THE COURT: -- cavalier about this. I mean the complexity of this case goes without saying. Everybody repeats it, so we don't have to keep saying it.

But again, my point is that the bankruptcy system that does allow some flexibility shouldn't become an impediment if all these other forces line up together. And it's not -- the problem isn't going to get solved in this courtroom, it's just going to get implemented perhaps in this courtroom, but it's outside court -- anyway, let's -- if Ms. Cabraser is going to help me understand it, I would like to hear from her.

Good morning.

MS. CABRASER: Good morning, Your Honor, or this after -- good afternoon.

THE COURT: Well, it's morning in Hawaii. How's that?

MS. CABRASER: Yes. Aloha, Your Honor, and thank you very much for hearing from us today. And thank you for the time and care and attention that you have taken with respect to the bar date issues, the proof of claim form issues, the notice plan issues. It is of tremendous and unusual importance in this bankruptcy to the tort claimants.

I do appear here as somewhat of a stranger. Unlike most lawyers in this courtroom, I am not a bankruptcy expert, I --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Most of the experts -- most of the nonexperts have come in and make the mistake of announcing at the podium that they don't know what they're talking about. You're too well known and too respected to even make that mistake of saying that.

MS. CABRASER: Well --

THE COURT: Some of us irreverent bankruptcy judges usually say, yeah, we knew that anyway.

MS. CABRASER: The --

THE COURT: But we don't go into your forum and tell you how to do things.

MS. CABRASER: And I'm not here to return the favor at all.

But I think it's important, particularly since like this Court in this circumstance, I live and die in my particular practice --

THE COURT: Right.

MS. CABRASER: -- by Mullane to ground what I'm going to say about the notice and outreach plan in that case, which is the one case that rules all.

And here, I think what --

THE COURT: Well, and we call it the seminal case, right? Right?

MS. CABRASER: The seminal case, it was the case that certainly is the touchstone for all things notice-related. And

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the due process concept that is the most profound one in Mullane is that due process operationalizes the right to hear and be heard.

The claim form, the proof of claim itself, operationalizes the right to be heard for claimants. The concern here is making sure they hear, making sure that we have enough reach, enough frequency through the media that these claimants use and understand so that they can take care of very clear, very reasonable principles or forms that Your Honor has developed in conjunction with the debtor and the TCC.

So in that regard, I also have to say how much we appreciate the fact, as you heard this morning, that the notice plan has -- that the debtors proposed has substantially improved in response to the Angeion program. That's what happens when competitors compete.

And I would like to focus on several remaining gaps that we believe can and should be filled, can be done. Right now, you'll notice that both plans have the same budget. It's now 21.5 million approximately, so --

THE COURT: I had a little trouble trying to figure out that.

MS. CABRASER: Well, we --

THE COURT: That's why I asked for some information.

MS. CABRASER: We did, too but I think the last comparison based on the 2.0 plan I think has the debtors

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 130 of 233

                program at 21,500,000, and the Angeion program is at 21,850,000.

The key differences don't have anything to do with mailing, but they have to do with aspects of the notice plan that would reach these claimants soonest and most effectively. And Your Honor that's where this interrelates with the bar date. You've heard all of the reasons why we believe the TCC proposed bar date is appropriate and that it will not impede with a swift resolution of the bankruptcy. That's what the TCC wants. They are not going to be the ones in front of that train.

But while those proceedings are progressing, if we can use the time that we have, whatever time Your Honor gives us for the bar date, to saturate these dispersed communities with effective notification, then we are increasing the probability that they will get their proofs of claim in on time.

THE COURT: Well, how do we know that? How do we know we're not saturating them with then hearing the notice over and over again, as distinguished from an earlier notice that tells them what the consequences are?

MS. CABRASER: The notice plan -- the Angeion notice plan that we think should be adopted, whether Angeion does it or the debtors' vendor does it or some combination of joint notice plan, which would be ideal, is done, actually frontloads the type of notice that's going to be most effective in

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

reaching these people, and that's why I mentioned frequency of messaging. It's a tentative advertising that no one is actually hearing your message until you're so sick of it, you don't want ever to say it again.

MR. KAROTKIN: Your Honor, can I interrupt? Is Ms. Cabraser here as a media expert and a noticing expert or is she here representing a client, because this sounds like testimony on behalf of Angeion. I'm confused.

MS. CABRASER: It is not testimony on behalf of Angeion -- I will tell you exactly why and how I'm here, Your Honor, and it is a little unusual.

THE COURT: Well, you know that Angeion was notably absent when the debtor wanted to pin them down, and I made it clear that I wasn't going to turn this into a --

MS. CABRASER: Understood.

THE COURT: -- you know what kind of a contest.

MS. CABRASER: Understood.

THE COURT: But that doesn't mean that suddenly we just pretend that they have provided the information to the debtor. I mean, to me you're making an argument for a later date. You haven't told me --

MS. CABRASER: Ah.

THE COURT: -- and Mr. Karotkin's criticism, why don't I just say you've persuaded me on the date, we'll go with the debtors' plan and make it go longer or more frontloaded. I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

mean --

MS. CABRASER: Right. They are interrelated issues, and that's a possibility, Your Honor.

THE COURT: Yeah.

MS. CABRASER: Let me simply explain why we believe -- and look, I am not Angeion. I am not a notice expert, but I am a lawyer that --

THE COURT: No, but you're known for your expertise and experience and track record and good results in cases in this court and lots of other courts, so everybody knows who you are --

MS. CABRASER: All right.

THE COURT: -- and including me, but that's the point. So therefore, what should I do that's different in this case?

MS. CABRASER: You --

THE COURT: And again, I made a comment earlier -- I don't know if you heard me -- your experience is in class actions, mostly, I guess, but class actions don't have bar dates.

MS. CABRASER: They do --

THE COURT: I mean -- excuse me, they don't have discharge dates, right? If you never got notice of a class action, and the company is still around, you're still alive and well, aren't you?

MS. CABRASER: It depends, Your Honor. In class

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

actions settlements there are bar dates.

THE COURT: Okay.

MS. CABRASER: There are claims deadlines.

THE COURT: But if you don't know about it, there's no statutory bar date like a claims deadline in the statute, right?

MS. CABRASER: There is case law that says if you don't know about it, if the best -- if the most -- if the best practical use was given to you consistent with due process, and you were the one that didn't find out about it, and you didn't make a claim, you're out. So it is somewhat --

THE COURT: Is the debt discharged? I don't think so.

MS. CABRASER: Yes, there would be a class -- well, there would be a class-wide dismissal and release.

THE COURT: Well, that could --

MS. CABRASER: It might be the --

THE COURT: But is it a legal discharge?

MS. CABRASER: It may be the -- it would be the functional equivalent of a discharge with respect to that claim.

THE COURT: Well, it's well established in Ninth -- not Ninth Circuit; it's case law, and I believe the seminal case on this was the Tenth Circuit -- if you never know about the bar date, you're not discharged. That's the --

MS. CABRASER: Well, that's the no harm, no foul.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, you know what? For most of our cases that I preside over, it's fatal because the debtor is gone.

MS. CABRASER: That's right.

THE COURT: I don't expect this debtor to be gone. And if a victim is able to persuade a court that it never knew of the discharge deadline, then it may not be discharged. And that's not such a bad thing if you've got a company like this company surviving.

MS. CABRASER: It isn't a bad thing. What we believe is a better thing, Your Honor, is that tort claimants have the fullest opportunity to actually make their claims --

THE COURT: No, I understand.

MS. CABRASER: -- while we're all in these proceedings. And so here are the major gaps --

THE COURT: Okay.

MS. CABRASER: -- that we see that can be filled, that should be filled, that would ensure Mullane compliance, that would maximize claims, and would do so without added cost overall. And this is first with respect to frequency of messaging. The TCC plan reaches all adults in Northern California on average of 51.95 times and reaches over eighty percent of all Californians, 28 times.

The 2.0 plan from the debtor reaches Northern Californians eight times, and Californians only five times.

The reason frequency is important is to get people to hear. The people in this group are displaced; many are homeless, and they live by their phones. We know they have their phones.

THE COURT: We don't have any data on this, though, right? I mean, I understand what you're saying, and I suspect you're right, but there's no real observable data about this out there.

MS. CABRASER: Have public health folks been able to poll these people? No. We're in the process of trying to reach them. But I can tell you this, Your Honor, on behalf of my clients from the Camp Fires community. I represent wrongful death claimants, as well as property claimants in both Camp Fire and North Bay.

And by the way, many North Bay fires folks are still unrepresented. With respect to North Bay, I know that people live by their phones because I've seen my clients do it.

THE COURT: No, but my -- no, I'm sorry, my question was different. Is there any observable data on the number of people who literally are -- by homeless, I mean are out of touch with any kind of system where reliable notice might work for them?

MS. CABRASER: What we know is there are thousands of folks that don't have a new permanent address, don't have a forwarding address, are in touch with family members and

friends, and members of their former communities primarily by phone, and that is why our notice program focuses so heavily on frequency through social media -- Facebook, Instagram, Twitter -- and also why it focuses so heavily on a live-streaming audio because people listen to that on their smartphone.

So here's what I would suggest as the gaps that can and should be filled without added expenses and without added time. And by the way, these are the aspects of a notice program that could be instituted most quickly, instantly. Social media can happen the day after Your Honor's order.

THE COURT: No, I'm sure that's true.

MS. CABRASER: Mailing is going to take two weeks before people receive letters, if indeed they get them.

THE COURT: But we have a law that says it has to be mailed.

MS. CABRASER: Of course. Of course. It's necessary here, but not sufficient, particularly when the addresses are of destroyed homes. But streaming audio, radio via smartphone, will reach people. It will reach them on a same-day basis, and it will reach them frequently.

The remaining gaps --

MR. KAROTKIN: Your Honor, I have to object. This is testimony. She is not a media expert.

THE COURT: No, I understand. I understand. And I'm

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

not sure what to make of it. I'm going to let her finish the point.

MS. CABRASER: All right. We are suggesting to the Court features of a notice plan, court-approved, that would do what we know the Court wishes to do, and what we know the debtor has said it wishes to do.

With respect to --

THE COURT: Wait, let's stop there.

MS. CABRASER: Yes.

THE COURT: Right. So why don't I just tell Mr. Karotkin I want to see a higher level of frequency, period? That doesn't answer the question of the bar date. I mean, that -- so it isn't related to the bar date.

MS. CABRASER: All right.

THE COURT: You just said it's frontloaded. So I mean, this is why I'm having trouble, and I'm not going to --

MS. CABRASER: All right. Let me try to tie it together.

THE COURT: I'm not going to throw you off because you're not a qualified expert in media, but you've got to understand, we've got to focus on the different issues here.

I've got a decision to make about a deadline, which is clear, and I've got a decision to approve the debtors' comprehensive plan or an alternative plan that frankly isn't very complete, except you're telling me how it can do all these

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

things. But I have the Angeion -- I mean, I find it strange, to be honest with you, that we would have this hearing, and the Angeion principals haven't even made themselves available to be deposed or interviewed by the debtor. And I'm supposed to say okay, well, let's just forget that. Let's just take a very respected, and -- respected member of the bar tell me why they should go with the Angeion who hasn't complied with very fundamental procedural processes, okay?

MS. CABRASER: My --

THE COURT: So let's mix the --

MS. CABRASER: All right.

THE COURT: Let's get the -- separate these things out.

MS. CABRASER: We'll separate them out.

THE COURT: Because you know why? You're making a very persuasive argument for me to tell Mr. Karotkin, you've got an October deadline; pick up the media and the audio streaming --

MS. CABRASER: Okay.

THE COURT: -- in the frontload.

MS. CABRASER: The deadline issue is this, Your Honor. And they are interrelated, and I'll try to extricate them to the extent I can.

THE COURT: Well, you've got to. Yeah, you've got to.

MS. CABRASER: All right.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Okay.

MS. CABRASER: The point that was made about seasonality is an important one. It's not anyone's fault that it's June and that a notice program would not launch into July. We have to live with that, but the reality of that under Mullane is that it's most difficult -- I don't think anybody would disagree for lots of reasons, it is most difficult to reach folks and motivate them to act over the summer months. It gets easier --

MR. KAROTKIN: Your Honor, I really -- this is expert testimony on noticing. This is completely inappropriate.

THE COURT: I know, Mr. Karotkin. I'm not going to make a finding. I'm just listening to the argument. I understand your point. I understand your point but make --

MS. CABRASER: Okay. My clients tell me -- without waiving attorney-client privilege --

THE COURT: Well, you're about to waive it. So --

MS. CABRASER: Generically, generically --

THE COURT: Yeah.

MS. CABRASER: -- that --

THE COURT: Shall we forget the hearsay rule while we're at it?

MS. CABRASER: We may forget a lot of things and --

THE COURT: Okay, you're in the bankruptcy court now.

MS. CABRASER: We're in the bankruptcy court. We're

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

in the bankruptcy court, Your Honor, and --

THE COURT: Yes, go ahead, what? Without waiving privilege and forgetting the rules of hearsay, what is the point?

MS. CABRASER: Community members gather, again, by phone, by social media, physically where they can during the holiday season. This happened --

THE COURT: Well, but so do nonvictims. So do people.

MS. CABRASER: Yes.

THE COURT: Just people.

MS. CABRASER: And --

THE COURT: Nonvictims.

MS. CABRASER: Yes, this is not specific to victims. That is why this is not a matter of notice expertise. This is a matter of recognizing the reality of human life that is even more important to displaced and dispersed victims to know that if we want to have an effective claim program with a meaningful bar date that is consistent with due process and that reasonably makes all reasonable efforts to apprise folks of the ability to file a proof of claim and get those claims in so that the bankruptcy can proceed, we would want to take advantage if at all humanly possible of the holiday season when people are most likely -- people, just people -- forget the particular needs of these people, my clients, just people -- are more likely to gather, to speak with each other, to

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

reinforce and encourage each other.

THE COURT: But what are they likely to do when they either get something in the mail or if they don't have mail delivery, get something in the newspaper or on their streaming phones that says you have to file a claim in the bankruptcy court? There can't be a victim alive who has intelligence who doesn't know that PG&E is in bankruptcy.

So what they shouldn't -- I can't assume they do know -- are the fine points of bankruptcy law and procedure, or any other civil procedure. What's going to be different about telling them fifty times rather than thirty times? If they're not going to do it, they're not going to do it. And if they know there's a deadline, why aren't they going to do it?

In other words, put it a different way and --

MS. CABRASER: What is different?

THE COURT: Put it this way, if I tell you ten times you've got to do it by a deadline, and you don't, and I tell you ten more, and ten more, and ten more, is something going to change?

MS. CABRASER: Yes.

THE COURT: What?

MS. CABRASER: It's going to get through to a traumatized victim, a dispersed victim, that they have to do it. They are going to --

THE COURT: But how many does it take?

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 142 of 233

PG&E Corporation; Pacific Gas and Electric Co.

MS. CABRASER: I could not tell you --

THE COURT: Okay.

MS. CABRASER: -- how many is enough. But the more we can give with a -- cost-effectively -- and remember, social media is very inexpensive, and frequency is very inexpensive.

THE COURT: I already agreed with you that maybe the simple solution is to increase the frequency and --

MS. CABRASER: To increase the frequency and to give enough time, Your Honor. These are the two aspects of it.

THE COURT: Okay.

MS. CABRASER: It is a balance.

THE COURT: But I need to have a better --

MS. CABRASER: And it is an art.

THE COURT: I need to have a better sense -- I mean the art -- the experts have just demonstrated a lot of art.

MS. CABRASER: Um-hum.

THE COURT: You're not an expert in this, nor am I, and I've read from both sides; whether there are difference of opinions as to who should be believed, they are both telling me things that I'm not familiar with. So I have to rely on them.

But this notion that people are going to gather around at Christmastime because they can put together a proof of claim is not very persuasive compared to doing it now or in October or September, if they are bombarded with information and reminders again and again, do it.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

It's almost if you keep telling them, they don't do it, they'll never do it. So why should I assume that after telling people fifty times, we should tell them ten more times? I mean that's really what you're saying.

MS. CABRASER: The --

THE COURT: Because it's the holidays.

MS. CABRASER: Well, there's --

THE COURT: And I don't see the connection.

MS. CABRASER: There is a substantial difference --

THE COURT: Okay.

MS. CABRASER: -- between telling someone something five times and telling them fifty times. Is fifty the minimum? Is it somewhere in between? I don't know that standing here today, but I do know that more is better.

THE COURT: What's the experience -- what's the class action experience?

MS. CABRASER: The class action --

THE COURT: And I'm not talking about people who got a -- paid too much for their Volkswagen that polluted the air. I'm talking about tort victims.

MS. CABRASER: That was an easy one, Your Honor.

THE COURT: Yeah, I'm sure it was. But I'm talking about tort victims.

MS. CABRASER: Tort victims.

THE COURT: So what's the magic formula?

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 144 of 233

MS. CABRASER: The magic formula is maximum frequency over maximum time through the most number of media, which is why on the class action side you see notice plans like the plan that you see developing before you in this courtroom through the back and forth of the debtor and the TCC. It's getting there. There's a plan. It's a multimedia plan. There are a couple of features that the debtor plan doesn't have yet that we thought it should: the public relations and word on the street.

On the class action side, we don't start from a clean slate every time. We go back to the last program that worked well that we have metrics for in a given type of case.

THE COURT: Right.

MS. CABRASER: And then we build on it because the technology is advanced --

THE COURT: Right.

MS. CABRASER: -- and because we learned from it. It's an iterative process. That's why the TCC submitted the declaration that it did from Mr. Deon (phonetic), who deals with traumatized folks.

THE COURT: Well, there are some --

MS. CABRASER: And I'm relying on --

THE COURT: But there's some question about the validity of the reliability of that.

MS. CABRASER: And --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: But that's neither here nor there.

MS. CABRASER: And when -- I'm just speaking from personal experience, not an expert -- when I worked on the notice program in Deepwater Horizon that Your Honor mentioned, where we had Gulf States, we didn't have mass injury claims but we had economic trauma.

THE COURT: Um-hum.

MS. CABRASER: So it was a little milder but it was acute. People were out of jobs. They were out of work. Their businesses were closed.

THE COURT: Yeah. No, I'm aware of that.

MS. CABRASER: We did a very similar plan to this one. There was actually more frequency. We --

THE COURT: What was the time frame? What was the --

MS. CABRASER: We had a longer time frame. We had about a year, Your Honor, and so we took full advantage of that. And so this one is really scaled to --

THE COURT: Is there any --

MS. CABRASER: -- we have less time.

THE COURT: Is there any data as to if you had a window that was a year long, when the claims built up or didn't build up? In other words, it's one thing to say, okay, Deepwater took a year, but if did a chart to go when were the claims filed --

MS. CABRASER: Oh, month-by-month? It -- fall,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                fall/winter, the holiday season. And that's something that seems to repeat across --

THE COURT: But when was the accident to begin with?

MS. CABRASER: The accident was --

THE COURT: I don't remember.

MS. CABRASER: -- in April of 2010.

THE COURT: Okay.

MS. CABRASER: There were various notice programs for various purposes throughout the life of the proceedings because it's a maritime case and there -- where there were different notices. The class notice --

THE COURT: Well, I know it's a maritime case but the people on the land who --

MS. CABRASER: Oh.

THE COURT: -- suffered oil or whatever the chemicals --

MS. CABRASER: Class notice started in April 2012 and went through April of the following year.

THE COURT: But my question was if you had a chart that showed what the frequency of the claims --

MS. CABRASER: Of the claims --

THE COURT: -- filing, and you told me that ninety-five percent of them were the first three months, and there were eight claims filed in the last three months, you won't persuade me to do something different here.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Again, due process is what it is, but the notion that we delay a process by a couple of more months to pick up three claims or two claims or six claims is not very --

MS. CABRASER: Understood.

THE COURT: -- persuasive. Because, again, I'm not unsympathetic to those people, but how many times do you have to tell them?

And I'll grant you that if there's a victim out there who doesn't know about it until the last day, I want that person and you want that person to be able to assert a claim.

MS. CABRASER: Um-hum.

THE COURT: But at some point, you have to draw the line, right?

MS. CABRASER: Understood.

THE COURT: Okay.

MS. CABRASER: Understood, Your Honor.

THE COURT: So the question is --

MS. CABRASER: We're trying to assist in --

THE COURT: -- with Deepwater as --

MS. CABRASER: -- the right balance.

THE COURT: So we're going to forget smoking Volkswagens and we're going to talk about large-scale torts. Is there any information that you can share about the timeline of the window to assert the claim compared to the actual assertions of claim?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MS. CABRASER: Yes. We know that the claims ramped up toward the -- what we could call a bar date, the end date for claims. You couldn't make any --

THE COURT: Well, that's probably always the standard.

MS. CABRASER: That's very standard.

THE COURT: That's human nature, right?

MS. CABRASER: That's fairly standard. That's going to happen here. I think we can predict that.

THE COURT: Yeah.

MS. CABRASER: I would have to compile the charts. These were reported monthly by the claims administrator.

THE COURT: Okay.

MS. CABRASER: But we know that the claims spiked in the fall after the summer. We know the claims spiked over the holiday season. And so frankly, Your Honor, just experientially, not as an expert, what we're trying to do here in striking a balance between a bar date and maximizing the reasonable opportunity for folks --

THE COURT: When the notices --

MS. CABRASER: -- was to use that.

THE COURT: -- went out in something like Deepwater -- or again, I'm not focusing only on Deepwater, but I want to --

MS. CABRASER: Um-hum.

THE COURT: -- talk about mass torts. I presume the original notices also had the deadlines?

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

MS. CABRASER: Yes.

THE COURT: So the ramping up of the claims filing is a direct function of what the deadline was in the first place.

So there's no data, I presume, that tells us what is the sequencing or the frequency of people asserting and filing claims after they first know of the claims.

MS. CABRASER: No.

THE COURT: In other words, if I am a victim of the Deepwater and I get a notice in April that says file your claim by next April, I'm going to say, okay. I'll get around to it. If I get a notice in PG&E that the bankruptcy court says file your claim in October, I'm going to file my claim in October unless I don't know in the first place, which gets back --

MS. CABRASER: Um-hum.

THE COURT: -- to the question of well, okay. Let's just front-load the noticing.

MS. CABRASER: Well, and that's the reach question, Your Honor. The reach question is the right to hear. So we need to get to folks, really decide the frequency which reinforces the idea and motivates. Let's just talk about the reach and how to get to people with a date so they can do something --

THE COURT: Okay.

MS. CABRASER: -- in a way they can understand.

THE COURT: But then, see, now we're where Mr.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Karotkin was going to object. He's objected a couple of times to your statement and I let you make the statement.

But how do I, as the poor old bankruptcy judge, know why I should tell Ms. Finegan in her effort, no, that's not good enough. Agajanian's is better. I don't know. There's no way of knowing this. I mean, you're making a pitch for why the Agajanian proposal is better, and why some victims of Camp Fire are maybe going to do better if they have more time. But I haven't heard you say anything, really, that's flawed about the debtors' proposal, other than maybe there ought to be a little more front-loading of the notice. But that doesn't speak to the question of the deadline.

So they --

MS. CABRASER: Speaking to --

THE COURT: -- I'm not asking you to make my decisions.

MS. CABRASER: Okay.

THE COURT: My decisions are to make, and I'll make it as soon as -- I finish --

MR. CABRASER: Right.

THE COURT: -- hearing the arguments. But it's one of these things where the reason why things are happening is because other things aren't happening. And there doesn't seem to be any very reliable evidence that we are actually going to save the day for some victims who are in that category of not

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corporation; Pacific Gas and Electric Co.

knowing, not communicated, not being -- and not responding to --

MS. CABRASER: Um-hum.

THE COURT: -- the first twenty-eight notices --

MS. CABRASER: Okay.

THE COURT: -- but maybe the last fifteen notices.

MS. CABRASER: Well, first of all to reach them, whatever the timing is, and to optimally reach them, more media are better. So public relations, free news reports, the street teams, old school hand-to-hand noticing --

THE COURT: Yeah, I know, I read that.

MS. CABRASER: -- community activation --

THE COURT: I don't know how that happens. I mean, that --

MS. CABRASER: People go out their way and distribute flyers in known population centers, (indiscernible) centers, Chico, Redding, where we know people are. In the areas of Sonoma County where we know people are. That's something the tort claims committee would be involved in personally because they know -- they know their communities.

The deadline, Your Honor, it is a balancing act. I don't think anybody, whether they're a notice expert or an advocate or someone that's had forty years' experience of trying to do the best plans in tort situations, as I have, could tell you that there is definitive data which is going to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

drive the absolutely perfect date.

THE COURT: You haven't had any experience in another bankruptcy case where we've had this happen, have you?

MS. CABRASER: In the zone light aspect of the W.R. Grace bankruptcy, Your Honor, we did a homeowners' class notice. We did it in conjunction with a plan. We had a relatively long bar date, primarily because it took folks a while to figure out, once we reached them, whether or not they had the asbestos-containing insulation in their attics, and we couldn't ask them to go up and look or they would get exposed. So that was a very particular problem.

But in a sense, we're dealing with an equally unique problem here, just trying to deal, as best we all can, with what we all understand or believe to be the reality of these particular tort claimants. And these particular tort claimants are the guinea pigs in an experiment. This experiment hasn't been run before, so we're doing the best we can.

THE COURT: No, I understand. Okay. I want to hear from any other parties that want to be heard.

MS. CABRASER: Thank you.

THE COURT: And then Mr. Karotkin, I'll come back to you for a closing.

Anyone else want to be heard on the issue? Well, oh. For the OCC?

MR. LEBLANC: Yes, Your Honor.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

THE COURT: Okay. Yeah, and I'll come to you after that.

Thank you, Ms. Cabraser.

Yes? Go ahead, Mr. LeBlanc.

MR. LEBLANC: Your Honor, Andrew LeBlanc again, of Millbank on behalf of the official committee. Your Honor, we rise to just make a few points.

And I know Your Honor had in your hearing order a request to discuss the BrownGreer database issues.

THE COURT: Well, I mean, it was -- should I touch on that subject in the time we have, yeah?

MR. LEBLANC: Your Honor, let me give you the committee's perspective throughout this process. And we agreed -- when the bar date motion was first filed, it was filed on May 1st.

THE COURT: Right.

MR. LEBLANC: So we're already several -- two months delayed from --

THE COURT: No, I'm aware --

MR. LEBLANC: -- the time it was filed.

THE COURT: -- I'm well aware of that.

MR. LEBLANC: And a large part of that delay, Your Honor, was we agreed with the TCC to push off this hearing the first time from the 25th of May, when it was originally scheduled, to June 11th. And we agreed with that expressly for

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the purpose of meeting and trying to get access to information that would allow these claims to move forward without respect -- or the analysis of the claims to move forward without, necessarily, regard to the bar date. And that's why --

THE COURT: Right.

MR. LEBLANC: -- we raised this in our objections.

THE COURT: They're separate. Separate issues, right?

MR. LEBLANC: It's a separate issue --

THE COURT: Yeah.

MR. LEBLANC: -- but it's related in the sense that you have to get this information somehow to move these cases forward. And what the committee -- what the official committee is singularly focused on is making sure that we can move these cases forward in an efficient and effective manner. And that's what we've been trying to do from the very beginning. And one way that we know we have to do that is through an exchange of information.

THE COURT: Um-hum.

MR. LEBLANC: And --

THE COURT: Right.

MR. LEBLANC: -- the debtors' bar date, as the claims form, as originally proposed, we thought would provide an alternative to that information. And we were supportive of that. But if we could get the information through other means

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

meaning, in particular, access to the BrownGreer database, that may have obviated the need for the debtors' more expansive claims form.

That issue was taken off the table. We put it in our pleadings that we didn't necessarily agree with that decision, but that decision has been made.

THE COURT: Made.

MR. LEBLANC: So we need to get access to this information because I think there are a few data points that I think are critical to the question of what the right bar date is here, given what has to happen in these cases.

First is that there has been a motion to terminate exclusivity in a planned term sheet that's been filed, that's only just been filed.

THE COURT: Right.

MR. LEBLANC: There's also -- the debtors' exclusivity today, based upon Your Honor's order, we -- Your Honor will recall they asked for an extension of six months --

THE COURT: Right.

MR. LEBLANC: -- we objected to it.

THE COURT: You got four.

MR. LEBLANC: Your Honor, we settled on four months. It expires on September 26th.

We share Your Honor's concern that if we are at September 26th, just to use that date as an example, and the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

bar date is not for another five months, I don't know how people are going to do what they need to do to move these cases forward in any expeditious manner, either to meet Governor Newsom's requirements or even just to ensure that we don't languish in bankruptcy through another fire season, which as everyone knows is --

THE COURT: Well --

MR. LEBLANC: -- critically important.

THE COURT: -- unfortunately, we are going to be at bankruptcy in another fire season.

MR. LEBLANC: Well, Your Honor, I mean next year's fire season.

THE COURT: Well, then another one.

MR. LEBLANC: Regardless of what Governor Newsom has said --

THE COURT: Yeah.

MR. LEBLANC: -- the fire season that begins in June of 2020 --

THE COURT: Right.

MR. LEBLANC: -- is what we're concerned about.

THE COURT: Okay.

MR. LEBLANC: And so what's critical to us is to take the steps necessary to move these cases forward. And that's why we believe the debtors' bar date is critical to getting this done.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

From the time that this was filed, and I know it doesn't help the uneducated, unrepresented people who aren't versed in bankruptcy, the fact that it was filed two months ago, but it's critical that we start this process, get the notice out, give them adequate time to respond, and I think the debtors have done a good job of striking the right balance.

It is unfortunate that we have to have a hearing of this length to deal with things like how many Twitter posts or how many influencers should be used. Those are the kinds of things that we should have been able to work out without having to come before the Court.

THE COURT: Okay. But it didn't happen, so here we are.

MR. LEBLANC: It didn't.

THE COURT: So the question is, what do I do?

MR. LEBLANC: So here we are.

So what we would urge, what the official committee would urge, is that Your Honor set the bar date that the debtors have requested of October 21st, that Your Honor approve the notice program that --

THE COURT: Do you have a --

MR. LEBLANC: -- has been devised.

THE COURT: -- Does the OCC have a position on tweaking the debtors' proposal also? I mean, what Ms. Cabraser talked about, that kind of thing?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

MR. LEBLANC: No, we don't, Your Honor.

THE COURT: Because I don't know how to know how to tell them what to do.

MR. LEBLANC: Well, Your Honor, I think we would rely on the experts, and the experts who have been retained --

THE COURT: Right.

MR. LEBLANC: -- in this case are Prime Clerk to do this notice.

THE COURT: Right.

MR. LEBLANC: We -- we were also the official committee in the Takata case where a Prime Clerk was the noticing agent and served eighty-eight million notices to people who -- and unlike in this case, who may not have even known that they had a potentially defective air bag, may have lost value in their car. These were latent potential tort claims that needed to get notice --

THE COURT: Now, listen. Let me stop you. This is not about promoting or bashing Prime Clerk. The issue is deadline and whether I should try to second-guess any of the experts and say, well, I think you ought to do a little more here, a little more there. Ms. Cabraser made her argument about it. I have to decide whether I buy that argument. My guess is if I tell Prime Clerk to do it, they'll do it. But the question is should I be telling them to do it?

But you made your point. Your point is stick with the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

October 21st --

MR. LEBLANC: Yes.

THE COURT: -- proposal.

MR. LEBLANC: Our point, stick with the October 21st, and with respect the notice program, if Prime Clerk has devised a notice program that they think is adequate, we support that notice program based on -- not based on it being Prime Clerk, but they're retained for this purpose in these cases and we had no concerns about their notice program even before it was supplemented through what Mr. Karotkin said today. We think it's an adequate notice program, under the circumstances, to provide notice.

THE COURT: And as long as you're up there, what am I supposed to do about this BrownGreer report? Anything? Do nothing? Act on it? Not act on it? What's your take?

MR. LEBLANC: Your Honor, I think you should enter an order to show cause as to why. And to be clear about what we're asking for, we served a document request on the TCC. We also served a document request on the debtors, we served a documents request on the subrogation claimants in which we asked of the TCC, just give us a password to this database, that's it. And we asked of the debtors -- we asked for the debtors to produce the documents that the TCC said to them, you would have to produce these documents for us to give you access to the database. And to be clear, they were talking about

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

giving access to us, to the TCC, and to the debtors. That's the request that we made.

The response we got from the tort committee was to accuse us of sanctionable conduct. They literally sent us a letter that twice argued that we were violating Rule 11 in asking for a username and password.

THE COURT: Well, I issued an order yesterday that was going to be a little earlier than I wanted -- than I had planned -- and on that day I said, tell me whether I should do something about this BrownGreer report. I'm not going to do anything today because that would be unfair to everyone.

But it's sort of like a 800-pound gorilla sitting in the living room. And I've got to go in the living room and see if he's in there. I don't even know what to do with it and how it relates to the questions before the house today. There's only two questions, there were three today. And that's why I'm not going to act on BrownGreer.

But so one more question for you, Mr. Leblanc, the OCC has accepted the debtors' willingness to go with the TCC's form. You've made it clear on the proposed deadline. I take it, then, when and how you get the BrownGreer information is not relevant to either of those two questions?

MR. LEBLANC: It no longer is --

THE COURT: Okay.

MR. LEBLANC: -- Your Honor --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Okay.

MR. LEBLANC: -- because --

THE COURT: Okay.

MR. LEBLANC: -- the debtors' claim form is not --

THE COURT: Correct.

MR. LEBLANC: -- the more expansive claims form is no longer here.

THE COURT: And so if I go with the debtors' claim form and it goes out, then something's going to happen, and whatever information needs to be obtained later, we deal with it later.

