# EXHIBIT 9

```
 1                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                      SAN FRANCISCO DIVISION

 3

 4  SAN FRANCISCO HERRING          )  Case No.  14-cv-04393-WHO
    ASSOCIATION; and DAN CLARKE,   )
 5                                 )  San Francisco, California
             Plaintiffs,           )  Courtroom 2, 17th Floor
 6                                 )  Wednesday, January 9, 2019
        v.                         )
 7                                 )
    PACIFIC GAS AND ELECTRIC       )
 8  COMPANY; and PG&E CORPORATION, )
                                   )
 9             Defendants.         )
    _____)
10

11

12                  TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE WILLIAM H. ORRICK
13               UNITED STATES DISTRICT COURT JUDGE

14

15  APPEARANCES:

16  For Plaintiff Clarke:      STUART G. GROSS, ESQ.
                               Gross & Klein LLP
17                             The Embarcadero
                               Pier 9, Suite 100
18                             San Francisco, California 94111
                               (415) 671-4628
19
    Also Present for           MATTHEW D. METZGER, ESQ.
20  Plaintiff Clarke:          Belvedere Legal, PC
                               1777 Borel Place, Suite 314
21                             San Mateo, California 94402
                               (415) 513-5980
22
                               DAN CLARKE, Plaintiff
23

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
```

```
 1  APPEARANCES:  (Cont'd.)

 2  For Defendants:              SCOTT D. MROZ, ESQ.
                                 JAMES L. MINK, ESQ.
 3                               Walsworth Franklin Bevins & McCall
                                 601 Montgomery Street, 9th Floor
 4                               San Francisco, California 94111
                                 (415) 781-7072
 5
                                 SANDI L. NICHOLS, ESQ.
 6                               Allen Matkins Leck Gamble
                                 Mallory & Natis LLP
 7                               Three Embarcadero Center, 12th Floor
                                 San Francisco, California 94111
 8                               (415) 837-1515

 9  Transcription Service:       Peggy Schuerger
                                 Ad Hoc Reporting
10                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
11                               (619) 236-9325

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>SAN FRANCISCO, CA  WEDNESDAY, JANUARY 9, 2019  2:02 P.M.</u>

--oOo--

THE CLERK:  All rise.  This court is now in session, the Honorable William H. Orrick, presiding.

THE COURT:  Good afternoon, everybody.

ALL:  Good afternoon.

THE COURT:  Please be seated.

THE CLERK:  We are hearing Case Number 14-4393, San Francisco Herring Association, et al. v. Pacific Gas and Electric Company, et al.

Counsel, if you would, please come forward and state your appearance for the record.

MR. GROSS:  Good afternoon, Your Honor.  Stuart Gross on behalf of Mr. Clarke.  With me at the table is Matt Metzger, who I wrote a letter to you about.

THE COURT:  Yes.  I got it.

MR. GROSS:  And as well as Mr. Clarke himself.

THE COURT:  Mr. Clarke, welcome.

MR. MROZ:  Good afternoon, Your Honor.  Scott Mroz for Pacific Gas and Electric Company and Pacific Gas and Electric Corporation.

MS. NICHOLS:  Sandi Nichols, Your Honor, from Allen Matkins also for the PG&E Defendants.

THE COURT:  Great.  Welcome.

MS. NICHOLS:  Thank you.

1    THE COURT:  All right.  So let me give you my tentative
2  on this and then have you argue.  So as I understand the positions
3  of the parties, the substantive concern of Mr. Clarke is the
4  inadequacy of the resolution of terrestrial pollution in the
5  affected area.  That's a broader environmental claim in which the
6  parties took pains to segregate out of the settlement agreement on
7  the known property claims.  Mr. Clarke explicitly wasn't a party
8  to the SFHA settlement and consent decree, which was approved by
9  the Federal Government.

10    So that claim might be able to be asserted as a citizen suit
11  under the -- under RCRA.  It's not pleaded that way.  But given
12  the history of this litigation and the clearly-expressed intent of
13  Mr. Clarke, I'm inclined to allow him to amend to state the claim
14  and have the parties more directly address the issue.

15    But I have several concerns.  First, it's not clear the
16  extent to which the consent decree effectively moots the claim.
17  The consent decree appears to focus, though, on the Clean Water
18  Act issues and land within a hundred-foot band of the Bay.

19    Second, I believe Mr. Clarke is going to be limited to the
20  NOI that was filed before the suit was brought.  And I'm not sure
21  that his current claims fall within it.

22    Third, civil penalties aren't available in that kind of a
23  lawsuit, and all of that makes me wonder whether the pursuit of
24  this particular claim is in the best interest of the parties, but
25  I'll leave that up to the parties.  That's not my call.

1    With respect to the other legal issues that are presented by
2 the motion, the settlement agreement describes the known Clarke
3 property claims as Counts 4 through 7 and punitive damages as they
4 relate to Clarke's property.  The release is broad and Mr. Clarke
5 has waived his damages claims.

6    But I think the state law -- private nuisance, trespass,
7 negligence, and strict liability claims -- are released.  Even if
8 not, I agree with the Defendants that there are no additional
9 remedies that would be available under them.  And so I would grant
10 the motion on those issues.

11    I don't think Mr. Clarke has a public nuisance claim because
12 he has no special injury under the citizen suit theory, so I would
13 grant the motion on that issue.

14    And I do think that the Clean Water Act claim is moot because
15 of the remediation and monitoring required under the consent
16 decree.  There's no realistic prospect that the Clean Water Act
17 violations will continue in light of my supervision over the
18 consent decree and, indeed, since Mr. Gross represents the SFHA
19 and has been aggressively pursuing this matter, I'm confident that
20 any issues that arise will be brought to my attention.

21    So I would grant the motion on that issue.

22    So let me start with the Defendants since it's their motion
23 and ask you to speak to the RCRA issue and then, Mr. Gross, I'll
24 let you take on all of the issues that I've laid out.

