MATTHEW D. METZGER (SBN 240437)
mmetzger@belvederelegal.com
BELVEDERE LEGAL, PC
1777 Borel Place, Suite 314
San Mateo, CA 94402
Telephone:     (415) 513-5980
Facsimile:     (415) 513-5985

STUART G. GROSS (SBN 251019)
sgross@grosskleinlaw.com
TIM KLINE (SBN 319227)
tk@grosskleinlaw.com
GROSS & KLEIN LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

Attorneys for Creditor,
Dan Clarke

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.** | Bankruptcy Case<br>Case No.  19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**DECLARATION OF MATTHEW D. METZGER IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE**<br><br>**Date:**  July 23, 2019<br>**Time:**  9:30 a.m.<br>**Ctrm:** Hon. Dennis Montali<br>   450 Golden Gate Avenue<br>   16th Floor, Courtroom No. 17<br>   San Francisco, CA 94102 |
| ☐   Affects PG&E Corporation<br>☐   Affects Pacific Gas and Electric Company<br>☒   Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

1

I, Matthew D. Metzger, declare as follows:

1.      I am principal at Belvedere Legal, PC and am counsel for creditor Dan Clarke.  I make this declaration in support of the Request for Judicial Notice.  The matters stated below are made and based upon my personal knowledge, except for those matters stated upon information and belief, and as to those matter, I believe them to be true. If called as a witness, I could and would testify to the matters as set forth below.

2.      Attached as Exhibit A is a true and correct copy of the Revised Cal. P.U.C. Sheet No. 43284-E, entitled "Electric Preliminary Statement Part S Hazardous Substance Mechanism", issued by Robert S. Kenney, PG&E Vice President, Regulatory Affairs, Sheets 1-5 ("Revised Cal. P.U.C. Sheet No. 43284-E"), submitted October 31, 2018 and effective November 30, 2018.

3.      I obtained the Revised Cal. P.U.C. Sheet No. 43284-E from the following PG&E website, at the following link: https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5418-E.pdf (last accessed July 2, 2019).

4.      In June 2001, then Chapter 11 Debtor Pacific Gas and Electric Company ("PG&E") filed a declaration by Mr. Robert C. Doss, Principal Consultant, Site Remediation, detailing PG&E's policies and practices regarding environmental remediation and related programs.

5.      Attached as Exhibit B is a true and correct copy of the Declaration of Robert C. Doss in Support of Motion for Authorization to Continue Its Hazardous Substance Cleanup, which PG&E filed June 6, 2001, *In re Pacific Gas and Electric Company,* a California corporation, United States Bankruptcy Court, Northern District of California, Case No. 01 30923 DM, Dkt No. 802.

/ / /

/ / /

/ / /

6.      Attached as Exhibit C is a true and correct copy of the material portion (page 36) of PG&E's Form 10-K for Fiscal Year Ended December 31, 2016 (the "Form 10-K"), which is available from the following link: https://www.sec.gov/Archives/edgar/data/75488/000100498017000006/form10k.htm#_Toc474938784 (last accessed June 15, 2019).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed July 2, 2019 at San Mateo, California.

/s/ *Matthew D. Metzger*
Matthew D. Metzger

3

# EXHIBIT A

**ELECTRIC PRELIMINARY STATEMENT PART S**      Sheet 1
HAZARDOUS SUBSTANCE MECHANISM

S.    HAZARDOUS SUBSTANCE MECHANISM (HSM)

1.    PURPOSE: The Hazardous Substance Mechanism (HSM) provides a uniform methodology for allocating costs and related recoveries associated with covered hazardous substance-related activities, including hazardous substance clean-up and litigation, and related insurance recoveries, as set forth in Decision 94-05-020. The HSM includes a balancing account, the Hazardous Substance Cost Recovery Account (HSCRA), and an interest-bearing tracking account, the Other Hazardous Substance Tracking Account (OHSTA). Costs recorded in the HSM shall include generation-related costs pursuant to Assembly Bill X1 6, which prohibits a facility for the generation of electricity owned by a public utility from being disposed of prior to January 1, 2006.

Terms and definitions relating to hazardous substance-related activities are found in Decision 94-05-020, Appendix A.

2.    APPLICABILITY: The HSCRA applies to all covered costs and recoveries associated with manufactured gas plant sites, presently-identified federal superfund sites, and other identified sites included in Decision 94-05-020, Appendix A. The OHSTA is an interest-bearing tracking account for costs and recoveries for sites not included within one of the three defined categories set forth in Decision 94-05-020, Appendix A.

3.    REVISION DATE: Disposition of the balances in this account shall be determined through the advice letter process.

The California Public Utilities Commission (CPUC) will not conduct a reasonableness review of costs under the HSM except, at its discretion, of costs recorded in the OHSTA.

