Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) AND FED. R. BANKR. P. 6004 AUTHORIZING DEBTORS TO PURCHASE DIRECTORS AND OFFICERS INSURANCE**<br><br>Date: July 9, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 2471 |

The Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the above-captioned chapter 11 cases, by its attorneys, Milbank LLP, hereby objects to the *Motion Pursuant to 11 U.S.C. §§ 363 and 105(a) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Purchase Directors and Officers Insurance* (the "Motion") [Docket No. 2471].[1]

## PRELIMINARY STATEMENT

1. The Creditors' Committee appreciates the importance of maintaining appropriate coverage of the Debtors' directors and officers (the "D&Os") and, in principle, has no issue with the Debtors obtaining such coverage where necessary and appropriate. However, the Creditors' Committee cannot support the relief requested in the Motion—the immediate funding of $50 million to secure a new D&O insurance policy (the "New Policy")—where it is entirely premised on an unlikely parade of horribles: the confluence of a variety of potential, hypothetical future circumstances and events described in the Motion.

2. As described herein, the Debtors have provided no evidence in the Motion nor in the documents provided to the Creditors' Committee that this parade of horribles will occur, and thus have not proven any need for the New Policy. Indeed, the Motion itself only articulates that the D&Os "could" face a "potential lack of coverage," without providing any actual support for the likelihood of such an occurrence. And given the nature of the claims and the fact that they have all been stayed, it is difficult to see how any of the Debtors' existing policies will be exhausted anytime in the near term. As such, the relief requested is purely speculative.

3. The relief requested in the Motion is also premature at best. The Debtors have shown no legitimate reason why they need the New Policy at this time, when the existing policies are not exhausted, the New Officers and Directors have already accepted their positions, and the New Policy will be entirely self-funded.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

4. Consequently, based on the information available to the Creditors' Committee, there does not appear to be any pressing need for additional coverage on top of the existing policies. To the extent any additional coverage is ever required, the Debtors may procure coverage at that time, but the Debtors should not be permitted to lock up $50 million for five years for a New Policy they may never need. Accordingly, the Creditors' Committee objects to the relief sought in the Motion.

## BACKGROUND

**A.  Existing Policies**

5. Before the commencement of these cases, the Debtors, in the ordinary course of business, maintained primary and excess D&O liability insurance. As a result, as of the petition date, the Debtors' D&Os were beneficiaries of two sets of "claims-made" policies: (i) one set, which covers the policy period between May 20, 2018 and May 20, 2020 (the "2018 Policies")[2] with $300 million in coverage limits; and (ii) another set, which covers the policy period between May 20, 2017 and May 20, 2018 with $250 million in coverage limits (the "2017 Policies" and together with the 2018 Policies, the "Existing Policies"). *See* Motion at 7–8.

6. Under the 2018 Policies, the first $200 million is available to the Debtors (*e.g.*, for securities claims) and to the Debtors' D&Os, while the next $100 million is available solely to the D&Os and is available only when the Debtors refuse or are unable to indemnify the covered individuals. This D&O-only insurance is known as "Side A Coverage." If the Side A Coverage is exhausted by a claim or a series of related claims, and a new, unrelated claim is asserted against the Debtors' D&Os, $90 million of coverage would be made available to respond to such new claim. In the event that another new, unrelated claim is asserted, an additional $90 million of coverage would be made available to provide additional coverage. Motion at 7–8. Under the 2017

---

[2] The policy period for the 2018 Policies was initially one year, but before the petition date, the Debtors extended the policy period an additional year.

Policies, the first $200 million is available to the Debtors and to the Debtors' D&Os, while the next $50 million is available only to the D&Os.

7. As part of a management shake-up following the petition date, the Debtors have recently: (i) hired a new CEO for PG&E Corp., and (ii) appointed eleven new directors to PG&E's Board (collectively, the "<u>New D&Os</u>"). The New D&Os are covered by the 2018 Policies, the term of which were extended to May 2020 at a cost of approximately ███████.

B. **<u>Claims Made Against The D&Os</u>**

8. The Creditors' Committee understands that as of the petition date, certain claims were pending against the Debtors' D&Os arising from the 2017 and 2018 Northern California wildfires (the "<u>Pending Claims</u>"). The Debtors have already noticed all such claims under the 2017 and 2018 Policies: claims first asserted during the policy period of the 2017 Policies were noticed under the 2017 Policies, and claims first asserted during the policy period of the 2018 Policies were noticed under both the 2017 and 2018 Policies. Motion at 8.

9. The Creditors' Committee requested information relating to these claims, as to both the nature of the claims and any amounts paid—including in defense costs—in response to such claims. The Creditors' Committee received information from the Debtors relating to these requests and based on this information now understands that ███ such Pending Claims exist, ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ The Creditors' Committee further now understands that the Debtors have incurred a total of ████████████████ in connection with these Pending Claims, an amount which ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ To the Creditors' Committee's knowledge, none of the Pending Claims have been liquidated—their resolution is at an early stage, and ████████████████████████████

4

[Lines 1-2 redacted]

### C. The New Policy

10. Despite the nascent stage of the Pending Claims and the significant coverage amounts already available, the Debtors engaged their insurance broker, Marsh USA, Inc. ("Marsh"), to obtain proposals for additional coverage for the benefit of their current directors and officers. Motion at 10–12. Marsh spent significant time and significant resources seeking and reviewing various proposals. *Id*. But all of the proposals received were extremely costly.

11. Eventually, the Debtors determined that they would obtain coverage from Energy Insurance Services, Inc. ("EIS"), and that they would self-fund the New Policy. To secure the New Policy, the Debtors would need to make (i) a premium payment of $10 million, and (ii) a capital contribution of $40 million to a protected cell. Motion at 13. These payments would buy the Debtors $50 million in Side A Coverage that would be available to the Debtors' current D&Os (including the New D&Os) for a term of five years (or until cancellation at the Debtors' direction). *Id*. According to the Debtors, the coverage provided by the New Policy would be available only to the extent the 2018 Policies are exhausted or are otherwise unavailable. During the five-year period, all funds would be invested, with the Debtors' representatives having input into the investment options. *Id*. If no claims arise against the insured D&Os during the five-year coverage period, the full $50 million (plus investment income less any expenses) would be returned to the Debtors upon termination of the policy. While both the premium and the capital contribution may be eventually returned to the Debtors, $50 million of the estates' funds would be locked up for five years and would not be available for distribution to the Debtors' creditors or available to them for any other administrative needs.

## ARGUMENT

**A.      The Requested Relief Is Not In The Ordinary Course**

12.     Pursuant to the *Final Order Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), and 364 and Fed. R. Bankr. P. 4001, 6003, and 6004 (I) Authorizing the Debtors to (A) Maintain Insurance Policies, Workers' Compensation Program, and Surety Bond Program and (B) Pay All Obligations with Respect Thereto; and (II) Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims* (the "Final Insurance Order") [Docket No. 695], the Debtors are authorized, in the ordinary course of business, to supplement or otherwise modify their insurance coverage as needed, including by purchasing new insurance policies. The Final Insurance Order provides, however, that before obtaining new insurance policies that contemplate coverage that is "materially inconsistent" with the coverage under the Debtors' existing insurance policies, the Debtors must provide advance notice to, among others, the Creditors' Committee, so that the Creditors' Committee has a chance to object. Final Insurance Order ¶ 5.

13.     The New Policy has a structure that is entirely different from that of the Existing Policies. The Existing Policies are not self-funded and do not require that the Debtors lock up $50 million. The Debtors themselves acknowledge that they could not obtain new coverage on terms similar to the Existing Policies. Accordingly, the terms of the New Policy are "materially inconsistent" with the Existing Policies and, thus, despite the Debtors' assertions to the contrary, are not already authorized under the Final Insurance Order and are not in the ordinary course of the Debtors' business.

14.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363, a court may authorize

a debtor to use estate funds where a sound business purpose justifies such use. *See, e.g.*, *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997); *In re Walter*, 83 B.R. 14, 20 (B.A.P. 9th Cir. 1988). Thus, a debtor's decision to enter into a transaction which is outside of the normal course of its business "must be based on its reasonable business judgment." *Id*. The movant "must establish a business justification for the transaction and the bankruptcy court must conclude, **from the evidence**, that the movant satisfied its fiduciary obligations and established a valid business justification." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009) (emphasis added).

15. Whether the proffered business justification is sufficient depends on the facts and circumstances of the case. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986). A court may, for example, find a sound business justification under section 363(b) where the use of funds is "reasonable and appropriate" and "designed to maximize the value of [the] estate." *See In re ASARCO, LLC*, 650 F.3d 593, 603 (5th Cir. 2011).

16. The Debtors have not shown any sound business justification for obtaining the New Policy at this time. The Debtors' proffered justification—that "there are circumstances under which the [New D&Os] *may not* have coverage for claims that *may arise*," Motion at 17 (emphasis added)—is in and of itself unsound. The Existing Policies are not, nor is there any evidence that they will be, exhausted in the near term; the mere possibility that the Existing Policies *may* be impaired or exhausted at some future time is pure conjecture, and is thus is not a sound business justification for *now* locking up $50 million for five years.

**B.**    **The Debtors Have Not Shown That The Requested Relief Is Needed**

17. The requested relief is not currently needed. Instead, the Debtors' purported need for the New Policy is purely speculative: it is premised on the confluence of a variety of prospective circumstances and events.

7

18.     First, the Debtors allege that its D&O insurers: (i) *may* attempt to treat claims arising from the 2017 and 2018 wildfires as a single "claim,"[3] and (ii) *may* contend that all of the wildfire claims trigger coverage only under the 2017 Policies. █████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ The Debtors then allege that: (iii) *if* these prospective positions are taken, and (iv) *if* a postpetition wildfire occurs, *then* the 2017 Policies *may* be exhausted—which would "leave no coverage under the 2017 Policies for the" New D&Os. Motion at 9. This parade of horribles is both unlikely—a claim that a 2018 wildfire must be covered under the 2017 Policies is notably dubious—and purely speculative, and the slight possibility that the 2017 Policies will be exhausted does not warrant the requested relief.

19.     Second, the Debtors alternatively argue that *if* its D&O insurers instead treat claims arising from the 2018 wildfires as distinct from the prior claims, and *if* postpetition claims are asserted against the New D&Os,[4] the 2018 Policies may be exhausted—and that such exhaustion "*could*" leave the New D&Os without coverage to pay for the defense and indemnification of postpetition claims. Motion at 9 (emphasis added). The Debtors attempt to buttress this claim by noting that the 2018 Policies give preference to pre-petition claims. Yet the Debtors have not made any showing that the $300 million in coverage limits (plus two $90 million coverage

---

[3] Specifically, the Debtors state that "[b]ased on correspondence from and discussions with" these insurers, "it is unclear whether the insurers will treat claims arising from the 2017 wildfires and the 2018 wildfires as a single 'Claim' (as defined in the 2017 Policies), and at least one carrier has indicated an intention to do so . . . ." Motion at 8–9.

[4] Because the New D&Os began their tenure postpetition, decisions made and actions taken by the New D&Os are subject to approval by the Bankruptcy Court—effectively diminishing the likelihood of success of any potential postpetition claims asserted against them.

reinstatements) under the 2018 Policies may be exhausted, whether in the near or far term.[5] Based on the information provided to the Creditors' Committee, given the nature of the claims—███ ████████████████████—and the ████ amounts incurred in defense costs, it appears unlikely that the Existing Policies are insufficient.[6] Because the Pending Claims have been stayed, it is clear that until these bankruptcy cases are resolved, little if any costs will be incurred in defense of the Pending Claims. As such, the Debtors have provided no evidence that the 2018 Policies' coverage limits are not sufficient, and the Debtors' pure unsupported speculation is insufficient to justify the requested relief.

C. **The Requested Relief Is Premature**

20. Even if the New Policy becomes necessary—which it likely will not—it is not necessary at this time. Because the New Policy is self-funded, the Debtors can obtain it at any time. As such, the Debtors will suffer no harm if they merely wait for the hypothetical risks they assert to occur, and seek authority to self-fund the policy at such later time. There is also no risk that the costs associated with the New Policy will increase in the future, given the self-funded nature of the New Policy. Thus, in light of these circumstances, denying the relief requested in the Motion at this time will in no way prevent the Debtors from seeking similar relief at a time when such relief is necessary, and the Debtors are not justified in segregating $50 million now,

---

[5] In an effort to obtain further information about the purported need for the New Policy, counsel to the Creditors' Committee sent counsel to the Debtors a Notice of Deposition of Janaize Markland, the Debtors' declarant in support of the Motion.

[6] 

9

1  when the self-funding can just as easily be done *if* and *when* such additional coverage becomes necessary.

21. In an attempt to combat this prematurity, the Debtors argue that the New Policy is needed, in part, to attract board members and qualified senior management during the pendency of these chapter 11 cases. Motion at 14. This assertion rings hollow, as the New D&Os have all already accepted their respective positions, presumably satisfied with the coverage under the Existing Policies.

22. The Debtors make no mention of their D&Os' rights to indemnification and advancement under PG&E Corp.'s Articles of Incorporation.[7] D&O insurance is no more than a way to insure against the costs of advancement and indemnification. But the rights to advancement and indemnification in the Debtors' Articles of Incorporation are not contingent on there being D&O coverage. Thus, even if the purported parade of horribles occurs and the Existing Policies are exhausted, the D&Os will still be covered and the Debtors can either pay the advancement costs in the ordinary course or can, at that time, seek to self-fund the New Policy. Further, a director or officer may be permitted to recover legal fees as an administrative expense, at least to the extent they arise from defending postpetition conduct as an officer or director.

23. Through the relief they seek in the Motion, the Debtors are not solving any identifiable problem. If all of the assumptions in their hypothetical construct materialize, the

---

[7] *See, e.g.*, Restated Articles of Incorporation of PG&E Corporation (incorporated by reference to PG&E Corporation's Form 10-Q for the quarter ended March 31, 2003 (File No. 1-12609), Exhibit 3.1) ("SIXTH: The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law."); *In re Keene Corp.*, 208 B.R. 112, 115–16 (Bankr. S.D.N.Y. 1997) ("Where, as here, the certificate of incorporation imposes an indemnification obligation on the corporate debtor, the corporate director or officer may, under certain circumstances, recover his legal fees as an administrative expense under section 503(b)(1)(A).") (citations omitted).

Debtors will be paying the costs of any new claims out of their own pockets, regardless of whether they implement the EIS plan. Finally, the Debtors also make no mention of the fact that they will presumably seek to spend far more than this $50 million on D&O insurance within the next year. Because the Debtors' Existing Policies expire in less than a year, if the Debtors have not emerged from bankruptcy by May 20, 2020, they will have no choice but to reenter the market to procure additional insurance coverage. The Debtors and their insurance broker will again explore ways to secure new policies and limits, and the cost of any such insurance is likely to be significant. As such, the prematurely and unnecessarily requested $50 million at issue now can instead be saved and used in mere months, when the need for it will be clear and imminent.

## CONCLUSION

Based on all of the foregoing, the Creditors' Committee respectfully requests that the Court (i) deny the Motion and (ii) grant such other and further relief as is just and reasonable.

DATED: July 2, 2019　　　　　　　　　　**MILBANK LLP**

　　　　　　　　　　　　　　　　　　　　*/s/ Gregory A. Bray*
　　　　　　　　　　　　　　　　　　　　DENNIS F. DUNNE
　　　　　　　　　　　　　　　　　　　　SAMUEL A. KHALIL
　　　　　　　　　　　　　　　　　　　　GREGORY A. BRAY
　　　　　　　　　　　　　　　　　　　　THOMAS R. KRELLER

　　　　　　　　　　　　　　　　　　　　*Counsel for the Official Committee of Unsecured Creditors*