**EXHIBIT E**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

STATE OF CALIFORNIA                                          GAVIN NEWSOM, *Governor*

## PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298

RECEIVED

FEB - 7 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**FILED**

FEB - 7 2019

SUSAN Y. SOONG
CLERK. U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

February 6, 2019

**VIA ELECTRONIC MAIL**

Honorable William H. Alsup
United States District Court
Northern District of California
Courtroom 12 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

*Re: Follow up to 01/30/2019 OSC Hearing in Case No. 14-CR-00175-WHA*

Dear Judge Alsup,

At the January 30, 2019 hearing on the Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, the Court asked certain questions of the California Public Utilities Commission (the "CPUC") and suggested the CPUC could follow up with a letter to provide more detailed responses. The exchange occurred on page 91 of the reporter's transcript of the proceeding, which we attach hereto as **Exhibit 1** for your convenience.

In essence, your Honor asked four questions of the CPUC: 1) How many times has San Diego Gas & Electric Co. ("SDG&E") de-energized in response to increased fire risk?, 2) Is it true there have been no wildfires more than an acre large since SDG&E began its de-energization program?, 3) What has been the public reaction to the de-energization program?, and 4) How have the inconveniences or other negative consequences of de-energization been handled?

On January 31, 2019, the CPUC sent a data request to SDG&E to gather certain information needed to respond to the Court's inquiries. The CPUC's response to the Court is supplemented by information obtained from SDG&E, as indicated below.

The following is not intended to capture the full extent and breadth of a CPUC record that supports one of its final decisions or orders, nor does it reflect all of the factors and nuances that inform de-energization decisions by utilities, but is a good faith attempt to respond to the Court's questions in a timely manner.

Hon. William H. Alsup
February 6, 2019
Page 2

## 1. How many times has SDG&E de-energized in response to increased fire risk?

During a CPUC proceeding[1] to consider SDG&E's application proposing a de-energization plan to proactively shut off power during periods of high fire danger, the CPUC issued Decision 09-09-030[2] (D.09-09-030), which affirmed that, under Public Utilities Code § 451, SDG&E has a duty to provide safe electric service that protects customers, employees, and the public. D.09-09-030 concluded that "SDG&E has authority under §§ 451 and 399.2(a) to shut off power in emergency situations when necessary to protect public safety."[3]

SDG&E's first de-energization took place on October 5, 2013. Including this first event, SDG&E has reported 13 Public Safety Power Shut-off ("PSPS") events that included 216 individual de-energizations of circuits in high risk areas.

**Table 1.** Number of SDG&E De-Energizations by Year.

| Year | Number of De-Energization Events | Number of Individual De-Energizations |
|------|----------------------------------|----------------------------------------|
| 2018 | 4 | 126 |
| 2017 | 5 | 72 |
| 2016 | 0 | 0 |
| 2015 | 0 | 0 |
| 2014 | 3 | 13 |
| 2013 | 1 | 5 |

The duration for each individual event ranged from one minute to approximately 145 hours (144 hours and 52 minutes). Customers impacted by each individual de-energization ranged from zero to 1,867 customers.

When asked what factors go into SDG&E's decision on whether to de-energize a line, it stated that "[t]he decision to de-energize for public safety is not made based on a single factor; numerous criteria are considered when making this decision," including but not limited to:

- Status of Red Flag Warning (RFW) declaration issued by the National Weather Service (NWS);

- Status of High Wind Warnings issued by the NWS;

- Santa Ana Wildfire Threat Index (SAWTI) ratings;

---

[1] Application 08-12-021 (Filed December 22, 2008).

[2] Decision 09-09-030, September 10, 2009.

[3] D.09-09-030, September 10, 2009. Page 69, Conclusion of Law 3.

Hon. William H. Alsup
February 6, 2019
Page 3

- Fire potential forecasts from the Predictive Services group at the Southern California Geographic Coordination Center;

- Output from SDG&E's weather forecast models;

- Output from NOAA/NWS weather forecast models;

- SDG&E's Fire Potential Index (FPI) rating;

- Live and dead fuel moisture values;

- Meteorological data from SDG&E's 177 weather stations;

- Wind climatology of each circuit or circuit segment;

- Infrastructure in temporary configurations due to construction activities;

- Observer reports of imminent threats to power lines, including: tree branches encroaching overhead lines, wire movement, debris blown into lines;

- Fire-suppression-air resource availability and constraints;

- Firefighting resources in region drawn down or diverted to fires in other areas of the state;

- Current wildfire activity across the state;

- Accessibility constraints should an ignition occur;

- Customer impacts; and

- A review of active outages on SDG&E's system.

As can be seen, SDG&E considers a multitude of factors when conducting any de-energization analysis, and the determination is not limited to wind speed or any solitary factor.

SDG&E's history and development of its de-energization program must be understood in the context of SDG&E's service territory, which is considerably smaller and less geologically diverse than PG&E's. Attached hereto as **Exhibit 2** is a map of California showing the respective service areas of all electric investor owned utilities, which illustrates the breadth of PG&E's service area and the climatical and terrain differences within it. SDG&E services two (2) counties and approximately 4,100 square miles of territory. By contrast, PG&E services forty-four (44) different counties covering some 70,000 square miles. SDG&E has 2,090 miles of transmission lines, whereas PG&E has 18,466 miles of transmission lines. SDG&E has 23,479 miles of distribution lines, in contrast with PG&E's 106,681 miles of distribution lines. As detailed in the CPUC's initial comments to the Court, the scope of PG&E's service area demands a nuanced de-energization program, which is the current focus of SB 901 and the CPUC-initiated Rulemaking 18-12-005.

Additionally, SDG&E has invested millions of dollars in developing the weather stations and computer modeling it uses to determine when to de-energize a specific line. SDG&E's weather modeling looks beyond wind speed and includes factors such as relative humidity and daily moisture content of local

Hon. William H. Alsup
February 6, 2019
Page 4

vegetation (based on satellite date). The computer modeling allows SDG&E to use a fire risk assessment model that goes beyond the "red flag" warning system used by the National Weather Service. Moreover, SDG&E has made considerable investments to "sectionalize" (i.e. modularize) its system, allowing targeted de-energizations that minimize the number of impacted customers. The modeling and sectionalizing of its overhead system allow SDG&E to narrowly target de-energizations based on factors beyond region wind speed. No other utility in the country has the modeling tools used by SDG&E, but legislation has been introduced to develop a statewide system based on SDG&E's program.

### 2. Is it true there have been no wildfires more than an acre large since SDG&E began its de-energization program?

As part of a Fire Incident Data Collection Plan, CPUC Decision 14-02-015 requires utilities to provide the CPUC with ignition data annually as of January 1, 2014. PG&E, SDG&E, and Southern California Edison ("SCE") are each required to submit this data by April 1st of each year as of 2015, for the prior calendar year. The information provided by those utilities 1) allows data comparisons among utilities and 2) improves regulations and utility standards to reduce the likelihood of fires. The table below is based on that data and the current inquiry to SDG&E for 2013 and 2018 information. Unfortunately, SDG&E does not track and report its fire incident data strictly in one-acre-and-above events, but hopefully the data below will help the Court in its inquiry.

**Table 2.** CPUC reportable fire incidents involving SDG&E from 0.26 acres to greater than 9.99 acres sorted by year.

| Year | Total CPUC reportable ignitions | Fire Size | | |
|------|-------------------|---------------------|---------|-----------|
| | | 0.26-9.99 acres | 1+ acre | 10+ acres |
| 2018 | 26 | 4 | Not captured | 2 |
| 2017 | 23 | 7 | Not captured | 0 |
| 2016 | 30 | 2 | Not captured | 0 |
| 2015 | 32 | 6 | Not captured | 1 |
| 2014 | 30 | 8 | Not captured | 0 |
| 2013 | 34 | 9 | 6 | 0 |

Table 2 represents the number of fires attributable or allegedly attributable to SDG&E facilities dating back to 2013 when SDG&E began de-energizing to mitigate wildfire risk. Within the fire incident data collected for SDG&E, some of the suspected initiating events include:

- Equipment/facility failure including conductor, splice/clamp/connector, transformer, etc.;

- Contact between third party facility on pole and electric lines;

- Wire to wire contact with an electric utility's own lines; and

Hon. William H. Alsup
February 6, 2019
Page 5

- Contact from objects including vehicles, vegetation, balloons, etc.

The two fires in 2018 that exceeded 10 acres were the July 6, 2018 West Fire and the May 22, 2018 Agua fire. The West fire burned 504 acres and destroyed 56 structures. The Agua fire burned 59 acres.

It is clear that even SDG&E's comparatively advanced and robust de-energization program does not eliminate the risk of wildfire from utility-owned facilities. Nevertheless, it is a tool that SDG&E has been able to employ on an increasingly surgical basis. But it has only developed this capability after years of ongoing consultation and input from the many different communities and agencies actually impacted by de-energization.

### 3.  What has been the public reaction to the de-energization program?

SDG&E implemented a pilot de-energization program in September 2009, with its first de-energization for safety event taking place on October 5, 2013. SDG&E reports that, during this period, it made various outreach efforts regarding de-energization, "including hosting community town halls, meeting with elected officials and facilitating dialogues with regional first responder and emergency support organizations, such as the American Red Cross and CAL FIRE. SDG&E listened to feedback and concerns from customers and other stakeholders during these meetings to understand communities' needs and concerns.

"Based on the information gathered during this outreach, SDG&E committed to make electric infrastructure improvements, provide emergency generators to the County of San Diego and help customers with special needs with support from local non-profit agencies supporting emergency response and customers with special needs. Additionally, SDG&E committed to enhance regional firefighting capability and improve coordination with regional first responders, firefighting agencies, law enforcement, communication companies, and other emergency responders.

"During outreach from 2009–13, there was significant concern expressed regarding the potential impacts, even after several meetings highlighting the safety benefits of de-energizations. The need to de-energize was not immediately widely understood. Since the first event in 2013, feedback from customers and elected representatives has evolved.

"In December 2017 and January 2018, prolonged severe weather conditions required SDG&E to de-energize certain circuits for public safety. During these incidents, public officials, emergency management agencies, and members of the public expressed concerns about de-energizations and their potential impacts. In response, SDG&E collaborated with 2-1-1 San Diego and the American Red Cross to host a series of nine public workshops in San Diego's highest fire risk communities. The workshops served as a medium to engage with those most-frequently impacted by the public safety power shutoffs and to educate customers about the company's enhanced technologies (i.e. weather network), talented workforce and commitment to reducing wildfire risk in the region. The meetings also provided an opportunity for SDG&E to hear feedback from impacted residents and communities. The events helped SDG&E better understand customers' concerns, and community leaders and the general public to understand the public safet[y] benefits of de-energization, the technologies and rationale used to make

Hon. William H. Alsup
February 6, 2019
Page 6

the decision to de-energize and the process for safe restoration of service. During these meetings, SDG&E received positive feedback from stakeholder groups in attendance."

It is important to recognize that SDG&E's description of its experience with the public's reaction to de-energization in many ways mirrors the rulemaking currently underway at the CPUC, which has and is holding workshops in affected communities and is bringing together those most affected by wildfires and the use of de-energization as one of the utilities' tools to address the issue. SDG&E's discussion of its outreach, coordination with many agencies, and ability to respond to feedback are precisely what is ongoing in the CPUC rulemaking.

The CPUC's de energization proceedings and the Court's hearing on its Order to Show Cause has drawn interest from many public quarters, including those advocating for the disabled and those in disadvantaged communities who could not participate in the January 30, 2019 hearing but who would be affected by an order from this Court ordering widespread de-energization. Melissa Kasnitz, the Legal Director for the Center for Accessible Technology ("CforAT") has long been an advocate for disability rights and is uniquely situated to provide the Court with an important perspective. Ms. Kasnitz has been involved with the issue of utility de-energization since 2008, when SDG&E first filed an application at the CPUC regarding its proposal to de-energize. Ms. Kasnitz has offered a declaration (attached hereto as **Exhibit 3**) discussing the particular reliance on electricity by people with disabilities who use assistive technology, and their inability to afford and house adequate backup generators. As she states, "[t]he risks facing people with disabilities based on de-energization go well beyond inconvenience, and implicate the health and safety of people who rely on equipment and devices powered by electricity for all aspects of their care. If a further emergency takes place while the power is out, the risk of harm, and the burden on first responders, is magnified yet further." **Id. at ¶ 11.**

Richard Skaff, the Executive Director of Designing Accessible Communities, has been an active participant in the CPUC's Rulemaking 18-12-005 and its workshops, and has been representing the disabled community in various positions for nearly 40 years. He knows first hand the specific risks of de-energization to the disabled community and asks that the CPUC's rulemaking be allowed time to address the concerns that are being expressed by the disabled in that forum. A copy of Mr. Skaff's declaration and his resume are attached hereto as **Exhibit 4**.

### 4. How have the inconveniences or other negative consequences of de-energization been handled?

In response to the Court's inquiry, the CPUC asked SDG&E what lessons it had learned and changes it had made to its de-energization program, and these were the key lessons learned as cited by SDG&E:

- "SDG&E considers wind speeds, as well as other criteria. The criteria should tolerate fluidity of decision-making to adapt to situational awareness that must be accounted for at the time of the decision.

- "The use of leading technology improves the Company's decision-making; specifically, the design and implementation of in-house tools to assess weather

conditions, including sophisticated forecasting and predictive modeling, to evaluate potential impacts to customers, to company infrastructure and to the broader impacted communities. The continuous refinement of situational awareness tools strengthens the company's capacity to be more precise in its decision-making to mitigate impacts and enable safe, swift restoration of service.

- "Create opportunities for customer engagement to understand communication needs, and preferred methods of communication, in order to provide customers with relevant, specific and timely customer communication, including critical business customers and medical baseline customers.

- "Partnership and coordination with first responders and emergency management agencies is important to ensure an integrated response. Those relationships must be cultivated, including the solicitation of feedback through formal and informal review processes.

- "Engage and facilitate dialogue with impacted community stakeholders such as elected officials, regional first responder and emergency support organizations, such as the Red Cross, CERTs, CAL FIRE and local emergency management agencies to solicit feedback, understand impact, refine de-energization processes and communications as appropriate, ultimately ensuring an integrated response."

SDG&E also noted that the Commission's recent Resolution ESRB-8 "outlines many of the changes SDG&E implemented regarding communication and notification protocols." The CPUC has thus already begun implementing the lessons learned from SDG&E's de-energization program statewide. The CPUC has, in fact, been working closely in conjunction with CAL FIRE and the California Governor's Office of Emergency Services ("Cal OES") to convey expectations and provide technical assistance to utilities to enable them to minimize state and local government, first responder, and community impacts resulting from de-energization. A copy of an October 26, 2018 letter sent jointly by the CPUC, CAL FIRE, and Cal OES to PG&E, SDG&E and SCE is attached hereto as **Exhibit 5**. The joint letter was intended to provide guidance regarding information sharing obligations in the event of power de-energization and set forth the specific real-time data utilities would be required to provide, such as Geographic Information System (GIS) datasets identifying the number of potentially impacted customers, vulnerable populations, and critical facilities. The CPUC is working closely with Cal OES and CAL FIRE in participating in the ongoing workshops with stakeholders.

The CPUC respectfully submits that the above SDG&E bullet points indicate that it is current, collaborative CPUC proceedings, and not judicial involvement, that will ultimately result in learned best practices being woven into PG&E's de-energization plan. SDG&E's lessons speak of a plan that "should tolerate fluidity of decision-making to adapt to situational awareness," and not an externally imposed de-energization requirement that fails to consider "[p]artnership and coordination with first responders and emergency management agencies," which are relationships that "must be cultivated, including the solicitation of feedback through formal and informal review processes."

Hon. William H. Alsup
February 6, 2019
Page 8

## Conclusion

The CPUC respectfully urges the Court to respect the CPUC's jurisdiction and its mandatory
implementation of SB 901 under California state law, in conjunction with state and local authorities and
neighboring communities, to address the complexities of the ongoing wildfire risks.

Sincerely,


/s/      *Christine Jun Hammond*
AROCLES AGUILAR
CHRISTINE JUN HAMMOND
CHRISTOFER NOLAN
Attorneys for the CALIFORNIA PUBLIC UTILITIES
COMMISSION

# Exhibit 1

Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
  VS.                          )        NO. CR 14-00175 WHA
                               )
PACIFIC GAS AND ELECTRIC       )
COMPANY,                       )
                               )
           Defendant.          )
_____)

San Francisco, California
Wednesday, January 30, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **HALLIE M. HOFFMAN**
                    **ASSISTANT UNITED STATES ATTORNEY**

                    DAVID L. ANDERSON
                    United States Attorney
                    150 Almaden Boulevard - Suite 900
                    San Jose, California  95113
              BY:   **JEFFREY B. SCHENK**
                    **ASSISTANT UNITED STATES ATTORNEY**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    first of all, to find that; but there have not been any

2    fatalities, I agree.

3            **THE COURT:**  Do you know how many times San Diego Gas

4    and Electric has turned off the power?

5            **MS. TERKEURST:**  We do know that, and all of that is on

6    our website.  I believe we could probably give you some rough

7    estimates today, but it is all publicly available information

8    on our website.

9            **THE COURT:**  Well, maybe you can submit a letter or

10   something to me afterwards.

11           But is it true that there have been no wildfires, say,

12   beyond one acre?  And is it true that -- how many times have

13   they actually turned off the power?  And what has been the

14   public's reaction to it?  Does the public accept it or does the

15   public growl about it?  You know, what -- and how have the

16   inconveniences -- that's maybe too mild a word, but how have

17   those inconveniences been dealt with?

18           **MS. TERKEURST:**  The public -- some members of the

19   public have growled about it, and we've had meetings with some

20   of them who have come to our offices and we've made field

21   trips -- some people have, I didn't go, but some people have --

22   to their areas to talk with them and the local communities

23   about the issue of balancing.  You know, that comes up a lot.

24           **THE COURT:**  Is there wind temperature -- not

25   temperature -- the wind speed that triggers a de-energization

## CERTIFICATE OF REPORTER

        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:    Thursday, January 31, 2019




_____

        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

# Exhibit 2



# Exhibit 3

1
2
3
4
5
6
7
8
9
10
11
12
13

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

14    UNITED STATES OF AMERICA,

15                              Plaintiff,

16         vs.

17    PACIFIC GAS AND ELECTRIC COMPANY,

18

19                              Defendant.

20
21
22
23
24
25
26
27
28

Case No. 14-CR-00175-WHA

**DECLARATION OF MELISSA W.**
**KASNITZ IN SUPPORT OF**
**COMMENTS OF THE**
**CALIFORNIA PUBLIC UTILITIES**
**COMMISSION IN RESPONSE TO**
**ORDER TO SHOW CAUSE**

Hearing Date: January 30, 2019
Time:            9:00 a.m.
Courtroom:    12, 19th Floor
Judge:          Hon. William H. Alsup

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

I, Melissa W. Kasnitz, declare as follows:

1.      I am currently employed as Legal Director for the Center for Accessible Technology in Berkeley, California.  I make this declaration in support of comments filed by the California Public Utilities Commission ("CPUC") in response to an Order to Show Cause issued by this Court on January 10, 2019. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2.      I hold a JD from the Boalt Hall School of Law at U.C. Berkeley and a bachelor's degree in Humanities from Yale University.  I am admitted to practice in all courts in California, including the Northern District.  I have been employed by the Center for Accessible Technology ("CforAT") since 2011, serving as the Legal Director since 2017. CforAT regularly participates in advocacy before the CPUC representing the interests of utility customers with disabilities on matters of energy policy.

3.      Prior to 2011, I worked at a nonprofit legal center called Disability Rights Advocates.  I joined Disability Rights Advocates in 1997, where I represented the interests of people with disabilities in litigation before federal and state courts.  While still at Disability Rights Advocates, I added representation of people with disabilities before the CPUC, beginning in 2004.  I have regularly represented the interests of this population before the CPUC since that time.

4.      The community of people with disabilities has a strong interest in the CPUC's obligation to ensure that Californians have access to safe and reliable energy at just and reasonable rates.  This is because people with disabilities are likely to require access to reliable energy at affordable rates in order to live independently in their community.

1  Without reliable and affordable energy, people with disabilities are at risk of being forced

2  into institutionalized settings or facing other harms, including reduced health and safety.  In

3  addition, in an emergency situation where there is a loss of power, people with disabilities

4
   who are able to maintain their independence with the use of assistive technology are at
5
6  heightened risk compared to the general population because they will have greater difficulty

7  during an evacuation, and will be more likely to require assistance from emergency response

8  personnel.

9        5.      Reliable and affordable access to electricity supports the ability of people

10  with disabilities to live independently because it allows them to make use of technology and

11
    participate effectively in activities of daily living. This includes medical technology and
12
13  devices that power participation in commerce and community.  As a result, CPUC decisions

14  have strong and enduring impacts on the disability community.

15        6.      Extended power outages or other actions that make access to electricity

16  unreliable create serious risk of harm to people with disabilities.  Some people will lose

17
    access to medical equipment necessary for health and safety, such as home dialysis
18
19  machines, nebulizers, or respirators. Some will lose the ability to power equipment they rely

20  on for mobility such as power wheelchairs.  Some will face health risks if they lose the

21  ability to regulate the temperature or environment in their homes.  Some will lose access to

22  vital (and expensive) medication if they lose access to refrigeration.  Many will be at greater

23  risk of harm in an emergency (including a localized emergency such as a fall, as well as a

24  community emergency such as a wildfire) if they do not have reliable access to

25
    telecommunications services to contact emergency personnel, or friends, family and/or
26
27  assistants.

28

7.     The CPUC is presently conducting a rulemaking on de-energization. The CPUC held a workshop on December 14, 2018, to address the impacts of electricity grid de-energization on vulnerable populations. I was one of the panelists asked to speak at this workshop to address the impacts of de-energization on people with disabilities.

8.     I have been involved with issues regarding potential de-energization by utilities since 2008, when the San Diego Gas & Electric Company ("SDG&E") filed an application before the CPUC requesting authority to de-energize parts of its service territory during times of fire risk.  In that proceeding, as well as the current proceeding and recent workshop, CforAT has recognized the importance of reducing the risk of wildfires, while also stressing the need for the Commission to consider the risks of depriving vulnerable populations of access to electricity, particularly because de-energization would occur at times where other health and safety risks are heightened.  Specifically, de-energization would occur during Santa Ana (or Santa Ana-like) conditions of heat and high wind.  These conditions require many people with disabilities or chronic health conditions to take extra care to manage their temperature and their levels of exertion.  The risk of harm that would ordinarily come from losing access to the ability to control their environment or to devices that allow them to take action with reduced effort is magnified in these conditions.

9.     Additional risks, as described above, include loss of access to medical devices and mobility equipment.  For both people with disabilities and many who may not think of themselves as disabled (including seniors), it may also include loss of necessary medication.  Even devices that are used by the general population are more significant to many people with disabilities; for example, this population may be less able to open their garage door manually to evacuate if they are unable to use an opener.  Similarly, the loss of

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
3

communication services in a power outage, while a matter of concern for everyone, creates increased risk for vulnerable populations if another emergency takes places while the power is off. The reduced ability of these populations to take action for themselves due to loss of power will add to the burden of emergency personnel during an outage.

10.   It would not be realistic for people with disabilities to all obtain generators in order to mitigate these risks from extended loss of power due to de-energization. People with disabilities are disproportionately low-income, making them less likely to be able to afford a generator. People with disabilities are also less likely than the general population to have room to store a generator or to have the ability to install or activate a generator.

11.   The risks facing people with disabilities based on de-energization go well beyond inconvenience, and implicate the health and safety of people who rely on equipment and devices powered by electricity for all aspects of their care. If a further emergency takes place while the power is out, the risk of harm, and the burden on first responders, is magnified yet further.

12.   For these reasons, CforAT has advocated the need for caution by the CPUC in authorizing energy utilities to de-energize their systems even during times of high fire risk. The risks and harms of extended power outages for vulnerable populations are substantial, and must be taken into consideration as part of any action that reduces the availability of reliable energy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
4

1   Executed this 5 th day of February, 2019.

2

3                                           Melissa W. Kasnitz, Legal Director
                                            Center for Accessible Technology
4                                           3075 Adeline Street, Suite 220
                                            Berkeley, CA 94703
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
        DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
                            Case No. 14-CR-00175-WHA
                                        5

# Exhibit 4

1
2
3
4
5
6
7
8
9
10
11
12
13

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

14    UNITED STATES OF AMERICA,                    Case No. 14-CR-00175-WHA

15                         Plaintiff,              **DECLARATION OF RICHARD SKAFF
                                                   IN SUPPORT OF COMMENTS OF THE**
16         vs.                                     **CALIFORNIA PUBLIC UTILITIES
                                                   COMMISSION IN RESPONSE TO**
17    PACIFIC GAS AND ELECTRIC COMPANY,            **ORDER TO SHOW CAUSE**

18
                                                   Hearing Date: January 30, 2019
19                         Defendant.              Time:          9:00 a.m.
                                                   Courtroom:     12, 19th Floor
20                                                 Judge:         Hon. William H. Alsup

21
22
23
24
25
26
27
28

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

I, Richard Skaff, declare as follows:

1.      I am currently the Executive Director of Designing Accessible Communities.  My 501C3 non-profit organization office is located in the town of Guerneville, CA.  I make this declaration in support of comments filed by the California Public Utilities Commission in response to an Order to Show Cause issued by this Court on January 10, 2019. I have personal and professional knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2.      I hold an Associates of Arts degree in Hotel and Restaurant Management and Business from the San Francisco City College in San Francisco. I created Designing Accessible Communities in 2006 and have been the Executive Director for Designing Accessible Communities  for 13 years.

3.      In 1978, after a 35 foot fall while trimming a tree at my home in Marin County, I became a paraplegic.  Six months after returning to work as the General Manager of the Franciscan Restaurant located at Fisherman's Wharf in San Francisco and training my replacement,  I left the restaurant that I had managed for almost 20 years and created three positions within the City and County of San Francisco.  The first positions I created was in 1989 for the position of Chief Building Official.  In that position, I enforced the California Building Code sections relating to physical access for persons with disabilities overseeing both City projects and those in private businesses that served the public.  The second position I created in 1991, shortly after the Americans with Disabilities Act (ADA), a civil rights mandate for persons with disabilities became law. The position I created was the ADA Accessibility  Coordinator for the City's Department of Public Works.  In that position I reviewed all City building projects to assure they met both state and federal access codes

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1

and standards.  I was also responsible for training all City staff involved in the design and construction of City building projects.  It was during that time that I was invited to travel to many countries to talk about the physical and programmatic accessibility my office was helping to create.  The third position I created was in 1998 when then Mayor Willie Brown asked me to create the Mayor's Office on Disability, which I did as Deputy Director.  I worked in that position until about 2006, when I retired.  It was in 2006 when I created my non-profit organization, Designing Accessible Communities.

4..       As already stated, my organization, Designing Accessible Communities, is a 501C3 non-profit organization.  The following is the Designing Accessible Communities Mission Statement: *"The organization's MISSION is to promote, facilitate, and support the use of policies, accessible design, and use of accessible manufactured products to ensure that all individuals, regardless of disability or age, are able to live within and participate fully in all aspects of their community and our society."*

5.       The California Public Utilities Commission ("CPUC") is presently conducting a rulemaking on de-energization. The CPUC held a workshop on December 14, 2018, to address the impacts of electricity grid de-energization on vulnerable populations. I was asked to be a panel member because of my many years as a person with a physical disability, my professional work as a Court approved disability code and regulatory expert, my many years (since my accident in 1978) of work with the cross section of the disability community, and my background in business, public employment with the City of San Francisco, and my political career as a Mayor and Councilmember in Marin County, California.

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
2

6.       Almost 4 months ago, I first learned that P.G.&E. had received approval from the California Public Utilities Commission (CPUC) to de-energize portions of their service areas during times of high heat and low humidity.     Having spent over 40 years as a person with a disability, developing and opening one of 23 Independent Living Centers (non-profit advocacy organizations who work to assure the rights of people with disabilities is protected) in Marin County shortly after my accident, and having been on three of the U.S. Access Board Advisory Committees developing national standards for physical access, 15 years in three positions with the City of San Francisco, and over ten years creating and running Designing Accessible Communities, I have substantial knowledge about the many types of disabilities and a clear understanding of the dangerous effect de-energization can have on many people in the disability community who depend on consistent electricity to operate both life-sustaining medical and mobility equipment.  I lost two friends and associates who were post-polio and used an electric breathing machine all day and all night while sleeping.  Both suffocated when the mouthpiece slipped out of their mouths while they were sleeping.  It would have been the same outcome as if the power to their breathing machines had been shut off.  What will happen to those people who depend on that type of equipment and other electrically powered equipment when P.G.&E. makes the determination that de-energization is necessary and no acceptable mitigation measures have been put in place?  I am presently trying to mitigate the negative and dangerous effects of de-energization by bringing California electric utilities, the CPUC, the Governor and State Legislature, manufacturers of solar panels and battery backup systems together with leaders in the disability/senior communities to see if we can't develop acceptable mitigation

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

3

1  measures that will help to protect the lives and health of persons with disabilities and

2  seniors.

3      7.    I would ask that we be given time to work through that process to see if we can

4  find some acceptable solutions, while recognizing the need for the utility managed de-

5  energization programs.

6

7

8  I declare under penalty of perjury that the foregoing is true and correct to the best of my

9  knowledge.

10

11  Executed this 5th day of February, 2019.

12

13  /S/  Richard Skaff
    Richard Skaff
14  Executive Director
    Designing Accessible Communities
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
4



# RESUME

## Richard M. Skaff

**Founder and Executive Director**
**Designing Accessible Communities – a 501C3 Non-profit Organization**

15500 Monte Rosa Avenue                                    Voice:707-604-3503
Guerneville, CA 95446                                       Cell:707-755-1681

Mailing Address:
Designing Accessible Communities
15500 Monte Rosa Avenue
Guerneville, CA 95446
Email:richardskaff@designingaccessiblecommunities.org
Web: www.designingaccessiblecommunities.org

---

**EXPERIENCE:**

Executive Director
Designing Accessible Communities                **2004 - Present**
www.designingaccessiblecommunities.org

Created **Designing Accessible Communities, a 501C3 non-profit organization.** The
organization's mission is to promote, facilitate, and support the use of policies, accessible design,
and use of accessible manufactured products to ensure that all individuals, regardless of disability or
age, are able to live within and participate fully in all aspects of their community and our society.

Deputy Director                                   **May 1, 1998 – May 1, 2004**
Mayor's Office on Disability (Retired)

Develop code training for all City departments involved in project design, review and approval.
Oversaw resolution of public complaints regarding physical accessibility within City facilities.
Provide plan and site review of all new and remodeled City funded/owned facilities.  Participate as
member in State and Federal code/regulatory committees, including the U.S. Architectural

Page 2
Resume-Richard Skaff

Transportation Barriers Compliance Board's Recreation, Passenger Vessel and Rights-of Way
Access Advisory Committees and the California State Architect's Code Advisory Board. Oversaw
development and maintenance of City Transition Plan.

**Program Manager/Chief Building Inspector**                                  **1989 – 1998**
**San Francisco Department of Public Works**
**ADA and Disability Access Coordinator**

Developed City's first access code enforcement/training program and was San Francisco's first access code
specialist. Provided code interpretation, code development (State and Federal), code training, reviewed plans
and sites for the Department of Public Works 13 Bureaus and other San Francisco departments (Port, Airport,
Recreation & Park, Housing Authority, etc.)

**Executive Director**                                                        **1983-1989**
**Fisherman's Wharf Port Tenants Association - San Francisco, California**

Responsible for all fiscal/administrative and operation issues including development of "Festa Italiana", a San
Francisco Port Tenant's sponsored annual celebration of Italian-Americans in the Bay Area.

**Program Developer**                                                         **1983-1985**
**Access Marin**
**Marin County**

State Building Code, Title 24 consultant to city, county and state building departments, other state and local
agencies, architects, engineers and individuals with disabilities.

                                                                             **1982-1985**
**Mayor/Council Member**
**Town of Corte Madera**

Fiscal/policy responsibility. Personally developed and gained public support for the first successful flood
control bond measure in Marin County. Developed continuing local transit program for local primary school
children and developed Town/school disaster plan.

**Chairperson/Member**                     **Member 1982 – 1985 Chairperson 1985**
**Marin Council of Mayors and Council Members**
**County of Marin**

Presided over all meetings of Council representing eleven cities. Represented Council at all local and State
functions. Member of Legislative, Foundation Priority Setting, County Issues Committees and represented the
Council as a member of the Marin County Transit Board for four years.

**Chairperson/Member**                     **Member 1982 – 1984 Chairperson 1983**
**Ross Valley Paramedics Authority**
**Ross Valley, County of Marin**

Initiated, developed, and implemented a joint powers agreement between five cities, two fire districts, and the
County of Marin. Initiated, developed and implemented a successful bond measure in the Ross Valley for
funding of the Authority. Developed and was successful in getting a $150.00 grant from the San Francisco
Foundation to fund the purchase of the Authority's first paramedic ambulance.

Page 3
Resume-Richard Skaff

funding of the Authority. Developed and was successful in getting a grant from the San Francisco Foundation to fund the purchase of the Authority's first paramedic ambulance.

**Board Member**                                                                                  **1982 – 1986**
**Ross Valley Paramedics Authority**
**County of Marin**

Responsible for all fiscal/administrative/policy for District.

**Board President/Executive Director**                                                **1980 – 1982**
**Marin Center for Independent Living**
**San Rafael, California**

Developed and implemented Marin County's Independent Living Center for persons with disabilities. Formulated and implemented policies, budgeting/fiscal management, public relations and fund development.

**RESTAURANT MANAGEMENT/RELATED EXPERIENCE:**

**Board Member**
**Golden Gate Restaurant Association**

Negotiated labor contracts and participated in union arbitration.

**General Manager**                                                                              **1962 – 1979**
**Franciscan Restaurant**
**San Francisco**

Managed a 165 seat restaurant with a 135 seat lounge and bar. Hired and supervised all restaurant personnel (approximately 120). Responsible to corporate owners for all profit and loss percentages (labor, food, and bar), purchased liquor and all restaurant equipment including kitchen. Responsible for menu and bar pricing, advertising. Managed all office procedures including supervision of Certified Public Accountant, payroll, accounts receivable and payable, inventory, and correspondence.

**Assistant Manager**                                                                           **1962 – 1963**
**Engineers Club**
**San Francisco**

Page 4
Resume-Richard Skaff

**EDUCATION/TRAINING:**

| | |
|---|---|
| **Associates of Arts Degree – City College, San Francisco** | **1966** |
| **State Fire Marshal Annual Symposium** | **1986** |
| **Office of the State Architect/Department of Rehabilitation Training for Building Inspectors/Community Access Network Members** | **1980 - 1984** |
| **National Restaurant Association Educational Seminar – Controlling Food Costs** | **1975** |
| **National Restaurant Association Educational Seminar – Management by Objectives** | **1976** |

**AFFILIATIONS (current and past)**

| | |
|---|---|
| Member | **Board of Directors – Southern Marin Fire District CERT** |
| Member | **California Department of Transportation  Access Task Force** |
| Member | **California Coastal Conservancy Bay Water Trail Advisory Committee** |
| Member (retired) | **California Building Officials (CALBO)** |
| Co-Chair | California State Fire Marshal Access Advisory Task Force |
| Member | NFPA  National Access Code Advisory Board |
| Member | State Architect's Access Advisory Committee |
| Member | State Building Standards Building and Fire Codes Committee |
| Member | California Department of Housing and Community Development Universal Design Ordinance Focus Group |
| Member | U.S. Architectural and Transportation Barriers Compliance Board Recreation, Passenger Vessel and Right-of Way Advisory Committees |
| Commissioner | State Attorney General – Commission on Disability |
| Member | California Highway Patrol, Bus Lift Specifications Committee |
| Chairperson | National Parks Accessibility Advisory Committee - U.S. Vice Presidential Appointment |
| Member | State of California Parks and Recreation Disabled Employees Advisory Committee and Accessibility Task Force-Developed first California State Parks Accessibility Guidelines |
| Member/Chairperson | Marin County Paratransit Coordinating Council |
| Member | Golden Gate Bridge Highway and Transportation District Advisory Committee on Services for Handicapped Persons |
| Member | Community Access Network, California State Department of Rehabilitation |
| Member | Marin General Hospital Accessibility Task Force |
| Board of Directors | Innovative Housing, Inc. |
| Co-Chairperson | Marin County Council of Agencies Task Force on Accessibility |
| Advisor/Committee Member | California State Coastal Commission/Conservancy |

Page 5
Resume-Richard Skaff

| | |
|---|---|
| Advisor | San Francisco Bay Conservation and Development Commission |
| Advisor and Co -Chair | Office of the State Fire Marshal – Emergency Evacuation Access Advisory Committee |
| Advisor | Office of the State Architect |

**HONORS/AWARDS:**

City of San Francisco – Commendation - 1989 Loma Prieta Earthquake Response
Marin County Transit District
Golden Gate Bridge Highway and Transportation District
Metropolitan Transportation Commission Transit Award
Ross Valley Paramedic Authority
Marin County Department of Health and Human Services
Town of Corte Madera

# Exhibit 5

  

October 26, 2018

Geisha Williams
Chief Executive Officer
Pacific Gas and Electric Company
77 Beale Street
San Francisco, California 94105

Kevin Sagara
Chairman and Chief Executive Officer
San Diego Gas and Electric
8330 Century Park Court
San Diego, California 92123-4150

Kevin M. Payne
Chief Executive Officer
Southern California Edison
2244 Walnut Grove Avenue
Rosemead, California 91770

**Subject: Public Safety Power Shut-Off**

Dear Ms. Williams, Mr. Sagara, and Mr. Payne:

Ensuring the safety of Californians is of the utmost importance to the Governor's Office of Emergency Services (Cal OES), the Department of Forestry and Fire Protection (CAL FIRE), and the California Public Utilities Commission (CPUC). Recent actions of Pacific Gas and Electric (PG&E), Southern California Edison (SCE), and San Diego Gas and Electric (SDG&E), to proactively de-energize power lines during high wildfire danger weather conditions make clear that utilities must provide specific, real-time information so the State can take appropriate steps to ensure public safety. This letter sets forth Cal OES, CAL FIRE, and the CPUC's expectations regarding your potential Public Safety Power Shut-off (PSPS) that may occur during high wildfire danger weather conditions.

<u>NOTIFICATIONS</u>

The State expects PG&E, SCE, and SDG&E to provide notifications at several distinct stages of a PSPS event. These notifications must be made to the California State Warning Center [warning.center@caloes.ca.gov; (916) 845-8911] as follows:



  

- First, immediately notify the California State Warning Center upon the utility's decision to activate its PSPS program to consider de-energization during high wildfire danger weather conditions. This notice to the California State Warning Center must be made in advance of any public notice of this potential de-energization.
- Second, immediately notify the California State Warning Center upon the decision to carry out the de-energizing of power lines.
- Third, immediately notify the California State Warning Center upon the actual de-energization of power lines.
- Finally, immediately notify the California State Warning Center upon the restoration of power.

INFORMATION AND BRIEFINGS

In its initial notification(s) to the California State Warning Center, the utility must provide the designated point of contact, to include name, phone number, and email address, within that utility who will serve as the primary source of updated information regarding the potential PSPS.

The utility must also provide the State with its proposed operational periods and provide briefings prior to the PSPS, during the power shut-down, and during restoration. The State expects no less than three briefings per day. In the event the State requests a modification to the briefing schedule, the utility is expected to make its best effort to comply with the State's request.

In these briefings, the State expects the utility to provide information including, but not limited to: the expected duration of the power outage; the number of customers potentially impacted; the method of public notification, including the proposed language to be disseminated to the public; the plan for public messaging, as well as coordination with Cal OES, CAL FIRE, and local public safety agencies; and information regarding the deployment of any asset.

Additionally, if Cal OES, CAL FIRE, or the CPUC deploys a representative to a utility's Emergency Operations Center, the State expects the utility to accommodate that deployment, include the State representative in its operational briefings, and provide workspace within its Emergency Operations Center.

DATA

It is critical that each utility provide the State with real-time data, in advance of the utility's actual de-energization, so the State can prepare for the proposed power outage. Therefore, upon its initial notification to the California State Warning Center of a potential de-energization, the utility must provide the State with all data related to the potentially-impacted areas, as set forth below. Additionally, the State must have the ability to share such data with any state or local agency it deems necessary to protect public safety.



  

The utility must provide the State with maps in PDF format, containing: outage areas; circuits; impacted critical customers; and roads for distribution to emergency response personnel at the local, state, and federal partner agencies. Additionally, each utility must provide GIS datasets, as set forth below, in an ESRI-compliant web service updated and maintained by the utility. If web service is unavailable, data can be in geodatabase format, shapefile, or a KMZ file type. The utility must provide updated files as the data changes. Any point location data provided via a spreadsheet must include an address and/or latitude and longitude.

The specific GIS datasets are as follows:

- Planned Outage Areas (Polygon)
  - Customers per outage area
  - Time of outage
  - Time to restoration
  - # of Medical Baseline Customers

- Current Outage Areas (Polygon)
  - Customers per outage area
  - Time of outage
  - Time to restoration
  - # of Medical Baseline Customers

- Impacted Circuits (Line)
  - Circuit type
  - Customers per circuit
  - Voltage
  - # of Medical Baseline Customers

- Impacted Critical Customers (e.g. Hospitals, Fire Stations, Police Stations, Water/Irrigation Districts, Waste Water Treatment Plants, Telecom, Schools) (Point)
  - Facility Name
  - Street Address
  - City
  - ZIP
  - County
  - Latitude
  - Longitude
  - Customer Type

- Medical Baseline Customer (this can be provided in a spreadsheet format)
  - Impacted Population, by County
  - Impacted Population, by City



CAL OES | 3650 SCHRIEVER AVENUE, MATHER, CA 95655
(916) 845-8506 | TELEPHONE (916) 845-8511 FAX

  

Having real-time information in preparation for, during, and following a utility's de-energization of a community is essential for the preservation of public safety. This effort will ensure that the State, as well as all potentially-impacted local jurisdictions, are able to effectively prepare for any impacts that may result from a utility's de-energization and respond accordingly. We look forward to your cooperation.

Sincerely,

Mark S. Ghilarducci
Director, Governor's Office of
Emergency Services

Ken Pimlott
Director, California Department of
Forestry and Fire Protection

Michael Picker
President, California Public Utilities
Commission

Cliff Rechtschaffen
Commissioner, California Public Utilities
Commission