1
2
3
4
5
6
7
8
9
10 **EXHIBIT J**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FILED

MAR - 1 2002

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

1  JAMES L. LOPES (No. 63678)
   JEFFREY L. SCHAFFER (No. 91404)
2  JANET A. NEXON (No. 104747)
   HOWARD, RICE, NEMEROVSKI, CANADY,
3     FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California 94111-4065
5  Telephone:    415/434-1600
   Facsimile:    415/217-5910
6
   Attorneys for Debtor and Debtor in Possession
7  PACIFIC GAS AND ELECTRIC COMPANY

8  ROGER J. PETERS (No. 77743)
   IATHAN T. ANNAND (No. 70009)
9  MICHAEL D. WHELAN (No. 58617)
   PACIFIC GAS AND ELECTRIC COMPANY
10 77 Beale Street
   San Francisco, California 94105
11 Telephone: 415/973-7000
   Facsimile: 415/973-5520
12

13              UNITED STATES BANKRUPTCY COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16
   In re
17
   PACIFIC GAS AND ELECTRIC COMPANY, a          Case No. 01-30923 DM
18 California corporation,
                                                 Chapter 11 Case
19                        Debtor.

20                                               Date:   March 27, 2002
   Federal I.D. No. 94-0742640                   Time:   9:30 a.m.
21                                               Place:  235 Pine Street, 22nd Floor
                                                         San Francisco, CA
22                                               Judge:  Honorable Dennis Montali

23

24

25   PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING
     CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES;
26       MEMORANDUM OF POINTS AND AUTHORITIES

27      [DECLARATION OF IATHAN ANNAND FILED SEPARATELY]

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................... 1

I.     INTRODUCTION AND OVERVIEW .................................................. 1

II.    LEGAL ARGUMENT .......................................................................... 5

     A.    Estimation Of Claims For Feasibility Purposes, In General. .... 5

     B.    The Statutory And Legal Bases For Estimating Claims For
          Feasibility Purposes. ................................................................. 7

     C.    The Claims Requiring Estimation In This Case Are In Any Event
          Predominantly "Contingent" Or "Unliquidated" And Therefore
          Must Be Estimated For Feasibility Purposes. ......................... 11

     D.    As To Claims Estimation-Related Matters As To Which The
          Debtor Suggests That It Retain An Expert, Section 327(a) Provides
          Authority For Such Retention. ................................................. 14

     E.    Alternatively, The Court Can Appoint An Expert Pursuant To
          Federal Rule of Evidence 706 For The Purpose Of Receiving And
          Evaluating Evidence And Advising The Court In Estimating The
          Aggregate Value Of Claims For Feasibility Purposes. ........... 14

     F.    In The Alternative, The Court May Exercise Its Discretion Under
          Section 105(a) To Appoint An Assistant For Claims Estimation
          Purposes. .................................................................................. 17

III.   ENVIRONMENTAL CLAIMS .......................................................... 19

     A.    The Value Of Environmental Claims Against PG&E Is Vastly
          Overstated. ................................................................................ 19

          1.    The State's Inflated Environmental Claims. ................... 20

              a.    Many Other Financially Viable Parties, Including
                   DTSC, Also Are Responsible Parties At The Casmalia
                   Landfill, And PG&E's Share Of That Liability Is A
                   Small Percentage Of The Amount The State Is
                   Claiming. .................................................................. 20

              b.    PG&E Previously Settled All Its Obligations At The
                   GBF/Pittsburgh Landfill, And Other Parties Are
                   Performing The Cleanup There, Secured By A $120
                   Million Insurance Policy. ........................................ 23

              c.    The State's $100 Million Claim For Substation
                   Contamination Is Speculative And Contrary To Fact. ... 24

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF CONTENTS

Page

2. PG&E Already Has Settled Its Liabilities At A Number Of Sites Which The Claimants Include Within Their Respective Claims. ........ 25

3. Claimants Estimate Total Cost Rather Than Present Value. ........ 25

4. The Environmental Claims Filed By The Non-State Claimants Are Similarly Inflated. ........ 26

B. If The Environmental Claims Must Be Estimated On A Claim-By-Claim Basis, Utilization Of A Court-Appointed Expert To Assist Will Materially Streamline The Estimation Process. ........ 27

C. A Statistical Approach To Estimation Of Environmental Claims In The Aggregate, With The Assistance Of An Expert, Appears To Be A More Efficient Estimation Alternative. ........ 30

IV. GENERATOR CLAIMS ........ 32

A. Generator Claims Asserting PG&E Owes Sums Actually Owed By Southern California Edison. ........ 32

B. PX Cash Holdings. ........ 33

C. Claims For Electricity And Ancillary Services Provided On Or After 1/17/01. ........ 33

D. Generator Claims Should Be Reduced By At Least $400 Million Because They Are Based On Prices FERC Has Determined Are Subject To Refund As Unjust And Unreasonable. ........ 34

E. The PX Claim Duplicating That Of The Generators. ........ 34

F. Underscheduling Penalty Claims. ........ 35

V. ENERGY SERVICE PROVIDER CLAIMS ........ 35

VI. COMMERCIAL CLAIMS ........ 36

VII. TORT CLAIMS ........ 38

VIII. EMPLOYMENT CLAIMS ........ 42

CONCLUSION ........ 44

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Cases

Amoco Oil Co. v. Borden, Inc., 889 F.2d 664 (5th Cir. 1989) ................................ 22, 29

Audre, Inc. v. Casey (In re Audre, Inc.), 216 B.R. 19 (B.A.P. 9th Cir. 1997) ................ 11

Bancamerica Commercial Corp. v. Trinity Indus., Inc., 900 F. Supp. 1427 (D.Kan. 1995), aff'd in part & rev'd in part on other grounds, 100 F.3d 792 (10th Cir. 1996) .................................................................................................................. 22

Bittner v. Borne Chem. Co., 691 F.2d 134 (3d Cir. 1982) ........................................ 6

Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc. (In re Dennis Ponte, Inc.), 61 B.R. 296 (B.A.P. 9th Cir. 1986) .......................................................................... 6, 9

Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.), 137 B.R. 811 (Bankr. D. Colo. 1992) ...................................................................................................... 13

Corey v. Louis (In re Corey), 892 F.2d 829 (9th Cir. 1989) .................................... 6

Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503 (7th Cir. 1992) .......... 22

Federal Deposit Ins. Corp. v. Wenberg (In re Wenberg), 94 B.R. 631 (B.A.P. 9th Cir. 1988), aff'd, 902 F.2d 768 (9th Cir. 1990) ...................................................... 11, 12

Fostvedt v. Dow (In re Fostvedt), 823 F.2d 305 (9th Cir. 1987) ............................... 12

In re A.H. Robins Co., 880 F.2d 694 (4th Cir. 1989) ............................................ 28

In re A.H. Robins Co., 88 B.R. 742 (Bankr. E.D.Va. 1988), aff'd, 880 F.2d 694 (4th Cir. 1989) .......................................................................................................... 39

In re Bell Petroleum Serv., Inc., 3 F.3d 889 (5th Cir. 1993) ................................... 22

In re Distrigas of Mass. LLC., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,275 (July 27, 2000) ......................................................................... 35

In re Dow Corning Corp., 211 B.R. 545 (Bankr. E.D. Mich. 1997) ........................... 8, 17

In re Eagle-Picher Indus., Inc., 189 B.R. 681 (S.D. Ohio 1995) ............................... 41

In re Farley, Inc., 146 B.R. 748 (Bankr. N.D. Ill. 1992) ........................................ 39

In re Johns-Mansville Corp., 36 B.R. 743 (Bankr. S.D.N.Y. 1984) ........................... 18

In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 830 F. Supp. 686 (E.D.N.Y. & S.D.N.Y. 1993) ...................................................................... 15

In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 982 F.2d 721 (2d Cir. 1992) ...................................................................................................... 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

Page(s)

In re Loya, 123 B.R. 338 (B.A.P. 9th Cir. 1991) .......... 11

In re National Gypsum Co., 139 B.R. 397 (N.D.Tex 1992) .......... 27

In re Nova Real Estate Inv. Trust, 23 B.R. 62 (Bankr. E.D. Va. 1982) .......... 6, 9, 10

In re Poole Funeral Chapel, Inc., 63 B.R. 527 (Bankr. N.D. Ala. 1986) .......... 39

In re Royal Composing Room, Inc., 62 B.R. 403 (Bankr. S.D.N.Y. 1986) .......... 18

In re Thomson McKinnon Sec., Inc., 191 B.R. 976 (Bankr. S.D.N.Y. 1996) .......... 6, 40

In re UNR Indus. Inc., 45 B.R. 322 (N.D.Ill. 1984) .......... 39

In re Windsor Plumbing Supply Co., 170 B.R. 503 (Bankr. E.D.N.Y. 1994) .......... 13

Interco, Inc. v. Ilgwa Nat'l Ret. Fund (In re Interco, Inc.), 137 B.R. 993 (Bankr. E.D. Miss. 1992) .......... 6, 13

Kamb v. United States Coast Guard, 869 F. Supp. 793 (N.D. Cal. 1994) .......... 22

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) .......... 8. 28

Mathis v. Veliscol Chem. Corp., 786 F. Supp. 971 (N.D. Ga. 1991) .......... 22

Nicholes v. Johnny Appleseed of Washington (In re Nicholes), 184 B.R. 82 (B.A.P. 9th Cir. 1995) .......... 12, 13

Old Orchard Inv. Co. v. A.D.I. Distrib., Inc. (In re Old Orchard Inv. Co.), 31 B.R. 599 (W.D. Mich. 1983) .......... 17

Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374 (9th Cir. 1985) .......... 6, 8, 9

Prisco v. New York, 902 F. Supp. 374 (S.D.N.Y. 1995) .......... 22

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61, 294 (December 15, 2000) .......... 35

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 96 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61, 120 (July 25, 2001) .......... 34

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 97 Fed. Energy Reg. Comm'n Rep. (CCH) ¶21, 275 (December 19, 2001) .......... 34, 35

Scott v. Spanjer Bros., Inc. 298 F.2d 928 (2d Cir. 1962) .......... 15, 16

Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994 (D.N.J. 1988) .......... 22

United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983) .......... 21

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

United States v. Rohm & Haas Co., 939 F. Supp. 1142 (D.N.J. 1996)    29

United States v. Sutton, 786 F.2d 1305 (5th Cir. 1986)    18

## Statutes

11 U.S.C.
§§101 et seq.    1
§105    18, 29
§105(a)    1, 10, 14, 17, 18, 31, 38
§109(e)    11, 12
§327(a)    14, 17, 18, 31
§502(c)    1, 7, 9, 10, 11, 13, 14
§502(j)    8
§1107(a)    14
§1113    18
§1129(a)(11)    1, 5, 6, 8, 10, 14, 17, 18, 42
§1141(d)    8

28 U.S.C. §157(b)(2)(B)    39

42 U.S.C. §9601 et seq.    20

CERCLA §113(f)    22

Fed. R. Bankr. P.
3018    8
3018(a)    8
9017    15, 18
9031    17, 18

Fed. R. Civ. P. 14(a)    22

Fed R. Evid.
702    18
706    14, 15, 16, 17, 18, 29, 31, 38
706(a)    15, 18

## Other Authorities

126 Cong. Rec. (1980)
26,779    22
26,781    22

2 Lawrence P. King Collier on Bankruptcy ¶105.01 (15th ed. rev. 2000)    10

5 Lawrence P. King Collier on Bankruptcy ¶1129.02[11] (15th ed. 1984)    8

H.R. Rep. No. 99-253 (III) (1985), reprinted in 1986 U.S.C.C.A.N. 3038    22

Joe S. Cecil & Thomas E. Willging, Court Appointed Experts: Defining the Role of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

Experts Appointed Under Federal Rule of Evidence 706 (Fed. Jud. Center 1993)    15, 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 27, 2002, at 9:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Dennis Montali, located at 235 Pine Street, 22nd Floor, San Francisco, California, Pacific Gas and Electric Company, the debtor and debtor in possession in the above-captioned Chapter 11 case ("PG&E" or the "Debtor"), will and hereby does move the Court (the "Motion") for order determining the process and procedures for estimating, for purposes of determining the feasibility of the pending First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company, as amended (the "Plan"), jointly propounded by PG&E and its parent PG&E Corporation (the "Plan Proponents"), those claims against the estate described in the accompanying Memorandum of Points and Authorities incorporated by reference herein.

This Motion is made pursuant to Sections 1129(a)(11), 502(c) and 105(a) of the United States Bankruptcy Code (11 U.S.C. §§1129(a)(11), 502(c) & 105(a)) and is based on the facts and law set forth herein (including the accompanying Memorandum of Points and Authorities), the Declaration of Iathan Annand filed concurrently herewith (hereinafter referred to as the "Annand Declaration" and cited as the "Annand Decl."), the record of this case and any evidence presented at or prior to the hearing on the Motion.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 9014-1(c)(2) of the Bankruptcy Local Rules for the Northern District of California, any written opposition to the Motion and the relief requested therein must be filed with the Bankruptcy Court and served upon appropriate parties (including counsel for PG&E, the Office of the United States Trustee and the Official Committee of Unsecured Creditors) at least five (5) days prior to the scheduled hearing date. If there is no timely objection to the requested relief, the Court may enter an order granting such relief without further hearing.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION AND OVERVIEW[1]

Many of the large claims filed in this case are grossly inflated. This is particularly the case with environmental, generator, energy service provider, tort and employment claims and certain commercial claims. PG&E intends to object to allowance of all or a portion of many of these claims, and the objection process has begun. However, were the Court to await final adjudication, liquidation and allowance or disallowance of these claims, it would materially retard the progress of the case and frustrate the reorganization effort. It is necessary and appropriate, therefore, for the Court to estimate these claims for the limited purpose of judging the feasibility of the Plan pursuant to Section 1129(a)(11) of the Bankruptcy Code,[2] and not for the purpose of adjudicating these claims or binding any claimholders to any resolution of their claims on the merits.

More specifically, approximately 13,000 proofs of claim ("POCs") have been filed in this case. Many are small, simple trade payables or are otherwise reasonably amenable to speedy liquidation (80% are for amounts less than $100,000). However, a number of the claims are large, complex, and not necessarily readily subject to resolution. These include approximately 112 environmental claims covering hundreds of sites for a total of approximately $1 billion, over 200 generator claims totaling about $8.4 billion, approximately 50 claims filed by energy service providers totaling more than $580 million, approximately nine commercial claims totaling over $4 billion, approximately 1,250 chromium-related tort claims totaling approximately $580 million, approximately 450 miscellaneous tort claims totaling more than $315 million, and approximately 15 employment claims totaling over $110 million (hereinafter collectively referred to as the "Claims"). As explained more fully in Parts III through VIII below, most of the Claims are for inflated

---

[1] Unless specifically noted otherwise, the evidentiary basis for all facts set forth in this memorandum of points and authorities is contained in the Annand Declaration.

[2] Unless otherwise specified, all statutory references are to the United States Bankruptcy Code (title 11 of the United States Code), 11 U.S.C. §§101 et seq.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
*A Professional Corporation*

1    amounts, often for wildly inflated amounts, which in the aggregate constitute billions of dollars of

2    overstated Claims. Because such billions of dollars of overstated Claims may clearly affect the

3    feasibility of the Plan, under controlling Ninth Circuit authority these Claims must be estimated for

4    purposes of assessing the feasibility of the Plan. It bears emphasis that such estimation for

5    feasibility purposes has no binding or preclusive effect respecting the claims that are being

6    estimated, and therefore is in no way determinative of the allowed amount of such claims or the

7    distributions on such claims. Not surprisingly, then, the Court has substantial discretion and

8    flexibility in determining how best to proceed with claims estimation for feasibility purposes.

9         The challenge for the Court, the Debtor and parties in interest is to fashion a practicable

10   and reasonable process for estimating the Claims within a reasonable time frame. Estimation of the

11   Claims is likely to require substantial time and attention because of their volume, diversity and

12   complexity. If performed by the Court unassisted, the process could substantially burden the

13   Court's docket and interfere with the efficient administration of this case. Accordingly, the Court

14   will want to consider various means of streamlining the process. PG&E requests that the Court

15   consider the following suggested procedures and process for estimating the Claims, broken down by

16   type:

17       •  Environmental Claims. Retention of a Court-approved expert to evaluate the

18   approximately 112 environmental Claims[3] involving over 548 separate sites and totaling

19   approximately $1 billion. The expert would report to the Court with a recommendation regarding

20   the estimated amount PG&E will reasonably need to address these Claims. The expert could be

21   empowered to determine in the first instance, subject to the Court's approval, the appropriate

22   procedures for accomplishing the estimation (e.g., statistical methodologies, nature of

23   recommendations to the Court). The expert should be highly experienced in the evaluation of

24   liability and damages for all types of statutory and common law environmental claims, impartial,

25

26       [3]"Environmental claims" that PG&E proposes be subject to estimation include all
27   environmental claims for which timely POCs have been filed alleging pre-petition violations,
     except, to the extent discussed in footnote 36 infra and its accompanying text, claims that do not
28   state or refer to any dollar amount.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 | and available to devote substantial time to the task over a relatively short period. Subject to the
2 | Court's approval, PG&E proposes to file appropriate papers on or before April 17, 2002 for the
3 | retention of such expert, coupled with a motion for the Court's estimation of such environmental
4 | Claims for feasibility purposes at such time as the Court has the benefit of such expert's report.

5 | • Commercial Claims. Retention of a Court-approved expert to evaluate approximately
6 | nine commercial Claims[4] totaling approximately $4 billion, and report back to the Court with a
7 | recommendation regarding the estimated amount PG&E will reasonably need to address them. The
8 | expert could be empowered to determine in the first instance, subject to the Court's approval, the
9 | appropriate procedures for accomplishing the estimation. Such expert should be highly experienced
10 | in the evaluation of liability and damages for contract and other commercial claims, impartial, and
11 | available. Subject to the Court's approval, PG&E proposes to file appropriate papers on or before
12 | April 17, 2002 for the retention of such expert, coupled with a motion for the Court's estimation of
13 | such commercial Claims for feasibility purposes at such time as the Court has the benefit of such
14 | expert's report.

15 | • Employment Claims. Retention of a Court-approved expert to evaluate approximately
16 | 15 employment Claims[5] totaling about $100 million and report back to the Court with a
17 | recommendation regarding the estimated amount PG&E will reasonably need to address these
18 | Claims. The expert could be empowered to determine in the first instance, subject to the Court's
19 | approval, the appropriate procedures for accomplishing the estimation. Such expert should be
20 | available, impartial, and highly experienced in the evaluation of liability and damages for all types
21 | of statutory and common law employment claims. Subject to the Court's approval, PG&E proposes
22 | to file appropriate papers on or before April 17, 2002 for the retention of such expert, coupled with a

23 |

---

24 | [4]"Commercial claims" that PG&E proposes be subject to estimation include all commercial
claims for which a timely POC in excess of $5 million has been filed, with the exception of two
25 | large claims aggregating $9 billion (one filed by Baldwin Associates, Inc. and the other by Wayne
Roberts) that already have been disallowed by separate orders dated January 23, 2002 (docket nos.
26 | 4490, 4488).

27 | [5]"Employment claims" that PG&E proposes be subject to estimation include approximately 15
claims by litigants alleging pre-petition employment law-related claims who have filed timely
28 | POCs.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  motion for the Court's estimation of such employment Claims for feasibility purposes at such time

2  as the Court has the benefit of such expert's report.

3  • Generator Claims. Estimation by the Court of several categories of generator Claims[6]

4  totaling over $8 billion, based on written submissions. Subject to the Court's approval, PG&E

5  proposes to file one or more motions for estimation on or before April 17, 2002 for the estimation of

6  these Claims.

7  • Energy Service Provider Claims. Estimation by the Court of Energy Service Provider

8  ("ESP") Claims aggregating more than $580 million. Subject to the Court's approval, PG&E

9  proposes to file a motion for the estimation of such Claims on or before April 17, 2002.

10  • SPI Commercial Claim. Estimation by the Court of one commercial Claim, asserted by

11  Sierra Pacific Industries ("SPI"), for more than $1 billion, with which the Court is already familiar.

12  Subject to the Court's approval, PG&E proposes to file a motion on or before April 17, 2002 for the

13  estimation of this Claim.

14  • Tort Claims. Retention of a Court-approved expert to assist the Court in estimating, on

15  an aggregate basis, approximately 450 miscellaneous tort Claims totaling more than $315 million,[7]

16  based on the application of statistical methodology to relevant litigation data accumulated by PG&E

17  over the last five years. PG&E also will ask the Court to estimate the reasonable aggregate value of

18  approximately 1,250 additional personal injury tort Claims, with an alleged value of approximately

19  $580 million, that relate to alleged exposure to chromium from particular PG&E compressor

20  stations (the "Chromium Claims"). Subject to the Court's approval, PG&E proposes to file

21  appropriate papers on or before April 17, 2002 for the retention of the expert to be retained in

22

23  [6]"Generator claims" that PG&E proposes be subject to estimation include all claims by
   generators and related entities such as the PX and ISO which have filed timely POCs alleging
24  amounts owed pre-petition, except, to the extent discussed in footnote 36 infra and its accompanying
   text, claims that do not state or refer to any dollar amount.

25  [7]"Tort claims" that PG&E proposes be subject to estimation include all claims for personal
   injury, wrongful death, and property damage by persons who have filed timely POCs alleging pre-
26  petition torts, except (i) claims for workers' compensation, (ii) those pre-litigation claims that PG&E
   has assigned to its Safety, Health and Claims Department for resolution and that have been or are
27  anticipated to be fully resolved through this process, and (iii) to the extent discussed in footnote 36
   infra and its accompanying text, those claims that do not state or refer to any dollar amount.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1     connection with valuation of the miscellaneous tort Claims, coupled with a motion for the Court's

2     estimation of such Claims for feasibility purposes at such time as the Court has the benefit of such

3     expert's analysis, as well as a motion for the Court's estimation of the Chromium Claims for

4     feasibility purposes.

5          PG&E addresses each of these categories of Claims requiring estimation in greater detail

6     in Parts III through VIII below. However, before proceeding with such fuller explanation of the

7     extent to which the Claims are overstated and why estimation of each category of Claims is

8     necessary, we turn first to the applicable legal principles.

9

10                                    II.

11                         LEGAL ARGUMENT

12     A.     Estimation Of Claims For Feasibility Purposes, In General.

13          Section 1129(a)(11) requires as a condition of confirmation of any plan of

14     reorganization that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the

15     need for further financial reorganization, of the debtor or any successor to the debtor under the

16     plan . . . ." In other words, a plan must be feasible and leave the reorganized entity financially stable

17     enough to be in a position to meet its obligations under the plan.

18          In this case, approximately 13,000 proofs of claim have been filed aggregating over $44

19     billion.[8] Tellingly, a very small percentage of these filed claims account for a huge percentage of

20     the total claimed amount, such that less than 10% of the aggregate number of filed claims account

21     for approximately 90% of the aggregate amount of filed claims. As noted above, PG&E maintains

22     that many of these large claims are materially overstated, to the tune of billions of dollars in the

23     aggregate. Accordingly, in order to determine whether the Plan is feasible, the Court can and must

24

25          [8]This $44 billion figure includes approximately $9 billion of claims that already have been

26     disallowed. See footnote 4, supra. In addition, PG&E is in the process of filing objections to various facially duplicative claims (PG&E already has filed two omnibus objections covering

27     numerous duplicative claims and intends to file one or more additional omnibus objections to other groups of duplicative claims), which should be resolved relatively soon and further reduce the

28     existing aggregate claims.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  estimate the Claims for feasibility purposes under Section 1129(a)(11).  Pizza of Hawaii, Inc. v.

2  Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985) (bankruptcy court

3  erred by finding the debtor's Chapter 11 plan feasible without estimating the value of a potentially

4  large civil suit for damages against the estate).

5          As a lesser-included proposition, courts also have recognized that estimation of claims

6  for feasibility purposes promotes the objectives of Chapter 11 reorganization, and that freezing the

7  plan process pending the final allowance or disallowance of claims would be antithetical to the

8  reorganization process.  See Interco, Inc. v. Ilgwa Nat'l Ret. Fund (In re Interco, Inc.), 137 B.R. 993,

9  998 (Bankr. E.D. Miss. 1992) (claim liquidation would adversely affect debtor's ability to formulate

10  and implement a plan of reorganization and frustrate the reorganization case); In re Nova Real

11  Estate Inv. Trust, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982) (same).

12          In the estimation proceeding, the bankruptcy court need only obtain a "rough estimate"

13  of the value of the claims requiring estimation.  In re Thomson McKinnon Sec., Inc., 191 B.R. 976,

14  989 (Bankr. S.D.N.Y. 1996).  Further, the court has broad discretion in choosing the estimation

15  process(es).  Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc. (In re Dennis Ponte, Inc.), 61 B.R.

16  296, 299 (B.A.P. 9th Cir. 1986) (citing with approval in the context of estimating a claim for

17  feasibility purposes the directive in Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982), to

18  "us[e] whatever method is best suited to the particular contingencies at issue"); Corey v. Louis (In re

19  Corey), 892 F.2d 829, 834 (9th Cir. 1989) ("court has broad discretion when estimating the value of

20  an unliquidated claim").  Non-bankruptcy law applicable to particular claims is binding, e.g., a claim

21  based on a contract is governed by the contract and by legal principles applicable to that contract.

22  Bittner, 691 F.2d at 135.  Discretion is otherwise virtually unfettered.

23          Given that both Section 1129(a)(11) and controlling Ninth Circuit authority mandate the

24  estimation of claims where necessary to determine whether a plan or reorganization is feasible, it is

25  not surprising that bankruptcy courts have considerable discretion in choosing the means and

26  methods of estimation, in order to complete the estimation process as promptly and efficiently as

27  possible for feasibility purposes.  This is because estimation of a claim for feasibility purposes does

28  not in any way affect or bind the claimholder regarding the ultimate allowance of the claim or the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  distribution the claimholder will be entitled to receive thereon. Rather, it is merely a rough estimate

2  for the limited purpose of determining whether a plan of reorganization meets the feasibility

3  requirement. And if bankruptcy courts did not have broad authority to estimate claims for feasibility

4  purposes, virtually any recalcitrant creditor or group of creditors could bring the plan process to a

5  standstill by asserting large and factually complex claims that they claim are merely "disputed,"

6  insisting that the plan feasibility requirement could not be applied or satisfied until after the

7  conclusion of evidentiary hearings resulting in the allowance or disallowance of the claim. This

8  paralysis of the Chapter 11 process is neither contemplated nor countenanced by the Bankruptcy

9  Code.

10    B.    The Statutory And Legal Bases For Estimating Claims For Feasibility Purposes.

11         Although courts draw loosely upon Section 502(c) as authority for estimating claims for

12  feasibility purposes, this section applies by its terms only to estimation for allowance purposes.[9]

13  The differences in the goals and impact of estimation for allowance purposes, on the one hand, and

14  feasibility purposes, on the other, dictates against strict application of Section 502(c) requirements to

15  feasibility estimation. In particular, both logic and case law demonstrate that courts can and should

16  estimate any disputed claims for plan feasibility purposes if the alleged value of those claims may

17  affect the feasibility of a plan of reorganization.

18         As necessary background, it is important to keep in mind that there are a variety of

19  circumstances under which a bankruptcy court may be required to estimate claims during the course

20  of a Chapter 11 case. Section 502(c), as already noted, provides for estimation of claims for the

21  purpose of the allowance of claims. The ramifications of a bankruptcy court's estimation of the

22  value of claims for this purpose is dramatic. Absent reconsideration for cause pursuant to Section

23

24    [9]Section 502(c) states in full:
       There shall be estimated for purpose of allowance under this section—

25    (1)   any contingent or unliquidated claim, the fixing or liquidation of which, as the
26          case may be, would unduly delay the administration of the case; or

27    (2)   any right to payment arising from a right to an equitable remedy for breach of
            performance.

28    11 U.S.C. §502(c).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

502(j), the claim is allowed in the estimated amount, the claimant will be entitled to distributions only up to the amount estimated by the bankruptcy court, and the claim will otherwise be discharged under Section 1141(d) upon confirmation of a plan.[10] Similarly, the court may estimate claims pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for purposes of determining voting rights.[11] Creditors' interests are directly affected in this context as well, since disallowance or underestimation of a claim reduces or eliminates any ability the claimant may otherwise have had to affect the approval of a plan of reorganization.

A feasibility determination, in contrast, is a preliminary examination that does not directly affect any particular creditor's rights. Rather, the feasibility test is designed merely to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" In re Pizza of Hawaii, 761 F.2d at 1382 (quoting 5 Lawrence P. King Collier on Bankruptcy ¶1129.02[11] at 1129-34 (15th ed. 1984)). Courts have repeatedly held that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (emphasis added). Consequently, estimation serves a different goal for feasibility than for allowance or even voting purposes.

---

[10] This important distinction between the purposes for seeking estimation is highlighted by In re Dow Corning Corp., 211 B.R. 545 (Bankr. E.D. Mich. 1997). There, estimation of mass tort claims was sought for a number of purposes, including purportedly for plan feasibility purposes under Section 1129(a)(11). However, the court, in analyzing the plan, correctly noted that the proposed plan in that case was not a full payment plan, but rather provided that the reorganized debtor would set aside a specified dollar amount that the debtor anticipated would be sufficient to pay all claims in full, but that limited recovery to a pro rata share of the set-aside funds if such funds proved insufficient to pay all claims in full. Id. at 568. Thus the court properly concluded that "estimation is not necessary for plan confirmation purposes" because "[t]he Reorganized Debtor's ability to pay tort claims in full would simply not be an issue under §1129(a)(11) for no matter how large the actual aggregate tort liability may turn out to be, the Reorganized Debtor would clearly be able to perform the pertinent terms of the plan. If the Court estimated the aggregate claims at something within the $2 billion [to be set aside under the plan], the plan would be feasible. If the Court estimated the claims at an amount far in excess of $2 billion, the plan would still be feasible, because the Reorganized Debtor's obligation is capped by the plan at $2 billion, and the Debtor has $2 billion." Id. at 568-69. In the PG&E case, by contrast, the Plan does provide for full payment and there is no artificial cap, and it therefore is necessary to obtain a realistic estimate of the overstated Claims in order for the Court to apply Section 1129(a)(11)'s feasibility test.

[11] Bankruptcy Rule 3018(a) states, in relevant part, that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan."

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    There is no particular Bankruptcy Code provision or rule that directly addresses the

2   bankruptcy court's power to estimate claims for feasibility purposes. Nevertheless, it is clear that a

3   bankruptcy court must take into account pending lawsuits and other claims in making its feasibility

4   determination if such claims could compromise the ability of the debtor to reorganize. In re Pizza of

5   Hawaii, 761 F.2d at 1382; In re Dennis Ponte, Inc., 61 B.R. at 299. Estimation of the value of large

6   claims, in other words, has been found to be inherent in the process of determining whether the

7   debtor's reorganization plan enjoys a reasonable prospect of success and therefore is feasible.

8           While some courts have cited generally to Section 502(c) as authority for the estimation

9   of claims for feasibility purposes, it is clear that the Section 502(c) standard is not strictly applied in

10  this context. Thus, although Section 502(c) specifically authorizes estimation of only "contingent"

11  or "unliquidated" claims for allowance purposes, a feasibility determination can require the

12  estimation of any sort of disputed claims. In Pizza of Hawaii, for example, Shakey's, a national

13  franchisor of fast food outlets, entered into a dealer agreement with three individuals. Shakey's filed

14  a suit in district court against the individuals for breach of contract and trademark infringement. Id.,

15  761 F.2d at 1375. Shortly thereafter, the individuals assigned their interest in the dealer agreement

16  to Pizza of Hawaii, which filed a Chapter 11 petition the following day. Id. Pizza of Hawaii was

17  granted leave to intervene in this lawsuit after Shakey's amended its complaint to allege violations

18  of its contractual and trademark rights by Pizza of Hawaii itself. Id. at 1375. Shakey's complaint

19  requested $58,335.23 in unpaid dealer fees, but did not quantify the damages for its unfair

20  competition and trademark infringement claims. Id. at 1381. The Ninth Circuit held that "[u]ntil the

21  bankruptcy court has estimated the value of Shakey's claim, it is impossible to determine whether

22  $291,295.99 is sufficient to effectuate the plan and enable Pizza to continue in business." Id. at

23  1382. Significantly, the Ninth Circuit did not limit estimation to the unquantified or non-contractual

24  claims of the complaint, nor did it discuss whether any portion of the claim was either contingent or

25  unliquidated.

26          Similarly, in In re Nova Real Estate Investment Trust, 23 B.R. 62, the court estimated

27  disputed contract-based claims for purposes of making a feasibility determination. In that case,

28  Nova loaned money to the claimant for the purpose of purchasing land and building a condominium.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  The claimant defaulted on the loans, and conveyed the land and the nearly completed building to
2  Nova. Three years later, the claimant filed suit against Nova in state court based on these contracts.
3  Id. at 64. Nova filed a petition for reorganization under Chapter 11 two years later, while the suit
4  was still pending in state court. The claimant asserted that his claims totaled $12 million. Id. The
5  court nevertheless estimated the claims for feasibility purposes, loosely deeming them to be
6  "unliquidated" and noting that "[s]imply allowing the claim in full as stated by [the claimant] . . .
7  could have jeopardized the feasibility of the debtor's plan." Id. at 65. Rather than allow the
8  claimant to unilaterally block confirmation of the plan, the court estimated all of the claimant's
9  causes of action—even those based purely on alleged nonpayment pursuant to the terms of the
10  contracts at issue in that case. Id.

11        Thus, a bankruptcy court has the authority to estimate any disputed claim for feasibility
12  purposes if the purported value of such disputed claim could reasonably affect the success of the
13  reorganization plan. In doing so, the court need not determine that the claim is either "contingent,"
14  or "unliquidated," as those terms are defined by the courts for other purposes. If such authority does
15  not exist squarely under Section 502(c), then it in any event surely exists under Section 1129(a)(11)
16  itself, since feasibility determinations necessarily require the evaluation of any factor that might
17  reasonably be expected to materially affect the success of a reorganization plan, including the
18  existence of large outstanding disputed claims. Additionally, Section 105(a) of the Bankruptcy
19  Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or
20  appropriate to carry out the provisions of this title." The purpose of Section 105 is "to assure the
21  bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of
22  their jurisdiction." 2 Lawrence P. King Collier on Bankruptcy ¶105.01 at 105-6 (15th ed. rev.
23  2000). Accordingly, Section 105(a) of the Bankruptcy Code also provides this Court with authority
24  to estimate the Claims for feasibility purposes in order to carry out the provisions of Section
25  1129(a)(11).

26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

## C. The Claims Requiring Estimation In This Case Are In Any Event Predominantly "Contingent" Or "Unliquidated" And Therefore Must Be Estimated For Feasibility Purposes.

Even assuming arguendo that Section 502(c) was the sole basis for the bankruptcy court's authority to estimate claims for feasibility purposes and that Section 502(c) applies only to "contingent" or "unliquidated" claims even in the feasibility determination context, the Claims that PG&E seeks to have estimated in any event qualify as "contingent" or "unliquidated" claims under applicable case law.

The Bankruptcy Code does not define the terms "contingent" or "unliquidated." In general, the courts have determined that "if all events giving rise to liability occurred prior to the filing of the bankruptcy petition, the claim is not contingent." Audre, Inc. v. Casey (In re Audre, Inc.), 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997). In addition, "'whether a debt is liquidated or not . . . does not depend strictly on whether the claim sounds in tort or in contract, but whether it is capable of ready computation.'" Id. (quoting In re Loya, 123 B.R. 338, 340 (B.A.P. 9th Cir. 1991) (construing Section 109(e) to determine eligibility for relief under Chapter 13)).

Most of the bankruptcy case law construing the meaning of the term "unliquidated" analyzes Section 109(e), which governs eligibility for relief under Chapter 13.[12] The Ninth Circuit has held in this context that a dispute as to liability may render a debt "unliquidated," depending on whether resolution of the dispute would require more than a preliminary hearing. In Federal Deposit Ins. Corp. v. Wenberg (In re Wenberg), 94 B.R. 631 (B.A.P. 9th Cir. 1988), aff'd, 902 F.2d 768 (9th Cir. 1990), for example, the Ninth Circuit Bankruptcy Appellate Panel examined whether accounting and attorney fees imposed as part of a prepetition judgment constituted "liquidated" debts for purposes of Section 109(e). In doing so, the court noted that "the question whether a debt

[12]Section 109(e) provides:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than \$290,525 and noncontingent, liquidated, secured debts of less than \$871,550, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than \$290,525 and noncontingent, liquidated, secured debts of less than \$871,550 may be a debtor under Chapter 13 of this title.

11 U.S.C. §109(e).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    is liquidated 'turns on whether it is subject to ready determination and precision in computation of

2    the amount due.'" Id. at 634 (quoting Fostvedt v. Dow (In re Fostvedt), 823 F.2d 305, 306 (9th Cir.

3    1987)). The Wenberg court went on to explain that:

4            The definition of "ready determination" turns on the distinction between a
         simple hearing to determine the amount of a certain debt, and an extensive
5        and contested evidentiary hearing in which substantial evidence may be
         necessary to establish amounts or liability. (Wenberg, 94 B.R. at 634
6        (emphasis added))

7    In other words, a dispute as to liability may render a claim unliquidated.

8            Similarly, in Nicholes v. Johnny Appleseed of Washington (In re Nicholes), 184 B.R. 82

9    (B.A.P. 9th Cir. 1995), the Ninth Circuit Bankruptcy Appellate Panel reviewed a bankruptcy court

10   determination that the debtor was ineligible for Chapter 13 relief under Section 109(e) due to

11   excessive contingent and/or liquidated debts. The debtor argued that certain debts that the

12   bankruptcy court had determined to be noncontingent were in fact contingent and/or unliquidated

13   because they were earned in the name of his company.

14           The Nicholes court first noted that Section 109(e) "excludes unliquidated or contingent

15   debts from the Chapter 13 eligibility computation, but does not exclude debts which are merely

16   disputed." Id. at 88. Although the court noted that "the terms disputed, contingent and liquidated

17   have different meanings," the court held that a dispute could, under certain circumstances, render a

18   debt unliquidated. Id.

19           The Nicholes court noted that "[a] debt is liquidated if it is capable of 'ready

20   determination and precision in computation of the amount due.'" Id. at 89. The test for this "ready

21   determination" is "whether the amount due is fixed or certain or otherwise ascertainable by

22   reference to an agreement or by a simple computation." Id. It further noted that "the term

23   'disputed' is broad and can encompass either liquidated or unliquidated debts." Id. In other words,

24   "it is the nature of the dispute, and not the existence of the dispute, that makes a claim unliquidated."

25   Id. at 90.

26           The Nicholes court specifically examined divergent lines of cases discussing whether a

27   dispute as to liability alone could render a debt unliquidated. It followed Wenberg in holding that

28   "if the dispute itself makes the claim difficult to ascertain or prevents the ready determination of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    amount due, the debt is unliquidated . . . ." Nicholes, 184 B.R. at 91.

2        Further, beyond these Ninth Circuit cases, courts throughout the country have shown a

3 flexible approach to determining what disputed claims qualify as "contingent" or "unliquidated."

4 Thus, in In re Windsor Plumbing Supply Co., 170 B.R. 503 (Bankr. E.D. N.Y. 1994), one part of the

5 claim was for a fixed amount allegedly due under invoices for merchandise shipped to the debtor,

6 and the second component of the claim was for treble damages under RICO. In estimating the entire

7 claim for voting purposes (which presumably employs a stricter standard than for feasibility

8 purposes because of the more pronounced effect on the claimholder), the court stated "[w]hile the

9 magnitude of the plaintiff's loss may be fixed, liquidated and undisputed, the extent, if any, to which

10 The Debtors caused such loss or otherwise may be liable therefore clearly is not." Id. at 521. In

11 other words, the court treated the claim as unliquidated because the debtor contested liability, not the

12 amount of the claimant's loss. See also Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.),

13 137 B.R. 811 (Bankr. D. Colo. 1992) (court estimated for allowance purposes under Section 502(c)

14 various employee claims for wages and benefits, even though claims were contract-based and

15 appeared readily calculable from collective bargaining or other employment agreements); In re

16 Interco, Inc., 137 B.R. at 993 (over claimant's objection, court estimated for feasibility purposes

17 under Section 502(c) a retirement fund's claim for withdrawal liability under ERISA, holding that

18 claim was unliquidated even though ERISA set forth formulae for calculating such liability, noting

19 that the debtor intended to challenge the actuarial assumptions upon which the fund's computation

20 was based).

21        The Claims that PG&E seeks to have the Court estimate are virtually all properly

22 considered either "unliquidated" or "contingent." Most of the Claims—such as the environmental

23 Claims and the tort Claims—fall within even the strictest definition of these terms. Others, such as

24 the generator Claims, while based on contracts or tariffs, fall well within the case law concepts of

25 "unliquidated" because they involve complex factual matters and calculations, and resolution of the

26 disputes requires more than a cursory examination. Indeed, the bulk of the generator Claims can not

27 be "liquidated" until final actions on matters pending at FERC.

28        In short, while there is and should be no requirement that large disputed claims be

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

13

strictly "unliquidated" or "contingent" to qualify for estimation for feasibility purposes under one or more Section 1129(a)(11), Section 105(a) or Section 502(c), even if one accepted the proposition that this Court only has authority to estimate "unliquidated" or "contingent" claims for feasibility purposes, there is ample authority for determining that the Claims here at issue are "unliquidated" or "contingent" and therefore can and should be estimated by the Court.

D.  As To Claims Estimation-Related Matters As To Which The Debtor Suggests That It Retain An Expert, Section 327(a) Provides Authority For Such Retention.

Section 327(a) authorizes a debtor in possession, with Bankruptcy Court approval, to employ one or more "appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor in possession] in carrying out the [debtor in possession's] duties under this title. 11 U.S.C. §§327(a); 1107(a). In a Chapter 11 case, propounding and seeking confirmation of a plan of reorganization is one of the principal responsibilities and the ultimate goal of a debtor in possession. Thus, a debtor in possession's requested retention of experts for purposes of developing evidence to assist in any required estimation process under Section 1129(a)(11) appears to be well within the ambit of Section 327(a). PG&E proposes that it submit to the Court a list of proposed experts in the various relevant subject areas (including a detailed curriculum vitae of each such proposed expert) along with its applications for retention of such experts, and that the form of order(s) appointing the experts shall expressly charge and instruct the experts to be impartial in reviewing and analyzing relevant data and formulating recommendations as to estimated values of Claims. Accordingly, PG&E, with the Court's approval following the hearing on this Motion, will move for appointment of experts to assist in those estimations that PG&E has indicated would most efficiently be aided by an expert's analysis and recommendations.

E.  Alternatively, The Court Can Appoint An Expert Pursuant To Federal Rule of Evidence 706 For The Purpose Of Receiving And Evaluating Evidence And Advising The Court In Estimating The Aggregate Value Of Claims For Feasibility Purposes.

As indicated in the foregoing paragraph, PG&E believes that the most efficient and expeditious way of enlisting expert assistance in the claims estimation process would be for PG&E to retain experts with Court approval pursuant to Section 327(a) of the Bankruptcy Code.

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

1    Nonetheless, if for any reason the Court believes that this is not the most salutary route to obtaining

2    expert assistance in the claims estimation process, there are other statutory and rule bases for the

3    appointment of experts to assist the Court. Most prominently, there is express authority for the

4    Court to appoint its own expert under the Federal Rules of Evidence, which apply to cases under the

5    Bankruptcy Code. See Fed. R. Bankr. P. 9017.

6            More particularly, Rule 706 of the Federal Rules of Evidence states:

7        The court may on its own motion or on the motion of any party enter an
order to show cause why expert witnesses should not be appointed, and may

8        request the parties to submit nominations. The court may appoint any expert
witnesses agreed upon by the parties, and may appoint expert witnesses of

9        its own selection. (Fed. R. Evid. 706(a))

10            Even before the adoption of Rule 706 of the Federal Rules of Evidence, the importance

11    and historical role of court-appointed experts was recognized. In re Joint E. & S. Dist. Asbestos

12    Litig. (In re Johns-Manville Corp.), 830 F. Supp. 686, 692 (E.D.N.Y. & S.D.N.Y. 1993) (citing

13    Scott v. Spanjer Bros., Inc. 298 F.2d 928, 930 (2d Cir. 1962) ("[a]ppellate courts no longer question

14    the inherent power of a trial court to appoint an expert under proper circumstances, to aid it in the

15    just disposition of a case . . . . [t]he appointment of an impartial . . . expert by the court in the

16    exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair

17    trial of a lawsuit").

18            Although the appointment of court-appointed expert assistance under Rule 706 is not

19    commonplace, the power is well recognized, and it is an important tool for dealing with "some of

20    the most demanding evidentiary issues that arise in federal courts." 830 F. Supp. at 693 (citing

21    Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts

22    Appointed Under Federal Rule of Evidence 706 4-5 (Fed. Jud. Center 1993)). Judge Weinstein

23    listed several factors which, "alone and in combination," justified the appointment of such experts in

24    connection with a bankruptcy case: the questions are "complex and riven with uncertainties and

25    interdependent variables"; the number of people affected is large; the courts "cannot proceed toward

26    a just and equitable result without some reasonably firm data"; and "all parties have strong and

27    conflicting interest in the character of that data." Id. The court further noted its obligations to

28    oversee a complex bankruptcy reorganization, which "cannot be met without the oversight court

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1 having a solid grounding in fact." Id. (citing In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-

2 Manville Corp.), 982 F.2d 721, 750 (2d Cir. 1992)).

3       The Johns-Manville litigation presents a good example of the use of an expert appointed

4 under Rule 706 in a claims-related context. There, a class action suit was brought by beneficiaries

5 of an insolvent bankruptcy trust, which sought to establish an equitable distribution of the trust res.

6 The district court judge (overseeing the bankruptcy plan's implementation jointly with the

7 bankruptcy court) appointed an expert to advise the court pursuant to Rule 706. See Johns-Manville

8 Corp., 982 F.2d at 728-30. "Among the tasks assigned to [the expert] were reporting to the [c]ourt

9 on the feasibility of providing accurate estimates of future claims upon the Trust . . . ." Id. at 731.

10 The district court had recognized that a major issue in the administration of the trust would be the

11 proper allocation of the proceeds between payment of current claims and maintenance of a reserve

12 for future claims. See id. "Critical to that allocation would be estimates of the number of future

13 claimants." Id.

14       When the parties objected to the court's adoption of the expert's interim Rule 706

15 report, the court responded, wholly apart from the class action portion of the case, "we have no

16 doubt of the Court's authority to exercise its bankruptcy court powers to appoint experts to advise it

17 on matters that concern the ongoing administration of the Chapter 11 proceeding." Id. at 750. The

18 court ruled that the appointment of such an expert was not "in conflict with the mechanism

19 contemplated by the [class action settlement] for estimation of future claims" and that the trust

20 beneficiaries "lack the power to impair the authority of the Bankruptcy Court to exercise its retained

21 powers under the Plan to implement the Plan." Id. Further, the court expressed "no doubt that the

22 role of the experts is within the broad authority of Rule 706." Id. (citing Scott, 298 F.2d at 930).

23       Another case considering the use of Rule 706 experts in the claims estimation process is

24 In re Dow Corning Corp., 211 B.R. at 554. There, the debtor had moved for the appointment of a

25 panel of experts to estimate mass tort claims for a variety of purposes. The court denied the motion

26 for estimation because estimation was not necessary or appropriate for feasibility purposes since the

27 plan was feasible on its face insofar as the debtor's ability to discharge its obligations under the plan

28 was concerned. Id. at 568-69; see also footnote 10, supra, for a more detailed explanation of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  holding. As a lesser-included proposition, the court also declined to appoint a panel of experts,

2  since no estimation was necessary. Id. at 590-91. However, at the same time, the court noted the

3  bankruptcy court's power to appoint its own expert witness under Rule 706 of the Federal Rules of

4  Evidence. Id. at 591.[13]

5  In light of the complex issues attendant to the claims estimation process and the broad

6  authority conferred under Rule 706, this Court can and should proceed with the appointment of one

7  or more experts under Rule 706 if the Court for any reason is not comfortable authorizing PG&E to

8  retain an expert pursuant to Section 327(a). One way or another, the use of experts is a sensible

9  approach to moving forward with and timely concluding the claims estimation process without

10  causing an undue burden on the Court.

11  F.  In The Alternative, The Court May Exercise Its Discretion Under Section 105(a) To
        Appoint An Assistant For Claims Estimation Purposes.

12

13  Section 105(a) confers on bankruptcy courts the power to issue "any order, process or

14  judgment that is necessary or appropriate to carry out the provisions of this title," and confers

15  equitable powers upon the bankruptcy courts. Old Orchard Inv. Co. v. A.D.I. Distrib., Inc. (In re

16  Old Orchard Inv. Co.), 31 B.R. 599 (W.D. Mich. 1983). Where necessary and appropriate, courts

17  can and should rely on Section 105(a) to appoint third persons to assist in resolving various issues

18  that arise in a bankruptcy case.

19  For example, in a case involving a debtor's motion to reject its collective bargaining

20

21  [13]The Dow Corning court noted that there is some tension between the lack of authority for

22  appointing special masters in bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure
    9031, on the one hand, and the express authority for bankruptcy judges to appoint experts under

23  Federal Rule of Evidence 706, on the other, and questioned whether the appointment of a panel of
    experts as requested by the debtor would constitute the unauthorized appointment of a special

24  master. The court deemed the issue "of no significance" in light of its prior ruling that estimation
    under Section 1129(a)(11) was not required, and the court therefore did not reach or decide the

25  issue. Id. at 591. PG&E submits that there should be and is little doubt that a bankruptcy court has
    authority to appoint an expert to assist in the fact-finding process on time-consuming or complex

26  issues, since the Bankruptcy Rules expressly makes the Federal Rules of Evidence (including Rule
    706) applicable to bankruptcy cases. Further, and in any event, because the Dow Corning court did

27  not fully discuss or vet the issue, it failed to appreciate that the function of an expert under Rule 706
    is not to make the fact-finding decisions, but to render opinions and/or recommendations to assist

28  the bankruptcy court as the ultimate trier of fact.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1 agreement with a union pursuant to Section 1113, the debtor and a union were unable to reach a

2 compromise on the debtor's desire to reject. In re Royal Composing Room, Inc., 62 B.R. 403, 405

3 (Bankr. S.D.N.Y. 1986). While the court noted that Section 1113 provides no mechanism for the

4 court to appoint a mediator, it stated that Section 105(a) might permit the creation of the office of

5 "labor negotiator." See id. (citing In re Johns-Mansville Corp., 36 B.R. 743, 758 (Bankr. S.D.N.Y.

6 1984) (appointment of representative for future claimants appropriate as "courts readily use their

7 equitable powers to protect the substantive rights of persons similarly situated who are not before

8 the court); United States v. Sutton, 786 F.2d 1305, 1307 (5th Cir. 1986) (Section 105(a) simply

9 authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the

10 substantive provisions of the Bankruptcy Code)).

11 In considering other options, that court contrasted the broad authority conferred by

12 Section 105 with the narrower functions accorded specific actors in the bankruptcy context, such as

13 a trustee, examiner, special master, or Rule 706 expert:

> A trustee would supplant the debtor-in-possession, not assist it. An
> examiner's role is investigative. The court need not consider whether a
> special master might be able to so function as the bankruptcy court is
> forbidden to appoint a special master. See Bankruptcy Rule 9031.
> Although the bankruptcy court could appoint an expert under Rule 706(a) of
> the Federal Rules of Evidence, an expert's function would appear to be
> limited to rendering opinions to assist the court as the trier of the fact to
> understand the evidence or to determine a fact in issue. See Rule 702 of the
> Federal Rules of Evidence and Bankruptcy Rule 9017. (Id.)

19 Thus, although declining to exercise its power under Section 105, the court suggested that the

20 authority conferred by the section is both broad and flexible in comparison to the specialized

21 purposes of other Bankruptcy Code provisions.

22 Should the Court for any reason not want to authorize PG&E to retain experts pursuant

23 to Section 327(a) and find that the tasks required of an advisor in the claims estimation process

24 exceed the bounds of authority conferred by Rule 706 of the Federal Rules of Evidence, Section

25 105(a) represents a broader and more flexible grant of authority to this Court, enabling it to exercise

26 its discretion in the furtherance of other, substantive Bankruptcy Code provisions, such as the fact-

27 finding required in order to make the Plan feasibility determination required under Section

28 1129(a)(11).

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

1    We turn now to a fuller description of the Claims requiring estimation and the proposed

2    processes for moving forward with the estimation of the several categories of Claims. We pay

3    particular attention to the environmental claims category because it well illustrates the types of

4    overstatement and overlap (and the range of complex factual issues) that require estimation for

5    feasibility purposes, and two different potential approaches to the estimation process.

6

7                                              III.

8                               ENVIRONMENTAL CLAIMS

9           PG&E believes that the actual amount of environmental liabilities attributable to PG&E

10   is a small percentage of the amounts asserted, which are dramatically overstated. By the very nature

11   of these environmental Claims, finally adjudicating and liquidating these Claims insofar as they may

12   be attributable to PG&E will be a long and complex process, conceivably stretching over years.

13   Such a process would inordinately consume the Court's and the Debtor's time and resources, delay

14   progress of the case, and frustrate the effort to reorganize, to the detriment of the estate and its

15   creditors.[14]  Therefore estimation of the environmental Claims is essential.

16        A.   The Value Of Environmental Claims Against PG&E Is Vastly Overstated.

17          The State of California ("State"), through the Department of Toxic Substance Control

18   ("DTSC"), the Regional Water Quality Control Boards ("RWQCBs"), and other divisions, has filed

19   eight Claims involving alleged environmental liability at approximately 535 sites throughout

20   California, and asserts that PG&E owes three-quarters of a billion dollars in related cleanup,

21   oversight and monitoring costs, as well as other costs and penalties.[15]  Private party claimants and

22

23          [14]Indeed, it is in part because of the complexities and long-term horizon in resolving many
     environmental claims that the Plan Proponents, at the urging of key environmental claimants, have
     provided for unimpaired, pass-through treatment under the Plan for all timely asserted
24   environmental claims, meaning that for virtually all purposes such claims will be resolved in the
     ordinary course under applicable non-bankruptcy law in non-bankruptcy forums. See Plan §4.18.
25   Thus, by virtue of the provisions of the Plan, there will not be any need for the Court to actually
     allow or disallow any timely asserted environmental claims, since the whole point of the pass-
26   through treatment is to provide that environmental claims will be determined by non-bankruptcy
     courts and enforced by the claimants as if the bankruptcy case had never been commenced.

27          [15]See, e.g., Claim Nos. 12680-12682 filed by DTSC and Claim Nos. 12684, 12689-12692 and
28   12694 filed by various Regional Water Quality Control Boards.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  local or quasi-governmental agencies (collectively "Non-State Claimants") have filed 113 Claims

2  involving alleged environmental liability at a number of these same sites, as well as at other sites in

3  California. These Non-State Claimants collectively assert PG&E owes approximately $259 million

4  for PG&E's alleged share of cleanup, oversight, monitoring and other costs and penalties. The total

5  for environmental Claims thus is approximately $1 billion.

6  The actual amount of environmental liabilities attributable to PG&E is a small

7  percentage of the Claims values submitted by the State and Non-State Claimants (collectively

8  "Environmental Claimants"). This is perhaps understandable in that the Environmental Claimants'

9  claimed amounts are often calculated based on the maximum, most far-fetched theoretical exposure

10 under environmental laws, since the Environmental Claimants are motivated to preserve their rights

11 to assert claims, rather than to try and determine the actual probable liability of the Debtor. Thus,

12 without intending this observation as a criticism of the Environmental Claimants, their cost

13 estimations are frequently without regard for the ultimate legal, factual, technical and practical

14 considerations applied by state and federal courts in resolving environmental claims and allocating

15 costs among potentially responsible parties ("PRPs"), and their cost estimations therefore bear little

16 relation to any real or probable liability outcomes.

17  1.  The State's Inflated Environmental Claims.

18  The hyperinflated amount of the State's estimates is illustrated by three of the State's

19 Claims. In these three Claims alone—Casmalia Landfill, GBF/Pittsburgh Landfill and the

20 "Substation Sites"—the State asserts that PG&E is solely responsible for $432 million in cleanup

21 costs. That amount of liability is extremely far-fetched and unrealistic.

22  a.  Many Other Financially Viable Parties, Including DTSC, Also Are
       Responsible Parties At The Casmalia Landfill, And PG&E's Share Of That
23     Liability Is A Small Percentage Of The Amount The State Is Claiming.

24  The Casmalia Landfill in Central California is being closed under the direction of the

25 Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental

26 Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq. During its

27 operation, over 10,000 entities, including the State, PG&E and many Fortune 500 companies, sent

28 hazardous wastes for disposal at this site. About 50 of those parties, including PG&E, have formed

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 a steering committee that has entered into a judicially approved consent order with EPA to
2 investigate the landfill contamination, establish the appropriate remedy, and install a functioning
3 remedial system. EPA has filed a claim in this bankruptcy case maintaining its authority to direct
4 PG&E regarding PG&E's allocated share of costs at Casmalia.[16] PG&E does not plan to object to
5 that claim.

6 Notwithstanding the foregoing, DTSC has filed a Claim alleging PG&E owes it $294
7 million for Casmalia—the total cost for cleaning up the landfill.[17] The State's Claim overlooks the
8 following facts: (1) over 10,000 entities are responsible for waste disposal at the site; (2) PG&E
9 contributed less than 5.2% of the manifested waste sent there; (3) the State itself is a responsible
10 party at the site and contributed a significant volume of waste to the site; (4) EPA brought the
11 enforcement action, not the State; (5) substantial remediation work already has been completed at
12 the site under an agreement with EPA; (6) PG&E already has paid most of the costs it owes under
13 that agreement; and (7) the agreement with EPA looks to other, additional parties as responsible for
14 ongoing cleanup activities through the point where a final remedy is implemented. Those other
15 parties include many large, financially viable companies.

16 The State's $294 million Casmalia-related Claim apparently rests upon the theory that
17 should it ever file an action (even though EPA already has done so), joint and several liability
18 theoretically could be available under environmental statutes such as CERCLA. The State might
19 then require PG&E to pay for the entire $294 million cleanup, despite PG&E's status as but one of
20 thousands of companies that sent waste to the site, and despite EPA's ongoing enforcement of
21 CERCLA.

22 However, in reality, where, as here, EPA has brought claims against numerous
23 financially viable PRPs, joint and several liability is virtually never applied to require a single PRP
24 to pay the entire cost of the cleanup.[18] Indeed, such a requirement would contravene Congress'

25

26 [16]Claim No. 12677.

27 [17]Claim No. 12682, at Exhibit 1, Table H. The amount claimed appears to be for all costs associated with the cleanup of the entire Landfill, including oversight costs, fines and penalties.

28 [18]United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-21-

1    express intent that the financial burden of cleaning up hazardous waste sites be allocated fairly

2    among all parties responsible for the creation and disposal of the waste.[19] Pursuant to Section 113(f)

3    of CERCLA and Rule 14(a) of the Federal Rules of Civil Procedure, each PRP can bring a claim for

4    contribution seeking equitable allocation of cleanup costs during (or after) an action brought by EPA

5    or DTSC.[20] Further, if a PRP can prove its waste did not contribute to the cleanup costs or only

6    contributed to a divisible portion of the harm, there will be no liability for those unrelated costs.[21]

7       The practical result is that before significant cleanup costs are paid, they are virtually

8    always apportioned amongst the PRPs (here, including DTSC) in accordance with a variety of legal

9    and equitable factors. Those equitable factors often include the so-called Gore Factors,[22] though

10    courts are not limited to those factors and may consider any facts relevant to allocating

11    responsibility.[23] Particularly in situations involving landfills, courts have allocated cleanup costs

12    according to the relative percentages of waste a PRP contributed, taking into account variations for

13    the relative toxicity of the wastes contributed.[24]

---

[19] Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994, 998 (D.N.J. 1988).

[20] Mathis v. Veliscol Chem. Corp., 786 F. Supp. 971, 976 (N.D. Ga. 1991).

[21] Prisco v. New York, 902 F. Supp. 374 (S.D. N.Y. 1995).

[22]  (i)    the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

    (ii)    the amount of the hazardous waste involved;

    (iii)    the degree of toxicity of the hazardous waste involved;

    (iv)    the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

    (v)    the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristic of such waste; and

    (vi)    the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

126 Cong. Rec. 26,779, 26,781 (1980). The legislative history of the Superfund Amendments and Reauthorization Act of 1986 cites the Gore factors as criteria that a court might consider in apportioning liability under Section 113(f)(1). H.R. Rep. No. 99-253 (III) (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042.

[23] Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 673-674 (5th Cir. 1989); Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508-509 (7th Cir. 1992).

[24] In re Bell Petroleum Serv., Inc., 3 F.3d 889, 895-903 (5th Cir. 1993) (adopting volumetric approach to apportioning harm); Kamb v. United States Coast Guard, 869 F. Supp. 793, 799 (N.D.Cal. 1994) (same); Bancamerica Commercial Corp. v. Trinity Indus., Inc., 900 F. Supp. 1427, ( . . . continued)

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

1    Accordingly, PG&E's actual liability at the Casmalia Landfill is but a fraction of the

2    $294 million amount set forth in the State's Claim, and such Claim can and should be estimated for

3    feasibility purposes.

         b.    PG&E Previously Settled All Its Obligations At The GBF/Pittsburgh
4                Landfill, And Other Parties Are Performing The Cleanup There, Secured By
5                A $120 Million Insurance Policy.

6    The State's Claim asserts that PG&E has over $37 million in liability for cleanup of the

7    GBF/Pittsburgh Landfill, again apparently on the theory that PG&E could be jointly and severally

8    liable for the entire cost of cleaning up the site. As with Casmalia, the State's Claim overlooks

9    crucial facts, such as: (1) hundreds of parties have sent waste to this landfill over many years;

10   (2) DTSC's cleanup orders regarding the landfill list between 50 and 100 responsible parties, many

11   of which are large, financially viable entities; and (3) PG&E contributed less than 1% of the waste at

12   the site. The issues identified above with respect to the Casmalia Landfill apply equally here, and

13   PG&E's actual responsibility for the GBF Landfill is a minor percentage of the $37 million amount

14   asserted in the State's Claim.

15   Practically speaking, PG&E's actual dollar exposure at the GBF/Pittsburgh Landfill is

16   likely zero. Many of the responsible parties identified by DTSC in its cleanup order, including

17   PG&E and the former landfill owner and operator, have entered into a settlement agreement for the

18   GBF site. Under the terms of this agreement TRC, a reputable remediation company that has

19   successfully remediated several sites, took possession of the GBF site and is undertaking the cleanup

20   obligations there. As part of the settlement, TRC's performance has been secured by $120 million

21   in insurance, and PG&E is indemnified for all claims by any person or agency arising out of the

22   contamination. In fact, DTSC has been working with TRC over the past year on implementation of

23   a final remedial action plan ("RAP") for the site. In short, there is another responsible, viable party

24   and significant insurance fully covering the liabilities for which the State has now asserted the same

25   Claim against PG&E, no doubt trying to preserve all of its potential rights and claims. But this

26

27   1473-1474 (D.Kan. 1995) (allocating by volume and toxicity), aff'd in part, rev'd in part on other
28   grounds, 100 F.3d 792, 802-803 (10th Cir. 1996).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-23-

1  "hedging" by the State, while understandable as a means of protecting its theoretical right to assert a
2  joint-and-several-liability claim against PG&E, in no way realistically measures PG&E's "true" or
3  likely remaining liability, which in fact is zero. Thus, if PG&E is correct, the State's Claim relating
4  to the GBF/Pittsburgh Landfill should be disregarded (i.e., valued at zero) for feasibility purposes.

5           c.    The State's $100 Million Claim For Substation Contamination Is
6                Speculative And Contrary To Fact.

7        The State's Claim asserts that PG&E owes $100 million for hundreds of substations
8  scattered across Northern California,[25] several of which are no longer owned or operated by PG&E.
9  The State claims this $100 million (about $300,000 for each substation) is for "future investigation
10 and remedial action" of polynuclear aromatic hydrocarbons ("PAHs") and PCBs. The only
11 documentation it has submitted for this Claim, however, is an alphabetical list of 301 substations.
12 The State concedes its estimates are based upon "minimal information" and premised upon the
13 "assumption" that it will be forced to undertake cleanup at all these sites. Further, the State
14 essentially admits it has virtually no evidence of contamination at these sites.

15       The State's assumption that remediation is or may be required at all these 301 sites, and
16 its claim that PG&E is a "significant source" of contamination, are factually unsupported. For
17 example, the State listed all 32 substations in San Francisco as sites that allegedly contributed to its
18 $100 million estimate. The State apparently made this claim without investigating any of those
19 substations, since it is improbable that many of the listed substations could be the source of soil or
20 groundwater contamination. For example, 13 of the listed substations are located within buildings
21 or concrete vaults and have at least one, and often several, concrete building floors between the
22 substations and any soil or groundwater. One of those substations is located on the 54th floor of the
23 Bank of America building in downtown San Francisco. Further, not all of the equipment in
24 substations listed in the Claim of the San Francisco Bay Regional Water Quality Control Board is
25 classified as PCB equipment, which significantly impacts remediation costs. Similar facts apply to
26

27      [25]Claim No. 12690 by the San Francisco Bay Regional Water Quality Control Board
28 ("SFBRWQCB"), at 2 and Exhibit 2.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-24-

1    the City of Oakland substations listed by the State.

2        In addition, the San Francisco Bay Regional Water Quality Control Board is aware of

3    PG&E's pilot program for investigation of substations. As part of that program, 12 larger

4    substations were selected for testing, and over 200 soil samples were taken in close proximity to the

5    electrical equipment at those substations. None of those samples detected PAHs, and none

6    contained PCB concentrations at or above actionable levels. Consequently, the data that is available

7    on these sites indicates the State's estimates of cleanup costs are vastly overstated, if not entirely

8    speculative. Absent factual support that an identifiable and imminent threat of harm to the public

9    health and welfare or the environment exists, these claims should fairly be valued at zero.

10    Accordingly, here too it is appropriate that PG&E have the opportunity to have this Court review

11    and estimate the State's Claim for Plan feasibility purposes.

12        2.    PG&E Already Has Settled Its Liabilities At A Number Of Sites Which The
              Claimants Include Within Their Respective Claims.

13

14        PG&E has previously entered into Consent Decrees and other Settlement Agreements

15    resolving its liability for at least seven of the sites listed by the State in its Claims, including, for

16    example, the Casmalia and GBF Landfills discussed above. Pursuant to these Consent Decrees and

17    Settlement Agreements, PG&E has liquidated its obligations for the presence of contaminants at

18    these sites.

19        The State unaccountably assigns a value of $340,058,178 to those sites, claiming PG&E

20    is 100% responsible for those costs, when it knows PG&E has already paid its allocable share of the

21    cleanup costs in settlement either to EPA, the State itself, or to other PRPs. Under these Settlement

22    Agreements, the other PRPs are contractually obligated to pay for cleanup. Under the Consent

23    Decrees, EPA or the State itself have provided contribution protection to PG&E. Thus, PG&E

24    believes the actual value of the State's claims for these eight sites is $0, and the Court should thus

25    examine and estimate this Claim for feasibility purposes.

26        3.    Claimants Estimate Total Cost Rather Than Present Value.

27        The State further inflates its Claims by failing to recognize that cleanup of a

28    contaminated property is a multi-phased project and that costs are not incurred or paid all at once or

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation