immediately. Rather, the costs of investigation, remediation and monitoring are spread out over an extended period. Based on PG&E's experience, the average time for cleaning up manufactured gas plant ("MGP") sites is in excess of six years, with smaller costs incurred in the early years. The time required to clean up a landfill could be decades depending upon the size of the landfill and the nature of the contamination. Remediation costs at other types of sites are similarly spread out over time.

Nonetheless, the State's claims are styled as if the entire inflated or phantom amounts are to be paid all at once. However, the relevant consideration is the expected annual expenditures of PG&E for environmental liabilities, and PG&E's annual cost for environmental liabilities is far less than the State suggests. PG&E incurred expenditures of approximately $16 million for its entire hazardous substances cleanup program in 1999, and approximately $18.5 million in 2000. PG&E's cleanup budget for 2001 and 2002 are consistent with the amounts expended in prior years. There is no legitimate reason why this measured, empirical approach to addressing contamination at sites for which PG&E has liability should suddenly be ignored or cast aside, particularly in light of the pass-through treatment of environmental claims under the Plan. See footnote 14, supra.

4. The Environmental Claims Filed By The Non-State Claimants Are Similarly Inflated.

Claims filed by non-state claimants are similarly flawed legally and factually, or are otherwise inappropriately valued. Many of these Claims overlap those of the State, and often are based on invalid assumptions. In some the claimant is itself a PRP and the asserted value of such Claims is not always limited to that portion of costs incurred that exceeded or is likely to exceed the claimant's own equitably allocated share. The following examples illustrate some of the complex issues raised by these frequently overlapping Claims.

- The City and County of San Francisco has filed a Claim regarding various sites that it collectively values at over $75 million. Many of these Claims, such as the $56 million Claim relating to the Potrero Power Plant ("PPP"),[26] address sites that are the subject of claims filed by

---

[26] Claim No. 12640.

multiple claimants and typically involve a complex land use history. $37 million of this $56 million Claim apparently is based on a contractual obligation by PG&E to Mirant Corporation for remediation of the power plant site as the new plant is built. PG&E believes that the City has no standing under the contract or relevant environmental law to assert the Claim. In addition, the City is itself a PRP because its adjacent property was historically used as a sugar refinery, steel mill and towing yard.

- The City of Vallejo has filed two Claims regarding a single MGP site in Vallejo, each for over $33 million, which MGP site is also subject to two State Claims in excess of $1.6 million.[27] In addition to being duplicates, these Claims are materially overstated because they seek cleanup costs for environmental conditions associated with the long history of industrial uses in the area, including ship building, auto wrecking, fuel storage, and Kaiser steel operations, with which PG&E was not involved.

B. If The Environmental Claims Must Be Estimated On A Claim-By-Claim Basis, Utilization Of A Court-Appointed Expert To Assist Will Materially Streamline The Estimation Process.

Not only are the environmental claims in the main grossly inflated and premised upon overly generalized legal principles, but the State in particular and others in general disregard the scientific and factual inquiries necessary to derive technically valid and scientifically supportable valuations. Because the environmental claimants have taken such an expansive approach to valuation, if the Court determines that the estimation process must proceed on a Claim-by-Claim basis (rather than a statistical approach to estimating the environmental Claims in the aggregate, as discussed in Part III.C. below), PG&E will be required to challenge most Claims as to hundreds of sites, and the Court will need to estimate the amounts properly attributable to these Claims. An expert skilled in evaluating such claims could facilitate this process, as explained below.

In undertaking this estimation process, the Court should follow applicable environmental law as closely as possible.[28] For example, where equitable allocations among

---

[27] Claim Nos. 9805, 10598.
[28] In re National Gypsum Co., 139 B.R. 397, 415 (N.D.Tex. 1992).

multiple responsible parties are appropriate, as is typically the case, a claim should reflect only the Debtor's allocated share.[29] Estimating the actual values allocable to PG&E will require an understanding of the allocation decisions of multiple state and federal non-bankruptcy courts applying sometimes divergent and contradictory state and federal substantive law and complex scientific evaluations to an array of factual scenarios. Simply determining how estimated environmental liability should be allocated at each of hundreds of sites will be time consuming.

For example, depending upon the source of a release, the chemical(s) released, and the types of media impacted, various agencies could have overlapping and conflicting jurisdiction.[30] Each of these agencies has its own statutory authority, standards, procedures, methods and requirements for public input, enforcement mechanisms, preferred scientists, consultants and attorneys, allocation procedures, and cleanup obligation enforcement. In addition, any number of overlapping state and federal statutes could be implicated in a given claim.[31] Each of these statutes has its own standards for establishing liability, the basis for cost recovery, cleanup procedures, standards and goals, and recoverable costs and penalties. Given this complex overlap of enforcement agencies and statutes, simply determining which standards of liability apply and what costs are appropriate will be time consuming.

Further complicating the estimation process is the need to determine whether a particular site presents a risk to the public health and welfare or the environment. Determining this issue is a condition precedent to assessing environmental liabilities, and may involve an assessment by scientific and environmental remediation experts who often differ among themselves.[32]

---

[29] Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re A.H. Robins Co., 880 F.2d 694 (4th Cir. 1989).

[30] E.g., DTSC, RWQCBs, EPA, California Department of Health Services, various California Air Quality Management Districts, California Department of Fish and Game, California Attorney General, and other certified local oversight agencies.

[31] E.g., the Federal Clean Water Act ("CWA"), Clean Air Act ("CAA), Toxic Substance Control Act ("TSCA"), Resource Conservation and Recovery Act ("RCRA"), CERCLA, and California's Hazardous Substance Account Act ("HSAA"), Porter-Cologne Water Quality Control Act, common law claims such as nuisance and trespass law, Proposition 65, and the Fish and Game Code.

[32] E.g., chemists, geologists, hydrogeologists, toxicologists, environmental engineers and health risk assessors.

Experts and attorneys typically undertake studies and reach agreement to determine, among other things, (1) the nature and extent of the investigation required, (2) the extent of the contamination, (3) the feasibility and appropriateness of a remedial approach, including its cost-effectiveness, (4) which party is responsible for which portion or volume of the contamination, (5) whether a threat to the public health and welfare or the environment exits, (6) which cleanup standards should apply, (7) the feasibility of attaining those standards, (8) the best remediation methods to use under a given set of circumstances, and (9) what type of post-remediation monitoring is appropriate. Each of these factors can impact the cost of cleanup at a site and may need to be evaluated prior to determining whether a cleanup is warranted, and if so the cost, which in turn provides the basis upon which the estimate of the claims asserted against PG&E can be determined.

Further, in the common situation where multiple parties have owned, operated at, or contributed to the contamination at a site, the Court will need to allocate the costs of cleanup among those parties since PG&E as a practical matter only has real-world liability for its allocable share. Application of these equitable apportionment factors is factually intensive.[33] It can involve generating, presenting and assessing volumes of historical, technical and financial information, much of it in the form of expert opinion. The discussion of Claims filed by the City and County of San Francisco and the City of Vallejo demonstrate the complexity of the issues of property ownership, overlapping releases of contaminates, hydrogeology and chemistry that can be involved in allocating liability.

If the Court determines to estimate the environmental Claims on a Claim-by-Claim basis, the Debtor's retention of an expert pursuant to Section 327(a) (or the Court's appointment of an expert pursuant to Rule 706 or Section 105), who could develop the relevant facts and make recommendations regarding the governing law, the allocation of liability and ultimately PG&E's probable liability, would greatly streamline the estimation of these Claims for feasibility purposes.

---

[33] The courts are not limited to the Gore Factors and may consider any fact or set of factors that reasonably relate to a PRPs "fault" in allocating liability. United States v. Rohm & Haas Co., 939 F. Supp. 1142, 1151 (D.N.J. 1996). See, e.g., Amoco Oil v. Borden, Inc., 889 F.2d at 673-674 (applying Gore Factors).

Case: 19-30088    Doc# 2844-11    Filed: 07/02/19    Entered: 07/02/19 18:16:23    Page 4 of 19

C. A Statistical Approach To Estimation Of Environmental Claims In The Aggregate, With The Assistance Of An Expert, Appears To Be A More Efficient Estimation Alternative.

As is set out in the foregoing discussion, estimation of the value of the environmental claims brought by the State and private parties could prove to be a very lengthy, fact intensive and legally challenging endeavor, requiring a technical and legal analysis of the specific conditions and history at the many sites listed in the various Claims. This effort will be complicated by the need to deal with the many sites where no cost has been assigned for site remediation or where, as exists in many instances, duplicate or overlapping claims have been submitted.[34]

As the Court is aware, the Plan provides that all environmental claims will pass through the bankruptcy unimpaired. Plan §4.18. For this reason, the issue for the Court's consideration is in reality not the estimated aggregate amount of the environmental Claims at present, but rather, the amount of expense the reorganized Debtor can expect to face in the future on an annual basis as a result of the environmental liability upon which the environmental Claims are based. Thus, a more reasonable approach to estimating the value for sites where PG&E has not already resolved its liability through settlements or the entry of judicially approved Consent Orders is to utilize a statistical analysis to estimate the value of these Claims as they will be incurred over time.

For the past 15-plus years, PG&E has, under the supervision of State agencies, conducted an ongoing contamination remediation program[35] to address environmentally impaired sites. PG&E's budgeting and planning for the future of this remedial program remains consistent with the trend in past expenditures and resource commitments. PG&E expects, and there is no reason to believe otherwise, that this rate of expenditure and resource commitment will remain consistent into the future.

---

[34] In fact, government agencies have themselves filed duplicate and overlapping claims. The City and County of San Francisco, the DTSC and the SFBRWQCB have all filed claims for the Potrero Power Plant site; the DTSC and the Central Valley Regional Water Quality Control Board have filed claims for the Kern Power Plant Facility, while the DTSC and the SFBRWQCB have filed claims for Station T in San Francisco.

[35] See Motion for Authority to Continue Hazardous Substance Cleanup Program; Memorandum of Points and Authorities (docket no. 801), and supporting Declaration of Robert Doss (docket no. 802), filed with the Court on June 6, 2001, which together provide a detailed description of PG&E's historical remediation program and of agency oversight of that program.

Based upon PG&E's history of expenditures and its experience and expertise in implementing remedial programs, it is reasonable for the purposes of estimation to utilize this historical information to derive a statistically and practically significant estimate of the realistic value of the PG&E's true liability on a going-forward basis. Implementing a statistical procedure to estimate these claims in the aggregate will eliminate the need to undertake the expensive and time-consuming process of determining the value for each of the sites for estimation purposes, while simultaneously providing the Court with an acceptable method to reasonably estimate all of the environmental Claims for feasibility purposes.

Another advantage to the approach of estimating environmental Claims in the aggregate based on statistical methodology is that there is no need to determine the significance, for Plan feasibility estimation purposes, of POCs that do not state or incorporate any specific dollar amount. Under the statistical approach to estimation that takes into account a variety of historical and current data to estimate go-forward environmental liabilities in the aggregate, it is irrelevant whether any particular POC states a dollar amount because the whole range of probable environmental liabilities should in any event be included in the statistically-based estimation. On the other hand, if a Claim-by-Claim approach is taken, one must decide what (if any significance) should be accorded to a POC that fails to state any amount, i.e., whether such Claim must be estimated, or whether such Claim should not be considered for feasibility purposes because it states no amount and therefore should be presumed to be a zero dollar amount.[36]

If the Court determines to proceed with the statistical approach to estimating claims in the aggregate, either PG&E should be authorized to retain pursuant to Section 327(a), or this Court should retain pursuant to Rule 706 of the Federal Rules of Evidence or Section 105(a), an expert qualified in assessment of environmental liabilities based on statistical analysis and extrapolation.

The estimation process selected, whether it be a technical/legal analysis of all sites set

---

[36] If the Court determines to proceed on a Claim-by-Claim approach to estimation with respect to any category of Claims, PG&E proposes that any POC in such category that does not state or incorporate any dollar amount should be valued at zero for Plan feasibility purposes, since there is little basis to begin analyzing or estimating a Claim where the claimant has not been specific enough to state a dollar amount.

out in the environmental Claims, on the one hand, or a statistical analysis based on historical remediation efforts, on the other, will dictate the character of the estimation expert required for the process. In either case, the effort will require material time of one or more experts with significant technical expertise in working with large volumes of information and data.

## IV.

## GENERATOR CLAIMS

Sellers of power and ancillary services ("Generators") to the Power Exchange Corporation ("PX") and Independent System Operator ("ISO"), supposedly for PG&E's benefit, have filed over 200 Claims totaling about $8 billion. Because these Claims vastly exceed the amounts owed by the Debtor, PG&E will be filing objections if these Claims cannot be consensually resolved. However, because these objections may take a substantial time to resolve, PG&E will request that the Court estimate the reasonable value of the Generators' Claims for Plan feasibility purposes. Through the estimation process, PG&E will seek to have the aggregate dollar amount of generator Claims reduced by more than $5 billion for Plan feasibility purposes.[37] The categories described below are illustrative (but not a complete or exhaustive description) of the issues relevant to the estimation of Generator Claims. Each category involves many Claims, and many Claims fit in more than one category.

A. <u>Generator Claims Asserting PG&E Owes Sums Actually Owed By Southern California Edison.</u>

Most Generators filed individual Claims for the aggregate amounts they believe PG&E, Southern California Edison ("SCE"), the PX and ISO owe them. PG&E's consultant has analyzed the available data and allocated each Generator's charges between PG&E and SCE. PG&E estimates that approximately $850 million of the Generator Claims are properly attributable to SCE and should be deducted from the gross amount of the Generator Claims.

---

[37] After taking into account the results of the Court's estimation process and the ruling on PG&E's pending objections to duplicate claims, PG&E believes the Generator Claims ultimately will be valued for Plan feasibility purposes at approximately $1.1 billion.

B. PX Cash Holdings.

The Generator Claims against PG&E also include approximately $400 million already paid by PG&E and others to the PX, but currently being held by the PX. This $400 million represents partial cash payments from PG&E and other market participants to the PX, as well as cash the PX has collected by calling on surety bonds and lines of credit. Normally, the PX would have distributed this cash to sellers of power upon receipt, but given the circumstances of non-payment and partial payment by various market participants, coupled with the bankruptcy of the PX, the PX did not pay this cash out to the generators. The PX is holding such cash pending the outcome of proceedings at FERC and other forums. Upon the conclusion of those proceedings, the $400 million in cash held by the PX will be distributed to parties with valid claims against the PX, as determined by those various proceedings. PG&E is prepared to demonstrate and support its estimation request with an analysis showing approximately $400 million of the Generator Claims are not owed by PG&E, but rather are owed by the PX and/or are attributable to the PX's cash holdings.

C. Claims For Electricity And Ancillary Services Provided On Or After 1/17/01.

The PX, the Department of Water Resources ("DWR"), and many Generators have asserted claims for power purchases made on or after January 17, 2001. All of these purchases were made by DWR and ISO, not PG&E. Indeed, as of January 17, 2001, PG&E was precluded by the creditworthiness requirements of the ISO and PX tariffs from purchasing power from third-party suppliers. Under governing FERC orders and authorizing legislation, PG&E is not responsible for any charges for power purchases made on or after January 17, 2001. Many Generators did not segregate pre-January 17 and on-or-after-January 17 amounts in their Claim documentation, and PG&E will request estimation of those Claims based on its consultant's analysis of energy purchases by the ISO and DWR on or after January 17, 2001. PG&E's consultant has preliminarily estimated such power purchases made on or after January 17, 2001 at $1.5 billion.

D. Generator Claims Should Be Reduced By At Least $400 Million Because They Are Based On Prices FERC Has Determined Are Subject To Refund As Unjust And Unreasonable.

FERC has found that prices charged by many Generators selling into the PX and ISO were not just and reasonable. FERC has held extensive hearings and issued a series of decisions ordering refunds from Generators selling into the PX and ISO after October 1, 2000, under specified criteria. On July 25, 2001, FERC issued an "Order Establishing Evidentiary Hearing Procedures, Granting Rehearing in Part, and Denying Rehearing in Part,"[38] that established the scope of, and methodology for, the calculation of refunds related to transactions in the electric spot markets operated by the ISO and the PX. The July 25 Order also set an evidentiary hearing to calculate the refunds based on the established methodology. FERC later issued a December 19, 2001 Order clarifying the scope of its July 25 Order and reaffirming the refund methodology set forth in that Order.[39]

PG&E's consultant has modeled the likely outcome of the FERC refund process, which probably will not be completed within any reasonable time frame contemplated for confirmation of the Plan. PG&E believes that the FERC-ordered refunds will reduce the Generator Claims by at least $400 million. PG&E therefore will request estimation of those Claims, based on its consultant's analysis of the anticipated FERC-ordered refund.

E. The PX Claim Duplicating That Of The Generators.

The PX has asserted a Claim (no. 7411) for more than $1.7 billion for energy and ancillary services duplicating Claims of Generators which sold into the PX and ISO. A handful of Generators did not file Claims, but instead relied on the PX Claim to meet the claims bar date. For the most part, however, the PX Claim is duplicative of the Claims filed by Generators. PG&E will ask the Court to estimate the PX Claim to take into account only the Claims of those few Generators which did not file their own Claims.[40]

---

[38] San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 96 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,120 (July 25, 2001).

[39] San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 97 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (December 19, 2001).

[40] PG&E intends to object to the PX Claim, at least to the extent it is duplicative of POCs (... continued)

F. Underscheduling Penalty Claims.

In December 2000, FERC ordered the ISO to assess underscheduling penalties to discourage market participants from using the ISO's real-time market as the primary spot market.[41] The underscheduling penalties were to be assessed by the ISO against underscheduling market participants and distributed to scheduling coordinators that could accurately schedule.[42] ISO market participants have filed Claims seeking approximately $400 million in underscheduling penalties. The penalties were stayed, and, upon rehearing, were invalidated by FERC before they were assessed by the ISO.[43] PG&E will object to all Claims seeking underscheduling penalties and will request the Court to estimate such Claims as zero for Plan feasibility purposes.

V.

ENERGY SERVICE PROVIDER CLAIMS

There are over $580 million in Claims from energy service providers ("ESPs") and their Direct Access ("DA") customers for a credit commonly referred to as the DA credit. DA customers purchase their energy from ESPs but use PG&E's distribution and transmission services. Pursuant to CPUC orders, these customers are charged by PG&E the same bundled service rate as other PG&E customers. However, since they buy their energy from an ESP, they receive a credit off the bundled service rate in an amount intended to approximate the energy component of PG&E's bundled service rate. The methodology for calculating the DA credit was established by the CPUC in Decision No. 97-08-056 and Resolution E-3510, and was intended to achieve the CPUC's objective of ensuring that during the rate freeze DA customers pay the same unbundled component

---

(continued . . .)
timely filed by Generators. Alternatively, PG&E may object to the entire PX Claim as duplicative, and stipulate that those Generators who did not file their own POCs because they were included in the PX Claim can proceed to file their own POCs, which will be deemed to be timely filed.

[41] San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 93 Fed. Energy Comm'n Rep. (CCH) ¶61,294 (December 15, 2000).

[42] 97 Fed. Energy Comm'n Rep. ¶61,275; 93 Fed. Energy Comm'n Rep. ¶61,294, at 62,002-04.

[43] In re Distrigas of Mass. LLC., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (July 27, 2000).

Case: 19-30088    Doc# 2844-11    Filed: 07/02/19    Entered: 07/02/19 18:16:23    Page 10 of 19

charges, other than energy, as bundled service customers. The CPUC ordered PG&E to use the PX price to approximate the energy component of the bundled rate, under the assumption the PX price would reflect the amount PG&E actually saved by not being required to purchase energy for the DA customers. As the PX prices began to skyrocket, so did the DA credit, and the DA customers' charges from PG&E began to reflect amounts due to them from PG&E, i.e., the charges became "negative."

PG&E believes the rate freeze and DA credit should have ended no later than August 2000. However, even assuming the rate freeze will not end until March 2002, the DA credit Claims are overstated. FERC's July 25 Order discussed above effectively reduces PX wholesale energy prices from October 2, 2000 to June 20, 2001, by requiring generators to refund amounts received or due from the utilities for generation used during that period. FERC's July 25 Order reduces the DA credit because it reduces the amount PG&E saved by not serving as the DA customers' ESP during that period. The reduction of the PX price reduces the DA credit by approximately $100 million from October 20, 2000 through January 17, 2001. Because it is unlikely the administrative processes will be resolved within any reasonable time frame for obtaining confirmation of the Plan, PG&E will seek a reduction in the amount of the DA credit Claims for Plan feasibility purposes. PG&E believes a reasonable estimation can be made based on its consultant's FERC refund analysis.

Further, some of the DA credit Claims are overlapping because both the ESPs and their DA customers claim a right to the same DA credits. Thus, in the estimation process, PG&E also will ask the Court to reduce the DA credit Claims by approximately $60 million due to duplicative Claims.

## VI.

## COMMERCIAL CLAIMS

There are approximately nine miscellaneous commercial Claims for amounts totaling in excess of $4 billion to which PG&E will be filing objections. However, because they are grossly inflated and because it is unlikely they can be resolved any time soon, they will need to be estimated

Case: 19-30088  Doc# 2844-11  Filed: 07/02/19  Entered: 07/02/19 18:16:23  Page 11 of 19

for feasibility purposes.

One such Claim, by Sierra Pacific Industries ("SPI"), is for "at least" $1,108,361,147, mostly for alleged punitive damages, and arises out of PG&E's alleged interference with SPI's efforts to sell its QF power at market prices well above the prices SPI had contracted to accept. The Court is familiar with this Claim, having adjudicated preliminary injunction, partial summary judgment and remand motions. The size of this Claim and its heavy reliance on punitive damages make it appropriate for estimation, and by virtue of the nature of the Claim and this Court's familiarity with it, it does not appear that retention of an expert is necessary or appropriate in connection with such estimation.

The other commercial Claims total about $3 billion and could be estimated by the Court with or without the assistance of an expert. They cover a wide range of causes of action. For example, two Claims, aggregating over $100 million, are by irrigation districts alleging federal antitrust violations stemming from PG&E's refusal to interconnect the districts' proposed electric facilities. PG&E contended in federal court that each scheme proposed "sham wholesale" transactions in violation of the Federal Power Act. The District Court's Order dismissing one of the complaints without leave to amend is under submission to the Ninth Circuit. The other case is currently inactive. Neither Claim is likely to be resolved within the timeframe contemplated by the Plan.

Two other Claims for a total of almost $50 million are by 34 property developers seeking punitive damages only, allegedly arising out of PG&E's failure to obtain CPUC approval before changing the practice of paying refunds for gas franchise costs. The punitive nature of the damages sought make these Claims particularly appropriate for estimation.

A $25 million Claim is by a residential developer for alleged breach of a contract to relocate gas and electric transmission facilities. The claimant alleges it provided land to which the facilities could be moved and PG&E alleges it did not. The Claim is grossly inflated because it fails to take into account the existence of highly disputed factual and legal issues.

One QF has filed a Claim seeking approximately $10 million for alleged violation of the fixed price period of its Interim Standard Offer 4 power purchase agreement. PG&E has

successfully defended identical suits by QFs before the same judge hearing the pending case. Other commercial Claims assert a variety of breaches and violations allegedly arising under a variety of causes of action.

VII.

TORT CLAIMS

PG&E believes that an expert could provide invaluable assistance in estimating the <u>aggregate</u> value of the approximately 450 miscellaneous personal injury, wrongful death and property damage Claims submitted as timely POCs. These Claims have an alleged value of more than $315 million, which is significantly larger than any reasonable estimate of PG&E's true liability to these claimants.[44]

Adjudicating and liquidating each of these 450 diverse Claims—ranging from slip and falls to auto accidents to alleged asbestos exposure to electric contact wrongful death cases—will be extremely fact-intensive. If considered individually, it could take many months of evidentiary hearings to resolve these miscellaneous tort Claims, and such a protracted process will disproportionately consume the Court and the Debtor's time and resources and will unduly delay and frustrate the reorganization. An aggregate estimation procedure is the most reasonable method for resolving these issues and Claims.

Accordingly, PG&E proposes that the Court authorize PG&E to retain (pursuant to Section 327(a), or that the Court appoint (pursuant to Rule 706 or Section 105(a)) a statistician/claims estimation expert to estimate the aggregate value of the miscellaneous tort Claims based upon such factors as the number of Claims filed, the type or category of Claim made, the type of injuries alleged, the data contained in the POCs submitted, and PG&E's historical litigation data

---

[44] As an example of how inflated the alleged dollar value of these Claims is, between 1996 and 2000, PG&E resolved an average of over 15,000 personal injury and property damage claims per year, including litigation and pre-litigation claims, at an aggregate average cost of $31 million per year (excluding individual payments greater than $5 million and unusual events such as the 12/8/98 outage, which generated more than 19,000 claims.) Furthermore, PG&E's third-party claims department, which handles pre-litigation matters, is currently resolving bankruptcy claims at about 5% on average of the demand value.

from the last five years, including the average amount of the settlements for the various types of claims in designated categories. The use of five years of historical data to determine a reasonable estimate for these Claims is particularly logical and appropriate because PG&E's universe of miscellaneous tort cases on April 6, 2001 was not materially different from any other time in the previous five years. Under this proposal, the expert will review samples of historical claims within the designated categories and will sort the POCs into similar categories. By using a variety of statistical approaches predicated on PG&E's actual experience with similar type claims, the expert will estimate the aggregate value of the miscellaneous tort Claims. Because so much historical data is available for the estimation process, a statistically and practically significant estimate should be possible without engaging in the time-consuming task of reviewing each claim on the merits. See generally parallel discussion in Part III.C. above re environmental Claims. And, importantly, as already noted, this estimation will have no binding effect on the individual claimants respecting the allowable amount of their Claims or the distribution they will receive on their Claims.[45]

If an aggregate estimation method is not used, the 450 Claims will have to be addressed individually, applying a fact-intensive, legal analysis. This would be a long, tedious process that would constitute an unnecessary drain on the Court's resources and that is not necessary for Plan feasibility determination purposes. Indeed, part of the reason a Claim-by-Claim review would be difficult is because of the poor quality of information available in the POCs. Many of the tort claimants have taken an unrealistic approach to the valuation of their Claims, perhaps believing that there is settlement or other leverage in inflating rather than estimating actual worth. Thus, many claimants have provided little in the way of information to readily and accurately assess liability and damages. As to a significant number of the miscellaneous tort Claims, PG&E currently has little or

---

[45]Bankruptcy courts are constrained from utilizing abbreviated estimation procedures to definitively adjudicate and resolve personal injury and wrongful death claims, pursuant to 28 U.S.C. §157(b)(2)(B). However, bankruptcy courts may estimate such claims so long as that estimation is not for "the purposes of distribution." See, e.g., In re UNR Indus. Inc., 45 B.R. 322 (N.D.Ill. 1984). Accordingly, courts permit the use of estimation procedures to value tort claims for a variety of plan confirmation purposes, including determining whether a proposed plan is feasible. See, e.g., In re A.H. Robins Co., 88 B.R. 742, 751-52 (Bankr. E.D.Va. 1988), aff'd, 880 F.2d 694 (4th Cir. 1989); In re Farley, Inc., 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992); In re Poole Funeral Chapel, Inc., 63 B.R. 527, 533-34 (Bankr. N.D. Ala. 1986).

no information other than that contained in the POC form and any accompanying attachments. Discovery will be necessary to garner the data to individually evaluate each of these Claims.

The following will serve as a few illustrative examples of how overstated many of the miscellaneous tort Claims are and how time-consuming it would be to individually assess the value of these Claims:

- One of the miscellaneous tort Claims against PG&E is for $14 million and arises out of an explosion and fire that occurred at a residence. Investigations by the police department, fire department, District Attorney's office, and the Bureau of Alcohol, Tobacco and Firearms determined the cause to be detonation of illegal fireworks in the home. There are multiple defendants named in this consolidated action.

- A Claim for $5 million is premised on the notion that "balls of electricity" have flown off the PG&E overhead lines causing personal and property damage to claimants. Extensive testing performed by public and private entities has not substantiated this Claim. PG&E believes the actual value of this Claim is zero.

- Another Claim involves an auto accident in which the claimant rear-ended a PG&E truck. The personal injury Claim is for $1 million and alleges that claimant sustained a fractured leg, cheek bone and jaw injury. PG&E disputes liability and contends in any event that the damages are vastly overstated.

- A $1.4 million Claim is for contribution and indemnity for property damage allegedly resulting from the diversion of water onto land owned by a recreation park. PG&E is not a party to the underlying lawsuit but has received a $1.4 million POC for indemnity from one of the defendants named in the suit. PG&E's sole information is limited to the assertions contained in the complaint and the stated amount of the Claim. Discovery will be required to determine the basis of PG&E's alleged liability and the nature of the damages.

If the Court were required to individually review each of the tort cases, a tremendous amount of judicial resources would be drained. Therefore, the only logical and practical approach is for the Court to make a "rough estimate" of the value of the claims requiring estimation for feasibility purposes. In re Thomson McKinnon Sec., 191 B.R. at 989.

In addition to seeking estimation of the approximately 450 miscellaneous tort Claims, PG&E will seek estimation by the Court of the Chromium Claims, consisting of the Claims filed by approximately 1,250 individuals alleging exposure to chromium from PG&E's compressor stations near Kettleman, Topock and Hinkley, California. Nearly all of the Chromium Claims were filed by individuals who are plaintiffs in 15 civil lawsuits pending against PG&E in California courts. According to their POCs, these claimants seek to recover approximately $580 million.[46] PG&E will propose an estimate for the aggregate value of these Claims based upon such factors as (i) the number of Chromium Claims filed, (ii) the particular PG&E facility from which a majority of those plaintiffs claim exposure to chromium, (iii) the distance from the compressor station to the alleged exposure locations, (iv) the type of claimed exposure (ingestion or inhalation), (v) the types of injuries alleged, (vi) epidemiological data, (vii) scientific literature regarding chromium, (viii) discovery responses, (ix) legal defenses, and (x) the POCs submitted.

PG&E's proposed estimated value of the Chromium Claims will also consider prior settlements of other chromium cases. See In re Eagle-Picher Indus., Inc., 189 B.R. 681, 686 (S.D. Ohio 1995) (estimating value of thousands of pre-petition personal injury asbestos cases; basing estimation in part on settlement amounts of prior asbestos cases). Like the estimation process for miscellaneous tort Claims, the estimation for Chromium Claims will be presented by noticed motion to establish an aggregate estimate for Plan feasibility purposes, with no binding effect on PG&E or the individual claimants in the pending cases or for any other purpose.

A motion for aggregate estimation is the most reasonable method for determining the estimated value for Chromium Claims. If considered individually, it could take months of evidentiary hearings to resolve them. Each individual claim presents questions regarding the alleged method, duration and concentration of exposure. These issues will ultimately be resolved in the

---

[46] There are approximately 1,450 personal injury Claims alleging chromium exposure, approximately 200 of which PG&E expects will be disallowed as duplicate claims. Approximately 1,050 of these individuals filed Claims aggregating approximately $580 million, and approximately 210 of these individuals filed Claims for unknown amounts. PG&E expects that all of the Chromium Claims (including those that state amounts and those that do not) will be estimated because it is requesting an aggregate approach to estimation of the Chromium Claims. See footnote 37 supra and accompanying text.

pending litigation. These issues are generally based upon detailed scientific and expert analysis of groundwater contamination and air modeling. The analysis must also include a determination of whether the exposure alleged could have caused the particular ailments claimed. These issues are generally resolved by evaluating expert testimony from toxicologists, epidemiologists, particular disease specialists and other medical professionals. For example, the parties have estimated that trial of 18 test cases involving these issues could take up to six months.

That level of detailed analysis for individual cases is not necessary to obtain a reasonable aggregate estimate for Plan feasibility purposes. Instead, the most reasonable method to estimate the approximately 1,250 Chromium Claims for Plan feasibility purposes is to develop an aggregate estimate by considering groups with similar characteristics. For example, an examination of categories of current claims based upon alleged exposure, type of injury and legal defenses can provide a reasonable estimate of the value of the Chromium Claims. Attempting to create that same estimate by reviewing each individual case for each of these parameters to reach an estimate would be a monumental and unnecessary task, given the limited purpose and effect of the estimation. For purposes of applying the feasibility test of Section 1129(a)(11), the aggregate estimation procedure proposed by PG&E is the most reasonable and appropriate estimation method for the Chromium Claims.

## VIII.

## EMPLOYMENT CLAIMS

Approximately 15 litigants have filed employment-related POCs against the Debtor totaling more than $110 million. The amounts claimed are inflated in virtually all cases, sometimes outrageously so. One clear indicator of the extent to which employment Claims are very unrealistic is that during the most recent five-year period for which data is fully available (from 1996 through 2000), the total paid out by PG&E in connection with employment-related litigation was $10.78 million, or an average of $2.15 million per year. An expert experienced in the employment litigation field would be able to assist in estimating the actual value of the inflated employment Claims, which assert a variety of statutory and common law violations.

For example, the largest Claim, seeking over $40 million, is a complex putative class action lawsuit involving alleged violation of state and federal overtime laws. Specifically, four employees purporting to represent 300 senior new business representatives, distribution engineers, and others "similarly situated" allege PG&E improperly classified them as exempt administrators and/or professionals, thus denying them overtime payments to which they were purportedly entitled. The amount claimed is based on the assumption that all plaintiffs will prevail on all issues. PG&E believes the claims do not meet the criteria for a class action, which then limits the number of plaintiffs to four. Further, PG&E believes that plaintiffs have improperly calculated the number of claimed overtime hours.

Several of the other employment Claims allege various forms of disability discrimination, such as failure reasonably to accommodate an alleged disability, or wrongful demotion. For example, one plaintiff, who seeks more than $36 million, suffers from a degenerative condition and alleges that after years of attempting to accommodate his condition, PG&E wrongfully removed him from his position as a fieldman in response to a physician's recommendation after a fitness for duty exam. PG&E believes that this is a highly inflated claim.

One claim for $10 million is by a short-term former employee of Corestaff Services, Inc., a PG&E contractor, who sued his former employer and several of its employees for wrongful termination, and has named PG&E because it allegedly failed to respond to various complaints plaintiff claims to have made against Corestaff. Corestaff has agreed to indemnify and defend PG&E without reservation of rights. Particularly in view of the provision for indemnification, this Claim has an actual value of zero, and, for Plan feasibility purposes, PG&E should have an opportunity to so demonstrate to this Court.

Other Claims in this category requiring estimation allege sex discrimination, including sexual harassment, intentional infliction of emotional distress, retaliation, and/or wrongful termination.

## CONCLUSION

Based on the foregoing, PG&E respectfully requests that this Court make and enter its order determining the processes and procedures for estimating the Claims in a timely fashion for purposes of determining the feasibility of the Plan under Section 1129(a)(11).

DATED: March 1, 2002

Respectfully,

HOWARD, RICE, NEMEROVSKI, CANADY,
FALK & RABKIN
A Professional Corporation

By: /s/ Jeffrey L. Schaffer
JEFFREY L. SCHAFFER

Attorneys for Debtor and Debtor in Possession
PACIFIC GAS AND ELECTRIC COMPANY