Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    628.208.6434
Facsimile:    310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone:   310.820.8800
Facsimile:   310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>     **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                              **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR RELIEF FROM AUTOMATIC STAY TO PERMIT STATE COURT JURY TRIAL OF 2017 TUBBS WILDFIRE CLAIMS [Dkt. No. 2842]**<br><br>Date:        July 24, 2019<br>Time:       9:30 a.m. (Pacific Time)<br>Place:      United States Bankruptcy Court<br>                Courtroom 17, 16 Floor<br>                San Francisco, CA  94102<br><br>Objection Deadline: July 19, 2019 at 4:00 p.m. |

I. JURISDICTION ............................................................................................................ 1

II. BACKGROUND .......................................................................................................... 1

III. INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

IV. FACTS ........................................................................................................................ 3

    A. The Wildfires ................................................................................................... 3

    B. The Value of the Wildfire Claims .................................................................... 3

    C. PG&E Disputes Liability for the Tubbs Fire .................................................... 5

    D. A Tubbs Trial Would Likely Resolve All Fire Claims ...................................... 6

    E. The Necessity of a Tubbs Trial ....................................................................... 7

V. ARGUMENT ................................................................................................................ 9

    A. Estimation Under the Code ............................................................................. 9

        1. The Court may estimate claims pursuant to Bankruptcy Code section 502(c) if the liquidation of the claims would unduly delay the administration of the case .................................................................................. 9

        2. Section 157(b)(2)(B) permits the Court to estimate personal injury claims for purposes of plan confirmation, but not for distribution. .......... 10

        3. Section 157(b)(5) and 1411(a) provides that personal injury claimants are entitled to a jury trial on their claims. .................................................. 10

        4. The Court may not estimate a debtor's liability for personal injury claims if the resolution impacts distribution. ............................................. 11

    B. Estimation of the Tubbs Fire Claims Would Violate the Claimants' Seventh Amendment Rights and Would Delay this Case Further. Liquidation in State Court Would Promote a Consensual Resolution of All Fire Claims. .................. 14

        1. A Court may not estimate liability when estate cash is insufficient to pay claims in full, and estimation would necessarily create a limited fund or cap on the debtor's liability or ability to pay the claims in full.... 14

        2. A Court may not estimate liability when a debtor disputes the validity of the claims based on a factual causation issue. ...................................... 16

        3. A Court may not estimate liability when the parties are unable to determine the amount of money to set aside to pay the claims because the debtor disputes liability for the claims as a factual matter, and the parties would thereby be unable to negotiate a plan of reorganization that would pay the amount of claims in dispute....................................... 17

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.     Courts in mass tort chapter 11 cases have granted relief from stay and abstention when such relief would promote settlement and are in the public interest. ................................................................................. 18

C.     Relief from Stay Should be Granted for Good Cause, Including the Standards Applicable in Mass Tort Chapter 11 Cases and Abstention Cases. ...................... 18

1.     The standards for relief from stay set forth in the mass tort chapter 11 cases are met here. .............................................................................. 19

2.     Cause for relief from stay under the general case law standards are also present in this case. ................................................................................. 21

3.     Cause for discretionary abstention under the general case law standards are also present in this case. ...................................................... 23

D.     The Court should grant relief from stay over the personal injury claimants' entire claim, including their property damage claim, because the jury should consider the entire claim in furtherance of judicial economy and a full exposition of the liability and causation issues. ...................................................... 25

VI.     CONCLUSION ............................................................................................... 25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- ii -

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apex Oil Co., v. Stinnes Interoil Inc. (In re Apex Oil Co.)*,
   107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) ...............................................................9

*In re Baleine, LP*,
   No. CV 14-02513 SJO, 2015 U.S. Dist. LEXIS 140145 (C.D. Cal. Oct. 13,
   2015) ..........................................................................................................................22

*Benedor Corp. v. Conejo Enters. (In re Conejo Enters., Inc.)*,
   96 F.3d 346 (9th Cir. 1996) .......................................................................................23

*Bieser v. Davies*,
   119 Cal. App. 659 (Cal. Ct. App. 1932) ....................................................................11

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*,
   912 F.2d 1162 (9th Cir. 1990) ..............................................................................22, 24

*In re Curtis*,
   40 B.R. 795 (Bankr. D. Utah 1984) ...........................................................................22

*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) ............................................................. *passim*

*In re Dow Corning Corp.*,
   215 B.R. 346 (Bankr. E.D. Mich. 1997) ................................................................9, 11

*Falk v. Falk (In re Falk)*,
   No. NC-12-1385-DJuPa, 2013 Bankr. LEXIS 4645 (B.A.P. 9th Cir. Sep. 26,
   2013) ..........................................................................................................................24

*Grzybowski v. Aquaslide 'N' Dive Corp. (In re Aquaslide 'N' Dive Corp.)*,
   85 B.R. 545 (B.A.P. 9th Cir. 1987) .......................................................................10, 16

*Kayle v. Lake Balboa Health Care, Inc.*,
   No. LA CV15-01629 JAK (ASx), 2015 U.S. Dist. LEXIS 63629 (C.D. Cal.
   May 14, 2015) .............................................................................................................14

*Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer)*,
   405 B.R. 915 (B.A.P. 9th Cir. 2009) ..........................................................................21

*In re Lane*,
   68 B.R. 609 (Bankr. D. Hawaii 1986) ..........................................................................9

*Mac Donald v. Mac Donald (In re Mac Donald)*,
   755 F.2d 715 (9th Cir. 1985) ......................................................................................18

- iii -

*In re N. Am. Health Care, Inc.*,
    544 B.R. 684 (Bankr. C.D. Cal. 2016)................................................................9, 10, 15

*Olivas v. Diocese of San Diego Educ. & Welfare Corp. (In re Roman Catholic*
    *Bishop of San Diego)*,
    No. 07-00989-LA11, 2007 WL 2406899 (S.D. Cal. Aug. 20, 2007) ......................11

*In re Pac. Gas & Elec. Co.*,
    279 B.R. 561 (Bankr. N.D. Cal. 2002)..............................................................9, 19, 23

*Piombo Corp. v. Castlerock Props. (In re Castlerock Props.*),
    781 F.2d 159 (9th Cir. 1986)........................................................................................18

*Plys v. Ang (In re Ang)*,
    589 B.R. 165 (Bankr. S.D. Cal. 2018) ........................................................................10

*Pursifull v. Eakin*,
    814 F.2d 1501 (10th Cir. 1987)....................................................................................23

*Republic Reader's Serv., Inc. v. Magazine Service Bureau, Inc. (In re Republic*
    *Reader's Serv., Inc.)*,
    81 B.R. 422 (Bankr. S.D. Tex. 1986)..........................................................................24

*In re Roman Catholic Archbishop of Portland*,
    338 B.R. 414 (Bankr. D. Or. 2006)..................................................................... *passim*

*In re Roman Catholic Archbishop of Portland in Oregon*,
    339 B.R. 215 (Bankr. D. Or. 2006)..................................................................... *passim*

*In re Roman Catholic Bishop of San Diego*,
    374 B.R. 756 (Bankr. S.D. Cal. 2007) ..................................................................11, 13

*Russell v. Andersen*,
    101 Cal. App. 2d 684 (Cal. Ct. App. 1951) ................................................................11

*In re Standard Insulations, Inc.*,
    138 B.R. 947 (Bankr. W.D. Mo. 1992)........................................................................11

*Swift v. Bellucci (In re Bellucci)*,
    119 B.R. 763 (Bankr. E.D. Cal. 1990) ..........................................................................9

*Truebro Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty*
    *Prods., Inc.)*,
    311 B.R. 551 (Bankr. C.D. Cal. 2004)........................................................................22

**Statutes**

11 U.S.C. § 362(d)(1)..............................................................................................18, 22

11 U.S.C. § 502(c) .....................................................................................................8, 9

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iv -

11 U.S.C. § 522(f) .......................................................................................................22

11 U.S.C. § 1141(d) ...............................................................................................12, 15

28 U.S.C. § 157 ...........................................................................................................1

28 U.S.C. § 157(b) .......................................................................................................1

28 U.S.C. section 157 (b)(2)(B) ...........................................................................10, 24

28 U.S.C. § 157(b)(5) ................................................................................8, 10, 15, 16

28 U.S.C. § 1334 .........................................................................................................24

28 U.S.C. section 1334(c)(1) ..............................................................................23, 24

28 U.S.C. section 1334(c)(2) ...................................................................................23

28 U.S.C. § 1408 ...........................................................................................................1

28 U.S.C. § 1409 ...........................................................................................................1

28 U.S.C. § 1411(a) ........................................................................................10, 12, 16

United States Code chapter 11 ..................................................................... *passim*

**Rules**

Bankruptcy Local Rule 5011-1(a) ...............................................................................1

Bankruptcy Local Rule 9015-2(d) .............................................................................11

Fed. R. Civ. P. § 36 ....................................................................................................1, 8

**Other Authorities**

1 *Collier on Bankruptcy* ¶ 3.06[1] .........................................................................10

Douglas G. Smith, Resolution of Mass Tort Claims in the Bankruptcy System, 41
    Univ. Cal. Davis L. Rev. 1613 (2008) ................................................................13

John K. DiMugno and Paul E.B. Glad, California Insurance Law Handbook
    § 46:123 (2019) ....................................................................................................23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## I. JURISDICTION

This Court has jurisdiction to determine this motion pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California ("**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**") commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the United States Code ("**Bankruptcy Code**"). PG&E's chapter 11 filings were necessitated by a confluence of factors resulting from catastrophic fires that occurred in Northern California prior to the Petition Date, and PG&E's potential liabilities arising therefrom. *See* Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief (Dkt. No. 263) ("**Wells Decl.**"), at 3. PG&E contends that it is not at fault for the 2017 Tubbs Fire. *Id*. at 13-14.

The Official Committee of Tort Claimants ("**TCC**") in the Chapter 11 Cases, in support of its motion ("**Motion**") for entry of an order terminating the automatic stay to permit the eight individuals listed on Exhibit A to the Motion ("**Tubbs Preference Plaintiffs**") to proceed to a jury trial on their personal injury and related property damage claims against the Debtors arising from the 2017 Tubbs Fire as set forth in Complaints against PG&E, and to request the Court in the California North Bay Fire Cases, JCCP 4955, to order one or more of the cases of the Tubbs Preference Plaintiffs to trial with preference pursuant to California Code of Civil Procedure section 36, and further supported by the declarations submitted in support of the Motion (such declarations are abbreviated herein as defined in the Motion), respectfully states as follows:

## III. INTRODUCTION AND SUMMARY OF ARGUMENT

The parties cannot negotiate a plan of reorganization, or confirm a contested plan, unless the Debtors and the North Bay Fire victims try a set of personal injury cases to determine whether

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PG&E is liable for the $18 billion plus of wildfire claims that arose out of the 2017 Tubbs Fire in Sonoma County ("**Tubbs Fire Claims**").

The Tubbs Fire was just one of the 2017 and 2018 Northern California wildfires; but the Tubbs Fire produced approximately a third of the $54 billion of wildfire claims in these Chapter 11 Cases, and PG&E contests its liability for the Tubbs Fire, but not the other fires. The parties cannot negotiate a consensual plan in this case without determining PG&E's liability for this significant proportion of claims in this case, because the parties' valuation of the Tubbs Fire Claims are very far apart and impact the solvency of the Debtors. The validity of the Tubbs Fire Claims directly impacts the amount of money PG&E owes fire claimants and the terms for resolution of any plan.

These facts are not controversial. Eight months ago, PG&E's lead trial counsel, Kevin Orsini, admitted in the litigation that trying the Tubbs claims "has the highest probability of getting all the others tied up in a global resolution. . . . We can't figure out how to resolve these until we have some visibility into what the resolution is going to be of the Tubbs case." Kelly Decl. at ¶ 9.

The Tubbs Preference Plaintiffs' claims involve personal injury claims that may be determined on a liability basis only by a district court or state court jury trial. But the district court's time to a jury trial would be potentially two years off, and a two-year delay in resolving the liability dispute would impair the reorganization in these Chapter 11 Cases. Hence, the solution is for this Court to grant relief from stay to permit eight 2017 Tubbs Fire jury trial claims to proceed to trial in the California Superior Court, where the subject claims may be resolved quickly in 120 days under California's preference statute for claims involving the elderly and infirm.

The leading chapter 11 cases have granted relief from stay and/or abstention to try mass tort personal injury claims on each of the following grounds that are present in this case: (1) PG&E proposes to create a Trust with a limited fund to pay wildfire claims, based on the Court's estimation of the dollar amount of the claims that need to be paid by the capped Trust, and such claims must be tried by a jury under the Judicial Code, and not estimated, because the determination would affect the amount available in the Trust for distribution to wildfire claimants; (2) PG&E disputes the validity of the Tubbs Fire Claims based on a factual causation issue that must be tried, and not estimated, because the determination of causation would necessarily determine the validity of the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

claims for distribution; (3) if the Debtors are liable for the Tubbs Fire Claims, the Debtors are likely insolvent, and the parties need to know if the Debtors are liable for such a large set of claims or insolvent in order to negotiate a consensual plan of reorganization or confirm a contested plan; (4) relief from stay would result in settlement of the Chapter 11 Cases, because PG&E's three year track record in the fire litigation establishes that PG&E settles every single fire claim before the jury trial; and (5) a jury trial is in the victims' and public interests, because the victims' age and infirmity require immediate trials, and PG&E intends to pay the thousands of Tubbs Fire victims nothing in the absence of an adverse verdict.

## IV. FACTS

### A. The Wildfires

The Debtors filed their Chapter 11 Cases to resolve their liabilities for the 2017 and 2018 Northern California wildfires. Wells Decl. at 3-5. The wildfires killed 130 individuals, destroyed approximately 30,000 structures, and injured over 55,000 individuals who fled the fires and were not killed by the advancing flames. Wells Decl. at 11-13; Julian Decl., Ex. A, B, California Department of Insurance Reports.[1] The victims' insurers have paid approximately $18 billion of the victims' property damage losses. More specifically, the victims' insurers have reported to the Department of Insurance ("**DOI**") expedited payouts of $9,553,047,901 on 26,892 North Bay Insured Losses from the October 2017 Wildfires (Julian Decl. Ex. A), and $8,473,363,059 on 28,118 Camp Fire Insured Losses from the 2018 Camp Fire in Butte County (Julian Decl. Ex. B). In summary, the victims' insurers have reported they will pay approximately $18 billion of insured losses on 55,000 victim claims in the two years of fires. PG&E has not paid any of the victims' uninsured/underinsured property damage losses, and none of the victims' considerable personal injury losses. Wells Decl. at 11-17.

### B. The Value of the Wildfire Claims

PG&E has a well-documented record of paying fire losses on a ratio of roughly 3-1 for total losses versus insured losses, after litigating the fire claims extensively. For example, in the previous

---

[1] Cal. Dept. of Ins., North Bay Insured Losses from the October 2017 Wildfires, dated January 31, 2018, Julian Decl. Ex. A; Insured Losses from the 2018 California Wildfires, dated April 30, 2019, Julian Decl. Ex. B.

Case: 19-30088   Doc# 2855   Filed: 07/03/19   Entered: 07/03/19 09:10:34   Page 9 of 31

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2015 Butte Fire, PG&E litigated its liability for 549 residential losses and related wildfire claims extensively for three years (Campora Decl. at 2-3), and eventually settled those claims for $904 million, as of March 31, 2019. Julian Decl. Ex. C, PG&E, Form 10-Q, dated Mar. 31, 2019, at 56 n.1. The California Department of Insurance reported that approximately $300 million of the losses were insured. Julian Decl. Ex. D, DOI Press Release and Report (residential property losses of $271 million, commercial losses of $21.5 million, and $6.4 million of miscellaneous losses). In other words, according to PG&E and the DOI, PG&E paid approximately $300 million on insured property damage losses and approximately $600 million on uninsured/underinsured property and personal injury claims for the victims who fled the Butte Fire. *Id.* That is a ratio of 3-1 total settlements versus insured losses. The insurers' reported losses of $18 billion on 55,000 insured 2017 and 2018 wildfire claims (Julian Decl. Ex. A and B) indicates the total wildfire claim pool of insured and uninsured losses in this case exceeds $54 billion, based on PG&E's well-documented litigation history in the Butte Fire that established a 3-1 ratio for total losses paid by PG&E versus insured losses reported by the insurers to the DOI.

The $54 billion estimate includes an extremely conservative estimate for the 2018 Camp Fire claims, because the time and cost of rebuilding in Paradise is significantly greater than what occurred in the Butte Fire, and hence the Camp Fire claims should dwarf the average pay outs in the 2015 Butte Fire settlements. A shortage of contractors is now driving up construction prices. *See, e.g.*, Kurtis Alexander, "Reclaiming Paradise," S.F. Chron., May 3, 2019. California law requires that these new buildings include safety features, such as fire-resistant roofs and heat repellant windows. *Id.* Lots will not be ready for building until at least next year, and clean water will not be available for two years. *Id.* The sewer system alone will cost $85 million and repair of the contaminated water lines will cost at least $50 million. *Id.* Other estimates are that a new water system will cost up to $300 million: "One noted water systems engineer said solving the benzene-contamination problem is the most scientifically complex task he has ever seen. The contamination is both in the water, moving around, and in the pores of some pipes." *See* Tony Bizjak, "Rare Toxic Cocktail from Camp Fire is poisoning Paradise water. It could cost $300 million to fix." Sacramento Bee, Apr. 18, 2109. "[E]ven if 400 new homes were to go up each year — about 10

times what the town has historically built — it could be 15 years or more before the area can accommodate its prefire population." *Id.* The new building codes in Paradise will affect the cost of building and renting, driving out many renters. *See, e.g.,* "Rebuilding Paradise, One New Home at a Time," NPR, Mar. 20, 2019. On the other hand, the North Bay Fire claims involved other factors that could offset the Paradise increased impact on a ratio analysis.[2]

### C. PG&E Disputes Liability for the Tubbs Fire

PG&E has admitted its equipment was involved in the ignition of all of the fires except one, the 2017 Tubbs Fire that destroyed the Fountaingrove and Coffee Park neighborhoods in Santa Rosa. Wells Decl. at 13, 14. PG&E denies liability for the Tubbs Fire on the basis PG&E's electricity allegedly sparked on private property. *Id.* at 14. In their Master Complaint, the victims allege PG&E's equipment sparked the Tubbs Fire, just like the other 18 fires that night; PG&E negligently, willfully and with a knowing, conscious disregard for the safety of the victims, failed to deenergize its lines in accordance with prudent risk management practices, especially after the issuance of red flag warnings and high fire danger days before the fire ignited; and PG&E's actions caused the victims injury to their health, mental pain and suffering, emotional distress, anguish, debilitating injuries suffered during their evacuations from the fire, and other damages. Motion, Ex. A (describing evacuations); Ex. B, Master Complaint ¶¶ 196-207. The deenergizing claim was never addressed by the CalFire investigators as a cause of the Tubbs fire.[3]

---

[2] These factors impact the $54 billion damage estimate for the 2017 and 2018 fire claims. However, the Debtors should be estopped from arguing the 2015 Butte settlements resolved claims materially different than those involved in the 2017 and 2018 fires because the Debtors have repeatedly refused to produce the individual settlement data from the 2015 Butte settlements and the estimation data the Debtors used to estimate their $30 billion plus liability for the fires in their SEC filings. Julian Decl. ¶ 11, Exs. H, I. At any rate, the 3-1 ratio produces a benchmark which should provide the parties in this case with a reality check, given PG&E's thorough litigation and settlement of the 2015 Butte Fire claims.

[3] PGE denies liability for the Tubbs Fire even though PG&E failed to deenergize the electrical lines on the night of the October 8, 2017 fire, as any reasonable prudent utility would have done: (1) on October 5, 2018, the National Weather Service issued a Fire Weather Watch and a Wind Advisory with critical fire weather conditions through the weekend, https://twitter.com/NWSBayArea/status/1048294863278669826 and https://twitter.com/NWSBayArea/status/1048347904262524928 and, then, on October 7, 2018, CalFire issued its "#RedFlagWarning" that there would be "gusty winds and low humidity. Use extreme caution when outdoors," https://twitter.com/CAL_FIRE/status/1048998155147083776/ photo/1 and (2) San Diego Gas & Electric Company deenergized its electrical lines pursuant to its deenergizing policy under the same type of circumstances 72 times in the Fall of 2017 to protect the public, Letter from the CPUC, dated Feb. 6, 2019, Julian Decl. Ex. E. and (3) PGE did not have such a policy and did not deenergize a single line in 2017 in conformance with the standard of care of its closest peer, San Diego Gas & Electric. PGE was aware of the devastation that could result from not following the standard set by San Diego, as the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PG&E has recorded $14 billion of charges for the "lower end of the range of PG&E Corporation's and the Utility's reasonably estimated losses" for the claims for "property damage" and "personal injuries" arising from the fires. Julian Decl. Ex. C, PG&E 10-Q at 48-49. PG&E intends to pay nothing to the Tubbs Fire victims unless "PG&E were to be found liable" by an adverse jury trial verdict. Julian Decl. Ex. G, PG&E 8-K, dated Jan. 13, 2019 at 4. However, PG&E's 10-Q filing admits that "if PG&E…were to be found liable…with respect to the 2018 Camp fire and 2017 Northern California wildfires, the amount of such liability could exceed $30 billion." Julian Decl. Ex. C at 47.

### D. A Tubbs Trial Would Likely Resolve All Fire Claims

After the 2017 North Bay Fire victims filed their state court litigation against PG&E in Napa and Sonoma Counties, the San Francisco Superior Court coordinated the litigation in the California North Bay Fire Cases as JCCP 4955 before Judge Curtis Karnow (the "**Coordination Judge**"), and appointed lead counsel and a leadership team to represent the individual victims. Kelly Decl. at ¶ 4, Ex. A. On October 25, 2018, PG&E's lead trial counsel, Kevin Orsini, requested the Coordination Judge to order the Tubbs claims to a jury trial first, because PG&E contested liability for that fire and resolution the Tubbs claim "has the highest probability of getting all the others tied up in a global resolution. . . . [W]e set the Tubbs trial first for precisely that reason . . . . We can't figure out how to resolve these until we have some visibility into what the resolution is going to be of the Tubbs case." Kelly Decl. at ¶ 9, Ex. C, California North Bay Fire Cases Hrg. Tr. at 16, 42-43. The Coordination Judge ordered the Atlas Fire claims to trial first, solely because they appeared to be a "somewhat simpler" case to try than the Tubbs claims. Kelly Decl. Ex. B at 2.

The TCC agrees with PG&E's conclusion that a jury trial of the Tubbs Preference Plaintiffs' claims would resolve the fire litigation, because of the size of the Tubbs Fire Claims and the fact PG&E settles all such claims before trial. Campora Decl. at ¶¶ 8-12. PG&E contends the Tubbs

---

local CBS affiliate warned that week, that "Weather officials said any fire that starts will likely spread quickly…. Downed power lines in remote areas will likely cause a fire to start, weather officials said." *See* Red Flag Warning Through Tuesday For North Bay Mountains, dated Oct. 2, 2017, https://sanfrancisco.cbslocal.com/2017/10/02/red-flag-warning-through-tuesday-for-north-bay-mountains/.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Fire Claims make up two-thirds of the 2017 North Bay Fire claim pool. Kelly Decl., Ex. C at 16:18-20 (Statement of PG&E counsel Orsini, Tubbs Fire Claims are "two-thirds of the potential liabilities" in the California North Bay Fire Cases). The Department of Insurance reports that the North Bay Fire Claim insured loss is $9.55 billion on 26,892 claims, so the Tubbs Fire Claims would equal roughly $6.2 billion of insured losses, and roughly $18.6 billion of total insured and uninsured losses based on the 3-1 multiplier ratio, representing about a third of a total wildfire claim pool of $54 billion.

### E. The Necessity of a Tubbs Trial

On January 31, 2019, at hearings on the first day motions in the Chapter 11 Cases, the Debtors' counsel informed this Court that the "ultimate goal, Your Honor, in Chapter 11 would be to establish a trust under a Plan of Reorganization to which all of the wildfire claims would be channeled and resolved." Dkt. No. 326, Transcript regarding Hearing Held Jan. 31, 2019, at 23. Such mass tort chapter 11 trusts cap distributions to the victims based on the amount paid into the Trust to resolve the tort claims, and hence impact the amount available for distribution as a matter of law. *See, e.g., In re Dow Corning Corp.*, 211 B.R. 545, 568-569 (Bankr. E.D. Mich. 1997). But, PG&E is either liable for the Tubbs Fire Claims or not. There is no middle ground. The inaccurate estimation of $18 billion in capitalization of the Trust would make a difference in the payments to the victims, and thereby limit the amount of cash available to pay wildfire claims.

The swing of $18 billion or more of Tubbs Fire Claims also would determine whether this is a solvent or insolvent case, because PG&E has scheduled its asset value at $61 billion and has non-tort claims of approximately $30 billion. Schedules, Dkt. No. 903, at 1. The Debtors' liabilities excluding fire claims are approximately $30 billion: $5.5 billion for the DIP financing, $1 billion of administrative claims, $21.5 billion of bank and unsecured bond claims, and $2 billion of trade debt. Wells Decl. at 6, 10-11. If more than $31 billion of tort claims are valid, PG&E is insolvent based on a $61 billion valuation. A $65 valuation of PG&E would create insolvency if the tort claims exceed $36 billion, and so on. In short, the parties cannot adequately capitalize a Trust, negotiate a consensual plan, or litigate a contested plan confirmation without resolving PG&E's liability for the Tubbs Fire Claims. Williams Decl. at ¶ 3.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Estimation of the Tubbs Fire Claims for purposes of determining feasibility of a plan under section 502(c) of the Bankruptcy Code is not an answer. As discussed in this brief, estimation of personal injury claims for purposes of plan voting or feasibility is possible in cases in which liability is admitted, the disputed issue is the dollar amount of the claims, and estimation does not impact the amount available for distribution. But estimation cannot resolve a multi-billion dollar factual liability issue that determines such a large dollar amount of claims, whether the Debtors are solvent or not, or the amount available for distribution on such claims from the capped Trust. Under the prevailing case law discussed below, estimation of a debtor's liability for a third of the claim pool paid by a capped trust impacts the ultimate distribution on the claims, and hence implicates the provisions of 28 U.S.C. section 157(b)(5), which reserve such determinations to a jury trial in the district court. The Debtors admitted this fact in 2002 in the estimation motion they filed in their first chapter 11 case. Julian Decl., Ex. J, PG&E Estimation Motion, at 8 n.10, discussed below, at page 12.

But a trial in the district court on a Tubbs claim would be, on average, at least two years away, and that would be too far off to assist the parties to negotiate their consensual plan now. Julian Decl., Ex. F, U.S. District Court — Judicial Caseload Profile, California Northern (finding that the median time from filing to trial is 28.4 months). The Governor has proposed legislation dependent on a PG&E resolution before June 2020, well before a district court trial is probable. Fortunately, the Court may grant relief from stay to permit a jury trial in the California Superior Court now, just as PG&E demanded last year. Eight infirm victims aged 73-97 and their North Bay Fire Cases lead counsel together have decided to try their cases in the Superior Court on the basis the claims are entitled to immediate trials under California's preference statute. Kelly Decl. at ¶ 5. Those complaints are attached as Exhibits B and C to the Motion. Kelly Decl. at ¶ 6. The Superior Court must set the cases of those victims for trial within 120 days of the Superior Court's order granting the preference pursuant to Code of Civil Procedure section 36. *Id.*

Trial of the preference Tubbs claims would resolve these Chapter 11 Cases. PG&E has a well-documented history of never trying a fire claim and always settling before trial. Campora Decl. at ¶¶ 10-12. In the words of PG&E's lead trial counsel Orsini, a resolution of the Tubbs Fire

Claims "has the highest probability of getting all the others tied up in a global resolution." Kelly Decl. at ¶ 9. The record establishes substantial cause for relief from the automatic stay to permit the Tubbs Preference Plaintiffs to proceed to trial in state court promptly, as this Court similarly ordered personal injury claims to be tried in state court in 2002, in the first PG&E chapter 11 case. *In re Pac. Gas & Elec. Co.*, 279 B.R. 561, 572 (Bankr. N.D. Cal. 2002).

## V. ARGUMENT

### A. Estimation Under the Code

#### 1. The Court may estimate claims pursuant to Bankruptcy Code section 502(c) if the liquidation of the claims would unduly delay the administration of the case.

Section 502(c) of the Bankruptcy Code authorizes bankruptcy courts to estimate "for purpose of allowance" "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Before the court may estimate a claim, it must determine that the claim at issue is "unliquidated" and that liquidation would "unduly delay" the bankruptcy case's administration. *See In re Lane*, 68 B.R. 609, 611 (Bankr. D. Hawaii 1986).

Claims for damages arising from personal injuries are unliquidated claims. *In re Dow Corning Corp.*, 215 B.R. 346, 359 (Bankr. E.D. Mich. 1997). Whether delay would be undue is a question that calls for the exercise of judicial discretion, *Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990), and depends on the particular facts and circumstances before the court. *See In re N. Am. Health Care, Inc.*, 544 B.R. 684, 688, 690 (Bankr. C.D. Cal. 2016) (determining that liquidation would unduly delay the case's administration because liquidation would likely take several years, and any estimated amount would not cap eventual distributions); *Apex Oil Co., v. Stinnes Interoil Inc. (In re Apex Oil Co.)*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) (determining that liquidation would not unduly delay the bankruptcy case and lifting the automatic stay to liquidate the claims based on finding that a trial would be scheduled before the district court and would take place in several months). "From the plain language of section 502(c), it is clear that estimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation. Nonetheless, bankruptcy law's general rule is to liquidate,

not to estimate. For estimation to be mandatory, then, the delay associated with liquidation must be 'undue.'" *In re Dow Corning Corp.*, 211 B.R. at 545, 563 (Bankr. E.D. Mich 1997).

### 2. Section 157(b)(2)(B) permits the Court to estimate personal injury claims for purposes of plan confirmation, but not for distribution.

PG&E's 10-Q states the wildfire damages are either property or personal injury. Julian Decl. Ex. C at 48. The Tubbs Preference Plaintiffs' injuries to their health, mental pain and suffering, emotional distress, anguish, and debilitating injuries suffered during their evacuations from the fire constitute personal injuries under 28 U.S.C. section 157 (b)(2)(B). *Plys v. Ang (In re Ang)*, 589 B.R. 165, 180 (Bankr. S.D. Cal. 2018), and cases cited therein. *In re Roman Catholic Archbishop of Portland in Oregon*, 339 B.R. 215, 224 (Bankr. D. Or. 2006) ("*Portland II*") (emotional distress claims). Congress has drawn a distinction regarding the bankruptcy court's authority to hear and determine personal injury claims. "[W]hen it comes time to determine the claims for purposes of distribution, section 157(b)(2)(B) lets it be known that this is not a core matter, and that the determination for purposes of distribution must be undertaken by the district court". 1 *Collier on Bankruptcy* ¶ 3.06[1] *citing Portland II*, 339 B.R. at 218-21. The estimation of a personal injury claim for the purpose of voting on a plan or feasibility determination is a core proceeding, 28 U.S.C. § 157(b)(2)(B), and does not necessarily implicate a claimant's jury trial rights. *See Grzybowski v. Aquaslide 'N' Dive Corp. (In re Aquaslide 'N' Dive Corp.)*, 85 B.R. 545, 549 (B.A.P. 9th Cir. 1987); *N. Am. Health Care, Inc.*, 544 B.R. at 690 (finding that an aggregate estimate of claims would not affect the eventual distributions to the claimants). However, the liquidation or estimation of such claims that impacts distribution in a bankruptcy case is non-core, 28 U.S.C. § 157(b)(2)(B).

### 3. Section 157(b)(5) and 1411(a) provides that personal injury claimants are entitled to a jury trial on their claims.

28 U.S.C. section 157(b)(5) deprives a bankruptcy court of the ability to hear and liquidate personal injury claims. To the extent a personal injury claimant has the right to a jury trial under applicable law, that right is preserved. 28 U.S.C. §1411(a) ("[T]his chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury tort claim.") "The combination of §§ 157(b)(5) and 1411(a) supports

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the view that no individual personal injury claimant can be forced to forego a jury trial of her claim." *Dow Corning Corp.*, 211 B.R. at 596. *See also Bankruptcy Local Rule* 9015-2(d) ("Upon timely motion of a party or upon the Bankruptcy Judge's own motion, the Bankruptcy Judge may determine that a claim is a personal injury tort claim requiring trial by a District Judge.").[4]

Importantly, personal injury claimants, like those injured in the Tubbs Fire, are entitled to a jury trial under California law. *See Russell v. Andersen*, 101 Cal. App. 2d 684, 697 (Cal. Ct. App. 1951); *Bieser v. Davies*, 119 Cal. App. 659, 663-64 (Cal. Ct. App. 1932).

### 4. The Court may not estimate a debtor's liability for personal injury claims if the resolution impacts distribution.

In chapter 11 cases involving mass torts, resolution of the tort claims is often a gating issue before plan proposals, confirmations and consensual resolutions. Often, the parties simply do not have enough data or are too far apart in their positions to be able to negotiate meaningfully. For example, in *Dow Corning*, the debtor contested liability for silicone breast implants, which were alleged to cause cancer. 211 B.R. at 561.[5] In that case, the court denied estimation motions filed by both the debtor and the tort claimants' committee for several reasons. One reason was because the delay associated with liquidating claims was not "undue," particularly because the estimation trial would be time consuming, costly, and be a repeat of any future jury trial to liquidate the claim. *Id.* at 562-63. The court found that the claims should be liquidated without delay. The court noted that its concerns about "undue delay" of the bankruptcy case were weakened because Dow Corning was operating on a profitable basis in bankruptcy. *Id.* at 564. And, stacking estimation proceedings before liquidation trials did not materially advance the case for all parties because it would speed up confirmation but delay the ultimate distribution to creditors. The court also noted that the

---

[4] To the extent that a bankruptcy court estimates the liability on a personal injury claim, it does so on threshold questions of law and not with regard to facts. *See, e.g., Dow Corning Corp.*, 215 B.R. at 351 (holding that the court could hear a summary judgment motion on *Daubert* issues because it was determining issues as part of the claims allowance process); *In re Standard Insulations, Inc.*, 138 B.R. 947, 951 (Bankr. W.D. Mo. 1992) (holding that the bankruptcy court may conduct a threshold inquiry on claims, as long as the court stops short of liquidating those claims it allows or of any genuine factual dispute, because eventually all allowable personal injury claims must be sent to district court or the court where the claim arose for liquidation); *see also Olivas v. Diocese of San Diego Educ. & Welfare Corp. (In re Roman Catholic Bishop of San Diego)*, No. 07-00989-LA11, 2007 WL 2406899, at *5 (S.D. Cal. Aug. 20, 2007) (recognizing that the court may need to withdraw the reference "at the proper time" to liquidate or estimate sexual abuse, but bankruptcy court was in the best position to manage mediation).

[5] *Cited with approval in In re Roman Catholic Bishop of San Diego*, 374 B.R. 756, 763 (Bankr. S.D. Cal. 2007).

estimation may be inaccurate. *Id.* at 563, 566. The court was concerned that other courts were more qualified to handle product liability matters. *Id.*

Most importantly, however, the court noted that an estimate of total liability would functionally cap distributions in violation of section 1411(a). *Id.* at 561-563, 568-69. The court held that estimation of the claims in a way that limited the amount of claimants' recovery in the reorganization would constitute a liquidation of the claims for distribution purposes, in violation of the plaintiffs' Seventh Amendment jury trial rights: "allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effect of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well." *Id.*

The *Dow Corning* court also found it was not strategically advantageous to estimate solely for voting purposes, where the tort claimants would be unlikely to vote for a plan regardless of the estimation. *Id.* at 572-73. "Estimation has little to recommend it. Moreover, estimation only delays the inevitable. Eventually the contested claims of tort claimants will have to be liquidated. For many claimants, liquidation would likely occur through lengthy jury trials. Better that process begin sooner rather than later. Additionally, no good reason exists why the process of liquidating the claims cannot begin immediately." *Id.* at 574.

This analysis is not controversial. PG&E cited this *Dow Corning* ruling with approval in PG&E's first chapter 11 case motion for an order determining estimation procedures for tort claims, on the basis that PGE had not proposed to cap payments to tort claimants in its first chapter 11 case. In that motion, PG&E admitted the *Dow Corning* court "*correctly* noted that the proposed plan in that case was not a full payment plan, but rather provided that the reorganized debtor would set aside a specified dollar amount . . . that limited recovery to a pro rata share of the set-aside funds if such funds proved insufficient to pay all claims in full" and the court could estimate the tort claims in PG&E's first chapter 11 case because *PG&E did not intend to cap distributions to the tort claimants*. Julian Decl. Ex. J, PG&E's Motion for Order Determining Procedures for Estimating Certain Claims for Plan Feasibility Purposes, at 8 n.10 (emphasis added).

The court in *Dow Corning* proposed an aggregative approach to liquidating and resolving

Case: 19-30088   Doc# 2855   Filed: 07/03/19   Entered: 07/03/19 09:10:34   Page 18 of 31

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the tort claims. *Id.* at 574. The court detailed the problems of due process and fairness in mass tort cases for all parties, such as the "impediments to achieving a fair and final adjudication" for both plaintiff and defendant. *Id.* at 574-75. "The inescapable conclusion is that the traditional tort system simply does not work in mass tort situations like the one facing the Debtor." *Id.* at 577.

Ultimately, the court in *Dow Corning* suggested that the parties liquidate claims via trial of the causation issue, if the case could not be resolved consensually in the meantime. *Id.* at 589. The court's proposal was only a suggestion – the court stated that depending on the result of a pending summary judgment motion, the court would issue this opinion as a formal report and recommendation to the district court. *Id.* at 603. If consensual resolution was not possible, the court stated that it would recommend consolidated general causation trials. *Id.* at 593. While that summary judgment motion was pending, the parties consensually resolved the issues and agreed to a plan of reorganization. Douglas G. Smith, Resolution of Mass Tort Claims in the Bankruptcy System, 41 Univ. Cal. Davis L. Rev. 1613, 1638 (2008).

Another instructive case is *In re Roman Catholic Bishop of San Diego*, 374 B.R. 756 (Bankr. S.D. Cal. 2007). In that case, the court rejected the debtor's argument that estimation of claims must occur in the federal system and remanded 42 state law sexual abuse lawsuits because: (1) resolution of the lawsuits was central to administration of the case, noting "[t]he lawsuits are the reason the Debtor filed this case"; (2) absent a settlement, prompt resolution of the claims through the bankruptcy process was unlikely; (3) the bar date had not yet passed so the claims estimation could not begin until that time, and the court anticipated significant disputes about estimation, including the potential right to appeal regarding the plaintiffs' Seventh Amendment rights; (4) the court foresaw a lengthy confirmation process; (5) state law, not federal law, issues predominated; and (6) the subject matter was of compelling state interest and factors of comity favored the state court system. *Id.* at 762-64.

In *In re Roman Catholic Archbishop of Portland*, 338 B.R. 414, 418 (Bankr. D. Or. 2006) ("*Portland I*"), Judge Perris addressed the fact that the debtor proposed to cap the assets available to pay the personal injury claims, and the parties had not been able to resolve the case consensually because they had *different views of what a jury would award the claimants in the liquidation stage*.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Judge Perris granted relief from stay to liquidate the tort claims, because "settlement efforts with respect to individual claims have been tried and have largely failed, it is time to move forward with the liquidation of the claims for distribution purposes. . . . *Trying a few of the claims will help solve that problem*, and may cause some of the parties to reevaluate their position." *Id.* (emphasis added).

Similarly, in a second decision in the same case, *Portland II*, the debtors proposed to estimate a second set of sex abuse/emotional distress claims that were not subject to Judge Perris' relief from stay decision in *Portland I,* and channel that liability to a limited fund while discharging the debtor from all liability, just like PG&E proposes to do in this case. 339 B.R. at 218-19. Because the plan capped the amount of money set aside for those creditors, Bankruptcy Judge Perris ruled once again that any estimation would essentially be an improper estimation for distribution purposes. *Id.* at 220-23. In the light of that record, Judge Perris decided she would not estimate claims even for purposes of voting and that only the district court could perform such an estimation for that purpose. *Id.* at 223-24. Judge Perris ruled that (i) if the debtor insisted, she would "at the appropriate time prepare a report and recommendation to the district court" on the subject, (ii) because "due process likely requires an individualized estimation of claims" though something like test cases or a matrix comparing Oregon jury verdicts to specific aggravating factors, and (iii) "I would likely recommend to the district court that estimation of the claims for compensatory damages should err on the high side of the probable range, to assure an adequate fund for payment of liquidated claims." *Id.* at 221-23. *See also Kayle v. Lake Balboa Health Care, Inc.*, No. LA CV15-01629 JAK (ASx), 2015 U.S. Dist. LEXIS 63629, at *2, *4 (C.D. Cal. May 14, 2015) (deferring a wrongful death action to state court because of the predominance of state law issues and the state court's familiarity with them).

**B.  Estimation of the Tubbs Fire Claims Would Violate the Claimants' Seventh Amendment Rights and Would Delay this Case Further. Liquidation in State Court Would Promote a Consensual Resolution of All Fire Claims.**

**1.  A Court may not estimate liability when estate cash is insufficient to pay claims in full, and estimation would necessarily create a limited fund or cap on the debtor's liability or ability to pay the claims in full.**

As discussed above, if a plan caps payment of mass tort personal injury claims entitled to a jury trial for purposes of distribution, such as by placing limited funds in a trust, then a court order estimating the size of those claims for the purpose of sizing the trust would necessarily be an

estimation for the purposes of distribution prohibited by 28 U.S.C. section 157(b)(5), which preserves the right to determine the claim by a jury trial in the district court. In such a case, the bankruptcy court should order the parties to try the personal injury cases in jury trials pre-confirmation, in order to assist the parties to negotiate or confirm a plan.

"[A]llowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effects of 11 U.S.C. § 1141(d), can create the result that estimation was actually for purposes of distribution as well." *Dow Corning*, 211 B.R. at 569. The right to a jury trial is implicated by a "de facto estimation for distribution purposes." *Id.* "Therefore, a strong argument can be made that estimating the aggregate value of tort claims for plan purposes runs roughshod over personal injury claimants' rights." *Id.*

Similarly, in *Portland II*, the debtor "intend[ed] to use the estimation" in a way that resulted in capping the liability it would pay. 339 B.R. at 221. Judge Perris explained that such a request was akin to estimating personal injury tort claims for purposes of distribution, and thus impermissible. *Id.*

PG&E and the bondholders have proposed to pay wildfire claims from a capped Trust based on the value of the wildfire claims. Unless the Court estimates the Tubbs Fire Claims at 100% of the amount requested by the TCC, any plan that uses an estimated number would result in the Tubbs Fire Claims being capped or somehow limited in the ultimate plan of reorganization. *See In re N. Am. Health Care, Inc.*, 544 B.R. 684, 690 (Bankr. C.D. Cal. 2016) (finding that an aggregate estimate of claims would not affect distribution because the tort claims were not being discharged in bankruptcy). Because the tort claims will be fully resolved before discharge, the situation here is identical to the circumstances in *Dow Corning, Portland I,* and *Portland II*, where the courts held that the use of an estimated number for plan distribution results in a "de facto estimation for distribution purposes." 211 B.R. at 569. If the Court were to estimate claims at an amount less than 100%, even if the Tubbs Fire claimants bring their claims to a jury for liquidation purposes after plan confirmation, that liquidation would be moot because their distribution amount would

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

have already been capped by the plan. Thus, estimation of the Tubbs Fire Claims for plan development is impermissible in this case.

**2. A Court may not estimate liability when a debtor disputes the validity of the claims based on a factual causation issue.**

Where the validity of the personal injury jury trial claims turns on a liability and causation issue of fact, the Court should order the parties to try the causation issue before a jury, in order for the parties to negotiate a plan that would pay the claims, or to permit the parties to determine the debtor's liability for the claims in a contested confirmation hearing. All personal injury or wrongful death claims must be heard by a jury. 28 U.S.C. §§ 157(b)(5), 1411(a). Any estimation of liability can be for voting purposes only, and so any liability trial must be repeated in front of a jury for all other purposes. *Aquaslide 'N' Dive Corp.,* 85 B.R. at 549. In *Dow Corning*, the court explained that when liability is an issue, estimation provides no time savings over liquidation. 211 B.R. at 563. "[T]here is no guarantee that estimation would in fact move matters along significantly faster." *Id.* The court explained that an estimation hearing would likely include many witnesses, many pieces of evidence and "extensive oral argument." *Id.* If the parties present their contentious cases at an estimation hearing, they would only need to hold a trial again in front of a jury when it is time to actually liquidate the claims. *Id.* at 566. As a result, the court in *Dow Corning* suggested a consolidated trial on causation. *Id.* at 582. Judge Perris similarly ordered relief from stay in *Portland I* to try the personal injury claims as a test case to assist the court.

Here, PG&E disputes liability for the Tubbs Fire. Wells Decl. at 14. This is the threshold issue that stalls negotiations. If the Court were to estimate the Tubbs Fire Claims for liability purposes, it would need to hold a preliminary causation trial to determine whether the claims are valid in the first place. This trial would be long and contentious. And, this trial would then need to be repeated in state court in front of a jury for liquidation purposes – with no guarantee that a jury decides the result consistently with the estimation. 28 U.S.C. §§ 157(b)(5), 1411(a). For this reason, the courts in *Dow Corning* and *Portland I* denied estimation and favored a jury trial on these claims. As the court stated in *Dow Corning*, estimation would not save any judicial resources, and thus the "undue delay" from liquidation would not be present, and thus any estimation would be without merit. 211 B.R. at 574. "[E]stimation only delays the inevitable. . . . For many

- 16 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

claimants, liquidation would likely occur through lengthy jury trials. Better that process begin sooner rather than later." *Id*.

**3.** **A Court may not estimate liability when the parties are unable to determine the amount of money to set aside to pay the claims because the debtor disputes liability for the claims as a factual matter, and the parties would thereby be unable to negotiate a plan of reorganization that would pay the amount of claims in dispute.**

Where the parties cannot negotiate or confirm a plan because they have not determined the factual validity of the personal injury claims and thereby cannot negotiate the payment of the claims, the Court should grant relief from stay to permit the state court to resolve the jury trial claims and provide a basis for the parties to negotiate or confirm a plan of reorganization on the basis of the jury trial result. For example, in *Portland I,* Judge Perris granted relief from stay to liquidate the tort claims, given the fact that "settlement efforts with respect to individual claims have been tried and have largely failed, it is time to move forward with the liquidation of the claims for distribution purposes. . . . *Trying a few of the claims will help solve that problem*, and may cause some of the parties to reevaluate their position." *Id.* at 418 (emphasis added). The court noted that state court was more expeditious than federal court, particularly because, among other things, the differences in expert discovery. *Id.* at 419.

Similarly, in *Dow Corning*, the court made clear that its proposal was made "[w]ith an eye towards fostering settlements." 211 B.R. at 576. "It is fairly obvious that there is a factual question common to all the implant claims—namely, whether silicone is pathogenic. . . . A determination that silicone is bio-inert would, in one fell swoop, fully or partially dispose of many thousands of implant claims. . . . A contrary determination, while not dispositive, would likely have a favorable impact on settlement prospects." *Id.* at 582-84.

Here, ideally, the parties will come together to determine the ultimate resolution of these fire claims. Such a resolution is not out of the picture. However, certain issues are unlikely to be resolved consensually, particularly where so many claimants are involved. The causation and liability of the Tubbs Fire is exactly such an issue. Estimation, because it would not be the final arbiter of liability, would not provide the resolution that the parties need. Liquidation, on the other

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

hand, would give the parties an accurate and reliable information point from which a plan may be resolved, as the courts have noted in the similar *Dow Corning*, *Portland I* and *II* decisions.

**4.  Courts in mass tort chapter 11 cases have granted relief from stay and abstention when such relief would promote settlement and are in the public interest.**

Forward momentum on the liability issues often foster settlements on the liability issues as well.  As the bankruptcy court in *Dow Corning* explained, the debtor "has historically settled such claims and has expressed willingness to continue to do so."  211 B.R. at 597.  When companies such as Dow Corning are repeatedly sued in personal injury actions, they understand how and when to settle cases.  This prospect for settlement was one of the reasons that the bankruptcy court suggested moving forward on causation trials in *Dow Corning*.

Also, as the court in *Portland I* noted, these personal injury actions may have a public impact as well.  Judge Perris noted that there is a continual "tug of war" between all parties, the protracted litigation of the cases not only affected the victims, but also the parishioners, thus impacting the public.  338 B.R. at 418.  She ultimately granted relief from stay to allow those cases to go to trial.

**C.  Relief from Stay Should be Granted for Good Cause, Including the Standards Applicable in Mass Tort Chapter 11 Cases and Abstention Cases.**

Under Section 362(d)(1) of the Bankruptcy Code, the court may grant relief from the automatic stay for "cause."  "Because there is no clear definition of what constitutes 'cause,' discretionary relief from the stay must be determined on a case by case basis."  *Mac Donald v. Mac Donald (In re Mac Donald)*, 755 F.2d 715, 716 (9th Cir. 1985); *see also Piombo Corp. v. Castlerock Props. (In re Castlerock Props.)*, 781 F.2d 159, 163 (9th Cir. 1986).

As discussed more fully above in section B, in mass tort chapter 11 cases, a court should grant relief from stay and/or abstain in each of the following situations:  (1) where the debtor has proposed a Trust that is capitalized with estate cash insufficient to pay claims in full if the liquidations exceed the amount estimated to capitalize the Trust, because estimation would necessarily create a limited fund or cap on the debtor's liability or ability to pay the claims in full; (2) where the debtor disputes the validity of the claims based on a factual causation issue; (3) where the parties are unable to determine the amount of money to set aside to pay the claims because the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

debtor disputes liability for the claims as a factual matter, the disputed claims involve a large dollar amount, and the parties would thereby be unable to negotiate a plan of reorganization that would pay the amount of claims in dispute because they have a fundamental disagreement on claim value (4) where relief from stay and abstention would result in settlement of the cases; and (5) when a trial is in the individual's or the public's interest.

### 1. The standards for relief from stay set forth in the mass tort chapter 11 cases are met here.

The Tubbs Fire is a gating issue in this case. The Debtors dispute liability for the Tubbs Fire, and any consensual plan of reorganization is impossible until a jury tells the parties whether PG&E is liable for the Tubbs Fire. In that sense, it is like the chromium claimants in the first PG&E bankruptcy, 279 B.R. 561, or the implant claimants in *Dow Corning*. As the court explained in *Dow Corning,* "it is fairly obvious that there is a factual question common to all the implant claims—namely, whether silicone is pathogenic. . . . A determination that silicone is bio-inert would, in one fell swoop, fully or partially dispose of many thousands of implant claims. . . . A contrary determination, while not dispositive, would likely have a favorable impact on settlement prospects." *Id.* at 582-84. Here, the TCC seeks exactly the same, using a case or cases in state court – is PG&E liable for the Tubbs Fire? A determination of liability would, "in one fell swoop" either dispose of claims or have a favorable impact on settlement prospects.

Each of the five situations that justify relief from stay and abstention in mass tort chapter 11 cases are present here.

### a. PG&E's value is insufficient to pay claims in full, and estimation would necessarily create a limited fund or cap on the Debtors' liability or ability to pay the claims in full.

The TCC estimates that tort claims in this case exceed $54 billion, including liability for the 2017 Tubbs Fire. Based on the Debtors' current value, and based on other liabilities in the case, the Debtors would not be able to propose a plan using current value that pays claims in full. As a result, the Debtors intend to create a Trust with a limited Trust fund that caps the Debtors' liability for fire claims pursuant to an estimation proceeding. The Ad Hoc Committee of Senior Unsecured Noteholders proposed the same capped Trust to limit the distributions to the wildfire claimants

pursuant to an estimation motion. *See* Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code, Dkt. No. 2741, Ex. B at 11-14, and notes 9 and 10 (proposing that distribution is capped and is dependent on estimation proceedings).

Such an estimation is a *de facto* estimation for distribution purposes because the estimation would cap the amount available, and thus would be improper under the *Dow Corning and Portland II* line of decisions. *See supra* at A.4. PG&E agreed with this conclusion in its first chapter 11 case estimation filing. Julian Decl. Ex. J, PG&E Motion at 8, n. 10. Judge Perris denied estimation on this ground in *Portland II*, 339 B.R. at 220-21, and the bankruptcy court in *Dow Corning* denied estimation for the same reason in favor of trying test cases. 211 B.R. at 569.

### b. PG&E disputes the validity of the Tubbs Fire Claims based on a factual causation issue.

The major gating issue here is whether PG&E is liable for the Tubbs Fire. A case or cases can be tried in order to resolve PG&E's liability, similar to the claims in *Dow Corning*. There, the court denied estimation motions because hearing the liability issues in the bankruptcy court would be needlessly duplicative of the ultimately required trial by jury. 211 B.R. at 563.

### c. The parties need to resolve the Tubbs Fire Claims in order to negotiate a consensual plan of reorganization or confirm a contested plan.

The Tubbs Fire is a gating issue because PG&E's liability would change the landscape of the case. According to PG&E's trial counsel, the Tubbs Fire Claims are roughly one-third the value of the entire wildfire claim pool. Moreover, if PG&E is liable for the claims, the Debtors likely are insolvent. The parties cannot negotiate a consensual plan if the landscape could change that dramatically. PG&E's lead trial counsel, Kevin Orsini, admitted that fact eight months ago, stating that trying the Tubbs claims "has the highest probability of getting all the others tied up in a global resolution. . . . We can't figure out how to resolve these until we have some visibility into what the resolution is going to be of the Tubbs case." Kelly Decl. at ¶ 9. The TCC's Financial Advisor who has been attempting to structure such a settlement made the same point in his declaration. Williams Decl. at ¶ 3. The bondholders' motion to terminate exclusivity (Dkt. No. 2741, Ex. B at 11-12) highlights this fact by capping the distributions for Tubbs Fire Claims at 10% of the amount paid

- 20 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

for other claims. And the Governor has proposed legislation dependent on a PG&E resolution before June 2020, which can be obtained only by using the state court fast track forum. Judge Perris granted relief from stay on similar grounds in the *Portland* cases.

### d. Relief from stay would result in settlement of the Chapter 11 Cases.

It is undisputed that PG&E settles all fire claims before trial. Campora Decl. at ¶¶ 8-12. True to form, just eight months ago, PG&E's lead trial counsel, Kevin Orsini, admitted in the litigation that trying the Tubbs claims "has the highest probability of getting all the others tied up in a global resolution." Kelly Decl. at ¶ 9. Like *Dow Corning* and the *Portland* cases, this Court should order a jury trial because the trial setting would result in settlement.

### e. A Tubbs Fire jury trial is in the victim's and public's interests.

The individual victims who have requested an immediate trial are between the ages of 73 and 97 and infirm. They cannot await the district court's adjudication of their claims two years from now. The Superior Court must try the preferential jury trial claims immediately, within 120 days, under California's preference statute. Such cause is substantial and warrants relief from stay to liquidate the claims. *See Portland I*, 338 B.R. at 418 (explaining the impact of the "tug of war" on all parties, including the parishioners).

The public interest also is considerable. The Tubbs Fire destroyed the entire communities of Fountaingrove and Coffee Park in Santa Rosa. The victims suffered serious injuries evacuating the fire. Many lost their loved ones. Thousands of people lost their homes. Coffee Park in particular looked like pictures of Hiroshima after it was destroyed by an atomic bomb. *See* Appendices A and B hereto. PG&E intends to pay nothing to the victims absent an adverse verdict. A jury trial resolution of the claims of two entire communities is compelling, and in the public interest by definition. *Portland I*, 338 B.R. at 418.

### 2. Cause for relief from stay under the general case law standards are also present in this case.

"Among factors appropriate to consider in determining whether relief from the automatic stay should be granted to allow state court proceedings to continue are considerations of judicial economy and the expertise of the state court, as well as prejudice to the parties and whether exclusively bankruptcy issues are involved." *Kronemyer v. Am. Contractors Indem. Co. (In re*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 21 -

*Kronemyer)*, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009) (internal citations omitted). Importantly, courts in the Ninth Circuit have granted relief from the stay under § 362(d)(1) when necessary to permit pending litigation to be concluded in another forum if the non-bankruptcy suit involves multiple parties or is ready for trial. *Truebro Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty Prods., Inc.)*, 311 B.R. 551, 556 (Bankr. C.D. Cal. 2004) (citing *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990)).

To determine whether "cause" exists, some courts in the Ninth Circuit analyze twelve factors set forth in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984). *In re Baleine, LP*, No. CV 14-02513 SJO, 2015 U.S. Dist. LEXIS 140145, at *21-22 (C.D. Cal. Oct. 13, 2015). These factors are as follows: "(1) Whether the relief will result in a partial or complete resolution of the issues. … (2) The lack of any connection with or interference with the bankruptcy case. … (3) Whether the foreign proceeding involves the debtor as a fiduciary. … (4) Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases. … (5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation. … (6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question. … (7) Whether the litigation in another forum would prejudice the interests of other creditors, the creditor's committee and other interested parties. … (8) Whether the judgment claim arising from the foreign action is subject to equitable subordination. … (9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f). … (10) The interest of judicial economy and the expeditious and economical determination of litigation for the parties. … (11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial. … (12) The impact of the stay and the balance of hurt." 40 B.R. at 799-800 (internal citations omitted); *see also Plumberex*, 311 B.R. at 559 (adopting the *Curtis* factors and recognizing courts in other circuits that have done the same).

The relevant *Curtis* factors weigh in favor of relief from stay. The trial would resolve the liability issue over the Tubbs fire and provide a verdict from which the parties can value personal injury claims in a consensual plan. The trial would speed up the Chapter 11 Cases – not interfere

with the cases. The debtor is not a fiduciary. The JCCP is a specialized tribunal that has already been established and has expertise to set the cases for a preferential trial. The Debtors have liability insurance for the wildfire claims (Julian Decl. Ex. C, PG&E 10-Q at 63), and such liability policies pay for the defense of such claims without reducing the amount of coverage to pay the claims. John K. DiMugno and Paul E.B. Glad, California Insurance Law Handbook § 46:123 (2019) ("A primary insurer cannot shift its duty to defend to the excess insurer by tendering its limits."). The litigation would not prejudice other creditors because the plaintiffs would not receive a distribution. Equitable and judicial liens are not applicable. The plaintiffs can proceed to trial within 120 days of the trial setting as required by CCP section 36. And, the interests of judicial economy and the impact of the stay all weigh in favor of granting relief from the stay. In particular, the 73 to 97 year old infirm victims cannot wait for their district court jury trials in two years.

### 3. Cause for discretionary abstention under the general case law standards are also present in this case.

The abstention factors also provide cause for relief from the automatic stay, particularly when the lifting the stay is in the best interest of the bankruptcy case. *See Pursifull v. Eakin*, 814 F.2d 1501, 1505-1506 (10th Cir. 1987) (affirming the lifting of the automatic say for cause) *cited with approval in Benedor Corp. v. Conejo Enters. (In re Conejo Enters., Inc.)*, 96 F.3d 346, 352 (9th Cir. 1996). Section 157(b)(4) of the Judicial Code provides that the liquidation or estimation of personal injury and wrongful death claims for the purposes of distribution shall not be subject to the mandatory abstention provisions of 28 U.S.C. section 1334(c)(2) that apply to a proceeding. However, the bankruptcy court may abstain from estimating or liquidating such claims in a proceeding in favor of a state court "in the interests of justice or comity with State courts" under the provisions of 28 U.S.C. section 1334(c)(1). *In re Pac. Gas & Elec. Co.*, 279 B.R. 561, 566-68 (Bankr. N.D. Cal. 2002) (holding that bankruptcy judges have the authority to decide abstention motions pertaining to personal injury claims). The Tubbs Preference Plaintiffs' claims are not pending in an adversary proceeding or contested matter in this case, so the Court is not presented with a motion in such a proceeding. However, the abstention standards are relevant in evaluating cause for relief from the automatic stay, and abstention regarding the estimation proceedings the Debtor intends to file.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

A bankruptcy court should consider the following factors when deciding whether to abstain pursuant to section 1334(c)(1): "'(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than form of an asserted 'core' proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of [the bankruptcy court's] docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of nondebtor parties.'" *Tucson Estates, Inc.*, 912 F.2d at 1166-67 (quoting *Republic Reader's Serv., Inc. v. Magazine Service Bureau, Inc. (In re Republic Reader's Serv., Inc.)*, 81 B.R. 422, 429 (Bankr. S.D. Tex. 1986) (internal quotation marks omitted)); *Falk v. Falk (In re Falk)*, No. NC-12-1385-DJuPa, 2013 Bankr. LEXIS 4645, at *25-26 (B.A.P. 9th Cir. Sep. 26, 2013).

The *Tucson Estates* abstention factors would weigh in favor of abstention here. The first factor, efficiency, is met here because the Tubbs Fire is a gating issue unlikely to resolve consensually. The second factor is met here because the issue of PG&E's liability is a state law issue, in which the state is heavily invested, not a bankruptcy issue. The third factor favors state court because any unsettled state law should be resolved in state court. The fourth factor, the presence of a related proceeding commenced in state court has been met. The fifth issue favors abstention because no other jurisdictional basis exists given the personal injury claimants' rights to a jury trial and the unavailability of a timely jury trial in the district court. The sixth and seventh factor, the degree of relatedness or remoteness of the proceeding to the main bankruptcy case and the asserted "core" proceeding, favors state court because these claims are non-core, state law claims under 28 U.S.C. section 157(b)(2)(B). The eighth factor, the feasibility of severing state law claims, favors state law because severing these claims is straight forward. The ninth factor, the

burden to the Court, favors abstention. The tenth factor, the likelihood of forum shopping, also favors abstention because the Tubbs Preference Plaintiffs chose state court because of the availability of a trial within 120 days. The eleventh factor, the claimants' right to a jury trial, favors a jury trial by definition. And finally, the twelfth factor, the presence of non-debtor parties, the victims' insurers, also favors state court, because the victims' insurers also favor state court trials of the Tubbs claims.

### D. The Court should grant relief from stay over the personal injury claimants' entire claim, including their property damage claim, because the jury should consider the entire claim in furtherance of judicial economy and a full exposition of the liability and causation issues.

The Tubbs Preference Plaintiffs' claims request personal injury and property damages as part of the same cause of action. Accordingly, the Court should terminate the stay to permit the victims to liquidate their entire claim in the context of the victims' loss. If the claim is not tried as one, bifurcation would require the state court to hear the personal injury damage part of the claim and then this Court, arguably, to hear evidence on the property damage part of the same claim, resulting in duplicative proceedings and a waste of judicial and party resources. The TCC contends splitting the cause of action would result in a jurisdictional objection to the bankruptcy court's determination of the remainder of the split cause of action. Given that the state court would already be hearing the personal injury damage component of the claim, the most efficient way to proceed would be to include the personal injury and property damage components together as part of the single claim.

## VI. CONCLUSION

The TCC respectfully requests the Court enter an order terminating the automatic stay to permit the claims of the Tubbs Preference Plaintiffs to proceed to a state court jury trial.

Dated: July 3, 2019

Respectfully submitted,

BAKER & HOSTETLER LLP

By: */s/ Robert A. Julian*
Robert A. Julian

*Counsel for Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 25 -