**DIEMER & WEI, LLP**

Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**

Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
        jminias@willkie.com
        bmccallen@willkie.com

*Counsel for Ad Hoc Group of Subrogation
Claim Holders*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 19-30088 |
| PG&E CORPORATION, | Chapter 11 |
|    - and - | (Lead Case) |
| PACIFIC GAS AND ELECTRIC COMPANY, | (Jointly Administered) |
|         Debtors. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors | Date:     July 24, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>           Courtroom 17, 16th Floor<br>           San Francisco, CA 94102 |
| *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Objection Deadline: July 19, 2019 at 4:00 p.m. |

## Table of Contents

Page

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS .......................................................................6

ARGUMENT ....................................................................................9

I.  THE AD HOC SUBROGATION GROUP'S CLAIMS SHOULD BE TRIED TOGETHER WITH THE TCC PLAINTIFFS' CLAIMS...................................9

II.  THIS COURT SHOULD LIFT THE AUTOMATIC STAY TO ALLOW THE CLAIMS OF THE AD HOC SUBROGATION GROUP TO PROCEED TO TRIAL IN STATE COURT....................................................................................12

    A.  Permitting The Ad Hoc Subrogation Group To Proceed With Its Claims In State Court Would Assist In the Administration Of The Estate. ...................................13

    B.  Judicial Economy Concerns Weigh In Favor Of Lifting the Stay. .......................14

    C.  Lifting The Automatic Stay Would Not Prejudice Other Creditors. ....................15

    D.  The Balance of Hardships Favors Lifting The Automatic Stay............................16

    E.  This Motion Is Distinguishable From Prior Motions For Relief From The Automatic Stay In These Cases That This Court Has Continued. .........................16

III.  THE ABSTENTION FACTORS ARE MET HERE, WHICH FURTHER SUPPORTS LIFTING THE AUTOMATIC STAY.....................................................16

CONCLUSION..................................................................................18

i

Table of Authorities

**Cases**                                                                                                    **Page(s)**

*Abadie v. Poppin*,
    154 B.R. 86 (N.D. Cal. 1993) ...................................................................................18

*Allstate Ins. Co. v. Mel Rapton, Inc.*,
    77 Cal. App. 4th 901 (Cal. Ct. App. 2000) .............................................................11, 15

*In re Am. Spectrum Realty, Inc.*,
    540 B.R. 730 (Bankr. C.D. Cal. 2015)...................................................................13

*In re Baleine, LP*,
    No. 13-27610 (MH), 2015 WL 5979948 (C.D. Cal. Oct. 13, 2015) ...............................15

*Cavanagh v. California (In re Plantica Landscape Corp.)*,
    BAP No. CC-05-1245, 2006 WL 6811001 (B.A.P. 9th Cir. Aug. 18, 2006) ...................18

*In re Consol. Distribs., Inc.*,
    No. 13-40350 (NHL), 2013 WL 3929851 (Bankr. E.D.N.Y. July 24, 2013) ...................13

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*,
    912 F.2d 1162 (9th Cir. 1990) ...........................................................................12

*Coordination Proceeding Special Title (Rule 3.550)*,
    No. CJC170004955, 2018 WL 491364 (Cal. Super. Ct. Jan. 4, 2018)...........................11

*In re Curtis*,
    40 B.R. 795 (Bankr. D. Utah 1984) ......................................................................13

*Ferraro v. S. Cal. Gas Co.*,
    102 Cal. App. 3d 33 (Cal. Ct. App. 1980) ..............................................................11

*In re Fung*,
    No. 16-15784 (RK), 2016 WL 4148097 (Bankr. C.D. Cal. Aug. 2, 2016) ....................13

*Gonzales Construction Co. v. Fulfer (In re Fulfer)*,
    159 B.R. 921 (Bankr. D. Idaho 1993).....................................................................18

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*,
    499 F.3d 1048 (9th Cir. 2007) ...........................................................................15

*Kennilworth Partners II LP v. Crisman*,
    No. C-00-3218 (VRW), 2001 WL 30534 (N.D. Cal. Jan. 3, 2001)..........................17, 18

ii

*Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer)*,
    405 B.R. 915 (B.A.P. 9th Cir. 2009)................................................................13

*Labankoff v. GMAC Mortg., LLC (In re Labankoff)*,
    No. NC-09–1294, 2010 WL 2384543 (B.A.P. 9th Cir. June 14, 2010)............................18

*Lapierre v. Advanced Med. Spa Inc. (In re Advanced Med. Spa Inc.)*,
    BAP No. EC-16-1087, 2016 WL 6958130 (B.A.P. 9th Cir. Nov. 28, 2016) ........12, 14, 16

*M.K. v. Tenet*,
    216 F.R.D. 133 (D.D.C. 2002)................................................................11

*In re Pac. Gas & Elec. Co.*,
    279 B.R. 561 (Bankr. N.D. Cal. 2002) ....................................................5, 17

*In re PG&E Corp.*,
    No. 19-30088 (DM), 2019 WL 2122733 (Bankr. N.D. Cal. May 13, 2019)....................16

*In re Pingrey*,
    No. 12-10158, 2012 WL 1833928 (Bankr. N.D. Cal. May 18, 2012) ............................18

*Rebein v. Kost*,
    No. 06–204 (CM), 2006 WL 3842124 (D. Kan. Nov. 3, 2006) ....................................10

*In re Res. Tech. Corp.*,
    No. 03 C 5785, 2004 WL 419918 (N.D. Ill. Feb. 13, 2004).................................11, 14

*In re Roger*,
    539 B.R. 837 (C.D. Cal. 2015) ................................................................13

*In re Roger*,
    No. 15-00087, 2015 WL 7566647 (C.D. Cal. Nov. 24, 2015) ..................................17, 18

*Roy v. Bank of N. Y. Mellon*,
    No. 17-CV-6729 (MKB) (LB), 2018 WL 4771898 (E.D.N.Y. Sept. 30, 2018)...............11

*Santa Clara Cty. Fair Ass'n v. Sanders (In re Santa Clara Cty. Fair Ass'n)*,
    180 B.R. 564 (B.A.P. 9th Cir. 1995)................................................................14

*Sedlachek v. Nat'l Bank of Long Beach (In re Kold Kist Brands, Inc.)*,
    158 B.R. 175 (C.D. Cal. 1993) ................................................................18

*In re Shaffer*,
    563 B.R. 301 (Bankr. D. Ariz. 2016)................................................................13

Case: 19-30088   Doc# 2863-1   Filed: 07/03/19   Entered: 07/03/19 18:36:16   Page 4 of 24

*In re Shiloh Church Ministries, Inc.*,
    No. 07-40590 (DML), 2007 WL 7087064 (Bankr. N.D. Tex. June 1, 2007)....................10

*Springer v. Ernst & Young, LLP*,
    No. C-05-25 (JF), 2005 WL 1566554 (N.D. Cal. July 5, 2005) ........................15

*Sutterfield v. Micromuse, Inc.*,
    No. C 04-0893 (SBA), 2004 WL 6058065 (N.D. Cal. July 13, 2004) ...........................11

**<u>Statutes and Other Authorities</u>**

11 U.S.C. § 362(d) ...............................................................................................12

28 U.S.C.

    § 1334(c)(1) .................................................................................................17

Cal. Civ. Proc. Code

    § 404.1.........................................................................................................11

Fed. R. Civ. P. 20 ...............................................................................................11

H.R. Rep. 95-595, *as reprinted in* 1978 U.S.C.C.A.N. 5963 ......................................14

iv

The Ad Hoc Group of subrogation claim holders (the "Ad Hoc Subrogation Group") hereby moves for relief from the automatic stay under Bankruptcy Code 362(d) in order to pursue claims of the Ad Hoc Subrogation Group's members against PG&E Corporation and Pacific Gas and Electric Company (hereinafter "PG&E" or the "Debtors") regarding the issue of the Debtors' liability for the Tubbs Fire in the California Superior Court, where the claims are currently pending in a Coordination Proceeding, Case No. 4955.

## PRELIMINARY STATEMENT

The Ad Hoc Subrogation Group brings this motion in conjunction with the *Amended Memorandum of Points and Authorities in Support of Motion of the Official Committee of Tort Claimants for Relief From Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* (the "TCC Motion"). The Official Committee of Tort Claimants (the "TCC") and the Ad Hoc Subrogation Group file these motions in order to move these bankruptcy cases toward a confirmable plan of reorganization expeditiously and efficiently. That goal can best be achieved by answering the question that most separates the key parties negotiating a plan: Is PG&E liable for the devastating 2017 Tubbs Fire?

This is a gating issue for any consensual resolution of the wildfire claims against PG&E, because: (a) the damages caused by the Tubbs Fire represent a major component of PG&E's aggregate wildfire damages exposure; and (b) as a result of a flawed report by Cal Fire regarding the cause of the Tubbs Fire, the wildfire claimants on the one hand, and the Debtors and other PG&E stakeholders on the other hand, are materially farther apart in their assessments of PG&E's liability for the Tubbs Fire than they are in their assessments of PG&E's liability for any of the other fires. The dramatic difference in the parties' assessments of PG&E's liability for the Tubbs Fire is the greatest obstacle to a consensual resolution of these cases. Thus, a trial of that issue will materially advance the resolution of these cases.

Of all the fires across Northern California in October 2017, the Tubbs Fire was the most destructive, burning 36,807 acres across Sonoma and Napa Counties, killing at least 22 people, and destroying 5% of the housing stock in Santa Rosa. By some estimates, the Tubbs Fire could account for as much as two-thirds of PG&E's total liability for the 2017 wildfires. The Ad Hoc

Subrogation Group and the plaintiffs represented by the TCC are by far the two largest constituencies in these bankruptcy cases, holding tens of billions of dollars of claims between them, much of which arose from the Tubbs Fire. As a result, a central issue in structuring a plan of reorganization will be whether the Debtors are liable for the Tubbs Fire. However, the Debtors and these claimants are nowhere near an agreement on this question.

As it stated in its first day pleadings and has repeated since, PG&E steadfastly denies that it bears any liability for the Tubbs Fire. That view has been adopted by other parties in these cases as well, most recently by the Ad Hoc Committee of Unsecured Noteholders, who filed a motion to terminate exclusivity on June 24, 2019, appending a proposed plan of reorganization that provides for only approximately 12% recovery for the subrogation claimants affected by the Tubbs Fire, as compared to a 57% recovery for the non-Tubbs wildfire subrogation claimants. The position of these parties seems to be based largely, if not exclusively, on a report from Cal Fire that stated it is "unlikely PG&E equipment is responsible for causing the Tubbs Fire."

As will be shown at trial, however, Cal Fire got it wrong. There is substantial evidence establishing that PG&E equipment caused the Tubbs Fire, which the Cal Fire report inexplicably ignored. In particular, there is video footage from the Bennett Lane Winery – which is located near the origin area of the Tubbs Fire – showing a bright arc flash at the same time (9:20:46 PM on October 8, 2017) that an electrical fault is recorded by PG&E, downstream smart meters on PG&E's Calistoga 1101 Circuit failed and fuses blew on PG&E Pole 773. *The arc flash, electrical fault, smart meter failure, and blown fuses simultaneously occurred near the area of origin of the Tubbs Fire, only 18 minutes before that fire was first observed – consistent with the amount of time it can take for a spark to spread to visible fire.*

Documents annexed to Cal Fire's report show that Cal Fire was alerted to evidence of the arc flash and its relationship with the smart meter failure and blown fuses months before it issued its report—which does not even mention the arc flash. The evidence at trial will establish that the arc flash could only have been caused by a high-voltage electrical event on PG&E's distribution system – precisely the kind of electrical event that is known to start fires. Below are two frames from the video footage, showing the moment immediately prior to the flash and the moment the

flash occurred:

 

Cal Fire turned a blind eye to this critical evidence.  The report Cal Fire issued days before the Petition Date fails to account for or otherwise address the videotaped arc flash, the electrical occurrences on PG&E's lines or provide a definitive explanation of what caused the Tubbs Fire. Moreover, PG&E's argument that an unspecified event on insulated, low-voltage, customer-owned lines caused the Tubbs Fire is unsupported by eyewitness testimony and cannot be squared with the physical evidence or explain the events of 9:20:46 PM.  After that time, the private lines were de-energized, and could not have caused a fire.[1]

The high voltage arc flash and corresponding power outage and blown fuses on PG&E's distribution circuit make up a portion of the significant evidence showing that PG&E equipment caused the Tubbs Fire.[2]  While discovery is not yet complete, the TCC and the Ad Hoc Subrogation Group are confident, based in part on the evidence discussed in this motion, that PG&E will be held either strictly liable or liable in negligence.  Until this issue is resolved, it is unlikely any agreement can be reached on a chapter 11 plan.  Because PG&E has few if any defenses to the remaining fires, once PG&E's liability for the Tubbs Fire is determined it should be possible to develop a plan of reorganization that fully and fairly compensates the victims of the 2017 and 2018 wildfires, consistent with the rules of priority for what PG&E contends are solvent Debtors, and

---

[1] In fact, PG&E also disagrees with material findings in the Cal Fire report, as PG&E does not even place the start of the Tubbs Fire in the same area of origin as Cal Fire.

[2] Despite their obligation to preserve all relevant evidence, PG&E intentionally discarded the blown fuses on Pole 773 immediately following the fire.  This will entitle claimants to an adverse inference at trial.  As to additional relevant evidence, earlier this week, the Ad Hoc Subrogation Group and the Individual Plaintiffs Leadership Counsel sent a joint letter to PG&E seeking to re-open discovery, including in Tubbs, so as to complete necessary evidence inspection and witness depositions concerning the cause of the Tubbs Fire.

consistent with PG&E's professed desire to fully and fairly compensate those wildfire victims.

To that end, the TCC Motion proposes a sensible process that will allow for an efficient adjudication of the Debtors' liability related to Tubbs.[3]  Specifically, the TCC asks the Court to lift the automatic stay to allow eight plaintiffs to proceed to a jury trial on their personal injury and related property damage claims against the Debtors arising from the Tubbs Fire, and to request the court in the California North Bay Fire Cases, JCCP 4955 (the "**Coordination Proceeding**"), to order one or more of the cases of those plaintiffs to trial with preference pursuant to California Code of Civil Procedure section 36.  As further explained by the TCC, the Coordination Proceeding is a specialized proceeding that has already been established and is well-situated to set the cases for an expedited, preferential trial.

Once this Court determines that the Superior Court is the appropriate forum for an adjudication of the claims of the TCC Plaintiffs, it follows that the Ad Hoc Subrogation Group should be permitted to participate in those trials as well, to which they are already parties.  In addition to personal injury claims, each of the TCC Plaintiffs also has property damage claims that raise substantially the same threshold liability issues as those asserted by the members of the Ad Hoc Subrogation Group, including:

- Whether PG&E's equipment was the cause of the Tubbs Fire;

- Whether the California law of inverse condemnation applies and holds PG&E strictly liable for any damage caused by a fire which it caused;

- Whether PG&E's negligence – for instance, in inadequately maintaining power lines and equipment or failing to de-energize the high power lines that caused the Tubbs Fire – was a contributing cause of the damage caused by the Tubbs Fire.

The individuals represented by the TCC and the Ad Hoc Subrogation Group assert substantially similar legal causes of action, seek substantially similar relief, and their claims are based on the same underlying facts and evidence.  It is well-settled that common issues of law and fact, such as

---

[3] While the Ad Hoc Subrogation Group supports the relief sought by the TCC, it does not adopt the arguments set forth in the TCC Motion except to the extent explicitly set forth in this motion.  For instance, the Ad Hoc Subrogation Group disagrees with the assertion that a ratio of total losses to insured losses for past wildfires (TCC Motion at 4) should be used to predict the losses for the 2017 and 2018 Northern California wildfires.  However, the Ad Hoc Subrogation Group agrees with the TCC's fundamental conclusion that determining liability for the Tubbs Fire will allow for substantial progress in developing a confirmable plan of reorganization – which is true regardless of whether a ratio between total losses and insured losses should be used here.

4

exist here, should be heard together to avoid piecemeal litigation, further judicial efficiency, and mitigate the risk of inconsistent adjudication of identical issues. Indeed, in circumstances such as these, where both a subrogation plaintiff and the underlying insured seeks to recover from a tortfeasor, California law provides that both parties' claims should be heard in a single suit. Thus, the Court should lift the stay to allow the Ad Hoc Subrogation Group to litigate these fundamental liability issues in the California Superior Court, along with the TCC Plaintiffs.

For the Ad Hoc Subrogation Group, the request to lift the stay is even narrower than that of the TCC: the Group seeks to have the stay lifted *only as to the issue of liability*. Once there is a finding of liability on the part of PG&E on the Tubbs Fire, the Ad Hoc Subrogation will return to this Court for any adjudication of damages issues, and to have their claims liquidated.

The proposals of the Ad Hoc Subrogation Group and TCC are consistent with this Court's decision in PG&E's prior chapter 11 case, in which it lifted the stay and abstained in favor of pending state court proceedings relating to thousands of personal injury claims which had been filed against PG&E. *In re Pac. Gas & Elec. Co.*, 279 B.R. 561, 563 (Bankr. N.D. Cal. 2002). In that case, as it should here, the Court granted the motion to lift the stay because "[a]ll of the claims involve purely state law issues; there are no bankruptcy issues" there was related litigation pending in state court; and because there was no basis for federal jurisdiction other than Section 1334. *Id.* at 570-72. All of the same factors are present here and, while a motion to abstain is not necessary at this stage of the proceedings, as set forth below those factors favor lifting the automatic stay. While this Court lifted the stay in the prior PG&E cases in part due to the fact that the claims were not central to the overall bankruptcy, *id.* at 570, in this case the importance of the Tubbs Fire issue to developing a confirmable plan of reorganization should be a factor that weighs in favor of lifting the stay.

For all of these reasons, this Court should lift the automatic stay so as to allow the California Superior Court to determine whether PG&E is liable for the damages caused by the Tubbs Fire. In the alternative, if this Court chooses to lift the stay with respect to the claims of the TCC Plaintiffs but not the Ad Hoc Subrogation Group, we ask for clarification that counsel for members of the Ad Hoc Subrogation Group may assist the TCC Plaintiffs' counsel in trying the

issue of PG&E's liability for the Tubbs Fire without violating the automatic stay.

## STATEMENT OF FACTS

Among the fires that devastated Napa, Sonoma, Butte, Humboldt, Mendocino, Lake, Nevada, and Yuba counties (collectively, the "North Bay Fires") in October 2017, Tubbs "involve[d] the greatest amount of damage, loss, and harm." (McCallen Decl. Ex. 1 (Joint Case Management Conference Statement, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. Oct. 22, 2018)) at 3 (hereinafter "Joint Case Mgmt. Statement").) Indeed, until the November 2018 Camp Fire, Tubbs was "the most destructive fire in [California's] history." (*Id.*) PG&E estimated that "the structures destroyed in the Tubbs Fire comprise approximately 63 percent of the total structures involved in all of the North Bay Fires." (*Id.*) Debtors' counsel estimates that the Tubbs Fire accounts for two-thirds of PG&E's potential liabilities stemming from the North Bay Fires, and the TCC estimates that the Tubbs Fire accounts for around one-third of the overall wildfire claim pool. (TCC Motion at 6−7.)

Given the high value of the Tubbs Fire claims, it is perhaps no surprise that PG&E unequivocally disclaims all liability, stating in its Amended First Day Declaration that "its equipment did not cause the Tubbs Fire." (*See Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Dkt. No. 263] at 13 (hereinafter "Wells Decl.").) Moreover, PG&E is not the only party grossly undervaluing the Tubbs Fire claims. On June 25, 2019, the Ad Hoc Committee of Senior Unsecured Noteholders filed a motion to terminate the Debtors' exclusivity period so it could put forth its own plan of reorganization. (*Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Dkt. No. 2741] (hereinafter "UNC Motion").) That motion attached a proposed term sheet that allows the Tubbs-related claims of all subrogation insurers (including the members of the Ad Hoc Subrogation Group) at $975 million, only a fraction of the actual subrogation losses suffered during that fire. (*Id.* at Ex. B p. 12.)

The dispute over liability largely stems from a flawed January 2019 report by Cal Fire that purported to find that PG&E equipment did not cause the Tubbs Fire, which has been repeatedly cited by PG&E. (Wells Decl. at 13; UNC Motion at 12.) However, the evidence does not support

Cal Fire's conclusion that the Tubbs Fire was caused by an electrical event on private, customer-owned power lines. (McCallen Decl. Ex. 2 (CALIFORNIA DEP'T OF FORESTRY & FIRE PROTECTION, SONOMA-LAKE NAPA UNIT, INVESTIGATION REPORT: TUBBS INCIDENT (January 20, 2019)) at 3 (hereinafter "Cal Fire Report").) A trial would feature expert testimony showing that an arc flash caught on video 18 minutes before witnesses first observed the Tubbs Fire could only have been caused by a high-voltage electrical event on PG&E's distribution system, not on low-voltage, insulated, customer lines as PG&E maintains. Further, the trial evidence will show that the arc flash occurred at 9:20:46 PM on October 8, 2017—simultaneous with the fuses blowing on a nearby PG&E pole and the failure of downstream smart meters on PG&E's circuit. After that time, the private lines onto which PG&E seeks to deflect blame for the Tubbs Fire were de-energized, and therefore could not have caused a fire.

Indeed, the exhibits attached to Cal Fire's own report demonstrate that Cal Fire inexplicably ignored evidence of the arc flash and its relationship to the blown fuses and smart meter failure. On October 12, 2018—three months before it released its report—Cal Fire's lead investigator on the Tubbs Fire received an email advising him that "[t]he arc flash seen in the winery video was at 21:20:51 which is the same time multiple smart meters downstream from [Pole] 773 went dead. It appears the flash event is what caused [Pole] 773 fuses to function." (McCallen Decl. Ex. 2 (Cal Fire Report) Attachment J.) Inexplicably, Cal Fire did not explain, or even mention, this powerful evidence in its report, and a trier of fact, assisted by the adversarial process, has not yet had an opportunity to consider it.

In sum, the parties remain further apart on the question of Tubbs liability than any other issue of liability in these bankruptcy cases. While the parties may make progress on bridging this gap on their own, it makes sense to lift the stay and put the parties on a path that would allow a determination of PG&E's liability for the Tubbs Fire, including under theories of inverse condemnation and negligence. Lifting the stay increases the possibility of a consensual resolution and, if that fails, it accelerates a possible trial, the outcome of which will facilitate settlement or estimation focused on damages. In short, a state court adjudication of PG&E's Tubbs Fire liability will require the Debtors to confront the full extent of their wildfire liability and assist in developing

a confirmable plan of reorganization.

Indeed, prior to its bankruptcy, PG&E itself stressed the importance of determining liability around the Tubbs Fire. In addition to the arguments offered by PG&E's counsel that the TCC notes (TCC Motion at 6, 8–9), in a Joint Case Management Statement in the Coordination Proceeding, PG&E maintained that the Tubbs Fire presented a good opportunity for a "bellwether" trial, and claimed it put forth the Tubbs Fire as the subject of the first trial in order to "obtain as much information through a trial verdict as [PG&E] can to have the maximum potential impact on the overall resolution of the many thousands of cases associated with the North Bay Fires." (McCallen Decl. Ex. 1 (Joint Case Mgmt. Statement) at 3.)

Had such a trial proceeded prior to PG&E's bankruptcy, it would have included claims brought by subrogation plaintiffs, such as those currently represented by the Ad Hoc Subrogation Group, and individual plaintiffs such as the TCC Plaintiffs, and it would have resolved the question of PG&E's liability for the Tubbs Fire. As PG&E acknowledged, the claims brought by the subrogation plaintiffs are "similar to the ones made by individual plaintiffs," as both sets of plaintiffs "allege, among other things, negligence, inverse condemnation, trespass and nuisance." (Wells Decl. at 16.)

The Ad Hoc Subrogation Group agrees with PG&E that both it and the TCC bring substantially similar legal causes of action and that the extent to which PG&E is liable for damages flowing from the Tubbs Fire will turn on the same issues for both claimant groups. For instance, a central factual issue in these cases is the cause of the Tubbs Fire. That issue has yet to be decided by any trier of fact, and additional fact and expert discovery will be needed to resolve that issue. In addition to evidence related to the cause of the Tubbs Fire, a coordinated trial on liability for that fire will adjudicate other key issues, including:

- PG&E's failure to properly construct, monitor, maintain, repair and replace its electrical equipment, despite being aware that its infrastructure was aging, unsafe, likely to cause fires, and vulnerable to environmental conditions (McCallen Decl. Ex. 3 (Master Complaint–Individual Plaintiffs, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. Mar. 12, 2018)) ¶ 4 (hereinafter "Master Compl. – Individual Plaintiffs")); McCallen Decl. Ex. 4 (Master Complaint–Subrogation Plaintiffs, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. Mar. 12, 2018)) ¶ 4, (hereinafter "Master Compl. – Subrogation Plaintiffs"));

- PG&E's knowledge about the significant risks of wildfires and other disasters from its unsafe equipment and aging infrastructure for decades, and having been repeatedly fined or convicted of crimes for causing wildfires, explosions and other disasters by failing to mitigate risks. (McCallen Decl. Ex. 3 (Master Compl. – Individual Plaintiffs) ¶ 5; McCallen Decl. Ex. 4 (Master Compl. – Subrogation Plaintiffs) ¶ 5); and

- PG&E's failure to de-energize power lines despite warnings from the National Weather Service before the start of the Tubbs Fire, including ultimately a "Red Flag Warning". (McCallen Decl. Ex. 5 (Nicholas J. Nauslar, John T. Abatzoglou & Patrick T. Marsh, *The 2017 North Bay and Southern California Fires: A Case Study*, FIRE 2018, 1, 18 at 8 (June 9, 2018))).

By its own admission, PG&E did not have a "procedure to de-energize power lines . . . in advance of weather conditions that indicate extreme fire risk" at the time of the Tubbs Fire. (McCallen Decl. Ex. 6 (PG&E's Response to the CPUC's Safety and Enforcement Division's 10/14/17 Questions (Oct. 17, 2017)).) This was a clear departure from standard practice by other California utilities, as well as longstanding opinions of the California Public Utilities Commission that California law requires utilities to de-energize power lines that would present a safety risk in extreme weather conditions. (McCallen Decl. Ex. 7 (CPUC's Decision Denying Without Prejudice San Diego Gas & Electric Company's Application to Shut Off Power During Periods of High Fire Danger, *Application of San Diego Gas & Elec. Co. for Review of its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions (U902E)*, Application 08-12-021 CAL. PUB. UTILITIES COMM'N (Issued Sept. 18, 2009)) at 61 ("SDG&E's statutory obligation to operate its system safely requires SDG&E to shut off its system if doing so is necessary to protect public safety.").)

## ARGUMENT

### I. THE AD HOC SUBROGATION GROUP'S CLAIMS SHOULD BE TRIED TOGETHER WITH THE TCC PLAINTIFFS' CLAIMS.

The TCC argues in its motion that this Court may not estimate the personal injury and wrongful death claims of its constituents for purposes of distribution. Even if this Court were to disagree with that position, given the importance of the Tubbs Fire tort claims to these bankruptcy

cases, those claims should be decided in a court of unquestioned jurisdiction in order to avoid creating any jurisdictional issue for appeal. Indeed, the Court need not even reach that jurisdictional issue in order to conclude that it would materially advance the progress of these cases to permit the California Superior Court to address, in a proceeding that has been pending for some time, the Tubbs Fire-related claims of the TCC Plaintiffs. Once this Court decides to grant the relief requested in the TCC Motion, it naturally follows that the interests of the parties and this Court are best served by granting the relief specified in this motion with respect to the subrogation claims as well.

It is well established that claims raising common issues of law and fact should be tried together – a principle that bankruptcy courts hearing jurisdictional issues recognize. For example, in *In re Shiloh Church Ministries, Inc.*, parties sought relief from the automatic stay in order to liquidate claims for damages against the debtor in state court. No. 07-40590 (DML), 2007 WL 7087064, at *1 (Bankr. N.D. Tex. June 1, 2007). The parties to that action raised claims that were unquestionably personal injury claims, as well as claims that were "arguably not personal injury claims." *Id.* at *1 n.1. The court found that "[b]oth parties recognize that 28 U.S.C. 157(b)(2)(B) does not allow this court to liquidate a personal injury claim," and that "[l]iquidation of the [claims] through entry of a money judgment may be helpful to Debtor's reorganization." *Id.* at *1. The court granted relief from the automatic stay, and extended that relief to all claims – even those that may not have been personal injury claims – because it found that "all the claims arise from the same conduct and, therefore, should be tried together." *Id.* at *1 n.1.

Similarly, in *Rebein v. Kost*, the debtor filed an adversary proceeding against three defendants. No. 06–204 (CM), 2006 WL 3842124, at *1 (D. Kan. Nov. 3, 2006). The defendants moved to have the district court withdraw the reference and transfer the adversary proceeding to the district court, where a jury trial could be held. *Id.* The court found that two of the defendants, by filing a proof of claim, had waived their right to a jury trial, but one had not. *Id.* at *2. Finding that the claims against the non-waiving defendant were "identical to and aris[ing] out of the same facts and allegations" against the defendants who had waived their rights, the court found that "[s]eparating the claims against [the waiving defendants] from those against [the non-waiving

defendant] would be a waste of judicial resources and the parties' time and money" and that it was in the "best interest of the parties and the court to try the claims together[.]" *Id. at *3*; *see also In re Res. Tech. Corp.*, No. 03 C 5785, 2004 WL 419918, at *3 (N.D. Ill. Feb. 13, 2004) (affirming bankruptcy court decision to lift the automatic stay and holding that "[e]fficiency clearly counsels in favor of the consolidation of [related] claims against [the defendants] before a single judge.").[4]

Indeed, these overlapping factual and legal issues among all plaintiffs led the California Superior Court to coordinate the claims relating to the North Bay Fires in a single proceeding. The California Code of Civil Procedure provides that "[c]oordination of civil actions sharing a common question of fact or law is appropriate if one judge hearing all of the actions for all purposes in a selected site or sites will promote the ends of justice[.]" Cal. Civ. Proc. Code § 404.1. Factors a court considers include "whether the common question of fact or law is predominating and significant to the litigation; the convenience of parties, witnesses, and counsel; the relative development of the actions and the work product of counsel; the efficient utilization of judicial facilities and manpower; the calendar of the courts; [and] the disadvantages of duplicative and inconsistent rulings, orders, or judgments[.]" *Id.* In the Coordination Proceeding, the various plaintiffs, including individual and subrogation plaintiffs — not to mention PG&E — agreed that coordination was appropriate, leading the court to find that the claims stemming from all the fires belonged in a single proceeding. *Coordination Proceeding Special Title (Rule 3.550)*, No. CJC170004955, 2018 WL 491364 (Cal. Super. Ct. Jan. 4, 2018). Indeed, in the subrogation context, a single cause of action cannot be split among insurers and insureds and made the basis for separate suits. *Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal. App. 4th 901, 909 (Cal. Ct. App. 2000) (citing *Ferraro v. S. Cal. Gas Co.*, 102 Cal. App. 3d 33, 43 (Cal. Ct. App. 1980) ("To avoid

---

[4] The same principles apply outside the bankruptcy context. Rule 20 of the Federal Rules of Civil Procedure permits joinder of parties in a single action where the parties assert claims "arising out of the same transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or fact common to all [these persons] will arise in the action." FED. R. CIV. P. 20. The purpose of this rule "is to promote trial convenience and expedite the final resolution of disputes, thereby preventing multiple lawsuits, extra expense to the parties, and loss of time to the court as well as the litigants appearing before it." *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002). Similarly, courts applying the *Colorado River* abstention doctrine have considered the importance of avoiding piecemeal litigation, and held that "avoidance of piecemeal litigation is particularly important where the issues in the parallel proceedings are the same or substantially similar." *Sutterfield v. Micromuse, Inc.*, No. C 04-0893 (SBA), 2004 WL 6058065, at *6 (N.D. Cal. July 13, 2004); *see also Roy v. Bank of N.Y. Mellon*, No. No. 17-CV-6729 (MKB), 2018 WL 4771898, at *5 (E.D.N.Y. Sept. 30, 2018) (abstention favored where "maintaining . . . parallel proceedings would waste judicial resources and invite duplicative effort") (internal quotations omitted).

a violation of the rule against splitting a cause of action, the insured and insurer 'should join in a single suit against the tortfeasor.'")).

In this case, the prevalence of common issues of law and fact strongly counsels in favor of hearing the Ad Hoc Subrogation Group's and the TCC Plaintiffs' claims together. As explained above, the key question underlying both sets of claims is whether PG&E is responsible for the Tubbs Fire. Each of the parties' claims is based on the allegation that PG&E's equipment was responsible for that fire, and contains the assertion that, among other things, PG&E failed to maintain and repair its equipment in a safe manner. (McCallen Decl. Ex. 3 (Master Compl. – Individual Plaintiffs") ¶4; McCallen Decl. Ex. 4 (Master Compl. – Subrogation Plaintiffs) ¶4.) Either PG&E caused the Tubbs fire or it did not: the answer cannot be different for the TCC Plaintiffs' claims and the Ad Hoc Subrogation Group's claims. Determining this fundamental issue will involve fact finding based on the same documents, witnesses and expert testimony.

The relevant law also will be significantly the same for the claims of the TCC Plaintiffs and the Ad Hoc Subrogation Group. For example, both parties bring claims that sound in negligence. Moreover, both the TCC Plaintiffs and the Ad Hoc Subrogation Group will be seeking to hold PG&E liable under a theory of inverse condemnation under California law. *(See* Wells Decl. 14–16.) These claims can and should be heard together.

## II.   THIS COURT SHOULD LIFT THE AUTOMATIC STAY TO ALLOW THE CLAIMS OF THE AD HOC SUBROGATION GROUP TO PROCEED TO TRIAL IN STATE COURT.

The Bankruptcy Code provides that, upon the request of a "party in interest," a court "shall" lift the automatic stay for "cause." 11 U.S.C. § 362(d); *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990). The party moving to lift the stay must "produc[e] . . . enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Lapierre v. Advanced Med. Spa Inc. (In re Advanced Med. Spa Inc.)*, BAP No. EC-16-1087, 2016 WL 6958130, at *5 (B.A.P. 9th Cir. Nov. 28, 2016) (*quoting* Black's Law Dictionary (10th ed. 2014)). Once that occurs, "the ultimate burden of persuasion" falls on the debtor to show that the harm to it in lifting the stay outweighs harm to the movant in leaving the stay in place. *Id.* at *6. Here, this Court should lift the stay against the Ad Hoc Subrogation Group

Case: 19-30088   Doc# 2863-1   Filed: 07/03/19   Entered: 07/03/19 18:36:16   Page 17 of 24

for the narrow purpose of its being able to try the issue of PG&E's Tubbs Fire liability before the California Superior Court.

Courts seeking to determine whether cause exists often utilize a set of 12 factors, known as the "*Curtis* Factors." *Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer)*, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009) (citing *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984)). These are "appropriate, nonexclusive, factors to consider in deciding whether to grant relief from the automatic stay to allow pending litigation to continue in another forum." *Kronemyer*, 405 B.R. at 921. However, "not all of the factors are relevant in every case, nor is a court required to give each factor equal weight." *In re Roger*, 539 B.R. 837, 845 (C.D. Cal. 2015). Here, each of the relevant factors strongly favors lifting the automatic stay.

### A. Permitting The Ad Hoc Subrogation Group To Proceed With Its Claims In State Court Would Assist In the Administration Of The Estate.

Courts have held that the "most important factor in determining whether to grant relief from the automatic stay to permit litigation against the debtor in another forum is the effect of such litigation on the administration of the estate." *Roger*, 539 B.R. at 845 (*quoting Curtis*, 40 B.R. at 806); *see also In re Am. Spectrum Realty, Inc.*, 540 B.R. 730, 739 (Bankr. C.D. Cal. 2015). Courts have found this factor favors lifting the stay when doing so would "assist the bankruptcy court in" subsequently determining other issues. *In re Shaffer*, 563 B.R. 301, 307 (Bankr. D. Ariz. 2016); *In re Consol. Distribs., Inc.*, No. 13-40350 (NHL), 2013 WL 3929851, at *11 (Bankr. E.D.N.Y. July 24, 2013) (resolution of the claims was "critical to the progress of the bankruptcy case."). In deciding whether to lift the automatic stay, courts have also held that "state law disputes . . . are better left for resolution in accordance with state law and for adjudication in state court[.]" *In re Fung*, No. 16-15784 (RK), 2016 WL 4148097, at *4 (Bankr. C.D. Cal. Aug. 2, 2016).

Here, lifting the stay and allowing a fact finder to determine PG&E's liability for the Tubbs Fire would assist in the administration of the estate. Indeed, PG&E itself prior to bankruptcy argued that trying the Tubbs Fire first would have the "maximum potential impact on the overall resolution of the many thousands of cases associated with the North Bay Fires." (Joint Case Mgmt. Statement at 3.) PG&E went on to argue that the Tubbs Fire presented a good opportunity for a

"bellwether" trial. *Id.* Currently, PG&E claims zero liability related to the Tubbs Fire. Allowing the TCC and the Ad Hoc Subrogation Group's claims to proceed to trial would allow a jury to resolve the issue or, as the TCC Motion points out, push PG&E into reaching a settlement. (TCC Motion at 21.) Once that occurs, assuming the parties do not settle, this Court would be able to determine the Ad Hoc Subrogation Group's damages on a schedule that makes sense for these cases.

In addition, the claims brought by the Ad Hoc Subrogation Group against the Debtors constitute a quintessential "state law dispute." These claims are based on California statutory and common law causes of action. They are non-core, state law claims of the variety that should be litigated in a state court forum. Moreover, once the stay is lifted as to the TCC Plaintiffs' claims, there will be a decision from a separate court on the same issues and of fact and law that govern the Ad Hoc Subrogation Group's claims. It makes no sense to leave the claims of the Ad Hoc Subrogation Group in this Court for duplicative, expensive and potentially inconsistent adjudication. Accordingly, the stay should be lifted to allow both groups to have their day in court together on these issues now.

### B.   Judicial Economy Concerns Weigh In Favor Of Lifting the Stay.

Courts in the Ninth Circuit may "consider the factor of judicial economy when deciding lift stay issues." *Santa Clara Cty. Fair Ass'n v. Sanders (In re Santa Clara Cty. Fair Ass'n)*, 180 B.R. 564, 566 (B.A.P. 9th Cir. 1995). As stated by Congress and reiterated in Ninth Circuit courts, it "'will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.'" *Id.* (*quoting* H.R. Rep. 95-595, 341, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6297); *see also Advanced Med. Spa*, 2016 WL 6958130, at *6 (same); *Res. Tech. Corp.*, 2004 WL 419918, at *3 (bankruptcy court did not abuse its discretion in lifting stay to avoid "duplicative litigation").

As explained above, judicial efficiency dictates that these similar claims dealing with substantially similar issues be consolidated and litigated together, rather than having this Court hold duplicative proceedings. Moreover, the claims asserted are purely state law claims, which

are more efficiently adjudicated in that forum, particularly as the judge in the Coordination Proceeding had been overseeing the litigation for months prior to PG&E's bankruptcy and is thoroughly familiar with the issues they raise.

Indeed, under California law, subrogation plaintiffs in certain circumstances *must* bring their claims alongside the insureds. In California, "[a]lthough the insurer may bring a separate action against the tortfeasor, the rule against splitting a cause of action is violated where both the insurer and insured pursue separate actions." *Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal. App. 4th 901, 909 (Cal. Ct. App. 2000); *see also Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1055 (9th Cir. 2007) (although insured "was only partially compensated for its loss because its insurance policy . . . did not cover all of its losses, [the insured] should have pursued its claims in a single action" with the insurer). This rule further weighs in favor of individual plaintiffs and subrogation claimants litigating their claims together in the same forum.

Absent the relief requested here, this Court would have to determine PG&E's liability to the Ad Hoc Subrogation Group, because the state court proceedings would not have a collateral estoppel effect on the Ad Hoc Subrogation Group if it is not permitted to participate in that trial. *See e.g., Springer v. Ernst & Young, LLP*, No. C-05-25 (JF), 2005 WL 1566554, at *3 (N.D. Cal. July 5, 2005) ("Moreover, judgment for Plaintiffs in the instant actions against E & Y could not have a collateral estoppel effect upon NextCard because NextCard is not a party to the instant actions."). Therefore, the interests of judicial economy support granting relief from the automatic stay, rather than having the identical liability issues tried twice in two separate courts.

### C.     Lifting The Automatic Stay Would Not Prejudice Other Creditors.

Where the court finds "no evidence [that] . . . the . . . bankruptcy estate would [be] negatively impacted by lifting the stay . . . it follows that there is no evidence that the [non-movant creditors] would be prejudiced by granting relief from stay." *In re Baleine, LP*, No. 13-27610 (MH), 2015 WL 5979948, at *10 (C.D. Cal. Oct. 13, 2015). As explained in Section IV.A. *supra*, there is no evidence that the bankruptcy estate would be harmed. In fact, other creditor groups – who may resolve their claims with the Debtors but cannot be paid until a plan is confirmed and becomes effective – would only benefit from the resolution of a major outstanding issue of

PG&E's liability.  In any event, they would suffer no prejudice from the stay being lifted.

### D. The Balance of Hardships Favors Lifting The Automatic Stay.

Courts have found that "the balancing of potential harm to the creditor on the one hand and to the debtor and the bankruptcy estate on the other hand frequently is dispositive" in deciding whether or not to lift the automatic stay.  *Advanced Med. Spa*, 2016 WL 6958130, at *4.  In this case, because the Debtors would already be litigating the Tubbs Fire against the TCC Plaintiffs in a separate court, there is no additional hardship in allowing another group of plaintiffs to join the litigation.  Indeed, doing so would ultimately reduce the Debtors' costs in defending these claims multiple times in multiple fora.  If this Court does not lift the stay and the Ad Hoc Subrogation Group is forced to ultimately litigate PG&E's liability in this Court, the Debtors would be forced to engage in proceedings that are duplicative – an inefficient use of estate resources to all stakeholders' detriment.

### E. This Motion Is Distinguishable From Prior Motions For Relief From The Automatic Stay In These Cases That This Court Has Continued.

This motion to lift the stay is different than those this Court previously continued.  *See In re PG&E Corp.*, No. 19-30088 (DM), 2019 WL 2122733, at *1 (Bankr. N.D. Cal. May 13, 2019). This Court has continued motions to lift the stay in the case of specific personal injury cases so that the Debtors would be able to focus and "make progress toward the goal of a successful reorganization."  *Id.*  Unlike those claims, which were not relevant to the task of "liquidation or aggregate estimation of countless claims from the recent wildfires" and thus not central to "craft[ing] the contours of the reorganization," *id.* at *2, resolution of the Debtors' legal responsibility for the Tubbs Fire would greatly advance both of those objectives and bring the cases closer to a confirmable—and possibly consensual—plan.  Lifting the stay and allowing the Ad Hoc Subrogation Group and the TCC Plaintiffs to litigate their claims arising out of Tubbs, which even PG&E argued previously should serve as the "bellwether" trial, would allow Debtors to make significant progress in resolving claims and ultimately reaching terms of a plan of reorganization.

### III. THE ABSTENTION FACTORS ARE MET HERE, WHICH FURTHER SUPPORTS LIFTING THE AUTOMATIC STAY.

As with the TCC Plaintiffs, at this time there is no adversary proceeding or contested matter pending with respect to the claims of the Ad Hoc Subrogation Group, thus there is no pending matter before this Court that requires it to determine that abstention is appropriate. Nevertheless, given that the Ad Hoc Subrogation Group will file proofs of claim in these cases at the appropriate time, the fact that the relevant abstention factors are met further supports lifting the stay and allowing those claims to be pursued in state court.

Discretionary abstention would be appropriate under 28 U.S.C. § 1334(c)(1), which states that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Bankruptcy courts have the authority to decide such motions, and do so by applying multiple factors including: (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (4) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; and (5) the burden on the Bankruptcy Court's docket. *Pac. Gas & Elec. Co.*, 279 B.R. at 566, 569–70.

Allowing a trial in state court is the best mechanism at this point for ensuring that the Ad Hoc Subrogation Group's claims are tried expeditiously. By having the "threshold issue of liability" decided by the California Superior Court – which has expertise in adjudicating these types of claims and was overseeing the Coordination Proceeding prior to the filing of these bankruptcy cases – the goal of efficient administration of the estate is furthered. *See In re Roger*, No. 15-00087, 2015 WL 7566647, at *8 (C.D. Cal. Nov. 24, 2015).

In addition, the parties had already begun the process of exchanging discovery in state court prior to the Debtors' chapter 11 petition, which the Superior Court was overseeing. Thus, this process can be completed more quickly than in the district court, which would not be as familiar with the cases and may not be familiar with the state law causes of action. *Kennilworth Partners II LP v. Crisman*, No. C-00-3218 (VRW), 2001 WL 30534, at *4 (N.D. Cal. Jan. 3, 2001) (state court was "more efficient forum" for hearing state law claims).

1    Moreover, all of these claims arise under state law, which would also weigh in favor of

2    abstention. *In re Pingrey*, No. 12-10158, 2012 WL 1833928, at *1 (Bankr. N.D. Cal. May 18,

3    2012). State law issues not only predominate, they are the only issues that the Ad Hoc Subrogation

4    Group will pursue. Indeed, the Ad Hoc Subrogation Group asserts claims that are "classically

5    non-core, in that all the alleged claims . . . arose out of pre-bankruptcy conduct and transactions,

6    were not based on bankruptcy law, and could have been prosecuted in a nonbankruptcy court."

7    *Labankoff v. GMAC Mortg., LLC (In re Labankoff)*, No. NC-09–1294, 2010 WL 2384543, at *4

8    (B.A.P. 9th Cir. June 14, 2010) (affirming decision to abstain where claims were).

9    By simply abstaining and allowing the California Superior Court to decide PG&E's

10   liability for the Tubbs Fire, this Court can concentrate on other matters related to PG&E's

11   bankruptcy and leave the state law claims to a California Superior Court well-equipped to handle

12   them. Indeed, deciding this case would unnecessarily burden this Court's docket, given the parallel

13   state court proceeding. *See Roger*, 2015 WL 7566647, at *13 (bankruptcy court committed clear

14   error by failing to appreciate that the denial of abstention "necessarily imposes an enormous

15   expenditure of scarce judicial resources") (internal quotations omitted).[5]

16                                   **CONCLUSION**

17   For the foregoing reasons, this Court should grant relief from the automatic stay, thereby

18   allowing the Ad Hoc Subrogation Group to pursue its claims against PG&E regarding the issue of

---

[5] With respect to the claims of the Ad Hoc Subrogation Group, mandatory abstention also may apply. This Court must abstain from hearing certain claims when the following seven criteria are present: "(1) [a] timely motion to abstain; (2) a purely state law question; (3) a non-core proceeding; (4) a lack of independent federal jurisdiction absent the petition under title 11; (5) a state court action which, (6) may be timely adjudicated; and (7) the existence of a state forum of appropriate jurisdiction." *Cavanagh v. California (In re Plantica Landscape Corp.)*, BAP No. CC-05-1245, 2006 WL 6811001, at *7 (B.A.P. 9th Cir. Aug. 18, 2006); *see also Kennilworth Partners*, 2001 WL 30534, at *1. All of these factors are met in this case. First, a motion to abstain at this point would be timely, as the Ad Hoc Subrogation Group has moved simultaneously with the TCC to lift the automatic stay. *See, e.g.*, *Gonzales Construction Co. v. Fulfer (In re Fulfer)*, 159 B.R. 921, 923 (Bankr. D. Idaho 1993) (finding abstention motion after four months timely, and noting at least one court had done so after eight months). Second, the Ad Hoc Subrogation Group asserts purely state law claims. *See, e.g.*, *Abadie v. Poppin*, 154 B.R. 86, 89 (N.D. Cal. 1993) (mandatory abstention applicable where the "complaint [was] entirely based on state law."). Third, the claims that the Ad Hoc Subrogation Group were pursuing – and now seek to pursue again – in state court are non-core claims that neither "arise under" the Bankruptcy Code or "arise in" a bankruptcy case. *Sedlachek v. Nat'l Bank of Long Beach (In re Kold Kist Brands, Inc.)*, 158 B.R. 175, 178 (C.D. Cal. 1993). Fourth, there is no basis for federal jurisdiction other than that this case is related to the Debtors' bankruptcy. Finally, there is a pending state law action in a court with jurisdiction and which may adjudicate the claims in a timely fashion (factors five through seven). The state court proceedings were underway for months before the Debtors' bankruptcy, without any kind of jurisdictional challenge, and were set to commence trial mere months from now. And as set forth in the TCC Motion, those claims can be heard on an expedited basis.

the Debtors' liability for the Tubbs Fire in the California Superior Court, where the claims are currently pending in a Coordination Proceeding, Case No. 4955. This Court will retain jurisdiction of the issue of damages awarded to the Ad Hoc Subrogation Group for all fires, including the Tubbs Fire. Finally, if this Court chooses not to grant relief from the stay as to the Ad Hoc Subrogation Group's claims but does as to the TCC Plaintiffs' claims, the Ad Hoc Subrogation Group seeks clarification that its counsel may assist the TCC Plaintiffs' counsel in trying the issue of PG&E's liability for the Tubbs Fire without violating the automatic stay.

Dated: July 3, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Benjamin P. McCallen*
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
        jminias@willkie.com
        bmccallen@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*