# Exhibit 7

**Date of Issuance  9/18/2009**

Decision 09-09-030  September 10, 2009

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of San Diego Gas & Electric Company for Review of its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions (U902E). | Application 08-12-021 (Filed December 22, 2008) |

**DECISION DENYING WITHOUT PREJUDICE
SAN DIEGO GAS & ELECTRIC COMPANY'S APPLICATION TO
SHUT OFF POWER DURING PERIODS OF HIGH FIRE DANGER**

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 2 of 76

# TABLE OF CONTENTS

**Title**                                                                                                   **Page**

DECISION DENYING WITHOUT PREJUDICE
SAN DIEGO GAS & ELECTRIC COMPANY'S APPLICATION TO
SHUT OFF POWER DURING PERIODS OF HIGH FIRE DANGER ...................... 2

1. Summary of Decision ................................................................................. 2
2. Summary of SDG&E's Application .......................................................... 2
3. Procedural Background and Chronology ............................................... 3
4. Summary of Parties' Positions ................................................................ 7
5. Commission Jurisdiction and Standard of Review ............................... 7
6. Summary of SDG&E's Community Fire Safety Program ..................... 9
   6.1. Hardening of Facilities ...................................................................... 9
   6.2. Power Line Re-Closers ..................................................................... 10
   6.3. Inspection of Overhead Power Lines ............................................ 11
   6.4. Vegetation Management ................................................................... 12
   6.5. Staging Personnel ............................................................................ 12
   6.6. Emergency Power Shut-Off Plan .................................................... 12
        6.6.1. Power Shut-Off Criteria ...................................................... 12
        6.6.2. Re-Energization of Power Lines ......................................... 15
        6.6.3. Power Shut-Off Areas .......................................................... 15
        6.6.4. Number of Affected People and Customers ...................... 16
        6.6.5. Customer Education .............................................................. 18
        6.6.6. Customer Notice of Power Shut-Off Events ..................... 20
        6.6.7. Mitigation of Adverse Impacts on Customers .................. 21
        6.6.8. Cost of the Power Shut-Off Plan ........................................ 23
7. Review of SDG&E's Power Shut-Off Plan ............................................ 24
   7.1. Position of the Parties ..................................................................... 24
        7.1.1. SDG&E ................................................................................... 24
        7.1.2. Opposition Parties ............................................................... 30
        7.1.3. SCE ......................................................................................... 40
   7.2. Discussion .......................................................................................... 41
        7.2.1. Impact on the Number of Wildfires ................................... 42
        7.2.2. Historical Data on Power-Line Fires ................................. 48
        7.2.3. Shutting Off Power During Major Wildfires .................... 50
        7.2.4. SCE's Power Shut-Off Program .......................................... 54
        7.2.5. Costs and Benefits ................................................................ 55
        7.2.6. Conclusion ............................................................................. 57

Case: 19-30088     Doc# 2864-8     Filed: 07/03/19     Entered: 07/03/19 18:48:47     Page 3
of 76

**TABLE OF CONTENTS (cont.)**

<u>Title</u>                                                                                                      <u>Page</u>

8.  Electric Tariff Rule 14 ........................................................................................ 63

   8.1.  Position of the Parties ................................................................................ 64

       8.1.1.  SDG&E ............................................................................................ 64

       8.1.2.  SCE .................................................................................................. 64

       8.1.3.  The Opposition Parties ................................................................ 65

   8.2.  Discussion .................................................................................................... 65

9.  Proceeding Category and Need for Hearings ............................................... 66

10. Comments on the Alternate Proposed Decision .......................................... 66

11. Assignment of the Proceeding ........................................................................ 67

Findings of Fact ........................................................................................................ 67

Conclusions of Law ................................................................................................. 69

ORDER ....................................................................................................................... 70

Appendix A:  Map of the 2009 Power Shut-Off Areas

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 4
of 76

**DECISION DENYING WITHOUT PREJUDICE
SAN DIEGO GAS & ELECTRIC COMPANY'S APPLICATION TO
SHUT OFF POWER DURING PERIODS OF HIGH FIRE DANGER**

## 1. Summary of Decision

This decision denies, without prejudice, San Diego Gas & Electric Company's (SDG&E) application to shut off power to certain areas when hazardous fire conditions are present. SDG&E has not met its burden to demonstrate that the benefits of shutting off power outweigh the significant costs, burdens, and risks that would be imposed on customers and communities in the areas where power is shut off.

Today's decision directs SDG&E to make a good faith effort to develop a comprehensive fire prevention program in collaboration with all stakeholders. Parties are encouraged to use the Commission's Alternative Dispute Resolution process for this purpose. The agreed-upon fire prevention program must be based on a cost-benefit analysis that demonstrates (1) the program will result in a net reduction in wildfire ignitions, and (2) the benefits of the program outweigh any costs, burdens, or risks the program imposes on customers and communities.

## 2. Summary of SDG&E's Application

In Application (A.) 08-12-021, SDG&E asks the Commission to review its Emergency Power Shut-Off Plan (referred to hereafter as "the Power Shut-Off Plan").[1] Under its Power Shut-Off Plan, SDG&E will turn off electricity to certain

---

[1] We interpret SDG&E's request for Commission review of its Power Shut-Off Plan as a request for Commission authorization to implement the Power Shut-Off Plan.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 5 of 76

regions during periods of high fire danger in order to prevent its overhead power lines from igniting potentially catastrophic wildfires. SDG&E intends to implement its Power Shut-Off Plan in time for the 2009 autumn fire season in Southern California.

SDG&E anticipates that providers of essential services, such as police departments and hospitals, may need to increase their use of electricity in the hours leading up to an announced power shut-off event in order to prepare for the event. SDG&E requests that electric usage by these customers during the period immediately preceding a shut-off event be exempted from (1) the determination of peak demand changes, (2) critical peak pricing, and (3) the demand response program.

Finally, SDG&E requests authority to revise Electric Tariff Rule 14. The existing Tariff Rule 14 states that SDG&E is not liable to its customers for an interruption in service "caused by inevitable accident, act of God, fire, strikes, riots, war or any other cause not within its control." SDG&E seeks to revise Tariff Rule 14 to explicitly state that SDG&E will not be liable for any costs or adverse impacts that customers experience due to the Power Shut-Off Plan.

## 3. Procedural Background and Chronology

SDG&E filed A.08-12-021 on December 22, 2008. Notice of A.08-12-021 appeared in the Daily Calendar on December 30, 2008. SDG&E served copies of A.08-12-021 on the San Diego Office of Emergency Services; the San Diego County Red Cross; and all State Legislators and members of Congress who represent any part of SDG&E's service territory. SDG&E also mailed a notice of A.08-12-021 to (1) all cities and counties in SDG&E's service territory, and (2) all customers in areas subject to the Power Shut-Off Plan. In addition, SDG&E published notice of A.08-12-021 in newspapers of general circulation.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 6 of 76

The following parties filed protests to A.08-12-021:  Pacific Bell Telephone Company d/b/a/ AT&T California and affiliated entities (together, "AT&T");[2] the California Cable and Telecommunications Association (CCTA); CTIA-The Wireless Association (CTIA); the Commission's Consumer Protection and Safety Division (CPSD); the Commission's Division of Ratepayer Advocates (DRA); and a consortium of six municipal water districts (together, "the Water Districts").[3] SDG&E filed a reply on February 9, 2009.

A prehearing conference (PHC) was held on February 10, 2009.  The following parties filed PHC statements:  AT&T; CCTA; CoxCom, Inc., and Cox California Telecom, L.L.C. (together, "Cox"); CPSD and DRA (together, "CPSD/DRA"); CTIA; Disability Rights Advocates (DisabRA); the Mussey Grade Road Alliance (the Alliance); the San Diego County Superintendent of Schools ("the School Districts"); SDG&E; Southern California Edison Company (SCE); Time Warner Cable Inc. (Time Warner); Utility Consumers Action Network (UCAN); and the Water Districts.  An Assigned Commissioner's Ruling and Scoping Memo was issued on February 26, 2009, pursuant to Rule 7.3 of the Commission's Rules of Practice and Procedure (Rule).

---

[2]  The entities filing the AT&T protest were Pacific Bell Telephone Company (U-1001-C); AT&T Communications of California, Inc. (U-5002-C); TCG San Francisco (U-5454-C); TCG Los Angeles, Inc. (U-5462-C); TCG San Diego (U-5389-C); AT&T Mobility LLC; New Cingular Wireless PCS, LLC (U-3060-C); Cagal Cellular Communications Corporation (U-3021-C); Santa Barbara Cellular Systems, Ltd. (U-3015-C); and Visalia Cellular Telephone Company (U-3014-C) d/b/a AT&T Mobility LLC.

[3]  The Water Districts are Valley Center Municipal Water District, Ramona Municipal Water District, Padre Dam Municipal Water District, Rainbow Municipal Water District, Fallbrook Public Utilities District, and Yuima Municipal Water District.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 7 of 76

There were no evidentiary hearings.  The formal record was developed
primarily though the direct written testimony submitted by SDG&E with its
Application,[4] informational filings submitted by SDG&E, and written comments
submitted by all the parties.  The factual assertions in these documents were
verified in accordance with Rule 1.11.  The following table shows the chronology
of the informational filings and written comments.

| Date 2009 | Document | Party Filing Document |
|---|---|---|
| March 13 | Informational Filing | SDG&E |
| March 27 | Opening Comments | AT&T; the Alliance; CCTA and Time Warner (together, CCTA); CPSD/DRA; Cox; CTIA; DisabRA; SDG&E; SCE; the School Districts; the Water Districts; and UCAN |
| April 3 | Informational Filing | SDG&E |
| April 10 | Reply Comments | AT&T; the Alliance; CCTA; CPSD/DRA; Cox; the California Farm Bureau (CFB); DisabRA; SDG&E; SCE; the School Districts; the Water Districts; and UCAN |
| April 10 | Informational Filing | SDG&E |
| April 17 | Reply to Informational Filing on April 10 | DisabRA; and jointly by the School Districts and the Water Districts |

---

[4]  SDG&E provided the direct written testimony of the following witnesses with their
subject topics in parentheses:  David L. Geier (Policy); Sohrab A. Yari (Engineering
and Operations); Joe Velasquez (Customer Issues); and Greg Lawless (Special Needs
and Low-Income customer Issues).

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 8 of 76

| Date 2009 | Document | Party Filing Document |
|-----------|----------|----------------------|
| May 12 | Comments re: Portable Backup Generators to Pump Water for Fire Fighting Purposes | SDG&E and CPSD/DRA |
| May 19 | Reply to Comments Filed on May 12 | SDG&E and DisabRA |
| May 26 | Additional Comments re: Portable Backup Generators | The Alliance, CPSD/DRA, and SDG&E |
| June 10 | Further Comments re:  Portable Backup Generators | SDG&E and the Water Districts |
| June 30 | Comments re:  (1) Use of San Diego County's Reverse 911 System, and (2) County Oversight of Portable Backup Generators | The Alliance, SDG&E, and the Water Districts |
| July 2 | Reply to the Comments Filed on June 30, 2009 | DisabRA; SDG&E; and jointly by CCTA, Cox and CTIA |

Two public participation hearings (PPHs) were held in San Diego County. One was held in Alpine on April 7, 2009, and the second in Valley Center on April 8, 2009.  Both PPHs were held in areas subject to the Power Shut-Off Plan. In addition, a public workshop was held in Valley Center on April 8, 2009, to obtain input from local governmental agencies regarding the impact of the Power Shut-Off Plan on public health, safety, and welfare.  Workshop participants included the San Diego County Sheriff Department, the San Diego County Office of Emergency Services, the San Diego County Air Pollution Control District, the School Districts, and the Water Districts.

There was considerable public participation in this proceeding.  More than 100 members of the public, elected representatives, government officials, and representatives of community organizations spoke at the PPHs and public

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 9 of 76

workshop, and there were many letters and email sent to the Commission. The public's input was carefully considered in crafting today's decision.

## 4. Summary of Parties' Positions

All the intervening parties except SCE oppose SDG&E's Power Shut-Off Plan. Most of the comments received from the public also oppose the Plan. Those who oppose the Plan believe it will do little to prevent wildfires while increasing the risk of wildfires from other sources. They also contend that shutting off power will impose burdens on SDG&E's customers that outweigh any likely benefit.

Those who support SDG&E's Power Shut-Off Plan believe that shutting off power when fire risks are high is a reasonable precaution against the possibility of catastrophic wildfires being ignited by power lines.

## 5. Commission Jurisdiction and Standard of Review

SDG&E's Application to shut off power under specified circumstances in order to eliminate the risk of power-line fires is subject to Pub. Util. Code § 451[5] which states, in relevant part, as follows:

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities … as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

SDG&E has a duty under § 451 to provide electric service in a way that protects the safety of its customers, employees, and the public at large. The

---

[5]  All statutory references are to the Public Utilities Code unless otherwise indicated.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 10 of 76

central issue in this proceeding is whether SDG&E should be relieved of its duty when, as SDG&E asserts, there is a heightened risk that its power lines could ignite a catastrophic wildfire.

The California Constitution[6] and the Public Utilities Code[7] provide the Commission with broad jurisdiction on matters regarding the safety of electric utility facilities and operations, including authority to promulgate regulations regarding the safety of overhead power lines.[8] Electric utilities are required by § 702 to "obey and comply" with such requirements.

The provision of electricity to the public carries some risk. Every year, people are injured and killed by contact with power lines, and numerous fires are started when foreign objects (e.g., balloons and tree branches) contact power lines. Despite the risks, electric utilities have a duty to provide electricity to the public because, as stated in § 330(g), "electric service is of utmost importance to the safety, health, and welfare of the state's citizenry and economy." To minimize the risks, the Commission has promulgated safety regulations governing electric utility operations and facilities.[9] In addition, electric utilities may suspend service when necessary to protect public safety. For example, if a vehicle crashes into a utility pole, the electric utility may shut off the power line until the accident is cleared and pole is repaired.

---

[6]  Cal. Constitution, Article XII, §§ 3 and 6.

[7]  Pub. Util. Code §§ 216, 701, and 768.

[8]  Pub. Util. Code §§ 8037 and 8056. *See* also Pub. Util. Code §§ 761, 768, and 770.

[9]  *See*, for example, General Orders 95 and 128.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 11 of 76

SDG&E's Application to shut off power under certain conditions in order to prevent wildfires places two fundamental goals in conflict: the need for continuous electric service versus the need for public safety. While there are always trade offs, today's decision endeavors to achieve both goals using our judgment, experience, and expertise in regulating electric utilities.

## 6. Summary of SDG&E's Community Fire Safety Program

Santa Ana winds occur annually in Southern California during the fall and early winter. These strong, dry, offshore winds have led to some of California's largest and most damaging fires. Over the past decade, wildfires fanned by Santa Ana winds have burned hundreds of thousands of acres in San Diego County, caused billions of dollars of damage, and killed numerous people. In October 2003 and 2007, wildfires driven by Santa Ana winds spiraled out of control to become devastating firestorms.

SDG&E is currently implementing a multi-pronged program to reduce the likelihood of strong winds causing power-line fires. The major elements of the program, which SDG&E calls the Community Fire Safety Program, are summarized below. SDG&E represents that it developed its Community Fire Safety Program after consulting with local governments, public safety agencies, the Red Cross, various community groups, and other stakeholders.

### 6.1. Hardening of Facilities

SDG&E uses the term "hardening of facilities" to describe physical improvements to its overhead electric transmission and distribution system in areas that are prone to wildfires. SDG&E states the hardened facilities will be better able to withstand Santa Ana winds, which should lessen the risk of keeping power on during windy conditions. The hardened facilities will also be

- 9 -

more resistant to damage from wildfires, potentially reducing the time needed to restore power after a fire.

The steps SDG&E is taking to harden its overhead power lines include the replacement of wood poles with steel poles, use of heavier wire conductors, increased spacing between conductors, and expanded use of conductor spacers. The hardened facilities are designed to withstand wind gusts of 85 miles per hour (mph). SDG&E is also implementing limited conversion of overhead power lines to underground lines in order to make the electric service provided to some essential public service infrastructure, such as selected water utility pump stations, less susceptible to outages from Santa Ana winds and wildfires. Because placing facilities underground is quite expensive, this form of hardening will be implemented sparingly.

The hardening of facilities will have little effect on SDG&E's Power Shut-Off Plan. Areas served by hardened above-ground facilities will remain subject to the Plan, even though such facilities will be better able to withstand high winds and fires. Only the few areas that are served by newly undergrounded facilities will be removed from the Power Shut-Off Plan.

### 6.2. Power Line Re-Closers

Many of SDG&E's power lines have switches known as "re-closers" that automatically de-energize circuits if unusually high electric currents are detected, and then automatically restore power. Under the Community Fire Safety Program, SDG&E will modify the operation of re-closers for overhead power

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 13 of 76

lines in the areas of high fire risk.  When an Elevated Fire Condition[10] is present, SDG&E will adjust the operation of re-closers to allow either one or two re-energization attempts, depending on the location.  If a circuit fails to re-close following the specified one or two attempts, the re-closer will be turned off remotely until the line is inspected and the re-closer is manually reset.  Re-closers that cannot be monitored remotely will be turned off.[11]

SDG&E will turn off re-closers when a Red Flag Warning is declared by the National Weather Service for high winds and/or low humidity.  When an outage occurs due to the operation of a re-closer, there will be a visual patrol of the line to ensure that it is safe to restore power.  Although inspecting the line will increase the duration of the outage, SDG&E believes this step is warranted by the heightened fire risk conditions, especially since high-wind conditions increase the likelihood of damage to overhead facilities.[12]

### 6.3.    Inspection of Overhead Power Lines

As part of its Community Fire Safety Program, SDG&E has implemented expanded inspections of overhead power lines and associated facilities in areas of high fire risk.  The expanded inspections exceed current regulatory requirements.

---

[10] SDG&E defines an "Elevated Fire Condition" as occurring when live vegetation fuel moisture is 75% or less as measured by the California Department of Forestry and Fire (Cal Fire).

[11] The planned operation of re-closers is described in Exhibit SDG&E-2, p. 11.  Turning off re-closers prevents automatic attempts to re-energize the line.

[12] SDG&E is considering the use of a new technology that sends a low-energy pulse through faulted power lines to determine if it is safe to re-energize.  These devices might reduce restoration time.

### 6.4.  Vegetation Management

SDG&E maintains clearance for approximately 72,000 trees located near overhead power lines in areas of high fire risk.  SDG&E is working with local governments, public safety agencies, the Commission, and the legislature to modify laws and regulations to allow for increased vegetation management.

### 6.5.  Staging Personnel

As part of its Community Fire Safety Program, SDG&E will stage personnel in or near Power Shut-Off Areas [13] when an Elevated Fire Condition is present or a Red Flag Warning for high winds and/or low humidity is declared.[14]  The purpose of staging personnel is to improve response times.

### 6.6.  Emergency Power Shut-Off Plan

The final element of SDG&E's Community Fire Safety Program is the Power Shut-Off Plan.  The purpose of this Plan is to de-energize overhead power lines when certain criteria are met in order to eliminate power lines as an ignition source when fire risks are high.  SDG&E intends to implement its Plan on September 1, 2009.  Power shut-off events will most likely occur during the September – December fire season in Southern California, but power will be shut off whenever the criteria are met.

#### 6.6.1.  Power Shut-Off Criteria

SDG&E's Power Shut-Off Plan calls for power to be shut off in certain areas when all five of the following criteria are met in those areas.

---

[13]  The term "Power Shut-Off Areas" is defined later in today's decision.

[14]  The planned staging of personnel is summarized in Exhibit SDG&E-2, p. 13.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 15 of 76

**Criterion 1: Live Fuel Moisture**. The less moisture in living plants, the higher the fire risk. SDG&E intends to use a live fuel moisture level of 75% or less as one of the five criteria for initiating a power shut-off event.[15] SDG&E will obtain measurements of live fuel moisture from Cal Fire and the United States (U.S.) Forest Service.

**Criterion 2: Non-Living Fuel Moisture**. The less moisture in dead vegetation, the higher the fire risk. SDG&E intends to use a non-living fuel moisture level of 10% or less as the second criterion for initiating a power shut-off event.[16] Measurements of this criterion are made hourly at Remote Automatic Weather Stations (RAWS) operated by Cal Fire, the U.S. Forrest Service, and the U.S. Bureau of Land Management.

**Criterion 3: Relative Humidity**. The risk of wildfires is inversely proportional to the amount of moisture in the air, also known as relative humidity.[17] The lower the relative humidity, the higher the fire risk. SDG&E intends to use a relative humidity of 20% or less as the third criterion for initiating a power shut-off event. Measurements of relative humidity are readily available from RAWS.

**Criterion 4: Red Flag Warning**. The risk of wildfires increases when there is low humidity, high winds, and/or dry lightning. The National Weather

---

[15] Live fuel moisture is the amount of moisture, expressed as a percentage of weight, in a living fuel sample compared to that sample when oven dry.

[16] Non-living fuel moisture is the amount of moisture in a non-living wood dowel expressed as a percent of the dry weight of that wood.

[17] Relative humidity is the ratio of actual moisture in a given volume of air at a given temperature compared to the total amount of moisture that volume of air could hold.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 16 of 76

Service declares a "Red Flag Warning," its highest fire alert, when any of the following conditions are forecasted:

- Relative Humidity is 10% or less (for a duration of 10 hours or more) with no associated wind criteria.

- Relative Humidity is 15% or less, with sustained winds of 25 mph or more and/or frequent gusts of 35 mph or more (for duration of 6 hours or more).

- Dry lightning that is not accompanied by enough precipitation to significantly wet fuels that are critically dry.

SDG&E plans to use Red Flag Warnings for low humidity and/or high winds, but not dry lightning, as the fourth criterion for initiating a power shut-off event.

**Criterion 5:  High Winds**.  High winds are a significant fire hazard for power lines.  High winds can topple utility poles, detach power lines, blow flammable debris onto power lines, and cause trees to fall onto power lines. Power-line fires that occur during high winds spread faster and are more difficult to extinguish.

SDG&E intends to use wind speed as the final criterion for initiating a power shut-off event.  The criterion is sustained winds of 35 mph, or gusts of 55 mph accompanied by sustained winds of 30 mph.[18]  These wind speeds are at 10 meters above ground level, which corresponds to the top of utility poles. However, the actual measurements of wind speeds will be made by the RAWS at

---

[18] Wind speeds are measured at RAWS and are reported once per hour.  The reported sustained wind speed is the average wind speed during the ten-minute interval prior to the hourly report.  The reported maximum gust speed is the maximum wind speed recorded for any six-second interval since the prior hourly report.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 17 of 76

six meters above ground level. SDG&E estimates that wind speeds at 6 meters are 15% less than wind speeds at 10 meters. The wind-speed criterion at 6 meters, where the actual measurements will be made, is sustained winds of 30 mph, or gusts of 48 mph accompanied by sustained winds of 25 mph.

### 6.6.2. Re-Energization of Power Lines

After SDG&E shuts off power, SDG&E will not re-energize until sustained winds drop to 25 mph or less for two hours and the affected power lines have been visually inspected to ensure that it is safe to re-energize. SDG&E will monitor weather data to determine when inspections can begin.

If requested by an outside agency, SDG&E will re-energize prior to sustained winds staying at 25 mph or less for two hours, but only after SDG&E has deemed it safe to re-energize. SDG&E anticipates the process of re-energizing its lines, including inspections, could take up to two hours.

### 6.6.3. Power Shut-Off Areas

SDG&E's Power Shut-Off Plan applies to all circuits with overhead facilities that pass through regions designated by SDG&E as "Highest Risk Fire Areas." In general, these are areas with a high fuel load and strong winds. The geographic areas served by the circuits that are included in the Power Shut-Off Plan are called "Potential De-Energization Areas" (referred to hereafter as "Power Shut-Off Areas"). The Power Shut-Off Areas extend beyond the Highest Risk Fire Areas because circuits do not stop at the boundaries of these regions.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 18 of 76

There are 17 Power Shut-Off Areas.  Each Area is associated with its own
RAWS that is located in or near the Area, for a total of 17 RAWS.[19]  Appendix A
of today's decision contains a map that shows the 17 Power Shut-Off Areas and
the 17 RAWS.  There is some overlap of Power Shut-Off Areas.  Thus, individual
customers may be in two or more Power Shut-Off Areas.

SDG&E will be able to turn off power in each Power Shut-Off Area
individually.[20]  SDG&E believes it is extremely unlikely there will be a need to
shut off power to all 17 Areas simultaneously.  Should the need to shut off power
occur, SDG&E believes it will be limited to only a few Areas, which will
minimize the number of people affected by an outage.

### 6.6.4.  Number of Affected People and Customers

SDG&E estimates there are 59,130 electric customers (meters) and 129,976
people living in the Power Shut-Off Areas, or about 4% of the total electric
customers and population served by SDG&E.  In addition, there are
approximately 160 SCE customers served by SDG&E "fringe area circuits" who
may be subject to SDG&E's Power Shut-Off Plan.  SDG&E and SCE are taking
steps to ensure inter-utility coordination on this matter.

---

[19]  The RAWS monitor and automatically report three of the five criteria used by
SDG&E's Power Shut-Off Plan.  The two criteria that are not monitored by the RAWS
are (1) the Red Flag Warnings declared by the National Weather Service, and (2) live
fuel moisture, which is provided periodically by Cal Fire and the U.S. Forrest Service.

[20]  There is some overlap between Power Shut-Off Areas.  Consequently, shutting off
power in one Area could affect another Area to the extent the two Areas overlap.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 19
of 76

The following table shows the estimated number of customers (meters) and people (residents) subject to the Power Shut-Off Plan in 2009, broken down by the 17 Power Shut-Off Areas.

| Number of Meters and Residents in Power Shut-Off Areas | | | | | |
|---|---|---|---|---|---|
| Area by RAWS Name | Total Meters | Residential Meters | Commercial Meters | Industrial Meters | Residents |
| Alpine | 18,566 | 15,615 | 2,943 | 8 | 42,205 |
| Ammo Dump | 1,736 | 1,139 | 597 | 0 | 3,289 |
| Bell Canyon | 68 | 7 | 56 | 5 | 81 |
| Cameron | 4,231 | 3,363 | 865 | 3 | 7,908 |
| Camp Elliott | 2,882 | 2,565 | 317 | 0 | 8,199 |
| Descano | 8,436 | 6,806 | 1,624 | 6 | 17,089 |
| Goose Valley | 18,027 | 15,136 | 2,885 | 5 | 45,580 |
| Julian | 3,294 | 2,393 | 901 | 0 | 4,001 |
| Mount Laguna | 286 | 226 | 60 | 0 | 391 |
| Oak Grove | 640 | 394 | 246 | 0 | 1,272 |
| Palomar | 1,310 | 885 | 424 | 1 | 1,126 |
| Pine Hills | 2,387 | 1,659 | 728 | 0 | 3,706 |
| Potrero | 2,471 | 1,890 | 581 | 0 | 5,423 |
| Ranchita | 1,116 | 747 | 369 | 0 | 1,802 |
| San Miguel | 2,298 | 1,977 | 321 | 0 | 6,119 |
| Talega | 19 | 0 | 17 | 2 | 19 |
| Valley Center | 13,886 | 10,815 | 3,062 | 9 | 29,932 |
| Total [1] | 81,653 [1] | 65,617 | 15,996 | 39 | 178,142 [1] |

**Note 1:** Due to overlapping Areas, the sum of the meters in individual Areas (81,653) is greater than the total meters (59,130), and the sum of the residents in individual Areas (178,142) is greater than the total residents (129,976).

SDG&E has identified approximately 902 Medical Baseline customers in the Power Shut-Off Areas. Of these, 590 require life support equipment. There

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 20 of 76

are also approximately 5,700 customers in the Power Shut-Off Areas who participate in the California Alternative Rates for Energy (CARE) program.

Some customers will be removed from the Power Shut-Off Plan in 2009 due to a project that is currently underway to place certain overhead power lines underground.  When the project is complete, it will remove approximately 2,300 customers from the Power Shut-Off Plan, including 14 water pumping stations, leaving 56,830 customers affected by the Plan.

SDG&E estimates that the duration of power shut-off events will range from 12 to 72 hours, and that the average number of residents affected by each event will be 18,600.  This estimate of residents excludes approximately 160 SCE customers (meters) subject to SDG&E's Power Shut-Off Plan.

### 6.6.5.  Customer Education

SDG&E believes it is important for customers to understand the Power Shut-Off Plan so they can prepare for power shut-off events before they occur. To this end, SDG&E has mailed information packets to all customers in the Power Shut-Off Areas.  The package included a cover letter, program fact sheet, list of frequently asked questions, map of the impacted areas, a guide for developing an emergency plan, an unplanned outage fact sheet, a portable generator fact sheet, and a customer contact form.  SDG&E will continue to mail a package annually to customers in Power Shut-Off Areas that contains the previously identified information.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 21 of 76

SDG&E will survey its Special Needs Customers[21] to ascertain each customer's readiness for a power shut-off event and any transportation needs they may have.  Special Needs Customers with mobility restrictions who cannot remain in their homes without electricity (as identified through customer surveys) will be provided round trip transportation to appropriate facilities.  Similarly, customers with special needs for diet, medication, and medical equipment will be provided round trip transportation to acute care facilities or hospitals in accordance with their needs and insurance restrictions.  All transportation will be at SDG&E's expense.

SDG&E has made significant outreach efforts to Essential Customers, i.e., customers who provide services that are essential to public health, safety, and welfare.  SDG&E defines Essential Customers as including the following:

A.    Fire, police, and prison facilities.

B.    Lighting for streets, highways, and other public areas.

C.    National defense agencies.

D.    Hospitals and convalescent homes.

E.    Public, private, and municipal utilities that provide services that are essential for public health and safety (i.e., electric, gas, water, communication, and sewage disposal utilities).

F.    Public transportation.

G.    Radio and broadcasting stations that transmit emergency information.

---

[21] SDG&E defines Special Needs Customers as those who participate in the Medical Baseline Allowance and/or Life Support programs.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 22 of 76

     H.   Residential customers who use medical life support equipment.

     I.    Schools K-12.[22]

Essential Customers are not exempt from the Power Shut-Off Plan.  Due to the nature of their loads, most Essential Customers are prepared to operate during outages.  For example, hospitals and skilled nursing facilities have back-up generation to support critical load for 12 to 72 hours.

SDG&E has contacted all Essential Customers in the Power Shut-Off Areas to discuss the Power Shut-Off Plan.  SDG&E will continue to contact all Essential Customers prior to each fire season to help them plan for power shut-off events.

### 6.6.6.  Customer Notice of Power Shut-Off Events

SDG&E will attempt to provide all customers with two notices when a power shut-off event appears likely.  The first notice will occur at approximately four to six hours prior to the forecasted shut-off event.  SDG&E will use its outbound dialer system to send telephone alerts to affected customers.  The outbound dialing system can make more than 20,000 calls per hour, including calls to communications devices commonly used by persons with hearing, speech, and/or vision disabilities.  The first notice will indicate that high fire risk conditions are forecast to occur, that SDG&E may shut off power, and that customers should prepare for a power shut-off event.

---

[22] SDG&E treatment of schools as Essential Customers is limited to customer education and notice.  SDG&E does not treat schools as Essential Customers with respect to SDG&E's proposed tariff provisions for demand normalization, critical peak pricing, and demand response.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 23 of 76

The second notice will occur two to three hours prior to the forecasted shut-off event.  This second notice will have a more urgent tone about the need to prepare for the expected shut-off event.  If the forecast changes and SDG&E determines that a power shut-off event is no longer likely, SDG&E will use its outbound dialer system to notify customers.

Essential Customers will be notified at the same times as other customers, but through phone calls and e-mails consistent with the individual customer preferences.  SDG&E will also alert the Red Cross and 2-1-1 when a shut-off event is forecasted.

It is possible that the first forecast that SDG&E receives indicates a shut-off event could occur in three hours or less.  In this situation, only one notice will be provided.  In the unlikely event that a shut-off event occurs with no warning, SDG&E will notify customers as soon as practicable.  Customers with functioning land lines or registered cell phones will receive a call.

### 6.6.7.  Mitigation of Adverse Impacts on Customers

SDG&E acknowledges that shutting off power imposes hardships on customers, particularly low income customers and customers with medical needs.  SDG&E will implement a variety of measures to mitigate the hardships, such as providing advance warning of an impending shut-off event whenever possible so customers can prepare; providing $250 debit cards to customers participating in the CARE and/or Medical Baseline programs; opening shelters in the areas where power is shut off; and transporting customers who depend on life support equipment to appropriate medical facilities when a shut-off event is declared.  SDG&E does not request additional funding in rates for these mitigation efforts in 2009.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 24 of 76

SDG&E will contact all impacted Special Needs Customers in person or by telephone to discuss their emergency readiness and medical transportation needs in the case of a power shut-off event.  Because Special Needs Customers are recertified bi-annually, SDG&E will use this opportunity to again discuss their emergency readiness and medical transportation needs.  Once the power shut-off event is over and the Special Needs Customers are back home, there will be an in-person visit by an SDG&E employee to deliver assistance, followed by a live-person phone call to discuss the service level and overall experience.

SDG&E also recognizes that shutting off power will prevent the Water Districts from using many of their electric-powered pumps, which could disrupt the supply of water used to fight fires.  To mitigate this adverse impact, SDG&E will procure a pool of six portable backup generators (four 400 kW and two 750 kW) that can be dispatched to the Water Districts during power shut-off events.  The six portable generators are intended to support 20 critical pump stations with loads of 100 kW or greater.  SDG&E will install and own the wiring and permanent electric transfer safety switches at these 20 facilities.  The total estimated cost of the six generators and wiring is $3.9 million.[23]

If more than six generators are needed to provide water for fire-fighting purposes, SDG&E will re-energize any part of its system if ordered to do so by

---

[23] At the all-party meeting held on July 6, 2009, SDG&E stated that it would procure a pool of 31 portable generators.  Six would be for the Water Districts, ten for evacuation centers, and 15 for schools.  SDG&E also proposed to pre-wire 110 sites to accept the portable generators.  Ten of these sites would be evacuation centers, 20 sites would be critical pump stations, and the remainder would be schools.  SDG&E did not state who will ultimately pay for the generators and wiring.  (Reporter's Transcript, pp. 39-40.)

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 25 of 76

the incident commander.  For example, if all six generators have been deployed to Water District facilities and additional Water District pump stations need to be brought on line at locations that remain de-energized, SDG&E could re-energize the circuit(s) serving the pump stations after conducting a safety inspection.

SDG&E is willing to own and maintain a pool of six generators for a two-year period.  SDG&E believes that two years is enough time for the Water Districts to procure and install emergency back-up generation they should have for any of a number of emergency situations.

SDG&E does not intend to procure a pool of portable generators or install wiring for critical pump stations with a load of less than 100 kW.  SDG&E believes that back-up generators for loads of less than 100 kW should be the responsibility of the individual Water Districts.

### 6.6.8.  Cost of the Power Shut-Off Plan

SDG&E states that the costs for its Power Shut-Off Plan will depend on the frequency and scope of shut-off events.  Assuming two events per year, the annual costs will be in the range of $7 - $11 million.  Startup costs will be in the range of $14 - $24 million.[24]  These estimates do not include any costs that result from Commission requirements that are adopted in this proceeding.  SDG&E does not seek ratepayer funding for costs incurred in 2009.[25]

---

[24] At the all-party meeting held on July 6, 2009, SDG&E stated that its startup costs would be in the range of $24 - $36 million.  (Reporter's Transcript, pp. 39 – 40.)

[25] SDG&E does not state if or when it will request ratepayer funding of costs incurred in 2010 and future years.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 26 of 76

The above costs for the Power Shut-Off Plan are incremental to normal operating and maintenance costs and do not include other expenses for SDG&E's Community Fire Safety Program such as system hardening.

## 7. Review of SDG&E's Power Shut-Off Plan

### 7.1. Position of the Parties

#### 7.1.1. SDG&E

SDG&E asserts that its Power Shut-Off Plan is needed to address the serious fire danger that occurs when strong Santa Ana winds blow across SDG&E's service territory.  The severity of the danger is demonstrated by the firestorms of October 2003 and October 2007.  In October 2007, Santa Ana winds reportedly caused SDG&E's overhead power lines to ignite the Witch Fire, the Guejito Fire, and the Rice Fire.[26]  The Witch Fire and Guejito Fire combined into a single wildfire that burned 197,990 acres and 1,624 buildings (including 440 homes), and killed two people.  The Rice Fire burned 9,000 acres and 248 buildings (including 240 homes).  There were no deaths.  SDG&E is concerned that failure to shut off power during severe conditions could lead to firestorms like those in 2003 and 2007.

SDG&E used historical data to "backcast" the number of times it would have shut off power had its Power Shut-Off Plan been in effect in prior years. The following table lists the backcast of shut-off events, with an "event" defined

---

[26] The Commission is currently investigating the Witch Fire and Guejito Fire in Investigation (I.) 08-11-006 and the Rice Fire in I.08-11-007.  Today's decision does not prejudge any issues being addressed in those Investigations.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 27 of 76

as any calendar day in which power would have been shut off.  A single calendar day in which power is shut off at multiple locations is counted as one event.

| Backcast of Power Shut-Off Events During Red Flag Warnings | | | | | | | |
|---|---|---|---|---|---|---|---|
| Event Date/ Time | RAWS | Vegetation Fuel Moisture | | Relative Humidity | Sustained Wind or Gusts @ 6 Meters | Duration (Hours) | # Meters/ # of People |
| | | Non-Living | Living | | | | |
| | | < 10% | < 75% | < 20% | **At 6 meters** • Sustain > 30 mph, _or_ • Sustain > 25 mph + gusts > 48 mph | | |
| **Event 1** | | | | | | | |
| 2/9/02 @ 1500 | Cameron | Note 1 | 71% | 12% | Sustain  26 mph Gusts 48 mph | 24 hours | 4,231/ 10,587 |
| 2/9/02 @ 2230 | Descanso | 4% | 71% | 11% | Sustain  27 mph Gusts 59 mph | 18 hours | 8,436/ 21,299 |
| **Event 2** | | | | | | | |
| 2/10/02 @ 0050 | Alpine | 5% | 71% | 7% | Sustain  28 mph Gusts 52 mph | 13 hours | 18,566/ 48,078 |
| 2/10/02 @ 0410 | Potrero | Note 1 | 71% | 10% | Sustain  26 mph Gusts 53 mph | 12 hours | 2,471/ 6,043 |
| **Event 3** | | | | | | | |
| 2/25/02 @ 1720 | Ammo Dump | 10% | 58% | 10% | Sustain  37 mph Gusts 37 mph | 3 hours | 1,736/ 3,889 |
| **Event 4** | | | | | | | |
| 1/5/03 @ 2320 | Ammo Dump | 6% | 74% | 12% | Sustain  33 mph Gusts 45 mph | 11 hours | 1,736/ 3,889 |
| **Event 5** | | | | | | | |
| 1/6/03 @ 0130 | Bell Canyon | 7% | 74% | 7% | Sustain  38 mph Gusts 62 mph | 7 hours | 68/ 81 |
| 1/6/03 @ 0220 | Talega | 0% | 74% | 8% | Sustain  36 mph Gusts 39 mph | 7 hours | 19/ 19 |
| **Event 6** | | | | | | | |
| 1/7/03 @ 1220 | Bell Canyon | 7% | 74% | 20% | Sustain  38 mph Gusts 65 mph | 3 hours | 68/ 81 |

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 28 of 76

| Backcast of Power Shut-Off Events During Red Flag Warnings | | | | | | |
|---|---|---|---|---|---|---|
| Event Date/ Time | RAWS | Vegetation Fuel Moisture | | Relative Humidity | Sustained Wind or Gusts @ 6 Meters | Duration (Hours) | # Meters/ # of People |
| | | Non-Living | Living | | | | |
| | | < 10% | < 75% | < 20% | **At 6 meters** <br>• Sustain > 30 mph, <br><u>or</u> <br>• Sustain > 25 mph + gusts > 48 mph | | |
| **Event 7** | | | | | | | |
| 10/26/03 @ 1230 | Descanso | Note 1 | 64% | 4% | Sustain  27 mph Gusts 56 mph | 6 hours | 8,436/ 21,299 |
| **Event 8** | | | | | | | |
| 12/16/04 @ 1820 | Ammo Dump | 4% | 66% | 18% | Sustain  34 mph Gusts 39 mph | 13 hours | 1,736/ 3,889 |
| 12/16/04 @ 1500 | Cameron | 6% | 66% | 18% | Sustain  26 mph Gusts 50 mph | 3 hours | 4,231/ 10,587 |
| **Event 9** | | | | | | | |
| 12/24/04 @ 0900 | Cameron | 7% | 66% | 4% | Sustain  28 mph Gusts 49 mph | 5 hours | 4,231/ 10,587 |
| **Event 10** | | | | | | | |
| 2/8/06 @ 0630 | Bell Canyon | 2% | 72% | 4% | Sustain  29 mph Gusts 48 mph | 17 hours | 68/ 81 |
| **Event 11** | | | | | | | |
| 11/30/06 @ 0520 | Ammo Dump | 9% | 58% | 8% | Sustain  31 mph Gusts 37 mph | 3 hours | 1,736/ 3,889 |
| **Event 12** | | | | | | | |
| 10/21/07 @ 2222 | Ammo Dump | 9% | 66% | 7% | Sustain  30 mph Gusts 35 mph | 38 hours | 1,736/ 3,889 |
| 10/21/07 @ 2303 | Cameron | 0% | 66% | 9% | Sustain  28 mph Gusts 51 mph | 18 hours | 4,231/ 10,587 |
| 10/21/07 @ 1933 | Descanso | 3% | 66% | 10% | Sustain  26 mph Gusts 52 mph | 28 hours | 8,436/ 21,299 |
| 10/21/07 @ 2058 | Goose Valley | 8% | 66% | 8% | Sustain  29 mph Gusts 50 mph | 13 hours | 18,027/ 46,634 |
| 10/21/07 @ 1214 | Potrero | 0% | 66% | 8% | Sustain  27 mph Gusts 51 mph | 49 hours | 2,471/ 6,043 |

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 29 of 76

| Backcast of Power Shut-Off Events During Red Flag Warnings | | | | | | |
|---|---|---|---|---|---|---|
| Event Date/ Time | RAWS | Vegetation Fuel Moisture | | Relative Humidity | Sustained Wind or Gusts @ 6 Meters | Duration (Hours) | # Meters/ # of People |
| | | Non-Living | Living | | | | |
| | | < 10% | < 75% | < 20% | **At 6 meters** <br> • Sustain > 30 mph, <br> <u>or</u> <br> • Sustain > 25 mph + gusts > 48 mph | | |
| **Event 13** | | | | | | | |
| 10/22/07 @ 0653 | Alpine | 4% | 66% | 9% | Sustain  27 mph Gusts 51 mph | 5 hours | 18,566/ 48,078 |
| 10/22/07 @ 0014 | Julian | 6% | 66% | 15% | Sustain  29 mph Gusts 57 mph | 30 hours | 3,294/ 7,817 |
| 10/22/07 @ 0313 | Valley Center | 6% | 66% | 0% | Sustain  26 mph Gusts 50 mph | 10 hours | 13,886/ 34,326 |
| **Event 14** | | | | | | | |
| 10/14/08 @ 0403 | Cameron | 0% | 73% | 13% | Sustain  30 mph Gusts 40 mph | 7 hours | 4,231/ 10,587 |
| <u>**Note 1**</u>:  Data for the "Non-living Fuel Moisture" was not available at the RAWS at that time. However, nearby RAWS reported data that met the criterion. | | | | | | | |

SDG&E's backcast shows that power shut-off events would have occurred 14 times in the last eight years.  The duration of the backcast events ranges from 3 hours to 49 hours, with an average of 13 hours.[27]  Duration includes the time that power is shut off due to exceeding the shut-off criteria plus the time required for the inspection and restoration process.  The number of customers (meters) affected by each backcast event ranges from 68 to 35,746, with an average of 9,475 customers.  The number of residents (people) affected by each

---

[27] The average duration of 13 hours is the resident-weighted average.

event ranges from 100 to 90,221, with an average of 23,826 residents.  SDG&E believes this information shows that an average shut-off event will be far less disruptive to the public than the devastating firestorms that could occur if power is not shut off.

SDG&E identified 167 fires from August 2003 through early 2009 that in some way relate to its power lines.  Most fires were insignificant.  Of the 167 incidents, 13 are associated with high winds.  SDG&E provided the following information for each of the 13 wind-related power-line fires:  (a) date the fire started; (b) location; (c) size in acres; (d) injuries and/or property damage, if known; (e) how the fire was ignited; (f) why the fire is associated with high winds; and (g) whether shutting off power might have prevented the fire.

The information for (a) – (f) is provided in the following table.  For (f), SDG&E does not know the exact wind speed at the time of the fire.  The rationale for labeling a fire as wind related comes from incident reports for each fire.  With respect to (g) regarding whether the Power Shut-Off Plan might have prevented the fire, SDG&E does not know for 10 of the fires because of a lack of data.  In three cases (Fire Event Nos. 2, 11, and 13 in the following table), SDG&E is confident that all five criteria of its Power Shut-Off Plan were met.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 31 of 76

| Historical Data for Wind-Related Power-Line Fires | | | | | |
|---|---|---|---|---|---|
| Fire Event | Date Started | Location | Size in Acres | Injuries & Property Damage | Wind-Related Cause of Fire |
| 1 | 12/16/04 | Wynola | 5 | None noted | Power line down from heavy winds |
| 2 | 12/16/04 | Descanso | 1 | None noted | Power line down from heavy winds |
| 3 | 12/17/04 | Ramona | 1 | None noted | Power line down from heavy winds |
| 4 | 2/19/05 | Fallbrook | 1 | None noted | Tree branch into power line from high winds |
| 5 | 2/7/06 | Laguna Niguel | 1 | None noted | Tree branch into power line from high winds |
| 6 | 6/27/06 | Fallbrook | 1 | None noted | Tree branch into power line from high winds |
| 7 | 10/27/06 | Boulder Creek | 2 | None noted | Power line down from heavy winds |
| 8 | 11/30/06 | San Ysabel | 130 | Damage to bridge; loss of pasture land | Power line down. High winds of 40 mph w/gusts to 60 mph |
| 9 | 12/27/06 | Camp Pendleton | 3 | None noted | Power line down from heavy winds |
| 10 | 3/3/07 | Jamul | 0.1 | None noted | Tree branch into power line from high winds |
| 11 | 10/21/07 | Guejito, San Pasqual | 197,990* | Extensive damage & injuries* | Alleged contact w/conductor. High winds observed in area. |
| 12 | 10/21/07 | Witch, Ramona | 197,990* | Extensive damage & injuries* | Alleged arcing between power lines. Santa Ana winds in area. |
| 13 | 10/22/07 | Rice, Rainbow | 9,472 | Extensive damage & injuries | Alleged tree branch into power line from high winds |
| * Witch and Guejito acreage, injuries, and damage are aggregated. | | | | | |

     SDG&E cautions that while past experience is instructive, future power
shut-off events and power-line fires may not follow historical patterns. SDG&E
anticipates there will be fewer power-line fires in the future due to its
Community Fire Safety Program and Power Shut-Off Plan.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 32 of 76

SDG&E believes that the parties who oppose its Power Shut-Off Plan overestimate the risk of fires being ignited by candles, barbeques, portable generators, and other sources when SDG&E shuts off power.  To illustrate the small risk of fires from other sources, SDG&E cited statistical information maintained by the State Fire Marshal that shows during the five-year period of 2003 – 2007 there were 55,636 equipment-related fires in all of California, of which 71 were ignited by generators and 243 by grills, hibachis, and barbeques.

### 7.1.2.  Opposition Parties

SDG&E's Power Shut-Off Plan is opposed by the Alliance, AT&T, CCTA, CFB, Cox, CPSD, CTIA, DRA, DisabRA, the School Districts, the Water Districts, and UCAN (collectively, the "Opposition Parties").  They contend that SDG&E's Power Shut-Off Plan will eliminate one ignition source but create many others.  This is because customers without electricity will use other means for lighting and cooking, such as candles, lanterns, fireplaces, barbecues, and camp stoves.  In addition, some customers may resort to providing their own power with portable generators that are not maintained and/or operated properly.  AT&T notes that the U. S. Fire Administration has issued a warning about the fire hazard posed by generators.[28]

The Opposition Parties assert that SDG&E has presented no evidence that its Power Shut-Off Plan will reduce the overall risk of wildfires.  Rather, SDG&E's Plan reduces one risk but increases others.  The risk that is reduced is the one for which SDG&E might be held liable - fires caused by its power lines.  The risks that are increased are those for which SDG&E would not be held liable.

---

[28]  www.usfa.dhs.gov/citizens/all_citizens/co/generator.shtm.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 33 of 76

The Opposing Parties note that SDG&E has identified 13 power-line fires since 2003 that are linked to high-wind events, but only three of these fires would have been prevented had its Power Shut-Off Plan been in effect at the time. The Opposing Parties question the benefit of shutting off power 13 times to prevent three fires. CCTA opines that the three fires could have been prevented by better maintenance, making SDG&E's Power Shut-Off Plan unnecessary.

The Alliance and CPSD contend that SDG&E has selected a wind-speed criterion that is too low, which will cause needless power shut-off events. They state that SDG&E is required by General Order 95 to design, construct, and maintain power lines that can withstand wind speeds well in excess of SDG&E's wind-speed criterion.

Finally, the Opposing Parties believe that the Power Shut-Off Plan will impose many significant costs, burdens, and risks on customers and communities in the areas where power is shut off. They argue that SDG&E has not conducted a cost-benefit analysis of the claimed benefits of its Power Shut-Off Plan versus the many adverse impacts. These adverse impacts are summarized below.

**Disruption of Communications Networks**. Communications providers rely on commercial power to provide landline telephone service, cable TV, internet, and wireless telephone service. Network facilities located in the Power Shut-Off Areas can function when commercial power is shut off by using onsite backup batteries and generators, but service could start to fail for many customers after 4 - 12 hours as batteries are exhausted and generator fuel is consumed. To keep networks functioning, the exhausted batteries would need to be replaced with fresh batteries or portable generators, and the generators would need to be refueled. This could become a herculean task during a widespread

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 34 of 76

and prolonged power shut-off event, as there are hundreds of sites in the Power Shut-Off Areas where backup power would be needed to keep communications networks functioning.[29]  Communications providers are concerned that if backup generators are not installed or refueled in time due to distance, terrain, traffic, blocked roads, or other obstacles, customers could lose communications services, including copper-based landline service, cable TV service, internet service, and/or wireless service.

Communications providers estimate they will incur significant costs to respond to power shut-off events.  The actual costs will vary depending on how widespread the shut off is, how long it lasts, and other factors.  They will also lose an unknown amount of revenue if service is disrupted.

**Loss of Communications at Customer Premises**.  Even if communications networks continue to function during a power shut-off event, the loss of power at customers' premises could cause many customers to lose access to communications services.  For example, AT&T provided information that shows approximately 37% of households use only cordless phones for their landline service.  Cordless phones rely on commercial power at customers' premises and are not usually sold with back-up batteries.  As a result, thousands of households could be without landline service during a power shut-off event.  Some of these households may have cell phones, but they might not be able to recharge cell phone batteries when power is shut off.

---

[29] AT&T alone has hundreds of remote terminals in the Power Shut-Off Areas where calls carried by its landline network are aggregated and disaggregated.  These remote terminals collectively serve tens of thousands of lines, and have an industry standard of about eight hours of battery backup.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 35 of 76

Customers who subscribe to cable voice services receive a modem with battery back-up for up to eight hours. Voice service will be lost after eight hours.

Many residents rely on broadband internet for "over-the-top" phone service (e.g., Vonage, Skype, and MagicJack). However, desktop computers will not function without power, and laptop computers will be unable to access the internet because the Wi-Fi modems that connect laptops to the internet will be without power. Only those customers who subscribe to wireless data services will be able to access the internet with a laptop, but only if the wireless networks are functioning and only for as long as laptop batteries hold out.

Large communications customers such as government agencies, financial institutions, and hospitals are often served by on-site equipment rooms with battery backup for short outages. These equipment rooms usually cannot accommodate portable generators. SDG&E estimates there are about 10,930 commercial customers in the shut-off area. Extended outages could force many commercial customers to curtail or halt their operations.

**Public Safety Impacts of Degraded Communications**. The loss of communications caused by a power shut-off event would adversely affect public health, safety, and welfare. These adverse impacts include:

- The loss of communications would occur during periods of high fire risk. Residents may not be able to call 911 to report fires. The delayed reporting of fires could allow fires to escape initial attack and spiral out of control.

- Residents may not be able to call 911 to report crimes, medical emergencies, and vehicle accidents. The delayed response to emergencies of all types poses a serious risk to lives and public safety in general.

- First responders may not be able to communicate with each other or the public via cell phones. The inability of first

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 36 of 76

responders to communicate effectively could impede coordinated and timely responses to emergencies.

- Residents may not be able to receive emergency information such as evacuation notices disseminated through reverse 911.

- Health monitoring services and security services that rely on telecommunications may not function.  Many seniors and persons with disabilities may not be able to use their "lifeline" emergency button when power is shut off.

**Loss of News and Information**.  Government agencies depend on television and the internet to disseminate emergency information.  During the 2003 and 2007 firestorms, television and internet media provided around-the-clock coverage of events and disseminated emergency information to residents throughout the area.  SDG&E's Power Shut-Off Plan could cut off this important source of emergency information, since most televisions and computers will not work without external power.

**Customers with Disabilities**.  Shutting off power for an extended period would impose a number of hardships on people with disabilities.  First, many people with disabilities depend on electric-powered devices.  If power is shut off, people who use electric wheelchairs will find their mobility limited once the batteries run down.  People with hearing or vision disabilities who rely on specialized communications equipment will not be able to communicate with the outside world.[30]  People who take medications that must remain refrigerated may be forced to leave their homes in order to find a location with refrigeration

---

[30]  DRA reports that most of the equipment provided by the Deaf and Disabled Telecommunications Program needs external power to operate.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 37 of 76

facilities. Similarly, people with medical conditions that require them to maintain their environment at a certain temperature may have to evacuate because the loss of power makes temperature control impossible.

Second, SDG&E estimates there are 902 Medical Baseline Customers in the Power Shut-Off Areas, including 590 customers who rely on life support equipment. Many of these individuals will have to evacuate if there is an extended outage. Because these people have serious medical conditions, any evacuation creates some risk.

SDG&E plans to offer free transportation to medically fragile customers if a power shut-off event is called. However, any care provided at the hospital or other medical facility would be the customers' responsibility. This will result in hefty medical bills for the customers or their insurance providers.

Third, people with disabilities rely on communications services to stay in contact with caregivers and other essential resources. If an outage occurs, many people with disabilities will need additional assistance. Any breakdown in communications places people with disabilities at risk of having health and medical needs go unmet.

Finally, disabled people are disproportionately low-income and can ill afford the costs of purchasing provisions for power shut-off events, such as landline phones, flashlights, coolers, spare batteries, and backup generators. Consequently, SDG&E's Plan will force many customers with disabilities to evacuate their homes and incur the costs and inconvenience that such evacuation entails. Even if some disabled persons could afford a generator, they may not be able to operate it due to mobility or vision impairments.

**Adverse Impact on Schools**. There are 65 public elementary schools, middle schools, and high schools in the Power Shut-Off Areas that serve

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 38 of 76

approximately 19,867 students. None of these schools has backup power. All the affected schools use phone systems that need external power to operate.

During a power shut-off event, the schools affected by the event will be without internet, television, and phone service, which creates health and safety issues on three fronts. First, if a student is seriously hurt during an outage, the school may not be able to contact emergency services in a timely manner. Second, if there is an emergency outside of the school, such as a major wildfire, the school may not receive timely warning, thereby compromising the school's ability to protect children and staff. Third, schools without power may not be able to meet health and safety requirements, such as providing water from wells, lighting, and air conditioning. The School Districts estimate that it would cost several million dollars to prepare for power shut-off events.

The School Districts are very concerned about the loss of Average Daily Attendance (ADA) funding from the State, which is the main source of funds for the School Districts. If a lengthy power shut-off event occurs, schools may have to cancel school days, causing a loss of ADA funds. The Education Code provides for waivers of ADA requirements if an emergency is established to the satisfaction of the State Superintendent of Public Instruction. The School Districts are worried that a power shut-off event might not be deemed an emergency, resulting in a loss of ADA funds.

**Adverse Impact on Water Supply**. The Water Districts have 39 "critical pump stations" in the Power Shut-Off Areas that do not have backup power. These pump stations provide water to tens of thousands of customers and for fire fighting purposes. If SDG&E shuts off power, the supply of water in the areas served by the affected critical pump stations will be limited to whatever is on hand in tanks and small reservoirs. If a fire breaks out, the heavy demand for

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 39 of 76

water to fight the fire could exhaust the available supply within hours.  The lack of water to fight fires could be disastrous, as the fires would be occurring during periods of high fire danger (i.e., when winds are high, humidity is low, and vegetation is dry).

The Water Districts estimate that it would cost $8 million to install backup generators and associated wiring at the 39 critical pump stations.  They also state that SDG&E's proposal to procure a pool of six portable generators for use by the Water Districts during power shut-off events is insufficient.  SDG&E's backcast shows that during the October 2007 firestorm, SDG&E would have shut off power to more than 30 critical pump stations simultaneously.

**Adverse Impact on Sewage Service**.  Several of the Water Districts provide sewer service.  In order to avoid spills or unlawful discharges, the Water Districts will need to rent generators during power shut-off events to keep sewer facilities operating.

**Costs to Prepare for a Power Shut-Off Event**.  Customers could incur significant costs to prepare for a power shut-off event.  Such costs could include the purchase of landline phones; flashlights and portable radios; extra batteries for flashlights, radios, laptop computers, and communications devices; coolers to store perishable foods and medications; candles, camp stoves, and lanterns; and backup generators and fuel.

**Costs Incurred During a Power Shut-Off Event**.  Many customers could incur significant costs due to a power shut-off event.  Such costs could include the rental of portable generators; lost business revenues; lodging and restaurant costs for residents who leave the area while power is shut off; loss of refrigerated foods and medicines; and general loss of public convenience.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 40 of 76

**Impacts on Low Income Customers**.  Low income customers might not be able to afford the loss of refrigerated foods and medications, or to take actions to mitigate the impacts of shut-off events, such as evacuating to a hotel, eating at restaurants, or buying batteries, coolers, and generators.

**Portable Generators**.  Customers without power may use portable generators to provide electricity for their appliances and lights.  The use of portable generators poses a fire risk for the reasons described previously, but that is not the only hazard.  UCAN states that owners of portable generators may need to store 20 gallons of fuel on site in order to power a generator through a shut-off event lasting 72 hours.  If a wildfire passes through the property, the fuel could explode with deadly consequences for residents and fire crews.

In addition, some residents may connect their generators to the electrical wiring of their homes.  If "do-it-yourselfers" do not disconnect their electrical panels from the utility system, the generators would energize utility lines, thereby nullifying SDG&E's intent to reduce ignitions from power lines.  This would also pose a danger to utility employees because power lines would be "hot" when the workers do not expect it.

Finally, generators emit dangerous levels of carbon monoxide (CO).  UCAN cites a study that shows portable generators were implicated in 96% of poisonings from CO following hurricanes Charley and Jeanne in Florida in 2004.

**Loss of Traffic Lights and Street Lights**.  Traffic lights and street lights depend on commercial power.  The loss of traffic lights and street lights during power shut-off events would increase the risk of vehicle accidents, particularly at night.  Crash victims may not be able to summon help if the wireless network has ceased functioning.  The loss of traffic lights could also delay the arrival of first responders to the scene of the accident or other emergency.  If a general

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 41 of 76

evacuation is declared due to an approaching wildfire, the lack of traffic signals and street lights could slow the evacuation and place many lives at risk.

**Hampering Evacuations**.  Shutting off power could hamper evacuation efforts because customers might not receive timely notices to evacuate for the reasons stated previously.  In addition, elderly and disabled persons may not be able to open their garage doors without electric garage door openers, trapping them in their homes.  Evacuations from homes at night will be slower and more difficult without lights.  Loss of power to traffic lights and street lights may impede and disrupt evacuations.  Loss of power to fueling stations might trap evacuees without sufficient fuel in their vehicles.

The October 2007 firestorm demonstrates that concerns about evacuating during a power shut-off event are warranted.  On October 21, 2007, the Witch Fire started at 12:35 p.m. near the community of Ramona.  If the Power Shut-Off Plan had been in effect, SDG&E would have shut-off power to Ramona at 8:58 p.m.  Sixteen minutes later, at 9:14 p.m., residents of Ramona received reverse 911 calls to evacuate.[31]  Fortunately, power was on, and residents were able to receive reverse 911 calls and to evacuate at night with the aid of lights in their homes and on the streets.

**Diversion of Public Safety Personnel**.  Shutting off power would divert police and sheriff personnel from their primary missions.  For example, officers would need to direct traffic at intersections where traffic lights no longer function until temporary stop signs could be set up.  Police and fire department

---

[31]  Reporter's Transcript of the all party meeting held on July 6, 2009, p. 47.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 42 of 76

personnel might have to drive longer distances to find gas stations with working pumps to refuel emergency vehicles.

Police and sheriff personnel would be diverted at a time when many burglar alarms and security lights would not function, providing increased opportunity for criminal activity.

**Loss of Economic Activity**.  Many businesses could not operate without commercial power.  For example, some retail businesses could not function without scanners at checkout stands, gas stations could not pump fuel, and many restaurants could not cook.  Employees who rely on computers could not work.

**Setting the Stage for Catastrophic Wildfires**.  The simultaneous occurrence of the all of the above circumstances under high fire risk conditions (e.g., loss of communications, lack of water, disruption of traffic, disabled and elderly residents trapped in their homes, etc.) would increase the potential for catastrophic wildfires.

### 7.1.3.  SCE

SCE is the only party that supports SDG&E's Power Shut-Off Plan.  SCE opines that shutting off power is better than running the risk of igniting catastrophic fires like those that occurred in October 2003 and October 2007.

SCE does not currently have a power shut-off plan in effect.  However, in 2003 SCE implemented a temporary program to shut off power to rural areas where the Governor had declared a state of emergency due to the fire risk posed by the large number of dead trees killed by bark beetles.  The purpose of SCE's power shut-off program was to protect against the possibility of strong winds causing dead trees to fall onto its power lines and igniting a wildfire.  The region affected by SCE's program had 34,500 customers (meters), and was dividend into 11 areas where power could be shut off independently from each other.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 43 of 76

SCE implemented its power shut-off program in 2003 on its own initiative and obtained Commission authorization sometime later.  SCE terminated the program in August 2005, after the dead and diseased trees had been cleared from the region.  During the time SCE's power shut-off program was in effect, SCE shut off power one time.  The shut-off occurred on October 26-27, 2003, in the Idyllwild area.  It affected approximately 4,000 customers and lasted 26 hours.  When SCE inspected its power lines prior to re-energization, it found six locations where trees had fallen onto the lines.  SCE views its program as a success because it prevented what could have been a catastrophic wildfire.

### 7.2.    Discussion

We will approve SDG&E's Power Shut-Off Plan only if we are convinced that the need to shut off power to protect public safety takes precedence over the vital necessity of keeping power on.  There is a strong presumption that power should stay on.  As the California Legislature recognized in § 330(g), "[r]eliable electric service is of utmost importance to the safety, health, and welfare of the state's citizenry and economy."

There are two threshold issues we must consider in deciding whether to approve SDG&E's Power Shut-Off Plan.  The first issue is whether shutting off power results in a net reduction in wildfire ignitions during hazardous fire conditions.  The second issue is whether the benefits of SDG&E's Power Shut-Off Plan outweigh the adverse impacts.  If SDG&E's Power Shut-Off Plan fails either test, then SDG&E's Application for Commission approval of its Plan should be denied.  SDG&E has the burden of demonstrating that its Power Shut-Off Plan passes both tests.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 44 of 76

### 7.2.1.  Impact on the Number of Wildfires

We begin our analysis of SDG&E's Power Shut-Off Plan by assessing whether it will reduce the number of wildfires during periods of high fire danger.  There is no doubt that shutting off power eliminates the risk of power lines igniting fires.  However, the Opposition Parties have demonstrated that shutting off power increases the risk of fires starting from sources other than power lines.  This is because people who do not have power in their homes will light candles or lanterns when the sun goes down; will use barbeques and camp stoves to cook food, especially when faced with the loss of costly groceries in a freezer or refrigerator that is not receiving power;[32] and will use fireplaces for heat, light, and cooking.  All of these actions create new ignition sources.  In addition, some customers may use portable generators to power their appliances and homes.  AT&T cites the following warning from the U. S. Fire Administration regarding the fire hazard posed by generators:

> Before refueling the generator, turn it off and let it cool.  Fuel spilled on hot engine parts could ignite.[33]

UCAN notes that sparks from vehicles are responsible for 11.6% of fires.[34] Shutting off power could increase the number of miles driven by forcing people in the areas where power is shut off to drive long distances to find restaurants

---

[32] Customers with gas stoves and ovens will still be able to cook but many of these customers will have to use matches to light the cooking fire.  The use of matches increases the risk of fire because explosive levels of gas could accumulate if customers cannot light the stove or oven by the second or third try.

[33] www.usfa.dhs.gov/citizens/all_citizens/co/generator.shtm.

[34] UCAN Comments filed March 27, 2009, p. 5.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 45 of 76

and retail stores where power is on so they can eat and buy groceries, batteries, gasoline, and other necessities.  The increased driving would exacerbate the risk of vehicle-ignited fires.

The risk of customers igniting fires increases as the number of affected customers increases and the length of the outage increases.  SDG&E's backcast shows that SDG&E would have shut off power on October 22, 2007, to 35,746 meters serving 90,221 residents.  The meter-weighted average duration of the shut-off would have been 23.8 hours, or about one full day.  We believe it is likely that if SDG&E ever shuts off power to 90,211 residents for one full day, the residents would collectively light tens of thousands of candles, lanterns, camp stoves, barbeques, and fireplaces, and turn on numerous portable generators. This would present a significant risk of wildfire ignitions that could equal or exceed the risk of ignitions from power lines.[35]

The Alliance provided information that shows power-line fires constitute about 3% of all wildfires and only 1% of significant wildfires (i.e., fires greater than 100 acres) in Southern California.[36]  Thus, wildfires that are not started by power lines constitute 97% to 99% of all wildfires.  Anything that increases the number of fires caused by sources other than power lines, even by a small fraction, is a greater threat to public safety than the threat from power-line fires.

---

[35]  Fires started by any of these ignition sources could spread to nearby wildlands, especially in Santa Ana wind conditions.

[36]  The Alliance's Comments filed March 27, 2009, p. 10, and Appendix A, pp. 14, 16, and 23.  See also the Water Districts' Comments filed April 19, 2009, p. 3.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 46 of 76

SDG&E provided no evidence or analysis that shows its Power Shut-Off Plan will result in a net reduction in wildfire ignitions during periods of high fire danger. SDG&E suggests that the threat of wildfire ignitions from sources other than power lines will be reduced by its customer education efforts, which will help customers to prepare for power shut-off events. We agree this will help to some extent. Nevertheless, a significant and irreducible risk will remain. When SDG&E shuts off power, customers will have to use alternative means to light their homes at night, cook their food, and power their appliances, all of which increases the risk of wildfire ignitions.

SDG&E downplays the threat of wildfire ignitions from other sources by citing information from the State Fire Marshal that shows during a recent five-year period there were 55,636 equipment-related fires in all of California, of which 71 were caused by generators; 253 were caused by grills, hibachis, barbeques, and charcoal lighters; and 347 were caused by fireplaces and chimneys.[37] SDG&E believes its education campaign will reduce what it views as an already meager threat of wildfires from generators and other sources.

We see portable generators, grills, hibachis, barbeques, and fireplaces (referred to hereafter as "other fire sources" or "other sources") as a much more serious fire risk than SDG&E. The information that SDG&E obtained from the State Fire Marshal shows there were 671 fires caused by generators, grills,

---

[37] SDG&E Comments filed June 30, 2009, p. 7, Fn. 3, citing a report titled "Fires by Equipment Involved in Ignition, 2003-2007" prepared by the State Fire Marshall at http://osfm.fire.ca.gov/cairs/pdf/firesbyeqinignition2003_07.pdf. SDG&E's motion to take official notice of this information pursuant to Rule 13.9 and Evidence Code §§ 452(c) and 452(h) was granted by the assigned Administrative Law Judge (ALJ) in a ruling issue on August 6, 2009.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 47 of 76

hibachis, barbeques, fireplaces, charcoal lighters, and chimneys compared to 343 power-line fires.[38]  The reported number of fires from other sources does <u>not</u> reflect the impact of SDG&E's Power Shut-Off Plan because the Plan has never been put into effect.  For example, we would expect there would normally be very few generator fires in SDG&E's service territory because there would be little need for SDG&E's customers to use portable generators on a day-to-day basis.  However, if a power shut-off event occurs, then every affected customer with a portable generator would have a need to use it.  The number of people using generators during a shut-off event may be significant, as SDG&E stated that "a large number of people in the backcountry have portable generators."[39] The upshot is that the risk of fires from other sources would be multiplied manyfold during a power shut-off event, perhaps surpassing the risk of wind-related power-line fires that the Power Shut-Off Plan is intended to address.[40]

In its comments on the proposed decision, SDG&E asserts that the data from the State Fire Marshall shows that shutting off power will prevent many types of fires besides power-line fires.  For instance, the data shows that during the five-year period of 2003-2007, thousands of fires were caused by electrical appliances, wiring, transformers, and motors.  During a power shut-off event,

---

[38]  It is important to keep in mind that the 671 fires from other sources and the 343 power-line fires are categorized as equipment-related fires.  There is no information on how many of these fires resulted in wildfires.

[39]  Reporter's Transcript of the all party meeting held on July 6, 2009, p. 73.

[40]  As noted previously in today's decision, wind is not a factor in most fires associated with SDG&E's power lines.  This suggests that wind was not a factor in causing most of the 343 power-line fires reported by the State Fire Marshall.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 48 of 76

none of these ignition sources would be capable of starting a fire, including: soldering equipment (91 fires), power tools (138 fires), clothes dryers (1,058 fires), dishwashers (84 fires), microwave ovens (167 fires), toasters and toaster ovens (83 fires), electrical wiring (562 fires), electric distribution/power transfer equipment (155 fires), extension cords (76 fires), and fans (378 fires).

We agree that shutting off power will eliminate many sources of ignition while the power is shut off.  However, it is unclear to what extent, if any, there will be a net reduction in the number ignitions.  The timing of many activities that require electric power — such as using dishwashers, clothes dryers, and power tools — will simply be shifted to when power is on.  Furthermore, it is likely that when customers receive notice of a forecasted power shut-off event, there will be a spike in the use of electric devices and appliances as customers rush to prepare for the shut-off event (e.g., charging batteries and cell phones) and complete activities that require power (e.g., cooking meals and washing dishes and clothes) before power is shut off.[41]  These activities will increase the number of ignition sources immediately prior to a shut off event.[42]  If a fire were

---

[41] SDG&E anticipates that Essential Customers will increase their use of electricity to prepare for a noticed shut-off event. (Exhibit SDG&E-3, pp. JSV-17 – 19.)  We believe that many other customers will likewise need to increase their use of electricity to prepare for a shut-off event.

[42] It is possible that customers may use their appliances less efficiently in an effort to prepare for a power shut off event that will likely last 12 to 72 hours (e.g., wash less than a full load of clothes).  The inefficient use of appliances could result in greater use of appliances immediately before and after a power shut-off event and thereby increase the number of appliance-related ignitions.  Customer might also overload their appliances in order to get as much done as possible before a shut-off event

*Footnote continued on next page*

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 49 of 76

to ignite, it would occur at a time when the overall fire hazard is increasing (i.e., when humidity is dropping and winds are becoming stronger).

SDG&E also argues in its comments on the proposed decision that its Power Shut-Off Plan will not significantly increase the risk of generator-related fires. SDG&E states there are more than 5,000 outages per year on its system, and that its Plan will cause only one to two additional outages annually.

We are not persuaded by SDG&E's argument. The 5,000 outages that occur annually are not comparable, on average, to outages that will occur under the Power Shut-Off Plan. Outages under the Power Shut-Off Plan will last far longer than the typical outage. During the 10-year period of 1999-2008, the average minutes of sustained outages per SDG&E customer was 101.62 minutes per year, or less than two hours.[43] In contrast, outages under the Power Shut-Off Plan will last 12 to 72 hours.

Given the relatively short duration of the vast majority of the 50,000 outages that have occurred over the last decade, it is likely that many customers with generators may choose to wait out a typical outage based on their experience that it will last only a few hours at most, rather than going through the inconvenience of pulling their generators from storage, fueling them, turning

---

(e.g., washing more than a full load of clothes), which could increase the risk of appliances sparking a fire.

[43] See ALJ Ruling dated August 5, 2009, taking official notice of the System Average interruption Duration Index pursuant to Rule 13.9 of the Commission's Rules of Practice and Procedure and California Evidence Code §§ 452(c) and 452(h). The 10-year annual average of minutes of sustained outages per SDG&E customer includes the widespread and prolonged outages that occurred due to firestorms in October 2003 and October 2007. (Response of SDG&E Response to Water and School District Joint Motion for Offical Notice filed July 20, 2009, p. 6, Fn. 5.)

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 50 of 76

them on, connecting appliances, and then returning the generators to storage when the outage ends.

On the other hand, when SDG&E notifies customers of a forecasted outage under its Power Shut-Off Plan, customers will know in advance that the outage could last up to 72 hours because of SDG&E's previous customer education efforts.[44]  These circumstances lead us to conclude that outages under the Power Shut-Off Plan will (1) spur much greater use of generators than typical outages, and (2) significantly increase the risk of generator-related fires.

For the previous reasons, we find that SDG&E has not met its burden to demonstrate that its Power Shut-Off Plan will reduce the overall number of wildfires occurring during hazardous fire conditions.  Based on the available information, we conclude that it is more likely than not that SDG&E's Plan will increase the risk of wildfire ignitions during hazardous fire conditions.

### 7.2.2.  Historical Data on Power-Line Fires

We next review the available historical data on wind-related fires ignited by SDG&E's power lines for insight on weighing the costs and benefits of SDG&E's Power Shut-Off Plan.  SDG&E reports that its power lines have been involved in 13 wind-related fires since August 2003.  Ten of these fires were

---

[44] SDG&E's customer education for its Power Shut-Off Plan includes workshops and advice for the safe installation, connection, and operation of generators, which indicates that SDG&E anticipates widespread use of generators during outages under its Power Shut-Off Plan.  (Exhibit SDG&E-3, page JSV-16 and Attachment A.) Customers in power Shut-Off Areas may also be more likely to purchase generators in the future to prepare for the possibility of lengthy outages under the SDG&E's Power Shut-Off Plan.  The increased number of generators increases the risk of generator-related fires during outages under the Power Shut-Off Plan as well as during any of the other 5,000 outages that occur annually.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 51 of 76

minor, burning a total of 145 acres. There were no injuries. Only one of the ten fires caused property damage, which was limited to the loss of pasture land and unspecified damage to a bridge.

The remaining three wind-related fires involving SDG&E's power lines occurred during the October 2007 firestorm. These were the Guejito, Rice, and Witch Fires. All three were major wildfires. We are currently investigating the causes of these fires in I.08-11-007 and I.08-11-006.

SDG&E's backcast of power shut-off events purports to show that if SDG&E's Power Shut-Off Plan had been in effect in prior years, it would have prevented three of the 13 wind-related fires involving SDG&E's power lines. The three fires that would have been prevented are listed in the following table:

| Fires That SDG&E Believes Would have Been Prevented By Its Power Shut-Off Plan | | |
|---|---|---|
| Date | Location | Acres |
| 12/16/04 | Descanso | 1 |
| 10/21/07 | Guejito | 197,990* |
| 10/22/07 | Rice | 9,472 |
| * **Note**: Includes the area burned in both the Guejito and Witch Fires. | | |

The Descanso Fire in the above table was a minor, 1-acre fire. The Guejito and Rice Fires were major wildfires, the causes of which are currently being investigated in I.08-11-007 and I.08-11-006, respectively. Until the investigations

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 52 of 76

are complete, we cannot say whether SDG&E's Power Shut-Off Plan would have prevented these two fires.[45]

It is important to recognize that SDG&E's Power Shut-Off Plan would not have prevented the Witch Fire, which was allegedly ignited by SDG&E's power lines on October 21, 2007.[46] After it was ignited, the Witch Fire moved west and merged with the Guejito Fire on October 22, 2009.[47] The Witch Fire moved into the Guejito area at the exact time that SDG&E would have shut off power to the Guejito area under its Power Shut-Off Plan. This demonstrates that major wildfires can occur in areas where power is shut off. As discussed in more detail below, shutting off power in areas where major wildfires are burning creates significant risks to public safety.

### 7.2.3. Shutting Off Power During Major Wildfires

SDG&E's Power Shut-Off Plan does nothing to prevent wildfires started by sources other than power lines, which constitute about 97% of all wildfires and 99% of significant wildfires (i.e., fires greater than 100 acres) in Southern California. The Cedar Fire in San Diego County during the October 2003

---

[45] SDG&E acknowledges that the "role power lines played in [the Witch, Guejito and Rice Fires] has not been determined with certainty." (Joint Comments filed by the School Districts and the Water Districts on April 17, 2009, p. 4, quoting an SDG&E data response provided to DisabRA.)

[46] The cause of the Witch Fire is currently being investigated in I.08-11-006.

[47] See Cal Fire's report "California Fire Siege 2007, An Overview" at http://www.fire.ca.gov/fire_protection/downloads/siege/2007/Overview_CompleteFinal.pdf, p. 84. The School Districts and Water Districts' joint motion to take official notice of the report pursuant to Rule 13.9 and Evidence Code § 452(h) was granted by the assigned ALJ in a ruling issue on August 5, 2009.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 53 of 76

firestorm demonstrates the serious threat from wildfires ignited by sources other than power lines. The Cedar Fire is the largest fire in California's recorded history. It started when a lost hunter lit a signal fire, and it eventually burned 280,275 acres, destroyed more than 2,200 structures, and killed 14 people.[48]

As discussed previously, the Witch Fire demonstrates that major wildfires can occur in an area at the same time that SDG&E would shut off power to the area under its Power Shut-Off Plan. Shutting off power increases the public safety risk of wildfires, including the 99% of significant wildfires that are not started by power lines. The heightened risks include:

- Shutting off power could disrupt landline and wireless telephone service. SDG&E recognizes this, and warns its customers that they may lose phone service during a power shut-off event.[49] Without phone service, customers may not be able to report fires, which could delay the initial attack by firefighters and thereby increase the chance of wildfires growing to catastrophic size. Such fires would be occurring at the exact time when there is the greatest potential for the rapid spread of wildfires (i.e., when winds are strong, humidity is low, and vegetation is dry).

- Customers without power may not be able to use their telephones, televisions, radios, and computers. Thus, those who work or live in an area where power is shut off will lose their primary means to learn of approaching fires, evacuation notices, and other critical information. A report on the October 2007 firestorm that was jointly prepared by Cal Fire, the U.S. Forest Service, and the San Diego County Office of Emergency Services

---

[48] Cal Fire's report "California Fire Siege 2003, The Story" at (http://www.fire.ca.gov/fire_protection/downloads/2003FireStoryInternet.pdf, pp. 72-73.) We take official notice of Cal Fire's report pursuant to Rule 13.9.

[49] Exhibit SDG&E-3, Appendix A, Fact Sheet.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 54 of 76

highlighted the vital importance of communications during
evacuations and other emergencies.  The Report stated: "A vital
component in any evacuation or emergency situation is
communication.  During the October fire siege, the Reverse 911
system was employed on a large scale, and was key to reaching
thousands of citizens.  Previous evacuation communications,
such as those employed in the 2003 fire siege, depended on
residents watching the news, listening to radio broadcasts or
waiting for a personal visit from law enforcement officials giving
evacuation orders.  The Reverse 911 system contacted nearly
200,000 citizens with recorded phone messages relevant to their
communities."[50]

- People with disabilities rely disproportionately on
  communications devices that need to be plugged into a power
  outlet to operate, such as TTYs and computers, making them
  vulnerable to being cut off from communications with the
  outside world during a power shut-off event.  Shutting off power
  would place such people at risk of not receiving a notice to
  evacuate due to an oncoming wildfire.  In addition, people with
  disabilities are more likely to need assistance in evacuating.  The
  inability to receive evacuation notices or to call for assistance
  could have deadly consequences.[51]

- Electric garage door openers will not work when power is shut
  off.  If wildfire forces an evacuation, customers who are elderly
  or have disabilities may not be able to open their garage doors
  manually, potentially trapping them in their homes.  Trapped
  customers may not be able to call for help if telephone service is
  disrupted.

---

[50] *See* "California Fire Siege 2007: An Overview," at p. 86.  The School Districts and
Water Districts' joint motion to take official notice of the report pursuant to Rule 13.9
was granted by the assigned ALJ in a ruling issue on August 5, 2009.

[51] DisabRA's comments on the Proposed Decision of Commissioner Simon, p. 12.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 55
of 76

- Loss of power to traffic signals and street lights may cause traffic accidents and impede evacuations, particularly at night.

- The Water Districts have 39 electric-powered pump stations in SDG&E's Power Shut-Off Areas that are critical to maintaining the supply of water, but which have no backup power.[52] If power is shut off to any of these 39 pump stations while a wildfire is burning, the supply of stored water in the area served by the pump station could be exhausted within hours, leaving no water to fight fires. In order to satisfy the immense demand for water during a major wildfire, the Water Districts must pump around the clock.[53]

SDG&E did not provide any evidence or analysis that shows the benefits from the reduction in the number of power-line fires made possible by its Power Shut-Off Plan exceeds the increase in public-safety risk from wildfires that threaten communities in areas where power is shut off.

SDG&E intends to mitigate the risk of shutting off power to critical pump stations by forming a pool of six large portable generators for use by the Water Districts during power shut-off events. We agree with the Water Districts that six generators are not enough. During the October 2007 firestorm, SDG&E would have shut off power to more than 30 critical pump stations simultaneously.[54]

---

[52] Water Districts Comments filed on June 10, 2009, pp. 1-2. The 39 pump stations without backup power excludes pump stations that will be removed from the Power Shut-Off Areas during 2009 after the conversion of certain overhead power lines to underground lines pursuant to SDG&E Advice Letter 2075-E. (Ibid.)

[53] Water Districts Comments filed on May 19, 2009, p. 13.

[54] Water Districts Comments filed on June 10, 2009, p. 1 and Appendix A.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 56 of 76

SDG&E states that it will restore power to any area threatened by a wildfire if ordered to do so by a public-safety agency.  However, restoring power to communities already threatened by a wildfire does not mitigate the risk that while power is shut off, residents may not be able to report fires.  This could delay the initial attack by firefighters and thereby increase the chance of large scale wildfires.  SDG&E also states that it may take as long as two hours to restore power once it is ordered to do so.[55]  During that interval, lives and property would be at increased risk from fast-moving wildfires driven by strong Santa Ana winds.

### 7.2.4.  SCE's Power Shut-Off Program

The only precedent for SDG&E's Power Shut-Off Plan is a temporary program that SCE implemented in 2003.  The fact that SCE instituted a shut-off program does not mean that SDG&E should be allowed to do the same.

SCE's shut-off program was instituted in response to emergency conditions that arose from the tremendous number of trees that had been killed by bark beetles.  On March 7, 2003, the Governor issued an emergency proclamation that, among other things, directed utilities to clear dead and diseased trees near power lines due to the fire hazard.  SCE was concerned that until the trees were removed, high winds could cause dead and diseased trees to fall onto its power lines and ignite wildfires.  After the dead and diseased trees were removed, SCE ended its power shut-off program in 2005.

The lesson we draw from SCE's power shut-off program is that it may be appropriate to implement a power shut-off program when emergency conditions

---

[55]  SDG&E Comments filed July 2, 2009, p. 2.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 57 of 76

are present, but the program should end when the emergency is over. SDG&E's Power Shut-Off Plan is not limited to emergency conditions, but applies to situations that occur annually (e.g., sustained winds of 35 mph). SDG&E is required by General Order 95 to design, construct, and maintain its power-line facilities to operate safely under these regularly occurring conditions.[56]

### 7.2.5. Costs and Benefits

The Opposition Parties have identified many significant costs, burdens, and risks that shutting off power imposes on customers and communities in the areas where power is shut off. These adverse impacts were summarized previously and are not repeated here.[57] SDG&E has proposed several measures to mitigate the adverse impacts, including the opening of shelters; offering free medical transport; providing $250 debit cards to customers participating in the CARE and Medical Baseline Programs; and procuring a pool of six large portable generators for use by the Water Districts. SDG&E does not seek ratepayer funding for mitigation costs incurred in 2009.

We commend SDG&E for its willingness to undertake extensive and costly mitigation measures. However, SDG&E provided no evidence or analysis that shows the benefits of its Power Shut-Off Program, as mitigated, outweigh the many significant adverse impacts on customers and communities. Given this fundamental lack of information, we cannot find that the Power Shut-Off Plan is in the public interest.

---

[56] CPSD/DRA Comments filed May 26, 2009, pp. 9-11. There is no dispute that SDG&E may shut off power when high winds exceed General Order 95 design standards.

[57] See the previous summary in today's decision of the Opposition Parties' position on SDG&E's Power Shut-Off Plan.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 58 of 76

SDG&E contends that shutting off power is better than risking the chance of more firestorms like those that devastated San Diego County in October 2003 and October 2007.  SDG&E states that unless decisive action is taken, it is only a matter of time before the next catastrophic firestorm.

We agree that every reasonable action should be taken to avoid firestorms. However, SDG&E has not demonstrated that shutting off power is likely to decrease the number of wildfires.  Nor did SDG&E cite a single fire during the October 2003 firestorm that was ignited by its power lines.  Thus, shutting of power would have done nothing to prevent the October 2003 firestorm.

On the other hand, SDG&E's power lines have been implicated in three of the many fires that collectively comprise the October 2007 firestorm.  These were the Guejito, Rice, and Witch Fires.[58]  We are currently investigating these fires in I.08-11-007 and I.08-11-006.  Until the investigations are complete, we decline to speculate on the causes of these fires.  At this point in time, there is no basis to conclude that SDG&E's Power Shut-Off Plan is an appropriate response to the October 2007 firestorm.[59]

SDG&E asserts that its Power Shut-Off Plan is not based on costs and benefits.  Rather, it is meant to protect public safety.  SDG&E observes that

---

[58] SDG&E states that its Power Shut-Off Plan would have prevented the Guejito and Rice Fires, but not the Witch Fire.

[59] SDG&E acknowledges that the "role power lines played in [the October 2007 fires] has not been determined with certainty." (Joint Comments filed by the School Districts and the Water Districts on April 17, 2009, at p. 4, quoting an SDG&E data response to DisabRA.)

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 59 of 76

several Public Utilities Code sections require SDG&E to operate its system in a safe manner. (§§ 330, 399, 451, 761, 762, 768, and 770).

We agree that the Public Utilities Code ranks public safety as a top priority. We further agree that a safe electric system is one which is operated to prevent fires. However, operating a safe system also includes the reliable provision of electricity. Without power, numerous unsafe conditions can occur. Traffic signals do not work, life support systems do not work, water pumps do not work, and communication systems do not work. As the California Legislature recognized in § 330(g), "[r]eliable electric service is of utmost importance to the safety, health, and welfare of the state's citizenry and economy." In short, there is a strong presumption that power should remain on for public safety reasons.

### 7.2.6. Conclusion

SDG&E's Power Shut-Off Plan would impose significant costs, burdens, and risks on the customers and communities in the areas where power is shut off. In light of these hardships, SDG&E's Power Shut-Off Plan should be adopted only if SDG&E demonstrates that its Plan will improve public safety. While the Power Shut-Off Plan will eliminate power lines as a source of ignition during hazardous fire conditions, it will create many new sources of ignition and exacerbate the risk to public safety from fires that occur in areas where power is shut off. SDG&E provided no evidence or analysis that shows its Plan will improve public safety overall. Based on our review of the record, we believe it is more likely than not that SDG&E's Power Shut-Off Plan would, on balance, negatively affect public health, safety, and welfare.

We conclude for the previous reasons that SDG&E's Application should be denied without prejudice. Because SDG&E's Application is denied, there is no

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 60 of 76

need to decide if the shut-off criteria proposed by SDG&E are reasonable or to address ancillary issues raised in SDG&E's application pertaining to demand normalization, critical peak pricing, and demand response.

Although today's decision rejects SDG&E's proposed Power Shut-Off Plan, we recognize that SDG&E's power lines pose an ongoing fire hazard.[60]  We commend SDG&E for its concern for fire safety and its extensive efforts to implement measures to protect the public, both in this proceeding and with its broader Community Fire Safety Program.  We encourage SDG&E to continue its efforts, particularly with respect to its inspections of overhead power lines, hardening its facilities in fire-prone areas, and sound vegetation management.

In an effort to ensure steady progress in reducing the fire hazard of overhead power lines, we will direct SDG&E to make a good faith effort to develop a comprehensive fire-prevention program in collaboration with all stakeholders.[61]  Parties may use the Commission's Alternative Dispute Resolution (ADR) process for this purpose.  If ADR is selected, SDG&E and the parties should agree on the type of Commission ADR process they would like to use and then contact the Commission's ADR coordinator for assistance. Information about the Commission's ADR program, the types of ADR available,

---

[60]  SDG&E and the Commission have implemented numerous measures to reduce the fire hazard to an acceptable level, including (i) the elements of SDG&E's Community Fire Safety Program other than its Power Shut-Off Plan, and (ii) the Commission's General Order 95.

[61]  SDG&E should invite the following stakeholders to participate in the collaborative process:  the parties to A.08-12-021, the San Diego County Office of Emergency Services, Cal Fire, the San Diego County Sheriff's Department, and major healthcare providers.  Other stakeholders may participate as well.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 61 of 76

and how to request ADR is available at the Commission's website at
http://www.cpuc.ca.gov/PUC/adr/.

 The agreed-upon fire-prevention program must be based on a cost-benefit
analysis that demonstrates (A) the program will likely result in a net reduction in
wildfire ignitions, and (B) the benefits of the program outweigh any costs,
burdens, or risks the program imposes on customers and communities. The cost-
benefit model proposed by the Alliance may provide a reasonable conceptual
framework. SDG&E shall confer with the other stakeholders, including the
parties to A.08-12-021, for the purpose of reaching a consensus on (1) the design
and conduct of the cost-benefit study, and (2) the development and submittal of
a joint fire-prevention program.

 The cost-benefit study shall assess whether re-closer devices[62] and/or
measures to harden SDG&E's system can be used instead of the drastic step of
shutting off power. If not, the study should assess if it is cost effective to spend
money on re-closer devices and hardening if power will be shut off anyway.

 If the cost-benefit study finds the public-safety benefits of shutting off
power outweigh the many attendant costs, burdens, and risks, the study should
include a careful assessment of the criteria that should be used to trigger a
shut-off event, particularly wind speed. There are many complex engineering

---

[62] At the all-party meeting held on July 6, 2009, SDG&E stated for the first time that the
re-closer policy it is implementing as part of its Community Fire Safety Program
would have prevented the Witch Fire in October 2007 had the re-closer policy been in
effect at that time. (Reporter's Transcript, p. 68.) The new re-closer policy is separate
from SDG&E's Power Shut-Off Plan. SDG&E did not address whether its new
re-closer policy would be just as effective at preventing wildfires as its Power
Shut-Off Plan, but with considerably fewer impacts on customers and communities.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 62
of 76

factors and public safety considerations that need to be thoroughly evaluated in determining the wind-speed criteria.[63]  Similarly, Cal Fire states that several of the criteria proposed by SDG&E in the instant proceeding (i.e., non-living fuel moisture, relative humidity, and wind speed) place unwarranted confidence in the accuracy and reliability of the RAWS system.  The cost-benefit study needs to assess to what extent it is appropriate to rely on RAWS data for determining when to shut off power.  In addition, the cost-benefit study should consider what mitigation measures should be implemented to eliminate or reduce the inevitable adverse impacts caused by shutting off power.  Particular attention should be placed on mitigating the adverse impacts on people with disabilities, providers of essential services, and schools.

Finally, the cost-benefit study should endeavor to identify and assess environmental impacts, if any, of agreed-upon fire-prevention measures.

At the conclusion of the collaborative process, SDG&E may file an application for approval of the jointly developed fire-prevention program.  The application should include (1) a copy of the previously described cost-benefit study; (2) detailed plans and timelines for mitigating any adverse impacts on customers and communities; and (3) a proponent's environmental assessment, if appropriate.  If the collaborative process does not result in a consensus proposal, SDG&E may file an application containing its own proposed fire-prevention program.  SDG&E's proposed fire-prevention program shall be based upon the

---

[63] CPSD and the Alliance have identified several potential deficiencies in the wind-speed criteria that SDG&E proposed in A.08-12-021.  These deficiencies are summarized in the Alliance's Comments on the Proposed Decision, pp. 6-8.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 63 of 76

previously described cost-benefit study and its application shall include the previously identified documents and information. If SDG&E chooses to not file an application, it shall file and serve a notice of its decision on the service list for A.08-12-021. The notice shall include an explanation for SDG&E's decision.

Our denial of SDG&E's application does not affect SDG&E's authority under § 451 and § 399.2(a) to shut off power in emergency situations when necessary to protect public safety. These laws state, in relevant part, as follows:

> **§ 451**: Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities…as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

> **399.2 (a)(1)**: It is the policy of this state, and the intent of the Legislature, to reaffirm that each electrical corporation shall continue to operate its electric distribution grid in its service territory and shall do so in a safe, reliable, efficient, and cost-effective manner.

> **399.2 (a)(2)**: In furtherance of this policy, it is the intent of the Legislature that each electrical corporation shall continue to be responsible for operating its own electric distribution grid including, but not limited to, owning, controlling, operating, managing, maintaining, planning, engineering, designing, and constructing its own electric distribution grid, emergency response and restoration, service connections, service turnons and turnoffs, and service inquiries relating to the operation of its electric distribution grid, subject to the commission's authority.

SDG&E's statutory obligation to operate its system safely requires SDG&E to shut off its system if doing so is necessary to protect public safety. For example, there is no dispute that SDG&E may need to shut off power in order to protect public safety if Santa Ana winds exceed the design limits for SDG&E's

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 64 of 76

system and threaten to topple power lines onto tinder dry brush.[64] Any decision by SDG&E to shut off power under its existing statutory authority may be reviewed by the Commission pursuant to its broad jurisdiction over matters regarding the safety of public utility operations and facilities. The Commission may decide at that time whether SDG&E's decision to shut off power was reasonable and qualifies for an exemption from liability under Tariff Rule 14.

Our denial of the SDG&E's Application does not signal any diminishment in our resolve to protect Californians from the wildfire-related risks of overhead power lines. We take very seriously our obligation to protect public safety on matters within the scope of our jurisdiction. There is perhaps no better example of our commitment to protecting the public than General Order 95. This General Order is over 500 pages long and contains comprehensive guidelines for the design, construction, and maintenance of overhead electric lines. These guidelines are specifically intended to provide the public with a high level of protection from the hazards associated with overhead power lines, including fire-related risks.

The paramount importance we place on public safety can be seen by our current investigations of the October 2007 wildfires. (I.08-11-007 and I.08-11-006) The ultimate objective of these investigations is to identify the root causes of the wildfires so that corrective actions can be taken to prevent future wildfires. We also have an ongoing rulemaking proceeding (Rulemaking 08-11-005) to consider

---

[64] There is disagreement between SDG&E on the one hand, and CPSD, DRA, and the Alliance on the other hand, regarding how the wind-loading standards for power line facilities set forth in General Order 95 should be interpreted in terms of setting a threshold for shutting off power. Today's decision does not resolve this dispute.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 65 of 76

new regulations to reduce the fire hazards associated with utility operations and facilities. On August 20, 2009, we issued our first decision in Rulemaking (R.) 08-11-005 adopting such regulations.[65] Additional regulations to reduce fire hazards will be considered in R.08-11-005 in the near future.

We commend SDG&E for its concern for fire safety and its extensive efforts to implement measures to protect the public, both in this proceeding and with its broader Community Fire Safety Program. We encourage SDG&E to continue its efforts, particularly with respect to its inspections of overhead power lines, hardening its facilities in fire-prone areas, and sound vegetation management.

## 8. Electric Tariff Rule 14

SDG&E's Electric Tariff Rule 14 requires SDG&E to exercise "reasonable diligence and care to furnish and deliver a continuous and sufficient supply of electric energy to the customer, and to avoid any shortage or interruption of delivery of same."[66] Tariff Rule 14 also states that SDG&E will not be held liable for an interruption in service "caused by inevitable accident, act of God, fire, strikes, riots, war or any other cause not within its control."

SDG&E requests authority to amend Tariff Rule 14 to include the statement that SDG&E may shut off power "without liability to Customers"

---

[65] *See* D.09-08-029. Among other things, D.09-08-029 requires utilities to take the following actions in extreme and very high fire treat zones in Southern California: (i) increase the frequency of patrols of overhead facilities in order to identify and correct potential fire hazards; and (ii) increase the minimum clearance between overhead power lines and vegetation at the time of trim.

[66] Tariff Rule 14, Section A.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 66 of 76

when in "SDG&E's sole opinion such interruption is necessary for . . . [an] [e]mergency affecting or likely to affect SDG&E's distribution system."[67] The text of SDG&E's proposed revisions to Tariff Rule 14 mirrors PG&E's current Tariff Rule 14.

SDG&E's proposed revisions to Tariff Rule 14 are not contingent on Commission approval of SDG&E's Power Shut-Off Plan. Rather, SDG&E sees these as separate matters.

## 8.1. Position of the Parties

### 8.1.1. SDG&E

SDG&E avers that its proposed revisions to Tariff Rule 14 will help customers understand that power may be shut off unexpectedly in order to protect public safety. SDG&E also asserts that customers are currently responsible for any losses they might occur when power is shut off for safety reasons, and that the proposed revisions to Tariff Rule 14 will not change that.

SDG&E maintains that PG&E's current Tariff Rule 14 is an appropriate template for revising SDG&E's Tariff Rule l4 even though PG&E's Tariff was not adopted as a part of a fire-safety program. Rather, it was approved in 1997 as part of the Commission's direct access program. SDG&E submits that PG&E's Tariff Rule 14 is not limited to situations involving direct access; it covers safety and interruption of service in a general sense.

### 8.1.2. SCE

SCE supports SDG&E's proposed revisions to Tariff Rule 14.

---

[67] Exhibit SDG&E-3, Appendix C.

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 67 of 76

### 8.1.3.  The Opposition Parties

The Opposition Parties assert that SDG&E's proposed revisions to Tariff Rule 14 will unfairly shift all costs and liabilities for power shut-off events to the customers and communities in the areas where power is shut off.

The Opposition Parties dismiss SDG&E's assertion that PG&E's Tariff Rule 14 is an appropriate template for revising SDG&E's Tariff Rule 14.  They state that PG&E's Tariff Rule 14 was implemented as part of the direct access program, not a fire-safety program.

### 8.2.  Discussion

It appears that the main purpose of SDG&E's proposed revisions to Tariff Rule 14 is to allow SDG&E to shut off power in a manner consistent with its Power Shut-Off Plan, without liability to its customers or others.  Because today's decision denies SDG&E's request for authority to implement its Power Shut-Off Plan, we decline to authorize the proposed changes to SDG&E's Tariff Rule 14. Our denial of SDG&E's proposed revisions to Tariff Rule 14 means we do not have to decide whether the proposed tariff language would permit SDG&E to shut off power under the circumstances described in its Power Shut-Off Plan.

SDG&E argues that the proposed revisions will help its customers understand that SDG&E may need to shut off power unexpectedly in order to protect public safety.  SDG&E does not explain why revising Tariff Rule 14 will achieve this objective, particularly if few customers ever read Tariff Rule 14.  We believe that most customers already expect that SDG&E will shut off power when necessary to protect public safety, thereby making SDG&E's proposed revisions to Tariff Rule 14 superfluous.

SDG&E also argues that it should be allowed to revise its Tariff Rule 14 to mirror PG&E's Tariff Rule 14.  We disagree.  As noted by several parties, the

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 68 of 76

revisions to PG&E's tariff were made in a different context.  PG&E's Tariff
Rule 14 stems from D.97-10-087, which concerned the interruption of energy
supplied by energy marketers to direct access customers.  Thus, the revisions to
PG&E's Tariff Rule 14 were wholly unrelated to the main purpose of SDG&E's
proposed revisions to its Tariff Rule 14.  Nor does SDG&E explain why a tariff
filed by PG&E more than a decade ago to implement direct access is appropriate
today given all the ensuing changes to direct access.

## 9.    Proceeding Category and Need for Hearings

In Resolution ALJ 176-3228, dated January 29, 2009, the Commission
preliminarily categorized this proceeding as ratesetting and preliminarily
determined that hearings were needed.  The Assigned Commissioner's Ruling
and Scoping Memo (Scoping Memo) dated February 26, 2009, affirmed these
preliminary determinations, but left open the possibility that hearings would not
be held by requiring parties to file motions for evidentiary hearings by April 10,
2009.  The evidentiary hearings, if held, were set to begin on April 30, 2009.

There were no motions for evidentiary hearings.  After consulting with the
assigned Commissioner, the assigned Administrative Law Judge (ALJ) issued a
ruling on April 15, 2009, that canceled the previously scheduled evidentiary
hearings.

Rule 7.5 requires that the Commission to approve a change to the
preliminary determination on the need for hearings.  Today's decision affirms
that evidentiary hearings are not needed in this proceeding.

## 10.    Comments on the Alternate Proposed Decision

The proposed decision of the assigned Commissioner and the alternate
proposed decision of the ALJ in this matter was mailed to the parties in
accordance with Pub. Util. Code § 311, and comments were allowed pursuant to

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 69
of 76

Rule 14.3.  Comments were filed on August 31, 2009, by Cal Fire, a coalition of communications providers,[68] CPSD, DisabRA, DRA, the Alliance, the County of San Diego, SDG&E, the School Districts, the Water Districts, and UCAN.  Reply comments were filed on September 8, 2009, by Cal Fire, a coalition of communications providers, CPSD, DisabRA, DRA, the Alliance, and the County of San Diego, SDG&E, the School Districts, and the Water Districts.  These comments and reply comments are reflected, as appropriate, in today's decision.

## 11.  Assignment of the Proceeding

Timothy Alan Simon is the assigned Commissioner for A.08-12-021 and Timothy Kenney is the assigned ALJ.

## Findings of Fact

1.  The purpose of SDG&E's Power Shut-Off Plan is to prevent the ignition of wildfires by shutting off power lines during hazardous fire conditions.

2.  Although shutting off power eliminates the risk of power lines igniting fires, it also increases the number of potential ignition sources as people use alternate means for cooking, lighting, and power, such as candles, lanterns, fireplaces, barbeques, hibachis, camp stoves, and portable generators.

3.  Wildfires that occur in areas where power is shut off are a much greater threat to public safety than wildfires that occur where power is on.

4.  SDG&E's Power Shut-Off Plan imposes significant costs, burdens, and risks on customers and communities in areas where power is shut off.

---

[68]  The coalition of communications providers consist of CCTA, AT&T and affiliates, CoxCom, Inc., Cox California Telcom, L.L.C., dba Cox Communications, CTIA-The Wireless Association, and Time Warner Cable.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 70 of 76

5.  SDG&E did not demonstrate that its Power Shut-Off Plan will result in an overall reduction in the number of wildfires, or that the public safety benefits of its Plan exceed the significant costs, burdens, and risks that are imposed on customers and communities in areas where power is shut off.

6.  SDG&E's power lines pose an ongoing fire hazard.  SDG&E and the Commission have implemented numerous measures to reduce the fire hazard to an acceptable level, including (i) the elements of SDG&E's Community Fire Safety Program other than its Power Shut-Off plan, and (ii) the Commission's General Order 95.

7.  The purpose of the Commission's ADR program is to facilitate informal resolution of disputes in order to improve decision making, conserve Commission resources, and to identify parties' fundamental interests.

8.  One purpose of SDG&E's proposed revisions to Tariff Rule 14 is to allow SDG&E to shut off power in a manner consistent with its Power Shut-Off Plan.

9.  SDG&E's proposed revisions to Tariff Rule 14 will do little to help its customers understand that power may be shut off unexpectedly in order to protect public safety because most customers will never read the Tariff.

10.  Most customers already expect that SDG&E will shut off power when necessary to protect public safety, thereby making SDG&E's proposed revisions to Tariff Rule 14 superfluous.

11.  There is no evidence that PG&E's Tariff Rule 14 was filed to implement a power shut-off program like the one proposed by SDG&E.

12.  In Resolution ALJ 176-3228, dated January 29, 2009, the Commission preliminarily determined that there was a need for evidentiary hearings in this proceeding.  The preliminary determination on the need for hearings was

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 71 of 76

affirmed in the Scoping Memo, but the Scoping Memo also directed parties to file motions for evidentiary hearings.

13. There were no motions for evidentiary hearings.

**Conclusions of Law**

1. A.08-12-021 should be denied without prejudice because SDG&E has not met its burden to demonstrate that (i) its Power Shut-Off Plan will decrease the number of wildfires, and (ii) the benefits of its Power Shut-Off Plan outweigh the significant costs, burdens, and risks imposed on customers and communities in the areas where power is shut off under the Plan.

2. SDG&E should make a good faith effort to develop a comprehensive fire-prevention program in collaboration with other stakeholders, including the parties to A.08-12-021, that is based on a thorough and detailed cost-benefit analysis that addresses the matters identified in the body of today's decision.

3. SDG&E has authority under §§ 451 and 399.2(a) to shut off power in emergency situations when necessary to protect public safety. Any decision by SDG&E to shut off power may be reviewed by the Commission pursuant to its broad jurisdiction regarding the safety of public utility operations and facilities.

4. Because today's decision does not authorize SDG&E to implement its Power Shut-Off Plan, there is no need to (i) adopt SDG&E's proposed revisions to Tariff Rule 14, or (ii) decide if the proposed revisions would permit SDG&E to shut off power under the circumstances described in its Power Shut-Off Plan.

5. PG&E's Tariff Rule 14 was filed to implement direct access and, therefore, does not constitute a reasonable precedent for revising SDG&E's Tariff Rule 14 for the purpose of implementing a power shut-off program.

6. SDG&E's proposed revisions to Electric Tariff Rule 14 should be denied.

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 72 of 76

7.  There is no need for evidentiary hearings in this proceeding.  This changed determination on the need for hearings should be approved by the Commission in accordance with Rule 7.5 of the Commission's Rules of Practice and Procedure.

8.  The following Order should be effective immediately.

# O R D E R

**IT IS ORDERED** that:

1.  San Diego Gas & Electric Company's Application (A.) 08-12-021 is denied without prejudice.  Any future application filed by San Diego Gas & Electric Company to implement a power shut-off program shall include a cost-benefit study that addresses the matters identified in the body of today's decision.

2.  Within 30 days from the effective date of today's decision, San Diego Gas & Electric Company shall initiate a collaborative process with other stakeholders, including the parties to A.08-12-021, for the purpose of reaching a consensus on (i) the design and conduct of the cost-benefit study indentified in the previous ordering paragraph, and (ii) the development and submittal of a joint fire-prevention program.  San Diego Gas & Electric Company and the parties may use the Commission's Alternative Dispute Resolution program for this purpose.  If Alternative Dispute Resolution is selected, San Diego Gas & Electric Company and the parties shall attempt to agree on the type of Commission Alternative Dispute Resolution process they would like to use and then contact the Commission's Alternative Dispute Resolution coordinator for assistance.

3.  At the conclusion of the collaborative process described in the previous ordering paragraph, San Diego Gas & Electric Company may file an application for approval of the jointly developed fire-prevention program.  The application

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 73 of 76

shall include (i) a copy of the cost-benefit study that is described in the body of today's decision; (ii) detailed plans and timelines for mitigating any adverse impacts on customers and communities; and (iii) a proponent's environmental assessment, if appropriate.  If the collaborative process does not result in a consensus proposal, San Diego Gas & Electric Company may file an application containing its own proposed fire-prevention program.  San Diego Gas & Electric Company's proposal shall be based on the previously identified cost-benefit study and its application shall include the previously identified documents and information.  If San Diego Gas & Electric Company chooses to not file an application, it shall file and serve a notice of its decision on the service list for A.08-12-021.  The notice shall include an explanation for San Diego Gas & Electric Company's decision.

4.  There is no need for evidentiary hearings in this proceeding.

5.  A.08-12-021 is closed.

This Order is effective today.

Dated September 10, 2009, at San Francisco, California.

> MICHAEL R. PEEVEY
> President
> DIAN M. GRUENEICH
> JOHN A. BOHN
> RACHELLE B. CHONG
> Commissioners

Case: 19-30088    Doc# 2864-8    Filed: 07/03/19    Entered: 07/03/19 18:48:47    Page 74 of 76

I reserve the right to file a concurrence.

/s/ RACHELLE B. CHONG
    Commissioner


I will file a dissent.

/s/ TIMOTHY ALAN SIMON
    Commissioner

Case: 19-30088   Doc# 2864-8   Filed: 07/03/19   Entered: 07/03/19 18:48:47   Page 75 of 76

## Appendix A:  Map of the 2009 Power Shut-Off Areas