# EXHIBIT A

1　　　　　UNITED STATES BANKRUPTCY COURT

2　　　　　NORTHERN DISTRICT OF CALIFORNIA

3　　　　　　SAN FRANCISCO DIVISION

4　_____

5　In re:　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　)

6　　　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　)

7　PG&E CORPORATION,　　　　　　　　)

　　　　　　　　　　　　　　　　　　　)

8　　　and　　　　　　　　　　　　　)　Bankruptcy Case

　　　　　　　　　　　　　　　　　　　)　No. 19-30088(DM)

9　PACIFIC GAS and ELECTRIC,　　　　)

　　COMPANY,　　　　　　　　　　　　)

10　　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　)

11　　　　　　　　Debtors.　　　　　)

　　　　　　　　　　　　　　　　　　　)

12　_____)

13

14　　　　　　　　　　CONFIDENTIAL

15　　　Deposition of PG&E, By and through its Designated

16　　　　　　　　　　Representative,

17　　　　　　　JANAIZE M. MARKLAND

18　　　　　　San Francisco, California

19　　　　　　Wednesday, July 3, 2019

20

21

22

23　Reported by Stenographer

　　MARY J. GOFF

24　CSR No. 13427

25　Job No. 163807

1

2

3

4

5      DEPOSITION of JANAIZE M. MARKLAND, Volume I, taken

6  on behalf of Official Committee of Unsecured Creditors,

7  at FTI Consulting, 50 California Street, Suite 1900,

8  San Francisco, California 94111, beginning at

9  9:30 a.m. and ending at 11:11 a.m., on July 3, 2019,

10  before MARY J. GOFF, California Certified Shorthand

11  Reporter No. 13427.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 3 of 23

1   APPEARANCES:

2

3   For Official Committee of Unsecured Creditors

4       Milbank

5       BY:  ALAN STONE

6           JULIE WOLF

7       Attorneys at Law

8       55 Hudson Yards

9       New York, New York 10001

10

11

12

13  For Debtors and Janaize M. Markland

14      Weil, Gotshal & Manges

15      BY:  THEODORE TSEKERIDES

16      Attorney at Law

17      767 Fifth Avenue

18      New York, New York 10153

19

20

21

22

23

24

25

1    APPEARANCES (continued):

2

3    For Official Committee of Tort Claimants "TCC"

4         Baker & Hostetler

5         BY:  LARS FULLER

6         Attorney at Law

7         1801 California Street

8         Denver, Colorado 80202

9

10

11

12

13

14   ALSO PRESENT:  Tom Schinckel

15

16

17

18

19

20

21

22

23

24

25

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 5 of 23

1    is attached to the transcript.)

2        Q    (BY MR. STONE) Ms. Markland, I'm handing you a

3    document that's been marked as Exhibit 1.  That is your

4    "Declaration" that was filed in this action.

5            And we'll be referring to this frequently

6    today, so I wanted you to have that in front of you.

7        A    Thank you.

8        Q    So you have been responsible for, among other

9    things, the company's director and officer insurance for

10   the last five years; is that right?

11       A    That's correct.

12       Q    And when -- when you say that you're

13   responsible for it, what is your role with respect to

14   the director and officer insurance program?

15       A    My role is to secure financial risk transfer

16   for our directors and officers typically on an annual

17   basis.

18           So my job involves working with our brokers to

19   approach insurance markets and bind -- bind capacity to

20   the benefit of our directors and officers.

21       Q    Okay.  Does -- does PG&E have a specific

22   broker for D&O insurance?

23       A    We do.  Marsh.

24       Q    Have you used Marsh continuously since you

25   took over the D&O program?

1     A    Yes, we have.

2     Q    Okay.  Are you familiar with the concept of an

3  insurance tower?

4     A    I am.

5     Q    Okay.  And what does that mean to you?

6     A    An insurance tower is the amount of limits

7  that we have.  So the total capacity that we purchase on

8  behalf of our directors and officers.

9        And then within that, I think of it as

10  somewhat of a high-rise building, different tenants on

11  each floor.

12        And the tower is built based on the amount of

13  capacity and the amount of capacity individual companies

14  are willing to offer.

15        We build the tower with multiple different

16  insurance companies until we reach the amount of

17  financial risk transfer we're looking for.

18     Q    Right.  So you'll have a primary carrier and

19  then you'll have excess carriers above that; is that

20  correct?

21     A    Correct.

22     Q    Okay.  Who -- have you had the same primary

23  carrier for the last five years?

24     A    I believe so, yes.

25     Q    And who is that?

1    A    That's correct.

2    Q    And that's in the case that the company cannot

3  or will not indemnify; is that right?

4    A    That's true.

5    Q    How much was the premium for the 2017 tower in

6  total, including the Side A?

7    A    Oh, I don't remember.

8    Q    Okay.  Do you remember the magnitude?

9    A    A couple million dollars.

10    Q    All right.  And that -- that policy expired in

11  May of 2018; is that right?

12    A    Correct.

13    Q    And during the -- or early part of 2018, you

14  worked with Marsh to try to procure a new policy for the

15  company; is that right?

16    A    That's right.

17    Q    Okay.  And am I correct that the 2018 policies

18  consist of 200 million in regular side ABC coverage and

19  a hundred million in Side A DIC?

20    A    That's correct.

21    Q    And in addition to that, there are two

22  reinstatement limits?

23    A    Yes.

24    Q    Okay.  Can you explain how the reinstatements

25  limits work?

CONFIDENTIAL

1    filed the claim and the nature of the action and the

2    claims themselves.

3         Q     Okay.  Do you know who prepared this document?

4         A     I believe our law department did.

5         Q     Okay.  I think you said before that you were

6    not familiar with the substance of the claims?

7         A     No.  Like, I haven't read the individual

8    claims.  I'm aware of sort of broad strokes what they

9    are about, but not detailed arguments for the case.  I

10   haven't read the papers.

11        Q     Okay.  What do you understand in broad strokes

12   what they are about?

13        A     Generally wrongful acts committed by boards

14   of -- members of the boards of directors.  And they're

15   different depending on the action that was taken.

16        Q     Okay.  Do you know the status of the cases

17   that were noticed under the policies on page 9?

18        A     I believe they're all stayed at the moment.

19        Q     Okay.  And would you agree with me that

20   because they're all stayed, that there are no fees and

21   costs being incurred with respect to those actions?

22        A     I --

23              MR. TSEKERIDES:  Objection to the form.

24        A     -- yeah, I don't know what's being incurred.

25        Q     (BY MR. STONE)  Okay.

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 9 of 23

1    Q    Okay.

2    A    -- mean, it makes sense.  That's the answer.

3    Q    The Response No. 3 says, The amount incurred

4    to date ███████████████ retention under the

5    2017 and 2018 D&O policies.  Accordingly, at this time,

6    both towers contain the coverage limits described in the

7    motion.

8         Do you see that?

9    A    I do.

10   Q    And does that comport with your understanding?

11   A    It does.

12   Q    Okay.  When it says there's a ████████

13   retention, is that a ██████████ retention under each

14   policy?

15   A    It is.

16   Q    Okay.  Now, the 2018 policy that you initially

17   procured was to expire on May 20, 2019; is that right?

18   A    That's right.

19   Q    And at some point PG&E negotiated an extension

20   of that policy?

21   A    That's correct.

22   Q    Okay.  Tell me about the process of -- of

23   getting that extension.

24   A    Sure.  So we worked with our broker, Marsh, to

25   reach out to incumbent markets on our tower and talk

1  about the possibility of an extension.

2          We went to New York to discuss, as we normally

3  do -- it's somewhat of a marketing trip -- the status of

4  the company, what's going on, the uncertainty involved

5  in our current deteriorating financial condition at the

6  time.

7          And then due to that uncertainty, we asked

8  that they would consider extending the limits for

9  another year rather than purchasing a fresh set of

10 limits in May of 2020 -- or 2019, when we normally would

11 have.

12          We start that process generally in February

13 anyway, so it was not unusual to go out to the markets

14 and ask at that time.

15     Q    Okay.  And is that when it -- when those

16 discussions occurred?

17     A    No.  They occurred in January.

18     Q    Okay.  Was -- was there a discussion at that

19 time about the possibility of a bankruptcy filing?

20     A    No.

21     Q    Okay.  What was the reason for seeking an

22 extension as opposed to getting a new policy?

23     A    Well, deteriorating financial conditions of

24 the company, ongoing uncertainty.  There was a lot of

25 news about PG&E and its fate.

1  the claims or anything like that, no.

2      Q    Okay.  What were the discussions that you had

3  when you were getting the policies?

4      A    So we were talking about the status of

5  derivatives and securities claims against the company

6  with respect to the 2017 and 2018 policies.

7      Q    When did those discussions occur?

8      A    That was in January.

9      Q    Okay.  And what did the insurers tell you at

10  that time with respect to the issue of whether they

11  would treat claims under the 2018 policy as being the

12  same as those claims that have been noticed under the

13  2017 policy?

14      A    They did not provide a position in that

15  discussion, so it -- they were listening.  We were

16  telling them the updates.

17           And they didn't say one way or the other

18  whether they were going to treat them as a single

19  relating-back issue or if there were two towers in play.

20      Q    Okay.  When did you first become aware that

21  one or more participants in the tower -- in the tower

22  were taking the position that -- that claims under the

23  2018 policy could be relate -- could relate back to the

24  2017 policy?

25      A    Springtime at some point as we started

1    discussions about:  What is the status of our current

2    policy coverage?

3              So we talked about scenarios.

4        Q    Okay.  And who raised that issue?

5              MR. TSEKERIDES:  Objection to the form.  You

6    can answer.

7        A    I believe it was our general counsel, Janet

8    Loduca, who asked the question:  What do we have?

9        Q    (BY MR. STONE) Asked the question of whom?

10       A    Me.

11       Q    Okay.  And were you the one who raised the

12   possibility that the insurers might take the position

13   that claims noticed under the 2018 policy related back

14   to the 2017 policy?

15       A    No, it was not me.  It was either Marsh or our

16   law department.  I don't remember who.

17       Q    Okay.  And there's an indication in this

18   sentence that we were looking at that said, At least one

19   carrier has indicated an intention to do so, meaning

20   to -- to make that argument?

21       A    Decision, yeah.

22       Q    Do you know who that is?

23       A    I don't.

24       Q    Okay.  Do you know if that carrier is the

25   primary carrier?

1    A    It may be.

2    Q    But you don't know?

3    A    I don't know for sure.

4    Q    Okay.  Who would know that?

5    A    Robin Reilly would know that.

6    Q    Who is Robin Reilly?

7    A    Robin Reilly is our D&O attorney.  She

8 supports -- she's not a D&O attorney, per se.  She

9 supports our D&O program.  She's a PG&E attorney.

10    Q    Okay.  Further on in the paragraph -- and I

11 don't mean to deprive you of the opportunity to read the

12 entire paragraph, but it says, Under these

13 circumstances, in the unfortunate event of a

14 post-petition wildfire, the insurers may similarly

15 attempt to treat any new claims as part of the same

16 single claim triggering only the 2017 policies.

17         Do you see that?

18    A    I do.

19    Q    To your knowledge, has any insurer made the

20 statement that they would treat any new claim arising

21 from a post-petition wildfire as the same single claim

22 triggering only the 2017 policy?

23    A    Well, I believe in that sentence that you read

24 me previously, it says, At least one carrier has

25 indicated an intention to do so --

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 14 of 23

1    Q    Right --

2    A    -- so...

3    Q    And that -- that's -- that sentence was

4  referring to those claims that have already been noticed

5  under the --

6    A    Oh, I see.  Sorry.

7    Q    -- 2017 and 2018 policies.

8         This is -- this relates -- my question now

9  relates to a post-petition wildfire, which is what that

10  sentence --

11         MR. TSEKERIDES:  All right.  So if you need to

12  read the paragraph so you're both on the same page --

13    A    Yeah.  Okay.  I -- yeah, I understand.

14  Post-petition wildfire, the insurers may similarly

15  attempt to treat any new claims as part of a new claim.

16         MR. TSEKERIDES:  You can read it to yourself.

17    A    Yeah.  Sorry.

18         Can you repeat the question?

19    Q    (BY MR. STONE) Sure.  To your knowledge, has

20  any insurer made the statement that they would treat any

21  new claim arising from a post-petition wildfire as the

22  same single claim triggering only the 2017 policy?

23    A    Not to my knowledge, no.

24    Q    The next paragraph -- sentence in that

25  paragraph says, Under these circumstances, the available

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 15 of 23

1    coverage under the 2017 policies could be exhausted as a

2    result of the prepetition claims noticed to the

3    insurers, which would lead -- leave no coverage under

4    the 2017 policies for the new directors and officers.

5           Do you see that?

6    A    I do.

7    Q    What is the basis for your belief that the

8    2017 policies could be exhausted as a result of the

9    prepetition claims noticed to the insurers?

10   A    The list of them that we have currently

11   outstanding, that's the basis.

12   Q    Okay.

13   A    There are a number of actions.

14   Q    So the fact that there are these 16 actions,

15   that's your basis?

16   A    Um-hum.

17   Q    Okay.  And in --

18   A    I mean, the ones that were noticed to the 2017

19   tower.

20   Q    The -- you'll agree with me that Exhibit 3

21   indicates that so far ███████████████ in defense costs

22   have -- has been paid out with respect to those claims,

23   right?

24   A    That's what this document says, yes.

25   Q    All right.  Do you have -- do you have any

1    basis to believe that there will be additional amounts

2    incurred with respect to those claims between now and

3    the end of the bankruptcy?

4        A    I don't know.

5        Q    Okay.  Well, let's assume that the actions all

6    are stayed through the end of the bankruptcy.

7             Do you have a belief that there will be

8    additional costs associated with those claims between

9    now and the -- the end of bankruptcy?

10            MR. TSEKERIDES:  Objection to the form --

11       A    I don't know --

12            MR. TSEKERIDES:  -- hypothetical.

13       A    -- yeah.

14       Q    (BY MR. STONE) Okay.  Well, who would know

15   that?

16            MR. TSEKERIDES:  Objection to the form.

17       A    Our law department would know that --

18       Q    (BY MR. STONE) Okay.

19       A    -- may know that.

20            THE COURT REPORTER:  (Reporter clarification.)

21       A    Our law department may know that.

22       Q    (BY MR. STONE) Okay.  Just so I'm clear, the

23   basis for your belief that those 2017 policies could be

24   exhausted as a result of prepetition claims noticed to

25   the insurers is these 16 actions that have been listed

1  on page 9 of Exhibit 2?

2      A    And also as a result of scenario analysis that

3  we undertook to understand how these claims may play

4  out.

5      Q    Okay.  What scenario analysis is that?

6      A    So conference call discussions with our

7  external counsel and internal counsel and Marsh to

8  discuss the current state of our D&O coverage and under

9  what conditions it could be exhausted.

10     Q    Okay.  All right.  Well, what was the

11  substance of those discussions?

12          MR. TSEKERIDES:  Well, hold on a second.  If

13  you can answer that in a way that doesn't divulge -- I

14  assume it's -- let me go off the record for a second.

15          MR. STONE:  Yeah, you can confer.  That's

16  fine.

17          (Discussion off the record.)

18     Q    (BY MR. STONE) Ms. Markland, we were

19  discussing some conference call discussions with your

20  external counsel and internal counsel and Marsh to

21  discuss the current state of our D&O coverage, under

22  what conditions it could be exhausted.

23          And my question to you was:  What was the

24  substance of those discussions?

25     A    So I characterize them as brainstorming

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 18
of 23

1    sessions.  So we were just talking about what could

2    happen, how could it be considered.

3              Mostly a creative process really to understand

4    all the different ways.  I mean, typically in any sort

5    of risk assessment you would want to know what could

6    potentially happen, and that's the conversation that we

7    had.

8         Q    Okay.  Did you walk away from that conference

9    call believing that there was a significant possibility

10   that the company would have to pay out -- or --

11   significant amounts of money with respect to these

12   claims?

13             MR. TSEKERIDES:  Objection to the form.

14        A    I came away from that conversation believing

15   there was a lot of uncertainty about what would be paid

16   out when, to whom, and how much, and whether anything

17   would be left for our directors and officers.

18        Q    (BY MR. STONE) Was there a discussion of the

19   fact that the actions had been stayed during the

20   bankruptcy?

21        A    I don't believe that was part of the

22   discussion.

23        Q    Okay.  Did anyone raise the idea that while an

24   action is stayed, there's not a lot of -- there's not a

25   lot of cost related to -- to the claims?

1  in -- in the context of bankruptcy?

2      A    Correct.

3      Q    What is your basis for that?

4      A    The policies themselves that state it; that

5  it's available there in case that -- we're indemnifiable

6  by the re -- the company.

7          So Robin and -- Reilly and I have had this

8  discussion in previous years about what that actually

9  means prior to bankruptcy even occurring.

10         And so I said, You know, in what circumstances

11 would the company be unable to indemnify our directors

12 and officers?

13         And she said, If we were in bankruptcy.

14         So that's the basis of my discussion -- or my

15 statement.

16     Q    Okay.  Do you have any understanding of

17 whether a director or officer who incurs costs in

18 connection with business for the company or

19 indemnification -- or as a result of lawsuits during a

20 bankruptcy has an ability to recover that as an

21 administrative expense in a bankruptcy?

22     A    I don't know the details of it.

23     Q    Okay.  In paragraph 25, you say, It is my view

24 that the EIS policy is essential to attract and retain

25 board members and senior officers and to provide them

1    with adequate coverage to enable them to carry out their

2    duties during the pendency of Chapter 11 cases.

3              Do you see that?

4        A    I do.

5        Q    And what is your basis for that statement?

6        A    Doing this job and in particular obtaining

7    directors and officers insurance for our company board

8    of directors and our officers since 2014, I provide an

9    annual update to the board on the status of insurance

10   coverage every year.

11             And every year, this is a very interesting

12   topic to them about how much coverage they have, so I

13   know it's important to the board of directors we did

14   have.

15             I understand from discussions with my peers

16   that directors and officers insurance is commonly

17   procured for their boards as well.  It seems as though

18   it's a standard expectation that there will be

19   sufficient coverage for D&Os and that -- that is

20   important for attracting and retaining.

21       Q    Do you have any reason to believe that any

22   board members or senior officers have a belief that the

23   current coverage under the 2018 policy is not adequate?

24             MR. TSEKERIDES:  Objection --

25       A    I don't --

1          MR. TSEKERIDES:  I'm going to have one

2     question.

3                    EXAMINATION BY COUNSEL

4     BY MR. TSEKERIDES:

5          Q     Ted Tsekerides for the company.  You were

6     asked some questions earlier about why you couldn't just

7     wait on the EIS policy.

8          My question is:  Do you know if the EIS policy

9     would be available, let's say, in six months if a loss

10    came in between now and then?

11         A     No, it wouldn't.  You can't get insurance post

12    event.

13         MR. TSEKERIDES:  Okay.  I have no further

14    questions.

15         MR. STONE:  I have got a follow-up.

16         MR. TSEKERIDES:  Okay.

17                    EXAMINATION BY COUNSEL

18    BY MR. STONE:

19         Q     With respect to the question that you just

20    answered from Mr. Tsekerides, what is your basis for

21    believing that you can't get insurance post event?

22         A     I would equate that to buying insurance after

23    your house burns down.  Home insurance, you can't insure

24    post fact.  That's probably a legal term I'm using

25    incorrectly.

Case: 19-30088   Doc# 2885-1   Filed: 07/08/19   Entered: 07/08/19 09:58:54   Page 22
of 23

1          But once the damage is done, you can't say:

2    Oops, I should have bought an insurance policy.

3         Q    Okay.  Any other basis for that belief?

4         A    No.

5         Q    Okay.  Can you get the insurance for -- well,

6    I'll withdraw it.

7              MR. STONE:  I have no further questions.

8              MR. TSEKERIDES:  Okay.  Just do

9    "Confidential."

10

11             (TIME NOTED:  11:11 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25