BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT B</u>**

1  FRANK M. PITRE (SBN 100077)
   fpitre@cpmlegal.com
2  ALISON E. CORDOVA (SBN 284942)
   acordova@cpmlegal.com
3  ABIGAIL D. BLODGETT (SBN 278813)
   ablodgett@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
5  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
6  Burlingame, CA  94010
   Telephone:  (650) 697-6000
7  Facsimile:  (650) 697-0577
8
   MICHAEL A. KELLY (SBN 71460)
9  mkelly@walkuplawoffice.com
   **WALKUP MELODIA KELLY & SCHOENBERGER**
10 650 California Street, 26th Floor
11 San Francisco, CA  94108
   Telephone:  (415) 981-7210
12 Facsimile:   (415) 391-6965
13
   BILL ROBINS, III (SBN 296101)
14 robins@robinscloud.com
   **ROBINS CLOUD LLP**
15 808 Wilshire Boulevard, Suite 450
   Santa Monica, CA  90401
16 Telephone:  (301) 929-4200
   Facsimile:   (301) 566-5900
17
18 *Co-Lead Counsel for Individual Plaintiffs*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**03/12/2018**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

19
20 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
21 **IN AND FOR THE COUNTY OF SAN FRANCISCO**

22 | Coordination Proceeding Special Title | Judicial Council Coordination Proceeding |
23 | (Rule 3.550) | No. 4955 |
24 | **CALIFORNIA NORTH BAY FIRE CASES** | **MASTER COMPLAINT – INDIVIDUAL PLAINTIFFS** |
25 | | |
26 | | Judge:  Honorable Curtis E.A. Karnow |
27 | | Department:  304 |
28 | | **JURY TRIAL DEMANDED** |

LAW OFFICES
COTCHETT,
COTCHETT, PITRE &
McCARTHY, LLP

**MASTER COMPLAINT – INDIVIDUAL PLAINTIFFS**

Case: 19-30088   Doc# 2904-2   Filed: 07/09/19   Entered: 07/09/19 12:59:18   Page 2
of 42

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................ 1

II. JURISDICTION AND VENUE ..................................................... 4

III. THE PARTIES ........................................................................... 4

    A. PLAINTIFFS ..................................................................... 4

    B. DEFENDANTS .................................................................. 5

    C. DOE DEFENDANTS ......................................................... 7

    D. AGENCY & CONCERT OF ACTION ............................... 8

IV. STATEMENT OF FACTS ......................................................... 8

    A. PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS ................................................ 8

    B. PG&E'S HISTORY OF SAFETY FAILURES ..................... 10

        1. PG&E'S Long History of Safety Violations ................ 10

        2. The 1981 San Francisco Gas Explosion ..................... 11

        3. The 1991 Santa Rosa Gas Explosion .......................... 11

        4. The 1994 Trauner Fire ............................................... 11

        5. The 1996 Mission Substation Electrical Fire ............. 12

        6. The 1999 Pendola Fire ............................................... 12

        7. The 2003 Mission District Substation Fire ................ 12

        8. The 2004 Sims Fire .................................................... 13

        9. The 2004 Freds Fire ................................................... 13

        10. The 2004 Power Fire .................................................. 13

        11. The 2005 San Francisco Electrical Explosion ............ 13

        12. The 2008 Rancho Cordova Explosion ........................ 14

        13. The 2008 Whiskey Fire .............................................. 14

        14. The 2009 San Francisco Electrical Explosion ............ 15

        15. The 2010 San Bruno Explosion .................................. 15

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

| | | | |
|---|---|---|---|
| 1 | **16.** | The 2011 Cupertino Explosion | 16 |
| 2 | **17.** | The 2014 Carmel Explosion | 16 |
| 3 | **18.** | The 2015 San Francisco Transformer Explosion | 16 |
| 4 | **19.** | The 2015 Butte Fire | 17 |
| 5 | **20.** | PG&E's Conduct After the Butte Fires Reflect Its Conscious Disregard for | |
| 6 | | Public Safety | 17 |
| 7 | C. | THE NORTH BAY FIRES BROUGHT DEATH AND DESTRUCTION TO | |
| 8 | | NORTHERN CALIFORNIA | 19 |
| 9 | E. | THE DEADLY AND DESTRUCTIVE NORTH BAY FIRES | 25 |
| 10 | **1.** | The Atlas Fire | 25 |
| 11 | **2.** | The Cascade/LaPorte Fires | 27 |
| 12 | **3.** | The Cherokee Fire | 28 |
| 13 | **4.** | The Honey Fire | 28 |
| 14 | **5.** | The Lobo Fire | 29 |
| 15 | **6.** | The Maacama or No Name Fire | 29 |
| 16 | **7.** | The McCourtney Fire | 29 |
| 17 | **8.** | The Nuns Fire | 30 |
| 18 | **9.** | The Pocket Fire | 32 |
| 19 | **10.** | The Point Fire | 33 |
| 20 | **11.** | The Redwood Valley/Potter Fires | 33 |
| 21 | **12.** | The Sullivan Fire | 34 |
| 22 | **13.** | The Sulphur Fire | 35 |
| 23 | **14.** | The Tubbs Fire | 36 |
| 24 | **15.** | The Highway 37 Fire | 37 |
| 25 | F. | PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO | |
| 26 | | CAUSING THE NORTH BAY FIRES | 37 |
| 27 | **1.** | The 2013 Liberty Report Found that PG&E's Distribution System | |
| 28 | | Presented "Significant Safety Issues" | 37 |

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**MASTER COMPLAINT – INDIVIDUAL PLAINTIFFS**                                                                ii

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 4
of 42

| | | |
|---|---|---|
| | **2.** | The 2013 Liberty Report Found that PG&E's Wires Were Highly Susceptible to Failure Due to Age ........................................................ 38 |
| | **3.** | PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment ............................................................................................... 38 |
| | **4.** | PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law ................................ 41 |
| | **5.** | PG&E's Unsafe Use of Reclosers ........................................................... 42 |
| | **6.** | PG&E Knew That Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation ................. 43 |
| | **7.** | PG&E's Reckless Adoption of the VMII Program Where It Paid Its Contractors to Cut Fewer Trees ................................................................. 44 |
| | **8.** | PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees ........... 46 |
| | **9.** | PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk .......................................................................... 47 |
| | **10.** | PG&E's "Run to Failure" Approach to Maintenance .............................. 47 |
| | **11.** | PG&E's Purchase of Insurance Coverage for Punitive Damages ........... 48 |
| G. | | PG&E'S CORPORATE CULTURE IS THE ROOT CAUSE OF THE NORTH BAY FIRES ................................................................................... 49 |

V.    CAUSES OF ACTION ...................................................................................... 52

FIRST CAUSE OF ACTION ........................................................................................ 52

NEGLIGENCE .............................................................................................................. 52

SECOND CAUSE OF ACTION .................................................................................... 55

WRONGFUL DEATH ................................................................................................... 55

THIRD CAUSE OF ACTION ........................................................................................ 55

SURVIVAL ACTION .................................................................................................... 55

FOURTH CAUSE OF ACTION .................................................................................... 56

INVERSE CONDEMNATION ...................................................................................... 56

FIFTH CAUSE OF ACTION ......................................................................................... 58

MASTER COMPLAINT – INDIVIDUAL PLAINTIFFS          iii

1  PUBLIC NUISANCE ................................................................................................ 58

2  SIXTH CAUSE OF ACTION ................................................................................. 61

3  PRIVATE NUISANCE ........................................................................................... 61

4  SEVENTH CAUSE OF ACTION ......................................................................... 61

5  PREMISES LIABILITY ......................................................................................... 61

6  EIGHTH CAUSE OF ACTION ............................................................................ 62

7  TRESPASS ............................................................................................................... 62

8  NINTH CAUSE OF ACTION ............................................................................... 63

9  PRIVATE ACTION UNDER PUBLIC UTILITIES CODE § 2106 .................. 63

10  TENTH CAUSE OF ACTION .............................................................................. 65

11  VIOLATION OF HEALTH & SAFETY CODE § 13007 ................................. 65

12  ELEVENTH CAUSE OF ACTION ...................................................................... 66

13  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ............................ 66

14  VI.     PRAYER FOR RELIEF ............................................................................ 67

15  VII.     JURY DEMAND ..................................................................................... 70

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS** bring this action for damages against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20** (collectively, "**DEFENDANTS**") as follows:

## I.    INTRODUCTION

1.    This case arises from **PG&E CORPORATION** and/or **PACIFIC GAS & ELECTRIC COMPANY's** (collectively, "**PG&E**") longstanding corporate culture of decision-making that places profits over public safety.  **PG&E's** well-documented disregard for safety regulations and risk management practices, along with their blind eye towards the use of effective maintenance and inspection practices for their facilities and equipment, lies at the root of the various factors which caused and/or contributed to causing the most destructive and deadly wildfires California has ever seen (collectively, the "North Bay Fires").

2.    On or around the night of Sunday, October 8, 2017, the North Bay Fires started when a system disturbance on the electrical grid constructed, owned, operated, managed, and/or maintained by **PG&E** caused transformers designed, constructed, owned, operated, managed, and/or maintained by **PG&E** to fail, fault, spark, and/or explode, causing energized power lines constructed, owned, operated, managed, and/or maintained by **PG&E** to burn and/or fall down. These downed lines sparked nearby  vegetation, igniting fires simultaneously across multiple counties.  Other fires caused electrical currents to flow through down guys owned, designed, operated, managed and/or maintained by **PG&E**, creating arcing at ground level in dry grass.  The arcing from down guys at or around ground level sparked fires in and around vegetation.  All of these events, and others, including but not limited to conductors, poles, insulators, reclosers, and/or other electrical equipment constructed, owned, operated, managed, and/or maintained by **PG&E** that fell down, broke, failed, sparked, exploded, and/or came into contact with vegetation, caused and contributed to causing the North Bay Fires.  Although the numerous fires constituting the North Bay Fires have different points or origin, they all share the same underlying causes and arose from **PG&E's** disregard of mandated safety practices and foreseeable hazardous risks associated with its infrastructure.



**PG&E Equipment on October 9, 2017, in Fountaingrove, a Neighborhood Decimated by the Tubbs Fire[1]**

3. Over the following days, the North Bay Fires spread rapidly and caused extensive damage throughout Northern California, including populated neighborhoods and sprawling vineyards. The North Bay Fires claimed the lives of at least 44 individuals, injured many others, burned over 245,000 acres, and destroyed over 14,700 homes. The following fires in Sonoma, Napa, Mendocino, Solano, Lake, Butte, Calaveras, Nevada, and Yuba Counties are collectively referred to as the North Bay Fires, including: the Adobe, Atlas, Cascade, Cherokee, Honey, LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Potter, Pressley, Redwood Valley, Sullivan, Sulphur, Tubbs, and Highway 37 Fires.

/ / /

/ / /

/ / /

---

[1] http://www.mercurynews.com/2017/10/25/pge-missed-electricity-inspections-violated-safety-rules-in-bay-area-including-north-bay-audits/ (last accessed February 2, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**Map of the North Bay Fires[2]**

4.     As set forth in more detail in the following pages, based on multiple reports, audits, investigations, and/or interviews, it is clear that the North Bay Fires were an inevitable byproduct of **PG&E's** willful and conscious disregard of public safety.  **PG&E**, although mandated to do so, failed to identify, inspect, manage, and/or control vegetation growth near its power lines and/or other electrical equipment.  This created a foreseeable danger of trees and/or other vegetation coming into contact with **PG&E's** power lines and/or other electrical equipment and causing electrical problems.  Further, **PG&E** failed to construct, manage, track, monitor, maintain, operate, replace, repair, and/or improve its power lines, poles, transformers, conductors, insulators, reclosers, and/or other electrical equipment in a safe manner, despite being aware that its infrastructure was aging, unsafe, likely to cause fires, and/or vulnerable to environmental

---

[2] Derived from Cal Fire map at http://www.fire.ca.gov/general/firemaps (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

conditions. Finally, **PG&E** failed to adequately design, maintain, replace, repair, and/or improve its anchors and/or down guys, despite being aware from prior fires that these anchors and/or down guys could cause fires when ground currents exist.

5. **PG&E** knew about the significant risk of wildfires and other disasters from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the North Bay Fires began and, as described below, has been repeatedly fined and/or convicted of crimes for causing wildfires, explosions, and other disasters by failing to mitigate these risks.

6. Wildfires, explosions, and other devastating events have resulted from **PG&E's** long history of choosing to divert funds from its public safety, vegetation management, and/or infrastructure maintenance programs to instead line its own corporate pockets.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to Code of Civil Procedure §§ 395(a) and 410.10 because Defendants, and/or each of them, reside in, are incorporated in, and/or do significant business in the County of San Francisco, State of California. The amount in controversy exceeds the jurisdictional minimum of this Court.

8. Venue is proper in this Court pursuant to Code of Civil Procedure § 404.3 and California Rules of Court, Rule 3.540. The Honorable Curtis E.A. Karnow of the Superior Court of California, County of San Francisco was assigned as the Coordination Trial Judge for this action.

## III. THE PARTIES

### A. PLAINTIFFS

9. **PLAINTIFFS** are individuals and/or business entities who suffered and/or continue to suffer personal injuries, property losses, and/or other damages from the North Bay Fires, including but not limited to the Adobe, Atlas, Cascade, Cherokee, Honey, LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Potter, Pressley, Redwood Valley, Sullivan, Sulphur, Tubbs, and/or Highway 37 Fires.

## B. DEFENDANTS

10. At all times herein mentioned Defendants **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** were corporations authorized to do business and were doing business in the State of California with their principal place of business in the County of San Francisco, State of California. Defendant **PG&E CORPORATION** is an energy-based holding company headquartered in San Francisco. It is the parent company of Defendant **PACIFIC GAS AND ELECTRIC COMPANY**. **PG&E CORPORATION** and **PACIFIC GAS AND ELECTRIC COMPANY** provide public utility services, including the generation of electricity and the transmission and distribution of electricity and natural gas to millions of customers in Northern and Central California, including the residents of Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and Yuba Counties.

11. **PLAINTIFFS** allege that **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** are jointly and severally liable for each other's wrongful acts and/or omissions as hereafter alleged, in that:

   a. **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** operate as a single business enterprise operating out of the same building located at 77 Beale St, San Francisco, California for the purpose of effectuating and carrying out **PG&E CORPORATION's** business and operations and/or for the benefit of **PG&E CORPORATION**;

   b. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose;

   c. **PACIFIC GAS & ELECTRIC COMPANY** is so organized and controlled, and its decisions, affairs and business so conducted as to make it an instrumentality, agent, conduit and/or adjunct of **PG&E CORPORATION**;

   d. **PACIFIC GAS & ELECTRIC COMPANY's** income contribution results from its function, integration, centralization of management and economies of scale with **PG&E CORPORATION**;

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

e. **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and management are intertwined and do not act completely independent of one another;

f. **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and managers act in the interest of **PG&E CORPORATION** as a single enterprise;

g. **PG&E CORPORATION** has control and authority to choose and appoint **PACIFIC GAS & ELECTRIC COMPANY's** board members as well as its other top officers and managers;

h. Despite both being Electric Companies and Public Utilities, **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not compete with one another, but have been structured, organized, and businesses effectuated so as to create a synergistic, integrated single enterprise where various components operate in concert with one with another;

i. **PG&E CORPORATION** maintains unified administrative control over **PACIFIC GAS & ELECTRIC COMPANY**;

j. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are insured by the same carriers and provide uniform or similar pension, health, life and disability insurance plans for employees;

k. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified 401(k) Plans, pensions and investment plans, bonus programs, vacation policies and paid time off from work schedules and policies;

l. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** invest these funds from their programs and plans by a consolidated and/or coordinated Benefits Committee controlled by **PG&E CORPORATION** and administered by common trustees and administrators;

m. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified personnel policies and practices and/or a consolidated personnel

organization or structure;

n. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified accounting policies and practices dictated by **PG&E CORPORATION** and/or common or integrated accounting organizations or personnel;

o. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are represented by common legal counsel;

p. **PG&E CORPORATION's** officers, directors, and other management make policies and decisions to be effectuated by **PACIFIC GAS & ELECTRIC COMPANY** and/or otherwise play roles in providing directions and making decisions for **PACIFIC GAS & ELECTRIC COMPANY**;

q. **PG&E CORPORATION's** officers, directors, and other management direct certain financial decisions for **PACIFIC GAS & ELECTRIC COMPANY** including the amount and nature of capital outlays;

r. **PG&E CORPORATION's** written guidelines, policies, and procedures control **PACIFIC GAS & ELECTRIC COMPANY**, its employees, policies, and practices;

s. **PG&E CORPORATION** files consolidated earnings statements factoring all revenue and losses from **PACIFIC GAS & ELECTRIC COMPANY** as well as consolidated tax returns, including those seeking tax relief; and/or, without limitation; and

t. **PG&E CORPORATION** generally directs and controls **PACIFIC GAS & ELECTRIC COMPANY's** relationship with, requests to, and responses to inquiries from, the Public Utilities Commission and uses such direction and control for the benefit of **PG&E CORPORATION**.

## C. DOE DEFENDANTS

12. The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants **DOES 1 through 100**, inclusive, are unknown to **PLAINTIFFS** who

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474. **PLAINTIFFS** further allege that each of said fictitious Defendants is in some manner responsible for the acts and occurrences hereinafter set forth. **PLAINTIFFS** will amend this Master Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible.

### D.     AGENCY & CONCERT OF ACTION

13.     At all times mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified and approved the acts of each of the remaining **DEFENDANTS**. Each of the **DEFENDANTS** aided and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **PLAINTIFFS** as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## IV.     STATEMENT OF FACTS

### A.     PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS

14.     **PG&E** owns, installs, constructs, operates, and maintains overhead power lines, together with supporting poles and appurtenances throughout Northern and Central California for the purpose of transmitting and distributing electricity to the general public. These lines and equipment were located at and around the origin points for the North Bay Fires.

15.     Electrical infrastructure is inherently dangerous and hazardous, and **PG&E** recognizes it as such. The transmission and distribution of electricity requires **PG&E** to exercise an increased level of care in line with the increased risk of associated danger.

Case: 19-30088     Doc# 2904-2     Filed: 07/09/19     Entered: 07/09/19 12:59:18     Page 14 of 42

16.     At all times **PG&E** had and continues to have a duty to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment. **PG&E** also has a duty to keep vegetation properly trimmed and maintained to prevent foreseeable contact with its electrical equipment.

17.     In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, **PG&E** had an obligation to comply with, *inter alia*: (a) Code of Civil Procedure § 733; (b) Public Resource Code §§ 4292, 4293, and 4435; (c) Public Utilities Code § 451; and (d) General Order Numbers 95 and 165.

18.     California's drought years increased the risk of wildfire and consequently heightened **PG&E's** duty of care in the prevention of wildfires. In January 2014, Governor Edmund Gerald Brown, Jr. declared a state of emergency due to California's continued drought. In June 2014, pursuant to Resolution ESRB-4, the California Public Utilities Commission ("CPUC") directed **PG&E** and all investor-owned utilities to take remedial measures to reduce the likelihood of fires started by or threatening utility facilities.[3] In addition, the CPUC informed **PG&E** it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, agreeing to provide additional funding on top of vegetation management funding already authorized to ensure remedial measures would not go unperformed due to lack of funding.

19.     In early 2017, the CPUC issued a Fact Sheet on "**PG&E** Vegetation Management Spending," directing **PG&E** to take increased efforts to reduce fire risk due to the drought emergency: "Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency, the declaration directed state agencies 'to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife.' The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown regarding the bark beetle infestation and resulting tree mortality remains in effect. The CPUC has not rescinded

_____

[3] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M096/K415/96415169.pdf (last accessed February 12, 2018).

ESRB-4, and work by the utilities to comply with it and the Tree Mortality Emergency continues."[4]

20.     **PG&E** knew or should have known that these statutory and regulatory standards are minimum standards. **PG&E** knew or should have known that it has: (a) a duty to identify vegetation that is dead, diseased, and/or dying, or that otherwise poses a foreseeable hazard to power lines and/or other electrical equipment; and (b) a duty to manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire.

21.     Further, **PG&E** has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, but not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

22.     **PG&E** knew or should have known that failure to comply and conform to applicable standards and duties constituted negligence and would expose members of the general public to a risk of death, injury, and/or damage to their property.

**B.     PG&E'S HISTORY OF SAFETY FAILURES**

**1.     PG&E'S Long History of Safety Violations**

23.     Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the following fines, penalties, and/or convictions. Despite these recurring punishments, **PG&E** refuses to modify its behavior, and has continued to conduct its business with a conscious disregard for the safety of the public, including **PLAINTIFFS**.

24.     As detailed below, the North Bay Fires are among the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations. **PG&E** power lines, transformers, conductors, poles, insulators, and/or other electrical

---

[4] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation%20Management%20Spending.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment. Further, **PG&E's** deteriorating and carelessly maintained infrastructure has caused multiple disasters throughout California.

### 2. The 1981 San Francisco Gas Explosion

25. A **PG&E** gas main in downtown San Francisco exploded in 1981, forcing 30,000 people to evacuate. It took workers nine hours to shut off the gas main's manual shut-off valves and stop the flow of gas that continued to feed the flames in the interim.

### 3. The 1991 Santa Rosa Gas Explosion

26. Two people were killed and three others were injured when a **PG&E** gas line exploded in Santa Rosa in December 1991. The pipeline was improperly marked, failing to give proper notice to contractors working in the area. A contractor hit the pipe with a backhoe, causing the pipe to leak and explode several months later.

### 4. The 1994 Trauner Fire

27. In 1994, **PG&E's** failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California. This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a historic schoolhouse that was built in 1868.

28. Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that **PG&E** was supposed to keep trimmed. Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire. Approximately 200 of these violations involved contact between vegetation and one of **PG&E's** power lines. As a result, on or around June 19, 1997, **PG&E** was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

29. After the trial, a 1998 CPUC report revealed that **PG&E** diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994. During that same time, **PG&E** under spent its authorized budgets for maintaining its systems by $495 million and instead, used

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

this money to boost corporate profits.  Despite this public outing, **PG&E** continued its corporate culture of putting profits before safety.

### 5.     The 1996 Mission Substation Electrical Fire

30.     At approximately 1:00 a.m. on November 27, 1996, a cable splice at **PG&E's** Mission Substation in San Francisco short-circuited, burning and melting the insulation around the splice.  Smoke from the fire rose through a floor opening above the splice into a switch cabinet. That smoke was so thick that it caused a flashover between phases of the bus bars connecting the overhead N bus to the switch.   This caused insulation on the N bus to ignite and a circuit breaker to open, resulting in the loss of power to a group of **PG&E** customers. The substation was unmanned at the time and the fire was only discovered by chance by an employee who had stopped by the substation to use the restroom.

### 6.     The 1999 Pendola Fire

31.     A rotten pine, which the federal government determined **PG&E** should have removed, fell on a power line, starting the Pendola Fire in 1999.  It burned for 11 days and scorched 11,725 acres, mainly in the Tahoe and Plumas National Forests.  **PG&E** paid a $14.75 million settlement to the U.S. Forest Service in 2009.  That year, the utility also reached a $22.7 million settlement with the CPUC after regulators found **PG&E** had not spent money earmarked for tree trimming and removal toward those purposes.

### 7.     The 2003 Mission District Substation Fire

32.     In December 2003, a fire broke out at **PG&E's** Mission District Substation in San Francisco.  Despite signs of trouble appearing at control centers, the fire burned for nearly two hours before **PG&E** operators showed up at the Substation, found it full of smoke, and finally called the fire department.  The source of the fire was not located until five hours after it began. As a result, nearly one-third of San Francisco's residents and business owners lost power, with some waiting over 24 hours for their power to be restored.

33.     The CPUC report of the investigation, which was released in 2004, illustrated **PG&E's** careless approach to safety and apparent inability to learn from its past mistakes.   An excerpt from the report describes the following:

> Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's Consumer Protection and Safety Division] discovered that another fire had occurred at Mission Substation in 1996. CPSD's investigation team conducted a thorough analysis of both fires and found strikingly similar contributing factors and root causes. CPSD's team further determined that **PG&E** had not implemented the recommendations resulting from its own investigation of the 1996 fire. . . .**CPSD finds it quite troubling that PG&E did not implement its own recommendations from its own investigation of the 1996 fire**.[5]

The findings related to the Mission Substation Fire should have been a wake-up call to **PG&E** to revamp its operating procedures to prevent future disasters. Instead, **PG&E's** focus remained on corporate profits, while safety was relegated to the backburner.

### 8.      The 2004 Sims Fire

34.     In July 2004, the Sims Fire burned over 4,000 acres of forest land in the Six Rivers and Trinity National Forests. A federal lawsuit alleged that **PG&E** failed to remove a decaying tree, which fell on a transmission line and ignited the blaze.

### 9.      The 2004 Freds Fire

35.     The Freds Fire started in October 2004 near Kyburz, El Dorado County, California. A lawsuit filed by the United States Government claimed that employees of **PG&E's** contractor lost control of a large tree they were cutting down. It fell onto a **PG&E** power line and caused a fire that burned over 7,500 acres. **PG&E** and its contractors paid $29.5 million to settle the lawsuits over the Freds Fire and the Sims Fire.

### 10.      The 2004 Power Fire

36.     In October 2004, the Power Fire burned approximately 17,000 acres on the Eldorado National Forest and on private timberlands. A federal lawsuit alleged that the Power Fire was ignited by a lit cigarette that was dropped by a **PG&E** tree trimming contractor. **PG&E** and its contractor paid the federal government $45 million to settle the lawsuit.

### 11.      The 2005 San Francisco Electrical Explosion

37.     In August 2005, a **PG&E** electrical transformer exploded in the San Francisco

---

[5] http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

financial district at Kearny and Post Streets, severely burning a woman who had been walking by. A lawsuit by the injured woman settled for an undisclosed sum.

### 12.    The 2008 Rancho Cordova Explosion

38.    In December 2008, a gas leak from a **PG&E** pipe caused an explosion in Rancho Cordova, California.  This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

39.    A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by incorrect repairs performed by **PG&E** in 2006, at which time **PG&E** installed a piece of pipe to patch up an earlier leak.  The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that **PG&E** failed to timely send properly trained personnel to check out the leak, even though **PG&E** had been told several months earlier that its emergency plans fell below required standards.  Specifically, the report noted the following:

> Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public.[6]

40.    In November 2010, the CPUC filed administrative charges against **PG&E** in connection with the Rancho Cordova explosion, alleging that **PG&E** was at fault for the blast and that **PG&E** should have discovered the improper repair job that caused the explosion, but failed to timely do so.  As a result, the CPUC required **PG&E** to pay a $38 million fine.

### 13.    The 2008 Whiskey Fire

41.    The June 2008 Whiskey Fire burned more than 5,000 acres of land in the Mendocino National Forest.  The fire started when a gray pine tree that did not have the required clearance from a **PG&E** transmission line came into contact with the line.  **PG&E** and its contractors agreed to pay $5.5 million to settle a federal lawsuit.

---

[6] http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## 14. The 2009 San Francisco Electrical Explosion

42.     In June 2009, a **PG&E** underground electrical vault exploded in San Francisco's Tenderloin neighborhood, sending 30-foot flames and smoke into the air for two hours. This explosion left thousands of people without power.

## 15. The 2010 San Bruno Explosion

43.     On September 9, 2010, **PG&E's** continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on **PG&E's** poor management of its pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) **PG&E's** inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) **PG&E's** inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

44.     As a result, **PG&E** was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC slapped **PG&E** with a $1.6 billion fine for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted **PG&E** of six felony charges and ordered it to pay $3 million in fines for causing the explosion.

45.     Due to **PG&E's** corporate culture which repeatedly ignored public safety, the **CPUC** launched an investigation into the manner by which **PG&E** officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President called out **PG&E's** ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into **PG&E's** actions and operations, including the investigations we voted on today, federal grand jury, and California

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Department of Justice investigation, **continued safety lapses at PG&E continue to occur**.[7]

### 16. The 2011 Cupertino Explosion

46. After the San Bruno explosion, in September 2011, **PG&E** caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

47. Prior to the explosion, the manufacture of Aldyl-A, the NTSB, and the federal Pipeline and Hazardous Materials Safety Administration had all issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least 2002. Despite these warnings and **PG&E's** knowledge of this risk, **PG&E** did nothing to prevent the explosion. Although some utilities around the United States had been replacing Aldyl-A pipes, **PG&E** did not have a replacement program to phase them out and adequately protect the public.

### 17. The 2014 Carmel Explosion

48. In March 2014, a home in Carmel, California was destroyed due to a gas explosion caused by **PG&E**. Prior to the explosion, **PG&E** was attempting to replace a gas distribution line, but **PG&E's** legally inadequate records did not show that the steel pipe had a plastic insert. When crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced, allowing gas to leak through the pipe and into the residence.

49. The CPUC once again required **PG&E** to pay a massive fine because of their wrongdoing. In August 2016, the CPUC imposed a $25.6 million fine on **PG&E**. With a $10.85 million citation previously paid by **PG&E** in 2015 for the explosion, **PG&E** was required to pay a total of over $36 million in penalties for its shoddy recordkeeping and disregard of public safety.

### 18. The 2015 San Francisco Transformer Explosion

50. In September 2015, a **PG&E** underground transformer exploded in San Francisco's Bernal Heights neighborhood. This explosion injured two people, one of them critically.

---

[7] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/ Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnfor cementTheory.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## 19. The 2015 Butte Fire

51. Tragedy struck yet again in September 2015, when **PG&E's** inadequate and ineffective vegetation management programs resulted in the Butte Fire in the Sierra foothills. The Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed 921 homes and/or structures, and charred over 70,000 acres.

52. Similar to the other disasters caused by **PG&E's** wrongdoing, the Butte Fire could have been prevented by **PG&E**. The Butte Fire was ignited by a gray pine tree that grew and came into contact with one of **PG&E's** power lines. **PG&E** knew that gray pines posed the highest risk of catastrophic wildfires, but failed to identify and/or remove the dangerous tree pursuant to its vegetation management practices. Instead, **PG&E** removed the two trees surrounding the gray pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact with **PG&E's** power line. Indeed, in **PG&E's** prepared testimony to the Public Utilities Commission Safety Model Assessment Proceeding, dated May 1, 2015, the company expressly stated that it was accepting the risk posed by outages in the range of 17 per 1,000 miles, less than 0.02 percent of trees in contact with its lines, and a small number of wildfires caused by **PG&E** equipment each year. As such, **PG&E** consciously chose not to mitigate those risks further, thereby exposing Plaintiffs to the risk of wildfire.

53. Subsequent to the Butte Fire, in April 2017, the CPUC fined **PG&E** a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. Cal Fire also sent **PG&E** a bill for $90 million to cover state firefighting costs. Despite these consequences, **PG&E** did not change, revise, or improve any of its vegetation management practices after the Butte Fire, paving the way for another massive wildfire.

## 20. PG&E's Conduct After the Butte Fires Reflect Its Conscious Disregard for Public Safety

54. The Butte Fire was not an isolated incident, as shown by **PG&E's** long history of safety lapses that caused injury or death to many California residents, and destroyed or damaged their property.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

55. The North Bay Fires started approximately three years after the Butte Fire, where a 44-foot tall, weak and spindly gray pine tree that should have been removed by **PG&E** struck a 12,000-volt overhead power line that was owned and operated by **PG&E**. The resulting fire burned for 22 days, killing two people, burning over 70,000 acres, destroying and damaging 475 residences, 343 outbuildings, and 45 other structures. The fire also left tens of thousands of dead or dying trees and the risk of water pollution and erosion in its wake. Thousands of people were forced to evacuate their homes, and thousands were damaged in their person and property.

56. **PG&E's** actions leading up to the Butte Fire illustrate its conscious disregard of public safety, as follows:

- *First*, **PG&E chose** to not ensure that properly qualified and trained inspectors were being used by its contractors to identify hazard trees.

- *Second*, **PG&E chose** not to verify that its quality assurance audits were properly conducted.

- *Third*, **PG&E directed** its inspection contractor to hire inspectors that they knew did not meet the minimum qualifications required by **PG&E's** own specifications.

- *Fourth*, **PG&E chose** not to train inspectors on **PG&E's** hazardous tree rating system ("HTRS").

- *Fifth*, **PG&E chose** not to verify that its contractor trained inspectors on the HTRS.

- *Sixth*, **PG&E chose** not to require inspectors to use the HTRS.

- *Seventh*, **PG&E knew** that wildfires caused by contact between vegetation and its power lines posed the highest degree of risk to the public.

- *Eighth*, **PG&E knew** that its vegetation management program failed to identify over 500,000 trees annually that were closer than the required distance away from its power lines.

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 24 of 42

- *Ninth*, **PG&E knew** that its inspectors failed every year to identify tens of thousands of "facility protect trees" or "hazard trees" that were dead, diseased, and/or dying, or that otherwise posed a risk of contacting a power line.

- *Finally*, **PG&E did nothing** to remove those trees, one of which was the 44-foot tall, weak, and spindly gray pine tree that started the Butte Fire.

57. In April 2017, the CPUC fined **PG&E** a total of $8.3 million because of the Butte Fire for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. Cal Fire also sent **PG&E** a bill for $90 million to cover state firefighting costs.

58. After the Butte Fire, **PG&E** did not change, revise, or improve any of its vegetation management practices, and its managers, executives, and directors astoundingly and repeatedly testified at their depositions that none of **PG&E's** programs had failed to prevent the Butte Fire, and that none of **PG&E's** employees had done anything at all to contribute to the cause of the Butte Fire. This blind arrogance paved the way for the future disasters that came to pass with the ignition of the North Bay Fires in October 2017.

## C. THE NORTH BAY FIRES BROUGHT DEATH AND DESTRUCTION TO NORTHERN CALIFORNIA

59. On Sunday, October 8, 2017, tragedy struck communities across Northern California when a series of fires began to spark and spread. These deadly fires quickly spread through neighborhoods and destroyed everything in their path, including residences, vegetation, structures, and businesses.

60. The North Bay Fires are collectively the most destructive fires in California's history. In just a few weeks, the fires caused the deaths of at least 44 people, hospitalized over 185 individuals, displaced about 100,000 people who were forced to leave their homes and search for safety, burned over 245,000 acres, and damaged or destroyed an estimated 14,700 homes, 3,600 vehicles, and 728 businesses.

61. **PG&E** caused and/or contributed to causing the North Bay Fires. As the North Bay Fires started to rage, emergency responders received many calls regarding electrical problems,

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 25 of 42

transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees.[8]  Witnesses observed, reported and described downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, and unrepaired poles in the areas in and around the North Bay Fires.

62.     Following the same negligent conduct that led to the Butte Fire, **PG&E** continued to adhere to  the practices that served to increase the risk of wildfires leading up to the North Bay Fires:

- Reclosers in **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions were known to be extreme.
- **PG&E** failed to have a reasonable system in place to make sure its contractors were properly performing tree and/or vegetation inspections and removal, pole clearance, and pole inspections.
- **PG&E** failed to take any steps to look for what it calls "Facility Protect Trees" (trees that pose a risk of falling into the line), even though it knew such trees were likely to exist after its contractors had performed their work.
- **PG&E** failed to properly construct its power lines and thereafter failed to take reasonable steps to make sure the poles and lines were sufficiently strong to support lines and other equipment that were added by third parties.
- **PG&E** chose to not ensure that its contractors were properly trained in tree inspections and removal.
- **PG&E** chose to not ensure that its contractors hired people who met **PG&E's** minimum qualifications.
- **PG&E** chose to not participate in the training of its contractors.

63.     **PG&E** owes the public a non-delegable duty with regard to the operation of its power lines, which includes maintenance, inspection, repair, vegetation management, and/or all other obligations imposed by the Public Utilities Code and the CPUC, specifically including, but

---

[8]  http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires

not limited to, General Orders Numbers 95 and 165. Even when **PG&E** chooses to hire contractors, its obligations remain non-delegable. **PG&E's** acts and omissions, as described herein, were a cause of the North Bay Fires and/or aggravated the spread of the fires and destruction left in their path.

64. **PG&E** responded to the North Bay Fires by acknowledging that there were problems with its electrical equipment the night the North Bay Fires began. However, **PG&E** blamed its failing electrical equipment on winds combined with "millions of trees weakened by years of drought and recent renewed vegetation growth from winter storms."[9] However, the fault lies with **PG&E**. Knowing the effects of the drought on vegetation near its power lines, **PG&E** had a duty to inspect and maintain that vegetation to minimize and avoid risk of fire, injury, death and harm to the public, but **PG&E** failed to do so.

65. At all times relevant to this action, **PG&E** had specific knowledge that the greatest risk to the public from its operations was wildfire. **PG&E** knew that wildfire could result in death and injury to members of the public and could result in the destruction of structures and property.

66. Despite such knowledge, **PG&E** chose to accept vegetation management that would result in 17 tree-related outages for each 1,000 miles of lines, despite knowing that such outages could result in wildfires that would cause injury, death, harm, and property destruction.

67. **PG&E** has acknowledged and at all times relevant to this action knew that it was not adequately directing resources to its vegetation management program to reduce the risk of wildfire. **PG&E** cited its limited resources as the reason it chose to put the public in danger, while at the same time it was receiving approximately $1,400,000,000 in profits each year. **PG&E's** decision-making and practices resulted in numerous deaths, injuries, and damage to structures and property, just as **PG&E** knew it could when it implemented such choices and practices.

**D.      THE IMPACT OF THE NORTH BAY FIRES ON THE WINE INDUSTRY**

68. Sonoma County has 17 unique regions, and more than 60 grape varieties thrive in the County. Each growing region and every vineyard is distinctive, with the climate, soils, and/or

_____

[9] http://www.pgecurrents.com/2017/10/11/pge-statement-on-north-bay-wildfires/ (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

site creating unique characteristics. Forty percent of Sonoma County's vineyards are less than 40 acres, and 80 percent are less than 100 acres. More than 85 percent of Sonoma County's vineyards are family-owned and operated. One in four Sonoma County jobs are in the wine industry. Due to the geological activity in Sonoma County, the County has a greater diversity of soils than all of France. Chardonnay is the most abundant varietal in Sonoma County, with over 15,000 planted vineyard acres. Further, more Pinot Noir grapes are planted in Sonoma County than any other red grape, with over 12,500 acres.

69.     Further, Napa Valley is one of the most renowned winegrowing regions in the world. Napa Valley contains about 45,000 acres under cultivation. It also has one of the most diverse soils in the world, including half of the world's 12 recognized soil orders and 33 different soil series. Napa Valley also contains more than 34 different wine grapes. Twenty-three percent of its planted acreage is to white wine grapes and 77 percent is red wine grapes. The Napa Valley is best known for its Cabernet Sauvignon variety (47 percent or 20,342 acres) followed by Chardonnay (14 percent or 6,397), Merlot, Sauvignon Blanc, Pinot Noir, and then Zinfandel. There are 700 grape growers in Napa County, 475 physical wineries, and over 1,000 different wine brands. Ninety-five percent of the wineries in Napa Valley are family-owned. The local wine industry and related businesses provide an annual economic impact of over $13 billion locally and over $50 billion in the United States, which results in 46,000 jobs locally and 300,000 jobs nationally.

70.     The North Bay Fires caused significant damage to the entire wine industry in Northern California, including physical damage to vineyards, tasting rooms, houses, machinery, and the surrounding land. The fire damage and destruction also reduced the value of affected property, and will reduce the resale value and development potential for such property.

71.     In addition to damage and destruction of real and personal property, the North Bay Fires caused widespread economic losses to businesses throughout the region, and will continue to do so into the future. Businesses have incurred and will continue to incur economic losses due to inability to operate their businesses, loss of access to their business locations, and/or inability

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

of staff and employees to reach the business. In addition, wine supplies were adversely affected, including but not limited to the taste of wine, for many years to come.

72.     Many businesses in Northern California derive significant business from tourists and other out-of-region customers. These businesses have suffered and will continue to suffer economic loss due to these tourists and out-of-region customers choosing not to visit Northern California in the aftermath of the North Bay Fires.

73.     Individual employees of affected businesses also incurred and will continue to incur economic losses due to the inability of businesses to operate, be accessed, and/or attract or service customers due to the North Bay Fires. Businesses have incurred and will continue to incur economic losses due to the chemical retardant that was used to put out the North Bay Fires. Cal Fire dumped several million gallons to try to control the blazes. The chemical used kills the plants it comes into contact with and also harms the soil. Organic businesses incurred and will continue to incur economic losses due to the foreseeable use of chemical retardant because the product contains fertilizer-type materials that will ruin an organic accreditation. These conditions are ongoing and will continue for an unknown time into the future.

74.     The wine industry is investigating to what extent the taste of grapes harvested during this past season was altered by the North Bay Fires. The grapes on the vines that survived the North Bay Fires may suffer from "smoke taint" and be unusable for winemaking or otherwise be of reduced value. Part of the investigation is whether smoke permeated into plants' leaves or the skin of the grapes, which will only be revealed during fermentation. If damage is present, this condition severely damages flavor and the "nose" of a wine. In bad cases, a wine can take on the taste of a "dirty ashtray" or smell like a "smoked fish." This would directly affect wines sold from the 2017 harvest season but may also affect the overall market reputation and value of wines coming from Napa and Sonoma Counties and/or the surrounding regions for years to come.

75.     Wines made from grapes harvested before the North Bay Fires may also be damaged. Many wineries lost power during the fires. Without power, the fermentation process may accelerate too quickly, ruining the wines. Reserves of wines aging in barrels and bottles may also be lost to smoke and heat damage.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

76.     Further, the North Bay Fires damaged soils, which can impact the taste and quality of wines grown in the regions far into the future.  Many wine growers cultivate the soil and break down their land into subplots sharing similar characteristics, called "natural" or "basic terroir units."  The concept of terroir reflects the idea that each particular piece of land imparts its own unique flavor to the grapes.  Those who lost vineyards may have to wait as many as three to five years to return the soil to a place where they can produce a viable crop of grapes.  The delay for viable grapes may be much longer for growers who suffered physical damage to their vines.  At a minimum, grape vines will not produce viable fruit for three years.  As destroyed vines are replanted, growers may be forced to remediate their soils or wait out the natural restoration of their soils before infant vines can be planted.  Cumulatively, some growers may be looking at an eight year delay before parts of their vineyard can produce viable grapes.  For growers who lost "old vines," the delay before a comparable crop can be produced may be decades.

77.     There are more than 100,000 vine-growing acres in Napa County, Sonoma County, and the surrounding areas, but the full damage to the vines cannot be seen yet.  It may take at least two years to fully understand if each vine is still viable or how its growth patterns were altered.  The viability of the vines depends on where they were burned.  The part of the vine which creates fruit is grafted onto different, hardier rootstock, so it has a better chance to grow and be resistant to disease.  Thus, even if the roots were undamaged, the rootstock does not produce grapes which are desirable for winemaking.  Whether the vine will remain fruitful is also dependent on the extent of the damage.  For example, scorched vines will not produce as much fruit.  The worst case scenario is when the trunk of the plant is damaged.  If a substantial portion of the trunk is destroyed, there is no saving a vine.  A vine does not actually have to catch fire to be harmed, even just exposure to heat from adjacent burning can cause damage.  Slightly damaged vines are also vulnerable to damaging pathogens like fungi.  Each of these lost vines represents many hours of human labor, skill, and artistry.  They cannot be easily replaced.  Each vine has been manipulated for decades to develop a particular taste or a quality, such as the thickness of the grapes' skin.  Furthermore, it takes at least three years for a vine to produce usable fruit, and the higher quality grapes come from more mature vines.  Many of the vines in the areas impacted by the North Bay

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Fires were thirty to forty years old. Certain vines were more than a century old and brought to the United States in the "baggage of a European immigrant."

78.     The North Bay Fires also caused a huge risk of erosion. Businesses have and will incur damage to personal and real property, business losses, and/or other damages related to preparing for and/or preventing erosion, runoff, and/or debris flow for an unknown period of time.

79.     Beyond the damage to their properties, vines, and/or inventories, the North Bay Fires also reduced tourism for wineries. Last year, California wineries drew more than 23 million visits and earned more than $7.2 billion in tourist-related income, most of which was spent in Napa and Sonoma Counties. Northern California receives most of its tourists around the fall harvest season, and October is typically among the busiest months for hotels and other tourism-related industries in Northern California. Many hotels had to evacuate and close their properties because of the North Bay Fires. If they reopened, they housed emergency responders, evacuees, and/or insurance groups at lower rates. However, news of the North Bay Fires drove away visitors and/or lead them to choose other destinations. Many come to Northern California to appreciate its picturesque valleys and the natural beauty of the verdant landscape. Even when businesses are able to reopen, it is hard to say when the environment will be able to recover.

E.     **THE DEADLY AND DESTRUCTIVE NORTH BAY FIRES**

1.     **The Atlas Fire**

80.     The devastating Atlas Fire that tore through Napa and Solano Counties was one of California's most destructive wildfires. The Atlas Fire killed six people, burned approximately 51,600 acres, and damaged or destroyed at least 571 homes, wineries, and other structures in Napa and Solano counties.

81.     Thousands of residents were displaced and forced to flee in the dark hours before dawn when the fire grew and spread. Many left on only a moment's notice, fleeing from flames without their belongings, as their neighborhoods were consumed by smoke and fire.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

82.     Cal Fire reported that the origin of the Atlas Fire was at or near Atlas Peak Road, south of Lake Berryessa.  Cal Fire also reported that the Atlas Fire started at or around 9:52 p.m. on Sunday, October 8, 2017.[10]

83.     Contemporaneous calls and reports indicated trees hitting **PG&E** power lines and/or problems with other electrical equipment at or around the time and place the Atlas Fire started.  For example, in Napa County, a live oak tree and a live oak branch fell and struck two electricity distribution lines near the City of Napa.

84.     As described in **PG&E** Electric Safety Incident Report No. 171020-8589, on October 19, 2017, **PG&E** identified a broken tree limb and broken field-phase primary insulator on the Pueblo 1104 **PG&E** facility at or near 4011 Atlas Peak Road, Napa, California.  The incident report notes, "An approximately 25 foot tree limb fell from a White Oak that was rooted approximately 15 feet from the distribution conductors."  This incident occurred the day the Atlas Fire began.[11]

85.     As described in **PG&E** Electric Safety Incident Report No. 171023-8596, on October 21, 2017, "**PG&E** identified a 19-inch diameter Oak tree, approximately 45 feet tall, that broke at the base and took down one phase of the Pueblo 1104 (12 kV) Circuit near 3683 Atlas Peak Road. The butt of the Oak tree was completely burned and located 10 to 15 feet from the distribution conductors."[12]

86.     Shortly after the fire, Cal Fire investigators were observed along Atlas Peak Road looking closely at a line of oak trees whose branches extended through overhead utility lines on the west side of the road, less than a quarter mile south of a sprawling ranch on the plateau of a Napa peak.  A twisted, fallen wire lay on the ground, surrounded by stake flags.  A broken oak branch precariously dangled overhead among the wires and other branches.[13]

_____

[10] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1866 (last accessed February 12, 2018).
[11] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[12] *Ibid.*
[13] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed February 12, 2018).

## 2. The Cascade/LaPorte Fires

87. The Cascade and LaPorte Fires forced scores of individuals to evacuate in the dark hours before dawn as the fires grew and spread. Many left on only a moment's notice, fleeing from flames without their belongings, as their neighborhoods were consumed by smoke and fire. Collectively, the Cascade and LaPorte Fires killed approximately four people and destroyed over 450 structures and homes.

88. Cal Fire reported that the origin of the Cascade Fire was at or near the intersection of Cascade Way and Marysville Road, north of Collins Lake, California. The Cascade Fire started at or around 11:03 p.m. on Sunday, October 8, 2017, and burned approximately 9,989 acres in Yuba County.[14]

89. Witnesses saw and/or reported trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Cascade Fire started. For example, in the half hour before the fire began, firefighters responded to at least two trees falling into power lines and power lines falling across the road. When emergency responders headed to the Cascade Fire, they warned each other of downed power lines to ensure firefighter safety.[15]

90. Cal Fire reported that the origin of the LaPorte Fire was at or near the intersection of LaPorte Road and Oro Bangor Highway, Bangor, California. The LaPorte Fire started at or around 12:57 a.m. on early Monday, October 9, 2017, and burned approximately 6,151 acres in Butte County.[16] The Cascade and LaPorte Fires merged later that week.

91. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the LaPorte Fire started. **PG&E** Electrical Safety Incident Report No. 171013-8569 shows that at or around

---

[14] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1871 (last accessed February 12, 2018).
[15] https://www.mercurynews.com/2017/10/17/yuba-countys-cascade-fire-bore-similar-hallmarks-to-wine-country-fires/ (last accessed February 12, 2018).
[16] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1870 (last accessed February 12, 2018).

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 33 of 42

11:20 p.m. on October 8, 2017, an oak tree limb broke and hit a nearby electrical wire at or near 167 Darby Road, Bangor, California.[17]

### 3.   The Cherokee Fire

92.    Cal Fire reported that the origin of the Cherokee Fire was at or near the intersection of Cherokee Road and Zonalea Lane in Oroville, California.  Cal Fire also reported that the Cherokee Fire started on Sunday, October 8, 2017, at or around 9:45 p.m.  The fire burned approximately 8,417 acres and destroyed 6 structures in Butte County.[18]

93.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Cherokee Fire started.  **PG&E** Electric Safety Incident Report No. 171010-8557 shows that at or around 9:45 p.m. on October 8, 2017, an incident caused a broken tree limb and wires to come down on the Clark Road 1102 **PG&E** facility at or near 3401 Cherokee Road, Oroville, California.  The tree was rooted approximately 15 feet from **PG&E** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[19]

### 4.   The Honey Fire

94.    Cal Fire reported that the origin of the Honey Fire was at or near the intersection of Honey Run Road and Merlin Lane, southwest of Paradise, California.  Cal Fire also reported that the Honey Fire started on Monday, October 9, 2017, at or around 3:05 p.m.  The fire burned approximately 150 acres in Butte County.[20]

95.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Honey Fire started.  Witnesses observed downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, unrepaired poles, problems

---

[17] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[18] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1865 (last accessed February 12, 2018).
[19] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[20] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1880 (last accessed February 12, 2018).

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 34 of 42

with other electrical equipment, and/or down trees, tree limbs, and/or other vegetation in the area in and around the Honey Fire.

### 5. The Lobo Fire

96. Cal Fire reported that the origin of the Lobo Fire was at or near Lone Lobo Trail near Rough and Ready, California. Cal Fire also reports that the Lobo Fire started on early Monday, October 9, 2017, at or around 12:01 a.m. The fire burned approximately 821 acres in Nevada County.[21]

97. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Lobo Fire started. **PG&E** Electric Safety Incident Report No. 171012-8565 shows that at or around 11:20 p.m. on October 8, 2917, a ponderosa pine tree fell on the Narrows 2102 **PG&E** Circuit at or near 11218 Lone Lobo Trail, Nevada City, California. The tree was rooted approximately 50 feet from **PG&E** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[22]

### 6. The Maacama or No Name Fire

98. The "Maacama" or "No Name" Fire was first reported at approximately 10:01 p.m. on Sunday, October 8, 2017, and originated near Maacama Lane and Chalk Hill Road in Healdsburg just east of Maacama Creek.[23]

99. The Maacama Fire forced two families to flee their homes shortly before they were destroyed by the fire, and burned approximately 50 acres, including sections of a vineyard.

### 7. The McCourtney Fire

100. Cal Fire reported that the origin of the McCourtney Fire was at or near the intersection of McCourtney Road and Highway 20 in Grass Valley, California. Cal Fire also

---

[21] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1877 (last accessed February 12, 2018).
[22] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[23] Cal Fire did not give the "Maacama Fire" a name. It is also known to local residents as the "No Name Fire" due to its proximity to No Name Road.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

reported that the McCourtney Fire started on early Monday, October 9, 2017, at or around 12:00 a.m. The fire burned approximately 76 acres in Nevada County and destroyed 13 structures.[24]

101.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the McCourtney Fire started. **PG&E** Electric Safety Incident Report No. 171011-8563 shows that at or around 11:00 p.m. on October 8, 2017, a broken ponderosa pine tree and wire were down on the Grass Valley 1103 **PG&E** Circuit near 11253 Orion Way, Grass Valley, California. The tree was rooted approximately 6 to 8 feet from **PG&E** distribution conductors and took down 3 primary conductors at approximately the same location as the fire origin reported by Cal Fire.[25]

## 8.    **The Nuns Fire**

102.    The Nuns Fire forced scores of individuals to evacuate in the dark hours before dawn as the fire grew and spread. Many left on only a moment's notice, fleeing from flames without their belongings, as their neighborhoods were consumed by smoke and fire. The Nuns Fire merged with the Adobe, Norrbom, Oakmont, Partrick, and Pressley Fires (collectively, the "Nuns Fire"). These fires claimed two lives and destroyed approximately 1527 structures and homes.[26]

103.    Cal Fire reported that the origin of the Nuns Fire was at or near Highway 12 north of Glen Ellen, California. Cal Fire also reported that the Nuns Fire started on Sunday, October 8, 2017, at or around 10:00 p.m. The fire burned approximately 56,556 acres in Napa and Sonoma Counties.[27]

---

[24] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1872 (last accessed February 12, 2018).
[25] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[26] http://www.latimes.com/projects/la-me-northern-california-fires-structures (last accessed February 12, 2018).
[27] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1868 (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

104.     Cal Fire also reported that the origin of the Partrick Fire, the first fire to merge with the Nuns Fire, was off Partrick Road west of Napa, California. The Partrick Fire started on Sunday, October 8, 2017, at or around 11:48 p.m. and burned in Napa County.[28]

105.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Nuns Fire started. At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees. Further, several calls reported problems with electrical equipment in the vicinity of the Nuns Fire, including a call at approximately 9:43 p.m. reporting trees and wires down and a call at approximately 10:40 p.m. reporting a blown transformer.[29]

106.     **PG&E** Electric Safety Incident Report No. 171010-8558 shows that at or around 10:00 p.m. on October 8, 2017, a broken eucalyptus tree and wire was down on the Dunbar 1101 **PG&E** facility at or near 8555 Sonoma Highway near Kenwood, California. The tree was rooted approximately 50 feet from **PG&E** fallen lines, and took down 3 primary conductors.[30] Further, **PG&E** Electric Safety Incident Report No. 171016-8576 shows that at or around 1:00 a.m. on October 9, 2017, an alder tree broke at the top and fell on an open wire at or near 1210 Nuns Canyon Road near Glen Ellen, California. The tree was rooted approximately 30 feet from **PG&E** overhead secondary distribution conductors.[31] The sites of these **PG&E** incidents are near or the same location as the two origin locations of Nuns Fire origin reported by Cal Fire.

107.     At or around the start time of the Nuns Fire, **PG&E's** website for electrical outages reported two outages at or very near the origin of the Nuns Fire. The first outage was reported at 10:31 p.m. on October 8, 2017, stating "found a broken power pole in the area." The second

---

[28] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1869 (last accessed February 12, 2018).
[29] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).
[30] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[31] *Ibid.*

1    PG&E outage at or near the origin of the Nuns Fire was reported at 11:50 p.m. on October 8, 2017,

2    stating "found a broken power pole in the area."[32]

3         108.    For the Partrick Fire, PG&E Electric Safety Incident Report No. 171020-8586

4    shows that on or around October 8, 2017, an oak tree fell and took down one phase of the Pueblo

5    2103 PG&E Circuit at or near 1721 Partrick Road near Napa, California. The tree was rooted

6    approximately 44 feet from PG&E distribution conductors at or near the same location as the

7    origin of the Partrick Fire reported by Cal Fire.[33] After the fire was extinguished, witnesses

8    observed Cal Fire investigators looking at downed power lines near the suspected origin point of

9    the Partrick Fire.[34]

10        109.    Further, at or near the start time of the Partrick Fire, PG&E's website reported four

11   separate outages at or very near the origin of the Partrick Fire. All four outages reflected the same

12   outage cause: "found a broken power pole in the area." The date and time stamps were the same

13   as well: 1:47 a.m. on October 9, 2017.[35]

14                          9.    **The Pocket Fire**

15        110.    Cal Fire reported that the origin of the Pocket Fire was at or near the intersection

16   of Pocket Ranch Road and Ridge Ranch Road in Geyserville, California. Cal Fire also reported

17   that the Pocket Fire started on early Monday, October 9, 2017, at or around 3:30 a.m. The fire

18   burned approximately 17,357 acres in Sonoma County.[36]

19        111.    Contemporaneous calls and reports indicated trees hitting PG&E electrical lines

20   and/or problems with other electrical equipment at or around the same time and place the Pocket

21   Fire started. PG&E Electric Safety Incident Report No. 171021-8592 shows that at or around

22   3:30 a.m. on October 9, 2017, there was a broken oak tree limb and wire down on the Cloverdale

---

[32] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no longer available on that site.
[33] *Ibid.*
[34] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed February 12, 2018).
[35] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no longer available on that site.
[36] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1883 (last accessed February 12, 2018).

1102 **PG&E** facility near the intersection of Ridge Ranch Road and Ridge Oaks Road near Geyserville, California. The tree was rooted approximately 15 feet from **PG&E's** lines at approximately the same location as the fire origin reported by Cal Fire.[37]

### 10. The Point Fire

112. Cal Fire reported that the origin of the Point Fire was at or near the intersection of Highway 26 and Higdon Road in West Point, California. Cal Fire also reported that the Point Fire started on early Monday, October 9, 2017, at or around 1:10 a.m. The fire burned approximately 130 acres in Calaveras County.[38]

113. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Point Fire started. **PG&E** Electric Safety Incident Report No. 171009-8554 shows that at or around 10:00 a.m. on October 9, 2017, there was a broken tree limb and wire down on the West Point 1102 **PG&E** facility at or near 22894 Highway 26, West Point, California. The tree was rooted approximately 50 feet from **PG&E's** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[39]

### 11. The Redwood Valley/Potter Fires

114. Cal Fire reported that the origin of the Redwood Valley Fire was north of Highway 20, west of Mendocino National Forest, and south of Black Bart, California, and that it started on October 8, 2017, at or around 11:36 p.m. Cal Fire also reported that the origin of the Potter Fire was near Busch Lane in Potter Valley, California. The fires merged into each other and became commonly referred to as the Redwood Valley Fire. Collectively, the fires burned approximately

---

[37] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[38] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1875 (last accessed February 12, 2018).
[39] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   36,526 acres in Mendocino County, and destroyed or damaged around 588 homes and structures.[40]

2   The fires claimed the lives of 8 individuals, including a 14-year old boy.[41]

3          115.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines

4   and/or problems with other electrical equipment at or around the same time and place the Redwood

5   Valley and Potter Fires started.  **PG&E** Electric Safety Incident Report No. 171009-8553 shows

6   that at or around 11:35 p.m. on October 8, 2017, there was a wire down and broken tree near

7   structure 0/8 of the **PG&E** Potter Valley-Mendocino transmission line in Potter Valley, California.

8   **PG&E** found a broken tree top near the downed conductor.  The tree was rooted approximately

9   60 feet from **PG&E's** transmission line at approximately the same location as the fire origin

10  reported by Cal Fire.[42]

11         116.    It was difficult for firefighters to access the Redwood Valley and Potter Fires

12  because of downed power lines and trees.  Local county officials reported that within 30 minutes

13  of the fire dispatch coming in, Cal Fire dispatched every available Cal Fire unit except one, and

14  local dispatchers fielded hundreds of calls reporting power outages and fires.[43]

15                      **12.    The Sullivan Fire**

16         117.    The Sullivan Fire was first reported at approximately 12:17 a.m. on Monday,

17  October 9, 2017, and originated near 4822 Sullivan Way in Santa Rosa, California.

18         118.    The Sullivan Fire forced families to flee the area in the middle of the night before

19  it destroyed several homes located on Sullivan Way.

20         119.    Contemporaneous calls and reports indicated arcing activity or problems with

21  **PG&E** electrical equipment at the same time and place the Sullivan Fire started.  **PG&E** Electric

22  Safety Incident Report No. 171015-8573 shows that fire damaged two structures "at or near 4818

23  Sullivan Way" and upon arrival at the scene, **PG&E** "noticed a possible issue with the secondary

24

25         [40] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1874 (last accessed February 12, 2018).

26         [41] http://krcrtv.com/archive/remembering-the-victims-8-dead-from-redwood-valley-fire (last accessed February 12, 2018).

27         [42] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

28         [43] http://www.ukiahdailyjournal.com/article/NP/20171109/NEWS/171109874 (last accessed February 12, 2018).

conductor."[44]

### 13. **The Sulphur Fire**

120. Hundreds of residents were displaced and forced to evacuate in the dark hours before dawn as the Sulphur Fire grew and spread. In Clearlake Park, residents had to be picked up off their docks by boat patrols to escape the raging flames.[45] Other residents with homes on Gooseneck Point were trapped by the fire and had to flee by rowboat. Many other residents left on only a moment's notice, fleeing from flames without their belongings, as their entire neighborhoods were consumed by smoke and fire.[46]

121. Cal Fire reported that the origin of the Sulphur Fire was off of Highway 20 at Sulphur Bank Road, Clearlake Oaks, California. Cal Fire also reported that the Sulphur Fire started on Sunday, October 8, 2017, at or around 11:59 p.m. The fire burned approximately 2,207 acres in Lake County[47] and destroyed approximately 162 homes, businesses, and outbuildings.[48]

122. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Redwood Valley Fire started. **PG&E** Electric Safety Incident Report No. 171011-8562 shows that at or around 11:55 p.m. on October 8, 2917, there were two broken poles on the Redbud 1102 **PG&E** Circuit near the intersection of Pomo Road and Sulphur Bank Road near Clearlake, California. The top section of Fuse Cutout Pole 1447 had broken and fallen to the ground. In addition, a pole one span to the west was burned and fell to the ground.[49] The site of this **PG&E** incident is approximately the same location as the fire origin reported by Cal Fire, and that at least one of these poles was rotten and riddled with woodpecker holes.

---

[44] http://cpuc.ca.gov/pgefireincidentreports (last accessed March 9, 2018).
[45] http://www.latimes.com/local/california/la-northern-california-fires-live-clearlake-park-neighborhood-hit-hard-by-1508100783-htmlstory.html (last accessed February 12, 2018).
[46] http://abc7news.com/exclusive-sulphur-fire-victims-tell-harrowing-tale-of-driving-through-flames/2553638 (last accessed February 12, 2018).
[47] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1876 (last accessed February 12, 2018).
[48] https://yubanet.com/Fires/sulphur (last accessed February 12, 2018).
[49] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

Case: 19-30088   Doc# 2904-2   Filed: 07/09/19   Entered: 07/09/19 12:59:18   Page 41 of 42

## 14. The Tubbs Fire

123. The Tubbs Fire was the most destructive of the North Bay Fires. The fire destroyed approximately five percent of Santa Rosa's housing stock, burned over 36,807 acres across Sonoma and Napa Counties, and killed at least 22 individuals.

124. Cal Fire reported that the origin of the Tubbs Fire was at or near the intersection of Highway 128 and Bennett Lane, Calistoga, California. Cal Fire also reported that the Tubbs Fire started on Sunday, October 8, 2017, at or around 9:45 p.m.[50]

125. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Tubbs Fire started. At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees. Further, several calls reported problems with electrical equipment in the vicinity of the Tubbs Fire, including a call at approximately 9:24 p.m. reporting a **PG&E** transformer explosion, a call at approximately 9:58 p.m. reporting down power lines, a call at approximately 10:14 p.m. reporting flames in trees, and a call at approximately 10:34 p.m. reporting falling power line wires.[51]

126. At or around the start time of the Tubbs Fire, **PG&E's** website for electrical outages reported two outages right next to each other at or very near the origin of the Tubbs Fire. The causes of the **PG&E** outages read: "found damaged equipment on a power pole," and "fire in the area." The start time of both outages was exactly 8:51 p.m. on October 8, 2017 – near the reported start time of the Tubbs Fire.[52]

127. There were multiple power lines, power poles, and/or associated equipment in and around the reported origin of the Tubbs Fire. After containment of the Tubbs Fire, there was

---

[50] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1867 (last accessed February 12, 2018).

[51] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).

[52] This quote appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but is no longer available on that site.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Case: 19-30088    Doc# 2904-2    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 42 of 42