caution tape around the **PG&E** power poles located at or near Highway 128 and Bennett Lane, where the outage reports originated. Several trees were dangerously close to power poles and electrical wires coming off the poles in the area of the Tubbs Fire origin. Further, electric equipment that appeared to have come off the poles in the area of the Tubbs Fire origin was on the ground.

### 15. The Highway 37 Fire

128. Cal Fire reported that the origin of the Highway 37 Fire was at or near the intersection of Highway 37 and Lakeville Highway near Sonoma, California. Cal Fire also reported that the Highway 37 Fire started on October 9, 2017, at or around 2:00 p.m., and burned approximately 1,660 acres in Sonoma County.[53]

129. **PLAINTIFFS** are informed that witnesses observed downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, unrepaired poles, problems with other electrical equipment, and/or down trees, tree limbs, and/or other vegetation in the area in and around the Highway 37 Fire.

### F. PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO CAUSING THE NORTH BAY FIRES

#### 1. The 2013 Liberty Report Found that PG&E's Distribution System Presented "Significant Safety Issues"

130. On May 6, 2013, a report was sent to the Safety and Enforcement Division of the CPUC from the Liberty Consulting Group who had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by **PG&E** (hereinafter the "2013 Liberty Report").[54] The 2013 Liberty Report concluded that: "several aspects of the **PG&E** distribution system present significant safety issues." It also found: (a) "addressing risks associated with electrical distribution components has been overshadowed by electric transmission and gas facilities;" (b) "addressing aging infrastructure and adding SCADA to the system comprise

---

[53] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1882 (last accessed February 12, 2018).

[54] http://docs.cpuc.ca.gov/publisheddocs/efile/g000/m065/k394/65394210.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT,
MCCARTHY, LLP

the major focuses of safety initiatives for the distribution system;" and (c) "current employee/contractor serious injury and fatality levels require significantly greater mitigation."

### 2. The 2013 Liberty Report Found that PG&E's Wires Were Highly Susceptible to Failure Due to Age

131. One of the first key findings of the 2013 Liberty Report was that **PG&E** had a "large amount of small size obsolete conductor remaining on **PG&E's** system." **PG&E** has 113,000 miles of conductors, and according to the report, over 60 percent of those conductors are highly susceptible to failure. The conductors are very small, and generally more susceptible to breaking than standard size conductors. As a conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones. For these reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

132. **PG&E's** failure to replace these undersized and obsolete conductors was a proximate cause of the North Bay Fires and Plaintiffs' harm and damages arising therefrom.

### 3. PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment

133. **PG&E** failed to perform the necessary inspections, maintenance, repair, and/or replacement of its electrical equipment.

134. A 2015 audit of **PG&E's** Sonoma Division revealed that there were over 3,500 unfilled **PG&E** repair and maintenance requests in the area of the Tubbs Fire.[55] The volume of unfilled repair and maintenance requests reflects **PG&E's** reckless and conscious disregard for public safety in the North Bay Fire zones.

135. In a December 31, 2015, letter to **PG&E** regarding the audit, Fayi Daye, a supervising electric safety regulator with the CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of **PG&E** electrical distribution equipment. She stated the following:

---

[55] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/ Electric_Safety_and_Reliability/Reports_and_Audits/Electric_Facilities/EA2015-018.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PG&E's** records indicated that from August 2010 to September 21, 2015, a total of **3,527 work orders were completed past their scheduled date of corrective action** per **PG&E's** Electric Notification Prioritization Standards. Late work orders included overhead and underground facilities.[56]

136.    The letter concluded that these delays violated CPUC General Order No. 128, Rule 17.1, which sets forth the CPUC's design, construction, and maintenance rules for electrical systems.

137.    The audit also reviewed **PG&E's** maps for its electrical distribution lines and found that over 50 pieces of overhead equipment - including pole mounted transformers and power lines has not been inspected every year as required by law. This was a violation of CPUC General Order No. 165, § 111-B, which sets forth standards for inspections.[57]

138.    According to State Senator Jerry Hill, these findings are especially troubling because "they are getting the money for these, they are getting the funds to do the work in a timely manner."[58] Yet, **PG&E** takes the money but fails to correct the problems.

139.    Further, according to records maintained by Cal Fire, approximately 135 fires in Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015.[59] In 2015, the last year of reported data, electrical power problems sparked the burning of 149,241 acres across California – more than twice the amount from any other cause.[60]

140.    Since prior to 1996, **PG&E** has known or should have known that its choice of chemical treatments for its poles can also make its equipment unsafe. For example, **PG&E** uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon® process. Those poles tend to experience surface decay below ground regardless of the type of

---

[56] *Ibid.*
[57] *Ibid.*
[58] https://www.nbcbayarea.com/news/local/State-Audit-Shows-PGE-Had-Repair-Job-Backlog-in-Sonoma-Santa-Rosa-451996923.html (last accessed February 12, 2018).
[59] http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks (last accessed February 12, 2018).
[60] http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

wood used for the poles. As a result, digging inspections are required for poles treated by these processes for all wood types. However, **PG&E** has failed to conduct the proper inspections. Further, when **PG&E** has been advised of necessary repairs to such poles, it has failed to repair the poles in a timely manner.

141. According to the 2017 CPUC Order Instituting Investigation into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit:

> Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State. For example, inadequate clearance between communication and power lines, perhaps in conjunction with a broken cable lashing wire, caused the Southern California Guejito Fire of 2007 which (together with the Witch Fire) burned 197,990 acres and caused two deaths. Three more deaths occurred in 2011 when an electrical conductor separated from a pole in high winds, causing a live wire to fall to the ground. At least five more people lost their lives in pole-related failures in 2012 and 2015.

> Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.

> Communication and other wires are not infrequently found hanging onto roads or yards. Poles with excessive and/or unauthorized attachments can put utility workers at risk. Facilities deployed in the field may differ from what appears on paper or in a utility's database.[61]

142. In the June 29, 2017 CPUC press release for the investigation, CPUC President Michael Picker stated, "Plain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "Not knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the

---

[61] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M190/K872/190872933.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[62]

143.    **PG&E's** failure to conduct proper and regular inspections of its wood utility poles and failure to replace them or make necessary repairs contributed to causing the North Bay Fires.

### 4.    PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law

144.    Despite **PG&E's** public protestations to the contrary, Northern California did not experience uncommon weather patterns the night the North Bay Fires began. Readings at weather stations in the areas impacted by the North Bay Fires show that winds were at foreseeable levels when **PG&E's** electrical equipment began to fail. For example, on October 8, 2017, a weather station in Santa Rosa in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:29 p.m. About an hour later, the same station recorded wind gusts of 41 miles per hour. These wind speeds were surpassed in other recent storms in the area on a number of occasions.

145.    According to **PG&E's** 2014 Annual Electric Distribution Reliability Report, sent to the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten **PG&E** electrical outages each year since at least 2004, putting the utility on notice that these weather conditions occur and that they can cause electrical problems. For example, four of the "ten largest 2004 outage events" for **PG&E** occurred in the Santa Rosa and Sonoma areas where winds were documented in the 35 to 65 mph range, much higher levels than those of October 8, 2017.[63]

146.    **PG&E's** largest outage in 2009 was caused by a strong early season storm that "affected the entire service area with many stations reporting wind gusts over 50 mph. National Weather Service records indicate this storm was the strongest October rain and wind event since

---

[62] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.pdf (last accessed February 12, 2018).

[63] https://www.pge.com/includes/docs/pdfs/myhome/outages/outage/reliability/ AnnualElectricDistributionReliabilityReport.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1962. Therefore, **PG&E** had notice of the type of winds that occurred on October 8, 2017, the night the North Bay Fires began.

147. **PG&E's** wood utility poles in the areas where the North Bay Fires began did not meet the wind load and safety factors required by General Order 95, Rule 48, under which wood utility poles must be replaced if they are not strong enough to withstand wind speeds of 92 mph. No weather station in the areas affected by the North Bay Fires recorded wind speeds at or above 92 mph on the night of October 8, 2017.

148. **PG&E's** failure to replace old and deteriorated wood utility poles that did not meet the strength and safety requirements of General Order 95, Rule 48, and that could not withstand wind speeds of less than 92 mph contributed to the cause of the North Bay Fires.

## 5. PG&E's Unsafe Use of Reclosers

149. Another key finding of the 2013 Liberty Report was that on a daily basis and in 36 percent of cases, **PG&E** cannot remotely de-energize a downed line and must send someone on-site to manually turn off the feed. An energized downed line is a hazard, and, according to the 2013 Liberty Report, this hazard has "contributed to a number of fatalities and injuries."

150. **PG&E** has a long-standing practice of using reclosers throughout its system to automatically restart power after interruptions, even though it knows these devices may cause wildfires. Reclosers are circuit breakers equipped with a mechanism that can automatically "reclose" the breaker and reenergize a power line after it has been "opened" due to a fault. Many of **PG&E's** reclosers are set to reenergize the line up to three times after a fault.

151. Reclosers are key tools to prevent power blackouts, but if a fault occurs from contact between a line and a tree or vegetation, reenergizing the line can ignite fires. This danger is so significant that the other two major utilities in California, San Diego Gas & Electric Company and Southern California Edison, have reprogramed their electrical systems during fire seasons to ensure that reclosers do not automatically restart electrical currents after a service interruption.

152. **PG&E** knew that its reclosers posed a great risk of wildfire but has only taken slow and incomplete steps to eliminate that risk. At a Congressional hearing in 2015, **PG&E's** Senior Vice President of Electrical Operations, Patrick Hogan, stated that **PG&E** had the ability to

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

reprogram its reclosers during fire season to not restart power. Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain the wildfire benefit."[64]

153. In contrast to San Diego Gas & Electric Company and Southern California Edison having disabled all of their reclosers from reenergizing lines during fire season, and despite its own knowledge of the dangers posed by reclosers, **PG&E** began an experimental pilot program in 2017 to reprogram its reclosers that only affected a limited area of California.

154. Even before the Butte Fire in 2015, **PG&E** began a process of replacing all reclosers that can only be programmed or controlled on-site with reclosers that can be remotely programmed and controlled. However, that process has been so slow and deliberate many of its reclosers must still be programmed or controlled only at the site where they are installed.

155. On its own initiative, **PG&E** did not turn off a number of reclosers on transmission and distribution systems in the area of the North Bay Fires. Instead, **PG&E** left those reclosers active and did not turn them off until directed to do so by Cal Fire between October 12 and 15, 2017.

156. **PG&E's** failure to turn off its reclosers during fire season and its failure to ensure all of its reclosers could be programmed and controlled remotely proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 6. PG&E Knew That Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation

157. Electrical arcing is a process by which guy wires or "down-guys," when designed improperly and/or installed according to improper design, conduct ground current at ground level during high winds, igniting fires to nearby vegetation. Guy wires are the metal support cables that are used to tie electrical poles to the ground. **PG&E** utilizes an inverted "V" shape design without any separation or in-line insulators as an attempt to help its poles withstand high wind. However, in **PG&E's** sub-transmission design, **PG&E** does not separate the connection at the pole by 12 inches, utilize any in-line insulator to prevent ground current from flowing, or utilize a shunt so

---

[64] http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-12324764.php (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

when ground current exists it does not cause an electrical arc.  In addition, if not properly maintained, the down-guys become loose.  In high wind conditions, when the poles sway and ground currents exist, arcing occurs.  With the combination of high winds, swaying poles, loose connections, two down-guys attached by a common bolt, and ground current, electrical arcing occurs, igniting local vegetation.

158.    It is believed that arcing from San Diego Gas & Electric wires was the cause of the 2007 San Diego "Witch Creek" Fires, in addition to the 2003 Cedar and Paradise Fires.

159.    The down-guy design utilized by **PG&E** is a violation of CPUC General Order Number 95.  Industry experts have demonstrated to the CPUC and California utilities how the dangerous design causes arcing and fires for over a decade. They believe this design is unreasonably dangerous and that the fix is cheap and easy.  CPUC General Order Number 95 sets forth two possible solutions: either have a 12-inch separation on a pole; or add an in-line insulator. An additional solution is adding a shunt from the down-guy anchor to the down-guy itself.  All three inexpensive solutions prevent electrical arcs at ground levels that ignite fires.

### 7.    PG&E's Reckless Adoption of the VMII Program Where It Paid Its Contractors to Cut Fewer Trees

160.    **PG&E's** Vegetation Management Program performs two types of tree work: annual routine compliance tree work and reliability tree work.

161.    Annual routine compliance work focuses on maintaining regulatory distances between energized conductors and vegetation.  Reliability tree work focuses on locations where there has been a history of vegetation-related outage problems based on three historical indexes: System Average Interruption Frequency Index ("SAIFI"), Customer Experiencing Multiple Interruption ("CEMI"), and System Average Interruption Duration Index ("SAIDI").

162.    In 2006, **PG&E's** Vegetation Management Program adopted the "Vegetation Management Incentive Initiative" ("VMII").  The ostensible purpose of VMII was to reduce the annual routine compliance tree work and share the resulting cost savings with the contractors whose compensation would be reduced by the loss of actual work.  The actual purpose of VMII was to shift costs from annual routine compliance work to fund additional reliability work.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

163.     For example, in 2011, **PG&E** set a goal to reduce routine "units" worked from 1.18 million trees in 2011 to 1 million in 2012 in order to increase the amount of money available for reliability work by $20 million.  In 2012, **PG&E** set a goal to goal to reduce routine "units" worked by 25 percent in 2013 in order to increase the amount of money available for reliability work by $35 million.  In 2013, **PG&E** only performed routine patrol inspections on 75 percent of its distribution circuits, using the cost savings to increase its reliability patrols.  In 2014, **PG&E** set a goal to reduce routine units worked by 7.5 percent annually through 2016.

164.     Between 2006 and 2013, **PG&E** actually reduced the number of routine trees worked from 1.7 million to 1.25 million in 2013, paid contractors $85 million, and increased reliability spending by $134 million.  During that time, customer satisfaction as measured by SAIFI increased by 40 percent.

165.     Most of **PG&E's** annual routine compliance work is performed in rural areas in California, while most of **PG&E's** "reliability" work is performed in the more densely populated urban or semi-urban areas where outages will generate more complaints per square mile than in the rural counties served by **PG&E**.  Although the actual vegetation management work performed in the annual routine compliance patrols and the reliability patrols is virtually the same, **PG&E's** only comprehensible rationale for differentiating the "two types of work" is that the "reliability" work is directed at reducing statistical measurements of customer dissatisfaction over outages and that goal can be better accomplished by concentrating on work in urban or semi-urban areas at the expense of work needed in rural areas.

166.     Under **PG&E's** bonus incentive program, reducing the number of customer complaints over outages leads to an increased likelihood of increases in executive and management bonuses.

167.     **PG&E's** reckless implementation and continued application of VMII proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

///

///

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## 8. **PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees**

168.    LiDAR (an acronym for "Light Detection and Ranging") is a surveying method that measures distances to a target by illuminating that target with a pulsed laser light and measures the reflected pulses with a sensor. These light pulses, when combined with other data recorded by the system, orthoimagery, and hyperspectral data, can generate precise three-dimensional images and information about the shape of the Earth and objects such as buildings or trees.

169.    When used in a vegetation management program for electric utilities, LiDAR scans and analyses can be used to identify trees that have the potential for contacting conductors, whether because of proximity to the conductors or because they are dead, diseased, or dying. Annual LiDAR scans and analyzes the change in the dead or diseased vegetation by comparing one year's data to the prior year's inventory of dead or diseased trees. When the analysis is conducted over a subset dataset, it can provide a statistical understanding in the percent change in vegetation identified as dead or diseased.

170.    **PG&E's** use of LiDAR is funded by its "Catastrophic Event Memorandum Account" ("CEMA"). If a catastrophic event is declared a state of emergency by the state or federal government, then utilities like **PG&E** can record costs caused by the event in this memorandum account. By recording these costs, the utilities can later ask for recovery of these costs from the CPUC.

171.    In 2014, **PG&E** began to use LiDAR to scan and analyze small sections of its electric transmission and distribution system. In 2015, **PG&E** employed a contractor who created spatially accurate alignment information for approximately 10 percent of **PG&E** distribution lines using LiDAR and imagery. The contractor identified 2.2 million "Hazard Trees" in the LiDAR data having the potential to fail-in or encroach on distribution lines, performed "dead and diseased analysis" on 1.6 million trees, and identified 23,000 trees as potentially dead or diseased.

172.    In 2015, for some unfortunate reason **PG&E** scheduled the LiDAR contractor's deliverables for October 2015 at the very tail end of California's fire season. The contractor's final product identified the 44 foot-tall gray pine that started the Butte Fire as a "Hazard Tree" that

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Case: 19-30088    Doc# 2904-3    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 10 of 35

had the potential to fall into one of **PG&E's** distribution lines, but unfortunately **PG&E** received the information over a month after the Butte Fire started.

173.    In 2016 and 2017, **PG&E** again employed LiDAR technology to scan and analyze its electric transmission and distribution system, but only employed the technology in limited sections of that system, and again scheduled the deliverables at the tail end of the California wildfire season.

174.    **PG&E's** failure to fully employ LiDAR technology in the area of the North Bay Fires and its failure to timely schedule deliverables of LiDAR analyses proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 9.    PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk

175.    Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations."  According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place.  These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets.  These types of formal programs also take failure modes into consideration.  Long-term sustainable plans can then be prepared to address the asset conditions.  A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

176.    The 2013 Liberty Report specifically recommended that "**PG&E** treat aging infrastructure as an enterprise-level risk."

177.    **PG&E's** failure to treat its aging infrastructure as an enterprise-level risk proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 10.    PG&E's "Run to Failure" Approach to Maintenance

178.    **PG&E's**: failure to address the "significant safety hazards" identified by the 2013 Liberty Report; failure to replace obsolete and undersized conductors; failure to halt its unsafe use of reclosers; adoption of the VMII program; failure to fully employ LiDAR to identify hazard

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

trees; failure to treat the conditions of its aging infrastructure as an enterprise-level risk; failure to inspect, maintain, repair, and/or replace its aging equipment; failure to conduct an inventory of its electrical assets; and failure to ensure its infrastructure could withstand foreseeable weather conditions as required by law are all indicative of what has been called **PG&E's** "run to failure" approach to its infrastructure.

179.     **PG&E** has a well-documented history of implementing this "run to failure" approach with its aging infrastructure, ignoring necessary maintenance and creating hazards to the public.  According to a filing by Office of Ratepayer Advocates with the CPUC in May 2013:

> However, as we saw in Section V.F.3 above, the Overland Audit explains how **PG&E** systematically underfunded GT&S integrity management and maintenance operations for the years 2008 through 2010.  **PG&E** engaged in a 'run to failure' strategy whereby it deferred needed maintenance projects and changed the assessment method for several pipelines from ILI to the less informative ECDA approach – all to increase its profits even further beyond its already generous authorized rate of return, which averaged 11.2% between 1996 and 2010.

> Given **PG&E's** excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique.  The IRP Report supplements the Overland Audit findings with additional examples of **PG&E** management's commitment to profits over safety.  Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of **PG&E** management's long-standing policy to squeeze every nickel it could from **PG&E** gas operations and maintenance, regardless of the long term 'run to failure' impacts.  And **PG&E** has offered no evidence to the contrary.[65]

180.     **PG&E's** "run to failure" approach to maintenance proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 11.     PG&E's Purchase of Insurance Coverage for Punitive Damages

181.     Insurance Code § 533 provides in pertinent part: "An insurer is not liable for a loss caused by the willful act of the insured."

---

[65] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/ SB_GT&S_0039691.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

182.     Civil Code § 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

183.     Despite the statutory exoneration given to insurance companies for liability for losses caused by willful acts of an insured, and despite the fact that the public policy of the State of California invalidates any insurance contract that purports to provide coverage for punitive damages, **PG&E** has purchased policies of insurance from offshore companies in Bermuda, London, and elsewhere that expressly provide coverage for punitive damages in amounts that exceed hundreds of millions of dollars.

184.     **PG&E** purchased insurance policies that cover punitive damages for the purpose of providing corporate security at the cost of public safety.  This contributed to a culture of reckless disregard for the safety of the residents of Northern and Central California and contributed to causing the North Bay Fires.

## G.     PG&E'S CORPORATE CULTURE IS THE ROOT CAUSE OF THE NORTH BAY FIRES

185.     **PG&E** has a virtual monopoly in the provision of gas and electric services to the general public in almost all counties and cities across Northern and Central California.[66]

186.     Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the fines, penalties, settlements, and convictions detailed above.  Despite these recurring punishments, **PG&E** continues to display a shocking degree of arrogant complacency, refuses to modify its behavior, and continues to conduct its business with a conscious disregard for the safety of the public, including **PLAINTIFFS**.

187.     Rather than spend the money it obtains from customers for infrastructure maintenance and safety, **PG&E** funnels this funding to boost its own corporate profits and

---

[66] A few cities like Palo Alto and Sacramento provide their own gas and electric utility services.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

compensation. This pattern and practice of favoring profits over having a solid and well-maintained infrastructure that would be safe and dependable for years to come left **PG&E** vulnerable to an increased risk of a catastrophic event such as the North Bay Fires.

188. For example, according to documents released by The Utility Reform Network ("TURN"), **PG&E** planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in **PG&E's** system. **PG&E** collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, **PG&E** spent nearly $5 million on bonuses for six of its top executives.

189. Further, Geisha Williams, **PG&E's** CEO, is slated to receive at least $12.23 million in bonuses over the next few years, depending on the future performance of the company. This is on top of her $1.085 million annual salary, which rose 3 percent from 2017 to 2018.[67]

190. Moreover, **PG&E** has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to not protect public safety. Prior to the Butte Fire, **PG&E** chose to provide a monetary incentive through the VMII program to its contractors to cut fewer trees, even though **PG&E** was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a **PG&E** contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but **PG&E** chose to keep this program despite knowing this risk.

191. Similarly, prior to the San Bruno explosion, **PG&E** had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, **PG&E's** incentive system was "training and rewarding people to do the wrong thing," emblematic

---

[67] https://www.sfchronicle.com/business/article/PG-E-CEO-could-get-more-than-12-million-in-12714473.php (last accessed March 6, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

of "a seriously broken process," and "explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy."[68]

192.    As detailed above, the North Bay Fires are just one example of the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations.  PG&E power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment.  Further, **PG&E's** aging infrastructure has caused multiple disasters throughout California.

193.    As detailed more fully above, **PG&E's** failures to reduce the risk of wildfire are serious and widespread, and contributed to causing the North Bay Fires.  The reclosers in **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions were known to be extreme.  **PG&E** failed to have a reasonable system in place to make sure that its contractors were properly performing tree and/or vegetation inspections and removal, pole clearance, and pole inspections.  **PG&E** failed to take any steps to look for what it calls Facility Protect Trees (trees which pose a risk of falling into the line), even though it knew such trees were likely to exist after its contractors had performed their work.  **PG&E** failed to properly construct its power lines and thereafter failed to take reasonable steps to make sure the poles and lines were sufficiently strong to support lines and other equipment that were added by third parties.  Finally, despite knowing that wildfires posed the greatest risk to the public from its electrical operations, **PG&E** chose to not ensure that its contractors were properly trained in tree inspections and removal, chose to not ensure that its contractors hired people who met **PG&E's** minimum qualifications, and chose to not participate in the training of its contractors.

194.    As the numbers of disasters caused by **PG&E** continue to mount, the number of "feel good" commercials it airs increases exponentially.  Those "concerned neighbor" commercials cannot hide the true nature of **PG&E's** corporate culture of greed, indifference,

---

[68] http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php (last accessed March 6, 2018).

Case: 19-30088    Doc# 2904-3    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 15 of 35

dogged refusal to take responsibility for its actions, and persistent failure to institute obvious measures to protect the public.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

195.   **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

196.   The North Bay Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them.  **DEFENDANTS**, and/or each of them, breached their respective duties owed individually and/or collectively to **PLAINTIFFS** by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care;  (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (4) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard within close proximity of the subject power line; (5) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections and/or repairs of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain electrical transmission and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons by allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and/or repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing to de-energize power lines during fire prone conditions; (11) failing to de-energize power lines after the ignition of the North Bay Fires; and/or (12) failing to properly train and to supervise employees and/or

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

agents responsible for maintenance and inspection of the distribution lines and/or vegetation areas nearby these lines.

197.    As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** were injured in their health, strength, and/or activity in an amount according to proof at trial.

198.    As a further direct and legal result of the premises, **PLAINTIFFS** were required to and/or continue to employ physicians and other healthcare providers to examine, treat, and/or care for their injuries.   **PLAINTIFFS** have incurred, and will continue to incur, medical and/or incidental expenses in an amount according to proof at trial.

199.    As a further direct and legal result of the premises, **PLAINTIFFS** have suffered and/or continue to suffer great mental pain and suffering, including worry, emotional distress, humiliation, embarrassment, anguish, anxiety, and/or nervousness.   **PLAINTIFFS** are informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries in an amount according to proof at trial.

200.    As a further direct and legal result of the premises, **PLAINTIFFS** have suffered a loss of income, loss of earning capacity, loss of profits, increased expenses due to displacement, and/or other consequential economic losses in an amount according to proof at trial.

201.    As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have suffered damage to real property, including the loss of vegetation, trees, and structures, the creation of hydrophobic soil conditions, and a loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

202.    As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have suffered damage to and/or a loss of personal property, including but not limited to items of peculiar value to **PLAINTIFFS**, in an amount according to proof at trial.

203.    As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have incurred and will continue to incur expenses and other

economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

204. **PG&E** has a virtual monopoly over the transmission and distribution of electrical power to the areas affected by the North Bay Fires and has individual contracts with all residents and businesses in those areas to whom it distributes that electrical power. The communities affected by the North Bay Fires are all dependent upon the safe transmission and distribution of that electrical power for continuous residential and commercial usage, and **PG&E** has contractual, statutory, and public duties to provide that electrical power in a manner that promotes those individual and public interests.

205. The potential harms to **PLAINTIFFS** from wildfires such as the North Bay Fires were objectively foreseeable both in nature and in scope and were subjectively known to **PG&E** from its long and tragic history of causing such wildfires.

206. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **DEFENDANTS'** conduct. A high degree of moral blame is attached to **DEFENDANTS'** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **DEFENDANTS** to all **PLAINTIFFS** and the imposition of all damages described above.

207. Based on the foregoing, **DEFENDANTS**, and/or each of them, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such the **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** additional damages pursuant to Code of Civil Procedure § 3294 for the sake of example and sufficient to punish the **DEFENDANTS**, and/or each of them, for their despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages and **DEFENDANTS'** financial condition, yet sufficiently large enough to be an example to others and to deter **DEFENDANTS** and others from engaging in similar conduct in the future.

Case: 19-30088    Doc# 2904-3    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 18 of 35

208.     As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek exemplary damages for injuries to **PLAINTIFFS'** animals as allowed under Code of Civil Procedure § 3340.

## SECOND CAUSE OF ACTION
### WRONGFUL DEATH
### (Against All Defendants)

209.     **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

210.     As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, at least 44 people died in or from the North Bay Fires ("**DECEDENTS**").

211.     As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENTS** in an amount to be determined at trial.

212.     As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

213.     As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

## THIRD CAUSE OF ACTION
### SURVIVAL ACTION
### (Against All Defendants)

214.     **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

215.     Prior to **DECEDENTS'** death, this cause of action arose in their favor.  Since **DECEDENTS'** death, **PLAINTIFFS** have served as representatives for **DECEDENTS'** estates and are authorized as successors in interest with respect to their interest in the property that was damaged, lost, and/or destroyed in the North Bay Fires, to pursue any and all legal claims for

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

damages relevant thereto, and/or to recover damages for expenses incurred related to medical and/or emergency services related to the fires.

216. As set forth above, the North Bay Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them.

217. As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, immediately prior to **DECEDENTS'** death, **DECEDENTS** suffered personal injuries, great pain and suffering, and/or damage to their real and/or personal property. Had they survived, **DECEDENTS** would have been entitled to recover all such damages allowed under Code of Civil Procedure § 377.30 under the causes of action alleged in this Master Complaint for, *inter alia*, inverse condemnation, negligence, negligent infliction of emotional distress, private nuisance, public nuisance, premises liability, trespass, and/or violations of statutes and regulations.

218. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, expenses were incurred for the identification and/or removal of **DECEDENTS'** remains and other medical and/or emergency services related to the North Bay Fires.

219. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

### FOURTH CAUSE OF ACTION
### INVERSE CONDEMNATION
### (Against All Defendants)

220. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

221. On or around October 8 or 9, 2017, **PLAINTIFFS** were owners of real property and/or personal property located within Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in the area of the North Bay Fires.

222.    Prior to and on October 8 or 9, 2017, **DEFENDANTS**, and/or each of them, installed, owned, operated, used, controlled, and/or maintained power lines and other electrical equipment for the public delivery of electricity, including power lines in and around the location of the North Bay Fires.

223.    On or around October 8 or 9, 2017, as a direct, necessary, and legal result of **DEFENDANTS'** installation, ownership, operation, use, control, management, and/or maintenance for a public use the power lines and/or other electrical equipment, the power lines and/or other electrical equipment came in contact with vegetation and/or broke, failed, fell down, sparked, and/or exploded, causing wildfires that burned thousands of acres, including property owned or occupied by **PLAINTIFFS**.  The fires damaged and/or destroyed **PLAINTIFFS'** real and/or personal property.

224.    The above described damage to **PLAINTIFFS'** property was legally and substantially caused by the actions of **DEFENDANTS**, and/or each of them, in their installation, ownership, operation, use, control, management, and/or maintenance of the power lines and other electrical equipment for a public use.  **PG&E** is a privately owned public utility which enjoys a state-protected monopoly or quasi-monopoly derived from its exclusive franchise provided by the State of California, is more akin to a governmental entity than a purely private entity, and runs its utility affairs like a governmental entity.  **PG&E's** monopoly is guaranteed and safeguarded by the CPUC, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter the market.  The policy justifications underlying inverse condemnation liability are that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole.  Under the rules and regulations set forth by the CPUC, amounts that **DEFENDANTS** must pay in inverse condemnation can be included in their rates and spread among the entire group of rate payers so long as they are otherwise acting as a reasonable and prudent manager of their electric distribution systems.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

225. **PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of **PLAINTIFFS'** property by **DEFENDANTS**, and/or each of them, without just compensation.

226. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** suffered damages to their real and/or personal property, including loss of use, interference with access, and/or diminution in value and/or marketability in an amount according to proof at trial.

227. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable attorney, appraisal, engineering, and/or other expert fees due to the conduct of the **DEFENDANTS** in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil Procedure § 1036.

## FIFTH CAUSE OF ACTION
### PUBLIC NUISANCE
### (Against All Defendants)

228. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

229. **PLAINTIFFS** own and/or occupy property at or near the site of the fire which is the subject of this action. At all relevant times herein, **PLAINTIFFS** had a right to occupy, enjoy, and/or use their property without interference by **DEFENDANTS**, and/or each of them.

230. **DEFENDANTS**, and/or each of them, owed a duty to the public, including **PLAINTIFFS** herein, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their power lines in and around Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in a manner that did not threaten harm or injury to the public welfare from operation of those power lines.

231. **DEFENDANTS**, and/or each of them, by acting and/or failing to act, as alleged hereinabove, created a condition which was harmful to the health of the public, including these

**PLAINTIFFS**, and which interfered with the comfortable occupancy, use, and/or enjoyment of **PLAINTIFFS'** property.

232. **PLAINTIFFS** did not consent, expressly or impliedly, to the wrongful conduct of **DEFENDANTS**, and/or each of them, in acting in the manner set forth above.

233. The hazardous conditions that were created by and/or permitted to exist by **DEFENDANTS**, and/or each of them, affected a substantial number of people within the general public, including **PLAINTIFFS** herein, and constituted a public nuisance under Civil Code §§ 3479 and 3480 and Public Resources Code § 4171. Further, the ensuing uncontrolled wildfire constituted a public nuisance under Public Resources Code § 4170.

234. The damaging effects of **DEFENDANTS'** maintenance of a fire hazard and the ensuing uncontrolled wildfire are ongoing and affect the public at large. As a result of the fire's location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the fire's perimeter. This further caused significant post fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment laden flow hazards, and hillside erosion. As a result, large quantities of ash and sediment will be deposited in perennial and ephemeral watercourses.

235. As a direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered harm that is different from the type of harm suffered by the general public. Specifically, **PLAINTIFFS** have lost the occupancy, possession, use, and/or enjoyment of their land, real and/or personal property, including, but not limited to: (a) a reasonable and rational fear that the area is still dangerous; (b) a diminution in the fair market value of their property; (c) an impairment of the salability of their property; (d) soils that have become hydrophobic; (e) exposure to an array of toxic substances on their land; (f) the presence of "special waste" on their property that requires special management and disposal; and (g) a lingering smell of smoke, and/or constant soot, ash, and/or dust in the air.

236. As a further direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with **PLAINTIFFS'** occupancy, possession, use and/or enjoyment of their property, as alleged above.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

237. A reasonable, ordinary person would be reasonably annoyed or disturbed by the condition created by **DEFENDANTS**, and/or each of them, and the resulting fire.

238. The conduct of **DEFENDANTS**, and/or each of them, is unreasonable and the seriousness of the harm to the public, including **PLAINTIFFS** herein, outweighs the social utility of **DEFENDANTS'** conduct.

239. The individual and/or collective conduct of **DEFENDANTS** set forth above, and/or each of them, resulting in the North Bay Fires is not an isolated incident, but is ongoing and/or a repeated course of conduct, and **DEFENDANTS'** prior conduct and/or failures have resulted in other fires and damage to the public.

240. The unreasonable conduct of **DEFENDANTS**, and/or each of them, is a direct and legal cause of the harm, injury, and/or damage to the public, including **PLAINTIFFS** herein.

241. **DEFENDANTS**, and/or each of them, have individually and/or collectively, failed and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in order to ensure the sole delivery of electricity to residents through the operation of power lines in the affected area, and **DEFENDANTS'** individual and/or collective failure to do so exposed every member of the public, residing in Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties, to a foreseeable danger of personal injury, death, and/or a loss of or destruction of real and personal property.

242. The conduct of **DEFENDANTS**, and/or each of them, set forth above constitutes a public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code §§ 4104 and 4170, and Code of Civil Procedure § 731. Under Civil Code § 3493, **PLAINTIFFS** have standing to maintain an action for public nuisance because the nuisance is especially injurious to **PLAINTIFFS** because, as more specifically described above, it is injurious and/or offensive to the senses of the **PLAINTIFFS**, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of **PLAINTIFFS'** properties, and have suffered harm, injury, and/or damages.

243. For these reasons, **PLAINTIFFS** seek a permanent injunction ordering that **DEFENDANTS**, and each of them, stop continued violation of: (a) General Order No. 95, Rules

31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451. **PLAINTIFFS** also seek an order directing **DEFENDANTS** to abate the existing and continuing nuisance described above.

## SIXTH CAUSE OF ACTION
### PRIVATE NUISANCE
### (Against All Defendants)

244. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

245. **DEFENDANTS**, and/or each of them, by their acts and/or omissions set forth above, directly and legally caused an obstruction to the free use of **PLAINTIFFS'** property, an invasion the **PLAINTIFFS'** right to use their property, and/or an interference with the enjoyment of **PLAINTIFFS'** property, resulting in **PLAINTIFFS** suffering unreasonable harm and substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

246. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and/or damages as set forth above.

247. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## SEVENTH CAUSE OF ACTION
### PREMISES LIABILITY
### (Against All Defendants)

248. **PLAINTIFFS** incorporate and re-allege by this reference, each of the paragraphs set forth as though fully set forth herein.

249. **DEFENDANTS**, and/or each of them, were the owners of an easement and/or real property in the area of the origins of the North Bay Fires, and/or were the owners of the power lines upon said easement(s) and/or right(s) of way.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

250. **DEFENDANTS**, and/or each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near its power lines along the real property and easement(s), allowing an unsafe condition presenting a foreseeable risk of fire danger to exist on said property.

251. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and/or damages as set forth above.

252. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## EIGHTH CAUSE OF ACTION
### TRESPASS
**(Against All Defendants)**

253. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

254. At all times relevant herein, **PLAINTIFFS** were the owners, tenants, and/or lawful occupants of property damaged by the North Bay Fires.

255. **DEFENDANTS**, and/or each of them, in wrongfully acting and/or failing to act in the manner set forth above, caused the North Bay Fires to ignite and/or spread out of control, causing harm, damage, and/or injury to **PLAINTIFFS** herein, resulting in a trespass upon **PLAINTIFFS** property interests.

256. **PLAINTIFFS** did not grant permission for **DEFENDANTS** to wrongfully act in a manner so as to cause the North Bay Fires, and thereby produce fires which spread and wrongfully entered upon their property, resulting in the harm, injury, and/or damage alleged above.

257. As a direct and legal result of the wrongful conduct of **DEFENDANTS**, and/or each of them, which led to the trespass, **PLAINTIFFS** have suffered and will continue to suffer damages as set forth above, in an amount according to proof at trial.

258. As a further direct and legal result of the wrongful conduct of **DEFENDANTS**, **PLAINTIFFS**, whose land was under cultivation, and was used for raising livestock or was intended to be used for raising livestock, have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under Code of Civil Procedure § 1021.9.

259. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek treble damages for injuries to trees or timber on **PLAINTIFFS'** property as allowed under Code of Civil Procedure § 733.

260. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek exemplary damages for injuries to **PLAINTIFFS'** animals as allowed under Code of Civil Procedure § 3340.

261. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek double or treble damages for the negligent, willful, and wrongful injuries to timber, trees, or underwood on their property, as allowed under Civil Code § 3346.

262. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

### NINTH CAUSE OF ACTION
### PRIVATE ACTION UNDER PUBLIC UTILITIES CODE § 2106
### (Against All Defendants)

263. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

264. Public Utilities Code § 2106 creates a private right of action against "[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission . . . ."

265. As a Public Utility, **DEFENDANTS** at all times herein had a duty to properly design, construct, operate, maintain, inspect, and manage its electrical infrastructure as well as trim

Case: 19-30088    Doc# 2904-3    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 27 of 35

trees and vegetation in compliance with all relevant provisions of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

266. The violation of a legislative enactment or administrative regulation which defines a minimum standard of conduct is unreasonable per se.

267. **DEFENDANTS** violated the above listed requirements, by:

    a. Failing to service, inspect or maintain electrical infrastructure, structures and vegetation affixed to and in close proximity to high voltage electrical lines;

    b. Failing to provide electrical supply systems of suitable design;

    c. Failing to construct and to maintain such systems for their intended use of safe transmission of electricity considering the known condition of the combination of the dry season and vegetation of the area, resulting in **PLAINTIFFS** being susceptible to the ignition and spread of fire and the fire hazard and danger of electricity and electrical transmission and distribution;

    d. Failing to properly design, construct, operate, maintain, inspect and manage its electrical supply systems and the surrounding arid vegetation resulting in said vegetation igniting and accelerating the spread of the fire;

    e. Failing to properly safeguard against the ignition of fire during the course and scope of employee work on behalf of **DEFENDANTS**; and

    f. Failing to comply with the enumerated legislative enactments and administrative regulations.

268. **DEFENDANTS** proximately and substantially caused the destruction, damage, and injury to **PLAINTIFFS** by their violations of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 4511.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

269.  **PLAINTIFFS** were and are within the class of persons for whose protection applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

270.  As alleged herein according to proof, **DEFENDANTS** are liable to **PLAINTIFFS** for all loss, damages and injury caused by and resulting from **DEFENDANTS'** violation of applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

271.  As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

### TENTH CAUSE OF ACTION
### VIOLATION OF HEALTH & SAFETY CODE § 13007
### (Against All Defendants)

272.  **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

273.  By engaging in the acts and/or omissions alleged in this Master Complaint, **DEFENDANTS**, and/or each of them, willfully, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of Health & Safety Code § 13007.

274.  As a direct and legal result of **DEFENDANTS'** violation of Health & Safety Code § 13007, **PLAINTIFFS** suffered recoverable damages to property under Health & Safety Code § 13007.21 and continue to suffer the injuries and damages described above.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

275. As a further direct and legal result of the **DEFENDANTS**, and/or each of them, violating Health & Safety Code § 13007, **PLAINTIFFS** are entitled to reasonable attorney's fees under Code of Civil Procedure § 1021.9.

276. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and/or damages as set forth above.

277. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## ELEVENTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**(Against All Defendants)**

278. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

279. As set forth above, the North Bay Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them.

280. As a result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered serious emotional distress. As set forth above, **PLAINTIFFS** were physically injured by the North Bay Fires. Further, as set forth above, **PLAINTIFFS** suffered from damage to and/or loss of real and/or personal property and were in the zone of danger while evacuating from the North Bay Fires. **DEFENDANTS** knew or should have known that **PLAINTIFFS** would suffer serious emotional distress during and as a result of their wrongful acts and/or omissions and the ensuing North Bay Fires due to their injuries, death, property damages, and/or other damages. **DEFENDANTS'** wrongful acts and/or omissions were a substantial factor in causing **PLAINTIFFS'** serious emotional distress.

281. Additionally and/or alternatively, the wrongful acts and/or omission of **DEFENDANTS**, and/or each of them, resulted in the deaths of **DECEDENTS** and/or injuries to

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFFS' loved ones as PLAINTIFFS watched the horrific North Bay Fires destroy, damage, and/or injure their communities and loved ones in person, on television, on the internet, and/or through text messages and/or other communications from their loved ones. PLAINTIFFS knew that that their loved ones were trapped in and around their burning homes, structures, and/or vehicles, and/or trying to evacuate from the North Bay Fires. PLAINTIFFS were thus aware that their loved ones were being injured. The DEFENDANTS' wrongful acts and/or omissions were a substantial factor in causing PLAINTIFFS' serious emotional distress.

282. As a direct and legal result of the wrongful acts and/or omissions of DEFENDANTS, and/or each of them, PLAINTIFFS have suffered and will continue to suffer great mental pain and suffering, including emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, shame, and/or other emotional distress. PLAINTIFFS are informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries in an amount according to proof at trial.

283. As a further direct and legal result of the wrongful acts and/or omissions of DEFENDANTS, and/or each of them, PLAINTIFFS seek the recovery of punitive and exemplary damages against DEFENDANTS as set forth above.

WHEREFORE, PLAINTIFFS pray for relief as set forth below.

VI. **PRAYER FOR RELIEF**

WHEREFORE, **PLAINTIFFS** pray for judgment against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20**, and each of them as follows:

**From All DEFENDANTS for Inverse Condemnation:**

1.    Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.    Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

4. All costs of suit, including attorneys' fees where appropriate, appraisal fees, engineering fees, and related costs;

5. Prejudgment interest according to proof; and

6. For such other and further relief as the Court shall deem proper, all according to proof.

**From All DEFENDANTS for Negligence, Wrongful Death, Survival Action, Public Nuisance, Private Nuisance, Premises Liability, Trespass, Private Action Under Public Utilities Code § 2106, Violation of Health & Safety Code § 13007, and Negligent Infliction of Emotional Distress:**

1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2. Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

4. Past and future medical expenses and incidental expenses according to proof;

5. Treble damages for wrongful injuries to timber, trees, or underwood on their property as allowed under Civil Code § 3346;

6. Treble damages in an amount according to proof for injuries to trees as allowed under Code of Civil Procedure § 733;

7. Exemplary damages in an amount according to proof as allowed under Civil Code § 3294;

8. Exemplary damages in an amount according to proof for wrongful injuries to animals as allowed under Civil Code § 3340;

9. Exemplary damages in an amount according to proof as allowed under Public Utilities Code § 2106;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

10. General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, personal injury, and for such other and further relief as the Court shall deem proper, all according to proof;

11. Imposition of a permanent injunction ordering that **DEFENDANTS**, and each of them, stop continued violation of: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451.

12. Issuance of an order directing **DEFENDANTS** to abate the existing and continuing nuisance they created;

13. Attorney's fees, expert fees, consultant fees, and litigation costs and expense as allowed under Code of Civil Procedure § 1021.9;

14. For all costs of suit incurred;

15. Prejudgment interest according to proof; and

16. For such other and further relief as the Court shall deem proper, all according to proof.

**COTCHETT, PITRE & McCARTHY, LLP**


Dated: March 12, 2018        By: ___/s/ Frank M. Pitre_____
                             **FRANK M. PITRE**
                             *Co-Lead Counsel for Individual Plaintiffs*


**WALKUP MELODIA KELLY & SCHOENBERGER**


Dated: March 12, 2018        By: _____
                             **MICHAEL A. KELLY**
                             *Co-Lead Counsel for Individual Plaintiffs*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

ROBINS CLOUD LLP

Dated: March 12, 2018    By:    /s/ Bill Robins, III
                                **BILL ROBINS, III**
                                *Co-Lead Counsel for Individual Plaintiffs*

**VII.    JURY DEMAND**

**PLAINTIFFS** demand a trial by jury as to all claims in this action.

                         **COTCHETT, PITRE & McCARTHY, LLP**

Dated: March 12, 2018    By:    /s/ Frank M. Pitre
                                **FRANK M. PITRE**
                                *Co-Lead Counsel for Individual Plaintiffs*

                         **WALKUP MELODIA KELLY &
                         SCHOENBERGER**

Dated: March 12, 2018    By:
                                **MICHAEL A. KELLY**
                                *Co-Lead Counsel for Individual Plaintiffs*

                         **ROBINS CLOUD LLP**

Dated: March 12, 2018    By:    /s/ Bill Robins, III
                                **BILL ROBINS, III**
                                *Co-Lead Counsel for Individual Plaintiffs*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Case: 19-30088    Doc# 2904-3    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 34
of 35

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

## PROOF OF SERVICE
**California North Bay Fire Cases**
**JCCP No. 4955**

  At the time of service, I was over 18 years of age and not a party to this action. I am employed in the county where the mailing took place. My business address is 650 California Street, 26th Floor, City and County of San Francisco, CA 94108-2615.

  **BY ELECTRONIC SERVICE:** I caused to be served the within document(s) described as: **MASTER COMPLAINT – INDIVIDUAL PLAINTIFFS** on the interested parties in this action pursuant to the most recent Omnibus Service List by submitting an electronic version of the document(s) via file transfer protocol (FTP) to CaseHomePage through the upload feature at www.casehomepage.com.

  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  Executed on March 12, 2018, at San Francisco, California.

_____
Lily Connors