22. Immediately following the start of the Tubbs Fire, **PG&E's** website reported two outages, right next to each other, that were at or very near the origin of the Tubbs Fire.[13]

23. The causes of the **PG&E** outages read: "found damaged equipment on a power pole," and "fire in the area." The start time of both outages was exactly 8:51 p.m. on October 8, 2017 – immediately preceding the reported start time of the Tubbs Fire.

Electric Outage Details

| | |
|---|---|
| START TIME: | OCT 8, 8:51 PM |
| ESTIMATED RESTORATION: | OCT 20, 11:00 PM |
| CUSTOMERS AFFECTED: | 1 |
| CAUSE: | Found damaged equipment on a power pole. |
| STATUS: | PG&E repair crew is on-site working to restore power. |
| LAST UPDATED: | OCT 19, 10:37 AM |

Receive Updates

[13] *Id.*

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 1 of 40

Electric Outage Details

| | |
|---|---|
| START TIME: | OCT 8, 8:51 PM |
| ESTIMATED RESTORATION: | OCT 20, 11:00 PM |
| CUSTOMERS AFFECTED: | 2 |
| CAUSE: | Fire in the area |
| STATUS: | PG&E repair crew is on-site working to restore power. |
| LAST UPDATED: | OCT 19, 10:32 AM |

Receive Updates

24. After containment of the Tubbs Fire, there was caution tape around the **PG&E** power pole located at Highway 128 and Bennett Lane, where the outage reports originated. There are several trees that are dangerously close to the subject power pole and the electric wires coming off the pole. There was also electric equipment on the ground that appears to have come off the pole.



C. **PG&E WAS AWARE OF FORESEEABLE WEATHER CONDITIONS AND EFFECTS OF THOSE CONDITIONS ON AGING INFRASTRUCTURE**

25. Northern California did not experience uncommon weather patterns the night the North Bay Fires began. A review of readings at weather stations in the areas impacted by the fires shows that winds were at standard levels when **PG&E's** electrical equipment began to fail. For example, a weather station in Santa Rosa in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:29 p.m. on October 8, 2017. About an hour later, the same station recorded wind gusts of 41 miles per hour. These wind speeds were surpassed in other recent storms in the area on a number of occasions.

26. According to **PG&E's** 2014 Annual Electric Distribution Reliability Report, sent to the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten **PG&E** electrical outages each year since at least 2004, putting the utility on notice that these weather conditions occur and that they can cause electrical problems. For example, four of the "ten largest 2004 outage events" for **PG&E** occurred in the Santa Rosa and Sonoma areas, and winds were documented at much higher levels than those of October 8, 2017:

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 3 of 40

> No. 3: "A strong weather front with gusty winds and heavy rain crossed the service area. Peak wind gusts in the norther and central portions of the service areas generally ranged in the 35 to 65 mph range (58 mph at Arcata, **53 mph at Santa Rosa**. . .)"
>
> No. 4: "A strong weather front with gusty winds and heavy rain affected the northern half of the service area. Winds gusted from 35 to 65 mph in the Bay Area, Redwood and Northern Interior zones on February 17th (…**45 mph at Santa Rosa**)"
>
> No. 6: "A strong weather front with gusty winds and heavy rain affected the norther half of the service area…Winds gusted from 35 to 60 mph … (…**60 mph at Santa Rosa**)"
>
> No. 7: "Gusty north winds developed over norther and central portions of the service area as a strong high pressure system developed. Peak wind speeds included 58 mph at Hopland, **51 mph in Santa Rosa, 47 mph at Sonoma**. Peak gusts in the East Bay hills ranged from 50-60 mph."[14]

27. In October of 2004, **PG&E's** largest outage of the year affected 522,213 customers, and involved "[T]wo storms (Oct 17 and 19) moved through the service area. Wind gusts were generally between 24-50 mph (51 mph at Redding, 40 mph at Red Bluff, 37 mph at Napa) on Oct 17, and 35-60 mph on Oct 19 (51 mph Redding, 47 mph at Red Bluff, 51 mph at Marysville, 49 mph at San Francisco Airport, 55 mph at Bellota, 57 mph at San Luis Obispo)."[15]

28. Later, in October of 2009, **PG&E's** largest outage of the year was "A strong early season storm affected the entire service area with many stations reporting wind gusts over 50 mph (57 mph at Ft. Funston (SF), 56 mph at Fairfield, 55 mph at Oroville, 51 mph at Monterey). Single day rainfall totals ranged between two and five inches at many locations (4.54 in. at Watsonville, 4.27 in. at Fairfield, and 3.66 in. at Napa). National Weather Service records indicate this storm was the strongest October rain and wind event since 1962."[16] Therefore, **PG&E** had notice of the type of winds that occurred on October 8, 2017, the night the North Bay Fires began.

29. Further, according to records maintained by CalFire, approximately 135 fires in

---

[14] https://www.pge.com/includes/docs/pdfs/myhome/outages/outage/reliability/AnnualElectricDistributionReliabilityReport.pdf.

[15] *Id.*

[16] *Id.*

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 4 of 40

Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015.[17] In 2015, the last year of reported data, electrical power problems sparked the burning of 149,241 acres across California – more than twice the amount from any other cause.[18]

30. In May 2016, the CPUC adopted Fire Map 1, which is a map that "depicts areas of California where there is an elevated hazard for the ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and other environmental conditions."[19] It was "developed by a team of independent experts selected and led by the California Department of Forestry and Fire Protection."[20]

31. The CPUC adopted Fire Map 1 "in response to past devastating wildfires that were reportedly ignited by power lines."[21] According to CPUC commissioner Mike Florio, "Fire Map 1 represents an important milestone in identifying areas that face a very high risk of a devastating wildfire."[22] **PG&E** was put on direct notice of this pap.

32. On Fire Map 1, the area in and around the origin of the Tubbs Fire is both red and orange, indicating the highest level of elevated hazard for the "ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and/or other environmental conditions."

---

[17] http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks.
[18] http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html.
[19] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M162/K498/162498284.PDF.
[20] *Id.*
[21] *Id.*
[22] *Id.*

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 5 of 40

## D. PG&E KNEW ITS INFRASTRUCTURE WAS AGING AND LESS RELIABLE TO PREVENT FIRES

33. On May 6, 2013, a report was sent to the Safety and Enforcement Division of the CPUC from the **Liberty Consulting Group** who had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by **PG&E** (hereinafter the "2013 Liberty Report").[23] The **2013 Liberty Report** concluded that: "several aspects of the PG&E distribution system present significant safety issues." It also found: (a) "addressing risks associated with electrical distribution components has been overshadowed by electric transmission and gas facilities;" (b) "addressing aging infrastructure and adding SCADA to the system comprise the major focuses of safety initiatives for the distribution system;" and (c) "current employee/contractor serious injury and fatality levels require significantly greater mitigation."

### i. PG&E's Wires Were Found Highly Susceptible to Failure Due to Age

34. One of the first key findings of the 2013 Liberty Report was that **PG&E** had a "large amount of small size obsolete conductor remaining on PG&E's system." **PG&E** has 113,000 miles of conductors (a.k.a. wires), and according to the report, over 60 percent of those conductors are highly susceptible to failure. The conductors are very small, and generally more susceptible to breaking than standard size conductors. As the conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones. For these reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

### ii. Many of PG&E's Wires Do Not Remotely De-Energize When Down and In a Hazardous State

35. A second key finding of the 2013 Liberty Report was that upon review of **PG&E's** documents, on a daily basis and in 36 percent of cases, **PG&E** cannot remotely de-energize a downed line and must send someone on-scene to manually turn off the feed. During

[23] http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M065/K394/65394210.PDF.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 6 of 40

that time, the downed line is a hazard, and according to the 2013 Liberty Report, this hazard has "contributed to a number of fatalities and injuries."

iii. The CPUC Announced that Aging Power Poles Are Causing Significant Safety Hazards That Must Be Addressed

36. According to the 2017 CPUC Order Instituting Investigation Into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit:

> Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State. For example, inadequate clearance between communication and power lines, perhaps in conjunction with a broken cable lashing wire, caused the Southern California Guejito Fire of 2007 which (together with the Witch Fire) burned 197,990 acres and caused two deaths. Three more deaths occurred in 2011 when an electrical conductor separated from a pole in high winds, causing a live wire to fall to the ground. At least five more people lost their lives in pole-related failures in 2012 and 2015.
>
> Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.
>
> Communication and other wires are not infrequently found hanging onto roads or yards. Poles with excessive and/or unauthorized attachments can put utility workers at risk. Facilities deployed in the field may differ from what appears on paper or in a utility's database.[24]

37. In the June 29, 2017 CPUC press release for the Order, the CPUC President Michael Picker stated, "Plain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "[n]ot knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments

[24] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M190/K872/190872933.PDF.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 7 of 40

on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[25]

**iv.** PG&E Was Not Tracking the Condition of Its Electrical Assets, Despite Its Aging Infrastructure

38. Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations." According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place. These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets. These types of formal programs also take failure modes into consideration. Long term sustainable plans can then be prepared to address the asset conditions. A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

39. The 2013 Liberty Report was so concerned about the state of **PG&E's** aging infrastructure that it advised: "[w]e also recommend that PG&E treat aging infrastructure as an enterprise-level risk."

## E. PG&E KNEW ITS ELECTRICAL EQUIPMENT WAS UNSAFE

40. **PG&E** has a long-standing practice of using reclosers throughout its system to automatically restart power after interruptions, even though it knows these devices may cause wildfires. Reclosers send pulses of electricity through power lines whenever an interruption occurs on lines equipped with the devices. According to experts, if power lines are in contact with trees or vegetation, these pulses of electricity can start fires. For this reason, other utilities have changed their operations to protect the public.

41. The dangers posed by reclosers are so significant that the other two major utilities in California, **San Diego Gas & Electric Company and Southern California Edison**, have reprogramed their electrical systems during fire seasons to ensure that reclosers **do not** automatically restart electrical currents after a service interruption. In contrast, **PG&E** began an

[25] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.PDF.

LAW OFFICES COTCHETT, PITRE & MCCARTHY, LLP
Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 8 of 40

experimental pilot program in 2017 in limited parts of California to reprogram its reclosures. Since **PG&E** did not reprogram all of its reclosures to keep electricity turned off after a disruption during fire season, the night the North Bay Fires began, some of **PG&E's** devices were programmed to try up to three times to restore power by sparking electricity.

42. **PG&E** knew that its reclosures posed a great risk of wildfire. At a Congressional hearing in 2015, **PG&E's** Senior Vice President of Electrical Operations, Patrick Hogan, stated that **PG&E** had the ability to reprogram its reclosures during fire season to not restart power. Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain the wildfire benefit."[26] **PLAINTIFFS** believe that despite this knowledge and ability, **PG&E** never reprogramed all of its reclosures to prevent wildfires.

43. In addition, since prior to 1996, **PG&E** has known or should have known that its choice of chemical treatments for its poles can also make its equipment unsafe. For example, **PG&E** uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon® process. Those poles tend to experience surface decay below ground regardless of the type of wood used for the poles. As a result, digging inspections are required for poles treated by these processes for all wood types. However, **PLAINTIFFS** believe that **PG&E** has failed to conduct the proper inspections and further, when **PG&E** has been advised of necessary repairs to such poles, **PG&E** failed to repair the poles in a timely manner. These failures are a breach of **PG&E** obligations to the public and have been a cause of fires.

## F. DESPITE THIS KNOWLEDGE, PG&E DID NOT MAINTAIN, REPAIR, OR REPLACE ITS EQUIPMENT

44. On top of having wide-scale aging infrastructure and no formal, organized system to track the condition of the infrastructure, **PG&E** failed to perform the necessary maintenance and inspections of its electrical equipment. A 2015 audit of **PG&E's** Sonoma Division revealed

---

[26] http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-12324764.php.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 9 of 40

that there were over 3,500 unfilled PG&E repair and maintenance requests in the area of the Tubbs Fire.[27] This number is staggering in terms of safety to the people caught up in the fire zones.

45. In a December 31, 2015 letter to **PG&E** regarding the audit, Fayi Daye, a supervising electric safety regulator with the CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of **PG&E** electrical distribution equipment. Fayi Daye's letter stated the following:

> **PG&E's records indicated that from August 2010 to September 21, 2015, a total of <u>3,527 work orders were completed past their scheduled date</u> of corrective action per PG&E's Electric Notification Prioritization Standards. Late work orders included overhead and underground facilities.**[28]

The letter concluded that these delays violated CPUC General Order No. 128, Rule 17.1, which sets forth the CPUC's design, construction, and maintenance rules for electrical systems.

46. The audit also reviewed **PG&E's** maps for its electrical distribution lines and found that over 50 pieces of overhead equipment – including pole mounted transformers and power lines – has not been inspected every year as required by law. This was a violation of CPUC General Order No. 165, Section III-B, which sets forth standards for inspections.[29]

47. According to State Senator Jerry Hill, these findings are especially troubling because "they are getting the money for these, they are getting the funds to do the work in a timely manner."[30] Yet, **PG&E** takes the money but fails to correct the problems.

## G. <u>PG&E'S "RUN TO FAILURE" APPROACH TO MAINTENANCE</u>

48. **PG&E** has a well-documented history of implementing a "run to failure" approach with its aging infrastructure, whereby it ignores necessary maintenance in order to line its own pockets with excessive profits. According to a filing by the CPUC in May 2013:

---

[27] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Reliability/Reports_and_Audits/Electric_Facilities/EA2015-018.pdf.

[28] *Id.*

[29] *Id.*

[30] https://www.nbcbayarea.com/news/local/State-Audit-Shows-PGE-Had-Repair-Job-Backlog-in-Sonoma-Santa-Rosa-451996923.html.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 10 of 40

> However, as we saw in Section V.F.3 above, the Overland Audit explains how PG&E systematically underfunded GT&S integrity management and maintenance operations for the years 2008 through 2010. **PG&E engaged in a "run to failure" strategy whereby it deferred needed maintenance projects** and changed the assessment method for several pipelines from ILI to the less informative ECDA approach - **all to increase its profits even further beyond its already generous authorized rate of return**, which averaged 11.2% between 1996 and 2010.
>
> Given PG&E's excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique. The IRP Report supplements the Overland Audit findings with additional examples of PG&E management's commitment to profits over safety. **Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of PG&E management's long standing policy to squeeze every nickel it could from PG&E gas operations and maintenance, regardless of the long term "run to failure" impacts. And PG&E has offered no evidence to the contrary**.[31]

## H. PG&E'S LONG HISTORY OF SAFETY VIOLATIONS

49. Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the following fines, penalties, and/or convictions. Despite these recurring punishments, **PG&E** refuses to modify its behavior, and has continued to conduct its business with a conscious disregard for the safety of the public, including **PLAINTIFFS**.

50. As detailed below, the North Bay Fires are just one example of the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations. **PG&E** power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment. Further, **PG&E's** aging infrastructure has caused multiple disasters throughout California.

---

[31] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/SB_GT&S_0039691.pdf.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 11 of 40

i. The 1994 Trauner Fire

51. In 1994, **PG&E's** failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California. This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a schoolhouse that was built in 1868.

52. Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that **PG&E** was supposed to keep trimmed. Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire. Approximately 200 of these violations involved contact between vegetation and one of **PG&E's** power lines. As a result, on or around June 19, 1997, **PG&E** was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

53. Subsequent to the trial, a 1998 CPUC report revealed that **PG&E** diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994. During that same time, **PG&E** under spent its authorized budgets for maintaining its systems by $495 million and instead, used this money to boost corporate profits. Despite this public outing, **PG&E** continued its corporate culture of putting profits before safety.

ii. The 2003 Mission District Substation Fire

54. In December 2003, a fire broke out at **PG&E's** Mission District Substation in San Francisco. Despite signs of trouble appearing at control centers, the fire burned for nearly two hours before **PG&E** operators showed up at the Substation, finding it full of smoke, and finally called the Fire Department. The source of the fire was not located until five hours after it began. As a result, nearly one-third of San Francisco's residents and business owners lost power, with some waiting over 24 hours for their power to be restored.

55. The CPUC report of the investigation, which was released in 2004, illustrated **PG&E's** careless approach to safety and apparent inability to learn from its past mistakes. An excerpt from the report describes the following:

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 12 of 40

> Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's Consumer Protection and Safety Division] discovered that another fire had occurred at Mission Substation in 1996. CPSD's investigation team conducted a thorough analysis of both fires and found strikingly similar contributing factors and root causes. CPSD's team further determined that PG&E had not implemented the recommendations resulting from its own investigation of the 1996 fire. . . .**CPSD finds it quite troubling that PG&E did not implement its own recommendations from its own investigation of the 1996 fire**.[32]

The findings related to the Mission Substation Fire should have been a wake-up call to **PG&E** to revamp its operating procedures to prevent future disasters. Instead, **PG&E's** focus remained on corporate profits, while safety was relegated to the backburner.

iii. The 2008 Rancho Cordova Explosion

56. In December 2008, a gas leak from a **PG&E** pipe caused an explosion in Rancho Cordova, California. This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

57. A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by **PG&E's** incorrect repairs in 2006, at which time **PG&E** installed a piece of pipe to patch up an earlier leak. The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that **PG&E** failed to timely send properly trained personnel to check out the leak, even though **PG&E** had been told several months earlier that its emergency plans fell below required standards. Specifically, the report noted the following:

> Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public. [33]

58. In November 2010, the CPUC filed administrative charges against **PG&E** in connection with the Rancho Cordova explosion, alleging that **PG&E** was at fault for the blast and

---

[32] http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF.

[33] http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 13 of 40

that **PG&E** should have discovered the improper repair job that caused the explosion, but failed to timely do so. As a result, the CPUC required **PG&E** to pay a $38 million fine.

iv. The 2010 San Bruno Explosion

59. On September 9, 2010, **PG&E's** continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on **PG&E's** poor management of its pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) **PG&E's** inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) **PG&E's** inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

60. As a result, **PG&E** was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC slapped **PG&E** with a $1.6 billion fine for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted **PG&E** of six felony charges and ordered it to pay $3 million in fines for causing the explosion.

61. Also, due to **PG&E's** corporate culture which repeatedly placed profits over safety, the **CPUC** launched an investigation into the manner by which **PG&E** officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President harped on **PG&E's** ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into PG&E's actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, continued safety lapses at PG&E continue to occur. [34]

---

[34] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnforcementTheory.pdf.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 14 of 40

v. The 2011 Cupertino Explosion

62. After the San Bruno explosion, in September 2011, **PG&E** caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

63. Prior to the explosion, the manufacture of Aldyl-A and the NTSB had both issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least 2002. Despite these warnings and **PG&E's** knowledge of this risk, **PG&E** did nothing to prevent the explosion. Although some utilities around the United States have been replacing Aldyl-A pipes, **PG&E** did not have a replacement program to phase them out and adequately protect the public.

vi. The 2014 Carmel Explosion

64. In March 2014, a home in Carmel, California was destroyed due to a gas explosion caused by **PG&E**. Prior to the explosion, **PG&E** was attempting to replace a gas distribution line, but **PG&E's** records did not show that the steel pipe had a plastic insert. When crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced, allowing gas to leak through the pipe and into the residence.

65. The CPUC once again required **PG&E** to pay a massive fine because of their wrongdoing. In August 2016, the CPUC imposed a $25.6 million fine on **PG&E**. With a $10.85 million citation previously paid by **PG&E** in 2015 for the explosion, **PG&E** was require to pay a total of over $36 million in penalties for its shoddy recordkeeping and disregard of public safety.

vii. The 2015 Butte Fire

66. Tragedy struck yet again in September 2015, when **PG&E's** inadequate and ineffective vegetation management programs resulted in the "Butte Fire" in the Sierra foothills. The Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed 921 homes and/or structures, and charred over 70,000 acres.

67. Similar to the other disasters caused by **PG&E's** wrongdoing, the Butte Fire could have been prevented by **PG&E**. The Butte Fire was ignited by a gray pine tree that grew and came into contact with one of **PG&E's** power lines. **PG&E** knew that gray pines posed the highest risk

Case: 19-30088    Doc# 2904-5    Filed: 07/09/19    Entered: 07/09/19 12:59:18    Page 15 of 40

of catastrophic wildfires, but failed to identify and/or remove the dangerous tree pursuant to its vegetation management practices. Instead, **PG&E** removed the two trees surrounding the gray pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact with **PG&E's** power line.

68. **PG&E** made several decisions leading up to the Butte Fire that illustrate its conscious disregard of public safety. First, **PG&E's** Risk & Compliance Management Committee chose to not confirm their assumption that properly qualified and trained inspectors were being used by its contractors to identify hazard trees. Similarly, **PG&E** chose not to verify that its quality assurance audits were properly conducted. Moreover, **PG&E** Vegetation Management managers directed its contractor to hire inspectors that they knew did not meet the minimum qualifications required by **PG&E's** own specifications. Furthermore, **PG&E** managing agents chose to not train inspectors on **PG&E's** hazardous tree rating system ("HTRS"), verify that its contractor trained inspectors on the HTRS, or require inspectors to use **PG&E's** HTRS. Finally, **PG&E** conducts annual quality assurance audits that identify a select number of hazardous trees from a small sample, but chose to not look for additional dangerous trees despite knowing that its statistical sample warned of the likelihood that thousands more hazardous trees existed in the larger population.

69. Subsequent to the Butte Fire, in April 2017, the CPUC fined **PG&E** a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. CalFire also sent **PG&E** a bill for $90 million to cover state firefighting costs. Despite these consequences, **PG&E** did not change, revise, or improve any of its vegetation management practices after the Butte Fire, paving the way for another massive wildfire.

## I. THE CORPORATE CULTURE AT PG&E THAT PUTS PROFITS BEFORE SAFETY

70. Rather than spend the money it obtains from customers for infrastructure maintenance and safety, **PG&E** funnels this funding to boost its own corporate profits and compensation. This pattern and practice of favoring profits over having a solid and well-

maintained infrastructure that would be safe and dependable for years to come left **PG&E** vulnerable to an increased risk of a catastrophic event such as the North Bay Fires.

71. For example, According to documents released by The Utility Reform Network ("TURN"), **PG&E** supposedly planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in **PG&E's** system. **PG&E** collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, **PG&E** spent nearly $5 million on bonuses for six of its top executives.

72. Moreover, **PG&E** has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to ***not*** protect public safety. Prior to the Butte Fire, **PG&E** chose to provide a monetary incentive to its contractors to cut fewer trees, even though **PG&E** was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a **PG&E** contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but **PG&E** chose to keep this program despite knowing this risk. Similarly, prior to the San Bruno explosion, **PG&E** had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, **PG&E's** incentive system was "training and rewarding people to do the wrong thing," emblematic of "a seriously broken process," and "explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy."[35]

### J. PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS AND THE SURROUNDING VEGETATION

73. At all times prior to October 8, 2017, **PG&E** had a duty to properly construct, inspect, repair, maintain, manage and/or operate its power lines and/or other electrical equipment

---

[35] http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 17 of 40

and to keep vegetation properly trimmed and maintained so as to prevent foreseeable contact with such electrical equipment. In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, **PG&E** had an obligation to comply with a number of statutes, regulations, and standards, including the following.

74. Pursuant to Public Utilities Code § 451, "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

75. To meet this safety mandate, **PG&E** is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, **PG&E** also must ensure that its power lines can withstand winds of up to 92 miles per hour.

76. Further, **PG&E** must follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code § 4292, **PG&E** is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower." Also, Public Resources Code § 4293 mandates **PG&E** to maintain clearances of four to 10 feet for all of its power lines, depending of their voltage. In addition, "Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

77. Pursuant to CPUC General Order 165, **PG&E** is also required to inspect its distribution facilities to maintain a safe and reliable electric system. In particular, **PG&E** must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. **PG&E** is also required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over 15 years old every 10 years.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 18 of 40

78. **PG&E** knew or should have known that such standards and regulations were minimum standards and that **PG&E** has a duty to identify vegetation which posed a foreseeable hazard to power lines and/or other electrical equipment, and manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire. Further, **PG&E** has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, by not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

79. Finally, in June of 2014, the CPUC directed **PG&E**, by way of Resolution ESRB-4, to take remedial measures to reduce fires since the Governor had declared a drought in January. In addition, the CPUC informed **PG&E** that it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, i.e. the CPUC was agreeing to provide additional funding on top of vegetation management funding already authorized in order to make sure remedial measures would not go unperformed due to lack of funding. "Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency, the declaration directed state agencies 'to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife.' The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown regarding the bark beetle infestation and resulting tree mortality remains in effect. The CPUC has not rescinded ESRB-4, and work by the utilities to comply with it and the Tree Mortality Emergency continues."[36]

---

[36] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation %20 Management%20Spending.pdf.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 19 of 40

## V. DETAILS OF PLAINTIFFS' LOSSES

80. Plaintiffs **GREGORY WILSON** and **CHRISTINA WILSON** are husband and wife. In 2005, they purchased their dream property at 1420 Lorraine Way in Santa Rosa that included a home and an outdoor swimming pool.

**Plaintiffs' Home Before the Tubbs Fire**

81. On the evening of October 8, 2017, **PLAINTIFFS** started to smell smoke and heard from their neighbors that there may be a fire in the distance. **PLAINTIFFS** decided to pack up their car with some belongings in case they needed to evacuate. However, the fire approached so rapidly that it prevented them from evacuating in their vehicle.

82. Since **PLAINTIFFS** could not evacuate, they decided to try to save their lives by hiding from the Tubbs Fire in their pool. From approximately 12:30 a.m. to 3:30 a.m., **PLAINTIFFS** huddled in their pool and watched in horror as their home and everything surrounding them burned to the ground. During this time, **PLAINTIFFS** repeatedly put their heads underwater to escape the extremely hot air and burning embers. **PLAINTIFFS** would then resurface, quickly gasp for more smoke-filled air, and go back underwater. After several hours, **PLAINTIFFS** were finally rescued by emergency responders and taken to a hospital, where they were treated for burns and smoke inhalation injuries over the course of approximately 10 days.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 20 of 40

83. In addition to their injuries, **PLAINTIFFS'** property and all of their personal items in and around their home were completely destroyed in the Tubbs Fire and are no longer ascertainable due to the intensity of the fire. Therefore, **PLAINTIFFS** suffered major losses and injuries in an amount according to proof at trial.

**Plaintiffs' Home After the Tubbs Fire**

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 21 of 40

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

84. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

85. The fire herein alleged was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them. **DEFENDANTS**, and/or each of them, breached their respective duties owed individually and/or collectively to **PLAINTIFFS** by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care; (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (4) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard within close proximity of the subject power line; (5) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain high voltage electrical transmission, and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons by allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing to de-energize power lines during fire prone conditions; (11) failing to de-energize power lines after the fire's ignition; and/or (12) failing to properly train and to supervise employees and agents responsible for maintenance and inspection of the distribution lines and/or vegetation areas nearby these lines.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 22 of 40

86. As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** were injured in their health, strength, and/or activity in an amount according to proof at trial.

87. As a further direct and legal result of the premises, **PLAINTIFFS** were required to and/or continue to employ physicians and other healthcare providers to examine, treat, and/or care for their injuries. **PLAINTIFFS** have incurred, and will continue to incur, medical and incidental expenses in an amount according to proof at trial.

88. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered and/or continue to suffer great mental pain and suffering, including worry, emotional distress, humiliation, embarrassment, anguish, anxiety, and nervousness. **PLAINTIFFS** are informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries in an amount according to proof at trial.

89. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered a loss of income, loss of earning capacity, loss of profits, increased expenses due to displacement, and/or other consequential economic losses in an amount according to proof at trial.

90. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered damage to real property, including the loss of vegetation, trees, and structures, the creation of hydrophobic soil conditions, and a loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

91. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered damage to and/or a loss of personal property, including but not limited to items of peculiar value to **PLAINTIFFS** in an amount according to proof at trial.

92. As a further direct and legal result of the premises, **PLAINTIFFS** have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 23 of 40

93. Based on the foregoing, **DEFENDANTS**, and/or each of them, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such the **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** additional damages for the sake of example and sufficient to punish the **DEFENDANTS**, and/or each of them, for their despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages and **DEFENDANTS'** financial condition, yet sufficiently large enough to be an example to others and to deter **DEFENDANTS** and others from engaging in similar conduct in the future.

## SECOND CAUSE OF ACTION
## INVERSE CONDEMNATION
## (Against All Defendants)

94. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

95. On or about October 8, 2017, **PLAINTIFFS** were owners of real property and/or personal property located within Sonoma County in the area of the Tubbs Fire.

96. Prior to and on October 8, 2017, **DEFENDANTS**, and/or each of them, installed, owned, operated, used, controlled, and/or maintained power lines and other electrical equipment for the public delivery of electricity, including power lines in and around the location of the Tubbs Fire.

97. On October 8, 2017, as a direct, necessary, and legal result of **DEFENDANTS'** installation, ownership, operation, use, control, management, and/or maintenance for a public use the power lines and/or other electrical equipment, the power lines and/or other electrical equipment came in contact with vegetation and/or broke, failed, fell down, sparked, and/or exploded, causing a wildfire that burned thousands of acres, including property owned or occupied by **PLAINTIFFS**. The fire damaged and/or destroyed **PLAINTIFFS'** real and/or personal property.

98. The above described damage to **PLAINTIFFS'** property was legally and substantially caused by the actions of **DEFENDANTS**, and/or each of them, in their installation,

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 24 of 40

ownership, operation, use, control, management, and/or maintenance of the power lines and other electrical equipment for a public use.

99. **PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of **PLAINTIFFS'** property by **DEFENDANTS**, and/or each of them, without just compensation.

100. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** suffered damages to their real and/or personal property, including loss of use, interference with access, and/or diminution in value and/or marketability in an amount according to proof at trial.

101. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable attorney, appraisal, engineering, and/or other expert fees due to the conduct of the **DEFENDANTS** in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil Procedure § 1036.

## THIRD CAUSE OF ACTION
## PUBLIC NUISANCE
## (Against All Defendants)

102. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

103. **PLAINTIFFS** own and/or occupy property at or near the site of the fire which is the subject of this action. At all relevant times herein, **PLAINTIFFS** had a right to occupy, enjoy, and/or use their property without interference by **DEFENDANTS**, and/or each of them.

104. **DEFENDANTS**, and/or each of them, owed a duty to the public, including **PLAINTIFFS** herein, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their power lines in Napa and/or Sonoma Counties in a manner that did not threaten harm or injury to the public welfare from operation of those power lines.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 25 of 40

105. **DEFENDANTS**, and/or each of them, by acting and/or failing to act, as alleged hereinabove, created a condition which was harmful to the health of the public, including these **PLAINTIFFS**, and which interfered with the comfortable occupancy, use, and/or enjoyment of **PLAINTIFFS'** property. **PLAINTIFFS** did not consent, expressly or impliedly, to the wrongful conduct of **DEFENDANTS**, and/or each of them, in acting in the manner set forth above.

106. The hazardous condition which was created by and/or permitted to exist by **DEFENDANTS**, and/or each of them, affected a substantial number of people within the general public, including **PLAINTIFFS** herein, and constituted a public nuisance under Civil Code §§ 3479 and 3480 and Public Resources Code § 4171. Further, the ensuing uncontrolled wildfire constituted a public nuisance under Public Resources Code § 4170.

107. The damaging effects of **DEFENDANTS'** maintenance of a fire hazard and the ensuing uncontrolled wildfire are ongoing and affect the public at large. As a result of the fire's location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the fire's perimeter. This further caused significant post fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment laden flow hazards, and hillside erosion. As a result, large quantities of ash and sediment will be deposited in perennial and ephemeral watercourses.

108. As a direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered harm that is different from the type of harm suffered by the general public. Specifically, **PLAINTIFFS** have lost the occupancy, possession, use, and/or enjoyment of their land, real and/or personal property, including, but not limited to: a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the salability of their property; soils that have become hydrophobic; exposure to an array of toxic substances on their land; the presence of "special waste" on their property that requires special management and disposal; and a lingering smell of smoke, and/or constant soot, ash, and/or dust in the air.

109. As a further direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** have suffered, and will continue to suffer, discomfort, anxiety, fear,

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 26 of 40

worries, annoyance, and/or stress attendant to the interference with **PLAINTIFFS'** occupancy, possession, use and/or enjoyment of their property, as alleged above.

110. A reasonable, ordinary person would be reasonably annoyed or disturbed by the condition created by **DEFENDANTS**, and/or each of them, and the resulting fire.

111. The conduct of **DEFENDANTS**, and/or each of them, is unreasonable and the seriousness of the harm to the public, including **PLAINTIFFS** herein, outweighs the social utility of **DEFENDANTS'** conduct.

112. The individual and/or collective conduct of **DEFENDANTS** set forth above, and/or each of them, resulting in the Tubbs Fire is not an isolated incident, but is ongoing and/or a repeated course of conduct, and **DEFENDANTS'** prior conduct and/or failures have resulted in other fires and damage to the public.

113. The unreasonable conduct of **DEFENDANTS**, and/or each of them, is a direct and legal cause of the harm, injury, and/or damage to the public, including **PLAINTIFFS** herein.

114. **DEFENDANTS**, and/or each of them, have individually and/or collectively, failed and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in order to ensure the sole delivery of electricity to residents through the operation of power lines in the affected area, and **DEFENDANTS'** individual and/or collective failure to do so exposed every member of the public, including those residing in Napa and/or Sonoma Counties, to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

115. The conduct of **DEFENDANTS**, and/or each of them, set forth above constitutes a public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code §§ 4104 and 4170, and Code of Civil Procedure § 731. Under Civil Code § 3493, **PLAINTIFFS** have standing to maintain an action for public nuisance because the nuisance is specially injurious to **PLAINTIFFS** because, as more specifically described above, it is injurious and/or offensive to the senses of the **PLAINTIFFS**, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of **PLAINTIFFS'** properties, and have suffered harm, injury, and damages.

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 27 of 40

116. For these reasons, **PLAINTIFFS** seek a permanent injunction ordering that **DEFENDANTS**, and each of them, stop continued violation of Public Resource Code §§ 4292 and 4293 and Public Utilities Commission General Order 95, Rule 35. **PLAINTIFFS** also seek an order directing **DEFENDANTS** to abate the existing and continuing nuisance described above.

**FOURTH CAUSE OF ACTION**
**PRIVATE NUISANCE**
**(Against All Defendants)**

117. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

118. **DEFENDANTS**, and/or each of them, by their acts and/or omissions set forth above, directly and legally caused an obstruction to the free use of **PLAINTIFFS'** property, an invasion the **PLAINTIFFS'** right to use their property, and/or an interference with the enjoyment of **PLAINTIFFS'** property, resulting in **PLAINTIFFS** suffering unreasonable harm and substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

119. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

120. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

**FIFTH CAUSE OF ACTION**
**PREMISES LIABILITY**
**(Against All Defendants)**

121. **PLAINTIFFS** incorporate and re-allege by this reference, each of the paragraphs set forth as though fully set forth herein.

122. **DEFENDANTS**, and/or each of them, were the owners of an easement and/or real property in the area of origin of the Tubbs Fire and/or near Highway 128 and Bennett Lane, Calistoga, California, and/or were the owners of the power lines upon said easement and/or right of way.

123. **DEFENDANTS**, and/or each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near its power lines along the real property and easement, allowing an unsafe condition presenting a foreseeable risk of fire danger to exist on said property.

124. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

125. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## SIXTH CAUSE OF ACTION
## TRESPASS
## (Against All Defendants)

126. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

127. At all times relevant herein, **PLAINTIFFS** were the owners, tenants, and/or lawful occupants of property damaged by the Tubbs Fire.

128. **DEFENDANTS**, and/or each of them, in wrongfully acting and/or failing to act in the manner set forth above, caused the Tubbs Fire to ignite and/or spread out of control, causing harm, damage, and/or injury to **PLAINTIFFS** herein, resulting in a trespass upon **PLAINTIFFS** property interests.

129. **PLAINTIFFS** did not grant permission for **DEFENDANTS** to wrongfully act in a manner so as to cause the Tubbs Fire, and thereby produce a wildland fire which spread and wrongfully entered upon their property, resulting in the harm, injury, and/or damage alleged above.

130. As a direct and legal result of the wrongful conduct of **DEFENDANTS**, and/or each of them, which led to the trespass, **PLAINTIFFS** have suffered and will continue to suffer damages as set forth above, in an amount according to proof at trial.

131. As a further direct and legal result of the wrongful conduct of **DEFENDANTS**, **PLAINTIFFS**, whose land was under cultivation, and/or was used for raising livestock or was intended to be used for raising livestock, have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under Code of Civil Procedure § 1021.9.

132. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek double and/or treble damages for the negligent, willful, and wrongful injuries to timber, trees, or underwood on their property, as allowed under Civil Code § 3346.

133. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

134. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF PUBLIC UTILITIES CODE § 2106
## (Against All Defendants)

135. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

136. As a Public Utility, **DEFENDANTS**, and/or each of them, are legally required to comply with the rules and orders promulgated by the Public Utilities Commission pursuant to Public Utilities Code § 702.

137. Public Utilities that fail to comply with duties required by the California Constitution, a law of the State, a regulation, or order of the Public Utilities Commission, which thereby leads to loss or injury, are liable for that loss or injury pursuant to Public Utilities Code § 2106.

LAW OFFICES
COTCHETT, PITRE & McCARTHY, LLP

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 30 of 40

138. As a Public Utility, **DEFENDANTS**, and/or each of them, are required to provide and maintain service, equipment and facilities in a manner adequate to maintain the safety, health, and convenience of their customers and the public, pursuant to Public Utilities Code § 451.

139. **DEFENDANTS**, and/or each of them, are required to design, engineer, construct, operate, manage, and maintain electrical supply lines in a manner consistent with their use, taking into consideration local conditions and other circumstances, so as to provide safe and adequate electric service, pursuant to Public Utility Commission General Orders 95 and 165, and Rule 33.1.

140. **DEFENDANTS**, and/or each of them, are required to maintain vegetation in compliance with Public Resources Code §§ 4293, 4294, and 4435, and Health & Safety Code § 13001.

141. By their conduct alleged above, **DEFENDANTS**, and/or each of them, violated Public Utilities Code §§ 702 and 451 and/or Public Utilities Commission General Order 95, thereby imposing liability on **DEFENDANTS** for losses, damages, and/or injury sustained by **PLAINTIFFS** pursuant to Public Utilities Code § 2106.

142. By further reason of the premises set forth above **DEFENDANTS**, and/or each of them, acted in a manner which violated the laws of this State and/or the orders or decisions of the Public Utilities Commission, as referenced herein.

143. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

144. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF HEALTH & SAFETY CODE § 13007
## (Against All Defendants)

145. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

146. By engaging in the acts and/or omissions alleged in this Complaint, **DEFENDANTS**, and/or each of them, willfully, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of Health & Safety Code § 13007.

147. As a direct and legal result of **DEFENDANTS'** violation of Health & Safety Code § 13007, **PLAINTIFFS** suffered recoverable damages to property under Health & Safety Code § 13007.21.

148. As a further direct and legal result of the **DEFENDANTS**, and/or each of them, violating Health & Safety Code § 13007, **PLAINTIFFS** are entitled to reasonable attorney's fees under Code of Civil Procedure § 1021.9.

149. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

150. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

WHEREFORE, **PLAINTIFFS** pray for relief as set forth below.

## VII. PRAYER FOR RELIEF

WHEREFORE, **PLAINTIFFS** pray for judgment against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20**, and each of them as follows:

**From All DEFENDANTS for Inverse Condemnation:**

1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;
2. Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;
3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 32 of 40

4. All costs of suit, including attorneys' fees where appropriate, appraisal fees, engineering fees, and related costs;

5. Prejudgment interest according to proof;

6. For such other and further relief as the Court shall deem proper, all according to proof.

**From All DEFENDANTS for Negligence, Public Nuisance, Private Nuisance, Premises Liability, Trespass, Violation of Public Utilities Code § 2106, and Violation of Health & Safety Code § 13007:**

1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2. Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

4. Past and future medical expenses and incidental expenses according to proof;

5. Attorney's fees, expert fees, consultant fees, and litigation costs and expense as allowed under Code of Civil Procedure § 1021.9;

6. Treble damages for wrongful injuries to timber, trees, or underwood on their property as allowed under Civil Code § 3346;

7. General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, personal injury, and for such other and further relief as the Court shall deem proper, all according to proof;

8. Punitive damages as allowed by the law;

9. For all costs of suit incurred;

/ / /

/ / /

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 33 of 40

10. Prejudgment interest according to proof; and

11. Any other and further relief as the Court may deem just and proper.

**COTCHETT, PITRE & McCARTHY, LLP**

Dated: 11/13/17

By: ______________________
**FRANK M. PITRE**
*Attorneys for Plaintiffs*

STEVEN M. CAMPORA (SBN 110909)
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500 Facsimile: (916) 379-3599

BRIAN J. PANISH (SBN 116060)
**PANISH SHEA & BOYLE, LLP**
11111 Santa Monica Blvd., Suite 700
Los Angeles, CA 90025
Tele: (310) 477-1700 Fax: (310) 477-1699

MICHAEL A. KELLY (SBN 71460)
**WALKUP MELODIA KELLY & SCHOENBERGER**
650 California Street
San Francisco, CA 94108
Tele: (415) 981-7210 Fax: (415) 391-6965

MICHAEL D. GREEN (SBN 214142)
**ABBEY, WEITZENBERG, WARREN & EMERY, PC**
100 Stony Point Rd, Suite 200
Santa Rosa, CA 95401
Tele: (707) 542-5050 Fax: (707) 542-2589

//

//

//

//

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 34 of 40

## VIII. JURY DEMAND

**PLAINTIFFS** demand a trial by jury as to all claims in this action.

**COTCHETT, PITRE & McCARTHY, LLP**

Dated: 11/13/17

By: ______________________
**FRANK M. PITRE**
*Attorneys for Plaintiffs*

STEVEN M. CAMPORA (SBN 110909)
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500 Facsimile: (916) 379-3599

BRIAN J. PANISH (SBN 116060)
**PANISH SHEA & BOYLE, LLP**
11111 Santa Monica Blvd., Suite 700
Los Angeles, CA 90025
Tele: (310) 477-1700 Fax: (310) 477-1699

MICHAEL A. KELLY (SBN 71460)
**WALKUP MELODIA KELLY & SCHOENBERGER**
650 California Street
San Francisco, CA 94108
Tele: (415) 981-7210 Fax: (415) 391-6965

MICHAEL D. GREEN (SBN 214142)
**ABBEY, WEITZENBERG, WARREN & EMERY, PC**
100 Stony Point Rd, Suite 200
Santa Rosa, CA 95401
Tele: (707) 542-5050 Fax: (707) 542-2589

FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
ALISON E. CORDOVA (SBN 284942)
acordova@cpmlegal.com
**COTCHETT, PITRE & McCARTHY , LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000 Facsimile: (650) 697-0577

STEVEN M. CAMPORA (SBN 110909)
scampora@dbbwlaw.com
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500 Facsimile: (916) 379-3599

*Attorneys for Plaintiffs*

[Additional co-counsel listed on the signature page]

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

COORDINATION PROCEEDING
Special Title (California Rule of Court 3.550)

CALIFORNIA NORTH BAY FIRES

GREGORY WILSON, an individual; and CHRISTINA WILSON, an individual;

Plaintiffs,

v.

PACIFIC GAS AND ELECTRIC COMPANY, PG&E CORPORATION, AND DOES 1 THROUGH 20,

Defendants.

JCCP 4955

**San Francisco Superior Court Case No.: CGC-17-562458**

**INDIVIDUAL PLAINTIFFS' NOTICE OF ADOPTION OF THE MASTER COMPLAINT**

**TUBBS-CPMC-0002**

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 36 of 40

Pursuant to Case Management Order No. 1, Plaintiffs hereby submit this Short Form Complaint ("SFC") against Defendants identified below, and hereby adopt and incorporate by reference as set forth in Plaintiffs' most recent Master Complaint filed in this matter on March 12, 2018, and any and all later amendments thereto.

PLAINTIFF GREGORY WILSON, an individual, was damaged by the North Bay Fires as set forth below and makes the claims set forth below.

PLAINTIFF CHRISTINA WILSON, an individual, was damaged by the North Bay Fires as set forth below and makes the claims set forth below.

**PLAINTIFFS COMPLAIN OF EACH DEFENDANT AS FOLLOWS:**

1. Notice of Adoption of the Master Complaint. Plaintiffs refer to and incorporate herein by reference that Master Complaint filed on behalf of Individual Plaintiffs in the CALIFORNIA NORTH BAY FIRE CASES, Judicial Council Coordinated Proceeding No. 4955, as though fully set forth herein. Plaintiffs hereby adopt the Master Complaint and agree to be bound by any rulings with respect to the pleadings.

2. Plaintiffs adopt each of the general allegations of the Master Complaint except for those paragraph numbers set forth here, if any: Not applicable.

3. Plaintiffs incorporate by reference each of the causes of action in the Master Complaint checked below against those Defendants named in that cause of action:

- ☒ First Cause of Action for Negligence
- ☐ Second Cause of Action for Wrongful Death
- ☐ Third Cause of Action for Survival Action
- ☒ Fourth Cause of Action for Inverse Condemnation
- ☒ Fifth Cause of Action for Public Nuisance
- ☒ Sixth Cause of Action for Private Nuisance
- ☒ Seventh Cause of Action for Premises Liability
- ☒ Eighth Cause of Action for Trespass
- ☒ Ninth Cause of Action for Private Action Under Public Utilities Code § 2106

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 37 of 40

☒ Tenth Cause of Action for Violation of Health & Safety Code § 13007

☒ Eleventh Cause of Action for Negligent Infliction of Emotional Distress

4. In addition to the defendants named in the Master Complaint, Plaintiffs also name the following individuals as Nominal Defendants: Not applicable.

5. Plaintiffs respectfully reserve the right to seek transfer or remand of the trial of this action to the County of Sonoma, Napa, or another appropriate venue.

**ADDRESSES OF ALL AFFECTED PROPERTIES**

Plaintiffs allege the following properties have been impacted by the CALIFORNIA NORTH BAY FIRES for which Plaintiffs seek recovery: 1420 Lorraine Way, Santa Rosa, CA 95404.

**SPECIFY WHETHER PLAINTIFF(S) ARE:**

☒ Insured by Liberty Mutual.

☐ Uninsured

☒ Owner of real property

☐ Renter of real property

☐ Business owner

☒ Employee

☐ Other [Please indicate]

**CALIFORNIA NORTH BAY FIRE THAT IMPACTED PLAINTIFF(S):**

☐ Atlas Fire (Master Complaint ¶¶ 80-86)

☐ Cascade/LaPorte Fire (Master Complaint ¶¶ 87-91)

☐ Cherokee Fire (Master Complaint ¶¶ 92-93)

☐ Honey Fire (Master Complaint ¶¶ 94-95)

☐ Lobo Fire (Master Complaint ¶¶ 96-97)

☐ Maacama or No Name Fire (Master Complaint ¶¶ 98-99)

☐ McCourtney Fire (Master Complaint ¶¶ 100-101)

☐ Nuns Fire (Master Complaint ¶¶ 102-109)

☐ Pocket Fire (Master Complaint ¶¶ 110-111)

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 38 of 40

☐ Point Fire (Master Complaint ¶¶ 112-113)

☐ Redwood Valley/ Potter Fires (Master Complaint ¶¶ 114-116)

☐ Sullivan Fire (Master Complaint ¶¶ 117-119)

☐ Sulphur Fire (Master Complaint ¶¶ 120-122)

☒ Tubbs Fire (Master Complaint ¶¶ 123-127)

☐ Highway 37 Fire (Master Complaint ¶¶ 128-129)

☐ Other Ignition Point [Describe in Additional Allegations Section below, p. 7]

**PLAINTIFFS SUFFERED DAMAGE IN THE FOLLOWING WAY:**

☐ Wrongful death and survival

☒ Personal injury

☒ Emotional distress (including but not limited to presence in zone of danger) and/or bystander claims)

☒ Mental anguish (including but not limited to loss of use and enjoyment of property under nuisance)

☒ Residence destroyed

☒ Residence damaged

☒ Other structures destroyed

☒ Other structures damaged

☒ Real property improvements (fences, roads, well, septic system, etc.) destroyed

☒ Real property improvements (fences, roads, well, septic system, etc.) damaged

☒ Personal property damage

☒ Damage to trees

☒ Diminution in value of real property

☐ Damage to crops

☐ Damage to business equipment

☐ Damage to business goodwill or brand

☐ Loss of use of business property

☐ Loss of future profits

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 39 of 40

☐ Loss or reduction of future insurance benefits due to lower crop yield in 2017

☒ Harm to pets or livestock

☒ Employment-related damages

**DAMAGES ALLEGED:**

**AS AGAINST ALL DEFENDANTS for Inverse Condemnation, all according to proof, for:**

☒ Diminution in real property and/or personal property value, cost of repairs, loss of use of the property, loss of rent, loss of profits, loss of prospective profits, increased operating expenses, and/or all other detriment proximately caused by the harm to Plaintiffs' property;

☒ All costs of suit, including reasonable attorneys' fees, appraisal fees, engineering fees, other expert fees, and related costs;

☒ Prejudgment interest;

☒ For such other and further relief as the Court shall deem just and proper.

**AS AGAINST ALL DEFENDANTS for Wrongful Death and Survival Action, all according to proof, for:**

☐ Loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and moral support from Decedent/s;

☐ Funeral and burial expenses, and related medical expenses;

☐ Economic loss, including but not limited to the loss of financial support and/or the loss of household services;

☐ Recovery of Decedent/s' damages as allowed under Code of Civil Procedure § 377.30 under the causes of action alleged in the Master Complaint for, *inter alia*, inverse condemnation, negligence, nuisance, premises liability, trespass, and violations of statutes and regulations;

☐ Expenses for the identification and/or removal of Decedent/s' remains and other medical and/or emergency services;

☐ Punitive and exemplary damages as allowed under Civil Code § 3294;

☐ All costs of suit;

☐ Prejudgment interest; and

☐ For such other and further relief as the Court shall deem just and proper.

**AS AGAINST ALL DEFENDANTS for Negligence, Public Nuisance, Private Nuisance, Premises Liability, Trespass, Private Action Under Public Utilities Code § 2106, and Violation of Health & Safety Code § 13007, all according to proof, for:**

☒ Repair, diminution in value, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

Case: 19-30088 Doc# 2904-5 Filed: 07/09/19 Entered: 07/09/19 12:59:18 Page 40 of 40