1
2
3
4
5
6
7
8
9
10
**<u>EXHIBIT D</u>**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Baker & Hostetler LLP
Attorneys at Law
San Francisco

```
1              UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        -oOo-

4   In Re:                    ) Case No. 19-30088
                              ) (Lead Case) (Jointly
5   PG&E CORPORATION AND PACIFIC  ) Administered)
    GAS AND ELECTRIC COMPANY  ) Chapter 11
6                             )
                     Debtors. ) San Francisco, California
7   _____ ) Monday, April 29, 2019
                                  10:00 AM
8
                                  CONTINUED MEETING OF
9                                 CREDITORS PURSUANT TO SECTION
                                  341(A) OF THE BANKRUPTCY CODE
10
                      TRANSCRIPT OF PROCEEDINGS
11              BEFORE TIMOTHY S LAFFREDI, AUST
            FOR THE OFFICE OF THE UNITED STATES TRUSTEE
12
    APPEARANCES:
13  For the Debtor:           STEPHEN KAROTKIN, ESQ.
                              Weil, Gotshal & Manges LLP
14                            767 Fifth Avenue
                              New York, NY 10153
15                            (212)310-8000

16                            TOBIAS S. KELLER, ESQ.
                              Keller & Benvenutti LLP
17                            650 California Street
                              Suite 1900
18                            San Francisco, CA 94108
                              (415) 796-0709
19
                              KEVIN J. ORSINI, ESQ.
20                            Cravath, Swaine & Moore LLP
                              825 Eighth Avenue
21                            New York, NY 10019
                              (212) 474-1000
22
    For the Official Committee DANIEL B. DENNY, ESQ.
23  of Unsecured Creditors:   Milbank LLP
                              2029 Century Park East
24                            33rd Floor
                              Los Angeles, CA 90067
25                            (424) 386-4302
```

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 2
of 192

```
 1   For the Official Committee    CECILY A. DUMAS, ESQ.
     of Tort Claimants:            Baker & Hostetler LLP
 2                                 11601 Wilshire Boulevard
                                   Suite 1400
 3                                 Los Angeles, CA 90025
                                   (310) 442-8886
 4
     For the Ad Hoc Group of       KATHRYN S. DIEMER, ESQ.
 5   Subrogation Claim Holders:    Diemer & Wei, LLP
                                   100 West San Fernando Street
 6                                 Suite 555
                                   San Jose, CA 95113
 7                                 (408) 971-6270

 8   For Creditors Heather         STEVEN M. CAMPORA, ESQ.
     Blowers, Sharon Britt,        Dreyer Babich Buccola Wood
 9   Brian Bolton, Adam Balogh,    Campora, LLP
     Lara Balas, Chippewa Pest     20 Bicentennial Circle
10   Control, Inc., Lisa           Sacramento, CA 95826
     Delaine Allain, and Thomas    (916) 379-3500
11   Atkinson:
     For Various Fire Victims:     GERALD SINGLETON, ESQ.
12                                 Singleton Law Firm, APC
                                   450 A Street
13                                 5th Floor
                                   San Diego, CA 92101
14                                 (760) 697-1330

15   For Various Fire Victims:     MIKE DANKO, ESQ.
                                   Danko Meredith
16                                 333 Twin Dolphin Drive
                                   Suite 145
17                                 Redwood Shores, CA 94065
                                   (650) 453-3600
18
     Also Present:                 David Thomason
19                                 Controller, PG&E

20                                 James Mesterharm
                                   AlixPartners
21
                                   Lindsay Wood
22                                 Plumas Audubon Society and Audubon
                                    California
23
                                   Adam Cronin
24
                                   Bryan Gavin George Montgomery,
25                                 Creditor
```

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 3
of 192

1                              Marta Villacorta
                               Trial Attorney, Office of the
2                               United States Trustee

3                              Ianthe V. Del Rosario
                               Legal Assistant, Office of the
4                               United States Trustee

5                              Ankey To
                               Paralegal Specialist, Office of
6                               the United States Trustee

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Court Recorder:          N/A

21    Transcriber:             CLARA RUBIN
                               eScribers, LLC
22                             7227 N. 16th Street
                               Suite #207
23                             Phoenix, AZ 85020
                               (973)406-2250
24
      Proceedings recorded by electronic sound recording;
25    transcript provided by transcription service.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 4
of 192

1    SAN FRANCISCO, CALIFORNIA, MONDAY, APRIL 29, 2019, 10:00 AM

2                              -oOo-

3           MR. LAFFREDI:  All right, this is the continued

4    Section 341 meeting of creditors in the jointly administered

5    cases of PG&E Corporation, bankruptcy case number 19-30088, and

6    Pacific Gas and Electric Company, bankruptcy case number

7    19-30089.  These -- the meetings of creditors will be called

8    together for the two cases.

9           Today's date is April 29, 2019.  It is 10 o'clock in

10   the morning.  We are in the Northern District of California,

11   San Francisco division.  My name is Tim Laffredi.  I'm the

12   Assistant United States Trustee for the Northern District of

13   California.  I'll be conducting the meetings this morning.

14   Also present from our office is Marta Villacorta, who's a trial

15   attorney in the San Francisco office.  Additionally, we have

16   Ianthe Del Rosario and Ankey To, who are outside helping with

17   signing people in.

18          This meeting, which is required under Section 341(a)

19   of the Bankruptcy Code, was initially called on March 4th, 2019

20   at 10 o'clock in the morning.  At that meeting, I, on behalf of

21   the United States Trustee, made some preliminary -- excuse

22   me -- preliminary comments and asked some basic questions about

23   the debtors' operations and the bankruptcy filing.  The

24   debtors' schedules and statements had not been filed at that

25   time, so it was not possible to examine the debtors about

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 5
of 192

1  specific assets and liabilities, and the meeting was continued
2  to this date.

3  Some of you may have attended that March 4th, 2019
4  meeting and may have already examined the debtors.  That
5  meeting, along with this meeting, is part of the official
6  record, and any question you asked at that last meeting has
7  already been recorded and is already part of the record.  You
8  are welcome to come forward and ask questions when I call for
9  you to come forward, but you do not need to ask the same
10 questions that you already asked.  In fact, in the interest of
11 time, I would ask that any creditor present would limit their
12 questioning to any new inquiries, not questions that you had
13 already asked at that March 4th, 2019 meeting.  And these new
14 questions would be based upon the debtors' schedules,
15 statements, operations, and prospects for reorganization.

16 The format of this meeting will be the same as last
17 time.  I will initially ask questions of the debtor; then I
18 will turn it over to creditors-committee counsel to examine the
19 debtor:  first the official committee of unsecured creditors,
20 then to the official committee of tort claimants.  After the
21 official committees have concluded their examination, I will
22 invite creditors to come up and ask questions of the debtors.

23 The order of who will be called was determined by the
24 sign-in sheets that you all saw when you came in this morning.
25 If you have not signed in, please be sure that you do so.

1    Creditors who are present are not required to ask questions of
2    the debtors and may opt to listen and observe.  In fact, many
3    of the questions that are asked by me and the committees may be
4    the same questions that you are planning to ask, so it may be
5    that you came here intending to ask a question but your
6    questions have already been answered.

7              Again I'm going to make some preliminary -- the
8    same -- some of the same preliminary comments I made last time,
9    to ensure there's no confusion, since it has been nearly two
10   months since the first meeting.  First of all, this meeting is
11   open to the public.  Anyone is welcome to attend and observe,
12   including the press.  As this is a meeting of creditors,
13   creditors are invited to examine the debtor under oath.  Unless
14   you're a creditor or represent a creditor, you will not be
15   permitted to examine the debtors.  Accordingly, although the
16   press is welcome to attend this meeting, the press may not
17   participate in any way other than to observe, and the press may
18   not make any inquiries of the debtors under oath on the record.

19             Second, this meeting is being digitally recorded.
20   This recording is the official record of the proceedings and is
21   kept in our office.  Recording this meeting or these
22   proceedings by any other means is strictly prohibited, and
23   there are no recording devices authorized in this room.  Once
24   again, you're explicitly prohibited from making a video- or
25   audio recording of this meeting, and the only official

1  recording is the one that this office is making with this
2  recording device here.  The Office of the United States Trustee
3  maintains this recording and, if you're interested in obtaining
4  a copy of the recording, then you can make this request in
5  writing, including a self-addressed stamped envelope and a
6  blank CD, and send that to my attention here in San Francisco.

7         Third, this meeting is -- as this meeting is being
8  recorded, please remember that the recorder cannot see who you
9  are or when you make gestures.  For the debtors:  please give
10 verbal responses to all questions.  For creditors:  please
11 identify yourself prior to beginning your examination.  For
12 everyone:  please make sure you do not speak over each other.
13 We keep the recordings for two years after case closures; after
14 the cases are closed.  And again, please make arrangements for
15 obtaining recordings, with our office.

16        Fourth, although our time is limited, we'll try to
17 make sure that everybody who would like to ask questions gets
18 that opportunity.

19        Fifth, this is not a courtroom.  This is a meeting,
20 not a court hearing.  I am not a judge.  And the Rules of
21 Evidence do not apply.  I, on behalf of the United States
22 Trustee, will preside over this meeting, so I will ensure that
23 the meeting is conducted in an orderly fashion.  Once again,
24 the purpose of this meeting is to allow creditors to ask
25 questions of the debtors with regard to general financial

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 8
of 192

1  aspects of the debtors' bankruptcy cases, including why these
2  cases were filed, the debtors' finances, the debtors'
3  operations, and the debtors' prospects for reorganization.
4  This is not a Rule 2004 examination and this is not a
5  deposition.  All creditors are reminded of their rights, under
6  the Bankruptcy Code and Rules, to conduct their own discovery
7  with regard to their particular claims and interests, at
8  another date and time.

9          Sixth, as I indicated earlier, the meetings for these
10  two cases have been called at the same time.  So if you have
11  questions that pertain to one particular debtor, please
12  indicate that when you are making your inquiry.  Unless
13  specifically stated on the record, the questions and responses
14  apply to both cases.  When referring to both PG&E Corp. and the
15  Pacific Gas and Electric Company, I will refer to them together
16  as the "debtors".  If I'm referring to PG&E Corporation, I will
17  refer to that as the "Holding Company".  And if I'm referring
18  to Pacific Gas and Electric Company, I will refer to that as
19  the "Utility".

20          Seventh, this is not the forum for you to file proofs
21  of claim.  If you intend to file a proof of claim, you'll need
22  to file that with the bankruptcy court.

23          All right, could we have appearances for the debtors,
24  please?

25          MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

1  Manges --

2          MR. LAFFREDI:  Here, let me give you this real quick.

3  There you go.

4          MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

5  Manges, for the debtors.

6          MR. LAFFREDI:  All right, and who will be answering

7  questions on behalf of the debtors this morning?

8          MR. KAROTKIN:  Mr. Wells and Mr. Tomlinson (sic).

9          MR. LAFFREDI:  Okay.  All right.  So what I'm going to

10  do --

11          MR. KAROTKIN:  We have other --

12          MR. LAFFREDI:  Oh, go ahead.  I'm sorry; go ahead.

13          MR. ORSINI:  Kevin Orsini, Cravath, Swaine & Moore,

14  for the debtors.

15          MR. KELLER:  Tobias Keller, Keller & Benvenutti, for

16  the debtors as well.

17          MR. MESTERHARM:  Jim Mesterharm with AlixPartners.

18          MR. LAFFREDI:  Great.  So what I'm going to do is -- I

19  think I'll just swear both of you in.

20          UNIDENTIFIED SPEAKER:  Perfect.

21          MR. LAFFREDI:  And that way, whoever knows the answer

22  to the question can answer the question.  Is there going to be

23  somebody who will primarily be answering the questions?  Do you

24  know?

25          MR. KAROTKIN:  It depends what the question --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 10
of 192

1          MR. LAFFREDI:  Okay.  So I don't know if you want to

2    stay in the middle, because you're going to have to be passing

3    it back and forth; but, whatever.

4          MR. KAROTKIN:  Have to keep them apart.

5          MR. LAFFREDI:  Yeah, exactly.

6          All right.  So, Mr. Wells, I'll swear you in first.

7    Could you please raise your right hand?

8       (Mr. Wells sworn.)

9          MR. LAFFREDI:  And, Mr. Thomason.

10      (Mr. Thomason sworn.)

11         MR. LAFFREDI:  All right.  Thank you.  Okay, so now,

12   before I begin in my questioning of the debtors, I want to

13   address the global notes that were attached as part of the

14   debtors' schedules and statements filed March 14th, 2019 and

15   April 15th, 2019, respectively.  The Office of the United

16   States Trustee acknowledges the existence of the global notes

17   and appreciates any information they contain.  The global

18   notes, however, are not contemplated by the Bankruptcy Code,

19   are not authorized by the Bankruptcy Rules, and are not part of

20   any official form.

21         I would note that the global notes contain several

22   inconsistencies between the Bankruptcy Code and Rules.  For

23   example, Bankruptcy Rule 1009 provides that schedules may be

24   amended at any time.  So, reservation of rights, in the global

25   notes, to amend the schedules is unnecessary.  Debtors have an

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 11
of 192

1    affirmative obligation to disclose all assets and liabilities.

2    And to the extent that the debtors have opted not to disclose

3    assets and liabilities for any reason, the global notes do not

4    relieve them of the affirmative obligation to not only disclose

5    all assets and liabilities but also to ensure that the

6    schedules and statements are -- as filed are accurate.

7              Section 502(a) provides that a filed proof of claim is

8    deemed allowed unless a party-in-interest objects.

9    Additionally, by operation of Section 1111(a), claims listed by

10   debtors but not listed as contingent, unliquidated, or disputed

11   are deemed allowed.  Any statement in the global notes that

12   attempts to alter the claims-allowance process in Chapter 11 or

13   the rights of creditors as provided by the Bankruptcy Code and

14   Rules, obviously has no effect.  Although I only listed these

15   few examples, there are other examples of legal inconsistencies

16   with the Bankruptcy Code and Rules.  And to the extent that the

17   global notes conflict with the Bankruptcy Code and Rules, the

18   global notes are irrelevant.

19             All right.

20             MR. KAROTKIN:  Would you like us to respond to that?

21             MR. LAFFREDI:  If you'd like.

22             MR. KAROTKIN:  Your position --

23             MR. LAFFREDI:  It's not necessary.

24             MR. KAROTKIN:  Your position is so noted, and we think

25   the global notes are appropriate.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 12
of 192

1          MR. LAFFREDI:  Thank you.

2          All right, so now I'm going to go through and ask

3    questions primarily about the debtors' schedules and

4    statements, including the global notes.  All right, so, Mr.

5    Tomlinson, are you the person who signed the bankruptcy

6    schedules and statements?

7          MR. THOMASON:  Yes, that's correct.

8          MR. LAFFREDI:  And is your signature -- is this your

9    signature that appears on the declaration under penalty of

10   perjury, for nonindividual debtors, for example, at document

11   number 903-2?

12         MR. THOMASON:  Yes, it is.

13         MR. LAFFREDI:  Okay, thank you.  With regard to the

14   global notes, would you have signed the schedules and

15   statements but for the global notes?

16         MR. THOMASON:  Yes, I would.

17         MR. LAFFREDI:  Okay.  In other words, do you have a

18   reasonable belief that the schedules and statements, as filed

19   without the global notes, are true and correct under penalties

20   of perjury?

21         MR. THOMASON:  Yes, I believe they're -- that's true.

22         MR. LAFFREDI:  Okay.  All right, before we go into the

23   schedules, I'd like to revisit a couple questions that I had

24   from last time, and either one of you can answer these.

25         MR. WELLS:  Sure.

1          MR. LAFFREDI:  So what are the debtors' current plans

2    for reorganization?  Actually, you know what, why don't we --

3    well, is that going to be easier?

4          MR. WELLS:  We can pass --

5          MR. LAFFREDI:  Okay.

6          MR. WELLS:  We currently don't have a plan of

7    reorganization.  We are continuing to evaluate and try to

8    assess the total claims coming from the 2018, 2019 -- or,

9    sorry, 2017, 2018 fires.  Until we have a better handle on the

10   total claims exposure as well as the legislation to reform

11   wildfire liability laws, we are not in a position to be able to

12   put forward a plan of reorganization.

13         MR. LAFFREDI:  So at this point do you know when a

14   plan will be -- is able to filed?

15         MR. WELLS:  No, I don't know when a plan is going to

16   be in a -- well, will be in a position to -- to file a plan.

17   We will be filing a motion to extend exclusivity.

18         MR. LAFFREDI:  Thank you.  Okay, so now I have some

19   specific questions about the global notes to the schedules and

20   amendments -- schedules and statements that apply generally.

21   First with regard to global note number 4 regarding

22   liabilities, this note indicates -- it's on page 4 of

23   document -- oh, you found it, okay.  In this latter part of the

24   first paragraph, it indicates that, as additional information

25   becomes available and further research is conducted, the

1    allocations of liabilities may change.  Has additional

2    information become available or has additional research been

3    conducted since March 14th?

4            MR. THOMASON:  Yeah.  So what that's referring to is

5    we made our -- our best effort, as of March 14th, to identify

6    pre-petition liabilities, but in some cases we didn't have

7    invoices for --

8            MR. LAFFREDI:  Right.

9            MR. THOMASON:  -- certain transactions.  And so as --

10   as more information becomes available about our pre-petition

11   liabilities, we'll update -- or that updates our --

12           MR. LAFFREDI:  Um-hum.

13           MR. THOMASON:  -- understanding of those -- those

14   balances.

15           MR. LAFFREDI:  Well, I understand that, but my

16   specific question is, has additional information become

17   available and has additional research been conducted since

18   March 14th?

19           MR. THOMASON:  Yes, it has.

20           MR. LAFFREDI:  So will amendments be filed to the

21   schedules, to address those?

22           MR. THOMASON:  Yes, they will.

23           MR. LAFFREDI:  Okay, do you know when?

24           MR. THOMASON:  I'm not sure that we have a -- a

25   date --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 15
of 192

1          MR. LAFFREDI:  Okay.

2          MR. THOMASON:  -- certain on that.

3          MR. LAFFREDI:  Well, at the very end I'll get to,

4    like, when can we look at amendments.  So maybe we could talk

5    about it then.

6          Okay, next, Schedule -- I'm sorry; note 11 regarding

7    intercompany payables and receivables.  That second paragraph

8    there indicates, "Listing, by the debtors, of any account

9    between the debtors or between a debtor and a nondebtor, is a

10   statement of what appears in that particular debtor's books and

11   records and does not reflect any admission or conclusion of the

12   debtors, regarding allowance, classification, characterization,

13   validity, or priority of such amount" -- "account.  The debtors

14   take no position, in these schedules, as to whether such

15   accounts would be allowed as claims, interests, or not allowed

16   at all."

17         What does that mean -- what does that mean about

18   accounts?  I'm not sure I follow what that means.  Is this

19   talking about bank accounts or other -- what is it?

20         MR. THOMASON:  No.  It's talking about balances

21   payable and receivable balances between the -- the Holding

22   Company and -- and the Utility.  So the Utility provides

23   services to the Holding Company; Holding Company provides --

24         MR. LAFFREDI:  Um-hum.

25         MR. THOMASON:  -- services to the Utility.  There's

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 16
of 192

1  an -- intercompany billings and there's balances outstanding

2  at -- at any given point in time.  So that's what we mean by

3  "accounts".

4         MR. LAFFREDI:  Okay.  And so -- but does this mean

5  that the debtors have not listed claims between themselves?

6         MR. THOMASON:  No, the pre-petition claims have been

7  listed.

8         MR. LAFFREDI:  Between the two debtors?

9         MR. THOMASON:  Between the two debtors --

10         MR. LAFFREDI:  Okay.

11         MR. THOMASON:  -- yes.

12         MR. LAFFREDI:  So what does it mean, then, that the

13  debtors take no position as to whether they would be allowed as

14  claims, interests, or not allowed at all?  I don't get that.

15         MR. THOMASON:  Yeah, I'm not sure I can elaborate much

16  more.  I think we're -- we're not taking a position in terms of

17  the amount necessarily being an -- an allowed claim or, sort

18  of, any -- any different from a general unsecured claim just

19  because it's in between related parties.

20         MR. LAFFREDI:  Well, but isn't listing it as a claim

21  taking a position?  And you said you already listed them.

22         MR. KAROTKIN:  It is what it is.  It's listed with a

23  note which explains it.  I don't know how else --

24         MR. LAFFREDI:  So are you saying, then --

25         MR. KAROTKIN:  -- to explain --

1          MR. LAFFREDI:  Well, I just -- I don't know -- I'm
2    trying to understand why this was even included if --
3          MR. KAROTKIN:  Because intercompany balances are
4    listed in order to make full disclosure.
5          MR. LAFFREDI:  Right.  That --
6          MR. KAROTKIN:  And then --
7          MR. LAFFREDI:  That is required under the schedules.
8          MR. KAROTKIN:  Okay.
9          MR. LAFFREDI:  I get that part.
10         MR. KAROTKIN:  And then this explains that the debtors
11   are not taking a position whether it's an allowed claim or not
12   an allowed claim.  I don't know how else to explain it.
13         MR. LAFFREDI:  Okay, I guess the claims-allowance
14   process would govern there, so I'm not sure if this sentence
15   helps much.  But thank you.
16         Okay, next; to number 13, regarding classification.
17   And again, maybe the same -- might be the same.  But it
18   indicates that reasonable efforts have been made to correctly
19   identify and classify assets, liabilities, contracts, et
20   cetera.  What does that mean, "reasonable efforts"?  What was
21   that?  What had happened to --
22         MR. KAROTKIN:  Want to do that?
23         MR. WELLS:  There was an extensive amount of work done
24   to prepare these schedules and statement of financial affairs.
25   We engaged extensively the employees within the company.  We

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 18
of 192

1    brought in third-party contractors to help us sort through

2    invoices.  We prepared these responses with the support of

3    external advisors and counsel.  And so it -- it reflects our

4    best efforts to be responsive to the requirements.

5              MR. LAFFREDI:  Thank you.  Then the last sentence:

6    "The debtors reserve rights to recharacterize, reclassify", et

7    cetera, "as necessary or appropriate, as additional information

8    becomes available."  Again, my question, like before, is has

9    additional information become available since March 14th, that

10   you're aware of?

11             MR. WELLS:  Yes.  We continue to work.

12             MR. LAFFREDI:  And then -- so that means that the

13   debtors have reviewed the information that was filed in the

14   schedules on March 14th, to ensure that it's either still

15   accurate or needs to be updated?

16             MR. WELLS:  That's correct.

17             MR. LAFFREDI:  Okay, then to number 18 and then note

18   to -- this is -- also appears in the note to the statement of

19   financial affairs, regarding confidentiality.  It indicates

20   that there may be instances in the schedules where the debtors

21   have deemed it necessary and appropriate to redact or withhold,

22   from the public record, information such as names, addresses,

23   and amounts.  Were there -- sorry.  Has -- so what does it mean

24   that the debtor has deemed it necessary and appropriate?  Who

25   made that determination?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 19
of 192

1       MR. WELLS:  Those determinations were based on the

2  advice of outside advisors as we looked at the confidentiality

3  of the data that we were submitting.

4       MR. LAFFREDI:  Okay.  But who -- I mean, they

5  recommended, but who made the determination?

6       MR. WELLS:  Ultimately, I -- I reviewed the -- the

7  conclusions.  David Thomason, as previously indicated,

8  certified the filings.  We both were comfortable with the --

9  the conclusions.

10      MR. LAFFREDI:  Okay.  So has the debtor complied with

11  Section 107, with regard to protection from public disclosure

12  of information?

13      MR. KAROTKIN:  Yes, as far as we know.

14      MR. LAFFREDI:  So a motion has been filed to withhold

15  all of the information that this confidentiality note --

16      MR. KAROTKIN:  To the extent required by the statute,

17  yes.

18      MR. LAFFREDI:  And when was that motion filed?

19      MR. KAROTKIN:  There was no motion filed.

20      MR. LAFFREDI:  Well --

21      MR. KAROTKIN:  We believe we fully complied with the

22  statute with respect to the schedules.  And if you believe

23  otherwise, you feel free to take appropriate relief.

24      MR. LAFFREDI:  Okay, but the debtor has the

25  obligation, under Section 107, to disclose everything.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 20
of 192

1      MR. KAROTKIN:  The debtor's well aware of its
2  obligations under the statute and, in our judgment, has fully
3  complied.
4      MR. LAFFREDI:  Okay.  Again, it says there may be
5  instances, so are there or are there not?
6      MR. THOMASON:  Yeah, the -- the only thing I'm aware
7  of that we didn't include would be employee addresses.
8      MR. LAFFREDI:  Okay.  Okay.  Additionally, it says
9  certain agreements may not have been included.  Are you saying
10  that that's also -- that isn't the case, or -- if it was just
11  employee addresses?  And it -- again, it says "may not have
12  been", so I'm just, like, what does that mean?
13      MR. WELLS:  As a larger complex enterprise, we have
14  numerous agreements subject to confidentiality.  For instance,
15  one agreement is gas that we procure to provide our customers,
16  held in third-party locations.  We have not disclosed those
17  specific locations.  We have disclosed the assets as part of
18  our schedules.
19      MR. LAFFREDI:  Have you provided all of this
20  information that was not disclosed, to the United States
21  Trustee?
22      MR. KAROTKIN:  Not that I'm aware of.
23      MR. LAFFREDI:  And why not?
24      MR. KAROTKIN:  We're not aware that we have an
25  obligation to do that.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 21
of 192

1          MR. LAFFREDI:  It's in Section 107.

2          MR. KAROTKIN:  Okay, fine.

3          MR. LAFFREDI:  So then I'm asking that you provide all

4    of this information.

5          MR. KAROTKIN:  And we'll take your request under

6    advisement.

7          MR. LAFFREDI:  Thank you.

8       (Pause.)

9          MR. LAFFREDI:  All right, so then now let's move to

10   the statement of -- oh, sorry, the schedules.  See if I can

11   follow my notes here.  All right, so we'll first turn to

12   Schedule A/B, and I have a few questions about -- generally

13   about this schedule, and then we'll go into them in more

14   detail.  One of the notes, note 5 to the -- the global note 5

15   to the schedules indicates that immaterial assets and

16   liabilities may have -- may also have been excluded.  What does

17   that mean?

18         MR. THOMASON:  The source for developing the schedules

19   is --

20         MR. LAFFREDI:  Um-hum.

21         MR. THOMASON:  -- is generally the company's general

22   ledger.  But if there's a de minimis asset that -- that isn't

23   reflected in the general ledger, then it's -- it wouldn't be

24   reflected in our statements.

25         MR. LAFFREDI:  And who made the determination as to

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 22
of 192

 1  what is de minimis or what is immaterial?

 2         MR. THOMASON:  It would generally follow the -- the

 3  company's accounting practice.

 4         MR. LAFFREDI:  So can you give me an explan -- like,

 5  an example of what would be a de minimis asset that you would

 6  not include?

 7         MR. THOMASON:  If there was a -- if there was a pre-

 8  paid balance, per se, and it was under -- under 50,000 dollars,

 9  we may reflect it as a -- as a pre-paid.  We may expense that

10  amount.

11         MR. LAFFREDI:  And that's what you would consider as

12  de minimis?

13         MR. THOMASON:  Generally, yes.

14         MR. LAFFREDI:  Okay.  Are you aware that the debtors

15  are required to list all assets and liabilities, under the

16  Bankruptcy Code?

17         MR. THOMASON:  Yes.

18         MR. LAFFREDI:  And so why did you make the

19  determination not to list some?

20         MR. THOMASON:  For practical purposes, we don't track

21  de minimis asset values on our balance sheet; nonconsequential

22  or -- or --

23         MR. LAFFREDI:  Immaterial.

24         MR. THOMASON:  -- really not material, from the

25  perspective of our -- our assets.

 1             MR. LAFFREDI:  Is "de minimis" and "immaterial" the

 2    same thing to you?

 3             MR. THOMASON:  No.  "De minimis" is a smaller

 4    threshold than "immaterial".

 5             MR. LAFFREDI:  What does "immaterial" mean to you?

 6             MR. THOMASON:  Depends on the perspective you're

 7    taking around materiality.

 8             MR. LAFFREDI:  That's what I'm asking you.  What does

 9    that mean?

10             MR. THOMASON:  Well, from an investor's perspective,

11    generally we would view it as a hundred million dollars.

12             MR. LAFFREDI:  Okay.  So assets less than a hundred

13    million dollars were not --

14             MR. THOMASON:  No.

15             MR. LAFFREDI:  -- included?

16             MR. THOMASON:  No.  Our accounting standards require

17    us to record significantly less than -- than that.  I've said

18    50,000 dollars.  If we had a -- a prepayment for an amount that

19    was de minims, under 50,000 dollars, we may not record it.

20             MR. LAFFREDI:  Okay.  I mean, but, for example, your

21    bank accounts -- you've listed a whole bunch that have zero

22    value; some are 23,000, 46,000.  Why would you list those

23    and --

24             MR. THOMASON:  Yeah, well, cash is cash.  So cash

25    doesn't require any special accounting the way something like

1    a -- a pre-paid asset would.

2            MR. LAFFREDI:  Okay.  So there's different meanings of

3    "immateriality", depending on what the asset is, is what you're

4    saying?

5            MR. THOMASON:  Yes.

6            MR. LAFFREDI:  Is that identified somewhere?  Like,

7    how are we --

8            MR. THOMASON:  Well --

9            MR. LAFFREDI:  -- going to know?

10            MR. THOMASON:  Different meanings of what we would

11    consider de minimis and not -- and would not include in this

12    case.

13            MR. LAFFREDI:  No, I'm not talking about de minimis.

14            MR. THOMASON:  It's not materially --

15            MR. LAFFREDI:  I'm talking materiality.  Immaterial;

16    because you said --

17            MR. THOMASON:  Anything that's --

18            MR. LAFFREDI:  -- they were two different --

19            MR. THOMASON:  Anything that's material we would

20    include on the schedules.

21            MR. LAFFREDI:  What does that mean to you?

22            MR. THOMASON:  The hundred million I mentioned

23    previously.

24            MR. LAFFREDI:  Okay.  There's a legal definition of

25    materiality.  Are you aware of that?  I'm asking him if he's

1    aware of it.  He doesn't have to know.

2            MR. KAROTKIN:  Are you -- what is it?

3            MR. LAFFREDI:  Well, I'm not ask -- I'm asking if he's

4    aware.

5            MR. KAROTKIN:  Maybe if you asked him what it was, he

6    could answer the question.

7            MR. LAFFREDI:  Well, are you aware of the legal

8    definition of materiality?

9            MR. KAROTKIN:  If you tell him what the legal

10   definition is, he could answer the question.

11           MR. LAFFREDI:  No, I'm --

12           MR. KAROTKIN:  What's the legal definition of it?

13           MR. LAFFREDI:  I'm ask -- you -- I'm asking the

14   questions here, okay?  I want to know whether he --

15           MR. KAROTKIN:  No, and I'm --

16           MR. LAFFREDI:  -- knows.

17           MR. KAROTKIN:  -- and I'm representing my client.

18           MR. LAFFREDI:  So are you not answering the question?

19           MR. KAROTKIN:  Yes, he's not.

20           MR. LAFFREDI:  Okay.  So that sounds to me like you do

21   not understand.

22           MR. KAROTKIN:  It sounds to me like he's not answering

23   the question, Mr. Laffredi.

24           MR. LAFFREDI:  Okay, that's great.

25           And can you answer that --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 26
of 192

1          MR. KAROTKIN:  Maybe if you could --

2          MR. LAFFREDI:  Maybe --

3          MR. KAROTKIN:  -- explain --

4          MR. LAFFREDI:  Can he answer the question --

5          MR. KAROTKIN:  Could you --

6          MR. LAFFREDI:  -- please?

7          MR. KAROTKIN:  -- give him your definition of -- the

8  legal definition of "materiality"?  Because I frankly would

9  like to know.

10          MR. LAFFREDI:  I just want to know whether he knows.

11  And he can answer the question.  So could you please pass him

12  the microphone?

13          MR. WELLS:  As a public entity that files with the

14  SEC, we are aware of the legal definition of "materiality".

15          MR. LAFFREDI:  Okay.

16          MR. WELLS:  We certify our financial statements that

17  we file with the -- the SEC quarterly, in accordance with those

18  definitions.  And as David Thomason had alluded to, the basis

19  for the submissions in these schedules and statements were the

20  company's books and records, which are in compliance with

21  securities laws around materiality.

22          MR. LAFFREDI:  Okay, so you do know?

23          MR. WELLS:  Yes.

24          MR. LAFFREDI:  Okay.  Next, note 8 about intellectual-

25  property rights.  There's a disclaimer about -- well,

1    there's -- I mean, the whole paragraph seems to be a

2    disclaimer.  "Exclusion of certain intellectual property shall

3    not be construed to be an admission that the property has been

4    sold, abandoned, or otherwise expired, transferred.  And then

5    conversely, inclusion also shall not be construed as an

6    admission that they have not been sold."  What does all that

7    mean?  Why are -- why is that in here?

8              If you don't know the answer, just say, "I don't

9    know."

10             MR. WELLS:  I don't know.

11             MR. LAFFREDI:  So you don't know why this is here?

12             MR. WELLS:  It was -- we included it based on the

13   advice of our outside advisors.  But no, I don't specifically

14   recall the issue with intellectual property.

15             MR. LAFFREDI:  Did the debtors review to make sure --

16   to make a determination as to the existence of intellectual

17   property as of the date of filing?

18             MR. WELLS:  Yes, we did.

19             MR. LAFFREDI:  And are you confident that the

20   intellectual property that's listed in the schedules is

21   accurate?

22             MR. WELLS:  Yes.

23             MR. LAFFREDI:  Do you know whether there's going to be

24   any amendments made?  I mean since the filing of the schedules.

25             MR. WELLS:  As we've talked about previously, we

1  continue to do work.  I'm not aware of any update here, but we

2  will continue to assess, and we'll amend as --

3          MR. LAFFREDI:  Okay.

4          MR. WELLS:  -- as appropriate.

5          MR. LAFFREDI:  And then number 12, causes of action.

6  This note indicates that the debtors have not yet listed any

7  causes of action against third parties, as assets in their

8  schedules.  Why not?

9          MR. WELLS:  Because a complete analysis of that hasn't

10 been done.

11         MR. LAFFREDI:  Is that true, what your attorney just

12 said?

13         MR. WELLS:  Yes, it is.

14         MR. LAFFREDI:  And so what does that mean, "yet"?  It

15 sounds like you're going to be doing an analysis.  When will

16 that be done?

17         MR. WELLS:  You know, as I indicated, we're continuing

18 to evaluate the responses here and, as we come to conclusions

19 that require an update, we will find a -- file an amendment as

20 needed.

21         MR. LAFFREDI:  Does --

22         MR. WELLS:  I -- I don't have a date, as we continue

23 to work through this on a day-by-day basis.

24         MR. LAFFREDI:  Do you know -- has an evaluation been

25 done yet?

1        MR. WELLS:  With respect to causes of action, no.

2        MR. LAFFREDI:  Okay.  Okay, next I'm going to go into

3  the specific schedule -- the specific items in Schedule A/B.

4  First the bank accounts.  You've listed many bank accounts, for

5  example, in the 30089 case, with a zero balance.  Why are there

6  all these bank accounts with zero balances?

7        MR. THOMASON:  Yeah, it's just part of our -- our

8  cash-management system.  Sometimes we'll -- we'll set up an

9  account that has a purpose at one point in time, and then we

10  will stop using the account if things in our -- our business

11  changes.

12        MR. LAFFREDI:  Um-hum.

13        MR. THOMASON:  Some accounts are zero-balance

14  accounts; I mean they're -- the balance in the account is -- is

15  swept on a daily basis.

16        MR. LAFFREDI:  Then if we could go to part 3, number

17  11.  This is in the actual schedules; I don't know if you have

18  a copy of them there, but this is the question about accounts

19  receivable.  And there's a specific note that says, "For

20  purposes of these schedules, the debtors have not analyzed all

21  accounts-receivable accounts to calculate the receivables which

22  are over ninety days old."  And then it's listed -- the

23  accounts receivable over ninety days old are all listed at

24  zero.  Why has -- why have the debtors not analyzed all those

25  accounts receivable over ninety days?

1          MR. THOMASON:  So we haven't done a specific analysis

2     of every receivable account -- estimates specifically what that

3     balance -- the value of that balance.  From an accounting

4     standpoint, we're required to age our receivables and apply a

5     allowance for doubtful accounts, based on previous history.  We

6     just haven't done a specific receivable-by-receivable

7     assessment of our accounts-receivable balance.

8          MR. LAFFREDI:  And why not?

9          MR. THOMASON:  Practicality.  Just given the number

10    of -- of different parties which we have receivable balances

11    (sic).  And imperfection in terms of our ability to really

12    assess specifically the collectibility of that amount.

13         MR. LAFFREDI:  Is -- are the debtors going to do that

14    ever?

15         MR. THOMASON:  We don't have any specific plans to do

16    that.

17         MR. LAFFREDI:  So it's not zero but you just don't

18    know what it is?  Or are you saying that it's zero?  Because

19    that's what it says here on this schedule is zero.

20         MR. THOMASON:  Yeah, the -- I mean, the -- the balance

21    is reflecting what's in our -- our general ledger, so there is

22    a -- a allowance for doubtful accounts, against the amount.

23    There's assumably (sic) some value with respect to that

24    receivable, but from an accounting standpoint we can't

25    recognize it, just given the doubt with respect to the -- the

1  collectibility.

2           MR. LAFFREDI:  And so, I'm sorry, have you analyzed it

3  or have you not?  It sounds like you have, then.

4           MR. THOMASON:  We -- we don't do a specific account-

5  by-account analysis in terms of aging our -- our receivables.

6  We apply a history in terms of collectibility of amounts as

7  they -- as they age.

8           MR. LAFFREDI:  Okay.

9           MR. THOMASON:  And --

10          MR. LAFFREDI:  Okay.  Page -- this is now part 7,

11  office furniture, fixtures, equipment, collectibles.  You've

12  listed -- well, first of all, there are two pages that are --

13  look the same, except one -- I don't know if you want to look

14  at this, but there's two --

15          MR. KAROTKIN:  Yeah, if you don't mind.

16          MR. LAFFREDI:  -- different ones that, like -- this

17  looks the same, and the only difference looks like they added

18  server inventory here.  So I don't know what that is.  It's the

19  same -- looks like the same page, only one has another asset

20  that was not listed.  Is it maybe just, like, over -- like --

21          UNIDENTIFIED SPEAKER:  It lays out a summary and then

22  a detail.  So what you have there are two pages:  one's a

23  summary --

24          MR. LAFFREDI:  No --

25          UNIDENTIFIED SPEAKER:  -- one's a detail.  Just so

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 32
of 192

1  happens that that one (indiscernible).

2          MR. LAFFREDI:  No, I don't think so.  It looks like
3  it's the same one, except it's just got one more asset.

4          MR. KAROTKIN:  No, it's different.

5          MR. LAFFREDI:  Oh, it's different?  What is different
6  about it, other than that one asset?

7          MR. KAROTKIN:  Well, computers and parts is different.

8          MR. THOMASON:  Looks like the same number summarized
9  two different ways:  one has got the breakdown of the -- the
10 office equipment, between computers and parts, and then server
11 inventory, whereas the other lists that as one value.  So
12 it's -- the second page is just providing more detail --

13         MR. LAFFREDI:  Oh.

14         MR. THOMASON:  -- than this, the first.

15         MR. LAFFREDI:  Okay.  Thank you.  And then the 42. --
16 sorry; question 42 about collectibles, it lists artwork and
17 miscellaneous.  What kind of artwork does the debtor -- do the
18 debtors own?

19         MR. WELLS:  It's general office furnishings.  We have
20 larger office space.  It's the -- the artwork that's adorned on
21 the walls.  It's not as it sounds.  It's not high-worth
22 investments in art.

23         MR. LAFFREDI:  So somebody made that determination?

24         MR. WELLS:  Yes.  It's general office furnishings.

25         MR. LAFFREDI:  And then so that's what miscellaneous

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 33
of 192

 1   is, then, also is general --

 2              MR. WELLS:  Yeah, what page --

 3              MR. KAROTKIN:  He's got --

 4              MR. LAFFREDI:  Oh, here.

 5              MR. WELLS:  It's -- it's -- we're a large company with

 6   a lot of office furnishings, and it's -- it's miscellaneous

 7   items that --

 8              MR. LAFFREDI:  Well, it's listed under "Collectibles",

 9   so I'm just wondering what kind of collectibles would be

10   miscellaneous.

11              MR. WELLS:  We have a lot of -- we're a hundred-plus-

12   year-old company that has a great history here in California.

13   We have a number of our equipment that we've utilized in our

14   operations, displayed throughout our corporate office building.

15   They're things like that that we'd consider collectibles, but

16   not in the sense of -- of, you know, maybe -- collectibles

17   are -- and they are -- eye of the beholder.

18              MR. LAFFREDI:  Well, has anybody valued them?  I mean

19   sounds like, if you had some really old stuff from way back,

20   some of that might be valuable.

21              MR. WELLS:  We have not undertaken a fair-value

22   assessment of those collectibles.

23              MR. LAFFREDI:  Are they part of the insurance

24   policies?

25              MR. WELLS:  Yeah.  Our insurance policies cover damage

 1    to our property, so it would cover also the contents within
 2    the -- the office buildings.
 3            MR. LAFFREDI:  So there -- do you know whether there's
 4    any rider as far as any, like, artifacts or --
 5            MR. WELLS:  No, there isn't, because it's not -- it's
 6    not significant.
 7            MR. LAFFREDI:  Okay.  Then -- okay, then question 67
 8    under "Intangibles and Intellectual Property" asks, "Do your
 9    lists or records include personally identifiable information of
10    customers?"  And you've checked the box that says no.  Is that
11    true?
12            MR. THOMASON:  As a company, we have personally
13    identifiable information on our customers.  We didn't report
14    any -- of that in any of the schedules.
15            MR. LAFFREDI:  Well, no, it's not asking whether you
16    reported it.  It's asking whether the debtors -- whether the
17    debtors' records include this information.
18            MR. KAROTKIN:  Do you want to show it to him?
19            MR. LAFFREDI:  Oh, yeah.  67.  Because I think in the
20    statement of financial affairs you indicated that you do have
21    that, but --
22            MR. KAROTKIN:  We can get back to you on that.
23            MR. THOMASON:  The company does have personally
24    identifiable information on our customers.
25            MR. LAFFREDI:  Yeah, I think it may be just you need

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 35
of 192

 1  to check this Yes box instead, but --

 2            MR. KAROTKIN:  You need --

 3            MR. LAFFREDI:  Yeah, I need my notes back.  Sorry.

 4            MR. KAROTKIN:  We won't give them --

 5       (Laughter.)

 6            MR. LAFFREDI:  You can just go through and answer them

 7  all if you want, but -- here.  Thank you.

 8            Number 60 talks about patents, copyrights, trademarks,

 9  and trade secrets.  And then 61 -- I'm sorry, and let's just

10  give him 60.  The notes indicate that, for a valuation of some

11  of this intellectual property, it would be unduly burdensome to

12  come up with a value.  What does that mean to be unduly

13  burdensome?

14            MR. THOMASON:  Relative to the value of the

15  intellectual property, doing an assessment when it's extremely

16  difficult to tell what ultimately the -- the market value --

17  there may not be a market value for the property.  So, un --

18  "unduly burdensome" means it wouldn't make business sense to

19  actually try to evaluate.  It may not be even possible to

20  evaluate the value of that property.

21            MR. LAFFREDI:  And then who made that determination?

22            MR. THOMASON:  The com -- the company made that

23  determination in conjunction with outside support.

24            MR. LAFFREDI:  Well, you signed the schedules, but --

25  so did you make that determination or --

1          MR. THOMASON:  I -- I agree with that determination.

2          MR. LAFFREDI:  Who would have made it, though?

3          MR. THOMASON:  I made the determination.

4          MR. LAFFREDI:  Okay.  Next, it lists -- you've listed

5     a bunch of internet-domain names and websites, and I just had a

6     couple questions about some of them.  For example, the

7     debtor -- the debtors own pgefailure.com and pgeguilty.com.

8     What is that?

9          MR. THOMASON:  I'm actually not sure what specifically

10    that is.

11         MR. LAFFREDI:  Why would the debtor own those?

12         MR. THOMASON:  Why would we own the domain name?

13         MR. LAFFREDI:  Um-hum.  Or stoppge.com.

14         MR. THOMASON:  Assumably, the company would purchase

15    that domain name to keep it from being used by another party.

16         MR. LAFFREDI:  Okay.  Does it operate a website there,

17    or --

18         MR. THOMASON:  Not that I'm aware of.

19         MR. LAFFREDI:  Number 75, there's -- this is about

20    other contingent and unliquidated claims or causes of action of

21    every nature, including counterclaims and rights to set off.

22    One of the notes -- a note, small Roman viii, indicates that

23    either of the debtors may be a party to a pending litigation in

24    which the debtors have asserted or may assert claims as a

25    plaintiff, or counterclaims and cross-claims.  But because such

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 37
of 192

1  claims are unknown to the debtors and not quantifiable as of

2  the petition date, they were not listed here.  What does that

3  mean?  Are you saying that the debtors don't know whether they

4  have claims or counterclaims?

5           MR. THOMASON:  In -- no, we should know whether we

6  have counterclaims.  I mean, we haven't -- we haven't valued

7  any of the claims against the company.  So whether there's a

8  counterclaim or not wouldn't change the -- the value of the

9  claim against the company.

10          MR. LAFFREDI:  Well, but you listed other assets that

11 you didn't know the value of.  Why would you not list this?

12     (Pause.)

13          MR. THOMASON:  So we're -- we're not aware of all of

14 the counterclaims the company may have --

15          MR. LAFFREDI:  Okay.

16          MR. THOMASON:  -- related to claims against the

17 company.

18          MR. LAFFREDI:  Are you aware of some?

19          MR. THOMASON:  Yeah, we -- we didn't list any

20 counterclaims.  I -- I'm not aware of specifically the

21 counterclaims we have, related to claims that we've listed

22 against the company.

23          MR. LAFFREDI:  Is there somebody else who would know

24 that, though?

25          MR. THOMASON:  Presumably, yes.  It may be the case

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 38
of 192

1  that we have a -- we have a pending counterclaim.  But

2  presumably, yes.

3          MR. LAFFREDI:  Number 77.  This is other property of

4  any kind not already listed.  And one of the notes, note sub 9,

5  discusses insurance receivables for insurance recoveries.  And

6  it indicates that the amounts of the receivable is (sic)

7  subject to change based on additional information.  This is

8  with regard to the wildfires, I think, specifically.  So has

9  additional information become available since March 14th?

10          MR. THOMASON:  Not that would change the --

11          MR. LAFFREDI:  Okay.

12          MR. THOMASON:  -- amount we've reported in the --

13          MR. LAFFREDI:  Okay.  And I'm going to go to Schedule

14  D.  And generally I have a question about -- well, never mind;

15  this -- so this note 14, global note 14, is with regard to

16  secured claims -- or specifically with regard to secured

17  claims, indicating that listing a claim on the schedules as

18  secured does not constitute an admission by the debtors of the

19  legal rights of a claimant, or a waiver of the debtors' right

20  to reclassify such claim.  And then the debtors reserve all

21  rights to amend, supplement, or otherwise modify as necessary

22  and appropriate.

23          So to your knowledge, since March 14th, is it

24  necessary and appropriate to amend any of the schedules or to

25  change or reclassify the nature of the listed claim?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 39
of 192

1           MR. THOMASON:  Not between secured and unsecured.

2           MR. LAFFREDI:  Okay.  Then note B to the global notes,

3   with regard to Schedule D in particular, indicates that it

4   would be unduly burdensome and cost-prohibitive to include the

5   dates the claims were incurred.  So you've indicated earlier

6   that "unduly burdensome" means that it would not make business

7   sense to undertake that?  Is that what you said earlier?

8           MR. THOMASON:  Yeah, that's what I said earlier.

9           MR. LAFFREDI:  And does that apply here too, to

10  indicate what date the claims were incurred?

11          MR. THOMASON:  Yes, that's correct.

12          MR. LAFFREDI:  And also cost-prohibitive; did somebody

13  make a determination that it would be cost-prohibitive to

14  include the dates the claims were incurred?

15          MR. THOMASON:  Yes.  That was part of the decision in

16  terms of not providing the date upon which the claim was

17  incurred.

18          MR. LAFFREDI:  And do you know who made that call?

19          MR. THOMASON:  It -- it was a company decision that I

20  support.

21          MR. LAFFREDI:  Okay.  And then same goes for the

22  unsecured claims listed on Schedules E and F.  Would it be your

23  same answer for those -- the dates the claims were incurred

24  there?

25          MR. THOMASON:  Yes.  That's the majority of our

1  claims.  Yes.

2          MR. LAFFREDI:  Okay.  Okay, number -- now going to

3  Schedule E/F.  Note 5 to the -- the global note 5 indicates

4  that the debtors have excluded certain items, including accrued

5  liabilities -- certain accrued liabilities, including accrued

6  salaries, employee-benefit accruals, and other accruals.  Why

7  are those not included here?

8          MR. THOMASON:  Yeah, we didn't include accrued wages

9  and benefits that were covered under the -- the first-day

10  motion.  Those payments continue to be made in the normal

11  course of the business.

12          MR. LAFFREDI:  Your reason for not including that was

13  because they continue to be paid in the normal course?  I don't

14  want to put words in your mouth.  I'm trying to understand what

15  you said.

16          MR. KAROTKIN:  On the advice of counsel.

17          MR. LAFFREDI:  Well, I'm trying to -- why -- I'm just

18  trying to understand the answer that you just gave.  Was the

19  reason because --

20          MR. THOMASON:  That's correct.

21          MR. LAFFREDI:  -- it would be paid in the --

22          MR. THOMASON:  That's correct.

23          MR. LAFFREDI:  -- normal course -- okay.

24          And same with refund claims.  Why were those not

25  listed?

1          MR. THOMASON:  Same -- same reason:  we continue to

2     pay those back in the normal course of the business.

3          MR. LAFFREDI:  Okay.  And then what about claims

4     against other plaintiffs that you might have?  I guess maybe

5     this could be a cross-claim, counterclaim we already discussed.

6          MR. KAROTKIN:  What are you referring to?

7          MR. LAFFREDI:  Well, no, I'm asking why, for example,

8     claims against other plaintiffs wouldn't have been included.

9     That's not specifically number 5, but that's -- where is that?

10          MR. WELLS:  Yeah, I think we -- we covered that in

11     our --

12          MR. LAFFREDI:  Okay.

13          MR. WELLS:  -- discussion around cross-claims.

14          MR. LAFFREDI:  Okay, then now going to note C for

15     Schedule E/F, specifically with regard to employees.  It

16     indicates that the debtors have used reasonable efforts to

17     include all employees on Schedule E/F that had pre-petition

18     claims as of the petition date.  What does that mean,

19     "reasonable efforts"?

20          MR. THOMASON:  So we have our HR records of the

21     residents in our -- our nonqualified plans.  So, reasonable

22     effort essentially was going to those -- those records.  We --

23     we believe they're full and accurate.

24          MR. LAFFREDI:  Okay.  And so -- but didn't you just

25     say earlier that you didn't include those employees who had

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 42
of 192

1  wages owed to them?

2          MR. THOMASON:  Yeah.  What I was talking about is

3  accrued salaries and -- and wages.

4          MR. LAFFREDI:  Okay.

5          MR. THOMASON:  We had the bankruptcy-court authority

6  to continue paying the --

7          MR. LAFFREDI:  Oh.

8          MR. THOMASON:  -- amounts that employees would have

9  claims associated with -- would be associated with the

10  nonqualified --

11          MR. LAFFREDI:  Right.

12          MR. THOMASON:  -- plans.

13          MR. LAFFREDI:  And so those were listed?

14          MR. THOMASON:  Those were listed.

15          MR. LAFFREDI:  And about the addresses, as you

16  mentioned earlier, did the debtors take efforts to make sure

17  that the -- those employees who had claims received notice of

18  this 341 meeting?

19          MR. THOMASON:  Yes.  Employees were -- employees were

20  notified regarding their inclusion in the -- the schedules that

21  we are filing with the bankruptcy court.

22          MR. LAFFREDI:  I'm sorry; they were notified of what?

23          MR. THOMASON:  Employees were notified about their

24  inclusion in terms of their names in schedules we were filing

25  associated with the bankruptcy.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 43
of 192

1          MR. LAFFREDI:  Right, but I'm asking whether they
2    received notice of this meeting of creditors.
3          MR. THOMASON:  Yeah, all -- all employees have
4    received notice of this meeting.
5          MR. LAFFREDI:  Okay.  So then we go to customer
6    deposits.  The note here indicates that the debtors have not
7    listed customer deposits, due to the number of customers with
8    deposits, the relief granted in connection with the customer-
9    programs motion, and the confidential nature of these deposits.
10   So what are these reasons?  I guess I'm not following what
11   the -- so first let's start with, due to the number of
12   customers, you didn't list them.
13         MR. THOMASON:  We have quite a few customers that have
14   deposits with -- with the company.  Given that we had the
15   authority to continue refunding those deposits from the
16   bankruptcy court --
17         MR. LAFFREDI:  Well, I'm not talking about that reason
18   yet.  I'm still just talking about the nature.  Is that -- are
19   you saying that it's, like, a cost-prohibitive thing, or
20   business judgment, like the other ones?
21         MR. THOMASON:  To list the actual customers?
22         MR. LAFFREDI:  Yes.  Well, why didn't you say that?
23   That's why -- I guess that's what I'm asking.  Why didn't you
24   use the same language that you had used earlier?
25         MR. KAROTKIN:  The language is very clear.  I don't

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 44
of 192

1   understand why you have a problem with it.

2           MR. LAFFREDI:  Well, no, you used the language

3   throughout and then you don't use it here.  I'm just wondering

4   if there's a reason.

5           MR. KAROTKIN:  The language is clear.

6           MR. LAFFREDI:  Is there a reason?

7           MR. KAROTKIN:  Can you move on, please?

8           MR. LAFFREDI:  No, I'm asking if there's a reason why

9   you didn't use it here.  If there isn't a reason, then just say

10  that.

11          MR. KAROTKIN:  The language is clear and explains why

12  it was done.  I don't know what else you would like to know.

13  Okay?

14          MR. LAFFREDI:  I'm asking why that language was not

15  used.  And if you don't know, then just say you don't know.

16          MR. KAROTKIN:  The language is clear.  I think that's

17  all we have to say.

18          MR. LAFFREDI:  Okay.

19          MR. KAROTKIN:  Okay?

20          MR. LAFFREDI:  Do you know, sir?  I already know what

21  your attorney thinks.

22          MR. THOMASON:  I mean, we tried to be as clear as

23  possible in -- in each section.

24          MR. LAFFREDI:  Okay.  All right, then let's go to the

25  next one, the relief granted.  That's what you were starting to

1  get into next.  So the reason you didn't list them is because
2  you believe that the Court already authorized them not to be
3  listed?  Is that what you're saying?

4          MR. KAROTKIN:  The Court authorized all those amounts
5  to be paid pursuant to a first-day order.  That's the reason
6  they were not listed.  The debtors, on advice of their retained
7  professionals, made a determination that it would be not only
8  impractable -- impracticable and costly to list sixteen million
9  people on the schedules -- that there was no point to do it.

10          MR. LAFFREDI:  Is that true?

11          MR. THOMASON:  Yes.

12          MR. LAFFREDI:  And then also the confidential nature?
13  That was part of the calculus?

14          MR. THOMASON:  Yes.

15          MR. LAFFREDI:  And who made that determination?

16          MR. THOMASON:  The company made that determination; I
17  agree with it.

18          MR. LAFFREDI:  Okay.  Then we get to internal
19  grievance claims, and the note indicates that the debtors have
20  generally excluded internal grievance claims, to protect the
21  privacy interests of the grieving party and because the
22  majority of this -- such claims will not result in actual
23  litigation.  And in addition, certain litigation covered by
24  insurance policies may be excluded.

25          So let's -- again, let's break this down.  It says

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 46
of 192

1  "generally excluded internal grievance claims".  Does that mean
2  that some have been included?
3          MR. THOMASON:  If the company was sued by a -- a
4  former employee, if we had a ongoing legal action related to an
5  internal matter, then it would -- would be listed.  Not all
6  internal grievances have risen to that --
7          MR. LAFFREDI:  So --
8          MR. THOMASON:  -- to that point.
9          MR. LAFFREDI:  So are you saying that if it was a
10  former employee who's no longer internal, turned into a
11  lawsuit --
12          MR. THOMASON:  If it -- if it's a lawsuit, then it's
13  included.
14          MR. LAFFREDI:  Right.
15          MR. THOMASON:  If it's an internal grievance --
16          MR. LAFFREDI:  Okay.
17          MR. THOMASON:  -- it wouldn't necessarily be included.
18          MR. LAFFREDI:  And so do those parties -- well, strike
19  that.
20          Okay, then let's go to the next reason:  "The majority
21  of such claims generally will not result in actual litigation."
22  Why is that a reason?
23          MR. THOMASON:  I would say we have internal employee
24  matters raised all the time in the normal course of -- of
25  business.  They're generally not financial claims against

1   the -- the company.

2           MR. LAFFREDI:  So -- but can you tell which ones are

3   financial and which ones are not?

4           MR. THOMASON:  Assumably we could, based on an

5   assessment of each individual grievance.

6           MR. LAFFREDI:  And again, I'm sorry if I -- I don't

7   think I asked this, but who made the determination not to list

8   these?

9           MR. THOMASON:  The company made a determination that I

10  support.

11          MR. LAFFREDI:  And then the last paragraph under this

12  note is, "As of the filing of the schedules, the debtors have

13  not received all invoices for payables, expenses, or

14  liabilities that may have accrued before the petition date and,

15  accordingly, the information may be incomplete" that was listed

16  in Schedule E/F.  Have you since received this information?

17          MR. THOMASON:  Yes -- well, invoices have continued

18  to -- to come in for services that were provided before the

19  petition date.

20          MR. LAFFREDI:  Okay.

21          MR. THOMASON:  So in the schedules, it had a cutoff of

22  invoices as of March 11th.  So we have received updated

23  information regarding pre-petition claims.  We spoke about that

24  earlier.

25          MR. LAFFREDI:  And so you will be amending if

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 48
of 192

 1   necessary, if there are changes?

 2           MR. KAROTKIN:  To the extent these schedules need to

 3   be amended, we'll do so.

 4           MR. LAFFREDI:  Okay.  Okay, then I'm going to go to

 5   Schedule G, with regard to note -- global note number 7;

 6   indicates that -- the second paragraph indicates that the

 7   Financial Accounting Standard (sic) Board issued an ASU that

 8   was effective on January 1st.  Then it says, "PG&E and the

 9   Utility plan to adopt this guidance in the first quarter of

10   2019," and so therefore the schedules don't include the asset

11   or liability of those operating leases.  Now that the first

12   quarter is over, do you know what the information would be that

13   should be included?

14           MR. THOMASON:  Well, we will adopt in -- in Q1 and we

15   will reflect a lease liability for those leases that were

16   previously accounted for as -- as operating leases.

17           MR. LAFFREDI:  Well, but quarter -- the first quarter

18   has already passed.

19           MR. THOMASON:  Well, we haven't reported our first-

20   quarter financials yet.  We do that later this week.

21           MR. LAFFREDI:  Oh, you're talking about when it will

22   be reported, not -- sorry, I'm -- when is it supposed to be

23   reported?  When is the first quarter supported to be reported?

24           MR. THOMASON:  So, later -- later this week.

25           MR. LAFFREDI:  Okay, later this week.  So that's when

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 49
of 192

1    you'll know --

2              MR. THOMASON:  Well --

3              MR. LAFFREDI:  No, no, I'm just wondering, is that --

4    you will know what the value is -- or the amount of the assets

5    and liabilities of any of those operating leases, and they will

6    be included?

7              MR. THOMASON:  So, yeah, they will be externally

8    reported when we publish our 10-Q later this week.

9              MR. LAFFREDI:  That's great about being externally

10   reported.  I'm talking about the bankruptcy schedules here.

11             MR. THOMASON:  So from a bankruptcy-schedule

12   standpoint, the -- the liability we're -- we will recognize

13   when we adopt a new accounting standard --

14             Sorry.  So the liability will recognize when we adopt

15   the accounting standard as associated with operating leases.

16   But the -- the future payments with respect to outstanding

17   operating leases wouldn't be claims as of the -- the filing

18   date.  So they're not -- so adopting the accounting standards

19   isn't necessarily relevant for liabilities that existed as of

20   the filing date.

21             MR. LAFFREDI:  Right, which gets to my -- the main

22   point of my question is are they listed in the Schedule G or

23   not?  Because all it is, is executory contracts and unexpired

24   leases and --

25             MR. THOMASON:  Yeah -- yeah, all the contracts'd be

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 50
of 192

1  listed as executory --

2          MR. LAFFREDI:  Okay.

3          MR. THOMASON:  -- contracts.  To the extent there's

4  any amount outstanding as of the filing date, it would have

5  been listed --

6          MR. LAFFREDI:  Okay.  Then note D indicates, with

7  regard to Schedule G, that reasonable efforts have been made to

8  ensure the accuracy -- again, what are those efforts that were

9  undertaken?

10          MR. THOMASON:  Sorry, what -- can you give me a

11  reference --

12          MR. LAFFREDI:  No, the note -- it's note D on page 12;

13  the first -- second sentence.

14          MR. THOMASON:  Yeah.  So we -- we worked with all of

15  our -- our sourcing team, our corporate real-estate team,

16  general counsel.  We basically reached out to all the different

17  parts of -- of the business that oversees contracts.  We have

18  an inventory of contracts as part of our implementation of the

19  lease standards, so we have sources to make sure that what

20  we're reporting in terms of outstanding executory contracts was

21  comprehensive.

22          MR. LAFFREDI:  Okay.  Then the last paragraph under

23  this note is -- talks about master services agreements, and it

24  says, in the second paragraph -- or second sentence, "Schedule

25  G includes certain of such MSAs or other governing documents."

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 51
of 192

1  Does that mean that some MSAs are not included?

2          MR. THOMASON:  Yeah, generally all of them would be

3  there.  The ones that we're aware of -- that I'm aware of,

4  were -- were reported.

5          MR. LAFFREDI:  And so the reasonable efforts, would

6  that be how you would become aware of them?

7          MR. THOMASON:  Yes.

8          MR. LAFFREDI:  So you're not aware that any were

9  excluded?

10          MR. THOMASON:  We didn't purposely exclude any.

11          MR. LAFFREDI:  Has anybody reviewed this schedule for

12  accuracy since March 14th, to make sure that none were left

13  off?

14          MR. THOMASON:  We haven't reviewed since March 14th to

15  verify the accuracy of the executory contracts that were

16  reported.

17          MR. LAFFREDI:  Is that review going to happen; do you

18  know?

19          MR. THOMASON:  I think the -- the review would be

20  essentially performing the same procedures that we -- we

21  performed when we originally provided the response.

22          MR. LAFFREDI:  So it will happen?

23          MR. KAROTKIN:  No.

24          MR. LAFFREDI:  You just said it will be.

25          MR. THOMASON:  No, I -- I guess what I'm saying is I

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 52
of 192

1  don't -- I don't know what additional steps we could perform

2  to -- to identify contracts.  I mean, the -- the contracts --

3  list of contracts inventory would change all the time, to the

4  extent we're entering into new contracts.  But in terms of the

5  contracts that existed as of the filing date, that should not

6  change.

7         MR. LAFFREDI:  Okay.  Okay, then Schedule H, co-

8  debtors.  You've listed that -- or you've indicated that, with

9  regard to pending or threatened litigation, environmental

10  matters, and claims arising out of conduct of the business,

11  which may involve multiple plaintiffs, those claims are listed

12  elsewhere in the statements and schedules and they have not

13  been set forth individually on Schedule H.  Do you know where

14  they are listed?  Because I thought earlier you said you didn't

15  know whether there were any cross-claims or counterclaims.

16         MR. THOMASON:  Yeah, I think -- yeah, everything

17  that -- that we would be aware of in terms of a -- a

18  counterclaim would essentially have been reported in Schedule F

19  or on another schedule.

20         MR. LAFFREDI:  Okay.  Then the last sentence there,

21  "The debtors reserve their right, but shall not be required, to

22  amend the schedules to the extent that additional guarantees

23  are identified or such guarantees are discovered to have

24  expired or are under" -- "or are unenforceable," what does that

25  mean?  Are you saying that the debtors don't have to correct an

 1  error?

 2          MR. KAROTKIN:  It doesn't refer to errors.

 3          MR. LAFFREDI:  Well, I'm asking what it's referring

 4  to.  What does that mean?

 5          MR. KAROTKIN:  It means what it says.

 6          MR. LAFFREDI:  I'm ask -- I don't understand what it

 7  says.  What does it mean?

 8          MR. KAROTKIN:  I don't know how else to explain it to

 9  you.  It's pretty straightforward.

10          MR. LAFFREDI:  Mr. Tomlinson, do you know how to

11  explain it to me?

12          MR. THOMASON:  I -- I think the -- I think the words

13  speak for themselves.  I don't know that I can add --

14          MR. LAFFREDI:  So you don't know what it means?

15          MR. KAROTKIN:  It's not what he said.

16          MR. LAFFREDI:  I'm asking him to explain --

17          MR. KAROTKIN:  Okay --

18          MR. LAFFREDI:  -- it to me.

19          MR. KAROTKIN:  He answered your quest --

20          MR. LAFFREDI:  He cannot explain it.

21          MR. KAROTKIN:  He answered your question.

22          MR. LAFFREDI:  It doesn't make sense to me, so --

23          MR. KAROTKIN:  Okay, that's fine.  If it doesn't make

24  sense to you, Tim, it's fine.  Everything doesn't have to make

25  sense to you.

1          MR. LAFFREDI:  It has to make sense for the record,
2    and I don't think it does.
3          MR. THOMASON:  It --
4          MR. LAFFREDI:  So the --
5          MR. KAROTKIN:  I think the answer to the question --
6          MR. LAFFREDI:  So, "additional guarantees are
7    identified"; does that mean additional guarantees that are
8    identified as of the date of the petition or after?
9          MR. KAROTKIN:  If you know.
10         MR. THOMASON:  After is what we're referring to.
11         MR. LAFFREDI:  Okay, after the petition.  "or such
12   guarantees are discovered to have expired or are
13   unenforceable"; is that as of the date of the petition or
14   after?
15         MR. THOMASON:  After.
16         MR. LAFFREDI:  Okay, so this means that the debtor
17   does not believe it has an obligation to amend the schedules to
18   correct any -- or to amend anything, with regard to the
19   schedule, that occurred after the petition date?  Is that what
20   it's saying?
21         MR. KAROTKIN:  You mean as to the guarantees?
22         MR. LAFFREDI:  Yes.
23         MR. KAROTKIN:  Or anything?
24         MR. LAFFREDI:  The guarant -- I'm asking about this
25   sentence right here in front of you.

1        MR. KAROTKIN:  You said "amend the schedules at all".

2        MR. LAFFREDI:  I'm asking about this sentence.  We

3  just went over this.  I'm trying to understand the sentence.

4        MR. THOMASON:  Yeah, the sentence is conveying that we

5  didn't have the intention to update for --

6        MR. LAFFREDI:  Got it.

7        MR. THOMASON:  -- new information.

8        MR. LAFFREDI:  Thank you.  That helps.  Thank you.

9        Okay, now let's go to the statement of financial

10  affairs.  Okay, number 4 -- part 2, number 4 asks about

11  payments to -- payments or other transfers made within the year

12  before filing, that benefited any insider.  And now note D to

13  the statement of financial affairs; it contains a definition of

14  what an insider is, and it says, "For purposes of the

15  statements, 'insiders' is defined as current or former

16  executives as defined in the Form 10-K, as well as nonemployee

17  directors and affiliates of the debtors."  Is that a different

18  definition that is included right there in the instructions,

19  under the Bankruptcy Code?  Which, if you don't have it in

20  front of you, it's, "Insiders include officers, directors, and

21  anyone in control of a corporate debtor and their relatives;

22  general partners of a partnership debtor and their relatives;

23  affiliates of the debtor and insiders of such affiliates; and

24  any managing agent of the debtor."

25        MR. KAROTKIN:  The definition of "insider", for

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 56
of 192

1    purpose of the schedules, was done on the basis of advice of

2    counsel.

3              MR. LAFFREDI:  Why would you use a different

4    definition than --

5              MR. KAROTKIN:  Because that's what's --

6              MR. LAFFREDI:  -- under the Bankruptcy --

7              MR. KAROTKIN:  -- generally used in the practice of

8    law in this district and other districts, and that's --

9              MR. LAFFREDI:  There's a different definition than the

10   one under the Bankruptcy Code?  Is that what you're saying?

11             MR. KAROTKIN:  You can read the language.  The

12   definition we used for "insiders" is as set forth in that note.

13             MR. LAFFREDI:  Right; I'm asking why you used a --

14             MR. KAROTKIN:  And I --

15             MR. LAFFREDI:  First I'm asking is it different than

16   the one that's listed right there?

17             MR. KAROTKIN:  I think you can draw your own

18   conclusions as to that by --

19             MR. LAFFREDI:  I --

20             MR. KAROTKIN:  -- reading the words.

21             MR. LAFFREDI:  Okay, Mr. Tomlinson --

22             MR. KAROTKIN:  As I said, we can move on.

23             MR. LAFFREDI:  Can I ask Mr. Tomlinson --

24             MR. KAROTKIN:  No, no, no.  We can move on.

25             MR. LAFFREDI:  No, I'm not ready to move on.

1           MR. KAROTKIN:  The definition of "insider" was done on

2    the basis of advice of counsel, period.  And he's not going to

3    answer any more questions about that.

4           MR. LAFFREDI:  Mr. Tomlinson, is that true?

5           MR. KAROTKIN:  What I just said, is that true?

6           MR. LAFFREDI:  I'm asking Mr. Tomlinson --

7           MR. KAROTKIN:  Is that the question?

8           MR. LAFFREDI:  Yes.

9           MR. KAROTKIN:  Okay, fine.

10          MR. LAFFREDI:  He is testifying, not you.

11          MR. KAROTKIN:  You -- are you asking him is --

12          MR. LAFFREDI:  What you just said --

13          MR. KAROTKIN:  What I said is true?

14          MR. LAFFREDI:  -- true.  Yes?

15          MR. KAROTKIN:  Yes, you can ask him that.

16          MR. LAFFREDI:  Yes.

17          MR. THOMASON:  Yeah, we -- we defined "insiders" based

18   on the advice of counsel.

19          MR. LAFFREDI:  And why would you -- why would you use

20   a different definition?

21          MR. KAROTKIN:  He answered the question.  It was done

22   on advice of counsel.  That's it.  If you --

23          MR. LAFFREDI:  Are you aware --

24          MR. KAROTKIN:  -- don't like it --

25          MR. LAFFREDI:  Are you aware --

 1          MR. KAROTKIN:  If you don't --

 2          MR. LAFFREDI:  -- that there are --

 3          MR. KAROTKIN:  -- like it --

 4          MR. LAFFREDI:  Excuse me.

 5          MR. KAROTKIN:  -- you may go to the court and seek

 6     appropriate relief.

 7          MR. LAFFREDI:  Thank you.

 8          MR. KAROTKIN:  Okay?

 9          MR. LAFFREDI:  Are you aware that there are different

10     definitions?

11          MR. KAROTKIN:  Where?

12          MR. LAFFREDI:  I'm not asking you.  I'm asking Mr.

13     Tomlinson.

14          MR. KAROTKIN:  I think -- look, Mr. Laffredi, I think

15     we should move on.

16          MR. LAFFREDI:  I'm not ready to move on.

17          MR. KAROTKIN:  Well --

18          MR. LAFFREDI:  Mr. Tomlinson --

19          Could you please hand him the microphone?

20          -- are you aware --

21          MR. KAROTKIN:  I'll make --

22          MR. LAFFREDI:  -- that there are different definitions

23     of the term "insider"?

24          MR. KAROTKIN:  Where?

25          MR. LAFFREDI:  In the Bankruptcy Code and in this Form

1  10-K.

2           MR. KAROTKIN:  If you know.

3           MR. THOMASON:  So I understand there are different

4  interpretations of the term "insider".  I'm not aware of -- of

5  a -- I'll leave it there.

6           MR. LAFFREDI:  Okay.  And did you make a determination

7  that one was more appropriate than the other?

8           MR. KAROTKIN:  He did it on advice of counsel.

9           MR. LAFFREDI:  Is that true?

10          MR. KAROTKIN:  He already answered that it was true.

11          MR. THOMASON:  So you made this -- you were the one

12  who made this determination?

13          MR. KAROTKIN:  He took advice of counsel as to what

14  "insider" means for purpose of the schedules.  I don't know how

15  to make that any clearer to you.

16          MR. LAFFREDI:  Right.  So what I'm asking is why you

17  made that.  Can you tell me --

18          MR. KAROTKIN:  On advice of counsel.

19          MR. LAFFREDI:  Can you tell me why?

20          MR. KAROTKIN:  On advice of counsel.

21          MR. LAFFREDI:  Mr. Tomlinson, can you tell me why?

22          MR. KAROTKIN:  He answered your question.

23          MR. LAFFREDI:  Can you please hand him the microphone?

24          MR. KAROTKIN:  No.

25          MR. LAFFREDI:  I'm asking --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 60
of 192

1          MR. KAROTKIN:  No.  No.

2          MR. LAFFREDI:  Okay, well, I guess we're going to have

3    to move on, because the debtor will not answer this question.

4          MR. KAROTKIN:  The debtor answered the question.  He

5    said he did it on advice of counsel.  I suggest you move on.

6          MR. LAFFREDI:  Okay, thank you.

7          So on this question number 4, you've indicated --

8    you've listed insiders, I guess, under the definition that

9    you've stated that's different than the Bankruptcy Code

10   definition.

11         MR. KAROTKIN:  Is that a question --

12         MR. LAFFREDI:  But you listed --

13         MR. KAROTKIN:  -- or is that your editorializing?

14         MR. LAFFREDI:  That was an editorial.

15         MR. KAROTKIN:  If you have a question, ask him a

16   question.

17         MR. LAFFREDI:  I am asking.  I am asking.

18         MR. KAROTKIN:  Okay.  Then rephrase the question.

19         MR. LAFFREDI:  Okay, thank you.

20         So the names that you've listed for insiders, with

21   your definition, are the former and current, I guess, executive

22   officers as well as nonemployee debtors and affiliates.  But

23   you did not list addresses.  What you listed was "Address

24   available upon request."  Why did you not list the addresses?

25         MR. THOMASON:  We -- we talked about this before, the

 1    sensitive nature of providing somebody's home address.  So
 2    these are employees of the company, and members of our board of
 3    directors.  We didn't think it's appropriate to provide their
 4    home addresses.
 5            MR. LAFFREDI:  Well, could you have provided a
 6    business address?
 7            MR. THOMASON:  The -- the business address would be
 8    the company's address.
 9            MR. LAFFREDI:  Okay.  Except former employ -- former
10    executives?
11            MR. THOMASON:  Except for, yeah, former employees.
12            MR. LAFFREDI:  So why would you not list the former
13    ones, then, like if they have a new business address?
14            MR. THOMASON:  Protecting their personal information
15    that's --
16            MR. LAFFREDI:  No, I'm asking about their business
17    address, not personal?
18            MR. THOMASON:  I don't know that we necessarily have
19    their business address.
20            MR. LAFFREDI:  Okay.  You wouldn't have the former
21    executives' businesses addresses?
22            MR. THOMASON:  Well, we didn't -- we didn't list it in
23    the schedules.  We didn't --
24            MR. LAFFREDI:  Yeah, no, I know you didn't.  I'm
25    asking why you wouldn't have put the business?

1          MR. THOMASON:  I think it's the same, I think,
2    principle that applies, in terms of -- of privacy.
3          MR. LAFFREDI:  Okay, so I'm requesting that you
4    provide this infor -- first, have you provided this information
5    to the Office of the U.S. Trustee?
6          MR. THOMASON:  No.
7          THE COURT:  And why not?
8          MR. KAROTKIN:  Because we didn't.
9          MR. LAFFREDI:  I'm asking Mr. Thomason.
10         MR. THOMASON:  Yeah, I -- if we were required to, I
11   wasn't aware that that was a requirement.
12         MR. LAFFREDI:  Okay.  Well, I'm asking that you
13   provide that, please.
14         MR. KAROTKIN:  We'll take your request under
15   advisement.
16         MR. LAFFREDI:  Question 6 talks about setoffs, and the
17   note here indicates that normal setoffs and net payments are
18   consistent with the ordinary course and can be particularly
19   voluminous, making it unduly burdensome and costly.
20         Does this have the same meaning that you described
21   earlier with regard to "unduly burdensome and costly"?
22         MR. THOMASON:  Yes.
23         MR. LAFFREDI:  Okay.  And who made that determination?
24         MR. THOMASON:  The company made that determination.  I
25   supported it.

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 63
of 192

1          MR. LAFFREDI:  So and then the last sentence says that

2     "although such setoffs and nettings may have been accounted for

3     when scheduling certain amounts, these ordinary-course setoffs

4     and nettings are not independently accounted for and have been

5     excluded."

6          So does that mean that they may have been included

7     somewhere else in the schedules other than this statement?

8          MR. THOMASON:  I think what it's saying is there -- if

9     there's a -- if there's a net balance, essentially that's what

10    we reported instead of a payable and a receivable to the same

11    party.

12         MR. LAFFREDI:  Okay.  But not here under number 6.

13    Because both number 6 SOFAs on both debtors say "zero" and

14    "none".

15         MR. THOMASON:  Yeah, so we didn't -- we didn't

16    identify the specific setoffs.

17         MR. LAFFREDI:  Oh, okay.  Okay, then number 10, all

18    losses from fire, theft, or other casualty within the year

19    before filing.  And note (I) indicates that the losses listed

20    in response to this question may exclude those in the ordinary

21    course, those whose amounts are de minimis, or where the loss

22    is less than the insurance deductible.

23         Again, what does "de minimis" mean in terms of losses?

24         MR. THOMASON:  It essentially means something that's

25    below the threshold where we would account for it from a

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 64
of 192

1  financial accounting standpoint, something we wouldn't have

2  reflected in our accounting records based on the -- the dollar

3  value.

4          MR. LAFFREDI:  What is that threshold?

5          MR. THOMASON:  I don't have a specific threshold for

6  this area.

7          MR. LAFFREDI:  Okay.  Who made the determine -- who

8  makes the determination as far as what is de minimis in terms

9  of losses?

10          MR. THOMASON:  Ultimately that's the -- from an

11  accounting standpoint, it would be set forth in our accounting

12  policies in terms of what we reflect on the general ledger.

13  And that's my responsibility.

14          MR. LAFFREDI:  Okay.

15          MR. THOMASON:  I just don't have a specific, for this

16  area, dollar threshold that we applied in this area.

17          MR. LAFFREDI:  Okay.  And then what about this -- the

18  losses that are incurred in the ordinary course of business;

19  why would you not include that?  What does that mean?

20          MR. THOMASON:  Yeah, I think it's just referring to

21  the next two statements around the size of the -- the loss or

22  amounts that are less than our insurance deductible that we

23  wouldn't necessarily track.

24          MR. LAFFREDI:  Okay.  But you're aware it says right

25  up there, "all losses", so the debtor is required to list all

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 65
of 192

1   losses whether or not it's de minimis, whether or not it's in
2   the ordinary course, whether or not it's less than the
3   insurance; are you aware of that?

4           MR. THOMASON:  Yeah, but if we don't have a -- if it's
5   not something we're keeping a record for, there'd be no
6   practical way that we could actually report it.

7           MR. LAFFREDI:  Okay.  Then question 11, this is just a
8   general question, this is about payments related to the
9   bankruptcy filing, specifically professionals or anybody else
10  who assists with the bankruptcy.  Have you listed all payments
11  that were made within the year prior to filing?

12          MR. THOMASON:  Yeah, the -- to my knowledge, we've
13  listed all payments that were made a year before the filing.

14          MR. LAFFREDI:  Okay.  And then question 13, transfers
15  outside the ordinary course of business in the last two years.
16  You've indicated "none".  Is that accurate?

17          MR. THOMASON:  Yes.

18          MR. LAFFREDI:  Okay.  You listed on question 18, which
19  is a question about closed financial accounts, I believe there
20  was one bank account listed -- hang on here -- Bank of America
21  account that was closed in April of 2018 for the Utility -- I'm
22  sorry, for the corporation, and then the Utility had two other
23  accounts, Bank of America, also closed in April of 2018, and
24  then Bank of New York Mellon, closed in August of 2018.  Why
25  did -- why did the debtors close those?

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 66
of 192

1          MR. THOMASON:  Yeah, it's not -- it doesn't fall

2     specifically under my area, but assumedly, we closed the bank

3     accounts because we were no longer using it, no longer required

4     for our business.

5          MR. LAFFREDI:  Okay.  Number 20 is about off-premises

6     storage.  And we talked a little bit about this.  I think you

7     indicated you did not disclose these off-premises storage

8     locations due to confidentiality.  Have you provided a list of

9     these off-premises storages to -- the locations -- to the U.S.

10    Trustee?

11         MR. THOMASON:  No, no.

12         MR. LAFFREDI:  Okay, will you do that?

13         MR. THOMASON:  We can do that.

14         MR. LAFFREDI:  Okay.  Question 21 asks about property

15    held for another, and it indicates on both cases that the

16    debtor does not have any -- does not hold any property -- oops,

17    sorry; hold on.  Never mind.  Strike that.

18         Okay.  Questions 22 through 24 are about environmental

19    information.  The note (Q) has some disclaimer language

20    indicating that as to some locations, the debtors don't have

21    any operations and they may no longer maintain relevant records

22    or the records may no longer be complete or reasonably

23    accessible.  Is that the case?  It says "may no longer be", so

24    do you know whether that's the case; whether either they're

25    not -- they don't maintain or they're not complete or

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 67
of 192

1  reasonably accessible?

2           MR. THOMASON:  I believe that's -- that is the case --

3           MR. LAFFREDI:  Okay.

4           MR. THOMASON:  -- in certain instances.

5           MR. LAFFREDI:  But are there -- so you're aware that

6  there are some that -- in other instances?  I guess I'm just

7  trying to limit the qualifying language here to figure out

8  exactly what we're talking about.

9           Have you -- so in other words, has the debtor

10  determined that at the time of the filing of the schedule or

11  the SOFA, that they were not either maintained or complete, but

12  since discovered that, oh, we do have them or they are

13  complete?

14           MR. THOMASON:  No, we haven't discovered anything with

15  respect to -- to records that would change what we reported on

16  statements 22 through 24.

17           MR. LAFFREDI:  Okay.  And there's a lot of

18  "reasonable" language in here, so for example:  "For all these

19  reasons, it is not reasonably possible to identify and supply

20  the requested information;" "they have used reasonable efforts

21  to identify the information;" "as reasonably possible."

22           What are those -- what is the -- all this "reasonable"

23  qualifying language mean?

24           MR. THOMASON:  Yeah, "reasonably" means in -- where

25  the company has records, where there's potentially a

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 68
of 192

1    significant liability.  So that's what I would -- that's how I
2    would define "reasonable".

3              MR. LAFFREDI:  Okay.  And then finally question 30
4    with regard to payments given to insiders, the note and the
5    specific question indicate, "Refer to question 4".  I just want
6    to make clear that you're still using this 10-K definition of
7    "insider", and not the bankruptcy definition; is that right?

8              MR. THOMASON:  That's right.

9              MR. LAFFREDI:  Okay.  I have no further questions at
10   this point.  So now I'm going to go down the list and ask
11   creditors who are present who want to come up and ask
12   questions.

13             So I think what I'm going to do, if you can hand me --
14   well, do you mind just passing it back and forth?

15             MR. WELLS:  We don't, at all.

16             MR. LAFFREDI:  Okay.  Then I'll just do this.  First
17   is Kathryn Diemer.

18             MS. DIEMER:  We don't have any questions.

19             MR. LAFFREDI:  Thank you.  I'm just going to go down
20   every -- there's not a whole lot here, so I'm just going to ask
21   if people have questions.  Steven Campora?

22             UNIDENTIFIED SPEAKER:  I'm sorry, were you going to
23   have the creditors' committee go first?

24             MR. LAFFREDI:  Oh, yeah, I'm sorry.  Yes, thank you.
25   Duh.

1          Okay, so creditors' committee -- official committee of
2     unsecured creditors, please.  Sorry about that.  Thank you,
3     sir.  I don't know what I was thinking.
4          MR. DENNY:  This is Daniel Denny with Milbank LLP,
5     representing the official committee for the unsecured
6     creditors, noting our appearance for the record.  We have no
7     questions for the debtors at this time.
8          MR. LAFFREDI:  Thank you very much, sir.
9          And then the official committee of tort claimants?
10          MR. DUMAS:  Thank you, Mr. Laffredi.  Cecily Dumas,
11     Baker Hostetler, on behalf of the official committee of tort
12     claimants.  First I want to thank you gentlemen for being here
13     and helping inform the public about what's going on in the PG&E
14     bankruptcy case.
15          I have enormous respect for --
16          MR. LAFFREDI:  Can you move that little closer?  It's
17     hard for them to hear.  I'm sorry.
18          MS. DUMAS:  Yes.  Enormous respect for all the
19     professionals representing you, and I realize that you, as well
20     as the other people employed by PG&E, have an enormous task
21     ahead of you.  So we appreciate all your efforts.
22          As you know, the constituent that I represent are
23     the -- not only the wildfire victims, but all of the parties
24     that have tort claims as opposed to contractual claims against
25     PG&E, referring to themselves sometimes as the involuntary

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 70
of 192

 1   creditors.

 2          So I'm going to ask you a few questions.  I don't have

 3   any trick questions.  I'll tell you in advance the topics I

 4   want to cover.  The first one is the -- in no particular

 5   order -- the wildfire plan that's been recently amended.  The

 6   second one is the governor's strike force report.  The third is

 7   the changes since we were here last to the board of directors.

 8   And the fourth one is whether or not there is plans on the part

 9   of the debtor to propose and fund an emergency fund for tort

10   victims.

11          So I guess let me start with whoever knows about the

12   emergency fund.  We'll start from the last one.  Is there going

13   to be a proposed fund made available to people who are

14   uninsured as -- and I don't know if you're aware that the

15   debtor did, following the San Bruno gas explosion and the 2015

16   Butte fires -- I'm not saying that it's going to do the same

17   thing, I'm just asking what's the -- what's the current status?

18          MR. WELLS:  I'm aware of the company's action -- aware

19   of the company's action after San Bruno.  We are currently

20   evaluating, and it is our intention to bring forward a motion,

21   a formal motion, to provide relief.  We are working with

22   governmental agencies to make sure that the relief that we --

23   we intend to provide is not in conflict with relief that the

24   federal government is providing to those victims.

25          MS. DUMAS:  And that's the FEMA question?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 71
of 192

1          MR. WELLS:  That's correct.

2          MS. DUMAS:  Yeah.

3          MR. WELLS:  Yeah.

4          MS. DUMAS:  And was the FEMA issue of sort of double

5    payments or eligibility addressed in the Butte -- to your --

6          MR. WELLS:  To my understanding, the question was

7    raised and addressed in the San Bruno relief.  I'm not aware of

8    anything related to the Butte fire.

9          MS. DUMAS:  Okay.  So you're aware -- so you're aware

10   of a 2010 program but not the 2015 program?

11         MR. WELLS:  That's correct.

12         MS. DUMAS:  Okay.  I'm just curious, timewise, were

13   you around or just not involved in the 2015?

14         MR. WELLS:  I've been with the company for twelve

15   years, so I've been around, you know, before San Bruno.  I'm

16   just not aware of the --

17         MS. DUMAS:  Okay.  All right.

18         MR. WELLS:  -- program as it relates to --

19         MS. DUMAS:  Fair enough.  As it's currently being

20   contemplated, what's the size of the fund?

21         MR. KAROTKIN:  We'd rather not get into that at this

22   meeting, considering that it's still being reviewed with the

23   appropriate governmental authorities.

24         MS. DUMAS:  Okay.  Is there anything else you can tell

25   me about timing?

1          MR. WELLS:  We understand the impact this has had --
2    these fires have had on the communities.  We're trying to work
3    as quickly as possible to close all related questions as it
4    relates to questions with -- with the FEMA and jeopardizing
5    federal funding.
6          So I don't have a specific timetable in mind, but I
7    can assure you that we are all collectively working as quickly
8    as possible to -- to close that and bring the formal motion
9    forward.
10          MS. DUMAS:  We appreciate that.
11          I guess a second question that was asked in court,
12    only tangentially related to the emergency fund, is the
13    question that a number of the Butte fire victims asked about
14    the debtors seeking authorization to make the payments under
15    their settlement agreements reached in late 2018 and early
16    2019.  Any news on that front?
17          MR. KAROTKIN:  I don't think the debtor ever raised
18    the possibility of filing a motion to pay the Butte
19    settlements.  I think counsel for the Butte plaintiffs has
20    raised the issue a number of times in the bankruptcy court and
21    I believe was invited by the judge, if he believed that that
22    relief was appropriate, to file an appropriate motion.  And if
23    such a motion were filed, we would address it.
24          MS. DUMAS:  Okay.  Yes, sir, that's my recollection as
25    well, and I thought that I said that it was raised by the Butte

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 73
of 192

1  fire victims, not the debtor.

2          So my question is, I guess, you correctly recited what
3  I remembered to be the positions taken in court; is it -- so it
4  is not the debtors' current intention to affirmatively file
5  such a motion asking for authorization to make these payments?

6          MR. WELLS:  We have not received the motion from those
7  plaintiffs.  One of the reasons, as I stated in my declaration,
8  that we filed for bankruptcy, was to accelerate the fair
9  resolution of all of the wildfire-victim claims, not just the
10  2015 Butte settlement fire victims.

11          MS. DUMAS:  Okay.  All right, thank you.

12          Next topic, Wildfire Safety Plan.  The debtor recently
13  filed an amendment, I think on the 25th or 26th.  Are either of
14  you gentlemen involved in the development and administration of
15  the Wildfire Safety Plan, I mean directly involved?

16          MR. WELLS:  I'm not directly involved in the
17  administration of the -- of the plan, but I am responsible, as
18  an executive officer of the company, overseeing progress of --
19  of that plan.  So I understand the details.

20          MS. DUMAS:  Okay.  So that was actually going to be my
21  next question, which is within the corporate structure of PG&E,
22  who is the -- what's the management chain of individuals who
23  are responsible for the development and administration of the
24  new Wildfire Safety Plan?

25          MR. WELLS:  We have leaders in the company at all

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 74
of 192

1   organizational levels, but ultimately the -- the plan is the

2   responsibility of Michael Lewis, the senior vice president of

3   electric operations, with periodic feedback and input from the

4   company's board of directors as well as the rest of the senior

5   leadership team.

6           MS. DUMAS:  Okay, and thank you for that.  Just trying

7   to understand structurally.  So, Mr. Lewis, on matters relating

8   to the Wildfire Safety Plan, would report directly to the board

9   or to the CEO or how does that work?

10          MR. WELLS:  On the day-to-day aspects of these plans

11  as well as progress, Mr. Lewis reports to John Simon as well as

12  the rest of the executive leadership team.  Periodically, Mr.

13  Lewis also reports to the -- to the board of directors as well.

14          MS. DUMAS:  Okay.  And the board of directors approved

15  the second amendment to the Wildfire Mitigation Plan that was

16  filed with the PUC on -- it looks like -- April 25th?

17          MR. WELLS:  The -- the board of directors is aware of

18  the amendment that was filed and the basis for that filing.

19          MS. DUMAS:  Okay.  I'm not a wildfire expert, so I'm

20  not going to ask for detail about vegetation management and

21  inspections and drones and all the things that are in the plan.

22  I'll leave that to experts.  But one question that I had,

23  reading everything and trying to understand how the plan works

24  is:  is it actually PG&E employees who are going out and

25  inspecting the lines, or cutting the trees, or deciding which

1    tree, or is it outside contractors?  Can you describe, sort of,

2    on the ground, how that program is being administered?

3             MR. WELLS:  Yeah.  Well, it's an incredibly

4    significant increase in the level of work beyond what would be

5    available to be completed by our internal employees.  So the

6    work, whether it's inspection, remediation, is conducted by

7    both PG&E employees as well as outside contractors, under the

8    management and supervision of PG&E employees.

9             With respect to vegetation management in particular,

10   that is -- the work there is almost exclusively performed by

11   contractors, again, under the supervision of -- of PG&E

12   employees.

13            MS. DUMAS:  Okay.  So vegetation management, meaning

14   the tree trimming?

15            MR. WELLS:  That's right, yep.

16            MS. DUMAS:  How about the inspection of trees along

17   the transmission and distribution lines for which ones are

18   tipping or about to tip over, that kind of thing?  Is that also

19   outside --

20            MR. WELLS:  It's a --

21            MS. DUMAS:  -- contractors?

22            MR. WELLS:  -- combination of both internal and

23   external employees.

24            MS. DUMAS:  Okay.  Proportion?

25            MR. WELLS:  I don't have --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 76
of 192

1          MS. DUMAS:  Eighty-percent external?  Twenty percent?

2          MR. WELLS:  -- I don't have the proportion at the --

3          MS. DUMAS:  Okay.

4          MR. WELLS:  -- at my -- in my fingers.

5          MS. DUMAS:  And the -- you have a budget for the

6   Wildfire Mitigation Plan, and I may be misreading this, but

7   there was a -- so there was a cost-of-capital proposal that was

8   filed with the PUC, and the cost-of-capital proposal indicated

9   what it terms as "twenty-one billion in spending for electric

10  and gas safety and reliability and increased system hardening."

11  And that number is a dramatically different number than the

12  cost estimate in the Wildfire Mitigation Plan.

13          Are there -- the Wildfire Mitigation Plan has a much

14  lower number.  Is there more that's addressed in the cost-of-

15  capital projection?

16          MR. WELLS:  That's correct.  Yes.  The Wildfire Safety

17  Mitigation Plan is a subset of the company's overall spend.

18  And so the reference in the cost-of-capital application

19  includes all of the work the company's doing on all of its

20  systems.  So the gas network or generation system as well as

21  other components of our electrical system that aren't

22  necessarily directly covered by the Wildfire Safety Action

23  Plan.

24          MS. DUMAS:  Got it.  Okay, well, thank you for

25  clarifying that.

1          Talk for a minute about the governor's strike force
2    report.  I'm assuming you've read it?
3          MR. WELLS:  I have.
4          MS. DUMAS:  And I'm talking about -- I have a copy of
5    it with me, but it's the "Wildfires and Climate Change
6    California's Energy Future", a report from Governor Newsom's
7    strike force, April 12, 2019.  Like I said, a lot has happened
8    since we were here in March.
9          MR. WELLS:  That's right.
10         MS. DUMAS:  Is PG&E considering adopting aspects of
11   the governor's plan or all of the governor's plan?  How is the
12   company -- let me start again.
13         As you said at the beginning when Mr. Laffredi started
14   asking you questions about the plan of reorganization, you
15   acknowledged, which I think most people agree, isn't something
16   that's going to be accomplished simply by -- solely by PG&E,
17   that there are a number of things that need to be resolved,
18   both on the regulatory side, legislative side, and the
19   company's own resources, that need to be brought to bear.
20         So what's the -- what's PG&E's response to the
21   governor's plan?  Does it intend to incorporate aspects of the
22   governor's plan in connection with its plan of reorganization?
23   How are you -- how are you viewing it?
24         MR. WELLS:  We were encouraged by and appreciative of
25   the governor's leadership with respect to addressing wildfire

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 78
of 192

1    liability reform as well as methods to prevent the catastrophic
2    fires in the future.
3            We -- we are looking forward to working constructively
4    with both the governor as well as the state legislature in
5    adopting meaningful wildfire liability reform as well as
6    adopting those measures to prevent future -- future fires.
7            With respect to this case, in terms of the company's
8    ability to raise the money to ultimately settle liabilities
9    that the company faces, we will need a durable solution from
10   the state legislature that will attract both debt and equity
11   investors back into the State of California.  And in that
12   regards, we -- we will work constructively to a common outcome
13   with the -- with the state legislature and the governor's
14   office.
15           MS. DUMAS:  Has PG&E been in discussions with the
16   governor's office following this proposal?
17           MR. WELLS:  We have had a couple of conversations with
18   the -- the governor's staff as well as their outside advisors
19   on follow-up questions that they have had related to the -- to
20   the release; yes.
21           MS. DUMAS:  I'm going to ask you a tough question.  I
22   don't think anybody in the room knows the answer to this, but
23   do you see a path forward to a legislative and regulatory
24   solution in this session?
25           MR. WELLS:  There's a lot of work that the State needs

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 79
of 192

1    to do before there's a solution that I think all stakeholders

2    can support.  But we are encouraged with respect to the sense

3    of urgency, the ideas that were raised in that report.  And we

4    think that parties could work constructively, given those sets

5    of ideas, to a common outcome, this legislative session.  But

6    it's going to require a significant amount of work by not just

7    those in Sacramento but by all of the stakeholders that are

8    impacted by these issues.

9          MS. DUMAS:  Well, I thank you for that.  And as you

10   can imagine, the tort claimants' committee, representing

11   thousands of victims of wildfires, want to emphasize as

12   strongly as we can the need for speed and urgency in resolving

13   these claims.

14          All right.  That brings me --

15          MR. WELLS:  We hold that as a priority.  Thank you.

16          MS. DUMAS:  Well, thank you.  Appreciate that.

17          That brings me to my last topic.  Since you were here

18   last giving information at the 341, a number of new directors

19   have been installed on the board, and is the board now settled,

20   or do you anticipate further changes, if you know?

21          MR. WELLS:  The company recognizes we've lost the

22   trust and confidence of the communities we serve.  One of a

23   number of steps that the company intended to -- to begin steps

24   to rebuild that trust and confidence was a refreshment of both

25   the board and management team.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 80
of 192

1          With respect directly to your question on do I

2   anticipate any future changes in the board, the company

3   believes that it has reached an agreement with -- with key

4   stakeholders as it relates to the refreshment, and the next

5   step will be the annual shareholder meeting, where our

6   shareholders will vote on reappointing the current members of

7   the board.

8          So absent a shareholder vote, I'm not aware of any

9   additional action to -- to refresh the board.

10          MS. DUMAS:  What's the company's current target date

11   for that shareholder meeting to occur?

12          MR. WELLS:  We haven't currently set that date.  It

13   was originally scheduled on May 21st.  We had to move that

14   date, given some of the reporting requirements with the

15   Securities and Exchange Commission.  We are looking to -- to

16   lock down that date as quickly as possible but currently don't

17   have an estimate yet.

18          MS. DUMAS:  Okay.  All right.  Fair enough.  I'd heard

19   there was as change and not heard a new date; so thanks for

20   clarifying that.

21          In PG&E's review of the need to -- as you said --

22   refresh the board and management, can you describe, what were

23   the -- what were you looking for?  What were the criteria for

24   new candidates to the board?

25          MR. WELLS:  The board of directors, at the time, they

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 81
of 192

1  came up with a comprehensive set of criteria focused on safety,

2  both applied safety in terms of the utility industry as well as

3  other industries; matters of public policy; matters of

4  financial expertise, given the complexity of the situation the

5  company -- company faces.

6        It was important to reflect diversity of the

7  communities that we serve.  It's important to the -- to the

8  board of directors to also have the issues of -- of California

9  represented by having some members of the board be -- be

10  California residents.  And so those were the -- at the highest

11  level, the sets of qualities and criteria that the board used

12  to consider new candidates.

13        MS. DUMAS:  Do you feel like those were achieved?

14        MR. WELLS:  I think, yes.  I think there's an

15  appropriate balance, given the complexity of issues this

16  company faces.

17        MS. DUMAS:  Okay.  Has the -- let me start again.

18        I've read in media, talking with creditors, rate-

19  payers, customers, that there's a sense that the old board, the

20  previous board, did not have a good grasp of developing a

21  safety-oriented culture.  Whether you agree with that or not --

22  that perception -- can you tell me what the new board plans to

23  do to address that perception of a lack of emphasis on the

24  safety of PG&E's operations?

25        MR. WELLS:  Cultural -- the culture of a company is

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 82
of 192

1    multifaceted.  There isn't any singular solution that drives at

2    a -- an improvement in outcome.  But what I can say in terms of

3    the concrete steps that the new board has taken, they've

4    increased our incoming CEO's compensation weighting to sixty-

5    five-percent safety, in terms of performance metrics.

6          That compares to the rest of the industry where I

7    think the next highest weighting for safety-related metrics is

8    somewhere in the order of about ten percent.  So aligning

9    compensation incentives with outcomes that we all want to see

10   is step one.

11         I think step two, the board, as part of the most

12   recent announcement, indicated that they were hiring a safety-

13   related individual from the National Transmission (sic) Safety

14   Board to help advise the company, and the board of directors

15   specifically, on the multifaceted aspects of cultural change.

16         Those were two immediate steps that were taken in the

17   short while that this board has been seated.

18         MS. DUMAS:  I'm sorry, who's the individual from the

19   NTSB that --

20         MR. WELLS:  Chris Hart.

21         MS. DUMAS:  I'm sorry?

22         MR. WELLS:  Chris Hart.

23         MS. DUMAS:  And has Mr. Hart started?

24         MR. WELLS:  No, the -- the announcement came, I want

25   to say, last week.  They're in the process of bringing --

1          MS. DUMAS:  There are certain --

2          MR. WELLS:  -- Chris Hart on --

3          MS. DUMAS:  -- yeah.  There -- it's like an

4    announcement a day --

5          MR. WELLS:  Yes.

6          MS. DUMAS:  -- out of the company, so I apologize for

7    not keeping track.

8          So when is it that -- his anticipated start date?

9          MR. WELLS:  The board is onboarding Mr. Hart as we

10   speak.  So I don't have a specific date, but it's -- it's

11   imminent.

12         MS. DUMAS:  Okay.  So you mentioned the two things, a

13   new CEO whose performance metrics are weighted more towards

14   safety than industry-wide and in the past, and bringing in Mr.

15   Hart, who has a history of safety from his previous employment.

16   Those are the two things you mentioned.  Is that -- did I get

17   that right?

18         MR. WELLS:  Those are two immediate measures or steps

19   that the -- the board has taken in the short while that they've

20   been seated.

21         MS. DUMAS:  Okay.

22         MR. WELLS:  And additionally, as I said, culture is

23   a -- is a complicated issue for any company.  What I would --

24   you know, the current board is in the process of -- of being

25   onboarded.  They're working extensively with the management

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 84
of 192

1    teams to get up-to-speed on the variety of issues the company

2    faces, offering their unique perspective based on their skills

3    and experiences in their previous roles and throughout their

4    career.

5            And so we're in the process of assessing our plans,

6    revising our plans, and incorporating their feedback.  I would

7    anticipate that that's a process that continues to evolve.

8    It's not something that's done on any one day.  But as you saw

9    with the two examples that I mentioned, I think we will

10   continue to see examples like that follow in the -- in the

11   coming months.

12           MS. DUMAS:  We wish you luck with that, so there are

13   no further people who have suffered the consequences of some of

14   the safety issues in the past.

15           I don't have any further questions, and I thank you

16   gentlemen for your time.

17           MR. WELLS:  Thank you.

18           MR. LAFFREDI:  Thank you.

19           All right, so now we'll go down the list of creditors

20   who have appeared.  So, Mr. Campora?

21           MR. CAMPORA:  My name is Steve Campora.  I represent

22   many victims as a result of PG&E's conduct; and I have some

23   questions for you.  You were just talking about safety culture.

24   A lot of the things you just said were said following San

25   Bruno, were said following the Butte fire.  Why is this time

1  going to be any different?

2          MR. WELLS:  The company had made significant progress

3  after San Bruno.  The company, as we talked about in the

4  previous 341 meeting, had also taken into consideration and

5  changed as a result of the 2015 Butte fire.

6          But there's clearly more work that the company needs

7  to do.  We do believe that bringing in the unique experiences

8  of, as I said, the refreshed board, as well as new members of

9  the management team, as well as programs that the company is

10  currently implementing, will lead to a stronger-performing PG&E

11  in the future.

12          MR. CAMPORA:  What's the status of the investigation

13  of the falsification of gas records?

14          MR. WELLS:  The matter is in front of our principal

15  regulator, the California Public Utilities Commission.

16          MR. CAMPORA:  I understand.  What's PG&E doing to

17  investigate it?

18          MR. WELLS:  We had substantially completed our

19  investigation as of the time -- as we've talked.  The leaders

20  in the organization are no longer with the company.  We are

21  implementing changes to the underlying technology that captures

22  the locate-and-mark dates to limit the ability for the dates to

23  be modified, which is sort of the central issue in the locate-

24  and-mark investigation.  And so we are actively implementing

25  the remedial measures that came out of the investigation.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 86
of 192

1          MR. CAMPORA:  Are you saying that somebody at PG&E was
2     let go because of it?
3          MR. WELLS:  All I'm saying is that the leaders that
4     were involved are no longer with the company.
5          MR. CAMPORA:  Did they leave with severance packages?
6          MR. WELLS:  What I will say is those leaders are no
7     longer with the company.
8          MR. CAMPORA:  Did they leave with severance packages?
9          MR. KAROTKIN:  I think he answered your question.
10          MR. CAMPORA:  No, he didn't.
11          MR. KAROTKIN:  Okay, well, he's not going to answer
12     your question.
13          MR. CAMPORA:  He's not going to tell us whether an
14     insider got a severance package when they left?
15          MR. KAROTKIN:  You have a list a insiders payments you
16     want to go through, you can ask him those questions.
17          MR. CAMPORA:  I'm asking him.  Did those people get
18     payments when they left?
19          MR. WELLS:  Those individuals are not part of the
20     insiders that we reported --
21          MR. CAMPORA:  Did Mr. Stavropolous get payment when he
22     left?
23          MR. WELLS:  No, he did not.
24          MR. CAMPORA:  The PG&E's bankruptcy filing indicates
25     that they want to have an expeditious resolution of claims; is

1  that true?

2          MR. WELLS:  That's correct.

3          MR. CAMPORA:  What does "expeditious" mean to you?

4          MR. WELLS:  As quickly as possible.

5          MR. CAMPORA:  So the Butte fire happened in 2015,

6  right?

7          MR. WELLS:  That's correct.

8          MR. CAMPORA:  Okay.  And there's over 1,000 victims

9  who haven't yet been compensated; are you aware of that?

10          MR. WELLS: Yes, I am.

11          MR. CAMPORA:  There are also a group of victims who

12  had signed settlement agreements that were in effect prior to

13  PG&E's filing of bankruptcy; are you aware of that?

14          MR. WELLS:  I am, yes.

15          MR. CAMPORA:  And are you aware, also, that PG&E paid,

16  for example, Ms. Williams, who was an insider, 2,585,000

17  dollars?

18          MR. WELLS:  Yes.

19          MR. CAMPORA:  At the same time they didn't pay the

20  contracts to the Butte fire victims?

21          MR. WELLS:  We covered this extensively at the last

22  341 meeting.

23          MR. CAMPORA:  No, sir, you didn't, because we -- I

24  wanted to know who made that decision, and you didn't know.  So

25  I'm asking today, who made that decision?

1              MR. WELLS:  We, as a company, collectively made that
2     decision, in order to prioritize the ongoing service to the
3     communities we serve.
4              MR. CAMPORA:  Okay.  "We, as a company" doesn't help
5     me.  Give me the names of some people who made that decision?
6              MR. KAROTKIN:  He answered the question.
7              MR. CAMPORA:  No, he didn't.  Companies don't make
8     decisions.
9              MR. KAROTKIN:  He answered the question.  If you'd
10    care to move on, you can move on.
11             MR. CAMPORA:  I'm not --
12             MR. KAROTKIN:  He's not --
13             MR. CAMPORA:  -- I want to know the names of the
14    people who made the decision.
15             MR. KAROTKIN:  He answered your question.  That's all.
16             MR. CAMPORA:  No, he didn't, sir.
17             MR. KAROTKIN:  I'm sorry.
18             MR. CAMPORA:  You are sorry, but he's not.
19             MR. KAROTKIN:  I'm sorry.
20             MR. CAMPORA:  Sir, I'm entitled to know the names of
21    the people --
22             MR. KAROTKIN:  I'm sorry, you're not.
23             MR. CAMPORA:  Yes, I am.
24             MR. LAFFREDI:  If he's not going to answer the
25    question, you can take other --

1           MR. CAMPORA:  I will, thank you.

2           MR. LAFFREDI:  -- efforts to require him to answer it

3    outside of this meeting.  I can't --

4           MR. CAMPORA:  I understand.

5           MR. LAFFREDI:  -- do anything about that.

6           MR. CAMPORA:  Mr. Hogan was in charge of electric

7    operations, right?

8           MR. WELLS:  That's correct.

9           MR. CAMPORA:  He was responsible for overseeing

10   wildfires, true?

11          MR. WELLS:  That's correct.

12          MR. CAMPORA:  Okay.  He got a severance package of

13   699,000 dollars at the same time you weren't paying the Butte

14   fire victims; is that right?

15          MR. WELLS:  That sounds right.  I don't have the

16   number.

17          MR. CAMPORA:  Who made that decision?

18          MR. WELLS:  The same answer.

19          MR. CAMPORA:  No answer?

20          MR. KAROTKIN:  The same answer.

21          MR. CAMPORA:  The same answer is no answer, sir.

22          MR. KAROTKIN:  The same answer.

23          MR. CAMPORA:  Which is no answer.

24          MR. KAROTKIN:  That's your interpretation, Mr.

25   Campora.

1           MR. CAMPORA:  Yes, it is.

2           MR. KAROTKIN:  You can continue to say whatever you

3    want, okay?

4           MR. WELLS:  As of --

5           MR. KAROTKIN:  If you want discovery, go make a 2004

6    motion.

7           MR. CAMPORA:  Sir, at the time of the Butte fire, PG&E

8    said they were committed to doing the right thing for the fire

9    victims and to promptly resolving their claims.  Was that a

10   true statement, sir?

11          MR. WELLS:  It was a true statement and continues to

12   be a true statement.

13          MR. CAMPORA:  What --

14          MR. WELLS:  Part of --

15          THE COURT:  -- does "promptly" mean to you, sir?

16          MR. WELLS:  One of the challenges, as we noted, and as

17   I noted in my first-day declaration, is the ad hoc nature of

18   state court trial system.  To the extent that we continue down

19   that path, as we've seen in the past, it takes years to resolve

20   those issues.  It is our -- it is our priority as part of this

21   bankruptcy proceeding to expeditiously resolve all of the

22   wildfire claims, those that still extend from the 2015 Butte

23   fire, as well as those that have arisen in the '17 and '18

24   fires.

25          MR. CAMPORA:  So what's your target date for

1  submitting a plan?

2          MR. WELLS:  As I said, we are -- we don't have a date

3  at this point.

4          MR. CAMPORA:  Well, sir, in the state courts, at least

5  some people were getting paid, now nobody's getting paid.  So

6  you, sitting here today, have no plan, can't tell the victims a

7  date by which you will submit a plan, true?

8          MR. WELLS:  We do not have a date.

9          MR. CAMPORA:  Within a year?

10          MR. ORSINI:  He's answered that question.

11          MR. KAROTKIN:  He answered the question.

12          MR. ORSINI:  Leave it lay.

13          MR. CAMPORA:  Do you have a target date of doing it

14  within a year?

15          MR. KAROTKIN:  He answered your question.

16          MR. ORSINI:  He's already said --

17          MR. CAMPORA:  That's a different question.

18          MR. ORSINI:  -- he already said to you --

19          MR. LAFFREDI:  I'm sorry, we have all these people

20  talking, sir, can you identify yourself, for the record?

21          MR. ORSINI:  Yes, Kevin Orsini, from Cravath.

22          Mr. Campora, he's answered that question to you

23  multiple times, as well as to the U.S. Trustee.  He's stated

24  that we're not able to currently project when a plan can be put

25  forward, including because, as the committee who represents

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 92
of 192

1  your claimants, itself recognized, there are a lot of other
2  parties who have to be a part of that process.  So move on.
3          MR. CAMPORA:  So you have no estimate?
4          MR. ORSINI:  Move on.  It's been answered.
5          MR. CAMPORA:  I'll move on when I'm ready, counsel.
6          MR. ORSINI:  It's been answered.
7          MR. CAMPORA:  I'm not taking your direction.
8          MR. ORSINI:  Okay.  It's been answered.
9          MR. CAMPORA:  So you have no idea?
10          MR. KAROTKIN:  He answered your --
11          MR. WELLS:  I currently don't have an estimate, as I
12  said --
13          MR. CAMPORA:  Okay.
14          MR. WELLS:  -- repeatedly.
15          MR. CAMPORA:  Last time we were here I asked whether
16  or not PG&E had made any demands on its contractors as
17  additional insureds under their policies; do you remember that?
18          MR. WELLS:  I do.
19          MR. CAMPORA:  Okay.  Have you -- since that time, have
20  you done anything to find -- investigate whether PG&E has made
21  demands on their contractors for indemnity?
22          MR. KAROTKIN:  Can I explain to him what you're asking
23  him?
24          MR. CAMPORA:  Sure.
25          MR. LAFFREDI:  Can you --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 93
of 192

1          MR. ORSINI:  If you don't know, just say --

2          MR. LAFFREDI:  -- if you don't know --

3          MR. WELLS:  I don't know.

4          MR. LAFFREDI:  Maybe you can rephrase your question.

5          THE WITNESS:  I don't know.

6          MR. CAMPORA:  Well, sir, you're aware that when PG&E

7    signs contracts with their contractors, they require,

8    typically, that PG&E be named as an additional insured under

9    their contractors' insurance policy?

10          MR. WELLS:  Yes, I'm aware of that.

11          MR. CAMPORA:  Okay.  So for example, talking about the

12   Atlas fire, Davey Tree was working in that area.  Do you know

13   whether or not PG&E has made demands either on Davey Tree's

14   carrier or on Davey Tree to make payments as a result of that

15   fire?

16          MR. WELLS:  I'm not aware.

17          MR. CAMPORA:  Okay.  Who would know?

18          MR. WELLS:  Somebody in our legal organization

19   would -- would know.

20          MR. CAMPORA:  Well, you were asked earlier whether or

21   not PG&E had investigated causes of action that it may have,

22   and my understanding was there were none listed, or at least

23   you didn't know what the causes of action were, true?

24          MR. WELLS:  I'm not aware.

25          MR. CAMPORA:  Okay.  Well the NorCAL FIRE happened in

 1  October of 2017; you've had legal counsel since that time, and
 2  paid them millions and millions of dollars, are you telling us
 3  under oath that you don't know whether or not PG&E has a claim
 4  against any of its contractors for those fires?
 5          MR. WELLS:  I know we're evaluating, but I'm not aware
 6  of --
 7          MR. CAMPORA:  Well, when --
 8          MR. WELLS:  -- any specific claim.
 9          MR. CAMPORA:  -- when will that evaluation be
10  completed?
11          MR. WELLS:  I don't have a date for you.
12          MR. CAMPORA:  Are you aware that PG&E has filed a
13  cross-complaint as a result of the Butte fire case?
14          MR. WELLS:  The 2015 Butte fire?
15          MR. CAMPORA:  Correct.
16          MR. WELLS:  Yes, I am.
17          MR. CAMPORA:  Okay.  And is that claim being pursued?
18          MR. WELLS:  Yes, it is.
19          MR. CAMPORA:  Okay.  So Trees, Inc., as I recall, had
20  200 million of insurance.  Has that been paid to PG&E?
21          MR. WELLS:  A portion of the insurance from our
22  subcontractors has been paid and received by the company, or
23  paid --
24          MR. CAMPORA:  How --
25          MR. WELLS:  -- paid to and received by the company.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 95
of 192

1              MR. CAMPORA:  How much?

2              MR. WELLS:  Roughly sixty million dollars.

3              MR. CAMPORA:  Is PG&E pursuing the balance of the --

4    of the policies?

5              MR. WELLS:  We continue to explore our legal remedies.

6              MR. CAMPORA:  Well, sir, that fire happened in 2015,

7    and PG&E has paid its lawyers over a hundred million dollars.

8    Are you telling me that as of today you don't know what your

9    remedies are against the contractors?

10             MR. WELLS:  The 200-million-dollar policy was for a

11   company that does business with a number of entities.  That

12   business -- that wasn't the insurance policy that was allocated

13   just to the work that those contractors were performing on

14   behalf of the company.  And so we are continuing to evaluate,

15   as I said, the opportunity for additional recovery.

16             MR. CAMPORA:  Well, Trees, Inc. disclosed under oath

17   that they had a 200-million-dollar policy limit for that fire.

18   Are you saying that's not accurate?

19             MR. WELLS:  I'm saying we're continuing to evaluate

20   whether we can continue to pursue additional recovery.

21             MR. CAMPORA:  Okay.  So the fire was almost four years

22   ago.  When will you have that evaluation complete?

23             MR. WELLS:  I don't have a date for you.

24             MR. CAMPORA:  Who's evaluating it?

25             MR. WELLS:  Our legal team is.

1            MR. CAMPORA:  Do you know -- you know the Camp fire
2    occurred up in Butte County, right?

3            MR. WELLS:  Yes, I do.

4            MR. CAMPORA:  And it has to do with a C-hook on the
5    transmission line, correct?

6            MR. WELLS:  I understand that that's one of the areas
7    that is being investigated, yes.

8            MR. CAMPORA:  Do you know, or has any evaluation been
9    done, as to which contractors of PG&E inspected that C-hook
10   prior to the date of the fire?

11           MR. WELLS:  Do you mind repeating the question?

12           MR. CAMPORA:  Sure.  Do you know, or had any
13   evaluation been done, as to which contractors inspected that
14   C-hook for PG&E prior to the date of the fire?

15           MR. WELLS:  I'm not aware.

16           MR. CAMPORA:  PG&E's disclosure to the CPUC, it was
17   inspected in 2009 and in 2014.  Do you know who did the
18   inspections?

19           MR. WELLS:  I am -- I'm personally not aware of who
20   did the --

21           MR. CAMPORA:  Who would know?

22           MR. WELLS:  Our legal team who's conducting that --
23   that review.

24           MR. CAMPORA:  And is there a claim anticipated against
25   the contractors who did those inspections?

1              MR. WELLS:  Not that I know of at this time.

2              MR. CAMPORA:  Okay, well, the inspections took place

3    in 2009 and 2014.  The fire happened in October of 2018.  Are

4    you saying, as of today, you don't know whether there's a claim

5    to be made?

6              MR. WELLS:  I'm saying I personally don't know as of

7    today --

8              MR. CAMPORA:  Okay.

9              MR. WELLS:  -- the status.

10             MR. CAMPORA:  And should we direct that question to

11   your legal team?

12             MR. WELLS:  Yes.

13             MR. CAMPORA:  Okay.  Do you know if they know the

14   answer?

15             MR. WELLS:  I can't speak for them.

16             MR. CAMPORA:  Do you know who the McKinsey company is?

17             MR. WELLS:  I do.

18             MR. CAMPORA:  What role does the McKinsey company have

19   in risk assessment with regard to the Caribou-Palermo Line?

20             MR. WELLS:  I'm not aware of McKinsey's role in the

21   evaluation of the risk assessment of the Caribou-Palermo Line.

22             MR. CAMPORA:  Who within the company would know that?

23             MR. WELLS:  I actually don't know.  If they are

24   involved, then our electric operations team.  I have not -- I'm

25   not aware that they've been engaged with respect to that --

1  that specific asset.

2          MR. CAMPORA:  What criminal investigations are you

3  aware of against PG&E arising from the Camp fire?

4          MR. WELLS:  We understand that the local district

5  attorney is evaluating whether or not to bring charges against

6  the company.

7          MR. CAMPORA:  Has that been reported to Judge Alsup?

8          MR. WELLS:  I'm not -- I'm not aware.

9          MR. CAMPORA:  Has PG&E conducted its own investigation

10  of the Camp fire -- cause of the Camp fire?

11          MR. ORSINI:  There's privilege questions, and we're

12  getting into discovery of the underlying issues, which as the

13  trustee noted, is not the appropriate avenue for this hearing.

14  So he's not going to answer that question.

15          MR. CAMPORA:  Well, it has to do with what assets are

16  available when trying to determine what insurance could be

17  available to the -- to the estate.

18          MR. ORSINI:  He's not going to answer any specific

19  questions about any particular fire.

20          MR. CAMPORA:  The question wasn't about the fire, it

21  was whether or not they --

22          MR. ORSINI:  He's not going to answer the question.

23          MR. CAMPORA:  The question was whether yes or no, have

24  they started investigation?

25          MR. ORISINI:  And, Mr. Campora, I've told you, he's

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page 99
of 192

1  not going to answer the question.

2          MR. CAMPORA:  On what basis?

3          MR. ORSINI:  On the basis that I've instructed him not

4  to answer the question.  If you want to seek further relief,

5  you can.

6          MR. CAMPORA:  I'll be happy to.

7          Same answer for Atlas?

8          MR. ORSINI:  Yup.

9          MR. CAMPORA:  Same answer for Cascade?

10         MR. ORSINI:  Sure.

11         MR. CAMPORA:  Laford?

12         MR. ORSINI:  Yes.

13         MR. CAMPORA:  Sulfur?

14         MR. ORSINI:  Yes.

15         MR. CAMPORA:  Redwood?

16         MR. ORSINI:  Yes.

17         MR. CAMPORA:  Nans (ph.)?

18         MR. ORSINI:  Yep.

19         MR. CAMPORA:  Okay.  Has PG&E conducted any

20  investigation into the destruction of evidence at the location

21  of the Tubbs fire?

22         MR. ORSINI:  Same answer.  I also have no idea what

23  destruction of evidence you're referring to, if it's --

24         MR. CAMPORA:  I'd be happy to help you, sir.  There

25  were two fuses taken off the pole and --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
100 of 192

1          MR. KAROTKIN:  Is this your testimony?  Is this
2    your --
3          MR. CAMPORA:  -- thrown away.
4          MR. KAROTKIN:  -- testimony?
5          MR. CAMPORA:  Well, he asked.  I'm telling him.  If
6    you want to swear me in, I'm happy to.
7          Let's talk for a minute about the emergency funds.
8    You asked -- you indicated there was being some evaluation by a
9    governmental entity; is that right?
10          MR. WELLS:  We are working with a governmental entity
11    to make sure that the introduction of an emergency fund does
12    not jeopardize federal funding, yes.
13          MR. CAMPORA:  Okay.  Have you seen the letter that
14    FEMA wrote to PG&E in 2015 about the emergency funds and how it
15    would work not to interfere with FEMA?
16          MR. WELLS:  As I indicated in the last set of
17    questioning, no.
18          MR. CAMPORA:  Who is looking at that issue for you,
19    because I'll be happy to send them the letter?
20          MR. WELLS:  Our general counsel.
21          MR. CAMPORA:  So who is that now that Mr. Simon's
22    acting?
23          MR. WELLS:  Janet Loduca.
24          MR. CAMPORA:  Do you know why PG&E set up the
25    emergency funds in San Bruno and the Butte fire?

1           MR. WELLS:  As I've repeatedly answered in today's

2     hearing, I'm not aware of the emergency funds for the 2015

3     Butte fire.

4           MR. CAMPORA:  Okay.  Do you know why they did it

5     following San Bruno?

6           MR. KAROTKIN:  What does this have relevance to do

7     with the administration of this case?

8           MR. CAMPORA:  Well, it's part of the case that they're

9     going to do.  And I want to make sure that there's a business

10    purpose for doing it, because I'm going to ask him whether they

11    intend to say there's a business purpose when they file their

12    motion.

13          MR. KAROTKIN:  I don't see that that has anything to

14    do with --

15          MR. CAMPORA:  We'd like to have it granted.

16          MR. KAROTKIN:  -- the administration of this case,

17    whether it --

18          MR. CAMPORA:  Sir, you aren't the judge.  You can tell

19    him whatever you want, and I'll do --

20          MR. KAROTKIN:  Okay, so you don't have to answer that

21    question.

22          MR. CAMPORA:  The filing of the statement indicating

23    that you were behind schedule on the wildfire plan; do you know

24    what I'm talking about?

25          MR. WELLS:  Yes.

1            MR. CAMPORA:  Okay.  Has that affected the STIP

2     payments?

3            MR. WELLS:  I haven't looked at the -- the calculation

4     of the 2019 STIP payments.  We're focused on the execution of

5     the work to -- to prevent future fires.

6            MR. CAMPORA:  Okay, but the STIP payments are, at

7     least in part, based on the execution of the work, right?

8            MR. WELLS:  They are, yes.  But our focus is on the

9     execution of the work.

10            MR. CAMPORA:  So today you don't know whether it will

11     or won't have an effect on the STIP payments?

12            MR. WELLS:  I do not have the answer for you today.

13            MR. CAMPORA:  I don't have any other questions.  Thank

14     you.

15            MR. LAFFREDI:  Thank you.

16            Lindsay Wood?

17            MS. WOOD:  Good morning.

18            MR. WELLS:  Hi.

19            MR. THOMASON:  Good morning.

20            MR. LAFFREDI:  I think it's afternoon now.

21            MS. WOOD:  It is afternoon.  Thank you.

22            So as you probably know, I'm here with Plumas Audubon

23     and kind of also in that way representing Audubon California,

24     as well.  And these questions are all for you, Jason.

25            MR. WELLS:  Sure.

1          MS. WOOD:  Do you remember at the last meeting when I

2    gave you our combined letter from Plumas Audubon Society and

3    Audubon California, regarding the nesting Aechmophorus Grebes

4    at Lake Almanor?

5          MR. WELLS:  Yes, I do.

6          MS. WOOD:  Awesome.  Is PG&E morally and fiscally

7    responsible for public trust wildlife resources that live on

8    their facilities, such as Lake Almanor?

9          MR. WELLS:  I don't know.

10         MS. WOOD:  You don't know if you're morally

11   responsible or fiscally responsible for what happens on the

12   property that is owned by your company?

13         MR. WELLS:  I'm not aware of the legal obligations

14   with respect to the wildlife that you -- that you mentioned.

15   Obviously I am aware of our obligation to comply with

16   regulations, laws, and standards of the State of California,

17   with respect to where our facilities operate.

18         MS. WOOD:  Okay.  Are you aware that the nesting

19   Aechmophorus Grebes are protected by the public trust doctrine,

20   the Migratory Bird Treaty Act, and the California Department of

21   Fishing and Game Code?

22         MR. WELLS:  Only through the letter that you had

23   provided.  And otherwise no -- don't have much in the way of

24   detail beyond this.

25         MS. WOOD:  Okay.  I can provide you with more detail.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
104 of 192

1              MR. WELLS:  That would be great.

2              MS. WOOD:  Are you aware that the nesting -- the large

3    nesting colony of Aechmophorus Grebes completely abandoned last

4    year in 2018?

5              MR. WELLS:  I am not, no.

6              MS. WOOD:  Okay, that was outlined in the letter that

7    I had given to you last time.

8              MR. WELLS:  Um-hum.

9              MS. WOOD:  Are you aware that in 2016 Plumas Audubon

10   Society has coordinated with PG&E to prevent this stake of

11   species, and we had recommended a no more than .72 elevation

12   change at Reservoir Almanor?

13             MR. WELLS:  I understand that.  And I understand that

14   we are trying to continue to work on an acceptable solution.

15             MS. WOOD:  Awesome.  Are you aware that in 2016 and in

16   2018 that your hydro operations exceeded our recommendation and

17   our agreement with PG&E in those years?

18             MR. WELLS:  I am aware of the allegation, and I know

19   that we are investigating and trying to work for a common

20   solution here.

21             MS. WOOD:  Are you aware that in 2018 your operations

22   resulted in the abandonment of 1,184 nesting grebes, which is

23   the equivalent of 3,457 lost bird years?

24             MR. WELLS:  No, I was not aware of that.

25             MS. WOOD:  Are you aware that in 2018, you -- your

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
105 of 192

1   operations resulted in the loss of 788 lost nests, a total of

2   2,300 lost bird years?

3           MR. WELLS:  No, I was not aware.

4           MR. LAFFREDI:  I don't mean to interrupt, but these

5   are very specific questions about a very particular claim.  Do

6   you have questions more generally about the debtors --

7           MS. WOOD:  Yeah.

8           MR. LAFFREDI:  -- finances and --

9           MS. WOOD:  I'm getting there.

10          MR. LAFFREDI:  Okay.

11          MS. WOOD:  I'm getting there.

12          MR. LAFFREDI:  Thank you.

13          MS. WOOD:  And I'm almost done.

14          MR. LAFFREDI:  Thank you.

15          MS. WOOD:  Are you aware that Plumas Audubon Society

16  is legally responsible for the protection of these nests under

17  our contract with Audubon California, which was a result of the

18  U.S. Luckenbach settlement, which was an oil spill that had

19  happened previously?

20          MR. WELLS:  I was not aware, no.

21          MS. WOOD:  Okay.  Are you aware that your hydro

22  operations resulted in an estimated total 5,757 birds lost?

23          MR. WELLS:  I was not aware.

24          MS. WOOD:  Are you aware that the -- that there is an

25  established baseline cost per grebe, which is priced at $62.34?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
106 of 192

1          MR. WELLS:  I was not, no.

2          MS. WOOD:  Earlier you said that you're responsible

3    for being in accordance with the regulations on your property.

4    How will you mitigate the loss of 5,758 birds on your property?

5          MR. WELLS:  I don't have an answer for you today.

6          MS. WOOD:  Will you help Plumas Audubon by providing

7    access to historical data from the Prattville Tunnel?

8          MR. WELLS:  As I indicated after the last hearing and

9    as we've communicated since then, you have my support

10   personally for us to find a common solution with the company.

11   I understand that the team that's responsible for maintaining

12   our hydro system is actively working with -- with the Society.

13   And I will support those -- those continued discussions.

14         MS. WOOD:  Thank you.

15         In the 2019 grebe nesting season, will you provide

16   daily data from the Prattville Tunnel as well as elevation data

17   from Lake Almanor?

18         MR. WELLS:  I'm not in a position here at this hearing

19   to commit to specific data.

20         MS. WOOD:  Awesome.  That's all.

21         MR. LAFFREDI:  Thank you.

22         I'm asking about this loud music.  I don't know where

23   that's coming from.

24         MS. WOOD:  No, it sounds like zumba is happening here.

25         MR. LAFFREDI:  Oh, is this for me or --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
107 of 192

1          MS. WOOD:  It's for Jason.

2          MR. LAFFREDI:  Oh, I'm sorry.

3          MR. WELLS:  Thank you.

4          MR. LAFFREDI:  Thank you.

5          MR. WELLS:  Thank you.

6          MS. WOOD:  Yeah.  Yeah.

7          MR. LAFFREDI:  Okay, thank you very much.

8          MS. WOOD:  Thank you.

9          MR. LAFFREDI:  Gerald Singleton?

10          MR. ORSINI:  That's not the U.S. Trustee's Office?

11          MR. LAFFREDI:  No, I don't think so.

12          MR. SINGLETON:  All right.  Good afternoon.

13          MR. WELLS:  Good afternoon.

14          MR. SINGLETON:  Mr. Wells, I think you testified last

15  time and you indicated that you are the CFO; is that correct?

16          MR. WELLS:  That's correct, yes.

17          MR. SINGLETON:  And is it Mr. Thomason?

18          MR. THOMASON:  Thomason, yes.

19          MR. SINGLETON:  Thomason.  And what is your position

20  with the company, sir?

21          MR. THOMASON:  I am the chief financial officer of

22  Pacific Gas and Electric Company and the controller of Pacific

23  Gas and Electric Company as well as PG&E Corporation.

24          MR. SINGLETON:  Okay.  Thank you.

25          I want to follow up on some of the questions asked by

1  Mr. Campora and then some of the questions that were asked last

2  time for which you provided more information here.

3          Starting off, we talked last time about some of the

4  CAL FIRE reports for the various fires, and I think that you're

5  aware that there are seventeen fires that are the subject of

6  this bankruptcy, which CAL FIRE has determined were started by

7  PG&E's equipment; is that correct?

8          MR. KAROTKIN:  The CAL FIRE reports say what they say.

9  You've read them.  I'm sure you understand what they say.  I

10  don't think you need Mr. Wells to interpret the reports for

11  you.

12          MR. SINGLETON:  I appreciate that, counsel.  I'm

13  asking him what he's aware of.  He's either aware of it or he's

14  not.

15          MR. KAROTKIN:  He's aware of the reports.

16          MR. SINGLETON:  Okay.  Do you mind handing him the

17  microphone?

18          MR. KAROTKIN:  No, but it's not going to change

19  things.

20          MR. SINGLETON:  Okay.

21          MR. WELLS:  Yes, I'm aware of the reports.

22          MR. SINGLETON:  Thank you.  And again, you're aware,

23  are you not, that there were seventeen -- I'm sorry --

24  eighteen -- seventeen North Bay fires and then the Butte fire,

25  where CAL FIRE determined that PG&E's equipment started the

1    fire, correct?

2          MR. WELLS:  I am aware of those reports, yes.

3          MR. SINGLETON:  Great.  Now, for those eighteen fires,

4    does PG&E intend to contest liability as part of this

5    proceeding?

6          MR. ORSINI:  He's not answering those questions.  He's

7    not getting into what the company's legal position is, what its

8    work -- attorneys' work product is with respect to particular

9    fires.  We're just not going down that path.  He's not

10   answering the questions.

11         MR. SINGLETON:  Okay.  And again, the purpose of this

12   is to find out how PG&E intends to treat the different -- I

13   would say -- categories, for lack of a better term, of wildfire

14   plaintiffs, since obviously there are differences between Tubbs

15   and the other ones.

16         And are you saying, Mr. Orsini, that he is not going

17   to answer any questions on whether or not PG&E intends to treat

18   the Tubbs plaintiffs any differently than any of the other

19   eighteen?

20         MR. ORSINI:  Well, first of all, I'm not saying that

21   we accept your proposition one way or another, that there are

22   different categories of fires or that Tubbs is different than

23   the others.  Obviously the reports speak for themselves.

24         But we're not going to sit here in this hearing and

25   get into what PG&E's view is of the particular facts with

1  respect to any particular fire.  It's not an appropriate source

2  of discussion at this hearing.  We're not going to do it.  And

3  a lot of that subject to attorney-client privilege.

4          MR. SINGLETON:  Well, again, I'm not asking in terms

5  of whether or not this is going to be tried or anything like

6  that.  I'm asking for the purposes of the plan.  And --

7          MR. ORSINI:  And we've already said that we're not

8  prepared to put forward a plan and we're not sure when a plan

9  will be able to be put forward.

10          We've been here for a long time, Mr. Singleton.  You

11  and I can debate this all you want offline.  No point in

12  continuing to do this now.  He's not going to answer the

13  questions.

14          MR. SINGLETON:  All right, well, counsel, again, I

15  appreciate your comments, and I want to ask him the questions,

16  and if you want to instruct him not to answer, you're welcome

17  to do that.

18          So again, sir, you've already said that you were aware

19  of the eighteen reports where CAL FIRE found that PG&E's

20  equipment started it.  I'm not asking you to adopt that

21  finding.  But again, what I am asking about is in the context

22  of coming up with a bankruptcy plan, have you given any

23  consideration to whether or not Tubbs, which was the one fire

24  where CAL FIRE did not find PG&E's equipment started it -- have

25  you given any consideration to whether or not you will treat

1  the Tubbs fire victims any differently than the other eighteen

2  fires?

3          MR. KAROTKIN:  We're not going to answer those

4  questions.

5          MR. SINGLETON:  Sir, are you adopting your attorneys'

6  recommendation?

7          MR. WELLS:  Yes, I'm adopting the recommendation.

8          MR. SINGLETON:  So you will not answer the question?

9          MR. WELLS:  That's correct.  I won't answer the

10  questions.

11          MR. SINGLETON:  Okay.  And again, you're certainly

12  free to refuse to answer this question as well, but do you have

13  any idea when PG&E will make a determination as to whether or

14  not they're going to treat the Tubbs fire victims any

15  differently than the other eighteen fire victims?

16          MR. WELLS:  I'm not going to answer any questions

17  around the specific treatment of different fire cases.

18          MR. SINGLETON:  The question, though, was a little

19  different.  Again, I understand that you've declined to answer

20  a question about whether or not you'll treat them differently,

21  but as I'm sure you can understand, there were 5,300 homes that

22  were lost as part of Tubbs, and obviously those folks are very

23  eager to know what's going to happen to them as part of the

24  bankruptcy proceeding.

25          The question here is are you able to give us any kind

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
112 of 192

1  of a time table as to when PG&E may be able to say how they're

2  going to handle the various fires?

3          MR. WELLS:  I understood the question.  And as I said,

4  I'm not going to respond to questions about the different

5  treatment of different fires.

6          MR. SINGLETON:  Okay.  All right.  And moving on to --

7  this was covered briefly by Mr. Campora and Ms. Dumas, and I

8  don't want to belabor it, but I just want to make sure that

9  we're on the same page here.  You do understand that there are

10  roughly fifty plaintiffs, and the total amount of the

11  settlements are slightly less than ten million from the Butte

12  fire, where both PG&E and the plaintiffs agreed to a specific

13  amount of settlement, correct?

14          MR. WELLS:  I am aware, yes.

15          MR. SINGLETON:  Okay.  And would you agree that, given

16  that both PG&E and the plaintiffs agreed on a specific number,

17  that the fair value of those claims has been determined?

18          MR. KAROTKIN:  He's not going to answer that question

19  either.  That's a legal conclusion.  Those claims are subject

20  to settlement agreements, as you know.  And if you think they

21  should be paid, make a motion seeking -- asking the court for

22  authority to pay them.

23          MR. SINGLETON:  Okay.  And we will make that motion,

24  but I'm --

25          MR. KAROTKIN:  Well, I know you've threatened that

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
113 of 192

 1  before.

 2              MR. SINGLETON:  Okay.

 3              MR. KAROTKIN:  Many times.

 4              MR. SINGLETON:  And again, I think this will go more

 5  quickly if we can just ask questions and have him answer them

 6  without you editorializing.

 7              MR. KAROTKIN:  Well, I think it'll go more quickly if

 8  you ask appropriate questions and then we can move ahead with

 9  this.

10              MR. ORSINI:  And stop asking the same one over and

11  over.

12              MR. LAFFREDI:  Okay, let's just -- just ask --

13              MR. SINGLETON:  Sure.

14              MR. LAFFREDI:  -- ask your next question.

15              MR. SINGLETON:  No problem at all.

16              All right, so I want to make sure.  You're not going

17  to answer the question of whether or not you agree that those

18  amounts were fair or not; is that correct?

19              MR. WELLS:  I'm not responding to that question, no.

20              MR. SINGLETON:  Okay.  All right.

21              Following up on a question that Ms. Dumas asked and

22  addressing a comment your attorney just made, does PG&E have

23  any current intention to bring a motion to pay those claims?

24              MR. KAROTKIN:  Are you talking about the Butte claims?

25              MR. SINGLETON:  Again, I'm sorry, I thought we were

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
114 of 192

1    clear.  I'm talking about those specific fifty claims for which

2    settlement agreements were issued by PG&E and they were signed

3    by the plaintiffs.  Again, the total amount is around nine-and-

4    a-half million dollars.  And I'd just like to know -- and I

5    would appreciate it if the witness could answer --

6          MR. KAROTKIN:  I just want to clarify.  Are these the

7    claims that you've told the bankruptcy court you're going to

8    make a motion to compel us to pay several times -- you've told

9    the bankruptcy court you're going to do that?  Is that what

10   you're talking about?

11         MR. SINGLETON:  Are you talking about have I told the

12   bankruptcy court?

13         MR. LAFFREDI:  Just rephrase your question.

14         MR. KAROTKIN:  Yeah, that's my question.

15         MR. SINGLETON:  Sure.  Absolutely.

16         There are fifty claims where PG&E and the plaintiffs

17   agreed on the number.  PG&E issued settlement agreements;

18   plaintiffs signed them and returned them.  Then PG&E did not

19   pay them.

20         So my question is does PG&E and have any intention of

21   bringing a motion asking for permission to pay those?

22         MR. KAROTKIN:  The answer is those are pre-petition

23   claims like all of the other wildfire claims, and PG&E has no

24   current intention to bring that motion.

25         MR. SINGLETON:  Okay.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
115 of 192

1      MR. KAROTKIN:  As I said before, other parties have
2  said they're going to bring that motion to the bankruptcy
3  court, and they promised it many times.  So far we haven't seen
4  it.  When it is filed, and if it is filed, we will address it
5  appropriately.
6      MR. SINGLETON:  Thank you.  So if I could just have
7  the witness who's under oath answer that.
8      So do you adopt your attorney's answer that PG&E and
9  does not intend to bring a motion to have those paid?
10      MR. WELLS:  I adopt Mr. Karotkin's answer.
11      MR. SINGLETON:  Okay.  Could someone, either you or
12  him -- preferably you, give me a yes or a no as to whether or
13  not PG&E is going to bring a motion?
14      MR. KAROTKIN:  We answered your question.
15      MR. LAFFREDI:  Yeah, I think he just answered that,
16  so.
17      MR. SINGLETON:  When we were here last time, we talked
18  a little bit about the amount of insurance that had been
19  received by PG&E in connection with Butte.  And I think the
20  filings indicated that there was 922 million.
21      MR. ORSINI:  Can I just clarify one thing?  When
22  you're talking about Butte, you mean the 2015 fire?
23      MR. SINGLETON:  I mean the Butte fire.
24      MR. ORSINI:  Right.  I understand.  But some people
25  have used --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
116 of 192

1          MR. SINGLETON:  Sure, absolutely.

2          MR. ORSINI:  -- Butte to refer to Camp.  I just want

3     the record to be clear.

4          MR. SINGLETON:  Fair point.  When I say "Butte" in

5     this context, I'm talking about the 2015 Butte fire --

6          MR. WELLS:  Yeah.

7          MR. SINGLETON:  -- that began in Amador County and

8     spread to Calaveras County.  Okay.

9          So I believe that you said there was 922 million that

10    was recovered from insurance, correct?

11          MR. WELLS:  That's right.

12          MR. SINGLETON:  And then I think today -- and I

13    believe also in your filings -- you've indicated that there was

14    an additional sixty million that was recovered from the two

15    subcontractors, Trees, Inc. and ACRT?

16          MR. WELLS:  That's correct.

17          MR. SINGLETON:  All right.  So that's 982 million?

18          MR. WELLS:  Yes.

19          MR. SINGLETON:  Okay.  And as I think Mr. Campora

20    asked and I believe you answered, PG&E is listed as an insured

21    on the policies for Trees, Inc. and ACRT, correct?

22          MR. WELLS:  That's right.

23          MR. SINGLETON:  Okay.  So 982 million in insurance

24    funds -- and I believe you said you'd paid out 800 million in

25    settlements; is that correct?

1           MR. WELLS:  Approximately.

2           MR. SINGLETON:  Okay.  So we looked at the amount of

3   litigation expenses that were listed in the 10-K, and it looks

4   like the total amount of money that was paid out with the 800

5   million plus roughly 120 million in litigation expenses, was

6   920 million.  Do you know if that is correct?

7           MR. WELLS:  That sounds approximately right.

8           I don't know, David, if you want to comment

9   specifically on the exact number?

10          MR. THOMASON:  Just one correction.  The amount we've

11  paid out in claims is actually closer to 900 million.  So I

12  think it's 880-something.

13          MR. SINGLETON:  Okay.  So can you tell us, then, the

14  total amount?  Because again, we were just going off of the

15  10-K filings, and it looked to us like the total amount of

16  settlement payments and litigation expenses came out to about

17  920 million.  Do you know if that's correct?

18          MR. THOMASON:  No, that's -- I mean, if we've paid out

19  900 in settlement payments, you add the legal costs on top of

20  that, it's -- it's over a billion.  Basically, I'll take your

21  legal-cost number for the truth.  If you add that to 900

22  million, it's -- it's a little over a billion -- a billion-20-

23  million.

24          MR. SINGLETON:  Okay.  And where is the -- where can

25  we find in any public filings the -- I think the number you

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
118 of 192

1  gave today is 900 million?

2          MR. THOMASON:  So our -- our 10-Q that we'll be

3  issuing later this week will have disclosures around contingent

4  liabilities.  So that -- that will have the latest information

5  in terms of where we are with respect to settlements and

6  amounts that we've paid.

7          MR. SINGLETON:  All right.

8          MR. WELLS:  You could look at the company's 10-K which

9  was filed with the Securities Exchange Commission at the end of

10  February; and as David indicated, when we file the first

11  quarter financial statements, that table will be updated.

12          MR. SINGLETON:  Okay, thank you.  And just so you

13  know, we did look at the 10-K, and we were going off the 800-

14  million testimony last time, and we thought 800 million was

15  correct.  It sounds like you're saying that it's actually 880

16  or closer to 900.  And that will be listed in the -- I believe

17  you said -- 10-Q?

18          MR. WELLS:  The 10-Q filed with the SEC --

19          MR. SINGLETON:  Okay.

20          MR. WELLS:  -- this Thursday.

21          MR. SINGLETON:  Okay.  All right.

22          All right.  Addressing a question that Mr. Campora and

23  Ms. Dumas asked about the hardship fund for the Camp fire

24  victims.  And I don't want to belabor anything.  Obviously you

25  are aware that there are Camp fire victims that are still

1  homeless?

2          MR. WELLS:  I am, which is why we want to put that

3  motion forward.

4          MR. SINGLETON:  Sure.

5          One question I had was you said something that I

6  didn't quite understand.  I was wondering if you could explain

7  this, you said you were concerned about jeopardizing federal

8  funding.  What did you mean by that?

9          MR. WELLS:  As I understand it, the question has been

10  raised that if we were to provide specific relief to the

11  victims of the 2018 fire, that may put at risk federal funding

12  that is being administered by FEMA with respect to those same

13  victims.

14          MR. SINGLETON:  I'm sorry; I just never heard of that.

15  It didn't happen in Butte.

16          MR. WELLS:  I'm not aware of it.  The question came up

17  with discussions with California's Office of Emergency Services

18  as well as in our outreach with FEMA to ensure that we weren't

19  complicating the current government actions that were underway.

20          MR. SINGLETON:  Okay.  I can just represent to you

21  that having represented several hundred folks who received the

22  emergency fund in Butte, and who also received FEMA, there was

23  absolutely no issue there.  So I don't know of anything.  Did

24  you have any --

25          MR. WELLS:  We were asked to verify this by the

 1  appropriate governmental agencies.  As I mentioned in my

 2  earlier comments, it's our intention to file this as quickly as

 3  possible.  We understand the impact the fire has had on so many

 4  individuals, and as soon as we complete these discussions with

 5  the governmental agencies, it's our intention to file that

 6  motion.

 7          MR. SINGLETON:  Good.  Do you have any kind of a

 8  timetable at all?

 9          MR. WELLS:  I unfortunately can't give you a timetable

10  because we're actively discussing with the governmental

11  agencies and I don't know when they will conclude their

12  evaluation.  We are trying to move through this as

13  expeditiously as possible.

14          MR. SINGLETON:  Do you have a target date internally?

15          MR. WELLS:  We would have liked to have already filed

16  this, but we have to complete this analysis, and I don't have a

17  date specifically for you.  But what I can commit to you as

18  I've indicated is we're trying to move through this as quickly

19  as possible.

20          MR. SINGLETON:  And what type of fund are you talking

21  about in terms of size?  Would this be, for example, a capped

22  fund of X amount of dollars?  Would it be X amount available

23  for specific individuals as was the case in Butte and San

24  Bruno?  Are you able to give us any idea of what that would

25  look like?

1          MR. WELLS:  I declined to comment previously on the

2   specifics of the fund.  I'll decline to comment again now on

3   the specifics.  We are trying to size this for meaningful

4   relief for those most in need and who have been impacted by the

5   fires.

6          MR. SINGLETON:  I don't hear an objection that that's

7   somehow attorney-client.  I mean, what's the basis for

8   declining to comment?

9          MR. WELLS:  We're continuing to work through the

10  specifics of the motion with governmental agencies, and I

11  don't -- I don't want to jeopardize, you know, any of the

12  relief.  And so until we conclude and make that filing, I

13  don't -- I don't think it's in anyone's interest to discuss the

14  particulars of the motion.

15         MR. SINGLETON:  But how would that jeopardize the

16  relief?

17         MR. WELLS:  I don't want to unnecessarily complicate

18  the relief that we're trying to provide these communities by

19  establishing a number and an expectation now when we have not

20  completed, as I've indicated, the requisite and required

21  communications with the governmental agencies.

22         So until those communications are finalized, I don't

23  want to create a false expectation.

24         MR. SINGLETON:  Okay.  Moving on to the individuals

25  affected by the 2017 North Bay fires, do you know what ALE

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
122 of 192

1  benefits are?

2          MR. WELLS:  Yes.  Alternative Living Expenses.

3          MR. SINGLETON:  And you know that the purpose of those

4  is to provide alternative housing when someone loses their

5  primary domicile?

6          MR. WELLS:  I am, yes.

7          MR. SINGLETON:  Okay.  Do you know how long they

8  typically last for fire victims?

9          MR. WELLS:  It can vary by policy; twelve to twenty-

10 four months is what I've heard kind of on average, but it

11 varies by policy.

12         MR. SINGLETON:  Right.  And you know that the standard

13 is twenty-four months when you're dealing with a federally

14 declared disaster?

15         MR. WELLS:  I was not aware of that, but --

16         MR. SINGLETON:  I'll represent to you that that's the

17 case.

18         MR. WELLS:  Okay.

19         MR. SINGLETON:  Now, that twenty-four month window

20 expires in five months, correct?

21         MR. WELLS:  That's right.

22         MR. SINGLETON:  Okay.  And so are there any talks

23 about any type of a fund that will help the individuals who

24 were burned out of their homes in the 2017 fires, and five

25 months from now will run out of ALE benefits and will be

1    looking at having to pay both rent and a mortgage?

2              MR. WELLS:  We're looking at the impacts that both the

3    '17 and '18 fires have had on the communities that we serve as

4    part of this temporary housing motion.  I -- it's premature to

5    talk about a additional motion as we've talked about throughout

6    this hearing.  And as part of my first-day declaration, we are

7    working to expeditiously resolve all of the liabilities the

8    company faces during this bankruptcy proceeding until we have a

9    handle on the date that we'll have that resolution, it's

10   premature to talk about additional emergency matters.

11             MR. SINGLETON:  So according to your testimony in

12   response to Mr. Campora, you can give absolutely no idea when

13   you may have a plan?

14             MR. WELLS:  That's right.

15             MR. SINGLETON:  The ALE benefits are set to run out in

16   five months, correct?

17             MR. WELLS:  That's correct, yes.  I'll take your word

18   for that.

19             MR. SINGLETON:  But it's premature to talk about

20   whether or not PG&E is going to do anything for when these ALE

21   benefits run out?

22             MR. WELLS:  Well, I think, as I said, the fund that we

23   are evaluating to put forward as part of this temporary relief

24   housing motion takes into considering both the '17 and '18

25   fires.  Anything beyond that fund is what I've said is

 1  premature.

 2           MR. SINGLETON:  Okay.  So I just want to make I

 3  understand and not putting words in your mouth, the emergency

 4  fund would not just be applicable to Camp Fire victims.  It

 5  might also be application to the 2017 fire victims as well?

 6           MR. WELLS:  We are looking to provide the most -- to

 7  support to those most in need, yes, both for the '17 and '18

 8  fires.

 9           MR. SINGLETON:  Okay.  Thank you.

10           Now, you mentioned earlier in response to a question

11  from Mr. Campora that you want to get the wildfire victims'

12  claims resolved as quickly as possible, correct?

13           MR. WELLS:  That's correct, yes.

14           MR. SINGLETON:  All right.  And you also said, I

15  believe, this time and at the prior hearing that you wanted to

16  do it more expeditiously than the state court timetable?

17           MR. WELLS:  That's correct, yes.

18           MR. SINGLETON:  Okay.  As far as you understand it,

19  what is the state court timetable?

20           MR. WELLS:  I don't believe there's a specific

21  timetable, but I think as we look at the history with respect

22  to catastrophic fires in California, it could take years.  So

23  with respect to which fire that occurred in Southern

24  California, it took well over five years for those victims to

25  be compensated.

1          As we've been talking here for the 2015 Butte fire, we

2    have only resolved roughly, call it, two-thirds of the claims

3    the company faces, and we're now approximately three and half

4    years after the date of that fire.  So it is from that

5    experience that I say that we want to more expeditiously

6    resolve the claim -- the total claims the company's facing.

7          MR. SINGLETON:  So in this context, when you say

8    "expeditiously," you mean some time before that, through the

9    five year period?

10         MR. WELLS:  Yes.  As I indicated in my first-day

11   declaration, we want to accelerate resolution of these claims

12   in a manner that would be more expeditious than the traditional

13   path in a state court system, yes.

14         MR. SINGLETON:  Okay.  And again, not to belabor the

15   point, but as you understand it, that means something quicker

16   than the three to five years that you just talked about?

17         MR. WELLS:  That's correct.  Yes.

18         MR. SINGLETON:  Okay.

19         MR. WELLS:  We endeavor to resolve these as

20   expeditiously as possible as I've indicated in previous

21   comments.  It will require changes of outside of the company's

22   control.  We will work constructively for those changes as

23   well, but that is the -- because there are events that are

24   outside of the company's control, that is the reason why today

25   I can't give you the exact date for a plan of reorganization.

1          MR. SINGLETON:  What are some of those events?

2          MR. WELLS:  As we've talked about in this hearing, in
3    order to raise the required financing, there will likely need
4    to be changes in wildfire liability laws here in California to
5    attract new debt and equity investments.

6          MR. SINGLETON:  And just so everybody's clear, when
7    you say "changes in wildfire liability laws, you're talking
8    about limiting the amount of the utilities liability?

9          MR. WELLS:  Not necessarily.  I think as the
10   Governor's report has outlined, there are multiple ways that
11   the state can bring stability to the situation that will allow
12   investors the confidence to begin reinvesting in California and
13   that can take a number of different forms.

14         MR. SINGLETON:  What are some other forms other than
15   limiting liability?

16         MR. WELLS:  I think some of them, those ideas don't --
17   don't speak to any limited liability.  The catastrophic fund
18   that could be established similar wo what California has done
19   after the devastating earthquakes in the early '90s with the
20   California Earthquake Agency, we can look to the impact of
21   catastrophic hurricanes in Florida.  And so there are a number
22   of different ideas that are being discussed some of which don't
23   speak to any limitation of liability.

24         MR. SINGLETON:  Okay.  In terms of plan, and I know
25   you've said you cannot give us a date, but do you expect the

1  plan to call for payment in full of allowed claims for fire

2  victims?

3          MR. KAROTKIN:  We're not going to comment on the plan

4  or potential provisions of a plan, period.

5          MR. SINGLETON:  Why not?

6          UNIDENTIFIED SPEAKER:  Because we're not, and it's

7  premature, so I suggest you move on.

8          MR. SINGLETON:  So the purpose of this is to find out

9  how the case is going to be administered, but the second time

10  we're back here it's still too early to talk about any portion

11  of a plan at all?

12          UNIDENTIFIED SPEAKER:  That's correct.  What are you

13  smirking about?

14          MR. SINGLETON:  I was just wondering -- I was actually

15  thinking about something I heard on NPR this morning.  It's

16  about a couple who lost their home in the 2017 fires --

17          UNIDENTIFIED SPEAKER:  I heard that today in the news.

18          MR. SINGLETON:  Thank you.  And they were talking

19  about how they're going to run out of ALE benefits in five

20  months, and they and their six-year-old autistic son and their

21  two other children are going to have to move into a motor home

22  because they couldn't afford to both pay the mortgage and their

23  rent, and I was just wondering about them and whether or not

24  they'd agree with you that it's premature and inappropriate to

25  talk about the plan or when PG&E might get around to

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
128 of 192

1  compensating some of its tens of thousands of victims.  That's

2  what I was thinking.

3          UNIDENTIFIED SPEAKER:  Beating a dead horse.

4          MR. WELLS:  This is an incredibly complicated case.

5  We understand the devastation it has caused in communities we

6  serve which is why as I mentioned we intend to bring a motion

7  forward to address the impact of -- we need to help support

8  temporary living for the victims in most need of the '17 and

9  '18 fires.

10         As of today, you know, we talked about it at the last

11 341 hearing, we have made estimates of the potential damage,

12 but given the size and complexity of this case, we have not

13 seen the underlying claims detail.  And so it would be

14 premature to discuss a plan of reorganization without a full

15 understanding of the claims that the company needs to settle.

16         MR. SINGLETON:  Okay.  Let me ask you just a couple of

17 follow-up questions about the assets and liabilities.  And I

18 know the trustee talked about this at length and was very

19 thorough, I just want to make sure that we have the most

20 current data.

21         So looking at the summary that was filed on 3/14, is

22 that the most up-to-date summary or have there been newer ones?

23         MR. WELLS:  That's the most updated summary.

24         MR. SINGLETON:  Okay.  And in this you listed -- "you"

25 being PG&E -- the total summary of assets at slightly over

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
129 of 192

1  sixty-one billion dollars; is that correct?

2            MR. WELLS:  That sounds about right, yep.

3            MR. SINGLETON:  Okay.  And then, you listed the

4  summary of liabilities, and this excluded in these wild fire

5  claims, but you listed those as being 24.7 billion; is that

6  correct?

7            MR. WELLS:  I'm sorry; can you repeat the question?

8            MR. SINGLETON:  Sure, absolutely.

9            In this filing, the summary of assets and liabilities

10  on the 14th of March, you listed the total liabilities,

11  excluding any potential wildfire liabilities at 24.7 billion

12  dollars; is that correct?

13            MR. WELLS:  That sounds accurate.

14            MR. SINGLETON:  Okay.  And then looking to the notes

15  that were filed on the same day, I believe you stated that you

16  had -- "you" being PG&E -- a range of the potential wildfire

17  claims; is that correct?

18            MR. WELLS:  Yes, we have disclosed a range within our

19  financial statements.

20            MR. SINGLETON:  Then is it correct that that range was

21  13.4 billion to 30 billion?

22            MR. WELLS:  There's an error on that reference to 13.4

23  billion.  We have disclosed as part of our financial statements

24  fourteen billion dollars.

25            MR. SINGLETON:  Okay.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
130 of 192

1                MR. WELLS:  But yes.

2                MR. SINGLETON:  All right.  So based upon best

3     information you have now, understanding you might get more

4     information, but based on what you have now, you're looking at

5     somewhere between fourteen to thirty billion for the wild fire

6     claims, correct?

7                MR. WELLS:  I wouldn't -- I wouldn't say that.  The

8     fourteen to thirty billion is a number derived for external

9     reporting purposes under the accounting rules is not reflective

10    of a legal analysis of the specific claims.

11               MR. SINGLETON:  Understood.  But I'm just saying based

12    upon the information you have today --

13               MR. WELLS:  That's what we publicly disclosed, yes.

14               MR. SINGLETON:  And that's your most accurate

15    information, correct?

16               MR. WELLS:  That's what we've disclosed in our

17    financial statements that we filed with the Securities and

18    Exchange Commission, yes.

19               MR. SINGLETON:  That's a little bit different than the

20    question I asked.  The question I asked was this, based upon

21    what PG&E knows today, the most accurate assessment you have is

22    that it's between fourteen and thirty billion.

23               MR. KAROTKIN:  No, that's mischaracterizing the public

24    disclosures.  If you want to ask him about public disclosures,

25    you should show it to him, because what you just said is not

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
131 of 192

1   what's been disclosed publicly.

2            MR. SINGLETON:  Oh, okay.  This would be page 11 of

3   document 903-1 that was filed on 3/14/19.  And do you have that

4   with you?

5            UNIDENTIFIED SPEAKER:  I think it's in this page.

6            MR. WELLS:  What page?

7            MR. SINGLETON:  I'm new to bankruptcies.  Are counsel

8   allowed to coach him up like that when a question is pending?

9            MR. LAFFREDI:  I think he can consult.

10           MR. SINGLETON:  Okay.

11           MR. KAROTKIN:  What page?

12           MR. SINGLETON:  This would be on page 11 of 903-1,

13   filed on 3/14/19.

14           MR. KAROTKIN:  I don't think you have that.

15           MR. WELLS:  There.

16           MR. KAROTKIN:  Can you see it?  Can you just show me

17   what you have there?

18           MR. SINGLETON:  Sure.  Page 11.

19           MR. KAROTKIN:  Yeah, okay.

20           MR. SINGLETON:  Yeah.

21           And you're looking at the third full paragraph.

22           MR. WELLS:  I am.  I'm reading that quickly.

23           MR. SINGLETON:  Okay.  Lines 18 through 21.

24           MR. WELLS:  I've read it, yes.

25           MR. SINGLETON:  Okay.  And you -- with the

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
132 of 192

1   clarification that you said, the 13.4 billion is not correct

2   and it's 14 billion, this seems to say that the range is

3   somewhere between 14 billion and 30 billion; is that correct?

4             MR. ORSINI:  Read the text.

5             MR. SINGLETON:  I'm sorry, counsel.  He's under oath,

6   you're not.

7             MR. ORSINI:  Well, you're --

8             MR. SINGLETON:  Quit coaching him.

9             MR. ORSINI:  I'm just reading the text.

10            MR. SINGLETON:  Let him answer the question.

11            MR. ORSINI:  No, I'm trying to make sure you have

12  accurate information.  Go ahead.

13            MR. SINGLETON:  Well, you're not even looking at it.

14            MR. KAROTKIN:  Can you -- sir, answer the question.

15            MR. ORSINI:  I don't have to read it to read it

16  correctly unlike you're doing.

17            MR. WELLS:  The range says it could exceed thirty

18  billion.

19            MR. ORSINI:  Could exceed.  Could exceed.

20            MR. SINGLETON:  Note those words; no problem at all.

21  Could exceed thirty billion; that's what it says.

22            MR. WELLS:  It says we reported total charges of

23  fourteen billion, and cutting to the end, could exceed -- the

24  upward end of the range could exceed thirty billion.

25            MR. SINGLETON:  Good.  And is that the most accurate

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
133 of 192

1  information you have to date?

2          MR. WELLS:  That's what we have to date.

3          MR. SINGLETON:  Okay.  Perfect.

4          So if we look at that and we add the top end of the

5  range, understanding that it could exceed 30 billion, but note

6  that you didn't put 31 or 32 or 33, you said could exceed 30

7  billion, if we add 30 billion to 24.7, that's 54.7 billion; is

8  that correct?

9          MR. WELLS:  Yes.

10          MR. SINGLETON:  Okay.  And that would mean that the

11  total liabilities would be a little more than six billion less

12  than the total assets; is that correct?

13          MR. WELLS:  Based on that math, yes.

14          MR. SINGLETON:  Is there any other math we should be

15  aware of?  I'm just -- go ahead.

16          MR. WELLS:  The glo -- yes, the global notes that

17  you're referring to have -- and that we've gone through

18  extensively during this hearing have indicated that there may

19  be differences.

20          And so based on what you've -- you've provided, yes, I

21  would agree that that's what the math would tell us.

22          MR. SINGLETON:  And again, I'm not suggesting that

23  these are final.  You've been very clear that there are things

24  you are still looking into, and there may be additions.

25          MR. WELLS:  Okay.

1          MR. SINGLETON:  I'm just asking you based on what you

2    have right now and what you filed.  Looks to me like you're

3    looking at sixty-one billion in assets, and if we take the

4    upper end of the range with the understanding that it could

5    exceed it, thirty billion.  If we had 30 to 24.7 we'd get 54.7

6    billion, correct?

7          MR. WELLS:  I've agreed to that math, yes.

8          MR. SINGLETON:  Okay.  So then is it fair to say that

9    based upon the best information you have today, it appears that

10   PG&E's assets exceed its liabilities by roughly six billion?

11         MR. WELLS:  Based on that math, yes.  I think as we've

12   been talking about throughout the court of this hearing,

13   though, in order to ultimately compensate the victims, it's not

14   an exercise of subtracting from liabilities total assets.  It's

15   also in part bringing the needed reform to the wildfire

16   liability rules here in the State of California.  In order to

17   monetize that asset value, one must need -- must have the

18   ability to attract new and incremental debt in equity

19   investments until it's not as simple of an exercise as taking

20   total assets minus liabilities as you have done in this case.

21         MR. SINGLETON:  And let me address that because that's

22   an interesting point.  I'm just going off the math.

23         So again, based upon the best math we have, your best

24   information, your assets, "you" being PG&E, exceed your

25   liabilities by a little over six billion?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
135 of 192

1          MR. WELLS:  Yes.  I've answered that question.

2          MR. SINGLETON:  Okay.  So let's go to the next.

3          Now, my understanding, and again, I'm new to the

4    bankruptcy process, but isn't there a rule that says that

5    creditors can't be treated any worse under a Chapter 11 than

6    they could under a Chapter 7?

7          MR. WELLS:  I'm not a lawyer, but I understand from

8    advice of counsel that's the case.

9          MR. SINGLETON:  Okay.  And so -- but again, my

10   question is this, if you were proceeding as a Chapter 7 and you

11   liquidated those sixty-one billion in assets wouldn't the fair

12   market value of those sixty-one billion in assets be sixty-one

13   billion?

14         UNIDENTIFIED SPEAKER:  No.

15         MR. WELLS:  No, not necessarily.

16         MR. SINGLETON:  Okay.

17         MR. WELLS:  As we've talked about the assets that were

18   reported extensively in these schedules and SOFAs are reported

19   at net book value.  Fair market value could differ from the net

20   book value estimates that we've got in in these documents.

21         MR. SINGLETON:  As you sit here today, are you able to

22   give us an estimate as the -- as to the fair market value of

23   the sixty-one billion in assets that were reported in the

24   summary of assets and liabilities?

25         MR. WELLS:  I am not.

 1          MR. KAROTKIN:  The fair market value is not relevant

 2   in Chapter 7 anyway.

 3          MR. SINGLETON:  Okay.  What would be the

 4   appropriate -- counsel, what would --

 5          MR. KAROTKIN:  Liquidation value.

 6          MR. SINGLETON:  Liquidation value.  What's the

 7   liquidation value?

 8          MR. WELLS:  I don't have that number.

 9          MR. SINGLETON:  Has that been -- has that assessment

10   been done by PG&E?

11          MR. WELLS:  Not to my knowledge.

12          MR. SINGLETON:  Well, let me ask you this, this plan

13   that -- assuming we assume is going to come out Sunday, with

14   that plan I would assume that you're going to make sure that

15   what you propose complies with the law and what you're offering

16   the creditors is at least as much as what they would receive

17   under Chapter 7, correct?

18          MR. WELLS:  We will comply with the law with our plan

19   of reorganization when we put it forth, yes.

20          MR. SINGLETON:  Can you answer the rest of the

21   question which is are you going to make sure that what you

22   propose the creditors be given is at least as much as they

23   would receive under Chapter 7?

24          MR. WELLS:  I'll confirm today that we will comply

25   with the law with the plan of reorganization.  I don't --

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
137 of 192

1          MR. KAROTKIN:  These are requirements for

2  confirmation, so --

3          MR. SINGLETON:  I'm just curious.

4          MR. KAROTKIN:  Do you have more -- any more questions

5  about the debtors' --

6          MR. SINGLETON:  Sure.

7          MR. KAROTKIN:  -- renditions of --

8          MR. SINGLETON:  Absolutely.  A couple more quick

9  questions.

10          In terms of the amounts that preparing for bankruptcy,

11  the paper, I think it was The Chronicle, reported that that was

12  somewhere between seventy-five to a hundred-million dollars.  I

13  was just wondering as a CFO if that was accurate?

14          MR. WELLS:  I don't think that was accurate.  We were

15  facing complex litigation resulting from the '17 fires as we

16  talked about in the 341 hearing.  Last year, we -- last time we

17  met a couple of months ago, the focus on bankruptcy was

18  really -- really came into effect at the end of 2018.

19          And so much of that legal defense was -- or legal cost

20  was incurred in order to defend the company against the complex

21  litigation it was facing.

22          MR. SINGLETON:  Okay.  As the CFO, you're able to give

23  us an estimate as to how much PG&E spent preparing for their

24  current bankruptcy filing?

25          MR. WELLS:  I don't have an estimate today.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
138 of 192

1              MR. SINGLETON:  How much is spent each month on

2    average on bankruptcy counsel?  Maybe counsel wants to answer

3    this one.

4              MR. WELLS:  I don't know the number.

5              MR. SINGLETON:  Does your counsel?

6              MR. ORSINI:  It's all a public record.

7              MR. SINGLETON:  Okay.  Will PG&E ask the rate payers

8    to pay any portion of the amount that you spent on bankruptcy

9    counsel?

10             MR. WELLS:  No.

11             MR. SINGLETON:  Okay.  Last question I have relates to

12   the crossclaims and counterclaims.

13             Now, I know you're aware, because we talked about it,

14   that CAL FIRE determined that several of the 2017 North Bay

15   fires were started by tree line contact, correct?

16             MR. WELLS:  (No audible response).

17             MR. SINGLETON:  What have you done, "you" being the

18   company, to look into filing claims against the contractors who

19   would have been responsible for maintaining those lines?

20             MR. KELLER:  You're asking him to disclose privileged

21   information.  I'm going to instruct him not to answer.

22             MR. SINGLETON:  Okay.  Let me ask it this way in the

23   context of bankruptcy.  Obviously, the contractors would have

24   insurance, correct?

25             MR. WELLS:  Correct.

1          MR. SINGLETON:  Have you looked into the total amount
2    of insurance that is available from those contractors if you
3    decided to make a claim against them?
4          MR. WELLS:  We have evaluated that, yes.
5          MR. SINGLETON:  How much is that?
6          MR. WELLS:  I don't have a number.
7          MR. SINGLETON:  Are you able to give us an estimate?
8          MR. WELLS:  I am not, no.
9          MR. SINGLETON:  Okay.  Have you looked at what the
10   assets of those contractors are in the event that you decided
11   not to accept insurance and to proceed against them?
12         MR. WELLS:  I have not personally done that.
13         MR. SINGLETON:  Do you know if the company has?
14         MR. WELLS:  I'm not aware if the company has.
15         MR. SINGLETON:  Okay.  Great.
16         That's all I have.  Thank you, gentlemen.
17         MR. WELLS:  Thank you.
18         MR. LAFFREDI:  All right.  So there's one more
19   creditor who has indicated they were going to ask a question.
20   That is Monica Marie Armstrong (ph.).  Ms. Armstrong?
21         MR. KAROTKIN:  I think there's another gentlemen too.
22         MR. MONTGOMERY:  Does he have to be here?
23         MR. LAFFREDI:  Sorry?
24         MR. MONTGOMERY:  I have some questions.
25         MR. LAFFREDI:  Okay.  Are you Mr. Armstrong?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
140 of 192

1          MR. MONTGOMERY:  No, I'm not.

2          MR. LAFFREDI:  Okay.  Well, I was going to go through

3    the ones who indicated that they had questions, and then I will

4    ask if anybody else has some.

5          MR. MONTGOMERY:  Absolutely.

6          MR. LAFFREDI:  Ms. Armstrong, are you here?

7          Okay.  So is there anybody else who did not indicate

8    that they had questions that would like to ask questions?

9    Okay.

10         Sir, why don't you come forward first since you were

11   the first one.  Did you have questions, sir?

12         MR. MONTGOMERY:  Yeah, I have a lot of questions.

13         MR. LAFFREDI:  Okay.  Come forward.  And again -- I

14   mean, I ask that you limit your questions to the debtors'

15   financial situation, the prospects for reorganization,

16   schedules and statements.

17         MR. MONTGOMERY:  Do that again.

18         MR. LAFFREDI:  First, identify yourself, please, if

19   you could for the record.

20         MR. MONTGOMERY:  Bryan Gavin George Montgomery.

21         MR. LAFFREDI:  Okay.  And --

22         MR. MONTGOMERY:  I live in Calaveras County.  I stayed

23   and fought the fire personally when everybody left.  I got

24   burned up.  Had no hair, no eyebrows.  I jumped in a pool to

25   survive; my son and I.  It's been three and half years, maybe

 1   even more.

 2           How do you -- how did some people get paid on this

 3   Butte -- I'm talking the Butte fire in 2015 -- and then

 4   suddenly you file bankruptcy?  How did that -- how did that get

 5   determined?  How did that come about like that?  How come some

 6   people got paid but not the rest of the people?

 7           MR. WELLS:  Well, first of all, let me apologize for

 8   the impact that this had on you and your son.

 9           MR. MONTGOMERY:  Well, my whole family.

10           MR. WELLS:  Your whole family.

11           MR. MONTGOMERY:  I lost everything.  Houses, I burned

12   out -- I had no hair, no eyebrows, nothing.  Literally, just --

13   anyway, regardless.  I jumped in a pool --

14           MR. WELLS:  You have my --

15           MR. MONTGOMERY:  -- to be able to survive.  I came up,

16   I didn't see a firefighter for a week, I didn't see a PG&E

17   worker.  No one.  CDF took off.  There was no one in there but

18   squirrels falling out of trees, and a bunch of other crap that

19   I don't even want to tell you about, looters.

20           All I want is what I lost --

21           MR. WELLS:  Sure.

22           MR. MONTGOMERY:  -- to get back the life that I was

23   living.  And you keep saying the word "premature."  How is it

24   premature?  It's been three and a half years.  I've been living

25   on the ground for three years.  I didn't have enough insurance

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
142 of 192

1   to build a house because the contractors all wanted 200 dollars
2   a square foot.  So I lived on the ground for three years, and
3   so did my son.  That was his choice.  He didn't have to.  He
4   quit a job to help me.  It was -- he's got a lot out but
5   something else happened.

6         So now he lost his job, and he had a really good job
7   and he's having a hard time getting a good job right now.  Can
8   he get paid?  He put a claim in.  I want him to move on with
9   his life.  I mean, he's crying.  A twenty-eight-year old kid
10  sitting there crying and I got to say no, my Brock, we'll be
11  all right, but we weren't all right.

12        I told him to get the hell out of there.  I stayed,
13  though.  I mean, there was literally nothing to step off here.
14  There was he screaming, crying.  You guys should have been in
15  there.  I wish you had been in there.

16        MR. WELLS:  Well --

17        MR. MONTGOMERY:  I saved your telephone poles after I
18  got up.  I fixed the dredges.  I pumped 2,000 gallons a minute.
19  I can out-pump their tanks.  I'm a mechanic.  I worked for CDF
20  for years.

21        So we got out and we fixed our stuff and we pulled up
22  all your telephone poles out on -- as far as I could reach, and
23  I saved homes.  Mine, I couldn't save.  That doesn't count for
24  something?

25        I'm living on nothing right now.  I parked illegally

1  to get down here.  I didn't have enough money for the fucking

2  toll bridge.  I literally did not have enough money for the

3  toll bridge to get across here.

4          Now, I parked illegal on some corner right now.  I'm

5  sure I'll be towed, or I'll have a huge ticket.

6          I retired early.  I live on 550 dollars a month.

7  That's it.  That's all I got.

8          I'm living in a modular home.  I want my other home

9  back, but I'm living in some modular home till I can have

10  enough to rebuild.  I have to pay a contractor to rebuild.

11  They take advantage of me too.  As far as I'm concerned,

12  everybody took advantage of us.

13          I fed them every day.  I fed CDF, PG&E guys every day,

14  go to that big area.  And this is what we get in return?  It's

15  not right.  Just plain not right.

16          How did -- answer?  Tell me.  How did that get

17  determined?

18          MR. WELLS:  Again, my deepest apologies.  I can't even

19  begin to express this impact.

20          How it got determined is as I've indicated in my other

21  responses, it was unacceptable to the company among other

22  things, to be settling one-off claims for a period of three to

23  five years putting you and others in a lengthy line of

24  resolving the claims that the company faces.

25          As we believe, and as I continue to reassert, we

1  believe that the bankruptcy court allows us to more

2  expeditiously pull the claims a company faces together and

3  resolve them much more timely than a lengthy process which is,

4  frankly, who gets in front of the line.

5          I agree --

6          MR. MONTGOMERY:  No, I don't want to be in the front

7  of the line.

8          MR. WELLS:  But I'm not --

9          MR. MONTGOMERY:  I'm not in the front of the line.

10         MR. WELLS:  I'm not saying that you are.

11         MR. MONTGOMERY:  This is three and a half years ago.

12  So how did it get drug on if it was three and a half years?  It

13  just suddenly 800 million got paid out and now you're just

14  going to stop.  I mean, where is the rhyme and reason?  Is

15  it -- are they going to finish the Butte fire or are they --

16  are we going to be locked in?

17         MR. WELLS:  Because we nearly ran out of money which

18  is why we had to file for bankruptcy.

19         MR. MONTGOMERY:  No way.  You guys got tons of assets.

20         MR. WELLS:  When we filed for bankruptcy, we had 240

21  million dollars left of unrestricted cash.

22         MR. MONTGOMERY:  It just the Butte fire, is that

23  correct?

24         MR. WELLS:  At the end of --

25         MR. MONTGOMERY:  2015 fire?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
145 of 192

1            MR. WELLS:  At the end of January, January 29th, when

2    we filed for bankruptcy, we had 240 million of unrestricted

3    cash remaining to address operations, to continue to provide

4    gas and electric service to customers during the middle of the

5    winter.  We were running out of money.  It's not a fair

6    situation.  I -- my deepest sympathies, but as part of this

7    process this allows us --

8            MR. MONTGOMERY:  I don't know how -- I don't know it

9    got determined the way it did.  It's beyond me.  Do you guys

10   have a plan?  What are you going to go from fire to fire?

11   Where you going to go -- pay your bills like I do?  Pay my bill

12   on time and you pay it next month.  Where you going to pay the

13   Butte fire people off first?

14           MR. WELLS:  We were actively trying as quickly as

15   possible, as you know, that we've --

16           MR. MONTGOMERY:  It's not going to happen.

17           MR. WELLS:  Sir, it'll happen as part of the

18   resolution of all of the wildfire claims, the '17 and '18 fires

19   as well.

20           MR. MONTGOMERY:  But you're saying it's premature --

21   three and a half years is premature right now to determine

22   the -- that whole thing you guys were just talking about with

23   Mr. Singleton.

24           MR. WELLS:  The plan of reorganization, yes.

25           Until we --

1        MR. MONTGOMERY:  By then we're going to be five years
2    anyway.  It's going to be four years September here.
3        MR. WELLS:  Not necessarily.  The bankruptcy
4    proceeding provides mechanisms to accelerate the recognition of
5    claims in a couple of places.
6        MR. MONTGOMERY:  You know, I don't care.  I can get
7    by.
8        MR. WELLS:  Okay.
9        MR. MONTGOMERY:  I'm an older guy; I can care less,
10   but my son and the rest of them there's a lot of stuff that
11   really includes -- is really, really important.  He don't know
12   about.  They lost four kids before that and I -- whole trophy
13   room and having his -- I couldn't find one thing.  I looked for
14   two weeks in the ground shifting through that.  Not one medal.
15   Not my dog tags, not my dad's dog tags, not -- World War I dog
16   tags his grand -- nothing.  Fried eggs.  All of it's melted.
17   The ground was bubbling.  It literally was bubbling while I'm
18   in the pool.  I'm glad I was in the pool, believe me.
19        So --
20        MR. WELLS:  I'm terribly sorry.
21        MR. MONTGOMERY:  -- it affected my life.  I didn't
22   think it was any big deal.  I thought it was fine.  I didn't
23   care about.  I've been in some really dangerous situations
24   before, but now when I looked at it -- I look back on it, it's
25   affected my family's lives, and I didn't know that.  The

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
147 of 192

1  Brock's still suffering from -- I made him come back.  I went

2  and got him after.

3          All my hoses were burnt up so when you barrel (ph.)

4  like that.  I made him come back and help me.

5          Four or five days we didn't have any food or water.

6  Didn't see anybody.  Ran out of gasoline.  I would have more

7  homes out, but we ran out of gasoline and we couldn't.  Yeah, I

8  still have about 10,000 gallons of water left.

9          MR. WELLS:  Well, thank you --

10          MR. MONTGOMERY:  No, I -- then the poles, we cared

11  about the poles, I mean, because they were all tar and once

12  they started then it was very hard to put out.

13          Life up there isn't the same.  It's never going to be

14  the same in, like, twenty, thirty years.  I look out and it's

15  just not the same.  I don't want to live there anymore.  I

16  don't have enough money to move.  Who wants to buy a place

17  that's all burned up?  All my neighbors left.  Say, poor old

18  guys, they can't do the -- the work that they left us to do,

19  luckily I have all them saws, you know, I went and bought them

20  all back, the all burned up.

21          How could they expect people to do that kind of work,

22  because they left us a mess?  And you know what I mean by

23  "they."  PG&E, those work crews that came in, the ones that

24  they farmed out for whoever they are, and all the rest of them,

25  just dropped the trees and they -- they don't butt them up,

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
148 of 192

1  they just leave you a mess.

2         Those people walked away from their homes.  That's

3  sad.  They lived there all their lives.  It was like a

4  retirement community; it really is.

5         You ought to drive through there some time and see

6  what it's like.

7         MR. WELLS:  I have, and I continue to do so, yes.

8         MR. MONTGOMERY:  It affected our whole community.

9         MR. LAFFREDI:  Did you --

10        MR. MONTGOMERY:  The only one I want an answer is are

11  we going to be, you know, you probably don't know.  Are we

12  going to be lumped in with the 2017 and '18 and the Napa fires

13  and the Tubb fires, because that's what the -- no one can

14  answer me?  Are we going to -- is the Butte fire now going to

15  be put in by the judge and say -- I mean, how's it -- are we

16  going to be locked in with that so I have to be waiting three

17  more years?

18        MR. WELLS:  For a practical purpose, all the

19  companies' liabilities are going to be lumped together, but we

20  are working to resolve each and every one of these claims.

21        MR. MONTGOMERY:  So we could possibly be lumped

22  together?

23        MR. WELLS:  For a practical matter that's how this

24  process works.

25        MR. MONTGOMERY:  I mean, it might be selfish of me to

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
149 of 192

1  be here right now to ask you this question, but I feel like I

2  need my son to move on.

3          Gerald hit the nail on the head, it's, like -- I

4  forgot what the word was -- was right on what he said, and I

5  forgot what it was.  Something to do with -- hundreds of people

6  died in those fires.

7          MR. WELLS:  We are deeply committed --

8          MR. MONTGOMERY:  I mean --

9          MR. WELLS:  -- to addressing your loss as well as the

10 loss of others.  I can commit to you, that as a company we are

11 deeply committed.

12         MR. MONTGOMERY:  And I mean, I had propane tanks going

13 up on my head.  I had one that I'm glad I -- you know, when

14 those valves don't go off, they sound like a giant piccolo, but

15 they'll make you deaf.  I can't even hear out of this ear.  But

16 then when the tank doesn't -- safety valve go off, that lid

17 blow right out.

18         I found mine 200-and-something yards away from me.  I

19 just -- so we were just lucky.  We were saving animals because

20 there's a lot of people just left their animals out there.

21 It's horrible, listening to them scream.  It was absolutely

22 horrible, because they're just like humans; they're crying

23 while they're baking.

24         So you have to act like you care but you really don't;

25 I hate to say that.  You, I got no respect for you.  I know who

1   you are.  Got none.  By the way, you treat them, they just want

2   answers.

3          I know the CFO is the company right now.  I know a lot

4   of people, and I'm not a very important person.  I chose not to

5   be because they just want answers.  Not famous or not -- what

6   was the other one you were using -- legal counsel knows.

7   Aren't you guys the legal counsel?  How do they give you that

8   excuse?  You are legal counsel; aren't you?

9          MR. WELLS:  I --

10          MR. MONTGOMERY:  You're the CFO.

11          MR. WELLS:  I'm a CFO, yes.

12          MR. MONTGOMERY:  He's your lawyer?

13          MR. WELLS:  Yes.

14          MR. MONTGOMERY:  I -- he's like an acting judge, I

15   think.  So and you, I don't know what you are.  You guys think

16   it's funny.  I'd love to see you up there.  That's all I have

17   to say.  I'd like to see you smirk up there.

18          MR. WELLS:  There's nothing funny about this

19   situation.

20          MR. MONTGOMERY:  He's smirking.

21          MR. WELLS:  There's nothing funny about the situation.

22          MR. MONTGOMERY:  It ain't funny what I lost; I'll tell

23   you that.  What we went through, running looters off and

24   telling us they can shoot us anyway.  We didn't -- you know

25   what, it wasn't fun, and it ain't ever going to be the same for

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
151 of 192

1    me.  I lost my faith in humanity and you guys are part of it.

2          MR. WELLS:  I personally apologize.

3          MR. MONTGOMERY:  No, I really mean that.  I think you

4    guys are part of it.

5          MR. KELLER:  Thank you.

6          MR. LAFFREDI:  Thank you, sir.

7          Is there anybody else who would like to ask questions

8    who did not get an opportunity?  Sir, with the glasses.

9          MR. DANKO:  Mike Danko, we spoke before.

10         So why did PG&E decide to pay Geisha Williams her 2.5

11   million dollar bonus in the days leading up to the bankruptcy

12   but not pay the Butte fire victims the agreed-upon settlements?

13         MR. WELLS:  Just as during the previous hearing, we

14   had to make a decision of -- or how to preserve the ongoing

15   service of our gas and electric business and we were put in an

16   untenable situation given the unusual notice of Senate Bill 901

17   which required us to disclose that we intended to file for

18   bankruptcy without having the protection of the bankruptcy

19   court itself.  And so unfortunately, we were in a position of

20   having to make prioritization on payments so we didn't run out

21   of cash.

22         MR. DANKO:  I understand that you said last time that

23   you wanted to preserve cash, and that's why you didn't pay the

24   Butte fire victims, you didn't honor the agreements that you

25   made with the Butte fire victims.

1          My question is why did you pay Geisha Williams her

2     bonus in the days leading to the bankruptcy and not honor your

3     other agreements?  Why did you prioritize her deal over the

4     deal you had reached with the Butte fire victims?

5          MR. WELLS:  Sir, we've asked this question and we've

6     answered it extensively as part of the 341 hearing two months

7     ago --

8          MR. DANKO:  Okay.  Can I --

9          MR. WELLS:  -- and also today.

10          MR. DANKO:  -- can I just -- and you looked at the

11     transcript of that hearing, I'm sure?

12          MR. WELLS:  No.

13          MR. DANKO:  Oh, you didn't.  Well, let me refresh you.

14     I asked you:

15     "Q.  Why did PG&E decide to pay Geisha Williams her severance

16     and not pay the Butte fire victims their settlements?"

17          Your answer was,

18     "A.  I don't have an answer for your question."

19          I ask you then,

20     "Q.  Where would I get the answer?  If not from you then from

21     who?"

22          And then you promised me,

23     "A.  I'll be prepared to discuss that at the next meeting."

24          That's why I'm here now.  So I'm looking for -- you've

25     had two months to think about it.  I'm looking for the answer

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
153 of 192

 1    as to why you paid Geisha Williams her 2.5 million-dollar bonus

 2    while you were trying to preserve cash to such an extent that

 3    you couldn't pay, you couldn't honor the agreements that you

 4    had made with the Butte fire victims to pay them?

 5          So why did you prioritize Geisha Williams who was in

 6    charge of the whole operation when those people were burnt out

 7    of house and lost all their belongings?  Why did you prioritize

 8    her bonus to the money that you agreed to pay the victims who

 9    needed that because they were homeless?  That's my question for

10    you, and I thought you had two months to think about that

11    answer and you were going to give it to me when we came here

12    today.  So that's my question.

13          MR. WELLS:  No, I appreciate your question. We had to

14    take into consideration all of the obligations the company was

15    facing, and we collectively came to the conclusion that we

16    needed to make that severance payment.

17          MR. DANKO:  And why?  Why did you need to make that

18    severance payment?  Was she -- was Geisha Williams homeless?

19          MR. WELLS:  She was not homeless.  It was --

20          MR. DANKO:  Had she lost her home in a fire?

21          MR. WELLS:  She had not lost her home in a fire.

22          MR. DANKO:  Okay.  So why did you feel that you had

23    to -- that's the question that I'd asked last time, and you

24    were going to be prepared to discuss that with me today.  Why

25    is it that you had to pay -- that you decided to pay Geisha

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
154 of 192

1   Williams her bonus but not honor the agreement to pay the Butte

2   fire victims what they were owed?

3              MR. WELLS:  It was part of her employment agreement,

4   her arrangement with the company.

5              MR. DANKO:  So that's why you gave that some sort of a

6   priority, because she had an employment agreement?

7              MR. WELLS:  Ultimately we --

8              MR. DANKO:  Why did you prioritize the employment

9   agreement over people who basically had nothing?

10             MR. WELLS:  Sir, we're committed to resolving these

11  claims that the company faces.

12             MR. DANKO:  I'm sorry.  I just didn't hear you.

13             MR. WELLS:  We are committed to resolving the claims

14  the company faces.

15             MR. DANKO:  Yes, but my question is not whether you're

16  committed to resolving the claims the company faces.  My

17  question is why did you prioritize Geisha Williams' claim over

18  the claims of the fire victims?

19             MR. WELLS:  Sir, you've made your point.  We --

20             MR. DANKO:  I'm looking for an answer.  You told me

21  you'd be prepared to discuss it today.  I've waited two months

22  on behalf of my clients.  This is all they want to know is --

23             MR. WELLS:  Yes.

24             MR. DANKO:  -- why you paid Geisha Williams.

25             MR. WELLS:  You've made your point, sir.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
155 of 192

1          MR. DANKO:  Is your answer you'd have no idea, or is

2    your answer that you just --

3          MR. WELLS:  As I said, she was entitled to it under an

4    employment agreement.

5          MR. DANKO:  So you prioritized the employment

6    agreement over people's living situation?

7          MR. WELLS:  Sir, we, as a company, collect and

8    disburse more than eighty million dollars a day.  We were

9    making hundreds, thousands, of decisions on prioritization.

10   You have my answer.  You've made your point many times.

11         MR. DANKO:  PG&E is now running commercials.  They're

12   running commercials telling people to prepare "go bags", to be

13   ready in case of an emergency.  Are you familiar with those

14   commercials?

15         MR. WELLS:  Yes, I am.

16         MR. DANKO:  And where does the money for those

17   commercials come from?

18         MR. WELLS:  It comes from our debtor-in-possession

19   financing arrangement.

20         MR. DANKO:  So was there some discussion or did some

21   people make an evaluation as to whether money should be

22   spent -- well, first of all, what is the purpose of those

23   commercials?  Is the purpose of those commercials to raise

24   PG&E's profile in the community, to make people think that PG&E

25   is concerned about their safety?

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
156 of 192

1          MR. WELLS:  Yeah, I'm sorry.  The purpose of those

2    commercials are to prepare our communities for the upcoming

3    fire season, to make sure that our customers, those

4    communities, have a plan in the -- to the extent that there is

5    another catastrophic wildfire.

6          MR. DANKO:  Was there any analysis done as to whether

7    that -- whether the -- that the message being sent and the

8    money being spent on those commercials would be better spent by

9    giving it to the victims of those who actually lost their homes

10   in the fires?

11         MR. WELLS:  Yes, an evaluation was made and has been

12   reported extensively covering the '17 and '18 fires.  There's

13   been numerous failures that have led to the loss of life,

14   including lack of preparation of -- in emergencies, and so

15   these commercials are intended to help address those, amongst a

16   number of other programs that we have underway to address the

17   risk of future fires.

18         MR. DANKO:  How much do you spend on those

19   commercials?

20         MR. WELLS:  I don't have the dollar --

21         MR. DANKO:  Where would I get?  You're the CFO, so

22   that's a very important program, and you don't know what --

23         Mr. Thomason, do you know how much you're spending on

24   those commercials?

25         MR. WELLS:  Sir, I don't appreciate the pejorative

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
157 of 192

1 | aspect of this. I -- we -- I'm --

2 |        MR. DANKO: I'm sorry if you find it inconvenient.

3 |        MR. WELLS: I don't -- it's not --

4 |        MR. DANKO: I'm sorry if you feel that people are

5 | attacking you.

6 |        MR. WELLS: It's not an -- it's not an inconvenience,

7 | but as a CFO for a public corporation with nearly seventeen

8 | billion dollars of annual revenues, I don't look at every

9 | contract that the company has.

10 |        MR. DANKO: Okay. Just where would I get that

11 | information?

12 |        MR. WELLS: If you -- if you make a data request, we

13 | would be happy to respond to it.

14 |        MR. DANKO: And where do I get the information as to

15 | why? You don't have the answer as to why PG&E decided to

16 | elevate Geisha Williams' severance package, her bonus, over the

17 | victims --

18 |        UNIDENTIFIED SPEAKER: Mr. --

19 |        MR. DANKO: Where would I get that information if not

20 | from you?

21 |        UNIDENTIFIED SPEAKER: I have no idea what this has to

22 | do with the ongoing administration of this case. He's asked

23 | this question a dozen times.

24 |        UNIDENTIFIED SPEAKER: You've asked this -- you've

25 | asked the question many times.

1          MR. DANKO:  I am now saying -- because this witness

2     can't tell me what the answer is.  I'm not asking him that

3     question.  I'm asking where do I get the answer.

4          UNIDENTIFIED SPEAKER:  It's not relevant to the

5     ongoing administration of the Chapter 11 case.  It's not.

6          UNIDENTIFIED SPEAKER:  I think he's indicating they're

7     not answering a question.

8          MR. DANKO:  Okay.  You're not going to answer the

9     question.

10          UNIDENTIFIED SPEAKER:  You have my answer.

11          MR. DANKO:  Thank you.

12          UNIDENTIFIED SPEAKER:  I told you.

13          MR. DANKO:  You know what?  And I don't care one wit

14     about your answer.

15          UNIDENTIFIED SPEAKER:  Okay.

16          MR. DANKO:  Okay?  I care about the witness's answer.

17          UNIDENTIFIED SPEAKER:  Okay.

18          MR. DANKO:  And I take it you're not going to let him

19     answer my question.

20          UNIDENTIFIED SPEAKER:  He answered your question.

21          MR. DANKO:  No, my question is where do I get the

22     information.

23          UNIDENTIFIED SPEAKER:  He answered the question.

24          MR. DANKO:  That's my question.  It's very clear.

25          UNIDENTIFIED SPEAKER:  Please don't point --

1            MR. DANKO:  Where do I get the information.

2            UNIDENTIFIED SPEAKER:  Please don't point at me.

3    Okay?

4            MR. DANKO:  My question is where do I get the

5    information?

6            UNIDENTIFIED SPEAKER:  Well, we'll take your request.

7            MR. DANKO:  Are you expecting him not to answer that

8    question?

9            UNIDENTIFIED SPEAKER:  We'll take your request under

10   advisement, okay?

11           MR. DANKO:  Thank you.  That's kind of you.  That's

12   very considerate.  Thank you.

13           MR. WELLS:  Thank you.

14           UNIDENTIFIED SPEAKER:  Thank you, sir.  Is there

15   someone else who would like to come on up?

16           If you could please state your name for the record?

17           MR. CRONIN:  Adam Cronin.

18           So I'm not going to beat you guys up over the same

19   stuff that kept getting brought up but, Mr. Wells, at the

20   opening of this hearing you said that PG&E does not have a

21   reorganization plan primarily due to the variables and unknowns

22   related to the wildfire claims.  Are you implying that aside

23   from the wildfire claims that PG&E is financially stable?

24           MR. WELLS:  No.  We go to the core elements to the

25   plan of reorganization and financial stability is understanding

 1  the total claims the company faces, so that is, in part, a

 2  large variable.  I pointed out in my previous comments, and

 3  will continue to point out, our ability to satisfy those claims

 4  are dependent on another variable, and that is reform of the

 5  Wildfire --

 6          MR. CRONIN:  Now, when you say claims, you are

 7  referring to all legal claims or wildfire claims?

 8          MR. WELLS:  We intend to address all claims, inclusive

 9  of wildfire claims.

10          MR. CRONIN:  But aside from the wildfire claims --

11          MR. WELLS:  Yes.

12          MR. CRONIN:  If that wasn't on the table right now,

13  PG&E would be financially stable?

14          MR. WELLS:  No, not necessarily, because at the same

15  time we face the unique risk of inverse condemnation, which no

16  other state in this country applies to investor-owned

17  utilities.

18          MR. CRONIN:  Right.

19          MR. WELLS:  And so even absent the claims from the '17

20  and '18 fires we would have a challenge to raise the funding

21  necessary for our ongoing business.  We are a cash-flow-

22  negative enterprise, meaning we make significant investments on

23  behalf of the communities we serve, significant -- investments

24  that exceed the amount that we collect in annual revenues.  So

25  in order to make those investments we rely on the confidence of

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
161 of 192

1    the debt and equity markets today.  Many of the investors that

2    cover those markets have said -- it says California's un-

3    investible, and so we have to address both the standards in

4    which we operate as well as the claims before we would have

5    financial stability.

6              MR. CRONIN:  Okay.  Is it fair to say that your number

7    of pending legal claim liabilities, aside from the wildfires,

8    is a very small number compared to what you have in pending

9    liabilities from wildfires?

10             MR. WELLS:  Yes.  When we put in our declaration for

11   the basis of filing it was primarily related to the

12   catastrophic nature of the liabilities the company faces from

13   the fires.

14             MR. CRONIN:  Okay.  So for an unsecured creditor that

15   has an unliquidated legal claim that's unrelated to wildfires,

16   would PG&E stipulate to a relief or modified relief from stay

17   in bankruptcy court?

18             UNIDENTIFIED SPEAKER:  I'm not -- can you repeat your

19   question?

20             UNIDENTIFIED SPEAKER:  I'm sorry. Just --

21             MR. CRONIN:  For an unsecured creditor --

22             UNIDENTIFIED SPEAKER:  Can we have a little closer to

23   the microphone.

24             UNIDENTIFIED SPEAKER:  Yes, can you move it?  Sorry

25   about that.  Sorry.

1          MR. CRONIN:  For an unsecured creditor claim that is

2    unliquidated pending in state court, which is unrelated to the

3    wildfires, would PG&E stipulate to a relief or modified relief

4    from stay in bankruptcy court?

5          MR. KAROTKIN:  To do what?

6          MR. CRONIN:  To liquidate the claim.

7          MR. KAROTKIN:  It would depend what type of claim.

8          MR. CRONIN:  It's employment law.

9          MR. KAROTKIN:  Perhaps.

10         MR. CRONIN:  Okay.

11         MR. KAROTKIN:  To liquidate it for purposes of being

12   treated in the bankruptcy case?

13         MR. CRONIN:  Well, I think it would -- it would be up

14   to the bankruptcy court whether or not it gets liquidated in

15   the bankruptcy court.

16         MR. KAROTKIN:  No, no, no.  If you're asking would we

17   agree to let a state -- a nonwildfire state court action go

18   forward to liquidate the claim for purposes of establishing an

19   allowed claim to be dealt with in the Chapter 11 case; is that

20   what you're asking?

21         MR. CRONIN:  Yes.  Correct.

22         MR. KAROTKIN:  We would consider doing that, depending

23   on the type of claim.

24         MR. CRONIN:  Employment law.

25         MR. KAROTKIN:  We would consider it.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
163 of 192

1          MR. CRONIN:  Okay.

2          MR. KAROTKIN:  But we'd have to have more details.

3          MR. CRONIN:  Who should I talk to about those details?

4          MR. KAROTKIN:  You can talk to me.

5          MR. CRONIN:  What was your name again?

6          MR. KAROTKIN:  Karotkin, K-A-R-O-T-K-I-N.

7          MR. CRONIN:  K-A-R-O-T-K-I-N?

8          MR. KAROTKIN:  Yes, sir.

9          MR. CRONIN:  Sorry.  I'm just looking through my

10    notes.

11          So PG&E has publicly agreed that the organization, the

12    corporate culture, needs to change; is that correct?

13          MR. WELLS:  That's correct.

14          MR. CRONIN:  And you personally agree with that?

15          MR. WELLS:  I do.

16          MR. CRONIN:  Have you or any other PG&E officers, as

17    far as you're aware, identified problems with the corporate

18    legal -- excuse me -- the corporate legal team culture within

19    PG&E and how that fosters the type of situations that PG&E

20    seems to get themselves in over and over again?

21          MR. WELLS:  I'm not aware of specific deficiencies

22    with respect to the corporate legal team.  Areas of focus are

23    on -- my personal area of focus has been on managing the risk

24    of delivering gas and electricity to the customers in

25    communities we serve.

1          MR. CRONIN:  Are you aware of the comments the NTSB

2    made about PG&E's legal team throughout the San Bernardino

3    case?

4          MR. WELLS:  I am, yes.

5          MR. CRONIN:  And you're aware that the public

6    perception --

7          UNIDENTIFIED SPEAKER:  Could you speak into the

8    microphone?

9          MR. CRONIN:  You're aware that the public perception

10   of PG&E's legal team is very combative, and they don't hold any

11   accountability whatsoever?

12         MR. WELLS:  Frankly, I'm not proud of the perception

13   of -- that the company has where we are working to improve our

14   relationships.

15         MR. CRONIN:  I'm specifically talking about the legal

16   team and how they handle their legal cases.

17         MR. WELLS:  I understand the challenges that were

18   raised by the NTSB.  We took several steps after that

19   investigation to improve, and I am not aware of any current

20   allegations.

21         MR. CRONIN:  Well, I was a PG&E employee for ten

22   years, and I was illegally terminated.  I'm in the process of

23   trying to liquidate that in the state court, and I can tell you

24   firsthand that a huge part of PG&E's problem is that they --

25   excuse me when I say they.  I mean the legal team.

1          MR. WELLS:  Sure.

2          MR. CRONIN:  Does not hold management -- in particular

3   middle management -- accountable at all.  I would be convinced

4   to say if, you know, some middle manager broke the law, they

5   would find some way to try to defend it, even though they know

6   that they broke the law, instead of holding them accountable.

7   And I've actually witnessed this.

8          MR. WELLS:  I appreciate your raising the concerns.

9   You have my commitment that I will personally reflect on it and

10  think about it as we think about the totality of changing our

11  operations.

12         MR. CRONIN:  Karotkin, right, is your name?  Okay.  Do

13  you have a business card I can get in contact with you, because

14  I'm mainly focused on or concerned about getting my --

15         MR. KAROTKIN:  Sure.

16         MR. CRONIN:  -- my --

17         MR. KAROTKIN:  Absolutely.

18         MR. CRONIN:  -- relief from stay granted.

19         MR. KAROTKIN:  Yes.

20         MR. CRONIN:  And everybody that I've talked to has a

21  tune about it because --

22         MR. KAROTKIN:  I'm more than happy to talk with you

23  about it anytime you want.

24         MR. CRONIN:  Sure.

25         MR. KAROTKIN:  Even after this hearing, if you'd like.

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
166 of 192

1           MR. CRONIN:  All right.  That's all.

2           UNIDENTIFIED SPEAKER:  Thank you.

3           UNIDENTIFIED SPEAKER:  Thank you.

4           MR. LAFFREDI:  Is there anybody else who has any

5    questions?  Thank you.

6           All right.  I have no further questions.  Given some

7    of the amendments that we discussed earlier, how long do you

8    think it will take the debtors to file any amendments to the

9    schedules or statements?

10          MR. KAROTKIN:  I have no idea.  We'll get back to you

11   on that.

12          MR. LAFFREDI:  Okay.  With that, then, we will

13   conclude this meeting of creditors.  Thank you all very much

14   for your attendance and for your participation.

15          This meeting is concluded.  Thank you.

16      (Whereupon these proceedings were concluded at 1:26 PM)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3    I, Clara Rubin, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8

9

10   _____

11   /s/ CLARA RUBIN

12

13   eScribers

14   7227 N. 16th Street, Suite #207

15   Phoenix, AZ 85020

16

17   Date:  May 1, 2019

18

19

20

21

22

23

24

25

**$**

**$62.34 (1)**
105:25

**A**

**A/B (2)**
21:12;29:3
**abandoned (2)**
27:4;104:3
**abandonment (1)**
104:22
**ability (5)**
30:11;78:8;85:22;
134:18;160:3
**able (11)**
13:11,14;91:24;
110:9;111:25;112:1;
120:24;135:21;
137:22;139:7;
141:15
**absent (2)**
80:8;160:19
**Absolutely (9)**
114:15;116:1;
119:23;123:12;
129:8;137:8;140:5;
149:21;165:17
**accelerate (3)**
73:8;125:11;146:4
**accept (2)**
109:21;139:11
**acceptable (1)**
104:14
**access (1)**
106:7
**accessible (2)**
66:23;67:1
**accomplished (1)**
77:16
**accordance (2)**
26:17;106:3
**according (1)**
123:11
**Accordingly (2)**
6:15;47:15
**account (9)**
15:8,13;29:9,10,
14;30:2;63:25;
65:20,21
**account- (1)**
31:4
**accountability (1)**
164:11
**accountable (2)**
165:3,6
**accounted (3)**
48:16;63:2,4
**accounting (14)**
22:3;23:16,25;
30:3,24;48:7;49:13,

**15,18;64:1,2,11,11;**
**130:9**
**accounts (19)**
15:15,18,19;16:3;
23:21;29:4,4,6,13,
14,18,21,23,25;30:5,
22;65:19,23;66:3
**accounts-receivable (2)**
29:21;30:7
**accruals (2)**
40:6,6
**accrued (6)**
40:4,5,5,8;42:3;
47:14
**accuracy (3)**
50:8;51:12,15
**accurate (13)**
11:6;18:15;27:21;
41:23;65:16;95:18;
129:13;130:14,21;
132:12,25;137:13,14
**achieved (1)**
81:13
**acknowledged (1)**
77:15
**acknowledges (1)**
10:16
**across (1)**
143:3
**ACRT (2)**
116:15,21
**Act (2)**
103:20;149:24
**acting (2)**
100:22;150:14
**action (12)**
28:5,7;29:1;36:20;
46:4;70:18,19;
76:22;80:9;93:21,
23;162:17
**actions (1)**
119:19
**actively (4)**
85:24;106:12;
120:10;145:14
**actual (4)**
29:17;43:21;
45:22;46:21
**Actually (12)**
13:2;35:19;36:9;
65:6;73:20;74:24;
97:23;117:11;
118:15;127:14;
156:9;165:7
**ad (1)**
90:17
**Adam (1)**
159:17
**add (5)**
53:13;117:19,21;
133:4,7
**added (1)**
31:17

**addition (1)**
45:23
**additional (21)**
13:24;14:1,2,16,
17;18:7,9;38:7,9;
52:1,22;54:6,7;80:9;
92:17;93:8;95:15,
20;116:14;123:5,10
**Additionally (4)**
4:15;11:9;20:8;
83:22
**additions (1)**
133:24
**address (20)**
10:13;14:21;
60:23;61:1,6,7,8,13,
17,19;72:23;81:23;
115:4;128:7;134:21;
145:3;156:15,16;
160:8;161:3
**addressed (3)**
71:5,7;76:14
**addresses (8)**
18:22;20:7,11;
42:15;60:23,24;61:4,
21
**addressing (4)**
77:25;113:22;
118:22;149:9
**administered (4)**
4:4;75:2;119:12;
127:9
**administration (7)**
73:14,17,23;101:7,
16;157:22;158:5
**admission (4)**
15:11;27:3,6;
38:18
**adopt (7)**
48:9,14;49:13,14;
110:20;115:8,10
**adopting (6)**
49:18;77:10;78:5,
6;111:5,7
**adorned (1)**
32:20
**advance (1)**
70:3
**advantage (2)**
143:11,12
**advice (14)**
19:2;27:13;40:16;
45:6;56:1;57:2,18,
22;59:8,13,18,20;
60:5;135:8
**advise (1)**
82:14
**advisement (3)**
21:6;62:15;159:10
**advisors (4)**
18:3;19:2;27:13;
78:18
**Aechmophorus (3)**

**103:3,19;104:3**
**affairs (5)**
17:24;18:19;
34:20;55:10,13
**affected (5)**
102:1;121:25;
146:21,25;148:8
**affiliates (4)**
55:17,23,23;60:22
**affirmative (2)**
11:1,4
**affirmatively (1)**
73:4
**afford (1)**
127:22
**afternoon (4)**
102:20,21;107:12,
13
**Again (38)**
6:7,24;7:14,23;
17:17;18:8;20:4,11;
45:25;47:6;50:8;
63:23;75:11;77:12;
81:17;108:22;
109:11;110:4,14,18,
21;111:11,19;113:4,
25;114:3;117:14;
121:2;125:14;
133:22;134:23;
135:3,9;140:13,17;
143:18;163:5,20
**against (19)**
28:7;30:22;37:7,9,
16,22;41:4,8;46:25;
69:24;94:4;95:9;
96:24;98:3,5;
137:20;138:18;
139:3,11
**age (2)**
30:4;31:7
**agencies (6)**
70:22;120:1,5,11;
121:10,21
**Agency (1)**
126:20
**agent (1)**
55:24
**aging (1)**
31:5
**ago (4)**
95:22;137:17;
144:11;152:7
**agree (11)**
36:1;45:17;77:15;
81:21;112:15;
113:17;127:24;
133:21;144:5;
162:17;163:14
**agreed (6)**
112:12,16;114:17;
134:7;153:8;163:11
**agreed-upon (1)**
151:12

**agreement (9)**
20:15;80:3;
104:17;154:1,3,6,9;
155:4,6
**agreements (11)**
20:9;14;50:23;
72:15;87:12;112:20;
114:2,17;151:24;
152:3;153:3
**a-half (1)**
114:4
**ahead (6)**
9:12,12;69:21;
113:8;132:12;
133:15
**ain't (2)**
150:22,25
**ALE (5)**
121:25;122:25;
123:15,20;127:19
**aligning (1)**
82:8
**AlixPartners (1)**
9:17
**allegation (1)**
104:18
**allegations (1)**
164:20
**allocated (1)**
95:12
**allocations (1)**
14:1
**allow (2)**
7:24;126:11
**allowance (3)**
15:12;30:5,22
**allowed (12)**
11:8,11;15:15,15;
16:13,14,17;17:11,
12;127:1;131:8;
162:19
**allows (2)**
144:1;145:7
**alluded (1)**
26:18
**Almanor (4)**
103:4,8;104:12;
106:17
**almost (3)**
75:10;95:21;
105:13
**along (2)**
5:5;75:16
**Alsup (1)**
98:7
**alter (1)**
11:12
**Alternative (2)**
122:2,4
**although (4)**
6:15;7:16;11:14;
63:2
**Amador (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
169 of 192

116:7
**amend (8)**
10:25;28:2;38:21,
24;52:22;54:17,18;
55:1
**amended (3)**
10:24;48:3;70:5
**amending (1)**
47:25
**amendment (4)**
28:19;73:13;
74:15,18
**amendments (6)**
13:20;14:20;15:4;
27:24;166:7,8
**America (2)**
65:20,23
**among (1)**
143:21
**amongst (1)**
156:15
**amount (26)**
15:13;16:17;
17:23;22:10;23:18;
30:12,22;38:12;
49:4;50:4;79:6;
112:10,13;114:3;
115:18;117:2,4,10,
14,15;120:22,22;
126:8;138:8;139:1;
160:24
**amounts (11)**
18:23;31:6;38:6;
42:8;45:4;63:3,21;
64:22;113:18;118:6;
137:10
**analysis (7)**
28:9,15;30:1;31:5;
120:16;130:10;
156:6
**analyzed (3)**
29:20,24;31:2
**and-mark (1)**
85:24
**animals (2)**
149:19,20
**Ankey (1)**
4:16
**announcement (3)**
82:12,24;83:4
**annual (3)**
80:5;157:8;160:24
**answered (27)**
6:6;53:19,21;
57:21;59:10,22;
60:4;86:9;88:6,9,15;
91:10,11,15,22;92:4,
6,8,10;101:1;115:14,
15;116:20;135:1;
152:6;158:20,23
**anticipate (3)**
79:20;80:2;84:7
**anticipated (2)**

83:8;96:24
**anymore (1)**
147:15
**apart (1)**
10:4
**apologies (1)**
143:18
**apologize (3)**
83:6;141:7;151:2
**appearance (1)**
69:6
**appearances (1)**
8:23
**appeared (1)**
84:20
**appears (4)**
12:9;15:10;18:18;
134:9
**applicable (1)**
124:4
**application (2)**
76:18;124:5
**applied (2)**
64:16;81:2
**applies (2)**
62:2;160:16
**apply (6)**
7:21;8:14;13:20;
30:4;31:6;39:9
**appreciate (9)**
69:21;72:10;
79:16;108:12;
110:15;114:5;
153:13;156:25;
165:8
**appreciates (1)**
10:17
**appreciative (1)**
77:24
**appropriate (20)**
11:25;18:7,21,24;
19:23;28:4;38:22,
24;58:6;59:7;61:3;
71:23;72:22,22;
81:15;98:13;110:1;
113:8;120:1;136:4
**appropriately (1)**
115:5
**approved (1)**
74:14
**Approximately (3)**
117:1,7;125:3
**APRIL (7)**
4:1,9;10:15;65:21,
23;74:16;77:7
**area (7)**
64:6,16,16;66:2;
93:12;143:14;
163:23
**areas (2)**
96:6;163:22
**arisen (1)**
90:23

**arising (2)**
52:10;98:3
**Armstrong (4)**
139:20,20,25;
140:6
**around (10)**
23:7;26:21;41:13;
64:21;71:13,15;
111:17;114:3;118:3;
127:25
**arrangement (2)**
154:4;155:19
**arrangements (1)**
7:14
**art (1)**
32:22
**artifacts (1)**
34:4
**artwork (3)**
32:16,17,20
**aside (3)**
159:22;160:10;
161:7
**aspect (1)**
157:1
**aspects (5)**
8:1;74:10;77:10,
21;82:15
**assert (1)**
36:24
**asserted (1)**
36:24
**assess (3)**
13:8;28:2;30:12
**assessing (1)**
84:5
**assessment (8)**
30:7;33:22;35:15;
47:5;97:19,21;
130:21;136:9
**asset (11)**
21:22;22:5,21;
24:1,3;31:19;32:3,6;
48:10;98:1;134:17
**assets (30)**
5:1;11:1,3,5;
17:19;20:17;21:15;
22:15,25;23:12;
28:7;37:10;49:4;
98:15;128:17,25;
129:9;133:12;134:3,
10,14,20,24;135:11,
12,17,23,24;139:10;
144:19
**Assistant (1)**
4:12
**assists (1)**
65:10
**associated (4)**
42:9,9,25;49:15
**assumably (3)**
30:23;36:14;47:4
**assume (2)**

136:13,14
**assumedly (1)**
66:2
**assuming (2)**
77:2;136:13
**assure (1)**
72:7
**ASU (1)**
48:7
**Atlas (2)**
93:12;99:7
**attached (1)**
10:13
**attacking (1)**
157:5
**attempts (1)**
11:12
**attend (2)**
6:11,16
**attendance (1)**
166:14
**attended (1)**
5:3
**attention (1)**
7:6
**attorney (5)**
4:15;28:11;44:21;
98:5;113:22
**attorney-client (2)**
110:3;121:7
**attorneys' (2)**
109:8;111:5
**attorney's (1)**
115:8
**attract (3)**
78:10;126:5;
134:18
**audible (1)**
138:16
**audio (1)**
6:25
**Audubon (8)**
102:22,23;103:2,
3;104:9;105:15,17;
106:6
**August (1)**
65:24
**authorities (1)**
71:23
**authority (3)**
42:5;43:15;112:22
**authorization (2)**
72:14;73:5
**authorized (4)**
6:23;10:19;45:2,4
**autistic (1)**
127:20
**available (14)**
13:25;14:2,10,17;
18:8,9;38:9;60:24;
70:13;75:5;98:16,
17;120:22;139:2
**avenue (1)**

98:13
**average (2)**
122:10;138:2
**aware (92)**
18:10;20:1,6,22,
24;22:14;24:25;
25:1,4,7;26:14;28:1;
36:18;37:13,18,20;
51:3,3,6,8;52:17;
57:23,25;58:9,20;
59:4;62:11;64:24;
65:3;67:5;70:14,18,
18;71:7,9,9,16;
74:17;80:8;87:9,13,
15;93:6,10,16,24;
94:5,12;96:15,19;
97:20,25;98:3,8;
101:2;103:13,15,18;
104:2,9,15,18,21,24,
25;105:3,15,20,21,
23,24;108:5,13,13,
15,21,22;109:2;
110:18;112:14;
118:25;119:16;
122:15;133:15;
138:13;139:14;
163:17,21;164:1,5,9,
19
**away (3)**
100:3;148:2;
149:18
**Awesome (3)**
103:6;104:15;
106:20

**B**

**back (15)**
10:3;33:19;34:22;
35:3;41:2;68:14;
78:11;127:10;
141:22;143:9;
146:24;147:1,4,20;
166:10
**bags (1)**
155:12
**Baker (1)**
69:11
**baking (1)**
149:23
**balance (11)**
22:8,21;29:5,14;
30:3,3,7,20;63:9;
81:15;95:3
**balances (7)**
14:14;15:20,21;
16:1;17:3;29:6;
30:10
**bank (10)**
15:19;23:21;29:4,
4,6;65:20,20,23,24;
66:2
**bankruptcies (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
170 of 192

131:7
**bankruptcy (64)**
4:5,6,19,23;8:1,6,
22;10:18,19,22,23;
11:13,16,17;12:5;
22:16;42:21,25;
43:16;49:10;55:19;
56:6,10;58:25;60:9;
65:9,10;68:7;69:14;
72:20;73:8;86:24;
87:13;90:21;108:6;
110:22;111:24;
114:7,9,12;115:2;
123:8;135:4;137:10,
17,24;138:2,8,23;
141:4;144:1,18,20;
145:2;146:3;151:11,
18,18;152:2;161:17;
162:4,12,14,15
**bankruptcy-court (1)**
42:5
**bankruptcy-schedule (1)**
49:11
**barrel (1)**
147:3
**based (20)**
5:14;19:1;27:12;
30:5;38:7;47:4;
57:17;64:2;84:2;
102:7;130:2,4,11,20;
133:13,20;134:1,9,
11,23
**baseline (1)**
105:25
**basic (1)**
4:22
**basically (3)**
50:16;117:20;
154:9
**basis (10)**
26:18;28:23;
29:15;56:1;57:2;
74:18;99:2,3;121:7;
161:11
**Bay (3)**
108:24;121:25;
138:14
**bear (1)**
77:19
**beat (1)**
159:18
**Beating (1)**
128:3
**become (5)**
14:2,16;18:9;38:9;
51:6
**becomes (3)**
13:25;14:10;18:8
**began (1)**
116:7
**begin (6)**
10:12;79:23;
126:12;143:19

**beginning (2)**
7:11;77:13
**behalf (7)**
4:20;7:21;9:7;
69:11;95:14;154:22;
160:23
**behind (1)**
101:23
**beholder (1)**
33:17
**belabor (3)**
112:8;118:24;
125:14
**belief (1)**
12:18
**believes (1)**
80:3
**belongings (1)**
153:7
**below (1)**
63:25
**benefited (1)**
55:12
**benefits (6)**
40:9;122:1,25;
123:15,21;127:19
**Benvenutti (1)**
9:15
**Bernardino (1)**
164:2
**best (6)**
14:5;18:4;130:2;
134:9,23,23
**better (3)**
13:9;109:13;156:8
**beyond (4)**
75:4;103:24;
123:25;145:9
**big (2)**
143:14;146:22
**bill (2)**
145:11;151:16
**billings (1)**
16:1
**billion (36)**
76:9;117:20,22;
129:1,5,11,21,21,23,
24;130:5,8,22;132:1,
2,3,3,18,21,23,24;
133:5,7,7,7,11;
134:3,5,6,10,25;
135:11,12,13,23;
157:8
**billion-20- (1)**
117:22
**bills (1)**
145:11
**Bird (3)**
103:20;104:23;
105:2
**birds (2)**
105:22;106:4
**bit (3)**

66:6;115:18;
130:19
**blank (1)**
7:6
**blow (1)**
149:17
**Board (32)**
48:7;61:2;70:7;
74:4,8,13,14,17;
79:19,19,25;80:2,7,
9,22,24,25;81:8,9,11,
19,20,22;82:3,11,14,
14,17;83:9,19,24;
85:8
**bonus (6)**
151:11;152:2;
153:1,8;154:1;
157:16
**book (2)**
135:19,20
**books (2)**
15:10;26:20
**both (22)**
8:14,14;9:19;19:8;
63:13,13;66:15;75:7,
22;77:18;78:4,10;
79:24;81:2;112:12,
16;123:1,2,24;124:7;
127:22;161:3
**bought (1)**
147:19
**box (2)**
34:10;35:1
**break (1)**
45:25
**breakdown (1)**
32:9
**bridge (2)**
143:2,3
**briefly (1)**
112:7
**bring (10)**
70:20;72:8;98:5;
113:23;114:24;
115:2,9,13;126:11;
128:6
**bringing (5)**
82:25;83:14;85:7;
114:21;134:15
**brings (2)**
79:14,17
**Brock (1)**
142:10
**Brock's (1)**
147:1
**broke (2)**
165:4,6
**brought (3)**
18:1;77:19;159:19
**Bruno (9)**
70:15,19;71:7,15;
84:25;85:3;100:25;
101:5;120:24

**Bryan (1)**
140:20
**bubbling (2)**
146:17,17
**budget (1)**
76:5
**build (1)**
142:1
**building (1)**
33:14
**buildings (1)**
34:2
**bunch (3)**
23:21;36:5;141:18
**burdensome (7)**
35:11,13,18;39:4,
6;62:19,21
**burned (5)**
122:24;140:24;
141:11;147:17,20
**burnt (2)**
147:3;153:6
**business (25)**
29:10;35:18;39:6;
40:11;41:2;43:20;
46:25;50:17;52:10;
61:6,7,13,16,19,25;
64:18;65:15;66:4;
95:11,12;101:9,11;
151:15;160:21;
165:13
**businesses (1)**
61:21
**butt (1)**
147:25
**Butte (46)**
70:16;71:5,8;
72:13,18,19,25;
73:10;84:25;85:5;
87:5,20;89:13;90:7,
22;94:13,14;96:2;
100:25;101:3;
108:24;112:11;
113:24;115:19,22,
23;116:2,4,5;119:15,
22;120:23;125:1;
141:3,3;144:15,22;
145:13;148:14;
151:12,24,25;152:4,
16;153:4;154:1
**buy (1)**
147:16
**by-account (1)**
31:5

**C**

**CAL (7)**
108:4,6,8,25;
110:19,24;138:14
**Calaveras (2)**
116:8;140:22
**calculate (1)**

29:21
**calculation (1)**
102:3
**calculus (1)**
45:13
**CALIFORNIA (20)**
4:1,10,13;33:12;
78:11;81:8,10;
85:15;102:23;103:3,
16,20;105:17;
124:22,24;126:4,12,
18,20;134:16
**California's (3)**
77:6;119:17;161:2
**call (4)**
5:8;39:18;125:2;
127:1
**called (4)**
4:7,19;5:23;8:10
**came (12)**
5:24;6:5;81:1;
82:24;85:25;117:16;
119:16;137:18;
141:15;147:23;
153:11,15
**Camp (8)**
96:1;98:3,10,10;
116:2;118:23,25;
124:4
**Campora (125)**
68:21;84:20,21,
21;85:12,16;86:1,5,
8,10,13,17,21,24;
87:3,5,8,11,13,16,19,23;
88:4,7,11,13,16,18,
20,23;89:1,4,6,9,12,
17,19,21,23,25;90:1,
7,13,25;91:4,9,13,17,
22;92:3,5,7,9,13,15,
19,24;93:6,11,17,20,
25;94:7,9,12,15,17,
19,24;95:1,3,6,16,21,
24;96:1,4,8,12,16,21,
24;97:2,8,10,13,16,
18,22;98:2,7,9,15,20,
23,25;99:2,6,9,11,13,
15,17,19,24;100:3,5,
13,18,21,24;101:4,8,
15,18,22;102:1,6,10,
13;108:1;112:7;
116:19;118:22;
123:12;124:11
**can (89)**
7:4;9:22;12:24;
13:4;15:4;16:15;
21:10;22:4;25:25;
26:4,11;34:22;35:6;
44:7;47:2;50:10;
53:13;56:11,17,22,
23,24;57:15;59:17,
19,21,23;62:18;
66:13;68:13;69:16;
71:24;72:7;75:1;

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
171 of 192

79:2,10,12;80:22;
81:22;82:2;86:16;
88:10,25;90:2;91:20,
24;92:22,25;93:4;
95:20;99:5;101:18;
103:25;110:11;
111:21;113:5,8;
115:21;117:13,24;
119:20;120:17;
122:9;123:12;
126:11,13,20;129:7;
131:9,16,16;132:14;
136:20;142:7,19;
143:9;146:6,9;
148:13;149:10;
150:24;152:8,10;
161:18,22,24;163:4;
164:23;165:13
**candidates (2)**
80:24;81:12
**capital (1)**
76:15
**capped (1)**
120:21
**captures (1)**
85:21
**card (1)**
165:13
**care (7)**
88:10;146:6,9,23;
149:24;158:13,16
**cared (1)**
147:10
**career (1)**
84:4
**Caribou-Palermo (2)**
97:19,21
**carrier (1)**
93:14
**Cascade (1)**
99:9
**case (29)**
4:5,6;7:13;20:10;
24:12;29:5;37:25;
66:23,24;67:2;
69:14;78:7;94:13;
101:7,8,16;120:23;
122:17;127:9;128:4,
12;134:20;135:8;
155:13;157:22;
158:5;162:12,19;
164:3
**cases (11)**
4:5,8;7:14;8:1,2,
10,14;14:6;66:15;
111:17;164:16
**cash (8)**
23:24,24,24;
144:21;145:3;
151:21,23;153:2
**cash-flow- (1)**
160:21
**cash-management (1)**

29:8
**casualty (1)**
63:18
**catastrophic (6)**
78:1;124:22;
126:17,21;156:5;
161:12
**categories (2)**
109:13,22
**cause (1)**
98:10
**caused (1)**
128:5
**causes (6)**
28:5;7;29:1;36:20;
93:21,23
**CD (1)**
7:6
**CDF (3)**
141:17;142:19;
143:13
**Cecily (1)**
69:10
**central (1)**
85:23
**CEO (2)**
74:9;83:13
**CEO's (1)**
82:4
**certain (11)**
14:9;15:2;20:9;
27:2;40:4,5;45:23;
50:25;63:3;67:4;
83:1
**certainly (1)**
111:11
**certified (1)**
19:8
**certify (1)**
26:16
**cetera (2)**
17:20;18:7
**CFO (8)**
107:15;137:13,22;
150:3,10,11;156:21;
157:7
**chain (1)**
73:22
**challenge (1)**
160:20
**challenges (2)**
90:16;164:17
**change (14)**
14:1;37:8;38:7,10,
25;52:3,6;67:15;
77:5;80:19;82:15;
104:12;108:18;
163:12
**changed (1)**
85:5
**changes (10)**
29:11;48:1;70:7;
79:20;80:2;85:21;

125:21,22;126:4,7
**changing (1)**
165:10
**Chapter (9)**
11:12;135:5,6,10;
136:2,17,23;158:5;
162:19
**characterization (1)**
15:12
**charge (2)**
89:6;153:6
**charges (2)**
98:5;132:22
**check (1)**
35:1
**checked (1)**
34:10
**chief (1)**
107:21
**children (1)**
127:21
**choice (1)**
142:3
**C-hook (3)**
96:4,9,14
**chose (1)**
150:4
**Chris (3)**
82:20,22;83:2
**Chronicle (1)**
137:11
**claim (31)**
8:21,21;11:7;
16:17,18,20;17:11,
12;37:9;38:17,20,25;
39:16;94:3,8,17;
96:24;97:4;105:5;
125:6;139:3;142:8;
154:17;161:7,15;
162:1,6,7,18,19,23
**claimant (1)**
38:19
**claimants (4)**
5:20;69:9,12;92:1
**claimants' (1)**
79:10
**claims (90)**
8:7;11:9;13:8,10;
15:15;16:5,6,14;
36:20,24;37:1,4,7,
16,21;38:16,17;39:5,
10,14,22,23;40:1,24;
41:3,8,18;42:9,17;
45:19,20,22;46:1,21,
25;47:23;49:17;
52:10,11;69:24,24;
73:9;79:13;86:25;
90:9,22;112:17,19;
113:23,24;114:1,7,
16,23,23;117:11;
124:12;125:2,6,11;
127:1;128:13,15;
129:5,17;130:6,10;

138:18;143:22,24;
144:2;145:18;146:5;
148:20;154:11,13,
16,18;159:22,23;
160:1,3,6,7,7,8,9,10,
19;161:4
**claims-allowance (2)**
11:12;17:13
**clarification (1)**
132:1
**clarify (2)**
114:6;115:21
**clarifying (2)**
76:25;80:20
**classification (2)**
15:12;17:16
**classify (1)**
17:19
**clear (11)**
43:25;44:5,11,16,
22;68:6;114:1;
116:3;126:6;133:23;
158:24
**clearer (1)**
59:15
**clearly (1)**
85:6
**client (1)**
25:17
**clients (1)**
154:22
**Climate (1)**
77:5
**close (3)**
65:25;72:3,8
**closed (6)**
7:14;65:19,21,23,
24;66:2
**closer (4)**
69:16;117:11;
118:16;161:22
**closures (1)**
7:13
**co- (1)**
52:7
**coach (1)**
131:8
**coaching (1)**
132:8
**Code (13)**
4:19;8:6;10:18,22;
11:13,16,17;22:16;
55:19;56:10;58:25;
60:9;103:21
**collect (2)**
155:7;160:24
**collectibility (3)**
30:12;31:1,6
**collectibles (7)**
31:11;32:16;33:8,
9,15,16,22
**collectively (3)**
72:7;88:1;153:15

**colony (1)**
104:3
**com (1)**
35:22
**combative (1)**
164:10
**combination (1)**
75:22
**combined (1)**
103:2
**comfortable (1)**
19:8
**coming (4)**
13:8;84:11;
106:23;110:22
**comment (6)**
113:22;117:8;
121:1,2,8;127:3
**comments (7)**
4:22;6:8;110:15;
120:2;125:21;160:2;
164:1
**commercials (11)**
155:11,12,14,17,
23,23;156:2,8,15,19,
24
**Commission (4)**
80:15;85:15;
118:9;130:18
**commit (3)**
106:19;120:17;
149:10
**commitment (1)**
165:9
**committed (6)**
90:8;149:7,11;
154:10,13,16
**committee (10)**
5:19,20;68:23;
69:1,1,5,9,11;79:10;
91:25
**committees (2)**
5:21;6:3
**common (4)**
78:12;79:5;
104:19;106:10
**communicated (1)**
106:9
**communications (2)**
121:21,22
**communities (11)**
72:2;79:22;81:7;
88:3;121:18;123:3;
128:5;156:2,4;
160:23;163:25
**community (3)**
148:4,8;155:24
**Companies (1)**
88:7
**companies' (1)**
148:19
**Company (88)**
4:6;8:15,17,18;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(4) candidates - Company

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
172 of 192

15:22,23,23;17:25;
33:5,12;34:12,23;
35:22;36:14;37:7,9,
14,17,22;39:19;
43:14;45:16;46:3;
47:1,9;61:2;62:24;
67:25;71:14;73:18,
25;77:12;78:9;
79:21,23;80:2;81:5,
5,16,25;82:14;83:6,
23;84:1;85:2,3,6,9,
20;86:4,7;88:1,4;
94:22,25;95:11,14;
97:16,18,22;98:6;
103:12;106:10;
107:20,22,23;123:8;
125:3;128:15;
137:20;138:18;
139:13,14;143:21,
24;144:2;149:10;
150:3;153:14;154:4,
11,14,16;155:7;
157:9;160:1;161:12;
164:13
**company's (17)**
21:21;22:3;26:20;
61:8;70:18,19;74:4;
76:17,19;77:19;
78:7;80:10;109:7;
118:8;125:6,21,24
**compared (1)**
161:8
**compares (1)**
82:6
**compel (1)**
114:8
**compensate (1)**
134:13
**compensated (2)**
87:9;124:25
**compensating (1)**
128:1
**compensation (2)**
82:4,9
**complete (8)**
28:9;66:22,25;
67:11,13;95:22;
120:4,16
**completed (4)**
75:5;85:18;94:10;
121:20
**completely (1)**
104:3
**complex (3)**
20:13;137:15,20
**complexity (3)**
81:4,15;128:12
**compliance (1)**
26:20
**complicate (1)**
121:17
**complicated (2)**
83:23;128:4

**complicating (1)**
119:19
**complied (3)**
19:10,21;20:3
**complies (1)**
136:15
**comply (3)**
103:15;136:18,24
**components (1)**
76:21
**comprehensive (2)**
50:21;81:1
**computers (2)**
32:7,10
**concerned (4)**
119:7;143:11;
155:25;165:14
**concerns (1)**
165:8
**conclude (3)**
120:11;121:12;
166:13
**concluded (3)**
5:21;166:15,16
**conclusion (3)**
15:11;112:19;
153:15
**conclusions (4)**
19:7,9;28:18;
56:18
**concrete (1)**
82:3
**condemnation (1)**
160:15
**conduct (3)**
8:6;52:10;84:22
**conducted (7)**
7:23;13:25;14:3,
17;75:6;98:9;99:19
**conducting (2)**
4:13;96:22
**confidence (4)**
79:22,24;126:12;
160:25
**confident (1)**
27:19
**confidential (2)**
43:9;45:12
**confidentiality (5)**
18:19;19:2,15;
20:14;66:8
**confirm (1)**
136:24
**confirmation (1)**
137:2
**conflict (2)**
11:17;70:23
**confusion (1)**
6:9
**conjunction (1)**
35:23
**connection (3)**
43:8;77:22;115:19

**consequences (1)**
84:13
**consider (6)**
22:11;24:11;
33:15;81:12;162:22,
25
**considerate (1)**
159:12
**consideration (4)**
85:4;110:23,25;
153:14
**considering (3)**
71:22;77:10;
123:24
**consistent (1)**
62:18
**constituent (1)**
69:22
**constitute (1)**
38:18
**constructively (4)**
78:3,12;79:4;
125:22
**construed (2)**
27:3,5
**consult (1)**
131:9
**contact (2)**
138:15;165:13
**contain (2)**
10:17,21
**contains (1)**
55:13
**contemplated (2)**
10:18;71:20
**contents (1)**
34:1
**contest (1)**
109:4
**context (4)**
110:21;116:5;
125:7;138:23
**contingent (3)**
11:10;36:20;118:3
**continue (19)**
18:11;28:1,2,22;
40:10,13;41:1;42:6;
43:15;84:10;90:2,
18;95:5,20;104:14;
143:25;145:3;148:7;
160:3
**continued (4)**
4:3;5:1;47:17;
106:13
**continues (2)**
84:7;90:11
**continuing (6)**
13:7;28:17;95:14,
19;110:12;121:9
**contract (2)**
105:17;157:9
**contractor (1)**
143:10

**contractors (19)**
18:1;75:1,7,11,21;
92:16,21;93:7;94:4;
95:9,13;96:9,13,25;
138:18,23;139:2,10;
142:1
**contractors' (1)**
93:9
**contracts (14)**
17:19;49:23;50:3,
17,18,20;51:15;52:2,
2,3,4,5;87:20;93:7
**contracts'd (1)**
49:25
**contractual (1)**
69:24
**control (3)**
55:21;125:22,24
**controller (1)**
107:22
**conversations (1)**
78:17
**conversely (1)**
27:5
**conveying (1)**
55:4
**convinced (1)**
165:3
**coordinated (1)**
104:10
**copy (3)**
7:4;29:18;77:4
**copyrights (1)**
35:8
**core (1)**
159:24
**corner (1)**
143:4
**Corp (1)**
8:14
**corporate (8)**
33:14;50:15;
55:21;73:21;163:12,
17,18,22
**Corporation (5)**
4:5;8:16;65:22;
107:23;157:7
**correction (1)**
117:10
**correctly (3)**
17:18;73:2;132:16
**cost (3)**
76:12;105:25;
137:19
**costly (3)**
45:8;62:19,21
**cost-of- (1)**
76:14
**cost-of-capital (3)**
76:7,8,18
**cost-prohibitive (4)**
39:4,12,13;43:19
**costs (1)**

**contractors (19)**
117:19
**counsel (30)**
5:18;18:3;40:16;
50:16;56:2;57:2,18,
22;59:8,13,18,20;
60:5;72:19;92:5;
94:1;100:20;108:12;
110:14;131:7;132:5;
135:8;136:4;138:2,2,
5,9;150:6,7,8
**count (1)**
142:23
**counterclaim (4)**
37:8;38:1;41:5;
52:18
**counterclaims (9)**
36:21,25;37:4,6,
14,20,21;52:15;
138:12
**country (1)**
160:16
**County (4)**
96:2;116:7,8;
140:22
**couple (8)**
12:23;36:6;78:17;
127:16;128:16;
137:8,17;146:5
**course (10)**
40:11,13,23;41:2;
46:24;62:18;63:21;
64:18;65:2,15
**court (31)**
7:20;8:22;42:21;
43:16;45:2,4;58:5;
62:7;72:11,20;73:3;
90:15,18;112:21;
114:7,9,12;115:3;
124:16,19;125:13;
134:12;144:1;
151:19;161:17;
162:2,4,14,15,17;
164:23
**courtroom (1)**
7:19
**courts (1)**
91:4
**cover (4)**
33:25;34:1;70:4;
161:2
**covered (6)**
40:9;41:10;45:23;
76:22;87:21;112:7
**covering (1)**
156:12
**CPUC (1)**
96:16
**crap (1)**
141:18
**Cravath (2)**
9:13;91:21
**create (1)**
121:23

Min-U-Script®
Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
173 of 192
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(5) company's - create

**creditor (7)**
5:11;6:14,14;
139:19;161:14,21;
162:1
**creditors (22)**
4:4,7;5:19,22;6:1,
12,13;7:10,24;8:5;
11:13;43:2;68:11;
69:2,6;70:1;81:18;
84:19;135:5;136:16,
22;166:13
**creditors' (2)**
68:23;69:1
**creditors-committee (1)**
5:18
**crews (1)**
147:23
**criminal (1)**
98:2
**criteria (3)**
80:23;81:1,11
**CRONIN (35)**
159:17,17;160:6,
10,12,18;161:6,14,
21;162:1,6,8,10,13,
21,24;163:1,3,5,7,9,
14,16;164:1,5,9,15,
21;165:2,12,16,18,
20,24;166:1
**cross-claim (1)**
41:5
**crossclaims (1)**
138:12
**cross-claims (3)**
36:25;41:13;52:15
**cross-complaint (1)**
94:13
**crying (4)**
142:9,10,14;
149:22
**Cultural (2)**
81:25;82:15
**culture (6)**
81:21,25;83:22;
84:23;163:12,18
**curious (2)**
71:12;137:3
**current (14)**
13:1;55:15;60:21;
70:17;73:4;80:6,10;
83:24;113:23;
114:24;119:19;
128:20;137:24;
164:19
**currently (8)**
13:6;70:19;71:19;
80:12,16;85:10;
91:24;92:11
**customer (2)**
43:5,7
**customer- (1)**
43:8
**customers (12)**

20:15;34:10,13,
24;43:7,12,13,21;
81:19;145:4;156:3;
163:24
**cutoff (1)**
47:21
**cutting (2)**
74:25;132:23

**D**

**dad's (1)**
146:15
**daily (2)**
29:15;106:16
**damage (2)**
33:25;128:11
**dangerous (1)**
146:23
**Daniel (1)**
69:4
**Danko (40)**
151:9,9,22;152:8,
10,13;153:17,20,22;
154:5,8,12,15,20,24;
155:1,5,11,16,20;
156:6,18,21;157:2,4,
10,14,19;158:1,8,11,
13,16,18,21,24;
159:1,4,7,11
**data (7)**
19:3;106:7,16,16,
19;128:20;157:12
**date (43)**
4:9;5:2;8:8;14:25;
27:17;28:22;37:2;
39:10,16;41:18;
47:14,19;49:18,20;
50:4;52:5;54:8,13,
19;80:10,12,14,16,
19;83:8,10;90:25;
91:2,7,8,13;94:11;
95:23;96:10,14;
120:14,17;123:9;
125:4,25;126:25;
133:1,2
**dates (5)**
39:5,14,23;85:22,
22
**Davey (3)**
93:12,13,14
**David (4)**
19:7;26:18;117:8;
118:10
**day (6)**
83:4;84:8;129:15;
143:13,13;155:8
**day-by-day (1)**
28:23
**days (6)**
29:22,23,25;
147:5;151:11;152:2
**day-to-day (1)**

74:10
**de (14)**
21:22;22:1,5,12,
21;23:1,3,19;24:11,
13;63:21,23;64:8;
65:1
**dead (1)**
128:3
**deaf (1)**
149:15
**deal (3)**
146:22;152:3,4
**dealing (1)**
122:13
**dealt (1)**
162:19
**debate (1)**
110:11
**debt (4)**
78:10;126:5;
134:18;161:1
**debtor (26)**
5:17,19;6:13;8:11;
15:9;18:24;19:10,
24;32:17;36:7,11;
54:16;55:21,22,23,
24;60:3,4;64:25;
66:16;67:9;70:9,15;
72:17;73:1,12
**debtor-in-possession (1)**
155:18
**debtors (65)**
4:25;5:4,22;6:2,
15,18;7:9,25;8:16,
23;9:5,7,14,16;
10:12,25;11:2,10;
12:10;15:8,9,12,13;
16:5,8,9,13;17:10;
18:6,13,20;22:14;
27:15;28:6;29:20,
24;30:13,13;18;
34:16;36:7,23,24;
37:1,3;38:18,20;
40:4;41:16;42:16;
43:6;45:6,19;47:12;
52:8,21,25;55:17;
60:22;63:13;65:25;
66:20;69:7;72:14;
105:6;166:8
**debtors' (15)**
4:23,24;5:14;8:1,
2,2,3;10:14;12:3;
13:1;34:17;38:19;
73:4;137:5;140:14
**debtor's (2)**
15:10;20:1
**decide (2)**
151:10;152:15
**decided (4)**
139:3,10;153:25;
157:15
**deciding (1)**
74:25

**decision (9)**
39:15,19;87:24,
25;88:2,5,14;89:17;
151:14
**decisions (2)**
88:8;155:9
**declaration (6)**
12:9;73:7;90:17;
123:6;125:11;
161:10
**declared (1)**
122:14
**decline (1)**
121:2
**declined (2)**
111:19;121:1
**declining (1)**
121:8
**deductible (2)**
63:22;64:22
**deemed (4)**
11:8,11;18:21,24
**deepest (2)**
143:18;145:6
**deeply (2)**
149:7,11
**defend (2)**
137:20;165:5
**defense (1)**
137:19
**deficiencies (1)**
163:21
**define (1)**
68:2
**defined (3)**
55:15,16;57:17
**definition (20)**
24:24;25:8,10,12;
26:7,8,14;55:13,18,
25;56:4,9,12;57:1,
20;60:8,10,10,21;68:6,7
**definitions (3)**
26:18;58:10,22
**Del (1)**
4:16
**delivering (1)**
163:24
**demands (3)**
92:16,21;93:13
**DENNY (2)**
69:4,4
**Department (1)**
103:20
**depend (1)**
162:7
**dependent (1)**
160:4
**depending (2)**
24:3;162:22
**depends (2)**
9:25;23:6
**deposition (1)**
8:5

**deposits (6)**
43:6,7,8,9,14,15
**derived (1)**
130:8
**describe (2)**
75:1;80:22
**described (1)**
62:20
**destruction (2)**
99:20,23
**detail (8)**
21:14;31:22,25;
32:12;74:20;103:24,
25;128:13
**details (3)**
73:19;163:2,3
**determination (23)**
18:25;19:5;21:25;
22:19;27:16;32:23;
35:21,23,25;36:1,3;
39:13;45:7,15,16;
47:7,9;59:6,12;
62:23,24;64:8;
111:13
**determinations (1)**
19:1
**determine (3)**
64:7;98:16;145:21
**determined (10)**
5:23;67:10;108:6,
25;112:17;138:14;
141:5;143:17,20;
145:9
**devastating (1)**
126:19
**devastation (1)**
128:5
**developing (2)**
21:18;81:20
**development (2)**
73:14,23
**device (1)**
7:2
**devices (1)**
6:23
**died (1)**
149:6
**Diemer (2)**
68:17,18
**differ (1)**
135:19
**difference (1)**
31:17
**differences (2)**
109:14;133:19
**different (34)**
16:18;24:2,10,18;
30:10;31:16;32:4,5,
5,7,9;50:16;55:17;
56:3,9,15;57:20;
58:9,22;59:3;60:9;
76:11;85:1;91:17;
109:12,22,22;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) creditor - different

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
174 of 192

111:17,19;112:4,5;
126:13,22;130:19
**differently (4)**
109:18;111:1,15,
20
**difficult (1)**
35:16
**digitally (1)**
6:19
**direct (1)**
97:10
**direction (1)**
92:7
**directly (5)**
73:15,16;74:8;
76:22;80:1
**directors (12)**
55:17,20;61:3;
70:7;74:4,13,14,17;
79:18;80:25;81:8;
82:14
**disaster (1)**
122:14
**disburse (1)**
155:8
**disclaimer (3)**
26:25;27:2;66:19
**disclose (7)**
11:1,2,4;19:25;
66:7;138:20;151:17
**disclosed (9)**
20:16,17,20;
95:16;129:18,23;
130:13,16;131:1
**disclosure (3)**
17:4;19:11;96:16
**disclosures (3)**
118:3;130:24,24
**discovered (4)**
52:23;54:12;
67:12,14
**discovery (3)**
8:6;90:5;98:12
**discuss (5)**
121:13;128:14;
152:23;153:24;
154:21
**discussed (3)**
41:5;126:22;166:7
**discusses (1)**
38:5
**discussing (1)**
120:10
**discussion (3)**
41:13;110:2;
155:20
**discussions (4)**
78:15;106:13;
119:17;120:4
**displayed (1)**
33:14
**disputed (1)**
11:10

**distribution (1)**
75:17
**District (4)**
4:10,12;56:8;98:4
**districts (1)**
56:8
**diversity (1)**
81:6
**division (1)**
4:11
**doctrine (1)**
103:19
**document (3)**
12:10;13:23;131:3
**documents (2)**
50:25;135:20
**dog (3)**
146:15,15,15
**dollar (4)**
64:2,16;151:11;
156:20
**dollars (21)**
22:8;23:11,13,18,
19;87:17;89:13;
94:2;95:2,7;114:4;
120:22;129:1,12,24;
137:12;142:1;143:6;
144:21;155:8;157:8
**domain (2)**
36:12,15
**domicile (1)**
122:5
**done (21)**
17:23;28:10,16,
25;30:1,6;44:12;
56:1;57:1,21;84:8;
92:20;96:9,13;
105:13;126:18;
134:20;136:10;
138:17;139:12;
156:6
**double (1)**
71:4
**doubt (1)**
30:25
**doubtful (2)**
30:5,22
**down (8)**
45:25;68:10,19;
80:16;84:19;90:18;
109:9;143:1
**dozen (1)**
157:23
**dramatically (1)**
76:11
**draw (1)**
56:17
**dredges (1)**
142:18
**drive (1)**
148:5
**drives (1)**
82:1

**drones (1)**
74:21
**dropped (1)**
147:25
**drug (1)**
144:12
**due (4)**
43:7,11;66:8;
159:21
**Duh (1)**
68:25
**Dumas (48)**
69:10,10,18;
70:25;71:2,4,9,12,
17,19,24;72:10,24;
73:11,20;74:6,14,19;
75:13,16,21,24;76:1,
3,5,24;77:4,10;
78:15,21;79:9,16;
80:10,18;81:13,17;
82:18,21,23;83:1,3,
6,12,21;84:12;112:7;
113:21;118:23
**durable (1)**
78:9
**during (4)**
123:8;133:18;
145:4;151:13

**E**

**E/F (4)**
40:3;41:15,17;
47:16
**eager (1)**
111:23
**ear (1)**
149:15
**earlier (15)**
8:9;39:5,7,8;
41:25;42:16;43:24;
47:24;52:14;62:21;
93:20;106:2;120:2;
124:10;166:7
**early (4)**
72:15;126:19;
127:10;143:6
**Earthquake (1)**
126:20
**earthquakes (1)**
126:19
**easier (1)**
13:3
**editorial (1)**
60:14
**editorializing (2)**
60:13;113:6
**effect (4)**
11:14;87:12;
102:11;137:18
**effective (1)**
48:8
**effort (2)**

14:5;41:22
**efforts (12)**
17:18,20;18:4;
41:16,19;42:16;50:7,
8;51:5;67:20;69:21;
89:2
**eggs (1)**
146:16
**eighteen (6)**
108:24;109:3,19;
110:19;111:1,15
**eighty (1)**
155:8
**Eighty-percent (1)**
76:1
**either (10)**
12:24;18:14;
36:23;66:24;67:11;
73:13;93:13;108:13;
112:19;115:11
**elaborate (1)**
16:15
**Electric (11)**
4:6;8:15,18;74:3;
76:9;89:6;97:24;
107:22,23;145:4;
151:15
**electrical (1)**
76:21
**electricity (1)**
163:24
**elements (1)**
159:24
**elevate (1)**
157:16
**elevation (2)**
104:11;106:16
**eligibility (1)**
71:5
**else (14)**
16:23;17:12;
37:23;44:12;53:8;
63:7;65:9;71:24;
140:4,7;142:5;
151:7;159:15;166:4
**elsewhere (1)**
52:12
**emergencies (1)**
156:14
**emergency (13)**
70:9,12;72:12;
100:7,11,14,25;
101:2;119:17,22;
123:10;124:3;
155:13
**emphasis (1)**
81:23
**emphasize (1)**
79:11
**employ (1)**
61:9
**employed (1)**
69:20

**employee (6)**
20:7,11;46:4,10,
23;164:21
**employee-benefit (1)**
40:6
**employees (18)**
17:25;41:15,17,
25;42:8,17,19,19,23;
43:3;61:2,11;74:24;
75:5,7,8,12,23
**employment (8)**
83:15;154:3,6,8;
155:4,5;162:8,24
**encouraged (2)**
77:24;79:2
**end (9)**
15:3;118:9;
132:23,24;133:4;
134:4;137:18;
144:24;145:1
**endeavor (1)**
125:19
**Energy (1)**
77:6
**engaged (2)**
17:25;97:25
**enormous (3)**
69:15,18,20
**enough (7)**
71:19;80:18;
141:25;143:1,2,10;
147:16
**ensure (6)**
6:9;7:22;11:5;
18:14;50:8;119:18
**entering (1)**
52:4
**enterprise (2)**
20:13;160:22
**entities (1)**
95:11
**entitled (2)**
88:20;155:3
**entity (3)**
26:13;100:9,10
**envelope (1)**
7:5
**environmental (2)**
52:9;66:18
**equipment (7)**
31:11;32:10;
33:13;108:7,25;
110:20,24
**equity (4)**
78:10;126:5;
134:18;161:1
**equivalent (1)**
104:23
**error (2)**
53:1;129:22
**errors (1)**
53:2
**essentially (5)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
175 of 192

41:22;51:20;
52:18;63:9,24
**established (2)**
105:25;126:18
**establishing (2)**
121:19;162:18
**estate (1)**
98:17
**estimate (8)**
76:12;80:17;92:3,
11;135:22;137:23,
25;139:7
**estimated (1)**
105:22
**estimates (3)**
30:2;128:11;
135:20
**et (2)**
17:19;18:6
**evaluate (6)**
13:7;28:18;35:19,
20;95:14,19
**evaluated (1)**
139:4
**evaluating (5)**
70:20;94:5;95:24;
98:5;123:23
**evaluation (10)**
28:24;94:9;95:22;
96:8;13;97:21;
100:8;120:12;
155:21;156:11
**even (10)**
17:2;35:19;
132:13;141:1,19;
143:18;149:15;
160:19;165:5,25
**event (1)**
139:10
**events (2)**
125:23;126:1
**everybody (4)**
7:17;140:23;
143:12;165:20
**everybody's (1)**
126:6
**everyone (1)**
7:12
**Evidence (3)**
7:21;99:20,23
**evolve (1)**
84:7
**exact (2)**
117:9;125:25
**exactly (2)**
10:5;67:8
**examination (3)**
5:21;7:11;8:4
**examine (4)**
4:25;5:18;6:13,15
**examined (1)**
5:4
**example (11)**

10:23;12:10;22:5;
23:20;29:5;36:6;
41:7;67:18;87:16;
93:11;120:21
**examples (4)**
11:15,15;84:9,10
**exceed (12)**
132:17,19,19,21,
23,24;133:5,6;134:5,
10,24;160:24
**exceeded (1)**
104:16
**except (4)**
31:13;32:3;61:9,
11
**Exchange (3)**
80:15;118:9;
130:18
**exclude (2)**
51:10;63:20
**excluded (8)**
21:16;40:4;45:20,
24;46:1;51:9;63:5;
129:4
**excluding (1)**
129:11
**Exclusion (1)**
27:2
**exclusively (1)**
75:10
**exclusivity (1)**
13:17
**excuse (5)**
4:21;58:4;150:8;
163:18;164:25
**execution (3)**
102:4,7,9
**executive (3)**
60:21;73:18;74:12
**executives (2)**
55:16;61:10
**executives' (1)**
61:21
**execultory (4)**
49:23;50:1,20;
51:15
**exercise (2)**
134:14,19
**existed (2)**
49:19;52:5
**existence (2)**
10:16;27:16
**expect (2)**
126:25;147:21
**expectation (2)**
121:19,23
**expecting (1)**
159:7
**expeditious (3)**
86:25;87:3;125:12
**expeditiously (8)**
90:21;120:13;
123:7;124:16;125:5,

8,20;144:2
**expense (1)**
22:9
**expenses (5)**
47:13;117:3,5,16;
122:2
**experience (1)**
125:5
**experiences (2)**
84:3;85:7
**expert (1)**
74:19
**expertise (1)**
81:4
**experts (1)**
74:22
**expired (3)**
27:4;52:24;54:12
**expires (1)**
122:20
**explain (9)**
16:25;17:12;26:3;
53:8,11,16,20;92:22;
119:6
**explains (3)**
16:23;17:10;44:11
**explan (1)**
22:4
**explicitly (1)**
6:24
**explore (1)**
95:5
**explosion (1)**
70:15
**exposure (1)**
13:10
**express (1)**
143:19
**extend (2)**
13:17;90:22
**extensive (1)**
17:23
**extensively (7)**
17:25;83:25;
87:21;133:18;
135:18;152:6;
156:12
**extent (10)**
11:2,16;19:16;
48:2;50:3;52:4,22;
90:18;153:2;156:4
**external (4)**
18:3;75:23;76:1;
130:8
**externally (2)**
49:7,9
**extremely (1)**
35:15
**eye (1)**
33:17
**eyebrows (2)**
140:24;141:12

8,20;144:2

**F**

**face (1)**
160:15
**faces (13)**
78:9;81:5,16;84:2;
123:8;125:3;143:24;
144:2;154:11,14,16;
160:1;161:12
**facilities (2)**
103:8,17
**facing (4)**
125:6;137:15,21;
153:15
**fact (2)**
5:10;6:2
**facts (1)**
109:25
**failures (1)**
156:13
**Fair (13)**
71:19;73:8;80:18;
112:17;113:18;
116:4;134:8;135:11,
19,22;136:1;145:5;
161:6
**fair-value (1)**
33:21
**faith (1)**
151:1
**fall (1)**
66:1
**falling (1)**
141:18
**false (1)**
121:23
**falsification (1)**
85:13
**familiar (1)**
155:13
**family (2)**
141:9,10
**family's (1)**
146:25
**famous (1)**
150:5
**far (8)**
19:13;34:4;64:8;
115:3;124:18;
142:22;143:11;
163:17
**farmed (1)**
147:24
**fashion (1)**
7:23
**February (1)**
118:10
**fed (2)**
143:13,13
**federal (3)**
70:24;72:5;
100:12;119:7,11

**federally (1)**
122:13
**feedback (2)**
74:3;84:6
**feel (5)**
19:23;81:13;
149:1;153:22;157:4
**FEMA (8)**
70:25;71:4;72:4;
100:14,15;119:12,
18,22
**few (4)**
11:15;21:12;
43:13;70:2
**Fifth (1)**
7:19
**fifty (3)**
112:10;114:1,16
**figure (1)**
67:7
**file (16)**
8:20,21,22;13:16;
26:17;28:19;72:22;
73:4;101:11;118:10;
120:2,5;141:4;
144:18;151:17;
166:8
**filed (32)**
4:24;8:2;10:14;
11:6,7;12:18;13:14;
14:20;18:13;19:14,
18,19;72:23;73:8,13;
74:16,18;76:8;
94:12;115:4,4;118:9,
18;120:15;128:21;
129:15;130:17;
131:3,13;134:2;
144:20;145:2
**files (1)**
26:13
**filing (27)**
4:23;13:17;27:17,
24;42:21,24;47:12;
49:17,20;50:4;52:5;
55:12;63:19;65:9,11,
13;67:10;72:18;
74:18;86:24;87:13;
101:22;121:12;
129:9;137:24;
138:18;161:11
**filings (2)**
19:8;115:20;
116:13;117:15,25
**final (1)**
133:23
**finalized (1)**
121:22
**finally (1)**
68:3
**finances (2)**
8:2;105:8
**financial (21)**
7:25;17:24;18:19;

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
176 of 192

26:16;34:20;46:25;
47:3;48:7;55:9,13;
64:1;65:19;81:4;
107:21;118:11;
129:19,23;130:17;
140:15;159:25;
161:5
**financially (2)**
159:23;160:13
**financials (1)**
48:20
**financing (2)**
126:3;155:19
**find (10)**
28:19;92:20;
106:10;109:12;
110:24;117:25;
127:8;146:13;157:2;
165:5
**finding (1)**
110:21
**fine (5)**
21:2;53:23,24;
57:9;146:22
**fingers (1)**
76:4
**finish (1)**
144:15
**fire (85)**
63:18;71:8;72:13;
73:1,10;84:25;85:5;
87:5,20;89:14;90:7,
8,23;93:12,15,25;
94:13,14;95:6,17,21;
96:1,10,14;97:3;
98:3,10,10,19,20;
99:21;100:25;101:3;
108:4,6,8,24,25;
109:1;110:1,19,23,
24;111:1,14,15,17;
112:12;115:22,23;
116:5;118:23,25;
119:11;120:3;122:8;
124:4,5,23;125:1,4;
127:1;129:4;130:5;
138:14;140:23;
141:3;144:15,22,25;
145:10,10,13;
148:14;151:12,24,
25;152:4,16;153:4,
20,21;154:2,18;
156:3
**firefighter (1)**
141:16
**fires (37)**
13:9;70:16;72:2;
78:2,6;90:24;94:4;
102:5;108:4,5,24;
109:3,9,22;111:2;
112:2,5;121:5,25;
122:24;123:3,25;
124:8,22;127:16;
128:9;137:15;

138:15;145:18;
148:12,13;149:6;
156:10,12,17;
160:20;161:13
**first (30)**
5:19;6:10,10;10:6;
13:21,24;21:11;
29:4;31:12;32:14;
43:11;48:9,11,17,23;
50:13;56:15;62:4;
68:16,23;69:12;
70:4;109:20;118:10;
140:10,11,18;141:7;
145:13;155:22
**first- (1)**
48:19
**first-day (5)**
40:9;45:5;90:17;
123:6;125:10
**firsthand (1)**
164:24
**fiscally (2)**
103:6,11
**Fishing (1)**
103:21
**five (10)**
122:20,24;123:16;
124:24;125:9,16;
127:19;143:23;
146:1;147:5
**five-percent (1)**
82:5
**fixed (2)**
142:18,21
**fixtures (1)**
31:11
**Florida (1)**
126:21
**focus (4)**
102:8;137:17;
163:22,23
**focused (3)**
81:1;102:4;165:14
**folks (2)**
111:22;119:21
**follow (5)**
15:18;21:11;22:2;
84:10;107:25
**following (7)**
43:10;70:15;
78:16;84:24,25;
101:5;113:21
**follow-up (2)**
78:19;128:17
**food (1)**
147:5
**foot (1)**
142:2
**force (3)**
70:6;77:1,7
**forgot (2)**
149:4,5
**form (3)**

10:20;55:16;58:25
**formal (2)**
70:21;72:8
**format (1)**
5:16
**former (9)**
46:4,10;55:15;
60:21;61:9,9,11,12,
20
**forms (2)**
126:13,14
**forth (6)**
10:3;52:13;56:12;
64:11;68:14;136:19
**forum (1)**
8:20
**forward (16)**
5:8,9;13:12;70:20;
72:9;78:3,23;91:25;
110:8,9;119:3;
123:23;128:7;
140:10,13;162:18
**fosters (1)**
163:19
**fought (1)**
140:23
**found (3)**
13:23;110:19;
149:18
**four (5)**
95:21;122:10;
146:2,12;147:5
**fourteen (5)**
129:24;130:5,8,
22;132:23
**Fourth (2)**
7:16;70:8
**FRANCISCO (4)**
4:1,11,15;7:6
**frankly (3)**
26:8;144:4;164:12
**free (2)**
19:23;111:12
**Fried (1)**
146:16
**front (7)**
54:25;55:20;
72:16;85:14;144:4,6,
9
**fucking (1)**
143:1
**full (5)**
17:4;41:23;127:1;
128:14;131:21
**fully (2)**
19:21;20:2
**fun (1)**
150:25
**fund (17)**
70:9,9,12,13;
71:20;72:12;100:11;
118:23;119:22;
120:20,22;121:2;

122:23;123:22,25;
124:4;126:17
**funding (5)**
72:5;100:12;
119:8,11;160:20
**funds (7)**
100:7,14,25;
101:2;116:24
**funny (4)**
150:16,18,21,22
**furnishings (3)**
32:19,24;33:6
**furniture (1)**
31:11
**further (7)**
13:25;68:9;79:20;
84:13,15;99:4;166:6
**fuses (1)**
99:25
**future (9)**
49:16;77:6;78:2,6,
6;80:2;85:11;102:5;
156:17

## G

**gallons (2)**
142:18;147:8
**Game (1)**
103:21
**Gas (13)**
4:6;8:15,18;20:15;
70:15;76:10,20;
85:13;107:22,23;
145:4;151:15;
163:24
**gasoline (2)**
147:6,7
**gave (4)**
40:18;103:2;
118:1;154:5
**Gavin (1)**
140:20
**Geisha (10)**
151:10;152:1,15;
153:1,5,18,25;
154:17,24;157:16
**general (13)**
7:25;16:18;21:21,
23;30:21;32:19,24;
33:1;50:16;55:22;
64:12;65:8;100:20
**generally (14)**
13:20;21:12,21;
22:2,13;23:11;
38:14;45:20;46:1,21,
25;51:2;56:7;105:6
**generation (1)**
76:20
**gentlemen (5)**
69:12;73:14;
84:16;139:16,21
**George (1)**

140:20
**Gerald (2)**
107:9;149:3
**gestures (1)**
7:9
**gets (4)**
7:17;49:21;144:4;
162:14
**giant (1)**
149:14
**given (17)**
16:2;30:9,25;
43:14;68:4;79:4;
80:14;81:4,15;
104:7;110:22,25;
112:15;128:12;
136:22;151:16;
166:6
**giving (2)**
79:18;156:9
**glad (2)**
146:18;149:13
**glasses (1)**
151:8
**glo (1)**
133:16
**global (22)**
10:13,16,17,21,24;
11:3,11,17,18,25;
12:4,14,15,19;13:19,
21;21:14;38:15;
39:2;40:3;48:5;
133:16
**goes (1)**
39:21
**good (9)**
81:20;102:17,19;
107:12,13;120:7;
132:25;142:6,7
**Gotshal (2)**
8:25;9:4
**govern (1)**
17:14
**governing (1)**
50:25
**government (2)**
70:24;119:19
**governmental (9)**
70:22;71:23;
100:9,10;120:1,5,10;
121:10,21
**Governor (2)**
77:6;78:4
**governor's (11)**
70:6;77:1,11,11,
21,22,25;78:13,16,
18;126:10
**grand (1)**
146:16
**granted (4)**
43:8;44:25;
101:15;165:18
**grasp (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) financially - grasp
Page
177 of 192

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05

81:20
**Great (7)**
9:18;25:24;33:12;
49:9;104:1;109:3;
139:15
**grebe (2)**
105:25;106:15
**Grebes (4)**
103:3,19;104:3,22
**grievance (5)**
45:19,20;46:1,15;
47:5
**grievances (1)**
46:6
**grieving (1)**
45:21
**ground (5)**
75:2;141:25;
142:2;146:14,17
**group (1)**
87:11
**guarant (1)**
54:24
**guarantees (6)**
52:22,23;54:6,7,
12,21
**guess (12)**
17:13;41:4;43:10,
23;51:25;60:2,8,21;
67:6;70:11;72:11;
73:2
**guidance (1)**
48:9
**guy (1)**
146:9
**guys (11)**
142:14;143:13;
144:19;145:9,22;
147:18;150:7,15;
151:1,4;159:18

**H**

**hair (2)**
140:24;141:12
**half (6)**
125:3;140:25;
141:24;144:11,12;
145:21
**hand (4)**
10:7;58:19;59:23;
68:13
**handing (1)**
108:16
**handle (4)**
13:9;112:2;123:9;
164:16
**hang (1)**
65:20
**happen (6)**
51:17,22;111:23;
119:15;145:16,17
**happened (8)**

17:21;77:7;87:5;
93:25;95:6;97:3;
105:19;142:5
**happening (1)**
106:24
**happens (2)**
32:1;103:11
**happy (6)**
99:6,24;100:6,19;
157:13;165:22
**hard (3)**
69:17;142:7;
147:12
**hardening (1)**
76:10
**hardship (1)**
118:23
**Hart (5)**
82:20,22,23;83:2,
9,15
**hate (1)**
149:25
**head (2)**
149:3,13
**hear (4)**
69:17;121:6;
149:15;154:12
**heard (6)**
80:18,19;119:14;
122:10;127:15,17
**hearing (19)**
7:20;98:13;101:2;
106:8,18;109:24;
110:2;123:6;124:15;
126:2;128:11;
133:18;134:12;
137:16;151:13;
152:6,11;159:20;
165:25
**held (2)**
20:16;66:15
**hell (1)**
142:12
**help (10)**
18:1;82:14;88:4;
99:24;106:6;122:23;
128:7;142:4;147:4;
156:15
**helping (2)**
4:16;69:13
**helps (2)**
17:15;55:8
**Hi (1)**
102:18
**highest (2)**
81:10;82:7
**high-worth (1)**
32:21
**hiring (1)**
82:12
**historical (1)**
106:7
**history (5)**

30:5;31:6;33:12;
83:15;124:21
**hit (1)**
149:3
**hoc (1)**
90:17
**Hogan (1)**
89:6
**hold (5)**
66:16,17;79:15;
164:10;165:2
**Holding (5)**
8:17;15:21,23,23;
165:6
**home (9)**
61:1,4;127:16,21;
143:8,8,9;153:20,21
**homeless (4)**
119:1;153:9,18,19
**homes (6)**
111:21;122:24;
142:23;147:7;148:2;
156:9
**honor (4)**
151:24;152:2;
153:3;154:1
**horrible (2)**
149:21,22
**horse (1)**
128:3
**hoses (1)**
147:3
**Hostetler (1)**
69:11
**house (2)**
142:1;153:7
**Houses (1)**
141:11
**housing (3)**
122:4;123:4,24
**how's (1)**
148:15
**HR (1)**
41:20
**huge (2)**
143:5;164:24
**humanity (1)**
151:1
**humans (1)**
149:22
**hundred (5)**
23:11,12;24:22;
95:7;119:21
**hundred-million (1)**
137:12
**hundred-plus- (1)**
33:11
**hundreds (2)**
149:5;155:9
**hurricanes (1)**
126:21
**hydro (3)**
104:16;105:21;

106:12

**I**

**Ianthe (1)**
4:16
**idea (8)**
92:9;99:22;
111:13;120:24;
123:12;155:1;
157:21;166:10
**ideas (4)**
79:3,5;126:16,22
**identifiable (3)**
34:9,13,24
**identified (5)**
24:6;52:23;54:7,8;
163:17
**identify (9)**
7:11;14:5;17:19;
52:2;63:16;67:19,
21;91:20;140:18
**illegal (1)**
143:4
**illegally (2)**
142:25;164:22
**imagine (1)**
79:10
**immaterial (7)**
21:15;22:1,23;
23:1,4,5;24:15
**immateriality (1)**
24:3
**immediate (2)**
82:16;83:18
**imminent (1)**
83:11
**impact (6)**
72:1;120:3;
126:20;128:7;141:8;
143:19
**impacted (2)**
79:8;121:4
**impacts (1)**
123:2
**imperfection (1)**
30:11
**implementation (1)**
50:18
**implementing (3)**
85:10,21,24
**implying (1)**
159:22
**important (5)**
81:6,7;146:11;
150:4;156:22
**impractable (1)**
45:8
**impracticable (1)**
45:8
**improve (2)**
164:13,19
**improvement (1)**

82:2
**inappropriate (1)**
127:24
**Inc (4)**
94:19;95:16;
116:15,21
**incentives (1)**
82:9
**include (14)**
20:7;22:6;24:11,
20;34:9,17;39:4,14;
40:8;41:17,25;
48:10;55:20;64:19
**included (14)**
17:2;20:9;23:15;
27:12;40:7;41:8;
46:2,13,17;48:13;
49:6;51:1;55:18;
63:6
**includes (3)**
50:25;76:19;
146:11
**including (10)**
6:12;7:5;8:1;12:4;
36:21;40:4,5,12;
91:25;156:14
**inclusion (3)**
27:5;42:20,24
**inclusive (1)**
160:8
**incoming (1)**
82:4
**incomplete (1)**
47:15
**inconsistencies (2)**
10:22;11:15
**inconvenience (1)**
157:6
**inconvenient (1)**
157:2
**incorporate (1)**
77:21
**incorporating (1)**
84:6
**increase (1)**
75:4
**increased (2)**
76:10;82:4
**incredibly (2)**
75:3;128:4
**incremental (1)**
134:18
**incurred (7)**
39:5,10,14,17,23;
64:18;137:20
**indemnity (1)**
92:21
**independently (1)**
63:4
**indicate (5)**
8:12;35:10;39:10;
68:5;140:7
**indicated (26)**

Min-U-Script®
Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
178 of 192

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(10) Great - indicated

8:9;19:7;28:17;
34:20;39:5;52:8;
60:7;65:16;66:7;
76:8;82:12;100:8,
16;106:8;107:15;
115:20;116:13;
118:10;120:18;
121:20;125:10,20;
133:18;139:19;
140:3;143:20
**indicates (21)**
13:22,24;15:8;
17:18;18:19;21:15;
28:6;36:22;38:6;
39:3;40:3;41:16;
43:6;45:19;48:6,6;
50:6;62:17;63:19;
66:15;86:24
**indicating (4)**
38:17;66:20;
101:22;158:6
**indiscernible (1)**
32:1
**individual (3)**
47:5;82:13,18
**individually (1)**
52:13
**individuals (6)**
73:22;86:19;
120:4,23;121:24;
122:23
**industries (1)**
81:3
**industry (2)**
81:2;82:6
**industry-wide (1)**
83:14
**infor (1)**
62:4
**inform (1)**
69:13
**information (47)**
10:17;13:24;14:2,
10,16;18:7,9,13,22;
19:12,15;20:20;
21:4;34:9,13,17,24;
38:7,9;47:15,16,23;
48:12;55:7;61:14;
62:4;66:19;67:20,
21;79:18;108:2;
118:4;130:3,4,12,15;
132:12;133:1;134:9,
24;138:21;157:11,
14,19;158:22;159:1,
5
**initially (2)**
4:19;5:17
**input (1)**
74:3
**inquiries (2)**
5:12;6:18
**inquiry (1)**
8:12

**insider (10)**
55:12,14,25;57:1;
58:23;59:4,14;68:7;
86:14;87:16
**Insiders (9)**
55:20,23;56:12;
57:17;60:8,20;68:4;
86:15,20
**insiders' (1)**
55:15
**inspected (3)**
96:9,13,17
**inspecting (1)**
74:25
**inspection (2)**
75:6,16
**inspections (4)**
74:21;96:18,25;
97:2
**installed (1)**
79:19
**instance (1)**
20:14
**instances (4)**
18:20;20:5;67:4,6
**instead (3)**
35:1;63:10;165:6
**instruct (2)**
110:16;138:21
**instructed (1)**
99:3
**instructions (1)**
55:18
**insurance (20)**
33:23,25;38:5,5;
45:24;63:22;64:22;
65:3;93:9;94:20,21;
95:12;98:16;115:18;
116:10,23;138:24;
139:2,11;141:25
**insured (2)**
93:8;116:20
**insureds (1)**
92:17
**Intangibles (1)**
34:8
**intellectual (7)**
27:2,14,16,20;
34:8;35:11,15
**intellectual- (1)**
26:24
**intend (8)**
8:21;70:23;77:21;
101:11;109:4;115:9;
128:6;160:8
**intended (3)**
79:23;151:17;
156:15
**intending (1)**
6:5
**intends (2)**
109:12,17
**intention (8)**

55:5;70:20;73:4;
113:23;114:20,24;
120:2,5
**intercompany (3)**
15:7;16:1;17:3
**interest (2)**
5:10;121:13
**interested (1)**
7:3
**interesting (1)**
134:22
**interests (4)**
8:7;15:15;16:14;
45:21
**interfere (1)**
100:15
**internal (10)**
45:18,20;46:1,5,6,
10,15,23;75:5,22
**internally (1)**
120:14
**internet-domain (1)**
36:5
**interpret (1)**
108:10
**interpretation (1)**
89:24
**interpretations (1)**
59:4
**interrupt (1)**
105:4
**into (21)**
12:22;21:13;29:2;
45:1;46:10;52:4;
71:21;78:11;85:4;
98:12;99:20;109:7,
25;123:24;127:21;
133:24;137:18;
138:18;139:1;
153:14;164:7
**introduction (1)**
100:11
**inventory (4)**
31:18;32:11;
50:18;52:3
**inverse (1)**
160:15
**investible (1)**
161:3
**investigate (2)**
85:17;92:20
**investigated (2)**
93:21;96:7
**investigating (1)**
104:19
**investigation (8)**
85:12,19,24,25;
98:9,24;99:20;
164:19
**investigations (1)**
98:2
**investments (6)**
32:22;126:5;

134:19;160:22,23,25
**investor-owned (1)**
160:16
**investors (3)**
78:11;126:12;
161:1
**investor's (1)**
23:10
**invite (1)**
5:22
**invited (2)**
6:13;72:21
**invoices (5)**
14:7;18:2;47:13,
17,22
**involuntary (1)**
69:25
**involve (1)**
52:11
**involved (6)**
71:13;73:14,15,
16;86:4;97:24
**irrelevant (1)**
11:18
**issue (7)**
27:14;71:4;72:20;
83:23;85:23;100:18;
119:23
**issued (3)**
48:7;114:2,17
**issues (7)**
79:8;81:8,15;84:1,
14;90:20;98:12
**issuing (1)**
118:3
**items (3)**
29:3;33:7;40:4

**J**

**Janet (1)**
100:23
**January (3)**
48:8;145:1,1
**Jason (2)**
102:24;107:1
**jeopardize (3)**
100:12;121:11,15
**jeopardizing (2)**
72:4;119:7
**Jim (1)**
9:17
**job (4)**
142:4,6,6,7
**John (1)**
74:11
**jointly (1)**
4:4
**judge (6)**
7:20;72:21;98:7;
101:18;148:15;
150:14
**judgment (2)**

20:2;43:20
**jumped (2)**
140:24;141:13

**K**

**Karotkin (187)**
8:25,25;9:4,4,8,11,
25;10:4;11:20,22,24;
16:22,25;17:3,6,8,
10,22;19:13,16,19,
21;20:1,22,24;21:2,
5;25:2,5,9,12,15,17,
19,22;26:1,3,5,7;
31:15;32:4,7;33:3;
34:18,22;35:2,4;
40:16;41:6;43:25;
44:5,7,11,16,19;
45:4;48:2;51:23;
53:2,5,8,15,17,19,21,
23;54:5,9,21,23;
55:1,25;56:5,7,11,
14,17,20,22,24;57:1,
5,7,9,11,13,15,21,24;
58:1,3,5,8,11,14,17,
21,24;59:2,8,10,13,
18,20,22,24;60:1,4,
11,13,15,18;62:8,14;
71:21;72:17;86:9,11,
15;88:6,9,12,15,17,
19,22;89:20,22,24;
90:2,5;91:11,15;
92:10,22;100:1,4;
101:6,13,16,20;
108:8,15,18;111:3;
112:18,25;113:3,7,
24;114:6,14,22;
115:1,14;127:3;
130:23;131:11,14,
16,19;132:14;136:1,
5;137:1,4,7;139:21;
162:5,7,9,11,16,22,
25;163:2,4,6,6,8;
165:12,15,17,19,22,
25;166:10
**K-A-R-O-T-K-I-N (2)**
163:6,7
**Karotkin's (1)**
115:10
**Kathryn (1)**
68:17
**keep (4)**
7:13;10:4;36:15;
141:23
**keeping (2)**
65:5;83:7
**Keller (5)**
9:15,15,15;
138:20;151:5
**kept (2)**
6:21;159:19
**Kevin (1)**
9:13;91:21

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
179 of 192

**key (1)**
80:3
**kid (1)**
142:9
**kids (1)**
146:12
**kind (10)**
32:17;33:9;38:4;
75:18;102:23;
111:25;120:7;
122:10;147:21;
159:11
**knowledge (3)**
38:23;65:12;
136:11
**knows (7)**
9:21;25:16;26:10;
70:11;78:22;130:21;
150:6

# L

**lack (3)**
81:23;109:13;
156:14
**LAFFREDI (350)**
4:3,11;9:2,6,9,12,
18,21;10:1,5,9,11;
11:21,23;12:1,8,13,
17,22;13:1,5,13,18;
14:8,12,15,20,23;
15:1,3,24;16:4,8,10,
12,20,24;17:1,5,7,9,
13;18:5,12,17;19:4,
10,14,18,20,24;20:4,
8,19,23;21:1,3,7,9,
20,25;22:4,11,14,18,
23;23:1,5,8,12,15,
20,24:2,6,9,13,15,18,
21,24;25:3,7,11,13,
16,18,20,23,24;26:2,
4,6,10,15,22,24;
27:11,15,19,23;28:3,
5,11,14,21,24;29:2,
12,16;30:8,13,17;
31:2,8,10,16,24;
32:2,5,13,15,23,25;
33:4,8,18,23;34:3,7,
15,19,25;35:3,6,21,
24;36:2,4,11,13,16,
19;37:10,15,18,23;
38:3,11,13;39:2,9,
12,18,21;40:2,12,17,
21,23;41:3,7,12,14,
24;42:4,7,11,13,15,
22;43:1,5,17,22;
44:2,6,8,14,18,20,24;
45:10,12,15,18;46:7,
9,14,16,18;47:2,6,11,
20,25;48:4,17,21,25;
49:3,9,21;50:2,6,12,
22;51:5,8,11,17,22,
24;52:7,20;53:3,6,

10,14,16,18,20,22;
54:1,4,6,11,16,22,24;
55:2,6,8;56:3,6,9,13,
15,19,21,23,25;57:4,
6,8,10,12,14,16,19,
23,25;58:2,4,7,9,12,
14,16,18,22,25;59:6,
9,16,19,21,23,25;
60:2,6,12,14,17,19;
61:5,9,12,16,20,24;
62:3,9,12,16,23;
63:1,12,17;64:4,7,
14,17,24;65:7,14,18;
66:5,12,14;67:3,5,
17;68:3,9,16,19,24;
69:8,10,16;77:13;
84:18;88:24;89:2,5;
91:19;92:25;93:2,4;
102:15,20;105:4,8,
10,12,14;106:21,25;
107:2,4,7,9,11;
113:12,14;114:13;
115:15;131:9;
139:18,23,25;140:2,
6,13,18,21;148:9;
151:6;166:4,12
**Laford (1)**
99:11
**Lake (3)**
103:4,8;106:17
**language (12)**
43:24,25;44:2,5,
11,14,16;56:11;
66:19;67:7,18,23
**large (3)**
33:5;104:2;160:2
**larger (2)**
20:13;32:20
**last (34)**
5:6,16;6:8;12:24;
18:5;47:11;50:22;
52:20;63:1;65:15;
70:7,12;79:17,18;
82:25;87:21;92:15;
100:16;103:1;104:3,
7;106:8;107:14;
108:1,3;115:17;
118:14;122:8;
128:10;137:16,16;
138:11;151:22;
153:23
**late (1)**
72:15
**later (6)**
48:20,24,24,25;
49:8;118:3
**latest (1)**
118:4
**latter (1)**
13:23
**Laughter (1)**
35:5
**law (8)**

56:8;136:15,18,
25;162:8;24;165:4,6
**laws (5)**
13:11;26:21;
103:16;126:4,7
**lawsuit (2)**
46:11,12
**lawyer (2)**
135:7;150:12
**lawyers (1)**
95:7
**lay (1)**
91:12
**lays (1)**
31:21
**lead (1)**
85:10
**leaders (4)**
73:25;85:19;86:3,
6
**leadership (3)**
74:5,12;77:25
**leading (2)**
151:11;152:2
**lease (2)**
48:15;50:19
**leases (7)**
48:11,15,16;49:5,
15,17,24
**least (5)**
91:4;93:22;102:7;
136:16,22
**leave (6)**
59:5;74:22;86:5,8;
91:12;148:1
**led (1)**
156:13
**ledger (4)**
21:22,23;30:21;
64:12
**left (11)**
51:12;86:14,18,
22;140:23;144:21;
147:8,17,18,22;
149:20
**legal (36)**
11:15;24:24;25:7,
9,12;26:8,14;38:19;
46:4;93:18;94:1;
95:5,25;96:22;
97:11;103:13;109:7;
112:19;117:19;
130:10;137:19,19;
150:6,7,8;160:7;
161:7,15;163:18,18,
22;164:2,10,15,16,
25
**legal-cost (1)**
117:21
**legally (1)**
105:16
**legislation (1)**
13:10

**legislative (3)**
77:18;78:23;79:5
**legislature (3)**
78:4,10,13
**length (1)**
128:18
**lengthy (2)**
143:23;144:3
**less (8)**
23:12,17;63:22;
64:22;65:2;112:11;
133:11;146:9
**letter (5)**
100:13,19;103:2,
22;104:6
**level (2)**
75:4;81:11
**levels (1)**
74:1
**Lewis (4)**
74:2,7,11,13
**liabilities (34)**
5:1;11:1,3,5;
13:22;14:1,6,11;
17:19;21:16;22:15;
40:5,5;47:14;49:5,
19;78:8;118:4;
123:7;128:17;129:4,
9,10,11;133:11;
134:10,14,20,25;
135:24;148:19;
161:7,9,12
**liability (16)**
13:11;48:11,15;
49:12,14;68:1;78:1,
5;109:4;126:4,7,8,
15,17,23;134:16
**lid (1)**
149:16
**life (5)**
141:22;142:9;
146:21;147:13;
156:13
**liked (1)**
120:15
**likely (1)**
126:3
**limit (5)**
5:11;67:7;85:22;
95:17;140:14
**limitation (1)**
126:23
**limited (2)**
7:16;126:17
**limiting (2)**
126:8,15
**Lindsay (1)**
102:16
**line (8)**
96:5;97:19,21;
138:15;143:23;
144:4,7,9
**lines (4)**

74:25;75:17;
131:23;138:19
**liquidate (4)**
162:6,11,18;
164:23
**liquidated (2)**
135:11;162:14
**Liquidation (3)**
136:5,6,7
**list (20)**
22:15,19;23:22;
37:11,19;43:12,21;
45:1,8;47:7;52:3;
60:23,24;61:12,22;
64:25;66:8;68:10;
84:19;86:15
**listed (56)**
11:9,10,14;16:5,7,
21,22;17:4;23:21;
27:20;28:6;29:4,22,
23;31:12,20;33:8;
36:4;37:2,10,21;
38:4,25;39:22;
40:25;42:13,14;
43:7;45:3,6;46:5;
47:15;49:22;50:1,5;
52:8,11,14;56:16;
60:8,12,20,23;63:19;
65:10,13,18,20;
93:22;116:20;117:3;
118:16;128:24;
129:3,5,10
**listen (1)**
6:2
**listening (1)**
149:21
**Listing (3)**
15:8;16:20;38:17
**lists (4)**
32:11,16;34:9;
36:4
**Literally (4)**
141:12;142:13;
143:2;146:17
**litigation (10)**
36:23;45:23,23;
46:21;52:9;117:3,5,
16;137:15,21
**little (9)**
66:6;69:16;
111:18;115:18;
117:22;130:19;
133:11;134:25;
161:22
**live (4)**
103:7;140:22;
143:6;147:15
**lived (2)**
142:2;148:3
**lives (2)**
146:25;148:3
**Living (8)**
122:2;128:8;

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
180 of 192

141:23,24;142:25;
143:8,9;155:6
**LLP (1)**
  69:4
**local (1)**
  98:4
**locate- (1)**
  85:23
**locate-and-mark (1)**
  85:22
**location (1)**
  99:20
**locations (5)**
  20:16,17;66:8,9,20
**lock (1)**
  80:16
**locked (2)**
  144:16;148:16
**Loduca (1)**
  100:23
**long (3)**
  110:10;122:7;
  166:7
**longer (9)**
  46:10;66:3,3,21,
  22,23;85:20;86:4,7
**look (14)**
  15:4;31:13,13;
  58:14;118:8,13;
  120:25;124:21;
  126:20;133:4;
  138:18;146:24;
  147:14;157:8
**looked (9)**
  19:2;102:3;117:2,
  15;139:1,9;146:13,
  24;152:10
**looking (18)**
  78:3;80:15,23;
  100:18;123:1,2;
  124:6;128:21;
  129:14;130:4;
  131:21;132:13;
  133:24;134:3;
  152:24,25;154:20;
  163:9
**looks (8)**
  31:17,17,19;32:2,
  8;74:16;117:3;134:2
**looters (2)**
  141:19;150:23
**loses (1)**
  122:4
**loss (7)**
  63:21;64:21;
  105:1;106:4;149:9,
  10;156:13
**losses (7)**
  63:18,19,23;64:9,
  18,25;65:1
**lost (17)**
  79:21;104:23;
  105:1,2,22;111:22;

127:16;141:11,20;
142:6;146:12;
150:22;151:1;153:7,
20,21;156:9
**lot (14)**
  33:6,11;67:17;
  68:20;77:7;78:25;
  84:24;92:1;110:3;
  140:12;142:4;
  146:10;149:20;
  150:3
**loud (1)**
  106:22
**love (1)**
  150:16
**lower (1)**
  76:14
**luck (1)**
  84:12
**Luckenbach (1)**
  105:18
**luckily (1)**
  147:19
**lucky (1)**
  149:19
**lumped (3)**
  148:12,19,21

**M**

**main (1)**
  49:21
**mainly (1)**
  165:14
**maintain (2)**
  66:21,25
**maintained (1)**
  67:11
**maintaining (2)**
  106:11;138:19
**maintains (1)**
  7:3
**majority (3)**
  39:25;45:22;46:20
**makes (1)**
  64:8
**making (5)**
  6:24;7:1;8:12;
  62:19;155:9
**management (11)**
  73:22;74:20;75:8,
  9,13;79:25;80:22;
  83:25;85:9;165:2,3
**manager (1)**
  165:4
**managing (2)**
  55:24;163:23
**Manges (2)**
  9:1,5
**manner (1)**
  125:12
**many (9)**
  6:2;29:4;84:22;

113:3;115:3;120:3;
155:10;157:25;
161:1
**March (16)**
  4:19;5:3,13;10:14;
  14:3,5,18;18:9,14;
  38:9,23;47:22;51:12,
  14;77:8;129:10
**Marie (1)**
  139:20
**market (6)**
  35:16,17;135:12,
  19,22;136:1
**markets (2)**
  161:1,2
**Marta (1)**
  4:14
**master (1)**
  50:23
**material (2)**
  22:24;24:19
**materiality (7)**
  23:7;24:15,25;
  25:8;26:8,14,21
**materially (1)**
  24:14
**math (7)**
  133:13,14,21;
  134:7,11,22,23
**matter (3)**
  46:5;85:14;148:23
**matters (6)**
  46:24;52:10;74:7;
  81:3,3;123:10
**may (44)**
  5:3,4;6:2,3,4,16,
  17;10:23;14:1;
  18:20;20:4,9,11;
  21:16,16;22:9,9;
  23:19;34:25;35:17,
  19;36:23,24;37:14,
  25;45:24;47:14,15;
  52:11;58:5;63:2,6,
  20;66:21,22,23;76:6;
  80:13;93:21;112:1;
  119:11;123:13;
  133:18,24
**maybe (11)**
  15:4;17:17;25:5;
  26:1,2;31:20;33:16;
  41:4;93:4;138:2;
  140:25
**McKinsey (2)**
  97:16,18
**McKinsey's (1)**
  97:20
**mean (61)**
  15:17,17;16:2,4,
  12;17:20;18:23;
  19:4;20:12;21:17;
  23:5,9,20;24:21;
  27:1,7,24;28:14;
  29:14;30:20;33:18;

35:12;37:3,6;41:18;
44:22;46:1;51:1;
52:2,25;53:4,7;54:7,
21;63:6,23;64:19;
67:23;73:15;87:3;
90:15;105:4;115:22,
23;117:18;119:8;
121:7;125:8;133:10;
140:14;142:9,13;
144:14;147:11,22;
148:15,25;149:8,12;
151:3;164:25
**meaning (3)**
  62:20;75:13;
  160:22
**meaningful (2)**
  78:5;121:3
**meanings (2)**
  24:2,10
**means (12)**
  6:22;15:18;18:12;
  35:18;39:6;53:5,14;
  54:16;59:14;63:24;
  67:24;125:15
**measures (3)**
  78:6;83:18;85:25
**mechanic (1)**
  142:19
**mechanisms (1)**
  146:4
**medal (1)**
  146:14
**media (1)**
  81:18
**meeting (36)**
  4:4,18,20;5:1,4,5,
  5,6,13,16;6:10,10,12,
  16,19,21,25;7:7,7,19,
  22,23,24;42:18;43:2,
  4;71:22;80:5,11;
  85:4;87:22;89:3;
  103:1;152:23;
  166:13,15
**meetings (3)**
  4:7,13;8:9
**Mellon (1)**
  65:24
**melted (2)**
  146:16
**members (4)**
  61:2;80:6;81:9;
  85:8
**mentioned (9)**
  24:22;42:16;
  83:12,16;84:9;
  103:14;120:1;
  124:10;128:6
**mess (2)**
  147:22;148:1
**message (1)**
  156:7
**Mesterharm (2)**
  9:17,17

**met (1)**
  137:17
**methods (1)**
  78:1
**metrics (3)**
  82:5,7;83:13
**Michael (1)**
  74:2
**microphone (6)**
  26:12;58:19;
  59:23;108:17;
  161:23;164:8
**middle (4)**
  10:2;145:4;165:3,
  4
**might (7)**
  17:17;33:20;41:4;
  124:5;127:25;130:3;
  148:25
**Migratory (1)**
  103:20
**Mike (1)**
  151:9
**Milbank (1)**
  69:4
**million (30)**
  23:11,13;24:22;
  45:8;94:20;95:2,7;
  112:11;114:4;
  115:20;116:9,14,17,
  23,24;117:5,5,6,11,
  17,22,23;118:1,14,
  14;144:13,21;145:2;
  151:11;155:8
**million-dollar (1)**
  153:1
**millions (2)**
  94:2,2
**mind (7)**
  31:15;38:14;
  66:17;68:14;72:6;
  96:11;108:16
**Mine (2)**
  142:23;149:18
**minimis (13)**
  21:22;22:1,5,12,
  21;23:1,3;24:11,13;
  63:21,23;64:8;65:1
**minims (1)**
  23:19
**minus (1)**
  134:20
**minute (3)**
  77:1;100:7;142:18
**miscellaneous (4)**
  32:17,25;33:6,10
**mischaracterizing (1)**
  130:23
**misreading (1)**
  76:6
**mitigate (1)**
  106:4
**Mitigation (5)**

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
181 of 192

74:15;76:6,12,13,
17
modified (3)
85:23;161:16;
162:3
modify (1)
38:21
modular (2)
143:8,9
MONDAY (1)
4:1
monetize (1)
134:17
money (11)
78:8;117:4;143:1,
2;144:17;145:5;
147:16;153:8;
155:16,21;156:8
Monica (1)
139:20
MONTGOMERY (40)
139:22,24;140:1,5,
12,17,20,20,22;
141:9,11,15,22;
142:17;144:6,9,11,
19,22,25;145:8,16,
20;146:1,6,9,21;
147:10;148:8,10,21,
25;149:8,12;150:10,
12,14,20,22;151:3
month (4)
122:19;138:1;
143:6;145:12
months (13)
6:10;84:11;
122:10,13,20,25;
123:16;127:20;
137:17;152:6,25;
153:10;154:21
Moore (1)
9:13
morally (2)
103:6,10
more (33)
14:10;16:16;
21:13;32:3,12;57:3;
59:7;76:14;83:13;
85:6;103:25;104:11;
105:6;108:2;113:4,
7;124:16;125:5,12;
130:3;133:11;137:4,
4,8;139:18;141:1;
144:1,3;147:6;
148:17;155:8;163:2;
165:22
morning (8)
4:10,13,20;5:24;
9:7;102:17,19;
127:15
mortgage (2)
123:1;127:22
most (12)
77:15;82:11;

121:4;124:6,7;128:8,
19,22,23;130:14,21;
132:25
motion (33)
13:17;19:14,18,
19;40:10;43:9;
70:20,21;72:8,18,22,
23;73:5,6;90:6;
101:12;112:21,23;
113:23;114:8,21,24;
115:2,9,13;119:3;
120:6;121:10,14;
123:4,5,24;128:6
motor (1)
127:21
mouth (2)
40:14;124:3
move (25)
21:9;44:7;56:22,
24,25;58:15,16;60:3,
5;69:16;80:13;
88:10,10;92:2,4,5;
113:8;120:12,18;
127:7,21;142:8;
147:16;149:2;
161:24
moving (2)
112:6;121:24
MSAs (2)
50:25;51:1
much (17)
16:15;17:15;69:8;
76:13;95:1;103:23;
107:7;136:16,22;
137:19,23;138:1;
139:5;144:3;156:18,
23;166:13
multifaceted (2)
82:1,15
multiple (3)
52:11;91:23;
126:10
music (1)
106:22
must (2)
134:17,17

N

nail (1)
149:3
name (17)
4:11;36:12,15;
84:21;159:16;163:5;
165:12
named (1)
93:8
names (7)
18:22;36:5;42:24;
60:20;88:5,13,20
Nans (1)
99:17
Napa (1)

148:12
National (1)
82:13
nature (8)
36:21;38:25;43:9,
18;45:12;61:1;
90:17;161:12
nearly (3)
6:9;144:17;157:7
necessarily (10)
16:17;46:17;
49:19;61:18;64:23;
76:22;126:9;135:15;
146:3;160:14
necessary (8)
11:23;18:7,21,24;
38:21,24;48:1;
160:21
need (20)
5:9;8:21;34:25;
35:2,3;48:2;77:17,
19;78:9;79:12;
80:21;108:10;121:4;
124:7;126:3;128:7,
8;134:17;149:2;
153:17
needed (4)
28:20;134:15;
153:9,16
needs (5)
18:15;78:25;85:6;
128:15;163:12
negative (1)
160:22
neighbors (1)
147:17
nesting (6)
103:3,18;104:2,3,
22;106:15
nests (2)
105:1,16
net (4)
62:17;63:9;
135:19,19
nettings (2)
63:2,4
network (1)
76:20
new (20)
5:12,13;49:13;
52:4;55:7;61:13;
65:24;73:24;79:18;
80:19,24;81:12,22;
82:3;83:13;85:8;
126:5;131:7;134:18;
135:3
newer (1)
128:22
news (2)
72:16;127:17
Newsom's (1)
77:6
next (17)

15:6;17:16;26:24;
29:2;36:4;44:25;
45:1;46:20;64:21;
73:12,21;80:4;82:7;
113:14;135:2;
145:12;152:23
nine-and- (1)
114:3
ninety (3)
29:22,23,25
nobody's (1)
91:5
nonconsequential (1)
22:21
nondebtor (1)
15:9
none (5)
51:12;63:14;
65:16;93:22;150:1
nonemployee (2)
55:16;60:22
nonindividual (1)
12:10
nonqualified (2)
41:21;42:10
nonwildfire (1)
162:17
NorCAL (1)
93:25
normal (6)
40:10,13,23;41:2;
46:24;62:17
North (3)
108:24;121:25;
138:14
Northern (2)
4:10,12
note (38)
10:21;13:21,22;
15:6;16:23;18:17,
18;19:15;21:14,14;
26:24;28:6;29:19;
36:22;38:4,15,15;
39:2;40:3,3;41:14;
43:6;45:19;47:12;
48:5,5;50:6,12,12,
23;55:12;56:12;
62:17;63:19;66:19;
68:4;132:20;133:5
noted (4)
11:24;90:16,17;
98:13
notes (25)
10:13,16,18,21,25;
11:3,11,17,18,25;
12:4,14,15,19;13:19;
21:11,14;35:3,10;
36:22;38:4;39:2;
129:14;133:16;
163:10
notice (4)
42:17;43:2,4;
151:16

notified (2)
42:20,22,23
noting (1)
69:6
NPR (1)
127:15
NTSB (3)
82:19;164:1,18
number (51)
4:5,6;12:11;13:21;
17:16;18:17;28:5;
29:16;30:9;32:8;
33:13;35:8;36:19;
38:3;40:2;41:9;43:7,
11;48:5;55:10,10;
60:7;63:12,13,17;
66:5;72:13,20;76:11,
11,14;77:17;79:18,
23;89:16;95:11;
112:16;114:17;
117:9,21,25;121:19;
126:13,21;130:8;
136:8;138:4;139:6;
156:16;161:6,8
numerous (2)
20:14;156:13

O

oath (6)
6:13,18;94:3;
95:16;115:7;132:5
objection (1)
121:6
objects (1)
11:8
obligation (6)
11:1,4;19:25;
20:25;54:17;103:15
obligations (3)
20:2;103:13;
153:14
observe (3)
6:2,11,17
obtaining (2)
7:3,15
obviously (7)
11:14;103:15;
109:14,23;111:22;
118:24;138:23
occur (1)
80:11
occurred (3)
54:19;96:2;124:23
o'clock (2)
4:9,20
October (2)
94:1;97:3
off (13)
36:21;51:13;
99:25;108:3;117:14;
118:13;134:22;
141:17;142:13;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(14) modified - off

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
182 of 192

145:13;149:14,16;
150:23
**offering (2)**
84:2;136:15
**office (20)**
4:14,15;6:21;7:1,
2,15;10:15;31:11;
32:10,19,20,24;33:6,
14;34:2;62:5;78:14,
16;107:10;119:17
**officer (2)**
73:18;107:21
**officers (3)**
55:20;60:22;
163:16
**official (11)**
5:5,19,20,21;6:20,
25;10:20;69:1,5,9,11
**offline (1)**
110:11
**off-premises (3)**
66:5,7,9
**oil (1)**
105:18
**old (6)**
29:22,23;33:19;
81:19;142:9;147:17
**older (1)**
146:9
**onboarded (1)**
83:25
**onboarding (1)**
83:9
**Once (3)**
6:23;7:23;147:11
**one (53)**
7:1;8:11;12:24;
20:15;21:14;29:9;
31:13,19;32:1,3,3,6,
9,11;36:22;38:4;
44:25;56:10,16;59:7,
11;65:20;70:4,6,8,
12;73:7;74:22;
79:22;82:10;84:8;
90:16;96:6;109:21;
110:23;113:10;
115:21;117:10;
119:5;134:17;138:3;
139:18;140:11;
141:17,17;146:13,
14;148:10,13,20;
149:13;150:6;
158:13
**one-off (1)**
143:22
**ones (11)**
31:16;43:20;47:2,
3;51:3;61:13;75:17;
109:15;128:22;
140:3;147:23
**one's (2)**
31:22,25
**ongoing (6)**

46:4;88:2;151:14;
157:22;158:5;
160:21
**only (12)**
6:25;11:4,14;20:6;
31:17,19;45:7;
69:23;72:12;103:22;
125:2;148:10
**oOo- (1)**
4:2
**oops (1)**
66:16
**open (1)**
6:11
**opening (1)**
159:20
**operate (3)**
36:16;103:17;
161:4
**operating (5)**
48:11,16;49:5,15,
17
**operation (2)**
11:9;153:6
**operations (15)**
4:23;5:15;8:3;
33:14;66:21;74:3;
81:24;89:7;97:24;
104:16,21;105:1,22;
145:3;165:11
**opportunity (1)**
7:18;95:15;151:8
**opposed (1)**
69:24
**opt (1)**
6:2
**opted (1)**
11:2
**order (11)**
5:23;17:4;45:5;
70:5;82:8;88:2;
126:3;134:13,16;
137:20;160:25
**orderly (1)**
7:23
**ordinary (5)**
62:18;63:20;
64:18;65:2,15
**ordinary-course (1)**
63:3
**organization (3)**
85:20;93:18;
163:11
**organizational (1)**
74:1
**originally (2)**
51:21;80:13
**ORISINI (1)**
98:25
**Orsini (39)**
9:13,13;91:10,12,
16,18,21,21;92:4,6,
8;93:1;98:11,18,22;

99:3,8,10,12,14,16,
18,22;107:10;109:6,
16,20;110:7;113:10;
115:21,24;116:2;
132:4,7,9,11,15,19;
138:6
**others (3)**
109:23;143:23;
149:10
**otherwise (4)**
19:23;27:4;38:21;
103:23
**ought (1)**
148:5
**out (42)**
31:21;50:16;
52:10;67:7;74:24;
83:6;85:25;109:12;
116:24;117:4,11,16,
18;122:24,25;
123:15,21;127:8,19;
136:13;141:12,18;
142:4,12,21,22;
144:13,17;145:5;
147:6,7,7,12,14,24;
149:15,17,20;
151:20;153:6;160:2,
3
**outcome (3)**
78:12;79:5;82:2
**outcomes (1)**
82:9
**outlined (1)**
104:6;126:10
**out-pump (1)**
142:19
**outreach (1)**
119:18
**outside (12)**
4:16;19:2;27:13;
35:23;65:15;75:1,7,
19;78:18;89:3;
125:21,24
**outstanding (4)**
16:1;49:16;50:4,
20
**over (27)**
5:18;7:12,22;
29:22,23,25;31:20;
48:12;55:3;75:18;
87:8;95:7;113:10,
11;117:20,22;
124:24;128:25;
134:25;152:3;154:9,
17;155:6;157:16;
159:18;163:20,20
**overall (1)**
76:17
**overseeing (2)**
73:18;89:9
**oversees (1)**
50:17
**owed (2)**

42:1;154:2
**own (8)**
8:6;32:18;36:7,11,
12;56:17;77:19;98:9
**owned (1)**
103:12

**P**

**Pacific (5)**
4:6;8:15,18;
107:22,22
**package (3)**
86:14;89:12;
157:16
**packages (2)**
86:5,8
**page (13)**
13:22;31:10,19;
32:12;33:2;50:12;
112:9;131:2,5,6,11,
12,18
**pages (2)**
31:12,22
**paid (26)**
22:8;40:13,21;
45:5;87:15;91:5,5;
94:2,20,22,23,25;
95:7;112:21;115:9;
116:24;117:4,11,18;
118:6;141:2,6;
142:8;144:13;153:1;
154:24
**paper (1)**
137:11
**paragraph (8)**
13:24;15:7;27:1;
47:11;48:6;50:22,
24;131:21
**parked (2)**
142:25;143:4
**part (39)**
5:5,7;10:13,19;
13:23;17:9;20:17;
29:7,16;31:10;
33:23;39:15;45:13;
50:18;55:10;70:8;
82:11;86:19;90:14,
20;92:2;101:8;
102:7;109:4;111:22,
23;123:4,6,23;
129:23;134:15;
145:6,17;151:1,4;
152:6;154:3;160:1;
164:24
**participate (1)**
6:17
**participation (1)**
166:14
**particular (12)**
8:7,11;15:10;39:3;
70:4;75:9;98:19;
105:5;109:8,25;

110:1;165:2
**particularly (1)**
62:18
**particulars (1)**
121:14
**parties (8)**
16:19;28:7;30:10;
46:18;69:23;79:4;
92:2;115:1
**partners (1)**
55:22
**partnership (1)**
55:22
**parts (3)**
32:7,10;50:17
**party (4)**
36:15,23;45:21;
63:11
**party-in-interest (1)**
11:8
**pass (2)**
13:4;26:11
**passed (1)**
48:18
**passing (2)**
10:2;68:14
**past (3)**
83:14;84:14;90:19
**patents (1)**
35:8
**path (4)**
78:23;90:19;
109:9;125:13
**Pause (2)**
21:8;37:12
**pay (28)**
41:2;72:18;87:19;
112:22;113:23;
114:8,19,21;123:1;
127:22;138:8;
143:10;145:11,11,
12,12;151:10,12,23;
152:1,15,16;153:3,4,
8,25,25;154:1
**payable (2)**
15:21;63:10
**payables (2)**
15:7;47:13
**payers (2)**
81:19;138:7
**paying (2)**
42:6;89:13
**payment (4)**
86:21;127:1;
153:16,18
**payments (22)**
40:10;49:16;
55:11,11;62:17;65:8,
10,13;68:4;71:5;
72:14;73:5;86:15,
18;93:14;102:2,4,6,
11;117:16,19;151:20
**pejorative (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
183 of 192

156:25
**penalties (1)**
12:19
**penalty (1)**
12:9
**pending (7)**
36:23;38:1;52:9;
131:8;161:7,8;162:2
**people (29)**
4:17;45:9;68:21;
69:20;70:13;77:15;
84:13;86:17;88:5,14,
21;91:5,19;115:24;
141:2,6,6;145:13;
147:21;148:2;149:5,
20;150:4;153:6;
154:9;155:12,21,24;
157:4
**people's (1)**
155:6
**per (2)**
22:8;105:25
**percent (2)**
76:1;82:8
**perception (5)**
81:22,23;164:6,9,
12
**Perfect (2)**
9:20;133:3
**perform (1)**
52:1
**performance (2)**
82:5;83:13
**performed (2)**
51:21;75:10
**performing (2)**
51:20;95:13
**Perhaps (1)**
162:9
**period (4)**
57:2;125:9;127:4;
143:22
**periodic (1)**
74:3
**Periodically (1)**
74:12
**perjury (2)**
12:10,20
**permission (1)**
114:21
**permitted (1)**
6:15
**person (2)**
12:5;150:4
**personal (3)**
61:14,17;163:23
**personally (11)**
34:9,12,23;96:19;
97:6;106:10;139:12;
140:23;151:2;
163:14;165:9
**perspective (4)**
22:25;23:6,10;

84:2
**pertain (1)**
8:11
**petition (8)**
37:2;41:18;47:14,
19;54:8,11,13,19
**PG&E (87)**
4:5;8:14,16;48:8;
69:13,20,25;73:21;
74:24;75:7,8,11;
77:10,16;78:15;
85:10,16;86:1;
87:15;90:7;92:16,
20;93:6,8,13,21;
94:3,12,20;95:3,7;
96:9,14;98:3,9;
99:19;100:14,24;
103:6;104:10,17;
107:23;109:4,12,17;
111:13;112:1,12,16;
113:22;114:2,16,17,
18,20,23;115:8,13,
19;116:20;123:20;
127:25;128:25;
129:16;130:21;
134:24;136:10;
137:23;138:7;
141:16;143:13;
147:23;151:10;
152:15;155:11,24;
157:15;159:20,23;
160:13;161:16;
162:3;163:11,16,19,
19;164:21
**PG&E's (17)**
77:20;80:21;
81:24;84:22;86:24;
87:13;96:16;108:7,
25;109:25;110:19,
24;134:10;155:24;
162:2,10,24
**pgefailurecom (1)**
36:7
**pgeguiltycom (1)**
36:7
**ph (3)**
99:17;139:20;
147:3
**piccolo (1)**
149:14
**place (2)**
97:2;147:16
**places (1)**
146:5
**plain (1)**
143:15
**plaintiff (1)**
36:25
**plaintiffs (13)**
41:4,8;52:11;
72:19;73:7;109:14,
18;112:10,12,16;
114:3,16,18

**plan (55)**
13:6,12,14,15,16;
48:9;70:5;73:12,15,
17,19,24;74:1,8,15,
21,23;76:6,12,13,17,
23;77:11,11,14,21,
22,22;91:1,6,7,24;
101:23;110:6,8,8,22;
123:13;125:25;
126:24;127:1,3,4,11,
25;128:14;136:12,
14,18,25;145:10,24;
156:4;159:21,25
**planning (1)**
6:4
**plans (9)**
13:1;30:15;41:21;
42:12;70:8;74:10;
81:22;84:5,6
**please (20)**
5:25;7:8,9,10,12,
14;8:11,24;10:7;
26:6,11;44:7;58:19;
59:23;62:13;69:2;
140:18;158:25;
159:2,16
**Plumas (5)**
102:22;103:2;
104:9;105:15;106:6
**plus (1)**
117:5
**PM (1)**
166:16
**point (18)**
13:13;16:2;29:9;
45:9;46:8;49:22;
68:10;91:3;110:11;
116:4;125:15;
134:22;154:19,25;
155:10;158:25;
159:2;160:3
**pointed (1)**
160:2
**pole (1)**
99:25
**poles (4)**
142:17,22;147:10,
11
**policies (7)**
33:24,25;45:24;
64:12;92:17;95:4;
116:21
**policy (7)**
81:3;93:9;95:10,
12,17;122:9,11
**pool (4)**
140:24;141:13;
146:18,18
**poor (1)**
147:17
**portion (3)**
94:21;127:10;
138:8

**position (13)**
11:22,24;13:11,
16;15:14;16:13,16,
21;17:11;106:18;
107:19;109:7;
151:19
**positions (1)**
73:3
**possibility (1)**
72:18
**possible (15)**
4:25;35:19;44:23;
67:19,21;72:3,8;
80:16;87:4;120:3,13,
19;124:12;125:20;
145:15
**possibly (1)**
148:21
**potential (4)**
127:4;128:11;
129:11,16
**potentially (1)**
67:25
**practical (3)**
22:20;65:6;
148:18,23
**Practicality (1)**
30:9
**practice (2)**
22:3;56:7
**Prattville (2)**
106:7,16
**pre- (1)**
22:7
**preferably (1)**
115:12
**preliminary (3)**
4:22;6:7,8
**preliminary (1)**
4:21
**premature (11)**
123:4,10,19;
124:1;127:7,24;
128:14;141:23,24;
145:20,21
**pre-paid (2)**
22:9;24:1
**preparation (1)**
156:14
**prepare (3)**
17:24;155:12;
156:2
**prepared (5)**
18:2;110:8;
152:23;153:24;
154:21
**preparing (2)**
137:10,23
**prepayment (1)**
23:18
**pre-petition (6)**
14:6,10;16:6;
41:17;47:23;114:22

**present (4)**
4:14;5:11;6:1;
68:11
**preserve (3)**
151:14,23;153:2
**preside (1)**
7:22
**president (1)**
74:2
**press (4)**
6:12,16,16,17
**Presumably (2)**
37:25;38:2
**pretty (1)**
53:9
**prevent (2)**
78:1,6;102:5;
104:10
**previous (8)**
30:5;81:20;83:15;
84:3;85:4;125:20;
151:13;160:2
**previously (5)**
19:7;24:23;27:25;
48:16;105:19;121:1
**priced (1)**
105:25
**primarily (4)**
9:23;12:3;159:21;
161:11
**primary (1)**
122:5
**principal (1)**
85:14
**principle (1)**
62:2
**prior (6)**
7:11;65:11;87:12;
96:10,14;124:15
**prioritization (2)**
151:20;155:9
**prioritize (6)**
88:2;152:3;153:5,
7;154:8,17
**prioritized (1)**
155:5
**priority (4)**
15:13;79:15;
90:20;154:6
**privacy (2)**
45:21;62:2
**privilege (2)**
98:11;110:3
**privileged (1)**
138:20
**probably (2)**
102:22;148:11
**problem (4)**
44:1;113:15;
132:20;164:24
**problems (1)**
163:17
**procedures (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
184 of 192

51:20
**proceed (1)**
139:11
**proceeding (6)**
90:21;109:5;
111:24;123:8;
135:10;146:4
**proceedings (2)**
6:20,22;166:16
**process (12)**
11:12;17:14;
82:25;83:24;84:5,7;
92:2;135:4;144:3;
145:7;148:24;
164:22
**procure (1)**
20:15
**product (1)**
109:8
**professionals (3)**
45:7;65:9;69:19
**profile (1)**
155:24
**program (5)**
71:10,10,18;75:2;
156:22
**programs (3)**
43:9;85:9;156:16
**progress (3)**
73:18;74:11;85:2
**prohibited (2)**
6:22,24
**project (1)**
91:24
**projection (1)**
76:15
**promised (2)**
115:3;152:22
**promptly (2)**
90:9,15
**proof (2)**
8:21;11:7
**proofs (1)**
8:20
**propane (1)**
149:12
**property (18)**
26:25;27:2,3,14,
17,20;34:1,8;35:11,
15,17,20;38:3;66:14,
16;103:12;106:3,4
**Proportion (2)**
75:24;76:2
**proposal (3)**
76:7,8;78:16
**propose (3)**
70:9;136:15,22
**proposed (1)**
70:13
**proposition (1)**
109:21
**prospects (3)**
5:15;8:3;140:15

**protect (1)**
45:20
**protected (1)**
103:19
**Protecting (1)**
61:14
**protection (3)**
19:11;105:16;
151:18
**proud (1)**
164:12
**provide (14)**
20:15;21:3;61:3;
62:4,13;70:21,23;
103:25;106:15;
119:10;121:18;
122:4;124:6;145:3
**provided (10)**
11:13;20:19;
47:18;51:21;61:5;
62:4;66:8;103:23;
108:2;133:20
**provides (5)**
10:23;11:7;15:22,
23;146:4
**providing (5)**
32:12;39:16;61:1;
70:24;106:6
**provisions (1)**
127:4
**public (16)**
6:11;18:22;19:11;
26:13;69:13;81:3;
85:15;103:7,19;
117:25;130:23,24;
138:6;157:7;164:5,9
**publicly (1)**
130:13;131:1;
163:11
**publish (1)**
49:8
**PUC (2)**
74:16;76:8
**pull (1)**
144:2
**pulled (1)**
142:21
**pumped (1)**
142:18
**purchase (1)**
36:14
**purpose (13)**
7:24;29:9;56:1;
59:14;101:10,11;
109:11;122:3;127:8;
148:18;155:22,23;
156:1
**purposely (1)**
51:10
**purposes (7)**
22:20;29:20;
55:14;110:6;130:9;
162:11,18

**pursuant (1)**
45:5
**pursue (1)**
95:20
**pursued (1)**
94:17
**pursuing (1)**
95:3
**put (16)**
13:12;40:14;
61:25;91:24;110:8,
9;119:2,11;123:23;
133:6;136:19;142:8;
147:12;148:15;
151:15;161:10
**putting (2)**
124:3;143:23

## Q

**Q1 (1)**
48:14
**qualifying (2)**
67:7,23
**qualities (1)**
81:11
**quantifiable (1)**
37:1
**quarter (7)**
48:9,12,17,17,20,
23;118:11
**quarterly (1)**
26:17
**quest (1)**
53:19
**quick (2)**
9:2;137:8
**quicker (1)**
125:15
**quickly (11)**
72:3,7;80:16;87:4;
113:5,7;120:2,18;
124:12;131:22;
145:14
**Quit (2)**
132:8;142:4
**quite (2)**
43:13;119:6

## R

**raise (5)**
10:7;78:8;126:3;
155:23;160:20
**raised (8)**
46:24;71:7;72:17,
20,25;79:3;119:10;
164:18
**raising (1)**
165:8
**ran (3)**
144:17;147:6,7
**range (8)**

129:16,18,20;
132:2,17,24;133:5;
134:4
**rate (1)**
138:7
**rate- (1)**
81:18
**rather (1)**
71:21
**reach (1)**
142:22
**reached (4)**
50:16;72:15;80:3;
152:4
**read (8)**
56:11;77:2;81:18;
108:9;131:24;132:4,
15,15
**reading (4)**
56:20;74:23;
131:22;132:9
**ready (4)**
56:25;58:16;92:5;
155:13
**real (1)**
9:2
**real-estate (1)**
50:15
**realize (1)**
69:19
**really (13)**
22:24;30:11;
33:19;137:18,18;
142:6;146:11,11,11,
23;148:4;149:24;
151:3
**reappointing (1)**
80:6
**reason (15)**
11:3;40:12,19;
41:1;43:17;44:4,6,8,
9;45:1,5;46:20,22;
125:24;144:14
**reasonable (12)**
12:18;17:18,20;
41:16,19,21;50:7;
51:5;67:18,20,22;
68:2
**reasonably (5)**
66:22;67:1,19,21,
24
**reasons (3)**
43:10;67:19;73:7
**reassert (1)**
143:25
**rebuild (3)**
79:24;143:10,10
**recall (2)**
27:14;94:19
**receivable (9)**
15:21;29:19,23,
25;30:2,10,24;38:6;
63:10

**receivable-by-receivable (1)**
30:6
**receivables (5)**
15:7;29:21;30:4;
31:5;38:5
**receive (2)**
136:16,23
**received (12)**
42:17;43:2,4;
47:13,16,22;73:6;
94:22,25;115:19;
119:21,22
**recent (1)**
82:12
**recently (2)**
70:5;73:12
**recharacterize (1)**
18:6
**recited (1)**
73:2
**reclassify (3)**
18:6;38:20,25
**recognition (1)**
146:4
**recognize (3)**
30:25;49:12,14
**recognized (1)**
92:1
**recognizes (1)**
79:21
**recollection (1)**
72:24
**recommendation (3)**
104:16;111:6,7
**recommended (2)**
19:5;104:11
**record (16)**
5:6,7;6:18,20;
8:13;18:22;23:17,
19;54:1;65:5;69:6;
91:20;116:3;138:6;
140:19;159:16
**recorded (3)**
5:7;6:19;7:8
**recorder (1)**
7:8
**recording (8)**
6:20,21,23,25;7:1,
2,3,4
**recordings (2)**
7:13,15
**records (12)**
15:11;26:20;34:9,
17;41:20,22;64:2;
66:21,22;67:15,25;
85:13
**recovered (2)**
116:10,14
**recoveries (1)**
38:5
**recovery (2)**
95:15,20
**redact (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
185 of 192

18:21
**Redwood (1)**
99:15
**refer (6)**
8:15,17,18;53:2;
68:5;116:2
**reference (3)**
50:11;76:18;
129:22
**referring (12)**
8:14,16,17;14:4;
41:6;53:3;54:10;
64:20;69:25;99:23;
133:17;160:7
**reflect (6)**
15:11;22:9;48:15;
64:12;81:6;165:9
**reflected (3)**
21:23,24;64:2
**reflecting (1)**
30:21
**reflective (1)**
130:9
**reflects (1)**
18:3
**reform (5)**
13:10;78:1,5;
134:15;160:4
**refresh (3)**
80:9,22;152:13
**refreshed (1)**
85:8
**refreshment (2)**
79:24;80:4
**refund (1)**
40:24
**refunding (1)**
43:15
**refuse (1)**
111:12
**regard (17)**
7:25;8:7;12:13;
13:21;19:11;38:8,15,
16;39:3;41:15;48:5;
50:7;52:9;54:18;
62:21;68:4;97:19
**regarding (8)**
13:21;15:6,12;
17:16;18:19;42:20;
47:23;103:3
**regardless (1)**
141:13
**regards (1)**
78:12
**regulations (2)**
103:16;106:3
**regulator (1)**
85:15
**regulatory (2)**
77:18;78:23
**reinvesting (1)**
126:12
**related (12)**

16:19;37:16,21;
46:4;65:8;71:8;72:3,
12;78:19;82:13;
159:22;161:11
**relates (4)**
71:18;72:4;80:4;
138:11
**relating (1)**
74:7
**relationships (1)**
164:14
**Relative (1)**
35:14
**relatives (2)**
55:21,22
**release (1)**
78:20
**relevance (1)**
101:6
**relevant (4)**
49:19;66:21;
136:1;158:4
**reliability (1)**
76:10
**relief (21)**
19:23;43:8;44:25;
58:6;70:21,22,23;
71:7;72:22;99:4;
119:10;121:4,12,16,
18;123:23;161:16,
16;162:3,3;165:18
**relieve (1)**
11:4
**rely (1)**
160:25
**remaining (1)**
145:3
**remedial (1)**
85:25
**remediation (1)**
75:6
**remedies (2)**
95:5,9
**remember (3)**
7:8;92:17;103:1
**remembered (1)**
73:3
**reminded (1)**
8:5
**renditions (1)**
137:7
**rent (2)**
123:1;127:23
**reorganization (15)**
5:15;8:3;13:2,7,
12;77:14,22;125:25;
128:14;136:19,25;
140:15;145:24;
159:21,25
**repeat (2)**
129:7;161:18
**repeatedly (2)**
92:14;101:1

**repeating (1)**
96:11
**rephrase (3)**
60:18;93:4;114:13
**report (8)**
34:13;65:6;70:6;
74:8;77:2,6;79:3;
126:10
**reported (21)**
34:16;38:12;
48:19,22,23,23;49:8,
10;51:4,16;52:18;
63:10;67:15;86:20;
98:7;132:22;135:18,
18,23;137:11;156:12
**reporting (3)**
50:20;80:14;130:9
**reports (10)**
74:11,13;108:4,8,
10,15,21;109:2,23;
110:19
**represent (5)**
6:14;69:22;84:21;
119:20;122:16
**represented (2)**
81:9;119:21
**representing (5)**
25:17;69:5,19;
79:10;102:23
**represents (1)**
91:25
**request (7)**
7:4;21:5;60:24;
62:14;157:12;159:6,
9
**requested (1)**
67:20
**requesting (1)**
62:3
**require (7)**
23:16,25;28:19;
79:6;89:2;93:7;
125:21
**required (13)**
4:18;6:1;17:7;
19:16;22:15;30:4;
52:21;62:10;64:25;
66:3;121:20;126:3;
151:17
**requirement (1)**
62:11
**requirements (3)**
18:4;80:14;137:1
**requisite (1)**
121:20
**research (3)**
13:25;14:2,17
**reservation (1)**
10:24
**reserve (3)**
18:6;38:20;52:21
**Reservoir (1)**
104:12

**residents (2)**
41:21;81:10
**resolution (5)**
73:9;86:25;123:9;
125:11;145:18
**resolve (7)**
90:19,21;123:7;
125:6,19;144:3;
148:20
**resolved (3)**
77:17;124:12;
125:2
**resolving (6)**
79:12;90:9;
143:24;154:10,13,16
**resources (2)**
77:19;103:7
**respect (24)**
19:22;29:1;30:23,
25;49:16;67:15;
69:15,18;75:9;
77:25;78:7;79:2;
80:1;97:25;103:14,
17;109:8;110:1;
118:5;119:12;
124:21,23;149:25;
163:22
**respectively (1)**
10:15
**respond (3)**
11:20;112:4;
157:13
**responding (1)**
113:19
**response (6)**
51:21;63:20;
77:20;123:12;
124:10;138:16
**responses (5)**
7:10;8:13;18:2;
28:18;143:21
**responsibility (2)**
64:13;74:2
**responsible (10)**
73:17,23;89:9;
103:7,11,11;105:16;
106:2,11;138:19
**responsive (1)**
18:4
**rest (7)**
74:4,12;82:6;
136:20;141:6;
146:10;147:24
**result (7)**
45:22;46:21;
84:22;85:5;93:14;
94:13;105:17
**resulted (3)**
104:22;105:1,22
**resulting (1)**
137:15
**retained (1)**
45:6

**retired (1)**
143:6
**retirement (1)**
148:4
**return (1)**
143:14
**returned (1)**
114:18
**revenues (2)**
157:8;160:24
**review (5)**
27:15;51:17,19;
80:21;96:23
**reviewed (5)**
18:13;19:6;51:11,
14;71:22
**revising (1)**
84:6
**revisit (1)**
12:23
**rhyme (1)**
144:14
**rider (1)**
34:4
**right (84)**
4:3;8:23;9:6,9;
10:6,7,11;11:19;
12:2,4,22;14:8;17:5;
21:9,11;38:19;
42:11;43:1;44:24;
46:14;49:21;52:21;
54:25;55:18;56:13,
16;59:16;64:24;
68:7,8;71:17;73:11;
75:15;77:9;79:14;
80:18;83:17;84:19;
87:6;89:7,14,15;
90:8;96:2;100:9;
102:7;107:12;
110:14;112:6;
113:16,20;115:24;
116:11,17,22;117:7;
118:7,21,22;122:12,
21;123:14;124:14;
129:2;130:2;134:2;
139:18;142:7,11,11,
25;143:4,15,15;
145:21;149:1,4,17;
150:3;160:12,18;
165:12;166:1,6
**rights (8)**
8:5;10:24;11:13;
18:6;26:25;36:21;
38:19,21
**risen (1)**
46:6
**risk (6)**
97:19,21;119:11;
156:17;160:15;
163:23
**role (2)**
97:18,20
**roles (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05

84:3

**Roman (1)**
36:22

**room (3)**
6:23;78:22;146:13

**Rosario (1)**
4:16

**Roughly (5)**
95:2;112:10;
117:5;125:2;134:10

**Rule (3)**
8:4;10:23;135:4

**Rules (9)**
7:20;8:6;10:19,22;
11:14,16,17;130:9;
134:16

**run (5)**
122:25;123:15,21;
127:19;151:20

**running (4)**
145:5;150:23;
155:11,12

**S**

**Sacramento (1)**
79:7

**sad (1)**
148:3

**Safety (18)**
73:12,15,24;74:8;
76:10,16,22;81:1,2,
24;82:5,13;83:14,15;
84:14,23;149:16;
155:25

**safety- (1)**
82:12

**safety-oriented (1)**
81:21

**safety-related (1)**
82:7

**salaries (2)**
40:6;42:3

**same (45)**
5:9,16;6:4,8,8;
8:10;17:17,17;23:2;
31:13,17,19,19;32:3,
8;39:21,23;40:24;
41:1,1;43:24;51:20;
62:1,20;63:10;
70:16;87:19;89:13,
18,20,21,22;99:7,9,
22;112:9;113:10;
119:12;129:15;
147:13,14,15;
150:25;159:18;
160:14

**SAN (14)**
4:1,11,15;7:6;
70:15,19;71:7,15;
84:24;85:3;100:25;
101:5;120:23;164:2

**satisfy (1)**

160:3

**save (1)**
142:23

**saved (2)**
142:17,23

**saving (1)**
149:19

**saw (2)**
5:24;84:8

**saws (1)**
147:19

**saying (28)**
16:24;20:9;24:4;
30:18;37:3;43:19;
45:3;46:9;51:25;
52:25;54:20;56:10;
63:8;70:16;86:1,3;
95:18,19;97:4,6;
109:16,20;118:15;
130:11;141:23;
144:10;145:20;
158:1

**Schedule (24)**
15:6;21:12,13;
29:3,3;30:19;38:13;
39:3;40:3;41:15,17;
47:16;48:5;49:22;
50:7,24;51:11;52:7,
13,18,19;54:19;
67:10;101:23

**scheduled (1)**
80:13

**schedules (55)**
4:24;5:14;10:14,
23,25;11:6;12:3,6,
14,18,23;13:19,20;
14:21;15:14;17:7,
24;18:14,20;19:22;
20:18;21:10,15,18;
24:20;26:19;27:20,
24;28:8;29:17,20;
34:14;35:24;38:17,
24;39:22;42:20,24;
45:9;47:12,21;48:2,
10;49:10;52:12,22;
54:17;55:1;56:1;
59:14;61:23;63:7;
135:18;140:16;
166:9

**scheduling (1)**
63:3

**scream (1)**
149:21

**screaming (1)**
142:14

**se (1)**
22:8

**season (2)**
106:15;156:3

**seated (2)**
82:17;83:20

**SEC (3)**
26:14,17;118:18

**Second (11)**
6:19;15:7;32:12;
48:6;50:13,24,24;
70:6;72:11;74:15;
127:9

**secrets (1)**
35:9

**Section (8)**
4:4,18;11:7,9;
19:11,25;21:1;44:23

**secured (4)**
38:16,16,18;39:1

**securities (4)**
26:21;80:15;
118:9;130:17

**seek (2)**
58:5;99:4

**seeking (2)**
72:14;112:21

**seems (3)**
27:1;132:2;163:20

**self-addressed (1)**
7:5

**selfish (1)**
148:25

**Senate (1)**
151:16

**send (2)**
7:6;100:19

**senior (2)**
74:2,4

**sense (9)**
33:16;35:18;39:7;
53:22,24,25;54:1;
79:2;81:19

**sensitive (1)**
61:1

**sent (1)**
156:7

**sentence (10)**
17:14;18:5;50:13,
24;52:20;54:25;
55:2,3,4;63:1

**September (1)**
146:2

**serve (7)**
79:22;81:7;88:3;
123:3;128:6;160:23;
163:25

**server (2)**
31:18;32:10

**service (3)**
88:2;145:4;151:15

**services (5)**
15:23,25;47:18;
50:23;119:17

**session (2)**
78:24;79:5

**set (10)**
29:8;36:21;52:13;
56:12;64:11;80:12;
81:1;100:16,24;
123:15

**setoffs (5)**
62:16,17;63:2,3,16

**sets (2)**
79:4;81:11

**settle (2)**
78:8;128:15

**settled (1)**
79:19

**settlement (10)**
72:15;73:10;
87:12;105:18;
112:13,20;114:2,17;
117:16,19

**settlements (6)**
72:19;112:11;
116:25;118:5;
151:12;152:16

**settling (1)**
143:22

**seventeen (4)**
108:5,23,24;157:7

**Seventh (1)**
8:20

**seventy-five (1)**
137:12

**several (5)**
10:21;114:8;
119:21;138:14;
164:18

**severance (8)**
86:5,8,14;89:12;
152:15;153:16,18;
157:16

**shall (3)**
27:2,5;52:21

**shareholder (3)**
80:5,8,11

**shareholders (1)**
80:6

**sheet (1)**
22:21

**sheets (1)**
5:24

**shifting (1)**
146:14

**shoot (1)**
150:24

**short (2)**
82:17;83:19

**show (3)**
34:18;130:25;
131:16

**sic (6)**
9:8;30:11,23;38:6;
48:7;82:13

**side (2)**
77:18,18

**signature (2)**
12:8,9

**signed (7)**
5:25;12:5,14;
35:24;87:12;114:2,
18

**setoffs (5)** [second column header area continues]

**significant (7)**
34:6;68:1;75:4;
79:6;85:2;160:22,23

**significantly (1)**
23:17

**sign-in (1)**
5:24

**signing (1)**
4:17

**signs (1)**
93:7

**similar (1)**
126:18

**Simon (1)**
74:11

**Simon's (1)**
100:21

**simple (1)**
134:19

**simply (1)**
77:16

**Singleton (140)**
107:9,12,14,17,19,
24;108:12,16,20,22;
109:3,11;110:4,10,
14;111:5,8,11,18;
112:6,15,23;113:2,4,
13,15,20,25;114:11,
15,25;115:6,11,17,
23;116:1,4,7,12,17,
19,23;117:2,13,24;
118:7,12,19,21;
119:4,14,20;120:7,
14,20;121:6,15,24;
122:3,7,12,16,19,22;
123:11,15,19;124:2,
9,14,18;125:7,14,18;
126:1,6,14,24;127:5,
8,14,18;128:16,24;
129:3,8,14,20,25;
130:2,11,14,19;
131:2,7,10,12,18,20,
23,25;132:5,8,10,13,
20,25;133:3,10,14,
22;134:1,8,21;135:2,
9,16,21;136:3,6,9,12,
20;137:3,6,8,22;
138:1,5,7,11,17,22;
139:1,5,7,9,13,15;
145:23

**singular (1)**
82:1

**sit (2)**
109:24;135:21

**sitting (2)**
91:6;142:10

**situation (8)**
81:4;126:11;
140:15;145:6;
150:19,21;151:16;
155:6

**situations (2)**
146:23;163:19

Min-U-Script®

**six (3)**
133:11;134:10,25
**sixteen (1)**
45:8
**Sixth (1)**
8:9
**sixty (2)**
95:2;116:14
**sixty- (1)**
82:4
**sixty-one (6)**
129:1;134:3;
135:11,12,12,23
**six-year-old (1)**
127:20
**size (5)**
64:21;71:20;
120:21;121:3;
128:12
**skills (1)**
84:2
**slightly (2)**
112:11;128:25
**small (2)**
36:22;161:8
**smaller (1)**
23:3
**smirk (1)**
150:17
**smirking (2)**
127:13;150:20
**Society (4)**
103:2;104:10;
105:15;106:12
**SOFA (1)**
67:11
**SOFAs (2)**
63:13;135:18
**sold (2)**
27:4,6
**solely (1)**
77:16
**solution (7)**
78:9,24;79:1;82:1;
104:14,20;106:10
**somebody (6)**
9:23;32:23;37:23;
39:12;86:1;93:18
**somebody's (1)**
61:1
**somehow (1)**
121:7
**someone (3)**
115:11;122:4;
159:15
**Sometimes (2)**
29:8;69:25
**somewhere (6)**
24:6;63:7;82:8;
130:5;132:3;137:12
**son (6)**
127:20;140:25;
141:8;142:3;146:10;

149:2
**soon (1)**
120:4
**sorry (43)**
9:12;13:9;15:6;
18:23;21:10;31:2;
32:16;35:3,9;42:22;
47:6;48:22;49:14;
50:10;65:22;66:17;
68:22,24;69:2,17;
82:18,21;88:17,18,
19,22;91:19;107:2;
108:23;113:25;
119:14;129:7;132:5;
139:23;146:20;
154:12;156:1;157:2,
4;161:20,24,25;
163:9
**sort (6)**
16:17;18:1;71:4;
75:1;85:23;154:5
**sound (1)**
149:14
**sounds (12)**
25:20,22;28:15;
31:3;32:21;33:19;
89:15;106:24;117:7;
118:15;129:2,13
**source (2)**
21:18;110:1
**sources (1)**
50:19
**sourcing (1)**
50:15
**Southern (1)**
124:23
**space (1)**
32:20
**speak (8)**
7:12;53:13;83:10;
97:15;109:23;
126:17,23;164:7
**SPEAKER (33)**
9:20;31:21,25;
68:22;127:6,12,17;
128:3;131:5;135:14;
157:18,21,24;158:4,
6,10,12,15,17,20,23,
25;159:2,6,9,16;
161:18,20,22,24;
164:7;166:2,3
**special (1)**
23:25
**species (1)**
104:11
**specific (31)**
5:1;13:19;14:16;
20:17;29:3,3,19;
30:1,6,15;31:4;
63:16;64:5,15;68:5;
72:6;83:10;94:8;
98:1,18;105:5;
106:19;111:17;

112:12,16;114:1;
119:10;120:23;
124:20;130:10;
163:21
**specifically (16)**
8:13;27:13;30:2,
12;36:9;37:20;38:8,
16;41:9,15;65:9;
66:2;82:15;117:9;
120:17;164:15
**specifics (3)**
121:2,3,10
**speed (1)**
79:12
**spend (2)**
76:17;156:18
**spending (2)**
76:9;156:23
**spent (5)**
137:23;138:1,8;
152:22;156:8,8
**spill (1)**
105:18
**spoke (2)**
47:23;151:9
**spread (1)**
116:8
**square (1)**
142:2
**squirrels (1)**
141:18
**stability (3)**
126:11;159:25;
161:5
**stable (2)**
159:23;160:13
**staff (1)**
78:18
**stake (1)**
104:10
**stakeholders (3)**
79:1,7;80:4
**stamped (1)**
7:5
**Standard (4)**
48:7;49:13,15;
122:12
**standards (5)**
23:16;49:18;
50:19;103:16;161:3
**standpoint (5)**
30:4,24;49:12;
64:1,11
**start (6)**
43:11;70:11,12;
77:12;81:17;83:8
**started (9)**
77:13;82:23;
98:24;108:6,25;
110:20,24;138:15;
147:12
**starting (1)**
44:25;108:3

**state (19)**
78:4,10,11,13,25;
90:18;91:4;103:16;
124:16,19;125:13;
126:11;134:16;
159:16;160:16;
162:2,17,17;164:23
**stated (5)**
8:13;60:9;73:7;
91:23;129:15
**statement (13)**
11:11;15:10;
17:24;18:18;21:10;
34:20;55:9,13;63:7;
90:10,11,12;101:22
**statements (22)**
4:24;5:15;10:14;
11:6;12:4,6,15,18;
13:20;21:24;26:16,
19;52:12;55:15;
64:21;67:16;118:11;
129:19,23;130:17;
140:16;166:9
**States (6)**
4:12,21;7:2,21;
10:16;20:20
**status (3)**
70:17;85:12;97:9
**statute (3)**
19:16,22;20:2
**Stavropolous (1)**
86:21
**stay (4)**
10:2;161:16;
162:4;165:18
**stayed (2)**
140:22;142:12
**step (4)**
80:5;82:10,11;
142:13
**Stephen (2)**
8:25;9:4
**steps (7)**
52:1;79:23,23;
82:3,16;83:18;
164:18
**Steve (1)**
84:21
**Steven (1)**
68:21
**still (10)**
18:14;43:18;68:6;
71:22;90:22;118:25;
127:10;133:24;
147:1,8
**STIP (1)**
102:1,4,6,11
**stipulate (2)**
161:16;162:3
**stop (3)**
29:10;113:10;
144:14
**stoppgecom (1)**

36:13
**storage (2)**
66:6,7
**storages (1)**
66:9
**straightforward (1)**
53:9
**strictly (1)**
6:22
**strike (5)**
46:18;66:17;70:6;
77:1,7
**stronger-performing (1)**
85:10
**strongly (1)**
79:12
**structurally (1)**
74:7
**structure (1)**
73:21
**stuff (4)**
33:19;142:21;
146:10;159:19
**sub (1)**
38:4
**subcontractors (2)**
94:22;116:15
**subject (5)**
20:14;38:7;108:5;
110:3;112:19
**submissions (1)**
26:19
**submit (1)**
91:7
**submitting (2)**
19:3;91:1
**subset (1)**
76:17
**substantially (1)**
85:18
**subtracting (1)**
134:14
**suddenly (2)**
141:4;144:13
**sued (1)**
46:3
**suffered (1)**
84:13
**suffering (1)**
147:1
**suggest (2)**
60:5;127:7
**suggesting (1)**
133:22
**Sulfur (1)**
99:13
**summarized (1)**
32:8
**summary (9)**
31:21,23;128:21,
22,23,25;129:4,9;
135:24
**Sunday (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
188 of 192

136:13
**supervision (2)**
75:8,11
**supplement (1)**
38:21
**supply (1)**
67:19
**support (9)**
18:2;35:23;39:20;
47:10;79:2;106:9,
13;124:7;128:7
**supported (2)**
48:23;62:25
**supposed (1)**
48:22
**sure (43)**
5:25;7:12,17;
12:25;14:24;15:18;
16:15;17:14;27:15;
36:9;42:16;50:19;
51:12;70:22;92:24;
96:12;99:10;100:11;
101:9;102:25;108:9;
110:8;111:21;112:8;
113:13,16;114:15;
116:1;119:4;128:19;
129:8;131:18;
132:11;136:14,21;
137:6;141:21;143:5;
152:11;156:3;165:1,
15,24
**survive (2)**
140:25;141:15
**Swaine (1)**
9:13
**swear (3)**
9:19;10:6;100:6
**swept (1)**
29:15
**sworn (2)**
10:8,10
**sympathies (1)**
145:6
**system (7)**
29:8;76:10,20,21;
90:18;106:12;
125:13
**systems (1)**
76:20

**T**

**table (3)**
112:1;118:11;
160:12
**tags (3)**
146:15,15,16
**talk (11)**
15:4;77:1;100:7;
123:5,10,19;127:10,
25;163:3,4;165:22
**talked (16)**
27:25;60:25;66:6;

85:3,19;108:3;
115:17;123:5;
125:16;126:2;
128:10,18;135:17;
137:16;138:13;
165:20
**talking (30)**
15:19,20;24:13,
15;42:2;43:17,18;
48:21;49:10;67:8;
77:4;81:18;84:23;
91:20;93:11;101:24;
113:24;114:1,10,11;
115:22;116:5;
120:20;125:1;126:7;
127:18;134:12;
141:3;145:22;
164:15
**talks (4)**
35:8;50:23;62:16;
122:22
**tangentially (1)**
72:12
**tank (1)**
149:16
**tanks (2)**
142:19;149:12
**tar (1)**
147:11
**target (4)**
80:10;90:25;
91:13;120:14
**task (1)**
69:20
**team (17)**
50:15,15;74:5,12;
79:25;85:9;95:25;
96:22;97:11,24;
106:11;163:18,22;
164:2,10,16,25
**teams (1)**
84:1
**technology (1)**
85:21
**telephone (2)**
142:17,22
**telling (5)**
94:2;95:8;100:5;
150:24;155:12
**temporary (3)**
123:4,23;128:8
**ten (3)**
82:8;112:11;
164:21
**tens (1)**
128:1
**term (3)**
58:23;59:4;109:13
**terminated (1)**
164:22
**terms (2)**
16:16;30:11;31:5,
6;39:16;42:24;

50:20;52:4,17;62:2;
63:23;64:8,12;76:9;
78:7;81:2;82:2,5;
110:4;118:5;120:21;
126:24;137:10
**terribly (1)**
146:20
**testified (1)**
107:14
**testifying (1)**
57:10
**testimony (4)**
100:1,4;118:14;
123:11
**thanks (1)**
80:19
**theft (1)**
63:18
**there'd (1)**
65:5
**therefore (1)**
48:10
**thinking (3)**
69:3;127:15;128:2
**Third (4)**
7:7;28:7;70:6;
131:21
**third-party (2)**
18:1;20:16
**thirty (8)**
130:5,8,22;132:17,
21,24;134:5;147:14
**Thomason (171)**
10:9,10;12:7,12,
16,21;14:4,9,13,19,
22,24;15:2,20,25;
16:6,9,11,15;19:7;
20:6;21:18,21;22:2,
7,13,17,20,24;23:3,6,
10,14,16,24;24:5,8,
10,14,17,19,22;
26:18;29:7,13;30:1,
9,15,20;31:4,9;32:8,
14;34:12,23;35:14,
22;36:1,3,9,12,14,
18;37:5,13,16,19,25;
38:10,12;39:1,8,11,
15,19,25;40:8,20,22;
41:1,20;42:2,5,8,12,
14,19,23;43:3,13,21;
44:22;45:11,14,16;
46:3,8,12,15,17,23;
47:4,9,17,21;48:14,
19,24;49:2,7,11,25;
50:3,10,14;51:2,7,
10,14,19,25;52:16;
53:12;54:3,10,15;
55:4,7;57:17;59:3,
11;60:25;61:7,11,14,
18,22;62:1,6,9,10,22,
24;63:8,15,24;64:5,
10,15,20;65:4,12,17;
66:1,11,13;67:2,4,

14,24;68:8;102:19;
107:17,18,18,19,21;
117:10,18;118:2;
156:23
**thorough (1)**
128:19
**though (6)**
36:2;37:24;
111:18;134:13;
142:13;165:5
**thought (6)**
52:14;72:25;
113:25;118:14;
146:22;153:10
**thousands (3)**
79:11;128:1;155:9
**threatened (2)**
52:9;112:25
**three (11)**
125:3,16;140:25;
141:24,25;142:2;
143:22;144:11,12;
145:21;148:16
**threshold (5)**
23:4;63:25;64:4,5,
16
**throughout (6)**
33:14;44:3;84:3;
123:5;134:12;164:2
**thrown (1)**
100:3
**Thursday (1)**
118:20
**ticket (1)**
143:5
**till (1)**
143:9
**Tim (2)**
4:11;53:24
**timely (1)**
144:3
**times (8)**
72:20;91:23;
113:3;114:8;115:3;
155:10;157:23,25
**timetable (6)**
72:6;120:8,9;
124:16,19,21
**timewise (1)**
71:12
**timing (1)**
71:25
**tip (1)**
75:18
**tipping (1)**
75:18
**Tobias (1)**
9:15
**today (24)**
87:25;91:6;95:8;
97:4,7;102:10,12;
106:5;116:12;118:1;
125:24;127:17;

128:10;130:12,21;
134:9;135:21;
136:24;137:25;
152:9;153:12,24;
154:21;161:1
**Today's (2)**
4:9;101:1
**together (5)**
4:8;8:15;144:2;
148:19,22
**told (7)**
98:25;114:7,8,11;
142:12;154:20;
158:12
**toll (2)**
143:2,3
**Tomlinson (10)**
9:8;12:5;53:10;
56:21,23;57:4,6;
58:13,18;59:21
**tons (1)**
144:19
**took (5)**
59:13;97:2;
124:24;141:17;
143:12;164:18
**top (2)**
117:19;133:4
**topic (2)**
73:12;79:17
**topics (1)**
70:3
**tort (6)**
5:20;69:9,11,24;
70:9;79:10
**total (19)**
13:8,10;105:1,22;
112:10;114:3;117:4,
14,15;125:6;128:25;
129:10;132:22;
133:11,12;134:14,
20;139:1;160:1
**totality (1)**
165:10
**tough (1)**
78:21
**towards (1)**
83:13
**towed (1)**
143:5
**track (3)**
22:20;64:23;83:7
**trade (1)**
35:9
**trademarks (1)**
35:8
**traditional (1)**
125:12
**transactions (1)**
14:9
**transcript (1)**
152:11
**transferred (1)**

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page
189 of 192

27:4
**transfers (2)**
55:11;65:14
**transmission (3)**
75:17;82:13;96:5
**treat (6)**
109:12,17;110:25;
111:14,20;150:1
**treated (2)**
135:5;162:12
**treatment (2)**
111:17;112:5
**Treaty (1)**
103:20
**tree (5)**
75:1,14;93:12,14;
138:15
**trees (8)**
74:25;75:16;
94:19;95:16;116:15,
21;141:18;147:25
**Tree's (1)**
93:13
**trial (2)**
4:14;90:18
**trick (1)**
70:3
**tried (2)**
44:22;110:5
**trimming (1)**
75:14
**trophy (1)**
146:12
**true (18)**
12:19,21;28:11;
34:11;45:10;57:4,5,
13,14;59:9,10;87:1;
89:10;90:10,11,12;
91:7;93:23
**trust (4)**
79:22,24;103:7,19
**Trustee (11)**
4:12,21;7:2,22;
10:16;20:21;62:5;
66:10;91:23;98:13;
128:18
**Trustee's (1)**
107:10
**truth (1)**
117:21
**try (4)**
7:16;13:7;35:19;
165:5
**trying (20)**
17:2;40:14,17,18;
55:3;67:7;72:2;74:6,
23;98:16;104:14,19;
120:12,18;121:3,18;
132:11;145:14;
153:2;164:23
**Tubb (1)**
148:13
**Tubbs (8)**

99:21;109:14,18,
22;110:23;111:1,14,
22
**tune (1)**
165:21
**Tunnel (2)**
106:7,16
**turn (2)**
5:18;21:11
**turned (1)**
46:10
**twelve (2)**
71:14;122:9
**Twenty (2)**
76:1;147:14
**twenty- (1)**
122:9
**twenty-eight-year (1)**
142:9
**twenty-four (2)**
122:13,19
**twenty-one (1)**
76:9
**two (28)**
4:8;6:9;7:13;8:10;
16:8;9;24:18;31:12,
14,22;32:9;64:21;
65:15,22;82:11,16;
83:12,16,18;84:9;
99:25;116:14;
127:21;146:14;
152:6,25;153:10;
154:21
**two-thirds (1)**
125:2
**type (5)**
120:20;122:23;
162:7,23;163:19
**typically (2)**
93:8;122:8

## U

**Ultimately (7)**
19:6;35:16;64:10;
74:1;78:8;134:13;
154:7
**Um-hum (6)**
14:12;15:24;
21:20;29:12;36:13;
104:8
**un (1)**
35:17
**un- (1)**
161:2
**unacceptable (1)**
143:21
**under (44)**
4:18;6:13,18;8:5;
12:9,19;17:7;19:25;
20:2;21:5;22:8,8,15;
23:19;33:8;34:8;
40:9;47:11;50:22;

52:24;55:19;56:6,
10;60:8;62:14;
63:12;66:2;72:14;
75:7,11;92:17;93:8;
94:3;95:16;105:16;
115:7;130:9;132:5;
135:5,6;136:17,23;
155:3;159:9
**underlying (3)**
85:21;98:12;
128:13
**understood (2)**
112:3;130:11
**undertake (1)**
39:7
**undertaken (2)**
33:21;50:9
**underway (2)**
119:19;156:16
**unduly (7)**
35:11,12,18;39:4,
6;62:19,21
**unenforceable (2)**
52:24;54:13
**unexpired (1)**
49:23
**unfortunately (2)**
120:9;151:19
**UNIDENTIFIED (33)**
9:20;31:21,25;
68:22;127:6,12,17;
128:3;131:5;135:14;
157:18,21,24;158:4,
6,10,12,15,17,20,23,
25;159:2,6,9,14;
161:18,20,22,24;
164:7;166:2,3
**uninsured (1)**
70:14
**unique (3)**
84:2;85:7;160:15
**United (6)**
4:12,21;7:2,21;
10:15;20:20
**unknown (1)**
37:1
**unknowns (1)**
159:21
**Unless (3)**
6:13;8:12;11:8
**unlike (1)**
132:16
**unliquidated (4)**
11:10;36:20;
161:15;162:2
**unnecessarily (1)**
121:17
**unnecessary (1)**
10:25
**unrelated (2)**
161:15;162:2
**unrestricted (2)**
144:21;145:2

**unsecured (9)**
5:19;16:18;39:1,
22;69:2,5;161:14,21;
162:1
**untenable (1)**
151:16
**unusual (1)**
151:16
**up (30)**
5:22;29:8;35:12;
64:25;68:11;81:1;
96:2;100:24;107:25;
110:22;113:21;
119:16;131:8;
140:24;141:15;
142:18,21;147:3,13,
17,20,25;149:13;
150:16,17;151:11;
159:15,18,19;162:13
**upcoming (1)**
156:2
**update (4)**
14:11;28:1,19;
55:5
**updated (4)**
18:15;47:22;
118:11;128:23
**updates (1)**
14:11
**upon (8)**
5:14;39:16;60:24;
130:2,12,20;134:9,
23
**upper (2)**
134:4
**up-to-date (1)**
128:22
**up-to-speed (1)**
84:1
**upward (1)**
132:24
**urgency (2)**
79:3,12
**use (5)**
43:24;44:3,9;56:3;
57:19
**used (11)**
36:15;41:16;
43:24;44:2,15;56:7,
12,13;67:20;81:11;
115:25
**using (4)**
29:10;66:3;68:6;
150:6
**Utilities (3)**
85:15;126:8;
160:17
**Utility (8)**
8:19;15:22,22,25;
48:9;65:21,22;81:2
**utilized (1)**
33:13

## V

**validity (1)**
15:13
**valuable (1)**
33:20
**valuation (1)**
35:10
**value (24)**
23:22;30:3,23;
32:11;35:12,14,16,
17,20;37:8,11;49:4;
64:3;112:17;134:17;
135:12,19,19,20,22;
136:1,5,6,7
**valued (2)**
33:18;37:6
**values (1)**
22:21
**valve (1)**
149:16
**valves (1)**
149:14
**variable (2)**
160:2,4
**variables (1)**
159:21
**varies (1)**
122:11
**variety (1)**
84:1
**various (2)**
108:4;112:2
**vary (1)**
122:9
**vegetation (3)**
74:20;75:9,13
**verbal (1)**
7:10
**verify (2)**
51:15;119:25
**vice (1)**
74:2
**victims (40)**
69:23;70:10,24;
72:13;73:1,10;
79:11;84:22;87:8,11,
20;89:14;90:9;91:6;
111:1,14,15;118:24,
25;119:11,13;122:8;
124:4,5,24;127:2;
128:1,8;134:13;
151:12,24,25;152:4,
16;153:4;8;154:2,18;
156:9;157:17
**victims' (1)**
124:11
**video- (1)**
6:24
**view (2)**
23:11;109:25
**viewing (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(22) transfers - viewing

Page
190 of 192

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page

77:23
**viii (1)**
  36:22
**Villacorta (1)**
  4:14
**voluminous (1)**
  62:19
**vote (2)**
  80:6,8

**W**

**wages (3)**
  40:8;42:1,3
**waited (1)**
  154:21
**waiting (1)**
  148:16
**waiver (1)**
  38:19
**walked (1)**
  148:2
**walls (1)**
  32:21
**wants (2)**
  138:2;147:16
**War (1)**
  146:15
**water (2)**
  147:5,8
**way (13)**
  6:17;9:21;23:25;
  33:19;65:6;102:23;
  103:23;109:21;
  138:22;144:19;
  145:9;150:1;165:5
**ways (2)**
  32:9;126:10
**website (1)**
  36:16
**websites (1)**
  36:5
**week (7)**
  48:20,24,25;49:8;
  82:25;148:3;141:16
**weeks (1)**
  146:14
**weighted (1)**
  83:13
**weighting (2)**
  82:4,7
**Weil (2)**
  8:25;9:4
**welcome (4)**
  5:8;6:11,16;
  110:16
**Wells (340)**
  9:8;10:6,8;12:25;
  13:4,6,15;17:23;
  18:11,16;19:1,6;
  20:13;26:13,16,23;
  27:10,12,18,22,25;
  28:4,9,13,17,22;

29:1;32:19,24;33:2,
  5,11,21,25;34:5;
  41:10,13;68:15;
  70:18;71:1,3,6,11,
  14,18;72:1;73:6,16,
  25;74:10,17;75:3,15,
  20,22,25;76:2,4,16;
  77:3,9,24;78:17,25;
  79:15,21;80:12,25;
  81:14,25;82:20,22,
  24;83:2,5,9,18,22;
  84:17;85:2,14,18;
  86:3,6,19,23;87:2,4,
  7,10,14,18,21;88:1;
  89:8,11,15,18;90:4,
  11,14,16;91:2,8;
  92:11,14,18;93:3,10,
  16,18,24;94:5,8,11,
  14,16,18,21,25;95:2,
  5,10,19,23,25;96:3,6,
  11,15,19,22;97:1,6,9,
  12,15,17,20,23;98:4,
  8;100:10,16,20,23;
  101:1,25;102:3,8,12,
  18,25;103:5,9,13,22;
  104:1,5,8,13,18,24;
  105:3,20,23;106:1,5,
  8,18;107:3,5,13,14,
  16;108:10,21;109:2;
  111:7,9,16;112:3,14;
  113:19;115:10;
  116:6,11,16,18,22;
  117:1,7;118:8,18,20;
  119:2,9,16,25;120:9,
  15;121:1,9,17;122:2,
  6,9,15,18,21;123:2,
  14,17,22;124:6,13,
  17,20;125:10,17,19;
  126:2,9,16;128:4,23;
  129:2,7,13,18,22;
  130:1,7,13,16;131:6,
  15,22,24;132:17,22;
  133:2,9,13,16,25;
  134:7,11;135:1,7,15,
  17,25;136:8,11,18,
  24;137:14,25;138:4,
  10,16,25;139:4,6,8,
  12,14,17;141:7,10,
  14,21;142:16;
  143:18;144:8,10,17,
  20,24;145:1,14,17,
  24;146:3,8,20;147:9;
  148:7,18,23;149:7,9;
  150:9,11,13,18,21;
  151:2,13;152:5,9,12;
  153:13,19,21;154:3,
  7,10,13,19,23,25;
  155:3,7,15,18;156:1,
  11,20,25;157:3,6,12;
  159:13,19,24;160:8,
  11,14,19;161:10;
  163:13,15,21;164:4,
  12,17;165:1,8

weren't (3)
  89:13;119:18;
  142:11
**What's (18)**
  25:12;30:21;56:5;
  69:13;70:17,17;
  71:20;73:22;77:20,
  20;80:10;85:12,16;
  90:25;111:23;121:7;
  131:1;136:6
**whatsoever (1)**
  164:11
**whereas (1)**
  32:11
**Whereupon (1)**
  166:16
**whole (9)**
  23:21;27:1;68:20;
  141:9,10;145:22;
  146:12;148:8;153:6
**who's (6)**
  4:14;46:10;82:18;
  95:24;96:22;115:7
**whose (2)**
  63:21;83:13
**wild (2)**
  129:4;130:5
**wildfire (34)**
  13:11;69:23;70:5;
  73:12,15,24;74:8,15,
  19;76:6,12,13,16,22;
  77:25;78:5;90:22;
  101:23;109:13;
  114:23;124:11;
  126:4,7;129:11,16;
  134:15;145:18;
  156:5;159:22,23;
  160:5,7,9,10
**wildfires (8)**
  38:8;77:5;79:11;
  89:10;161:7,9,15;
  162:3
**wildfire-victim (1)**
  73:9
**wildlife (2)**
  103:7,14
**Williams (9)**
  87:16;151:10;
  152:1,15;153:1,5,18;
  154:1,24
**Williams' (2)**
  154:17;157:16
**window (1)**
  122:19
**winter (1)**
  145:5
**wish (2)**
  84:12;142:15
**wit (1)**
  158:13
**withhold (2)**
  18:21;19:14
**within (11)**

17:25;34:1;55:11;
  63:18;65:11;73:21;
  91:9,14;97:22;
  129:18;163:18
**without (4)**
  12:19;113:6;
  128:14;151:18
**WITNESS (4)**
  93:5;114:5;115:7;
  158:1
**witnessed (1)**
  165:7
**witness's (1)**
  158:16
**wo (1)**
  126:18
**wondering (7)**
  33:9;44:3;49:3;
  119:6;127:14,23;
  137:13
**Wood (29)**
  102:16,17,21;
  103:1,6,10,18,25;
  104:2,6,9,15,21,25;
  105:7,9,11,13,15,21,
  24;106:2,6,14,20,24;
  107:1,6,8
**word (3)**
  123:17;141:23;
  149:4
**words (7)**
  12:17;40:14;
  53:12;56:20;67:9;
  124:3;132:20
**work (29)**
  17:23;18:11;28:1,
  23;72:2;74:9;75:4,6,
  10;76:19;78:12,25;
  79:4,6;85:6;95:13;
  100:15;102:5,7,9;
  104:14,19;109:8,8;
  121:9;125:22;
  147:18,21,23
**worked (2)**
  50:14;142:19
**worker (1)**
  141:17
**working (10)**
  70:21;72:7;78:3;
  83:25;93:12;100:10;
  106:12;123:7;
  148:20;164:13
**works (2)**
  74:23;148:24
**World (1)**
  146:15
**worse (1)**
  135:5
**writing (1)**
  7:5
**wrote (1)**
  100:14

**Y**

**yards (1)**
  149:18
**year (7)**
  55:11;63:18;
  65:11,13;91:9,14;
  104:4;125:9;137:16
**year-old (1)**
  33:12
**years (26)**
  7:13;65:15;71:15;
  90:19;95:21;104:17,
  23;105:2;124:22,24;
  125:4,16;140:25;
  141:24,25;142:2,20;
  143:23;144:11,12;
  145:21;146:1,2;
  147:14;148:17;
  164:22
**yep (3)**
  75:15;99:18;129:2
**York (1)**
  65:24
**Yup (1)**
  99:8

**Z**

**zero (8)**
  23:21;29:5,6,24;
  30:17,18,19;63:13
**zero-balance (1)**
  29:13
**zumba (1)**
  106:24

**1**

**1,000 (1)**
  87:8
**1,184 (1)**
  104:22
**1:26 (1)**
  166:16
**10 (3)**
  4:9,20;63:17
**10,000 (1)**
  147:8
**10:00 (1)**
  4:1
**1009 (1)**
  10:23
**107 (3)**
  19:11,25;21:1
**10-K (7)**
  55:16;59:1;68:6;
  117:3,15;118:8,13
**10-Q (4)**
  49:8;118:2,17,18
**11 (10)**
  11:12;15:6;29:17;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(23) viii - 11

Case: 19-30088   Doc# 2965-4   Filed: 07/12/19   Entered: 07/12/19 18:29:05   Page
191 of 192

65:7;131:2,12,18;
135:5;158:5;162:19
**1111a (1)**
11:9
**11th (1)**
47:22
**12 (3)**
28:5;50:12;77:7
**120 (1)**
117:5
**13 (2)**
17:16;65:14
**13.4 (3)**
129:21,22;132:1
**14 (4)**
38:15,15;132:2,3
**14th (11)**
10:14;14:3,5,18;
18:9,14;38:9,23;
51:12,14;129:10
**15th (1)**
10:15
**17 (9)**
90:23;123:3,24;
124:7;128:8;137:15;
145:18;156:12;
160:19
**18 (12)**
18:17;65:18;
90:23;123:3,24;
124:7;128:9;131:23;
145:18;148:12;
156:12;160:20
**19-30088 (1)**
4:5
**19-30089 (1)**
4:7
**1st (1)**
48:8

**2**

**2 (1)**
55:10
**2,000 (1)**
142:18
**2,300 (1)**
105:2
**2,585,000 (1)**
87:16
**2.5 (2)**
151:10;153:1
**20 (1)**
66:5
**200 (2)**
94:20;142:1
**2004 (2)**
8:4;90:5
**2009 (2)**
96:17;97:3
**200-and-something (1)**
149:18
**200-million-dollar (2)**

95:10,17
**2010 (1)**
71:10
**2014 (2)**
96:17;97:3
**2015 (16)**
70:15;71:10,13;
73:10;85:5;87:5;
90:22;94:14;95:6;
100:14;101:2;
115:22;116:5;125:1;
141:3;144:25
**2016 (2)**
104:9,15
**2017 (8)**
13:9;94:1;121:25;
122:24;124:5;
127:16;138:14;
148:12
**2018 (13)**
13:8,9;65:21,23,
24;72:15;97:3;
104:4,16,21,25;
119:11;137:18
**2019 (13)**
4:1,9,19;5:3,13;
10:14,15;13:8;
48:10;72:16;77:7;
102:4;106:15
**21 (2)**
66:14;131:23
**21st (1)**
80:13
**22 (2)**
66:18;67:16
**23,000 (1)**
23:22
**24 (2)**
66:18;67:16
**24.7 (4)**
129:5,11;133:7;
134:5
**240 (2)**
144:20;145:2
**25th (2)**
73:13;74:16
**26th (1)**
73:13
**29 (2)**
4:1,9
**29th (1)**
145:1

**3**

**3 (1)**
29:16
**3,457 (1)**
104:23
**3/14 (1)**
128:21
**3/14/19 (2)**
131:3,13

**30 (7)**
68:3;129:21;
132:3;133:5,6,7;
134:5
**30089 (1)**
29:5
**31 (1)**
133:6
**32 (1)**
133:6
**33 (1)**
133:6
**341 (8)**
4:4;42:18;79:18;
85:4;87:22;128:11;
137:16;152:6
**341a (1)**
4:18

**4**

**4 (6)**
13:21,22;55:10,
10;60:7;68:5
**42 (2)**
32:15,16
**46,000 (1)**
23:22
**4th (3)**
4:19;5:3,13

**5**

**5 (5)**
21:14,14;40:3,3;
41:9
**5,300 (1)**
111:21
**5,757 (1)**
105:22
**5,758 (1)**
106:4
**50,000 (3)**
22:8;23:18,19
**502a (1)**
11:7
**54.7 (2)**
133:7;134:5
**550 (1)**
143:6

**6**

**6 (3)**
62:16;63:12,13
**60 (2)**
35:8,10
**61 (1)**
35:9
**67 (2)**
34:7,19
**699,000 (1)**
89:13

**7**

**7 (7)**
31:10;48:5;135:6,
10;136:2,17,23
**72 (1)**
104:11
**75 (1)**
36:19
**77 (1)**
38:3
**788 (1)**
105:1

**8**

**8 (1)**
26:24
**800 (4)**
116:24;117:4;
118:14;144:13
**800- (1)**
118:13
**880 (1)**
118:15
**880-something (1)**
117:12

**9**

**9 (1)**
38:4
**900 (5)**
117:11,19,21;
118:1,16
**901 (1)**
151:16
**903-1 (2)**
131:3,12
**903-2 (1)**
12:11
**90s (1)**
126:19
**920 (2)**
117:6,17
**922 (2)**
115:20;116:9
**982 (2)**
116:17,23

Case: 19-30088    Doc# 2965-4    Filed: 07/12/19    Entered: 07/12/19 18:29:05    Page 192 of 192