TIMOTHY S. LAFFREDI (WI SBN 1055133)
Assistant United States Trustee
JASON BLUMBERG (NY SBN 4055257)
Trial Attorney
MARTA E. VILLACORTA (NY SBN 4918280)
Trial Attorney
United States Department of Justice
Office of the U.S. Trustee
450 Golden Gate Avenue, Suite 05-0153
San Francisco, CA 94102
Telephone: (415) 705-3333
Facsimile: (415) 705-3379
Email: jason.blumberg@usdoj.gov
       marta.villacorta@usdoj.gov

Attorneys for Andrew R. Vara,
Acting United States Trustee for Region 3[1]

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**,<br>- and -<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>**Debtors**.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>Date: July 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102 |

**UNITED STATES TRUSTEE'S OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER APPROVING KEY EMPLOYEE INCENTIVE PLAN**

Andrew R. Vara, Acting United States Trustee for Region 3 (the "United States Trustee"), by and through his undersigned counsel, hereby files this objection (the "Objection")

---

[1] Andrew R. Vara, Acting United States Trustee for Region 3, is acting in this appointment for Tracy Hope Davis, United States Trustee for Region 17, who has recused herself.

1

to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(c) for Entry of an Order (I) Approving Debtors' Incentive Program for Certain Key Employees and (II) Granting Related Relief* (ECF No. 2664) (the "Motion"). This Objection is supported by the following memorandum of points and authorities and any argument the Court may permit.[2]

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction

The Motion seeks authority to pay the Debtors' senior executives KEIP Awards[3] that would exceed $5.4 million at the "threshold" performance (or more than 92% of the executives' aggregate base salaries); $10.9 million at the "target" performance (or more than 185% of the executives' aggregate base salaries); and $16.3 million at the "maximum" performance (or more than 275% of the executives' aggregate base salaries).

The Court should deny the Motion as lacking sufficient information for the Court and parties in interest to assess whether the KEIP is a true incentive plan – particularly at the "threshold" level. The Debtors provide no information about the performance levels for the "Financial Performance" metric, and the relevant contracts are not on file with the Court.

The Debtors represent in the Motion only that the performance metrics for the KEIP are "similar" to those approved under the 2019 STIP. But without specifics, the Court and parties in interest are left to wonder just how "similar" the performance metrics actually are. Moreover, by the time the Court hears the Motion, the Performance Period for the KEIP will be more than 50%

---

[2] The United States Trustee requests that the Court take judicial notice of the pleadings and documents filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

complete. The Motion likewise provides no information with respect to whether the Debtors are on track to satisfy the performance metrics.

Based on the Debtors' limited disclosures, it appears that the goals are easily achievable. The Debtors reveal that they have achieved "target" performance levels for their incentive plans in "only" five of the past nine years. It appears, though, that the Debtors achieved the "threshold" performance level in each of the other four years. Thus, past performance strongly suggests that the "threshold" performance level under the KEIP is not "challenging yet achievable." Rather, it is more in the nature of a Golden State Warrior "lay-up."

The Debtors should provide relevant information, as set forth below.

**B.     Background Facts and Procedural Posture**

1.     On January 29, 2019, the Debtors commenced the above-captioned cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). *See* ECF No. 1. No trustee has been appointed in the Debtors' cases. *See generally* Case Dockets.

2.     On February 12, 2019, the United States Trustee appointed an Official Committee of Unsecured Creditors. *See* ECF No. 409. On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants. *See* ECF No. 453.

3.     The section 341(a) meeting of creditors in these cases was initially held on March 4, 2019 and concluded on April 29, 2019. *See* ECF Nos. 396, 736.

**The 2019 STIP**

4.     On April 29, 2019, the Court approved the Debtors' 2019 short-term incentive program for approximately 10,000 non-insider employees (the "2019 STIP"). *See* ECF No. 1751 (Order approving 2019 STIP); *see also* Motion, at pp. 7, 11, 20.

5.  The performance metrics for the 2019 STIP are weighted as follows: (i) 65% for "Safety Metrics"; (ii) 10% for "Customer Satisfaction"; and (iii) 25% for "Financial Performance." *See* ECF No. 1751; ECF No. 806 (the "2019 STIP Motion"), at p.14.

6.  The "Safety Metrics" consist of five measures: (i) "Nuclear Reliability and Safety Indicator" (weight: 5%); (ii) "Public Safety Index" (weight: 25%); (iii) "First-Time ILI Miles" (weight: 10%); (iv) "Asset Records Duration Index" (weight: 10%); and (v) "Serious Injuries and Fatalities Corrective Actions Index" (weight: 15%). The "Public Safety Index" is, in turn, comprised of an "Enhanced Vegetation Management" metric and a "System Hardening" metric. *See* 2019 STIP Motion, at p.14; ECF No. 1751.

**The KEIP**

7.  Pursuant to the Motion, the Debtors seek approval of a key employee incentive plan (the "KEIP") for 12 senior executive officers (the "KEIP Participants"). *See* Motion, at pp. 2, 7.

8.  The KEIP Participants are: (i) John Simon, EVP, Law, Strategy and Policy; (ii) Jason Wells, EVP and CFO; (iii) Janet Loduca, SVP and General Counsel; (iv) Melvin Christopher, VP, Gas Operations; (v) Michael Lewis, SVP, Electric Operations; (vi) Julie Kane, SVP, Chief Ethics & Compliance Officer, and Deputy General Counsel; (vii) Dinyar Mistry, SVP, Human Resources, Shared Services and Chief Diversity Officer; (viii) Loraine Giammona, SVP and Chief Customer Officer; (ix) Fong Wan, SVP, Energy Policy & Procurement; (x) Kathleen Kay, SVP and Chief Information Officer; (xi) James Welsch, SVP and Chief Nuclear Officer; and (xii) David Thomason, VP, CFO Utility and Controller. *See* Motion, at pp. 11-12.[4]

---

[4] The Chief Executive Officer is not a KEIP Participant. *See* Motion, at p.7. The Debtors have filed a separate motion for approval of the Chief Executive Officer's compensation. *See* ECF No. 2662.

4

9. The base salaries of the KEIP Participants total approximately $5,899,000. *See* Motion, at p.14; *see also* Declaration of Douglas J. Friske (ECF No. 2667) (the "Friske Declaration"), at p.9; Declaration of John Lowe (ECF No. 2668) (the "Lowe Declaration"), at p. 8.

10. The total cost of the KEIP Awards could exceed $16 million. More specifically, at "threshold performance," the aggregate value of the KEIP Awards would be $5,465,500; at "target performance," the aggregate value of the KEIP Awards would be $10,931,000; and at "maximum performance," the aggregate value of the KEIP Awards would be $16,396.500. *See* Motion, at p.12.

11. The KEIP Awards would be payable in cash (50%) and equity (50%). The equity portion of the award would be in the form of performance-based restricted stock. But the Debtors would have the option to settle the performance-based restricted stock *in cash*. *See* Motion, at pp. 8, 12.

12. As part of the Motion, the Debtors seek authority to replace any KEIP Participant whose employment ends prior to the conclusion of the Performance Period. The replacement would be eligible to receive a prorated share of the applicable KEIP Award. *See* Motion, at p.14.

13. The Debtors also seek authority to provide KEIP Awards for up to two additional KEIP Participants in 2019. The aggregate KEIP Awards for the additional KEIP Participants could be as much as $4 million. *See* Motion, at p.14.

14. According to the Motion, the Performance Metrics for the KEIP "are *similar* to those approved by this Court in connection with the 2019 STIP …." *See* Motion, at p.16 (emphasis added). As with the 2019 STIP, "Safety Metrics" are weighted at 65%, while the

5

"Customer Satisfaction" and "Financial Performance" metrics are weighted at 10% and 25%, respectively. *See id.*, at pp. 12-13.

15. The KEIP also includes a downward modifier if the Debtors fail to meet the threshold level (-50%) or the target level (-25%) for the Public Safety Index component of the Safety Metric. *See id.*, at p.13.

16. The Performance Period for the KEIP is January 1, 2019 through December 31, 2019. *See* Motion, at p.12.

17. According to the Motion, the Debtors have "achieved their target STIP metrics in five of the past nine years …." *See* Motion, at p.17; *see also* Lowe Declaration, at p.10.

**The Apparent Bonuses Paid to Executives After the Petition Date**

18. The Debtors' operating report for March (ECF No. 1945) (the "March MOR") reflects that ten KEIP Participants have already received increases in their salaries for that month (the "Additional March Payments"). Two non-KEIP Participants - Mr. Malnight and Mr. Soto – also received the Additional March Payments. *See* March MOR, at p.13.

19. A summary of the increased payments for March 2019 is reflected in the following chart (showing a return to normal payments in April):

| # | Name | Title | 1/31/2019 Cons. | 2/28/2019 Cons. | 3/31/2019 Cons. | 4/30/2019 Cons. |
|---|---|---|---|---|---|---|
| 1 | **PAYMENTS TO INSIDERS** | | | | | |
| 2 | MONTH ENDED | | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 |
| 3 | (in ones) | | | | | |
| 4 | Name | Title | Cons. | Cons. | Cons. | Cons. |
| 5 | Loraine Giammona | Senior VP & Chief Customer Officer | $ - | $ 40,000 | $ 60,000 | $ 40,465 |
| 6 | Julie Kane | Senior VP, Chief Ethics and Compliance Officer | $ - | $ 39,433 | $ 59,433 | $ 40,444 |
| 7 | Kathleen Kay | Senior VP and Chief Information Officer | $ - | $ 34,583 | $ 49,827 | $ 35,048 |
| 8 | Michael Lewis | Senior VP. E;ectric Operations | $ - | $ 37,500 | $ 57,500 | $ 37,500 |
| 9 | Janet Loduca | Senior VP and Interim General Counsel | $ - | $ 87,296 | $101,833 | $ 52,298 |
| 10 | Steven Malnight | Senior VP, Energy Supply and Policy | $ - | $ 43,750 | $ 68,750 | $ 85,286 |
| 11 | Dinyar Mistry | Senior VP, Human Resources & Chief Diversity Officer | $ - | $ 42,667 | $ 62,667 | $ 42,667 |
| 12 | John Simon | Interim Chief Executive Officer | $ - | $135,078 | $ 75,317 | $ 50,782 |
| 13 | Jesus Sota | Senior VP, Gas Operations | $ - | $ 49,819 | $ 67,917 | $ 47,917 |
| 14 | David Thomason | VP and Controller | $ - | $ 33,333 | $ 42,083 | $ 27,548 |
| 15 | Fong Wan | Senior VP, Energy Policy and Procurement | $ - | $ 45,456 | $ 54,483 | $ 34,948 |
| 16 | Jason Wells | Senior VP and Chief Financial Officer | $ - | $ 52,500 | $ 77,500 | $ 52,965 |
| 17 | James Welsch | Vice President, Nuclear Generation and Chief Nuclear Officer | $ - | $ - | $ - | $ 43,498 |
| 18 | Total | | $ - | $641,415 | $777,310 | $591,366 |

20. Copies of the relevant pages of the February monthly operating report (ECF No. 1137), the March MOR (ECF No. 1945) and the April monthly operating report (ECF No. 2276) are attached as *Exhibit A* to the Declaration of Laurie A. Brugger filed herewith (the "Brugger Declaration").

21. The United States Trustee and the Debtors have exchanged information about the Additional March Payments. The Debtors have described these payments as "annual allowances for perquisite benefits. This is … not a bonus; rather it is a lump-sum annual cash stipend paid in lieu of providing broader perquisite benefits." The email exchange between the Debtors and the United States Trustee is attached as *Exhibit B* to the Brugger Declaration.

22. By letter dated June 18, 2019, the United States Trustee wrote to the Debtors' counsel (the "UST Letter") asking for more information, including whether payments similar to the Additional March Payments have been made to the employees in the past and whether these payments were the subject of written contracts. A copy of the UST Letter is attached as *Exhibit C* to the Brugger Declaration.

23. The Debtors responded to the UST Letter by letter dated June 28, 2019. In their letter, the Debtors asserted that the Additional March Payments "are a long-running element of the Debtors' compensation to their officers, consistent with their terms of employment and prepetition policies of the Debtors and are justified as appropriate compensation for the Debtors' officers' service as senior executives in a large and complex business….. Accordingly, the requirements of section 503(c) do not apply to the Lump Sum Perquisite Allowance." The Debtors' letter did not address whether the Additional March Payments were made in accordance with written contracts. A copy of the Debtors' letter is attached as *Exhibit D* to the Brugger Declaration.

7

Case: 19-30088    Doc# 3029    Filed: 07/17/19    Entered: 07/17/19 13:50:05    Page 7 of 18

## C. Statutory Framework

Section 503 governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving" a debtor's bankruptcy estate. 11 U.S.C. § 503(b)(1)(A). The two general overriding policies of Section 503 of the Bankruptcy Code are to: (i) preserve the value of the estate for the benefit of its creditors; and (ii) prevent the unjust enrichment of the insiders of the estate at the expense of its creditors. *See In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009).

Section 503(c)(1) of the Bankruptcy Code prohibits any transfer:

> made to, or an obligation incurred for the benefit, *of an insider of the debtor for the purpose of inducing such person to remain with the debtor's business,* absent a finding by the court based on evidence in the record that--
>
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B) the services provided by the person are essential to the survival of the business; and
>
> (C) either –
>
> (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>
> (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

Case: 19-30088    Doc# 3029    Filed: 07/17/19    Entered: 07/17/19 13:50:05    Page 8 of 18

11 U.S.C. § 503(c)(1) (emphasis added).

A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of Section 503(c)(1) of the Bankruptcy Code to be subject to this subdivision's exception. 4 *Collier on Bankruptcy* ¶ 503.17 (15th ed. rev. 2007); *see also In re Dana Corp.,* 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("*Dana II*") (summarizing the requirements under Section 503(c)(1) of the Bankruptcy Code).

Section 503(c) of the Bankruptcy Code, added in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), was intended to curtail payments of retention incentives to insiders, including bonuses granted to other employees without factual and circumstantial justification. *See Journal Register*; 407 B.R. at 536; *see also In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009) ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case."); *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (the amendments were added to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process."); *see also In re Maust Transp., Inc.*, 589 B.R. 887, 893 (Bankr. W.D. Wash. 2018) ("[T]he 2005 amendments to § 503, which specifically prohibit certain insider retention bonus administrative claims, make it clear that Congress can and has removed the broad discretion granted to courts in § 503 where it deems the exercise of such discretion improper as to certain specific categories of administrative claims.").

This section establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business. *See In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); 11 U.S.C. § 503(c)(1).

The BAPCPA amendments make it abundantly clear that if a proposed transfer falls within Section 503(c)(1), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist. *Id.* at 101; *see also In re Siliken Mfg. USA, Inc.*, 2013 WL 5330481, at *7 (Bankr. S.D. Cal. Sept. 19, 2013) ("[T]he Code often subjects insider dealings to heightened scrutiny in recognition that even ostensibly arm's length transactions between insiders have an inherently coercive element to them.").

The effect of Section 503(c) of the Bankruptcy Code was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid. *See In re Mesa Air Group, Inc.*, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (*citing Global Home Prods.*, 369 B.R. at 785).

## ARGUMENT

### I. The Debtors Have Not Established that Section 503(c)(1) is Inapplicable to the KEIP.

To avoid the requirements of section 503(c)(1), a debtor must show that "the proposed transfers *are not to insiders of a debtor* or, if the recipients of the proposed transfers are insiders, that the transfers are not being made *for the purpose of retaining those insiders*." *See In re Residential Capital, LLC*, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012) (emphasis added) ("*Rescap*").

Here, the Debtors contend that Section 503(c)(1) is inapplicable to the relief requested in the Motion, because the KEIP is an incentive plan. *See* Motion, at p.15. Consequently, the Motion does not address the KEIP's compliance with the strict requirements of subdivisions (A), (B), and (C) of Section 503(c)(1).

As discussed below, however, the Motion fails to provide sufficient information for the Court and parties in interest to assess whether the KEIP is, in fact, primarily incentive in nature.[5]

A.   **The KEIP Participants are Insiders.**

Pursuant to the Section 101(31) of the Bankruptcy Code, if a debtor is a corporation, the term "insider" includes an officer of the debtor. 11 U.S.C. § 101(31)(B)(ii). A vice president, as an officer, is presumptively an insider. *See In re Foothills Texas, Inc.*, 408 B.R. 573, 574, 579 (Bankr. D. Del. 2009); *see also In re The Village at Lakeridge, LLC*, 814 F.3d 993, 999 (9th Cir. 2016) ("Statutory insiders, also known as '*per se* insiders,' are persons explicitly described in 11 U.S.C. § 101(31) …. As a matter of law, a statutory insider has a sufficiently close relationship with a debtor to warrant special treatment.").

Moreover, regardless of title, a person with broad responsibilities over significant aspects of a debtor's business is considered an insider, even if he or she is not a member of senior management. *See In re Foothills Texas, Inc.*, 408 B.R. at 584 (finding vice presidents who were not members of senior management, but who had broad responsibilities over significant aspects of debtor's business, to be insiders); *see also In re The Village at Lakeridge, LLC*, 814 F.3d at 1001 ("Having – or being subject to – some degree of control is one of many indications that a creditor may be a non-statutory insider, but actual control is not required to find non-statutory insider status."); *In re Borders Group, Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) ("[i]nsider status can also be determined on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs").

Here, each of the KEIP Participants hold officer titles, such as Vice President or Chief Financial Officer. Also, the Debtors acknowledge that the KEIP Participants are their "most

---

[5] The United States Trustee reserves his right to conduct discovery on these issues and any matter relevant to the Motion.

11

Case: 19-30088    Doc# 3029    Filed: 07/17/19    Entered: 07/17/19 13:50:05    Page 11 of 18

senior officers" and "are largely responsible for the Debtors' ongoing day-to-day operations and guiding the Debtors' overall business strategy." See Motion, at pp. 7, 9 11.

Thus, the KEIP Participants are insiders based both on their titles *and* their degree of control over the Debtors' affairs.[6]

### B. The Debtors Have Failed to Satisfy their Burden of Demonstrating that the KEIP is an Incentive Plan.

As discussed above, retention plans implicate Section 503(c)(1). Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is unclear and when those employees would be most likely to search for other employment." See In re Georgetown Steel Co., LLC, 306 B.R. 549, 556 (Bankr. D.S.C. 2004). In contrast, incentive plans are designed to motivate employees to achieve performance goals. See Mesa Air Group, Inc., 2010 WL 3810899, at *4.

The Debtors bear the burden of establishing by a preponderance of the evidence that the KEIP is primarily incentivizing, rather than primarily retentive. See Rescap, 478 B.R. at 170; see also In re Hawker Beechcraft, 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012). In other words, the Debtors must demonstrate that the KEIP is not retention-based, but rather that it presents significant hurdles which are difficult to achieve. See Rescap, 478 B.R. at 157-58, 164, 169, 173; In re Velo Holdings Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); Global Home, 369 B.R. at 784; see also Dana II, 358 B.R. at 583 (benchmarks for the debtors' long-term KEIP "are difficult targets to reach and are clearly not 'lay-ups'").

---

[6] The Debtors' monthly operating reports reflects two insiders who are not listed in the Motion - Steven Malnight and Jesus Soto. See Exhibit A to the Brugger Declaration. While the Debtors' operating report for April states that Mr. Malnight resigned in April (ECF No. 2276, at p.14), the Debtors must explain their decision to exclude Mr. Soto from the KEIP.

The Debtors have not satisfied this burden. While the Debtors represent that the KEIP is an incentive plan, it is the substance of how and why the proposed payments are made - not the label put on the plan - that is determinative. *See, e.g., Mesa Air Group, Inc.*, 2010 WL 3810899, at *2, 4 (incentive plans are designed to motivate employees to achieve performance goals).

The Debtors' Motion fails to identify the specific targets for each Performance Metric or how those targets can be achieved. The Motion instead represents that the KEIP metrics "are *similar* to those approved by this Court in connection with the 2019 STIP" and directs the Court and parties in interest to Mr. Lowe's testimony in support of the 2019 STIP and a demonstrative presentation filed as part of ECF No. 1634 (the "*Demonstrative Presentation*"). *See* Motion, at pp. 8, 16 & n.3 (emphasis added).[7]

The Court and parties in interest are left to wonder just how "similar" the Performance Metrics under the KEIP are to those under the 2019 STIP. Even if the Performance Metrics are identical, the Motion fails to provide any information as to whether the Debtors are on track to satisfy the metrics. This information is critical, because the Debtors have already completed more than 50% of the Performance Period. What seemed like a challenging target in April may now be a lay-up.

Moreover, the Motion acknowledges that the Debtors have achieved the "target" performance in five of the past nine years. But it provides no information as to whether the

---

[7] The Demonstrative Presentation identifies the threshold, target, and maximum performance levels for the Performance Metrics under the 2019 STIP, *except* for the "Financial Performance" metric. *See* ECF No. 1634-1, at p.6. The "threshold" performance levels for the "Public Safety Index" metric (comprised of the "Enhanced Vegetation Management" and "System Hardening" metrics) appear to be lower than the mileage targets in the Debtors' Wildfire Safety Plan. *Compare* Demonstrative Presentation, at p.6 *with* ECF No. 1014-2 in Case No. 3:14-cr-00175-WHA (N.D. Cal.), at pp. 151-52 of 318. Notwithstanding the PSI modifier, this begs the question of whether senior executives should be entitled to any bonus if the Debtors fail to reach the targets in their Wildfire Safety Plan – particularly because compliance with the plan is a condition of PG&E's probation (ECF No. 1040 in Case No. 3:14-cr-00175-WHA, at ¶ 2).

Debtors achieved the "threshold" performance in the other four years. The Demonstrative Presentation, though, suggests that the Debtors did achieve the "threshold" performance in each of the four years. *See* ECF No. 1634-1, at p.12.

Without more specific information, the Court and parties in interest cannot assess whether the Performance Metrics present difficult targets and are not "lay-ups" - particularly at the "threshold" level. *See, e.g.*, *In re Hawker Beechcraft*, 479 B.R. at 313, 315 ("[A]lthough the KEIP includes incentivizing targets, the lowest levels are well within reach…. Because the SLT members will likely earn some bonus under the KEIP merely by remaining with the Debtors … approval of the KEIP must be denied."); *In re GT Advanced Tech., Inc.*, 2015 WL 5737181, at *5 (Bankr. D.N.H. Sept. 30, 2015) (holding that bonus plan was primarily retentive, in part, because it was "designed to provide … Insiders with some performance bonuses in addition to their base salaries *even if* their performance meets only the 'threshold' level, a level below that provided for in the Debtors' Business Plan.") (emphasis in original).

C. **Even if the KEIP is Governed by Section 503(c)(3), the Debtors Have Not Established that the KEIP is Justified by the Facts and Circumstances of the Case.**

Even if the Court were to find that Section 503(c)(1) does not apply to the KEIP, the Motion may be granted only if the Court finds that it is necessary to preserve the value of the Debtors' estate, and is "justified by the facts and circumstances of the case." *See* 11 U.S.C. § 503(c)(3); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988) ("Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors."), *superseded by statute on other grounds*, 11 U.S.C. § 365(d)(3); *see also In re Regensteiner Printing Co.*, 122 B.R. 323, 326 (N.D. Ill. 1990) (reversing approval of severance agreements for key employees, because debtors presented no evidence that

severance payments were necessary to preserve bankruptcy estate); *In re Pacific Gas and Electric Co.*, 2001 WL 34133840, at *2 n.4 (Bankr. N.D. Cal. July 13, 2001) (initial declaration "'on information and belief'" was "insufficient" basis to grant KERP motion).[8]

In *Dana II*, Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development satisfy Section 503(c)(3):

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576–77. The Debtors have failed to satisfy several of these factors.

---

[8] The Debtors contend that the test under Section 503(c)(3) is identical to the business judgment rule as applied under Section 363(b)(1). *See* Motion, at pp. 17-18. This reading, however, would render Section 503(c)(3) superfluous. *See In re Pilgrim's Pride Corp.*, 401 B.R. at 236–37 (Bankr. N.D. Tex. 2009) ("To read section 503(c)(3) as requiring nothing not already required by section 363(b)(1) would violate" the principle of construction that Congress intended independent Code Sections to "have independent, differing impacts."); *see also In re GT Advanced Tech. Inc.*, 2015 WL 4459502, at *7 (D.N.H. July 21, 2015) (Section 503(c)(3) "directs courts to give more scrutiny to the business judgment of debtors than is permitted under the § 363(b)(1) business judgment test.").

First, the Motion fails to establish a reasonable relationship between effort and outcome. Particularly at the "threshold" level, it is not evident that the Performance Metrics are challenging to meet. Even under the less rigorous standards of Sections 503(c)(3), the benchmarks for the payment of bonuses must be "difficult targets to reach." *Dana II*, 358 B.R. at 583-84.

Also, the Motion provides very little information about the correlation of the responsibilities of KEIP Participants and the satisfaction of specific Performance Metrics. It is, for example, unclear how the duties of the Chief Diversity Officer or the Chief Information Officer directly impact the Debtors' achievement of the safety metric targets.

Second, there is insufficient evidence that the KEIP Awards are consistent with industry standards. At "maximum" performance, the total cost of the KEIP would exceed $16 million. That amount is more than 275% of the KEIP Participants' aggregate base salaries. *See* Motion, at pp. 12, 14.

In his declaration, Mr. Friske concludes that (i) the total direct compensation of the KEIP Participants is below market (unless "maximum" performance is achieved), and (ii) the cost of the KEIP *expressed as a percentage of the Debtors' revenue* is reasonable relative to KEIPs implemented by "Restructuring Peers." However, Mr. Friske's declaration omits the data that he relied upon to make these conclusions. *See* Friske Declaration, at pp. 9-12.

Also conspicuously absent from Mr. Friske's declaration is an analysis of whether the high cost of the KEIP *relative to the KEIP Participants' base salaries* is consistent with incentive programs implemented by other debtors. *Cf. In re GT Advanced Techs., Inc.*, 2015 WL 5737181, at *6 ("Interestingly, under the KEIP, the other four Insiders have the ability to earn bonuses that actually *exceed* their prepetition cash income. The Debtors have failed to

justify why any of the Insiders should potentially be compensated for their work during this Chapter 11 case in an amount greater than … their prepetition remuneration.") (emphasis in original); *United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*, 553 B.R. 556, 564 (E.D. Va. 2016) ("Another factor demonstrating that the KEIP is justifiable is its similarity to the KEIPs of peer companies. When Meridian analyzed twenty peer companies, they took note of the number of participants, number and duration of performance periods, types of metrics, *target payout as a percentage of participants' base salaries*, payout timing, and cost of the program as a percentage of prepetition assets.") (emphasis added).

<u>Lastly</u>, the Debtors are seeking an open-ended authorization to pay an additional $4 million in KEIP Awards to two employees that could be named as KEIP Participants *at any time in 2019*. There is no evidence of the reasonableness of this request, or how significantly increasing the amount of the KEIP Awards late in the Performance Period would help the Debtors achieve the Performance Metrics. This request should be denied.

**D.     The Post-Petition Payments to Insiders**

As discussed above, the Debtors made the Additional March Payments, as reflected in the March MOR. The Debtors have characterized these payments as "perquisites." *See Exhibit B* to the Brugger Declaration.

Section 503(c) was added to the Bankruptcy Code as one of the BAPCPA amendments in 2005, to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Residential Capital, LLC*, 491 B.R. 73, 82 (Bankr. S.D.N.Y. 2013) (*citing In re Global Home Prods., LLC*, 369 B.R. at 783–84).

Attempts to characterize what are essentially prohibited retention programs as "incentive" programs to bypass the requirements of Section 503(c)(1) of the Bankruptcy Code are looked

17

upon with disfavor, as courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1) of the Bankruptcy Code. *See In re Mesa Air Group, Inc.*, 2010 WL 3810899, at *2 (citing *Dana I*, 351 B.R. at 102, n.3 (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP).")).

The UST Letter outlines the United States Trustee's continuing concerns about these payments. *See Exhibit C* to the Brugger Declaration. The Debtors must explain whether the Additional March Payments were made pursuant to written contracts and demonstrate that the payments meet the requirements of Section 503, as set forth above.

## **CONCLUSION**

The United States Trustee respectfully requests that the Court deny the Motion and grant such other relief as the Court deems fair and just.

Dated: July 17, 2019

          Andrew R. Vara
          Acting United States Trustee, Region 3

          By: /s/ Jason Blumberg
          Jason Blumberg
          Trial Attorney for United States Trustee