1  Robert A. Julian (SBN 88469)
   Cecily A. Dumas (SBN 111449)
2  BAKER & HOSTETLER LLP
   1160 Battery Street, Suite 100
3  San Francisco, CA 94111
   Telephone:    628.208.6434
4  Facsimile:    310.820.8859
   Email: rjulian@bakerlaw.com
5  Email: cdumas@bakerlaw.com

6  Eric E. Sagerman (SBN 155496)
   Lauren T. Attard (SBN 320898)
7  BAKER & HOSTETLER LLP
   11601 Wilshire Blvd., Suite 1400
8  Los Angeles, CA 90025-0509
   Telephone:    310.820.8800
9  Facsimile:    310.820.8859
   Email: esagerman@bakerlaw.com
10 Email: lattard@bakerlaw.com

11 *Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>    -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>              **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OPPOSITION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(c) FOR ENTRY OF AN ORDER (I) APPROVING DEBTORS' INCENTIVE PROGRAM FOR CERTAIN KEY EMPLOYEES AND (II) GRANTING RELATED RELIEF (Dkt. No. 2664)**<br><br>Date:    July 24, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102 |

The Official Committee of Tort Claimants ("**TCC**") in the chapter 11 cases ("**Bankruptcy Cases**") of the above-captioned debtors and debtors-in-possession (collectively, hereafter the "**Debtors**") hereby submits its Opposition to the Motion of Debtors Pursuant to 11 U.S.C. §§105(a), 363(b) and 503(c) for Entry of an Order (I) Approving the Debtors' Incentive Program for Certain Key Employees and (II) Granting Related Relief (the "**KEIP Motion**"), and respectfully represent as follows:

## I. SUMMARY OF ARGUMENT

Neither the California Legislature, the California Public Utilities Commission ("**PUC**") nor the United States District Court for the Northern District of California ("**District Court**") are satisfied that the Debtors have adequately prioritized the safety of the gas and electricity systems they operate. Each of these oversight bodies has found that this convicted felon and criminal offender has egregiously neglected public safety. The Court has not been presented with justification to reject the serious concerns of every party that is charged with overseeing the Debtors' operations, and to simply rubber stamp its senior management bonus program.

The senior management bonuses requested through the KEIP Motion are yet another example of business as usual at PG&E. Either the incentive plan should be rejected in its entirety, or approved only upon the conditions that (1) the performance metrics are revised to a 100% weighting on safety, and (2) the senior management incentive payments may be disgorged if, during the performance period, (a) the Debtors cause a catastrophic wildfire that results in one or more fatalities, or (b) if either the District Court or the PUC find that the Debtors have engaged in more lies relating to or a cover-up of their safety performance.

## II. STATEMENT OF RELEVANT FACTS

### AB 1054

On July 12, 2019, the State Assembly passed AB 1054, the "Public utilities: wildfire and employee protection" bill. By any reasonable evaluation, the bill is an extraordinary measure designed to stabilize the major investor owned utilities ("**IOUs**") in California, particularly the debtor, Pacific Gas and Electric Company, the largest IOU in the State.

AB 1054 is a lengthy and complicated bill, the full discussion of which is beyond the scope of this memorandum. The relevant point for these Debtors' right to propose a business as usual bonus plan is this: The history of the Debtors' safety record is so abysmal that the State of California has decided that it must step in and remove management's discretion with regard to wildfire safety. Specifically, AB 1054 calls for the establishment of a California Wildfire Safety Advisory Board and a Wildfire Safety Division of the PUC. Under new Public Utilities Code §8389(b), the board shall make recommendations to the division on, among other things, "[a]ppropriate performance metrics and processes for determining an electrical corporation's compliance with its approved wildfire mitigation plan," and "[t]he appropriate scope and process for assessing the safety culture of an electrical corporation."

Moreover, the legislation has teeth where it comes to executive incentive compensation. Section 8389(e) authorizes the PUC director, commencing as of June 30, 2020, to issue a safety certificate to an electrical corporation, if the electrical corporation provides documentation of, among other requirements, that "[t]he electrical corporation has established an executive compensation structure approved by the division and structured to promote safety as a priority and to ensure the public safety and utility financial stability with performance metrics, including incentive compensation based on meeting performance metrics that are measurable and enforceable, for all executive officers [as defined]. *This may include tying 100 percent of incentive compensation to safety performance and denying all incentive compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities*." (Emphasis added.) Although the statute will not come into effect until June 2020, and is therefore not yet binding on the Debtors and this Court, the message from the state government to place safety above all other metrics is clear.

**PUC – 18-12-007 PG&E Locate and Mark Order Instituting Investigation ("OII")**

The PUC initiated the OII in December 2018, and the probe is continuing. A status conference has been set for July 30, 2019, at 1:00 p.m. This investigation arises from the aftermath of the San Bruno gas explosion that destroyed a neighborhood and killed eight people in 2010. It was commenced after an investigation by the PUC found that the Debtors had

- 3 -

falsified records for five years. Under California law, the Debtors were required to locate and mark their natural gas pipelines in a timely manner. Apparently, as they fell behind in meeting their safety requirements, the Debtors pressured supervisors and contractors to falsify data so that the locating and marking would not appear as late. In the OII proceeding, the PUC is considering the penalties it will impose on the Debtors for their violations. This proceeding is not business as usual for a well-run IOU: The Debtors—the State's largest IOU—lied to regulators for years, all while under criminal investigation.

**District Court Criminal Probation Proceeding**

As the Court is aware, Honorable William Alsup, United States District Judge for the Northern District of California, is presiding over a criminal probation of the Debtors arising from the San Bruno fire and the Debtors' conduct in its aftermath.

Just days ago, on July 10, 2019, the district court ordered the Debtors to respond to a new Wall Street Journal story claiming that the Debtors knew for years that its power lines that ultimately caused the 2018 Camp Fire were deficient and that they intentionally failed to perform upgrades. (The Butte County District Attorney also has commenced a criminal investigation in connection with the Camp Fire.) The Debtors' detailed response to the order is due on July 31, 2019.

Judge Alsup also questioned the Debtors' decisions to pay over $5 billion in dividends and millions in campaign contributions during the same time frame, while ignoring unsafe conditions.

The proceedings identified above, together with the catastrophic damage and loss of life that occurred as a result of 18 fires in 2017 and 2018 that the Debtors' equipment started, are the context in which the Court must review the proposed KEIP.

**III.  ARGUMENT**

The Debtors recite that Section 503(c)(3) of the Bankruptcy Code permits payments to employees outside the ordinary course of business when those payments are justified by the facts and circumstances of the case. They say that this standard is "determined by application of the same business judgment standard utilized under Section 363(b) of the Bankruptcy Code." The

familiar corporate law prism that this standard invokes is the business judgment rule, which is premised on the Debtors' directors' discharge of their fiduciary duties of care and loyalty. (The Debtors recognize this, as well, on page 21 of their motion.) Importantly, the particular action that is required to discharge those duties is context-driven, that is, is driven by the facts and circumstances – the reality – prevailing when the action is taken. *See Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("Although the fiduciary duty of a . . . director is unremitting, the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the director is taking . . . ."); *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000) (the contours of the common law fiduciary duties directors must discharge "depends on the specific context that gives occasion to the board's exercise of its business judgment"); *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (*quoting Malone v. Brincat* passage quoted above); *Marchand v. Barnhill*, 2019 WL 2509617, at *15 (Del. 2019) (though directors have great discretion to tailor context-specific approaches to their companies' businesses and resources, they must make a good faith effort to address "central compliance risks"). Nothing in the bankruptcy law repeals these precepts.

The incentive plan at issue here is not the Debtors' 2019 STIP, which covers thousands of their rank-and-file employees. The plan at issue is the Debtors' proposed 2019 KEIP, whose participants are "their most senior officers whose performance would have the greatest impact on the Debtors' operations [and] safety . . ." and who "are largely responsible for the Debtors' ongoing day-to-day operations and . . . overall business strategy." (KEIP Motion at 9). The KEIP participants, say the Debtors, "are vital to the Debtors' safety, operations and revenue-generating capacity." (KEIP Motion at 7). In short, the KEIP participants are the people who set the priorities and direction for the STIP participants, and who set and manifest the "tone at the top" of all of the Debtors' endeavors.

The context for the Debtors' proposed KEIP, which cannot responsibly be brushed aside, is that the Debtors are on criminal probation because of public safety failures that resulted in fatalities, and that subsequent to their criminal convictions, the Debtors committed additional

safety violations that resulted in more fatalities.  The horrific consequences of the Debtors' enduring and pervasive pattern of safety violations, some of which occurred under the proposed KEIP participants' leadership, are what led the Debtors to initiate these bankruptcy proceedings and to the need for the motion that we are addressing.  That is the present reality.

And yet somehow, though it seems nearly inconceivable, the Debtors move for approval of a KEIP designed and presented as if this context – reality – simply did not exist.  They proceed blithely as if they were just one of so many "peers" that somehow has had the misfortune to find itself in bankruptcy proceedings, with only the faintest nod to the public safety failure millstone that dominates its, and the Northern California public's, current and future fate.  Some observations from the Debtors' motion will illustrate the point.

The Debtors formulated the KEIP together with their advisors and the Compensation Committee of PG&E's board of directors (which committee now comprises two hedge fund leaders and a utility industry consultant).  (KEIP Motion at 9).  The "Debtors believe that the KEIP's design and scope is reasonable . . . and that its implementation reflects a sound exercise of the Debtors' business judgment."  (KEIP Motion at 8-9).  The Debtors' lead advisor, Willis Towers Watson ("**WTW**"), a compensation consulting firm, believes that "the KEIP's design is reasonable when compared to the Debtors' peer group and consistent with market practice."  WTW "undertook a comprehensive analysis of the KEIP . . . ."  (KEIP Motion at 11).  Elaborating on WTW's analysis on their behalf, the Debtors noted that WTW conducted a benchmarking analysis "of 21 companies with revenues greater than $1 billion that recently implemented KEIPs in Chapter 11" and evaluated data from "a sample of 19 peer companies . . . approved by the Compensation Committee, published survey compensation data for [those] companies, published survey data for the broader energy services industry, and published survey data for general industry companies."

The declaration of Douglas J. Friske, a Managing Director at WTW, filed with the Debtors' motion, lists the items WTW discussed with the Debtors at the start of WTW's engagement:  "the Debtors' operational history, financial performance, and various issues regarding the Debtors' workforce and employee programs."  WTW also reviewed the Debtors'

Case: 19-30088    Doc# 3030    Filed: 07/17/19    Entered: 07/17/19 13:50:22    Page 6 of 10

"existing base salary and primary incentive programs, paying specific attention to the incentive plans' performance metrics [and] participating employees." *See* Declaration of Douglas J. Friske in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(c) for Entry of an Order (i) Approving Debtors' Incentive Program for Certain Key Employees and (ii) Granting Related Relief ("**Friske Declaration**,") at 4). Mr. Friske notes that the KEIP was designed to reflect "the unique circumstances of this case, taking into consideration typical market practices in both restructuring scenarios as well as normal course, [sic] utility industry practices." (Friske Declaration at 11).

The Debtors' motion and supporting declarations make it amply clear that "peer" comparisons and "market" practice have carried the day. The only thing missing from the KEIP efforts that the Debtors choose to highlight and emphasize is a reflection of the proposed plan's context, i.e., any discernible recognition whatsoever of the Debtors' safety posture and solutions as issues of overriding importance in everything they do, including how they incentivize those who control their strategy and day-to-day operations.

In another presumably unintended confirmation of the Debtors' "business as usual" approach, the target KEIP awards are based on "the historical STIP and LTIP target award values," specifically on the target awards approved by the Debtors' pre-filing compensation committee in December 2018. (KEIP Motion at 10). But here comes the safety nod: the KEIP weights "safety metrics" at 65%, financial (earnings from operations) performance at 25%, and customer satisfaction at 10%. The safety metrics components are: nuclear reliability and safety, 5%; first-time inspection of gas transmission pipeline miles, 10%; documentation of electric and gas construction projects, 10%; corrective action in response to employee or contractor injuries or fatalities, 15%; and the public safety index ("**PSI**") (relating to circuit miles of vegetation cleared and circuit miles of system hardening completed), 25%. If the threshold level public safety index metrics are not met, the overall KEIP payout that would otherwise be made will be reduced by 50%; if the threshold level public safety index metrics are met but the target level ones are not, the overall KEIP payout will be reduced by 25%. (KEIP Motion at 12-13). Last but perhaps not least, the Debtors tell us that the "KEIP Performance Metrics are not easily achievable or

Baker & Hostetler LLP
Attorneys at Law
San Francisco

'layups'" and that the "PSI Metric . . . is subject to revision if the California Public Utilities Commission requires changes." (KEIP Motion at 16). And the Board or Compensation Committee can eliminate payment of the KEIP awards completely, in their discretion, even if the performance targets are met. (KEIP Motion at 8).

So the Debtors have checked the safety box. What's not to like? Well, in the context of an incentive compensation plan for the executives who will determine and direct the public safety outcomes of a company that is on criminal probation for public safety violations, even a slightly closer examination of the Debtors' KEIP presentation raises a number of troubling issues regarding the Debtors' purportedly "sound" exercise of their business judgment.

First, the Debtors tout the KEIP's weighting of safety at 65%. But the reality is that the only metric that attaches legitimately to wildfire safety (the problem that brought us here; *see* above) is the public safety index. Its weighting is 25%, exactly the same as – not higher than – the earnings from operations metric. In glaring contrast to the Debtors' proposed KEIP plan, AB 1054 sets the safety metric at up to 100%. Second, the KEIP was formulated by the Debtors' Compensation Committee and the Debtors' advisors. Nothing in the Debtors' motion or in the supporting declarations refers to any consultation with the Debtors' Safety and Nuclear Oversight Committee, the PUC, or with any other safety expert or authority.

Third, the Debtors and WTW congratulate themselves on having a "PSI Modifier" that would effect the payout reductions that we describe above. But in the Debtors' and Northern California public's wildfire safety context, the more valid and salient description of the modifier is that even if the Debtors fail to achieve the threshold PSI metrics, the KEIP participants will still get 50% of their aggregate KEIP payout. And if the Debtors eke over the threshold PSI metrics level but fail to reach the target PSI metrics level, those participants will still get 75% of their aggregate KEIP payout. To say the least, this hardly signifies giving priority to the issue that will most affect the Debtors' financial survival and the financial and other outcomes for the Debtors' stakeholders.

Fourth, the Debtors' claim that the KEIP performance metrics are not easily achievable is, simply, not verifiable based on the information that the Debtors have provided in their motion or

supporting declarations. The Debtors keep telling us that the metrics are not easily achievable: they keep not telling us essentially anything about what those metrics are, and keep not telling us anything at all about what makes the metrics difficult to achieve. The Debtors' related statement that the PSI metrics are subject to revision "if the California Public Utilities Commission requires changes" obviously provides no reassurance concerning the Debtors' appetite for developing public safety incentives that are not imposed on them externally. And the notion that a Debtor board or Compensation Committee can (but is not obligated to) eliminate KEIP payouts entirely is almost as useful as Oscar Wilde's observation that the rich and poor alike can sleep under bridges.

A brief review of the *Marchand v. Barnhill* case cited above is instructive here. The plaintiff in that case sued the directors of the Blue Bell ice cream company for breach of their fiduciary duties in failing to monitor recurrent listeria problems in the company's production system. Those problems ultimately led to three fatalities. In ruling that the plaintiff had made viable allegations of fiduciary duty breaches, the court observed that "[i]n Blue Bell's case, food safety was essential and mission critical." The court noted further that " . . . a corporate board must make a good faith effort to exercise its duty of care. A failure to make that effort constitutes a breach of the duty of loyalty." For the Debtors, public safety, encompassing most visibly wildfire safety, is "essential and mission critical." The Debtors' directors are not on trial with respect to the proposed KEIP. But the proposition that their duties of care and loyalty mandate including heightened measures to incentivize public safety in a KEIP for their executives, in the context of the Debtors' public safety history and current posture, cannot responsibly be brushed aside.

In summary, the Debtors' artfully crafted proclamations about their devotion to public safety in the design of their proposed KEIP are a thin veneer – one that they hope will mask their stubbornly persistent dismissiveness of public safety concerns. It no doubt will take more than requiring a KEIP design that prioritizes safety appropriately to change the Debtors' safety culture. But at each turn, it is incumbent on the Debtors, their constituents, and those otherwise positioned to affect the Debtors' affairs, to face and deal with the reality of the facts and circumstances that

dominate their current condition and to demand discharge of their boards' fiduciary duties with the required full recognition of those facts and circumstances. The Debtors are companies that have a badly broken safety culture, and this court should require that any KEIP that it will approve will in fact prioritize, and demonstrate that it prioritizes, public safety above all other considerations. The KEIP that the Debtors now propose for approval fails utterly to do that, and approval of it will endorse the Debtors' boards' breach of their fiduciary duties and send utterly the wrong message to the Debtors and their constituents.

**IV.  CONCLUSION**

The Debtors' motion for approval of the proposed KEIP should be denied.

Dated: July 17, 2019							Respectfully submitted,

BAKER & HOSTETLER LLP

By: */s/ Cecily A. Dumas*
　　　Cecily A. Dumas

*Counsel to the Official Committee of Tort Claimants*