**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email:   mfeldman@willkie.com
          jminias@willkie.com
          dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>            **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Chapter 11<br>Bankr. Case No. 19-30088 (DM)<br>(Jointly Administered)<br><br>**OBJECTION AND RESPONSE OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO THE MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>**Hearing Date and Time**: July 24, 2019 at 9:30 a.m. (PT)<br>**Hearing Location**: 450 Golden Gate Ave., San Francisco, CA, Courtroom 17<br>**Judge**: Hon. Dennis Montali |

## TABLE OF CONTENTS

|   | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| BACKGROUND | 5 |
|    A.  General Background | 5 |
|    B.  Background to the Motion | 5 |
| ARGUMENT | 6 |
|    I.  The Ad Hoc Bondholder Group Has Not Proposed a Credible and Potentially Confirmable Plan | 6 |
|       A.  The Bondholder Plan's $18.4 Billion Cap on All Wildfire Claims Is Unreasonably Low | 7 |
|       B.  The Bondholder Plan Suffers from Major Deficiencies | 9 |
|    II.  If Exclusivity Is Terminated, It Should Be Terminated for Everyone, So That The Ad Hoc Subrogation Group May Pursue Confirmation of Its Proposed Plan | 10 |
| CONCLUSION | 14 |

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Adelphia Commc'ns Corp.*,
　　352 B.R. 578 (Bankr. S.D.N.Y. 2006) ...................................................................................6

*In re Borders Grp., Inc.*,
　　No. 11-10614 (MG), 2011 WL 9155779 (Bankr. S.D.N.Y. June 2, 2011) .......................12

*In re Bi-Lo, LLC*,
　　No. 09-02140 (HB), 2010 WL 5140036 (Bankr. D.S.C. Aug. 5, 2010) ....................12, 13

*In re Crescent Beach Inn, Inc.*,
　　22 B.R. 155 (Bankr. D. Me. 1982) ...................................................................................12

*In re Dow Corning Corp.*,
　　208 B.R. 661 (Bankr. E.D. Mich. 1997) .............................................................................6

*In re Gibson & Cushman Dredging Corp.*,
　　101 B.R. 405 (E.D.N.Y. 1989) .........................................................................................11

*In re GMG Capital Partners III, L.P.*,
　　503 B.R. 596 (Bankr. S.D.N.Y. 2014) ..............................................................................12

*In re Kun*,
　　15 B.R. 852 (Bankr. D. Ariz. 1981) .................................................................................12

*L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.)*,
　　995 F.2d 940 (9th Cir. 1993) ............................................................................................10

*In re New Meatco Provisions, LLC*,
　　No. 13-bk-22155 (PC), 2014 WL 917335 (Bankr. C.D. Cal. March 10, 2014) ...............12

*In re Texaco Inc.*,
　　81 B.R. 806 (Bankr. S.D.N.Y. 1988) ................................................................................12

*In re United Press Int'l, Inc.*,
　　60 B.R. 265 (Bankr. D.D.C. 1986) ...................................................................................12

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*,
　　808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) ................................................11

*In re Victory Constr. Co.*,
　　42 B.R. 145 (Bankr. C.D. Cal. 1984) ...............................................................................10

**Statutes**

11 U.S.C. § 1121(d)(1) ................................................................................................................6

11 U.S.C. § 1129(a)(3) ...............................................................................................................10

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**" or the "**Debtors**"), by its attorneys Willkie Farr & Gallagher LLP and Diemer & Wei, LLP, hereby submits this objection and response (the "**Response**") to the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] (the "**Motion**"). In support of the Response, the Ad Hoc Subrogation Group respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Court's statements at the May 22nd exclusivity hearing were unambiguous—a party wishing to terminate exclusivity must propose a "credible, potentially confirmable plan." May 22, 2019 Hr'g Tr. at 76:9-13. By this standard, the Motion should be denied because the plan (the "**Bondholder Plan**") described in the term sheet filed by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Bondholder Group**") is neither credible nor potentially confirmable. Nor will pursuit of the Bondholder Plan push these cases forward. Accordingly, the Bondholder Plan cannot satisfy any legal standard, and terminating exclusivity to pursue it would waste the Court's and all stakeholders' time as the June 2020 deadline to emerge from bankruptcy quickly approaches.

*The Bondholder Plan's Serious Shortcomings*

2. In order to place the Ad Hoc Bondholder Group's Motion—and its shortcomings—in perspective, it is important to understand that, as a practical matter, there are only two classes of claims in these cases that have not already settled with the Debtors[1] on the treatment of their claims that will be impaired under a plan and whose votes on confirmation must be solicited: (a) Wildfire

---

[1] The municipalities holding Wildfire Claims have settled with the Debtors on the amount to be paid under a "Debtor Plan" in satisfaction of their claims and, whether technically impaired or not by the Bondholder Plan, have agreed to vote against any plan not proposed or supported by the Debtors. *See, e.g.*, PG&E Corp., Current Report (Form 8-K), at Ex. 10-1, Section 3(b)(iii) (June 19, 2019). The Bondholder Plan lacks a legitimately impaired accepting class, and therefore must rely on the municipalities' vote.

Claims (as defined below) held by individuals for direct damages; and (b) Subrogation Claims[2] based on payments of insurers to individuals. The Ad Hoc Bondholder Group's Motion concedes as much by attaching a proposed term sheet that allegedly would leave every other class of claims unimpaired, except for a purported "impairment" of certain bondholder claims. This purported impairment consists of collateralizing existing unsecured bonds whose maturities extend beyond January 21, 2023 and reducing their interest rate by just 0.10%. There is no need, however, to "impair" these bonds by making them more secure and more valuable; the transparent purpose is to manufacture an impaired consenting class to try to address the Bondholder Plan's failure to comply with Section 1129(a)(10) of the Bankruptcy Code.[3]

3. The Ad Hoc Bondholder Group's Motion is not intended to protect creditor interests. Instead, it is intended to gift to a subset of bondholders what they perceive as a lucrative investment opportunity and hundreds of millions of dollars in backstop fees to the detriment of the Debtors and holders of Wildfire Claims, while simultaneously attempting to force unfairly low distributions on the Wildfire Claim classes who will be voting creditors in nearly every plan that could be proposed. Although the Ad Hoc Bondholder Group asserts the need to build consensus, it does nothing of the sort.

4. These cases were filed to address Wildfire Claims. However, the Bondholder Plan ignores traditional consensus building and simply proposes to litigate aggregate wildfire liability as a substitute for the normal chapter 11 process. As a result, the Bondholder Plan is conditioned on the remote possibility that the Court estimates wildfire liability at less than $18.4 billion. That approach has failed to build any momentum because the Ad Hoc Bondholder Group's "offer" is far below what the members of the Ad Hoc Subrogation Group or of the Official Committee of Tort

---

[2] "**Subrogation Claims**" are Wildfire Claims that include, but are not limited to, claims that arise from subrogation (whether such subrogation is contractual, equitable or statutory), assignment (whether such assignment is contractual, equitable or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law, including, without limitation, Section 509 of the Bankruptcy Code.

[3] The proposed collateralization of these currently unsecured bonds would also result in an instrument that would likely have a value that exceeds the full face amount of the related allowed bond claim, in violation of the Bankruptcy Code's "fair and equitable" requirement.

Claimants (the "**Tort Claimants Committee**") could ever support and if approved, would leave them collecting pennies on the dollar in a supposedly solvent chapter 11 case. The Debtors have estimated that Wildfire Claims could exceed $30 billion,[4] and the holders of Subrogation Claims alone hold in excess of $20 billion of Wildfire Claims.[5] The Bondholder Plan simply is not sufficiently credible to warrant terminating exclusivity.

*The Subrogation Creditors' Approach*

5. Unlike the Ad Hoc Bondholder Group, the Ad Hoc Subrogation Group did not understand the Court to be inviting a race to the courthouse to file self-serving plans. Instead, the Ad Hoc Subrogation Group has been negotiating with various representatives of the Wildfire Claims, including the Tort Claimants Committee, and developing a plan it believes may actually provide a viable, timely exit from these cases. Only the holders of Wildfire Claims and the Debtors' existing equity have something meaningful to lose in these cases; all other classes can be left unimpaired. So the Ad Hoc Subrogation Group has developed a plan that would: (a) allow individual wildfire victims to elect to settle their claims promptly or proceed to litigate and ultimately recover the full compensable value of their claims from a well-funded trust; (b) settle Subrogation Claims at a reasonable level; and (c) provide existing equity with the exclusive opportunity to participate in a rights offering to recapitalize the Debtors. Rather than rush to file a

---

[4] *Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 28], p. 1. ("PG&E's potential liability with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, without taking into account potential punitive damages, fines and penalties or damages with respect to 'future claims.'").

[5] Holders of Subrogation Claims have reported approximately $18.5 billion of payments and policy reserves to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law. As of September 2018, holders of Subrogation Claims had reported approximately $10 billion in direct incurred losses resulting from the 2017 Northern California Wildfires. *See* Press Release, *Cal. Dep't of Insurance, Carr and Mendocino Complex fire insurance claims top $845 million*, "California Department of Insurance Insured Losses from the 2018 Mudslide and the 2017 & 2018 Wildfires" (Sept. 6, 2018), http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/upload/nr106Insuredlosses090618.pdf (reporting losses for Lake, Mendocino, Napa, Nevada, Solano, Sonoma and Yuba). As of April 30, 2019, holders of Subrogation Claims had reported approximately $8.5 billion in direct incurred losses resulting from the 2018 Northern California Wildfires. *See* Press Release, Cal. Dep't of Insurance, *Wildfire insurance losses from November 2018 blazes top $12 billion*, "California Department of Insurance Insured Losses from the 2018 California Wildfires" (April 30, 2019), http://www.insurance.ca.gov/0400-news/0100-press-releases/2019/upload/nr041-19InsuredLosses2018Wildfires050819.pdf (reporting losses for November 2018 wildfires).

term sheet with the Court, the Ad Hoc Subrogation Group has chosen to negotiate with other constituents, because a consensual resolution is in every stakeholder's interest. The legislature has injected new urgency into these cases by passing new legislation (Assembly Bill 1054) which requires that the Debtors emerge from bankruptcy by June 30, 2020 in order to enjoy the legislation's benefits. If circumstances warrant, or if the Court terminates exclusivity, the Ad Hoc Subrogation Group is prepared to file its plan.

6. Separately, the Ad Hoc Subrogation Group has also moved to lift the stay to allow determination of the Debtors' liability on account of the Tubbs fire in state court. As set forth in the *Motion of the Ad Hoc Subrogation Group for Relief from the Automatic Stay* [Docket No. 2863], lifting the stay will remove a major impediment to a negotiated, consensual resolution of these cases, whether or not exclusivity is terminated. To date, very little progress has been made in settlement negotiations with the Debtors in large part because the parties cannot agree on the extent of the Debtors' liability for the Tubbs fire. In fact, a fatal flaw of the Bondholder Plan is that it fails if the Debtors are liable for Tubbs. In contrast, lifting the stay will provide the best opportunity to have these cases successfully resolved by the June 2020 deadline for participating in the insurance wildfire fund and within a time frame that will expedite distributions to individual wildfire victims.

7. Rather than upset negotiations, lifting the stay will force all parties to constantly reevaluate their positions as evidence is discovered, depositions are taken and the trial progresses. Thus, lifting the stay will facilitate rather than interrupt settlement negotiations. On the other hand, terminating exclusivity to allow pursuit of the Bondholder Plan will force all parties to devote time and energy to defeat a plan that has little to no chance of confirmation from the outset.

8. The Motion also requests the unprecedented relief of terminating exclusivity for just one interested party.[6] But if any party in interest in these cases other than the Debtors is granted the

---

[6] Multiple objections to the Motion filed so far have taken issue with the request that exclusivity be terminated solely for the bondholders. *See International Brotherhood of Electrical Workers, Local Union No. 1245's Joinder to Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3012], p. 4 (". . . the IBEW . . . further requests that these Exclusive Periods be terminated for all parties rather than just for the Ad Hoc Committee alone."); *The Public Advocates Office's Statement of Position re: Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods* [Docket No. 3008], p. 2 ("Cal Advocates

4

ability to file a plan, the Ad Hoc Subrogation Group should be afforded the same opportunity. Unlike the Bondholder Plan, the Ad Hoc Subrogation Group's plan, which the Tort Claimants Committee may eventually support, will credibly address wildfire liability—the central issue of these cases.

## BACKGROUND

**A.  General Background**

9.  On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession, commenced these voluntary cases under chapter 11 of the Bankruptcy Code.

10.  The Ad Hoc Subrogation Group's membership and collective holdings of claims and interests are disclosed in the *Third Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019* [Docket No. 3020], as may be amended from time to time.

**B.  Background to the Motion**

11.  On May 1, 2019 the Debtors filed a motion seeking their first extension of the exclusive period to file a plan of reorganization to November 29, 2019 and the exclusive period to solicit acceptances of their plan to January 28, 2020 [Docket No. 1797] (the "**Exclusivity Extension Motion**").  On May 22, 2019, this Court held a hearing on the Exclusivity Extension Motion and over certain objections, granted the Debtors an extension of the exclusive right to file a plan until September 26, 2019 and the exclusive right to seek acceptances for such plan until November 26, 2019.

12.  On June 25, 2019, the Ad Hoc Bondholder Group filed the Motion.  The Motion seeks, among other things, to terminate exclusivity solely for the Ad Hoc Bondholder Group.  In

---

asserts that competing plans are in the best interests of all parties in interest in this case."); *Joinder by ESC Local 20 in Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket. No. 3007], p. 2 ("Because ESC Local 20 believes that competing plans will ultimately yield the best possible result for employees and other critical stakeholders, ESC Local 20 supports . . . [an] order to permit all parties to file and solicit acceptances of a plan of reorganization.").

support of the Motion, the Ad Hoc Bondholder Group attached as Exhibit B to the Motion a term sheet for a plan of reorganization (the "**Bondholder Term Sheet**") that the Ad Hoc Bondholder Group asserts forms the basis for the Bondholder Plan. A fundamental condition precedent to confirmation under the Bondholder Term Sheet is the estimation of substantially all claims (including both claims held by individuals and Subrogation Claims) against the Debtors relating to prepetition Northern California wildfires (the "**Wildfire Claims**") at no more than $16 billion (or $18.4 billion including the 15% estimation cushion referenced in the Bondholder Term Sheet).

## ARGUMENT

### I. The Ad Hoc Bondholder Group Has Not Proposed a Credible and Potentially Confirmable Plan

13. At the time the Court articulated its standard for terminating exclusivity in these cases, the Court was similarly clear that "[O]ne thing I won't do is waste time on nonplans or tire kickers or troublemakers." May 22, 2019 Hr'g Tr. at 51:7-8. By any measure, advancement of the Bondholder Plan would be a waste of time.

14. Section 1121 of the Bankruptcy Code provides that the court may modify exclusivity "for cause," which has been interpreted to be a fact specific, multi-factor inquiry. 11 U.S.C. § 1121(d)(1); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586-87 (Bankr. S.D.N.Y. 2006) (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997)). Importantly, as noted by the court in *Dow Corning*, "[w]hen the Court is determining whether to terminate a debtor's exclusivity, the *primary consideration* should be whether or not doing so would facilitate moving the case forward." 208 B.R. at 670 (emphasis added). Notably, this determination is one of practicality, which can override a mere "toting up of the factors." *Id.* Here, even if some of the traditional factors may weigh towards terminating exclusivity, the Bondholder Plan's inability to move the cases forward, and the likelihood that pursuit of the Bondholder Plan actually stalls progress, undermines any case the Motion makes for terminating exclusivity.

### A. The Bondholder Plan's $18.4 Billion Cap on All Wildfire Claims Is Unreasonably Low

15. The Ad Hoc Bondholder Group acknowledges in the Motion that these cases hinge on fairly resolving and paying wildfire liabilities and developing consensus around a confirmable plan. Motion, ¶ 3. But the Bondholder Plan misses the mark on both counts. The Bondholder Plan is predicated upon a requirement that the aggregate amount of all Wildfire Claims not exceed $18.4 billion. Specifically, the Bondholder Plan requires an estimation trial to determine the allowed amount of certain Wildfire Claims for purposes of distribution. It is a condition precedent to the effective date of the Bondholder Plan that estimated Wildfire Claims "shall not exceed $16 billion" plus a maximum 15% upward adjustment, *i.e.*, $18.4 billion total.[7] One billion dollars of that total is set aside for the municipality claims in accordance with the settlement reached with the Debtors, leaving at most only $17.4 billion for all subrogation and individual Wildfire Claims.

16. $17.4 billion is not nearly enough to satisfy the unliquidated Wildfire Claims in full and, therefore, an essential condition precedent to the effectiveness of the Bondholder Plan will not be satisfied. As previously noted, the Debtors themselves have estimated that Wildfire Claims could exceed $30 billion, with Subrogation Claims totaling more than $20 billion.

17. One obvious flaw in the Bondholder Plan is the allocation of only $975 million for Subrogation Claims related to the Tubbs fire. With approximately $8 billion in Subrogation Claims related solely to Tubbs, the Bondholder Plan represents a ~12%[8] recovery (even before considering related claims for interest and attorney fees permitted under applicable law)—nothing more than a nuisance value payment for billions of dollars of Tubbs-related Wildfire Claims, despite the substantial evidence that the Debtors caused the Tubbs fire. The same flaw applies to the Bondholder Plan's proposed treatment of individual Wildfire Claims related to Tubbs.

18. The Ad Hoc Bondholder Group's assumption that the Debtors are not liable for the Tubbs fire is likely relying on the flawed January 2019 report by Cal Fire that stated it is "unlikely

---

[7] Bondholder Term Sheet, p. 22.

[8] Before the 15% adjustment.

7

PG&E equipment is responsible for causing the Tubbs fire."[9]  However, Cal Fire got it wrong.  As further described in the Ad Hoc Subrogation Group's pending lift stay motion [Docket No. 2863], there is substantial physical evidence establishing that PG&E equipment caused the Tubbs fire, which the Cal Fire Report inexplicably ignored.  Video footage from the Bennett Lane Winery—which is located near the origin area of the Tubbs fire—shows a bright arc flash at the same time (9:20:46 p.m. on October 8, 2017) that an electrical fault was recorded by PG&E, downstream smart meters on PG&E's Calistoga 1101 Circuit failed and fuses blew on PG&E Pole 773.  The arc flash could only have been caused by a high voltage electrical event on PG&E's distribution system—precisely the kind of electrical event that is known to start fires.  The arc flash, electrical fault, smart meter failure, and blown fuses simultaneously occurred near the area of origin of the Tubbs fire, only eighteen minutes before that fire was first observed—consistent with the amount of time it can take for a spark to spread to visible fire.

19. Cal Fire turned a blind eye to this critical evidence.  The Cal Fire Report fails to address either the videotaped arc flash or the electrical occurrences on PG&E's lines.  Nor did Cal Fire provide a definitive explanation of what caused the Tubbs fire.  Moreover, PG&E's argument that an unspecified event on insulated, low-voltage, customer-owned lines caused the Tubbs fire is unsupported by eyewitness testimony and cannot be squared with the physical evidence or explain the events of 9:20:46 p.m.  After that time, the private lines were de-energized, and could not have caused a fire.

20. While discovery is not yet complete, the Tort Claimants Committee and the Ad Hoc Subrogation Group are confident that PG&E would be held strictly liable and liable in negligence for its role in the Tubbs fire if such claims were to be adjudicated.  Since the Ad Hoc Bondholder Group does not claim to have any evidence that the Debtors are not responsible for the Tubbs fire, the assumption made in the Bondholder Plan that the Debtors are not liable for that fire is

---

[9] Declaration of Benjamin P. McCallen in Support of the Ad Hoc Group of Subrogation Claim Holders' Motion for Relief From the Automatic Stay [Docket No. 2864], Ex. 2 (CALIFORNIA DEP'T OF FORESTRY & FIRE PROTECTION, SONOMA-LAKE NAPA UNIT, INVESTIGATION REPORT: TUBBS INCIDENT (January 20, 2019)) at 76 (the "**Cal Fire Report**").

1      unsupportable.  A finding against the Debtors on causation of the Tubbs fire alone would be the end
2      of the Bondholder Plan.

3              21.     Moreover, putting aside the specifics of the Tubbs fire, as time goes on, evidence
4      mounts of PG&E's systemic culpability for the epidemic of wildfires in 2017 and 2018.  As was
5      most recently detailed in the July 10, 2019 scathing report in *The Wall Street Journal*, entitled
6      "PG&E Knew for Years Its Lines Could Spark Wildfires, and Didn't Fix Them,"[10] there exists
7      substantial evidence that PG&E was responsible for those wildfires.  Much of that evidence is only
8      beginning to be made public, and will ultimately demonstrate PG&E's liability and negligence with
9      respect to all prepetition wildfires in any protracted litigation.

10             22.     The same day that report appeared in *The Wall Street Journal*, Judge Alsup entered
11     an order *sua sponte,* requiring the Debtors to: (i) respond to the report on a paragraph-by-paragraph
12     basis, in up to 40 double-spaced pages, in a "fresh, forthright statement owning up to the true
13     extent" of the report; and (ii) answer the following questions, (a) explain why various political
14     contributions "were more important [than] replacing or repairing aging transmission lines . . . and
15     removing or trimming the backlog of hazard trees, and increasing vegetation management," and
16     (b) explain why almost $5 billion in dividends prior to the bankruptcy filing were made "at a time
17     when PG&E was aware of the problems named in the Wall Street Journal report and knew of its
18     hazard tree backlog."[11]  Any plan that gives short-shrift to holders of Wildfire Claims is not only
19     unlikely to be confirmed, but also unconscionable.

20          **B.     The Bondholder Plan Suffers from Major Deficiencies**

21             23.     Given the wildfire claimants' views of the strength of the Wildfire Claims, it is clear
22     that both the subrogation and individual classes of Wildfire Claims would vote to reject the
23     Bondholder Plan, because the actual amount of such Wildfire Claims far exceeds the $17.4 billion

---

[10] Katherine Blunt & Russell Gold, *PG&E Knew for Years Its Lines Could Spark Wildfires, and Didn't Fix Them*, The Wall Street Journal (July 10, 2019), https://www.wsj.com/articles/pg-e-knew-for-years-its-lines-could-spark-wildfires-and-didnt-fix-them-11562768885?tesla=y, attached as Exhibit A.

[11] Request for Offender PG&E to Supply Information, *United States v. Pacific Gas & Elec. Co.*, No. Cr. 14-00175 (N.D. Cal. July 10, 2019) [Docket No. 1075], p. 1-2, attached as Exhibit B.

reserved for such claims. Accordingly, the Bondholder Plan would lack the support of any wildfire claimant constituency, and fail to resolve the primary reason these cases were commenced.

24. Not only would the Bondholder Plan lack any wildfire claimant support, the Ad Hoc Bondholder Group's attempt to manufacture an impaired consenting class cannot satisfy section 1129(a)(3)'s requirement of good faith. *L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.)*, 995 F.2d 940, 943 n.2 (9th Cir. 1993) ("We believe, however, that abuses on the part of a plan proponent ought not affect the application of Congress's definition of impairment. The bankruptcy court can and should address such abuses by denying confirmation on the grounds that the plan has not been 'proposed in good faith.'") (quoting 11 U.S.C. § 1129(a)(3)). As noted above, the Bondholder Plan purports to impair the long-term bonds by reducing their interest rate by just 0.10%, while elevating their priority by securing their currently unsecured bonds with liens on the Debtors' principal assets. Moreover, whether or not the proponents intend to argue that reduced interest offset by collateralization that makes an instrument *more valuable* constitutes technical impairment, the proposal would also violate the Bankruptcy Code's "fair and equitable" requirement. An instrument that is secured by the Debtors' assets would quite likely have a value in excess of the full face amount of the bondholders' allowed claims, and would result in those bondholders receiving consideration that exceeds the allowed amount of their claims, in violation of section 1129(b). *In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984). It would also give them a priority over future wildfire and other unsecured claims.

**II.** **If Exclusivity Is Terminated, It Should Be Terminated for Everyone, So That The Ad Hoc Subrogation Group May Pursue Confirmation of Its Proposed Plan**

25. The Ad Hoc Subrogation Group believes for the reasons stated in this Response that termination of exclusivity in favor of the Ad Hoc Bondholder Group is inappropriate. However, if the Court disagrees and is inclined to grant the Motion, exclusivity should be terminated for all

parties in interest, so that the Ad Hoc Subrogation Group may quickly begin to prepare to file and seek confirmation of its own proposed plan, which will be credible and confirmable.

26. While still subject to negotiation, features of the plan that will be proposed by the Ad Hoc Subrogation Group are expected to include: (a) reinstatement or refinancing of all funded debt claims; (b) establishment of a well-funded trust from which individual wildfire victims will be allowed to elect to settle their claims promptly or proceed to litigate and ultimately recover the full compensable value of their claims; (c) resolution and equitization of a substantial portion of the aggregate allowed Subrogation Claims; (d) the option for existing equity holders to invest in the reorganized Debtors through a rights offering; (e) payment in full, or reinstatement of, general unsecured claims; (f) a balance sheet upon emergence that allows the reorganized Debtors to maintain an investment grade rating, and will position the reorganized Utility to continue its compliance with state renewable standards and invest in requisite grid improvement and safety enhancement initiatives; (g) the assumption of the Debtors' existing retirement plan; and (h) rate neutrality for the reorganized Debtors' customers.

27. Without meaningful argument in the Motion, the Ad Hoc Bondholder Group's proposed order would terminate exclusivity solely for them. Such relief is atypical, and not justified by the facts of this case. If allowed, the "undue bargaining leverage" granted to the Debtor by virtue of its exclusive power to file a chapter 11 plan would inappropriately shift to a single group of creditors without any fiduciary duties or public mission (and without support from any truly impaired class). *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (intention of section 1121 is to "cure the prior practice that gave debtors undue bargaining leverage to delay and thereby force a settlement out of otherwise unwilling creditors" (internal quotations omitted)); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988).

28. In nearly all cases, when exclusivity is terminated, it is terminated for all parties in interest. *See, e.g., In re New Meatco Provisions, LLC*, No. 13-bk-22155 (PC), 2014 WL 917335, at *3 (Bankr. C.D. Cal. March 10, 2014) (terminating exclusivity "so that all the players, including the debtor, have an even chance in proposing a plan.") (citations omitted); *In re Kun*, 15 B.R. 852, 853 (Bankr. D. Ariz. 1981) ("[T]he exclusive plan period has expired and . . .any party in interest, including the debtor, the trustee, a creditor, a creditors' committee, an equity security holders' committee, an equity security holder, or any indenture trustee may file a plan as provided for under Section 1121(c) of the Bankruptcy Code."); *In re Borders Grp., Inc.*, No. 11-10614 (MG), 2011 WL 9155779, at *1 (Bankr. S.D.N.Y. June 2, 2011) ("Once the 120-day period expires or is terminated, any party in interest may file a plan of reorganization."); *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) ("Once exclusivity terminates, any party in interest, including the debtor, can file a plan."); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160-61 (Bankr. D. Me. 1982) ("Shortening the debtor's exclusive period for filing a plan will permit any party in interest . . . to file a plan.").

29. In the handful of cases where exclusivity was not terminated globally, it has terminated for the benefit of another fiduciary, or in the 2001 cases of the Utility, was allowed to expire in favor of the California Public Utility Commission, the Utility's primary regulator, acting in the public interest. *See* Order Terminating Exclusivity With Respect to the California Public Utilities Commission and Authorizing the California Public Utilities Commission to File an Alternative Plan of Reorganization, *In re Pacific Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. 2001) [Docket No. 5155]; *In re United Press Int'l, Inc.*, 60 B.R. 265, 271 (Bankr. D.D.C. 1986) (mentioning without explanation a previous consent order whereby the unsecured creditors' committee and the debtor's employee union were granted co-exclusive authority with the debtor to file plans of reorganization); *In re Texaco Inc.*, 81 B.R. 806, 808 (Bankr. S.D.N.Y. 1988) (discussing a previous decision to modify exclusivity for the purpose of allowing the statutory committees the opportunity to file their plan); *In re Bi-Lo, LLC*, No. 09-02140 (HB), 2010 WL

5140036, at *7 (Bankr. D.S.C. Aug. 5, 2010) (noting that the unsecured creditors' committee had previously been granted co-exclusive authority with the debtors to propose a plan of reorganization).

30. The specific relief sought in the Motion by the Ad Hoc Bondholder Group, who are not fiduciaries or a state regulator charged with acting in the public interest, is unprecedented and unjustified. The Ad Hoc Bondholder Group complains in the Motion that the Debtors have thus far not sufficiently engaged with the Ad Hoc Bondholder Group. However, the Ad Hoc Bondholder Group's claims are likely to be largely unimpaired and ride through the bankruptcy. If the proposed order is entered, the Ad Hoc Bondholder Group, a stakeholder without any meaningful role in the reorganization process, would be elevated and given a unique position equal to the Debtors, undermining the equality of distribution principals at the heart of the Bankruptcy Code. Those that support terminating exclusivity in these cases have generally stated that it should be terminated for everyone, to truly allow for the marketplace of ideas to select from among competing plans, rather than to allow the Ad Hoc Bondholder Group to launch a hostile takeover of these cases.[12]

---

[12] *See* Note 6, supra.

# CONCLUSION

WHEREFORE, the Ad Hoc Subrogation Group requests that the Court deny the Motion, or in the alternative, grant relief consistent with this Response as it determines is just and proper.

Dated: July 18, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ Matthew A. Feldman
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
　　　　jminias@willkie.com
　　　　　dforman@willkie.com


**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

# Exhibit A

## Wall Street Journal Article:

## PG&E Knew for Years Its Lines Could Spark Wildfires, and Didn't Fix Them

# Exhibit B

## Judge Alsup Order, July 10, 2019