Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* All papers shall be filed in the Lead Case, No. 19-30088 (DM). | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS' MOTION TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>Date: July 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 2741 |

The Official Committee of Unsecured Creditors (the "Official Committee") respectfully submits this statement in response to the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* (the "Motion") [Docket No. 2741], filed by the Ad Hoc Committee of Senior Unsecured Noteholders (the "Ad Hoc Committee").

**PRELIMINARY STATEMENT**

1. On July 12, 2019, Governor Newsom signed into law the Wildfire Safety Legislation (defined below) that had been passed by the California Senate and Assembly earlier that week. The Wildfire Safety Legislation is notable for many reasons, but two provisions have particular significance in these bankruptcy cases. First, the Wildfire Safety Legislation provides a necessary cornerstone for any chapter 11 plan to be pursued in these cases by creating a roadmap for the Debtors' participation in the $21 billion "Wildfire Recovery Fund." Second, it imposes a timeline on the bankruptcy process of June 30, 2020 in order for the Debtors to be eligible to participate in the Wildfire Recovery Fund. In other words, the clock on plan confirmation is now loudly ticking.

2. With the enactment of the Wildfire Safety Legislation, the Official Committee submits that the time is ripe for parties to engage in earnest on the plan process, and that the Motion can serve as an appropriate springboard for these discussions. At the hearing on the Debtors' initial request for an extension of exclusivity, the Court made clear that credible, potentially confirmable plan proposals from other parties would be taken seriously. The Ad Hoc Committee has outlined a restructuring proposal that includes an up to $30 billion new money investment that states it is designed to: (i) pay the Debtors' general unsecured creditors in full; (ii) be ratepayer neutral; and (iii) not require any further or additional legislative relief. The Official Committee

2

believes that this proposal, while still under review and subject to ongoing diligence, is credible and worthy of serious consideration as it may lead to a confirmable plan for the Debtors.

3.  The Ad Hoc Committee proposal has much to commend. It provides for payment in full to unsecured creditors and a path to exit before the June 30, 2020 deadline. That being said, the Official Committee does not at this time endorse or support a plan of reorganization based on the Term Sheet (defined below), and its review, analysis and diligence with respect to the Term Sheet is ongoing. But the Official Committee believes that the Ad Hoc Committee has established a sufficient basis to permit it to move forward with formulating a plan based on the Term Sheet. Accordingly, the Official Committee respectfully requests that the Court grant the Motion and terminate the Debtors' exclusivity to permit the Ad Hoc Committee to proceed with formulating, negotiating, filing and otherwise prosecuting a reorganization plan based substantially on the terms set forth in the Term Sheet.

4.  The Debtors' loss of exclusivity will not prevent the Debtors from proposing a plan of their own. To the contrary, if the Debtors wish to file a plan, hopefully the loss of exclusivity will prompt them to action. However, to be clear, even if the Debtors file a plan before or after this hearing, the Official Committee requests that exclusivity be terminated as set forth herein. Likewise, the termination of exclusivity in favor of the Ad Hoc Committee should not prejudice the rights of any other interested parties to seek similar relief, subject to coming forward, as the Ad Hoc Committee has done, with a credible, potentially confirmable plan proposal. Given the June 30, 2020 deadline established by the Wildfire Safety Legislation, the Official Committee believes it makes sense to pursue multiple plan options to provide the estates with the best possible opportunity to timely complete this process.

5.  The Official Committee, nonetheless, appreciates that the Court will appropriately want to maintain an order in the context of the submission of at least two competing plans. The

Official Committee suggests that any other party that may wish to propose a plan for the Debtors be granted similar relief if the Court determines, following notice and a hearing, that such party's proposal constitutes a credible plan that can reasonably be expected to be confirmed and consummated by June 30, 2020. If multiple plans are submitted, the Court can then conduct a further hearing to set an appropriate scheduling order and protocol for concurrent disclosure statement approval and plan confirmation proceedings that will provide the Court with appropriate oversight and control.

## RELEVANT BACKGROUND

6. On May 1, 2019, the Debtors filed their *Motion Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusive Periods* (the "Exclusivity Extension Motion") [Docket No. 1795] seeking an order extending for approximately six months the periods during which the Debtors maintain the exclusive right to file and solicit votes on a chapter 11 plan (collectively, the "Exclusive Periods").

7. The Official Committee filed a Limited Objection to the Exclusivity Extension Motion (the "Limited Objection") [Docket No. 2009]. In the Limited Objection, the Official Committee asserted that the six month extension requested by the Debtors was too long and that a four month extension (with the exclusive filing period ending in late September) would be more appropriate. The Official Committee's rationale was based in large part on the belief that no viable plan could be proposed without a clear understanding of the nature, scope, and timing of any expected legislation addressing wildfire claims, as well as the implications of any such legislation with respect to the Debtors' reorganization. The Official Committee believed that the end of September would be an appropriate checkpoint on exclusivity, because by then, the parties would be likely to have a well-developed understanding of the nature of, and the prospects for, any such legislation.

8. The Court agreed with the Official Committee's assessment and, by an *Order Pursuant to 11 U.S.C. § 1121(d) Extending Exclusive Periods* [Docket No. 2226], extended the Debtors' Exclusive Periods by the four months suggested by the Official Committee. This extension was not immutable, however. In approving the extension, the Court expressly indicated that it would consider motions to terminate the Debtors' Exclusive Periods if a party in interest came forward with a "credible, potentially confirmable plan." May 22, 2019 Hr'g Tr. 76:10–12 ("The door is half open to the ad hoc committee . . . or any other party who believes there's a way to come up with a credible, potentially confirmable plan.").

9. Heeding that suggestion, on June 25, 2019, the Ad Hoc Committee filed the Motion accompanied by a term sheet (the "Term Sheet") outlining in summary form certain material terms of a potential plan for the Debtors based on, among other things, a $22 billion capital investment to be underwritten by certain members of the Ad Hoc Committee. According to the Ad Hoc Committee, the Term Sheet represents a "viable, comprehensive and credible solution" that will position the Debtors to "emerge from bankruptcy quickly, maintain an investment-grade credit rating in the future and meet the requirements of the [then] Proposed Wildfire Safety Legislation" without negatively impacting ratepayers. *See* Motion, ¶ 6.

10. On July 12, 2019, Governor Newsom signed into law a series of wildfire safety and accountability bills (collectively, the "Wildfire Safety Legislation"). The enactment of the Wildfire Safety Legislation represents the culmination of Governor Newsom's and the California legislature's efforts to act swiftly and decisively to address the wildfire safety and liability issues faced by the Debtors and their peers. Among other things, the Wildfire Safety Legislation has established a $21 billion Wildfire Recovery Fund that the participating utilities, including the Debtors (to the extent they meet certain requirements), may access to pay claims related to the wildfires caused by their equipment.

11.     The importance of the Wildfire Recovery Fund for the formulation of a confirmable plan for the Debtors cannot be overstated—among other things, it: (i) requires the Debtors to fully and fairly compensate victims of prepetition fires; (ii) protects consumers from potential rate increases that might otherwise be necessary; and (iii) encourages capital market investment in the Debtors by placating rating agency concerns over the Debtors' investment grade status.  Thus, the Debtors' ability to participate in the Wildfire Recovery Fund should serve as a cornerstone of any confirmable plan of reorganization in these cases.

12.     For purposes of the Motion and the chapter 11 plan process in these cases generally, the Official Committee notes that one of the key conditions to the Debtors' ability to participate in the Wildfire Recovery Fund is that they must exit bankruptcy protection prior to June 30, 2020 (the "<u>Wildfire Recovery Fund Deadline</u>").  If the Debtors are precluded from participating in the Wildfire Recovery Fund due to a failure to emerge from bankruptcy before the Wildfire Recovery Fund Deadline, the prospects for a successful resolution of these cases and full recoveries by all creditors will be jeopardized.  Accordingly, it is now incumbent upon the parties to engage promptly and diligently in the plan process with the knowledge that the clock is now ticking.

## **ARGUMENT**

**A.     The Wildfire Safety Legislation Should Serve as an Important Catalyst**

13.     At the time of the hearing on the Exclusivity Extension Motion, there was no clarity as to whether or when the Wildfire Safety Legislation might be enacted or what form it might take.  These gating issues have now been resolved.  As such, time is of the essence, as the Debtors must now exit bankruptcy prior to June 30, 2020 to be eligible to access the Wildfire Recovery Fund.

14.     Given that the legislative framework is now in place (earlier than anticipated), there is no reason to delay the plan process until the end of the current exclusive filing period in September.  To the contrary, the plan process should now be expedited, both to take advantage of

the speed with which Governor Newsom and the California legislature acted and to mitigate any risk of having the Debtors' reorganization efforts bump up against the Wildfire Recovery Fund Deadline. For these reasons, the Official Committee supports termination of the Debtors' exclusivity rights as described herein in order to permit—indeed to encourage—the Ad Hoc Committee to continue with its efforts to advance a plan substantially on the terms outlined in the Term Sheet.

15. To be clear, the Official Committee at this time does not support or endorse a plan of reorganization based on the Term Sheet. While the Official Committee finds much to like about the Term Sheet, the Official Committee's review and analysis is ongoing, and there remains a significant amount of "wood to chop" before the Official Committee can be in position to come to a definitive conclusion about a plan based on the Term Sheet. The Official Committee nevertheless believes that the Term Sheet meets the standard articulated by the Court of being "credible" and relating to a "potentially confirmable" plan, such that the Ad Hoc Committee should be given the opportunity to continue with its efforts to advance the ball.

16. The Debtors should, of course, still be entitled and encouraged to pursue their own plan of reorganization. And, to the extent any other party in interest wishes to propose a plan, those efforts likewise should be encouraged—provided that any such plan meets the Court's threshold of "credible" and "potentially confirmable." As such, the Official Committee believes that any other party with a potentially confirmable plan should be permitted to, as the Ad Hoc Committee did, file a motion, on shortened notice if needed, seeking authority to file *its* plan, conditioned upon a showing that such plan is credible and potentially confirmable. Requiring the filing of a motion, and having a hearing before the Court, will ensure that only credible and potentially confirmable plans will be allowed to proceed, thus protecting against a chaotic rush of plan filings. The Official Committee respectfully submits that this process is both consistent with

the Court's approach to competing plans in the 2001 PG&E bankruptcy case[1] and yet tailored to the facts and circumstances of these cases.

17. The Official Committee believes that terminating exclusivity to allow the filing of credible and confirmable plans will create a competitive process that could benefit the estates and their creditors as well as put these cases on a fast track, which is critical in light of the Wildfire Recovery Fund Deadline. In contrast, permitting the Debtors to maintain exclusivity, thus "leaving all the eggs in one basket," could only serve to delay the conclusion of these cases and jeopardize the Debtors' ability to participate in the Wildfire Recovery Fund. Since the previous hearing on exclusivity, the Official Committee has been requesting that the Debtors share their views and game plan on plan substance, process and timing. To date, however, the Official Committee's overtures have been met with silence. With the Wildfire Safety Legislation now in place, there is no longer any excuse for the Debtors' lack of both transparency and urgency and the Official Committee hopes that, rather than "defend" against the Ad Hoc Committee's (or anyone else's) efforts to propose a plan, the Debtors see the filing of the Motion as an opportunity to move these cases forward and not just as another reason for further stonewalling.

**B.     "Cause" Exists to Terminate Exclusivity**

18. Pursuant to section 1121(d) of the Bankruptcy Code, the Court may terminate the Debtors' Exclusivity Periods for cause shown. 11 U.S.C. § 1121(d)(1). Although the Bankruptcy Code does not define "cause," legislative history indicates that "cause," for purposes of section 1121, is intended to be a flexible standard applied on a case-by-case basis that balances competing interests of a debtor and its creditors. See, e.g., In re Ames Dep't Stores Inc., 1991 WL 259036, at *3 (S.D.N.Y. Nov. 25, 1991) ("The purpose of the Bankruptcy Code's exclusivity period is to

---

[1] See *Order Terminating Exclusivity with Respect to the California Public Utilities Commission and Authorizing the California Public Utilities Commission to File an Alternate Plan of Reorganization* [Docket No. 5155; Case No. 01-30923].

allow the debtor flexibility to negotiate with its creditors."). The determination of whether to terminate exclusivity for cause lies within the discretion of the bankruptcy court. In re New Meatco Provisions, LLC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (finding that the totality of the circumstances weighed in favor of terminating exclusivity, particularly when there were no unresolved contingencies preventing the proposal of a plan); In re Excel Mar. Carriers Ltd., 2013 WL 5155040, at *2 (Bankr. S.D.N.Y. Sept. 13, 2013) ("The ultimate test is left to considerable discretion by the Court, and it is very fact driven.").

19. In making that determination, courts are typically guided by the following non-exclusive factors:

> (i) the size and complexity of the case; (ii) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (iii) the existence of good faith progress toward reorganization; (iv) the fact that the debtor is paying its bills as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress in negotiations with its creditors; (vii) the amount of time which has elapsed in the case; (viii) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (ix) whether an unresolved contingency exists.

In re Adelphia Commc'ns Corp., 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). While these factors inform the court's analysis, not all of them may be relevant in a particular case and certain factors may carry more weight in one case than in another. Importantly, as noted in Adelphia, the ultimate consideration for the court is what will best move the case forward. Adelphia Commc'ns, 352 B.R. at 590.

20. It is true that certain courts have found that the "mere fact that key players want to file a competing plan is [usually] not sufficient cause to terminate a debtor's exclusive periods." Excel Mar. Carriers, 2013 WL 5155040, at *1; see also In re Energy Conversion Devices, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) ("Where creditors and parties in interest argue for termination of the exclusivity period on the basis that 'they [are] prepared to offer more favorable

plans if the court were to terminate the exclusivity period,' that does not constitute 'sufficient cause to cut short the debtor's window of opportunity opened by Congress[.]'").[2] Here, however, the Court has expressly encouraged parties in interest to seek to terminate the Debtors' Exclusivity Periods to propose their own plans.

21. Moreover, this case presents a unique set of circumstances which requires that it be treated in a *sui generis* manner. See, e.g., May 22, 2019 Hr'g Tr. 42:6–13 (The Court: "I guess I don't share with you that an exclusivity deadline, in a case of this complexity, is a critical path item[.]"); id. 17:11–16 (Debtors' counsel: "You, Your Honor, [have yourself noted] I think every time we've been in this courthouse, the size and complexity of these cases. We think that the requested extension [of exclusivity] recognizes the reality of these cases. We think it's appropriate. Again, as you noted, people are free to come in at any time and file a motion to shorten that time."); June 26, 2019 Hr'g Tr. 117:21–22 (Counsel for the TCC stating: "Your Honor, this is a unique case, right? I mean, the debtors filed as purportedly solvent entities.").

22. Indeed, the Court itself has made consistent reference to the size, uniqueness, and impact of these chapter 11 cases. See Mar. 13, 2019 Hr'g. Tr. 149:5 ("We can all agree, [this case] is extraordinary"); see also id. 100:4–5 (noting "the hundred things that make this case different"); Mar. 27, 2019 Hr'g Tr. 59:17–18 ("I don't want to get into the bad habit of equating this case to everyday cases.").

23. Additionally, looking back to PG&E's 2001 bankruptcy, the Court terminated the debtor's exclusivity when a party in interest, the California Public Utilities Commission (the

---

[2] Indeed, some courts have held that the filing of a plan proposal (such as a term sheet) prior to the expiration of the debtor's exclusive filing period violates the Bankruptcy Code. See, e.g., In re Charles St. African Methodist Episcopal Church of Bos., 499 B.R. 126, 132 (Bankr. D. Mass. 2013) ("Section 1121(b) creates not only a bright line but a 'third rail': don't file a plan during the exclusivity period. The right of exclusivity was violated by the filing of a plan and needs to be vindicated.").

"Commission"), came forward with a competing plan. Counsel for the Commission argued that "by terminating exclusivity, you're actually going to move this case along more efficiently, and there's going to be more impetus to get something done." See In re Pacific Gas and Electric Company, Case No. 01-30923 (DM) Feb. 27, 2002 Hr'g Tr. 153:18–21. The Court, "not able to say that [the competing plan was] a bad faith, or a frivolous plan," granted the Commission's motion to break PG&E's exclusivity. See id. 162:25–163:1. Taking into account the uniqueness of these cases and the pressing need to move them forward in an expeditious manner, the Official Committee believes that a similar approach is warranted here.

24. Not only do the facts of these cases make them unique, but the Governor of California and the California legislature have both taken extraordinary steps to put in place – on an extremely expedited timeline – a legislative regime to assist the state's utilities, including the Debtors. Given such herculean governmental efforts, special care must be taken to put these cases on a path to exit before the Wildfire Recovery Fund Deadline, as a failure to meet this deadline will have devastating repercussions. Everything possible must be done to ensure that these cases proceed to emergence on the fastest track possible. Thus, the Official Committee believes that the Debtors' exclusivity must be terminated so that the plan process can begin in earnest.

[Remainder of Page Left Intentionally Blank]

## CONCLUSION

25. For the reasons set forth above, the Official Committee respectfully requests that the Court grant the Motion to permit the Ad Hoc Committee to proceed with formulating, negotiating, filing and otherwise prosecuting a reorganization plan substantially on the terms set forth in the Term Sheet and grant such other relief as may be appropriate based upon the Official Committee's recommendations set forth herein.

Dated: July 18, 2019

**MILBANK LLP**

*/s/Gregory A. Bray*
DENNIS F. DUNNE
SAMUEL A. KHALIL
GREGORY A. BRAY
THOMAS R. KRELLER

*Counsel for the Official Committee of Unsecured Creditors*