Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    628.208.6434
Facsimile:    310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone:    310.820.8800
Facsimile:    310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>  -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>　　　　　　　　　　　　　Debtors.<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF THE COMMITTEE OF TORT CLAIMANTS TO MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE [Dkt. No. 2741]**<br><br>Date:　　July 24, 2019<br>Time:　　9:30 a.m. (Pacific Time)<br>Place:　　United States Bankruptcy Court<br>　　　　　Courtroom 17, 16th Floor<br>　　　　　San Francisco, CA 94102 |

# TABLE OF CONTENTS

Page

I. SUMMARY OF ARGUMENT ................................................................................... 1
II. OVERVIEW OF THE PROPOSED PLAN ............................................................... 3
    A. The Bondholders' Treatment of the Fire Claims ..................................................... 3
    B. The Bondholders' Treatment of Their Claims ......................................................... 4
    C. The Bondholder' Treatment of Equity Claims ........................................................ 4
III. ARGUMENT ................................................................................................................ 4
    A. When Personal Injury or Wrongful Death Claims Will be Paid from a Capped Trust in Non-Asbestos Mass Tort Cases, and the Debtors Dispute Liability for the Claims on a Factual Issue, a Court Must Make Special Considerations for Estimation Because Traditional Estimation Could Underfund the Capped Trust in Violation of the Judicial Code. ................................................................. 4
    B. Capped Trusts in Asbestos Cases Are Always Implemented with Consent of Tort Victims. .................................................................................................................. 7
    C. Lumping Subrogated Claims with Fire Claims Violates the Bankruptcy Code ... 10
    D. The Bondholders' Proposed Plan Is Illegally Discriminatory .............................. 12
    E. The Bondholders' Proposed Plan Violates the Absolute Priority Rule ................ 13
    F. The Bondholders Play Additional Games Regarding Voting Rights ................... 14
IV. CONCLUSION ........................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co.*,
 88 B.R. 742 (E.D. Va. 1988) ...................................................................................................9

*In re Armstrong World Indus.*,
 348 B.R. 111 (D. Del. 2006) ...................................................................................................9

*Barakat v. Life Ins. Co. of Va. (In re Barakat)*,
 99 F.3d 1520 (9th Cir. 1996) .................................................................................................11

*In re Chateaugay Corp.*,
 89 F.3d 942 (2d Cir. 1996) ....................................................................................................11

*In re Combustion Eng'g, Inc.*,
 391 F.3d 190 (3d Cir. 2004) ....................................................................................................8

*In re Combustion Eng'g Inc.*,
 No. 03-10495 (JFK), 2005 Bankr. LEXIS 2623 (Bankr. D. Del. Dec. 19, 2005) ....................8

*In re Dow Corning Corp.*,
 211 B.R. 545 (Bankr. E.D. Mich. 1997) .......................................................................*passim*

*In re Dow Corning Corp.*,
 No. 95-20512 (DPH) (Bankr. E.D. Mich. Feb. 4, 1999), Dkt No. 16712 ................................9

*In re Eagle-Picher Indus., Inc.*,
 189 B.R. 681 (Bankr. S.D. Ohio 1995) ..................................................................................10

*In re Eagle-Picher Indus., Inc.*,
 203 B.R. 256 (S.D. Ohio 1996) ...............................................................................................9

*In re G-1 Holdings, Inc.*,
 No. 01-30135 (RG), (Bankr. D.N.J. Nov. 9, 2012), Dkt. No. 9787 .........................................9

*In re Garlock Sealing Techs., LLC*,
 504 B.R. 71 (Bankr. W.D.N.C. 2014) ...................................................................................10

*In re Garlock Sealing Techs.*,
 No. 10-31607 (JCW), (Bankr. W.D.N.C. July 29, 2016), Dkt. No. 5443 ................................9

*In re Global Indus. Techs.*,
 645 F.3d 201 (3d Cir. 2011) ....................................................................................................9

*In re Johns-Manville Corp.*
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd* 78 B.R. 407 (S.D.N.Y. 1987) *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1987) ............................. 7, 8, 9

*In re Maremont Corp.*,
   No. 19-10118 (LSS) (Bankr. D. Del. May 17, 2019), Dkt. No. 241 ........................................... 9

*In re N. Am. Health Care, Inc.*,
   544 B.R. 684 (Bankr. C.D. Cal. 2016) ........................................................................................ 6

*In re Pac. Gas & Elec. Co.*,
   No. 01-30923 (DM), (Bankr. N.D. Cal. Mar. 1, 2002), Dkt. No. 5008 .................................... 6

*Pacifica L 51, LLC v. New Invs., Inc. (In re New Invs., Inc.)*
   840 F.3d 1137 (9th Cir. 2016) .................................................................................................. 12

*In re Roman Catholic Archbishop of Portland*,
   338 B.R. 414 (Bankr. D. Or. 2006) .................................................................................. 6, 7, 10

*In re Roman Catholic Archbishop of Portland*,
   339 B.R. 215 (Bankr. D. Or. 2006) ........................................................................................ 6, 7

*In re Roman Catholic Archbishop of Portland in Oregon*,
   No. 04-37154-elp11, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) ................. 9, 10

*In re Roman Catholic Bishop of San Diego*,
   374 B.R. 756 (Bankr. S.D. Cal. 2007) ....................................................................................... 6

*Steelcase Inc. v. Johnston (In re Johnston)*,
   21 F.3d 323 (9th Cir. 1994) ..................................................................................................... 11

*In re TK Holdings, Inc.*,
   No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120 ....................................... 9

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ........................................................................................................ 9

**Statutes**

11 U.S.C. § 524(g)(2)(B)(II) ............................................................................................................ 8

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ............................................................................................... 8

11 U.S.C. § 1121(d)(1) ..................................................................................................................... 1

11 U.S.C. § 1122 ............................................................................................................................ 11

11 U.S.C. § 1123(a)(4) ................................................................................................................... 11

11 U.S.C. § 1129(a)(11) ................................................................................................................... 6

11 U.S.C. § 1129(b)(1) ............................................................................................................12

11 U.S.C. § 1129(b)(2)(B)(ii) ...................................................................................................13

11 U.S.C. § 1141(d) ...................................................................................................................5

Pub. L. 98–353, title I, § 102(a), July 10, 1984, 98 Stat. 335 ....................................................8

Pub. L. 103–394, title I, § 111(a), Oct. 22, 1994, 108 Stat. 4108, 4113, 4145 .........................8

**Rules**

Bankr. L. R. 5011-2 ....................................................................................................................7

Bankr. L. R. 9015-2 ....................................................................................................................7

**Other Authorities**

Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System,* 41
    Univ. Cal. Davis L. Rev. 1613 (2008) ................................................................................9

MEALEY'S Asbestos Bankruptcy Report, Vol. 5, #4, November 2005 *available at*
    https://www.crowell.com/documents/DOCASSOCFKTYPE_ARTICLES_419.
    pdf .........................................................................................................................................8

Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C.
    § 524(g) in Light of the Third Circuit's Ongoing Business Requirement Dicta
    in Combustion Engineering*, 62 N.Y.U. Annual Surv. Am. L. 187 (2006) ..........................8, 9

The Official Committee of Tort Claimants ("**TCC**") in the chapter 11 cases (the "**Chapter 11 Cases**") of PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**") hereby objects to the motion [Dkt. No. 2741] ("**Motion**")[1] of the Ad Hoc Committee of Senior Unsecured Noteholders ("**Bondholders**") to terminate the Debtors' exclusive periods pursuant to section 1121(d)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") and respectfully states as follows:

## I. SUMMARY OF ARGUMENT

The TCC previously objected [Dkt. No. 2017] to the Debtors' motion to extend exclusivity because, among other things, the Debtors' equity security holders have an outsized influence in this case that results in the Debtors' unwillingness to propose a feasible plan that follows the priority scheme in the Bankruptcy Code and pays the tort claimants in full ahead of equity security holders. In the two months since the TCC filed that objection, nothing has changed. The Debtors have not engaged in negotiations with the TCC. They deny the TCC's requests for documents and data that the Debtors have used to estimate their tort liability in their SEC filings. They are hindering the equitable resolution of this case and are not proceeding in good faith. As a result, the TCC maintains its position that the Debtors' exclusivity should be terminated.

However, this Court stated that it would terminate exclusivity if a party submits a "credible, potentially confirmable plan." Hr'g Tr. 76:11-12, May 22, 2019. The TCC will advise the Court when it is ready to file its plan so that the Court may terminate the Debtors exclusivity at that time.

Right now, however, the Bondholders' proposed plan is not "credible," nor is it "potentially confirmable," and, as such, the TCC opposes terminating exclusivity to allow the Bondholders' plan. The Bondholders' plan is not a plan—it is a mechanism to set up the Court to estimate the Fire Claims and Subrogation Claims,[2] and then give the Bondholders the option to buy reorganized

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

[2] As used herein, the term "**Fire Claims**" shall mean a prepetition claim against the Debtors for monetary losses, personal injuries (including death), losses or asserted damages arising out of or relating to fires that occurred in California prior to the Petition Date, including, without limitation, the November 2018 Camp Fire, the October 2017 Atlas Fire, the October 2017 Adobe Fire, the October 2017 Bear Fire, the October 2017 Blue Fire, the October 2017 Cascade Fire, the October 2017 Cherokee Fire, the October 2017 Honey Fire, the October 2017 La Porte Fire, the October 2017 Lobo Fire, the October 2017 McCourtney Fire, the October 2017 Norrbom Fire, the October 2017 Nuns Fire, the October 2017 Oakmont Fire, the October 2017 Partrick Fire, the October 2017 Pocket Fire, the October 2017 Point Fire, the October 2017 Potter Fire, the October 2017 Pythian Fire, the October 2017 Redwood Fire, the October

- 1 -

Case: 19-30088    Doc# 3069    Filed: 07/18/19    Entered: 07/18/19 15:37:23    Page 6 of 19

PG&E for the bargain basement price of $18 billion if the Fire Claims and Subrogation Claims are estimated at a small fraction of the amount actually owed to victims and the insurers. The plan would allow the Bondholders to take over the company on their terms, while the claims of the fire victims go unsatisfied and are subject to the real risk that the capped trust will be completely exhausted leaving victims without any recourse.

The plan is illegal for multiple reasons. Most critically, the plan requires an improper estimation of the Fire Claims and dictates the Court's result at less than half of the actual value of the claims. The proposed plan creates an unusual mega-class of Fire Claims and Subrogation Claims, all as part of Class 9B. In violation of the Bankruptcy Code, this class includes claims that are not substantially similar and treats the claims within it differently. For example, the Tubbs Wildfire Claims receive a very low percentage of the capped amount, because the Debtors contest liability, while the Public Entities receive the full amount of their $1 billion settlement with the Debtors.

The plan illegally discriminates against the Fire Claims because it treats the Bondholders much more favorably. While Fire Claims are relegated to recovering from a capped trust capitalized with less than half of the current estimates for their claims, Bondholders receive the full amount of their claims, plus default interest during the pendency of the Chapter 11 Cases, and an option to reinstate their debt and buy virtually all of the stock in a reorganized PG&E at half of what it is worth. The plan also violates the absolute priority rule because while the Fire Claims are impaired, and if appropriately classified, would vote down the plan, equity receives a distribution and an option to buy stock in a reorganized PG&E on account of its existing interests.

Each one of these problems, standing alone, is unable to be fixed in a way that could rehabilitate the plan. These reasons, however, taken together, show that this plan is doomed to fail. To be clear, if the Court's position is to maintain exclusivity unless a competing plan that could be confirmed is proposed, the TCC submits that the Bondholders plan does not satisfy such condition.

---

2017 Sulphur Fire, the October 2017 Sullivan Fire, the October 2017 Tubbs Fire, the October 2017 37 Fire, the December 2016 Ghost Ship Fire, and the September 2015 Butte Fire. The term "**Subrogation Claims**" shall mean claims arising by way of subrogation under applicable law or contract on account of amounts paid by an insurer under the provisions of a property and casualty policy for losses arising out of the foregoing Fires.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

But, if the Court terminates exclusivity here, the TCC requests that the Court terminate exclusivity such that the Committees also may file their respective plans.

## II.  OVERVIEW OF THE PROPOSED PLAN

### A.  The Bondholders' Treatment of the Fire Claims

The proposed plan creates a Wildfire Claims Trust, which is capitalized with $16 billion, but is subject to an upward adjustment of 15% based upon the outcome of the estimation proceeding. Term Sheet[3] at 15. All prepetition Fire Claims and Subrogation Claims are channeled to the Wildfire Claims Trust, regardless of notice or any other issues. *Id.*

All Fire Claims and Subrogation Claims are part of the same class, Class 9B. The Bondholders have subdivided Class 9B: Tubbs Wildfire Claims are capped at $570 million; non-Tubbs Wildfire Claims are capped at $5.45 billion; Ghost Ship Fire Claims are capped at $25 million; the Public Entity Wildfire Claims are capped at $1 billion; Subrogation Tubbs Wildfire Claims are capped at $975 million; Subrogation Non-Tubbs Wildfire Claims are capped at $6.82 billion; and Agreed Attorneys' Fees and Costs are capped at $1.15 billion. So the Court is clear on the math, of the $16 billion being set aside under the umbrella of the "Wildfire Claims Trust," only $6.045 billion is being set aside to paid Fire Claims. Nearly $9 billion goes to insurance companies and the Public Entities.

The Debtors and the Bondholders contend the Tubbs Fire claims are not valid because the Debtors did not cause the Tubbs Fire. The Tubbs Fire claims include claims for personal injury and wrongful death, because virtually all of the victims who fled that fire in the middle of the night either were injured in their escape or killed. Under the Judicial Code, those victims are entitled to have the amount of their claims determined by a jury for the purpose of obtaining their distribution from the Trust. The plan is conditioned on the Bankruptcy Court estimating that the juries will find that the Debtors did not cause the Tubbs Fire and hence are not liable for the thousands of Tubbs Fire claims.

Any claimants who vote against the plan are still required to recover against the Wildfire Claims Trust, but they have the option to either settle their claim, submit to binding arbitration, or,

---

[3] All citations to the "Term Sheet" are to the amended Term Sheet, as filed on July 17, 2019, Dkt. No. 3024.

if the claim is a personal injury or wrongful death claim, proceed to a jury trial, and that judgment is capped according to the amount determined by the estimation proceeding. Term Sheet at 11, 15.

### B. The Bondholders' Treatment of Their Claims

Under the plan, the short-term noteholders' $1.75 billion claim would be paid in full. The long-term noteholders' $15.8 billion claim would receive all prepetition interest payments, postpetition default interest, and a replacement note on substantially the same terms, except the interest rate would be 10 basis points less, but also secured by a first mortgage on all of the Debtors' principal property. *Id.* at 9-10. The plan characterizes these notes as impaired and entitled to vote, although the noteholders' recovery under the proposed plan may actually be greater than their recovery had the Debtors never filed for bankruptcy.

### C. The Bondholder' Treatment of Equity Claims

Most of the equity holders receive stock in new PG&E. Term Sheet at 6, 14. The common stock holders of PG&E Corp. receive ownership in reorganized PG&E, subject to dilution, and they have the opportunity to commit for their pro rata share of 5% of the "PG&E Corp. New Money Investment." The stock in a reorganized PG&E is getting even more valuable as a result of legislation that would channel future fire liabilities to a fund and away from shareholders, which is a provision for which the Bondholders fought. Matt Wirz, *Paul Singer's Elliott Is on the Verge of a Big Win in PG&E Clash*, Wall Street Journal, July 11, 2019, *available at* https://www.wsj.com/articles/paul-singers-elliott-is-on-the-verge-of-a-big-win-in-pg-e-clash-11562852390 (explaining that the Bondholders heavily advocated for a state-created fire fund that pays only future fire liability, leaving current shareholders to deal with the past fire liability).

## III. ARGUMENT

### A. When Personal Injury or Wrongful Death Claims Will be Paid from a Capped Trust in Non-Asbestos Mass Tort Cases, and the Debtors Dispute Liability for the Claims on a Factual Issue, a Court Must Make Special Considerations for Estimation Because Traditional Estimation Could Underfund the Capped Trust in Violation of the Judicial Code.

The Bondholders' proposed plan requires that "the Bankruptcy Court and/or the District Court will estimate the Debtors' liability on all personal injury, wrongful death, property damage,

- 4 -

insurance subrogation, and any other Wildfire Claims for purposes of confirming the Plan and for purposes of distribution thereunder, in accordance with the Bankruptcy Code and applicable law." Term Sheet, at 14. The Fire Claims, however cannot be estimated in the way that the plan suggests in accordance with applicable law.

The courts in the non-asbestos mass tort cases have consistently stated that, where the debtors dispute liability for the personal injury and wrongful death claims on the basis of a factual causation issue, estimation of the claims for the purpose of capitalizing a capped trust to pay the claims is in reality estimation for purposes of distribution, because an incorrect estimation of the jury's finding of no causation would limit the amount of money to be deposited in the trust, and a later jury finding of causation would cause the victims to bankrupt the underfunded trust with thousands of claims that are suddenly entitled to payment. In addition, where a large set of the claims is disputed on the basis of causation, in those circumstances, the bankruptcy courts have held that the capped trust may not be capitalized by the traditional estimation process, because such an estimation is likely to trample individuals' jury trial rights. Accordingly, the bankruptcy courts have held that the district courts should estimate the damages on the high side of the probable range after the court orders causation or test jury trials to aid them in the process.

For example, the court disapproved of this type of trust estimation funding in *Dow Corning*: "allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effect of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well." *In re Dow Corning Corp.*, 211 B.R. 545, 569 (Bankr. E.D. Mich. 1997). In addition, the court stated that "we will recommend that the District Court schedule staggered consolidated general causation trials" in order to resolve the case. *Id.* at 593.

This analysis is not controversial. PG&E cited the *Dow Corning* ruling with approval in PG&E's first chapter 11 case, in a motion for an order determining estimation procedures for tort claims, on the basis that PG&E had not proposed to cap payments to tort claimants in its first chapter 11 case. In that motion, PG&E admitted the *Dow Corning* court "correctly noted that the proposed plan in that case was not a full payment plan, but rather provided that the reorganized

debtor would set aside a specified dollar amount . . . that limited recovery to a pro rata share of the set-aside funds if such funds proved insufficient to pay all claims in full. . . . In the PG&E case, by contrast, the Plan does provide for full payment and there is no artificial cap, and it therefore is necessary to obtain a realistic estimate of the overstated Claims in order for the Court to apply Section 1129(a)(11)'s feasibility test." PG&E's Motion for Order Determining Procedures for Estimating Certain Claims for Plan Feasibility Purposes at 8 n.10, *In re Pac. Gas & Elec. Co.*, No. 01-30923 (DM), (Bankr. N.D. Cal. Mar. 1, 2002), Dkt. No. 5008.

In another case, the court in *In re Roman Catholic Archbishop of Portland*, 338 B.R. 414, 418, 422 (Bankr. D. Or. 2006) ("*Portland I*"), granted relief from stay of personal injury claims that were contested on the basis of lack of causation and liability in order to determine their value for distribution purposes. Shortly thereafter, in that same case, *In re Roman Catholic Archbishop of Portland*, 339 B.R. 215, 221 (Bankr. D. Or. 2006) ("*Portland II*"), Judge Perris faced the same issue as in *Dow Corning*, where the debtor "intend[ed] to use the estimation" in a way that resulted in capping the liability it would pay. Judge Perris explained that such a request was akin to estimating personal injury tort claims for purposes of distribution and denied estimation on that basis. *Id.* The other cases are in accord. *See, e.g., In re Roman Catholic Bishop of San Diego*, 374 B.R. 756, 762-63 (Bankr. S.D. Cal. 2007); *see also In re N. Am. Health Care, Inc.*, 544 B.R. 684, 690 (Bankr. C.D. Cal. 2016) (finding that an aggregate estimate of claims would not affect distribution because the tort claims were not being capped).

The plan requires that a court estimate that a jury would find that PG&E did not cause the Tubbs Fire, because PG&E contends the company did not start that fire; and that accordingly the plan should pay only a fraction of the Debtors' alleged liability for that fire. The Bondholders' proposed plan also states that it is not confirmable if a court estimates Fire Claims in excess of the $18.4 billion capped threshold. This type of estimation process is antithetical to proper estimation of a large percentage of the entire multi-billion dollar claim pool to be paid by a capped trust.

When causation is at issue, a court must make additional considerations to supplement the standard estimation process because of the foregoing issues. For example, as discussed above, in *Dow Corning*, the judge denied estimation and suggested a causation trial to determine liability.

- 6 -

211 B.R. at 589, 593. In *Portland I*, Judge Perris granted relief from stay and recommended test cases. *Portland I*, 338 B.R. at 418-22. In *Portland II*, Judge Perris denied estimation and noted that if estimation was required, she "would likely recommend to the district court that estimation of the claims for compensatory damages should err on the high side of the probable range, to assure an adequate fund for payment of liquidated claims," and consider using "a few advisory summary jury trials" to aid in estimation. *Portland II*, 339 B.R. at 223.

Consistent with the *Dow Corning* and *Portland* special estimation considerations, the TCC and Tubbs Fire claimants have requested the Court to terminate the automatic stay to permit a group of Tubbs Fire claims to be tried by a state court jury, in order to inform the estimation process and determine the amount of distributable value on the Fire Claims. The Bondholders' plan is diametrically opposed to that process by capping the Tubbs Fire Claims at a de minimis settlement amount that bears no relationship to the balance of the Fire Claims, or the result of such a trial determination.

The Bondholders' proposal to estimate the personal injury and wrongful death claims for the purpose of sizing a capped trust would determine the amount of money available for distribution of a substantial percentage of the multi-billion dollar wildfire claim pool and would thereby implicate the District Court's involvement in the process, as Judge Perris decided in *Portland II*. With the plan confirmation process under the pressure of time, the question that will confront the Court and the parties is whether to request the District Court's involvement sooner than later. *Cf.* Bankr. L. R. 5011-2, 9015-2. Whatever the timing, the TCC believes the District Court proceeding would be related to PG&E's pending criminal proceeding that involves past and ongoing review of the factual issues involved in the wildfire claim litigation and the appropriate remedies therefor. There is substantial overlap that would justify the District Court's earlier involvement if that is the right course in these cases.

**B. Capped Trusts in Asbestos Cases Are Always Implemented with Consent of Tort Victims.**

The Bondholders may argue that capped trusts are used in asbestos cases almost uniformly. In 1986, the court in *Johns-Manville Corp.* confirmed a plan, which was supported by the asbestos

committee and future claims representative and received 95% approval from asbestos claimants. *See In re Johns-Manville Corp.* 68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd* 78 B.R. 407 (S.D.N.Y. 1987) *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1987). The plan set a cap on the trust as follows: $815 million in cash, plus 80% of the stock, plus $75 million a year for 25 years, plus an "evergreen" right to draw down 20% of corporate profits if needed to fund the asbestos health trust. *Id.* at 621-22. It also established a channeling injunction. *Id.* at 622. This case predated section 1411 of title 28, which was enacted in 1984. Pub. L. 98–353, title I, § 102(a), July 10, 1984, 98 Stat. 335.

After *Johns-Manville*, other debtors attempted to use a capped trust and channeling injunction model to resolve asbestos liabilities. Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C. § 524(g) in Light of the Third Circuit's Ongoing Business Requirement Dicta in Combustion Engineering*, 62 N.Y.U. Annual Surv. Am. L. 187, 191 (2006). At the time, parties heavily debated whether the bankruptcy court had the power to issue the permanent injunction, which resulted in uncertainty implementing the *Johns-Manville* injunction. *Id.* In 1994, Congress solved this problem by codifying the use of trusts modeled after the *Johns-Manville* trust. Pub. L. 103–394, title I, § 111(a), Oct. 22, 1994, 108 Stat. 4108, 4113, 4145. The 524(g) asbestos trust is an "evergreen" trust. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 248 (3d Cir. 2004). This means an asbestos trust, as an evergreen trust, is subject to continual recapitalization, because section 524(g)(2)(B)(II) requires that the trust "is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." In that sense, the statutory asbestos evergreen trust is not a trust with a true "capped" limit of funding. Section 524(g) also requires approval by 75% of tort claimants whose claims are to be paid through the trust. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

Since section 524(g) was enacted, bankruptcy courts in asbestos cases have used evergreen trusts with claimants' support in every asbestos case: *Combustion Engineering*,[4] *Armstrong World*

---

[4] *See In re Combustion Eng'g Inc.*, No. 03-10495 (JFK), 2005 Bankr. LEXIS 2623 (Bankr. D. Del. Dec. 19, 2005); *see also* MEALEY'S Asbestos Bankruptcy Report, Vol. 5, #4, November 2005 *available at*

- 8 -

*Industries Inc.*,[5] *Maremont Corp.*,[6] *Garlock Sealing Technologies*,[7] *W.R. Grace*,[8] *Eagle-Picher*,[9] *G-1 Holdings*,[10] *Owens Corning*,[11] *Johns-Manville*,[12] and *Global Industrial Technologies*.[13]

Congress did not adopt a statute establishing capped or evergreen trusts for non-asbestos personal injury cases. Nonetheless, in non-asbestos mass tort cases, courts have used capped trusts with the consent of the claimants only. *See Dow Corning*,[14] *A.H. Robins*,[15] *Takata*,[16] *Roman*

---

https://www.crowell.com/documents/DOCASSOCFKTYPE_ARTICLES_419.pdf (plan was negotiated with cancer claimants).

[5] *See In re Armstrong World Indus.*, 348 B.R. 111, 114-15 (D. Del. 2006) ($1.8 billion hard cap confirmed with consent of asbestos claimants' committee).

[6] *See* Findings of Fact, Conclusions of Law and Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Prepetition Solicitation Procedures, and (III) Confirming the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, *In re Maremont Corp.*, No. 19-10118 (LSS) (Bankr. D. Del. May 17, 2019), Dkt. No. 241 (consensual plan based on extensive negotiations with asbestos personal injury claimants).

[7] *See* Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and Oldco, LLC, Proposed Successor by Merger to Coltec Industries Inc. at 13, *In re Garlock Sealing Techs.*, No. 10-31607 (JCW), (Bankr. W.D.N.C. July 29, 2016), Dkt. No. 5443 (plan jointly proposed by the asbestos claimants' committee, future claimants' representative and the debtors).

[8] *See In re W.R. Grace & Co.*, 475 B.R. 34, 71-72, 174, 205 (D. Del. 2012) (all classes voted in favor of the joint plan, which was approved by the district court on a report and recommendation from the bankruptcy court).

[9] *See In re Eagle-Picher Indus., Inc.,* 203 B.R. 256, 262 (S.D. Ohio 1996) (plan jointly proposed by the debtors, the injury claimants' committee and the future claimants' representative).

[10] *See* Order Confirming Eighth Amended Joint Plan of Reorganization of G-I Holdings, Inc. and ACI Inc. Pursuant to Chapter 11 of the Bankruptcy Code, *In re G-1 Holdings, Inc.*, No. 01-30135 (RG), (Bankr. D.N.J. Nov. 9, 2012), Dkt. No. 9787 (jointly proposed plan by the debtors, the asbestos claimants committee and the legal representative for the present and future holders of asbestos related demands).

[11] Disclosure Statement with Respect to Sixth Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-In-Possession, Owens Corning Form 8-K, dated Aug. 17, 2006, Ex. 99.1, at 1 (stating that the plan proponents are debtors, the future claimants' representative, and the asbestos claimants' committee).

[12] *See In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) (plan supported by asbestos committee and received 95% approval from the claimants).

[13] *See In re Global Indus. Techs.*, 645 F.3d 201, 205 (3d Cir. 2011) (the plan was approved by 75% of victims in accordance with Bankruptcy Code section 524(g)).

[14] *See* Amended Joint Plan of Reorganization, *In re Dow Corning Corp.*, No. 95-20512 (DPH) (Bankr. E.D. Mich. Feb. 4, 1999), Dkt No. 16712 (joint plan submitted by the debtor and official committee of tort claimants); *see also* Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 Univ. Cal. Davis L. Rev. 1613, 1638 (2008) (plan was consensual).

[15] *See In re A.H. Robins Co.*, 88 B.R. 742, 750 (E.D. Va. 1988) (confirming consensual plan following extensive negotiations between the debtor and official committees, including the tort claimants' committee); "Judge OKs A. H. Robins Reorganization Plan," L.A. Times, July 27, 1988, *available at* https://www.latimes.com/archives/la-xpm-1988-07-27-fi-6314-story.html.

[16] *See* Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc., and its Affiliated Debtors, Ex. A, Sec. 9(1)(e), *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120. Only one of the original equipment manufacturers requested and received a channeling injunction, and that manufacturer agreed to fund the trust on an ongoing basis to pay claims as they are allowed post-confirmation.

*Catholic Archbishop of Portland in Oregon*.[17] Courts have noted the problems capping a trust over the objection of the tort claimants can produce underfunding of the trust for distribution purposes. *Dow Corning*, 211 B.R. at 596; *Portland I,* 338 B.R. at 418.

The TCC could not locate any cases, asbestos or otherwise, where a court implemented a capped trust over the objection of personal injury tort claimants.

In the asbestos cases, the courts have estimated claims on consent of parties or for limited purposes. In *In re Garlock Sealing Techs., LLC¸* 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014), the court estimated "the aggregate amount of Garlock's asbestos liability for the purpose of formulating a plan of reorganization," on consent of the Official Committee of Asbestos Personal Injury Claimants. Brief of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative as to the Nature and Scope of The Estimation Proceeding at 5, *In re Garlock Sealing Techs., LLC,* 504 B.R. 71 (Bankr. W.D.N.C. 2014), Dkt. No. 2008; *see also In re Eagle-Picher Indus., Inc.,* 189 B.R. 681, 682 (Bankr. S.D. Ohio 1995), as amended (Dec. 14, 1995) (explaining that the requested purpose of the estimation was to "decide the liability with respect to present and future asbestos-related personal injury claims in the aggregate for the purposes of determining the appropriate distributions to creditor classes under the Plan or any other plan that may be proposed in these Chapter 11 cases. The Court would not decide liability or assign a permanently fixed value for such claims.").

Asbestos case procedures are not applicable in non-asbestos mass tort cases such as this one.

### C. Lumping Subrogated Claims with Fire Claims Violates the Bankruptcy Code.

The Bondholders admit that Fire Claims are dissimilar: the proposed plan treats all of the Class 9B Wildfire Claims differently depending on the fire giving rise to each Fire Claim. For example, the Tubbs Wildfire Claims are a small fraction of the total Fire Claims, presumably because of an inaccurate Cal Fire report stating that PG&E did not cause the fire. The Bondholders also propose to pay Ghost Ship Fire Claims in an amount substantially less than the other fires. The

---

[17] *See In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154-elp11, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) (confirming Third Amended and Restated Joint Plan of Reorganization proposed by the Debtor, Tort Claimants Committee, Future Claimants Representative, and Parish and Parishioners Committee).

Non-Tubbs Wildfire Claims, on the other hand, appear to be treated more favorably than the Tubbs Wildfire Claims, as they are eligible to share in $5.45 billion.

Class 9B also includes the Public Entity Wildfire Claims, which are capped the full amount of the Debtors' settlement with the Public Entities, $1 billion. Since the Public Entities are receiving the full amount under their settlement with the Debtors, they are not even impaired, but that they are somehow included in Class 9B for voting purposes. Finally, Class 9B includes the Subrogation Claims, for both Tubbs and Non-Tubbs Wildfire Claims, $7.795 billion.

Yet, in violation of Bankruptcy Code section 1122, the Bondholders attempt to classify all such claims together in a single class. Bankruptcy Code section 1122 requires that claims may be together only if they are "substantially similar." The leading Ninth Circuit cases about the classification of claims explain that in order to determine whether claims are substantially similar, "bankruptcy court judges must evaluate the nature of each claim, *i.e.,* the kind, species, or character of each category of claims." *Steelcase Inc. v. Johnston (In re Johnston),* 21 F.3d 323, 327 (9th Cir. 1994), as amended (May 6, 1994); *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996). These cases also held that with a "legitimate business or economic justification," substantially similar claims may be classified differently. *Barakat*, 99 F.3d at 1526; *Johnston*, 21 F.3d at 327. "Thus, classification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996).

At the same time, Bankruptcy Code section 1123(a)(4) also requires that all claims in the same class receive the same treatment. Yet here, the Bondholders plan violates the Bankruptcy Code in two ways: the plan combines dissimilar claims into one class, in violation of section 1122, and then treats them differently, in violation of section 1123(a)(4).

The Public Entities, who settled with the Debtors for $1 billion, get $1 billion under this plan, and so they would surely vote to accept the plan. The Subrogation Claims, which also are treated differently than the estimated Tubbs and Non-Tubbs Wildfire Claims, are not substantially similar. *See., e.g., Chateaugay*, 89 F.3d at 949-51 (affirming the categorization of subrogation claims separately from related unpaid workers' compensation claims). For various reasons beyond

- 11 -

the scope of this Motion, Subrogation Claims have a different legal character than unpaid Fire Claims and cannot be categorized in the same class. Some of the claims in Class 9B have been liquidated, others are not. Yet, all of these dissimilar claims, which are treated differently, are considered as one Class 9B, in violation of the Bankruptcy Code.

To put a fine point on this—all holders of tort claims arising out of the Ghost Ship fire could uniformly vote against plan confirmation. Yet, under the proposed plan, if the Bondholders are somehow about to secure "yes" votes from holders of tort claims arising out of other fires by offering them special treatment, or Subrogation Claims that should be separately classified in any event, the Ghost Ship claimants could be deemed to be part of an accepting class notwithstanding their uniform opposition to plan confirmation. This is bankruptcy gerrymandering at its worst and is plainly illegal. The TCC opposes any plan that engages in unlawful gerrymandering to silence fire victims.

### D. The Bondholders' Proposed Plan Is Illegally Discriminatory.

Next, the proposed plan engages in unlawful discrimination. The Bankruptcy Code provides that when an impaired class rejects a plan, the plan cannot be confirmed over such rejection if the plan engages in unlawful discrimination. 11 U.S.C. § 1129(b)(1). Yet, this plan egregiously creates exactly that.

Fire Claims are critically impaired and would line up to oppose the Bondholders' proposed plan. The Debtors have already estimated liability for just the North Bay and Camp fires at $30 billion. PG&E 10-Q, dated Mar. 31, 2019, at 47. This estimate of liability does not include other fires included in the Bondholders' plan, including the Butte Fire and the Ghost Ship Fire. Plan Term Sheet, Schedule 1. Yet, the Bondholders' plan is contingent on the Court estimating the liability for all of these fires at $18.4 billion or less. Term Sheet at 15. This should never happen.

At the same time, the Bondholders would receive a complete windfall. They would receive 100% of their claims plus interest. *Id.* at 9-10. Class 6B, the long-term utility unsecured notes claims, would receive 98-99% of their claim—which, conveniently, allows their class to vote on the plan because of the technical impairment. Under *Pacifica L 51, LLC v. New Invs., Inc. (In re New Invs., Inc.)*, the Bondholders could receive default-rate interest. 840 F.3d 1137 (9th Cir. 2016).

- 12 -

The Bondholders have set themselves up to receive more than if the Debtors had never filed for bankruptcy in the first place.

These provisions, standing alone, demonstrate the discriminatory treatment between these classes that are supposed to be treated equally. The Fire Claims and Subrogation Claims can only recover against the capped Wildfire Claims Trust, which is undercapitalized with a maximum of $18.4 billion. By all accounts, $18.4 billion is nowhere near 100% of the actual amount of the Fire Claims and Subrogation Claims. Yet, the Fire Claims are deemed to be unimpaired, and at the same time the Bondholders receive 100% (or virtually 100%), with default rate interest. The Bondholders even provide for distribution of any remainder of the Wildfire Claims Trust to the bondholders of the reorganized PG&E. Term Sheet at 15.

But, the Bondholders' windfall does not end there. The Bondholders have created for themselves an option to buy stock in a reorganized PG&E at $18 billion, which much less than what the stock is will be worth particularly given the recently passed legislation that creates an insurance fund that will substantially enhance the value the equity in new PG&E. *Id.* at 16. By the TCC's estimate, the Bondholders will realize a $33 billion profit on an $18 billion investment within a few years of plan confirmation, all while value that should be used to pay Fire Claims and pay for critical safety upgrades is diverted to financial stakeholders. This is disgusting. And, this option costs nothing to the Bondholders, and they can back out if the other conditions of the plan are not met. *Id.* at 15 ("The Wildfire Claims Trust Agreement shall be in a form and substance acceptable to the Ad Hoc Committee."). The Bondholders can also purchase $4 billion of unsecured notes and $5.5 billion of secured notes, on unknown terms. *Id.* at 16-17.

**E.    The Bondholders' Proposed Plan Violates the Absolute Priority Rule.**

The absolute priority rule requires that a plan be fair and equitable with respect to each non-accepting class of claims or interests that is impaired under the plan. 11 U.S.C. § 1129(b)(2)(B)(ii). This means that a junior class may not receive a distribution if a senior unsecured class that votes against plan confirmation is not paid in full.

As discussed above, under the proposed plan, the Fire Claims are impaired. If the Fire Claims are properly classified, there will be multiple impaired unsecured classes that vote against

plan confirmation given the paltry amounts offered to pay Fire Claims under the proposed plan. Meanwhile, equity security holders receive either stock in the reorganized PG&E, or an option to buy stock in the reorganized PG&E. Term Sheet at 6, 14. Under these circumstances, the Bankruptcy Code requires that existing equity holders receive nothing.

### F. The Bondholders Play Additional Games Regarding Voting Rights.

The Bondholders claim that Class 6B, the long-term utility unsecured notes claims, are impaired because they receive 98-99% of their $15.8 billion claim—their bonds are reinstated at an interest rate 0.1% lower than their current rate. The one mega class of Fire Claims and Subrogation Claims and Class 6B are the only classes of the 13 classes of claims that are impaired and entitled to vote. The only other impaired class is the class of PG&E Corp. common stock. Those stockholders receive their stock back in reorganized PG&E, albeit diluted, and an opportunity to purchase 5% of the newly issued shares of the reorganized PG&E. The only claims entitled to vote on this plan are the improperly classified mega Class 9B, of all Fire Claims and Subrogation Claims, the artificially impaired class of Bondholders and a portion of the equity security holders.

## IV. CONCLUSION

For the foregoing reasons, the TCC objects to the Court terminating exclusivity to allow the Bondholders to file their proposed plan. If the Court terminates exclusivity, the TCC requests that the Court terminate exclusivity such that the Committees also may file their respective plans. The TCC reserves the right to raise other and further objections to the Bondholders' proposed plan.

Dated: July 18, 2019　　　　　　　　　BAKER & HOSTETLER LLP

　　　　　　　　　　　　　　　　　　　By: */s/ Robert A. Julian*
　　　　　　　　　　　　　　　　　　　　　　Robert A. Julian

　　　　　　　　　　　　　　　　　　　*Counsel for Official Committee of Tort Claimants*