1  Bruce S. Bennett (SBN 105430)
   Joshua M. Mester (SBN 194783)
2  James O. Johnston (SBN 167330)
   JONES DAY
3  555 South Flower Street
   Fiftieth Floor
4  Los Angeles, CA 90071-2300
   Telephone:  (213) 489-3939
5  Facsimile:  (213) 243-2539
   E-mail:     bbennett@jonesday.com
6              jmester@jonesday.com
               jjohnston@jonesday.com
7
   *Attorneys for PG&E Shareholders*
8

9              UNITED STATES BANKRUPTCY COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12

| 13 | In re: | Bankruptcy Case No. 19-30088 (DM) |
|---|---|---|
| 14 | PG&E CORPORATION | Chapter 11 (Lead Case) (Jointly Administered) |
| 15 | - and - | |
| 16 | PACIFIC GAS AND ELECTRIC COMPANY, | **OBJECTION OF CERTAIN PG&E SHAREHOLDERS TO MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS** |
| 17 | | |
| 18 | Debtors. | |
| 19 | | |
| 20 | ☐ Affects PG&E Corporation ☐ Affects Pacific Gas and Electric Company ☒ Affects both Debtors | Date: July 24, 2019 Time: 9:30 a.m. (Pacific Time) Place: United States Bankruptcy Court Courtroom 17, 16th Floor 450 Golden Gate Avenue San Francisco, CA 94102 |
| 21 | | |
| 22 | *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |
| 23 | | Re: Docket No. 2741 |
| 24 | | |

25

26

27

28

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ........................................................................................ 1

**PG&E'S PROGRESS** ...................................................................................................... 3

**EXCLUSIVITY TERMINATION WOULD WREAK HAVOC ON THESE CASES** ........... 8

**CONCLUSION** ............................................................................................................... 13

# <u>TABLE OF AUTHORITIES</u>

Page

CASES

*In re Adelphia Comm. Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006) ...................................................................8

*In re Cardelucci*,
    285 F.3d 1231 (9th Cir. 2002)..........................................................................11

*In re Thrifty Oil Co.*,
    205 B.R. 1009 (Bankr. S.D. Cal. 1997) ...........................................................8

STATUTES

Cal. Pub. Util. Code § 451.1 ..................................................................................3

Cal. Pub. Util. Code § 1701.8 ................................................................................6

Cal. Pub. Util. Code § 3282 ...................................................................................6

Cal. Pub. Util. Code § 3292 ...........................................................................3, 4, 6

Cal. Pub. Util. Code § 8386 ...................................................................................3

Cal. Pub. Util. Code § 8386.3 ................................................................................3

Cal. Pub. Util. Code § 8389 ...................................................................................3

OTHER AUTHORITIES

CAL FIRE News Release, *CAL FIRE Investigators Determine The Cause Of The
    Tubbs Fire* (January 24, 2019) ..........................................................................6

Matt Wirz, *Paul Singer's Elliott Scores Big Win In PG&E Clash*,
    WALL STREET JOURNAL (July 11, 2019) ............................................................4

Press Release, PG&E, *PG&E Announces New Chief Executive Officer And
    Appointment Of A Refreshed Board of Directors; New Leadership Focused On
    Enhancing Safety Culture And Operational Excellence* (April 3, 2019) ..................7

Press Release, PG&E, *PG&E and Local Public Entities Resolve 2015, 2017 And
    2018 Wildfire Claims* (June 19, 2019) ..............................................................5

Case: 19-30088   Doc# 3072   Filed: 07/18/19   Entered: 07/18/19 15:41:47   Page 3 of
19

Certain owners of common stock of PG&E Corporation (the "<u>PG&E Shareholders</u>")[1] hereby object to the *Motion To Terminate The Debtors' Exclusive Periods Pursuant To Section 1121(d)(1) Of The Bankruptcy Code* [ECF 2741 ("<u>Motion</u>")] filed by the Ad Hoc Committee of Senior Unsecured Noteholders (the "<u>Ad Hoc Committee</u>"). In the aggregate, the PG&E Shareholders own 35% (over 185 million shares) of the outstanding common stock of PG&E Corporation. As PG&E is solvent by billions of dollars, the PG&E Shareholders are material stakeholders in this reorganization.

<u>**PRELIMINARY STATEMENT**</u>

On May 23, 2019, the Court extended PG&E's plan exclusivity period for four months, to September 26, 2019. At the time, recognizing "the many legal and operational issues the Debtors must contend with during these chapter 11 cases," the Ad Hoc Committee – comprised of PG&E bondholders – had no objection to an even longer six-month extension. [ECF 2008 ¶ 2]. Just one month later, however, the Ad Hoc Committee abruptly reversed course by moving to terminate the exclusivity period the Court had just extended. Complaining of "the Debtors' sluggish pace," Motion ¶ 4, the Ad Hoc Committee seeks this relief so that it can advance a plan based on the purported "term sheet" appended to the Motion.

The Motion should be seen for what it is – a naked attempt to seize control of PG&E at a fire sale price. The Ad Hoc Committee proposes to acquire virtually all of PG&E at a price billions of dollars less than its actual value, *and* acquire new debt with interest rates nearly double market rates, *and* overpay the claims held by its members through new debt worth billions of dollars more than the allowed amounts of the claims, *and* pay itself $600 million in fees in the process. As shown below, this takeover would come at the expense not only of shareholders but also fire victims, ratepayers, and the State. It would serve no purpose other than lining the

---

[1] The PG&E Shareholders are identified in the *First Amended Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019* [ECF 3066]. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

pockets of a group of bondholders whose claims will be paid in full under PG&E's plan and who have no legitimate reason to pursue their own plan. This is not a case involving a logjam caused by warring creditors or fights over an estate too small to satisfy all legitimate claims, and there is no cause to terminate exclusivity at this early date in the reorganization process.

Acting responsibly as a fiduciary for the bankruptcy estates, PG&E has made great strides toward developing a confirmable plan of reorganization that will provide for the satisfaction or reinstatement of all allowed claims. We understand that PG&E will outline the contours of that plan in the near future. In developing its restructuring plan, PG&E provided feedback to Governor Newsom's staff and the key state legislators who crafted Assembly Bill 1054 ("AB 1054"), a critical legislative component of PG&E's reorganization. AB 1054 was signed into law on July 12, 2019, three weeks *after* the Ad Hoc Committee prematurely filed its Motion bemoaning PG&E's purported lack of progress. It would have been reckless to propose a plan, as the Ad Hoc Committee did, before that outcome determinative legislation was passed.

While working on the legislation, PG&E also has engaged in mediation with multiple different groups of fire victim claimants, reaching a $1 billion settlement with public entity claimants who asserted claims in excess of $4 billion. Despite efforts by the Tort Claimants' Committee (the "TCC") and others to slow down the process, PG&E continues to make progress quantifying its remaining wildfire liabilities and soon will be in a position to propose a plan that will address those liabilities responsibly and fully while complying with the new legislation's requirement that the plan be rate neutral for customers.

PG&E must resolve these cases by June 30, 2020, in order to access the wildfire insurance fund to be created by AB 1054. By that time, PG&E not only must engage in traditional restructuring activity (negotiations with creditors, reconciliation of claims, etc.) but also come to a resolution with its chief regulator, the California Public Utilities Commission ("CPUC"), on many of the components of its plan of reorganization. PG&E, as the debtor in possession of a solvent estate, is the appropriate steward of that process and the only entity that will be able to achieve the newly established legislative timetable. As demonstrated by the Ad Hoc Committee's (non)plan, terminating exclusivity now would open the floodgates to "nonplans or tire kickers or

troublemakers," Tr. 5/22/19 at 51:7-8, producing internecine warfare over competing plans that advance parochial interests at the expense of the bankruptcy estates and all stakeholders, in the process imperiling PG&E's restructuring. There is no good cause to do so.

### PG&E'S PROGRESS

At the hearing on PG&E's plan exclusivity motion, the Court observed that "the fact that I haven't seen something on file doesn't mean there's a lack of progress." Tr. 5/22/19 at 36:21-22. Those were apt remarks, as much of this case – even more so than a typical large reorganization – has transpired outside of the courtroom.

AB 1054. Most notably, as Governor Newsom explained to the Court a few months ago, massive efforts have been devoted "towards the goal of enacting legislation this summer that will reshape the existing policy and regulatory frameworks and – together with decisions by the CPUC – will circumscribe the options for PG&E." [ECF 2006 ¶ 14; *id.* ¶¶ 11-13 (describing legislative, regulatory and executive efforts)]. Thanks to the leadership of the Governor and key legislative leaders, AB 1054 was enacted and signed into law on July 12, just six days ago.

AB 1054 will have a major impact on PG&E's reorganization. Among many other things, the new legislation:

- Provides for the creation of a $21 billion statewide insurance fund to be tapped for payment of claims in the event of future utility-caused wildfires, to which PG&E must contribute $4.8 billion upon emergence from bankruptcy and $193 million annually thereafter (if it elects to participate), Cal. Pub. Util. Code § 3292;

- Changes the standards by which PG&E and other utilities may pass expenses to ratepayers, Cal. Pub. Util. Code § 451.1;

- Requires billions of dollars of ongoing utility wildfire prevention measures, Cal. Pub. Util. Code § 8386.3;

- Creates a new process for utility safety certification and wildfire mitigation plans, Cal. Pub. Util. Code §§ 8386, 8386.3, 8389; and

- Limits liability for wildfires caused by unreasonable utility conduct, Cal. Pub. Util. Code § 3292(h).

Critically, *AB 1054 directly addresses the timing and contents of PG&E's plan of reorganization*. In order for PG&E to opt into the wildfire insurance fund described above, it must (a) within sixty days after the legislation's effective date (July 12), obtain approval from the Court of its determination to contribute to the wildfire fund upon emergence from bankruptcy, and (b) by June 30, 2020, have resolved the bankruptcy case pursuant to a plan of reorganization that, among other things:

- "satisf[ies] any prepetition wildfire claims asserted against [it] . . . in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court"; and

- is approved by the CPUC as:

  ○ "acceptable in light of [PG&E]'s safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission,"

  ○ "(i) consistent with the state's climate goals . . . and (ii) neutral, on average, to the ratepayers of [PG&E]," and

  ○ "recogniz[ing] the contributions of ratepayers, if any, and compensat[ing] them accordingly through mechanisms approved by the commission, which may include sharing of value appreciation."

Cal. Pub. Util. Code § 3292(b). AB 1054 thus directly impacts not only PG&E's business but this bankruptcy case. Critically, it establishes a timetable and plan prerequisites (including the consent of the CPUC) that, as practical matter, only PG&E can meet.

PG&E prudently waited until this sea change legislation was enacted before launching its reorganization plan. All the while, in an effort to limit PG&E's financial flexibility, raise the cost of required new capital, and narrow PG&E's options for exiting bankruptcy, the Ad Hoc Committee was actively lobbying *against* elements of AB 1054 that would have established a low-cost mechanism for utilities (including PG&E) to finance payments to wildfire victims and contributions to the wildfire insurance fund at the expense of shareholders and without any rate increases. *See* Matt Wirz, *Paul Singer's Elliott Scores Big Win In PG&E Clash*, WALL STREET

JOURNAL (July 11, 2019).[2] Claiming that it alone can provide the relevant financing for a plan, the Ad Hoc Committee now seeks to capitalize on its own destructive behavior through an order terminating exclusivity.[3]

<u>Wildfire Liabilities</u>. PG&E was not otherwise inactive while the legislation was being developed. Most notably, PG&E reached a comprehensive $1 billion settlement – to be implemented through its plan of reorganization – with local public agencies that had asserted over $4 billion in claims relating to the 2015, 2017, and 2018 California wildfires.[4] As described in PG&E's objection to the Motion, PG&E also has actively engaged in constructive dialogue with numerous other stakeholders and worked to quantify its potential liabilities in respect of prepetition wildfires.

Unfortunately, PG&E's efforts to quantify wildfire liabilities have been hindered by the TCC. As the Court is aware, the TCC sought to delay assertion of wildfire claims, arguing that no bar date should be set until next year and that claim forms, when filed, should not require claimants to include supporting documentation or even state an amount for their claims, "as this would serve no useful purpose at this stage in the Chapter 11 Cases." [ECF 1825 at 9]. The TCC's objections resulted in the bar date being postponed to late October and the inclusion of a claim form that makes it optional for fire victims to state the amount of their claims.

---

[2] "The California legislature delivered a preliminary victory to hedge-fund billionaire Paul Singer and other PG&E Corp. bondholders in their monthslong battle with the utility's shareholders. Mr. Singer's firm, Elliott Management Corp., is one of the biggest owners of bonds issued by the power company, which filed for bankruptcy protection in January while estimating that it could owe tens of billions of dollars to victims of the state's deadly 2017 and 2018 wildfires. The investors have been lobbying in Sacramento for months to sway the wildfire-liability bill the legislature passed Thursday" in an effort to prevent "language in the bill that would have allowed the company to pay for those liabilities by issuing a new bond backed by income that would otherwise be paid to shareholders." *Id.*

[3] Notwithstanding the Ad Hoc Committee's bad faith efforts, it is anticipated that California legislators will take up an additional bill after their July recess addressing mechanisms by which utilities can obtain such shareholder funded financing.

[4] Press Release, PG&E, *PG&E And Local Public Entities Resolve 2015, 2017 And 2018 Wildfire Claims* (June 19, 2019), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190619_pge_and_local_public_entities_resolve_2015_2017_and_2018_wildfire_claims.

1    The reason for this filibustering became clear when the TCC recently filed a motion for

2    relief from stay to permit a hand-picked selection of cases to proceed to a rushed trial in state

3    court.  [ECF 2843].  Those cases involve the Tubbs fire.  After an exhaustive, year-long

4    investigation, official State investigators at CAL FIRE conclusively determined that PG&E in fact

5    did *not* cause the Tubbs fire and that the fire, instead, was sparked by "a private electrical

6    system."[5]  This is critically important, as CAL FIRE is the statewide arbiter of wildfire ignition

7    sources.[6]  Yet the TCC claims that the Tubbs Fire "produced approximately a third of the

8    $54 billion of wildfire claims in these Chapter 11 Cases."  [ECF 2843 at 2].  The TCC apparently

9    thinks it can leverage an oversize settlement of all wildfire claims if it can put PG&E in the

10   position of facing a jury trial regarding a fire that – while enormous – the State has determined

11   was not caused by PG&E, apparently reasoning that PG&E will not risk an adverse judgment for

12   a sympathetic plaintiff impacting an alleged $18 billion in claims.  *Id.* at 3 (relief from stay

13   "would result in settlement of the Chapter 11 Cases, because PG&E's three year track record in

14   the fire litigation establishes that PG&E settles every single fire claim before the jury trial"); *id.*

15   at 21.

16        Given all of this, the fact that PG&E has not resolved its wildfire liabilities in the first six

17   months of this case does not support a termination of the plan exclusivity period the Court

18   recently extended.  To the contrary, as the Court observed at the prior exclusivity hearing, even if

19   all of the unresolved issues faced by PG&E were magically resolved tomorrow, it would be "a

20   long time before [PG&E] gets the plan into the file" due to the complexities of the case and

21   PG&E's business.  Tr. 5/22/19 at 31:4-5.

22        The New Board and CEO.  The Ad Hoc Committee asserts that "the Debtors have wasted

23   crucial time needlessly overhauling its [sic] board of directors to protect and entrench the

---

[5]   CAL FIRE News Release, *CAL FIRE Investigators Determine the Cause of the Tubbs Fire*
      (Jan. 24, 2019), https://fire.ca.gov/media/5032/tubbscause1v.pdf.

[6]   For example, the statewide wildfire insurance fund to be created pursuant to AB 1054 will
      only pay claims arising from a wildfire "caused by an electrical corporation as determined by
      the governmental agency responsible for determining causation [*i.e.* CAL FIRE]."  Cal. Pub.
      Util. Code §§ 1701.8, 3282(d), 3282(f), 3292(a).  Thus, claims relating to the Tubbs Fire
      would not be able to be paid from the wildfire insurance fund even if it had been in existence
      at the time the fire was ignited.

parochial interests of an aggressive new subset of equity holders. The valuable time spent resolving these internal disputes and then educating new directors – the majority of whom have little or no utility and safety experience – has come at the expense of making critical progress towards a successful and swift exit from Chapter 11." Motion ¶ 2. This false assertion belies any suggestion that the Ad Hoc Committee is a credible candidate to pursue a takeover of PG&E.

To start, the "overhaul" of the PG&E board of directors was completed on April 3, 2019,[7] *six weeks before the Ad Hoc Committee told the Court that it had no objection to a six-month extension of exclusivity* [ECF 2008] and two-and-a-half months before the Motion was filed. The Ad Hoc Committee's after-the-fact complaint about replacement of the board of directors is pretextual. So is the Ad Hoc Committee's claim that the board overhaul was "needless." Virtually every stakeholder has cited the need to replace PG&E's prepetition board, improve safety, and reduce accidents. Until now, no constituent dared suggest that the board of directors on whose watch the prepetition wildfires occurred should remain in place to lead PG&E out of bankruptcy.

Finally, as demonstrated in our reply in support of PG&E's motion to extend exclusivity, the Ad Hoc Committee's claim that "the majority of [the new board] have little or no utility and safety experience" is simply false. New members of the board have vast utility *and* safety experience. [ECF 2082 at 2-5]. So does Bill Johnson, former President and CEO of the Tennessee Valley Authority (TVA), whom the new board hired as PG&E's Chief Executive Officer and President. On Mr. Johnson's watch, TVA (the nation's largest publicly owned utility) achieved the best safety records in its 85-year history and was been a perennial top decile safety performer in the industry.

At the same time, the new board also includes members with vast financial restructuring experience. [ECF 2082 at 5]. The Ad Hoc Committee disingenuously claims that the

---

[7]    Press Release, PG&E, *PG&E Announces New Chief Executive Officer And Appointment Of A Refreshed Board of Directors; New Leadership Focused on Enhancing Safety Culture And Operational Excellence* (April 3, 2019), https://www.pge.com/en/about/newsroom/ newsdetails/index.page?title=20190403_pge_announces_new_chief_executive_officer_and_a ppointment_of_a_refreshed_board_of_directors_new_leadership_focused_on_enhancing_safe ty_culture_and_operational_excellence.

appointment of those directors "raises critical plan process concerns regarding the Debtors' ability to prioritize a rapid and equitable exit from these cases above the economic interests of equity holders." Motion ¶ 2. To the contrary, directors with restructuring expertise will help PG&E expedite resolution of these cases. Given the extraordinary challenges facing the bankruptcy estates, it would have been a disservice to all stakeholders had PG&E shareholders not nominated at least several directors with restructuring expertise.

As we previously noted, the appointment of a new board and new CEO with a broad set of necessary skills and expertise is cause for an extension of exclusivity, not termination. PG&E and its shareholders did what the Governor and others urged: they cleaned house and brought in a new regime dedicated to addressing PG&E's safety culture and improving its performance while reorganizing fairly and rapidly. The Court should give them the opportunity to finish that job.

## EXCLUSIVITY TERMINATION WOULD WREAK HAVOC ON THESE CASES

The Ad Hoc Committee asks the Court to terminate exclusivity "so that it may file and pursue confirmation of a plan of reorganization that it believes will allow the Debtors to emerge successfully from chapter 11 by the end of 2019 or shortly thereafter." Motion ¶ 1.

This is fantastical. The only realistic prospect for achieving confirmation and resolution of these cases by AB 1054's June 30, 2020, deadline is for PG&E to file and pursue a confirmable proposed plan that complies with the legislative directive. As demonstrated by the Ad Hoc Committee's purported plan "term sheet," termination of exclusivity would open the floodgates to any number of unconfirmable plans, miring these cases in litigation and dooming PG&E's ability to access the wildfire insurance fund the legislature has made available to it. *E.g.*, *In re Adelphia Comm. Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) ("Terminating exclusivity might well result in the solicitation of three or even more plans (not just one or two), with some addressing only parochial concerns. Or, given predictions creditors have made to me, several creditor constituencies might file their own 'wish list' plans, with each being no more palatable to other constituencies than all of the proposals that I've seen to date.") (denying motion to terminate exclusivity); *In re Thrifty Oil Co.*, 205 B.R. 1009, 1016 (Bankr. S.D. Cal. 1997) (extending exclusivity after "[t]he court expressed strong reservations as to the merits of the

[objector's] draft plan, stating that to terminate exclusivity in order to permit the filing of such a plan would bury the case in litigation").

The Ad Hoc Committee's "Term Sheet". To start, the Ad Hoc Committee's "term sheet" (as amended on July 17, 2019 [ECF 3024 at Ex. A], the "Term Sheet") is not the precursor to a confirmable plan. The Term Sheet was proposed by a group of creditors of a solvent estate who hold bonds that largely are trading above par (over 100%) even given all of the uncertainties of PG&E's reorganization.[8] It is a misleading prescription for a plan that cannot be confirmed.

For one thing, the Term Sheet is based on "compromises" that do not exist. The Ad Hoc Committee says that "consensus must be built among a diverse set of stakeholders around a confirmable plan construct" and claims that the Term Sheet "reflects compromises that would ensure PG&E's long-term viability without ratepayers shouldering the costs of the restructuring." Motion ¶ 3. The Term Sheet purportedly implements those "compromises" by providing for wildfire claims to be limited to an "Agreed Capped Amount" for each of six different categories of claims (an aggregate of $16 billion, "subject to upward adjustment of up to 15%"). Term Sheet at 11 n.8, 11-13, 14-15. *But there is no "agreement" or "compromise" as to those caps*. Rather, the Term Sheet provides for *the Court* to fix the claim limits *in a contested estimation proceeding*. Term Sheet at 14. Calling a prospective litigated judgment an "agreed amount" does not make it so.

The Ad Hoc Committee also touts as the "centerpiece" of its proposal "up to $30 billion of new money investment (the vast majority of which is equity) in the Debtors by members of the Ad Hoc Committee," something "the Ad Hoc Committee believes will be unrivaled in any competing proposal that will be put forward." Motion ¶ 5. Unsurprisingly, this "centerpiece investment" is to be provided on extremely expensive terms. For example, the Ad Hoc Committee purports to be willing to purchase between $19 billion and $20 billion in new equity in PG&E, but only in exchange for between 85% and 95% ownership of the reorganized enterprise. [ECF 3024 at Ex. C]. That implies a price of between $2 and $6.50 per share, a

---

[8]  *Exhibit A* shows recent trading prices of PG&E's unsecured bonds.

fraction of the price at which PG&E shares currently trade (over $18 per share) even with the threat of a value-destructive bondholder plan[9] and all of the ongoing risks faced by PG&E, including the risk of postpetition wildfires, the risk that wildfire claims exceed the capped amounts set forth in the Term Sheet, the risk of unfavorable regulatory rulings in PG&E's cost of capital case, and the risk that PG&E will be unable to resolve its bankruptcy case by the legislative deadline of June 30, 2020. As noted below, the Ad Hoc Committee has insulated itself against every one of those risks by making its financing contingent on favorable resolutions of each. The upshot is that the Ad Hoc Committee's risk free "commitment" is one to acquire PG&E at pennies on the dollar for a price that literally is billions of dollars (likely $10 billion or more) less than PG&E is worth.

Similarly, the Ad Hoc Committee purports to be willing to fund between $4 billion and $5.4 billion of new unsecured notes, but only on much more expensive terms than reorganized PG&E could command in the market. [ECF 3024 at Ex. B]. Among other things, the Ad Hoc Committee proposes to pay itself 7.5% interest – about double the rate reorganized PG&E likely could obtain in the market and certainly not indicative of the investment grade rating that the California Legislature intended to protect in AB 1054. This would transfer an additional $1 billion or more of value to the Ad Hoc Committee.

At the same time, there are many conditions to the Ad Hoc Committee's "commitment" to provide any of this financing, including:

- "No material wildfire claims exposure to the Debtors due to postpetition fires during the pendency of the chapter 11 cases";

- "Satisfactory conclusion, which, for purposes of this condition, means resolution consistent with other similarly situated California utilities in terms of regulated capital structures and returns on equity, of the Utility's 2020 general rate case and 2019 cost of capital proceeding before the CPUC or a mutually agreed deferral for a period of 24 months from the Effective Date of the Plan";

---

[9]    PG&E shares closed at $21.67 the day before the Motion was filed.

Case: 19-30088    Doc# 3072    Filed: 07/18/19    Entered: 07/18/19 15:41:47    Page 13 of 19

1        • "no material adverse change to PG&E Corp."; and

2        • "A plan of reorganization that provides a binding cap on the Wildfire Claims equal to

3        the Estimated Wildfire Liability, not to exceed $16.0 billion plus a maximum 15% upward

4        adjustment."

5    Term Sheet at 23. For this essentially risk free commitment, the Ad Hoc Committee would line

6    its pockets with $600 million in fees for its exclusive "backstop" of the new financing.

7        But that is not all. The Term Sheet requires that PG&E overpay for the bonds the Ad Hoc

8    Committee's members now hold by providing for postpetition interest at the contract rate instead

9    of the federal judgment rate as required by controlling Ninth Circuit law, *In re Cardelucci*, 285

10   F.3d 1231 (9th Cir. 2002), and seemingly for billions of dollars of "makewholes" or prepayment

11   premiums not provided for under the governing debt documents or allowable under governing

12   law. It also provides for PG&E to "replace" $15.8 billion in *unsecured* debt with a comparable

13   amount of *secured* debt, bearing an interest rate nominally reduced by a tenth of a percentage

14   point (0.1%). Those newly secured notes are sure to trade well above par, as a ten basis point

15   reduction is a mere fraction of the reduction in interest rates that would constitute fair

16   consideration for the security to be granted to the bondholders. At current market rates, this

17   scheme would overpay bondholder claims by more than $5 billion while artificially impairing the

18   bondholder class for purposes of achieving acceptance of a plan.[10]

19       All of this would result in Ad Hoc Committee members taking over PG&E, controlling its

20   board, *and* receiving billions of dollars of value over the allowed amounts of their claims. It is no

21   wonder the Ad Hoc Committee's lobbied hard to limit PG&E's other financing options. But,

22   needless to say, the Term Sheet does not describe a confirmable plan, and if such a plan were to

23   be filed it would be met with hotly contested confirmation litigation.

24

25

---

26   [10]   When this refinanced unsecured debt is combined with the $5.5 billion in newly issued
27         secured debt, the Term Sheet contemplates more than $21 billion in new utility-level secured
           debt at emergence. This much new secured debt at the operating company is singularly
           inappropriate given that liens would give secured creditors priority over the claims of any
28         future wildfire victims and severely limit reorganized PG&E's financing opportunities.

| | |
|---|---|
| 1 |      <u>The Floodgates</u>.  The Ad Hoc Committee's misleading "term sheet" already has sown |
| 2 | confusion.  For example, the Utility Reform Network (TURN) recently weighed in to support a |
| 3 | termination of exclusivity under the mistaken belief that the Ad Hoc Committee's proposed plan |
| 4 | would be neutral to ratepayers while a PG&E plan "would shift to others the risk and |
| 5 | responsibility for corporate malfeasance and criminality."  [ECF 2918 at 2].  In fact, it is the Ad |
| 6 | Hoc Committee that is putting ratepayers at risk by cynically lobbying against lower cost capital |
| 7 | solutions and pursuing a proposal that will engender substantial litigation and threaten PG&E's |
| 8 | ability to meet the legislature's June 30, 2020, resolution deadline.  Indeed, by forcing PG&E to |
| 9 | assume billions of dollars of above-market bonds and to replace billions of dollars of other |
| 10 | unsecured bonds with above-market secured debt, the Ad Hoc Committee's proposal would wind |
| 11 | up costing ratepayers billions of dollars as the burden of that lucrative financing is passed on to |
| 12 | customers.[11] |
| 13 |      In a similar vein, several labor organizations have suggested that it would be beneficial |
| 14 | and expeditious to create a "competition" among constituents via competing plans of |
| 15 | reorganization.  [ECF 3007 (ESC Local 20) and ECF 3012 (IBEW Local 1245)].  More broadly, |
| 16 | we are aware that other stakeholders (including, most notably, the ad hoc committee of |
| 17 | subrogation claim holders) are likely to respond to the Motion by seeking exclusivity termination |
| 18 | in order to file (or threaten to file) their own plans in pursuit of their own parochial interests.  But, |
| 19 | while "competition" among plans theoretically might benefit creditors in an ordinary case, the |
| 20 | unique facts and circumstances of this case dispel any such notion here. |
| 21 |      Rather, multiple proposed plans of reorganization will only worsen the confusion |
| 22 | engendered by the Ad Hoc Committee and magnify the significant execution risks already faced |
| 23 | by PG&E in attempting resolve these cases by the middle of next year.  Moreover, there is no |
| 24 | creditor benefit to be gained by competing plans.  PG&E will propose a plan that satisfies or |
| 25 | reinstates all claims.  Proposals from the Ad Hoc Committee and others cannot legally pay |
| 26 | |

---

[11] The Term Sheet states that the Ad Hoc Committee will not seek to recover PG&E's contributions to the new wildfire insurance fund from ratepayers, Term Sheet at 20, but it conveniently does not make such a commitment with respect to the financing costs it wants to impose upon PG&E.

- 12 -

creditors more than their allowed amounts. The only reason for a stakeholder to propose a competing plan would be to overpay itself (as the Ad Hoc Committee proposes to do) or otherwise advance personal objectives at the expense of the estates.

California's new legislation literally has just passed. Additional legislation is likely to be passed before the end of the current legislative session in mid-September. Time is of the essence, as PG&E must develop and solicit votes on a confirmable plan *and* negotiate and reach consensus with the CPUC (which in turn will need to conduct a public comment and approval process that can take over six months) by the middle of next year. To maximize PG&E's prospects of achieving the legislature's difficult conditions for accessing the wildfire insurance fund and other benefits of that legislation, it is imperative that PG&E retain the opportunity to pursue its plan during the exclusive period the Court recently ordered (and for such additional reasonable period if warranted by continued progress toward a swift and just resolution of these cases).[12]

### CONCLUSION

These cases hang in a delicate balance. The California Legislature has established a number of time-sensitive conditions that PG&E must satisfy before it can access the wildfire insurance fund and other elements of AB 1054. There is little margin for error. The chaos resulting from exclusivity termination would imperil PG&E's ability to satisfy the legislative conditions, ultimately harming PG&E, wildfire victims, ratepayers, and all stakeholders. The PG&E Shareholders urge the Court to deny the Motion.

---

[12] The PG&E Shareholders have worked constructively with PG&E and other stakeholders toward a consensual restructuring and do not believe that exclusivity should be terminated. If, however, the Court determines that cause exists to terminate exclusivity, the PG&E Shareholders would have no choice but to consider proposing their own plan in order to protect shareholders from the Ad Hoc Committee's efforts to seize the company. The PG&E Shareholders have begun work on such a plan and will be in a position to file it if the plan process is opened up to stakeholders.

| | |
|---|---|
| 1 | Dated: July 18, 2019 |

JONES DAY

By: */s/ James O. Johnston*
    James O. Johnston

*Attorneys for PG&E Shareholders*

1

**EXHIBIT A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PG&E Bond Pricing



Case: 19-30088   Doc# 3072   Filed: 07/18/19   Entered: 07/18/19 15:41:47   Page 19 of 19

Source: Bloomberg.