WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                            **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>Related Docket Ref: Docket No. 2741<br><br>**DEBTORS' OBJECTION TO MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>Date:    July 24, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102<br><br>**Obj. Deadline**: July 18, 2019, 4:00 p.m. (PT) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this objection to the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] (the "**Termination Motion**")[1] filed by the Ad Hoc Committee of Senior Unsecured Noteholders of the Utility (the "**Ad Hoc Committee**"). In support of the Objection, the Debtors respectfully submit the Declarations of James Mesterharm (the "**Mesterharm Declaration**") and Tomer Perry (the "**Perry Declaration**"), filed contemporaneously herewith.

---

[1] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Termination Motion.

# **Table of Contents**

Preliminary Statement ................................................................................. ii

The Termination Motion Should be Denied ..................................................9

    A.  The Amended Ad Hoc Plan is not Confirmable on its Face..................................11

        1.  The Amended Ad Hoc Plan does not Satisfy Section 1129(a)(3) of the Bankruptcy Code. ...............................................11

        2.  The Amended Ad Hoc Plan Discriminates Unfairly in Violation of Section 1123(a)(4) of the Bankruptcy Code and, Therefore, Fails to Satisfy the Requirements of Section 1129(a)(1) of the Bankruptcy Code. ...............................................13

    B.  The Amended Ad Hoc Plan is not Credible................................................14

    C.  The Ad Hoc Committee Ignores the Substantial Progress Made by the Debtors to Date ...................................................17

Conclusion ...........................................................................................19

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# **TABLE OF AUTHORITIES**

**Cases**

*In re Art & breiteculture Books of the 21st Century*,
   2016 WL 1118743 (Bankr. C.D. Cal. Mar. 18, 2016) ........................................................12

*In re Breitburn Energy Partners LP*,
   582 B.R. 321 (Bankr. S.D.N.Y. 2018) ............................................................................12

*Connecticut General Life Ins. Co. v. Hotel Assoc.*,
   165 B.R. 470 (9th Cir. BAP 1994) ..................................................................................13

*In re Eagle-Picher Indust., Inc.*,
   176 B.R. 143 (Bank. S.D. Ohio 1994) ............................................................................18

*In re Energy Conversion Devices, Inc.*,
   474 B.R. 503 (Bankr. E.D. Mich. 2012) ..........................................................................9

*Matter of Fansteel, Inc.*,
   No. 16-01823-ALS11, 2017 WL 782865 (Bankr. S.D. Iowa Feb. 28, 2017) ...................10

*In re Fountain Powerboat Indust., Inc.*,
   2009 WL 4738202 (Bankr. E.D.N.C. Dec. 4, 2009) .......................................................10

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ...............................................................................12

*In re Lichtin/Wade, L.L.C.*,
   478 B.R. 204 (Bankr. E.D.N.C. 2012) ..............................................................................9

*In re New Meatco Provisions*,
   No. 2:13-BK-22155-PC, 2014 WL 917335 (Bankr. C.D. Cal. Mar. 10, 2014) ...............10

*In re NNN Parkway 400 25 LLC*,
   505 B.R. 277 (Bankr. C.D. Cal. 2014) ............................................................................13

*In re Orchards Village Investments, LLC*,
   2010 WL 143706 (Bankr. D. Or. 2010) ...........................................................................13

*In re Pac. Gas & Elec. Co.*,
   Case No. 01-30923 (Bankr. N.D. Cal. Mar. 13, 2001) .....................................................9

*Phoenix Premier Properties LLC v. Fed. Nat'l Mortgage, Assoc.*,
   2012 WL 2389955 (D. Ariz. June 25, 2012) ...................................................................13

*In re Situation Mgmt. Systems, Inc.*,
   252 B.R. 859 (Bankr. D. Mass. 2000) ............................................................................10

*In re SunEdison, Inc.*,
   575 B.R. 220 (Bankr. S.D.N.Y. 2017) ............................................................................12

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088   Doc# 3075   Filed: 07/18/19   Entered: 07/18/19 16:13:44   Page 4 of 25

*In re Texaco Inc.*,
    76 B.R. 322 (Bankr. S.D.N.Y. 1987) ........................................................16

*In re Texaco, Inc.*,
    81 B.R. 806 (Bankr. S.D.N.Y. 1988) ........................................................10

**Statutes**

11 U.S.C. § 1121 ................................................................................2, 7, 9, 17

11 U.S.C. § 1123(a)(4) ..........................................................................11, 13, 14

11 U.S.C. § 1129 ................................................................................................3, 9

11 U.S.C. § 1129(a)(1) ..........................................................................11, 13, 14

11 U.S.C. § 1129(a)(3) ................................................................................11, 13

11 U.S.C. § 1129(a)(10) ....................................................................................11

**Other Authorities**

*Wall Street Journal* ..............................................................................................7

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Preliminary Statement**

On June 25, 2019, just one month after the Ad Hoc Committee stated on the record of the hearing on the Debtors' Motion to Extend the Exclusive Periods (the "**Exclusivity Hearing**") that they "don't oppose the extension [to November 29, 2019] being sought [by the Debtors]," and that "given the complexities of the case [the Ad Hoc Committee] thinks an extension is warranted" (Exclusivity Hr'g Tr., at 36:17, 37:10-11), the Ad Hoc Committee has filed its motion to terminate the Debtors' Exclusive Periods *solely* to permit the Ad Hoc Committee to file a chapter 11 plan. The Termination Motion seeks an immediate, unprecedented termination of the Exclusive Periods less than six months after the commencement of one of the largest and most complex chapter 11 cases in U.S. history.

In fact, despite their short duration, the Debtors have made substantial progress in the administration of the Chapter 11 Cases and towards the formulation of a viable and confirmable plan of reorganization.  This includes:

- Stabilizing business operations, including restoring trade credit, and thereby substantially enhancing the Debtors' liquidity profile;

- Virtually eliminating demands for cash collateral and other forms of credit enhancement that were rampant at the inception of these cases and presented a significant liquidity challenge;

- Achieving a key settlement with the Public Entities (as defined below) resolving all of their wildfire claims for an aggregate amount of $1 billion;

- Creating a $105 million fund to address the housing needs of those displaced by the wildfires;

- Hiring a new Chief Executive Officer with significant utility experience and a well-documented safety record;

- Installing new senior leadership in both the Debtors' electric and gas businesses;

- Refreshing the Debtors' Board of Directors with 12 of 14 new members with substantial safety, utility, and restructuring experience;

- Engaging in ongoing negotiations and discussions with the other two wildfire claimants' constituencies in an effort to achieve a consensual resolution of their claims to be embodied in a chapter 11 plan; and

Case: 19-30088   Doc# 3075   Filed: 07/18/19   Entered: 07/18/19 16:13:44   Page 6 of 25

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- Engaging in regular weekly meetings with the CPUC to assure that all issues within the jurisdiction and authority of the CPUC are timely and comprehensively addressed in the context of a chapter 11 plan.

These efforts, together with the recently enacted legislation, which the Governor has noted is just the first step in the legislative process to address the issues facing the Debtors, now enable the Debtors to continue moving forward with the chapter 11 plan process in a rational manner that will ensure achieving the June 30, 2020 date for emergence from chapter 11 that is a condition to the Debtors' participation in the recently enacted go-forward wildfire fund, and will optimize the opportunity to achieve a consensual plan.

Further, as the Court is well-aware, a fundamental prerequisite to a confirmable plan and knowing its actual funding requirements is a determination of the Debtors' aggregate liability for the wildfire claims that are to be treated under the plan. That liability must be determined for chapter 11 plan purposes either consensually or by an estimation process in this Court.

To address this fundamental issue, concurrently herewith the Debtors are filing a motion for the establishment of wildfire claims estimation procedures (the "**Estimation Motion**") in order to implement a formal process to address the parties' disparate views on these issues in a timely manner. The Debtors believe that establishing such a process also will serve to create an environment that will facilitate and foster settlement negotiations as well as to ensure satisfaction of the legislative requirements for PG&E to participate in the go-forward wildfire fund.

In an attempt to hijack the chapter 11 plan process and undermine Congressional intent in enacting section 1121 of the Bankruptcy Code, the Ad Hoc Committee annexed to its Termination Motion a purported "Term Sheet for Plan of Reorganization" (the "**Ad Hoc Term Sheet**," and the plan described therein, the "**Ad Hoc Plan**") asserting in its Termination Motion that it represents a "comprehensive and credible solution that will allow the Debtors to emerge from chapter 11 quickly" (Termination Mot. ¶ 6), that the Ad Hoc Plan "is both credible and confirmable" (Termination Mot. ¶ 23), that the Ad Hoc Plan is "advantageous to virtually every stakeholder in these cases" (Termination Mot. ¶ 24), and that the Ad Hoc Plan "reflects

compromises that would ensure the [Debtors'] long-term viability" (Termination Mot. ¶ 3). Nothing could be further from reality.

Recognizing the obvious infirmities of the Ad Hoc Plan, yesterday, more than three weeks after the Termination Motion was filed and on the eve of the Objection Deadline, the Ad Hoc Committee filed a 91-page submission with the Court, including an *Amended Plan Term Sheet* (the "**Amended Ad Hoc Term Sheet**"), in a futile, eleventh hour attempt to salvage its so-called plan (the "**Amended Ad Hoc Plan**"). The new filing, however, does not change the inescapable conclusion that, as is the case with the original Ad Hoc Plan, the plan reflected in the Amended Ad Hoc Term Sheet also is not a credible way to move these cases forward to a successful conclusion.

Even a cursory review of the Amended Ad Hoc Term Sheet plainly shows that not only is the Amended Ad Hoc Plan incomplete and lacking credibility, it is unconfirmable on its face. Simply by way of example:

1. The Amended Ad Hoc Term Sheet's treatment of the class of prepetition unsecured notes held by the Ad Hoc Committee violates the good faith requirement of section 1129(a)(3) of the Bankruptcy Code and the absolute priority rule. The Amended Ad Hoc Term Sheet manufactures impairment of the class of claims held by the members of the Ad Hoc Committee in an attempt to "create" an impaired accepting class and, more importantly, to enhance their position. More specifically, the Amended Ad Hoc Term Sheet proposes that the $15.8 billion in prepetition, unsecured notes (the lion's share of which are held by members of the Ad Hoc Committee) be paid pre- and post-petition interest in cash, and receive in exchange first priority, *secured* "replacement notes" in the same principal amount with precisely the same terms and maturity, but with only a token one-tenth of one percent reduction in interest rate. Though classifying the class as "impaired," the Amended Ad Hoc Term Sheet itself nevertheless reflects a "98-99%" recovery on these claims. As demonstrated in the Perry Declaration, however, this treatment actually delivers more than a 100% recovery in violation of the absolute priority rule. More specifically and, again, as demonstrated in the Perry Declaration, the collateral to secure the replacement notes will substantially outweigh the impact of the *de minimis* interest rate reduction, resulting in the replacement notes having a value in excess of their face amount. Moreover, the motivation of the Ad Hoc Committee is abundantly clear – although a simple reinstatement and unimpairment of the notes would be more economically beneficial to the reorganized Debtors, that approach would not enable the Ad Hoc Committee to both improve and secure their position to the detriment of other stakeholders, and to create the impaired accepting class necessary for the Amended Ad Hoc Plan to be confirmable under section 1129.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

It should also be noted that granting fully-secured replacement notes to the members of the Ad Hoc Committee rather than simply reinstating their existing unsecured notes, will elevate and make the replacement notes senior to all post-emergence wildfire claims and trade claims, and leave the reorganized Debtors with minimal flexibility for additional capital raises.

2. The Amended Ad Hoc Term Sheet provides no explicit economic terms for the new equity investment, including with respect to price and pro forma enterprise value. Nevertheless, the Amended Ad Hoc Term Sheet makes plain what the original term sheet only suggested – that the economics underlying the Amended Ad Hoc Plan materially undervalue the Debtors' enterprise value to capture the benefit for the new money investors (at least 95% of which will be provided by members of the Ad Hoc Committee) at the expense of current shareholders.

3. There is no commitment for the $5.5 billion in new secured notes which have unspecified terms that must be unilaterally "acceptable to the Ad Hoc Committee." These new secured notes are to be funded by unnamed and unidentified "third party investors."

4. The $4 billion in new senior unsecured notes to be issued to members of the Ad Hoc Committee provide for a 7.5% interest rate that is well-above rates for investment grade debt and indications that the Debtors have received from money center banks.

5. As demonstrated below, the amount of proposed funding to treat and satisfy claims and for the Debtors to successfully emerge from chapter 11 as proposed in the Amended Ad Hoc Term Sheet is insufficient by nearly $4.0 billion, even at the low end of the amount set forth in the Amended Ad Hoc Term Sheet to treat and fund wildfire claims.

6. The Amended Ad Hoc Plan unfairly discriminates with respect to the class of PG&E common stockholders by proposing to eliminate the effect of any dilution resulting from the proposed investment *solely* with respect to common stock held by employees and retirees in pension accounts, 410(k) accounts, and company-sponsored plans, and not with respect to common stock held directly or indirectly by all other common stockholders, including third party pension funds, retirees, and educational institutions.

7. The Ad Hoc Term Sheet puts at risk the Debtors' substantial net operating losses ("**NOLs**") for tax purposes.

8. Lastly, confirmation and consummation of the Amended Ad Hoc Plan and the so-called "commitments" provided yesterday are subject to a multitude of conditions precedent, including:

   • The Debtors' estimated wildfire liability shall not exceed $16 billion (subject to a 15% upward adjustment), with seven individual categories of subcaps;

Case: 19-30088    Doc# 3075    Filed: 07/18/19    Entered: 07/18/19 16:13:44    Page 9 of 25

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- Broad releases (including third party releases) for each member of the Ad Hoc Committee;

- The Ad Hoc Committee having complete and unilateral discretion as to the approval of the form and substance of all documentation relating to the plan;

- The CPUC having determined that the Amended Ad Hoc Plan fully compensates ratepayers throughout the existence of the wildfire fund *in a manner acceptable to the Ad Hoc Committee*; and

- No material post-petition wildfire exposure.

The Amended Ad Hoc Term Sheet also provides for the payment of $600 million in backstop fees to members of the Ad Hoc Committee.

Additionally in an attempt to address the fact that the Ad Hoc Term Sheet filed with the Termination Motion three weeks ago was completely devoid of any commitments and did not identify any of the proposed investors, the pleading filed yesterday by the Ad Hoc Committee contains a proposed "commitment" letter for the Debtors to execute. Notably, however, the commitment is subject to all of the conditions set forth in the Amended Ad Hoc Term Sheet, as well as a litany of additional conditions set forth in the commitment letter, including a requirement that the Debtors, who had absolutely no involvement in negotiating the commitment, comply with and perform all covenants and obligations in the "Plan Documents" (which do not even exist and approval of which, of course, is subject to the discretion of the Ad Hoc Committee), including the payment by the Debtors of all fees contemplated therein.

Simply stated, the Ad Hoc Committee's recent filing does not change a thing. The complete conditionality of the Amended Ad Hoc Term Sheet, the lack of substance and details, and the inadequate emergence financing on which it is predicated, renders the proposal illusory, leaving the Debtors and other parties in interest in an uncertain position as to, among other things, regulatory compliance, pro forma credit ratings, impact on extremely valuable NOLs, future liquidity and overall valuation.

As the Court made abundantly clear at the Exclusivity Hearing, "this case does not need frivolous motions", and the Court will not "waste time on nonplans or tirekickers or troublemakers" (Exclusivity Hr'g Tr., at 28, 51). In fact, as every major constituency in this case

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

is well-aware, Elliott Management Corporation ("**Elliott**"), the driving force behind the Ad Hoc Plan, has been shopping this proposed "plan" for months, meeting with all constituencies, but finding no "buyers" other than its own constituency – the Ad Hoc Committee – which, of course, fares extraordinarily well under the Amended Ad Hoc Term Sheet at the expense of all other stakeholders. In fact, the only actual "compromise" and consensual arrangement reflected in the Amended Ad Hoc Term Sheet is not one achieved by the Ad Hoc Committee, but rather the recently announced $1 billion settlement the Debtors reached with the 18 public governmental entities in the Northern California wildfire districts (the "**Public Entities**").[2]

In addition to the fundamental infirmities in the Amended Ad Hoc Plan, it is important to consider the Termination Motion in the current context of these cases.

1. As the Ad Hoc Committee necessarily acknowledges, the legislation (signed into law by the Governor on July 12, 2019) is a gating item in these cases and a critical element in the formulation and proposal of any confirmable chapter 11 plan. As aptly noted by the Court at the Exclusivity Hearing: "It's inconceivable to me, if tomorrow the Governor and the legislature and the CPUC all solved all of these other problems -- that even if Mr. Karotkin wakes up Friday morning and all of those problems are solved, it's going to be a long time before he gets the plan into the file. *It's just so complicated.*" (Exclusivity Hr'g Tr., at 30-31 emphasis supplied.) With the passage of the legislation, the Debtors now know the terms and requirements, plan funding needs, and other plan provisions that will be necessary to address the legislation and for the Debtors to successfully emerge from chapter 11 on or before June 30, 2020;

2. The Bar Date of October 21, 2019 for filing claims was just established by the Court by Order, dated July 1, 2019 [Docket No. 2806]. As the Court itself noted, this too is a critical element of the chapter 11 plan process; and

3. As the Tort Claimants Committee and the Ad Hoc Committee of Subrogation Claimants recognize with their recently filed lift stay motions, the threshold issue of whether the Debtors were responsible for the Tubbs fire is fundamental to the magnitude of the Debtors' wildfire liability to be treated under a plan and, of course, to the plan formulation and funding process. To expedite this process, as noted above, the Debtors have concurrently herewith filed the Estimation Motion, which asks this Court to determine the Debtors' responsibility for the Tubbs fire as a threshold matter.

---

[2] Although the Amended Ad Hoc Term Sheet states that there are "Agreed Capped Amounts" for each of the seven subcategories of wildfire claims, no such agreed amounts exist other than with respect to the agreed amount the Debtors reached with the Public Entities.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Under these circumstances and in view of the inadequacies of the Amended Ad Hoc Term Sheet, a termination of the Exclusive Periods only six months after these admittedly large and complex cases were commenced, would not only be unprecedented but would be completely antithetical to Congressional intent in enacting section 1121 – to provide a debtor with a full and fair opportunity to propose and confirm a plan. In fact, Elliott's and the Ad Hoc Committee's repeated meetings with the other constituencies in these cases in an effort to convince them to support their proposed plan already has undermined the Debtors' Exclusive Periods in direct contravention of section 1121 of the Bankruptcy Code.

Additionally, as reported on July 11, 2018 in the *Wall Street Journal* (see **Exhibit A** annexed hereto) and as widely known, in the weeks preceding the recently enacted legislation, Elliott was engaged in a concerted lobbying campaign to defeat the Debtors' efforts to obtain in that legislation the flexibility to utilize rate neutral, equity financed securitized bonds as a source of plan funding to pay wildfire claims under a chapter 11 plan and to partially fund the Debtors' upfront contribution to the legislation's go-forward wildfire fund. Elliott's motivation was clear – to promote its plan to acquire PG&E, and to undermine the Debtors' ability to propose their own plan. This blatant subversion of the Debtors' rights under section 1121 of the Bankruptcy Code should not be countenanced by the Court.

Notably, despite the Ad Hoc Committee's statements in its Termination Motion that it has "worked diligently with multiple key stakeholders to develop the viable step forward set forth in the [Ad Hoc Term Sheet]," and that the Ad Hoc Committee has made progress in achieving "a consensus . . . among a diverse set of stakeholders" (Termination Mot., ¶¶ 3, 5), it has achieved a consensus with no one but itself – a consensus that inures to the substantial economic advantage of its members.

With the recent passage of the legislation which now defines the specific parameters, funding needs, chapter 11 plan provisions, and other items necessary for the Debtors' participation in the new go-forward wildfire fund, the Debtors are in a position to, and in fact, are refining a chapter 11 plan that will address all of those issues and which will encompass, among other things:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- payment in full or reinstatement of all prepetition funded debt obligations;

- payment in full of all prepetition trade claims and employee-related claims;

- payment of post-petition interest on unsecured prepetition claims;

- satisfaction of all prepetition wildfire claims in amounts agreed upon or as otherwise authorized or allowed by this Court, fully consistent with the terms of the new legislation – AB-1054;

- rate neutrality for the Debtors' 16 million customers;

- the assumption or voluntary modification of power purchase agreements, collective bargaining agreements, pension obligations, and other employee obligations;

- participation in the go-forward wildfire fund provided in the newly-enacted legislation; and

- emergence financing supported by a substantial infusion of cash raised from existing equity holders on market terms or in the capital markets if available on better terms, plus equity financed securitized bonds.

The Debtors are keenly aware of the June 30, 2020 deadline provided for in the legislation. The Debtors' plan proposal will demonstrate the ability to timely satisfy all chapter 11 emergence costs, including those necessary to meet all of the requirements of the Governor's new legislation and those necessary for the Debtors' participation in the go-forward wildfire liability fund.

The Court is aware of the risks of competing plan scenarios and the chaos and degradation in enterprise value that will necessarily ensue, particularly at this stage of these Chapter 11 Cases. And what has become abundantly clear from the responsive pleadings that already have been filed is that, for obvious reasons, no one is supporting the Ad Hoc Plan. Rather, the parties are seeking a blanket termination of exclusivity to open the floodgates.

The plan negotiation process already is very complex involving the different claimant groups, regulators, and the legislative requirements. Introducing multiple plan proponents, each individually empowered to promote and pursue their own economic agenda, will only further complicate this process.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Indeed, competing chapter 11 plans will serve only to polarize the parties and frustrate, rather than facilitate, any chance of achieving a consensus and expeditious resolution of these cases. To subject these Debtors and their business enterprise to these risks would be particularly inappropriate and unwarranted here where the Amended Ad Hoc Term Sheet represents nothing more than a conditional, nonconsensual, and aspirational value grab, with no ability to satisfy the requirements for confirmation under section 1129 of the Bankruptcy Code.

The Ad Hoc Committee has the burden of establishing cause for terminating the Exclusive Periods. Having one month prior to its Termination Motion supported a six month extension of the Exclusive Periods until November 29, 2019 and having filed a term sheet summarizing a "plan" lacking in substance, credibility, and confirmability, it has not and cannot sustain this burden.

Rather, under the current circumstances of these Chapter 11 Cases, the Court should maintain the status quo and afford the Debtors the opportunity to which they are entitled under section 1121 of the Bankruptcy Code.

### The Termination Motion Should be Denied

As a general rule, the party seeking to terminate or modify a debtor's exclusive periods bears the burden of proof because it is the moving party who seeks to change the status quo.[3] The burden of proof for such motions is a "heavy one" and termination of a debtor's exclusive periods should be granted "neither routinely nor cavalierly." *In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) ("Therefore, 'cause' to reduce the exclusivity period should only be found in extraordinary circumstances."); *see also In re Lichtin/Wade, L.L.C.*, 478 B.R. 204, 215 (Bankr. E.D.N.C. 2012) (the Court "maintains the position that considering termination of an exclusivity period is a 'serious matter' and termination 'should be granted neither routinely nor

---

[3] In contrast to the present circumstances, in PG&E's 2001 chapter 11 case, the Court was not asked to rule on a motion or request from a creditor or other party in interest to terminate or reduce the Utility's exclusive periods; rather the Court declined to grant the Utility's request for a further extension of its exclusive periods after maintaining exclusivity for over nine months. *See In re Pac. Gas & Elec. Co.*, Case No. 01-30923 (Bankr. N.D. Cal. Mar. 13, 2001) [Docket No. 5155].

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

cavalierly'") (quoting *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, *6 (Bankr. E.D.N.C. Dec. 4, 2009)); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (Bankr. S.D. Iowa Feb. 28, 2017) ("A survey of case law reveals that finding cause to reduce or terminate exclusivity is the exception, not the rule.").

Although Courts often discuss much of the same criteria that is examined in connection with requests to extend exclusivity, *see, e.g.*, *In re New Meatco Provisions*, No. 2:13-BK-22155-PC, 2014 WL 917335 at *2 (Bankr. C.D. Cal. Mar. 10, 2014) (citing the nine *Dow Corning* factors to determine whether there is cause to extend or reduce exclusivity), Courts typically have found cause to terminate a debtor's exclusive periods only where the following circumstances exist: (a) gross mismanagement of the debtor's operations; (b) acrimonious relations between the debtors' principals; and (c) use of the exclusive periods to force creditors to accept an unsatisfactory or unconfirmable plan. *See In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988) ("In those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations or acrimonious feuding between the debtor's principals were major obstacles to a successful reorganization and were regarded as 'cause' for the reduction of the exclusivity periods.") (internal citations omitted); *see also In re Situation Mgmt. Systems, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (same); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (denying creditors committee's motion to terminate exclusive periods where there was no evidence that the time period since filing had been used by the debtors to coerce creditors to accept a plan, no delay in filing a plan as required by the Bankruptcy Code, no allegations of mismanagement or evidence of such conduct, and no evidence of an acrimonious relationship between the debtors' principals); *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, at *6 (denying creditor's motion to terminate exclusivity due to, among other things, a lack of any showing or allegations of gross mismanagement of the debtors or feuding between the debtor's principals). None of these circumstances is present here.

The Termination Motion, not surprisingly, is devoid of any meaningful discussion, analysis, or examination of the above factors that Bankruptcy Courts typically consider in connection with a request to modify or terminate a debtor's exclusive periods. Rather, the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Termination Motion is premised entirely on the Ad Hoc Committee's faulty assertion that the Ad Hoc Term Sheet provides a credible and confirmable option for the Debtors to successfully emerge from chapter 11. However, as was the case with the Ad Hoc Plan, the Amended Ad Hoc Plan is unconfirmable on its face, is premised on insufficient funding, completely lacks material terms, and is entirely conditional.

### A. The Amended Ad Hoc Plan is not Confirmable on its Face

As demonstrated below, the Amended Ad Hoc Plan (i) does not satisfy the requirements of good faith under section 1129(a)(3) of the Bankruptcy Code, and (ii) discriminates unfairly with respect to the Class of PG&E common stockholders in contravention of sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code. Accordingly, the Amended Ad Hoc Plan is not capable of being confirmed.

### 1. The Amended Ad Hoc Plan does not Satisfy Section 1129(a)(3) of the Bankruptcy Code.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). In addition, section 1129(a)(10) of the Bankruptcy Code requires that if a class of claims is impaired under the plan, the plan must be accepted by at least one class of claims that is impaired. 11 U.S.C. § 1129(a)(10).

Recognizing that the only supporters of the Amended Ad Hoc Plan are the Ad Hoc Noteholders themselves, the Ad Hoc Committee had no choice but to impair their class of unsecured notes under the Amended Ad Hoc Plan to create an impaired accepting class of claims. Indeed, rather than providing for the reinstatement of their prepetition unsecured notes which could be easily accomplished and, in fact, would be more economically beneficial to the reorganized Debtors, the Ad Hoc Committee manufactures impairment not only to create the necessary impaired accepting class but, more importantly, as a means to improve the position of its members by collateralizing their previously unsecured claims and structurally elevating them above all other liabilities of the reorganized Debtors, including any future wildfire claims.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

As stated, this so-called "impairment" consists of replacing the existing unsecured notes with new first priority secured "replacement notes" in the same principal amounts, with a one-tenth of one percent reduction in the applicable rates of interest, and with all other terms of the notes remaining precisely the same.  Of course, securing previously unsecured notes with first priority liens, far outweighs the *de minimis* interest rate reduction, rending any impairment completely illusory. Indeed, because the new replacement notes are to be secured, undoubtedly they will trade over par, thereby causing the Amended Ad Hoc Plan to also violate the fair and equitable rule.[4]

It should also be noted that to accomplish this, the Amended Ad Hoc Term Sheet inappropriately classifies the Debtors' unsecured bonds (all of which are similar) held by members of the Ad Hoc Committee into two separate classes – Class 5B: Short-Term Utility Unsecured Notes Claims, and Class 6B: Long-Term Utility Unsecured Notes Claim.  Notably, Class 6B is the allegedly impaired class, treated and collateralized as described above.  The notes in Class 5B, on the other hand, are to be cashed out in full under the Amended Ad Hoc Plan, including the payment of pre- and post-petition interest at the contract rate, *plus* all prepayment premiums, makewhole, or other similar call protections.  Although, as set forth above, it would be substantially more economically beneficial simply to reinstate the unsecured notes in Class 6B, that obviously would not enable the Ad Hoc Committee to improve and enhance its position and to attempt to create the necessary impairment.

Courts in the Ninth Circuit and other jurisdictions have refused to confirm chapter 11 plans based on a lack of good faith where, as here, the only impaired consenting class was found to

---

[4]   A plan that pays a class of creditors more than 100% of their claims at the expense and impairment of junior creditors or interest holders fails to be fair and equitable.  *See In re Art & Architecture Books of the 21st Century*, 2016 WL 1118743, at *24 (Bankr. C.D. Cal. Mar. 18, 2016) (noting that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims"); *see also In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) ("An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims"); *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017) (same); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) (same).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

have been manufactured without any rational business justification. *See, e.g., Connecticut General Life Ins. Co. v. Hotel Assoc.*, 165 B.R. 470, 475 (9th Cir. BAP 1994) (instructing the Bankruptcy Court on remand to "recognize the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith"); *see also In re NNN Parkway 400 25 LLC*, 505 B.R. 277, 285 (Bankr. C.D. Cal. 2014) (declining to confirm chapter 11 plan for lack of an impaired accepting class and stating that "A doctrine has emerged that 'artificial impairment' is a form of gerrymandering and when abusively used is held to be antithetical to the good faith which must be at the center of any restructuring effort."); *Phoenix Premier Properties LLC v. Fed. Nat'l Mortgage, Assoc.*, 2012 WL 2389955, *4 (D. Ariz. June 25, 2012) (finding that the chapter 11 plan was proposed in bad faith due to, among other things, the "lack of any apparent necessity for the impairment" of the sole impaired accepting class); *In re Orchards Village Investments, LLC*, 2010 WL 143706, *13 (Bankr. D. Or. 2010) ("The act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith for purposes of § 1129(a)(3)[.]").

Here, the artificial impairment is not only transparent, but completely illusory. In fact, the purported impairment actually results in proposed treatment that is even more beneficial to the Ad Hoc Committee than reinstatement. Under these circumstances, the Amended Ad Hoc Plan does not satisfy the good faith requirements of section 1129(a)(1) of the Bankruptcy Code and, accordingly, could not be confirmed.

**2. The Amended Ad Hoc Plan Discriminates Unfairly in Violation of Section 1123(a)(4) of the Bankruptcy Code and, Therefore, Fails to Satisfy the Requirements of Section 1129(a)(1) of the Bankruptcy Code.**

Section 1123(a)(4) of the Bankruptcy Code provides that a chapter 11 plan *shall*:

Provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Section 1129(a)(1) of the Bankruptcy Code provides that the Court shall confirm a plan only if the plan complies with all of the provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The Amended Ad Hoc Plan plainly violates section 1123(a)(4) of the Bankruptcy Code in its proposed treatment of PG&E Corp. common stockholders.

As noted in the Classification/Treatment/Voting section on page 6 of the Amended Ad Hoc Term Sheet, holders of existing PG&E common stock are to retain their ownership "subject to dilution on account of the Reorganized PGE Corp. Common Stock issued pursuant to the New Money Reorganized PG&E Common Stock Issuance." Pages 20–21 of the Amended Ad Hoc Term Sheet, however, provide that a select portion of existing PG&E common stock held only by employees and retirees will be protected from any such dilution. More specifically, the Section of the Amended Ad Hoc Term Sheet entitled "Key Employee Matters" on pages 20–21 provides as follows:

> All PG&E Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the [Amended Ad Hoc] Plan with new equity issuances within 90 days after the Effective Date.

This unfair discrimination within the class plainly does not comply with section 1123(a)(4), thereby rendering the Amended Ad Hoc Plan unconfirmable under section 1129(a)(1) on this basis as well.

## B. The Amended Ad Hoc Plan is not Credible

As noted above, in addition to being unconfirmable on its face, the Amended Ad Hoc Plan is lacking in several material respects. Despite the Amended Ad Hoc Term Sheet and Amended Ad Hoc Plan being predicated on an "up to $31 billion" cash infusion, the following facts are indisputable:

- The purported commitments for the promised cash infusion are purely conditional;

- The economic terms of the new money investment, including price, and pro forma enterprise value, are completely missing;

- There is nothing setting forth the terms of the proposed new $5.5 billion in secured notes nor even a purported "commitment" for such notes or any identified potential investors; and

- Granting the Ad Hoc Committee members the new replacement notes when they can be easily and more economically reinstated, will not only elevate the priority of their post-emergence claims, but will severely limit the reorganized Debtors ongoing financial flexibility.

Moreover, the Amended Ad Hoc Term Sheet provides no specific information for any party to assess the fairness of the price for the 85% – 95% of the reorganized equity of the Debtors to be purchased pursuant to the Amended Ad Hoc Plan, although it is abundantly clear that it is at a significant discount to current market value. And, as noted above, the manifest conditionality of the Amended Ad Hoc Plan, including with respect to documentation, releases, and regulatory approvals, undermines its credibility.

Even if the proposal were credible, the proposed funding in the Amended Ad Hoc Plan is insufficient to fund the payments proposed to be made under the Amended Ad Hoc Plan and necessary for the Debtors to successfully emerge from chapter 11. As set forth in the Mesterharm Declaration and noted in the chart below, the Amended Ad Hoc Term Sheet is insufficient by at least $3.8 billion, without even taking into account any makewhole, prepayment premiums or similar call provisions payable.

| Sources of Plan Emergence Financing Under Amended Ad Hoc Plan (in billions) | | Funds Necessary to Emerge From Chapter 11 Under Terms of Amended Ad Hoc Plan (in billions) | |
|---|---|---|---|
| New Unsecured Debt Issuance | $4.0 | Wildfire Claims Settlement | $16.0 |
| New Secured Debt Issuance | $5.5 | Initial Contribution to New Go-Forward Wildfire Fund | $5.0 |
| New Investment in Equity of Reorganized Debtors | $19.0 | Repayment of DIP Facility | $2.6 |
| Company Insurance Proceeds | $2.2 | Repayment of Bond Maturities through 2022 | $6.4 |
| | | Accrued Interest on Funded Debt (excluding makewhole or similar costs) | $1.4 |
| | | Trade Claims and Other Emergence Costs (excluding any pre and postpetition interest) | $3.1 |
| **Total** | **$30.7** | **Total** | **$34.5** |
| **Shortfall = $3.8 Billion** | | | |

And, although the Ad Hoc Committee would have the Court believe that the Amended Ad Hoc Term Sheet represents a consensus among the Debtors' economic stakeholders, that is not the case. As stated above, the only consensus reflected in the Amended Ad Hoc Term Sheet is the consensus among the Ad Hoc Noteholders themselves to substantially improve their position. Again, the only real agreement and compromise reflected in the Amended Ad Hoc Term Sheet is the settlement that the Debtors reached with the Public Entities, which the Ad Hoc Committee seeks to adopt.

The inadequacies and lack of substance of the Amended Ad Hoc Term Sheet are patent. Indeed, any party could easily file a plan term sheet promising billions in a wholly conditional investment and financing with no valuation or other information necessary to assess the economics or the bona fides of the proposal. That, of course, can provide no basis to terminate the Exclusive Periods at this early stage of cases of this magnitude and complexity. *See, e.g., In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### C. The Ad Hoc Committee Ignores the Substantial Progress Made by the Debtors to Date

The Debtors have made substantial progress in the administration of these cases. As stated, the Debtors achieved a major milestone in settling with the Public Entities, and the Debtors are engaged in ongoing settlement discussions with the subrogation claimants and the Tort Claimants Committee and its constituency. The Court only recently established October 21, 2019, as the Bar Date for filing claims, an important element of the plan process, and in either negotiating or estimating the Debtors' aggregate liability for the remaining wildfire claims. Additionally, from an operating standpoint, the Debtors' business operations have been stabilized, normal trade credit terms have been restored, and the Debtors have been focused on managing the current wildfire season to minimize the risks associated therewith.

On July 12, 2019, legislation was enacted by the California State legislature that is fundamental to the proposal of any confirmable plan, and to determine the funding needs for the Debtors' successful exit from chapter 11. That legislation addresses, among other things, the Governor's go-forward wildfire fund, the Debtors' costs and conditions to participate in the fund, and the treatment of existing wildfire claims under a chapter 11 plan. Additionally, as Governor Newsom noted when he signed the legislation, it was "not the end of the process" and that he "will be doing more in August" when the legislature returns. A termination of the Exclusive Periods under these circumstances where this legislation was just enacted (and there may be more to come), would be completely inappropriate and contrary to the intent and purpose of section 1121 of the Bankruptcy Code.

Nevertheless, as reflected above, the Debtors currently are refining a plan that contemplates, among other things, a substantial new cash equity infusion, completely equity-funded securitization, rate neutrality, and compliance with all of the requirements of the new legislation to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

ensure the Debtors' participation in the new wildfire fund, including an exit from chapter 11 by no later than June 30, 2020.

The Ad Hoc Committee's assertion that the Debtors have refused to timely engage with them in meaningful plan discussions, even if true, is irrelevant. First, the fundamental issue in these Chapter 11 Cases is the extent of the Debtors' wildfire liability, not liquidated funded debt claims purchased by the members of the Ad Hoc Committee. That is why the Debtors have appropriately focused their energies and resources on the wildfire claims. Second, any plan treatment for the claims held by the Ad Hoc Committee is simple and does not require any negotiation. Unlike the Amended Ad Hoc Plan that seeks to enhance the value of the unsecured claims held by the Ad Hoc Committee members by granting them replacement notes with first priority liens, the Debtors' plan will simply reinstate or refinance those notes.

Nevertheless, the Ad Hoc Committee's dissatisfaction with the plan negotiation process is not cause for terminating the Exclusive Periods. Courts have repeatedly declined to terminate a debtor's exclusive periods based on a creditor's dissatisfaction with a debtor's plan or plan development process. For example, in *In re Eagle-Picher Indust., Inc.*, the Bankruptcy Court for the Southern District of Ohio found that cause did not exist to terminate the debtors' exclusive periods based on the creditors' committee's allegations that it was "excluded from negotiations being conducted under the aegis of a mediator" and that the filing of the committee's competing plan would "expedite the prompt resolution of [the debtors'] bankruptcy cases[.]" *In re Eagle-Picher Indust., Inc.*, 176 B.R. 143, 147 (Bank. S.D. Ohio 1994). In the *Eagle-Picher* case, similar to the case here, one of the central issues to be resolved as part of the plan formulation process was the value of the thousands of claims of asbestos tort victims. To address that gating issue, the *Eagle-Picher* debtors engaged in mediation with the tort claimants and a future claims representative before engaging with other creditor constituencies on the terms of a chapter 11 plan, including the creditors' committee. Like the Ad Hoc Committee here, the creditors' committee in *Eagle-Picher* sought to terminate the debtors' exclusive periods arguing that it had been treated

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

unfairly because the debtors had failed to engage with it earlier and it had not been allowed to participate in the negotiations conducted by the mediator. The Bankruptcy Court declined to terminate the debtors' exclusive periods, noting that there was no evidence of "undue delay" or that "continuation of the exclusivity period is being employed as a tactical device to put pressure on [the statutory committees] to yield to a plan that they consider unsatisfactory." *Id.* at 147. That same result is appropriate here.

## **Conclusion**

Just two months ago, the Court rendered its reasoned decision to extend the Debtors' Exclusive Period to file a plan to September 26, 2019. In so ruling, the Court took into account the complexities of these cases, including the quantification and resolution of the wildfire claims, the role of the Governor and the legislation that was being considered that is fundamental to the proposal of any confirmable plan, and noting that even if the legislation is passed, because of the obvious complications and complexities, the filing of a confirmable plan would take a substantial period of time.

The Amended Ad Hoc Term Sheet does not change these circumstances. It is not credible, it is woefully incomplete, it is not confirmable, and it is plainly crafted to advance the economic interests of the Ad Hoc Committee.

The Ad Hoc Committee has not and cannot meet its heavy burden to terminate the Exclusive Periods. In view of the current circumstances of these Chapter 11 Cases and particularly in view of the newly-enacted legislation, the recent establishment of the Bar Date, and the Debtors' settlement with the Public Entities, the status quo should be maintained.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

WHEREFORE the Debtors respectfully request entry of an order denying the Termination Motion, and granting the Debtors such other and further relief as the Court may deem just and appropriate.

Dated: July 18, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**


/s/ Stephen Karotkin
Stephen Karotkin


*Attorneys for Debtors and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119