WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
David A. Herman (*pro hac vice*)
(dherman@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.** | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c) FOR THE ESTABLISHMENT OF WILDFIRE CLAIMS ESTIMATION PROCEDURES**<br><br>Date: August 14, 2019<br>Time: 9:30 a.m. PST<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br><br>Objection Deadline: August 7, 2019 |

| | |
|---|---|
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| | |
| *All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM).* | |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a) and 502(c) of title 11, United States Code (the "**Bankruptcy Code**") for entry of an order establishing procedures and schedules for the estimation of the Debtors' aggregate liability for contingent and/or unliquidated claims arising out of the 2015, 2017 and 2018 Northern California Wildfires (the "**Wildfires**" and the "**Wildfire Claims**"),[1] as described in the accompanying Memorandum of Points and Authorities. In support of the Motion, the Debtors respectfully submit the Declaration of Kevin J. Orsini (the "**Orsini Declaration**"), filed contemporaneously herewith.

A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

---

[1] For the avoidance of doubt, as used in this Motion and the Proposed Order, the terms "**Wildfires**" and "**Wildfire Claims**" refer to the 2015 Butte Fire, the 2018 Camp Fire and the following 22 2017 North Bay Wildfires: (1) Adobe; (2) Atlas; (3) Blue; (4) Cascade; (5) Cherokee; (6) Highway 37; (7) Honey; (8) La Porte; (9) Lobo; (10) Maacama; (11) McCourtney; (12) Norrbom; (13) Nuns; (14) Oakmont/Pythian; (15) Partrick; (16) Pocket; (17) Point; (18) Potter/Redwood; (19) Pressley; (20) Sullivan; (21) Sulphur and (22) Tubbs.

iii

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    JURISDICTION ...................................................................................................8

III.   BACKGROUND ....................................................................................................9

       A.    The Northern California Wildfires...................................................................9

       B.    The Debtors File for Relief Under Chapter 11 ...............................................11

       C.    The Bar Date .........................................................................................11

IV.    BASIS FOR RELIEF REQUESTED ......................................................................12

       A.    Claims Estimation Is Required in this Case...................................................12

       B.    Estimation Methodology..........................................................................15

             1.    Phase 1:  Applicability of Inverse Condemnation to PG&E...........................16

             2.    Phase 2:  The Tubbs Fire ..........................................................20

             3.    Phase 3:  Final Estimation Hearing.................................................24

V.     NOTICE.............................................................................................................25

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A & B Assocs., L.P.*,
  No. 17-40185-EJC, 2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) ............................13

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ........................................................................................9, 13

*In re Adelphia Bus. Sol., Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...............................................................................13

*Albers v. Cty. of Los Angeles*,
  398 P.2d 129 (Cal. 1965) ............................................................................................5, 17

*Am. Tower Corp. v. City of San Diego*,
  763 F.3d 1035 (9th Cir. 2014) ...........................................................................................20

*In re Aquaslide 'N' Dive Corp.*,
  85 B.R. 545 (B.A.P. 9th Cir. 1987)................................................................................3, 21

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ....................................................................................3, 13, 15

*Barham v. S. Cal. Edison Co.*,
  74 Cal. App. 4th 744 (Ct. App. 1999)................................................................................18

*Bittner v. Borne Chemical Co., Inc.*,
  691 F.2d 134 (3d Cir. 1982)................................................................................15, 16, 21

*Bunch v. Coachella Valley Water Dist.*,
  935 P.2d 796 (Cal. 1997) ...................................................................................................21

*In re Chateaugay Corp.*,
  111 B.R. 67 (Bankr. S.D.N.Y. 1990) ....................................................................................3

*In re Cont'l Airlines*,
  981 F.2d 1450 (5th Cir. 1993) ...........................................................................................13

*In re Corey*,
  892 F.2d 829 (9th Cir. 1989) .............................................................................................21

*In re Dow Corning, Corp.*,
  211 B.R. 545 (Bankr. E.D. Mich. 1997) ............................................................................15

*In re Eagle-Picher Indus., Inc.*,
  189 B.R. 681 (Bankr. S.D. Ohio, 1995)........................................................................14, 15

*In re Farley, Inc.*,
  146 B.R. 748 (Bankr. N.D. Ill. 1992) ................................................................................16

*In re Federal-Mogul Global Inc.*,
  330 B.R. 133 (D. Del. 2005)................................................................................14, 15, 16

v

*In re G-I Holdings, Inc.*,
   323 B.R. 583 (Bankr. D.N.J. 2005) ....................................................3, 15, 16, 20

*In re Garlock Sealing Techs., LLC*,
   504 B.R. 71 (Bankr. W.D.N.C. 2014)............................................................. passim

*In re Gawker Media LLC*,
   571 B.R. 612 (Bankr. S.D.N.Y. 2017) ................................................................15

*Gutierrez v. Cty. of San Bernardino*,
   198 Cal. App. 4th 831 (Cal. Ct. App. 2011) ..................................................5, 18

*Holtz v. Superior Court*,
   475 P.2d 441 (Cal. 1970) .................................................................................5, 17

*In re Imaging3, Inc.*,
   634 F. App'x 172 (9th Cir. 2015) ....................................................................4, 14

*Knick v. Twp. of Scott, Pa.*,
   139 S. Ct. 2162 (2019)......................................................................................6, 20

*In re Lionel LLC*,
   No. 04-17324, 2007 WL 2261539 (Bankr. S.D.N.Y. Aug. 3, 2007)...................13

*In re Mud King Prods., Inc.*,
   514 B.R. 496 (Bankr. S.D. Tex. 2014) .................................................................13

*In re N. Am. Health Care, Inc.*,
   544 B.R. 684 (Bankr. C.D. Cal. 2016).............................................................3, 16

*Orkin v. Taylor*,
   487 F.3d 734 (9th Cir. 2007) ...........................................................................5, 19

*Owens Corning v. Credit Suisse First Bos.*,
   322 B.R. 719 (D. Del. 2005)..................................................................................3

*Pacific Bell Tel. Co. v. S. Cal. Edison Co.*,
   208 Cal. App. 4th 1400 (Ct. App. 2012)........................................................18, 19

*In re POC Properties, LLC*,
   580 B.R. 504 (E.D.Wisc. 2017) ......................................................................16, 21

*In re Residential Capital*,
   519 B.R. 890 (Bankr. S.D.N.Y. 2014) ................................................................14

*In re S.G. Phillips Constructors, Inc.*,
   45 F.3d 702 (2d Cir. 1995)..............................................................................16, 20

*Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley,*
   *Myerson, & Casey)*,
   194 B.R. 728 (S.D.N.Y. 1995).............................................................................15

*In re Specialty Prod. Holding Corp.*,
   No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013) ....................3, 14

*In re Standard Insulations, Inc.*,
   138 B.R. 947 (Bankr. W.D. Miss. 1992) .........................................................16, 20

vi

*Ulloa v. McMillin Real Estate & Mortg., Inc.,*
    57 Cal. Rptr. 3d 1 (Cal. Ct. App. 2007) ...........................................................21

*In re USG Corp.,*
    290 B.R. 223 (Bankr. D. Del. 2003) ...............................................................17

**Statutes & Rules**

11 U.S.C. § 502(b)(9) .......................................................................................11

11 U.S.C. § 502(c) ..................................................................................3, 12, 13

11 U.S.C. § 1107(a) ..........................................................................................11

11 U.S.C. § 1108 ...............................................................................................11

28 U.S.C. § 157 ...............................................................................................5, 8

28 U.S.C. § 157(b) ..............................................................................................9

28 U.S.C. § 157(b)(1)(B) .....................................................................................4

28 U.S.C. § 157(b)(2)(B) ..............................................................................14, 17

28 U.S.C. § 1408 .................................................................................................9

28 U.S.C. § 1409 .................................................................................................9

B. L. R. 5011-1(a) ...............................................................................................8

Cal. Civ. Proc. Code § 1036 .............................................................................17

Fed. R. Bankr. P. 1015(b) .................................................................................11

Fed. R. Bankr. P. 2002 ......................................................................................25

Pub. Util. Code § 2106 .....................................................................................11

**Other Authorities**

6 Witkin, Summary 11th Torts § 1912 (2019) ......................................................7

Cal. Const., Art. I, § 19 .....................................................................................17

Case: 19-30088   Doc# 3091   Filed: 07/18/19   Entered: 07/18/19 22:50:30   Page 7 of 33

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

These Chapter 11 Cases were necessitated by the tragic wildfires that occurred in Northern California in 2017 and 2018. PG&E filed these cases to establish an orderly, fair and expeditious process to resolve PG&E's liabilities resulting from those Wildfires, while preserving and maximizing the value of PG&E's business enterprise for the benefit of all of its economic stakeholders. Time is of the essence in reaching that goal. Tens of thousands of California residents whose lives have been affected by the Wildfires need to know whether, and how much, they will recover from PG&E so they can continue the hard but necessary work of rebuilding lives that have been devastated by the Wildfires. In addition, legislation that passed in the California State Assembly last week has set a deadline of June 30, 2020, for these Chapter 11 Cases to be "resolved pursuant to a plan" for PG&E to be eligible to participate in a newly-created wildfire insurance fund that is intended to "support[] the credit worthiness of electrical corporations, and provide[] a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers". A.B. 1054, 2019 Assemb. (Cal. 2019). For PG&E to enjoy the benefit of this insurance against future wildfire liability, the legislation requires this Court to determine by June 30, 2020, that the plan satisfies the prepetition Wildfire Claims in "the amounts agreed upon in any pre-insolvency proceeding settlement agreements or post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court".

The fundamental issue that needs to be resolved in order for the Debtors to emerge from Chapter 11 is the value of the tens of thousands of unadjudicated, unliquidated Wildfire Claims to be addressed in a Chapter 11 plan. It has become clear, however, at this point that the stakeholders have materially divergent views of that issue. While PG&E has taken accounting charges of $14 billion in connection with the 2017 and 2018 Wildfire Claims, the Official Committee of Tort Claimants (the "**Tort Claimants Committee**" or the "**TCC**") has asserted in recent filings that they believe the damages for the victims of the 2017 and 2018 Wildfires are $54 billion or more. (TCC Motion for Stay Relief (Dkt. No. 2843) at 4.) The TCC came up with this number not by engaging

in any meaningful analysis of the actual damages suffered by victims, but instead simply by multiplying the amounts paid out by insurance companies for the 2017 and 2018 Wildfires by three (*i.e.*, 3 times) because, they claim, such a ratio has been used in resolving claims for certain other fires. Such an unscientific approach, divorced completely from any analysis of the facts of the 2017 and 2018 Wildfires, cannot serve as the basis for a resolution of these cases. Indeed, even the Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") has repudiated the TCC's approach, stating that it disagrees "with the assertion that a ratio of total losses to insured losses for past wildfires should be used to predict the losses for the 2017 and 2018 Northern California wildfires". (Ad Hoc Subrogation Group Motion for Stay Relief (Dkt. No. 2863) at 4 n.3.) As yet another data point, and in stark contrast to the TCC's proposal, the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Group**") has taken the position that *all* Wildfire Claims are valued at no more than $16 billion, subject to an upward adjustment of up to 15% based on the outcome of an estimation proceeding. (Ad Hoc Noteholder Group Motion to Terminate the Debtors' Exclusivity Periods (Dkt. No. 2741) at 4-5; 27.)

The Debtors remain optimistic that all stakeholders, working together, will ultimately reach a negotiated resolution and that the Debtors will be able to propose a consensual plan of reorganization. That is the best path toward expeditiously compensating victims who deserve compensation and ensuring that PG&E can continue to provide safe, reliable and clean energy to Northern California. PG&E is already making significant progress down that path. On June 19, 2019, PG&E settled with 18 public entities, including cities, counties, districts and public agencies in the very communities that have been most directly affected by the Wildfires, to resolve their claims in a Chapter 11 plan for an aggregate amount of $1 billion. Discussions and negotiations with other constituencies are ongoing. To date, however, the Debtors and the remaining parties have not reached a consensus, and the Debtors have concluded that there must be a formal process to address the parties' remaining disputes in a timely manner in the event they cannot settle the claims. The initiation of that process—including addressing important threshold legal and other gating issues as described further

2

below—will also encourage the parties to continue working towards a negotiated resolution. As the Court is well aware, deadlines and potential resolution of material legal issues can encourage the parties to reach a consensus, as would a framework for estimating claims based on actual damages.

By this motion, the Debtors seek to establish an estimation procedure to create exactly that environment to foster settlement negotiations, which is in the public interest and in the interest of the various direct economic stakeholders in these Chapter 11 Cases. An estimation process also will enable the Debtors and the Court to, among other things, determine plan feasibility and voting issues, and preserve the Debtors' ability to satisfy the legislative requirement that any Chapter 11 plan satisfy the Wildfire Claims in an amount that is agreed-upon or is "authorized by the court through an estimation process or otherwise allowed by the court". The estimation process must begin now to give the Debtors the best chance to emerge from Chapter 11 by the legislative deadline of June 30, 2020, thereby enabling the Debtors to participate in the newly-created wildfire fund.

Estimation for these purposes is a core proceeding that is standard in mass tort bankruptcies. *See, e.g.*, *In re Aquaslide 'N' Dive Corp.*, 85 B.R. 545 (B.A.P. 9th Cir. 1987); *In re Armstrong World Indus., Inc.,* 348 B.R. 111 (D. Del. 2006); *Owens Corning v. Credit Suisse First Bos.*, 322 B.R. 719 (D. Del. 2005); *In re N. Am. Health Care, Inc.*, 544 B.R. 684 (Bankr. C.D. Cal. 2016); *In re Specialty Prod. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013); *In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005); *In re Chateaugay Corp.*, 111 B.R. 67 (Bankr. S.D.N.Y. 1990).

Estimation is also mandatory here. Under Section 502(c) of the Bankruptcy Code, the Court "**shall**" estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c) (emphasis added). Just as in the other mass tort bankruptcies cited above and discussed below, liquidating each of the tens of thousands of individual claims one by one during the course of these Chapter 11 Cases would be impossible without undermining the objective of paying victims promptly and fairly. Litigating claims individually would take years, impede the successful reorganization of the Debtors,

3

delay distributions to wildfire victims and all other creditors and preclude PG&E from participating in the wildfire fund. There is no question that such a delay would be "undue" and contrary to the interests of all economic stakeholders.

That leaves the question of exactly how the estimation process should be structured in these cases. These are highly complex Chapter 11 Cases involving tens of thousands of claims related to more than two dozen different fires that started at different times, in different places and by different means. Estimation of the Wildfire Claims will require the Court to examine a number of critical issues relating either to the likelihood of success on the merits (and therefore value) of certain claims or to the proper calculation of the aggregate damages suffered by the claimants. Given the importance of time—both for the benefit of the wildfire victims and in light of the wildfire fund deadline—the Debtors are proposing a three-phased approach to estimation that will enable adjudication of the most critical threshold issues—the issues that have the highest financial stakes and therefore the best chance of driving negotiated resolutions—as soon as possible and, indeed, much more quickly than those issues could be determined in the state court system. To facilitate that process and ensure maximum efficiency, the Debtors are prepared to agree that as part of their proposed estimation process they will not contest causation with respect to any Wildfire for which the California Department of Forestry and Fire Protection ("**CAL FIRE**") has concluded PG&E is responsible. That means the Debtors will not contest causation for estimation purposes with respect to the 2018 Camp Fire or any of the 22 separate 2017 North Bay Fires listed in section III.A below, except the 2017 Tubbs Fire. The general parameters of the estimation process proposed by Debtors are as follows:

*First*, the Debtors request that the Court promptly examine the threshold legal issue of whether, pursuant to the state law doctrine of "inverse condemnation", PG&E may be held strictly liable for Wildfire Claims asserting property damage even where PG&E was not negligent. The question of whether claims based on inverse condemnation must be disallowed as a matter of law is a core proceeding with respect to all Wildfire Claims. 28 U.S.C. § 157(b)(1)(B) ("Core proceedings include, but are not limited to [] allowance or disallowance of claims against the estate"); *In re*

4

*Imaging3, Inc.*, 634 F. App'x 172, 175 (9th Cir. 2015) ("Allowance and disallowance of claims against an estate are specifically listed as 'core' proceedings under 28 U.S.C. § 157.").  The applicability of inverse condemnation materially impacts the value of claims arising out of the Wildfires, because without strict liability, a claimant would have to prove that PG&E was negligent.

As discussed in more detail below, the California Supreme Court has consistently explained that the "underlying purpose of [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements:  to socialize the burden . . . that should be assumed by society".  *Holtz v. Superior Court*, 475 P.2d 441, 445 (Cal. 1970) (internal citations and quotation marks omitted).  Inverse condemnation thus serves as a form of social insurance, financed by the general public, based on the premise that the costs of damage from a public good "can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole".  *Albers v. Cty. of Los Angeles*, 398 P.2d 129, 137 (Cal. 1965).  The *public entity* inverse condemnation defendant serves merely as a conduit to socialize losses suffered by one individual among the public at large through taxes or utility rate increases; the public entity does not itself bear the loss.   This loss distribution framework is the constitutional "underpinning [of] inverse condemnation".  *Gutierrez v. Cty. of San Bernardino*, 198 Cal. App. 4th 831, 837 (Cal. Ct. App. 2011).  That framework is absent, however, with respect to an *investor-owned* utility, since an investor-owned utility cannot spread losses across even its own ratepayers without approval from the California Public Utilities Commission (the "**CPUC**").  While some lower California courts have nonetheless concluded that inverse condemnation still applies to PG&E even absent the "constitutional underpinning", the CPUC itself has noted that those courts have "done so without really grappling with the salient difference between public and private utilities".  (*See* Orsini Decl. Ex. A, at 21:29-22:15.)  Because California's highest court has not yet ruled on this precise issue, this Court "must predict how the state's highest court would decide the question".  *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007). In addition, even if inverse condemnation does apply to PG&E under California state law, it is an unconstitutional taking and a violation of PG&E's substantive due process rights under the United

5

States Constitution. Those federal issues are also ripe for immediate adjudication by this Court. *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2179 (2019).

As set forth in the Proposed Order, the Debtors propose to file their brief supporting disallowance of all inverse condemnation claims within one week of entry of that order.

*Second*, as noted above, the only Wildfire which the Debtors will contest causation for the purposes of estimation is the Tubbs Fire. The Tubbs Fire was the largest of the 2017 wildfires. It destroyed more than 5,000 homes and resulted in insurance payouts estimated to exceed $5 billion. Importantly, the evidence shows that PG&E did not cause the Tubbs Fire. Indeed, two separate investigatory teams from CAL FIRE have ruled out PG&E equipment as a cause.[2] Because both individual and insurance subrogation claimants are demanding compensation from PG&E for damages incurred by the Tubbs fire despite the CAL FIRE determination, addressing PG&E's likelihood of liability (if any) related to the Tubbs Fire is a crucial threshold issue in determining the aggregate amount required to resolve all Wildfire Claims.

On this point, the Debtors, the TCC and the Ad Hoc Subrogation Group are in agreement. The TCC has described the Tubbs Fire as a "gating issue" and stated that the "parties cannot negotiate a consensual plan if the [liability] landscape could change" as dramatically as it would if PG&E were liable for Tubbs. (TCC Motion at 19-20.) The Ad Hoc Subrogation Group has said the goal of moving these cases "toward a confirmable plan of reorganization expeditiously and efficiently" can "best be achieved by answering the question that most separates the key parties negotiating a plan: Is PG&E liable for the devastating 2017 Tubbs Fire?". (Ad Hoc Subrogation Group Motion at 1.) All stakeholders also agree that the question of Tubbs liability can be prepared for a hearing quickly. The only dispute is whether this Court should address this issue that cuts to the core of these Chapter 11 Cases or, instead, whether this Court should lift the stay and allow a trial of a very small, unrepresentative sampling of claims to be tried before a jury to reach a verdict on both causation and damages. If this Court were to lift the stay, any such verdict would be subject to years

---

[2] *See* CAL FIRE Report, dated January 20, 2019, https://www.fire.ca.gov/programs/fire-protection/reports/incident-reporting-collection/.

6

of state court appeals and of limited binding effect in the Chapter 11 Cases, not to mention being completely contrary to the Debtors' need to emerge from Chapter 11 by June 30, 2020.

As discussed below, and as will be discussed in the Debtors' forthcoming objections to the motions of the TCC and the Ad Hoc Subrogation Group seeking relief from the stay, the proper and most expeditious forum for addressing PG&E's responsibility for the Tubbs Fire is this Court, where *all* Wildfire Claimants and all other interested parties can be heard and can participate directly or through formal representative committees with fiduciary duties to their members. In this way, the Court can assess the Debtors' potential responsibility with respect to *all* claims arising out of the Tubbs Fire, not just a hand-selected few. The Debtors propose the Court schedule a hearing on the limited issue of causation of the Tubbs Fire on October 7, 2019, or as soon as possible thereafter. The Debtors also request that the Court direct the Debtors, TCC and Ad Hoc Subrogation Group to negotiate a pre-hearing schedule once that hearing date has been set and propose it to the Court promptly.

*Third*, the final phase of the proposed estimation process would involve the Court's determination of aggregate values of the Wildfire Claims. This phase, unlike the first two phases, would need to occur after the October 21, 2019, Bar Date so that all stakeholders would have knowledge of the number of claimants and the aggregate amount of alleged claims in these proceedings. By the time of the Phase 3 hearing, the Court will have determined the threshold questions of the applicability of inverse condemnation and likelihood of liability for the Tubbs Fire.[3] Phase 3 would involve the resolution of questions around the likelihood of success of the Wildfire Claims on other issues such as negligence, the recoverability of certain categories of damages (such as the cost of rebuilding damaged structures, rather than the accepted standard of diminution in value, *see* 6 Witkin, Summary 11th Torts § 1912 (2019) ("the basic and normal rule uses diminution in value

---

[3] While all three phases could, in theory, be collapsed into a single phase that would begin after the Bar Date, that would be far less efficient and expeditious. The purpose of the proposed three-phase approach is to allow the stakeholders and the Court to make the best use of the time between now and the Bar Date to address critical issues that will be necessary to the final estimation ruling while simultaneously giving all stakeholders certainty on those critical issues as soon as possible.

7

as the measure; *i.e.*, the difference between the market value of the land before and after the injury"))
and the aggregate estimate of overall damages based upon sampling of claims and expert testimony.
The Debtors submit that all stakeholders should work together to agree upon the mechanics and
schedule for Phase 3 or, if consensus cannot be achieved, submit competing proposals to the Court. If
circumstances allow, such proceedings could take place in coordination with or as part of a plan
confirmation hearing. Rather than request the Court to wade into those details now, the Debtors
propose that the Court schedule the Phase 3 estimation hearing to begin in early December 2019 and
direct the parties to report back within three weeks of entry of the Proposed Order with further details
about Phase 3.

In summary, the Debtors propose the following schedule of proceedings:

| **Phase 1: Inverse Condemnation** | |
|---|---|
| Briefs in support of Debtors' position | One week after entry of the Proposed Order |
| Briefs in opposition | Three weeks after opening briefs |
| Replies in support of Debtors' position | Two weeks after opposition briefs |
| Hearing on inverse condemnation | Two weeks after reply briefs |
| **Phase 2: Tubbs Fire** | |
| Proposed pre-hearing schedule | Two weeks after entry of the Proposed Order |
| Hearing on Tubbs Fire | Beginning October 7, 2019, for three weeks |
| **Phase 3: Final Estimation Hearing** | |
| Proposed pre-hearing schedule | Three weeks after entry of the Proposed Order |
| Final estimation hearing | Early December (no later than Dec. 16) |

## II.      JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and
1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order
24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court
for the Northern District of California (the "**Bankruptcy Local Rules**"). Estimation for the purpose

8

of aiding the development of a plan of reorganization and for determining the feasibility of any such plan is a core proceeding pursuant to 28 U.S.C. § 157(b). *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1986). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. BACKGROUND

### A. The Northern California Wildfires

On September 9, 2015, a wildfire started in Amador County California (the "**Butte Fire**"). According to CAL FIRE, the Butte Fire burned over 70,800 acres within Amador and Calaveras counties, destroyed approximately 965 structures and resulted in two fatalities and one injury.[4] As of January 29, 2019 (the **"Petition Date"**), PG&E was aware of approximately 2,000 complaints on behalf of at least 4,000 plaintiffs related to the Butte Fire. As of the Petition Date, approximately 25% of those claims remained unliquidated and/or contingent.

Beginning on October 8 and 9, 2017, multiple wildfires spread through Northern California, including the counties of Napa, Sonoma, Butte, Humboldt, Mendocino, Lake, Nevada and Yuba (collectively the "**North Bay Fires**"). According to CAL FIRE, the North Bay Fires consisted of 21 major fires that burned over 245,000 acres, destroyed an estimated 8,900 structures, and resulted in 44 fatalities.[5] (Am. Decl. of Jason P. Wells in Support of the First Day Motions and Related Relief [Docket No. 263] (the "**Wells Declaration**") at 13-14.)

The most destructive of the North Bay Fires was the Tubbs Fire, which began in the area of Highway 128 and Bennett Lane in Calistoga. The Tubbs Fire accounts for the largest number of potential claims against the Debtors stemming from the North Bay Fires, including the majority of structures destroyed and/or damaged in the North Bay Fires. According to CAL FIRE, the Tubbs Fire burned 36,807 acres in both Napa and Sonoma Counties, destroyed 5,636 structures, damaged an

---

[4] *See* CAL FIRE Report, dated April 28, 2016, https://www.fire.ca.gov/media/5443/butte-15-ca-aeu-024918_redacted.pdf.

[5] An additional fire, the Maacama fire, was not initially separately reported by CAL FIRE.

9

additional 317 structures, and resulted in 22 fatalities.[6]   By contrast, all of the other North Bay Fires combined resulted in the same number of fatalities, destroyed 2,597 structures and damaged 1,026 structures.  (Orsini Decl. ¶ 3.)  On January 20, 2019, CAL FIRE issued an investigative report that ruled out PG&E equipment as the cause of the Tubbs Fire.[7]  This is the only significant North Bay Fire that CAL FIRE concluded was not started by PG&E, and the only fire for which—to the Debtors' knowledge—CAL FIRE assigned two separate investigative teams.

As of the Petition Date, PG&E was aware of approximately 700 complaints on behalf of 3,600 plaintiffs related to the North Bay Fires.  (Wells Decl. at 15.)  Plaintiffs brought claims against PG&E with respect to 22 separate fires:  (1) Adobe; (2) Atlas; (3) Blue; (4) Cascade; (5) Cherokee; (6) Highway 37; (7) Honey; (8) La Porte; (9) Lobo; (10) Maacama; (11) McCourtney; (12) Norrbom; (13) Nuns; (14) Oakmont/Pythian; (15) Partrick; (16) Pocket; (17) Point; (18) Potter/Redwood; (19) Pressley; (20) Sullivan; (21) Sulphur and (22) Tubbs.[8]  The cases had been coordinated in the San Francisco County Superior Court and, as of the Petition Date, were in the midst of liability discovery.  (Wells Decl. at 15.)  Many significant liability depositions had neither been taken nor scheduled, and no damages discovery had been conducted.  (Orsini Decl. ¶ 2.)

On November 8, 2018, a wildfire began near the city of Paradise in Butte County, California (the "**Camp Fire**").  According to CAL FIRE, the Camp Fire consumed 153,336 acres and resulted in 86 fatalities and the destruction of 13,972 residences, 528 commercial structures and 4,293 other buildings.  (Wells Decl. at 11.)  As of January 11, 2019, the Debtors were aware of approximately 46 complaints on behalf of at least 2,000 plaintiffs related to the Camp Fire.  (Wells Decl. at 14-15.)  As of the Petition Date, no civil discovery had been taken with respect to the Camp Fire.

---

[6] *See* CAL FIRE Report, dated January 20, 2019, https://www.fire.ca.gov/programs/fire-protection/reports/incident-reporting-collection/.

[7] *See* CAL FIRE Report, dated January 20, 2019, https://www.fire.ca.gov/programs/fire-protection/reports/incident-reporting-collection/.

[8] The Adobe, Norrbom, Nuns, Partrick and Oakmont/Pythian fires involved overlapping terrain and together with the Pressley fire are often referred to collectively as the Nuns Complex fires.

10

For each fire, claimants allege causes of action for, *inter alia,* inverse condemnation, negligence (causing bodily harm, loss of profits/income and property damage), private nuisance, public nuisance, premises liability, trespass, violation of Public Utility Code § 2106, wrongful death, survival actions and/or negligent infliction of emotional distress. PG&E has acknowledged that its transmission facilities near Pulga ignited the Camp Fire and had previously acknowledged causation for the Butte Fire. As noted above, if the Proposed Order is entered, PG&E will not contest causation with respect to any of the 2017 or 2018 Wildfires, except for with respect to the Tubbs Fire.[9]

### B. The Debtors File for Relief Under Chapter 11

On January 29, 2019, the Debtors commenced with this Court voluntary cases under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed the Tort Claimants Committee. Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and the Debtors' businesses and capital structure is set forth in the Wells Declaration.

### C. The Bar Date

On May 1, 2019, the Debtors filed a *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [Dkt. No. 1784] (the "**Bar Date Motion**"). A

---

[9] With respect to the Camp Fire, while the Debtors have accepted CAL FIRE's determination that PG&E transmission facilities near Pulga ignited the fire, the Debtors have not formed a conclusion as to whether a second fire ignited nearby as a result of vegetation contact with its electrical distribution lines and reserve all rights concerning that causation issue.

11

hearing on the Bar Date Motion was held on June 26, 2019. At the hearing, the Court established a Bar Date of October 21, 2019, and approved the Debtors' proposed noticing procedures and customized proof of claims forms for both individual and subrogation (insurance) Wildfire Claims.

## IV.   BASIS FOR RELIEF REQUESTED

Section 502(c) of the Bankruptcy Code requires this Court to estimate the Wildfire Claims given the practical impossibility of liquidating each claim individually without severely impairing the interests of all stakeholders and delaying for years the resolution of these cases. Estimation for at least voting and plan feasibility purposes therefore is not discretionary, regardless of the extent to which estimation also may prove useful for other purposes (such as establishing trusts with specified funding amounts as part of a Plan) later in these proceedings. (*See infra* Part IV.A.)

The discretionary question, instead, is *how* the Court should estimate the Wildfire Claims. The Bankruptcy Code and applicable case law leave the manner in which estimation is conducted to the sound discretion of the Bankruptcy Court. The guiding principles under the circumstances of these cases should be efficiency and fairness. In particular, the stakeholders and the Court would benefit most from a process that presents discrete, but material, threshold issues as quickly as practicable while the Wildfire Claimants, the Debtors and the other stakeholders avail themselves of the time between now and the final estimation hearing to develop the information necessary to assess the dollar value of the aggregate claims and, at the same time, pursue negotiated resolutions. The Debtors' process achieves these goals by creating a phased estimation hearing that tees up for the Court the most material issues first in order to help the stakeholders realistically value their claims and to facilitate reaching a consensus. (*See infra* Part IV.B) The Debtors' proposed process also provides the best chance for the Debtors to meet the June 30, 2020, legislative deadline to emerge from Chapter 11.

### A.   Claims Estimation Is Required in this Case

Section 502(c) of the Bankruptcy Code provides that the Court "**shall**" estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly

12

delay the administration of the case." 11 U.S.C. § 502(c) (emphasis added). Claims estimation enables the parties and the court to "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions," and to "promote a fair distribution to creditors through a realistic assessment of uncertain claims." *In re Adelphia Bus. Sol., Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (quoting *In re Cont'l Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993)). Estimation "provides a means for a bankruptcy court to achieve reorganization, and/or distribution of claims, without awaiting the results of [potentially protracted] legal proceedings." *Adelphia*, 341 B.R. at 422 (*citing Continental Airlines*, 981 F.2d at 1461); *In re Lionel LLC*, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (estimation avoids lengthy proceedings that result in "delayed distributions, which in turn, greatly devalue the claims of all creditors as they cannot use the assets until they receive them") (citation omitted); *Armstrong*, 348 B.R. at 123-125 (D.Del. 2006); *In re A & B Assocs., L.P.*, No. 17-40185-EJC, 2019 WL 1470892, at *34-36 (Bankr. S.D. Ga. Mar. 29, 2019).

Estimation is mandatory here. There simply is no practical ability to liquidate tens of thousands of Wildfire Claims individually, and even attempting to engage in such a process would unduly delay the resolution of these Cases. As courts have recognized, it is a "mandatory obligation of the bankruptcy court" to estimate claims "if failure to do so 'would unduly delay the administration of the case.'" *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011 (4th Cir. 1986); *see also In re A & B Assocs., L.P.*, 2019 WL 1470892, at *35 ("numerous bankruptcy courts have held that '[e]stimation pursuant to Bankruptcy Code section 502(c) is mandatory where adjudication of the claim would unduly delay the administration of the bankruptcy case'"); *In re Mud King Prods., Inc.*, 514 B.R. 496, 510 (Bankr. S.D. Tex. 2014) ("Claims estimation 'is a procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long time'" (internal quotation omitted).). Litigating individual Wildfire Claims to their conclusion would take years, needlessly delaying compensation to Wildfire Claimants with legitimate claims and imposing extraordinary and

13

unnecessary costs and delay on the Debtors and the other stakeholders. Such a process would be directly contrary to the very purpose of these Chapter 11 Cases. (Wells Decl. at 4-5.)

Moreover, as the TCC acknowledges, there can be no dispute that estimating claims for the purposes of voting and plan feasibility, as the Debtors propose here, is a core proceeding. *See* TCC Motion at 10 ("The estimation of a personal injury claim for the purpose of voting on a plan or feasibility determination is a core proceeding, 28 U.S.C. § 157(b)(2)(B), and does not necessarily implicate a claimant's jury trial rights".). The proceedings the Debtors are proposing are a common feature of bankruptcies, like this one, that involve a large number of contingent and unliquidated tort claims. *See, e.g.*, *In re Specialty Prod. Holding Corp.*, 2013 WL 2177694, at *1 (involving "estimation of the amount of contingent or unliquidated . . . mesothelioma claims caused by exposure to the Debtors' asbestos"); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 73 (Bankr. W.D.N.C. 2014) (determining the "responsibility for causing mesothelioma and the aggregate amount of money that is required to satisfy its liability to present claimants and future victims"); *In re Federal-Mogul Global Inc.*, 330 B.R. 133, 154 (D. Del. 2005); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 682 (Bankr. S.D. Ohio, 1995), as amended (Dec. 14, 1995) (estimating "present and future asbestos-related personal injury claims in the aggregate" "so that a proper allocation of plan funding assets can be made as between the unsecured creditors and the PI Trust created by the plan"). Although the question of how the Court should estimate the Wildfire Claims may turn out to be complicated, the fact that the Court is empowered to conduct this estimation for the proposed purposes is not genuinely in dispute.

Likewise, it is beyond dispute that this Court is authorized to decide threshold legal questions that determine the allowance or disallowance of claims against the Debtors. *See* 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are not limited to . . . allowance or disallowance of claims against the estate"); *In re Imaging3, Inc.*, 634 F. App'x 172, 175 (9th Cir. 2015) ("Allowance and disallowance of claims against an estate are specifically listed as "core" proceedings under 28 U.S.C. § 157."). A ruling that a contingent or unliquidated claim is not enforceable against the Debtors as a matter of law and therefore must be disallowed is a core proceeding. *See, e.g.*, *In re Residential*

14

*Capital*, 519 B.R. 890, 905 (Bankr. S.D.N.Y. 2014) ("[T]his court has jurisdiction over the allowance or disallowance of personal injury tort claims"); *In re Dow Corning*, *Corp.*, 211 B.R. 545, 554-555 (Bankr. E.D. Mich. 1997) (bankruptcy court has jurisdiction to adjudicate defenses to tort claims).

The TCC argues extensively in its stay relief motion that estimation of personal injury claims is impermissible if it is done for purposes of distribution, but that is not an issue the Court needs to address on this Motion.[10]  There is no question that estimating the Wildfire Claims is permissible for at least some purposes, including voting and plan feasibility, which is all that is proposed here. Whether and to what extent the results of that estimation ultimately may be used to determine the amount of consideration to be provided to claimants or groups of claimants as part of a Plan, consensual or otherwise, is a question that can be determined, if it is presented, at a later stage.

## B.    Estimation Methodology

As noted above, the Bankruptcy Court has broad discretion to determine the process and methodology for claims estimation.  Neither the Bankruptcy Code nor the Bankruptcy Rules set forth a procedure for estimating claims; instead, the court may use "whatever method is best suited to the particular contingencies at issue".  *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).  "The principal consideration in estimating unliquidated claims must be an accommodation to

---

[10] Addressing that issue would involve deciding a variety of issues not presented in this Motion.  The lion's share of the Wildfire Claims are for property damage resulting from the Wildfires.  This raises a number of issues, including: (1) whether claims of emotional distress that are incidental to property damage claims, which comprise the vast majority of alleged personal injury claims here, are properly characterized as personal injury tort claims for jurisdictional purposes, *see, e.g.*, *In re Gawker Media LLC*, 571 B.R. 612, 623 (Bankr. S.D.N.Y. 2017) ("incidental claims of emotional injury do not suffice to transform a tort claim into a personal injury tort when it otherwise would not be"); *Siewert v. Christy* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*), 194 B.R. 728, 734 (S.D.N.Y. 1995) (incidental claims of emotional damages do not "transform [a] business tort into a personal injury tort") and (2) whether funding a resolution of personal injury claims with a limited fund trust as part of a confirmed plan amounts to a "*de facto* liquidation" notwithstanding the multitude of mass tort bankruptcies that have done exactly that.  *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 115 (D. Del. 2006); *In re G-I Holdings, Inc.*, 323 B.R. at 623; *In re Fed.-Mogul Glob., Inc.*, 330 B.R. 133, 136-37 (D. Del. 2005);  *In re Garlock Sealing Techs.*, 504 B.R. at 74; *In re Eagle-Picher Indus.*, 189 B.R. at 682.  Debtors reserve all rights with respect to these and other issues raised in the TCC's separate stay relief motion.

15

the underlying purposes of the Bankruptcy Code," *In re N. Am. Health Care*, 544 B.R. 684, 688 (Bankr. C.D. Cal. 2016), and those purposes include "promoting the quick and efficient administration of the estate," *In re Fed.-Mogul Glob.*, 330 B.R. at 154. Moreover, by fairly and accurately estimating claims, the Court will be helping those victims with legitimate, allowable claims.

In estimating the value of a claim, "the court is bound by the legal rules which may govern the ultimate value of the claim". *See Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982). The value of any claim depends upon a variety of factors, including, importantly, the strength of the Debtors' defenses to liability under non-bankruptcy law. *In re Garlock Sealing Techs.*, 504 B.R. at 73 (ruling that the "best evidence" of the debtor's "responsibility" in an asbestos liability estimation "is the projection of its legal liability that takes into consideration causation, limited exposure and the contribution of exposures to other products"); *In re POC Properties, LLC*, 580 B.R. 504, 509 (E.D.Wisc. 2017) (employing methodology of estimating tort claims that took into account the likelihood that "each party's version might or might not be accepted by a trier of fact"); *In re Farley, Inc.*, 146 B.R. 748, 753-54 (Bankr. N.D. Ill. 1992) (estimating personal injury claim by discounting stipulated damages by the high probability that the debtor would not be found liable). In accordance with those principles, the Debtors propose the following estimation approach.

### 1. Phase 1: Applicability of Inverse Condemnation to PG&E

As explained above, the Court has as part of its core jurisdiction the right—indeed the obligation—to disallow in an estimation proceeding claims that are unenforceable against the debtor as a matter of substantive nonbankruptcy law, regardless of the nature of those claims. *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995) ("Because nothing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor, the bankruptcy court's determination whether to allow or disallow a claim is a core function."); *see also In re G-I Holdings, Inc.*, 323 B.R. at 607; *In re Standard Insulations, Inc.*, 138 B.R. 947, 953-54 (Bankr. W.D. Miss. 1992). By "reject[ing] unsubstantiated claims" based on invalid liability theories,

16

"[t]he Court will *protect those who have been truly harmed*". *In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) (emphasis added).

Determining the viability of inverse condemnation claims is exactly the type of core proceeding under 28 U.S.C. § 157(b)(2)(B) that this Court should address as a matter of law as soon as possible. Any assessment of the likelihood of success of the Wildfire Claims turns materially on the resolution of the threshold question that will be presented in Phase 1: does strict liability apply to the fires caused by PG&E, or can the Wildfire Claimants prevail only upon a showing of negligence?

The judicially created doctrine of inverse condemnation arises from the Takings Clause of the California Constitution, which provides that "Private property may be taken or damaged for a public use and only when just compensation . . . has first been paid to . . . the owner." Cal. Const., Art. I, § 19. The theory behind inverse condemnation is that a private party whose property was "damaged for a public use"—*i.e.*, by a public improvement—should not bear the entire loss; instead, the loss should be borne by the *public* for whose benefit the improvement was made. *See, e.g.*, *Holtz v. Superior Court*, 475 P.2d 441, 444 (Cal. 1970) ("The 'underlying purpose of [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements.") In other words, the taking of (or damage to) private property for *public* use must be *publicly* compensated. *See Albers v. Cty. of Los Angeles*, 398 P.2d 129, 136 (Cal. 1965), (theory of inverse condemnation is that costs of damage to private parties from a public good "can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole"). Because inverse condemnation is a form of "social insurance," the standard of recovery is one of strict liability—the private property owner need not establish negligence. Rather, inverse condemnation allegedly imposes strict liability (including liability for attorneys' fees) for damages as a result of the design, construction and maintenance of utility facilities or other public improvements, including utilities' transmission lines. *See Albers*, 398 P.2d at 136-37; Cal. Civ. Proc. Code § 1036.

When inverse condemnation is applied to a true public entity, such as a municipality or government utility, that entity serves merely as a conduit for the socialization of losses. The public

17

entity pays an award of inverse condemnation damages to the impacted individual and then socializes those damages by recouping them from the public at large though taxes or utility rate increases. The public entity does not itself bear the loss. This loss distribution framework is the constitutional "underpinning [of] inverse condemnation". *Gutierrez v. Cty. of San Bernardino* 198 Cal. App. 4th 831, 837 (Ct. App. 2011). However, as most acutely demonstrated by these Chapter 11 Cases— necessitated by the overwhelming potential liabilities under inverse condemnation for the North Bay and Camp Fires—this loss distribution framework breaks down when inverse condemnation is applied to an investor-owned utility. As a private investor-owned utility, PG&E cannot simply spread the losses suffered as a result of inverse condemnation among the public by raising rates or levying taxes (as a true public utility would). PG&E has no taxation power and can increase utility rates only with the express permission of the CPUC. Inverse condemnation exists based on the theory that the utility, rather than absorbing the economic loss, would spread it among the entire community. Since PG&E cannot do that, how can inverse condemnation possibly apply when the net result is not cost-spreading but rather a naked transfer of resources from one private party (PG&E) to another private party (the property owner)?

It is true that two intermediate California court decisions have addressed this question and extended inverse condemnation liability to privately owned utilities. *See Pacific Bell Tel. Co. v. S. Cal. Edison Co*., 208 Cal. App. 4th 1400 (Ct. App. 2012) ("*Pacific Bell*"); *Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744 (Ct. App. 1999) ("*Barham*"). However, both decisions did so based on the express (incorrect) assumption that privately owned utilities, just like governments and public entities, would be able to spread the cost of inverse condemnation liability among the benefitted public. *See, e.g., Pacific Bell*, 208 Cal. App. 4th at 1407. More recently, however, the CPUC, the regulatory body empowered by California law to set rates for utilities like the Debtors, has expressly rejected that assumption. (Orsini Decl. Ex. B.) Calling the cost-spreading rationale "unsound" and insisting that inverse condemnation liability is "not relevant" to rate recovery, the CPUC denied an application by privately owned utility San Diego Gas & Electric ("**SDG&E**") to recover $379 million in uninsured

18

costs resulting from the settlement of claims for inverse condemnation based on wildfires within SDG&E's service territory. *Id.* at 65. Thus, unlike a public entity, PG&E has no guarantee that it can engage in the very loss-spreading that forms the constitutional underpinning of inverse condemnation. Privately owned utilities like PG&E are now caught in a whipsaw between unlimited strict inverse condemnation liability as a result of the prior California intermediate appellate decisions and the CPUC's refusal to take that liability into account in rate recovery.

As several CPUC Commissioners have recognized, that regulatory framework undercuts the constitutional basis for applying inverse condemnation to PG&E. (Orsini Decl. Ex. A. at 21:29-22:15 (CPUC Commissioner explaining that "courts applying the cases to public utilities have done so without really grappling with the salient difference between public and private utilities, which is that there's no guaranty that . . . private utilities can recover the cost from their rate payers"); Orsini Decl. Ex. C at 5 (CPUC President explaining that "the logic for applying inverse condemnation to utilities—costs will necessarily be socialized across a large group rather than borne by a single injured property owner, regardless of prudence on the part of the utility—is unsound. . . ."); *see also id.* at 6.)

California trial courts addressing these questions (including with respect to PG&E) have been constrained by the decisions of California's intermediate appellate court in *Barham* and *Pacific Bell*, which were premised on the incorrect assumption that private utilities would have the right to socialize the costs as discussed above. This Court is not constrained by the reasoning of those cases or by their faulty assumptions. Instead, this Court is obligated to reach its own conclusion about how the California Supreme Court would address this question that it has never confronted, and that no intermediate court has considered since the CPUC expressly disclaimed any notion of loss-spreading and thereby destroyed the foundation of the doctrine as applied to investor-owned utilities like the Debtors. *See Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007) ("If the state's highest appellate court has not decided the question presented, then we must predict how the state's highest court would decide the question."). This Court is not constrained to follow intermediate appellate decisions if it is "convinced by other persuasive data that the highest court of the state would decide

19

otherwise". *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1047 (9th Cir. 2014). The CPUC pronouncements described above—not to mention the clear holdings of the California Supreme Court on the constitutional basis and rationale for inverse condemnation—are just such persuasive data.

The assertion of inverse condemnation liability against the Debtors also raises significant questions under the United States Constitution. Because PG&E does not have the right to spread any losses it is forced to pay as a result of inverse condemnation claims, the application of inverse condemnation to PG&E effects an uncompensated transfer of property from one private party (PG&E) to another private party (the claimant). That uncompensated taking of PG&E's property violates the Fifth Amendment of the United States Constitution as incorporated against the state of California by the Fourteenth Amendment and Article I, section 19 of the California Constitution. That federal constitutional issue is directly within the jurisdiction of this Court and is ripe for immediate adjudication under the Supreme Court's recent decision in *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019).

The question of whether any inverse condemnation claims can be allowed presents a pure issue of law; there are no disputed facts. The Court has core jurisdiction to address this issue now, and doing so will significantly aid the stakeholders in valuing their claims. *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995); *see also In re G-I Holdings, Inc.*, 323 B.R. at 607; *In re Standard Insulations, Inc.*, 138 B.R. 947, 953-54 (Bankr. W.D. Miss. 1992).

### 2. Phase 2: The Tubbs Fire

As stated, the Tubbs Fire was the largest of the Wildfires that occurred in 2017, resulting in 22 fatalities, the destruction of more than 5,000 homes and insurance payouts estimated to be greater than $5 billion. The TCC estimates the Tubbs Fire caused at least $18 billion in damages, and the Ad Hoc Subrogation Group agrees this is a critical issue to resolve if the parties are to have the best chance of arriving at a negotiated resolution. Both of those groups have argued strongly that the issue of Tubbs causation needs to be decided as soon as possible. The Wildfire Claimants believe they can be ready to litigate both causation and damages (for a subset of claimants) approximately 120

20

days from now.  The Debtors agree that speed is important and propose the Court schedule a hearing on the issue of causation to begin no later than October 7, 2019.

Estimating the Debtors' Tubbs Fire liability (if any) is within this Court's core jurisdiction.  This Court has "the right and duty . . . to estimate these tort claims for the purpose of confirming a plan under Chapter 11".  *In re Aquaslide*, 85 B.R. at 549.  A threshold question in estimating an unliquidated tort claim is to assess the probability of success of that claim.  *See In re Garlock Sealing Techs.*, 504 B.R. at 73; *In re POC Props.*, 580 B.R. at 509.  Groups of claims that have no merit as a matter of law should be estimated at zero because those claims, if litigated, ultimately would be disallowed.  *See In re Corey*, 892 F.2d 829, 834 (9th Cir. 1989) (affirming zero estimate because of "the highly speculative nature" of the claims); *Bittner,* 691 F.2d at 139 (affirming valuation of contract claims at zero based on the ultimate merits of the state law claim); *In re Aquaslide*, 85 B.R. 546 (valuing claim at zero where claimant did not plead that he used product manufactured by debtor).  It is, therefore, routine for bankruptcy courts to assess the factual merits of an unadjudicated state law tort claim as part of an estimation process.  That is all the Debtors are requesting here; they are not requesting that individual claims be liquidated.

During the Phase 2 estimation hearing, the Debtors will put on evidence confirming that PG&E did not cause the Tubbs Fire, and therefore, that its aggregate liability with respect to claims arising from the Tubbs Fire should be estimated at zero.  *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 57 Cal. Rptr. 3d 1, 4 (Cal. Ct. App. 2007) ("'Causation' is an essential element of a tort action."); *Bunch v. Coachella Valley Water Dist.*, 935 P.2d 796, 800 (Cal. 1997) (causation is an element of inverse condemnation liability).  CAL FIRE has ruled out PG&E equipment as a potential cause of the Tubbs Fire, concluding that the fire "was caused by a private electrical system adjacent to a residential structure."[11]  The Debtors would expect to call the CAL FIRE investigators as witnesses at the hearing, along with other expert and percipient fact witnesses (including the numerous

---

[11] CAL FIRE News Release, *CAL FIRE Investigators Determine the Cause of the Tubbs Fire*, (January 24, 2019), https://www.fire.ca.gov/media/5032/tubbscause1v.pdf.

21

first responders who were already deposed in the state court proceedings and whose testimony, photographs and videos confirm that PG&E could not have started the Tubbs Fire). The evidence will show that the Tubbs Fire began as a result of illegally installed and poorly maintained customer-owned equipment for which the Debtors had no legal responsibility. The Tubbs Fire and the devastation that it caused was a horrible tragedy. But that tragedy, and the attendant loss of life and property, is the responsibility of the property owners at 1128 Bennett Lane and their insurers, not the Debtors.

The Debtors will also rebut the theories put forth by the Tubbs Fire claimants, who attack CAL FIRE's conclusions with respect to the Tubbs Fire while simultaneously adopting as unassailable CAL FIRE's conclusions that PG&E caused every other 2017 and 2018 Wildfire for which claims have been asserted. For example, the evidence will show that the Ad Hoc Subrogation Group is incorrect when it asserts that the Tubbs Fire was caused by an "arc flash [that] occurred at 9:20:46 PM on October 8, 2017" near PG&E's electrical lines. (Ad Hoc Subrogation Group Motion at 7.) The subrogation plaintiffs assert that this arc flash, which was recorded on video, was "inexplicably ignored" by CAL FIRE in determining that PG&E's equipment was not the cause of the Tubbs Fire. *Id.* To the contrary, CAL FIRE considered and rejected the possibility that the arc flash was related to the cause of the Tubbs Fire. Indeed, CAL FIRE's lead investigator on the Tubbs Fire and drafter of the CAL FIRE report considered and rejected an email from the North Bay Fires plaintiffs' investigator regarding the arc flash and included it as an attachment to the CAL FIRE report. *See id.*; CAL FIRE Report, Attachment J4. Other presentations regarding potential causes of the Tubbs Fire, including the video footage, were also considered and enclosed by CAL FIRE as attachments to its report and rejected. CAL FIRE Report, Attachment J2. CAL FIRE did not "ignore" the evidence of the arc flash; it reviewed that evidence and determined that it did not relate to the cause of the Tubbs Fire. Electrical analysis of PG&E's system as well as expert analysis of the surveillance video confirms this conclusion.

Finally, the evidence will also show that the TCC is incorrect in asserting that PG&E caused the Tubbs Fire because it "failed to deenergize its lines". TCC Motion for Relief at 5. Prior

22

to the North Bay Fires, the CPUC had explicitly confirmed that PG&E did not have an obligation to develop a policy to de-energize its electrical lines in order to prevent wildfires. (Orsini Decl. Ex. D at 49 ("Unlike Southern California, the need for electric utilities to develop fire-prevention plans in Northern California is not clear cut.").) The CPUC also emphasized that "there is a strong presumption that power should remain on for public safety reasons". (Orsini Decl. Ex. E at 30.) PG&E's de-energization practices were influenced by the specific environment in Northern California; accordingly, practices in other parts of California are not probative.[12] Moreover, de-energization policies are explicitly designed to prevent wildfires from being caused by utility equipment, not to prevent the possibility that faulty (and illegally installed and improperly maintained) customer equipment could start a fire. This issue raises important legal questions that may be addressed either at the hearing before this Court or in advance through dispositive motions on undisputed facts.

As the Court is aware, the TCC and the Ad Hoc Subrogation Group have requested relief from the automatic stay to liquidate the claims of just a small number of Tubbs Fire claimants in state court. The Debtors will object to those requests and will not repeat here all of the arguments to be presented in their objection. However, it does bear mentioning that estimation is an obviously superior means of resolving the Debtor's threshold responsibility for these claims, as it will allow *all* interested parties to be heard and will lead to the resolution of issues, including key legal issues such as legal duty and proximate cause. Further, resolution through estimation will apply equally to *all* stakeholders, not just a cherry-picked subset of Wildfire Claimants where any possible binding effect on PG&E, in the event a victory by the Wildfire Claimants in a state court proceeding, would have to await the outcome of years of appeals. Alternatively, the Wildfire Claimants would argue that any victory by PG&E in such a proceeding has zero preclusive effect on the thousands of other claims.

---

[12] Orsini Decl. Ex. D at 49 ("To our knowledge, there has never been an instance in Northern California where strong winds have caused power lines to ignite large-scale wildfires."); *see* Orsini Decl. Ex. F at 2 (noting that "[t]here are a number of significant changes in the conditions that are prevalent in Southern California and/or SDG&E's service territory that support implementation of proactive de-energization").

23

1   Resolution of these issues in estimation will also aid in plan formation, voting and confirmation (none

2   of which is true with respect to a state court trial).

3            Estimation is also far more expeditious.  While the TCC and the Ad Hoc Subrogation

4   Group make predictions about how soon the Tubbs Fire can be tried in state court, that is ultimately

5   up to the state court and will depend upon the outcome of various procedural issues that are likely to

6   take some time to resolve in state court.  By contrast, this Court controls its own calendar and can set

7   a date certain right now for the Phase 2 estimation hearing that has the best chance of allowing the

8   Debtors to emerge from Chapter 11 by June 30, 2020.  Some liability discovery (but no damages

9   discovery) already had been conducted regarding the Tubbs Fire in prepetition litigation.  As set forth

10   in the Proposed Order, the Debtors believe the Phase 2 estimation hearing can and should begin no

11   later than October 7, 2019.  If the Wildfire Claimants think they can complete all causation *and*

12   damages discovery with respect to more than a dozen claimants in 120 days, they can hardly complain

13   that approximately 90 days are insufficient for just causation discovery.

14            Finally, estimation is also more efficient.  Prior to the initiation of these cases, the

15   Debtors explained to the state court that a Tubbs Fire trial would last five to seven weeks.  The state

16   court trial requested by the TCC and the Ad Hoc Subrogation Group will take at least that long.  With

17   the TCC's series of amendments to its motion to add additional plaintiffs, it will likely take even

18   longer.  Given the nature of an estimation hearing and the ability to limit a hearing in Phase 2 to the

19   question of causation (including whether PG&E can be responsible because it did not de-energize its

20   lines even if someone else's illegal equipment started the fire), PG&E believes the hearing can be held

21   over the course of no more than three weeks.

22         **3.**      **Phase 3:  Final Estimation Hearing**

23            Finally, the Court should hold a final Phase 3 hearing to estimate the aggregate amount

24   of the Wildfire Claims, after taking into account the Court's determinations in Phases 1 and 2, to begin

25   no later than December 16, 2019.  The Debtors anticipate that this hearing will involve addressing

26   some fire-specific legal questions that bear on the likelihood of success on the merits with respect to

27

28

24

certain of the Wildfires, but that a central feature of this stage of the proceedings will be the presentation of expert testimony concerning the aggregate amount required to resolve all Wildfire Claims. *See, e.g.*, *Garlock*, 504 B.R. at 87 (describing estimation cases that made use of expert testimony as a part of valuation of claims). As discussed above, determining that aggregate amount will be materially advanced by the completion of the first two phases of the estimation proceedings, as proposed by the Debtors above. The Debtors further propose that the parties report back to the Court within three weeks of the entry of the Proposed Order with further details about Phase 3. The Debtors submit that the Phase 3 hearings should begin no later than December 16, 2019, thereby giving the Debtors every possible opportunity to emerge from Chapter 11 prior to the June 30, 2020 legislative deadline.

## V. <u>NOTICE</u>

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the TCC; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors.

25

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: July 18, 2019

**WEIL, GOTSHAL & MANGES LLP**
**CRAVATH, SWAINE & MOORE LLP**
**KELLER & BENVENUTTI LLP**

    /s/*Kevin J. Orsini*

Kevin J. Orsini

*Attorneys for Debtors and Debtors in Possession*

26