WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Case No. 19-30088 (DM) <br> Chapter 11 <br> (Lead Case) (Jointly Administered) |
| **PG&E CORPORATION,** | |
| **- and -** | **DEBTORS' OBJECTION TO THE AMENDED MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR RELIEF FROM AUTOMATIC STAY TO PERMIT STATE COURT JURY TRIAL OF 2017 TUBBS WILDFIRE CLAIMS AND THE MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS FOR RELIEF FROM THE AUTOMATIC STAY** |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | |
| **Debtors.** | |
| ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☑ Affects both Debtors | Related to Dkt. Nos. 2904 and 2863 |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date: July 24, 2019 <br> Time: 9:30 a.m. <br> Place: United States Bankruptcy Court <br> Courtroom 17, 16th Floor <br> San Francisco, CA 94102 <br> Judge: Hon. Dennis Montali |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**") as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this objection (the "**Objection**") to the Official Committee of Tort Claimants' (the "**TCC**") *Amended Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims*, Dkt. No. 2904 (the "**TCC Motion**"); to the Ad Hoc Group of Subrogation Claim Holders' (the "**Subro Group**," and collectively with the TCC, the "**Movants**") *Motion of the Ad Hoc Group of Subrogation Claim Holders for Relief from the Automatic Stay*, Dkt. No. 2863 (the "**Subro Motion**," and collectively with the TCC Motion, the "**Lift Stay Motions**"); and to joinders in the TCC's Motion from Barbara Thompson and Raymond Breitenstein, Dkt. No. 2861; Michael A. Kelly, as co-lead counsel in the Judicial Council Coordination Proceeding, Dkt. No. 2908; John Caslin and Phyllis Lowe, Dkt. No. 2929; William Edelen, Burton Fohrman, and the heirs of decedent Monte Kirven, Dkt. No. 2930; Don Louis Kamprath, Elizabeth Fourkas, and Greg and Christina Wilson, Dkt. No. 2942; Armando A. Berriz, the heirs of Carmen Caldentey Berriz, and the estate of Carmen Caldentey Berriz, Dkt. No. 2943; the Joining Subrogation Claim Holders, Dkt. No. 2959; State Farm, Dkt. No. 2983; and the SLF Claimants, Dkt. No. 3067.

Filed contemporaneously herewith in support of the Debtors' Objection is the *Declaration of Kevin J. Orsini in Support of Debtors' Objection to the Amended Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims and the Motion of the Ad Hoc Group of Subrogation Claim Holders for Relief from Automatic Stay* (the **"Orsini Declaration"**).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF CONTENTS

Memorandum of Points and Authorities .................................................................................1

I.     Preliminary Statement ....................................................................................................1

II.    Background ......................................................................................................................3

III.   The Movants Fail to Show Cause to Lift the Automatic Stay ......................................5

     A.     The Tubbs Fire Claims Are Central to These Cases (Factor 2) ........................7

     B.     Lifting the Stay Will Not Result in Complete—or Even Partial—Resolution of the "Gating" Tubbs Fire Issue (Factor 1) ...............................................9

     C.     Lifting the Stay Will Result in Significant Prejudice and Will Delay Resolution of These Cases (Factors 7, 10, 11 & 12) ....................................12

         1.     Congress Has Already Decided that Bankruptcy Courts Are Best Positioned to Oversee Estimation in Cases Involving Thousands of Unliquidated Claims ...............................................................12

         2.     Lifting the Stay and Awaiting the Outcome of a State Court Trial Significantly Increases the Risk that the Debtors Miss the June 30, 2020, Deadline ...........................................................................15

         3.     The Movants Will Not Be Prejudiced by Remaining Before This Court and Participating in the Mandatory Estimation Process ...................18

IV.   The Movants' Arguments About Estimation and Personal Injury Claims Are Red Herrings and Do Not Provide Cause to Lift the Stay.............................................21

V.     Conclusion ....................................................................................................................23

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................................................19

*In re Aquaslide 'N' Dive Corp.*,
    85 B.R. 545 (B.A.P. 9th Cir. 1987)...............................................................................................13

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) .........................................................................................................22

*In re Associated Vintage Grp., Inc.*,
    283 B.R. 549 (B.A.P. 9th Cir. 2002)............................................................................................11

*In re Atron Inc. of Michigan*,
    172 B.R. 541 (Bankr. W.D. Mich. 1994) .....................................................................................22

*Bertholet v. Harman*,
    26 B.R. 413 (Bankr. D.N.H. 1991) ...............................................................................................22

*In re Bicoastal Corp.*,
    122 B.R. 771 (Bankr. M.D. Fla. 1990) .........................................................................................21

*Bittner v. Borne Chem. Co.*,
    691 F.2d 134 (3d Cir. 1982)....................................................................................................18, 19

*In re Brotman Med. Ctr., Inc.*,
    No. BAP.CC-08-1056-DKMO, 2008 WL 8444797 (B.A.P. 9th Cir. Aug. 15, 2008).....5, 6, 16, 20

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995)........................................................................................................................2

*In re Chateaugay Corp.*,
    111 B.R. 67 (Bankr. S.D.N.Y. 1990) ............................................................................................13

*Collins v. D.R. Horton, Inc.*,
    505 F.3d 874 (9th Cir. 2007) ..........................................................................................................9

*In re Conejo Enterprises, Inc.*,
    96 F.3d 346 (9th Cir. 1996) ...............................................................................................5, 11, 20

*In re Curtis*,
    40 B.R. 795 (Bankr. D. Utah 1984) ...................................................................................... *passim*

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich. 1997) ............................................................................... *passim*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Eagle-Picher Indus.*,
   189 B.R 681 (S.D. Ohio 1995). ...................................................................22

*In re Fed.-Mogul Glob., Inc.*,
   330 B.R. 133 (D. Del. 2005) ........................................................12, 21, 22

*Matter of Ford*,
   967 F.2d 1047 (5th Cir. 1992) .................................................................12

*In re G-I Holdings, Inc.*,
   323 B.R. 583 (Bankr. D.N.J. 2005) .....................................................13, 22

*In re Garlock Sealing Techs.*,
   504 B.R 71 (W.D. North Carolina 2014)..................................................22

*In re Gasprom, Inc.*,
   500 B.R. 598 (B.A.P. 9th Cir. 2013).........................................................1

*In re Gawker Media LLC*,
   571 B.R. 612 (Bankr. S.D.N.Y. 2017).....................................................22

*Matter of Interco, Inc.*,
   135 B.R. 359 (Bankr. E.D. Mo. 1991).....................................................23

*In re Ionosphere Clubs, Inc.*,
   922 F.2d 984 (2d Cir. 1990).....................................................................2

*In re Mac Donald*,
   755 F.2d 715 (9th Cir. 1985) ....................................................................5

*Mackey v. Montrym*,
   443 U.S. 1 (1979).....................................................................................18

*Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*,
   474 U.S. 494 (1986).................................................................................5

*Morris v. McCauley's Quality Transmission Serv.*,
   60 Cal. App. 3d 964 (1976) ....................................................................10

*In re N. Am. Health Care, Inc.*,
   544 B.R. 684 (Bankr. C.D. Cal. 2016).............................................2, 12, 13

*Owens Corning v. Credit Suisse First Bos.*,
   322 B.R. 719 (D. Del. 2005).........................................................13, 19, 21

*In re Pacific Gas & Electric Co.*,
   279 B.R. 561 (Bankr. N.D. Cal. 2002) .....................................................8

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984).....................................................................2

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)..................................................................................................9

*In re Plumberex Specialty Products, Inc.*,
311 B.R. 551 (Bankr. C.D. Cal. 2004).......................................................................6

*In re Roman Catholic Archbishop of Portland in Oregon*,
338 B.R. 414 (Bankr. D. Or. 2006)..........................................................................14

*In re Roman Catholic Bishop of San Diego*,
374 B.R. 756 (Bankr. S.D. Cal. 2007)......................................................................14

*Siewert v. Christy* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*),
194 B.R. 728 (S.D.N.Y. 1995)..................................................................................22

*In re Specialty Prod. Holding Corp.*,
No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013) ..............13

*United States v. Whiting Pools, Inc.*,
462 U.S. 198 (1983)...................................................................................................2

**Statutes**

11 U.S.C. § 105.....................................................................................................5, 19

11 U.S.C. § 362...........................................................................................................6

11 U.S.C. § 363.........................................................................................................19

11 U.S.C. § 502.............................................................................................2, 13, 18

11 U.S.C. § 503.........................................................................................................19

11 U.S.C. § 522...........................................................................................................6

11 U.S.C. § 1109...........................................................................................2, 8, 19, 22

11 U.S.C. § 1121.......................................................................................................20

28 U.S.C. § 157....................................................................................................12, 22

Public Utility Code § 2106..........................................................................................4

Health and Safety Code § 13007.................................................................................4

**Other Authorities**

U.S. Const. amend. VII..............................................................................................21

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  PRELIMINARY STATEMENT

As the Court knows, the determination of the value of the wildfire claims asserted against the Debtors goes to the core of the Debtors' reorganization and chapter 11 plan process and is vital to the Debtors' successful emergence from chapter 11.  On this core issue, the Tubbs Fire was the largest of the 2017 wildfires, destroying over 5,000 homes and resulting in insurance payouts estimated to exceed $5 billion.  In fact, the damages attributable to the Tubbs Fire could exceed 2/3 of the total damages for the 2017 wildfires.  Notably, the evidence demonstrates that the Debtors did not cause the Tubbs Fire:  two separate investigatory teams from the California Department of Forestry and Fire Protection ("**Cal Fire**") have ruled out PG&E equipment as a potential cause.

Given the significance of the Tubbs Fire claims, both the TCC and the Subro Group concede that addressing the issue of Tubbs Fire causation is a "gating issue."  For its part, the TCC describes the question of Tubbs causation as an issue that needs to be addressed "to negotiate or confirm a plan." *See* TCC Mot. at 15.  The Subro Group similarly describes the Tubbs Fire as a "central issue in structuring a plan of reorganization." *See* Subro Mot. at 2.  The Debtors, of course, agree with a simple point:  there is no single issue that is more central to the resolution of these cases and the Debtors' ability to emerge by June 30, 2020, than estimating the potential liability the Debtors might have for the thousands of unliquidated Tubbs Fire claims.  Where the Debtors cannot agree with the TCC and the Subro Group is with respect to their suggestion that this Court should send this "gating issue," which is critical to the ability of all stakeholders to "negotiate and confirm" a plan of reorganization, back to the prepetition landscape of state court litigation, thereby relegating this Court to the status of a mere spectator to the central issue in these Chapter 11 Cases.  Taking control of this key issue away from this Court would cause severe prejudice both to the Debtors and to the interests of other creditors, and should not be countenanced by this Court.

Congress designed the automatic stay to effectuate the twin goals of providing a debtor "respite from any creditor efforts to enforce rights against the debtor and its property" while "protect[ing] the creditors from each other" by "prevent[ing] the creditors from racing to be the first to claim the debtor's limited assets." *In re Gasprom, Inc.*, 500 B.R. 598, 606 (B.A.P. 9th Cir. 2013).  Racing back

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

to the state court (if the state court would even allow what the TCC proposes), as the TCC requests this Court to allow, would be directly contrary to this core Bankruptcy Code principle. Just as the automatic stay puts an end to the scrum of litigation preceding a debtor's descent into bankruptcy, the Bankruptcy Code's comprehensive process for the administration and equitable resolution of claims is designed to impose order on what was once chaos. And when there are so many unliquidated claims pending against a debtor that no court could possibly address them within a time frame that allows the debtor to timely emerge from chapter 11 so it can continue "to provide jobs, to satisfy creditors' claims, and to produce a return for its owners," *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983), Congress has also decided to emphasize "the overarching goal of avoiding undue delay in a case's administration." *In re N. Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016). Efficiency—and procedural fairness to *all* parties in interest through the ability to participate—is key, and section 502(c) of the Bankruptcy Code embodies that policy by providing that such claims "shall" be estimated if doing otherwise would "unduly delay the administration of the case." 11 U.S.C. § 502(c). Estimation procedures such as those that have now been proposed by the Debtors (Dkt. No. 3091) are the answer here, not lifting the stay.

Estimation of the value of unliquidated tort claims—including through a determination by the Bankruptcy Court of the claimants' likelihood of success—is a common feature of mass tort bankruptcies. The potential uncertainties of estimation are mitigated by the Bankruptcy Code's broad inclusivity, under which anyone with a claim against, or an interest in, the estate has a right to be heard. *See* 11 U.S.C. § 1109. The Bankruptcy Code "centralize[s] all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). And at the heart of this centralized activity is the Bankruptcy Court, with "comprehensive jurisdiction" to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). The system designed by Congress is predictable, it is efficient, and, most importantly, it works.

The TCC dedicates most of its motion to setting up an estimation strawman and knocking it down, arguing for pages that there are certain purposes for which estimation is not appropriate. As set forth briefly below and in more detail in the Debtors' Estimation Motion, estimation is not only permissible in these cases, it is necessary. The only question presented to the Court on the Lift Stay Motions is whether the Court should simultaneously lift the stay and allow a cherry-picked, unrepresentative set of claimants to liquidate their own claims in state court. The Debtors submit that the answer to this question is no. The approach advocated by the TCC and Subro Group would lead to a jury trial on an uncertain timeline, necessarily exclude entire categories of stakeholders in these cases from proceedings concerning this core valuation issue, and lead to a result that would only be binding on any parties after years of appeals. It would also require the resolution of critical legal issues concerning claims relating to the Tubbs Fire that are unambiguously—and appropriately—within this Court's core jurisdiction. At the end of all this, estimation would still be necessary and there would remain thousands of other unliquidated Tubbs Fire claims.

## II. BACKGROUND

Beginning on October 8 and 9, 2017, multiple wildfires spread through Northern California, including the counties of Napa, Sonoma, Butte, Humboldt, Mendocino, Lake, Nevada, and Yuba (collectively the "**North Bay Fires**"). According to a report issued by Cal Fire on October 30, 2017, the North Bay Fires consisted of 21 major fires that burned over 245,000 acres, destroyed an estimated 8,900 structures, and resulted in 44 fatalities.[1] *See Am. Decl. of Jason P. Wells in Support of the First Day Motions and Related Relief*, at 13–14, Dkt. No. 263 (the "**Wells Declaration**").

The most destructive of the North Bay Fires was the Tubbs Fire, which began in the area of Highway 128 and Bennett Lane in Calistoga. The Tubbs Fire accounts for the largest number of potential claims against the Debtors stemming from the North Bay Fires, including the majority of structures destroyed or damaged in the North Bay Fires. According to a report issued by Cal Fire on January 20, 2019, the Tubbs Fire burned 36,807 acres in both Napa and Sonoma Counties, destroyed 5,636 structures, damaged an additional 317 structures, and resulted in 22 fatalities. *See* Orsini Decl.

[1] An additional fire, the Maacama fire, was not initially separately reported by Cal Fire.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

¶ 3, Dkt. No. 3092. By contrast, all of the other North Bay Fires combined resulted in the same number of fatalities, destroyed 2,597 structures, and damaged an additional 1,026 structures. *Id.* On January 20, 2019, Cal Fire issued an investigative report that ruled out PG&E equipment as the cause of the Tubbs Fire.[2] This is the only significant North Bay Fire that Cal Fire concluded was started by someone other than PG&E, and it is also the only fire for which Cal Fire assigned two separate investigative teams before releasing its investigative report.

As of January 29, 2019 (the **"Petition Date"**), PG&E was aware of approximately 700 complaints on behalf of at least 3,600 plaintiffs related to the North Bay Fires, five of which sought to be certified as class actions. *See* Wells Decl. at 15. Plaintiffs brought claims against PG&E with respect to 22 separate fires: (1) Adobe; (2) Atlas; (3) Blue; (4) Cascade; (5) Cherokee; (6) Highway 37; (7) Honey; (8) La Porte; (9) Lobo; (10) Maacama; (11) McCourtney; (12) Norrbom; (13) Nuns; (14) Oakmont/Pythian; (15) Partrick; (16) Pocket; (17) Point; (18) Potter/Redwood; (19) Pressley; (20) Sullivan; (21) Sulphur; and (22) Tubbs.[3] The cases arising from the North Bay Fires were coordinated for pre-trial purposes (the "**Coordinated Proceeding**") in the San Francisco County Superior Court (the "**Superior Court**"). *Id.* For each of these fires, claimants allege causes of action that include inverse condemnation, negligence (causing bodily harm, loss of profits or income, and property damage), private nuisance, public nuisance, premises liability, trespass, violation of Public Utility Code § 2106, violation of Health and Safety Code § 13007, negligent interference with prospective economic advantage, wrongful death, survival actions, and negligent infliction of emotional distress.

The Movants propose that thirteen claimants with injuries stemming from the Tubbs Fire (the "**Tubbs Preference Plaintiffs**") proceed to trial. The Tubbs Preference Plaintiffs' claims in the Coordinated Proceeding are currently stayed as a result of the automatic stay under the Bankruptcy Code, along with the other claims arising from each of the 2017 North Bay Fires. At the Petition Date,

---

[2] *See* Cal Fire Report, dated January 20, 2019, https://calfire.app.box.com/s/tpml34qwpy7inbr096fxfglg7broqep4/file/449219240904.

[3] The Adobe, Norrbom, Nuns, Pressley, Partrick and Oakmont/Pythian fires involved overlapping terrain and are often grouped together as the Nuns Complex fires.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  fact discovery had not yet been completed as to any of the 2017 North Bay Fires, including the Tubbs

2  Fire. Among the outstanding issues that remained open in the state court proceedings were extensive

3  fact witness depositions, expert discovery, all damages discovery, likely dozens of motions *in limine*,

4  jury instruction conferences, and perhaps dispositive motions. *See* Am. Kelly Decl. Ex. B, ¶ 3, Dkt.

5  No. 2907. The only trial that had been scheduled was a trial on the Atlas Fire; the very plaintiffs'

6  attorneys who now advocate for a Tubbs Fire preference trial had successfully opposed scheduling

7  any trial on Tubbs.

8      Yesterday, the Debtors filed their *Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the*

9  *Establishment of Wildfire Claims Estimation Procedures*, Dkt. No. 3091 (the "**Estimation Motion**").

10  The Estimation Motion seeks to initiate a three-phased approach to estimating the Debtors' aggregate

11  liability for all wildfire claims, with an evidentiary hearing on whether the Debtors caused the Tubbs

12  Fire to be held in this Court as early as October 7, 2019. The Debtors are requesting that the hearing

13  on the TCC and Subro Group's Motions for stay relief be adjourned so that the matter can be heard at

14  the same time as the hearing on the Debtors' Estimation Motion.

15  ## III.  THE MOVANTS FAIL TO SHOW CAUSE TO LIFT THE AUTOMATIC STAY

16

17      The Movants seek to renew litigation in state court, but to do so they must show that the

18  Debtors should lose one of the fundamental protections afforded to them by the Bankruptcy Code. *See*

19  *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986). "For the debtor,

20  the stay provides a 'breathing spell' from creditors, allowing the debtor to focus its efforts on

21  reorganization." *In re Brotman Med. Ctr., Inc.*, No. BAP.CC-08-1056-DKMO, 2008 WL 8444797, at

22  *2 (B.A.P. 9th Cir. Aug. 15, 2008) (citing *In re Conejo Enterprises, Inc.*, 96 F.3d 346, 351 (9th Cir.

23  1996)). "For the creditors, the stay facilitates an orderly liquidation process under which all like

24  situated creditors receive equal treatment." *Id.* Indeed, the Bankruptcy Code's foremost protection

25  benefits all parties, as the "automatic stay gives the bankruptcy court an opportunity to harmonize the

26  interests of both debtor and creditors while preserving the debtor's assets for repayment and

27  reorganization of his or her obligations." *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985).

28

The Movants bear the burden to demonstrate "cause" to dispel these fundamental protections and proceed with what they claim will be an accelerated jury trial in state court. *See* 11 U.S.C. § 362(d)(1); *In re Plumberex Specialty Prod., Inc.*, 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004) ("To obtain relief from the automatic stay, the party seeking relief must first establish a prima facie case. . . . If the movant fails to meet its initial burden to demonstrate cause, relief from the automatic stay should be denied."). Because "cause" is not defined in the Bankruptcy Code, courts "consider the totality of the circumstances in each case," *Brotman*, 2008 WL 8444797, at *5 (citations omitted), often turning to the twelve factors enumerated in *In re Curtis*, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984). These factors ask the Court to consider:

(1) Whether the relief will result in a partial or complete resolution of the issues;

(2) The lack of any connection with or interference with the bankruptcy case;

(3) Whether the foreign proceeding involves the debtor as a fiduciary;

(4) Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;

(5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

(6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

(7) Whether the litigation in another forum would prejudice the interests of other creditors, the creditor's committee and other interested parties;

(8) Whether the judgment claim arising from the foreign action is subject to equitable subordination;

(9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under section 522(f) of the Bankruptcy Code;

(10) The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

(11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and

(12) The impact of the stay and the balance of hurt.

*Curtis*, 40 B.R. at 799–800.

Only in passing do the Movants address the applicable test for lifting the stay and whether the applicable twelve *Curtis* factors support their requested relief. *See* 40 B.R. at 799–800. That is because they cannot carry their burden when the applicable test is considered. Even a quick review of the factors demonstrates that many that would weigh in favor of lifting a stay are absent: the debtors

are not parties in the state court proceedings as a fiduciary (factor 3); no specialized tribunal has been

established to hear the Tubbs Fire cases (factor 4)[4]; the costs of defending the litigation will not be

covered by the debtors insurance given the exhaustion of the coverage as a result of the other wildfires

(factor 5); and state court action does not primarily involve third parties (factor 6).  Two other factors

that would weigh in favor of granting stay relief are simply irrelevant on these facts (factors 8 and 9).

The application of the remaining *Curtis* factors all weigh strongly against lifting the stay; the Movants'

extensive discussion of estimation for the alleged purposes of distribution cannot overcome that

conclusion.[5]

### A.    The Tubbs Fire Claims Are Central to These Cases (Factor 2)

The centrality of the Tubbs Fire to these Chapter 11 Cases, and the Court's continued

supervision of it, provides a critical reason why this Court should deny the Movants' request to lift the

stay and proceed to estimation.  As the Subro Group has put it, "common issues of law and fact, such

as exist here, should be heard together to avoid piecemeal litigation, further judicial efficiency, and

mitigate the risk of inconsistent adjudication of identical issues."  Subro. Mot. at 5.  And though they

advanced this argument in favor of the Coordinated Proceeding in state court, with both Movants

repeatedly invoking the assertions of the Debtors' trial counsel that resolving the Tubbs Fire "has the

highest probability of getting all the others tied up in a global resolution," Am. Kelly Decl., at ¶ 9, the

effect of the Debtors' chapter 11 filing was to give those claimants—as well as all other stakeholders—

---

[4]    The Subro Group argues that "judicial efficiency" dictates that Tubbs Fire litigation recommence because "the judge in the Coordination Proceeding had been overseeing the litigation for months prior to PG&E's bankruptcy."  Subro. Mot. at 15.  That assertion is simply false.  The reality is that the Coordinated Proceeding, and the Tubbs Fire with it, was reassigned to a new state court judge just weeks before the automatic stay went into effect.  *See* Orsini Decl., Ex. E.  The new judge—while no doubt capable of presiding over these issues—never held a single hearing and has no experience whatsoever with these litigations.  More to the point, regardless of the presiding judge, the state court is not the type of specialized tribunal contemplated by *Curtis* factor 4.  *See* 40 B.R. at 800.

[5]    If the Court were to grant the TCC's Motion, and were also inclined to permit the subrogation plaintiffs to participate in the state court trial, the stay should only be lifted with respect to the subrogation insurers only with respect to, and only to the extent of, any insurance claims associated with the specific preference plaintiffs proposed by the TCC.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

access to the protection and tools of the Bankruptcy Code.  Though the Coordinated Proceeding was once the most effective—indeed, only—means of addressing thousands of wildfire claims, it was only the most effective in a pre-petition world.  Post-petition, the path leading to the greatest likelihood of a global resolution is and should remain this Court, hopefully through a consensual resolution reached by all parties in interest under this Court's supervision.  Given the centrality of the wildfire claims in this restructuring, going back to the Coordinated Proceeding would be a monumental step backward for both creditors and the Debtors alike.

This is also why the TCC's reliance on the Debtors' first bankruptcy is misplaced.  In *In re Pacific Gas & Electric Co.*, 279 B.R. 561, 571 (Bankr. N.D. Cal. 2002), this Court abstained from hearing a series of cases relating to the Debtors' liabilities for hexavalent chromium.  Those claims were at the peripheries of the Debtors' prior chapter 11 cases, having neither precipitated the bankruptcy nor materially affected the reorganization plan, and did not figure prominently in the restructuring.  Here, by contrast, the opposite is true.

Perhaps most importantly, the Tubbs Fire is so important to these Chapter 11 Cases that it is essential that all interested parties get an opportunity to participate in these proceedings.  The Bankruptcy Code's broad inclusivity ensures that all interested parties "may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).  Because all parties in interest agree that "a central issue in structuring a plan of reorganization will be whether the Debtors are liable for the Tubbs Fire," Subro. Mot. at 2, allowing the Movants to reopen litigation in state proceedings would be entirely inappropriate.  Doing so would immediately shift the center of gravity of these Chapter 11 Cases, prejudicing all other interested parties, who would be unable to participate in the state proceedings.  The Court should accordingly deny the Movants' request and should instead retain control over these proceedings.  This is especially true now that the Debtors have filed their Estimation Motion, which would establish the threshold question of the likelihood of liability for the Tubbs Fire as phase 1 of the estimation proceedings.

### B.  Lifting the Stay Will Not Result in Complete—or Even Partial—Resolution of the "Gating" Tubbs Fire Issue (Factor 1)

The TCC's proposal is that the Court should permit a dozen or so out of the thousands of Tubbs Fire claims to proceed to a jury trial. The Subro Group asks that it be allowed to join at least with respect to a few of its claims. Doing so would not result in any meaningful legal resolution of the Tubbs Fire issue on any schedule remotely approaching emergence from Chapter 11 by the critical June 30, 2020 date.

On the one hand, if the Debtors were to win the TCC's proposed trial, it is certain that no other fire claimant would acknowledge that such a result was binding on them and would undoubtedly argue strenuously that such a result from a single trial would do little to help this Court estimate the value of his or her claims. Indeed, such an argument might even have merit, as the United States Supreme Court has held that "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy" to the prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979); *see also Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 880 n.6 (9th Cir. 2007) (same). Thus, because any individual who was not a party would potentially not be bound by a judgment of no-causation, and because the automatic stay and practical realities of a state court trial would bar any but a handful of plaintiffs from actively participating in a separate state court action, there would not be anything close to the full resolution contemplated by *Curtis* factor 1. The result, then, would be that *even if the Debtors win the proposed trial*, they still lose: every other Tubbs Fire victim would still have an argument that the Debtors must liquidate their claims too and the TCC would undoubtedly continue to argue, as it does here, that those claims could still not be estimated without violating the rights of those other absent claimants. The alleged uncertainty on causation of the Tubbs Fire—which all parties agree is a "gating issue" to resolving these Chapter 11 Cases—would remain as unresolved as before.

On the other hand, if the Debtors were to *lose* the TCC's proposed trial, the law of collateral estoppel would mean that the result would be binding upon the Debtors only after all appeals could be exhausted; appeals that are certain in the event of an adverse jury verdict on what are likely many issues, including issues specific to jury trials. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 876 n.1

1  (9th Cir. 2007) ("Offensive non-mutual collateral estoppel is a version of the doctrine [of collateral

2  estoppel] that arises when a plaintiff seeks to estop a defendant from relitigating an issue which the

3  defendant previously litigated and lost against another plaintiff.") (alteration in original) (internal

4  quotations omitted); *see also Morris v. McCauley's Quality Transmission Serv.*, 60 Cal. App. 3d 964,

5  973 (1976) (stating, within the context of issue preclusion specifically, "[t]he doctrine of res judicata

6  applies only to final judgments, that is, to judgments which are free from attack on appeal.").

7  Moreover, the Movants ignore the limited impact that any jury trial result involving their

8  cherry-picked set of plaintiffs would actually have on the ability of the stakeholders to meaningfully

9  assess the value of the thousands of other Tubbs Fire claims. Stated differently, a verdict in a trial

10  involving the specific plaintiffs picked by the TCC would do little to further the answer to the question

11  that actually matters: the likelihood of success of *all* Tubbs Fire claimants. This concern about the

12  limited value of an unrepresentative trial is not something the Debtors have come up with to oppose

13  this motion; it is something that the very lawyers who represent the Tubbs Preference Plaintiffs

14  **stipulated to in the prepetition state court proceedings**.

15  Prior to the consummation of these Chapter 11 Cases, the question of what types of plaintiffs

16  would be included in any initial bellwether trial was a hotly contested issue in state court. Considering

17  competing proposals about how to select the plaintiffs in the first trial such that they would present a

18  representative cross-section of claims, the court directed the parties in the Coordinated Proceeding to

19  confer and "select about 15 plaintiffs for the trial" and "fix the dates and steps in this process." *See*

20  Orsini Decl. Ex. B, at 4–5. Following extensive negotiations, the parties agreed upon a process for

21  selecting plaintiffs for the first trial. *See* Orsini Decl. Ex. C, at 8–9. Specifically, the parties agreed to

22  ten separate categories of claimants "representing the majority of types of claims that will be presented

23  by average or typical plaintiffs in the litigation as a whole," an agreement predicated on the parties'

24  stipulated understanding that bellwether trials of unrepresentative plaintiffs would provide little insight

25  into how the vast mass of cases would ultimately be resolved.[6] *Id.* at 8. The Movants now repudiate

26  

27  [6]  These ten categories include holders of the following claims: (1) wrongful death; (2) personal injury; (3) total loss of home on property larger than 5 acres; (4) total loss of home on property

28  smaller than 5 acres; (5) partial loss/non-total damage to home; (6) commercial loss to non-winery; (7) commercial loss to winery/vineyard; (8) loss/displacement of renter/tenant with destruction of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

this prior stipulated approach and urge this Court to allow a limited subset of claims to proceed to trial in contravention of this existing state court order.

The Movants fail to address, nevermind grapple with, these complex issues. Instead, they argue that the Court and the other stakeholders need not worry about this since the claims are certain to settle before any trial. *See, e.g.*, TCC Mot. at 3 ("relief from stay would result in settlement of the Chapter 11 Cases, because PG&E's three year track record in the fire litigation establishes that PG&E settles every single fire claim before the jury trial"); *id.* at 19 ("relief from stay . . . would result in settlement"); *id.* at 21 ("the trial setting would result in settlement"). In other words, the argument is that the stay should be lifted not to actually try the claims, but instead to force a settlement. Whether it is true or not that lifting the stay would increase settlement pressure on the Debtors—a doubtful proposition given the fact that two independent sets of Cal Fire experts have concluded that the Debtors did not cause the fire and the fact that the fire claimants otherwise claim Cal Fire has an accuracy rate of 100% with respect to all other fires—that is a very large assumption to serve as the basis for sending the most significant issues in these cases back to state court.

If the goal—as the Movants candidly admit—is to tee up the Tubbs Fire issue so that there is a date certain on the calendar that can encourage settlement discussions, that same goal is better achieved by granting the Debtors' Estimation Motion and setting a date certain—controlled exclusively by this Court—to address the likelihood of responsibility for the Tubbs Fire. *See In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 560 (B.A.P. 9th Cir. 2002) (noting that a primary function of chapter 11 is to provide "structured negotiation conducted under rules prescribed by the Bankruptcy Code."). This is exactly what the Debtors propose to do in phase 1 of the estimation proceedings, in which all parties in interest will be able to participate. Moreover, any argument that the threat of a jury trial is more likely to extract a settlement is an inappropriate justification for lifting the stay on its face. *See Conejo*, 95 F.3d at 352 (denying stay relief to a movant "seeking relief from the stay to strengthen its position against [the debtor]" because of the importance of "preserving a level playing field for negotiation"). And, of course, if settlement negotiations in advance of an estimation hearing

---

personal property; (9) damage/destruction to raw land without loss of home; and (10) smoke and soot. *See* Orsini Decl. Ex. C, at 8.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

fail, at least the Court's assessment of the cause of the Tubbs Fire will meaningfully and rapidly advance the formulation, voting, and confirmation of a plan of reorganization. *See, e.g.*, *In re Fed.- Mogul Glob., Inc.*, 330 B.R. 133, 154–55 (D. Del. 2005) (finding that "an estimation of asbestos liability for the limited purposes of plan formulation is a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code, while not implicating the procedural rights of the individual claimants."). None of that would be true under the path proposed in the Lift Stay Motions.

## C. Lifting the Stay Will Result in Significant Prejudice and Will Delay Resolution of These Cases (Factors 7, 10, 11 & 12)

As the Court is aware, the recently enacted wildfire fund legislation has set what is effectively a June 30, 2020, deadline for the Debtors to emerge from chapter 11. If that deadline is not met, the Debtors cannot participate in a new wildfire fund to address potential future wildfire liability. As a result, the Debtors are driven by two fundamental goals: (1) fairly compensating those wildfire victims who are entitled to compensation; and (2) successfully exiting reorganization by June 30, 2020. That is precisely why the Debtors have filed the Estimation Motion. And it is precisely why these Lift Stay Motions should be denied. Sending the critical issue at the core of formulating a plan of reorganization to state court in order to liquidate the claims of a select few will put that deadline at serious risk and would prejudice the Debtors and numerous other stakeholders.

### 1. Congress Has Already Decided that Bankruptcy Courts Are Best Positioned to Oversee Estimation in Cases Involving Thousands of Unliquidated Claims

As set forth in the Estimation Motion, the very point of estimation is to "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions." *Matter of Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992). Congress provided the Bankruptcy Court with core jurisdiction over the aggregate estimation of claims, 28 U.S.C. § 157(b)(2)(B), including personal injury and wrongful death claims. *See, e.g.*, *N. Am. Health Care*, 544 B.R. at 690 ("The Court's aggregate estimation of the tort claims for voting and plan confirmation purposes only is a core matter under 28 U.S.C. § 157(b)(2)(B)."). "Indeed, it is beyond dispute that this Court does have jurisdiction to 'allow,' 'disallow,' 'liquidate,' or

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

‘estimate’ certain aspects of the Claims which assert causes of action . . . based on contract law,” and “[t]he same is true with respect to Claims for property damage.” *Chateaugay*, 111 B.R. at 71.

In exercising its jurisdiction, the Bankruptcy Court “shall” make an estimation of aggregate liability for “any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.” 11 U.S.C. § 502(c). Section 502(c)’s language “is mandatory and places upon the court an affirmative duty to estimate unliquidated claims when appropriate.” 4 Collier on Bankruptcy ¶ 502.04 (16th 2019). It should be obvious that liquidation of the Debtors’ potential liabilities—tens of thousands of claims with potential valuations ranging in the billions—would create exactly the type of “undue delay” that makes estimation mandatory in this case. Even if narrowed to a comparatively more discrete issue, such as the Tubbs Fire, proceeding with state court trial is completely untenable.

Some form of estimation proceeding is required here, as in virtually all bankruptcies involving mass torts, and is a standard feature of such mass tort bankruptcies, including those that involve large numbers of personal injury tort claims. *See, e.g.*, *In re Aquaslide ‘N’ Dive Corp.*, 85 B.R. 545, 547 (B.A.P. 9th Cir. 1987); *N. Am. Health Care*, 544 B.R. at 688; *In re Specialty Prod. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. May 20, 2013); *Owens Corning v. Credit Suisse First Bos.*, 322 B.R. 719, 721–24 (D. Del. 2005); *In re G-I Holdings, Inc.*, 323 B.R. 583, 623–25 (Bankr. D.N.J. 2005); *Chateaugay*, 111 B.R. at 76. This case is not exceptional in that regard. The plain language of the Bankruptcy Code and the clear advantages of having central issues of the Debtors’ Chapter 11 Cases unfold within the Bankruptcy Court, where all stakeholders can participate, are circumstances that mandate estimation.

Notwithstanding estimation’s ubiquity in bankruptcy proceedings, the Movants assert that estimation will yield profound inequities if allowed to proceed at this time and that the Court must lift the stay so that certain Tubbs Fire claimants and their subrogated insurers may temporarily shift the center of gravity of these Chapter 11 Cases to state proceedings until the question of causation of the Tubbs Fire is presumably resolved. In support of this argument, the TCC primarily relies on *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997). In that case, litigation had raged for nearly two decades over the question of whether silicone was a toxic substance causing connective tissue

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

disorders, and as litigation expenses mounted Dow Corning became unable to address the "crippling effect" of an explosion in products liability suits. *Id.* at 551–53. As Dow Corning's bankruptcy dragged on, key stakeholders could not reach a consensual resolution because no one could agree whether silicone was a "bio-inert" substance that harms, or does not harm, the human body, a dispute that continues to this very day.[7] *Id.* at 570. Ultimately, the debtor and the torts' claimants committee filed competing motions to estimate the total aggregate liability of the silicone suits for purposes of confirmation of a plan. *Id.* at 554–601. The Court, denying both motions, found under the circumstances of that case that there was no "undue delay" in postponing estimation until liquidation trials at the district court could provide some degree of clarity on the matter. *Id.* at 566.

*Dow Corning* thus stands for the proposition that estimation is not *immediately* mandatory when trials may add clarity where none was there before and where the ultimate resolution of the chapter 11 case may be aided by first allowing the liquidation of certain claims outside of bankruptcy. But while that may have been true in *Dow Corning*, where the question of silicone toxicity was central to virtually all of the tort claimants, the facts here are quite different, where dozens of fires have raised distinct issues of liability and created classes of claimants whose interests in a rapid resolution diverge from one another. Delaying estimation for the (possible) benefit of the Tubbs Fire victims will prejudice the Debtors and other creditor constituencies, including other wildfire victims. With many other classes of creditors in these Chapter 11 Cases, the delay created by placing liquidation before confirmation is essentially a delay in distribution to all other creditors, and an unjustified one at that.[8]

---

[7] *See, e.g.*, U.S. Food and Drug Administration, *FDA Update on the Safety of Silicone Gel-Filled Breast Implants* (June 2011), at 3, https://www.fda.gov/media/80685/download (last visited July 18, 2019) ("The post-approval studies to date do not show evidence that silicone gel-filled breast implants cause connective tissue disease, reproductive problems, or breast cancer.").

[8] Nor are the sex abuse cases cited by the TCC, *In re Roman Catholic Bishop of San Diego*, 374 B.R. 756 (Bankr. S.D. Cal. 2007), and *In re Roman Catholic Archbishop of Portland in Oregon*, 338 B.R. 414 (Bankr. D. Or. 2006), applicable here. *San Diego* is a remand decision concerning a matter at the apex of a "compelling state interest"—the "protection of children from sexual predators"—dealing with far fewer claims than here, all involving highly individualized fact patterns. 374 B.R. at 764. And *Portland* involved a debtor that had persistently argued for 18 months that no claims should proceed to trial until the plan was confirmed, a situation that had become simply untenable given the total failure of settlement discussions. 338 B.R. at 418. Here, by contrast, the Debtors have diligently pursued consensual resolutions with key stakeholders and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

A number of other factors readily distinguish *Dow Corning*. First and foremost, *Dow Corning* solely involved personal injury and wrongful death cases, whereas the largest potential liabilities arising from the Tubbs Fire relate to property damage. Second, the TCC submits that this Court should lift the stay here on the theory that, as in *Dow Corning*, "proceeding directly to liquidation would have the salutary effect of saving time, money and eliminating potential negative side effects that could easily result from the estimation process." *Id.* at 566. But what the TCC ignores in its request is that outsourcing one of the most contentious issues of these Chapter 11 Cases—an issue that affects thousands of similarly-situated claimants who would not be able to participate in a state court proceeding—would destroy the collective forum framework that is fundamental to chapter 11. Third, there is no evidence that there was any particular urgency to the resolution of the chapter 11 proceedings in *Dow Corning*. The court there made a judgment, in its discretion and based on the facts of that case, that all stakeholders would have benefitted from any delay that might come from first litigating certain issues in foreign courts. The same is most certainly not the case here. June 30, 2020, will arrive quickly. There are tens of thousands of Tubbs and non-Tubbs Fire claimants for whom estimation is necessary, and all of the other creditors' interests will be impaired if the deadline is missed and the fund protections evaporate. And such delay in the state court system is exactly the likely result for the reasons discussed in the following section.

2. **Lifting the Stay and Awaiting the Outcome of a State Court Trial Significantly Increases the Risk that the Debtors Miss the June 30, 2020, Deadline**

The Movants' proposal, as contrasted to the Debtors' Estimation Motion, introduces substantial uncertainty about timing and multiple opportunities for delay.

First, it is not at all clear that the state court would agree to proceed with the preference claims hand-selected by the Movants, even if those claims are determined by the state court to qualify for statutory preference. To be clear, the Movants have hand-selected a subset of claimants for their preferred trial in state court. But these very same movants successfully opposed an effort by a different

---

this Court's estimation relating to the Tubbs Fire would also have a substantial impact in settlement negotiations.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

set of plaintiffs to jump to the front of the line in the Coordinated Proceeding. Indeed, Plaintiffs' Leadership in the state court proceedings—led by a partner of Mr. Kelly, the TCC's declarant—argued that "enabling a preference motion to proceed in the absence of a broader coordination process is going to make it very difficult if not impossible for us to continue in that coordination process." *See* Orsini Decl. Ex. D, Tr. 35:16–20. In particular, they asserted that allowing preference claims to proceed unabated would result in a group of "wild mavericks all going out and doing what they want to do because they say, well, it's my decision on behalf of my client that needs this discovery to go first." *Id*. at 55:7–21.

The Superior Court found these arguments compelling: it denied the preference request, reasoning, among other things, that even if only 5% of claimants were elderly or infirm within the meaning of section 36, that would still result in "about 250 cases" arguably eligible for a preference motion. *See* Orsini Decl. Ex. F, at 2–3. "If hundreds of plaintiffs opted for preference trials across a variety of the fires, coordinating these cases would be impossible." *Id.* The preference motion was accordingly denied and the Superior Court entered a case management order specifying how preference claims would be dealt with. *See* Orsini Decl. Ex. G. The Superior Court's protocol was specifically designed to prevent any subset of lawyers from favoring their own clients by pursuing an unrepresentative trial that could disturb the entire Coordinated Proceeding.

If creditors trying to jump the line was inefficient and inappropriate in the prepetition world, it is even more so in a postpetition world. If this Court granted stay relief, the Movants would have to return to the Coordinated Proceeding and attempt to comply with the preference protocols or else ask the Superior Court to disregard or amend its own protocols. Neither approach is promising, and both show that the Movants' insistence on moving their cases forward in the Coordinated Proceeding will be no simple task. Indeed, there is no evidence that the protocol has been followed here, and there is every reason to believe that a request to allow only a subset of Tubbs Fire cases to go to trial will engender a wave of requests for relief from stay from other similarly situated litigants seeking to have their cases tried too. *See Brotman*, 2008 WL 8444797, at *6 ("[I]f the bankruptcy court granted relief from the stay to [the movant] at that time, it logically would have to grant relief from the stay to other creditors with similar actions pending against the debtor."). Given the number of Tubbs Fire claimants,

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the balance of the hurt if the Lift Stay Motions were granted would clearly fall on the Debtors, their other creditors (including other wildfire victims), and other parties in interest.

Second, before any trial could be scheduled in state court, the court would first have to assess whether the proposed plaintiffs satisfy the preference statute and then resolve the likely disputed issue about which court should try the case:  San Francisco or Sonoma County.  The latter issue—the proper forum—was hotly contested prior to the filing of the Chapter 11 Cases and resolved only in the context of a completely different fire (the Atlas fire) based primarily upon facts relevant to Napa County (whereas Tubbs primarily impacted Sonoma County).  *See* Orsini Decl. Ex. B.  If this Court grants relief from stay, the issue of forum will also have to be litigated and decided, causing yet further delay for no practical purpose.

Third, even if these procedural hurdles were somehow cleared, trying the actual cases will consume enormous amounts of time.  A host of pre-trial issues will unavoidably need to be resolved before any trial could occur in state court.  The parties will unavoidably engage in expert discovery, motions to qualify experts, motions *in limine*, and the empaneling of juries.  With $18 billion in damages allegedly on the line, all parties involved have every incentive to litigate every conceivable issue, with the result that setting trial is the costliest way imaginable to proceed.  It stands to do substantial and needless harm to the estates' resources.  And although discovery would be needed in the estimation proceedings contemplated by the Debtors' Estimation Motion, it would be much more limited because it would only address causation, not actual individual damages.  Moreover, this Court would be best positioned to oversee such discovery and set its timing and scope in light of the overall interests of the Debtors and all stakeholders in these Chapter 11 Cases.

Fourth, a jury trial, as contrasted to an estimation hearing, will also yield its own delays.  The Tubbs Preference Plaintiffs' proposal to try the claims of 13 plaintiffs in 120 days would take longer than the Debtors' proposed estimation.  The preference statute requires that trial be set within 120 days of the *granting* of a preference motion, but the unique circumstances of the Coordinated Proceeding call into question whether that will happen at all.  Even if the trial started on schedule, though, it

promises to be time consuming. The parties will inevitably dispute liability,[9] as well as the appropriate way to calculate any such damages. Months before the Debtors initiated these Chapter 11 Cases, the parties to the Coordinated Proceeding litigated which fires would be tried first and how long any such trial would take. In that context, the Debtors proposed that a Tubbs Fire trial would take as long as 5 to 7 weeks, or 35 to 42 days. By contrast, an estimation hearing, given this Court's ability to limit such a hearing to the likelihood of success on causation, could be held in under 3 weeks—and it would occur only once.

Fifth, there remains the pressing legal question of whether PG&E could be held liable for failing to de-energize its system where the resulting alleged harm was the failure of customer equipment, not PG&E equipment. This legal issue raises serious questions about legal duty, proximate cause, and intervening actors, all of which will be addressed and intensely contested. This Court is best positioned to resolve these issues as to all victims of the Tubbs Fire, as well as all wildfire victims more broadly and it is within the Court's core jurisdiction to do so.

### 3. The Movants Will Not Be Prejudiced by Remaining Before This Court and Participating in the Mandatory Estimation Process

For all of the reasons noted above, numerous stakeholders—including the Debtors, non-wildfire creditors and non-Tubbs wildfire creditors—will be prejudiced by pursuing the liquidation of a subset of claims in state court. By contrast, estimation will not prejudice the Movants' ability to protect their rights in the chapter 11 proceedings.

As noted, Bankruptcy Courts make aggregate estimations all the time; that is the entire purpose of section 502(c), which reflects Congress's considered judgment. "One cannot overemphasize the advantages of speed and simplicity to both creditors and debtors." *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136 (3d Cir. 1982) (quoting 124 Cong. Rec. H 11101-H 11102 (daily ed. Sept. 28, 1978) (statement of Rep. D. Edwards of California, floor manager for bankruptcy legislation in the House of Representatives)); *see also Mackey v. Montrym*, 443 U.S. 1, 13 (1979) ("[T]he Due Process Clause

---

9    The issue of inverse condemnation would be covered in phase 2 of the estimation proceedings contemplated by the Debtors' Estimation Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible [sic] 'property' or 'liberty' interest be so comprehensive as to preclude any possibility of error."); *Owens Corning*, 322 B.R. at 725 ("[S]ince mathematical precision cannot be achieved in the prediction being undertaken, it is important that we not pretend to have achieved mathematical accuracy.").

In estimation, the TCC, or any other interested party, may put on evidence, including expert testimony. It may raise legal arguments and it may refute legal arguments. The Court may use "whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization 'must be accomplished quickly and efficiently.'" *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007) (citing *Bittner*, 691 F.2d at 135–37). Because "Congress intended the procedure [for estimation] to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue," *Bittner*, 691 F.2d at 135, this Court can attend to the particular contingencies of the case and the Tubbs Fire victims' voices will be heard. And should that process leave the Movants or any other party in interest unsatisfied, they may subsequently object to the Debtors' plan at confirmation, 11 U.S.C. § 1109(b), or may even seek reconsideration of whether their claims should have been allowed. *Id.* § 502(j).

To be sure, the TCC argues strenuously that the question of what caused the Tubbs Fire is a complicated issue. It is adamant that Cal Fire's conclusions that PG&E did not cause the Tubbs Fire are of no evidentiary value and must be taken before a jury for trial. But the Movants' insistence on this point here is betrayed by the fact that the TCC has repeatedly invoked Cal Fire's conclusions throughout these Chapter 11 Cases and will surely do so again when it once more suits its purposes. *See, e.g.*, *Opposition of the Official Committee of Tort Claimants to Corrected Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief (Dkt. No. 806)*, at 28, Dkt. No. 1109 ("CalFire's investigations found that the company's equipment caused the majority of the fires and the company's maintenance violated state law."); *Official Committee of Tort Claimants' Limited Joinder, Objection and Counter Motion to Debtors' Wildfire Assistance Program Motion*, at 4–5, Dkt. No. 2013 (arguing

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

that Cal Fire's findings establish that the Debtors started the Butte Fire); *Objection of the Official Committee of Tort Claimants to Corrected Motion of Debtors Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusivity Periods*, at 5, Dkt. No. 2017 ("Cal Fire issued a News Release stating that the Debtors caused the Camp Fire."). Just because Cal Fire's conclusions are inconvenient to the Movants in this instance—but are presumably viewed as admissible evidence for all the other unliquidated claims relating to wildfire, not one of which has gone to judgment—does not mean that this Court cannot properly estimate claims relating to the Tubbs Fire.

Finally, the Movants' invocation of abstention doctrine is inapplicable here. Simply put, there are currently no Tubbs Fire proceedings from which this Court can abstain, a point the Subro Group recognizes when it concedes that "there is no pending matter before this Court that requires it to determine that abstention is appropriate." Subro Mot. at 17. Since there is no independent "cause" to warrant relief from stay, the principles of abstention do not move the needle either.

\*        \*        \*

As detailed above, a holistic view of the circumstances here shows that not only is there no cause to lift the stay, but also that lifting the stay here and now would unduly harm the Debtors and their restructuring efforts. If the stay were lifted, the Debtors would be forced to litigate on two fronts. The Tubbs Preference Plaintiffs, on the other hand, would suffer little, if any, hardship by continuing in this Court, where they could make meaningful progress on their claims through discovery in the context of estimation proceedings. *See Brotman*, 8444797, at \*7 (finding cause to lift the stay lacking where creditor could still obtain discovery on her wrongful death claim). Moreover, discovery in the context of estimation proceedings will promote judicial economy because it would also prepare the Tubbs Preference Plaintiffs for trial, should that need eventually arise, thereby "minimizing the duplication of litigation in two separate forums." *Conejo*, 96 F.3d at 353. Estimation would also protect the interests of other creditors because, unlike in state court, all interested parties could participate in both fact and expert discovery, thus "preserving a level playing field for negotiation of a consensual reorganization plan." *Conejo*, 96 F.3d at 353; *see also Brotman*, 2008 WL 8444797, at \*5 ("The stay protects not only the debtor, but its creditors as well."). It would also help move toward the goal of reaching a negotiated resolution.

#### IV.   THE MOVANTS' ARGUMENTS ABOUT ESTIMATION AND PERSONAL INJURY CLAIMS ARE RED HERRINGS AND DO NOT PROVIDE CAUSE TO LIFT THE STAY

Reduced to its fundamentals, the Movants' argument that the stay should be lifted rests on the following set of suppositions: (1) because the Court may reach an inadequate estimation, the estimation will effectively determine the distribution of claims by creating a trust that is insufficiently funded; and, (2) because estimation here is supposedly tantamount to distribution, estimation would violate the Tubbs Claimants' Seventh Amendment rights to a jury trial.  Thus, the Movants argue, estimation is effectively unconstitutional in these circumstances and the Court must grant relief from stay.  These arguments fail for a variety of reasons.

First, estimation for purposes of plan confirmation is mandatory in these circumstances. "There is no question that the estimation of claims in bankruptcy does not establish a binding legal determination of the ultimate validity of a claim nor a binding determination of any issues." *In re Bicoastal Corp.*, 122 B.R. 771, 775 (Bankr. M.D. Fla. 1990).  When a court estimates the aggregate amount to which claimants are entitled, it is not "deciding how much each claimant will actually be entitled to receive, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." *Owens Corning*, 322 B.R. at 722.  Instead, "[t]he object of [an estimation]  proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan." *Federal-Mogul*, 330 B.R. at 154.  And importantly, the Debtors are not asking this Court to liquidate any individual personal injury claim.  The Movants therefore cannot complain that estimation will prejudice any Tubbs Fire victims.  The simple application of the relevant factors, as discussed above, is more than sufficient to deny the requested relief.

Second, even if the estimation sought here served to limit or cap liabilities as a part of a confirmed plan, such an estimation would still not amount to a *de facto* claim liquidation.  The TCC's contention that, "[u]nless the Court estimates the Tubbs Fire Claims at 100% of the amount requested by the TCC, any plan that uses an estimated number would result in the Tubbs Fire Claims being capped or somehow limited in the ultimate plan of reorganization" (TCC Motion at 15) is wrong.  Bankruptcy courts have estimated personal injury liabilities in countless cases, many of which

involved debtors with insufficient funds to pay all general unsecured claims in full.  None of those cases required that the debtor fund a trust in the full amount sought by the tort claimants.  *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 115 (D. Del. 2006);  *In re G-I Holdings, Inc.*, 323 B.R. at 623;  *Federal Mogul*, 330 B.R. at 136–37;  *In re Garlock Sealing Techs*., 504 B.R 71, 74 (W.D.N.C. 2014); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 682 (Bankr. S.D. Ohio 1995).  Rather, estimation of the total aggregate value of claims has consistently been acknowledged as an efficient way to aid the parties to reach a consensual plan of reorganization and expedite the Chapter 11 plan process.  Moreover, the Movants' complaints about *de facto* liquidation are made without any evidence and with every opportunity to have their voices heard.  As explicitly recognized by the Bankruptcy Code, the Movants, and any other party in interest, will be able to present their arguments at an estimation hearing or even object to plan confirmation.  *See* 11 U.S.C. § 1109(b).  The Bankruptcy Code's protections, and any other that the Court may decide to adopt in the future, remove any possibility of prejudice against the Movants.  Furthermore, the risks of over- and under-estimation fall equally on the Debtors, creditors, and other interested parties alike, providing every stakeholder in the Debtors' estates with a strong incentive to guide the Court to the correct decision.

Third, the Movants' concerns about jury rights are similarly attenuated and hypothetical.  They will only arise, if ever, for a minority of claimholders, because the overwhelming majority of claims arising from the Tubbs Fire are property damage claims and do not implicate jury rights at the liquidation stage.  *See* 28 U.S.C. § 157(b)(2).  For those claims that are not property claims, the vast majority are emotional distress claims incidental to property damage claims and do not involve any bodily injury.  Analyzing similar claims, courts have held that "incidental claims of emotional injury do not suffice to transform a tort claim into a personal injury tort when it otherwise would not be."  *In re Gawker Media LLC*, 571 B.R. 612, 623 (Bankr. S.D.N.Y. 2017) (citations omitted); *see also Siewert v. Christy* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*), 194 B.R. 728, 734 (S.D.N.Y. 1995) (finding incidental claims of emotional damages insufficient to "transform [a] business tort into a personal injury tort" (citing *Bertholet v. Harman*, 126 B.R. 413, 415 (Bankr. D.N.H. 1991))); *In re Atron Inc. of Michigan*, 172 B.R. 541, 544 (Bankr. W.D. Mich. 1994) (finding that Congress did not intend to allow creditors to divest bankruptcy courts of ability to liquidate claims

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

"by merely alleging a questionable, ambiguous emotional injury in the context of a nontraditional personal injury tort claim"); *Matter of Interco, Inc.*, 135 B.R. 359, 362 (Bankr. E.D. Mo. 1991) ("Congress intended to limit this exception to a 'narrow range of claims.'" (citation omitted)).

That leaves the subset of claims that actually involve physical injury or wrongful death claims, a small portion of the much larger pool of Tubbs Fire cases. But even for this subset of individuals, the Movants' complaint that they may one day elect to exercise jury rights and may receive less in distribution than they otherwise would have simply mischaracterizes the law. *See Dow Corning*, 211 B.R. at 569 ("A right to a jury trial does not mean a right to payment in full of the liquidated amount of the claim."). The Debtors of course acknowledge the serious injuries represented by these claims, but in the context of this Motion, the Movants' concerns about jury rights are remote, inapplicable to the facts facing the Court right now, and do not justify lifting the stay.

## V. CONCLUSION

For the reasons stated herein, the Court should deny the Movants' Lift Stay Motions.

Dated: July 19, 2019       **WEIL, GOTSHAL & MANGES LLP**

                                       **CRAVATH, SWAINE & MOORE LLP**

                                       **KELLER & BENVENUTTI LLP**

                                       */s/ Stephen Karotkin*

                                       Stephen Karotkin

                                       *Attorneys for Debtors and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119