AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
 idizengoff@akingump.com
 dbotter@akingump.com
 aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
Email: avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS' JOINDER TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTIONS OF (I) AD HOC GROUP OF SUBROGATION CLAIM HOLDERS AND (II) OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR RELIEF FROM AUTOMATIC STAY**<br><br>**Hearing**<br>Date: July 24, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: Courtroom 17<br>  450 Golden Gate Ave, 16th Floor<br>  San Francisco, CA 94102<br><br>**Re:** Docket Nos. 2904, 2855, 2863 |

The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee") in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby joins (the "Joinder") the *Objection of The Official Committee of Unsecured Creditors to Motions of (i) Ad Hoc Group Of Subrogation Claim Holders and (ii) Official Committee of Tort Claimants for Relief From Automatic Stay* [Docket. No. 3101] (the "Official Committee Objection"),[1] filed in objection to the (i) *Motion of the Ad Hoc Group of Subrogation Claim Holders for Relief from the Automatic Stay* [Docket No. 2863] (the "Subrogation Group Motion") and (ii) *Amended Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* [Docket No. 2904] (the "TCC Motion" and, together with the Subrogation Motion, the "Motions").[2]  In support of the Joinder, the Ad Hoc Committee respectfully states the following:

1. The Ad Hoc Committee joins in the Official Committee Objection and agrees that the Motions should be denied because the Subrogation Group and the TCC have failed to establish cause for granting relief from the automatic stay.

2. As the Official Committee explains, the TCC and the Subrogation Group's request to try individual wildfire claims would frustrate the purpose of these chapter 11 proceedings. The Debtors entered bankruptcy to ensure an efficient and prompt resolution of the wildfire claims by *avoiding* piecemeal litigation through a centralized forum for resolution of the claims. As the Official Committee notes, estimation in the bankruptcy proceedings, which, in the Ad Hoc Committee's view, should have been initiated at the outset of these cases, was designed for this precise purpose: to "facilitate the speedy and expeditious resolution of claims in bankruptcy courts[,]" *Matter of Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992), and "promote a fair distribution to creditors through a realistic assessment of uncertain claims." *Matter of Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992).

---

[1] Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Official Committee Objection.

[2] In addition to the TCC Motion, the TCC also filed the *Amended Memorandum of Points and Authorities in Support of Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* [Docket No. 2855] (the "TCC Memorandum").

3.      The TCC admittedly seeks a strategic advantage at the expense of other creditors, the Debtors, and judicial economy.  The TCC admits, for example, that it seeks relief from the stay primarily to strengthen its position against the Debtors in settling and negotiating a reorganization plan.  TCC Memorandum at 3 ("[R]elief from stay would result in settlement of the Chapter 11 Cases, because PG&E's three year track record in the fire litigation establishes that PG&E settles every single fire claim before the jury trial[.]"); TCC Memorandum at 21 ("[T]his Court should order a jury trial because the trial setting would result in settlement.").  This is a tactic that the Ninth Circuit has called "highly inappropriate" and one that weighs *against* granting relief from the stay.  *In re Conejo Enterprises, Inc.*, 96 F.3d 346, 353 (9th Cir. 1996) (affirming the Bankruptcy Court's determination that staying a pre-petition state court action preserved a level playing field for negotiation of a consensual reorganization plan in light of the movant's admission that it sought relief from the automatic stay to strengthen its position against the debtor and other creditors in negotiating a reorganization plan).

4.      The TCC's proposal would unacceptably delay these proceedings and critically prejudice the Debtors for the sole benefit of one subset of wildfire claimants.  If, for example, the Debtors were to lose the state court action, findings on issues in that case may be asserted as collateral estoppel against the Debtors, but the estoppel may be nonmutual.  *See Vandenberg v. Superior Court*, 21 Cal. 4th 815, 829-30 (1999) (collateral estoppel may be asserted against a defendant that was a party to prior litigation, but it cannot be asserted by a victorious defendant against plaintiffs who were not parties to the litigation).  In other words, each of the Tubbs Preference Plaintiffs would have a separate opportunity to convince a jury that the Debtors are liable for the Tubbs Fire.  Even if the Debtors won ten out of eleven trials, but lost the last, other Tubbs claimants could use the one adverse verdict against the Debtors for every case thereafter.

5.      The inefficiency and prejudice to the Debtors and all other creditors is even further exacerbated by what would undoubtedly be a lengthy appellate fight over any verdict.  Even with preference for trial setting and appeal, the cases may take years to become final.  *See Nat'l Union Fire Ins. Co. v. Stites Prof. Law Corp.*, 235 Cal. App. 3d 1718, 1726 (1991); *Gabor v. Deshler*, No. 17-CV-01524-LHK, 2017 WL 4151042, at *11 (N.D. Cal. Sept. 19, 2017) (refusing to apply collateral

estoppel because California state court judgment was pending on appeal); *see also* Cal. Code Civ. Proc. §1049 (an action remains pending "until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied").

6. Because a trial will not necessarily resolve the claims and could needlessly delay resolution of this bankruptcy for years, a trial of the Tubbs Wildfire Claims is not in the interest of judicial economy and would severely prejudice the interests of all creditors and the Debtors. It is imperative that the Debtors move as expeditiously as possible to exit bankruptcy. The legislation signed by Governor Newsom on July 12, 2019, sets a deadline of June 30, 2020 for the Debtors to exit these chapter 11 proceedings to access the new Wildfire Fund for future wildfires. Without the protection of the Wildfire Fund, future wildfires could severely diminish all creditors' recoveries and continue to threaten the financial viability of the Debtors. A trial of the Tubbs Wildfire Claims would prolong, not hasten, the Debtors' exit from chapter 11.

7. Rather than litigating a single subset of claims in the California Superior Court, the interests of judicial economy, efficiency, the Debtors, and all creditors favor a claims estimation process in the bankruptcy proceedings. As explained in the Official Committee Objection and the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures* [Docket No. 3091] ("<u>Estimation Motion</u>"), through the claims estimation process, the Court can fairly and efficiently determine the value of the unliquidated claims against the Debtors while expeditiously moving the case towards completion. The estimation process is particularly valuable to chapter 11 bankruptcies involving mass tort claims, where courts consistently find that estimation is required because trying individual claims will unduly delay administration of the bankruptcy.[3] *See, e.g., A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012-13 (4th Cir. 1986) (Finding that 5,000 personal injury claims must be estimated in the bankruptcy proceeding before trials because estimation would facilitate "the real purpose of the proceeding (*i.e.*, a reorganization of the debtor and its continuance as a going business)" and observing that "the authorities which have considered this question in connection with a complicated products liability situation such as this are all unanimous.

---

[3] The Court's decision in *In re Dow Corning Corp.*, 211 B.R. 545, 561 (Bankr. E.D. Mich. 1997), relied upon by the TCC, is an outlier on this point.

The estimations of the potential and pending claims by the bankruptcy courts should precede any trials of the claims"); *In re Fed.-Mogul Glob., Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (finding trials of unliquidated personal injury and wrongful death asbestos claims would unduly delay administration of bankruptcy such that estimation was required: "[I] n accordance with the underlying principles in bankruptcy of promoting the quick and efficient administration of the estate, the estimation of the aggregate allowable amount on all . . . pending and future asbestos claims will be determined by this Court."); *In re Johns-Manville Corp.*, 45 B.R. 823, 826-27 (S.D.N.Y. 1984) (finding that trying asbestos victims' personal injury claims would unduly delay bankruptcy proceedings such that estimation was required because, even though the claimant argued that an immediate trial was necessary in light of his declining health, the court did not "see the sense in ordering the parties to trial until a plan has been developed and until there is reason to believe that the time and expense of potentially 25,000 trials will not deplete the estate and leave other creditors with empty judgments"); *see also In re Baldwin-United Corp.*, 57 B.R. 759, 765 (S.D. Ohio 1985) (affirming the bankruptcy court's determination that litigation of class action involving approximately 100,000 claimants "would disastrously delay or undermine debtors' [chapter 11] reorganization.").

8. Contrary to the TCC's claim, nothing prevents the Court from estimating the wildfire victims' claims at the appropriate time.[4] Indeed, courts can and have routinely estimated personal injury and wrongful death claims in this context. The fact that the Ad Hoc Committee's plan will include a cap on aggregate liability does not change the analysis. Estimation here will result only in a determination of the aggregate amount necessary to pay claims. And even if a cap were to be imposed on wildfire claims through the estimation proceeding, claimants with a right to a jury trial could still exercise that right, for example, against a capped trust established under a plan of reorganization to which the wildfire victims would be channeled. The estimation contemplated in the Ad Hoc Committee's term sheet, filed as an exhibit to the *Motion of the Ad Hoc Committee of Senior*

---

[4] The TCC assumes that the Tubbs Preference Plaintiffs' alleged emotional distress claims qualify as "personal injury torts" under 28 U.S.C. § 157(b)(2)(B). TCC Memorandum at 10. However, it is not clear that all of the noneconomic damages sought as "personal injury torts" qualify under 28 U.S.C. § 157(b)(2)(B). Courts have split on how to interpret "personal injury torts" under the statute, and the Ninth Circuit has not addressed the issue. *See* Estimation Motion at 15, n.10.

*Unsecured Noteholders to Terminate the Debtors' Exclusive periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741], for example, specifically provides for jury trials for claimants who opt out of the proposed agreed capped amounts. Courts have properly estimated the total aggregate liability of unliquidated personal injury and wrongful death claims without jury trials under these circumstances. *See In re A.H. Robins Co., Inc.*, 88 B.R. 742, *aff'd*, 880 F.2d 694, 747 (4th Cir. 1989) (following an estimation hearing, finding reorganization plan that capped debtor's liability at $2.475 billion feasible because that amount was "sufficient to pay in full all Dalkon Shield personal injury claims as well as expenses of the Trusts established to administer the claims[.]"); *In re Fed.-Mogul Glob., Inc.*, 330 B.R. at 135, 155 (estimating, without a jury trial, the "aggregate present value of pending and projected future asbestos personal injury and wrongful death claims asserted against" the debtors and rejecting the claimants' argument that jury trials were required because "[t]o do otherwise would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create."); *see also In re Roman Catholic Archbishop of Portland in Or.,* 339 B.R. at 221 (indicating that the bankruptcy court could, by way of a report and recommendation to the district court, estimate the total aggregate liability of personal injury claims without a jury trial, and stating: "If debtor decides that it wants to proceed with a plan of reorganization that depends on an aggregate estimation of present child sex abuse claims for purposes of capping the fund from which tort claims will be paid, *I will at the appropriate time prepare a report and recommendation to the district court*.") (emphasis added).

9. The TCC's heavy reliance on *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997) is misplaced. Notably, the *Dow Corning* Court ultimately *confirmed* a plan of reorganization that established an aggregate fund capping the debtor's liability over the dissent of certain creditors. *In re Dow Corning Corp.*, 244 B.R. 721, 732 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002) (overruling objections to plan's $400 million cap on available damages for personal injury claimants who chose to litigate their claims after finding fund sufficient to pay claims); *In re Dow Corning Corp.*, 255 B.R. 445, 502 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002) (upholding $400 million cap on available damages).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves the right to raise further and other objections to the Motions at the hearing as may be necessary or appropriate.

**WHEREFORE**, for the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court (i) sustain the Official Committee Objection and deny the Motions, and (ii) grant such other and further relief as is just, equitable and proper.

Dated: July 19, 2019                    **AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ Ashley Vinson Crawford
Ashley Vinson Crawford (SBN 257246)
David H. Botter (*pro hac vice*)
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*