AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002
Email:        mstamer@akingump.com
              idizengoff@akingump.com
              dbotter@akingump.com
              aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone:    (415) 765-9500
Facsimile:    (415) 765-9501
Email:        avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured
Noteholders of Pacific Gas and Electric Company*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                    Debtors.<br><br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**REPLY IN SUPPORT OF MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br><u>Hearing</u><br>Date:   July 24, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:  Courtroom 17<br>         450 Golden Gate Ave, 16th Floor<br>         San Francisco, CA 94102<br><br>**Re: Docket No. 2741** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................1

FACTUAL DEVELOPMENTS SINCE THE FILING OF THE MOTION...................................6

    A.    California Enacts AB 1054 .................................................................6

    B.    The Ad Hoc Committee Secures Financing Commitments ...........................7

    C.    Outlines for Plan Constructs by Other Parties Show That the Ad Hoc Committee Proposal is Currently the Only Credible Plan Proposal..........................8

    D.    There is Substantial Frustration Among Stakeholders With The Debtors' Lack of Progress And Support For Termination ................................11

    E.    The Debtors File The Estimation Motion .............................................12

THE COURT SHOULD TERMINATE EXCLUSIVITY AS TO THE AD HOC COMMITTEE IMMEDIATELY .........................................................................................12

    A.    The Ad Hoc Committee Proposal Is Credible........................................13

    B.    The Ad Hoc Committee Proposal Is Confirmable ..................................14

    C.    The Court Should Not Grant A Blanket Termination of Exclusivity..................19

CONCLUSION..............................................................................................21

TABLE OF AUTHORITIES

CASES

*Beal Bank USA v. Windmill Durango Office, LLC (In re Windmill Durango Office, LLC)*,
  473 B.R. 762, 779 (B.A.P. 9th Cir. 2012) -------------------------------------------- 16

*In Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006)------------------------------- 12

*In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656 (9th Cir. 1997) -------------------------------- 17

*In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) -------------------------------- 12

*In re Dow Corning Corp.*, 244 B.R. 721, 732-33 (Bankr. E.D. Mich. 1999) ---------------------------- 18

*In re L&J Anaheim Assocs.*, 995 F.2d 940, 943 (9th Cir. 1993)--------------------------------------- 15

*In re Pac. Gas & Elec. Co.*, No. 01-30923 [Docket No. 5060], Tr. of Feb. 27, 2002 Hearing, 115:6-7 13

*In re Pac. Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. 2001) [Docket No. 4580] ----- 19

*In re Pac. Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. 2001) [Docket No. 5155] ----- 20

*In re Rexford Props. LLC*, 558 B.R. 352, 365 (Bankr. C.D. Cal. 2016) -------------------------------- 17

*In re United Press Int'l, Inc.*, 60 B.R. 265, 271 (Bankr. D.D.C. 1986) -------------------------------- 19

*Pacific Gas and Electric Company*, Decision 03-12-035, 2002 Cal. PUC LEXIS 1051, at *107-115
  (CPUC April 22, 2002)-------------------------------------------------------------------- 8

STATUTES

28 U.S.C. § 157(b)(5) ------------------------------------------------------------------------ 18

Assembly Bill No. 1054 ("AB 1054"), §1(a)(5) ------------------------------------------*passim*

Cal Pub. Util. Code §§ 816, 818, 825 ----------------------------------------------------- 8

Cal. Pub. Util. Code §§ 451.1, 3292---------------------------------------------------------- 6

*Southern California Edison Co.*, Decision 18-06-008 (CPUC June 21, 2018) ------------------------------ 4

OTHER AUTHORITIES

PG&E Corp., Current Report (Form 8-K), Ex 10-1, Section 3(b)(iii) ------------------------------------- 11

The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby submits this reply in support (the "Reply") of the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* (the "Motion"). In further support of the Motion, and in response to the objections to the Motion (collectively, the "Objections" and the objecting parties, collectively the "Objectors"), the Ad Hoc Committee respectfully states the following:

## PRELIMINARY STATEMENT

1.    The Debtors' first day declaration made clear that the primary issues necessitating the commencement of these chapter 11 cases were their inability to address the "multitude of pending claims and lawsuits" stemming from the 2017 and 2018 Northern California wildfires and "the continuing uncertainty surrounding [the Debtors'] ability to recover costs associated with [the unique doctrine of] inverse condemnation." *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263], 3. In order to address these issues and successfully emerge from these chapter 11 cases, at the very least, the Debtors need (i) substantial consideration to pay claimants of the recent catastrophic wildfires, and (ii) legislation to alleviate the burdens of inverse condemnation in the event there are future wildfires.

2.    The Debtors' legislative requirement was addressed on July 12, 2019, when Governor Newsom signed into law comprehensive legislation to establish a statewide "wildfire fund [to] support[] the credit worthiness of electrical corporations, and provide[] a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers." Assembly Bill No. 1054 ("AB 1054"), §1(a)(5). However, in order to access the benefits of the legislation that are critical to restoring the credit-worthiness of the Debtors—the Wildfire Fund provided under the newly-

---

[1] The Ad Hoc Committee filed an amended verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure on July 18, 2019 [Docket No. 3083].

enacted section 3292 of the Public Utilities Code (the "<u>Wildfire Fund</u>"), and the revised standard to recover costs associated with future wildfires—**<u>the Debtors must emerge from these chapter 11 cases by June 30, 2020</u>**.

3. The first requirement—the need for substantial consideration to pay wildfire claims—is addressed through the Ad Hoc Committee's good faith plan proposal (the "<u>Ad Hoc Committee Proposal</u>"), which provides for up to $31 billion in new money financing.[2] As further detailed below, it is the only credible, confirmable plan of reorganization proposal that will provide the Debtors with the unprecedented level of financing needed to resolve and pay prepetition wildfire liabilities, continue the implementation of all necessary safety and hardening measures to avoid future wildfire disasters, fund the multi-billion dollar contributions that are required to participate in the Wildfire Fund, and emerge from these chapter 11 cases on the expedited timeline required by AB 1054. The plan construct proposed by the Debtors lacks the critical, substantial consideration necessary to address the wildfire liabilities and is, thus, unworkable. The plan construct referenced in the Ad Hoc Subrogation Group's objection is bereft of any meaningful detail. It is in no stakeholder's interest to waste critically important time to pursue plan constructs that are not credible or potentially confirmable, especially those that lack funding to address wildfire claims.

4. The Ad Hoc Committee members are 25 diverse financial institutions, including investment companies, mutual funds, banks and an insurance company, which collectively have assets under management in the trillions, hold over $10 billion of the Utility's debt, and have more than $11.3 billion in claims against the Debtors. These institutions manage investments on behalf of, among others, individuals, pension plans, labor unions and college endowments. A number of the Ad Hoc Committee's members are significant California-based institutions that employ thousands of California residents and have held the Utility's debt for decades. Collectively, they have invested tens of billions of dollars across a variety of California industries, including other publicly owned and investor owned utilities.

---

[2] The Ad Hoc Committee Proposal originally provided for an investment of new capital of up to $30 billion. This amount was subsequently increased to $31 billion in the amended Term Sheet filed on July 17, 2020 (the "<u>Amended Term Sheet</u>") as Exhibit A to the commitment letter (the "<u>Commitment Letter</u>") relating to the new equity and unsecured debt investments contemplated the Ad Hoc Committee Proposal. *See Notice of Filing of Commitment Letter and Amended Plan Term Sheet* [Docket No. 3024] (the "<u>Notice of Filing of the Commitment Letter</u>").

Accordingly, the members of the Ad Hoc Committee have substantial, vested interests in the long-term health and success of the Debtors, as well as the energy system of California as a whole. The Objectors attempts to smear this group as "hijackers" only demonstrates their desperation and the absence of cogent arguments to deny termination.

5. With the recent inception of the 2019 wildfire season and the impending June 30, 2020 deadline, it is now time to move these cases as quickly as possible towards emergence. Unfortunately, to date the Debtors have almost entirely failed to do so and instead have spent a considerable amount of time lobbying for a controversial legislative bail-out for its equity holders that will almost certainly never materialize. Prior to the passage of AB 1054, the Debtors and the Shareholder Group (as defined below) aggressively lobbied to include language in AB 1054 that would permit the Debtors to attempt to pay for existing wildfire liabilities through the issuance of massive amounts of new debt via new securitization notes (self-servingly called "equity securitization bonds"). The Debtors apparently believe that a utility in bankruptcy should raise more debt to pay for the liabilities that drove it into chapter 11 in the first place – thereby increasing the financial fragility of the company, but giving equity holders a lifeline against dilution. Their efforts in this regard are entirely misguided.

6. The California state legislature and Governor Newsom flatly declined to provide authorization for the Debtors to issue equity securitization bonds in AB 1054. Indeed, just two weeks ago it was reported by *Bloomberg* (see **Exhibit A** annexed hereto), that Governor Newsom did not support PG&E's contemplated equity securitization bond proposal. Nevertheless, the Debtors' plan proposal outlined in their Objection remains dependent on the passage of the same legislation that was rejected earlier this month. As Tom Dalzell, the business manager of IBEW 1245 (which represents a large number of the Debtors' workforce), recently stated[3] with respect to the failure and ability to resuscitate the Debtors' and Shareholder Group's equity securitization bond proposal:

> First, the equity plan assumed that PG&E could issue tax-free bonds based on future profits. Legislation is required to realize that goal, and that doesn't strike us as likely in the existing political climate.

---

[3] Mr. Dalzell's op-ed published in *CalMatters* is attached hereto as **Exhibit B**.

Second, the equity plan assumed that PG&E could issue tax-free bonds based on $5 billion in cost savings achieved over the next 10 years, when it was pointed out that those savings belong to ratepayers, not the shareholders, that part of the plan collapsed.

7.      There is no reason to believe that the Debtors will be able to convince the leadership in Sacramento to reverse course, and allow the Debtors to shield current equity holders from dilution by requiring ratepayers to bear the burden of the Debtors' preexisting wildfire liabilities, meaningfully impairing the credit quality of the reorganized Debtors, and placing undue stress on the company, its capital structure, and cost of capital going forward.

8.      Even if the legislature and Governor granted the Debtors the ability to issue such bonds, the California Public Utilities Commission (CPUC), the Debtors' primary regulator, would have to find that the issuance of debt will not be detrimental to PG&E's utility operations or adverse to the public interest. That is highly speculative given CPUC's mandate to protect and promote the public interest and ensure utility rates are just and reasonable. *See e.g., Southern California Edison Co.,* Decision 18-06-008 (CPUC June 21, 2018). And even if CPUC granted approval there is no indication that these massive securitizations will be purchased at the Debtors' desired price.

9.      It is not surprising that the Debtors have made almost no progress with key constituents in this case. The Debtors have demonstrated that they have no ability in the near-term or long-term to raise the funds necessary to compensate wildfire victims and other creditors. The Debtors are unwilling to have a serious dialogue with bondholders and key creditors about alternative and more efficient ways to access capital, because any such financing would dilute the position of current shareholders, some of whom appear to be dictating the Debtors' chosen path.

10.     Faced with the Debtors' clear lack of meaningful progress and the Debtors' insistence on pushing a plan proposal that favors current shareholders at the expense of all creditors, ratepayers and the State, as well as the substantial risks that continue to grow each day the Debtors languish in bankruptcy, the Ad Hoc Committee did exactly what it said it would do at the May 22, 2019 hearing on the Debtors' motion to extend exclusivity[4]—file a motion to terminate the Debtors' exclusive period,

---

[4] Contrary to the Debtors' and Shareholder Group's contentions, counsel for the Ad Hoc Committee made clear that it would move to terminate exclusivity if it did not see progress in these chapter 11 cases: "We are concerned by the lack of progress that has been made toward a plan in—outside of this Court's purview, outside of the courtroom. We are

accompanied by a term sheet (the "Term Sheet") outlining the Ad Hoc Committee Proposal, in order to move these cases forward and provide a credible path to emergence.

11. As intended, the filing of the Motion, and the proffer of a credible plan construct as set forth in the Term Sheet, appears to have finally spurred parties into action. In response to the Motion, albeit in the form of the Objections rather than constructive engagement, the Debtors and the Ad Hoc Subrogation Group have provided broad outlines of plan constructs, both, however, suffering from multiple material deficiencies, as explained in greater detail below. The Debtors have also finally taken a necessary, proactive step to resolve the Debtors' prepetition wildfire liabilities with the filing of the *Debtors' Motion Pursuant to 11 U.S.C. § 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures* [Docket No. 3091] (the "Estimation Motion").

12. Recent developments, discussed in more detail below, in fact prove that the Ad Hoc Committee Proposal is credible and that decisive steps must be taken now. Notwithstanding the hyperbolic statements, none of the Objectors has identified a legitimate basis for the Court to conclude that the Ad Hoc Committee Proposal is not credible or that terminating exclusivity now to allow the Ad Hoc Committee to develop and pursue confirmation of its plan would not materially accelerate the path towards a timely emergence and galvanize key stakeholders. Moreover, the Objectors lose sight of the fact that the Ad Hoc Committee Proposal is a *proposal*, and that modifications can, and are expected to, be made as the Ad Hoc Committee develops a formal plan and builds consensus with the other major stakeholders, as is to be expected in *all* large and complex chapter 11 cases. The Ad Hoc Committee invites engagement with the Debtors and further negotiation with other stakeholders and believes that, if exclusivity is terminated, it will propose a confirmable plan of reorganization that provides for full and fair payment of all creditors, including wildfire claimants, and can resolve these chapter 11 cases prior to June 30, 2020.

---

concerned about that. We remain concerned about that. And Your Honor, if those circumstances don't change soon, if progress is not made towards a confirmable plan of reorganization here, then it is our expectation that in that circumstance a motion either to shorten whatever remains of the exclusivity period that might be granted today, or a motion to terminate it right away, might in those circumstances be appropriate….[O]nce there is a path towards a viable and confirmable plan and we don't see the debtor making progress toward their own plan, that would be a circumstance in which our group…might be back before the Court with a motion to terminate or a motion to shorten." Tr. of May 22, 2019 Hearing, 36:7-37:4.

13.     As required by this Court as a prerequisite to terminating exclusivity, the Ad Hoc Committee Proposal sets forth a credible, confirmable plan and, therefore, the Ad Hoc Committee respectfully requests the authority to propose and pursue confirmation of a plan of reorganization.  That said, the Ad Hoc Committee welcomes competition from any other party that is willing to file its own motion to terminate exclusivity and make an alternative, credible and potentially confirmable proposal. As Governor Newsom recently stated at a press conference after signing AB 1054, "I think more competition's good – between the bondholders and the equity.  I think having a process where there's alternative considerations…is healthy.  I want a healthy process.  I don't want one side of that equation dominating the process."[5]  Ultimately, the market will determine if the Ad Hoc Committee Proposal is the best arrangement for the Debtors and all stakeholders, and competition from other parties, with credible sources of financing may ultimately result in substantial modifications to the Ad Hoc Committee Proposal.  In any event, maintaining exclusivity to enable the Debtors to pursue fruitless paths that are ultimately negative for all stakeholders, simply to protect shareholders is counterproductive and imperils the Debtors' ability to meet the approaching legislative deadline.

## FACTUAL DEVELOPMENTS SINCE THE FILING OF THE MOTION

### A.      California Enacts AB 1054

14.     On July 12, 2019, through the extraordinary efforts of the California state legislature and Governor Newsom, Assembly Bill No. 1054 ("AB 1054") was signed into law.  The legislation provides for, among other things, the establishment of a $21 billion Wildfire Fund and a revised cost recovery standard, which together will provide California utilities that elect to participate in the fund timely access to capital, additional insurance, and greater certainty regarding cost recovery for the expenses associated with potential future utility-caused wildfires.  *E.g.*, Cal. Pub. Util. Code §§ 451.1, 3292.  All parties agree that it is critical that the Debtors meet all applicable criteria for participation in the Wildfire Fund, as the Wildfire Fund is the best and only solution for the Debtors' long-term wildfire exposure and provides the Debtors with some amount of insurance against new wildfire liabilities arising during the pendency of these chapter 11 cases.  Crucially, for the Debtors to participate in the Wildfire Fund, they

---

[5] Footage available at https://twitter.com/govpressoffice?lang=en (statement begins at 18:02 of 20:52).

must emerge from these chapter 11 cases by June 30, 2020. Uncertainty regarding the passage of AB 1054 and the creation of the Wildfire Fund was a significant contingency at the time of the filing of the Motion and Term Sheet.[6] Following the enactment of the required legislation, the Ad Hoc Committee promptly filed an Amended Term Sheet to clarify that the legislation would be acceptable, so long as the Debtors comply with all of the requirements to participate in the Wildfire Fund and to gain access to the new cost recovery standard, including, importantly, that the Debtors emerge from these chapter 11 cases by the legislatively-mandated deadline of June 30, 2020.

**B.    The Ad Hoc Committee Secures Financing Commitments**

15.    On July 17, 2020, the Ad Hoc Committee filed a commitment letter (the "Commitment Letter") [Docket No. 3024] executed by 12 members of the Ad Hoc Committee, all reputable and well-capitalized financial institutions, committing to provide the funding for (a) the $19-20 billion new equity financing (the PG&E Corp. New Money Investment) and (b) the $4.0-5.4 billion unsecured debt financing (the New PG&E Corp. Senior Unsecured Notes Investment) contemplated in the Amended Term Sheet, which accounts for $25.4 billion of the up to $31 billion new money investment required under the Ad Hoc Committee Proposal. The Ad Hoc Committee Proposal contemplates that the remaining new money will be raised from a market offering of $5.5 billion of New Utility Secured Notes[7] and the proceeds of the Debtors' insurance policies. While the Debtors take issue with the reasonable conditions to funding provided in the Commitment Letter and the Amended Term Sheet, which are market terms for commitments of this type, the Commitment Letter proves that the Ad Hoc Committee is currently the only credible source of the billions of dollars of committed financing required to fund the Debtors' prompt exit from chapter 11 under any reasonable plan scenario.

---

[6] Under the original Term Sheet, the seventh condition precedent to the effective date of the plan was intended to reflect the Ad Hoc Committee's concern about, and the Debtors need for, the creation of a Wildfire Fund.

[7] The Debtors raise issues with the lack of clarity and commitment regarding the New Utility Secured Notes. It is the Ad Hoc Committee's view that the issuance of the New Utility Secured Notes on market terms did not require a formal commitment, which would give rise to additional fees. If the Debtors would like the members of the Ad Hoc Committee to formally commit to purchase the New Utility Secured Notes, the Commitment Letter can be amended to so provide.

### C. Outlines for Plan Constructs by Other Parties Show That the Ad Hoc Committee Proposal is Currently the Only Credible Plan Proposal

16.     The Motion and proposal embodied in the Term Sheet for a plan of reorganization backed by the Ad Hoc Committee have had their desired effect and, after nearly 6 months, key parties in these cases—the Debtors and the Ad Hoc Subrogation Group—have finally expressed their views on the contours of a plan of reorganization in the Objections.  Interestingly, despite the attacks leveled at the Ad Hoc Committee Proposal, a review of the broad plan concepts outlined by the Debtors and the Ad Hoc Subrogation Group demonstrate overlap in several broad respects with the material terms of the Ad Hoc Committee Proposal.[8]

17.     The fact that the other plan concepts are, just that, concepts contained in the Objections also highlights that the Ad Hoc Committee Proposal is the only credible, fully-baked plan proposal currently before the Court and why exclusivity should be terminated immediately to allow the Ad Hoc Committee to pursue its plan.  Under any plan construct, the Debtors will require tens of billions of dollars in new money to guarantee their successful emergence.  It is unclear how the Debtors and the Ad Hoc Subrogation Group will raise the financing required under their proposed plan constructs, and these constructs suffer from insurmountable contingencies.

18.     The Debtors' proposed plan construct is entirely impracticable, as it contemplates funding by way of cash raised from existing equity holders "plus equity financed securitized bonds." Debtor Objection, 8:12-13.  The Debtors' proposed rights offering to existing equity holders suffers from a material contingency with respect to the existing equity holders' willingness and ability to fund the required amounts.  More problematic is the Debtors' proposed financing through equity securitization bonds, which is highly contingent and will require both additional legislation to be passed in order to authorize the Debtors to issue such bonds and approval from the CPUC.  *See, e.g.*, Cal Pub. Util. Code §§ 816, 818, 825; *Pacific Gas and Electric Company*, Decision 03-12-035, 2002 Cal. PUC LEXIS 1051, at *107-115 (CPUC April 22, 2002). And since the cost of securitization debt is paid directly by fixed amounts of rate payment, it is highly uncertain whether the Debtors could raise the requisite fund.  What

---

[8] *See* Debtor Objection, 8:1-13; *Objection and Response of the Ad Hoc Group of Subrogation Claim Holders to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3062] (the "Subrogation Group Objection"), 3:13-17, 26:3-14.

the Debtors fail to mention, though, is that the California state legislature declined to build such authorization into AB 1054. The Debtors' financing, therefore, is entirely contingent on the pursuit of legislation that has already been rejected. *See* Debtors' Objection, Ex. A (WSJ Article). And there is no reason for this Court to assume that such legislation could pass in the next session, or even if it did, that it would provide the Debtors a workable path to emergence. If the Debtors proceed with seeking approval of the equity securitization bond construct, such legislation would not be considered, no less enacted, until the legislature returns from its summer recess, assuming the Governor and the legislature would even enact legislation that has already been rejected. Assuming passage, the Debtors then have to seek CPUC-approval in a contested process that will last an undetermined amount of time. This runs the significant risk that a Debtor-proposed plan will not be effective by the June 30, 2020 deadline. Therefore, a "wait-and-see" approach that would open up exclusivity in late September simply is not workable.

19. Contrary to the Debtors' suggestion that their plan is ratepayer-neutral, the "equity securitization bonds" would place undue stress on the Company's cash flow and credit metrics, thereby increasing the reorganized Debtors' cost of debt financing, which would ultimately be passed through to ratepayers in the form of higher rates. Furthermore, the Company's reduced cash flow would potentially prevent it from spending additional funds for needed system hardening and other safety measures, which would create further risk to ratepayers from potential future wildfire liabilities. The Utility Reform Network, in its joinder to the Motion, stated the distinction between the Ad Hoc Committee Proposal and the Debtor/Shareholder Group plan construct the best: "What is notable is that the [Ad Hoc Committee is] proposing a substantial influx of new capital to address the many needs of the Debtors and creditors with a neutral impact on ratepayers going forward. By contrast, all reports are that the Debtors and stockholders would shift to others the risk and responsibility for corporate malfeasance and criminality with little or no impact on their own positions." *Joinder by TURN in Motion by Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2918].

20. The contentions made by the shareholder group represented by the Jones Day firm (the "Shareholder Group") that such legislation would have provided for a "low-cost mechanism for utilities

(including PG&E) to finance payments to wildfire victims and contributions to the wildfire insurance fund at the expense of shareholders without any rate increases" or that California lawmakers' rejection of such legislation was due to the "bad faith" efforts of the Ad Hoc Committee are simply false. *Objection of Certain PG&E Shareholders to Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods* [Docket No. 3072] (the "Shareholder Group Objection"), 4:24-5:3. To the extent members of the Ad Hoc Committee shared views on prospective legislation, those discussions were in good faith and primarily focused on explaining the terms under which the Ad Hoc Committee's members would be willing to provide the magnitude of new capital necessary to recapitalize and rehabilitate the Utility so that the Debtors could once again provide safe, affordable and reliable service to its customers. While today is not the day to analyze the good faith, or lack thereof, of the Shareholder Group, suffice it to say that their attempts to have California ratepayers shoulder the costs of the wildfires so that they suffer no dilution were far from altruistic.

21. The Ad Hoc Subrogation Group proposes giving existing equity holders "the exclusive opportunity to participate in a rights offering to recapitalize the Debtors" in order to, presumably, fund (a) a settlement of the Debtors' subrogation claims at a "reasonable level" and (b) a wildfire claims trust. However, the success of the rights offering is dependent on the ability and willingness of existing equity holders to fund into the Ad Hoc Subrogation Group's plan. The Ad Hoc Subrogation Group has stated in their objection to the Motion that the Ad Hoc Committee's proposed maximum amount for estimated aggregate wildfire liabilities, $18.4 billion, is "far below what the members of the Ad Hoc Subrogation Group or of the Official Committee of Tort Claimants could ever support." Subrogation Group Objection, 2:20-3:1. Assuming that the Ad Hoc Subrogation Group implies that the settlement of the subrogation and wildfire claims will require substantially greater funding than the $18.4 billion provided for in the Ad Hoc Committee Proposal, there is a legitimate question as to whether equity holders would ever be willing to participate in a rights offering of the required size or suffer the dilution contemplated therein. There is also no indication that the Ad Hoc Subrogation Group has had any discussions with equity holders regarding the rights offering, and the Ad Hoc Subrogation Group itself admits that there had been little progress in negotiations with the Debtors, who appear to be acting as a proxy for the controlling equity holders. *Id.*, 4:11-13.

**D.** **There is Substantial Frustration Among Stakeholders With The Debtors' Lack of Progress And Support For Termination**

22.     Despite the Debtors' protestations to the contrary, the Court should be troubled by the lack of progress made by the Debtors in these cases.  Similarly, the number of parties from many different constituencies that have expressed their support for termination of exclusivity should also be troubling.  Some of these parties have objected to the Motion, but indicated that they would support termination of exclusivity in one form or another, such as the Ad Hoc Subrogation Group, which asks that termination apply to all parties if it is granted, and the Tort Committee, which will support termination of exclusivity but only "when it is ready to file its own plan," whenever that may be.

23.     To date, despite the Debtors' purported "substantial progress," they have entered into one settlement with a group of public entities that hold wildfire claims (the "Public Entities"), which represent only a small portion of the universe of claims against the Debtors.  *See* PG&E Corp., Current Report (Form 8-K), Ex 10-1, Section 3(b)(iii).  As pointed out by the Ad Hoc Subrogation Group, a critical term of this settlement is the agreement of the Public Entities to vote against any plan not proposed or supported by the Debtors.  Subrogation Group Objection, n.1.  By locking-in these Public Entities and prohibiting them from supporting anything other than a plan proposed by the Debtors, including a superior competing plan even if it provides the same treatment for such claims, the Debtors are merely attempting to insulate themselves from any competition.  The basis for the Debtors' substantial progress argument is, thus, questionable from a fiduciary duty and/or good faith perspective and could be characterized as holding the plan process hostage.

24.     Nor have the Debtors made any progress with other substantial stakeholders, as is evident from the various pleadings filed by key stakeholders.  Specifically, the Tort Committee flatly alleges, "The Debtors have not engaged in negotiations with the TCC."  *Objection of the Committee of Tort Claimants to Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Period Pursuant to Section 1121(d)(1)* [Docket No. 3069] (the "TCC Objection"), 1:12-13.  The Ad Hoc Subrogation Group states, "To date, very little progress has been made in settlement negotiations with the Debtors in large part because the parties cannot agree on the extent of the Debtors' liability for the Tubbs fire."  Subrogation Group Objection, 4:11-13.  The Official

Committee of Unsecured Creditors asserts that "the Official Committee's overtures" regarding plan substance, process and timing "have been met with silence." *Statement of the Official Committee of Unsecured Creditors Regarding the Ad Hoc Committee of Senior Unsecured Noteholders' Motion to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3064], 8:9-12. In addition, the Debtors have failed completely to engage with the Ad Hoc Committee.

25. These facts indicate that there has been little or no progress by the Debtors in these cases toward the negotiation of a plan of reorganization. Therefore, it is in the interest of all stakeholders and the estates for the Court to terminate exclusivity immediately to allow the Ad Hoc Committee to propose its plan of reorganization, to introduce the competition that the Debtors and the Shareholder Group desperately want to avoid, and to encourage parties to begin truly negotiating with each other.

### E. The Debtors File The Estimation Motion

26. On July 18, 2019, without notice to the Ad Hoc Committee despite its repeated request for a dialogue and discussion regarding a plan for estimating wildfire claims, the Debtors filed the Estimation Motion. While the Ad Hoc Committee continues to analyze the Estimation Motion to determine its position with respect to the specific procedures proposed by the Debtors, it appears to be an important first step, albeit six months into these cases, towards resolving the Debtors' prepetition wildfire liabilities.

### THE COURT SHOULD TERMINATE EXCLUSIVITY AS TO THE AD HOC COMMITTEE IMMEDIATELY

27. The Debtors' contention that the Motion is surprisingly "devoid of any meaningful discussion, analysis, or examination of the…factors that Bankruptcy Courts typically consider" is entirely misplaced. Debtor Objection, 10:26-28. First, as discussed in the Motion, the primary consideration for a court in determining whether to terminate exclusivity is whether termination will move the case forward. Motion, 8:17-20 (citing *In Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006); and *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997)). As set forth in the Motion and herein, based on the current facts and circumstances, terminating exclusivity will clearly move these cases forward. Second, and more importantly, the Court was very clear regarding its

views on exclusivity and clearly articulated the standard it would apply. As stated by this Court at the May 22, 2019 hearing on the Debtors' motion to extend exclusivity, the relevant inquiry in determining whether to terminate exclusivity to allow a party other than the Debtor to file and solicit a plan of reorganization is whether the party has a proposal for a plan that is "credible and potentially confirmable." Tr. of May 22, 2019 Hearing, 76:11-12. The Ad Hoc Committee Proposal clearly satisfies the Court's standard.

### A. The Ad Hoc Committee Proposal Is Credible

28. The Amended Term Sheet and the Ad Hoc Committee Proposal are the product of significant time and effort expended by the members of the Ad Hoc Committee and their advisors to craft a confirmable plan of reorganization. As stated above, the credibility of the Ad Hoc Committee has only been enhanced by developments in the past several weeks. The Ad Hoc Committee has secured commitments from 12 of its members, which are all reputable and well-capitalized financial institutions, to provide up to $25.4 billion of new money financing. Moreover, legislation providing for the creation of the Wildfire Fund, which was contemplated in and required by the original Term Sheet, has passed, and the Amended Term Sheet requires only that the Debtors fully comply with the requirements of AB 1054 to qualify to participate in the Wildfire Fund.

29. In response, the Debtors contend that the commitments are "purely conditional," that economic terms of the new money investment, such as pricing and pro forma enterprise value are missing, that the Amended Term Sheet does not provide terms for the proposed $5.5 billion New Utility Secured Notes and that issuing secured replacement debt will "severely limit" the Debtors' financial flexibility. Debtor Objection, 14:24-15:5. In addition, the Debtors allege that there is a new money shortfall in the Ad Hoc Committee Proposal of nearly $4 billion. *Id.*, 15:15-18.

30. None of these supposed "deficiencies," which are not deficiencies in any event, affects the credibility of the Ad Hoc Committee Proposal. As the Court stated in 2002 in the first PG&E bankruptcy when confronted with a similar decision, "The fact that you don't have all the t's crossed and the i's dotted doesn't mean you can't propose a plan." *In re Pac. Gas & Elec. Co.*, No. 01-30923 [Docket No. 5060], Tr. of Feb. 27, 2002 Hearing, 115:6-7. First, the Debtors do not identify any specific problematic or non-market conditions in either the Commitment Letter or the Amended Term Sheet.

Any investor group committing more than $20 billion of financing will be expected to seek the protection of certain reasonable conditions to such financing. Second, the Ad Hoc Committee is not required to perform a valuation at this stage. While the time may come for the Ad Hoc Committee to opine on the valuation of the Debtors, that question is irrelevant to the Court's inquiry with respect to the narrow question of terminating the exclusivity periods. Ultimately, the market will determine if the Ad Hoc Committee is proposing to pay fair market value. Third, the Amended Term Sheet provides that the New Secured Utility Notes will be issued through a market transaction, and, as a result, the terms of what is essentially a refinancing transaction will be determined by the market closer to the issuance of such notes. Fourth, the Ad Hoc Committee disputes the Debtors' baseless contention that the Debtors' financial condition will be severely impaired by the Replacement Notes, which is contradicted by the fact that Debtors intend to seek to raise massively greater amounts of debt by securing rate payments (and not just replacing existing unsecured debt with secured debt as the Ad Hoc Committee Proposal provides). In any event, this is clearly a factual, feasibility issue that is more properly reserved for a confirmation hearing.

31.     Lastly, it is impossible for the Ad Hoc Committee to opine on the Debtors' contention of a purported shortfall in the Ad Hoc Committee Proposal. The quantum of the new money investment commitment provided by the Ad Hoc Committee is based on publicly available information because the Debtors have failed to share any substantive information with the Ad Hoc Committee or its advisors to-date, despite substantial information requests. The Ad Hoc Committee will require access to substantially more operational information than it has been given by the Debtors in order to determine whether its proposal needs to be modified. The Ad Hoc Committee considers the Amended Term Sheet a living, breathing document and will gladly work with the Debtors in making any necessary adjustments. In sum, there are no material contingencies or deficiencies that would indicate that the Ad Hoc Committee proposal is anything other than credible.

   **B.     The Ad Hoc Committee Proposal Is Confirmable**

32.     As the Ad Hoc Committee understands the Court's standard, the question is not whether the proposed plan is perfectly confirmable today, but whether it is "potentially confirmable." None of the arguments raised by the Objectors suggests that the Ad Hoc Committee will not be able to confirm

a plan that is broadly consistent with the terms set forth in the Amended Term Sheet. As stated previously, the Ad Hoc Committee Proposal is a *proposal* and is, therefore, subject to modification, including to account for any issue that may be an impediment to confirmation. However, the Ad Hoc Committee will address some of the major substantive confirmation arguments raised by the Objectors below.

33. **Treatment of Note Claims**. The Objectors contend that the proposed treatment for the class of longer-term unsecured notes of the Utility violates the absolute priority rule. They argue that the holders of the Replacement Notes will receive greater than full payment of their claims based on the conclusory assertion that the trading value post-effective date will be greater than par, despite the Replacement Notes' lower rate of interest. First, as a factual matter, this is a highly speculative argument for which the Objectors present no credible, verifiable evidence and, as with many other supposed deficiencies identified by the Objectors, is more properly reserved for a confirmation hearing. Second, the Objectors cite no case law, other than cases that merely restate the axiom that a creditor cannot receive more than full payment of its claim, in support of their incorrect proposition that recoveries for creditors receiving replacement debt should be assessed by reference to the potential future trading price of such replacement debt. The hypothetical post-effective date trading price of the Replacement Notes is both speculative and irrelevant.

34. In conjunction with the full payment argument, the Objectors contend that the Ad Hoc Committee Proposal artificially impairs long-term unsecured notes in order to manufacture an impaired accepting class. This implies that the interest rate reduction proposed for long-term unsecured notes is somehow not material. But the interest rate reduction yields cash savings to the Utility and its ratepayers of approximately $200 million. Moreover, even assuming the Court deems the impairment not to be material, the Objectors' case law arguments are not applicable. The Ninth Circuit has held that "impairment" is a term of art that applies to any alteration of rights. *In re L&J Anaheim Assocs.*, 995 F.2d 940, 943 (9th Cir. 1993). A court's determination that a plan has not been proposed in good faith under Bankruptcy Code section 1129(a)(3) is a fact-specific inquiry into whether the totality of circumstances supports a conclusion that the plan "achieves a result consistent with the objectives and purposes of the Bankruptcy Code." *Beal Bank USA v. Windmill Durango Office, LLC (In re Windmill*

5

*Durango Office, LLC)*, 473 B.R. 762, 779 (B.A.P. 9th Cir. 2012). Again, this is naturally a confirmation issue and in any event it is clear that the Ad Hoc Committee's actions to date should indicate that it has at all times acted in good faith in developing and furthering its plan proposal.

35. In addition, the Ad Hoc Committee will object to any settlement that contains the Debtors' inappropriate and anti-competitive lock-up provision contained in their settlement agreement with the Public Entities, which prohibits the Public Entities from voting for any other plan. The Ad Hoc Committee does not believe such lock-ups are enforceable and will be rejected by this Court. The Amended Term Sheet provides the Public Entities with the same treatment as required under the settlement agreement and therefore it is anticipated that the Public Entities will be an additional impaired accepting class.

36. The Shareholder Group contends that the Ad Hoc Committee Proposal provides for makewhole premiums that are not present in the governing debt documents and provides for postpetition interest at the contract rate in contravention of Ninth Circuit law. Shareholder Group Objection, 11:10-12. The Ad Hoc Committee Proposal provides for the payment of makewhole premiums to the holders of shorter-term unsecured notes issued by the Utility, which will be paid in full in cash. Payment of the premium is pursuant to and in accordance with the language in the governing debt documents, contrary to the Shareholder Group's contention. Moreover, the applicability and payment of any makewhole is also a confirmation issue. Likewise, the proper postpetition interest rate to be paid to creditors is an issue for determination at the confirmation hearing.

37. **Treatment of Equity.** The Debtors contend that the Ad Hoc Committee Proposal unfairly discriminates against non-employee shareholders by providing for "true-ups" of equity holdings of employees and retirees to protect against the dilutive effects of the new money investments contemplated by the Ad Hoc Committee Proposal. Debtor Objection, 4:18-22. This argument is both distasteful and without merit. First, there is no discriminatory treatment under the plan of employee and retiree shareholders. Instead, the true-ups contemplated under the Amended Term Sheet are provided as an employee and retirement benefit and will occur pursuant to new equity issuances within 90 days after the effective date of the plan. Moreover, even if non-employee shareholders do not receive the benefit

of the employee true-up under the plan, the key inquiry is whether the discrimination is "unfair."[9] Here, the Debtors must surely recognize that there is ample justification for the proposed treatment because it is intended to maintain the Debtors' relationship with their own workforce, which will be critical to the success of the reorganization, and to protect employee benefits that have been earned through services provided by the Debtors' employees. It is telling that the Debtors would rather take up the cause of protecting shareholders from dilution than protecting the interests of their employees. As with other issues raised by the Objectors, however, this is a confirmation issue.

38. The Debtors also contend that the Ad Hoc Committee Proposal "puts at risk the Debtors' substantial net operating losses ("NOLS") for tax purposes" and that the Ad Hoc Committee Proposal leaves the Debtors uncertain as to "the impact on extremely valuable NOLs." Debtor Objection, 4:22-23; 5:24. Based on the Ad Hoc Committee's analysis of publicly available information, the Ad Hoc Committee proposal will result in no risk of loss of NOLs and that the impact on the use of NOLs will not be material in the overall context of the transaction.

39. **Treatment of Wildfire Claims.** The Tort Committee and Ad Hoc Subrogation Group each take issue with the Ad Hoc Committee Proposal's total proposed amount for the payment of wildfire and subrogation claims and the contemplated estimation of such claims. The Ad Hoc Committee Proposal sets forth reasonable and legally permissible mechanisms to treat Wildfire Claims. Holders of Wildfire Claims who vote in favor of the Plan agree to have their claims paid in full in accordance with the Wildfire Claims Trust procedures, subject to the Agreed Capped Amounts set forth in the term sheet. The Agreed Capped Amounts were developed based on (i) the California Department of Insurance reports of insured losses resulting from the 2017 and 2018 Northern California wildfires in the Utility's service territory, (ii) publicly-available and other information relating to the ratio of insured to under and uninsured losses and historical settlement values for past wildfire claims, and (iii) reasonable adjustments

---

[9] In the Ninth Circuit, discrimination is permissible if: (1) the discrimination is supported by a reasonable basis, (2) the debtor could not confirm or consummate a plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656 (9th Cir. 1997). When applying the standard, courts may consider the extent of the benefit conferred by the members of the class benefitting from any proposed discrimination (i.e. whether they are critical or necessary to the success of the reorganization) and whether the extent of the benefit justifies the discrimination proposed. *In re Rexford Props. LLC*, 558 B.R. 352, 365 (Bankr. C.D. Cal. 2016).

to account for risk, variability, and inflation of asserted claim amounts. Holders of Wildfire Claims who do not vote to accept the Plan ("Opt-Out Wildfire Claimants") will have the allowed amount of their claims determined in accordance with the procedures of the Wildfire Claims Trust, subject to the aggregate cap set by the estimation proceedings in the Bankruptcy Court and/or District Court, as appropriate. Opt-Out Wildfire Claimants can settle their claims, agree to binding arbitration, or, solely with respect to personal injury torts or wrongful death claims, have the allowed amounts of their claims determined in jury trials pursuant to 28 U.S.C. § 157(b)(5).

40. The Tort Committee and Ad Hoc Subrogation Group's arguments concerning estimation are both premature and unfounded, for at least the following reasons.[10] First, the Tort Committee appears to concede, as it must, that, at a minimum, the District Court can properly estimate the claims at issue here. TCC Objection, 5, 7. Second, courts in chapter 11 bankruptcies involving mass tort claims – in both asbestos litigation and other mass tort proceedings – consistently find that estimation is required because trying individual claims will unduly delay administration of the bankruptcy. Third, it is legally permissible and appropriate to use estimation proceedings to determine and potentially cap the aggregate amount necessary to pay claims, including personal injury tort and wrongful death claims even where causation is disputed and over the dissent of tort claimants. *In re Dow Corning Corp.*, 244 B.R. 721, 732-33 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002); *In re Dow Corning Corp.*, 215 B.R. 346, 352 (Bankr. E.D. Mich.), *supplemented*, 215 B.R. 526 (Bankr. E.D. Mich. 1997).

41. Lastly, the Tort Committee contends that the Ad Hoc Committee Proposal both improperly classifies wildfire claims and unfairly discriminates against them in comparison to the claims of unsecured notes, which are of the same priority. With respect to the classification argument, this can easily be remedied by separately classifying categories of wildfire claims, as necessary, in a formal plan. The Tort Committee's unfair discrimination argument is without merit. As stated above, discrimination in a plan can be permissible if it is supported by an appropriate justification. *See* ¶ 37 & n.9, *supra*. The

---

[10] The Ad Hoc Committee's arguments, and case law in support, are addressed in greater detail in the *Ad Hoc Committee's Joinder to the Objection of the Official Committee of Unsecured Creditors to Motions of (i) Ad Hoc Group of Subrogation Claim Holders and (ii) Official Committee of Tort Claimants for Relief from Automatic Stay* [Docket No. 3106].

Ad Hoc Committee Proposal sets forth a procedure that provides for payment of wildfire claims up to the full estimated, allowed amount. Any difference in timing of payment and procedure for paying claims is clearly justified by the difference in nature of the liquidated, funded debt claims and unliquidated, contingent litigation claims.

### C. The Court Should Not Grant A Blanket Termination of Exclusivity

42. Despite the fact that the Ad Hoc Committee seeks only termination of exclusivity as to itself to file its plan of reorganization, the Debtors contend that termination of exclusivity will result in "chaos" and that "degradation in enterprise value" will "necessarily ensue." Debtor Objection, 8:19-21. The Shareholder Group also contends, similarly, that terminating exclusivity will "open the floodgates to any number of unconfirmable plans." Shareholder Group Objection, 8:19-20. While multiple parties have, in fact, requested the blanket termination of exclusivity of all parties, the Court maintains the discretion to fashion the appropriate relief in these cases. *See In re United Press Int'l, Inc.*, 60 B.R. 265, 271 (Bankr. D.D.C. 1986) (describing "middle path" of limited termination of exclusivity, which is not expressly prohibited by the Bankruptcy Code). The appropriate mechanism for balancing the interest of moving these cases forward and allowing parties to have their proposals considered, but also to prevent so-called "nonplans and tirekickers" is to require any party that wishes to file its own plan to make a motion to terminate exclusivity supported by a term sheet outlining the material terms of its plan, which can be heard and considered on an expedited basis. If the Court determines that the proposal sets forth a credible, confirmable plan, the Court can then terminate exclusivity as to that party. The Ad Hoc Committee is confident that the Court can maintain order and avoid "chaos" in the event exclusivity is terminated.

43. This procedure is consistent with the Court's practice and prior experience in the first PG&E bankruptcy. As the Court is aware, in the prior case, the Court entered an order on February 2, 2002, granting the Utility an extension of exclusivity to June 30, 2002, except that with respect to the CPUC, the Court ordered that exclusivity was extended to the *earlier* of (i) June 30, 2002 or (ii) such time as the Court made a determination as to whether to authorize CPUC to file a competing plan of reorganization. *In re Pac. Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. 2001) [Docket No. 4580]. The order directed the CPUC to file a term sheet for its contemplated plan by February 13,

2002.  *Id.*  The CPUC complied with the order and filed its term sheet, and the Court held a subsequent hearing on February 27, 2002.  After determining that the CPUC had made a credible plan proposal, the Court terminated exclusivity only as to the CPUC to allow it to file its competing plan.  *In re Pac. Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. 2001) [Docket No. 5155].

44.    Several parties have incorrectly suggested that the Utility's exclusivity in the first PG&E case was simply "allowed to expire" with respect to the CPUC, or that the Court declined to grant the Utility's motion for a further extension.  Debtor Objection, n.3; Subrogation Group Objection, 12:15-18.  This is simply not true.  The Court required an affirmative showing from the party seeking to file its plan that a limited termination of exclusivity was warranted.  The Court can impose such a requirement again here.

*Remainder of Page Left Intentionally Blank*

20

## **CONCLUSION**

45.     It is now approximately eleven months until June 30, 2020.  The Ad Hoc Committee Proposal is the only credible plan proposal that is currently before this Court.  The termination of the Debtors' Exclusive Periods to pursue a plan of reorganization based on the Ad Hoc Committee Proposal will clearly move these cases forward.  The Ad Hoc Committee stands ready, able and willing to engage with all parties in an effort to arrive at a consensual plan of reorganization, which will undoubtedly benefit all stakeholders and give the Debtors the best chance of exiting chapter 11 on or before June 30, 2020.  For the foregoing reasons and the reasons set forth in the Motion, the Ad Hoc Committee respectfully requests that the Court grant the Motion and enter an order terminating the Debtors' Exclusive Periods to permit the Ad Hoc Committee to file and solicit acceptances of a plan of reorganization.

Dated:  July 23, 2019

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ *Ashley Vinson Crawford*
　　Ashley Vinson Crawford (SBN 257246)
　　Michael S. Stamer (*pro hac vice*)
　　Ira S. Dizengoff (*pro hac vice*)
　　David H. Botter (*pro hac vice*)
　　Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

# **Exhibit A**

July 11, 2019 Bloomberg Article

Deals

# PG&E Is Pushing Tax-Exempt Bond Bill for Fire Claims

By Scott Deveau, Mark Chediak, and Jeffrey Taylor
July 11, 2019, 11:04 AM PDT
*Updated on July 11, 2019, 4:51 PM PDT*

▶ Bankrupt utility is lobbying California governor, lawmakers

▶ Bill's passage would provide funding for past, future claims

PG&E Corp. is lobbying California legislators to allow it to issue tax-exempt bonds to help pay for past and future wildfire claims, according to people familiar with the matter.

The bankrupt utility is pushing lawmakers to introduce the legislation next month to allow PG&E to present its $31 billion restructuring plan by Sept. 26, after which stakeholders will be able to submit competing proposals, said the people, who asked not to be identified because the matter is private.

ADVERTISING

Case: 19-30088    Doc# 3143    Filed: 07/23/19    Entered: 07/23/19 09:00:34    Page 26
of 33



PG&E currently intends to file its reorganization plan in August and exit bankruptcy protection in March 2020, according to documents reviewed by Bloomberg.

Any bill would need California Governor Gavin Newsom's sign-off. Newsom, a Democrat, said in an interview on Thursday that he doesn't support PG&E's proposal at this time. "That's not where we are," Newsom said, noting that some legislators have proposed the idea.

Any bill would have to clear the state's Democratic-controlled Assembly and Senate by the end of the legislative session on Sept. 13 and then be signed by the governor by Oct. 13.

A representative for PG&E declined to comment.

PG&E shares were down 4.4% to $20.45 at the close in New York. They dropped as much as 2.2% more in after-market trading after Newsom said he didn't support the plan.

## Wildfire Claims

Under separate legislation approved Thursday, power companies would be able to borrow from a multibillion-dollar fund to pay for future wildfire claims. The measure would also make it easier for utilities to recover the costs from their customers if they meet new, more stringent safety standards.

PG&E wouldn't be able to tap into the fund until it settles claims with past wildfire victims and emerges from bankruptcy by June 30 of next year.

"We're not at this stage entertaining new proposals," said Ann O'Leary, Newsom's chief of staff. Once PG&E starts "making serious moves to comply with this plan, sure, we'll entertain other ways of moving forward, but we're not presently supporting that," she said of PG&E's bond request.

The bill being pushed by San Francisco-based PG&E would authorize a state entity to issue about $10 billion in tax-exempt bonds. The tax-exempt status would allow more capital to be raised more quickly, with the debt being securitized by diverting a portion of the company's earnings over the life of the bonds, the people said.

## Proceeds Earmarked

About $7 billion of the proceeds would be set aside for a $14 billion fund for claims from past wildfire victims, according to the people. Another $3 billion would be earmarked for PG&E's contributions to the statewide fund, they said.

The utility doesn't believe legislation would be required to raise another $5 billion that would be securitized through $500 million in cost cuts at the utility, the people said.

If the bill fails to pass by the September deadline, PG&E is considering raising the capital to help finance part of its reorganization through a rights offering that would allow existing shareholders to buy additional equity in the utility proportionate to their current holdings to avoid dilution, the people said. A rights offering would delay the company's emergence from bankruptcy, the people said, adding that issuing bonds would be essential for paying wildfire claims expeditiously.

## Current Proposal

PG&E's proposed restructuring would be funded by $15 billion of securitizations, the issuance of $14 billion in debt and $2 billion in insurance proceeds, according to documents reviewed by Bloomberg.

An ad hoc committee of the company's senior creditors led by Pacific Investment Management Co., Elliott Management Corp. and Davidson Kempner Capital Management is developing an alternative $47.5 billion restructuring plan. That group has asked a bankruptcy judge to end the exclusivity period granted to PG&E through Sept. 26 so it can present its own plan.

Case: 19-30088    Doc# 3143    Filed: 07/23/19    Entered: 07/23/19 09:00:34    Page 28
of 33

*– With assistance by Jeffrey Taylor, and Romy Varghese*

*(Updates with Newsom comments in the fourth paragraph.)*

## In this article

PCG
**PG&E CORP**
17.79  USD  ▼ -0.67  -3.63%

Terms of Service
Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices     Contact Us Help

Case: 19-30088   Doc# 3143   Filed: 07/23/19   Entered: 07/23/19 09:00:34   Page 29
of 33

## Exhibit B

July 12, 2019 *CalMatters* Op-Ed

COMMENTARY     ENVIRONMENT     MY TURN

# As hedge funds' fight for control of PG&E, here is how workers see it

**BY GUEST COMMENTARY**

**PUBLISHED: JULY 12, 2019**



A fight is on between hedge funds for control of PG&E. Photo by Ray Chavez/Bay Area News Group.

**By Tom Dalzell, Special to CalMatters**

Case: 19-30088    Doc# 3143    Filed: 07/23/19    Entered: 07/23/19 09:00:34    Page 31
of 33



As the elected leader of the International Brotherhood of Electrical Workers Local 1245, which represents approximately 12,000 frontline utility workers at Pacific Gas & Electric Co., I have paid careful attention both to legislative activity in Sacramento and to PG&E's bankruptcy proceeding.

Our members work around the clock to deliver clean, safe and reliable gas and electricity to PG&E's customers. As such, we are uniquely positioned to observe and evaluate the policies and proceedings that stand to impact the utility, its employees, and the millions of residents and businesses they serve.

Several months ago, a consortium of hedge funds that owns a large percentage of PG&E's stock replaced PG&E's existing board of directors with a new board, which included several direct representatives of hedge funds. Traditional institutional investors are no longer running PG&E. Hedge funds are.

And in the last few days, there has been much criticism of a reorganization plan that was put forward by another group in bankruptcy court. That other group also includes hedge funds. But those hedge funds own PG&E bonds.

Those who follow finance will appreciate the traditional friction between equity and debt. But from our perspective, all the hedge funds on the stage at PG&E, be they bondholders or stockholders, are, in essence, the same creatures.

They are investors who use high-risk methods in hopes of realizing large capital gains. Whether they

**Logo of CalMatters**

The rational thing to do here is to compare all the plans for reorganizing PG&E and weigh the merits of each. However, as things stand today, there is only one viable plan for reorganization, and that is the one put forward by the bondholders, as the plan articulated several weeks ago by the shareholder hedge funds has dissolved to all but nothing.

The equity plan for reorganization was based on assumptions that have not proven feasible.

- First, the equity plan assumed that PG&E could issue tax-free bonds based on future profits. Legislation is required to realize that goal, and that doesn't strike us as likely in the existing political climate.
- Second, the equity plan assumed that PG&E could issue tax-free bonds based on $5 billion in cost savings achieved over the next 10 years. When it was pointed out that those savings belong to ratepayers, not the shareholders, that part of the plan collapsed.

The bondholder plan may not be perfect, but it is the only plan that is currently publicly available and politically feasible.

I am sure that the hedge funds that control PG&E will develop a revised plan for reorganization. I look forward to seeing it, and I look forward to seeing plans that others might develop. Then, and only then, can we do a rational comparison of plans.

For the time being, our members will do their jobs, providing critical electric and gas service to millions of Californians.

These dedicated men and women are highly skilled and proud of their work, and we are steadfastly committed to ensuring they do not become collateral damage in the course of these proceedings.

We do not have the luxury of doing without hedge funds today, but as Mavis Staples urged us, let's keep our eyes on the prize – clean, safe, affordable energy for California.

–

*Tom Dalzell is business manager of IBEW Local 1245, which represents PG&E workers,* [info@ibew1245.com](mailto:info@ibew1245.com). *He wrote this commentary for CalMatters.*



**WE WANT TO HEAR FROM YOU**

Want to submit a guest commentary or reaction to an article we wrote? You can find our submission guidelines here. Please