**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
      jminias@willkie.com
      dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>               **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Chapter 11<br>Bankr. Case No. 19-30088 (DM)<br>(Jointly Administered)<br><br>**MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>**Hearing Date and Time**: August 13, 2019 at 9:30 a.m. (PT)<br>**Objection Deadline**: August 6, 2019 at 4:00 p.m. (PT)<br>**Hearing Location**: 450 Golden Gate Ave., San Francisco, CA, Courtroom 17<br>**Judge**: Hon. Dennis Montali |

# TABLE OF CONTENTS

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| BACKGROUND | 6 |
|     A.    General Background | 6 |
|     B.    Background to the Motion | 6 |
| ARGUMENT | 7 |
|     I.    Termination of Exclusivity is Appropriate in These Cases | 7 |
| NOTICE | 11 |
| CONCLUSION | 12 |

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006)......................................................................................7, 8

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006).........................................................................................8

*In re Dow Corning Corp.*,
    208 B.R. 661 (Bankr. E.D. Mich. 1997).....................................................................................8

*In re Gibson & Cushman Dredging Corp.*,
    101 B.R. 405 (E.D.N.Y. 1989) ....................................................................................................7

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*,
    808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) .......................................................7

**Statutes**

11 U.S.C. § 1121(d)(1) ......................................................................................................................7

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**" or the "**Debtors**"), by its attorneys Willkie Farr & Gallagher LLP and Diemer & Wei, LLP, hereby submits this motion (the "**Motion**") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order, substantially in the form attached hereto as **Exhibit A**, terminating the Debtors' exclusive periods to file and solicit acceptances of a proposed plan of reorganization (the "**Exclusive Periods**"). In support of the Motion, the Ad Hoc Subrogation Group[1] respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. At the May 22 hearing on the Debtors' motion to extend the Exclusive Periods, the Court invited parties that were committed to advancing these chapter 11 cases to submit proposed plans of reorganization. Specifically, the Court said, "[t]he door is half open to the ad hoc committee, the tort claimant committee, or any other party who believes there's a way to come up with a credible, potentially confirmable plan, other than what the debtors' counsel may have." May 22, 2019 Hr'g Tr. at 76:9-13. Since that hearing, the Ad Hoc Subrogation Group has worked tirelessly to present the Court with a credible, confirmable plan (the "**Subrogation Plan**"), the key terms of which are reflected in the term sheet attached hereto as Exhibit A. In light of the Subrogation Plan's numerous benefits discussed below, and the inability of the Debtors to effectively use the Exclusive Periods to build consensus around a plan structure, the Ad Hoc Subrogation Group submits that the Debtors' Exclusive Periods should be terminated immediately in order to enable the Ad Hoc Subrogation Group to file the Subrogation Plan.

2. These cases were filed to address and resolve Wildfire Claims (as defined below). This point is underscored by the fact that (except for the Bondholder Plan's (as defined below) contrived "impairment" of long term bond claims) both the Bondholder Plan and the Subrogation

---

[1] The Ad Hoc Subrogation Group is governed by a steering committee, which supports the relief requested herein. The steering committee of the Ad Hoc Subrogation Group collectively holds more than 85% of the group's aggregate Subrogation Claims (as defined below).

1 Plan propose to leave all other creditor classes unimpaired. Further, the Debtors have publicly acknowledged that such claims could exceed $30 billion.[2] Holders of Subrogation Claims[3] alone—the overwhelming majority of which are members of the Ad Hoc Subrogation Group—hold in excess of $20 billion of Wildfire Claims.[4] By far, the two largest groups of creditors holding Wildfire Claims are the Ad Hoc Subrogation Group and the Official Committee of Tort Claimants (the "**Tort Claimants Committee**"). The Subrogation Plan is the only path forward that has garnered the support of at least one of these two critical constituencies, and the Ad Hoc Subrogation Group has spent considerable time and effort negotiating with the Tort Claimants Committee to push forward a joint plan (and will continue to do so).

3. The Subrogation Plan not only incorporates a reasonable settlement of the total value of all Subrogation Claims, but also preserves the ability of individual fire victims to assert their claims against a well-funded trust and realize a full recovery on their claims.[5] Admittedly, the

---

[2] *Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 28], at p. 1. ("PG&E's potential liability with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, without taking into account potential punitive damages, fines and penalties or damages with respect to 'future claims.'").

[3] "**Subrogation Claims**" are Wildfire Claims that include, but are not limited to, claims that arise from subrogation (whether such subrogation is contractual, equitable or statutory), assignment (whether such assignment is contractual, equitable or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law, including, without limitation, Section 509 of the Bankruptcy Code. Insurers seek to recover the cost associated with claims it has paid to its affected customers, which in many cases results in the reimbursement of customer paid deductibles associated with the loss. Subrogation helps keep rates low for customers and controls insurer claim costs.

[4] Holders of Subrogation Claims have reported approximately $18.5 billion of payments and policy reserves to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law. As of September 2018, holders of Subrogation Claims had reported approximately $10 billion in direct incurred losses resulting from the 2017 Northern California Wildfires. *See* http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/upload/nr106Insuredlosses090618.pdf (reporting losses for Lake, Mendocino, Napa, Nevada, Solano, Sonoma and Yuba). As of April 30, 2019, holders of Subrogation Claims had reported approximately $8.5 billion in direct incurred losses resulting from the 2018 Northern California Wildfires. *See* http://www.insurance.ca.gov/0400-news/0100-press-releases/2019/upload/nr041-19InsuredLosses2018Wildfires050819.pdf (reporting losses for November 2018 wildfires).

[5] The Subrogation Plan contemplates that each individual fire victim will have the opportunity to realize a full recovery on his or her provable and compensable claim subject to the trust funding amount (including, for the avoidance of doubt, reimbursement of any deductibles paid prior to receipt of insurance policy proceeds). The Ad Hoc Subrogation Group intends to continue to work with the representatives of the Tort Claimants Committee and expects to file an amended term sheet that, in the judgment of the Ad Hoc Subrogation Group, provides for sufficient funding for a settlement trust in order to achieve this goal. While the Ad Hoc

2

major open issue in the Subrogation Plan is the total funding required for the individual fire victims' trust, which will be resolved following further negotiations, or (only if necessary) a targeted estimation process that will address only the individual Wildfire Claims.

4. The Court is currently scheduled to hear this Motion concurrently with the two motions of the Ad Hoc Subrogation Group and Tort Claimants Committee to lift the stay. Terminating exclusivity to permit pursuit of the Subrogation Plan and lifting the stay to allow determination of the Debtors' liability on account of the Tubbs fire in state court can work in tandem, on parallel paths, to resolve these cases on a fair, equitable and timely basis.[6] In and of itself, lifting the stay to permit the prompt adjudication of liability for the Tubbs fire will remove a major impediment to a negotiated, consensual resolution of these cases, whether or not exclusivity is terminated. Similarly, if only exclusivity is terminated, the Subrogation Plan proposes a reasonable settlement of Tubbs liability that could be approved through the plan confirmation process. But lifting the stay and terminating exclusivity together will provide the best opportunity to have these cases successfully resolved by the June 2020 deadline for participating in the insurance wildfire fund and within a time frame that will expedite distributions to individual wildfire victims.[7]

---

Subrogation Group continues to negotiate with the Tort Claimants Committee, the Subrogation Plan described herein is expected to provide recoveries up to a higher level than the Bondholder Plan. To the extent the funding required for the settlement trust in order to pay victims impacts the plan's feasibility, additional legislative or regulatory solutions may need to be explored and pursued.

[6] *See Motion of the Ad Hoc Subrogation Group for Relief from the Automatic Stay* [Docket No. 2863]. Various parties that filed responses to the Bondholders' Motion (defined below) were supportive of terminating exclusivity for a truly credible and potentially confirmable plan. *Statement of the Official Committee of Unsecured Creditors Regarding the Ad Hoc Committee of Senior Unsecured Noteholders' Motion to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3064], at p. 3-4 ("The Official Committee suggests that any other party that may wish to propose a plan for the Debtors be granted similar relief if the Court determines, following notice and a hearing, that such party's proposal constitutes a credible plan…"); *Statement of BOKF, N.A. in Support of the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusivity Period* [Docket No. 3061], at p. 4 ("In the event any other non-Debtor party wishes to file and propose a chapter 11 plan, it should only be permitted to do so if it too can demonstrate that its proposed plan is real, credible and viable…").

[7] The Subrogation Plan is designed to work on a parallel path with Tubbs litigation (without being contingent on its outcome), because it proposes a reasonable settlement of Tubbs liability. Nevertheless, it is critical to commence litigating the Tubbs issues now so that these cases do not return to square one in the event the Subrogation Plan is not confirmed.

3

5. Customer safety is a paramount concern for members of the Ad Hoc Subrogation Group. The Subrogation Plan term sheet includes specific provisions to ensure wildfire prevention and mitigation are a top priority for the reorganized PG&E. A majority of the directors will be appointed to help safeguard that appropriate investments are made in upgrades to PG&E's transmission system, forest management and other efforts to reduce the risk and severity of future wildfires. In summary, the Subrogation Plan also:

- Provides for payment of Individual Wildfire Claims from a well-funded settlement trust;
- Includes an expedited and efficient claim process for individuals to be paid based either on individual claim settlements with the trust or contingent upon proving their claims, to enable the individual wildfire victims to rebuild and move forward in their recovery;
- Resolves Wildfire Subrogation Claims at an amount significantly less than full recovery to help expedite the bankruptcy proceedings;[8]
- Converts a significant portion of all Wildfire Subrogation Claims into equity to strengthen the reorganized Debtors' balance sheet and reduce the amount of new money (and substantial related costs) necessary for the Debtors to exit chapter 11;
- Creates a strong balance sheet for the reorganized Debtors that allows the company to maintain an investment grade rating and positions the reorganized utility to (a) maintain compliance with state renewable energy standards, and (b) invest in requisite grid improvement and safety enhancement initiatives;

---

[8] The aggregate recovery on account of Subrogation Claims is a settlement and compromise solely for purposes of the Subrogation Plan. If the allowed amount of all Subrogation Claims were litigated, holders of Subrogation Claims could and would assert claims in a substantially higher amount than the compromise amount proposed in the Subrogation Plan. Approximately $18.5 billion of payments and policy reserves have been reported to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law, and would raise the total amount of Subrogation Claims to over $20 billion. Upon confirmation of the Subrogation Plan, the compromised aggregate allowed claim will be binding on each individual class member and a binding allocation of the recovery among class members will be set forth in the Subrogation Plan or a supplement thereto.

4

- Maintains rate neutrality for all of the Debtors' customers;
- Contributes approximately $5 billion to the proposed wildfire recovery fund for future wildfire claims;
- Strengthens and extends the relationship with the reorganized Debtors' active workforce;
- Assumes the Debtors' current retirement plan; and
- Allocates more value to existing equity holders than any other option presently on file.

6. The motion of the Ad Hoc Group of Senior Unsecured Noteholders to terminate exclusivity, and their proposed term sheet, do nothing to move the needle on the key issue in this case—the resolution of Wildfire Claims—because their plan, and satisfaction of a key condition precedent to its confirmation, has no support from either of the two major Wildfire Claim constituencies and depends on an unrealistically low cap for all Wildfire Claims.[9] Further, that plan (the "**Bondholder Plan**") is deficient for all the reasons set forth in the Ad Hoc Subrogation Group's objection and response to the related motion.[10] Moreover, the Subrogation Plan is superior to the Bondholder Plan in many key areas. A chart comparing the two plans is below:

| **Issue** | **Bondholder Plan** | **Subrogation Plan** |
|---|---|---|
| Subrogation Claims Amount | Up to $7.795 billion[11] | $15.8 billion |
| Individual Claims Amount | Up to $6.045 billion[12] | Paid in full up to the trust funding amount |
| Municipal Claims Amount | $1 billion | $1 billion |

---

[9] *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] (the "**Bondholders' Motion**").

[10] *See Objection and Response of the Ad Hoc Group of Subrogation Claim Holders to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3062].

[11] Excluding the potential 15% adjustment.

[12] Excluding the potential 15% adjustment and legal fees.

| Treatment of Existing Funded Debt | Long term unsecured notes exchanged for replacement *secured* notes with claim priority over future wildfire victims and other unsecured creditors | Reinstated or refinanced (without security or priority over future wildfire victims and other unsecured creditors) |
|---|---|---|
| Contribution to the Wildfire Recovery Fund | $5 billion | $5 billion |

7. Accordingly, the Ad Hoc Subrogation Group respectfully requests that the Court terminate exclusivity in its favor and enter the order attached hereto as Exhibit B, so that the Ad Hoc Subrogation Group may prosecute the Subrogation Plan.

## BACKGROUND

**A. General Background**

8. On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession, commenced these voluntary cases under chapter 11 of the Bankruptcy Code.

9. The Ad Hoc Subrogation Group's membership and collective holdings of claims and interests are disclosed in the *Third Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019* [Docket No. 3020], as may be amended from time to time.

**B. Background to the Motion**

10. On May 1, 2019, the Debtors filed a motion seeking their first extension of the exclusive period to file a plan of reorganization to November 29, 2019 and the exclusive period to solicit acceptances of their plan to January 28, 2020 [Docket No. 1797] (the "**Exclusivity Extension Motion**"). On May 22, 2019, this Court held a hearing on the Exclusivity Extension Motion and over certain objections, granted the Debtors an extension of the exclusive right to file a plan until September 26, 2019 and the exclusive right to seek acceptances for such plan until November 26, 2019.

11. On June 25, 2019, the Ad Hoc Group of Senior Unsecured Noteholders filed the

Bondholders' Motion.  On July 18, the Ad Hoc Subrogation Group filed an objection to that motion.  There, the Ad Hoc Subrogation Group explained why the Bondholder Plan is neither credible nor confirmable, and noted that it was working towards presenting its own plan which would satisfy this Court's "credible and potentially confirmable" standard and would "(a) allow individual wildfire victims to elect to settle their claims promptly or proceed to litigate and ultimately recover the compensable value of their claims from a well-funded trust; (b) settle Subrogation Claims at a reasonable level; and (c) provide existing equity with the exclusive opportunity to participate in a rights offering to recapitalize the Debtors."[13]

## ARGUMENT

### I. Termination of Exclusivity is Appropriate in These Cases

12. The time has come for this Court to terminate exclusivity for a viable plan.  Section 1121 of the Bankruptcy Code provides that the court "may for cause reduce or increase" periods during which the Debtors enjoy the exclusive right to file and solicit acceptances of a plan.  11 U.S.C. § 1121(d)(1); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (intention of section 1121 is to "cure the prior practice that gave debtors undue bargaining leverage to delay and thereby force a settlement out of otherwise unwilling creditors" (internal quotations omitted)); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988).

13. The Bankruptcy Code does not define "cause," and the determination of cause is a fact-specific inquiry.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586-87 (Bankr. S.D.N.Y. 2006).  While the Bankruptcy Code is silent as to what constitutes cause for extending or terminating exclusivity, the courts have identified nine factors for consideration:  (1) the size and

---

[13]  *See Objection and Response of the Ad Hoc Group of Subrogation Claim Holders to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3062], at p. 3.

complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *Adelphia*, 352 B.R. at 586-87 (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006) (Gerber, J.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, J.)).

14. Importantly, as noted by the court in *Dow Corning*, "[w]hen the Court is determining whether to terminate a debtor's exclusivity, the *primary consideration* should be whether or not doing so would facilitate moving the case forward." 208 B.R. at 670 (emphasis added). Notably, this determination is one of practicality, which can override a mere "toting up of the factors." *Id.* Terminating exclusivity to move the case forward is the overriding factor here, both because of the June 2020 deadline for participating in the wildfire fund, and the inability of wildfire victims to receive adequate compensation until a plan is confirmed.

15. Here, other factors also weigh in favor of terminating exclusivity to accelerate progress towards plan consummation before the June 2020 deadline. While the case is complex, these cases have unique and significant time exigencies. After over six months, the Debtors have reached a settlement with only a relatively small subset of all wildfire claimants, and no meaningful progress toward settlement or resolution with the remaining creditors in these cases whose claims need to be impaired. It is precisely this lack of progress and engagement that has necessitated the Ad Hoc Subrogation Group to seek the relief proposed herein. Without significant cooperation with the Wildfire Claim holders, any plan proposed by the Debtors would be illusory. Furthermore, termination of exclusivity is required because the Debtors failed to demonstrate urgency in utilizing their exclusive periods to negotiate a plan in earnest (factors 2, 3 and 6), and to this point the

8

Debtors have failed to demonstrate a reasonable prospect for filing a viable plan (factor 5).

16. The Ad Hoc Subrogation Group has designed a plan that holders of Subrogation Claims will support, and constructively proposes a procedure whereby individuals with Wildfire Claims have the opportunity to realize a full recovery on their compensable claims. It is fully expected that the trust funding amount in the Subrogation Plan will significantly exceed the distributable amount for individual Wildfire Claims in the Bondholder Plan, which makes it more likely that the relevant condition to confirmation will be satisfied in the case of the Subrogation Plan. Moreover, through equitizing a significant portion of the Subrogation Claims, the Ad Hoc Subrogation Group has the resources to provide the necessary financing to render the Subrogation Plan both credible and confirmable.

17. Features of the Subrogation Plan include (a) reinstatement or refinancing of all funded debt claims; (b) establishment of a sufficiently funded claims resolution trust to satisfy the claims of individual wildfire claimants; (c) equitization of 90% of the aggregate allowed Subrogation Claims; (d) the option for existing equity holders, if they timely choose to support the plan, to invest in the reorganized company through a rights offering;[14] (e) payment in full, or reinstatement of, general unsecured claims; (f) a balance sheet upon emergence that allows the reorganized Debtors to maintain an investment grade rating, and will position the reorganized Utility to continue its compliance with state renewable energy standards and invest in requisite grid improvement and safety enhancement initiatives; (g) the assumption of the Debtors' existing retirement plan; and (h) rate neutrality for the reorganized Debtors' customers.

18. All stakeholders stand to benefit from the Subrogation Plan, which gives these chapter 11 cases a viable path towards confirmation and emergence. Specifically:

- Current individual holders of Wildfire Claims will be able to recover quickly from a settlement trust funded with sufficient consideration to pay such

---

[14] If existing equity holders decline to participate in the rights offering, the Ad Hoc Subrogation Group is confident it will either (a) find other parties willing to participate, including existing stakeholders and/or outside parties, or (b) eliminate the need for further capital through additional sources of funding.

claims;

- Future victims of wildfires will be able to look to the new proposed wildfire recovery fund and take advantage of the $5 billion contributed under the Subrogation Plan;

- Current holders of funded debt against the company will be reinstated against an investment grade issuer;

- The Utility's customers will not suffer a net rate increase, and will benefit from a safer and more reliable network in line with the state's renewable energy standards; and

- The Debtors' employees' and retirees' jobs and benefits will be preserved.

19. The cornerstone of the Subrogation Plan is the willingness of holders of Subrogation Wildfire Claims to equitize their voluntarily reduced claims in exchange for mandatory convertible preferred equity ("**MCP**").[15] The MCP structure ensures the Subrogation Plan's feasibility, as it minimizes the Debtors' need to raise significant amounts of cash to emerge from chapter 11. Another chief benefit of the MCP structure is that objections to the plan based on enterprise value will be blunted because the Court will have the benefit of the market, not just experts, to help determine the value of the MCP issued under the Subrogation Plan.

20. This Motion is being filed on a date of great uncertainty in these cases. The Bondholders' Motion, the two lift stay motions relating to the Tubbs fire, and the Debtors' motion to estimate are all likely to be heard either before or concurrently with this Motion. In any potential set of outcomes, however, granting this Motion so that the Subrogation Plan, the most credible and potentially confirmable plan yet proposed, can be pursued will move these cases forward and put these cases on a viable path to an early resolution. For the reasons set forth herein, the Ad Hoc Subrogation Group respectfully requests that this Court enter the order attached hereto as Exhibit B

---

[15] The MCP in the Subrogation Plan has been successfully implemented before. It was inspired by preferred equity with similar features in the 2013 bankruptcy of American Airlines. *See* Disclosure Statement for Debtors' Second Amended Join Chapter 11 Plan, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) [Docket No. 8591], at p. 11-14.

and permit the Ad Hoc Subrogation Group to file and solicit acceptances of the Subrogation Plan.

**NOTICE**

21. Notice of this Response will be provided to (a) counsel to the Debtors; (b) the Office of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (c) counsel to the Official Committee of Unsecured Creditors (d) counsel to the Tort Claimants Committee; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Office of the California Attorney General; (h) the California Public Utilities Commission; (i) the Nuclear Regulatory Commission; (j) the Federal Regulatory Commission; (k) the Office of the United States Attorney for the Northern District of California; (l) counsel for the agent under the Debtors' debtor in possession financing facility; and (m) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. The Ad Hoc Subrogation Group respectfully submits that no further notice is required.

# CONCLUSION

WHEREFORE, the Ad Hoc Subrogation Group requests that the Court grant the relief set forth in the proposed order attached as Exhibit B, or otherwise as is just and proper.

Dated: July 23, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ Matthew A. Feldman
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email:  mfeldman@willkie.com
            jminias@willkie.com
            dforman@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*