```
1   WEIL, GOTSHAL & MANGES LLP
    Stephen Karotkin (pro hac vice)
2   (stephen.karotkin@weil.com)
    Ray C. Schrock, P.C. (pro hac vice)
3   (ray.schrock@weil.com)
    Jessica Liou (pro hac vice)
4   (jessica.liou@weil.com)
    Matthew Goren (pro hac vice)
5   (matthew.goren@weil.com)
    767 Fifth Avenue
6   New York, NY 10153-0119
    Tel: 212 310 8000
7   Fax: 212 310 8007

8
    KELLER & BENVENUTTI LLP
9   Tobias S. Keller (#151445)
    (tkeller@kellerbenvenutti.com)
10  Jane Kim (#298192)
    (jkim@kellerbenvenutti.com)
11  650 California Street, Suite 1900
    San Francisco, CA 94108
12  Tel: 415 496 6723
    Fax: 650 636 9251
13
```

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 (Lead Case) (Jointly Administered) |
| - and - | |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **DECLARATION OF MARINO MONARDI IN SUPPORT OF THE DISCOUNTED EP ASSUMPTION MOTION** |
| **Debtors.** | Hearing Date: August 28, 2019<br>Hearing Time: 9:30am (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Judge: Hon. Dennis Montali |
| ☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors | |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Objection Deadline: August 14, 2019, at 4:00 p.m. (Pacific Time) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

I, Marino Monardi, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Director, Energy Procurement and Policy Division, at Pacific Gas and Electric Company (the "**Utility**" and, together with PG&E Corporation, the "**Debtors**").

2. I am knowledgeable and familiar with the Utility's day-to-day operations and, specifically, the Utility's energy procurement agreements.

3. I am authorized to submit this Declaration (the "**Declaration**") on behalf of the Debtors in support of the *Third Omnibus Motion of Debtors Pursuant to 11 U.S.C § 365(a), Fed. R. Bankr. P. 6006, and B.L.R. 6006-1 for an Order Approving Assumption of Certain Contract Price Discounted Energy Procurement Agreements* (the "**Motion**").[1]

4. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors' employees or the Debtors' legal, restructuring, and financial advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

## THE EP AGREEMENTS

5. In the ordinary course of its operations, the Utility is party to various types of energy procurement agreements, including, without limitation, (a) power purchase agreements, pursuant to which the Utility purchases electric power from generators, and (b) capacity storage agreements, which provide the Utility access to capacity from energy storage facilities.

6. The Utility routinely and continuously evaluates its energy procurement agreements in light of, among other things, the Utility's operations, market conditions, pricing, the needs of the Utility's customers, the regulatory requirements imposed on the Utility, and to ensure the Utility is safely and reliably delivering power. As part of that evaluation, the Utility has identified the EP Agreements for assumption in the Chapter 11 Cases. Following discussions with the EP Counterparties (as defined herein), the Utility and each of the respective counterparties have agreed that, in exchange for assumption of the applicable EP Agreement, the parties will enter into the EP Amendments described below, which include valuable discounts for the Utility.

7. It is my understanding that the effectiveness of each of the EP Amendments and assumption of the EP Agreements pursuant to the Motion is conditioned upon the Utility obtaining the necessary approvals from the Bankruptcy Court and California Public Utility Commission (the "**CPUC**"). Accordingly, contemporaneously herewith, the Utility is seeking CPUC approval for the EP Amendments but, to the extent such approval is not obtained prior to the hearing on the Motion, the Utility requests that the Court approve the Utility's assumption of the EP Agreements, as amended, subject to CPUC approval. Pursuant to the EP Amendments, in the event CPUC approval is not attained within one hundred and eighty (180) days from the date approval is sought from the CPUC or the date of the Motion (whichever is later), either party may terminate the applicable EP Amendment and the assumption of the applicable EP Agreement shall be null and void. The various EP Agreements and the EP Amendments are discussed in further detail below.

## THE POWER PURCHASE AGREEMENTS

8. To enable the Utility to provide power to its customers and meet regulatory requirements, the Utility is party to various power purchase agreements (each, a "**PPA**") with developers and operators of power generation facilities and projects. Pursuant to the Motion, the

Utility is seeking to assume the following three (3) PPAs, each as amended by the applicable PPA Amendment Agreements (as defined below):

- Power Purchase Agreement between the Utility and Re Gaskell West 3 LLC dated September 22, 2017 (the "**Gaskell 3 PPA**");

- Power Purchase Agreement between the Utility and Re Gaskell West 4 LLC dated September 22, 2017 (the "**Gaskell 4 PPA**"); and

- Power Purchase Agreement between the Utility and Re Gaskell West 5 LLC dated September 22, 2017 (the "**Gaskell 5 PPA**" and, together with the Gaskell 3 PPA and the Gaskell 4 PPA, the "**PPAs**").

9. A copy of the form of the PPAs is available at https://www.pge.com/pge_global/common/pdfs/for-our-business-partners/energy-supply/electric-rfo/wholesale-electric-power-procurement/2017%20PV/PGE_2017_PV_PPA_final.docx. Aside from confidential commercial terms, I understand that the PPAs are substantially similar to the form.

10. The PPAs are long-term purchase agreements pursuant to which the Utility will purchase electric power generated by a generation facility or project operated by the respective counterparty to the PPAs (collectively, the "**PPA Counterparties**"). The generation projects that will generate the power to be purchased by the Utility pursuant to the PPAs, however, are currently under development and not yet operational and, as a result, the PPA Counterparties have not yet commenced delivering power to the Utility.[2] Upon completion of the generation projects, pursuant to the terms of the respective PPAs, the Utility will purchase power from the PPA Counterparties for a period of fifteen years, on a dollar per megawatt hour basis. Consequently, the Utility has no outstanding obligations to the PPA Counterparties under the PPAs, and no cure amounts are owed or payable in connection with the assumption of the PPAs as proposed pursuant to the Motion.

11. In connection with the proposed assumption of the PPAs, the Utility has negotiated favorable amendments to the PPAs with the PPA Counterparties. These amendments are memorialized in agreements between the Utility and the respective PPA Counterparty (the "**PPA**

---

[2] The PPA Counterparties entered into the PPAs prior to the completion of the respective generation projects because the PPA Counterparties use projected future revenue from the PPAs to obtain financing for the development and construction of the projects.

Amendment Agreements"). Among other things, the Utility and the PPA Counterparties have agreed to a ten percent (10%) discount to the respective per megawatt hour purchase price of power under each PPA. Additionally, the Utility and the PPA Counterparties have agreed to extend project and construction related deadlines in each PPA, and consequently, the time by which the Debtors would be obligated to commence purchasing power, by up to 24 months.

## THE ENERGY STORAGE AGREEMENTS

12. To enable the Utility to comply with applicable regulatory requirements related to storage capacity and resource adequacy, the Utility is party to various energy storage agreements with various counterparties that provide energy storage services. Pursuant to the Motion, the Utility is seeking to assume the following two (2) energy storage agreements, each as amended by the applicable ESA Amendment Agreements (as defined below):

- Behind the Retail Meter Capacity Storage Agreement between the Utility and mNOC AERS LLC ("**mNOC**"), dated June 1, 2018, as previously amended by letters dated October 11, 2018 and November 27, 2018 (the "**mNOC ESA**"); and

- Energy Storage Resource Adequacy Agreement between the Utility and Hummingbird Energy Storage, LLC ("**Hummingbird**"), dated June 1, 2018, as previously amended by letters dated October 11, 2018, November 27, 2018 and March 28, 2019, (the "**Hummingbird ESA**" together with the mNOC ESA, the "**ESAs**" and, collectively with the PPAs, the "**EP Agreements**").

13. Copies of the forms of the ESAs are available at http://www.pge.com/includes/docs/word_xls/b2b/wholesaleelectricsuppliersolicitation/Energy_Storage_2016/AppendixF2_CapacityStorageAgreement_IssuanceFinal.docx and http://www.pge.com/includes/docs/word_xls/b2b/wholesaleelectricsuppliersolicitation/Energy_Storage_2016/AppendixF3_BTMCapacityStorageAgreement_IssuanceFinal.docx. Aside from confidential commercial terms, the ESAs are substantially similar to the forms.

14. The ESAs are long term agreements, pursuant to which the Utility will purchase storage capacity in certain battery storage projects from the respective counterparties to the ESAs (the "**ESA Counterparties**" and together with the PPA Counterparties, the "**EP Counterparties**"). The Utility utilizes the ESAs to meet the resource adequacy requirements (the "**RARs**") imposed on it by

the CPUC and other regulators. The RARs ensure that California's load serving entities (including utilities, community choice aggregators, and energy service providers) have sufficient capacity to meet peak electric load demand on their networks, and require that load-serving entities maintain a reserve margin. Like the PPAs, the energy storage projects that are the subject of the ESAs are currently under development and not yet operational, and the ESA Counterparties have not yet commenced providing storage capacity to the Utility.[3] Upon completion of the storage projects, the Utility will purchase storage capacity from mNOC and Hummingbird for periods of ten (10) or fifteen (15) years, respectively, on a dollar per kilowatt-month basis. Consequently, the Utility has no outstanding obligations to the ESA Counterparties under the ESAs and no cure amounts are owed or payable in connection with the assumption of the ESAs as proposed pursuant to the Motion.

15. In connection with the assumption of the ESAs, the Utility has negotiated favorable amendments to the ESAs with the ESA Counterparties The ESA Amendments are memorialized in amendment agreements between the Utility and the respective ESA Counterparty (the "**ESA Amendment Agreements**" and, together with the PPA Amendment Agreements, the "**EP Amendments**"). Specifically, with respect to the mNOC ESA, among other things the parties have agreed to discounts on the contract price of approximately eleven percent (11%), and have agreed to extend two project completion milestones in the mNOC ESA by approximately fifteen (15) months, which will result in a corresponding delay to the Utility's obligations to pay for the additional capacity by approximately fifteen (15) months. Similarly, with respect to the Hummingbird ESA, among other things, the parties have agreed to discounts on the contract price of approximately ten percent (10%) and have agreed to extend two project completion milestones in the Hummingbird ESA by twelve (12) months, which will result in a corresponding delay to the Utility's obligations to pay for such capacity by approximately twelve (12) months.

## BASIS FOR ASSUMPTION

16. I believe that the Utility's assumption of the EP Agreements, as amended, represents a valid exercise of the Utility's business judgment and will benefit the Utility's estate. Energy

---

[3] The ESA Counterparties use the projected future revenue from the ESAs to obtain financing for the development and construction of the energy storage project.

procurement is a critical aspect of the Utility's business operations. The Utility is undertaking a careful and thorough review of its portfolio of EP Agreements and has determined that the terms of the EP Agreements, as amended, are reasonable under the circumstances and that maintaining the ongoing, mutually beneficial relationships with the EP Counterparties is in the best interests of the Utility and its estate. Additionally, the EP Agreements ensure that the Utility will continue to have sources of power generated by renewable energy and battery storage capacity, enabling the Utility to comply with the California Renewables Portfolio Standard Program, energy storage compliance requirements, and other related procurement requirements, as required by sections 3291(b)(1)(D) and 3292(b)(1)(D) of the California Public Utilities Code, as recently amended by Assembly Bill 1054.

17. The Utility has negotiated considerable discounts to the contract prices under the EP Agreements. The Utility estimates that the nominal value of the aggregate savings achieved pursuant to the EP Amendments is approximately $20 million over the collective life of the EP Agreements. Moreover, the Utility has determined that the savings obtained through the discounted contract price far outweighs the milestone extensions that the Utility is granting to the EP Counterparties under the EP Amendments. Such extensions necessarily arose from the Utility's commencement of the Chapter 11 Cases and the resulting difficulty for the EP Counterparties to obtain the requisite financing to complete the underlying projects. Finally, as discussed above, the assumption of the EP Agreements will not result in any incremental costs to the Debtors' estates because no cure amounts are owed by the Utility to assume the EP Agreements.

18. Accordingly, for the reasons set forth above and in the Motion, I believe that assumption of the EP Agreements, as amended, is a valid exercise of the Utility's business judgment, is in the best interest of the Utility, its creditors and other parties in interest, and the relief sought in the Motion should be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at San Francisco, California on July 31, 2019.

/s/ *Marino Monardi*
Marino Monardi

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119