WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br> - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>           **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>Related Docket Ref: Docket No. 3147<br><br>**DEBTORS' OBJECTION TO MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>Date: August 13, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102<br><br>**Obj. Deadline**: August 6, 2019, 4:00 p.m. (PT) |

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this objection to the *Motion of the Ad Hoc Group of Subrogation Claim Holders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3147] (the "**Subrogation Termination Motion**")[1] filed by the Ad Hoc Group of Subrogation Claim Holders (the "**Subrogation Group**").

---

[1]    Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Subrogation Termination Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Preliminary Statement**

The Debtors remain uniquely positioned to retain the exclusive right to file and pursue a plan of reorganization given the complexity of these Chapter 11 Cases (from a financial, political, and regulatory perspective) and the need to commence an orderly wildfire estimation process, without the needless distraction associated with a competing plan process, especially at this stage of these cases.

The motion filed by the Subrogation Group, in reaction to the motion to terminate the Debtors' Exclusive Periods [Docket No. 2741] (the "**Noteholder Termination Motion**") filed by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**"), underscores the chaos (and waste) that would ensue if this Court were to terminate exclusivity, just as the Debtors are on the cusp of moving toward their requested estimation process. As set forth below, the Subrogation Group (similar to the Ad Hoc Noteholder Committee) has failed to carry its heavy burden of establishing *cause* for the unprecedented relief that it is seeking.

Indeed, similar to the plan term sheet annexed to the Noteholder Termination Motion, the Subrogation Group's term sheet (the "**Subrogation Term Sheet**" and the plan described therein, the "**Subrogation Plan**") is equally deficient. Neither plan is credible or confirmable. At this time, the Debtors' focus must remain on pursuing the expeditious and fair resolution of their wildfire liabilities, while acting as a fiduciary to build stakeholder consensus around a confirmable plan.

As an initial matter, the Debtors have made significant progress in the administration of these admittedly large and extremely complex Chapter 11 Cases, and the fact that the Debtors have not yet consensually resolved their liability for all wildfire claims at this juncture is not unexpected given the significance and complexities surrounding the potential liabilities. The Debtors, however, have attained a critical milestone by settling with 18 public governmental entities in the Northern California wildfire districts (the "**Public Entities**") for $1 billion, which the other parties are quick to adopt in their plan proposals. And notably, other than championing a settlement with themselves, the Subrogation Group like the Ad Hoc Noteholder

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Committee, has made no progress in achieving a consensus with any other critical constituents, including those represented by the Tort Claimants Committee.

The Subrogation Group also neglects to value the mandatory convertible preferred equity (the "**MCP**") it proposes to distribute to its members, which is the cornerstone of the Subrogation Term Sheet. The reason for this omission is obvious, as the MCP's carry an above-market dividend and a conversion rate at a very significant discount. Although the Subrogation Group cites to the *American Airlines* chapter 11 case as support for its proposal, again, it neglects to mention that the *American Airlines* plan was overwhelmingly consensual among all constituencies. *See* Disclosure Statement for Debtors' Second Amended Join Chapter 11 Plan, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) [Docket No. 8591]. Certainly, those circumstances do not exist with respect to the Subrogation Plan.

Further, and perhaps more importantly, to terminate the Debtors' Exclusive Periods when the Debtors' wildfire liabilities have not been determined will lead to further distraction, costs, and waste of judicial and estate resources that will jeopardize achieving the June 30, 2020 legislative deadline. The quantification of the wildfire liabilities is a necessary predicate for any chapter 11 plan and to help resolve this fundamental issue, the Debtors filed a motion to estimate the tens of thousands of unliquidated wildfire claims. Indeed, the California Public Utilities Commission (the "**CPUC**") and the Governor's Office have made it abundantly clear that termination of exclusivity is not the answer, with the chaos that necessarily will ensue.

As the Court is aware, state legislation relating to the formulation and proposal of a chapter 11 plan was only recently enacted. Further, the Governor has made it clear that such legislation is not the end of the process and the legislature will be convening next week to address the next phase. Certainly, the Exclusive Periods should remain in effect while the legislative process continues to unfold, particularly when it will be concluded by September 13, 2019 – well within the existing plan Exclusive Periods.

The Debtors, as estate fiduciaries, consistent with the intent and purpose of section 1121 of the Bankruptcy Code, should continue to be the stewards of the chapter 11 plan process to ensure that a fair and equitable plan for all parties in interest is achieved and that these cases

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

are successfully concluded by June 30, 2020. This process should not be derailed or usurped by the parties that have achieved a consensus with no one but themselves, and who are motivated by a singular desire to promote their own parochial interests and to secure a windfall at the expense of other constituencies in these cases.

### The Subrogation Termination Motion Should be Denied

As set forth in the Debtors' opposition to the Noteholder Termination Motion, the party seeking to terminate or modify a debtor's exclusive periods bears the burden of proof because it is the moving party who seeks to change the status quo.[2] The burden of proof for such motions is a "heavy one" and termination of a debtor's exclusive periods should be granted "neither routinely nor cavalierly." *In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) ("Therefore, 'cause' to reduce the exclusivity period should only be found in extraordinary circumstances."); *see also In re Lichtin/Wade, L.L.C.*, 478 B.R. 204, 215 (Bankr. E.D.N.C. 2012) (the Court "maintains the position that considering termination of an exclusivity period is a 'serious matter' and termination 'should be granted neither routinely nor cavalierly'") (quoting *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, *6 (Bankr. E.D.N.C. Dec. 4, 2009)); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (Bankr. S.D. Iowa Feb. 28, 2017) ("A survey of case law reveals that finding cause to reduce or terminate exclusivity is the exception, not the rule.").

Although Courts often discuss much of the same criteria that is examined in connection with requests to extend exclusivity, *see, e.g.*, *In re New Meatco Provisions*, No. 2:13-BK-22155-PC, 2014 WL 917335 at *2 (Bankr. C.D. Cal. Mar. 10, 2014) (citing the nine *Dow Corning* factors to determine whether there is cause to extend or reduce exclusivity), Courts typically have found cause to terminate a debtor's exclusive periods only where the following

---

[2]  In contrast to the present circumstances, in the Utility's 2001 chapter 11 case, the Court was not asked to rule on a motion or request from a creditor or other party in interest to terminate or reduce the Utility's exclusive periods; rather the Court declined to grant the Utility's request for a further extension of its exclusive periods after maintaining exclusivity for over nine months. *See In re Pac. Gas & Elec. Co.*, Case No. 01-30923 (Bankr. N.D. Cal. Mar. 13, 2001) [Docket No. 5155].

circumstances exist: (a) gross mismanagement of the debtor's operations; (b) acrimonious relations between the debtors' principals; and (c) use of the exclusive periods to force creditors to accept an unsatisfactory or unconfirmable plan. *See In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988) ("In those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations or acrimonious feuding between the debtor's principals were major obstacles to a successful reorganization and were regarded as 'cause' for the reduction of the exclusivity periods.") (internal citations omitted); *see also In re Situation Mgmt. Systems, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (same); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (denying creditors committee's motion to terminate exclusive periods where there was no evidence that the time period since filing had been used by the debtors to coerce creditors to accept a plan, no delay in filing a plan as required by the Bankruptcy Code, no allegations of mismanagement or evidence of such conduct, and no evidence of an acrimonious relationship between the debtors' principals); *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, at *6 (denying creditor's motion to terminate exclusivity due to, among other things, a lack of any showing or allegations of gross mismanagement of the debtors or feuding between the debtor's principals); *In re Standard Mill Ltd. P'ship*, No. BKY 4-96-2656, 1996 WL 521190, at *1 (Bankr. D. Minn. Sept. 12, 1996) ("For example, factors such as the gross mismanagement of the debtor's operations, the debtor's failure to negotiate with creditors in good faith, the debtor's use of the exclusivity period to force creditors to accept a patently unconfirmable plan, and acrimonious feuding between the debtor's principals have constituted 'cause' to reduce the exclusivity period when they amounted to 'major obstacles to a successful reorganization.'"). Clearly, none of these circumstances are present here.

### A.  The Subrogation Plan is Not Credible

Although the Subrogation Group touts its plan as "the only path forward that has garnered the support of at least one of [the] two critical constituencies" in these Chapter 11 Cases (Subrogation Termination Motion at ¶ 2.), the Subrogation Plan does not have the support of any constituency other than itself. As with the Noteholder Plan, the only actual consensual resolution

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

reflected in the Subrogation Term Sheet is the settlement with the Public Entities, which was negotiated by the Debtors and which the Subrogation Group now seeks to adopt as its own.

And, of course, the Subrogation Group's support for its own plan proposal hardly is surprising. As an initial matter, approximately $7.5 billion of the Subrogation Group's $18 billion in asserted claims is comprised of claims related to the Tubbs fire, which CalFire has determined was not caused by the Debtors' equipment, and a significant portion of the asserted claims include unpaid reserves. Nevertheless, the Subrogation Group proposes to satisfy its claims with consideration that it asserts has a value of $15.8 billion where, in fact, it is worth substantially more.[3] At its essence, the Subrogation Group, holding disputed and unliquidated claims of its own, seeks to settle with itself and obtain the Debtors' reorganized equity at enormous discounts through the MCP.

Additionally, the Subrogation Term Sheet provides nothing substantive with respect to the treatment of Individual Wildfire Claims or any terms for the proposed new indebtedness to be incurred by the Debtors in order to fund the payments required for a successful emergence from chapter 11. As is the case with the Noteholder Plan, the Subrogation Plan is purely self-serving and does not represent a constructive step forward to a timely, fair, and equitable resolution of these Chapter 11 Cases.

## B. The Subrogation Group Ignores the Substantial Progress Made by the Debtors to Date

As set forth in the Debtors' opposition to the Noteholder Termination Motion, despite their short duration, the Debtors have made substantial progress in the administration of these Chapter 11 Cases and towards the formulation of a viable and confirmable plan of reorganization. This includes:

- Stabilizing business operations, including restoring trade credit, and thereby substantially enhancing the Debtors' liquidity profile;

_____

[3] As noted in the Subrogation Term Sheet, the Subrogation Group, in addition to $1.6 billion in cash, is to receive $14.2 billion in MCP with an above-market 8% dividend, and a conversion rate at 15% discount to the market price at the time of conversion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- Virtually eliminating demands for cash collateral and other forms of credit enhancement that were rampant at the inception of these cases and presented a significant liquidity challenge;

- Achieving a key settlement with the Public Entities resolving all of their wildfire claims for an aggregate amount of $1 billion;

- Creating a $105 million fund to address the housing needs of those displaced by the wildfires;

- Hiring a new Chief Executive Officer with significant utility experience and a well-documented safety record;

- Installing new senior leadership in both the Debtors' electric and gas businesses;

- Refreshing the Debtors' Board of Directors with 12 of 14 new members with substantial safety, utility, and restructuring experience;

- Engaging in ongoing negotiations and discussions with the other two wildfire claimants' constituencies in an effort to achieve a consensual resolution of their claims to be embodied in a chapter 11 plan; and

- Engaging in regular weekly meetings with the CPUC to assure that all issues within the jurisdiction and authority of the CPUC are timely and comprehensively addressed in the context of a chapter 11 plan.

Additionally, on July 12, 2019, the California State legislature enacted AB-1054 that is fundamental to the proposal of any confirmable plan and to determining the funding needs for the Debtors' successful exit from chapter 11. That legislation addresses, among other things, the Governor's go-forward wildfire fund, the Debtors' costs and conditions to participate in the fund, and the treatment of existing wildfire claims under a chapter 11 plan. Moreover, as Governor Newsom noted when he signed the legislation, it was "not the end of the process" and that he "will be doing more in August" when the legislature returns next week.

Further, as the Court is well-aware, a fundamental prerequisite to a confirmable plan and knowing its actual funding requirements is a determination of the Debtors' aggregate liability for the wildfire claims that are to be treated under the plan. That liability must be determined for chapter 11 plan purposes either consensually or by an estimation process in this Court. To address this fundamental issue, the Debtors have filed a motion for the establishment of wildfire claims estimation procedures (the "**Estimation Motion**"), in order to implement a

formal process to address the parties' disparate views on these issues in a timely manner. The Debtors believe that establishing such a process will serve to create an environment that will facilitate and foster settlement negotiations as well as to ensure satisfaction of the legislative requirements for PG&E to participate in the go-forward wildfire fund. The Estimation Motion is scheduled to be heard by the Court on August 14, 2019 and, if approved, will require a substantial amount of estate and judicial resources. To inundate the Court with unconfirmable plans that are motivated by parochial interests will, quite simply, jeopardize any hope of achieving confirmation by June 30, 2020.

Again, as stated in the objection to the Noteholder Termination Motion, with the recent passage of the legislation which now defines the specific parameters, funding needs, chapter 11 plan provisions, and other items necessary for the Debtors' participation in the new go-forward wildfire fund, the Debtors are in a position to, and in fact, are refining a chapter 11 plan that will address all of those issues and which will encompass, among other things:

- payment in full or reinstatement of all prepetition funded debt obligations;

- payment in full of all prepetition trade claims and employee-related claims;

- payment of post-petition interest on all unsecured prepetition claims;

- satisfaction of all prepetition wildfire claims in amounts agreed upon or as otherwise authorized or allowed by this Court, fully consistent with the terms of the new legislation – AB-1054;

- rate neutrality for the Debtors' 16 million customers;

- the assumption of all power purchase agreements and community choice aggregation servicing agreements;

- the assumption of all pension obligations and other employee obligations;

- the assumption of all collective bargaining agreements;

- participation in the go-forward wildfire fund provided in the newly-enacted legislation; and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- emergence financing supported by a substantial infusion of cash raised from existing equity holders on market terms or in the capital markets if available on better terms, plus equity financed securitized bonds.

The Debtors are keenly aware of the June 30, 2020 deadline provided for in the new legislation. The Debtors' plan proposal will demonstrate the ability to timely satisfy all chapter 11 emergence costs, including those necessary to meet all of the requirements of the Governor's new legislation and those necessary for the Debtors' participation in the go-forward wildfire liability fund. Under these circumstances, where all creditors will be paid in full, there is no basis to wrest control of the process from the fiduciaries for all parties in interest, particularly at this stage of these Chapter 11 Cases.

The Debtors are now poised to move forward with the chapter 11 plan process in a rational fashion, taking into account the legitimate interests of all economic stakeholders and the Debtors' commitment to achieve a fair and expeditious resolution of all wildfire claims. This effort and attaining the June 30, 2020 legislative deadline should not be undermined by competing plans, especially when those plans lack any consensus and, more importantly, are designed to line the pockets of the proponents at the expense of other key constituencies in these cases.

## <u>Conclusion</u>

The Subrogation Group has not and, indeed, cannot sustain the heavy burden for the extraordinary relief it is seeking. The Subrogation Termination Motion should be denied.

WHEREFORE the Debtors respectfully request entry of an order denying the Subrogation Termination Motion, and granting the Debtors such other and further relief as the Court may deem just and appropriate.

Dated: August 6, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

/s/ *Stephen Karotkin*
Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119