1  Bruce S. Bennett (SBN 105430)
   Joshua M. Mester (SBN 194783)
2  James O. Johnston (SBN 167330)
   JONES DAY
3  555 South Flower Street
   Fiftieth Floor
4  Los Angeles, CA 90071.2300
   Telephone:    (213) 489-3939
5  Facsimile:    (213) 243-2539
   E-mail:       bbennett@jonesday.com
6                jmester@jonesday.com
                 jjohnston@jonesday.com
7
   *Attorneys for PG&E Shareholders*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>   - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>            Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF CERTAIN PG&E SHAREHOLDERS TO MOTION OF THE AD HOC COMMITTEE OF SUBROGATION CLAIM HOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS**<br><br>Date: August 13, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 3147 |

Certain owners of common stock of PG&E Corporation (the "PG&E Shareholders")[1] hereby object to the *Motion To Terminate The Debtors' Exclusive Periods Pursuant To Section 1121(d)(1) Of The Bankruptcy Code* [ECF 3147] (the "Motion") filed by the Ad Hoc Group of Subrogation Claim Holders (the "Subrogation Group").

## PRELIMINARY STATEMENT

The PG&E Shareholders object to the Subrogation Group's request to terminate exclusivity for largely the same reasons we objected to the similar request made by the Ad Hoc Committee of Senior Unsecured Noteholders (the "Bondholder Group").[2] Termination of exclusivity now – whether in favor of the Subrogation Group, the Bondholder Group, or other parties hoping to advance their own interests – would not "facilitate moving the case forward." Motion ¶ 14 (quotation omitted).

Ironically, the Subrogation Group's request comes just five days after it objected to the Bondholder Group's exclusivity termination motion on the grounds that the Bondholder Group had "ignore[d] traditional consensus building" and that "pursuit of the Bondholder Plan will force all parties to devote time and energy to defeat a plan that has little to no chance of confirmation from the outset." [ECF 3062 ¶¶ 4, 7] ("Subrogation Obj."). So too with the Subrogation Group's request. Disregarding its own rhetoric, the Subrogation Group now has proposed a plan that eschews compromise, is supported by no constituency other than its own members, and cannot be confirmed due to its massive overpayment of subrogation claims.

PG&E's suggested path forward is superior. PG&E will propose a plan that pays all claims in full. [ECF 3075 at 8]. To the extent compromises of some or all wildfire liabilities can

---

[1] The PG&E Shareholders are the entities identified on Exhibit A to the *Second Amended Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019* [ECF 3158], excluding Abrams Capital Management, LP, on behalf of certain funds and accounts, and Knighthead Capital Management, LLC, on behalf of certain funds and accounts. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

[2] *See Objection Of Certain PG&E Shareholders To Motion Of The Ad Hoc Committee Of Senior Noteholders To Terminate The Debtors' Exclusive Period* [ECF 3072] ("Prior Obj.").

be reached, they will be incorporated. If not, unliquidated wildfire claims will be estimated fairly and fully. In either case, PG&E as the fiduciary for a solvent estate will manage the process to ensure that the Court and the CPUC are able to consider the plan before June 30, 2020, the deadline by which PG&E must resolve these cases in order to access the wildfire insurance fund recently made available by the California Legislature.

**THE SUBROGATION GROUP PLAN IS NEITHER CREDIBLE NOR CONFIRMABLE**

Five days before it filed the Motion, the Subrogation Group told the Court that it had refrained from "rush[ing] to file a term sheet" and instead had "chosen to negotiate with other constituents, because a consensual resolution is in every stakeholder's interest." Subrogation Obj. ¶ 5. With the ink barely dry on those words, the Subrogation Group then filed the Motion seeking to press forward with a plan that has the support of no one other than the members of the Subrogation Group. Contrary to the Subrogation Group's assertion, Motion ¶ 1, that plan is neither credible nor confirmable.

The Subrogation Group claims that its plan proposal "has garnered the support of at least one of [] two critical constituencies." Motion ¶ 2. But the only "support" the Subrogation Group has achieved comes from its own members – those that will benefit the most from the plan it proposes. The Subrogation Group's proposed plan is no more consensual than the Bondholder Group's proposed plan – meaning, not at all.

Instead, much like the Bondholder Group's proposal, the Subrogation Group's plan feathers the nest of its sponsors. The Subrogation Group claims that total subrogation claims exceed $18 billion and proposes to satisfy those claims with consideration that it purportedly values at $15.8 billion but actually is worth billions of dollars more.[3] *See* Motion ¶ 6. The Subrogation Group claims that this is "a reasonable settlement" that "[r]esolves Wildfire Subrogation Claims at an amount significantly less than full recovery to help expedite the bankruptcy proceedings." Motion ¶¶ 3, 5 & n.4.

---

[3] Among other things, the Subrogation Group proposes to pay itself a nominal $14.2 billion in preferred stock that carries an above-market 8% dividend and converts into common equity over time at a 15% discount to market price. Motion, Ex. A at 13-14. Given the large dividend and cheap conversion price, that preferred stock alone likely would have a market value of $17 billion or more.

Not so.  To start, a "settlement" among the members of the Subrogation Group – not approved by PG&E or other constituents – is not a settlement at all.  *E.g.*, *In re Lighthouse Lodge LLC*, No. 09-52610-RLE, 2010 WL 4053984, *8 (Bankr. N.D. Cal. Oct. 14, 2010) ("[T]he 'settlement' here is not put forth by a fiduciary acting for the estate, is not negotiated in an arm's length transaction, and is proposed unilaterally by the party who receives the benefit of the release.  Thus, to the extent the law favors compromise and provides for a wide deference to the wisdom of the proponent's view of the settlement, such deference will not be given here on these facts"); *In re Whispering Pines Estates, Inc.*, 370 B.R. 452, 461 (BAP 1st Cir. 2007) ("Where, as here, the 'settlement' is not put forth by a fiduciary having authority and responsibility to act for the estate and who negotiated it in an arm's length transaction, but unilaterally by the very party who would be receiving the benefit of the release, there is no cause for deference in the matter.").[4]

More importantly, there is no compromise embodied in the Subrogation Group's proposal.  To the contrary, the Subrogation Group proposes to pay subrogation claims asserted on account of the Tubbs fire – a wildfire that, according to the official investigators at CAL FIRE, *PG&E did not start*.  Prior Obj. at 6.  In fact, the Subrogation Group's alleged $18 billion in subrogation claims includes at least $7.5 billion of claims relating to the Tubbs fire.  The Subrogation Group thus proposes to pay itself well over $15.8 billion in respect of claims likely to be allowed in amounts that are billions of dollars less than that.  The Subrogation Group calls this "a reasonable settlement of Tubbs liability," Motion ¶ 4 & n.7, but does not even attempt to explain the reasonableness of paying more than $4.3 billion on an asserted $7.5 billion of subrogation claims for a fire that PG&E did not start.

The Court will recall that the plan term sheet filed by the Bondholder Group raises similar issues.  In the Bondholder Group's case, the absence of arm's length negotiation with anyone other than Bondholder Group members resulted in a plan proposal that would force PG&E to

---

[4] *See generally In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("good faith negotiation" required for court approval of a compromise); *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (considering "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion") (quotations omitted); *Turney v. F.D.I.C.*, 18 F.3d 865, 867 n.2 (10th Cir. 1995) (same).

convert $15.8 billion of unsecured debt into secured debt in exchange for token consideration, forgo the opportunity to reduce interest rates on long term debts to prevailing market rates, and pay billions of dollars of contract "makewhole" premiums not allowable or enforceable under governing law. Prior Obj. at 9-11.

If the floodgates are opened, exclusivity termination may well result in still more self-serving "wish list" proposals. *In re Adelphia Comm. Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) ("Terminating exclusivity might well result in the solicitation of three or even more plans (not just one or two), with some addressing only parochial concerns. Or, given predictions creditors have made to me, several creditor constituencies might file their own 'wish list' plans, with each being no more palatable to other constituencies than all of the proposals that I've seen to date.") (denying motion to terminate exclusivity).

## THE COURT SHOULD BE PARTICULARLY RELUCTANT TO TERMINATE EXCLUSIVITY IN A SOLVENT CASE

The Subrogation Group, like the Bondholder Group before it, has conceded that PG&E is solvent. Specifically, the Subrogation Group's plan (like the Bondholder Group's plan) proposes that PG&E pay postpetition interest at contract rates to all classes of unsecured claims. Motion, Ex. A at 3-11. Assuming PG&E exits bankruptcy on June 30, 2020, more than $1.4 billion in postpetition interest at contract rates (more than $700 million at the legal federal judgment rate) will have accrued on PG&E's funded debt alone. Because postpetition interest on unsecured claims cannot be paid unless the debtor is solvent, *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002), the proposals to pay that interest are unequivocal concessions that PG&E is solvent by billions of dollars. Moreover, under governing Ninth Circuit law, plans that propose to pay postpetition interest at contract rates instead of the federal judgment rate cannot be confirmed over the objection of equity. *Cardelucci*, 285 F.3d at 1234-36. The plan issues in these cases thus revolve around how, not whether, claims will be paid in full.[5]

---

[5] Of course, the allowability and amount of claims is very much at issue. This, however, is not a plan treatment issue. Estimation and liquidation of claims will require arm's length bargaining and, potentially, litigation. As noted above, that is not something that can be short cut with a non-consensual unilateral plan proposal.

Because PG&E is solvent and the claims against it will be paid in full, PG&E and the board of directors elected by its shareholders are especially suited to propose and advance a plan. The Subrogation Group frankly concedes that "[o]nly the holders of Wildfire Claims and the Debtors' existing equity have something meaningful to lose in these cases; all other classes can be left unimpaired." Subrogation Obj. ¶ 5. Where it is conceded that there is enough value to allow PG&E to pay claims asserted against it, it is particularly appropriate to allow PG&E the first opportunity to do so without interference from constituencies that concede solvency.

Indeed, even if PG&E were not demonstrably solvent, its shareholders would retain the right to elect the board of directors to manage its affairs. *See, e.g., Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1500 (9th Cir. 1995) ("shareholders still have the power to elect directors of the corporation, and the directors still have the power to elect officers and to guide the corporation's business activities where director action is required by state law") (quoting Richard F. Broude, *Reorganizations Under Chapter 11 of the Bankruptcy Code*, § 6.06); *In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986) ("As a consequence of the shareholders' right to govern their corporation, a prerogative ordinarily uncompromised by reorganization, a bankruptcy court should not lightly employ its equitable power to block an election of a new board of directors.") (quotation omitted); *In re Marvel Entm't Grp.*, 209 B.R. 832, 838 (D. Del. 1997) ("Shareholders, moreover, should have the right to be adequately represented in the conduct of a debtor's affairs, particularly in such an important matter as the reorganization of the debtor.") (quotations omitted); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("There is little question that shareholders of a corporate debtor-in-possession retain their state law rights to control a corporation, and that such rights cannot be lightly cast aside by this Court.").

Thus, there is no merit to the suggestion that the election of new PG&E directors at the start of these cases somehow warrants termination of exclusivity or amounts to a forfeiture of traditional corporate governance.

## **CONCLUSION**

The Court is well aware that time is of the essence. Exclusivity termination – whether in favor of the Subrogation Group, the Bondholder Group, or another creditor constituency – would threaten PG&E's ability to access the wildfire insurance fund to be created by AB 1054. Opening the floodgates to creditor proposals will only lead to more of what the Court already has seen: creditors attempting to game the system through overpayment of claims and/or underpayment for new equity. Particularly given that PG&E is willing and able to propose a plan that pays creditors in full, the appropriate path forward in these cases is for PG&E to proceed with its restructuring without having to litigate parochial creditor-proposed plans that serve to overpay claims at the expense of equity. The Motion should be denied.

Dated: August 6, 2019                                         JONES DAY

                                                              By: */s/ James O. Johnston*
                                                                    James O. Johnston

                                                              *Attorneys for PG&E Shareholders*