**HUNTON ANDREWS KURTH LLP**
Paul N. Silverstein *Pro Hac Vice Pending*
Brian M. Clarke *Pro Hac Vice Pending*
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Email: paulsilverstein@HuntonAK.com
brianclarke@HuntonAK.com

- and –

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
    A Limited Liability Partnership
    Including Professional Corporations
ROBERT K. SAHYAN, Cal. Bar No.
253763 Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone: 415-434-9100
Facsimile: 415-434-3947
Email: rsahyan@sheppardmullin.com

*Attorneys for Columbus Hill Capital Management, L.P.*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY<br><br><br><br><br>Debtors.<br><hr>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF COLUMBUS HILL CAPITAL MANAGEMENT, L.P. TO MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS**<br><br>Date: August 13, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br><br>Re: Docket No. 3147 |

Columbus Hill Capital Management, L.P. ("Columbus Hill"), the manager of funds that hold claims against, and interests in, Pacific Gas and Electric Company and PG&E Corporation (collectively, the "Debtors"), for its objection to the *Motion of the Ad Hoc Group of Subrogation Claim Holders to Terminate the Debtors' Exclusive Periods* (the "Subrogation Group Termination Motion") [Docket No. 3147],[1] respectively represents:

1. On July 18, 2019, Columbus Hill filed its *Objection to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Period* (the "Ad Hoc Noteholder Termination Motion") [Docket No. 3079] (the "Prior Columbus Hill Objection"). The grounds set forth therein for denying the Ad Hoc Noteholder Termination Motion apply equally to the Subrogation Group Termination Motion. Like the Ad Hoc Noteholder Termination Motion, the Subrogation Group Termination Motion does not demonstrate "cause" under Section 1121(d) of the Bankruptcy Code to terminate the Debtors' plan exclusivity period. The factors relied upon by courts to determine whether to extend or reduce exclusivity require denying the Subrogation Group Termination Motion. *See, e.g.*, *In re Dow Corning Corp.*, 208 B.R. 661, 663–670 (Bankr. E.D. Mich. 1997) (denying motion to terminate exclusivity).

2. As everyone is well aware, the Debtors chapter 11 cases are among the largest *and most complex* chapter 11 cases ever filed. The Debtors are solvent. Termination of exclusivity a mere seven months after the beginning of these cases will lead to chaos and would hamper the Debtors' ability to exercise their fiduciary duty to reconcile, estimate and address claims alleged against it for the benefit of its key stakeholders. While progress toward a framework for a plan has been made, unresolved contingencies still exist including, but not limited to, the determination of the value of the wildfire claims asserted against the Debtors. The Subrogation Group Termination Motion contains no justification for ignoring these facts and terminating prematurely an exclusivity extension granted by this court on May

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Subrogation Group Termination Motion.

23, 2019 after full briefing and a contested hearing. That the Ad Hoc Subrogation Group has now put forward a plan construct that includes a proposed so-called "estimated recovery" for holders of Subrogation Claims should not change the conclusion made by the Court at the May 23, 2019 hearing. Moreover, as discussed herein, the proposed "cap" on the distribution to be made to holders of Subrogation Claims included in the Ad Hoc Subrogation Group's Restructuring Term Sheet is highly misleading and significantly overstated.

3. In addition to failing even to come close to meeting the legal standard for exclusivity termination, the proposed "plan" construct outlined in the term sheet appended to the Subrogation Group Termination Motion is not confirmable and does not even meet the "credible and potentially confirmable" standard articulated by the court at the May 23, 2019 hearing. Columbus Hill files this objection to highlight, among other things, some of the material defects in the "plan" construct proposed by the Subrogation Group.

4. Most notably, other than certain incorrectly premised terms applicable solely to holders of Subrogation Claims in their "plan" construct, substantially all of the material economic and business terms in the Subrogation Group's plan are blank. As such, the Ad Hoc Subrogation Group's "plan" construct is neither credible nor confirmable. The unresolved contingencies that must be satisfied before such terms can be finalized must be resolved in the context of the Debtors' claims resolution, estimation and plan process. These terms may be the subject of discussion among key stakeholders, but, certainly exclusivity need not be terminated to facilitate such discussions. Moreover, terminating exclusivity for the benefit of the Ad Hoc Subrogation Group (or any other group) would make it more difficult for such discussions to occur in a productive manner, and, as previously discussed, would create chaos.

5. Material terms in the Ad Hoc Subrogation Group's "plan" construct that are currently blank include: (i) the amount of the proposed rights offering under which existing stockholders would fund the Debtors' exit from chapter 11; (ii) the reorganized equity value at which such rights would be issued; (iii) the allocation of claims in Classes 1A and 1C

- 3 -

arising from the Tubbs wildfire and those that arise from other wildfires; and (iv) funding amounts and mechanics for the trust proposed to be established to assume and pay wildfire claims held by individual uninsured and underinsured tort creditors. As noted in the Subrogation Group Termination Motion, many of these "blanks" are dependent on determining the total wildfire claims pool. *See* Subrogation Group Termination Motion at p. 2-3. Given the various open items that bear on the liquidation of the Wildfire Claims, including the review and reconciliation of proofs of claim, the Debtors' proposed estimation framework and the Ad Hoc Subrogation Group's and the Tort Claimants Committee's respective motions for relief from the automatic stay seeking authority to litigate claims arising from the Tubbs fire in state court, it will take at least several months to arrive at an approximate range for the total wildfire claims pool.

6. The Ad Hoc Subrogation Group seeks unlawfully to coerce PG&E Corporation stockholders to execute plan support agreements by September 30, 2019. Even if sufficient information were available to provide consents prior to that date, such plan construct for these solvent Debtors is patently unconfirmable for the reasons set forth herein. The Ad Hoc Subrogation Group, if such consents are not provided in sufficient amounts, would rescind its proposed rights offering construct, which would then be "reallocated in the discretion of the Ad Hoc Subrogation Group." *See id.*, at p. 15. Under the Ad Hoc Subrogation Group's construct, PG&E Corporation stockholders would have a choice either to (i) execute a support agreement to commit to finance a proposed plan prior to the material terms of such plan being known or (ii) decline to execute support agreements, vote to reject the proposed "plan" and oppose confirmation under Section 1129(b) of the Code against what would be a massive impairment and dilution of their ownership interests under the Ad Hoc Subrogation Group's proposed "plan" construct. This Court should not permit the Ad Hoc Subrogation Group to coerce PG&E Corporation stockholders, which would be impaired under the proposed plan construct and would be entitled to vote to accept or reject a chapter 11 plan under the

- 4 -

Bankruptcy Code and other applicable law and rules, including with respect to the issuance of new equity.

7. The Ad Hoc Subrogation Group's proposed "plan" construct similarly fails to meet the credible and confirmable standard articulated by the Court. The Ad Hoc Subrogation Group proposes to bind the Debtors to an overstated aggregate amount of Subrogation Claims and provide a recovery on those claims far in excess of such amount and far in excess of what they are entitled to under the Bankruptcy Code. The "estimated recovery" asserted by the holders of Subrogation Claims is approximately $15.8 billion, which is an extremely inflated amount. *See id.*, at p. 4. In a footnote, the Ad Hoc Subrogation Group purports to demonstrate that the real value of their claims is in excess of $20 billion and that the $15.8 billion represents an approximate 70% recovery or distribution on aggregate Subrogation Claims. *See id.*, at fn. 4. First, such 70% approximation is arbitrary and inconsistent with historical settlements of subrogation claims.[2] Second, this amount includes claims arising from the Tubbs fire, which CalFire has determined was not caused by the Debtors, as well as other amounts that may not be recoverable under applicable California law, including billions in attorneys' fees. *See id*. The aggregate amount of Subrogation Claims should be determined after the claims reconciliation and estimation process, and not by filings with the California Department of Insurance that are not before the Court.

8. In addition to providing for an inflated claim amount, the Ad Hoc Subrogation Group proposes to secure unlawfully a windfall for holders of Subrogation Claims by providing for the satisfaction of such claims with Mandatory Convertible Preferred Stock that would convert over time into PG&E Corporation common stock at a material discount to the then applicable market value. This would entitle the holders of Subrogation Claims to receive a substantial portion of the equity in the reorganized Debtors, thereby subjecting the existing stockholders to substantial dilution of their interests. As a threshold matter, there is no reason

---

[2] *See, e.g.*, *Utility Risk Financing Options*, Testimony of David J. Heller, Edison International Vice President, Risk Management and Insurance, Before the Commission on Catastrophic Wildfire Cost and Recovery. April 3, 2019, at p. 8 (testifying that "subrogation claims are settled at historical levels, around 50%").

115869.0195307 NYC 429608v2
099900.16053 EMF_US 75452971v6
Case: 19-30088    Doc# 3399    Filed: 08/06/19    Entered: 08/06/19 18:37:36    Page 5 of 7

for Subrogation Claims to be paid in stock or other securities when they can and should, particularly in these solvent estates, be paid in cash. In addition, the Mandatory Convertible Preferred Stock is proposed to include an 8% per annum paid-in-kind dividend that would also convert over time into PG&E Corporation common stock at the same material discount and further dilution to existing stockholders. Factoring in the material conversion discount and proposed paid-in-kind dividend makes clear that the holders of Subrogation Claims will receive far in excess of the inflated and misleading $15.8 billion "estimated recovery" or "cap" set forth in the Ad Hoc Subrogation Group's Restructuring Term Sheet, and far more than they would be legally entitled to under the Bankruptcy Code. It is no wonder that the Mandatory Convertible Preferred Stock forms the "cornerstone" of the Ad Hoc Subrogation Group's proposed plan: there is simply no reason to provide holders of Subrogation Claims with such a windfall when they can and should be paid in cash on the effective date of a plan.

9. In addition to there being no factual or legal basis to terminate the Debtors' exclusivity under Section 1121 of the Bankruptcy Code, permitting the Ad Hoc Subrogation Group to pursue confirmation of such a plan construct would prevent the Debtors from exercising their fiduciary obligations to take actions necessary to ensure they are not required to make distributions on account of claims for which they have no liability, such as claims arising from the Tubbs fire. For the reasons set forth herein and in the Prior Columbus Hill Objection, Columbus Hill submits that the Debtors must be permitted to use their exclusive periods to continue to address all of the issues that are preconditions to a successful reorganization here, including finalizing a mechanism or process for resolving, allowing and satisfying pre-petition wildfire claims and liabilities and meeting applicable safety and regulatory requirements. Accordingly, Columbus Hill respectfully requests that the Termination Motion be denied in all respects.

[*Signature Page Follows*]

115869.0195307 NYC 429608v2
099900.16053 EMF_US 75452971v6

Respectfully submitted,

Dated: August 6, 2019           */s/ Robert Sahyan*

                                            **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

*Attorneys for Columbus Hill Capital Management, L.P.*

115869.0195307 NYC 429608v2
099900.16053 EMF_US 75452971v6