1 | **DIEMER & WEI, LLP**

2 | Kathryn S. Diemer (#133977)
3 | 100 West San Fernando Street, Suite 555
San Jose, CA 95113
4 | Telephone: 408-971-6270
Facsimile: 408-971-6271
5 | Email: kdiemer@diemerwei.com

6 | **WILLKIE FARR & GALLAGHER LLP**

7 | Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
8 | Benjamin P. McCallen (*pro hac vice*)
787 Seventh Avenue
9 | New York, NY 10019-6099
Telephone: (212) 728-8000
10 | Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
11 |      jminias@willkie.com
     bmccallen@willkie.com
12 |
13 | *Counsel for Ad Hoc Group of Subrogation Claim Holders*

14 | **UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
15 | **SAN FRANCISCO DIVISION**

16 | In re: | Case No. 19-30088

17 | PG&E CORPORATION, | Chapter 11

18 |      - and - | (Lead Case)

19 | PACIFIC GAS AND ELECTRIC COMPANY, | (Jointly Administered)

20 |      Debtors. | **AD HOC GROUP OF SUBROGATION CLAIM HOLDERS' OBJECTION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c) FOR THE ESTABLISHMENT OF WILDFIRE CLAIMS ESTIMATION PROCEDURES**

21 | ☐ Affects PG&E Corporation
22 | ☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors | [Relates to Docket No. 3091]

23 |

24 | *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Date:     August 14, 2019
25 | | Time:     9:30 a.m. (Pacific Time)
Place:     United States Bankruptcy Court
26 | |           Courtroom 17, 16th Floor
           San Francisco, CA 94102

27 |

28 |

1

## **Table of Contents**

2 PRELIMINARY STATEMENT ........................................................................................1

3 BACKGROUND ........................................................................................................6

4 ARGUMENT .............................................................................................................9

5 I. THE DEBTORS' ESTIMATION PROPOSAL IS AT ODDS WITH
STATUTORY AND COMMON LAW REQUIREMENTS FOR ESTIMATION
6 UNDER THE BANKRUPTCY CODE. .............................................................9

7 A. The Debtors Ask The Court To Estimate Claims Before All Interested
Parties Are Required To Appear..........................................................10

8
B. The Debtors Ask The Court To Exceed The Bounds Of Federal Law In
9 Making Its Own Determination On A Settled Question Of State Law.................11

10 C. The Debtors Ask the Court to Take Unprecedented Actions in Disallowing
Billions of Dollars of Tubbs Wildfire Claims......................................18

11
II. THE COURT SHOULD CONDUCT A SINGLE ESTIMATION PROCEEDING
12 USING AS A CRITICAL DATA POINT A SINGLE BELLWETHER TRIAL
OF THE TUBBS PREFERENCE PLAINTIFFS. ............................................21
13

14 III. THE COURT SHOULD ORDER THE PARTIES TO MEET AND CONFER ON
THE STRUCTURE OF A SINGLE ESTIMATION PROCEEDING. ...........................23
15

16 CONCLUSION...........................................................................................................25

17

18

19

20

21

22

23

24

25

26

27

28

i

# Table of Authorities

**Cases**                                                                            **Page(s)**

*American Tower Corp. v. City of San Diego*,
    763 F.3d 1035 (9th Cir. 2014) .................................................................13

*Barham v. S. Cal. Edison Co*.,
    74 Cal. App. 4th 744 (Cal. Ct. App. 1999),
    *review denied* (Nov. 23, 1999)..............................................2, 8, 11, 13

*Bittner v. Borne Chemical Co*.,
    691 F.2d 134 (3d Cir. 1982).................................................................18

*CUNA Mut. Life Ins. Co. v. Los Angeles Cty. Metro. Transp. Auth*.,
    108 Cal. App. 4th 382 (Cal. Ct. App. 2003) .......................................16

*Curtis v. Irwin Indus., Inc*.,
    913 F.3d 1146 (9th Cir. 2019) .............................................................12

*In re Eagle-Picher Indus., Inc*.,
    137 B.R. 679 (Bankr. S.D. Ohio 1992) ...............................................10

*In re Garlock Sealing Technologies, LLC*,
    504 B.R. 71 (Bankr. W.D.N.C. 2014).............................................18, 23

*Grzybowski v. Aquaslide 'N' Dive Corp.* (*In re Aquaslide 'N' Dive Corp.*),
    85 B.R. 545 (B.A.P. 9th Cir. 1987)......................................................19

*Jones v. Heskett* (*In re Jones*),
    106 F.3d 923 (9th Cir. 1997) ...............................................................12

*Jonna Corp. v. City of Sunnyvale, Ca*,
    No. 17-CV-00956 (LHK), 2017 WL 2617983 (N.D. Cal. June 16, 2017) .......................17

*In re Keenan*,
    201 B.R. 263 (Bankr. S.D. Cal. 1996) ..............................................9, 16

*In re Keene Corp*.,
    188 B.R. 903 (Bankr. S.D.N.Y. 1995) .................................................10

*Kuba v. 1-A Agric. Ass'n*,
    387 F.3d 850 (9th Cir. 2004) ...............................................................17

*Marin Mun. Water Dist. v. City of Mill Valley*,
    202 Cal. App. 3d 1161 (Cal. Ct. App. 1988) .......................................15

ii

*Muniz v. United Parcel Serv., Inc.,*
    738 F.3d 214 (9th Cir. 2013) ............................................................................12

*Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-Mogul Glob. Inc.),*
    330 B.R. 133 (D. Del 2005) .............................................................................16

*Orkin v. Taylor,*
    487 F.3d 734 (9th Cir. 2007) ............................................................................12

*Owens Corning v. Credit Suisse First Boston,*
    322 B.R. 719 (D. Del. 2005)...........................................................................9, 23

*Pac. Bell Tel. Co. v. S. Cal. Edison Co.,*
    208 Cal. App. 4th 1400 (Cal. Ct. App. 2012),
    *as modified* (Sept. 13, 2012), *review denied* (Nov. 14, 2012) ..........................2, 11, 13, 14

*In re Pac. Gas & Elec. Co.,*
    295 B.R. 635 (Bankr. N.D. Cal. 2003) ............................................................16

*Reardon v. City & County of San Francisco,*
    66 Cal. 492 (Cal. 1885).....................................................................................13

*Ryan v. Loui (In re Corey),*
    892 F.2d 829 (9th Cir. 1989) ............................................................................19

*United States v. King Mountain Tobacco Co.,*
    745 F. App'x 700 (9th Cir. 2018),
    *cert. denied*, No. 18-984, 2019 WL 358379 (U.S. June 10, 2019) ....................17

*West v. Am. Tel. & Tel. Co.,*
    311 U.S. 223 (1940)..........................................................................................14

*Wolfson v. Watts (In re Watts),*
    298 F.3d 1077 (9th Cir. 2002) .....................................................................2, 11, 12

**Statutes and Other Authorities**

11 U.S.C. § 501(a) ........................................................................................................10

11 U.S.C. § 502(a) ........................................................................................................10

11 U.S.C.  § 502(b) .......................................................................................................11

11 U.S.C. § 502(c) .................................................................................................*passim*

Cal. Pub. Util. Code § 451.2(b)-(c)..............................................................................16

iii

Cal. Civ. Proc. Code § 36 ...............................................................................................21

*Coordination Proceeding Special Title (Rule 3.550)*,
    No. CJC170004955, 2018 WL 491364 (Cal. Super. Jan. 4, 2018)......................................6

Fed. R. Bankr. P. 3007(a) ...............................................................................................11

*Order Denying Petition for Writ of Mandate, Prohibition, or Other Appropriate Relief, Pac. Gas*
    *& Elec. Co. v. Super. Ct. of San Francisco Cty.*,
    No. A154847 (Cal. Ct. App. Sept. 17, 2018) ........................................................14

*Opinion Denying Petition for Review, Pac. Gas & Elec. Co. v. Super. Ct. of San Francisco Cty.*,
    No. S251585, 2018 BL 431523 (Cal. Nov. 14, 2018) ..........................................14

*Order Denying Petition for Writ of Mandate, Prohibition, or Other Appropriate Relief, Pac. Gas*
    *& Elec. Co. v. Super. Ct. of Sacramento Cty.*,
    No. C087071 (Cal. Ct. App. June 7, 2018) ...........................................................14

*Opinion Denying Petition for Review, Pac. Gas & Elec. Co. v. Super. Ct. of Sacramento Cty.*,
    No. S249429, 2018 BL 292961 (Cal. Aug. 8, 2018) ............................................14

*Order Denying Petition for Writ of Mandate and/or Prohibition and Related Request for Stay,*
    *Pac. Gas & Elec. Co. v. Super. Ct. of San Mateo Cty.*,
    No. A146436 (Cal. Ct. App. Oct. 22, 2015) ..........................................................14

*Order Denying Rehearing of Decision (D.) 17-11-033*,
    2018 WL 3753814 (Cal. P.U.C. July 12, 2018).....................................................15

iv

## PRELIMINARY STATEMENT

Faced with stay relief motions to try the Tubbs Fire claims, efforts to terminate the Debtors' plan exclusivity, and a deadline to confirm a plan of reorganization in the next eleven months, PG&E Corporation and Pacific Gas and Electric Company (collectively, "**PG&E**" or the "**Debtors**") ask this Court to implement a cumbersome and disjointed three-stage process to estimate their wildfire liability. In their haste, the Debtors propose an estimation process that would do more harm than good. The Debtors' proposal is fundamentally infirm in that it would have the Court adjudicate what they characterize as "the most critical threshold issues" before the claims Bar Date (as defined below), unnecessarily raising serious due process concerns for parties not yet before the Court, in derogation of Sections 501 and 502 of the Bankruptcy Code.[1] In addition, the Debtors' proposal is inefficient, creates unnecessary appellate risk, and in many respects runs counter to the purpose of estimation: to estimate the value of the Wildfire Claims (as defined below) under California law, as if adjudicated by California trial courts.

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") does not dispute that an estimation hearing to address the value of the Wildfire Claims may be appropriate. But any such proceeding should be conducted in a single hearing addressing all outstanding estimation issues, after discovery and after all claims are filed under the terms of the Bar Date order and, ideally, after one or more of the most contentious Wildfire Claims (the Tubbs Fire claims) are tried in state court.

The Debtors' proposed three-tiered estimation proceeding would begin with an adjudication of the applicability of inverse condemnation to PG&E, with the benefit of only a few weeks of briefing and argument and no evidence. According to the Debtors, the Court would "not [be] constrained by the reasoning" of the California courts that have ruled that inverse condemnation applies to PG&E, and could issue a determination that would upend a

---

[1] If the Court were going to proceed with any part of the estimation proceeding before the Bar Date, due process would require that the Debtors send notice in a manner that mirrored the notice of the claims bar date, so that every party that may have a claim that is not yet filed would have the opportunity to respond to the proposed estimation process for not yet filed claims.

Case: 19-30088   Doc# 3419   Filed: 08/07/19   Entered: 08/07/19 14:44:55   Page 6 of 30

principle of California law and be binding on all parties for all claims on the basis of a few briefs. This approach is inconsistent with settled Ninth Circuit and California law.

Estimation requires the Court to determine, as best it can, how California courts would treat inverse condemnation, and the best evidence of that is undoubtedly the two California Court of Appeal rulings that inverse condemnation applies to a utility like PG&E, and the California Supreme Court's refusal (twice) to revisit those determinations. *Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744 (Cal. Ct. App. 1999), *review denied* (Nov. 23, 1999); *Pac. Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400 (Cal. Ct. App. 2012), *as modified* (Sept. 13, 2012), *review denied* (Nov. 14, 2012). The Debtors' suggestion that the Court should overrule all of those courts and speculate that one day the California Supreme Court will change its mind, take up the issue and reverse well-settled law, contravenes binding precedent that prohibits this Court, absent "convincing evidence" the California Supreme Court would reach a different conclusion, from doing exactly that. *Wolfson v. Watts* (*In re Watts*), 298 F.3d 1077, 1082-83 (9th Cir. 2002).

Adherence to California law is not only required, but fully consistent with estimation under Section 502(c). The state court Wildfire Claims are governed by existing California law. If they were tried today in state court, that court would be bound by California's inverse condemnation law. Estimation requires this Court to determine not whether it agrees with the California courts, but how they would have ruled in the ordinary course had the claims not been stayed by PG&E's bankruptcy. Put another way, PG&E cannot use this proceeding to invite a federal bankruptcy court to overturn what it views as unfavorable California law.

Moreover, there is no efficiency to be gained by asking the Court to issue a ruling on inverse condemnation in isolation at the outset of the estimation process. Inverse condemnation typically does not stand alone, but rather appears alongside other theories of liability, such as negligence, which, if established, could obviate the need to address the issue of inverse condemnation entirely. This dynamic is particularly notable because the Debtors argue that the inverse condemnation doctrine violates the U.S. Constitution. Basic precepts of constitutional avoidance counsel that the Court should not address what the Debtors have cast as an issue of

constitutional law unless it is clear that confronting that argument is necessary, which here argues strongly for addressing inverse condemnation in the context of all other claims, and not in isolation.

In short, there is significant risk in singling out inverse condemnation for an immediate ruling. And while the Debtors baldly assert that inverse condemnation is a "critical" issue, they do not present any empirical analysis that ties the issue to a quantifiable effect on the value of the Wildfire Claims. The Debtors thus ask the Court to assume that risk with no real showing of potential benefit. It makes far more sense to allow the Court to address any arguments the Debtors choose to make regarding inverse condemnation in the context of a single estimation hearing, during which it can consider all the evidence, claims and defenses related to estimation comprehensively, and give the doctrine of inverse condemnation appropriate weight in its overall claims estimation analysis.

Equally imprudent is the Debtors' proposal to "address[] PG&E's likelihood of liability (if any) related to the Tubbs Fire" in a stand-alone second stage. If the Court prematurely conducts a proceeding to estimate Tubbs Fire liabilities over the objection of the victims of those fires, it will create a contentious and uncertain issue for appeal that will hang over these proceedings, particularly if the Court accepts the Debtors' position that they should be valued at zero, effectively disallowing them. Indeed, none of the cases the Debtors cite suggest that the thousands of multifaceted Tubbs Fire property claims are amenable to effective disallowance through an estimation proceeding. Should an appellate court later determine that this Court erred in exercising jurisdiction over those claims, or in disallowing them wholesale, the completion of the case by June 2020 would be in serious jeopardy. The Debtors' proposal also disingenuously suggests that this Court can estimate for voting and plan feasibility purposes, while leaving questions about the potential jurisdictional limit on estimating personal injury claims "to a later stage." (Mot. at 15.). Given the compressed timetable the parties and Court face, it makes no sense to conduct multiple estimation proceedings. The Debtors fail to explain how following their proposed course will push these cases toward a timely resolution and not massively

inefficient serial estimation proceedings.

The more prudent course would be to avoid these contested issues and lift the stay to allow a bellwether trial of a Tubbs Fire Plaintiff to be conducted in California state court, as the Official Committee of Tort Claimants (the "**TCC**") has requested.  The Court's role in an estimation proceeding is to estimate the value of the Wildfire Claims based on how a California court would resolve them in the absence of bankruptcy.  No amount of litigation in this Court can replace the value of a jury verdict on Tubbs liability—the issue all parties agree represents the biggest impediment to consensually approving a plan.  Regardless of what result the jury reaches, this Court can use that verdict with the flexibility offered by estimation under Section 502(c) to best approximate what the Debtors' liability for the Tubbs Fire would have been absent a bankruptcy filing.  The Debtors' argument that a state court trial will result in time consuming appeals misses the mark:  the value of the jury verdict is that it will provide the most apt data point for the Court's estimation of the Tubbs Fire claims, and may even provide the necessary impetus for a global resolution of the Wildfire Claims, regardless of the outcome.

Whether or not the Court lifts the stay to permit a state court trial to proceed, it should not try to estimate the value of the Tubbs Fire claims separately in advance of all others.  There are numerous overlapping fact issues shared in common by the Tubbs Fire claims and other Wildfire Claims that would make it incredibly inefficient for this Court to estimate the Tubbs Fire claims in isolation.  For example, PG&E's policies and practices related to de-energizing and maintaining lines will be at issue in evaluating the Tubbs Fire claims, as well as many others. More broadly, PG&E's systemic negligence will be an issue that cuts across the adjudication of all Wildfire Claims.  Carving out one fire from the rest – all of which are contested notwithstanding that PG&E has admitted that its facilities started the 19 other fires at issue[2] – would be inherently inefficient and exceedingly impractical given the June 2020 deadline.

The Debtors incorrectly frame estimation and the pending lift stay motions as mutually

---

[2]      PG&E concedes only causation.  It does not concede that it was negligent or that inverse condemnation applies to its actions for any fire.  Therefore, these issues must be addressed with respect to all fires.

4

exclusive options that the Court must choose between now. That is simply wrong. As discussed above, allowing a trial to proceed in state court provides several important benefits, including promoting settlement and obtaining an important data point for estimation. At the same time, the risk of lifting the stay is nonexistent. There is no reason the parties cannot prepare in the coming months to present this Court with evidence that the state court jury would otherwise hear regarding the Tubbs Fire. In the event the state court proceedings do not move quickly enough, the Court has the flexibility to adjust the evidence it hears at an estimation proceeding to account for the possibility that it will be unable to factor in a Tubbs Fire result in state court as it estimates under Section 502(c). Indeed, as the parties and Court prepare, flexibility in connection with the ultimate structure of the estimation hearing is critical at this stage of this large, fast-moving and complex case that is constantly evolving as interested stakeholders negotiate and work to narrow the issues of disagreement.

In sum, the Court should not chain itself to the convoluted, inefficient, and legally dubious estimation procedure urged by the Debtors. Rather, the Court should order the parties to meet and confer regarding the scope of a potential estimation proceeding to be calendared in December or January. Among other issues, the parties should discuss a schedule for fact and expert discovery, pre-trial briefing, trial time and post-trial briefing for a single estimation hearing. Any disagreements over the structure and schedule for such a proceeding can be presented to the Court promptly, even as discovery progresses. All of this work could proceed in parallel to a state court bellwether trial of a Tubbs Fire claim; but even if this Court does not lift the stay, all estimation issues can and should be reserved for a single proceeding at the end of the year or early January.

In the event the parties have not reached a resolution of their claims by the time of the estimation hearing, this Court will be in a position to conduct a single adjudication of any remaining disputed issues, with the benefit of a fully developed record through discovery and pre-trial proceedings. This is the most feasible path to estimating the Wildfire Claims in a fast, fair and procedurally sound manner—which is what all parties claim that they want—while

providing additional time and opportunities for negotiations around a potential plan of reorganization.

For these reasons and those set forth more fully below, the Court should deny the Debtors' Motion.

## BACKGROUND

As the Debtors admit, a central purpose of these chapter 11 cases is to assess and resolve PG&E's potential liabilities for the death and destruction wrought by the North Bay and Camp Fires. (*See Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] at 4 (hereinafter "**Wells Decl.**").) The hundreds of complaints filed on behalf of thousands of plaintiffs following the 2017 and 2018 wildfires raise common legal and factual issues that cut across categories of plaintiffs, whether it be the individual plaintiffs or subrogation plaintiffs. These wildfire actions, which were eventually coordinated in a single proceeding, seek to recover for, among other things, wrongful death, personal injury, and property damage, based on complaints that allege similar theories of liability, including negligence and inverse condemnation. *Coordination Proceeding Special Title (Rule 3.550)*, No. CJC170004955, 2018 WL 491364, at *2-3 (Cal. Super. Jan. 4, 2018); (Wells Decl. at 14-15.).

During the Coordination Proceeding prior to the Debtors' bankruptcy, PG&E requested that the Tubbs Fire be set for trial before any of the other North Bay Fires, while the individual plaintiffs sought to try the Atlas Fire first because of "proof issues common to all vegetation management fires" and the fact that Tubbs "implicate[d] a broader range of negligent corporate conduct as it relates to wildfire risk management." (McCallen Decl. Ex. 1 (Joint Case Management Conference Statement, *California North Bay Fire Cases*, JCCP No. 4955, at 2 (Cal. Super. Oct. 22, 2018)) (hereinafter "**Joint Case Mgmt. Statement**").) At the time, PG&E disputed plaintiffs' causation theory for the Atlas Fire. (*Id.* at 3, 4 n.1.) In arguing that Tubbs should be tried first, PG&E asserted that Tubbs and Atlas would require experts on some of the same issues, namely: "cause and origin, weather, LiDAR, de-energization, risk management and

damages." (*Id.* at 4 n.2.)  The state court decided to set a bellwether trial of the Atlas Fire first, in part because it appeared to be a simpler case to resolve.  (McCallen Decl. Ex. 2 (Case Management Order No. 4, *California North Bay Fire Cases*, JCCP No. 4955, at 2 (Cal. Super. Nov. 2, 2018)).)  The trial was to include a group of about fifteen plaintiffs that would represent the various categories of claims, such as wrongful death, personal injury, and total loss of home. (McCallen Decl. Ex. 2 (Case Management Order No. 4, *California North Bay Fire Cases*, JCCP No. 4955, at 4-5 (Cal. Super. Nov. 2, 2018)); McCallen Decl. Ex. 1 (Joint Case Mgmt. Statement), at 8-9.)

The Debtors cited inverse condemnation as one impetus for their bankruptcy filing, explaining that the doctrine "is routinely invoked in California wildfire damages, claims and litigation . . . . [and] imposes strict liability . . . for damages as a result of the design, construction and maintenance of utility facilities, including utilities' transmission lines."  (Wells Decl. at 14.) PG&E claimed that the doctrine "exacerbated" its "potential liability" for the fires because inverse condemnation "imposes strict liability on PG&E regardless of whether it was negligent." (*Id.* at 3.)

On July 1, 2019, this Court set October 21, 2019 as the deadline for filing proofs of claim on prepetition claims (the "**Bar Date**") (Order Establishing Bar Date [Docket No. 2806]), including all contingent and/or unliquidated claims arising out of the 2015, 2017 and 2018 Northern California Wildfires (the "**Wildfire Claims**").[3]  After the TCC and the Ad Hoc Subrogation Group moved to lift the automatic stay to allow the state court to try Tubbs Fire claims, the Debtors filed *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures* (the "**Motion**").  The Motion seeks to estimate the Debtors' aggregate liability for contingent and/or unliquidated claims arising out of

---

[3]      The terms "**Wildfires**" and "**Wildfire Claims**" refer to the following fires: the 2015 Butte Fire, the 2018 Camp Fire, and the following twenty-two 2017 North Bay Fires: (1) Adobe; (2) Atlas; (3) Blue; (4) Cascade; (5) Cherokee; (6) Highway 37; (7) Honey; (8) La Porte; (9) Lobo; (10) Maacama; (11) McCourtney; (12) Norrbom; (13) Nuns; (14) Oakmont/Pythian; (15) Partrick; (16) Pocket; (17) Point; (18) Potter/Redwood; (19) Pressley; (20) Sullivan; (21) Sulphur; and (22) Tubbs.

7

the 2015, 2017 and 2018 Northern California Wildfires.  (Mot. at 1.)

In their Motion, the Debtors assert that they will not contest causation for the Camp Fire or any of the 22 separate 2017 North Bay Fires, except for the Tubbs Fire (*Id.* at 4.), although Debtors are careful to assert that they are not liable for any harm caused by the 19 fires they admit they started.  The Debtors seek "adjudication of the most critical threshold issues" in two phases, leaving all remaining estimation issues to a third phase.  (*Id.*)  In the first phase, the Debtors argue that this Court should decide "whether claims based on inverse condemnation must be disallowed as a matter of law. . . ." (*Id.*)  The Debtors categorize inverse condemnation as a "threshold legal issue," and argue that "there are no disputed facts."  (*Id.* at 4, 20.)  The Debtors claim that the doctrine of inverse condemnation should not apply to privately-owned entities like PG&E, despite two California appellate decisions holding that it does.  (*Id.* at 19.) *See Pacific Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400 (Ct. App. 2012), *as modified* (Sept. 13, 2012), *review denied* (Nov. 14, 2012.); *Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744 (Ct. App. 1999) *review denied* (Nov. 23, 1999).  While conceding that California trial courts have followed the reasoning of the two appellate opinions, including with respect to PG&E itself, the Debtors argue that this Court is unconstrained by those cases and must "reach its own conclusions" about how the California Supreme Court would rule, and ask this Court to order briefing to commence within one week of issuing an order with a hearing eight weeks after entry of the order.  (Mot.at 8, 19.)  The Debtors also preview an argument that the doctrine, as consistently applied by California courts, violates the takings clause of the U.S. Constitution. (*Id.* at 20.)

The Debtors propose to have the Court address the issue of liability for the Tubbs Fire in "Phase 2", contending that "PG&E's likelihood of liability (if any) related to the Tubbs Fire is a crucial threshold issue in determining the aggregate amount required to resolve all Wildfire Claims."  (*Id.* at 6.)  According to the Debtors, it is "routine for bankruptcy courts to assess the factual merits of an unadjudicated state law tort claim as part of an estimation process," and the court may estimate those claims at zero.  (*Id.* at 21.)  The Debtors propose that the evidentiary

hearing on the cause of the Tubbs Fire begin on October 7, weeks before the Bar Date that has already been set.  (*Id.* at 8.)

The Debtors propose that "Phase 3" of their estimation proceeding begin on December 16, 2019 and address all remaining estimation issues.  (*Id.* at 24.)  In that phase, the Court would estimate the aggregate value of the Wildfire Claims.  (*Id.*)  The Debtors provide few details on this final proceeding, stating that the parties could come back to the Court with planned proceedings three weeks after the order granting their Motion.  (*Id.* at 25.)

## ARGUMENT

## I. THE DEBTORS' ESTIMATION PROPOSAL IS AT ODDS WITH STATUTORY AND COMMON LAW REQUIREMENTS FOR ESTIMATION UNDER THE BANKRUPTCY CODE.

The Court's role in an estimation proceeding is not to adjudicate the Wildfire Claims, but to estimate their value based on how California courts would resolve them in the absence of a bankruptcy.  *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721-22 (D. Del. 2005) (given the "'basic federal rule in bankruptcy. . . that state law governs the substance of [state law] claims' . . . claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy" (internal quotation marks omitted)); *In re Keenan*, 201 B.R. 263, 266 (Bankr. S.D. Cal. 1996) ("Estimation . . . contemplates that the bankruptcy court will, in effect, put itself in the place of a nonbankruptcy court or jury to estimate whether a debtor is liable to the claimant . . .").  The Debtors' proposed approach— frontloading two cherry-picked issues and resolving them (before the Bar Date) in isolation from the myriad legal and factual issues presented by valuing the Wildfire Claims—fundamentally misconstrues the nature of the estimation process, ignores governing law, and threatens to bog down these proceedings in duplicative and inefficient litigation.  The Debtor's proposal should be rejected.

9

A.   The Debtors Ask The Court To Estimate Claims Before All Interested Parties Are Required To Appear.

The Debtors' motion asks the Court to disallow billions of dollars of claims before those claims are even required to be filed.  The Debtors seek an immediate ruling from the Court that claimants cannot recover property damages based on inverse condemnation (even though California law is clear that the claimants can recover such damages), well in advance of the Bar Date, and ask the Court to conduct a hearing to "assess the Debtors' potential responsibility with respect to *all* claims arising out of the Tubbs Fire" two weeks before the Bar Date.  (Mot. at 4-7 (emphasis in original).)  Thus, two-thirds of the Debtors' three-step process would be nearly completed before the Bar Date, undercutting the very purpose of having a Bar Date in the first place.  The Bar Date "is critically important to the administration of a successful chapter 11 case . . .  serv[ing] the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate . . . ." *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (citations and internal quotations omitted); *see also In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 681 (Bankr. S. D. Ohio 1992) ("it is manifest that fixing the number and identity of such claimants will lend considerable assistance to the process of arriving at a value of the claims. . . .").  Recognizing as much, the Debtors admit that "determination of aggregate values of the Wildfire Claims . . . would need to occur after the October 21, 2019, [sic] Bar Date so that all stakeholders would have knowledge of the number of claimants and the aggregate amount of alleged claims . . . ."  (Mot. at 7.)  The Debtors do not explain why certain "critical issues" of liability can be resolved before the Bar Date and others only after the Bar Date.

The Debtors' proposal is also inconsistent with the orderly process for claim allowance and disallowance as set forth in Sections 501 and 502.  Section 501 allows creditors to file proofs of claim.  11 U.S.C. § 501(a).  Section 502(a) of the Code provides that a claim filed under Section 501 will be deemed allowed unless a party in interest objects.  *Id.* § 502(a).  If a party in interest objects, the court then determines the amount of the claim for allowance after notice

10

(which must be "**served on the claimant** by first-class mail," Fed. R. Bankr. P. 3007(a)), and a hearing under Section 502(b). 11 U.S.C. § 502(b). Alternatively, and as the Debtors seek here, a bankruptcy court can estimate under Section 502(c) any contingent or unliquidated claim "for purposes of allowance under this section [Section 502]." *Id.* § 502(c). The reference to allowance under Section 502 presupposes that there is some claim before the Court to be allowed or disallowed. In essence, the Debtors are trying to jump the gun and have the Court estimate the value of Wildfire Claims under Section 502(c) before those claims are required to be filed and can be objected to under Section 501. Conducting any portion of an estimation proceeding prior to the Bar Date creates unnecessary due process issues and appellate risk, as well as questions about how the result of such proceedings, conducted before certain claimants have filed proofs of claim and received notice, can be binding on such claimants, all the while doing nothing to advance the orderly administration of this bankruptcy proceeding, as explained below.

**B.**     **The Debtors Ask The Court To Exceed The Bounds Of Federal Law In Making Its Own Determination On A Settled Question Of State Law.**

The premise of Debtors' first "phase"—that this Court can ignore controlling California state law on the applicability of inverse condemnation and "reach its own conclusion" about whether inverse condemnation applies (Mot. at 19)—is simply wrong. California appellate courts have twice held that the inverse condemnation doctrine applies to utilities like PG&E. *See Barham v. S. Cal. Edison Co.*, 74 Cal. App. 4th 744 (1999), *review denied* (Nov. 23, 1999); *Pac. Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400 (2012), *as modified* (Sept. 13, 2012), *review denied* (Nov. 14, 2012.) On both occasions, the California Supreme Court had the opportunity to reverse the decision, but instead denied review.

The California Court of Appeals decisions on inverse condemnation are binding on this Court in estimating the Wildfire Claims. On issues of state law, Ninth Circuit courts, including bankruptcy courts, must follow decisions of the California intermediate appellate courts absent "convincing" evidence that the California Supreme Court would reject those decisions. *See In re Watts*, 298 F.3d at 1082-83 ("We are bound to follow *Smith* and *Teaman* absent convincing

evidence that the California Supreme Court would reject the interpretation of section 704.950(c) by these two courts.") (collecting cases); *Muniz v. United Parcel Serv. Inc.*, 738 F.3d 214, 219 (9th Cir. 2013) ("We should nevertheless follow a published intermediate state court decision regarding California law unless we are convinced that the California Supreme Court would reject it.") (citations omitted). The Ninth Circuit recently reaffirmed that the federal courts are "bound to follow the rulings of intermediate state courts" absent convincing evidence that they would not be followed by the state supreme court. *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1155 (9th Cir. 2019).

As the facts of *Watts* illustrate, the "convincing" evidence standard is a high hurdle. *Watts*, a bankruptcy case, turned on the application of California's homestead exemption. 298 F.3d at 1080. Prior to *Watts*, a Ninth Circuit panel had held as a matter of first impression that under California law a judgment lien could attach to a homestead under certain circumstances. *See Jones v. Heskett (In re Jones)*, 106 F.3d 923 (9th Cir. 1997). But thereafter, the California Court of Appeals rejected that approach in two separate cases. *Watts*, 298 F.3d at 1081-82. When the bankruptcy court in *Watts* strayed from those Court of Appeal decisions, the Ninth Circuit reversed, concluding that Court of Appeals decisions were binding in construing California law absent convincing evidence that they would be rejected by the California Supreme Court—evidence which was as lacking there as it is here. *Id.* at 1082.

None of Debtors' cases are to the contrary. The Debtors cite *Orkin v. Taylor*, 487 F.3d 734 (9th Cir. 2007) for the proposition that this Court must "predict" how the California Supreme Court would decide the application of inverse condemnation to PG&E. (Mot. at 5.) But *Orkin* does not support the theory that bankruptcy courts are free to disregard the decisions of state courts in favor of their own "predictions." To the contrary, *Orkin* emphasized that the task of the federal court is to "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." 487 F.3d at 741 (citations omitted). In so holding, the Ninth Circuit explained that "we take state law as it exists without speculating as to future changes in the law." *Id.* at 741-42. The Debtors'

reliance on *American Tower Corp. v. City of San Diego*, 763 F.3d 1035 (9th Cir. 2014) is equally misplaced. (*See* Mot. at 19-20.) In that case, the Ninth Circuit applied the limited exception for disregarding intermediate appellate authority based on "convincing" data and held that a California Court of Appeal's interpretation of a state statute did not control its own interpretation of the statute because the appellate court had read certain words out of the statute, violating a "fundamental canon of statutory construction" which the court did not believe the California Supreme Court would do. 763 F.3d at 1048 (quotation omitted). There, the plain text of the statute itself was the convincing data relied upon by the court to determine that the California Supreme Court would overrule the appellate court. *Id.* at 1047.

The Debtors offer no "convincing" evidence that the California Supreme Court would reverse the Court of Appeals decisions here. To the contrary, the prospects for reversal are exceedingly remote. Inverse condemnation has been settled law in California for over 130 years. *See Reardon v. City and County of San Francisco*, 66 Cal. 492 (Cal. 1885). The California Court of Appeal decisions holding that utilities like PG&E are subject to inverse condemnation are well-reasoned and directly on point. Like many of the wildfires here, the *Barham* case involved a wildfire that resulted from the failure of a utility's electric transmission lines during high winds. The California Court of Appeals observed that, for inverse condemnation purposes, there was no material difference between "publicly" or "privately" owned electrical utilities, and the relevant question was thus whether the improvement was for "public use." 74 Cal. App. 4th at 753-54.

In 2012, the Court of Appeals reaffirmed *Barham* in the *Pac. Bell* decision. As the court in *Pac. Bell* reasoned, a public utility such as PG&E has "monopolistic or quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state," that makes it "more akin to a governmental entity than to a purely private employer[.]" 208 Cal. App. 4th at 1406 (internal quotations omitted). Since *Pac. Bell*, California courts have uniformly rejected arguments by privately-owned utilities that they should be exempted from inverse condemnation. Indeed, PG&E has repeatedly tried to obtain writs concerning interlocutory rulings on inverse

Case: 19-30088    Doc# 3419    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 18 of 30

condemnation, including in North Bay Fire-related litigation, and its petitions were all denied by the Court of Appeals and, in some cases, the California Supreme Court.[4]  *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (intermediate appellate court decisions are especially persuasive "where . . . the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.").

Were this issue again presented to the California Supreme Court, there is no reason to believe that it would grant review, much less reverse *Barham* and *Pac. Bell*.  The primary argument against inverse condemnation advanced by the Debtors here has already been rejected by the California Court of Appeals.  (Mot. at 17-19.)  Specifically, the utility in *Pac. Bell* argued that "as a public utility it does not have taxing authority and may raise rates only with the approval of California's Public Utilities Commission [CPUC]."  208 Cal. App. 4th at 1407.  The court in *Pac. Bell* noted that the California legislature could make municipally-owned utilities subject to CPUC regulation, and expressed doubts that "such regulation would immunize municipal utilities from inverse condemnation liability under the theory that they were no longer able to spread the cost of public improvements."  *Id.* at 1407 n.6.  This result is also supported by considerations of basic fairness towards the property owners.  As the *Pac. Bell* court emphasized: "[f]or an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned."  *Id.* at 1408.  Whether property owners can assert an inverse condemnation claim should not depend on "the happenstance of which type of utility

---

[4]    *See* Order Denying Petition for Writ of Mandate, Prohibition, or Other Appropriate Relief, *Pac. Gas & Elec. Co. v. Super. Ct. of San Francisco Cty.*, No. A154847 (Cal. Ct. App. Sept. 17, 2018); Opinion Denying Petition for Review, *Pac. Gas & Elec. Co. v. Super. Ct. of San Francisco Cty.*, No. S251585, 2018 BL 431523 (Cal. Nov. 14, 2018); Order Denying Petition for Writ of Mandate, Prohibition, or Other Appropriate Relief, *Pac. Gas & Elec. Co. v. Super. Ct. of Sacramento Cty.*, No. C087071 (Cal. Ct. App. June 7, 2018); Opinion Denying Petition for Review, *Pac. Gas & Elec. Co. v. Super. Ct. of Sacramento Cty.*, No. S249429, 2018 BL 292961 (Cal. Aug. 8, 2018); Order Denying Petition for Writ of Mandate and/or Prohibition and Related Request for Stay, *Pac. Gas & Elec. Co. v. Super. Ct. of San Mateo Cty.*, No. A146436 (Cal. Ct. App. Oct. 22, 2015).

operates in an area[.]" *Id.* Simply put, arguing, as the Debtors do, that they are right and the Court of Appeals is wrong is not "convincing" evidence for reversal.

The Debtors' argument that inverse condemnation liability should not be imposed on them because they may not be allowed to spread the cost to ratepayers fares no better. (Mot. at 18-19.) As an initial matter, cost-spreading is a policy rationale articulated by California courts for a right embedded in California's constitution, but it is a judicial gloss, not a substantive limitation on a constitutional entitlement. Moreover, the ability to spread costs is not even the sole rationale cited by California courts for the inverse condemnation doctrine. As one California Court of Appeal decision explained, "[w]hen a public entity fails to construct or maintain its improvement properly, it takes a calculated risk that damage to private property may occur," and "[i]f damage to private property results, it is proper to require the entity that took this risk to bear the loss when damage occurs." *Marin Mun. Water Dist. v. City of Mill Valley*, 202 Cal. App. 3d 1161, 1165 (Cal. Ct. App. 1988). Therefore, inverse condemnation can be understood as a doctrine determining the proper party to bear the risk of harm caused by a public improvement.

Moreover, this Court should not accept on its face the Debtors' assertion that PG&E would not be able to spread its losses from being found liable. The Debtors cite a decision by the CPUC denying an application by San Diego Gas & Electric (SDG&E) to recover costs resulting from the settlement of claims for inverse condemnation (Mot. at 18-19), but this decision does not preclude the CPUC from allowing PG&E to recover its inverse condemnation liability if it can satisfy the "Prudent Manager" standard. *See Order Denying Rehearing of Decision (D.) 17-11-033*, 2018 WL 3753814, at *2 (Cal. P.U.C. July 12, 2018). Further, the "Prudent Manager" inquiry is not the same as inquiring as to whether the utility was negligent, but rather whether the utility engaged in "good utility practices" as judged by such factors as "cost-effectiveness, reliability, safety, and expedition." *Id.* (internal quotations omitted). The California Legislature also has been considering, among other potential reforms, capping the liability that can be imposed on a privately owned utility without recovery from ratepayers. *See*

Cal. Pub. Util. Code § 451.2(b)-(c). To the extent PG&E's ability to recoup its "losses" through rate increases is even relevant to the application of inverse condemnation, PG&E may seek authority from the CPUC to increase its rates. Determination of any such application would involve significant factual issues, belying the Debtors' claim that inverse condemnation is a pure legal issue.

Equally fundamentally, in asking this Court to disregard California law and decide the issue of inverse condemnation *de novo*, the Debtors misconstrue the role of the bankruptcy court in an estimation proceeding. "Estimation . . . contemplates that the bankruptcy court will, in effect, put itself in the place of a nonbankruptcy court or jury to estimate whether a debtor is liable to the claimant and, if so, to estimate the amount of the debt." *Keenan*, 201 B.R. at 266; *see also In re Pac. Gas & Elec. Co.*, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003) (bankruptcy court must apply the law of the jurisdiction "governing the nature of the claim"); *Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-Mogul Glob., Inc.),* 330 B.R. 133, 155 (D. Del 2005) (bankruptcy court "is bound by the legal rules which may govern the ultimate value of the claim"). Therefore, in any estimation of inverse condemnation, placing itself in the role of a state trial court, which is bound by the appellate court decisions, is exactly what this Court *must* do.

It would also be highly inefficient and a potential waste of the Court's and the parties' limited time to prepare for and conduct a hearing on the "applicability" of inverse condemnation before everything else. The doctrine may prove entirely irrelevant based on the substantial evidence of PG&E's negligence that the parties intend to present, which may even inform the Court's holding on inverse condemnation. *See CUNA Mut. Life Ins. Co. v. Los Angeles Cty. Metro. Transp. Auth.,* 108 Cal. App. 4th 382, 391 (Cal. Ct. App. 2003) ("The question of whether there has been inverse condemnation is a mixed question of law and fact."). All of these prudential considerations weigh against accepting the invitation now to speculate about how the California Supreme Court would rule now, and instead to reserve judgment on whether such a ruling is even necessary.

Case: 19-30088    Doc# 3419    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 21 of 30

The Debtors also contend that inverse condemnation as applied to PG&E violates the United States Constitution as an "uncompensated taking of [their] property." (Mot. at 20.) According to the Debtors, a doctrine of strict liability grounded in the California Constitution that has been enforced by California courts for many decades actually amounts to such a taking. On the merits, this argument fails. First of all, "confiscations of money," such as an adverse money judgment, "are only treated as a taking when the confiscation operates upon or alters an identified property interest," and the Debtors have identified no such interest. *United States v. King Mountain Tobacco Co.*, 745 F. App'x 700, 702 (9th Cir. 2018), *cert. denied*, No. 18-984, 2019 WL 358379 (U.S. June 10, 2019) (citations omitted). Moreover, a party cannot bring a Takings Clause claim unless that party "is unable to receive just compensation from the government." *Jonna Corp. v. City of Sunnyvale, Ca*, No. 17-CV-00956 (LHK), 2017 WL 2617983, at *6 (N.D. Cal. June 16, 2017) (internal quotations omitted). As detailed above, PG&E can seek compensation for whatever "taking" it is alleging by seeking a rate increase from the CPUC. Thus, California law and the regulatory scheme do provide for just compensation (assuming a "taking" is even involved).

More importantly for purposes of the Debtors' pending Motion, this Court should not address the Debtors' dubious Takings Clause argument unless it is absolutely necessary to reach that issue. Courts should "abide by the doctrine that federal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004). Accordingly, the Court should not address any federal constitutional challenge to inverse condemnation in isolation before determining whether a California court would find the Debtors liable under other theories. Finally, in the extremely unlikely event the application of inverse condemnation were determined to be a judicial taking in violation of the Fifth Amendment, any just compensation to which PG&E would be entitled would have no impact on the value of the Wildfire Claims.[5]

---

[5]     PG&E appears to contend that it would be a taking if both of the following facts exist: (1) it is liable for inverse condemnation, but (2) PG&E is not allowed to add the liability to rates. Even if PG&E were correct (and for the reasons stated above, it is not), depriving California homeowners of the constitutional protection against the

**C.    The Debtors Ask the Court to Take Unprecedented Actions in Disallowing Billions of Dollars of Tubbs Wildfire Claims.**

The Debtors ask this Court to estimate thousands of Tubbs Fire claims, worth billions of dollars, at zero.  (Mot. at 21.)  This is an abuse of the estimation process.  The purpose of an estimation is to value claims based on the likely outcome of a state court or jury finding on liability.  If PG&E were not in bankruptcy, it would be subject to serial trials on its liability for the Tubbs Fire.  There is substantial evidence that PG&E equipment caused the Tubbs Fire, including video footage of an arc flash that could only have been caused by a high-voltage electrical event on PG&E's distribution system—the type of electrical event known to start fires.  Even if the Debtors could create doubt around this issue, the purpose of an estimation is to assess the Debtor's likely liability, not decide that a set of multi-faceted, multi-billion dollar claims which drove the debtor into bankruptcy in the first place, are worth nothing.

None of the cases cited by the Debtors for the proposition that "[g]roups of claims that have no merit as a matter of law should be estimated at zero" advance their position.  Those cases involved either highly speculative or previously adjudicated claims, or as in *Bittner v. Borne Chemical Co.,* 691 F.2d 134 (3d Cir. 1982), claims that were estimated at zero only *temporarily* pending later adjudication in state court.  *Id.*  The Debtors provide no authority for this Court to estimate at zero the thousands of claims stemming from the Tubbs Fire, essentially finding that, in hypothetical state court trials, none of the claimants would be successful.  What Debtors are asking the Court to do is unprecedented.

Indeed in one of the Debtors' mass tort examples, the Court did just the opposite of estimating aggregate liability for tort claims at zero.  In *In re Garlock Sealing Technologies, LLC*, the court stressed that the "estimation process requires a pure (or more academic) analysis of [debtor's] 'liability' to claimants, which must be estimated as of [debtor's] petition date and pursuant to state law."  504 B.R. 71, 94-95, 97 (Bankr. W.D.N.C. 2014) (estimating aggregate

---

catastrophic taking of their homes by fires caused by PG&E's equipment would be an unnecessary and inappropriate "remedy."  A more appropriate remedy would be to allow PG&E to add its liability to rates so long as it was a prudent manager, as California law permits.

current and future mesothelioma liability at $125 million using publicly reported mesothelioma verdicts and factors such as the debtor's potential share of the award, and the likelihood of the claimant's recovery). The only claims that court valued at zero were individuals who asserted no exposure to the company's products. *Id.* at 96.

*Ryan v. Loui* (*In re Corey*), which Debtors also cite, is inapposite. 892 F.2d 829 (9th Cir. 1989). There, the Ninth Circuit held that the district court's estimation of claims at zero was appropriate because of their "highly speculative nature," emphasizing that the same issue had been "litigated vigorously for nearly two decades in various bankruptcy proceedings and in the state courts . . . ." The single plaintiff's personal injury and property damage claims at issue in *Grzybowski v. Aquaslide 'N' Dive Corp.* (*In re Aquaslide 'N' Dive Corp.*), 85 B.R. 545, 546 (B.A.P. 9th Cir. 1987), were equally speculative, given that "[t]he slide in question contained no identification, no serial number, no manufacturer's name or other identifying marks which would designate a specific manufacturer." In sum, estimating a claim at zero—and thus effectively disallowing the claim—is reserved for those few cases where the claim suffers from facially apparent legal and factual deficiencies.

Moreover, it would be inefficient to estimate the Debtors' liability for the Tubbs claims in one proceeding and then separately estimate the Debtors' liability for all the other Wildfire Claims months later in a separate proceeding. The question of PG&E's liability for the Tubbs Fire is inextricably linked to the question of its liability for other fires, whether on the basis of negligence or another theory, presenting such overlapping questions as whether:

- PG&E was aware that its infrastructure was aging, unsafe, likely to cause fires, and vulnerable to environmental conditions, but still failed to properly construct, maintain, monitor, repair and replace its electrical equipment (McCallen Decl. Ex. 3 (Master Complaint–Subrogation Plaintiffs, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Mar. 12, 2018)) ¶ 4);

- PG&E was on notice of the danger posed by its equipment and infrastructure, having been repeatedly fined and convicted for crimes for causing wildfires and other disasters by failing to mitigate risks (*Id.* ¶ 5); and

- PG&E can be held liable for failing to de-energize powerlines in adverse conditions. (*Id.* ¶ 196).

19

Moreover, the Debtors ask the Court to separate out and estimate at zero all Tubbs Fire claims—which represent about two-thirds of the Debtors' potential liability from the 2017 fires according to them. The TCC contests that this Court has the authority to do so because they argue that the Debtors effectively ask the Court to limit the size of the distribution available to personal injury and wrongful death plaintiffs. (*Amended Memorandum of Points and Authorities in Support of the Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* [Docket No. 2855] at 11-14 (hereinafter "**TCC Memorandum**").)

The Debtors sidestep this issue in their Motion, arguing that whether estimation of personal injury claims for distribution is impermissible "is not an issue the Court needs to address on this Motion" because all that they propose is estimation for "voting and plan feasibility." (Mot. at 15.) The Debtors seem to concede that the Court may not be able to estimate personal injury claims for purposes of distribution, but do not explain how their proposal helps the Court solve this problem, as opposed to leading to the potential for multiple estimation proceedings—one on voting and plan feasibility and a second proceeding (perhaps in another court) for allowance purposes, which is a tremendously inefficient result.

In sum, the Debtors have offered no sound reason to split the proposed estimation proceeding before this Court into three phases, two of which (inverse condemnation and liability for the Tubbs Fire) will take place before the Bar Date; two of which (liability for the Tubbs Fire and liability for all of the other fires) will involve overlapping evidence; and one of which (inverse condemnation) will involve an unprecedented and dubious effort to have a federal court overrule a consistently applied principle of California constitutional law, as well as a federal constitutional challenge to that principle, both of which may be obviated, in whole or in part, by proceedings in another phrase. Clearly, the Debtors' estimation proposal was designed to promote a strategic advantage, not to implement the most efficient estimation process. For at least the reasons discussed above, the Debtors' proposal for a three-phase proceeding is

unworkable and should be rejected.

## II. THE COURT SHOULD CONDUCT A SINGLE ESTIMATION PROCEEDING USING AS A CRITICAL DATA POINT A SINGLE BELLWETHER TRIAL OF THE TUBBS PREFERENCE PLAINTIFFS.

The primary stakeholders in these cases agree that the key disputed issue standing in the way of an agreement on the size of Wildfire Claims (for both individual plaintiffs and subrogation claimholders) is the extent of PG&E's liability for the Tubbs Fire. The question whether PG&E's equipment caused the Tubbs Fire is no minor issue. The Tubbs Fire resulted in twenty-two deaths, along with 36,087 acres burned, and more than 5,600 structures destroyed or damaged. (Mot. at 9-10.) As matters now stand, the Debtors are asking the Court to make that causation assessment in the context of a Section 502(c) estimation proceeding without the benefit of any state court findings, and without the benefit of any jury having heard the evidence of causation, as would have occurred without a bankruptcy filing. It would be unwise to adopt Debtors' proposed estimation plan when there is a very real possibility that a bellwether Tubbs Fire trial could proceed in parallel in state court and conclude in sufficient time for the Court to consider the result when estimating the value of the Tubbs Fire claims.

The TCC state law preference plaintiffs are entitled to a trial under California Code of Civil Procedure Section 36, which mandates that the court "shall set the matter for trial" within 120 days of granting the preference motion, and that there shall be "no continuance beyond 120 days" unless for physical disability or good cause. *See* Cal. Civ. Proc. Code § 36. The California rules dictate that a continuance must be limited to 15 days, and there can only be one such continuance for physical disability. *Id.* It is pure speculation by the Debtors to say that the preference motion would not be granted, or that the statutory time-frame will not be complied with. Notably, Debtors have it in their power to take steps that would help ensure deadlines were met, and this Court could encourage them to do so.

Given that 120 days from the August 14, 2019 hearing is mid-December, assuming the lift stay and preference motions are granted promptly, we would expect trial to be set in late

December or January. The TCC and Ad Hoc Subrogation Group believe such a trial can be conducted within four weeks (or 45 hours per side). The state court would be aware of the legislative deadline of June 30, 2020, and certainly would take those steps in its power to help the parties meet that deadline.

The fact that the state court set the Atlas Fire to be tried first before these bankruptcy cases were filed does not change the equation. In the pre-bankruptcy landscape, when the trial court was administering thousands of claims, the cause of the Atlas Fire was still a matter of dispute, and the court's decision was based at least in part on the fact that Atlas presented a simpler causation trial than Tubbs. (*See supra* p. 7.) Now that the Debtors have stated they will concede causation of the Atlas Fire, the largest impediment to restructuring PG&E is determining its liability for the Tubbs Fire, and the thousands of additional actions that are on the state court's docket are stayed. Thus, the calculus has changed entirely, and the state court would have every incentive to assist in resolving the key open issue in the bankruptcy, which could help foster a consensual resolution of all the 2017 and 2018 Wildfire Claims still pending on its docket.

The Ad Hoc Subrogation Group asks the Court to weigh the potential benefits and costs of lifting the stay. The benefits are obvious and substantial. The TCC has argued that estimating its constituents' personal injury and wrongful death claims in a way that caps the amount available to claimants is inconsistent with governing law. (TCC Memorandum at 14-16.) If the Court conducts an estimation proceeding over the TCC's objection, it increases the likelihood of subsequent appeals which, if successful, could impede the Debtors' ability to confirm a plan by June 2020.

The Court need not reach these complex jurisdictional questions, however, to conclude that lifting the stay is the best method to push these cases toward resolution. Lifting the stay could lead to a global settlement of the Wildfire Claims, either before or after a jury verdict. And if the case does not settle, the Court will have lost nothing but may gain something invaluable: a jury's finding on the Debtors' liability for the Tubbs Fire. In any future estimation

Case: 19-30088    Doc# 3419    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 27 of 30

proceeding, such a finding would be the most valuable data point obtainable for determining the liability that the Debtors would have faced in state court absent a bankruptcy filing. *Owens Corning*, 322 B.R. at 721-22; *Garlock Sealing Techs*., 504 B.R. at 94-95.

Concerns about whether an estimation proceeding might result in a *de facto* cap on tort claimants' and other wildfire victims' recoveries are matters that can be addressed in the context of plan structure and approval post-estimation. It is quite possible that if an estimation proceeding is conducted on terms that incorporate the TCC's concerns by permitting a concurrent state court trial on Tubbs Fire claims, the parties will have enough certainty about the value of the Wildfire Claims to reach a consensual resolution and plan, or at least agree on the scope of estimation proceedings to be held in this Court.

While the benefits of lifting the stay are real, the costs of permitting a parallel-tracked state court trial are illusory. Several objectors to the lift stay motions argue that lifting the stay would not result in complete, or even partial, resolution of the Tubbs liability issue because if the Debtors win a state court trial, other litigants would not be bound by that determination, and if the Debtors lose, the law of collateral estoppel would not bind Debtors until all appeals were exhausted. (Debtors' Objection to Lift Stay Motions [Docket No. 3104] at 9; UCC Objection to Lift Stay Motions [Docket No. 3101] ¶ 24; Noteholders' Joinder to UCC Objection to Lift Stay Motions [Docket No. 3106] ¶ 4.) This argument is a red herring. The purpose of the lift stay motions is not to obtain a final, non-appealable judicial determination of all wildfire liability—something that could never happen before June 2020. Rather, the import of a state court jury determination of Tubbs liability is that it will provide a critical data point, which both individual and subrogation claimants would be entitled to outside of bankruptcy court, for the parties and the Court in determining the value of the Tubbs Fire claims, either through estimation or settlement.

## III. THE COURT SHOULD ORDER THE PARTIES TO MEET AND CONFER ON THE STRUCTURE OF A SINGLE ESTIMATION PROCEEDING.

The Debtors' proposal to conduct a disjointed, three-phase estimation proceeding is

Case: 19-30088    Doc# 3419    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 28 of 30

inefficient, cumbersome and raises statutory and constitutional concerns. The Ad Hoc Subrogation Group urges the Court instead to schedule a single estimation proceeding following the passage of the Bar Date and after a state court adjudication of PG&E's liability for the Tubbs Fire. While the state court proceeding is pending, the parties can utilize the time to prepare for the estimation proceeding. That proceeding will most likely have to address, in some fashion, issues related to the Tubbs Fire, given that the vast majority of the subrogation and individual claimants will not be parties to the state court trial. But the extent of the evidence that is heard in an estimation proceeding, including related to the Tubbs Fire, can be determined by the Court in proceedings leading up to the hearing, with the benefit of pretrial briefing by the parties and the knowledge that is gained from discovery and the state court proceedings in the interim.[6]

In the short term, the Court should order the TCC, the Ad Hoc Subrogation Group, and the Debtors to meet and confer regarding the anticipated length, scope and necessary disclosures for a proceeding, which the Court can schedule for December or January, after the parties discuss further the scope of the state court trial and commence discovery. The parties can then present any disputes to the Court promptly, and discuss with the Court the scope of any further proceedings before it.

---

[6] At the appropriate time, the Court theoretically could bifurcate an estimation proceeding between property damage and personal injury/wrongful death claims. Here, however, bifurcation likely would not make sense because determinations of PG&E's liability for both claims turn on the same questions of law and fact, which in turn rely on the same evidence, particularly in those instances where claimants have suffered both personal injury and property damage. Again, however, this is not a determination that the Court needs to make now, but rather with the benefit of additional work by the parties here and in state court.

## CONCLUSION

For the reasons stated herein, the Court should deny the Debtors' Estimation Motion.

Dated:  August 7, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Benjamin P. McCallen*

Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email:   mfeldman@willkie.com
              jminias@willkie.com
              bmccallen@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

25