## Exhibit 3

Howard D. Maycon, Esq., SBN 183766
**COZEN O'CONNOR**
601 S. Figueroa Street
Suite 3700
Los Angeles, CA 90017
Telephone: 213.892.7900
hmaycon@cozen.com

Shawn Caine, Esq., SBN 134987
**THE LAW OFFICES OF SHAWN E. CAINE**
1221 Camino Del Mar
Del Mar, CA 92014
Tel: (619) 838-1365
scaine@cainelaw.com

Mark Grotefeld, Esq.
**GROTEFELD, HOFFMANN, SCHLEITER,
GORDON, OCHOA & EVINGER LLP**
Shepard Mountain Plaza
6034 West Courtyard Drive, Suite 200
Austin, TX 78730
Tel: (737) 226-5310
mgrotefeld@ghlaw-llp.com

Craig S. Simon, Esq., SBN 78158
**BERGER KAHN, A LAW CORPORATION**
2 Park Plaza, Suite 650
Irvine, CA 92614
Phone: (949) 474-1880
csimon@bergerkahn.com

Maura Walsh Ochoa, Esq., SBN 193799
**GROTEFELD, HOFFMANN, SCHLEITER,
GORDON, OCHOA & EVINGER LLP**
700 Larkspur Landing Circle, Suite 280
Larkspur, California 94939
Tel: (415) 344-9670
mochoa@ghlaw-llp.com

Co-Lead Counsel for Subrogation Plaintiffs

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**03/12/2018**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| Coordination Proceeding Special Title (Rule 3.550)<br><br>**CALIFORNIA NORTH BAY FIRE CASES**<br><br>_____ | Judicial Council Coordination Proceeding No. 4955<br><br>**MASTER COMPLAINT – SUBROGATION PLAINTIFFS**<br><br>Judge: Honorable Curtis E.A. Karnow<br>Department: 304<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................. 1

II. JURISDICTION AND VENUE ......................................................... 4

III. THE PARTIES.................................................................................. 4

    A. SUBROGATION PLAINTIFFS.............................................. 4

    B. DEFENDANTS ......................................................................... 5

    C. DOE DEFENDANTS ............................................................... 8

    D. AGENCY & CONCERT OF ACTION .................................. 8

IV. STATEMENT OF FACTS ............................................................... 9

    A. PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS ............................. 9

    B. PG&E'S HISTORY OF SAFETY FAILURES........................ 11

        1. PG&E'S Long History of Safety Violations.................. 11

        2. The 1981 San Francisco Gas Explosion ...................... 11

        3. The 1991 Santa Rosa Gas Explosion ........................... 11

        4. The 1994 Trauner Fire .................................................. 12

        5. The 1996 Mission Substation Electrical Fire................ 12

        6. The 1999 Pendola Fire .................................................. 13

        7. The 2003 Mission District Substation Fire .................. 13

        8. The 2004 Sims Fire ...................................................... 14

        9. The 2004 Freds Fire ..................................................... 14

        10. The 2004 Power Fire..................................................... 14

        11. The 2005 San Francisco Electrical Explosion ............. 14

        12. The 2008 Rancho Cordova Explosion ......................... 14

        13. The 2008 Whiskey Fire................................................. 15

        14. The 2009 San Francisco Electrical Explosion ............. 15

| | | | |
|---|---|---|---|
| | **15.** | The 2010 San Bruno Explosion | 15 |
| | **16.** | The 2011 Cupertino Explosion | 16 |
| | **17.** | The 2014 Carmel Explosion | 17 |
| | **18.** | The 2015 San Francisco Transformer Explosion | 17 |
| | **19.** | The 2015 Butte Fire | 17 |
| | **20.** | PG&E's Conduct After the Butte Fires Reflect Its Conscious Disregard for Public Safety. | 18 |
| C. | | THE NORTH BAY FIRES BROUGHT DEATH AND DESTRUCTION TO NORTHERN CALIFORNIA | 19 |
| D. | | THE IMPACT OF THE NORTH BAY FIRES ON THE WINE INDUSTRY | 22 |
| E. | | THE DEADLY AND DESTRUCTIVE NORTH BAY FIRES | 26 |
| | **1.** | The Atlas Fire | 26 |
| | **2.** | The Cascade/LaPorte Fires | 27 |
| | **3.** | The Cherokee Fire | 28 |
| | **4.** | The Honey Fire | 29 |
| | **5.** | The Lobo Fire | 29 |
| | **6.** | The Maacama or No Name Fire | 30 |
| | **7.** | The McCourtney Fire | 30 |
| | **8.** | The Nuns Fire | 30 |
| | **9.** | The Pocket Fire | 33 |
| | **10.** | The Point Fire | 33 |
| | **11.** | The Redwood Valley Fire | 34 |
| | **12.** | The Sullivan Fire | 35 |
| | **13.** | The Sulphur Fire | 35 |
| | **14.** | The Tubbs Fire | 37 |
| | **15.** | The 37 Fire | 37 |
| F. | | PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO CAUSING THE NORTH BAY FIRES | 38 |

1.    The 2013 Liberty Report Found that PG&E's Distribution System Presented "Significant Safety Issues" ....................................................... 38

2.    The 2013 Liberty Report Found that PG&E's Wires Were Highly Susceptible to Failure Due to Age ............................................................ 38

3.    PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment ............................................................................................................... 39

4.    PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law .................................................. 41

5.    PG&E's Unsafe Use of Reclosers .......................................................... 43

6.    PG&E's Reckless Adoption of the VMII Program Where It Paid Its Contractors to Cut Fewer Trees .................................................................. 44

7.    PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees ........... 45

8.    PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk .......................................................................... 47

9.    PG&E's "Run to Failure" Approach to Maintenance .............................. 48

10.    PG&E's Purchase of Insurance Coverage for Punitive Damages ........... 49

G.    PG&E'S CORPORATE CULTURE IS THE ROOT CAUSE OF THE NORTH BAY FIRES .................................................................................................. 50

V.    CAUSES OF ACTION ............................................................................... 52

FIRST CAUSE OF ACTION - NEGLIGENCE ............................................. 52

SECOND CAUSE OF ACTION - WRONGFUL DEATH ............................... 55

THIRD CAUSE OF ACTION - SURVIVAL ACTION .................................. 56

FOURTH CAUSE OF ACTION - INVERSE CONDEMNATION .................. 56

FIFTH CAUSE OF ACTION - PUBLIC NUISANCE .................................... 58

SIXTH CAUSE OF ACTION - PRIVATE NUISANCE .................................. 61

SEVENTH CAUSE OF ACTION - PREMISES LIABILITY ......................... 62

EIGHTH CAUSE OF ACTION - TRESPASS .............................................. 62

NINTH CAUSE OF ACTION - PRIVATE ACTION UNDER PUBLIC UTILITIES CODE §
    2106.................................................................................................................. 63

TENTH CAUSE OF ACTION - VIOLATION OF HEALTH & SAFETY CODE § 13007....... 65

VI.    PRAYER FOR RELIEF ................................................................................. 66

VII.    JURY DEMAND ........................................................................................... 68

**SUBROGATION PLAINTIFFS** bring this action for damages against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 100 (**collectively, "**DEFENDANTS**"**)** as follows:

## I.     INTRODUCTION[1]

1.      This case arises from **PG&E CORPORATION** and/or **PACIFIC GAS & ELECTRIC COMPANY's** (collectively, "**PG&E**") longstanding corporate culture of decision-making that places profits over public safety.  **PG&E's** well-documented disregard for safety regulations and risk management practices, along with their blind eye towards the use of effective maintenance and inspection practices for their facilities and equipment, lies at the root of the various factors which caused and/or contributed to causing the most destructive and deadly wildfires California has ever seen (collectively, the "North Bay Fires").

2.      On or around the night of Sunday, October 8, 2017, the North Bay Fires started when a system disturbance on the electrical grid constructed, owned, operated, managed, and/or maintained by **PG&E** caused transformers designed, constructed, owned, operated, managed, and/or maintained by **PG&E** to fail, fault, spark, and/or explode, causing energized power lines constructed, owned, operated, managed, and/or maintained by **PG&E** to burn and/or fall down. These downed lines sparked nearby vegetation, igniting fires simultaneously across multiple counties.  Other fires caused electrical currents to flow through down guys owned, designed, operated, managed and/or maintained by **PG&E**, creating arcing at ground level in dry grass. The arcing from down guys at or around ground level sparked fires in and around vegetation. All of these events, and others, including but not limited to conductors, poles, insulators,

---

[1] The Master Complaint filed on behalf of Individual Plaintiffs contained 283 numbered paragraphs with 11 Causes of Action.  Many of the Individual Plaintiffs are insured with one or more of the Subrogation Plaintiffs, and therefore Subrogation Plaintiffs "stand in the shoes" of their insureds under the law of subrogation.  To make it easier on the Court, Subrogation Plaintiffs have mirrored the Master Complaint of the Individual Plaintiffs where possible.  The Individual Plaintiffs' Master Complaint Second Cause of Action-Wrongful Death, Third Cause of Action-Survival Action, Seventh Cause of Action-Premises Liability, and Eleventh Cause of Action-Negligent Infliction of Emotional Distress have been omitted from this Master Complaint as not applying to the Subrogation Plaintiffs. Again, to make it more convenient for the Court, the Causes of Action alleged herein match by number the Causes of Action alleged by the Individual Plaintiffs.

reclosers, and/or other electrical equipment constructed, owned, operated, managed, and/or maintained by **PG&E** that fell down, broke, failed, sparked, exploded, and/or came into contact with vegetation, caused and contributed to causing the North Bay Fires. Although the numerous fires constituting the North Bay Fires have different points or origin, they all share the same underlying causes and arose from **PG&E's** disregard of mandated safety practices and foreseeable hazardous risks associated with its infrastructure.



**PG&E Equipment on October 9, 2017, in Fountaingrove, a Neighborhood Decimated by the Tubbs Fire[2]**

3.     Over the following days, the North Bay Fires spread rapidly and caused extensive damage throughout Northern California, including populated neighborhoods and sprawling vineyards. The North Bay Fires claimed the lives of at least 44 individuals, injured many others, burned over 245,000 acres, and destroyed over 14,700 homes. The following fires in Sonoma, Napa, Mendocino, Solano, Lake, Butte, Calaveras, Nevada, and Yuba Counties are collectively referred to as the North Bay Fires, including: the Adobe, Atlas, Cascade, Cherokee, Honey,

---

[2] http://www.mercurynews.com/2017/10/25/pge-missed-electricity-inspections-violated-safety-rules-in-bay-area-including-north-bay-audits/ (last accessed February 2, 2018).

1  LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point,

2  Pressley, Redwood Valley, Potter, Sulphur, Tubbs, Sullivan, and the 37 Fire.



**Map of the North Bay Fires[3]**

4.      As set forth in more detail in the following pages, based on multiple reports, audits, investigations, and/or interviews, it is clear that the North Bay Fires were an inevitable byproduct of **PG&E's** disregard of public safety.  **PG&E**, although mandated to do so, failed to identify, inspect, manage, and/or control vegetation growth near its power lines and/or other electrical equipment.  This created a foreseeable danger of trees and/or other vegetation coming into contact with **PG&E's** power lines and/or other electrical equipment and causing electrical problems.  Further, **PG&E** failed to construct, manage, track, monitor, maintain, operate, replace, repair, and/or improve its power lines, poles, transformers, conductors, insulators,

[3] Derived from Cal Fire map at http://www.fire.ca.gov/general/firemaps (last accessed February 12, 2018).

reclosers, and/or other electrical equipment in a safe manner, despite being aware that its infrastructure was aging, unsafe, likely to cause fires, and/or vulnerable to environmental conditions.

5. **PG&E** knew about the significant risk of wildfires and other disasters from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the North Bay Fires began and, as described below, has been repeatedly fined and/or convicted of crimes for causing wildfires, explosions, and other disasters by failing to mitigate these risks.

6. Wildfires, explosions, and other devastating events have resulted from **PG&E's** long history of choosing to divert funds from its public safety, vegetation management, and/or infrastructure maintenance programs to instead line its own corporate pockets.

## II. <u>JURISDICTION AND VENUE</u>

7. This Court has jurisdiction over this matter pursuant to Code of Civil Procedure §§ 395(a) and 410.10 because Defendants, and/or each of them, reside in, are incorporated in, and/or do significant business in the County of San Francisco, State of California. The amount in controversy exceeds the jurisdictional minimum of this Court.

8. Venue is proper in this Court pursuant to Code of Civil Procedure § 404.3 and California Rules of Court, Rule 3.540. The Honorable Curtis E.A. Karnow of the Superior Court of California, County of San Francisco was assigned as the Coordination Trial Judge for this action.

## III. <u>THE PARTIES</u>

### A. **SUBROGATION PLAINTIFFS**

9. **SUBROGATION PLAINTIFFS**[4] in this case were and are insurers authorized to carry on the business of insurance within the State of California as an insurance company. The insured(s) of **SUBROGATION PLAINTIFFS** owned property that suffered damages by

---

[4] The plural term "Subrogation Plaintiffs" is used for ease of reference. One insurance company could file an adoption form incorporating the terms of this Master Complaint, and the plural term applies equally to the single insurer.

the North Bay Fires, including but not limited to the Adobe, Atlas, Cascade, Cherokee, Honey, LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Pressley, Redwood Valley, Potter, Sulphur, Tubbs, Sullivan, and/or 37 Fire.  As a result of the North Bay Fires, **SUBROGATION PLAINTIFFS** have paid and/or will pay money to their respective insured(s) under their policies of insurance for losses caused by the North Bay Fires. Such payments include, but are not limited to repair of real and personal property, replacement of real and personal property, additional living expenses, loss of use and business interruption. The money was paid to their insured(s) pursuant to various homeowners, automobile, business/commercial and property insurance policies.  This action seeks recovery of amounts paid, and to be paid, by **SUBROGATION PLAINTIFFS** to their insured(s).  **SUBROGATION PLAINTIFFS** who are obligated to make payments or have made payments to their insured(s) are equitably subrogated to the rights of their insured(s), "stand in their shoes," and are entitled to bring this claim for payments made or to be made.  **SUBROGATION PLAINTIFFS** investigated, adjusted and paid, and may in the future pay, said damage, injury and loss, consistent with its policies of insurance and its obligations under law, and said payments were not voluntary.  **SUBROGATION PLAINTIFFS'** damages are in a liquidated sum; the amount paid to their insureds.  **SUBROGATION PLAINTIFFS'** insureds have an existing, assignable cause of action against **DEFENDANTS**, which the insureds could have asserted for their own benefit had they not been compensated for their losses by **SUBROGATION PLAINTIFFS**.  As such, **SUBROGATION PLAINTIFFS** have suffered damages caused by an act or omission of **DEFENDANTS**, and **SUBROGATION PLAINTIFFS** have equitable and/or legal subrogation rights against **DEFENDANTS** herein, to the extent of payments made.  Justice requires that the loss be entirely shifted from **SUBROGATION PLAINTIFFS** to **DEFENDANTS**, whose equitable position is inferior to that of **SUBROGATION PLAINTIFFS**.

**B.    DEFENDANTS**

10.    At all times herein mentioned Defendants **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** were corporations authorized to do business and doing business in the State of California with their principal place of business in the County of

San Francisco, State of California. Defendant **PG&E CORPORATION** is an energy-based holding company headquartered in San Francisco. It is the parent company of Defendant **PACIFIC GAS AND ELECTRIC COMPANY**. **PG&E CORPORATION** and **PACIFIC GAS AND ELECTRIC COMPANY** provide public utility services, including the generation of electricity and the transmission and distribution of electricity and natural gas to millions of customers in Northern and Central California, including the residents of Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and Yuba Counties.

11. **SUBROGATION PLAINTIFFS** allege that **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** are jointly and severally liable for each other's wrongful acts and/or omissions as hereafter alleged, in that:

    a. **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** operate as a single business enterprise operating out of the same building located at 77 Beale St, San Francisco, California for the purpose of effectuating and carrying out **PG&E CORPORATION's** business and operations and/or for the benefit of **PG&E CORPORATION**;

    b. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose;

    c. **PACIFIC GAS & ELECTRIC COMPANY** is so organized and controlled, and its decisions, affairs and business so conducted as to make it an instrumentality, agent, conduit and/or adjunct of **PG&E CORPORATION**;

    d. **PACIFIC GAS & ELECTRIC COMPANY's** income contribution results from its function, integration, centralization of management and economies of scale with **PG&E CORPORATION**;

    e. **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and management are intertwined and do not act completely independent of one another;

f. **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and managers act in the interest of **PG&E CORPORATION** as a single enterprise;

g. **PG&E CORPORATION** has control and authority to choose and appoint **PACIFIC GAS & ELECTRIC COMPANY's** board members as well as its other top officers and managers;

h. Despite both being Electric Companies and Public Utilities, **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not compete with one another, but have been structured, organized, and businesses effectuated so as to create a synergistic, integrated single enterprise where various components operate in concert one with another;

i. **PG&E CORPORATION** maintains unified administrative control over **PACIFIC GAS & ELECTRIC COMPANY**;

j. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are insured by the same carriers and provide uniform or similar pension, health, life and disability insurance plans for employees;

k. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified 401(k) Plans, pensions and investment plans, bonus programs, vacation policies and paid time off from work schedules and policies;

l. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** invest these funds from their programs and plans by a consolidated and/or coordinated Benefits Committee controlled by **PG&E CORPORATION** and administered by common trustees and administrators;

m. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified personnel policies and practices and/or a consolidated personnel organization or structure;

n. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified accounting policies and practices dictated by **PG&E**

LEGAL\34788396\1
7

**CORPORATION** and/or common or integrated accounting organizations or personnel;

o. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are represented by common legal counsel;

p. **PG&E CORPORATION's** officers, directors, and other management make policies and decisions to be effectuated by **PACIFIC GAS & ELECTRIC COMPANY** and/or otherwise play roles in providing directions and making decisions for **PACIFIC GAS & ELECTRIC COMPANY**;

q. **PG&E CORPORATION's** officers, directors, and other management direct certain financial decisions for **PACIFIC GAS & ELECTRIC COMPANY** including the amount and nature of capital outlays;

r. **PG&E CORPORATION's** written guidelines, policies, and procedures control **PACIFIC GAS & ELECTRIC COMPANY**, its employees, policies, and practices;

s. **PG&E CORPORATION** files consolidated earnings statements factoring all revenue and losses from **PACIFIC GAS & ELECTRIC COMPANY** as well as consolidated tax returns, including those seeking tax relief; and/or, without limitation; and

t. **PG&E CORPORATION** generally directs and controls **PACIFIC GAS & ELECTRIC COMPANY**'s relationship with, requests to, and responses to inquiries from, the Public Utilities Commission and uses such direction and control for the benefit of **PG&E CORPORATION**.

**C.    DOE DEFENDANTS**

12.    The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants **DOES 1 through 100**, inclusive, are unknown to **SUBROGATION PLAINTIFFS** who therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474. **SUBROGATION PLAINTIFFS** further allege that each of said fictitious Defendants is in some manner responsible for the acts and occurrences hereinafter set

LEGAL\34788396\18

forth. **SUBROGATION PLAINTIFFS** will amend this Master Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible.

### D. AGENCY & CONCERT OF ACTION

13. At all times herein mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified and approved the acts of each of the remaining **DEFENDANTS**. Each of the **DEFENDANTS** aided

and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **SUBROGATION PLAINTIFFS** and the insured(s) of **SUBROGATION PLAINTIFFS** as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## IV. STATEMENT OF FACTS

### A. PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS

14. **PG&E** owns, installs, constructs, operates, and maintains overhead power lines, together with supporting poles and appurtenances throughout Northern and Central California for the purpose of transmitting and distributing electricity to the general public. These lines and equipment were located at and around the origin points for the North Bay Fires.

15. Electrical infrastructure is inherently dangerous and hazardous, and **PG&E** recognizes it as such. The transmission and distribution of electricity requires **PG&E** to exercise an increased level of care in line with the increased risk of associated danger.

16.     At all times **PG&E** had and continues to have a duty to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment.   **PG&E** also has a duty to keep vegetation properly trimmed and maintained to prevent foreseeable contact with its electrical equipment.

17.     In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, **PG&E** had an obligation to comply with, *inter alia*:  (a) Code of Civil Procedure § 733; (b) Public Resource Code §§ 4292, 4293, and 4435; (c) Public Utilities Code § 451; and (d) General Order Nos. 95 and 165.

18.     California's drought years increased the risk of wildfire and consequently heightened **PG&E's** duty of care in the prevention of wildfires.  In January 2014, Governor Edmund Gerald Brown, Jr. declared a state of emergency due to California's continued drought. In June 2014, pursuant to Resolution ESRB-4, the California Public Utilities Commission ("CPUC") directed **PG&E** and all investor-owned utilities to take remedial measures to reduce the likelihood of fires started by or threatening utility facilities.[5]  In addition, the CPUC informed **PG&E** it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, agreeing to provide additional funding on top of vegetation management funding already authorized to ensure remedial measures would not go unperformed due to lack of funding.

19.     In early 2017, the CPUC issued a Fact Sheet on "**PG&E** Vegetation Management Spending," directing **PG&E** to take increased efforts to reduce fire risk due to the drought emergency:  "Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency, the declaration directed state agencies 'to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife.' The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown regarding the bark beetle infestation and resulting tree mortality remains in effect.  The CPUC

---

[5] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M096/K415/96415169.pdf (last accessed February 12, 2018).

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 16 of 74

has not rescinded ESRB-4, and work by the utilities to comply with it and the Tree Mortality Emergency continues."[6]

20.    **PG&E** knew or should have known that these statutory and regulatory standards are minimum standards.  **PG&E** knew or should have known that it has:  (a) a duty to identify vegetation that is dead, diseased, and/or dying, or that otherwise poses a foreseeable hazard to power lines and/or other electrical equipment; and (b) a duty manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire.

21.    Further, **PG&E** has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety.  These objectives could and should have been accomplished in a number of ways, including, but not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

22.    **PG&E** knew or should have known that failure to comply and conform to applicable standards and duties constituted negligence and would expose members of the general public to a risk of death, injury, and/or damage to their property.

**B.    PG&E'S HISTORY OF SAFETY FAILURES**

**1.    PG&E'S Long History of Safety Violations**

23.    Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the following fines, penalties, and/or convictions.  Despite these recurring punishments, **PG&E** refuses to modify its behavior, and has continued to conduct its business with a conscious disregard for the safety of the public, including the insured(s) of **SUBROGATION PLAINTIFFS**.

---

[6] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation %20Management%20Spending.pdf (last accessed February 12, 2018).

24.     As detailed below, the North Bay Fires are among the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations.     **PG&E** power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment.     Further, **PG&E's** deteriorating and carelessly maintained infrastructure has caused multiple disasters throughout California.

## 2.     The 1981 San Francisco Gas Explosion

25.     A **PG&E** gas main in downtown San Francisco exploded in 1981, forcing 30,000 people to evacuate.  It took workers nine hours to shut off the gas main's manual shut-off valves and stop the flow of gas that continued to feed the flames in the interim.

## 3.     The 1991 Santa Rosa Gas Explosion

26.     Two people were killed and three others were injured when a **PG&E** gas line exploded in Santa Rosa in December 1991.  The pipeline was improperly marked, failing to give proper notice to contractors working in the area.  A contractor hit the pipe with a backhoe, causing the pipe to leak and explode several months later.

## 4.     The 1994 Trauner Fire

27.     In 1994, **PG&E's** failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California.  This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a historic schoolhouse that was built in 1868.

28.     Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that **PG&E** was supposed to keep trimmed.  Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire.  Approximately 200 of these violations involved contact between vegetation and one of **PG&E's** power lines.  As a result, on or around June 19, 1997, **PG&E** was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

Case: 19-30088     Doc# 3419-4     Filed: 08/07/19     Entered: 08/07/19 14:44:55     Page 18
of 74

29. After the trial, a 1998 CPUC report revealed that **PG&E** diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994. During that same time, **PG&E** under spent its authorized budgets for maintaining its systems by $495 million and instead, used this money to boost corporate profits. Despite this public outing, **PG&E** continued its corporate culture of putting profits before safety.

### 5. The 1996 Mission Substation Electrical Fire

30. At approximately 1:00 a.m. on November 27, 1996, a cable splice at **PG&E's** Mission Substation in San Francisco short-circuited, burning and melting the insulation around the splice. Smoke from the fire rose through a floor opening above the splice into a switch cabinet. That smoke was so thick that it caused a flashover between phases of the bus bars connecting the overhead N bus to the switch. This caused insulation on the N bus to ignite and a circuit breaker to open, resulting in the loss of power to a group of **PG&E** customers. The substation was unmanned at the time and the fire was only discovered by chance by an employee who had stopped by the substation to use the restroom.

### 6. The 1999 Pendola Fire

31. A rotten pine, which the federal government determined **PG&E** should have removed, fell on a power line, starting the Pendola Fire in 1999. It burned for 11 days and scorched 11,725 acres, mainly in the Tahoe and Plumas National Forests. **PG&E** paid a $14.75 million settlement to the U.S. Forest Service in 2009. That year, the utility also reached a $22.7 million settlement with the CPUC after regulators found **PG&E** had not spent money earmarked for tree trimming and removal toward those purposes.

### 7. The 2003 Mission District Substation Fire

32. In December 2003, a fire broke out at **PG&E's** Mission District Substation in San Francisco. Despite signs of trouble appearing at control centers, the fire burned for nearly two hours before **PG&E** operators showed up at the Substation, found it full of smoke, and finally called the fire department. The source of the fire was not located until five hours after it began. As a result, nearly one-third of San Francisco's residents and business owners lost power, with some waiting over 24 hours for their power to be restored.

33.     The CPUC report of the investigation, which was released in 2004, illustrated **PG&E's** careless approach to safety and apparent inability to learn from its past mistakes.   An excerpt from the report describes the following:

> Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's Consumer Protection and Safety Division] discovered that another fire had occurred at Mission Substation in 1996. CPSD's investigation team conducted a thorough analysis of both fires and found strikingly similar contributing factors and root causes.  CPSD's team further determined that **PG&E** had not implemented the recommendations resulting from its own investigation of the 1996 fire. . . .**CPSD finds it quite troubling that PG&E did not implement its own recommendations from its own investigation of the 1996 fire**.[7]

The findings related to the Mission Substation Fire should have been a wake-up call to **PG&E** to revamp its operating procedures to prevent future disasters.  Instead, **PG&E's** focus remained on corporate profits, while safety was relegated to the backburner.

### 8.     The 2004 Sims Fire

34.     In July 2004, the Sims Fire burned over 4,000 acres of forest land in the Six Rivers and Trinity National Forests.  A federal lawsuit alleged that **PG&E** failed to remove a decaying tree, which fell on a transmission line and ignited the blaze.

### 9.     The 2004 Freds Fire

35.     The Freds Fire started in October 2004 near Kyburz, El Dorado County, California.  A lawsuit filed by the United States Government claimed that employees of **PG&E's** contractor lost control of a large tree they were cutting down.  It fell onto a **PG&E** power line and caused a fire that burned over 7,500 acres.  **PG&E** and its contractors paid $29.5 million to settle the lawsuits over the Freds Fire and the Sims Fire.

### 10.     The 2004 Power Fire

36.     In October 2004, the Power Fire burned approximately 17,000 acres on the Eldorado National Forest and on private timberlands.  A federal lawsuit alleged that the Power Fire was ignited by a lit cigarette that was dropped by a **PG&E** tree trimming contractor.  **PG&E** and its contractor paid the federal government $45 million to settle the lawsuit.

---

[7] http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF (last accessed February 12, 2018).

## 11. The 2005 San Francisco Electrical Explosion

37.     In August 2005, a **PG&E** electrical transformer exploded in the San Francisco financial district at Kearny and Post Streets, severely burning a woman who had been walking by.  A lawsuit by the injured woman settled for an undisclosed sum.

## 12. The 2008 Rancho Cordova Explosion

38.     In December 2008, a gas leak from a **PG&E** pipe caused an explosion in Rancho Cordova, California.  This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

39.     A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by incorrect repairs performed by **PG&E** in 2006, at which time **PG&E** installed a piece of pipe to patch up an earlier leak.  The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that **PG&E** failed to timely send properly trained personnel to check out the leak, even though **PG&E** had been told several months earlier that its emergency plans fell below required standards.  Specifically, the report noted the following:

> Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public.[8]

40.     In November 2010, the CPUC filed administrative charges against **PG&E** in connection with the Rancho Cordova explosion, alleging that **PG&E** was at fault for the blast and that **PG&E** should have discovered the improper repair job that caused the explosion, but failed to timely do so.  As a result, the CPUC required **PG&E** to pay a $38 million fine.

## 13. The 2008 Whiskey Fire

41.     The June 2008 Whiskey Fire burned more than 5,000 acres of land in the Mendocino National Forest.  The fire started when a gray pine tree that did not have the required

---

[8] http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm (last accessed February 12, 2018).

clearance from a **PG&E** transmission line came into contact with the line. **PG&E** and its contractors agreed to pay $5.5 million to settle a federal lawsuit.

### 14. The 2009 San Francisco Electrical Explosion

42. In June 2009, a **PG&E** underground electrical vault exploded in San Francisco's Tenderloin neighborhood, sending 30-foot flames and smoke into the air for two hours. This explosion left thousands of people without power.

### 15. The 2010 San Bruno Explosion

43. On September 9, 2010, **PG&E's** continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on **PG&E's** poor management of its pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) **PG&E's** inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) **PG&E's** inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

44. As a result, **PG&E** was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC slapped **PG&E** with a $1.6 billion fine for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted **PG&E** of six felony charges and ordered it to pay $3 million in fines for causing the explosion.

45. Due to **PG&E's** corporate culture which repeatedly ignored public safety, the **CPUC** launched an investigation into the manner by which **PG&E** officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President called out **PG&E's** ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into **PG&E's** actions and operations, including the

---

investigations we voted on today, federal grand jury, and California Department of Justice investigation, **continued safety lapses at PG&E continue to occur**.[9]

### 16. The 2011 Cupertino Explosion

46. After the San Bruno explosion, in September 2011, **PG&E** caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

47. Prior to the explosion, the manufacture of Aldyl-A, the NTSB, and the federal Pipeline and Hazardous Materials Safety Administration had all issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least 2002. Despite these warnings and **PG&E's** knowledge of this risk, **PG&E** did nothing to prevent the explosion. Although some utilities around the United States had been replacing Aldyl-A pipes, **PG&E** did not have a replacement program to phase them out and adequately protect the public.

### 17. The 2014 Carmel Explosion

48. In March 2014, a home in Carmel, California was destroyed due to a gas explosion caused by **PG&E**. Prior to the explosion, **PG&E** was attempting to replace a gas distribution line, but **PG&E's** legally inadequate records did not show that the steel pipe had a plastic insert. When crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced, allowing gas to leak through the pipe and into the residence.

49. The CPUC once again required **PG&E** to pay a massive fine because of their wrongdoing. In August 2016, the CPUC imposed a $25.6 million fine on **PG&E**. With a $10.85 million citation previously paid by **PG&E** in 2015 for the explosion, **PG&E** was require to pay a total of over $36 million in penalties for its shoddy recordkeeping and disregard of public safety.

### 18. The 2015 San Francisco Transformer Explosion

---

[9] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/ Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnfor cementTheory.pdf (last accessed February 12, 2018).

50.     In September 2015, a **PG&E** underground transformer exploded in San Francisco's Bernal Heights neighborhood.  This explosion injured two people, one of them critically.

### 19.     The 2015 Butte Fire

51.     Tragedy struck yet again in September 2015, when **PG&E's** inadequate and ineffective vegetation management programs resulted in the Butte Fire in the Sierra foothills. The Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed 921 homes and/or structures, and charred over 70,000 acres.

52.     Similar to the other disasters caused by **PG&E's** wrongdoing, the Butte Fire could have been prevented by **PG&E**.  The Butte Fire was ignited by a gray pine tree that grew and came into contact with one of **PG&E's** power lines.  **PG&E** knew that gray pines posed the highest risk of catastrophic wildfires, but failed to identify and/or remove the dangerous tree pursuant to its vegetation management practices.   Instead, **PG&E** removed the two trees surrounding the gray pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact with **PG&E's** power line.  Indeed, in **PG&E's** prepared testimony to the CPUC's Safety Model Assessment Proceeding, dated May 1, 2015, the company expressly stated that it was accepting the risk posted by outages in the range of 17 per 1,000 miles, less than 0.02 percent of trees in contact with its lines, and a small number of wildfires caused by **PG&E** equipment each year.  As such, **PG&**E consciously chose not to mitigate those risks further, thereby exposing Plaintiffs to the risk of wildfire.

53.     Subsequent to the Butte Fire, in April 2017, the CPUC fined **PG&E** a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation.  Cal Fire also sent **PG&E** a bill for $90 million to cover state firefighting costs.  Despite these consequences, **PG&E** did not change, revise, or improve any of its vegetation management practices after the Butte Fire, paving the way for another massive wildfire.

/ / /

/ / /

1  ///

2  ///

3  **20.** **PG&E's Conduct After the Butte Fires Reflect Its Conscious**

4  **Disregard for Public Safety.**

5  54.  The Butte Fire was not an isolated incident, as shown by **PG&E's** long history of

6  safety lapses that caused injury or death to many California residents, and destroyed or damaged

7  their property.

8  55.  The North Bay Fires started approximately two years after the Butte Fire, where a

9  44-foot tall, weak and spindly gray pine tree that should have been removed by **PG&E** struck a

10  12,000-volt overhead power line that was owned and operated by **PG&E**.  The resulting fire

11  burned for 22 days, claimed the lives of two people, burned over 70,000 acres, and destroyed 921

12  homes and/or structures.  The fire also left tens of thousands of dead or dying trees and the risk

13  of water pollution and erosion in its wake.  Thousands of people were forced to evacuate their

14  homes, and thousands were damaged in their person and property.

15  56.  **PG&E's** actions leading up to the Butte Fire illustrate its conscious disregard of

16  public safety, as follows:

17  • *First*, **PG&E chose** to not ensure that properly qualified and trained

18  inspectors were being used by its contractors to identify hazard trees.

19  • *Second*, **PG&E chose** not to verify that its quality assurance audits were

20  properly conducted.

21  • *Third*, **PG&E directed** its inspection contractor to hire inspectors that they

22  knew did not meet the minimum qualifications required by **PG&E's** own

23  specifications.

24  • *Fourth*, **PG&E chose** not to train inspectors on **PG&E's** hazardous tree

25  rating system ("HTRS").

26  • *Fifth*, **PG&E chose** not to verify that its contractor trained inspectors on the

27  HTRS.

28  • *Sixth*, **PG&E chose** not to require inspectors to use the HTRS.

- *Seventh*, **PG&E knew** that wildfires caused by contact between vegetation and its power lines posed the highest degree of risk to the public.
- *Eighth,* **PG&E knew** that its vegetation management program failed to identify over 500,000 trees annually that were closer than the required distance away from its power lines.
- *Ninth,* **PG&E knew** that its inspectors failed every year to identify tens of thousands of "facility protect trees" or "hazard trees" that were dead, diseased, and/or dying, or that otherwise posed a risk of contacting a power line.
- *Finally,* **PG&E did nothing** to remove those trees, one of which was the 44-foot tall, weak, and spindly gray pine tree that started the Butte Fire.

57.     In April 2017, the CPUC fined **PG&E** a total of $8.3 million because of the Butte Fire for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation.  Cal Fire also sent **PG&E** a bill for $90 million to cover state firefighting costs.

58.     After the Butte Fire, **PG&E** did not change, revise, or improve any of its vegetation management practices, and its managers, executives, and directors astoundingly and repeatedly testified at their depositions that none of **PG&E's** programs had failed to prevent the Butte Fire, and that none of **PG&E's** employees had done anything at all to contribute to the cause of the Butte Fire.  This blind arrogance paved the way for the future disasters that came to pass with the ignition of the North Bay Fires in October 2017.

C.      **THE NORTH BAY FIRES BROUGHT DEATH AND DESTRUCTION TO NORTHERN CALIFORNIA**

59.     On Sunday, October 8, 2017, tragedy struck communities across Northern California when a series of fires began to spark and spread.  These deadly fires quickly spread through neighborhoods and destroyed everything in their path, including residences, vegetation, structures, and businesses.

60.     The North Bay Fires are collectively the most destructive fires in California's history.  In just a few weeks, the fires caused the deaths of at least 43 people, hospitalized over 185 individuals, displaced about 100,000 people who were forced to leave their homes and search for safety, burned over 245,000 acres, and damaged or destroyed an estimated 14,700 homes, 3,600 vehicles, and 728 businesses.

61.     **PG&E** caused and/or contributed to causing the North Bay Fires.  As the North Bay Fires started to rage, emergency responders received many calls regarding electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees.[10]   Witnesses observed, reported and described downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, and unrepaired poles in the areas in and around the North Bay Fires.

62.     Following the same negligent conduct that led to the Butte Fire, **PG&E** continued to adhere to the practices that served to increase the risk of wildfires leading up to the North Bay Fires:

- Reclosers in **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions were known to be extreme.
- **PG&E** failed to have a reasonable system in place to make sure its contractors were properly performing tree and/or vegetation inspections and removal, pole clearance, and pole inspections.
- **PG&E** failed to take any steps to look for what it calls "Facility Protect Trees" (trees that pose a risk of falling into the line), even though it knew such trees were likely to exist after its contractors had performed their work.
- **PG&E** failed to properly construct its power lines and thereafter failed to take reasonable steps to make sure the poles and lines were sufficiently strong to support lines and other equipment that were added by third parties.

---

[10]  http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires

LEGAL\34788396\1
21

- **PG&E** chose to not ensure that its contractors were properly trained in tree inspections and removal.
- **PG&E** chose to not ensure that its contractors hired people who met **PG&E's** minimum qualifications.
- **PG&E** chose to not participate in the training of its contractors.

63.    **PG&E** owes the public a non-delegable duty with regard to the operation of its power lines, which includes maintenance, inspection, repair, vegetation management, and/or all other obligations imposed by the Public Utilities Code and the CPUC, specifically including, but not limited to, General Orders Numbers 95 and 165.   Even when **PG&E** chooses to hire contractors, its obligations remain non-delegable.   **PG&E's** acts and omissions, as described herein, were a cause of the North Bay Fires and/or aggravated the spread of the fires and destruction left in their path.

64.    **PG&E** responded to the North Bay Fires by acknowledging that there were problems with its electrical equipment the night the North Bay Fires began.   However, **PG&E** blamed its failing electrical equipment on winds combined with "millions of trees weakened by years of drought and recent renewed vegetation growth from winter storms."[11]   However, the fault lies with **PG&E**.   Knowing the effects of the drought on vegetation near its power lines, **PG&E** had a duty to inspect and maintain that vegetation to minimize and avoid risk of fire, injury, death and harm to the public, but **PG&E** failed to do so.

65.    At all times relevant to this action, **PG&E** had specific knowledge that the greatest risk to the public from its operations was wildfire.   **PG&E** knew that wildfire could result in death and injury to members of the public and could result in the destruction of structures and property.

---

[11] http://www.pgecurrents.com/2017/10/11/pge-statement-on-north-bay-wildfires/ (last accessed February 12, 2018).

LEGAL\34788396\1
22

66.   Despite such knowledge, **PG&E** chose to accept vegetation management that would result in 17 tree-related outages for each 1,000 miles of lines, despite knowing that such outages could result in wildfires that would cause injury, death, harm, and property destruction.

67.   **PG&E** has acknowledged and at all times relevant to this action knew that it was not adequately directing resources to its vegetation management program to reduce the risk of wildfire.  **PG&E** cited its limited resources as the reason it chose to put the public in danger, while at the same time it was receiving approximately $1,400,000,000 in profits each year.  **PG&E's** decision-making and practices resulted in numerous deaths, injuries, and damage to structures and property, just as **PG&E** knew it could when it implemented such choices and practices.

**D.    THE IMPACT OF THE NORTH BAY FIRES ON THE WINE INDUSTRY**

68.   **[INTENTIONALLY OMITTED].**

69.   **[INTENTIONALLY OMITTED].**

70.   **[INTENTIONALLY OMITTED].**

71.   **[INTENTIONALLY OMITTED].**

72.   **[INTENTIONALLY OMITTED].**

73.   **[INTENTIONALLY OMITTED].**

74.   **[INTENTIONALLY OMITTED].**

75.   **[INTENTIONALLY OMITTED].**

76.   **[INTENTIONALLY OMITTED].**

77.   **[INTENTIONALLY OMITTED].**

78.   **[INTENTIONALLY OMITTED].**

79.   **[INTENTIONALLY OMITTED].**

**E.    THE DEADLY AND DESTRUCTIVE NORTH BAY FIRES**

**1.    The Atlas Fire**

80.   The devastating Atlas Fire that tore through Napa and Solano Counties was one of California's most destructive wildfires.  The Atlas Fire killed six people, burned approximately

1  51,600 acres, and damaged or destroyed at least 571 homes, wineries, and other structures in

2  Napa and Solano counties.

3      81.    Thousands of residents were displaced and forced to flee in the dark hours before

4  dawn when the fire grew and spread. Many left on only a moment's notice, fleeing from flames

5  without their belongings, as their neighborhoods were consumed by smoke and fire.

6      82.    Cal Fire reported that the origin of the Atlas Fire was at or near Atlas Peak Road,

7  south of Lake Berryessa. Cal Fire also reported that the Atlas Fire started at or around 9:52 p.m.

8  on Sunday, October 8, 2017.[12]

9      83.    Contemporaneous calls and reports indicated trees hitting **PG&E** power lines

10 and/or problems with other electrical equipment at or around the time and place the Atlas Fire

11 started. For example, in Napa County, a live oak tree and a live oak branch fell and struck two

12 electricity distribution lines near the City of Napa.

13     84.    As described in **PG&E** Electric Safety Incident Report No. 171020-8589, at or

14 around midnight on October 19, 2017, **PG&E** identified a broken tree limb and broken field-

15 phase primary insulator on the Pueblo 1104 **PG&E** facility at or near 4011 Atlas Peak Road,

16 Napa, California. The incident report notes, "An approximately 25 foot tree limb fell from a

17 White Oak that was rooted approximately 15 feet from the distribution conductors." This

18 incident occurred the night the Atlas Fire began.[13]

19     85.    As described in **PG&E** Electric Safety Incident Report No. 171023-8596, on

20 October 21, 2017, "**PG&E** identified a 19-inch diameter Oak tree, approximately 45 feet tall,

21 that broke at the base and took down one phase of the Pueblo 1104 (12 kV) Circuit near 3683

22 Atlas Peak Road. The butt of the Oak tree was completely burned and located 10 to 15 feet from

23 the distribution conductors."[14]

24

25

26

27     [12] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1866 (last accessed February 12, 2018).

28     [13] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
       [14] *Ibid.*

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 30
                                       of 74

86.     Shortly after the fire, Cal Fire investigators were observed along Atlas Peak Road looking closely at a line of oak trees whose branches extended through overhead utility lines on the west side of the road, less than a quarter mile south of a sprawling ranch on the plateau of a Napa peak.  A twisted, fallen wire lay on the ground, surrounded by stake flags.  A broken oak branch precariously dangled overhead among the wires and other branches.[15]

### 2.     The Cascade/LaPorte Fires

87.     The Cascade and LaPorte Fires forced scores of individuals to evacuate in the dark hours before dawn as the fires grew and spread.  Many left on only a moment's notice, fleeing from flames without their belongings, as their neighborhoods were consumed by smoke and fire.  Collectively, the Cascade and LaPorte Fires killed approximately four people and destroyed over 450 structures and homes.

88.     The origin of the Cascade Fire was at or near 13916 Cascade Way, Browns Valley CA 95918.  The Cascade Fire started at or around 11:03 p.m. on Sunday, October 8, 2017, and burned approximately 9,989 acres in Yuba County.[16]

89.     Witnesses saw and/or reported trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Cascade Fire started.  For example, in the half hour before the fire began, firefighters responded to at least two trees falling into power lines and power lines falling across the road.  When emergency responders headed to the Cascade Fire, they warned each other of downed power lines to ensure firefighter safety.[17]

90.     Cal Fire reported that the origin of the LaPorte Fire was at or near 167 Darby Road, Bangor, California.  The LaPorte Fire started at or around 11:03 p.m. on October 8, 2017,

---

[15] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed February 12, 2018).
[16] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1871 (last accessed February 12, 2018).
[17] https://www.mercurynews.com/2017/10/17/yuba-countys-cascade-fire-bore-similar-hallmarks-to-wine-country-fires/ (last accessed February 12, 2018).

and burned approximately 6,151 acres in Butte County.[18]  The Cascade and LaPorte Fires merged later that week.

91.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the LaPorte Fire started.  **PG&E** Electrical Safety Incident Report No. 171013-8569 shows that at or around 11:20 p.m. on October 8, 2017, an oak tree limb broke and hit a nearby electrical wire at or near the area of origin.[19]

### 3.     The Cherokee Fire

92.     Cal Fire reported that the origin of the Cherokee Fire was at or near the intersection of Cherokee Road and Zonalea Lane in Oroville, California.  Cal Fire also reported that the Cherokee Fire started on Sunday, October 8, 2017, at or around 9:45 p.m.  The fire burned approximately 8,417 acres and destroyed 6 structures in Butte County.[20]

93.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Cherokee Fire started.  **PG&E** Electric Safety Incident Report No. 171010-8557 shows that at or around 9:45 p.m. on October 8, 2017, an incident caused a broken tree limb and wires down on the Clark Road 1102 **PG&E** facility at or near 3401 Cherokee Road, Oroville, California.  The tree was rooted approximately 15 feet from **PG&E** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[21]

### 4.     The Honey Fire

94.     Cal Fire reported that the origin of the Honey Fire was at or near the intersection of Honey Run Road and Merlin Lane, southwest of Paradise, California.  Cal Fire also reported

---

[18] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1870 (last accessed February 12, 2018).
[19] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[20] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1865 (last accessed February 12, 2018).
[21] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

**MASTER COMPLAINT – SUBROGATION PLAINTIFFS; JCCP 4955**

that the Honey Fire started on Monday, October 9, 2017, at or around 3:05 p.m. The fire burned approximately 150 acres in Butte County.[22]

95.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Honey Fire started. Witnesses observed downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, unrepaired poles, problems with other electrical equipment, and/or down trees, tree limbs, and/or other vegetation in the area in and around the Honey Fire.

### 5.    The Lobo Fire

96.    Cal Fire reported that the origin of the Lobo Fire was at or near Lone Lobo Trail near Rough and Ready, California. Cal Fire also reports that the Lobo Fire started on early Monday, October 9, 2017, at or around 12:01 a.m. The fire burned approximately 821 acres in Nevada County.[23]

97.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Lobo Fire started. **PG&E** Electric Safety Incident Report No. 171012-8565 shows that at or around 11:20 p.m. on October 8, 2917, a ponderosa pine tree fell on the Narrows 2102 **PG&E** Circuit at or near 11218 Lone Lobo Trail, Nevada City, California. The tree was rooted approximately 50 feet from **PG&E** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[24]

### 6.    The Maacama or No Name Fire

---

[22] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1880 (last accessed February 12, 2018).
[23] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1877 (last accessed February 12, 2018).
[24] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

98.     The "Maacama" or "No Name" Fire was first reported at approximately 10:01 p.m. on Sunday, October 8, 2017, and originated near Maacama Lane and Chalk Hill Road in Healdsburg just east of Maacama Creek.[25]

99.     The Maacama Fire forced two families to flee their homes shortly before they were destroyed by the fire, and burned approximately 50 acres, including sections of a vineyard.

### 7.     The McCourtney Fire

100.     Cal Fire reported that the origin of the McCourtney Fire was at or near the intersection of McCourtney Road and Highway 20 in Grass Valley, California.  Cal Fire also reported that the McCourtney Fire started on early Monday, October 9, 2017, at or around 12:00 a.m.  The fire burned approximately 76 acres in Nevada County and destroyed 13 structures.[26]

101.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the McCourtney Fire started.  **PG&E** Electric Safety Incident Report No. 171011-8563 shows that at or around 11:00 p.m. on October 8, 2017, a broken ponderosa pine tree and wire were down on the Grass Valley 1103 **PG&E** Circuit near 11253 Orion Way, Grass Valley, California.  The tree was rooted approximately 6 to 8 feet from **PG&E** distribution conductors and took down 3 primary conductors at approximately the same location as the fire origin reported by Cal Fire.[27]

### 8.     The Nuns Fire

102.     The Nuns Fire forced scores of individuals to evacuate in the dark hours before dawn as the fire grew and spread.  Many left on only a moment's notice, fleeing from flames without their belongings, as their neighborhoods were consumed by smoke and fire.  The Nuns Fire merged with the Adobe, Norrbom, Oakmont, Partrick, and Pressley Fires (collectively, the

---

[25] Cal Fire did not give the "Maacama Fire" a name.  It is also known to local residents as the "No Name Fire" due to its proximity to No Name Road.

[26] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1872 (last accessed February 12, 2018).

[27] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

"Nuns Fire"). These fires claimed two lives and destroyed approximately 1527 structures and homes.[28]

103. Cal Fire reported that the origin of the Nuns Fire was at or near Highway 12 north of Glen Ellen, California. Cal Fire also reported that the Nuns Fire started on Sunday, October 8, 2017, at or around 10:00 p.m. The fire burned approximately 56,556 acres in Napa and Sonoma Counties.[29]

104. Cal Fire also reported that the origin of the Partrick Fire, the first fire to merge with the Nuns Fire, was off Partrick Road west of Napa, California. The Partrick Fire started on Sunday, October 8, 2017, at or around 11:48 p.m. and burned in Napa County.[30]

105. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Nuns Fire started. At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees. Further, several calls reported problems with electrical equipment in the vicinity of the Nuns Fire, including a call at approximately 9:43 p.m. reporting trees and wires down and a call at approximately 10:40 p.m. reporting a blown transformer.[31]

106. **PG&E** Electric Safety Incident Report No. 171010-8558 shows that at or around 10:00 p.m. on October 8, 2017, a broken eucalyptus tree and wire was down on the Dunbar 1101 **PG&E** facility at or near 8555 Sonoma Highway near Kenwood, California. The tree was rooted approximately 50 feet from **PG&E** fallen lines, and took down 3 primary conductors.[32] Further, **PG&E** Electric Safety Incident Report No. 171016-8576 shows that at or around 1:00 a.m. on October 9, 2017, an alder tree broke at the top and fell on an open wire at or near 1210

---

[28] http://www.latimes.com/projects/la-me-northern-california-fires-structures (last accessed February 12, 2018).
[29] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1868 (last accessed February 12, 2018).
[30] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1869 (last accessed February 12, 2018).
[31] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).
[32] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

Nuns Canyon Road near Glen Ellen, California. The tree was rooted approximately 30 feet from **PG&E** overhead secondary distribution conductors.[33] The sites of these **PG&E** incidents are near or the same location as the two origin locations of Nuns Fire origin reported by Cal Fire.

107. At or around the start time of the Nuns Fire, **PG&E's** website for electrical outages reported two outages at or very near the origin of the Nuns Fire. The first outage was reported at 10:31 p.m. on October 8, 2017, stating "found a broken power pole in the area." The second **PG&E** outage at or near the origin of the Nuns Fire was reported at 11:50 p.m. on October 8, 2017, stating "found a broken power pole in the area."[34]

108. For the Partrick Fire, **PG&E** Electric Safety Incident Report No. 171020-8586 shows that on or around October 8, 2017, an oak tree fell and took down one phase of the Pueblo 2103 **PG&E** Circuit at or near 1721 Partrick Road near Napa, California. The tree was rooted approximately 44 feet from **PG&E** distribution conductors at or near the same location as the origin of the Partrick Fire reported by Cal Fire.[35] After the fire was extinguished, witnesses observed Cal Fire investigators looking at downed power lines near the suspected origin point of the Partrick Fire.[36]

109. Further, at or near the start time of the Partrick Fire, **PG&E's** website reported four separate outages at or very near the origin of the Partrick Fire. All four outages reflected the same outage cause: "found a broken power pole in the area." The date and time stamps were the same as well: 1:47 a.m. on October 9, 2017.[37]

### 9. The Pocket Fire

110. Cal Fire reported that the origin of the Pocket Fire was at or near the intersection of Pocket Ranch Road and Ridge Ranch Road in Geyserville, California. Cal Fire also reported

---

[33] *Ibid.*
[34] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no longer available on that site.
[35] *Ibid.*
[36] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed February 12, 2018).
[37] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no longer available on that site.

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 36 of 74

1   that the Pocket Fire started on early Monday, October 9, 2017, at or around 3:30 a.m. The fire

2   burned approximately 17,357 acres in Sonoma County.[38]

3       111.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines

4   and/or problems with other electrical equipment at or around the same time and place the Pocket

5   Fire started. **PG&E** Electric Safety Incident Report No. 171021-8592 shows that at or around

6   3:30 a.m. on October 9, 2017, there was a broken oak tree limb and wire down on the Cloverdale

7   1102 **PG&E** facility near the intersection of Ridge Ranch Road and Ridge Oaks Road near

8   Geyserville, California. The tree was rooted approximately 15 feet from **PG&E's** lines at

9   approximately the same location as the fire origin reported by Cal Fire.[39]

10                          **10.    The Point Fire**

11      112.    Cal Fire reported that the origin of the Point Fire was at or near the intersection of

12  Highway 26 and Higdon Road in West Point, California. Cal Fire also reported that the Point

13  Fire started on early Monday, October 9, 2017, at or around 1:10 a.m. The fire burned

14  approximately 130 acres in Calaveras County.[40]

15      113.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines

16  and/or problems with other electrical equipment at or around the same time and place the Point

17  Fire started. **PG&E** Electric Safety Incident Report No. 171009-8554 shows that at or around

18  10:00 a.m. on October 9, 2017, there was a broken tree limb and wire down on the West Point

19  1102 **PG&E** facility at or near 22894 Highway 26, West Point, California. The tree was rooted

20  approximately 50 feet from **PG&E's** distribution conductors at approximately the same location

21  as the fire origin reported by Cal Fire.[41]

22                          **11.    The Redwood Valley and Potter Fire**

23

24

25   _____

26   [38] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1883 (last accessed
     February 12, 2018).
     [39] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
27   [40] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1875 (last accessed
     February 12, 2018).
28   [41] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

114.    Cal Fire reported that the origin of the Redwood Valley Fire was north of Highway 20, west of Mendocino National Forest, and south of Black Bart, California, and that it started on October 8, 2017, at or around 11:36 p.m.  Cal Fire also reported that the origin of the Potter Fire was near Busch Lane in Pottery Valley.  The fires merged into each other and became commonly referred to as the Redwood Valley Fire or Redwood Fire.  Collectively the fires burned approximately 36,526 acres in Mendocino County, and destroyed or damaged around 588 homes and structures.[42]  The fires claimed the lives of 8 individuals, including a 14-year old boy.[43]

115.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Redwood Valley Fire and Potter Fire started.  **PG&E** Electric Safety Incident Report No. 171009-8553 shows that at or around 11:35 p.m. on October 8, 2017, there was a wire down and broken tree near structure 0/8 of the **PG&E** Potter Valley-Mendocino transmission line in Potter Valley, California.  **PG&E** found a broken tree top near the downed conductor.  The tree was rooted approximately 60 feet from **PG&E's** transmission line at approximately the same location as the fire origin reported by Cal Fire.[44]

116.    It was difficult for firefighters to access the Redwood Valley Fire and Potter Fire because of downed power lines and trees.  Local county officials reported that within 30 minutes of the fire dispatch coming in, Cal Fire dispatched every available Cal Fire unit except one, and local dispatchers fielded hundreds of calls reporting power outages and fires.[45]

### 12.    The Sullivan Fire

117.    The Sullivan Fire was first reported at approximately 12:17 a.m. on Monday, October 9, 2017, and originated near 4822 Sullivan Way in Santa Rosa, California.

---

[42] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1874 (last accessed February 12, 2018).

[43] http://krcrtv.com/archive/remembering-the-victims-8-dead-from-redwood-valley-fire (last accessed February 12, 2018).

[44] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

[45] http://www.ukiahdailyjournal.com/article/NP/20171109/NEWS/171109874 (last accessed February 12, 2018).

118.     The Sullivan Fire forced families to flee the area in the middle of the night before it destroyed several homes on Sullivan Way.

119.     Contemporaneous calls and reports indicated arcing activity or problems with **PG&E** electrical equipment at the same time and place the Sullivan Fire started. **PG&E** Electric Safety Incident Report No. 171015-8573 shows that fire damaged two structures "at or near 4818 Sullivan Way" and upon arrival at the scene, **PG&E** "noticed a possible issue with the secondary conductor."[46]

### 13.     **The Sulphur Fire**

120.     Hundreds of residents were displaced and forced to evacuate in the dark hours before dawn as the Sulphur Fire grew and spread. In Clearlake Park, residents had to be picked up off their docks by boat patrols to escape the raging flames.[47] Other residents with homes on Gooseneck Point were trapped by the fire and had to flee by rowboat. Many other residents left on only a moment's notice, fleeing from flames without their belongings, as their entire neighborhoods were consumed by smoke and fire.[48]

121.     Cal Fire reported that the origin of the Sulphur Fire was off Highway 20 at Sulphur Bank Road, Clearlake Oaks, California. Cal Fire also reported that the Sulphur Fire started on Sunday, October 8, 2017, at or around 11:59 p.m. The fire burned approximately 2,207 acres in Lake County[49] and destroyed approximately 162 homes, businesses, and outbuildings.[50]

122.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Redwood Valley Fire started. **PG&E** Electric Safety Incident Report No. 171011-8562 shows

---

[46] http://cpuc.ca.gov/pgefireincidentreports (last accessed March 9, 2018).
[47] http://www.latimes.com/local/california/la-northern-california-fires-live-clearlake-park-neighborhood-hit-hard-by-1508100783-htmlstory.html (last accessed February 12, 2018).
[48] http://abc7news.com/exclusive-sulphur-fire-victims-tell-harrowing-tale-of-driving-through-flames/2553638 (last accessed February 12, 2018).
[49] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1876 (last accessed February 12, 2018).
[50] https://yubanet.com/Fires/sulphur (last accessed February 12, 2018).

that at or around 11:55 p.m. on October 8, 2917, there were two broken poles on the Redbud 1102 **PG&E** Circuit near the intersection of Pomo Road and Sulphur Bank Road near Clearlake, California. The top section of Fuse Cutout Pole 1447 had broken and fallen to the ground. In addition, a pole one span to the west was burned and fell to the ground.[51] The site of this **PG&E** incident is approximately the same location as the fire origin reported by Cal Fire, and that at least one of these poles was rotten and riddled with woodpecker holes.

### 14. The Tubbs Fire

123. The Tubbs Fire was the most destructive of the North Bay Fires. The fire destroyed approximately five percent of Santa Rosa's housing stock, burned over 36,807 acres across Sonoma and Napa Counties, and killed at least 22 individuals.

124. Cal Fire reported that the origin of the Tubbs Fire was at or near the intersection of Highway 128 and Bennett Lane, Calistoga, California. Cal Fire also reported that the Tubbs Fire started on Sunday, October 8, 2017, at or around 9:45 p.m.[52]

125. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Tubbs Fire started. At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees. Further, several calls reported problems with electrical equipment in the vicinity of the Tubbs Fire, including a call at approximately 9:24 p.m. reporting a **PG&E** transformer explosion, a call at approximately 9:58 p.m. reporting down power lines, a call at approximately 10:14 p.m. reporting flames in trees, and a call at approximately 10:34 p.m. reporting falling power line wires.[53]

126. At or around the start time of the Tubbs Fire, **PG&E's** website for electrical outages reported two outages right next to each other at or very near the origin of the Tubbs Fire.

[51] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[52] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1867 (last accessed February 12, 2018).
[53] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).

LEGAL\34788396\1

The causes of the **PG&E** outages read: "found damaged equipment on a power pole," and "fire in the area." The start time of both outages was exactly 8:51 p.m. on October 8, 2017 – near the the reported start time of the Tubbs Fire.[54]

127.    There were multiple power lines, power poles, and associated equipment in and around the reported area of Tubbs origin. After containment of the Tubbs Fire, there was caution tape around the **PG&E** power poles located at or near Highway 128 and Bennett Lane, where the outage reports originated. There were several trees dangerously close to power poles and electrical wires coming off the poles in the area of the Tubbs origin. There was also electric equipment on the ground that appeared to have come off the poles in the area of the Tubbs origin.

### 15.    The 37 Fire

128.    Cal Fire reported that the origin of the "37 Fire" was at or near the intersection of Highway 37 and Lakeville Highway near Sonoma, California. Cal Fire also reported that the 37 Fire started on October 9, 2017, at or around 2:00 p.m., and burned approximately 1,660 acres in Sonoma County.[55]

129.    **SUBROGATION PLAINTIFFS** are informed that witnesses observed downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, unrepaired poles, problems with other electrical equipment, and/or down trees, tree limbs, and/or other vegetation in the area in and around the 37 Fire.

### F.    PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO CAUSING THE NORTH BAY FIRES

#### 1.    The 2013 Liberty Report Found that PG&E's Distribution System Presented "Significant Safety Issues"

---

[54] This quote appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but is no longer available on that site.

[55] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1882 (last accessed February 12, 2018).

130.     On May 6, 2013, a report was sent to the Safety and Enforcement Division of the CPUC from the Liberty Consulting Group who had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by **PG&E** (hereinafter the "2013 Liberty Report").[56]   The 2013 Liberty Report concluded that: "several aspects of the **PG&E** distribution system present significant safety issues."  It also found: (a) "addressing risks associated with electrical distribution components has been overshadowed by electric transmission and gas facilities;" (b) "addressing aging infrastructure and adding SCADA to the system comprise the major focuses of safety initiatives for the distribution system;" and (c) "current employee/contractor serious injury and fatality levels require significantly greater mitigation."

### 2.     The 2013 Liberty Report Found that PG&E's Wires Were Highly Susceptible to Failure Due to Age

131.     One of the first key findings of the 2013 Liberty Report was that **PG&E** had a "large amount of small size obsolete conductor remaining on **PG&E's** system."  **PG&E** has 113,000 miles of conductors, and according to the report, over 60 percent of those conductors are highly susceptible to failure.  The conductors are very small, and generally more susceptible to breaking than standard size conductors.  As a conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones.  For these reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

132.     **PG&E's** failure to replace these undersized and obsolete conductors was a proximate cause of the North Bay Fires and the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS'** harm and damages arising therefrom.

### 3.     PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment

---

[56] http://docs.cpuc.ca.gov/publisheddocs/efile/g000/m065/k394/65394210.pdf (last accessed February 12, 2018).

Case: 19-30088     Doc# 3419-4     Filed: 08/07/19     Entered: 08/07/19 14:44:55     Page 42 of 74

1     133.   **PG&E** failed to perform the necessary inspections, maintenance, repair, and/or

2 replacement of its electrical equipment.

3     134.   A 2015 audit of **PG&E's** Sonoma Division revealed that there were over 3,500

4 unfilled **PG&E** repair and maintenance requests in the area of the Tubbs Fire.[57] The volume of

5 unfilled repair and maintenance requests reflects PG&E's reckless and conscious disregard for

6 public safety in the North Bay Fire zones.

7     135.   In a December 31, 2015, letter to **PG&E** regarding the audit, Fayi Daye, a

8 supervising electric safety regulator with the CPUC, outlined the violations found in the review

9 of records between 2010 and 2015 and a spot check of **PG&E** electrical distribution equipment.

10 She stated the following:

11         **PG&E's** records indicated that from August 2010 to September 21, 2015, a total

12         of **3,527 work orders were completed past their scheduled date of corrective
        action** per **PG&E's** Electric Notification Prioritization Standards. Late work

13         orders included overhead and underground facilities.[58]

14     136.   The letter concluded that these delays violated CPUC General Order No. 128,

15 Rule 17.1, which sets forth the CPUC's design, construction, and maintenance rules for electrical

16 systems.

17     137.   The audit also reviewed **PG&E's** maps for its electrical distribution lines and

18 found that over 50 pieces of overhead equipment - including pole mounted transformers and

19 power lines has not been inspected every year as required by law. This was a violation of CPUC

20 General Order No. 165, § 111-B, which sets forth standards for inspections.[59]

21     138.   According to State Senator Jerry Hill, these findings are especially troubling

22 because "they are getting the money for these, they are getting the funds to do the work in a

23 timely manner."[60] Yet, **PG&E** takes the money but fails to correct the problems.

24

25     [57] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/
Electric_Safety_and_Reliability/Reports_and_Audits/Electric_Facilities/EA2015-018.pdf (last accessed

26 February 12, 2018).
    [58] *Ibid.*

27     [59] *Ibid.*
    [60] https://www.nbcbayarea.com/news/local/State-Audit-Shows-PGE-Had-Repair-Job-Backlog-in-

28 Sonoma-Santa-Rosa-451996923.html (last accessed February 12, 2018).

139.    Further, according to records maintained by Cal Fire, approximately 135 fires in Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015.[61]  In 2015, the last year of reported data, electrical power problems sparked the burning of 149,241 acres across California – more than twice the amount from any other cause.[62]

140.    Since prior to 1996, **PG&E** has known or should have known that its choice of chemical treatments for its poles can also make its equipment unsafe.  For example, **PG&E** uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon® process.  Those poles tend to experience surface decay below ground regardless of the type of wood used for the poles.  As a result, digging inspections are required for poles treated by these processes for all wood types.  However, **PG&E** has failed to conduct the proper inspections.  Further, when **PG&E** has been advised of necessary repairs to such poles, failed to repair the poles in a timely manner.

141.    According to the 2017 CPUC Order Instituting Investigation into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit:

> Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State.  For example, inadequate clearance between communication and power lines, perhaps in conjunction with a broken cable lashing wire, caused the Southern California Guejito Fire of 2007 which (together with the Witch Fire) burned 197,990 acres and caused two deaths. Three more deaths occurred in 2011 when an electrical conductor separated from a pole in high winds, causing a live wire to fall to the ground.  At least five more people lost their lives in pole-related failures in 2012 and 2015.

> Unauthorized pole attachments are particularly problematic.  A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres.  Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.

---

[61] http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks (last accessed February 12, 2018).
[62] http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html (last accessed February 12, 2018).

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 44 of 74

Communication and other wires are not infrequently found hanging onto roads or yards. Poles with excessive and/or unauthorized attachments can put utility workers at risk. Facilities deployed in the field may differ from what appears on paper or in a utility's database.[63]

142. In the June 29, 2017 CPUC press release for the investigation, CPUC President Michael Picker stated, "Plain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "Not knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[64]

143. **PG&E's** failure to conduct proper and regular inspections of its wood utility poles and failure to replace them or make necessary repairs contributed to causing the North Bay Fires.

### 4. PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law

144. Despite **PG&E's** public protestations to the contrary, Northern California did not experience uncommon weather patterns the night the North Bay Fires began. Readings at weather stations in the areas impacted by the North Bay Fires show that winds were at foreseeable levels when **PG&E's** electrical equipment began to fail. For example, on October 8, 2017, a weather station in Santa Rosa in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:29 p.m. About an hour later, the same station recorded

---

[63] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M190/K872/190872933.pdf (last accessed February 12, 2018).
[64] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.pdf (last accessed February 12, 2018).

wind gusts of 41 miles per hour. These wind speeds were surpassed in other recent storms in the area on a number of occasions.

145. According to **PG&E's** 2014 Annual Electric Distribution Reliability Report, sent to the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten **PG&E** electrical outages each year since at least 2004, putting the utility on notice that these weather conditions occur and that they can cause electrical problems. For example, four of the "ten largest 2004 outage events" for **PG&E** occurred in the Santa Rosa and Sonoma areas where winds were documented in the 35 to 65 mph range, much higher levels than those of October 8, 2017.[65]

146. **PG&E's** largest outage in 2009 was caused by a strong early season storm that affected the entire service area with many stations reporting wind gusts over 50 mph. National Weather Service records indicate this storm was the strongest October rain and wind event since 1962. Therefore, **PG&E** had notice of the type of winds that occurred on October 8, 2017, the night the North Bay Fires began.

147. **PG&E's** wood utility poles in the areas where the North Bay Fires began did not meet the wind load and safety factors required by General Order 95, Rule 48, under which wood utility poles must be replaced if they are not strong enough to withstand wind speeds of 92 mph. No weather station in the areas affected by the North Bay Fires recorded wind speeds at or above 92 mph on the night of October 8, 2017.

148. **PG&E's** failure to replace old and deteriorated wood utility poles that did not meet the strength and safety requirements of General Order 95, Rule 48, and that could not withstand wind speeds of less than 92 mph contributed to the cause of the North Bay Fires.

### 5. PG&E's Unsafe Use of Reclosers

149. Another key finding of the 2013 Liberty Report was that on a daily basis and in 36 percent of cases, **PG&E** cannot remotely de-energize a downed line and must send someone

---

[65] https://www.pge.com/includes/docs/pdfs/myhome/outages/outage/reliability/
AnnualElectricDistributionReliabilityReport.pdf (last accessed February 12, 2018).

on-site to manually turn off the feed. An energized downed line is a hazard, and, according to the 2013 Liberty Report, this hazard has "contributed to a number of fatalities and injuries."

150. **PG&E** has a long-standing practice of using reclosers throughout its system to automatically restart power after interruptions, even though it knows these devices may cause wildfires. Reclosers are circuit breakers equipped with a mechanism that can automatically "reclose" the breaker and reenergize a power line after it has been "opened" due to a fault. Many of **PG&E's** reclosers are set to reenergize the line up to three times after a fault.

151. Reclosers are key tools to prevent power blackouts, but if a fault occurs from contact between a line and a tree or vegetation, reenergizing the line can ignite fires. This danger is so significant that other major utilities in California claim that they have reprogramed their electrical systems during fire seasons to ensure that reclosers do not automatically restart electrical currents after a service interruption.

152. **PG&E** knew that its reclosers posed a great risk of wildfire but has only taken slow and incomplete steps to eliminate that risk. The "Power Line Prevention Field Guide" ("2008 Field Guide") makes the following prescient statement:

> The potential exists that power line caused fires will become conflagrations during the long, hot and dry fire season commonly experienced in California. The very same weather conditions that contribute to power line faults also lead and contribute to the rapid spread of wildfire. The most critical of these weather factors is high wind, which is commonly accompanied by high temperatures and low humidity.
>
> High, gusty winds may cause vegetation to sway into power lines, break off limbs or fall into power lines. High winds may also create vibrations in power lines that can lead to stress failures or cause loose connections to separate. Arcing usually accompanies such faults. *Automatic Reclosers re-energizing the line into the fault may cause repeated arcing and increase the probability of igniting vegetation.* [Emphasis added.][66]

---

[66] 2008 Field Guide, p. 1-5, http://cdfdata.fire.ca.gov/fire_er/fpp_engineering_view?guide_id=15. The 2008 Field Guide was developed as a mutual undertaking by Cal Fire, PG&E, Southern California Edison, San Diego Gas and Electric, and the other electric utilities of California. PG&E's name and logo is displayed prominently on the cover page.

At a Congressional hearing in 2015, **PG&E's** Senior Vice President of Electrical Operations, Patrick Hogan, stated that **PG&E** had the ability to reprogram its reclosers during fire season to not restart power. Patrick Hogan admitted that shutting down power means "you take the reliability hit, but you gain the wildfire benefit."[67]

153. Despite its knowledge of the dangers posed by reclosers reenergizing lines during fire season, **PG&E** only untimely and limited response has been to begin an experimental pilot program in 2017 to reprogram its reclosers that affected only a limited area of California.

154. Before the Butte Fire in 2015, **PG&E** began a process of replacing all reclosers that can only be programmed or controlled on-site with reclosers that can be remotely programmed and controlled. However, that process has been so slow and deliberate many of its reclosers must still be programmed or controlled only at the site where they are installed.

155. On its own initiative, **PG&E** did not turn off a number of reclosers on transmission and distribution systems in the area of the North Bay Fires. Instead, **PG&E** left those reclosers active and did not turn them off until directed to do so by Cal Fire between October 12 and 15, 2017.

156. **PG&E's** failure to turn off its reclosers during fire season and its failure to ensure all of its reclosers could be programmed and controlled remotely proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 6. PG&E Knew That Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation

157. Electrical arcing is a process by which guy wires or "down-guys," when designed improperly and/or installed according to improper design, conduct ground current at ground level during high winds, igniting fires to nearby vegetation. Guy wires are the metal support cables that are used to tie electrical poles to the ground. **PG&E** utilizes an inverted "V" shape design without any separation or in-line insulators as an attempt to help its poles withstand high wind. However, in **PG&E's** sub-transmission design, **PG&E** does not separate the connection at the

---

[67] http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-12324764.php (last accessed February 12, 2018).

pole by 12 inches, utilize any in-line insulator to prevent ground current from flowing, or utilize a shunt so when ground current exists it does not cause an electrical arc. In addition, if not properly maintained, the down-guys become loose. In high wind conditions, when the poles sway and ground currents exist, arcing occurs. With the combination of high winds, swaying poles, loose connections, two down-guys attached by a common bolt, and ground current, electrical arcing occurs, igniting local vegetation.

158. It is believed that arcing from San Diego Gas & Electric wires was the cause of the 2007 San Diego "Witch Creek" Fires, in addition to the 2003 Cedar and Paradise Fires.

159. The down-guy design utilized by **PG&E** is a violation of CPUC General Order Number 95. Industry experts have demonstrated to the CPUC and California utilities how the dangerous design causes arcing and fires for over a decade. They believe this design is unreasonably dangerous and that the fix is cheap and easy. CPUC General Order Number 95 sets forth two possible solutions: either have a 12-inch separation on a pole; or add an in-line insulator. An additional solution is adding a shunt from the down-guy anchor to the down-guy itself. All three inexpensive solutions prevent electrical arcs at ground levels that ignite fires.

### 7. PG&E's Reckless Adoption of the VMII Program Where It Paid Its Contractors to Cut Fewer Trees

160. **PG&E's** Vegetation Management Program performs two types of tree work: annual routine compliance tree work and reliability tree work.

161. Annual routine compliance work focuses on maintaining regulatory distances between energized conductors and vegetation. "Reliability tree work" focuses on locations where there has been a history of vegetation-related outage problems based on three historical indexes: System Average Interruption Frequency Index ("SAIFI"), Customer Experiencing Multiple Interruption ("CEMI"), and System Average Interruption Duration Index ("SAIDI").

162. In 2006, **PG&E's** Vegetation Management Program adopted the "Vegetation Management Incentive Initiative" ("VMII"). The ostensible purpose of VMII was to reduce the annual routine compliance tree work and share the resulting cost savings with the contractors

whose compensation would be reduced by the loss of actual work. The actual purpose of VMII was to shift costs from annual routine compliance work to fund additional reliability work.

163. For example, in 2011, **PG&E** set a goal to reduce routine "units" worked from 1.18 million trees in 2011 to 1 million in 2012 in order to increase the amount of money available for reliability work by $20 million. In 2012, **PG&E** set a goal to goal to reduce routine "units" worked by 25 percent in 2013 in order to increase the amount of money available for reliability work by $35 million. In 2013, **PG&E** only performed routine patrol inspections on 75 percent of its distribution circuits, using the cost savings to increase its reliability patrols. In 2014, **PG&E** set a goal to reduce routine units worked by 7.5 percent annually through 2016.

164. Between 2006 and 2013, **PG&E** actually reduced the number of routine trees worked from 1.7 million to 1.25 million in 2013, paid contractors $85 million, and increased reliability spending by $134 million. During that time, customer satisfaction as measured by SAIFI increased by 40 percent.

165. Most of **PG&E's** annual routine compliance work is performed in rural areas in California, while most of **PG&E's** "reliability" work is performed in the more densely populated urban or semi-urban areas where outages will generate more complaints per square mile than in the rural counties served by **PG&E**. Although the actual vegetation management work performed in the annual routine compliance patrols and the reliability patrols is virtually the same, **PG&E's** only comprehensible rationale for differentiating the "two types of work" is that the "reliability" work is directed at reducing statistical measurements of customer dissatisfaction over outages and that goal can be better accomplished by concentrating on work in urban or semi-urban areas at the expense of work needed in rural areas.

166. Under **PG&E's** bonus incentive program, reducing the number of customer complaints over outages leads to an increased likelihood of increases in executive and management bonuses.

167.    **PG&E's** reckless implementation and continued application of VMII proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 8.    PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees

168.    LiDAR (an acronym for "Light Detection and Ranging") is a surveying method that measures distances to a target by illuminating that target with a pulsed laser light and measures the reflected pulses with a sensor. These light pulses, when combined with other data recorded by the system, orthoimagery, and hyperspectral data, can generate precise three-dimensional images and information about the shape of the Earth and objects such as buildings or trees.

169.    When used in a vegetation management program for electric utilities, LiDAR scans and analyses can be used to identify trees that have the potential for contacting conductors, whether because of proximity to the conductors and/or because the trees are dead, diseased, or dying. Annual LiDAR scans and analyses of the electric system can also identify changes in the dead or diseased vegetation by comparing one year's data to the prior year's inventory of dead or diseased trees. When the analysis is conducted over a subset dataset, it can provide a statistical understanding in the percent change in vegetation identified as dead or diseased.

170.    **PG&E's** use of LiDAR is funded by its "Catastrophic Event Memorandum Account" ("CEMA"). If a catastrophic event is declared a state of emergency by the state or federal government, then utilities like **PG&E** can record costs caused by the event in this memorandum account. By recording these costs, the utilities can later ask for recovery of these costs from the CPUC.

171.    In 2014, **PG&E** began to use LiDAR to scan and analyze small sections of its electric transmission and distribution system. In 2015, **PG&E** employed a contractor who created spatially accurate alignment information for approximately 10 percent of **PG&E** distribution lines using LiDAR and imagery. The contractor identified 2.2 million "Hazard Trees" in the LiDAR data having the potential to fail-in or encroach on distribution lines,

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 51 of 74

performed "dead and diseased analysis" on 1.6 million trees, and identified 23,000 trees as potentially dead or diseased.

172.    In 2015, for some unfortunate reason **PG&E** scheduled the LiDAR contractor's deliverables for October 2015 at the very tail end of California's fire season.  The contractor's final product identified the 44 foot-tall gray pine that started the Butte Fire as a "Hazard Tree" that had the potential to fall into one of **PG&E's** distribution lines, but unfortunately **PG&E** received the information over a month after the Butte Fire started.

173.    In 2016 and 2017, **PG&E** again employed LiDAR technology to scan and analyze its electric transmission and distribution system, but only employed the technology in limited sections of that system, and again scheduled the deliverables at the tail end of the California wildfire season.

174.    **PG&E's** failure to fully employ LiDAR technology in the area of the North Bay Fires and its failure to timely schedule deliverables of LiDAR analyses proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 9.    PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk

175.    Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations."  According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place.  These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets.  These types of formal programs also take failure modes into consideration.  Long term sustainable plans can then be prepared to address the asset conditions.  A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

176.    The 2013 Liberty Report specifically recommended that "**PG&E** treat aging infrastructure as an enterprise-level risk."

177.  **PG&E's** failure to treat its aging infrastructure as an enterprise-level risk proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 10.  PG&E's "Run to Failure" Approach to Maintenance

178.  **PG&E's**: failure to address the "significant safety hazards" identified by the 2013 Liberty Report; replace obsolete and undersized conductors; halt its unsafe use of reclosers; adoption of the VMII program; failure to fully employ LiDAR to identify hazard trees; failure to treat the conditions of its aging infrastructure as an enterprise-level risk; failure to inspect, maintain, repair, and/or replace its aging equipment; failure to conduct an inventory of its electrical assets; and failure to ensure its infrastructure could withstand foreseeable weather conditions as required by law are all indicative of what has been called **PG&E's** "run to failure" approach to its infrastructure.

179.  **PG&E** has a well-documented history of implementing this "run to failure" approach with its aging infrastructure, ignoring necessary maintenance and creating hazards to the public.  According to a filing by Office of Ratepayer Advocates with the CPUC in May 2013:

> However, as we saw in Section V.F.3 above, the Overland Audit explains how **PG&E** systematically underfunded GT&S integrity management and maintenance operations for the years 2008 through 2010.  **PG&E** engaged in a 'run to failure' strategy whereby it deferred needed maintenance projects and changed the assessment method for several pipelines from ILI to the less informative ECDA approach – all to increase its profits even further beyond its already generous authorized rate of return, which averaged 11.2% between 1996 and 2010.
>
> Given **PG&E's** excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique.  The IRP Report supplements the Overland Audit findings with additional examples of **PG&E** management's commitment to profits over safety.  Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of **PG&E** management's long-standing policy to squeeze every nickel it could from **PG&E** gas operations and maintenance, regardless of the long term 'run to failure' impacts.  And **PG&E** has offered no evidence to the contrary.[68]

---

[68] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/

LEGAL\34788396\1

47

180. **PG&E's** "run to failure" approach to maintenance proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

181. **[INTENTIONALLY OMITTED].**

182. **[INTENTIONALLY OMITTED].**

183. **[INTENTIONALLY OMITTED].**

184. **[INTENTIONALLY OMITTED].**

G. **PG&E'S CORPORATE CULTURE IS THE ROOT CAUSE OF THE NORTH BAY FIRES**

185. **PG&E** has a virtual monopoly in the provision of gas and electric services to the general public in almost all counties and cities across Northern and Central California.[69]

186. Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the fines, penalties, settlements, and convictions detailed above. Despite these recurring punishments, **PG&E** continues to display a shocking degree of arrogant complacency, refuses to modify its behavior, and continues to conduct its business with a conscious disregard for· the safety of the public, including the insured(s) of **SUBROGATION PLAINTIFFS**.

187. Rather than spend the money it obtains from customers for infrastructure maintenance and safety, **PG&E** funnels this funding to boost its own corporate profits and compensation. This pattern and practice of favoring profits over having a solid and well-maintained infrastructure that would be safe and dependable for years to come left **PG&E** vulnerable to an increased risk of a catastrophic event such as the North Bay Fires.

188. For example, according to documents released by The Utility Reform Network ("TURN"), **PG&E** planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in **PG&E's** system. **PG&E** collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too

_____

SB_GT&S_0039691.pdf (last accessed February 12, 2018).

[69] A few cities like Palo Alto and Sacramento provide their own gas and electric utility services.

late and repurposed the money to other priorities. That same year, **PG&E** spent nearly $5 million on bonuses for six of its top executives.

189. Further, Geisha Williams, PG&E's CEO, is slated to receive at least $12.23 million in bonuses over the next few years, depending on the future performance of the company. This is on top of her $1.085 million annual salary, which rose 3 percent from 2017 to 2018.[70]

190. Moreover, **PG&E** has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to not protect public safety. Prior to the Butte Fire, **PG&E** chose to provide a monetary incentive through the VMII program to its contractors to cut fewer trees, even though **PG&E** was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a **PG&E** contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but **PG&E** chose to keep this program despite knowing this risk.

191. Similarly, prior to the San Bruno explosion, **PG&E** had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, **PG&E's** incentive system was "training and rewarding people to do the wrong thing," emblematic of "a seriously broken process," and "explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy."[71]

192. As detailed above, the North Bay Fires are just one example of the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations. PG&E power lines, transformers, conductors, poles, insulators,

---

[70] https://www.sfchronicle.com/business/article/PG-E-CEO-could-get-more-than-12-million-in-12714473.php (last accessed March 6, 2018).
[71] http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php

and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment. Further, **PG&E's** aging infrastructure has caused multiple disasters throughout California.

193.    As detailed more fully above, **PG&E's** failures to reduce the risk of wildfire are serious and widespread, and contributed to causing the North Bay Fires. The reclosers in **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions were known to be extreme. **PG&E** failed to have a reasonable system in place to make sure that its contractors were properly performing tree and/or vegetation inspections and removal, pole clearance, and pole inspections. **PG&E** failed to take any steps to look for what it calls Facility Protect Trees (trees which pose a risk of falling into the line), even though it knew such trees were likely to exist after its contractors had performed their work. **PG&E** failed to properly construct its power lines and thereafter failed to take reasonable steps to make sure the poles and lines were sufficiently strong to support lines and other equipment that were added by third parties. Finally, despite knowing that wildfires posed the greatest risk to the public from its electrical operations, **PG&E** chose to not ensure that its contractors were properly trained in tree inspections and removal, chose to not ensure that its contractors hired people who met **PG&E's** minimum qualifications, and chose to not participate in the training of its contractors.

194.    As the numbers of disasters caused by **PG&E** continue to mount, the number of "feel good" commercials it airs increases exponentially. Those "concerned neighbor" commercials cannot the true nature of **PG&E's** corporate culture of greed, indifference, dogged refusal to take responsibility for its actions, and persistent failure to institute obvious measures to protect the public.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

195.    **SUBROGATION PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

196.    The North Bay Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them.  **DEFENDANTS**, and/or each of them, breached their respective duties owed individually and/or collectively to the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care;  (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (4) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard within close proximity of the subject power line; (5) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain high voltage electrical transmission, and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons by allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing to de-energize power lines during fire prone conditions; (11) failing to de-energize power lines after the fire's ignition; and/or (12) failing to properly train and to supervise employees and agents responsible for maintenance and inspection of the distribution lines and/or vegetation areas nearby these lines.

197.    As a direct and legal result of **DEFENDANTS'** actions and omissions, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have suffered damage as alleged in Paragraph 9. **SUBROGATION PLAINTIFFS** who are obligated to make payments or have made payments to their insured(s) are equitably subrogated to the rights of their insured(s), "stand in their shoes," and are entitled to bring this claim for payments

LEGAL\34788396\1
51

made or to be made. **SUBROGATION PLAINTIFFS** investigated, adjusted and paid, and may in the future pay, said damage, injury and loss, consistent with its policies of insurance and its obligations under law, and said payments were not voluntary. **SUBROGATION PLAINTIFFS'** damages are in a liquidated sum; the amount paid to their insureds. **SUBROGATION PLAINTIFFS'** insureds have an existing, assignable cause of action against **DEFENDANTS**, which the insureds could have asserted for their own benefit had they not been compensated for their losses by **SUBROGATION PLAINTIFFS**. As such, **SUBROGATION PLAINTIFFS** have suffered damages caused by an act or omission of **DEFENDANTS**, and **SUBROGATION PLAINTIFFS** have equitable and/or legal subrogation rights against **DEFENDANTS** herein, to the extent of the payments made. Justice requires that the loss be entirely shifted from **SUBROGATION PLAINTIFFS** to **DEFENDANTS**, whose equitable position is inferior to that of **SUBROGATION PLAINTIFFS**.

198. **[INTENTIONALLY OMITTED]**

199. **[INTENTIONALLY OMITTED]**

200. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have suffered a loss of income, loss of earning capacity, loss of profits, increased expenses due to displacement, and/or other consequential economic losses in an amount according to proof at trial.

201. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have suffered damage to real property, including the loss of vegetation, trees, and structures, the creation of hydrophobic soil conditions, and a loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

202. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have suffered damage to and/or a loss of personal property, including but not

limited to items of peculiar value to the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** in an amount according to proof at trial.

203.    As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

204.    **PG&E** has a virtual monopoly over the transmission and distribution of electrical power to the areas affected by the North Bay Fires and has individual contracts with all residents and businesses in those areas to whom it distributes that electrical power. The communities affected by the North Bay Fires are all dependent upon the safe transmission and distribution of that electrical power for continuous residential and commercial usage, and **PG&E** has contractual, statutory, and public duties to provide that electrical power in a manner that promotes those individual and public interests.

205.    The potential harms to the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** from wildfires such as the North Bay Fires were objectively foreseeable both in nature and in scope and were subjectively known to **PG&E** from its long and tragic history of causing such wildfires.

206.    **[INTENTIONALLY OMITTED]**

207.    **[INTENTIONALLY OMITTED]**

208.    **[INTENTIONALLY OMITTED]**

## SECOND CAUSE OF ACTION
### (Against All Defendants)

209.    **[INTENTIONALLY OMITTED]**

210.    **[INTENTIONALLY OMITTED]**

211.    **[INTENTIONALLY OMITTED]**

1     212.    **[INTENTIONALLY OMITTED]**

2     213.    **[INTENTIONALLY OMITTED]**

3

4                        **THIRD CAUSE OF ACTION**
                         **(Against All Defendants)**

5     214.    **[INTENTIONALLY OMITTED]**

6     215.    **[INTENTIONALLY OMITTED]**

7     216.    **[INTENTIONALLY OMITTED]**

8     217.    **[INTENTIONALLY OMITTED]**

9     218.    **[INTENTIONALLY OMITTED]**

10     219.    **[INTENTIONALLY OMITTED]**

11

12                       **FOURTH CAUSE OF ACTION**
13                       **INVERSE CONDEMNATION**
                       **(Against All Defendants)**

14     220.    **SUBROGATION PLAINTIFFS** incorporate and re-allege each of the

15 paragraphs set forth above as though fully set forth herein.

16     221.    On or around October 8 or 9, 2017, **SUBROGATION PLAINTIFFS'** insureds

17 were owners of real property and/or personal property and/or automobiles located within Butte,

18 Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in the area

19 of the North Bay Fires.

20     222.    Prior to and on October 8 or 9, 2017, **DEFENDANTS**, and/or each of them,

21 installed, owned, operated, used, controlled, and/or maintained power lines and other electrical

22 equipment for the public delivery of electricity, including power lines in and around the location

23 of the North Bay Fires.

24     223.    On or around October 8 or 9, 2017, as a direct, necessary, and legal result of

25 **DEFENDANTS'** design, installation, ownership, operation, use, control, management, and/or

26 maintenance for a public use, the power lines and/or other electrical equipment came in contact

27 with vegetation and/or broke, failed, fell down, sparked, and/or exploded, causing wildfires that

28

burned thousands of acres, including property owned or occupied by insured(s) of **SUBROGATION PLAINTIFFS**. The fires damaged and/or destroyed the insured(s) of **SUBROGATION PLAINTIFFS'** real and/or personal property.

224. The above described damage to the insured(s) of **SUBROGATION PLAINTIFFS'** property was legally and substantially caused by the actions of **DEFENDANTS**, and/or each of them, in their design, installation, ownership, operation, use, control, management, and/or maintenance of the power lines and other electrical equipment for a public use. **PG&E** is a privately owned public utility, which enjoys a state-protected monopoly or quasi-monopoly, derived from its exclusive franchise provided by the State of California and is more akin to a governmental entity than a purely private entity, and runs its utility affairs like a governmental entity. **PG&E's** monopoly is guaranteed and safeguarded by the California Public Utilities Commission, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter the market. The policy justifications underlying inverse condemnation liability are that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole. Under the rules and regulations set forth by the California Public Utilities Commission, amounts that **DEFENDANTS** must pay in inverse condemnation can be included in their rates and spread among the entire group of rate payers so long as they are otherwise acting as a reasonable and prudent manager of their electric distribution systems.

225. The insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of the insured(s) of **SUBROGATION PLAINTIFFS'** property by **DEFENDANTS**, and/or each of them, without just compensation.

226. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, the insured(s) of **SUBROGATION PLAINTIFFS** suffered damages to their real and/or personal property and/or automobiles, including loss of use, business interruption, interference with access, and/or diminution in value and/or marketability, which amounts were paid by **SUBROGATION PLAINTIFFS** in an amount according to proof at trial.

227. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **SUBROGATION PLAINTIFFS** have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable attorney, appraisal, engineering, and/or other expert fees due to the conduct of the **DEFENDANTS** in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil Procedure § 1036.

**FIFTH CAUSE OF ACTION**
**PUBLIC NUISANCE**
**(Against All Defendants)**

228. **SUBROGATION PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

229. The insured(s) of **SUBROGATION PLAINTIFFS** own and/or occupy property at or near the site of the North Bay Fires which is the subject of this action. At all relevant times herein, the insured(s) of **SUBROGATION PLAINTIFFS** had a right to occupy, enjoy, and/or use their property without interference by **DEFENDANTS**, and/or each of them.

230. **DEFENDANTS**, and/or each of them, owed a duty to the public, including the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** herein, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their power lines in and around Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in a manner that did not threaten harm or injury to the public welfare from operation of those power lines.

231. **DEFENDANTS**, and/or each of them, by acting and/or failing to act, as alleged hereinabove, created a conditions which was harmful to the health of the public, including these **SUBROGATION PLAINTIFFS** and their insured(s), and which interfered with the comfortable occupancy, use, and/or enjoyment of **SUBROGATION PLAINTIFFS'** insured(s) property.

232. **SUBROGATION PLAINTIFFS** did not consent, expressly or impliedly, to the wrongful conduct of **DEFENDANTS**, and/or each of them, in acting in the manner set forth above.

233. The hazardous conditions that were created by and/or permitted to exist by **DEFENDANTS**, and/or each of them, affected a substantial number of people within the general public, including the insured(s) of **SUBROGATION PLAINTIFFS** herein, and constituted a public nuisance under Civil Code §§ 3479 and 3480 and Public Resources Code § 4171. Further, the ensuing uncontrolled wildfire constituted a public nuisance under Public Resources Code § 4170.

234. The damaging effects of **DEFENDANTS'** maintenance of a fire hazard and the ensuing uncontrolled wildfire are ongoing and affect the public at large. As a result of the fire's location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the fire's perimeter. This further caused significant post fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment laden flow hazards, and hillside erosion. As a result, large quantities of ash and sediment will be deposited in perennial and ephemeral watercourses.

235. As a direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** suffered harm that is different from the type of harm suffered by the general public. Specifically, the insured(s) of **SUBROGATION PLAINTIFFS** have lost the occupancy, possession, use, and/or enjoyment of their land, real and/or personal property and/or automobiles, including, but not limited to: (a) a reasonable and rational fear that the area is still dangerous; (b) a diminution in the fair market value of their property; (c) an impairment of the salability of their property; (d) soils that have become hydrophobic; (e) exposure to an array of toxic substances on their land; (f) the presence of "special waste" on their property that requires special management and disposal; and (g) a lingering smell of smoke, and/or constant soot, ash, and/or dust in the air. To the extent that **SUBROGATION PLAINTIFFS** insured such losses and made payment for such losses, **SUBROGATION PLAINTIFFS** are entitled to recover such amounts from **DEFENDANTS**.

236.     As a further direct and legal result of the conduct of **DEFENDANTS**, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with **PLAINTIFFS'** occupancy, possession, use and/or enjoyment of their property, as alleged above.   To the extent that **SUBROGATION PLAINTIFFS** insured such losses and made payment for such losses, **SUBROGATION PLAINTIFFS** are entitled to recover such amounts from **DEFENDANTS**.

237.     A reasonable, ordinary person would be reasonably annoyed or disturbed by the condition created by **DEFENDANTS**, and/or each of them, and the resulting fire.

238.     The conduct of **DEFENDANTS**, and/or each of them, is unreasonable and the seriousness of the harm to the public, including the insured(s) of **SUBROGATION PLAINTIFFS** herein, outweighs the social utility of **DEFENDANTS'** conduct.

239.     The individual and/or collective conduct of **DEFENDANTS** set forth above, and/or each of them, resulting in the North Bay Fires is not an isolated incident, but is ongoing and/or a repeated course of conduct, and **DEFENDANTS'** prior conduct and/or failures have resulted in other fires and damage to the public.

240.     The unreasonable conduct of **DEFENDANTS**, and/or each of them, is a direct and legal cause of the harm, injury, and/or damage to the public, including **SUBROGATION PLAINTIFFS** herein.   To the extent that **SUBROGATION PLAINTIFFS** insured such losses and made payment for such losses, **SUBROGATION PLAINTIFFS** are entitled to recover such amounts from **DEFENDANTS**.

241.     **DEFENDANTS**, and/or each of them, have individually and/or collectively, failed and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in order to ensure the sole delivery of electricity to residents through the operation of power lines in the affected area, and **DEFENDANTS'** individual and/or collective failure to do so exposed every member of the public, residing in Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties, to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

242. The conduct of **DEFENDANTS**, and/or each of them, set forth above constitutes a public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code §§ 4104, 4170 and 4171, and Code of Civil Procedure § 731. Under Civil Code § 3493, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** have standing to maintain an action for public nuisance because the nuisance is especially injurious to the insured(s) of **SUBROGATION PLAINTIFFS** because, as more specifically described above, it is injurious and/or offensive to the senses of the insured(s) of **SUBROGATION PLAINTIFFS**, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of the insured(s) of **SUBROGATION PLAINTIFFS'** properties, and have suffered harm, injury, and damages.

243. For these reasons, **SUBROGATION PLAINTIFFS** seek a permanent injunction enjoining **DEFENDANTS**, and each of them, from continued violation of: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451. **SUBROGATION PLAINTIFFS** also seek an order directing **DEFENDANTS** to abate the existing and continuing nuisance described above, and to the extent that **SUBROGATION PLAINTIFFS** insured such losses and made payment for such losses, **SUBROGATION PLAINTIFFS** are entitled to recover such amounts from **DEFENDANTS**.

**SIXTH CAUSE OF ACTION**
**PRIVATE NUISANCE**
**(Against All Defendants)**

244. **SUBROGATION PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

245. **DEFENDANTS**, and/or each of them, by their acts and/or omissions set forth above, directly and legally caused an obstruction to the free use of **SUROGATION PLAINTIFFS'** insured(s) property, an invasion the insured(s) of **SUBROGATION PLAINTIFFS'** right to use their property, and/or an interference with the enjoyment of the insured(s) of **SUBROGATION PLAINTIFFS'** property, resulting in the insured(s) of

SUBROGATION PLAINTIFFS suffering unreasonable harm and substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

246. As a direct and legal result of the wrongful acts and/or omissions of DEFENDANTS, and/or each of them, the insured(s) of SUBROGATION PLAINTIFFS suffered, and continue to suffer, the injuries and damages as set forth above, and to the extent that SUBROGATION PLAINTIFFS insured such losses and made payment for such losses, SUBROGATION PLAINTIFFS are entitled to recover such amounts from DEFENDANTS in an amount according to proof at trial.

247. **[INTENTIONALLY OMITTED]**

## SEVENTH CAUSE OF ACTION
### (Against All Defendants)

248. **[INTENTIONALLY OMITTED]**

249. **[INTENTIONALLY OMITTED]**

250. **[INTENTIONALLY OMITTED]**

251. **[INTENTIONALLY OMITTED]**

252. **[INTENTIONALLY OMITTED]**

## EIGHTH CAUSE OF ACTION
### TRESPASS
### (Against All Defendants)

253. **SUBROGATION PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

254. At all times relevant herein, the insured(s) of **SUBROGATION PLAINTIFFS** were the owners, tenants, and/or lawful occupants of property damaged by the North Bay Fires.

255. **DEFENDANTS**, and/or each of them, in wrongfully acting and/or failing to act in the manner set forth above, caused the North Bay Fires to ignite and/or spread out of control, causing harm, damage, and/or injury to the insured(s) of **SUBROGATION PLAINTIFFS**

herein, resulting in a trespass upon the insured(s) of **SUBROGATION PLAINTIFFS'** property interests.

256.    The insured(s) of **SUBROGATION PLAINTIFFS** did not grant permission for **DEFENDANTS** to wrongfully act in a manner so as to cause the North Bay Fires, and thereby produce fires which spread and wrongfully entered upon their property, resulting in the harm, injury, and/or damage alleged above.

257.    As a direct and legal result of the wrongful conduct of **DEFENDANTS**, and/or each of them, which led to the trespass, the insured(s) of **SUBROGATION PLAINTIFFS** have suffered and will continue to suffer damages.    To the extent that **SUBROGATION PLAINTIFFS** insured such losses and made payment for such losses, **SUBROGATION PLAINTIFFS** are entitled to recover such amounts from **DEFENDANTS** in an amount according to proof at trial.

258.    **[INTENTIONALLY OMITTED]**

259.    **[INTENTIONALLY OMITTED]**

260.    **[INTENTIONALLY OMITTED]**

261.    **[INTENTIONALLY OMITTED]**

262.    **[INTENTIONALLY OMITTED]**

## NINTH CAUSE OF ACTION
### PRIVATE ACTION UNDER PUBLIC UTILITIES CODE § 2106
### (Against All Defendants)

263.    **SUBROGATION PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

264.    Public Utilities Code § 2106 creates a private right of action against "[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission . . . ."

265.    As a Public Utility, **DEFENDANTS** at all times herein had a duty to properly design, construct, operate, maintain, inspect, and manage its electrical infrastructure as well as

trim trees and vegetation in compliance with all relevant provisions of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

266. The violation of a legislative enactment or administrative regulation which defines a minimum standard of conduct is unreasonable per se.

267. **DEFENDANTS** violated the above listed requirements, by:

    a. Failing to service, inspect or maintain electrical infrastructure, structures and vegetation affixed to and in close proximity to high voltage electrical lines;

    b. Failing to provide electrical supply systems of suitable design;

    c. Failing to construct and to maintain such systems for their intended use of safe transmission of electricity considering the known condition of the combination of the dry season and vegetation of the area, resulting in the property of the insureds of **SUBROGATION PLAINTIFFS** being susceptible to the ignition and spread of fire and the fire hazard and danger of electricity and electrical transmission and distribution;

    d. Failing to properly design, construct, operate, maintain, inspect and manage its electrical supply systems and the surrounding arid vegetation resulting in said vegetation igniting and accelerating the spread of the fire;

    e. Failing to properly safeguard against the ignition of fire during the course and scope of employee work on behalf of **DEFENDANTS**; and

    f. Failing to comply with the enumerated legislative enactments and administrative regulations.

268. **DEFENDANTS** proximately and substantially caused the destruction, damage, and injury to the property of insured(s) of **SUBROGATION PLAINTIFFS** by their violations of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those

LEGAL\34788396\1
62

stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 4511.

269. The insured(s) of **SUBROGATION PLAINTIFFS** were and are within the class of persons for whose protection applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

270. As alleged herein according to proof, **DEFENDANTS** are liable to **SUBROGATION PLAINTIFFS** for all loss, damages and injury caused by and resulting from **DEFENDANTS'** violation of applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

271. **[INTENTIONALLY OMITTED].**

## TENTH CAUSE OF ACTION
### VIOLATION OF HEALTH & SAFETY CODE § 13007
### (Against All Defendants)

272. **SUBROGATION PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

273. By engaging in the acts and/or omissions alleged in this Master Complaint, **DEFENDANTS**, and/or each of them, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of Health & Safety Code § 13007.

274. As a direct and legal result of **DEFENDANTS'** violation of Health & Safety Code § 13007, **SUBROGATION PLAINTIFFS** suffered recoverable damages to property under Health & Safety Code § 13007.21 for amounts paid to its insured(s).

275. As a further direct and legal result of the **DEFENDANTS**, and/or each of them, violating Health & Safety Code § 13007, **SUBROGATION PLAINTIFFS** are entitled to reasonable attorney's fees under Code of Civil Procedure § 1021.9.

276. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, the insured(s) of **SUBROGATION PLAINTIFFS** and **SUBROGATION PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

277. **[INTENTIONALLY OMITTED].**

## VI. PRAYER FOR RELIEF

WHEREFORE, **SUBROGATION PLAINTIFFS** pray for judgment against **DEFENDANTS** and DOES 1 through 100, and each of them as follows:

1. For monetary damages in an amount to be proven at trial, which exceeds the jurisdictional minimum of this Court;

2. For prejudgment interest in accordance with California Civil Code §3287;

3. For attorneys' fees and cost of suit to the extent allowed by California law, including California Code of Civil Procedure §1036;

4. On the claim for inverse condemnation, all amounts recoverable under the California Constitution including prejudgment interest, attorney's fees, litigation expenses, expenses for consultants and experts, and other just compensation; and

5. For such other relief as the Court deems just and proper.

**COZEN O'CONNOR**

Dated: __3/12/18_____          By: _____
**HOWARD D. MAYCON**
*Lead Counsel for Subrogation Plaintiffs*

**The Law Offices of Shawn E. Caine**

Dated: __3/12/18_____          By: _____
**SHAWN E. CAINE**
*Lead Counsel for Subrogation Plaintiffs*

**Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa & Evinger LLP**

Dated: __3/12/18_____          By: _____
**MARK GROTEFELD**
*Lead Counsel for Subrogation Plaintiffs*

Berger Kahn, A Law Corporation

Dated: __3/12/18_____ By: _____
CRAIG S. SIMON
*Lead Counsel for Subrogation Plaintiffs*


Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa &

Evinger LLP

Dated: __3/12/18___ _ By: _____
MAURA WALSH OCHOA
*Lead Counsel for Subrogation Plaintiffs*

Case: 19-30088    Doc# 3419-4    Filed: 08/07/19    Entered: 08/07/19 14:44:55    Page 72
of 74

1   **VII.   JURY DEMAND**

2       **SUBROGATION PLAINTIFFS** demand a trial by jury as to all claims in this action.

3

4                  **COZEN O'CONNOR**

5

6
    Dated: __3/12/18_____   By: _____
7
                         **HOWARD D. MAYCON**
8
                         *Lead Counsel for Subrogation Plaintiffs*
9

10                 **The Law Offices of Shawn E. Caine**

11  Dated: __3/12/18_____   By: _____

12                       **SHAWN E. CAINE**
                         *Lead Counsel for Subrogation Plaintiffs*
13

14                 **Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa &**

15                 **Evinger LLP**

16
    Dated: __3/12/18_____   By: _____
17
                         **MARK GROTEFELD**
18
                         *Lead Counsel for Subrogation Plaintiffs*
19

20                 **Berger Kahn, A Law Corporation**

21  Dated: __3/12/18_____   By: _____

22                       **CRAIG S. SIMON**
                         *Lead Counsel for Subrogation Plaintiffs*
23

24                 **Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa &**

25                 **Evinger LLP**

26
    Dated: ___3/12/18__ _   By: _____
27
                         **MAURA WALSH OCHOA**
                         *Lead Counsel for Subrogation Plaintiffs*
28

LEGAL\34788396\1
67

# PROOF OF SERVICE

I, the undersigned, certify and declare as follows:

I am over the age of 18 years, and not a party to this action. My business address is 700 Larkspur Landing Circle, Suite 280, Larkspur, CA 94939 which is located in the county where the mailing described below took place.

On the date stated below, I caused to be served in the manner indicated the following documents:

**MASTER COMPLAINT – SUBROGATION PLAINTIFFS**

on the parties involved addressed as follows:

TO ALL PARTIES LISTED ON THE SERVICE LIST MAINTAINED BY CASEHOMEPAGE

[ ]  **By Personal Delivery**: I caused each such envelope to be delivered by hand to the parties listed above on _____.

[]  **By Mail**: I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail at Larkspur, California. I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

[]  **By Facsimile**: By use of facsimile machine telephone number (415) 989-2802, I served a copy of the within document on the interested parties at the facsimile numbers listed. The transmission was reported as complete and without error.

[]  **By Overnight Delivery**: I caused each envelope, with delivery fees provided for, to be deposited in a box regularly maintained by UPS or Federal Express. I am readily familiar with the business practice at my place of business for collection and processing of correspondence for overnight delivery and know that in the ordinary course of my business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS or Federal Express or delivered to an authorized courier or driver authorized by UPS or Federal Express to receive documents on the same date that is placed at my place of business for collection

[X]  **By Electronic Mail Transmission:** By submitting a PDF format copy of such document via file transfer protocol (ftp) to CaseHomePage through the upload feature on March 12, 2018. The document(s) was transmitted by file transfer protocol (ftp) without error. Service will be deemed effective per the Electronic Service Agreement amongst the parties.

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

EXECUTED ON March 12, 2018

Letitia Johnson Smith