Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| -and- | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| Debtors. | |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | **STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF DEBTORS' MOTION FOR THE ESTABLISHMENT OF WILDFIRE CLAIMS ESTIMATION PROCEDURES**<br><br>Date: August 14, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Re: Docket No. 3091 |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................... 1

      A.     Overview of Wildfire Liabilities Asserted Against the Debtors ................... 2

      B.     The Lift Stay Motions ................................................................................... 3

      C.     The Estimation Motion and the Relief Sought Therein ............................... 4

ARGUMENT ................................................................................................................................. 4

      A.     Impact of Estimation on Individual Wildfire Claimants' Rights .................. 6

      B.     Relationship Between Claims Estimation and Bar Date .............................. 6

      C.     The Court's Authority to Estimate Personal Injury Claims ......................... 7

CONCLUSION ............................................................................................................................ 11

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page(s)**

*In re Arnold*,
  407 B.R. 849 (Bankr. M.D.N.C. 2009) ............................................................................... 9

*In re Atron Inc. of Mich.*,
  172 B.R. 541 (Bankr. W.D. Mich. 1994) .......................................................................... 8, 9

*Bertholet v. Harman*,
  126 B.R. 143 (Bankr. D.N.H. 1991) ................................................................................... 8

*Bittner v. Borne Chem. Co.*,
  691 F.2d 134 (3d Cir. 1982) .............................................................................................. 5

*In re Chateaugay Corp.*,
  111 B.R. 67 (Bankr. S.D.N.Y. 1990) ................................................................................. 6

*In re City of San Bernardino*,
  No. 5:15-CV-00815-ODW, 2015 WL 6957998 (C.D. Cal. Nov. 10,
  2015) ................................................................................................................................. 9

*In re Corey*,
  892 F.2d 829 (9th Cir. 1989) ............................................................................................. 6

*In re G-I Holdings, Inc.*,
  323 B.R. 583 (Bankr. D.N.J. 2005) .................................................................................. 6

*In re Gawker Media LLC*,
  571 B.R. 612 (Bankr. S.D.N.Y. 2017) ...................................................................... 8, 9, 10

*In re Grimes*,
  388 B.R. 195 (Bankr. N.D.W. Va. 2008) ........................................................................... 9

*Massey Energy Co. v. W. Va. Consumers for Justice*,
  351 B.R. 348 (E.D. Va. 2006) ........................................................................................... 9

*In re N. Am. Health Care, Inc.*,
  544 B.R. 684 (Bankr. C.D. Cal. 2016) ..................................................................... 5, 6, 11

*In re Poole Funeral Chapel, Inc.*,
  63 B.R. 527 (Bankr. N.D. Ala. 1986) ................................................................................ 6

*In re Residential Capital, LLC*,
  536 B.R. 566 (Bankr. S.D.N.Y. 2015) .......................................................................... 8, 10

*In re Roth*,
    518 B.R. 63 (S.D. Cal. 2014), *aff'd*, 662 F. App'x 540 (9th Cir. 2016) ...................... 11

*In re Standard Insulations, Inc.*,
    138 B.R. 947 (Bankr. W.D. Mo. 1992) ............................................................................. 6

*In re Trost*,
    735 F. App'x 875 (6th Cir.), *cert. denied sub nom. Trost v. Trost*, 139 S.
    Ct. 458 (2018), *reh'g denied*, 139 S. Ct. 868 (2019) .................................................... 11

*In re UNR Indus.*,
    1996 Bankr. LEXIS 1455 (Bankr. N.D. Ill. Aug. 13, 1996) ........................................ 11

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) .......................................................................................... 11

**Statutes**

11 U.S.C. § 502 ...................................................................................................................... 5

11 U.S.C. § 523 .................................................................................................................... 11

11 U.S.C. § 1109 .................................................................................................................... 8

28 U.S.C. § 157 ................................................................................................... 1, 7, 8, 9, 10

**Other Authorities**

Cal. Health and Safety Code § 13007 .............................................................................. 2, 3

Cal. Pub. Util. Code § 2106 .............................................................................................. 2, 3

Fed. Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333 (1984) ........................... 10

H. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977) ........................................................... 5

S. Rep. No. 989, 95th Cong., 2d Sess. 65 (1978) .............................................................. 5

U.S. Const. amend. V ........................................................................................................... 3

The Official Committee of Unsecured Creditors (the "Official Committee") appointed in the above-captioned chapter 11 cases hereby submits this statement in support of the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures* [Docket No. 3091] (the "Estimation Motion" or "Mot.").[1]

**PRELIMINARY STATEMENT**

1. The Official Committee supports the Debtors' proposed estimation procedures, which enable an efficient resolution of heavily contested issues, allow time for negotiations to proceed, and fall well within the Court's considerable latitude and discretion in devising procedures for estimation of unliquidated claims.

2. At the July 24 hearing, the Court requested guidance on several topics, and the Official Committee sets forth its views in full below. In brief, however, the Official Committee's positions on the Court's questions are as follows:

- While the details of the proposed Phase 3 final estimation hearing are reserved for a later date, the Court's broad discretion with respect to estimation procedures enables it to estimate Wildfire Claims in the aggregate, including for purposes of distribution.

- Holding the proposed Phase 2 Tubbs causation trial before the bar date does not present due process concerns, especially given the significant notice and representation protections in place for claimants.

- Emotional distress claims are not personal injury torts within the meaning of 28 U.S.C. § 157(b)(2)(B). The best-reasoned view of the various approaches taken to this question is that a narrow interpretation of the phrase "personal injury torts" in the statute comports best with policy concerns and Congressional intent.

- Furthermore, the Court may separately estimate certain categories of claims such as property damage claims distinct from personal injury tort claims.

**BACKGROUND**

3. The Debtors have maintained from the petition date that the purpose of these cases is "to establish a process for PG&E to fully address and resolve its liabilities resulting from the 2017 and 2018 Northern California wildfires and to provide compensation to those entitled to

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Estimation Motion.

compensation from the Debtors fairly and expeditiously." *Decl. of Jason P. Wells in Support of First Day Motions and Related Relief* (the "First Day Declaration") [Docket No. 28] at 4.

4. The Estimation Motion attempts to promote this purpose by establishing a procedure for centralized resolution of the Debtors' wildfire liabilities.

### A. Overview of Wildfire Claims Asserted Against the Debtors

5. Claims stemming from 23 wildfires, including the fire beginning on the evening of October 8, 2017 (the "Tubbs Fire"), are asserted against the Debtors. *See id.* at 12-13. In addition to the Tubbs Fire, the Debtors face liability relating to the Adobe, Atlas, Cascade, Cherokee, Honey, La Porte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Potter, Pressley, Redwood Valley, Sullivan, Sulphur, Highway 37, and Camp fires.

6. While the bar date in these cases has not yet passed, the history of wildfire litigation against the Debtors illuminates the potential scope of liability that must be addressed to confirm any plan of reorganization. Before these cases were filed, the California Superior Court created a Judicial Council Coordination Proceeding (the "JCCP") to address efficiently the claims filed against the Debtors concerning the North Bay Wildfires. Three groups of plaintiffs filed Master Complaints in the JCCP: the "Individual Plaintiffs," "Public Entity Plaintiffs," and "Subrogation Plaintiffs." Numerous causes of action are asserted against the Debtors by these three groups of plaintiffs, including, *inter alia*, inverse condemnation, wrongful death, and multiple negligence-based theories. *See Declaration of Thomas R. Kreller in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures* ("Kreller Decl."), Ex. A (*Individual Plaintiffs Master Compl.*, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. March 12, 2018)) at 52-66; Ex. B (*Subrogation Plaintiffs Master Compl.*, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. March 12, 2018)) at 52-66; Ex. C (*Public Entity Master Compl.*, *California North Bay Fire Cases*, JCCP No. 4955 (Cal. Super. Ct. March 12, 2018)) at 47-66.[2]

---

[2] Additional causes of action asserted by the Individual and Subrogation Plaintiffs include survival actions, public nuisance, private nuisance, premises liability, trespass, private action under California Public Utilities Code §
(continued . . .)

7. The Debtors contest the application of the California doctrine of inverse condemnation. *See* Mot. at 16-20. Inverse condemnation imposes strict liability for damages caused by the equipment and facilities (and construction and maintenance thereof) of utility providers; the Debtors argue that application of inverse condemnation to a private, investor-owned utility company is improper, and amounts to a violation of the Fifth Amendment of the United States Constitution. *See id*. at 17:8-24.

8. To facilitate their proposed claims estimation process "and ensure maximum efficiency," however, the Debtors represent that they will not contest "causation" for estimation purposes with respect to any of the 2015, 2017 and 2018 Northern California Wildfires for which CAL FIRE has concluded PG&E is responsible. Mot. at 4:14-19.[3] Of these Wildfires, the Debtors will only contest causation for estimation purposes with respect to the 2017 Tubbs Fire, which CAL FIRE determined through two separate investigations was not caused by PG&E equipment. *Id*. at 6:5-9. Disagreement on the issue of Tubbs causation has resulted in vastly different valuations of the Debtors' liabilities. For example, the Debtors estimate wildfire liabilities at about $30 billion;[4] the TCC believes the damages for the victims of the 2017 and 2018 Wildfires are $54 billion;[5] other stakeholders have estimated liability closer to $18 billion.[6]

### B. The Lift Stay Motions

9. On July 3 and July 9, 2019, the Ad Hoc Group of Subrogation Claim Holders and the TCC each filed motions (the "Lift Stay Motions") seeking relief from the automatic stay to

---

2106, violation of California Health and Safety Code § 13007, and negligent infliction of emotional distress. *See* Kreller Decl., Ex. A at 52-66; Ex. B at 52-66. Additionally, the Public Entity Plaintiffs assert nine causes of action, including negligence and respondeat superior, inverse condemnation, public nuisance, private nuisance, premises liability, trespass, negligence per se, private action under California Public Utilities Code § 2106, and violation of California Health and Safety Code § 13007. *See* Kreller Decl., Ex. C at 47-66.

[3] This does not mean, however, that the Debtors will not ultimately contest liability with respect to these Wildfires. If the Court deems the doctrine of inverse condemnation inapplicable to PG&E, then Debtors maintain that they will need to be proven liable under other theories. *Id.* at 5:2-4.

[4] *See* First Day Declaration at 16.

[5] *See Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* [Docket No. 2843] at 4.

[6] *See Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] at 5.

(continued . . .)

allow certain plaintiffs (the "Preference Plaintiffs"), all of whom hold claims related to the Tubbs Fire, to request that their claims proceed to jury trials before the California Superior Court.[7] Joinders to the Lift Stay Motions seek to expand the number of Preference Plaintiffs to about thirty-five.

10. The Official Committee has argued that terminating the automatic stay at this point in the proceedings would draw away resources and attention from a centralized estimation process, and thereby create delay rather than efficiencies.[8]

### C. The Estimation Motion and the Relief Sought Therein

11. The Estimation Motion proposes a centralized, three-phased procedure to value the unliquidated Wildfire Claims for the purposes of voting on, and determining feasibility of, the Debtors' chapter 11 plan. The proposed procedures seek to create an environment to foster settlement negotiations while enabling the Court to make key determinations necessary for the Debtors to move towards plan confirmation. Mot. at 3:4-10.

12. The first two phases of the proposed estimation procedures address certain threshold legal and factual issues. Phase 3, scheduled to take place after the October 21, 2019 bar date, constitutes a final hearing to estimate the aggregate amount of the Wildfire Claims. While the Debtors contemplate this hearing will involve the presentation of expert testimony concerning the aggregate amount of all allowed Wildfire Claims, the Debtors have deferred seeking an order with respect to the Phase 3 proceedings to a later date to allow time for the first two phases to begin and for parties to continue to negotiate.

## ARGUMENT

### I. Claims Estimation Is Appropriate and Necessary.

13. Section 502(c) of the Bankruptcy Code mandates that the bankruptcy court estimate for the purpose of allowance "any contingent or unliquidated claim, the liquidation of which, as

---

[7] *See Motion of the Ad Hoc Group of Subrogation Claim Holders for Relief from the Automatic Stay* [Docket No. 2863]; *Amended Motion of the Official Committee of Tort Claimants for Relief from Automatic Stay to Permit State Court Jury Trial of 2017 Tubbs Wildfire Claims* [Docket No. 2904].

[8] *See Objection of the Official Committee of Unsecured Creditors to Motions of (I) Ad Hoc Group of Subrogation Claim Holders and (II) Official Committee of Tort Claimants for Relief from Automatic Stay* [Docket No. 3101].

the case may be, would unduly delay the administration of the case." Thus, if liquidation of any claim would "unduly" delay the administration of a case, the bankruptcy court has an affirmative duty to estimate that claim. *See In re N. Am. Health Care, Inc.*, 544 B.R. 684, 688 (Bankr. C.D. Cal. 2016) (duty to estimate unliquidated tort claims "is not simply optional in this case, it is required"); H. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 65 (1978) ("This subsection *requires* that all claims against the debtor be converted into dollar amounts.") (emphasis added).

14. Here, where there are thousands of wildfire claimants asserting claims against the Debtors on multiple theories of liability, litigating these claims to liquidation would cause enormous delay. And the need to move quickly is made more pressing by the recent enactment of AB 1054, which requires the Debtors, among other things, to have confirmed a plan of reorganization by June 30, 2020.

15. It is therefore imperative that the Court estimate the Wildfire Claims; the only question remaining is how. The Official Committee supports the path laid out in the Debtors' proposed estimation procedures.

## II. The Court's July 24 Questions.

16. At the July 24, 2019 hearing, the Court asked the parties for guidance on several topics related to its claim estimation powers. The Official Committee's views on these topics follow.

17. At the outset, it is important to emphasize the significant flexibility the Court has with respect to claims estimation. "Congress intended [an estimation] procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue." *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982); *see also In re Corey*, 892 F.2d 829, 834 (9th Cir. 1989) ("A court has broad discretion when estimating the value of an unliquidated claim.").

18. This considerable latitude enables the Court to utilize one or several of the various estimation tools available to it. Bankruptcy courts may estimate all unliquidated claims of a

particular type in the aggregate, rather than estimating individual claims;[9] may estimate claims for the purpose of distribution and for purposes of feasibility and voting;[10] and may determine whether certain categories of claims are allowed or disallowed.[11] The Official Committee believes, as the Debtors appear to, that the Court utilizing a combination of these powers is the best way to move forward expeditiously but fairly.

### A. *Impact of Estimation on Individual Wildfire Claimants' Rights*

19. The Court's first question concerns the impact of the proposed estimation procedures on the individual rights of wildfire claim holders—for example, whether estimation must result in separate classification of claims that are liquidated from those that are not.

20. The answers to these questions largely turn on the precise nature of the estimation proceedings selected and the purposes for which estimation is performed. The Estimation Motion defers these questions for resolution at a later date, purposefully postponing the exact nature of the relief sought in Phase 3 to allow time for negotiation to occur. Mot. at 8:3-9. Moreover, the results of the initial phases of the estimation proceedings may have a material effect on the type of relief the parties elect to ultimately seek. The Official Committee looks forward to working with the parties during the three-week period following the entry of the Proposed Order to determine what procedures are best suited for the circumstances here.

### B. *Relationship Between Claims Estimation and Bar Date*

21. The Court's second question is whether, as a matter of due process, the Court may conduct a trial on the causation of the Tubbs Fire (Phase 2) before the bar date has passed, as the

---

[9] *See In re N. Am. Health Care, Inc.*, 544 B.R. at 688 (determining to estimate tort claims in the aggregate, and not individually); *In re G-I Holdings, Inc.*, 323 B.R. 583, 622 (Bankr. D.N.J. 2005) (estimating asbestos liability of the debtor in the aggregate).

[10] *See In re Poole Funeral Chapel, Inc.*, 63 B.R. 527, 532 (Bankr. N.D. Ala. 1986) (determining to estimate non-tort claims for purposes of confirmation and distribution and tort claims for purposes of confirmation); *In re G-I Holdings, Inc.*, 323 B.R. at 625 (estimating different claims related to asbestos liability in separate phases).

[11] *See, e.g.*, *In re Chateaugay Corp.*, 111 B.R. 67, 73-74 (Bankr. S.D.N.Y. 1990) ("[a]llowing or disallowing claims is clearly a separate and distinct function from liquidating or estimating that claim"); *In re Standard Insulations, Inc.*, 138 B.R. 947, 953-59 (Bankr. W.D. Mo. 1992) (recognizing bankruptcy court subject matter jurisdiction to make threshold determinations on allowance of claims, including personal injury claims); *In re G-I Holdings, Inc.*, 323 B.R. at 607 ("bankruptcy court jurisdiction over the claims allowance process is distinct from liquidation for purposes of distribution").

proposed procedures contemplate. The Official Committee submits that holding a causation trial two weeks prior to the bar date poses minimal due process concerns due to the nature of the proposed trial and the significant notice and representation available to affected parties.

22. The contemplated Tubbs trial is in the nature of an estimation proceeding affecting a particular category of claims, rather than a liquidation proceeding with respect to any particular claim. *See* Mot. at 21:7-9 ("Groups of claims that have no merit as a matter of law should be estimated at zero because those claims, if litigated, ultimately would be disallowed"); *id.* at 21:15 ("[The Debtors] are not requesting that individual claims be liquidated."). The effect of the proceeding is binary—allowed or disallowed—on all Tubbs-related claims, whenever filed.

23. Further, significant due process protections are in place for affected claimants. All Tubbs claimants will have notice of the Phase 2 trial through the public filings in these cases and may appear and be heard as parties in interest under 11 U.S.C. § 1109(b). And the TCC, a fiduciary for all tort claimants, has an active role in these cases and will advocate on behalf of the Tubbs claimants.

24. However, if the Court deems it appropriate, the proposed schedule is likely flexible enough to accommodate a two-week delay in the Phase 2 trial date such that it coincides with the bar date.

### C. *The Court's Authority to Estimate Personal Injury Claims*

25. The Court's final question concerns (i) whether emotional distress claims fall within the category of "personal injury tort" claims under 28 U.S.C. § 157(b)(2)(B), and (ii) whether the Court may "bifurcate" claims—may estimate only a certain type of claim at a given time (*i.e.*, property damage claims), rather than estimating all claims of all types at once. The Official Committee's view is that emotional distress claims do not constitute "personal injury torts," and that the Court does have the power to estimate different categories of claims separately.

#### i. *Emotional Distress Claims Are Not Personal Injury Claims*

26. Although courts have arrived at different conclusions as to whether emotional distress claims fall within the reservation for personal injury claims under 28 U.S.C.

§ 157(b)(2)(B), the better view, which comports with the weight of case law, recent trends, and congressional intent, is that they do not.

27. 28 U.S.C. § 157(b)(2)(B) removes from a bankruptcy court's jurisdiction the liquidation or estimation of contingent or unliquidated "personal injury tort" or "wrongful death claims" for purposes of distribution in a chapter 11 case. Relatedly, 28 U.S.C. § 157(b)(5) provides that "[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." Together, these two sections reserve final adjudication on personal injury tort and wrongful death claims for the district court.

28. This reservation was intended to be "a narrow exception to the bankruptcy court's jurisdiction to resolve claims, and did not intend to remove all torts from that process." *In re Gawker Media LLC*, 571 B.R. 612, 622-23 (Bankr. S.D.N.Y. 2017). Indeed, as courts have recognized (and cautioned against), expanding the definition of "personal injury" to encompass emotional distress claims would lead to a "mass exodus" of such claims from the claims allowance process to the district court—"an outcome which § 157(b)(5) was enacted to preclude." *In re Atron Inc. of Michigan*, 172 B.R. at 545; *see also Bertholet v. Harman*, 126 B.R. 413, 416 (Bankr. D.N.H. 1991) (citing concern that under a broad approach, "jurisdiction would too easily be lost from this [bankruptcy] court," a result the court "[did] not believe Congress intended"); *In re Residential Capital, LLC*, 536 B.R. at 573 ("if an [intentional infliction of emotional distress] claim is the tail wagging the dog, section 157(b)(5) should not require dislodging the claim from bankruptcy court resolution of a portion of a claim asserted against a debtor").

29. There exists a split in the case law on whether emotional distress claims and certain other tort claims constitute personal injury torts, with courts variously adopting the following approaches: a "broad" approach, which includes emotional distress claims within the section 157(b)(2)(B) definition of "personal injury"; a "hybrid" approach, which looks to whether the alleged emotional distress has earmarks of a property or financial claim; and a "narrow" approach

that requires a physical injury.[12] The majority of courts, however, reject the broad approach in favor of a more circumscribed approach.[13] Together, the weight of the case law suggests that the best approach is to exclude claims for emotional distress from the category of personal injury tort claims.

30. Two recent cases directly addressed whether emotional distress claims are personal injury tort claims, and each, although reasoned differently, rejected the broad approach and determined that such claims are not personal injury torts. In *In re Gawker Media LLC*, the court considered whether defamation, false light, injurious falsehood, reputational injury, and emotional injury are personal injury torts. The court surveyed case law on the three approaches (broad, narrow, hybrid) and found each to be facially reasonable given the absence of a statutory definition of "personal injury tort" as the phrase is used in 28 U.S.C. §§ 157(b)(2)(B) and (b)(5). 571 B.R. at 620. Applying a canon of statutory interpretation (*noscitur a sociis*), however, the court found that the coupling of the phrases "personal injury torts" and "wrongful death" in these statutes requires construing "'personal injury tort' . . . in a manner meaningfully similar to 'wrongful death,' and require a physical trauma." *Id.* at 621. Emotional distress claims, which do not require a physical trauma, are therefore not personal injury torts. *See id.*

31. In *In re Residential Capital*, instead of looking to statutory interpretation, the court inquired into the nature of the emotional distress claim at issue. The court considered a claim for intentional infliction of emotional distress ("IIED"). After examining the three approaches, the court noted that under either the hybrid or the narrow approach, an IIED claim is not a personal injury tort. 536 B.R. at 575. The court reasoned that because the IIED claim at issue flowed from

---

[12] *See In re Residential Capital, LLC*, 536 B.R. 566, 571-72 (Bankr. S.D.N.Y. 2015) (contrasting three approaches and collecting cases); *In re Arnold*, 407 B.R. 849, 851-53 (Bankr. M.D.N.C. 2009) (same); *In re City of San Bernardino*, No. 5:15-CV-00815-ODW, 2015 WL 6957998, at *4 (C.D. Cal. Nov. 10, 2015) (same).

[13] *See, e.g.*, *In re Gawker Media LLC*, 571 B.R. 612, 620 (Bankr. S.D.N.Y. 2017) (adopting narrow approach); *Massey Energy Co. v. W. Virginia Consumers for Justice*, 351 B.R. 348, 351 (E.D. Va. 2006) (adopting narrow approach); *In re Atron Inc. of Michigan*, 172 B.R. 541, 545 (Bankr. W.D. Mich. 1994) (adopting hybrid approach); *In re Residential Capital, LLC*, 536 B.R. at 573 (adopting hybrid approach); *In re City of San Bernardino*, 2015 WL 6957998, at *4 (rejecting the "expansive view"); *In re Grimes*, 388 B.R. 195, 199 (Bankr. N.D.W. Va. 2008) (rejecting the "expansive view").

(continued . . .)

flawed mortgage foreclosure processes, it arose primarily out of a financial, contract, or property claim, and therefore "[wa]s not, by its 'nature,' a 'personal injury tort.'" *Id.* at 576.

32. Legislative history accords. The Bankruptcy Amendments and Federal Judgeship Act of 1984[14] introduced the phrase "personal injury tort or wrongful death claim" (or variants thereof) into title 28. In its deliberations on the act, Congress considered testimony from asbestos claimants in the *Johns-Manville* bankruptcy and others, particularly on a "bankruptcy court's power to estimate and liquidate personal injury and wrongful death claims, and the denial of the right to try those claims before a jury." *In re Gawker Media LLC*, 571 B.R. at 622. "These specific concerns [regarding personal injury and wrongful death claims]—and not others—were addressed" in 28 U.S.C. § 157(b)'s restrictions on bankruptcy court jurisdiction; accordingly, "the exception was intended to be narrow and not derogate from the bankruptcy court's traditional role of resolving claims through the claims resolution process." *Id.* (discussing Senate committee hearings and debates); *see also id.* at 622-23 ("[T]he Congress that passed the 1984 Amendments viewed the personal injury/wrongful death limitation as a narrow exception to the bankruptcy court's jurisdiction to resolve claims, and did not intend to remove all torts from that process.").

33. In sum, the weight of authority, and the better reasoned view, compels the conclusion that emotional distress claims, especially where arising from a property-related claim, are not "personal injury torts" within the meaning of 28 U.S.C. § 157(b)(2)(B).[15]

---

[14] Pub. L. No. 98–353, 98 Stat. 333 (1984).

[15] The Court suggested that case law construing 11 U.S.C. § 523(a)(6)—nondischargeability of willful and malicious torts—might provide guidance in interpreting whether emotional distress claims may be considered personal injury torts. The Official Committee has not discovered case law construing the two sections together. And while certain courts have found claims for intentional infliction of emotional distress to be nondischargeable, the claims at issue in those cases were judgment claims arising from prepetition verdicts. Rather than making or deferring rulings on claims involving willful misconduct, the courts relied on issue preclusion arising from prepetition verdicts in finding the claims nondischargeable. *See, e.g.*, *In re Roth*, 518 B.R. 63, 74 (S.D. Cal. 2014), *aff'd*, 662 F. App'x 540 (9th Cir. 2016) ("Bankruptcy courts have found based exclusively on issue preclusion that a debt incurred from intention infliction of emotional distress is not dischargeable"); *In re Trost*, 735 F. App'x 875, 879 (6th Cir.), *cert. denied sub nom. Trost v. Trost*, 139 S. Ct. 458 (2018), *reh'g denied*, 139 S. Ct. 868 (2019) ("The bankruptcy court rightly invoked collateral estoppel to bar Zachary from relitigating certain factual issues determined in the conversion suit. And it correctly concluded that those prior factual determinations showed Zachary caused a willful and malicious injury, rendering his debt nondischargeable under bankruptcy law."). Such cases present a far different situation than the disputed and unliquidated claims before the Court here.

*ii. Bifurcation of Claims Is Appropriate*

34. It is well within the Court's powers to separately estimate different types of claims, especially where doing so increases efficiency. Not only does the Court have considerable latitude in designing appropriate estimation procedures, there is precedent for bankruptcy courts separately considering different types of claims. *See, e.g.*, *In re UNR Indus.*, 1996 Bankr. LEXIS 1455, at *3-8 (Bankr. N.D. Ill. Aug. 13, 1996) (discussing separate classification and allowance processes for asbestos property-related claims and asbestos disease-related claims); *In re W.R. Grace & Co.*, 475 B.R. 34, 71-118 (D. Del. 2012) (noting the occurrence of several estimation trials for property and personal injury claims and the creation of a separate trust for each category of claims). The Court has "wide discretion and latitude in estimating claims"; separate estimation of different types of claims falls comfortably within the Court's broad discretion. *See In re N. Am. Health Care, Inc.*, 544 B.R. at 688.

## CONCLUSION

35. For these reasons, the Official Committee respectfully requests that the Court grant the Estimation Motion.

DATED: August 7, 2019     MILBANK LLP

　　　　　　　　　　　　　　 */s/ Gregory A. Bray*
　　　　　　　　　　　　　　 DENNIS F. DUNNE
　　　　　　　　　　　　　　 SAMUEL A. KHALIL
　　　　　　　　　　　　　　 GREGORY A. BRAY
　　　　　　　　　　　　　　 THOMAS R. KRELLER

　　　　　　　　　　　　　　 *Counsel for the Official Committee of Unsecured Creditors*