1  Robert A. Julian (SBN 88469)
   Cecily A. Dumas (SBN 111449)
2  BAKER & HOSTETLER LLP
   1160 Battery Street, Suite 100
3  San Francisco, CA 94111
   Telephone:    628.208.6434
4  Facsimile:    310.820.8859
   Email: rjulian@bakerlaw.com
5  Email: cdumas@bakerlaw.com

6  Eric E. Sagerman (SBN 155496)
   Lauren T. Attard (SBN 320898)
7  BAKER & HOSTETLER LLP
   11601 Wilshire Blvd., Suite 1400
8  Los Angeles, CA 90025-0509
   Telephone:    310.820.8800
9  Facsimile:    310.820.8859
   Email: esagerman@bakerlaw.com
10 Email: lattard@bakerlaw.com

11 *Counsel to the Official Committee of Tort Claimants*

12              **UNITED STATES BANKRUPTCY COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                    **SAN FRANCISCO DIVISION**

15 | **In re:** | Bankruptcy Case |

16 | | No. 19-30088 (DM) |

   **PG&E CORPORATION**

17 | | Chapter 11 |
   |         -and- | (Lead Case) |

18 | | (Jointly Administered) |
   **PACIFIC GAS AND ELECTRIC**

19 **COMPANY,**
   |                      **Debtors.** | **OPPOSITION OF THE OFFICIAL** |

20 | | **COMMITTEE OF TORT CLAIMANTS** |
   | ☐ Affects PG&E Corporation | **TO THE DEBTORS' MOTION** |

21 | | **PURSUANT TO 11 U.S.C. §§ 105(a) AND** |
   | ☐ Affects Pacific Gas and Electric Company | **502(c) FOR THE ESTABLISHMENT OF** |

22 | | **WILDFIRE CLAIMS ESTIMATION** |
   | ■ Affects both Debtors | **PROCEDURES [Dkt. No. 3091]** |

23

24 | *All papers shall be filed in the Lead Case,* | Date:   August 14, 2019 |
   | *No. 19-30088 (DM)* | Time:   9:30 a.m. (Pacific Time) |
   | | Place:  United States Bankruptcy Court |

25 | | Courtroom 17, 16th Floor |
   | | San Francisco, CA 94102 |

26

27

28

Baker & Hostetler LLP
Attorneys at Law
San Francisco

**<u>TABLE OF CONTENTS</u>**

**Page(s)**

I.   INTRODUCTION AND ROAD MAP FOR THE CASE ................................................. 1

   A.   Background ............................................................................................................. 1

   B.   Mass Tort Asbestos Resolution Trusts .................................................................. 2

   C.   The Product Liability Mass Tort Cases ................................................................. 3

      1.   *A.H. Robins* ............................................................................................... 4

      2.   *Dow Corning* ............................................................................................ 5

      3.   *Archbishop of Portland* ............................................................................ 6

   D.   Mass Tort Case Management in General ............................................................... 7

   E.   The Court Should Deny the Debtors' Motion ........................................................ 8

      1.   Identification of the Claims and Issues to Be Tried ................................... 8

      2.   Identifying the Issues Informs Relief from Stay and Bifurcation ............. 10

   F.   Relief from Stay to Try the Tubbs Claims ........................................................... 11

      1.   Tubbs State Court Trial ............................................................................ 11

      2.   Court Question:  How will relief from stay impact resolution of these cases?  Courts use test cases to settle or estimate claims ......................... 14

   G.   Estimation Procedures Hearing ........................................................................... 14

   H.   Estimation Road Map .......................................................................................... 15

      1.   Adoption of Inverse .................................................................................. 15

      2.   Estimation of Economic Damages ............................................................ 17

      3.   Status Conference for Further Proceedings .............................................. 18

      4.   Immediate Opening of Discovery ............................................................ 18

II.  THE COURT'S QUESTIONS ABOUT THE JCCP NORTH BAY CASES .................. 19

   A.   Court Question:  What is the timeline and Court for a JCCP Tubbs trial? JCCP Judge Picks the Court, Mandatory trial "no later than 120 days." ............. 19

   B.   Court Question:  Why would the JCCP Court try the Tubbs Fire claims first, before Atlas?  Both cases are stayed, and the parties agree trial of Tubbs is a gating issue, not Atlas ..................................................................................... 19

Case: 19-30088   Doc# 3431   Filed: 08/07/19   Entered: 08/07/19 15:51:42   Page 2 of 39

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

C.    Court Question:  Would a JCCP jury trial resolution of Tubbs Fire claims assist the chapter 11 process via a midpoint resolution?  Yes. ............................ 20

III.    ARGUMENT ................................................................................................. 21

A.    Court Question:  Are the victims' emotional distress damage claims personal injury claims under California law and 28 USC § 157(b)(2)(B) and 157(b)(5)? Yes. .................................................................................................................. 21

1.    Emotional Distress is a Personal Injury Claim under California Law and the Restatement of Torts ....................................................... 21

2.    The Majority of California and Out of State Bankruptcy Cases Have Held That the Bankruptcy Code's Use of the Term Personal Injury Claims Includes Claims for Emotional Distress. ......................... 23

3.    The Victims Suffered Personal Injury Damages Under Every Court's Definition of the Term ............................................................. 24

B.    Court Question:  Does estimation of personal injury claims for the purpose of funding a capped trust constitute an estimation for purposes of distribution? Yes. .................................................................................................................. 25

C.    The Motion Should be Denied Because it Does Not Candidly Explain its Purpose is for Distribution, as Judge Perris Ruled in the Analogous *Portland* Case. ................................................................................................................ 26

D.    The Motion Should Be Denied Because It Does Not Identify the Factual Issues That Need to Be Estimated and Fails to Distinguish Between Causation and Liability. ...................................................................................................... 27

E.    The Motion Should Be Denied Because Estimation Would Result in Duplicative Trials as The Courts Ruled in The *Dow Corning* And *Portland* Cases. ................................................................................................................ 28

F.    Absent the Court's Adoption of the TCC's Estimation Plan, the Court Should Transfer Estimation Proceedings to the District Court at the Pretrial Stage in Order to Avoid the Duplicative Proceedings Inherent in These Cases. ............... 29

G.    The Court Should Deny Estimation of Tubbs Claims and Abstain in Favor of The State Court Trial, Because the State Court System Would Produce a More Favorable Procedure, the Debtors' Proposal for an October Trial Would Violate Due Process and is Fundamentally Unfair and Would Cause More Problems Than It Solves. .................................................................................... 29

H.    Court Question:  May the Court bifurcate property damage negligence issues and personal injury negligence issues?  No. ...................................................... 31

IV.    CONCLUSION .............................................................................................. 31

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- ii -

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986)..................................................................................4

*Abelleira v. District Court of Appeal*,
    17 Cal.2d 280 (1941) ...........................................................................................16

*In re Adelphia Bus. Solutions*,
    341 B.R. 415 (Bankr. S.D.N.Y. 2003) ................................................................30

*Aetna Life & Cas. Co. v. City of Los Angeles*,
    170 Cal. App. 3d 865 (Cal. Ct. App. 1985) .........................................................9

*B.B. v. Grossman*,
    538 B.R. 34 (Bankr. E.D. Cal. 2015) ............................................................23, 24

*Bakke v. Regents of Univ. of California*,
    18 Cal. 3d 34, 39 (Cal. 1976), *aff'd in part, rev'd in part*, 438 U.S. 265 (1978).....................16

*Barham v. S. Cal. Edison Co.*,
    74 Cal. App. 4th 744 (Cal. Ct. App. 1999) ........................................................15

*Beacon Theaters, Inc. v. Westover*,
    359 U.S. 500 (1959)......................................................................................13, 31

*In re Chevron U.S.A., Inc.*,
    109 B.R. 1016 (5th Cir. 1997) ............................................................................14

*Dairy Queen v. Wood*,
    369 U.S. 469 (1962)......................................................................................13, 31

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich 1997) .....................................5, 6, 13, 25, 26, 27, 28, 29, 31

*Edison Int'l v. Superior Ct. (Abate)*,
    No. B294164 (Cal. Feb. 20, 2019) ......................................................................16

*In re Gawker Media LLC*,
    571 B.R. 612 (Bankr. S.D.N.Y. 2017) ................................................................24

*In re Hanford Reservation Litig.*,
    497 F.3d 1005 (9th Cir. 2007)..............................................................................14

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- i -

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd* 78 B.R. 407 (S.D.N.Y. 1987) *aff'd*
  *sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ......................................2

*Katchen v. Landy*,
  382 U.S. 323 (1966) ...................................................................................................13

*Krein v. Szewc*,
  568 B.R. 348 (Bankr. D. Or. 2017) ............................................................................23

*In re Louie*,
  213 B.R. 754 (Bankr. N.D. Cal. 1997) ......................................................................23

*Molien v. Kaiser Found. Hosps.*,
  27 Cal. 3d 916 (Cal. 1980) ...........................................................................21, 22, 23

*Mosk v. Superior Court*,
  25 Cal. 3d 474 (Cal. 1979) ........................................................................................16

*Pacemaker v. Instromedix*,
  725 F.2d 537 (9th Cir. 1984) .....................................................................................29

*Pacific Bell Tel. Co. v. S. Cal. Edison Co.*,
  208 Cal. App. 4th 1400 (2012) ...............................................................................9, 15

*Paulson v. Arbaugh*,
  2012 Bankr. LEXIS 4920 (Bankr. D. Or. Apr. 26, 2012) ..........................................23

*Plys v. Ang (In re Ang)*,
  589 B.R. 165 (Bankr. S.D. Cal. 2018) ..................................................................23, 24

*Prof. Engs. Calif. Gov't v. Schwarzenegger*,
  50 Cal.4th 989 (Cal. 2010) ........................................................................................16

*In re Roman Catholic Archbishop of Portland*,
  338 B.R. 414 (Bankr. D. Or. 2006) .........................................................................6, 14

*In re Roman Catholic Archbishop of Portland*,
  339 B.R. 215 (Bankr. D. Or. 2006) .........................................6, 7, 25, 26, 27, 31

*In re Roman Catholic Archbishop of Portland in Oregon*,
  No. 04-37154-elp11, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) .......................7

*In re Roman Catholic Bishop of San Diego*,
  374 B.R. 756 (Bankr. S.D. Cal. 2007) ..................................................................25, 26

*Sloane v. Southern Cal. Ry. Co.*,
  111 Cal. 668 (Cal. 1896) ............................................................................................21

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- ii -

*Smith v. Cty. of Los Angeles*,
214 Cal. App. 3d 266 (Cal. Ct. App. 1989) (Oct. 1, 1989) ...................................20, 23

*State Rubbish Collectors Ass'n v. Siliznoff*
38 Cal. 330, 336 (Cal. 1952) .........................................................................21

*Thomas v. Adams (In re Gary Brew Enters.)*,
198 B.R. 616 (Bankr. S.D. Cal. 1996) ...........................................................23

*U.S. v. Burke*,
504 U.S. 229 (1992) .......................................................................................23

*West v. American Tel. & Tel. Co.*,
311 U.S. 223 (1940) ..................................................................................15, 16

**Statutes**

11 U.S.C. § 523(a)(6) ..............................................................................................23

11 U.S.C. § 524(g) .....................................................................................................2

11 U.S.C. § 1141(d) ...............................................................................6, 25, 27, 28

11 U.S.C. § 1328(a)(4) ............................................................................................23

28 U.S.C. § 157(b)(2)(B) ..............................................................................5, 28, 32

28 U.S.C. § 157(b)(5) ..............................................................................................32

28 U.S.C. § 157(c)(1) ..........................................................................................6, 29

28 U.S.C. § 1334(c) .................................................................................................17

28 U.S.C. § 1334(c)(1) .......................................................................................31, 32

28 U.S.C. § 1411 ..........................................................................................13, 31, 32

Cal. Code Civ. Pro. § 1005 .....................................................................................19

Cal. Code Civ. Pro. § 1036 ...............................................................................9, 15

**Rules**

Bankr. L. R. 9015-2 .................................................................................................32

**Other Authorities**

140 Cong. Rec. H10 (daily ed. Oct. 4, 1994) ...........................................................2

CAL. CONST. art VI, § 12 ......................................................................................16

Case: 19-30088    Doc# 3431    Filed: 08/07/19    Entered: 08/07/19 15:51:42    Page 6 of 39

California Constitution ........................................................................................................9

Restatement (Third) of Torts, § 45 (2012) ......................................................................22

Restatement (Third) of Torts, § 47 (2012) ................................................................22, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Official Committee of Tort Claimants ("**TCC**") in the chapter 11 cases (the "**Chapter 11 Cases"**) of PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**") hereby submits its opposition ("**Opposition**") to the motion [Dkt. No. 3091] ("**Motion**") filed by the Debtors pursuant to Sections 105(a) and 502(c) of title 11 of the United States Code (the "**Bankruptcy Code**") for the establishment of wildfire claims estimation procedures.  In support of this Opposition, the TCC submits the declaration of Roger K. Pitman, M.D. ("**Pitman Decl.**") and the declaration of Michael A. Kelly (the "**Kelly Decl.**"), filed contemporaneously herewith.  The TCC also relies on the previously filed Declaration of Robert A. Julian, dated July 2, 2019 [Dkt. No. 2844] ("**Julian Decl.**").  The TCC respectfully states as follows:

I.    **INTRODUCTION AND ROAD MAP FOR THE CASE**

A.    **Background**

The Debtors would like to cram down a plan that pays contract creditors in full, permits shareholders to retain their equity in the utility, channels tort claims to a trust that has a limited fund to pay tort claimants, and discharges the Debtors from liability on the claims.  There can be no assurance the trust would have enough funding to pay the claimants in full when they liquidate their claims via settlements or jury trials.  If the capitalization of the trust fund is insufficient to pay the tort claims in full, the result would be contract creditors and shareholders will have been paid in full and retain their interests, and the victims lose, the only question is by how much.  The result would be an unlawful discharge of tort claims under Bankruptcy Code Section 1141(d), and a plan that violates the unfair discrimination and absolute priority standards of plan confirmation.  If PG&E wanted to avoid this problem, PG&E could agree to pay the tort claimants in full like everyone else in this case instead of capping the distributions.

Capped trust plans that pay all creditors in full except a massive number of tort claimants, without the consent of the tort claimants, are inherently non-confirmable.  In the 30-year history of mass tort bankruptcies, the plan proponents and tort claimant committees have resolved the deficiencies in the use of resolution trusts by confirming consensual plans with overwhelming consent of the tort claimants.  The history of those cases, and Congressional reaction to the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

problems posed by these cases, shines a spotlight on the problems inherent in the trusts, and how the courts have navigated around the problems by engineering the consent of the victim class necessary to confirm plans built on such trusts.

This Introduction summarizes the mass tort tools the courts use to manage these cases and navigate the problems caused by capped trusts. Based on that precedent, the TCC requests the Court to order the following: (1) terminate the stay for a Tubbs state court jury trial; (2) deny the Debtors' motion because it does not identify the factual and legal issues to estimate, and hence the Court cannot determine the fundamental components of an estimation plan: the precise factual issues to be estimated, the core versus non-core jurisdictional basis for those issues, the scope of discovery, the time needed to prepare the issues for estimation, and the date and length of the estimation hearing; (3) set one or more hearings to determine the scope and time necessary to pre-try and try the estimation issues, and which courts should be involved; (4) appoint a discovery referee and open up discovery on the Debtors' liability for the fire claims immediately, in order to avoid the due process violations inherent in estimating over $30 billion of claims involving multiple fires and the multiple factual issues about whether the Debtors negligently maintained and operated their electrical system and vegetation management (the TCC needs a minimum of six months of discovery); and (5) adopt the estimation Road Map the TCC recommends in this Introduction.

### B.     Mass Tort Asbestos Resolution Trusts

In the *Johns-Manville* case, the 1986 plan set a cap on an asbestos claims resolution trust. *See In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd* 78 B.R. 407 (S.D.N.Y. 1987) *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). However, the plan imposed an obligation on reorganized Manville to pay up to 20% of the company's post-confirmation profits if the trust capitalization turned out insufficient; and 95% of the victims approved the plan. Nonetheless, the trust still became underfunded. In 1994, Congress codified much of the Manville plan trust mechanisms for mass tort asbestos cases by enacting Section 524(g) of the Code. *See* 11 U.S.C. § 524(g); 140 Cong. Rec. H10, 765 (daily ed. Oct. 4, 1994). That section requires continual recapitalization of the asbestos claims trust, and approval of 75% of the tort claimants. The judicial and Congressional teachings from this history are that asbestos trusts

pass muster under fundamental bankruptcy confirmation principles because of the statutory requirement for recapitalization, and then only with overwhelming consent of the victims who are channeled to the trust.

Since *Johns-Manville*, these asbestos confirmation procedures have been all the more capable of implementation by virtue of the fact the plaintiffs' bar has developed a well-defined historical matrix of the values asbestos defendants pay in settlement of the three types of asbestos claims, mesothelioma, lung cancer, and asbestosis. In short, estimation of the value of asbestos claims has historically been straightforward and formula-based, smoothing the way to negotiation of a consensual plan under the exacting standards of Section 524(g) based on recapitalization of the trust and the overwhelming consent of the tort claimants.

### C.    The Product Liability Mass Tort Cases

Once the courts had mastered the plan confirmation process for asbestos cases, a new challenge arose for resolution of mass tort bankruptcies, the explosion of product liability cases that threatened the solvency of manufacturers. The history of those cases is a lesson in bankruptcy case management involving use of the Judicial Code's treatment of core and non-core proceedings, centralization in the home court, abstention, and threats and cajoling by the courts to force the parties to agree on the capitalization amount for the trusts, and thereby obtain the consent of the tort claimant committees to ensure the necessary consent of the victims, and avoid the discrimination, absolute priority and discharge problems inherent with capped trusts. These cases established two overriding principles the courts used successfully to manage product liability mass tort chapter 11 cases: First, the courts used their mass tort management tools involving centralization and relief from stay to instill order and resolve test cases that inform the process. Second, the courts routinely denied debtors' requests to estimate claims that could undercapitalize the trusts in order to force the debtors to propose a payment plan acceptable to the victims under specialized estimation procedures and avoid the potential defects in cramming a capped trust plan over the objection of tort claimants. Our overview of those cases and principles informs the Road Map we will recommend in this case, using specialized estimation procedures that are calculated to achieve the legitimate objectives of the parties.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 3 -

### 1. *A.H. Robins*

A.H. Robins filed its chapter 11 case in August of 1985 in order to centralize the multiple Dalkon Shield product defect cases pending throughout the Nation that forced A.H. Robins to litigate far and wide. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 996 (4th Cir. 1986). U.S. District Judge Merhige, presiding in Richmond, Virginia, the locale of A.H. Robins' headquarters, had looked for a way to centralize the litigation in order to control the claims process. On the day of the filing, Judge Merhige signed Administrative Order No. 1. *See In re A.H. Robins Co.*, 59 B.R. 99, 101-02 (Bankr. E.D. Va. 1986). That order withdrew the reference of the entire bankruptcy case, referred select proceedings to Bankruptcy Judge Shelley, and retained the proceedings that affected the product liability cases. *Id.* at 105-07. District Judge Merhige managed the retained proceedings, often with Bankruptcy Judge Shelley seated next to Judge Merhige, as the district judge's adjunct and advisor. When it came time to centralize the litigation for ease of management, A.H. Robins's bankruptcy counsel picked six test tort claimants to sue for injunctive and declaratory relief that all of the tort claimants in the case could not proceed against the debtors' insurance policies, and that the claimants' tort cases should be centralized in the Richmond District Court in order to assist Judge Merhige to manage the litigation, something he could not do before the chapter 11 filing. In a landmark decision, the Fourth Circuit upheld A.H. Robins' use of the test claimants to obtain the required injunctions and centralization but remanded for a determination whether centralization would be appropriate on a case by case basis or whether certain cases should proceed to trial, giving due regard to state law and interests, if requested to do so by claimants. *A.H. Robins Co.*, 788 F.2d at 1015. The lessons from the *A.H. Robins* case are severalfold. First, bankruptcy judges should employ mass tort procedures of directly communicating with other judges, and obtain their assistance, in order to manage the mass tort cases effectively. Second, the litigation of test cases advances the chapter 11 case. Third, the bankruptcy judge may use the Judicial Code's procedures to centralize and streamline litigation in the home court. And, fourth, the bankruptcy court's power to centralize litigation is not unfettered, and should balance competing litigant rights under state law, when it is fair to do so.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 4 -

## 2. *Dow Corning*

Dow Corning's 1995 chapter 11 filing to escape the pressures of the defective breast implant litigation is another example of a bankruptcy judge's effective use of mass tort case management tools. That case involved approximately 440,000 claims, 19,000 pending breast implant lawsuits, and 470 lawsuits involving other medical devices. *In re Dow Corning Corp.*, 211 B.R. 545, 552-53 (Bankr. E.D. Mich 1997). The magnitude of the tort claims in that case dwarfs the estimated 50,000 to 70,000 tort claims in the PG&E case. In the *Dow Corning* chapter 11 case, the debtor and tort claimants committee disagreed whether the breast implant caused cancer and proposed competing procedures to estimate the claims and liability issues in order to fund a capped trust. Facing the infirmity of confirming a plan with a capped trust, *id.* at 566-67, Bankruptcy Judge Spector concluded that "allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effect of Bankruptcy Code § 1141(d), can create the result that the estimation was actually for purposes of distribution as well" (*id.* at 569) and stated that care and specialized fact-finding causation trials by the district court, and not the bankruptcy court, must be used, if the tort claimants committee and the debtor did not agree on a consensual plan (*id.* at 603).

Judge Spector denied both estimation motions on a variety of procedural and substantive grounds. First, facing the parties' request for a contested estimation battle over personal injury causation and liability issues subject to the district court's original, or de novo review, Judge Spector ruled "what a monumental waste it would be if all this Court did was hear, i.e., conduct, the estimation trial and issue proposed findings of fact and conclusions of law subject to de novo review by the district court." *Id.* at 569. This is because, as Judge Spector found, an estimation of personal injury claims for purposes of establishing a capped trust for distribution on the claims constitutes an estimation for distribution, which is a non-core proceeding under 28 U.S.C. § 157(b)(2)(B), subject to de novo retrial in the district court. *Id.* at 561, 569. Second, Judge Spector ruled the estimation motions were defective because they proposed traditional methods of estimating claims (*id.* at 570-72) and did not solve the potential underfunding of the trust by employing specialized jury trials to resolve the liability and causation issues across the entire class,

Case: 19-30088    Doc# 3431    Filed: 08/07/19    Entered: 08/07/19 15:51:42    Page 12 of 39

which would provide a greater certainty of adequate funding for resolution of the tort claims in the resolution trust (*id.* at 591-93, 97). Judge Spector concluded by warning the parties he would recommend that procedure to the district court, for district court trials on causation, if they did not agree on a consensual plan. *Id.* at 603. Judge Spector's warning was successful; the debtor and the tort committee proposed a joint plan that funded the trust in an amount agreed upon by the tort committee and approved overwhelmingly by the tort claimants, including 95.5% of domestic breast implant claimants. S. Elizabeth Gibson, *Case Studies of Mass Tort Limited Fund Class Action Settlements & Bankruptcy Reorganizations* at 232 (Federal Judicial Center 2000) https://www.uscourts.gov/sites/default/files/masstort_1.pdf.

### 3. *Archbishop of Portland*

Judge Perris followed Judge Spector's reasoning and arm twisting in the *Archbishop of Portland* chapter 11 case in two decisions, *In re Roman Catholic Archbishop of Portland*, 338 B.R. 414 (Bankr. D. Or. 2006) ("*Portland I*") and 339 B.R. 215 (Bankr. D. Or. 2006) ("*Portland II*"). In *Portland I*, Judge Perris terminated the stay to permit a group of sexual abuse claimants to try their emotional distress claims in state court jury trials because, like the PG&E case, "the lack of data about how much juries will actually award on the tort claims may be impeding negotiation of a plan of reorganization [and] Trying a few of the claims will help solve that problem, and may cause some of the parties to reevaluate their positions." 338 B.R. at 418.

In *Portland II*, Judge Perris chided the debtor for claiming its estimation motion was for the purpose of "feasibility" and, following Judge Spector's decision, ruled that estimation for "feasibility" of a capped trust means "distribution," which creates a threshold confirmation problem for the case, whether the trust would be underfunded and thereby result in an improper discharge under Section 1141(d). 339 B.R. at 219-21, citing *Dow Corning*, 211 B.R. at 566-7, 569. Like Judge Spector before her, Judge Perris concluded that the estimation of the emotional distress claims entitled to jury trial resolution of significant disputed causation and liability issues in the distribution stage meant the district court would need to estimate the claims as part of its original jurisdiction over the claims, rather than via de novo review under 28 U.S.C. § 157(c)(1). 339 B.R. at 221.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Reviewing the landscape of the *Portland* case, Judge Perris adopted a two-step process for recommending an estimation procedure to the district court judge. As step one, Judge Perris ruled that "Before recommending a methodology to the district court, I would explore with the parties the methods for individualizing the estimation process that would not require mini-trials for every claim but would address the lack of pertinent Oregon jury verdicts." 339 B.R. at 223. As for step two, Judge Perris ruled that after exploring the specific estimation procedures with the parties, she would likely recommend the district court adopt an overriding estimation standard of estimating high, and advisory jury trials to gauge how jury trials would resolve the cases, to guard against an illegal discharge of the tort claims from a capped trust: (1) "estimation of the tort claims for compensatory damages should err on the high side of the probable range, to assure an adequate fund for payment of liquidated claims"; and (2) "another possibility would be to conduct a few advisory summary jury trials such as are used in alternative dispute resolution, to obtain some indication of how Oregon juries might evaluate these claims." *Id.* at 223. Judge Perris' decision in *Portland II* produced a consensual plan, just like Judge Spector's guidance produced the required consent. *In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154-elp11, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) (confirming Third Amended and Restated Joint Plan of Reorganization proposed by the Debtor, Tort Claimants Committee, Future Claimants Representative, and Parish and Parishioners Committee).

### D.    Mass Tort Case Management in General

Professor Elizabeth Gibson summarized much of this history in her seminal 2005 article on Judicial Management of Mass Tort Bankruptcy Cases, that the Federal Judicial Center maintains on its website at https://www.uscourts.gov/sites/default/files/gibsjudi_1.pdf, "in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees." *Id.* As Professor Gibson explained on page 14 of her article, "the judge involved in the resolution of the bankruptcy case should consider whether any of the judges who were involved with the tort or related litigation prior to the debtor's bankruptcy filing could play a useful role in the bankruptcy case and whether the creative use of interdistrict or intercircuit assignment procedures might make their involvement possible." *Id.* at 14. Following this procedure, District

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Judge Charles Bryer coordinated the state court litigation, with the help of former District Judge Fern Smith, in the Celebrex Product Liability Litigation, CV-01699 CRB. *See* Appendix D, Dkt. No. 247, Pretrial Order at ¶ 8. In this case, the specialized JCCP North Bay Fire Cases state court has managed the 2017 North Bay Fire cases through six Case Management Orders that have prepared the cases for trial. *See* Kelly Decl., Exs. A-F. That JCCP is ready for this Court's direct coordination with the JCCP judge, under basic principles of mass tort bankruptcy administration.

### E. The Court Should Deny the Debtors' Motion.

The Court should deny the Debtors' motion because it does not identify the exact elements of the victims' claims, affirmative defenses and disputed factual issues that the Debtors request the Court to estimate how a jury, court or settlement process would resolve. That fundamental first step would provide the Court with a foundation for the parties, experts, and the Court to evaluate what issues are worth estimating, the court's jurisdiction, whether bifurcation is appropriate, the length and scope of discovery, and the time for the hearing on bifurcated issues.

### 1. Identification of the Claims and Issues to Be Tried

The reason the parties to these Chapter 11 Cases cannot get a plan confirmed right now is because no one can agree on the amount owed to wildfire claimants.

The amount owed to wildfire claimants depends on two basic determinations: (1) extent of liability; and (2) value of damages. Value of economic damages alone is not a complex question for the Court to resolve in an estimation proceeding because the Court can utilize expert testimony and modeling based on data that is mostly available publicly.

However, extent of liability can be an enormous, complex question for the Court because it requires significant discovery of the alleged wrongdoer, and resolution of personal injury claims. And here especially, it will be an enormous, complex question if PG&E is contesting liability in regard to every cause of action (i.e., all theories of liability, including but not limited to, negligence, nuisance, and trespass) and for every fire.

The Debtors' motion discusses only two specific issues for estimation, "causation" of the Tubbs fire, and PG&E's responsibility for damages under California Constitutional inverse condemnation law. The Debtors' August 1, 2019 letter (Kelly Decl. Ex. H) states that although the

- 8 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Debtors have admitted causation, the TCC would still need to prove liability, but does not explain what those legal and factual liability issues are. The Debtors' tactic is a classic bait and switch for the non-Tubbs fires: Although the Debtors contend they do not contest causation as a way to make estimation seem simple, in reality, there will have to be a liability trial for each of these fires to determine whether PG&E responsible for the fire claims under theories of negligence and other non-inverse claims, and the Court must first identify and evaluate those theories and factual issues to determine the procedures and timing to estimate the claims. That explanation matters in this case. The TCC's description of the victims' claims is reproduced in Appendix A hereto, which summarizes relevant claims and elements in the North Bay Master Complaint, *see* TCC's Stay Relief Motion, Ex. B, and a Camp Fire complaint, Kelly Decl. Ex. G.

For example, an inverse condemnation claim involves two issues: did PG&E's equipment cause the fire, and, if so, what are the damages? *Pacific Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400, 1410 (2012). For purposes of estimation, PG&E has agreed it will not contest causation of any fire except Tubbs. Hence, under an inverse claim, the only issue to estimate would be damages, for all fires except Tubbs. Under the California Court of Appeal's inverse condemnation decisions, if PG&E's equipment caused the wildfires, then the California Constitution makes PG&E responsible for the fire victims' uninsured and underinsured economic losses, which include the cost to rebuild or lost value of the structures, personal property, restoration of trees and other vegetation, lost profits and good will attendant to business losses, prejudgment interest, and attorneys' fees. *Id. See, e.g., Aetna Life & Cas. Co. v. City of Los Angeles*, 170 Cal. App. 3d 865, 878-79 (Cal. Ct. App. 1985) (affirming award of damages, including interest); Cal. Code Civ. Pro. ("**CCP**") § 1036.

Estimation of the inverse claim alone, and those damages, would be a core proceeding, that would not be subject to a second retrial in the district court under the de novo review statute. Hypothetically, if the Debtors have only $32 billion of distributable value to pay the fire claims, and the victims' and subrogation claimants' inverse damages are some number greater than $32 billion, the Court should understand that fact; because estimation of the inverse economic damages could produce a consensual plan and resolve the case before estimating personal injury and

wrongful death claims that create the double bankruptcy/district court trial problem identified by the *Dow Corning* and *Portland* decisions. The TCC could estimate such damages only at an estimation hearing in four or five months' time after the August 14 hearing, because the discovery issues would involve damages only, and not factual liability issues.

However, the victims' remaining negligence, nuisance, trespass, statutory and other claims raise factual and legal issues that permit the victims to recover many of their inverse damages, plus their wrongful death and personal injury damages. The discovery for those issues is massive and critical, requiring well in excess of five months of discovery, and then only if PG&E produces its documents immediately, as explained in this brief. The negligence factual issues are different for each of the 21 fires, some of which are summarized on Appendix B hereto. For example: Did PG&E negligently fail to deenergize its line, which caused the fire? In one fire, did PG&E negligently fail to remove a tree that fell and sparked the fire? In another fire, did PG&E negligently fail to replace its aging electrical conduits or insulators? In the Camp Fire, did PG&E negligently, or recklessly, fail to replace its obsolete towers and corroded hooks, after learning they had a high risk of failure, that failed and sparked the Camp Fire? And so on. (Appendix B). Estimation of those claim issues would require in excess of five months of discovery, require trials on 20 separate fires, and negligence, nuisance, statutory and other claims, and damages issues, for each fire. If the Court used the specialized JCCP to manage discovery and trial of Tubbs, and if the Court narrowed the negligence trials to the next two biggest fires, Camp and Atlas, the TCC would still need in excess of five months to prepare its estimation trial of just the narrowed negligence cases.

In summary, our jurisdiction, discovery, and efficiency point is a simple one: Inverse=damages discovery=most of the damages=core jurisdiction=one trial.

Negligence, etc.=multiple issues=critical discovery=non-core=bankruptcy and district court trials.

Tubbs state court=multiple issues=state jurisdiction=one trial.

### 2. Identifying the Issues Informs Relief from Stay and Bifurcation

The relevance of identifying these factual issues is important. What if this Court coordinated the JCCP's jury trial of the Tubbs claims to resolve that gating issue in this case, and separately estimated the victims' inverse damages for the rest of the fires in a core proceeding,

- 10 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

based on PG&E's stipulation that its equipment caused those fires? And what if the Court's estimation of the Tubbs fire claims based on the state court jury verdict, and the inverse damages estimated on the basis of PG&E's stipulation, indicates that the combined number is so high that the parties can then agree to a consensual plan and need not participate in a non-core estimation of the victims' remaining negligence claims that seek recovery of the personal injury damages, that would cause a de novo retrial in the district court? Wouldn't the Court want to know the core versus non-core damage difference caused by bifurcation of the claims, in order to evaluate whether the Debtors' proposed estimation game is worth the candle? But PG&E has so far not explained the differences in the claims and damages to the Court, so the Court cannot evaluate bifurcation.

Accordingly, the TCC requests the Court to grant the TCC's relief from stay motion,[1] deny the estimation motion and direct the parties to appear at a continued hearing to brief these foundational issues so the Court may adopt an estimation plan.

### F. Relief from Stay to Try the Tubbs Claims.

The judges in the foregoing cases invoked special mass tort and estimation standards and procedures to force and support a consensual plan that would not be subject to the confirmation infirmities caused by the courts' predictions of how juries would resolve factually intensive disputed issues of causation and liability that establish the amount of capped trusts. How then can the Court in the PG&E case utilize these methods to achieve the same prudent goals? A state court Tubbs trial avoids two trials in the bankruptcy and district courts and permits the bankruptcy court to estimate the inverse damages to produce the basis for a consensual plan. In pursuit of this goal, the TCC recommends the Court grant the TCC's Relief from Stay Motion now, and, at a future estimation procedures hearing, consider adopting the following estimation procedures that should resolve this case efficiently:

### 1. Tubbs State Court Trial.

Employing the most basic procedure for mass tort cases, the Court would terminate the automatic stay and coordinate the JCCP court's trial of the Tubbs cases pursuant to CCP Section 36,

---

[1] TCC's relief from stay motion, as amended, Dkt. No. 2904 (**"TCC's Relief from Stay Motion"**) and memorandum in support, as amended, Dkt. No. 2855.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

because all of the parties in this case agree resolution of PG&E's liability for the Tubbs claims is the gating issue for confirmation of a plan, and the state court JCCP is uniquely qualified to finish the job it started, as Professor Gibson noted is typical in such cases. Section 36 of the CCP requires the state court to provide a jury trial start of the elderly, infirm and other special needs Tubbs fire claimants within 120 days of the JCCP order that the claims should proceed to trial. Under CCP Section 36, the state court has no discretion, the state court must start the trial within the 120-day period. Like Judge Merhige did in *A.H. Robins*, coordinating with the bankruptcy judge, and Judge Bryer did with his state court proceedings, this Court may, and should, communicate directly with the State Court JCCP and trial judges, to inquire about the JCCP and ensure the state court Tubbs trial takes place on this Court's schedule, and to inform this Court's estimation proceeding based on that proceeding. This Court could also request the JCCP Court to order the Tubbs jury required by CCP Section 36, by providing a special court room and a current or retired Superior Court judge who agrees to preside over the case. Any costs attendant to the coordination would be paid by the estate as a cost of administration.

Relief from stay to try the Tubbs case would also open up discovery on the broad negligence issues in that case immediately. This is important, because as explained in this brief below, the Debtors' preparation of their defense and estimation the past two years with over $90 million of litigation analysis, without producing the documentation of the Debtors' negligence to the victims, has denied the victims their due process rights to date. The opening of discovery on the critical negligence issues is a fundamental requirement to address this denial of due process.

The Tubbs state court trial would relieve this Court of a four-week Tubbs Fire "estimation proceeding" resolution of the Tubbs issues recommended by PG&E for October, which would be subject to the TCC's due process objections that AB 1054 and this Court are forcing an estimation of claims for a capped trust without adequate preparation and discovery. Such an estimation would also be subject to retrial in the district court, because that estimation impacts the Tubbs personal injury and wrongful death distribution rights, as the *Dow Corning* and *Portland* decisions explained. PG&E's idea that estimating just "causation" and "liability" for the Tubbs claims makes the proceeding core, is a non-starter. The *Dow Corning* court ruled estimation and a causation trial

involving personal injury claims makes the case non-core, and the fact the issue impacts such a large set of claims and disputed issues means the district court should determine the estimation at the outset instead of the bankruptcy court, absent the consent of the tort committee. 211 B.R. at 569-70.

Indeed, trying so called equitable Tubbs issues first as a core proceeding in the context of a capped trust case would violate the claimants' right to have those issues determined on a non-core basis, subject to protection of the claimants' jury trial rights, under the Supreme Court's directive that legal issues must be tried first in such analogous civil action circumstances. *See Beacon Theaters, Inc. v. Westover,* 359 U.S. 500 (1959); *Dairy Queen v. Wood,* 369 U.S. 469 (1962).[2]

A state court jury trial is in the best interests of the public and the federal courts. We are dealing with a case in which the evidence will show the ignition of the Tubbs Fire was PG&E equipment on two PG&E poles, followed by PG&E's destruction of some of the evidence that caused the ignition, after Cal Fire had instructed PG&E to preserve the equipment and evidence. Memorandum of Points and Authorities in Support of Motion of the Ad Hoc Group of Subrogation Claim Holders for Relief from the Automatic Stay, Dkt. No. 2863 at 3, and n.2. The Tubbs trial also involves a determination of PG&E's negligent maintenance of that electrical system, and negligent failure to deenergize its lines when warned the red flag warnings would result in downed power lines sparking fires. Such an estimation trial in bankruptcy court would most assuredly be followed by a district court retrial on de novo review of the factual findings of such important and hotly contested disputed facts.

Resolution of the Tubbs trial would also help a post-confirmation resolution trust. With a decision in the Tubbs trial, the resolution trust would know whether to pay Tubbs claims or not. The trust's litigation of the Tubbs claims would deplete the trust of money that should be paid to the victims, and not for litigation costs. In short, delaying the Tubbs trials to the resolution trust stage would damage the trust capitalization materially, and harm the victims directly by diverting

---

[2] *Katchen v. Landy's* statement that *Beacon Theaters* and *Dairy Queen* are inapplicable to bankruptcy proof of claim litigation (382 U.S. 323, 338-39 (1966)) is inapplicable in the advent of Congressional adoption of 28 U.S.C. § 1411's preservation of jury trial rights for personal injury and wrongful death issues in bankruptcy.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scarce funds from the distributions. Better to resolve the Tubbs claims now, in advance of the trust establishment. In fact, prudence requires that course in our opinion.

**2. Court Question: How will relief from stay impact resolution of these cases? Courts use test cases to settle or estimate claims.**

In support of this Court's estimation of claims, the TCC, as the official representative of the tort claimants' interests, would use the jury's verdict in the Tubbs trial on all issues so tried, including causation, liability, and the amount of damages for each component of the damage case, for purposes of agreeing on the terms of the consensual plan, estimating the fire claims in this case, and determining the amount to be reserved for payment of the fire claims in any plan in this case. "The reasons for acceptance by bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the case as reflected by the jury verdicts." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); *accord, In re Hanford Reservation Litig.*, 497 F.3d 1005, 1014 (9th Cir. 2007). Judge Perris agreed in *Portland I*, stating, "The lack of data about how much juries will actually award on the tort claims may be impeding negotiation of a plan of reorganization. Trying a few of the claims will help solve that problem and may cause some of the parties to reevaluate their positions." 338 B.R. at 418. That state court trial would be far preferable to this Court itself deciding the Tubbs fire claims over a four-week court trial, as PG&E suggested, that would then be subject to a retrial in the district court four or more months later, given the magnitude of the disputed issues involved in the bankruptcy trial, as the courts in *Dow Corning* and *Portland* similarly ruled.

**G. Estimation Procedures Hearing.**

The TCC requests the Court to deny the estimation motion, and order the parties to brief the following issues so the Court may determine the scope and length of the estimation hearing at a future hearing: (1) the factual and legal issues to estimate for each of the fires; (2) whether the Court may dispense with estimating fire claims for some of the fires on the basis some of the fires did not destroy a substantial number of structures compared to the balance of the fires (Camp, Tubbs and Atlas destroyed 90% of the structures); (3) the core versus non-core jurisdictional basis

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 14 -

for those issues; (4) the scope of discovery for those issues; (5) the time needed to prepare the issues for estimation; (6) the date and length of the estimation hearing for those issues; (7) the selective use of the district court or other courts to assist this Court; and (8) open up discovery on the Debtors' liability for the fire claims immediately, in order to avoid the due process violations inherent in estimating over $30 billion of claims involving multiple fires in the near future.

### H. Estimation Road Map.

If the Court decides the Court does not need additional briefing on these subjects as recommended above, the TCC requests the Court to adopt the following Road Map for this case:

#### 1. Adoption of Inverse.

The Court must adopt the two Court of Appeal decisions that apply California inverse condemnation law to utilities and deny the Debtors' motion for briefing on whether the California Supreme Court would overturn those two decisions. Those Court of Appeal decisions declare that, when private property is taken or damaged by a California utility, the State Constitution requires the utility to compensate the owner for damages caused by the utility's improvements, which includes interest and attorneys' fees. *Pac. Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400, 1410 (2012) *as modified* (Sept. 13, 2012); *Barham v. S. Cal. Edison Co*., 74 Cal. App. 4th 744, 751-52 (Cal. Ct. App. 1999); CCP § 1036. The Debtors dispute their responsibility for inverse condemnation damages on a single basis: The Debtors argue a federal court should not apply the Court of Appeal's decisions if there is "persuasive data" the California Supreme Court would overturn the Court of Appeal's decisions, and such persuasive arguments supposedly exist.

However, in *West v. American Tel. & Tel. Co*., 311 U.S. 223 (1940), the U.S. Supreme Court ruled the persuasive data rule does not apply if a state Supreme Court "denied review" of the appellate issue, because a state Supreme Court's denial of review is persuasive evidence the state Supreme Court did not see the necessity of reviewing or modifying the existing intermediate appellate court decision. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. [citations omitted] This is the more so where, as in this

- 15 -

case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court." 311 U.S. at 237. That is the case here.

As PG&E explained in its March 31, 2019 10-Q, in two separate Supreme Court decisions, dated September 6, 2018, and November 14, 2018, the California Supreme Court denied PG&E's petitions for review of the California Court of Appeal's separate decisions refusing to overturn the Sacramento Superior Court's and the San Francisco Superior Court's JCCP trial court decisions applying the California Court of Appeal's inverse law to PG&E's liability for the 2015 Butte fire and the 2017 North Bay Fires. We attach PG&E's 10-Q explanation of the Supreme Court's repeated denials of its petitions for review, to this Memorandum as Appendix C, excerpted from the Julian Decl., Ex. C, at 46, 54-55. The Supreme Court also recently denied a third petition for review of an inverse condemnation issue based on the 2017 Thomas fire. *Edison Int'l v. Superior Ct. (Abate)*, No. B294164 (Cal. Feb. 20, 2019) (denying petition for review based on 2017 Thomas Fires), *available at* https://tinyurl.com/y36725fj, https://appellatecases.courtinfo.ca.gov.

PG&E is also barred from requesting this Court to predict whether the Supreme Court would overturn the California appellate precedent because PG&E failed to exhaust its existing remedy under California Constitution Article VI, Section 12, to request the California Supreme Court to immediately decide this precise inverse condemnation appellate issue, now pending in the Court of Appeal on PG&E's *third appellate review* attempt of the California Superior Court's 2018 inverse rulings. *See* Appendix C, 10-Q at 55. An Article VI, Section 12 transfer of an appeal raising constitutional issues to the Supreme Court is a fundamental step of appellate practice. *See, e.g., Prof. Engs. Calif. Gov't v. Schwarzenegger*, 50 Cal.4th 989, 1000 (Cal. 2010) (reviewing a transferred appeal pursuant to Article VI Section 12 regarding the Governor's authority); *Mosk v. Superior Court*, 25 Cal. 3d 474, 480 (Cal. 1979) (noting that the court transferred constitutional issues to itself pursuant to Article VI Section 12); *Bakke v. Regents of Univ. of California*, 18 Cal. 3d 34, 39 (Cal. 1976) ("We transferred the cause directly here, prior to a decision by the Court of Appeal, because of the importance of the issues involved."), *aff'd in part, rev'd in part*, 438 U.S. 265 (1978). *Cf. Abelleira v. District Court of Appeal*, 17 Cal.2d 280, 291-92 (1941) (discussing

- 16 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the doctrine of exhaustion of administrative remedies).

In other words, rather than ask this Court to "predict" whether the California Supreme Court would decide to grant review of the recent 2018 Court of Appeal decisions, PG&E could have simply filed a request with the California Supreme Court asking the Supreme Court to resolve PG&E's actual pending, third, inverse appeal, and the Supreme Court would respond directly, for a fourth time in one year, whether the Supreme Court believes the issue is worthy of deciding and reversing the appellate precedent. PG&E's decision not to take this fundamental step of appellate practice is fatal under the exhaustion of remedies doctrine and establishes cause for abstention under 28 U.S.C. § 1334(c) based on the Debtors' forum shopping the pending appeal to this Court.

As explained next, this Court's application of the Court of Appeal inverse precedent would permit the Court to estimate the non-economic damages that flow from that claim on a non-core basis, without de novo review by the district court, streamlining the estimation and plan process.

## 2. Estimation of Economic Damages.

This Court could estimate the economic damages for the rest of the fire claims based only on the inverse condemnation law that imposes responsibility on PG&E for the victims' economic damages, interest, and attorneys' fees without estimating the victims' personal injury damages in that proceeding. PG&E's alternative of estimating PG&E's liability for negligent maintenance of its electrical system and policies, trespass, nuisance, and statutory violations, would require individual trials, or one super long trial, on PG&E's negligence for its deenergizing policies, and maintenance of the trees, lines and equipment that failed under different circumstances in each of the remaining fires and caused the personal injury damages that make up the balance of the victims' damages. That remaining set of negligence and other damage claims would subject this Court's estimation of the personal injury damages to an initial trial in the district court, as Judges Spector and Perris ruled is necessary in these types of cases, or a complete retrial in the district court under this district's Report and Recommendation procedures for such non-core matters. There is every reason for the Court to avoid such duplicative litigation if the result of the Tubbs trial and this Court's core proceeding estimation of the economic damages would establish the resulting damage number is so high that it eclipses the amount available for distribution in this case, or the dollar

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

amount is simply a sufficient number for the parties to agree otherwise on a consensual plan.

### 3. Status Conference for Further Proceedings.

At an appropriate time, the Court should hold a status conference or hearing for the purpose of determining if this procedure would produce a consensual plan for the reasons discussed above, which we believe would be likely, or whether the parties need an estimation of the remaining claims, which we believe would be unlikely. In the unlikely event the Court decides it should estimate the balance of the personal injury claims that arose from the remaining fires, the Court could then evaluate whether to estimate the Debtors' negligence and similar liability for the three principal wildfires that damaged and injured 90% of the households according to Cal Fire reports[3]: Camp Fire, Tubbs, and Atlas, with other test cases, trials, or other special procedures as Judges Spector and Perris ordered or recommended in the *Dow Corning* and *Portland* cases.

### 4. Immediate Opening of Discovery.

Under all events, the Court must open discovery on causation and liability for all the fires in order to protect the tort claimants' due process rights to prepare these cases for trial or estimation. PG&E has sole possession of the company documents and witnesses that establish PG&E negligently maintained and managed its electrical system policies, infrastructure and adjacent vegetation, and destruction of evidence. PG&E spent over one year and $90 million in legal fees analyzing that information and destruction of evidence and preparing its estimation case. *See* Dkt. No. 1025 (PG&E paid Cravath $75,729,004 pre-petition), Dkt. Nos. 2645, 3084 (Cravath post-petition work totaled $15.9 million). The TCC does not have PG&E's information and has not spent any comparable time or money analyzing the information or preparing for such a trial. It would be a monumental one-sided denial of due process to force the TCC to commence litigation without the immediate opening of discovery or compress the timetable to force a trial on any wildfire issue within the next six months, and the TCC strenuously objects to any such proceeding. PG&E's plan is aimed at preparing its case for trial, compressing the timetable for discovery and estimation, taking advantage of the system, and making the Court a party to a denial of due process.

---

[3] Cal Fire DINS reports, *available at* https://calfire.box.com/s/y42j5i83yrpbfp134vpl80bjw8vqn9xl; https://calfire.app.box.com/s/6wdmkgyjxnm61yaktdmz4d6ffd59sxyg/file/249577253203; https://calfire.app.box.com/s/6wdmkgyjxnm61yaktdmz4d6ffd59sxyg/file/334221104743.

In the balance of this Memorandum, we answer this Court's recent "concerns and questions" about the Tubbs trial and the estimation process, and brief the legal issues raised by the Debtors' Motion and our proposed Road Map.

## II. THE COURT'S QUESTIONS ABOUT THE JCCP NORTH BAY CASES.

### A. Court Question: What is the timeline and Court for a JCCP Tubbs trial? JCCP Judge Picks the Court, Mandatory trial "no later than 120 days."

Preference Plaintiffs are entitled to immediate trial under CCP Section 36. The TCC and the individual plaintiffs picked CCP preference plaintiffs to provide a fast track forum, and obtain a liability finding to assist the bankruptcy court's estimation process.

If relief from stay is granted, the North Bay leadership group would take the following steps to obtain a trial date:

- There would be a motion for preference in JCCP on 16-day notice. CCP § 1005.
- There would be a hearing on motion for preference.
- The standard is CCP Section 36.
- The only issue of fact under CCP Section 36 is age, counsel certificate of infirmity, and explanation of why non-age cases are important.
- If the showing is made, the JCCP court must grant preference under CCP Section 36 and determine the Superior Court venue after considering the parties' "Proposed county for trial" pursuant to Case Management Order No. 3 (Kelly Decl. Ex. C), at 2.
- Under CCP Section 36, the trial court must provide a court room and the trial must start within 120 days of the order approving the preference.
- The JCCP can order the case to trial with a judge devoted to this case, who may report to Judge Montali. In this way Judge Montali could coordinate the process.
- The North Bay leadership group believes the jury trial should occur in January 2020, pursuant to the 120-day period of time set by CCP Section 36.

A JCCP Tubbs trial will take 45 hours per side.

### B. Court Question: Why would the JCCP Court try the Tubbs Fire claims first, before Atlas? Both cases are stayed, and the parties agree trial of Tubbs is a gating issue, not Atlas.

The JCCP judge picked Atlas because it was a "somewhat simpler" case to try than Tubbs, and it was not a gating issue for the JCCP litigation. Kelly Decl. Ex. D at 2. With the issuance of the Cal Fire report in January of 2019, PG&E filed their Chapter 11 Cases and, in their first day bankruptcy and SEC filings booked $14 billion of reserves for the non-Tubbs fire claims and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 19 -

estimated the allowed claims could exceed $30 billion, and disputed liability for Tubbs claims on the basis of the Cal Fire report. With that change of circumstance, all parties in the Chapter 11 Cases now agree that the determination of PG&E's liability for Tubbs is the first gating issue in the case for plan confirmation. Hence, the TCC contends cause exists for relief from stay for Tubbs claims, but not for the previously set Atlas trial, and the previous stayed Atlas trial remains stayed and none of the parties contend an Atlas trial is a gating issue.

## C. Court Question: Would a JCCP jury trial resolution of Tubbs Fire claims assist the chapter 11 process via a midpoint resolution? Yes.

Relief from stay resolves all fire claims or provides a midpoint resolution. All parties agree that the determination of PG&E's liability for Tubbs claims is a gating issue that they believe would enable them to negotiate a consensual plan. But if a broader settlement did not occur, a jury determination of Tubbs claims would resolve several issues in the case that would assist the Court and parties to estimate the value of the key damage components that PG&E contends have no or de minimis value in these cases separate from the victims' loss of their homes and businesses: (1) emotional distress and shock to the nervous system caused by the individuals being trapped in their fire escape or otherwise evacuating under prolonged believe they would either be killed, burned or injured; (2) emotional distress suffered by suffering the loss of use of personal and real property;[4] (3) the value of trees and other vegetation lost in the fires (one Sonoma recent case awarded hundreds of thousands of dollars for the loss of a specimen oak tree); (4) payment of alternative living expenses for the duration of the rebuild period; and (5) square foot costs to rebuild in the burn areas.

The Court's granting relief from stay for personal injury claims only and not property damage claims would impair the victims' presentation of their case, produce duplicative trials, and impair the estimation process. In order to present the plaintiffs' claims fairly to the jury, the plaintiffs need to present all their claims in context as a matter of fairness and to avoid splitting a cause of action. For example, the negligence and nuisance claim request damages for loss of the individual's property and the emotional distress the individual suffered as a result of that property

---

[4] *Smith v. Cty. of Los Angeles*, 214 Cal. App. 3d 266, 287-88 (Cal. Ct. App. 1989), *reh'g denied and opinion modified* (Oct. 1, 1989) (holding that damages for emotional distress may be awarded in a damages action).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

loss, among other damages. The individual must present his or her entire property and personal injury case on that claim in order for the jury to understand it. It would not make sense to hold a second trial in the estimation phase on the property damage part of the negligence and nuisance claims after the jury heard and considered the entire property and personal injury claim. Moreover, the jury's verdict on the value of property damage losses suffered by the victim's loss of trees would help in the property damage phase because the Debtors cannot understand the state court system's award of hundreds of thousands of dollars for lost trees, that cost that much to replace.

The Court has asked how the timing requirements of AB 1054 impact this case. As this Court noted during the last hearing, the Court can expedite the plan process. The timetable we suggest here is compatible with confirmation of a plan by June 30, 2020. But more importantly, almost every party in this case has said repeatedly this case's famous mantra, we want to fairly compensate the victims. The Road Map we propose here is crafted to help the victims and protect their due process and related rights in bankruptcy.

## III.    ARGUMENT

### A.    Court Question:  Are the victims' emotional distress damage claims personal injury claims under California law and 28 USC § 157(b)(2)(B) and 157(b)(5)? Yes.

#### 1.    Emotional Distress is a Personal Injury Claim under California Law and the Restatement of Torts.

Recovery of emotional distress damages is a fundamental right in California. In *State Rubbish Collectors Ass'n v. Siliznoff*, Justice Traynor authored the California Supreme Court's landmark decision that an emotional distress claim is a recoverable personal injury claim. The Supreme Court held "a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault." 38 Cal. 330, 336 (Cal. 1952). The Supreme Court extended that holding to negligence claims in several decisions, including, *Molien v. Kaiser Found. Hosps*., 27 Cal. 3d 916, 924 (Cal. 1980) *quoting Sloane v. Southern Cal. Ry. Co.,* 111 Cal. 668, 680 (Cal. 1896). "[E]motional injury may be fully as severe and debilitating as physical harm and is no less

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

deserving of redress; the refusal to recognize a cause of action for negligently inflicted injury in the absence of some physical consequence is therefore an anachronism" *Molien*, 27 Cal. 3d at 919.

The Supreme Court also has held that "the unqualified requirement of physical injury is no longer justifiable." *Molien*, 27 Cal. 3d at 928. The Restatement of Torts follows the California law: "Emotional harm encompasses a variety of mental states, including fright, fear, sadness, sorrow, despondency, anxiety, humiliation, depression (and other mental illnesses), and a host of other detrimental—from mildly unpleasant to disabling—mental conditions. . . . When an actor's tortious conduct causes emotional harm that then produces bodily harm, the rules for liability provided for physical harm . . . govern." Restatement (Third) of Torts, § 45 cmts. a, b (2012).

Recovery for direct (not bystander) emotional harm is available when the victim is in danger of immediate bodily harm "in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." Restatement (Third) of Torts § 47. The Restatement of Torts applies the "zone of danger" test, where the plaintiff may recover for "serious emotional harm caused by reaction to the danger, even though the conduct did not cause any impact or bodily harm to the other." *Id.* cmt. e. In this case, the zone of danger was the fire and its surrounding evacuation environment.

The Restatement explains what "serious" emotional harm means. "[T]here are objective and subjective components to this requirement. Objectively, an unusually susceptible person may not recover if an ordinary person would not have suffered serious emotional harm. But if that 'reasonable person' threshold is met, a person may recover for all harm subjectively suffered, even if that suffering is greater than an ordinary person's because of a predisposition or special vulnerability." *Id.* cmt. *l*. The California Supreme Court cases are in accord. *Molien*, 27 Cal. 3d at 928 ("[S]erious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." (internal quotations omitted)).

The California Supreme Court recognizes "the jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience. In addition, there will doubtless be circumstances in which the alleged emotional injury

is susceptible of objective ascertainment by expert medical testimony." *Id.* at 929-30; *accord* Restatement (Third) of Torts § 47 cmt. *l.*

### 2. The Majority of California and Out of State Bankruptcy Cases Have Held That the Bankruptcy Code's Use of the Term Personal Injury Claims Includes Claims for Emotional Distress.

Bankruptcy courts in the Ninth Circuit always have treated emotional distress claims as personal injury claims. *See, e.g., Plys v. Ang (In re Ang)*, 589 B.R. 165, 180 (Bankr. S.D. Cal. 2018) (determining that "personal injury" under Section 1328(a)(4) of the Bankruptcy Code encompasses harassment and emotional distress claims); *B.B. v. Grossman (In re Grossman),* 538 B.R. 34, 43 (Bankr. E.D. Cal. 2015) (holding that emotional distress claims were personal injury claims); *In re Louie*, 213 B.R. 754, 758 (Bankr. N.D. Cal. 1997) (holding that properly pled claim for intentional infliction of emotional distress provides the required elements of a non-dischargeable debt under § 523(a)(6)); *Krein v. Szewc (In re Szewc)*, 568 B.R. 348 (Bankr. D. Or. 2017) (holding that public nuisance claim and accompanying emotional distress claims were non-dischargeable as "personal injury" claims); *Paulson v. Arbaugh (In re Paulson)*, 2012 Bankr. LEXIS 4920, at *11 (Bankr. D. Or. Apr. 26, 2012) ("Because the conspiracy and [intentional infliction of emotional distress] claims neither arise under title 11 nor arise in a case under title 11, at best they can be considered to be related to a case under title 11, and therefore non-core. It is undisputed that without the consent of the parties I have no authority to enter a final judgment in a non-core matter."); *see also In re Smith*, 389 B.R. 902, 908 (Bankr. D. Nev. 2008) (libel claims constitute personal injury tort claims); *Thomas v. Adams (In re Gary Brew Enters.)*, 198 B.R. 616, 620 (Bankr. S.D. Cal. 1996) (Section 1983 civil rights claims are personal injury tort claims).

Moreover, two California bankruptcy courts have noted that Congress's use of the term "personal injury" encompasses non-bodily injury because if Congress wanted to say "personal bodily injury" it would have, just as it did Bankruptcy Code Section 522(d)(11)(D). *Grossman*, 538 B.R. at 41-42; *see also Ang*, 589 B.R. at 180-81. The court in *Grossman* also noted that at the time that "personal injury" was added, the Supreme Court had already construed the phrase "personal injury" in a former version of the Internal Revenue Code to include nonphysical injuries. *Grossman*, 538 B.R. at 41-42, citing *U.S. v. Burke*, 504 U.S. 229, 234-37 (1992). The *Grossman*

and *Ang* courts further relied on case law construing the phrase "personal injury tort" in Section 157 to include non-bodily personal injury. *Grossman*, 538 B.R. at 42; *Ang*, 589 B.R. at 180.

The Debtors cite to *In re Gawker Media LLC,* 571 B.R. 612, 623 (Bankr. S.D.N.Y. 2017) for the premise that the emotional distress claims here may be "incidental to property damage claims." Motion at 15 n.10. The court in that case stated that it was applying a narrow interpretation of the definition of "personal injury" claims and found that the complaint did not allege bodily injury or emotional damage beyond "mere shame and humiliation." 571 B.R. at 624-25 (internal quotations omitted). The *Gawker* court focused on the defamation claim, a claim for recovery of a reputation interest, which was like an intellectual property right. The *Gawker* court concluded that the claimant's addition of emotional distress damages appeared on the facts to be such a non-material claim that it was surplusage, or in the word of the court, incidental. *Id.* at 623. A fair reading of the decision is that the judge disbelieved the claimant's assertion of a real emotional distress claim.

### 3. The Victims Suffered Personal Injury Damages Under Every Court's Definition of the Term

Even *Gawker*'s speculation of the weight of a surplusage emotional distress claim would not apply in this case. In 2017 and 2018 the Tubbs Fire hit in the middle of night, and the Camp Fire hit at dawn. In short, it is likely that most households were home at the time. The videos of the victims being trapped in the fires on stalled exit roads, and fleeing the smoke filled blind roads over extended hours, without knowing if they would be burned, killed, suffocated, or escape eventually, show the victims suffering without even knowing if their house had been burned or not.[5] That suffering cannot be viewed as "incidental" under any meaning of that word.

The Debtors' Motion admits there were 5,000 households in the Tubbs fire, and 14,000 households in the Camp Fire. That is 19,000 households, with a census average person per household of approximately 2.56. U.S. Census Bureau, https://www.census.gov/quickfacts /buttecountycalifornia, https://www.census.gov/quickfacts/sonomacountycalifornia. That is an estimated 48,640 fleeing victims, who suffered greatly, not knowing if they would be trapped,

---

[5] *See* Pitman Decl. at ¶ 7, citing to videos of the escape, such as https://www.cnn.com/2018/11/13/us/california-wildfires-woolsey-camp-hill-testimonies/index.html.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

burned, suffocated, or killed like the other 130 victims. That's over 48,000 victims who may have suffered severe trauma without even knowing what, if any, property damage they suffered, and hence their injuries are not "incidental to" any such property damage under any the meaning of incidental. Even so, well-established literature on the emotional effects of being exposed to the risk of serious injury or death or even learning that loved ones were exposed to serious injury or death, such as when fleeing through a firestorm, results in mental disorders that include physical bodily injury. Pitman Decl. at ¶¶ 12-16.

**B.      Court Question:  Does estimation of personal injury claims for the purpose of funding a capped trust constitute an estimation for purposes of distribution? Yes.**

Capped trusts create a problem by definition because they limit the amount of funding available to pay claimants—claimants entitled to a jury trial determination of their claim. But, in many cases, the full resolution of all jury trials would render a debtor's exit from bankruptcy impracticable. As a result, until the plan becomes consensual, the courts estimate the claims in accordance with the claimants' due process rights, in an effort to force a consensual plan that moots the confirmation issues.

The Court is well aware of the cases which did exactly this:  *Dow Corning, Portland,* and *In re Roman Catholic Bishop of San Diego*, 374 B.R. 756 (Bankr. S.D. Cal. 2007). Those cases hold that estimation for the purposes of determining the size of a capped trusts is actually estimation for the purposes of distribution or terminate the stay in order to avoid that result. As the court explained in *Dow Corning*, "allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effect of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well."  211 B.R. at 569; *see also Portland II* , 339 B.R. at 221 ("This court does not have jurisdiction to estimate personal injury tort claims for purposes of distribution . . . ."); *San Diego,* 374 B.R. at 762-64 (remanding state court lawsuits and denying a bankruptcy court estimation because, among other things, "loss of the Seventh Amendment right to a jury trial will cause severe prejudice to the plaintiffs").

As the court in *Dow Corning* explained:

A personal injury claimant would, of course, contend that a plan cannot permit discharge of her claim without providing for actual—not hypothetical via estimation—payment in full. Such a claimant might, therefore, request the court to add appropriate conditions to the discharge which a debtor receives under § 1141(d) upon plan confirmation ("Except as otherwise provided in ... the order confirming the plan, the confirmation of a plan —(A) discharges the debtor from any debt...."). And if estimation for plan confirmation purposes results in *de facto* estimation for distribution purposes via the effects of the plan of reorganization and the discharge provisions of § 1141(d), a claimant's right to a jury trial for purposes of liquidating her claim becomes hollow. Therefore, a strong argument can be made that estimating the aggregate value of tort claims for plan purposes runs roughshod over personal injury claimants' rights.

211 B.R. at 569; *see also Portland II* 339 B.R. at 221 ("it intends to use the estimation, along with estimation of other present tort claims, to put an upper limit on the amount it will pay on all of the tort claims, while discharging any actual liability in excess of the estimated amount."). As a result of these problems, the courts offered multiple avenues for determination of claims: remand to state court, *San Diego*, 374 B.R. at 764-65, staggered general causation trials, *Dow Corning*, 211 B.R. at 593, or an "individualized estimation of claims" though something like test cases or a matrix comparing Oregon jury verdicts to specific aggravating factors, advisory summary jury trials, and, district court estimation "on the high side of the probable range." *Portland II*, 339 B.R. at 223. All of these cases rejected the idea of an estimation hearing in bankruptcy court.

### C. The Motion Should be Denied Because it Does Not Candidly Explain its Purpose is for Distribution, as Judge Perris Ruled in the Analogous *Portland* Case.

PG&E's motion argues "all that is proposed here" is "estimating the Wildfire Claims . . . for . . . voting and plan feasibility," while in the next sentence stating, "Whether and to what extent the results of that estimation ultimately may be used to determine the amount of consideration to be provided to claimants or groups of claimants as part of a Plan, consensual or otherwise, is a question that can be determined, if it is presented, at a later stage." Motion at 15. In a backhanded way, the Debtors admitted estimation will affect the distribution to the Fire Claimants. Estimation to project whether the Debtors will be able to operate as a reorganized company is one thing, estimation of how much the Debtors will pay to the claimants, and no more, is quite another calculation.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 26 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Courts have seen right through such pretenses. As the courts in *Dow Corning* and *Portland* explained, the court can evaluate whether estimation will advance the case only if the debtor explains the purpose of estimation. Where, as in the *Dow Corning* and *Portland* cases, the debtor has previously indicated the debtor would like to establish a capped trust that limits distributions to tort claimants and then requests the court to estimate claims for so called "voting and feasibility," the courts prudently unmask the charade, and call a spade for a spade: the debtor is trying to fund the trust on the basis of the estimation. In *Dow Corning*, the court explained that "allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effect of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well." 211 B.R. at 569. Judge Perris slapped the debtor with that same finding, stating that the debtor's estimation proposal was for "the purported purpose of confirmation and voting," when in reality it was using the estimation "to put an upper limit on the amount it will pay on all of the tort claims, while discharging any actual liability in excess of the estimated amount." 339 B.R. at 221. The same scenario is playing out in the case with PG&E's disingenuous claim that estimation is for "voting and plan feasibility" and any use "at a later stage" can be argued then. A debtor's lack of candor on this foundational element of an estimation motion requires denial. *Portland II*, 339 B.R. at 221 ("Because I conclude that the estimation debtor seeks is at least in part for the purpose of distribution, I cannot make that estimation."). The Motion should be denied on this basis alone.

> **D.      The Motion Should Be Denied Because It Does Not Identify the Factual Issues That Need to Be Estimated and Fails to Distinguish Between Causation and Liability.**

The Debtors state that they will not contest causation with respect to all of the wildfires except the Tubbs Fire and the 2016 Ghost Ship Fire. However, causation is only one material element to establish legal liability under the negligence, nuisance, and trespass causes of action alleged by the Fire Claimants. Therefore, although the Debtors have conceded causation, they have not conceded legal liability as it relates to those causes of action and have not identified the foundational issues that would permit this Court to evaluate and determine estimation procedures.

If the Debtors do not concede liability for any of the trials, then their "phase 3" December estimation trial will be virtually unlimited and contain none of the special procedures the courts in *Dow Corning* and *Portland* cases found were necessary to include in an estimation procedures plan.

**E.     The Motion Should Be Denied Because Estimation Would Result in Duplicative Trials as The Courts Ruled in The *Dow Corning* And *Portland* Cases.**

Estimation of personal injury claims for sizing a capped trust must be resolved by a district court only because estimation of personal injury claims for sizing a capped trust is equivalent to estimating personal injury claims for distribution and determining the amount of personal injury claims for distribution must be resolved by district court jury trial only (unless abstention). As a result, estimation of a massive number of personal injury claims, with multiple factual issues requiring retrial, for a capped trust must be resolved by a district court preparatory to a jury trial.

For these reasons, PG&E's Motion is a non-core proceeding under 28 U.S.C. § 157(b)(2)(B). PG&E wants the Court to estimate the value of mass tort personal injury claims in order to establish a trust that would limit the distribution on the claims to a capped limit. The court in *Dow Corning* explained the problem: "when plugged into a confirmed plan, an estimation of the aggregate value of all personal injury claims for purposes of feasibility, which on the surface appears benign and 'core,' would be transformed into a discharge of unsatisfied personal injury claims via § 1141(d). If that were the case, the estimation would turn out to be 'noncore' for purposes of distribution and a bankruptcy court lacking the consent of all parties that would be affected thereby, would not have the authority to perform such an estimation." 211 B.R. at 570.

Judges Spector and Perris both ruled that, in such a non-core proceeding that implicates the personal injury claimants' jury trial rights, the bankruptcy court should transfer the proceeding to the district court after pretrial proceedings as an original proceeding. *Dow Corning,* 211 B.R. at 570 ("And what a monumental waste it would be if all this Court did was hear, i.e., conduct, the estimation trial and issue proposed findings of fact and conclusions of law subject to de novo review by the district court."). That would require this Court to deny the estimation motions as Judge Spector did in *Dow Corning* and Judge Perris did in *Portland II*.

The TCC's proposed Road Map for this case avoids these complications.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**F.** **Absent the Court's Adoption of the TCC's Estimation Plan, the Court Should Transfer Estimation Proceedings to the District Court at the Pretrial Stage in Order to Avoid the Duplicative Proceedings Inherent in These Cases.**

As Judge Spector concluded in *Dow Corning*, a district court cannot possibly review a bankruptcy court's estimation of over tens of thousands of claims involving multiple factual causation and liability issues and billions of dollars of damages without conducting a complete de novo review that would amount to a retrial of such claims in the district court. 211 B.R. at 569 ("what a monumental waste it would be if all this Court did was hear, *i.e.*, conduct, the estimation trial and issue proposed findings of fact and conclusions of law subject to de novo review by the district court.") To do otherwise, in such a massive case impacting a substantial percentage of Northern California residents and hotly disputed factual issues, would deny the litigants an Article III determination and cast doubt on these bankruptcy proceedings, as the Ninth Circuit noted in an analogous case involving the reference to magistrates that did not include real de novo review, *Pacemaker v. Instromedix*, 725 F.2d 537, 546 (9th Cir. 1984):

> The plan contains at least the potential for district judges to engage in routine and cursory examinations, so that decisions nominally made by district judges will in fact be those of the magistrate. The identity of the officer responsible for the decision may be unclear to the public or to the litigants. Where the responsibility becomes blurred, power may be either abused or too timidly exercised.

After a state court Tubbs test jury trial and application of the California Court of Appeal's decisions on inverse condemnation, the Court should hold an appropriate conference to identify the remaining issues for resolution by the district court's original district court jurisdiction or, if the Court denies that request, the bankruptcy court's estimation subject to de novo review in the district court pursuant to 28 U.S.C. § 157(c)(1), and/or the use of other state court trials under Judge Montali's direction and supervision.

In any event, the TCC recommends the Court appoint its own neutral claims estimation expert to advise the Court on the parties' evidence.

**G.** **The Court Should Deny Estimation of Tubbs Claims and Abstain in Favor of The State Court Trial, Because the State Court System Would Produce a More Favorable Procedure, the Debtors' Proposal for an October Trial Would Violate Due Process and is Fundamentally Unfair and Would Cause More Problems Than It Solves.**

The TCC contends the state court's trial of the Tubbs claims is preferable to estimation

Case: 19-30088    Doc# 3431    Filed: 08/07/19    Entered: 08/07/19 15:51:42    Page 36 of 39

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

because the case has been pending and managed through six Case Management Orders (Kelly Decl. Exs. A-F); this Court can coordinate the trial with the state court judge; the claimants' jury trial rights are at stake; the capped trust impacts those rights; the bankruptcy process would impair the claimants' presentation of their case; and the state court system is geared to resolving such claims with specialized discovery and trial procedures. Other state court or district court jury trials may be necessary also, and may be evaluated at a future status conference.

If the Court decides to estimate PG&E's liability for the Tubbs claims over the TCC's and the victims' objections, that trial would require six months of preparation, 40-50 hours of trial time per side, and involve a resolution of the disputed causation and negligence liability issues, and not just a question of whether PG&E's equipment was the cause of the fire. Hence, PG&E's estimated Phase 2 compressed four-week discovery schedule and three-week trial is not prudent and would violate the claimants' due process rights. *In re Adelphia Bus. Solutions*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003) (finding debtors' proposed procedures for estimating claim for feasibility purposes were permissible, but 20-day timeframe for estimating allowance of alleged $70 million administrative claim did not comport with due process).

The Debtors and their state court trial counsel at Cravath have spent two years and over $70 million preparing for their Tubbs and other fire trials and estimation. The TCC was just appointed six months ago and needs six months to prepare for such an estimation trial and estimates the trial would last four weeks. The Debtors' proposed schedule, under threat of AB 1054 or otherwise, would be manifestly unfair, and appears to be a sandbag after refusing to produce estimation documentation to the TCC throughout these cases, only to request a trial on estimation on the spur of the moment in response to the TCC's motion for relief from stay to try the Tubbs claims. The TCC objects on due process grounds, principles of fundamental fairness, and estoppel.

**Court Question: Can the Court Estimate Claims Before the Bar Date Identifies the Claims? No.** In this case, the parties need to identify the claimants, the fires and the claims in order to shape and narrow the estimation hearings. And then, the TCC needs six months of discovery from August 14, to prepare its case that PG&E has spent $90 million preparing the past two years, well before the TCC even hired counsel.

**H.    Court Question:  May the Court bifurcate property damage negligence issues and personal injury negligence issues?  No.**

The Court may not bifurcate the personal injury negligence issues from the property damage negligence issues in the same claim, and estimate the debtor's liability for the property damage claims for purposes of distribution from a capped trust, because that procedure would:  (1) result in duplicative proceedings in the bankruptcy court and district court, which the leading bankruptcy court decisions find is not prudent, as Bankruptcy Judges Spector and Perris found in similar circumstances; and (2) violate the claimants' rights to have dispositive jury trial disputed issues of fact determined first by the district court pursuant to 28 U.S.C. Section 1411, before equitable issues, under the Supreme Court's *Beacon Theaters* and *Dairy Queen* principles.  *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (when legal and equitable claims turn on common issues of fact, the common issues must be tried first by a jury); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 473, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (reaffirming *Beacon* and holding that the right to a trial by jury must be preserved even if the issues common to the legal and equitable claims are only "incidental" to the legal claims).

As the courts determined in *Dow Corning*, 221 B.R. at 569, and *Portland II*, 339 B.R. at 221, a bankruptcy court should not estimate personal injury claims if there are sufficient disputed factual issues that would necessarily require extensive de novo review by the district court such that the parties would engage in two duplicative sets of estimation proceedings.

In the memorandum in support of the TCC's Relief from Stay Motion, the TCC briefed the grounds for the Court's abstention for the Debtors' eventual motion to estimate Tubbs claims pursuant to 28 U.S.C. § 1334(c)(1).  Dkt. No. 2855, at 23-25.  The TCC requests the Court to abstain from estimating the Tubbs claims, including causation and liability, on those grounds, without rebriefing them here.

**IV.    CONCLUSION**

The TCC respectfully requests the Court to deny the Debtors' Motion and abstain pursuant to 28 U.S.C. § 1334(c)(1) from estimating the Tubbs claims in whole or in part via a causation or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 31 -

negligence liability trial or hearing, and set a continued hearing on estimation procedures and adopt the TCC's Road Map and the estimation procedures briefed in this Opposition.

In preservation of the TCC's positions in this case, the TCC contends that the portion of the Debtors' Motion to estimate the inverse condemnation claims after the Court's adoption of California inverse precedent is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and the portion of the Debtors' Motion to estimate the balance of the individual tort claimants' claims is a non-core proceeding under 28 U.S.C. § 157(b)(2)(B), (b)(5), and (c)(1), that impacts claimants' rights under 28 U.S.C. §§ 157(b)(5) and 1411, and Bankruptcy Local Rule 9015-2, as the courts in *Dow Corning* and *Portland* concluded with respect to similar proceedings.

The TCC objects to any further proceedings without a reopening of discovery on fire claim negligence liability issues on basic fairness and due process grounds. The TCC also reserves all rights with respect to its ability to challenge various elements of the estimation proceeding, whether or not briefed here, including but not limited to the TCC's contention that the time constraints and other provisions of AB 1054 are potentially unconstitutional by the virtue of being preempted by federal law, including the Bankruptcy Code, and being violative of the Due Process Clause.

Dated:  August 7, 2019                                         Respectfully submitted,


                                                               BAKER & HOSTETLER LLP

                                                               By:    /s/ Robert A. Julian
                                                                       Robert A. Julian
                                                               *Counsel to the Official Committee of Tort Claimants*

Case: 19-30088    Doc# 3431    Filed: 08/07/19    Entered: 08/07/19 15:51:42    Page 39 of 39

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO