# Exhibit C

1   SCOTT SUMMY (*pro hac vice pending*)
    (Texas Bar No. 19507500)
2   JOHN FISKE (SBN 249256)
3   **BARON & BUDD, P.C.**
    603 N. Coast Highway, Suite G
4   Solana Beach, California 92075
    Telephone: (619) 261-4090
5   Email: ssummy@baronbudd.com
        jfiske@baronbudd.com
6
7   *Lead Counsel for Public Entity Plaintiffs*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*
**03/12/2018**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **IN AND FOR THE COUNTY OF SAN FRANCISCO**

10

11  Coordination Proceeding Special Title         Judicial Council Coordination Proceeding
12  (Rule 3.550)                                  No. 4955

13  **CALIFORNIA NORTH BAY FIRE**                 **PUBLIC ENTITY MASTER COMPLAINT**
    **CASES**
14                                                Judge: Honorable Curtis E.A. Karnow
15                                                Department: 304

16                                                **JURY TRIAL DEMANDED**

17

18

19

20

21

22

23

24

25

26

27

28

**PUBLIC ENTITY MASTER COMPLAINT**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 3

III.    THE PARTIES ................................................................................................... 3

        A.     PLAINTIFFS ......................................................................................... 3

        B.     DEFENDANTS ..................................................................................... 3

        C.     DOE DEFENDANTS ........................................................................... 6

        D.     AGENCY & CONCERT OF ACTION ................................................ 6

IV.     STATEMENT OF FACTS ................................................................................ 7

        A.     PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN

               ITS ELECTRICAL SYSTEMS ............................................................ 7

        B.     PG&E'S FIRE/EXPLOSION BACKGROUND .................................. 9

               1.     PG&E'S Fire Involvement ...................................................... 9

               2.     The 1981 San Francisco Gas Explosion .................................. 9

               3.     The 1991 Santa Rosa Gas Explosion ...................................... 9

               4.     The 1994 Trauner Fire ........................................................... 10

               5.     The 1996 Mission Substation Electrical Fire ......................... 10

               6.     The 1999 Pendola Fire ........................................................... 11

               7.     The 2003 Mission District Substation Fire ............................ 11

               8.     The 2004 Sims Fire ................................................................ 11

               9.     The 2004 Freds Fire ............................................................... 12

               10.    The 2004 Power Fire ............................................................. 12

               11.    The 2005 San Francisco Electrical Explosion ....................... 12

               12.    The 2008 Rancho Cordova Explosion .................................... 12

               13.    The 2008 Whiskey Fire .......................................................... 13

               14.    The 2009 San Francisco Electrical Explosion ....................... 13

               15.    The 2010 San Bruno Explosion .............................................. 13

PUBLIC ENTITY MASTER COMPLAINT                                                    ii

16. The 2011 Cupertino Explosion ........................................................ 14

17. The 2014 Carmel Explosion. ......................................................... 14

18. The 2015 San Francisco Transformer Explosion .............................. 15

19. The 2015 Butte Fire .................................................................... 15

20. PG&E's Conduct Regarding the Butte Fire ..................................... 16

C. THE NORTH BAY FIRES ............................................................. 17

D. IMPACT ON THE WINE, AGRICULTURAL, TOURISM, AND OTHER
INDUSTRIES CAUSING TAX REVENUE LOSSES TO PUBLIC ENTITIES 19

E. IMPACT TO PUBLIC ENTITIES ..................................................... 20

F. EACH NORTH BAY FIRE ............................................................. 22

1. The Atlas Fire ........................................................................... 22

2. The Cascade/LaPorte Fires .......................................................... 23

3. The Cherokee Fire ...................................................................... 24

4. The Honey Fire .......................................................................... 25

5. The Lobo Fire ............................................................................ 25

6. The Maacama or No Name Fire ..................................................... 26

7. The McCourtney Fire ................................................................... 26

8. The Nuns Fire ............................................................................ 27

9. The Pocket Fire .......................................................................... 29

10. The Point Fire .......................................................................... 29

11. The Redwood Valley Complex Fire ............................................... 30

12. The Sullivan Fire ...................................................................... 30

13. The Sulphur Fire ....................................................................... 31

14. The Tubbs Fire ......................................................................... 31

15. The Highway 37 Fire .................................................................. 33

G. PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO
CAUSING THE NORTH BAY FIRES .................................................. 33

**PUBLIC ENTITY MASTER COMPLAINT**

iii

| | 1. | The 2013 Liberty Report Found that PG&E's Distribution System Presented "Significant Safety Issues"........................................................ 33 |

1. The 2013 Liberty Report Found that PG&E's Distribution System Presented "Significant Safety Issues"........................................................ 33

2. The 2013 Liberty Report Found that PG&E's Equipment Was Highly Susceptible to Failure................................................................................ 34

3. PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment ...................................................................................................................... 34

4. PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law .................................................. 37

5. PG&E's Unsafe Use of Reclosers............................................................. 38

6. PG&E Knew That Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation .................... 39

7. PG&E's Reckless Adoption of the VMII Program Where It Paid Its Contractors to Cut Fewer Trees ................................................................ 40

8. PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees ............ 41

9. PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk .............................................................................. 43

10. PG&E's "Run to Failure" Approach to Maintenance................................ 43

11. PG&E's Purchase of Insurance Coverage for Punitive Damages ............ 44

H. PG&E'S CORPORATE CULTURE ..................................................................... 45

V. CAUSES OF ACTION ..................................................................................................... 47

FIRST CAUSE OF ACTION - NEGLIGENCE and RESPONDEAT SUPERIOR .................... 47

SECOND CAUSE OF ACTION - INVERSE CONDEMNATION ........................................... 51

THIRD CAUSE OF ACTION - PUBLIC NUISANCE ................................................................ 53

FOURTH CAUSE OF ACTION - PRIVATE NUISANCE........................................................... 57

FIFTH CAUSE OF ACTION - PREMISES LIABILITY ............................................................. 58

SIXTH CAUSE OF ACTION - TRESPASS................................................................................. 59

SEVENTH CAUSE OF ACTION - NEGLIGENCE PER SE ..................................................... 61

**PUBLIC ENTITY MASTER COMPLAINT**    iv

Case: 19-30088  Doc# 3434-3  Filed: 08/07/19  Entered: 08/07/19 16:06:20  Page 5 of 81

EIGHTH CAUSE OF ACTION - PRIVATE ACTION UNDER PUBLIC UTILITIES
    CODE §2106............................................................................................................ 63
NINTH CAUSE OF ACTION - VIOLATION OF HEALTH & SAFETY CODE § 13007 ....... 66
VI.    PRAYER FOR RELIEF .......................................................................................... 68
VII.   JURY DEMAND ...................................................................................................... 74

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 6
of 81

1    **PLAINTIFFS** bring this action for damages against Defendants **PG&E**
2    **CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20**
3    (collectively, "**DEFENDANTS**") as follows:

4    **I.    INTRODUCTION**

5        1.    This case arises from **PG&E CORPORATION** and/or **PACIFIC GAS &**
6    **ELECTRIC COMPANY's** (collectively, "**PG&E**") systemic decision making process.
7    **PG&E's** well-documented systemic failures, including lack of adequate safety regulations,
8    inspection, maintenance, and risk management practices that caused and/or contributed to
9    causing the most destructive and deadly wildfires California has ever seen (collectively, the
10   "North Bay Fires").

11       2.    On or around the night of Sunday, October 8, 2017, the North Bay Fires started
12   when a system disturbance on the electrical grid constructed, owned, operated, managed, and/or
13   maintained by **PG&E** caused transformers designed, constructed, owned, operated, managed,
14   and/or maintained by **PG&E** to fail, fault, spark, and/or explode, causing energized power lines
15   constructed, owned, operated, managed, and/or maintained by **PG&E** to burn and/or fall down.
16   These downed lines sparked nearby overgrown and poorly maintained vegetation, igniting fires
17   simultaneously across multiple counties. Electrical currents flowed through down guys owned,
18   designed, operated, managed and/or maintained by **PG&E**, creating arcing at ground level in dry
19   grass. The arcing from down guys at or around ground level sparked fires in and around
20   overgrown and poorly maintained vegetation. All of these events, and others, including but not
21   limited to conductors, poles, insulators, reclosers, and/or other electrical equipment constructed,
22   owned, operated, managed, and/or maintained by **PG&E** that fell down, broke, failed, sparked,
23   exploded, and/or came into contact with vegetation, caused and contributed to causing the North
24   Bay Fires. Although the numerous fires constituting the North Bay Fires have different points of
25   origin, they all share the same underlying causes and arose from **PG&E's** disregard of mandated
26   safety practices and foreseeable hazardous risks associated with its infrastructure.

27       3.    Over the following days, the North Bay Fires spread rapidly and caused extensive
28   damage throughout Northern California, including populated neighborhoods and sprawling

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 7
of 81

vineyards. The North Bay Fires claimed the lives of at least 44 individuals, injured many others, burned over 245,000 acres, and destroyed over 14,700 homes. The following fires in Sonoma, Napa, Mendocino, Solano, Lake, Butte, Calaveras, Nevada, and Yuba Counties are included, collectively referred to as the North Bay Fires, including but not limited to the following: the Adobe, Atlas, Cascade, Cherokee, Honey, LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Pressley, Redwood Valley Complex, Sulphur, Tubbs, and Highway 37 Fires.

4.      As set forth in more detail in the following pages, based on multiple reports, audits, investigations, and/or interviews, it is clear that the North Bay Fires resulted from **PG&E's** willful and conscious disregard of public safety. **PG&E**, although mandated to do so, failed to identify, inspect, manage, and/or control vegetation growth near its power lines and/or other electrical equipment. This created a foreseeable danger of trees and/or other vegetation coming into contact with **PG&E's** power lines and/or other electrical equipment and causing electrical problems. Further, **PG&E** failed to construct, manage, track, monitor, maintain, operate, replace, repair, and/or improve its power lines, poles, transformers, conductors, insulators, reclosers, and/or other electrical equipment in a safe manner, despite being aware that its infrastructure was aging, unsafe, likely to cause fires, and/or vulnerable to environmental conditions. Finally, **PG&E** failed to adequately design, maintain, replace, repair, and/or improve its anchors and/or down guys, despite being aware from prior fires that these anchors and/or down guys could cause fires when ground currents exist.

5.      **PG&E** knew about the significant risk of wildfires and other disasters from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the North Bay Fires began and, as described below, has been repeatedly fined and/or convicted of crimes for causing wildfires, explosions, and other disasters by failing to mitigate these risks.

6.      Wildfires, explosions, and other devastating events have resulted from **PG&E's** long history of choosing to divert funds from its public safety, vegetation management, and/or infrastructure maintenance programs.

## II.   JURISDICTION AND VENUE

7.   This Court has jurisdiction over this matter pursuant to Code of Civil Procedure §§ 395(a) and 410.10 because Defendants, and/or each of them, reside in, are incorporated in, and/or do significant business in the County of San Francisco, State of California. The amount in controversy exceeds the jurisdictional minimum of this Court.

8.   Venue is proper in this Court pursuant to Code of Civil Procedure § 404.3 and California Rules of Court, Rule 3.540. The Honorable Curtis E.A. Karnow of the Superior Court of California, County of San Francisco was assigned as the Coordination Trial Judge for this action.

## III.   THE PARTIES

### A.   PLAINTIFFS

9.   **PLAINTIFFS** are public entities that suffered and/or continue to suffer property losses, and other damages from the North Bay Fires, including but not limited to the Adobe, Atlas, Cascade, Cherokee, Honey, LaPorte, Lobo, Maacama, McCourtney, Norrbom, Nuns, Oakmont, Partrick, Pocket, Point, Pressley, Redwood Valley Complex, Sulphur, Tubbs, and/or Highway 37 Fires.

### B.   DEFENDANTS

10.   At all times herein mentioned Defendants **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** were corporations authorized to do business and doing business in the State of California with their principal place of business in the County of San Francisco, State of California. Defendant **PG&E CORPORATION** is an energy-based holding company headquartered in San Francisco. It is the parent company of Defendant **PACIFIC GAS AND ELECTRIC COMPANY**. **PG&E CORPORATION** and **PACIFIC GAS AND ELECTRIC COMPANY** provide public utility services, including the generation of electricity and the transmission and distribution of electricity and natural gas to millions of customers in Northern and Central California, including the residents of Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and Yuba Counties.

///

---

**PUBLIC ENTITY MASTER COMPLAINT**                                   3

11.     **PLAINTIFFS** allege that **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** are jointly and severally liable for each other's wrongful acts and/or omissions as hereafter alleged, in that:

      a.  **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** operate as a single business enterprise operating out of the same building located at 77 Beale St, San Francisco, California for the purpose of effectuating and carrying out **PG&E CORPORATION's** business and operations and/or for the benefit of **PG&E CORPORATION**;

      b.  **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose;

      c.  **PACIFIC GAS & ELECTRIC COMPANY** is so organized and controlled, and its decisions, affairs and business so conducted as to make it an instrumentality, agent, conduit and/or adjunct of **PG&E CORPORATION**;

      d.  **PACIFIC GAS & ELECTRIC COMPANY's** income contribution results from its function, integration, centralization of management and economies of scale with **PG&E CORPORATION**;

      e.  **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and management are intertwined and do not act completely independent of one another;

      f.  **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's** officers and managers act in the interest of **PG&E CORPORATION** as a single enterprise;

      g.  **PG&E CORPORATION** has control and authority to choose and appoint **PACIFIC GAS & ELECTRIC COMPANY's** board members as well as its other top officers and managers;

      h.  Despite both being Electric Companies and Public Utilities, **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not compete

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 10 of 81

with one another, but have been structured, organized, and businesses effectuated so as to create a synergistic, integrated single enterprise where various components operate in concert one with another;

i. **PG&E CORPORATION** maintains unified administrative control over **PACIFIC GAS & ELECTRIC COMPANY**;

j. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are insured by the same carriers and provide uniform or similar pension, health, life and disability insurance plans for employees;

k. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified 401(k) Plans, pensions and investment plans, bonus programs, vacation policies and paid time off from work schedules and policies;

l. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** invest these funds from their programs and plans by a consolidated and/or coordinated Benefits Committee controlled by **PG&E CORPORATION** and administered by common trustees and administrators;

m. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified personnel policies and practices and/or a consolidated personnel organization or structure;

n. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified accounting policies and practices dictated by **PG&E CORPORATION** and/or common or integrated accounting organizations or personnel;

o. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are represented by common legal counsel;

p. **PG&E CORPORATION's** officers, directors, and other management make policies and decisions to be effectuated by **PACIFIC GAS & ELECTRIC COMPANY** and/or otherwise play roles in providing directions and making decisions for **PACIFIC GAS & ELECTRIC COMPANY**;

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 11 of 81

q. **PG&E CORPORATION's** officers, directors, and other management direct certain financial decisions for **PACIFIC GAS & ELECTRIC COMPANY** including the amount and nature of capital outlays;

r. **PG&E CORPORATION's** written guidelines, policies, and procedures control **PACIFIC GAS & ELECTRIC COMPANY**, its employees, policies, and practices;

s. **PG&E CORPORATION** files consolidated earnings statements factoring all revenue and losses from **PACIFIC GAS & ELECTRIC COMPANY** as well as consolidated tax returns, including those seeking tax relief; without limitation; and

t. **PG&E CORPORATION** generally directs and controls **PACIFIC GAS & ELECTRIC COMPANY**'s relationship with, requests to, and responses to inquiries from, the Public Utilities Commission and uses such direction and control for the benefit of **PG&E CORPORATION**.

**C.    DOE DEFENDANTS**

12.    The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants **DOES 1 through 200**, inclusive, are unknown to **PLAINTIFFS** who therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474. **PLAINTIFFS** further allege that each of said fictitious Defendants is in some manner responsible for the acts and occurrences hereinafter set forth. **PLAINTIFFS** will amend this Master Complaint to show the true names and capacities of said Defendants when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible.

**D.    AGENCY & CONCERT OF ACTION**

13.    At all times herein mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified

and approved the acts of each of the remaining **DEFENDANTS**.  Each of the **DEFENDANTS** aided and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **PLAINTIFFS** as alleged herein.  In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

IV.    **STATEMENT OF FACTS**

**A. PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS**

14.    **PG&E** owns, installs, constructs, operates, and maintains overhead power lines, together with supporting poles and appurtenances throughout Northern and Central California for the purpose of transmitting and distributing electricity to the general public.  These lines and equipment were located at and around the origin points for the North Bay Fires.

15.    Electrical infrastructure is inherently dangerous and hazardous, and **PG&E** recognizes it as such.  The transmission and distribution of electricity requires **PG&E** to exercise an increased level of care in line with the increased risk of associated danger.

16.    At all times **PG&E** had and continues to have a duty to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment.  **PG&E** also has a duty to keep vegetation properly trimmed and maintained to prevent foreseeable contact with its electrical equipment.

17.    In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, **PG&E** had an obligation to comply with, *inter alia*:  (a) Code of Civil Procedure § 733; (b) Public Resource Code §§ 4292, 4293, and 4435; (c) Public Utilities Code § 451; and (d) CPUC General Order Numbers 95 and 165.

18.    California's drought years increased the risk of wildfire and consequently heightened **PG&E's** duty of care in the prevention of wildfires.  In January 2014, Governor

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 13 of 81

1  Edmund Gerald Brown, Jr. declared a state of emergency due to California's continued drought.
2  In June 2014, pursuant to Resolution ESRB-4, the California Public Utilities Commission
3  ("CPUC") directed **PG&E** and all investor-owned utilities to take remedial measures to reduce
4  the likelihood of fires started by or threatening utility facilities.[1]  In addition, the CPUC informed
5  **PG&E** it could seek recovery of incremental costs associated with these remedial measures
6  outside of the standard funding process, agreeing to provide additional funding on top of
7  vegetation management funding already authorized to ensure remedial measures would not go
8  unperformed due to lack of funding.

9      19.    In early 2017, the CPUC issued a Fact Sheet on "**PG&E** Vegetation Management
10  Spending," directing **PG&E** to take increased efforts to reduce fire risk due to the drought
11  emergency:  "Although the Governor issued an Executive Order in April 2017 ending the
12  Drought State of Emergency, the declaration directed state agencies 'to continue response
13  activities that may be needed to manage the lingering drought impacts to people and wildlife.'
14  The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown
15  regarding the bark beetle infestation and resulting tree mortality remains in effect.  The CPUC
16  has not rescinded ESRB-4, and work by the utilities to comply with it and the Tree Mortality
17  Emergency continues."[2]

18      20.    **PG&E** knew or should have known that these statutory and regulatory standards
19  are minimum standards.  **PG&E** knew or should have known that it has:  (a) a duty to identify
20  vegetation that is dead, diseased, and/or dying, or that otherwise poses a foreseeable hazard to
21  power lines and/or other electrical equipment; and (b) a duty manage the growth of vegetation
22  near its power lines and equipment so as to prevent the foreseeable danger of contact between
23  vegetation and power lines starting a fire.

24      21.    Further, **PG&E** has a duty to manage, maintain, repair, and/or replace its aging
25  infrastructure to protect public safety.    These objectives could and should have been

26  _____

27  [1] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M096/K415/96415169.pdf (last accessed February 12, 2018).

28  [2] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation%20Management%20Spending.pdf (last accessed February 12, 2018).

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 14 of 81

accomplished in a number of ways, including, but not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

22.     **PG&E** knew or should have known that failure to comply and conform to applicable standards and duties constituted negligence and would expose members of the general public to a risk of death, injury, and/or damage to their property.

### B.     PG&E'S FIRE/EXPLOSION BACKGROUND

#### 1.  PG&E'S Fire Involvement

23.     Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the following fines, penalties, and/or convictions.   Despite these recurring punishments, **PG&E**  has continued to conduct its business with a conscious disregard for the safety of the public, including **PLAINTIFFS**.

24.     As detailed below, the North Bay Fires are among the many tragedies that have resulted from **PG&E's** conduct and operations.  **PG&E** power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment. Further, **PG&E's** deteriorating and carelessly maintained infrastructure has caused multiple disasters throughout California.

#### 2.  The 1981 San Francisco Gas Explosion

25.     A **PG&E** gas main in downtown San Francisco exploded in 1981, forcing 30,000 people to evacuate.  It took workers nine hours to shut off the gas main's manual shut-off valves and stop the flow of gas that continued to feed the flames in the interim.

#### 3.  The 1991 Santa Rosa Gas Explosion

26.     Two people were killed and three others were injured when a **PG&E** gas line exploded in Santa Rosa in December 1991.  The pipeline was improperly marked, failing to give

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 15 of 81

1 proper notice to contractors working in the area. A contractor hit the pipe with a backhoe,
2 causing the pipe to leak and explode several months later.

### 4. The 1994 Trauner Fire

27. In 1994, **PG&E's** failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California. This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a historic schoolhouse that was built in 1868.

28. Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that **PG&E** was supposed to keep trimmed. Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire. Approximately 200 of these violations involved contact between vegetation and one of **PG&E's** power lines. As a result, on or around June 19, 1997, **PG&E** was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

29. After the trial, a 1998 CPUC report revealed that **PG&E** diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994. During that same time, **PG&E** under spent its authorized budgets for maintaining its systems by $495 million and instead, used this money to boost corporate profits.

### 5. The 1996 Mission Substation Electrical Fire

30. At approximately 1:00 a.m. on November 27, 1996, a cable splice at **PG&E's** Mission Substation in San Francisco short-circuited, burning and melting the insulation around the splice. Smoke from the fire rose through a floor opening above the splice into a switch cabinet. That smoke was so thick that it caused a flashover between phases of the bus bars connecting the overhead N bus to the switch. This caused insulation on the N bus to ignite and a circuit breaker to open, resulting in the loss of power to a group of **PG&E** customers. The substation was unmanned at the time and the fire was only discovered by chance by an employee who had stopped by the substation to use the restroom.

///

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 16 of 81

## 6. The 1999 Pendola Fire

31.     A rotten pine, which the federal government determined **PG&E** should have removed, fell on a power line, starting the Pendola Fire in 1999. It burned for 11 days and scorched 11,725 acres, mainly in the Tahoe and Plumas National Forests. **PG&E** paid a $14.75 million settlement to the U.S. Forest Service in 2009. That year, the utility also reached a $22.7 million settlement with the CPUC after regulators found **PG&E** had not spent money earmarked for tree trimming and removal toward those purposes.

## 7. The 2003 Mission District Substation Fire

32.     In December 2003, a fire broke out at **PG&E's** Mission District Substation in San Francisco. Despite signs of trouble appearing at control centers, the fire burned for nearly two hours before **PG&E** operators showed up at the Substation, found it full of smoke, and finally called the fire department. The source of the fire was not located until five hours after it began. As a result, nearly one-third of San Francisco's residents and business owners lost power, with some waiting over 24 hours for their power to be restored.

33.     The CPUC report of the investigation, which was released in 2004, states in part:

> Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's Consumer Protection and Safety Division] discovered that another fire had occurred at Mission Substation in 1996. CPSD's investigation team conducted a thorough analysis of both fires and found strikingly similar contributing factors and root causes. CPSD's team further determined that **PG&E** had not implemented the recommendations resulting from its own investigation of the 1996 fire. . . .**CPSD finds it quite troubling that PG&E did not implement its own recommendations from its own investigation of the 1996 fire.**[3]

## 8. The 2004 Sims Fire

34.     In July 2004, the Sims Fire burned over 4,000 acres of forest land in the Six Rivers and Trinity National Forests. A federal lawsuit alleged that **PG&E** failed to remove a decaying tree, which fell on a transmission line and ignited the blaze.

---

[3] http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 17 of 81

### 9. The 2004 Freds Fire

35.     The Freds Fire started in October 2004 near Kyburz, El Dorado County, California. A lawsuit filed by the United States Government claimed that employees of **PG&E's** contractor lost control of a large tree they were cutting down. It fell onto a **PG&E** power line and caused a fire that burned over 7,500 acres. **PG&E** and its contractors paid $29.5 million to settle the lawsuits over the Freds Fire and the Sims Fire.

### 10. The 2004 Power Fire

36.     In October 2004, the Power Fire burned approximately 17,000 acres on the Eldorado National Forest and on private timberlands. A federal lawsuit alleged that the Power Fire was ignited by a lit cigarette that was dropped by a **PG&E** tree trimming contractor. **PG&E** and its contractor paid the federal government $45 million to settle the lawsuit.

### 11. The 2005 San Francisco Electrical Explosion

37.     In August 2005, a **PG&E** electrical transformer exploded in the San Francisco financial district at Kearny and Post Streets, severely burning a woman who had been walking by. A lawsuit by the injured woman settled for an undisclosed sum.

### 12. The 2008 Rancho Cordova Explosion

38.     In December 2008, a gas leak from a **PG&E** pipe caused an explosion in Rancho Cordova, California. This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

39.     A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by incorrect repairs performed by **PG&E** in 2006, at which time **PG&E** installed a piece of pipe to patch up an earlier leak. The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that **PG&E** failed to timely send properly trained personnel to check out the leak, even though **PG&E** had been told several months earlier that its emergency plans fell below required standards. Specifically, the report noted the following:

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 18 of 81

Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public.[4]

40.     In November 2010, the CPUC filed administrative charges against **PG&E** in connection with the Rancho Cordova explosion, alleging that **PG&E** was at fault for the blast and that **PG&E** should have discovered the improper repair job that caused the explosion, but failed to timely do so. As a result, the CPUC required **PG&E** to pay a $38 million fine.

### 13. The 2008 Whiskey Fire

41.     The June 2008 Whiskey Fire burned more than 5,000 acres of land in the Mendocino National Forest. The fire started when a gray pine tree that did not have the required clearance from a **PG&E** transmission line came into contact with the line. **PG&E** and its contractors agreed to pay $5.5 million to settle a federal lawsuit.

### 14. The 2009 San Francisco Electrical Explosion

42.     In June 2009, a **PG&E** underground electrical vault exploded in San Francisco's Tenderloin neighborhood, sending 30-foot flames and smoke into the air for two hours. This explosion left thousands of people without power.

### 15. The 2010 San Bruno Explosion

43.     On September 9, 2010, **PG&E's** continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on **PG&E's** poor management of its pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) **PG&E's** inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) **PG&E's** inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

---

[4] http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm (last accessed February 12, 2018).

Case: 19-30088     Doc# 3434-3     Filed: 08/07/19     Entered: 08/07/19 16:06:20     Page 19 of 81

44. As a result, **PG&E** was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC imposed a $1.6 billion fine on **PG&E** for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted **PG&E** of six felony charges and ordered it to pay $3 million in additional fines for causing the explosion.

45. The **CPUC** launched an investigation into the manner by which **PG&E** officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President identified **PG&E's** ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into **PG&E's** actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, **continued safety lapses at PG&E continue to occur**.[5]

### 16. The 2011 Cupertino Explosion

46. After the San Bruno explosion, in September 2011, **PG&E**'s failure to take appropriate action caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

47. Prior to the explosion, the manufacture of Aldyl-A, the NTSB, and the federal Pipeline and Hazardous Materials Safety Administration had all issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least 2002. Although some utilities around the United States had been replacing Aldyl-A pipes, **PG&E** did not have a replacement program to phase them out, leaving the public vulnerable.

### 17. The 2014 Carmel Explosion.

48. In March 2014, a home in Carmel, California was destroyed due to a gas explosion caused by **PG&E**'s actions. Prior to the explosion, **PG&E** was attempting to replace

---

[5] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/ Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnfor cementTheory.pdf (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 20 of 81

a gas distribution line, but **PG&E's** legally inadequate records did not show that the steel pipe had a plastic insert. When crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced, allowing gas to leak through the pipe and into the residence.

49.    The CPUC required **PG&E** to pay substantial fines. In 2015, the CPUC imposed a $10.85 million fine for the Carmel explosion. In August 2016, the CPUC imposed an additional $25.6 million fine, bringing the total to over $36 million.

### 18. The 2015 San Francisco Transformer Explosion

50.    In September 2015, a **PG&E** underground transformer exploded in San Francisco's Bernal Heights neighborhood. This explosion injured two people, one of them critically.

### 19. The 2015 Butte Fire

51.    Tragedy struck again in September 2015, when **PG&E's** inadequate and ineffective vegetation management programs resulted in the Butte Fire in the Sierra foothills. The Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed 921 homes and/or structures, and charred over 70,000 acres. The fire also left tens of thousands of dead or dying trees and the risk of water pollution and erosion in its wake. Thousands of people were forced to evacuate their homes, and thousands were damaged in their person and property.

52.    Similar to the other disasters caused by **PG&E's** wrongdoing, the Butte Fire could have been prevented by **PG&E**. The Butte Fire was ignited by a gray pine tree that grew and came into contact with one of **PG&E's** power lines. **PG&E** knew that gray pines posed the highest risk of catastrophic wildfires, but failed to identify and/or remove the dangerous tree pursuant to its vegetation management practices. Instead, **PG&E** removed the two trees surrounding the gray pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact with **PG&E's** power line.

53.    Subsequent to the Butte Fire, in April 2017, the CPUC fined **PG&E** a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. Cal Fire also

1    sent **PG&E** a bill for $90 million to cover state firefighting costs. Despite these consequences,

2    **PG&E** did not change, revise, or improve any of its vegetation management practices after the

3    Butte Fire.

4    **20. PG&E's Conduct Regarding the Butte Fire**

5    54.    The North Bay Fires started approximately three years after the Butte Fire.

6    55.    **PG&E's** actions leading up to the Butte Fire included the following:

7    • *First*, **PG&E** failed to ensure that properly qualified and trained inspectors

8    were being used by its contractors to identify hazard trees.

9    • *Second*, **PG&E** failed to verify that its quality assurance audits were properly

10   conducted.

11   • *Third*, **PG&E** knew  that inspectors who were hired did not meet the

12   minimum qualifications required by **PG&E's** own specifications.

13   • *Fourth*, **PG&E** failed to train inspectors on **PG&E's** hazardous tree rating

14   system ("HTRS").

15   • *Fifth*, **PG&E** failed to verify that its contractor trained inspectors on the

16   HTRS.

17   • *Sixth*, **PG&E** failed to require inspectors to use the HTRS.

18   • *Seventh*, **PG&E** knew that wildfires caused by contact between vegetation

19   and its power lines posed the highest degree of risk to the public.

20   • *Eighth*, **PG&E** knew that its vegetation management program failed to

21   identify over 500,000 trees annually that were closer than the required

22   distance away from its power lines.

23   • *Ninth*, **PG&E** knew that its inspectors failed every year to identify tens of

24   thousands of "facility protect trees" or "hazard trees" that were dead, diseased,

25   and/or dying, or that otherwise posed a risk of contacting a power line.

26   • *Finally*, **PG&E** failed to remove those trees, one of which was the 44-foot

27   tall, weak, and spindly gray pine tree that started the Butte Fire.

28   56.    After the Butte Fire, **PG&E** did not meaningfully change, revise, or improve any

**PUBLIC ENTITY MASTER COMPLAINT**                                    16

of its vegetation management practices.

C.    THE NORTH BAY FIRES

57.    On Sunday, October 8, 2017, tragedy struck communities across Northern California when a series of fires began to spark and spread. These deadly fires quickly spread through neighborhoods and destroyed everything in their path, including residences, vegetation, structures, and businesses, and public lands, resources, parks, infrastructure, and other government-owned property.

58.    The North Bay Fires are collectively the most destructive fires in California's history. In just a few weeks, the fires caused the deaths of at least 44 people, hospitalized over 185 individuals, displaced about 100,000 people who were forced to leave their homes and search for safety, burned over 245,000 acres, and damaged or destroyed an estimated 14,700 homes, 3,600 vehicles, and 728 businesses.

59.    **PG&E** caused and/or contributed to causing the North Bay Fires. Witnesses observed, reported and described downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, and unrepaired poles in the areas in and around the North Bay Fires.

60.    Following the same negligent conduct that led to the Butte Fire, **PG&E** continued to adhere to the practices that served to increase the risk of wildfires leading up to the North Bay Fires:

- Reclosers in **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions were known to be extreme.

- **PG&E** failed to have a reasonable system in place to make sure its contractors were properly performing tree and/or vegetation inspections and removal, pole clearance, and pole inspections.

- **PG&E** failed to take any steps to look for what it calls "Facility Protect Trees" (trees that pose a risk of falling into the line), even though it knew such trees were likely to exist after its contractors had performed their work.

- **PG&E** failed to properly construct its power lines and thereafter failed to take

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 23 of 81

reasonable steps to make sure the poles and lines were sufficiently strong to support lines and other equipment that were added by third parties.

- **PG&E** failed to ensure that its contractors were properly trained in tree inspections and removal.

- **PG&E** failed to ensure that its contractors hired people who met **PG&E's** minimum qualifications.

- **PG&E** failed to participate in the training of its contractors.

61. **PG&E** owes the public a non-delegable duty with regard to the operation of its power lines, which includes maintenance, inspection, repair, vegetation management, and/or all other obligations imposed by the Public Utilities Code and the CPUC, specifically including, but not limited to CPUC General Orders Numbers 95 and 165. Even when **PG&E** chooses to hire contractors, its obligations remain non-delegable. **PG&E's** acts and omissions, as described herein, were a cause of the North Bay Fires and/or aggravated the spread of the fires and destruction left in their path.

62. **PG&E** responded to the North Bay Fires by acknowledging that there were problems with its electrical equipment the night the North Bay Fires began. However, **PG&E** blamed its failing electrical equipment on winds combined with "millions of trees weakened by years of drought and recent renewed vegetation growth from winter storms."[6] However, the fault lies with **PG&E**. Knowing the effects of the drought on vegetation near its power lines, **PG&E** had a duty to inspect and maintain that vegetation to minimize and avoid risk of fire, injury, death and harm to the public, but **PG&E** failed to do so.

63. At all times relevant to this action, **PG&E** had specific knowledge that the greatest risk to the public from its operations was wildfire. **PG&E** knew that wildfire could result in death and injury to members of the public and could result in the destruction of structures and property.

64. Despite such knowledge, **PG&E** accepted vegetation management that would

---

[6] http://www.pgecurrents.com/2017/10/11/pge-statement-on-north-bay-wildfires/ (last accessed February 12, 2018).

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 24 of 81

result in 17 tree-related outages for each 1,000 miles of lines, despite knowing that such outages could result in wildfires that would cause injury, death, harm, and property destruction.

65. **PG&E** has acknowledged and at all times relevant to this action knew that it was not adequately directing resources to its vegetation management program to reduce the risk of wildfire. **PG&E** cited its limited resources as the reason it chose to put the public in danger, however, it received approximately $1,400,000,000 in profits each year. **PG&E's** decision-making and practices resulted in numerous deaths, injuries, and damage to structures and property.

**D.    IMPACT ON THE WINE, AGRICULTURAL, TOURISM, AND OTHER INDUSTRIES CAUSING TAX REVENUE LOSSES TO PUBLIC ENTITIES**

66. The North Bay Fires caused significant damage to the entire wine industry in Northern California, including physical damage to vineyards, tasting rooms, houses, machinery, and the surrounding land and soil. The fire damage and destruction also reduced the value of affected property, and will reduce the resale value and development potential for such property. The destruction and/or negative impacts to the wine industry, including the vines, vineyards, grapes, soil, and wine-making processes, has caused a tax revenue loss to the public entities.

67. In addition to damage and destruction of real and personal property, the North Bay Fires caused widespread economic losses to businesses throughout the region, and will continue to do so into the future. Businesses have incurred and will continue to incur economic losses due to inability to operate their businesses, loss of access to their business locations, and/or inability of staff and employees to reach the business. In addition, wine supplies were adversely affected, including but not limited to the taste and/or quality of wine, for many years to come. The negative impacts to all businesses, including wine, agricultural, visitor services, tourism and other industries, has caused a tax revenue loss to the public entities.

68. Many businesses in Northern California derive significant business from tourists and other out-of-region customers. These businesses have suffered and will continue to suffer economic loss due to these tourists and out-of-region customers choosing not to visit Northern

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 25 of 81

1  California in the aftermath of the North Bay Fires. The negative impacts to the tourism and
2  visitor services industry has caused a sales and transient occupancy tax loss to the public entities.

3      69.     Businesses have incurred and will continue to incur economic losses due to the
4  chemical retardant that was used to put out the North Bay Fires. Cal Fire dumped several million
5  gallons to try to control the blazes. The chemical used kills the plants it comes into contact with
6  and also harms the soil. Organic businesses incurred and will continue to incur economic losses
7  due to the foreseeable use of chemical retardant because the product contains fertilizer-type
8  materials that will ruin an organic accreditation. These conditions are ongoing and will continue
9  for an unknown time into the future.

10     70.     Due to the nature and extent of the losses, the wine, agricultural, business,
11 tourism, and visitor services industries may not recover for a number of years, causing tax
12 revenue losses to the public entities for a number of years.

13     **E.     IMPACT TO PUBLIC ENTITIES**

14     71.     The Public Entities suffered injuries and damages including but not limited to the
15 following: loss of natural resources, open space, and public lands; loss of public parks; property
16 damages including real and personal property; fire suppression costs including personnel,
17 overtime labor costs, materials, and other fire suppression damages; evacuation expenses,
18 economic damages such as loss of tax revenue including property, sales, and transient occupancy
19 taxes; economic damages such as losses from impacts on business like activities; costs associated
20 with response and recovery including debris removal, emergency response, and other costs;
21 damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and
22 sewer systems, and underground infrastructure, and other public entity-owned infrastructure;
23 damages based on soil erosion, and loss of soil stability and productivity; damages related to
24 water contamination including water quality preservation and correction expenses; loss of water
25 storage; loss of aesthetic value; and other significant injuries, damages, and losses directly
26 related to and caused by the Fires.

27     72.     A further enumerated list of impacts to public entities includes but is not limited
28 to the following:

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 26 of 81

a. Fire suppression costs;

b. Administration, funding, and operation of emergency operations centers;

c. Administration, funding, and operation of evacuation centers and shelters;

d. Securing and managing burn areas, including safe re-entry for the public;

e. Staff overtime, labor costs, personnel, and other materials;

f. Additional law enforcement costs;

g. Lost work and productivity due to public entity employees unable to return to work;

h. Loss of natural resources, open space, wildlife, and public lands;

i. Loss of parks, including damage to real property and to recreational opportunities and programs, and the revenue generated therefrom;

j. Destruction or damage to public infrastructure, including but not limited to roads, sidewalks, water storage facilities, water distribution systems, sewer collection systems, stormwater systems, fire stations, and other infrastructure;

k. Damage or harm to facility and infrastructure lifespan, including water treatment facilities and landfills;

l. Costs of debris removal and related administrative obligations;

m. Costs of facilitating/administering community rebuilding efforts, staffing and administration of permitting centers;

n. Costs of administering community outreach efforts, including towards revisions to new ordinances, guidelines, and rules, and housing assisteance programs and policies;

o. Costs of watershed, waterway, and water body management and protection;

p. Damages related to soil erosion and mitigation, loss of soil stability and productivity, including management of risk of debris flow and landslides;

q. Damages related to water contamination, including water quality preservation and correction expenses, including but not limited to repair and/or replacement of water treatment facilities or systems;

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 27 of 81

| 1 | r. | Economic damages including but not limited to loss of tax revenues such as |
| 2 | | property, sales, business, and transient occupancy taxes; |
| 3 | s. | Economic damages including but not limited to business like or proprietary |
| 4 | | revenues, such as airport use, facility rentals, educational and recreational |
| 5 | | programs and others; |
| 6 | t. | Economic damages from loss of workforce housing; |
| 7 | u. | Economic damages from damage to tourism and economic development, such as |
| 8 | | overall branding and reputation; |
| 9 | v. | Damages resulting from short and long term public health impacts, including |
| 10 | | costs to provide educational, outreach, and other services; |
| 11 | w. | Other impacts, injuries, and damages to public entities. |

73.     The public entities suffered other injuries and damages not yet identified including those unique to the public entity plaintiffs.

F.     **EACH NORTH BAY FIRE**

   1.     **The Atlas Fire**

74.     The Atlas Fire that tore through Napa and Solano Counties was one of California's most destructive wildfires. The Atlas Fire burned approximately 51,600 acres, and damaged or destroyed at least 571 homes, wineries, and other structures, land, infrastructure, and resources in Napa and Solano counties.

75.     Cal Fire reported that the origin of the Atlas Fire was at or near Atlas Peak Road, south of Lake Berryessa. Cal Fire also reported that the Atlas Fire started at or around 9:52 p.m. on Sunday, October 8, 2017.[7]

76.     Contemporaneous calls and reports indicated trees hitting **PG&E** power lines and/or problems with other electrical equipment at or around the time and place the Atlas Fire started. For example, in Napa County, a live oak tree and a live oak branch fell and struck two electricity distribution lines near the City of Napa.

---

[7] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1866 (last accessed February 12, 2018).

Case: 19-30088     Doc# 3434-3     Filed: 08/07/19     Entered: 08/07/19 16:06:20     Page 28 of 81

77. As described in **PG&E** Electric Safety Incident Report No. 171020-8589, on October 19, 2017, **PG&E** identified a broken tree limb and broken field-phase primary insulator on the Pueblo 1104 **PG&E** facility at or near 4011 Atlas Peak Road, Napa, California. The incident report notes, "An approximately 25 foot tree limb fell from a White Oak that was rooted approximately 15 feet from the distribution conductors." This incident occurred the day the Atlas Fire began.[8]

78. As described in **PG&E** Electric Safety Incident Report No. 171023-8596, on October 21, 2017, "**PG&E** identified a 19-inch diameter Oak tree, approximately 45 feet tall, that broke at the base and took down one phase of the Pueblo 1104 (12 kV) Circuit near 3683 Atlas Peak Road. The butt of the Oak tree was completely burned and located 10 to 15 feet from the distribution conductors."[9]

79. Shortly after the fire, Cal Fire investigators were observed along Atlas Peak Road looking closely at a line of oak trees whose branches extended through overhead utility lines on the west side of the road, less than a quarter mile south of a sprawling ranch on the plateau of a Napa peak. A twisted, fallen wire lay on the ground, surrounded by stake flags. A broken oak branch precariously dangled overhead among the wires and other branches.[10]

## 2. The Cascade/LaPorte Fires

80. Collectively, the Cascade and LaPorte Fires destroyed over 450 structures and homes, and other land, infrastructure, and resources.

81. Cal Fire reported that the origin of the Cascade Fire was at or near the intersection of Cascade Way and Marysville Road, north of Collins Lake, California. The Cascade Fire started at or around 11:03 p.m. on Sunday, October 8, 2017, and burned approximately 9,989 acres in Yuba County.[11]

---

[8] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[9] *Ibid.*
[10] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed February 12, 2018).
[11] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1871 (last accessed February 12, 2018).

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 29 of 81

82. Witnesses saw and/or reported trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Cascade Fire started. For example, in the half hour before the fire began, firefighters responded to at least two trees falling into power lines and power lines falling across the road. When emergency responders headed to the Cascade Fire, they warned each other of downed power lines to ensure firefighter safety.[12]

83. Cal Fire reported that the origin of the LaPorte Fire was at or near the intersection of LaPorte Road and Oro Bangor Highway, Bangor, California. The LaPorte Fire started at or around 12:57 a.m. on early Monday, October 9, 2017, and burned approximately 6,151 acres in Butte County.[13] The Cascade and LaPorte Fires merged later that week.

84. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the LaPorte Fire started. **PG&E** Electrical Safety Incident Report No. 171013-8569 shows that at or around 11:20 p.m. on October 8, 2017, an oak tree limb broke and hit a nearby electrical wire at or near 167 Darby Road, Bangor, California.[14]

### 3. The Cherokee Fire

85. Cal Fire reported that the origin of the Cherokee Fire was at or near the intersection of Cherokee Road and Zonalea Lane in Oroville, California. Cal Fire also reported that the Cherokee Fire started on Sunday, October 8, 2017, at or around 9:45 p.m. The fire burned approximately 8,417 acres and destroyed 6 structures in Butte County, and other land, infrastructure, and resources.[15]

86. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the

---

[12] https://www.mercurynews.com/2017/10/17/yuba-countys-cascade-fire-bore-similar-hallmarks-to-wine-country-fires/ (last accessed February 12, 2018).
[13] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1870 (last accessed February 12, 2018).
[14] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[15] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1865 (last accessed February 12, 2018).

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 30 of 81

Cherokee Fire started. **PG&E** Electric Safety Incident Report No. 171010-8557 shows that at or around 9:45 p.m. on October 8, 2017, an incident caused a broken tree limb and wires down on the Clark Road 1102 **PG&E** facility at or near 3401 Cherokee Road, Oroville, California. The tree was rooted approximately 15 feet from **PG&E** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[16]

#### 4. The Honey Fire

87.     Cal Fire reported that the origin of the Honey Fire was at or near the intersection of Honey Run Road and Merlin Lane, southwest of Paradise, California. Cal Fire also reported that the Honey Fire started on Monday, October 9, 2017, at or around 3:05 p.m. The fire burned approximately 150 acres in Butte County, and other land, infrastructure, and resources.[17]

88.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Honey Fire started. Witnesses observed downed power lines, exploding transformers, improper fuses, improper connections, improper clearances, aged and defective poles, unrepaired poles, problems with other electrical equipment, and/or down trees, tree limbs, and/or other vegetation in the area in and around the Honey Fire.

#### 5. The Lobo Fire

89.     Cal Fire reported that the origin of the Lobo Fire was at or near Lone Lobo Trail near Rough and Ready, California. Cal Fire also reports that the Lobo Fire started on early Monday, October 9, 2017, at or around 12:01 a.m. The fire burned approximately 821 acres in Nevada County, and other land, infrastructure, and resources.[18]

90.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Lobo Fire started. **PG&E** Electric Safety Incident Report No. 171012-8565 shows that at or around

---

[16] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[17] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1880 (last accessed February 12, 2018).
[18] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1877 (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 31 of 81

1  11:20 p.m. on October 8, 2917, a ponderosa pine tree fell on the Narrows 2102 **PG&E** Circuit at
2  or near 11218 Lone Lobo Trail, Nevada City, California. The tree was rooted approximately 50
3  feet from **PG&E** distribution conductors at approximately the same location as the fire origin
4  reported by Cal Fire.[19]

5  ### 6. The Maacama or No Name Fire

6  91.    The "Maacama" or "No Name" Fire was first reported at approximately 10:01
7  p.m. on Sunday, October 8, 2017, and originated near Maacama Lane and Chalk Hill Road in
8  Healdsburg just east of Maacama Creek.[20]

9  92.    The Maacama Fire burned approximately 50 acres, including sections of a
10 vineyard, and other land, infrastructure, and resources.

11 ### 7. The McCourtney Fire

12 93.    Cal Fire reported that the origin of the McCourtney Fire was at or near the
13 intersection of McCourtney Road and Highway 20 in Grass Valley, California. Cal Fire also
14 reported that the McCourtney Fire started on early Monday, October 9, 2017, at or around 12:00
15 a.m. The fire burned approximately 76 acres in Nevada County and destroyed 13 structures, and
16 other land, infrastructure, and resources.[21]

17 94.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines
18 and/or problems with other electrical equipment at or around the same time and place the
19 McCourtney Fire started. **PG&E** Electric Safety Incident Report No. 171011-8563 shows that at
20 or around 11:00 p.m. on October 8, 2017, a broken ponderosa pine tree and wire were down on
21 the Grass Valley 1103 **PG&E** Circuit near 11253 Orion Way, Grass Valley, California. The tree
22 was rooted approximately 6 to 8 feet from **PG&E** distribution conductors and took down 3
23 primary conductors at approximately the same location as the fire origin reported by Cal Fire.[22]

24

25

---

[19] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[20] Cal Fire did not give the "Maacama Fire" a name. It is also known to local residents as the "No Name Fire" due to its proximity to No Name Road.
[21] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1872 (last accessed February 12, 2018).
[22] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

## 8. The Nuns Fire

95. The Nuns Fire merged with the Adobe, Norrbom, Oakmont, Partrick, and Pressley Fires (collectively, the "Nuns Fire"). These fires destroyed approximately 1527 structures and homes, and other land, infrastructure, and resources.[23]

96. Cal Fire also reported that the origin of the Partrick Fire, the first fire to merge with the Nuns Fire, was off Partrick Road west of Napa, California. The Partrick Fire started on Sunday, October 8, 2017, at or around 11:48 p.m. and burned in Napa County.[24]

97. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Nuns Fire started. At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees. Further, several calls reported problems with electrical equipment in the vicinity of the Nuns Fire, including a call at approximately 9:43 p.m. reporting trees and wires down and a call at approximately 10:40 p.m. reporting a blown transformer.[25]

98. **PG&E** Electric Safety Incident Report No. 171010-8558 shows that at or around 10:00 p.m. on October 8, 2017, a broken eucalyptus tree and wire was down on the Dunbar 1101 **PG&E** facility at or near 8555 Sonoma Highway near Kenwood, California. The tree was rooted approximately 50 feet from **PG&E** fallen lines, and took down 3 primary conductors.[26] Further, **PG&E** Electric Safety Incident Report No. 171016-8576 shows that at or around 1:00 a.m. on October 9, 2017, an alder tree broke at the top and fell on an open wire at or near 1210 Nuns Canyon Road near Glen Ellen, California. The tree was rooted approximately 30 feet from **PG&E** overhead secondary distribution conductors.[27] The sites of these **PG&E** incidents are

[23] http://www.latimes.com/projects/la-me-northern-california-fires-structures (last accessed February 12, 2018).
[24] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1869 (last accessed February 12, 2018).
[25] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).
[26] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[27] *Ibid.*

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 33 of 81

1 near or the same location as the two origin locations of Nuns Fire origin reported by Cal Fire.

2     99.     Cal Fire reported that the origin of the Nuns Fire was at or near Highway 12 north
3 of Glen Ellen, California. Cal Fire also reported that the Nuns Fire started on Sunday, October 8,
4 2017, at or around 10:00 p.m. The fire burned approximately 56,556 acres in Napa and Sonoma
5 Counties.[28]

6     100.     At or around the start time of the Nuns Fire, **PG&E's** website for electrical
7 outages reported two outages at or very near the origin of the Nuns Fire. The first outage was
8 reported at 10:31 p.m. on October 8, 2017, stating "found a broken power pole in the area." The
9 second **PG&E** outage at or near the origin of the Nuns Fire was reported at 11:50 p.m. on
10 October 8, 2017, stating "found a broken power pole in the area."[29]

11     101.     For the Partrick Fire, **PG&E** Electric Safety Incident Report No. 171020-8586
12 shows that on or around October 8, 2017, an oak tree fell and took down one phase of the Pueblo
13 2103 **PG&E** Circuit at or near 1721 Partrick Road near Napa, California. The tree was rooted
14 approximately 44 feet from **PG&E** distribution conductors at or near the same location as the
15 origin of the Partrick Fire reported by Cal Fire.[30] After the fire was extinguished, witnesses
16 observed Cal Fire investigators looking at downed power lines near the suspected origin point of
17 the Partrick Fire.[31]

18     102.     Further, at or near the start time of the Partrick Fire, **PG&E's** website reported
19 four separate outages at or very near the origin of the Partrick Fire. All four outages reflected the
20 same outage cause: "found a broken power pole in the area." The date and time stamps were the
21 same as well: 1:47 a.m. on October 9, 2017.[32]

22 ///

23

24     [28] http://cdfdata.fire.ca.gov/inrerecidents/incidents_details_info?incident_id=1868 (last accessed
February 12, 2018).
25     [29] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no
longer available on that site.
26     [30] *Ibid.*
27     [31] http://www.sfchronicle.com/news/article/where-the-blazes-began-12294729.php (last accessed
February 12, 2018).
28     [32] These quotes appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but are no
longer available on that site.

### 9. The Pocket Fire

103. Cal Fire reported that the origin of the Pocket Fire was at or near the intersection of Pocket Ranch Road and Ridge Ranch Road in Geyserville, California. Cal Fire also reported that the Pocket Fire started on early Monday, October 9, 2017, at or around 3:30 a.m. The fire burned approximately 17,357 acres in Sonoma County, and other land, infrastructure, and resources.[33]

104. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Pocket Fire started. **PG&E** Electric Safety Incident Report No. 171021-8592 shows that at or around 3:30 a.m. on October 9, 2017, there was a broken oak tree limb and wire down on the Cloverdale 1102 **PG&E** facility near the intersection of Ridge Ranch Road and Ridge Oaks Road near Geyserville, California. The tree was rooted approximately 15 feet from **PG&E's** lines at approximately the same location as the fire origin reported by Cal Fire.[34]

### 10. The Point Fire

105. Cal Fire reported that the origin of the Point Fire was at or near the intersection of Highway 26 and Higdon Road in West Point, California. Cal Fire also reported that the Point Fire started on early Monday, October 9, 2017, at or around 1:10 a.m. The fire burned approximately 130 acres in Calaveras County, and other land, infrastructure, and resources.[35]

106. Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Point Fire started. **PG&E** Electric Safety Incident Report No. 171009-8554 shows that at or around 10:00 a.m. on October 9, 2017, there was a broken tree limb and wire down on the West Point 1102 **PG&E** facility at or near 22894 Highway 26, West Point, California. The tree was rooted

---

[33] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1883 (last accessed February 12, 2018).
[34] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[35] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1875 (last accessed February 12, 2018).

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 35 of 81

approximately 50 feet from **PG&E's** distribution conductors at approximately the same location as the fire origin reported by Cal Fire.[36]

### 11. The Redwood Valley Complex Fire

107.    Cal Fire reported that the origin of the Redwood Valley Fire was north of Highway 20, west of Mendocino National Forest, and south of Black Bart, California, and that it started on October 8, 2017, at or around 11:36 p.m. Cal Fire also reported that the origin of the Potter Fire was near Busch Lane in Pottery Valley. The fires merged into each other and became commonly referred to as the Redwood Valley Complex Fire. Collectively the fires burned approximately 36,526 acres in Mendocino County, and destroyed or damaged around 588 homes and structures.

108.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Redwood Valley and Potter Fire started. **PG&E** Electric Safety Incident Report No. 171009-8553 shows that at or around 11:35 p.m. on October 8, 2017, there was a wire down and broken tree near structure 0/8 of the **PG&E** Potter Valley-Mendocino transmission line in Potter Valley, California. **PG&E** found a broken tree top near the downed conductor. The tree was rooted approximately 60 feet from **PG&E's** transmission line at approximately the same location as the fire origin reported by Cal Fire.[37]

### 12. The Sullivan Fire

109.    The Sullivan Fire was first reported at approximately 12:17 a.m. on Monday, October 9, 2017, and originated near 4822 Sullivan Way in Santa Rosa, California, and damaged land, infrastructure and resources.

110.    Contemporaneous calls and reports indicated arcing activity or problems with **PG&E** electrical equipment at the same time and place the Sullivan Fire started. **PG&E** Electric Safety Incident Report No. 171015-8573 shows that fire damaged two structures "at or near 4818 Sullivan Way" and upon arrival at the scene, **PG&E** "noticed a possible issue with the secondary

---

[36] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
[37] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 36 of 81

1    conductor."[38]

2    **13. The Sulphur Fire**

3      111.    Cal Fire reported that the origin of the Sulphur Fire was off of Highway 20 at
4 Sulphur Bank Road, Clearlake Oaks, California. Cal Fire also reported that the Sulphur Fire
5 started on Sunday, October 8, 2017, at or around 11:59 p.m. The fire burned approximately
6 2,207 acres in Lake County[39] and destroyed approximately 162 homes, businesses, and
7 outbuildings, and other land, infrastructure, and resources.[40]

8      112.    Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines
9 and/or problems with other electrical equipment at or around the same time and place the
10 Redwood Valley Complex Fire started. **PG&E** Electric Safety Incident Report No. 171011-
11 8562 shows that at or around 11:55 p.m. on October 8, 2917, there were two broken poles on the
12 Redbud 1102 **PG&E** Circuit near the intersection of Pomo Road and Sulphur Bank Road near
13 Clearlake, California. The top section of Fuse Cutout Pole 1447 had broken and fallen to the
14 ground. In addition, a pole one span to the west was burned and fell to the ground.[41] The site of
15 this **PG&E** incident is approximately the same location as the fire origin reported by Cal Fire,
16 and that at least one of these poles was rotten and riddled with woodpecker holes.

17    **14. The Tubbs Fire**

18      113.    The fire destroyed over 5,000 homes and several thousand additional structures,
19 burned over 36,807 acres across Sonoma and Napa Counties, and other land, infrastructure, and
20 resources.

21      114.    Cal Fire reported that the origin of the Tubbs Fire was at or near the intersection
22 of Highway 128 and Bennett Lane, Calistoga, California. Cal Fire also reported that the Tubbs
23 Fire started on Sunday, October 8, 2017, at or around 9:45 p.m.[42]

24

25        [38] http://cpuc.ca.gov/pgefireincidentreports (last accessed March 9, 2018).
       [39] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1876 (last accessed
26 February 12, 2018).
       [40] https://yubanet.com/Fires/sulphur (last accessed February 12, 2018).
27        [41] http://cpuc.ca.gov/pgefireincidentreports (last accessed February 12, 2018).
       [42] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1867 (last accessed
28 February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 37 of 81

115.     Contemporaneous calls and reports indicated trees hitting **PG&E** electrical lines and/or problems with other electrical equipment at or around the same time and place the Tubbs Fire started.  At least ten of the calls reported electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and/or flames in trees.  Further, several calls reported problems with electrical equipment in the vicinity of the Tubbs Fire, including a call at approximately 9:24 p.m. reporting a **PG&E** transformer explosion, a call at approximately 9:58 p.m. reporting down power lines, a call at approximately 10:14 p.m. reporting flames in trees, and a call at approximately 10:34 p.m. reporting falling power line wires.[43]

116.     One witness in Santa Rosa observed a power line and/or transformer near his home sparking for approximately two minutes at or around 9:50 p.m. on October 8, 2017.  The sparks fell onto trees that were right next to **PG&E's** power lines and other electrical equipment.  After the sparking stopped, the witnesses' neighborhood lost power and **PG&E's** power lines and/or other electrical equipment fell down.  This sparking occurred just outside of the Tubbs Fire.[44]

117.     At or around the start time of the Tubbs Fire, **PG&E's** website for electrical outages reported two outages right next to each other at or very near the origin of the Tubbs Fire.  The causes of the **PG&E** outages read: "found damaged equipment on a power pole," and "fire in the area."  The start time of both outages was exactly 8:51 p.m. on October 8, 2017 – immediately preceding the reported start time of the Tubbs Fire.[45]

118.     After containment of the Tubbs Fire, there was caution tape around the **PG&E** power pole located at or near Highway 128 and Bennett Lane, where the outage reports originated. There were several trees dangerously close to the subject power pole and the electric

---

[43] http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires (last accessed February 12, 2018).
[44] http://abc7news.com/i-team-pg-e-workers-believe-hurricane-level-winds-caused-deadly-north-bay-wildfires-power-line-damage/2525497 (last accessed February 12, 2018).
[45] This quote appeared on https://m.pge.com/?WT.pgeac=Home_Outages#outages but is no longer available on that site.

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 38 of 81

1   wires coming off the pole. There was also electric equipment on the ground that appeared to
2   have come off the pole.

3           **15. The Highway 37 Fire**

4           119.    Cal Fire reported that the origin of the Highway 37 Fire was at or near the
5   intersection of Highway 37 and Lakeville Highway near Sonoma, California. Cal Fire also
6   reported that the Highway 37 Fire started on October 9, 2017, at or around 2:00 p.m., and burned
7   approximately 1,660 acres in Sonoma County, and other land, infrastructure, and resources.[46]

8           120.    **PLAINTIFFS** are informed that witnesses observed downed power lines,
9   exploding transformers, improper fuses, improper connections, improper clearances, aged and
10  defective poles, unrepaired poles, problems with other electrical equipment, and/or down trees,
11  tree limbs, and/or other vegetation in the area in and around the Highway 37 Fire.

12          **G.      PG&E'S ACTS AND OMISSIONS CAUSED AND CONTRIBUTED TO**
13          **CAUSING THE NORTH BAY FIRES**

14                  **1.      The 2013 Liberty Report Found that PG&E's Distribution System**
15                  **Presented "Significant Safety Issues"**

16          121.    On May 6, 2013, a report was sent to the Safety and Enforcement Division of the
17  CPUC from the Liberty Consulting Group who had been retained to conduct an independent
18  review of capital and operations and maintenance expenditures proposed by **PG&E** (hereinafter
19  the "2013 Liberty Report").[47] The 2013 Liberty Report concluded that: "several aspects of the
20  **PG&E** distribution system present significant safety issues." It also found: (a) "addressing risks
21  associated with electrical distribution components has been overshadowed by electric
22  transmission and gas facilities;" (b) "addressing aging infrastructure and adding SCADA to the
23  system comprise the major focuses of safety initiatives for the distribution system;" and (c)
24  "current employee/contractor serious injury and fatality levels require significantly greater
25  mitigation."

26  _____

27  [46] http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1882 (last accessed
    February 12, 2018).
28  [47] http://docs.cpuc.ca.gov/publisheddocs/efile/g000/m065/k394/65394210.pdf (last accessed
    February 12, 2018).

### 2. The 2013 Liberty Report Found that PG&E's Equipment Was Highly Susceptible to Failure

122. One of the first key findings of the 2013 Liberty Report was that **PG&E** had a "large amount of small size obsolete conductor remaining on **PG&E's** system." **PG&E** has 113,000 miles of conductors, and according to the report, over 60 percent of those conductors are highly susceptible to failure. The conductors are very small, and generally more susceptible to breaking than standard size conductors. As a conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones. For these reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

123. **PG&E's** failure to replace these undersized and obsolete conductors was a proximate cause of the North Bay Fires and Plaintiffs' harm and damages arising therefrom.

### 3. PG&E Failed to Inspect, Maintain, Repair, and/or Replace Its Equipment

124. **PG&E** failed to perform the necessary inspections, maintenance, repair, and/or replacement of its electrical equipment.

125. A 2015 audit of **PG&E's** Sonoma Division revealed that there were over 3,500 unfilled **PG&E** repair and maintenance requests in the area of the Tubbs Fire.[48]

126. In a December 31, 2015, letter to **PG&E** regarding the audit, Fayi Daye, a supervising electric safety regulator with the CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of **PG&E** electrical distribution equipment. She stated the following:

> **PG&E's** records indicated that from August 2010 to September 21, 2015, a total of **3,527 work orders were completed past their scheduled date of corrective action** per **PG&E's** Electric Notification Prioritization Standards. Late work orders included overhead and underground

---

[48] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/ Electric_Safety_and_Reliability/Reports_and_Audits/Electric_Facilities/EA2015-018.pdf (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 40 of 81

1        facilities.[49]

2        127.    The letter concluded that these delays violated CPUC General Order No. 128,

3 Rule 17.1, which sets forth the CPUC's design, construction, and maintenance rules for electrical

4 systems.

5        128.    The audit also reviewed **PG&E's** maps for its electrical distribution lines and

6 found that over 50 pieces of overhead equipment - including pole mounted transformers and

7 power lines has not been inspected every year as required by law. This was a violation of CPUC

8 General Order No. 165, § 111-B, which sets forth standards for inspections.[50]

9        129.    Further, according to records maintained by Cal Fire, approximately 135 fires in

10 Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015.[51] In

11 2015, the last year of reported data, electrical power problems sparked the burning of 149,241

12 acres across California – more than twice the amount from any other cause.[52]

13        130.    Since prior to 1996, **PG&E** has known or should have known that its choice of

14 chemical treatments for its poles can also make its equipment unsafe. For example, **PG&E** uses

15 and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon®

16 process. Those poles tend to experience surface decay below ground regardless of the type of

17 wood used for the poles. As a result, digging inspections are required for poles treated by these

18 processes for all wood types. However, **PG&E** has failed to conduct the proper inspections.

19 Further, when **PG&E** has been advised of necessary repairs to such poles, failed to repair the

20 poles in a timely manner.

21        131.    According to the 2017 CPUC Order Instituting Investigation into the Creation of a

22 Shared Database or Statewide Census of Utility Poles and Conduit:

23               Poorly maintained poles and attachments have caused substantial property

24               damage and repeated loss of life in this State. For example, inadequate

25 _____

26 [49] *Ibid.*
  [50] *Ibid.*

27 [51] http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks (last accessed February 12, 2018).

28 [52] http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 41 of 81

clearance between communication and power lines, perhaps in conjunction with a broken cable lashing wire, caused the Southern California Guejito Fire of 2007 which (together with the Witch Fire) burned 197,990 acres and caused two deaths. Three more deaths occurred in 2011 when an electrical conductor separated from a pole in high winds, causing a live wire to fall to the ground. At least five more people lost their lives in pole-related failures in 2012 and 2015.

Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.

Communication and other wires are not infrequently found hanging onto roads or yards. Poles with excessive and/or unauthorized attachments can put utility workers at risk. Facilities deployed in the field may differ from what appears on paper or in a utility's database.[53]

132.    In the June 29, 2017 CPUC press release for the investigation, CPUC President Michael Picker stated, "Plain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "Not knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[54]

133.    **PG&E's** failure to conduct proper and regular inspections of its wood utility poles and failure to replace them or make necessary repairs contributed to causing the North Bay Fires.

[53] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M190/K872/190872933.pdf (last accessed February 12, 2018).
[54] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.pdf (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 42 of 81

**4.  PG&E Failed to Ensure Its Infrastructure Could Withstand Foreseeable Weather Conditions as Required by Law**

134.  Despite **PG&E's** public protestations to the contrary, Northern California did not experience uncommon weather patterns the night the North Bay Fires began. Readings at weather stations in the areas impacted by the North Bay Fires show that winds were at foreseeable levels when **PG&E's** electrical equipment began to fail. For example, on October 8, 2017, a weather station in Santa Rosa in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:29 p.m. About an hour later, the same station recorded wind gusts of 41 miles per hour. These wind speeds were surpassed in other recent storms in the area on a number of occasions.

135.  According to **PG&E's** 2014 Annual Electric Distribution Reliability Report, sent to the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten **PG&E** electrical outages each year since at least 2004, putting the utility on notice that these weather conditions occur and that they can cause electrical problems. For example, four of the "ten largest 2004 outage events" for **PG&E** occurred in the Santa Rosa and Sonoma areas where winds were documented in the 35 to 65 mph range, much higher levels than those of October 8, 2017.[55]

136.  **PG&E's** largest outage in 2009 was caused by a strong early season storm that "affected the entire service area with many stations reporting wind gusts over 50 mph. National Weather Service records indicate this storm was the strongest October rain and wind event since 1962. Therefore, **PG&E** had notice of the type of winds that occurred on October 8, 2017, the night the North Bay Fires began.

137.  **PG&E's** wood utility poles in the areas where the North Bay Fires began did not meet the wind load and safety factors required by CPUC General Order 95, Rule 48, under which wood utility poles must be replaced if they are not strong enough to withstand wind speeds of 92 mph. No weather station in the areas affected by the North Bay Fires recorded wind speeds at or

---

[55] https://www.pge.com/includes/docs/pdfs/myhome/outages/outage/reliability/
AnnualElectricDistributionReliabilityReport.pdf (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 43 of 81

1  above 92 mph on the night of October 8, 2017.

2  138.  **PG&E's** failure to replace old and deteriorated wood utility poles that did not

3  meet the strength and safety requirements of CPUC General Order 95, Rule 48, and that could

4  not withstand wind speeds of less than 92 mph contributed to the cause of the North Bay Fires.

5  **5.  PG&E's Unsafe Use of Reclosers**

6  139.  Another key finding of the 2013 Liberty Report was that on a daily basis and in

7  36 percent of cases, **PG&E** cannot remotely de-energize a downed line and must send someone

8  on-site to manually turn off the feed.  An energized downed line is a hazard, and, according to

9  the 2013 Liberty Report, this hazard has "contributed to a number of fatalities and injuries."

10  140.  **PG&E** has a long-standing practice of using reclosers throughout its system to

11  automatically restart power after interruptions, even though it knows these devices may cause

12  wildfires.  Reclosers are circuit breakers equipped with a mechanism that can automatically

13  "reclose" the breaker and reenergize a power line after it has been "opened" due to a fault.  Many

14  of **PG&E's** reclosers are set to reenergize the line up to three times after a fault.

15  141.  Reclosers are key tools to prevent power blackouts, but if a fault occurs from

16  contact between a line and a tree or vegetation, reenergizing the line can ignite fires.  This danger

17  is so significant that the other two major utilities in California, San Diego Gas & Electric

18  Company and Southern California Edison, have reprogramed their electrical systems during fire

19  seasons to ensure that reclosers do not automatically restart electrical currents after a service

20  interruption.

21  142.  **PG&E** knew that its reclosers posed a great risk of wildfire but has only taken

22  slow and incomplete steps to eliminate that risk.  At a Congressional hearing in 2015, **PG&E's**

23  Senior Vice President of Electrical Operations, Patrick Hogan, stated that **PG&E** had the ability

24  to reprogram its reclosers during fire season to not restart power.  Patrick Hogan claimed that

25  shutting down power means "you take the reliability hit, but you gain the wildfire benefit."[56]

26  143.  In contrast to San Diego Gas & Electric Company and Southern California Edison

27

28  [56] http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-12324764.php (last accessed February 12, 2018).

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 44 of 81

having disabled all of their reclosers from reenergizing lines during fire season, and despite its own knowledge of the dangers posed by reclosers, **PG&E** began an experimental pilot program in 2017 to reprogram its reclosers that only affected a limited area of California.

144. Even before the Butte Fire in 2015, **PG&E** began a process of replacing all reclosers that can only be programmed or controlled on-site with reclosers that can be remotely programmed and controlled. However, that process has been so slow and deliberate many of its reclosers must still be programmed or controlled only at the site where they are installed.

145. On its own initiative, **PG&E** did not turn off a number of reclosers on transmission and distribution systems in the area of the North Bay Fires. Instead, **PG&E** left those reclosers active and did not turn them off until directed to do so by Cal Fire between October 12 and 15, 2017.

146. **PG&E's** failure to turn off its reclosers during fire season and its failure to ensure all of its reclosers could be programmed and controlled remotely proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

## 6. **PG&E Knew That Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation**

147. Electrical arcing is a process by which guy wires or "down-guys," when designed improperly and/or installed according to improper design, conduct ground current at ground level during high winds, igniting fires to nearby vegetation. Guy wires are the metal support cables that are used to tie electrical poles to the ground. **PG&E** utilizes an inverted "V" shape design without any separation or in-line insulators as an attempt to help its poles withstand high wind. However, in **PG&E's** sub-transmission design, **PG&E** does not separate the connection at the pole by 12 inches, utilize any in-line insulator to prevent ground current from flowing, or utilize a shunt so when ground current exists it does not cause an electrical arc. In addition, if not properly maintained, the down-guys become loose. In high wind conditions, when the poles sway and ground currents exist, arcing occurs. With the combination of high winds, swaying poles, loose connections, two down-guys attached by a common bolt, and ground current, electrical arcing occurs, igniting local vegetation.

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 45 of 81

1  148. It is believed that arcing from San Diego Gas & Electric wires was the cause of
2  the 2007 San Diego "Witch Creek" Fires, in addition to the 2003 Cedar and Paradise Fires.

3  149. The down-guy design utilized by **PG&E** is a violation of CPUC General Order
4  Number 95. Industry experts have demonstrated to the CPUC and California utilities how the
5  dangerous design causes arcing and fires for over a decade. They believe this design is
6  unreasonably dangerous and that the fix is cheap and easy. CPUC General Order Number 95
7  sets forth two possible solutions: either have a 12-inch separation on a pole; or add an in-line
8  insulator. An additional solution is adding a shunt from the down-guy anchor to the down-guy
9  itself. All three inexpensive solutions prevent electrical arcs at ground levels that ignite fires.

10                    **7.    PG&E's Reckless Adoption of the VMII Program Where It Paid Its**
11                           **Contractors to Cut Fewer Trees**

12  150. **PG&E's** Vegetation Management Program performs two types of tree work:
13  annual routine compliance tree work and reliability tree work.

14  151. Annual routine compliance work focuses on maintaining regulatory distances
15  between energized conductors and vegetation. Reliability tree work focuses on locations where
16  there has been a history of vegetation-related outage problems based on three historical indexes:
17  System Average Interruption Frequency Index ("SAIFI"), Customer Experiencing Multiple
18  Interruption ("CEMI"), and System Average Interruption Duration Index ("SAIDI").

19  152. In 2006, PG&E's Vegetation Management Program adopted the "Vegetation
20  Management Incentive Initiative" ("VMII"). The ostensible purpose of VMII was to reduce the
21  annual routine compliance tree work and share the resulting cost savings with the contractors
22  whose compensation would be reduced by the loss of actual work. The actual purpose of VMII
23  was to shift costs from annual routine compliance work to fund additional reliability work.

24  153. For example, in 2011, PG&E set a goal to reduce routine "units" worked from
25  1.18 million trees in 2011 to 1 million in 2012 in order to increase the amount of money
26  available for reliability work by $20 million. In 2012, PG&E set a goal to goal to reduce routine
27  "units" worked by 25 percent in 2013 in order to increase the amount of money available for
28  reliability work by $35 million. In 2013, PG&E only performed routine patrol inspections on 75

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 46
of 81

1   percent of its distribution circuits, using the cost savings to increase its reliability patrols. In
2   2014, PG&E set a goal to reduce routine units worked by 7.5 percent annually through 2016.

3        154.    Between 2006 and 2013, PG&E actually reduced the number of routine trees
4   worked from 1.7 million to 1.25 million in 2013, paid contractors $85 million, and increased
5   reliability spending by $134 million. During that time, customer satisfaction as measured by
6   SAIFI increased by 40 percent.

7        155.    Most of PG&E's annual routine compliance work is performed in rural areas in
8   California, while most of PG&E's "reliability" work is performed in the more densely populated
9   urban or semi-urban areas where outages will generate more complaints per square mile than in
10  the rural counties served by PG&E. Although the actual vegetation management work
11  performed in the annual routine compliance patrols and the reliability patrols is virtually the
12  same, PG&E's only comprehensible rationale for differentiating the "two types of work" is that
13  the "reliability" work is directed at reducing statistical measurements of customer dissatisfaction
14  over outages and that goal can be better accomplished by concentrating on work in urban or
15  semi-urban areas at the expense of work needed in rural areas.

16       156.    Under PG&E's bonus incentive program, reducing the number of customer
17  complaints over outages leads to an increased likelihood of increases in executive and
18  management bonuses.

19       157.    PG&E's reckless implementation and continued application of VMII proximately
20  caused the North Bay Fires and the injuries, deaths, harm and property destruction arising
21  therefrom.

22            **8.    PG&E Failed to Fully Employ LiDAR to Identify Hazard Trees**

23       158.    LiDAR (an acronym for "Light Detection and Ranging") is a surveying method
24  that measures distances to a target by illuminating that target with a pulsed laser light and
25  measures the reflected pulses with a sensor. These light pulses, when combined with other data
26  recorded by the system, orthoimagery, and hyperspectral data, can generate precise three-
27  dimensional images and information about the shape of the Earth and objects such as buildings
28  or trees.

159. When used in a vegetation management program for electric utilities, LiDAR scans and analyses can be used to identify trees that have the potential for contacting conductors, whether because of proximity to the conductors or are dead, diseased, or dying. Annual LiDAR scans analyze the electric system and the change in the dead or diseased vegetation by comparing one year's data to the prior year's inventory of dead or diseased trees. When the analysis is conducted over a subset dataset, it can provide a statistical understanding in the percent change in vegetation identified as dead or diseased.

160. **PG&E's** use of LiDAR is funded by its "Catastrophic Event Memorandum Account" ("CEMA"). If a catastrophic event is declared a state of emergency by the state or federal government, then utilities like **PG&E** can record costs caused by the event in this memorandum account. By recording these costs, the utilities can later ask for recovery of these costs from the CPUC.

161. In 2014, **PG&E** began to use LiDAR to scan and analyze small sections of its electric transmission and distribution system. In 2015, **PG&E** employed a contractor who created spatially accurate alignment information for approximately 10 percent of **PG&E** distribution lines using LiDAR and imagery. The contractor identified 2.2 million "Hazard Trees" in the LiDAR data having the potential to fail-in or encroach on distribution lines, performed "dead and diseased analysis" on 1.6 million trees, and identified 23,000 trees as potentially dead or diseased.

162. In 2015, **PG&E** scheduled the LiDAR contractor's deliverables for October 2015 at the very tail end of California's fire season. The contractor's final product identified the 44 foot-tall gray pine that started the Butte Fire as a "Hazard Tree" that had the potential to fall into one of **PG&E's** distribution lines, but unfortunately **PG&E** received the information over a month after the Butte Fire started.

163. In 2016 and 2017, **PG&E** again employed LiDAR technology to scan and analyze its electric transmission and distribution system, but only employed the technology in limited sections of that system, and again scheduled the deliverables at the tail end of the California wildfire season.

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 48 of 81

164.    **PG&E's** failure to fully employ LiDAR technology in the area of the North Bay Fires and its failure to timely schedule deliverables of LiDAR analyses proximately caused the North Bay Fires and the injuries, harm and property destruction arising therefrom.

### 9.    PG&E Failed to Treat the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk

165.    Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations." According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place. These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets. These types of formal programs also take failure modes into consideration. Long term sustainable plans can then be prepared to address the asset conditions. A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

166.    The 2013 Liberty Report specifically recommended that "**PG&E** treat aging infrastructure as an enterprise-level risk."

167.    **PG&E's** failure to treat its aging infrastructure as an enterprise-level risk proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 10.    PG&E's "Run to Failure" Approach to Maintenance

168.    **PG&E's**: failure to address the "significant safety hazards" identified by the 2013 Liberty Report; replace obsolete and undersized conductors; halt its unsafe use of reclosers; adoption of the VMII program; failure to fully employ LiDAR to identify hazard trees; failure to treat the conditions of its aging infrastructure as an enterprise-level risk; failure to inspect, maintain, repair, and/or replace its aging equipment; failure to conduct an inventory of its electrical assets; and failure to ensure its infrastructure could withstand foreseeable weather conditions as required by law are all indicative of what has been called **PG&E's** "run to failure" approach to its infrastructure.

169.    **PG&E** has a well-documented history of implementing this "run to failure"

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 49 of 81

1 | approach with its aging infrastructure, ignoring necessary maintenance and creating hazards to

2 | the public. According to a filing by Office of Ratepayer Advocates with the CPUC in May 2013:

> However, as we saw in Section V.F.3 above, the Overland Audit explains how **PG&E** systematically underfunded GT&S integrity management and maintenance operations for the years 2008 through 2010. **PG&E** engaged in a 'run to failure' strategy whereby it deferred needed maintenance projects and changed the assessment method for several pipelines from ILI to the less informative ECDA approach – all to increase its profits even further beyond its already generous authorized rate of return, which averaged 11.2% between 1996 and 2010.

> Given **PG&E's** excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique. The IRP Report supplements the Overland Audit findings with additional examples of **PG&E** management's commitment to profits over safety. Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of **PG&E** management's long-standing policy to squeeze every nickel it could from **PG&E** gas operations and maintenance, regardless of the long term 'run to failure' impacts. And **PG&E** has offered no evidence to the contrary.[57]

170. **PG&E's** "run to failure" approach to maintenance proximately caused the North Bay Fires and the injuries, deaths, harm and property destruction arising therefrom.

### 11. PG&E's Purchase of Insurance Coverage for Punitive Damages

171. Insurance Code § 533 provides in pertinent part: "An insurer is not liable for a loss caused by the willful act of the insured."

172. Civil Code § 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

173. Despite the statutory exoneration given to insurance companies for liability for losses caused by willful acts of an insured, and despite the fact that the public policy of the State

---

[57] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/ SB_GT&S_0039691.pdf (last accessed February 12, 2018).

Case: 19-30088 Doc# 3434-3 Filed: 08/07/19 Entered: 08/07/19 16:06:20 Page 50 of 81

of California invalidates any insurance contract that purports to provide coverage for punitive damages, **PG&E** has purchased policies of insurance from offshore companies in Bermuda, London, and elsewhere that expressly provide coverage for punitive damages in amounts that exceed hundreds of millions of dollars.

174. **PG&E** purchased insurance policies that cover punitive damages for the purpose of providing corporate security without regard to public safety.

### H. PG&E'S CORPORATE CULTURE

175. **PG&E** has a virtual monopoly in the provision of gas and electric services to the general public in almost all counties and cities across Northern and Central California.[58]

176. Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the fines, penalties, settlements, and convictions detailed above.

177. **PG&E** redirects money it obtains from customers for infrastructure maintenance and safety, thereby failing to provide adequate funding for a solid and well-maintained infrastructure that would be safe and dependable for years to come.

178. For example, according to documents released by The Utility Reform Network ("TURN"), **PG&E** planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in **PG&E's** system. **PG&E** collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, **PG&E** spent nearly $5 million on bonuses for six of its top executives.

179. Moreover, **PG&E** has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors contrary to public safety. Prior to the Butte Fire, **PG&E** chose to provide a monetary incentive through the VMII program to its contractors to cut fewer trees, even though **PG&E** was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional

---

[58] A few cities like Palo Alto and Sacramento provide their own gas and electric utility services.

1  officer for a **PG&E** contractor, stated that he had a concern that the bonus system incentivized
2  his employees to not do their job, but **PG&E** chose to keep this program despite knowing this
3  risk.

4  180.  Similarly, prior to the San Bruno explosion, **PG&E** had a program that provided
5  financial incentives to employees to not report or fix gas leaks and keep repair costs down. This
6  program resulted in the failure to detect a significant number of gas leaks, many of which were
7  considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety
8  expert, **PG&E's** incentive system was "training and rewarding people to do the wrong thing,"
9  emblematic of "a seriously broken process," and "explains many of the systemic problems in this
10 operation that contributed to the [San Bruno] tragedy."[59]

11 181.  As detailed above, the North Bay Fires are just one example of the many tragedies
12 that have resulted from **PG&E's** failure to protect the public from the dangers associated with its
13 operations.  PG&E power lines, transformers, conductors, poles, insulators, and/or other
14 electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create,
15 manage, implement, and/or maintain effective vegetation management programs for the areas
16 near and around its electrical equipment. Further, **PG&E's** aging infrastructure and lack of asset
17 management has caused multiple disasters throughout California.

18 182.  As detailed more fully above, **PG&E's** failures to reduce the risk of wildfire are
19 serious and widespread, and contributed to causing the North Bay Fires. The reclosers in
20 **PG&E's** system were set to avoid outages and not to avoid fires, even though fire conditions
21 were known to be extreme. **PG&E** failed to have a reasonable system in place to make sure that
22 its contractors were properly performing tree and/or vegetation inspections and removal, pole
23 clearance, and pole inspections. **PG&E** failed to take any steps to look for what it calls Facility
24 Protect Trees (trees which pose a risk of falling into the line), even though it knew such trees
25 were likely to exist after its contractors had performed their work. **PG&E** failed to properly
26 construct its power lines and thereafter failed to take reasonable steps to make sure the poles and
27

28  [59] http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-
2424430.php (last accessed March 6, 2018).

1    lines were sufficiently strong to support lines and other equipment that were added by third
2    parties. Finally, despite knowing that wildfires posed the greatest risk to the public from its
3    electrical operations, **PG&E** failed to ensure that its contractors were properly trained in tree
4    inspections and removal, failed to ensure that its contractors hired people who met **PG&E's**
5    minimum qualifications, and failed to participate in the training of its contractors.

6    **V.    CAUSES OF ACTION**

7    ### FIRST CAUSE OF ACTION

8    ### NEGLIGENCE and RESPONDEAT SUPERIOR

9    **(Against All Defendants)**

10   183.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as
11   though fully set forth herein.

12   184.    **DEFENDANTS** have a non-delegable duty to apply a level of care
13   commensurate with and proportionate to the danger of designing, engineering, constructing,
14   operating and maintaining electrical transmission and distribution systems, inclusive of
15   vegetation clearance.

16   185.    **DEFENDANTS** have a non-delegable duty of vigilant oversight in the
17   maintenance, use, operation, repair and inspection appropriate to the changing conditions and
18   circumstances of their electrical transmission and distribution systems.

19   186.    Prior to the subject North Bay Fires, Defendant PG&E hired, retained,
20   contracted, allowed, and/or otherwise collaborated with vegetation management companies and
21   certain of the **DOE DEFENDANTS** and/or other parties, to perform work along and maintain
22   the network of distribution lines, infrastructure, and vegetation. The work for which the
23   vegetation management companies and **DOE DEFENDANTS** were hired involved a risk of fire
24   that was peculiar to the nature of the agency relationship. A reasonable property/easement
25   owner and/or lessee, in the position of the PG&E, knew, or should have recognized, the
26   necessity of taking special precautions to protect adjoining property owners against the risk of
27   harm created by work performed, work to be performed and/or the failure to perform such work
28   of vegetation management, removal and/or control.

187. **DEFENDANTS**, and each of them, knew or should have known that the activities of **DOE DEFENDANTS**, and/or other parties, involved a risk that was peculiar to the operation of **DEFENDANTS**' business that was foreseeable and arose from the nature and/or location of the work. Notwithstanding the above, **DEFENDANTS**, and each of them, failed to take reasonable precautions to protect adjoining property owners against the foreseeable risk of harm created by their activities.

188. **DEFENDANTS**, and each of them, have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair and maintenance of electrical lines, infrastructure, equipment and vegetation in order to assure safety under all the local conditions in their service area, including but not limited to, those conditions identified herein.

189. The North Bay Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them. **DEFENDANTS**, and/or each of them, breached their respective duties owed individually and/or collectively to **PLAINTIFFS** by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care; (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (4) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard within close proximity of the subject power line; (5) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections and/or repairs of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain electrical transmission and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons, including allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and/or repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 54 of 81

1   making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep

2   equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing

3   to de-energize power lines during fire prone conditions; (11) failing to de-energize power lines

4   after the ignition of the North Bay Fires; and/or (12) failing to properly train and to supervise

5   employees and/or agents responsible for maintenance and inspection of the distribution lines

6   and/or vegetation areas nearby these lines.

7       190.   As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or

8   each of them, **PLAINTIFFS** were injured in an amount according to proof at trial.

9       191.   As a further direct and legal result of **DEFENDANTS'** actions and/or omissions,

10   and/or each of them, **PLAINTIFFS** have suffered damage to real property, including the loss of

11   vegetation, trees, and structures, the creation of hydrophobic soil conditions, and a loss of use,

12   benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount

13   according to proof at trial, including public facilities, resources, infrastructure, parks, and other

14   public property.

15       192.   As a further direct and legal result of **DEFENDANTS'** actions and/or omissions,

16   and/or each of them, **PLAINTIFFS** have suffered damage to and/or a loss of personal property,

17   including but not limited to items of peculiar value to **PLAINTIFFS** in an amount according to

18   proof at trial, including public property and infrastructure.

19       193.   As a further direct and legal result of **DEFENDANTS'** actions and/or omissions,

20   and/or each of them, **PLAINTIFFS** have incurred and will continue to incur expenses and other

21   economic damages related to the damage to their property, including costs relating to storage,

22   clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related

23   consequential damages in an amount according to proof at trial.

24       194.   **PG&E** has a virtual monopoly over the transmission and distribution of electrical

25   power to the areas affected by the North Bay Fires and has individual contracts with all residents

26   and businesses in those areas to whom it distributes that electrical power. The communities

27   affected by the North Bay Fires are all dependent upon the safe transmission and distribution of

28   that electrical power for continuous residential and commercial usage, and **PG&E** has

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 55 of 81

1  contractual, statutory, and public duties to provide that electrical power in a manner that
2  promotes those individual and public interests.

3      195.    The potential harms to **PLAINTIFFS** from wildfires such as the North Bay Fires
4  were objectively foreseeable both in nature and in scope and were subjectively known to **PG&E**
5  from past wildfires.

6      196.    As set forth above and as will be shown by proof, there is a high degree of
7  certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an
8  extremely close connection between those injuries and damages and **DEFENDANTS'** conduct.

9      197.    Based on the foregoing, **DEFENDANTS**, and/or each of them, acted willfully,
10  wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the
11  rights and/or safety of others, such the **PLAINTIFFS** request that the trier of fact, in the exercise
12  of sound discretion, award **PLAINTIFFS** additional damages pursuant to Code of Civil
13  Procedure § 3294 for the sake of example and sufficient to punish the **DEFENDANTS**, and/or
14  each of them, for their conduct, in an amount reasonably related to **PLAINTIFFS'** actual
15  damages and **DEFENDANTS'** financial condition, yet sufficiently large enough to be an
16  example to others and to deter **DEFENDANTS** and others from engaging in similar conduct in
17  the future. An officer, director, or managing agent of PG&E personally committed, authorized
18  and/or ratified the reckless and wrongful conduct alleged in this complaint.

19      198.    The **PLAINTIFFS** suffered injuries and damages including but not limited to the
20  following: loss of natural resources, open space, and public lands; loss of public parks; property
21  damages including real and personal property; fire suppression costs including personnel,
22  overtime labor costs, materials, and other fire suppression damages; evacuation expenses,
23  economic damages such as loss of tax revenue including property, sales, and transient
24  occupancy taxes; economic damages such as losses from impacts on business like activities;
25  costs associated with response and recovery including debris removal, emergency response, and
26  other costs; damage to infrastructure including but not limited to roads, sidewalks, water,
27  stormwater and sewer systems, and other underground infrastructure, and other public entity-
28  owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity;

damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

199. The **PLAINTIFFS** suffered other injuries and damages not yet identified including those unique to the public entity plaintiffs.

## SECOND CAUSE OF ACTION

### INVERSE CONDEMNATION

#### (Against All Defendants)

200. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

201. **DEFENDANTS'** operation of their electrical equipment, lines, and infrastructure were a substantial cause of the **PLAINTIFFS'** damages, are a public improvement for a public use, and constitute an "Electrical Plant" pursuant to California Public Utilities Code §217.

202. **DEFENDANTS'** facilities, wires, lines, equipment, infrastructure and other public improvements, as deliberately designed and constructed, present an inherent danger and risk of fire to private and public property. In acting in furtherance of the public objective of supplying electricity, **DEFENDANTS** took and did take on or about October 8, 2017, a known, calculated risk that private property would be damaged and destroyed by fire.

203. On or about October 8, 2017, the inherent risk of fire became a reality, which directly and legally resulted in the taking of the **PLAINTIFFS'** private and public property. **PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of its real and personal property, thus constituting a taking of **PLAINTIFFS'** property by **DEFENDANTS** without just compensation, in an amount to be proven at trial.

204. **DEFENDANTS** conduct as described herein was a substantial factor in causing damage to a property interest of the COUNTY protected by the Fifth Amendment of the U.S. Constitution and Article I, Section 19, of the California Constitution, which entitles the COUNTY to just compensation according to proof at trial for all damages incurred.

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 57 of 81

205. Under and pursuant to California Code of Civil Procedure §1036, the **PLAINTIFFS** are entitled to recover all litigation costs and expense with regard to the compensation of damage to properties, including attorney's fees, expert fees, consulting fees and litigation costs.

206. On or around October 8 or 9, 2017, **PLAINTIFFS** were owners of real property and/or personal property located within Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in the area of the North Bay Fires.

207. Prior to and on October 8 or 9, 2017, **DEFENDANTS**, and/or each of them, installed, owned, operated, used, controlled, and/or maintained power lines and other electrical equipment for the public delivery of electricity, including power lines in and around the location of the North Bay Fires.

208. On or around October 8 or 9, 2017, as a direct, necessary, and legal result of **DEFENDANTS'** installation, ownership, operation, use, control, management, and/or maintenance for a public use the power lines and/or other electrical equipment, the power lines and/or other electrical equipment came in contact with vegetation and/or broke, failed, fell down, sparked, and/or exploded, causing wildfires that burned thousands of acres, including property owned or occupied by **PLAINTIFFS**. The fires damaged and/or destroyed **PLAINTIFFS'** real and/or personal property.

209. The above described damage to **PLAINTIFFS'** property was legally and substantially caused by the actions of **DEFENDANTS**, and/or each of them, in their installation, ownership, operation, use, control, management, and/or maintenance of the power lines and other electrical equipment for a public use.

210. **PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of **PLAINTIFFS'** property by **DEFENDANTS**, and/or each of them, without just compensation.

211. As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** suffered damages to their real and/or personal property, including loss of use, interference with access, and/or diminution in value and/or marketability in

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 58 of 81

an amount according to proof at trial.

212.    As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable attorney, appraisal, engineering, and/or other expert fees due to the conduct of the **DEFENDANTS** in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil Procedure § 1036.

213.    The **PLAINTIFFS** suffered injuries and damages including but not limited to the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; fire suppression costs including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses, economic damages such as loss of tax revenue including property, sales, and transient occupancy taxes; economic damages such as losses from impacts on business like activities; costs associated with response and recovery including debris removal, emergency response, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

214.    The **PLAINTIFFS** suffered other injuries and damages yet identified including those unique to the public entity plaintiffs.

**THIRD CAUSE OF ACTION**

**PUBLIC NUISANCE**

**(Against All Defendants)**

215.    **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

216.    **DEFENDANTS'** actions, conduct, omissions, negligence, trespass, and failure to act resulted in a fire hazard and a foreseeable obstruction to the free use of the **PLAINTIFFS'**

property, invaded the right to use the **PLAINTIFFS'** property and interfered with the enjoyment of the **PLAINTIFFS'** property, causing the **PLAINTIFFS** to suffer unreasonable harm and substantial actual damages constituting a nuisance, pursuant to California Civil Code §3479.

217.    **PLAINTIFFS** own and/or occupy property at or near the site of the fire which is the subject of this action.  At all relevant times herein, **PLAINTIFFS** had a right to occupy, enjoy, and/or use their property without interference by **DEFENDANTS**, and/or each of them.

218.    **DEFENDANTS**, and/or each of them, owed a duty to the public, including **PLAINTIFFS** herein, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their power lines in and around Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and/or Yuba Counties in a manner that did not threaten harm or injury to the public welfare from operation of those power lines.

219.    **DEFENDANTS**, and/or each of them, by acting and/or failing to act, as alleged hereinabove, created a condition which was harmful to the health of the public, including these **PLAINTIFFS**, and which interfered with the comfortable occupancy, use, and/or enjoyment of **PLAINTIFFS'** property.

220.    **PLAINTIFFS** did not consent, expressly or impliedly, to the wrongful conduct of **DEFENDANTS**, and/or each of them, in acting in the manner set forth above.

221.    The hazardous conditions that were created by and/or permitted to exist by **DEFENDANTS**, and/or each of them, affected a substantial number of people within the general public, including **PLAINTIFFS** herein, and constituted a public nuisance under Civil Code §§ 3479 and 3480 and Public Resources Code § 4171.  Further, the ensuing uncontrolled wildfire constituted a public nuisance under Public Resources Code § 4170.

222.    The damaging effects of **DEFENDANTS'** maintenance of a fire hazard and the ensuing uncontrolled wildfire are ongoing and affect the public at large.  As a result of the fire's location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the fire's perimeter.  This further caused significant post fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment laden flow hazards, and hillside erosion.  As a

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 60 of 81

1   result, large quantities of ash and sediment will be deposited in perennial and ephemeral
2   watercourses.

3       223.    As a direct and legal result of the conduct of **DEFENDANTS**, and/or each of
4   them, **PLAINTIFFS** suffered harm that is different from the type of harm suffered by the
5   general public. Specifically, **PLAINTIFFS** have lost the occupancy, possession, use, and/or
6   enjoyment of their land, real and/or personal property, including, but not limited to:   (a) a
7   reasonable and rational fear that the area is still dangerous; (b) a diminution in the fair market
8   value of their property; (c) an impairment of the salability of their property; (d) soils that have
9   become hydrophobic; (e) exposure to an array of toxic substances on their land; (f) the presence
10  of "special waste" on their property that requires special management and disposal; and (g) a
11  lingering smell of smoke, and/or constant soot, ash, and/or dust in the air.

12      224.    As a further direct and legal result of the conduct of **DEFENDANTS**, and/or each
13  of them, **PLAINTIFFS** have suffered, and will continue to be harmed by the interference with
14  **PLAINTIFFS'** occupancy, possession, use and/or enjoyment of their property, as alleged above.

15      225.    A reasonable, ordinary person would be reasonably annoyed or disturbed by the
16  condition created by **DEFENDANTS**, and/or each of them, and the resulting fire.

17      226.    The conduct of **DEFENDANTS**, and/or each of them, is unreasonable and the
18  seriousness of the harm to the public, including **PLAINTIFFS** herein, outweighs the social
19  utility of **DEFENDANTS'** conduct.

20      227.    The individual and/or collective conduct of **DEFENDANTS** set forth above,
21  and/or each of them, resulting in the North Bay Fires is not an isolated incident, but is ongoing
22  and/or a repeated course of conduct, and **DEFENDANTS'** prior conduct and/or failures have
23  resulted in other fires and damage to the public.

24      228.    The unreasonable conduct of **DEFENDANTS**, and/or each of them, is a direct
25  and legal cause of the harm, injury, and/or damage to the public, including **PLAINTIFFS** herein.

26      229.    **DEFENDANTS**, and/or each of them, have individually and/or collectively,
27  failed and refused to conduct proper inspections and to properly trim, prune, and/or cut
28  vegetation in order to ensure the sole delivery of electricity to residents through the operation of

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 61
of 81

1 power lines in the affected area, and **DEFENDANTS'** individual and/or collective failure to do
2 so exposed every member of the public, residing in Butte, Calaveras, Lake, Mendocino, Napa,
3 Nevada, Solano, Sonoma, and/or Yuba Counties, to a foreseeable danger of a loss of or
4 destruction real and personal property.

5      230.    The conduct of **DEFENDANTS**, and/or each of them, set forth above constitutes
6 a public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code
7 §§ 4104 and 4170, and Code of Civil Procedure § 731. Under Civil Code § 3493, **PLAINTIFFS**
8 have standing to maintain an action for public nuisance because the nuisance is especially
9 injurious to **PLAINTIFFS** because, as more specifically described above, it is injurious and/or
10 offensive to the senses of the **PLAINTIFFS**, unreasonably interferes with the comfortable
11 enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner,
12 of **PLAINTIFFS'** properties, and have suffered harm, injury, and damages.

13      231.    For these reasons, **PLAINTIFFS** seek a permanent injunction ordering that
14 **DEFENDANTS**, and each of them, stop continued violation of:  (a) General Order No. 95,
15 Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public
16 Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451. **PLAINTIFFS**
17 also seek an order directing **DEFENDANTS** to abate the existing and continuing nuisance
18 described above.

19      232.    Further, the conduct of **DEFENDANTS** and their failures to act as alleged in this
20 complaint were in reckless disregard of their consequences and in reckless disregard of the
21 rights and safety of the **PLAINTIFFS** and subjected the **PLAINTIFFS** to cruel and unjust
22 hardship, thus constituting malice and oppression on **DEFENDANTS'** part for which they must
23 be punished by punitive and exemplary damages in an amount according to proof.  An officer,
24 director, or managing agent of PG&E personally committed, authorized and/or ratified the
25 reckless and wrongful conduct alleged in this complaint.

26      233.    The **PLAINTIFFS** suffered injuries and damages including but not limited to the
27 following: loss of natural resources, open space, and public lands; loss of public parks; property
28 damages including real and personal property; fire suppression costs including personnel,

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 62
of 81

1 | overtime labor costs, materials, and other fire suppression damages; evacuation expenses,
2 | economic damages such as loss of tax revenue including property, sales, and transient
3 | occupancy taxes; economic damages such as losses from impacts on business like activities;
4 | costs associated with response and recovery including debris removal, emergency response, and
5 | other costs; damage to infrastructure including but not limited to roads, sidewalks, water,
6 | stormwater and sewer systems, and underground infrastructure, and other public entity-owned
7 | infrastructure; damages based on soil erosion, and loss of soil stability and productivity;
8 | damages related to water contamination including water quality preservation and correction
9 | expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages,
10 | and losses directly related to and caused by the Fires.

11 | 234. The **PLAINTIFFS** suffered other injuries and damages yet identified including
12 | those unique to the public entity plaintiffs.

### FOURTH CAUSE OF ACTION

### PRIVATE NUISANCE

### (Against All Defendants)

16 | 235. **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs
17 | set forth as though fully set forth herein.

18 | 236. **DEFENDANTS**, and/or each of them, by their acts and/or omissions set forth
19 | above, directly and legally caused an obstruction to the free use of **PLAINTIFFS'** property, an
20 | invasion the **PLAINTIFFS'** right to use their property, and/or an interference with the
21 | enjoyment of **PLAINTIFFS'** property, resulting in **PLAINTIFFS** suffering unreasonable harm
22 | and substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

23 | 237. As a direct and legal result of the wrongful acts and/or omissions of
24 | **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the
25 | injuries and damages as set forth above.

26 | 238. As a further direct and legal result of the wrongful acts and/or omissions of
27 | **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and
28 | exemplary damages against **DEFENDANTS** as set forth above.

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 63 of 81

239. The **PLAINTIFFS** suffered injuries and damages including but not limited to the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; fire suppression costs including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses, economic damages such as loss of tax revenue including property, sales, and transient occupancy taxes; economic damages such as losses from impacts on business like activities; costs associated with response and recovery including debris removal, emergency response, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

240. The **PLAINTIFFS** suffered other injuries and damages yet identified including those unique to the public entity plaintiffs.

## FIFTH CAUSE OF ACTION

### PREMISES LIABILITY

### (Against All Defendants)

241. **PLAINTIFFS** incorporate and re-allege by this reference, each of the paragraphs set forth as though fully set forth herein.

242. **DEFENDANTS**, and/or each of them, were the owners of an easement and/or real property in the area of the origins of the North Bay Fires, and/or were the owners of the power lines upon said easement(s) and/or right(s) of way.

243. **DEFENDANTS**, and/or each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near its power lines along the real property and easement(s), allowing an unsafe condition presenting a foreseeable risk of fire danger to exist on said property.

244. As a direct and legal result of the wrongful acts and/or omissions of

Case: 19-30088 Doc# 3434-3 Filed: 08/07/19 Entered: 08/07/19 16:06:20 Page 64 of 81

1 | **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the
2 | injuries and damages as set forth above.

3 | 245.   As a further direct and legal result of the wrongful acts and/or omissions of
4 | **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and
5 | exemplary damages against **DEFENDANTS** as set forth above.

6 | 246.   The **PLAINTIFFS** suffered injuries and damages including but not limited to the
7 | following: loss of natural resources, open space, and public lands; loss of public parks; property
8 | damages including real and personal property; fire suppression costs including personnel,
9 | overtime labor costs, materials, and other fire suppression damages; evacuation expenses,
10 | economic damages such as loss of tax revenue including property, sales, and transient occupancy
11 | taxes; economic damages such as losses from impacts on business like activities; costs associated
12 | with response and recovery including debris removal, emergency response, and other costs;
13 | damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and
14 | sewer systems, and underground infrastructure, and other public entity-owned infrastructure;
15 | damages based on soil erosion, and loss of soil stability and productivity; damages related to
16 | water contamination including water quality preservation and correction expenses; loss of water
17 | storage; loss of aesthetic value; and other significant injuries, damages, and losses directly
18 | related to and caused by the Fires.

19 | 247.   The **PLAINTIFFS** suffered other injuries and damages yet identified including
20 | those unique to the public entity plaintiffs.

21 | **SIXTH CAUSE OF ACTION**

22 | **TRESPASS**

23 | **(Against All Defendants)**

24 | 248.   **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs
25 | set forth as though fully set forth herein.

26 | 249.   At all times relevant herein, **PLAINTIFFS** were the owners, tenants, and/or
27 | lawful occupants of property damaged by the North Bay Fires.

28 | 250.   **DEFENDANTS**, and/or each of them, in wrongfully acting and/or failing to act

**PUBLIC ENTITY MASTER COMPLAINT**                    59

in the manner set forth above, caused the North Bay Fires to ignite and/or spread out of control, causing harm, damage, and/or injury to **PLAINTIFFS** herein, resulting in a trespass upon **PLAINTIFFS** property interests.

251. **PLAINTIFFS** did not grant permission for **DEFENDANTS** to wrongfully act in a manner so as to cause the North Bay Fires, and thereby produce fires which spread and wrongfully entered upon their property, resulting in the harm, injury, and/or damage alleged above.

252. As a direct and legal result of the wrongful conduct of **DEFENDANTS**, and/or each of them, which led to the trespass, **PLAINTIFFS** have suffered and will continue to suffer damages as set forth above, in an amount according to proof at trial.

253. As a further direct and legal result of the wrongful conduct of **DEFENDANTS**, **PLAINTIFFS**, whose land was under cultivation, and was used for raising livestock or was intended to be used for raising livestock, have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under Code of Civil Procedure § 1021.9.

254. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek treble damages for injuries to trees or timber on **PLAINTIFFS'** property as allowed under Code of Civil Procedure § 733.

255. As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek double or treble damages for the negligent, willful, and wrongful injuries to timber, trees, or underwood on their property, as allowed under Civil Code § 3346.

256. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above. An officer, director, or managing agent of PG&E personally committed, authorized and/or ratified the reckless and wrongful conduct alleged in this complaint. Further, the conduct of **DEFENDANTS** and their failures to act as alleged in this complaint were in reckless disregard of their consequences and

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 66 of 81

in reckless disregard of the rights and safety of the **PLAINTIFFS** and subjected the **PLAINTIFFS** to cruel and unjust hardship, thus constituting malice and oppression on **DEFENDANTS'** part for which they must be punished by punitive and exemplary damages in an amount according to proof. An officer, director, or managing agent of PG&E personally committed, authorized and/or ratified the reckless and wrongful conduct alleged in this complaint.

257. The **PLAINTIFFS** suffered injuries and damages including but not limited to the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; fire suppression costs including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses, economic damages such as loss of tax revenue including property, sales, and transient occupancy taxes; economic damages such as losses from impacts on business like activities; costs associated with response and recovery including debris removal, emergency response, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

258. The **PLAINTIFFS** suffered other injuries and damages yet identified including those unique to the public entity plaintiffs.

**SEVENTH CAUSE OF ACTION**

**NEGLIGENCE PER SE**

**(Against all Defendants)**

259. The **PLAINTIFFS** hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

260. **DEFENDANTS** at all times herein had a duty to properly design, construct, operate, maintain, inspect, and manage their electrical infrastructure as well as trim trees and

**PUBLIC ENTITY MASTER COMPLAINT**

61

vegetation in compliance with all relevant provisions of applicable orders, decisions, directions, rules or statutes, including those delineated by, but not limited to, Public Utilities Commission General Order 95, including but not limited to Rules 31.2 and 38, Public Resources Code Section 4435, and Public Utilities Commission General Order 165.

261.    The violation of a legislative enactment or administrative regulation which defines a minimum standard of conduct is unreasonable per se.

262.    **DEFENDANTS** violated the above by, but not limited to:

    a.    Failing to service, inspect or maintain electrical infrastructure, structures and vegetation affixed to and in close proximity to high voltage electrical lines;

    b.    Failing to provide electrical supply systems of suitable design;

    c.    Failing to construct and to maintain such systems for their intended use of safe transmission of electricity considering the known condition of the combination of the dry season and vegetation of the area, resulting in Plaintiff(s) being susceptible to the ignition and spread of fire and the fire hazard and danger of electricity and electrical transmission and distribution;

    d.    Failing to properly design, construct, operate, maintain, inspect and manage its electrical supply systems and the surrounding arid vegetation resulting in said vegetation igniting and accelerating the spread of the fire;

    e.    Failing to properly safeguard against the ignition of fire during the course and scope of employee work on behalf of PG&E.

    f.    By failing to comply with the enumerated legislative enactments and administrative regulations.

263.    The violation of General Order 95, including, but not limited to, Rules 31.2 and 38, Public Resources Code section 4435, and Public Utilities Commission General Order 165 by the Defendants proximately and substantially caused the destruction, damage and injury to the **PLAINTIFFS**.

264.    The **PLAINTIFFS** were and are within the class of persons for whose protection General Order 95, including but not limited to Rules 31.2 and 38, Public Resources Code

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 68 of 81

section 4435, and Public Utilities Commission General Order 165 were adopted.

265.    **DEFENDANTS** are liable to the **PLAINTIFFS** for all loss, damages and injury caused by and resulting from Defendants' violation of General Order 95, including, but not limited to Rules 31.2 and 38, Public Resources Code Section 4435, and Public Utilities Commission General Order 165 as alleged herein according to proof.

266.    Further, the conduct of **DEFENDANTS** and their failures to act as alleged in this complaint were in reckless disregard of their consequences and in reckless disregard of the rights and safety of the **PLAINTIFFS** and subjected the **PLAINTIFFS** to cruel and unjust hardship, thus constituting malice and oppression on **DEFENDANTS**' part for which they must be punished by punitive and exemplary damages in an amount according to proof.  An officer, director, or managing agent of PG&E personally committed, authorized and/or ratified the reckless and wrongful conduct alleged in this complaint.

## EIGHTH CAUSE OF ACTION

### PRIVATE ACTION UNDER PUBLIC UTILITIES CODE § 2106

### (Against All Defendants)

267.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

268.    As a Utility and employees of a Utility, **DEFENDANTS** are legally required to comply with the rules and orders promulgated by the California Public Utilities Commission pursuant to California Public Utilities Code §702.

269.    A Utility that performs or fails to perform something required to be done by the California Constitution, a law of the State, or a regulation or order of the Public Utilities Commission, which leads to the loss or injury, is liable for that loss or injury, pursuant to Public Utilities Code §2106.

270.    As Utilities, **DEFENDANTS** are required to provide, maintain, and service equipment and facilities in a manner adequate to maintain the safety, health and convenience of their customers and the public, pursuant to Public Utilities Code §451.

271.    **DEFENDANTS** are required to design, engineer, construct, operate and

maintain electrical supply lines in a manner consonant with their use, taking into consideration local conditions and other circumstances, so as to provide safe and adequate electric service, pursuant to Public Utility Commission General Order 95, Rule 33.1 and General Order 165.

272. Through their omissions, commissions, and conduct alleged herein, **DEFEDNANTS** violated <u>Public Utilities Code</u> sections 702 and 451, and/or Public Utilities Commission General Order 95, thereby making them liable for losses, damages and injury sustained by the **PLAINTIFFS** pursuant to <u>Public Utilities Code</u> §2106.

273. Public Utilities Code § 2106 creates a private right of action against "[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission . . . ."

274. As a Public Utility, **DEFENDANTS** at all times herein had a duty to properly design, construct, operate, maintain, inspect, and manage its electrical infrastructure as well as trim trees and vegetation in compliance with all relevant provisions of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

275. The violation of a legislative enactment or administrative regulation which defines a minimum standard of conduct is unreasonable per se.

276. **DEFENDANTS** violated the above listed requirements, by:

      a. Failing to service, inspect or maintain electrical infrastructure, structures and vegetation affixed to and in close proximity to high voltage electrical lines;

      b. Failing to provide electrical supply systems of suitable design;

      c. Failing to construct and to maintain such systems for their intended use of safe transmission of electricity considering the known condition of the combination of the dry season and vegetation of the area, resulting in **PLAINTIFFS** being susceptible to the ignition and spread of fire and the fire

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 70 of 81

hazard and danger of electricity and electrical transmission and distribution;

    d. Failing to properly design, construct, operate, maintain, inspect and manage its electrical supply systems and the surrounding arid vegetation resulting in said vegetation igniting and accelerating the spread of the fire;

    e. Failing to properly safeguard against the ignition of fire during the course and scope of employee work on behalf of **DEFENDANTS**; and

    f. Failing to comply with the enumerated legislative enactments and administrative regulations.

277.    **DEFENDANTS** proximately and substantially caused the destruction, damage, and injury to **PLAINTIFFS** by their violations of applicable orders, decisions, directions, rules or statutes, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 4511.

278.    **PLAINTIFFS** were and are within the class of persons for whose protection applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

279.    As alleged herein according to proof, **DEFENDANTS** are liable to **PLAINTIFFS** for all loss, damages and injury caused by and resulting from **DEFENDANTS'** violation of applicable orders, decisions, directions, rules or statutes were adopted, including, but not limited to, those stated in: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Code of Civil Procedure § 733; (d) Public Resources Code §§ 4292, 4293, and 4435; and (e) Public Utilities Code § 451.

280.    As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

281. The **PLAINTIFFS** suffered injuries and damages including but not limited to the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; fire suppression costs including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses, economic damages such as loss of tax revenue including property, sales, and transient occupancy taxes; economic damages such as losses from impacts on business like activities; costs associated with response and recovery including debris removal, emergency response, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

282. The **PLAINTIFFS** suffered other injuries and damages yet identified including those unique to the public entity plaintiffs.

## NINTH CAUSE OF ACTION

### VIOLATION OF HEALTH & SAFETY CODE § 13007

### (Against All Defendants)

283. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

284. By engaging in the acts and/or omissions alleged in this Master Complaint, **DEFENDANTS**, and/or each of them, willfully, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of Health & Safety Code § 13007.

285. As a direct and legal result of **DEFENDANTS'** violation of Health & Safety Code § 13007, **PLAINTIFFS** suffered recoverable damages to property under Health & Safety Code § 13007.21 and continue to suffer the injuries and damages described above.

286. As a further direct and legal result of the **DEFENDANTS**, and/or each of them,

1  violating Health & Safety Code § 13007, **PLAINTIFFS** are entitled to reasonable attorney's fees
2  under Code of Civil Procedure § 1021.9.

3      287.  As a direct and legal result of the wrongful acts and/or omissions of
4  **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the
5  injuries and damages as set forth above.

6      288.  As a further direct and legal result of the wrongful acts and/or omissions of
7  **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and
8  exemplary damages against **DEFENDANTS** as set forth above.

9      289.  Further, the conduct of Defendants and their failures to act as alleged in this
10  complaint were in reckless disregard of their consequences and in reckless disregard of the rights
11  and safety of the **PLAINTIFFS** and subjected the **PLAINTIFFS** to cruel and unjust hardship,
12  thus constituting malice and oppression on Defendants' part for which they must be punished by
13  punitive and exemplary damages in an amount according to proof.  An officer, director, or
14  managing agent of PG&E personally committed, authorized and/or ratified the reckless and
15  wrongful conduct alleged in this complaint.

16      290.  The **PLAINTIFFS** suffered injuries and damages including but not limited to the
17  following: loss of natural resources, open space, and public lands; loss of public parks; property
18  damages including real and personal property; fire suppression costs including personnel,
19  overtime labor costs, materials, and other fire suppression damages; evacuation expenses,
20  economic damages such as loss of tax revenue including property, sales, and transient
21  occupancy taxes; economic damages such as losses from impacts on business like activities;
22  costs associated with response and recovery including debris removal, emergency response, and
23  other costs; damage to infrastructure including but not limited to roads, sidewalks, water,
24  stormwater and sewer systems, and underground infrastructure, and other public entity-owned
25  infrastructure; damages based on soil erosion, and loss of soil stability and productivity;
26  damages related to water contamination including water quality preservation and correction
27  expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages,
28  and losses directly related to and caused by the Fires.

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 73
of 81

| | |
|---|---|
| 1 | 291. The **PLAINTIFFS** suffered other injuries and damages yet identified including |
| 2 | those unique to the public entity plaintiffs. |

**VI.    PRAYER FOR RELIEF**

WHEREFORE, **PLAINTIFFS** pray for judgment against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20**, and each of them as follows:

**From All DEFENDANTS for Inverse Condemnation:**

1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2. Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3. Economic losses according to proof at trial;

   a. Fire suppression costs;

   b. Administration, funding, and operation of emergency operations centers;

   c. Administration, funding, and operation of evacuation centers and shelters;

   d. Securing and managing burn areas, including safe re-entry for the public;

   e. Staff overtime, labor costs, personnel, and other materials;

   f. Additional law enforcement costs;

   g. Lost work and productivity due to public entity employees unable to return to work;

   h. Loss of natural resources, open space, wildlife, and public lands;

   i. Loss of parks, including damage to real property and to recreational opportunities and programs, and the revenue generated therefrom;

   j. Destruction or damage to public infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, and sidewalks, water storage facilities, water distribution systems, sewer collection systems, stormwater systems, fire stations, and other infrastructure;

   k. Damage or harm to facility and infrastructure lifespan, including water

1     treatment facilities and landfills;

2     l. Costs of debris removal and related administrative obligations;

3     m. Costs of facilitating/administering community rebuilding efforts, staffing and

4     administration of permitting centers;

5     n. Costs of administering community outreach efforts, including towards

6     revisions to new ordinances, guidelines, and rules, and housing assisteance

7     programs and policies;

8     o. Costs of watershed, waterway, and water body management and protection;

9     p. Damages related to soil erosion and mitigation, loss of soil stability and

10     productivity, including management of risk of debris flow and landslides;

11     q. Damages related to water contamination, including water quality preservation

12     and correction expenses, including but not limited to repair and/or

13     replacement of water treatment facilities or systems;

14     r. Economic damages including but not limited to loss of tax revenues such as

15     property, sales, business, and transient occupancy taxes;

16     s. Economic damages including but not limited to business like or proprietary

17     revenues, such as airport use, facility rentals, educational and recreational

18     programs and others;

19     t. Economic damages from loss of workforce housing;

20     u. Economic damages from damage to tourism and economic development,

21     such as overall branding and reputation;

22     v. Damages resulting from short and long term public health impacts, including

23     costs to provide educational, outreach, and other services;

24     w. Other impacts, injuries, and damages to public entities.

25    4. All costs of suit, including attorneys' fees where appropriate, appraisal fees,

26     engineering fees, and related costs;

27    5. Prejudgment interest according to proof; and

28   ///

6.     For such other and further relief as the Court shall deem proper, all according to proof.

7.     The **PLAINTIFFS** suffered injuries and damages including but not limited to the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; fire suppression costs including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses, economic damages such as loss of tax revenue including property, sales, and transient occupancy taxes; economic damages such as losses from impacts on business like activities; costs associated with response and recovery including debris removal, emergency response, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion, and loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and other significant injuries, damages, and losses directly related to and caused by the Fires.

8.     The **PLAINTIFFS** suffered other injuries and damages yet identified including those unique to the public entity plaintiffs.

**From All DEFENDANTS for Negligence, Public Nuisance, Private Nuisance, Premises Liability, Trespass, Negligence Per Se, Private Action Under Public Utilities Code § 2106, and Violation of Health & Safety Code § 13007:**

1.     Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.     Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3.     Economic losses according to proof at trial;

4.     General and/or special damages according to proof at trial;

a. Fire suppression costs;

b. Administration, funding, and operation of emergency operations centers;

c. Administration, funding, and operation of evacuation centers and shelters;

d. Securing and managing burn areas, including safe re-entry for the public;

e. Staff overtime, labor costs, personnel, and other materials;

f. Additional law enforcement costs;

g. Lost work and productivity due to public entity employees unable to return to work;

h. Loss of natural resources, open space, wildlife, and public lands;

i. Loss of parks, including damage to real property and to recreational opportunities and programs, and the revenue generated therefrom;

j. Destruction or damage to public infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, and sidewalks, water storage facilities, water distribution systems, sewer collection systems, stormwater systems, fire stations, and other infrastructure;

k. Damage or harm to facility and infrastructure lifespan, including water treatment facilities and landfills;

l. Costs of debris removal and related administrative obligations;

m. Costs of facilitating/administering community rebuilding efforts, staffing and administration of permitting centers;

n. Costs of administering community outreach efforts, including towards revisions to new ordinances, guidelines, and rules, and housing assisteance programs and policies;

o. Costs of watershed, waterway, and water body management and protection;

p. Damages related to soil erosion and mitigation, loss of soil stability and productivity, including management of risk of debris flow and landslides;

q. Damages related to water contamination, including water quality preservation and correction expenses, including but not limited to repair and/or

Case: 19-30088    Doc# 3434-3    Filed: 08/07/19    Entered: 08/07/19 16:06:20    Page 77 of 81

| | | |
|---|---|---|
| 1 | | replacement of water treatment facilities or systems; |
| 2 | | r. Economic damages including but not limited to loss of tax revenues such as |
| 3 | | property, sales, business, and transient occupancy taxes; |
| 4 | | s. Economic damages including but not limited to business like or proprietary |
| 5 | | revenues, such as airport use, facility rentals, educational and recreational |
| 6 | | programs and others; |
| 7 | | t. Economic damages from loss of workforce housing; |
| 8 | | u. Economic damages from damage to tourism and economic development, |
| 9 | | such as overall branding and reputation; |
| 10 | | v. Damages resulting from short and long term public health impacts, including |
| 11 | | costs to provide educational, outreach, and other services; |
| 12 | | w. Other impacts, injuries, and damages to public entities. |
| 13 | 5. | Double or Treble damages for wrongful injuries to timber, trees, or underwood on |
| 14 | | their property as allowed under Civil Code § 3346; |
| 15 | 6. | Treble damages in an amount according to proof for injuries to trees as allowed |
| 16 | | under Code of Civil Procedure § 733; |
| 17 | 7. | Exemplary damages in an amount according to proof as allowed under Civil Code |
| 18 | | § 3294; |
| 19 | 8. | Exemplary damages in an amount according to proof as allowed under Public |
| 20 | | Utilities Code § 2106; |
| 21 | 9. | Imposition of a permanent injunction ordering that **DEFENDANTS**, and each of |
| 22 | | them, stop continued violation of: (a) General Order No. 95, Rules 31.1-31.5, 35, |
| 23 | | 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public |
| 24 | | Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451. |
| 25 | 10. | Issuance of an order directing **DEFENDANTS** to abate the existing and |
| 26 | | continuing nuisance they created; |
| 27 | 11. | Attorney's fees, expert fees, consultant fees, and litigation costs and expense as |
| 28 | | allowed under Code of Civil Procedure § 1021.9; |

**PUBLIC ENTITY MASTER COMPLAINT** 72

| | |
|---|---|
| 1 | 12. For all costs of suit incurred; |
| 2 | 13. Prejudgment interest according to proof; and |
| 3 | 14. For such other and further relief as the Court shall deem proper, all according to |
| 4 | proof. |
| 5 | 15. The **PLAINTIFFS** suffered injuries and damages including but not limited to the |
| 6 | following: loss of natural resources, open space, and public lands; loss of public |
| 7 | parks; property damages including real and personal property; fire suppression |
| 8 | costs including personnel, overtime labor costs, materials, and other fire |
| 9 | suppression damages; evacuation expenses, economic damages such as loss of |
| 10 | tax revenue including property, sales, and transient occupancy taxes; economic |
| 11 | damages such as losses from impacts on business like activities; costs associated |
| 12 | with response and recovery including debris removal, emergency response, and |
| 13 | other costs; damage to infrastructure including but not limited to roads, |
| 14 | sidewalks, water, stormwater and sewer systems, and underground infrastructure, |
| 15 | and other public entity-owned infrastructure; damages based on soil erosion, and |
| 16 | loss of soil stability and productivity; damages related to water contamination |
| 17 | including water quality preservation and correction expenses; loss of water |
| 18 | storage; loss of aesthetic value; and other significant injuries, damages, and |
| 19 | losses directly related to and caused by the Fires. |
| 20 | 16. The **PLAINTIFFS** suffered other injuries and damages yet identified including |
| 21 | those unique to the public entity plaintiffs. |

**BARON & BUDD, P.C.**

Dated: March 12, 2018          By: _Scott Summy_
                               **SCOTT SUMMY**
                               **JOHN FISKE**
                               *Lead Counsel for Public Entity Plaintiffs*

Case: 19-30088   Doc# 3434-3   Filed: 08/07/19   Entered: 08/07/19 16:06:20   Page 79 of 81

## VII. JURY DEMAND

**PLAINTIFFS** demand a trial by jury as to all claims in this action.

**BARON & BUDD, P.C.**

Dated: March 12, 2018

By: _____
**SCOTT SUMMY**
**JOHN FISKE**
*Lead Counsel for Public Entity Plaintiffs*

---

**PUBLIC ENTITY MASTER COMPLAINT**

74

*California North Bay Fire Cases*

ELECTRONIC PROOF OF SERVICE

I, Jennifer Nard, hereby declare as follows:

I am employed by Baron & Budd, P.C., 603 North Coast Highway, Suite G, Solana Beach, CA 92075. I am over the age of 18 and am not a party to this action.

On March 12, 2018, I caused service of true and correct copies of the following: **PUBLIC ENTITY MASTER COMPLAINT** on the interested parties in this action pursuant to the most recent Omnibus Service List by submitting an electronic version of the document(s) via file transfer protocol (FTP) to CaseHomePage through the upload feature at www.casehomepage.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 12, 2018 at San Diego, California.

JENNIFER NARD

---

**PROOF OF SERVICE** 1