# EXHIBIT G

1   FRANK M. PITRE (SBN 100077)
    fpitre@cpmlegal.com
2   ALISON E. CORDOVA (SBN 284942)
    acordova@cpmlegal.com
3   JOHN P. THYKEN (SBN 286598)
    jthyken@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
5   San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
6   Burlingame, CA 94010
    Telephone: (650) 697-6000 Facsimile: (650) 697-0577
7
8   RICHARD L. HARRIMAN (SBN 66124)
    Harrimanlaw1@sbcglobal.net
9   **LAW OFFICES OF RICHARD L. HARRIMAN**
    1078 Via Verona Dr.
10  Chico, CA 95973
    Telephone: (530) 343-1386 Facsimile: (530) 343-1155
11
12  *Counsel for Plaintiffs*
13  [Additional co-counsel listed on the signature page]
14

F I L E D

Superior Court of California
County of Butte

12/10/2018

By _____ Kimberly Flener, Clerk _____ Deputy
*Electronically FILED*

15          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16              **IN AND FOR THE COUNTY OF BUTTE**

17  **LILA WILLIAMS,** an individual; and          Case No. 18CV03993
    **LOUISE HOWELL,** an individual;
18                                                 **COMPLAINT FOR DAMAGES AND**
19          **Plaintiffs,**                        **DECLARATORY RELIEF:**

20          v.                                     1.  **NEGLIGENCE**
                                                   2.  **INVERSE CONDEMNATION**
21  **PACIFIC GAS & ELECTRIC COMPANY,**            3.  **PUBLIC NUISANCE**
    a California corporation;                      4.  **PRIVATE NUISANCE**
22  **PG&E CORPORATION,** a California             5.  **PREMISES LIABILITY**
    corporation; and                              6.  **TRESPASS**
23  **DOES 1 through 20,** inclusive;             7.  **VIOLATION OF PUBLIC**
                                                       **UTILITIES CODE § 2106**
24                                                 8.  **VIOLATION OF HEALTH &**
            **Defendants.**                            **SAFETY CODE § 13007**
25                                                 9.  **VIOLATION OF CAL. BUS. &**
                                                       **PROF. CODE § 17500**
26                                                 10. **INJUNCTION UNDER CAL.**
27                                                     **BUS. & PROF. CODE § 17535**

28                                                 **JURY TRIAL DEMANDED**

LAW OFFICES
COTCHETT, PITRE &          **COMPLAINT**
McCARTHY, LLP

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. BACKGROUND | 2 |
| A. THE START | 2 |
| B. THE PLIGHT OF PLAINTIFFS WILLIAMS & HOWELL | 3 |
| C. AWARENESS OF THE FORESEEABLE RISK AND CONSEQUENCE OF FAILING TO MANAGE THE WILDFIRE RISK | 4 |
| III. JURISDICTION AND VENUE | 6 |
| IV. PARTIES | 6 |
| A. PLAINTIFFS | 6 |
| B. DEFENDANTS | 6 |
| C. DOE DEFENDANTS | 9 |
| D. AGENCY & CONCERT OF ACTION | 9 |
| V. STATEMENT OF FACTS | 10 |
| A. PG&E'S EQUIPMENT SPARKED THE MOST DESTRUCTIVE AND DEADLY FIRE IN CALIFORNIA HISTORY | 10 |
| B. PG&E CONSIDERED PREEMPTIVELY SHUTTING OFF POWER TO MANY NORTHERN CALIFORNIA AREAS DUE TO EXTREME FIRE DANGER | 13 |
| C. PG&E KNEW ITS INFRASTRUCTURE WAS AGING AND UNRELIABLE | 16 |
| i. PG&E's Wires Were Found Highly Susceptible to Failure Due to Age | 17 |
| ii. Many of PG&E's Wires Do Not Remotely De-Energize When Down and In a Hazardous State | 17 |
| iii. The CPUC Announced that Aging Power Poles Are Causing Significant Safety Hazards That Must Be Addressed | 18 |
| iv. PG&E Was Not Tracking the Condition of Its Electrical Assets, Despite Its Aging Infrastructure | 19 |

COMPLAINT i

| | | v. | PG&E Knew that Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation ......... 20 |
| | D. | | PG&E RECKLESSLY ADOPTED IS VMII PROGRAM WHERE IT PAID CONTRACTORS TO CUT FEWER TREES ....................................... 21 |
| | E. | | PG&E FAILED TO FULLY EMPLOY LiDAR TO IDENTIFY HAZARD TREES .................................................................................................. 22 |
| | F. | | PG&E KNEW ITS ELECTRICAL EQUIPMENT WAS UNSAFE .................... 23 |
| | G. | | PG&E'S "RUN TO FAILURE" APPROACH TO MAINTENANCE ............... 24 |
| | H. | | PG&E'S LONG HISTORY OF SAFETY VIOLATIONS ................................. 25 |
| | | 1. | The 1981 San Francisco Gas Explosion ....................................... 25 |
| | | 2. | The 1991 Santa Rosa Gas Explosion ............................................. 26 |
| | | 3. | The 1994 Trauner Fire .................................................................. 26 |
| | | 4. | The 1996 Mission Substation Electrical Fire ............................... 26 |
| | | 5. | The 1999 Pendola Fire .................................................................. 27 |
| | | 6. | The 2003 Mission District Substation Fire ................................... 27 |
| | | 7. | The 2004 Sims Fire ....................................................................... 28 |
| | | 8. | The 2004 Freds Fire ...................................................................... 28 |
| | | 9. | The 2004 Power Fire ..................................................................... 28 |
| | | 10. | The 2005 San Francisco Electrical Explosion ............................. 28 |
| | | 11. | The 2008 Rancho Cordova Explosion ........................................... 28 |
| | | 12. | The 2008 Whiskey Fire ................................................................. 29 |
| | | 13. | The 2009 San Francisco Electrical Explosion ............................. 29 |
| | | 14. | The 2010 San Bruno Explosion .................................................... 29 |
| | | 15. | The 2011 Cupertino Explosion ..................................................... 30 |
| | | 16. | The 2014 Carmel Explosion ......................................................... 31 |
| | | 17. | The 2015 San Francisco Transformer Explosion .......................... 31 |
| | | 18. | The 2015 Butte Fire ...................................................................... 31 |

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 4
of 32

19.    The 2017 North Bay Fires...................................................... 32

I.     THE CORPORATE CULTURE AT PG&E THAT PUTS PROFITS BEFORE SAFETY ....................................................................................... 33

    i.    PG&E Has Repeatedly And Continuously Diverted Safety Funds .......... 34

    ii.    PG&E Continually And Habitually Flaunts CPUC Regulations And Investigations .................................................................................. 35

J.    PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS AND THE SURROUNDING VEGETATION . 37

VI.    PLAINTIFFS' LOSSES.............................................................................39

VII.    CAUSES OF ACTION ...........................................................................41

FIRST CAUSE OF ACTION ................................................................. 41
NEGLIGENCE
(Against All Defendants)

SECOND CAUSE OF ACTION ............................................................. 44
INVERSE CONDEMNATION
(Against All Defendants)

THIRD CAUSE OF ACTION ................................................................. 45
PUBLIC NUISANCE
(Against All Defendants)

FOURTH CAUSE OF ACTION ............................................................. 47
PRIVATE NUISANCE
(Against All Defendants)

FIFTH CAUSE OF ACTION .................................................................. 48
PREMISES LIABILITY
(Against All Defendants)

SIXTH CAUSE OF ACTION ................................................................. 49
TRESPASS
(Against All Defendants)

SEVENTH CAUSE OF ACTION.............................................................. 50
VIOLATION OF PUBLIC UTILITIES CODE § 2106
(Against All Defendants)

EIGHTH CAUSE OF ACTION ............................................................... 51
VIOLATION OF HEALTH & SAFETY CODE § 13007
(Against All Defendants)

NINTH CAUSE OF ACTION ........................................................................ 52
VIOLATION OF CAL. BUS. & PROF. CODE § 17500
(Against All Defendants)

TENTH CAUSE OF ACTION ........................................................................ 58
INJUNCTION UNDER CAL. BUS. & PROF. CODE § 17535
(Against All Defendants)

VIII.   PRAYER FOR RELIEF ........................................................................... 59

IX.   JURY DEMAND ........................................................................................ 62

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 6
of 32

**PLAINTIFFS** bring this action for damages against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20** (collectively, "**DEFENDANTS**") as follows:

## I.   INTRODUCTION

1.     This case arises from **PG&E CORPORATION** and/or **PACIFIC GAS & ELECTRIC COMPANY's** (collectively, "**PG&E**") repeated and willful disregard for public safety in failing to manage the risks associated with the operation of their facilities and equipment

2.     **PG&E's** abdication of responsibility for assessing the effectiveness of their risk management practices to prevent catastrophic wildfires is exacerbated by the fact that those charged with managing wildfire risks choose to ignore the lessons learned from the Butte and North Bay Wildfires.  These events exposed serious problems with the efficacy of the practices **PG&E** relies upon to prevent wildfires.  As described by one senior officer of **PG&E** charged with assessing **PG&E's** overall Risk Management Program prior to the San Bruno explosion in 2010, *"PG&E lacks a well defined documented risk policy/standard at the enterprise level.  One that explains PG&E's overall risk assessment methodology; defines the lines of business roles and responsibility; specifies the requirements for performing and documenting risks; links risk assessments to controls, self-assessment, reviews and audits; and specifies the requirements for metrics to track the risks."*

3.     Given the calamities experienced by the victims of the Butte Fire in Calaveras County in 2015, the North Bay Fires in 2017 and the recent Camp Fire, it is clear that **PG&E's** dysfunctional risk assessment methodologies have not improved.  **PG&E** has spent millions of dollars on media advertising, instead of investing to upgrade infrastructure and revamp their vegetation management practices, demonstrating that **PG&E** places its reputation above public safety.  **PG&E** refuses to authorize audits of its wildfire risk management practices by independent consultants to provide objective assessments of whether their policies are effective.  Rather, **PG&E** conducts self-audits of its practices which fail to accurately evaluate the safety risks posed to the public.  As a result, **PG&E** promotes a false and misleading picture of their ability to safely supply its customer base, and the public, with a safe supply of electricity.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                                                    1

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 7
of 32

1     4.    This callous and despicable disregard for the safety of California communities is

2 underscored by **PG&E's** diversion of necessary safety related expenditures into funding corporate

3 bonuses, boosting shareholder profits, and/or fueling advertising campaigns -- while ignoring the

4 serious and irreparable nature of the public safety threat posed by its aging infrastructure and

5 ineffective vegetation management practices. As a result, the people of the State of California

6 have paid for corporate greed with the lives of their loved ones, their homes, and their most

7 cherished belongings. This action seeks not only the recovery of damages on behalf of Plaintiffs

8 herein, but also seeks to: (1) stop **PG&E** officers and directors from spending the company's

9 monopolistic profits and ratepayer assessments on advertising to promote a false and misleading

10 picture of safety surrounding their operations; and (2) recoup all monies spent by **PG&E** for

11 advertising to promote their false image of safety since September 9, 2010.

## II.   BACKGROUND

### A.   THE START

14     5.    On the morning of November 8, 2018, a fire began in Butte County which would

15 eventually ravage the town of Paradise and several other communities (hereinafter "Camp Fire").

16 The first reported sighting of a fire that morning was near Pulga Road and Camp Creek Road,

17 northeast of the Town of Paradise. The discovery of the fire coincided with a reported malfunction

18 in one of **PG&E's** transmission lines just minutes earlier, the Caribou-Palermo 115kV

19 Transmission Line, which is more than fifty (50) years old. Approximately thirty minutes after the

20 first malfunction, a second power outage was reported by **PG&E** in its power lines near Concow,

21 just east of Paradise.

22     6.    Fanned by high winds, the fire spread at an estimated rate of a football field every

23 second. By around 8 a.m., the fire had reached Paradise, a scenic forest community nestled in the

24 Sierra foothills with a population of 26,000, many of them seniors, retirees, and families seeking

25 to escape the high cost of living found in other California cities.

26     7.    Many residents had little, to no, warning of the approaching blaze and were forced

27 into bottlenecks of traffic in a desperate attempt to escape on the few small roads out of town.

28 Vehicles waited in bumper-to-bumper traffic hoping to outpace the flames as the enveloping

smoke turned the mid-day sky to night. By the end of the day, the Camp Fire had destroyed nearly all of Paradise and surrounding communities, and inflicted horrific death and destruction.



**Devastation of the Camp Fire[1]**

### B.     THE PLIGHT OF PLAINTIFFS WILLIAMS & HOWELL

8.      Plaintiffs, 93-year-old **LILA WILLIAMS** and her daughter, 67-year-old **LOUISE HOWELL**, were two of those desperately trying to escape the inferno which enveloped.

9.      **LOUISE** barely escaped her Concow property as the fire closed in around her. With her dog and cat nowhere in sight, she had no choice but to leave without them. **LOUISE** then found herself stuck in a row of cars unable to cross Concow Creek on the one road out of town. The fire began melting the stopped cars, forcing **LOUISE** and others trapped by the flames to leave their vehicles and seek shelter in Lake Concow. After fire crews were able to clear debris from the road, **LOUISE** joined a convoy of cars following behind a fire truck, passing through flaming forests as the fire truck batted away burning tree limbs. Throughout this ordeal, **LOUISE** was unable to reach her 93-year-old mother in Magalia and was tormented by the fear that her mother could not get out in time.

---

[1] https://www.firehouse.com/operations-training/wildland/news/21031685/at-least-five-people-dead-camp-wildfire-paradise-chico-ca-firefighters

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

10.     **LILA** was returning from a doctor's appointment with her granddaughter on the morning of November 8 when embers from the Camp Fire began falling on their car. Fearful that she would not have enough gas to escape the fire, she stopped at a gas station, but left without refueling due to the long lines of vehicles. She tried another gas station, only to have the power shut off just as she reached the pump. Fortunately, **LILA** was finally able to abandon her vehicle at her granddaughter's home in Magalia and evacuate in her granddaughter's truck. They then joined the clogged roads heading towards to Chico. Terrified of being overrun by the flames in the slow-moving traffic, **LILA** made the harrowing decision of turning around and heading deeper into the mountains in an attempt to escape. **LILA** and her family managed to survive, but their homes, property, and community were destroyed.

### C.     AWARENESS OF THE FORESEEABLE RISK AND CONSEQUENCE OF FAILING TO MANAGE THE WILDFIRE RISK

11.     In the days leading up to the Camp Fire, weather forecasts predicted high winds and low humidity which, coupled with dry vegetation, presented an extreme risk of fire danger. This prompted the National Weather Service to issue a Red Flag Warning for Butte County. Aware of these risks, **PG&E** began notifying customers on November 6 that it may be proactively shutting off power in certain affected Northern California counties in order to reduce the foreseeable and probable risk of their equipment igniting a wildfire. Despite these warnings, **PG&E** ultimately decided not to shut off power on November 8.

12.     Prior to this event, **PG&E** was well aware of the catastrophic consequences of failing to de-energize powerlines during conditions of high fire danger and red-flag warnings. Little more than a year has passed since the North Bay Counties mourned the losses of the North Bay Fires, which took 44 lives, and only three years have gone by since the Butte Fire destroyed over 70,000 acres in Calaveras County. **PG&E** was even aware of the risk high winds posed to the specific transmission lines near Pulga as five steel support towers were toppled during a 2012 storm. But in the face of this predictable risk, **PG&E** decided not to take the simple and easy fail safe step of flipping the switch and shutting off power to the circuits in areas of extreme wildfire danger so that its overhead electrical equipment, which has proven to be a likely source of wildfires

1  and potentially the most prevalent cause of fires in California, would not serve as the spark to yet

2  another deadly and destructive wildfire.

3    13.    The Camp Fire was an inevitable byproduct of **PG&E's** willful and conscious

4  disregard of public safety. **PG&E**, although mandated to do so, failed to identify, inspect, manage,

5  and/or control vegetation growth near its power lines and/or other electrical equipment.  This

6  created a clear and present danger of trees and/or other vegetation coming into contact with

7  **PG&E's** power lines and/or other electrical equipment and causing electrical problems.  Further,

8  **PG&E** failed to construct, manage, track, monitor, maintain, replace, repair, and/or improve its

9  transmission and distribution lines, appurtenant equipment, poles, transformers, conductors,

10  insulators, "jumper" cables, reclosers, and/or other electrical equipment, despite being aware that

11  its infrastructure was unsafe, aging, and/or vulnerable to environmental conditions. **PG&E's** risk

12  mitigation systems were knowingly ineffective in assessing deficiencies in its wildfire safety

13  programs, vegetation management programs, maintenance and inspection programs. Moreover,

14  **PG&E's** officers, employees, and/or agents abdicated their responsibility of oversight, auditing

15  and/or evaluation of mitigation measures used to prevent against the risk of wildfires caused by

16  operation of its equipment.

17    14.    **PG&E's** officers, employees, and/or agents continually and repeatedly add insult

18  to injury by using misleading and/or untrue advertising related to **PG&E's** mitigation measures,

19  including maintenance and inspection of electrical equipment and facilities, as well as vegetation

20  management, used to prevent the risk of wildfires caused by the operation of its equipment, which

21  foreseeably and unreasonably misled **PLAINTIFFS** and the residents of Paradise and California,

22  generally, related to the risk of catastrophic wildfires caused by **PG&E's** equipment.  Not to

23  mention, **PG&E's** misleading and untrue media posts during the Camp Fire, which indicated that

24  while a wildfire was probable, it had not occurred yet.  This was over an hour after the fire had

25  started, homes had been destroyed, and people were fleeing for their lives.  This misleading media

26  contributed to and/or caused a false sense of security for **PLAINTIFFS** and/or residents of

27  Paradise, generally, who were deprived of adequate and/or proper advance warning, then left with

28

1  no other option but to make a desperate attempt to escape while the fire was descending upon
2  them.

## III. JURISDICTION AND VENUE

3
4      15.     This Court has subject matter jurisdiction over this matter pursuant to Code of Civil
5  395(a) because, at all times relevant, Defendants and each of them have resided in, been
6  incorporated in, or done significant business in the State of California so as to render the exercise
7  of jurisdiction over Defendants and each of them, by California Courts consistent with traditional
8  notions of fair play and substantial justice.  The amount in controversy exceeds the jurisdictional
9  minimum of this Court.

10     16.     Venue is proper in this County because substantially all of the events, acts,
11  omissions, and/or transactions complained of herein occurred in/or originated from Butte County,
12  State of California.

## IV. PARTIES

13
### A.  PLAINTIFFS

14
15     17.     Plaintiffs **LILA WILLIAMS** and **LOUISE HOWELL** (collectively,
16  "**PLAINTIFFS**") are a mother and daughter who lost personal property and their respective homes
17  on land they owned at 6758 Ishi Drive in Magalia, California and 3488 Hoffman Road in Concow,
18  California. All of the damages alleged herein occurred in and around Butte County and arose from
19  the Camp Fire, as set forth in more detail below.

### B.  DEFENDANTS

20
21     18.     At all times herein mentioned Defendants **PG&E CORPORATION** and
22  **PACIFIC GAS & ELECTRIC COMPANY** (collectively, "**PG&E**") were corporations
23  authorized to do business and doing business, in the State of California, with their principal place
24  of business in the County of San Francisco, California.  Defendant **PG&E CORPORATION** is
25  an energy-based holding company headquartered in San Francisco.  It is the parent company of
26  Defendant **PACIFIC GAS AND ELECTRIC COMPANY**.  **PG&E CORPORATION** and
27  **PACIFIC GAS AND ELECTRIC COMPANY** provide customers with public utility services,

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                          6

Case: 19-30088   Doc# 3436-7   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 12
of 32

1 and services relating to the generation of energy, transmission of electricity and natural gas,
2 generation of electricity, and the distribution of energy.

3     19.     **PLAINTIFFS** allege that **PG&E CORPORATION** and **PACIFIC GAS &**
4 **ELECTRIC COMPANY** are jointly and severally liable for each other's wrongful acts and/or
5 omissions as hereafter alleged, in that:

6     a.   **PG&E CORPORATION** and **PACIFIC GAS & ELECTRIC COMPANY** operate
7         as a single business enterprise operating out of the same building located at 77 Beale
8         St, San Francisco, California for the purpose of effectuating and carrying out **PG&E**
9         **CORPORATION's** business and operations and/or for the benefit of **PG&E**
10         **CORPORATION;**

11     b.   **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not
12         operate as completely separate entities, but rather, integrate their resources to achieve
13         a common business purpose;

14     c.   **PACIFIC GAS & ELECTRIC COMPANY** is so organized and controlled, and its
15         decisions, affairs and business so conducted as to make it a mere instrumentality, agent,
16         conduit and/or adjunct of **PG&E CORPORATION;**

17     d.   **PACIFIC GAS & ELECTRIC COMPANY's** income contribution results from its
18         function, integration, centralization of management and economies of scale with
19         **PG&E CORPORATION;**

20     e.   **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's**
21         officers and management are intertwined and do not act completely independent of one
22         another;

23     f.   **PACIFIC GAS & ELECTRIC COMPANY's** and **PG&E CORPORATION's**
24         officers and managers act in the interest of **PG&E CORPORATION** as a single
25         enterprise;

26     g.   **PG&E CORPORATION** has control and authority to choose and appoint **PACIFIC**
27         **GAS & ELECTRIC COMPANY's** board members as well as its other top officers
28         and managers;

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**     7

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 13
of 32

h. Despite both being Electric Companies and Public Utilities, **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** do not compete with one another, but have been structured, organized, and businesses effectuated so as to create a synergistic, integrated single enterprise where various components operate in concert one with another;

i. **PG&E CORPORATION** maintains unified administrative control over **PACIFIC GAS & ELECTRIC COMPANY**;

j. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are insured by the same carriers and provide uniform or similar pension, health, life and disability insurance plans for employees;

k. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified 401(k) Plans, pensions and investment plans, bonus programs, vacation policies and paid time off from work schedules and policies;

l. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** invest these funds from their programs and plans by a consolidated and/or coordinated Benefits Committee controlled by **PG&E CORPORATION** and administered by common trustees and administrators;

m. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified personnel policies and practices and/or a consolidated personnel organization or structure;

n. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** have unified accounting policies and practices dictated by **PG&E CORPORATION** and/or common or integrated accounting organizations or personnel;

o. **PACIFIC GAS & ELECTRIC COMPANY** and **PG&E CORPORATION** are represented by common legal counsel;

p. **PG&E CORPORATION's** officers, directors, and other management make policies and decisions to be effectuated by **PACIFIC GAS & ELECTRIC COMPANY** and/or

otherwise play roles in providing directions and making decisions for **PACIFIC GAS & ELECTRIC COMPANY**;

q. **PG&E CORPORATION's** officers, directors, and other management direct certain financial decisions for **PACIFIC GAS & ELECTRIC COMPANY** including the amount and nature of capital outlays;

r. **PG&E CORPORATION's** written guidelines, policies, and procedures control **PACIFIC GAS & ELECTRIC COMPANY**, its employees, policies, and practices;

s. **PG&E CORPORATION** files consolidated earnings statements factoring all revenue and losses from **PACIFIC GAS & ELECTRIC COMPANY** as well as consolidated tax returns, including those seeking tax relief; and/or, without limitation; and

t. **PG&E CORPORATION** generally directs and controls **PACIFIC GAS & ELECTRIC COMPANY's** relationship with, requests to, and responses to inquiries from, the Public Utilities Commission and uses such direction and control for the benefit of **PG&E CORPORATION**.

**C.    DOE DEFENDANTS**

20.    The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants **DOES 1 through 20**, inclusive, are unknown to **PLAINTIFFS** who therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure section 474.  **PLAINTIFFS** further allege that each of said fictitious Defendants is in some manner responsible for the acts and occurrences hereinafter set forth.  **PLAINTIFFS** will amend this Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible.

**D.    AGENCY & CONCERT OF ACTION**

21.    At all times herein mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment,

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

9

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 15
of 32

1   partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified and

2   approved the acts of each of the remaining **DEFENDANTS**. Each of the **DEFENDANTS** aided

3   and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in

4   breaching their obligations to **PLAINTIFFS** as alleged herein. In taking action to aid and abet

5   and substantially assist the commission of these wrongful acts and other wrongdoings complained

6   of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary

7   wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of

8   the wrongful conduct, wrongful goals, and wrongdoing.

9   **V.  STATEMENT OF FACTS**

10      **A.  PG&E'S EQUIPMENT SPARKED THE MOST DESTRUCTIVE AND
              DEADLY FIRE IN CALIFORNIA HISTORY**
11

12      22.    On November 7, 2018, **PG&E** emailed a customer who owns property near the

13  location where the Camp Fire is suspected of originating. The **PG&E** e-mail notified the customer

14  that crews would need to access the **PG&E** equipment on her land because **PG&E** was "having

15  problems with sparks."[2]

16      23.    The following morning at 6:15 a.m., **PG&E** reported a power outage on its

17  "Caribou-Palermo 115kV Transmission line" in the same area. Just eighteen minutes later, at 6:33

18  a.m., the Camp Fire was first reported.

19      24.    Later that day, **PG&E** conducted an aerial patrol of the area and observed damage

20  to the transmission tower on the same Caribou-Palermo 115kV Transmission line, approximately

21  one mile north-east of the town of Pulga, "in the area of the Camp Fire."[3] Five of the transmission

22  towers in this exact area suffered damage by winds in a 2012 storm and required replacement.

23  The project took years longer than planned and was not completed until 2016.[4] It is not presently

24  known whether the tower damaged on November 8, 2018 was one of those replaced just two years

25  earlier or if it experienced the same failure mechanism as the towers damaged in the 2012 storm.

26  _____

27      [2] https://sacramento.cbslocal.com/2018/11/12/pge-sparks-power-lines-camp-fire/
        [3] Id.
28      [4] https://www.mercurynews.com/2018/11/19/pge-transmission-line-eyed-in-camp-fire-had-
        collapsed-during-2012-storm/

25.     Dispatch reports initially described the Camp Fire as a vegetation fire "under the high tension power lines" near the Feather River and Poe Dam. Firefighters arrived at the scene around 6:43 a.m. and confirmed that the fire was in fact located "underneath the transmission lines."



**The Black Arrow Follows the Path of PG&E Transmission Lines with the Black Circle Depicting the Suspected Area of Origin of the Camp Fire [5]**

26.     The first firefighter on the scene immediately realized the danger presented by the fire. He reported to dispatch that "this has got the potential for a major incident" and requested an additional 15 engines, four bulldozers, two water tenders, four strike teams and hand crews. He further recommended the evacuation of the nearby town of Pulga and requested air support.[6] Shortly after arriving at the scene, another firefighter estimated the growing fire to be about 10 acres with a "really good wind on it."[7]

---

[5] https://www.kqed.org/news/11705306/pge-transmission-line-may-be-tied-to-disastrous-butte-county-fire

[6] Id.

[7] Id.

27.     At 6:45 AM on November 8, 2018, while the fire near Pulga was already burning, **PG&E** reported a separate malfunction with a 12kV Big Bend 1101 distribution line in the nearby community of Concow. Cal Fire has reported that the Concow location is a potential "second origin" for the Camp Fire.[8]

28.     Aided by high winds, the fire spread quickly and soon endangered populated areas. By the night of November 8, an estimated 80 to 90 percent of the nearby town of Paradise was destroyed.[9] Residents of the town had only a matter of moments to gather their families and attempt to escape the blaze. Many could not escape and tragically perished.



**Satellite View of Camp Fire, November 8, 2018[10]**

29.     The Camp Fire was not 100% contained until November 25 and not until it consumed more than 153,000 acres, and destroyed nearly 14,000 homes and more than 4,800

[8] https://www.kqed.org/news/11707191/second-pge-outage-reported-around-ignition-of-deadly-camp-fire

[9] https://weather.com/news/news/2018-11-09-northern-california-wildfire-camp-fire-paradise

[10] https://earthobservatory.nasa.gov/images/144225/camp-fire-rages-in-california

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 18 of 32

additional structures.[11] The official search for those that died in the blaze was concluded on November 29, with 88 confirmed dead and nearly 200 still listed as missing.[12]



Spread of the Camp Fire November 8th – 12th [13]

## B. PG&E CONSIDERED PREEMPTIVELY SHUTTING OFF POWER TO MANY NORTHERN CALIFORNIA AREAS DUE TO EXTREME FIRE DANGER

30.     PG&E was aware in advance of the Camp Fire of the extreme fire danger presented by weather conditions on November 8. Two days earlier, on November 6, PG&E activated its Emergency Operations Center (EOC) "due to forecasted weather conditions with increasing fire risk."[14]

31.     PG&E then began notifying customers that it might be shutting down power in certain Northern California counties on November 8 due to forecasted high winds and low humidity.

---

[11]   https://www.mercurynews.com/2018/11/25/deadly-camp-fire-now-100-percent-contained-fire-officials-say/

[12]  https://www.nytimes.com/2018/11/29/us/victims-california-fires-missing.html

[13]  https://www.nytimes.com/interactive/2018/11/11/us/california-fires-tracker.html

[14]  PG&E's November 27, 2018 Resolution ESRB-8 Compliance Report to CPUC.

COMPLAINT                                                                                                    13

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PG&E** ✓
*@PGE4Me*

POTENTIAL OUTAGE PREPARATION. PG&E urges customers
to prepare for possible proactive power shutoff (11/8) and
extended outages in portions of the following counties: Lake,
Napa, Sonoma, Butte, Plumas, Yuba, Sierra, Placer & Nevada.
Learn more and prepare: bit.ly/2RDWQRJ

23  6:56 P.M · Nov 6, 2018

54 people are talking about this

32.　　**PG&E** followed up with 17 additional warnings over the next two days advising that it was going to shut off power on the morning of November 8. **PG&E's** warnings referenced forecasts of sustained winds of 20 to 30 miles per hour, with gusts of 40 to 50 mph overnight Wednesday into Thursday and lasting until late afternoon.[15]

33.　　At 7:56 a.m. on the morning of November 8 – over an hour after the Camp Fire had already started – **PG&E** was still reporting that it may be shutting off power due to the "potential extreme fire danger":

> **ADVISORY FOR THURSDAY (11/8): Due to
> evolving weather & potential extreme fire
> danger, PG&E may proactively shutoff power
> for safety to some customers in parts of
> (counties): Lake, Napa, Butte, Plumas, Yuba,
> Sierra, Placer and Nevada. Learn more:**
> https://t.co/OkH27t2G52
> — PG&E (@PGE4Me) November 8, 2018

**PG&E's November 8 Tweet[16]**

34.　　Despite these warnings, its own assessment of the potential for extreme fire danger, and the fact that the Camp Fire was actively burning, **PG&E** callously sent a tweet – **more than six hours after the Camp Fire started burning** – defending its decision not to shut down power in Butte County that morning.

/ / /

/ / /

/ / /

---

[15] https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/
[16] Id.

COMPLAINT　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　14

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



35. **PG&E's** purported justification for not preemptively shutting off power was that weather conditions did not warrant the power shutoff; however, this ran contrary to **PG&E's** own stated criteria for conducting preemptive power shutoffs.

36. **PG&E** represented to the public that they did an evaluation and developed factors to assess when a shutdown of power was warranted. They call this preemptive shutdown a "Public Safety Power Shutoff" or "PSPS." According to **PG&E**, __no single factor is determinative__ in **PG&E's** decision to initiate a PSPS. On the morning the Camp Fire ignited, every one of **PG&E's** factors supported the cutting of power.

| PG&E'S DE-ENERGIZATION PROTOCOL | |
| --- | --- |
| *Factors* | *Actual Conditions* |
| • "Extreme" fire danger threat level, as classified by the National Fire Danger Rating System | • 11/7/18: National Weather Service issued a strong wind advisory, which will "create critical fire weather danger" |
| • A Red Flag Warning declared by the National Weather Service | • National Weather Service issued a Red Flag Warning on 11/7/18 |
| • Low humidity levels, generally 20 percent and below | • On 11/8/18 relative humidity ranged from a low of 11 to a high of 23, for an average of 16 percent. |

| | |
|---|---|
| • Sustained winds above approx. 25 mph and wind gusts in excess of approx. 45 mph | • Sustained winds of 32 mph and gusts up to 52 mph at 4AM on the morning of the fire[17] |
| • Site-specific conditions such as temperature, terrain and local climate | • Temperature 48°F at 6:00am; Hilly terrain; Hot summer Mediterranean climate |
| • Critically dry vegetation that could serve as fuel for a wildfire | • Extended dry fall weather and periods of dry north winds causing low moisture content in live and dry fuels |
| • On-the-ground, real-time observations from PG&E field crew | • Unknown |

37.     **PG&E** claims that its PSPS plan only applies to power lines that are 70kV or lower, meaning that higher voltage lines are not preemptively de-energized. This is different from other power utilities, such as San Diego Gas & Electric, which include long-distance transmission lines in its de-energization protocol.[18] Had **PG&E** included the 115kV transmission line that malfunctioned near Pulga in its de-energization protocol and implemented the preemptive shutdown as indicated by its PSPS criteria, then the ignition of the Camp Fire would have been prevented.

38.     In contrast to the 115kV transmission line, **PG&E** admits that the 12kV line near Concow – the location of the potential "second origin" for the Camp Fire – was one of the circuits which "would have been de-energized" in the event of a **PG&E** preemptive power shutoff.[19] This line would never have malfunctioned – potentially igniting or exacerbating the spread of the Camp Fire – had **PG&E** heeded its own warnings and protocols, and preemptively de-energized this line.

C.     <u>**PG&E KNEW ITS INFRASTRUCTURE WAS AGING AND UNRELIABLE**</u>

39.     On May 6, 2013, a report was sent to the Safety and Enforcement Division of the CPUC from the **Liberty Consulting Group** who had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by **PG&E** (hereinafter

---

[17] https://www.mercurynews.com/2018/11/17/why-didnt-pge-shut-down-power-in-advance-of-deadly-camp-fire-heres-the-data/
[18] https://www.bloomberg.com/news/articles/2018-11-28/pg-e-chose-not-to-cut-power-as-winds-raged-before-deadliest-fire
[19] Id.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

the "2013 Liberty Report").[20]  The **2013 Liberty Report** concluded that: "several aspects of the **PG&E** distribution system present significant safety issues."  It also found: (a) "addressing risks associated with electrical distribution components has been overshadowed by electric transmission and gas facilities;" and (b) "addressing aging infrastructure and adding SCADA to the system comprise the major focuses of safety initiatives for the distribution system".

<blockquote>

i.      **PG&E's Wires Were Found Highly Susceptible to Failure Due to Age**

</blockquote>

40.     One of the first key findings of the 2013 Liberty Report was that **PG&E** had a "large amount of small size obsolete conductor remaining on **PG&E's** system."  **PG&E** has 113,000 miles of conductors (a.k.a. wires), and according to the report, over 60 percent of those conductors are highly susceptible to failure.  The conductors are very small, and generally more susceptible to breaking than standard size conductors.  As the conductor ages, it becomes even more susceptible to breaking.  Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones.  For these reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

<blockquote>

ii.     **Many of PG&E's Wires Do Not Remotely De-Energize When Down and In a Hazardous State**

</blockquote>

41.     A second key finding of the 2013 Liberty Report was that upon review of **PG&E's** documents, on a daily basis and in 36 percent of cases, **PG&E** cannot remotely de-energize a downed line and must send someone on-scene to manually turn off the feed.  During that time, the downed line is a hazard, and according to the 2013 Liberty Report, this hazard has "contributed to a number of fatalities and injuries."

42.     **PG&E** has a long-standing practice of using reclosers throughout its system to automatically restart power after interruptions, even though it knows these devices may cause wildfires.  Reclosers are circuit breakers equipped with a mechanism that can automatically "reclose" the breaker and reenergize a power line after it has been "opened" due to a fault.  Many of **PG&E's** reclosers are set to reenergize the line up to three times after a fault.

---

[20] http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M065/K394/65394210.PDF.

43.     Reclosers are key tools to prevent power blackouts, but if a fault occurs from contact between a line and a tree or vegetation, reenergizing the line can ignite fires. This danger is so significant that the other two major utilities in California, San Diego Gas & Electric Company and Southern California Edison, have reprogramed their electrical systems during fire seasons to ensure that reclosers do not automatically restart electrical currents after a service interruption.

44.     **PG&E** knew that its reclosers posed a great risk of wildfire but has only taken slow and incomplete steps to eliminate that risk. At a Congressional hearing in 2015, **PG&E's** Senior Vice President of Electrical Operations, Patrick Hogan, stated that **PG&E** had the ability to reprogram its reclosers during fire season to not restart power. Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain the wildfire benefit."21

45.     In contrast to San Diego Gas & Electric Company and Southern California Edison having disabled all of their reclosers from reenergizing lines during fire season, and despite its own knowledge of the dangers posed by reclosers, **PG&E** began an experimental pilot program in 2017 to reprogram its reclosers that only affected a limited area of California.

46.     Even before the Butte Fire in 2015, **PG&E** began a process of replacing all reclosers that can only be programmed or controlled on-site with reclosers that can be remotely programmed and controlled. However, that process has been so slow and deliberate many of its reclosers must still be programmed or controlled only at the site where they are installed.

iii.     **The CPUC Announced that Aging Power Poles Are Causing Significant Safety Hazards That Must Be Addressed**

47.     According to the 2017 CPUC Order Instituting Investigation Into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit:

> Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State. For example, inadequate clearance between communication and power lines, perhaps in conjunction with a broken cable lashing wire, caused the Southern California Guejito Fire of 2007 which (together with the Witch Fire) burned 197,990 acres and caused two deaths. Three more deaths occurred in 2011 when an electrical

---

21 http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-12324764.php (last accessed February 12, 2018).

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 24 of 32

conductor separated from a pole in high winds, causing a live wire to fall to the ground. At least five more people lost their lives in pole-related failures in 2012 and 2015.

Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.

Communication and other wires are not infrequently found hanging onto roads or yards. Poles with excessive and/or unauthorized attachments can put utility workers at risk. Facilities deployed in the field may differ from what appears on paper or in a utility's database.[22]

48.     In the June 29, 2017 CPUC press release for the Order, the CPUC President Michael Picker stated, "Plain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "[n]ot knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[23]

### iv.     PG&E Was Not Tracking the Condition of Its Electrical Assets, Despite Its Aging Infrastructure

49.     Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations." According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place. These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets. These types of formal programs also take failure modes

---

[22] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M190/K872/190872933.PDF.
[23] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.PDF.

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 25 of 32

into consideration. Long term sustainable plans can then be prepared to address the asset conditions. A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

50. The 2013 Liberty Report was so concerned about the state of **PG&E's** aging infrastructure that it advised: **"[w]e also recommend that PG&E treat aging infrastructure as an enterprise-level risk."**

         v.     **PG&E Knew that Its Down-Guy Design Was Flawed and Could Cause Ground Currents That Create Arcing and Spark Vegetation**

51. Electrical arcing is a process by which guy wires or "down-guys," when designed improperly and/or installed according to improper design, conduct ground current at ground level during high winds, igniting fires to nearby vegetation. Guy wires are the metal support cables that are used to tie electrical poles to the ground. **PG&E** utilizes an inverted "V" shape design without any separation or in-line insulators as an attempt to help its poles withstand high wind. However, in **PG&E's** sub-transmission design, **PG&E** does not separate the connection at the pole by 12 inches, utilize any in-line insulator to prevent ground current from flowing, or utilize a shunt so when ground current exists it does not cause an electrical arc. In addition, if not properly maintained, the down-guys become loose. In high wind conditions, when the poles sway and ground currents exist, arcing occurs. With the combination of high winds, swaying poles, loose connections, two down-guys attached by a common bolt, and ground current, electrical arcing occurs, igniting local vegetation.

52. It is believed that arcing from San Diego Gas & Electric wires was the cause of the 2007 San Diego "Witch Creek" Fires, in addition to the 2003 Cedar and Paradise Fires.

53. The down-guy design utilized by **PG&E** is a violation of CPUC General Order Number 95. Industry experts have demonstrated to the CPUC and California utilities how the dangerous design causes arcing and fires for over a decade. They believe this design is unreasonably dangerous and that the fix is cheap and easy. CPUC General Order Number 95 sets forth two possible solutions: either have a 12-inch separation on a pole; or add an in-line insulator.

Case: 19-30088   Doc# 3436-7   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 26 of 32

An additional solution is adding a shunt from the down-guy anchor to the down-guy itself. All three inexpensive solutions prevent electrical arcs at ground levels that ignite fires.

**D.  PG&E RECKLESSLY ADOPTED IS VMII PROGRAM WHERE IT PAID CONTRACTORS TO CUT FEWER TREES**

54.    **PG&E's** Vegetation Management Program performs two types of tree work: annual routine compliance tree work and reliability tree work.

55.    Annual routine compliance work focuses on maintaining regulatory distances between energized conductors and vegetation. Reliability tree work" focuses on locations where there has been a history of vegetation-related outage problems based on three historical indexes: System Average Interruption Frequency Index ("SAIFI"), Customer Experiencing Multiple Interruption ("CEMI"), and System Average Interruption Duration Index ("SAIDI").

56.    In 2006, **PG&E's** Vegetation Management Program adopted the "Vegetation Management Incentive Initiative" ("VMII"). The ostensible purpose of VMII was to reduce the annual routine compliance tree work and share the resulting cost savings with the contractors whose compensation would be reduced by the loss of actual work. The actual purpose of VMII was to shift costs from annual routine compliance work to fund additional reliability work.

57.    For example, in 2011, **PG&E** set a goal to reduce routine "units" worked from 1.18 million trees in 2011 to 1 million in 2012 in order to increase the amount of money available for reliability work by $20 million. In 2012, **PG&E** set a goal to goal to reduce routine "units" worked by 25 percent in 2013 in order to increase the amount of money available for reliability work by $35 million. In 2013, **PG&E** only performed routine patrol inspections on 75 percent of its distribution circuits, using the cost savings to increase its reliability patrols. In 2014, **PG&E** set a goal to reduce routine units worked by 7.5 percent annually through 2016.

58.    Between 2006 and 2013, **PG&E** actually reduced the number of routine trees worked from 1.7 million to 1.25 million in 2013, paid contractors $85 million, and increased reliability spending by $134 million. During that time, customer satisfaction as measured by SAIFI increased by 40 percent.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

59. Most of **PG&E's** annual routine compliance work is performed in rural areas in California, while most of **PG&E's** "reliability" work is performed in the more densely populated urban or semi-urban areas where outages will generate more complaints per square mile than in the rural counties served by **PG&E**. Although the actual vegetation management work performed in the annual routine compliance patrols and the reliability patrols is virtually the same, **PG&E's** only comprehensible rationale for differentiating the "two types of work" is that the "reliability" work is directed at reducing statistical measurements of customer dissatisfaction over outages and that goal can be better accomplished by concentrating on work in urban or semi-urban areas at the expense of work needed in rural areas.

60. Under **PG&E's** bonus incentive program, reducing the number of customer complaints over outages leads to an increased likelihood of increases in executive and management bonuses.

**E. PG&E FAILED TO FULLY EMPLOY LiDAR TO IDENTIFY HAZARD TREES**

61. *LiDAR (an acronym for "Light Detection and Ranging")* is a surveying method that measures distances to a target by illuminating that target with a pulsed laser light and measures the reflected pulses with a sensor. These light pulses, when combined with other data recorded by the system, orthoimagery, and hyperspectral data, can generate precise three-dimensional images and information about the shape of the Earth and objects such as buildings or trees.

62. When used in a vegetation management program for electric utilities, LiDAR scans and analyses can be used to identify trees that have the potential for contacting conductors, whether because of proximity to the conductors or are dead, diseased, or dying. Annual LiDAR scans and analyzes the electric system the change in the dead or diseased vegetation by comparing one year's data to the prior year's inventory of dead or diseased trees. When the analysis is conducted over a subset dataset, it can provide a statistical understanding in the percent change in vegetation identified as dead or diseased.

63. **PG&E's** use of LiDAR is funded by its "Catastrophic Event Memorandum Account" ("CEMA"). If a catastrophic event is declared a state of emergency by the state or

1    federal government, then utilities like **PG&E** can record costs caused by the event in this

2    memorandum account. By recording these costs, the utilities can later ask for recovery of these

3    costs from the CPUC.

4         64.     In 2014, **PG&E** began to use LiDAR to scan and analyze small sections of its

5    electric transmission and distribution system. In 2015, **PG&E** employed a contractor who created

6    spatially accurate alignment information for approximately 10 percent of **PG&E** distribution lines

7    using LiDAR and imagery. The contractor identified 2.2 million "Hazard Trees" in the LiDAR

8    data having the potential to fail-in or encroach on distribution lines, performed "dead and diseased

9    analysis" on 1.6 million trees, and identified 23,000 trees as potentially dead or diseased.

10        65.     In 2015, for some unfortunate reason **PG&E** scheduled the LiDAR contractor's

11    deliverables for October 2015 at the very tail end of California's fire season. The contractor's

12    final product identified the 44 foot-tall gray pine that started the Butte Fire as a "Hazard Tree" that

13    had the potential to fall into one of **PG&E's** distribution lines, but unfortunately **PG&E** received

14    the information over a month after the Butte Fire started.

15        66.     In 2016 and 2017, **PG&E** again employed LiDAR technology to scan and analyze

16    its electric transmission and distribution system, but only employed the technology in limited

17    sections of that system, and again scheduled the deliverables at the tail end of the California

18    wildfire season.

19        F.      **PG&E KNEW ITS ELECTRICAL EQUIPMENT WAS UNSAFE**

20        67.     **PG&E** has a long-standing practice of using reclosers throughout its system to

21    automatically restart power after interruptions, even though it knows these devices may cause

22    wildfires. Reclosers send pulses of electricity through power lines whenever an interruption occurs

23    on lines equipped with the devices. According to experts, if power lines are in contact with trees

24    or vegetation, these pulses of electricity can start fires. For this reason, other utilities have changed

25    their operations to protect the public.

26        68.     The dangers posed by reclosers are so significant that the other two major utilities

27    in California, **San Diego Gas & Electric Company and Southern California Edison**, have

28    reprogramed their electrical systems during fire seasons to ensure that reclosers **do not**

Case: 19-30088    Doc# 3436-7    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 29
of 32

1  automatically restart electrical currents after a service interruption.  In contrast, **PG&E** began an
2  experimental pilot program in 2017 in limited parts of California to reprogram its reclosures.

3       69.    **PG&E** knew that its reclosures posed a great risk of wildfire.  At a Congressional
4  hearing in 2015, **PG&E's** Senior Vice President of Electrical Operations, Patrick Hogan, stated
5  that **PG&E** had the ability to reprogram its reclosures during fire season to not restart power.
6  Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain
7  the wildfire benefit."[24]  **PLAINTIFFS** believe that despite this knowledge and ability, **PG&E**
8  never reprogramed all of its reclosures to prevent wildfires.

9       70.    In addition, since prior to 1996, **PG&E** has known or should have known that its
10  choice of chemical treatments for its poles can also make its equipment unsafe.  For example,
11  **PG&E** uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the
12  Cellon® process.  Those poles tend to experience surface decay below ground regardless of the
13  type of wood used for the poles.  As a result, digging inspections are required for poles treated by
14  these processes for all wood types.  However, **PLAINTIFFS** believe that **PG&E** has failed to
15  conduct the proper inspections and further, when **PG&E** has been advised of necessary repairs to
16  such poles, **PG&E** failed to repair the poles in a timely manner.  These failures are a breach of
17  **PG&E** obligations to the public and have been a cause of fires.

18  **G.    PG&E'S "RUN TO FAILURE" APPROACH TO MAINTENANCE**

19       71.    **PG&E** has a well-documented history of implementing a "run to failure" approach
20  with its aging infrastructure, whereby it ignores necessary maintenance in order to line its own
21  pockets with excessive profits.  According to a filing by the CPUC in May 2013:

22       However, as we saw in Section V.F.3 above, the Overland Audit explains
        how PG&E systematically underfunded GT&S integrity management and
23       maintenance operations for the years 2008 through 2010. **PG&E engaged
        in a "run to failure" strategy whereby it deferred needed maintenance
24       projects** and changed the assessment method for several pipelines from ILI
        to the less informative ECDA approach - **all to increase its profits even
25       further beyond its already generous authorized rate of return,** which
        averaged 11.2% between 1996 and 2010.
26

27

28  ───────────────────────
    [24] http://www.sfchronicle.com/bayarea/article/Power-line-restart-device-implicated-in-past-
    12324764.php.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Given PG&E's excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique. The IRP Report supplements the Overland Audit findings with additional examples of PG&E management's commitment to profits over safety. **Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of PG&E management's long standing policy to squeeze every nickel it could from PG&E gas operations and maintenance, regardless of the long term "run to failure" impacts. And PG&E has offered no evidence to the contrary.**[25]

### H. PG&E'S LONG HISTORY OF SAFETY VIOLATIONS

72. Over the past thirty-plus years, **PG&E** has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations, including the following fines, penalties, and/or convictions. Despite these recurring punishments, **PG&E** refuses to modify its behavior, and has continued to conduct its business with a conscious disregard for the safety of the public, including **PLAINTIFFS**.

73. As detailed below, the Camp Fire is just one example of the many tragedies that have resulted from **PG&E's** enduring failure to protect the public from the dangers associated with its operations. **PG&E** power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to **PG&E's** ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment. Further, **PG&E's** aging infrastructure has caused multiple disasters throughout California.

#### 1. The 1981 San Francisco Gas Explosion

74. A **PG&E** gas main in downtown San Francisco exploded in 1981, forcing 30,000 people to evacuate. It took workers nine hours to shut off the gas main's manual shut-off valves and stop the flow of gas that continued to feed the flames in the interim.

/ / /

/ / /

---

[25] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/SB_GT&S_0039691.pdf.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

### 2. The 1991 Santa Rosa Gas Explosion

75.     Two people were killed and three others were injured when a **PG&E** gas line exploded in Santa Rosa in December 1991.  The pipeline was improperly marked, failing to give proper notice to contractors working in the area.  A contractor hit the pipe with a backhoe, causing the pipe to leak and explode several months later.

### 3. The 1994 Trauner Fire

76.     In 1994, **PG&E's** failure to maintain the vegetation surrounding its electrical equipment caused a devastating wildfire in Nevada County, California.  This Fire, commonly known as the "Trauner Fire" or the "Rough and Ready Fire," burned approximately 500 acres in and around the town of Rough and Ready, destroyed 12 homes, and burned 22 structures, including a historic schoolhouse that was built in 1868.

77.     Investigators determined that the Trauner Fire began when a 21,000-volt power line brushed against a tree limb that **PG&E** was supposed to keep trimmed.  Through random spot inspections, the investigators found several hundred safety violations in the area near the Trauner Fire.  Approximately 200 of these violations involved contact between vegetation and one of **PG&E's** power lines.  As a result, on or around June 19, 1997, **PG&E** was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties.

78.     After the trial, a 1998 CPUC report revealed that **PG&E** diverted $77.6 million from its tree-trimming budget to other uses from 1987 to 1994.  During that same time, **PG&E** under spent its authorized budgets for maintaining its systems by $495 million and instead, used this money to boost corporate profits.  Despite this public outing, **PG&E** continued its corporate culture of putting profits before safety.

### 4. The 1996 Mission Substation Electrical Fire

79.     At approximately 1:00 a.m. on November 27, 1996, a cable splice at **PG&E's** Mission Substation in San Francisco short-circuited, burning and melting the insulation around the splice.  Smoke from the fire rose through a floor opening above the splice into a switch cabinet.  That smoke was so thick that it caused a flashover between phases of the bus bars connecting the overhead N bus to the switch.  This caused insulation on the N bus to ignite and a circuit breaker

Case: 19-30088     Doc# 3436-7     Filed: 08/07/19     Entered: 08/07/19 16:13:52     Page 32
of 32