1  to open, resulting in the loss of power to a group of **PG&E** customers. The substation was

2  unmanned at the time and the fire was only discovered by chance by an employee who had stopped

3  by the substation to use the restroom.

4          **5.**    <u>**The 1999 Pendola Fire**</u>

5          80.    A rotten pine, which the federal government determined **PG&E** should have

6  removed, fell on a power line, starting the Pendola Fire in 1999. It burned for 11 days and scorched

7  11,725 acres, mainly in the Tahoe and Plumas National Forests. **PG&E** paid a $14.75 million

8  settlement to the U.S. Forest Service in 2009. That year, the utility also reached a $22.7 million

9  settlement with the CPUC after regulators found **PG&E** had not spent money earmarked for tree

10 trimming and removal toward those purposes.

11         **6.**    <u>**The 2003 Mission District Substation Fire**</u>

12         81.    In December 2003, a fire broke out at **PG&E's** Mission District Substation in San

13 Francisco. Despite signs of trouble appearing at control centers, the fire burned for nearly two

14 hours before **PG&E** operators showed up at the Substation, found it full of smoke, and finally

15 called the fire department. The source of the fire was not located until five hours after it began.

16 As a result, nearly one-third of San Francisco's residents and business owners lost power, with

17 some waiting over 24 hours for their power to be restored.

18         82.    The CPUC report of the investigation, which was released in 2004, illustrated

19 **PG&E's** careless approach to safety and apparent inability to learn from its past mistakes. An

20 excerpt from the report describes the following:

21         Soon after undertaking the investigation of the 2003 fire, CPSD [CPUC's
22         Consumer Protection and Safety Division] discovered that another fire had
        occurred at Mission Substation in 1996. CPSD's investigation team
23         conducted a thorough analysis of both fires and found strikingly similar
        contributing factors and root causes. CPSD's team further determined that
24         **PG&E** had not implemented the recommendations resulting from its own
        investigation of the 1996 fire. . . . <u>**CPSD finds it quite troubling that**</u>
25         <u>**PG&E did not implement its own recommendations from its own**</u>
        <u>**investigation of the 1996 fire.**</u>[26]
26

27

28      [26] http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

The findings related to the Mission Substation Fire should have been a wake-up call to **PG&E** to revamp its operating procedures to prevent future disasters. Instead, **PG&E's** focus remained on corporate profits, while safety was relegated to the backburner.

### 7. The 2004 Sims Fire

83. In July 2004, the Sims Fire burned over 4,000 acres of forest land in the Six Rivers and Trinity National Forests. A federal lawsuit alleged that **PG&E** failed to remove a decaying tree, which fell on a transmission line and ignited the blaze.

### 8. The 2004 Freds Fire

84. The Freds Fire started in October 2004 near Kyburz, El Dorado County, California. A lawsuit filed by the United States Government claimed that employees of **PG&E's** contractor lost control of a large tree they were cutting down. It fell onto a **PG&E** power line and caused a fire that burned over 7,500 acres. **PG&E** and its contractors paid $29.5 million to settle the lawsuits over the Freds Fire and the Sims Fire.

### 9. The 2004 Power Fire

85. In October 2004, the Power Fire burned approximately 17,000 acres on the Eldorado National Forest and on private timberlands. A federal lawsuit alleged that the Power Fire was ignited by a lit cigarette that was dropped by a **PG&E** tree trimming contractor. **PG&E** and its contractor paid the federal government $45 million to settle the lawsuit.

### 10. The 2005 San Francisco Electrical Explosion

86. In August 2005, a **PG&E** electrical transformer exploded in the San Francisco financial district at Kearny and Post Streets, severely burning a woman who had been walking by. A lawsuit by the injured woman settled for an undisclosed sum.

### 11. The 2008 Rancho Cordova Explosion

87. In December 2008, a gas leak from a **PG&E** pipe caused an explosion in Rancho Cordova, California. This explosion left one person dead, injured several others, and caused over $260,000 in property damage.

88. A National Transportation Safety Board ("NTSB") investigation revealed that the leak was caused by incorrect repairs performed by **PG&E** in 2006, at which time **PG&E** installed

a piece of pipe to patch up an earlier leak. The investigative report for the incident concluded that the walls of the new pipe were too thin, allowing gas to leak from the pipe, and that **PG&E** failed to timely send properly trained personnel to check out the leak, even though **PG&E** had been told several months earlier that its emergency plans fell below required standards. Specifically, the report noted the following:

> Contributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a Pacific Gas and Electric Company crew that was properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public.[27]

89. In November 2010, the CPUC filed administrative charges against **PG&E** in connection with the Rancho Cordova explosion, alleging that **PG&E** was at fault for the blast and that **PG&E** should have discovered the improper repair job that caused the explosion, but failed to timely do so. As a result, the CPUC required **PG&E** to pay a $38 million fine.

### 12. The 2008 Whiskey Fire

90. The June 2008 Whiskey Fire burned more than 5,000 acres of land in the Mendocino National Forest. The fire started when a gray pine tree that did not have the required clearance from a **PG&E** transmission line came into contact with the line. **PG&E** and its contractors agreed to pay $5.5 million to settle a federal lawsuit.

### 13. The 2009 San Francisco Electrical Explosion

91. In June 2009, a **PG&E** underground electrical vault exploded in San Francisco's Tenderloin neighborhood, sending 30-foot flames and smoke into the air for two hours. This explosion left thousands of people without power.

### 14. The 2010 San Bruno Explosion

92. On September 9, 2010, **PG&E's** continued disregard of public safety caused the death of eight people, injured 58 people, and destroyed an entire neighborhood in San Bruno, California when one of its gas pipelines exploded and burst into flames. Subsequent to the explosion, the NTSB issued a report that blamed the disaster on **PG&E's** poor management of its

---

[27] http://docs.cpuc.ca.gov/published/Final_decision/146914-03.htm (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 3
of 36

pipeline. In January 2011, federal investigators reported that the probable cause of the accident was: (i) **PG&E's** inadequate quality assurance and quality control during its Line 132 pipeline relocation project, which allowed the installation of a substandard and poorly-welded pipe section; and (ii) **PG&E's** inadequate pipeline integrity management program, which failed to detect and remove the defective pipe section.

93. As a result, **PG&E** was required to pay substantial fines for its massive safety violations. In April 2015, the CPUC slapped **PG&E** with a $1.6 billion fine for causing the explosion and diverting maintenance funds into stockholder dividends and executive bonuses. Further, in January 2017, a federal judge convicted **PG&E** of six felony charges and ordered it to pay $3 million in fines for causing the explosion.

94. Due to **PG&E's** corporate culture which repeatedly ignored public safety, the **CPUC** launched an investigation into the manner by which **PG&E** officers, directors, and/or managing agents establish safety policies and practices to prevent catastrophic events. At the beginning of the investigation, the CPUC President called out **PG&E's** ongoing safety violations:

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into **PG&E's** actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, **continued safety lapses at PG&E continue to occur**.[28]

### 15. The 2011 Cupertino Explosion

95. After the San Bruno explosion, in September 2011, **PG&E** caused a gas explosion that partially engulfed a condominium in Cupertino, California. The explosion was the result of cracked Aldyl-A plastic pipe.

96. Prior to the explosion, the manufacture of Aldyl-A, the NTSB, and the federal Pipeline and Hazardous Materials Safety Administration had all issued warnings about this type of plastic pipe that was prone to premature brittleness, cracking, and failure dating back to at least

---

[28] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/ Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnfor cementTheory.pdf (last accessed February 12, 2018).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1 │ 2002. Despite these warnings and **PG&E's** knowledge of this risk, **PG&E** did nothing to prevent

2 │ the explosion. Although some utilities around the United States had been replacing Aldyl-A pipes,

3 │ **PG&E** did not have a replacement program to phase them out and adequately protect the public.

### 16. The 2014 Carmel Explosion

5 │ 97. In March 2014, a home in Carmel, California was destroyed due to a gas explosion

6 │ caused by **PG&E**. Prior to the explosion, **PG&E** was attempting to replace a gas distribution line,

7 │ but **PG&E's** legally inadequate records did not show that the steel pipe had a plastic insert. When

8 │ crews dug into the steel pipe to perform the replacement, the unknown plastic insert was pierced,

9 │ allowing gas to leak through the pipe and into the residence.

10 │ 98. The CPUC once again required **PG&E** to pay a massive fine because of their

11 │ wrongdoing. In August 2016, the CPUC imposed a $25.6 million fine on **PG&E**. With a $10.85

12 │ million citation previously paid by **PG&E** in 2015 for the explosion, **PG&E** was require to pay a

13 │ total of over $36 million in penalties for its shoddy recordkeeping and disregard of public safety.

### 17. The 2015 San Francisco Transformer Explosion

15 │ 99. In September 2015, a **PG&E** underground transformer exploded in San Francisco's

16 │ Bernal Heights neighborhood. This explosion injured two people, one of them critically.

### 18. The 2015 Butte Fire

18 │ 100. Tragedy struck yet again in September 2015, when **PG&E's** inadequate and

19 │ ineffective vegetation management programs resulted in the Butte Fire in the Sierra foothills. The

20 │ Butte Fire burned for 22 days across Amador and Calaveras Counties, killed two people, destroyed

21 │ 921 homes and/or structures, and charred over 70,000 acres.

22 │ 101. Similar to the other disasters caused by **PG&E's** wrongdoing, the Butte Fire could

23 │ have been prevented by **PG&E**. The Butte Fire was ignited by a gray pine tree that grew and came

24 │ into contact with one of **PG&E's** power lines. **PG&E** knew that gray pines posed the highest risk

25 │ of catastrophic wildfires, but failed to identify and/or remove the dangerous tree pursuant to its

26 │ vegetation management practices. Instead, **PG&E** removed the two trees surrounding the gray

27 │ pine at issue, which exposed the gray pine to sunlight and allowed it to quickly come into contact

28 │ with **PG&E's** power line.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT** 31

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 5
of 36

102.     Subsequent to the Butte Fire, in April 2017, the CPUC fined **PG&E** a total of $8.3 million for "failing to maintain its 12kV overhead conductors safely and properly" and failing to maintain a minimum distance between its power lines and vegetation. Cal Fire also sent **PG&E** a bill for $90 million to cover state firefighting costs. Despite these consequences, **PG&E** did not change, revise, or improve any of its vegetation management practices after the Butte Fire, paving the way for another massive wildfire.

### 19.     The 2017 North Bay Fires

103.     On or around the night of October 8, 2017, more than a dozen fires in Sonoma, Napa, Mendocino, Solano, Lake, Butte, Calaveras, Nevada, and Yuba Counties (collectively known as the "North Bay Fires") ignited and caused destruction on scale at the time which seemed unimaginable.

104.     In just a few weeks, the fires caused the deaths of at least 44 people, hospitalized over 185 individuals, displaced about 100,000 people who were forced to leave their homes and search for safety, burned over 245,000 acres, and damaged or destroyed an estimated 14,700 homes, 3,600 vehicles, and 728 businesses.

105.     The North Bay Fires were caused by multiple points of failure in PG&E's electrical delivery system. Witnesses described electrical problems, transformer explosions, transformer fires, arcing transformers, down power lines, arcing power lines, and flames in trees.[29]     Although the numerous fires constituting the North Bay Fires had different points of origin, they all shared the same underlying causes and arose from **PG&E's** disregard of mandated safety practices and foreseeable hazardous risks associated with its infrastructure.

106.     Until the Camp Fire, the North Bay Fires were collectively the most destructive fires in California's history.

/ / /

/ / /

/ / /

---

[29]  http://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# I. THE CORPORATE CULTURE AT PG&E THAT PUTS PROFITS BEFORE SAFETY

107. Rather than spend the monopolistic profits it earns for infrastructure maintenance and safety, **PG&E** redirects the money to enhancing its reputation as a utility dedicated to customer safety and reliability, and paying lavish corporate bonuses – irrespective of the catastrophic losses suffered by victims of wildfires in recent years. This pattern and practice of favoring profits over having a safe and well-maintained infrastructure, left **PG&E** vulnerable to an increased risk of a catastrophic event such as the Camp Fire.

108. For example, according to documents released by The Utility Reform Network (**"TURN"**), **PG&E** planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in **PG&E's** system. **PG&E** collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, **PG&E** spent nearly $5 million on bonuses for six of its top executives.

109. Moreover, **PG&E** implemented multiple programs that provide financial incentives to its employees, agents, and/or contractors to *not* protecting public safety. Prior to the Butte Fire, **PG&E** chose to provide a monetary incentive to its contractors to cut fewer trees, even though **PG&E** was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a **PG&E** contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but **PG&E** chose to keep this program despite knowing this risk. Similarly, prior to the San Bruno explosion, **PG&E** had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, **PG&E's** incentive system was "training and rewarding people to do the wrong thing," emblematic of "a seriously broken process," and

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

"explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy."[30]

110.    **PG&E** fed its toxic culture when it purchased policies of insurance from offshore companies in Bermuda, London, and elsewhere that expressly provide coverage for punitive damages in amounts that exceed hundreds of millions of dollars. These policies provide corporate security at the cost of public safety. This contributed to a culture of reckless disregard for the safety of the residents of Northern and Central California and contributed to causing the Camp Fire.

### i.    PG&E Has Repeatedly And Continuously Diverted Safety Funds

111.    In an investigation covering 1994 to 1998, CPUC staff accused **PG&E** of more than 500,000 counts of violating state laws requiring utilities to keep trees pruned a safe distance from overhead electric lines.  Much of the incriminating information cited by CPUC investigators was culled from the electric utility's own records.

112.    In another investigation by the CPUC and Overland (an independent auditing company) covering 1997 to 2012, it was uncovered that **PG&E** diverted more than $100 million in gas safety and operations money collected from customers and spent it for other purposes, including profit for stockholders and bonuses for executives.

113.    According to the audit, from 1999 to 2010, **PG&E** also collected $430 million more than its guaranteed revenue from its gas-transmission and -storage operations.

114.    In a separate report, the CPUC concluded that in the three years leading up to the 2010 San Bruno explosion, the company spent $56 million annually on an incentive plan for executives and "non-employee directors," including stock awards, performance shares and deferred compensation.

115.    According to **PG&E's** 2016 Annual Report to Investors:

> The Utility **incurred costs of $498 million**, pre-tax, **during the year ended December 31, 2016 associated with fines and penalties**. This includes costs of $412 million, pre-tax, associated with **safety-related cost disallowances** imposed by the California Public Utilities Commission (the "CPUC") in its April 9, 2015

---

[30] http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

decision in the gas transmission pipeline investigations. The Utility also recorded $57 million, pre-tax, for disallowances imposed by the CPUC in its final phase two decision of the 2015 Gas Transmission and Storage (GT&S) rate case for **prohibited ex parte communications**. In addition, the Utility accrued fines of $26 million in connection with the final decision approved by the CPUC on August 18, 2016 in its investigation regarding **natural gas distribution record-keeping practices** and $3 million in connection with the maximum statutory fine imposed on January 26, 2017 in the **federal criminal trial against the Utility**.

116. In 2017, Geisha Williams, **PG&E's** chief executive officer, was awarded $8.6 million in total direct compensation, according to a **PG&E** filing with the Securities and Exchange Commission. This was a 106% raise from her prior year's salary.

117. Nickolas Stavropoulos, chief operating officer and president of Pacific Gas and Electric, **PG&E's** utility subsidiary, received $6.4 million in total direct compensation in 2017, up 88.9% from his prior year's salary.

118. According to public documents uncovered by two investigators from the CPUC in July 2018, **PG&E** stocked away $246 million dollars over the last 17 years that was meant for undergrounding powerlines, which can help prevent wildfires in zones that are prone to extreme wildfire danger, but **PG&E** did not use the funds to do so.

119. **PG&E's** advertising campaigns further highlight that avoiding accountability – and not public safety – is its top priority. Instead of allocating all available resources into maintenance, inspections, and fire safety, **PG&E** spent millions on advertising, including full page newspaper ads and feel-good television commercials, designed to distract the public from the fact that **PG&E** is a six-time felon.

120.

    **ii.   PG&E Continually And Habitually Flaunts CPUC Regulations And Investigations**

121. In 2007, the CPUC began working to tighten regulations on utilities and force the utilities to create maps that detail where power lines present the highest risk for wildfires. As of 2017, a decade later, the maps were still incomplete. And the CPUC had not adopted strict new regulations.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

122. A review of the mapping project shows that **PG&E** repeatedly asked to slow down the effort, claiming for example in October 2016, that the CPUC's plans to complete the map by March of 2017 year was "too aggressive." And in July 2017, the utility called a proposed regulation to increase the wind speed that power poles must sustain "arbitrary," and that certain proposed regulations would "add unnecessary costs to construction and maintenance projects in rural areas." On Oct. 6, 2017—two days before the deadly North Bay Fires—two administrative law judges assigned to oversee the project granted yet another delay at the request of **PG&E** and other utilities.

123. In response to **PG&E's** repeated failure to correct its behavior and the 2010 San Bruno explosion, the CPUC's Safety and Enforcement Division commissioned a report, prepared by NorthStar Consulting Group, to determine whether **PG&E's** "organizational culture and governance prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards." The NorthStar report concluded that while **PG&E** purportedly has been making efforts to reduce incidents and increase safety since the 2010 San Bruno explosion, "these efforts had been somewhat reactionary" and were not driven by a "comprehensive enterprise-wide approach to addressing safety."

124. The report was issued May 8, 2017 and made 61 separate recommendations for **PG&E** to be completed before July 1, 2019. While **PG&E** publicly supports the NorthStar recommendations, the CPUC has raised doubts that **PG&E's** enthusiasm is sincere. In one example, **PG&E** attempted to bolster its commitment to safety in front of the CPUC by exaggerating the safety expertise of its Directors. When asked to substantiate this expertise, **PG&E** could not provide any support for its claim. This prompted the CPUC to question "whether **PG&E** truly is changing its culture, or just trying to 'check the boxes'."[31]

125. On April 26, 2018, **PG&E** agreed to pay $97.5 million because it engaged in prohibited communications with the CPUC and failed to timely report ex parte communications from 2010 to 2014, in violation of CPUC rules.

---

[31] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M243/K614/243614812.PDF

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 10
of 36

126. As part of the settlement agreement, **PG&E** admitted to the following:

> During the period from 2010 to 2014, PG&E committed multiple violations of the Commission's ex parte rules in Article 8 of the Rules of Practice and Procedure, through **communications that were either prohibited or not reported to the Commission as required by these rules**. On at least one occasion during this time period, PG&E also **violated Rule 12.6 of the Commission's Rules of Practice and Procedure, which requires that parties to settlement negotiations hold such negotiations confidential, by disclosing to a Commission decisionmaker the contents of ongoing settlement negotiations.** Finally, by the totality of these violations, PG&E also violated Commission Rule of Practice and Procedure 1.1. Article II, § 2.1.B: Conduct Harmful to Customers and Other Constituents PG&E's employees and agents engaged in communications with decisionmakers at the Commission, as well as related conduct that was harmful to the regulatory process.

127. **PG&E** specifically admitted to 12 violations, including:

- a conversation between Brian Cherry, **PG&E's** Vice President of Regulatory Affairs, and a CPUC Commissioner about whether to bump Administrative Law Judge Roscow from a proceeding.

- A conversation between a **PG&E** attorney and a CPUC Commissioner regarding a gas pipeline project and possible ratepayers' payment for upgrading the gas system.

- A meeting between the CPUC President and a **PG&E** officer regarding a "independent" forensic analysis.

128. And this is not the first time **PG&E** has interfered and/or failed to comply with an investigation as it was also found guilty of a felony for interfering with the federal investigation of the 2010 San Bruno explosion.

**J.** **PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS AND THE SURROUNDING VEGETATION**

129. At all times prior to November 8, 2018, **PG&E** had a duty to properly construct, inspect, repair, maintain, manage and/or operate its power lines and/or other electrical equipment and to keep vegetation properly trimmed and maintained so as to prevent foreseeable contact with such electrical equipment. In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, **PG&E** had an obligation to comply with a number of statutes, regulations, and standards, including the following.

130. Pursuant to Public Utilities Code § 451, "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

131. To meet this safety mandate, **PG&E** is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, **PG&E** also must ensure that its power lines can withstand winds of up to 92 miles per hour.

132. Further, **PG&E** must follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code § 4292, **PG&E** is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower." Also, Public Resources Code § 4293 mandates **PG&E** to maintain clearances of four to 10 feet for all of its power lines, depending of their voltage. In addition, "Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

133. Pursuant to CPUC General Order 165, **PG&E** is also required to inspect its distribution facilities to maintain a safe and reliable electric system. In particular, **PG&E** must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. **PG&E** is also required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over 15 years old every 10 years.

134. **PG&E** knew or should have known that such standards and regulations were minimum standards and that **PG&E** has a duty to identify vegetation which posed a foreseeable hazard to power lines and/or other electrical equipment, and manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire. Further, **PG&E** has a duty to manage, maintain, repair,

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

9-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 12
of 36

and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, by not limited to, putting electrical equipment in wildfire-prone areas underground, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

135. Finally, in June of 2014, the CPUC directed **PG&E**, by way of Resolution ESRB-4, to take remedial measures to reduce fires since the Governor had declared a drought in January. In addition, the CPUC informed **PG&E** that it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, i.e. the CPUC was agreeing to provide additional funding on top of vegetation management funding already authorized in order to make sure remedial measures would not go unperformed due to lack of funding. "Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency, the declaration directed state agencies 'to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife.' The California Tree Mortality State of Emergency issued in October 2015 by Governor Brown regarding the bark beetle infestation and resulting tree mortality remains in effect. The CPUC has not rescinded ESRB-4, and work by the utilities to comply with it and the Tree Mortality Emergency continues."[32]

## VI.  PLAINTIFFS' LOSSES

136. Plaintiff **LILA WILLIAMS ("LILA")** is a 93-year-old great-great-grandmother of five generations of her family who have resided on the Paradise Ridge. Prior to coming to the Ridge, she was raised on a ranch in Lake County. She worked for many years in Silicon Valley as a Lead Worker in production assembly at Hewlett-Packard.

137. On November 8, **LILA**, who lived in Magalia, was returning from a doctor's appointment with her granddaughter when embers from the fire began landing on their vehicle. Fearful that she would not have enough gas to escape the fire, **LILA** stopped at two gas stations,

---

[32] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/PGE%20Vegetation%20Management%20Spending.pdf.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

COMPLAINT                                                                    39

Case: 19-30088   Doc# 3436-8   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 13
of 36

1  but was unable to refuel. She was fortunately able to get a ride in her granddaughter's vehicle, but

2  still faced clogged roads heading toward Chico. They then made the terrifying decision of turning

3  around, heading deeper into the mountains towards Butte Meadow, which was so crowded with

4  other evacuees that they kept on going uphill to Chester. She stayed there until finally re-uniting

5  with her family. **LILA's** home in Magalia, and mementos from a full life of experiences, were

6  completely destroyed.

7      138.    **LOUISE** is **LILA's** 66-year-old daughter. **LOUISE** owned property in Concow at

8  3488 Hoffman Road, where she had built her own off-the-grid home with solar panels and storage

9  batteries, so that she would not have to rely upon **PG&E**.

10      139.    The Camp Fire suddenly and quickly consumed **LOUISE's** property. By the time

11  she was able to get into her car, the fire had already entered her home and was burning the fence

12  at the end of her driveway, potentially cutting off her escape.  She screamed her dog's name, but

13  he did not answer. She had no choice but to leave her dog and cat behind. After hurrying down her

14  driveway and onto Hoffman Road, passing burning homes along the way, **LOUISE** was forced to

15  stop at Lake Concow. The single crossing was blocked by a truck and row of cars, unable to pass.

16  The flames from the burning trees licked at the stopped vehicles. A firefighter screamed at

17  everyone to go to the lake. **LOUISE** got out of her car and ran. Standing in the freezing waters of

18  Lake Concow, they waited as crews tried to clear the road ahead of fallen trees and debris.

19      140.    **LOUISE** was eventually able to rejoin a convoy of cars leaving Concow. They

20  followed behind a firetruck and through burning forest. Tree limbs consumed by flames hung over

21  the road. After driving for miles, **LOUISE** was able to leave the flames behind and reach a place

22  of relative safety.

23      141.    **PLAINTIFFS'** property and all of their personal items in and around their home,

24  and other structures, were completely destroyed in the Camp Fire and are no longer ascertainable

25  due to the intensity of the fire.  As a result of the fire and evacuation, **PLAINTIFFS** suffered major

26  losses and damages in an amount according to proof at trial.

27  ///

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

40

Case: 19-30088   Doc# 3436-8   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 14
of 36

# VII. CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Against All Defendants)

142. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

143. The Camp Fire was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of **DEFENDANTS**, and/or each of them. **DEFENDANTS**, and/or each of them, breached their respective duties owed individually and/or collectively to **PLAINTIFFS** by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care; (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (4) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard within close proximity of the subject power line; (5) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections and/or repairs of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain electrical transmission and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons by allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and/or repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing to de-energize power lines during fire prone conditions; (11) failing to de-energize power lines after the ignition of the Camp Fires; and/or (12) failing to properly train and to supervise employees and/or agents

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

responsible for maintenance and inspection of the distribution lines and/or vegetation areas nearby these lines.

144. As a direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** were injured in their health, strength, and/or activity in an amount according to proof at trial.

145. As a further direct and legal result of the premises, **PLAINTIFFS** were required to and/or continue to employ physicians and other healthcare providers to examine, treat, and/or care for their injuries. **PLAINTIFFS** have incurred, and will continue to incur, medical and/or incidental expenses in an amount according to proof at trial.

146. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered and/or continue to suffer great mental pain and suffering, including worry, emotional distress, humiliation, embarrassment, anguish, anxiety, and/or nervousness. **PLAINTIFFS** are informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries in an amount according to proof at trial.

147. As a further direct and legal result of the premises, **PLAINTIFFS** have suffered a loss of income, loss of earning capacity, loss of profits, increased expenses due to displacement, and/or other consequential economic losses in an amount according to proof at trial.

148. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have suffered damage to real property, including the loss of vegetation, trees, and structures, the creation of hydrophobic soil conditions, and a loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

149. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have suffered damage to and/or a loss of personal property, including but not limited to items of peculiar value to **PLAINTIFFS**, in an amount according to proof at trial.

150. As a further direct and legal result of **DEFENDANTS'** actions and/or omissions, and/or each of them, **PLAINTIFFS** have incurred and will continue to incur expenses and other

1  economic damages related to the damage to their property, including costs relating to storage,

2  clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related

3  consequential damages in an amount according to proof at trial.

4      151.   **PG&E** has a virtual monopoly over the transmission and distribution of electrical

5  power to the areas affected by the Camp Fire and has individual contracts with all residents and

6  businesses in those areas to whom it distributes that electrical power.  The communities affected

7  by the Camp Fire are all dependent upon the safe transmission and distribution of that electrical

8  power for continuous residential and commercial usage, and **PG&E** has contractual, statutory, and

9  public duties to provide that electrical power in a manner that promotes those individual and public

10  interests.

11      152.   The potential harms to **PLAINTIFFS** from wildfires such as the Camp Fire was

12  objectively foreseeable both in nature and in scope and were subjectively known to **PG&E** from

13  its long and tragic history of causing such wildfires.

14      153.   As set forth above and as will be shown by proof, there is a high degree of certainty

15  that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close

16  connection between those injuries and damages and **DEFENDANTS'** conduct.  A high degree of

17  moral blame is attached to **DEFENDANTS'** conduct, and the policy of preventing future harm

18  justifies both the recognition of the existence of a duty of care owed by **DEFENDANTS** to all

19  **PLAINTIFFS** and the imposition of all damages described above.

20      154.   Based on the foregoing, **DEFENDANTS**, and/or each of them, acted willfully,

21  wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights

22  and/or safety of others, such the **PLAINTIFFS** request that the trier of fact, in the exercise of

23  sound discretion, award **PLAINTIFFS** additional damages pursuant to Code of Civil Procedure §

24  3294 for the sake of example and sufficient to punish the **DEFENDANTS**, and/or each of them,

25  for their despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages

26  and **DEFENDANTS'** financial condition, yet sufficiently large enough to be an example to others

27  and to deter **DEFENDANTS** and others from engaging in similar conduct in the future.

28

Case: 19-30088   Doc# 3436-8   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 17
of 36

155.   As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek exemplary damages for injuries to **PLAINTIFFS'** animals as allowed under Code of Civil Procedure § 3340.

**SECOND CAUSE OF ACTION**
**INVERSE CONDEMNATION**
**(Against All Defendants)**

156.   **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

157.   On or about November 8, 2018, **PLAINTIFFS** were owners of real property and/or personal property located within Butte County in the area of the Camp Fire.

158.   Prior to and on November 8, 2018, **DEFENDANTS**, and/or each of them, installed, owned, operated, used, controlled, and/or maintained power lines and other electrical equipment for the public delivery of electricity, including power lines in and around the location of the Camp Fire.

159.   On November 8, 2018, as a direct, necessary, and legal result of **DEFENDANTS'** installation, ownership, operation, use, control, management, and/or maintenance for a public use the power lines and/or other electrical equipment, the power lines and/or other electrical equipment came in contact with vegetation and/or broke, failed, fell down, sparked, and/or exploded, causing a wildfire that burned thousands of acres, including property owned or occupied by **PLAINTIFFS**. The fire damaged and/or destroyed **PLAINTIFFS'** real and/or personal property.

160.   The above described damage to **PLAINTIFFS'** property was legally and substantially caused by the actions of **DEFENDANTS**, and/or each of them, in their installation, ownership, operation, use, control, management, and/or maintenance of the power lines and other electrical equipment for a public use.

161.   **PLAINTIFFS** have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of **PLAINTIFFS'** property by **DEFENDANTS**, and/or each of them, without just compensation.

162.   As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** suffered damages to their real and/or personal property, including loss of use,

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

interference with access, and/or diminution in value and/or marketability in an amount according to proof at trial.

163.    As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable attorney, appraisal, engineering, and/or other expert fees due to the conduct of the **DEFENDANTS** in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil Procedure § 1036.

**THIRD CAUSE OF ACTION**
**PUBLIC NUISANCE**
**(Against All Defendants)**

164.    **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

165.    **PLAINTIFFS** own and/or occupy property at or near the site of the fire which is the subject of this action.  At all relevant times herein, **PLAINTIFFS** had a right to occupy, enjoy, and/or use their property without interference by **DEFENDANTS**, and/or each of them.

166.    **DEFENDANTS**, and/or each of them, owed a duty to the public, including **PLAINTIFFS** herein, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their power lines in Butte County in a manner that did not threaten harm or injury to the public welfare from operation of those power lines.

167.    **DEFENDANTS**, and/or each of them, by acting and/or failing to act, as alleged hereinabove, created a condition which was harmful to the health of the public, including these **PLAINTIFFS**, and which interfered with the comfortable occupancy, use, and/or enjoyment of **PLAINTIFFS'** property.  **PLAINTIFFS** did not consent, expressly or impliedly, to the wrongful conduct of **DEFENDANTS**, and/or each of them, in acting in the manner set forth above.

168.    The hazardous condition which was created by and/or permitted to exist by **DEFENDANTS**, and/or each of them, affected a substantial number of people within the general public, including **PLAINTIFFS** herein, and constituted a public nuisance under Civil Code §§

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 19 of 36

1  3479 and 3480 and Public Resources Code § 4171. Further, the ensuing uncontrolled wildfire
2  constituted a public nuisance under Public Resources Code § 4170.

3      169. The damaging effects of **DEFENDANTS'** maintenance of a fire hazard and the
4  ensuing uncontrolled wildfire are ongoing and affect the public at large. As a result of the fire's
5  location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the
6  fire's perimeter. This further caused significant post fire runoff hazards to occur, including hillside
7  erosion, debris flow hazards, sediment laden flow hazards, and hillside erosion. As a result, large
8  quantities of ash and sediment will be deposited in perennial and ephemeral watercourses.

9      170. As a direct and legal result of the conduct of **DEFENDANTS**, and/or each of them,
10  **PLAINTIFFS** suffered harm that is different from the type of harm suffered by the general public.
11  Specifically, **PLAINTIFFS** have lost the occupancy, possession, use, and/or enjoyment of their
12  land, real and/or personal property, including, but not limited to: a reasonable and rational fear that
13  the area is still dangerous; a diminution in the fair market value of their property; an impairment
14  of the salability of their property; soils that have become hydrophobic; exposure to an array of
15  toxic substances on their land; the presence of "special waste" on their property that requires
16  special management and disposal; and a lingering smell of smoke, and/or constant soot, ash, and/or
17  dust in the air.

18      171. As a further direct and legal result of the conduct of **DEFENDANTS**, and/or each
19  of them, **PLAINTIFFS** have suffered, and will continue to suffer, discomfort, anxiety, fear,
20  worries, annoyance, and/or stress attendant to the interference with **PLAINTIFFS'** occupancy,
21  possession, use and/or enjoyment of their property, as alleged above.

22      172. A reasonable, ordinary person would be reasonably annoyed or disturbed by the
23  condition created by **DEFENDANTS**, and/or each of them, and the resulting fire.

24      173. The conduct of **DEFENDANTS**, and/or each of them, is unreasonable and the
25  seriousness of the harm to the public, including **PLAINTIFFS** herein, outweighs the social utility
26  of **DEFENDANTS'** conduct.

27      174. The individual and/or collective conduct of **DEFENDANTS** set forth above, and/or
28  each of them, resulting in the Camp Fire is not an isolated incident, but is ongoing and/or a

1 repeated course of conduct, and **DEFENDANTS'** prior conduct and/or failures have resulted in
2 other fires and damage to the public.

3     175.    The unreasonable conduct of **DEFENDANTS**, and/or each of them, is a direct and
4 legal cause of the harm, injury, and/or damage to the public, including **PLAINTIFFS** herein.

5     176.    **DEFENDANTS**, and/or each of them, have individually and/or collectively, failed
6 and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in
7 order to ensure the sole delivery of electricity to residents through the operation of power lines in
8 the affected area, and **DEFENDANTS'** individual and/or collective failure to do so exposed every
9 member of the public, including those residing in Butte County, to a foreseeable danger of personal
10 injury, death, and/or a loss of or destruction real and personal property.

11     177.    The conduct of **DEFENDANTS**, and/or each of them, set forth above constitutes a
12 public nuisance within the meaning of Civil Code §§ 3479 and 3480, Public Resources Code §§
13 4104 and 4170, and Code of Civil Procedure § 731. Under Civil Code § 3493, **PLAINTIFFS** have
14 standing to maintain an action for public nuisance because the nuisance is specially injurious to
15 **PLAINTIFFS** because, as more specifically described above, it is injurious and/or offensive to
16 the senses of the **PLAINTIFFS**, unreasonably interferes with the comfortable enjoyment of their
17 properties, and/or unlawfully obstructs the free use, in the customary manner, of **PLAINTIFFS'**
18 properties, and have suffered harm, injury, and damages.

19     178.    For these reasons, **PLAINTIFFS** seek a permanent injunction ordering that
20 **DEFENDANTS**, and each of them, stop continued violation of Public Resource Code §§ 4292
21 and 4293 and Public Utilities Commission General Order 95, Rule 35. **PLAINTIFFS** also seek
22 an order directing **DEFENDANTS** to abate the existing and continuing nuisance described above.

23
24              **FOURTH CAUSE OF ACTION**
                    **PRIVATE NUISANCE**
25                 **(Against All Defendants)**

26     179.    **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs
27 set forth as though fully set forth herein.

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                          47

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 21
of 36

180. **DEFENDANTS**, and/or each of them, by their acts and/or omissions set forth above, directly and legally caused an obstruction to the free use of **PLAINTIFFS'** property, an invasion the **PLAINTIFFS'** right to use their property, and/or an interference with the enjoyment of **PLAINTIFFS'** property, resulting in **PLAINTIFFS** suffering unreasonable harm and substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

181. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

182. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## FIFTH CAUSE OF ACTION
## PREMISES LIABILITY
### (Against All Defendants)

183. **PLAINTIFFS** incorporate and re-allege by this reference, each of the paragraphs set forth as though fully set forth herein.

184. **DEFENDANTS**, and/or each of them, were the owners of an easement and/or real property in and around the area of the Camp Fire, and/or were the owners of the power lines upon said easement and/or right of way.

185. **DEFENDANTS**, and/or each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near its power lines along the real property and easement, allowing an unsafe condition presenting a foreseeable risk of fire danger to exist on said property.

186. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

187.   As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

**SIXTH CAUSE OF ACTION**
**TRESPASS**
**(Against All Defendants)**

188.   **PLAINTIFFS** incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

189.   At all times relevant herein, **PLAINTIFFS** were the owners, tenants, and/or lawful occupants of property damaged by the Camp Fire.

190.   **DEFENDANTS**, and/or each of them, in wrongfully acting and/or failing to act in the manner set forth above, caused the Camp Fire to ignite and/or spread out of control, causing harm, damage, and/or injury to **PLAINTIFFS** herein, resulting in a trespass upon **PLAINTIFFS** property interests.

191.   **PLAINTIFFS** did not grant permission for **DEFENDANTS** to wrongfully act in a manner so as to cause the Camp Fire, and thereby produce a wildland fire which spread and wrongfully entered upon their property, resulting in the harm, injury, and/or damage alleged above.

192.   As a direct and legal result of the wrongful conduct of **DEFENDANTS**, and/or each of them, which led to the trespass, **PLAINTIFFS** have suffered and will continue to suffer damages as set forth above, in an amount according to proof at trial.

193.   As a further direct and legal result of the wrongful conduct of **DEFENDANTS**, **PLAINTIFFS**, whose land was under cultivation, and/or was used for raising livestock or was intended to be used for raising livestock, have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under Code of Civil Procedure § 1021.9.

194.   As a further direct and legal result of the conduct of **DEFENDANTS**, **PLAINTIFFS** seek double and/or treble damages for the negligent, willful, and wrongful injuries to timber, trees, or underwood on their property, as allowed under Civil Code § 3346.

195.     As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

196.     As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF PUBLIC UTILITIES CODE § 2106**
**(Against All Defendants)**

197.     **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

198.     As a Public Utility, **DEFENDANTS**, and/or each of them, are legally required to comply with the rules and orders promulgated by the Public Utilities Commission pursuant to Public Utilities Code § 702.

199.     Public Utilities that fail to comply with duties required by the California Constitution, a law of the State, a regulation, or order of the Public Utilities Commission, which thereby leads to loss or injury, are liable for that loss or injury pursuant to Public Utilities Code § 2106.

200.     As a Public Utility, **DEFENDANTS**, and/or each of them, are required to provide and maintain service, equipment and facilities in a manner adequate to maintain the safety, health, and convenience of their customers and the public, pursuant to Public Utilities Code § 451.

201.     **DEFENDANTS**, and/or each of them, are required to design, engineer, construct, operate, manage, and maintain electrical supply lines in a manner consistent with their use, taking into consideration local conditions and other circumstances, so as to provide safe and adequate electric service, pursuant to Public Utility Commission General Orders 95 and 165, and Rule 33.1.

202.     **DEFENDANTS**, and/or each of them, are required to maintain vegetation in compliance with Public Resources Code §§ 4293, 4294, and 4435, and Health & Safety Code § 13001.

203. By their conduct alleged above, **DEFENDANTS**, and/or each of them, violated Public Utilities Code §§ 702 and 451 and/or Public Utilities Commission General Order 95, thereby imposing liability on **DEFENDANTS** for losses, damages, and/or injury sustained by **PLAINTIFFS** pursuant to Public Utilities Code § 2106.

204. By further reason of the premises set forth above **DEFENDANTS**, and/or each of them, acted in a manner which violated the laws of this State and/or the orders or decisions of the Public Utilities Commission, as referenced herein.

205. As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

206. As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF HEALTH & SAFETY CODE § 13007
### (Against All Defendants)

207. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

208. By engaging in the acts and/or omissions alleged in this Complaint, **DEFENDANTS**, and/or each of them, willfully, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of Health & Safety Code § 13007.

209. As a direct and legal result of **DEFENDANTS'** violation of Health & Safety Code § 13007, **PLAINTIFFS** suffered recoverable damages to property under Health & Safety Code § 13007.21.

210. As a further direct and legal result of the **DEFENDANTS**, and/or each of them, violating Health & Safety Code § 13007, **PLAINTIFFS** are entitled to reasonable attorney's fees under Code of Civil Procedure § 1021.9.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

51

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 25
of 36

211.   As a direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** suffered, and continue to suffer, the injuries and damages as set forth above.

212.   As a further direct and legal result of the wrongful acts and/or omissions of **DEFENDANTS**, and/or each of them, **PLAINTIFFS** seek the recovery of punitive and exemplary damages against **DEFENDANTS** as set forth above.

### NINTH CAUSE OF ACTION
### VIOLATION OF CAL. BUS. & PROF. CODE § 17500
**(Against All Defendants)**

213.   **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

214.   By engaging in the acts and/or omissions alleged in this Complaint, **DEFENDANTS**, and/or each of them, willfully, negligently, carelessly, recklessly, and/or in violation of law, made, caused to be made, and/or disseminated before the public in this state untrue and/or misleading publications and/or other advertising devices, public outcries and/or proclamations, including social media posts such as Twitter, concerning PG&E's risk management services, including vegetation management, maintenance, inspection, and operation of electrical equipment, professional or otherwise, and/or concerning any circumstance or matter of fact connected with the proposed performance and/or disposition thereof.  And by the exercise of reasonable care, **PG&E** knew and/or should have known to be untrue and/or misleading.

215.   In the years following the September 9, 2010 San Bruno fire and explosion, PG&E attempted to rehabilitate its image with advertising and representations that touted its purported commitment to safety and proactive maintenance. This includes the following representation regarding maintenance to electric transmission towers.

///

///

///

PG&E's number one priority is providing our customers with safe, reliable and affordable energy. As part of that commitment, we're advancing the state of our electric infrastructure by extending the height of electric transmission towers.

What is PG&E doing?

We will be checking and adjusting the transmission lines which transport electricity to our substations that feed the distribution lines responsible for serving our local communities, businesses and residential customers. The adjustments may include:

- Modifying electric transmission towers
- Modifying electric substations

- Replacing or modifying transmission lines
- Replacing wooden poles

216. This publication is untrue and/or misleading in suggesting that **PG&E** would be inspecting its electrical transmission towers and making necessary adjustments. As discussed herein above, PG&E failed to discover and/or correct equipment issues with the transmission tower that malfunctioned on November 8, 2018 despite the fact that five towers along the same line were knocked over during a 2012 storm.

217. In addition to the untrue and/or misleading publications already referenced herein above, **PG&E** made and continues to make repeated untrue and/or misleading publications regarding their vegetation management practices, including but not limited to the television commercials transcribed below:

"Years of drought, millions of dead trees, extreme winds, and leading scientists say there will be even more dangerous fires in the years ahead. Our weather is becoming more extreme, and we all need to work together to keep our neighborhoods safe. I'm Lisa Veliz Waweru from PG&E. At PG&E, we are accelerating our forest management work in high fire-threat areas, removing dead trees, trimming branches and creating 12-foot safety clearances around power lines. As part of our Community Wildfire Safety Program, we are implementing additional safety measures, including a 24-hour Wildfire Safety Operation Center, new early warning weather stations, and stronger power lines in high fire-threat areas. And we want to make sure you know what steps you can take, like cutting back vegetation around your home, having the right emergency plan, and signing up for safety alerts. For more information on how to keep you and your neighborhood safe, visit pge.com/wildfiresafety"

"In 2017 California had the worst wildfire season on record scientists say our weather is becoming more extreme and we all have to be better prepared that's why PG&E; is adopting new and additional safety precautions to help us monitor

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

and respond to dangerous weather. hi I'm Alison Bagley a meteorologist with PGA's community wildfire safety program we're working now to enhance our weather forecasting capabilities building a network of new weather stations to identify when and where extreme wildfire conditions may occur so we can respond faster and better we're installing cutting-edge technology to provide real-time mapping and tracking of weather patterns and we use this information in partnership with first responders and California's emergency response systems to learn more about the community wildfire safety program and how you can help keep your home and community safe visit PG&E.COM/wildfiresafety."

"Wildfire season is here and we all need to be ready to address the growing wildfire threat. PG&E has opened a new 24 hour Operations Center the heart of the new community wildfire safety program this Center helps us coordinate with our safety partners and it's directly connected to our new weather stations network so we can monitor and respond to extreme weather conditions even faster we're out right now removing dead trees trimming vegetation back even farther and strengthening existing lines we're working closely with California's mutual aid in emergency response systems and as a last resort we can turn off power in the most extreme weather conditions to help keep you safer wildfire season is longer than ever before winds are stronger and we must all work together to address the growing threat of wildfires to learn more about the community wildfire safety program and how you can help keep your home and community safe visit PGE dot-com slash wildfire safety."

"The greatest dangers up here in the North State are no doubt fires two things happen first the fire department is dispatched and secondly they call PG&E; dispatch center to activate PG&E; first responders to the scene the writing fire department is an extremely proud and busy department facing limited firefighter staffing with nearly 15,000 calls out of eight stations we depend very heavily on mutual aid with our neighboring fire agencies and PG&E is a big part of that effort. We rely on PG&E extensively not only for the technical expertise and the resources that they have but getting there quickly so that we can free up critical emergency response resources their expedient response and their professional services are essential to the successful outcome of any incident and to that end our relationship has been very healthy collectively and collaboratively we make a difference and I'm very proud of what we do every day here in Redding"

"Every fire department every police department is part of a bigger picture that bigger picture is statewide mutual aid California years ago realize the need to work together teamwork is important to protect the community but we have to do it the right way we have a working knowledge and we can reduce the impacts of a small disaster but we need the help of experts PG&E; is an integral part of our emergency response team they're the industry expert with utilities whether it's a gas leak or wired down just having someone there that deals with this every day is is pretty comforting we each bring something to the table that is unique and that is a specialty with all of us working together we can keep all these emergencies small and the fact that we can bring it together and effectively work together it's pretty special they bring their knowledge their tools and equipment and the

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                 54

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 28
of 36

proficiency to get the job done and the whole time I've been in the fire service PG&E; has been there too whatever we need whenever we need it I do count on PG&E; to keep our firefighters safe that's why we ask for their help"

"I'm April Kennedy and I'm an arborist with PG&E; in this years since the onset of the drought more than a hundred and twenty nine million trees have died in California PG&E; prunes and removes over a million trees every year to ensure that hazardous trees can't impact our lands and since the onset of the drought we've doubled our efforts I grew up in the forest out in this area and honestly it's heartbreaking to see all these trees die what guides me is ensuring that the public is going to be safer and that these forests can be sustained and enjoyed by the community in the future"

"Firefighting is a very dangerous profession we have one to two fires a day and when you respond together and you put your lives on the line you do have to surround yourself with experts and for us the expert in gas electric is PG&E; we run about 2,500 to 2,800 fire calls a year and on almost every one of those calls PG&E responding to that call as well and so when we show up to a fire and PG&E shows up with us it makes a tremendous team during a moment of crisis. I rely on them. The firefighters in this department rely on them. And so we have to practice safety every day utilizing PG&E's talent and expertise in that area trains our firefighters on the gas or electric aspect of a fire and when we have an emergency situation we are going to be much more skilled and prepared to mitigate that emergency for all concerned. The things we do every single day that puts ourselves in harm's way and to have a partner that is so skilled at what they do is indispensable and it couldn't ask for a better partner"

"Wildfire season is here. Be prepared by signing up for alerts at PG&E.COM/mywildfirealerts"

"In the years since the onset of the drought more than a hundred and twenty nine million trees have died in California. P&GE [sic] prunes and removes over a million trees every year to ensure that hazardous trees can't impact our lands and since the onset of the drought we've doubled our efforts. I grew up in the forest out in this area and honestly its heartbreaking to see all these trees die. What guides me is ensuring that the public is going to be safer and that these forests can be sustained and enjoyed by the community in the future."

"People like to live where nature is so we've got this wildland-urban interface area we all of our parks and the best way to keep them healthy is to come in and manage them. Hi my name is Eileen Tighly [sic] I'm acting fire chief for East Bay Regional Park District's Fire Department. What keeps me up at night is that people have a short memory they'll forget the Oakland Hills fire storm that happened in 1991. We lost well over 2000 homes. 26 people lost their lives. We really need to stay vigilant especially with climate change. This area California is a fire prone landscape. The one thing that we can control is the fuels. East Bay Regional Park district partners with PG&E to annually find or remove more than 1,000 acres of hazardous vegetation. PG&E is accelerating its wildfire risk

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

reduction program pruning around overhead electrical lines reducing the fuel loads underneath those electrical lines to help reduce the spread of wildfire what we're really doing is making the property that's adjacent to their home safer PG&E; East Bay Regional Parks District and our communities we're all in this together to keep people safe."

218.    Moreover, the continual and/or repeated use and/or dissemination of misleading and/or untrue advertising related to **PG&E's** mitigation measures, including maintenance and inspection of electrical equipment and facilities, as well as vegetation management, used to prevent the risk of wildfires caused by the operation of its equipment, foreseeably and unreasonably misled **PLAINTIFFS** and the residents of Paradise and California, generally, related to the risk of catastrophic wildfires caused by **PG&E's** equipment. And in turn, gave **PLAINTIFFS** and the residents of Paradise and California, generally, a false sense of security.

219.    **PG&E** made further misleading and/or untrue publications regarding its electrical risk management procedures, including precautions **PG&E** claimed to be taking to mitigate the risk of extreme weather conditions. These misleading and/or untrue claims, include but are not limited to, the following **PG&E** news release:

> "**The safety of our customers and the communities we serve is PG&E's top priority.** We know how much our customers rely on electric service and would only consider temporarily turning off power in the interest of safety, and as a last resort during extreme weather conditions. **PG&E has a plan.** We want our customers to have plans, too."

220.    This statement from **PG&E's** Vice President of Electrical Asset Management, Kevin Dasso, fails to mention that de-energization of transmission lines is not included in **PG&E's** "plan" or that **PG&E** may arbitrarily decide not to implement its de-energization plan even when its own stated criteria call for de-energization. Further, **PG&E's** avowed commitment to making safety its top priority is misleading and/or untrue in light of **PG&E's** aforementioned diversion of safety funds for other purposes, runaway executive compensation, and substantial investments in misleading and/or untrue advertising.

221.    Further, **PG&E's** misleading and untrue media posts during the Camp Fire, which indicated that while a wildfire was probable, it had not occurred yet, was over an hour after the

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                                          56

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 30
of 36

1  fire had started, homes had been destroyed, and people were fleeing for their lives. This misleading
2  and untrue media contributed to and/or caused **PLAINTIFFS** and/or residents of Paradise and the
3  surrounding communities, generally, to be misled regarding the existence of a wildfire and/or the
4  imminent and lethal nature of the fire, delaying **PLAINTIFFS's** evacuation efforts and leaving
5  them with no other option than to make a desperate attempt to escape at the last minute.

6      222.   In just three years since 2015, **PG&E** has spent over $37 million dollars promoting
7  itself as a company that places the safety of its customers and operations first. The clear
8  implication is that its budgets and decisions on expenditures for improving its infrastructure and
9  vegetation management practices are safety driven, by a culture which places the safety of the
10  public first and foremost above profits.

11      223.   **PG&E's** rhetoric does not match its actions. **PG&E's** culture pays greater
12  attention to its reputation and performance on Wall Street, that a dedication to ensuring that it has
13  a robust system of risk management over its operations. As set forth hereinabove, **PG&E** routinely
14  delayed safety related projects or slashed budgets for infrastructure improvement, to assure
15  financial performance goals were satisfied.

16      224.   The aforementioned wrongful acts and/or omissions of **DEFENDANTS**, and/or
17  each of them, were done in violation of California Business and Professions Code Section 17500,
18  and it is likely **DEFENDANTS'** wrongful conduct is to reoccur and/or continue into the future.

19      225.   **PLAINTIFFS** hereby seek to enjoin **PG&E** from further exploiting their false and
20  misleading advertising in order to misrepresent their commitment to safety.

21      226.   **PLAINTIFFS** hereby seek restitution of all amount expended for such false and
22  misleading advertising from September 9, 2010 through the present date.

23      227.   As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**,
24  **PLAINTIFFS** have incurred and will continue to incur attorneys' fees due to the conduct of the
25  **DEFENDANTS** in an amount that cannot yet be ascertained, but which is recoverable pursuant to
26  Code of Civil Procedure § 1021.5.

27
28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**

57

Case: 19-30088   Doc# 3436-8   Filed: 08/07/19   Entered: 08/07/19 16:13:52   Page 31
of 36

## TENTH CAUSE OF ACTION
## INJUNCTION UNDER CAL. BUS. & PROF. CODE § 17535
### (Against All Defendants)

228.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

229.    Pursuant to California Business and Professions Code Section 17535, any court of competent jurisdiction may enjoin "any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate [Chapter 1. Advertising [17500-17606]", which includes the prohibition against false advertising in California Business and Professions Code Section 17500.

230.    Pursuant to California Business and Professions Code Section 17535, "any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter," may prosecute an action for injunction. **PLAINTIFFS** have suffered injury in fact and lost money and/or property, as described hereinabove, as a result of **PG&E's** false advertising.

231.    In addition, pursuant to California Business and Professions Code Section 17535, "[a]ny person may pursue representative claims or relief on behalf of others," "if the claimant meets the standing requirements of this section and complies with Section 382 of the Code of Civil Procedure." Since this is a question of common or general interest of many persons, the parties are numerous in this action, and it is impracticable to bring them all before the court, these **PLAINTIFFS** sue for the benefit of all and ask this Court to impose an injunction to halt **PG&E's** false advertising for the benefit of **PLAINTIFFS** and/or the public.

232.    As a direct and legal result of the actions and/or omissions of the **DEFENDANTS**, **PLAINTIFFS** have incurred and will continue to incur attorneys' fees due to the conduct of the **DEFENDANTS** in an amount that cannot yet be ascertained, but which is recoverable pursuant to Code of Civil Procedure § 1021.5.

///

///

///

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 32 of 36

By engaging in the acts and/or omissions alleged in this Complaint, **DEFENDANTS,** and/or each

WHEREFORE, **PLAINTIFFS** pray for relief as set forth below.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, **PLAINTIFFS** pray for judgment against Defendants **PG&E CORPORATION, PACIFIC GAS & ELECTRIC COMPANY,** and **DOES 1 through 20,** and each of them as follows:

**From All DEFENDANTS for Inverse Condemnation:**

1.     Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.     Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3.     Loss of wages, and/or earning capacity;

4.     All costs of suit, including attorneys' fees where appropriate, appraisal fees, engineering fees, and related costs;

5.     Prejudgment interest according to proof;

6.     For such other and further relief as the Court shall deem proper, all according to proof.

**From All DEFENDANTS for Negligence, Public Nuisance, Private Nuisance, Premises Liability, Trespass, Private Action Under Public Utilities Code § 2106, Violation of Health & Safety Code § 13007, and Violation of Cal. Bus. & Prof. Code § 17500:**

1.     Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.     Loss of the use, benefit, goodwill, and enjoyment of **PLAINTIFFS'** real and/or personal property;

3.     Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

4.     Past and future medical expenses and incidental expenses according to proof;

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                                   59

Case: 19-30088    Doc# 3436-8    Filed: 08/07/19    Entered: 08/07/19 16:13:52    Page 33
of 36

5.   Treble damages for wrongful injuries to timber, trees, or underwood on their property as allowed under Civil Code § 3346;

6.   Treble damages in an amount according to proof for injuries to trees as allowed under Code of Civil Procedure § 733;

7.   Exemplary damages in an amount according to proof as allowed under Civil Code § 3294;

8.   Exemplary damages in an amount according to proof for wrongful injuries to animals as allowed under Civil Code § 3340;

9.   Exemplary damages in an amount according to proof as allowed under Public Utilities Code § 2106;

10.  General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, personal injury, and for such other and further relief as the Court shall deem proper, all according to proof;

11.  Imposition of an injunction ordering **DEFENDANTS** to refrain from false advertising related to their wildfire risk mitigation practices, including vegetation management and inspection, maintenance and operation of overhead electrical equipment and restitution of all amounts paid for advertising that falsely promotes the safety of their operations since September 9, 2010;

12.  Imposition of an injunction ordering that **DEFENDANTS**, and each of them, stop continued violation of: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1; (b) General Order No. 165; (c) Public Resources Code §§ 4292, 4293, and 4435; and (d) Public Utilities Code § 451.

13.  Issuance of an order directing **DEFENDANTS** to abate the existing and continuing nuisance they created;

14.  Attorney's fees, expert fees, consultant fees, and litigation costs and expense as allowed under Code of Civil Procedure § 1021.9;

15.  Attorney's fees as allowed under Code of Civil Procedure § 1021.5;

1 16. For all costs of suit incurred;

2 17. Prejudgment interest according to proof;

3 18. For punitive damages as allowed by law; and

4 19. For such other and further relief as the Court shall deem proper, all according to

5   proof.

6          **COTCHETT, PITRE & McCARTHY, LLP**

7

 Dated: 12/10/18    By: _____

8          **FRANK M. PITRE**
           **ALISON E. CORDOVA**

9          *Attorneys for Plaintiffs*

10       STEVEN M. CAMPORA (SBN 110909)
        **DREYER BABICH BUCCOLA WOOD**

11       **CAMPORA, LLP**
        20 Bicentennial Circle

12       Sacramento, CA 95826
        Telephone: (916) 379-3500  Fax: (916) 379-3599

13

14       BRIAN J. PANISH (SBN 116060)

15       **PANISH SHEA & BOYLE, LLP**
        11111 Santa Monica Blvd., Suite 700

16       Los Angeles, CA 90025
        Tele:  (310) 477-1700 Fax:  (310) 477-1699

17

18       MICHAEL A. KELLY (SBN 71460)

19       **WALKUP MELODIA KELLY &**
        **SCHOENBERGER**

20       650 California Street
        San Francisco, CA 94108

21       Tele:  (415) 981-7210 Fax:  (415) 391-6965

22

23       RICHARD L. HARRIMAN (SBN 66124)
        **LAW OFFICES OF RICHARD L. HARRIMAN**

24       1078 Via Verona Drive
        Chico, CA 95973

25       Tele:  (530) 343-1386 Fax: (530) 343-1155

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

COMPLAINT                 61

Case: 19-30088  Doc# 3436-8  Filed: 08/07/19  Entered: 08/07/19 16:13:52  Page 35
of 36

## IX. JURY DEMAND

**PLAINTIFFS** demand a trial by jury as to all claims in this action.

COTCHETT, PITRE & McCARTHY, LLP

Dated: 12/10/18

By: _____
**FRANK M. PITRE**
**ALISON E. CORDOVA**
*Attorneys for Plaintiffs*

STEVEN M. CAMPORA (SBN 110909)
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500 Fax: (916) 379-3599

BRIAN J. PANISH (SBN 116060)
**PANISH SHEA & BOYLE, LLP**
11111 Santa Monica Blvd., Suite 700
Los Angeles, CA 90025
Tele: (310) 477-1700 Fax: (310) 477-1699

MICHAEL A. KELLY (SBN 71460)
**WALKUP MELODIA KELLY & SCHOENBERGER**
650 California Street
San Francisco, CA 94108
Tele: (415) 981-7210 Fax: (415) 391-6965

RICHARD L. HARRIMAN (SBN 66124)
**LAW OFFICES OF RICHARD L. HARRIMAN**
1078 Via Verona Drive
Chico, CA 95973
Tele: (530) 343-1386 Fax: (530) 343-1155

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP