RICHARD A. MARSHACK, #107291
rmarshack@marshackhays.com
DAVID A. WOOD #272406
dwood@marshackhays.com
LAILA MASUD, #311731
lmasud@marshckhays.com
MARSHACK HAYS LLP
870 Roosevelt, Irvine, CA 92620
Tel: 949-333-7777 -/- Fax: 949-333-7778

GERALD SINGLETON, #208783
JOHN C. LEMON, #175847
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, CA 92101
Tel. (619) 771-3473
Email: gerald@slffirm.com
       john@slffirm.com

Attorneys for SLF Fire Victim Claimants

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION,<br><br>    and,<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>            Debtors.<br><br>Affects:<br><br>☐   PG&E Corporation<br><br>☐   Pacific Gas & Electric Company<br><br>☒   Both Debtors<br><br>* All papers shall be filed in Lead Case, No. 19-30088 (DM). | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case Jointly Administered)<br><br>OPPOSITION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) and 502(c) FOR THE ESTABLISHMENT OF WILDFIRE CLAIMS ESTIMATION PROCEDURES<br><br>[Docket No. 3091]<br><br>Hearing:<br>Date:    August 14, 2019<br>Time:    9:30 a.m.<br>Ctrm:    Courtroom 17, 16th Floor<br>Place:   United States Bankruptcy Court<br>         San Francisco, CA 94102 |

/ / /

/ / /

1

OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES

# TABLE OF CONTENTS

1. Summary of Argument ........................................................................................................2

2. Procedural Background .....................................................................................................3

3. Legal Argument .................................................................................................................3

    A. Claims estimation .................................................................................................3

    B. Debtors' Motion is masquerading its true intent, which is to cap victims' potential recovery while denying those same victims due process ..............................4

    C. Alternative proposal to estimation ........................................................................8

4. Conclusion .......................................................................................................................11

Declaration of Gerald Singleton .............................................................................................12

# TABLE OF AUTHORITIES

**Cases**

211 B.R. at 566-67 ........................................................................................................ 6

*Beatrice Co. v. Rusty Jones, Inc.*,
   153 B.R. 535, 536 (N.D. Ill. 1993) ............................................................................ 4

*Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) .................................................................... 6

*In re Apex Oil Co.*,
   107 B.R. 189 (Bankr. E.D. MI 1997) ........................................................................ 4

*In re Frontier Airlines, Inc.*,
   137 B.R. 811, 814 (D. Co. 1992) ............................................................................... 4

*In re N. Am. Health Care, Inc.*,
   544 B.R. 684 (Bankr. C.D. Cal. 2016) ...................................................................... 8

*In re North American Health Care, Inc.*,
   544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) .............................................................. 4

*In re Roman Catholic Archbishop of Portland*,
 339 B.R. 215 (Bankr. D. Or. 2006) ................................................................................. 6
*Libby v. Illinois High School Ass'n*,
 921 F.2d 96 (7th Cir. 1990) ............................................................................................. 4

**Statutes**

11 U.S.C. § 362 .................................................................................................................... 7
11 U.S.C. § 502(c) ........................................................................................................... 3, 4
11 U.S.C. §502(c)(1) ............................................................................................................ 3
11 U.S.C. § 1141(d) ......................................................................................................... 7, 8
28 U.S.C. § 1411(a) ............................................................................................................. 7
28 U.S.C. § 157(b)(c) .......................................................................................................... 5
28 U.S.C. §157(b)(2)(B) .................................................................................................. 3, 5
U.S.C. §§ 101–1532 ............................................................................................................ 3

**Other Authorities**

Collier on Bankruptcy ¶ 502.04[3] (16th ed. 2015) ............................................................. 4
House Report No. 95-595, 95th Cong., 1st Sess. 354 (1977);
Senate Report No. 95-989, 95th Cong., 2nd Sess. 65 (1978),
U.S. Code Cong. & Admin. News 1978, pp. 5851, 6310 ................................................... 4

TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

The Singleton Law Firm ("SLF") and Marshack Hays LLP, together with several other firms, represent approximately 5,200 victims of the fires started by PG&E Corporation ("PG&E") and/or Pacific Gas and Electric Company ("PGE Company," collectively with PG&E the "Debtors") in 2015 ("Butte Fire"), 2017 (the twenty fires collectively referred to as the "North Bay Fires") and 2018 ("Camp Fire").[1] The SLF Claimants submit this opposition ("Opposition") to Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) For the Establishment of Wildfire Claims Estimation Procedures ("Estimation Motion"), filed on July 18, 2019, as Docket No 3091.

## 1. Summary of Argument

On January 29, 2019, Debtors filed voluntary Chapter 11 petitions under Title 11 of the United States Bankruptcy Code ("Petition Date"). Debtors' stated reason for seeking bankruptcy protection was that they were facing $30 billion in damages from the 2015 Butte Fire, the 2017 North Bay Fires (18 fires in 10 Northern California counties), and the 2018 Camp Fire. Together, these fires burned nearly 500,000 acres, killed over 100 people, destroyed almost 20,000 homes, and left tens of thousands of people homeless.

The SLF Claimants consist of individuals from each of the three major fires: the 2015 Butte Fire (coordinated in Superior Court of California, County of Sacramento under JCCP Number 4853), the 2017 North Bay Fires (coordinated in the Superior Court of California, County of San Francisco under JCCP Number 4955), and the 2018 Camp Fire (which had not been coordinated or consolidated at the time of the Petition Date). The SLF Claimants sustained damages in each of the eighteen major North Bay Fires. Accordingly, the SLF Claimants comprise a more complete representative group of fire victims than any other group in this proceeding.

---

[1] The claimants represented by SLF, Marshack Hays LLP, and other firms are jointly referred to as the "SLF Claimants."

This Court must decide how to square each wildfire victim's right to an individual determination of damages (which due process requires) with the necessity of resolving 20,000 to 30,000 claims within a reasonable period of time given the upcoming legislative deadline of June 30, 2020. However, the estimation process proposed by Debtors in the Motion fails to account for the due process rights of each wildfire victim. The SLF Claimants propose an alternative methodology, which has been previously employed, to promptly resolve outstanding matters with the ultimate goal of meeting the June 30, 2020, California Legislative Deadline in AB-1054.

## 2. Procedural Background

Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) & 1108. Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("FRBP"). On February 12, 2019, the United States Trustee ("U.S. Trustee") appointed an Official Committee of Unsecured Creditors ("Creditors Committee"). A torts claimants committee has also been formed ("TCC").

None of the SLF Claimants are members of the TCC.

On July 18, 2019, as Dk. No. 3091, Debtors filed the instant Motion seeking to establish wildfire claims estimation procedures.

## 3. Legal Argument

### A. Claims estimation

Pursuant to 11 U.S.C. § 502(c), a bankruptcy court can estimate contingent or unliquidated claims to establish the amount (if any) distributable to those claim holders under the plan if liquidation of the claims would "unduly delay the administration of the case" 28 U.S.C. §157(b)(2)(B); 11 U.S.C. §502(c)(1). The essence of Section[2] 502(c) is that "all claims against the debtor be converted into dollar amounts."[3] If the goal of avoiding undue delay can be achieved

---

[2] Unless otherwise indicated, all Chapter and Section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[3] House Report No. 95-595, 95th Cong., 1st Sess. 354 (1977); Senate Report No. 95-989, 95th

3

*through a limited mode or form of claim estimation, a bankruptcy court ought not to expand the estimation's scope beyond this limited extent absent compelling reasons to do so*. *See In re North American Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016)("Because estimation is a second-best method, the Court concludes that the scope of unliquidated claim estimation in this case should be confined to the extent necessary to accomplish the overarching goal of avoiding undue delay in this case's administration and not expanded beyond that point.") Stated otherwise, the bankruptcy court is not required to estimate a claim for distribution purposes unless it determines that liquidating the claim would unduly delay the case. *In re Apex Oil Co.*, 107 B.R. 189 (Bankr. E.D. MI 1997). Where undue delay is shown, the court must estimate the subject claims only to the extent necessary to accomplish the overarching goal of avoiding undue delay. *In re Frontier Airlines, Inc.*, 137 B.R. 811, 814 (D. Co. 1992).

## B. Debtors' Motion is masquerading its true intent, which is to cap victims' potential recovery while denying those same victims due process.

Section 502(c) states that estimation is "for purpose of allowance under this section." 11 U.S.C. §502(c). As such, "an estimation under section 502(c) generally should result in an allowed claim for all purposes in the bankruptcy case." Collier on Bankruptcy ¶ 502.04[3] (16th ed. 2015). But, even if a bankruptcy court's estimation is not for such a limited purpose, its order allowing or disallowing a claim against a bankruptcy estate has the same effect as any other order of a court of competent jurisdiction. Accordingly, subject to due process limitations, principles of judicial finality apply, including the principles of *res judicata* and collateral estoppel. *See Beatrice Co. v. Rusty Jones, Inc.*, 153 B.R. 535, 536 (N.D. Ill. 1993)(holding that the district court "can reverse a bankruptcy court's decision on the method for ascertaining the value of claims only when it is so fundamentally wrong that no reasonable person could agree with it") (citing to *Libby v. Illinois High School Ass'n*, 921 F.2d 96 (7th Cir. 1990)).

---

Cong., 2nd Sess. 65 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5851, 6310

4
OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES

For purposes of determining plan feasibility and voting issues, Debtors assert that estimation is a core proceeding that is "standard in mass tort bankruptcies." Mot., pg. 3:6-10; pg. 3:13-19. However, Debtors gloss over the fact that estimation "of contingent or unliquidated personal injury tort or wrongful death claims against the estate *for purposes of distribution*" are, in fact, non-core proceedings. *See* 28 U.S.C. § 157(b)(2)(B). Unless all parties consent, bankruptcy judges may not finally determine non-core matters as those matters must be determined by the federal district court. *See* 28 U.S.C. § 157(b)(c).

The Motion constitutes a thinly disguised attempt to execute a claims estimation process for purposes of distribution rather than strictly for voting and plan feasibility purposes. The contradictory nature of the Motion reveals Debtors' actual intent. Initially, Debtors declare that they are seeking claim estimation to "estimate voting and plan feasibility." Mot., pg. 15:6-7. Yet, immediately thereafter, Debtors true motives are revealed:

> ***[w]hether and to what extent the results of that estimating ultimately may be used to determine the amount of consideration to be provided*** to claimants or groups of claimants as part of a Plan, consensual or otherwise, ***is a question that can be determined***, if it is presented at a later stage.

Mot., pg. 15:8-15 (emphasis added).

A careful reading of the proposed phases of estimation confirm that Debtor *is* seeking estimation for purposes of distribution, which is outside this Court's jurisdiction and far beyond the simple goal of avoiding undue delay. Phase 3 of the proposed estimation process is particularly concerning. *See* Mot., pg. 4:21-8:21. In Phase 3, Debtors propose to determine aggregate damages for all claimants, based on a small sampling, and without individualized review:

> Phase 3 would involve the resolution of questions around the likelihood of success of the Wildfire Claims on other issues such as negligence, the recoverability of certain categories of damages (such as the cost of rebuilding damaged structures, rather than the accepted standard of diminution in value, see 6 Witkin, Summary 11th Torts § 1912 (2019) ("the basic and normal rule uses diminution in value as the measure; *i.e.*, the difference between the market value of the land before and after the injury")) ***and the aggregate estimate of overall damages*** based upon sampling of claims and expert testimony.

Mot., pg. 7:19-18:2 (emphasis added).

5

It appears Debtors propose to use the claim estimation process to create a limited fund for payment of all present tort claims, thereby limiting the liability Debtors will have on those claims, all without allowing the SLF Claimants and other tort claimants to conduct discovery. *Id.* Despite Debtors' insistence that the proposed estimation process is for confirmation and voting purposes only, the estimation process may also significantly affect distribution. *See In re Roman Catholic Archbishop of Portland*, 339 B.R. 215 (Bankr. D. Or. 2006).

In *Roman Catholic,* the bankruptcy court ruled that, if the debtor wished to create a trust with a cap on claims, due process likely requires ***individual estimation of claims***, rather than the aggregate estimation process proposed by the Debtor in the Motion, which will divide the claims into a few groups and use the same estimated amount for each claim in the given group. *Id*. The Court explained, "[a] claimant's right to a remedy for tortious behavior could be substantially and irreversibly affected by the estimation, where estimation is being used to establish a cap on the fund that will be available to pay liquidated claims, and that fund could prove to be inadequate if the estimate is too low. In that circumstance, due process likely requires an individualized estimation of claims, as opposed to the aggregate estimation process debtor proposes." *Id.*, at 223.

Debtors' proposal to use estimation to effectively cap the amount of the fund available to pay all tort claimants is similar to that proposed in *In re Dow Corning Corp*., 211 B.R. 545 (Bankr. E.D. Mich. 1997). In *Dow Corning*, the debtor allegedly sought estimation of the claims to establish the feasibility of the plan and proposed to deposit into a trust a certain amount for payment of pending personal injury claims. The court, however, determined that Dow Corning's strategy behind its request for "estimation of the aggregate value of tort claims is to limit the amount it will ultimately have to pay on account of tort liability." 211 B.R. at 566-67. The Michigan bankruptcy court explained that Dow Corning "assumes that estimation will lead to a discharge of all liability and that individual post-confirmation liquidation can only be had against a trust fund established as part of a plan of reorganization ***regardless of whether such liquidation proves that the estimate was too low***." *Id*. at 567. (emphasis added). The bankruptcy court acknowledged:

> Allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when

6
OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES
4843-6147-2671, v. 1
4843-4115-9838v.1 0112895-000001

Case: 19-30088    Doc# 3451    Filed: 08/07/19    Entered: 08/07/19 17:25:58    Page 8 of 17

combined with the effects of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well.

*Id*. at 569.

The bankruptcy court also pointed out that the claimants had a right to a jury trial, and stated "if estimation for plan confirmation purposes results in de facto estimation for distribution purposes via the effects of the plan of reorganization and the discharge provisions of § 1141(d), ***a claimant's right to a jury trial for purposes of liquidating her claim becomes hollow***." *Id*. (emphasis added). Such an outcome would seem to be inconsistent with at least the spirit of 28 U.S.C. § 1411(a), providing as it does that "this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death claim." 28 U.S.C. § 1411(a).

Here, Debtors are attempting to execute a similar plan as Dow Corning. Debtors seek estimation in the aggregate amounts of the tort claims for the purported purpose of confirmation and voting. But, they in fact, intend to use the estimation, along with the bankruptcy court's determination of liability on inverse condemnation and liability for the Tubbs Fire, to cap the amount they will pay on all tort claims, while discharging any actual liability in excess of the estimated amount. This Court does not have jurisdiction to estimate personal injury tort claims for purposes of distribution, which is in effect what Debtors ask this Court to do.

The Motion, although masquerading as an estimation motion, seeks to effectively determine the cap on the amount of money that will be made available to pay the tort claims of the countless victims of the Wildfires. Mot., pg. 7:19-18:2. All without the ability for claimants to conduct discovery. Indeed, in light of the provisions of the automatic stay pursuant to 11 U.S.C. § 362, the SLF Claimants have been unable to engage in discovery since the Petition Date. Such lack of due process is problematic, as through the Motion, the Debtors seek a determination from this Court whether they are liable for the Tubbs Fire. Mot., pg. 6:5-13. All claimants must have the ability to propound and examine discovery if this Court is to determine whether Debtors are liable for the Tubbs fire. Failure to do so would be a deprivation of due process.

7

OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES

It is disingenuous to say the estimated aggregate amount does not constitute a cap on eventual distributions by the Debtors to the tort claimants. Admittedly, the Motion is devoid of an affirmative statement that Debtors will use this estimation process as a basis for capping the tort claims under their eventual plan of reorganization. But, if their eventual Chapter 11 plan of reorganization somehow makes it "uneconomic for jury trials to go forward (although stopping short of outright elimination of the possibility of a jury trial through a Section 1141(d) discharge), the tort claimants effectively would be deprived of their Seventh Amendment right to a jury trial, which …[is]… unfair, prejudicial and an outcome to be avoided. *In re N. Am. Health Care, Inc*., 544 B.R. 684 (Bankr. C.D. Cal. 2016). Simply stated, claimants could suffer abrogation of their right to jury trial. Without exception, estimation should not come at the cost of deprivation of due process.

To the extent the Court is inclined to grant the Motion, SLF Claimants request that any order confirming a plan of reorganization contain a provision whereby the tort claims that have not previously been resolved (through mediation or otherwise) are not discharged under Section 1141(d), but instead will be liquidated in amount through trials in state court or federal district court (or settled in such courts).

### C. Alternative proposal to estimation

Debtors settled nearly 2,000 individual cases (involving over 3,500 plaintiffs) from the 2015 Butte Fire (JCCP 4853). There is a great deal of institutional knowledge among both PG&E and attorneys who are experienced in fire cases regarding the value of individual cases. While some of these cases were settled through formal mediations, the vast majority were settled through informal negotiations between individual plaintiffs' attorneys and outside counsel for PG&E (Quinn Emanuel Urquhart & Sullivan).

The 2015 Butte Fire is one of the 3 major fire complexes (the other two being the 2017 North Bay Fires, JCCP 4955, and the 2018 Camp Fire) in which the wildfire creditors suffered damages. Like the other two fire complexes, the 2015 Butte Fire involved damages to real and personal property, personal injuries, emotional distress, and wrongful deaths. Like the 2017 and 2018 fires, the Plaintiffs in the 2015 Butte Fire asserted causes of action for inverse condemnation, negligence,

4843-6147-2671, v. 1
4843-4115-9838v.1 0112895-000001
Case: 19-30088    Doc# 3451    Filed: 08/07/19    Entered: 08/07/19 17:25:58    Page 10 of 17

and trespass (among others) against PG&E. Accordingly, the settlements in the 2015 Butte Fire cases strongly inform both the parties and the Court as to the appropriate amount of the damages in the bankruptcy proceeding.

As has been the case with prior major fires (for example, the 2007 San Diego Fires), the Butte Fire cases were settled on an individual basis. Each plaintiff presented a demand, received an individual settlement offer, and then determined whether to accept the offer or proceed to trial.

Here, the complex issue of how to reasonably balance the right to individual determinations of damages with the upcoming AB1054 deadline looming is one that will require further briefing, negotiations between the parties, and, in all likelihood, an ultimate decision by the Court. But, as an initial matter, the SLF Fire Victims' Claimants would like to offer the following example from the Butte Fire cases as a starting point for discussion[4]:

- In July 2017, the Singleton Butte Fire Plaintiffs reached an agreement with PG&E for a dispute resolution process that the parties termed "binding mediation." This process was built on a similar "binding mediation" model process that PG&E and the Singleton Firm developed for use in the 2007 San Diego Fires;
- While the precise terms of the process are subject to the mediation privilege, the general terms of the process included; (1) PG&E did not contest liability; (2) victims did not seek punitive damages; and (3) the parties agreed to a basic framework regarding compensatory damages;
- Thereafter, the counsel for PG&E, Quinn Emanuel, and SLF negotiated *each case individually* in an attempt to reach an informal resolution;
- If we were unsuccessful, we could attend a "binding mediation" in which both parties would present their damages evidence to the mediator and attempt to resolve the case;
- Prior to attending the "binding mediation" the parties would agree on a range of

---

[4] *See*, Declaration of Gerald Singleton ¶6-15. The SLF Fire Victim Claimants readily acknowledge that one size does not fit all, and different plaintiffs' groups may reach different agreements with PG&E and/or put forth different proposals to the Court.

9
OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES

> potential damages ("high-low agreement");
> 
> - If mediation was unsuccessful, then the mediator would become an arbitrator and decide on a final settlement amount within the high low agreement that would be binding on the parties.

The above mentioned-process worked extremely well and the parties were able to settle several hundred cases on an individual basis in a short period of time *without having to engage in a single binding mediation*. This process could easily be adapted for use in this bankruptcy proceeding. All it would require is for PG&E to; (1) hire a firm (like Quinn Emanuel) that has institutional knowledge with respect to fire cases and (2) commit the necessary funds to permit enough attorneys from the firm to work on the case to meet the necessary deadline.

While it certainly would require a great deal of work, if both parties proceeded in good faith, the 20,000 to 30,000 individual claims could be resolved on an individual basis prior to the June 30, 2020 deadline imposed by AB1054.

SLF has personally resolved well over 1,000 fire cases, including over 700 from the Butte Fire alone. If Debtors were to employ/dedicate 10-15 experienced fire attorneys to this case, settlements could easily be reached at a 1,000 claims per week. Assuming 30,000 individual fire claims, this would take roughly 30 weeks (i.e., 7-8 months) to resolve. If the proposed process began in September, it would be done by April or May, and in advance of the June 30, 2020 deadline.

Granted, not all cases can be resolved this way, so binding mediations should take place simultaneously for the small number of cases (likely somewhere between 5-10%) that do not resolve informally. Similarly, there will be certain catastrophic cases (specifically, wrongful deaths and serious personal injuries) for which the claimants will demand a trial. However, since these cases are not numerous (the total number wrongful deaths from all fires is roughly 130, and that includes 25 from the Tubbs Fire, while the number of serious injury cases is commensurate), they could also be completed prior to June 30, 2020.

While this just one suggestion, the idea is that it is possible for this Court to fashion a solution for distributing funds which grants each individual fire victim his/her due process right to a

meaningful individual determination of his/her damages while completing the process by June 30, 2020. While the task ahead certainly is daunting, it is not impossible. The Court should not succumb to Debtors' suggestion that, given the large number of claims, it must resolve these cases using a matrix (or similar group estimation) that does not fully take into account the individual damages suffered by each of Debtors' victims.

## 4. Conclusion

Rather than allow victims their day in the proper forum to determine liability and damages or have the opportunity to fully present their individual damages in a streamlined process, Debtors seeks to short cut due process and ram a proposal for all victims – *regardless of each individual's rights*- down everyone's throats. For the reasons set forth above, SLF Fire Claimants respectfully request that the Motion be denied.

Dated: August 7, 2019    MARSHACK HAYS LLP

By: _____
RICHARD A. MARSHACK
DAVID A. WOOD
LAILA MASUD
Attorneys for SINGLETON LAW FIRM
FIRE VICTIM CLAIMANTS

Dated: August _7_, 2019    SINGLETON LAW FIRM, APC

By: _____
GERALD SINGLETON
AMANDA W. LOCURTO
Attorneys for SINGLETON LAW FIRM
FIRE VICTIM CLAIMANTS

11
OPPOSITION TO DEBTOR'S MOTION TO ESTABLISH WILDFIRE CLAIMS ESTIMATION PROCEDURES

4843-6147-2671, v. 1
4843-4115-9838v.1 0112895-000001

# Declaration of Gerald Singleton

I, Gerald Singleton declare as follows:

1. I am an individual over 18 years of age and competent to make this Declaration.

2. If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3. The facts set forth below are true of my personal knowledge.

4. I am an attorney with the Singleton Law Firm ("SLF"). SLF and Marshack Hays LLP, together with several other firms, represent approximately 5,200 victims of the fires started by PG&E Corporation ("PG&E") and/or Pacific Gas and Electric Company ("PGE Company," collectively with PG&E the "Debtors") in 2015 ("Butte Fire"), 2017 (the twenty fires generally referred to as the "North Bay and Wind Complex Fires") and 2018 ("Camp Fire").[5]

5. I make this declaration in support of the SLF Fire Victim Claimants opposition ("Opposition") to PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company ("Utility"), as debtors and debtors in possession (collectively, "PG&E" or the "Debtors") Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) For the Establishment of Wildfire Claims Estimation Procedures ("Estimation Motion"), filed on July 18, 2019, as Docket No 3091.

6. From the 2015 Butte Fire (JCCP 4853), Debtors have settled nearly 2,000 individual cases (involving over 3,500 plaintiffs). My firm and I have personally resolved well over 1,000 fire cases, including over 700 from the Butte Fire alone. Based on this experience, I believe there is a great deal of institutional knowledge among both PG&E and attorneys who are experienced in fire cases regarding the value of individual cases.

7. While some of these cases were settled through formal mediations, the vast majority were settled through informal negotiations between individual plaintiffs' attorneys and outside counsel for PG&E (Quinn Emanuel Urquhart & Sullivan).

///

---

[5] The claimants represented by SLF, Marshack Hays LLP and other firms are jointly referred to as the "SLF Claimants."

13

DECLARATION

8. The 2015 Butte Fire is one of the 3 major fire complexes (the other two being the 2017 North Bay Fires, JCCP 4955, and the 2018 Camp Fire) in which the wildfire creditors suffered damages. Like the other two fire complexes, the 2015 Butte Fire involved damages to real and personal property, personal injuries, emotional distress, and wrongful deaths. Like the 2017 and 2018 fires, the Plaintiffs in the 2015 Butte Fire asserted causes of action for inverse condemnation, negligence, and trespass (among others) against PG&E. Accordingly, the settlements in the 2015 Butte Fire cases strongly inform both the parties and the Court as to the appropriate amount of the damages in the bankruptcy proceeding.

9. As has been the case with prior major fires (for example, the 2007 San Diego Fires), the Butte Fire cases were settled on an individual basis. Each plaintiff presented a demand, received an individual settlement offer, and then determined whether to accept the offer or proceed to trial.

10. Here, the complex issue of how to reasonably balance the right to individual determinations of damages with the upcoming AB1054 deadline looming overheard is one that will require further briefing, negotiations between the parties, and, in all likelihood, an ultimate decision by the Court. But, as an initial matter, I would like to offer the following example from the Butte Fire cases as a starting point for discussion[6]:

- In July 2017, the Singleton Butte Fire Plaintiffs reached an agreement with PG&E for a dispute resolution process that the parties termed "binding mediation." This process was built on a similar "binding mediation" model process that PG&E and the Singleton Firm developed for use in the 2007 San Diego Fires;

- While the precise terms of the process are subject to the mediation privilege, the general terms of the process included; (1) PG&E did not contest liability; (2) victims did not seek punitive damages; and (3) the parties agreed to a basic framework

---

[6] In so doing, the SLF Fire Victim Claimants readily acknowledge that one size does not fit all, and different plaintiffs' groups may reach different agreements with PG&E and/or put forth different proposals to the Court.

regarding compensatory damages;

- Thereafter, the counsel for PG&E, Quinn Emanuel, and my firm negotiated *each case individually* in an attempt to reach an informal resolution;
- If we were unsuccessful, we could attend a "binding mediation" in which both parties would present their damages evidence to the mediator and attempt to resolve the case;
- Prior to attending the "binding mediation" the parties would agree on a range of potential damages ("high-low agreement");
- If mediation was unsuccessful, then the mediator would become an arbitrator and decide on a final settlement amount within the high low agreement that would be binding on the parties.

11. The above mentioned-process worked extremely well and the parties were able to settle several hundred cases on an individual basis in a short period of time ***without having to engage in a single binding mediation***. This process could easily be adapted for use in this bankruptcy proceeding. All it would require is for PG&E to; (1) hire a firm (like Quinn Emanuel) that has institutional knowledge with respect to fire cases and (2) commit the necessary funds to permit enough attorneys from the firm to work on the case to meet the necessary deadline.

12. While it certainly would require a great deal of work, if both parties proceeded in good faith, the 20,000 to 30,000 individual claims could be resolved on an individual basis prior to the June 30, 2020 deadline imposed by AB1054.

13. My firm has personally resolved well over 1,000 fire cases, including over 700 from the Butte Fire alone. If Debtors were to employ/dedicate 10-15 experienced fire attorneys to this case, settlements could easily be reached at a 1,000 claims per week. Assuming 30,000 individual fire claims, this would take roughly 30 weeks (i.e., 7-8 months) to resolve. If the proposed process began in September, it would be done by April or May, and in advance of the June 30, 2020 deadline.

///

14. Granted, not all cases can be resolved this way, so binding mediations should take place simultaneously for the small number of cases (likely somewhere between 5-10%) that do not resolve informally. Similarly, there will be certain catastrophic cases (specifically, wrongful deaths and serious personal injuries) for which the claimants will demand a trial. However, since these cases are not numerous (the total number wrongful deaths from all fires is roughly 130, and that includes 25 from the Tubbs Fire, while the number of serious injury cases is commensurate), they could also be completed prior to June 30, 2020.

15. While this just one suggestion, the idea is that it is possible for this Court to fashion a solution for distributing funds which grants each individual fire victim his/her due process right to a meaningful individual determination of his/her damages while completing the process by June 30, 2020. While the task ahead certainly is daunting, it is not impossible.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2019.

*Gerald Singleton*

GERALD SINGLETON