1     UNITED STATES BANKRUPTCY COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3        -oOo-

4 In Re:       ) Case No. 19-30088
           ) Chapter 11
5 PG&E CORPORATION AND PACIFIC )
 GAS AND ELECTRIC COMPANY  ) San Francisco, California
6          ) Wednesday, August 7, 2019
       Debtor. ) 9:30 AM
7 _____ )
           MOTION OF THE OFFICIAL
8           COMMITTEE OF TORT CLAIMANTS
           TO COMPEL PRODUCTION OF
9           THIRD-PARTY CONTRACTOR
           DOCUMENTS
10
           STATUS CONFERENCE RE
11          DISCOVERY

12     TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE DENNIS MONTALI
13     UNITED STATES BANKRUPTCY JUDGE

14 APPEARANCES:
 For the Debtors:    KEVIN J. ORSINI, ESQ.
15          (Telephonically)
          Cravath, Swaine & Moore LLP
16          825 Eighth Avenue
          New York, NY 10019
17          (212)474-1596

18 For the Debtors:    TOBIAS S. KELLER, ESQ.
          JANE KIM, ESQ.
19          (Telephonically)
          Keller & Benvenutti LLP
20          650 California Street
          Suite 1900
21          San Francisco, CA 94108
          (415)796-0709
22

23 For the Debtors:    STEPHEN KAROTKIN, ESQ.
          (Telephonically)
          Weil, Gotshal & Manges LLP
24          767 Fifth Avenue
          New York, NY 10153
25          (212) 310-8350

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1
    For High Speed Rail          PAUL J. PASCUZZI, ESQ.
 2  Authority, California        (Telephonically)
    Resources Board,             Felderstein Fitzgerald Willoughby
 3  California Department of      & Pascuzzi LLP
    Toxic Control, et al.:       500 Capitol Mall
 4                               Suite 2250
                                 Sacramento, CA 95814
 5                               (916)329-7400

 6  For State of California:     ANNADEL ANGELINE ALMENDRAS, ESQ.
                                 (Telephonically)
 7                               California Department of Justice
                                 455 Golden Gate Avenue
 8                               Suite 11000
                                 San Francisco, CA 94102
 9                               (415)510-3367

10  For California Department    TRACY LYNN WINSOR, ESQ.
    of Enforcement of Fire       (Telephonically)
11  Protection:                  California Department of Justice
                                 1300 I Street
12                               Suite 125
                                 Sacramento, CA 95814
13                               (916) 210-7796

14  For Travelers Insurance      MARK CHARLES BAUMAN, ESQ.
    Company and Hartford         ADRIAN SCOTT LOEWE, ESQ.
15  Insurance Company:           (Telephonically)
                                 765 East Bell Road
16                               Suite 210
                                 Scottsdale, AZ 85260
17                               (480) 502-4664

18  For Liberty Mutual           KEVIN DALE BUSH, ESQ.
    Insurance:                   (Telephonically)
19                               Cozen & O'Connor
                                 501 West Broadway #1610
20                               San Diego, CA 92101
                                 (619) 685-1716
21
    For Becky Christensen:       STEVEN M. CAMPORA, ESQ.
22                               (Telephonically)
                                 Dreyer Babich Buccola Wood
23                               Campora, LLP
                                 20 Bicentennial Circle
24                               Sacramento, CA 95826
                                 916-379-3500
25
```

```
 1
    For Official Committee of    ERIC EVAN SAGERMAN, ESQ.
 2  Tort Claimants:              CECILY A. DUMAS, ESQ.
                                 ROBERT A. JULIAN, ESQ.
 3                               KIMBERLY S. MORRIS, ESQ.
                                 (Telephonically)
 4                               Baker & Hostetler LLP
                                 11601 Wilshire Boulevard
 5                               Suite 1400
                                 Los Angeles, CA 90025
 6                               (310) 820-8800

 7                               LARS TERENCE FULLER, ESQ.
                                 (Telephonically)
 8                               Baker & Hostetler LLP
                                 1801 California Street
 9                               Suite 4400
                                 Denver, CO 80202
10                               303.764.4114

11                               KODY D. L. KLEBER, ESQ.
                                 (Telephonically)
12                               Baker & Hostetler LLP
                                 811 Main Street, Suite 1100,
13                               Houston, TX 77002
                                 (713) 751-1600
14
    For Public Utilities         SANDER L. ESSERMAN, ESQ.
15  Impacted by the Wildfires:   (Telephonically)
                                 Stutzman, Bromberg, Esserman &
16                               Plifka
                                 2323 Bryan Street
17                               Suite 2200
                                 Dallas, Texas 75201
18                               (214) 969-4910

19  For California Public        BRIAN S. HERMANN, ESQ.
    Utilities Commission:        ALAN KORNBERG, ESQ.
20                               (Telephonically)
                                 Paul, Weiss, Rifkind, Wharton &
21                               Garrison LLP
                                 1285 Avenue of the Americas
22                               New York, NY 10019
                                 (212) 373-3000
23

24

25
```

```
 1
    For Severson & Werson:      BERNARD JARON KORNBERG, ESQ.
 2                              (Telephonically)
                                Severson & Werson
 3                              1 Embarcadero Center
                                Suite 2600
 4                              San Francisco, CA 94111
                                (415) 398-3344
 5
    For Official Creditor's     ANDREW M. LEBLANC, ESQ.
 6  Committee:                  (Telephonically)
                                Millbank LLP
 7                              1850 K Street, NW
                                Suite 1100
 8                              Washington, DC 20006
                                (202) 835-7500
 9
    For Court Claimants:        RICHARD ALAN MARSHACK, ESQ.
10                              (Telephonically)
                                Marshack Hays LLP
11                              870 Roosevelt
                                Irvine, CA 92620
12                              (949) 333.7777

13  For Ad Hoc Group of         BENJAMIN P. MCCALLEN, ESQ.
    Subrogation Claimholders:   (Telephonically)
14                              Willkie Farr & Gallagher LLP
                                787 Seventh Avenue
15                              New York, NY 10019
                                (212) 728 8182
16

17
    Court Recorder:             JOHN BOLTS
18                              United States Bankruptcy
                                Court
19                              450 Golden Gate Avenue
                                16th Floor
20                              San Francisco, CA 94102

21  Transcriber:                JENNIFER HAMILTON
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (973)406-2250
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

PG&E Corporaation; Pacific Gas & Electric Company

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, AUGUST 7, 2019, 9:32 AM

2                              -oOo-

3         (Call to order of the Court.)

4              THE CLERK:  Court is now in session, the Honorable

5    Dennis Montali presiding.  The matter of PG&E Corporation.

6              THE COURT:  All right, good morning, counsel on the

7    phone.  I thought, with my invitation for a phone conference,

8    that somebody would come to court, but here I have an empty

9    courtroom, so what a cha -- what a deal.

10             Let me just double-check if my four invited guests are

11   on the call.

12             Mr. Julian, are you there?

13             MR. JULIAN:  Yes, Your Honor.  And with me are

14   Kimberly Morris and Kody Kleber, who are hand -- who are

15   handling the discovery issues since they arose.

16             THE COURT:  Okay, and Mr. Fuller, are you with us?

17             MR. FULLER:  Yes, Your Honor.  Good morning.

18             THE COURT:  Good morning.

19             And Mr. Karotkin?

20             Mr. Karotkinon the call?

21             No?  How about Mr. Orsini?

22             Well, that's not encouraging, those are the two people

23   I wanted on the phone.  I have Mr. Orsini's name on the call

24   list.  Our -- is anyone from Mr. Orsini's firm on the call?

25             Hm.  Well, this is going to be a quick hearing.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    Mr. Julian, have you been in touch with either -- or

2    particularly Mr. Orsini about the discovery issues?

3    MR. ORSINI:  Hello, Your Honor?

4    THE COURT:  Yeah.  Hello?

5    MR. ORSINI:  Is anyone here?

6    THE COURT:  All right, let's try again.  Who was that

7    who just spoke up?  Was that Mr. Orsini?

8    MR. ORSINI:  It is, Your Honor.  I don't know why you

9    were unable to hear me the first couple of times

10   (indiscernible) my line, I apologize --

11   THE COURT:  Okay.

12   MR. ORSINI:  -- but I am here.

13   THE COURT:  How about Mr. Karotkin?

14   No?  Well, okay.  Well, all right.  I wanted -- the

15   reason I asked Mr. Julian and Mr. Orsini, you were the

16   principal counsel that were sort of in point position on these

17   discovery issues.  I realize that both of you are supported by

18   lots of other lawyers or nonlawyers and, again, my purpose

19   isn't to do anything other than to try to get the word out.

20   So let me just run through a short list of things, and

21   then I'll see what I want to hear from any of you and any of

22   the other counsel on the phone.  There were a number of items

23   on my list.  The first one, there was, just again, one of these

24   miscommunications that I want to avoid going forward.  The TCC

25   filed a motion to compel regarding third-party documents on

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    July 25th, and somehow it managed to get on the August 9th

2    calendar before there was even a request for shortened time, or

3    maybe that it was at the same time, and I was not that

4    interested in having things on that August 9th calendar

5    because, first of all, I have other matters, non PG&E matters,

6    and that -- and then, secondly, that was the specific date

7    reserved for any report back from CPUC and the Governor's

8    Office and the continued hearing on the two contested motions

9    pertaining to compensation matter.  And so I just didn't want

10   it to get on with the discovery -- any discovery issues,

11   because of the congestions.

12          And so that's why, on the 29th of July, I issued the

13   order that led to today's hearing, and said I would take up

14   that motion to compel today, August 7th.  Well, the very next

15   day, the TCC set that motion to compel regarding third-party

16   documents out to the end of August on the 27th, and I'm

17   wondering:  did they --

18          Wait, I have a correction here.

19          What?

20       (Court and clerk confer.)

21          THE COURT:  Okay.  Okay, Mr. Karotkin, you're on the

22   call now?

23          MS. KIM:  Actually, this is Jane Kim.  I'm trying to

24   get him conferenced in.

25          THE COURT:  Okay, Okay.  Well, let me go forward.  I

PG&E Corporaation; Pacific Gas & Electric Company

1  want to move on.

2         So when the TCC then, a day after I said I wanted to

3  hear the motion to compel today, and the TCC set it over for

4  August 27th.  I'm not going to make a big deal of it.  I'm not

5  going to take it up today, even though I said I was going to.

6  But I want to make sure that everybody in this complicated case

7  with so many lawyers in so many places dealing with it, just we

8  be on the same page.

9         And so I'm going to ask again if I set something,

10  please don't mess around with the schedule, unless you get --

11  clarify from me.  So I don't need any discussion about it.  I'm

12  not going to take up the motion to compel because I'll write it

13  off to a -- just a failure of communication and not any

14  mischief.  So I had -- and then I wanted to --

15         MR. KLEBER:  Your --

16         THE COURT:  -- I wanted to just -- oh, yes, sir,

17  someone wanted to speak?

18         MR. KLEBER:  Your Honor, this is Kody Kleber.  First

19  of all, we represent the TCC.

20         I apologize for any confusion with regard to that

21  setting of the motion to compel.  I just want to say that we

22  interpreted your order as denying the motion to shorten time,

23  and that's the reason why we set it for that later date.  We

24  are, of course, prepared to move forward and argue that today

25  if we're permitted to do so.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    THE COURT:  Well, I denied the shorten time, but set

2    the time, and then the next day, it got set.

3    And Mr. Kleber, I'm not looking for an apology, I'm

4    not mad at anybody, and I'm not even prepared to discuss the

5    motion to compel today because I understood what was happening.

6    So but and further to the whole question of -- I just

7    want to make sure we communicate both my chambers and my staff,

8    and then all of the various counsel representing so many

9    people, that we don't get at further cross-purposes.

10   So after this discussion back-and-forth about the

11   motion, then on July 26th, I received a letter from other

12   counsel from the TCC asking for a discovery conference

13   regarding a number of matters that are on the subject -- you

14   know, on the agenda for today.  And again, my observation is

15   simply that the ships are passing in the night slightly on

16   matters that -- ships don't need to pass in the night, we need

17   to make progress down on the -- on the voyage.

18   So I guess I'm going to encourage each firm and each

19   constituency to make sure there's some sort of internal

20   consistent coordination as to dates for requested hearings or

21   discovery conference or anything that I or my staff or our

22   responsibility falls.

23   So let's not -- let's not spend any more time on it.

24   I'm not -- I'm not going to, and none of you need to.

25   Taking the matters that are left for today in kind of

PG&E Corporaation; Pacific Gas & Electric Company

1    an order of simplicity to more complex, they only thing that

2    was an action item that I got from the official creditors'

3    committee, not the fire -- not the TCC, but the official

4    unsecured creditors committee is Mr. Leblanc's letter of August

5    1st.  And Mr. Leblanc is asking for information about the

6    BrownGreer portal, and I'm -- I can ask Mr. Leblanc to tell me

7    where things stand on that.

8         But to the extent that it might be something that Mr.

9    Orsini and the debtor is going to tell me about, generally, on

10   what's ex -- what's expected from the debtor or from others is

11   part of the suggestion that was in the statement from Weil,

12   Gotshal that maybe there's been some resolution of all these

13   matters.

14        So why don't I ask Mr. Orsini if you can help me on

15   that broader subject?  So I'm looking at the debtors' response

16   that was filed to my order.  It was filed on the 5th.  It's

17   docket 3371, and it's lengthy.  And the first topic is what the

18   debtor is waiting for from the TCC and the subrogation group.

19   Instead of talking about that, let's go to the second topic, or

20   the conclusion of that portion of the filing, that says that

21   the debtors and the wildfire claimants are working on an

22   agreement that wil provide some sort of a consensual

23   resolution.

24        So Mr. Orsini, is there anything to report in a

25   discovery context in that -- in that subject, or not?

PG&E Corporaation; Pacific Gas & Electric Company

1    As the Court knows, we haven't been able to do that

2 yet, but data is very important to that effort and so we're

3 working on this agreement to try to move those discussions

4 forward and also permit the use of BrownGreer to bring a

5 significant number of wildfire claims into the bankruptcy

6 proceeding as quickly as possible to assist people in meeting

7 their obligations under the bar date.

8    So we're not quite over the goal line yet.  We have

9 extended the return date on the subpoena we served on

10 BrownGreer until August 9th with the goal of trying to wrap up

11 the agreement by then.  If we're unable to do so, then we'll

12 need to come back to the Court and ask the Court to resolve the

13 disputed issue of access to BrownGreer.  I remain hopeful that

14 we won't wind up there, but that's the current status.

15    THE COURT:  Okay.  Well, so I take it, then, Mr.

16 Orsini, that to the extent that there are topics in your

17 response, under Roman I, "Debtors' Request for TCC", that that

18 covers much of that.  And that's on hold, then, consistent with

19 what you said; is that a fair statement?

20    MR. ORSINI:  I think there are some issues that are

21 separate and apart from the BrownGreer database that are listed

22 in Section I.  For example, informational support, the overall

23 fifty-four billion dollar figure that --

24    THE COURT:  Right.

25    MR. ORSINI:  -- the TCC has --

PG&E Corporaation; Pacific Gas & Electric Company

1          THE COURT:  No, I understand.

2          MR. ORSINI:  -- put forward.

3          THE COURT:  I understand.

4          MR. ORSINI:  So I do think there will be some -- yeah.

5    I do think even if we can secure the BrownGreer agreement,

6    there might be some other discovery items we're seeking.  We

7    have requested to meet and confer with the TCC about those.  We

8    haven't yet been able to do that.  But I don't think that

9    there's anything ripe for discussion today, but it is all of a

10   kind, which is trying to get to the bottom of what these claims

11   are valued at, since that is the core (indiscernible).

12         THE COURT:  Well, no, of course.  I understand.  And

13   if you're satisfied, you, on behalf of the debtors, are

14   satisfied at least where things stand and don't want me to act

15   on paragraph I of your report, I won't.  And therefore, no one

16   else who was, perhaps, on the other side of that dispute needs

17   to even be heard.  I'm not going to interject myself in what's

18   going forward, and so I'll leave it to you, Mr. Orsini.  Should

19   we put this entire topic number I on hold, or not at this

20   point?

21         MR. ORSINI:  I think that would be -- no, I think that

22   would be prudent, Your Honor.  We will obviously not be shy

23   about asking for your help if we need it, but let us continue

24   the discussions and come back when they're ripe for

25   adjudication.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1          THE COURT:  Okay.  And Mr. Leblanc, are you with us on

2    the call?

3          MR. LEBLANC:  Yes.

4          THE COURT:  And --

5          MR. LEBLANC:  Yes, Your Honor, I am.  I was just about

6    to speak up.

7          THE COURT:  Okay.  Well, it was your letter that had

8    this one issue, so --

9          MR. LEBLANC:  Yeah.

10          THE COURT:  -- are you comfortable with where things

11    stand?

12          MR. LEBLANC:  I am, Your Honor.  We filed our letter

13    at the time that you had asked for those types of letters from

14    other parties, so we wanted to make it clear that we had this

15    open issue.

16          We've been working -- Mr. Orsini has kept us involved

17    and kept us in the loop and, in fact, the draft of the

18    agreement provides access not only to the debtors, but also to

19    the UCC and its professionals.  And so we're satisfied with

20    that, assuming that stays on course.  Our issue can equally be

21    tabled to let those discussions run to fruition.

22          THE COURT:  Okay.  That's fine.  Again, same thing.

23    I'm not going to interject myself into this.  You gentlemen

24    know what you're doing better than I do.

25          So before I go to open items from the TCC, let me go

(972) 660-2210 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1   to the Willkie Farr letter.  And that's -- I'm sorry.  Let me

2   get the right document here.  Too many documents come through

3   the mail here.

4          There was a short list of items that the subrogation

5   committee has asked for, and I have managed to set aside what

6   I'm looking for.  Here it is.  Well, I don't know where it is.

7          So let me hear from the subrogation counsel.  Are

8   things stand -- where do things stand from what -- your request

9   for information?

10         MR. MCCALLEN:  Sure, Your Honor.  This is Benjamin

11  McCallen at Willkie Farr & Gallagher on behalf of the

12  subrogation committee.

13         THE COURT:  Right.

14         MR. MCCALLEN:  Your Honor, since the TCC and the ad

15  hoc subrogation group sent their letters to the Court, we've

16  started a meet-and-confer process with the debtors.  From our

17  perspective, Your Honor, we want to do this as efficiently and

18  quickly as possible, and I think there's some ways that we can

19  do that.

20         You know, the key issue, from our perspective, is

21  getting access to the physical evidence that is in the debtors'

22  possession and CAL FIRE's possession to conduct physical

23  examinations.  That was part of our meet-and-confer discussion

24  with the debtors earlier this week.  My understanding, and Mr.

25  Orsini will correct me if I'm wrong, but he's generally

PG&E Corporaation; Pacific Gas & Electric Company

1    speaking in agreement that that's something that can and should

2    move forward, provided that we can get an agreement in place to

3    have all parties involved in that and to do it in a sensible

4    fashion going forward that everybody can participate in.

5         And so I think, Your Honor, from my perspective, I

6    think that the issues related to the physical evidence, I think

7    we're going to be able to come to agreement on that.  And I

8    don't want to bring something to Your Honor prematurely if we

9    can come to an agreement on our own.  So I think for the time

10   being, in the hope that we can reach an agreement with the

11   debtors, we can take those issues off the table.

12        The one issue which I think could be dealt with today,

13   Your Honor, because I don't want to bring issues prematurely to

14   the Court, is that the TCC has obviously served a lot of

15   discovery requests, and we'll get into those in a minute.  And

16   in particular, anything that the TCC is asking for that is

17   relevant to wildfire claims is going to be equally relevant to

18   our claims.  And in fact, for the final request category we

19   have in there, which is documents supporting estimates or

20   projections of wildfire claim amounts as set forth in public

21   and court filings by the debtors, and the debtors have

22   responded saying that they have produced all nonprivileged

23   documents to responsive to these requests of the TCC, but those

24   productions have not been made to us.

25        And so I think, Your Honor, one issue that we could

PG&E Corporaation; Pacific Gas & Electric Company

1    address today -- and I don't know if any parties will have any

2    objection to this because, frankly, we haven't had a chance to

3    discuss it, but is an agreement that any materials that are

4    produced to the TCC in response to their requests on the

5    wildfire claims would come to us as well, which would allow us,

6    I think, Your Honor, to streamline and focus our requests on

7    supplemental or additional things the TCC hasn't already

8    requested.

9         THE COURT:  Okay.  Mr. McCallen, I'll ask Mr. Orsini

10   or anyone else from the law firm to respond, but in one -- I

11   located what I couldn't find a moment ago, and indeed, it was

12   the filing that you made on the 1st, number 3352, and that was

13   the one that had a list of about eight items.  The first ones

14   were the nondestructive examination of physical evidence, and

15   I'm going to assume that the others on that list, policies and

16   practices and procedures and the de-energizing and depositions

17   and so on, that's under control for now.

18        Mr. Orsini, or someone on your side, do you have a

19   problem with Mr. McCallen's request that whatever you give to

20   the TCC can go to the subrogation group, at least in the way

21   it's referred --

22        MR. ORSINI:  Your --

23        THE COURT:  -- referred to in his statement?

24        Yes, go head.

25        MR. ORSINI:  Yes, Your Honor, this is Kevin Orsini.

PG&E Corporaation; Pacific Gas & Electric Company

1    I, candidly, thought that they already had a copy of those, so

2    I certainly have no objection to getting them a copy of those.

3    I do think that it obviously makes sense for the ad hoc

4    subrogation group to get any of the discovery that we are

5    providing with respect to wildfire liability issues, since they

6    have wildfire liability claims.

7           THE COURT:  Okay.

8           MR. ORSINI:  So I don't think there's any issue there.

9           THE COURT:  Okay.  Well, I'm glad you said that

10   because it seemed to me that that's the sensible approach.

11          But Mr. Orsini, as long as I've got you speaking

12   again, I want to go back to something that I'm unclear about

13   that you said.  And this is -- what I'm looking at now is the

14   BakerHostetler -- that means signed by Mr. Julian -- letter of

15   July 26th, and that was the letter that triggered my need, my

16   sense that I better get moving on this discovery request.

17          And Exhibit 2 to Mr. Julian's letter includes an email

18   from you to Mr. Macon that I -- I guess I don't know who Mr.

19   Macon is, but I can guess who he is.  And what your statement

20   concerned me in your letter, your email, was that since your

21   group, meaning the subrogation group, has moved to lift the

22   stay related to Tubbs, we think the Court needs to resolve the

23   question of how these wildfires -- issues will be addressed in

24   these proceedings before we embark on a path of discussing

25   specific discovery demands.

PG&E Corporaation; Pacific Gas & Electric Company

1    I realize that that's a big question, but we can't put

2  discovery on hold while we're dealing with the estimation

3  matter that is coming back up on calendar next week.  So did

4  you mean something else in that statement, if you recall?  And

5  maybe the specific sentence doesn't pop up into your memory,

6  but can you help me on that?

7    MR. ORSINI:  I can, Your Honor.  And I know exactly

8  what you now are referring to.

9    Just for a little bit of context, the letter to which

10  I was responding was a fifteen to twenty-page letter from Mr.

11  Macon, who is one of the subrogation trial lawyers for the

12  state court proceedings, requesting that we open up

13  discovery -- I think that his phrase says, that we lift the

14  discovery stay and proceed with wildfire liability discovery.

15    My response was sent prior to us getting our

16  estimation motion on file.  And the point that I was trying to

17  make in my response was simply that we weren't going to consent

18  to lifting the stay, because I wasn't even quite sure what that

19  meant in this context, but that we do believe that estimation

20  is going to require some form of liability discovery.

21    As I'm sure Your Honor recalls, part of our estimation

22  motion actually asks for an order directing all of us to get

23  together and essentially do what we're doing right now, which

24  is talk about how we're going to get the discovery in place for

25  estimation.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    So just to state it very directly, so there's no

2    ambiguity, it is not our position that liability discovery

3    needs to be completely shut off for now until we resolve these

4    issues.  To the contrary, we completely agree that as part of

5    the estimation process we propose, there will need to be some

6    reasonable discovery into liability issues.

7    I stated in a number of letters subsequent to the

8    email Your Honor is citing that we are very amenable to having

9    those conversations.  As Mr. McCallen just reported, we've had

10   meet-and-confers with the subrogation group on exactly some of

11   those issues since, and we've made it clear to the TCC,

12   generally speaking, we're ready.  We do think discovery needs

13   to move forward on the liability issues, and we're prepared to

14   sit down and negotiate a protocol for that that makes sense to

15   everybody, including the Court.

16   THE COURT:  Okay.  Again, Mr. Orsini, you're on a

17   roll.  You've given me the right answer because it seemed to

18   me, we -- discovery is a fact.  There are no facts that pertain

19   only to a state court action rather than a bankruptcy action,

20   so you're on the right path, and I won't discuss it further

21   unless any other counsel want to raise it.

22   And come next week, when I deal with -- unless there's

23   some change, I'll be dealing with both the relief from stay

24   question again and the estimation motion.  And by my

25   calculation, a whole bunch of people are going to be filing a

PG&E Corporaation; Pacific Gas & Electric Company

1    whole bunch of things between now and then.

2            So unless someone else on the phone has a different

3    desire, I'm prepared to now go to the debtors' response to the

4    TCC discovery and find out from Mr. Julian or any of his

5    colleagues what needs action from me and what can we wait on.

6            So for purposes of tracking where we are, I'm now back

7    to the debtor; I guess -- again, I guess Mr. Orsini bears his

8    name on there, but it doesn't matter.  It's the debtors'

9    document 3371, beginning on page 4, "Responses to TCC

10   Submission and Subrogation Submission".  And there are numbers

11   of them, and I see that some have been answered; some have not

12   been answered.  And I'm ready to have Mr. Julian, or whoever is

13   going to speak for the TCC, go down the list and tell me where

14   they're satisfied and where they're not satisfied.  So let's

15   proceed that way, unless someone wants to suggest a different

16   approach.

17           MR. PASCUZZI:  Your Honor, this is Paul Pascuzzi for

18   CAL FIRE.  Can I interject here, before we get into the weeds

19   too much?

20           THE COURT:  Absolutely.  If you have something good to

21   say.  Sure, Mr. --

22           MR. PASCUZZI:  Well, I think I do.

23           THE COURT:  Yeah.

24           MR. PASCUZZI:  I think I do, Your Honor.  Paul

25   Pascuzzi, Felderstein Fitzgerald Willoughby Pascuzzi & Rios,

PG&E Corporaation; Pacific Gas & Electric Company

1 for CAL FIRE. We're co-counsel with the Attorney General's

2 Office. There are a couple of Attorney General lawyers on the

3 phone, listening, as well.

4 As everybody has seen, CAL FIRE, I believe, is going

5 to be prominently involved in the discovery process here.

6 There's already a subpoena from the Singleton Law Firm; there's

7 two subpoenas by the tort committee to CAL FIRE indirectly on

8 the Camp Fire. And so I wanted to just interject and request

9 that the parties kind of coordinate to eliminate duplication

10 and overbroad requests and other issues that can arise from

11 kind of a scattershot approach.

12 For example, the ad hoc subrogation committee pleading

13 mentions just looking at evidence in CAL FIRE's possession. We

14 have not been contacted about that. I assume parties will

15 contact us and we'll be able to meet and confer. There are

16 going to be some issues with respect to the Camp Fire with

17 regard to investigative privilege because there are criminal

18 investigation going on.

19 So I just wanted to chime in here, just generally, let

20 everybody know we're out here for CAL FIRE. We're looking to

21 meet and confer and assist in good faith for an efficient

22 process, and for the Court not to forget that CAL FIRE is out

23 here.

24 THE COURT: Okay. Thank you, Mr. Pascuzzi. I'll

25 leave it to you to notify all counsel what you want to

PG&E Corporaation; Pacific Gas & Electric Company

1    coordinate.  You'll be the center of gravity for that kind of

2    coordination.  That sounds helpful.  That's not something that

3    I was aware of, at least from the papers that I read today, but

4    that's fine.

5              All right.  Unless somebody else wants to be heard --

6              MR. PASCUZZI:  Thank you.

7              THE COURT:  -- let's go back to Mr. Julian, or

8    whoever, if Mr. Julian wants to lead the discussion on what the

9    TCC is expecting from the debtors.

10             And I do note that, from what the debtors filed, there

11   was a promise for a number of documents two days from now.  So

12   those of you who are waiting for something to happen by August

13   9th, you don't have to tell me this morning that you expect it

14   on August 9th; I'll assume you all expect it on August 9th, or

15   the TCC.

16             So Mr. Julian, are you going to speak, or Mr. Kleber,

17   or someone else in your department?

18             MR. JULIAN:  Your Honor, it's Robert Julian for the

19   TCC.  And I wanted to divide my comments into two.

20             First, the seventy open requests that are in our

21   response to your order will be addressed by Kim Morris.  And

22   what she has done is grouped them into four buckets.  And she

23   will have four common sense solutions for how the debtors, she,

24   and the Court can resolve those.

25             But before she speaks on those seventy open items,

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1   Your Honor, I would like to address Mr. Orsini's comments about

2   my July 26th letter to you in which the TCC joined in the state

3   court leadership counsels' and subrogation claimants' July 1

4   letter requesting an opening of discovery for liability issues

5   in both the bankruptcy and any relief from stay matter, with

6   respect to the twenty fires listed in there.

7        And Mr. Orsini correctly stated the debtors' view that

8   they would like to get together after August 14th to discuss a

9   discovery protocol for how to handle those types of discovery

10  requests with respect to liability for the twenty fires in

11  which the TCC has joined.

12       My point is whether or not the parties narrow the

13  discovery or not, one thing is clear.  We're looking at

14  compressed discovery schedules.  And that is the reason why the

15  TCC joined with the North Bay fire groups in requesting an

16  immediate opening of discovery on that.  And obviously, the

17  debtors can object to some of the request as narrow, but we

18  think it's improper to simply say we're still not going to

19  produce discovery.

20       So we once again ask for discovery to be reopened,

21  that those discovery requests be responded to that are in our

22  letter.

23       And I'd like to point out why we joined with the North

24  Bay in subrogation group's request in their July 1 letter, and

25  joining in my July 26th letter.  The reason is, as you'll see

PG&E Corporaation; Pacific Gas & Electric Company

1    in our estimation brief that we're filing today, that under the

2    mass tort procedures that bankruptcy judges and district judges

3    have used to coordinate the pending state court litigation that

4    has been brought in one way or another into the federal courts,

5    either the district court or the bankruptcy court, is because

6    the state court litigants have been litigating this stuff for

7    two years.  And the tort committee creditors' committee has to

8    simply work in tandem with the state court trial for a couple

9    of reasons.

10            First, as you've seen in the docket, the Cravath firm

11   has been paid ninety million dollars to work up this case for

12   two years for both liability and estimation.  And we have not

13   looked at any of that information, and we haven't spent any

14   money at all on preparing because we don't have the

15   information.  The state court lawyers, on the other hand, have

16   about half of the information, but not the rest of the half

17   that the debtors have.

18            And it's important to realize that in proving, as we

19   will have to do, in either an estimation proceeding or a

20   district court trial, or in the Tubbs trial, that PG&E

21   negligently managed the trees, or the system, or failed to de-

22   energize, that the documents that prove that are uniquely in

23   PG&E's possession alone.  They have them.  They haven't given

24   them up.  They still haven't given them up.  They want to have

25   a discovery plan over that.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    Your Honor, we simply can't wait.  And we ask for

2    today that you simply acknowledge that the parties can go

3    forward with that July 1 request and that the debtors be

4    ordered to respond to it in some way.  And I'd like to be heard

5    on that.  I'm done with that, but after this, Kim Morris can

6    tell you about the four buckets --

7    THE COURT:  Well, let's --

8    MR. JULIAN:  -- that she has, and her four solutions

9    for resolving them.

10   THE COURT:  Well, let's come back to Ms. Morris in a

11   minute.

12   MR. JULIAN:  Thank you.

13   THE COURT:  Let me let Mr. Orsini respond to your

14   statement that you just made.

15   MR. ORSINI:  Yes.  Thank you, Your Honor.  So I don't

16   quite understand Mr. Julian's statement that I've refused to

17   provide discovery until after August 14th.  I think I said the

18   opposite just a few minutes ago, and I've told him repeatedly

19   in letters and discussions over the previous couple of weeks

20   that we're ready.  We're standing here, ready to embark upon

21   this liability discovery.

22   All that we're suggesting is we ought to have an

23   actual protocol in place that governs how that discovery is

24   going to work:  when requests are going to be served, when

25   responses will be filed, how we'll address disputes, when

PG&E Corporaation; Pacific Gas & Electric Company

1    depositions can start.  Basically, a discovery plan, like you

2    have in every litigation with contested, factual issues.

3            And so I don't -- there's been no effort on our part

4    to delay here.  We've told them repeatedly we're ready to go

5    when they want to sit down and have the protocol put in place.

6    Mr. Julian had informed me in a letter last week that they were

7    working on a protocol that covers those issues, and we were

8    waiting to receive that protocol and provide responses to it.

9            So again, I'll just say, we're prepared to move

10   forward.  We just think, particularly given the amount of

11   parties, the number of parties, the compressed time schedule

12   that we have by virtue of the June 30th deadline set by the

13   legislature, that it just makes sense to have a plan in place

14   to get us from where we are today to where we need to be for an

15   estimation hearing.

16           THE COURT:  Okay.  But let's make sure we're on the

17   same --

18           MR. ORSINI:  Yep.

19           THE COURT:  Mr. Orsini, from my point of view, I have

20   to decide soon whether to grant relief from stay to two

21   different motions -- on two different motions, but really, it's

22   the same issue raised by two different moving parties.  And if

23   I were to do so, then presumably the discovery would be

24   governed by the state court processes.  If I deny the relief

25   from stay and say we're going with estimation -- and I'm not

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1  suggesting that it's either/or, but from my point of view, that

2  is an option -- and so if we were -- for the moment, let's just

3  take relief from stay off the table.  The debtor has admitted

4  that its equipment caused all the fires except Tubbs -- and I'm

5  not going to worry about Ghost Ship; that's a different set of

6  issues -- so the wildfires, but that's all you've admitted.

7          And if I read correctly your arguments, and to some

8  extent, what Mr. Karotkin argued, if I accept the debtors'

9  contention about inverse condemnation, then to say your

10 equipment caused the fire doesn't say much of anything, in

11 terms of liability.  And if, in fact, there's no proof of

12 negligence -- there still has to be proof of negligence,

13 correct, and no negligence if inverse condemnation applies.  Do

14 I got the basics right?

15         MR. ORSINI:  A couple clarifying points, Your Honor.

16 I think generally speaking, yes.

17         Just to be clear on a couple of things, so the debtor

18 has acknowledged causation --

19         THE COURT:  Yes.

20         MR. ORSINI:  -- for all purposes with respect to the

21 Camp Fire.

22         THE COURT:  But causation means --

23         MR. ORSINI:  With respect to the other fires --

24         THE COURT:  Causation means my equipment caused the

25 fire, right?

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1        MR. ORSINI:  Correct.

2        THE COURT:  But it doesn't mean I --

3        MR. ORSINI:  Correct.  And with respect --

4        THE COURT:  It doesn't mean you were negligent?

5        MR. ORSINI:  That's correct, Your Honor.

6        THE COURT:  Okay.

7        MR. ORSINI:  The one other point I want to clarify on

8    that point is, with respect to the fires that are not Camp or

9    Tubbs, what we have said is we will not contest causation in an

10   estimation hearing.

11       But Your Honor's absolutely right.  If we move forward

12   with the estimation process, there are questions of legal

13   liability because factual causation does not equal legal

14   liability.

15       THE COURT:  I understand.

16       MR. ORSINI:  And Your Honor's absolutely right.

17       THE COURT:  Yeah.  But the difference is --

18       MR. ORSINI:  But Your Honor's absolutely right.

19   The --

20       THE COURT:  The difference between will not contest

21   and admit is like a guilty plea and a nolo plea, right?  "Will

22   not contest" means the plaintiffs don't have to prove that PG&E

23   equipment cause the Atlas Fire, or the -- I can't keep track of

24   all the names, but we're putting Tubbs on a separate -- Tubbs

25   and Ghost Ship are different.  Your statement that will not

PG&E Corporaation; Pacific Gas & Electric Company

1    contest for purposes of an estimation trial means they don't

2    have to prove that PG&E's equipment was the physical cause of

3    the fire, right?

4    MR. ORSINI:  In an estimation trial, that's correct.

5    I'm simply just clarifying that if we somehow found ourselves

6    in a different situation, let's say a state court trial because

7    the motion to lift the stay on Atlas expires by tomorrow, that

8    our agreement not to contest causation is limited to an

9    estimation proceeding, not to any potential state court action.

10    THE COURT:  Okay.  Okay, that's fine.  But if I were

11    to grant relief from stay to any plaintiff for any fire, it's

12    up to the court in that matter to deal with what do all these

13    things mean.

14    If I am presiding --

15    MR. ORSINI:  Precisely.

16    THE COURT:  If I am presiding over an estimation

17    trial, or if a district judge is supposed to do it, if a

18    federal judicial officer in the bankruptcy is doing it, you

19    have made it clear that for these purposes, that's not

20    contested.

21    But beyond that, I mean, there is a pretty broad range

22    of discovery that's relevant, even for the estimation.  Sounds

23    to me you don't disagree with that?

24    MR. ORSINI:  Not even a little bit, Your Honor.  We

25    completely agree with that proposition.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    THE COURT:  Okay.  Mr. Julian, I think that Mr. Orsini

2   clarified it to my satisfaction.  Are you -- still want to take

3   him on for the way he responded to first your question, then my

4   question?

5    MR. JULIAN:  I understand what he's saying, and I have

6   two requests that I think can help you see where we're coming

7   from.

8    The first is, by way of background, the North Bay Fire

9   litigation, which figures prominently in any estimation

10   proceeding, had a bunch of documents produced that are in a

11   database that we now have access to for the first time, as of

12   last week.  But on the eve of the bankruptcy, the debtors were

13   ready to produce thousands of documents dealing with liability.

14   They told the North Bay group that they were ready to be

15   produced on February 15th.

16    Now, those had been bought and paid for via state

17   money.  They're in a database that the debtors have, that

18   Cravath has.  With the touch of a button, more or less, that

19   could be produced to us because it was ready to be produced.

20   It's already been produced.

21    I request that the Court order the debtors to produce

22   the discovery that was ready to be produced on February 15th,

23   or whatever the date was -- it's already ready to go -- to the

24   TCC, and secondly, that the 800 or so investigation reports and

25   related documents that the debtors turned over to Judge Alsup

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    that we have not been a copy to be given to us, because they

2    directly relate to their responsibility and their cover-up and

3    destruction of evidence that is so key in any estimation

4    proceeding.

5         And once again, with the touch of a button, those two

6    items could be sent to us.  And I'd like a ruling on that

7    today, if I may, Your Honor.

8         THE COURT:  Well, let's take the latter of those two.

9    The first one, I understand the issue.  The second one, when

10   what was provided to Judge Alsup, does it relate to the 2010

11   San Bruno matter, or does it relate to the wildfires?

12        MR. JULIAN:  As we understand, it relates to primarily

13   Camp, but also any wildfire.  And remember, the reason for

14   that, Your Honor, is that the probation hearings have turned,

15   now, from responsibility for the 2010 San Bruno gas explosion

16   to a determination by Judge Alsup that a term of the probation

17   dealing with not violating any other laws or complying with

18   discovery disclosures means Judge Alsup is not going to let any

19   more fires happen, and he's going to investigate what PG&E did

20   with respect to the 2017 and 2018 fires.  Those are the focus

21   points of Judge Alsup's orders in 2019:  responsibility for

22   2017 and 2018 fires and the payment of dividends rather than

23   putting it into wildfire mitigation.

24        So yes, Your Honor.  Our understanding is PG&E, in

25   response to the 2017 and 2018 questions raised by Judge Alsup

PG&E Corporaation; Pacific Gas & Electric Company

1    as to those fires, submitted inspection reports and related

2    documentation with respect to their culpability to Judge Alsup.

3            And it's important to remember that this is so

4    important to Judge Alsup and the TCC that Judge Alsup read in

5    the Wall Street Journal --

6            THE COURT:  Oh, I know that.  I know.

7            MR. JULIAN:  -- an article that said --

8            THE COURT:  I'm aware of that.  I've read his order --

9            MR. JULIAN:  Yeah.

10           THE COURT:  -- and I've read the response.

11           MR. JULIAN:  And so yes, Your Honor.  His order shows

12   that he's focused on the 2017 and 2018 fires, and we want those

13   inspection reports and related documents.

14           THE COURT:  Okay.  Mr. Orsini, you've taken Mr. Julian

15   into two parts.  The North Bay data that was going to be

16   produced by February 15th, any reason why that shouldn't be

17   available now?  It seems like it's very relevant --

18           MR. ORSINI:  Okay, Your Honor, I've got --

19           THE COURT:  -- to the estimations.  Pardon?

20           MR. ORSINI:  So Your Honor, I need to correct some

21   facts, because Mr. Julian's facts are incorrect.  There was not

22   a set of documents that were ready to go as of February 15th.

23   There's no database for which at the touch of a button we could

24   produce tens of thousands of pages of responsive materials.

25           What Mr. Julian is referring to, I believe, is there

PG&E Corporaation; Pacific Gas & Electric Company

1    was an extensive protocol in the North Bay fire cases

2    concerning the collection of emails and other electronic

3    documents from hundreds of custodians:  over a hundred company

4    employees, over a course of many years, going back in time.

5    And those were then being reviewed and produced, subject to

6    technology that was being negotiated between the parties to

7    identify that which was responsive.

8           There were many technological problems with getting

9    that all done.  The reality is, there's still months' worth of

10   work to do with respect to going and getting those documents

11   ready for production, with respect to pulling out the

12   privileged information, with respect to preparing privilege

13   logs.  It's a massive amount of work, data, and documentation,

14   the overwhelming majority of which is, frankly, overbroad,

15   certainly for the purposes that we're addressing here.

16          So there's not a treasure trove of information that

17   I've just got sitting in some database back at PG&E or Cravath

18   where we could hit the button and produce it.

19          And this brings me back to, if -- we agree 100 percent

20   that we need to engage in some liability discovery.  But we

21   also need to be cognizant of the schedule we have, as well as

22   the debtor resources, and formulate a plan that actually makes

23   sense, given the current context.  And the current context is

24   not state court proceedings that could last for any number of

25   years with no deadline in sight.

PG&E Corporaation; Pacific Gas & Electric Company

1    So again, I have no objection to producing relevant,

2  responsive information.  My point is simply that we need to

3  work together to put together a process that makes sense and is

4  actually accomplishable -- if that's a word; I don't believe

5  that it is -- that's actually feasible in the context of the

6  proceedings that we have before us right now.

7    THE COURT:  Well, what would have --

8    MR. ORSINI:  That's point number 1.

9    THE COURT:  What would have been produced on February

10  15th, if there hadn't been a bankruptcy?

11    MR. ORSINI:  My understanding is very little because

12  there was still going to be a lot of work done over the ensuing

13  couple of months.  I've looked into this issue with my team,

14  and there were significant amounts of work left to be done with

15  respect to the production of these custodial documents.

16    THE COURT:  And what's your quick response to --

17    MR. CAMPORA:  Your Honor --

18    THE COURT:  Wait.  Let Mr. Orsini finish here.

19    Your quick response, Mr. Orsini, to the 800 or so

20  reports that were delivered to Judge Alsup; why shouldn't the

21  TCC have access to that?

22    MR. ORSINI:  I just need to go back and double check

23  the facts there, Your Honor.  My understanding -- and I'm

24  involved in the Alsup proceedings, as I think Your Honor

25  knows -- my understanding is everything that we submitted to

PG&E Corporaation; Pacific Gas & Electric Company

1    Judge Alsup was produced -- was submitted publicly.  It was

2    filed on PACER, publicly available, not subject to sealing

3    orders or anything like that.  So I believe everything we gave

4    to Judge Alsup they have access to.

5         I think what Mr. Julian is actually referring to is

6    that there may be some documents that were referenced in some

7    of the materials provided to Judge Alsup that we didn't

8    actually give Judge Alsup copies of because it was just too

9    much information.  And if what Mr. Julian is saying is they

10   would separately like discovery of those documents, I'm happy

11   to review a discovery request, and I expect we would produce

12   those.

13        THE COURT:  Okay.  Someone else started to speak, and

14   I asked that person to wait.  Who was that?

15        MR. CAMPORA:  Your Honor, my name is Steve Campora,

16   and I represent many individuals in the state court proceedings

17   and also in the bankruptcy.  And I wanted to comment about what

18   Mr. Orsini just said about the document production that was due

19   in February and also the documents that were filed under seal

20   with Judge Alsup in December of 2018.

21        THE COURT:  Okay.

22        MR. JULIAN:  Yes, Your Honor, may I just supplement

23   that?  Mr. Campora represents the chair of the tort committee.

24   And he does have relevant information, and thank you for

25   hearing from him.

PG&E Corporaation; Pacific Gas & Electric Company

1      THE COURT:  Well, I'm happy to hear from him.

2      Go ahead, Mr. Campora.

3      MR. CAMPORA:  Your Honor, in the state court

4  proceedings, we have been working with PG&E for this entire

5  process to get documents produces for approximately a year.

6  And the documents were to be done in February, and I'm happy to

7  get copies of transcripts from our hearings before the judge

8  and our correspondence on the items, but PG&E was supposed to

9  be producing the documents from the prior proceeding by

10  February.

11      We have been waiting.  They have excuse after excuse

12  of why they haven't been done in nearly a year, but my

13  recollection is, and I'm happy to get the transcript, is that

14  there was an order that they be done in February.

15      So for Mr. Orsini now to say it was months and months

16  away is not accurate, and I'm happy to get those documents for

17  you.

18      THE COURT:  I don't want them.

19      MR. CAMPORA:  So with --

20      THE COURT:  I don't --

21      MR. CAMPORA:  -- regard to the documents --

22      THE COURT:  Mr. Campora, I don't want them.  I can't

23  process the volume of stuff.  You need to make -- I take you at

24  your word, and Mr. Orsini has to figure out how he's going to

25  accommodate you or tee up a ruling that I would say that he

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    doesn't have to.  But for you to give me transcripts isn't

2    efficient because I can't process all that.

3            MR. CAMPORA:  Well --

4            THE COURT:  So --

5            MR. CAMPORA:  -- I'll tee it up however you'd like,

6    Your Honor.  But --

7            THE COURT:  No, I'll take your word for it that you

8    believe that there is some information that would have been

9    available, and I'm going to tell Mr. Orsini to respond to that

10   in some way.  Again, I'm not taking sides here.  I'm just

11   trying to make the system go.

12           We all know that the best way to avoid a complaint

13   that the debtor isn't providing information is for the debtor

14   to provide information.  And so Mr. Orsini knows that, and the

15   bankruptcy lawyers with him know that.  And that's what we're

16   stuck with.

17           So Mr. Julian, I'm not going to make a ruling today,

18   but I'm certainly going to -- I'm going to put this request of

19   yours on the front burner and tell Mr. Orsini he's got to

20   respond specifically and deal with this protocol issue sooner

21   rather than later.  And that's all I can hope for at this

22   point.

23           MR. JULIAN:  Your Honor, thank you for that.  And may

24   I ask Mr. Campora to explain to the 800 documents that PG&E

25   filed under seal with Judge Alsup and are ready for production

PG&E Corporaation; Pacific Gas & Electric Company

1    to us?

2            THE COURT:  Well, I thought --

3            MR. CAMPORA:  Your Honor --

4            THE COURT:  I thought Mr. Orsini said he didn't think

5    it was under seal.

6            But yes, Mr. Campora, go ahead and say that.

7            MR. CAMPORA:  Well, Your Honor, what we've been told

8    is that there were 800 documents.  There were inspection

9    reports and other documents related to the Camp Fire which

10   were, in fact, filed under seal or not made public at the time

11   it was done in December of 2018.  And so those documents are

12   the ones we're requesting to be turned over.

13           THE COURT:  Well, Mr. Orsini --

14           MR. ORSINI:  Your Honor, this is --

15           THE COURT:  -- you've got a response?

16           Yes, sir.  Go ahead.

17           MR. ORSINI:  Yeah.  No, I can just cut through this

18   one, Your Honor, because I want to get back on a roll.

19           As I said, I don't believe we filed anything under

20   seal, but I make mistakes.  I could be wrong about that.  We'll

21   go back and take a look, and if there was something that was

22   filed under seal with Judge Alsup, those absolutely are readily

23   available.  And so if that set of documents exists, we'll

24   produce them, subject to the confidentiality order here.

25           If I'm correct, that there was not something filed

PG&E Corporaation; Pacific Gas & Electric Company

1    under seal, then I believe what Mr. Campora and Mr. Julian are

2    getting at are documents that were referenced in our

3    submissions but not actually provided to Judge Alsup.  And as I

4    said, I'm also happy to speak to Mr. Julian, Mr. Campora, or

5    anyone else about making those documents available to them as a

6    separate production.  And then the only thing --

7              MR. JULIAN:  Let me rephrase.  Let me rephrase; it's

8    Julian here.  Any documents given to Judge Alsup in camera,

9    under seal, or otherwise that are not on the public record is

10   what we're referring to and what the Wall Street Journal's

11   referring to and what Judge Alsup's referring to.

12             THE COURT:  Well, let me say this.  I don't know what

13   the procedure is in the criminal court -- in criminal matter

14   pending before Judge Alsup.  In our court, in the civil matter,

15   in the bankruptcy court, if something's under seal, the docket

16   will reflect that there is something under seal.

17             So although the docket, I'm sure, in the docket that

18   Judge Alsup has before him is lengthy, there should be a docket

19   entry that says there's something under seal.

20             Now, if, in fact, Judge Alsup did it in some other

21   way, I can't know that.  But Mr. Orsini said what he's willing

22   to do, and certainly, if there was something that was under

23   seal by a judge's order, then, as long as the debtors

24   voluntarily turn it over, it should be turned over under the

25   same kind of protections we have existing in this case for

PG&E Corporaation; Pacific Gas & Electric Company

1   various limited access.

2          And we don't want to read a sealed document in Alsup's

3   court in the Daily Journal tomorrow and San Francisco

4   newspaper.  So it has to be treated in the same fashion.  But

5   principle counsel for the TCC and the subrogation group would

6   seem to me to be entitled to have that.  And I'm not drawing a

7   line between something other than lead counsel.  I'm saying

8   consistent with the discovery and the protective orders that

9   are in place in our case, that's what I would assume.

10          Whether or not PG&E needs to get bogged down now in an

11  estimation trial about how much was paid out to dividends, pre-

12  petition -- I'm not terribly sympathetic to that needing to be

13  discovered because I don't think it's probative.  But to the --

14  because they did what they did.  And they told Judge Alsup, and

15  the public, and the SEC filings what they did, and if the TCC

16  wants to argue that that is somehow legally relevant to the

17  estimation process, that's another argument that can be made.

18          But I don't want to have a discovery conference to get

19  into a debate about whether details of pre-petition dividend

20  distributions are standing in the way of what we're supposed to

21  be doing in either the estimation -- well, I say the estimation

22  trial because, I'll repeat again, if I'm persuaded to grant

23  relief from stay, it seems to me there's less discovery issues

24  that are left to worry about here.  But that's for another day.

25          So Mr. Orsini, I'm going to not ask you to put your

PG&E Corporaation; Pacific Gas & Electric Company

1    responses to these issues on my record in this court.  You are

2    committing to me that you are going to look into one or more of

3    these issues to Mr. Julian and Mr. Campora.  If I'm pronouncing

4    your name incorrectly, I'm sorry.  But the principal lawyers

5    that are looking for this information.  And if you can satisfy

6    them, then you will have satisfied me.

7          And so I won't dwell on it.  But Mr. Julian, I won't

8    make a ruling, either.  I consider this as some progress.

9          So let's go to the four buckets that Ms. Morris -- can

10   you take over, Ms. Morris?  Are you there?

11         MS. MORRIS:  Yes, I'm here.  Thank you, Your Honor.

12   Kimberly Morris of BakerHostetler for the TCC.

13         The documents in our submission to the Court that were

14   numbered 1 through, I believe, 70, can be grouped into four

15   separate buckets.  One is the third-party contractor documents

16   that were the subject of our motion to compel.  And I

17   understand Your Honor doesn't want to hear that today.  We did,

18   for clarity sake's, file a notice of hearing for today, and we

19   are ready to proceed with that if Your Honor would like to hear

20   it.  The debtors' response --

21         THE COURT:  Yeah, but you -- please, Ms. Morris.

22   Please understand; I take some pride in preparing.  But when

23   you filed something that moves it over to later in the month, I

24   don't prepare for it.  So I will let you respond if the

25   principal lawyers on the other side want to hear from you.  I

PG&E Corporaation; Pacific Gas & Electric Company

1  wouldn't even know what you're talking about.

2        So have you communicated before this hearing with Mr.

3  Orsini or others with him on your position on the third-party

4  contractors?

5        MS. MORRIS:  We have.  We had communications with them

6  and then it resulted in our motion to compel that was filed by

7  my partner, Kody Kleber.  And the debtors have responded that

8  they have produced all of the relevant documents in their

9  response to your order for this hearing.  And so I believe the

10  record is ripe for a discussion of this today if Your Honor is

11  willing to take it up.

12        THE COURT:  Okay.  Go ahead.  All right, so --

13        MS. MORRIS:  Well, I'd first like to get through the

14  list of the other topics, just so that you have clarity going

15  into this, what those four topics are.

16        THE COURT:  Okay.

17        MS. MORRIS:  One is those third-party documents and

18  contracts.

19        The second are insurance policies, and that made up a

20  large section of our list.  And those are obviously relevant

21  because they're assets of the debtor, and it is important for

22  the TCC to understand the coverages that are available for

23  their claims -- for the tort victims' claims, as well as

24  whether or not notices of claims and tenders of claims have

25  been properly made to make sure those buckets of money are

PG&E Corporaation; Pacific Gas & Electric Company

1   available for claims such as this.

2          The third documents are what I'm going to call board-

3   related documents.  And these are documents that have been

4   outstanding for almost five months now.  And the debtors have

5   responded that they've produced all -- or have not located or

6   produced all nonprivileged documents.

7          Your Honor, we have not received a privilege log, so

8   we're not able to evaluate that response sufficiently without a

9   log.  So with that request, that one's simple.  We just ask

10  Your Honor to order the debtors today to produce a privilege

11  log for documents that are outstanding for almost five months

12  now.

13         And the last, most important, I believe, for this

14  call, for purposes of this call, are the claims estimations

15  documents.  And those documents, Your Honor, fit into two main

16  buckets.  They're the settlements relating to prior fire

17  claims, so claims relating to the 2015 Butte fire and the 2010

18  San Bruno fire, and all the information the debtors are using

19  to estimate claims.

20         They've made many statements, both in financial

21  filings as well as in this court and publicly, about the value

22  of the liability for these tort claims.  And the TCC has sought

23  information upon which they're basing that because, as we know

24  for financial filings, there has to be some reasonable basis

25  for it.

PG&E Corporaation; Pacific Gas & Electric Company

1    The debtors have been estimating their liabilities in

2  connection with these public filings and public statements

3  mainly in reliance upon the underlying settlement agreement.

4  Yet in my meet-and-confer sessions with Mr. Orsini, he's saying

5  that they're not able to turn over those settlement agreements

6  and related documents and that they're producing their internal

7  records relating to those settlements in redacted form because

8  they contain privileged and work-product information.

9    Your Honor, bankruptcy courts consistently rely

10  upon -- in estimating mass tort liabilities -- consistently

11  rely upon prior settlement information, and it's why we cited

12  to the Eagle-Picher case underneath our request for the

13  settlement data.  That case drives home the point that

14  settlement data is the most reliable information that you can

15  use to estimate claims because it's the direct information on

16  how the debtors have handled claims that -- similar claims in

17  the past that are being asserted against them now.  And to

18  ignore that information would be to ignore valuable

19  experiential resource that the parties in the case could use to

20  estimate those claims.

21    The debtors' internal records that have been produced

22  show that they are relying upon those settlement agreements in

23  their internal estimations of the claims here.  They have

24  produced many of those documents in heavily redacted form.  And

25  what they have produced is incomplete; we only have maybe less

PG&E Corporaation; Pacific Gas & Electric Company

1   than ten percent of the settlement data related to the Butte

2   fire.  And the debtors have refused to produce any information

3   in connection with the San Bruno fire, claiming that it's a

4   wholly different event.  However, it is a fire event caused by

5   PG&E that resulted in the exact same damages that are at issue

6   here, the exact same types of claims.  And so we claim that it

7   is actually very relevant to look at that information as well.

8        And they're withholding this information from us

9   either in redacted form or in withholding the settlement

10  agreements and related documents themselves, claiming that

11  they're subject to a mediation privilege and that they're

12  subject to other privileges.

13       And with respect to the mediation privilege, Your

14  Honor, they're relying upon California Evidence Code Section

15  1119 that states that the documents are protected from

16  disclosure.  However, there are exceptions to that under

17  California law, namely, Evidence Code Section 1123, that say

18  that if the settlement agreements themselves contain language

19  that they are enforceable or otherwise admissible, that they

20  can be -- that they're not subject to the protections of the

21  mediation privilege.

22       But more importantly, Your Honor, this is information

23  that can be turned over confidentially to the tort claimants.

24  In this case, we heavily negotiated a protective order.  That

25  protective order contains language saying that if a party has a

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    pre-existing obligation to third parties to treat information

2    as confidential, that they can mark it as such, and it would be

3    covered by the protective order.

4         And telling us -- the debtors have told us that we

5    need the 1,500 or so underlying claimants that they settled

6    those cases with to give their permission to turn over those

7    documents.  But we don't need that, Your Honor.  We have the

8    protections of the protective order here and, most importantly,

9    the debtors themselves are relying upon this information.

10   Bankruptcy courts expect that the parties will all rely upon

11   this information, and the debtors are not providing it to us.

12        So in connection with our request for this

13   information, Your Honor, we simply ask that the debtors be

14   ordered to produce all settlement agreements and demands in

15   connection with the 2015 Butte fire settlements and the 2010

16   San Bruno fire settlements, that they be ordered to produce all

17   of the internal reports that they're using to estimate claims

18   which include their internal reports on these settlements in an

19   unredacted form so we're all on a level playing field here as

20   we seek to do the most important job which is estimate the

21   massive amount of liability in connection with these cases.

22   They've been doing it for months, and we'd like to get up to

23   speed and be on the same level, fair playing field with them.

24        And then, lastly and specifically, that they be

25   ordered to produce all the information that they're producing

PG&E Corporaation; Pacific Gas & Electric Company

1    to the SEC, in connection with the SEC's almost identical

2    request to them -- that they produce information relating to

3    their public disclosures and accounting for losses associated

4    with the 2017 and '18 Northern California wildfires.

5         So the SEC is seeking the same exact information that

6    we are, yet the debtors are saying that they're not going to

7    produce that in its entirety to us.  So our requests are simply

8    for those three items to be ordered to be produced today, Your

9    Honor.

10        THE COURT:  Well, Ms. Morris, you did a nice summary

11   of the four buckets for you, then proceeded to argue all the

12   merits of bucket number four.

13        So Mr. --

14        MS. MORRIS:  I did, and --

15        THE COURT:  That's all right.

16        MS. MORRIS:  I --

17        THE COURT:  That's all right.

18        MS. MORRIS:  I'm happy to cover the other buckets now

19   or just handle this one.

20        THE COURT:  Well, I'm going to ask Mr. Orsini to make

21   my job simple about the privilege log for bucket number three.

22        Mr. Orsini, is there some reason why you can't commit

23   to a privilege log for what we're going to call bucket number

24   three?

25        MR. ORSINI:  No reason at all, Your Honor.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1      THE COURT:  All right.

2      MR. ORSINI:  We're happy to do that.

3      THE COURT:  Okay.  When is that likely to be produced?

4      MR. ORSINI:  I will commit to Your Honor that we'll

5  produce it as soon as we reasonably can.  I'm a little reticent

6  to just give you a date right now, because I don't know the

7  scope of what's been done on that front and how many documents

8  we're talking about.

9      If it's acceptable to Your Honor, I will be in court

10  next week on the other motions, and I'd be happy to report to

11  the Court a deadline that is based upon actually looking into

12  the work that's required.  But I can commit that we'll do what

13  we can in good faith to get it done as soon as possible.

14      THE COURT:  Well, okay.  I'll tell you what.

15      MS. MORRIS:  Your Honor, if I may respond to that?

16      THE COURT:  Well, Ms. --

17      MS. MORRIS:  If I may respond, those requests have

18  been outstanding for five months.

19      THE COURT:  Ms. Morris --

20      MS. MORRIS:  And so --

21      THE COURT:  Ms. Morris --

22      MS. MORRIS:  -- I think it --

23      THE COURT:  Ms. Morris --

24      MS. MORRIS:  Yes.

25      THE COURT:  I can only handle so many issues.  And a

(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corporaation; Pacific Gas & Electric Company

1    privilege log is important, but it's not as important as bucket

2    four.  So I'm going to let Mr. Orsini give either you a

3    response on the merits or me a response as to when there'll be

4    a response, next week at the hearing.  So we have hearings on

5    the 13th --

6                MS. MORRIS:  Understood.

7                THE COURT:  -- and the 14th.  So five months is a long

8    time, but one more week isn't going to kill the deal.

9                So Mr. Orsini, I'll take your word for what you'll

10   give us.  If Ms. Morris gets the response and she's satisfied

11   with the timing, then you needn't come back to me on it.

12               So Mr. Orsini, do you want to defer the third-party

13   contractor issue, bucket one?  Because I was prepared to do it

14   because the debtor -- I mean, excuse me, the TCC had kicked

15   that one out.  What would you like to do about the third-party

16   contractor information?

17               MR. ORSINI:  I can address it now, Your Honor,

18   although I do think it would be beneficial to the Court for us

19   to have the opportunity to put in a short written response,

20   before we take it up.  Ultimately, I think it's premised upon a

21   misreading on their part of the request they actually

22   submitted.  We were preparing a response, but then had

23   understood, based upon the various notices they filed, which

24   confused us, that it wouldn't be taken up today.  So I do think

25   it would be better for the Court to have the benefit of a very

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1   short written response --

2           THE COURT:  Okay.

3           MR. ORSINI:  -- for us, and then we could take it

4   up --

5           THE COURT:  Okay.

6           MR. ORSINI:  -- at a later date.

7           THE COURT:  No, give your opponent a response.  And if

8   they're satisfied, I don't need a response.  If they're not

9   satisfied, then we'll deal with it on the calendar where it is.

10          I mean, to me, it's one thing -- as I said at the

11  start, I'm not faulting anybody.  It would have been better

12  that we not have different people setting deadlines.  But since

13  the TCC's counsel was willing to put things out to the 27th,

14  I'm putting them out to the 27th, but maybe we don't get there.

15          Okay.  So that leaves two buckets.  Insurance

16  policies, when she --

17          MR. KLEBER:  Your Honor?

18          THE COURT:  Yes, sir?  Yes?  Who's that?

19          MR. KLEBER:  This is Kody Kleber again.

20          THE COURT:  Oh.

21          MR. KLEBER:  If I may again apologize for any

22  confusion regarding the notice.  But the motion to compel,

23  regarding third party documents, is on calendar today.  We did

24  file an amended notice for the hearing today, and it is on the

25  docket.  We are prepared to speak to that at more length --

PG&E Corporaation; Pacific Gas & Electric Company

1      THE COURT:  I'm --

2      MR. KLEBER:  -- but if you're inclined to give

3  opposing counsel --

4      THE COURT:  I'm not prepared.  I didn't --

5      MR. KLEBER:  -- the opportunity to respond, we can --

6      THE COURT:  I'm not prepared.  Did you withdraw

7  your --

8      MR. KLEBER:  Understood.

9      THE COURT:  -- setting of it on the 27th?

10      Pardon?  You did or didn't?

11      MR. KLEBER:  Yes, Your Honor.  We filed an amended

12  notice setting it for today, in accordance with the Court's

13  order --

14      THE COURT:  When did you file that?

15      MR. KLEBER:  -- denying the motion to --

16      THE COURT:  When did you file that?

17      MR. KLEBER:  On August 2nd, Your Honor.

18      THE COURT:  Okay.  I just can't --

19      MR. KLEBER:  On August 2nd, Your Honor.

20      THE COURT:  My staff and I can't keep up with the

21  pace.  This is going over to the 27th, but Mr. Orsini will be

22  responding informally, Mr. Kleber, to you and Ms. Morris.  And

23  if that satisfies you, that's the end of it.  If not, the

24  motion will stay on calendar on the 27th, and that's where

25  we'll be.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1      Okay.  On the insurance policies, when I read the

2  written responses on the debtors' filing, I thought that they

3  were responding to most of the requests about the insurance

4  policy.  Ms. Morris doesn't feel that way.

5      So Mr. Orsini, what's your response to that?

6      MR. ORSINI:  Well, I guess we're not quite sure what

7  it is that they're looking for, Your Honor.  A large number of

8  the issues related to the insurance policies were raised with

9  us for the first time in their submission to the Court.

10  (Indiscernible) through the end.

11      As we have set forth in our response, if there are

12  specific issues they'd like to address with us, we're happy to

13  look into those.  More broadly, on the insurance issues, we

14  either have provided or will provide everything that we've

15  identified that we believe is responsive to their request.  And

16  some of those are the documents that, as Your Honor noted, we

17  said we'd produce by August 9th.

18      There are certain categories of policies that they're

19  pushing for, in response to requests for insurance that could

20  cover wildfire claims, that, after having reviewed them and

21  consulted with the internal PG&E insurance experts, we don't

22  believe are responsive because they don't cover wildfire

23  claims, things like fiduciary coverage for employee benefit

24  plans, things like property insurance coverage that covers

25  PG&E's property itself.

PG&E Corporaation; Pacific Gas & Electric Company

1    So I think, really, this bucket falls into two

2    sub-buckets:  a bucket where I'm not sure exactly what it is

3    they don't think we've given them, but we're happy to look into

4    that; and then a bucket where we believe, based upon our work,

5    we've actually satisfied the request, or will, in short order.

6    THE COURT:  Yeah.  Ms. Morris, I, of course, looked at

7    the items, the numbers all the way through number seventy, that

8    you put there.  And I don't know -- I can't tell what kind of

9    policies they are.  I mean, what's the relevance of a policy

10   that might cover a direct loss of PG&E's own property or some

11   other kind of thing that really has nothing to do with a fire?

12   I mean, why do you want to go exploring things that clearly, on

13   their face, aren't going to be relevant?

14   MS. MORRIS:  Well, Your Honor, it's because we don't

15   believe that it's clear on its face that they are irrelevant.

16   We have an insurance specialty team that has been reviewing

17   these policies and that have worked with policies similar to

18   this in the past.  And without actually seeing the policies,

19   it's not clear that they wouldn't cover claims like this.

20   And the debtors are making blanket statements that

21   they don't cover claims like this.  However, my insurance

22   experts are telling me that they could, in fact.  And so all

23   I'm asking is that the policies be produced and the TCC be

24   allowed to make its own determination as to whether or not the

25   policies would provide coverage for these claims and an

PG&E Corporaation; Pacific Gas & Electric Company

1    additional source of recovery for these claims, as an asset of

2    the debtor.  And so all the other lines of coverage for which

3    we're seeking are specific to that request.

4         THE COURT:  Well, looking at your list, starting with

5    number 27, that's an errors and omissions policy, and then it

6    goes on.  After that, there's an all-property insurance

7    policies for various years.  And in every case, the debtor

8    says -- or for many of them, starting with, let's say, number

9    32, it says, "Debtors produced this policy.  Debtors need

10   further information as to what's missing."  Well, if the debtor

11   produced the policy, isn't that enough for your expert to know

12   what that policy insures?

13        MS. MORRIS:  Yeah, my understanding, Your Honor, is

14   that we have not received any policies that are specific to

15   those lines of coverage.  I believe the debtor is referring to

16   the fact that their CGL policies or their general liability

17   policies may cover some (indiscernible) information, but they

18   also may have stand-alone policies in these particular coverage

19   areas that may provide additional coverage.

20        And so, Your Honor, we'd like to see those policies

21   and make a determination for ourselves as to whether they do

22   add additional pots of money to the wildfire claim and possible

23   recovery.

24        THE COURT:  So let's again stick with the one that I

25   started with, number 32.  It's a general liability policy --

PG&E Corporaation; Pacific Gas & Electric Company

1          MS. MORRIS:  Um-hum.

2          THE COURT:  -- ACE Bermuda Limited, and I won't read

3    the numbers.  And your list says, "full policy not produced".

4    But are you telling me that your experts need to look at the

5    full policy; if they look at the face page or the coverage,

6    that that's not going to tell them, by the way, this doesn't

7    cover fires?  It covers lost furniture or lost something or if

8    a PG&E truck crashes into a plaintiff or something?  I mean,

9    how much information is enough information?  I don't know the

10   answer here.

11         MS. MORRIS:  I think I can clarify.  When I was

12   responding earlier, I was responding to the other lines of

13   coverage.  As to the specific policies where a policy number is

14   referenced here, that's a little bit different.  Those are

15   either CGL, punitive, or D&O policies.  The debtors have

16   provided charts that say:  here's all the policies within these

17   buckets.

18         And we've cross-referenced their productions in quite

19   onerous detail to those charts, to make sure we have all of

20   those policies.  And for ones where we say the full policy is

21   not produced, we only have maybe a declaration page or an

22   endorsement page.  We don't have the full policy.  And without

23   having the full policy, there's no way to tell if that

24   coverage -- what the coverage terms are.

25         And so I think this is a very easy one to handle.

PG&E Corporaation; Pacific Gas & Electric Company

1   Where we referenced a specific policy number, saying we either

2   don't have it or that we don't have a full policy, my request

3   is just that you order the debtors to go back and produce that

4   full policy.  If they don't have it, that we be allowed to take

5   discovery from -- we'll serve discovery from their broker,

6   Marsh, who undoubtedly has it.

7           THE COURT:  Isn't this getting a little bit

8   attenuated?  We're supposed to dealing with estimation of fire

9   claims, and now you're telling me you're going to take the

10  deposition of the broker to find out if some GLP -- general

11  liability policy or D&O policy or some other thing might cover

12  the fire losses?  I mean, that seems to be such an extreme

13  extension.  I just don't know why I would permit it.  It seems

14  overly burdensome.

15          And now, having said that, I don't know what any of

16  these policies say.  But it seems like -- it seems far broader

17  than I'd be inclined to order, at this point.  I mean, the

18  thought of taking a deposition -- of having the TCC lawyers

19  take the deposition of the insurance broker, to determine what

20  is not evident on the first page of a policy seems like a waste

21  of effort.

22          I'm going to let the debtors -- I'm going to let you,

23  Ms. Morris, tell Mr. Orsini or the debtors, in each of these

24  instances where the debtor says, "need further information",

25  that you give him a response per item.  And if he can respond

                    PG&E Corporaation; Pacific Gas & Electric Company

1    and is willing to respond, that's fine.  If not, I'll do my

2    best to try to resolve it.

3             But keep in mind, D&O policies don't cover third party

4    fire losses the last time I checked, and it's hard for me to

5    understand why that would be relevant to you.  So I'll leave it

6    at that.

7             Let's come back to the big question, bucket four.  Mr.

8    Orsini, why don't we start with San Bruno.  Why are you

9    resisting giving them information about the San Bruno fire?

10            MR. ORSINI:  Well, Your Honor, I think there's a macro

11   issue that relates to both San Bruno and the Butte fire case,

12   that we have to get into first.  As a quick response to your

13   question, because we don't think the San Bruno fire, which was

14   a gas pipeline explosion in a residential neighborhood nine

15   years ago, in a circumstance where the company's insurance

16   coverage covered all of the losses, is even remotely probative

17   of the estimation of damages here.

18            It's, as I was explaining to the TCC, not something

19   the company has looked at, in any way, shape, or form.  To try

20   to estimate potential losses with respect to either the 2015

21   Butte fire or the 2017/2018 fires, though Ms. Morris's argument

22   about the work we've been doing and what the company's relying

23   upon -- taking that argument at face value, our own approach,

24   given our experience, has been San Bruno's just not part of the

25   equation.  We think it's a fundamentally different type of

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    event that is not remotely probative here.

2         Now, I think the bigger issue that relates, Your

3    Honor, to both the San Bruno fire and with respect to the 2015

4    Butte settlement agreement that Ms. Morris sort of glided over,

5    is there is a very strong, very specific mediation privilege in

6    the state of California.  And it prohibits either party to the

7    mediation to turning over documents that were communicated as

8    part of the mediation efforts -- exactly the type of documents

9    that Ms. Morris is talking about -- the offers, the demands,

10   the back-and-forth in a mediation, and ultimately the final

11   settlement agreement.

12        So absent an agreement from both sides to waive that

13   mediation privilege, we don't believe the documents can be

14   produced, given the clear California law.  Now, what Ms. Morris

15   also did not mention is that I have stated to her that the

16   debtor is absolutely prepared on its part to waive the

17   mediation privilege with respect to the 2015 Butte settlement.

18        If the TCC has been arguing that they're entitled to,

19   in total, fifty-four billion dollars in damages based upon some

20   ratio analysis to the 2015 Butte settlement, as we've stated in

21   the filings to Your Honor, we just believe that's flat wrong.

22   The (indiscernible) believe that's flat wrong.  And we frankly

23   believe that analyzing the specifics and the trends of the

24   Butte settlements will demonstrate why that was a different

25   fire at a different time in a different place under a different

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    insurance regime.

2           And so we are one hundred percent prepared to waive

3    the mediation privilege with respect to the 2015 Butte fire and

4    provide that information.  The problem is we don't get to waive

5    that ourselves.  It's not a one-party waiver scenario.  And so

6    we asked the TCC almost a month ago whether they could talk to

7    the trial lawyers who they're working with, including Mr.

8    Campora, who the Court heard from earlier, to see if they would

9    be willing to waive the privilege with respect to their part.

10          We never got an answer back to that until after they

11   had already told the Court that the issue was ripe for

12   determination.  We had a subsequent call, where I said we were

13   still waiting for this, and they told us that the answer from

14   the trial lawyers was it's too much work.  It's too much work

15   to go back and try to get this consent from 1,500 people.

16          We don't have a whole lot of empathy for that

17   position.  But in the end of the day, from our perspective,

18   we're stuck here, because we have California law that says we

19   can't do this.  We've said we're willing to waive this.

20   They're here arguing to the Court that we're stonewalling and

21   trying to hide this, but they're unwilling to make the effort

22   to actually get the consent that would be needed to get access

23   to the documents.

24          The reference to confidentiality order solves nothing.

25   The confidentiality order, as the Court well knows, is just

PG&E Corporaation; Pacific Gas & Electric Company

1    about exactly who can see a set of documents that are produced.

2    But if the law says the documents can't be produced in the

3    first instance -- and that's what the mediation language seems

4    to say -- under California state law, the fact that you

5    produced it subject to a confidentiality agreement doesn't

6    change the fact that you've made an unlawful disclosure.

7         THE COURT:  Okay.  Let me ask you this question.

8         MR. ORSINI:  And so --

9         THE COURT:  Mr. Orsini, I seem to recall there were a

10   number of Butte County plaintiffs who settled and got paid and

11   were home free, and a large number of others complained because

12   the bankruptcy stopped them.  Focusing on the latter group, the

13   plaintiffs who settled with Butte on Butte fire but didn't get

14   paid, they will either fish or cut bait.  They will either file

15   a claim, or they won't.  Correct?  And so if there --

16        MR. ORSINI:  I would expect so, Your Honor.

17        THE COURT:  If there's a victim of the Butte fire who

18   has a settlement agreement that says you're entitled to X

19   dollars and that person doesn't file a claim, that person might

20   be out of luck.  If the person does file a claim, it would seem

21   to me -- I don't know where there's a privilege or perhaps a

22   privilege waived as to the final document.  I'll leave aside

23   the negotiations and the backs and forth.

24        But at the end of the day, if there's a document that

25   a claimant files to say, I settled for X dollars; here's my

PG&E Corporaation; Pacific Gas & Electric Company

1    settlement agreement; this is my claim, it's hard for me to

2    imagine that that document is privileged any longer.  Do you

3    think, Mr. Orsini, that's a correct, accurate statement or an

4    inaccurate statement?

5              MR. ORSINI:  Well, to answer the question, Your Honor,

6    I don't really know the answer to that, and that's part of what

7    we're struggling with here, because I think the face of the

8    mediation statement -- the mediation privilege -- would

9    arguably say -- and I think, right on its four corners would

10   say they can't disclose that settlement agreement in this

11   context.  Now --

12             THE COURT:  But the claimant --

13             MR. ORSINI:  -- as you just heard me say --

14             THE COURT:  But the claimant can.  If PG&E --

15             MR. ORSINI:  Well, no.  I don't think so, Your Honor.

16             THE COURT:  Wait a minute.  If PG&E publicly states

17   that it will waive a privilege for people they settled with --

18             MR. ORSINI:  Yes, that's where I was going.

19             THE COURT:  -- and Mr. X --

20             MR. ORSINI:  Yes.  That is where I was going with

21   that.

22             THE COURT:  -- settled, and he files his proof of

23   claim, that sounds to me like a waiver of any privilege.

24             Now, Ms. Morris --

25             MR. ORSINI:  I think you're right, Your Honor.  That's

PG&E Corporaation; Pacific Gas & Electric Company

1  where --

2      THE COURT:  Okay.

3      MR. ORSINI:  Sorry.

4      THE COURT:  Ms. Morris, is that your understanding of

5  the California law?  If both sides to the settlement meet and

6  waive the existence or the four corners of the settlement

7  document, isn't that their prerogative?

8  MS. MORRIS:  I agree with you that the parties can waive the

9  settlement privilege, Your Honor, but I don't think that that's

10  the relevant analysis here.  The analysis is the fact that it's

11  not covered by the mediation privilege from the get-go because

12  of the related evidence code Section 113 -- 1123 which says

13  that they're not subject to the mediation privilege or

14  protection if the policy includes language that is admissible

15  or subject to disclosure, or words to that effect.  Or if the

16  agreement provides that it's enforceable or words to that

17  effect.

18      So the protections are -- include specific additional

19  provisions that would take them outside of the mediation

20  privilege themselves.

21      THE COURT:  Well, I don't --

22      MS. MORRIS:  And beyond that, Your Honor --

23      THE COURT:  But again, how do I know that?  How do I

24  know what they actually say?  I don't know.  Who knows?

25      MS. MORRIS:  Well, that's the point.  We have no

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    testimony or evidence before this Court that any of these

2    documents are subject to the mediation privilege or are marked

3    as such.

4         THE COURT:  Well, we have on your side of the debate

5    here, the plaintiffs' lawyers.  And they are in a position to

6    express their opinions as to whether their own clients have

7    waived a privilege.  Again, that's not -- they didn't do

8    anything wrong.  The question is if there's a settlement

9    agreement between Mr. X and PG&E and it has on it's face the

10   kind of language you say, then why would anybody assert that

11   it's privileged?  But if the debtor says, we waive any claim of

12   privilege, it seems to me the ball is in the TCC's court and

13   the option to make those documents available freely and

14   voluntarily.

15        Remember the TCC and its bankruptcy lawyers want to

16   put together all this information to come up with an estimation

17   of the aggregate claims for purposes of confirmation of a plan.

18   We are not talking an individual's particular rights.  In fact,

19   if there's been a settlement, I don't know that there's

20   anything to talk about in terms about estimation.  It's a done

21   deal.  It's not an unliquidated claim, it's not -- it's

22   certainly not contingent, and it's not disputed.  So it's the

23   unliquidated claim that we're talking about.

24        So I guess what I'm saying --

25        MS. MORRIS:  No, actually, Your Honor --

PG&E Corporaation; Pacific Gas & Electric Company

1      THE COURT:  Go ahead.  Why isn't it --

2      MS. MORRIS:  Sorry.

3      THE COURT:  Doesn't it -- why isn't it a liquidated

4  claim and therefore isn't even up for estimation?

5      MS. MORRIS:  But we're not seeking the settlement

6  agreement -- the 1,500 settlement agreements from Butte and the

7  hundreds of settlement agreements from San Bruno, we're not

8  seeking it for purposes of determining the value of those

9  claims.  We're seeking them, quite frankly, for the same reason

10 that the debtors are using them.  Because they provide a lot of

11 useful data points from which the TCC and all the parties can

12 use to estimate claims in this process.

13      All of the debtors' documents that they've produced so

14 far give reference to the fact that they are relying upon prior

15 settlement data to analyze what the value of the future claims

16 are worth.  Because they're identical.  They contain property

17 losses.  They contain nuisance claims.  They contain zone of

18 danger claims.  They contain emotional distress claims and

19 wrongful death claims.  They're the exact type of claims under

20 very similar circumstances as what we're trying to estimate now

21 and the debtors recognize the relevance and importance of this

22 because they're relying upon them in how they're approaching

23 estimation.

24      And so the bankruptcy courts regularly recognize this

25 and the Eagle-Picher case is probably the most prominent one on

PG&E Corporaation; Pacific Gas & Electric Company

1  point but all of the (indiscernible) cases do as well.

2  THE COURT: You know, it doesn't help -- Ms. Morris,

3  it doesn't help for you to keep citing a bankruptcy court level

4  case. It's not controlling doctrine. I will consider it but,

5  on the fly, I can't. Okay? I prepared for a discovery

6  dispute, not for a legal argument about the applicability about

7  another bankruptcy court decision.

8  And I know it's an important case but I don't -- I

9  have to deal with it in this case. If to the extent -- you

10  persuaded me that to the extent that the debtor is going to

11  rely on this data for its part of the calculation to estimate,

12  then indeed they -- you should be entitled to it also. I don't

13  disagree with that.

14  But I will say that if there is a claimant who settled

15  and the only thing that happened is that -- well, one --

16  claimant A settled and got paid, claimant B settled and didn't

17  get paid, those two claims may be relevant for various purposes

18  but neither of them is disputed or unliquidated. Each is

19  liquidated and each is undisputed.

20  Now, does that mean it's taken into account for

21  purposes of the estimation? I don't have an answer. But I

22  would think that the inquiry that the trier of fact has to make

23  here for purposes of confirmation or -- well, for confirmation

24  purposes at the moment, is that's not an unliquidated claim,

25  it's not considered. Now, I -- you all and you, Ms. Morris,

PG&E Corporaation; Pacific Gas & Electric Company

1    specifically, have done much more research and learning on

2    this.  I have not.  So you may believe that I have overstated

3    or oversimplified and if so then I will hope to be educated

4    when I have to.  For now, I'm just dealing with it as a

5    discovery dispute.

6          And so I -- look, I'm looking for a solution for at

7    least the Butte fire discovery question and it strikes me that

8    maybe the answer is found in the plaintiffs' willingness to

9    consent, at least, to the providing of the information that

10   we've talked about.

11         Mr. Orsini, was that you about to speak or someone?

12         MR. ORSINI:  It was, Your Honor.  I was going to

13   offer, at least what I view is a constructive solution.  One

14   piece of it is what you just said which is that the easiest

15   path here is for the plaintiffs' lawyers to get the consent of

16   their clients and then we don't have an issue.  Because

17   ultimately, as I stated Your Honor, the debtors want to get

18   this information into the TCC's possession and ultimately

19   before the Court.  What I can't do is advise my client to

20   produce documents when I think we might be violating California

21   state law.

22         And so I think in the first instance, the easiest

23   solution is the consent from the plaintiffs' counsel.  And if

24   we're unable to get that consent, frankly, it raises my concern

25   about producing the documents because you don't hear them

PG&E Corporaation; Pacific Gas & Electric Company

1    saying that the documents can just be produced.  And so we've

2    got a legal question as to the ability if the debtor, my

3    clients, turn them over.  If we don't get the consent of the

4    plaintiff's lawyers, maybe then we need to have a motion teed

5    up for the Court, I hate to suggest more paper Your Honor but

6    this is an important issue, we have a motion teed up for the

7    Court, a motion to compel from the TCC, where they can set

8    forth specifically why they believe we actually can produce the

9    documents under California law.  We can provide Your Honor with

10   a counterargument and if Your Honor agrees with the TCC which,

11   you know, frankly, would be the outcome we're looking for here,

12   there would be an order that requires us to produce the

13   documents.

14            THE COURT:  Well, Mr. Orsini --

15            MR. ORSINI:  As we stand here --

16            THE COURT:  Mr. Orsini, why can't you in the aggregate

17   estimate -- why can't you say, what are the amounts and the

18   number of claims settled and the number and the amount of money

19   paid or committed to be paid to settle Butte?  That doesn't

20   disclose a specific --

21            MR. ORSINI:  But we can, Your Honor.

22            THE COURT:  I mean, when it comes to an estimate -- if

23   we were having an estimation trial, we wouldn't be looking at

24   individual documents, we'd be looking at the aggregate.  And

25   this goes back to my point about if the claims are liquidated

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1   and no longer disputed, I don't even know they are relevant.

2   But let's assume that it is.  Certainly the debtor is able to

3   say, we had X number of claims asserted against us in Butte and

4   we settled for Y amount of dollars.  And I would think that

5   that might very well be probative in terms of, well, okay, what

6   is the inference one might draw to estimate the claims for the

7   Atlas fire or the -- some other fire, if there's a comparable

8   of fires.  There certainly might not be comparable fires but

9   they're comparable of the kinds of damages that are asserted by

10  the victims and what got them compromised and settled.

11         MR. ORSINI:  And to address that, Your Honor, I do

12  believe we can disclose the aggregate number.  We have

13  disclosed that aggregate number.  It's in the company's

14  financial statements.  The aggregate numbers are in the

15  documents that have already been produced to the TCC.  But this

16  is where there could be significant prejudice to the debtors

17  and other stakeholders if we're just talking about the

18  aggregate number.

19         A fire from 2015 that involves different geographies,

20  different claims, different insurance law, we don't believe the

21  aggregate number itself would fairly and accurately describe

22  what an estimated liability would be for the current fires.

23         THE COURT:  But isn't that for your --

24         MR. ORSINI:  And while the --

25         THE COURT:  -- isn't that for your expert to say?  In

PG&E Corporaation; Pacific Gas & Electric Company

1    other words, doesn't --

2         MR. ORSINI:  It is, Your Honor.  It absolutely is for

3    our expert to say, but how can our expert do that and how can

4    our expert do that with any level of confidence to present to

5    Your Honor if the expert can't dig into what drove particular

6    settlements.  But why it -- you know, taking a sampling of the

7    settlements, why did this amount of money get paid out for this

8    type of claim?

9         THE COURT:  But that -- Mr. Orsini, I --

10        MR. ORSINI:  And how does that --

11        THE COURT:  I think that's why estimation is

12   different.  In other words, if we were having a trial with a

13   group of plaintiffs here each to prove his own case and it may

14   be inappropriate to look to see the specifics of settlements of

15   some prior claims of some prior people in comparable

16   situations.  But when there's an estimation, by definition it

17   is an aggregate approach.

18        Now, I believe that an expert on one side or the other

19   might try to say, well, why is the Butte fire different from

20   the Camp fire, or the Tubbs fire, or any other fire?  And

21   indeed, I'm sure your experts would say, well, of course, the

22   San Bruno fire is completely different and so was the Goshen

23   fire.  Because they are different.  The question is whether

24   they are relevant for purposes of making an estimation, and if

25   an expert says, you know, whether it's Atlas or Camp or you

PG&E Corporaation; Pacific Gas & Electric Company

1   know whatever the other names of all the other fires, it's all

2   part of the aggregate estimation of property damage, wrongful

3   death, personal injury, et cetera.  That's much different.

4          So I guess what I'm saying is that I don't know why

5   you can't provide enough detail that protects the privilege but

6   is responsive to how do you, as PG&E's counsel go about your

7   estimation of this component called the Butte 2015 fire.  And

8   it seems to me that could be shared with the plaintiffs.

9          And I don't know this for sure but I'm pretty sure

10  that the estimation process is unique to bankruptcy.  I

11  don't -- there may be similar processes in class actions and in

12  multi -- mass tort litigation under state law or even under

13  federal civil practice but in thinking about this case, as I

14  have a lot lately also, and reading the briefs, I'm not sure

15  I'm aware of any counterpart or corollary to the estimation

16  process that has to be done under Section 502(C).

17         So let's get back to work.  Ms. Morris, I think --

18         MS. MORRIS:  Your Honor, if I could respond to --

19         THE COURT:  Well, I think --

20         MS. MORRIS:  -- your comments and Mr. Orsini's?

21         THE COURT:  Well, yeah.  But I think you're going to

22  have to be -- give me more information before I can order what

23  you want me to order at this point.  And I -- including -- I'm

24  really not at all of the view that the San Bruno fire is fair

25  game for this one.

(97<del>7/0 61 2150</del> operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1          But go ahead, Ms. Morris.

2          MS. MORRIS:  Sure.  Thank you.

3          I think Your Honor is exactly right on the relevance

4     of this information.  It's information that the debtors are

5     relying upon in how they're estimating the tort claims here for

6     '17 and '18.  And it's relevant because it's the exact same

7     types of causes of action and damages that were occurring in

8     2015 are occurring here in '17 and '18.

9          And the bigger picture is that we are looking at maybe

10    a six-month window in which we need to estimate claims.  The

11    debtors have been looking at this data set for months and

12    months.  And they're using it to estimate claims and they're

13    referring to it in public filings and internal documents as the

14    source of how they're estimating the claims that they

15    aggregate.  And it's even broken down by different categories

16    of losses, like, tree loss and emotional distress.  These

17    documents are extremely relevant.

18         We are happy to brief the issue on the settlement

19    agreements and related documents themselves.  But at least for

20    today -- and to put the TCC on the same footing as the debtors

21    and looking -- and starting to estimate plans and look at how

22    we're going to estimate claims in this expedited process, we

23    would ask that you order, at a minimum, that the debtors be

24    forced to produce their internal data spreadsheets -- and we

25    know they have them because we have them for a hundred or so of

PG&E Corporaation; Pacific Gas & Electric Company

1   the Butte cases -- the internal spreadsheets that give the

2   settlement amounts in the aggregate, as well as their

3   allocation of those settlement amounts to various types of

4   claims, like, property loss, tree loss, emotional distress,

5   because that's exactly what they're referring to in their

6   estimation-related documents, and we should be given access to

7   the same thing.  And then we can separately brief the issue, as

8   Mr. Orsini suggested, on the actual settlement agreements and

9   demands themselves, if Your Honor wishes.

10          There's over 2,800 people who settled these claims in

11  San Bruno and in Butte.  Some of them are no longer living.

12  The plaintiffs' lawyers do not represent all 2,800 and they

13  can't consent on behalf of 2,800 people.

14          So Mr. Orsini's suggestion that we have to go back to

15  2,800 people is a nonstarter, and not only that, we contend

16  that it's not necessary under the relevant California law, but

17  we can brief that issue.

18          But at least for purposes of today, we'd ask that Your

19  Honor rule that they have to produce the spreadsheets that show

20  the settlement amounts with the allocations to the various

21  categories of the plan.

22          THE COURT:  Mr. Orsini, are you willing to continue

23  your hat trick of roles here?  Are you going to agree to that

24  spreadsheet?

25          MR. ORSINI:  I would love to, Your Honor, but I can't

PG&E Corporaation; Pacific Gas & Electric Company

1   because I don't believe it's a separate issue.  It's the same

2   mediation-protected information just taken out of one document

3   and put into another.  That doesn't change the fact that --

4         THE COURT:  But what makes that document -- what makes

5   that internally and generated aggregate document privileged?

6   It's --

7         MR. ORSINI:  Because the information contained in

8   the -- the information from the mediation itself is what is

9   protected from disclosure.

10        THE COURT:  Well, how are you --

11        MR. ORSINI:  And so it's not --

12        THE COURT:  Well, how are you going to produce it at

13  trial?  I mean, you're not going to have a trial --

14        MR. ORSINI:  Well, Your Honor, that's where --

15        THE COURT:  -- with only one side here, are you?  No,

16  I mean --

17        MR. ORSINI:  Well, no, we don't want to have one, Your

18  Honor.

19        THE COURT:  Mr. Orsini --

20        MR. ORSINI:  And that's --

21        THE COURT:  -- if you've got twenty -- forget --

22  again, I'm going to put San Bruno aside.  So Ms. Morris said

23  that there are 2,800 settlements.  Let's assume there's some

24  large number lower than 2,800.  So that means that there are

25  some numbers of settlement agreements.  But all of those

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1  settlement agreements are considered in the aggregate and put

2  into a spreadsheet for you to say, our total exposure for

3  personal injury was this, and tree damage was that, and

4  property damage was that.  What makes that spreadsheet or that

5  work product privileged?  It's not.

6            MR. ORSINI:  No, but there are two issues though, Your

7  Honor.  Number one, with the spreadsheets that Ms. Morris is

8  talking about, we've provided aggregate numbers.  But the

9  spreadsheet that she's talking about is breaking it down into

10  damages category, and then breaking it down further into

11  individual settlements.  And the individual settlement level

12  information is protected by mediation privilege.

13            THE COURT:  Does the spreadsheet --

14            MR. ORSINI:  And also (indiscernible) --

15            THE COURT:  Wait, hold on.  Does the spreadsheet name

16  the claimants, the individuals?

17            MR. ORSINI:  It does, Your Honor.  It does, Your

18  Honor.

19            MS. MORRIS:  Your Honor, if I could -- if I could

20  interject.  We have one of those spreadsheets already and

21  they've redacted the identifying information for the claimant.

22  They produced a spreadsheet related to the 2015 San Bruno fire

23  and it redacts the --

24            THE COURT:  No, 2015 --

25            MS. MORRIS:  -- names of the claimants.

PG&E Corporaation; Pacific Gas & Electric Company

1    THE COURT:  2015 --

2    MS. MORRIS:  I'm sorry.  I'm sorry 2000- --

3    THE COURT:  -- Butte fire.

4    MS. MORRIS:  Yeah, sorry.  Thank you for the

5 clarification.  The 2015 Butte fire and it redacts the

6 claimants' names but it's only for a hundred of those 2,800

7 settlements.

8    THE COURT:  Okay.

9    MS. MORRIS:  The one thing that they did redact was

10 their allocation of which amount goes to which bucket, which is

11 absolutely necessary here for the claims estimation process.

12    In addition, they've produced this information to the

13 SEC as part of the SEC's investigation.  And so we contend,

14 Your Honor, that they can't selectively redact this information

15 and rely upon it for estimation and selectively redact it.  And

16 so we've seen the version of the spreadsheet.  Our request is

17 that they produce it, not just for a hundred, that they produce

18 it for all 2,800.

19    THE COURT:  Okay.  Again --

20    MS. MORRIS:  And that the redactions that are not

21 identified redactions be removed.

22    THE COURT:  Ms. Morris, again, I'm --

23    MR. ORSINI:  Your Honor, if I may?

24    THE COURT:  -- I'm not rolling over on San Bruno.  So

25 I'm prepared, I think, to agree with you for Butte until Mr.

PG&E Corporaation; Pacific Gas & Electric Company

1    Orsini tries to persuade me otherwise.  But it seems to me

2    redacting the names of the individuals does not disclose what a

3    particular individual's claim was or what you settled with that

4    individual for because you don't tell who the individual is.

5    So what's wrong with that reasoning?

6         MR. ORSINI:  So Your Honor, that may very well be

7    accurate reasoning, but I think that issue needs to be briefed

8    because it's not clear to me that California law supports that

9    outcome.  And so all I'm asking is that the Court hear both --

10        THE COURT:  But do you have any sense that why would

11   California do it?  In other words, did PG&E, did you breach the

12   confidences of the mediation when you turned it over the SEC?

13        MR. ORSINI:  No, Your Honor, because we did not

14   provide anything to the SEC that were not already -- that we

15   have not provided to the TCC in this context.  They got the

16   same version of this spreadsheet that the SEC received.

17        THE COURT:  Then give them --

18        MR. ORSINI:  We made redactions --

19        THE COURT:  Give them the same version of all the

20   spreadsheets then for Butte.

21        MR. ORSINI:  We've said we will, Your Honor.  We've

22   said we will.

23        THE COURT:  Well.

24        MR. ORSINI:  The SEC was focused, Your Honor, on one

25   particular -- or a couple of years' worth of disclosure.  And

PG&E Corporaation; Pacific Gas & Electric Company

1   so the more recent versions of the spreadsheet that cover later

2   years and more of the settlements, the SEC was not interested

3   in receiving.

4           So what we've said is, we will provide, in the same

5   redacted form, the updated years to the TCC.  We've already

6   said we would do that.

7           What the real dispute here, Your Honor, is, is with

8   respect to the more detailed information with the offers, with

9   the agreements, with the responses, and that's the one that I

10  think Your Honor needs to be --

11          THE COURT:  But I think I've --

12          MR. ORSINI:  -- briefed, and there --

13          THE COURT:  But I've agreed -- I'm agreeing with you

14  on that.  But that's --

15          MR. ORSINI:  No, I understand, Your Honor.

16          THE COURT:  That's not relevant.

17          MR. ORSINI:  I just wanted to make sure --

18          THE COURT:  That's not, to me, if we were at a trial

19  and the issue -- look, for those of you that are not bankruptcy

20  lawyers, let me just give you Bankruptcy 101 here.  We could

21  have an -- and leave aside whether it requires Article III or

22  not, that's not my point for what I'm making.

23          You could have an estimation trial with one claim.

24  You could have one individual who was injured by someone in

25  bankruptcy, but it's going to take years to determine the sum

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    total of that person's injuries.  But you would have to

2    estimate it to move under 502(c) -- for 502(c) to operate.

3           And so you wouldn't have a trial, you would have

4    something else, an estimation.  What do you have to do to

5    estimate this individual?  The person lost a leg.  Okay.  What

6    is the damages?  This person suffered traumatic injury.  What

7    are the projections?  Well, this person suffered crippling

8    physical injury.  What are the estimations?  And it's an

9    estimation.

10          So when we multiply it by thousands, obviously, it

11   gets more complicated.  But it's the same inquiry.  It's not

12   the trial, it's the estimation of the liability.

13          So I'm inclined to -- of the opinion that, for

14   openers, anything that relates to any of the fires that we're

15   talking about, and the only thing we've talked about today in

16   calendar year 2015 is the one fire about Butte in Butte County.

17   I don't remember, going back to the hearing we had on the claim

18   deadline, whether there's some other fires that I've forgotten,

19   but you all know what fires are part of the aggregate label

20   California Wildfires.  And we know that Ghost Ship is in that

21   label, San Bruno is not.  And I'm not talking about the Ghost

22   Ship issue today.

23          So at least for today's purposes, without further

24   briefing, I'm inclined to say that the debtor will have to

25   produce, for the Butte 2015 fire, all the information that it's

                  PG&E Corporaation; Pacific Gas & Electric Company

1    given to the SEC.

2         And for now, I'm not going to order them to produce

3    anything about the San Bruno fire because I'm not persuaded

4    that -- at this point, that the San Bruno fire explosion, and

5    what happened there, would be legally relevant at an estimation

6    trial for the 2015, '17, and '18 wildfires.  That's not, and

7    I'll keep an open mind about it, but I'm doing this on the fly

8    today, and Ms. Morris, I'm not prepared to give that to you at

9    this point.

10         Now --

11         MS. MORRIS:  Your Honor, could I just seek one

12   clarification of your order?

13         THE COURT:  Yes.

14         MS. MORRIS:  So Mr. Orsini said that the only

15   information they gave to the SEC are these hundred cases, a

16   spreadsheet that we already have.  And it's a hundred of the

17   over 2,000 settlements from 2015.

18         I would request that you consider clarifying your

19   order to include all of the 2015 Butte settlements and include

20   all of the allocations that PG&E used to put the total

21   settlement amount into the different buckets of claims because

22   that's how they're using it for purposes of estimation.

23         THE COURT:  Well, I --

24         MS. MORRIS:  And to put everybody on the same playing

25   field, that's how we'd like to use it.

PG&E Corporaation; Pacific Gas & Electric Company

1    THE COURT:  Ms. Morris, I thought I was -- maybe you

2    did a better job of restating it.  That's what I had in mind.

3    So Mr. Orsini, that's what I intend by this ruling.

4    MR. ORSINI:  Your Honor, just to clarify, we have no

5    objection to providing additional spreadsheets that provide the

6    same level information that we provided to the SEC, which will

7    cover additional settlements for additional years.

8    What we do object to providing, on the basis of the

9    mediation privilege and the point I was getting to, there's

10   also attorney work product associated with it, the unredacting

11   that which was redacted to the SEC, we don't believe is

12   appropriate, and that needs to be further briefed if the

13   Court's going to order that issue.

14   THE COURT:  No, I'm agreeing with you.  I mean, I

15   don't know what this spreadsheet looks like.  But if the

16   spreadsheet has Mr. X is the plaintiff, and you believe

17   disclosing his status or his, as it is, and it's in any way

18   relevant to -- I mean, it may be relevant -- it may be public

19   knowledge, he may have been a coplaintiff, it doesn't matter.

20   If it links up to something that PG&E has settled that should

21   be privileged, then I'm not changing that at this point.

22   But the allocation into the nature -- I mean, look, if

23   you say whatever the number is, 2,200, 25, you know better than

24   I the number of claims that are 2015 Butte fire settlements.

25   There is a spreadsheet that one could look at and determine

PG&E Corporaation; Pacific Gas & Electric Company

1    lots of information, what kind of claims were settled and what

2    were the aggregate amounts settled.  It seems to me that is

3    perfectly proper.  And to me, the test here is, if you think

4    you would have the -- you would be able to produce it at an

5    estimation trial, clearly, they have to have it the same way.

6    They, meaning TCC, but also the subrogation committee.

7            And certainly, it goes without saying, that the

8    information that's provided to the SEC has to be given to those

9    two groups as well.  And I'm not asking for attorney-client --

10   excuse me, attorney work product.  I'm not asking for specific

11   disclosures that are, at this point, on this record today, were

12   part of a settlement agreement.

13           If Ms. Morris is right that the settlement agreement

14   on its face has an opening for disclosure elsewhere, let's find

15   out.  You've provided her, I take it, with specimens of

16   settlement agreements, haven't you?

17           MS. MORRIS:  No, we haven't Your Honor.

18           MR. ORSINI:  We have not.

19           THE COURT:  Well, but --

20           MR. ORSINI:  But we can do that.  We can do that.

21           THE COURT:  You can blank out all the personal

22   information on a settlement agreement and say this is the

23   settlement agreement that was used, right?  You could do that,

24   can't you?

25           MR. ORSINI:  Yes.  I'm happy to share a specimen,

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    sample settlement agreement with them so they can understand

2    what the language is, and we can talk with them about their

3    argument.  There is something on the face of that settlement

4    agreement means it actually can be produced.

5         THE COURT:  And Ms. Morris, I take your word that

6    there are a lot of victims of Butte fire who perhaps died,

7    perhaps are not accounted for, perhaps are not represented by

8    counsel.  But you have access to a lot of those settlement

9    agreements that the very lawyers who are working with you, I'm

10   sure, can provide you with a check to look and compare what

11   they hold for their clients, vis a vis what Mr. Orsini and his

12   client makes available to you as the specimens.  And the

13   message is, he better provide specimens of things that are

14   consistent with what have been produced.  And I'm going to take

15   his word that he's going to do that.  All right.

16        MS. MORRIS:  Thank you, Your Honor.  And I think that

17   will help.  And just one last clarification, Your Honor.  And

18   it may be that we don't even need to come back to you for the

19   actual agreements and the demands.  I'll hold that in reserve

20   for further briefing if we get these spreadsheets in the manner

21   that Your Honor is producing them.  But I would like to make

22   one clarification.

23        There are two types of redactions on these

24   spreadsheets.  One is for claimant identifying information,

25   like their names, and we are in agreement with the debtors and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    with the Court that those should stay redacted.

2           There's a separate type of redaction and they're

3    redacting the allocation amounts.  And I believe Mr. Orsini is

4    claiming that they're subject to work product.

5           And I would ask that Your Honor order that these be

6    produced without those redactions.  The allocations are the

7    ones that say this claim settled at this dollar amount, and we

8    take this amount that goes to the emotional distress component,

9    this amount goes to the property loss component.  Without that

10   information, Your Honor, the total dollar amount of the

11   settlement is no more information than we can get just from the

12   debtors' report as to what their total liability is.

13          THE COURT:  Well --

14          MS. MORRIS:  We absolutely need that information, and

15   PG&E's internal records make it clear that they're relying upon

16   that allocation and those specific dollar numbers to drive

17   their estimation numbers.  So it's critical that we get that,

18   Your Honor.

19          THE COURT:  Well, Mr. Orsini --

20          MS. MORRIS:  And it may negate the need for the

21   settlement agreements themselves.

22          THE COURT:  Mr. Orsini, let me ask you a question

23   since I presume -- were you personally involved in the 2015

24   settlements, or are there some other lawyers in your firm?

25          MR. ORSINI:  No, I was not personally involved, Your

PG&E Corporaation; Pacific Gas & Electric Company

1   Honor, and it's not my law firm.

2          THE COURT:  Well, then maybe you can't answer the

3   question, but I'm sure you've seen them.  So if you looked at a

4   settlement agreement with one of the victims, does that show an

5   allocation or does it have the usual --

6          MR. ORSINI:  It does not.

7          THE COURT:  -- recitals about so and so was injured,

8   or lost property and here's the settlement?  So on the face of

9   the document, like you'd see in any settlement agreement, there

10  would be an assertion, you know, plaintiff contends A, B, C;

11  defendant denies A, B, C, but the parties settle for one

12  million dollars.  It's probably more like that than a breakdown

13  of how much for the dog, and how much for the car, and how much

14  for the other components, right?

15         MR. ORSINI:  You're right, Your Honor.  I have looked

16  at a number of these contracts, a number of these settlement

17  agreements, and every one that I have seen has simply a lump

18  sum settlement amount.  And the amounts that are then, for

19  internal purposes, allocated, including to inform further

20  settlement discussions that the attorneys were having, that's

21  done through an exercise of attorney work product.

22         THE COURT:  Yeah, but --

23         MR. ORSINI:  Now, there are other documents that are

24  subject to the mediation privilege that are exchanged between

25  the mediating parties that actually do break it down.

PG&E Corporaation; Pacific Gas & Electric Company

1          THE COURT:  No, but if --

2          MR. ORSINI:  Claim demand letters --

3          THE COURT:  But if there's a document that was used

4    internally at PG&E, perhaps for the future settlements in 2015,

5    I don't know why that would be privileged.  In other words, I

6    don't know why, if it's work product -- it might be work

7    product, but it may be relevant here.  I mean, does work

8    product mean privileged?

9          In other words, if somebody in your firm or the

10   company took Mr. X's million dollars and did some internal

11   calculation from other information and says, you know he had a

12   new car, and he had an old cow, and he had a broken down fence,

13   and he suffered crippling injuries, and these are the

14   components, that's an internal allocation, but I don't know why

15   it would be privileged.  Why would it be privileged?

16         MR. ORSINI:  Well, it's an internal allocation, Your

17   Honor, that's being done by lawyers for the purpose of

18   conducting further mediations and settlement discussions.  So I

19   think it is absolutely protected attorney work product.  And to

20   the extent that the Court is inclined to require the production

21   of the internal work product, we would ask to be able to submit

22   briefing on that issue.

23         THE COURT:  Well, you can --

24         MR. ORSINI:  That's an important issue.

25         THE COURT:  -- have briefing on it, but again, we

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1   start with if you think you're going to get it into evidence as

2   part of your estimation, if your estimation is --

3           MR. ORSINI:  I understand that part, Your Honor.

4           THE COURT:  You know, it's a lost argument here.  All

5   right.  Let's defer on that one.  Going back to --

6           MS. MORRIS:  Your Honor, I would -- Your Honor, if I

7   could just respond briefly?

8           The debtors have already waived any privileges over

9   this information by using it in connection with estimations

10  that they're already doing in their SEC filings, and in

11  estimating claims in the aggregate of thirty billion.  They

12  have to know how those settlement agreements break out between

13  the different categories in order to use them to estimate

14  claims.  They intend to use those settlement agreements to

15  estimate claims in this case, and they've waived any privileges

16  associated with it.

17          And not only that, to claim privilege over some of the

18  information but not other information, to deny the tort

19  claimant the ability to evaluate and estimate claims in the

20  same exact manner that they've doing for months and months, is

21  just unfair and the selective waiver law in the Ninth Circuit,

22  I think should be factored in here.  But they shouldn't be able

23  to claim work product protection, yet pick which information

24  they want to disclose and be able to use the redacted

25  information themselves while denying us the ability to do so.

PG&E Corporaation; Pacific Gas & Electric Company

1    And so further briefing is going to further delay

2    this.  It's critical information that we need to start

3    estimating these claims and to start the estimation

4    proceedings, and I would ask that Your Honor consider ordering

5    them to produce the charts that they've already agreed to

6    produce, but with the allocation to the different components,

7    as Your Honor stated before is absolutely relevant to

8    understanding this, that they be ordered to produce it today.

9    We can defer all arguments on San Bruno and on getting

10   the actual settlement agreements until later, but this is

11   critical information that we need to start looking at

12   estimation and to be on the same level playing field as the

13   debtors here.

14   THE COURT:  Mr. Orsini, I'll state it differently.  I

15   don't have to break it down into these elements.  I'd say if

16   PG&E, either in this court or publicly, or in press releases,

17   or in SEC filings, or in filings before Judge Alsup or anywhere

18   else has said, we think our estimate of liability for this

19   particular fire or these fires is X, I think a fair

20   interrogatory would be, how did you get to X?  And if the

21   answer is well, we can't tell you because it's privileged,

22   that's not a winning argument.  Because if you -- again, we're

23   back to the point, if you're not going to explain it as a

24   matter of discovery, I'm not going to let you show it as a

25   matter of proof.

PG&E Corporaation; Pacific Gas & Electric Company

1      So I think I'm going to go with what Ms. Morris argues

2    here, unless you believe this is a miscarriage of justice and

3    needs immediate briefing, then you better brief it quickly.  So

4    let's leave that for now.

5      And Ms. Morris, the last item that was on my list,

6    when you were describing your buckets after we talked about

7    settlements in 2015 Butte, you then went to what's included in

8    the estimate.  Generally, I presume, you're -- that means even

9    beyond Butte.  So much of the last hour -- or half-an-hour,

10   we've been talking about, are things that, for reasons I

11   (indiscernible), maybe aren't even any more estimated claims,

12   they may be liquidated claims.

13     You want the same kind of information for the 2017 and

14   2018 fires, which I think for almost probably one hundred

15   percent are unliquidated except -- well, I presume they're

16   unliquidated except maybe the public settlement that PG&E

17   brought in with Butte County.  That is one that's no longer

18   unliquidated.  But otherwise, for individual claimants, do I

19   understand your argument correctly?

20     MS. MORRIS:  No, I think the documents, specifically

21   that we were looking for, they are -- the SEC has opened an

22   investigation, that the debtors have disclosed in their public

23   filings, and the purpose of that investigation, as reported by

24   the debtors in their public filings, is that the SEC is seeking

25   information relating to the debtors' public disclosures and

PG&E Corporaation; Pacific Gas & Electric Company

1    accounting for losses associated with the 2017 and 2018 wild

2    fires and the 2015 Butte fire.

3           And our request is simply that they be obligated to

4    produce the same information they're producing to the SEC to

5    the tort claimants.  They said, in their response to Your

6    Honor's request for the pleadings that led to today's hearing,

7    that they're only producing that information to the extent it's

8    responsive to another request.  And we would ask that Your

9    Honor order the debtors to produce it all, and not just

10   selectively pick what they want to produce as responsive to

11   other requests, given that the narrow focus of the SEC

12   investigation is exactly what we're talking here, which is

13   estimation of the 2017 and '18 wildfire liability.

14          THE COURT:  Well, when you were describing your four

15   buckets, what I wrote down for number four, in your words -- I

16   won't quote you verbatim -- but your words were, there are two

17   sub-buckets and the first of the two was the settlement 2015

18   and 2020 San Bruno.  And then the second one, I wrote, what was

19   used to estimate them, unless I misunderstood you.

20          So I'm not sure what you want me to order the debtor

21   to do now, beyond what we've just talked about.  So I've stated

22   again -- forget --

23          MS. MORRIS:  I -- I'm --

24          THE COURT:  -- 2015 --

25          MS. MORRIS:  Sure.

PG&E Corporaation; Pacific Gas & Electric Company

1          THE COURT:  We're past that.  If I asked you --

2          MS. MORRIS:  Yes.

3          THE COURT:  -- to describe specifically what you want

4   me to tell Mr. Orsini he has to produce beyond that, just

5   restate it so we're on the same page.

6          MS. MORRIS:  Sure.  Any information upon which the

7   debtors rely to estimate fire claims exposure for 2017 and

8   2018, which would include anything they produced to the SEC in

9   response to their nearly identical requests for the debtors.

10         THE COURT:  So it's, "which would include" which

11  means, therefore, anything else?

12         MS. MORRIS:  Yes.

13         THE COURT:  Okay.

14         MS. MORRIS:  So it's everything beyond the settlement

15  agreements and documents that the debtors are using to estimate

16  their liability in which they've relied upon in their SEC

17  filings and other documents to estimate the aggregate of their

18  liability for 2017 and 2018 fires.

19         THE COURT:  Okay.  But what about if Mr. Orsini tells

20  me there's some privileged work product included there?  What

21  do I do about that?  He's entitled to protect that, isn't he?

22         MS. MORRIS:  If they use it in connection with

23  estimating claims and public filings with the SEC or in public

24  statements made with this Court, then I would argue that it's

25  not privileged.  And so I -- to the extent that it's their

PG&E Corporaation; Pacific Gas & Electric Company

1    expert work product or whatever, they can certainly put that on

2    a privilege order for documents, produce a log identifying the

3    documents or stating that it's an expert work product.  But to

4    the extent that they're relying upon that information to give a

5    public disclosure about the extent of their liabilities, I

6    would argue that that's not privileged or subject to any

7    protection.

8              THE COURT:  Okay.

9         Mr. Orsini, you got the message here?

10        MR. ORSINI:  Don't miss the fact, Your Honor, could --

11   I think a couple of issues are being confused here.  With

12   respect to the SEC investigation, what we have told the TCC was

13   that if there are documents we've produced to the SEC that

14   relate to the estimates of liability for the 2017 and 2018

15   fires -- which is exactly the coverage of the document request

16   the TCC has already served -- we're producing them.  So we're

17   producing those documents by subject to privilege, subject to

18   mediation confidentiality.

19             If there are other documents on other topics that we

20   have produced for the SEC, we're not agreeing to just give them

21   all of those documents because they've been given to the SEC.

22   If they can articulate a need and relevance to any other

23   documents on other topics, so be it; we can talk about those in

24   the context of discovery requests.

25             So I don't think there's really a dispute with respect

(970) 352-7150 operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1 to the SEC documents as Ms. Morris just articulated them. If

2 it's a document we produced to the SEC that relates to the 2017

3 and '18 wild fire claims liability estimates, those documents

4 have already been provided to the TCC in the same format they

5 were produced to the FCC.

6 Separately, with respect to documents that were

7 flagged either mediation privileged or attorney work product,

8 we have not produced those to the SEC, and we do not believe

9 that those tenure should be produced to the TCC even if they

10 were also used as part of public disclosure.

11 And that's an issue that, as I said, Your Honor, has

12 not been briefed. We believe that we're correct in the

13 California law, and we're happy to brief that quickly.

14 THE COURT: Well, Ms. Morris, I'm --

15 MS. MORRIS: Your Honor, that doesn't address the

16 question --

17 THE COURT: All right. Go ahead. I'm having trouble

18 keeping up with you.

19 MS. MORRIS: That doesn't --

20 THE COURT: Go ahead, Ms. Morris.

21 MS. MORRIS: That doesn't address the question of

22 whether if the debtors used documentation to support the

23 thirty-billion-dollar number that they put in their SEC filings

24 as what they're expecting their disclosure could be, not

25 inclusive of punitive damages and fines and other amounts.

PG&E Corporaation; Pacific Gas & Electric Company

1    Whatever documents they relied upon to come up with that

2    number, they've waived the privilege over that.

3          So separate and apart from what they've produced to

4    the SEC, and whatever they're claiming as protection for the

5    SEC, they've waived any privilege when they relied upon those

6    documents and put down that thirty-billion-dollar number in

7    their SEC filing or to put that number in the filings they've

8    made in this Court or in public statements.

9          THE COURT:  Okay.  So to state it differently, if Mr.

10   Orsini said that you've been given what's been said to the SEC,

11   what you're saying is, if you said to the SEC that the estimate

12   is thirty million, what do you have to rely on making that

13   statement; and he's saying -- and you're saying he hasn't

14   produced that; is that correct, Ms. Morris?  That is --

15         MS. MORRIS:  That's right.  We've gotten very limited

16   productions in that regard.  And --

17         THE COURT:  Okay.

18         MS. MORRIS:  And he said that he would produce some

19   information, but he's also withholding a bunch of information

20   on privileged ground, and I would argue that they're not

21   privileged because he's relied upon them to make a public

22   disclosure --

23         THE COURT:  Okay.  I --

24         MS. MORRIS:  -- as you know.

25         THE COURT:  I guess I don't have enough of a sense to

PG&E Corporaation; Pacific Gas & Electric Company

1 know that I -- which of you I agree with on whether there's a

2 waiver of the privilege.  But the question is -- well, I don't

3 have an answer.

4        Mr. Orsini, is there -- you believe no waiver and

5 privilege when you tell the SEC that we estimate our

6 liabilities for the 2017 and '18 fires at thirty billion?  I

7 mean, that -- again, we're back to the simple interrogatory:

8 what did you rely on to get the thirty billion?  What's the

9 answer?  If the only answer is, attorney work product, if

10 that's your answer, that's what I want to hear.

11        MR. ORSINI:  Well, Your Honor, there are a lot of

12 public documents that were relied upon in coming up with those

13 figures.  Those documents have been produced to the TCC.  They

14 were produced both by us as well as in connection with the

15 whole Compass Lexecon STI issue that Your Honor probably

16 remembers.

17        THE COURT:  Yep.

18        MR. ORSINI:  The way to resolve -- the way to -- the

19 way that was resolved was an exchange of information -- public

20 information; that was the stipulated resolution there.  So the

21 publicly available information, the documents, have been

22 produced.

23        There is also work product that was done by our

24 litigation consulting experts that further support the

25 thirty-billion-dollar number, and it is absolutely our view

PG&E Corporaation; Pacific Gas & Electric Company

1  that that expert work product remains one hundred percent

2  protected by the work product doctrine.

3  THE COURT:  Well, but --

4  MS. MORRIS:  Your Honor, maybe I can make this simple

5  for you.  Why don't we do this?  the TCC is perfectly wiling to

6  send the debtors a set of interrogatories asking them to

7  identify each and every document that they relied upon to come

8  up with those numbers.  We would ask that they identify all

9  those documents and whether or not they're claiming a privilege

10  over those documents, and that Your Honor order them to respond

11  to that on an expedited basis, so that we can get to the

12  evidence matter, which is what are they withholding from us

13  that they're not giving to us which we don't even know what

14  that information is at this point.

15  THE COURT:  Well, Ms. Morris, that might be the way to

16  approach it.

17  Mr. Orsini, I take it your statement -- your last

18  statement there was, you absolutely rely on the litigation

19  consultant's expert as privileged; I understand that.  But you

20  could say -- you could name it on a privilege log, couldn't

21  you?

22  MR. ORSINI:  I could name it on a privilege log, and

23  we can also identify, with specificity, the public documents

24  that were actually used to do these calculations, all of which

25  they already have.

PG&E Corporaation; Pacific Gas & Electric Company

1    THE COURT:  Okay.  So it sounds to me that what your

2  representation is, that the universe of data to get to that

3  public -- I'm using the hypothetical thirty billion -- is a

4  combination of what's already been produced plus what would be

5  on the privilege log, but nothing else.  Is that what I'm to

6  assume?  Because if there's --

7    MR. ORSINI:  I think that's -- I think that's --

8    THE COURT:  If there's something else --

9    MR. ORSINI:  I that's generally right, Your Honor.

10 (Indiscernible) --

11   THE COURT:  If there's something else, then they're

12 entitled to it.  Okay.

13   MR. ORSINI:  No, no, I think that's right.  I mean, I

14 would just state it slightly differently, which is that there

15 were public documents that were relied upon for this.  There

16 was also expert work product by a litigation consultant to

17 interpret those public documents -- just like they can, just

18 like anybody else can.  But the actual mechanism of doing that

19 analysis is what we believe is work product and that was part

20 of the agreed resolution of the Compass Lexecon issue.

21   And candidly, I wouldn't even know how to begin to log

22 all of the materials and all of the work that was done by a

23 litigation consultant; that would be highly unusual.

24   THE COURT:  Well, I understand.  It would be.  I

25 don't --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    MS. MORRIS:  The point here, though, is that if

2   they're -- regardless if they're using -- if they're using the

3   same litigation consultant for purposes of estimation trials,

4   and they're using the same litigation consultant for purposes

5   of estimating for the SEC filings, there's no privilege because

6   they're waiving the privilege by identifying that number in

7   connection with their SEC filings.  The underlying documents

8   and analysis that they're using to come up with that

9   thirty-billion-dollar number is not privileged.

10    THE COURT:  Well, all right.  Ms. Morris, you've said

11   what you would inquire of.  You make -- you'd expedite a

12   written interrogatory.  Mr. Orsini can respond, and if his

13   response is all privileged, then that's the response.

14    And I'll -- I'm not going to make a decision without

15   it being briefed a little bit on this subject.  I think we're

16   clear on the subject of mediation privileges different from

17   something else here.  And there may be some information that

18   properly doesn't fall into what the expert has opined and what

19   is filed with the SEC, and PG&E should at least explain what it

20   is that might be in that category.

21    And I don't know what else I can do about it today.  I

22   can't make a decision on a matter of this importance today.

23   I'd like to think we've made some progress in the last two

24   hours.  Hopefully, we have.

25    MS. MORRIS:  Your Honor, if I could just ask for one

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporaation; Pacific Gas & Electric Company

1    additional clarification?  Our experience in working with the

2    debtors on discovery is that unless there's a motion to compel

3    or a deadline that is provided by Your Honor, that we don't get

4    all the information.  And so I would ask that the spreadsheet

5    that Your Honor ordered earlier be produced in unredacted form,

6    that we give the debtors a timeline by which to produce that

7    information.  We're fine with two weeks, and think that's

8    reasonable and more than sufficient time, given that they're

9    already relying upon this information, and ask that Your Honor

10   order that be produced within that time frame.

11           THE COURT:  Two weeks from today is August 21st, Mr.

12   Orsini.  Any problem with that?

13           MR. ORSINI:  I obviously take exceptions -- I

14   obviously take exceptions, Your Honor, to Ms. Morris's

15   characterization of discovery history; I think that's

16   fundamentally false.  But I have no objection to agreeing to

17   produce those spreadsheets within two weeks.

18           THE COURT:  Okay.

19           Ms. Morris, your request is granted by your opponent.

20           All right.  What else do we have --

21           MS. MORRIS:  Thank you.

22           THE COURT:  -- to deal with?  All right.  I'm going

23   to -- if there are other parties on the call or want to be

24   heard, I think I'm getting a little tired out, and my staff

25   here is, and probably a lot of you are.  And I do think we made

PG&E Corporaation; Pacific Gas & Electric Company

1   some progress, and if not, not.

2          So I will call it a day.  I'm not going to try issue a

3   formal order.  I couldn't actually do it.  If TCC or the debtor

4   want to try to reduce this to a written order, I'll sign an

5   order that opposing counsel has agreed to as to form.  I like

6   to think with the combination of the written transcript, the

7   audio upload, and everybody paying attention to this, that's

8   going to be adequate right now.  If we have a disagreement and

9   we have to have a further hearing with somebody, a he said/she

10  said, then we have a record to rely on.

11         I want to thank you all for your time and effort and I

12  look forward to seeing some of you on Friday and many of you

13  next week.  Thank you for your time today.

14         MR. ORSINI:  Thank you, Your Honor.

15         MS. MORRIS:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17     (Whereupon these proceedings were concluded at 11:43 PM)

18

19

20

21

22

23

24

25

PG&E Corporation

1                    I N D E X

2    RULINGS:                                    PAGE  LINE

3    Debtors ordered to produce requested          99    19

4    discovery to TCC on or before August 24,

5    2019.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          C E R T I F I C A T I O N

2

3    I, Jennifer Hamilton, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ JENNIFER HAMILTON

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  August 8, 2019

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

## A

**ability (3)**
68:2;87:19,25
**able (12)**
11:22;12:1;13:8;
16:7;22:15;44:8;45:5;
69:2;82:4;86:21;87:22,
24
**absent (1)**
59:12
**Absolutely (13)**
21:20;29:11,16,18;
39:22;59:16;70:2;
76:11;84:14;86:19;
88:7;95:25;96:18
**accept (1)**
28:8
**acceptable (1)**
49:9
**access (11)**
11:17;12:13;14:18;
15:21;31:11;35:21;
36:4;41:1;60:22;73:6;
83:8
**accommodate (1)**
37:25
**accomplishable (1)**
35:4
**accordance (1)**
52:12
**account (1)**
66:20
**accounted (1)**
83:7
**accounting (2)**
48:3;90:1
**accurate (2)**
37:16;62:3;77:7
**accurately (1)**
69:21
**ACE (1)**
56:2
**acknowledge (1)**
26:2
**acknowledged (1)**
28:18
**act (1)**
13:14
**action (4)**
10:2;20:19,19;21:5;
30:9;72:7
**actions (1)**
71:11
**actual (5)**
26:23;73:8;83:19;
88:10;97:18
**Actually (21)**
7:23;19:22;34:22;
35:4,5;36:5,8;40:3;
46:7;49:11;50:21;54:5,
18;60:22;63:24;64:25;

68:8;83:4;85:25;96:24;
100:3
**ad (3)**
15:14;18:3;22:12
**add (1)**
55:22
**addition (1)**
76:12
**additional (10)**
11:19;17:7;55:1,19,
22;63:18;81:5,7,7;99:1
**address (8)**
17:1;24:1;26:25;
50:17;53:12;69:11;
93:15,21
**addressed (2)**
18:23;23:21
**addressing (1)**
34:15
**adequate (1)**
100:8
**adjudication (1)**
13:25
**admissible (2)**
46:19;63:14
**admit (1)**
29:21
**admitted (2)**
28:3,6
**advise (1)**
67:19
**again (28)**
6:6,18,23;8:9;9:14;
14:22;18:12;20:16,24;
21:7;24:20;27:9;32:5;
35:1;38:10;41:22;
51:19,21;55:24;63:23;
64:7;74:22;76:19,22;
86:25;88:22;90:22;
95:7
**against (1)**
45:17;69:3
**agenda (1)**
9:14
**aggregate (19)**
64:17;68:16,24;
69:12,13,14,18,21;
70:17;71:2;72:15;73:2;
74:5;75:1,8;79:19;
82:2;87:11;91:17
**ago (4)**
17:11;26:18;58:15;
60:6
**agree (7)**
20:4;30:25;34:19;
63:8;73:23;76:25;95:1
**agreed (1)**
78:13;88:5;97:20;
100:5
**agreeing (4)**
78:13;81:14;92:20;
99:16
**agreement (34)**

10:22;11:12,14;12:3,
11;13:5;14:18;16:1,2,
7,9,10;17:3;30:8;45:3;
59:4,11,12;61:5,18;
62:1,10;63:16;64:9;
65:6;82:12,13,22,23;
83:1,4,25;85:4,9
**agreements (21)**
45:5,22;46:10,18;
47:14;65:6,7;72:19;
73:8;74:25;75:1;78:9;
82:16;83:9,19;84:21;
85:17;87:12,14;88:10;
91:15
**agrees (1)**
68:10
**ahead (8)**
37:2;39:6,16;43:12;
65:1;72:1;93:17,20
**allocated (1)**
85:19
**allocation (9)**
73:3;76:10;81:22;
84:3,16;85:5;86:14,16;
88:6
**allocations (3)**
73:20;80:20;84:6
**allow (2)**
11:17;17:5
**allowed (2)**
54:24;57:4
**all-property (1)**
55:6
**almost (5)**
44:4,11;48:1;60:6;
89:14
**alone (1)**
25:23
**Alsup (24)**
31:25;32:10,16,18,
25;33:2,4,4;35:20,24;
36:1,4,7,8;20;38:25;
39:22;40:3,8,14,18,20;
41:14;88:17
**Alsup's (3)**
32:21;40:11;41:2
**although (2)**
40:17;50:18
**ambiguity (1)**
20:2
**amenable (1)**
20:8
**amended (2)**
51:24;52:11
**amount (13)**
27:10;34:13;47:21;
68:18;69:4;70:7;76:10;
80:21;84:7,8,9,10;
85:18
**amounts (10)**
16:20;35:14;68:17;
73:2,3,20;82:2;84:3;
85:18;93:25

**analysis (5)**
59:20;63:10,10;
97:19;98:8
**analyze (1)**
65:15
**analyzing (1)**
59:23
**answered (2)**
21:11,12
**apart (2)**
12:21;94:3
**apologize (3)**
6:10;8:20;51:21
**apology (1)**
9:3
**applicability (1)**
66:6
**applies (1)**
28:13
**approach (6)**
18:10;21:16;22:11;
58:23;70:17;96:16
**approaching (1)**
65:22
**appropriate (1)**
81:12
**approximately (1)**
37:5
**areas (1)**
55:19
**arguably (1)**
62:9
**argue (6)**
8:24;41:16;48:11;
91:24;92:6;94:20
**argued (1)**
28:8
**argues (1)**
89:1
**arguing (2)**
59:18;60:20
**argument (8)**
41:17;58:21,23;66:6;
83:3;87:4;88:22;89:19
**arguments (2)**
28:7;88:9
**arise (1)**
22:10
**arose (1)**
5:15
**around (1)**
8:10
**article (2)**
33:7;78:21
**articulate (1)**
92:22
**articulated (1)**
93:1
**aside (4)**
15:5;61:22;74:22;
78:21
**assert (1)**
64:10

**asserted (3)**
45:17;69:3,9
**assertion (1)**
85:10
**asset (1)**
55:1
**assets (1)**
43:21
**assist (1)**
12:6;22:21
**associated (4)**
48:3;81:10;87:16;
90:1
**assume (7)**
17:15;22:14;23:14;
41:9;69:2;74:23;97:6
**assuming (1)**
14:20
**Atlas (4)**
29:23;30:7;69:7;
70:25
**attention (1)**
100:7
**attenuated (1)**
57:8
**Attorney (8)**
22:1,2;81:10;82:10;
85:21;86:19;93:7;95:9
**attorney-client (1)**
82:9
**attorneys (1)**
85:20
**audio (1)**
100:7
**AUGUST (18)**
5:1;7:1,4,14,16;8:4;
10:4;12:10;23:12,14,
14;24:8;26:17;52:17,
19;53:17;99:11;101:4
**available (10)**
33:17;36:2;38:9;
39:23;40:5;43:22;44:1;
64:13;83:12;95:21
**avoid (2)**
6:24;38:12
**aware (3)**
23:3;33:8;71:15
**away (1)**
37:16

## B

**back (27)**
7:7;12:12;13:24;
18:12;19:3;21:6;23:7;
26:10;34:4,17,19;
35:22;39:18,21;50:11;
57:3;58:7;60:10,15;
68:25;71:17;73:14;
79:17;83:18;87:5;
88:23;95:7
**back-and-forth (2)**
9:10;59:10

Min-U-Script®
Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 103
of 119
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(1) ability - back-and-forth

**background (1)**
31:8
**backs (1)**
61:23
**bait (1)**
61:14
**BakerHostetler (2)**
18:14;42:12
**ball (1)**
64:12
**bankruptcy (22)**
12:5;20:19;24:5;
25:2,5;30:18;31:12;
35:10;36:17;38:15;
40:15;45:9;47:10;
61:12;64:15;65:24;
66:3,7;71:10;78:19,20,
25
**bar (2)**
11:24;12:7
**based (4)**
49:11;50:23;54:4;
59:19
**Basically (1)**
27:1
**basics (1)**
28:14
**basing (1)**
44:23
**basis (3)**
44:24;81:8;96:11
**Bay (6)**
24:15,24;31:8,14;
33:15;34:1
**bears (1)**
21:7
**begin (1)**
97:21
**beginning (1)**
21:9
**behalf (3)**
13:13;15:11;73:13
**beneficial (1)**
50:18
**benefit (2)**
50:25;53:23
**Benjamin (1)**
15:10
**Bermuda (1)**
56:2
**best (2)**
38:12;58:2
**better (8)**
14:24;18:16;50:25;
51:11;81:2,23;83:13;
89:3
**beyond (6)**
30:21;63:22;89:9;
90:21;91:4,14
**big (3)**
8:4;19:1;58:7
**bigger (1)**
59:2;72:9

**billion (6)**
12:23;59:19;87:11;
95:6,8;97:3
**bit (5)**
19:9;30:24;56:14;
57:7;98:15
**blank (1)**
82:21
**blanket (1)**
54:20
**board- (1)**
44:2
**bogged (1)**
41:10
**both (13)**
6:17;9:7;11:13;
20:23;24:5;25:12;
44:20;58:11;59:3,12;
63:5;77:9;95:14
**bottom (1)**
13:10
**bought (1)**
31:16
**breach (1)**
77:11
**break (3)**
85:25;87:12;88:15
**breakdown (1)**
85:12
**breaking (2)**
75:9,10
**brief (6)**
25:1;72:18;73:7,17;
89:3;93:13
**briefed (5)**
77:7;78:12;81:12;
93:12;98:15
**briefing (6)**
79:24;83:20;86:22,
25;88:1;89:3
**briefly (1)**
87:7
**briefs (1)**
71:14
**bring (3)**
12:4;16:8,13
**brings (1)**
34:19
**broad (1)**
30:21
**broader (2)**
10:15;57:16
**broadly (1)**
53:13
**broken (2)**
72:15;86:12
**broker (3)**
57:5,10,19
**brought (2)**
25:4;89:17
**BrownGreer (10)**
10:6;11:7,8,18,20;
12:4,10,13,21;13:5

**Bruno (22)**
32:11,15;44:18;46:3;
47:16;58:8,9,11,13;
59:3;65:7;70:22;71:24;
73:11;74:22;75:22;
76:24;79:21;80:3,4;
88:9;90:18
**Bruno's (1)**
58:24
**bucket (10)**
48:12,21,23;50:1,13;
54:1,2,4;58:7;76:10
**buckets (11)**
23:22;26:6;42:9,15;
43:25;44:16;48:11,18;
51:15;56:17;80:21;
89:6;90:15
**bunch (4)**
20:25;21:1;31:10;
94:19
**burdensome (1)**
57:14
**burner (1)**
38:19
**Butte (36)**
44:17;46:1;47:15;
58:11,21;59:4,17,20,
24;60:3;61:10,13,13,
17;65:6;67:7;68:19;
69:3;70:19;71:7;73:1,
11;76:3,5,25;77:20;
79:16,16,25;80:19;
81:24;83:6;89:7,9,17;
90:2
**button (4)**
31:18;32:5;33:23;
34:18

# C

**CAL (8)**
15:22;21:18;22:1,4,
7,13,20,22
**calculation (3)**
20:25;66:11;86:11
**calculations (1)**
96:24
**calendar (7)**
7:2,4;19:3;51:9,23;
52:24;79:16
**CALIFORNIA (16)**
5:1;46:14,17;48:4;
59:6,14;60:18;61:4;
63:5;67:20;68:9;73:16;
77:8,11;79:20;93:13
**Call (14)**
5:3,11,20,23,24;
7:22;14:2;44:2,14,14;
48:23;60:12;99:23;
100:2
**called (1)**
71:7
**camera (1)**

40:8
**Camp (8)**
22:8,16;28:21;29:8;
32:13;39:9;70:20,25
**CAMPORA (19)**
35:17;36:15,15,23;
37:2,3,19,21,22;38:3,5,
24;39:3,6,7;40:1,4;
42:3;60:8
**can (81)**
10:6,14;11:1,1,25;
13:5;14:20;15:18;16:1,
2,4,9,10,11;17:20;
18:19;19:6,7;21:5,18;
22:10;23:24;24:17;
26:2,5;27:1;31:6;
38:21;39:17;41:17;
42:5,9,14;45:14;46:20,
23;47:2;49:5,12,13,25;
50:17;52:5;56:11;
57:25;59:13;61:1;
62:14;63:8;65:11;68:1,
7,8,9,21;69:12;70:3,3;
71:22;73:7,17;82:20,
20,21;83:1,2,4,10;
84:11;86:23;88:9;92:1,
22,23;96:4,11,23;
97:17,18;98:12,21
**candidly (2)**
18:1;97:21
**car (2)**
85:13;86:12
**case (17)**
8:6;25:11;40:25;
41:9;45:12,13,19;
46:24;55:7;58:11;
65:25;66:4,8,9;70:13;
71:13;87:15
**cases (6)**
34:1;47:6,21;66:1;
73:1;80:15
**categories (3)**
53:18;72:15;73:21;
87:13
**category (3)**
16:18;75:10;98:20
**causation (6)**
28:18,22,24;29:9,13;
30:8
**cause (2)**
29:23;30:2
**caused (4)**
28:4,10,24;46:4
**causes (1)**
72:7
**center (1)**
23:1
**certain (1)**
53:18
**certainly (9)**
18:2;34:15;38:18;
40:22;64:22;69:2,8;
82:7;92:1

**cetera (1)**
71:3
**CGL (2)**
55:16;56:15
**cha (1)**
5:9
**chair (1)**
36:23
**chambers (1)**
9:7
**chance (1)**
17:2
**change (3)**
20:23;61:6;74:3
**changing (1)**
81:21
**characterization (1)**
99:15
**charts (3)**
56:16,19;88:5
**check (2)**
35:22;83:10
**checked (1)**
58:4
**chime (1)**
22:19
**Circuit (1)**
87:21
**circumstance (1)**
58:15
**circumstances (1)**
65:20
**cited (1)**
45:11
**citing (2)**
20:8;66:3
**civil (2)**
40:14;71:13
**claim (21)**
16:20;46:6;55:22;
61:15,19,20;62:1,13;
64:11,21,23;65:4;
66:24;70:8;77:3;78:23;
79:17;84:7;86:2;87:17,
23
**claimant (10)**
11:24;61:25;62:12,
14;66:14,16,16;75:21;
83:24;87:19
**claimants (7)**
10:21;46:23;47:5;
75:16,25;89:18;90:5
**claimants' (2)**
24:3;76:6
**claiming (5)**
46:3,10;84:4;94:4;
96:9
**claims (68)**
11:21;12:5;13:10;
16:17,18;17:5;18:6;
43:23,23,24,24;44:1,
14,17,17,19,22;45:15,
16,16,20,23;46:6;

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 104
of 119

47:17;53:20,23;54:19,
21,25;55:1;57:9;64:17;
65:9,12,15,17,18,18,19,
19;66:17;68:18,25;
69:3,6,20;70:15;72:5,
10,12,14,22;73:4,10;
76:11;80:21;81:24;
82:1;87:11,14,15,19;
88:3;89:11,12;91:7,23;
93:3
**clarification (5)**
76:5;80:12;83:17,22;
99:1
**clarified (1)**
31:2
**clarify (4)**
8:11;29:7;56:11;
81:4
**clarifying (3)**
28:15;30:5;80:18
**clarity (2)**
42:18;43:14
**class (1)**
71:11
**clear (11)**
14:14;20:11;24:13;
28:17;30:19;54:15,19;
59:14;77:8;84:15;
98:16
**clearly (2)**
54:12;82:5
**CLERK (2)**
5:4;7:20
**client (2)**
67:19;83:12
**clients (4)**
64:6;67:16;68:3;
83:11
**close (1)**
11:14
**co-counsel (1)**
22:1
**Code (3)**
46:14,17;63:12
**cognizant (1)**
34:21
**colleagues (1)**
21:5
**collection (1)**
34:2
**combination (2)**
97:4;100:6
**comfortable (1)**
14:10
**coming (3)**
19:3;31:6;95:12
**comment (1)**
36:17
**comments (3)**
23:19;24:1;71:20
**commit (3)**
48:22;49:4,12
**committed (1)**

68:19
**committee (10)**
10:3,4;15:5,12;22:7,
12;25:7,7;36:23;82:6
**committing (1)**
42:2
**common (2)**
11:18;23:23
**communicate (1)**
9:7
**communicated (2)**
43:2;59:7
**communication (1)**
8:13
**communications (1)**
43:5
**company (3)**
34:3;58:19;86:10
**company's (3)**
58:15,22;69:13
**comparable (4)**
69:7,8,9;70:15
**compare (1)**
83:10
**Compass (2)**
95:15;97:20
**compel (12)**
6:25;7:14,15;8:3,12,
21;9:5;42:16;43:6;
51:22;68:7;99:2
**compensation (1)**
7:9
**complained (1)**
61:11
**complaint (1)**
38:12
**completely (4)**
20:3,4;30:25;70:22
**complex (1)**
10:1
**complicated (2)**
8:6;79:11
**complying (1)**
32:17
**component (3)**
71:7;84:8,9
**components (3)**
85:14;86:14;88:6
**compressed (2)**
24:14;27:11
**compromised (1)**
69:10
**concern (1)**
67:24
**concerned (1)**
18:20
**concerning (2)**
11:21;34:2
**concluded (1)**
100:17
**conclusion (1)**
10:20
**condemnation (2)**

28:9,13
**conduct (1)**
15:22
**conducting (1)**
86:18
**confer (4)**
7:20;13:7;22:15,21
**conference (4)**
5:7;9:12,21;41:18
**conferenced (1)**
7:24
**confidence (1)**
70:4
**confidences (1)**
77:12
**confidential (1)**
47:2
**confidentiality (5)**
39:24;60:24,25;61:5;
92:18
**confidentially (1)**
46:23
**confirmation (3)**
64:17;66:23,23
**confused (2)**
50:24;92:11
**confusion (2)**
8:20;51:22
**congestions (1)**
7:11
**connection (10)**
45:2;46:3;47:12,15,
21;48:1;87:9;91:22;
95:14;98:7
**consensual (2)**
10:22;11:25
**consent (9)**
19:17;60:15,22;67:9,
15,23,24;68:3;73:13
**consider (4)**
42:8;66:4;80:18;
88:4
**considered (2)**
66:25;75:1
**consistent (4)**
9:20;12:18;41:8;
83:14
**consistently (2)**
45:9,10
**constituency (1)**
9:19
**constructive (1)**
67:13
**consultant (4)**
97:16,23;98:3,4
**consultant's (1)**
96:19
**consulted (1)**
53:21
**consulting (1)**
95:24
**contact (1)**
22:15

**contacted (1)**
22:14
**contain (6)**
45:8;46:18;65:16,17,
17,18
**contained (1)**
74:7
**contains (1)**
46:25
**contend (2)**
73:15;76:13
**contends (1)**
85:10
**contention (1)**
28:9
**contest (5)**
29:9,20,22;30:1,8
**contested (3)**
7:8;27:2;30:20
**context (9)**
10:25;19:9,19;34:23,
23;35:5;62:11;77:15;
92:24
**contingent (1)**
64:22
**continue (2)**
13:23;73:22
**continued (1)**
7:8
**contractor (3)**
42:15;50:13,16
**contractors (1)**
43:4
**contracts (2)**
43:18;85:16
**contrary (1)**
20:4
**control (1)**
17:17
**controlling (1)**
66:4
**conversations (1)**
20:9
**coordinate (3)**
22:9;23:1;25:3
**coordination (2)**
9:20;23:2
**copies (2)**
36:8;37:7
**coplaintiff (1)**
81:19
**copy (3)**
18:1,2;32:1
**core (1)**
13:11
**corners (1)**
62:9;63:6
**corollary (1)**
71:15
**Corporation (1)**
5:5
**correction (1)**
7:18

**correctly (3)**
24:7;28:7;89:19
**correspondence (1)**
37:8
**counsel (16)**
5:6;6:16,22;9:8,12;
15:7;20:21;22:25;41:5,
7;51:13;52:3;67:23;
71:6;83:8;100:5
**counsels' (1)**
24:3
**counterargument (1)**
68:10
**counterpart (1)**
71:15
**County (3)**
61:10;79:16;89:17
**couple (9)**
6:9;22:2;25:8;26:19;
28:15,17;35:13;77:25;
92:11
**course (6)**
8:24;13:12;14:20;
34:4;54:6;70:21
**Court (265)**
5:3,4,6,8,16,18;6:4,6,
11,13;7:20,21,25;8:16;
9:1;11:3,6,10,11;12:1,
12,12,15,24;13:1,3,12;
14:1,4,7,10,22;15:13,
15;16:14,21;17:9,23;
18:7,9,22;19:12;20:15,
16,19;21:20,23;22:22,
24;23:7,24;24:3;25:3,
5,5,6,8,15,20;26:7,10,
13;27:16,19,24;28:19,
22,24;29:2,4,6,15,17,
20;30:6,9,10,12,16;
31:1,21;32:8;33:6,8,10,
14,19;34:24;35:7,9,16,
18;36:13,16,21;37:13,
18,20,22;38:4,7;39:2,4,
13,15;40:12,13,14,15;
41:3;42:1,13,21;43:12,
16;44:21;48:10,15,17,
20;49:1,3,9,11,14,16,
19,21,23,25;50:7,18,
25;51:2,5,7,18,20;52:1,
4,6,9,14,16,18,20;53:9;
54:6;55:4,24;56:2;
57:7;60:8,11,20,25;
61:7,9,17;62:12,14,16,
19,22;63:2,4,21,23;
64:1,4,12;65:1,3;66:2,
3,7;67:19;68:5,7,14,16,
22;69:23,25;70:9,11;
71:19,21;73:22;74:4,
10,12,15,19,21;75:13,
15,24;76:1,3,8,19,22,
24;77:9,10,17,19,23;
78:11,13,16,18;80:13,
23;81:1,14;82:19,21;
83:5;84:1,13,19,22;

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 105
of 119

85:2,7,22;86:1,3,20,23,
25;87:4;88:14,16;
90:14,24;91:1,3,10,13,
19,24;92:8;93:14,17,
20;94:8,9,17,23,25;
95:17;96:3,15;97:1,8,
11,24;98:10;99:11,18,
22;100:16
**courtroom (1)**
5:9
**courts (4)**
25:4;45:9;47:10;
65:24
**Court's (2)**
52:12;81:13
**cover (12)**
48:18;53:20,22;
54:10,19,21;55:17;
56:7;57:11;58:3;78:1;
81:7
**coverage (13)**
53:23,24;54:25;55:2,
15,18,19;56:5,13,24,
24;58:16;92:15
**coverages (1)**
43:22
**covered (3)**
47:3;58:16;63:11
**covers (4)**
12:18;27:7;53:24;
56:7
**cover-up (1)**
32:2
**cow (1)**
86:12
**CPUC (1)**
7:7
**crashes (1)**
56:8
**Cravath (3)**
25:10;31:18;34:17
**created (1)**
11:8
**creditors (1)**
10:4
**creditors' (2)**
10:2;25:7
**criminal (3)**
22:17;40:13,13
**crippling (2)**
79:7;86:13
**critical (3)**
84:17;88:2,11
**cross-purposes (1)**
9:9
**cross-referenced (1)**
56:18
**culpability (1)**
33:2
**current (4)**
12:14;34:23,23;
69:22
**custodial (1)**

35:15
**custodians (1)**
34:3
**cut (2)**
39:17;61:14

**D**

**D&O (3)**
56:15;57:11;58:3
**Daily (1)**
41:3
**damage (3)**
71:2;75:3,4
**damages (9)**
11:21;46:5;58:17;
59:19;69:9;72:7;75:10;
79:6;93:25
**danger (1)**
65:18
**data (13)**
11:19;12:2;33:15;
34:13;45:13,14;46:1;
65:11,15;66:11;72:11,
24;97:2
**database (9)**
11:7,8,18,20;12:21;
31:11,17;33:23;34:17
**date (8)**
7:6;8:23;11:24;12:7,
9;31:23;49:6;51:6
**dates (1)**
9:20
**day (7)**
7:15;8:2;9:2;41:24;
60:17;61:24;100:2
**days (1)**
23:11
**de- (1)**
25:21
**deadline (5)**
27:12;34:25;49:11;
79:18;99:3
**deadlines (1)**
51:12
**deal (10)**
5:9;8:4;20:22;30:12;
38:20;50:8;51:9;64:21;
66:9;99:22
**dealing (7)**
8:7;19:2;20:23;
31:13;32:17;57:8;67:4
**dealt (1)**
16:12
**death (2)**
65:19;71:3
**debate (2)**
41:19;64:4
**debtor (26)**
10:9,10,18;11:5,23;
21:7;28:3,17;34:22;
38:13,13;43:21;50:14;
55:2,7,10,15;57:24;

59:16;64:11;66:10;
68:2;69:2;79:24;90:20;
100:3
**debtors (60)**
10:21;13:13;14:18;
15:16,24;16:11,21,21;
23:9,10,23;24:17;
25:17;26:3;31:12,17,
21,25;40:23;43:7;44:4,
10,18;45:1,16;46:2;
47:4,9,11,13;48:6;
54:20;55:9,9;56:15;
57:3,22,23;65:10,21;
67:17;69:16;72:4,11,
20,23;83:25;87:8;
88:13;89:22,24;90:9;
91:7,9,15;93:22;96:6;
99:2,6;101:3
**debtors' (13)**
10:15;12:17;15:21;
21:3,8;24:7;28:8;
42:20;45:21;53:2;
65:13;84:12;89:25
**December (2)**
36:20;39:11
**decide (1)**
27:20
**decision (3)**
66:7;98:14,22
**declaration (1)**
56:21
**de-energizing (1)**
17:16
**defendant (1)**
85:11
**defer (2)**
50:12;87:5;88:9
**definition (1)**
70:16
**delay (2)**
27:4;88:1
**delivered (1)**
35:20
**demand (1)**
86:2
**demands (5)**
18:25;47:14;59:9;
73:9;83:19
**demonstrate (1)**
59:24
**denied (1)**
9:1
**denies (1)**
85:11
**Dennis (1)**
5:5
**deny (2)**
27:24;87:18
**denying (3)**
8:22;52:15;87:25
**department (1)**
23:17
**deposition (3)**

57:10,18,19
**depositions (2)**
17:16;27:1
**describe (2)**
69:21;91:3
**describing (2)**
89:6;90:14
**desire (1)**
21:3
**destruction (1)**
32:3
**detail (2)**
56:19;71:5
**detailed (1)**
78:8
**details (1)**
41:19
**determination (4)**
32:16;54:24;55:21;
60:12
**determine (3)**
57:19;78:25;81:25
**determining (1)**
65:8
**died (1)**
83:6
**difference (2)**
29:17,20
**different (29)**
21:2,15;27:21,21,22;
28:5;29:25;30:6;46:4;
51:12;56:14;58:25;
59:24,25,25,25;69:19,
20,20;70:12,19,22,23;
71:3;72:15;80:21;
87:13;88:6;98:16
**differently (3)**
88:14;94:9;97:14
**dig (1)**
70:5
**direct (2)**
45:15;54:10
**directing (1)**
19:22
**directly (2)**
20:1;32:2
**disagree (2)**
30:23;66:13
**disagreement (1)**
100:8
**disclose (5)**
62:10;68:20;69:12;
77:2;87:24
**disclosed (2)**
69:13;89:22
**disclosing (1)**
81:17
**disclosure (10)**
46:16;61:6;63:15;
74:9;77:25;82:14;92:5;
93:10,24;94:22
**disclosures (4)**
32:18;48:3;82:11;

89:25
**discovered (1)**
41:13
**discovery (59)**
5:15;6:2,17;7:10,10;
9:12,21;10:25;13:6;
16:15;18:4,16,25;19:2,
13,14,14,20,24;20:2,6,
12,18;21:4;22:5;24:4,
9,9,13,14,16,19,20,21;
25:25;26:17,21,23;
27:1,23;30:22;31:22;
32:18;34:20;36:10,11;
41:8,18,23;57:5,5;
66:5;67:5,7;88:24;
92:24;99:2,15;101:4
**discuss (4)**
9:4;17:3;20:20;24:8
**discussing (1)**
18:24
**discussion (7)**
8:11;9:10;11:17;
13:9;15:23;23:8;43:10
**discussions (7)**
11:23;12:3;13:24;
14:21;26:19;85:20;
86:18
**dispute (5)**
13:16;66:6;67:5;
78:7;92:25
**disputed (4)**
12:13;64:22;66:18;
69:1
**disputes (1)**
26:25
**distress (4)**
65:18;72:16;73:4;
84:8
**distributions (1)**
41:20
**district (4)**
25:2,5,20;30:17
**divide (1)**
23:19
**dividend (1)**
41:19
**dividends (2)**
32:22;41:11
**docket (7)**
10:17;25:10;40:15,
17,17,18;51:25
**doctrine (2)**
66:4;96:2
**document (16)**
15:2;21:9;36:18;
41:2;61:22,24;62:2;
63:7;74:2,4,5;85:9;
86:3;92:15;93:2;96:7
**documentation (3)**
33:2;34:13;93:22
**documents (96)**
6:25;7:16;11:19;
15:2;16:19,23;23:11;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(4) courtroom - documents
Page 106
Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 106 of 119

25:22;31:10,13,25;
33:13,22;34:3,10;
35:15;36:6,10,19;37:5,
6,9,16,21;38:24;39:8,9,
11,23;40:2,5,8;42:13,
15;43:8,17;44:2,3,3,6,
11,15,15;45:6,24;
46:10,15;47:7;49:7;
51:23;53:16;59:7,8,13;
60:23;61:1,2;64:2,13;
65:13;67:20,25;68:1,9,
13,24;69:15;72:13,17,
19;73:6;85:23;89:20;
91:15,17;92:2,3,13,17,
19,21,23;93:1,3,6;94:1,
6;95:12,13,21;96:9,10,
23;97:15,17;98:7
**dog (1)**
85:13
**dollar (4)**
12:23;84:7,10,16
**dollars (7)**
25:11;59:19;61:19,
25;69:4;85:12;86:10
**done (18)**
23:22;26:5;34:9;
35:12,14;37:6,12,14;
39:11;49:7,13;64:20;
67:1;71:16;85:21;
86:17;95:23;97:22
**double (1)**
35:22
**double-check (1)**
5:10
**down (13)**
9:17;20:14;21:13;
27:5;41:10;72:15;75:9,
10;85:25;86:12;88:15;
90:15;94:6
**draft (1)**
14:17
**draw (1)**
69:6
**drawing (1)**
41:6
**drive (1)**
84:16
**drives (1)**
45:13
**drove (1)**
70:5
**due (1)**
36:18
**duplication (1)**
22:9
**dwell (1)**
42:7

**E**

**Eagle-Picher (2)**
45:12;65:25
**earlier (4)**

15:24;56:12;60:8;
99:5
**easiest (2)**
67:14,22
**easy (1)**
56:25
**educated (1)**
67:3
**effect (2)**
63:15,17
**efficient (2)**
22:21;38:2
**efficiently (1)**
15:17
**effort (5)**
12:2;27:3;57:21;
60:21;100:11
**efforts (1)**
59:8
**eight (1)**
17:13
**either (16)**
6:1;25:5,19;41:21;
42:8;46:9;50:2;53:14;
56:15;57:1;58:20;59:6;
61:14,14;88:16;93:7
**either/or (1)**
28:1
**electronic (1)**
34:2
**elements (1)**
88:15
**eliminate (1)**
22:9
**else (18)**
13:16;17:10;19:4;
21:2;23:5,17;36:13;
40:5;79:4;88:18;91:11;
97:5,8,11,18;98:17,21;
99:20
**elsewhere (1)**
82:14
**email (3)**
18:17,20;20:8
**emails (1)**
34:2
**embark (2)**
18:24;26:20
**emotional (4)**
65:18;72:16;73:4;
84:8
**empathy (1)**
60:16
**employee (1)**
53:23
**employees (1)**
34:4
**empty (1)**
5:8
**enable (1)**
11:23
**encourage (1)**
9:18

**encouraging (1)**
5:22
**end (5)**
7:16;52:23;53:10;
60:17;61:24
**endorsement (1)**
56:22
**energize (1)**
25:22
**enforceable (2)**
46:19;63:16
**engage (1)**
34:20
**enough (4)**
55:11;56:9;71:5;
94:25
**ensuing (1)**
35:12
**entire (2)**
13:19;37:4
**entirety (1)**
48:7
**entitled (5)**
41:6;59:18;61:18;
66:12;91:21;97:12
**entry (1)**
40:19
**equal (1)**
29:13
**equally (2)**
14:20;16:17
**equation (1)**
58:25
**equipment (5)**
28:4,10,24;29:23;
30:2
**errors (1)**
55:5
**essentially (1)**
19:23
**estimate (29)**
44:19;45:15,20;
47:17,20;58:20;65:12,
20;66:11;68:17,22;
69:6;72:10,12,21,22;
79:2,5;87:13,15,19;
88:18;89:8;90:19;91:7,
15,17;94:11;95:5
**estimated (2)**
69:22;89:11
**estimates (3)**
16:19;92:14;93:3
**estimating (8)**
45:1,10;72:5,14;
87:11;88:3;91:23;98:5
**estimation (56)**
19:2,16,19,21,25;
20:5,24;25:1,12,19;
27:15,25;29:10,12;
30:1,4,9,16,22;31:9;
32:3;41:11,17,21,21;
57:8;58:17;64:16,20;
65:4,23;66:21;68:23;

70:11,16,24;71:2,7,10,
15;76:11,15;78:23;
79:4,9,12;80:5,22;
82:5;84:17;87:2,2;
88:3,12;90:13;98:3
**estimation-related (1)**
73:6
**estimations (5)**
33:19;44:14;45:23;
79:8;87:9
**et (1)**
71:3
**evaluate (2)**
44:8;87:19
**eve (1)**
31:12
**even (20)**
7:2;8:5;9:4;13:5,17;
19:18;30:22,24;43:1;
58:16;65:4;69:1;71:12;
72:15;83:18;89:8,11;
93:9;96:13;97:21
**event (3)**
46:4,4;59:1
**everybody (7)**
8:6;16:4;20:15;22:4,
20;80:24;100:7
**evidence (11)**
15:21;16:6;17:14;
22:13;32:3;46:14,17;
63:12;64:1;87:1;96:12
**evident (1)**
57:20
**ex (1)**
10:10
**exact (6)**
46:5,6;48:5;65:19;
72:6;87:20
**exactly (7)**
19:7;20:10;54:2;
59:8;61:1;72:3;73:5;
90:12;92:15
**examination (1)**
17:14
**examinations (1)**
15:23
**example (2)**
12:22;22:12
**except (3)**
28:4;89:15,16
**exceptions (2)**
46:16;99:13,14
**exchange (1)**
95:19
**exchanged (1)**
85:24
**excuse (4)**
37:11,11;50:14;
82:10
**exercise (1)**
85:21
**Exhibit (1)**
18:17

**existence (1)**
63:6
**existing (1)**
40:25
**exists (1)**
39:23
**expect (5)**
23:13,14;36:11;
47:10;61:16
**expected (1)**
10:10
**expecting (2)**
23:9;93:24
**expedite (1)**
98:11
**expedited (2)**
72:22;96:11
**experience (2)**
58:24;99:1
**experiential (1)**
45:19
**expert (14)**
55:11;69:25;70:3,3,
4,5,18,25;92:1,3;96:1,
19;97:16;98:18
**experts (5)**
53:21;54:22;56:4;
70:21;95:24
**expires (1)**
30:7
**explain (3)**
38:24;88:23;98:19
**explaining (1)**
58:18
**exploring (1)**
54:12
**explosion (3)**
32:15;58:14;80:4
**exposure (2)**
75:2;91:7
**express (1)**
64:6
**extended (1)**
12:9
**extension (1)**
57:13
**extensive (1)**
34:1
**extent (10)**
10:8;12:16;28:8;
66:9,10;86:20;90:7;
91:25;92:4,5
**extreme (1)**
57:12
**extremely (1)**
72:17

**F**

**face (9)**
54:13,15;56:5;58:23;
62:7;64:9;82:14;83:3;
85:8

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 107
of 119

**fact (16)**
14:17;16:18;20:18;
28:11;39:10;40:20;
54:22;55:16;61:4,6;
63:10;64:18;65:14;
66:22;74:3;92:10
**factored (1)**
87:22
**facts (4)**
20:18;33:21,21;
35:23
**factual (2)**
27:2;29:13
**failed (1)**
25:21
**failure (1)**
8:13
**fair (4)**
12:19;47:23;71:24;
88:19
**fairly (1)**
69:21
**faith (2)**
22:21;49:13
**fall (1)**
98:18
**falls (2)**
9:22;54:1
**false (1)**
99:16
**far (2)**
57:16;65:14
**Farr (2)**
15:1,11
**fashion (2)**
16:4;41:4
**faulting (1)**
51:11
**FCC (1)**
93:5
**feasible (1)**
35:5
**February (9)**
31:15,22;33:16,22;
35:9;36:19;37:6,10,14
**federal (2)**
25:4;30:18;71:13
**feel (1)**
53:4
**Felderstein (1)**
21:25
**fence (1)**
86:12
**few (2)**
11:16;26:18
**fiduciary (1)**
53:23
**field (4)**
47:19,23;80:25;
88:12
**fifteen (1)**
19:10
**fifty-four (2)**

12:23;59:19
**figure (2)**
12:23;37:24
**figures (2)**
31:9;95:13
**file (8)**
19:16;42:18;51:24;
52:14,16;61:14,19,20
**filed (18)**
6:25;10:16,16;14:12;
23:10;26:25;36:2,19;
38:25;39:10,19,22,25;
42:23;43:6;50:23;
52:11;98:19
**files (2)**
61:25;62:22
**filing (6)**
10:20;17:12;20:25;
25:1;53:2;94:7
**filings (18)**
16:21;41:15;44:21,
24;45:2;59:21;72:13;
87:10;88:17,17;89:23,
24;91:17,23;93:23;
94:7;98:5,7
**final (3)**
16:18;59:10;61:22
**finalized (1)**
11:12
**financial (3)**
44:20,24;69:14
**find (4)**
17:11;21:4;57:10;
82:14
**fine (5)**
14:22;23:4;30:10;
58:1;99:7
**fines (1)**
93:25
**finish (1)**
35:18
**fire (65)**
10:3;21:18;22:1,4,7,
8,16,20,22;24:15;
28:10,21,25;29:23;
30:3,11;31:8;34:1;
39:9;44:16,17,18;46:2,
3,4;47:15,16;54:11;
57:8,12;58:4,9,11,13,
21;59:3,25;60:3;61:13,
17;67:7;69:7,7,19;
70:19,20,20,20,22,23;
71:7,24;75:22;76:3,5;
79:16,25;80:3,4;81:24;
83:6;88:19;90:2;91:7;
93:3
**fires (25)**
24:6,10;28:4,23;
29:8;32:19,20,22;33:1,
12;56:7;58:21;69:8,8,
22;71:1;79:14,18,19;
88:19;89:14;90:2;
91:18;92:15;95:6

**FIRE's (2)**
15:22;22:13
**firm (8)**
5:24;9:18;17:10;
22:6;25:10;84:24;85:1;
86:9
**first (19)**
6:9,23;7:5;8:18;
10:17;17:13;23:20;
25:10;31:3,8,11;32:9;
43:13;53:9;57:20;
58:12;61:3;67:22;
90:17
**fish (1)**
61:14
**fit (1)**
44:15
**Fitzgerald (1)**
21:25
**five (4)**
44:4,11;49:18;50:7
**flagged (1)**
93:7
**flat (2)**
59:21,22
**fly (2)**
66:5;80:7
**focus (3)**
17:6;32:20;90:11
**focused (2)**
33:12;77:24
**Focusing (1)**
61:12
**footing (1)**
72:20
**forced (1)**
72:24
**forget (2)**
22:22;74:21;90:22
**forgotten (1)**
79:18
**form (9)**
19:20;45:7,24;46:9;
47:19;58:19;78:5;99:5;
100:5
**formal (1)**
100:3
**format (1)**
93:4
**formulate (1)**
34:22
**forth (4)**
16:20;53:11;61:23;
68:8
**forward (13)**
6:24;7:25;8:24;12:4;
13:2,18;16:2,4;20:13;
26:3;27:10;29:11;
100:12
**found (2)**
30:5;67:8
**four (16)**
5:10;23:22,23;26:6,

8;42:9,14;43:15;48:11,
12;50:2;58:7;62:9;
63:6;90:14,15
**frame (1)**
99:10
**FRANCISCO (2)**
5:1;41:3
**frankly (6)**
17:2;34:14;59:22;
65:9;67:24;68:11
**free (1)**
61:11
**freely (1)**
64:13
**Friday (1)**
100:12
**front (2)**
38:19;49:7
**fruition (1)**
11:15;14:21
**full (7)**
56:3,5,20,22,23;57:2,
4
**Fuller (2)**
5:16,17
**fundamentally (2)**
58:25;99:16
**furniture (1)**
56:7
**further (16)**
9:6,9;11:23;20:20;
55:10;57:24;75:10;
79:23;81:12;83:20;
85:19;86:18;88:1,1;
95:24;100:9
**future (2)**
65:15;86:4

**G**

**Gallagher (1)**
15:11
**game (1)**
71:25
**gas (2)**
32:15;58:14
**gave (2)**
36:3;80:15
**general (5)**
11:17;22:2;55:16,25;
57:10
**generally (7)**
10:9;15:25;20:12;
22:19;28:16;89:8;97:9
**General's (1)**
22:1
**generated (1)**
74:5
**gentlemen (1)**
14:23
**geographies (1)**
69:19
**get-go (1)**

8;42:9,14;43:15;48:11,
12;50:2;58:7;62:9;
63:6;90:14,15
**frame (1)** 
99:10

63:11
**gets (2)**
50:10;79:11
**Ghost (4)**
28:5;29:25;79:20,21
**given (17)**
20:17;25:23,24;
27:10;32:1;34:23;40:8;
54:3;58:24;59:14;73:6;
80:1;82:8;90:11;92:21;
94:10;99:8
**giving (2)**
58:9;96:13
**glad (1)**
18:9
**glided (1)**
59:4
**GLP (1)**
57:10
**goal (2)**
12:8,10
**goes (6)**
55:6;68:25;76:10;
82:7;84:8,9
**good (6)**
5:6,17,18;21:20;
22:21;49:13
**Goshen (1)**
70:22
**Gotshal (1)**
10:12
**governed (1)**
27:24
**Governor's (1)**
7:7
**governs (1)**
26:23
**grant (3)**
27:20;30:11;41:22
**granted (1)**
99:19
**gravity (1)**
23:1
**Great (1)**
11:4
**ground (1)**
94:20
**group (11)**
10:18;15:15;17:20;
18:4,21,21;20:10;
31:14;41:5;61:12;
70:13
**grouped (2)**
23:22;42:14
**groups (2)**
24:15;82:9
**group's (1)**
24:24
**guess (9)**
9:18;18:18,19;21:7,
7;53:6;64:24;71:4;
94:25
**guests (1)**

Min-U-Script®

Case: 19-30088    Doc# 3478    eScribers, LLC | (973) 406-2250    Page 108
operations@escribers.net | www.escribers.net
Filed: 08/08/19    Entered: 08/08/19 17:24:49
of 119

(6) fact - guests

5:10
**guilty (1)**
29:21

# H

**half (2)**
25:16,16
**half-an-hour (1)**
89:9
**hand (2)**
5:14;25:15
**handle (4)**
24:9;48:19;49:25;
56:25
**handled (1)**
45:16
**handling (1)**
5:15
**happen (2)**
23:12;32:19
**happened (2)**
66:15;80:5
**happening (1)**
9:5
**happy (15)**
11:13;36:10;37:1,6,
13,16;40:4;48:18;49:2,
10;53:12;54:3;72:18;
82:25;93:13
**hard (3)**
11:5;58:4;62:1
**hat (1)**
73:23
**hate (1)**
68:5
**head (1)**
17:24
**hear (12)**
6:9,21;8:3;11:1;
15:7;37:1;42:17,19,25;
67:25;77:9;95:10
**heard (6)**
13:17;23:5;26:4;
60:8;62:13;99:24
**hearing (6)**
5:25;7:8,13;27:15;
29:10;36:25;42:18;
43:2,9;50:4;51:24;
79:17;90:6;100:9
**hearings (4)**
9:20;32:14;37:7;
50:4
**heavily (2)**
45:24;46:24
**Hello (2)**
6:3,4
**help (7)**
10:14;13:23;19:6;
31:6;66:2,3;83:17
**helpful (1)**
23:2
**here's (3)**
56:16;61:25;85:8
**hide (1)**
60:21
**highly (1)**
97:23
**history (1)**
99:15
**hit (1)**
34:18
**Hm (1)**
5:25
**hoc (3)**
15:15;18:3;22:12
**hold (6)**
12:18;13:19;19:2;
75:15;83:11,19
**home (2)**
45:13;61:11
**Honor (148)**
5:13,17;6:3,8;8:18;
11:1,7;13:22;14:5,12;
15:10,14,17;16:5,8,13,
25;17:6,25;19:7,21;
20:8;21:17,24;23:18;
24:1;26:1,15;28:15;
29:5;30:24;32:7,14,24;
33:11,18,20;35:17,23,
24;36:15,22;37:3;38:6,
23;39:3,7,14,18;42:11,
17,19;43:10,10;44:7,10,
15;45:9;46:14,22;47:7,
13;48:9,25;49:4,9,15;
50:17;51:17;52:11,17,
19;53:7,16;54:14;
55:13,20;58:10;59:3,
21;61:16;62:5,15,25;
63:9,22;64:25;67:12,
17;68:5,9,10,21;69:11;
70:2,5;71:18;72:3;
73:9,19,25;74:14,18;
75:7,17,18,19;76:14,
23;77:6,13,21,24;78:7,
10,15;80:11;81:4;
82:17;83:16,17,21;
84:5,10,18;85:1,15;
86:17;87:3,6,6;88:4,7;
90:9;92:10;93:11,15;
95:11,15;96:4,10;97:9;
98:25;99:3,5,9,14;
100:14,15
**Honorable (1)**
5:4
**Honor's (4)**
29:11,16,18;90:6
**hope (3)**
16:10;38:21;67:3
**hopeful (1)**
12:13
**Hopefully (1)**
98:24
**hour (1)**
89:9
**hours (1)**

98:24
**hundred (9)**
34:3;60:2;72:25;
76:6,17;80:15,16;
89:14;96:1
**hundreds (2)**
34:3;65:7
**hypothetical (1)**
97:3

# I

**idea (1)**
11:17
**identical (3)**
48:1;65:16;91:9
**identified (2)**
53:15;76:21
**identify (4)**
34:7;96:7,8,23
**identifying (4)**
75:21;83:24;92:2;
98:6
**ignore (2)**
45:18,18
**III (1)**
78:21
**imagine (1)**
62:2
**immediate (2)**
24:16;89:3
**importance (2)**
65:21;98:22
**important (12)**
12:2;25:18;33:3,4;
43:21;44:13;47:20;
50:1,1;66:8;68:6;86:24
**importantly (2)**
46:22;47:8
**improper (1)**
24:18
**inaccurate (1)**
62:4
**inappropriate (1)**
70:14
**inclined (5)**
52:2;57:17;79:13,24;
86:20
**include (6)**
47:18;63:18;80:19,
19;91:8,10
**included (2)**
89:7;91:20
**includes (2)**
18:17;63:14
**including (5)**
11:19;20:15;60:7;
71:23;85:19
**inclusive (1)**
93:25
**incomplete (1)**
45:25
**incorrect (1)**

33:21
**incorrectly (1)**
42:4
**indeed (3)**
17:11;66:12;70:21
**indirectly (1)**
22:7
**indiscernible (9)**
6:10;13:11;53:10;
55:17;59:22;66:1;
75:14;89:11;97:10
**individual (8)**
68:24;75:11,11;77:4,
4;78:24;79:5;89:18
**individuals (3)**
36:16;75:16;77:2
**individual's (2)**
64:18;77:3
**inference (1)**
69:6
**inform (1)**
85:19
**informally (1)**
52:22
**information (89)**
10:5;11:19;15:9;
25:13,15,16;34:12,16;
35:2;36:9,24;38:8,13,
14;42:5;44:18,23;45:8,
11,14,15,18;46:2,7,8,
22;47:1,9,11,13,25;
48:2,5;50:16;55:10,17;
56:9,9;57:24;58:9;
60:4;64:16;67:9,18;
71:22;72:4,4;74:2,7,8;
75:12,21;76:12,14;
78:8;79:25;80:15;81:6;
82:1,8,22;83:24;84:10,
11,14;86:11;87:9,18,
18,23,25;88:2,11;
89:13,25;90:4,7;91:6;
92:4;94:19,19;95:19,
20,21;96:14;98:17;
99:4,7,9
**informational (1)**
12:22
**informed (1)**
27:6
**injured (2)**
78:24;85:7
**injuries (2)**
79:1;86:13
**injury (4)**
71:3;75:3;79:6,8
**inquire (1)**
98:11
**inquiry (2)**
66:22;79:11
**inspection (3)**
33:1,13;39:8
**instance (2)**
61:3;67:22
**instances (1)**

57:24
**Instead (1)**
10:19
**insurance (16)**
43:19;51:15;53:1,3,
8,13,19,21,24;54:16,
21;55:6;57:19;58:15;
60:1;69:20
**insures (1)**
55:12
**intend (2)**
81:3;87:14
**interested (2)**
7:4;78:2
**interject (5)**
13:17;14:23;21:18;
22:8;75:20
**internal (7)**
9:19;45:6,21,23;
47:17,18;53:21;72:13,
24;73:1;84:15;85:19;
86:10,14,16,21
**internally (2)**
74:5;86:4
**interpret (1)**
97:17
**interpreted (1)**
8:22
**interrogatories (1)**
96:6
**interrogatory (3)**
88:20;95:7;98:12
**into (35)**
12:5;14:23;16:15;
19:5;20:6;21:18;23:19,
22;25:4;32:23;33:15;
35:13;41:19;42:2,14;
43:15;44:15;49:1,11;
53:13;54:1,3;56:8;
58:12;66:20;67:18;
70:5;74:3;75:2,9,10;
80:21;81:22;87:1;
88:15;98:18
**inverse (2)**
28:9,13
**investigate (1)**
32:19
**investigation (7)**
22:18;31:24;76:13;
89:22,23;90:12;92:12
**investigative (1)**
22:17
**invitation (1)**
5:7
**invited (1)**
5:10
**involved (6)**
14:16;16:3;22:5;
35:24;84:23,25
**involves (1)**
69:19
**irrelevant (1)**
54:15

Min-U-Script®

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 109
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(7) guilty - irrelevant

**issue (33)**
12:13;14:8,15,20;
15:20;16:12,25;18:8;
27:22;32:9;35:13;
38:20;46:5;50:13;
58:11;59:2;60:11;
67:16;68:6;72:18;73:7,
17;74:1;77:7;78:19;
79:22;81:13;86:22,24;
93:11;95:15;97:20;
100:2
**issued (1)**
7:12
**issues (29)**
5:15;6:2,17;7:10;
12:20;16:6,11,13;18:5,
23;20:4,6,11,13;22:10,
16;24:4;27:2,7;28:6;
41:23;42:1,3;49:25;
53:8,12,13;75:6;92:11
**item (3)**
10:2;57:25;89:5
**items (10)**
6:22;13:6;14:25;
15:4;17:13;23:25;32:6;
37:8;48:8;54:7

**J**

**Jane (1)**
7:23
**job (3)**
47:20;48:21;81:2
**joined (4)**
24:2,11,15,23
**joining (1)**
24:25
**Journal (2)**
33:5;41:3
**Journal's (1)**
40:10
**judge (27)**
30:17;31:25;32:10,
16,18,21,25;33:2,4,4;
35:20;36:1,4,7,8,20;
37:7;38:25;39:22;40:3,
8,11,14,18,20;41:14;
88:17
**judges (2)**
25:2,2
**judge's (1)**
40:23
**judicial (1)**
30:18
**Julian (34)**
5:12,13;6:1,15;
18:14;21:4,12;23:7,8,
16,18,18;26:8;12;27:6;
31:1,5;32:12;33:7,9,11,
14,25;36:5,9,22;38:17,
23;40:1,4,7,8;42:3,7
**Julian's (3)**
18:17;26:16;33:21

**July (9)**
7:1,12;9:11;18:15;
24:2,3,24,25;26:3
**June (1)**
27:12
**justice (1)**
89:2

**K**

**Karotkin (4)**
5:19;6:13;7:21;28:8
**Karotkinon (1)**
5:20
**keep (5)**
29:23;52:20;58:3;
66:3;80:7
**keeping (1)**
93:18
**kept (2)**
14:16,17
**Kevin (1)**
17:25
**key (1)**
15:20;32:3
**kicked (1)**
50:14
**kill (1)**
50:8
**Kim (4)**
7:23,23;23:21;26:5
**Kimberly (2)**
5:14;42:12
**kind (11)**
9:25;13:10;22:9,11;
23:1;40:25;54:8,11;
64:10;82:1;89:13
**kinds (1)**
69:9
**Kleber (19)**
5:14;8:15,18,18;9:3;
23:16;43:7;51:17,19,
19,21;52:2,5,8,11,15,
17,19,22
**knowledge (1)**
81:19
**knows (5)**
12:1;35:25;38:14;
60:25;63:24
**Kody (4)**
5:14;8:18;43:7;
51:19

**L**

**label (2)**
79:19,21
**language (6)**
46:18,25;61:3;63:14;
64:10;83:2
**large (4)**
43:20;53:7;61:11;
74:24

**last (10)**
27:6;31:12;34:24;
44:13;58:4;83:17;89:5,
9;96:17;98:23
**lastly (1)**
47:24
**lately (1)**
71:14
**later (6)**
8:23;38:21;42:23;
51:6;78:1;88:10
**latter (2)**
32:8;61:12
**law (17)**
17:10;22:6;46:17;
59:14;60:18;61:2,4;
63:5;67:21;68:9;69:20;
71:12;73:16;77:8;85:1;
87:21;93:13
**laws (1)**
32:17
**lawyers (22)**
6:18;8:7;11:6,9;
19:11;22:2;25:15;
38:15;42:4,25;57:18;
60:7,14;64:5,15;67:15;
68:4;73:12;78:20;83:9;
84:24;86:17
**lead (2)**
23:8;41:7
**leadership (1)**
24:3
**learning (1)**
67:1
**least (10)**
13:14;17:20;23:3;
67:7,9,13;72:19;73:18;
79:23;98:19
**leave (6)**
13:18;22:25;58:5;
61:22;78:21;89:4
**leaves (1)**
51:15
**Leblanc (7)**
10:5;6;14:1,3,5,9,12
**Leblanc's (1)**
10:4
**led (2)**
7:13;90:6
**left (3)**
9:25;35:14;41:24
**leg (1)**
79:5
**legal (4)**
29:12,13;66:6;68:2
**legally (1)**
41:16;80:5
**legislature (1)**
27:13
**length (1)**
51:25
**lengthy (2)**
10:17;40:18

**less (3)**
31:18;41:23;45:25
**letter (17)**
9:11;10:4;14:7,12;
15:1;18:14,15,17,20;
19:9,10;24:2,4,22,24,
25;27:6
**letters (5)**
14:13;15:15;20:7;
26:19;86:2
**level (7)**
47:19,23;66:3;70:4;
75:11;81:6;88:12
**Lexecon (2)**
95:15;97:20
**liabilities (1)**
45:1,10;92:5;95:6
**liability (30)**
18:5,6;19:14,20;
20:2,6,13;24:4,10;
25:12;26:21;28:11;
29:13,14;31:13;34:20;
44:22;47:21;55:16,25;
57:11;69:22;79:12;
84:12;88:18;90:13;
91:16,18;92:14;93:3
**lift (3)**
18:21;19:13;30:7
**lifting (1)**
19:18
**likely (1)**
49:3
**limited (4)**
30:8;41:1;56:2;
94:15
**line (4)**
6:10;12:8;41:7;
101:2
**lines (3)**
55:2,15;56:12
**links (1)**
81:20
**liquidated (4)**
65:3;66:19;68:25;
89:12
**list (12)**
5:24;6:20,23;15:4;
17:13,15;21:13;43:14,
20;55:4;56:3;89:5
**listed (2)**
12:21;24:6
**listening (1)**
22:3
**litigants (1)**
25:6
**litigating (1)**
25:6
**litigation (10)**
25:3;27:2;31:9;
71:12;95:24;96:18;
97:16,23;98:3,4
**little (8)**
19:9;30:24;35:11;

49:5;56:14;57:7;98:15;
99:24
**living (1)**
73:11
**located (2)**
17:11;44:5
**log (11)**
44:7,9,11;48:21,23;
50:1;92:2;96:20,22;
97:5,21
**logs (1)**
34:13
**long (3)**
18:11;40:23;50:7
**longer (4)**
62:2;69:1;73:11;
89:17
**look (15)**
39:21;42:2;46:7;
53:13;54:3;56:4,5;
67:6;70:14;72:21;
78:19;81:22,25;83:10;
100:12
**looked (6)**
25:13;35:13;54:6;
58:19;85:3,15
**looking (20)**
9:3;10:15;15:6;
18:13;22:13,20;24:13;
42:5;49:11;53:7;55:4;
67:6;68:11,13,24;72:9,
11,21;88:11;89:21
**looks (1)**
81:15
**loop (1)**
14:17
**loss (5)**
54:10;72:16;73:4,4;
84:9
**losses (8)**
48:3;57:12;58:4,16,
20;65:17;72:16;90:1
**lost (5)**
56:7,7;79:5;85:8;
87:4
**lot (9)**
16:14;35:12;60:16;
65:10;71:14;83:6,8;
95:11;99:25
**lots (2)**
6:18;82:1
**love (1)**
73:25
**lower (1)**
74:24
**luck (1)**
61:20
**lump (1)**
85:17

**M**

**Macon (3)**

Min-U-Script®

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 110
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) issue - Macon

18:18,19;19:11
**macro (1)**
58:10
**mad (1)**
9:4
**mail (1)**
15:3
**main (1)**
44:15
**mainly (1)**
45:3
**majority (1)**
34:14
**makes (9)**
18:3;20:14;27:13;
34:22;35:3;74:4,4;
75:4;83:12
**making (5)**
40:5;54:20;70:24;
78:22;94:12
**managed (3)**
7:1;15:5;25:21
**managing (1)**
11:6
**manner (2)**
83:20;87:20
**many (13)**
8:7;7;9:8;15:2;34:4,
8;36:16;44:20;45:24;
49:7,25;55:8;100:12
**mark (1)**
47:2
**marked (1)**
64:2
**Marsh (1)**
57:6
**mass (3)**
25:2;45:10;71:12
**massive (2)**
34:13;47:21
**materials (4)**
17:3;33:24;36:7;
97:22
**matter (14)**
5:5;7:9;19:3;21:8;
24:5;30:12;32:11;
40:13,14;81:19;88:24,
25;96:12;98:22
**matters (6)**
7:5,5;9:13,16,25;
10:13
**may (25)**
11:15;32:7;36:6,22;
38:23;49:15,17;51:21;
55:17,18,19;66:17;
67:2;70:13;71:11;
76:23;77:6;81:18,18,
19;83:18;84:20;86:7;
89:12;98:17
**maybe (14)**
7:3;10:12;19:5;
45:25;51:14;56:21;
67:8;68:4;72:9;81:1;

85:2;89:11,16;96:4
**MCCALLEN (5)**
15:10,11,14;17:9;
20:9
**McCallen's (1)**
17:19
**mean (23)**
19:4;29:2,4;30:13,
21;50:14;51:10;54:9,
12;56:8;57:12,17;
66:20;68:22;74:13,16;
81:14,18,22;86:7,8;
95:7;97:13
**meaning (2)**
18:21;82:6
**means (5)**
18:14;28:22,24;
29:22;30:1;32:18;
74:24;83:4;89:8;91:11
**meant (1)**
19:19
**mechanism (2)**
11:22;97:18
**mediating (1)**
85:25
**mediation (25)**
46:11,13,21;59:5,7,8,
10,13,17;60:3;61:3;
62:8,8;63:11,13,19;
64:2;74:8;75:12;77:12;
81:9;85:24;92:18;93:7;
98:16
**mediation-protected (1)**
74:2
**mediations (1)**
86:18
**meet (4)**
13:7;22:15,21;63:5
**meet-and-confer (3)**
15:16,23;45:4
**meet-and-confers (1)**
20:10
**meeting (1)**
12:6
**memory (1)**
19:5
**mention (1)**
59:15
**mentions (1)**
22:13
**merits (2)**
48:12;50:3
**mess (1)**
8:10
**message (2)**
83:13;92:9
**might (13)**
10:8;13:6;54:10;
57:11;61:19;67:20;
69:5,6,8;70:19;86:6;
96:15;98:20
**million (4)**
25:11;85:12;86:10;

94:12
**mind (3)**
58:3;80:7;81:2
**minimum (1)**
72:23
**minute (3)**
16:15;26:11;62:16
**minutes (1)**
26:18
**miscarriage (1)**
89:2
**mischief (1)**
8:14
**miscommunications (1)**
6:24
**misreading (1)**
50:21
**miss (1)**
92:10
**missing (1)**
55:10
**mistakes (1)**
39:20
**misunderstood (1)**
90:19
**mitigation (1)**
32:23
**moment (3)**
17:11;28:2;66:24
**money (6)**
25:14;31:17;43:25;
55:22;68:18;70:7
**Montali (1)**
5:5
**month (2)**
42:23;60:6
**months (12)**
35:13;37:15,15;44:4,
11;47:22;49:18;50:7;
72:11,12;87:20,20
**months' (1)**
34:9
**more (20)**
9:23;10:1;31:18;
32:19;42:2;46:22;50:8;
51:25;53:13;67:1;68:5;
71:22;78:1,2,8;79:11;
84:11;85:12;89:11;
99:8
**morning (4)**
5:6,17,18;23:13
**Morris (101)**
5:14;23:21;26:5,10;
42:9;10,11,12,21;43:5,
13,17;48:10,14,16,18;
49:15,17,19,20,22;
23,24;50:6,10;52:22;
53:4;54:6,14;55:13;
56:1,11;57:23;59:4,9,
14;62:24;63:4,8,22,25;
64:25;65:2,5;66:2,25;
71:17,18,20;72:1,2;
74:22;75:7,19,25;76:2,

4,9,20,22;80:8,11,14,
24;81:1;82:13,17;83:5,
16;84:14,20;87:6;89:1,
5,20;90:23,25;91:2,6,
12,14,22;93:1,14,15,
19,20,21;94:14,15,18,
24;96:4,15;98:1,10,25;
99:19,21;100:15
**Morris's (2)**
58:21;99:14
**most (6)**
44:13;45:14;47:8,20;
53:3;65:25
**motion (22)**
6:25;7:14,15;8:3,12,
21,22;9:5,11;19:16,22;
20:24;30:7;42:16;43:6;
51:22;52:15,24;68:4,6,
7;99:2
**motions (4)**
7:8;27:21,21;49:10
**move (8)**
8:1,24;12:3;16:2;
20:13;27:9;29:11;79:2
**moved (1)**
18:21
**moves (1)**
42:23
**moving (2)**
18:16;27:22
**much (14)**
12:18;21:19;28:10;
36:9;41:11;56:9;60:14,
14;67:1;71:3;85:13,13,
13;89:9
**multi (1)**
71:12
**multiply (1)**
79:10
**myself (2)**
13:17;14:23

**N**

**name (7)**
5:23;21:8;36:15;
42:4;75:15;96:20,22
**namely (1)**
46:17
**names (6)**
29:24;71:1;75:25;
76:6;77:2;83:25
**narrow (3)**
24:12,17;90:11
**nature (1)**
81:22
**nearly (2)**
37:12;91:9
**necessary (2)**
73:16;76:11
**need (29)**
8:11;9:16,16,24;
12:12;13:23;18:15;

4,9,20,22;80:8,11,14,
24;81:1;82:13,17;83:5,
16;84:14,20;87:6;89:1,
5,20;90:23,25;91:2,6,
12,14,22;93:1,14,15,
19,20,21;94:14,15,18,
24;96:4,15;98:1,10,25;
99:19,21;100:15
20:5;27:14;33:20;
34:20,21;35:2,22;
37:23;47:5,7;51:8;
55:9;56:4;57:24;68:4;
72:10;83:18;84:14,20;
88:2,11;92:22
**needed (1)**
60:22
**needing (1)**
41:12
**needn't (1)**
50:11
**needs (10)**
13:16;18:22;20:3,12;
21:5;41:10;77:7;78:10;
81:12;89:3
**negate (1)**
84:20
**negligence (3)**
28:12,12,13
**negligent (1)**
29:4
**negligently (1)**
25:21
**negotiate (1)**
20:14
**negotiated (1)**
34:6;46:24
**negotiations (2)**
11:8;61:23
**neighborhood (1)**
58:14
**neither (1)**
66:18
**new (1)**
86:12
**newspaper (1)**
41:4
**next (7)**
7:14;9:2;19:3;20:22;
49:10;50:4;100:13
**nice (1)**
48:10
**night (2)**
9:15,16
**nine (1)**
58:14
**ninety (1)**
25:11
**Ninth (1)**
87:21
**nolo (1)**
29:21
**non (1)**
7:5
**nondestructive (1)**
17:14
**none (1)**
9:24
**nonlawyers (1)**
6:18
**nonprivileged (2)**
16:22;44:6

Min-U-Script®

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 111
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**(9)** macro - nonprivileged

**nonstarter (1)**
73:15
**North (6)**
24:15,23;31:8,14;
33:15;34:1
**Northern (1)**
48:4
**note (1)**
23:10
**noted (1)**
53:16
**notice (4)**
42:18;51:22,24;
52:12
**notices (2)**
43:24;50:23
**notify (1)**
22:25
**nuisance (1)**
65:17
**number (43)**
6:22;9:13;12:5;
13:19;17:12;20:7;
23:11;27:11;34:24;
35:8;48:12,21,23;53:7;
54:7;55:5,8,25;56:13;
57:1;61:10,11;68:18,
18;69:3,12,13,18,21;
74:24;75:7;81:23,24;
85:16,16;90:15;93:23;
94:2,6,7;95:25;98:6,9
**numbered (1)**
42:14
**numbers (9)**
21:10;54:7;56:3;
69:14;74:25;75:8;
84:16,17;96:8

**O**

**object (2)**
24:17;81:8
**objection (5)**
17:2;18:2;35:1;81:5;
99:16
**obligated (1)**
90:3
**obligation (1)**
47:1
**obligations (1)**
12:7
**observation (1)**
9:14
**obviously (8)**
13:22;16:14;18:3;
24:16;43:20;79:10;
99:13,14
**occurring (2)**
72:7,8
**off (4)**
8:13;16:11;20:3;
28:3
**offer (1)**

**opinions (1)**
64:6
**opponent (2)**
51:7;99:19
**opportunity (2)**
50:19;52:5
**opposing (2)**
52:3;100:5
**opposite (1)**
26:18
**option (2)**
28:2;64:13
**order (44)**
5:3;7:13;8:22;10:1,
16;11:10;19:22;23:21;
31:21;33:8,11;37:14;
39:24;40:23;43:9;
44:10;46:24,25;47:3,8;
52:13;54:5;57:3,17;
60:24,25;68:12;71:22,
23;72:23;80:2,12,19;
81:13;84:5;87:13;90:9,
20;92:2;96:10;99:10;
100:3,4,5
**ordered (8)**
26:4;47:14,16,25;
48:8;88:8;99:5;101:3
**ordering (1)**
88:4
**orders (3)**
32:21;36:3;41:8
**originally (1)**
11:8
**Orsini (170)**
5:21;6:2,3,5,7,8,12,
15;10:9,14,24;11:1,4,
12;12:16,20,25;13:2,4,
18,21;14:16;15:25;
17:9,18,22,25,25;18:8,
11;19:7;20:16;21:7;
24:7;26:13,15;27:18,
19;28:15,20,23;29:1,3,
5,7,16,18;30:4,15,24;
31:1;33:14,18,20;35:8,
11,18,19,22;36:18;
37:15,24;38:9,14,19;
39:4,13,14,17;40:21;
41:25;43:3;45:4;48:20,
22,25;49:2,4;50:2,9,12,
17;51:3,6;52:21;53:5,
6;57:23;58:8,10;61:8,
9,16;62:3,5,13,15,18,
20,25;63:3;67:11,12;
68:14,15,16,21;69:11,
24;70:2,9,10;73:8,22,
25;74:7,11,14,17,19,
20;75:6,14,17;76:23;
77:1,6,13,18,21,24;
78:12,15,17;80:14;
81:3,4;82:18,20,25;
83:11;84:3,19,22,25;
85:6,15,23;86:2,16,24;
87:3;88:14;91:4,19;

92:9,10;94:10;95:4,11,
18;96:17,22;97:7,9,13;
98:12;99:12,13;100:14
**Orsini's (5)**
5:23,24;24:1;71:20;
73:14
**others (4)**
10:10;17:15;43:3;
61:11
**otherwise (4)**
40:9;46:19;77:1;
89:18
**ought (1)**
26:22
**ourselves (3)**
30:5;55:21;60:5
**out (20)**
6:19;7:16;21:4;
22:20,22;24:23;34:11;
37:24;41:11;50:15;
51:13,14;57:10;61:20;
70:7;74:2;82:15,21;
87:12;99:24
**outcome (2)**
68:11;77:9
**outside (1)**
63:19
**outstanding (3)**
44:4,11;49:18
**over (29)**
8:3;12:8;25:25;
26:19;30:16;31:25;
34:3,4;35:12;39:12;
40:24,24;42:10,23;
45:5;46:23;47:6;52:21;
59:4,7;68:3;73:10;
76:24;77:12;80:17;
87:8,17;94:2;96:10
**overall (1)**
12:22
**overbroad (2)**
22:10;34:14
**overly (1)**
57:14
**oversimplified (1)**
67:3
**overstated (1)**
67:2
**overwhelming (1)**
34:14
**own (6)**
16:9;54:10,24;58:23;
64:6;70:13

**P**

**pace (1)**
52:21
**PACER (1)**
36:2
**page (8)**
8:8;21:9;56:5,21,22;
57:20;91:5;101:2

**pages (1)**
33:24
**paid (10)**
25:11;31:16;41:11;
61:10,14;66:16,17;
68:19,19;70:7
**paper (1)**
68:5
**papers (1)**
23:3
**paragraph (1)**
13:15
**Pardon (2)**
33:19;52:10
**part (20)**
10:11;15:23;19:21;
20:4;27:3;50:21;58:24;
59:8,16;60:9;62:6;
66:11;71:2;76:13;
79:19;82:12;87:2,3;
93:10;97:19
**participate (1)**
16:4
**particular (7)**
16:16;55:18;64:18;
70:5;77:3,25;88:19
**particularly (2)**
6:2;27:10
**parties (19)**
14:14;16:3;17:1;
22:9,14;24:12;26:2;
27:11,11,22;34:6;
45:19;47:1,10;63:8;
65:11;85:11,25;99:23
**partner (1)**
43:7
**parts (1)**
33:15
**party (4)**
46:25;51:23;58:3;
59:6
**Pascuzzi (8)**
21:17,17,22,24,25,
25;22:24;23:6
**pass (1)**
9:16
**passing (1)**
9:15
**past (3)**
45:17;54:18;91:1
**path (3)**
18:24;20:20;67:15
**Paul (2)**
21:17,24
**paying (1)**
100:7
**payment (1)**
32:22
**pending (2)**
25:3;40:14
**people (11)**
5:22;9:9;12:6;20:25;
51:12;60:15;62:17;

67:13
**offers (2)**
59:9;78:8
**Office (1)**
7:8;22:2
**officer (1)**
30:18
**official (2)**
10:2,3
**old (1)**
86:12
**omissions (1)**
55:5
**once (2)**
24:20;32:5
**one (57)**
6:23,23;13:15;14:8;
16:12,25;17:10,13;
19:11;24:13;25:4;29:7;
32:9,9;39:18;42:2,15;
43:17;48:19;50:8,13,
15;51:10;55:24;56:25;
60:2;65:25;66:15;
67:13;69:6;70:18;
71:25;74:2,15,17;75:7,
20;76:9;77:24;78:9,23,
24;79:16;80:11;81:25;
83:17,22,24;85:4,11,
17;87:5;89:14,17;
90:18;96:1;98:25
**one-party (1)**
60:5
**onerous (1)**
56:19
**ones (4)**
17:13;39:12;56:20;
84:7
**one's (1)**
44:9
**only (17)**
10:1;11:16;14:18;
20:19;40:6;45:25;
49:25;56:21;66:15;
73:15;74:15;76:6;
79:15;80:14;87:17;
90:7;95:9
**oOo- (1)**
5:2
**open (6)**
14:15,25;19:12;
23:20,25;80:7
**opened (1)**
89:21
**openers (1)**
79:14
**opening (3)**
24:4,16;82:14
**operate (1)**
79:2
**opined (1)**
98:18
**opinion (1)**
79:13

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 112
of 119

70:15;73:10,13,15
**per (1)**
57:25
**percent (5)**
34:19;46:1;60:2;
89:15;96:1
**perfectly (2)**
82:3;96:5
**perhaps (6)**
13:16;61:21;83:6,7,
7;86:4
**permission (1)**
47:6
**permit (2)**
12:4;57:13
**permitted (1)**
8:25
**person (7)**
36:14;61:19,19,20;
79:5,6,7
**personal (3)**
71:3;75:3;82:21
**personally (2)**
84:23,25
**person's (1)**
79:1
**perspective (4)**
15:17,20;16:5;60:17
**persuade (1)**
77:1
**persuaded (3)**
41:22;66:10;80:3
**pertain (1)**
20:18
**pertaining (1)**
7:9
**petition (1)**
41:12
**PG&E (24)**
5:5;7:5;25:20;29:22;
32:19,24;34:17;37:4,8;
38:24;41:10;46:5;
53:21;56:8;62:14,16;
64:9;77:11;80:20;
81:20;86:4;88:16;
89:16;98:19
**PG&E's (6)**
25:23;30:2;53:25;
54:10;71:6;84:15
**phone (6)**
5:7,7,23;6:22;21:2;
22:3
**phrase (1)**
19:13
**physical (6)**
15:21,22;16:6;17:14;
30:2;79:8
**pick (2)**
87:23;90:10
**picture (1)**
72:9
**piece (1)**
67:14

**pipeline (1)**
58:14
**place (7)**
16:2;19:24;26:23;
27:5,13;41:9;59:25
**places (1)**
8:7
**plaintiff (4)**
30:11;56:8;81:16;
85:10
**plaintiffs (5)**
29:22;61:10,13;
70:13;71:8
**plaintiffs' (5)**
64:5;67:8,15,23;
73:12
**plaintiff's (1)**
68:4
**plan (6)**
25:25;27:1,13;34:22;
64:17;73:21
**plans (2)**
53:24;72:21
**playing (4)**
47:19,23;80:24;
88:12
**plea (2)**
29:21,21
**pleading (1)**
22:12
**pleadings (1)**
90:6
**please (3)**
8:10;42:21,22
**plus (1)**
97:4
**PM (1)**
100:17
**point (27)**
6:16;13:20;19:16;
24:12,23;27:19;28:1;
29:7,8;35:2,8;38:22;
45:13;57:17;63:25;
66:1;68:25;71:23;
78:22;80:4,9;81:9,21;
82:11;88:23;96:14;
98:1
**points (3)**
28:15;32:21;65:11
**policies (24)**
17:15;43:19;51:16;
53:1,8,18;54:9,17,17,
18,23,25;55:7,14,16,
17,18,20;56:13,15,16,
20;57:16;58:3
**policy (20)**
53:4;54:9;55:5,9,11,
12,25;56:3,5,13,20,22,
23;57:1,2,4,11,11,20;
63:14
**pop (1)**
19:5
**portal (1)**

10:6
**portion (1)**
10:20
**position (5)**
6:16;20:2;43:3;
60:17;64:5
**possession (5)**
15:22,22;22:13;
25:23;67:18
**possible (4)**
12:6;15:18;49:13;
55:22
**potential (2)**
30:9;58:20
**pots (1)**
55:22
**practice (1)**
71:13
**practices (1)**
17:16
**pre- (1)**
41:11
**Precisely (1)**
30:15
**pre-existing (1)**
47:1
**prejudice (1)**
69:16
**prematurely (2)**
16:8,13
**premised (1)**
50:20
**prepare (1)**
42:24
**prepared (14)**
8:24;9:4;20:13;21:3;
27:9;50:13;51:25;52:4,
6;59:16;60:2;66:5;
76:25;80:8
**preparing (4)**
25:14;34:12;42:22;
50:22
**pre-petition (1)**
41:19
**prerogative (1)**
63:7
**present (1)**
70:4
**presiding (3)**
5:5;30:14,16
**press (1)**
88:16
**presumably (1)**
27:23
**presume (3)**
84:23;89:8,15
**pretty (2)**
30:21;71:9
**previous (1)**
26:19
**pride (1)**
42:22
**primarily (1)**

32:12
**principal (3)**
6:16;42:4,25
**principle (1)**
41:5
**prior (7)**
19:15;37:9;44:16;
45:11;65:14;70:15,15
**privilege (44)**
22:17;34:12;44:7,10;
46:11,13,21;48:21,23;
50:1;59:5,13,17;60:3,
9;61:21,22;62:8,17,23;
63:9,11,13,20;64:2,7,
12;71:5;75:12;81:9;
85:24;87:17;92:2,17;
94:2,5;95:2,5;96:9,20,
22;97:5;98:5,6
**privileged (21)**
34:12;45:8;62:2;
64:11;74:5;75:5;81:21;
86:5,8,15,15;88:21;
91:20,25;92:6;93:7;
94:20,21;96:19;98:9,
13
**privileges (4)**
46:12;87:8,15;98:16
**probably (5)**
65:25;85:12;89:14;
95:15;99:25
**probation (2)**
32:14,16
**probative (4)**
41:13;58:16;59:1;
69:5
**problem (3)**
17:19;60:4;99:12
**problems (1)**
34:8
**procedure (1)**
40:13
**procedures (2)**
17:16;25:2
**proceed (3)**
19:14;21:15;42:19
**proceeded (1)**
48:11
**proceeding (6)**
12:6;25:19;30:9;
31:10;32:4;37:9
**proceedings (6)**
11:6:18:24;19:12;
34:24;35:6,24;36:16;
37:4;88:4;100:17
**process (15)**
15:16;20:5;22:5,22;
29:12;35:3;37:5,23;
38:2;41:17;65:12;
71:10,16;72:22;76:11
**processes (2)**
27:24;71:11
**produce (40)**
24:19;31:13,21;

33:24;34:18;36:11;
39:24;44:10;46:2;
47:14,16,25;48:2,7;
49:5;53:17;57:3;67:20;
68:8,12;72:24;73:19;
74:12;76:17,17;79:25;
80:2;82:4;88:5,6,8;
90:4,9,10;91:4;92:2;
94:18;99:6,17;101:3
**produced (52)**
16:22;17:4;31:10,15,
19,19,20,22;33:16;
34:5;35:9;36:1;43:8;
44:5,6;45:21,24,25;
48:8;49:3;54:23;55:9,
11;56:3,21;59:14;61:1,
2,5;65:13;68:1;69:15;
75:22;76:12;83:4,14;
84:6;91:8;92:13,20;
93:2,5,8,9;94:3,14;
95:13,14,22;97:4;99:5,
10
**produces (1)**
37:5
**producing (10)**
35:1;37:9;45:6;
47:25;67:25;83:21;
90:4,7;92:16,17
**product (21)**
75:5;81:10;82:10;
84:4;85:21;86:6,7,8,19,
21;87:23;91:20;92:1,3;
93:7;95:9,23;96:1,2;
97:16,19
**production (6)**
34:11;35:15;36:18;
38:25;40:6;86:20
**productions (3)**
16:24;56:18;94:16
**professionals (1)**
14:19
**progress (4)**
9:17;42:8;98:23;
100:1
**prohibits (1)**
59:6
**projections (2)**
16:20;79:7
**prominent (1)**
65:25
**prominently (2)**
22:5;31:9
**promise (1)**
23:11
**pronouncing (1)**
42:3
**proof (4)**
28:11,12;62:22;
88:25
**proper (1)**
82:3
**properly (2)**
43:25;98:18

Min-U-Script®    Case: 19-30088    Doc# 3478    eScribers, LLC | (973) 406-2250    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 113
operations@escribers.net | www.escribers.net    of 119

**property (9)**
53:24,25;54:10;
65:16;71:2;73:4;75:4;
84:9;85:8
**propose (1)**
20:5
**proposition (1)**
30:25
**protect (1)**
91:21
**protected (5)**
46:15;74:9;75:12;
86:19;96:2
**protection (4)**
63:14;87:23;92:7;
94:4
**protections (4)**
40:25;46:20;47:8;
63:18
**protective (5)**
41:8;46:24,25;47:3,8
**protects (1)**
71:5
**protocol (8)**
20:14;24:9;26:23;
27:5,7,8;34:1;38:20
**prove (4)**
25:22;29:22;30:2;
70:13
**provide (16)**
10:22;26:17;27:8;
38:14;53:14;54:25;
55:19;60:4;65:10;68:9;
71:5;77:14;78:4;81:5;
83:10,13
**provided (14)**
11:20;16:2;32:10;
36:7;40:3;53:14;56:16;
75:8;77:15;81:6;82:8,
15;93:4;99:3
**provides (2)**
14:18;63:16
**providing (6)**
18:5;38:13;47:11;
67:9;81:5,8
**proving (1)**
25:18
**provisions (1)**
63:19
**prudent (1)**
13:22
**public (25)**
16:20;39:10;40:9;
41:15;45:2,2;48:3;
72:13;81:18;89:16,22,
24,25;91:23,23;92:5;
93:10;94:8,21;95:12,
19;96:23;97:3,15,17
**publicly (6)**
36:1,2;44:21;62:16;
88:16;95:21
**pulling (1)**
34:11

**punitive (2)**
56:15;93:25
**purpose (3)**
6:18;86:17;89:23
**purposes (19)**
21:6;28:20;30:1,19;
34:15;44:14;64:17;
65:8;66:17,21,23,24;
70:24;73:18;79:23;
80:22;85:19;98:3,4
**pushing (1)**
53:19
**put (21)**
13:2,19;19:1;27:5;
35:3;38:18;41:25;
50:19;51:13;54:8;
64:16;72:20;74:3,22;
75:1;80:20,24;92:1;
93:23;94:6,7
**putting (3)**
29:24;32:23;51:14

# Q

**quick (4)**
5:25;35:16,19;58:12
**quickly (4)**
12:6;15:18;89:3;
93:13
**quite (6)**
12:8;19:18;26:16;
53:6;56:18;65:9
**quote (1)**
90:16

# R

**raise (1)**
20:21
**raised (3)**
27:22;32:25;53:8
**raises (1)**
67:24
**range (1)**
30:21
**rather (3)**
20:19;32:22;38:21
**ratio (1)**
59:20
**reach (1)**
16:10
**reaching (1)**
11:14
**read (8)**
23:3;28:7;33:4,8,10;
41:2;53:1;56:2
**readily (1)**
39:22
**reading (1)**
71:14
**ready (14)**
20:12;21:12;26:20,
20;27:4;31:13,14,19,

22,23;33:22;34:11;
38:25;42:19
**real (1)**
78:7
**reality (1)**
34:9
**realize (3)**
6:17;19:1;25:18
**really (6)**
27:21;54:1,11;62:6;
71:24;92:25
**reason (9)**
6:15;8:23;24:14,25;
32:13;33:16;48:22,25;
65:9
**reasonable (3)**
20:6;44:24;99:8
**reasonably (1)**
49:5
**reasoning (2)**
77:5,7
**reasons (2)**
25:9;89:10
**recall (3)**
11:7;19:4;61:9
**recalls (1)**
19:21
**receive (1)**
27:8
**received (4)**
9:11;44:7;55:14;
77:16
**receiving (1)**
78:3
**recent (1)**
78:1
**recitals (1)**
85:7
**recognize (2)**
65:21,24
**recollection (1)**
37:13
**record (5)**
40:9;42:1;43:10;
82:11;100:10
**records (3)**
45:7,21;84:15
**recovery (2)**
55:1,23
**redact (3)**
76:9,14,15
**redacted (8)**
45:7,24;46:9;75:21;
78:5;81:11;84:1;87:24
**redacting (2)**
77:2;84:3
**redaction (1)**
84:2
**redactions (5)**
76:20,21;77:18;
83:23;84:6
**redacts (2)**
75:23;76:5

**reduce (1)**
100:4
**reference (2)**
60:24;65:14
**referenced (4)**
36:6;40:2;56:14;
57:1
**referred (2)**
17:21,23
**referring (9)**
19:8;33:25;36:5;
40:10,11,11;55:15;
72:13;73:5
**reflect (1)**
40:16
**refused (2)**
26:16;46:2
**regard (4)**
8:20;22:17;37:21;
94:16
**regarding (5)**
6:25;7:15;9:13;
51:22,23
**regardless (1)**
98:2
**regime (1)**
60:1
**regularly (1)**
65:24
**relate (4)**
32:2,10,11;92:14
**related (14)**
16:6;18:22;31:25;
33:1,13;39:9;44:3;
45:6;46:1,10;53:8;
63:12;72:19;75:22
**relates (5)**
32:12;58:11;59:2;
79:14;93:2
**relating (5)**
44:16,17;45:7;48:2;
89:25
**releases (1)**
88:16
**relevance (4)**
54:9;65:21;72:3;
92:22
**relevant (25)**
16:17,17;30:22;
33:17;35:1;36:24;
41:16;43:8,20;46:7;
54:13;58:5;63:10;
66:17;69:1;70:24;72:6,
17;73:16;78:16;80:5;
81:18,18;86:7;88:7
**reliable (1)**
45:14
**reliance (1)**
45:3
**relied (7)**
91:16;94:1,5,21;
95:12;96:7;97:15
**relief (7)**

20:23;24:5;27:20,24;
28:3;30:11;41:23
**rely (10)**
45:9,11;47:10;66:11;
76:15;91:7;94:12;95:8;
96:18;100:10
**relying (10)**
45:22;46:14;47:9;
58:22;65:14,22;72:5;
84:15;92:4;99:9
**remain (1)**
12:13
**remains (1)**
96:1
**remember (4)**
32:13;33:3;64:15;
79:17
**remembers (1)**
95:16
**remotely (2)**
58:16;59:1
**removed (1)**
76:21
**reopened (1)**
24:20
**repeat (1)**
41:22
**repeatedly (2)**
26:18;27:4
**rephrase (2)**
40:7,7
**report (6)**
7:7;10:24;11:13;
13:15;49:10;84:12
**reported (2)**
20:9;89:23
**reports (7)**
31:24;33:1,13;35:20;
39:9;47:17,18
**represent (3)**
8:19;36:16;73:12
**representation (1)**
97:2
**represented (1)**
83:7
**representing (1)**
9:8
**represents (1)**
36:23
**request (29)**
7:2;12:17;15:8;
16:18;17:19;18:16;
22:8;24:17,24;26:3;
31:21;36:11;38:18;
44:9;45:12;47:12;48:2;
50:21;53:15;54:5;55:3;
57:2;76:16;80:18;90:3,
6,8;92:15;99:19
**requested (4)**
9:20;13:7;17:8;
101:3
**requesting (4)**
19:12;24:4,15;39:12

Min-U-Script®
Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 114
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(12) property - requesting

**requests (17)**
16:15,23;17:4,6;
22:10;23:20;24:10,21;
26:24;31:6;48:7;49:17;
53:3,19;90:11;91:9;
92:24
**require (2)**
19:20;86:20
**required (1)**
49:12
**requires (2)**
68:12;78:21
**research (1)**
67:1
**reserve (1)**
83:19
**reserved (1)**
7:7
**residential (1)**
58:14
**resisting (1)**
58:9
**resolution (5)**
10:12,23;11:25;
95:20;97:20
**resolve (6)**
12:12;18:22;20:3;
23:24;58:2;95:18
**resolved (1)**
95:19
**resolving (1)**
26:9
**resource (1)**
45:19
**resources (1)**
34:22
**respect (24)**
18:5;22:16;24:6,10;
28:20,23;29:3,8;32:20;
33:2;34:10,11,12;
35:15;46:13;58:20;
59:3,17;60:3,9;78:8;
92:12,25;93:6
**respond (5)**
17:10;26:4,13;38:9,
20;42:24;49:15,17;
52:5;57:25;58:1;71:18;
87:7;96:10;98:12
**responded (5)**
16:22;24:21;31:3;
43:7;44:5
**responding (5)**
19:10;52:22;53:3;
56:12,12
**response (33)**
10:15;12:17;17:4;
19:15,17;21:3;23:21;
32:25;33:10;35:16,19;
39:15;42:20;43:9;44:8;
50:3,3,4,10,19,22;51:1,
7,8;53:5,11,19;57:25;
58:12;90:5;91:9;98:13,
13

**Responses (6)**
21:9;26:25;27:8;
42:1;53:2;78:9
**responsibility (4)**
9:22;32:2,15,21
**responsive (9)**
16:23;33:24;34:7;
35:2;53:15,22;71:6;
90:8,10
**rest (1)**
25:16
**restate (1)**
91:5
**restating (1)**
81:2
**resulted (2)**
43:6;46:5
**reticent (1)**
49:5
**return (1)**
12:9
**review (1)**
36:11
**reviewed (2)**
34:5;53:20
**reviewing (1)**
54:16
**right (41)**
5:6;6,6,14;11:15;
12:24;15:2,13;19:23;
20:17,20;23:5;28:14,
25;29:11,16,18,21;
30:3;35:6;43:12;48:15,
17;49:1,6;62:9,25;
72:3;82:13,23;83:15;
85:14,15;87:5;93:17;
94:15;97:9,13;98:10;
99:20,22;100:8
**rights (1)**
64:18
**Rios (1)**
21:25
**ripe (4)**
13:9,24;43:10;60:11
**Robert (1)**
23:18
**roles (1)**
73:23
**roll (2)**
20:17;39:18
**rolling (1)**
76:24
**Roman (1)**
12:17
**rule (1)**
73:19
**ruling (5)**
32:6;37:25;38:17;
42:8;81:3
**RULINGS (1)**
101:2
**run (2)**
6:20;14:21

**S**

**said/she (1)**
100:9
**sake's (1)**
42:18
**same (31)**
7:3;8:8;14:22;27:17,
22;40:25;41:4;46:5,6;
47:23;48:5;65:9;72:6,
20;73:7;74:1;77:16,19;
78:4;79:11;80:24;81:6;
82:5;87:20;88:12;
89:13;90:4;91:5;93:4;
98:3,4
**sample (1)**
83:1
**sampling (1)**
70:6
**SAN (25)**
5:1;32:11,15;41:3;
44:18;46:3;47:16;58:8,
9,11,13,24;59:3;65:7;
70:22;71:24;73:11;
74:22;75:22;76:24;
79:21;80:3,4;88:9;
90:18
**satisfaction (1)**
31:2
**satisfied (10)**
13:13,14;14:19;
21:14,14;42:6;50:10;
51:8,9;54:5
**satisfies (1)**
52:23
**satisfy (1)**
42:5
**saying (15)**
16:22;31:5;36:9;
41:7;45:4;46:25;48:6;
57:1;64:24;68:1;71:4;
82:7;94:11,13,13
**scattershot (1)**
22:11
**scenario (1)**
60:5
**schedule (3)**
8:10;27:11;34:21
**schedules (1)**
24:14
**scope (1)**
49:7
**seal (12)**
36:19;38:25;39:5,10,
20,22;40:1,9,15,16,19,
23
**sealed (1)**
41:2
**sealing (1)**
36:2
**SEC (40)**
41:15;48:1,5;76:13;

77:12,14,16,24;78:2;
80:1,15;81:6,11;82:8;
87:10;88:17;89:21,24;
90:4,11;91:8,16,23;
92:12,13,20,21;93:1,2,
8,23;94:4,5,7,10,11;
95:5;98:5,7,19
**second (4)**
10:19;32:9;43:19;
90:18
**secondly (2)**
7:6;31:24
**SEC's (2)**
48:1;76:13
**Section (6)**
12:22;43:20;46:14,
17;63:12;71:16
**secure (1)**
13:5
**seeing (2)**
54:18;100:12
**seek (2)**
47:20;80:11
**seeking (7)**
13:6;48:5;55:3;65:5,
8,9;89:24
**seem (3)**
41:6;61:9,20
**seemed (2)**
18:10;20:17
**seems (12)**
33:17;41:23;57:12,
13,16,16,20;61:3;
64:12;71:8;77:1;82:2
**selective (1)**
87:21
**selectively (3)**
76:14,15;90:10
**send (1)**
96:6
**sense (9)**
18:3,16;20:14;23:23;
27:13;34:23;35:3;
77:10;94:25
**sensible (2)**
16:3;18:10
**sent (3)**
15:15;19:15;32:6
**sentence (1)**
19:5
**separate (3)**
12:21;29:24;40:6;
42:15;74:1;84:2;94:3
**separately (3)**
36:10;73:7;93:6
**serve (1)**
57:5
**served (4)**
12:9;16:14;26:24;
92:16
**session (1)**
5:4
**sessions (1)**

45:4
**set (17)**
7:15;8:3,9,23;9:1,2;
15:5;16:20;27:12;28:5;
33:22;39:23;53:11;
61:1;68:7;72:11;96:6
**setting (4)**
8:21;51:12;52:9,12
**settle (2)**
68:19;85:11
**settled (18)**
47:5;61:10,13,25;
62:17,22;66:14,16,16;
68:18;69:4,10;73:10;
77:3;81:20;82:1,2;84:7
**settlement (58)**
45:3,5,11,13,14,22;
46:1,9,18;47:14;59:4,
11,17,20;61:18;62:1,
10;63:5,6,9;64:8,19;
65:5,6,7,15;72:18;73:2,
3,8,20;74:25;75:1,11;
80:21;82:12,13,16,22,
23;83:1,3,8;84:11,21;
85:4,8,9,16,18,20;
86:18;87:12,14;88:10;
89:16;90:17;91:14
**settlements (20)**
44:16;45:7;47:15,16,
18;59:24;70:6,7,14;
74:23;75:11;76:7;78:2;
80:17,19;81:7,24;
84:24;86:4;89:7
**seventy (3)**
23:20,25;54:7
**shape (1)**
58:19
**share (1)**
82:25
**shared (1)**
71:8
**Ship (4)**
28:5;29:25;79:20,22
**ships (2)**
9:15,16
**short (5)**
6:20;15:4;50:19;
51:1;54:5
**shorten (2)**
8:22;9:1
**shortened (1)**
7:2
**show (4)**
45:22;73:19;85:4;
88:24
**shows (1)**
33:11
**shut (1)**
20:3
**shy (1)**
13:22
**side (6)**
13:16;17:18;42:25;

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 115
of 119

64:4;70:18;74:15
**sides (4)**
　11:13;38:10;59:12;
　63:5
**sight (1)**
　34:25
**sign (1)**
　100:4
**signed (1)**
　18:14
**significant (3)**
　12:5;35:14;69:16
**similar (4)**
　45:16;54:17;65:20;
　71:11
**simple (4)**
　44:9;48:21;95:7;
　96:4
**simplicity (1)**
　10:1
**simply (12)**
　9:15;19:17;24:18;
　25:8;26:1,2;30:5;35:2;
　47:13;48:7;85:17;90:3
**Singleton (1)**
　22:6
**sit (2)**
　20:14;27:5
**sitting (1)**
　34:17
**situation (1)**
　30:6
**situations (1)**
　70:16
**six-month (1)**
　72:10
**slightly (2)**
　9:15;97:14
**solution (3)**
　67:6,13,23
**solutions (2)**
　23:23;26:8
**solves (1)**
　60:24
**somebody (4)**
　5:8;23:5;86:9;100:9
**somehow (3)**
　7:1;30:5;41:16
**someone (8)**
　8:17;17:18;21:2,15;
　23:17;36:13;67:11;
　78:24
**something's (1)**
　40:15
**soon (3)**
　27:20;49:5,13
**sooner (1)**
　38:20
**sorry (7)**
　15:1;42:4;63:3;65:2;
　76:2,2,4
**sort (4)**
　6:16;9:19;10:22;

59:4
**sought (1)**
　44:22
**sounds (4)**
　23:2;30:22;62:23;
　97:1
**source (2)**
　55:1;72:14
**speak (8)**
　8:17;14:6;21:13;
　23:16;36:13;40:4;
　51:25;67:11
**speaking (4)**
　16:1;18:11;20:12;
　28:16
**speaks (1)**
　23:25
**specialty (1)**
　54:16
**specific (13)**
　7:6;18:25;19:5;
　53:12;55:3,14;56:13;
　57:1;59:5;63:18;68:20;
　82:10;84:16
**specifically (6)**
　38:20;47:24;67:1;
　68:8;89:20;91:3
**specificity (1)**
　96:23
**specifics (2)**
　59:23;70:14
**specimen (1)**
　82:25
**specimens (3)**
　82:15;83:12,13
**speed (1)**
　47:23
**spend (1)**
　9:23
**spent (1)**
　25:13
**spoke (1)**
　6:7
**spreadsheet (15)**
　73:24;75:2,4,9,13,15,
　22;76:16;77:16;78:1;
　80:16;81:15,16,25;
　99:4
**spreadsheets (10)**
　72:24;73:1,19;75:7,
　20;77:20;81:5;83:20,
　24;99:17
**staff (4)**
　9:7,21;52:20;99:24
**stakeholders (1)**
　69:17
**stand (6)**
　10:7;13:14;14:11;
　15:8,8;68:15
**stand-alone (1)**
　55:18
**standing (2)**
　26:20;41:20

start (7)
　27:1;51:11;58:8;
　87:1;88:2,3,11
**started (3)**
　15:16;36:13;55:25
**starting (3)**
　55:4,8;72:21
**state (24)**
　11:6;10;19:12;20:1,
　19;24:2;25:3,6,8,15;
　27:24;30:6,9;31:16;
　34:24;36:16;37:3;59:6;
　61:4;67:21;71:12;
　88:14;94:9;97:14
**stated (7)**
　20:7;24:7;59:15,20;
　67:17;88:7;90:21
**statement (14)**
　10:11;12:19;17:23;
　18:19;19:4;26:14,16;
　29:25;62:3,4,8;94:13;
　96:17,18
**statements (6)**
　44:20;45:2;54:20;
　69:14;91:24;94:8
**states (2)**
　46:15;62:16
**stating (1)**
　92:3
**status (2)**
　12:14;81:17
**stay (13)**
　18:22;19:14,18;
　20:23;24:5;27:20,25;
　28:3;30:7,11;41:23;
　52:24;84:1
**stays (1)**
　14:20
**Steve (1)**
　36:15
**STI (1)**
　95:15
**stick (1)**
　55:24
**still (9)**
　11:14,16;24:18;
　25:24;28:12;31:2;34:9;
　35:12;60:13
**stipulated (1)**
　95:20
**stonewalling (1)**
　60:20
**stopped (1)**
　61:12
**streamline (1)**
　17:6
**Street (2)**
　33:5;40:10
**strikes (1)**
　67:7
**strong (1)**
　59:5
**struggling (1)**

62:7
**stuck (2)**
　38:16;60:18
**stuff (2)**
　25:6;37:23
**sub-buckets (2)**
　54:2;90:17
**subject (23)**
　9:13;10:15,25;11:10,
　16;34:5;36:2;39:24;
　42:16;46:11,12,20;
　61:5;63:13,15;64:2;
　84:4;85:24;92:6,17,17;
　98:15,16
**Submission (4)**
　21:10,10;42:13;53:9
**submissions (1)**
　40:3
**submit (1)**
　86:21
**submitted (4)**
　33:1;35:25;36:1;
　50:22
**subpoena (2)**
　12:9;22:6
**subpoenas (1)**
　22:7
**subrogation (16)**
　10:18;15:4,7,12,15;
　17:20;18:4,21;19:11;
　20:10;21:10;22:12;
　24:3,24;41:5;82:6
**subsequent (2)**
　20:7;60:12
**suffered (3)**
　79:6,7;86:13
**sufficient (1)**
　99:8
**sufficiently (1)**
　44:8
**suggest (2)**
　21:15;68:5
**suggested (1)**
　73:8
**suggesting (2)**
　26:22;28:1
**suggestion (2)**
　10:11;73:14
**sum (2)**
　78:25;85:18
**summary (1)**
　48:10
**supplement (1)**
　36:22
**supplemental (1)**
　17:7
**support (3)**
　12:22;93:22;95:24
**supported (1)**
　6:17
**supporting (1)**
　16:19
**supports (1)**

77:8
**supposed (4)**
　30:17;37:8;41:20;
　57:8
**sure (25)**
　8:6;9:7,19;11:3;
　15:10;19:18,21;21:21;
　27:16;40:17;43:25;
　53:6;54:2;56:19;70:21;
　71:9,9,14;72:2;78:17;
　83:10;85:3;90:20,25;
　91:6
**sympathetic (1)**
　41:12
**system (2)**
　25:21;38:11

**T**

**table (2)**
　16:11;28:3
**tabled (1)**
　14:21
**talk (5)**
　19:24;60:6;64:20;
　83:2;92:23
**talked (4)**
　67:10;79:15;89:6;
　90:21
**talking (13)**
　10:19;43:1;49:8;
　59:9;64:18,23;69:17;
　75:8,9;79:15,21;89:10;
　90:12
**tandem (1)**
　25:8
**TCC (60)**
　6:24;7:15;8:2,3,19;
　9:12;10:3,18;12:17,25;
　13:7;14:25;15:14;
　16:14,16,23;17:4,7,20;
　20:11;21:4,9,13;23:9,
　15,19;24:2,11,15;
　31:24;33:4;35:21;41:5,
　15;42:12;43:22;44:22;
　50:14;54:23;57:18;
　58:18;59:18;60:6;
　64:15;65:11;68:7,10;
　69:15;72:20;77:15;
　78:5;82:6;92:12,16;
　93:4,9;95:13;96:5;
　100:3;101:4
**TCC's (3)**
　51:13;64:12;67:18
**team (2)**
　35:13;54:16
**technological (1)**
　34:8
**technology (1)**
　34:6
**tee (2)**
　37:25;38:5
**teed (2)**

Min-U-Script®

Case: 19-30088　　Doc# 3478　　Filed: 08/08/19　　Entered: 08/08/19 17:24:49　　Page 116
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(14) sides - teed

68:4,6
**telling (4)**
47:4;54:22;56:4;
57:9
**tells (1)**
91:19
**ten (1)**
46:1
**tenders (1)**
43:24
**tens (1)**
33:24
**tenure (1)**
93:9
**term (1)**
32:16
**terms (5)**
11:16;28:11;56:24;
64:20;69:5
**terribly (1)**
41:12
**test (1)**
82:3
**testimony (1)**
64:1
**therefore (3)**
13:15;65:4;91:11
**there'll (1)**
50:3
**thinking (1)**
71:13
**third (4)**
44:2;47:1;51:23;
58:3
**third-party (7)**
6:25;7:15;42:15;
43:3,17;50:12,15
**thirty (5)**
87:11;94:12;95:6,8;
97:3
**thirty-billion-dollar (4)**
93:23;94:6;95:25;
98:9
**though (4)**
8:5;58:21;75:6;98:1
**thought (7)**
5:7;18:1;39:2,4;
53:2;57:18;81:1
**thousands (3)**
31:13;33:24;79:10
**three (3)**
48:8,21,24
**timeline (1)**
99:6
**times (1)**
6:9
**timing (1)**
50:11
**tired (1)**
99:24
**today (36)**
7:14;8:3,5,24;9:5,14,
25;13:9;16:12;17:1;

23:3;25:1;26:2;27:14;
32:7;38:17;42:17,18;
43:10;44:10;48:8;
50:24;51:23,24;52:12;
72:20;73:18;79:15,22;
80:8;82:11;88:8;98:21,
22;99:11;100:13
**today's (3)**
7:13;79:23;90:6
**together (5)**
19:23;24:8;35:3,3;
64:16
**told (9)**
26:18;27:4;31:14;
39:7;41:14;47:4;60:11,
13;92:12
**tomorrow (2)**
30:7;41:3
**took (1)**
86:10
**topic (3)**
10:17,19;13:19
**topics (5)**
12:16;43:14,15;
92:19,23
**tort (12)**
22:7;25:2,7;36:23;
43:23;44:22;45:10;
46:23;71:12;72:5;
87:18;90:5
**total (6)**
59:19;75:2;79:1;
80:20;84:10,12
**touch (6)**
6:1;31:18;32:5;
33:23
**track (1)**
29:23
**tracking (1)**
21:6
**transcript (2)**
37:13;100:6
**transcripts (2)**
37:7;38:1
**traumatic (1)**
79:6
**treasure (1)**
34:16
**treat (1)**
47:1
**treated (1)**
41:4
**tree (3)**
72:16;73:4;75:3
**trees (1)**
25:21
**trends (1)**
59:23
**trial (23)**
11:5;19:11;25:8,20,
20;30:1,4,6,17;41:11,
22;60:7,14;68:23;
70:12;74:13,13;78:18,

23;79:3,12;80:6;82:5
**trials (1)**
98:3
**trick (1)**
73:23
**trier (1)**
66:22
**tries (1)**
77:1
**triggered (1)**
18:15
**trouble (1)**
93:17
**trove (1)**
34:16
**truck (1)**
56:8
**try (9)**
6:6,19;12:3;58:2,19;
60:15;70:19;100:2,4
**trying (7)**
7:23;12:10;13:10;
19:16;38:11;60:21;
65:20
**Tubbs (7)**
18:22;25:20;28:4;
29:9,24,24;70:20
**turn (4)**
40:24;45:5;47:6;
68:3
**turned (6)**
31:25;32:14;39:12;
40:24;46:23;77:12
**turning (1)**
59:7
**twenty (3)**
24:6,10;74:21
**twenty-page (1)**
19:10
**two (27)**
5:22;7:8;22:7;23:11,
19;25:7,12;27:20,21,
22;31:6;32:5,8;33:15;
44:15;51:15;54:1;
66:17;75:6;82:9;83:23;
90:16,17;98:23;99:7,
11,17
**type (5)**
58:25;59:8;65:19;
70:8;84:2
**types (6)**
14:13;24:9;46:6;
72:7;73:3;83:23

## U

**UCC (1)**
14:19
**ultimately (5)**
11:9;50:20;59:10;
67:17,18
**Um-hum (2)**
11:11;56:1

**unable (3)**
6:9;12:11;67:24
**unclear (1)**
18:12
**under (27)**
12:7,17;17:17;25:1;
36:19;38:25;39:5,10,
19,22;40:1,9,15,16,19,
22,24;46:16;59:25;
61:4;65:19;68:9;71:12,
12,16;73:16;79:2
**underlying (4)**
11:21;45:3;47:5;
98:7
**underneath (1)**
45:12
**understood (4)**
9:5;50:6,23;52:8
**undisputed (1)**
66:19
**undoubtedly (1)**
57:6
**unfair (1)**
87:21
**unique (1)**
71:10
**uniquely (1)**
25:22
**universe (1)**
97:2
**unlawful (1)**
61:6
**unless (9)**
8:10;20:21,22;21:2,
15;23:5;89:2;90:19;
99:2
**unliquidated (7)**
64:21,23;66:18,24;
89:15,16,18
**unredacted (2)**
47:19;99:5
**unredacting (1)**
81:10
**unsecured (1)**
10:4
**unusual (1)**
97:23
**unwilling (1)**
60:21
**up (33)**
6:7;7:13;8:5,12;
12:10,14;14:6;19:3,5,
12;25:11,24,24;30:12;
37:25;38:5;43:11,19;
47:22;50:20,24;51:4;
52:20;64:16;65:4;68:5,
6;81:20;93:18;94:1;
95:12;96:8;98:8
**updated (1)**
78:5
**upload (1)**
100:7
**upon (30)**

26:20;44:23;45:3,10,
11,22;46:14;47:9,10;
49:11;50:20,23;54:4;
58:23;59:19;65:14,22;
72:5;76:15;84:15;91:6,
16;92:4;94:1,5,21;
95:12;96:7;97:15;99:9
**use (10)**
11:22;12:4;45:15,19;
65:12;80:25;87:13,14,
24;91:22
**used (8)**
25:3;80:20;82:23;
86:3;90:19;93:10,22;
96:24
**useful (1)**
65:11
**using (12)**
44:18;47:17;65:10;
72:12;80:22;87:9;
91:15;97:3;98:2,2,4,8
**usual (1)**
85:5

## V

**valuable (1)**
45:18
**value (4)**
44:21;58:23;65:8,15
**valued (1)**
13:11
**various (8)**
9:8;11:21;41:1;
50:23;55:7;66:17;73:3,
20
**verbatim (1)**
90:16
**version (3)**
76:16;77:16,19
**versions (1)**
78:1
**via (1)**
31:16
**victim (1)**
61:17
**victims (4)**
11:22;69:10;83:6;
85:4
**victims' (1)**
43:23
**view (7)**
11:14;24:7;27:19;
28:1;67:13;71:24;
95:25
**violating (2)**
32:17;67:20
**virtue (1)**
27:12
**vis (2)**
83:11,11
**volume (1)**
37:23

Min-U-Script®

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 117
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(15) telling - volume

**voluntarily (2)**
40:24;64:14
**voyage (1)**
9:17

## W

**Wait (7)**
7:18;21:5;26:1;
35:18;36:14;62:16;
75:15
**waiting (5)**
10:18;23:12;27:8;
37:11;60:13
**waive (10)**
59:12,16;60:2,4,9,
19;62:17;63:6,8;64:11
**waived (5)**
61:22;64:7;87:8,15;
94:2,5
**waiver (5)**
60:5;62:23;87:21;
95:2,4
**waiving (1)**
98:6
**Wall (2)**
33:5;40:10
**wants (4)**
21:15;23:5,8;41:16
**waste (1)**
57:20
**way (21)**
17:20;21:15;25:4;
26:4;31:3,8;38:10,12;
40:21;41:20;53:4;54:7;
56:6,23;58:19;81:17;
82:5;95:18,18,19;
96:15
**ways (1)**
15:18
**WEDNESDAY (1)**
5:1
**weeds (1)**
21:18
**week (9)**
15:24;19:3;20:22;
27:6;31:12;49:10;50:4,
8;100:13
**weeks (4)**
26:19;99:7,11,17
**Weil (1)**
10:11
**weren't (1)**
19:17
**what's (13)**
10:10,10;13:17;
35:16;49:7;53:5;54:9;
55:10;77:5;89:7;94:10;
95:8;97:4
**whereas (1)**
11:5
**Whereupon (1)**
100:17

**whole (5)**
9:6;20:25;21:1;
60:16;95:15
**wholly (1)**
46:4
**Who's (1)**
51:18
**wil (1)**
10:22
**wild (2)**
90:1;93:3
**wildfire (16)**
10:21;11:22,24;12:5;
16:17,20;17:5;18:5,6;
19:14;32:13,23;53:20,
22;55:22;90:13
**wildfires (6)**
18:23;28:6;32:11;
48:4;79:20;80:6
**wiling (1)**
96:5
**willing (7)**
40:21;43:11;51:13;
58:1;60:9,19;73:22
**willingness (1)**
67:8
**Willkie (2)**
15:1,11
**Willoughby (1)**
21:25
**wind (1)**
12:14
**window (1)**
72:10
**winning (1)**
88:22
**wishes (1)**
73:9
**withdraw (1)**
52:6
**withholding (4)**
46:8,9;94:19;96:12
**within (3)**
56:16;99:10,17
**without (8)**
44:8;54:18;56:22;
79:23;82:7;84:6,9;
98:14
**wondering (1)**
7:17
**word (7)**
6:19;35:4;37:24;
38:7;50:9;83:5,15
**words (9)**
63:15,16;70:1,12;
77:11;86:5,9;90:15,16
**work (36)**
25:8,11;26:24;34:10,
13;35:3,12,14;49:12;
54:4;58:22;60:14,14;
71:17;75:5;81:10;
82:10;84:4;85:21;86:6,
6,7,19,21;87:23;91:20;

92:1,3;93:7;95:9,23;
96:1,2;97:16,19,22
**worked (1)**
54:17
**working (10)**
10:21;11:4,5;12:3;
14:16;27:7;37:4;60:7;
83:9;99:1
**work-product (1)**
45:8
**worry (2)**
28:5;41:24
**worth (3)**
34:9;65:16;77:25
**wrap (1)**
12:10
**write (1)**
8:12
**written (6)**
50:19;51:1;53:2;
98:12;100:4,6
**wrong (6)**
15:25;39:20;59:21,
22;64:8;77:5
**wrongful (2)**
65:19;71:2
**wrote (2)**
90:15,18

## X

**X's (1)**
86:10

## Y

**year (3)**
37:5,12;79:16
**years (10)**
25:7,12;34:4,25;
55:7;58:15;78:2,5,25;
81:7
**years' (1)**
77:25
**Yep (2)**
27:18;95:17

## Z

**zone (1)**
65:17

## 1

**1 (5)**
24:3,24;26:3;35:8;
42:14
**1,500 (3)**
47:5;60:15;65:6
**100 (1)**
34:19
**101 (1)**
78:20

**11:43 (1)**
100:17
**1119 (1)**
46:15
**1123 (2)**
46:17;63:12
**113 (1)**
63:12
**13th (1)**
50:5
**14th (3)**
24:8;26:17;50:7
**15th (5)**
31:15,22;33:16,22;
35:10
**17 (3)**
72:6,8;80:6
**18 (7)**
48:4;72:6,8;80:6;
90:13;93:3;95:6
**19 (1)**
101:3
**1st (2)**
10:5;17:12

## 2

**2 (1)**
18:17
**2,000 (1)**
80:17
**2,200 (1)**
81:23
**2,800 (8)**
73:10,12,13,15;
74:23,24;76:6,18
**2000- (1)**
76:2
**2010 (4)**
32:10,15;44:17;
47:15
**2015 (26)**
44:17;47:15;58:20;
59:3,17,20;60:3;69:19;
71:7;72:8;75:22,24;
76:1,5;79:16,25;80:6,
17,19;81:24;84:23;
86:4;89:7;90:2,17,24
**2017 (13)**
32:20,22,25;33:12;
48:4;89:13;90:1,13;
91:7,18;92:14;93:2;
95:6
**2017/2018 (1)**
58:21
**2018 (11)**
32:20,22,25;33:12;
36:20;39:11;89:14;
90:1;91:8,18;92:14
**2019 (3)**
5:1;32:21;101:5
**2020 (1)**
90:18

**21st (1)**
99:11
**24 (1)**
101:4
**25 (1)**
81:23
**25th (1)**
7:1
**26th (4)**
9:11;18:15;24:2,25
**27 (1)**
55:5
**27th (7)**
7:16;8:4;51:13,14;
52:9,21,24
**29th (1)**
7:12
**2nd (2)**
52:17,19

## 3

**30th (1)**
27:12
**32 (2)**
55:9,25
**3352 (1)**
17:12
**3371 (2)**
10:17;21:9

## 4

**4 (1)**
21:9

## 5

**502C (3)**
71:16;79:2,2
**5th (1)**
10:16

## 7

**7 (1)**
5:1
**70 (1)**
42:14
**7th (1)**
7:14

## 8

**800 (4)**
31:24;35:19;38:24;
39:8

## 9

**9:32 (1)**
5:1
**99 (1)**

Case: 19-30088    Doc# 3478    Filed: 08/08/19    Entered: 08/08/19 17:24:49    Page 118
of 119

101:3
**9th (7)**
  7:1,4;12:10;23:13,
  14,14;53:17