WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                 **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' OMNIBUS REPLY IN SUPPORT OF THEIR MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c) FOR THE ESTABLISHMENT OF WILDFIRE CLAIMS ESTIMATION PROCEDURES**<br><br>Re:    Dkt. No. 3091<br>Date:  August 14, 2019<br>Time:  9:30 a.m. PST<br>Place:  United States Bankruptcy Court<br>             Courtroom 17, 16th Floor<br>             San Francisco, CA 94102 |

PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Omnibus Reply in Support of the Debtors' Motion for the Establishment of Estimation Procedures (the "**Motion**" or "**Estimation Motion**").[1]  In support of this Reply, the Debtors respectfully submit the Supplemental Declaration of Kevin J. Orsini (the "**Supplemental Orsini Declaration**"), filed contemporaneously herewith.

---

[1] Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Motion.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................4

I.      ALL PARTIES AGREE THAT ESTIMATION IS REQUIRED ..................4

II.     THIS COURT—TOGETHER WITH THE DISTRICT COURT AS
APPROPRIATE—CAN ESTIMATE ALL WILDFIRE CLAIMS ...........................5

        A.     The Bankruptcy Court May Estimate for Purposes of Funding a Trust ............5

        B.     All Parties Agree That the District Court May Estimate PI Claims for
the Purposes of Funding a Capped Trust .............................................................6

        C.     PI Claims Constitute Only a Small Portion of the Claims in These
Cases ..................................................................................................................10

III.    TUBBS FIRE LIABILITY SHOULD BE ADDRESSED AS PART OF
ESTIMATION .............................................................................................16

IV.   THE REMAINING OBJECTIONS ARE WITHOUT MERIT ...............................20

        A.     Inverse Condemnation and Tubbs Issues May Be Heard Before the Bar
Date ...................................................................................................................20

        B.     The Court Should Address Inverse Condemnation in Phase 1 .......................21

        C.     The U.S.' and State Entities' Claims are Unliquidated and Must Be
Estimated............................................................................................................24

        D.     The Parties Should Meet and Confer About Phase 3......................................25

V.     CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A & B Assocs., L.P.*,
No. 17-401850-EJC, 2019 WL 1470892 (Bankr. S.D. Ga., March 29, 2019) ...............................5

*In re A.H. Robins Co., Inc.*,
88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989).................................................7

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ....................................................................................................5

*Acadia, California, Ltd. v. Herbert*,
54 Cal. 2d 328 (1960) ..............................................................................................................15

*Am. Tower Corp. v. City of San Diego*,
763 F.3d 1035 (9th Cir. 2014) ..................................................................................................21

*In re Atron Inc. of Michigan*,
172 B.R. 541 (Bankr. W.D. Mich. 1994).................................................................................12

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959).................................................................................................................10

*Bittner v. Borne Chemical Co., Inc.*,
691 F.2d 134 (3d Cir. 1982).....................................................................................................25

*In re Blitz*,
No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014)........................................6, 8

*Burgess v. Superior Court*,
2 Cal. 4th 1064 (1992) .........................................................................................................14, 15

*In re Cohen*,
107 B.R. 453 (S.D.N.Y. 1989)...............................................................................................13

*In re Corson*,
No. 03-18160F, 2004 WL 5865045 (Bankr. E.D. Pa., June 25, 2004).......................................24

*In re Cty. of Orange*,
784 F.3d 520 (9th Cir. 2015) .................................................................................................19

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962)..................................................................................................................10

*Denyer v AB Electrolux*,
No. 56-2014-00458073-CU-AS-VTA, 2015 WL 9916500 (Cal. Super. Aug. 25, 2015)..............................................................................................................................17

*In re Dow Corning Corp.*,
211 B.R. 545 (Bankr. E.D. Mich. 1997) ...............................................................................9, 13

*In re Dow Corning Corp.*,
215 B.R. 346 (Bankr. E.D. Mich. 1997) ...............................................................................13

*In re Dow Corning Corp.*,
    244 B.R. 721 (Bankr. E.D. Mich. 1999) ................................................................8

*In re Eagle-Picher Indus.*,
    189 B.R 681 (Bankr. S.D. Ohio 1995) ................................................................6

*In re Fed.-Mogul Glob., Inc.*,
    330 B.R. 133 (D.Del. 2005) ................................................................7

*Fox v. Superior Court*,
    21 Cal. App. 5th 529, 535 (Ct. App. 2018) ................................................................17

*In re G-I Holdings, Inc.*,
    323 B.R. 583 (Bankr. D.N.J. 2005) ................................................................7, 8

*In re G-I Holdings Inc.*,
    420 B.R. 216 (D.N.J. 2009) ................................................................7

*In re Garlock Sealing Techs.*,
    504 B.R. 71 (Bankr. W.D.N.C. 2014) ................................................................6

*In re Garlock Sealing Techs.*,
    Case No. 10-31607, Dkt No. 2102 (Bankr. W.D.N.C. Apr. 13, 2012) ................................................................20

*In re Garlock Sealing Techs*,
    No. 10-BK-31607 (W.D.N.C. June 12, 2017) Dkt. No. 6261 ................................................................8

*In re Gary Brew Enterprises Ltd.*,
    198 B.R. 616 (Bankr. S.D. Cal. 1996) ................................................................14

*In re Gawker Media LLC*,
    571 B.R. 612 (Bankr. S.D.N.Y. 2017) ................................................................12, 13

*Gonzales v. Raich*,
    545 U.S. 1 (2005) ................................................................20

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ................................................................12

*Hensley v. San Diego Gas & Elec. Co.*,
    7 Cal. App. 5th 1337 (Ct. App. 2017) ................................................................15

*Holtz v. Superior Court*,
    475 P.2d 441 (Cal. 1970) ................................................................22

*Institoris v. City of Los Angeles*,
    210 Cal. App. 3d 10 (Ct. App. 1989) ................................................................15

*Kelly v. CBI Constructors, Inc.*,
    179 Cal. App. 4th 442 (Ct. App. 2009) ................................................................15

*Kline v. Superior Court*,
    227 Cal. App. 3d 512 (Ct. App. 1991) ................................................................17

*Landry v. Berryessa Union Sch. Dist.*,
    39 Cal. App. 4th 691 (Ct. App. 1995) ................................................................18

*Luce v. A.W. Chesteron Co.*,
    No. C-10-0174 MMC, 2010 WL 785323 (N.D. Cal. Mar. 2, 2010) ................................................................20

*In re Marciano*,
    694 F. App'x 504 (9th Cir. 2017) ...................................................................11

*Massey Energy Co. v. W. Va. Consumers for Justice*,
    351 B.R. 348 (E.D. Va. 2006)......................................................................13

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950).....................................................................................20

*In re N. Am. Health Care, Inc.*,
    544 B.R. 684 (Bankr. C.D. Cal. 2016)...........................................................5

*Orkin v. Taylor*,
    487 F.3d 734 (9th Cir. 2007) .......................................................................21

*Raleigh v. Illinois Dep't of Revenue*,
    530 U.S. 15 (2000).......................................................................................20

*In re Residential Capital, LLC*,
    536 B.R. 566 (Bankr. S.D.N.Y. 2015) .........................................................11

*In re Roman Catholic Archbishop of Portland in Or.*,
    339 B.R. 215 (Bankr. D. Or. 2006)........................................................5, 7, 8

*In re Roman Catholic Archbishop of Portland in Oregon*,
    338 B.R. 414 (Bankr. D. Or. 2006)................................................................9

*In re Roman Catholic Archbishop of Portland in Oregon*,
    No. 04-37154 (Bankr. D. Or. Apr. 13, 2007) Dkt. No. 5065.........................8

*In re Roman Catholic Bishop of San Diego*,
    374 B.R. 756 (Bankr. S.D.Cal. 2007).......................................................9, 10

*In re Roman Catholic Bishop of San Diego*,
    No. 07-00989-LA11, 2007 WL 2406899 (S.D. Cal. Aug. 20, 2007) .............9

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010).....................................................................................20

*In re Sheehan Mem'l Hosp.*,
    377 B.R. 63 (Bankr. W.D.N.Y. 2007) .........................................................13

*In re Slack*,
    187 F.3d 1070 (9th Cir. 1999) .....................................................................24

*In re Smith*,
    389 B.R. 902 (Bankr. D. Nev. 2008) .......................................................11, 12

*In re Specialty Prod. Holding Corp.*,
    No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013) .................6

*United States v. Menasche*,
    348 U.S. 528 (1955).....................................................................................12

*United States v. Williams*,
    553 U.S. 285 (2008).....................................................................................12

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012).......................................................................8, 10

*In re W.R. Grace & Co., et al.*,
  No. 01-BK-1130 (Bankr. D.Del. August 31, 2005), Dkt. No. 9301 ...............................................6

*Wakefield v. Glob. Fin. Private Capital, LLC*,
  Civ. No. 15-0451, 2015 WL 12699870 (S.D. Cal. September 17, 2015).....................................20

*Walter v. W. Indus., Inc.*,
  2013 WL 12137687 (C.D. Cal. Dec. 10, 2013) ......................................................................15

*West v. Am. Tel. & Tel. Co.*,
  311 U.S. 223 (1940)...............................................................................................................22

**Statutes & Rules**

11 U.S.C. § 502(c) ................................................................................................................1, 24

11 U.S.C. § 523(a) ......................................................................................................................12

28 U.S.C. § 157(b)(2)(B) ................................................................................................... passim

28 U.S.C. § 157(b)(5) ................................................................................................................12

Cal. Civ. Code § 3493 ................................................................................................................16

Cal. Civ. P. Code. § 36(a) ..............................................................................................16, 17, 18

Cal. Civ. P. Code. § 36(b) ..........................................................................................................18

Cal. Civ. P. Code. § 1005 ...........................................................................................................17

There is no dispute by any stakeholder on the core issue presented by this Motion: estimation proceedings are required in these Chapter 11 Cases absent a consensual resolution. 11 U.S.C. § 502(c) (claims "shall be estimated" when "liquidation . . . would unduly delay the administration of the case").

Equally inescapable is the conclusion that estimation has to begin now. As this Court is well aware, the California legislature has imposed a June 30, 2020, deadline for the resolution of these Chapter 11 Cases, and the California Public Utilities Commission (the "**CPUC**") has indicated that, to meet the legislative deadline, a confirmable plan of reorganization must be selected and ready for the CPUC's consideration by January—five months from now. All parties acknowledge the importance of meeting that legislative deadline. Failure to do so would materially reduce the value of the estate by precluding the reorganized Debtors from participating in the newly created wildfire fund. The Debtors agree with the Court that this deadline is achievable and that the complexity of these proceedings should not and cannot be allowed to derail that goal. The only way to achieve that outcome is to begin the estimation process right away.

With all parties in agreement on the need for estimation, the only disagreements concern (a) arguments that certain claims constitute "personal injury tort" claims under 28 U.S.C. § 157(b)(2)(B) such that estimation of those claims for distribution purposes would be a non-core proceeding; (b) arguments that the estimation of the Tubbs Fire liabilities should be conducted only after a state court trial to liquidate a fraction of those claims; and (c) procedural disagreements about how to structure the estimation proceedings (which is entirely within the discretion of this Court). None of these issues prevents this Court from proceeding in the manner proposed by the Debtors.

*First*, the fact that certain of the Wildfire Claims are personal injury or wrongful death ("**PI**") claims to which jury rights may attach is not a barrier to estimation. Bankruptcy Courts have estimated the aggregate amount required to resolve PI claims through a trust with specified funding amounts on numerous occasions, and neither the Official Committee of Tort Claimants (the "**TCC**") nor the Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") explains why this case should be any different. Estimation to determine the feasibility of a "capped" trust does

not involve the liquidation of any individual claim or the distribution to any creditor, and all PI claimants maintain the right to liquidate their claims in the tort system, including in a jury trial, post-confirmation. Courts have recognized that estimating in that manner is for the purpose of plan formulation and feasibility, not for "distribution".

Moreover, there is no genuine dispute that, where necessary, this Court can estimate for distribution purposes simply by involving the District Court. Such joint proceedings could be accomplished—and have been accomplished in past cases—in at least three ways: (a) by proposing findings of fact and conclusions of law for review by the District Court with respect to PI claims; (b) by conducting joint proceedings; or (c) by bifurcating proceedings so that the District Court conducts estimation limited to PI claims. Importantly, PI claims constitute only a small proportion of the claims here. The overwhelming majority of the Wildfire Claims are property claims that this Court has core jurisdiction to estimate for all purposes. Indeed, the overwhelming majority of emotional distress damages that will be asserted against the Debtors arise as a matter of state law only as a measure of damages arising from property claims like trespass and public nuisance—claims that are classic *property* torts, not personal injury torts, under even the broadest reading of section 157(b)(2)(B). The TCC's assertions to the contrary are wholly untethered from the claims actually asserted under state law.

*Second*, the TCC and the Ad Hoc Subrogation Group's proposals to send Tubbs claims to state court will result in unnecessary and unacceptable delay. The TCC and Ad Hoc Subrogation Group predict that a Tubbs trial would occur in January 2020—by which time the Debtors already must have submitted a plan to the CPUC—and that further estimation proceedings would need to occur after that date. Then, the trial itself would take significantly longer than the three weeks proposed for an estimation hearing on causation. The parties will not be able to produce a complete plan by January if, as the TCC and Ad Hoc Subrogation Group predict, the Tubbs trial only begins in January 2020—and they certainly will not be able to do so if there are further delays or if (as they contend) estimation hearings must occur after the Tubbs trial is decided.

Timing issues aside, lifting the stay to permit an unrepresentative group of Tubbs claimants to proceed to trial in state court would also constitute a waste of estate assets. As the TCC's

and the Ad Hoc Subrogation Group's submissions make clear, numerous liability issues associated with the Tubbs Fire are also relevant to claims arising out of other Wildfires that all stakeholders agree can and should be addressed in this Court. Stay relief would mean litigating those important issues once in state court with respect to Tubbs and then a second time in this Court with respect to all the other fires. Nobody has described that extraordinary waste of effort better than the Ad Hoc Subrogation Group itself:

> "There are numerous overlapping fact issues shared in common by the Tubbs Fire claims and other Wildfire Claims that would make it incredibly inefficient [to address] the Tubbs Fire claims in isolation. For example, PG&E's policies and practices related to de-energizing and maintaining lines will be at issue in evaluating the Tubbs Fire claims, as well as many others. More broadly, PG&E's [alleged] negligence will be an issue that cuts across the adjudication of all Wildfire Claims. *Carving out one fire from the rest . . . would be inherently inefficient and exceedingly impractical given the June 2020 deadline.*" (Subro Grp. Obj., Dkt. No. 3419, at 9 (emphasis added).)[2]

The Debtors agree. The same court that has to address the totality of fires should also address Tubbs, and that should be this Court.

Moreover, if (as the Debtors expect) a jury considering the Tubbs Fire agrees with two separate CAL FIRE teams that concluded the Debtors did not cause the Tubbs Fire, the TCC and Ad Hoc Subrogation Group undoubtedly will contend that such a verdict is not binding on any other Wildfire claimant, and accordingly that the entire trial needs to be done yet again in this Court even with respect to the Tubbs Fire. In contrast, with this Court presiding over <u>all</u> phases of estimation, consistent with the Bankruptcy Code's goal of centralizing claims in a single forum, the Tubbs Fire has to be heard only once, and any generally applicable findings that come out in the Tubbs phase of estimation can be applied to later phases and in shaping the course of further proceedings.

*Third*, no party has proposed a workable alternative to the Debtors' estimation proposal that would allow the parties to fully and fairly estimate aggregate liabilities in time to submit a plan to the CPUC by January and meet the June 30, 2020 deadline. The Ad Hoc Subrogation Group proposes to lift the stay for Tubbs and hope for the best, while acknowledging (as it must) that the Tubbs Fire

---

[2] Citations to page numbers in filed briefing refer to page numbers assigned by ECF.

1   can be addressed—and addressed more quickly—in this Court.  (*See* Subro Grp. Obj., Dkt. No. 3419,

2   at 10.)  The TCC goes even further in its efforts to delay the process, asking this Court to "deny the

3   estimation motion and direct the parties to appear at a continued hearing" after yet another round of

4   proposed briefing on how to structure estimation proceedings (TCC Obj., Dkt. No. 3431, at 18), even

5   though such issues can simply be addressed as the estimation proceedings proposed by the Debtors

6   progress through the meet and confer process that is already contemplated in the Debtors' Proposed

7   Order.  (*See* Proposed Order, Dkt. No. 3091-1 ¶ 5.)  The Court should reject both of those proposals,

8   which are nothing more than plays for leverage without regard for the need to move expeditiously to

9   meet the legislative deadline.  The remaining procedural arguments raised by various objectors are

10  similarly unavailing and must be denied for the reasons discussed below.  The Debtors' Motion should

11  be granted, and stay relief should be denied.

12                                        **ARGUMENT**

13  **I.    ALL PARTIES AGREE THAT ESTIMATION IS REQUIRED**

14            All parties agree that estimation of the Wildfire Claims is required.  (*See, e.g.,* Subro

15  Grp. Obj., Dkt. No. 3419, at 6 ("The Ad Hoc Group of Subrogation Claim Holders . . . does not dispute

16  that an estimation hearing to address the value of the Wildfire Claims may be appropriate"); TCC Obj.,

17  Dkt. No. 3431, at 22 (advocating an "Estimation Road Map");  Ad Hoc Noteholder Group Joinder,

18  Dkt. No. 3418, at 7 ("Estimation of the Wildfire Claims is the only path that can ensure the orderly,

19  timely, and equitable resolution of these reorganization cases by the June 30, 2020 legislative

20  deadline"); Statement of Certain PG&E Shareholders, Dkt. No. 3430, at 2 ("[o]ut of all the discord

21  and divergent views in this case, one clear consensus emerges: the unliquidated wildfire claims against

22  PG&E – especially those relating to the Tubbs fire – must be quantified as rapidly and

23  comprehensively as possible").)

24            The parties likewise agree that estimation proceedings are critical to inform settlement

25  negotiations and facilitate the development of a confirmable plan—preferably consensual—in advance

26  of the legislative deadline for these cases to be resolved.  (*See* TCC Obj., Dkt. No. 3431, at 16

27  (acknowledging that estimation of economic damages "could produce a consensual plan and resolve

28  the case"); Subro Grp. Obj., Dkt. No. 3419, at 28 (estimation proceedings may allow parties to "reach

a consensual resolution and plan").) Importantly, the parties also agree that estimation proceedings must address both the likelihood of success of the Wildfire Claims (liability) and their aggregate value (damages). (TCC Obj., Dkt. No. 3431, at 16; Subro Grp. Obj., Dkt. No. 3419, at 23.) It is simply a fact that the individual liquidation of all Wildfire Claims, or even a substantial number of them, is not feasible. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011 (4th Cir. 1986); *see also In re A & B Assocs., L.P.*, 2019 WL 1470892, at *35 (Bankr. S.D. Ga., March 29, 2019).

## II. THIS COURT—TOGETHER WITH THE DISTRICT COURT AS APPROPRIATE— CAN ESTIMATE ALL WILDFIRE CLAIMS

As discussed below and in the Debtors' Estimation Motion (*see* Dkt. No. 3091 at 10), it is a core proceeding for this Court to estimate the aggregate value of all Wildfire Claims for the purposes of assisting the parties in formulating—and determining the feasibility of—a plan that provides for a trust with a specified funding amount.[3] Courts have done so in numerous mass tort chapter 11 cases in recent years, including in those that—unlike this one—involved the estimation of exclusively PI claims. That said, there is no dispute that the District Court may estimate all claims even for distribution purposes, and the Debtors would welcome the District Court's involvement in an estimation of the relatively small number of PI claims.

### A. The Bankruptcy Court May Estimate for Purposes of Funding a Trust

Estimation proceedings for the purpose of funding a trust with a "capped" amount has been a critical step towards emergence in numerous other mass tort chapter 11 cases involving PI claims. In each of the below cases, the Bankruptcy Court estimated the value of unliquidated PI claims for the purpose of assessing proposed plans that provided for funding a trust in a fixed aggregate amount to be used to pay out those claims. The objecting parties have not made any effort to distinguish these cases from the case at hand.

- *In re Garlock Sealing Techs.*, 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014): The Bankruptcy Court determined to estimate aggregate value of unliquidated mesothelioma claims for the purposes

---

[3] Estimation will also facilitate voting for plan confirmation, another purpose for which bankruptcy courts routinely conduct estimation. *See e.g.*, *In re N. Am. Health Care, Inc.*, 544 B.R. 684, 691 (Bankr. C.D. Cal. 2016); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215 (Bankr. D. Or. 2006).

of assessing a plan proposed by Garlock that would include a capped trust for PI claims. *Id.* at 74. Bankruptcy Court proceeded "to determine a reasonable and reliable estimate of Garlock's liability for present and future mesothelioma claims". *Id.*

- *In re Blitz*, No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014): Bankruptcy Court accepted expert testimony on the valuation of the pending PI products liability claims to determine whether PI trust was sufficiently funded. *Id.* at *5.

- *In re Specialty Prod. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013): Bankruptcy Court estimated "the amount of contingent or unliquidated claims against Debtors" for the purpose of formulating a plan of reorganization that included a funded PI trust. *Id.* at *1.

- *In re W.R. Grace & Co., et al.*, No. 01-BK-1130 (Bankr. D.Del. August 31, 2005), Dkt. No. 9301: Bankruptcy Court found that the estimation of asbestos personal injury claimants was "a core proceeding" which the Bankruptcy Court has jurisdiction over and ordered the estimation hearings to proceed in the Bankruptcy Court.

- *In re Eagle-Picher Indus.*, 189 B.R 681 (Bankr. S.D. Ohio 1995): Court "fix[ed] a figure for estimated asbestos liability" which would be used in the plan to fund a trust into which all asbestos-PI claims would be channeled when the parties could not agree on such a number. *Id.* at 682.

Contrary to the TCC's suggestion (TCC Obj., Dkt. No. 3431, at 8), the above cases demonstrate there is nothing "inherently non-confirmable" about a plan that funds a trust based on an amount fixed by estimation. Estimation in these cases was a core proceeding because the Bankruptcy Court was not being asked to liquidate or otherwise determine the distribution with respect to any particular PI claimant. Rather, the Court was asked to affix an aggregate value for all claims. The treatment of classes of claims and distribution procedures applicable to particular claims would be subject to voting and confirmation of the plan of reorganization.

**B.    All Parties Agree That the District Court May Estimate PI Claims for the Purposes of Funding a Capped Trust**

The TCC's fundamental objection to the Debtor's Motion is the argument that this Court does not have the jurisdiction to estimate PI claims for the purposes of distribution. Notably, the TCC concedes that a capped trust approach is appropriate for PI claims with the "consent of the tort claimants" (TCC Obj., Dkt. No. 3431, at 8-9)—*i.e.*, a plan of reorganization approved by the requisite majority of the voting wildfire claimants. However, the TCC assumes there will be no consensual resolution and argues based on that assumption that estimation procedures ultimately will be used to create a non-consensual capped trust of PI claims.

Even if the TCC were correct that such an estimation would be for purposes of distribution (which it is not; *see supra* Part II.A), that would simply raise the question, as the Court observed, of which "judicial officer" (July 24 Hearing Transcript at 27:14-15) can estimate the PI claims for that purpose. As the Ad Hoc Noteholder Group and the Unsecured Creditors Committee (the "**UCC**") correctly note, it is well within the power of the District Court to estimate those claims, even for distribution purposes. (Ad Hoc Noteholder Group Joinder, Dkt. No. 3418, at 12-15; UCC Statement, Dkt. No. 3429, at 12; *see In re Fed.-Mogul Glob., Inc.*, 330 B.R. 133 (D.Del. 2005).) The TCC concedes this point. *See* TCC Obj., Dkt. No. 3431, at 35 (acknowledging that "[e]stimation of personal injury claims for sizing a capped trust must be resolved by a district court"); *id.* at 13 (District Court may "estimate the claims as part of its original jurisdiction over the claims").)

As discussed below (*see infra* Part II.C), the number of such claims is relatively small and there are several ways that this Court may address the concerns of objecting parties by involving the District Court in the estimation of PI claims. *First*, this Court could conduct estimation proceedings and propose findings of fact and conclusions of law for review by the District Court with respect to the PI claims. *In re G-I Holdings, Inc.*, 323 B.R. 583, 611 (Bankr. D.N.J. 2005) (to estimate for distribution purposes, "this Court would conduct the estimation proceeding in the first instance and thereafter would submit proposed findings of fact and conclusions of law to the District Court for the entry of a final order, all in accordance with 28 U.S.C. § 157(c)"); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 221 (Bankr. D. Or. 2006) (if the debtors sought estimation, the Court would "at the appropriate time prepare a report and recommendation to the district court"). *Second*, this Court could conduct a joint proceeding with the District Court, as has been done in asbestos confirmation hearings where District Court review was necessary. *See e.g.*, *In re G-I Holdings Inc.*, 420 B.R. 216, 231-32 (D.N.J. 2009) ("the District Court partially withdrew the reference of the Confirmation Hearing to enable the Bankruptcy Court and the District Court to preside jointly over confirmation"); *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 743 (E.D. Va. 1988), aff'd, 880 F.2d 694 (4th Cir. 1989) (Bankruptcy Court and District Court conducted all proceedings jointly, including confirmation of a plan providing for a trust funded based on the court's estimation of aggregate tort liabilities). *Third*, this Court could bifurcate proceedings and have the District Court estimate PI

1  claims after this Court has decided all other estimation issues, which would cover the majority of

2  claims and damages.

3            No party has cited any case law holding that the District Court cannot estimate personal

4  injury claims for purposes of distribution, and the Debtors are aware of none.[4]  Indeed, in *Portland II*,

5  which is relied on by both the TCC and Subrogation Group, the Court explicitly stated that a District

6  Court may estimate for the purposes of distribution.  *In re Roman Catholic Archbishop of Portland in*

7  *Or.*, 339 B.R. at 221 ("the estimation debtor seeks is for purposes of distribution and therefore must

8  be done by the District Court").  And the District Court in that case ultimately did exactly that,

9  estimating unliquidated personal injury claims for purposes of a plan that included a capped trust.  *See*

10 *In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154, (Bankr. D. Or. Apr. 13, 2007)

11 (Dkt. No. 5065) ("The district court estimated the value of the three unresolved known tort claims held

12 by the objecting parties at $100,000 in total; $100,000 for one claim and $0 for the other two claims").

13 Likewise, in *In re Roman Catholic Bishop of San Diego*, the District Court held that withdrawal of the

14 reference would be appropriate when the time came for estimation or liquidation of personal injury

15 claims for the purpose of distribution if settlement negotiations were unsuccessful while also

16 recognizing that in the interim "the Bankruptcy Court is in the best position to determine from a case

17

---

18 [4] There is no support for the TCC's assertion that estimation by the district court must involve a jury.
(TCC Obj., Dkt. No. 3431, at 35.)  Regardless of which court ultimately performs the estimation, the

19 PI claimants' jury rights are preserved because the right to a jury trial attaches at the individual

20 liquidation phase.  *In re G-I Holdings*, 323 B.R. at 607 (personal injury claimants hold jury trial rights
under the Seventh Amendment "for the purposes of *liquidating* their respective claims against the . . .

21 bankruptcy estate").  Under a capped trust, the individual claimants' jury rights are preserved when
they have the opportunity to have their claim litigated in the tort system post-confirmation instead of

22 accepting a settlement amount from the trust.  This type of trust distribution procedure has been

23 approved by courts in a number of large scale mass tort bankruptcies.  *In re Blitz U.S.A., Inc.* 2014
WL 2582976 at *5 (finding that personal injury trust procedures are "fair and equitable" because they

24 allow claimants to proceed in the tort system to liquidated their claims); *In re Garlock Sealing Techs,*
No. 10-BK-31607 (W.D.N.C. June 12, 2017) Dkt. 6261 (same), *In re W.R. Grace & Co.*, 475 B.R. 34

25 (D. Del. 2012) (same).  In fact, the confirmed plans in both *Dow* and *Portland*—the primary cases
relied upon by the TCC—involved capped personal injury trusts that utilized the same procedures.  *In*

26 *re Dow Corning Corp.*, 244 B.R. 721, 729-30 (Bankr. E.D. Mich. 1999); *In re Roman Catholic*
*Archbishop of Portland in Oregon*, No. 04-37154, (Bankr. D. Or. Apr. 13, 2007) Dkt. 5065.

27

28

management standpoint how and when these actions should proceed for estimation". *In re Roman Catholic Bishop of San Diego*, No. 07-00989-LA11, 2007 WL 2406899, at \*5 (S.D. Cal. Aug. 20, 2007).

In fact, the only case that even <u>suggests</u> a District Court may not estimate for purposes of distribution is *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997). In that case, the Bankruptcy Court noted that an estimation of personal injury claims by a District Court for purposes of distribution could potentially mean that a personal injury claimant does not receive the full amount awarded by a jury if that trust is ultimately underfunded. *Id.* at 569-70. But that discussion is not binding on this Court. *First*, the relevant discussion is entirely dicta. In *Dow*, the Court denied the parties' motions to estimate because it found that under the particular circumstances of that case there was no "undue delay" in postponing estimation until liquidation trials at the District Court could provide some degree of clarity on the matter. *Id.* at 566. The Court thus did not reach the question of whether it or the District Court could estimate for purposes of funding a capped trust. *Id.* at 569. In fact, the Court specifically noted that it was "not yet called upon to decide" those issues. *Second*, while it expressed some concerns with estimation for purposes of distribution, the court also noted that "an estimation of the aggregate value of all tort claims . . . could be something the district court could do" and that it was "well within the bankruptcy jurisdiction of the district court". *Id.* at 569-70.[5]

In response to the Court's question at the July 24, 2019 hearing (July 24, 2019 Hearing Transcript at 26:10-19), the TCC argues that this Court may not bifurcate proceedings because doing

---

[5] While the TCC has also cited *In re Roman Catholic Archbishop of Portland in Oregon*, 338 B.R. 414 (Bankr. D. Or. 2006) (*Portland I*) and *In re Roman Catholic Bishop of San Diego*, 374 B.R. 756 (Bankr. S.D.Cal. 2007) (*San Diego II*), for the proposition that a Bankruptcy Court ought to remand personal injury cases to the state court system for distribution, those cases do not negate that the Bankruptcy Court or District Court may estimate personal injury claims. In *Portland I*, the court lifted the stay after <u>18 months</u> of failed settlement talks based on a determination that it would be faster and less expensive to conduct the trial in state court than the Federal District Court. (*Id*. at 417, 421). In *San Diego II* the Court found that the abstention factors were met due to the fact that the <u>42 </u>state court matters were on the eve of trial when the stay went in to effect, the state proceedings were part of a coordinated statewide specialized hearing involving numerous defendants, the state law defenses at issue were complex and unsettled and the Debtor's proposed plan sought to settle with claimants at an amount far below the statewide settlement average, giving the appearance of forum shopping. *San Diego II*, 374 B.R. at 762-64.

so would violate the claimants' rights to have dispositive jury trials on disputed issues of fact determined prior to equitable issues, citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) and *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962). (TCC Obj., Dkt. No. 3431, at 38.) But those cases merely stand for the proposition that a court presented with equitable and legal claims that share common issues of fact may not try the equitable issues first. They say nothing about this Court's ability to estimate liabilities in the aggregate for purposes of establishing a trust, where estimation will not determine the value of any specific claims and the trust will preserve PI claimants' right to liquidate their claims before a jury. As discussed above, this Court has various options that would allow it to involve the District Court in an efficient manner that avoids unnecessarily duplicative proceedings and this Court has broad discretion to structure estimation proceedings as it deems proper. *See e.g. In re W.R. Grace & Co.*, 475 B.R. 34, 162 (D. Del. 2012) ("the bankruptcy court oversaw numerous estimation trials between the parties that sought to determine Grace's assets and liabilities", including both personal injury and property claims).

### C. PI Claims Constitute Only a Small Portion of the Claims in These Cases

The vast majority of the Wildfire Claims in these Cases are property claims. The California Department of Insurance estimates over $18 billion in insured payouts related to the Wildfires, spanning across over 55,000 claims for residential, commercial and other property losses.[6] By contrast, public reports suggest that the number of claims for physical injury or wrongful death will be fewer than 320.[7] PI claims comprise less than 1% of the total number of Wildfire Claims.

---

[6] Press Release, Cal. Dep't of Insurance, North Bay Insured Losses from the October 2017 Wildfires, https://www.insurance.ca.gov/0400-news/0100-press-releases/2018/upload/nr013-2018NorthBayFireUpdate013118.pdf; Press Release, Cal. Dep't of Insurance, Insured Losses from the 2018 California Wildfires, https://www.insurance.ca.gov/0400-news/0100-press-releases/2019/upload/nr041-19InsuredLosses2018Wildfires050819.pdf.

[7] Alex Emslie, *October Fires' 44th Victim: A Creative, Globetrotting Engineer with 'the Kindest Heart'*, KQED News (Nov. 28, 2017), https://www.kqed.org/news/11633757/october-fires-44th-victim-a-creative-globetrotting-engineer-with-the-kindest-heart (news article indicating 44 reported civilian fatalities resulting from the 2017 North Bay Fires); Associated Press, *Hospitals Say at Least 185 Treated for Injuries*, WILX 10 (Oct. 10, 2017, 9:25 PM), https://www.wilx.com/content/news/Person-dies-fleeing-California-fire-total-dead-reaches-11-450259923.html (news article reporting 185 non-fatal injuries related to the 2017 North Bay Fires);

During the hearing on July 24, 2019, the Court asked whether claims for emotional distress that arise from property damage are properly considered "personal injury" claims for the purposes of section 157(b)(2)(B). (July 24, 2019 Hearing Transcript at 24:19-25:19.) As explained below, the answer to this question is "no". Claims for emotional harm do not constitute "personal injury tort" claims under section 157(b)(2)(B) because: (1) the definition of "personal injury tort" under Section 157(b)(2)(B) is narrow; and (2) under any definition of the term, as a matter of state law, very few Wildfire Claims that will be asserted in these Cases constitute personal injury tort claims.

### 1. The Definition of "Personal Injury Tort" Claims Under Section 157(b)(2)(B) is very narrow

Title 28 does not define "personal injury" or "personal injury tort", and the Ninth Circuit has not construed those terms as used in section 157(b)(2)(B). *See In re Marciano*, 694 F. App'x 504, 506 (9th Cir. 2017) (declining to "parse the meaning of 'personal injury tort' in any detail"). As noted by other stakeholders, courts across the country have taken three approaches to interpreting "personal injury tort" in the context of Section 157(b)(2)(B). Courts adopting the narrow construction require "actual physical injury". *In re Smith*, 389 B.R. 902, 908 (Bankr. D. Nev. 2008). On the other end of the spectrum, "courts adopt[ing] a 'broader view', hold[] that the term 'personal injury tort' embraces a broad category of private or civil wrongs or injuries for which a court provides a remedy in the form of an action for damages, and includes damage to an individual's person and any invasion of personal rights, such as libel, slander and mental suffering." *In re Residential Capital, LLC*, 536 B.R. 566, 572 (Bankr. S.D.N.Y. 2015) (citations omitted). In between is the intermediate or "hybrid" approach, which "encompasses torts involving bodily harm and reputational harm, without including torts that are personal injury torts by statutory designation only" such that "traditional, nonphysical torts, such as defamation and libel" would be considered personal injury torts, while "civil rights or sexual harassment claims" would not be. *Smith*, 389 B.R. at 908. The intermediate approach also queries whether claims which "might appear to be 'personal injury torts' under the broad view"

---

CAL FIRE, Camp Fire, https://www.fire.ca.gov/incidents/2018/11/8/camp-fire/ (CAL FIRE reporting 85 fatalities and three injuries related to the 2018 Camp Fire).

in fact "[bear] the earmarks of a financial, business or property tort claim, or a contract claim", such that they are not really "personal injury torts" and the Bankruptcy Court may still adjudicate them. *In re Gawker Media LLC*, 571 B.R. 612, 620 (Bankr. S.D.N.Y. 2017) (citations omitted). The Debtors—as with the UCC and the Ad Hoc Noteholder Group—submit that this Court should adopt the "narrow view" here.

*First*, statutes must be interpreted to give meaning to each of the words in them. *See United States v. Menasche*, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L.Ed. 615 (1955). In Section 157(b)(2)(B), the word "tort" is qualified by the words "personal injury", which implies that the torts at issue must arise from invasions of personal interests rather than invasions of property interests.[8] Conversely, traditional property torts such as trespass must be outside the definition of "personal injury tort"—if not, Congress simply would have exempted all "tort" claims from core proceedings.

*Second*, as courts have recognized, the phrase "personal injury tort" in section 157 must be read in harmony with the phrase "wrongful death". Under the principle of *noscitur a sociis*, words that are associated with each other in a statute must be read to bear each other's meaning, because "ascribing to one word a meaning so broad that it is inconsistent with its accompanying words . . . giv[es] unintended breadth to the Acts of Congress."[9] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (internal quotation marks omitted); *see United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). As one court explained, "wrongful death refers to a death caused by tortious injury" and "[t]he term 'personal injury tort' should be construed in a manner meaningfully similar to 'wrongful death,' and require a <u>physical</u> trauma." *In re Gawker Media LLC*, 571 B.R. 612, 621 (Bankr. S.D.N.Y. 2017) (alterations omitted) (emphasis added); *see also In re Sheehan Mem'l Hosp.*, 377 B.R. 63, 68 (Bankr. W.D.N.Y. 2007).

---

[8] In contrast, for example, section 523(a) of the Bankruptcy Code refers to "injury by the debtor to another entity or to the property of another entity". 11 U.S.C. § 523(a) (emphasis added).

[9] As one court aptly reasoned, "[i]f the Court were to adopt [an] expansive interpretation [of] §§ 157(b)(2)(B) and 157(b)(5) . . . bankruptcy courts would be customarily stripped of jurisdiction in the otherwise traditional claims allowance and liquidation process", a result the court doubted Congress intended. *In re Atron Inc. of Michigan*, 172 B.R. 541, 544 (Bankr. W.D. Mich. 1994).

*Third*, legislative history confirms that carve-out is meant to be limited to torts arising out of <u>physical</u> harm, such as those at issue in asbestos bankruptcies. As courts have recognized, "[t]he personal injury tort/wrongful death exception originated with lobbying, including testimony, from personal injury lawyers who found themselves and their clients dragged into the *Johns–Manville* case and other asbestos bankruptcies." *Gawker*, 571 B.R. at 621 (citing *In re Dow Corning Corp.*, 215 B.R. 346, 353-54 (Bankr. E.D. Mich. 1997)); *see Dow Corning*, 211 B.R. at 570. In the floor debates, the ranking member of the house judiciary committee "described the exceptions to core jurisdiction under the 1984 Amendments, including the personal injury tort/wrongful death exception, as a 'narrow category of cases.'" *Gawker*, 571 B.R. at 622 (quoting 130 CONG. REC. 20,227-28 (1984)); *see also In re Cohen*, 107 B.R. 453, 455 (S.D.N.Y. 1989) (same). Similarly, "Senator DeConcini referred to 'claims arising from automobile accidents' as examples of the personal injury tort claims he had in mind". *Gawker*, 571 B.R. at 621 (quoting 130 CONG. REC. 17,155 (1984)).

In light of that history, courts have rightly concluded that the "personal injury tort" exception applies only to claims of <u>physical</u> injury. *See Massey Energy Co. v. W. Va. Consumers for Justice*, 351 B.R. 348, 351 (E.D. Va. 2006) (defamation claim does not fall within section 157(b)(2)(B) because "Congress intended to limit the claims fitting the exception by introducing the narrow, modifying language 'personal injury'"); *In re Sheehan Mem'l Hosp.*, 377 B.R. 63, 68 (Bankr. W.D.N.Y. 2007) (discrimination claim was not a personal injury tort because "157(b)(2)(B) and § 157(b)(5) suggest that their jurisdictional restrictions should apply only to claims that involve <u>physical</u> injury, as distinct from other notions of <u>legal injury</u>") (emphasis added); *In re Cohen*, 107 B.R. 453 (S.D.N.Y. 1989) (violation of state antidiscrimination law is "not a claim for a 'personal injury tort' in the traditional, plain-meaning sense of those words"). As the court explained in *Gawker*, a broader "interpretation ignores both the canons of construction and the legislative history, and cuts a broad exception that removes all tort claims from the jurisdiction of the Bankruptcy Court's claim resolution process." 571 B.R. at 622. That is not what Congress intended.

## 2. Under Any Definition of the Term, Very Few Wildfire Claims That Will Be Asserted in These Cases Constitute Personal Injury Tort Claims.

Even under the broadest reading of section 157(b)(2)(B), the phrase "personal injury tort" has never been extended to torts, such as trespass, that involve invasion of *property* (as opposed to "personal") interests. *See In re Gary Brew Enterprises Ltd.*, 198 B.R. 616, 618–19 (Bankr. S.D. Cal. 1996) (emphasis added) (adopting interpretation that includes civil rights act violations but distinguishing between "tort claims for *personal injury*" and "claims for *damages to property*"). That is an important distinction because, as shown in the TCC's papers, torts for which the TCC asserts there may be emotional distress and similar damages are negligence, trespass and nuisance.[10] In each case, the alleged damages either arise from injuries to property (not personal) interests or are available only in narrow circumstances that either are inapplicable here or that characterize only a very small number of potential claims.

Importantly, absent physical injuries, California law does not entitle a plaintiff to recover damages for emotional harm caused solely by a defendant's negligent conduct that places the plaintiff in danger of immediate bodily harm. *See, e.g., Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992) ("[t]he negligent causing of emotional distress is not an independent tort"). Rather, under "the tort of negligence," a plaintiff my obtain damages for emotional distress only in three narrow circumstances, two of which also require that there were <u>physical</u> injuries: (a) "parasitic damages" related to the plaintiff's <u>physical</u> injuries; (b) "bystander" emotional distress damages from observing a close relative suffer <u>physical</u> injury; and (3) "direct victim" damages, arising from a "duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." *Burgess*, at 1073; *see also Walter v. W. Indus., Inc.*, 2013 WL

---

[10] The TCC confirmed as much in a recent letter to the Debtors, dated July 30, 2019, which referenced "all of the asserted theories of liability" related to the wildfire claims. (Supp. Orsini Decl. Ex. A; *see also* Exhibit B of the TCC's Amended Motion (short form complaints and the master complaint for the thirteen Tubbs Preference Plaintiffs).

12137687, at *2 (C.D. Cal. Dec. 10, 2013) (collecting authority). The third circumstance—the "direct victim" category—is extremely narrow and is inapplicable to the Wildfire Claims.[11]

Similarly, the classic property-based torts of trespass and private nuisance are not "personal injury tort" claims under any definition of that term. Damages for "annoyance and discomfort" under a trespass cause of action in California are based entirely on property-based interests. *See Hensley v. San Diego Gas & Elec. Co.*, 7 Cal. App. 5th 1337, 1348-49, 1352 (Ct. App. 2017) ("once a cause of action for trespass or nuisance is established, a landowner may recover for annoyance and discomfort, including emotional distress or mental anguish, proximately caused by the trespass or nuisance" as a "natural consequence of an invasion of a protectable interest in real property"). Such damages are not available as compensation for "general" mental anguish or fear, but instead are limited to compensation for "loss of [one's] peaceful occupation and enjoyment of the property". *See Kelly v. CBI Constructors, Inc.*, 179 Cal. App. 4th 442, 456 (Ct. App. 2nd Dist. 2009). Similarly, although emotional distress damages may be recovered under a nuisance cause of action, "private nuisance can support recovery *only* for harm to a property interest, not for personal injury". *Institoris v. City of Los Angeles*, 210 Cal. App. 3d 10, 20 (Ct. App. 1989) (emphasis added); *see also Acadia, California, Ltd. v. Herbert*, 54 Cal. 2d 328, 337 (1960).[12]

---

[11] Under California Supreme Court precedent, "foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress.]" *Burgess*, 2 Cal. 4th at 1074. A "duty arising from a "preexisting relationship" is the "principle which defines the phrase 'direct victim'" *Id.* The TCC's reference to *Molien* and the Restatement of Torts is unavailing. *First*, *Molien* is a "direct victim" case where emotional distress damage were awarded on the basis that a "duty arising from a preexisting relationship [was] negligently breached." *See Burgess,* 2 Cal. 4th at 1073 (noting that the *Molien* court held that a "hospital and a doctor owed a duty directly to the husband of a patient, who had been diagnosed incorrectly by the doctor as having syphilis"). The TCC does not claim that the Debtors had any similar duty arising from the type of preexisting relationship in *Burgess*. *Second*, the TCC's reliance on the Restatement of Torts and its "zone of danger" test is unavailing because California law does not entitle a plaintiff to recover for emotional distress damages except in the circumstances discussed above.

[12] So-called "public nuisance" claims are also unavailable here. A private person may maintain a public nuisance action only if he or she has suffered a "special injury to himself of a character different in kind—not merely in degree—from that suffered by the general public." *Institoris*, 210 Cal. App. 3d at 20; *see also* Cal. Civ. Code § 3493.

1   Even under the broadest definition of "personal injury tort" claims, the vast majority of

2   claims asserting damages for annoyance, discomfort and emotional distress are within this Court's

3   core jurisdiction to estimate for distribution purposes because they arise from claimants' property

4   interest and not personal interests.

5   **III.   TUBBS FIRE LIABILITY SHOULD BE ADDRESSED AS PART OF ESTIMATION**

6   In opposing the Motion, the TCC and Ad Hoc Subrogation Group continue to urge the

7   Court to adopt the alternative approach of lifting the stay and allowing a hand-selected, non-

8   representative set of a dozen Tubbs claims to proceed to liquidation in state court.  In addition to the

9   reasons set forth in the Debtors' Objections to those motions (*see* Debtors' Obj. to Stay Relief Motions,

10  Dkt. No. 3104), this approach should be rejected for at least the following reasons.

11  *First,* as both the TCC and Subrogation Group acknowledge, whatever the outcome of

12  a Tubbs trial, the Court will nevertheless need to estimate the aggregate value of Wildfire Claims,

13  including all Tubbs Wildfire Claims, before a plan is confirmed.   As a result, estimation is necessary

14  either way.  Acknowledging the palpable risk that the "state court proceedings [would] not move

15  quickly enough", the Subrogation Group states that this Court would "ha[ve] the flexibility to adjust

16  the evidence it hears at an estimation proceeding to account for the possibility that it will be unable to

17  factor in a Tubbs Fire result in state court as it estimates under Section 502(c)."  (Subro Grp. Obj.,

18  Dkt. No. 3419, at 10.)   In other words, the Ad Hoc Subrogation Group concedes that trying Tubbs in

19  state court may not happen fast enough to matter here and the Court could find itself estimating Tubbs

20  liability anyway.

21  *Second*, the timing risk noted by the Ad Hoc Subrogation Group is real.  If stay relief

22  were granted, a preference trial likely would not occur until January 2020 at the earliest according to

23  the TCC itself.[13]   The right to a trial within 120 days under Cal. Civ. Proc. § 36(a) only applies upon

24  
─────────────────

25  [13] As PG&E previously argued in state court, the Tubbs trial should occur in Sonoma County—where
    the fire occurred—if it is to be held in state court.  (October 22, 2018, Joint Case Management
26  Conference Statement, *North Bay Fire Cases* (JCCP No. 4995), at 20-21.)  The Atlas trial was set to
    occur in San Francisco only because, after discussing the issue with the Napa courts, the court found
27  that "[t]he resources of the court in Napa will be seriously compromised if the Atlas trial is held there"
    because "Napa currently has only two judges who conduct civil trials, and the Presiding Judge has
28  informed me that one will retire in January [2019]".  (November 2, 2018, Case Management Order

the state court decision that a preference trial is appropriate. Thus, as the TCC acknowledges, there will need to be briefing and a hearing on at least 16 business days' notice under Cal. Civ. Proc. § 1005 to decide whether any of the claimants actually satisfies the preference statute. (TCC Obj., Dkt. No. 3431, at 26.) Contrary to the assertions made by the TCC, the Debtors have not conceded that any of the so-called Tubbs Preference Plaintiffs actually qualify for preference.[14]

In fact, although the TCC states that six of the eight Tubbs Plaintiffs identified in the TCC's First Motion "qualif[y] for preference under CCP 36(a) based on [his/her] age alone", CCP 36(a) was amended, effective January 1, 1991, to eliminate automatic preference for litigants over 70. (Am. TCC Mot. to Lift Stay, Dkt. No. 2904, Ex. A.) Instead, the Legislature "conditioned the grant of preference upon the trial court's finding the health of the party is such that a preference is necessary to prevent prejudicing the party's interest in the litigation." *Kline v. Superior Court*, 227 Cal. App. 3d 512, 514 (Ct. App. 1991) (internal citation omitted). A preference under CCP 36(a) therefore requires a factual determination that the party faces a serious risk of not being able to meaningfully participate in the trial should the case be further delayed. *See e.g.*, *Fox v. Superior Court*, 21 Cal. App. 5th 529, 535 (Ct. App. 2018) (granting preference where plaintiff "suffers from stage IV lung cancer", has "difficulty performing basic life functions" and "has deteriorated to a point where she becomes confused and forgetful"); *Denyer v AB Electrolux*, 2015 WL 9916500, at *2 (Cal. Super. Aug. 25, 2015). The descriptions in Exhibit A to the TCC's Motion to Lift Stay do not establish that any of the those Plaintiffs qualify.

The five additional plaintiffs added to the Amended Motion—the only ones with physical injury or wrongful death claims—are even less likely to qualify for preference treatment.

---

No. 4, *North Bay Fire Cases* (JCCP No. 4955), at 3.) There is no reason to think this is the case with regard to Sonoma County at this time.

[14] Moreover, granting stay relief will inevitably lead to a race to the courthouse by those claimants that want to jump in front of the line, as already demonstrated by the Singleton Claimants' Response to the Joint Motion for Relief from Automatic Stay (Dkt. No. 3449), whereby five additional plaintiffs are seeking stay relief in order to pursue preference trials. Litigating whether a preference trial is appropriate for each such claimant will further delay these proceedings.

Two of those plaintiffs are in their 50s and accordingly, facially do not qualify.[15]  Two other plaintiffs are children of decedents, but they do not qualify under the relevant portion of the statute, under which a preference right is granted only to minors under the age of 14 who have suffered parental death.[16]  *See Landry v. Berryessa Union Sch. Dist.*, 39 Cal. App. 4th 691, 696 (1995); Cal. Civ. Proc. Code § 36(b).  Only one of the five additional plaintiffs (Mr. Armando Berriz) meets the age requirement for preference rights but the TCC has not shown that his "health . . . is such that a preference is necessary to prevent prejudicing [his] interest in the litigation".  Cal. Civ. Proc. Code § 36(a).  Thus, there is no guarantee that any preference trial would actually be granted by the state court.  Absent such a preference, the 120 day deadline to begin a trial evaporates.  This issue is unlikely even to be resolved for at least one month after a hypothetical order from this Court lifting the stay, and it could take even longer.[17]  The stakeholders to these cases cannot afford such a potential waste of time and resources, particularly in view of the June 30, 2020 deadline.

*Third*, even if preference were granted and the trial began in 120 days, it would take weeks to complete.  The notion that each side would try a case of this magnitude, and liquidate the claims of over a dozen individuals with disparate damages, disparate facts and disparate circumstances in 45 hours (about one week) per side blinks at reality.  In a state court trial, unlike in an estimation proceeding, the parties would need to fully resolve the claims of each of the plaintiffs. The presentation of evidence would be preceded by extensive hearings over threshold evidentiary issues, which under state court procedures generally are not heard until the first day of "trial" and can stretch for days, if not weeks.  Then there would be jury selection and all of the delay and disagreements that entails.

---

[15] Exhibit A of the Amended Motion includes claimants Greg and Christina Wilson who are "both 54 years old".  (Am. TCC Mot. to Lift Stay Ex. A, Dkt. No. 2904-1, at 3.)

[16] Mr. Monte Kirven is a decedent whose wrongful death claim is "brought by Mr. Kirven's adult children and his estate".  (Am. TCC Mot. to Lift Stay Ex. A, Dkt. No. 2904-1, at 3-4.)  One of the two remaining additional claimants—Mrs. Carmen Berriz—whose wrongful death action is "brought by Mr. Berriz, their three children, and Mrs. Berriz's estate" cannot qualify for mandatory preference because none of the parties asserting the wrongful death claim on her behalf is a minor under the age of 14.  (Am. TCC Mot. to Lift Stay Ex. A, Dkt. No. 2904-1, at 4.)

[17] In the Butte litigation, preference motions were not heard for almost two months after the filing of the motion.  (Supp. Orsini Decl. Ex. B, at 4.)

1    Only after all of this is complete could the actual presentation of evidence begin, which the Debtors

2    had proposed to the state court prepetition would take 5-8 weeks.  Adding this all up leads to a jury

3    verdict in March 2020, at the very best.  That is far too late.  (*See* Supp. Orsini Decl. Ex. C at 21:21-

4    22:5 (CPUC counsel explaining that "we really have to know what the plan is by January").)

5          *Fourth*, lifting the stay to permit an unrepresentative group of Tubbs claimants to

6    proceed to trial in state court would result in an extraordinary waste of estate assets.  As the Ad Hoc

7    Subrogation Group recognizes, there are "numerous overlapping fact issues shared in common by the

8    Tubbs Fire claims and other Wildfire Claims that would make it incredibly inefficient [to address] the

9    Tubbs Fire claims in isolation".  (Subro Grp. Obj., Dkt. No. 3419, at 9.)  Stay relief would mean

10   litigating those important issues twice:  once in state court with respect to Tubbs and then a second

11   time in this Court with respect to all the other fires.  Thus, "[c]arving out one fire from the rest . . .

12   would be inherently inefficient and exceedingly impractical given the June 2020 deadline".  *Id.*

13   Indeed, if the Debtors prevail in a state court trial, the TCC and Ad Hoc Subrogation Group

14   undoubtedly will contend that such a verdict is not binding on any other Wildfire claimant, and

15   accordingly that the entire trial needs to be done yet again in this Court even with respect to the Tubbs

16   Fire.  In contrast, with this Court presiding over <u>all</u> phases of estimation, consistently with the

17   Bankruptcy Code's goal of centralizing claims in a single forum, the Tubbs Fire has to be heard only

18   once, and any generally applicable findings that come out in the Tubbs phase of estimation can be

19   applied to later phases and in shaping the course of further proceedings.

20         *Fifth*, the argument that CCP 36 creates a "substantive right" that the Debtors cannot

21   "abridge" by using the "bankruptcy process" fails.  (*See* Reply of 2017 Tubbs Fire Victim Claimants,

22   Dkt. 3407, at 8.)  Just as "federal courts sitting in diversity apply state substantive law and federal

23   procedural law", the same is true for federal courts exercising bankruptcy jurisdiction.  *In re Cty. of*

24   *Orange*, 784 F.3d 520, 527 (9th Cir. 2015) (citation omitted).  However a "substantive right" might

25   be defined under state law, under federal law "[a] substantive rule is one that creates rights or

26   obligations, or is 'bound up with [state-created] rights and obligations", whereas a procedural rule

27   defines "a form and mode of enforcing" the substantive right or obligation.  *Id.*  Because section 36

28   does not have any effect on the merits of a claim, it is a rule of procedure, a point recognized by several

courts that have considered this precise issue. *See Wakefield v. Glob. Fin. Private Capital, LLC*, Civ. No. 15-0451 JM(JMA), 2015 WL 12699870, at *3 (S.D. Cal. Sept. 17, 2015) ("This statute . . . does not apply to federal actions."); *Luce v. A.W. Chesteron Co.*, No. C-10-0174 MMC, 2010 WL 785323, at *1 (N.D. Cal. Mar. 2, 2010) (section 36 is a "matter of California procedural law").[18]  That procedural right does not "alter[] the rights themselves, the available remedies, or the rules of decision" by which their claims will be adjudicated. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407-08 (2010).  Unlike the burden-of-proof issue in *Raleigh v. Illinois Dep't of Revenue,* 530 U.S. 15, 20 (2000), section 36 is not "an essential element of the claim itself", as it makes no reference to the substance of any claim.

## IV.  THE REMAINING OBJECTIONS ARE WITHOUT MERIT

### A.  Inverse Condemnation and Tubbs Issues May Be Heard Before the Bar Date

The parties do not need to wait until the Bar Date to conduct the first two phases of estimation.  Phase 1 (inverse condemnation) and Phase 2 (Tubbs) address threshold legal and factual questions, the resolution of which is not dependent on any claimant-specific facts.  (*See* July 24, 2019 Hearing Transcript at 21:7-25.)  Estimation proceedings can go forward before the bar date because "the estimation envisioned by the court does not involve a determination of any individual claim".  *See In re Garlock Sealing Techs.*, Case No. 10-31607, at 26 (Bankr. W.D.N.C. Apr. 13, 2012) (Dkt. No. 2102) (commencing pre-bar date estimation proceedings).

As with any other hearing—before or after the bar date—due process requires that the Debtors provide, with respect to the Phase 1 and 2 hearings, "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections".  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  With respect to Phases 1 and 2, all of the major parties in interest are well represented in these proceedings and all individual Wildfire claimants are represented by the TCC, a court-appointed

---

[18] Even if section 36 was viewed as a substantive right, state law would not be controlling in that conflict.  *See Gonzales v. Raich*, 545 U.S. 1, 29 (2005) ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail.").

fiduciary, as well as the state court trial lawyers who are actively included in these proceedings and represent a large proportion of claimants. Notice to all those parties is reasonable.

**B.     The Court Should Address Inverse Condemnation in Phase 1**

The vast majority of the briefing opposing the Debtors' proposal to address inverse condemnation in Phase 1 merely disagrees with the Debtors on the merits. (*See e.g.* San Francisco Obj., Dkt. No. 3412, at 4-6; Subro Group Obj., Dkt. No. 3419, at 16; TCC Obj., Dkt. No. 3431, at 15-16; Subro Group Obj at 17.)[19] However, the mere fact that parties do not agree with the Debtors on the merits does not mean that this Court can decline to address the merits.

For example, the TCC and Ad Hoc Subrogation Group cite intermediate appellate court decisions to argue that this Court should not rule on what they believe is a "matter of settled law". (Subro Group Obj., Dkt. No. 3419, at 11-17; TCC Obj., Dkt. No. 3431, at 15-16.) To be clear, the Debtors are not asking this Court to ignore those rulings. Rather, the Debtors will explain that the CPUC's subsequent decision denying automatic cost recovery for inverse condemnation claims undercut the constitutional underpinning of applying inverse condemnation to investor owned utilities as explained by the California Supreme Court and as assumed (incorrectly) by those prior appellate rulings.

Moreover, even if the intermediate courts compelled application of inverse condemnation to investor owned utilities under these circumstances, this Court still would be obligated to make an independent determination of what the California Supreme Court would do under these circumstances. *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007) ("If the state's highest appellate court has not decided the question presented, then we must predict how the state's highest court would decide the question."); *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1047 (9th Cir. 2014) (courts are not constrained to follow intermediate appellate decisions if they are "convinced by other

---

[19] The TCC also unconvincingly argues that the Debtors' stayed appeal on the applicability of inverse condemnation to the Court of Appeal prevents the Debtors from challenging the applicability of inverse condemnation in this Court. (TCC Obj., Dkt. No. 3431, at 17.) The existence of a stayed appeal in no way affects the fact that this Court must estimate the aggregate value of the Wildfire Claims, and that estimation necessarily involves an assessment, by this Court, of the applicability of inverse condemnation.

persuasive data that the highest court of the state would decide otherwise"). The TCC and Ad Hoc Subrogation Group do not disagree with this basic principle. Rather they argue that there is no "convincing evidence" or "persuasive data" that the two intermediate appellate decisions would not be followed by the California Supreme Court. (TCC Obj., Dkt. No. 3431, at 15-16; Subro Grp. Obj., Dkt. No. 3419, at 16-17.) But in making that argument the TCC and Ad Hoc Subrogation Group are simply expressing their disagreement with the Debtors on the merits, and that is not a reason for this Court not to hear briefing on this issue. When this issue is briefed on the merits, the Debtors will show that if the two intermediate appellate court decisions are interpreted as applying inverse condemnation to PG&E under these circumstances then they are inconsistent with clear guidance from the California Supreme Court, which grounds inverse condemnation in the loss spreading rationale. *See Holtz v. Superior Court,* 475 P.2d 441, 445 (Cal. 1970) (the "underlying purpose of [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements: to socialize the burden . . . that should be assumed by society") (internal citation and quotations omitted).

The TCC also argues that the convincing evidence doctrine "does not apply" where a state supreme court denies review of an appellate decision, citing *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). The TCC mischaracterizes *West*. That case merely held that the denial of review is one data point to consider. *West*, 311 U.S. at 237 ("[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise*") (emphasis added). To treat a denial of a discretionary petition or writ otherwise would transform every denial of appeal to a state supreme court into an affirmative endorsement of the appellate court decisions. The Debtors intend to point to other data, including prior rulings of the California Supreme Court, changed circumstances and constitutional principles to show that the California Supreme Court would not apply inverse condemnation to investor owned utilities under the current circumstances.[20]

---

[20] The Ad Hoc Subrogation Group also argues that in estimation, this Court must abide by the decisions of intermediate appellate courts because that is what a lower state court would be obligated to do.

The Debtors also intend to argue that this would violate the Due Process and Takings Clauses of the U.S. Constitution, an assessment that this Court must make after briefing from the parties. The Ad Hoc Subrogation Group argues that this Court should not decide this issue unless it finds that PG&E is not negligent, under the doctrine of constitutional avoidance. (Subro Grp. Obj., Dkt. No. 3419, at 22.) But the doctrine of constitutional avoidance does not apply here. The Wildfire claimants allege significant damages, including potentially billions of dollars for attorneys' fees, that are *only* recoverable if the Debtors are found liable under inverse condemnation.[21] There is no way the parties and this Court can resolve the Wildfire Claims without addressing whether inverse condemnation applies; the avoidance doctrine is irrelevant.

As explained in the Debtors' Motion, the question of whether inverse condemnation applies to PG&E is a critical gating issue for estimating of aggregate liabilities. The disallowance of inverse condemnation claims would mean that the claimants must establish that PG&E acted negligently for each fire in order to be compensated. Like causation issues surrounding the Tubbs Fire, a definitive answer from this Court on the issue of inverse condemnation will have a significant impact on the development of a negotiated resolution, which will be guided by the strength of negligence arguments, rather than just the establishment of causation (and corresponding strict liability if inverse condemnation applies). Resolving this issue as soon as possible will also provide an opportunity for expedited appellate review. The enforceability of inverse condemnation is a question of law that does not require factual determinations or evidence from individual claimants. In fact, counsel for many of the TCC members have already briefed this issue in the state court proceedings, so their legal arguments are ready to be heard. Briefing and argument on these purely legal issues may be heard while the parties are simultaneously performing important wildfire liability and damages discovery in preparation for the Tubbs hearing and aggregate damages estimation.

---

(Subro Grp. Obj., Dkt. No. 3419, at 21.) The Subrogation Group supplies no law to support that position. Any reasonable estimation of a claim's likelihood of success must account for the likely outcome of any potential appeals.

[21] For instance, the plan proposed by the Ad Hoc Committee of Senior Unsecured Noteholders awards $1.15 billion in attorneys' fees and costs related to the Wildfire Claims. (Dkt. No. 2741 at 29.)

1

**C.      The U.S.' and State Entities' Claims are Unliquidated and Must Be Estimated**

2            The United States and the California State Agencies are wrong in their arguments that

3   their claims arising from the Wildfires are not subject to estimation under 11 U.S.C. § 502(c) as a

4   result of the claims not being unliquidated.

5            As the United States points out, claims are unliquidated when they are not "subject to

6   ready determination and precision in computation of the amount due". (Response of the United States,

7   Dkt. No. 3424 at 4). The Ninth Circuit Bankruptcy Appellate Panel held in *In re Nicholes* that "debts

8   based on unlitigated tort . . . claims are generally unliquidated because damages are not based on a

9   fixed sum", noting also that "[i]f a debt is not readily determinable, whether as a result of a dispute or

10  otherwise, then the claim is unliquidated." 184 B.R. 82, 89-90 (B.A.P. 9th Cir. 1995) (emphasis

11  added).[22]     The Ninth Circuit has also held that "debt is liquidated if the amount is readily

12  ascertainable". *In re Slack*, 187 F.3d 1070, 1075 (9th Cir. 1999) (finding a parties' stipulation as to

13  amount of damages was sufficient to render a claim readily ascertainable).

14            The claims of the United States (which the United States admits it "is still in process

15  of identifying") and the claims of the California State Agencies (which they are "still in the process of

16  determining") are not readily ascertainable. (Response of the United States, Dkt. No. 3424 at 2;

17  Response of the California State Agencies, Dkt. No. 3421, at 4.) *First,* the Debtors dispute they are

18  liable for those claims. *Second,* although those parties may believe that they can readily calculate their

19  damages from their expended costs, the Debtors have not even seen any evidence of such costs and

20  reserve their right to dispute the claimed amounts.

21

22

23

24

25

_____

26  [22] The United States' reliance on *In re Corson* is misplaced. That case merely reiterates that unless

27  "[tort] claims are capable of simple calculation, without the use of opinion testimony or discretion",
    they "are viewed as unliquidated." *In re Corson*, 2004 WL 5865045 *5 n.10 (Bankr. E.D. Pa. 2004)

28  (collecting cases).

### D. The Parties Should Meet and Confer About Phase 3

The TCC also argues that the Motion should be denied because there is not enough specificity with respect to Phase 3.[23]  This is unconvincing, particularly given their alternative proposal that the Court address how to estimate the claims at some later time based on further briefing.  Time is of the essence and there is no reason for further delay.  The Proposed Order provides a framework for establishing mechanisms to conduct Phase 3 as quickly as possible.  Providing the stakeholders with a deadline to meet and confer and present an agreed schedule, or brief disputed schedules, for Phase 3 while the other phases get under way is inherently efficient and entirely within the Court's discretion to order.  *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).  The TCC's request for six months of discovery is both unnecessary and disconnected from the severe time constraints in this proceeding.  The state court plaintiffs' attorneys who have been coordinating with the TCC throughout these proceedings have already conducted months of discovery in the North Bay Fire cases (and completed discovery on similar issues as part of the Butte litigation).  All parties will benefit from narrowing the discovery categories so that they are tailored to the contested issues at play and avoiding the type of overbroad and unduly burdensome discovery from the state court litigation.  Allowing six months of discovery will all but guarantee that the Debtors miss the June 30, 2020, deadline for emergence.

### V. CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court grant the Debtors' Motion (Dkt. No. 3091), enter the Proposed Order (Dkt. No. 3091, Exhibit A), deny the motions for stay relief (Dkt. Nos. 2842, 2855, 2863), and grant such other and further relief as the Court may deem just and appropriate.

---

[23] The Herndon Parties also ask that the Court "clarify that any proposed claims estimation procedures explicitly allow for the estimation of class proofs of claim if such class proofs of claim are ultimately allowed."  (Dkt. No. 3437 at 3.)  This request is premature and should not be considered.

Dated: August 11, 2019

**WEIL, GOTSHAL & MANGES LLP**
**CRAVATH, SWAINE & MOORE LLP**
**KELLER & BENVENUTTI LLP**


_____/s/_Kevin J. Orsini_____

Kevin J. Orsini


*Attorneys for Debtors and Debtors in Possession*