# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. 19-30088 (DM)

------------------------------------x

In re:
PG&E CORPORATION
and PACIFIC GAS AND ELECTRIC
COMPANY,

------------------------------------x
                  August 9, 2019


(Transcription from audio recording)




   B E F O R E:

        HON. DENNIS MONTALI

1              THE COURT:  So I would like to

2    start with a report on the status

3    conference.  Is that okay?

4              So by my count we have two

5    matters that were scheduled and continued

6    relating to compensation matters and then

7    we have a status conference on the report

8    from the Governor's office and CPUC.  So

9    we've got Mr. Kornberg here, so that means

10   there is something to report, right?

11             MR. KORNBERG:  Unfortunately

12   not enough.  And, your Honor, Ms. Mitchell

13   is also here for the Governor's office.

14             Alan Kornberg from Paul Weiss

15   Rifkind Wharton & Garrison for the

16   California Public Utilities Commission.

17             Your Honor, since we were last

18   here on July 24, advisors for the

19   Governor's office and the CPUC solicited

20   views from the principal parties involved

21   in various pending exclusivity motions and

22   we did that before putting pen to paper.

23   We took into account the parties'

24   perspectives and then the Governor's office

25   and the PUC jointly distributed a competing

1  plan proposal protocol to the key parties

2  on Thursday, August 1.  We made it

3  abundantly clear that it was a draft for

4  discussion purposes and that nothing was

5  carved in stone.

6              We followed up with numerous

7  calls, meetings and e-mails with the

8  parties to solicit their comments and their

9  reactions and, your Honor, we did receive

10  some very thoughtful responses.

11  Unfortunately, it became very clear, very

12  quickly, that the single most controversial

13  issue revolved around the debtor's role in

14  selecting a plan proposal.  Frankly, all

15  the other matters seemed eminently

16  solvable.

17              There are some parties in this

18  case that take the position that although

19  the debtors are solvent, they should have

20  no role in selecting a plan proposal and

21  there are other parties that believe that

22  no special governance mechanisms are

23  required or acceptable despite the unique

24  and challenging circumstances of these

25  cases.

 1                    THE COURT:  By selecting a

 2     proposal, I mean, at the moment there is

 3     no -- as long as exclusivity is in place,

 4     the only selector is the debtor who is the

 5     prospective proponent, right?

 6                    MR. KORNBERG:  That's correct.

 7                    THE COURT:  You mean if we open

 8     up and one or more competing plans, the

 9     issue is who picks the competing plan, is

10     that what you are saying?

11                    MR. KORNBERG:  Yes, your Honor.

12                    THE COURT:  You think maybe the

13     judge might have a role in that?

14                    MR. KORNBERG:  Your Honor, but

15     that may be at the end of the process and

16     that's what is particularly troubling.

17                    By the way, your Honor, we made

18     that point repeatedly, that if there are

19     competing plans and there is no process for

20     decision-making --

21                    THE COURT:  Well, the law says

22     that.  But even before that, well, you go

23     ahead and then I will give you my thoughts.

24                    MR. KORNBERG:  So very

25     unfortunately the PUC sees an apparent

1    unwillingness of some of the parties to

2    engage constructively again on this

3    issue --

4                THE COURT:  No names, though.

5                MR. KORNBERG:  No names, I'm

6    not going to name names, but they know who

7    they are.

8                THE COURT:  But I don't.

9                MR. KORNBERG:  And we will keep

10   it that way, your Honor.  But that's really

11   the key issue here, which is if we are to

12   select a plan before unleashing a

13   confirmation process who is the decision

14   maker, the draft protocol that the

15   Governor's office and the PUC disseminated

16   provided for a decision-making process

17   after consultation with the key parties in

18   interest, which include the Governor's

19   office, the PUC and the official

20   committees, but there was a breakdown over

21   the issue of the debtor's role in that

22   process.

23                So I was told at one of our

24   meetings that the PUC was being naive about

25   these cases.  Your Honor, I believe the

1   naiveté here is with those that want to

2   embark on a risk-laden process without

3   paying sufficient heed to the legislatively

4   mandated deadline for resolution of these

5   cases, and that is June 30, 2020.  And,

6   your Honor, there are people that in this

7   process said, well, we are sure the

8   legislature will extend that deadline.  I

9   don't know how they have that degree of

10  confidence.

11              It is imperative to find a

12  solution to an extremely complex set of

13  problems that will drive these cases and we

14  believe that there should be a structure

15  imposed to achieve that goal, and, your

16  Honor, there are a couple of things that

17  are worth mentioning.

18              Everybody knows about what

19  we'll be facing in the Chapter 11 cases.  I

20  think there is going to be a very hotly

21  contested claims resolution process and you

22  will hear a lot more about that in the

23  coming days, and we may have three or

24  potentially more competing plan proposals

25  that could proceed to confirmation and

1   everybody knows what the confirmation

2   process looks like when you have competing

3   contested plans.  But that's just the

4   proceedings in this court.

5           I want to remind people that it

6   took approximately six months for the PUC

7   to conduct its approval process for the

8   global settlement and Chapter 11 plan that

9   resolved PG&E I, six months.

10          THE COURT:  Is that the

11  including the four-month mediation?

12          MR. KORNBERG:  Not including

13  the four-month mediation.  And, your Honor,

14  that plan and the settlement, because of

15  the mediation, were consensual.  Given the

16  fact-driven quasi-judicial nature of the

17  CPUC rate proceedings, which require their

18  own evidentiary hearings, we believe that

19  the parties are not paying sufficient

20  attention to have the CPUC go about

21  conducting its public process, and that

22  public process is an essential forum for

23  ratepayer input and protection, which also

24  requires that we make the findings mandated

25  by AB-1054.  How would we do that with

1    respect to multiple plans and do that

2    before June 2020?

3              And, your Honor, I'm being very

4    honest, we don't know how that could be

5    accomplished within that timeline.  We will

6    give it a lot of thought.  We will try our

7    hardest.  But this is a somewhat baffling

8    assignment, which is part of the reason

9    that motivated us to get up on the 24th and

10   say wait a minute, let's have competition,

11   but let's have competition before we

12   proceed to confirmation.

13             THE COURT:  Let me interrupt

14   you again, and I don't mean to, you know,

15   when someone says I don't mean to interrupt

16   you, they usually interrupt you.  But to

17   some extent I am a gatekeeper, and maybe

18   not the right one, but if I deny

19   exclusivity, there is only one person who

20   can be the proponent, and that's the

21   debtor, right, if I maintain exclusivity.

22             But then it seems to me from my

23   point of view and not even thinking about

24   CPUC or the legislature or any other

25   agency, I have to say well, what if that

1    plan gets run aground by unconfirmable, and

2    we are months down the road.  So am I

3    right?  I mean, if I maintain exclusivity,

4    there is only one plan to debate.  Isn't

5    that the case?

6              MR. KORNBERG:  Your Honor, I

7    think it is -- that is an undeniably true

8    statement, but the effect of not permitting

9    competing plans at this stage may have the

10   effect of requiring people to actually

11   negotiate and may be the byproduct of that.

12             THE COURT:  I understand that.

13             MR. KORNBERG:  Would be one

14   plan that actually works and that gets done

15   by June.

16             THE COURT:  But one of the

17   things that I intended to ask you today, if

18   you didn't report peace breaking out, was

19   to ask you to explain something that I

20   believe you said, and maybe it was one of

21   the other lawyers, I don't remember, but I

22   believe you said something like you don't

23   want there to be chaos, and, again,

24   sticking with my little world, it seems to

25   me that I can control a bit of the chaos,

1    at least if we oversimplify, if I allow a

2    competing plan.

3                   So let's assume there are two

4    plans on the table, or three, not 20, then

5    the next big step is disclosure statement

6    here, and the court controls that.  So

7    there could be -- so that doesn't -- it

8    sounds like it is complicated and

9    extensive, but it doesn't have to be

10   chaotic because the end result might just

11   be one disclosure statement, and then --

12   and then there is a natural attrition.

13                  It seems to me if you get past

14   that, then the process for soliciting votes

15   can be parallel in multiple plans, and then

16   the law says what to do if there is more

17   than one accepted plan.

18                  Leaving aside what is still

19   difficult and expensive, but maybe not

20   chaotic, is what if there is only one plan

21   left and then there are challenges to

22   confirmation, that's what we do.  We deal

23   with objections to confirmation.  So it

24   would seem to me that if we had two or

25   three competing plans, the voters would

1    have something to say with the one that

2    would survive that.

3                The court would have a

4    responsibility of picking out of more than

5    one, and you still have the confirmation

6    battle, and that's where, again, I'm not

7    suggesting that it wouldn't be difficult

8    and expensive and influenced by the clock

9    ticking for June 30th, but it's not chaotic

10   in the sense of -- I think it is my role to

11   maintain the non-chaos at least in the

12   bankruptcy arena.

13               Am I missing anything or

14   oversimplifying?

15               MR. KORNBERG:  I think there

16   may be a little simplification.

17               THE COURT:  Okay, that's fair.

18               MR. KORNBERG:  We do agree that

19   there are various points where the court

20   can be a gatekeeper, but let's say we get

21   through the disclosure statement process

22   and we all know the law that says you don't

23   try confirmation issues in a disclosure

24   statement hearing.

25               THE COURT:  I wish everybody

1   would remember that.

2           MR. KORNBERG:  So assume that

3   the plans that are presented are not

4   patently unconfirmable, which I think is

5   the right standard at that point, and let's

6   say we do have two confirmation proceedings

7   teed up.  Of course that's what we had in

8   PG&E I as I'm sure you well remember.  And

9   there was -- but there was a confirmation

10  trial and then we were in the midst of a

11  second confirmation trial, and I didn't

12  look up how long --

13          THE COURT:  40 days total.  We

14  counted them.

15          MR. KORNBERG:  Of trial time,

16  your Honor?

17          THE COURT:  Ms. Spratt and I

18  are victims of it.  I said victims.

19          MR. KORNBERG:  That is going to

20  take a while.  We will probably be well

21  into the spring.

22          THE COURT:  I understand.

23          MR. KORNBERG:  Then we have the

24  additional problem, as I mentioned, which

25  is not your problem, but it is a problem

1   for everyone in this courtroom which is

2   meanwhile the CPUC is supposed to be

3   approving a Chapter 11 plan.

4               THE COURT:  That was my

5   question to you.  Does it have to be

6   sequential or can it be parallel?

7               In other words, just suppose we

8   got past the first -- next round and we had

9   competing plans that are out for

10  consideration via the voting classes, which

11  really are two classes as I see it in at

12  least the plans that have been suggested.

13  Does the CPUC have to wait or can it start

14  its process?

15              MR. KORNBERG:  Our view is that

16  we have to know the plan that we are being

17  asked to approve.

18              THE COURT:  So it is kind of

19  linear.  The Bankruptcy Court has to what,

20  complete the confirmation before the CPUC

21  can make the final rule?

22              MR. KORNBERG:  Yes.  Your

23  Honor, I should really mention this, the

24  PUC proceedings, for those that are

25  unaware, are very fact-driven.

1           THE COURT:  I know they are.

2           MR. KORNBERG:  They are

3    quasi-judicial.  There will be lots of

4    detailed testimony about issues involving

5    billions of dollars of rates.  There is the

6    opportunity to cross-examine financial

7    advisors and the like and to do that with

8    respect to a plan that may never see the

9    light of day, and also just given the

10   timeline for those proceedings we are kind

11   of scratching our heads at the PUC to see

12   whether that is possible.

13           THE COURT:  So leave aside the

14   June 30 deadline that the Governor and the

15   legislature have set and without

16   speculating on whether that's concrete or

17   fluid.  You are saying that if we had a

18   traditional bankruptcy situation where the

19   disclosure statements are behind us,

20   whether there is one or multiple, leave

21   that aside, and we are now at a point where

22   there are plan A and plan B are out for

23   vote, that as we know, those situations

24   don't happen very often, but the voters

25   really tell us which one gets past the next

1    gate.  And if both get past the next gate,

2    I believe at some point, I forget whether

3    you have to deal with objections first or

4    not, but at some point the Court has to

5    make the call on which one to select.

6              You are telling me at least the

7    CPUC couldn't finish its job and maybe

8    couldn't even start its job until we are

9    down to one survival -- one surviving?

10             MR. KORNBERG:  Well, I can't

11   answer the detailed questions.  What I have

12   been told is that we really have to know

13   what plan it will be.  Whether you could

14   start the process without full knowledge of

15   that, I don't know.

16             But, your Honor, the idea that

17   we had and the Governor's office and the

18   PUC were promoting was instead of waiting

19   until the very -- let's say we have

20   multiple confirmable plans, rather than

21   waiting to the bitter end for your Honor to

22   decide unilateral which is in the best

23   interests, assuming that they were voted

24   on, rather than your Honor deciding at the

25   end, could we have a process at the outset

 1    to determine -- to make that determination,

 2    with the opportunity for people that were

 3    unhappy with its decision to come back and

 4    say I want you to terminate exclusivity,

 5    notwithstanding the process that's embarked

 6    upon here, and that was the issue that we

 7    really couldn't seem to resolve.  And

 8    without being unduly negative today,

 9    although I was accused of that already this

10    morning, we really could not get the

11    parties to listen to each other on this

12    governance issue.

13              There are people here that

14    believe your Honor is going to terminate

15    exclusivity and that they are going to get

16    what they want, and our answer to that is

17    of course even getting what you want may

18    not -- may be a Pyrrhic victory if we end

19    up with a process that extends beyond June.

20              Again, there are other people

21    who think that June deadline is not a real

22    deadline and I'm not sure of the basis for

23    that.  So I'm afraid that our failure in

24    our effort, and it was a lot of work put

25    into it, doesn't really bode very well for

1    these cases unless there is some

2    significant change in approach, and the

3    Commission will do whatever it can to help

4    make that happen, but we believe that

5    people really need to think about the June

6    deadline and how we are going to make it,

7    particularly if there are several positive

8    and constructive plan proposals on the

9    table.

10              THE COURT:  Well, I'm having a

11   little trouble knowing what's the best

12   message you are sending me, and maybe your

13   role is not to send me a message at all,

14   because my job is to do, you know, decide

15   what I have to decide next week on whether

16   I let one or two or more than that plans

17   compete with the debtor's plan that hasn't

18   seen the light -- I haven't seen, but I

19   have been told that it might be there, and

20   so I can't -- I can't do anything but do

21   that.

22              But it seems to me before, when

23   you asked for the continuance two weeks

24   ago, you, and the message from the

25   Governor, were welcoming competing plans,

1    and so you're not, I don't imagine, as a

2    litigant, or as a lawyer for your client,

3    you are not -- you are not changing your

4    recommendation on that, or if you are, you

5    need to tell me today.

6              MR. KORNBERG:  No.  Your Honor,

7    let me be very clear, our position has not

8    changed.  That is because we want a

9    competitive plan process that we are here.

10   We want there to be a competing plan

11   process.  I will say this again.  The

12   advent of the noteholder proposal we view

13   as a very positive event in this case.  I

14   think it has galvanized people in a

15   constructive way.

16              There are elements of the

17   subrogation claim holders term sheet that

18   are very attractive and interesting.  The

19   debtor is making progress, we understand,

20   on their plan proposal.  So the competition

21   is extremely welcome.  I think the end

22   result will be better for the State, better

23   for ratepayers, better for California.

24              THE COURT:  And how about for

25   the fire victims?  We wouldn't even be here

1    but for the fire victims.

2            MR. KORNBERG:  And better for

3    the fire victims.  The more money that this

4    case attracts to solve the problem,

5    certainly the better for the fire victims.

6            So the competition is a great

7    objective.  I think it is already having a

8    positive effect.  The question is how do we

9    channel that competition into a process

10   that is calculated to be successfully

11   resolved by the end of June.

12           THE COURT:  Okay.  We come back

13   to my question, I mean, I was aware and

14   anticipated that lots and lots of people

15   were spending lots and lots of time while I

16   was waiting for this two weeks to go by,

17   and that's fine, I appreciate this being

18   done outside of my germane, but I came back

19   to the same question, is Mr. Kornberg

20   right, there is going to be chaos because I

21   allow competing plans?

22           And the answer is well, there

23   is going to be complications, but at least

24   I think the bankruptcy system is in a

25   position to deal with that form of chaos.

1   It doesn't solve the problem.  It doesn't

2   solve any of these other problems.  Because

3   otherwise there might as well be

4   exclusivity permanently.

5               Again, I don't care.  I don't

6   have a stake in the outcome as long as

7   there is an outcome, and my fear personally

8   is what I said a minute ago, that whether

9   it is November or June 29th, I don't want

10  to then have a confirmation fight have

11  caused the deadline to miss and all the

12  ramifications to tell the victims, sorry,

13  you are not going to get paid for another X

14  days, weeks, months, years.

15              MR. KORNBERG:  Well, your

16  Honor, I can't -- hopefully chaos will not

17  ensue no matter what happens here.  But

18  here is the very real problem.  If we were

19  to go forward with a competing plan and

20  contested confirmation proceedings that are

21  very possible, again, I think that it would

22  be very difficult, I'm not saying it is

23  impossible, but it is very difficult to

24  imagine how we will be able to sync up the

25  PUC approval process, which also has to

1    occur by June, by the end of June.

2              THE COURT:  Well, again, I

3    don't want to turn this again into just the

4    two of us.  I know everybody wants to be

5    heard.  But to the extent that I am

6    persuaded to break exclusivity for one or

7    two at least, I will be looking to you for

8    some guidance as to what can the bankruptcy

9    system do to, you know, free up the logjam

10   so that the CPUC can act functionally; or,

11   stated differently, okay, let's suppose I

12   make the decision that I will allow two

13   competing plans, that's three, what should

14   we do for a timeline to get to the point

15   where this court and its rules, leaving

16   aside, you know, some of the unpredictable

17   things, would put the CPUC in a position to

18   know which plan is supposed to be passing

19   on or getting the public, and all the

20   things that have to happen?

21             MR. KORNBERG:  So if you assume

22   that it will be another six-month process

23   in order for the CPUC to do its work and to

24   let all the intervenors be heard and have

25   all the evidentiary presentations that are

1    required, we really have to know what the

2    plan is by January.  That's a very

3    simplistic answer.  I'm sure I will be told

4    afterwards there are a million other things

5    that have to happen.

6              THE COURT:  There probably are.

7              MR. KORNBERG:  It is the best

8    answer I can give you this morning, your

9    Honor.

10              THE COURT:  Does someone for

11    the Governor want to speak next?  And then

12    I will just go down to the debtor, the

13    official committees and everyone else.  For

14    me, this is not an action item today I

15    don't think.

16              Anyway, may I have your

17    appearance please.

18              MS. MITCHELL:  Nancy Mitchell,

19    your Honor, from O'Melveny & Myers on

20    behalf of Governor Gavin Newsome.

21              I think your Honor actually --

22    and we very much appreciate the Court

23    giving us the opportunity to try to work

24    with the CPUC on a protocol.  It is very

25    instructive to us, if nothing else, in

1  identifying the issues that your Honor went

2  to immediately.

3            Just to take a step back, the

4  protocol that we had worked on with the

5  CPUC essentially channeled the competition

6  to the front end.  There was a selection of

7  a winning plan, almost like a plan 363

8  process --

9            THE COURT:  A plan beauty

10  contest.

11            MS. MITCHELL:  Yeah, exactly.

12  And then there was only one solicitation

13  which, as Mr. Kornberg says, is probably

14  easier for your Honor's court docket, it is

15  probably easier for the CPUC process.

16            THE COURT:  There is no

17  question.

18            MS. MITCHELL:  You could,

19  though, go the way you are talking about

20  which is to have a couple, three competing

21  plans and try to build a schedule around

22  that, and I do know, and Mr. Bray may want

23  to speak to this, I do know that the UCC

24  has been working on something that looks

25  more like that and I think part of our

1    challenge is to try to weave that together

2    with the CPUC process and the other things

3    that happened that may at the end of the

4    day be the only choice we have to achieve

5    the goal of competition in the time frame

6    that we're talking about, and so I think

7    that's something that we are all still

8    trying to grapple with, and those are, from

9    a status conference perspective, at least

10   those conversations with the UCC have been

11   ongoing and I think we need to let that

12   process play out.

13                I did want to just give a

14   little bit of perspective from the

15   Governor's office.  Your Honor knows that

16   the State worked to pass AB-1054.  I had

17   the pleasure of basically living in

18   Sacramento for two months while that was

19   going on.  It was different.  I think

20   banking on the legislature being able to

21   change the June 30th date would be an

22   unintelligent move for many of the parties

23   in the case given how hard it was to get

24   that legislation passed in the first place.

25                I did also want to point out

1    that, I know your Honor knows this, but the

2    Governor has taken the extraordinary step

3    of being active in these bankruptcy cases

4    and hiring people to show up because of the

5    critical importance of the resolution of

6    these cases to the fire victims, to the

7    ratepayers, to the workers, and to the

8    State's energy policy goals generally.  And

9    in the AB-1054 process we found that the

10   creditors, the victims, the ratepayer

11   advocates were all very willing to come to

12   the table in good faith and to recognize

13   that while there was no perfect solution

14   you had to get somewhere, right, to solve

15   the problem for the fire victims.

16            I feel like I got a little lost

17   in the protocol discussion that we have had

18   the last two weeks.  I understand that

19   there are significant interests bidding for

20   this company on all sides of the table.  I

21   would ask them to remember that at the end

22   of the day this is about something more

23   than a little bit of return.  It is about

24   getting the fire victims paid and getting

25   this company out of bankruptcy so that the

1    California energy goals can be met, and I

2    think --

3                    THE COURT:  I presume that

4    implicit between the lines that's the

5    Governor's goal and the legislature's goal

6    for purposes of that deadline, it is not

7    that we are going to close the case, that

8    we claimed objections and lots of other

9    stuff that is normal, it is a confirmed

10   plan that treats the fire victims however

11   they either vote to approve or, like it or

12   not, could be forced upon them.

13                    MS. MITCHELL:  Or however you

14   determine at the end of the day.

15                    THE COURT:  Well, I understand.

16   But obviously the first choice would be

17   that it is consensual.  Excuse me,  I

18   didn't mean to interrupt you, that -- you

19   don't speak, you aren't the Governor and

20   you aren't a party of the legislature, but

21   when we look at AB-1540, that's one of the

22   numbers, that's what it means by emerge.

23   It is not a bankruptcy emerge.  It is the

24   confirmed plan.

25                    MS. MITCHELL:  I'm never going

1   to forget AB-1054.  But yes, your Honor, so

2   the June 30th date, and I recognize I'm not

3   a walking legislative history, although I

4   kind of feel like it on that particular

5   bill, but the June 30th date really had two

6   goals, and one was fire season, while it is

7   really all year in California now, the end

8   of the summer is really when it becomes

9   challenging, so the idea was to have PG&E

10  in a position to be able to make its

11  contribution to the fund before we got into

12  the heart of the next fire season.  That

13  was important to the legislature.

14          The word "resolved," which I

15  know you and Mr. Kornberg discussed at the

16  last hearing, was picked deliberately

17  because, and I think you will see this if

18  we ever submit any protocol of any type or

19  suggestion about scheduling order or

20  anything, the definition of "resolved" was

21  picked because it is possible that the

22  Court could enter a confirmation order that

23  limited conditions subsequent.

24          Obviously there will be all the

25  things that have to happen to get the cases

1    closed.  But also the confirmation order

2    could have limited conditions subsequent.

3    Where you were confident that the case was

4    going to happen, PG&E could make its

5    contribution to the fund and if the

6    effective date happened later because the

7    effective date was about meeting those sort

8    of nonmaterial conditions, I would say that

9    your Honor could decide that the case was

10   resolved for the purposes that AB-1054 was

11   achieving.

12            THE COURT:  Well, I don't know

13   that a federal bankruptcy court has the

14   authority to interpret state law that way,

15   but it can interpret the bankruptcy law to

16   when is it no longer debtor in possession,

17   when do the rights and the duties change,

18   but, more importantly, when do the rights

19   and duties per the plan kick in versus

20   preexisting.

21            I'm assuming -- well, I don't

22   know if you know this, Mr. Kornberg knows

23   it, the first PG&E case is still open.

24   That doesn't mean anything to anybody

25   except me and the clerk and the U.S.

1   Trustee who gets fees.  But I'm assuming

2   that that's what's meant here, an effective

3   plan, or now you have clarified a little

4   further, by the debtor in position to make

5   its contribution.

6            MS. MITCHELL:  And to be

7   honest, again, not a walking legislative

8   history, but it was selected to give your

9   Honor a little bit of flexibility in

10  determining when the debtor's obligation

11  under the plan were sufficiently ripe for

12  those purposes.

13           THE COURT:  It probably

14  wouldn't mean we have got a hearing set for

15  disclosure statement.

16           MS. MITCHELL:  No, sir.  I do

17  not believe that was the legislative

18  intent.

19           Our concern at the end of the

20  day is achieving, and I think your Honor

21  went to the right questions, the Governor's

22  concern is achieving a process that does

23  allow for the June 30th date, and, look,

24  the June 30th date is about getting PG&E

25  into the fund and allowing PG&E to be

1   investment grade.

2            There are a lot of consequences

3   to that not happening.  But we don't -- the

4   legislature does not legislate when the

5   bankruptcy court lets the debtor out of

6   bankruptcy.  It is about the participation

7   in the fund.  The Governor is concerned

8   that there be competition and that the best

9   plan comes to the table, however that gets

10  structured.

11           We recognize the challenges

12  that the CPUC has in trying to work through

13  their process.  I also would say, your

14  Honor, that a process that you put in

15  place, there are other parties that have

16  expressed some interest in potentially

17  participating.  I don't know whether we

18  want other plans at this point.

19           THE COURT:  Well, there are

20  some people that have said open it up to

21  everybody.  There are some that said if I

22  am going to open up to one, I should open

23  it up to others.

24           I can't remember, I believe

25  your office wanted the exclusivity period

1   shortened.  But as I recall going back to

2   the first hearing, I don't think the

3   Governor's office or anyone else got into

4   the fine detail about who.  They just said

5   open it up or extend it and I made the

6   decision that I made and then that led to

7   where we are today.  At the moment I have

8   two candidates.

9           MS. MITCHELL:  Right.  In

10  fashioning a process, whatever it is, of

11  looking like to achieve that competition

12  and achieve the June 30th goal, I think

13  there are other people in the market who,

14  given a clear process, might like to

15  participate as well.

16          So from our perspective, not

17  chaos, it just means a process that people

18  can follow that will get us to an end date,

19  and I think the Governor really feels that

20  that needs to look exactly like the process

21  that we put out there or exactly like the

22  competing process the noteholders put in

23  there.

24          I don't know if you have any

25  other questions for me.

```
 1              THE COURT:  I guess this is a
 2   question for everyone.  Next Tuesday I have
 3   on the table two motions to break
 4   exclusivity at least for those two parties,
 5   and I believe the debtor and others, lots
 6   of people have weighed in on that position.
 7   I can't tell you I have the exact box score
 8   memorized, but at least I see it as the
 9   option of saying no to everybody, in which
10   case the debtor still has exclusivity until
11   September, or say yes to one or both of the
12   moving parties, or to say open up the
13   doors.
14              Obviously anybody that knows me
15   knows I'm not inclined to do that.  That
16   doesn't mean I wouldn't listen.  So to the
17   extent that your office or CPUC want to
18   refine your position on that, don't be
19   bashful, weigh in, but do it on Tuesday.
20              We won't stick with the
21   traditional rules about filing something
22   today.  Just this is a very fluid thing.
23   So both you and Mr. Kornberg should give me
24   an update on Tuesday if you think of
25   something that is relevant.
```

1          MS. MITCHELL:  Happy to do

2     that.

3          THE COURT:  That's not an

4     indication, by the way, for everybody in

5     the case to file something Monday night.

6     I'm just saying you two are representing

7     two of the very major players in this

8     process that are alongside of a number of

9     other major players.  Okay.

10         MS. MITCHELL:  So thank you,

11    your Honor.  I really don't have anything

12    else, but I think I need to say -- I want

13    to again express how much we appreciate the

14    Court's efforts.  This is tough and we put

15    some additional pressure on your docket.

16              I did want to say one thing.

17    The parties, and I know your Honor knows

18    this, but the parties are very, very fond

19    of quoting my client in their papers to

20    support their positions from his press

21    releases, etc.  So far I actually haven't

22    seen them quote him in context correctly

23    once.  But putting that aside --

24         THE COURT:  Well, he chose to

25    be a politician.  That goes with the

1  territory.

2            MS. MITCHELL:  I appreciate

3  that.  But we are here and we are speaking

4  for him, and so I think the parties quoting

5  of the Governor should probably be given

6  the deference that it deserves.

7            THE COURT:  Thank you,

8  Ms. Mitchell.  Let's hear from the debtor's

9  counsel first, and then we will go to the

10  two official committees.  Mr. Karotkin.

11            MR. KAROTKIN:  Stephen

12  Karotkin, Weil Gotshal & Manges, for the

13  debtors.

14            First of all, your Honor, I

15  will say on behalf of the debtors that we

16  are disappointed that we so far have been

17  unable to reach an agreement certainly with

18  the parties on a protocol.  We don't think

19  that is necessarily all loss.  I think that

20  it is still possible to reach a consensus

21  if people want to be reasonable about it.

22            I'm not here today to argue

23  exclusivity.  We can do that on Tuesday.  I

24  hope that other people take the same

25  position on that.  I will say from the

1    debtor's standpoint we are willing to work

2    with all parties to achieve a consensus on

3    a plan.

4                As the debtor said, from day

5    one --

6                THE COURT:  Will you reiterate,

7    you are also willing to work on a

8    competitive pre-plan process similar to

9    what Mr. Kornberg was referring to?

10                MR. KAROTKIN:  Yes, and I think

11   there may have been some confusion about

12   what they were saying.  I think they were

13   saying that the protocol that was being

14   considered over the last two weeks was in

15   the context of exclusivity remaining in

16   place.  It was not in the context of your

17   lifting exclusivity and having competing

18   plans.  We were trying to come up with a

19   process as to how that would work in

20   consultation with the committees to arrive

21   at something.

22                I think now some of that

23   discussion perhaps has shifted to something

24   else.  But, again, that's for after

25   Tuesday, depending on what happens on

1   Tuesday.

2               As I said, the debtors are

3   willing to work with all parties to achieve

4   a consensus on a plan.  We believe that the

5   debtors, as fiduciaries for all parties in

6   this case, are the best situated to do

7   that.  There are a number of proposals out

8   there.  In fact, if you read the newspapers

9   over the past two days, there are equity

10  holders who have now come forward and are

11  willing to commit to provide $15 billion of

12  new financing, equity financing, in order

13  to propose a plan, and the debtors are

14  working with those people as well.

15              THE COURT:  I assume, again, I

16  read the headlines, but I'm assuming that

17  there will be a motion or a stipulation or

18  something to allow that equity group to

19  step up.  I can't act on newspaper

20  headlines, but procedurally, yes, the way

21  it should happen, don't you think?

22              MR. KAROTKIN:  I'm not sure I

23  understand your question.

24              THE COURT:  We have, as you

25  know, there are two, as I said to

1    Ms. Mitchell, there are two different

2    creditor groups that are on the table and

3    on the docket for Tuesday.  What I'm saying

4    is if there is another group that wants to

5    do it, the proper procedure is to file a

6    motion to do it.

7              MR. KAROTKIN:  They are

8    proposing to work with the debtors to come

9    up with a plan.  But in the typical,

10   customary circumstance of how cases are

11   typically administered, as existing equity,

12   particularly in a solvent debtor, they have

13   come forward to put up $15 billion of

14   financing.

15             THE COURT:  Okay, okay, the

16   equity group put it in.

17             MR. KAROTKIN:  I don't believe

18   they are seeking to file their own plan.

19   This would be a more conventional approach.

20             THE COURT:  The way you

21   introduced the subject, I wasn't clear that

22   that's what -- I understand your point now.

23             MR. KAROTKIN:  We can address

24   that again on Tuesday.

25             THE COURT:  Let me ask you, on

1   Tuesday you will be able to give me and

2   everyone else who is not privy to these

3   private conversations a date you might have

4   a plan on file?

5           MR. KAROTKIN:  Yes, sir.

6           THE COURT:  You don't have to

7   say it today if you don't want to, and you

8   don't have to say it on Tuesday, but it

9   might be helpful to know.

10          MR. KAROTKIN:  Yes, and we have

11  already in our pleadings, and I think you

12  alluded to it, indicated some of the key

13  provisions of that plan that we are

14  contemplating, and, again, this financing

15  would logically be a big part of this --

16  this equity financing would logically be a

17  big part of it.

18          THE COURT:  Sure.

19          MR. KAROTKIN:  As I said, we

20  are still willing to try to reach an

21  agreement with the parties with respect to

22  a protocol.  Going forward, we think that

23  is the most appropriate way to proceed over

24  the next month or so to avoid the situation

25  that Mr. Kornberg is concerned about, and

1   to have these cases administered in a

2   typical fashion, particularly, your Honor,

3   again, I don't want to argue exclusivity,

4   but in view of the complexity of these

5   cases, the fact that you still have to have

6   a hearing, unless we can resolve the

7   wildfire claims consensually, that really

8   is a gating item for any kind -- People can

9   put forward --

10          THE COURT:  You mean the

11  estimation?

12          MR. KAROTKIN:  The estimation,

13  or a consensual resolution.

14          THE COURT:  Of course a

15  consensual resolution is optimal, but you

16  were alluding to the estimation proceeding.

17          MR. KAROTKIN:  Yes, if you were

18  to grant that motion, of course.  That,

19  your Honor, really is a gating item for any

20  plan.  People can propose a plan saying I'm

21  willing -- my condition is the claims can't

22  be more than this, my condition is the

23  claims can't be more than that, but any

24  plan that is realistic here, that issue has

25  to be determined first, and that issue,

1   your Honor, will dictate the necessary

2   financing to get through the Chapter 11,

3   and not to say we won't be ready to file

4   the plan, but really any plan is premature

5   until that number is fixed.

6           THE COURT:  Well, Mr. Karotkin,

7   the complexity of this case, none of us

8   need to repeat.  From my point of view it

9   is this narrow little box that I live in

10  where I see these things going on and I

11  work with, and I think about myself, and so

12  exclusivity really from stay and estimation

13  are so interrelated.

14          MR. KAROTKIN:  I couldn't agree

15  more, your Honor.

16          THE COURT:  One of the

17  questions we will discuss, whether it is on

18  Tuesday or Wednesday or some other time,

19  is, you know, how does it all fit, what do

20  we do about the relief from stay.  And I

21  don't want this to be today's motion -- I

22  mean next Wednesday's motion to be argued

23  today, but they are all interrelated and

24  that's one of the challenges for all of us.

25          MR. KAROTKIN:  I  totally

1    agree.  Thank you, sir.

2              THE COURT:  Thank you,

3    Mr. Karotkin.

4              Why don't we go with the UCC

5    and then we will go to the TCC, assuming

6    you want to be heard.

7              Greg, did you get the duty

8    today?

9              MR. BRAY:  I did.  I will take

10   a shot at it, your Honor.

11             THE COURT:  Well, you had nice

12   things said about you.  That's a good

13   thing.

14             MR. BRAY:  It is unusual.

15   Thank you.

16             Your Honor, Gregory Bray,

17   Milbank, counsel for the Official Creditors

18   Committee.

19             Where to start?  Last time we

20   were here, Mr. Dunn told the Court that the

21   UCC would work in good faith with the CPUC

22   and the Governor on the requested protocol.

23   As you have heard, unfortunately, there was

24   not a resolution that could be reached.  An

25   interesting structure, but the structural

1    problems that are inherent in trying to

2    come up with a solution that doesn't

3    involve determination of exclusivity, they

4    are significant, and the Committee --

5                    THE COURT:  I'm sure there are.

6                    MR. BRAY:  -- has concluded

7    from that that really at a practical and

8    legal matter right now, we think the best

9    path forward to resolve the competition

10   that every party so far has stated they

11   want is for the Court to take up the

12   exclusivity motion next week and make a

13   decision on that.

14                   A comment that I am reminded

15   Mr. Dunne made last time is that realizing

16   there was this potential for not having

17   agreement on a protocol would suggest that

18   it might be good to have a plan B protocol,

19   which would be a protocol that would be

20   tethered to the Court's decision on

21   terminating exclusivity premised on the

22   fact the Court did terminate exclusivity

23   and set forth a timeline or a structure for

24   managing the process to attempt to mitigate

25   the discord that people are expressing

1  concern about.

2          THE COURT:  Well, do you agree

3  with me, if I were to pick exclusivity, you

4  know, the next thing, the next big ticket

5  item I think, leaving aside whether

6  estimation has to come first or late, is to

7  figure out how to be efficient in terms of

8  any disclosure statement phase before you

9  start to get to --

10          MR. BRAY:  Yes, agreed,

11  absolutely.

12          THE COURT:  And if I were on

13  Tuesday to say to these two parties'

14  exclusivity is broken, that doesn't mean

15  the debtor is out of the game.  The debtor

16  obviously -- obviously the debtor has the

17  right and no doubt would propose a plan,

18  whether it did it first or second.

19          MR. BRAY:  Agreed.  The

20  exclusivity does not apply to the debtor,

21  that's the law.

22          THE COURT:  Of course.

23          MR. BRAY:  So what we are

24  trying to do, your Honor, having gone

25  through this process now is work on this

1    plan B protocol and we hope to file it with

2    the Court before the hearing, and we will

3    of course share it with the key parties and

4    try and see if we can build some consensus

5    around this.  But among the other things it

6    will do is attempt to address the issue you

7    just raise is timing for filing a

8    disclosure statement, set forth a timeline.

9                    Of course the Court is the

10   ultimate decision-maker in all these

11   issues.  We would only proffer this as a

12   potential roadmap to try to move the

13   process along and it is expressly

14   conditioned on the Court having decided to

15   terminate exclusivity.  If the Court were

16   to rule the other way then this protocol

17   would be of no value.

18                    THE COURT:  Sure.  But the

19   short answer is if I were to deny

20   exclusivity, excuse me, deny the motion to

21   break it, to terminate it, and if I were to

22   leave the debtor in exclusivity, I would

23   still be pressing debtor's counsel for a

24   timeline.

25                    Again, I can't have any -- I

1    can't fix the things that Mr. Kornberg

2    talked about and I can't magically pretend

3    that I know that the legislature will

4    change the deadline.  So I would repeat

5    again what I said a couple of hearings ago,

6    my commitment is to make sure that the

7    bankruptcy court or the institution is not

8    the hang-up if we took this into account.

9    And so if I were to say to Mr. Karotkin,

10   you've got no competition yet, but I would

11   still be pressing him for a timeline, and

12   obviously if I terminate as to one or both

13   or more than that, it is going to be the

14   same question.  It is still going to be

15   everybody has to work together to have an

16   efficient and effective timetable.  Whether

17   your plan B is plan C or something, it is

18   something that you and your committee, I

19   welcome your role.

20            That's critical as kind of an

21   in-betweener, because, let's face it,

22   Mr. Bray, you know as well as I, if I were

23   to look just at the plan that's on the

24   table from the senior bondholders, their

25   class isn't even impaired.  There are two

1  impaired classes and that's the two sets of

2  fire victims and that's it.

3              So somebody has to figure out

4  how to make that work.  That's not to say

5  that there wouldn't be the equity or other

6  challenges to the confirmation standards

7  crammed down or what have you, but that's a

8  different discussion.

9              MR. BRAY:  I agree with

10  everything you said, your Honor.  I don't

11  want to get too far into the exclusivity

12  discussion for Tuesday.  I would just

13  repeat myself that we do think it makes

14  sense to go forward Tuesday.  We favor

15  competition.  I think we have heard from

16  the Governor and the CPUC that they gave

17  competition.  I will let Ms. Julian or

18  Ms. Dumas speak for themselves on that

19  issue.

20              As Mr. Kornberg has pointed out

21  so far, the competitive process has proven

22  valuable and to some extent moved this

23  process along, and I think you will hear us

24  argue next week that we favor lifting of

25  exclusivity sooner rather than later,

1   because it will take into account the

2   timeline issues we have, the legislative

3   overlay, and the other issues, and that the

4   sooner you make a decision probably the

5   better for the process so that then people

6   can sit down and sort out the timeline that

7   needs to be agreed to or realized because

8   of the decision that you have made.

9           THE COURT:  So that there would

10  be no secrets about it, I hope to be able

11  to make a decision when I hear the

12  arguments.  I wasn't intending to take it

13  under advisement and write a 35-page

14  publishable opinion that is due in six

15  months.  It may be that I just need to

16  absorb it.  But that's my hope is that I

17  will hear the arguments and give it some

18  reflection and issue an oral ruling.

19          MR. BRAY:  Understood.

20          THE COURT:  I can't promise it.

21  I will try.

22          MR. BRAY:  We will take a shot

23  at this protocol that we will file with the

24  Court.  Obviously I guess we will work for

25  some consensus around it.  It is certainly

1   not binding on anyone.  We don't want to

2   step on the Court's toes in any fashion.

3   It is simply there to try and assist the

4   process.

5              THE COURT:  I take it you would

6   like to continue things this way rather

7   than to take kind of another radical

8   departure of my looking to the UCC to be

9   sort of a mediator of this issue or maybe

10  you already are playing that role

11  effectively along with the Governor and the

12  CPUC, but to take further time out, I mean,

13  you don't want me to extend that two-week

14  moratorium next Tuesday?

15             MR. BRAY:  No.  Having been

16  through the last two weeks, we believe the

17  best thing for the process is for the Court

18  to have the hearing next week and rule on

19  the merits.

20             THE COURT:  Okay.

21             MR. BRAY:  Thank you, your

22  Honor.

23             THE COURT:  Thank you,

24  Mr. Bray.  Ms. Dumas?

25             MS. DUMAS:  Good morning, your

1    Honor, or good afternoon.  It is Cecily

2    Dumas, Baker Hostetler, on behalf of the

3    Official Committee of Tort Claimants.

4              We, the TCC, had positive and

5    constructive meetings with the CPUC and the

6    office of the Governor over the course of

7    the last week and a half.  We also have

8    been in communication with the other major

9    stakeholders in the case.

10             We understand the desire of all

11   the parties to really try to make the

12   AB-1054 deadline and acknowledge, as I

13   think your Honor mentioned, and

14   Mr. Karotkin mentioned, you know, the sort

15   of gating issue, or whatever term you want

16   to ascribe to it, of the claims estimation

17   process.

18             What we have indicated to the

19   Governor's office and the PUC is that the

20   Tort Claimants Committee is in the process

21   of developing a protocol for claims

22   estimation.  As your Honor is aware, the

23   only -- the only statement of the TCC thus

24   far relative to claims estimation process

25   relates to the Tubbs motion for relief from

1   stay, but there are 18 or 19 spires,

2   however you count them, all of which PG&E

3   denies legal liability completely, so we

4   are zero to however billions the tort

5   claimants believe they are entitled to.

6              So it is going to be a process

7   that will be needed to be hammered out with

8   the debtors.  It may be a combination

9   overseeing by your Honor of district court

10  mini trials, state court trials, estimation

11  proceedings.  Unlike other mass tort cases,

12  we have a different causal event for each

13  fire, and with PG&E I guess marginally

14  conceding causation, but not liability, you

15  know, we are in 17 or 18 times the trouble

16  of every other mass tort case that a

17  bankruptcy judge has had to deal with when

18  there has been one causal event, either

19  asbestos or an IUD or other causal events

20  that gave rise to mass tort claims.

21              THE COURT:  Well, since for

22  purposes of estimation PG&E, through

23  Mr. Orsini the other day, conceded that

24  they admit to having been the cause, the

25  only issue is they don't admit being

1  liable.  Is that really therefore 18

2  different causals or is it 18 different

3  fires all of which have their own

4  estimation of damages?

5              I mean, if you think --

6              MS. DUMAS:  Your Honor, I'm so

7  glad you asked that question.  There is a

8  magic act in Las Vegas that is very close

9  to Mr. Orsini's description of what PG&E's

10 actual position is.  I believe what he told

11 your Honor the other day -- well, first of

12 all, PG&E does not concede legal liability

13 at all because it contests strict liability

14 under --

15             THE COURT:  But as big a

16 question as that is, it is an easy question

17 to frame and a difficult question perhaps

18 to brief, but it is a judicial decision to

19 take, say, yes or no.

20             MS. DUMAS:  Yes, your Honor.

21 That is an easy one and, frankly, it is

22 insulting that they even put that on their

23 process.

24             THE COURT:  Don't argue the

25 merits.

1          MS. DUMAS:  I'm not.  I'm not

2     arguing the merits.

3          THE COURT:  Okay.

4          MS. DUMAS:  We will address

5     that in due time.  But what PG&E is saying,

6     it wasn't negligent with respect to any

7     fire.  I believe what your court didn't

8     comprehend, because it was said very

9     carefully, PG&E will only admit that its

10    equipment caused the fires in the context

11    of estimation proceedings, not trial.

12         THE COURT:  No, I heard that.

13    I heard that.  I heard that exactly.

14         Well, Ms. Dumas, I don't want

15    to distract, I want to stick with the

16    subject that we started with and hear from

17    you, but I will just make this statement,

18    don't confuse the fact that who the

19    judicial officer might be.  You made it

20    clear, and I haven't studied your responses

21    to the estimation motion, but I know that

22    your briefs -- brief does attempt to

23    respond to the questions I asked.

24         But as I see it, if the debtor

25    says for purposes of estimation, it means

1   that and if the inverse condemnation

2   principle comes out the way you think it

3   will, I mean, you can make a very large

4   estimation for all the damages, except for

5   Tubbs.

6              So be prepared to focus on

7   those fine points after the debtors file

8   their response -- their reply, rather, to

9   the estimation motion, and whether we deal

10  with it next Wednesday or sometime after

11  that, those are very much early-on issues

12  that have to --

13             MS. DUMAS:  Yes, your Honor.

14             THE COURT:  Let's go back to

15  the question of what to do about what

16  Mr. Kornberg brought up about this whole

17  topic.

18             MS. DUMAS:  Just one last

19  observation.  I would be thrilled, as would

20  all of the tort claimants, if you were

21  correct that what the estimation proceeding

22  will be will consist of damages estimation.

23  I don't believe that's PG&E's position.  I

24  hope I am wrong, fervently hope I am wrong,

25  your Honor.

1          So back to the plan process,

2    the TCC has been in communication, as I

3    said, with the other parties in the case.

4    We are mindful of the outside time

5    constraints imposed.  We are mindful that

6    we have to have parallel tracks of claim

7    estimation and plan process for the very

8    reasons that Mr. Kornberg eloquently

9    identified at the beginning of the hearing.

10          We will do our best to work

11   with the other parties.  We have been in

12   communication with the Official Committee

13   of Unsecured Creditors about its plan

14   protocol.  We hope to reach agreement so at

15   least the TCC can support a plan protocol

16   that is approved by the Court.  We will

17   work around whether the debtor retains

18   exclusivity longer or whether the

19   exclusivity is terminated as a result of

20   the hearings next week.

21          Suffice to say, without arguing

22   that point, that the TCC acknowledges that

23   the need at this point for speed on all

24   fronts and the possibility that if the

25   Court goes forward with each plan seriatim

1  as opposed to all at once, we may end up

2  with a busted plan and we will be exactly

3  where Mr. Kornberg doesn't want to be in

4  January or February.

5          THE COURT:  Okay.  Is that it

6  for now?

7          MS. DUMAS:  Yes, sir.

8          THE COURT:  Thank you.  Thank

9  you, Ms. Dumas.

10         I said I would call on anyone

11  else.  Just tell me who would like to speak

12  and let me hear from you.

13         MR. QURESHI:  Good afternoon

14  your Honor.  For the record, Abid Qureshi,

15  Akin Gump Strauss Hauer & Feld, on behalf

16  of the Ad Hoc Noteholder Group.  Just a few

17  comments, your Honor, and I will be brief.

18         First, the Ad Hoc Noteholder

19  Committee is very appreciative of the

20  efforts of both the Governor's office and

21  the CPUC and of course we also welcome the

22  role of the UCC in working towards a

23  proposal.

24         As your Honor is no doubt

25  aware, we did in advance of this hearing

1   file with the Court a proposed protocol of

2   our own.  It was a protocol that of course

3   contemplated the termination of

4   exclusivity, and there is just a couple of

5   points raised in there, your Honor, that I

6   would like to discuss with the Court.  It

7   was guided by three principles, three

8   principles that we understand to be

9   supported both by the Governor and by the

10  CPUC, and that is a plan process that is

11  competitive, that is fair, and that is

12  transparent, and we believe, your Honor,

13  that the proposal that we filed with the

14  Court accomplishes those things.

15          Now, if the UCC can improve

16  upon that, your Honor, we absolutely

17  welcome it and we look forward to seeing

18  what they file in advance of next week.

19          Your Honor, I wanted also to

20  comment on a couple of things that came up

21  in your Honor's colloquy with Mr. Kornberg,

22  three things in particular.

23          First, your Honor raised the

24  issue of who should be the decision-maker

25  when it comes to competing plans.

1   Absolutely 100 percent this court.

2            THE COURT:  Again,

3   decision-maker as to what?  Ultimately the

4   confirmation, but --

5            MR. QURESHI:  Decision-maker as

6   to what?  Decision-maker as to whether

7   there should be one or two or three or more

8   competing plans?

9            THE COURT:  Right, right.

10           MR. QURESHI:  We absolutely

11  think that it is unquestionably the role of

12  this court to play that gate-keeping

13  function, and that is what our protocol

14  contemplates.

15           The second point that arose in

16  your Honor's colloquy with Mr. Kornberg

17  related to the specter of chaos in the plan

18  process.  Again, I think your Honor is

19  absolutely right, which is it is this court

20  that can and no doubt will control that

21  chaos and ensure that chaos never breaks

22  out.

23           THE COURT:  Well, controlling

24  chaos is sort of a -- I like to think there

25  won't be any chaos.

1    MR. QURESHI:  Again, your

2    Honor, the interim deadlines that we set

3    forth in our protocol, the steps along the

4    way --

5         THE COURT:  I haven't studied

6    what you filed, only what is coming up in

7    the tunnel, not at the end of the tunnel.

8         MR. QURESHI:  Understood.  And

9    I certainly won't get into that, into our

10   protocol in any greater detail than I have,

11   other than to say there are a series of

12   milestones along the way designed precisely

13   to avoid chaos with this court serving as

14   the gate-keeping function, and we think it

15   is eminently doable without chaos ensuing.

16         The last point that I want to

17   comment on, your Honor, is, again, that

18   arose with Mr. Kornberg, the impact on

19   negotiations, of whether this court

20   terminates or does not terminate

21   exclusivity.

22         I heard, your Honor, from

23   Mr. Kornberg two things that frankly I have

24   difficulty reconciling.  One, he suggested

25   that continued exclusivity might actually

1    spur negotiations.  But then Mr. Kornberg

2    also noted that the filing of the Ad Hoc

3    Committee's plan was a welcome development

4    and one that galvanized people in a

5    positive way, to use his words, and we

6    agree that it did, but the fact is, your

7    Honor, that while there has been

8    exclusivity, it has not spurred

9    negotiations.  It is kind of remarkable

10   that with our plan term sheet out there the

11   debtors have not engaged with our group in

12   any meaningful way.

13           THE COURT:  Again, one thing

14   I'm trying to avoid is discussions about

15   what have -- have or have not happened sort

16   of outside the courtroom.

17           MR. QURESHI:  Fair enough.

18           THE COURT:  I can draw my own

19   inferences, but I don't want to be -- I

20   don't want to judge, I don't want to pick

21   good guys and bad guys.

22           MR. QURESHI:  That was not the

23   purpose of my comment, your Honor.

24           Suffice to say, that we think

25   the best way to galvanize the parties to

1  have a meaningful negotiation is for there

2  to be a process coming back to those three

3  principles, that is competitive, that is

4  fair, and that is transparent.

5          THE COURT:  Well, I mean,

6  competitive is good enough.  Competing

7  plans are by definition competitive.  In

8  fact, your three items there and your

9  protocol are only so good as you are

10  convincing me next week to break

11  exclusivity for your client, right?

12          If I say no, then you've got

13  to -- I don't know what you have to do.

14  No, I understand.  That's really what it

15  comes down to, is it better to stick with

16  the status quo or to open up the options.

17          MR. QURESHI:  And we think,

18  your Honor, that ultimately, and I won't

19  get into the merits, but that ultimately

20  time in this case just does not allow for a

21  serial plan process, that competition and

22  proceeding on multiple fronts at the same

23  time is the way to go.

24          So with that, your Honor, we

25  look forward to next Tuesday and if the

1  Court has any questions I'm happy to

2  address them.

3          THE COURT:  Thank you.  No, I'm

4  fine.  Anyone else want to be heard?

5          MR. FELDMANN:  Your Honor, on

6  the phone, I'm not sure what is going on in

7  the courtroom, could I be heard?

8          THE COURT:  Yeah.  Who is that?

9          MR. FELDMAN:  Your Honor, it is

10  Matthew Feldman from Willkie Farr &

11  Gallagher on behalf of the Ad Hoc Committee

12  of Subrogation Claims.

13          THE COURT:  Go ahead,

14  Mr. Feldman, please.

15          MR. FELDMAN:  I will be very

16  brief.

17          Your Honor, we were supportive

18  when we were in front of your Honor on July

19  24th about attempting to enter into a

20  protocol.  For all the reasons discussed

21  and not discussed, that's not been

22  successful.  Our view, your Honor, is at

23  this point going down the protocol, whether

24  it is the UCC, whether it is the ad hoc

25  group of bondholders, it is simply

1    unnecessary.

2              If the Court is inclined to

3    lift and terminate exclusivity next Tuesday

4    for either our group or the ad hoc group of

5    bonds, or both, it seems to me that the

6    Court can accomplish everything that was

7    intended by these various protocols by

8    simply putting out a scheduling order that

9    will create deadlines for people to file

10   plans, whether it is our plan, the debtor's

11   plans, or someone else who comes in and

12   seeks termination of exclusivity, and go

13   from there, because I am very cognizant, as

14   are my clients, of the June 2020 deadline.

15             Very interesting to hear

16   Mr. Kornberg's statement about how long the

17   CPUC process will take, and so from our

18   perspective, we think competition is good

19   and we think the Court is more than capable

20   of managing the process and that's how we

21   urge it to go forward.

22             Thank you, your Honor.

23             THE COURT:  Okay, Mr. Feldman.

24   Yeah, I understand that, and what you say,

25   again, is consistent with your motion to

1    terminate it, and if I grant your motion or

2    grant the senior bondholders' motion,

3    whether we call it a formal protocol or a

4    court scheduling order, I will still need

5    advice and guidance from the players as to

6    what that protocol ought to be, and timing

7    and so on, you are right.

8              If either or both of you get

9    that motion granted, it doesn't mean you

10   are going to file a hearing on confirmation

11   on next week.  We are going to deal with it

12   in some orderly fashion.  Thank you for

13   your comments.

14             All right, the gentleman that

15   came up, I didn't get your name.

16             MR. JOHNSTON:  Good afternoon,

17   your Honor.

18             THE COURT:  I'm trying to

19   recognize everybody, but I can't.

20             MR. JOHNSTON:  First time

21   appearing in this case.  Jim Johnston of

22   Jones Day on behalf of certain --

23             THE COURT:  I think your

24   partner was here for a prior hearing.

25             MR. JOHNSTON:  He has been here

1   several times, yes.

2              Your Honor, we heard a lot of

3   discussion about exclusivity and whether or

4   not you should break exclusivity today.

5   You have read in our papers, you will hear

6   next week, we do not think you should do

7   so, particularly given the June 30 date

8   that is looming in everyone's minds.

9              THE COURT:  Don't turn this

10  into your motion for that.

11             MR. JOHNSTON:  I'm not going to

12  do so.  I'm going to say that we believe

13  that the debtors are the best wards of the

14  process going forward.

15             But what I rose to say, though,

16  and I know I don't have to tell you, but

17  the Code gives you all the tools to deal

18  with what might happen if you do determine

19  that there is cause to terminate

20  exclusivity.  You did it in the first PG&E

21  case and managed it.  You can do it in this

22  case.

23             THE COURT:  By comparison, it

24  was awful easy.

25             MR. JOHNSTON:  I didn't have

  Page 65

1  the privilege of living through the first

2  PG&E case, but it sounded like a heck of a

3  lot of fun.

4          THE COURT:  Ask Mr. Kornberg.

5          MR. JOHNSTON:  I think your

6  Honor in your commentary with Mr. Feldman

7  hit the nail on the head, which is if you

8  do decide to terminate exclusivity, you are

9  going to want to develop a scheduling

10  order, a, quote/unquote, plan B protocol

11  with input from the parties.  We heard

12  reference from the Committee today saying

13  that boy, they may file something on Monday

14  night.  We heard reference from Mr.

15  Qureshi on behalf of the senior bondholders

16  and, boy, they filed something yesterday.

17          THE COURT:  Actually, they

18  filed it I think a couple of days earlier

19  in connection with their comment on the

20  efforts that the Governor's office -- I

21  mean, it doesn't matter what date they

22  filed it.  They did file it prior to this

23  morning.  I just haven't looked at it.

24          MR. JOHNSTON:  I don't know if

25  it was 24 hours ago or 48 hours ago.  It is

1   not something that will be before the Court

2   on Tuesday.

3           So we would submit, let's not

4   put the cart before the horse, that lets

5   consider exclusivity on Tuesday and if in

6   fact you do decide that exclusivity should

7   be terminated in some way, shape or form,

8   there will need to be a reasoned process

9   for dealing with what comes next.

10          THE COURT:  Right.  I did say

11  to Mr.  Qureshi specifically his protocol

12  and his three points about competitive, I

13  said that is fine unless I deny your motion

14  in which case you are back on hold.  I

15  mean, it is the same, I understand.  It is

16  the same with you.  If I grant it, then you

17  are going to be frustrated with the

18  position you're in, but that doesn't mean

19  you aren't going to be part of the process.

20          MR. JOHNSTON:  No, I understand

21  that, your Honor.  And the point simply was

22  especially if there is going to be

23  competing, quote/unquote, plan B protocols

24  as to what happens with competing plans,

25  that needs to be a reasoned process and it

1  can't be something that is decided on the

2  fly next week.

3            THE COURT:  And Mr. Johnston, I

4  wouldn't tell people they can't file

5  things.  I can only absorb so much.  And

6  the more people file, the more stuff I'm

7  just going to have to deal with when I can.

8            So, you know, it is true, and

9  I'm sticking with the exclusivity and the

10  oppositions, and that is the number one

11  topic for Tuesday.

12            MR. JOHNSTON:  Thank you, your

13  Honor.

14            THE COURT:  Thank you very

15  much.

16            Anyone else want to be heard?

17  Again, I don't mind hearing from you but I

18  also don't intend to take any action and I

19  do have a couple of other motions that we

20  would like to do today.  So unless -- I

21  have asked for, invited, and no one is

22  coming forward, so I'm prepared to

23  terminate today's hearing on what we just

24  called the status conference, for lack of

25  anything else, and thank you all for your

1  comments and say that I will pick up my

2  responsibility to do what I have to do come

3  Tuesday when I hear the arguments on the

4  exclusivity motions.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2

3

4

5      I, TODD DeSIMONE, a Registered

6    Professional Reporter and a Notary Public,

7    do hereby certify that the foregoing is a

8    true and accurate transcription of my

9    stenographic notes to the best of my

10   ability from the audio file supplied.

11        I further certify that I am not

12   employed by nor related to any party to

13   this action.

14

15

16

17

18             TODD DeSIMONE, RPR

19

20

21

22

23

24

25