# EXHIBIT D

1 | MICHAEL A. KELLY (SB #71460)
mkelly@walkuplawoffice.com
2 | KHALDOUN A. BAGHDADI (SB #190111)
kbaghdadi@walkuplawoffice.com
3 | **WALKUP, MELODIA, KELLY &**
**SCHOENBERGER**
4 | 650 California Street, 26th Floor
San Francisco, CA 94108
5 | Telephone: (415) 981-7210

6 | **ON BEHALF OF DIRECT PLAINTIFFS**

EVAN R. CHESLER (*pro hac vice*)
echesler@cravath.com
TIMOTHY G. CAMERON (*pro hac vice*)
tcameron@cravath.com
KEVIN J. ORSINI (*pro hac vice*)
korsini@cravath.com
OMID H. NASAB (*pro hac vice*)
onasab@cravath.com
DAMARIS HERNANDEZ (*pro hac vice*)
dhernandez@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

**ON BEHALF OF DEFENDANTS**

9 | CRAIG S. SIMON (SB #78158)
csimon@bergerkahn.com
10 | BERGER KAHN, A Law Corporation
1 Park Plaza, Suite 340
11 | Irvine, CA 92614
Telephone: (949) 474-1880

12 | **ON BEHALF OF SUBROGATION PLAINTIFFS**

SCOTT SUMMY (*pro hac vice*)
ssummy@baronbudd.com
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave #1100
Dallas, TX 75219
Telephone: (214) 521-3605

**ON BEHALF OF PUBLIC ENTITY PLAINTIFFS**

14 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

15 | COUNTY OF SAN FRANCISCO

16 | Coordination Proceeding
Special Title (Rule 3.550)

17 | CALIFORNIA NORTH BAY FIRE CASES

JCCP No. 4955

**JOINT CASE MANAGEMENT**
**CONFERENCE STATEMENT**

Date: October 25, 2018
Time: 9:00 a.m.
Dept.: 304

**Assigned for All Purposes to:**
**Hon. Curtis E.A. Karnow, Dept. 304**

23 | After meeting and conferring pursuant to California Rules of Court, Rules 3.724 and 3.727,

24 | Plaintiffs and Defendants Pacific Gas and Electric Company and PG&E Corporation (collectively,

25 | "PG&E") hereby jointly submit this Joint Complex Case Management Conference Statement in

26 | response to questions posed by the Court in Case Management Order Number Three dated

27 | September 24, 2018.

28 |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco
10/22/2018
Clerk of the Court
BY: JUDITH NUNEZ
Deputy Clerk

# I. TRIAL SETTING

## A. First Fire Case To Be Set For Trial

### 1. Plaintiffs' Position

#### (a) Individual Plaintiffs

Individual Plaintiffs propose that the first case to be set for trial should involve the <u>Atlas</u> fire. Atlas is a tree-line contact case which incorporates law and proof issues common to all vegetation management fires. Vegetation management issues are typical to the vast majority of the fires, excluding Tubbs, Sulphur and Cascade. Tubbs is a fire with mixed cause and origin issues, has substantially more evidence to be reviewed (much of which has not yet been released by Cal Fire), has as many as 15 to 20 additional potential percipient witnesses, and implicates a broader range of negligent corporate conduct as it relates to wildfire risk management. A trial of the Atlas fire case can be prepared far more quickly, will require fewer witnesses on liability, and provide important answers to questions relating to damage issues independent of cause and origin. The physical evidence inspections alone for the Tubbs fire are estimated to require more than a dozen separate examinations by expert consultants for both Plaintiffs and Defendants.

Plaintiffs believe that 60 days after the first fire set for trial, a second trial should be set. That fire should be the Tubbs fire, assuming all available evidence can be accessed from PG&E, Cal Fire, and other sources, and further assuming that evidence under PG&E's management and control is made available in a way that is sensibly organized and easy to access.

To the extent that Tubbs evidence is not made available from Cal Fire, either voluntarily or in response to a motion to compel, an alternative fire should be set for trial 60 days after the first trial. At the most recent CMC, Plaintiffs suggested that the second trial should be the Sulphur fire because it could be most quickly prepared. At the same time, if the court is disinclined to set the Sulphur fire because it does not affect as many structures or persons and is perceived for that reason as having less benefit in moving the greater litigation to resolution, then plaintiffs would suggest the Redwood fire or the Nuns complex fires be set in lieu of Tubbs.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1             **(b)**    **Public Entity Plaintiffs**

2          The Public Entity Plaintiffs' ("PEs") damages present issues that are distinct and unique

3  from those affecting the Individual Plaintiff cases. Accordingly, the PEs respectfully request that

4  once the Court issues an order governing the sequence of Individual Plaintiff, fire-specific trials,

5  the PEs be allowed to meet and confer with PG&E within 45 days of the order and report to the

6  Court whether those PEs impacted by the respective fire should participate in the trial as an

7  additional category of plaintiff.

8             **2.**    **PG&E's Position**

9          As an initial matter, PG&E and Plaintiffs agree that any trial ought to be a bellwether trial

10  concerning a single fire with respect to both liability and damages. This first trial will therefore be

11  persuasive in terms of allowing the parties to have a better sense as to PG&E's potential liability,

12  but will not be binding as to any other fires or any other Plaintiffs. Accordingly, in identifying

13  which fire it believes should be tried first, PG&E's primary focus is on obtaining as much

14  information through a trial verdict as it can to have the maximum potential impact on the overall

15  resolution of the many thousands of cases associated with the North Bay Fires.

16          There is no dispute that the Tubbs Fire, which is the most destructive fire in the State's

17  history, involves the greatest amount of damage, loss, and harm. As of October 1, 2018,

18  approximately 65 percent of the Individual Plaintiffs have filed claims relating to the Tubbs Fire,

19  and the structures destroyed in the Tubbs Fire comprise approximately 63 percent of the total

20  structures destroyed in all of the North Bay Fires. Because of the significance of the damages

21  associated with the Tubbs Fire, ordering a bellwether trial concerning that fire will be the most

22  efficient way for the Court "to expedite the just determination of the coordinated actions without

23  delay". (Rule of Court 3.541(b).)

24          Plaintiffs contend that because the Tubbs Fire's alleged cause is not vegetation contact

25  with a power line and is thus potentially more complex as it relates to causation than some of the

26  other fires, it should not be tried first.[1] (9/21/18 Tr. at 38:24-39:3 ("Mr. Simon: Tubbs has two

27  _____

28  [1] At the last Case Management Conference, at least one Plaintiffs' counsel suggested that a claim

1   electric lines. You've got a line that is owned and operated by PG&E, you have a homeowner that
2   there's some electricity that the homeowner uses for their own pumps, and you're going to have
3   issues about location, evidence, where.").) Plaintiffs are absolutely right that the available
4   evidence points away from vegetation contacting PG&E's power lines and towards private
5   electrical facilities that were replaced by unlicensed third parties without permit or inspection as
6   the cause of the Tubbs Fire. In that respect, any allegation of PG&E's liability will be far less
7   direct than in a fire that involves vegetation allegedly contacting a power line. But that is precisely
8   why a case concerning the Tubbs Fire needs to be tried first. If the Tubbs Fire was a small fire that
9   represented an insignificant portion of the overall damages, PG&E may agree with Plaintiffs that
10  another fire should be tried first. But because the Tubbs Fire may comprise at least two-thirds of
11  the ultimate potential liability, it is difficult for PG&E to contemplate resolution of the coordinated
12  proceeding without having further insight into how a jury may view the unique set of facts
13  concerning PG&E's liability for the Tubbs Fire.[2]

14          Moreover, Plaintiffs are incorrect that simply because the Atlas Fire involves alleged
15  vegetation contact, it will present "law and proof issues common to all vegetation fires". Each
16  alleged vegetation contact case is different and will involve a distinct set of factual issues.
17  Plaintiffs' suggestion that there will be broad issues regarding PG&E's corporate policy with
18  respect to vegetation management that apply to all fires is not true. Whether, and to what extent, a
19  
_____

20  concerning the Atlas Fire should be tried first because there is no dispute as to causation. That is
21  false. PG&E disputes liability with respect to the Atlas Fire as well as Plaintiffs' allegation that the
    Atlas Fire was caused by vegetation contacting a PG&E power line.

22  [2] PG&E also disagrees with Plaintiffs' assertion that an Atlas Fire trial will be far less complicated
    and streamlined. As set forth below, PG&E believes a Tubbs Fire trial could be completed in no
23  more than six weeks whereas Plaintiffs are estimating as many as eight weeks for an Atlas Fire
    trial. Plaintiffs' contention that the Tubbs Fire "has as many as 15 to 20 additional potential
24  percipient witnesses, and implicates a broader range of negligent corporate conduct as it relates to
    wildfire risk management" is conclusory and belied by their extensive witness list discussed
25  below, many of whom (*i.e.*, all the vegetation management witnesses and experts) would not be
    necessary for a Tubbs Fire trial. (*See infra,* Section I.E.1.) By contrast, and as discussed further
26  below, experts on cause and origin, weather, LiDAR, de-energization, risk management and
27  damages would be necessary in both trials.

28  

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1 particular vegetation management policy applies will depend entirely on the facts of each

2 particular fire including, for example, the type of tree allegedly at issue, whether the alleged

3 contact occurred as result of a tree falling or a branch dislodging, the distance of the alleged tree at

4 issue from the PG&E lines, the surrounding vegetation separating the alleged tree at issue and the

5 PG&E lines and the history of inspection and maintenance of that and other tree in the alleged

6 incident area in the months and years preceding the extreme weather events of October 2017.

7       To the extent Plaintiffs are suggesting that allegations of systemic vegetation management

8 issues will overlap across vegetation management trials, that is also untrue. As the Court of

9 Appeal has already found in the Butte Fire litigation, evidence concerning PG&E's alleged

10 vegetation system maintenance and inspection issues can only be relevant in a particular case if

11 that evidence and the alleged programmatic issues can be tied specifically to the tree at issue. (*See*

12 *PG&E v. Superior Court*, C085308 (Cal. Ct. Appeal, Third District, July 2, 2018) (evidence that

13 PG&E's audit program was allegedly unreliable was not relevant as plaintiffs did not show

14 PG&E's audit methodology contributed to the Butte fire, and evidence that PG&E's decision to

15 extend its routine patrol schedule not relevant as PG&E had returned to annual patrol by time of

16 Butte fire).) Even if it were true that Atlas and another fire were caused by vegetation contact to

17 PG&E power lines (a disputed factual issue), that would still say very little about how each of

18 those cases actually would be resolved given the many differences between all of the facts

19 concerning particular alleged ignition points. The reality is that the results of any single trial about

20 a particular fire will provide limited intelligence about how trials related to other fires that often

21 occurred hundreds of miles apart and involve very different facts will be resolved. That is

22 precisely why PG&E believes it is critical to gain some intelligence through the first trial about

23 how the single largest fire – representing most of the potential liability – will be resolved so that

24 the parties can have some insight into how other subsequent trials concerning that fire could be

25 resolved.

26       Further, at this point, the Tubbs Fire, just like the Atlas Fire, is still subject to investigation

27 by the relevant District Attorneys' offices (indeed, at least one District Attorney's office is looking

28 at both, *i.e.*, the Napa District Attorney, as the Tubbs Fire ignited in Napa County and then spread

to Sonoma County). As PG&E has disclosed, it has entered into an agreement with the Sonoma and Napa County District Attorneys to waive any applicable statutes of limitations related to the North Bay Fires for a period of six months, until April 8, 2019. As discussed in Section VIII, *infra*, the parties are discussing with those District Attorneys a mechanism to enable access to all of the relevant evidence for all parties in the litigation. There is therefore no reason to believe that there will be an ability to access, for example, Atlas Fire evidence but not Tubbs Fire evidence. And, to the extent the parties are precluded from accessing the evidence, this Court has the authority to compel inspection if it determines, after applying a balancing test, that access to the evidence is within the public's interest. Access to the physical evidence concerning the Tubbs Fire should therefore not delay the parties' ability to try a Tubbs Fire case.

Finally, with respect to the Public Entity Plaintiffs, PG&E proposes that if the first trial is one for which there is a corresponding Public Entity Plaintiff (*e.g.*, for a Tubbs Fire trial, Sonoma County, Napa County or the City of Santa Rosa), a representative Public Entity Plaintiff should participate. PG&E does not believe any further meet and confer, as proposed by the Public Entity Plaintiffs, is necessary.

### 3. Plaintiffs' Response

Though there is no dispute that Tubbs is the most destructive fire – there can be no serious dispute that the parties know the least about it. The ultimate origin and cause determination on Tubbs requires substantial additional discovery, which is now in the hands of Cal Fire and PG&E. Indeed, plaintiffs learned for the first time (during a deposition) that PG&E employees were on the scene of the Zink property (where they observed all of the purportedly unpermitted electrical work) several months before the fire.[3]

_____

[3] PG&E Response: This statement is false. There has been no testimony that any PG&E employee observed the unpermitted electrical work; indeed, the individual who did the unpermitted electrical work has testified that he did not tell PG&E anything about what he had done and to his knowledge PG&E had no idea what work he did. Plaintiffs may be referring to a picture that was used during the Andrews deposition that was taken by a PG&E employee of the property at 1128 Bennett Lane. That picture was taken in 2013, not "months before the fire". That was 4 years before the pole that may have caused the fire was replaced without a permit by an unlicensed electrician.

1    Moreover, there is no evidence discovered at this stage that the private lines on the Zink

2    property caused the Tubbs fire. If PG&E has any such evidence, none has been produced in

3    discovery.[4]

4    The volume of evidence required for examination in Tubbs is larger than any other fire.

5    Plaintiffs will likely require inspection of several distribution lines in the vicinity of the Zink

6    property for further examination. Plaintiffs also recently discovered (from the deposition of a

7    Calistoga Fire Fighter and deposition of an eye witness local resident) that PG&E was on scene,

8    by the Zink property, performing electrical work within hours after the Tubbs fire started, despite

9    PG&E not identifying any employees on scene at that time to the CPUC or in written discovery

10   responses to Plaintiffs.[5] Furthermore, the Zink property is only one suspected origin point of the

11   Tubbs Fire. At this time, there exists the very real possibility that there are several origin points of

12   the Tubbs Fire, and therefore, several cause and origin analyses that will need to be performed.

13   Additional physical Tubbs fire evidence remains in the hands of Cal Fire, which cannot be

14   disclosed without the added procedural hurdles caused by the tolling agreement, which neither the

15   Court nor Plaintiffs were made aware of until after the last CMC.

16   At this stage, categorizing Tubbs as a vegetation, non-vegetation, or any other category of

17   fire is premature. It may be more than one. The piecemeal discovery completed thus far, without

18   the access to physical evidence, does not provide a sufficiently detailed picture to set this case at

19   the first trial.

20

21

22   _____

23   [4] PG&E Response: This is also false. Among other evidence, PG&E has collected the customer
     owned pole that may have started the Tubbs fire and Plaintiffs have been given the opportunity to
24   inspect this evidence.

25   [5] PG&E Response: PG&E has no record of any PG&E personnel being on location. The Calistoga
     Fire Fighter testified only that he "is sure he saw some [PG&E personnel] or passed by some at
26   some point, but I can't recall where or when". PG&E believes that the resident who testified that
     he saw PG&E personnel in the area was likely misremembering the events given the absence of
27   any records that PG&E personnel were on scene the night of the Tubbs Fire and the fact that the
28   witness made other statements about his recollection of events that are demonstrably incorrect.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

**B.**    **Number of Plaintiffs**

    **1.**    **Plaintiffs' Position**

The number of plaintiffs will be dependent upon the types of claims presented in the first trial. In this respect, Plaintiffs propose that the Court try a group of claims representing the majority of types of claims that will be presented by average or typical plaintiffs in the litigation as a whole. With that in mind, Plaintiffs propose nine separate categories of claimants, each of whom holds one or more of the following types of claims. The aim here is to best provide information about claim value in the claim types most commonly seen in all of the fires as follows:

1. Wrongful death
2. Personal injury
3. Total loss of home on property larger than 5 acres
4. Total loss of home on property smaller than 5 acres
5. Partial loss/non-total damage to home
6. Commercial loss to non-winery
7. Commercial loss to winery/vineyard
8. Loss/displacement of renter/tenant with destruction of personal property
9. Damage/destruction to raw land without loss of home

An additional issue common in all of the fires cases is the right to claim emotional distress for plaintiffs who are within the "zone of danger" and who required evacuation. These are not set forth as a specific category. It is assumed that one or more of the plaintiffs who are selected as representatives holding one of the above 9 types of claims will also present an emotional distress claim. A plaintiff in categories two, three, four, five, and eight may well present such a claim. The same is true as regards subrogation.

A plaintiff in categories three, four, five, six, and seven is presumed to have a carrier with a subrogation claim that will be tried with the individual plaintiff claims.

    **2.**    **PG&E's Position**

PG&E largely agrees with Plaintiffs' position. However, PG&E disagrees that the first trial should include Plaintiffs from categories 6 and 7, commercial loss to non-winery and commercial loss to winery/vineyard, respectively. Given the potential complexities associated with commercial damages, such as business interruption loss, PG&E believes that these categories should be dealt with in a subsequent trial.

Moreover, PG&E proposes adding an Individual Plaintiff from an additional category:

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

annoyance damages (*e.g.*, smoke and soot, erosion), but no real property loss.

### 3.    Plaintiff's Response

Plaintiffs object to forcing a winery or business owner to wait for a subsequent trial. These types of damages are not too complex to be included in a first trial.

### C.    Total Number of Plaintiffs

The number of individual plaintiffs will likely be somewhere between 15 and 20 depending upon such factors as the number of wrongful death heirs, any potential loss of consortium case for any injury claim, whether real property or homeownership or tenancy is held in more than one name, whether commercial business owners are single or multiple individuals or businesses, etc.

### D.    Key Characteristics Of Each Plaintiff And Selection Process As Trial Plaintiffs.

### 1.    Plaintiffs' Position

Beyond having sustained their loss within the geographical limits of the specific fire (in this case, Atlas) each of the plaintiffs will represent the holder of a type of damage claim that arises from one of the nine plaintiff categories. Selection of individual plaintiffs holding a relevant cause of action is suggested to be made on a collaborative basis with plaintiffs' counsel providing defendant with a list of three or four suitable persons in each category who are fit to serve as a representative trial plaintiff, with supporting damage data and verification to validate their selection. Plaintiffs and defendant can collaboratively select two or three persons in each category to make certain that as the trial date approaches, should any individual claim be settled another suitable plaintiff holding the same type of right or claim can be slotted into the vacated category. In this way suitable backup plaintiffs will be available, and when the matter proceeds to trial, there will be plaintiffs to fill each of the categories. As far as timing and selection, the process for plaintiff designation and selection can begin 30 days after the court determines which of the fires will be the first to proceed to trial.

Individual Plaintiffs propose that cases representative of the nine categories of damages set forth above be tried in a unitary trial as bellwether cases. Initially, Plaintiffs would submit to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1  Defendants the names of not more than 5 cases which they believe are representative of each of

2  the nine types of damage embraced within each of the categories identified. Plaintiffs' submission

3  would include a brief description of the damages asserted within each category and the basis on

4  which they assert that the case is representative. Defendants would have two weeks to review the

5  submission and respond by indicating their acceptance or rejection and explain why a case is not

6  acceptable. Plaintiffs similarly would have one week to review Defendants' response and either

7  provide alternative plaintiff(s) or submit additional reasons to justify inclusion of an existing

8  plaintiff. In the event the parties cannot reach an agreement at the conclusion of the two-week

9  process, the parties would then submit their respective lists of bellwether cases to which they

10 could not agree to the court. The court will make the final decision on which cases are selected for

11 conducting damages discovery and trial. The goal is to select a sufficient number of cases for trial

12 so that multiple clients' cases (3-4) are trial ready within each category. Should the first case in the

13 category resolved by settlement prior to the date of trial, a second backup case would be ready to

14 take its place. Should the first and second cases resolve by settlement, a third case would be trial

15 ready.

16        **2.     PG&E's Position**

17        PG&E agrees with Plaintiffs' proposal, except that PG&E believes it should also be

18 permitted to propose a limited number of Plaintiffs (no more than three in each category) during

19 the meet and confer process if it so chooses.

20    **E.     Estimated Number Of Witnesses**

21        **1.     Plaintiffs' Position**

22        The estimated number of witnesses will be influenced by any pretrial stipulations on the

23 part of the defendant regarding both damage and issues, including of cause and origin, or other

24 agreed-upon facts.

25        Such stipulations have not as yet been discussed. Therefore, the following chart

26 contemplates a trial of the <u>Atlas</u> fire wherein all of the evidence is required to be produced absent

27 stipulated agreement, and the legal theories of liability which have been pleaded are fully litigated,

28 including inverse condemnation, negligence, trespass, nuisance, damages under PUC § 2106, and

conduct warranting punitive damages pursuant to Civil Code section 3294. Further, this witness

graph assumes that all damage theories including economic and noneconomic damages for

personal injury, wrongful death and emotional distress; economic damages for loss of real

property and personal property; economic damages for loss of use and/or loss of enjoyment of real

property; and economic damages for loss to business operations, vineyard operations, and punitive

damages are proved by the testimony of witnesses or the introduction of documentary evidence, in

the absence of agreement, stipulation, judicial notice or other method of proof.

## PLAINTIFFS' DRAFT TRIAL ESTIMATE

| BASIC FACTS – CAUSATION | |
|---|---|
| **WITNESS** | **TIME ESTIMATE[6]** |
| • Cal Fire Investigating Officer(s) to Describe Physical Evidence Supporting Tree-Line Contact (2-3 Witnesses). | 1 Hour Each 2.5-3.0 Hours |
| • Cal Fire Experts to Describe Physical Evidence of Tree Condition and Opinion of Cause of Tree-Line Contact (2-3 Experts from Cal Fire). | 1 Hour Each 2.5-3.0 Hours |
| • Eyewitness Testimony, If Any, Supporting Origin of Fire. | 30-45 Minutes |
| | **5.50-6.75 Total Hours** |

| PG&E WITNESSES | |
|---|---|
| **SUBJECT: Training & Qualifications of Third Party Tree Inspectors (Contract Utility Foresters)** | |
| **WITNESS** | **TIME ESTIMATE** |
| • PG&E PMK Regarding Hazard Tree Rating System Used to Identify Potential Risk of Tree Contacting Electrical Line. | 1.5 Hours |
| • Supervising Vegetation Program Manager: To Establish Wither Performance Criteria for Tree inspection s Within the District and Region Where Fire Originated Were Satisfied (Possibly 3 Witnesses) | 1 Hour Each 3 Hours |
| • PG&E Vegetation Inspection Contract Manager(s) to Establish Whether Qualification of Tree Inspectors Were Satisfied. | 1.5 – 2 Hours |
| • PG&E Quality Control Project Manager(s) to Establish Knowledge of Deficiencies in Tree Inspections by Third Party Contractors. | 3.0 -3.5 Hours |

_____

[6] All time estimates include direct and cross.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

| | PG&E WITNESSES | |
|---|---|---|
| | **Subject: Failure of PG&E Managing Agents to Manage Wildfire Risk** | |
| | **WITNESS** | **TIME ESTIMATE** |
| • | PG&E Director Risk Management For Compliance of Vegetation Management Standards to Establish Whether Tree Clearance From Electrical Lines Met Requirements. | 3.0-3.5 Hours |
| • | PG&E Director Risk Management to Establish Process for Identification & Removal of Hazard Trees. | 3.0-3.5 Hours |
| • | PG&E Operations Manager Vegetation Management to Establish Historical Process for Evaluating Effectiveness of Measure to Manage Risk of Wildfire. | 3.0-3.5 Hours |
| • | PG&E Program Manager(s) Vegetation Management to Establish Continued Failures for Managing Wildfire Risk. Years 2000-2017. (3 or More Witnesses to Cover Years Indicated) | 3.0-3.5 Hours |
| • | PG&E Program Managers For Public Safety & Reliability ("PS&R"). | 2.0-2.5 Hours |
| • | PG&E Manager for Governance & Support re: Budgets for Vegetation Management Historically and Through the Date of This Incident. | 2.0-2.5 Hours |
| • | PG&E Senior Compliance Specialist re: (1) Quality Assurance Audits; (2) Vegetation Management Incentive Program; (3) CPUC Fines & Penalties. | 3.0-3.5 Hours |
| • | PG&E Senior Manager, Vegetation Management of Operations re: Process for Assessment of Wildfire Risk. | 3.0-3.5 Hours |
| • | PG&E Quality Assurance Specialist to Identify Processes & Procedure for Evaluating Effectiveness of Inspections of Trees to Meet Compliance Standards & Identify Hazard Trees. | 3.0-3.5 Hours |
| • | PG&E PMK re: Process and Use of LiDAR Data for Inspections of Trees in the Area of Fire origin and Reports Related Thereto. | 2.0-2.5 Hours |
| | | **31-36 Total Hours** |
| | **SUBJECT: Corporate Disregard for Management of Wildfire Risk** | |
| | **WITNESS** | **TIME ESTIMATE** |
| • | Director(s) of Risk Management & Compliance, Vegetation Management to Evaluate Effectiveness of Mitigation Measures PG&E Relied Upon to Manage Wildfire Risk. | 3.0-3.5 Hours |
| • | Vice President Electric Strategy and Asset Management to Establish Whether Policies & Processes to Control Risk of Wildfire Were Audited or Evaluated. | 3.0-3.5 Hours |
| • | PG&E Vice President Electric Distribution to Address Effectiveness of Risk Management Process. | 3.0-3.5 Hours |
| • | CEO PG&E re: Policy for Management of Wildfire Risk. | 2.5 Hours |
| | **SUBJECT: Failure to De-Energize or De-Activate Reclosers** | |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

| PG&E WITNESSES | |
|---|---|
| **WITNESS** | **TIME ESTIMATE** |
| • PG&E PMK re: Role & Responsibility of Emergency Operations Center Activated On or Before October 5, 2017 to Monitor Events Leading Up To October 8, 2017 Fire. | 3.0-3.5 Hours |
| • PG&E PMK re: Policy, Practice & Procedure for Monitoring Weather Conditions in Advance of This Incident. | 2.5-3.0 Hours |
| • PG&E PMK re: Policy, Practice & Procedure for De-Activating Reclosers. | 2.5-3.0 Hours |
| • PG&E PMK re: Failure to De-Activate Reclosers in Advance of October 8, 2017 Events. | 2.5-3.0 Hours |
| • PG&E PMK re: Failure to De-Energize Lines in Advance of October 8, 2017 Events. | 3.0-3.5 Hours |
| • PG&E PMK re: Policy, Practice Or Procedures For De-Energizing Lines, Historical Background Regarding Any Evaluation of This Risk Prevention Measures Prior to This Incident. | 3.0-3.5 Hours |
| | **33-38.5 Total Hours** |

| 3RD PARTY WITNESSES | |
|---|---|
| **WITNESS** | **TIME ESTIMATE** |
| • Supervisor for Tree Inspection Company in Region of Fire Origin to Establish Failure to Satisfy Performance Criteria. | 3.0 -3.5 Hours |
| • Certified Urban Foresters Assigned to Inspect Area of Suspected Fire Origin to Identify Hazard Trees Posing a Threat to Distribution Line. | 2.5-3.0 Hours |
| • Tree Trimmers Assigned to Trim Trees in Area of Suspected Origin of Fire (2-3 Witnesses). | 3.5-4.0 Hours |
| • Tree Inspectors Assigned to Conduct CEMA Foot Patrols (Independent Inspections to Identify Tree Hazards [There are Multiple Individuals Involved in Patrol] {Up to 3}). | 3.0-3.5 Hours |
| | **12–14 Total Hours** |

| EXPERTS | |
|---|---|
| **WITNESS** | **TIME ESTIMATE** |
| • Plaintiffs' Expert re: Arboriculture and Tree Risk Analysis. | 3.0 Hours |
| • Plaintiffs' Expert re: Electrical Accident Investigation, Contact & Causation. | 3.0 Hours |
| • Plaintiffs' Expert re: Fire Cause and Origin. | 3.0 Hours |
| • Plaintiffs' Expert re: Quality Assurance Sampling and Audit Process. | 3.0 Hours |
| • Plaintiffs' Expert re: Risk Management Standards for Wildfire Prevention and Mitigation Measures. | 3.0 Hours |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

| | | |
|---|---|---|
| • Plaintiffs' Expert re: Identification of Hazard Trees Through Use of LiDAR Data. | | 3.0 Hours |
| | | **18 Total Hours** |

| **DAMAGES** | |
|---|---|
| **FACT WITNESSES** | |
| **WITNESS** | **TIME ESTIMATE** |
| • Plaintiff(s) <br> - Describe Extent of Economic & Non-Economic Losses | 3.0-3.5 |
| • Fact Witnesses to Corroborate Plaintiffs' Damages (2-3) | 30-45 Minutes Each <br> 1.5-2.0 Hours |
| **EXPERTS** | |
| **WITNESS** | **TIME ESTIMATE** |
| • Plaintiffs' Expert re: Fair Market Value of Property Pre- & Post-Incident. | 2.0 Hours |
| • Plaintiffs' Expert re: Cost to Rebuild Structure(s). | 2.0 Hours |
| • Plaintiffs' Expert re: Cost of Erosion Control Measures, If Any. | 1.5-2.0 Hours |
| • Plaintiffs' Expert re: Loss of Personal Property, if Necessary (No Stipulations). | 1.5-2.0 Hours |
| • Plaintiffs' Expert re: Cost to Restore Lost Vegetation & Amenity Trees. | 1.5-2.0 Hours |
| • Plaintiffs' Expert re: Losses to Vineyards or Loss of Profits to Business Owners. | 1.5-2.0 Hours |
| • Plaintiffs' Expert Economist Wrongful Death, Cost of Future Medical or Mental Health Care, and/or Loss of Earning Capacity. | 1.5-2.0 Hours |
| • Plaintiffs' Medical or Mental Health Care Expert Depending on Claims of Injury or Severe Emotional Distress Claims. | 1.5-2.0 Hours |
| | **17.5 – 21.5 Total Hours** |
| Assuming PG&E Has Same Number of Experts with similar time estimates | **17.5 – 21.5 Total Hours** |
| **GRAND TOTAL OF HOURS FOR PLAINTIFFS:** | **134.5 – 156.25 Hours**[7] |

### 2. PG&E's Position

There are approximately 29 vegetation management-related witnesses that Plaintiffs identify above who would not be necessary for a Tubbs Fire trial. These witnesses alone comprise approximately 69 hours (more than half) of Plaintiffs' proposed trial time. PG&E also disagrees

---

[7] Using 4 hours per day trial estimate is 33.63 – 39 days OR 8-12 weeks including voir dire, opening statement, and closing argument.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1  with many of the estimates provided by Plaintiffs above. For example, PG&E disagrees with

2  Plaintiffs concerning the apparent scope of any Cal Fire testimony. PG&E also believes that at

3  least 3-6 eyewitnesses to the fire would need to testify along with at least 3-4 emergency first

4  responders (which, as noted below, is the same expectation PG&E has with respect to Tubbs).

5  PG&E also disagrees that many of the categories of testimony concerning PG&E systems will be

6  admissible at an Atlas Fire Trial.

7  **PG&E'S DRAFT TRIAL ESTIMATE FOR TUBBS FIRE**

| BASIC FACTS | |
|---|---|
| **WITNESS** | **TIME ESTIMATE[8]** |
| • Caretaker of 1128 Bennett Lane (Alleged Tubbs Origin Point) | 4 Hours |
| • Third Party Witnesses Who Performed Electrical Work at 1128 Bennett Lane (Alleged Tubbs Origin Point) for the Property Owner (2-3 Witnesses) | 4-6 Hours Total |
| • Owners of 1128 Bennett Lane (Alleged Tubbs Origin Point) (2-3 witnesses) | 3-4.5 Hours Total |
| • Eyewitness Testimony Supporting Origin / Spread of Fire (3-6 Witnesses) | 3-6 Hours Total |
| • Emergency First Responders to the Tubbs Fire (3-4 Witnesses) | 3-4 Hours Total |
| • PG&E Employee Who Photographed at 1128 Bennett Lane (Alleged Tubbs Origin Point) Prior to Fire | 1 Hour |
| • PG&E Troubleman Who Responded to Area of 1128 Bennett Lane (Alleged Tubbs Origin Point) | 1 Hour |
| • Individual Plaintiffs (selection from approximately 15 plaintiffs) | 5 Hours Total |
| • Public Entity Witnesses regarding fire response and recovery (2-3 witnesses) | 2-3 Hours Total |
| | **26-34.5 Total Hours** |

| PG&E WITNESSES | |
|---|---|
| Subject: PG&E's Management of Wildfire Risk | |
| **WITNESS** | **TIME ESTIMATE** |
| • PG&E Employee With Oversight of Its Electric Operations Patrols and Inspections | 5 Hours |
| • PG&E Employee Concerning De-Energization & Recloser Protocols | 7 Hours |
| • PG&E Employee With Oversight of Its Emergency Response | 6 Hours |

---

[8] All time estimates include direct and cross.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

| | PG&E WITNESSES | |
|---|---|---|
| | Protocols | |
| | | **19 Total Hours** |

| | EXPERTS | |
|---|---|---|
| | **WITNESS** | **TIME ESTIMATE** |
| • | PG&E Expert re: Electrical Engineering to testify regarding the electrical facilities (PG&E and private) at and around 1128 Bennett Lane and whether such facilities contributed to the Tubbs Fire's ignition | 3 Hours |
| • | PG&E Expert re: Fire Cause and Origin to testify where the Tubbs Fire started and how | 3 Hours |
| • | PG&E Expert re: Metallurgy to testify regarding what the physical elements of metal demonstrates about electrical events | 2 Hours |
| • | PG&E Expert re: Fire Modeling to testify regarding how the Tubbs Fire spread | 2 Hours |
| • | PG&E Expert re: Wind and Weather at Fire Location to testify regarding the wind speeds and weather at and around 1128 Bennett Lane on October 8, 2017 | 2 Hour |
| • | PG&E Expert re: Climate Change to testify regarding the effects of climate change on Northern California, particularly as it relates to increased wildfire risk | 3 Hours |
| • | PG&E Expert re: Electrical Systems to testify regarding various programs used by utility companies, such as reclosers and de-energization protocols | 3 Hours |
| • | PG&E Expert re: LiDAR / Video Expert to testify regarding analysis of video footage of the Tubbs Fire | 1.5 Hours |
| | | **19.5 Total Hours** |
| | Assuming Plaintiffs Have Same Number of Experts with similar time estimates | **19.5 Total Hours** |

| | DAMAGES | |
|---|---|---|
| | EXPERTS | |
| | **WITNESS** | **TIME ESTIMATE** |
| • | PG&E Expert re: Fair Market Value of Property Pre- & Post-Incident | 2.0 Hours |
| • | PG&E Expert re: Cost to Rebuild Structure(s) | 2.0 Hours |
| • | PG&E Expert re: Cost of Erosion Control Measures, If Any | 1.5-2.0 Hours |
| • | PG&E Expert re: Loss of Personal Property, if Necessary | 1.5-2.0 Hours |
| • | PG&E Expert re: Cost to Restore Lost Vegetation & Amenity Trees | 1.5-2.0 Hours |
| • | PG&E Expert Economist Wrongful Death, Cost of Future | 1.5-2.0 Hours |

| | | |
|---|---|---|
| Medical or Mental Health Care, and/or Loss of Earning Capacity. | | |
| • PG&E Medical or Mental Health Care Expert Depending on Claims of Injury or Severe Emotional Distress Claims. | 1.5-2.0 Hours | |
| | **11.5-14 Total Hours** | |
| Assuming Plaintiffs Have Same Number of Experts with similar time estimates | **11.5-14 Total Hours** | |
| **GRAND TOTAL OF Hours:** | **107-120 Hours[9]** | |

**F.** **Estimated Number Of Days For Trial Accounting For Cross-Examination**

**1.** **Plaintiffs' Position**

Plaintiffs estimate that the trial of the cases described herein will take 6 to 8 weeks, including voir dire, opening statement, final argument and jury deliberation, assuming that all issues relating to liability and damages are fully tried without any stipulation as to cause and origin or fault or nature and extent of damages.

**2.** **PG&E's Position**

PG&E anticipates that a Tubbs Fire trial would last approximately five to seven weeks, including voir dire, opening statement, closing argument and jury deliberation.

**G.** **Proposed Trial Date And Discovery Cut-Off For Trial Cases**

**1.** **Plaintiffs' Position**

Assuming the ESI production is largely completed by the third week of December, Plaintiffs believe that an appropriate trial date for the first trial of these cases is August 19, 2019.

Plaintiffs propose that factual discovery be closed for the August 19, 2019 trial 90 days prior to the trial date. Plaintiffs additionally propose that expert disclosure take place 80 days, rather than the statutory 50 days prior to trial, and that supplemental experts be disclosed 60, rather than 30 days before trial, with expert discovery concluding 25 days prior to trial.

**2.** **PG&E's Position**

PG&E is continuing to assess the progress of its back-up tape restoration. Those back-ups

---

[9] Using 4 hours per day, PG&E's trial estimate is 26.75-30 trial days or approximately 4-6 weeks for trial witness time. PG&E also estimates 1 additional week would be necessary for voir dire, opening statement and closing argument.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

comprise approximately 1.3 Petabytes of data (over 1,000,000 gigabytes, which is approximately one-half of the data in all United States academic research libraries combined). PG&E is employing a vendor called Index Engines to assist in this restoration, using their proprietary software to index the contents of the back-up tapes and restore the snapshots of mailboxes for the 121 agreed custodians that were taken by the company approximately twice yearly going back to 2010.

At this time, PG&E has only been able to extract the relevant data from a little over one-third of the tapes, although PG&E started restoring its back-up tapes even before the parties had agreed custodians. PG&E has been backing up the mailboxes of every employee going back to 2010 on virtual tapes, and these mailboxes are distributed in such a way that the back-ups for all employees must be indexed in order to locate the mailboxes for the 121 agreed custodians. The process has been significantly slower than expected for two reasons: (1) the volume of data requiring indexing has been significantly larger due to the distributed manner in which the company stores email back-ups (requiring indexing of nearly all of the company's back-up tapes); and (2) the pace at which the company has been able to index this immense volume has been slower than expected. PG&E and its vendors have been exploring various options to try to address the second issue (unfortunately nothing can be done with respect to the first). At this time, it does not appear the chances of success are high.

PG&E therefore believes that it will be substantially complete with document production by February 15, 2019. Accordingly, PG&E proposes that an appropriate trial date is September 23, 2019.

PG&E proposes that document discovery close March 1, 2019 and that fact depositions be closed for the September 23, 2019 trial 90 days prior to the trial date. After March 1, 2019, Plaintiffs will be able to serve additional document discovery only for good cause shown.

PG&E agrees with Plaintiffs that expert disclosure should not follow the schedule and procedure set forth in the code. Plaintiffs have proposed that expert disclosure take place 80 days prior to trial, and that supplemental experts be disclosed 60 days before trial, with expert discovery concluding 25 days prior to trial. PG&E does not believe this is sufficient given the expected

number of experts and the significance of this matter and the expert testimony to the core issues that will be tried. Accordingly, PG&E proposes that the parties exchange formal expert reports, rather than just disclosures of expert names and general topics. This approach will minimize surprise at trial, allowing the parties to streamline the presentation of evidence and present any motions concerning expert testimony in advance of trial so as to avoid disrupting the trial and wasting jury time. PG&E proposes that opening reports be exchanged 100 days prior to trial, supplemental reports be exchanged 70 days prior to trial and all expert depositions be conducted between 70 days prior to trial and 30 days prior to trial.

### 3.    Plaintiff's Response

PG&E has now again extended the deadline for substantial completion of document discovery. The notion that document discovery would close two weeks later (absent good cause) makes no sense. Given the pace of productions thus far, it will take longer than two weeks for PG&E to produce a privilege log, identify which responses to document requests are complete, or otherwise identify which materials respond to which specific request. There is no sound basis to cutoff discovery, particularly on documents, any sooner than 90 days before trial.

Expert reports are neither authorized by Code nor necessary here. The expert discovery statutes (CCP 2034.010 et seq.) and accompanying declarations provide ample notice of the substance, basis and anticipated scope of expert testimony. Disclosing experts 80 days prior to trial addresses any concerns PG&E has outlined above. Written reports do nothing more than compress the amount of time plaintiffs will have to fairly complete their liability discovery, the majority of which rests in the hands of PG&E.

### H.    Proposed County For Trial

#### 1.    Plaintiffs' Position

Plaintiffs submit that the San Francisco Superior Court is the appropriate venue for trials in these cases. This Court is best equipped in terms of resources, and the potential venire is likely to contain fewer individuals who have personal knowledge or experience with the fires.

As a practical matter, because Napa County (the only other appropriate venue for the Atlas fire) is relatively small, there will be great difficulty with jury selection. A majority of the county's

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1   residents were negatively affected by the fire and judges and court staff may also have been
2   negatively affected or have suffered injury or property losses. The difficulty with finding an
3   impartial jury in Napa County for the Atlas fire could potentially extend the process of jury voir
4   for a period of weeks. A similar problem arises with relocating any trial of the Tubbs or Redwood
5   or other Sonoma-based fires to Sonoma County where tens of thousands of potential jurors have
6   been impacted – and most residents of the county, whether actual victims or not, have been
7   personally impacted. Victims' friends, neighbors and others have all heard and seen much of the
8   tragedy. San Francisco is an appropriate venue since it is where the defendant is located, has more
9   judges, courtrooms and support staff than the other venues, and has the resources to manage
10  complex litigation such as this.

11          Whether the matter proceeds in department 304 or whether department 304 manages the
12  case(s) up to and through case assignment via master calendar or single assignment to a specified
13  judge upon agreement of the parties is agreeable to Plaintiffs.

14                  **2.      PG&E's Position**

15          PG&E believes that the Tubbs Fire trial ought to occur in Sonoma County.[10] As described
16  above, there were thousands of homes destroyed in the Tubbs Fire. The overwhelming majority of
17  those homes were in the Sonoma County. Although there is no dispute that the Tubbs Fire started
18  in Napa County and Napa County was impacted, the Tubbs Fire was primarily a Sonoma County
19  event. Sonoma County residents experienced the aftermath of the Tubbs Fire and have watched as
20  their community has tried to recover from the tragedy over the past year. Sonoma County and its
21  residents therefore deserve the opportunity to resolve the question of liability. (Cal. Civ. Proc.
22  § 395(a) ("if the action is for injury to person or personal property or for death from wrongful act
23  or negligence" the superior court in either the county where the injury occurs or the injury causing
24  death is a proper venue).) Contrary to Plaintiffs' assertion, PG&E does not believe that San
25  Francisco residents' lack of personal knowledge or experience with the North Bay Fires is a

---

[10] To the extent the Court agrees with Plaintiffs and not PG&E regarding Plaintiffs' proposal that
an Atlas Fire case be tried first, PG&E requests that an Atlas Fire bellwether trial be held in Napa
County, which is where the overwhelming majority of the damage occurred.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1   positive attribute.

2        As PG&E stated at prior conferences, it believes that it would be efficient for the Court to

3   preside over the trial in either Sonoma or Napa County to the extent that the Court is able and

4   available to do so. Presiding over the trial in a county other than San Francisco is within this

5   Court's discretion. (*See* California Rule of Court 3.541(b)(2) (coordination trial judge may

6   "schedule and conduct…a trial or trials at any site within this state that the judge deems

7   appropriate"); *Keenan v. Superior Court*, 111 Cal. App. 3d 336, 341, 343 (1980) ("coordination

8   judge is not to be constrained by the preexisting law relating to the place of trials" and shall have

9   "broad discretion to conduct proceedings in various places as may be appropriate").) To the extent

10  that this Court will not preside over the trial in either Sonoma or Napa County, PG&E requests

11  that a judge in one of those counties be assigned as the trial judge. PG&E would object to

12  proceeding with the master calendar or single assignment approach in Department 304.

13       As this Court recognized, it has the authority to transfer a case to another jurisdiction for

14  trial. (2/27/2018 Tr. at 29:3-13 ("The Court: If [the Plaintiffs] file here in the first instance – let's

15  say both Napa County and San Francisco are proper. We could encourage – in the case of the draft

16  case management order that you're going to provide, we can encourage them to file here in the

17  first instance, I would think, just to make life easier for everybody and probably to lower costs.

18  And if they did so, I don't think it would prevent me, for example, from sending the case to Napa

19  County for a trial if it turns out that's the right thing to do for a wide variety of reasons").)

20  Plaintiffs' Leadership has already agreed that they would "have no problem" with that. (*Id.* at

21  29:16-23.) The county primarily affected by the Tubbs Fire, Sonoma, is the appropriate venue for

22  any Tubbs Fire case to be tried, and the Court should transfer the Tubbs Fire bellwether trial

23  accordingly.

24            **3.      Plaintiff's Response**

25       An initial trial in either Sonoma or Napa Counties would be far more difficult to complete

26  on the basis of logistics alone.

27       There is a practical reason these cases were assigned to San Francisco. The Judicial

28  Council has determined this Court has the resources to enable the best chances of a trial moving

1    forward on schedule.

2         Though Plaintiffs are certainly willing to consider subsequent trials in Napa or Sonoma,

3    there is no good reason to add a layer of complexity by transferring venue for the first trial in these

4    proceedings.

5    **II.**      **GENERAL DISCOVERY CUT-OFF**

6         **A.**      **Plaintiffs' Position**

7         Plaintiffs believe a generic overall discovery cut-off is not appropriate at this time.

8    Liability discovery is continuing and proceeding on several tracks. The facts, evidence and

9    documents relating to liability discovery are outside of the parties control given governmental

10    investigations. There cannot be a liability discovery cut off until such time as the relevant facts,

11    documents and evidence is available, the parties can complete the deposition and fact discovery

12    relating to each fire and the Court rules on course and scope.

13         **B.**      **PG&E's Position**

14         As stated above, PG&E proposes that fact document discovery close March 1, 2019 and

15    that fact depositions be closed for the September 23, 2019 trial 90 days prior to the trial date. As

16    Plaintiffs stated at the September 21 Case Management Conference, "corporate discovery" (*i.e.*,

17    non-fire related discovery) cannot begin until PG&E substantially completes document

18    production. PG&E therefore believes that there must be a date by which Plaintiffs have to serve all

19    Requests for Production (absent good cause) as well as a date by which PG&E must substantially

20    complete production of documents responsive to those requests. PG&E agrees, of course, that

21    Plaintiffs may serve additional Requests for Production after that date where they can demonstrate

22    good cause.

23         **C.**      **Plaintiffs' Response**

24         It is premature to discuss a liability fact discovery cut off, either generally or specifically as

25    to one fire. At this stage, PG&E still has not completed document productions responsive to

26    requests that Plaintiffs propounded on March 12, 2018. Production has been rolling, titrated, and

27    transmitted in a manner that has confounded Plaintiffs' efforts to understand when various

28    productions are complete, and which documents are responsive to which requests.

Plaintiffs can address specifics at the hearing, including the meet and confer efforts which have been ongoing and exhaustive. Just last week, Plaintiffs' e-discovery vendor transmitted to Plaintiffs a letter explaining that the manner, cadence, and composition of PG&E's productions are so outside the boundaries of industry expectations and norms, that processing these productions for review has proven to be an unusually challenging and time consuming project. Plaintiffs have since forwarded this letter to PG&E's counsel for yet a further round of meet and confer conversations.

While the parties have made some progress in addressing issues with PG&E's document productions, there is no way PG&E can today provide a reliable date upon which responsive document productions will be substantially complete, followed by a document request cutoff two weeks after that date.

Finally, this is a JCCP, not a single case event, involving tens of thousands of plaintiffs. The evidence is going to advance over time. An all-encompassing liability fact discovery cut off connected with the first trial makes no sense in the context of a large coordinated action.

**III.    PREFERENCE TRIAL SETTING**

The parties are negotiating a protocol for preference trial settings.

**IV.    PROCEDURES TO REFINE LEGAL ISSUES**

**A.    Early Instruction Conference**

The parties agree that the Court should have an early jury instruction conference once a case is set for trial.

**B.    Summary Judgment or Adjudication, Early *In Limine* Motions or Motions Under Cal. Code Proc. § 437(c)t)**

The parties also agree that there are certain issues that should be appropriately addressed through summary judgment or adjudication, early *in limine* motions or motions under Cal. Code Proc. § 437(c)(t). Those issues could include, for example:

- whether punitive damages are available against PG&E;
- whether fire constitutes a trespass sufficient to trigger double damages pursuant to Civil Code Section 3346;

- whether any Cal Fire report should be excluded;

- whether prior wildfire incidents should be excluded;

- whether PG&E's policies or practices that are unrelated to programs at issue with respect to the relevant fire should be excluded;

- whether evidence concerning PG&E executive compensation and bonuses should be excluded; and

- whether lay witnesses should be permitted to offer medical opinion testimony.

The parties will continue to meet and confer regarding how issues of inverse condemnation will be resolved.

The parties do not believe that a bench trial or bifurcated trial on any issues would be appropriate or efficient. The parties do believe that it would be useful to the Court, to the parties and, to the extent another judge ultimately tries the bellwether trial, to that judge, to have early resolution by this Court of critical evidentiary issues.

## V.    INDIVIDUAL ISSUES SURROUNDING DIRECT ACTION PLAINTIFFS

CMO 2 states, "The parties agree to have lead plaintiffs' counsel obtain responses from all plaintiffs to the questions, in effect: (i) if they saw what could have been the ignition of a fire, or (ii) know of someone who may have done so, or said they did. No verified responses are required." The plaintiffs provided PG&E both an updated account of plaintiffs' compliance with CMO 2 and separate witness reports organized by fire.

### A.    CMO 2 – Compliance Report

Since the September 17, 2018 Case Management Conference, there have been another 500 plaintiffs coordinated into the JCCP. There are now approximately 3167 individual plaintiffs in this JCCP. Individual Plaintiffs' leadership have been working with Brown Greer to ensure compliance and prepare the CMO 2 reports. The plaintiffs have almost 3000 complete responses (94%), with more than 1000 completed in the last 30 days. The remaining cases fall into several categories:

*New Cases*. Because each firm has kept in active communication with Individual Plaintiffs' liaison, the plaintiffs have been able to update the CMO 2 report with most of the new

cases that have come into the JCCP. Obviously, some plaintiffs have not had a sufficient opportunity to respond. Plaintiffs thus propose to update the CMO 2 reports for new cases every sixty (60) days.

*Cases Involving Entities or Trusts.* Obviously, a non-living entity such as a business or a trust cannot be a witness to the ignition of a fire.

*Cases Identified as Non-Responsive or Incomplete.* The plaintiffs' liaisons are working with the few firms left to complete their responses that have been identified as lacking or incomplete. Beyond compliance issues, there are some specific issues that we will need to address. For example, the Franz and Singleton firms have identified a number of individual plaintiffs they cannot locate and are now missing.

**B. CMO 2 – Plaintiffs as Witnesses**

Individual Plaintiffs' leadership has identified plaintiffs who, as of October 15, 2018 claim to have witnessed a fire's ignition. These are plaintiffs (human beings) who currently have provided affirmative responses to the questions posed to them about their personal knowledge. The Plaintiffs' leadership has sorted the individual plaintiffs by fire and has also provided to PG&E addresses for these plaintiffs as well as the law firm representing these plaintiffs.

As noted again on October 1st, only a tiny percentage of individuals who have filed lawsuits claim to have witnessed ignition of a fire or claim to know someone who claims to have witnessed a fire's ignition. Plaintiffs are providing to PG&E a supplemental report on addresses. Also, there are plaintiffs who at first reasonably said "yes" but either the plaintiff initially misinterpreted the question, the firm did not correctly enter the data, or the plaintiff did not claim to witness the actual ignition. Plaintiffs are providing that list to PG&E as well.

**C. CMO 2 – Witnesses Identified by Plaintiffs**

The Plaintiffs' leadership has also provided a report to PG&E that identifies those plaintiffs (human beings) who provided affirmative responses with respect to third-party witnesses. The leadership has sorted the individual plaintiffs who provided affirmative responses by fire and has also provided to PG&E the addresses for these witnesses and the law firm representing these plaintiffs. Most of these witnesses are represented by counsel, and Plaintiffs

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

have requested that PG&E not contact these individuals directly. The parties are meeting and conferring regarding further discovery.

**D.     Production of Damage Information**

**1.     Plaintiffs' Position**

Although case specific individual damage discovery is stayed under CMO 1, the parties have commenced discussions regarding methods by which Plaintiffs can gather case specific damage related information and promptly present it to PG&E without overwhelming the individual plaintiffs with formal case specific discovery. The CMO 2 voluntary process worked with the assistance of Brown Greer. The first step in this process is for each plaintiff to confirm through Plaintiffs' leadership the categories of damage claims stated court ordered Notice of Adoption. The parties will report more on this process at the status conference.

**2.     PG&E's Position**

The more than 100 cases that are still out of compliance belong to the Frantz Law Group, APLC and the Singleton Law Firm. Frantz Law Group has the vast majority of the cases. These Plaintiffs appear to have either become non-responsive or decided not to pursue their cases. These cases should be dismissed for failure to prosecute and failure to comply with this Court's Order.

PG&E is working with Plaintiffs' Leadership on the voluntary production of damage information as set forth above.

**VI.     MEDIATION**

**A.     Individual Plaintiffs**

The parties have agreed on the selection of a team of two experienced mediators, Judge Daniel Weinstein and Robert Meyer, to facilitate mediation of the Individual Plaintiffs' claims. PG&E and the Individual Plaintiffs are discussing the next steps in the mediation process.

**B.     Subrogation Plaintiffs**

PG&E and the Subrogation Plaintiffs have agreed to mediation. Retired Judge Vaughn R. Walker has been proposed to act as a Mediator. PG&E and the Subrogation Plaintiffs are finalizing the selection of the Mediator and discussing the next steps in the mediation process.

### C. Public Entities

PG&E and the Public Entity Plaintiffs are in the process of selecting a mediator.

## VII. CAL FIRE EVIDENCE

Plaintiffs originally filed a motion to compel production of Cal Fire's investigative reports on August 9, 2018. On August 14, 2018, Plaintiffs' counsel served the Attorney General with subpoenas to inspect the Cal Fire evidence. When Cal Fire filed its opposition to the motion to compel on August 22, Cal Fire made several procedural arguments, including that Plaintiffs had provided insufficient notice due to a confusion in service. Plaintiffs' counsel considered re-noticing the motion, but the earliest possible hearing date per the Code (and Court availability) was September 24th. Since the one-year criminal statute of limitations was set to expire on October 8, 2018, Plaintiffs' counsel decided to reach a compromise with Cal Fire instead.

On August 29, 2018, the Attorney General and Plaintiffs' counsel agreed that Cal Fire would allow Plaintiffs access to the investigative reports and evidence immediately after October 8, 2018, if no charges were brought by the relevant District Attorney for any county where the specific fire occurred. As part of that agreement, Cal Fire agreed to extend by 180 days the time within which Plaintiffs may enforce their subpoenas for the investigative reports and evidence.

On October 4, 2018, Plaintiffs' counsel was informed that PG&E and the District Attorneys of certain counties including Sonoma, Napa, Mendocino and Lake had entered into tolling agreement related to potential criminal charges, effectively extending the statute of limitations by six months.

Plaintiffs' counsel contacted the Attorney General immediately and was informed that he did not know these agreements had been negotiated. The Attorney General was ultimately provided with a copy of the tolling agreements.

With this material change in circumstances, Plaintiffs' counsel and the Attorney General started new negotiations which have been ongoing since October 4, 2018, including many layers of involved bureaucracy.

On October 12th, Plaintiffs' counsel and the Attorney General agreed to the following:

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955

1.    Cal Fire will produce the investigative reports and evidence from the *unreferred fires* and any fire that has been resolved through a settlement (*e.g.*, the Honey Fire). The evidence will be turned over to all parties in this case pursuant to a stipulation related to the storage location and a protocol. PG&E has also agreed to enter into this stipulation with Plaintiffs.

2.    Cal Fire is currently working to provide deposition dates for the investigators of the *unreferred fires*. The Attorney General represented to Plaintiffs' counsel that he expects there to be depositions going forward in late October and early November.

3.    Cal Fire will not block any evidence inspections or disclosure of reports related to *referred fires* if PG&E and Plaintiffs enter into agreements with the District Attorneys for this to happen. PG&E and Plaintiffs are currently working to contact the District Attorneys and negotiate an agreement with the following terms: (1) a nondestructive inspection with both the District Attorneys and Cal Fire present; and (2) production of the investigative reports pursuant to the protective order entered in this case and under a highly confidential designation.

If Plaintiffs and PG&E cannot reach an agreement with the District Attorneys related to the reports and/or evidence for the unreferred fires, then the parties intend to file a joint motion to compel.

Dated: October 22, 2018          WALKUP, MELODIA, KELLY & SCHOENBERGER

By:         */s/ Michael A. Kelly*
             MICHAEL A. KELLY
             Attorneys for Individual Plaintiffs

Dated: October 22, 2018          BERGER KAHN

By:         */s/ Craig Simon*
             CRAIG SIMON
             Attorneys for Subrogation Plaintiffs

| | |
|---|---|
| 1 | Dated: October 22, 2018          BARON & BUDD |
| 2 | |
| 3 | By: _____/s/ Scott Summy_____ |
| 4 | SCOTT SUMMY (admitted *pro hac vice*) |
| 5 | Attorneys for Public Entity Plaintiffs |
| 6 | Dated: October 22, 2018          CRAVATH, SWAINE & MOORE LLP |
| 7 | |
| 8 | By: _____/s/ Kevin J. Orsini_____ |
| 9 | KEVIN J. ORSINI |
| 10 | Attorneys for Defendants Pacific Gas & Electric Company and PG&E Corporation |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT - JCCP No. 4955