1                  UNITED STATES BANKRUPTCY COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                        -oOo-

4    In Re:                    ) Case No. 19-30088
                                ) Chapter 11

5    PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY      ) San Francisco, California

6                             ) Friday, August 9, 2019
                    Debtors. ) 11:30 AM

7    _____ )
                             MOTION OF DEBTORS PURSUANT TO

8                             11 U.S.C. SECTIONS 363 AND
                             105(a) FOR AN ORDER APPROVING

9                             TERMS OF EMPLOYMENT FOR NEW
                             CHIEF EXECUTIVE OFFICER AND

10                             PRESIDENT OF PG&E CORPORATION
                             [2662]

11

12                             MOTION OF DEBTORS PURSUANT TO
                             11 U.S.C. SECTIONS 105(a),

13                             363(b), AND 503(c) FOR ENTRY
                             OF AN ORDER (I) APPROVING

14                             DEBTORS' INCENTIVE PROGRAM
                             FOR CERTAIN KEY EMPLOYEES AND

15                             (II) GRANTING RELATED RELIEF
                             [2664]

16                   TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE DENNIS MONTALI

17              UNITED STATES BANKRUPTCY JUDGE

18    APPEARANCES:
    For the Debtors:         JESSICA LIOU, ESQ.

19                         RICHARD W. SLACK, ESQ.
                         STEPHEN KAROTKIN, ESQ.

20                         Weil, Gotshal & Manges LLP
                         767 Fifth Avenue

21                         New York, NY 10153
                         (212)310-8350

22                         JANE KIM, ESQ.

23                         Keller & Benvenutti LLP
                         650 California Street

24                         Suite 1900
                         San Francisco, CA 94108

25                         (415)364-6793

1    APPEARANCES (Continued):

2    For California Public       ALAN W. KORNBERG, ESQ.
     Utilities Commission:       BRIAN S. HERMANN, ESQ.
3                                 (Telephonically)
                                 Paul, Weiss, Rifkind, Wharton &
4                                Garrison LLP
                                 1285 Avenue of the Americas
5                                New York, NY 10019
                                 (212)373-3000

6
     For the Governor's Office: NANCY A. MITCHELL, ESQ.
7                                 O'Melveny & Myers
                                 1999 Avenue of the Stars
8                                8th floor
                                 Los Angeles, CA 90067
9                                (310)533-6700

10   For Official Creditors'     GREGORY A. BRAY, ESQ.
     Committee:                  Milbank LLP
11                                2029 Century Park East
                                 33rd Floor
12                               Los Angeles, CA 90067
                                 (424)386-4000

13
     For Official Committee of   CECILY A. DUMAS, ESQ.
14   Tort Claimants:             (Telephonically)
                                  Baker & Hostetler LLP
15                               11601 Wilshire Boulevard
                                 Suite 1400
16                               Los Angeles, CA 90025
                                 (310)820-8800

17
     For Ad Hoc Noteholders'     ABID QURESHI, ESQ.
18   Committee:                  MICHAEL S. STAMER, ESQ.
                                  Akin Gump Strauss Hauer & Feld LLP
19                               1999 Avenue of the Stars
                                 Suite 600
20                               Los Angeles, CA 90067
                                 (310)229-1000

21
     For Ad Hoc Group of         MATHEW A. FELDMAN, ESQ.
22   Subrogation:                (Telephonically)
                                  Willkie Farr & Gallagher LLP
23                               787 Seventh Avenue
                                 New York, NY 10019
24                               (212)728-8651

25

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 2 of
118

```
 1   APPEARANCES (Continued):

 2   For the Utility Reform      ROBERT G. HARRIS, ESQ.
     Network (TURN):            Binder & Malter LLP
 3                              2775 Park Ave
                                Santa Clara, CA 95050
 4                              (408)295-1700

 5   For PG&E Shareholders:      JAMES O. JOHNSTON, ESQ.
                                 Jones Day
 6                              555 California Street
                                26th Floor
 7                              San Francisco, CA 94104
                                (415)626-3939
 8
     For Office of the United   GREG M. ZIPES, ESQ.
 9   States Trustee:            Office of the United States
                                 Trustee
10                              U.S. Federal Office Building
                                Suite 1006
11                              New York, NY 10014
                                (212)510-0500
12
     For the Trustee, BOKF, NA: BETH M. BROWNSTEIN, ESQ.
13                                (Telephonically)
                                Arent Fox LLP
14                              1301 Avenue of the Americas
                                42nd Floor
15                              New York, NY 10019
                                (212)484-3900
16
     For State Farm:            ALLAN S. BRILLIANT, ESQ.
17                               Dechert LLP
                                Three Bryant Park
18                              1095 Avenue of the Americas
                                New York, NY 10036
19                              (212)698-3500

20   For Public Utilities       SANDER L. ESSERMAN, ESQ.
     Impacted by the Wildfires: (Telephonically)
21                              Stutzman, Bromberg, Esserman &
                                 Plifka
22                              2323 Bryan Street
                                Suite 2200
23                              Dallas, Texas 75201
                                (214)969-4910
24

25
```

```
 1   APPEARANCES (Continued):

 2   For HoldCo Lender Group:    AMY CATON, ESQ.
                                  (Telephonically)
 3                               Kramer Levin Naftalis & Frankel
                                 LLP
 4                               1177 Avenue of the Americas
                                 New York, NY 10036
 5                               (212)715-9100

 6   For Sonoma Clean Power      G. LARRY ENGEL, ESQ.
     Authority:                  (Telephonically)
 7                                Engel Law, PC
                                 12116 Horseshoe Lane
 8                               Nevada City, CA 95959
                                 (415)370-5943

 9

10   For JPMorgan Chase:         EREZ E. GILAD, ESQ.
                                  (Telephonically)
11                               Stroock & Stroock & Lavan LLP
                                 180 Maiden Lane
12                               New York, NY 10038
                                 (212)806-5400

13
                                 FRANK A. MEROLA, ESQ.
14                               (Telephonically)
                                 Stroock & Stroock & Lavan LLP
15                               2029 Century Park East
                                 Los Angeles, CA 90067
16                               (310)556-5800

17   For IBEW Local 1245:        BRADLEY C. KNAPP, ESQ.
                                  (Telephonically)
18                               Locke Lord LLP
                                 601 Poydras Street
19                               Suite 2660
                                 New Orleans, LA 70130
20                               (504)558-5100

21   For Severson & Werson:      BERNARD J. KORNBERG, ESQ.
                                  (Telephonically)
22                               Severson & Werson
                                 1 Embarcadero Center
23                               Suite 2600
                                 San Francisco, CA 94111
24                               (415)398-3344

25
```

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 4 of
118

```
 1  APPEARANCES (Continued):

 2  For the Court Claimants:    RICHARD A. MARSHACK, ESQ.
                                 (Telephonically)
 3                               Marshack Hays LLP
                                 870 Roosevelt
 4                               Irvine, CA 92620
                                 (949)333-7777
 5
     For High Speed Rail        PAUL J. PASCUZZI, ESQ.
 6   Authority, California       (Telephonically)
     Resources Board,           Felderstein Fitzgerald Willoughby
 7   California Department of    Pascuzzi & Rios LLP
     Toxic Control, et al.:     500 Capitol Mall
 8                               Suite 2250
                                 Sacramento, CA 95814
 9                               (916)329-7400

10  For Ghost Ship Warehouse:   ESTELA O. PINO, ESQ.
                                 (Telephonically)
11                               Pino & Associates, LLP
                                 Westchester Financial Center
12                               50 Main Street
                                 White Plains, NY 10606
13                               (914)946-0600

14  For Columbus Hill:          PAUL N. SILVERSTEIN, ESQ.
                                 (Telephonically)
15                               Hunton Andrews Kurth LLP
                                 200 Park Avenue
16                               New York, NY 10166
                                 (212)309-1000
17
     For NextEra Energy:        DAVID M. STERN, ESQ.
18                               (Telephonically)
                                 Klee, Tuchin, Bogdanoff & Stern
19                               LLP
                                 1999 Avenue of the Stars
20                               Thirty-Ninth Floor
                                 Los Angeles, CA 90067
21                               (310)407-4000

22  For the Board of            MICHAEL H. TORKIN, ESQ.
     Directors, et al.:          (Telephonically)
23                               Simpson Thacher & Bartlett LLP
                                 425 Lexington Avenue
24                               New York, NY 10017
                                 (212)455-3752
25
```

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 5 of
118

1  APPEARANCES (Continued):

2  For the City and County of EDWARD J. TREDINNICK, ESQ.
   San Francisco:              (Telephonically)
3                              Greene Radovsky Maloney Share &
                               Hennigh LLP
4                              1 Front Street
                               Suite 3200
5                              San Francisco, CA 94111
                               (415)981-1400

6

7

8

9

10

11

12

13

14

15

16

17
   Court Recorder:            JOHN BOLTS
18                            United States Bankruptcy
                              Court
19                            450 Golden Gate Avenue
                              San Francisco, CA 94102
20                            (888)821-7606

21 Transcriber:               COLIN RICHILANO
                              eScribers, LLC
22                            7227 N. 16th Street
                              Suite #207
23                            Phoenix, AZ 85020
                              (973)406-2250

24
   Proceedings recorded by electronic sound recording;
25 transcript provided by transcription service.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 6 of 118

1    SAN FRANCISCO, CALIFORNIA, FRIDAY, AUGUST 9, 2019, 12:02 PM

2                              -oOo-

3       (Call to order of the Court.)

4             THE CLERK:  All rise.

5             THE COURT:  Good morning, everyone.  Or yes.  Or good

6    evening, good afternoon, everyone.  Sorry to keep you waiting.

7    We had a little bit of a traffic jam on the prior calendar.

8             THE CLERK:  Matter of PG&E Corporation.

9             THE COURT:  Shall we start?  I'd like to start with

10   the report on the status conference; is that okay?

11            So just for -- so by my calendar, we have two matters

12   on that were scheduled and continued relating to compensation

13   matters, and then we had the status conference on the report

14   from the Governor's office and CPUC so.

15            We got Mr. Kornberg here, so that means there's

16   something to report, right?

17            MR. A. KORNBERG:  Unfortunately, not enough.  And Your

18   Honor, Ms. Mitchell is also here from the Governor's office.

19            Alan Kornberg from Paul, Weiss, Rifkind, Wharton &

20   Garrison for the California Public Utilities Commission.

21            Your Honor, since we were last here on July 24,

22   advisors for the Governor's office and the CPUC solicited views

23   from the principal parties involved in the various pending

24   exclusivity motions, and we did that before putting pen to

25   paper.  We took into account the parties' perspectives, and

1  then the Governor's office and the CPUC jointly distributed a

2  competing plan proposal protocol to the key parties on

3  Thursday, August 1. We made it abundantly clear that it was a

4  draft for discussion purposes and that nothing was carved in

5  stone. We followed up with numerous calls, meetings, and

6  emails with the parties to solicit their comments and their

7  reactions. And Your Honor, we did receive some very thoughtful

8  responses.

9        Unfortunately, it became very clear very quickly that

10  the single, most controversial issue revolved around the

11  debtors' role in selecting a plan proposal. Frankly, all the

12  other matters seem eminently solvable.

13        There are some parties in this case that take the

14  position that although the debtors are solvent, they should

15  have no role in selecting a plan proposal. And there are other

16  parties that believe that no special governance mechanisms are

17  required or acceptable, despite the unique and challenging

18  circumstances of these cases.

19        THE COURT: Well, by selecting a proposal, I mean, at

20  the moment there is no -- as long as exclusivity's in place,

21  the only selector is the debtor, who is the prospective

22  proponent, right?

23        MR. A. KORNBERG: That's --

24        THE COURT: You mean --

25        MR. A. KORNBERG: -- correct.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 8 of
118

1          THE COURT:  -- if we open it up and one or more

2    competing plans, the issue is who picks the competing plan; is

3    that what you're saying?

4          MR. A. KORNBERG:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. A. KORNBERG:  And again, I'll come back to this.

7          THE COURT:  But don't you think maybe the judge might

8    have a role in that?

9          MR. A. KORNBERG:  Well, Your Honor, but that might be

10   at the end of the process.

11         THE COURT:  Okay.

12         MR. A. KORNBERG:  And that's what's particularly

13   troubling.

14         THE COURT:  Okay.

15         MR. A. KORNBERG:  And by the way, Your Honor, we made

16   that point repeatedly, that if there are competing plans and

17   there's no process for decision making, and there --

18         THE COURT:  Well, the law says that.

19         MR. A. KORNBERG:  Right.

20         THE COURT:  -- if you have -- but even before that,

21   before -- well, you go ahead --

22         MR. A. KORNBERG:  Okay.

23         THE COURT:  -- and I'll give you my thoughts.

24         MR. A. KORNBERG:  So very unfortunately, the PUC sees

25   an apparent unwillingness of some of the parties to engage

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 9 of
118

1    constructively again on --

2         THE COURT:  Yeah.

3         MR. A. KORNBERG:  -- this issue.

4         THE COURT:  No names, though.

5         MR. A. KORNBERG:  No names.

6         THE COURT:  No, no names.

7         MR. A. KORNBERG:  I'm not going to name names, but

8    they know who they are.

9         THE COURT:  But I don't.

10        MR. A. KORNBERG:  And we'll keep it that way, Your

11   Honor.  But that's really the key issue here, which is if we

12   are to select a plan before unleashing a confirmation process,

13   who is the decision maker?

14        The draft protocol that the Governor's office and the

15   PUC disseminated provided for a decision-making process after

16   consultation with key parties-in-interest, which include the

17   Governor's office, the PUC, and the official committees, but

18   there was a breakdown over the issue of the debtors' role in

19   that process.

20        So I was told at one of our meetings that the PUC was

21   being naive about these cases.  Your Honor, I believe the

22   naivete here is with those that want to embark on a risk-laden

23   process without paying sufficient heed to the legislatively

24   mandated deadline for resolution of these cases, and that is

25   June 30, 2020.

1    And Your Honor, there are people that in this process
2    said, well, we're sure the legislature will extend that
3    deadline; I don't know how they have that degree of confidence.
4    It's imperative to find a solution to an extremely complex set
5    of problems that will drive these cases, and we believe that
6    there should be a structure imposed to achieve that goal.

7    And Your Honor, there are a couple things that are
8    worth mentioning.  Everybody knows about what we'll be facing
9    in the Chapter 11 cases.  I think there's going to be a very
10   hotly contested claims resolution process, and you'll hear a
11   lot more about that in the coming days, and we may have three,
12   or potentially more, competing plan proposals that can proceed
13   to confirmation, and everybody knows what the confirmation
14   process looks like when you have competing, contested plans.
15   But that's just the proceedings in this court.

16   I want to remind people that it took approximately six
17   months for the PUC to conduct its approval process for the
18   global settlement and Chapter 11 plan that resolved PG&E 1; six
19   months.

20   THE COURT:  That included the four months mediation,
21   or --

22   MR. A. KORNBERG:  Not including --

23   THE COURT:  -- after?

24   MR. A. KORNBERG:  -- the four-month mediation.

25   THE COURT:  Well, whatever the length was.  It was

1  long.

2           MR. A. KORNBERG:  And Your Honor, that plan and the

3  settlement, because of the mediation, were consensual.  Given

4  the fact-driven, quasi-judicial nature of the CPUC rate

5  proceedings, which require their own evidentiary hearings, we

6  believe that the parties are not paying sufficient attention to

7  how the PUC could go about conducting its public process, and

8  that public process is an essential forum for ratepayer input

9  and protection, which also requires that we make the findings

10  mandated by AB1054.  How would we do that with respect to

11  multiple plans and do that before June 2020?

12           And Your Honor, I'm being very honest, we don't know

13  how that could be accomplished within that timeline.  We will

14  give it a lot of thought.  We will try our hardest.  But this

15  is a somewhat baffling assignment, which is part of the reason

16  that motivated us to get up on the 24th and say, wait a moment.

17  Let's have competition, but let's have competition before we

18  proceed to confirmation.

19           THE COURT:  Well, let me interrupt you again.  And I

20  don't mean to -- you know, when someone says I don't mean to

21  interrupt you, they usually interrupt you.

22           But to some extent, I am a gatekeeper, and maybe not

23  the right one, but if I deny exclusivity, there is only one

24  person who can be the proponent, and that's the debtor, right?

25  If I maintain exclusivity.

1          But then, it seems to me from my point of view, and

2     not even thinking about CPUC or the legislature or any other

3     agency, I have to say, well, what if that plan gets run aground

4     by unconfirmable, and we're months down the road?  So am I

5     right?  If I maintain exclusivity, there's only one plan to

6     debate; isn't that the case?

7          MR. A. KORNBERG:  Your Honor, I think it's a -- that's

8     an undeniably true statement.

9          THE COURT:  Okay.

10          MR. A. KORNBERG:  But the effect of not permitting

11     competing plans at this stage may have the effect of requiring

12     people to actually negotiate.  And maybe the byproduct of

13     that --

14          THE COURT:  No, I understand that.

15          MR. A. KORNBERG:  -- would be one plan that actually

16     works and that gets done by June.

17          THE COURT:  But one of the things that I intended to

18     ask you today, if you didn't report peace breaking out, was to

19     ask you to explain something that I believe you said -- and

20     maybe it was one of the other lawyers, I don't remember -- but

21     I believe you said something like, you don't want there to be

22     chaos.

23          And again, sticking with my little world, it seems to

24     me that I can control a bit of the chaos, at least in a -- if

25     we oversimplify, if I allow a competing plan -- so let's assume

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 13
of 118

1    there are two plans on the table or three, not twenty -- then

2    the next big step is disclosure statement here.  And the Court

3    controls that.  So there could be -- so that sounds like it's

4    complicated and expensive, but it doesn't have to be chaotic

5    because the end result might just be one disclosure statement,

6    and then there's a natural attrition.

7           It seems to me, if you get past that, then the process

8    for soliciting votes can be parallel in multiple plans, and

9    then the law says what to do if there is more than one accepted

10   plan.  Leaving aside what is still difficult and expensive, but

11   maybe not chaotic, is what if there's only one plan left and

12   then there are challenges to confirmation?  That's what we do,

13   is deal with objections to confirmation.

14           MR. A. KORNBERG:  Um-hum.

15           THE COURT:  So it would seem to me that if we had two

16   or three competing plans, the voters would have something to

17   say with the one that would survive that, the Court would have

18   a responsibility of picking out of more than one, and you still

19   have the confirmation battle.  And that's where, again, I'm not

20   suggesting that it wouldn't be difficult and expensive and

21   influenced by the clock ticking for June 30th, but it's not

22   chaotic, in the sense of -- I think it's my role to maintain

23   the non-chaos, at least in the bankruptcy arena.  Am I missing

24   anything --

25           MR. A. KORNBERG:  It's certainly --

1          THE COURT:  -- or oversimplifying?

2          MR. A. KORNBERG:  I think it's a -- I think there may

3   be a little simplification.

4          THE COURT:  Okay.

5          MR. A. KORNBERG:  So --

6          THE COURT:  That's fair.

7          MR. A. KORNBERG:  -- we do agree that there are

8   various points where the Court can be a gatekeeper.  But let's

9   say we get through the disclosure statement process, and we all

10  know the law that says, you don't try confirmation issues at a

11  disclosure statement hearing, other --

12         THE COURT:  I wish everybody would remember that.

13         MR. A. KORNBERG:  And so assume that the plans that

14  are presented are not patently unconfirmable, which is think is

15  the right standard at that point, and let's say we do have two

16  confirmation proceedings teed up.  Of course, that's what we

17  had in PG&E 1, as I'm sure you well remember.

18         THE COURT:  Well, it got meditated.

19         MR. A. KORNBERG:  And there was -- but there was a

20  confirmation trial --

21         THE COURT:  Um-hum.

22         MR. A. KORNBERG:  -- and then we were in the midst of

23  a second confirmation trial, and I didn't look up how long that

24  took.

25         THE COURT:  Forty days, total.

1          MR. A. KORNBERG:  Forty days of --

2          THE COURT:  We counted them.

3          MR. A. KORNBERG:  -- of trial time, Your Honor?

4          THE COURT:  Ms. Brawder (ph.) and I are --

5          MR. A. KORNBERG:  Okay.

6          THE COURT:  -- veterans of it.  I almost said victims.

7          MR. A. KORNBERG:  So that is going to take a while.

8 We'll probably be well into the spring.

9          THE COURT:  No, I understand.

10          MR. A. KORNBERG:  And then we have the additional

11 problem, as I mentioned, which is not your problem, but it is a

12 problem for everyone in this courtroom, which is meanwhile, the

13 CPUC is supposed to be approving a Chapter 11 plan.

14          THE COURT:  Well, that was really my question to

15 you --

16          MR. A. KORNBERG:  Yes.

17          THE COURT:  -- does it have to be sequential, or can

18 it be parallel?  In other words, just suppose we got past the

19 first, next round and we had competing plans that are out for

20 consideration by the voting masses, which really are two

21 classes as I see it, in at least the plans that have been

22 suggested.  Does the CPUC have to wait, or can it start its

23 process?

24          MR. A. KORNBERG:  Our view is that we have to know the

25 plan that we're being asked to approve.

1      THE COURT:  So it's kind of linear?

2      MR. A. KORNBERG:  Yes.

3      THE COURT:  The bankruptcy court has to, what,

4  complete the confirmation before the CPUC can make the final

5  rule?

6      MR. A. KORNBERG:  Yes.  I mean --

7      THE COURT:  Okay.

8      MR. A. KORNBERG:  -- Your Honor, because I should

9  really mention this.  The PUC's proceedings, for those that are

10  not aware, are very fact driven.

11      THE COURT:  No --

12      MR. A. KORNBERG:  They're --

13      THE COURT:  -- I know they are.

14      MR. A. KORNBERG:  -- quasi-judicial.  There will be

15  lots of detailed testimony about issues involving billions of

16  dollars of rates.  There's the opportunity to cross-examine

17  financial advisors and the like --

18      THE COURT:  No, yeah, I know.

19      MR. A. KORNBERG:  -- and to do that with respect to a

20  plan that may never see the light of day, and also just getting

21  the timeline for those proceedings, we are kind of scratching

22  our heads at the PUC to see whether --

23      THE COURT:  Okay.

24      MR. A. KORNBERG:  -- that's possible.

25      THE COURT:  So leave aside the June 30 deadline that

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 17
of 118

1    the Governor and the legislators have set, and without

2    speculating on whether that's in concrete or fluid, you're

3    saying that if we had a traditional bankruptcy situation where

4    the disclosure statements are behind us, whether there's one or

5    multiple, leave that aside, and we're now at a point where Plan

6    A and Plan B are out for vote, that as we know, those

7    situations don't happen very often, but the voters, really,

8    tell us which one gets past the next gate.

9          MR. A. KORNBERG:  Um-hum.

10         THE COURT:  And if both get past that next gate, I

11   believe at some point -- I forget whether you have to deal with

12   objections first or not, but the Court at some point has to

13   make the call on which one to select.

14         You're telling me that at least the CPUC couldn't

15   finish its job, and maybe couldn't even start its job, until

16   we're down to one survivor?

17         MR. A. KORNBERG:  Well, I can't answer the detailed

18   questions.  What I've been told --

19         THE COURT:  Yeah.

20         MR. A. KORNBERG:  -- is that we really have to know

21   what plan it will be.  Whether you could start the process

22   without full knowledge of that, I don't know.

23         But Your Honor, the idea that we had, and the

24   Governor's office and the PUC were promoting was, instead of

25   waiting until the very -- let's say we have multiple,

1  confirmable plans.  Rather than waiting until the bitter end
2  for Your Honor to decide unilaterally which is in the best
3  interest -- assuming that they were voted on, rather than Your
4  Honor deciding that at the end, could we have a process at the
5  outset to make that determination, with the opportunity for
6  people that were unhappy with this decision to come back and
7  say, I want you to terminate exclusivity, notwithstanding the
8  process that's embarked upon here.  And that was the issue that
9  we really couldn't seem to resolve.

10          And without being unduly negative today, although I
11  was accused of that already this morning, we really could not
12  get the parties to listen to each other on this governance
13  issue.  There are people here that believe Your Honor is going
14  to terminate exclusivity and that they're going to get what
15  they want, and our answer to that is, of course, even getting
16  what you want may not be a pure victory if we end up with a
17  process that extends beyond June.

18          THE COURT:  Right.

19          MR. A. KORNBERG:  And again, there are other people
20  that think that June deadline is not really a real deadline,
21  and I'm not sure the basis for that, so I'm afraid that our
22  failure in our effort, and there was a lot of hard work put
23  into it, doesn't really bode very well for these cases, unless
24  there's some significant change in approach.  And the
25  Commission will do whatever it can to make that happen, but we

1  believe that people really need to think about the June
2  deadline and how we're going to make it, particularly if
3  there's several positive and constructive plan proposals on the
4  table.

5          THE COURT:  Well, I'm having a little trouble knowing
6  what's the best message you're sending me, and maybe your role
7  today is not to send me a message at all, because my job is to
8  decide what I have to decide next week on whether I let one or
9  two, or more than that, plans compete with the debtors' plan,
10  which hasn't seen the light of -- I haven't seen, but I've been
11  told that it might be there.  And so I can't do anything but do
12  that.

13          But it seems to me before, when you asked for the
14  continuance two weeks ago you, and the message from the
15  governor, were welcoming competing plan.  And so you're not --
16  I don't imagine, as a litigant or as a lawyer for your client,
17  you're not changing your recommendation on that?  Or if you
18  are, you need to tell me, maybe not today, but on --

19          MR. A. KORNBERG:  No.

20          THE COURT:  -- Tuesday.

21          MR. A. KORNBERG:  Your Honor, let me be very clear:
22  our position has not changed.  It's because we want a
23  competitive plan process --

24          THE COURT:  Right.

25          MR. A. KORNBERG:  -- that we're here.  We want there

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 20
of 118

1    to be a competing plan process.  I will say this again, the

2    advent of the noteholder proposal, we view as a very positive

3    event in this case.  I think it's galvanized people in a

4    constructive way.  There are elements of the subrogation claim

5    holders' term sheet that are very attractive and interesting.

6    The debtor is making progress, we understand, on their plan

7    proposal.

8            So the competition is extremely welcome.  I think the

9    end result will be better for the State, better for ratepayers,

10   better for California --

11           THE COURT:  And how about for the fire victims?

12   Because --

13           MR. A. KORNBERG:  And better for the --

14           THE COURT:  -- that's why we're here.

15           MR. A. KORNBERG:  -- fire victims.

16           THE COURT:  We wouldn't even be here, but for the fire

17   victims.

18           MR. A. KORNBERG:  And better for the fire victims.

19   The more money that this case attracts to solve the problem,

20   certainly the better for the fire victims.

21           So the competition is a great objective.  I think it's

22   already having a positive effect.  The question is how do we

23   channel that competition into a process that is calculated to

24   be successfully resolved by the end of June?

25           THE COURT:  Okay.

1             MR. A. KORNBERG:  And that's the issue.

2             THE COURT:  But then we come back to my question,

3    not -- I mean, I was aware and anticipated that lots and lots

4    of people were spending lots and lots of time, while I was

5    waiting for this two weeks to go by -- and that's fine, and I

6    appreciate what's being done outside of my domain -- but I came

7    back to the same question:  is Mr. Kornberg right, there's

8    going to be chaos because I allow competing plans?  And the

9    answer is well, there's going to be complications, but at least

10   I think the bankruptcy system is in a position to deal with

11   that form of chaos.  It doesn't solve the problem, it doesn't

12   solve any of these other problems, but -- because otherwise,

13   there might as well be exclusivity permanently.

14            MR. A. KORNBERG:  Um-hum.

15            THE COURT:  And that doesn't -- and again, I don't

16   care.  I don't have a stake in the outcome, as long as there's

17   an outcome.  And my fear, personally, is what I said a minute

18   ago, that whether it's November or June 29th, I don't want to

19   then have a confirmation fight cause the deadline to miss, and

20   all the ramifications, to tell the victims, sorry, you're not

21   going to get paid for another X days, weeks, months, years.

22            MR. A. KORNBERG:  Well, Your Honor, I can't --

23   hopefully, chaos will not ensue, no matter what happens here.

24            THE COURT:  Yeah.

25            MR. A. KORNBERG:  But here is the very real problem.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 22
of 118

1  If we were able to go forward with a competing plan in

2  contested confirmation proceedings that are very possible,

3  again, I think that it would be very difficult -- I'm not

4  saying it's impossible, but it's very difficult to imagine how

5  we will be able to sync up the PUC approval process, which also

6  has to occur by June -- by the end of June.

7         THE COURT:  Well, again, I don't want to turn this

8  into just the two of us.  I want to hear -- everybody wants to

9  be hears.  But to the extent that I'm persuaded to break

10  exclusivity for one or two, at least, I'll be looking to you

11  for some guidance as to what can the bankruptcy system do to

12  free up the log jam so that the CPUC can act functionally.

13         Or stated differently, okay, let's suppose I've made

14  the decision that I will allow two competing plans, so that's

15  three, what should we do for a timeline to get to the point

16  where this court and its rules, leaving aside some of the

17  unpredictable things, would put the CPUC in a position to know

18  which plan it's supposed to be passing on, or rather --

19         MR. A. KORNBERG:  Well --

20         THE COURT:  -- getting the public --

21         MR. A. KORNBERG:  Yeah.

22         THE COURT:  -- I mean, all the things that have to

23  happen?

24         MR. A. KORNBERG:  So if you assume that it will be

25  another six-month process in order for the CPUC to do its work

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 23
of 118

1  and to let all the interveners be heard and have the

2  evidentiary presentation that are required, if -- we really

3  have to know what the plan is by January.

4         THE COURT:  Yeah.

5         MR. A. KORNBERG:  And that's a very simplistic answer.

6  I'm sure I will be told afterwards there are a million other

7  things that have to happen --

8         THE COURT:  There are.

9         MR. A. KORNBERG:  -- but I think --

10        THE COURT:  There probably are.

11        MR. A. KORNBERG:  -- it's the best answer I can give

12  you this morning, Your Honor.

13        THE COURT:  Okay.  Well, and does someone from the

14  Governor want to speak --

15        MS. MITCHELL:  Yes.

16        THE COURT:  -- next?  And then I'll just go down to

17  the debtor and the two official committees and then everyone

18  else.  I mean, again, for me, this is not an action item today,

19  I don't think, anyway.

20        May I have your appearance, please?

21        MS. MITCHELL:  Nancy Mitchell, Your Honor, from

22  O'Melveny & Myers --

23        THE COURT:  Okay.

24        MS. MITCHELL:  -- on behalf of Governor Gavin Newsom.

25  I think, Your Honor, actually -- and I appreciate the Court --

1  we very much appreciate the Court giving us the opportunity to

2  try to work with the CPUC on a protocol.  I think it's been

3  very instructive to us, if nothing else, in identifying the

4  issues that Your Honor went to immediately.

5          Just to take a step back, the protocol that we had

6  worked on with the CPUC essentially channeled the competition

7  to the front end; there was a selection of a winning plan.

8  Almost like a plan 363 process.  And then --

9          THE COURT:  A plan beauty contest.

10          MS. MITCHELL:  Yeah, exactly.  And then there was only

11  one solicitation, which as Mr. Kornberg says, is probably

12  easier for Your Honor's court docket, it's probably easier for

13  the CPUC process.

14          THE COURT:  Oh, there's no question.

15          MS. MITCHELL:  Yeah.

16          THE COURT:  But it's not a law firm, it's a --

17          MS. MITCHELL:  You could, though, go the way you were

18  talking about, which is to have a couple, three competing plans

19  and try to build a schedule around that.  And I do know, and

20  Mr. Bray may want to speak to this -- I do know that the UCC

21  has been working on something that looks more like that.  And I

22  think part of our challenge is to try to weave that together

23  with the CPUC process and the other things that happen.

24          That may, at the end of the day, be the only choice we

25  have to achieve the goal of competition in the time frame that

1   we're talking about.  And so I think that's something that

2   we're all trying to kind of grapple with.  And those are, from

3   a status conference perspective, at least those conversations

4   with the UCC have been ongoing, and I think we need to let that

5   process play out.

6           I did want to just give a little bit of perspective

7   from the Governor's office.  Your Honor knows that the state

8   worked to pass AB1054.  I had the pleasure of basically living

9   in Sacramento for two months while that was going on; it was

10  different.  I think that banking on the legislature being able

11  to change the June 30th date would be an unintelligent move for

12  many of the parties in the case, given how hard it was to get

13  that legislation passed in the first place.

14          I did also want to point out that I know Your Honor

15  knows this, but the Governor has taken the extraordinary step

16  of being active in these bankruptcy cases and hiring people to

17  show up because of the critical importance of the resolution of

18  these cases to the fire victims, to the ratepayers, to the

19  workers, and to the State's energy policy goals generally.

20          And in the AB1054 process, we found that the

21  creditors, the victims, the ratepayer advocates, were all very

22  willing to come to the table in good faith and to recognize

23  that while there was no perfect solution, you had to get

24  somewhere, right, in order to solve the problem for the fire

25  victims.

1          I feel like I got a little lost in the protocol
2   discussion that we've had the last two weeks.  I understand
3   that there are significant interests bidding for this company
4   on all sides of the table.  I would ask them to remember that
5   at the end of the day, this is about something more than a
6   little bit of return.  It is about getting the fire victims
7   paid, and getting this company out of bankruptcy --
8          THE COURT:  Right.
9          MS. MITCHELL:  -- so that the California energy goals
10  can be met.  And I think that --
11         THE COURT:  And I presume that, implicit between the
12  lines, that's the Governor's goal and the legislators' goal --
13         MS. MITCHELL:  Yes.
14         THE COURT:  -- for the purpose of that deadline.  It's
15  not, we're going to close the case.  There will be claims
16  objections --
17         MS. MITCHELL:  Yes, sir.
18         THE COURT:  -- and lots of other stuff that's normal.
19  It's a confirmed plan that --
20         MS. MITCHELL:  Yes.
21         THE COURT:  -- treats the fire victims however they
22  either vote to approve on, or like it or not, could be forced
23  upon.
24         MS. MITCHELL:  Or however you determine, at the end of
25  the day.

1          THE COURT:  Well, I understand.  But obviously --

2          MS. MITCHELL:  Yeah.

3          THE COURT:  -- the first choice would be it would be

4    consensual.

5          MS. MITCHELL:  Totally agree, Your Honor.  Yes, that

6    was --

7          THE COURT:  But that, excuse me, I didn't mean to

8    interrupt you --

9          MS. MITCHELL:  No, that's fine.

10          THE COURT:  -- that is a -- you don't speak -- you

11    aren't the Governor, and you aren't the majority of the

12    legislature, but when we look at AB1540 (sic) -- whatever the

13    number is -- that's what it means by emerge.  It's not a

14    bankruptcy emerge, because it's a confirmed plan, right?

15          MS. MITCHELL:  I'm never going to forget AB1054, but

16    yes, Your Honor.  So the June 30th date -- and I recognize I am

17    not a walking legislative history, although I kind of feel like

18    it on that particular bill -- but the June 30th date really had

19    two goals.  And one was fire season, while it is really all

20    year in California now, the end of the summer is really when it

21    becomes challenging.  So the idea was to have PG&E in a

22    position to be able to make its contribution to the fund before

23    we got into the heart of the next fire season.  That was

24    important to the legislature.

25          The word "resolved", which I know you and Mr. Kornberg

1    discussed at the last hearing, was picked deliberately
2    because -- and I think you'll see this if we ever submit any
3    protocol of any type, or suggestion about scheduling order or
4    anything -- the definition of resolved was picked because it is
5    possible that the Court could enter a confirmation order that
6    had limited conditions subsequent -- obviously, there will be
7    all the things that have to happen to get the cases closed, but
8    also the confirmation could have limited conditions subsequent,
9    where you were confident that the case was going to happen,
10   PG&E could make its contribution to the fund, and if the
11   effective date happened later because the effective date was
12   about meeting those sort of nonmaterial conditions, I would say
13   Your Honor could decide that the case was resolved for the
14   purposes that AB1054 was achieving.  And so --
15            THE COURT:  Well, I don't know that a federal
16   bankruptcy court has the authority to interpret state law that
17   way, but we can -- I mean, it can interpret the bankruptcy law
18   to --
19            MS. MITCHELL:  Yes.
20            THE COURT:  -- when is it no longer debtor-in-
21   possession?  When do the rights and the duties and --
22            MS. MITCHELL:  Agreed.
23            THE COURT:  -- obligations change?  But more
24   importantly, when do the rights and duties per the plan kick
25   in, versus --

1          MS. MITCHELL:  Yes.

2          THE COURT:  -- pre-existing?

3          I'm assuming -- well, I don't know if you know this,

4    well, Mr. Kornberg knows it -- the first PG&E case is still

5    open.

6          MS. MITCHELL:  Yes, I know.

7          THE COURT:  But it doesn't mean anything to anybody

8    except --

9          MS. MITCHELL:  Right.

10          THE COURT:  -- me and the clerk and --

11          MS. MITCHELL:  Yes.

12          THE COURT:  -- the U.S. Trustee, who gets fees, but

13    I'm assuming that that's what's meant here.  An effective plan,

14    or now you've clarified a little further by the debtor in a

15    position to make its contribution to -

16          MS. MITCHELL:  And to be honest --

17          THE COURT:  -- the fund.

18          MS. MITCHELL:  -- again, not a walking legislative

19    history, but it was selected to give Your Honor a little bit of

20    flexibility --

21          THE COURT:  Yeah.

22          MS. MITCHELL:  -- in determining --

23          THE COURT:  Okay.

24          MS. MITCHELL:  -- when the debtors' obligations under

25    the plan were sufficiently ripe for those purposes.

1           THE COURT:  But it probably wouldn't mean we've got a
2    hearing set for disclosure statement.
3           MS. MITCHELL:  No, sir.
4           THE COURT:  Okay.
5           MS. MITCHELL:  I do not believe that was --
6           THE COURT:  Okay.
7           MS. MITCHELL:  -- the legislative intent.
8           So our concern at the end of the day is achieving --
9    and I think Your Honor went to the right questions.  The
10   Governor's concern is achieving a process that does allow for
11   the June 30th date.
12          And look, the June 30th date is about getting PG&E
13   into the fund --
14          THE COURT:  Yes.
15          MS. MITCHELL:  -- and allowing PG&E to be investment
16   grade.  There are a lot of consequences to that not happening,
17   but the legislature does not legislate when the bankruptcy
18   court lets the debtor out of bankruptcy.  It is about the
19   participation in the fund.
20          The Governor is concerned that there be competition,
21   and that the best plan come to the table, however that gets
22   structured.  We recognize the challenges that the CPUC has in
23   trying to work through their process.
24          I also would say, Your Honor, that a process that you
25   put in place, there are other parties that have expressed some

1  interest in potentially participating.  And I don't know
2  whether we want the other plans at this point, but there
3  certainly are third parties who --
4          THE COURT:  Well, there are some people that have
5  said, open it up to everybody, there are some that have said,
6  if I'm going to open it up to one, I should open it up to
7  others.  And I --
8          MS. MITCHELL:  Yeah.
9          THE COURT:  -- can't remember, I believe your office
10 wanted the exclusivity period shortened.  But as I recall,
11 going back to the first hearing, I don't think the Governor's
12 office or anyone else got into the fine detail about who, they
13 just said open it up or extend it, and I made the decision that
14 I made, and then that led to the --
15         MS. MITCHELL:  Yeah.
16         THE COURT:  -- where we are today.
17         MS. MITCHELL:  And I think --
18         THE COURT:  Well --
19         MS. MITCHELL:  -- Your Honor --
20         THE COURT:  -- at the moment I have two -- we've got
21 two candidates.
22         MS. MITCHELL:  Right.
23         THE COURT:  Okay.
24         MS. MITCHELL:  And in fashioning a process, whatever
25 it ends up looking like to achieve that competition and achieve

1   the June 30th goal, I think there are other people in the

2   market who, given a clear process, might like to participate as

3   well.

4           So from our perspective, not chaos just means a

5   process that people can follow that will get us to an end date.

6   I don't think the Governor really feels like that that needs to

7   look exactly like the process that we put out there or exactly

8   like the competing process that the noteholders put in there.

9           I don't know if you have any other questions --

10          THE COURT:  Well --

11          MS. MITCHELL:  -- from me?

12          THE COURT:  -- I guess this is a question for

13   everyone.  Next Tuesday I have, on the table, two motions --

14          MS. MITCHELL:  Yes.

15          THE COURT:  -- to break exclusivity, at least for

16   those two parties.  And I believe the debtor and others are --

17   and lots of people have weighed in on that position.  I can't

18   tell you that I got exact, the box score memorized, but at

19   least I see it as the option of saying not to everybody, in

20   which case, the debtor still has exclusivity for -- until

21   September, or say yes to one, or both, of the moving parties,

22   or to say open up the doors -- obviously, anybody that knows me

23   knows that I'm probably not inclined to do that, but that

24   doesn't mean I wouldn't listen.  So to the extent that your

25   office or CPUC want to refine your position on that, don't be

1    bashful.  Just weigh in.  But do it on Tuesday.

2         I mean, we won't stick with the traditional rules

3    about filing something today, and just this --

4         MS. MITCHELL:  Yep.

5         THE COURT:  -- is a very fluid thing.  So both you and

6    Mr. Kornberg should give me an update on Tuesday, if you think

7    it's something that is relevant.

8         MS. MITCHELL:  Happy to do that.

9         THE COURT:  That's not an invitation, by the way, to

10   everybody in the case to file something Monday night.  I'm just

11   saying, you two are representing two of the very major players

12   in this process that are alongside of a number of other major

13   players.  Okay.

14        MS. MITCHELL:  So thank you, Your Honor.  And I don't

15   really have anything else that I think I need to say except

16   that I did want to again express how much we appreciate the

17   Court's efforts.  This is tough, and --

18        THE COURT:  I'm doing much.

19        MS. MITCHELL:  -- 1054 --

20        THE COURT:  You guys are doing the effort.

21        MS. MITCHELL:  -- took a lot of -- put some additional

22   pressure on your docket.

23        I did want to say one thing.  The parties -- and I

24   know Your Honor knows this, but the parties are very, very fond

25   of quoting my client in their papers to support their positions

1    from his press releases, etc.  So far, I actually haven't seen

2    them quote him in context correctly once.  But putting that

3    aside --

4                THE COURT:  Well, he chose to be a politician; I guess

5    that goes with the territory, right?

6                MS. MITCHELL:  I appreciate that.  But he is here, and

7    we are speaking for him.  And so I think the parties quoting of

8    the Governor should probably be given the deference it

9    deserves.

10               THE COURT:  Okay.

11               MS. MITCHELL:  So thank you, sir.

12               THE COURT:  Thank you, Ms. Mitchell.

13               So let's hear from the debtors' counsel first, and

14   then we'll go to the two official committees.

15               Mr. Karotkin, some words of wisdom for me?

16               MR. KAROTKIN:  I hope so.  Stephen Karotkin, Weil,

17   Gotshal & Manges, for the debtors.

18               First of all, Your Honor, I will say on behalf of the

19   debtors that we are disappointed that we so far have been

20   unable to reach an agreement, certainly, with the parties on a

21   protocol.  We don't think that is necessarily all loss.  I

22   think that it is still possible to reach a consensus, if people

23   want to be reasonable about it.

24               I'm not here today to argue exclusivity; we can do

25   that --

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 35
of 118

1              THE COURT:  Right.

2              MR. KAROTKIN:  -- on Tuesday.  And I hope that other

3      people take the same position on that.

4              I will say, from the debtors' standpoint, we are

5      willing to work with all parties to achieve a consensus on a

6      plan.  As the debtors said from day one --

7              THE COURT:  But will you reiterate?  You're also

8      willing to work on a competitive preplan process, similar to

9      what Mr. Kornberg and Ms. Mitchell were referring to?  Is

10     that --

11             MR. KAROTKIN:  Yes.

12             THE COURT:  -- a fair statement, or not?

13             MR. KAROTKIN:  And I think there may have been some

14     confusion about --

15             THE COURT:  Okay.

16             MR. KAROTKIN:  -- what they were saying.  But I think

17     they were saying that the protocol that was being considered

18     over the last two weeks was in the context of exclusivity

19     remaining in place.

20             THE COURT:  Okay.

21             MR. KAROTKIN:  It was not in the context of you're

22     lifting exclusivity and having competing plans.  And we were

23     trying to come up with a process as to how that would work, in

24     consultation with the committees --

25             THE COURT:  Okay.

1           MR. KAROTKIN:  -- to arrive at something.

2           I think now some of that discussion perhaps has
3      shifted to something else, but again, that's for after Tuesday
4      depending on what happens on Tuesday.

5           As I said, the debtors are willing to work with all
6      parties to achieve a consensus on a plan.  We believe that the
7      debtors, as fiduciaries for all parties in this case, are the
8      best situated to do that.  There are a number of proposals out
9      there.  In fact, if you read the newspapers over the past two
10     days, there are equity holders who have now come forward and
11     are willing to commit to provide fifteen billion dollars of new
12     financing, equity financing, in order to propose a plan, and
13     the debtors are working with those people as well.  I think --

14          THE COURT:  Well, I assume -- again, I might read the
15     headlines, but I'm assuming that there will be a motion, or a
16     stipulation or something, to allow that equity group to step
17     up, too.  I can't act on newspaper headlines, but procedurally,
18     that's the way it should happen, don't you think?

19          MR. KAROTKIN:  I'm not sure I understand your
20     question.

21          THE COURT:  Well, if their -- as you know, there are
22     two -- as I said to Ms. Mitchell, there are two different
23     creditor groups that are on the table and on the docket for
24     Tuesday.  What I'm saying is if there's another group that
25     wants to do it, the proper procedure is to file a motion to do

 1    it, or to get a stipulation to do it.

 2              MR. KAROTKIN:  They're proposing to work with the

 3    debtors to come up with a plan --

 4              THE COURT:  Okay.

 5              MR. KAROTKIN:  -- like, in the typical, customary

 6    circumstances of how cases are typically administered.

 7              THE COURT:  Okay.

 8              MR. KAROTKIN:  As existing equity, particularly in a

 9    solvent debtor, they have come forward to put up fifteen

10    billion dollars of financing.

11              THE COURT:  Okay.  Equity group with the debtor.

12              MR. KAROTKIN:  I don't believe they're seeking to file

13    their own plan.  This would be a more conventional approach --

14              THE COURT:  Okay.

15              MR. KAROTKIN:  -- Your Honor, which --

16              THE COURT:  The way you introduced the subject, I

17    wasn't clear that that's what you'd done.  I understand your

18    point now.

19              MR. KAROTKIN:  And we can address that again on

20    Tuesday.

21              THE COURT:  Well, let me ask you if on Tuesday you

22    will be able to give me and everyone else who's not privy to

23    these private conversations, a date you might have a plan on

24    file?

25              MR. KAROTKIN:  Yes, sir.  We --

1          THE COURT:  You don't have to say it today, if you

2     don't want to.  And you don't have to say it on Tuesday, but it

3     might be helpful to know.

4          MR. KAROTKIN:  Yes.  And we have already in our

5     pleadings, and I think you alluded to it, indicated some of the

6     key provisions of that plan that we are contemplating.  And

7     again, this financing would logically be a big part of this,

8     equity financing would logically be a big part of it.

9          THE COURT:  Sure.

10          MR. KAROTKIN:  As I said --

11          THE COURT:  I understand.

12          MR. KAROTKIN:  -- we're still willing to try to reach

13     an agreement with the parties, with respect to a protocol,

14     going forward.  We think that is the most appropriate way to

15     proceed over the next month or so to avoid the situation that

16     Mr. Kornberg is concerned about, and to have these cases

17     administered in a typical fashion.

18          Particularly, Your Honor, I don't want to argue

19     exclusivity, but in view of the complexity of these cases, the

20     fact that you still have to have a hearing, unless we can

21     resolve the wildfire claims consensually, that really is a

22     gating item for any plan.  People can put forward --

23          THE COURT:  You mean the estimation?

24          MR. KAROTKIN:  The estimation --

25          THE COURT:  The estimation, yeah.

1          MR. KAROTKIN:  -- or a consensual resolution.

2          THE COURT:  No, no.  I just wanted to see what you

3    were -- of course, a consensual resolution is optimal.  But you

4    were eluding to the estimation --

5          MR. KAROTKIN:  Yes.

6          THE COURT:  -- proceeding in some --

7          MR. KAROTKIN:  If you were to grant that motion, of

8    course.

9          THE COURT:  Yeah, yeah.

10          MR. KAROTKIN:  And that, Your Honor, really is a

11    gating item for any plan.  People can propose a plan saying, my

12    condition is the claims can't be more than this, my condition

13    is the claims can't be more than that.  But any plan that's

14    realistic here, that issue has to be determined first.  And

15    that issue, Your Honor, will dictate the necessary financing to

16    get through the Chapter 11.  And not to say we won't be ready

17    to file the plan, but really, any plan is premature until that

18    number is fixed.

19          THE COURT:  Well, Mr. Karotkin, again, the complexity

20    of this case, none of us need to repeat.  From my point of

21    view, it's this narrow little box that I live in where I see

22    these things going on.  And I work with -- and I think about

23    myself.  And so exclusivity, relief from stay, and estimation

24    are so interrelated, and --

25          MR. KAROTKIN:  I couldn't agree more, Your Honor.

1      THE COURT:  -- so one of the questions that we'll

2 discuss, whether it's on Tuesday or Wednesday, or some other

3 time, is how does it all fit?  What do we do about the relief

4 from stay?  And I don't -- and I don't want this to be a --

5 today's motion to -- I mean, next Wednesday's motion to be

6 argued today, but they are all interrelated, and that's one of

7 the challenges for all of us.

8      MR. KAROTKIN:  I totally agree.

9      THE COURT:  Okay.

10      MR. KAROTKIN:  Thank you, sir.

11      THE COURT:  Thank you, Mr. Karotkin.

12      Why don't we go with the OCC, and then we'll go to the

13 TCC.  Assuming that you want to be heard.  Mr. Bray, did you

14 get that duty today?

15      MR. BRAY:  I did.  I'll take a shot at it, Your Honor.

16      THE COURT:  Well, you got nice things said about you,

17 that's a good thing.

18      MR. BRAY:  Well, it's unusual.  Thank you.

19      MS. MITCHELL:  I'm going to do it again.

20      MR. BRAY:  Your Honor, Gregory Bray, Milbank, counsel

21 for the Official Creditors' Committee.

22      Where to start?  Last time we were here, Mr. Dunne

23 told the Court that the UCC would work in good faith with the

24 CPUC and the Governor on the requested protocol.  As you've

25 heard, unfortunately there as not a resolution that could be

1    reached.  An interesting structure, but the structural problems

2    that are inherent in trying to come up with a solution that

3    doesn't involve determination of exclusivity, they're

4    significant.

5              THE COURT:  I know.

6              MR. BRAY:  And the committee has --

7              THE COURT:  I'm sure there are.

8              MR. BRAY:  -- yes -- has concluded from that that

9    really, as a practical and legal matter right now, we think the

10   best path forward to resolve the competition that every party

11   so far has stated they want is for the Court to take up the

12   exclusivity motion next week and make a decision on that.

13             One of the -- a comment that, remind you, Mr. Dunne

14   made last time was that, realizing there was this potential for

15   not having agreement on a protocol, it was suggested it might

16   be good to have a Plan B protocol, which would be a protocol

17   that would be tethered to the Court's decision on terminating

18   exclusivity, premised on the fact that the Court did terminate

19   exclusivity and set forth a timeline or a structure for

20   managing the process to attempt to mitigate the discord that

21   people are expressing concern about.

22             THE COURT:  Well, do you agree with me that if I were

23   to break exclusivity, the next thing, the next big-ticket item,

24   I think, leaving aside whether estimation has to come first or

25   late, is to figure out how to be efficient in terms of any

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 42
of 118

 1  disclosure statement phase, or before you start to get to --

 2          MR. BRAY:  Yes.  Agreed.

 3          THE COURT:  Yeah, yeah.

 4          MR. BRAY:  Absolutely.

 5          THE COURT:  Yeah, okay.

 6          MR. KAROTKIN:  And we --

 7          THE COURT:  And then --

 8          MR. KAROTKIN:  -- sorry.

 9          THE COURT:  And if I were, on Tuesday, to say to these

10  two parties, exclusivity's broken, that doesn't meant the

11  debtor's out of the game.  Obviously, the debtor has the right,

12  and no doubt would propose its plan, a plan; whether it did it

13  first or second is not a point.

14          MR. BRAY:  Agreed.  The exclusivity does not apply to

15  the debtor -=-

16          THE COURT:  Yeah.

17          MR. BRAY:  -- that's the law.

18          THE COURT:  Of course.

19          MR. BRAY:  So what we are trying to do, Your Honor,

20  having gone through this process now, is work on this Plan B

21  protocol.  And we hope to file it with the Court before the

22  hearing and we will, of course, share it with the key parties

23  and try and see if we can build some consensus around this.

24  But among the other things it will do is attempt to address the

25  issue you just raised, is timing for filing a disclosure

1    statement, set forth a timeline.

2              Of course, the Court is the ultimate decision maker on

3    all these issues.  We would only proffer this as a potential

4    road map to try and move the process along, and it is expressly

5    conditioned on the Court having decided to terminate

6    exclusivity.  If the Court were to rule the other way, then

7    this protocol would be of no value.

8              THE COURT:  Well, sure.  But the short answer is, if I

9    were to deny exclusivity -- excuse me, deny the motion to break

10   it, to terminate it -- if I were to leave the debtor in

11   exclusivity, I would still be pressing debtors' counsel for a

12   timeline.

13             Again, I can't have any -- I can't fix the things that

14   Mr. Kornberg talked about, and I can't magically pretend that I

15   know that the legislature will change the deadline, so I would

16   repeat again what I said a couple of hearings ago.  My

17   commitment is to make sure that the bankruptcy court, or the

18   institution, is not the hang up, to the best I can.  And so if

19   I were to say to Mr. Karotkin, you've got no competition yet,

20   but I'd still be pressing him for a timeline.  And obviously,

21   if I terminate as to one or both or more than that, it's going

22   to be the same question.  It's still going to be, everybody has

23   to work together to have an efficient and effective timetable.

24             So it may -- whether your Plan B is Plan C or

25   something, it's something that you and your committee -- I

1    welcome your role.  That's critical as kind of an in-betweener.

2    Because let's face it, Mr. Bray, you know it as well as I, if I

3    were to look just at the plan that's on the table from the

4    senior bond holders, their class isn't even impaired.  There's

5    two impaired classes, and they're the two sets of fire victims;

6    that's it.  So --

7              MR. BRAY:  Understood, Your Honor.

8              THE COURT:  -- somebody's got to figure out how to

9    make that work.  That's not to say there wouldn't be the equity

10   or other challenges to the confirmation standards crammed down,

11   and what have you, but that's a different discussion.

12             MR. BRAY:  I agree with everything you said, Your

13   Honor.

14             THE COURT:  Okay.

15             MR. BRAY:  I don't want to get too far into --

16             THE COURT:  Right.

17             MR. BRAY:  -- the exclusivity --

18             THE COURT:  Right.

19             MR. BRAY:  -- discussion for Tuesday.  I would just

20   repeat myself, that we do think probably -- there's no probably

21   about it.  It makes sense to go forward Tuesday.

22             THE COURT:  Yeah.

23             MR. BRAY:  We favor competition.  I think you've heard

24   from the Governor and the CPUC, they favor competition.  I'll

25   let Mr. Julian and Ms. Dumas speak for themselves on that

1      issue, but even as Mr. Kornberg has pointed out, so far, the

2      competitive process has proven valuable and to some extent

3      moved this process along.

4            And I think you will hear us argue next week that we

5      favor lifting of exclusivities --

6            THE COURT: Um-hum.

7            MR. BRAY: -- sooner rather than later, because it

8      will take into account the timeline issues we have, the

9      legislative overlay, and the other issues. And that the sooner

10     you make a decision, probably the better for the process so

11     that then people can sit down and sort out the timeline that

12     needs to be agreed to or realized because of the decision that

13     you've made.

14           THE COURT: Well, so there will be no secrets about

15     it, I hope to be able to make a decision when I hear the

16     arguments.

17           MR. BRAY: Understood.

18           THE COURT: I wasn't intending to take it under

19     advisement and write a thirty-five-page, publishable opinion

20     that's due in six months. It may be that I just need to absorb

21     it, but that's my hope is that I'll hear the arguments and give

22     it some reflection and issue an overt ruling. So --

23           MR. BRAY: Understood. So --

24           THE COURT: -- I can't promise it; I'll try.

25           MR. BRAY: -- we will take a shot at this protocol

1   that we'll file with the Court.  Obviously, I guess that we'll

2   work for some consensus around it; it's certainly not binding

3   on anyone and we don't want to step on the Court's toes in any

4   fashion.  It's simply there to try and assist the process.

5          THE COURT:  I take it you would like to continue

6   things this way, rather than to take kind of another radical

7   departure of my looking to the OCC to be sort of a mediator of

8   this issue -- or maybe you already are playing that role

9   effectively, along with the Governor and the CPUC -- but to

10  take further time out.  I mean, you don't want me to extend

11  that two-week moratorium --

12         MR. BRAY:  No, Your Honor.

13         THE COURT:  -- beyond next Tuesday?

14         MR. BRAY:  No.  Having --

15         THE COURT:  Okay.

16         MR. BRAY:  -- been through the last two weeks, we

17  believe the best thing for the process is for the Court --

18         THE COURT:  Okay.

19         MR. BRAY:  -- to have the hearing next week and rule

20  on the merits.

21         THE COURT:  Okay.

22         MR. BRAY:  Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Bray.

24         Ms. Dumas or Mr. --

25         MR. KAROTKIN:  Ms. Dumas is on the phone, Your Honor.

1          THE COURT:  Oh, okay.  Ms. Dumas --

2          MS. DUMAS:  Good morning, Your Honor, or good

3   afternoon.  It's Cecily Dumas --

4          THE COURT:  Good afternoon, Ms. Dumas, you're --

5          MS. DUMAS:  -- BakerHostetler, on behalf of the

6   Official Committee of Tort Claimants.

7          We, the TCC, had positive and constructive meetings

8   with the CPUC and the office of the Governor over the course of

9   the last week and a half.  We also have been in communication

10  with the other major stakeholders in the case.  We understand

11  the desire of all the parties to really try to meet the AB1054

12  deadline and acknowledge, as I think Your Honor mentioned and

13  Mr. Karotkin mentioned, the sort of dating issue, or whatever

14  term you want to ascribe to it, of the claims estimation

15  process.

16         What we have indicated to the Governor's office and

17  the PUC is that the Tort Claimants' Committee is in the process

18  of developing a protocol for claims estimation.  As Your Honor

19  is aware, the only statement of the TCC thus far, relative to

20  claims-estimation process, related to the Tubbs motion for

21  relief from stay, but there are eighteen or nineteen fires,

22  however you count them, all of which PG&E denies legal

23  liability completely.  So we're zero to however billions the

24  tort claimants believe they're entitled to.

25         So it's going to be a process that will be needed to

1   hammered out with the debtors. It may be a combination
2   oversight, overseeing of Your Honor of district court
3   minitrials, state court trials, estimation proceedings.
4            Unlike other mass tort cases, we have a different
5   causal event for each fire. And with PG&E, I guess marginally
6   conceding causation, but not liability, we're in seventeen or
7   eighteen times the trouble of every other mass tort case that a
8   bankruptcy judge has had to deal with, where there's been one
9   causal event, either asbestos or an IUD or other causal event
10  that gave rose to mass tort claims. So --
11           THE COURT: Well, is that --
12           MS. DUMAS: -- we see this --
13           THE COURT: Ms. Dumas, wait a minute. Since --
14           MS. DUMAS: Yeah, yeah.
15           THE COURT: -- for purposes -- since for purposes of
16  estimation, PG&E, through Mr. Orsini the other day, conceded
17  that they admit to having been the cause, the only issue is
18  they don't admit being liable. Is that really, therefore,
19  eighteen different causals, or is it eighteen different fires,
20  but all of which have their own estimation of damages? I mean,
21  if you take --
22           MS. DUMAS: Oh, Your Honor, I'm so, so glad you asked
23  that question. There's a magic act in Las Vegas that is very
24  close to Mr. Orsini's description of what PG&E's actual
25  position is.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 49
of 118

1           THE COURT:  Well, I wasn't aware --

2           MS. DUMAS:  I believe what --

3           THE COURT:  -- of that, but --

4           MS. DUMAS:  -- he told Your Honor the other day --

5    well, first of all, PG&E does not concede legal liability at

6    all because it contests strict liability under inverse

7    condemnation.

8           THE COURT:  But as big a question as that is, it's an

9    easy question to frame and a difficult question, perhaps, to

10   brief.  But it's a judicial decision to take, say, yes or no.

11          MS. DUMAS:  Sure.

12          THE COURT:  Okay.

13          MS. DUMAS:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MS. DUMAS:  And that's the easy one.  And frankly,

16   it's insulting that they even put that on their process, but --

17          THE COURT:  Well, don't argue the --

18          MS. DUMAS:  The more important --

19          THE COURT:  Don't argue the merits.

20          MS. DUMAS:  I'm not.

21          THE COURT:  It's identified as an issue.

22          MS. DUMAS:  I'm not arguing the merits.

23          THE COURT:  Okay.

24          MS. DUMAS:  We'll address that in due time.  But what

25   PG&E is saying is it wasn't negligent with respect to any fire.

1   And I believe what your Court didn't comprehend, because it was

2   said very carefully, is that PG&E will only admit that its

3   equipment caused the fires in the context of estimation

4   proceedings, not trials --

5          THE COURT:  No, I heard that.  I heard that.

6          MS. DUMAS:  -- which is a difference.

7          THE COURT:  I heard that exactly.

8          MS. DUMAS:  Yes.  Well, so --

9          THE COURT:  Well, but Ms. Dumas, I don't want to

10  distract, I want to stick with the subject that we started with

11  and hear from you, but I will just make this statement.  Don't

12  confuse the fact that who the judicial officer might be.  You

13  made it clear, and I haven't studied your responses to the

14  estimation motion, but I know that your brief does attempt to

15  respond to the questions I asked.

16         But as I see it, if the debtor says, for purposes of

17  estimation, it means that it -- and if the inverse-condemnation

18  principle comes out the way you think it will, I mean, you can

19  make a very large estimation for all the damages, except for

20  Tubbs.  So be prepared to focus on those fine points after the

21  debtors file their response to the -- their reply, rather, to

22  the estimation motion, and whether we deal with it next

23  Wednesday or sometime after that, those are very much early-on

24  issues that have to be discussed.

25         MS. DUMAS:  Yes, Your Honor.

1          THE COURT:  So let's go back to the question --

2          MS. DUMAS:  Yes.

3          THE COURT:  -- of what to do about what Mr.

4   Kornberg --

5          MS. DUMAS:  Yes.

6          THE COURT:  -- and Ms. Mitchell talked about.

7          MS. DUMAS:  Yes, sir.

8          THE COURT:  Okay.

9          MS. DUMAS:  So just one last observation.  I would be

10  thrilled, as would all of the tort claimants, if you were

11  correct that what the estimation proceeding will be will

12  consist of damages estimations.  I don't think that's PG&E's

13  position.  I hope I am wrong, fervently hope that I am wrong,

14  Your Honor.

15          So back to the plan process.  The TCC has been in

16  communication, as I said, with the other parties in the case.

17  We are mindful of the outside time constraints imposed.  We're

18  mindful that we have to have parallel tracks of claims

19  estimation and plan process for the very reasons that Mr.

20  Kornberg eloquently identified at the beginning of the hearing.

21          We will do our best to work with the other parties.

22  We have been in communication with the Official Committee of

23  Unsecured Creditors about its plan protocol.  We hope to reach

24  agreement so that the TCC can support a plan protocol that is

25  approved by the Court.  We will work around whether the debtor

1    retains exclusivity longer, or whether the exclusivity is

2    terminated as a result of the hearings next week.

3         Suffice to say, without arguing that point, that the

4    TCC acknowledges the need at this point for speed on all

5    fronts.  And the possibility that if the Court goes forward

6    with each plan seriatum, as opposed to all at once, we may end

7    up with a busted plan and we will be exactly where Mr. Kornberg

8    doesn't want to be in January or February.

9         THE COURT:  Okay.  All right.  Is that it for now?

10         MS. DUMAS:  Yes, sir.

11         THE COURT:  All right.

12         MS. DUMAS:  Thank you.

13         THE COURT:  Thank you.  Thank you, Ms. Dumas.

14         All right.  I said I'd call on anyone else.  Just tell

15    me who'd like to speak, and let me hear from you.

16         MR. QURESHI:  Good afternoon, Your Honor.  For the

17    record, Abid Qureshi, Akin Gump Strauss Hauer Feld, on behalf

18    of the Ad Hoc Noteholder group.

19         Just a few comments, Your Honor, and I will be brief.

20    First, the Ad Hoc Noteholder Committee is very appreciative of

21    the efforts of both the Governor's office and the CPUC.  And of

22    course, we also welcome the role of the OCC in working towards

23    a proposal.

24         As Your Honor is no doubt aware, we did in advance of

25    this hearing file with the Court a proposed protocol of our

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 53
of 118

1  own.  And now, it was a protocol that, of course, contemplated

2  determination of exclusivity.  And there's just a couple of

3  points raised in there, Your Honor, that I would like to

4  discuss with the Court.  It was guided by three principles.

5  Three principles that we understand to be supported both by the

6  Governor and by the CPUC.  And that is a plan process that is

7  competitive, that is fair, and that is transparent.

8          And we believe, Your Honor, that the proposal that we

9  filed with the Court accomplishes those things.  Now, if the

10 OCC can improve upon that, Your Honor, we absolutely welcome

11 it, and we look forward to seeing what they file in advance of

12 next week.

13         Your Honor, I wanted also to comment on a couple of

14 things that came up in Your Honor's colloquy with Mr. Kornberg,

15 three things in particular.

16         First, Your Honor raised the issue of who should be

17 the decision maker when it comes to competing plans.

18 Absolutely, one hundred percent this Court.  And --

19         THE COURT:  Well, again, decision maker as to what?

20 Ultimately the confirmation, but --

21         MR. QURESHI:  Decision maker as to what?  Decision

22 maker as to whether there should be one or two or three or more

23 competing --

24         THE COURT:  Right.

25         MR. QURESHI:  -- plans.

1          THE COURT:  Right.

2          MR. QURESHI:  We absolutely think that it is

3    unquestionably the role of this Court to play that gatekeeping

4    function, and that is what our protocol contemplates.

5          The second point that arose in Your Honor's colloquy

6    with Mr. Kornberg related to the specter of chaos in the plan

7    process.  And again, I think Your Honor is absolutely right,

8    which is it is this Court that can, and no doubt will, control

9    that chaos, and make sure that chaos never breaks out.

10          THE COURT:  Well, controlling chaos is sort of wishful

11    thinking.  I'd like to think that maybe there won't be any

12    chaos.

13          MR. QURESHI:  I think, again, Your Honor, the interim

14    deadlines that we set forth in our protocol, the steps --

15          THE COURT:  Yeah.

16          MR. QURESHI:  -- along the way --

17          THE COURT:  I haven't studied what you filed.  In this

18    job now, I have to deal with only what's coming up.

19          MR. QURESHI:  Fair enough.

20          THE COURT:  There's a light in the tunnel, not at the

21    end of the tunnel.

22          MR. QURESHI:  Understood.  And I certainly won't get

23    into that, into our protocol --

24          THE COURT:  Okay.

25          MR. QURESHI:  -- in any greater detail than I have,

1    other than to say there are a series of milestones along the
2    way designed precisely to avoid chaos, with this Court serving
3    as the gatekeeping function.  And we think it is eminently
4    doable without chaos ensuing.

5           The last point that I want to comment on, Your Honor,
6    is again, that arose with Mr. Kornberg.  The impact on
7    negotiations of whether this Court terminates or does not
8    terminate exclusivity.  And I heard, Your Honor, from Mr.
9    Kornberg two things that, frankly, I have difficulty
10   reconciling.  One, he suggested that continued exclusivity
11   might actually spur negotiations.  But then Mr. Kornberg also
12   noted that the filing of the Ad Hoc Committee's plan was a
13   welcome development, and one that galvanized people in a
14   positive way, to use his words.  And we agree that it did.

15          But the fact is, Your Honor, that while there has been
16   exclusivity, it has not spurred negotiations.  It's kind of
17   remarkable that with our plan term sheet out there, the debtors
18   have not engaged with our group in any meaningful way.

19          THE COURT:  Well, again, one thing I'm trying to avoid
20   is discussions about what have or happened -- has or have not
21   happened, sort of outside the courtroom.

22          MR. QURESHI:  Fair enough.

23          THE COURT:  I can draw my own inferences, but I don't
24   want to be the -- I don't want to judge.  I don't want to pick
25   good guys and bad guys.  I want to go on --

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 56
of 118

1          MR. QURESHI:  So --

2          THE COURT:  -- the record.

3          MR. QURESHI:  -- and that was not the purpose of my

4     comment, Your Honor.

5          THE COURT:  Okay.

6          MR. QURESHI:  Suffice to say that we think the best

7     way to galvanize the parties, to have a meaningful negotiation

8     is for there to be a process coming back to those three

9     principles:  that is competitive, that is fair, and that is

10    transparent.

11         THE COURT:  Well, I mean, competitive is good enough.

12    I mean --

13         MR. QURESHI:  Yep.

14         THE COURT:  -- competing plans are, by definition,

15    competitive.  And in effect, your three items there and your

16    protocol are only so good as your convincing me next week to

17    break exclusivity for your client, right?

18         MR. QURESHI:  Yep.

19         THE COURT:  And if I say no, then you've got to -- I

20    don't know what you have to do.  But no, I understand.  And so

21    that's certainly what it comes down to is, is it better to

22    stick to the status quo or to open up the options?

23         MR. QURESHI:  Right.  And we think, Your Honor, that

24    ultimately, and I won't get into the merits, but that

25    ultimately, time in this case just does not allow for a serial

1    plan process, that competition and proceeding on multiple

2    fronts at the same time is the way to go.

3              So with that, Your Honor, we look forward to next

4    Tuesday.  And if the Court has any questions, I'm happy to

5    address them, of course.

6              THE COURT:  Thank you, and no.  I'm fine.

7              MR. QURESHI:  Thank you.

8              THE COURT:  Anyone want to be heard, else?

9              Yes, sir.

10             MR. FELDMAN:  Your Honor, on the phone, I'm not sure

11   what's going on in the courtroom.  Could I be heard?

12             THE COURT:  Yeah.  Who's that?

13             MR. FELDMAN:  Your Honor, it's Mathew Feldman from

14   Willkie Farr & Gallagher --

15             THE COURT:  Okay.

16             MR. FELDMAN:  -- on behalf of the Ad Hoc --

17             THE COURT:  Just wait a second, hold on.

18             MR. FELDMAN:  -- Committee on Subrogation Claims.

19             THE COURT:  Okay, Mr. Feldman.  Go ahead, please.

20             MR. FELDMAN:  I'll be very brief.  Your Honor, we were

21   supportive when we were in front of Your Honor on July 24th

22   about attempting to enter into a protocol.  For all the reasons

23   discussed and not discussed, that's not been successful.

24             Our view, Your Honor, is at this point going down a

25   protocol, whether it's the OCC, whether it's the ad hoc group

1  of bondholders, it's simply unnecessary.  If the Court's

2  inclined to lift and terminate exclusivity next Tuesday for

3  either our group or the ad hoc group of bonds, or both, it

4  seems to me that the Court can accomplish everything that was

5  intended by these various protocols by simply putting out a

6  scheduling order that will create deadlines for people to file

7  plans, whether it's our plans, the debtors' plans, or someone

8  else who comes in and seeks termination of exclusivity, and go

9  from there, because I'm very cognizant, as are my clients, of

10 the June 2020 deadline.

11       Very interesting to hear Mr. Kornberg's statement

12 about how long the CPUC process will take, and so from our

13 perspective, we think competition is good, and we think the

14 Court is more than capable of managing the process, and that's

15 how we'd urge it to go forward.

16       THE COURT:  Okay.

17       MR. FELDMAN:  Thank you --

18       THE COURT:  -- Mr. Feldman.

19       MR. FELDMAN:  -- Your Honor.

20       THE COURT:  Yeah.  I mean, I understand that.  And

21 what you say, again, is consistent with your motion to

22 terminate it.  And if I grant your motion or grant the senior

23 bondholders' motion, whether we call it a formal protocol or a

24 court scheduling order, I'll still need advice and guidance

25 from the players as to what that protocol ought to be, and

1    timing, and so on.

2            You're right, and I'm not -- if either or both of you

3    get that motion granted, it doesn't mean you're going to file a

4    plan and set a hearing on confirmation next week.  So we're

5    going to deal with it in some orderly fashion.

6            Thank you for your comments.

7            All right, the gentleman that came up, and I didn't

8    get your name.

9            MR. JOHNSTON:  Good afternoon, Your Honor.

10           THE COURT:  I'm sorry, I try to recognize everybody,

11   but I can't.

12           MR. JOHNSTON:  First time appearing in this case.  Jim

13   Johnston of Jones Day, on behalf of certain --

14           THE COURT:  Well, I think your partner was here for a

15   prior hearing, but --

16           MR. JOHNSTON:  He's been here several times --

17           THE COURT:  Okay.

18           MR. JOHNSTON:  -- yes.

19           Your Honor, we heard a lot of discussion about

20   exclusivity and whether or not you should break exclusivity

21   today.  You've read in our papers, you'll hear next week, we do

22   not think you should do so.

23           THE COURT:  Right.

24           MR. JOHNSTON:  Particularly given the June 30 date

25   that is looming in everyone's minds.  We believe --

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 60
of 118

1          THE COURT:  Don't turn this into your motion for that.

2          MR. JOHNSTON:  I am not going to do so.

3          THE COURT:  Okay.

4          MR. JOHNSTON:  I'm going to say that we believe that

5   the debtors are the best stewards of the process going forward.

6          But what I rose to say, though, and I know I don't

7   have to tell you, but the Code gives you all the tools to deal

8   with what might happen if you do determine that there is cause

9   to terminate exclusivity.

10         THE COURT:  Um-hum.  Right.

11         MR. JOHNSTON:  You did it in the first PG&E case and

12  managed it, you can do it in this case.  Certainly --

13         THE COURT:  By comparison, it was awful easy.

14         MR. JOHNSTON:  I didn't have the privilege of living

15  through the first PG&E case, but it sounded like a heck of a

16  lot of fun.  The --

17         THE COURT:  Ask Mr. Kornberg.

18         MR. JOHNSTON:  I think Your Honor, in your commentary

19  with Mr. Feldman, hit the nail on the head, which is if you do

20  decide to terminate exclusivity, you are going to want to

21  develop a scheduling order, a "Plan B protocol" with input from

22  the parties.

23         We heard reference from the committee today saying

24  that, boy, they may file something on Monday night.  We heard

25  reference from Mr. Qureshi on behalf of the senior bondholders

1    that boy, they filed something yesterday.

2            THE COURT:  Well, no, actually they filed it, I think,

3    a couple days earlier in connection with their comment on the

4    efforts that the Governor's office.  I mean, it's --

5            It doesn't matter what day they filed it.  They did

6    file it prior to this morning or in that, I just haven't --

7            MR. JOHNSTON:  Yeah.  So I don't know if it was

8    twenty-four hours ago or forty-eight hours ago.

9            THE COURT:  Yeah, yeah.

10           MR. JOHNSTON:  It is not something that will be before

11   the Court on Tuesday.  And so we would submit, let's not put

12   the cart before the horse.  Let's consider exclusivity on

13   Tuesday and if, in fact, you do decide that exclusivity should

14   be terminated in some way, shape, or form, there will need to

15   be a reason to process for dealing with what comes next.

16           THE COURT:  Right.  But I did say to Mr. Quresky (sic)

17   specifically, his protocol and his three points about

18   competitive and so on, I said, that's fine unless I deny your

19   motion, in which case, you're back on hold.  I mean --

20           MR. JOHNSTON:  Yeah.

21           THE COURT:  -- it's the same.  I understand.  And the

22   same with you.  If I grant it, then you're going to be

23   frustrated with the position you're in, but that doesn't mean

24   you aren't going to be part of the process, too.

25           MR. JOHNSTON:  No, I understand that, Your Honor.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 62
of 118

1              THE COURT:  Yeah.

2              MR. JOHNSTON:  And the point simply was, especially if

3      there was going to be competing "Plan B protocols" as to what

4      happens with competing plans, that needs to be a reasoned

5      process and it can't be something that's decided on the fly

6      next week.

7              THE COURT:  And Mr. Johnston, I wouldn't tell people

8      they can't file things.  I can only absorb so much, and the

9      more people file, the more stuff I'm just going to have to deal

10     with when I can.  And so same is true.  And so I'm sticking

11     with the exclusivity and the oppositions, and that is the

12     number one topic for Tuesday.

13             MR. JOHNSTON:  Great.  Thank you, Your Honor.

14             THE COURT:  Thanks very much.

15             Okay.  Anyone else want to be heard?  Because again, I

16     don't mind hearing from you, but I also don't intend to take

17     any action, and I do have a couple other motions that we'd like

18     to deal today.  So unless there -- since I've asked for --

19     invited and no one's coming forward, so I'm prepared to

20     terminate today's hearing on what we just called the status

21     conference, for lack of anything else, and thank you all for

22     your comments, and say that I'll pick up my responsibility to

23     do what I have to do come Tuesday when I hear the arguments on

24     the exclusivity motions.

25             Mr. Karotkin, I'm prepared to go directly, without a

1    break, if we can move with the other two motions quickly.  But
2    we can also take a break, if you think that would be more
3    helpful.  What's your pleasure on this?
4              MR. KAROTKIN:  I think people are -- let me just fix
5    this.
6              THE COURT:  Yeah.  Don't do that.  We might have to
7    get a new microphone for you.
8              MR. KAROTKIN:  I think people are anxious to go home
9    on Friday, so --
10             THE COURT:  Yeah, listen.  I want to say to --
11             MR. KAROTKIN:  Including me.
12             THE COURT:  -- all the out-of-towners, this hearing
13   got set on Friday because somebody said it was important, and
14   that's why we ran late today.  We had a regular calendar for
15   other matters and I'm the one that lives here.  So I don't
16   know, we'll try not to set Friday midday hearings when we don't
17   need to.
18             MR. KAROTKIN:  I don't want to admit it was my idea.
19             THE COURT:  So we have the CEO motion and the KEIP
20   motion.  I --
21             MR. KAROTKIN:  Exactly.
22             MR. KAROTKIN:  -- know what you've said, I'd like to
23   hear from the U.S. Trustee, and --
24             MR. KAROTKIN:  Right.
25             THE COURT:  -- have a couple questions --

 1          MR. KAROTKIN:  Sure.

 2          THE COURT:  -- for you after that about the CEO

 3  motion.  I don't know there's anyone else that wants to be

 4  heard on that one.  Is that okay with you to go that way?

 5          MR. KAROTKIN:  That's fine with me.

 6          THE COURT:  There was one --

 7          MR. KAROTKIN:  And I was hoping you would take that

 8  one first because I know there are some people who have to

 9  catch airplanes.

10          THE COURT:  There was one other -- there's one other

11  party who filed the joinder, but it's --

12          MR. KAROTKIN:  Yes.  It's the same.

13          THE COURT:  Mr. Laffredi here?  I don't --

14          MR. ZIPES:  Your Honor, he's not here.  He had a

15  personal issue.  My name is Greg Zipes; you have not seen me

16  before.  I'm with the Office --

17          THE COURT:  I just --

18          MR. ZIPES:  -- of the United States Trustee.

19          THE COURT:  -- didn't get your name.

20          MR. ZIPES:  Zipes.  Z-I-P-E-S.

21          THE COURT:  Okay, Mr. Zipes, so you're taking over.

22  So did you have a chance to review Mr. Karotkin's opposition?

23          MR. ZIPES:  Yes, we did, Your Honor.

24          THE COURT:  What's your take on that?  What's your

25  recommendation?

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 65
of 118

1        MR. ZIPES:  Your Honor, the U.S. Trustee's Office --

2   and we're dealing with the CEO motion at the moment --

3        THE COURT:  Right.

4        MR. ZIPES:  -- correct?

5        THE COURT:  That's right.

6        MR. ZIPES:  The U.S. Trustee's objections, as this

7   Court is aware, fell into two buckets.  One was a request for

8   further information; that's something we often ask for in our

9   objections.  The motion as filed clearly lacked information on

10  how the debtors reached their conclusions for compensating the

11  CEO.

12       We asked for certain items that might have helped us

13  understand, including underlying contracts, and we learned

14  within the last couple days, perhaps, that there are actually

15  no -- there is no written contract.

16       Your Honor, I was prepared to talk about both motions,

17  so that's why you're hearing me say --

18       THE COURT:  Okay.

19       MR. ZIPES:  -- referring to more than one at a time.

20       I've heard this Court say that your bailiwick is the

21  Bankruptcy Code and resolving --

22       THE COURT:  Well --

23       MR. ZIPES:  -- things here, and that's -- and I

24  completely --

25       THE COURT:  -- I think so.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 66
of 118

1          MR. ZIPES:  -- agree with that, Your Honor, and we're

2     dealing with the Bankruptcy Code here.

3          So Your Honor, to answer your question, we believe

4     that there is still a few issues in the CEO motion that does

5     need to be resolved and I --

6          THE COURT:  Well, okay.  Let me just zero in on a

7     couple questions.  You observed in the response -- maybe it was

8     one of your -- maybe Mr. Laffredi signed it, it doesn't

9     matter -- you raised, but I don't think you want me to act on,

10    the fact that it wasn't until your research that we learned

11    that Mr. Johnson was actually paid a signing bonus, whether we

12    want to call it that, he didn't really disclose it specifically

13    in the motion.  You don't want me to do anything about that?

14    You don't want me to make him disgorge it?

15          MR. ZIPES:  Your Honor, yes.  I was getting to the

16    points that we --

17          THE COURT:  Okay.

18          MR. ZIPES:  -- still had outstanding.

19          All right, Your Honor, we were very concerned about

20    this disclosure, and there's a couple of questions here.  This

21    motion was filed under 363 of the Bankruptcy Code.  And 363, a

22    motion of this kind, is actually very unusual in a Chapter 11

23    case.  This is the retention of an executive, it's not a

24    retention --

25          THE COURT:  Right.

1          MR. ZIPES:  -- of a professional party.

2          THE COURT:  No, I understand.

3          MR. ZIPES:  And Your Honor --

4          THE COURT:  But it's not been the practice, in this
5    district particularly, for compensation levels of people
6    generally.  But this is a big item and a significant position,
7    important person.

8          MR. ZIPES:  Absolutely.

9          THE COURT:  So I can't fault the debtor for making
10   their request, but --

11         MR. ZIPES:  Absolutely, Your Honor.

12         THE COURT:  Okay.

13         MR. ZIPES:  And it is good that the information gets
14   out there, as we've been trying to do.  And that's one of the
15   goals of the U.S. Trustee's Office.

16         Your Honor, the transition payment, we still have
17   issues with that.  First of all, it wasn't disclosed prior to
18   it being paid; it was paid and then the motion was filed.

19         But in addition, Your Honor, we're dealing with a 363
20   motion.  And the question here is what standard applies, as
21   well, under the Bankruptcy Code.

22         THE COURT:  Well, but I want to be more specific.
23   Because I asked you, on that item, are you asking that I order
24   it be disgorged?  I don't think your papers say that.  I mean,
25   I'll agree with you that I think it should have been disclosed

1  as part of the request.  The question is, what do I do about it

2  because --

3           MR. ZIPES:  Because --

4           THE COURT:  -- Mr. Johnson's -- now, he personally

5  hasn't said anything, but the corporate counsel haven't denied

6  that.  They've said what they've said.  And it's not something

7  that was secret, it just wasn't in the motion.  So therefore,

8  what?

9           MR. ZIPES:  And Your Honor, you're correct, the table

10 has been set.  So the question is what is this payment and

11 should it be subject to a review?  And that's a question that

12 we still have.  Usually these payments aren't made before these

13 motions are filed, they're made after these motions are granted

14 and the standard is met.

15          So Your Honor, if we look at what was paid here, is

16 this a bonus?  And if it is, under --

17          THE COURT:  Well, who says it's a bonus?  I mean, it's

18 a -- I mean, I called it a signing bonus, but I mean, he took

19 on this big job and he came with a lot of credentials.  And I

20 don't know what the bid and ask was, but somebody made a

21 decision to give him three million dollars to take the

22 assignment.  So you can call it a bonus, or you can call it a

23 retention payment.

24          Again, I'm going to go back to my question.  Your

25 papers don't say I should order him to disgorge it, so are you

1  asking me to do that or not?  That's what I'm trying to pin you

2  down on.

3          MR. ZIPES:  Your Honor, and I don't -- I'm answering

4  this sort of indirectly because I --

5          THE COURT:  I know.  That's why I'm asking you to

6  answer it --

7          MR. ZIPES:  Okay.

8          THE COURT:  -- directly.

9          MR. ZIPES:  So Your Honor, I think if we had -- and

10 Your Honor, the answer is yes, pending satisfactory explanation

11 as to what this payment was.  So the question here is whether

12 the response of the debtors, that they filed two days ago,

13 adequately deals with this.

14         THE COURT:  And what do you say --

15         MR. ZIPES:  And so Your Honor --

16         THE COURT:  -- to that?

17         MR. ZIPES:  -- we had a chance to review the

18 declaration --

19         THE COURT:  Right.

20         MR. ZIPES:  -- and again, I'm trying to focus on the

21 statutory predicates here of what this should be moving under.

22 And I still think the debtor has not answered a question here.

23 If you look at the declaration that was filed two days ago,

24 there's a list of other executives and transition --

25         THE COURT:  Right.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 70
of 118

1          MR. ZIPES:  -- payments that were paid to them.  They

2  weren't just -- Your Honor, at least according to my reading of

3  this declaration, they weren't just paid.  There was shares,

4  there was equity payments as part of those packages.

5          THE COURT:  Well, but Mr. Johnson's compensation is a

6  variety of things; we're just focusing on one component of it.

7          MR. ZIPES:  Right.

8          THE COURT:  Okay.  Right?  So okay.  So I read the

9  response.  You believe that -- well, I mean, we know.  We know

10  from the motion and the response that his compensation is a

11  variety of things, some performance based, some just being

12  there, some only if he's terminated.  And if it comes to your

13  position on what if he's severed, what if he's terminated not

14  for cause, that's a separate issue.

15          So look, let me try it a different way.  Three million

16  dollars is a lot of money.  This case is high visibility, and

17  what would happen if the debtor hadn't asked for it?  Those are

18  all hypotheticals.  What if Mr. Johnson had been paid 30,000

19  dollars for signing on, or what I'll call for signing; would

20  you have the same issue?  Are you concerned about the size of

21  it, or the lack of disclosure of it?

22          MR. ZIPES:  Your Honor, we were initially mostly

23  concerned with the lack of disclosure and the explanation as to

24  what bucket this fits under, if this is properly a 363 request,

25  or if it should be something else.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 71
of 118

1          And I think the severance aspect of this, there's a

2    concession that 503(c)(2) would apply.  In this one, our focus

3    is what is this in actuality?  Because under a KERP or a 503

4    analysis, it's not necessarily what the debtor calls it, it's

5    what the Bankruptcy Code --

6          THE COURT:  Well, what do you call it?  Again, let's

7    go back to what do you call it.  You've used the word "bonus"

8    several times, the TCC uses the word "bonus" several times in

9    its opposition to the KEIP motion; the TCC hasn't taken a

10   position on Mr. Johnson's --

11         MR. ZIPES:  Sure.

12         THE COURT:  -- situation.  So you're using the word

13   bonus, but is it a bonus?  I mean, to me, the -- Kevin Durant

14   just signed with the New York Nets, and I presume he got a big

15   check, which everybody might call a signing bonus.  Mr. Johnson

16   took on a job, and he has some duties to perform and he's

17   getting paid a compensation, including the money he got paid up

18   front.  Now, what is the magic of saying that it's a bonus?  Or

19   Kevin Durant, calling it a bonus?  It's what -- they paid him

20   to come be on the team.  And so when he gets his leg fixed,

21   he'll be playing basketball.  Mr. Johnson, presumably, is out

22   there earing his pay right now.

23         The question is do I say sorry, slap his wrist, give

24   me the three million back and then say, but your compensation

25   is approved, therefore you can pay it now that it's been -- you

1   can have it back?  So what do you want me to do?

2            MR. ZIPES:  Okay.  Yes, Your Honor, and I can sense

3   your frustration with my answers here.

4            Your Honor, if this was done without seeking a court

5   order, and this is the way that it normally would be done,

6   parties with the consequences, whatever those consequences

7   might be.  Here, they're getting before the Court and they're

8   saying, we want a court order blessing this payment.  And so

9   we're just saying they need sufficient information.  Three

10  million dollars; is three million dollars a reasonable sum

11  under the circumstance?

12           We could say it's a big case, that it's necessary to

13  pay someone adequately for this case, but here, they're asking

14  this Court to bless a three-million-dollar payment.

15           THE COURT:  Well, it's a package.  They're asking me

16  to bless a whole package.  And --

17           MR. ZIPES:  Sure.

18           THE COURT:  -- again, we don't have motions like this

19  for every senior employee that the company hires.

20           MR. ZIPES:  Sure.

21           THE COURT:  We do it when it is the top man on the

22  totem pole in a highly visible position of a public company in

23  bankruptcy with enormous problems.  So I can't fault the

24  debtors for asking.  And I guess there is a be careful what you

25  ask for principle here, because the statements even say that if

1  I were to disapprove it -- Mr. Johnson didn't say anything, but
2  the corporate lawyers said he'll pay it back.  So I'm assuming
3  that's a true statement.

4         MR. ZIPES:  All right.  And we assume that's a true
5  statement as well, Your Honor.

6         THE COURT:  Okay.  Well, let's switch to the 503(b)(2)
7  question.  And that's focused, your paper's focused, on the
8  severance.  So were you satisfied or not satisfied with the
9  reply as to how Mr. Karotkin said the debtors will deal with it
10 if there is a severance, not for cause, during the bankruptcy?

11        MR. ZIPES:  And Your Honor, we appreciate the
12 concession here, and we have no problem with that, with one
13 caveat, Your Honor.  And that is we haven't filed a plan in
14 this case.  We haven't gone through the plan process.  And some
15 of the requests -- some of the relief requested is possibly
16 more appropriate for the plan stage.

17        THE COURT:  But how do you tell someone that comes on
18 board, we're going to bring you in, we're going to make you
19 work on one of the most difficult cases in your imagination,
20 and a portion of your compensation will be considered by a
21 court somewhere down the line, after this very simple process
22 called confirmation?  That's not fair to him, is it?

23        MR. ZIPES:  Or during confirmation.  There may be, for
24 example, a different compensation package, which is part of the
25 overall deal --

1          THE COURT:  But that --

2          MR. ZIPES:  -- and plan.

3          THE COURT:  -- goes both ways.  Because if I approve

4    this package and something makes Mr. Johnson's job all the more

5    difficult and he accomplishes all the more extreme outcome and

6    asks for more, I'm sure you'll be saying, wait a minute, you

7    can't ask for more.  We already fixed your compensation.

8          So look, I just want to zero in, and then I'll listen

9    to Mr. Karotkin --

10          MR. ZIPES:  Yeah.

11          THE COURT:  -- and you can make --

12          MR. ZIPES:  Yeah, no.

13          THE COURT:  -- any comment, but just one more time.

14          MR. ZIPES:  All right.

15          THE COURT:  Focusing on the severance, as --

16          MR. ZIPES:  Right.

17          THE COURT:  -- I read your papers, the motion said, if

18    Mr. Johnson is severed not for cause during the case or after,

19    but at least during the case, he gets paid a severance pay of

20    two-and-a-half million dollars, right?  And that's cash

21    dollars.  And your position is, that is inconsistent with

22    503(b)(2).

23          And the response was, as I read the response, well, if

24    it's triggered during the bankruptcy, the debtors will comply

25    with it.  I mean, I'm asking you, is that an adequate

1   explanation from your point of view?

2           MR. ZIPES:  Yes, Your Honor.

3           THE COURT:  Okay.

4           MR. ZIPES:  Yes.  So they would presumably -- and we

5   would work out some -- they would have to get before this Court

6   if there was some severance, and they would have to meet the

7   standard under 503(c)(2).

8           THE COURT:  Okay.

9           MR. ZIPES:  Yeah.

10          THE COURT:  Well, let me hear from Mr. Karotkin, and

11  then I'll come back to you, Mr. Zipes.

12          Now, Mr. Karotkin, my first question for you is my

13  last question for him:  what does that mean, the debtors will

14  comply with 503(c)(2)?  Does Mr. Johnson know that?

15          MR. KAROTKIN:  Yes.  Of course he does.

16          THE COURT:  Do I have a declaration from him?  I mean,

17  does that mean, Mr. Johnson, we promised you 2-1/2 million, but

18  your severance is only 50,000?

19          MR. KAROTKIN:  Yes.  He absolutely knows that.

20          THE COURT:  But I don't know that he knows that.  I

21  don't know the declaration.  I have your statement that the

22  debtors will comply with the Code, and I don't know what that

23  means.

24          MR. KAROTKIN:  It means exactly what it says it means.

25  The debtors filed the motion to approve the contract, and the

1  understanding is that's exactly how it will work.  And in

2  fact --

3          THE COURT:  I don't know exactly --

4          MR. KAROTKIN:  -- there's a --

5          THE COURT:  -- what the dollars are.  Is it the same

6  dollars?

7          MR. KAROTKIN:  No, it would --

8          THE COURT:  Well, I don't know.

9          MR. KAROTKIN:  It would be based on the formula

10  contained in the statute.

11          THE COURT:  Well, it's not a fixed formula --

12          MR. KAROTKIN:  No.

13          THE COURT:  -- it's a relative formula.

14          MR. KAROTKIN:  It would depend on when it happened.

15          THE COURT:  Well, and I say -- but no, I'm saying if

16  it happens before the effective date of the plan.

17          MR. KAROTKIN:  Well, that's the only time it would

18  apply --

19          THE COURT:  Well --

20          MR. KAROTKIN:  -- okay?

21          THE COURT:  -- there are differences of opinion about

22  that, but --

23          MR. KAROTKIN:  Well, I think that Mr. Zipes was

24  satisfied with our --

25          THE COURT:  Well --

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 77
of 118

1      MR. KAROTKIN:  -- explanation.

2      THE COURT:  -- but I'm not.

3      MR. KAROTKIN:  Okay.

4      THE COURT:  That's why I'm asking the question.  So

5  here's my question:  suppose, for its own reasons, the board

6  decides to terminate Mr. Johnson two months from now; what does

7  Mr. Johnson get?

8      MR. KAROTKIN:  He gets whatever severance he would be

9  entitled to under Section 503.

10      THE COURT:  But he and you today don't know what that

11  is.

12      MR. KAROTKIN:  That's correct.

13      THE COURT:  And it could be 50,000 dollars.

14      MR. KAROTKIN:  It could be.

15      THE COURT:  But how do I know that is what he's agreed

16  to?  Again, I don't suggest that you're making this up, but --

17      MR. KAROTKIN:  That's what the --

18      THE COURT:  -- it would seem to me, for the

19  corporation to say, this is what the terminated, severed, not-

20  for-cause executive is going to get, and I don't even know that

21  he knows that, I don't know that I should be approving it.  So

22  you need to tell me why I should make that choice when I don't

23  even know what it means.

24      MR. KAROTKIN:  Well, Your Honor, you lost me on how

25  you don't know what it means.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 78
of 118

1           THE COURT:  Okay.  I can't calculate it --

2           MR. KAROTKIN:  Well --

3           THE COURT:  -- in terms of dollars.

4           MR. KAROTKIN:  -- again, 503 provides for a

5    calculation.

6           THE COURT:  Yeah, but you have to take it in relation

7    to a set of facts.

8           MR. KAROTKIN:  At the time, if it happens.

9           THE COURT:  Okay.

10          MR. KAROTKIN:  Okay?  And what I'm saying to you is

11   that if Mr. Johnson is severed not for cause during the

12   pendency of the case, despite what his contract says, he will

13   get whatever that section provides in severance, and no more

14   than that.

15          THE COURT:  Okay.  And so my statement again is, how

16   do I know that he knows that?  And I'm not playing games with

17   you.

18          MR. KAROTKIN:  I realize that.

19          THE COURT:  I don't like a situation where we do a

20   gotcha on somebody.  Mr. Johnson's a very important person.

21          MR. KAROTKIN:  Yes.

22          THE COURT:  I never laid eyes on him unless he's here

23   in the courtroom.  I've never seen him.

24          MR. KAROTKIN:  I will tell you --

25          THE COURT:  No, don't.  Let me finish.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 79
of 118

1           MR. KAROTKIN:  Sorry.

2           THE COURT:  And when someone takes on this enormous

3    responsibility and risks whatever he is risking professionally,

4    although he hopes to be paid well, he also shouldn't be

5    punished by saying, I didn't understand that.  So if the board

6    decides to terminate him tomorrow, and he says, well, where's

7    my two-and-a-half million dollars, and you say, well, sorry,

8    Bill, you'd better read 502.3(c), here's your 50,000, he's

9    going to be an unhappy camper.  Okay?

10          MR. KAROTKIN:  Let me try to address that, okay?  I

11   can represent to you that Mr. Johnston is aware of it.  I can

12   also represent to you that having written this in the contract,

13   if he wasn't aware of it, I probably wouldn't be showing up at

14   the next hearing.

15          If you would like me to get a statement from him that

16   he understands that's how it will work, I'm happy to do that.

17          THE COURT:  Well, and this goes back to the other

18   question, Mr. Karotkin.  One of the things I would tell Mr.

19   Johnston if I welcomed him to the court and congratulated him

20   on taking on a horribly difficult task, is the one rule is

21   don't play games with the judge by being half complete in your

22   statement.  And I find the statements, the corporate papers

23   that you filed, and again, I don't mean to personalize this,

24   the statement that doesn't disclose the three million dollars,

25   and kind of indirectly to be very, very troublesome.  I'm not

1  going to -- there are no consequences, but I will tell you in
2  simple little cases when corporate officers start doing things
3  like that without proper disclosure, they are promptly
4  introduced to the trustee in a Chapter 11 case.

5           And I'm not going to do a thing here, but I'm
6  wondering why do they have to be so -- sort of -- half-
7  disclosed?  Why couldn't it just have been disclosed?

8           MR. KAROTKIN:  Right.  I think that there is
9  disclosure in the motion that he is being paid his
10 compensation.

11          THE COURT:  Yeah.  His compensation.  I know, but Mr.
12 Karotkin, that's sort of -- that's sort of -- what's that
13 phrase?  Too clever by half.  I mean, that doesn't say, and he
14 got three million dollars.

15          MR. KAROTKIN:  But Your Honor, again, his compensation
16 and the three million dollars is fully in the chart.  And there
17 is an exact --

18          THE COURT:  It's not disclosed in the motion.

19          MR. KAROTKIN:  Pardon me?

20          THE COURT:  It's not disclosed in the motion that
21 says, this is what we'd like to do.  Now, again, I promise you
22 I won't --

23          MR. KAROTKIN:  I believe the transition here is --

24          THE COURT:  -- dwell on this, but a fair reading of
25 that paper by me is that when I approve his motion -- your

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 81
of 118

1  motion -- he will get the payment.  And that's fine.  Again, I
2  don't quarrel with the concept.  But I found it troublesome to
3  have my first involvement with him, personally -- not really
4  personally, but -- to find it in the U.S. Trustee's response to
5  say, they didn't tell you that he got his three million
6  dollars.

7          MR. KAROTKIN:  Sure.

8          THE COURT:  So I'm not going to order it disgorged,
9  unless there's some other reading to it.  So your offer to me
10  is that Mr. Johnston would acknowledge that if the board
11  chooses to terminate him during the case, that he will get paid
12  something that may be different from what the document says is
13  his severance entitlement.

14          MR. KAROTKIN:  Correct.

15          THE COURT:  Okay.  Well, I didn't know that until you
16  clarified because it wasn't --

17          MR. KAROTKIN:  Well --

18          THE COURT:  I mean I didn't know it until you put it
19  in the thing.  There wasn't a whole lot of discussion about
20  503(c) in your reply.  The reply just said, we'll comply with
21  it.  And I didn't know what you meant by that.  You've answered
22  it now.

23          MR. KAROTKIN:  Okay, well, I apologize if it wasn't
24  clear.  I felt that saying we will comply with the statutory
25  provision would be clear enough for the Court to understand

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 82
of 118

1   that any severance would be subject to that formula.

2           THE COURT:  Again, not to beat it to death.  If Mr.

3   Johnston is terminated for cause, and he gets something that's

4   not the amount that's in the document, and he comes back with

5   separate counsel and makes a motion and says, why the hell

6   didn't I get what you said I was going to get, I will say,

7   well, Mr. Karotkin said you knew about it.

8           MR. KAROTKIN:  Yes.  You can do that.

9           THE COURT:  Okay.  All right.  I am going to leave it

10  at that.

11          Mr. Zipes, do you want to say anything further?

12          MR. ZIPES:  Your Honor, I --

13          THE COURT:  Excuse me, excuse me.

14          Mr. Karotkin, I dominated our colloquy.  If you wanted

15  to say anything else in response to his argument, I didn't mean

16  to cut you off.  I mean I -- you answered my question.

17          MR. KAROTKIN:  I don't have anything -- I don't have

18  anything to say.

19          THE COURT:  Okay.  Go ahead, Mr. Zipes, anything

20  further?

21          MR. ZIPES:  Your Honor, the only point I make, and I

22  appreciate all the Court's comments, is that this is a 363

23  motion.  It has possibly incentive-based bonuses in it and as

24  long as it's clear that any bonuses, any intent of base bonuses

25  will be brought to the Court's attention under 503 of the

1    Bankruptcy Code, I think we're --

2            THE COURT:  Well, I mean I -- but you're not asking me

3    to tell Mr. Karotkin if I approve the current motion, that he

4    has to come back and ask for permission to execute that motion.

5    He might have to come back with another motion, or choses to

6    change it, particularly if more favorably.  But you're not

7    asking for something other than that, are you?  I mean, if I

8    approve it, I approve it.  I'm not going to go back and say, I

9    gotcha, I really wasn't approving it.

10           MR. ZIPES:  Okay, Your Honor, we did ask for the

11   further disclosure.  We think 503 clearly has a role in this

12   motion, but I hear your -- I hear the Court.

13           THE COURT:  Okay.  I'm going to -- I'm going to take

14   the matter under advisement for now.  Let's go to the KIEP

15   motion.

16           And Mr. Karotkin, in the interest of time, I'm willing

17   to the same thing I did on that issue; if you want to make an

18   opening remark, you can, but I'd rather hear from the --

19           MR. KAROTKIN:  Opponent.

20           THE COURT:  -- opponent.

21           Let's go with the TCC.  Mr. Julian, are you going to

22   do that or is Ms. Dumas going to get that one, too?

23           MR. JULIAN:  Ms. Dumas -- she's on the phone.

24           THE COURT:  Ms. Dumas, are you still with us?

25           MS. DUMAS:  Yes, sir, I am.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 84
of 118

1          THE COURT:  Okay.  On the KIEP motion, I read your

2   response and I appreciate what you had to say.  Do you have

3   anything further to add based upon what the debtor has filed?

4          MS. DUMAS:  Very briefly, Your Honor, as the Court saw

5   from the TCC's lack of a formal objection to the Johnson

6   compensation motion, we are willing to give Mr. Johnson a shot.

7   We believe that a top-down corporate culture change is

8   essential.  And we work consensually with debtors' counsel, Ms.

9   Liou, to answer any questions or concerns we had with respect

10  to Mr. Johnson's compensation package.  And those questions

11  were answered to our satisfaction.

12         Our view is that the question is materially different

13  with respect to those individuals for whose compensation is

14  governed by the KIEP motion.  And because those are the

15  individuals who, while not at the top, were senior executives

16  during periods of time in which this corporate culture was

17  continued.  The problems that lie with PG&E's management and

18  its assets, it's failure to focus on safety are so known, I

19  can't even possibly repeat them, but they continue on into the

20  bankruptcy case and they're not abated.

21         We learn of -- every day, we learn of continuing

22  violations, falsifications, potential criminal actions.  These

23  are the people who brought us here, Your Honor.  And whereas

24  they're not the rank-and-file, as we pointed out, these are, in

25  fact, the people who retained McKenzie to give them a cost-

1  benefit analysis of whether they should repair something if

2  only 100 people would die as opposed to 100,000 would die.

3  These are the people who have directed PG&E's scorched-earth

4  litigation strategy against victims' counsel which continues to

5  this day as the Court has seen from our difference of

6  interpretation of the debtors' position on what it takes

7  responsibility for in claims estimation.

8         We don't know any other way to let PG&E know that this

9  can't continue, that these people should really not be

10 receiving bonuses, they should be losing their jobs, and

11 hopefully, Mr. Johnson will clean house.  And we understand

12 that there's a desire to keep the ship steady during the

13 bankruptcy case, and we're sympathetic to it.

14         Our fallback position, rather than disapproval, is to

15 require the debtor to change, during the course of the

16 bankruptcy case, its metrics to a hundred percent safety

17 focused.  As Ms. Mitchell aptly said earlier during the status

18 conference, we are all horribly, terribly concerned about

19 consequences of a wildfire during the course of the bankruptcy

20 case.  That should be everyone's focus.  And this does not

21 appear to be a plan that recognizes, as we said in our brief,

22 the realities on the ground as opposed to some hypothetical

23 company that's been managed properly and is conducting itself

24 properly in the bankruptcy case.

25         Thank you, Your Honor.

1        THE COURT:  Ms. Dumas, your opposition includes some
2    other comments that I want to understand better.  And I have
3    some questions for TURN, if their counsel's here, too.

4        One of the things that's stated in your papers is that
5    the Court should perhaps at some point, if necessary, order any
6    or some of the top-level management to disgorge any monies that
7    are paid, if it turns out that some of these things happened in
8    the future.  I don't have any real ability procedurally or
9    authority to do that, do I?  In other words, if I --

10       MS. DUMAS:  No, Your Honor, we -- it --

11       THE COURT:  -- authorize this bonus and a corporate
12   officer -- I'm not going to name anyone, you know there are
13   twelve people named on the list.  And you're not -- I mean, are
14   you really suggesting that if there's another fire, or if Judge
15   Alsup imposes further penalties, or the CPUC, and it says, all
16   right, PG&E, you did it, you violated another one of the rules,
17   that one of these individuals could be served with a summons
18   and a complaint or a motion to disgorge some of this money that
19   they might have been paid?  I mean, how would I do that?

20       MS. DUMAS:  I think Your Honor, you're absolutely
21   correct.  The argument was more rhetorical than practical.

22       THE COURT:  Okay.

23       MS. DUMAS:  We are at an absolute loss as to how to
24   communicate better than we did in the STIP and in any way
25   possible that this is not a typical company in operation.

1              THE COURT:  Okay, I understand.

2              MS. DUMAS:  It's seriously, seriously sideways.

3              THE COURT:  No, I know you believe strongly and I'm

4    not trying to deal with that.

5              You made another argument that suggests that somehow,

6    I'm supposed to look at what the new standards are under AB1054

7    for management compensation.  I mean, again, I don't -- I mean

8    Ms. Mitchell is the expert in the world on 1054, and I haven't

9    even worked through all forty-five single-spaced pages -- lines

10   of it.  But if there's some provision in there that deals with

11   management compensation, do you have any authority to say that

12   the bankruptcy court can take a statute that applies for future

13   events and use it to make a decision of a purely bankruptcy

14   question of the compensation program?  I mean, again, I'm not

15   trying to put you on the spot, I just need to know what my

16   choices are.

17             MS. DUMAS:  No, sir.  And I appreciate that.  And Your

18   Honor, you're not putting me on the spot.  The point we made in

19   our brief was that the State of California, the legislature,

20   deemed it necessary to not only enact legislation governing the

21   heightened need for properly managing these electrical assets

22   but also, by way of comparison, to the debtors' board committee

23   and executive compensation advisors saw fit to enact into

24   legislation a comparison between executive compensation and

25   safety.

1          So certainly, we understand that the Court can't

2     enforce AB1054.  It wasn't intended to be a guideline for the

3     Court, merely an item of comparison that this is of statewide

4     significance.

5          THE COURT:  Okay.  All right, thank you, Ms. Dumas.

6          Do we have -- is counsel for TURN here -- want to be

7     heard?  I don't see Mr. Harris.

8          MR. HARRIS:  Yes, Your Honor, this is Robert Harris.

9     Thank you.

10          THE COURT:  All right.  Okay.  Yeah.  Go ahead.

11          MR. HARRIS:  Your Honor, I appreciate you reviewing

12     our paperwork.  You know, I have stated in our pleadings that,

13     pursuant to the AMR case, to which I did not see a response in

14     the reply brief.  We do think it's too early to be approving

15     incentive or, really, bonus compensation that will be

16     unreviewable, even if it is, in fact, paid in equity.  That

17     equity component would saddle another potential plan component

18     with a very difficult burden.

19          THE COURT:  Do you -- I mean --

20          MR. HARRIS:  And I think we're pretty sure at this

21     point --

22          THE COURT:  Mr. Harris, do you really think that is

23     likely, given the size of the equity and the number, and the

24     number of shares that are owned by the entire universe of

25     equity holders, that the equity component of the compensation

1    of the KIEP would have any kind of a meaningful impact on

2    anything except those particular individuals?

3            I mean, it's hard for me to imagine that.  We're not

4    dealing with hedge fund managers or Warren Buffett.  We're

5    dealing with individuals who believe they're doing their job

6    and are asking -- their corporate employer is asking to have

7    approval of a compensation package that obviously, yes, affects

8    the individuals, but do I really -- do you really believe that

9    it would drive the market?  For example, would the trading

10   price of the stock move because a corporate officer got X

11   dollars with a publicly traded stock?  It's hard for me to

12   imagine that.

13           MR. HARRIS:  No, Your Honor.  I'll concede that in the

14   context of the overall financial picture in this case, it is a

15   relatively limitless amount.  But I do believe that it would

16   have to built into any future plan.  I think that's how this

17   will work, because I agree with you.  I don't think you can

18   undo this later.  Once you approved it, you've approved it.

19           I just want to make two other points very quickly,

20   Your Honor.  First, with the respect to the failure to meet the

21   evidentiary burden, Ms. Dumas, I think, said very nicely in her

22   pleading, that even if the debtors fail to achieve the

23   threshold PSI Metric, the key participants will still get fifty

24   percent of their aggregate KIEP payout.  That seems to be

25   conclusive evidence that this is a layup, that this is a bonus

1   plan.  They're going to get at least half, if that analysis is

2   correct.

3         And further, the U.S. Trustee notes, this is again

4   with regards to the evidentiary burden, that we are effectively

5   50 percent of the way, as of today, through the period that

6   would be covered by the KIEP plan, yet we do not seem to have

7   heard from the debtor any kind of an indication as to whether,

8   based on current performance, the KIEP will be met.

9         THE COURT:  Well, I think the debtors' response was,

10   in part, that this is confidential and it's also -- we're not

11   even through the -- well, I guess we are through the second

12   quarter now.  But I thought that was there.

13         But listen, you made another point in your paper that

14   the debtor needed to respond to the Wall Street Journal and

15   Judge Alsup.  Well, they've done that, and I presume you and

16   your client have studied whatever the debtor filed with Judge

17   Alsup.

18         Does that change your argument either way?  I mean,

19   for this motion.

20         MR. HARRIS:  Your Honor, they have responded, and I

21   don't have anything to add with respect to that.  I don't think

22   it's appropriate for me to comment on that.  I won't stand on

23   that as a further ground for objection.

24         THE COURT:  Okay.

25         MR. HARRIS:  If that answers the question.

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 91
of 118

1            THE COURT:  Okay.  All right.  Well --

2            MR. HARRIS:  That's all I have, Your Honor.

3            THE COURT:  All right, we're getting late, but I want

4   Mr. Karotkin to have an opportunity, of course, to respond.

5   But is there anyone else in court or on the phone who took a

6   position on this motion that wishes to be heard?  And I don't

7   need extra advice from people who didn't file.

8            All right.  Mr. Karotkin, I'm going to let you say

9   whatever you want to say, but I have one of my opening

10  questions for you.  And it's more of a rhetorical question this

11  time.  And this is something that got -- like the rest of us,

12  the more I'm absorbed in this case, the more I'm overwhelmed by

13  the magnitude of all the problems.

14           And so here's what I'm having trouble with, a phrase

15  in your papers.  And Mr. Karotkin, you've been in my courtroom

16  many months now.  I'm not personalizing this.  So I'm not

17  intending and I don't mean to imply that I'm criticizing you.

18  Because I'm not; I hope you don't take it that way.

19           But there's a phrase, "Key officers need to be

20  appropriately incentivized."  You know, I have a problem with

21  that.  They ought to be appropriately incentivized by being key

22  officers of the most complex utility bankruptcy in U.S. history

23  dealing with one of the most pervasive tragedies in Northern

24  California, if not world history.  If that isn't enough

25  appropriate incentivization to do the right thing, I don't know

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 92
of 118

1    what is.

2            So maybe it's just rhetoric, but looking at this thing

3    from 35,000 feet, why should I -- why should I, at this point,

4    when we've spent the last several hours with a discussion on

5    how is this company going to get reorganized, why do I have to

6    extra-incentivize highly paid professionals who should be

7    incentivized enough just for the burdens that they're carrying.

8    And if they're not incentivized enough, they ought to find

9    another job, frankly.

10           MR. KAROTKIN:  Well, Your Honor, obviously they are a

11   group of very, very dedicated employees.

12           THE COURT:  I assume that.

13           MR. KAROTKIN:  And they have been working -- despite

14   the comments that have been made, they have been working very

15   hard to right, let's say, right the system and regain the trust

16   of the State of California.  I think what it really comes down

17   to, Your Honor, is that these executives are entitled to

18   receive a market-based compensation.

19           And that's all we're seeking here is the opportunity.

20   The opportunity to receive a market-based compensation.  But

21   only, Your Honor, only if they achieve these targets.  And

22   that's the purpose of this, to give them the opportunity to be

23   paid in accordance with the market.  The fact that they are

24   incented to do a good job, of course they're incented to do a

25   good job.  But they're also entitled to receive -- or at least

1  have the ability to receive a market rate of compensation.

2          And if you look at Mr. Friske's affidavit -- he's here

3  today -- the declaration, in the absence of this KIEP

4  opportunity they are substantially below market.

5          THE COURT:  Why don't you --

6          MR. KAROTKIN:  They're below the 25th percentile.  And

7  all we're asking, Your Honor, is to give them the ability --

8  the ability -- if the company performs, to achieve what is a

9  market-based compensation.  Because they're working very hard.

10 And they're trying to do the right thing.

11         THE COURT:  I'll accept that.  I won't question that.

12         MR. KAROTKIN:  And the company had a business to run.

13 And incentive compensation is a fundamental element of running

14 an operations.  It's typical.  We're not asking for anything

15 atypical.  We have created the incentives which are sixty-five

16 percent safety related.  You've seen these metrics before.  The

17 new board of directors added the performance -- the --

18         THE COURT:  No, I know the details of that.

19         MR. KAROTKIN:  -- the modifier to make it even more

20 safety related.  And again, Your Honor, I'm not saying these

21 people are not incentivized to do the right thing, they are.

22 But I think it's important to give them the opportunity -- the

23 opportunity.  And it's not a guarantee.  And you're familiar

24 with how the program works, because it's very similar to the

25 STIP, but --

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 94
of 118

1    THE COURT: Yeah, I am. The problem is when I look at
2  the chart and I look at the numbers and I see what the bottom
3  potential -- and I understand, you're going to tell me what I
4  know, of course the board can terminate it anytime. But you
5  know, you have to assume that sometimes the maximum becomes the
6  minimum. And so there are -- and I don't want to pick out any
7  one of the twelve. I have nothing to do with them. I don't --
8  I like to assume if they aren't properly doing their job, the
9  board or the disciplinary people will take care of that.

10    But it's still a large sum of money. And I mean half of
11  the compensation is money. What if I said to you, it's got to
12  be tilted more to the equity side? You know, people in Silicon
13  Valley are used to getting equity and sometimes they end up
14  filing bankruptcy and sometimes they each buy two more Teslas
15  on them when the IPO happens.

16    Why not -- and this is a rhetorical question -- say, fine,
17  we'll incentivize these folks by tipping the metrics, so they
18  have a big equity play if the company comes through. But if it
19  doesn't, I have a lot of trouble saying that several million
20  dollars should paid and we still haven't got a plan.

21    And I understand. There are all the reasons we talked
22  about this morning why there isn't a plan. And I'm really
23  asking you to give me your best argument as to why even that's
24  a crazy idea. Because it's one of those things that's very
25  tempting to me, to incentivize the heck out of all twelve of

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 95
of 118

1    them by letting them get some more equity play if the whole
2    thing is successful.  But not giving them seven-figure checks
3    at the end of the year at a time when, based upon today, maybe
4    there won't be one dollar to one fire victim yet, leaving aside
5    the extra funds or the insurance recoveries.

6             MR. KAROTKIN:  Uh-huh.  All right.  Let me address
7    that.  First of all, and I don't know if you noticed that we've
8    had discussions with the Unsecured Creditors Committee and
9    there were certain modifications --

10            THE COURT:  Well, I know of some, yes.

11            MR. KAROTKIN:  -- that were made.

12            THE COURT:  Yeah, I --

13            MR. KAROTKIN:  So with respect to half of the award
14   which would be in equity, that is now deferred until the
15   effective date of the Chapter 11 plan.

16            THE COURT:  I know, but you know, what does that mean?

17            MR. KAROTKIN:  But I think -- but that addresses your
18   issue.  Them being involved in Chapter 11 --

19            THE COURT:  I mean come on, on Tuesday, I have to make
20   a couple rulings; who knows what the equity's going to do when
21   I make an announcement.  I mean a confirmed plan, ideally, will
22   have, as everybody has told me from Ms. Mitchell to you, that
23   one of the goals is to get this company out the door so they
24   can get stabilized in the equity market.

25            MR. KAROTKIN:  No, no I understand, Your Honor.  But I

Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 96
of 118

1  thought you were concerned about them receiving an award prior

2  to --

3          THE COURT:  No.

4          MR. KAROTKIN:  -- distributions being made under a

5  plan and I was trying to address that.

6          THE COURT:  No, but what I -- no.  What I'm saying is

7  that equity plays or equity compensation is standard procedure

8  in Silicon Valley and there probably aren't a whole lot of

9  start-ups that hand out fifty cents on the dollar to every

10  employee benefit plan.  They all get stock.  And the ones that

11  fail, they end up filing bankruptcy in court.  And the ones

12  that succeed, they buy Teslas.

13          So what I'm saying is why not here, why don't I just

14  say that all these people are worthy of some incentivization,

15  but not at the expense of real dollars that might otherwise

16  help fund a plan.

17          MR. KAROTKIN:  Well, again, I understand what you're

18  saying.

19          THE COURT:  You can't answer that.

20          MR. KAROTKIN:  And I'll give you two responses to

21  that.  Number one, as you know, in most Chapter 11 cases, it's

22  not customary to provide incentive in the form of stock because

23  you don't know, at the end of the day, that it will have any

24  value.

25          THE COURT:  Right.

1      MR. KAROTKIN:  And therefore, it doesn't really

2  incentivize someone to perform --

3      THE COURT:  Mr. Johnson's getting a bunch of them, if

4  he's still -- and your twelve people half of their KIEP stock.

5      MR. KAROTKIN:  Yes, that would be in the reorganized

6  company as it was modified to address the Creditors Committee's

7  concerns.

8      THE COURT:  Right.  No, I understand.

9      MR. KAROTKIN:  And so if the idea is to provide them

10  with a real opportunity to achieve a market rate of pay, yes,

11  we believe we're solvent.  Yes, we believe the stock has value.

12  I think that Ms. Dumas probably has other views on that as to

13  whether -- with the value of the claims they're asserting.

14      THE COURT:  No, of course she does.

15      MR. KAROTKIN:  I think that calls that into question

16  and we're trying to propose something that, again, is

17  meaningful to the employees.  And I think we addressed part of

18  that concern that the UCC raised by moving the half which is an

19  equity compensation to, again, confirmation of a plan when

20  distributions will have been made and this case will have been

21  resolved.

22      So I think we have addressed part of your issue.  I

23  think that the concern is exactly what kind of incentives are

24  you providing if there's uncertainty as to equity value.

25      And again, we believe the company's solvent --

1          THE COURT:  No, I know you do, and that --

2          MR. KAROTKIN:  -- but there are people who have other

3    views on that.  And --

4          THE COURT:  And there are facts yet to be found.

5          MR. KAROTKIN:  Exactly.

6          THE COURT:  And I have -- of course, of course.  We

7    know that.

8          MR. KAROTKIN:  And we're just trying to address that

9    concern.  I think that in the context of, again, as has been

10   demonstrated in Mr. Friske's affidavit -- I don't want to

11   dispute, Your Honor, that some of the numbers look big.  I

12   don't dispute that.  Okay?  But again, in the context of the

13   market, and what is a market rate of pay --

14         THE COURT:  No, I understand, I understand.

15         MR. KAROTKIN:  And again, there's no guarantee here,

16   they only would get these KIEP payments if the metrics are

17   achieved.

18         THE COURT:  I understand.

19         MR. KAROTKIN:  And --

20         THE COURT:  You taught me that on the first time

21   around.

22         MR. KAROTKIN:  And you've --

23         THE COURT:  And I understand that.

24         MR. KAROTKIN:  Okay.

25         THE COURT:  Okay.  I got it.

1          Anything further?

2          MR. KAROTKIN:  No.

3          THE COURT:  Okay.  I'm going to take this matter,

4    also, under advisement.  In both this matter and the CEO

5    compensation.  I've gone through a lot in the last few hours,

6    as everybody else has, and the lawyers working on the case.  I

7    will try to issue a decision either orally at one of the

8    hearings coming up or in writing, but fairly soon.  And that's

9    the best I can do.  So thank you all for a long morning and

10   I'll see many of you on Tuesday.

11         MR. KAROTKIN:  Thank you, sir.

12         MR. ZIPES:  Thank you, Your Honor.

13         THE COURT:  Have a nice weekend.

14      (Whereupon these proceedings were concluded at 1:56 PM)

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2

3    I, Colin Richilano, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ COLIN RICHILANO

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  August 12, 2019

16

17

18

19

20

21

22

23

24

25

**=**

**=- (1)**
43:15

**A**

**AB1054 (8)**
12:10;26:8,20;
28:15;29:14;48:11;
88:6;89:2
**AB1540 (1)**
28:12
**abated (1)**
85:20
**Abid (1)**
53:17
**ability (4)**
87:8;94:1,7,8
**able (6)**
23:1,5;26:10;
28:22;38:22;46:15
**absence (1)**
94:3
**absolute (1)**
87:23
**Absolutely (9)**
43:4;54:10,18;
55:2,7;68:8,11;
76:19;87:20
**absorb (2)**
46:20;63:8
**absorbed (1)**
92:12
**abundantly (1)**
8:3
**accept (1)**
94:11
**acceptable (1)**
8:17
**accepted (1)**
14:9
**accomplish (1)**
59:4
**accomplished (1)**
12:13
**accomplishes (2)**
54:9;75:5
**accordance (1)**
93:23
**according (1)**
71:2
**account (2)**
7:25;46:8
**accused (1)**
19:11
**achieve (10)**
11:6;25:25;32:25,
25;36:5;37:6;90:22;
93:21;94:8;98:10
**achieved (1)**
99:17

**achieving (3)**
29:14;31:8,10
**acknowledge (2)**
48:12;82:10
**acknowledges (1)**
53:4
**act (4)**
23:12;37:17;
49:23;67:9
**action (2)**
24:18;63:17
**actions (1)**
85:22
**active (1)**
26:16
**actual (1)**
49:24
**actuality (1)**
72:3
**actually (9)**
13:12,15;24:25;
35:1;56:11;62:2;
66:14;67:11,22
**Ad (6)**
53:18,20;56:12;
58:16,25;59:3
**add (2)**
85:3;91:21
**added (1)**
94:17
**addition (1)**
68:19
**additional (2)**
16:10;34:21
**address (9)**
38:19;43:24;
50:24;58:5;80:10;
96:6;97:5;98:6;99:8
**addressed (2)**
98:17,22
**addresses (1)**
96:17
**adequate (1)**
75:25
**adequately (2)**
70:13;73:13
**administered (2)**
38:6;39:17
**admit (4)**
49:17,18;51:2;
64:18
**advance (2)**
53:24;54:11
**advent (1)**
21:2
**advice (2)**
59:24;92:7
**advisement (3)**
46:19;84:14;100:4
**advisors (3)**
7:22;17:17;88:23
**advocates (1)**
26:21

**affects (1)**
90:7
**affidavit (2)**
94:2;99:10
**afraid (1)**
19:21
**afternoon (5)**
7:6;48:3,4;53:16;
60:9
**afterwards (1)**
24:6
**again (51)**
9:6;10:1;12:19;
13:23;14:19;19:19;
21:1;22:15;23:3,7;
24:18;30:18;34:16;
37:3,14;38:19;39:7;
40:19;41:19;44:13,
16;54:19;55:7,13;
56:6,19;59:21;
63:15;69:24;70:20;
72:6;73:18;78:16;
79:4,15;80:23;81:15,
21;82:1;83:2;88:7,
14;91:3;94:20;
97:17;98:16,19,25;
99:9,12,15
**against (1)**
86:4
**agency (1)**
13:3
**aggregate (1)**
90:24
**ago (7)**
20:14;22:18;
44:16;62:8,8;70:12,
23
**agree (10)**
15:7;28:5;40:25;
41:8;42:22;45:12;
56:14;67:1;68:25;
90:17
**Agreed (5)**
29:22;43:2,14;
46:12;78:15
**agreement (4)**
35:20;39:13;
42:15;52:24
**aground (1)**
13:3
**ahead (4)**
9:21;58:19;83:19;
89:10
**airplanes (1)**
65:9
**Akin (1)**
53:17
**Alan (1)**
7:19
**allow (6)**
13:25;22:8;23:14;
31:10;37:16;57:25
**allowing (1)**

**31:15**
**alluded (1)**
39:5
**almost (2)**
16:6;25:8
**along (5)**
44:4;46:3;47:9;
55:16;56:1
**alongside (1)**
34:12
**Alsup (3)**
87:15;91:15,17
**although (4)**
8:14;19:10;28:17;
80:4
**among (1)**
43:24
**amount (2)**
83:4;90:15
**AMR (1)**
89:13
**analysis (3)**
72:4;86:1;91:1
**announcement (1)**
96:21
**answered (4)**
70:22;82:21;
83:16;85:11
**anticipated (1)**
22:3
**anxious (1)**
64:8
**apologize (1)**
82:23
**apparent (1)**
9:25
**appear (1)**
86:21
**appearance (1)**
24:20
**appearing (1)**
60:12
**applies (2)**
68:20;88:12
**apply (3)**
43:14;72:2;77:18
**appreciate (10)**
22:6;24:25;25:1;
34:16;35:6;74:11;
83:22;85:2;88:17;
89:11
**appreciative (1)**
53:20
**approach (2)**
19:24;38:13
**appropriate (4)**
39:14;74:16;
91:22;92:25
**appropriately (2)**
92:20,21
**approval (2)**
11:17;23:5;90:7
**approve (8)**

**31:15;27:22;75:3;
76:25;81:25;84:3,8,8**
**approved (4)**
52:25;72:25;
90:18,18
**approving (4)**
16:13;78:21;84:9;
89:14
**approximately (1)**
11:16
**aptly (1)**
86:17
**arena (1)**
14:23
**argue (5)**
35:24;39:18;46:4;
50:17,19
**argued (1)**
41:6
**arguing (2)**
50:22;53:3
**argument (5)**
83:15;87:21;88:5;
91:18;95:23
**arguments (3)**
46:16,21;63:23
**arose (2)**
55:5;56:6
**around (10)**
8:10;25:19;43:23;
47:2;52:25;99:21
**arrive (1)**
37:1
**asbestos (1)**
49:9
**ascribe (1)**
48:14
**aside (7)**
14:10;17:25;18:5;
23:16;35:3;42:24;
96:4
**aspect (1)**
72:1
**asserting (1)**
98:13
**assets (2)**
85:18;88:21
**assignment (2)**
12:15;69:22
**assist (1)**
47:4
**assume (8)**
13:25;15:13;
23:24;37:14;74:4;
93:12;95:5,8
**assuming (6)**
19:3;30:3,13;
37:15;41:13;74:2
**attempt (3)**
42:20;43:24;51:14
**attempting (1)**
58:22
**attention (2)**

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 102
of 118

12:6;83:25
**attractive (1)**
  21:5
**attracts (1)**
  21:19
**attrition (1)**
  14:6
**atypical (1)**
  94:15
**AUGUST (2)**
  7:1;8:3
**authority (3)**
  29:16;87:9;88:11
**authorize (1)**
  87:11
**avoid (3)**
  39:15;56:2,19
**award (2)**
  96:13;97:1
**aware (8)**
  17:10;22:3;48:19;
  50:1;53:24;66:7;
  80:11,13
**awful (1)**
  61:13

## B

**back (21)**
  9:6;19:6;22:2,7;
  25:5;32:11;52:1,15;
  57:8;62:19;69:24;
  72:7,24;73:1;74:2;
  76:11;80:17;83:4;
  84:4,5,8
**bad (1)**
  56:25
**baffling (1)**
  12:15
**bailiwick (1)**
  66:20
**BakerHostetler (1)**
  48:5
**banking (1)**
  26:10
**bankruptcy (33)**
  14:23;17:3;18:3;
  22:10;23:11;26:16;
  27:7;28:14;29:16,
  17;31:17,18;44:17;
  49:8;66:21;67:2,21;
  68:21;72:5;73:23;
  74:10;75:24;84:1;
  85:20;86:13,16,19,
  24;88:12,13;92:22;
  95:14;97:11
**base (1)**
  83:24
**based (5)**
  71:11;77:9;85:3;
  91:8;96:3
**bashful (1)**
  34:1

**basically (1)**
  26:8
**basis (1)**
  19:21
**basketball (1)**
  72:21
**battle (1)**
  14:19
**beat (1)**
  83:2
**beauty (1)**
  25:9
**became (1)**
  8:9
**becomes (2)**
  28:21;95:5
**beginning (1)**
  52:20
**behalf (7)**
  24:24;35:18;48:5;
  53:17;58:16;60:13;
  61:25
**behind (1)**
  18:4
**below (2)**
  94:4,6
**benefit (2)**
  86:1;97:10
**best (3)**
  19:2;20:6;24:11;
  31:21;37:8;42:10;
  44:18;47:17;52:21;
  57:6;61:5;95:23;
  100:9
**better (11)**
  21:9,9,10,13,18,
  20;46:10;57:21;
  80:8;87:2,24
**beyond (2)**
  19:17;47:13
**bid (1)**
  69:20
**bidding (1)**
  27:3
**big (10)**
  14:2;39:7,8;50:8;
  68:6;69:19;72:14;
  73:12;95:18;99:11
**big-ticket (1)**
  42:23
**bill (2)**
  28:18;80:8
**billion (2)**
  37:11;38:10
**billions (2)**
  17:15;48:23
**binding (1)**
  47:2
**bit (5)**
  7:7;13:24;26:6;
  27:6;30:19
**bitter (1)**
  19:1

**bless (2)**
  73:14,16
**blessing (1)**
  73:8
**board (8)**
  74:18;78:5;80:5;
  82:10;88:22;94:17;
  95:4,9
**bode (1)**
  19:23
**bond (1)**
  45:4
**bondholders (2)**
  59:1;61:25
**bondholders' (1)**
  59:23
**bonds (1)**
  59:3
**bonus (15)**
  67:11;69:16,17,18,
  22;72:7,8,13,13,15,
  18,19;87:11;89:15;
  90:25
**bonuses (4)**
  83:23,24,24;86:10
**both (11)**
  18:10;33:21;34:5;
  44:21;53:21;54:5;
  59:3;60:2;66:16;
  75:3;100:4
**bottom (1)**
  95:2
**box (2)**
  33:18;40:21
**boy (2)**
  61:24;62:1
**Brawder (1)**
  16:4
**Bray (30)**
  25:20;41:13,15,18,
  20,20;42:6,8;43:2,4,
  14,17,19;45:2,7,12,
  15,17,19,23;46:7,17,
  23,25;47:12,14,16,
  19,22,23
**break (8)**
  23:9;33:15;42:23;
  44:9;57:17;60:20;
  64:1,2
**breakdown (1)**
  10:18
**breaking (1)**
  13:18
**breaks (1)**
  55:9
**brief (7)**
  50:10;51:14;
  53:19;58:20;86:21;
  88:19;89:14
**briefly (1)**
  85:4
**bring (1)**
  74:18

**broken (1)**
  43:10
**brought (2)**
  83:25;85:23
**bucket (1)**
  71:24
**buckets (1)**
  66:7
**Buffett (1)**
  90:4
**build (2)**
  25:19;43:23
**built (1)**
  90:16
**bunch (1)**
  98:3
**burden (3)**
  89:18;90:21;91:4
**burdens (1)**
  93:7
**business (1)**
  94:12
**busted (1)**
  53:7
**buy (2)**
  95:14;97:12
**byproduct (1)**
  13:12

## C

**calculate (1)**
  79:1
**calculated (1)**
  21:23
**calculation (1)**
  79:5
**calendar (1)**
  7:7,11;64:14
**CALIFORNIA (8)**
  7:1,20;21:10;27:9;
  28:20;88:19;92:24;
  93:16
**Call (11)**
  7:3;18:13;53:14;
  59:23;67:12;69:22,
  22;71:19;72:6,7,15
**called (3)**
  63:20;69:18;74:22
**calling (1)**
  72:19
**calls (3)**
  8:5;72:4;98:15
**came (4)**
  22:6;54:14;60:7;
  69:19
**camper (1)**
  80:9
**can (50)**
  11:12;12:24;
  13:24;14:8;15:8;
  16:17,22;17:4;
  19:25;23:11,12;

24:11;27:10;29:17,
17;33:5;35:24;
38:19;39:20,22;
40:11;43:23;44:18;
46:11;51:18;52:24;
54:10;55:8;56:23;
59:4;61:12;63:8,10;
64:1,2;69:22,22;
72:25;73:1,2;75:11;
80:11,11;83:8;
84:18;88:12;90:17;
95:4;96:24;100:9
**candidates (1)**
  32:21
**capable (1)**
  59:14
**care (2)**
  22:16;95:9
**careful (1)**
  73:24
**carefully (1)**
  51:2
**carrying (1)**
  93:7
**cart (1)**
  62:12
**carved (1)**
  8:4
**case (42)**
  8:13;13:6;21:3,19;
  26:12;27:15;29:9,
  13;30:4;33:20;
  34:10;37:7;40:20;
  48:10;49:7;52:16;
  57:25;60:12;61:11,
  12,15;62:19;67:23;
  71:16;73:12,13;
  74:14;75:18,19;
  79:12;81:4;82:11;
  85:20;86:13,16,20,
  24;89:13;90:14;
  92:12;98:20;100:6
**cases (16)**
  8:18;10:21,24;
  11:5,9;19:23;26:16,
  18;29:7;38:6;39:16,
  19;49:4;74:19;81:2;
  97:21
**cash (1)**
  75:20
**catch (1)**
  65:9
**causal (3)**
  49:5,9,9
**causals (1)**
  49:19
**causation (1)**
  49:6
**cause (8)**
  22:19;49:17;61:8;
  71:14;74:10;75:18;
  79:11;83:3
**caused (1)**

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 103 of 118

51:3
caveat (1)
74:13
Cecily (1)
48:3
cents (1)
97:9
CEO (6)
64:19;65:2;66:2,
11;67:4;100:4
certain (3)
60:13;66:12;96:9
certainly (9)
14:25;21:20;32:3;
35:20;47:2;55:22;
57:21;61:12;89:1
challenge (1)
25:22
challenges (4)
14:12;31:22;41:7;
45:10
challenging (2)
8:17;28:21
chance (2)
65:22;70:17
change (8)
19:24;26:11;
29:23;44:15;84:6;
85:7;86:15;91:18
changed (1)
20:22
changing (1)
20:17
channel (1)
21:23
channeled (1)
25:6
chaos (13)
13:22,24;22:8,11,
23;33:4;55:6,9,9,10,
12;56:2,4
chaotic (3)
14:4,11,22
Chapter (9)
11:9,18;16:13;
40:16;67:22;81:4;
96:15,18;97:21
chart (2)
81:16;95:2
check (1)
72:15
checks (1)
96:2
choice (3)
25:24;28:3;78:22
choices (1)
88:16
chooses (1)
82:11
chose (1)
35:4
choses (1)
84:5

circumstance (1)
73:11
circumstances (2)
8:18;38:6
claim (1)
21:4
Claimants (3)
48:6,24;52:10
Claimants' (1)
48:17
claims (12)
11:10;27:15;
39:21;40:12,13;
48:14,18;49:10;
52:18;58:18;86:7;
98:13
claims-estimation (1)
48:20
clarified (2)
30:14;82:16
class (1)
45:4
classes (2)
16:21;45:5
clean (1)
86:11
clear (9)
8:3,9;20:21;33:2;
38:17;51:13;82:24,
25;83:24
clearly (2)
66:9;84:11
CLERK (3)
7:4,8;30:10
clever (1)
81:13
client (4)
20:16;34:25;
57:17;91:16
clients (1)
59:9
clock (1)
14:21
close (2)
27:15;49:24
closed (1)
29:7
Code (8)
61:7;66:21;67:2,
21;68:21;72:5;
76:22;84:1
cognizant (1)
59:9
colloquy (3)
54:14;55:5;83:14
combination (1)
49:1
coming (5)
11:11;55:18;57:8;
63:19;100:8
comment (7)
42:13;54:13;56:5;
57:4;62:3;75:13;

91:22
commentary (1)
61:18
comments (7)
8:6;53:19;60:6;
63:22;83:22;87:2;
93:14
Commission (2)
7:20;19:25
commit (1)
37:11
commitment (1)
44:17
Committee (11)
41:21;42:6;44:25;
48:6,17;52:22;
53:20;58:18;61:23;
88:22;96:8
committees (4)
10:17;24:17;
35:14;36:24
Committee's (2)
56:12;98:6
communicate (1)
87:24
communication (3)
48:9;52:16,22
company (12)
27:3,7;73:19,22;
86:23;87:25;93:5;
94:8,12;95:18;
96:23;98:6
company's (1)
98:25
comparison (4)
61:13;88:22,24;
89:3
compensating (1)
66:10
compensation (32)
7:12;68:5;71:5,10;
72:17,24;74:20,24;
75:7;81:10,11,15;
85:6,10,13;88:7,11,
14,23,24;89:15,25;
90:7;93:18,20;94:1,
9,13;95:11;97:7;
98:19;100:5
compete (1)
20:9
competing (23)
8:2;9:2,2,16;
11:12,14;13:11,25;
14:16;16:19;20:15;
21:1;22:8;23:1,14;
25:18;33:8;36:22;
54:17,23;57:14;63:3,
4
competition (15)
12:17,17;21:8,21,
23;25:6,25;31:20;
32:25;42:10;44:19;
45:23,24;58:1;59:13

competitive (8)
20:23;36:8;46:2;
54:7;57:9,11,15;
62:18
complaint (1)
87:18
complete (2)
17:4;80:21
completely (2)
48:23;66:24
complex (2)
11:4;92:22
complexity (2)
39:19;40:19
complicated (1)
14:4
complications (1)
22:9
comply (5)
75:24;76:14,22;
82:20,24
component (4)
71:6;89:17,17,25
comprehend (1)
51:1
concede (2)
50:5;90:13
conceded (1)
49:16
conceding (1)
49:6
concept (1)
82:2
concern (6)
31:8;10;42:21;
98:18,23;99:9
concerned (7)
31:20;39:16;
67:19;71:20,23;
86:18;97:1
concerns (2)
85:9;98:7
concession (2)
72:2;74:12
concluded (2)
42:8;100:14
conclusions (1)
66:10
conclusive (1)
90:25
concrete (1)
18:2
condemnation (1)
50:7
condition (2)
40:12,12
conditioned (1)
44:5
conditions (3)
29:6,8,12
conduct (1)
11:17
conducting (2)

12:7;86:23
conference (5)
7:10,13;26:3;
63:21;86:18
confidence (1)
11:3
confident (1)
29:9
confidential (1)
91:10
confirmable (1)
19:1
confirmation (22)
10:12;11:13,13;
12:18;14:12,13,19;
15:10,16,20,23;17:4;
22:19;23:2;29:5,8;
45:10;54:20;60:4;
74:22,23;98:19
confirmed (3)
27:19;28:14;96:21
confuse (1)
51:12
confusion (1)
36:14
congratulated (1)
80:19
connection (1)
62:3
consensual (4)
12:3;28:4;40:1,3
consensually (2)
39:21;85:8
consensus (5)
35:22;36:5;37:6;
43:23;47:2
consequences (5)
31:16;73:6,6;81:1;
86:19
consider (2)
62:12
consideration (1)
16:20
considered (2)
36:17;74:20
consist (1)
52:12
consistent (1)
59:21
constraints (1)
52:17
constructive (3)
20:3;21:4;48:7
constructively (1)
10:1
consultation (2)
10:16;36:24
contained (1)
77:10
contemplated (1)
54:1
contemplates (1)
55:4

Min-U-Script®
Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 104
of 118

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) caveat - contemplates

**contemplating (1)**
39:6
**contest (1)**
25:9
**contested (3)**
11:10,14;23:2
**contests (1)**
50:6
**context (7)**
35:2;36:18,21;
51:3;90:14;99:9,12
**continuance (1)**
20:14
**continue (3)**
47:5;85:19;86:9
**continued (3)**
7:12;56:10;85:17
**continues (1)**
86:4
**continuing (1)**
85:21
**contract (4)**
66:15;76:25;
79:12;80:12
**contracts (1)**
66:13
**contribution (3)**
28:22;29:10;30:15
**control (2)**
13:24;55:8
**controlling (1)**
55:10
**controls (1)**
14:3
**controversial (1)**
8:10
**conventional (1)**
38:13
**conversations (2)**
26:3;38:23
**convincing (1)**
57:16
**corporate (9)**
69:5;74:2;80:22;
81:2;85:7,16;87:11;
90:6,10
**Corporation (2)**
7:8;78:19
**correctly (1)**
35:2
**cost- (1)**
85:25
**counsel (8)**
35:13;41:20;
44:11;69:5;83:5;
85:8;86:4;89:6
**counsel's (1)**
87:3
**count (1)**
48:22
**counted (1)**
16:2
**couple (12)**

11:7;25:18;44:16;
54:2;13;62:3;63:17;
64:25;66:14;67:7,
20;96:20
**course (20)**
15:16;19:15;40:3,
8;43:18;22;44:2;
48:8;53:22;54:1;
58:5;76:15;86:15,
19;92:4;93:24;95:4;
98:14;99:6,6
**Court (420)**
7:3,5,9;8:19,24;
9:1,5,7,11,14,18,20,
23;10:2,4,6,9;11:15,
20,23,25;12:19;13:9,
14,17;14:2,15,17;
15:1,4,6,8,12,18,21,
25;16:2,4,6,9,14,17;
17:1,3,3,7,11,13,18,
23,25;18:10,12,19;
19:18;20:5,20,24;
21:11,14,16,25;22:2,
15,24;23:7,16,20,22;
24:4,8,10,13,16,23,
25;25:1,9,12,14,16;
27:8,11,14,18,21;
28:1,3,7,10;29:5,15,
16,20,23;30:2,7,10,
12,17,21,23;31:1,4,6,
14,18;32:4,9,16,18,
20,23;33:10,12,15;
34:5,9,18,20;35:4,
10,12;36:1,7,12,15,
20,25;37:14,21;38:4,
7,11,14,16,21;39:1,9,
11,23,25;40:2,6,9,
19;41:1,9,11,16,23;
42:5,7,11,18,22;
43:3,5,7,9,16,18,21;
44:2,5,6,8,17;45:8,
14,16,18,22;46:6,14,
18,24;47:1,5,13,15,
17,18,21,23;48:1,4;
49:2,3,11,13,15;
50:1,3,8,12,14,17,19,
21,23;51:1,5,7,9;
52:1,3,6,8,25;53:5,9,
11,13,25;54:4,9,18,
19,24;55:1,3,8,10,15,
17,20,24;56:2,7,19,
23;57:2,5,11,14,19;
58:4,6,8,12,15,17,19;
59:4,14,16,18,20,24;
60:10,14,17,23;61:1,
3,10,13,17;62:2,9,11,
16,21;63:1,7,14,
64:6,10,12,19,25;
65:2,6,10,13,17,19,
21,24;66:3,5,7,18,20,
22,25;67:6,17,25;
68:2,4,9,12,22;69:4,
17;70:5,8,14,16,19,

25;71:5,8;72:6,12;
73:4,7,8,14,15,18,21;
74:6,17,21;75:1,3,
11,13,15,17;76:3,5,8,
10,16,20;77:3,5,8,11,
13,15,19,21,25;78:2,
4,10,13,15,18;79:1,3,
6,9,15,19,22,25;80:2,
17,19;81:11,18,20,
24;82:8,15,18,25;
83:2,9,13,19;84:2,
12,13,20,24;85:1,4;
86:5;87:1,5,11,22;
88:1,3,12;89:1,3,5,
10,19,22;91:9,24;
92:1,3,5;93:12;94:5,
11,18;95:1;96:10,12,
16,19;97:3,6,11,19,
25;98:3,8,14;99:1,4,
6,14,18,20,23,25;
100:3,13
**courtroom (5)**
16:12;56:21;
58:11;79:23;92:15
**Court's (1)**
34:17;42:17;47:3;
59:1;83:22,25
**covered (1)**
91:6
**CPUC (26)**
7:14,22;8:1;12:4;
13:2;16:13,22;17:4;
18:14;23:12,17,25;
25:2,6,13,23;31:22;
33:25;41:24;45:24;
47:9;48:8;53:21;
54:6;59:12;87:15
**crammed (1)**
45:10
**crazy (1)**
95:24
**create (1)**
59:6
**created (1)**
94:15
**credentials (1)**
69:19
**creditor (1)**
37:23
**creditors (4)**
26:21;52:23;96:8;
98:6
**Creditors' (1)**
41:21
**criminal (1)**
85:22
**critical (2)**
26:17;45:1
**criticizing (1)**
92:17
**cross-examine (1)**
17:16
**culture (2)**

85:7,16
**current (2)**
84:3;91:8
**customary (2)**
38:5;97:22
**cut (1)**
83:16

**D**

**damages (3)**
49:20;51:19;52:12
**date (12)**
26:11;28:16,18;
29:11,11;31:11,12;
33:5;38:23;60:24;
77:16;96:15
**dating (1)**
48:13
**day (13)**
17:20;25:24;27:5,
25;31:8;36:6;49:16;
50:4;60:13;62:5;
85:21;86:5;97:23
**days (9)**
11:11;15:25;16:1;
22:21;37:10;62:3;
66:14;70:12,23
**deadline (11)**
10:24;11:3;17:25;
19:20,20;20:2;
22:19;27:14;44:15;
48:12;59:10
**deadlines (2)**
55:14;59:6
**deal (13)**
14:13;18:11;
22:10;49:8;51:22;
55:18;60:5;61:7;
63:9,18;74:9,25;88:4
**dealing (7)**
62:15;66:2;67:2;
68:19;90:4,5;92:23
**deals (2)**
70:13;88:10
**death (1)**
83:2
**debate (1)**
13:6
**debtor (24)**
8:21;12:24;21:6;
24:17;30:14;31:18;
33:16,20;38:9,11;
43:11,15;44:10;
51:16;52:25;68:9;
70:22;71:17;72:4;
85:3;86:15;91:7,14,
16
**debtor-in- (1)**
29:20
**debtors (21)**
8:14;35:17,19;
36:6;37:5,7,13;38:3;

49:1;51:21;56:17;
61:5;66:10;70:12;
73:24;74:9;75:24;
76:13,22,25;90:22
**debtors' (12)**
8:11;10:18;20:9;
30:24;35:13;36:4;
44:11;59:7;85:8;
86:6;88:22;91:9
**debtor's (1)**
43:11
**decide (6)**
19:2;20:8,8;29:13;
61:20;62:13
**decided (2)**
44:5;63:5
**decides (2)**
78:6;80:6
**deciding (1)**
19:4
**decision (19)**
9:17;10:13;19:6;
23:14;32:13;42:12,
17;44:2;46:10,12,15;
50:10;54:17,19,21,
21;69:21;88:13;
100:7
**decision-making (1)**
10:15
**declaration (6)**
70:18,23;71:3;
76:16,21;94:3
**dedicated (1)**
93:11
**deemed (1)**
88:20
**deference (1)**
35:8
**deferred (1)**
96:14
**definition (2)**
29:4;57:14
**degree (1)**
11:3
**deliberately (1)**
29:1
**demonstrated (1)**
99:10
**denied (1)**
69:5
**denies (1)**
48:22
**deny (4)**
12:23;44:9,9;
62:18
**departure (1)**
47:7
**depend (1)**
77:14
**depending (1)**
37:4
**description (1)**
49:24

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 105
of 118

**deserves (1)**
35:9
**designed (1)**
56:2
**desire (2)**
48:11;86:12
**despite (3)**
8:17;79:12;93:13
**detail (2)**
32:12;55:25
**detailed (2)**
17:15;18:17
**details (1)**
94:18
**determination (3)**
19:5;42:3;54:2
**determine (2)**
27:24;61:8
**determined (1)**
40:14
**determining (1)**
30:22
**develop (1)**
61:21
**developing (1)**
48:18
**development (1)**
56:13
**dictate (1)**
40:15
**die (2)**
86:2,2
**difference (2)**
51:6;86:5
**differences (1)**
77:21
**different (10)**
26:10;37:22;
45:11;49:4,19,19;
71:15;74:24;82:12;
85:12
**differently (1)**
23:13
**difficult (9)**
14:10,20;23:3,4;
50:9;74:19;75:5;
80:20;89:18
**difficulty (1)**
56:9
**directed (1)**
86:3
**directly (2)**
63:25;70:8
**directors (1)**
94:17
**disappointed (1)**
35:19
**disapproval (1)**
86:14
**disapprove (1)**
74:1
**disciplinary (1)**
95:9

**disclose (2)**
67:12;80:24
**disclosed (6)**
68:17,25;81:7,7,
18,20
**disclosure (14)**
14:2,5;15:9,11;
18:4;31:2;43:1,25;
67:20;71:21,23;81:3,
9;84:11
**discord (1)**
42:20
**discuss (2)**
41:2;54:4
**discussed (4)**
29:1;51:24;58:23,
23
**discussion (8)**
8:4;27:2;37:2;
45:11,19;60:19;
82:19;93:4
**discussions (2)**
56:20;96:8
**disgorge (4)**
67:14;69:25;87:6,
18
**disgorged (2)**
68:24;82:8
**dispute (2)**
99:11,12
**disseminated (1)**
10:15
**distract (1)**
51:10
**distributed (1)**
8:1
**distributions (2)**
97:4;98:20
**district (2)**
49:2;68:5
**doable (1)**
56:4
**docket (3)**
25:12;34:22;37:23
**document (2)**
82:12;83:4
**dollar (2)**
96:4;97:9
**dollars (22)**
17:16;37:11;
38:10;69:21;71:16,
19;73:10,10;75:20,
21;77:5,6;78:13;
79:3;80:7,24;81:14,
16;82:6;90:11;
95:20;97:15
**domain (1)**
22:6
**dominated (1)**
83:14
**done (6)**
13:16;22:6;38:17;
73:4,5;91:15

**door (1)**
96:23
**doors (1)**
33:22
**doubt (3)**
43:12;53:24;55:8
**down (10)**
13:4;18:16;24:16;
45:10;46:11;57:21;
58:24;70:2;74:21;
93:16
**draft (2)**
8:4;10:14
**draw (1)**
56:23
**drive (2)**
11:5;90:9
**driven (1)**
17:10
**due (2)**
46:20;50:24
**Dumas (46)**
45:25;47:24,25;
48:1,2,3,4,5;49:12,
13,14,22;50:2,4,11,
13,15,18,20,22,24;
51:6,8,9,25;52:2,5,7,
9;53:10,12,13;84:22,
23,24,25;85:4;87:1,
10,20,23;88:2,17;
89:5;90:21;98:12
**Dunne (2)**
41:22;42:13
**Durant (2)**
72:13,19
**during (12)**
74:10,23;75:18,19,
24;79:11;82:11;
85:16;86:12,15,17,
19
**duties (3)**
29:21,24;72:16
**duty (1)**
41:14
**dwell (1)**
81:24

**E**

**earing (1)**
72:22
**earlier (2)**
62:3;86:17
**early (1)**
89:14
**early-on (1)**
51:23
**easier (2)**
25:12,12
**easy (3)**
50:9,15;61:13
**effect (4)**
13:10,11;21:22;

57:15
**effective (6)**
29:11,11;30:13;
44:23;77:16;96:15
**effectively (2)**
47:9;91:4
**efficient (2)**
42:25;44:23
**effort (2)**
19:22;34:20
**efforts (3)**
34:17;53:21;62:4
**eighteen (4)**
48:21;49:7,19,19
**either (6)**
27:22;49:9;59:3;
60:2;91:18;100:7
**electrical (1)**
88:21
**element (1)**
94:13
**elements (1)**
21:4
**eloquently (1)**
52:20
**else (16)**
24:18;25:3;32:12;
34:15;37:3;38:22;
53:14;58:8;59:8;
63:15,21;65:3;
71:25;83:15;92:5;
100:6
**eluding (1)**
40:4
**emails (1)**
8:6
**embark (1)**
10:22
**embarked (1)**
19:8
**emerge (2)**
28:13,14
**eminently (2)**
8:12;56:3
**employee (2)**
73:19;97:10
**employees (2)**
93:11;98:17
**employer (1)**
90:6
**enact (2)**
88:20,23
**end (21)**
9:10;14:5;19:1,4,
16;21:9,24;23:6;
25:7,24;27:5,24;
28:20;31:8;33:5;
53:6;55:21;95:13;
96:3;97:11,23
**ends (1)**
32:25
**energy (2)**
26:19;27:9

**enforce (1)**
89:2
**engage (1)**
9:25
**engaged (1)**
56:18
**enormous (2)**
73:23;80:2
**enough (8)**
7:17;55:19;56:22;
57:11;82:25;92:24;
93:7,8
**ensue (1)**
22:23
**ensuing (1)**
56:4
**enter (2)**
29:5;58:22
**entire (1)**
89:24
**entitled (4)**
48:24;78:9;93:17,
25
**entitlement (1)**
82:13
**equipment (1)**
51:3
**equity (23)**
37:10,12,16;38:8,
11;39:8;45:9;71:4;
89:16,17,23,25,25;
95:12,13,18;96:1,14,
24;97:7,7;98:19,24
**equity's (1)**
96:20
**especially (1)**
63:2
**essential (2)**
12:8;85:8
**essentially (1)**
25:6
**estimation (19)**
39:23,24,25;40:4,
23;42:24;48:14,18;
49:3,16,20;51:3,14,
17,19,22;52:11,19;
86:7
**estimations (1)**
52:12
**etc (1)**
35:1
**even (18)**
9:20;13:2;18:15;
19:15;21:16;45:4;
46:1;50:16;73:25;
78:20,23;85:19;
88:9;89:16;90:22;
91:11;94:19;95:23
**evening (1)**
7:6
**event (4)**
21:3;49:5,9,9
**events (1)**

88:13
**Everybody (12)**
11:8,13;15:12;
23:8;32:5;33:19;
34:10;44:22;60:10;
72:15;96:22;100:6
**everyone (6)**
7:5,6;16:12;24:17;
33:13;38:22
**everyone's (2)**
60:25;86:20
**evidence (1)**
90:25
**evidentiary (4)**
12:5;24:2;90:21;
91:4
**exact (2)**
33:18;81:17
**exactly (11)**
25:10;33:7,7;51:7;
53:7;64:21;76:24;
77:1,3;98:23;99:5
**example (1)**
74:24;90:9
**except (4)**
30:8;34:15;51:19;
90:2
**exclusivities (1)**
46:5
**exclusivity (43)**
7:24;12:23,25;
13:5;19:7,14;22:13;
23:10;32:10;33:15,
20;35:24;36:18,22;
39:19;40:23;42:3,12,
18,19,23;43:14;44:6,
9,11;45:17;53:1,1;
54:2;56:8,10,16;
57:17;59:2,8;60:20,
20;61:9,20;62:12,13;
63:11,24
**exclusivity's (2)**
8:20;43:10
**excuse (4)**
28:7;44:9;83:13,
13
**execute (1)**
84:4
**executive (4)**
67:23;78:20;
88:23,24
**executives (3)**
70:24;85:15;93:17
**existing (1)**
38:8
**expense (1)**
97:15
**expensive (3)**
14:4,10,20
**expert (1)**
88:8
**explain (1)**
13:19

explanation (4)
70:10;71:23;76:1;
78:1
**express (1)**
34:16
**expressed (1)**
31:25
**expressing (1)**
42:21
**expressly (1)**
44:4
**extend (3)**
11:2;32:13;47:10
**extends (1)**
19:17
**extent (4)**
12:22;23:9;33:24;
46:2
**extra (2)**
92:7;96:5
**extra-incentivize (1)**
93:6
**extraordinary (1)**
26:15
**extreme (1)**
75:5
**extremely (2)**
11:4;21:8
**eyes (1)**
79:22

**F**

**face (1)**
45:2
**facing (1)**
11:8
**fact (12)**
17:10;37:9;39:20;
42:18;51:12;56:15;
62:13;67:10;77:2;
85:25;89:16;93:23
**fact-driven (1)**
12:4
**facts (2)**
79:7;99:4
**fail (2)**
90:22;97:11
**failure (3)**
19:22;85:18;90:20
**fair (8)**
15:6;36:12;54:7;
55:19;56:22;57:9;
74:22;81:24
**fairly (1)**
100:8
**faith (2)**
26:22;41:23
**fallback (1)**
86:14
**falsifications (1)**
85:22
**familiar (1)**

94:23
**far (6)**
35:1,19;42:11;
45:15;46:1;48:19
**Farr (1)**
58:14
**fashion (3)**
39:17;47:4;60:5
**fashioning (1)**
32:24
**fault (2)**
68:9;73:23
**favor (3)**
45:23,24;46:5
**favorably (1)**
84:6
**fear (1)**
22:17
**February (1)**
53:8
**federal (1)**
29:15
**feel (2)**
27:1;28:17
**feels (1)**
33:6
**fees (1)**
30:12
**feet (1)**
93:3
**Feld (1)**
53:17
**FELDMAN (11)**
58:10,13,13,16,18,
19,20;59:17,18,19;
61:19
**fell (1)**
66:7
**felt (1)**
82:24
**fervently (1)**
52:13
**few (3)**
53:19;67:4;100:5
**fiduciaries (1)**
37:7
**fifteen (2)**
37:11;38:9
**fifty (2)**
90:23;97:9
**fight (1)**
22:19
**figure (2)**
42:25;45:8
**file (17)**
34:10;37:25;
38:12,24;40:17;
43:21;47:1;51:21;
53:25;54:11;59:6;
60:3;61:24;62:6;
63:8,9;92:7
**filed (17)**
54:9;55:17;62:1,2,

5;65:11;66:9;67:21;
68:18;69:13;70:12,
23;74:13;76:25;
80:23;85:3;91:16
**filing (5)**
34:3;43:25;56:12;
95:14;97:11
**final (1)**
17:4
**financial (2)**
17:17;90:14
**financing (6)**
37:12,12;38:10;
39:7,8;40:15
**find (4)**
11:4;80:22;82:4;
93:8
**findings (1)**
12:9
**fine (9)**
22:5;28:9;32:12;
51:20;58:6;62:18;
65:5;82:1;95:16
**finish (2)**
18:15;79:25
**fire (16)**
21:11,15,16,18,20;
26:18,24;27:6,21;
28:19,23;45:5;49:5;
50:25;87:14;96:4
**fires (3)**
48:21;49:19;51:3
**firm (1)**
25:16
**first (24)**
16:19;18:12;
26:13;28:3;30:4;
32:11;35:13,18;
40:14;42:24;43:13;
50:5;53:20;54:16;
60:12;61:11,15;
65:8;68:17;76:12;
82:3;90:20;96:7;
99:20
**fit (2)**
41:3;88:23
**fits (1)**
71:24
**fix (2)**
44:13;64:4
**fixed (4)**
40:18;72:20;75:7;
77:11
**flexibility (1)**
30:20
**fluid (2)**
18:2;34:5
**fly (1)**
63:5
**focus (5)**
51:20;70:20;72:2;
85:18;86:20
**focused (3)**

74:7,7;86:17
**focusing (2)**
71:6;75:15
**folks (1)**
95:17
**follow (1)**
33:5
**followed (1)**
8:5
**fond (1)**
34:24
**for-cause (1)**
78:20
**forced (1)**
27:22
**forget (2)**
18:11;28:15
**form (3)**
22:11;62:14;97:22
**formal (1)**
59:23;85:5
**formula (4)**
77:9,11,13;83:1
**forth (3)**
42:19;44:1;55:14
**Forty (2)**
15:25;16:1
**forty-eight (1)**
62:8
**forty-five (1)**
88:9
**forum (1)**
12:8
**forward (13)**
23:1;37:10;38:9;
39:14,22;42:10;
45:21;53:5;54:11;
58:3;59:15;61:5;
63:19
**found (3)**
26:20;82:2;99:4
**four (1)**
11:20
**four-month (1)**
11:24
**frame (2)**
25:25;50:9
**FRANCISCO (1)**
7:1
**Frankly (4)**
8:11;50:15;56:9;
93:9
**free (1)**
23:12
**FRIDAY (4)**
7:1;64:9,13,16
**Friske's (1)**
94:2;99:10
**front (3)**
25:7;58:21;72:18
**fronts (2)**
53:5;58:2
**frustrated (1)**

62:23
**frustration (1)**
73:3
**full (1)**
18:22
**fully (1)**
81:16
**fun (1)**
61:16
**function (2)**
55:4;56:3
**functionally (1)**
23:12
**fund (7)**
28:22;29:10;
30:17;31:13,19;
90:4;97:16
**fundamental (1)**
94:13
**funds (1)**
96:5
**further (11)**
30:14;47:10;66:8;
83:11,20;84:11;
85:3;87:15;91:3,23;
100:1
**future (3)**
87:8;88:12;90:16

## G

**Gallagher (1)**
58:14
**galvanize (1)**
57:7
**galvanized (2)**
21:3;56:13
**game (1)**
43:11
**games (2)**
79:16;80:21
**Garrison (1)**
7:20
**gate (2)**
18:8,10
**gatekeeper (2)**
12:22;15:8
**gatekeeping (2)**
55:3;56:3
**gating (2)**
39:22;40:11
**gave (1)**
49:10
**Gavin (1)**
24:24
**generally (2)**
26:19;68:6
**gentleman (1)**
60:7
**gets (10)**
13:3,16;18:8;
30:12;31:21;68:13;
72:20;75:19;78:8;

83:3
**Given (6)**
12:3;26:12;33:2;
35:8;60:24;89:23
**gives (1)**
61:7
**giving (2)**
25:1;96:2
**glad (1)**
49:22
**global (1)**
11:18
**goal (5)**
11:6;25:25;27:12,
12;33:1
**goals (5)**
26:19;27:9;28:19;
68:15;96:23
**goes (4)**
35:5;53:5;75:3;
80:17
**good (19)**
7:5,5,6;26:22;
41:17,23;42:16;48:2,
2,4;53:16;56:25;
57:11,16;59:13;
60:9;68:13;93:24,25
**gotcha (2)**
79:20;84:9
**Gotshal (1)**
35:17
**governance (2)**
8:16;19:12
**governed (1)**
85:14
**governing (1)**
88:20
**Governor (14)**
18:1;20:15;24:14,
24;26:15;28:11;
31:20;33:6;35:8;
41:24;45:24;47:9;
48:8;54:6
**Governor's (14)**
7:14,18,22;8:1;
10:14,17;18:24;
26:7;27:12;31:10;
32:11;48:16;53:21;
62:4
**grade (1)**
31:16
**grant (4)**
40:7;59:22,22;
62:22
**granted (2)**
60:3;69:13
**grapple (1)**
26:2
**great (2)**
21:21;63:13
**greater (1)**
55:25
**Greg (1)**

65:15
**Gregory (1)**
41:20
**ground (2)**
86:22;91:23
**group (9)**
37:16,24;38:11;
53:18;56:18;58:25;
59:3,3;93:11
**groups (1)**
37:23
**guarantee (2)**
94:23;99:15
**guess (6)**
33:12;35:4;47:1;
49:5;73:24;91:11
**guidance (2)**
23:11;59:24
**guided (1)**
54:4
**guideline (1)**
89:2
**Gump (1)**
53:17
**guys (3)**
34:20;56:25,25

## H

**half (8)**
48:9;80:21;81:13;
91:1;95:10;96:13;
98:4,18
**half- (1)**
81:6
**hammered (1)**
49:1
**hand (1)**
97:9
**hang (1)**
44:18
**happen (10)**
18:7;19:25;23:23;
24:7;25:23;29:7,9;
37:18;61:8;71:17
**happened (5)**
29:11;56:20,21;
77:14;87:7
**happening (1)**
31:16
**happens (6)**
22:23;37:4;63:4;
77:16;79:8;95:15
**Happy (3)**
34:8;58:4;80:16
**hard (6)**
19:22;26:12;90:3,
11;93:15;94:9
**hardest (1)**
12:14
**Harris (10)**
89:7,8,8,11,20,22;
90:13;91:20,25;92:2

**Hauer (1)**
53:17
**head (1)**
61:19
**headlines (2)**
37:15,17
**heads (1)**
17:22
**hear (16)**
11:10;23:8;35:13;
46:4,15,21;51:11;
53:15;59:11;60:21;
63:23;64:23;76:10;
84:12,12,18
**heard (19)**
24:1;41:13,25;
45:23;51:5,5,7;56:8;
58:8,11;60:19;61:23,
24;63:15;65:4;
66:20;89:7;91:7;
92:6
**hearing (16)**
15:11;29:1;31:2;
32:11;39:20;43:22;
47:19;52:20;53:25;
60:4,15;63:16,20;
64:12;66:17;80:14
**hearings (5)**
12:5;44:16;53:2;
64:16;100:8
**hears (1)**
23:9
**heart (1)**
28:23
**heck (2)**
61:15;95:25
**hedge (1)**
90:4
**heed (1)**
10:23
**heightened (1)**
88:21
**hell (1)**
83:5
**help (1)**
97:16
**helped (1)**
66:12
**helpful (2)**
39:3;64:3
**here's (3)**
78:5;80:8;92:14
**high (1)**
71:16
**highly (2)**
73:22;93:6
**hires (1)**
73:19
**hiring (1)**
26:16
**history (4)**
28:17;30:19;
92:22,24

**hit (1)**
61:19
**Hoc (6)**
53:18,20;56:12;
58:16,25;59:3
**hold (2)**
58:17;62:19
**holders (3)**
37:10;45:4;89:25
**holders' (1)**
21:5
**home (1)**
64:8
**honest (2)**
12:12;30:16
**Honor (137)**
7:18,21;8:7;9:4,9,
15;10:11,21;11:1,7;
12:2,12;13:7;16:3;
17:8;18:23;19:2,4,
13;20:21;22:22;
24:12,21,25;25:4;
26:7,14;28:5,16;
29:13;30:19;31:9,
24;32:19;34:14,24;
35:18;38:15;39:18;
40:10,15,25;41:15,
20;43:19;45:7,13;
47:12,22,25;48:2,12,
18;49:2,22;50:4,13;
51:25;52:14;53:16,
19,24;54:3,8,10,13,
16;55:7,13;56:5,8,
15;57:4,23;58:3,10,
13,20,21,24;59:19;
60:9,19;61:18;
62:25;63:13;65:14,
23;66:1,16;67:1,3,
15,19;68:3,11,16,19;
69:9,15;70:3,9,10,
15;71:2,22;73:2,4;
74:5,11,13;76:2;
78:24;81:15;83:12,
21;84:10;85:4,23;
86:25;87:10,20;
88:18;89:8,11;90:13,
20;91:20;92:2;
93:10,17,21;94:7,20;
96:25;99:11;100:12
**Honor's (3)**
25:12;54:14;55:5
**hope (9)**
35:16;36:2;43:21;
46:15,21;52:13,13,
23;92:18
**hopefully (2)**
22:23;86:11
**hopes (1)**
80:4
**hoping (1)**
65:7
**horribly (2)**
80:20;86:18

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 108
of 118

**horse (1)**
62:12
**hotly (1)**
11:10
**hours (4)**
62:8,8;93:4;100:5
**house (1)**
86:11
**hundred (2)**
54:18;86:16
**hypothetical (1)**
86:22
**hypotheticals (1)**
71:18

**I**

**idea (5)**
18:23;28:21;
64:18;95:24;98:9
**ideally (1)**
96:21
**identified (2)**
50:21;52:20
**identifying (1)**
25:3
**imagination (1)**
74:19
**imagine (4)**
20:16;23:4;90:3,
12
**immediately (1)**
25:4
**impact (2)**
56:6;90:1
**impaired (2)**
45:4,5
**imperative (1)**
11:4
**implicit (1)**
27:11
**imply (1)**
92:17
**importance (1)**
26:17
**important (6)**
28:24;50:18;
64:13;68:7;79:20;
94:22
**importantly (1)**
29:24
**imposed (2)**
11:6;52:17
**imposes (1)**
87:15
**impossible (1)**
23:4
**improve (1)**
54:10
**in-betweener (1)**
45:1
**incented (2)**
93:24,24

**incentive (3)**
89:15;94:13;97:22
**incentive-based (1)**
83:23
**incentives (2)**
94:15;98:23
**incentivization (2)**
92:25;97:14
**incentivize (3)**
95:17,25;98:2
**incentivized (5)**
92:20,21;93:7,8;
94:21
**inclined (2)**
33:23;59:2
**include (1)**
10:16
**included (1)**
11:20
**includes (1)**
87:1
**including (4)**
11:22;64:11;
66:13;72:17
**inconsistent (1)**
75:21
**indicated (2)**
39:5;48:16
**indication (1)**
91:7
**indirectly (2)**
70:4;80:25
**individuals (6)**
85:13,15;87:17;
90:2,5,8
**inferences (1)**
56:23
**influenced (1)**
14:21
**information (4)**
66:8,9;68:13;73:9
**inherent (1)**
42:2
**initially (1)**
71:22
**input (2)**
12:8;61:21
**instead (1)**
18:24
**institution (1)**
44:18
**instructive (1)**
25:3
**insulting (1)**
50:16
**insurance (1)**
96:5
**intend (1)**
63:16
**intended (3)**
13:17;59:5;89:2
**intending (2)**
46:18;92:17

**intent (2)**
31:7;83:24
**interest (3)**
19:3;32:1;84:16
**interesting (3)**
21:5;42:1;59:11
**interests (1)**
27:3
**interim (1)**
55:13
**interpret (2)**
29:16,17
**interpretation (1)**
86:6
**interrelated (2)**
40:24;41:6
**interrupt (4)**
12:19,21,21;28:8
**interveners (1)**
24:1
**into (20)**
7:25;16:8;19:23;
21:23;23:8;28:23;
31:13;32:12;45:15;
46:8;55:23,23;
57:24;58:22;61:1;
66:7;85:19;88:23;
90:16;98:15
**introduced (2)**
38:16;81:4
**inverse (1)**
50:6
**inverse-condemnation (1)**
51:17
**investment (1)**
31:15
**invitation (1)**
34:9
**invited (1)**
63:19
**involve (1)**
42:3
**involved (2)**
7:23;96:18
**involvement (1)**
82:3
**involving (1)**
17:15
**IPO (1)**
95:15
**issue (25)**
8:10;9:2;10:3,11,
18;19:8,13;22:1;
40:14,15;43:25;46:1,
22;47:8;48:13;
49:17;50:21;54:16;
65:15;71:14,20;
84:17;96:18;98:22;
100:7
**issues (9)**
15:10;17:15;25:4;
44:3;46:8,9;51:24;
67:4;68:17

**item (7)**
24:18;39:22;
40:11;42:23;68:6,
23;89:3
**items (2)**
57:15;66:12
**IUD (1)**
49:9

**J**

**jam (2)**
7:7;23:12
**January (2)**
24:3;53:8
**Jim (1)**
60:12
**job (12)**
18:15,15;20:7;
55:18;69:19;72:16;
75:4;90:5;93:9,24,
25;95:8
**jobs (1)**
86:10
**Johnson (14)**
67:11;71:18;
72:15,21;74:1;
75:18;76:14,17;78:6,
7;79:11;85:5,6;
86:11
**Johnson's (7)**
69:4;71:5;72:10;
75:4;79:20;85:10;
98:3
**JOHNSTON (22)**
60:9,12,13,16,18,
24;61:2,4,11,14,18;
62:7,10,20,25;63:2,
7,13;80:11,19;82:10;
83:3
**joinder (1)**
65:11
**jointly (1)**
8:1
**Jones (1)**
60:13
**Journal (1)**
91:14
**judge (7)**
9:7;49:8;56:24;
80:21;87:14;91:15,
16
**judicial (2)**
50:10;51:12
**Julian (3)**
45:25;84:21,23
**July (2)**
7:21;58:21
**June (20)**
10:25;12:11;
13:16;14:21;17:25;
19:17,20;20:1;
21:24;22:18;23:6,6,

**item (7)** column continues:
26:11;28:16,18;
31:11,12;33:1;
59:10;60:24

**K**

**Karotkin (124)**
35:15,16,16;36:2,
11,13,16,21;37:1,19;
38:2,5,8,12,15,19,25;
39:4,10,12,24;40:1,
5,7,10,19,25;41:8,10,
11;43:6,8;44:19;
47:25;48:13;63:25;
64:4,8,11,18,21,22,
24;65:1,5,7,12;74:9;
75:9;76:10,12,15,19,
24;77:4,7,9,12,14,17,
20,23;78:1,3,8,12,14,
17,24;79:2,4,8,10,18,
21,24;80:1,10,18;
81:8,12,15,19,23;
82:7,14,17,23;83:7,
8,14,17;84:3,16,19;
92:4,8,15;93:10,13;
94:6,12,19;96:6,11,
13,17,25;97:4,17,20;
98:1,5,9,15;99:2,5,8,
15,19,22,24;100:2,
11
**Karotkin's (1)**
65:22
**keep (3)**
7:6;10:10;86:12
**KEIP (2)**
64:19;72:9
**KERP (1)**
72:3
**Kevin (2)**
72:13,19
**key (8)**
8:2;10:11,16;39:6;
43:22;90:23;92:19,
21
**kick (1)**
29:24
**KIEP (10)**
84:14;85:1,14;
90:1,24;91:6,8;94:3;
98:4;99:16
**kind (12)**
17:1,21;26:2;
28:17;45:1;47:6;
56:16;67:22;80:25;
90:1;91:7;98:23
**knew (1)**
83:7
**knowing (1)**
20:5
**knowledge (1)**
18:22
**known (1)**
85:18

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 109
of 118

**knows (13)**
11:8,13;26:7,15;
30:4;33:22,23;
34:24;76:19,20;
78:21;79:16;96:20
**Kornberg (83)**
7:15,17,19;8:23,
25;9:4,6,9,12,15,19,
22,24;10:3,5,7,10;
11:22,24;12:2;13:7,
10,15;14:14,25;15:2,
5,7,13,19,22;16:1,3,
5,7,10,16,24;17:2,6,
8,12,14,19,24;18:9,
17,20;19:19;20:19,
21,25;21:13,15,18;
22:1,7,14,22,25;
23:19,21,24;24:5,9,
11;25:11;28:25;
30:4;34:6;36:9;
39:16;44:14;46:1;
52:4,20;53:7;54:14;
55:6;56:6,9,11;61:17
**Kornberg's (1)**
59:11

**L**

**lack (4)**
63:21;71:21,23;
85:5
**lacked (1)**
66:9
**Laffredi (2)**
65:13;67:8
**laid (1)**
79:22
**large (2)**
51:19;95:10
**Las (1)**
49:23
**last (14)**
7:21;27:2;29:1;
36:18;41:22;42:14;
47:16;48:9;52:9;
56:5;66:14;76:13;
93:4;100:5
**late (3)**
42:25;64:14;92:3
**later (3)**
29:11;46:7;90:18
**law (7)**
9:18;14:9;15:10;
25:16;29:16,17;
43:17
**lawyer (1)**
20:16
**lawyers (3)**
13:20;74:2;100:6
**layup (1)**
90:25
**learn (2)**
85:21,21

**learned (2)**
66:13;67:10
**least (13)**
13:24;14:23;
16:21;18:14;22:9;
23:10;26:3;33:15,
19;71:2;75:19;91:1;
93:25
**leave (4)**
17:25;18:5;44:10;
83:9
**Leaving (4)**
14:10;23:16;
42:24;96:4
**led (1)**
32:14
**left (1)**
14:11
**leg (1)**
72:20
**legal (3)**
42:9;48:22;50:5
**legislate (1)**
31:17
**legislation (3)**
26:13;88:20,24
**legislative (4)**
28:17;30:18;31:7;
46:9
**legislatively (1)**
10:23
**legislators (1)**
18:1
**legislators' (1)**
27:12
**legislature (8)**
11:2;13:2;26:10;
28:12,24;31:17;
44:15;88:19
**length (1)**
11:25
**lets (1)**
31:18
**letting (1)**
96:1
**levels (1)**
68:5
**liability (4)**
48:23;49:6;50:5,6
**liable (1)**
49:18
**lie (1)**
85:17
**lift (1)**
59:2
**lifting (1)**
36:22;46:5
**light (3)**
17:20;20:10;55:20
**likely (1)**
89:23
**limited (2)**
29:6,8

**limitless (1)**
90:15
**line (1)**
74:21
**linear (1)**
17:1
**lines (2)**
27:12;88:9
**Liou (1)**
85:9
**list (2)**
70:24;87:13
**listen (5)**
19:12;33:24;
64:10;75:8;91:13
**litigant (1)**
20:16
**litigation (1)**
86:4
**little (11)**
7:7;13:23;15:3;
20:5;26:6;27:1,6;
30:14,19;40:21;81:2
**live (1)**
40:21
**lives (1)**
64:15
**living (2)**
26:8;61:14
**log (1)**
23:12
**logically (2)**
39:7,8
**long (7)**
8:20;12:1;15:23;
22:16;59:12;83:24;
100:9
**longer (2)**
29:20;53:1
**look (16)**
15:23;28:12;
31:12;33:7;45:3;
54:11;58:3;69:15;
70:23;71:15;75:8;
88:6;94:2;95:1,2;
99:11
**looking (4)**
23:10;32:25;47:7;
93:2
**looks (2)**
11:14;25:21
**looming (1)**
60:25
**losing (1)**
86:10
**loss (2)**
35:21;87:23
**lost (2)**
27:1;78:24
**lot (13)**
11:11;12:14;
19:22;31:16;34:21;
60:19;61:16;69:19;

71:16;82:19;95:19;
97:8;100:5
**lots (7)**
17:15;22:3,3,4,4;
27:18;33:17

**M**

**magic (2)**
49:23;72:18
**magically (1)**
44:14
**magnitude (1)**
92:13
**maintain (3)**
12:25;13:5;14:22
**major (3)**
34:11,12;48:10
**majority (1)**
28:11
**maker (6)**
10:13;44:2;54:17,
19,21,22
**makes (3)**
45:21;75:4;83:5
**making (4)**
9:17;21:6;68:9;
78:16
**man (1)**
73:21
**managed (2)**
61:12;86:23
**management (4)**
85:17;87:6;88:7,
11
**managers (1)**
90:4
**managing (3)**
42:20;59:14;88:21
**mandated (2)**
10:24;12:10
**Manges (1)**
35:17
**many (3)**
26:12;92:16;
100:10
**map (1)**
44:4
**marginally (1)**
49:5
**market (9)**
33:2;90:9;93:23;
94:1,4;96:24;98:10;
99:13,13
**market-based (3)**
93:18,20;94:9
**mass (3)**
49:4,7,10
**masses (1)**
16:20
**materially (1)**
85:12
**Mathew (1)**

58:13
**Matter (8)**
7:8;22:23;42:9;
62:5;67:9;84:14;
100:3,4
**matters (4)**
7:11,13;8:12;
64:15
**maximum (1)**
95:5
**may (16)**
11:11;13:11;15:2;
17:20;19:16;24:20;
25:20,24;36:13;
44:24;46:20;49:1;
53:6;61:24;74:23;
82:12
**maybe (14)**
9:7;12:22;13:12,
20;14:11;18:15;
20:6,18;47:8;55:11;
67:7,8;93:2;96:3
**McKenzie (1)**
85:25
**mean (56)**
8:19,24;12:20,20;
17:6;22:3;23:22;
24:18;28:7;29:17;
30:7;31:1;33:24;
34:2;39:23;41:5;
47:10;49:20;51:18;
57:11,12;59:20;
60:3;62:4,19,23;
68:24;69:17,18,18;
71:9;72:13;75:25;
76:13,16,17;80:23;
81:13;82:18;83:15,
16;84:2,7;87:13,19;
88:7,7,14;89:19;
90:3;91:18;92:17;
95:10;96:16,19,21
**meaningful (4)**
56:18;57:7;90:1;
98:17
**means (9)**
7:15;28:13;33:4;
51:17;76:23,24,24;
78:23,25
**meant (3)**
30:13;43:10;82:21
**meanwhile (1)**
16:12
**mechanisms (1)**
8:16
**mediation (3)**
11:20,24;12:3
**mediator (1)**
47:7
**meditated (1)**
15:18
**meet (3)**
48:11;76:6;90:20
**meeting (1)**

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 110
of 118

29:12
**meetings (3)**
8:5;10:20;48:7
**memorized (1)**
33:18
**mention (1)**
17:9
**mentioned (2)**
16:11;48:12,13
**mentioning (1)**
11:8
**merely (1)**
89:3
**merits (4)**
47:20;50:19,22;
57:24
**message (3)**
20:6,7,14
**met (3)**
27:10;69:14;91:8
**Metric (1)**
90:23
**metrics (4)**
86:16;94:16;
95:17;99:16
**microphone (1)**
64:7
**midday (1)**
64:16
**midst (1)**
15:22
**might (20)**
9:7,9;14:5;20:11;
22:13;33:2;37:14;
38:23;39:3;42:15;
51:12;56:11;61:8;
64:6;66:12;72:15;
73:7;84:5;87:19;
97:15
**Milbank (1)**
41:20
**milestones (1)**
56:1
**million (14)**
24:6;69:21;71:15;
72:24;73:10,10;
75:20;76:17;80:7,
24;81:14,16;82:5;
95:19
**mind (1)**
63:16
**mindful (2)**
52:17,18
**minds (1)**
60:25
**minimum (1)**
95:6
**minitrials (1)**
49:3
**minute (3)**
22:17;49:13;75:6
**miss (1)**
22:19

**missing (1)**
14:23
**Mitchell (54)**
7:18;24:15,21,21,
24;25:10,15,17;27:9,
13,17,20,24;28:2,5,9,
15;29:19,22;30:1,6,
9,11,16,18,22,24;
31:3,5,7,15;32:8,15,
17,19,22,24;33:11,
14;34:4,8,14,19,21;
35:6,11,12;36:9;
37:22;41:19;52:6;
86:17;88:8;96:22
**mitigate (1)**
42:20
**modifications (1)**
96:9
**modified (1)**
98:6
**modifier (1)**
94:19
**moment (4)**
8:20;12:16;32:20;
66:2
**Monday (1)**
34:10;61:24
**money (6)**
21:19;71:16;
72:17;87:18;95:10,
11
**monies (1)**
87:6
**month (1)**
39:15
**months (9)**
11:17,19,20;13:4;
22:21;26:9;46:20;
78:6;92:16
**moratorium (1)**
47:11
**more (39)**
9:1;11:11,12;14:9,
18;20:9;21:19;
25:21;27:5;29:23;
38:13;40:12,13,25;
44:21;50:18;54:22;
59:14;63:9,9;64:2;
66:19;68:22;74:16;
75:4,5,6,7,13;79:13;
84:6;87:21;92:10,12,
12;94:19;95:12,14;
96:1
**morning (7)**
7:5;19:11;24:12;
48:2;62:6;95:22;
100:9
**most (6)**
8:10;39:14;74:19;
92:22,23;97:21
**mostly (1)**
71:22
**motion (50)**

37:15,25;40:7;
41:5,5;42:12;44:9;
48:20;51:14,22;
59:21,22,23;60:3;
61:1;62:19;64:19,
20;65:3;66:2,9;67:4,
13,21,22;68:18,20;
69:7;71:10;72:9;
75:17;76:25;81:9,18,
20,25;82:1;83:5,23;
84:3,4,5,12,15;85:1,
6,14;87:18;91:19;
92:6
**motions (9)**
7:24;33:13;63:17,
24;64:1;66:16;
69:13,13,13;73:18
**motivated (1)**
12:16
**move (4)**
26:11;44:4;64:1;
90:10
**moved (1)**
46:3
**moving (3)**
33:21;70:21;98:18
**much (6)**
25:1;34:16,18;
51:23;63:8,14
**multiple (5)**
12:11;14:8;18:5,
25;58:1
**Myers (1)**
24:22
**myself (2)**
40:23;45:20

**N**

**nail (1)**
61:19
**naive (1)**
10:21
**naivete (1)**
10:22
**name (5)**
10:7;60:8;65:15,
19;87:12
**named (1)**
87:13
**names (4)**
10:4,5,6,7
**Nancy (1)**
24:21
**narrow (1)**
40:21
**natural (1)**
14:6
**nature (1)**
12:4
**necessarily (2)**
35:21;72:4
**necessary (4)**

40:15;73:12;87:5;
88:20
**need (17)**
20:1,18;26:4;
34:15;40:20;46:20;
53:4;59:24;62:14;
64:17;67:5;73:9;
78:22;88:15,21;92:7,
19
**needed (2)**
48:25;91:14
**needs (3)**
33:6;46:12;63:4
**negative (1)**
19:10
**negligent (1)**
50:25
**negotiate (1)**
13:12
**negotiation (1)**
57:7
**negotiations (3)**
56:7,11,16
**Nets (1)**
72:14
**new (5)**
37:11;64:7;72:14;
88:6;94:17
**Newsom (1)**
24:24
**newspaper (1)**
37:17
**newspapers (1)**
37:9
**next (27)**
14:2;16:19;18:8,
10;20:8;24:16;
28:23;33:13;39:15;
41:5;42:12,23,23;
46:4;47:13,19;
51:22;53:2;54:12;
57:16;58:3;59:2;
60:4,21;62:15;63:6;
80:14
**nice (2)**
41:16;100:13
**nicely (1)**
90:21
**night (2)**
34:10;61:24
**nineteen (1)**
48:21
**non-chaos (1)**
14:23
**none (1)**
40:20
**nonmaterial (1)**
29:12
**normal (1)**
27:18
**normally (1)**
73:5
**Northern (1)**

92:23
**not- (1)**
78:19
**noted (1)**
56:12
**noteholder (3)**
21:2;53:18,20
**noteholders (1)**
33:8
**notes (1)**
91:3
**noticed (1)**
96:7
**notwithstanding (1)**
19:7
**November (1)**
22:18
**number (8)**
28:13;34:12;37:8;
40:18;63:12;89:23,
24;97:21
**numbers (2)**
95:2;99:11
**numerous (1)**
8:5

**O**

**objection (2)**
85:5;91:23
**objections (5)**
14:13;18:12;
27:16;66:6,9
**objective (1)**
21:21
**obligations (2)**
29:23;30:24
**observation (1)**
52:9
**observed (1)**
67:7
**obviously (8)**
28:1;29:6;33:22;
43:11;44:20;47:1;
90:7;93:10
**OCC (5)**
41:12;47:7;53:22;
54:10;58:25
**occur (1)**
23:6
**off (1)**
83:16
**offer (1)**
82:9
**office (18)**
7:14,18,22;8:1;
10:14,17;18:24;
26:7;32:9,12;33:25;
48:8,16;53:21;62:4;
65:16;66:1;68:15
**officer (3)**
51:12;87:12;90:10
**officers (3)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(10) meetings - officers

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 111
of 118

81:2;92:19,22
**official (6)**
10:17;24:17;
35:14;41:21;48:6;
52:22
**often (2)**
18:7;66:8
**O'Melveny (1)**
24:22
**once (3)**
35:2;53:6;90:18
**one (68)**
9:1;10:20;12:23,
23;13:5,15,17,20;
14:5,9,11,17,18;
18:4,8,13,16;20:8;
23:10;25:11;28:19;
32:6;33:21;34:23;
36:6;41:1,6;42:13;
44:21;49:8;50:15;
52:9;54:18,22;56:10,
13,19;63:12;64:15;
65:4,6,8,10,10;66:7,
19;67:8;68:14;71:6;
72:2;74:12,19;
75:13;80:18,20;
84:22;87:4,16,17;
92:9,23;95:7,24;
96:4,4,23;97:21;
100:7
**ones (2)**
97:10,11
**one's (1)**
63:19
**ongoing (1)**
26:4
**only (22)**
8:21;12:23;13:5;
14:11;25:10,24;
44:3;48:19;49:17;
51:2;55:18;57:16;
63:8;71:12;76:18;
77:17;83:21;86:2;
88:20;93:21,21;
99:16
**oOo- (1)**
7:2
**open (8)**
9:1;30:5;32:5,6,6,
13;33:22;57:22
**opening (2)**
84:18;92:9
**operation (1)**
87:25
**operations (1)**
94:14
**opinion (2)**
46:19;77:21
**Opponent (2)**
84:19,20
**opportunity (11)**
17:16;19:5;25:1;
92:4;93:19,20,22;

94:4,22,23;98:10
**opposed (3)**
53:6;86:2,22
**opposition (3)**
65:22;72:9;87:1
**oppositions (1)**
63:11
**optimal (1)**
40:3
**option (1)**
33:19
**options (1)**
57:22
**orally (1)**
100:7
**order (15)**
7:3;23:25;26:24;
29:3,5;37:12;59:6,
24;61:21;68:23;
69:25;73:5,8;82:8;
87:5
**orderly (1)**
60:5
**Orsini (1)**
49:16
**Orsini's (1)**
49:24
**others (2)**
32:7;33:16
**otherwise (2)**
22:12;97:15
**ought (3)**
59:25;92:21;93:8
**out (30)**
13:18;14:18;
16:19;18:6;26:5,14;
27:7;31:18;33:7;
37:8;42:25;43:11;
45:8;46:1,11;47:10;
49:1;51:18;55:9;
56:17;59:5;68:14;
72:21;76:5;85:24;
87:7;95:6,25;96:23;
97:9
**outcome (3)**
22:16,17;75:5
**out-of-towners (1)**
64:12
**outset (1)**
19:5
**outside (3)**
22:6;52:17;56:21
**outstanding (1)**
67:18
**over (6)**
10:18;36:18;37:9;
39:15;48:8;65:21
**overall (2)**
74:25;90:14
**overlay (1)**
46:9
**overseeing (1)**
49:2

oversight (1)
49:2
**oversimplify (1)**
13:25
**oversimplifying (1)**
15:1
**overt (1)**
46:22
**overwhelmed (1)**
92:12
**own (6)**
12:5;38:13;49:20;
54:1;56:23;78:5
**owned (1)**
89:24

**P**

**package (6)**
73:15,16;74:24;
75:4;85:10;90:7
**packages (1)**
71:4
**pages (1)**
88:9
**paid (22)**
22:21;27:7;67:11;
68:18,18;69:15;71:1,
3,18;72:17,17,19;
75:19;80:4;81:9;
82:11;87:7,19;
89:16;93:6,23;95:20
**paper (3)**
7:25;81:25;91:13
**papers (8)**
34:25;60:21;
68:24;69:25;75:17;
80:22;87:4;92:15
**paper's (1)**
74:7
**paperwork (1)**
89:12
**parallel (3)**
14:8;16:18;52:18
**Pardon (1)**
81:19
**part (11)**
12:15;25:22;39:7,
8;62:24;69:1;71:4;
74:24;91:10;98:17,
22
**participants (1)**
90:23
**participate (1)**
33:2
**participating (1)**
32:1
**participation (1)**
31:19
**particular (3)**
28:18;54:15;90:2
**particularly (7)**
9:12;20:2;38:8;

39:18;60:24;68:5;
84:6
**parties (29)**
7:23;8:2,6,13,16;
9:25;12:6;19:12;
26:12;31:25;32:3;
33:16,21;34:23,24;
35:7,20;36:5;37:6,7;
39:13;43:10,22;
48:11;52:16,21;
57:7;61:22;73:6
**parties' (1)**
7:25
**parties-in-interest (1)**
10:16
**partner (1)**
60:14
**party (3)**
42:10;65:11;68:1
**pass (1)**
26:8
**passed (1)**
26:13
**passing (1)**
23:18
**past (5)**
14:7;16:18;18:8,
10;37:9
**patently (1)**
15:14
**path (1)**
42:10
**Paul (1)**
7:19
**pay (7)**
72:22,25;73:13;
74:2;75:19;98:10;
99:13
**paying (1)**
10:23;12:6
**payment (7)**
68:16;69:10,23;
70:11;73:8,14;82:1
**payments (4)**
69:12;71:1,4;
99:16
**payout (1)**
90:24
**peace (1)**
13:18
**pen (1)**
7:24
**penalties (1)**
87:15
**pendency (1)**
79:12
**pending (2)**
7:23;70:10
**people (42)**
11:1,16;13:12;
19:6,13,19;20:1;
21:3;22:4;26:16;
32:4;33:1,5,17;

35:22;36:3;37:13;
39:22;40:11;42:21;
46:11;56:13;59:6;
63:7;9;64:4,8;65:8;
68:5;85:23,25;86:2,
3,9;87:13;92:7;
94:21;95:9,12;
97:14;98:4;99:2
**per (1)**
29:24
**percent (5)**
54:18;86:16;
90:24;91:5;94:16
**percentile (1)**
94:6
**perfect (1)**
26:23
**perform (2)**
72:16;98:2
**performance (3)**
71:11;91:8;94:17
**performs (1)**
94:8
**perhaps (4)**
37:2;50:9;66:14;
87:5
**period (2)**
32:10;91:5
**periods (1)**
85:16
**permanently (1)**
22:13
**permission (1)**
84:4
**permitting (1)**
13:10
**person (3)**
12:24;68:7;79:20
**personal (1)**
65:15
**personalize (1)**
80:23
**personalizing (1)**
92:16
**personally (4)**
22:17;69:4;82:3,4
**perspective (4)**
26:3,6;33:4;59:13
**perspectives (1)**
7:25
**persuaded (1)**
23:9
**pervasive (1)**
92:23
**PG&E (18)**
7:8;11:18;15:17;
28:21;29:10;30:4;
31:12,15;48:22;49:5,
16;50:5,25;51:2;
61:11,15;86:8;87:16
**PG&E's (1)**
49:24;52:12;
85:17;86:3

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 112
of 118

**ph (1)**
16:4
**phase (1)**
43:1
**phone (4)**
47:25;58:10;
84:23;92:5
**phrase (3)**
81:13;92:14,19
**pick (3)**
56:24;63:22;95:6
**picked (2)**
29:1,4
**picking (1)**
14:18
**picks (1)**
9:2
**picture (1)**
90:14
**pin (1)**
70:1
**place (4)**
8:20;26:13;31:25;
36:19
**plan (90)**
8:2,11,15;9:2;
10:12;11:12,18;
12:2;13:3,5,15,25;
14:10,11;16:13,25;
17:20;18:5,6,21;
20:3,9,15,23;21:1,6;
23:1,18;24:3;25:7,8,
9;27:19;28:14;
29:24;30:13,25;
31:21;36:6;37:6,12;
38:3,13,23;39:6,22;
40:11,11,13,17,17;
42:16;43:12,12,20;
44:24,24;45:3;52:15,
19,23,24;53:6,7;
54:6;55:6;56:12,17;
58:1;60:4;61:21;
63:3;74:13,14,16;
75:2;77:16;86:21;
89:17;90:16;91:1,6;
95:20,22;96:15,21;
97:5,10,16;98:19
**plans (25)**
9:2,16;11:14;
12:11;13:11;14:1,8,
16;15:13;16:19,21;
19:1;20:9;22:8;
23:14;25:18;32:2;
36:22;54:17,25;
57:14;59:7,7,7;63:4
**play (5)**
26:5;55:3;80:21;
95:18;96:1
**players (3)**
34:11,13;59:25
**playing (3)**
47:8;72:21;79:16
**plays (1)**

97:7
**pleading (1)**
90:22
**pleadings (2)**
39:5;89:12
**please (2)**
24:20;58:19
**pleasure (2)**
26:8;64:3
**PM (2)**
7:1;100:14
**point (25)**
9:16;13:1;15:15;
18:5,11,12;23:15;
26:14;32:2;38:18;
40:20;43:13;53:3,4;
55:5;56:5;58:24;
63:2;76:1;83:21;
87:5;88:18;89:21;
91:13;93:3
**pointed (2)**
46:1;85:24
**points (6)**
15:8;51:20;54:3;
62:17;67:16;90:19
**pole (1)**
73:22
**policy (1)**
26:19
**politician (1)**
35:4
**portion (1)**
74:20
**position (20)**
8:14;20:22;22:10;
23:17;28:2;30:15;
33:17,25;36:3;
49:25;52:13;62:23;
68:6;71:13;72:10;
73:22;75:21;86:6,
14;92:6
**positions (1)**
34:25
**positive (5)**
20:3;21:2,22;48:7;
56:14
**possession (1)**
29:21
**possibility (1)**
53:5
**possible (5)**
17:24;23:2;29:5;
35:22;87:25
**possibly (3)**
74:15;83:23;85:19
**potential (5)**
42:14;44:3;85:22;
89:17;95:3
**potentially (2)**
11:12;32:1
**practical (2)**
42:9;87:21
**practice (1)**

68:4
**precisely (1)**
56:2
**predicates (1)**
70:21
**pre-existing (1)**
30:2
**premature (1)**
40:17
**premised (1)**
42:18
**prepared (4)**
51:20;63:19,25;
66:16
**preplan (1)**
36:8
**presentation (1)**
24:2
**presented (1)**
15:14
**press (1)**
35:1
**pressing (2)**
44:11,20
**pressure (1)**
34:22
**presumably (2)**
72:21;76:4
**presume (3)**
27:11;72:14;91:15
**pretend (1)**
44:14
**pretty (1)**
89:20
**price (1)**
90:10
**principal (1)**
7:23
**principle (2)**
51:18;73:25
**principles (3)**
54:4,5;57:9
**prior (7)**
7:7;60:15;62:6;
68:17;97:1
**private (1)**
38:23
**privilege (1)**
61:14
**privy (1)**
38:22
**probably (13)**
16:8;24:10;25:11,
12;31:1;33:23;35:8;
45:20,20;46:10;
80:13;97:8;98:12
**problem (10)**
16:11,11,12;
21:19;22:11,25;
26:24;74:12;92:20;
95:1
**problems (6)**
11:5;22:12;42:1;

73:23;85:17;92:13
**procedurally (2)**
37:17;87:8
**procedure (2)**
37:25;97:7
**proceed (3)**
11:12;12:18;39:15
**proceeding (3)**
40:6;52:11;58:1
**proceedings (9)**
11:15;12:5;15:16;
17:9,21;23:2;49:3;
51:4;100:14
**process (67)**
9:10,17;10:12,15,
19,23;11:1,10,14,17;
12:7,8;14:7;15:9;
16:23;18:21;19:4,8,
17;20:23;21:1,23;
23:5,25;25:8,13,23;
26:5,20;31:10,23,24;
32:24;33:2,5,7,8;
34:12;36:8,23;
42:20;43:20;44:4;
46:2,3,10;47:4,17;
48:15,17,20,25;
50:16;52:15,19;
54:6;55:7;57:8;58:1;
59:12,14;61:5;62:15,
24;63:5;74:14,21
**professional (1)**
68:1
**professionally (1)**
80:3
**professionals (1)**
93:6
**proffer (1)**
44:3
**program (2)**
88:14;94:24
**progress (1)**
21:6
**promise (2)**
46:24;81:21
**promised (1)**
76:17
**promoting (1)**
18:24
**promptly (1)**
81:3
**proper (2)**
37:25;81:3
**properly (5)**
71:24;86:23,24;
88:21;95:8
**proponent (2)**
8:22;12:24
**proposal (8)**
8:2,11,15,19;21:2,
7;53:23;54:8
**proposals (3)**
11:12;20:3;37:8
**propose (4)**

37:12;40:11;
43:12;98:16
**proposed (1)**
53:25
**proposing (1)**
38:2
**prospective (1)**
8:21
**protection (1)**
12:9
**protocol (31)**
8:2;10:14;25:2,5;
27:1;29:3;35:21;
36:17;39:13;41:24;
42:15,16,16;43:21;
44:7;46:25;48:18;
52:23,24;53:25;
54:1;55:4,14,23;
57:16;58:22,25;
59:23,25;61:21;
62:17
**protocols (2)**
59:5;63:3
**proven (1)**
46:2
**provide (3)**
37:11;97:22;98:9
**provided (1)**
10:15
**provides (2)**
79:4,13
**providing (1)**
98:24
**provision (2)**
82:25;88:10
**provisions (1)**
39:6
**PSI (1)**
90:23
**Public (5)**
7:20;12:7,8;23:20;
73:22
**publicly (1)**
90:11
**publishable (1)**
46:19
**PUC (10)**
9:24;10:15,17,20;
11:17;12:7;17:22;
18:24;23:5;48:17
**PUC's (1)**
17:9
**punished (1)**
80:5
**pure (1)**
19:16
**purely (1)**
88:13
**purpose (3)**
27:14;57:3;93:22
**purposes (6)**
8:4;29:14;30:25;
49:15,15;51:16

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(12) ph - purposes
Case: 19-30088   Doc# 3502   Filed: 08/12/19   Entered: 08/12/19 09:00:41   Page 113
of 118

**pursuant (1)**
89:13
**put (12)**
19:22;23:17;
31:25;33:7,8;34:21;
38:9;39:22;50:16;
62:11;82:18;88:15
**putting (4)**
7:24;35:2;59:5;
88:18

**Q**

**quarrel (1)**
82:2
**quarter (1)**
91:12
**quasi-judicial (2)**
12:4;17:14
**quickly (3)**
8:9;64:1;90:19
**quo (1)**
57:22
**quote (1)**
35:2
**quoting (2)**
34:25;35:7
**QURESHI (19)**
53:16,17;54:21,
25;55:2,13,16,19,22,
25;56:22;57:1,3,6,
13,18,23;58:7;61:25
**Quresky (1)**
62:16

**R**

**radical (1)**
47:6
**raised (5)**
43:25;54:3,16;
67:9;98:18
**ramifications (1)**
22:20
**ran (1)**
64:14
**rank-and-file (1)**
85:24
**rate (4)**
12:4;94:1;98:10;
99:13
**ratepayer (2)**
12:8;26:21
**ratepayers (2)**
21:9;26:18
**rates (1)**
17:16
**Rather (8)**
19:1,3;23:18;46:7;
47:6;51:21;84:18;
86:14
**reach (4)**
35:20,22;39:12;

52:23
**reached (2)**
42:1;66:10
**reactions (1)**
8:7
**read (8)**
37:9,14;60:21;
71:8;75:17,23;80:8;
85:1
**reading (3)**
71:2;81:24;82:9
**ready (1)**
40:16
**real (5)**
19:20;22:25;87:8;
97:15;98:10
**realistic (1)**
40:14
**realities (1)**
86:22
**realize (1)**
79:18
**realized (1)**
46:12
**realizing (1)**
42:14
**really (35)**
10:11;16:14,20;
17:9;18:7,20;19:9,
11,20,23;20:1;24:2;
28:18,19,20;33:6;
34:15;39:21;40:10,
17;42:9;48:11;
49:18;67:12;82:3;
84:9;86:9;87:14;
89:15,22;90:8,8;
93:16;95:22;98:1
**reason (2)**
12:15;62:15
**reasonable (2)**
35:23;73:10
**reasoned (1)**
63:4
**reasons (4)**
52:19;58:22;78:5;
95:21
**recall (1)**
32:10
**receive (5)**
8:7;93:18,20,25;
94:1
**receiving (2)**
86:10;97:1
**recognize (4)**
26:22;28:16;
31:22;60:10
**recognizes (1)**
86:21
**recommendation (2)**
20:17;65:25
**reconciling (1)**
56:10
**record (2)**

53:17;57:2
**recoveries (1)**
96:5
**reference (2)**
61:23,25
**referring (2)**
36:9;66:19
**refine (1)**
33:25
**reflection (1)**
46:22
**regain (1)**
93:15
**regards (1)**
91:4
**regular (1)**
64:14
**reiterate (1)**
36:7
**related (4)**
48:20;55:6;94:16,
20
**relating (1)**
7:12
**relation (1)**
79:6
**relative (2)**
48:19;77:13
**relatively (1)**
90:15
**releases (1)**
35:1
**relevant (1)**
34:7
**relief (4)**
40:23;41:3;48:21;
74:15
**remaining (1)**
36:19
**remark (1)**
84:18
**remarkable (1)**
56:17
**remember (5)**
13:20;15:12,17;
27:4;32:9
**remind (2)**
11:16;42:13
**reorganized (2)**
93:5;98:5
**repair (1)**
86:1
**repeat (4)**
40:20;44:16;
45:20;85:19
**repeatedly (1)**
9:16
**reply (5)**
51:21;74:9;82:20,
20;89:14
**report (4)**
7:10,13,16;13:18
**represent (2)**

80:11,12
**representing (1)**
34:11
**request (4)**
66:7;68:10;69:1;
71:24
**requested (2)**
41:24;74:15
**requests (1)**
74:15
**require (2)**
12:5;86:15
**required (2)**
8:17;24:2
**requires (1)**
12:9
**requiring (1)**
13:11
**research (1)**
67:10
**resolution (6)**
10:24;11:10;
26:17;40:1,3;41:25
**resolve (3)**
19:9;39:21;42:10
**resolved (7)**
11:18;21:24;
28:25;29:4,13;67:5;
98:21
**resolving (1)**
66:21
**respect (9)**
12:10;17:19;
39:13;50:25;85:9,
13;90:20;91:21;
96:13
**respond (3)**
51:15;91:14;92:4
**responded (1)**
91:20
**response (12)**
51:21;67:7;70:12;
71:9,10;75:23,23;
82:4;83:15;85:2;
89:13;91:9
**responses (3)**
8:8;51:13;97:20
**responsibility (4)**
14:18;63:22;80:3;
86:7
**rest (1)**
92:11
**result (3)**
14:5;21:9;53:2
**retained (1)**
85:25
**retains (1)**
53:1
**retention (3)**
67:23,24;69:23
**return (1)**
27:6
**review (3)**

65:22;69:11;70:17
**reviewing (1)**
89:11
**revolved (1)**
8:10
**rhetoric (1)**
93:2
**rhetorical (3)**
87:21;92:10;95:16
**Rifkind (1)**
7:19
**right (65)**
7:16;8:22;9:19;
12:23,24;13:5;
15:15;19:18;20:24;
22:7;26:24;27:8;
28:14;30:9;31:9;
32:22;35:5;36:1;
42:9;43:11;45:16,
18;53:9,11,14;54:24;
55:1,7;57:17,23;
60:2,7,23;61:10;
62:16;64:24;66:3,5;
67:19,25;70:19,25;
71:7,8;72:22;74:4;
75:14,16,20;81:8;
83:9;87:16;89:5,10;
92:1,3,8,25;93:15,
15;94:10,21;96:6;
97:25;98:8
**rights (2)**
29:21,24
**ripe (1)**
30:25
**rise (1)**
7:4
**risking (1)**
80:3
**risk-laden (1)**
10:22
**risks (1)**
80:3
**road (2)**
13:4;44:4
**Robert (1)**
89:8
**role (11)**
8:11,15;9:8;10:18;
14:22;20:6;45:1;
47:8;53:22;55:3;
84:11
**rose (2)**
49:10;61:6
**round (1)**
16:19
**rule (4)**
17:5;44:6;47:19;
80:20
**rules (3)**
23:16;34:2;87:16
**ruling (1)**
46:22
**rulings (1)**

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 114
of 118

96:20
**run (2)**
13:3;94:12
**running (1)**
94:13

## S

**Sacramento (1)**
26:9
**saddle (1)**
89:17
**safety (5)**
85:18;86:16;
88:25;94:16,20
**same (11)**
22:7;36:3;44:22;
58:2;62:21,22;
63:10;65:12;71:20;
77:5;84:17
**SAN (1)**
7:1
**satisfaction (1)**
85:11
**satisfactory (1)**
70:10
**satisfied (3)**
74:8,8;77:24
**saw (2)**
85:4;88:23
**saying (24)**
9:3;18:3;23:4;
33:19;34:11;36:16,
17;37:24;40:11;
50:25;61:23;72:18;
73:8,9;75:6;77:15;
79:10;80:5;82:24;
94:20;95:19;97:6,13,
18
**schedule (1)**
25:19
**scheduled (1)**
7:12
**scheduling (4)**
29:3;59:6,24;
61:21
**scorched-earth (1)**
86:3
**score (1)**
33:18
**scratching (1)**
17:21
**season (2)**
28:19,23
**second (5)**
15:23;43:13;55:5;
58:17;91:11
**secret (1)**
69:7
**secrets (1)**
46:14
**Section (2)**
78:9;79:13

**seeing (1)**
54:11
**seeking (3)**
38:12;73:4;93:19
**seeks (1)**
59:8
**seem (5)**
8:12;14:15;19:9;
78:18;91:6
**seems (6)**
13:1,23;14:7;
20:13;59:4;90:24
**sees (1)**
9:24
**select (2)**
10:12;18:13
**selected (1)**
30:19
**selecting (3)**
8:11,15,19
**selection (1)**
25:7
**selector (1)**
8:21
**send (1)**
20:7
**sending (1)**
20:6
**senior (5)**
45:4;59:22;61:25;
73:19;85:15
**sense (3)**
14:22;45:21;73:2
**separate (2)**
71:14;83:5
**September (1)**
33:21
**sequential (1)**
16:17
**serial (1)**
57:25
**seriatum (1)**
53:6
**series (1)**
56:1
**seriously (2)**
88:2,2
**served (1)**
87:17
**serving (1)**
56:2
**set (11)**
11:4;18:1;31:2;
42:19;44:1;55:14;
60:4;64:13,16;
69:10;79:7
**sets (1)**
45:5
**settlement (2)**
11:18;12:3
**seven-figure (1)**
96:2
**seventeen (1)**

49:6
**several (6)**
20:3;60:16;72:8,8;
93:4;95:19
**severance (11)**
72:1;74:8,10;
75:15,19;76:6,18;
78:8;79:13;82:13;
83:1
**severed (4)**
71:13;75:18;
78:19;79:11
**Shall (1)**
7:9
**shape (1)**
62:14
**share (1)**
43:22
**shares (1)**
71:3;89:24
**sheet (2)**
21:5;56:17
**shifted (1)**
37:3
**ship (1)**
86:12
**short (1)**
44:8
**shortened (1)**
32:10
**shot (3)**
41:15;46:25;85:6
**show (1)**
26:17
**showing (1)**
80:13
**sic (2)**
28:12;62:16
**side (1)**
95:12
**sides (1)**
27:4
**sideways (1)**
88:2
**signed (2)**
67:8;72:14
**significance (1)**
89:4
**significant (4)**
19:24;27:3;42:4;
68:6
**signing (5)**
67:11;69:18;
71:19,19;72:15
**Silicon (2)**
95:12;97:8
**similar (2)**
36:8;94:24
**simple (2)**
74:21;81:2
**simplification (1)**
15:3
**simplistic (1)**

24:5
**simply (4)**
47:4;59:1,5;63:2
**single (1)**
8:10
**single-spaced (1)**
88:9
**sit (1)**
46:11
**situated (1)**
37:8
**situation (4)**
18:3;39:15;72:12;
79:19
**situations (1)**
18:7
**six (3)**
11:16,18;46:20
**six-month (1)**
23:25
**sixty-five (1)**
94:15
**size (2)**
71:20;89:23
**slap (1)**
72:23
**solicit (1)**
8:6
**solicitation (1)**
25:11
**solicited (1)**
7:22
**soliciting (1)**
14:8
**solution (3)**
11:4;26:23;42:2
**solvable (1)**
8:12
**solve (4)**
21:19;22:11,12;
26:24
**solvent (4)**
8:14;38:9;98:11,
25
**somebody (3)**
64:13;69:20;79:20
**somebody's (1)**
45:8
**somehow (1)**
88:5
**someone (7)**
12:20;24:13;59:7;
73:13;74:17;80:2;
98:2
**sometime (1)**
51:23
**sometimes (3)**
95:5,13,14
**somewhat (1)**
12:15
**somewhere (2)**
26:24;74:21
**soon (1)**

100:8
**sooner (2)**
46:7,9
**Sorry (7)**
7:6;22:20;43:8;
60:10;72:23;80:1,7
**sort (10)**
29:12;46:11;47:7;
48:13;55:10;56:21;
70:4;81:6,12,12
**sounded (1)**
61:15
**sounds (1)**
14:3
**speak (5)**
24:14;25:20;
28:10;45:25;53:15
**speaking (1)**
35:7
**special (1)**
8:16
**specific (1)**
68:22
**specifically (2)**
62:17;67:12
**specter (1)**
55:6
**speculating (1)**
18:2
**speed (1)**
53:4
**spending (1)**
22:4
**spent (1)**
93:4
**spot (2)**
88:15,18
**spring (1)**
16:8
**spur (1)**
56:11
**spurred (1)**
56:16
**stabilized (1)**
96:24
**stage (2)**
13:11;74:16
**stake (1)**
22:16
**stakeholders (1)**
48:10
**stand (1)**
91:22
**standard (5)**
15:15;68:20;
69:14;76:7;97:7
**standards (2)**
45:10;88:6
**standpoint (1)**
36:4
**start (8)**
7:9,9;16:22;18:15,
21;41:22;43:1;81:2

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 115
of 118

**started (1)**
　51:10
**start-ups (1)**
　97:9
**State (6)**
　21:9;26:7;29:16;
　49:3;88:19;93:16
**stated (4)**
　23:13;42:11;87:4;
　89:12
**statement (19)**
　13:8;14:2,5;15:9,
　11;31:2;36:12;43:1;
　44:1;48:19;51:11;
　59:11;74:3,5;76:21;
　79:15;80:15,22,24
**statements (3)**
　18:4;73:25;80:22
**States (1)**
　65:18
**State's (1)**
　26:19
**statewide (1)**
　89:3
**status (6)**
　7:10,13;26:3;
　57:22;63:20;86:17
**statute (2)**
　77:10;88:12
**statutory (2)**
　70:21;82:24
**stay (3)**
　40:23;41:4;48:21
**steady (1)**
　86:12
**step (5)**
　14:2;25:5;26:15;
　37:16;47:3
**Stephen (1)**
　35:16
**steps (1)**
　55:14
**stewards (1)**
　61:5
**stick (3)**
　34:2;51:10;57:22
**sticking (2)**
　13:23;63:10
**still (21)**
　14:10,18;30:4;
　33:20;35:22;39:12,
　20;44:11,20,22;
　59:24;67:4,18;
　68:16;69:12;70:22;
　84:24;90:23;95:10,
　20;98:4
**STIP (2)**
　87:24;94:25
**stipulation (2)**
　37:16;38:1
**stock (6)**
　90:10,11;97:10,
　22;98:4,11

**stone (1)**
　8:5
**strategy (1)**
　86:4
**Strauss (1)**
　53:17
**Street (1)**
　91:14
**strict (1)**
　50:6
**strongly (1)**
　88:3
**structural (1)**
　42:1
**structure (3)**
　11:6;42:1,19
**structured (1)**
　31:22
**studied (3)**
　51:13;55:17;91:16
**stuff (2)**
　27:18;63:9
**subject (4)**
　38:16;51:10;
　69:11;83:1
**submit (2)**
　29:2;62:11
**subrogation (2)**
　21:4;58:18
**subsequent (2)**
　29:6,8
**substantially (1)**
　94:4
**succeed (1)**
　97:12
**successful (2)**
　58:23;96:2
**successfully (1)**
　21:24
**Suffice (2)**
　53:3;57:6
**sufficient (3)**
　10:23;12:6;73:9
**sufficiently (1)**
　30:25
**suggest (1)**
　78:16
**suggested (3)**
　16:22;42:15;56:10
**suggesting (2)**
　14:20;87:14
**suggestion (1)**
　29:3
**suggests (1)**
　88:5
**sum (2)**
　73:10;95:10
**summer (1)**
　28:20
**summons (1)**
　87:17
**support (2)**
　34:25;52:24

**supported (1)**
　54:5
**supportive (1)**
　58:21
**suppose (3)**
　16:18;23:13;78:5
**supposed (3)**
　16:13;23:18;88:6
**sure (19)**
　11:2;15:17;19:21;
　24:6;37:19;39:9;
　42:7;44:8,17;50:11;
　55:9;58:10;65:1;
　72:11;73:17,20;
　75:6;82:7;89:20
**survive (1)**
　14:17
**survivor (1)**
　18:16
**switch (1)**
　74:6
**sympathetic (1)**
　86:13
**sync (1)**
　23:5
**system (3)**
　22:10;23:11;93:15

# T

**table (9)**
　14:1;20:4;26:22;
　27:4;31:21;33:13;
　37:23;45:3;69:9
**talk (1)**
　66:16
**talked (3)**
　44:14;52:6;95:21
**talking (2)**
　25:18;26:1
**targets (1)**
　93:21
**task (1)**
　80:20
**taught (1)**
　99:20
**TCC (9)**
　41:13;48:7,19;
　52:15,24;53:4;72:8,
　9;84:21
**TCC's (1)**
　85:5
**team (1)**
　72:20
**teed (1)**
　15:16
**telling (1)**
　18:14
**tempting (1)**
　95:25
**term (3)**
　21:5;48:14;56:17
**terminate (16)**

　19:7,14;42:18;
　44:5,10,21;56:8;
　59:2,22;61:9,20;
　63:20;78:6;80:6;
　82:11;95:4
**terminated (6)**
　53:2;62:14;71:12,
　13;78:19;83:3
**terminates (1)**
　56:7
**terminating (1)**
　42:17
**termination (1)**
　59:8
**terms (2)**
　42:25;79:3
**terribly (1)**
　86:18
**territory (1)**
　35:5
**Teslas (2)**
　95:14;97:12
**testimony (1)**
　17:15
**tethered (1)**
　42:17
**Thanks (1)**
　63:14
**therefore (4)**
　49:18;69:7;72:25;
　98:1
**thinking (2)**
　13:2;55:11
**third (1)**
　32:3
**thirty-five-page (1)**
　46:19
**though (3)**
　10:4;25:17;61:6
**thought (3)**
　12:14;91:12;97:1
**thoughtful (1)**
　8:7
**thoughts (1)**
　9:23
**three (21)**
　11:11;14:1,16;
　23:15;25:18;54:4,5,
　15,22;57:8,15;62:17;
　69:21;71:15;72:24;
　73:9,10;80:24;81:14,
　16;82:5
**three-million-dollar (1)**
　73:14
**threshold (1)**
　90:23
**thrilled (1)**
　52:10
**Thursday (1)**
　8:3
**thus (1)**
　48:19
**ticking (1)**

　14:21
**tilted (1)**
　95:12
**timeline (9)**
　12:13;17:21;
　23:15;42:19;44:1,12,
　20;46:8,11
**times (4)**
　49:7;60:16;72:8,8
**timetable (1)**
　44:23
**timing (2)**
　43:25;60:1
**tipping (1)**
　95:17
**today (19)**
　13:18;19:10;20:7,
　18;24:18;32:16;
　34:3;35:24;39:1;
　41:6,14;60:21;
　61:23;63:18;64:14;
　78:10;91:5;94:3;
　96:3
**today's (2)**
　41:5;63:20
**toes (1)**
　47:3
**together (2)**
　25:22;44:23
**told (7)**
　10:20;18:18;
　20:11;24:6;41:23;
　50:4;96:22
**tomorrow (1)**
　80:6
**took (7)**
　7:25;11:16;15:24;
　34:21;69:18;72:16;
　92:5
**tools (1)**
　61:7
**top (2)**
　73:21;85:15
**top-down (1)**
　85:7
**topic (1)**
　63:12
**top-level (1)**
　87:6
**Tort (7)**
　48:6,17,24;49:4,7,
　10;52:10
**total (1)**
　15:25
**Totally (2)**
　28:5;41:8
**totem (1)**
　73:22
**tough (1)**
　34:17
**towards (1)**
　53:22
**tracks (1)**

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 116
of 118

52:18
**traded (1)**
90:11
**trading (1)**
90:9
**traditional (2)**
18:3;34:2
**traffic (1)**
7:7
**tragedies (1)**
92:23
**transition (3)**
68:16;70:24;81:23
**transparent (2)**
54:7;57:10
**treats (1)**
27:21
**trial (3)**
15:20,23;16:3
**trials (2)**
49:3;51:4
**triggered (1)**
75:24
**trouble (4)**
20:5;49:7;92:14;
95:19
**troublesome (2)**
80:25;82:2
**troubling (1)**
9:13
**true (4)**
13:8;63:10;74:3,4
**trust (1)**
93:15
**Trustee (5)**
30:12;64:23;
65:18;81:4;91:3
**Trustee's (1)**
66:1,6;68:15;82:4
**try (16)**
12:14;15:10;25:2,
19,22;39:12;43:23;
44:4;46:24;47:4;
48:11;60:10;64:16;
71:15;80:10;100:7
**trying (15)**
26:2;31:23;36:23;
42:2;43:19;56:19;
68:14;70:1,20;88:4,
15;94:10;97:5;
98:16;99:8
**Tubbs (2)**
48:20;51:20
**Tuesday (24)**
20:20;33:13;34:1,
6;36:2;37:3,4,24;
38:20,21;39:2;41:2;
43:9;45:19,21;
47:13;58:4;59:2;
62:11,13;63:12,23;
96:19;100:10
**tunnel (2)**
55:20,21

**turn (4)**
23:7;61:1;87:3;
89:6
**turns (1)**
87:7
**twelve (4)**
87:13;95:7,25;
98:4
**twenty (1)**
14:1
**twenty-four (1)**
62:8
**two (40)**
7:11;14:1,15;
15:15;16:20;20:9,
14;22:5;23:8,10,14;
24:17;26:9;27:2;
28:19;32:20,21;
33:13,16;34:11,11;
35:14;36:18;37:9,22,
22;43:10;45:5,5;
47:16;54:22;56:9;
64:1;66:7;70:12,23;
78:6;90:19;95:14;
97:20
**two-and-a-half (2)**
75:20;80:7
**two-week (1)**
47:11
**type (1)**
29:3
**typical (4)**
38:5;39:17;87:25;
94:14
**typically (1)**
38:6

**U**

**UCC (4)**
25:20;26:4;41:23;
98:18
**ultimate (1)**
44:2
**Ultimately (3)**
54:20;57:24,25
**Um-hum (6)**
14:14;15:21;18:9;
22:14;46:6;61:10
**unable (1)**
35:20
**uncertainty (1)**
98:24
**unconfirmable (2)**
13:4;15:14
**undeniably (1)**
13:8
**under (17)**
30:24;46:18;50:6;
67:21;68:21;69:16;
70:21;71:24;72:3;
73:11;76:7;78:9;
83:25;84:14;88:6;

97:4;100:4
**underlying (1)**
66:13
**understands (1)**
80:16
**Understood (4)**
45:7;46:17,23;
55:22
**undo (1)**
90:18
**unduly (1)**
19:10
**Unfortunately (4)**
7:17;8:9;9:24;
41:25
**unhappy (2)**
19:6;80:9
**unilaterally (1)**
19:2
**unintelligent (1)**
26:11
**unique (1)**
8:17
**United (1)**
65:18
**universe (1)**
89:24
**unleashing (1)**
10:12
**unless (6)**
19:23;39:20;
62:18;63:18;79:22;
82:9
**Unlike (1)**
49:4
**unnecessary (1)**
59:1
**unpredictable (1)**
23:17
**unquestionably (1)**
55:3
**unreviewable (1)**
89:16
**Unsecured (2)**
52:23;96:8
**unusual (2)**
41:18;67:22
**unwillingness (1)**
9:25
**up (34)**
8:5;9:1;12:16;
15:16,23;19:16;23:5,
12;26:17;32:5,6,6,
13,25;33:22;36:23;
37:17;38:3,9;42:2,
11;44:18;53:7;
54:14;55:18;57:22;
60:7;63:22;72:17;
78:16;80:13;95:13;
97:11;100:8
**update (1)**
34:6
**upon (5)**

19:8;27:23;54:10;
85:3;96:3
**urge (1)**
59:15
**use (2)**
56:14;88:13
**used (2)**
72:7;95:13
**uses (1)**
72:8
**using (1)**
72:12
**usually (2)**
12:21;69:12
**Utilities (1)**
7:20
**utility (1)**
92:22

**V**

**Valley (2)**
95:13;97:8
**valuable (1)**
46:2
**value (5)**
44:7;97:24;98:11,
13,24
**variety (2)**
71:6,11
**various (3)**
7:23;15:8;59:5
**Vegas (1)**
49:23
**versus (1)**
29:25
**veterans (1)**
16:6
**victim (1)**
96:4
**victims (13)**
16:6;21:11,15,17,
18,20;22:20;26:18,
21,25;27:6,21;45:5
**victims' (1)**
86:4
**victory (1)**
19:16
**view (8)**
13:1;16:24;21:2;
39:19;40:21;58:24;
76:1;85:12
**views (3)**
7:22;98:12;99:3
**violated (1)**
87:16
**violations (1)**
85:22
**visibility (1)**
71:16
**visible (1)**
73:22
**vote (2)**

18:6;27:22
**voted (1)**
19:3
**voters (1)**
14:16;18:7
**votes (1)**
14:8
**voting (1)**
16:20

**W**

**wait (5)**
12:16;16:22;
49:13;58:17;75:6
**waiting (4)**
7:6;18:25;19:1;
22:5
**walking (2)**
28:17;30:18
**Wall (1)**
91:14
**wants (3)**
23:8;37:25;65:3
**Warren (1)**
90:4
**way (28)**
9:15;10:10;21:4;
25:17;29:17;34:9;
37:18;38:16;39:14;
44:6;47:6;51:18;
55:16;56:2,14,18;
57:7;58:2;62:14;
65:4;71:15;73:5;
86:8;87:24;88:22;
91:5,18;92:18
**ways (1)**
75:3
**weave (1)**
25:22
**Wednesday (2)**
41:2;51:23
**Wednesday's (1)**
41:5
**week (11)**
20:8;42:12;46:4;
47:19;48:9;53:2;
54:12;57:16;60:4,
21;63:6
**weekend (1)**
100:13
**weeks (6)**
20:14;22:5,21;
27:2;36:18;47:16
**weigh (1)**
34:1
**weighed (1)**
33:17
**Weil (1)**
35:16
**Weiss (1)**
7:19
**welcome (5)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 117
of 118

21:8;45:1;53:22;
54:10;56:13
**welcomed (1)**
80:19
**welcoming (1)**
20:15
**weren't (2)**
71:2,3
**Wharton (1)**
7:19
**what's (10)**
9:12;20:6;22:6;
30:13;55:18;58:11;
64:3;65:24,24;81:12
**whereas (1)**
85:23
**where's (1)**
80:6
**Whereupon (1)**
100:14
**who'd (1)**
53:15
**whole (4)**
73:16;82:19;96:1;
97:8
**who's (2)**
38:22;58:12
**whose (1)**
85:13
**wildfire (2)**
39:21;86:19
**willing (8)**
26:22;36:5,8;37:5,
11;39:12;84:16;85:6
**Willkie (1)**
58:14
**winning (1)**
25:7
**wisdom (1)**
35:15
**wish (1)**
15:12
**wishes (1)**
92:6
**wishful (1)**
55:10
**within (2)**
12:13;66:14
**without (9)**
10:23;18:1,22;
19:10;53:3;56:4;
63:25;73:4;81:3
**wondering (1)**
81:6
**word (4)**
28:25;72:7,8,12
**words (4)**
16:18;35:15;
56:14;87:9
**work (23)**
19:22;23:25;25:2;
31:23;36:5,8,23;
37:5;38:2;40:22;

41:23;43:20;44:23;
45:9;47:2;52:21,25;
74:19;76:5;77:1;
80:16;85:8;90:17
**worked (3)**
25:6;26:8;88:9
**workers (1)**
26:19
**working (7)**
25:21;37:13;
53:22;93:13,14;
94:9;100:6
**works (2)**
13:16;94:24
**world (3)**
13:23;88:8;92:24
**worth (1)**
11:8
**worthy (1)**
97:14
**wrist (1)**
72:23
**write (1)**
46:19
**writing (1)**
100:8
**written (2)**
66:15;80:12
**wrong (2)**
52:13,13

**Y**

**year (2)**
28:20;96:3
**years (1)**
22:21
**Yep (3)**
34:4;57:13,18
**yesterday (1)**
62:1
**York (1)**
72:14

**Z**

**zero (3)**
48:23;67:6;75:8
**ZIPES (54)**
65:14,15,18,20,20,
21,23;66:1,4,6,19,
23;67:1,15,18;68:1,
3,8,11,13;69:3,9;
70:3,7,9,15,17,20;
71:1,7,22;72:11;
73:2,17,20;74:4,11,
23;75:2,10,12,14,16;
76:2,4,9,11;77:23;
83:11,12,19,21;
84:10;100:12
**Z-I-P-E-S (1)**
65:20

**1**

**1 (3)**
8:3;11:18;15:17
**1:56 (1)**
100:14
**100 (1)**
86:2
**100,000 (1)**
86:2
**1054 (2)**
34:19;88:8
**11 (9)**
11:9,18;16:13;
40:16;67:22;81:4;
96:15,18;97:21
**12:02 (1)**
7:1

**2**

**2019 (1)**
7:1
**2020 (3)**
10:25;12:11;59:10
**2-1/2 (1)**
76:17
**24 (1)**
7:21
**24th (2)**
12:16;58:21
**25th (1)**
94:6
**29th (1)**
22:18

**3**

**30 (3)**
10:25;17:25;60:24
**30,000 (1)**
71:18
**30th (7)**
14:21;26:11;
28:16,18;31:11,12;
33:1
**35,000 (1)**
93:3
**363 (6)**
25:8;67:21,21;
68:19;71:24;83:22

**5**

**50 (1)**
91:5
**50,000 (3)**
76:18;78:13;80:8
**502.3c (1)**
80:8
**503 (5)**
72:3;78:9;79:4;

83:25;84:11
**503b2 (2)**
74:6;75:22
**503c (1)**
82:20
**503c2 (3)**
72:2;76:7,14

**9**

**9 (1)**
7:1

Case: 19-30088    Doc# 3502    Filed: 08/12/19    Entered: 08/12/19 09:00:41    Page 118 of 118