WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** <br><br> **PG&E CORPORATION,** <br><br> - and - <br><br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br>                               **Debtors.** <br><br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☒ Affects both Debtors <br><br> * *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case <br> No. 19-30088 (DM) <br><br> Chapter 11 <br> (Lead Case) <br> (Jointly Administered) <br><br> Related Docket Nos. 2741 and 3147 <br><br> **DEBTORS' <u>CORRECTED</u> SUPPLEMENTAL STATEMENT AND PLAN OF REORGANIZATION TIMELINE IN SUPPORT OF OPPOSITION TO MOTIONS TO TERMINATE EXCLUSIVITY** |

PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this supplemental statement and plan of reorganization timeline in further support of the Debtors' opposition to (a) the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] (the "**Ad Hoc Noteholder Termination Motion**"), filed by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**"), and (b) the *Motion of the Ad Hoc Group of Subrogation Claim Holders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3147] (the "**Subrogation Termination Motion**" and, together with the Ad Hoc Noteholder Termination Motion, the "**Exclusivity Termination Motions**"), filed by the Ad Hoc Group of Subrogation Claim Holders (the "**Subrogation Group**").

# SUPPLEMENTAL STATEMENT

As the Debtors have stated in each of their oppositions to the Exclusivity Termination Motions, the Debtors, as fiduciaries for all economic stakeholders in these Chapter 11 Cases, are uniquely positioned to retain the exclusive right to file a plan given (a) the complexities of these cases, (b) the need to determine the Debtors' wildfire liabilities either consensually or through an estimation proceeding, (c) the regulatory framework and approvals involved, and (d) the obvious parochial interests being pursued by both the Ad Hoc Noteholder Committee and the Subrogation Group in their chapter 11 plan proposals. Notably, the primary features of each of those plan proposals are "consensual" agreements with only their own constituencies, and rather transparent attempts to acquire the equity of the reorganized Debtors at substantial discounts. These are only some of the patent deficiencies of these plan proposals.

Moreover, again as noted in the Debtors' opposition pleadings, the Debtors are deeply involved in the process of refining a chapter 11 plan that will fully address all of the recent legislative enactments and ensure that the Debtors timely emerge from chapter 11 by the June 30, 2020 legislative deadline. A proposed timeline for the Debtors' plan process is annexed hereto as **Exhibit A**, which contemplates the Debtors' plan being filed by September 9, 2019. As stated, that plan will encompass, among other things:

- payment in full or reinstatement of all prepetition funded debt obligations;
- payment in full of all prepetition trade claims and employee-related claims;
- payment of post-petition interest on all unsecured prepetition claims;
- satisfaction of all prepetition wildfire claims in amounts agreed upon or as otherwise authorized or allowed by this Court, fully consistent with the terms of the new legislation – AB-1054;
- rate neutrality for the Debtors' 16 million customers;
- the assumption of all power purchase agreements and community choice aggregation servicing agreements;
- the assumption of all pension obligations and other employee obligations;
- the assumption of all collective bargaining agreements;
- participation in the go-forward wildfire fund provided in the newly-enacted legislation; and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- emergence financing supported by a substantial infusion of cash raised from existing equity holders on market terms or in the capital markets if available on better terms, plus equity financed securitized bonds, if available.

In connection with the formulation and development of the Debtors' plan, the Debtors have been engaged in ongoing dialogue with Jones Day, on behalf of Knighthead Capital Management, LLC and Abrams Capital Management, LP, with respect to securing the equity emergence financing referred to in the last bullet above to implement the plan and for the Debtors to successfully and timely emerge from chapter 11 to ensure that the Debtors can participate in the go-forward wildfire fund.

As stated at the hearing before the Court this past Friday, August 9, 2019, and as widely reported in the newspapers and other publications, in connection with the Debtors' plan, the Debtors have received commitments from more than twenty (20) financial institutions for billions in equity capital to fund the Debtors' plan (the "**Equity Commitment**"). As of the time of filing this pleading, the Equity Commitments aggregate approximately $10.25 billion and the Debtors expect that this will increase significantly over the next several days based on discussions with a number of large capital providers.[1] The Equity Commitment is premised on a plan incorporating the Debtors' plan provisions set forth above and includes the following additional features:

- it values the equity of the reorganized Debtors at multiples of the values per share proposed in the Ad Hoc Noteholder Plan Term Sheet;
- it does not disadvantage one group of financial stakeholders to benefit another such group; and
- it provides the Debtors with the flexibility to access more efficient sources of capital for the payment of wildfire and other claims and return the Debtors to a more traditional position in the capital markets.

A copy of one of the Equity Commitment letters is annexed hereto as **Exhibit B**, and the other Equity Commitment letters received by the Debtors to date are substantially identical (with of course different

---

[1] In addition, over the last several months, the Debtors have been engaged with several money center banks, all of which have provided assurances that the Debtors have ample access to deep pools of both debt and equity capital in order to finance their successful emergence from chapter 11. Several of those financial institutions have expressed high levels of confidence in their abilities to raise at least between $35 billion and $40 billion of both debt and equity capital to satisfy claims, refinance indebtedness, and address other bankruptcy related and post-emergence uses, as needed. Taken together, the indications of interest thus far received from various financing sources clearly demonstrate there is abundant capital available on favorable terms to finance the Debtors' emergence from chapter 11.

individual committed amounts aggregating the $10.25 billion referred to above).

And, notably, this funding proposal, without even having been further negotiated by the Debtors, is substantially superior to what has been proposed by the Ad Hoc Noteholders. Simply by way of example, the Equity Commitment proposes a floor share price of in excess of $17.00 per share as compared to the approximate $6.00 or less per share price implied by various commitment levels of the Ad Hoc Noteholder plan proposal. Further, as indicated above, in addition to the Equity Commitment, the Debtors' ongoing discussions with third party financing sources plainly demonstrate that there is robust interest among traditional utility investors that would easily enable the Debtors to raise debt and equity capital on terms far more advantageous than those provided in the Ad Hoc Noteholder plan proposal to fund and implement the Debtors' plan.

Moreover, to dispel the repeated allegations of the Ad Hoc Noteholders Committee that the Equity Commitment is conditioned on the passage of additional legislation in Sacramento (and despite the persistent efforts by members of the Ad Hoc Noteholders Committee to undermine that legislation) – *no such condition exists*. Of course, from the standpoint of the reorganized Debtors and all other parties in interest, such legislation would be beneficial because it would facilitate the ability to raise capital to satisfy the claims of wildfire victims and other creditors in the most efficient and lowest cost manner, which provides increased flexibility in achieving a timely plan that pays victims in accordance with AB-1054. But, as stated, the Equity Commitment is not conditioned on the passage of any further legislation.

Consistent with their fiduciary duties to all economic stakeholders in these Chapter 11 Cases, the Debtors are in the process of further engaging with the representatives of the equity holders to refine and improve upon what they have already offered – a proposal that much more fairly values the Debtors' business enterprise – to attempt to develop a mutually acceptable chapter 11 plan that will expedite fair and equitable distributions to holders of wildfire claims and all other parties in interest. This effort will include providing the Debtors with the appropriate flexibility to consider higher or better financing offers when there is more clarity as to the precise funding needs for a chapter 11 plan, because, as the Debtors have noted and as all parties recognize, any chapter 11 plan funding proposal will be

Case: 19-30088    Doc# 3515    Filed: 08/12/19    Entered: 08/12/19 15:18:52    Page 5 of 7

conditioned on the consensual resolution or estimation by the Court of the Debtors' wildfire liability.

## THE DEBTORS' PLAN TIMELINE

In view of the foregoing and these recent developments, the Debtors believe it is even more important to maintain the Exclusive Periods in effect. The Debtors are the appropriate parties to be the steward of the chapter 11 process, particularly where creditors are to be paid in full and the Debtors in a plan will take into account and properly address the legitimate interests of all stakeholders. This will maximize and, indeed, ensure achievement of the June 30, 2020 legislative deadline and obviate the concerns raised by the CPUC in dealing with the complex and extensive regulatory approval process.

In furtherance of this goal, the Debtors have prepared the annexed timeline (**Exhibit A**) for the chapter 11 plan process in the context of maintaining the Exclusive Periods. It sets forth a realistic and achievable path forward and, importantly, a timeline that will enable the Debtors to timely emerge and participate in the go-forward wildfire fund.

[*Signature page follows*]

Under the circumstances of these Chapter 11 Cases, their current posture and, in particular, the need to crystallize the Debtors' wildfire liability as a gating item to any confirmable plan, the Debtors submit that the Exclusive Periods should remain in effect.

Dated: August 12, 2019

      **WEIL, GOTSHAL & MANGES LLP**

      **KELLER & BENVENUTTI LLP**

      By: /s/ Stephen Karotkin
           Stephen Karotkin

      *Attorneys for Debtors*
      *and Debtors in Possession*