MR. LEBLANC: Yes. So I mean, Your Honor, the issue -- one of the issues that we were struggling with is, when the debtors advised everyone, the TCC and UCC at the same time, that they were moving to the TCC's claims form and away from their form, we then realized that our entire position, which was we just need to get this information --

THE COURT: Yeah.

MR. LEBLANC: -- whichever way we can, that that was affected by that. So we immediately served document requests pursuant under this motion.

THE COURT: Okay.

MR. LEBLANC: And the issue, Your Honor, is that among the objections that the TCC had was, well, you need to seek this under Rule 2004 and follow your -- serve a subpoena on us

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

under Rule 2004. And we'll obviously do that.

I think, Your Honor, it is -- the elephant in the room is this database because we've been told by the TCC and by the constituent members of the TCC that this database has the information that we'll all need to build up a claims estimate.

THE COURT: Okay. Well, again, I'm not going to act on it today.

MR. LEBLANC: Your Honor, we would urge the Court, though, to enter an order to show cause as to why that shouldn't be produced. Alternatively, we'll seek authority under Rule 2004 and begin pursuing it that way. It gets to the same place. I think we should -- it's been many months since we've had discussions about this database and haven't had access. So we'll deal with it in a different procedural way if we have to. But we think an order to show cause --

THE COURT: Okay.

MR. LEBLANC: -- would make sense.

THE COURT: Thank you, Mr. LeBlanc.

MR. LEBLANC: Thank you, Your Honor.

MR. GOODMAN: Your Honor, could I just be briefly heard on the --

THE COURT: Well --

MR. GOODMAN: -- BrownGreer issue?

THE COURT: -- what?

MR. GOODMAN: Could I just be briefly heard on the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

BrownGreer issue? I want to clarify --

THE COURT: Well, I'm not going to act on it. I'd rather that we get to the critical question, so let me come back to that.

So the gentleman over here. You wanted to be heard, so come on.

MR. LEMON: Thank you, Your Honor.

THE COURT: And then I'll go to you next, sir.

Again, just state your name for the record. I think I keep track of lawyers who have been appearing frequently, but --

MR. LEMON: Thank you. John Lemon, appearing for the Singleton firm on behalf of the Singleton firm's fire victims.

THE COURT: And you got on your plane late, but you got here, see?

MR. LEMON: I did. I made it.

THE COURT: Yeah. Well, the hearing went late, too.

So Mr. Lemon, what do you want me to do today?

MR. LEMON: I just wanted to address this issue of the bar date. And specifically, the Singleton firm -- I appreciate Your Honor's concerns about moving this process along. And frankly, we agree that the holiday season is not going to see a spike in claim forms being filed. We actually tend to agree more with the debtor than with the TCC.

However, we think that what strikes the best balance

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

here is a deadline of November 8th, which would be exactly one year since the Camp Fire.

THE COURT: But I mean, is there some magic to that? Is it because it's psychological or --

MR. LEMON: Exactly.

THE COURT: -- otherwise?

MR. LEMON: I just think it's easy. Because word of mouth, people can remember it. If your house or whatever burned down in the Camp Fire on November 8th, 2018, you have until November 8th, 2019 to file the claim in the bankruptcy. It's very similar to the debtors' bar date, but I think it would work better for everyone --

THE COURT: I mean, it's two and a half weeks.

MR. LEMON: Right.

THE COURT: Okay.

MR. LEMON: That's our request.

THE COURT: That's all?

MR. LEMON: Thank you.

THE COURT: Yes?

MR. STAMER: Good afternoon, Your Honor. For the record, Michael Stamer from Akin Gump Strauss Hauer & Feld, here on behalf of the ad hoc noteholder committee.

Your Honor, I'll be relatively brief.

THE COURT: That's okay. Take whatever time you want, Mr. Stamer.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. STAMER: I greatly appreciate that.

Your Honor, the members of the ad hoc committee hold approximately -- or in excess of ten billion dollars of the unsecured bond and bank debt of the debtors in these Chapter 11 cases. Your Honor, we filed a very short joinder to the UCC or the OCC's objection to the TCC's bar date motion, if you can follow that.

THE COURT: Well, I mean, there's just been a flurry of stuff.

MR. STAMER: I'll distill it.

THE COURT: And one of the great joys in life is to be told there's an update on something because then I don't have to read what's being updated.

MR. STAMER: Here's the update. Your Honor, I'll distill it.

We fully support the debtors' request for a bar date date of October 21st. As you'll hear in my presentation, it's bit of a back-handed support. But nevertheless we support --

THE COURT: Hey --

MR. STAMER: -- October 21st --

THE COURT: -- it's a support.

MR. STAMER: A support is a support.

Your Honor, also as referenced earlier, we filed yesterday a motion to terminate the debtors' exclusive periods --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Wait, Mr. Stamer, do you have a position on the methodology of -- maybe you heard Ms. Cabraser and others comment, and do you have -- your committee doesn't take a position on that?

MR. STAMER: We join the committee's pleading that they filed. From our perspective -- again, we support the debtors with respect to --

THE COURT: The debtors' proposal.

MR. STAMER: -- their proposed bar date. So their procedures and --

THE COURT: Well, bar date and procedure.

MR. STAMER: -- their date. Correct, Your Honor.

THE COURT: Okay.

MR. STAMER: We support the debtors on both.

THE COURT: Okay. So I mean, if you want to tell me that you filed the motion for exclusivity that's fine, but what else? That's not an action item today, right?

MR. STAMER: Actually, Your Honor, it's not. And I don't intend to stand at the podium and talk about it. In your provisional order, you asked the question regarding the status of the plan. And --

THE COURT: Right.

MR. STAMER: -- from our perspective, it was unfortunate that the company did not respond to your question directly.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

So you asked the question in your order, is there a cause for delay? There's nothing public with respect to the filing of the plan. Is a later bar date going to be a problem? And again, we agree that it is a significant problem. And the reason is, Your Honor, we believe that this case, more than anything else, needs a greater sense of urgency, a greater sense of transparency, and frankly, a greater sense of cooperation.

Your Honor, as people have said over and over again, these cases were filed principally to deal with the fire claims.

THE COURT: Right.

MR. STAMER: Equitable, fair treatment of the fire claimants. And Your Honor, as far as we can tell, and I say it with all due respect, the debtors have made very little progress with respect to reconciling fire claims.

They did, in fact, make a public announcement that they settled a billion dollars -- or they settled certain public entity claims for about a billion dollars. And Your Honor, many of us found out about that for the first time in the press reports. Which again, we think is --

THE COURT: You can add me to that list, by the way.

MR. STAMER: -- cooperation -- excuse me, Your Honor?

THE COURT: You can add me to that list.

MR. STAMER: Understood. But there's a lot of stuff

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that you find out through the press. Something like that, actually we shouldn't be reading about. We should be hearing about it from the debtors --

THE COURT: But again --

MR. STAMER: -- the UCC should as well.

THE COURT: -- I can't solve that problem today, can I? I mean, I can give everybody a lot of lecture about cooperate, but I can't make it happen.

MR. STAMER: Your Honor, you're exactly right.

THE COURT: Everybody knows my views on exclusivity if you haven't -- you've been living on the moon.

MR. STAMER: We have, Your Honor. And I understand we filed our pleading at 5 o'clock in the morning, California time, yesterday -- it seems like a month ago -- and Your Honor hasn't had an opportunity to read it.

THE COURT: I didn't say that.

MR. STAMER: You read it quickly. You read it quickly.

Your Honor, again, in the spirit of trying to move the case forward and in connection with answering your question in your provisional ruling, we do think that you need -- for the reasons that the debtor said as well, you need to have the earliest possible bar date.

The term sheet that we filed attached to the exclusivity motion calls for -- and this is all over the press,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Your Honor -- up to a thirty billion dollar new investment, Your Honor, with up to eighteen and a half billion dollars set aside for purposes of satisfying fire claims.

Now, as part of that construct there needs to be a determination, whether consensually or by the Court, as to what the amount of the fire claims are. There needs to be some form of a metric in place because this company's not going to get out of bankruptcy --

THE COURT: No. I'm well aware of that. And I got it. Of course, I understand that.

MR. STAMER: Again, also relevant to the timing here, one of the crazy things about this Chapter 11 case like no other, except for the prior PG&E Chapter 11 case, is there is a very significant political element to it, which is hard to kind of get your head around.

What we have done, Your Honor, in our proposal, when you read it a second time, is we have made this, the investment, attractive to hopefully everyone involved, but attractive to the politicians and the people that elected them to serve in the state congress and the governor's office. It's rate neutral. The idea is to put money in, not rely on the backs of the ratepayers in order to satisfy the fire claim.

MR. KAROTKIN: Excuse me. Is Mr. Stamer arguing his exclusivity motion now?

UNIDENTIFIED SPEAKER: I think so.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: No. He's actually supporting your positions.

MR. STAMER: Exactly, Your Honor. Exactly.

THE COURT: But let's --

MR. KAROTKIN: I think he's made that clear, and he can sit down now.

THE COURT: -- let's move on.

MR. STAMER: Right. It's a little bit of a back-handed support, but a support is a support.

THE COURT: Make sure you open the door when you go out.

MR. STAMER: All right. Probably a good idea.

THE COURT: Okay. Bust seriously, Mr. Stamer, I need to hear from others about this subject.

MR. STAMER: Just, Your Honor --

THE COURT: Okay.

MR. STAMER: -- I'll echo one other thing. Actually two other things, if I could.

You've heard about the governor's wildfire package. Again, we think that should be a wakeup call for this case. Again, the need for a greater sense of urgency.

Your Honor, with respect to BrownGreer -- and I give the tort claimants a tremendous amount of credit because they have masterfully held on to the relevant information to the detriment, I think, of everyone involved.

We don't minimize their struggles with respect to the damage cause by the fire, but our view is we want to get a plan confirmed that pays fire victims. And the best way to do that is to have everyone move this process along, to have an open and transparent process.

And Your Honor, what we would like -- and we joined the discovery requests that were made by the official committee seeking the relevant information. We would echo the committee's request with respect to the BrownGreer information. Finding a way to make that available, whether it's through order to show cause by this Court or otherwise, and if we have to go through the formal discovery process, it will be time-consuming and expensive. But it shouldn't just be limited to BrownGreer. It should be an open and transparent process so we can collectively get to the bottom of the fire claims to get this company out of bankruptcy as quickly as possible.

THE COURT: Well, I'll just make the statement to you, but I'm really making it to every lawyer in the room. I don't like to get bogged down on formalities of discovery requests in a culture that makes things happen more quickly, and people exchange information. I don't like the idea of on my own deciding to issue an order to show cause about somebody produced this report. But if nothing happens, I will be receptive to that.

But somebody either needs to meet and confer and come

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

to an understanding on how this information can be exchanged, or I will act quickly on a motion for somebody to compel it. So leave it at that for now. Let's stick with what I have to decide today. And I want to know if there's anyone else who wants to be heard on the subject of either the claims bar date or the methodology. Gentlemen --

MR. STAMER: Thank you, Your Honor.

THE COURT: Yes, sir.

MR. SKIKOS: Good afternoon, I'm Steve Skikos. I was liaison in the state court proceedings, and I will have a couple comments connected -- or facts, actually, to provide Your Honor that might help you in your determination as to the bar date and the notice.

THE COURT: Just tell me, what -- liaison in some of the state court coordinated litigation?

MR. SKIKOS: Yeah. There was --

THE COURT: The fire --

MR. SKIKOS: one --

THE COURT: Okay, yeah.

MR. SKIKOS: -- state court coordinated litigation --

THE COURT: Okay.

MR. SKIKOS: -- for the North Bay fires --

THE COURT: Yeah, all right.

MR. SKIKOS: -- run by --

THE COURT: I understand that.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. SKIKOS: Okay. So it's unfortunate that the issue of BrownGreer has come up in this context because this hearing is supposed to be about notice and the bar date and the proof of claims.

THE COURT: No, but I take responsibility for putting the BrownGreer out in the paper because I kept hearing about it.

MR. SKIKOS: Right. And it has some relevance, though.

THE COURT: But I told you I'm not going to act on it today.

MR. SKIKOS: Right. But it does have some relevance.

THE COURT: Okay.

MR. SKIKOS: There's 75,000 to 100,000 people who live outside this bankruptcy who have potential claims. Over half of them are unrepresented. There are tens of thousands of people who have been displaced. And within the BrownGreer system, which exists outside of this bankruptcy, it is not in the possession, custody or control of the TCC. It is not in the possession, custody, and control of BakerHostetler, they never had access to it. It is not in the possession, custody, and control of any financial analyst. It is the work product property of sixty law firms who got together when, after the Camp Fire happened and before the bankruptcy, and said, we have to do something because we are going to fall behind. And the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

tort claimants are so far behind in this case and this race to the bar date, with the insurance companies and with the UCC, that they need some way to try to catch up.

And so what we did with BrownGreer is we said to the sixty law firms, continue what you did in the state court. The state court -- BrownGreer exists as part of the state court orders --

THE COURT: Um-hum.

MR. SKIKOS: -- a set of integrated orders within the state court system which I will take two minutes to describe in a minute. But it's important for your ultimate decision here.

What we did is we said to the insurance companies and to PG&E and to the public entities, let's use what we did, what we accomplished in the state court here in this bankruptcy.

And I came to this Court on January 31st and I said, we should try this. Because we have to take 75 to 100,000 people out of being way behind the curve in this case and give them a chance to work up their claims safely and put their work product in with their damage categories without being attacked.

So what BrownGreer is, as it exists today, it exists completely outside of this bankruptcy. It is information created to help create a proof of claim form. We spent five months on a two-page document. I went to PG&E and to everybody else at the start and said, guys, we did the notice of adoption and short-form complaint and it's the same document, basically.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 175 of 233

                    Why can't we use the same systems we used in the state court case?

MR. SKIKOS: Now, Your Honor nailed it today when you analyzed the proof of claim. We have gone through this proof of claim form and you have to understand, sir, a couple of things about it. There are going to be a thousand questions. There's going to be immense confusion with this proof of claim form. The amount of time we have done just testing it, is unbelievable. And what's going to happen in the real world is that these people are going to get this proof of claim form and they're going to have tens of thousands of questions. What BrownGreer exists for is to run -- is to take the proof of claim form that the Court ultimately orders and allow the firms to put their data in, merge it, and run test plans within the work product.

THE COURT: But I'm losing something here because the claim form asks for a name, a date, nature of the damage -- I mean, the harm, you know, home, house, personal injury, and an estimate of claim. Period.

MR. SKIKOS: Loss -- loss of use, where did the use occur?

THE COURT: Right.

MR. SKIKOS: What is the damage?

THE COURT: Right. But I mean, is that -- I realize, that might be more than some unsophisticated people are

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

comfortable trying to assemble but it's not a lot of information.

MR. SKIKOS: We've done a good job.

THE COURT: Yeah.

MR. SKIKOS: Mainly us.

THE COURT: I'm not sure of the point you're making. You might've had a legitimate complaint about the form that the debtor wanted but that's iffy. You're not unhappy with the form that's in place now, right?

MR. SKIKOS: There's still going to be -- my point about BrownGreer is this. There's still going to be thousands of questions.

THE COURT: Okay.

MR. SKIKOS: Family versus individual.

THE COURT: Got it.

MR. SKIKOS: And what we are trying to do, BrownGreer exists for one reason at the start which is to allow firms to safely put the data in to run test proof of claims so that they can put together their families, their information related to that. That's just work product. BrownGreer exists because there're damage categories that people were doing under the state court system. Those damage categories are work product. BrownGreer exists to keep the medical information and the insurance information for an individual law firm to work within the system to put up work product so that we can do this in a

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

systematic way. And what we did is we went from 3,000 cases that were in within the JCCP, to 23,000 people outside of this bankruptcy.

And here's the most important part. I went to the debtor and to the insurance companies and to the public entities and said, we have protections in the state court system if we're going to use BrownGreer. We have case management orders that say it's work product. We have case management orders that say that the damages discovery will not be done against this. We have case management orders that deal with a bunch of different factors relating to this product. I said why aren't we using this in this case? Because everybody wants to speed this up. We could -- we would be at 35,000 cases right now. We would be at damage categories that would make sense. We would have an estimation worth that's moving forward.

Instead what we've done is we've taken five months to do a two-page form. And here's the problem we have, the sixty law firms are -- who are putting work product in there, they're not going to agree to turn over their work product to PG&E. They don't have any obligation to do that. But what we can do, is we could come up with a case-specific system in this bankruptcy that will speed this process dramatically. How do I know that? Because we did it in the state court case. We did the exact same thing.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

And here's the issues for your notice and for your bar date. We know from our work in the state court cases, unraveling 3,000 mixed cases and putting them into 2,000 cases, that it took about thirteen months for people to get together to start being able to recover from these fires. We know -- so that -- if you do the thirteen months, it's basically Thanksgiving.

We know from the state court case that with respect to the notice program, there is so much -- it's not the number of times. That's irrelevant. It's the substantive information that is missing for these people. These people have been told for a year by PG&E in ads that their fires were caused by climate change exclusively. These people have never been told that the insurance companies are making claims on their cases. These people have no idea what's going on with respect to the issues within the bankruptcy and that's why there's 75,000 people who are not in this court. And what we need to do -- my proposal is this. A Thanksgiving party, a notice program that allows for substantive facts to be presented. Because I don't have any opinion.

THE COURT: I don't know what you mean. What are you saying?

MR. SKIKOS: Substantive facts meaning there are certain facts, misinterpretations that exist out there. I'm not an expert in notice. I'm not going to even talk about

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

procedure. But there are misunderstandings out there that people are saying, I don't have a claim, because PG&E went bankrupt. I don't have a claim, even though my insurance company made a claim on my case. And they didn't know that.

MR. KAROTKIN: Your Honor, is this more testimony now?

MR. SKIKOS: This is just facts.

MR. KAROTKIN: Mr. Skikos didn't even file the responsive pleading and now he's testifying?

THE COURT: I know. I'm trying to figure out what to make of this.

Finish your point and tell me what your proposed action item is here.

MR. SKIKOS: Here are my proposed action items.

THE COURT: Because I still, like I said over and over again, I got two decisions to make.

MR. SKIKOS: Right. All I want is for the BrownGreer discussion to be one of an informed discussion for this Court to consider.

THE COURT: And I already said three times, I'm not going to act on it today.

MR. SKIKOS: Okay. And --

THE COURT: BrownGreer surfaced in the bankruptcy court yesterday because I put it into an order saying, somebody ought to tell me about it. You've told me some information about it. I'm not going to issue an order for you to produce

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

it. If somebody makes a motion to order it, I'll hear the arguments. But let me, Mr. Skikos, did I get it right?

MR. SKIKOS: Close enough.

THE COURT: Skikos. Bar date and procedure. Tell me what you recommend?

MR. SKIKOS: Bar date, based upon our experience in the North Bay cases, it takes about thirteen months for people to get moving again. I would propose November.

THE COURT: November what?

MR. SKIKOS: November -- Thanksgiving. Sorry.

THE COURT: Well, November what?

MR. SKIKOS: 28th.

THE COURT: November 28th. Okay. That is actually Thanksgiving. We don't really want the claims --

MR. SKIKOS: Notre Dame/USC game.

THE COURT: -- to be filed on Thanksgiving day. Huh?

MR. SKIKOS: The Notre Dame/USC game.

THE COURT: You had to say that, didn't you?

MR. SKIKOS: Yeah.

THE COURT: Okay. But you don't really want me to put a claims deadline of Thanksgiving?

MR. SKIKOS: No. But I mean around that day. That will give people -- what Ms. Cabraser said is accurate. There is going to be some holiday discussions and the holiday discussions have nothing to do with the number of times they've

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

seen it. The holiday discussions are going to be, oh my God, I didn't know my insurance companies were filing claims on my case, oh my God, I didn't know X, Y, and Z, that this wasn't climate change exclusively. So that's what the holiday discussions are about. So --

THE COURT: But if you get in the mail from somebody that says, I'm in bankruptcy and if you'd like to file a claim, you can file a claim. Do you have to get into a debate about climate change or what your insurance company did?

MR. SKIKOS: Yeah, because people -- these are not litigious people --

THE COURT: I know that.

MR. SKIKOS: -- these people just want to know --

THE COURT: I understand that. But if you get a form that says, if you sign this form and send it back, you're going to be in the system with a claim on file. I mean, that's -- that seems simple. Whether it's --

MR. SKIKOS: It seems simple but the unfortunate facts of this circumstance which I've been living since the fire, I'm from Santa Rosa --

THE COURT: Okay.

MR. SKIKOS: -- is that the people have been -- don't have sufficient information to make an informed decision.

THE COURT: I guess what I'm debating, and Mr. Karotkin is going to complain that you're testifying and you're

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

acting as an expert, is what information does a person need to know to file a proof of claim? You're saying, well, I need to know whether I can even assert a claim. Okay. I can't change that, and TV ads or serious radio isn't going to tell me that. It's going to tell me, if you have a claim, file it by a certain date. So you're arguing for November 28th, I've got October 21, November 8th, November 28th, and April -- I mean, January 31st. But what about the procedure? What about the notice procedure? Are you --

MR. SKIKOS: I can't --

THE COURT: Do you have a position one way or the other on that?

MR. SKIKOS: I have no understanding of notice procedures.

THE COURT: Okay.

MR. SKIKOS: Just bar date.

THE COURT: So focusing on -- so let's leave it at that. You're not taking a position on which procedure. You made an argument as to why I should move the date roughly one month down the road, despite the arguments of two other counsel representing different interests. And your view is that by putting another month in there, something will facilitate or make life a little more bearable for some of the victims to assert a claim.

MR. SKIKOS: A significant percentage --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: It's hard to know the difference between October 21 and November 28 but it's five weeks. So --

MR. SKIKOS: Well, it's because we're going to get through fire season. And there's two other points. The social media aspect that Ms. Cabraser talked about is incredibly important in this particular context. The -- I'm just telling you from a factual standpoint, dealing with -- as liaison in dealing with sixty law firms in the North Bay cases, that there is a significant movement, a change in the people after about thirteen months.

THE COURT: Okay. I'll accept that. But I also have to assume that those sixty law firms have at least sixty clients and probably a lot more than sixty, and they are responsible members of the bar and they will pass on the word to their clients, you've got to file a claim because the bankruptcy court has said you have to. And you know, word of mouth is important and victims know about the fate of other victims. So again, I will make a decision on a date and I think leave it at that.

MR. SKIKOS: I, 100 percent agree with you on everything you just said.

THE COURT: Okay.

MR. SKIKOS: The only caveat I would say is this. Over fifty percent of the people are unrepresented.

THE COURT: No, I got -- I understand that.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. SKIKOS: So anyway. Thank you, Your Honor.

THE COURT: Anyone else want to be heard before I -- Mr. Karotkin make closing argument? Any more opposition to this?

Yes. You were here before.

MR. GOODMAN: Thank you.

THE COURT: Go ahead.

MR. GOODMAN: Again, I just wanted to clarify --

THE COURT: Mr. Goodman.

MR. GOODMAN: -- something. Because I know that, you know, coming down the road, this issue of data and documents information, it's not here today and I appreciate the Court making that clear, but it is coming. You know, the TCC does not have possession, custody, or control of the BrownGreer database. I don't have access to it. Baker & Hostetler doesn't have access to it. The TCC's financial advisors don't have access to it.

THE COURT: Okay. But the bankruptcy lawyers can at least inform people like Mr. Sacos (phonetic) and others who aren't familiar with bankruptcy what the strengths and weaknesses are, and if work product says information cannot be obtained, it can't be. If Rule 2004 and the more generous discovery procedures of the bankruptcy law,do allow that information, then I suggest that somebody ought to get on with making it available. That's all. And we'll treat it

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

confidentially, and it's not going to go on the internet. It's going to be done -- something's going to be done with it properly. But that, again, I promise it's not an action item today.

MR. GOODMAN: And thank you for that clarification again. I appreciate that. But I also wanted to make this point as well is that the TCC does not have access to the debtors' database. BakerHostetler does not have access to the debtors' database. Our financial advisors don't have access.

THE COURT: But for what?

MR. GOODMAN: Well, I'm just saying to the extent that we end up in a situation involving BrownGreer it's also going to involve PG&E's data.

THE COURT: Well, it's a 2004, and before we get to 2004, it's the same judge who insists on lawyers, responsible lawyers being cooperative, and if not, we'll do it the hard way. That's all. What's the point?

MR. GOODMAN: Thank you, Your Honor.

THE COURT: Okay. Mr. Karotkin, you've got the closing argument here.

MR. KAROTKIN: I'll be very brief.

THE COURT: You don't have to be. No one else has been.

MR. KAROTKIN: That's why I'll be very brief. First of all, I got up a number of times because no evidence has been

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

put in in any --

THE COURT: And no findings have been made, either.

MR. KAROTKIN: All right. But to in any way question the notice program that we have proposed, no evidence. It's all colloquy. It's all hearsay. Nothing has been presented to you to question --

THE COURT: Well, but you know what, I'm going to interrupt you by saying this. I know and respect experienced lawyers, and they don't make a habit -- and you're one of them -- don't make a habit of making stuff up. So when respected members of the bar like your opponents make a statement, I take them as officers of the court trying to persuade me to reach an outcome. And you shouldn't take offense at it any more than I take offense at argument you make.

So they can make their argument. I'm not going to make a finding that something needs to be something. This is a discretionary call, as you know, and I have the very, very persuasive argument you presented. I have to decide whether to tweak it or reject it or something. That's all.

MR. KAROTKIN: Okay, but Your Honor --

THE COURT: Okay.

MR. KAROTKIN: -- what I'm saying is nothing was presented to you to give you a basis to tweak it. Nothing.

THE COURT: Well, certainly the opinions of a couple

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

of experienced lawyers.

MR. KAROTKIN: And let's go to Ms. Cabraser's opinion.

THE COURT: Okay.

MR. KAROTKIN: When you asked her what is the frequency in class action cases, you specifically asked her that question; she didn't answer that question. But our expert did answer that question. And she, in her affidavit, said it's a lot -- significantly less than the frequency we have here.

In addition, our expert, and she'll get on the stand and tell you right now, that what you said was exactly right. After ten times or fifteen times or twenty times -- and it's in her declaration -- there are diminishing returns. That's the situation. So just adding a hit of fifty-eight times is a waste of money. It actually is counterproductive. And if you want to hear testimony on that --

THE COURT: I don't.

MR. KAROTKIN: -- we have testimony on that.

THE COURT: It's in the record, and I've reviewed it.

MR. KAROTKIN: So as I'm saying -- what I'm saying, there is no basis to second-guess what we're proposing.

As to the October 21st date, again, we think it's more than adequate. No one has come up with any logical reason why it should be extended, particularly under the circumstances here where the proof of claim form has been modified to make it extremely simple. In the Takata case, a mass tort case, I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

believe that Mr. Leblanc referred to it, that notice was eighty days. There is an eighty-day bar date notice in a mass tort case for eighty-nine million people who got notice.

THE COURT: Yeah, I think people get a recall notice because their air bag might blow up are a little different from people whose house did blow up. So I mean it's different.

MR. KAROTKIN: But that was personal injuries, as well.

THE COURT: Well, a few. A very few.

MR. KAROTKIN: All right.

THE COURT: Most of the Takata airbags were recalled for people like my wife who got a notice saying I've got to take this damn thing in to get it fixed. And she had to stand in line to get it fixed and got it fixed. But, fortunately, it didn't blow up and --

MR. KAROTKIN: Fortunately.

THE COURT: -- kill her in the meantime.

MR. KAROTKIN: Yes.

THE COURT: Okay.

MR. KAROTKIN: But again, Your Honor, we're talking ninety, ninety-five days for people, actual notice. The notice will go out quickly. It's more than adequate and it's important -- as you said, bankruptcy should be leading this, not dragging this case to conclusion.

I'll make a couple of remarks about Mr. Stamer. I'm

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 189 of 233

not going to argue the exclusivity motion here today. Suffice it to say we will formally respond at the appropriate time and demonstrate why that motion should not be granted.

Talk about transparency and notice and cooperation, Mr. Stamer called me two minutes before his motion was filed. So if that demonstrates cooperation and transparency, well so be it.

And I will note that in their plan, he complains about nothing being resolved. Nothing is resolved in their plan. They have no deal with --

THE COURT: We're not arguing the --

MR. KAROTKIN: -- the fire claimants.

THE COURT: We're not arguing the exclusivity motion.

MR. KAROTKIN: I understand, but I think it's important to make sure the record is clear. And the only settlement in their so-called plan is the settlement we reached with the public entities, so let's leave it at that.

So Your Honor, we would ask that you approve the October 21st bar date and our noticing plan so that we can move these cases forward.

THE COURT: Mr. Goodman, we talked about, and I said in my order of yesterday, that I was going to decide whether to go with the debtors' plan or whether the TCC alternative should be chosen now or deferred. I mean, is this what I'm -- your view that I'm supposed to now make a choice between one or the

eScribers (973) 406-2250 operations@escribers.net | www.escribers.net

other and that's it?

I mean, there's still some of these failings or weaknesses that the debtor pointed out about the Angeion plan and Ms. Cabraser made some arguments, largely in favor of it, but don't you think that my only choice today is to approve the debtors' plan or disapprove it, because there isn't in the form of evidence and opportunity for the debtor to vet a comparative of Angeion as the other choice today. You agree or disagree?

MR. GOODMAN: I would say this. I think my understanding is that if the Court determines that there are factual disputes on these issues, it could schedule an evidentiary hearing --

THE COURT: Well, we'd never get this done. You'd have -- your motion will be granted by lethargy.

MR. GOODMAN: And given that response, obviously, I think we need to get this done today. I think on that point I would come back with this. The debtors, from when they first filed their plan to when they filed their reply brief seven days ago, to what they handed to you this morning and to us this morning for the first time, they've obviously made significant movements --

THE COURT: Right.

MR. GOODMAN: -- in response to what was filed by Angeion.

THE COURT: So the system works in that regard.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. GOODMAN: So that was positive news on the day. Obviously, I think that the critical issue for us right now is the bar date in terms of what that date ultimately ends up being. And that, in my view, Your Honor, that's not a -- one statute that I notice isn't cited in anyone's papers is Section 363(b). Right. We're not here on the debtors' business judgment. We're here on what is appropriate under the circumstances.

THE COURT: No, this is discretion to me, I'm sure.

MR. GOODMAN: Correct.

THE COURT: So I've got the Notre Dame game. What's the day of the presidential election? Oh, that's November 5th, I believe. Somebody else suggested November 8.

MR. GOODMAN: 2020, Your Honor.

THE COURT: Presidential election day, hm.

MR. GOODMAN: That's 2020, Your Honor.

THE COURT: Oh, yeah, that's right. 2020. Wishful thinking. I didn't say that. They'll call for my impeachment, but I can't even be impeached.

MR. GOODMAN: We have a range, obviously, before the Court, right. A number or a date in December I think would be very meaningful for the victims of the Camp Fire. Not in terms of the time that that would provide, but I also do believe Ms. Cabraser, and I take her at her word, that there are meaningful changes in terms of activity in the holiday season. If we

could get a date in December, if it's December 1st which is after Thanksgiving, just after Thanksgiving, or December 31st, so that you take the advantage of the December holiday season, I really do believe that that would make a meaningful difference in this case and could result in not just one or two, but potentially several thousand fire victims being able to file claims in this case and participate and be in a point where they can get a distribution.

And it's very critical, Your Honor, that we have the sufficient time to implement the notice procedures because if we do it right now, if we get -- if we allow sufficient time and we do a robust notice plan, what that means is on the backend of this case you have fewer issues where people show up and say I didn't know; I didn't hear notice.

THE COURT: No, I know.

MR. GOODMAN: We're just trying to avoid that. And we think if we do it right on the frontend we're maximizing the likelihood that that's not going to happen. I really appreciate the time and effort the Court has put into --

THE COURT: Well, I appreciate --

MR. GOODMAN: -- these issues.

THE COURT: -- all of your efforts, too. We can joke about things, but this is not a joking matter. It's serious business. Okay.

Let me just take one second to get my thought

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

together, but Mr. Karotkin, I wonder whether, given the time we've put in on this, whether we ought to defer this whole protective order issue to another day. Do you really want me to try to deal with that today? I mean, I won't take a break here until I tell you what my decision is on these two critical issues, but the question is we've been going -- it's twenty to 2 and people might want to have some food and take a break. And I'll resume if we think it's productive on the protective order, or we can do it either -- and we don't have to put it over to the next hearing. We can have a phone conference or something else. What do you recommend and the committee?

MR. KAROTKIN: Mr. Slack, can answer your question.

THE COURT: Yeah, what do you --

MR. SLACK: Your Honor, we're okay -- it's been a long day -- putting it off. We wouldn't want to put it off very long, and I would suggest doing it in person given the number of interested parties.

And the other thing I can say, Your Honor, is we've made a lot of progress --

THE COURT: Right.

MR. SLACK: -- in narrowing the issues. So hopefully we can make that presentation to you with even further narrowed issues.

THE COURT: Well, Mr. Goodman, are you in charge of this, too? You're pointing to your partner.

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 194 of 233

MR. GOODMAN: No, I'm not, Your Honor. That would be my partner Mr. Lars Fuller, who's --

THE COURT: So Mr. Fuller, do you agree to the changes that the debtors agreed to about this joint statement? I mean, if you are, then we can solve this problem.

MR. FULLER: Your Honor, the TCC and the debtors are aligned, I think, with respect to the issues that we were disputing. There's a number of other parties that have weighed in, and so separately, because we have two competing --

THE COURT: Yeah.

MR. FULLER: -- motions again --

THE COURT: Right.

MR. FULLER: -- the TCC has communicated with the NextEra objectors. It is not opposed to their proposed language. I don't think we're in alignment with PG&E in that respect. We've also communicated with the state agencies and the federal, the USA.

THE COURT: Right.

MR. FULLER: We're not opposed to their modifications. I think we are aligned with PG&E on those modifications. We almost need a Venn diagram at this point. But at least with respect to the disagreements that we were having, I think we're aligned.

THE COURT: Okay. Yes, sir, let me hear from you. And I promise I want to get this hearing over and resume it or

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

reschedule it, but --

MR. ESSER: Your Honor, good afternoon. Mike Esser, Kirkland & Ellis on behalf of Calpine Corporation. We were one of the objectors to the protective order, and we do have outstanding objections that are not yet as resolved. So we would actually welcome the opportunity to continue to engage with the debtors regarding those objections --

THE COURT: Okay, Mr. Esser.

MR. ESSER: -- and would encourage --

THE COURT: Anyone else? Is there anyone else who thinks I really need to do this today? Because I have a suggestion on how perhaps we can make some progress. And there is a gentleman in the other room, too. So let me take the gentleman at the podium, and then I'll go to the courtroom.

MR. FOREMAN: Daniel Foreman, Willkie Farr, on behalf of the ad hoc group of subrogation claimants. We also still have an outstanding objection and echo what was just said. We'll welcome the opportunity to continue to discuss it with the debtors.

THE COURT: Okay. In the courtroom? Who's there, please? Can you hear me in the other courtroom?

MR. DEGONCALVES: Yes, Your Honor.

THE COURT: Okay. What do you want -- sorry, your name, sir?

MR. DEGONCALVES: My name is Dario deGoncalves

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co. (phonetic).

THE COURT: Oh, yes, sir, I recognize you now that I see you on the side. What do you want to say about the protective order?

MR. DEGONCALVES: Well, I did file an objection, limited objection, and nobody's contacted us to discuss it, and nobody contacted us prior to filing either of the motions, and we're open to discussion.

THE COURT: Okay. Here's what I propose. What I'd like to do is have Mr. Fuller and Mr. Slack, or whoever's going to do it for the debtor, if you two have agreed, circulate a form of agreed protective order that you think will work, and send it and file it or upload it for me. And I will look and see -- well, what I may do is schedule another hearing. I can't really schedule it today or tomorrow, but if necessary, I probably could do it next week, if necessary. But I don't know that it has to be done that quickly. Or we could have a phone conference. And I am more encouraged that you gentlemen will work it out. Right? Okay?

MR. FULLER: Yes, Your Honor. And I think we largely have. I think our only concern is speed and urgency in this context. In particular, we have outstanding discovery, and the protective order is impacting disclosures and --

THE COURT: Well, no, it's important, but it's one of those things where it's a protective order, but it's not --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

what are we protecting at this point? It's going to be much different when there's a motion to reject or a motion to assume or a motion to do this or motion to do that. I understand, and I appreciate the hard work in trying to get together, and I like some of the progress we made.

Again, it's like everything else: I cannot keep up with -- my two law clerks and me and my courtroom staff, we just simply can't keep up with this, the papers coming in constantly. So I have to pick my priorities and, obviously, today's was the higher priority, and I just couldn't know what the outcome was on the protective order yet anyway except that you're about to resolve it, hopefully.

So what I get, therefore, and if the OCC has agreed with the form of order, then give me an order that the three principal players have agreed to, and I will set a further hearing if necessary. I might roll it over to the next regular calendar, but I don't want people who are left out or people like the PPAs. Everybody needs to be in the game. But if there's no particular discovery relevant at the moment, then there's no urgency in my mind about resolving the protective order. That's why the two committees and the debtor are the principal players. Which is another way of saying to all of you who are representing other parties, this won't be in concrete. We can adjust it and make different arrangements as appropriate for the needs of any particular constituent. Okay?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation; Pacific Gas and Electric Co.

All right. Mr. Pascuzzi, back for more?

MR. PASCUZZI: I just want to make sure we're going to have a chance to at least look at whatever order they do and respond to it because there's one issue we still have outstanding.

THE COURT: No, they are.

MR. PASCUZZI: Okay.

THE COURT: So I'll repeat it again. What I want TCC, OCC, and debtor is -- their counsel seem to be in agreement -- that they submit and go ahead and file it as tentative or proposed, whatever you want to call it, protective order and I won't act on it. It'll go out electronically and, therefore, whether it be Mr. D'Ghataldi (sic) or you, Mr. Pascuzzi, or any other counsel, I will figure out a way, and it might very well be I'll put it on the agenda for our next calendar, which I think is July 9th, isn't it? So July 9th we're due, and the only question that I have to decide is whether there's a reason to try to solve it before then. And I don't really think there is, but if there is we'll try to make it work, okay?

MR. PASCUZZI: Thank you, Your Honor.

THE COURT: One more person want to be heard?

MR. GORTON: Good afternoon, Your Honor. Mark Gorton of Boutin Jones.

THE COURT: Oh, Mr. Gorton, again. Good to see you again.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. GORTON: Appreciate that. We filed objections on behalf of the Sonoma Clean Power, the Redwood Coast Energy Authority, Pioneer Community Energy, and Valley Clean Energy. They joined our objection. In addition, the objection was joined on behalf of Northern California Power Agency and the City of San Francisco, Clean Power of San Francisco, Monterey Bay Community Power Authority, and the City of San Jose. So we would also like to have an opportunity to engage in that. We are having conversations. We have no objection to a continuance to the 9th of July. We agree with Your Honor: the issue isn't really ripe, if you will, in so far as there's no discovery --

THE COURT: Well, Mr. Gorton, again, thank you for coming up. I'll tweak it this way. In the next few days, I'm going to see from the principal players, the three constituents, what they three, those three have agreed on. I will anticipate for you or anyone else who still thinks there's a problem, I'll invite it to be up for further discussion on the 9th of July when we have a regular calendar.

MR. GORTON: Very good.

THE COURT: And there's nothing I can do about the fact that we've all, all of you have put in so many hours today for what seemed to be a simple question; obviously, it's not a simple question. It's very important, and I'm glad we took the time to do it.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

MR. GORTON: Thank you, Your Honor.

THE COURT: All right.

MR. LEBLANC: Andrew Leblanc on behalf of the committee. Just one proposed tweak to what Your Honor just said. As between the TCC, the official committee, and the debtor, we've agreed on the form that the debtor's prepared to submit. We would like it entered, though, because there is -- as between us, there is exchange of information going on currently that is governed by just --

THE COURT: Okay. Well, let's make it -- maybe on its face to say this is just as to these two parties for these purposes.

MR. LEBLANC: That's exactly what I would suggest, Your Honor. And then we're more than happy to try to work in whatever -- because the effort was to make this a universal protective order. We can do that between now and the 9th and then take up those issues on the 9th. But I think for our purposes, it's important to get it entered as soon as possible.

THE COURT: I think we should have a quiz for everybody. Ms. Finegan has really impressed me today, and I think what we'll do is we'll do for all the lawyers who are fighting about protective orders, we're going to have a Facebook page and Instagram, and we're going to stream online. And so you're going to be polled on your iPhone and your Apple watches on how you vote on the things. And I will be watching

the Notre Dame game at the same time. All right.

MR. LEBLANC: Thank you, Your Honor.

THE COURT: I appreciate the fervor and the energy and the activities of both committees and all the experts that came and helped me today. And this is not a science, and I appreciate from the Finegan declaration and the other declarations on both sides that there's more to the science of what those professionals do than I had any exposure to.

But this comes down to just going with what feels right. My instincts tell me that whereas many of the arguments that Ms. Cabraser and others talked about in terms of the emotions and the trauma and so on, I am not unsympathetic, but I simply don't believe that, given the circumstances, it would be appropriate for me to start to second-guess these things. And so if I were just going to use a crystal ball and go with what felt right I might pick a different date, but I can't do that. I have to stick with the debtors' proposal here and hope for the best.

And obviously, if there's some reason, as much as I hope this won't happen, to revisit it as we approach October 21st, if for some reason there's a need to extend that out, I guess I'll deal with it at that time. But for now the proposal that the debtor has supplemented frequently, including today, will be approved, and the deadline and the claims bar date of October 21st will be what I'll order.

Again, this is not -- this is my discretionary call based upon the factors. It is not a call that is a disapproval of Angeion or criticism of Angeion or TCC lawyers. It's going with something that works and is likely, in my mind -- and Ms. Cabraser may have a slightly different view -- it's faithful to what the Supreme Court in Mullane and everywhere else has told us. And if I knew it were precise and I knew that we could bring one more claimant into the field of those who are going to get the benefit and have lost property or homes or loved ones but for the deadline, I would change the deadline. But there's no way that I can do that.

So I will stick with the debtors' judgment on this one and approve the October 21 bar date, provided that the debtor then acts consistently with what Mr. Karotkin said about the timing.

So I'm looking at the piece of paper that I set aside somewhere, his timeline that talks about when the notices will be going out. And I believe his -- I set it aside, but it's July 15th seems to be the day that things start to go. And if for some reason the system breaks down or Prime can't make it happen and that date has to get changed, I might have to revisit this.

So the admonition here is to get moving on that schedule so that the methodology, what the experts call the frequency and the -- what's the other word --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

UNIDENTIFIED SPEAKER: The reach, Your Honor.

THE COURT: The reach, that's right. The reach. I used to think that was a sailing term, but the reach and the frequency get going and the many, many victims get the due process for them.

So thank you all for your time. Court will stand adjourned.

(Whereupon these proceedings were concluded at 1:53 PM)

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

C E R T I F I C A T I O N

I, Jennifer Hamilton, certify that the foregoing transcript is a true and accurate record of the proceedings.

Jennifer Hamilton

______________________________________

/s/ JENNIFER HAMILTON

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date: June 27, 2019

## A

**A-1 (3)**
53:14,20,24
**abilities (1)**
17:8
**ability (7)**
17:7,10;38:23;72:13;111:8;117:25;141:20
**able (9)**
106:8;113:16;127:19;135:6;136:9;148:10;158:10;179:5;193:6
**above (2)**
16:24;17:23
**absent (1)**
132:13
**absolutely (5)**
9:20;20:9;99:9;100:5;153:1
**abundantly (2)**
27:25;94:8
**abuse (1)**
122:13
**accept (6)**
45:3;62:7;66:12;93:25;94:17;184:11
**acceptable (2)**
64:2;125:13
**accepted (2)**
62:3;161:19
**access (13)**
155:1;156:1,8;160:24;161:1;163:14;174:21;185:15,16,17;186:7,8,9
**accident (3)**
78:17;147:3,4
**accommodate (2)**
61:6;94:22
**accommodated (2)**
42:11;46:6
**accomplished (1)**
175:14
**according (1)**
59:2
**accordingly (1)**
76:3
**account (3)**
25:14;85:1;109:2
**accurate (1)**
181:23
**accuse (1)**
161:4
**achieve (2)**
19:3,4
**acknowledge (1)**
43:9
**across (3)**
65:18,20;147:2
**act (12)**
100:19;140:8;152:21;160:15,15;161:17;163:6;164:2;173:2;174:10;180:20;199:12
**acting (1)**
183:1
**action (16)**
19:14,19,24,25;34:13,20;133:23;144:16,17;145:3,10;167:17;180:12,13;186:3;188:5
**actions (4)**
34:23;133:18,18;134:1
**activation (1)**
152:12
**active (1)**
50:21
**activities (2)**
8:1;202:4
**activity (1)**
192:25
**acts (2)**
117:23;203:14
**actual (9)**
37:9;38:13;45:7;53:16;78:22;89:11,21;148:24;189:21
**actually (27)**
12:19;57:5,20;61:8;81:4;82:20;91:5;105:1;108:3,5;116:17;123:17;124:8;131:24;132:3;135:12;146:13;151:24;164:23;167:18;169:2;171:1,17;173:11;181:13;188:14;196:6
**acute (1)**
146:9
**ad (4)**
72:11;165:22;166:2;196:16
**adamant (4)**
12:9;54:5;77:14;116:13
**add (6)**
14:2;17:1;42:1,22;168:22,24
**added (12)**
14:23;15:19,23;17:2;18:2;42:8;43:16;75:7;90:17;135:19;137:8,8
**adding (8)**
33:15;74:11;77:12,12;79:16;89:10,24;188:13
**addition (5)**
13:16;14:22;70:2;188:9;200:4
**additional (11)**
11:16;12:24,25;13:16;14:9,22;15:24;18:2,5,5;74:18
**address (27)**
7:3;9:15;11:8;14:7;21:14;42:9;44:17;48:25;50:10;51:16,17,19,21,24;52:9;67:19;91:2;99:19;100:17;109:21;113:19;114:8;116:13;121:15;136:24,25;164:19
**addressed (5)**
77:16;81:15;91:24;101:8;107:11
**addresses (5)**
17:9,24;23:19;51:18;137:18
**addressing (2)**
101:6;117:13
**adequacy (1)**
9:24
**adequate (7)**
25:16;125:16;158:5;160:6,11;188:22;189:22
**adjourned (1)**
204:7
**adjust (1)**
198:24
**administration (1)**
11:19
**administrator (1)**
149:11
**admonition (1)**
203:23
**adopted (2)**
92:11;131:22
**adoption (1)**
175:24
**ads (4)**
17:3,11;179:12;183:4
**adults (4)**
15:3;18:17,22;135:21
**advance (1)**
7:17
**advanced (1)**
145:15
**advantage (4)**
123:18;141:22;146:16;193:3
**adversary (2)**
34:21;36:8
**advertising (1)**
132:2
**advice (1)**
103:10
**advised (1)**
162:14
**advisors (3)**
49:11;185:16;186:9
**advocate (1)**
152:23
**affected (5)**
18:13;79:25;124:1;125:12;162:20
**affects (1)**
80:10
**affidavit (1)**
188:7
**affording (1)**
25:10
**afraid (1)**
10:11
**afternoon (5)**
128:15;165:20;173:9;196:2;199:22
**again (131)**
8:3;9:25;10:8;11:11;13:4,16;17:1;18:1;19:12;20:18,25;24:9;25:13,25;26:14,21,23;27:1,14;28:4,22;30:19;31:5,20;32:10,22;33:1,16;35:7,9;36:7,22,25;39:2,17,21;40:7;45:3,6,7;46:3;47:21;48:4,17;49:8;52:21;53:1,5;55:23;59:18;61:10,15,24;63:21;66:15,22;67:6;68:23;69:5,10;70:18;72:7;75:21;79:14;85:12;86:16;90:16,17;95:7;97:13;98:14;99:10,14;105:24;106:1;111:2,19;112:23;117:3,11;118:20;119:11,13,17;121:17,17;123:21;124:3,24;125:3,25;127:8,9,18;128:6;131:19;132:4;133:16;141:5;143:25,25;148:1,5;149:22;154:5;163:6;164:9;167:6;168:4,9,21;169:4,19;170:11;171:20,21;180:15;181:8;184:18;185:8;186:3,6;188:21;189:20;195:11;198:6;199:8,24,25;200:13;203:1
**against (3)**
20:18;37:4;178:10
**Agajanian (1)**
151:7
**Agajanian's (1)**
151:5
**age (2)**
18:17,23
**agencies (14)**
45:15;74:1,1;76:25;88:17,19;89:2,5,22;92:12,15;93:2,11;195:16
**agency (6)**
45:16,16,18;46:9;92:9;200:5
**agenda (2)**
104:20;199:15
**agent (5)**
32:13,13,17;35:8;159:12
**agent's (1)**
104:2
**aggregate (2)**
65:17;119:22
**ago (5)**
21:6;122:12;158:4;169:14;191:19
**agree (25)**
40:8,11,17;43:24;44:11,11;54:17;68:8,11;73:4;74:13;80:14;109:10;114:3;119:3;122:19;156:5;164:22,23;168:4;178:20;184:20;191:8;195:3;200:10
**agreed (23)**
9:25;27:14;41:20;42:18;55:14;56:18;57:2;58:21,24;60:16;62:7;72:16;143:6;154:14,23,25;195:4;197:11,12;198:13,15;200:16;201:6
**agreeing (2)**
82:8;109:9
**agreement (2)**
8:15;199:9
**Ah (1)**
132:22
**ahead (9)**
11:2,2;14:8;86:18;127:7;141:2;154:4;185:7;199:10
**air (4)**
125:23;144:19;159:14;189:5
**airbags (1)**
189:11
**Akin (1)**
165:21
**aligned (3)**
195:7,20,23
**alignment (1)**
195:15
**alive (2)**
133:23;142:6
**allow (9)**
31:15;38:23;99:17;128:7;155:2;176:13;177:17;185:23;193:11
**allowed (3)**
99:24;100:7;103:5
**allowing (1)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 206 of 233

31:15
**allows (1)**
179:19
**almost (8)**
10:10;21:4;66:13;70:24;119:12;121:1;144:1;195:21
**Aloha (1)**
128:17
**along (3)**
57:10;164:21;172:4
**alternative (7)**
21:3;29:9;65:4;114:23;138:24;155:24;190:23
**Alternatively (1)**
163:10
**although (3)**
8:20;20:3;95:1
**always (5)**
42:2;79:12;121:1,2;149:4
**amazed (1)**
20:24
**ambiguous (1)**
59:13
**amend (2)**
43:18;44:19
**among (1)**
162:23
**amount (15)**
19:17;28:5;58:22;59:1,3,3,23;60:12;65:17;67:2,11,20;170:6;171:23;176:8
**analysis (3)**
44:9;111:15;155:3
**analyst (1)**
174:22
**analyzed (1)**
176:4
**Andrew (2)**
154:5;201:3
**Angeion (18)**
18:11;21:1;130:14;131:1,21,22;132:8,10,12;133:6;139:1,3,7;191:3,8,24;203:3,3
**announcement (3)**
107:24;108:20;168:17
**announcing (1)**
129:2
**answered (2)**
37:18;39:7
**anticipate (2)**
111:13;200:17
**anticipated (1)**
79:25
**anxious (1)**
11:3
**apologize (1)**
66:16
**apparent (1)**
91:23
**apparently (1)**
12:3
**appear (1)**
128:23
**appearances (1)**
124:20
**appeared (1)**
126:2
**appearing (2)**
164:10,12
**Apple (1)**
201:24
**applicable (4)**
44:23;95:11;96:7;97:7
**apply (4)**
77:7;87:22;99:20,21
**appreciate (17)**
71:18;72:9;94:25;98:17;99:18;107:3;130:12;164:20;166:1;185:12;186:6;193:19,20;198:4;200:1;202:3,6
**apprise (2)**
121:21;141:19
**approach (5)**
9:19;14:10;22:20;54:20;202:20
**appropriate (17)**
10:2;36:2;44:15;46:24;55:25;82:20;83:6;100:20;101:8;102:7;115:14;125:24;131:8;190:2;192:7;198:25;202:14
**approval (1)**
117:24
**approve (6)**
114:18;138:23;158:19;190:18;191:5;203:13
**approved (1)**
202:24
**approximately (4)**
15:3;19:16;130:19;166:3
**April (6)**
147:6,17,18;150:9,10;183:7
**area (3)**
17:9,18;31:2
**areas (6)**
15:4,5,6;17:8;18:19;152:17
**argue (1)**
190:1
**argued (1)**
161:5
**arguing (5)**
104:1;170:23;183:6;190:11,13
**argument (17)**
45:3;64:11;79:1;92:19;100:6;105:20;132:20;139:16;140:13;159:21,22;183:19;185:3;186:20;187:14,16,19
**arguments (6)**
84:23;151:21;181:2;183:20;191:4;202:10
**arise (1)**
76:21
**arises (8)**
80:23;82:10,11,15;85:11;86:23;87:3,4
**arising (1)**
84:18
**arose (5)**
42:6;79:19;80:5;81:24;82:7
**around (8)**
24:13;98:8;106:5;133:23;143:21;150:10;170:15;181:22
**arrangements (1)**
198:24
**art (3)**
143:13,15,15
**asbestos-containing (1)**
153:9
**aside (3)**
170:3;203:16,18
**aspect (3)**
119:17;153:4;184:5
**aspects (3)**
131:4;137:9;143:9
**assemble (1)**
177:1
**assert (5)**
33:21;148:10,24;183:3,24
**asserted (1)**
35:13
**asserting (3)**
89:5;111:17;150:5
**assertions (1)**
148:25
**asserts (1)**
43:6
**assign (1)**
22:12
**assist (1)**
148:18
**assisted (1)**
22:16
**assume (9)**
22:12;23:1,4;41:5;90:8;142:8;144:2;184:12;198:2
**assumes (1)**
85:12
**assuming (2)**
22:23;26:21
**assure (3)**
17:19;33:4;47:2
**attach (5)**
48:22;63:2,8,8,10
**attached (3)**
47:22;72:22;169:24
**attaches (1)**
47:7
**attachment (2)**
47:15;72:15
**attachments (1)**
63:10
**attacked (1)**
175:19
**attention (3)**
75:16;121:16;128:19
**attics (1)**
153:9
**attorney (15)**
32:24;35:17,24,25;36:7,10;50:11,14;51:11,20,22;52:6,10,10;73:25
**attorney-client (1)**
140:16
**attorneys (4)**
50:20,22;102:12,19
**attractive (2)**
170:18,19
**audience (2)**
15:15;19:16
**audio (3)**
137:5,19;139:17
**aught (1)**
31:14
**authorities (3)**
92:14;93:1,10
**authority (7)**
35:6;44:23;91:19;109:24;163:10;200:3,7
**authorized (1)**
32:13
**available (3)**
139:3;172:10;185:25
**Avenue (1)**
78:18
**average (5)**
15:16;18:17,21,24;135:22
**avoid (4)**
69:17;106:25;107:1;193:16
**avoidance (4)**
69:19,20,21;90:24
**aware (5)**
74:25;146:11;154:19,21;170:9
**away (1)**
162:15

**B**

**back (31)**
10:8;21:8;24:9;28:8;29:9;35:7,9;36:6;37:23;38:6,19,24;40:12;41:11;65:2;68:12;72:12;74:17;75:7;78:20;105:3;124:15;125:14;145:5,11;150:13;153:21;164:4;182:15;191:17;199:1
**back- (1)**
171:8
**back-and-forth (1)**
21:19
**backend (1)**
193:13
**background (1)**
19:8
**back-handed (1)**
166:18
**backs (1)**
170:22
**bad (2)**
135:8,10
**bag (2)**
159:14;189:5
**Baker (2)**
58:13;185:15
**BakerHostetler (3)**
117:11;174:20;186:8
**balance (7)**
125:4;127:10;143:11;148:20;149:17;158:6;164:25
**balancing (1)**
152:21
**ball (2)**
126:9;202:15
**bank (1)**
166:4
**bankrupt (1)**
180:3
**bankruptcy (61)**
11:14;19:21;20:2,7;29:3;33:6;43:5;65:6;78:18;84:9;93:14;97:18;98:1;99:18,25;100:7,19;117:25;118:1;119:18;122:1;125:20;127:3,4;128:6,22,24;129:7;131:9;140:24,25;141:1,21;142:5,7,9;150:11;151:3;153:3,5;157:5,10;158:3;165:10;170:8;172:16;174:15,18,24;175:14,21;178:3,23;179:16;180:22;182:7;184:16;185:18,20,23;189:23
**bankruptcy-esque (1)**
64:7

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 207 of 233

**bar (106)**
7:8;8:22;10:2;25:22;27:22;29:5,6,11,22;30:4,7,9;50:8;53:1,2,4,5;65:3;66:14,18,21;78:16,16;82:23;97:8,9;98:1;103:18;104:23,24;105:3;107:9,16,21;109:2,23;110:18,18,20;112:1;114:9,19,24;115:3,5,20;116:6;117:13,21;118:21,25;119:5;121:2,19;123:19,25;124:3,25;125:13;127:8,18;128:20;131:6,8,14;133:18;134:1,5,24;138:12,13;139:6;141:18;149:2,17;153:7;154:14;155:4,22;156:10;157:1,24;158:18;164:20;165:11;166:6,16;167:9,11;168:3;169:23;173:5,13;174:3;175:2;179:1;181:4,6;183:16;184:14;187:11;189:2;190:19;192:3;202:24;203:13
**based (13)**
9:13;49:16;74:7;77:3;107:11,14;119:20;130:25;156:17;160:7,7;181:6;203:2
**bash (1)**
71:16
**bashing (1)**
159:18
**basically (4)**
89:25;99:17;175:25;179:6
**basis (12)**
44:10;49:10;72:14,16;111:17;112:20;119:2,22;126:8;137:20;187:24;188:20
**Bay (9)**
31:2;125:8;136:14,15,16;173:22;181:7;184:8;200:7
**bearable (1)**
183:23
**beating (1)**
66:16
**became (1)**
125:22
**become (1)**
128:7
**begin (3)**
47:20;147:3;163:11
**Beginning (3)**
27:11;39:10;155:16
**begins (1)**
157:17
**begun (1)**
120:17
**behalf (18)**
35:20;36:3;56:10;58:13;72:11;99:4;117:11;132:8,9;136:11;154:6;164:13;165:22;196:3,15;200:2,5;201:3
**behind (3)**
174:25;175:1,17
**beings (1)**
27:8
**belaboring (1)**
53:10
**believes (1)**
102:23
**bell (1)**
73:9
**belong (1)**
40:7
**below (2)**
63:4,9
**benefit (2)**
126:15;203:9
**best (13)**
22:11;33:21;85:25;112:18;123:5;134:8,8;152:24;153:13,17;164:25;172:3;202:18
**best-case (1)**
112:20
**better (15)**
12:15;35:15;48:7;74:21;80:3;83:11;135:11;143:12,14;144:14;151:5,7,8;152:9;165:12
**beyond (8)**
15:22;16:22,24;17:23;19:18,19;20:12;21:23
**Bidotti (1)**
126:2
**big (3)**
38:18;70:23;95:3
**bigger (1)**
114:17
**billion (5)**
166:3;168:18,19;170:1,2
**bit (5)**
57:13;88:20;126:6;166:18;171:8
**bizarre (2)**
119:4,6
**black (3)**
71:20,20;104:5
**bland (1)**
30:10
**blank (2)**
39:11,11
**blanket (1)**
35:19
**blood (1)**
71:19
**blow (3)**
189:5,6,15
**blue (2)**
71:20,21
**bogged (1)**
172:19
**bold (1)**
30:15
**bombarded (1)**
143:24
**bond (2)**
118:11;166:4
**bootstrap (4)**
81:19;83:5,8;86:12
**bootstrapping (2)**
83:11,15
**bore (1)**
43:11
**both (17)**
7:25;10:6;17:11,11;37:3,4,5;52:6,9;58:20;130:18;136:13;143:18,19;167:14;202:4,7
**bottom (3)**
50:8;103:6;172:15
**Boutin (1)**
199:23
**box (6)**
37:10;56:10;60:11;61:18;65:16;67:10
**boxes (4)**
59:1,6,7;105:17
**break (9)**
70:21,25;98:24;104:17,19;105:2;107:4;194:4,7
**breaks (1)**
203:20
**brief (5)**
100:11;165:23;186:21,24;191:18
**briefly (2)**
163:20,25
**bright (1)**
80:10
**bring (3)**
38:20;119:17;203:8
**brings (1)**
91:21
**broad (1)**
111:11
**broadcast (1)**
18:7
**broader (2)**
33:6;79:13
**brought (2)**
89:24;121:16
**BrownGreer (27)**
154:9;156:1;160:14;161:10,17,21;163:23;164:1;171:22;172:9,14;174:2,6,17;175:4,6,20;176:12;177:11,16,20,23;178:7;180:16,22;185:14;186:12
**brownie (1)**
54:10
**budget (1)**
130:18
**build (3)**
145:14;146:22;163:5
**building (2)**
18:3;31:1
**built (1)**
146:21
**bullet (1)**
62:4
**bunch (1)**
178:11
**burden (1)**
111:19
**burdensome (2)**
27:17,20
**burned (2)**
43:22;165:9
**business (4)**
27:3,8;192:6;193:24
**businesses (1)**
146:10
**Bust (1)**
171:13
**busy (1)**
118:16
**buy (1)**
159:22

**C**

**cable (2)**
18:7,8
**Cabraser (130)**
117:14,15;124:9;128:11,14,17;129:6,9,12,18,24;130:22,24;131:21;132:6,9,15,17,22;133:2,5,12,15,20,25;134:3,7,13,16,18,25;135:4,10,14,17;136:9,23;137:13,17;138:3,9,14,17;139:9,11,14,19,21,25;140:2,15,18,20,23,25;141:5,9,11,13;142:15,20,22;143:1,3,8,11,13,16;144:5,7,9,11,17,21,24;145:1,14,17,22,25;146:2,8,12,15,19,25;147:4,6,8,14,17,21;148:4,11,14,16,18,20;149:1,5,7,10,13,20,23;150:1,7,14,17,24;151:14,17,20;152:3,5,7,12,15;153:4,20;154:3;158:24;159:21;167:2;181:23;184:5;191:4;192:24;202:11;203:5
**Cabraser's (1)**
188:2
**CAL (2)**
75:3;76:25
**calculate (1)**
33:24
**calculated (2)**
33:15;121:20
**calculation (1)**
33:18
**calendar (3)**
198:17;199:15;200:19
**Calhoun (1)**
126:1
**CALIFORNIA (27)**
6:1;15:24;18:20,23;22:17;30:21,24;31:2;45:15,16,17;46:14;73:25;74:1,12;75:5,8;88:18;92:8,9,13,23;93:5,11;135:22;169:13;200:5
**Californians (3)**
135:23,25,25
**Call (17)**
6:3;20:8;21:25;37:9;53:15;55:14;83:15;106:14;129:22;149:2;171:20;187:18;192:18;199:11;203:1,2,24
**called (4)**
13:2;16:20;35:12;190:5
**calling (1)**
53:24
**calls (1)**
169:25
**Calpine (1)**
196:3
**came (2)**
175:15;202:4
**Camp (15)**
48:18,19;121:14;123:12,14;125:9,13,19;136:12,13;151:7;165:2,9;174:24;192:22
**campaigns (1)**
11:14
**can (122)**
7:9,22;9:17;11:20;14:13;17:18,22;26:17;28:16,21;29:17;30:1,17;31:8;32:17,21;33:3,4;36:23;42:5;43:4,11,12;48:23;51:24;52:13;53:11;55:21;57:24,24;58:5;60:9,15;66:8;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 208 of 233

67:4,8,12,21;68:9,9;70:25,25;75:18;81:6;82:1;84:6;85:25,25;89:3;94:22;96:2;97:6,22,23;100:9,17;102:2,5,5,10,15;104:18;105:18;113:19,20;115:14;120:15;130:8,17,17;131:12;132:5;135:17;136:11;137:7,11;138:25;139:23;141:6,21;143:4,22;148:23;149:8;150:21,24;153:13,17;155:14;162:19;165:8;166:6;168:14,22,24;169:6,7;171:6;172:15;173:1;177:19,25;178:21;182:8;183:3;185:18;187:16;190:19;193:8,22;194:9,10,12,18,22;195:5;196:12,21;198:24;200:21;201:16;203:11
**cancelled (1)** 118:7
**capabilities (1)** 16:22
**capital (2)** 94:12,13
**capitalized (2)** 29:4;53:1
**caption (1)** 69:24
**car (2)** 43:21;159:15
**care (12)** 31:5;39:6,7;45:20,21;60:14,23;106:12;126:23,23;128:19;130:8
**carefully (2)** 29:15;73:14
**cares (1)** 126:22
**carving (1)** 88:17
**case (75)** 12:4;19:14,20;20:3;22:11;44:10;48:13;50:21;53:16;64:2;71:6;78:15;85:17,20,22;104:5;107:18;108:5,7,12;110:3;112:2;113:4;114:10;115:3;117:22;119:14;120:21;121:24;122:11;123:11;125:16,24;126:5;127:15;128:4;129:19,20,22,24,24;133:14;134:7,22,23;145:12;147:10,12;153:3;159:7,11,13;168:5;169:20;170:12,13;171:20;175:1,17;176:2;178:7,8,10,12,24;179:8;180:4;182:3;188:25,25;189:3,24;193:5,7,13
**case-by- (1)** 44:9
**cases (32)** 11:18,19;13:1;31:20;78:24;98:5;108:7;109:7,7,15;120:24;122:13;133:9;135:2;155:12,15;156:11;157:2,23;160:8;166:5;168:10;178:1,14;179:2,3,3,14;181:7;184:8;188:5;190:20
**case-specific (1)** 178:22
**catch (2)** 99:8;175:3
**categories (4)** 175:19;177:21,22;178:14
**category (3)** 54:6;76:1;151:25
**cause (10)** 50:10;88:20;89:13;160:17;163:9,15;168:2;172:2,11,22
**caused (1)** 179:12
**cavalier (1)** 128:3
**caveat (1)** 184:23
**CCAs (2)** 91:20;92:15
**center (1)** 38:20
**centers (5)** 24:14;27:2;39:10;152:16,16
**certain (7)** 20:3;26:11;50:22;72:8;168:18;179:24;183:6
**certainly (14)** 20:16;25:18;26:10;29:17;30:17;33:3;96:3;109:9;110:21;114:3,4;126:12;129:25;187:25
**certainty (1)** 19:23
**cetera (6)** 27:24;34:21;46:11;49:21,22;50:9
**chance (3)** 124:22;175:18;199:3
**change (13)** 74:3,5;76:6;94:11;122:18,22;142:19;179:13;182:4,9;183:3;184:9;203:10
**changed (4)** 64:24;72:17;80:4;203:21
**changes (11)** 13:5;57:1,16;62:6;65:14;66:10;68:17;76:7;94:20;192:25;195:3
**changing (1)** 124:17
**Chapter (8)** 19:20;49:24;107:22;108:23;110:2;166:4;170:12,13
**charge (1)** 194:24
**charged (1)** 73:11
**chart (3)** 14:18;146:23;147:19
**charts (1)** 149:10
**check (2)** 59:1;60:11
**checked (1)** 113:23
**checking (2)** 60:10;61:17
**chemicals (1)** 147:16
**Chico (3)** 38:20;47:11;152:17
**chief (2)** 6:20,24
**choice (3)** 190:25;191:5,8
**choices (1)** 22:3
**choir (1)** 112:6
**chose (1)** 33:12
**chosen (2)** 41:13;190:24
**Christmastime (1)** 143:22
**Circuit (11)** 43:4,5,9,13,25;44:23;45:1;96:5;98:5;134:22,23
**circuits (1)** 98:7
**circulate (1)** 197:11
**circumstance (2)** 129:15;182:19
**circumstances (11)** 20:7;121:21;123:9,10;124:24;125:16,24;160:11;188:23;192:8;202:13
**cite (1)** 109:24
**cited (1)** 192:5
**cities (3)** 92:13,25;93:10
**city (3)** 22:17;200:6,7
**civil (1)** 142:10
**claim (240)** 7:8,16,25;8:18;23:18;27:15,18;28:18,20;30:11;31:11,11,12,16,16,17;32:5,8,24;33:9,10,11,15,17,20,23,23;34:13,14,19,20,23;35:19,24;36:2,3,3,16;37:3,8,9,10,22,23;38:10,12,20;39:6,14,23;40:20,21,21,22;41:5,22;42:1,5,5,7;43:4,7,10,13;44:1,9,13,19;45:1,18;46:9,11,16,18;47:7,15,22,24;48:11,11,21,23;49:4;50:3,8,14;53:4,25;55:8,10,11,18;57:1;58:18;59:2;62:5;65:4,12,15;66:24;67:2,2,20,23;68:7,8,19;69:11,11;70:15,16;72:15,21,23,24;76:18;77:8;78:12,19;79:19,25;80:2,23;81:1,16,16,18,24;82:2,2,9,22,23;83:12,15;84:25;85:3,6,14;86:23;87:3,21;89:1,1,6,8,12;92:10;95:2,3;96:6,18,22,24;97:11;99:17,22,23;100:7,13,17,19;101:1,4,6,8,14,25;102:2,5,8,10,14,15,17,22,24;103:3,7,11,14;104:2,2,3,3,6,7;105:4,14,19;107:16;109:10;111:16;114:7;115:8;116:24;123:23;124:2;125:20;128:20;130:4,4;131:16;134:11,20;141:17,20;142:5;143:22;148:10,24,25;150:9,12,12;162:4,8;164:23;165:10;170:22;175:22;176:4,5,7,10,13,17,19;180:2,3,4;182:7,8,16;183:2,3,5,24;184:15;188:24
**claimant (26)** 22:16;25:7;32:12,16,16,20;34:15;35:18,25;37:5;38:9;45:17;46:20,22;47:6;48:16;50:13;51:21;52:5;59:18,24;61:11;68:20;69:14;111:11;203:8
**claimants (41)** 8:16;11:9,24;23:6,19,25;25:8,18;32:17;36:4;37:3;50:10,13,22;58:16,22;66:1,24;68:24;72:14;100:10;107:13;112:24;113:7;114:5;117:12;128:22;130:5,8;131:5;135:11;136:13,13;153:15,15;160:20;168:14;171:23;175:1;190:12;196:16
**claimant's (1)** 33:21
**Claims (103)** 6:21;9:13;11:21;25:9;32:7;34:8;37:11;39:19;41:21,23;42:4;45:17;48:12,13;53:21;54:2,3;65:18;66:22,23;67:5;72:12;77:2,4,5,12,13,13,18,18;78:3;80:5;89:6,11;95:4;96:19;98:15,16;99:20;104:11;109:22;111:2,17,17;112:4;113:1;115:15;116:14;118:5;119:20,21;120:22;121:2;123:19;127:17;134:3,5;135:12,19;141:20;146:5,21,24;147:20,21,24;148:3,3,3;149:1,3,11,13,14;150:2,6,6;152:19;155:2,3,22;156:3;159:16;162:6,15;163:5;168:11,16,19;170:3,6;172:15;173:5;174:4,15;175:18;177:18;179:14;181:14,21;182:2;193:7;202:24
**claim's (1)** 64:20
**clamoring (1)** 124:18
**clarification (5)** 12:10;36:24;64:19;78:3;186:5
**clarified (4)** 50:24;52:20;57:12;98:2
**clarify (14)** 29:17;30:1,17;35:15;36:23;43:17;51:24;52:13,16;60:9;81:18;120:12;164:1;185:8
**clarifying (1)** 51:25
**clarity (2)** 80:21;107:2
**class (58)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 209 of 233

19:13,19,24,25; 34:13,13,13,20,21,23; 35:11,12,12,13,17,20; 36:3,7;99:17,20,23; 100:4,7,13,16,18; 101:3,6,7,13,14;102:2, 4,10,11,12,15,22,23; 103:4,5,10,14;104:2, 10;133:17,18,22,25; 134:13;144:15,17; 145:3,10;147:11,17; 153:5;188:5
**classic (1)** 85:17
**class-wide (1)** 134:14
**clean (6)** 59:5;91:19;145:10; 200:2,3,6
**clear (30)** 11:5;27:25;29:18; 44:18;46:13;52:15; 64:9;68:6;78:4,6,9; 81:17;83:17;86:12; 93:4;94:8,15;103:17; 109:18;117:4;125:25; 130:9;132:14;138:23; 160:17,25;161:20; 171:5;185:13;190:15
**clearer (1)** 98:6
**clearly (2)** 11:17;28:5
**clergy (1)** 122:13
**CLERK (20)** 6:4,25;37:21,22; 38:22;47:4,9,13,14,23, 23;73:11;107:7; 110:11;159:7,11,18,23; 160:5,7
**clerks (1)** 198:7
**client (2)** 75:4;132:7
**clients (9)** 31:24;50:23;51:15; 136:12,17;140:15; 141:24;184:13,15
**climate (3)** 179:13;182:4,9
**Close (1)** 181:3
**closed (1)** 146:10
**closing (3)** 153:22;185:3;186:20
**clutter (1)** 39:3
**Coast (1)** 200:2
**co-counsel (1)** 73:24
**code (2)** 92:21;93:15
**colleague (2)** 36:9;120:6
**colleagues (2)** 31:24;76:4
**collectively (1)** 172:15
**colloquy (1)** 187:5
**color (1)** 93:16
**combination (1)** 131:23
**combined (2)** 19:1;99:16
**comfort (1)** 63:25
**comfortable (7)** 8:7;25:19;28:8,23; 34:2;65:23;177:1
**coming (8)** 6:23;63:23;103:18; 126:13;185:11,13; 198:8;200:14
**commence (1)** 26:20
**commenced (1)** 11:18
**comment (13)** 7:14;29:1;42:15,25; 46:7;49:17,18;50:5; 68:21;88:6;96:4; 133:16;167:3
**comments (16)** 6:12;8:3;9:12;10:15; 15:13;17:3;20:18; 21:18;31:23;39:5; 53:11;70:19;74:7,7,8; 173:11
**commercials (1)** 18:7
**committee (35)** 11:9,23;12:3,3,8,21; 15:21,25;16:23;17:25; 25:21;58:16;64:13,13; 100:10;105:5,13; 106:2;117:12,17; 124:17;152:19;154:6; 155:13,13;158:17; 159:11;161:3;165:22; 166:2;167:3;172:7; 194:11;201:4,5
**committees (2)** 198:21;202:4
**committee's (5)** 17:2;109:9;154:13; 167:5;172:9
**common (2)** 7:25;8:5
**communicated (3)** 152:1;195:13,16
**communities (3)** 131:14;137:1;152:20
**community (7)** 19:2;64:12;136:12; 141:5;152:12;200:3,7
**companies (7)** 65:21;107:22;175:2, 12;178:5;179:14;182:2
**company (9)** 59:24;80:1;133:23; 135:8,9;167:24; 172:16;180:4;182:9
**company's (1)** 170:7
**comparative (1)** 191:7
**compare (1)** 93:19
**compared (2)** 143:23;148:24
**comparison (1)** 130:25
**compel (1)** 173:2
**compete (1)** 130:15
**competing (3)** 121:9;127:10;195:9
**competitors (1)** 130:15
**compile (1)** 149:10
**complain (1)** 182:25
**complains (1)** 190:8
**complaint (2)** 175:25;177:7
**complete (3)** 27:18;68:12;138:25
**completed (3)** 23:6;24:6,25
**completely (8)** 12:1;23:20;109:3,25; 115:12,16;140:11; 175:21
**complex (1)** 20:25
**complexity (3)** 29:10;121:8;128:4
**compliance (1)** 135:18
**compliant (1)** 114:12
**complicated (2)** 39:3;121:25
**complied (1)** 139:7
**comply (1)** 49:21
**comprehensive (2)** 11:13;138:24
**Compromise (1)** 87:12
**conceding (1)** 36:11
**conceive (1)** 113:6
**concept (1)** 130:1
**concern (7)** 73:6;74:25;121:13; 123:16;130:6;156:24; 197:21
**concerned (4)** 12:19;48:2;103:11; 157:20
**concerns (7)** 14:9;17:24;83:22; 127:5,11;160:9;164:21
**conclude (1)** 34:3
**concluded (1)** 204:8
**concludes (2)** 70:19;124:8
**conclusion (3)** 105:16;125:2;189:24
**concrete (1)** 198:24
**condition (1)** 118:4
**conduct (1)** 161:4
**confer (3)** 57:22;87:25;172:25
**conference (2)** 194:10;197:18
**conferring (1)** 31:24
**confidential (16)** 46:11,17,17,18; 47:19,20;48:14,16; 49:2,9;63:15,16;72:14, 16;73:3,8
**confidentiality (1)** 46:24
**confidentially (1)** 186:1
**confirm (4)** 17:22;19:13;37:19; 119:4
**confirmation (2)** 64:19;112:22
**confirmed (8)** 49:25;103:20,22,22, 24;118:7;119:1;172:3
**conforming (3)** 65:14;68:17;76:7
**conformity (1)** 69:15
**confronted (1)** 127:12
**confused (2)** 62:15;132:8
**confusing (1)** 88:18
**confusion (8)** 10:11;84:12;88:20; 89:13;96:14,15;117:4; 176:7
**congress (1)** 170:20
**conjunction (2)** 130:10;153:6
**connected (1)** 173:11
**connection (3)** 46:10;144:8;169:20
**cons (1)** 104:23
**consensually (1)** 170:5
**consequence (2)** 101:15;124:1
**consequences (2)** 102:24;131:20
**consider (3)** 53:19;114:23;180:18
**consistent (17)** 10:15;36:20;37:12; 45:25;53:3,6;76:8; 86:10,13;92:20,21,22; 97:1,15;98:1;134:9; 141:18
**consistently (2)** 11:17;203:14
**constantly (1)** 198:9
**constituent (2)** 163:4;198:25
**constituents (1)** 200:16
**construct (1)** 170:4
**constructive (3)** 13:1;54:1;123:22
**constructively (1)** 13:1
**consuming (1)** 172:13
**contacted (2)** 197:6,7
**contemplated (1)** 72:15
**contemplating (1)** 108:22
**contemplation (5)** 78:25;79:21,24; 85:20,22
**contest (1)** 132:16
**context (6)** 39:5;59:16;119:14; 174:2;184:6;197:22
**contingency (1)** 84:11
**continuance (1)** 200:10
**continue (4)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 210 of 233

72:3;175:5;196:6,18
**contract (11)**
67:21;70:8;77:12,12;79:16;80:18;88:25;89:2;90:2,4;126:15
**contracts (3)**
89:18,23;90:13
**contractual (9)**
25:7,8;37:4;42:4,5,5;67:14;70:8;77:2
**contrary (1)**
85:9
**control (4)**
174:19,20,22;185:14
**controlling (2)**
44:23,25
**conventional (1)**
114:9
**conversation (1)**
32:2
**conversations (1)**
200:9
**cooperate (1)**
169:8
**cooperation (4)**
168:8,23;190:4,6
**cooperative (1)**
186:16
**coordinated (2)**
173:15,20
**copies (1)**
14:15
**copy (4)**
38:12,13,18,20
**core (1)**
83:22
**corner (1)**
58:8
**Corporation (2)**
6:4;196:3
**correctly (1)**
62:7
**cost (3)**
12:25;124:22;135:19
**cost-effectively (1)**
143:4
**costs (1)**
76:25
**counsel (18)**
7:24;24:10;28:9,23;34:22;35:13;45:4;49:10;57:22;70:21;87:25;98:9;102:22;110:14;125:7;183:20;199:9,14
**counterparty (3)**
67:15,22,24
**counterproductive (1)**
188:14
**counties (5)**
15:10;18:19;92:14,25;93:10
**County (1)**
152:18
**couple (16)**
7:9;8:10;10:23;43:17;65:11;66:14;89:11,17;109:8;145:7;148:2;151:1;173:11;176:5;187:25;189:25
**course (15)**
6:18;20:2;22:21;42:24;64:25;99:7;103:10;112:25;115:17,17;118:6;124:14;137:17,17;170:10
**Court (936)**
6:3,5,8,11,15,18,23;7:1,6,11,13;8:5,11,13,17,24;9:2,4,6,9,17,21;10:3,6,8,13,18,21,25;11:2,4;12:5,7,17;13:4,6,11,13,18,20,23,25;14:2,4,6,8,11,13,16,24;15:7,11;16:5,10,13,15,18;17:13,16;19:6,7,8,11,21;20:6,10,13,16,22;21:5,11,13,16,18,25;22:5,10,15,19,21,24;23:2,8,12,14,17,22,24;24:2,7,9,17,22,24;25:4,12,15,20,25;26:5,8,13,16,18,22,24;27:2,5,8,11,13,16,19,24;28:1,3,8,11,17,20,22;29:1,14,19,21,25;30:2,5,13,15,19;31:5,9,19,22;32:10,22;33:5;34:1,6,11,16;35:1,4,7,22;36:1,6,13,15,17,19,22,24;37:8,14,16;38:2,4,6,8,14;39:2,17,21;40:3,5,12,16,18,22,24;41:2,4,7,9,11,16,18,25;42:12,15,18,22,25;43:19,24;44:3,5,11,16,20,22;45:3,9,11,13,22,25;46:5,7,20,25;47:2,6,10,14;48:4,7;49:3,6,14,18;50:2,5,18,20;51:1,3,5,8,10,12,14,18,21,25;52:2,5,12,14,17;53:8,14,19,23;54:5,10,14,21,23;55:2,6,9,11,13,16,19,22;56:2,4,7,13,16,20,23,25;57:4,9,12,17,21,23;58:1,4,6,8,10,12,15,19,23;59:7,10,17;60:14,18,20,25;61:3,7,10,11,20,22,24;62:1,10,12,18,20,22,25;63:3,7,14,18,22;64:5,10,18,22,24;65:1,8,10,23;66:2,5,8,10,12,21;67:12,24;68:3,6,11,14,16,19;69:4,8,10,16,20;70:3,7,11,14,18;71:2,4,6,10,12,15,19,22;72:1,4,6,19,25;73:4,6,11,15,17,19,22;74:2,5,9,15,20;75:2,10,13,15,19,21,25;76:11,14,17,19,23;77:4,9,14,20,22;78:1,8,14,24;79:11,18;80:7,12,15,17,22;81:1,3,6,8,10,13,21,23;82:5,7,12,14,17,19,24;83:7,10,14,20,23,25;84:5,9,14,16;85:4,9,12,16,22,24;86:4,6,16,18,22;87:2,12,14,16,23;88:1,5,8,11,13,15,22;89:5,9,15;90:9,15,19,22;91:6,10,12,16;92:1,4,6,16,18,20;93:7,12,19;94:10,21;95:7,10,13,15,20,22;96:1,4,10,13,16,25;97:3,6,13,15,20;98:4,14,18,21,23;99:2,8,10,14;100:1,14,22;101:2,9,13,22;102:3,6,18,21;103:2,16,20;104:12,15;105:4,7,10,12,20,23;106:1,3,11,14,19,22,25;107:5,8;108:1,4,6,9,12,14,18,24;109:13,15,19;110:9,12,25;111:4,6,9,21,23,25;112:8,15,20,25;113:4,9,12,15,18,20,22,25;114:2,14,16;115:6,8,11,17,22;116:9,11,19,21,23;117:2,6,8,15,20;118:9,12,15,23;119:3,8,12,15,19;120:2,5,8,11,19,24;121:8,16;122:3,5,9,11,20,25;123:2,7,9,21;124:10,13;125:5,7,10,20;126:9;127:21,24;128:1,3,11,16;129:1,7,10,15,17,22;130:20,23;131:17;132:12,16,18,23;133:4,8,10,13,16,21;134:2,4,12,15,17,21;135:1,5,6,13,16;136:5,18;137:12,15,25;138:4,5,8,10,15,19;139:10,12,15,20,24;140:1,12,17,19,21,24,24,25;141:1,2,8,10,12;142:2,6,16,21,25;143:2,6,10,12,14,17;144:6,8,10,15,18,22,25;145:13,16,21,23;146:1,7,11,14,18,20;147:3,5,7,12,15,19,22;148:1,5,12,15,17,19,21;149:4,6,9,12,19,21,24;150:2,8,11,15,23,25;151:15,18,21;152:4,6,11,13;153:2,18,21;154:1,10,16,19,21;155:6,8,10,19,21;156:7,15,19,21;157:7,9,13,16,19,21;158:11,12,15,21,23;159:2,6,9,17;160:3,13;161:7,24;162:1,3,5,8,18,22;163:6,8,16,18,22,24;164:2,8,14,17;165:3,6,13,15,17,19,24;166:8,11,19,21;167:1,8,11,13,15,22;168:12,22,24;169:4,6,10,16;170:5,9;171:1,4,7,10,13,16;172:11,17;173:8,10,14,15,17,19,20,21,23,25;174:5,10,13;175:5,6,6,8,10,14,15;176:1,13,16,22,24;177:4,6,13,15,22;178:6,24;179:2,8,17,21;180:9,14,17,19,22,23;181:4,9,11,13,16,18,20;182:6,12,14,21,24;183:11,15,17;184:1,11,16,22,25;185:2,7,9,12,18;186:10,14,19,22;187:2,7,12,22,25;188:3,16,18;189:4,9,11,17,19;190:11,13,21;191:10,13,22,25;192:9,11,15,17,21;193:15,19,20,22;194:13,20,24;195:3,10,12,18,24;196:8,10,20,23;197:2,9,24;199:6,8,21,24;200:13,21;201:2,10,19;202:3;203:6;204:2,6
**court-approved (1)**
138:4
**courtroom (14)**
14:17;71:7,24,25;93:3;104:19;128:9,10,24;145:4;196:14,20,21;198:7
**courts (2)**
79:23;133:10
**covenants (1)**
89:21
**cover (1)**
15:15
**coverage (2)**
18:6,9
**covered (4)**
99:23;100:18;101:3;103:12
**covers (1)**
15:10
**CPUC (1)**
127:5
**crazy (4)**
7:21;115:22;125:1;170:12
**create (1)**
175:22
**created (1)**
175:22
**creating (2)**
10:11;108:22
**credit (1)**
171:23
**creditor (3)**
49:21;96:21;101:21
**creditors (8)**
12:3;23:5,18;33:12;100:19;101:18;126:17,23
**creditors' (1)**
117:17
**creditor's (1)**
65:4
**critical (11)**
33:17;38:5;111:1;156:10;157:22,24;158:4;164:3;192:2;193:9;194:5
**critically (1)**
157:8
**criticism (2)**
132:23;203:3
**criticize (1)**
54:11
**cross-platforms (1)**
18:10
**crystal (2)**
126:9;202:15
**culture (3)**
111:25;112:4;172:20
**curious (1)**
106:23
**currency (1)**
31:13
**current (1)**
14:20
**currently (2)**
108:22;201:9
**curve (1)**
175:17
**custody (4)**
174:19,20,21;185:14
**customer (6)**
69:23;70:4,7,8,11,11
**customers (5)**
23:5;24:5,25;69:25;70:5
**customized (3)**
23:16,21;67:9
**cut (2)**
32:5;95:18
**cutting (1)**
41:20

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 211 of 233

## D

**daily (2)**
126:8;127:12
**Dalkon (1)**
122:11
**damage (10)**
77:1;79:8;86:20; 172:2;175:19;176:17, 23;177:21,22;178:14
**damages (4)**
48:20;76:21;79:17; 178:9
**Dame (2)**
192:11;202:1
**Dame/USC (2)**
181:15,17
**damn (1)**
189:13
**Daniel (2)**
72:10;196:15
**Dario (1)**
196:25
**data (12)**
119:20;136:5,7,19; 146:20;150:4;152:25; 156:9;176:14;177:18; 185:11;186:13
**database (11)**
119:21;154:9;156:1; 160:21,25;163:3,4,13; 185:15;186:8,9
**date (159)**
7:8;8:22;10:2;12:15; 21:15,21,23,23;22:7; 25:19,22;26:3,11; 27:22;29:5,6,11,18,21, 22;30:4,7,9,10,11; 33:14,16,17,23;39:25, 25;50:8;53:1,2,4,5; 59:12;60:4,10,23;61:9, 16;62:5;63:7;65:3,5; 66:14,18,21;76:22; 77:7;78:11,16,16; 79:23,23;82:23;84:18; 97:8,9;98:1;103:18; 104:23,24;105:3; 107:9,17,21;109:3,23; 110:18,18,20;112:9,9; 113:12,23;114:9,19,24; 115:3,5,5,20;116:3,6; 117:13,21;118:21,25; 119:5;121:2,19; 123:19,25;124:3; 125:1,13,23;127:9,19; 128:20;131:7,8,14; 132:21,24;134:5,24; 138:12,13;141:18; 149:2,2,17;150:21; 153:1,7;154:14;155:4, 22;156:10,25;157:1, 24;158:18;164:20; 165:11;166:6,16,17; 167:9,11,12;168:3; 169:23;173:5,13; 174:3;175:2;176:17; 179:2;181:4,6;183:6, 16,19;184:18;188:21; 189:2;190:19;192:3,3, 21;193:1;202:16,24; 203:13,21
**dates (5)**
112:1;116:7;133:19, 22;134:1
**date's (1)**
66:19
**daughters (1)**
127:14
**day (22)**
14:23;16:10;51:14; 71:25;72:24;78:15,18; 115:15;120:8;126:21; 137:11;148:9;151:25; 161:9;181:16,22; 192:1,12,15;194:3,15; 203:19
**days (18)**
8:2;22:19;24:6,18, 20,21,22;25:1,2,23; 39:25;50:9;98:9; 107:12;189:2,21; 191:19;200:14
**deadline (21)**
24:13;29:7;39:23; 115:8;134:5;135:7; 138:22;139:17,21; 142:13,17;150:3; 151:12;152:21;159:19; 161:20;165:1;181:21; 202:24;203:10,10
**deadlines (3)**
77:7;134:3;149:25
**deal (16)**
38:18;78:11;85:8; 89:13,22;96:5;116:2; 153:13;158:8;162:10; 163:14;168:10;178:10; 190:10;194:4;202:22
**dealing (6)**
75:24;77:1;78:12; 153:12;184:7,8
**deals (2)**
90:12;145:19
**dealt (1)**
96:19
**Dear (1)**
43:20
**death (7)**
42:2,23;66:17;79:9, 11,12;136:13
**debate (3)**
83:21;93:3;182:8
**debating (1)**
182:24
**debt (2)**
134:12;166:4
**debtor (35)**
34:14;50:9;61:12; 65:5;110:15,15; 116:14;118:4;120:3,7; 123:2;126:1;127:16; 130:10;132:13,20; 135:2,5,24;138:6; 139:4;145:5,7;164:24; 169:22;177:8;178:5; 191:3,7;197:11; 198:21;199:9;201:6; 202:23;203:13
**debtors (36)**
6:17;11:17;18:11; 37:4,4,6,10;49:10; 54:25;72:16;73:1; 74:17;80:13;81:5; 89:20;100:12;117:22; 130:13,25;158:6,19; 160:19,22,23;161:1; 162:14;166:4;167:7, 14;168:15;169:3; 191:17;195:4,6;196:7, 19
**debtors' (30)**
18:15;64:10,16; 116:5,5,6,23;131:23; 132:25;138:23;151:10; 155:22;156:2,16; 157:24;158:24;161:19; 162:4,8;165:11; 166:16,24;167:8; 186:8,9;190:23;191:6; 192:6;202:17;203:12
**debtor's (4)**
14:20;99:6;104:7; 201:6
**deceit (1)**
43:2
**December (7)**
112:11;124:6; 192:21;193:1,1,2,3
**decide (13)**
33:1;34:2;55:16; 81:17;99:19;100:6; 102:15;150:19;159:22; 173:4;187:19;190:22; 199:17
**deciding (2)**
102:25;172:22
**decision (14)**
12:11;55:19,21; 66:18;86:7;121:17; 138:22,23;156:5,6; 175:11;182:23;184:18; 194:5
**decisions (3)**
151:16,18;180:15
**declarants (1)**
6:18
**declaration (5)**
11:11;18:1;145:19; 188:12;202:6
**declarations (2)**
20:24;202:7
**deemed (1)**
37:3
**Deepwater (6)**
146:4,23;148:19; 149:21,22;150:9
**defeated (1)**
118:22
**defective (1)**
159:14
**defer (1)**
194:2
**deferred (1)**
190:24
**define (1)**
94:15
**defined (8)**
29:5,12;30:22;92:9; 93:13,14;94:3,18
**definition (6)**
30:24;31:3;63:9; 74:11;92:21;93:16
**definitions (2)**
75:5,24
**definitive (1)**
152:25
**DEGONCALVES (4)**
196:22,25,25;197:5
**delay (4)**
124:22;148:2; 154:22;168:2
**delayed (2)**
126:18;154:18
**delaying (1)**
121:5
**deleting (1)**
86:19
**delivery (1)**
142:4
**delta (1)**
97:4
**demonstrate (1)**
190:3
**demonstrated (2)**
111:18;143:15
**demonstrates (1)**
190:6
**denominated (1)**
31:13
**Deon (1)**
145:19
**depending (1)**
74:4
**depends (1)**
133:25
**deposed (1)**
139:4
**deputy (2)**
71:7,24
**describe (1)**
175:10
**designated (3)**
15:4,5;18:19
**designation (3)**
90:1,7;91:3
**designed (2)**
15:15;33:4
**despite (2)**
19:25;183:20
**destroyed (2)**
63:10;137:19
**detail (1)**
16:16
**details (1)**
72:7
**determination (2)**
170:5;173:12
**determine (3)**
59:21;61:11;102:5
**determined (12)**
44:14;59:1,12,16; 60:4,10,21,22;61:9,16, 18;104:10
**determines (1)**
191:10
**determining (1)**
59:18
**detriment (2)**
86:2;171:25
**developed (1)**
130:10
**developing (1)**
145:4
**development (1)**
117:18
**devised (2)**
158:22;160:5
**D'Ghataldi (1)**
199:13
**diagram (1)**
195:21
**die (1)**
129:15
**died (1)**
31:1
**difference (12)**
45:19;58:25;60:3; 91:23;112:8,10,12; 124:7;143:18;144:9; 184:1;193:5
**differences (1)**
131:3
**different (32)**
24:3;34:22;43:12; 54:19;70:9;75:14; 79:21;96:11;101:25; 104:25;110:19;112:3; 120:23;122:15;127:15; 133:14;136:19;138:21; 142:10,14,15;147:10, 25;163:14;178:11; 183:21;189:5,6;198:2, 24;202:16;203:5
**difficult (4)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 212 of 233

121:24;122:5;140:6, 7
**digressing (1)** 114:16
**diminishing (1)** 188:12
**DIP (1)** 117:24
**direct (1)** 150:3
**directly (2)** 121:12;167:25
**disagree (3)** 68:4;140:7;191:8
**disagreements (1)** 195:22
**disapproval (1)** 203:2
**disapprove (2)** 21:8;191:6
**disaster (1)** 121:23
**discharge (8)** 20:1,2,4;80:11; 133:22;134:17,19; 135:7
**discharged (3)** 134:12,24;135:7
**discharges (1)** 51:15
**disclose (1)** 73:7
**disclosure (1)** 28:13
**disclosures (1)** 197:23
**discovery (9)** 109:14;172:7,12,19; 178:9;185:23;197:22; 198:19;200:12
**discrete (3)** 10:4;68:24;114:24
**discretion (1)** 192:9
**discretionary (2)** 187:18;203:1
**discrimination (1)** 85:18
**discuss (4)** 126:22;154:9; 196:18;197:6
**discussing (1)** 96:17
**discussion (8)** 66:22;78:15;91:22; 120:16;180:17,17; 197:8;200:18
**discussions (5)** 163:13;181:24,25; 182:1,5
**dismissal (1)** 134:14
**dispersed (3)** 131:14;141:16; 142:23
**displaced (4)** 121:23;136:2; 141:16;174:17
**disposed (1)** 9:14
**disputes (1)** 191:11
**disputing (2)** 103:11;195:8
**disseminate (1)** 115:14
**distill (2)** 166:10,15
**distinguished (1)** 131:19
**distribute (2)** 103:23;152:15
**distribution (11)** 15:19;49:24;95:18; 96:21;100:23;101:25; 103:24;110:22;125:21; 126:10;193:8
**distributions (7)** 11:20,22;99:24; 101:4,21;103:13; 107:20
**division (2)** 6:20;117:10
**DMAs (2)** 15:5;18:18
**docket (1)** 99:12
**document (9)** 29:12;60:7;88:23; 90:23;160:18,19; 162:20;175:23,25
**documentation (6)** 31:7;32:15;46:10,16; 64:1;72:13
**documents (10)** 63:2,6,8,8,10;106:6; 160:20,23,24;185:11
**Doe (1)** 36:4
**dol (1)** 41:3
**dollar (4)** 40:21;58:22;60:12; 170:1
**dollars (9)** 43:21;48:20;59:20; 68:1,3;166:3;168:18, 19;170:2
**done (29)** 7:16;17:10;19:19,20; 20:15;32:6;34:20; 49:14;66:13;73:14; 78:22;104:3;105:19; 119:23;120:15;130:17; 131:24;157:25;158:6; 170:16;176:8;177:3; 178:10,17;186:2,2; 191:13,16;197:17
**door (3)** 71:15,16;171:10
**doubt (7)** 19:3;69:18,19,20,21; 90:24;107:1
**down (17)** 7:18;8:7;20:6;59:3, 20;63:4;124:19; 126:20;127:3;132:13; 165:9;171:6;172:19; 183:20;185:11;202:9; 203:20
**dozen (2)** 43:12;60:5
**drafting (1)** 50:16
**dragging (1)** 189:24
**dramatically (1)** 178:23
**draw (4)** 80:14;84:8,13; 148:12
**drive (1)** 153:1
**drop (4)** 22:16;24:13;27:2; 63:4
**due (14)** 11:7;19:23;25:7,10; 28:6;114:12;130:1,2; 134:9;141:18;148:1; 168:15;199:16;204:4
**during (2)** 27:8;141:6
**duties (1)** 11:24
**duty (1)** 73:12

## E

**earlier (11)** 21:22;24:12;50:15; 84:2;92:1;96:23;116:3; 131:19;133:16;161:8; 166:23
**earliest (1)** 169:23
**early (2)** 98:9;111:25
**earth (1)** 126:10
**easier (1)** 140:9
**easy (5)** 23:23;27:19;59:25; 144:21;165:7
**echo (3)** 171:17;172:8;196:17
**economic (2)** 123:11;146:6
**editorializing (1)** 55:25
**effect (3)** 68:14;85:4;96:22
**effective (6)** 113:12,23;131:15, 25;141:17;155:15
**effectively (1)** 131:5
**efficient (1)** 155:15
**effort (6)** 19:3;72:6;81:19; 151:4;193:19;201:15
**efforts (5)** 19:23,25;124:21; 141:19;193:22
**EGGENBERGER (15)** 99:3,4,9,12,16;100:5, 16,24;101:3,12,16; 103:9,19;104:9,13
**eight (3)** 18:18;135:25;147:24
**eighteen (5)** 15:3;18:17,21,23; 170:2
**eighty (4)** 19:14,15;135:22; 189:1
**eighty-day (1)** 189:2
**eighty-eight (1)** 159:12
**eighty-nine (1)** 189:3
**eighty-one (1)** 18:20
**either (21)** 10:15;25:8;29:9; 40:16;44:14;54:11; 60:9;65:3;82:21;84:10; 118:17;120:25;122:16; 142:3;157:3;161:22; 172:25;173:5;187:2; 194:9;197:7
**elected (1)** 170:19
**election (2)** 192:12,15
**electronic (2)** 37:23;38:22
**electronically (6)** 37:22;38:6,9,24; 39:14;199:12
**element (1)** 170:14
**elephant (1)** 163:2
**eliminate (3)** 42:17;48:3;49:17
**Elizabeth (1)** 117:14
**Ellis (1)** 196:3
**else (25)** 10:6;13:21;20:17; 37:21;73:19;79:14; 86:4,8;103:25;116:12; 121:9;153:23;167:17; 168:6;173:4;175:24; 185:2;186:22;192:13; 194:11;196:10,10; 198:6;200:17;203:6
**elsewhere (3)** 38:17;49:14,15
**emailed (1)** 38:12
**emotions (1)** 202:12
**employment (1)** 85:18
**encourage (2)** 142:1;196:9
**encouraged (1)** 197:18
**end (5)** 49:19;66:19;126:21; 149:2;186:12
**ends (1)** 192:3
**Energy (4)** 200:2,3,3;202:3
**engage (2)** 196:6;200:8
**ENGEL (71)** 83:9,10,19,20,21,24; 84:1,6,11,15,17,21; 85:7,11,15,20,23,25; 86:5,9,16;87:7,17,19; 88:1,4;90:20;91:16,18, 19;92:3,5,7,17,19,22; 93:9,17,20,23,25;94:2, 5,7,9,14,17,19,22;95:9, 12,14,16,21,24;96:3,9, 11,14,17;97:2,5,8,12, 22,24;98:11,13,16,19, 22
**English-speaking (1)** 17:4
**enormous (1)** 18:12
**enough (12)** 43:25;97:9,10; 107:15;114:13;115:23; 130:7,7;143:3,9;151:5; 181:3
**ensure (3)** 127:19;135:18;157:4
**enter (3)** 22:23;160:16;163:9
**entered (2)** 201:7,18
**entire (1)** 162:16
**entirely (1)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 213 of 233

42:17
**entities (4)**
117:23;175:13;178:6;190:17
**entitled (8)**
25:7;99:25;100:19,23;101:4,17,20;103:13
**entitlement (2)**
33:21;103:25
**entity (3)**
82:9;86:21;168:19
**entry (2)**
25:23;26:20
**envelopes (1)**
23:10
**equally (1)**
153:12
**Equitable (1)**
168:13
**equity (1)**
118:6
**equivalent (1)**
134:19
**Eric (3)**
57:19;58:11;117:11
**essential (1)**
111:18
**ESSER (4)**
196:2,2,8,9
**established (1)**
134:21
**estimate (2)**
163:5;176:19
**estimated (3)**
15:2;18:16;65:17
**estimation (15)**
107:18;110:24;111:10,12;112:17,19;113:2;119:16,18,20,22;120:9,16;121:8;178:15
**et (6)**
27:24;34:21;46:11;49:21,21;50:9
**etched (1)**
71:19
**even (38)**
8:1,2;20:3;30:20;33:15,24;34:20;42:9;48:13;60:1;76:1;85:19;90:12;92:2;101:3;106:1;109:15;110:7,18;112:1,2,2;116:14;119:9,9;129:4;139:3;141:15;157:4;159:13;160:9;161:14;179:25;180:3,7;183:3;192:19;194:22
**event (16)**
76:21;80:23;82:10,15;85:11;86:23;87:3,4,8,13,15,15,16,17;90:6;98:3
**events (6)**
9:13;78:13,21;79:7;84:18;114:6
**everybody (14)**
31:2;72:7;77:23;90:23;91:17;122:16;128:4;133:10;169:7,10;175:23;178:12;198:18;201:20
**Everybody's (1)**
98:21
**everyone (11)**
32:3;66:3,4;107:5;157:6;161:11;162:14;165:12;170:18;171:25;172:4
**everyone's (1)**
121:16
**everywhere (1)**
203:6
**evidence (4)**
151:24;186:25;187:4;191:7
**evidentiary (1)**
191:12
**exact (2)**
59:23;178:25
**Exactly (16)**
23:13;59:4;63:15;67:6;84:17;92:22;94:1;97:12;132:10;165:1,5;169:9;171:3,3;188:10;201:13
**example (8)**
8:6;46:22;51:1;67:15,16;101:11;102:22;156:25
**except (10)**
46:8;53:15;56:18;66:5,7;88:21;119:5;138:25;170:13;198:11
**excepting (1)**
46:14
**exception (1)**
45:15
**excess (1)**
166:3
**exchange (3)**
155:17;172:21;201:8
**exchanged (1)**
173:1
**exclude (2)**
30:22;92:25
**excluding (1)**
76:1
**exclusion (1)**
76:16
**exclusive (1)**
166:24
**exclusively (2)**
179:13;182:4
**exclusivity (10)**
110:17;118:10;156:13,16;167:16;169:10,25;170:24;190:1,13
**excuse (5)**
20:22;68:20;133:21;168:23;170:23
**executive (1)**
6:24
**executory (4)**
89:18,23;90:2,13
**Exhibit (4)**
53:24;95:1,17,23
**exist (1)**
179:24
**exists (8)**
174:18;175:6,20,20;176:12;177:17,20,23
**exit (1)**
108:23
**expanded (1)**
42:4
**expanding (2)**
42:7;77:15
**expansive (2)**
156:2;162:6
**expect (1)**
135:5
**expectation (2)**
64:4;118:5
**expeditious (1)**
157:3
**expeditiously (2)**
11:20;12:6
**expense (1)**
12:25
**expenses (1)**
137:8
**expensive (1)**
172:13
**experience (9)**
125:12;133:9,17;144:15,16;146:3;152:23;153:2;181:6
**experienced (3)**
114:7;187:8;188:1
**experientially (1)**
149:16
**experiment (2)**
153:16,16
**expert (15)**
128:24;132:6,6;133:6;137:24;138:20;140:10;143:17;146:3;149:16;152:22;179:25;183:1;188:6,9
**expertise (2)**
133:8;141:14
**experts (10)**
17:22;111:12;122:20;129:1;143:15;159:5,5,20;202:4;203:24
**expires (1)**
156:23
**explain (6)**
9:25;16:21;62:21;107:21;125:17;133:5
**explaining (1)**
123:24
**explana (1)**
19:9
**explanation (1)**
19:9
**exposed (1)**
153:10
**exposure (1)**
202:8
**expressly (1)**
154:25
**extend (2)**
110:16;202:21
**extended (2)**
25:22;188:23
**extension (1)**
156:18
**extent (23)**
7:15;8:19;9:24;23:19;35:16;40:20,20;43:17;44:22;46:22;49:1;65:14;68:18;76:21;80:23;86:23;87:2;95:10;96:7;101:5;106:11;139:23;186:11
**extra (1)**
38:20
**extract (1)**
47:23
**extremely (2)**
42:13;188:25
**extricate (1)**
139:22

## F

**face (1)**
201:11
**Facebook (3)**
17:19;137:3;201:23
**facilitate (1)**
183:22
**facilities (1)**
17:12
**facility (1)**
117:24
**fact (17)**
11:22;39:4;43:3;45:22;48:12;79:6,19;80:1;84:12;107:12;114:5;118:22;126:16;130:12;158:3;168:17;200:22
**factors (2)**
178:11;203:2
**facts (6)**
173:11;179:19,23,24;180:6;182:18
**factual (2)**
184:7;191:11
**failings (1)**
191:2
**Failure (1)**
49:20
**fair (10)**
9:15,22;13:7;78:24;79:5,21,24;85:20,22;168:13
**fairly (3)**
7:6;60:25;149:7
**faithful (1)**
203:5
**fall (4)**
115:25;146:25;149:14;174:25
**fall/winter (1)**
147:1
**familiar (3)**
10:14;143:20;185:20
**families (1)**
177:19
**family (4)**
56:11;127:14;136:25;177:14
**fantasy (1)**
126:6
**far (8)**
48:2;78:11;121:24,25;122:5;168:14;175:1;200:11
**Farr (2)**
72:11;196:15
**fast (1)**
95:20
**faster (1)**
127:22
**fatal (1)**
135:2
**fate (1)**
184:17
**fault (1)**
140:3
**favor (2)**
129:12;191:4
**features (2)**
138:4;145:7
**February (1)**
12:10
**federal (1)**
195:17
**feel (3)**
32:1;46:1;71:5
**feels (1)**
202:9
**Feld (1)**
165:21
**Felderstein (1)**
73:23
**felt (2)**
59:2;202:16
**FERC (1)**
127:6

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 214 of 233

**fervor (1)**
202:3
**few (12)**
7:12;8:2;24:18;53:11;66:17;74:7;84:9;154:7;156:9;189:9,9;200:14
**fewer (1)**
193:13
**fiduciary (1)**
11:24
**field (1)**
203:8
**fifteen (3)**
15:23;152:6;188:11
**fifteen-minute (2)**
104:17,19
**fifty (5)**
142:11;144:3,12,12;184:24
**fifty-eight (1)**
188:13
**fighting (1)**
201:22
**figure (9)**
21:25;48:5;77:23;89:3;127:22;130:20;153:8;180:9;199:14
**figured (1)**
60:1
**file (76)**
25:9;31:15;34:14,20,23;35:24;36:2,3,9;37:25;38:5,24;40:14,23;41:21,23;43:18;44:19;67:22;76:18;78:3,12;81:16,17,24;82:2,22;84:25;85:3;88:24,25;89:1;97:7;99:22;100:2,3,25,25;101:13,25;102:4,5,8,13,13,17,19,23;103:2,6,10,14;104:6,7;112:20;114:7;115:15;119:18;125:19;141:20;142:5;150:9,11,12;165:10;180:7;182:7,8,16;183:2,5;184:15;193:7;197:5,13;199:10
**filed (54)**
8:21,24;10:1;11:11;12:21,23;30:11;34:18;37:3;38:10;39:14;47:9,10;49:25;50:2,12;62:5;64:20;65:5;85:5;89:20;95:2,4;102:2;110:15,16;111:16;117:22;118:10,13;127:17;146:24;147:24;154:14,15,20;156:13,14;158:1,3;164:23;166:5,23;167:6,16;168:10;169:13,24;181:16;190:5;191:18,18,23;200:1
**files (4)**
37:22;38:9;47:8;102:22
**filing (10)**
35:19;50:3;56:10;124:1;147:22;150:2,5;168:3;182:2;197:7
**fill (1)**
62:5
**filled (4)**
130:17;135:17,18;137:8
**Final (1)**
69:22
**financial (5)**
49:11;118:4;174:22;185:16;186:9
**financing (2)**
117:24;118:2
**find (7)**
12:20;17:18;65:3;67:7;134:10;139:1;169:1
**finding (3)**
140:13;172:10;187:17
**findings (1)**
187:2
**fine (31)**
25:2;28:10,24;34:3;38:21;54:8;60:17;61:2;66:8;73:4;76:3;80:25;81:2;87:1,6,7,10;88:19;90:18;93:22;94:14;101:7;102:13,20;106:16,20,20;117:6;124:25;142:9;167:16
**Finegan (8)**
6:19;19:5,13;21:1;115:1;151:4;201:20;202:6
**Finegan's (4)**
11:10;13:20;18:1;20:24
**finish (4)**
97:23;138:1;151:19;180:11
**finite (1)**
59:25
**fire (74)**
30:5,22,23,25;31:3;48:18,19;55:8,8,8,9,10,11,18;57:6;61:14,17;63:24;68:22,23;75:3,19;76:25;77:6,23;78:10,22,23;85:13;89:2,11;92:10;105:6,8,14,15,21;106:4,8;107:13;121:14,22;123:12,15;124:1;125:9,13,19;126:17;136:14;151:7;157:5,10,12,17;164:13;165:2,9;168:10,13,16;170:3,6,22;172:2,3,15;173:17;174:24;182:19;184:4;190:12;192:22;193:6
**fire-related (3)**
105:21,24;106:15
**fires (12)**
18:13,19;74:13;75:1,9,16;77:1;136:12,15;173:22;179:5,12
**firm (3)**
164:13,20;177:24
**firms (7)**
174:23;175:5;176:13;177:17;178:19;184:8,12
**firm's (1)**
164:13
**first (39)**
11:11;16:14;22:13;25:2;26:12,12;29:1;32:8;37:17;53:14;54:1;55:1,4,8;59:1;62:4;63:1;64:9;75:6;97:16;102:1;108:12;112:1;117:23;123:12;135:20;147:23;150:3,6,13;152:4,7;154:14,24;156:12;168:20;186:24;191:17,20
**fit (2)**
120:21;127:9
**fits (1)**
92:11
**Fitzgerald (1)**
73:24
**five (11)**
18:22;27:3;34:22,22;135:25;144:12;147:23;157:1;175:22;178:17;184:2
**fix (3)**
32:21;33:3;76:4
**fixed (3)**
189:13,14,14
**fixing (1)**
120:8
**flawed (1)**
151:9
**flexibility (1)**
128:7
**floating (1)**
106:5
**flood (1)**
8:1
**flurry (1)**
166:8
**flush (1)**
8:1
**flyers (1)**
152:16
**focus (4)**
12:8;111:9;130:16;138:21
**focused (2)**
111:2;155:14
**focuses (2)**
137:2,4
**focusing (5)**
25:5;100:22;112:8;149:22;183:17
**folks (10)**
126:6;136:9,15,24;140:8;141:19;145:20;149:18;150:19;153:7
**follow (6)**
6:8;32:8;33:24;102:21;162:25;166:7
**followed (2)**
101:18,19
**following (2)**
104:21;147:18
**followings (1)**
18:12
**follows (3)**
18:16;103:3,3
**food (1)**
194:7
**footer (5)**
53:20;54:1;88:8,11,22
**footnote (7)**
30:21;74:10;75:6,12;87:22;88:9,11
**forces (2)**
127:1;128:8
**FOREMAN (12)**
72:5,10,11,22;73:1,5,10,13,16,18;196:15,15
**forest (1)**
30:25
**forget (5)**
139:5;140:21,23;141:23;148:21
**forgetting (2)**
126:16;141:3
**Forgive (1)**
88:4
**form (106)**
7:8,14,16,25;8:18;10:9;27:15,18;31:9;32:8;33:20;35:19;36:16;37:8,9,23;38:18;39:3,6;40:14;47:17;49:4;53:14,15,17,17,23,25;54:15,16,25;56:4;57:1,5;58:2;62:5,16;63:2;64:1,15,18;65:2,25;66:25;67:5,5,5,10,13;68:7,8,19;69:1,24;72:15;76:11;87:21,23,24;88:7,22;89:8,12;91:22,23,24;92:2,10;97:25;99:22;102:14;105:4,16,17,19;107:12;109:10,10;123:23;128:20;130:4;155:23;156:3;161:20;162:4,6,9,15,16;170:6;175:22;176:5,8,10,13,17;177:7,9;178:18;182:14,15;188:24;191:6;197:12;198:14;201:6
**formal (1)**
172:12
**formalities (1)**
172:19
**formally (1)**
190:2
**former (2)**
62:10;137:1
**forms (10)**
23:18;31:15;32:25;53:11;54:19;70:20;74:22;76:6;130:9;164:23
**formula (2)**
144:25;145:1
**forth (5)**
14:19;35:17;67:2;72:13;145:5
**fortunately (2)**
189:14,16
**forty (1)**
152:23
**forum (1)**
129:10
**forward (18)**
11:19;12:4;13:1;109:7,7;118:24;119:19;120:1;123:5;155:2,3,13,15;157:3,23;169:20;178:16;190:20
**forwarding (1)**
136:25
**foul (1)**
134:25
**found (1)**
168:20
**four (9)**
15:4,5;17:4;18:18,24;27:3;112:10;156:21,22
**frame (2)**
146:14,15
**FRANCISCO (4)**
6:1;108:10;200:6,6
**Frank (1)**
126:1
**frankly (7)**
12:25;42:10;126:15;138:24;149:15;164:22;168:7

**frays (1)** 106:4
**free (4)** 103:5;116:23,25; 152:9
**French (2)** 85:3,5
**frequency (25)** 15:1;18:15,18,21,24; 26:1;52:19;130:7; 132:1;135:20;136:1; 137:3;138:11;143:5,7, 8;145:1;146:13; 147:20;150:5,19; 188:5,8;203:25;204:4
**frequent (1)** 17:8
**frequently (4)** 69:1;137:21;164:10; 202:23
**friendly (2)** 61:13;64:7
**friends (1)** 137:1
**front (2)** 127:4;131:10
**frontend (1)** 193:17
**frontload (1)** 139:20
**front-load (1)** 150:16
**frontloaded (2)** 132:25;138:15
**front-loading (1)** 151:11
**frontloads (1)** 131:24
**full (8)** 38:12;113:9,11,15, 22;118:6;127:18; 146:16
**Fuller (8)** 195:2,3,6,11,13,19; 197:10,20
**fullest (1)** 135:12
**fully (2)** 114:12;166:16
**function (2)** 64:15;150:3
**functional (1)** 134:19
**Fund (1)** 108:21
**fundamental (5)** 107:17,17,19,20; 139:8
**further (10)** 9:25,25;12:10;19:10; 40:9;53:8;93:15; 194:22;198:15;200:18
**future (7)** 9:18;59:15,16;61:19; 77:18,18;84:23

## G

**Gallagher (1)** 72:11
**game (5)** 181:15,17;192:11; 198:18;202:1
**gaps (4)** 130:16;135:15; 137:7,22
**garbage (1)** 68:9
**Gate (1)** 78:18
**gather (3)** 141:5,25;143:21
**gathered (1)** 63:6
**gave (1)** 38:16
**Gems (1)** 108:16
**general (3)** 37:9;53:24;66:22
**generally (1)** 33:11
**General's (1)** 73:25
**generically (2)** 140:18,18
**generous (1)** 185:22
**gentleman (4)** 52:2;164:5;196:13, 14
**Gentlemen (2)** 173:6;197:18
**gets (4)** 67:25;140:9;150:13; 163:11
**Ghost (12)** 30:23;31:3;57:6; 68:22,23;69:7;75:19; 105:6,15,17;106:4,7
**Gilliam (1)** 78:20
**given (15)** 78:21;106:2;118:4; 121:1;123:11,12; 125:11,24;134:9; 145:12;156:11;191:15; 194:1,16;202:13
**gives (1)** 131:13
**giving (1)** 161:1
**glad (2)** 38:15;200:24
**glass (1)** 71:10
**glitch (1)** 50:16
**goal (4)** 11:18,24,25;12:4
**God (3)** 30:7;182:1,3
**goes (11)** 17:23;18:14;19:18; 20:12;21:3;66:22; 78:20;92:10;124:15; 128:4;162:9
**Golden (1)** 78:18
**good (39)** 6:5,7,23;7:21;26:16; 43:24;44:8,14,14; 47:25;72:5,10;74:8; 79:1,6;83:16;87:17; 97:9,10;103:10; 117:15;120:13;121:4; 124:19,23;128:13,14, 15;133:9;151:5;158:6; 165:20;171:12;173:9; 177:3;196:2;199:22, 24;200:20
**GOODMAN (100)** 57:24;58:3,5,7,9,10, 11,11,13,16,21,25; 59:8,11;60:6;61:5,8,15, 21,25;63:19,21,23; 64:6;100:9;104:25; 105:1,8,11,22,24; 106:2,10,18,21;107:2; 116:11,16,20,22,25; 117:3,7,9,11,16,21; 118:13,18;119:7,11,13, 16;120:4,10,12,23; 121:7,12;122:4,8,10, 19,24;123:1,3,8,10,24; 124:12;125:3,6,11; 127:8,23,25;128:2; 163:20,23,25;185:6,8, 9,10;186:5,11,18; 190:21;191:9,15,23; 192:1,10,14,16,20; 193:16,21;194:24; 195:1
**goods (1)** 67:16
**Goren (20)** 52:4,4,5,8,13;57:20; 74:23;90:16;93:12,13, 18,21,24;94:1,3,6,8,12, 15,18
**gorilla (1)** 161:12
**Gorton (7)** 199:22,22,24;200:1, 13,20;201:1
**Gotshal (2)** 6:16;52:4
**Gottfried (1)** 36:8
**governed (1)** 201:9
**government (2)** 46:15;92:12
**governmental (9)** 88:17;91:21;92:7,13; 93:4,4,14;94:11,12
**Governor (7)** 107:25;108:17,18, 19;127:1;157:3,14
**governor's (2)** 170:20;171:19
**governs (1)** 88:19
**Grace (1)** 153:5
**grant (1)** 148:8
**granted (2)** 190:3;191:14
**great (5)** 85:21;94:2,9;115:19; 166:11
**greater (5)** 19:4;168:6,6,7; 171:21
**greatly (1)** 166:1
**ground (1)** 129:18
**Group (7)** 6:21;35:8,11;36:4; 110:16;136:2;196:16
**Guardian (1)** 7:1
**guess (12)** 35:15;52:24;65:23; 70:19;103:16;104:13, 22;112:13;133:18; 159:23;182:24;202:22
**guinea (1)** 153:16
**Gulf (3)** 122:13,14;146:5
**Gulfstream (1)** 122:14
**Gump (1)** 165:21
**guys (3)** 60:9;75:21;175:24

## H

**habit (2)** 187:9,10
**half (8)** 43:12;60:5;71:21; 112:14,15;165:13; 170:2;174:15
**hand (2)** 47:23;126:25
**handed (4)** 56:21;60:8;171:9; 191:19
**hand-to-hand (1)** 152:10
**happen (22)** 22:13;82:6;104:4; 110:4,5,8,14,17;121:9; 127:22;137:11;149:8; 153:3;156:11;158:12; 162:9;169:8;172:20; 176:9;193:18;202:20; 203:21
**happened (7)** 30:22,23;32:7;78:13; 79:7;141:7;174:24
**happening (3)** 85:19;151:22,23
**happens (11)** 34:12,14;37:21;47:8; 77:18;78:10;79:19; 88:25;130:15;152:13; 172:23
**happy (11)** 7:2;10:19;28:7;48:2; 71:3;72:3;82:2,3; 90:16;98:25;201:14
**hard (8)** 73:8;98:10;113:6; 121:4;170:14;184:1; 186:16;198:4
**harm (3)** 77:15;134:25;176:18
**hate (1)** 52:23
**Hauer (1)** 165:21
**Hawaii (1)** 128:16
**head (1)** 170:15
**heading (1)** 105:16
**heads (1)** 75:21
**health (1)** 136:9
**hear (19)** 10:4;19:5;45:4;58:5; 70:21;74:17;128:12; 130:2,6;136:2;150:18; 153:18;166:17;171:14; 181:1;188:15;193:14; 195:24;196:21
**heard (19)** 35:10;73:19;86:4; 130:3,5,12;131:7; 133:17;151:9;153:19, 23;163:21,25;164:5; 167:2;171:19;173:5; 185:2;199:21
**hearing (26)** 7:3;30:8;43:20; 66:19;107:18;110:24; 111:10;113:3;126:2;

128:18;131:18;132:3; 139:2;151:21;154:8, 23;158:7;164:17; 169:2;174:2,6;191:12; 194:10;195:25;197:14; 198:16
**hearsay (3)** 140:21;141:3;187:5
**heavily (3)** 65:25;137:2,4
**Heffler (1)** 6:21
**held (1)** 171:24
**help (4)** 128:12;158:2; 173:12;175:22
**helped (2)** 19:11;202:5
**helpful (5)** 7:13,18;26:6;38:14; 61:16
**helps (1)** 10:9
**Here's (10)** 33:5;38:15;47:21; 48:20;137:7;166:14; 178:4,18;179:1;197:9
**Herndon (3)** 35:12;36:7;99:5
**hey (2)** 91:13;166:19
**HF (1)** 6:20
**higher (3)** 123:17;138:11; 198:10
**highlighted (3)** 55:1,5;56:19
**historic (1)** 119:20
**history (1)** 11:14
**hit (2)** 38:11;188:13
**hm (1)** 192:15
**hoc (4)** 72:11;165:22;166:2; 196:16
**hold (6)** 39:19;66:13;88:25; 114:23;122:23;166:2
**holder (1)** 34:19
**holders (2)** 11:21;118:11
**holdout (1)** 122:23
**holds (3)** 42:1;80:22;82:9
**holiday (11)** 141:7,22;147:1; 149:15;164:22;181:24, 24;182:1,4;192:25; 193:3
**holidays (3)** 123:18;124:6;144:6
**home (4)** 48:18,19;103:5; 176:18
**homeless (3)** 127:13;136:3,20
**homeowners' (1)** 153:5
**homes (2)** 137:19;203:9
**honest (1)** 139:2
**Honor (206)** 7:2;9:11;11:5,10,15, 18,23;12:19;13:2,10; 14:19;15:5;17:23,25; 18:14;19:12,18,19; 20:11;23:15;25:17,21; 27:14;29:13;35:5,16; 42:8;44:2;48:2;52:8; 55:4;61:5;63:21;64:8; 72:5,10;73:10,13,21; 74:6,10;75:3,4,18;76:9, 15;77:16;78:2,10;80:9; 81:9;82:21;83:1,19; 87:1,7,10,20;88:4;89:4, 14,16;90:3,16,21,25; 91:9,11,15,18;93:13; 94:24;95:25;96:12,15; 97:14;99:18;100:5,24; 101:5,16;103:9;104:9; 105:2;106:13;107:3, 10,16,23;109:2,5,21; 110:23;111:1,15; 112:23;114:4;115:13; 116:17;117:1,21; 118:18;119:7,19,25; 123:13;125:25;127:11; 128:14,17;130:9; 131:6,13;132:5,11; 133:3,25;135:11; 136:11;137:23;139:21; 140:10;141:1;143:9; 144:21;146:4,16; 148:16;149:15;150:18; 152:21;153:5,25; 154:5,6,8,12,23; 156:17,22;157:11; 158:18,19;159:1,4; 160:16;161:25;162:12, 23;163:2,8,19,20; 164:7;165:20,23; 166:2,5,14,23;167:12, 18;168:5,9,14,20,23; 169:9,12,14,19;170:1, 2,16;171:3,15,22; 172:6;173:7,12;176:3; 180:5;185:1;186:18; 187:21;189:20;190:18; 192:4,14,16;193:9; 194:14,18;195:1,6; 196:2,22;197:20; 199:20,22;200:10; 201:1,4,14;202:2; 204:1
**Honor's (5)** 99:4;137:11;156:17, 24;164:21
**hope (4)** 71:8;92:24;202:17, 20
**hopefully (5)** 41:12;107:18; 170:18;194:21;198:12
**Horizon (2)** 122:14;146:4
**horrible (1)** 126:11
**host (1)** 17:6
**Hostetler (2)** 58:13;185:15
**hours (3)** 27:9;70:25;200:22
**house (4)** 161:15;165:8; 176:18;189:6
**housekeeping (1)** 116:16
**How's (1)** 128:16
**huge (1)** 9:17
**Huh (2)** 87:14;181:16
**Hum (1)** 51:17
**human (3)** 27:8;141:15;149:6
**humanly (1)** 141:22
**hundred (3)** 24:20,21,22
**hundreds (2)** 21:6;113:8
**husbands (1)** 127:14
**hypothetical (1)** 47:21

**I**

**idea (9)** 7:21;84:8;85:18; 118:20;150:20;170:21; 171:12;172:21;179:15
**ideal (1)** 131:24
**ideally (1)** 24:12
**iffy (1)** 177:8
**ignored (1)** 75:17
**ignoring (1)** 43:2
**ii (1)** 31:12
**Illustrated (2)** 15:20,22
**imagine (1)** 115:25
**immediately (1)** 162:20
**immense (1)** 176:7
**imminent (1)** 121:2
**impact (2)** 110:21,21
**impacted (1)** 105:15
**impacting (1)** 197:23
**impeached (1)** 192:19
**impeachment (1)** 192:18
**impede (1)** 131:8
**impediment (1)** 128:7
**implement (1)** 193:10
**implemented (1)** 128:10
**implicates (1)** 44:25
**implicit (1)** 116:6
**importance (1)** 128:21
**important (19)** 32:4;63:19;75:24; 107:21;116:13;129:14; 136:1;140:3;141:16; 157:8;175:11;178:4; 184:6,17;189:23; 190:15;197:24;200:24; 201:18
**importantly (3)** 18:11;109:5;114:13
**impractical (1)** 109:3
**impressed (1)** 201:20
**impressions (1)** 18:9
**improved (1)** 130:14
**improvement (2)** 86:1,2
**inappropriate (4)** 36:5;44:13;110:1; 140:11
**incapable (1)** 59:14
**inclined (1)** 33:13
**include (9)** 26:10;31:8;48:16; 49:1,11;58:21;65:17; 75:8;80:18
**included (5)** 45:10,16;56:12,24; 102:9
**includes (9)** 14:21;19:18;36:12; 44:23;46:20;92:12,13, 14,14
**including (8)** 12:2;23:5;63:25; 74:24;93:9;99:22; 133:13;202:23
**incomprehensible (1)** 21:4
**inconsistency (1)** 52:22
**inconsistent (1)** 31:6
**incorporated (1)** 94:4
**incorporates (1)** 18:5
**increase (4)** 16:22;18:6;143:7,8
**increased (4)** 15:14,14;17:1;18:9
**increasing (1)** 131:15
**incredibly (1)** 184:5
**indeed (1)** 137:14
**indicated (3)** 63:15;79:9;105:12
**indicating (1)** 79:10
**indifferent (1)** 105:13
**indiscernible (1)** 152:16
**individual (22)** 24:10;32:12,14,17, 17;34:14,15;35:14; 50:21;64:13;65:19,20; 99:22;101:1;102:11, 12,16,23;103:10,14; 177:14,24
**individuals (3)** 48:8;102:8;104:1
**indulge (1)** 99:3
**indulgence (1)** 94:25
**inexpensive (2)** 143:5,5
**influencers (2)**

18:12;158:9
**inform (1)**
185:19
**informal (13)**
43:4,7,10,14;44:1,8,13;45:1;95:3;96:5,18,24;97:10
**information (46)**
35:18;36:12;47:5;49:1,9;62:5;63:9;67:20;68:7;69:22;73:1;102:10;109:11;119:21;130:23;132:19;143:24;148:23;155:1,12,18,24,25;156:9;161:21;162:10,17;163:5;171:24;172:8,9,21;173:1;175:21;177:2,19,23,24;179:10;180:24;182:23;183:1;185:12,21,24;201:8
**informed (2)**
180:17;182:23
**ingrained (1)**
98:7
**initially (1)**
16:19
**injuries (1)**
189:7
**injury (10)**
42:1;76:20;77:2;79:8,12,17;85:17;86:20;146:5;176:18
**input (1)**
125:7
**insert (1)**
67:18
**insisting (1)**
32:19
**insists (1)**
186:15
**Instagram (3)**
17:19;137:3;201:23
**instances (1)**
43:12
**instantly (1)**
137:10
**Instead (3)**
12:23;121:10;178:17
**instincts (1)**
202:10
**instituted (1)**
137:10
**instructed (1)**
63:7
**instruction (1)**
62:4
**instructions (5)**
55:4,5,24;56:2;62:1
**insulation (1)**
153:9
**insurance (10)**
65:18,21;175:2,12;177:24;178:5;179:14;180:3;182:2,9
**insurers (1)**
65:16
**integrated (1)**
175:9
**intelligence (1)**
142:6
**intelligent (1)**
120:16
**intend (1)**
167:19
**intent (1)**
51:7
**intentionally (1)**
69:23
**interacting (1)**
126:7
**interest (3)**
12:1;40:14;60:2
**interested (2)**
110:2;194:17
**interests (6)**
39:18;40:6;41:13;104:1;127:10;183:21
**internally (1)**
126:13
**internet (1)**
186:1
**interprets (1)**
94:14
**interrelated (2)**
133:2;139:22
**interrelates (1)**
131:6
**interrupt (2)**
132:5;187:8
**interval (1)**
16:7
**intervals (2)**
16:7,9
**interviewed (1)**
139:4
**intimidated (1)**
27:21
**into (18)**
16:15;21:3;25:14;54:6;74:21;77:17;92:11;94:4;96:15;109:2;129:10;132:14;140:4;179:3;180:23;182:8;193:19;203:8
**introduce (1)**
6:19
**investment (2)**
170:1,18
**invite (1)**
200:18
**invites (1)**
47:19
**involve (2)**
111:14;186:13
**involved (4)**
120:25;152:19;170:18;171:25
**involvement (1)**
122:12
**involving (1)**
186:12
**iPhone (1)**
201:24
**irrelevant (1)**
179:10
**irreverent (1)**
129:7
**issue (46)**
9:14;10:2;12:8;33:1;34:4;47:16;55:7,23;59:9;77:3;78:19;79:9;80:16;85:1,8;91:2;92:7;93:21;95:2;100:2,18;105:3,18;107:2,13;115:13;116:15;121:14;139:21;153:23;155:9;156:4;159:18;162:13,23;163:23;164:1,19;172:22;174:1;180:25;185:11;192:2;194:3;199:4;200:11
**issued (3)**
7:4;110:13;161:7
**issues (29)**
7:6,7;9:23;11:9;12:22;54:24;70:24;80:10;84:8;117:13,19;128:20,20,21;133:2;138:21;154:9;155:8;162:13;179:1,16;191:11;193:13,21;194:6,21,23;195:7;201:17
**item (3)**
167:17;180:12;186:3
**items (3)**
7:9;68:18;180:13
**iterative (1)**
145:18

**J**

**January (25)**
12:9,12;42:6;62:6;65:6;76:22;80:24;81:25;82:8,10,13,16;87:4;103:18;109:2;112:10,11;119:1;121:10;125:6,14;126:4;127:8;175:15;183:8
**JCCP (2)**
125:8;178:2
**jeopardizes (1)**
111:8
**job (2)**
158:6;177:3
**jobs (1)**
146:9
**John (4)**
36:3;67:13;102:9;164:12
**join (4)**
83:21,25;86:5;167:5
**joinder (1)**
166:5
**joined (4)**
91:20;172:6;200:4,5
**joint (5)**
92:14;93:1,10;131:23;195:4
**joke (1)**
193:22
**joking (1)**
193:23
**Jones (4)**
34:22;52:6;103:2;199:23
**Jose (1)**
200:7
**jot (1)**
7:18
**Journal (1)**
16:3
**joys (1)**
166:11
**Judge (9)**
84:12;107:24,24;108:1,8;121:1;124:3;151:3;186:15
**judges (1)**
129:7
**judging (1)**
100:13
**judgment (4)**
20:8;33:21;192:7;203:12
**Julian (2)**
120:6;122:12
**July (19)**
22:12;23:1,4,7;24:6,13;25:1;26:21,21;27:4,11;39:10;115:20;140:4;199:16,16;200:10,19;203:19
**JUNE (8)**
6:1;108:23;109:1;111:3;116:18;140:4;154:25;157:17

**K**

**Karotkin (450)**
6:5,7,10,14,16,16,24;7:2,12;8:4,9,12,14,18;9:1,3,5,7,10,19,22;10:5,7,12,17,19,23;11:1,3,5;12:6,16,18;13:5,9,12,14,19,22,24;14:1,3,5,7,9,12,15,18,25;15:9,12;16:9,12,14,17;17:15,17;19:7,10,12;20:5,9,11,14,20;21:10,12,14,17,24;22:4,9,14,18,20,22;23:1,4,11,13,15,18,23;24:1,4,8,16,20,23,25;25:11,13,16,21;26:4,7,9,15,17,19,23,25;27:4,7,10,12,14,17,23,25;28:2,4,10,16,18,21,25;29:13,17,20,24;30:1,4,12,14,16;31:4,8,18,21,22;32:9,21;33:3,13,25;34:5,10,15,25;35:3,5,16,23;36:2,12,14,16,18,21,23;37:1,7,13,15;38:1,3,7;39:1,4,16,20;40:2,4,10,15,17,19,23;41:1,3,5,8,10,15,17,24;42:8,13,16,20,24;43:15,21,23;44:2,4,7,12,17,21,24;45:7,10,12,21,24;46:3,6,19,21;47:1,4,9,12;48:1,6,25;49:5,13,16;50:1,4,17,19,25;51:2,4,7,9,11,13,16,19,23;52:1,16;53:7,13,18,22;54:4,9,13,20,22,24;55:3,7,10,12,15,17,20,23;56:3,6,12,15,17,22,24;57:3,8,11,15,18;59:6;60:13,14,16,19,22;61:2,22,23;62:9,11,15,17,19,21,23;63:1,4,17;64:8,17,21,23,25;65:7,9,22,25;66:3,7,9,11,15,20;67:8;68:17;69:3,6,9,15,19;70:1,5,10,13,17;71:1,3,5,9,11,13,17,18,20,24;72:2,7;74:23,24;75:18,20;76:4;77:14,16,21,25;78:5,7;79:2;80:6,18;81:7,9,11,14,22;82:1,6,11,13,15,18,20,25;83:2,4,13,17;86:9,15,25;87:6,10;95:13;96:4;97:6,14,16,23,25;98:23,25;101:23;102:1,4,7,19;103:1;106:11,13,16,20,23;107:9,10;108:3,5,7,10,13,15,19;109:1,14,17,20;110:7,23;111:1,5,7,14,22,24;112:7,14,19,23;113:1,6,10,13,16,19,21,24;114:1,3,15;115:5,7,10,12,21;116:8,10;119:16;132:5;137:23;138:11;139:16;140:10,12;151:1;153:21;160:10;170:23;171:5;180:5,7;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 218 of 233

182:25;185:3;186:19, 21,24;187:3,21,23; 188:2,4,17,19;189:7, 10,16,18,20;190:12,14; 194:1,12;203:14
**Karotkin's (1)** 132:23
**keep (18)** 30:7,8,9;44:5;52:3; 63:19;92:6;98:24,25; 99:10,14;116:21; 128:5;144:1;164:10; 177:23;198:6,8
**kept (1)** 174:6
**key (4)** 121:18;123:3,3; 131:3
**kidding (1)** 120:7
**kill (1)** 189:17
**kind (15)** 8:3;10:3;17:13;25:6; 66:5;73:8;81:1;114:16; 119:4;120:17;127:21; 132:16;136:21;158:25; 170:14
**kinds (3)** 13:6;90:4;158:9
**Kirkland (1)** 196:3
**knew (6)** 108:15;126:9;129:8; 135:6;203:7,7
**knowing (2)** 151:6;152:1
**known (13)** 23:5,6,6;31:14;34:8; 36:10;50:10;52:8; 59:14;129:4;133:8; 152:16;159:14
**knows (6)** 31:2;107:16;125:7; 133:10;157:6;169:10

## L

**labor (1)** 117:10
**laid (1)** 101:18
**land (2)** 89:22;147:13
**language (44)** 32:11;33:8;34:19; 44:12;45:7;46:3;49:4, 8,15;52:12,13;56:1,1; 57:13;59:11,15;60:6, 17,18,25;62:10;63:5, 13,20;64:16;72:17; 83:13;86:13,15;87:11; 90:2,17;91:1,2;92:8; 95:16;96:1;100:8,11, 12,16;116:17;121:18; 195:15
**languish (1)** 157:5
**large (2)** 124:22;154:22
**largely (2)** 191:4;197:20
**larger (1)** 16:11
**large-scale (1)** 148:22
**largest (1)** 11:13
**Larry (1)** 91:18
**Lars (1)** 195:2
**last (20)** 8:2;10:1;14:22,23; 18:24;26:13;30:4; 49:18;89:16;94:24; 113:23;121:17;122:23; 126:14;127:2;130:24; 145:11;147:24;148:9; 152:6
**late (10)** 95:2,4;96:19,22; 98:15,16;110:18; 125:1;164:14,17
**latent (1)** 159:15
**later (27)** 26:3,11;33:15,19; 59:12;60:4,10,21,22; 61:9,16;63:7;85:19; 99:19;103:15;108:2; 112:9;113:19,20; 115:25;116:2;118:25; 127:18;132:20;162:10, 11;168:3
**latter (1)** 62:8
**launch (1)** 140:4
**law (35)** 20:3;35:1,14;43:9; 44:6,23;45:1;79:3,18, 22;81:14,14,18;84:13; 90:9;95:4,11;96:6,8,22, 23;97:7;98:6;104:4; 134:7,22;137:15; 142:9;174:23;175:5; 177:24;178:19;184:8, 12;198:7
**lawdo (1)** 185:23
**lawful (1)** 31:13
**lawyer (5)** 33:6;59:19;120:25; 133:7;172:18
**lawyers (17)** 21:21;32:18;65:20; 72:2,4;84:7,10;126:2; 128:24;164:10;185:18; 186:15,16;187:9; 188:1;201:21;203:3
**layers (1)** 18:5
**layperson (1)** 29:22
**leader (1)** 120:5
**leading (1)** 189:23
**learned (1)** 145:17
**lease (1)** 90:4
**least (12)** 27:8;35:10;42:22; 43:9,9;54:1;111:15; 113:2;184:12;185:19; 195:21;199:3
**leave (8)** 40:7;42:20;65:12; 67:24;173:3;183:17; 184:19;190:17
**leaves (1)** 24:6
**LEBLANC (51)** 153:25;154:4,5,5,12, 17,20,22;155:7,9,11, 20,22;156:8,16,20,22; 157:8,11,14,17,20,22; 158:14,16,22;159:1,4, 7,10;160:2,4,16; 161:18,23,25;162:2,4, 6,12,19,23;163:8,17, 18,19;189:1;201:3,3, 13;202:2
**lecture (1)** 169:7
**led (1)** 96:14
**left (3)** 17:17;71:25;198:17
**legal (7)** 27:21;69:1;70:12; 85:1;88:23;90:23; 134:17
**legislature (3)** 108:21;127:1,6
**legitimate (2)** 17:24;177:7
**LEMON (11)** 164:7,12,12,16,18, 19;165:5,7,14,16,18
**length (1)** 158:8
**less (5)** 25:10;47:17;64:7; 146:19;188:8
**lesser (1)** 39:21
**lethargy (1)** 191:14
**lets (1)** 90:9
**letter (2)** 43:20;161:5
**letterhead (2)** 70:1,6
**letters (2)** 30:15;137:14
**letting (2)** 21:20;79:2
**level (2)** 111:11;138:11
**leveraging (1)** 18:12
**liaison (3)** 173:10,14;184:7
**liberal (1)** 43:3
**life (4)** 141:15;147:9; 166:11;183:23
**light (2)** 20:23;153:4
**likelihood (1)** 193:18
**likely (4)** 141:23,25;142:2; 203:4
**limitation (1)** 74:24
**limited (7)** 7:6;19:16;79:7; 92:22;93:1;172:13; 197:6
**limiting (1)** 79:8
**line (19)** 8:7;29:19,20;44:20; 53:1;58:21;59:3;69:13; 78:6,9;80:10,14;84:8; 96:21;103:6;110:11; 128:8;148:13;189:14
**Lines (1)** 52:25
**linked (1)** 79:12
**liquidated (1)** 59:25
**list (5)** 60:11;75:4;98:5; 168:22,24
**listed (2)** 67:3;90:5
**listen (7)** 20:17;21:7;45:5; 124:14;126:9;137:5; 159:17
**listening (2)** 32:3;140:13
**listens (1)** 43:19
**listing (1)** 68:21
**literally (2)** 136:20;161:4
**litigation (2)** 173:15,20
**litigious (1)** 182:11
**little (19)** 22:2;31:12,12;57:13; 62:15;65:16;88:20; 118:16;130:20;132:11; 146:8;151:10;159:20, 21;161:8;168:15; 171:8;183:23;189:5
**live (9)** 18:23;71:4;81:3,6; 129:15;136:3,17; 140:5;174:14
**live- (1)** 137:4
**lived (2)** 17:9;98:8
**lives (3)** 18:13;30:6;127:13
**living (4)** 161:13,13;169:11; 182:19
**local (4)** 16:25;18:8;92:12; 93:10
**locally (1)** 18:7
**located (3)** 92:23;93:5,11
**logical (2)** 125:2;188:22
**lone (1)** 25:22
**long (10)** 22:6;88:19;98:5; 104:9;126:11;146:21; 153:7;160:13;194:14, 16
**longer (5)** 114:9;132:25; 146:15;161:23;162:7
**look (32)** 14:18;15:1,12,25; 22:24;28:11;38:4; 40:10,11;41:7,8;47:16; 48:2;52:25;54:25; 57:17;61:5;62:13; 88:23;93:13,17;95:23; 96:15;104:20;110:2; 111:23;114:4;115:19; 133:6;153:10;197:13; 199:3
**looked (3)** 40:12;56:20;89:20
**looking (12)** 28:18;34:16;56:18;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 219 of 233

63:24;66:4;75:11;
80:10;87:9;95:16,22;
96:12;203:16
**looks (1)**
59:5
**losing (2)**
101:24;176:16
**loss (2)**
176:20,20
**losses (1)**
111:18
**lost (5)**
48:18,19;127:14;
159:15;203:9
**lot (22)**
21:2;29:4;31:1,16;
38:23;51:3;69:25;72:9;
89:21;93:2;98:4;106:6;
111:12;127:10;140:23;
143:15;168:25;169:7;
177:1;184:13;188:8;
194:19
**lots (5)**
33:18;84:7;126:14;
133:10;140:7
**loved (1)**
203:9
**luck (3)**
35:14;100:3;103:6
**luxury (2)**
119:7,8

**M**

**macro (1)**
111:11
**Magazine (4)**
15:19,20,22;18:6
**magazines (1)**
15:18
**magic (4)**
122:15;144:25;
145:1;165:3
**mail (6)**
22:16;24:14;38:19;
142:3,3;182:6
**mailed (5)**
24:15,18;50:10,13;
137:16
**mailing (6)**
23:4,5;24:4;26:16;
131:4;137:13
**main (1)**
121:13
**Mainly (1)**
177:5
**maintain (1)**
46:24
**maintained (2)**
49:2;63:6
**major (2)**
75:16;135:15
**makes (5)**
38:18;53:2;141:19;
172:20;181:1
**making (18)**
20:23;39:4;79:1;
86:1;103:17;116:2;
130:6,6;132:20;
139:15;151:6;155:14;
172:18;177:6;179:14;
185:13,25;187:10
**management (3)**
178:8,9,10
**Manges (2)**
6:17;52:4
**manned (1)**
27:6
**manner (2)**
155:15;157:3
**many (17)**
48:4;52:9;80:1;86:2;
136:2,15;142:25;
143:3;148:6;158:8,9;
163:12;168:20;200:22;
202:10;204:4,4
**margin (1)**
34:17
**maritime (2)**
147:10,12
**mark (2)**
28:19;199:22
**market (4)**
15:4,5;17:5;18:19
**markup (1)**
9:6
**mass (4)**
146:5;149:24;
188:25;189:2
**masterfully (1)**
171:24
**Matter (11)**
6:4;35:15;48:12;
55:13;90:1,6;91:4;
116:16;141:14,15;
193:23
**matters (2)**
7:17;105:4
**Matthew (1)**
52:4
**maximize (1)**
135:19
**maximizing (2)**
149:17;193:17
**maximum (2)**
145:1,2
**may (29)**
21:19;22:18,20;38:1;
40:19;45:18;49:25;
54:20;63:1,10,15;
68:19;83:19;102:24;
107:18;110:23;120:8,
11;124:19;134:18;
135:7;140:23;154:15,
24;156:2;159:13,14;
197:14;203:5
**maybe (21)**
25:9;29:12;45:19;
46:1;47:10,10;50:5,15,
16;96:25;97:20;98:6;
103:20,21;106:25;
143:6;151:8,10;152:6;
167:2;201:10
**mean (127)**
6:12;7:14,22;13:18,
21;16:10;22:1,1,24;
23:24;25:6;26:14;
28:11,14;29:22,25;
30:6,7,9;33:22;37:16;
39:6,11,19;41:2;42:16;
43:11;44:13;45:22;
46:1;47:24;48:11;
49:14,25;50:20;52:23;
59:14,21;60:3,14;
61:12,13;62:10;64:10;
67:5;68:20,25;69:24;
70:7,15;74:20;75:15;
76:7;77:9,24;79:1,11;
80:9;81:8,10;82:7;
83:7,12;84:22;86:6;
89:5;90:9;92:4,20;
94:10;97:23;98:14;
100:15;103:8;105:20;
106:14;107:25;109:15;
110:22;111:20;112:1,
1,17;115:1,13;117:22;
118:20;119:12;120:7,
8,21;125:1;126:22;
128:3;132:18,20;
133:1,21;136:6,20;
138:12,16;139:1;
143:14;144:4;151:6;
152:13;154:10;157:11;
158:24;162:12;165:3,
13;166:8;167:15;
169:7;176:18,24;
179:21;181:22;182:16;
183:7;189:6;190:24;
191:2;194:4;195:4
**meaning (3)**
105:14;156:1;179:23
**meaningful (6)**
124:6;125:18;
141:17;192:22,24;
193:4
**means (23)**
15:16;19:17;27:22;
29:7,23;30:4,10;33:12;
35:14;61:13;65:20,24;
82:3;84:4;85:13;93:3,
4,23;94:19;106:3;
109:10;155:25;193:12
**meantime (1)**
189:17
**measured (1)**
19:2
**Media (15)**
6:20,20;11:14;130:7;
132:6;137:3,11,24;
138:20;139:17;141:6;
143:5;145:2;152:8;
184:5
**mediated (2)**
108:9,12
**mediates (1)**
108:10
**mediator (1)**
108:16
**medical (4)**
46:23;47:22;48:22;
177:23
**meet (2)**
157:3;172:25
**meeting (1)**
155:1
**meetings (1)**
126:3
**meltdowns (1)**
122:13
**member (5)**
100:4;102:11,12;
117:16;139:6
**members (12)**
64:13;101:14;105:5;
126:3;127:14;136:25;
137:1;141:5;163:4;
166:2;184:14;187:11
**memorial (2)**
71:10,17
**memory (1)**
121:1
**mention (1)**
108:25
**mentioned (11)**
21:5;22:23;68:21;
69:4;74:11;76:15;
87:21;109:1,21;132:1;
146:4
**merge (1)**
176:14
**merits (1)**
35:9
**mess (1)**
44:6
**message (2)**
13:13;132:3
**messaging (2)**
132:2;135:21
**methodology (3)**
167:2;173:6;203:24
**methods (1)**
19:2
**metric (1)**
170:7
**metrics (1)**
145:12
**Michael (2)**
99:4;165:21
**middle (1)**
126:22
**might (30)**
7:11,19,20,21;10:11;
12:10;27:20;29:16;
39:17;43:24,25;48:12;
49:19;50:2;74:8;86:12;
89:13;108:1;112:10;
124:4;134:16;136:21;
173:12;176:25;189:5;
194:7;198:16;199:14;
202:16;203:21
**might've (1)**
177:7
**Mike (1)**
196:2
**milder (1)**
146:8
**mill (1)**
78:15
**Millbank (1)**
154:6
**million (6)**
24:5;48:20;59:20;
130:19;159:12;189:3
**mind (10)**
6:14;11:1;29:7;
34:12;37:18;57:14;
58:15;127:4;198:20;
203:4
**minds (1)**
10:13
**minimize (3)**
106:3;123:21;172:1
**minimum (1)**
144:12
**minor (1)**
65:12
**minute (8)**
28:13;31:25;32:24;
49:22;56:5;88:24;
90:20;175:11
**minutes (4)**
7:12;99:3;175:10;
190:5
**mirrors (1)**
7:15
**misinterpretations (1)**
179:24
**misled (1)**
73:7
**miss (1)**
50:13
**missed (5)**
29:12,16;50:6,7,16
**missing (2)**
21:20;179:11
**mistake (3)**
39:20;129:2,5
**mistaken (1)**
19:24
**misunderstandings (1)**
180:1
**mix (1)**
139:10
**mixed (1)**
179:3

**modifications (4)**
11:16;17:21;195:19, 20
**modified (1)**
188:24
**moment (5)**
22:3;110:15;114:20; 116:5;198:19
**money (4)**
67:16,22;170:21; 188:14
**Monterey (1)**
200:6
**month (6)**
103:21;107:1; 110:20;169:14;183:20, 22
**month-by-month (1)**
146:25
**monthly (1)**
149:11
**months (22)**
32:23;106:5;112:11, 11,12,21;140:8;147:23, 24;148:2;154:17; 156:18,22;157:1; 158:3;163:12;175:23; 178:17;179:4,6;181:7; 184:10
**moon (1)**
169:11
**more (81)**
7:2;8:7;10:15,22,23; 11:6,22;13:22;14:2,3,5, 6,6;18:8;25:16;28:8, 23;45:13,23;47:17; 48:8,15;49:6;53:11; 61:16;62:2,2;64:6,10; 73:1;82:20;85:7;94:19; 107:15;109:5;111:7,7; 112:5;114:13;117:4; 121:24,25;122:5; 127:19;132:25;141:16, 25;142:18,18,18; 143:3;144:3,14; 146:13;148:2;151:8, 11;152:8;156:2; 159:20,21;161:18; 162:6;164:24;168:5; 172:20;176:25;180:5; 183:23;184:13;185:3, 22;187:14;188:21; 189:22;197:18;199:1, 21;201:14;202:7;203:8
**moreover (1)**
23:15
**morning (17)**
6:5,7,23;35:10;72:5, 10;73:22;116:7; 117:15;121:18;128:13, 14,16;130:12;169:13; 191:19,20
**most (21)**
7:7;11:13;12:19,20; 20:14;22:15;128:24; 129:1,1;130:1;131:5, 25;134:8;135:1; 137:10;140:6,7; 141:23;145:2;178:4; 189:11
**mostly (2)**
91:20;133:18
**motion (31)**
12:21,24,24;35:9; 90:8;91:4;94:3;99:19; 100:21;110:16;118:10; 119:18;154:14;156:12; 162:21;166:6,24; 167:16;169:25;170:24; 173:2;181:1;190:1,3,5, 13;191:14;198:2,2,3,3
**motions (2)**
195:11;197:7
**motivate (1)**
140:8
**motivates (1)**
150:20
**motive (1)**
12:14
**mouth (2)**
165:8;184:17
**move (19)**
11:19;13:1;41:9; 105:3;109:6,7;110:20; 120:1;155:2,3,12,14; 157:2,23;169:19; 171:7;172:4;183:19; 190:19
**moved (1)**
18:24
**movement (1)**
184:9
**movements (1)**
191:21
**moving (7)**
12:4;111:19;162:15; 164:21;178:15;181:8; 203:23
**much (21)**
7:15,16;25:10;28:12; 32:3;33:19;37:21; 58:17;68:24;75:16; 95:2;98:7;107:11; 114:9;123:22;128:18; 130:11;144:19;179:9; 198:1;202:19
**Mullane (9)**
19:22;21:5;28:6; 121:17;129:18;130:2; 135:18;140:6;203:6
**multimedia (1)**
145:6
**must (10)**
30:11;32:15;34:20; 45:19,22;50:6;68:4; 69:14;102:8,16
**myself (2)**
103:17;127:6
**mystify (2)**
12:1,2

**N**

**nailed (1)**
176:3
**name (7)**
37:5;53:16;67:19; 164:9;176:17;196:24, 25
**names (4)**
23:19;35:20;52:3; 74:5
**narrowed (1)**
194:22
**narrowing (1)**
194:21
**national (2)**
15:19;40:16
**nationwide (3)**
18:6,8,23
**nature (2)**
149:6;176:17
**necessarily (5)**
40:11;98:6;119:23; 155:4;156:5
**necessary (12)**
17:24;66:10;107:19; 109:5;120:9,11;122:2; 137:17;157:23;197:15, 16;198:16
**need (45)**
16:15;25:5;40:9; 41:11;48:9;52:20;53:8; 78:3;81:18;86:22;87:7; 90:13;93:5,15;106:6; 110:23;113:1;121:5, 11;122:24;123:4,4,5; 125:19;143:12,14; 150:19;156:2,8;157:2; 162:17,24;163:5; 169:21,22;171:13,21; 175:3;179:17;183:1,2; 191:16;195:21;196:11; 202:21
**needed (3)**
57:12;94:20;159:16
**needing (1)**
76:18
**needs (15)**
39:11;64:24;69:1; 79:5;120:15;127:4; 141:24;162:10;168:6; 170:4,6;172:25; 187:17;198:18,25
**NEF (1)**
38:6
**negatively (1)**
110:21
**negligently (1)**
78:23
**negotiated (1)**
66:1
**negotiations (2)**
118:14,21
**neither (1)**
146:1
**neutral (1)**
170:21
**nevertheless (1)**
166:18
**new (4)**
21:1;22:17;136:24; 170:1
**news (4)**
17:11,12;152:9; 192:1
**Newsom (8)**
107:24,24,25;108:1, 8,18,19;157:14
**Newsom's (2)**
108:17;157:4
**newspaper (4)**
25:3,23;30:8;142:4
**newspapers (3)**
15:23,24;26:1
**next (26)**
29:13,18;30:19; 31:10,10;34:6,7;37:20; 41:11;42:25;43:20; 45:14;91:13;103:20, 21;107:9;108:23; 126:22;150:10;157:11; 164:8;194:10;197:16; 198:16;199:15;200:14
**NextEra (1)**
195:14
**night (1)**
121:17
**ninety (1)**
189:21
**ninety- (1)**
147:22
**ninety-five (6)**
15:3;18:16;19:15; 22:7;50:9;189:21
**ninety-seven (2)**
24:6;25:1
**ninety-two (1)**
25:2
**Ninth (10)**
43:3,5,13,25;44:23, 25;96:5;98:5;134:21, 22
**nitpick (1)**
39:17
**nitpicking (1)**
52:24
**nitpicks (2)**
10:10,10
**nobody (2)**
91:12;197:7
**nobody's (1)**
197:6
**no-brainer (1)**
122:6
**nominally (1)**
35:11
**non (1)**
23:25
**nonbankruptcy (1)**
84:7
**nonexperts (1)**
129:2
**nonissue (2)**
7:19;116:20
**nonnegotiable (1)**
32:1
**nonpersonal (1)**
85:17
**nontort (1)**
23:25
**nonvictims (2)**
141:8,12
**nor (2)**
143:17;146:1
**normal (2)**
37:10;121:25
**North (7)**
125:8;136:14,15,16; 173:22;181:7;184:8
**Northern (10)**
15:24;30:21,24;31:2; 74:12;75:5,7;135:21, 24;200:5
**nose (1)**
71:16
**notably (1)**
132:12
**notation (1)**
39:13
**note (7)**
15:20;16:23;19:12; 107:23;118:8;119:17; 190:8
**noted (5)**
7:5;17:3;95:1;105:4; 124:3
**noteholder (1)**
165:22
**notice (114)**
9:24;11:6,12,13,13; 14:21;15:16;17:19; 18:2,4,4,5,15;19:2,13, 17;20:1,4;25:6;28:5; 29:11;30:16,16;37:8; 50:9,23;51:2,6;52:6; 53:2,4,5;66:15,21; 68:20;69:1,11,12,22; 70:14;71:8;79:5;81:17; 105:12;107:11,14; 114:8;115:14;117:18; 121:19,20,24;125:17; 128:20;129:19;130:12, 18;131:4,18,19,21,21, 24,25;133:6,22;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 221 of 233

136:21;137:2,9;138:4;140:4;141:14;145:3;146:4;147:8,11,17;150:9,11;151:11;152:22;153:6;158:5,20;159:8,16;160:5,6,7,9,11,12;173:13;174:3;175:24;179:1,9,18,25;183:9,13;187:4;189:1,2,3,4,12,21,21;190:4;192:5;193:10,12,14
**noticed (1)**
71:9
**notice-related (1)**
129:25
**notices (8)**
16:2;147:11;149:19,25;152:4,6;159:12;203:17
**noticing (11)**
12:22;13:16;14:20;17:7;114:11;132:6;140:11;150:16;152:10;159:12;190:19
**notification (1)**
131:15
**notify (1)**
49:1
**notion (3)**
126:4;143:21;148:2
**Notre (4)**
181:15,17;192:11;202:1
**notwithstanding (2)**
99:23;103:14
**November (15)**
112:11;165:1,9,10;181:8,9,10,11,13;183:6,7,7;184:2;192:12,13
**number (23)**
18:6;22:19;52:18;56:8;60:1;69:17;70:9;99:12;107:12;109:8;124:21,22;125:8,22,23;136:19;145:2;179:9;181:25;186:25;192:21;194:16;195:8
**numbers (1)**
53:16
**numerous (1)**
73:25

**O**

**Oakland (1)**
105:9
**object (10)**
90:1,7,8;91:3,14;95:2;116:14,23;137:23;151:1
**objected (3)**
99:6;151:1;156:20
**objecting (1)**
45:8
**objection (12)**
32:24;42:9,10;48:10;61:12;166:6;196:17;197:5,6;200:4,4,9
**objections (10)**
8:19;9:11;99:7,15;109:22;155:7;162:24;196:5,7;200:1
**objectors (2)**
195:14;196:4
**obligation (1)**
178:21
**observable (2)**
136:7,19
**obstacle (1)**
119:1
**obtain (1)**
17:9
**obtained (2)**
162:10;185:22
**obviated (1)**
156:2
**obvious (1)**
115:18
**Obviously (18)**
59:23;68:17;75:16;118:1,5,19,22;119:21;121:18;125:1;163:1;191:15,20;192:2,20;198:9;200:23;202:19
**OCC (5)**
153:24;158:23;161:18;198:13;199:9
**OCC's (1)**
166:6
**occur (1)**
176:21
**occurred (10)**
15:9;18:20;76:21;78:21;80:24;82:10;86:23;87:3,4;105:9
**occurs (1)**
33:18
**o'clock (2)**
107:5;169:13
**October (33)**
12:12;21:14;24:8,16,18;25:1;26:5,16;30:10;85:10;103:17;112:9;115:15,23;116:6;118:25;121:10;139:17;143:23;150:12,12;158:19;160:1,4;166:17,20;183:7;184:2;188:21;190:19;202:20,25;203:13
**odds (1)**
126:5
**off (10)**
29:9;83:11;110:10;123:18;124:5;138:19;154:23;156:4;194:15,15
**offense (2)**
187:14,14
**Office (2)**
73:25;170:20
**officer (2)**
6:20,25
**officers (1)**
187:12
**official (14)**
53:15,16,17,23;58:16;67:4;87:23;117:12;154:6;155:13;158:17;159:10;172:7;201:5
**often (1)**
69:1
**oil (1)**
147:15
**Okay22 (1)**
23:22
**old (2)**
151:3;152:10
**older (3)**
15:4;18:17,21
**once (2)**
16:4;153:8
**one (91)**
7:21;8:24;9:3,4,5;11:13;12:15,18;21:21;24:14;28:21;30:19;34:11;35:22;37:3,5,17;38:19;41:14,18;43:1;46:12;51:14;52:24;57:20;60:4;64:16;68:16;69:17;75:6;76:1,9;78:8;83:10,16,21;88:24,25;89:1,2;96:2;100:3;101:14;105:3,17;107:19;109:9;110:16;112:6,17;114:24;117:23;118:9;126:11;129:20;130:1;132:2;134:10;140:3;144:21;146:12,17,22;151:21;155:16;157:13;161:18;162:13;165:1;166:11;170:12;171:17;173:18;177:17;180:17;183:11,19;186:22;187:9;188:22;190:25;192:4;193:5,25;196:3;197:24;199:4,21;201:4;203:8,12
**ones (6)**
16:14;25:6;75:17;126:7;131:10;203:10
**ongoing (1)**
120:17
**online (6)**
17:6,6;18:10,10;19:17;201:23
**only (25)**
7:9;9:23;15:21;16:24;19:14;52:9;54:24;55:7,23;58:25;76:1;78:12;80:5;85:25;96:2;114:20;135:25;149:22;156:14;161:16;184:23;190:15;191:5;197:21;199:17
**oOo- (1)**
6:2
**open (8)**
7:9;27:3;56:8;104:15;171:10;172:4,14;197:8
**opening (1)**
6:12
**operationalizes (2)**
130:2,5
**opinion (3)**
46:2;179:20;188:2
**opinions (2)**
143:19;187:25
**opponents (1)**
187:11
**opportunity (9)**
98:17;124:5;135:12;149:18;169:15;191:7;196:6,18;200:8
**opposed (2)**
195:14,19
**opposition (5)**
74:18;116:4;120:3,6;185:3
**optics (1)**
124:20
**optimally (1)**
152:8
**option (4)**
58:22;60:8,11;114:20
**optional (1)**
59:4
**order (93)**
6:3;7:3,5,14,15;8:2,6,21,22;9:12;10:9;11:3,8;14:7;20:19;21:17;22:10,23;25:24;26:10,10,20;28:7,15;29:2,2;39:5;40:14;41:12;44:24;52:14;54:18;72:17;74:11;76:11,13;77:17;88:16,19,21;89:18,25;90:12;91:22,23,24;92:12;94:6;95:23;97:19;98:1;99:6,20;100:10;103:12;105:12;109:21;110:13;116:17;118:7;124:16;125:20;137:11;154:8;156:17;160:17;161:7;163:9,15;167:20;168:1;170:22;172:11,22;180:23,25;181:1;190:22;194:3,9;196:4;197:4,12,23,25;198:11,14,14,21;199:3,11;201:16;202:25
**ordering (1)**
28:15
**orders (11)**
40:14;70:20;89:21;100:11;175:7,9;176:13;178:8,9,10;201:22
**ordinary (1)**
84:3
**original (8)**
11:6;14:20;15:2,2;18:3;47:17;63:10;149:25
**originally (3)**
59:12;154:24;155:23
**Others (9)**
7:20;31:25;78:20;91:19;127:6;167:3;171:14;185:19;202:11
**otherwise (4)**
88:21;118:6;165:6;172:11
**OTT (1)**
18:8
**ought (7)**
97:1,9;151:10;159:20;180:24;185:24;194:2
**out (86)**
6:18;12:18;21:25;23:12;25:22;32:5;34:23;35:14;40:8,9;41:21;47:24;48:7;60:1;66:24;67:24;71:6,13,15,16;74:22;77:23;79:2;80:4,19;81:22;86:1;88:17;89:3;90:17,18,19;95:15,18;100:3,11,17;101:18;103:6;104:6;106:17;107:22;109:8;110:2;111:3,7;117:8;118:20;123:25;125:22;127:4,22;130:21;134:10,11;136:8,20;139:13,14;146:9,9;148:8;149:21;152:15;153:8;158:5,10;162:9;168:20;169:1;170:8;171:11;172:16;174:6;175:17;179:24;180:1,9;189:22;191:3;197:19;198:17;199:12,14;202:21;203:18
**outcome (4)**
35:4;101:15;187:13;198:11
**outreach (4)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 222 of 233

19:3,17;64:12;
129:19
**outside (9)**
12:13;18:23;93:3;
126:13;128:11;174:15,
18;175:21;178:2
**outstanding (6)**
9:11;54:24;196:5,17;
197:22;199:5
**over (27)**
18:20,22;47:23;
78:17;93:3;106:5;
108:16;124:9;131:18,
19;135:2,22;140:8;
145:2;149:14;164:5;
168:9,9;169:25;
174:15;178:20;180:14,
14;184:24;194:10;
195:25;198:16
**overall (2)**
19:3;135:20
**overkill (2)**
98:3,4
**override (1)**
72:18
**overrule (1)**
44:25
**overseeing (1)**
117:18
**overwhelmed (1)**
29:10
**overwhelming (1)**
13:23
**owed (5)**
43:21;65:5;67:16,22,
25
**own (4)**
34:23;109:24;
119:21;172:21

**P**

**package (1)**
171:19
**page (39)**
28:14;29:2,13,18;
31:10,10;33:7;34:7,17;
39:9,12,18;40:6;41:16,
19;43:1;45:14,14;
49:18,19;50:6,8;52:25;
53:4,23;54:1,2;55:1,4,
4,8,24;65:1;66:21;
67:1;69:12;99:11,12;
201:23
**paid (5)**
59:25;113:22;118:6;
127:18;144:19
**Pandora (1)**
17:2
**paper (3)**
44:8;174:6;203:16
**papers (6)**
13:20;95:4;110:3;
118:16;192:5;198:8
**Paradise (1)**
22:17
**paragraph (58)**
11:12;18:2,14;28:15;
29:1;37:2;39:18;40:5;
41:19,25;43:1,8,15,16;
44:25;46:8;49:8;50:7;
52:18;53:3;55:25;58:9,
17;76:10;77:6;79:2;
80:4;81:11;88:17;
91:14,24;92:8;93:7;
94:11;95:6,7,22,24;
96:15,17,18,19;97:7,
17,18,19,20,21;98:1,3;
99:5,15,16,17;100:2,
17,23;101:19
**paragraphs (6)**
32:11;41:22;89:17,
18,24;96:11
**parallel (1)**
120:20
**paramount (1)**
11:25
**pardon (2)**
85:2,5
**parse (1)**
82:4
**part (9)**
48:22;56:8;57:5;
75:4;112:19;154:22;
170:4;175:6;178:4
**participant (1)**
103:4
**participate (5)**
108:21;125:20;
126:3;127:19;193:7
**particular (13)**
32:19;42:9;44:7;
129:16;141:24;153:11,
15,15;156:1;184:6;
197:22;198:19,25
**particularly (7)**
9:11;23:24;33:18;
106:7;129:14;137:18;
188:23
**parties (16)**
12:2;25:18;43:17;
45:8;79:5;109:7;110:5;
118:22;120:15;121:21;
126:16;153:19;194:17;
195:8;198:23;201:11
**partner (2)**
194:25;195:2
**party (4)**
70:8;110:7;118:9;
179:18
**Pascuzzi (72)**
73:20,21,23,23,24;
74:3,6,10,16;75:3,12,
14;76:3,9,13,15,18,20,
24;77:5,11,24;78:2,6,9;
79:4,16;80:9,13,16,20,
25;81:2,4;82:24;83:1,
3;84:20;86:17,19,19;
87:1,5,13,15,18,20,24;
88:5,6,9,12,14,16;89:4,
7,10,16;90:11,25;91:6,
8,11,15;92:17;93:2;
98:19;199:1,2,7,13,20
**Pascuzzi's (2)**
86:10;90:17
**pass (1)**
184:14
**password (2)**
160:21;161:6
**past (2)**
97:9;121:2
**Paul (3)**
73:23;84:19;86:19
**pause (1)**
122:3
**pay (4)**
113:7,9,10,15
**payments (1)**
65:5
**pays (1)**
172:3
**people (124)**
10:13;14:14,16;
15:19,21;17:7,9,17;
20:3;29:4,10;31:1,15;
33:12;35:8,11,20;
36:10,14;38:23;40:14;
41:22;42:11;44:18;
49:1;51:17,20;59:22;
64:13;71:13;75:22;
80:2;81:19;84:22,25;
85:2,16,17;87:7;92:22;
98:4;100:18;101:17;
103:12;114:13;115:14;
121:23;122:16,21;
123:18;124:4,21,22;
125:12;127:13,13,14,
19;132:1;136:1,2,10,
16,20;137:5,14,20;
141:8,10,23,23,23,24,
24;143:21;144:3,18;
146:9;147:13;148:6;
150:5,21;152:15,17,18;
157:2;158:2;159:13;
165:8;168:9;170:19;
172:20;174:14,17;
175:17;176:10,25;
177:21;178:2;179:4,
11,11,13,15,17;180:2;
181:7,23;182:10,11,13,
22;184:9,24;185:19;
189:3,4,6,12,21;
193:13;194:7;198:17,
17
**per (1)**
111:10
**percent (12)**
15:3,15;18:17,20,22;
19:14,15,15;135:23;
147:23;184:20,24
**percentage (1)**
183:25
**perception (2)**
75:25;105:4
**perfect (2)**
83:13;153:1
**perhaps (9)**
12:20;41:20;43:2;
48:15;49:6;68:24;
112:17;128:10;196:12
**period (8)**
16:11;63:4;72:24;
104:6;125:15;126:11;
138:11;176:19
**periods (1)**
166:25
**permanent (1)**
136:24
**permit (2)**
43:10;118:2
**permitted (4)**
44:22;95:10;96:7;
109:22
**person (15)**
20:1;32:4;37:21;
41:25;80:22;82:9,21;
84:3;85:13;86:20;
148:10,10;183:1;
194:16;199:21
**personal (11)**
42:1;47:8;76:20;
77:1;79:8,12,17;86:20;
146:3;176:18;189:7
**personalized (1)**
66:25
**personally (1)**
152:19
**perspective (6)**
13:10;63:23;120:14;
154:13;167:6,23
**persuade (4)**
114:23;135:6;
147:25;187:13
**persuaded (2)**
124:25;132:24
**persuades (1)**
114:18
**persuasive (5)**
64:11;139:16;
143:23;148:5;187:19
**pertains (1)**
80:5
**pertinent (1)**
32:11
**petition (12)**
33:14,16,23;39:25;
76:22;77:7;78:11,13;
79:23;81:18;83:16;
84:18
**Petrie (1)**
126:1
**PG&E (23)**
6:4;70:1,6;78:17;
91:24;92:9,11;95:22;
108:9,12,20;112:1;
119:17;142:7;150:11;
170:13;175:13,23;
178:20;179:12;180:2;
195:15,20
**PG&E's (2)**
119:21;186:13
**ph (1)**
108:16
**Phone (5)**
110:6;137:2;141:6;
194:10;197:17
**phones (4)**
136:3,4,17;142:5
**phonetic (4)**
126:2;145:19;
185:19;197:1
**phony (3)**
48:11,12,13
**phrase (5)**
44:22;49:23;53:5;
65:19;69:18
**phrases (1)**
69:17
**physically (2)**
27:5;141:6
**pick (6)**
21:21;88:2;139:17;
148:3;198:9;202:16
**picked (3)**
22:24;58:23;126:4
**picture (1)**
101:24
**piece (2)**
44:7;203:16
**pieces (1)**
24:5
**pigs (1)**
153:16
**pin (1)**
132:13
**Pioneer (1)**
200:3
**pitch (5)**
45:4,5;116:2,12;
151:6
**pivotal (1)**
79:23
**place (6)**
75:10;150:3,13;
163:12;170:7;177:9
**places (1)**
27:3
**plaintiffs (1)**
99:5
**plaintiffs' (1)**
125:7
**plan (69)**
11:13;14:20,21;
17:23;18:4,4,16;19:18,
18;20:14;49:24;80:11;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 223 of 233

103:20,22,22,24;
107:17,20;110:16;
112:21,24;113:17;
116:5,7;117:18;118:7,
13,13,21,24;119:1,5;
121:9;125:21;126:21;
127:17,22;128:21;
129:19;130:13,25;
131:4,21,22,24;132:25;
135:21,24;138:4,24,24;
145:3,6,6,7;146:12;
153:6;167:21;168:3;
172:2;190:8,9,16,19,
23;191:3,6,18;193:12
**plane (1)**
164:14
**planned (3)**
111:24;156:13;161:9
**plans (6)**
21:3;49:24;130:18;
145:3;152:24;176:14
**players (3)**
198:15,22;200:15
**playing (1)**
21:1
**pleading (7)**
70:12;74:3,4;76:24;
167:5;169:13;180:8
**pleadings (7)**
8:15;25:17;59:22;
91:20;109:24;126:1;
156:5
**please (8)**
44:18;50:6;68:16;
86:13;97:24;99:8;
107:8;196:21
**pleasure (3)**
71:1,2;72:1
**plenty (1)**
109:6
**plucked (1)**
125:22
**plugs (1)**
122:21
**pm (2)**
107:6;204:8
**podium (4)**
124:9;129:3;167:19;
196:14
**point (50)**
12:18;20:19,23;
31:17;36:25;37:16;
38:15;39:6,22;47:19;
57:10;62:4;64:4;71:6;
77:6;80:3;85:21;89:16;
94:24;95:15;103:24;
105:19;109:8;110:14;
115:24;118:20;119:16;
120:13,15,17;128:6;
133:13;138:2;140:2,
14,14;141:4;148:12;
159:25,25;160:4;
177:6,10;180:11;
186:7,17;191:16;
193:7;195:21;198:1
**pointed (3)**
71:13;100:11;191:3
**pointing (1)**
194:25
**points (9)**
10:9;12:11;26:22;
54:10;87:20;142:9;
154:7;156:9;184:4
**policies (2)**
65:19,20
**policy (1)**
90:4
**political (2)**
127:1;170:14
**politicians (1)**
170:19
**poll (1)**
136:10
**polled (1)**
201:24
**polluted (1)**
144:19
**poor (3)**
67:15,16;151:3
**population (2)**
68:24;152:16
**position (11)**
35:14;83:5,8;119:24;
124:18;158:23;162:16;
167:1,4;183:11,18
**positions (2)**
81:20;171:2
**positive (1)**
192:1
**positively (1)**
19:24
**Posner (1)**
84:12
**possession (4)**
174:19,20,21;185:14
**possibility (2)**
82:4;133:3
**possible (7)**
11:20,21;119:25;
141:22;169:23;172:16;
201:18
**post- (1)**
83:15
**postcard (1)**
43:5
**postpetition (1)**
84:4
**post-petition (9)**
9:13;41:21;77:21;
80:2;82:2,22;83:12,18;
84:24
**posts (1)**
158:8
**potential (3)**
9:13;159:15;174:15
**potentially (2)**
159:14;193:6
**power (12)**
35:24,25;36:6,9;
91:19;92:14;93:1,10;
200:2,5,6,7
**PPA (1)**
67:15
**PPAs (1)**
198:18
**practical (2)**
112:16;134:9
**practice (3)**
12:24;47:25;129:16
**pre- (2)**
81:17;100:12
**preaching (1)**
112:5
**precise (1)**
203:7
**precludes (1)**
43:16
**predict (1)**
149:8
**prefer (4)**
42:16,20;70:22;
80:20
**preference (1)**
61:8
**preferred (2)**
41:4;59:15
**pre-January (1)**
80:5
**pre-judge (2)**
83:4;102:1
**pre-judged (1)**
95:5
**pre-judges (1)**
96:22
**prejudging (1)**
85:1
**pre-judging (1)**
102:15
**pre-judgment (1)**
104:10
**premature (1)**
100:6
**preparation (1)**
123:22
**prepare (3)**
107:14,15;123:19
**prepared (3)**
18:2;118:23;201:6
**preparing (1)**
33:22
**prepetition (1)**
79:20
**pre-petition (8)**
75:20;77:4,5;78:19,
25;79:7;81:16;84:24
**present (1)**
7:18
**presentation (3)**
117:9;166:17;194:22
**presented (4)**
179:19;187:5,19,24
**preside (1)**
135:2
**president (1)**
6:20
**presidential (2)**
192:12,15
**press (4)**
106:6;168:21;169:1,
25
**pressure (1)**
25:10
**pressures (1)**
126:13
**presumably (1)**
24:18
**presume (2)**
149:24;150:4
**pretend (2)**
78:14;132:19
**pretty (3)**
27:15;64:9;107:11
**previously (1)**
62:6
**primarily (3)**
117:13;137:1;153:7
**Prime (20)**
6:25;21:1;23:8;
37:20,22;38:22;47:4,9,
12,14,23,23;73:11;
159:7,11,18,23;160:5,
7;203:20
**principal (6)**
11:18;23:9;110:14;
198:15,22;200:15
**principally (1)**
168:10
**principals (1)**
139:3
**principle (2)**
21:4;43:3
**principles (3)**
19:21;20:7;130:9
**print (3)**
15:18;16:2;31:12
**prior (9)**
24:19;49:16;50:9;
78:13;109:22;119:18;
120:21;170:13;197:7
**priorities (1)**
198:9
**priority (1)**
198:10
**privilege (2)**
140:16;141:3
**probability (1)**
131:15
**probably (11)**
38:16;49:17;67:9;
69:25;80:3;84:9;
119:13;149:4;171:12;
184:13;197:16
**problem (19)**
6:9;31:19,25;42:7;
43:18;75:4;79:3;80:7;
97:6;99:15;128:9;
153:11,13;168:3,4;
169:6;178:18;195:5;
200:18
**procedural (2)**
139:8;163:14
**procedure (10)**
99:21;124:11;142:9,
10;167:11;180:1;
181:4;183:8,9,18
**procedures (7)**
101:18,20;114:12;
167:10;183:14;185:23;
193:10
**proceed (3)**
102:15;118:21;
141:21
**proceeding (1)**
36:8
**proceedings (6)**
120:1;131:12;
135:15;147:9;173:10;
204:8
**process (30)**
11:7;19:23;25:8,10;
28:6;72:18;75:25;98:7;
107:17;111:2,19;
114:12;127:20;130:1,
2;134:9;136:10;
141:18;145:18;148:1,
2;154:13;158:4;
164:21;172:4,5,12,14;
178:23;204:5
**processes (1)**
139:8
**processing (1)**
38:20
**produce (3)**
160:23,24;180:25
**produced (2)**
163:10;172:23
**product (11)**
174:22;175:19;
176:15;177:20,22,25;
178:8,11,19,20;185:21
**productive (1)**
194:8
**professional (1)**
73:3
**professionalized-only (1)**
49:10
**professionals (2)**
29:3;202:8
**profound (1)**
130:1
**progeny (1)**
19:22
**program (26)**
14:20;90:4;107:12,
14;115:3,14,19;123:6;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 224 of 233

130:14;131:1,1;137:2, 10;140:4;141:17; 145:11;146:4;158:20; 160:5,6,7,9,11;179:9, 18;187:4
**programs (1)**
147:8
**progress (4)**
168:16;194:19; 196:12;198:5
**progressing (1)**
131:12
**promise (2)**
186:3;195:25
**promoting (1)**
159:18
**promulgation (1)**
114:19
**proof (92)**
7:8,16,25;8:18;33:9, 11;34:13;42:6;43:7; 44:1,8,13;45:1;46:8,10, 16,22;47:7,15,21,24; 48:20,23;49:4;57:1; 59:2;65:15;66:24;67:2; 68:7,8,19;69:10,11; 70:15;72:15,20,23,24; 78:12;81:24;82:22; 84:25;85:3,5;87:21; 89:7,12;92:10;95:3; 96:5;97:10;99:22,23; 100:17;101:1,4,13,25; 102:2,4,10,13,16,22, 24;103:6,10,14;104:2, 2,6,7,10;107:16; 109:10;115:8;125:19; 128:20;130:4;141:20; 143:22;174:3;175:22; 176:4,4,7,10,12; 177:18;183:2;188:24
**proofs (17)**
33:17;40:14;43:4,10; 89:1,6;96:18,24;99:17, 20;100:7,13,18;101:6, 7;111:15;131:16
**proper (4)**
33:20;48:21;56:9; 125:17
**properly (1)**
186:3
**property (8)**
76:20;77:1;79:8,17; 86:20;136:13;174:23; 203:9
**proposal (13)**
15:2;21:8;114:19; 116:5;151:7,10; 158:24;160:3;167:8; 170:16;179:18;202:17, 22
**propose (2)**
181:8;197:9
**proposed (30)**
7:15;8:2,6,21;11:6; 13:19;14:21;26:10,10; 28:15;29:2,2;81:4; 84:17;95:23;99:6; 100:10;107:12;116:17; 130:13;131:8;155:23; 161:20;167:9;180:11, 13;187:4;195:14; 199:11;201:4
**proposing (3)**
13:16;125:6;188:20
**pros (1)**
104:23
**protect (1)**
60:2
**protected (2)**
100:4;104:1
**protecting (1)**
198:1
**protections (1)**
178:6
**protective (12)**
194:3,8;196:4;197:4, 12,23,25;198:11,20; 199:11;201:16,22
**provide (7)**
64:2;119:22;125:16; 155:23;160:12;173:11; 192:23
**provided (6)**
46:21;49:9;63:7; 88:21;132:19;203:13
**provides (1)**
109:11
**provision (2)**
41:19;42:14
**provisional (2)**
167:20;169:21
**provisions (1)**
14:23
**psychological (1)**
165:4
**public (10)**
48:9;136:9;145:8; 152:9;168:2,17,19; 175:13;178:5;190:17
**publication (8)**
16:3,6;25:23;26:2,3, 11,12,13
**publications (2)**
16:1,8
**publish (1)**
26:5
**published (1)**
16:4
**PUC (1)**
127:1
**purchased (1)**
17:3
**purported (1)**
102:12
**purportedly (2)**
117:23;127:16
**purpose (3)**
105:13;155:1;160:8
**purposes (12)**
49:23;95:17,18; 96:21;106:7;111:24; 113:2;125:21;147:9; 170:3;201:12,18
**pursuant (2)**
97:18;162:21
**pursue (1)**
85:14
**pursuing (1)**
163:11
**push (2)**
111:7;154:23
**pushing (2)**
124:18,18
**put (38)**
14:13;26:17;31:22; 33:14;39:24;40:3; 42:18;56:10;59:2,3,23; 75:21;81:23;88:20; 91:1,2;95:3;114:23; 123:5;142:14,16; 143:22;156:4;170:21; 175:18;176:14;177:18, 19,25;180:23;181:20; 187:1;193:19;194:2,9, 15;199:15;200:22
**puts (2)**
13:9;109:3
**putting (9)**
23:9;53:15,20;54:6; 174:5;178:19;179:3; 183:22;194:15

**Q**

**qualified (1)**
138:20
**quantify (1)**
32:5
**quantifying (1)**
31:16
**quantity (3)**
31:17;122:6,7
**quick (1)**
91:21
**quickly (11)**
11:22;72:12;112:5; 137:10;169:17,18; 172:16,20;173:2; 189:22;197:17
**quite (2)**
65:19;107:14
**quiz (1)**
201:19
**quoted (1)**
126:1
**quoting (1)**
97:17

**R**

**race (1)**
175:1
**racial (1)**
85:18
**radio (11)**
16:25,25;17:1,4; 18:9,9;24:12;26:20; 30:8;137:19;183:4
**raise (7)**
54:11;57:4,4;74:8; 94:24;101:9;120:12
**raised (14)**
7:3;11:9;22:7;37:17; 54:17;57:7;68:18; 69:13;76:3,24;91:1; 106:17;127:12;155:7
**raises (1)**
57:6
**raising (2)**
78:20;106:24
**ramped (1)**
149:1
**ramping (1)**
150:2
**ran (2)**
78:17;127:13
**range (2)**
12:13;192:20
**rate (2)**
123:17;170:21
**ratepayers (1)**
170:22
**rather (8)**
12:14;21:16;24:14; 45:19;63:12;70:12; 142:11;164:3
**rationale (1)**
64:3
**reach (26)**
15:1,3,14,14;18:15, 16,20,22;105:16; 130:7;131:5;136:11; 137:20,20,21;140:8; 150:17,18,21;152:7,8; 187:13;204:1,2,2,3
**reached (3)**
8:15;153:8;190:16
**reaches (4)**
19:14;135:21,22,24
**reaching (1)**
132:1
**read (20)**
13:20;15:7;19:8; 20:23,24;30:23;62:7, 13,23;100:24;101:17; 103:12;121:17;143:18; 152:11;166:13;169:15, 17,17;170:17
**reader (1)**
64:6
**reading (3)**
29:6;30:8;169:2
**reads (3)**
52:14;82:9;101:5
**ready (2)**
28:23;119:4
**real (6)**
105:14;119:6; 125:18;126:19;136:7; 176:9
**reality (6)**
123:12;125:18; 127:12;140:5;141:15; 153:14
**realize (5)**
63:17;68:23;112:3, 10;176:24
**realized (1)**
162:16
**really (42)**
7:23;10:9;12:13; 20:6;22:7;25:5;27:20; 33:8;38:4;39:5,6; 42:10;57:5;79:13;80:1, 2;89:19;106:12;107:3, 13;109:3;112:8;119:1, 24;121:5;124:25; 140:10;144:4;146:17; 150:19;151:9;172:18; 181:14,20;193:4,18; 194:3;196:11;197:15; 199:18;200:11;201:20
**reason (18)**
12:14;32:19;38:17; 64:3;121:4;122:2; 124:20;126:20;127:15; 136:1;151:22;168:5; 177:17;188:22;199:17; 202:19,21;203:20
**reasonable (14)**
19:22;20:7,12;123:6, 7,8,9,10,11,11;124:24; 130:9;141:19;149:18
**reasonably (2)**
121:20;141:19
**reasons (4)**
12:1;131:7;140:7; 169:22
**recall (4)**
16:6;39:24;156:18; 189:4
**recalled (1)**
189:11
**receipt (2)**
37:24;38:12
**receive (5)**
65:5;72:16;99:24; 101:20;137:14
**recent (2)**
107:23;108:20
**receptive (1)**
172:24
**Recess (1)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 225 of 233

107:6
**recipient (1)**
67:7
**reckoning (1)**
120:8
**recognize (2)**
114:10;197:2
**recognizing (1)**
141:15
**recommend (3)**
79:15;181:5;194:11
**recommended (1)**
11:14
**recommends (1)**
25:23
**reconciling (1)**
168:16
**record (14)**
48:9;50:11,14;51:11;52:10,11;60:9;88:2;94:17;133:9;164:9;165:21;188:18;190:15
**records (3)**
46:23;47:22;48:22
**recover (1)**
179:5
**redacted (1)**
63:8
**redaction (1)**
63:9
**Redding (1)**
152:17
**redline (3)**
59:4;60:7;63:5
**Redwood (1)**
200:2
**reeling (1)**
59:19
**refer (4)**
17:25;18:1,11;99:7
**reference (9)**
8:14;11:10;39:22;52:25;53:2;57:6;58:17;97:21;98:12
**referenced (2)**
23:20;166:23
**references (2)**
40:6;75:14
**referred (2)**
100:12;189:1
**reflect (2)**
40:19;67:10
**reflection (1)**
31:24
**regard (5)**
74:10;90:13;130:11;155:4;191:25
**regarding (3)**
89:17;167:20;196:7
**regardless (2)**
102:8;157:14
**regrettable (1)**
127:2
**regular (3)**
89:7;198:16;200:19
**regulatory (1)**
127:5
**reimbursement (1)**
76:25
**reinforce (1)**
142:1
**reinforces (1)**
150:20
**reinstated (1)**
127:18
**reject (2)**
187:20;198:2
**relate (1)**
9:23
**related (13)**
54:16,21;55:8,12,13,14,18;114:24;117:13;121:19;138:13;155:11;177:19
**relates (1)**
161:15
**relating (1)**
178:11
**relations (2)**
145:8;152:9
**relationship (1)**
108:20
**relatively (4)**
14:25;107:14;153:7;165:23
**release (2)**
71:22;134:14
**relevance (2)**
174:8,12
**relevant (6)**
64:14;161:22;170:11;171:24;172:8;198:19
**reliability (1)**
145:24
**reliable (2)**
136:21;151:24
**relief (1)**
109:25
**rely (3)**
143:20;159:4;170:21
**relying (1)**
145:22
**remain (6)**
46:11,16;47:19;107:8;117:25;118:1
**remaining (3)**
9:23;130:16;137:22
**remarks (4)**
8:10;10:24;124:8;189:25
**Remember (8)**
40:13;41:22;63:14;65:3;74:15;143:4;147:5;165:8
**reminders (1)**
143:25
**remoteness (1)**
84:11
**repeat (3)**
34:9;147:2;199:8
**repeating (1)**
127:6
**repeats (1)**
128:4
**rephrase (1)**
49:22
**reply (2)**
8:14;191:18
**report (3)**
160:14;161:10;172:23
**reported (1)**
149:11
**reports (3)**
20:24;152:9;168:21
**represent (2)**
73:25;136:12
**represented (4)**
24:10;52:6;93:2;125:8
**representing (9)**
25:18;34:22;35:17,25;51:13;65:21;132:7;183:21;198:23
**represents (3)**
51:3;92:17;117:16
**request (14)**
16:23;17:2;43:16;74:19;90:18;117:5;154:9;160:18,19,20;161:2;165:16;166:16;172:9
**requested (8)**
15:21,24;16:24;45:8;46:4;74:12;109:22;158:19
**requesting (1)**
55:17
**requests (3)**
162:20;172:7,19
**require (3)**
35:1;40:23;48:17
**required (3)**
35:18;63:2;82:22
**requirements (2)**
28:6;157:4
**requires (2)**
100:25;102:8
**requiring (1)**
45:25
**reschedule (1)**
196:1
**rescission (1)**
41:5
**reservation (1)**
89:24
**reserve (5)**
89:17;90:13;91:7;98:19;109:11
**reserved (1)**
98:21
**reserves (1)**
97:7
**reserving (5)**
90:7,23;91:3,8,10
**residents (1)**
18:21
**resolution (2)**
66:16;131:9
**resolve (4)**
55:21;56:7;93:21;198:12
**resolved (10)**
7:7,20;8:20,23;9:11;53:12;105:18;190:9,9;196:5
**resolving (1)**
198:20
**respect (37)**
7:7,8;8:21;9:13;14:19;15:18,23;16:20,25,25;35:18;36:14;45:1;49:24;54:25;98:20;116:3;128:19;134:19;135:20;136:16;138:7;155:3;160:5;167:7;168:2,15,16;171:22;172:1,9;179:8,15;187:8;195:7,16,22
**respected (4)**
129:4;139:6,6;187:11
**respond (5)**
122:22;158:5;167:24;190:2;199:4
**responding (1)**
152:1
**response (9)**
22:6;96:6;101:23;123:13,17;130:14;161:3;191:15,23
**responsibility (1)**
174:5
**responsible (2)**
184:14;186:15
**responsive (1)**
180:8
**rest (1)**
104:18
**result (3)**
47:25;62:12;193:5
**results (2)**
19:4;133:9
**resume (2)**
194:8;195:25
**retained (3)**
111:13;159:5;160:8
**return (1)**
129:12
**returns (1)**
188:12
**reversed (1)**
121:3
**review (2)**
7:17;8:2
**reviewed (2)**
118:16;188:18
**reviewing (1)**
28:12
**revised (3)**
8:22,22;18:4
**revisit (3)**
45:6;202:20;203:22
**right (189)**
6:11;8:7,17;10:17;17:3;20:8;22:1,19;23:17;24:4,24;25:6,10,15;26:8,22;28:3;31:16;32:18;34:2,6;36:13,15;37:1,12,14;39:12;41:23,24;43:6,19;49:3,5;50:3,5,24;52:7;53:17;54:19;55:2;56:25;57:19;58:10,19;61:22;62:12;63:3;65:4,15;67:13;68:1,2,16;70:16;71:15;75:22;76:19,19,23;77:4;79:3;80:3,8;81:13;82:1,19;84:4,5,19;85:3,14,22;86:22;87:2,8;89:2,3,6;90:1,10;91:8;92:18,21;93:8;95:8;98:11;101:2,16;102:3,6;103:18,23;104:17;105:7;106:7;109:17;112:11,22;114:25,25;115:4,21;116:8,11,24;117:15,22;122:7,8,18;124:18;125:2,5,10;126:24;129:17,23,23;130:2,5,17;133:2,12,22;134:6;135:4;136:6,7;138:3,10,14,17;139:11,25;145:13,16;148:13,20;149:6;150:18;151:20;154:16;155:6,8,21;156:10,15,19;157:19;158:6;159:6,9;165:14;167:17,22;168:12;169:9;171:8,12;173:23;174:8,12;176:22,24;177:9;178:14;180:16;181:2;187:3;188:10,10;189:10;191:22;192:2,6,17,21;193:11,17;194:20;195:12,18;197:19;199:1;201:2;202:1,10,16;204:2
**right-hand (2)**
15:13,25
**Rightly (1)**
47:22

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 226 of 233

**rights (12)**
89:17;90:7,14;91:3,7,8,10;98:20,21;101:5;109:12;121:21
**ringing (1)**
110:6
**ripe (1)**
200:11
**rise (2)**
107:7;154:7
**risk (6)**
20:2;53:10;103:7,8;109:4;119:9
**road (2)**
183:20;185:11
**robust (4)**
18:8;20:14;114:11;193:12
**roll (1)**
198:16
**room (8)**
29:4;69:25;126:4;161:13,13;163:2;172:18;196:13
**Rosa (1)**
182:20
**roughly (1)**
183:19
**round (1)**
62:3
**rounds (1)**
11:8
**rule (12)**
97:17,17,18;98:2;99:19;100:20;140:21;161:5;162:25;163:1,11;185:22
**rules (4)**
40:12,16;129:20;141:3
**ruling (2)**
35:10;169:21
**run (7)**
16:1;89:22;153:17;173:24;176:12,14;177:18
**running (1)**
8:8
**run-of-the- (1)**
78:14

## S

**Sacos (1)**
185:19
**safe (1)**
103:7
**safely (2)**
175:18;177:18
**sailing (1)**
204:3
**same (24)**
32:6;34:7,8;49:8,8;64:18;65:1;68:21;69:12,13,15;75:12;83:9;91:16,16;105:2;130:18;162:14;163:12;175:25;176:1;178:25;186:15;202:1
**same-day (1)**
137:20
**sampling (1)**
111:15
**SAN (5)**
6:1;108:10;200:6,6,7
**sanctionable (1)**
161:4
**Santa (1)**
182:20
**satellite (1)**
24:12
**satisfied (3)**
11:7;28:6;96:7
**satisfy (1)**
170:22
**satisfying (1)**
170:3
**saturate (1)**
131:14
**saturating (1)**
131:18
**save (1)**
151:25
**saves (2)**
97:21;98:12
**savvy (1)**
24:11
**saw (1)**
16:5
**saying (36)**
9:14;20:11;24:22;31:19;35:23;38:18;41:21;46:15;56:17;80:19;97:8;98:2;102:16;103:2;104:7;113:7,10;119:23,25;124:19;128:4,5;129:5;136:6;144:4;179:22;180:2,23;183:2;186:11;187:8,23;188:19,19;189:12;198:22
**scaled (1)**
146:17
**scanning (1)**
63:11
**scary (2)**
17:13,15
**Schedule (9)**
67:18,21;89:20;90:5;91:4;191:11;197:14,15;203:24
**scheduled (4)**
23:20;67:10,20;154:25
**schedules (5)**
23:20;25:9;61:3;67:3;90:8
**school (1)**
152:10
**science (2)**
202:5,7
**scope (1)**
92:24
**screen (1)**
14:14
**screwed (2)**
85:2,5
**seal (2)**
71:17,17
**search (1)**
17:11
**season (12)**
141:7,22;147:1;149:15;157:5,10,12,17;164:22;184:4;192:25;193:3
**seasonality (2)**
123:16;140:3
**seated (1)**
107:8
**second (16)**
10:1;28:21;34:12;37:2,18;41:18;46:12;52:24;65:16;68:16;70:18;76:9;83:10;95:1;170:17;193:25
**second-guess (5)**
41:14;114:20;159:19;188:20;202:14
**section (2)**
95:3;192:5
**sections (1)**
56:19
**seek (2)**
162:24;163:10
**seeking (1)**
172:8
**seem (4)**
11:3;126:6;151:23;199:9
**seemed (3)**
26:2;52:22;200:23
**seems (19)**
20:16;22:3;31:14;33:20;36:10;45:22;48:15,21;77:15;83:12;104:22;116:15;126:12,19;147:2;169:14;182:17,18;203:19
**selected (1)**
25:19
**self-explanatory (1)**
14:25
**seminal (3)**
129:22,24;134:22
**send (6)**
38:19,19;43:4;68:12;182:15;197:13
**sends (1)**
43:20
**sense (14)**
10:10;30:25;68:8;113:14;126:19;143:14;153:12;155:11;163:17;168:6,7,7;171:21;178:15
**sensitive (1)**
114:4
**sent (2)**
66:24;161:4
**sentence (7)**
37:2,17,18;63:1,24;64:9;65:16
**separate (11)**
75:19;114:25;115:3,7,13;116:15;139:12,14;155:8,8,9
**separately (3)**
34:18;68:25;195:9
**September (3)**
143:24;156:23,25
**sequence (2)**
6:6;16:6
**sequencing (2)**
26:17;150:5
**series (1)**
7:22
**serious (2)**
183:4;193:23
**seriously (1)**
171:13
**serve (2)**
162:25;170:20
**served (5)**
159:12;160:18,19,19;162:20
**service (2)**
24:14;39:10
**services (1)**
67:17
**set (6)**
158:18;170:2;175:9;198:15;203:16,18
**sets (4)**
14:19;35:17;67:2;78:23
**setting (1)**
127:18
**settle (1)**
115:15
**settled (4)**
59:24;156:22;168:18,18
**settlement (2)**
190:16,16
**settlements (1)**
134:1
**seven (3)**
24:5;25:23;191:18
**seventy (2)**
19:14,14
**seventy-eight (1)**
18:22
**seventy-five (1)**
24:11
**several (8)**
31:20;34:8;37:11;71:13;112:21;130:16;154:17;193:6
**severe (1)**
109:3
**sex (1)**
122:12
**shaded (1)**
65:16
**shall (8)**
26:11;45:16;46:11,16;47:19;49:21;96:20;140:21
**share (3)**
12:4;148:23;156:24
**shared (2)**
11:23,25
**sheet (3)**
118:13;156:13;169:24
**Shield (1)**
122:11
**Ship (11)**
30:23;31:3;57:6;68:22,23;69:7;105:6,15,17;106:4,8
**short (3)**
64:8,11;166:5
**shorten (1)**
110:16
**shortened (1)**
112:2
**shorter (2)**
22:19;112:2
**short-form (1)**
175:25
**shortly (1)**
11:16
**show (8)**
31:20;67:4;160:17;163:9,15;172:11,22;193:13
**showed (2)**
62:16;147:20
**shows (3)**
32:6;37:25;49:15
**sic (2)**
67:13;199:13
**sick (1)**
132:3
**side (10)**
13:8;15:13,25;22:12;86:3;103:7;116:12;145:3,10;197:3
**sidebar (1)**
88:2
**sides (3)**
10:6;143:18;202:7

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 227 of 233

**sign (7)**
32:14,18,25;35:8;
36:3;71:22;182:15
**signed (5)**
32:13,16,25;69:14;
91:20
**significance (2)**
105:14;123:24
**significant (5)**
168:4;170:14;
183:25;184:9;191:21
**significantly (1)**
188:8
**signing (2)**
22:10;41:12
**similar (6)**
90:2;96:1;100:10,12;
146:12;165:11
**simple (15)**
21:20;27:15;29:3;
30:2,13;42:4;64:9,12;
107:14;143:7;182:17,
18;188:25;200:23,24
**simplest (1)**
109:15
**simplifying (1)**
123:23
**simply (7)**
65:15;85:2;92:25;
93:1;133:5;198:8;
202:13
**single (1)**
82:4
**Singleton (5)**
51:1,2;164:13,13,20
**singularly (1)**
155:14
**sit (1)**
171:6
**sites (1)**
17:18
**sitting (1)**
161:12
**situation (7)**
32:23;44:18;118:8;
121:22;123:11;186:12;
188:13
**situations (1)**
152:24
**six (6)**
15:10;18:19;32:23;
60:4;148:3;156:18
**sixty (7)**
174:23;175:5;
178:18;184:8,12,12,13
**Skikos (48)**
173:9,9,16,18,20,22,
24;174:1,8,12,14;
175:9;176:3,20,23;
177:3,5,10,14,16;
179:23;180:6,7,13,16,
21;181:2,3,4,6,10,12,
15,17,19,22;182:10,13,
18,22;183:10,13,16,25;
184:3,20,23;185:1
**Slack (4)**
194:12,14,21;197:10
**slate (1)**
145:11
**slight (3)**
52:22;97:3;117:10
**slightly (3)**
115:25;124:18;203:5
**slippery (1)**
74:21
**slope (1)**
74:21
**slow (1)**
124:19
**slowing (2)**
126:20;127:3
**small (2)**
31:11;124:21
**smaller (1)**
68:24
**smartphone (2)**
137:6,19
**Smith (5)**
32:25,25;52:6;67:14,
25
**smoking (1)**
148:21
**sober (1)**
31:24
**so-called (1)**
190:16
**social (6)**
18:12;137:3,11;
141:6;143:4;184:4
**solely (4)**
86:22,25;87:1,2
**solution (2)**
79:14;143:7
**solve (6)**
31:6;79:3;97:6;
169:6;195:5;199:18
**solved (1)**
128:9
**solvent (3)**
80:1;117:23;127:16
**solves (1)**
80:7
**Somebody (16)**
24:12;43:19;48:10;
50:2;67:16;73:7;78:17;
101:10;172:22,25;
173:2;180:23;181:1;
182:6;185:24;192:13
**somehow (3)**
75:25;126:5;155:12
**someone (10)**
19:25;27:18,20;29:5;
35:12;98:16;110:11;
116:12;144:11;152:23
**something-else (1)**
104:3
**something's (2)**
162:9;186:2
**somewhat (4)**
121:19;126:6;
128:23;134:11
**somewhere (3)**
30:6;144:13;203:17
**Sonoma (3)**
91:19;152:18;200:2
**soon (5)**
11:21;38:11;103:18;
151:19;201:18
**soonest (1)**
131:5
**sorry (13)**
32:3;53:22;69:11;
84:15;86:15;88:4;
91:14;95:21;107:24;
117:3;136:18;181:10;
196:23
**sort (6)**
59:15;63:25;64:2;
80:10;111:11;161:12
**sorts (2)**
64:14;127:5
**sought (1)**
125:7
**sound (1)**
90:22
**sounds (1)**
132:7
**source (1)**
23:9
**sources (1)**
126:14
**Spanish-speaking (1)**
17:4
**speak (4)**
20:17;74:22;141:25;
151:11
**SPEAKER (2)**
170:25;204:1
**speaking (3)**
117:19;146:2;151:14
**specific (4)**
17:7,8;90:3;141:13
**specifically (8)**
37:6;72:14;90:25;
114:8;117:17;124:11;
164:20;188:5
**speculating (1)**
9:18
**speed (3)**
178:13,23;197:21
**spend (1)**
124:5
**spent (1)**
175:22
**spike (1)**
164:23
**spiked (2)**
149:13,14
**spinning (1)**
64:14
**spirit (1)**
169:19
**spoke (1)**
96:6
**Sports (2)**
15:19,22
**spot (1)**
31:23
**spots (1)**
26:20
**spreading (1)**
48:8
**staff (2)**
104:19;198:7
**staffed (2)**
27:3;39:10
**stage (2)**
64:2;78:23
**STAMER (33)**
165:20,21,25;166:1,
10,14,20,22;167:1,5,9,
12,14,18,23;168:13,23,
25;169:5,9,12,17;
170:11,23;171:3,8,12,
13,15,17;173:7;
189:25;190:5
**stand (7)**
6:22;7:5;58:8;
167:19;188:9;189:13;
204:6
**standard (19)**
31:9,11,12;32:8;
33:8,9,11;45:18;47:7;
60:25;66:23,24;67:1;
87:21;89:12;97:25;
149:4,5,7
**standing (2)**
118:23;144:13
**standpoint (1)**
184:7
**start (14)**
9:18;16:19;21:4;
22:13;28:14;79:6;
116:7;145:10;158:4;
175:24;177:17;179:5;
202:14;203:19
**started (1)**
147:17
**starting (1)**
16:14
**State (31)**
45:18;46:15;74:1,1;
76:25;88:18,19;89:22;
92:8,9,13,15;93:1,11;
164:9;170:20;173:10,
15,20;175:5,6,6,10,14;
176:1;177:22;178:6,
24;179:2,8;195:16
**stated (2)**
11:17;49:20
**statement (9)**
11:15;28:13;66:12;
79:18;151:2,2;172:17;
187:12;195:4
**statements (1)**
61:3
**state-of-the-art (1)**
114:11
**states (3)**
11:12;33:14;146:5
**stations (2)**
17:5,5
**status (1)**
167:20
**statute (2)**
134:5;192:5
**statutory (5)**
77:3,3,13;79:16;
134:5
**stay (3)**
63:15;104:18,18
**Stephen (1)**
6:16
**steps (1)**
157:23
**Steve (1)**
173:9
**stick (10)**
24:10;56:4;64:15;
65:6;86:9;159:25;
160:4;173:3;202:17;
203:12
**still (16)**
33:7;40:5;44:19;
56:8;104:21;124:15;
133:23,23;136:15;
177:10,11;180:14;
191:2;196:16;199:4;
200:17
**stipulation (1)**
94:17
**stock (1)**
41:4
**stockholder (3)**
40:20,25,25
**stop (2)**
138:8;159:17
**strange (1)**
139:1
**stranger (1)**
128:23
**Strauss (1)**
165:21
**stream (1)**
201:23
**streaming (7)**
17:1,12;18:9;137:5,
19;139:18;142:4
**Street (3)**
16:3;145:9;152:9
**strengths (1)**
185:20
**stricken (2)**
56:1;63:13
**strike (2)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 228 of 233

100:16;125:3
**strikes (1)**
164:25
**striking (2)**
149:17;158:6
**stringent (1)**
72:8
**strong (1)**
115:2
**strongly (1)**
46:2
**struck (1)**
116:17
**struggles (1)**
172:1
**struggling (2)**
121:14;162:13
**stuff (6)**
47:17,17;73:8;166:9;168:25;187:10
**stuffing (1)**
23:9
**subject (9)**
42:6;44:9;86:6,7;97:19;98:2;154:11;171:14;173:5
**submit (6)**
38:11;67:21;68:5;72:13;199:10;201:7
**submits (1)**
46:23
**submitted (7)**
7:15;38:13;45:18;46:9,10;72:24;145:18
**subparagraph (6)**
33:7;34:11,17;36:22,25;39:22
**subpoena (1)**
162:25
**subro (4)**
66:1;72:2,4,4
**subrogation (9)**
8:15;53:21;54:3;65:12,15,18;72:12;160:20;196:16
**substantial (2)**
125:8;144:9
**substantially (1)**
130:13
**substantive (5)**
33:1;57:15;179:10,19,23
**successful (1)**
98:10
**sudden (1)**
91:13
**suddenly (2)**
48:23;132:18
**suffer (3)**
20:1;85:16,17
**suffered (3)**
48:20;85:13;147:15
**suffering (1)**
124:4
**Suffice (1)**
190:1
**sufficient (10)**
35:19;94:23;109:11;114:6,7;125:15;137:18;182:23;193:10,11
**suggest (10)**
33:5;77:12;81:22;84:14,16;110:3;137:7;185:24;194:16;201:13
**suggested (4)**
77:2,11;88:8;192:13
**suggesting (3)**
63:12;118:23;138:3
**suggestion (6)**
62:4;80:18;86:10;105:2;123:23;196:12
**suit (2)**
34:13,20
**summary (4)**
22:2;30:16;102:13;109:9
**summer (2)**
140:8;149:14
**Sunset (1)**
15:20
**supplement (1)**
10:1
**supplemental (6)**
9:24;11:12;14:19;18:3,4,15
**supplemented (3)**
14:21;160:10;202:23
**supplements (1)**
11:8
**support (12)**
160:6;166:16,18,18,21,22,22;167:6,14;171:9,9,9
**supporting (8)**
46:9,16,17;63:2,6;64:1;72:13;171:1
**supportive (1)**
155:24
**suppose (2)**
47:3;101:13
**supposed (6)**
88:24,24;139:4;160:14;174:3;190:25
**Supreme (1)**
203:6
**sure (54)**
6:15;8:11,13;10:12;14:11;28:22;30:14;31:6,21;34:1;37:1,19;38:19;40:4,8,10;46:13;47:24;52:5,23;53:3,7,13;54:4;56:6;58:5;68:22;69:2,9;73:14;74:25;89:19;90:11;98:14,17;101:7,22;113:13;118:16;120:4;122:4;123:5;127:23;130:6,6;137:12;138:1;144:22;155:14;171:10;177:6;190:15;192:9;199:2
**surfaced (1)**
180:22
**surprise (1)**
118:15
**survive (2)**
43:7,13
**survives (1)**
80:2
**surviving (1)**
135:9
**suspect (1)**
136:6
**swift (1)**
131:9
**sword (1)**
116:1
**system (16)**
11:23;27:21;126:23;127:3,4;128:6;136:21;174:18;175:10;177:22,25;178:7,22;182:16;191:25;203:20
**systematic (1)**
178:1
**systems (1)**
176:1

**T**

**table (3)**
28:9,23;156:4
**tailored (1)**
114:8
**Takata (3)**
159:11;188:25;189:11
**talk (17)**
12:14,14;20:18,21;49:6;54:7,7;70:23;104:23;111:13;124:10;148:22;149:24;150:20;167:19;179:25;190:4
**talked (12)**
52:19;64:22;65:13;66:17;79:24;86:13;99:5;116:7;158:25;184:5;190:21;202:11
**talking (7)**
96:18;129:3;144:18,20,22;160:25;189:20
**talks (2)**
100:23;203:17
**target (4)**
15:15;17:7;18:18;19:15
**tasked (1)**
117:17
**taught (1)**
21:5
**TCC (45)**
7:24;8:3;20:17;41:20;42:10;47:17;54:16,25;61:6;62:4;91:23;92:2,10,11;109:21;114:18,22;117:18;125:7;126:5;130:10;131:7,9;135:21;145:5,18;154:23;160:18,21,23;161:1;162:14,24;163:3,4;164:24;174:19;185:13;186:7;190:23;195:6,13;199:8;201:5;203:3
**TCC's (5)**
56:8;161:19;162:15;166:6;185:16
**team (2)**
115:2,2
**teams (1)**
152:10
**teased (1)**
75:16
**tech- (1)**
24:10
**technical (2)**
59:9;113:14
**technology (2)**
21:2;145:15
**television (3)**
16:20;18:7,8
**telling (11)**
70:14;85:2;138:25;142:11;143:19;144:1,3,11,12;159:24;184:6
**tells (8)**
79:22;84:24;85:6;93:23;120:2;127:21;131:19;150:4
**ten (10)**
15:16,17;70:24;142:16,18,18,18;144:3;166:3;188:11
**tend (1)**
164:23
**tens (3)**
121:23;174:16;176:11
**tentative (2)**
132:2;199:10
**Tenth (1)**
134:23
**term (17)**
16:20;29:5,12,21,22;30:21,22;59:13;93:13,14;94:18;105:11,13;118:13;156:13;169:24;204:3
**terminate (3)**
118:10;156:12;166:24
**terminology (3)**
52:23;53:6;57:9
**terms (10)**
25:10;53:1;57:12;65:2;117:9;118:2;192:3,22,25;202:11
**territory (1)**
21:2
**test (3)**
109:19;176:14;177:18
**testifying (2)**
180:8;182:25
**testimony (7)**
132:7,9;137:24;140:11;180:5;188:15,17
**testing (1)**
176:8
**Thanksgiving (10)**
123:20;124:5;179:7,18;181:10,14,16,21;193:2,2
**therefore (7)**
10:14;36:19;72:20;103:3;133:14;198:13;199:12
**there're (1)**
177:21
**thin (1)**
125:22
**thinking (3)**
49:20;119:9;192:18
**thirteen (4)**
179:4,6;181:7;184:10
**thirty (4)**
72:23;122:12;142:11;170:1
**thirty-four (1)**
17:5
**though (11)**
42:22;61:7;63:14;71:22;110:12;123:25;136:5;163:9;174:9;180:3;201:7
**thought (18)**
11:23,25;21:3;39:23;46:23;50:15,18;56:9;57:13,14;60:16;77:16;106:19,22;124:10;145:8;155:23;193:25
**thoughts (1)**
54:6
**thousand (2)**
176:6;193:6
**thousands (8)**
112:4;121:23;126:16,17;136:23;174:16;176:11;177:11
**three (18)**
12:23;16:2;19:16;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 229 of 233

112:11,12,14,15;117:25;118:1;147:23,24;148:3;161:16;180:19;198:14;200:15,16,16
**throughout (2)** 147:9;154:13
**throw (2)** 68:9;138:19
**tie (1)** 138:17
**time- (1)** 172:12
**timeline (3)** 127:9;148:23;203:17
**timely (7)** 43:6,10,14,18,25;115:14;119:2
**times (31)** 15:14,16,17;16:2;18:18,22,25;19:16;24:11;33:18;135:22,23,25,25;142:11,11,16;144:3,3,12,12;148:6;151:1;179:10;180:19;181:25;186:25;188:11,11,11,13
**timetable (2)** 26:25;28:5
**timing (5)** 16:18;107:15;152:8;170:11;203:15
**title (4)** 53:3;54:17;55:2,3
**today (51)** 6:8,19;7:5,6;12:2,11,24;13:14;17:23;19:7;22:2,11;36:7;71:16;83:18;102:25;112:21;116:12;117:10;118:18;119:24;124:17;128:18;144:14;156:17;160:10;161:11,15,16;163:7;164:18;167:17;169:6;173:4;174:11;175:20;176:3;180:20;185:12;186:4;190:1;191:5,8,16;194:4;196:11;197:15;200:22;201:20;202:5,23
**today's (2)** 22:24;198:10
**together (12)** 23:9;42:3;75:22;79:13;128:8;138:18;143:22;174:23;177:19;179:4;194:1;198:4
**told (12)** 39:9;78:24;92:1;132:21;147:22;163:3;166:12;174:10;179:11,13;180:24;203:6
**tomorrow (3)** 116:24;127:17;197:15
**took (7)** 25:13;80:4;146:16,23;153:7;179:4;200:24
**top (2)** 45:14;67:17
**tort (42)** 11:9,22,23;12:3,8,20;15:21,25;16:23;17:2,25;25:5,18,21;31:17;58:16;67:14;70:7;100:9;109:9;112:3;113:6;117:12;118:5;119:20;120:21;127:17;128:22;135:11;144:20,23,24;152:19,24;153:15,15;159:15;161:3;171:23;175:1;188:25;189:2
**torts (4)** 33:18;85:16;148:22;149:24
**toss (1)** 36:8
**total (4)** 16:1;17:5;65:17;84:12
**totally (1)** 40:17
**touch (3)** 136:21,25;154:10
**touched (1)** 110:12
**touchstone (1)** 129:25
**toward (1)** 149:2
**track (7)** 17:10,18;52:3;99:10,14;133:9;164:10
**traditional (3)** 30:25;36:9;59:22
**tragedy (2)** 31:1;106:4
**train (2)** 122:23;131:11
**transparency (3)** 168:7;190:4,6
**transparent (2)** 172:5,14
**trap (2)** 32:23;33:4
**trauma (3)** 124:4;146:6;202:12
**traumatic (1)** 114:6
**traumatized (4)** 27:21;125:18;142:23;145:20
**treat (1)** 185:25
**treated (7)** 46:11;49:21;68:25,25;70:9;76:2;96:20
**treating (1)** 10:3
**treatment (2)** 80:11;168:13
**tremendous (2)** 128:21;171:23
**tricky (1)** 43:2
**tried (5)** 12:11;27:23;61:5;64:8;124:16
**tries (1)** 44:25
**trigger (1)** 87:8
**trouble (2)** 130:20;138:16
**troubling (1)** 12:20
**TRPs (2)** 16:21,22
**truck (1)** 78:17
**true (2)** 46:12;137:12
**trustee (2)** 43:5;47:18
**try (16)** 13:7;16:21;79:21;82:4;110:19;122:24;123:4;138:17;139:22;159:19;175:3,16;194:4;199:18,19;201:14
**trying (26)** 64:6;80:13;83:5,8,17;103:16;112:13,15;120:18;125:3;127:10;130:20;136:10;148:18;149:16;152:24;153:13;155:1,16;169:19;177:1,16;180:9;187:12;193:16;198:4
**Tt's (1)** 22:19
**turn (4)** 55:3;124:9;132:14;178:20
**TV (4)** 26:19;30:9;122:20;183:4
**tweak (5)** 93:7;187:20,24;200:14;201:4
**tweaking (1)** 158:24
**twelve (1)** 41:22
**twenty (3)** 39:25;188:11;194:6
**twenty-eight (1)** 152:4
**twenty-nine (1)** 16:1
**twice (1)** 161:5
**Twitter (2)** 137:4;158:8
**two (42)** 11:8;17:4;19:16;26:20;37:10;40:6;42:2;54:19;56:18;59:6,7;70:24;75:5,14;87:20;89:1;96:11;97:15;99:3;105:5;108:7;137:13;143:9;148:3;154:17;158:3;161:16,22;165:13;171:18;175:10;180:15;183:20;184:4;190:5;193:6;194:5;195:9;197:11;198:7,21;201:11
**two-page (2)** 175:23;178:18
**type (9)** 26:25;77:2,7;78:15;85:17;89:11;109:25;131:25;145:12
**types (3)** 17:12;111:16;120:1
**typical (1)** 19:13
**typically (1)** 25:8

## U

**UCC (4)** 162:14;166:5;169:5;175:2
**ultimate (1)** 175:11
**ultimately (4)** 47:12;102:14;176:13;192:3
**Um-hum (12)** 8:4;15:11;36:1;110:25;143:16;146:7;148:11;149:23;150:14;152:3;155:19;175:8
**unable (1)** 108:22
**unbelievable (1)** 176:9
**unclear (1)** 94:10
**unconfidential (1)** 48:24
**under (19)** 10:14;20:7;28:6;36:9;59:22;121:20;123:9,10;124:24;125:16;140:5;160:11;162:21,25;163:1,11;177:21;188:23;192:7
**understandable (1)** 84:21
**understands (2)** 66:4;119:25
**Understood (9)** 73:10,13;91:15;132:15,17;148:4,14,16;168:25
**uneducated (2)** 30:5;158:2
**unfair (1)** 161:11
**unfortunate (4)** 158:7;167:24;174:1;182:18
**unfortunately (1)** 157:9
**unhappy (1)** 177:8
**unheard (2)** 119:12,14
**UNIDENTIFIED (2)** 170:25;204:1
**unimpaired (2)** 113:4,7
**unimpairment (1)** 113:13
**unique (2)** 117:22;153:12
**unit (5)** 92:7,13;93:4,5,14
**units (4)** 88:17;91:21;94:11,12
**universal (1)** 201:15
**unknown (15)** 35:20;36:4;59:11,13,14;60:3,4,10,20,20,22,23,25;61:9;122:6
**Unless (6)** 21:19;32:18;108:23;113:4;114:18;150:13
**unlike (3)** 19:24;128:23;159:13
**unlinked (1)** 115:16
**unmindful (1)** 127:11
**unnecessary (1)** 100:8
**unprecedented (1)** 109:23
**unraveling (1)** 179:3
**unrepresented (8)** 61:17;63:24;121:13;123:14;136:16;158:2;174:16;184:24
**unring (1)** 73:8
**unsecured (2)**

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 230 of 233

12:3;166:4
**unsophisticated (2)**
61:14;176:25
**unsympathetic (2)**
148:6;202:12
**untechnical (1)**
22:15
**untimely (1)**
43:13
**unusual (4)**
42:13;81:11;128:21;132:11
**unwilling (1)**
29:8
**up (55)**
6:22;28:10;31:20;32:6;35:8;39:3;49:15;57:24;58:23;75:22;79:14;88:2;89:24;91:22;92:6;98:25;99:8;102:21;103:18;112:21;116:21;119:17;122:23;128:8;139:17;146:21,22;148:3;149:1;150:2;153:10;160:13;163:5;170:1,2;174:2;175:3,18;177:25;178:13,22;186:12,25;187:10;188:22;189:5,6,15;192:3;193:13;198:6,8;200:14,18;201:17
**update (2)**
166:12,14
**updated (1)**
166:13
**upload (1)**
197:13
**upon (3)**
156:17;181:6;203:2
**urge (3)**
158:17,18;163:8
**urgency (4)**
168:6;171:21;197:21;198:20
**USA (1)**
195:17
**use (19)**
15:21;36:7;61:3;69:16;88:9,14;89:12;101:10;130:8;131:13;134:9;149:20;156:25;175:13;176:1,20,20;178:7;202:15
**used (11)**
53:20;54:2;59:12;65:2;79:11;93:14;105:17;119:22;158:9;176:1;204:3
**useful (1)**
39:23
**user (1)**
61:13
**username (1)**
161:6
**using (8)**
54:18;59:11;69:17;89:7;102:21;105:11,24;178:12
**usually (1)**
129:8
**utility (1)**
78:22
**utilizing (1)**
45:18

## V

**validity (2)**
111:16;145:24
**Valley (1)**
200:3
**value (2)**
112:16;159:15
**various (4)**
45:15;91:19;147:8,9
**vary (1)**
26:2
**vast (1)**
122:7
**vendor (1)**
131:23
**Venn (1)**
195:21
**versed (1)**
158:3
**version (1)**
59:5
**versions (1)**
7:25
**versus (3)**
21:1;22:15;177:14
**vet (1)**
191:7
**via (1)**
137:19
**viability (1)**
104:10
**victim (20)**
30:5;48:17,19;60:1;61:14,17;63:24;67:14;70:7;76:2,2,2;88:23,25;135:6;142:6,23,23;148:8;150:8
**victims (34)**
25:5;31:17;51:3,5;76:1;105:5;106:7;112:4;121:13;122:6,7;123:14,25;125:9,17;126:5,15,17,23;141:13,16;144:20,23,24;151:7,25;164:13;172:3;183:23;184:17,18;192:22;193:6;204:4
**video (1)**
18:10
**view (16)**
7:4;9:10,12;11:6;64:16;92:12;110:14;114:6;116:20,25;118:25;172:2;183:21;190:25;192:4;203:5
**views (1)**
169:10
**violating (1)**
161:5
**visit (2)**
17:11,18
**Volkswagen (1)**
144:19
**Volkswagens (1)**
148:22
**vote (7)**
99:25;101:21;112:24;113:5,16,23;201:25
**voting (7)**
49:23;95:17,18;96:21;101:5;111:24;125:21

## W

**Waisman (2)**
6:24;7:1
**wait (16)**
28:13;31:25;32:24;46:12;49:22;57:24;78:8;88:1,2,23;90:20;99:8;110:9;119:5;138:8;167:1
**waited (1)**
12:23
**waive (1)**
140:17
**waiver (1)**
89:25
**waiving (2)**
140:16;141:2
**wakeup (1)**
171:20
**walked (1)**
71:14
**Wall (1)**
16:3
**wand (1)**
122:15
**wants (8)**
20:17;21:7;84:23;86:8;90:18;131:10;173:5;178:13
**warehouse (1)**
105:9
**warn (1)**
48:16
**waste (1)**
188:14
**watch (1)**
69:21
**watches (1)**
201:25
**watching (1)**
201:25
**way (57)**
8:8;9:17;10:8;16:5;17:20;20:16;25:4;33:20;34:25;35:1,2;38:21;42:21;43:16;48:25;52:14;62:23;73:2;76:5;79:21;94:14;96:25;98:10,10;100:24;101:16;103:12;104:25;110:19;117:8;126:10,24;127:22;136:15;137:9;142:14,16;150:24;151:6;152:15;155:17;162:19;163:11,14;168:22;172:3,10;175:3,17;178:1;183:11;186:17;187:3;198:22;199:14;200:14;203:11
**ways (2)**
70:9;125:18
**weaknesses (2)**
185:21;191:3
**websites (2)**
17:7,11
**WEDNESDAY (2)**
6:1;22:25
**week (6)**
10:1;14:22;16:10;43:20;71:21;197:16
**weeks (5)**
12:23;26:20;137:13;165:13;184:2
**weigh (1)**
86:8
**weighed (2)**
47:18;195:8
**Weil (2)**
6:16;52:4
**Weissberg (1)**
67:12
**Weissmann (12)**
38:1,8,11;39:7;67:8,18;68:2,4,10,13,15;69:7
**welcome (2)**
196:6,18
**weren't (2)**
38:16;77:17
**what's (30)**
13:14;19:19;22:1;47:25;48:13;49:20;57:23;58:19;62:20;72:1;84:24,24;99:15;101:14,15;107:9;110:13;121:9;142:10;144:15,15,25;157:22;160:15;166:13;176:9;179:15;186:17;192:11;203:25
**whenever (1)**
120:25
**whereas (1)**
202:10
**Whereupon (1)**
204:8
**whichever (1)**
162:19
**white (1)**
104:6
**whoever's (1)**
197:10
**whole (2)**
17:6;194:2
**whomever (1)**
54:7
**who's (3)**
59:21;195:2;196:20
**whose (1)**
189:6
**wife (1)**
189:12
**wildfire (43)**
7:8;11:21;17:8;23:6,18;30:24,25;31:11;32:7;33:9;37:3,11;45:17;46:8,10,15,22;47:7;50:8,10;53:4,20,21;54:2,3,16,21;55:12,13,14,17;68:20;69:10,11;87:22;88:10,16;89:6;105:8,11;108:21;114:5;171:19
**wildfires (7)**
15:9;30:21;74:12;75:5,8,20;106:4
**willing (2)**
73:2,2
**willingness (1)**
161:19
**Willke (1)**
72:11
**Willkie (1)**
196:15
**Willoughby (1)**
73:24
**window (2)**
146:21;148:24
**wishes (3)**
108:20;138:5,6
**wishful (2)**
49:19;192:17
**withdraw (2)**
42:15;46:7
**withdrawing (1)**
117:5
**within (10)**
18:24;25:23;26:20;127:9;174:17;175:9;176:14;177:24;178:2;179:16
**without (13)**
31:16;74:24;81:1;

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 231 of 233

128:4;135:19;137:8,8;140:15;141:2;155:2,4;158:10;175:19
**wolf (1)** 25:22
**wonder (2)** 74:20;194:1
**woods (1)** 30:6
**word (13)** 41:12;59:13;60:20;69:21;93:25;104:14;123:25;145:8;165:7;184:14,16;192:24;203:25
**wording (1)** 92:24
**words (19)** 32:15;34:16,18;35:2;37:24;42:4;46:12;47:3,15,16;49:3;56:9;65:18;82:8;115:1,9;142:14;146:22;150:8
**work (29)** 58:7;72:9;106:17;120:14,16;123:18;124:5;136:21;146:9;158:10;165:12;174:22;175:18,18;176:15;177:20,22,24,25;178:8,19,20;179:2;185:21;197:12,19;198:4;199:19;201:14
**worked (4)** 72:7;126:23;145:11;146:3
**working (1)** 125:12
**works (5)** 35:21;96:8;126:24;191:25;203:4
**world (5)** 38:22;122:20;126:14;127:2;176:9
**worms (1)** 9:18
**worried (1)** 29:10
**worry (1)** 86:11
**worth (1)** 178:15
**WR (1)** 153:4
**write (1)** 59:20
**written (1)** 34:25
**wrong (3)** 64:12;100:9;126:24
**wrongful (6)** 42:2,23;79:9,11,12;136:12
**wrongly (1)** 47:22
**wrote (1)** 34:17

**Y**

**year (11)** 91:13;103:21;108:23,24;126:22;146:16,21,23;147:18;165:2;179:12
**years (10)** 15:4;18:17,21,24;21:6;74:22;85:19;117:25;118:2;122:12
**years' (1)** 152:23
**year's (1)** 157:11
**yellow (3)** 55:1,5;62:16
**Yep (2)** 65:9;69:3
**yesterday (12)** 7:4;9:12;54:18;77:17;105:12;110:13;124:17;161:7;166:24;169:14;180:23;190:22
**York (1)** 22:17
**YouTube (2)** 17:19;18:10

**Z**

**Zell (1)** 84:12
**zone (1)** 153:4

**1**

**1 (9)** 22:12;23:1,4;53:23;55:24;56:8;99:13;102:9;108:9
**1,000 (2)** 67:25;68:3
**1,300 (1)** 16:22
**1:53 (1)** 204:8
**10 (1)** 45:14
**100 (1)** 184:20
**100,000 (2)** 174:14;175:16
**11 (15)** 19:20;49:24;50:6,8;53:4;57:20;58:17;70:24;107:22;108:23;110:3;161:5;166:4;170:12,13
**11:44 (1)** 107:6
**11th (1)** 154:25
**12 (9)** 41:19,25;52:25;79:2;80:4,19;81:11;82:9;107:5
**12:01 (1)** 107:6
**13 (1)** 52:18
**15 (3)** 89:18;90:19;91:14
**15th (7)** 26:21;27:4,5,11;39:10;115:20;203:19
**16 (6)** 69:13;75:7;89:18;90:19,25;91:14
**16th (2)** 24:6;25:1
**17 (2)** 75:6;96:21
**18 (2)** 52:25;75:6
**19 (1)** 52:25
**19th (2)** 8:25;116:18
**1st (3)** 26:21;154:15;193:1

**2**

**2 (5)** 30:21;56:8;74:10;75:6;194:7
**2,000 (1)** 179:3
**2.0 (2)** 130:25;135:24
**2.3 (1)** 18:25
**20 (1)** 26:5
**2004 (6)** 162:25;163:1,11;185:22;186:14,15
**2010 (1)** 147:6
**2012 (1)** 147:17
**2014 (3)** 74:14;75:1,3
**2015 (1)** 75:6
**2016 (7)** 30:22,23;57:6;68:22;74:11;75:9;105:6
**2018 (5)** 123:12,14;125:13,19;165:9
**2019 (4)** 6:1;65:6;77:23;165:10
**2020 (8)** 109:1;125:1,14;126:4;157:18;192:14,16,17
**2021 (1)** 110:4
**20th (1)** 26:16
**21 (6)** 24:16;112:9;116:6;183:7;184:2;203:13
**21,500,000 (1)** 131:1
**21,850,000 (1)** 131:2
**21.5 (1)** 130:19
**21st (15)** 12:12;21:14;24:8,18;25:1;115:15;158:19;160:1,4;166:17,20;188:21;190:19;202:21,25
**22 (1)** 44:22
**23,000 (1)** 178:2
**25th (1)** 154:24
**26 (2)** 6:1;53:1
**2646- (1)** 99:12
**26th (2)** 156:23,25
**28 (2)** 135:23;184:2
**28th (5)** 12:10;181:12,13;183:6,7
**29 (3)** 76:22;80:5,24
**29th (8)** 62:6;65:6;81:25;82:8,10,13,16;87:4

**3**

**3 (6)** 28:14;29:1,2;57:5;66:21;67:1
**3,000 (2)** 178:1;179:3
**3003c2 (1)** 97:19
**30th (4)** 42:6;108:23;109:1;111:3
**31 (2)** 109:2;112:10
**31st (7)** 12:9,12;125:6;126:4;175:15;183:8;193:2
**35,000 (1)** 178:13
**363b (1)** 192:6
**3e (5)** 99:5,8,11,16;100:17
**3O12 (1)** 76:10

**4**

**4 (14)** 31:10;33:7;43:1,8;69:12;95:7,22,24;96:18;97:1,7,19;98:3,12
**401 (1)** 67:5
**410 (1)** 53:23

**5**

**5 (8)** 34:7,17;88:17;92:8;93:8;94:11;99:12;169:13
**5,000 (2)** 43:21;102:9
**5.8 (1)** 15:14
**500 (1)** 16:24
**503b9 (1)** 39:23
**51.95 (1)** 135:22
**5th (1)** 192:12

**6**

**6 (4)** 11:12;39:9;46:8;49:8

**7**

**7 (11)** 39:18;40:6;49:19;96:15,20;97:1,18,18;98:12;99:17;101:19
**75 (1)** 175:16
**75,000 (2)** 174:14;179:16
**7-B (1)** 31:12

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 232 of 233

## 8

**8 (1)**
192:13
**800-pound (1)**
161:12
**8th (6)**
23:7;24:13;165:1,9,10;183:7

## 9

**9 (6)**
41:16,17,19;43:1;50:7;53:3
**9:54 (1)**
6:1
**9014 (2)**
99:19;100:20
**95 (1)**
15:15
**98 (1)**
18:3
**99 (1)**
18:14
**9th (6)**
199:16,16;200:10,19;201:16,17

Case: 19-30088 Doc# 2781 Filed: 06/27/19 Entered: 06/27/19 17:46:25 Page 233 of 233