25        MS. NICHOLS:  Thank you, Your Honor.  So as I understand

1  the Court's tentative ruling, the -- it's the adequacy of the
2  terrestrial pollution -- the remediation of terrestrial pollution
3  that is Mr. Clarke's current concern, and the Court is inclined to
4  allow Mr. Clarke to amend his RCRA claim to assert that issue.

5       THE COURT:  To -- to allege the citizen suit -- to
6  allege a citizen suit and how that fits within the NOI that he's
7  already filed, which I think may be a challenge.  But -- but I do
8  think he's got -- he was intending to preserve these broader
9  environmental claims.  The RCRA one is the one that I could see
10 conceivably being alive 'cause I'm not sure that it's covered
11 through -- completely through the consent decree.  I just don't
12 know.  So that's why I parsed that the way that I did.

13      MS. NICHOLS:  So a couple of points, Your Honor.  It was
14 not intended in the first amended complaint to cover the entire
15 terrestrial area of the Marina and Fisherman's Wharf neighborhood,
16 except to the extent that the contamination in those areas was
17 thought or alleged to be impacting Mr. Clarke's home.  Your Honor
18 considered that issue, that exact issue, on the motion to dismiss.
19 And the Court found that "if there was an imminent and substantial
20 danger from Clarke's home" -- that is a quote -- then -- then Mr.
21 Clarke would be able to pursue that and, at that point in time,
22 given that was the allegation on the motion to dismiss, the Court
23 permitted Mr. Clarke to proceed.  But the Court also said that,
24 "At such time as there was not an imminent and substantial danger
25 from Clarke's home, then his RCRA claim may fail."

1     And so it was always the construct within the first amended

2  complaint that Mr. Clarke's concern was with the damage to his

3  home, the diminution in value to his property. He was concerned

4  about areas outside the scope of his property boundary only to the

5  extent that they were affecting his property. Your Honor also

6  dealt on the motion to dismiss with the fact that PG&E challenged

7  Mr. Clarke's standing under the Clean Water Act because Mr. Clarke

8  had -- basically had not alleged any interest in the Bay.

9     But Your Honor found that because he alleged that groundwater

10  from these other areas was flowing under his property and then

11  from his property, that that would be enough for him to pursue

12  standing under the Clean Water Act, at least on a motion to

13  dismiss.

14     So I don't think it's ever been as understood -- there was no

15  poison pill by the settlement -- that Mr. Clarke's claims have

16  been about his home when it came to the land side. And, frankly,

17  when it came to the Clean Water Act, too. So --

18     THE COURT: Well, but how can you say that when he

19  carved out at each point along the way the broader environmental

20  claims? And when I was dealing with this before you went into the

21  extended settlement discussions and the analysis of the land, that

22  was -- that was quite clear.

23     MS. NICHOLS: You are correct, Your Honor. I'm not

24  disputing that at all. But the fact that Mr. Clarke and PG&E

25  agreed that he may carve out the broader environmental claims that

they weren't settled was no waiver of PG&E's right to assert that

he no longer had standing to pursue them.  Now, that is a fight

left for another day.

So the fact that Mr. Clarke did not agree to settle "broader

environmental claims" under RCRA and the Clean Water Act does not

mean that he automatically had standing because he didn't settle

them.  So that was left for this hearing -- for a motion for

summary judgment.  Frankly, it was left for settlement

negotiations as well, just part and parcel of we want to get this

case resolved -- not that we admit he had standing to pursue them

-- so we did in fact continue with the mediated investigation

agreement that on its own for years investigated these areas.  You

know, that's what that was about.

Reports have been filed.  Judicial notice can be taken not of

the truth of the content of everything that's on those websites,

but of the fact that there are extensive reports of data that were

filed concerning investigations in these areas, whether that data

-- we're not arguing whether it was truthful or opinions are

accurate, but the investigations were undertaken and are

continuing to be undertaken on the land side.

And, in fact, the request for judicial notice both that PG&E

offered as well as the Plaintiffs, cite to work notices that are

issued by the Department of Toxic Substances Control about the

work that PG&E is doing and going to be doing on the land side.

And that includes soil investigation, soil gas investigation,

1    further groundwater investigation.

2        So it's -- that is happening.  PG&E never once, simply

3    because Mr. Clarke said, "I'm going to preserve my broader

4    environmental claims," intended to suggest that we conceded he

5    could bring them, that he could pursue them.

6        And I don't -- I think the Ninth Circuit law is clear, Your

7    Honor, respectfully, that opposition to a motion for summary

8    judgment is not the time to permit amendments to the complaint.

9            THE COURT:  Well, thank you for that argument, but that

10   one won't go very far with me in light of the procedural history

11   in this case.  So do you have another -- do you want to say

12   anything else with respect to that?

13           MS. NICHOLS:  I do.

14           THE COURT:  Okay.

15           MS. NICHOLS:  So with respect to -- assuming the -- I

16   would argue, Your Honor, that even if Mr. Clarke is permitted to

17   amend, it would be futile for the other reasons that the Court

18   mentioned, which is the claims that he's trying to pursue now in

19   terms of vapor intrusion or lead, those were not alleged in the

20   notice of intent.  And especially this whole notion of alleged

21   vapor intrusion, which is unsupported -- by the way -- on this

22   motion with any admissible expert opinion, that that's even a

23   concern of him.

24       So -- so there is nothing at this particular juncture to

25   support the credibility of the vapor intrusion concern.

1    The vapor intrusion pathway -- as a pathway from the shallow

2  groundwaters -- it's the claim that contamination in shallow

3  groundwater comes up, you know, through the subsurface into indoor

4  air.  Number one, it's not in the notice of intent.  And the *ERF*

5  case makes clear that that's a whole different pathway.  You don't

6  get to pursue that.  The Court has no subject matter jurisdiction

7  over it.

8    The other issue, too, is that Mr. Clarke has not even offered

9  in his opposition here or in his declaration any testimony that he

10 would be exposed to any indoor air on other people's property.

11 We're now talking about third parties' property that he wants to

12 pursue a claim to have PG&E go out and investigation soil gas on

13 their property.  But he's never said, "And I'm there all the

14 time."  You know, "I'm exposed to that and I know they'll let you

15 onto their property to come do this."

16    So it would be futile.

17    We also cited a case, Your Honor, that says, "The Court

18 cannot order injunctive relief as to third party properties where

19 those parties are not before the Court."

20        THE COURT:  I guess my issue -- and maybe I think I'll

21 turn it over to Mr. Gross -- is having an understanding of what

22 the citizen suit RCRA claim is, what it looks like, what issues

23 are raised under it, and that would be determined by the

24 amendment.  And then we can get into the substantive issues that

25 you're describing.

1    So let me -- let me turn over to Mr. Gross and start with

2    RCRA and --

3         MR. GROSS:  Absolutely, Your Honor.  So, first let me

4    grab the NOI 'cause I'll start with the NOI and we can work

5    logical in that way.

6         The first thing to be clear on is there's no law that

7    requires the -- a citizen to identify in their NOI every single

8    chemical and every single pathway.  What's required is sufficient

9    information to permit the polluter to figure those things out, and

10   we did that.  So the NOI states explicitly as to -- as to the RCRA

11   violations, says -- and I'll start from the top -- "Pursuant to 42

12   U.S.C. 6972 of RCRA, noticers intend to sue PG&E for disposing

13   solid waste in the form of MGP residue in a manner that may

14   present an imminent and substantial endangerment to health or the

15   environment," citing then 6972(a)(1)(B).  "Liability under RCRA is

16   retroactive."  And then here's the -- the money of it.  "And the

17   ongoing contamination resulting from PG&E's disposal of MGP

18   residue and the ongoing discharges therefrom into groundwater,

19   navigable waters, and air are illegal and subject to liability."

20        If you look at the other components of this NOI, it states

21   explicitly, as does the first amended complaint, that the concern

22   that Dan Clarke has as to the terrestrial areas is that they are

23   extensively contaminated and PG&E has known about this for 77

24   years and still hasn't cleaned it in 77 years -- since 1977 -- and

25   still has not cleaned it up.  They haven't even done a full

1  investigation.

2      So the NOI covers it.  The -- Mr. Clarke was not required

3  when he submitted this NOI in April of 2014 to identify every

4  single chemical component of MGP waste.  What he said is -- and it

5  states it explicitly in here -- is that there are three MGPs.

6  Those three MGPs are located in these locations that take up large

7  portions of the Marina and Fisherman's Wharf neighborhoods.  Those

8  cites are substantially contaminated with MGP waste.  And that MGP

9  waste then presents an imminent and substantial endangerment

10  through various pathways of exposure.

11      He was not required at that point to say, "Oh, in those

12  manufactured gas plant wastes are cyanide, polymeric hydrocarbons,

13  certain levels of arsenic, Cadmium.  He wasn't -- nothing says

14  that.  He put PG&E on notice to say, "PG&E, we think you're in

15  violation of RCRA.  Here's enough information.  We say this broad

16  area is contaminated by you and you need to go clean it up."

17  That's all that was required.

18      And the first amended complaint, moving to this issue of was

19  it pled, what were the extent of his broader environmental claims,

20  they've always dealt with the broader extent in the Marina

21  neighborhood of this contamination and Fisherman's Wharf and the

22  areas offshore.

23      The complaint -- I think there's something like 90 paragraphs

24  in this.  It goes in chapter and verse, "In this location in the

25  Marina District, this was found.  In this location, this was

1  found."  That's what the parties always knew was happening, which

2  is why we separated out the known Clarke property claims and the

3  broader environmental claims.

4      And I think it is relevant to reference back some of the

5  language in the settlement agreement, which not only excluded

6  explicitly the broader environment claims, but actually says in

7  the preamble that, "The settlement agreement does not settle,

8  release, or otherwise affect the broader environmental claims."

9      Now, you know, were they being honest at that point?  Are

10  they being honest now?  I mean, come on.  Like we know that there

11  are these claims here.  I appreciate Your Honor saying that --

12  giving us leave to amend.  I think that makes sense.  This

13  complaint has been on ice since 2015.

14      So we amend.  We proceed forward.  Then what is it?  What are

15  we looking for? -- what we've been looking for the entire time,

16  which is a comprehensive investigation that identifies exactly

17  where this contamination is and then addresses it.

18      Now, this question of private property owners.  We have not

19  and do not intend to ask the Court to order individual private

20  property owners to do any particular thing on their properties.

21  I represent several of these homeowners.  There are broad swaths

22  in these neighborhoods that are public.  That is what we were

23  investigating as part of the mediated investigation.  We were

24  investigating those public areas.

25      We can continue -- the Court can order that investigation to

1 be complete. We can resolve the question of, "Is all of this lead

2 that's being found at much higher levels on the footprint than

3 off, is that because of the manufactured gas plant or is it

4 because, as PG&E has claimed, there was a smelter downwind that

5 would cause this?"

6 Those issues the Court can and should resolve. And at the

7 end of that, the orders can say, "This area of contamination, this

8 needs to be cleaned up."

9 Now, in terms of vapor, now --

10 THE COURT: I wasn't -- this sort of goes beyond the

11 pleading issues and the facts that were alleged by both sides.

12 Why wasn't this dealt with in the -- with the agreement with the

13 Herring Association, who you also represented or -- and eventually

14 I'm going to see this, so I'm just -- I'm just curious.

15 MR. GROSS: Sure. So first of all, I need to get to

16 another one of your questions, which was where does the consent

17 decree start and where does it stop? Right.

18 So where it starts is -- and I know it's referred to as a

19 "hundred-foot band." Really what that is is there's a line of

20 monitoring wells right along the margin of the Bay; right? And

21 that's it. So there's monitoring wells. If there's a trigger --

22 if there's PAHs that are found above a certain level, then PG&E

23 has to propose some way to deal with that; right?

24 But beyond that narrow strip, it doesn't proceed inland. So

25 the consent decree does not require PG&E to do anything beyond

1    putting in those wells and then whatever is required if one of
2    those wells hits.

3         So that's first of all.  So there's large, large swaths of
4    what we refer to as the terrestrial contamination that aren't
5    affected at all.

6         Now, I think -- and this gets a little bit into another
7    issue, but to just sort of put a pin in it so you recognize -- the
8    consent decree as a compromise document does exclude certain
9    geographic areas offshore as well.  So I don't want to get into
10   that right now to blue things.  But just so we're clear.

11        But as to terrestrial, absolutely not included.  So why
12   wasn't it included?  There's limits to how much we can discuss
13   because --

14            THE COURT:  Yeah.  I don't want to --

15            MR. GROSS:  So there were --

16            THE COURT:  I don't want to get there.

17            MR. GROSS:  -- settlement negotiations.  Those
18   settlement negotiations involved all of the parties, and then they
19   did not, but there was an understanding I believe by both sides
20   that the interests of the Herring Association was limited to that
21   offshore area.

22        So in resolving the Herring Association's claims, it was just
23   the offshore.  And so the Herring Association never really had a
24   dog in the terrestrial contamination fight.  That was Dan.  Dan
25   had both of those dogs.  Ultimately, Dan decided not to join the

1  consent decree, as his right, but nothing was done as to the
2  terrestrial fights.

3      As to the motion to dismiss order, I think there was a couple
4  of points to clarify on that.  It's now been a long time ago;
5  right?  But if you'll recall, the gravamen of PG&E's argument at
6  that point, right, was essentially another permutation of a
7  mootness argument.  It was, "We've already offered to remediate
8  Dan's house and that offer moots his RCRA claims."

9      So the reason we were fighting about -- and the focus of all
10 the briefing on the contamination of Dan's house -- is because
11 that was their argument, was, "We've offered to remediate his
12 house.  That moots his claim." Dan's argument was, "Well, I can't
13 moot an offer to remediate.  I can't moot my claims that it needs
14 to be remediated."

15     So that's why it was there.  So I think pointing to, "Oh,
16 this was all we were talking about" or "This was all the judge,
17 Your Honor, stated in the motion to dismiss order concerning
18 that," I don't think that really has a lot of weight.

19     What has weight is Dan has a legally-cognizable interest in
20 this contamination, has for years, still has it.  He's got
21 standing to pursue this.  And the evidence of the last, you know,
22 40-plus years indicates it makes sense to pursue it.  It needs to
23 be pursued.

24     I mean, PG&E, first of all, is under absolutely no order
25 whatsoever -- be it an investigation order or a remediation order

1    -- for any of these terrestrial areas and has gone on the record

2    saying it's never going to or it doesn't think it should ever have

3    to remediate manufactured gas plant tar.  This is the source of an

4    indoor vapor threat.  It's literally what it sounds like.  It is

5    large deposits of tar.

6         So PG&E, left to its own devices, has indicated explicitly it

7    doesn't even want to touch that.  Indoor air and lead, yeah.  They

8    want this case dismissed so that they never have to deal with

9    lead.  They got the DTSC to agree that they didn't have to look

10   for lead.  We asked the DTSC, "DTSC, why is it that you're not

11   looking for lead?  Where in the files is there any evidence that

12   you looked at this and decided this should not be a contaminant

13   concern?"  "Couldn't find it."

14        So the need for this is real.  And that's why it's being

15   pursued and why it should be pursued.

16             THE COURT:  Okay.  So I understand your argument with

17   respect to need.  With respect to the other claims, --

18             MR. GROSS:  Uh-huh.

19             THE COURT:  -- do you have any argument that you want to

20   make, or am I right in thinking that your real claim would -- if

21   you've got one -- is the RCRA claim?

22             MR. GROSS:  So thank you , Your Honor.  First of all,

23   moving then to the Clean Water Act and the extent of the CD, as I

24   just previously indicated, the consent decree doesn't cover the

25   entire area that is -- that is likely contaminated here.  It is a

1   compromise document.  So could there be -- there are areas that

2   simply are not covered.  That's one.

3       The other issue is, as we put into the briefing, there is --

4   there is a limited term on that consent decree.  It lasts for ten

5   years.  The contamination that we've been dealing with here, PG&E

6   has known about it since 1977.  So, again, it's a -- it's a

7   compromise document.  It is a -- it is what it is.

8       But in terms of it being so co-extensive with Mr. Clarke's

9   claims, it's not.

10      The other point is on penalties.  Even if the -- you were to

11  find that the injunctive relief available to Mr. Clarke are

12  subsumed by the consent decree, the consent decree does not

13  release and doesn't affect his penalties.  Now, the only thing

14  that they've raised is the penalties.  The thing that they've

15  cited in their footnote is a statement by the Assistant U.S.

16  Attorney that set payments are of a type which can lead to

17  preventing a repeat of the violation.

18      Well, that's -- at the very most, that creates a material of

19  issue of fact about whether or not Mr. Clarke is still entitled to

20  penalties.

21      And if you go back to the *Laidlaw* case -- I mean, this is

22  what the *Laidlaw* case was about -- which was you have a -- you've

23  got a polluter who comes in.  The polluter says, We're all good

24  here.  Everything's addressed.  The Supreme Court says, Well, hold

25  on.  First of all, that's voluntary conduct and you've got to meet

1    a much higher standard if you're coming in with voluntary conduct

2    on the injunctive component.

3        But then they independently said, As to penalties -- as to

4    penalties, that's still live, even if we were to accept your

5    argument that the mess is all cleaned up.

6        So Mr. Clarke, even if the Court was to decide that the

7    consent decree basically occupies the field for injunctive relief

8    -- it doesn't occupy the field for penalties -- PG&E would

9    certainly be free to argue that the amount that it's paying in

10   these -- for these SEPs should be considered and etc., but that's

11   an argument at trial.  That's not summary judgment.  That's a

12   material issue of fact of whether that's sufficient.

13       Now, as to then these other state law claims --

14           THE COURT:  Okay.  So who assesses the penalties?  Is it

15   the judge?

16           MS. NICHOLS:  Yes.

17           THE COURT:  So -- and is this -- all the issues that are

18   remaining will be bench issues?

19           MS. NICHOLS:  Yes.

20           MR. GROSS:  Liability would not.  So liability --

21   liability is -- it depends also on which claims, and I believe

22   also liability -- so remedy under RCRA and Clean Water Act would

23   be a bench issue.  Liability is a jury issue.

24           MS. NICHOLS:  I disagree, Your Honor, and at the case

25   management conference, it was understood that this was going to be

1   a bench trial.

2           MR. GROSS:  Well, okay.  Setting that aside, Your Honor,

3   I think that, you know, it is what it is.

4           THE COURT:  All right.

5           MR. GROSS:  Right?  I mean, you know, the law is what

6   the law is on that.  The -- in terms of -- in terms of the state

7   law claims -- so, first of all, as to the scope of the release, if

8   you look at the settlement agreement itself, what it says is these

9   claims, to the extent that they relate to the known Clarke

10  property claims.  And how do you find the known Clarke property

11  claims?  They are the ones that arise out of the environmental

12  conditions on the known Clarke property.

13      So that release does not include those claims and -- and,

14  thus, they're still live.  So the negligence and the strict

15  liability, they're still live and were not affected by it.

16          THE COURT:  How is -- explain that to me.

17          MR. GROSS:  Uh-huh.

18          THE COURT:  Explain how Mr. Clarke would have standing

19  on a negligence claim for PG&E's conduct that doesn't affect his

20  property.

21          MR. GROSS:  Uh-huh.  For the same reason he has standing

22  for RCRA.

23          THE COURT:  Well, it's -- aren't they very different?

24  RCRA -- it seems conceivable to me that a citizen suit under RCRA

25  -- which happens from time to time -- allows a citizen to make

1     water environmental claims.

2            MR. GROSS:  Uh-huh.

3            THE COURT:  A negligence claim is something different.

4     You don't get to assert a negligence claim for injuries to third

5     parties.

6            MR. GROSS:  And he's not asserting it to a third party.

7     If you look at his declaration, his declaration states

8     specifically about the injuries that he himself suffers.  And if

9     -- it matches precisely what the Ninth Circuit and the Supreme

10     Court have said, which is it's not an injury to the environment.

11     It's an injury to the person.

12        And he is injured by it.  He's injured by the diminishment of

13     his recreational enjoyment as well as the aesthetic enjoyment as

14     well as the stress and anxiety that it causes him.  That's injury.

15     I mean, it's soft tissue, but it's injury.  So that's enough on

16     negligence.  Negligence requires harm.

17        And in terms of damages as -- in terms of elements, it's not

18     damages that you need.  You need harm.  And one of the remedies

19     that's available for a court under California law is injunctive

20     relief.  So he's there.  He's got it.

21        Now -- so that's on the strict liability and the negligence.

22     And then on the -- on the public nuisance, he is specially

23     situated.  He's got harms that are different than those of the

24     general public -- based on his close connection to that area.

25        If you look at the -- there was a case we cited from the

1  Ninth Circuit -- and these were folks who were suing concerning --
2  they were suing Glock; right?  And what was their harm?  They
3  lived in neighborhoods where they experienced additional trauma
4  because of gun violence.  And the Ninth Circuit said, That's
5  different than most people.

6      And Mr. Clarke has additional trauma from living in -- having
7  lived in the Marina neighborhood and the stress and anxiety that
8  arises from that both based on his exposure during that period as
9  well as his close connection and his knowledge and concern about
10 the effect that it's having.  That's an -- that's both an injury
11 that gives him standing and makes him specially situated.

12          MR. MROZ:  Your Honor, may I speak to --

13          THE COURT:  Hold on for just a second, Mr. Mroz, and
14 then --

15          MR. GROSS:  And the final point, I believe, is this
16 question of civil penalties under RCRA.  So civil -- as we
17 indicated, there is a split in authority.  Now, our position is
18 that split in authority is most likely to be resolved in favor of
19 -- by the Ninth Circuit, if and when it addresses this issue -- in
20 favor of the availability.  And where that comes from is *Covington*
21 as well as other more general environmental cases where the Ninth
22 Circuit has recognized the very important role that penalties have
23 in private party RCRA cases specifically in RCRA, as well as
24 private party cases for environmental laws generally.

25      So if you look at *Covington* in particular, the court says,

1    Look, the other reason why, you know, this is important that the

2    courts stay involved here and that these claims go forward is --

3    you know, in that case, there actually was a plan to do some

4    remediation.  But then also the penalties -- making sure that

5    those penalties are there ensures that the stuff will get

6    addressed.

7        So while it hasn't been addressed by the Ninth Circuit yet,

8    the wave authority in the Ninth Circuit on RCRA in particular and

9    federal environmental laws generally indicates that the Ninth

10   Circuit takes it up but they will decide that they're available.

11           THE COURT:  Somewhat different than the way that the

12   judges in this district look at that question.

13           MR. GROSS:  There are -- there haven't been that many

14   and -- but, yes.

15           THE COURT:  Okay.  Mr. Mroz?

16           MR. MROZ:  Your Honor, on the negligence, very quickly,

17   Mr. Clarke released all claims for damages.  And whether you look

18   at the cases we cited -- they are numerous -- that damages must be

19   pleaded and proved as an essential element of this cause of

20   action, or the case that Mr. Gross cited, *Kesner*, relied on two

21   other cases -- *Ortega v. Kmart* and *Castellon* -- which both said,

22   "Cause of action for negligence must include duty, breach,

23   causation, and damages."

24        So whether we're talking about damage or injury or harm

25   semantically, at the end of the day he has no claim left for any

1   compensable damage, injury, harm. He released it. It's over. He

2   doesn't live there. He cannot -- long-arm reach from Hillsborough

3   to make a claim for negligence when there is no damage -- and, by

4   the way, Mr. Gross cited no authority that in this instance Mr.

5   Clarke would be able to get injunctive relief on a negligence

6   cause of action.

7         THE COURT: Which is something I've never heard of.

8   Maybe there have been some, but --

9         MR. MROZ: Well, he said that he could, but he never

10   cited that. So I would ask him to cite that.

11       Strict liability, two things. One -- same thing -- cannot

12   make a prima facie case. But under *Luthringer v. Moore*, this is

13   a matter of law. So this idea that he needs to take an expert

14   deposition to determine -- to help the Court determine whether or

15   not a manufactured gas plant in 1900 was an ultra-hazardous

16   activity -- that's not true.

17       In fact, if he thought he needed expert testimony on that, he

18   should have submitted a declaration. Because it's a matter of

19   law. We're not going to have an expert on this issue. But we

20   cited cases, including a 1906 case, that said manufactured gas

21   plants are as common as electrical facilities. So it's common.

22   It's not a blasting case. *Luthringer* was an interesting case

23   where there was some sort of fumigant acid that leaked from one

24   room to another, and no matter what they did, they couldn't

25   protect the people in the adjacent building. That's not this

1  case.

2      And his allegations is the ultra-hazardous activity emanated

3  from the operation of the MGP.  The MGP stopped operating in 1905.

4      And then on the nuisance claim, he does not -- he doesn't

5  have a special injury here of any kind.  He's alleged that he has

6  annoyance and discomfort and fear and emotional distress and all

7  that.  I want to remind the Court that Mr. Clarke released all

8  damage claims, including all claims for personal injury.  Those

9  are gone.

10     So he is claiming personal injury, without any expert support

11 -- we could look at *Potter v. Firestone* where the court said --

12 that was a pure cancer case -- but that the medical testimony

13 would show that it's more likely than not that you have a

14 reasonable fear, based on an exposure.

15     Here, he has no exposure outside of his house.  He's never

16 alleged an exposure outside of his house.  He has -- he has

17 submitted his own declaration for toxicology, oncology, marine

18 biology, but there's no expert.  He's not an expert.  He's not

19 qualified to testify under 702 on any of these.

20     So the question about, "Well, I can put it in a declaration

21 now but later I'll submit the admissible evidence," no.  It has to

22 be in a form that would be admissible later.  He is not a

23 declarant that's qualified or capable to make that declaration.

24     So those -- frankly, we could not believe that we had to

25 fight to get those -- to get Counts 4 through 7 completely

1    resolved because we thought they had been at time of settlement.

2                    THE COURT:  All right.

3                    MS. NICHOLS:  Your Honor, may I respond to some of the

4    comments on the federal claims?

5                    THE COURT:  Please.  Yes.  Go ahead.

6                    MS. NICHOLS:  Thank you.  So with regard to the adequacy

7    of the notice of intent, again, Your Honor, there is nothing.

8    There is a reference -- one reference to air.  There is nothing --

9                    THE COURT:  Uh-huh.  And what I'm planning with respect

10   to this -- and I'll be thinking about this again when I get off

11   the bench -- is that we're going to see an amendment -- these --

12   the RCRA issues were not joined in sufficient detail, as far as I

13   was concerned, in order to dispose of this issue one way or

14   another.  The allegations with respect to the citizen suit aren't

15   there, particularly with the cause of action, and then I need to

16   match that up and you need to join the issue of whether the NOI is

17   -- fairly notified you of the problem at the time that the lawsuit

18   was filed.

19       So all of those things I think are better saved for later as

20   opposed to arguing about them now because I just don't think

21   there's enough detail in the complaint to -- for me to address

22   them one way or another.

23                    MS. NICHOLS:  So, Your Honor, the predicate for all of

24   that would be -- as to whether an amendment would not be futile --

25   is what I understood Mr. Gross to argue just now is that Mr.

1  Clarke has no intent to ask the Court to require anything on
2  private parties' property, that he's concerned with public rights-
3  of-way.  Okay.  So there's a couple of points on that.

4  Mr. Clarke has not established any standing with regard --
5  under *Lujan* -- with respect to any concrete and particularized
6  injury that he has suffered as a consequence of anything that's
7  under a public street or a public right-of-way.  What he's argued
8  in his opposition, in an attempt to save this case, is "I want the
9  data because I think that data may help me decide if I should be
10 stressed and anxious, if I should take certain precautions for my
11 health."

12 Your Honor, the best data to inform Mr. Clarke as to whether
13 he should reasonably have any health concerns are the 95 samples
14 that were taken at the Clarke property -- where he lived, where he
15 would be exposed.  He has not set forth anything in his opposition
16 -- no admissible testimony at all to show that he would have any
17 concrete and particularized injury with respect to a public right-
18 of-way.  He's not a ditch-digger.  He's not going out there as a
19 construction worker.  It just makes no sense.

20 So Mr. Gross made the leap to say, "Mr. Clarke has a legally
21 cognizable interest."  No, he doesn't.  He has an interest -- I'll
22 grant him that.  I absolutely believe Mr. Clarke has this concern,
23 but he does not have a concrete and particularized injury so as to
24 establish injury in fact under *Lujan*.  And that's his burden.
25 That is always a plaintiff's burden to establish his standing, and

1   he has failed.

2       But he also fails in that respect on another ground, which is
3   lack of redressability.  PG&E, as evidenced by the documents in
4   the request for judicial notice, is already well underway in
5   investigating the public rights-of-way in the Marina and
6   Fisherman's Wharf.  It's in the work plans for which we requested
7   judicial notice.  It's in the work notices issued by DTSC
8   notifying the public work's going to be undertaken in all of these
9   various rights-of-ways.  Mr. Clarke does not need to be involved.
10  He has no legal basis to be involved.  There's no legitimate
11  reason for him to be involved in a citizen suit.  The citizen suit
12  is intended to be -- to supplement the regulatory agency
13  involvement.  DTSC is all over that.  So, in fact, one of the
14  documents we don't think is admissible but that Mr. Clarke offered
15  was a transcript of a public hearing that the -- public meeting
16  that the Regional Board and DTSC attended, along with PG&E, and
17  any members of the public who were interested.

18      There's nothing that PG&E is trying to hide here or trying to
19  sneak by.  This is not a situation -- what it is, it's an --
20  frankly, it's an opportunistic smear campaign against PG&E.

21          THE COURT:  So that so doesn't help your argument.

22          MS. NICHOLS:  Well, I apologize, Your Honor.  But the
23  fact is PG&E is vigorously investigating the public rights-of-way
24  already.  This Court could not grant more injunctive relief than
25  is already being undertaken because the investigations are

1   ongoing.  Some are completed.  Some are still to be done.  But
2   that is work that Mr. Clarke doesn't need the Court to say, "I
3   want you to go do what you're already doing."

4         So we would disagree that he has established standing either
5   on the grounds of concrete and particularized harm or on
6   redressability.

7         With respect to the offshore areas, I don't think Mr. Gross
8   has made any arguments today that should change this Court's mind
9   in terms of the extensive scope in the 98-page consent decree and
10  the rigorous protocol that Mr. Clarke's consultant actively
11  participating in designing, with PG&E's consultants.  The fact
12  that he wishes there were a couple more things in there does not
13  make his case.

14        Let's see.  I want to make sure I cover everything here.  By
15  the way, a ten-year consent decree is actually quite a long
16  consent decree, in my experience.  I've handled quite a few of the
17  environmental consent decrees and, frankly, it's rare that they go
18  as long as ten years.  If the Court's willing to say, Yeah, I'm
19  willing to oversee this for ten years, so I disagree that that's
20  somehow skimpy.  It is not.

21        With regard to penalties, again, as we discuss in our papers,
22  Your Honor, the penalties claim is also moot.  The SEP -- the
23  Supplemental Environmental Project -- that are included at over $4
24  million for the -- addressing creosote pilings, for addressing
25  eelgrass habitat, that the EPA, DOJ -- both -- found acceptable to

1  address the claims in the complaint and, in fact, they were

2  coextensive.  There is no difference between the RCRA and Clean

3  Water Act claims made by Mr. Clarke and by SFHA.  They are

4  coextensive.  And the DOJ and EPA in fact did say these

5  Supplemental Environment Projects do serve the purpose of

6  deterring, you know, wrongful behavior.

7      Here -- *Laidlaw* is not our case.  This is not a case where

8  PG&E is coming in and saying, "Mea culpa.  We were wrong.  It's

9  not going to happen ever again.  We're voluntarily complying, Your

10  Honor."  That's not our argument.  Our argument is we have a 98-

11  page enforceable CD and two Regional Board orders and perhaps more

12  to come.  If investigation warrants remediation, we can expect

13  those to be forthcoming.

14      So there is absolutely no basis for the civil penalty claims.

15  They also -- one ground that was not raised -- the claim should be

16  barred in its entirety under the statute of limitations.  Because

17  the statute of limitations in any claim seeking civil penalties

18  under 2462 is that it -- that the statute of limitations begins to

19  run when the alleged wrongful behavior first accrues.

20      And the *Gabelli* court in -- U.S. Supreme Court in *Gabelli*

21  made that clear.

22      The more recent case in *Oklahoma Gas* by the Tenth Circuit

23  applied it in the Clean Air Act context.  And they -- the court

24  there rejected the exact same argument that is made by Mr. Clarke,

25  that, Well, there's a continuing violation.  And what the court

1    said is, No.  The first accrued doesn't mean it accrues every

2    single time.

3         THE COURT:  And I understand this argument.

4         MS. NICHOLS:  So -- so, Your Honor, with respect, we

5    would say that the Clean Water Act claim is barred by the statute

6    of limitations as well.

7         THE COURT:  All right.  Mr. Gross, last words.

8         MR. GROSS:  Last words.  Okay.  First, Mr. Mroz asked if

9    there were cases that would stand for the proposition of

10   injunctive relief for negligence claims. *Art Movers, Inc. v. NIW,*

11   *Inc.*, 3 Cal.App. 4th, 640, 646 (1992), states, "A permanent

12   injunction is a determination on the merits when a plaintiff has

13   prevailed on a cause of action for a tort or other wrongful act

14   against a defendant and that equitable relief is appropriate."  It

15   stands for the general proposition that injunctive relief is

16   available under California law for tort.

17        *Contra Costa City v. Pinole Point Props, LLC,* 235 Cal.App.

18   4th 914, 941 (2015), affirming a trial court injunction based on

19   negligence and nuisance claims.

20        To the -- let me just address quickly a couple of the points

21   here related to the public right-of-ways in that public right-of-

22   ways are large portions.  There's also parks.  There's also PG&E-

23   owned property.  When we say "private properties," we're not going

24   to seek -- compelling its -- we're not going to go to the private

25   homeowner.

1      Relief.  If there is a vapor intrusion there, a lot of the

2 vapor intrusion could well be coming from large coal tar deposits

3 that are in public property, so it would affect that.

4      And the role of a citizen suit certainly should be -- is not

5 that you cannot seek relief that has a general public benefit.

6 That's the reason for a citizen suit in and of itself.

7      To the necessity of Mr. Clarke doing this, again, this has

8 been going on for -- since 1977.  There wouldn't even have been

9 groundwater testing if it hadn't been for us bringing this

10 lawsuit.

11          THE COURT:  Right.  But the real question -- the real

12 question is now that you have obtained substantial relief as a

13 result of bringing this lawsuit, is that enough or is there more

14 that somebody's entitled to?  That's the thing that I'm looking

15 at.

16          MR. GROSS:  Absolutely, Your Honor.  And as to the

17 terrestrial side of things, that answer is very easy -- yes.

18 There is a large swath of area that is not covered by that consent

19 decree whatsoever.

20      As to the offshore areas, there are smaller areas and there

21 are certain elements -- and we do believe and we think it's an

22 issue that we would fight about as we -- when we get to that stage

23 of trial to say, "Look, we've proven that this is an issue.

24 Here's the consent decree.  This is the extent of the relief it

25 is.  It is a known fact, obviously, but there is this further that

1  needs to be done."  That's an issue of material fact.

2      The -- on the -- on this issue of strict liability being

3  decided as a matter of law, being decided as a matter of law, as

4  the Court well knows, means it's an issue for the judge.  It

5  doesn't mean the judge decides it only based on case law.  When

6  you're looking at whether or not the operations of a facility

7  hundreds of years ago, whether that meets the standard of strict

8  liability, the idea that you would not have expert testimony on

9  that, that you would simply say, "Oh, here's a couple cases where

10 they mentioned manufactured gas plants," no.  You'd look at that

11 standard and you'd have evidence that would come before the court

12 from an expert who'd say, "Actually, yeah.  It meets these

13 standards for strict liability" and theirs would say it would not.

14     And the idea that we should have -- a declaration, I did what

15 was required under 56(d).  It's an attorney declaration, not an

16 expert declaration.  I don't have to put in an expert declaration

17 to say I need the evidence.  I'm the one who knows I need the

18 evidence.

19     Statute of limitations, final point.  The Tenth Circuit case,

20 *OG&E*, is in conflict with Ninth Circuit decision in *Borden*.  What

21 it's based on is the idea that when you have an ongoing -- what it

22 calls "ongoing violation," there's one violation.  The Ninth

23 Circuit looks at this as being separate violations.  If they're

24 separate violations, they accrue each time they occur.  That's

25 what *Borden* decides and that's what all Ninth Circuit cases have

1    decided based on penalties because people bring these fights.

2    "Hey, why am I getting tagged for all these penalties on each of

3    these days?"  And the Ninth Circuit says because it's each

4    violation, each -- where you have continuous violations, each one

5    is separate.  Each one of those separate violations thus accrues

6    when it happens.  That says, "The D.C. District held the statute

7    of limitations goes five years back from the NOI as long as there

8    are continuous violations that occurred up to that point."

9         So *OG&E -- OG&E* is based on a premise that's in conflict with

10   Ninth Circuit law.

11        The Supreme Court case, that is a case which deals

12   fundamentally with whether the discovery rule is available to the

13   Government when it prosecutes security fraud cases.  It certainly

14   does not have any precedential barring of claims or wiping out

15   Ninth Circuit law as to the Clean Water Act.  It just doesn't

16   address it.  It talks about first accruing, sure.  Where the first

17   accrual that occurs when you have separate violations is when that

18   separate violation occurs.  That's how the Ninth Circuit looks at

19   continuous violations.  That's *Borden*.

20             THE COURT:  Okay.

21             MR. GROSS:  Thank you very much, Your Honor.

22             THE COURT:  All right.  Thank you, all.  I will try to

23   get an order out pretty quickly.  And if we -- and I will deal

24   with the issue of whether there's any substantive work that should

25   go on in this case until the pleadings are actually set because I

1  do want clarity about the RCRA claim and how it works. And so if

2  I stuck with my tentative, I might very well suggest that until

3  the pleadings are resolved, that no further discovery occur and

4  then we'll get that done and then move forward in a way that makes

5  sense.

6          MR. MROZ:  Your Honor, one housekeeping issue.

7          THE COURT:  Yes.

8          MR. MROZ:  PG&E would request that to the extent any

9  part of the transcript discusses the settlement agreement, that

10 that would be sealed.

11         THE COURT:  Okay.  I don't --

12         MR. MROZ:  I'm not sure we got into any of the

13 particulars.

14         THE COURT:  Okay.  So talk about this with Ms. Davis

15 after I sign the order.

16         MR. MROZ:  Thank you, Your Honor.

17         MS. NICHOLS:  Thank you very much, Your Honor.

18         THE COURT:  Okay.

19         MR. GROSS:  Thank you very much, Your Honor.

20 //

21 //

22 //

23 //

24 //

25 //

1      (Proceedings adjourned at 2:55 p.m.)

2

3          I, Peggy Schuerger, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   provided to me of the proceedings in the above-entitled matter.

6

7   _____          June 21, 2019
    Signature of Approved Transcriber        Date

8

9   Peggy Schuerger
    Typed or Printed Name
10  *Ad Hoc Reporting*
    Approved Transcription Provider
11  for the U.S. District Court,
    Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25