4.    HSM RATES: The HSM currently does not have a rate component.

5.    REPORTING REQUIREMENTS: On or before August 2, 1994, PG&E will file an initial report with the Energy Division (ED), describing previously recorded hazardous substance costs transferred to    (T)
the HSCRA. (Requirements for this initial report are found in Decision 94-05-020, Appendix A, p. 14.)

Commencing March 1, 1995, PG&E will file an annual report with the ED to reflect the costs and    (T)
recoveries recorded by PG&E in the HSM for the 12-month period ending December 31 of the previous year, except for the first year report, which will cover the period from June 3, 1994, through December 31, 1994. The Annual Report will be served on all parties to Application No. (A) 91-04-044.

(Continued)

| | | | |
|---|---|---|---|
| *Advice*   5418-E | *Issued by* | *Submitted* | October 31, 2018 |
| *Decision* | **Robert S. Kenney** | *Effective* | November 30, 2018 |
| | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page 5 of 22

**Pacific Gas and Electric Company**®

U 39    *San Francisco, California*

| | Revised | *Cal. P.U.C. Sheet No.* | 15720-E* |
| *Cancelling* | Revised | *Cal. P.U.C. Sheet No.* | 15232-E, |
| | | | 15233-E |

**ELECTRIC PRELIMINARY STATEMENT PART S**    Sheet 2
HAZARDOUS SUBSTANCE MECHANISM

S.    I HAZARDOUS SUBSTANCE MECHANISM (HSM)

REPORTING REQUIREMENTS:  (Cont'd.)    (L)

The Annual Report shall include the following:

a.    The name and location of each site for which costs were incurred or a recovery obtained.

b.    The amount of covered hazardous substance clean-up costs incurred for each site.

c.    The amount of internal PG&E costs included with the hazardous substance clean-up costs.

d.    The total third-party and insurance litigation costs incurred for all sites.

e.    The amount of covered third-party and insurance recoveries obtained for all sites.

f.    A description of the costs in sufficient detail to allow a determination of whether costs have been properly accounted for by PG&E, and whether reported internal PG&E costs are already being recovered through rates.    (L)

6.    COST ALLOCATION:  PG&E shall allocate all costs and related recoveries 70 percent to the Gas Department and 30 percent to the Electric Department, with the exception of hazardous substance insurance litigation costs recovered through PG&E's 1993 General Rate Case base revenues.

(Continued)

| *Advice* | 1735-E-A | *Issued by* | *Date Filed* | May 26, 1998 |
| *Decision* | 97-08-056 97-12-131 | **Robert S. Kenney** | *Effective* | January 1, 1998 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page 6 of 22

| | | Revised | Cal. P.U.C. Sheet No. | 40580-E |
|---|---|---|---|---|
| | Cancelling | Revised | Cal. P.U.C. Sheet No. | 22711-E |

**Pacific Gas and Electric Company®**
San Francisco, California
U 39

**ELECTRIC PRELIMINARY STATEMENT PART S**          Sheet 3
HAZARDOUS SUBSTANCE MECHANISM

S.    HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

    7.    ACCOUNTING PROCEDURE:  The Hazardous Substance Cost Recovery Account (HSCRA) records expenditures and recoveries associated with the HSM in accordance with D.94-05-020.

    The HSCRA consists of five subaccounts:

    a.    Hazardous Substance Clean-up Cost Account (HSCCA)

      This account records the ratepayers' share of covered hazardous substance costs.  Entries shall be made into the HSCCA at the end of each month as follows:

      1)    A debit entry equal to 90 percent of covered hazardous substance costs.

      2)    A credit entry equal to 90 percent of hazardous substance costs recovered from third parties.

      3)    A credit entry equal to 100 percent of hazardous substance insurance litigation costs recovered through PG&E's 1993 General Rate Case base revenues, excluding the allowance for Revenue Fees and Uncollectible (RF&U) accounts expense, for the period from June 3, 1994, through December 31, 1995.          (T)

      4)    A credit entry equal to the lesser of 10 percent of the remaining insurance recoveries, net of contingency fees paid to outside attorneys to obtain recoveries, if any, not applied to entries 7.c.2 and 7.d.2 below, or 11.111 percent of the entry in 7.b.3 below.

      5)    A credit entry for 60 percent of each debit entry under HSIRA Sections 7.e.3 through 7.e.7 for the ratepayers' portion of insurance recoveries under the HSIRA.

      6)    A debit or credit entry, as appropriate, equal to interest on the average balance in the account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

      7)    A credit entry to transfer the balance to another regulatory  account  as appropriate for rate recovery, upon approval by the CPUC.

    b.    Hazardous Substance Clean-up Cost Shareholder Account (HSCCSA)

      This account records the shareholders' share of covered hazardous substance costs.  Entries shall be made into the HSCCSA at the end of each month as follows:

      1)    A debit entry equal to 10 percent of covered hazardous substance costs.

      2)    A credit entry equal to 10 percent of hazardous substance costs recovered from third parties.

      3)    A credit entry equal to the lesser of 90 percent of the remaining insurance recoveries, net of contingency fees paid to outside attorneys to obtain recoveries, if any, not applied to entries 7.c.2 and 7.d.2 below, or the balance in this account.

(Continued)

| Advice | 5082-E | Issued by | Date Filed | June 12, 2017 |
|---|---|---|---|---|
| Decision | 15-09-001 | **Robert S. Kenney** | Effective | January 1, 2017 |
| | | Vice President, Regulatory Affairs | Resolution | |

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page 7 of 22

| | Revised | Cal. P.U.C. Sheet No. | 22712-E |
|---|---|---|---|
| *Cancelling* | Original | Cal. P.U.C. Sheet No. | 13419-E |

**Pacific Gas and Electric Company**
San Francisco, California
U 39

**ELECTRIC PRELIMINARY STATEMENT PART S**      Sheet 4
HAZARDOUS SUBSTANCE MECHANISM

S.   HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

  7.   ACCOUNTING PROCEDURE:  (Cont'd.)

   b.   Hazardous Substance Clean-up Cost Shareholder Account (HSCCSA) (Cont'd.)

    4)   A credit entry for 40 percent of each debit entry under HSIRA Sections 7.e.3 through 7.e.7 for the shareholders' portion of insurance recoveries under the HSIRA.

    5)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

   Shareholders are at risk for any balance remaining in this account following final disposition of all covered hazardous substance and insurance litigation costs and related recoveries.

   c.   Hazardous Substance Clean-up Cost Insurance Account (HSCCIA)

   This account records the ratepayers' share of covered insurance litigation costs.  Entries shall be made into the HSCCIA at the end of each month as follows:

    1)   A debit entry equal to 70 percent of covered insurance litigation costs.

    2)   A credit entry equal to the lesser of 70 percent of insurance recoveries net of contingency fees paid to outside attorneys to obtain recoveries, if any, or the balance in this account.  This account cannot have a credit balance.

    3)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

    4)   A credit entry to transfer the balance to another regulatory account as appropriate for         (T)
rate recovery, upon approval by the CPUC.                                                                        (T)

   d.   Hazardous Substance Clean-up Cost Shareholder Insurance Account (HSCCSIA)
   This account records the shareholders' share of covered insurance litigation costs.  Entries shall be made into the HSCCSIA at the end of each month as follows:
    1)   A debit entry equal to 30 percent of covered insurance litigation costs.

    2)   A credit entry equal to the lesser of 30 percent of insurance recoveries net of contingency fees paid to outside attorneys to obtain recoveries, if any, or the balance in this account.  This account cannot have a credit balance.

    3)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.
   Shareholders are at risk for any balance remaining in this account upon final disposition of all insurance litigation costs and related recoveries.

(Continued)

| *Advice* | 2617-E | *Issued by* | *Date Filed* | January 28, 2005 |
|---|---|---|---|---|
| *Decision* | | **Robert S. Kenney** | *Effective* | March 9, 2005 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | E-3906 |

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page 8 of 22

**ELECTRIC PRELIMINARY STATEMENT PART S**          Sheet 5
HAZARDOUS SUBSTANCE MECHANISM

S.    HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)          (N)

    7.    ACCOUNTING PROCEDURE:  (Cont'd.)

        e.    <u>Hazardous Substance Insurance Recovery Account (HSIRA)</u>

        Covered insurance recoveries will be tracked by the year received.  Any insurance recovery amounts remaining after allocation to subaccounts a through d, above, will be held in this interest-bearing account for 60 months from the end of the year in which the recovery was received. Entries to the HSIRA are as follows:

        1)    A credit entry equal to insurance recoveries net of contingency fees, if any.  Each insurance recovery will be recorded separately and distributed against covered hazardous substance and insurance litigation costs on a first-in, first-out basis.

        2)    A debit entry equal to the sum of insurance recoveries allocated to entries 7.a.4, 7.b.3, 7.c.2, and 7.d.2.

        3)    A debit entry to the HSIRA 72 months from the end of the year in which the specific insurance recovery was received for one-fifth, or 20 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

        4)    A debit entry to the HSIRA 84 months from the end of the year in which the specific insurance recovery was received for one-fourth, or 25 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

        5)    A debit entry to the HSIRA 96 months from the end of the year in which the specific insurance recovery was received for one-third, or 33.333 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

        6)    A debit entry to the HSIRA 108 months from the end of the year in which the specific insurance recovery was received for one-half, or 50 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

        7)    A debit entry to the HSIRA 120 months from the end of the year in which the specific insurance recovery was received for any remaining portion of the specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

        8)    A debit or credit entry, as appropriate, to this account equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

_____

*    A corresponding credit entry will be made to the HSCCA for 60 percent of each debit entry under Section 7.e.3 through 7.e.7. above for the ratepayers' portion of the insurance recovery, and a credit entry will be made to the HSCCSA for 40 percent of each debit entry under Section 7.e.3 through 7.e.7 for the shareholders' portion of the insurance recovery.

(N)

(Continued)

| | | | |
|---|---|---|---|
| *Advice* | 1477-E | *Issued by* | *Date Filed* | July 13, 1994 |
| *Decision* | 94-05-020 | **Robert S. Kenney** | *Effective* | June 9, 1994 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page 9 of 22

| | | Revised | Cal. P.U.C. Sheet No. | 43285-E |
|---|---|---|---|---|
| | Cancelling | Revised | Cal. P.U.C. Sheet No. | 37601-E |

**Pacific Gas and Electric Company®**
U 39    San Francisco, California

**ELECTRIC PRELIMINARY STATEMENT PART S**          Sheet 6
HAZARDOUS SUBSTANCE MECHANISM

S.    HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

8.    OTHER HAZARDOUS SUBSTANCE TRACKING ACCOUNT (OHSTA)

The OHSTA is an interest-bearing tracking account which, at PG&E's option, tracks hazardous substance clean-up, third-party litigation, and insurance litigation costs (collectively, "other hazardous substance costs") relating to sites not included within one of the three defined categories as set forth in D.94-05-020, Appendix A.

For Manufactured Gas Plant sites not listed in D.92-05-020, Appendix A, an information notice stating the location of the site and which governmental agency, if any, is overseeing the clean-up, must be sent to the CPUC and all parties to A.91-04-044 within 15 days of incurring expenses of $50,000 or more for a specific site.

PG&E may, at its option, file an advice letter requesting inclusion of other hazardous substance sites in the HSCRA.  Up to $50,000 may be recorded in the OHSTA for each hazardous substance site prior to advice filing.  At such time as the advice letter for inclusion of a specific site is filed, the $50,000 cap shall be removed.

The advice letter shall include:  (a) the name of the site, (b) location of the site, (c) the source, nature, and approximate date of the contamination, (d) PG&E's operations (historical and current) at the site, if any, and (e) environmental agency actions and oversight, if any, regarding the site.  In addition, D. 96-07-016 requires utilities to demonstrate that: 1) clean-up costs for which recovery is being sought are not being recovered through base rates or through any other recovery procedure, and 2) all of the costs for which recovery is being sought are hazardous waste clean-up costs (including insurance costs) found appropriate for recovery in the Hazardous Substance Cleanup Cost Recovery Collaborative Report.

The advice letter shall be treated as a compliance filing under General Order 96-A and will be processed by the ED within 40 days after the filing, if unopposed.  If the filing is protested, the ED will either prepare a resolution, or require PG&E to file an application seeking inclusion of the specified other hazardous substance costs in the HSCRA.                                    (T)

Or, PG&E may seek full recovery of other hazardous substance costs through the general rate case, by application, or by any other procedure approved by the CPUC.

The following entries will be recorded to the OHSTA at the end of each month:

a.    A debit entry equal to costs incurred associated with other hazardous substance sites.  The costs for each site, including interest, will be recorded separately.

b.    A credit entry equal to specific other hazardous substance costs transferred to the HSCRA upon CPUC approval of an advice letter for such costs.

c.    A credit entry equal to the amount approved by the CPUC for recovery from ratepayers when PG&E elects to seek full recovery through a process other than the HSCRA.

d.    A debit or credit entry, as appropriate, equal to interest on the average of the account balance in each account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

Case: 19-30088    Doc# 2823-13    Filed: 07/02/19    Entered: 07/02/19 12:56:04    Page
10 of 22

# EXHIBIT B

1  JAMES L. LOPES (No. 63678)
   JEFFREY L. SCHAFFER (No. 91404)
2  JANET A. NEXON (No. 104747)
   HOWARD, RICE, NEMEROVSKI, CANADY,
3      FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California 94111-4065
5  Telephone:   415/434-1600
   Facsimile:   415/217-5910
6
   Attorneys for Debtor and Debtor in Possession
7  PACIFIC GAS AND ELECTRIC COMPANY

8

9              UNITED STATES BANKRUPTCY COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12  In re                          No. 01 30923 DM

13  PACIFIC GAS AND ELECTRIC        Chapter 11 Case
    COMPANY, a California corporation,
14                                  Date:    June 26, 2001
                   Debtor.         Time:    9:30 a.m.
15                                  Place:   235 Pine St., 22nd Floor
                                             San Francisco, California
16  Federal I.D. No. 94-0742640     Judge:   Hon. Dennis Montali

17

18

19     DECLARATION OF ROBERT C. DOSS IN SUPPORT OF DEBTOR'S
       MOTION FOR AUTHORIZATION TO CONTINUE ITS
20     HAZARDOUS SUBSTANCES CLEANUP PROGRAMS

21

22

23

24

25

26

27

28



DECL. OF R. C. DOSS ISO OF DEBTOR'S MOT. FOR AUTH. TO CONT. ITS HAZ. SUBST. CLEANUP PROG. No. 01 30923 DM

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

I, Robert C. Doss, declare as follows:

1.    I am employed by Pacific Gas and Electric Company ("PG&E") as its Principal Consultant, Site Remediation, in connection with PG&E's environmental remediation programs. In such capacity, I am familiar with and knowledgeable about PG&E's policies and practices regarding environmental remediation and the details of such programs. I make this Declaration in support of the Debtor's Motion For Authorization To Continue Its Hazardous Substances Cleanup Programs (the "Motion"). This Declaration is based upon my personal knowledge (except as to any matters stated on information and belief, and as to such matters I am informed and believe they are true), and, if called as a witness, I could and would testify competently to the facts stated herein.

2.    PG&E has a long history of operations. PG&E or its predecessors have been in existence since the mid-1850s. Its operations include or have included manufactured gas plant sites, natural gas gathering system sites, natural gas compressor station sites, electric transmission and distribution facilities, steam-electric power plant sites, hydroelectric power plant sites, nuclear power plant sites and service centers. PG&E owns numerous separate parcels of real property and is a tenant under more than 250 leases. As a necessary part of its business, PG&E has used and continues to use a variety of different hazardous materials in a number of its sites. Given the size of PG&E's business operations, its long operating history, and the many properties PG&E owns and leases, the cleanup of sites containing hazardous substances is an ordinary and recurring part of PG&E's business and will be for many years to come.

3.    The development of PG&E's hazardous substances cleanup programs largely parallels, and is in response to, the emergence of environmental laws which govern the management and cleanup of hazardous wastes and hazardous substances. With the promulgation of federal Resource Conservation and Recovery Act regulations in 1979, PG&E began an overall examination of its operations to determine which facilities may contain historic sites of waste disposal. This effort was intensified in the early 1980s upon discovery of residues from gas manufacturing operations at two PG&E properties. During

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    the same period, the promulgation of a major regulatory program under the Toxic

2    Substances Control Act regarding the use and disposal of polychlorinated biphenyls

3    ("PCBs") led to PG&E's implementation of voluntary programs to replace the two major

4    categories of PCB-containing electrical equipment on its system, and placed increasing

5    emphasis on the cleanup of releases from in-service equipment and from historic discharges.

6    California's regulations regarding testing, upgrading and cleanup of releases from

7    underground tanks which store hazardous substances led to a major PG&E program to

8    remove over 500 such tanks from service, and to conduct investigations and, where

9    appropriate, remedial actions to mitigate the effects of any historic leaks or releases from the

10    tanks.  Finally, the development of regulatory programs under the federal Comprehensive

11    Environmental Response, Compensation and Liability Act of 1980 (commonly referred to as

12    "CERCLA" and the federal "Superfund" statute) and similar state statutes enacted under the

13    California Health and Safety Code have led PG&E to develop a comprehensive program,

14    operating under state and federal regulatory oversight, to evaluate known sites of historical

15    operations and potential releases, and to perform remedial measures at sites where necessary

16    to address ongoing or potential exposure risks.

17           4.     PG&E maintains a staff of environmental professionals to manage its

18    hazardous substance cleanup programs.  These include professional engineers, registered

19    geologists, certified engineering geologists, and personnel with training or certification in

20    related environmental fields.  The large number of sites involved, as well as the specialized

21    expertise mandated in site investigations, requires that the PG&E staff serve as "project

22    managers," setting the technical framework for site investigations, serving as the liaison with

23    regulatory agencies, local officials and the public, directing the performance of the

24    investigations and remedial actions, and managing all aspects of contracting, budgeting and

25    cost reporting.  By and large, PG&E uses the services of environmental consulting firms to

26    perform site investigations, conduct human health and ecological assessments, and to design

27    and implement any required remedial measures.  From time to time, specialized

28    environmental services are obtained, such as studies of biological habitat and development

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
*A Professional Corporation*

1    of measures to provide protection of endangered or threatened species, or forensic analyses

2    of residues to obtain information on their possible sources.

3        5.    PG&E's environmental professionals are supported in these programs by

4    internal PG&E legal counsel, who assist in the development of environmental policies,

5    provide guidance and direction on legal and regulatory issues, and manage regulatory and

6    third-party claims with respect to environmental issues. Where appropriate, PG&E counsel

7    utilize the services of outside legal firms to assist in responding to claims.

8        6.    PG&E's overall approach to the cleanup of hazardous substances sites is

9    predicated on full compliance with all applicable environmental laws. Remedial measures

10    are developed with the oversight of local, state or federal environmental regulatory agencies.

11    Sites which present an ongoing exposure risk to human health or the environment are, of

12    course, given first priority in investigation and remedial action. PG&E's policy is to provide

13    full notice to all involved regulatory agencies of the existence of such sites, and to work

14    cooperatively with the agencies, and under their oversight, throughout all phases of

15    investigation and cleanup.

16        7.    PG&E's approach to hazardous substance cleanup claims made by third

17    parties is to first ascertain whether the claims arise from conditions which are, or could be,

18    due to operations for which PG&E is responsible. For those sites where PG&E determines it

19    may be responsible for the environmental conditions, its preference is to work cooperatively

20    with the claimant in investigating site conditions and developing a mutually agreeable plan

21    for remedial actions. Under certain circumstances, PG&E will agree to share in financing

22    the costs of investigation and cleanup that meet the requirements of the overseeing

23    environmental agency, or will agree to a negotiated, fair and equitable allocation of costs

24    already incurred. This approach avoids the inefficiencies and extra cost involved in

25    litigating site cleanup responsibility, while at the same time providing some reasonable

26    assurance that PG&E is assuming responsibility only for those conditions brought about by

27    its operations. In those instances where an equitable allocation based on current California

28    and federal law cannot be reached, PG&E will litigate the claim.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

8. Although sites rarely qualify as "typical" in all respects, the following is a brief discussion of the most common study and mitigation elements of a cleanup program at sites where releases of hazardous substances have occurred.

a. Preliminary Studies. A site whose operations potentially could have contributed to hazardous substances contamination typically first undergoes one or more preliminary studies, termed preliminary assessments or Phase 1 environmental site assessments. In these studies, site operations are summarized and the potential for chemical release is evaluated, spills or other known releases are identified, known disposal repositories are identified and described, interviews are conducted with former employees or local officials to determine the likelihood that a release of a hazardous substance occurred on the site, and nearby sites of known hazardous substance releases are identified. These assessments generally include a review of public documents in the files of environmental regulatory agencies.

b. Sampling Of Environmental Media. The chemical data that forms the core of the site investigation process is obtained through remedial, or Phase 2, investigations, which involve the sampling of environmental media (soils, sediments, groundwater, surface water, air) to determine the nature and extent of chemical contamination on a site. These investigations also require that site hydrologic, geologic and geochemical conditions are defined, so that the fate and transport of chemical contaminants can be assessed.

c. Human Health And Environmental Risk Assessments. Using data obtained during the remedial investigation, an assessment may be made of the extent of risk posed by chemicals present at a site to human health or to ecological receptors, such as indigenous plant or animal species. These assessments seek to determine the theoretical increase in the probability of developing disease from exposure to the chemical at the site under study. The use of theoretical risk studies to assess the likelihood of adverse human health effects is widely accepted in both federal and state regulatory programs. So-called "risk-based cleanups" represent a scientifically defensible, and health-protective, means of establishing how "clean" a site must be made for a given purpose.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1         d. Other Specialized Studies.  The investigation of a site may involve the conduct

2    of highly specialized studies necessary to establish the historical framework for site

3    responsibility or to ascertain specific data on biological or cultural resources.  Historical

4    studies of all site operations, as well as site ownership, are often necessary to determine

5    whether or not, or to what extent, materials present at a site are the responsibility of PG&E,

6    and whether operations of others may be responsible for site conditions.  Forensic chemical

7    analysis is often useful in establishing the likely origins of hazardous substances, particularly

8    organic substances.  Species diversity and habitat studies help identify sites where threatened

9    or endangered species issues may arise.

10         e. Feasibility Studies.  A feasibility study is a formal evaluation of all alternatives

11    (including taking no action), which may be employed at a site to achieve remedial goals.

12    Remedial goals may include the reduction of human health risk to a level below an

13    established threshold and/or the reduction in concentration of a chemical to a level below an

14    adopted standard.  Alternative actions are identified and described in the feasibility study,

15    and are evaluated on the basis of diverse criteria including efficacy in achieving remedial

16    goals, effects of the action on public health and safety, effects of the action on beneficial

17    uses of resources, cost, ease of implementation, and permanence.  The feasibility study

18    concludes with a description of the recommended remedial alternative, based on the detailed

19    analysis and ranking of the range of remedial alternatives available.

20         f. Remedial Action Plans.  A remedial action plan is a conceptual design-level

21    plan for responding to exposure risks posed by hazardous substances at a site.  When

22    prepared following a feasibility study, a remedial action plan will be concerned with the

23    recommended remedial option identified in the feasibility study.  In cases where no

24    feasibility study has been prepared (as in the case of relatively uncomplicated sites where

25    cleanup is expected to be below certain statutorily established cost thresholds) a "remedial

26    action workplan" may be prepared, which combines a brief analysis of a limited range of

27    remedial measures with the identification and conceptual design of a preferred alternative.

28    Remedial action plans are adopted as part of a public notice and hearing process conducted

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    by environmental regulatory agencies. Following a public hearing to introduce and receive

2    comments on a remedial action plan, a formal comment and response period will commence.

3    At the conclusion of that period, the plan may be adopted by the agency as a final plan.

4          g. <u>Remedial Design Documents</u>. Upon adoption of a final remedial action plan, a

5    detailed engineering design must be prepared to implement the approved remedial measures.

6    In addition, and depending on the types of remedial measures proposed, workplans may be

7    required for various elements of the remedial measures, including the transportation of

8    wastes and materials to or from the site, the protection of on-site workers and the public

9    during implementation of the remedial measures, and the monitoring of ambient air, water or

10    soil during the remedial actions to ensure that hazardous substances are not dispersed by the

11    remedial actions.

12          h. <u>Remedial Actions</u>. Upon the conclusion of the investigation phase at a

13    hazardous substance release site (as represented by the various activities described above),

14    remedial measures are implemented in accordance with the approved plans. The basic

15    remedial options are: (1) containment of hazardous substances to eliminate future human

16    health or environmental exposure risks, (2) removal of hazardous substances to an

17    appropriate disposal or treatment facility, and (3) treatment of hazardous substances <u>in-situ</u>

18    to reduce their quantity, mobility, or toxicity.

19          i. <u>Post-Remedial Measures</u>. Following implementation of remedial measures at

20    a site, a number of post-remedial actions are generally required. Active remedial systems,

21    such as groundwater control, extraction and treatment systems, must be maintained

22    throughout their operating lives (which can range to 30 years or more). Passive remedial

23    facilities, such as soil caps or hydraulic slurry walls, must undergo regular inspections to

24    ensure their continued efficacy. Groundwater monitoring often must continue at a site, and

25    in the vicinity of that site, to ensure the containment and/or reduction of groundwater

26    contamination continues according to the remedial plans. Access restrictions must be

27    maintained at sites where such restrictions are a feature of the remedial measures.

28         9. PG&E's hazardous substances cleanup programs generally involve sites that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
_A Professional Corporation_

can be broadly grouped into the following three categories:

    (1)  PG&E-owned sites at which there are active operations;

    (2)  PG&E-owned sites at which there are no active operations; and,

    (3)  Third-party owned sites.

    10.   Pending the Court's hearing and ruling on the Motion, PG&E has suspended its hazardous materials cleanup programs on properties falling within the third category referenced above due to the concern that continuing with such programs may involve the payment of a prepetition claim and may be deemed not to benefit the bankruptcy estate.

    11.   PG&E incurred expenditures of approximately $16 million for its hazardous substances cleanup programs in calendar year 1999 and approximately $18.5 million in calendar year 2000. PG&E has budgeted expenditures of approximately $20.6 million for its hazardous substances cleanup programs in calendar year 2001, of which $2.3 million has been spent to date.

    12.   As may be expected, the anticipated costs for these programs overall can be highly variable. Unanticipated discoveries at sites not currently in the programs, or new claims relating to formerly owned sites, can add significant costs to a given year's budget. Information gathered during site investigations and from historical or forensic studies can affect dramatically the degree to which PG&E's operations can be considered to have resulted in the presence of hazardous materials at a site, and thus may necessitate a revision of PG&E's estimated cleanup liability at that site.

    13.   There is a benefit to the estate in avoiding any prolonged work stoppage at PG&E's cleanup sites. A prolonged stoppage may result in the loss of important consultants and contractors who may have to move on to other projects. It may also increase the costs of cleanup, particularly where the contamination is migrating. In allowing PG&E to continue its cleanup programs with minimal interruption, PG&E not only can avoid unproductive and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
_A Professional Corporation_

1  lengthy squabbles with governmental agencies and third parties, it can better control the
2  costs of the cleanup. PG&E is also benefited by cleaning up its non-operating properties in
3  that it will be able to sell such properties at a higher price in the future. PG&E believes that
4  in most instances the cost of the cleanup is less than the added value it brings to the property.
5  Also, cleaning up the property minimizes the potential for a lawsuit from the buyer or
6  subsequent owners of the property in the future.

7      14. The magnitude of the costs for which PG&E seeks Court authorization in
8  the Motion is relatively modest in light of PG&E's overall operations and the total assets and
9  liabilities of the estate. PG&E's request for authorization to expend up to $22 million
10  annually in environmental remediation costs is a small fraction of PG&E's total annual
11  operating expenditures, which exceeded $7 billion per year in each of the three most recent
12  calendar years and which averaged over $9 billion per year during such three-year period.
13  The estimated total assets and liabilities of PG&E as set forth in Exhibit "A" to the
14  Voluntary Petition filed in the above-captioned case, are approximately $24.2 billion and
15  $18.4 billion, respectively.

16      I declare under penalty of perjury under the laws of the United States of America
17  that the foregoing is true and correct. Executed this 5th day of June, 2001, at San Francisco,
18  California.

19
20
_____

*Robert C. Doss*

ROBERT C. DOSS

21  WD 060501/1-1419903/gf0/922061/v2

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# EXHIBIT C

On June 28, 2016 the California State Lands Commission approved an extension of the Utility's leases of coastal land occupied by the water intake and discharge structures for the nuclear generation units at Diablo Canyon, to run concurrently with Diablo Canyon's current operating licenses. The Utility will be required to obtain an additional lease extension from the State Lands Commission to cover the period of time necessary to decommission the facility. The State Lands Commission and California Coastal Commission will evaluate appropriate environmental mitigation and development conditions associated with the decommissioning project, the costs of which could be substantial.

The Utility also has an obligation to decommission its electricity generation facilities, including its nuclear facilities, as well as gas transmission system assets, at the end of their useful lives. (See Note 2: Summary of Significant Accounting Policies – Asset Retirement Obligations of the Notes to the Consolidated Financial Statement in Item 8.) The CPUC authorizes the Utility to recover its estimated costs to decommission its nuclear facilities through nuclear decommissioning charges that are collected from customers and held in nuclear decommissioning trusts to be used for the eventual decommissioning of each nuclear unit. If the Utility's actual decommissioning costs, including the amounts held in the nuclear decommissioning trusts, exceed estimated costs, PG&E Corporation's and the Utility's financial results could be materially affected.

### Risks Related to Environmental Factors

***The Utility's operations are subject to extensive environmental laws and changes in or liabilities under these laws could adversely affect PG&E Corporation's and the Utility's financial results.***

The Utility's operations are subject to extensive federal, state, and local environmental laws, regulations, orders, relating to air quality, water quality and usage, remediation of hazardous wastes, and the protection and conservation of natural resources and wildlife. The Utility incurs significant capital, operating, and other costs associated with compliance with these environmental statutes, rules, and regulations. The Utility has been in the past, and may be in the future, required to pay for environmental remediation costs at sites where it is identified as a potentially responsible party under federal and state environmental laws. Although the Utility has recorded liabilities for known environmental obligations, these costs can be difficult to estimate due to uncertainties about the extent of contamination, remediation alternatives, the applicable remediation levels, and the financial ability of other potentially responsible parties. (For more information, see Note 13 of the Notes to the Consolidated Financial Statements in Item 8.)

Environmental remediation costs could increase in the future as a result of new legislation, the current trend toward more stringent standards, and stricter and more expansive application of existing environmental regulations. Failure to comply with these laws and regulations, or failure to comply with the terms of licenses or permits issued by environmental or regulatory agencies, could expose the Utility to claims by third parties or the imposition of civil or criminal fines or other sanctions.

The CPUC has authorized the Utility to recover its environmental remediation costs for certain sites through various ratemaking mechanisms. One of these mechanisms allows the Utility rate recovery for 90% of its hazardous substance remediation costs for certain approved sites without a reasonableness review. The CPUC may discontinue or change these ratemaking mechanisms in the future or the Utility may incur environmental costs that exceed amounts the CPUC has authorized the Utility to recover in rates.

Some of the Utility's environmental costs, such as the remediation costs associated with the Hinkley natural gas compressor site, are not recoverable through rates or insurance. (See "Environmental Regulation" in Item 1.) The Utility's costs to remediate groundwater contamination near the Hinkley natural gas compressor site and to abate the effects of the contamination have had, and may continue to have, a material effect on PG&E Corporation's and the Utility's financial results. Their financial results also can be materially affected by changes in estimated costs and by the extent to which actual remediation costs differ from recorded liabilities.

***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows.***

The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. While snowpack in the Sierra Nevada Mountains has been at higher than normal levels this winter, California has experienced ongoing drought in the past. If temperatures and the levels of precipitation in the Utility's service territory continue to change, that could impact the levels of snowpack in the Sierra Nevada Mountains. As a result, the Utility's hydroelectric generation could change and the Utility would need to consider managing or acquiring additional generation. If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased