1          UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                    ) Case No. 19-30088
                              ) Chapter 11
5   PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY   ) San Francisco, California
6                              ) Tuesday, August 13, 2019
                    Debtors.  ) 10:00 AM
7   _____  )
                                 MOTION OF THE AD HOC GROUP OF
8                                SUBROGATION CLAIMHOLDERS TO
                                 TERMINATE THE DEBTORS'
9                                EXCLUSIVE PERIODS, PURSUANT
                                 TO SECTION 1121(D)(1) OF THE
10                               BANKRUPTCY CODE [3147]

11                               MOTION OF THE AD HOC
                                 COMMITTEE OF SENIOR UNSECURED
12                               NOTEHOLDERS TO TERMINATE THE
                                 DEBTORS' EXCLUSIVE PERIODS
13                               PURSUANT TO SECTION
                                 1121(D)(1) OF THE BANKRUPTCY
14                               CODE, FILED BY AD HOC
                                 COMMITTEE OF SENIOR UNSECURED
15                               NOTEHOLDERS OF PACIFIC GAS
                                 AND ELECTRIC COMPANY [2741]

16
                    TRANSCRIPT OF PROCEEDINGS
17              BEFORE HONORABLE DENNIS MONTALI
                 UNITED STATES BANKRUPTCY JUDGE
18
    APPEARANCES:
19  For the Debtor:         STEPHEN KAROTKIN, ESQ.
                            Weil, Gotshal & Manges LLP
20                          767 Fifth Avenue
                            New York, NY 10153
21                          (212) 310-8000

22                          JANE KIM, ESQ.
                            Keller & Benvenutti LLP
23                          650 California Street
                            Suite 1900
24                          San Francisco, CA 94108
                            (415) 796-0709

25

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For Debtors (cont'd.):      KEVIN J. ORSINI, ESQ.
                                 Cravath, Swaine & Moore LLP
 2                               825 Eighth Avenue
                                 New York, NY 10019
 3                               (212) 474-1000

 4   For the Official Committee  DENNIS F. DUNNE, ESQ.
     of Unsecured Creditors:     Milbank LLP
 5                               55 Hudson Yards
                                 New York, NY 10001
 6                               (212) 530-5770

 7                               GREGORY A. BRAY, ESQ.
                                 Milbank LLP
 8                               2029 Century Park East
                                 33rd Floor
 9                               Los Angeles, CA 90067
                                 (424) 386-4302
10
                                 ANDREW M. LEBLANC, ESQ.
11                               Milbank LLP
                                 1850 K Street, NW
12                               Suite 1100
                                 Washington, DC 20006
13                               (202) 835-7574

14   For the Official Committee  CECILY A. DUMAS, ESQ.
     of Tort Claimants:          Baker & Hostetler LLP
15                               11601 Wilshire Boulevard
                                 Suite 1400
16                               Los Angeles, CA 90025
                                 (310) 442-8886
17
     For the Ad Hoc Committee    ABID QURESHI, ESQ.
18   of Bondholders:             Akin Gump Strauss Hauer & Feld LLP
                                 1999 Avenue of the Stars
19                               Suite 600
                                 Los Angeles, CA 90067
20                               (310) 229-1000

21                               ASHLEY VINSON CRAWFORD, ESQ.
                                 Akin Gump Strauss Hauer & Feld LLP
22                               580 California Street
                                 Suite 1500
23                               San Francisco, CA 94104
                                 (415) 765-9561
24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For the Ad Hoc Committee    DAVID H. BOTTER, ESQ.
     of Bondholders (cont'd.):   MICHAEL S. STAMER, ESQ.
 2                               Akin Gump Strauss Hauer & Feld LLP
                                 One Bryant Park
 3                               New York, NY 10036
                                 (212) 872-1000
 4
     For the Ad Hoc Group of     MATHEW A. FELDMAN, ESQ.
 5   Subrogation Claim Holders:  Willkie Farr & Gallagher LLP
                                 787 Seventh Avenue
 6                               New York, NY 10019
                                 (212) 728-8651
 7
     For Aecom:                  MARSHA A. HOUSTON, ESQ.
 8                                (Telephonically)
                                 Reed Smith LLP
 9                               355 South Grand Avenue
                                 Suite 2900
10                               Los Angeles, CA, 90071
                                 (213) 457 8067
11
     For the Board of            JAMIE J. FELL, ESQ.
12   Directors, et al.:           (Telephonically)
                                 MICHAEL H. TORKIN, ESQ.
13                                (Telephonically)
                                 Simpson Thacher & Bartlett LLP
14                               425 Lexington Avenue
                                 New York, NY 10017
15                               (212) 455-3822

16   For California Department    PAUL J. PASCUZZI, ESQ.
     of Toxic Control:            (Telephonically)
17                               Felderstein Fitzgerald Willoughby
                                  Pascuzzi & Rios LLP
18                               500 Capitol Mall
                                 Suite 2250
19                               Sacramento, CA 95814
                                 (916) 329-7400
20
     For California Public        BRIAN S. HERMANN, ESQ.
21   Utilities Commission:        (Telephonically)
                                 ALAN W. KORNBERG, ESQ.
22                                (Telephonically)
                                 Paul, Weiss, Rifkind, Wharton &
23                                Garrison LLP
                                 1285 Avenue of the Americas
24                               New York, NY 10019
                                 (212) 373-3000
25
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For Columbus Hill:          PAUL N. SILVERSTEIN, ESQ.
                                   (Telephonically)
 2                               Hunton Andrews Kurth LLP
                                 200 Park Avenue
 3                               New York, NY 10166
                                 (212) 309-1000
 4
     For SLF Fire Victim         LAILA MASUD, ESQ.
 5   Claimants:                  Marshack Hays LLP
                                 870 Roosevelt
 6                               Irvine, CA 92620
                                 (949) 333-7777
 7
     For Equity Holders:         BRUCE BENNETT, ESQ.
 8                               Jones Day
                                 555 South Flower Street
 9                               50th Floor
                                 Los Angeles, CA 90071
10                               (213) 243-2382

11   For IBEW Local 1245:        BRADLEY C. KNAPP, ESQ.
                                 Locke Lord LLP
12                               601 Poydras Street
                                 Suite 2660
13                               New Orleans, LA 70130
                                 (504) 558-5100
14
     For JPMorgan Chase:         EREZ E. GILAD, ESQ.
15                                (Telephonically)
                                 Stroock & Stroock & Lavan LLP
16                               180 Maiden Lane
                                 New York, NY 10038
17                               (212) 806-5400

18                               FRANK A. MEROLA, ESQ.
                                  (Telephonically)
19                               Stroock & Stroock & Lavan LLP
                                 2029 Century Park East
20                               Los Angeles, CA 90067
                                 (310) 556-5800
21
     For Liberty Mutual          KEVIN D. BUSH, ESQ.
22   Insurance:                   (Telephonically)
                                 Cozen O'Connor
23                               501 West Broadway
                                 Suite 1610
24                               San Diego, CA 92101
                                 (619) 685-1716
25
```

```
 1    For Liberty Mutual         MARK E. FELGER, ESQ.
      Insurance (cont'd.):         (Telephonically)
 2                               Cozen O'Connor
                                 1201 North Market Street
 3                               Suite 1001
                                 Wilmington, DE 19801
 4                               (302) 295-2087

 5    For NextEra Energy:        DAVID M. STERN, ESQ.
                                  (Telephonically)
 6                               Klee, Tuchin, Bogdanoff & Stern
                                  LLP
 7                               1999 Avenue of the Stars
                                 39th Floor
 8                               Los Angeles, CA 90067
                                 (310) 407-4000
 9
      For PG&E Holdco Lenders:   AMY CATON, ESQ.
10                               Kramer Levin Naftalis & Frankel
                                  LLP
11                               1177 Avenue of the Americas
                                 New York, NY 10036
12                               (212) 715-7772

13    For Public Advocates       ALISA C. LACEY, ESQ.
      Office:                    Stinson LLP
14                               1850 N. Central Avenue
                                 Suite 2100
15                               Phoenix, AZ 85004
                                 (602) 212-8628
16
      For Public Utilities       SANDER L. ESSERMAN, ESQ.
17    Impacted by the Wildfires:  (Telephonically)
                                 Stutzman, Bromberg, Esserman &
18                                Plifka
                                 2323 Bryan Street
19                               Suite 2200
                                 Dallas, TX 75201
20                               (214) 969-4910

21    For Severson & Werson:     BERNARD J. KORNBERG, ESQ.
                                  (Telephonically)
22                               Severson & Werson
                                 Embarcadero Center
23                               Suite 2600
                                 San Francisco, CA 94111
24                               (415) 398-3344

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
1   For Travelers Insurance      PETER D. WOLFSON, ESQ.
    Company:                       (Telephonically)
2                                Dentons US LLP
                                 1221 Avenue of the Americas
3                                New York, NY 10020
                                 (212) 768-6840
4
    For Travelers Insurance      MARK C. BAUMAN, ESQ.
5   Company and Hartford           (Telephonically)
    Insurance Company:           Bauman Loewe Witt & Maxwell, PLLC
6                                8765 East Bell Road
                                 Suite 210
7                                Scottsdale, AZ 85260
                                 (480) 502-4664, Ext. 4201
8
    For the Indenture Trustee,   BETH M. BROWNSTEIN, ESQ.
9   BOKF, NA:                    Arent Fox LLP
                                 1301 Avenue of the Americas
10                               42nd Floor
                                 New York, NY 10019
11                               (212) 484-3900

12  For The Utility Reform       ROBERT G. HARRIS, ESQ.
    Network (TURN):              Binder & Malter LLP
13                               2775 Park Ave
                                 Santa Clara, CA 95050
14                               (408) 295-1700

15

16

17

18

19

20  Court Recorder:              LORENA PARADA

21  Transcriber:                 CLARA RUBIN
                                 eScribers, LLC
22                               7227 N. 16th Street
                                 Suite #207
23                               Phoenix, AZ 85020
                                 (973)406-2250
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

PG&E Corp., Pacific Gas and Electric Co.

1    SAN FRANCISCO, CALIFORNIA, TUESDAY, AUGUST 13, 2019, 9:31 AM

2                              -oOo-

3       (Call to order of the Court.)

4          THE CLERK:  All rise.  Court is now in session, the

5    Honorable Dennis Montali presiding.

6          THE COURT:  Good morning, everyone.

7          IN UNISON:  Good morning, Your Honor, Your Honor.

8          THE COURT:  Be seated.

9          THE CLERK:  Matter of PG&E Corporation.

10         THE COURT:  So let me make a few opening remarks and

11   then we'll get to the business at hand; one second.

12         So -- sorry; echoing here.

13         So we shouldn't -- don't have to really remind people

14   why we're here, but I think it's useful to just take a moment

15   to reflect on the context of why we are here, because we're

16   here for a very important reason.  Not many of us here in San

17   Francisco or in this courtroom or in the bankruptcy world were

18   in paradise last November, or in Santa Rosa the year before, or

19   anywhere else where all these horrible fires occurred.  And for

20   us, benign names like "Camp" and "Tubbs" and "Atlas" are kind

21   of like "Katrina" and "Harvey" and people that have gone

22   through -- think about hurricanes.  The only -- in thinking

23   about this, the only name that isn't benign on the list, of

24   course, is "Ghost Ship", but that's kind of a sinister reminder

25   of the horrors that the victims of all these fires have

(973) 410-9100 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    experienced.

2         And those of us here, I as a native San Franciscan, a

3    resident of the East Bay, can remember the smoke and the smells

4    last fall and the TV images.  And that's not really not much;

5    it's nothing like the nightmares and the horrors that were

6    experienced by all of the victims and their families and their

7    loved ones and that they are no doubt reliving endlessly in --

8    God knows forever, thousands of them, all of our Northern

9    California neighbors.

10         And that's why we're here.  That's why we're working

11   in this community in the bankruptcy world, to deal with one

12   aspect of that tragedy.  And so the circumstances that bring

13   this closer to here, to me personally and to my staff and to

14   the lawyers that are on this case, is what -- things changed

15   for us last January 29th when PG&E filed bankruptcy, and

16   suddenly there we were.  And I, for one, among others -- given

17   the task to try to have some role in this process.

18         So now I am presiding, with the help of all of the

19   able lawyers, of (sic) sorting through the toolbox that

20   Congress provided us in the bankruptcy world, to unravel some

21   of the complicated mess and piece together some meaningful step

22   in the part of the financial recovery process that we're

23   supposed to use.  Unfortunately, Congress didn't give us tools

24   to deal with physical and emotional and other kind of things

25   that we're not capable of handling, but we're dealing with the

PG&E Corp., Pacific Gas and Electric Co.

1  financial stress.

2  And today and more tomorrow are -- for those two days,

3  we're focusing on some very critical milestones or mileposts in

4  this hearing.  The bankruptcy world will use terms like

5  "estimation" and "exclusivity" and "relief from stay".  Those

6  are terms that bankruptcy professionals hear every day but

7  victims of fires hope to never have heard, and hopefully they

8  won't have to hear them again.

9  So my task, with the help of the many capable lawyers

10  who are working on this, is to go through those toolboxes, pick

11  the right ones, and try to use them promptly and properly.  So

12  I, for one -- and I ask the lawyers who make the presentation

13  today to do what I know you'll do and keep your eye on the ball

14  and how best we can make the bankruptcy process work for the

15  financial aspects of the recovery that the victims are entitled

16  to.

17  The -- what I have read over and over again were some

18  of my own words, and that is the phrase -- particularly the

19  phrase, "credible and confirmable".  That of course was a

20  phrase that I used in anticipation of the arguments about what

21  we're here for today as distinguished from tomorrow:  whether

22  there's going to be competing plans.

23  And so I don't intend, and didn't intend then, to --

24  for "credible and confirmable" to be defined legal terms.  The

25  word "confirmable", of course, again, to bankruptcy

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    professionals is somewhat precise.  But "credible" is one of

2    those vague terms that you know it when you see it.  And, for

3    example, if someone says, "I'm going to win the lottery and pay

4    all my creditors," that's not very credible, until you find out

5    that he's got a winning ticket in his pocket.  And when someone

6    says, "I've got a confirmable plan.  I'm going to open up bars

7    and sell liquor to minors," that would fail as a matter of law.

8         But beyond that -- and those are extreme

9    hypotheticals -- we need to focus -- and I will focus, and ask

10   the lawyers arguing today to focus, on whether competing

11   plans -- and there are two at the moment, competing by what

12   Pacific Gas Electric and its parents are proposing as

13   alternatives -- to see which of them, if any, will advance the

14   cause, will move the ball forward to that goal of reaching the

15   goal of the achievements that I outlined a moment ago.

16        Now, I'm mindful that as late as yesterday the debtor

17   filed a lengthy, comprehensive document that might influence my

18   thinking or your thinking.  Deal with it as you make your

19   argument, the best you can.  Don't, however, waste time

20   nitpicking or taking issue with what the debtors' lawyer said.

21   It's -- the issue today, again, to repeat, is to focus on the

22   two competing plans.  If it makes more sense to defer either

23   today, which I doubt, or the matters tomorrow because of what

24   the company filed late, then I'll cross that bridge when we

25   come to it.

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          The question really, then, comes down to the obvious:

2   that -- today's question of exclusivity and whether another --

3   whether two other entities -- one or both of the other entities

4   may file plans, and tomorrow's questions of what is the

5   estimation process and whether two groups of creditors, either

6   or both of them, may have relief from stay.  They are, as you

7   know, very interrelated, but here we are, again, sticking with

8   today's issue.

9          So -- and I ask counsel not to waste time on

10  alternative arguments that, well, there should be other plans.

11  I understand some of you believe fervently that that is the

12  case.  I simply don't believe it's the case at the moment.  And

13  so any arguments about why don't we just open the door to so-

14  called floodgates, that's not my interest.

15         Now, something else that's been said repeatedly by me

16  but probably more so by several of the lawyers in what they've

17  said, their arguments, and their written statements, are that

18  we should foster the dialogue, we should have a consensual

19  plan.  Certainly that was the message from the governor, from

20  the Public Utilities Commission, from many of you in your

21  submissions.  And I agree.  It would be wonderful, from my

22  point of view, if I don't have to make any of these tough

23  decisions, that if there were a consensual resolution, that

24  would be fine.

25         I believe, in the first PG&E case that I'm quick to

PG&E Corp., Pacific Gas and Electric Co.

1  remind myself about, that I thought fostering the dialogue was

2  enhanced by opening up at least one door to one competing plan.

3  I firmly believe that that was helpful.  Others may disagree.

4  Doesn't matter.  It's history.  So the question today is,

5  again, will it foster the dialogue, will it move things forward

6  to either a consensual resolution or, if not, will opening up

7  for one of both of the moving parties have a helpful and a

8  useful result for purposes of that goal that we're trying to

9  meet.

10          The debtor has, by statute, a presumption of

11  maintaining exclusivity, until the two motions were filed that

12  we're here for today.  It had the benefit of my thinking

13  previously -- again, some of you taking different views -- that

14  they had at least until later in September.  And based upon

15  what was filed yesterday, perhaps Debtors' counsel will argue

16  that that should be respected.  And that is certainly one of

17  the options.

18          One of the things that I will ask the debtors' counsel

19  to say is -- again, is to what -- what should I do if

20  exclusivity is maintained for a few weeks and that target, that

21  September 9th target, or thereabouts, is missed for some

22  reason?  Have we lost a month in a critical time line, or not?

23  I suspect there will be different views about that.

24          So another question I don't really want to answer, but

25  it's still a rhetorical question:  if the debtors' term sheet

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   that was filed yesterday is so good and solves so many

2   problems, why don't we just move on with it and -- because who

3   in the world would ever vote in favor of a plan that maybe is

4   less acceptable?  Again, today is not to decide how people will

5   vote; it is only that one question:  will it move the ball

6   forward?

7           I haven't taken time, and I don't expect counsel

8   making the arguments today, to weigh in, in any detail, on the

9   position stated yesterday by the official creditors' committee

10  on the same subject about its protocol for a competing plan.

11  That, to me, is for the next day.  And when I say "the next

12  day", I made it clear to everyone in this case that my

13  expectation at least will be, following the hearings tomorrow,

14  I will try to make a ruling on all three of the interrelated

15  questions:  exclusivity, estimation, and relief from stay.

16  Whether it happens at the end of the hearing or the next day or

17  early in the few days after that remains to be seen.

18          So with that, I will just end my opening comments.  I

19  will -- unless there're any announcements or surprise

20  developments that I need to hear about, I will follow our

21  agenda as I promised and we will deal with the ad hoc committee

22  of senior unsecured noteholders and their motion to terminate

23  the stay, consistent with the time limits that I gave you all.

24          So unless there's a change, I'll ask for counsel to

25  take over on that.

                    PG&E Corp., Pacific Gas and Electric Co.

1          Good morning.

2          MR. QURESHI:  Good morning, Your Honor.  For the

3    record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, on behalf

4    of the ad hoc committee of senior unsecured noteholders.

5          Your Honor, just to address time allocation upfront;

6    what I propose to do is to cede five minutes of both the

7    opening time and five minutes of the rebuttal time, to the

8    official committee.

9          THE COURT:  Okay.

10          MR. QURESHI:  And I also anticipate, in the upfront

11    thirty minutes, to cede just a couple of minutes for each of

12    the IBEW, TURN, and the indenture trustee, BOKF.  And they

13    will --

14          THE COURT:  Great.

15          MR. QURESHI:  -- all be very brief.

16          THE COURT:  Okay, Mr. Qureshi.  Thank you.

17          MR. QURESHI:  Thank you, Your Honor.  So, Your Honor,

18    after the three-week hiatus since we were last before you, we

19    obviously welcome the opportunity to be back.  And we're back,

20    Your Honor, with one very welcome development that didn't exist

21    three weeks ago, and that is the protocol.  And I'm not going

22    to get into the detail.  As Your Honor pointed out, those are

23    not up for approval today.  But their presence, I think, is

24    very important.  And it's important, Your Honor, because those

25    protocols -- there are two:  one filed by the ad hoc committee

PG&E Corp., Pacific Gas and Electric Co.

1     last week in advance of the status conference --

2          THE COURT:  Right.

3          MR. QURESHI:  -- and the one filed by the official

4     committee.  We think that those protocols take off the table

5     the idea that chaos should be a reason not to grant our motion.

6     Simply put, Your Honor --

7          THE COURT:  That's good; I'm going to hear that.

8          MR. QURESHI:  -- a competitive process will not be a

9     chaotic one.  And again, the official committee is going to

10    work with parties to try to achieve consensus around their

11    protocol.  But there is a rules-based path to proceed down,

12    Your Honor, and I think that's very important.

13         So just a little bit of background in light of the

14    nature of the objections, as to who the members of the ad hoc

15    committee are, because I do think that's important in context.

16    And let me say at the outset, Your Honor, that our proposal is

17    very much developed with an eye to what this case is really all

18    about, which is the wildfire victims.  And 18.4 billion dollars

19    is being committed at this stage to those victims, for a fair

20    and fast resolution of their claim.  And that's what ultimately

21    this proposal is all about.

22         Your Honor, the ad hoc committee consists of twenty-

23    five unaffiliated institutions that collectively hold in excess

24    of ten billion dollars of unsecured PG&E debt.  Its members

25    include investment companies, banks, mutual funds, and an

PG&E Corp., Pacific Gas and Electric Co.

1   insurance company.  They manage money on behalf of pension

2   plans, labor unions, and college endowments, among many other

3   categories.

4        Your Honor, those funds have a significant presence in

5   California.  They employ thousands of people here.  They have

6   tens of billions of dollars invested in California businesses

7   and in municipalities.  And indeed, Your Honor, many of the

8   members of the ad hoc committee have been long-term investors

9   in California utilities and of course in PG&E as well.

10       So why did we file our motion to terminate?  Your

11  Honor, there are three events that I think served as the

12  impetus for that and, in no particular order of priority, the

13  first, Your Honor, is a very clear and repeated statement from

14  both the Governor's Office and the CPUC that they welcome a

15  competitive process for a resolution of these cases.

16       Your Honor, the governor in particular has noted that

17  competition between the bondholders and the equity holders is

18  good.  He characterized a process with alternatives as healthy,

19  compared to one in which one side of the equation dominates.

20  And, Your Honor, we agree wholeheartedly with the governor's

21  sentiment.  At last Friday's status conference, Your Honor

22  heard Mr. Kornberg, on behalf of the CPUC, similarly and

23  unequivocally support a competitive process.  And I will talk

24  about how terminating the exclusivity helps with that process

25  and --

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Don't you think there's one risk, though,
2    and that is that we end up with a skirmish going on between
3    equity factions?  In other words, if we -- if your proposal or
4    the debtors' proposal is generally acceptable to the fire
5    victims, leave aside just for the moment the subrogation
6    group -- I don't mean to discount them, but -- and that we're
7    stuck because there's a confirmation battle over cramdown and
8    equity?  Then we're fighting for something that is the wrong
9    priority.
10   MR. QURESHI:  Well --
11   THE COURT:  And that does open up -- that is more
12   likely, it seems to me, than less likely if we have a competing
13   plan.
14   MR. QURESHI:  So --
15   THE COURT:  Tell me if I'm wrong.
16   MR. QURESHI:  I think, respectfully, that the Court is
17   wrong, and let --
18   THE COURT:  Okay.
19   MR. QURESHI:  -- let me explain why.
20   THE COURT:  Okay.
21   MR. QURESHI:  So, Your Honor, the principal risk with
22   what the debtors have proposed is -- their process involves the
23   debtors, at the behest of their equity holders, pursuing their
24   path to the exclusion of everybody else.  Their time line, a
25   September 9th plan filing --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. QURESHI:  -- followed by a bunch of interim dates

3     leading to a March --

4          THE COURT:  Well, a number of those events after

5     September 9th are sort of -- somewhat under my control,

6     somewhat, under the rules and the law.

7          MR. QURESHI:  Fair --

8          THE COURT:  Again --

9          MR. QURESHI:  Fair, Your Honor --

10         THE COURT:  -- control some of that.

11         MR. QURESHI:  -- but it's the end date that I'm

12    focused on --

13         THE COURT:  Um-hum.

14         MR. QURESHI:  -- which is a March confirmation here.

15         THE COURT:  Right.

16         MR. QURESHI:  What we know definitively from that

17    schedule is it leaves no possibility of another plan being

18    proposed should that plan fail, in advance of the June 30th

19    statutory deadline.

20         THE COURT:  I understand your point.  I -- when I --

21    my comment to you on that question didn't mean fail in March;

22    it meant fail on September 10th or 11th or 12th if Mr. Karotkin

23    stands up and says, you know what, we don't have something to

24    file.

25         MR. QURESHI:  Oh, so --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Then --

2          MR. QURESHI:  -- the question is --

3          THE COURT:  Then we've lost August 13th to September

4    blank.

5          MR. QURESHI:  Correct.

6          THE COURT:  Right?

7          MR. QURESHI:  And, Your Honor, I don't think this is a

8    situation where we can afford, in the time line that we are

9    living with, with the statutory deadline that has been imposed

10   upon these cases, to lose any more time.  We have lost three

11   weeks already, with efforts to achieve a protocol.

12   Unfortunately, and for a variety of reasons, those efforts

13   failed.  But, Your Honor, if one looks at the schedules laid

14   out by the official committee or by the ad hoc committee, and

15   our proposed protocols, the path to a confirmation is tight;

16   it's very tight.

17          THE COURT:  Correct.

18          MR. QURESHI:  Your Honor heard from Mr. Kornberg.  The

19   CPUC needs to engage in its process as well.

20          And so there really is no time to waste here, Your

21   Honor.  And to take three weeks to see if the debtors can get

22   there -- Your Honor, we have no way of knowing, if they get to

23   the financing commitments that they claim they will be able to

24   get to by September the 9th, how rock solid or not --

25          THE COURT:  No, I understand.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. QURESHI:  -- those financing commitments will be,

2  how committed they are.  The financing commitments they have

3  today, for example, have a diligence out, a diligence out from

4  a group of equity holders, some of whom are restricted and have

5  had access to nonpublic information for months.

6    And so we don't think, Your Honor, that it makes sense

7  to take that risk.  And perhaps more to the point, Your Honor,

8  there is no harm to the process by allowing the ad-hoc-

9  committee plan to go forward and the debtor plan to go forward.

10  There is of course nothing about our proposal that precludes

11  the debtors --

12    THE COURT:  No, --

13    MR. QURESHI:  -- with their equity holders --

14    THE COURT:  -- of course not.

15    MR. QURESHI:  -- from going forward --

16    THE COURT:  But --

17    MR. QURESHI:  -- on whatever path they want.

18    THE COURT:  And the law does it to.  I mean --

19    MR. QURESHI:  Right.

20    THE COURT:  -- you're not closing the door to the

21  debtor.

22    MR. QURESHI:  That is absolutely right.

23    So, Your Honor, a principal criteria in the case law

24  for whether a court should terminate exclusivity is, of course,

25  whether terminating it will lead to progress in the case.  Now,

PG&E Corp., Pacific Gas and Electric Co.

1    the debtors say, well, we've made meaningful progress.  And no

2    doubt, Mr. Karotkin is going to get up and he's going to say,

3    well, if we didn't have meaningful progress yesterday, we

4    certainly do today, because look at what we filed.

5            THE COURT:  I have a long list of questions to ask him

6    about that, but he cut me off with what he filed yesterday.

7            MR. QURESHI:  So, Your Honor, I don't think that

8    anything about yesterday's filing presents a reason to deny our

9    motion.  To the contrary, Your Honor, I think the filing of the

10   debtors' proposal yesterday demonstrates precisely why a

11   competitive process is the right one for these cases.  I mean,

12   Your Honor, let's look at what has occurred since we filed our

13   motion to terminate.  All of a sudden there's been all sorts of

14   activities.  It has been a galvanizing factor in these cases.

15   It has brought people finally to the table.  And that's a good

16   thing.

17           And so I don't think at this point, Your Honor, it is,

18   frankly, credible to say that, because they have cobbled

19   together a proposal that is a long way from being done, that

20   that should serve to stifle the process that is already

21   underway.

22           And, Your Honor, I think there's another important

23   point, and that is that what the debtors are ultimately saying

24   is, let us be the stewards of this process, let us run it.

25   And, Your Honor, I just don't think they've earned the right to

PG&E Corp., Pacific Gas and Electric Co.

1    do that here, and let me explain why.

2           We, the ad hoc committee, have never had a substantive

3    discussion with the debtors about our plan proposal.  It is

4    rather remarkable that a group of very well-respected and huge

5    funds with access to massive sources of capital, ready,

6    willing, and able to contribute north of thirty billion dollars

7    to PG&E -- and the debtors are not engaging with us, Your

8    Honor, even after we filed our motion to terminate, which has

9    been on the docket now for many weeks.  Still nothing.

10          THE COURT:  Well, this is kind of a dumb question, but

11   why do you need to engage in someone if you're going to leave

12   them unimpaired under a plan?  In other words --

13          MR. QURESHI:  Well --

14          THE COURT:  I understand, and obviously there're lots

15   of answers.

16          MR. QURESHI:  Sure.

17          THE COURT:  But if you're in the debtors' position and

18   you have a very, very active and well-represented victims

19   committee and a subrogation committee, those are the only --

20   effectively, the only impaired classes under -- even under your

21   plan --

22          MR. QURESHI:  Well --

23          THE COURT:  -- given everybody else's criticism of it.

24          So, I mean, it's not as though -- maybe they could

25   call you up and say, we're going to get back to you later.  But

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    there's nothing to negotiate if they leave you unimpaired,

2    right?

3             MR. QURESHI:  Well, but, Your Honor, I don't think

4    that's quite right.  And again, let --

5             THE COURT:  Okay.

6             MR. QURESHI:  -- let me explain.  So, to --

7             THE COURT:  I said it was an oversimplification.

8             MR. QURESHI:  -- to the extent that the debtors are

9    saying, and I believe they are, we should sit down and shut up

10   because they are going to reinstate us and we therefore have

11   nothing to worry about, that's absolutely wrong, for --

12            THE COURT:  Okay.

13            MR. QURESHI:  -- for any number of reasons; first of

14   all, if we are under a debtor plan to be reinstated, then we

15   obviously have a very critical stake in the long-term health of

16   PG&E on its way out of bankruptcy, because we will bear the

17   risk attendant with holding those notes.

18            THE COURT:  Um-hum.

19            MR. QURESHI:  In addition to that, Your Honor, there

20   is a tremendous amount of risk between where we are today and

21   hitting that June 30th deadline that is so critical for these

22   estates.  There is risk attendant to the estimation process and

23   where the wildfire claims ultimately come out.  What if, for

24   example, Your Honor, at the conclusion of the estimation

25   process the claims come out at a level significantly north of

PG&E Corp., Pacific Gas and Electric Co.

1  where the debtors' investment parties, their commitment

2  parties --

3          THE COURT:  But that --

4          MR. QURESHI:  -- are willing to fund?

5          THE COURT:  But that's true with your plan too.

6          MR. QURESHI:  Absolutely.  But that is why it doesn't

7  make sense, Your Honor, to put all of the proverbial eggs in

8  one basket.  That is precisely why.  This is a company that

9  needs alternatives, and it needs alternatives because of the

10  many uncertainties that exist.  What if there's a post-petition

11  wildfire, among any number of things that might happen, Your

12  Honor?

13          So that type of uncertainty, I think, means that, even

14  in a world where we theoretically could be reinstated, we

15  absolutely have a stake in the go-forward business.

16          And even more to the point, Your Honor, there's only

17  one way for PG&E to emerge successfully from these cases:  It

18  needs a massive investment of billions of dollars to get the

19  fair and the fast recovery that this case is all about, to the

20  wildfire victims.  And as long as there is no certainly as to

21  where those funds are going to come from, and there absolutely

22  is no such certainty in the debtors' proposal, Your Honor, I

23  think, frankly, it is a very significant mistake to say to a

24  group of credible institutions who are willing to commit to

25  north of thirty billion dollars, please go away, you're not

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    welcome.  That's just not the path to move these cases forward.

2            So, Your Honor, I think failing to terminate

3    exclusivity -- it will be a significant setback.  Again, the

4    prospects for emerging by June 30th of 2020 and for these

5    debtors to be able to participate in the fund set up to deal

6    with the future wildfires under AB 1054 is absolutely critical.

7            Your Honor, the case law under 1121 is deliberately

8    brought.  Congress has vested this Court with maximum

9    flexibility to align the length of the debtors' exclusive

10   period with the particular needs of the reorganization.  Your

11   Honor's been pointed to a lot of case law, and --

12           THE COURT:  Sure have.

13           MR. QURESHI:  Yeah.  And, Your Honor, the Fifth

14   Circuit Court of Appeals, in the Inwood decision -- it's one of

15   the cases that we cite -- they observe that the fundamental

16   purpose of Section 1121 of the Code is to, quote, "limit the

17   delay that makes creditors the hostages of Chapter 11 debtors".

18           Now, Your Honor no doubt will hear from Mr. Karotkin

19   about the laundry list of factors that many bankruptcy courts

20   discuss in considering whether to terminate exclusivity and how

21   in his view the debtors can check the box on a variety of those

22   factors.  But, Your Honor, there emerges from those factors one

23   common string, right, and one primary consideration, and that

24   primary consideration is whether termination of exclusivity

25   will move the case forward.  And there is no doubt that it

PG&E Corp., Pacific Gas and Electric Co.

1    will.  The mere filing of the motion, as I said earlier,

2    already has; it's already had that effect.

3            So, terminating now, I think, just continues the

4    positive path that these cases are on.  And, Your Honor, I

5    won't get into, at this stage, the details of what the

6    debtor --

7            THE COURT:  Okay.

8            MR. QURESHI:  -- filed last night.  I --

9            THE COURT:  Good.  I don't want you to.

10            MR. QURESHI:  I think I've --

11            THE COURT:  It's the same -- you'd make the same

12    argument if they hadn't filed anything.  I mean, to me it's the

13    same question.

14            MR. QURESHI:  Yeah.

15            THE COURT:  That's what I -- point I made.

16            MR. QURESHI:  I think I've said enough on that.

17            THE COURT:  Yeah.

18            MR. QURESHI:  So, being mindful of the time, let me

19    just hit a couple of the key points of our proposal.

20            THE COURT:  Um-hum.

21            MR. QURESHI:  And then I'll be happy, of course, to

22    take any further questions from the Court before I cede the

23    podium.

24            Again, Your Honor, the centerpiece is a trust fund of

25    up to 18.4 billion dollars to timely and fairly provide a cash

PG&E Corp., Pacific Gas and Electric Co.

1    recovery to all wildfire victims.  That is what these cases are

2    about.  That is the primary impetus and the primary feature of

3    the plan term sheet and the commitment that we have proposed:

4    cash, Your Honor, to enable reorganized PG&E to contribute

5    approximately five billion dollars to the wildfire fund that is

6    contemplated by AB 1054; payment in full of all general

7    unsecured claims; keeping in place the pension funds to

8    protected PG&E employees and their pensioners, going forward --

9        THE COURT:  So the TCC, which opposed your filing but

10   didn't offer an alternative, says, well, this is a -- or you're

11   getting a bargain-basement deal, you're getting too nice a

12   deal, you're getting more than you'd even be entitled to.  What

13   do I do about that?

14       MR. QURESHI:  So --

15       THE COURT:  In other words, I realize that if you

16   get -- if I grant the motion, that it's time to negotiate.  But

17   securitizing an unsecured debt, increasing a premium, getting a

18   discount on the rights offering and the equity, all the more

19   specific things that have been raised by various parties, what

20   do I do about that?

21       MR. QURESHI:  So the first thing, Your Honor, is let

22   there be competition, because one thing is clear:  whatever the

23   parties are proposing today to deal with all of those things,

24   it will only get better if the parties are able to compete.  We

25   believe, Your Honor, that a cap of up to 18.4 billion dollars

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    is appropriate for the wildfire victims --

2        THE COURT:  No, I wasn't --

3        MR. QURESHI:  -- but --

4        MR. QURESHI:  -- questioning on that.  I was

5    questioning on the dilution of the existing (ph.) equity,

6    the -- well, the secured -- I mean, rolling the unsecured ten

7    billion to part of the secured, and upping the interest rate.

8    Those are the kinds of -- call it nitpicks, but they're still

9    big-ticket items of part of your proposal.

10       MR. QURESHI:  They are big-ticket --

11       THE COURT:  And I grant you that, around the table,

12   people bargain for tradeoffs.

13       MR. QURESHI:  Those are, Your Honor, confirmation

14   issues, for one.  I don't think any of those items -- whether

15   the reduction in interest rate that yields a savings to the

16   company of 200 million dollars is enough, I don't think those

17   amount to the type of gating items that should influence

18   whether this Court decides to allow our plan to go forward.

19   Those are confirmation issues.  And to be clear, the debtors

20   have addressed others --

21       THE COURT:  Of course.

22       MR. QURESHI:  -- have raised others, and --

23       THE COURT:  No, I'm well aware of that.

24       MR. QURESHI:  And we have addressed them in our reply.

25   But again, I don't think any of those items are a gating issue.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  Your Honor raised the securitization point, though, and that, I

2  think, does bear mentioning, because although the debtors'

3  filing of last night changes tack and says, well,

4  securitization is no longer a pre-condition of our funding

5  commitments, but we'd still like to have it.  And that requires

6  new legislation and that, again, puts the debtors, I think, in

7  a very perilous position, Your Honor, when it comes to the

8  deadline.

9      THE COURT:  Well, your proposal doesn't require

10  legislation, right?

11      MR. QURESHI:  No.

12      THE COURT:  No.

13      MR. QURESHI:  No.  Our proposal has everything that we

14  need, Your Honor.  So we don't require any further legislation.

15  So --

16      THE COURT:  Why don't I -- unless you have another

17  point to make, let -- I don't -- I'd rather that we stick with

18  the agreed time.

19      MR. QURESHI:  Yeah.

20      THE COURT:  You have -- you'll have plenty of time to

21  respond.

22      MR. QURESHI:  Thank you, Your Honor.

23      THE COURT:  Okay, so you've said that the official

24  committee's going to --

25      THE COURT:  Yes.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  -- OCC's going to be heard.

2      So the OCC had a great quote for me to quote; it says,

3  "There's wood to chop."  So did some of the wood get chopped?

4  It's your phrase, not mine.

5      MR. DUNNE:  I think that what you've seen, Your Honor,

6  since the motion has been filed is we're chopping wood.  And

7  we're trying to --

8      THE COURT:  I'm sorry.  I know your name, but you need

9  to state --

10      MR. DUNNE:  Yeah.  Sorry.  For the record, it's Dennis

11  Dunne from --

12      THE COURT:  Mr. Dunne.

13      MR. DUNNE:  -- Milbank LLP, on behalf of the official

14  committee of unsecured creditors.

15      THE COURT:  Okay.

16      MR. DUNNE:  Your Honor, I will come back to that,

17  because I think that the wood-to-chop comment is we've made

18  progress as the motion's been filed, there's more to do, and I

19  think we see the benefit of competition, from what has happened

20  since the filing of the motion.

21      You've heard over the last couple of hearings, Your

22  Honor, many of the parties have spoken on this topic and have

23  fervently stated they wanted to see competition.  We say let

24  the best plan win.  We also had an attempt to fashion a

25  competitive process within the confines of exclusivity.  But as

PG&E Corp., Pacific Gas and Electric Co.

1   Your Honor heard on Friday, that attempt failed.  But the need

2   for competition remains.

3           The governor, on Friday, told the Court and everybody

4   else they support competition and transparency.  They

5   encouraged and commended our efforts to draft a protocol, Your

6   Honor, to imply only in the context of exclusivity being

7   terminated, which is why we don't really have to talk about the

8   specifics of the protocol today.  But we drafted that and filed

9   it.

10          But the legislative Sword of Damocles is still hanging

11  over our heads.

12          THE COURT:  Sure.

13          MR. DUNNE:  But now that I've said that, I guess,

14  unlike the ancient myth, though, we know exactly when that

15  sword is going to fall; it's June 30th of next year.  And the

16  June 30th deadline is now three weeks earlier -- or closer to

17  us than it was when we were here on July 24th.  So we think

18  it's urgent that Your Honor rule on the motion and terminate

19  exclusivity to proceed with multiple plans.

20          I want to address the comment Your Honor had to Mr.

21  Qureshi about what about -- let's see if peace can break out

22  between now and September 10th or 11th and would three weeks

23  really hurt.  Let me have three or four comments, or reaction,

24  to that; one is that the motion has been pending for seven

25  weeks now, since June 25th.  We don't have a plan filed yet by

PG&E Corp., Pacific Gas and Electric Co.

1    the debtors.  What they filed last night didn't have a fully

2    committed finance, and there's no deal with the tort claimants.

3    And --

4             THE COURT:  No, but it kind of resembles the old-

5    fashioned term sheet that --

6             MR. DUNNE:  Oh, I --

7             THE COURT:  -- originally

8             MR. DUNNE:  There's no doubt that --

9             THE COURT:  -- that I originally thought of years ago,

10   not one that was a twenty-five-page detailed term sheet.

11   But --

12            MR. DUNNE:  Exactly.

13            THE COURT:  Yeah.

14            MR. DUNNE:  We have no doubt -- by the way, just for

15   the record, this is exactly what we want to have happen.  We

16   wished it happened earlier.  We wish a --

17            THE COURT:  Right.

18            MR. DUNNE:  -- plan had been filed.  We wish we

19   weren't standing here not knowing exactly what all the

20   provisions of that plan might look like.

21            THE COURT:  Right.

22            MR. DUNNE:  And to another point Your Honor made; it

23   may be that soon the official committee is agnostic as to a

24   number of these plans, because the treatment of our

25   constituents is the same across those plans.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. DUNNE:  That is possible as well.

3          THE COURT:  Right.

4          MR. DUNNE:  In our view, though, I think there's only

5    a negligible chance that you can get to a deal with the tort

6    claimants in three weeks.  Speaking of wood to chop, there's a

7    massive woodpile with respect to estimation and settlement of

8    the tort claims.  Your Honor's --

9          THE COURT:  Well, to some extent --

10         MR. DUNNE:  -- going to hear a whole bunch --

11         THE COURT:  Something -- we can't solve everything,

12   but tomorrow's discussions and my decision should do something

13   to move that ball.  I can't promise anything more than a

14   decision, but having a decision's better than not having one.

15   So hopefully something will come from it.  Right?

16         MR. DUNNE:  My point here, Your Honor, is I think --

17         THE COURT:  Yeah.

18         MR. DUNNE:  -- that to wait three weeks in the hope

19   that peace will break out across all the major constituencies

20   is highly unlikely and not a reason to defer a ruling tomorrow.

21         THE COURT:  Okay.

22         MR. DUNNE:  The other thing -- and this is a point

23   that I just want to kind of drill down on -- that we're

24   concerned about one plan going forward and not multiple plans

25   is the pressure it may put on Your Honor.  Let's assume that

PG&E Corp., Pacific Gas and Electric Co.

1    one plan goes forward and it sets a proposed amount for the

2    tort claimants.  And let's assume it sets it at the low end of

3    the range of what might be the outcome --

4            THE COURT:  Um-hum.

5            MR. DUNNE:  -- and we burn through months and months

6    of going through the estimation work and we're here at

7    confirmation and Your Honor's faced with do I land at a low

8    number or do I deny confirmation and, if I deny confirmation,

9    there's not enough time to get another plan done by June 30th.

10           THE COURT:  Well --

11           MR. DUNNE:  That --

12           THE COURT:  -- that could happen.

13           MR. DUNNE:  That -- but that is why --

14           THE COURT:  But that could -- but that could happen --

15           MR. DUNNE:  -- exclusivity should be terminated.

16           THE COURT:  But that could happen even with a

17   competing plan.

18           MR. DUNNE:  No, if there's completing plans, what

19   you're going to have --

20           THE COURT:  What?

21           MR. DUNNE:  -- is you're going to have different

22   numbers on those, in terms of the tort -- and you're going to

23   have more committed financing in your courtroom, on different

24   plans, that is -- I'm proposing is much better to have

25   everybody in the room committed to writing billions of dollars

PG&E Corp., Pacific Gas and Electric Co.

1   of checks when we're figuring out where you land on that

2   number, Your Honor, and what we might have to put together at

3   the last minute.  We cannot do this seriatum.

4           And I only say that -- this is, like, the first time

5   in my career I've said that in a case, and it's only because of

6   the June 30th deadline.  Otherwise, we could have run this out

7   and let's see if the debtors' plan succeeds or fails, and we

8   could add an extra nine months onto the case at the end.  We

9   just don't have --

10          THE COURT:  Well, but don't you agree, if we get to a

11  date in the future -- I'm not going to suggest what the date

12  is.  But if there are at least more than one plan, if there's a

13  debtor plan and senior bondholders, ad hoc committee, some

14  other group, they still have to get the basic elements out of

15  the day.  And if it's unconfirmable for other reasons, they're

16  out of luck.  And if it all comes down to funding because the

17  Tubbs Fire ruling went the wrong way or the estimation took the

18  high road and then there's -- then you -- either way, you have

19  maybe a nonconfirmable plan, unless there's a major change to a

20  position by the money sources.  Right?

21          MR. DUNNE:  Correct.

22          THE COURT:  Okay.

23          MR. DUNNE:  And -- I agree with Your Honor.  And it

24  goes back to what you said, I think, a couple years ago, Your

25  Honor, about there was so much detail in the ad hoc bondholder

PG&E Corp., Pacific Gas and Electric Co.

1    plan that it allowed people to take shots at it, where, in my

2    experience, I haven't seen the plan term sheet be the one

3    that's actually containing all the elements of the confirmed

4    plan.

5         THE COURT:  No, I --

6         MR. DUNNE:  There's usually multiple --

7         THE COURT:  Nor I.

8         MR. DUNNE:  -- amended plans.  They're going to have

9    to deal with a number of the issues Your Honor raised and the

10   other parties have raised.

11        THE COURT:  Right.

12        MR. DUNNE:  But that's part of the process.  Let --

13        THE COURT:  No --

14        MR. DUNNE:  Let's have -- let's keep all of that alive

15   and let's see who can prevail at the end of the day.

16        THE COURT:  Okay.

17        MR. DUNNE:  Your Honor, you're -- and I know I only

18   have a minute left, but you're going to hear, I suspect, from

19   other parties that we somehow are irrelevant because we're

20   going to get paid in full under the plan.  Two points on that;

21   maybe three.  (a) It's not -- till we see all the plans, it's

22   not clear what people mean by "payment in full".  And that's

23   why I'd like to see the detail.  There's been a lot of

24   voiceovers and a lot of bullets on what that is.  And it may

25   be, as I said, that I'm in front of you in four weeks saying

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1     either plan's fine for my particular constituency.  But then

2     what am I focused on?  Then I care greatly about feasibility

3     and execution risk.

4            THE COURT:  Yeah, and by the way, there's one person

5     in this room that does not think the OCC is irrelevant.  I

6     think you play -- you and your clients play an important role,

7     even if every single variation of the plan leaves you

8     unimpaired.  You're not unimpaired until there's an effective

9     plan and, until then, your role is critical, in my opinion.  So

10    stay in there.  Chop some more wood.

11           MR. DUNNE:  Thank you, Judge.  You actually just

12    quoted from my script.  That was very -- I appreciate that.

13           But the point there is the path forward is fraught

14    with peril if we doubt it.  Right?  There's so many things that

15    could jeopardize an optimal outcome in these cases, that are

16    not within the four corners of this courtroom.

17           THE COURT:  Absolutely.

18           MR. DUNNE:  There's additional fires, heaven forbid.

19    Nobody wants that.  There's macroeconomic shocks and liquidity

20    drying up.  There's legislative developments.  So we're here

21    until the end --

22           THE COURT:  All we're dealing with --

23           MR. DUNNE:  -- and we hope --

24           THE COURT:  -- is the bankruptcy issues.

25           MR. DUNNE:  Exactly.  And that's why our protocol was

PG&E Corp., Pacific Gas and Electric Co.

1    very much focused on those bankruptcy issues, Your Honor.  And

2    I've run out -- through my five minutes, so --

3            THE COURT:  Okay.  You can --

4            MR. DUNNE:  -- let me cede the podium.

5            THE COURT:  -- go ahead.  And you know who you've

6    authorized some time with.

7            MR. DUNNE:  Yeah.

8            THE COURT:  So I'll just call the other counsel who

9    are planning to join in the opening presentation.  Just come up

10   and use your time.  State your name for the record.

11           MR. KNAPP:  Good morning, Your Honor.  Brad Knapp for

12   the International Brotherhood of Electrical Workers, Local

13   Union 1245.  I'm here from Locke Lord LLP.  I'll keep this very

14   short.

15           Our joinder is driven primarily by the hard work of

16   the governor and the legislator -- legislature in putting

17   together a plan to support a feasible exit.  And that's really

18   our focus.  We think that's best served by a competitive

19   process from serious players, because parties with a long-term

20   relationship with PG&E, like the IBEW -- that the strength of

21   the exit is a critical, critical component we'll be focused on.

22   So that's why we join the request to terminate exclusivity.

23           THE COURT:  Okay.  Thank you, Mr. Knapp.

24           Mr. Harris I know I see there.

25           Mr. Harris, good morning.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. HARRIS:  Thank you.  Good morning, Your Honor.

2  Robert Harris of Binder & Malter, appearing for TURN.  And with

3  me is Alisa Lacey --

4          MS. LACEY:  Good morning, Your Honor.

5          MR. HARRIS:  -- outside counsel for the Public

6  Advocates Office.

7          Your Honor --

8          THE COURT:  Are you dividing up a little piece?  Is

9  that the plan here --

10         MS. LACEY:  Your Honor, I'll let --

11         THE COURT:  -- a little time for each?

12         MS. LACEY:  -- I'll let TURN speak and --

13         THE COURT:  Okay.

14         MS. LACEY:  -- we'll simply join that.

15         THE COURT:  Okay.  Thank you.

16         MR. HARRIS:  Your Honor, TURN joins in the motion of

17  the senior noteholders, as you could see from our joinder.  The

18  time has come to engage in an open and competitive process.  I

19  agree --

20         THE COURT:  But you've only supported this one.  You

21  haven't supported the subrogation plan.

22         MR. HARRIS:  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MR. HARRIS:  We have engaged seriously with the senior

25  noteholders a couple of times, so we are in favor of opening

PG&E Corp., Pacific Gas and Electric Co.

1   the process to them.  We agree with the parties who've rejected

2   the debtors' nonpublic and nontransparent exclusive process.

3   We were gratefully included in that from the beginning.  We're

4   sorry to see it didn't go forward.  But we think today is the

5   time to terminate exclusivity.

6           With respect to TURN's mission, Your Honor, TURN has

7   the capability to analyze not just one but two, or even more,

8   reorganization plans and report to the Court and the CPUC on

9   the impact on ratepayers, something that's essential for

10  compliance with AB 1054.

11          We are familiar with the capability of the CPUC's

12  Public Advocates Office.  We think that capability is

13  supplemental to, if not exceeding, TURN's capability.  We think

14  that we can provide the Court with the desired result and that

15  multiple plans will not --

16          THE COURT:  Well, let me clarify that, that at least

17  the debtors' proposal and, I think, the senior bondholders',

18  but I've forgotten if they -- they both say they're rate-

19  neutral.  So if they're rate-neutral, you have nothing to argue

20  about, unless you don't believe them.  And then if there is a

21  rate impact, there's nothing much I can do, is there?

22          MR. HARRIS:  Well, Your Honor, there is a -- there's a

23  factor where I think they're all saying they're rate-neutral in

24  the end but they will -- there will be compensations.  So

25  somewhere down the line there's going to be --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, sure.

2          MR. HARRIS:  -- a piece of this plan where the

3    ratepayers are going to have to get paid.

4          THE COURT:  Well, I mean --

5          MR. HARRIS:  That's why we think we are going to

6    need --

7          THE COURT:  It's called -- that's called --

8          MR. HARRIS:  -- to comment.

9          THE COURT:  -- life.  It's going to happen.

10         MR. HARRIS:  Yeah.

11         THE COURT:  It always happens; right?  But at least as

12   far as the plan is concerned, even if any of these proponents

13   settle by (sic) the rates are going up X dollars, they got to

14   go to the CPUC.  I have no authority, even if -- I have no

15   ability to deal with that as a matter of law; right?

16         MR. HARRIS:  Well, it will be part of the

17   implementation of the plan.  It will be part of disclosure --

18         THE COURT:  Well, yes, I understand.

19         MR. HARRIS:  -- Your Honor.

20         THE COURT:  So if there -- if somebody's plan says the

21   rates are going to go up by X cents per kilowatt, I believe the

22   only thing the bankruptcy court could say is, let me know when

23   the CPUC approves it.  I can't approve it or disapprove it.  I

24   just have to get that -- to use the metaphor, I have to get

25   that box checked somewhere else, not in the bankruptcy court.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  Am I right?

2          MR. HARRIS: Well, Your Honor, to a point. We

3  think ---

4          THE COURT: Okay.

5          MR. HARRIS: -- that you're going to have a point in

6  the disclosure statement where you're going to have to let the

7  creditors -- let the ratepayers know what the impact is on

8  them.

9          THE COURT: The ratepayers don't get a disclosure

10  statement. They're not creditors. They don't -- you know the

11  rules.

12          MR. HARRIS: Yes, Your Honor.

13          THE COURT: They only -- the way I see it under the

14  proposed plan, for both today's plans, leaving aside the

15  criticism of the bondholders' proposal as being sort of

16  jiggering the impairment, they're just two impaired classes.

17  They're the two types of fire victims. Right?

18          MR. HARRIS: That's --

19          THE COURT: So they're the only ones who are going to

20  vote on this plan, as I see it. Right?

21          MR. HARRIS: Leaving aside the possibility that claims

22  will be filed for enforcement actions, which is something that

23  could well pop up in this case and run into the billions of

24  dollars, Your Honor, that's an issue for another day.

25          THE COURT: Right.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. HARRIS:  We believe that we are going to be

2  obligated to report on the impact on ratepayers.

3    THE COURT:  No, I understand.  I'm not differing with

4  you.  I understand that's what TURN does; that's what the

5  public advocates do.  What I'm saying is that the term sheets

6  of the two motions that are on today and the outline that Mr.

7  Karotkin and the debtors filed yesterday, I believe, all recite

8  that they're rate-neutral.

9    MR. HARRIS:  Yes.

10    THE COURT:  And that means to me -- well, it means to

11  me that that they can take that up with the CPUC or not, but at

12  least the term sheets for the two plans today have only

13  impaired classes are fire victims or subrogation fire

14  claimants.  There's no other impaired class.  So they are the

15  voters.

16    MR. HARRIS:  That's correct, Your Honor.

17    THE COURT:  And what do you vote on about a rate if

18  there's a recital that there's no change on the rate.  You can

19  vote however you want if you don't believe what you're

20  promised, but that to me is different.  So anyway, we'll cross

21  that bridge when we come to it.

22    MR. HARRIS:  Very good, Your Honor.

23    THE COURT:  Okay, thank you both for coming.

24    MR. HARRIS:  Thank you, Your Honor.

25    THE COURT:  All right, are we out of time?  Is anyone

PG&E Corp., Pacific Gas and Electric Co.

1    left expecting to be heard in support of the motion to

2    terminate exclusivity?

3           Good morning.

4           MS. BROWNSTEIN:  Good morning, Your Honor, Beth

5    Brownstein from Arent Fox on behalf of BOKF as indenture

6    trustee for the senior notes in the principal amount of

7    approximately 17.5 billion dollars.  I will be brief, Your

8    Honor.

9           The motion to terminate comes at a critical juncture

10   in these cases.  We all recognize time is of the essence, and

11   the plan process cannot be delayed any further.  The ad hoc

12   noteholder committee's credible plan proposal, which is based

13   on a structure that fits within the recently passed

14   legislation, is a significant and productive step forward in

15   the plan process and the debtor's timely emergence from

16   bankruptcy.

17          We are already feeling the positive impacts of the

18   motion since it was filed seven weeks ago.  The recent movement

19   demonstrates why under these unique circumstances competition

20   is beneficial and more likely to yield results.  Numerous

21   parties, including the Governor's Office, the PUC, both

22   official committees, the union and others have expressed

23   support for a competitive process under the supervision of this

24   Court.

25          The one glaring message from the pleadings on file is

PG&E Corp., Pacific Gas and Electric Co.

1    that despite ample time and opportunity to do so, the debtors

2    have failed to drive consensus on process and substance.  The

3    parties lack confidence in the debtors.  Unfortunately, the

4    debtors have used silence or surprise, rather than dialogue, to

5    communicate with their stakeholders.  And their inability and

6    unwillingness to meaningfully engage with their constituents on

7    Chapter 11 constructs is concerning.  This strategy is

8    unsustainable and detrimental, given the time lines imposed by

9    the legislature.

10          With this Court as gatekeeper, terminating exclusivity

11   now and allowing a competitive process to move forward will be

12   helpful, not harmful to the estates.  A competitor framework

13   under which parties seek to both consensus with incentivize

14   expedited negotiations, improve communications, and create much

15   needed transparency.  BOKF is hopeful it will also encourage

16   the debtors to be more forthright and open in seeking input

17   from their key stakeholders.

18          It is time to move the process forward and the relief

19   requested in the motion is timely, necessary, and warranted,

20   and BOKF therefore respectfully requests Your Honor grant the

21   motion.

22          THE COURT:  All right, thank you, Ms. Brownstein.

23          MS. BROWNSTEIN:  Thank you very much.

24          THE COURT:  All right, by my calculation, we're

25   finished on time.  Is there another lawyer who's expected to be

PG&E Corp., Pacific Gas and Electric Co.

1  heard?

2          MS. MASUD:  I will be very brief, Your Honor.

3          THE COURT:  All right.  Let me -- please state your

4  appearance and I won't call the time, but I'll expect you to be

5  brief, please.

6          MS. MASUD:  I will be very brief.  Good morning, Your

7  Honor.  Laila Masud of Marshack Hays, on behalf of the SLF fire

8  victims.  As Your Honor put it, we are representing 5,200 of

9  the fire victims --

10          THE COURT:  Right.

11          MS. MASUD:  -- across all of the fires, who are living

12  with this nightmare of a situation, and I will keep it very

13  brief.

14          We're just looking for a fast and efficient resolution

15  of this entire process.  And we would like -- there's nothing

16  like a little bit of competition to make sure that this goes

17  smoothly, and we believe that exclusivity should be terminated.

18  It doesn't foreclose debtors from pursuing negotiations with

19  their creditors.  In fact, all it'll do is help to make sure

20  that there's more dialogue across all parties, which,

21  unfortunately at this moment, is a little bit stagnant.

22          And that is it.

23          THE COURT:  Okay, thank you very much for your

24  comments.

25          MS. MASUD:  Thank you.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  All right.  By my -- by the rules that I

2    laid down that are being enforced somewhat lightly and loosely,

3    Mr. Karotkin, have you worked with other counsel as to how

4    you're going to divide up your forty-five minutes?

5    MR. KAROTKIN:  Yes, we have.

6    THE COURT:  Good morning.

7    MR. KAROTKIN:  Good morning, Your Honor.  Stephen

8    Karotkin, Weil, Gotshal & Manges for the debtors.  I know that

9    Mr. Bennett would like to enter fifteen minutes, and Ms. Caton

10   would like a couple of minutes.

11   THE COURT:  How about the TCC?  Is anyone from the TCC

12   going to --

13   MR. KAROTKIN:  Yes, oh, sorry.  Ms. Dumas said she

14   would like ten minutes.  So --

15   THE COURT:  Okay.

16   MR. KAROTKIN:  -- I guess I have to go quickly.

17   THE COURT:  So how many have you reserved for

18   yourself?

19   MR. KAROTKIN:  An hour?

20   THE COURT:  No, you've only -- you're down to forty-

21   four minutes now.

22   MR. KAROTKIN:  Okay.

23   Let me address a couple of items upfront that Mr.

24   Qureshi raised and some questions you had asked him.

25   First of all, with respect to the last case, the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Governor and the CPUC, when you modified this -- the exclusive

2    period for the CPUC, quite different from where we are today,

3    Your Honor.  The CPUC is not an economic party-in-interest, was

4    not a creditor in those cases, not really a creditor, was not

5    looking to improve its position, was not looking to buy the

6    company.

7         Much different from where we are today, where we have

8    two plan proposals that essentially seek, as Your Honor noted,

9    to buy the equity of the reorganized debtors at a discount.

10   Clearly, not the case with respect to the last time you

11   modified exclusivity.

12        I'd like to also point out, Your Honor, as to the

13   issue of prejudice, which you raised at the outset, with

14   respect to if we file a plan on September 9th what -- how have

15   other parties been prejudiced, and I will submit to Your Honor,

16   there is no prejudice if you -- I don't want to get into the

17   proposed --

18        THE COURT:  If you're successful.

19        MR. KAROTKIN:  Well, let me address that, Your Honor.

20        THE COURT:  Okay.

21        MR. KAROTKIN:  If you look at the proposed protocols

22   submitted by both the unsecured creditors committee, and I

23   believe by the ad hoc --

24        THE COURT:  The ad hoc committee.

25        MR. KAROTKIN:  -- the ad hoc committee of noteholders.

PG&E Corp., Pacific Gas and Electric Co.

1    They don't propose filing plans, actually filing plans until

2    sometime in November or December.  So what we're talking about,

3    Your Honor, is give us three weeks.  It's about three weeks to

4    file a plan.  We've set forth in three different pleadings what

5    that plan is going to provide.  We made it abundantly clear

6    that Mr. Dunne's clients will be unimpaired, including by the

7    way, all of the ad hoc noteholders.

8         Under that plan, Your Honor, by reason of the statute

9    that was enacted last month, the holders of wildfire claims

10   have to be satisfied in accordance with that statute, and of

11   course, of plan has to provide for that, as it will.  I

12   think --

13        THE COURT:  Can you -- I mean, what does 1054 do that

14   the Bankruptcy Code doesn't do for a dissenting class?  In

15   other words, I haven't studied the bill, because I've been

16   studying an awful lot of bankruptcy things.  So can you

17   crystalize what are the bankruptcy rules that the state has

18   imposed upon, that are --

19        MR. KAROTKIN:  I think, Your Honor, what this statute

20   does is it requires either that those claims be paid in

21   accordance with a settlement agreement.

22        THE COURT:  What -- okay.

23        MR. KAROTKIN:  That's one option.

24        THE COURT:  That's easy.

25        MR. KAROTKIN:  Be paid in full or be paid in

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    accordance with whatever you were to estimate as the total

2    liability.  So essentially --

3              THE COURT:  Okay.

4              MR. KAROTKIN:  -- they have to be satisfied in full.

5              THE COURT:  Well, but that -- okay, then what you're

6    telling me then is that leaving aside which to -- well,

7    obviously, that's been the whole discussion, and all the other

8    variations, if there is a binding determination of X dollars as

9    the estimated amount, then maybe 1054 says you got to pay them

10   that amount.

11             MR. KAROTKIN:  The plan must provide --

12             THE COURT:  Okay.

13             MR. KAROTKIN:  -- that that amount must be made

14   available to the fire claimants.

15             THE COURT:  Okay.

16             MR. KAROTKIN:  So --

17             THE COURT:  That's what I thought.  But I didn't know

18   for sure.

19             MR. KAROTKIN:  Yes, you're absolutely correct about

20   that.

21             Now, it was very interesting to me, Your Honor, when

22   you asked Mr. Qureshi about some of the infirmities in their

23   plan that were raised by a number of parties in their

24   objections, and what was his answer?  Not a substantive answer

25   to try to address the infirmities.  What he said is, those are

PG&E Corp., Pacific Gas and Electric Co.

1  all confirmation issues, Your Honor; let's defer those to

2  confirmation.  That doesn't make them go away.  It doesn't make

3  them -- that doesn't solve the problem.

4         The fact of the matter is, as I believe Mr. Bennett

5  will go into in much more detail, there are fundamental issues

6  as to artificial impairment or good faith in the Ninth Circuit.

7  There are fundamental issues with his claimants receiving --

8  again, his small group receiving more than a hundred cents on

9  the dollar.  He sort of glossed over, Your Honor, the issue of

10  how that plan grants collateral security to those claims going

11  forward.  He didn't address that question; he shifted to

12  another topic, meaning securitization, like the proposed

13  wildfire legislation that the debtors had been seeking.

14         THE COURT:  Well, but in fairness to him --

15         MR. KAROTKIN:  But --

16         THE COURT:  -- to me that is fairly a confirmation

17  issue, and it doesn't mean, in my mind, that it means therefore

18  I toss the plan, because today I determined that it could never

19  be confirmed.

20         MR. KAROTKIN:  But, Your Honor --

21         THE COURT:  It's not one of --

22         MR. KAROTKIN:  -- it does.

23         THE COURT:  It's not --

24         MR. KAROTKIN:  As a gatekeeper, have an obligation to

25  make those determinations, that if a plan is not confirmable on

PG&E Corp., Pacific Gas and Electric Co.

1    its face, this estate and these debtors should not suffer the

2    costs involved in going forward --

3              THE COURT:  Okay.

4              MR. KAROTKIN:  -- with that type of plan.  And that's

5    what we're saying.  And again, he didn't address those issues.

6    His response, Your Honor, was, well, these replacement notes

7    have a, I believe, a tenth of a point lower interest rate,

8    which results in a 200-million-dollar savings --

9              THE COURT:  No, that's right, and --

10             MR. KAROTKIN:  By the way, Your Honor, 200 million

11   dollars over ten years, which calculates to about ten cents a

12   year per -- a year -- ten cents a year per ratepayer.  Ten

13   cents a year.  That's the altruistic motives here of this group

14   that is trying to acquire this company at a substantial

15   discount, in moving forward with their plan.

16             And that's what we have here.  We don't have an entity

17   looking to get paid on its claims.  What we have here is an

18   entity, a group of creditors, that are trying to benefit

19   economically at the expense of other economic stakeholders in

20   these cases, and that's what they're asking you to do, Your

21   Honor.

22             And people say, and the woman who was up here before

23   in the pleadings say, well, Your Honor, the debtors haven't

24   made any progress in reaching a consensus.  And the debtors

25   therefore should -- exclusivity should be taken away from them.

PG&E Corp., Pacific Gas and Electric Co.

1    Well, Your Honor, it's not surprising that the debtors have not

2    yet resolved the claims with the wildfire claimants and with

3    the subrogation claimants.  These are difficult cases.  There

4    are -- you have seen the emotion in this courtroom about these

5    claims.  These are not easy claims to be resolved.

6         But let's look at what they have done.  What have the

7    other plan proponents done?  They haven't resolved those

8    claims.  They haven't resolved anything, other than they've

9    resolved how to treat themselves under a plan in a way that

10   significantly benefits them.

11        So they criticize us for not reaching a consensus, but

12   the only consensus in the plan submitted by the parties seeking

13   to terminate exclusivity, is the consensus that the debtor's

14   reached, Your Honor, with the public entities.  There is

15   nothing -- nothing -- in those plans that reflects a consensus

16   with anybody else.

17             THE COURT:  Well, but that --

18             MR. KAROTKIN:  And Your Honor --

19             THE COURT:  -- but that's not a disqualifier.  That's

20   not a statutory predicate to being able to file a competing

21   plan.

22             MR. KAROTKIN:  Not a disqualifying predicate --

23             THE COURT:  And you're --

24             MR. KAROTKIN:  -- but that is what they're using, Your

25   Honor --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, okay, but you're --

2          MR. KAROTKIN:  -- to say, Your Honor, you should take

3    exclusivity away from us.

4          THE COURT:  No, I got it.  I got it.

5          MR. KAROTKIN:  You should take it away from us --

6          THE COURT:  But Mr. Karotkin --

7          MR. KAROTKIN:  -- because we haven't made progress.

8          THE COURT:  Mr. Karotkin, how many times have I

9    acknowledged these are tough cases for everybody and probably

10   the toughest for the debtor and the debtor's counsel.  But the

11   list of things that you've accomplished, most of them are --

12   they go with the territory of being a debtor-in-possession, and

13   they have nothing to do with plans.  They have to do with all

14   the things that you've been dealing with, other contracts, and

15   first day motions, and compensations, and appointment of

16   professionals.  All important, but all your responsibility and

17   no one else's, anyway.

18          So I'll --

19          MR. KAROTKIN:  I totally agree, Your Honor.

20          THE COURT:  Okay.

21          MR. KAROTKIN:  And we have sequencing these -- we have

22   sequenced these cases in a classic traditional way --

23          THE COURT:  You have.  I --

24          MR. KAROTKIN:  -- to get to the point -- let me

25   address that, Your Honor -- to get to the point where the plan

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    process should start, to get to that point.  So yes, Your

2    Honor, by the way, we did settle with the public entities.

3              THE COURT:  No one --

4              MR. KAROTKIN:  And that was significant progress --

5              THE COURT:  It is.

6              MR. KAROTKIN:  -- in the plan process.  And let's not

7    ignore that.  And just a month ago, Your Honor, AB 1054 was

8    passed, which is fundamental to the Chapter 11 plan process, in

9    the formulation of any plan of reorganization, because that

10   statute dictates how the claims -- as we just discussed -- how

11   the wildfire claims have to be treated.  And that legislation,

12   Your Honor, dictated that if the debtors wanted to participate

13   in the go-forward wildfire plan, that would be a 4.8-billion-

14   dollar contribution, again, setting the parameters for what a

15   plan will have to address.

16              And as this Court knows, and as everybody involved in

17   these cases clearly knows, any Chapter 11 plan proposed in

18   these cases is dependent on the determination of the debtor's

19   wildfire liability.  Any plan.  And until that liability is

20   determined for plan purposes, whether it's consensually or

21   pursuant to an estimation hearing in the courthouse, no plan

22   can realistically proceed to confirmation because no plan knows

23   what that funding amount will be required under the statute.

24   Again, we talked about that earlier.

25              THE COURT:  Right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. KAROTKIN:  And to address that issue, as Your

2   Honor knows, we filed the estimation motion, and we filed --

3   and there's a hearing tomorrow in connection with the

4   modification of the stay in the Tubbs --

5      THE COURT:  Right.

6      MR. KAROTKIN:  -- in the Tubbs trials.  All of which,

7   as you said at the outset of this case, are inextricably tied

8   to the plan process and to what we're talking about today.

9      And let me remind you, Your Honor, of something you

10  said back in May.  I like to remind you sometimes of what you

11  said in the transcripts.  So you said --

12     THE COURT:  And if I don't remember, you show it to me

13  in written form.

14     MR. KAROTKIN:  And I'm going to show it to you,

15  because I think it's very appropriate for why we're here today.

16  And you said, it's in -- this is your words; I'm quoting

17  directly -- "It's inconceivable to me, if tomorrow the Governor

18  and the Legislature and the CPUC all solve all of these other

19  problems.  That even if Mr. Karotkin wakes up Friday

20  morning" -- which is tomorrow morning -- "and all of these

21  problems are solved, it's going to be a long time before he

22  gets the plan into the file."  And then again you said, "It's

23  just so complicated."

24     And that's where we are today, Your Honor.  That's

25  exactly where we are today, and now we are deeply engaged in

PG&E Corp., Pacific Gas and Electric Co.

1   the plan process, and we have set forth the parameters of the

2   plan we're going to file, and we -- and next to our

3   supplemental pleading, Your Honor, a time line to get that plan

4   on file and to have it prosecuted.

5           And we have been involved in ongoing dialogue with Mr.

6   Bennett's clients with respect to plan funding.  And as

7   indicated in the pleading we filed yesterday, those funding

8   commitments have been coming forward quite rapidly.  I believe

9   we are now well in excess of thirteen billion dollars.

10          THE COURT:  Oh, I had a question on that.  There was a

11  figure in a bracket, and I take it that's the number that just

12  moves every day, right?  So --

13          MR. KAROTKIN:  That the number, yes --

14          THE COURT:  So you're --

15          MR. KAROTKIN:  -- yes, Your Honor.

16          THE COURT:  If that were filed now, there'd be a 13

17  there instead of a 10.25?

18          MR. KAROTKIN:  I have that exact number for you, Your

19  Honor.

20          THE COURT:  Oh, that's okay.

21          MR. KAROTKIN:  I think it's 13.2 billion.

22          THE COURT:  Okay.

23          MR. KAROTKIN:  I wouldn't be surprised during the time

24  I've been in the courthouse that that hasn't increased, and in

25  fact --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Should we get a meter?  You want to have

2     like one of these meters like a --

3          MR. KAROTKIN:  We can put that over there if you'd

4     like.

5          THE COURT:  -- like a charity drive?  Okay.

6          MR. KAROTKIN:  And I am quite confident, and I'm sure

7     Mr. Bennett will address this further, that that will be well,

8     well oversubscribed.  And I think it's important to note, Your

9     Honor, that as again, reflected in our pleading, there are

10    multiple, multiple funding sources for a plan of reorganization

11    here.  The exact number when I first came into court, Your

12    Honor, was 13.19 billion from 33 different investors, okay.

13         THE COURT:  Yeah, okay, well, I --

14         MR. KAROTKIN:  And I will --

15         THE COURT:  I understand how it works.

16         MR. KAROTKIN:  And I will point out, Your Honor, there

17    is no question, again, as we have reflected in our pleadings,

18    there are ample sources of capital here.  Again, once it's been

19    determined, Your Honor, what the wildfire liability is in these

20    cases, it has to be addressed under a plan.

21         And I think it's important to note, and you alluded to

22    this earlier, about how these commitments compare to the ad hoc

23    senior noteholders' plan.  The value of the equity of the

24    reorganized debtors under those proposals is substantially in

25    excess of that proposed by the ad hoc noteholders.  The equity

PG&E Corp., Pacific Gas and Electric Co.

1  commitments do not disadvantage one group of financial

2  stakeholders for the benefit of the other group.

3          And quite importantly -- and this is extremely

4  important, Your Honor, and we did note it in our pleadings --

5  those equity commitments provide the debtors with the

6  flexibility to access even more efficient sources of capital,

7  and to return these debtors to a traditional position in the

8  capital markets.  They will have the flex --

9          THE COURT:  But what happened?  I mean, those

10  commitments don't go away if there's a competing plan, do they?

11  In other words, let's go back to what we're here today with my

12  opening comments, because we can stipulate, everyone in the

13  room understands those big items that have to get resolved in

14  estimation will drive the outcome.

15          But everything you've said about your proposal --

16  we'll call your September 9th outline -- it's still there on

17  the table, even if there's another plan to compete with, right?

18          MR. KAROTKIN:  I believe they do not go away.

19          THE COURT:  Okay.  Well, I hope so.

20          MR. KAROTKIN:  I believe they do not go away, assuming

21  we meet the conditions and the timetable set forth.

22          THE COURT:  Okay, so if we were -- if there were no

23  motions to break exclusivity by the two moving parties, and we

24  were just having this discussion about extending exclusivity,

25  you'd make the kind of argument you're making.  What I'm

PG&E Corp., Pacific Gas and Electric Co.

1    getting at is, your outlining very, very significant movement.

2    I don't disagree with that.  You've told me -- you told me

3    yesterday, and now you've told me today.

4              But what happens and what harm other than the fact

5    that you got to deal with it, of all these other counsel that

6    made the argument, competition, the governor's statement, the

7    CPUC's statement, TURN, and everybody else.  How does that --

8    how is that impacted in a negative way -- how is your outline

9    impacted in a negative way if there's another plan to compete

10   with?

11             MR. KAROTKIN:  Let me address this --

12             THE COURT:  Sorry.  Go ahead.

13             MR. KAROTKIN:  -- because I know you've made your --

14             THE COURT:  I couldn't ask the question very clearly.

15             MR. KAROTKIN:  You've made your feelings pretty clear

16   over the course of these cases on you view exclusivity.  You're

17   pretty candid about that.

18             THE COURT:  Right.

19             MR. KAROTKIN:  So let me try to address how I think

20   that --

21             THE COURT:  Okay.

22             MR. KAROTKIN:  -- that that's not the right answer to

23   terminate, and how it will prejudice other parties, and the

24   prejudice actually achieving the June 30th date.

25             Your Honor, what this case cries out for, and I think

PG&E Corp., Pacific Gas and Electric Co.

1    you mentioned it earlier, is a consensual resolution to the

2    wildfire liability.

3         THE COURT:  Okay.

4         MR. KAROTKIN:  A chance to achieve a consensual plan,

5    which the debtors, as the sole fiduciaries for all parties-in-

6    interest here, Your Honor.  We are fiduciaries for all economic

7    stakeholders.  We don't -- we're not looking to enhance the

8    position of any particular creditor or shareholder.  We're here

9    to be the economic steward of these cases to get to the right

10   answer.  And to get to the right answer by June 30th of next

11   year, so the debtors can take advantage of participating in the

12   go-forward wildfire funds -- wildfire fund.

13        Competing plans, Your Honor, and particularly, the

14   competing plans that you've seen today, which promote the

15   parochial interests of one constituency to the detriment of

16   others, will doom that effort to failure.  There are two

17   principle hallmarks of the plan, as I mentioned, the ad hoc

18   plan.  One is that there is no consensus with other -- any

19   other group but themselves.  And the other is the enhanced

20   treatment of their claims and their attempt to acquire the

21   equity of the reorganized company at a substantial discount.

22        Your Honor, it's difficult enough to negotiate a

23   consensual plan under normal circumstances.  And typically, the

24   debtor is the one that has the right and the opportunity to do

25   that.  Emboldening these parties by enabling them to proceed

PG&E Corp., Pacific Gas and Electric Co.

1    with their plans will serve only to polarize the parties.  They

2    are trying to advance their own economic interests.

3          Mr. Qureshi talks about the altruistic motives of the

4    ad hoc bondholder group.  Let's be realistic about that.  They

5    are not here as altruistic players.  They are here to acquire

6    the company at a discount, at a substantial discount, and to

7    enhance their claims.  That is abundantly clear in the plan

8    that they filed.

9          And where, Your Honor -- and I think you put your

10   finger on it -- where as here, any plan filed is going to

11   unimpair that group.  And the issue before the Court is going

12   to be a cramdown on equity.  That's what you said earlier.

13         THE COURT:  Well, am I wrong?

14         MR. KAROTKIN:  No, you're right, and that's why the

15   debtors should control the process, because as the honest

16   broker.  I think that -- and that's what the Code --

17         THE COURT:  I didn't laugh.

18         MR. KAROTKIN:  And what's the Code contemplate that

19   the debtors, again, as fiduciaries for all parties-in-interest,

20   are the appropriate parties to achieve that goal.

21         Your Honor, all we're saying is give us till September

22   9th.  Again, they're protocols don't provide for filing of

23   plans until November or December.  Give us till September

24   9th --

25         THE COURT:  Well, it's hard -- I mean, I didn't study

PG&E Corp., Pacific Gas and Electric Co.

1    the protocols, because I was studying a lot of other things,

2    both for today and tomorrow, but it's hard for me to imagine

3    that that's in concrete.  I mean, I suspect if I said to either

4    or both of the moving parties, I'll let you file a competing

5    plan as long as you file the same -- by the deadline that the

6    debtors tell me it's going to do that.  My guess is these

7    lawyers would figure out a way to file a plan by September 9th,

8    if I told them to.  You --

9            MR. KAROTKIN:  No doubt.

10           THE COURT:  So -- well, I think it's --

11           MR. KAROTKIN:  But I'm saying, Your Honor --

12           THE COURT:  But I think it's important that we not

13   pretend that -- I mean, that sounds like kind of a false

14   argument.  All the other arguments you make are quite credible.

15   This notion that, well, they won't a plan until November.

16   That's easy to fix.

17           MR. KAROTKIN:  Your Honor --

18           THE COURT:  And when -- and you know what?  When Mr.

19   Qureshi comes back up, he's going to tell me he'll have it

20   filed on September 10th probably.

21           MR. KAROTKIN:  I'm sure he will, Your Honor.  I have

22   no doubt that he will say that.

23           THE COURT:  Okay.

24           MR. KAROTKIN:  But what I'm saying is, Your Honor, we

25   will file our plan by September 9th.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yes.

2          MR. KAROTKIN:  If I don't meet that date, I will

3     suffer the consequences --

4          THE COURT:  Well --

5          MR. KAROTKIN:  -- and my client will suffer the

6     consequences.  And you know as you said at the original

7     exclusivity hearing, if the plan is no good, if what we file

8     doesn't pass muster, anyone can come in and ask that

9     exclusivity be terminated.  And if they want that to be heard

10    on an expedited basis, so be it.

11         THE COURT:  I did say that.

12         MR. KAROTKIN:  Okay.  And that is a remedy.  No one

13    will be prejudiced by three weeks.  And I will just note for

14    you one final comment, and again, I think, counsel indicated

15    that both the CPUC and the Governor's Office support

16    termination of exclusivity.  I never heard that.  They didn't

17    say that.  In fact, I don't think Mr. Kornberg, who's on the

18    phone, could have been clearer -- could have been clearer last

19    Friday when he said to Your Honor that competing plans will be

20    a nightmare for the CPUC.

21         THE COURT:  Well, I think Mr. Kornberg was -- who's

22    usually very clear, was a little equivocal about different

23    positions at the time.  And he doesn't have to defend himself;

24    I'm not criticizing him.  But I wasn't quite sure where the

25    CPUC came out of the ultimate question, but that's okay.  We

                PG&E Corp., Pacific Gas and Electric Co.

1    are where we are.  All right.

2              MR. KAROTKIN:  And --

3              THE COURT:  Do you want -- you don't get to reserve.

4    So you said Mr. Bennett's going to speak and then Ms. --

5              MR. KAROTKIN:  Yeah, I just want to make --

6              THE COURT:  -- Dumas.  Yes, go ahead.

7              MR. KAROTKIN:  -- one final point.

8              THE COURT:  Okay.

9              MR. KAROTKIN:  I think Mr. Qureshi eluded to the fact

10   or suggested that the commitments that we've received from the

11   equity holders are conditioned on legislation, conditioned on

12   what's been known as equity --

13             THE COURT:  Yeah, some --

14             MR. KAROTKIN:  -- equity bonds.

15             THE COURT:  Equity bonds, that's what I --

16             MR. KAROTKIN:  Categorically, that -- I don't know how

17   many times we can say it --

18             THE COURT:  You've said that's not true.

19             MR. KAROTKIN:  Categorically, they are not.

20             THE COURT:  Well, I think you've said it in your paper

21   yesterday.

22             MR. KAROTKIN:  I did, but apparently that didn't

23   resonate with Mr. Qureshi.

24             THE COURT:  Well, I -- that's okay.  I read it last

25   night that that's what you said.

PG&E Corp., Pacific Gas and Electric Co.

1        MR. KAROTKIN:  Right.

2        THE COURT:  So before Mr. Bennett speaks, so Mr.

3  Bennet's going to speak and then Ms. Dumas, is that plan, or

4  someone else?

5        MR. KAROTKIN:  No.

6        THE COURT:  Okay, well, I just wanted to make sure.

7        MR. KAROTKIN:  And then Ms. Dumas.

8        THE COURT:  Okay, Mr. Bennett?

9        Good morning, nice to see you.

10        MR. BENNETT:  Thank you, Your Honor.

11        THE COURT:  And just state your name for our record,

12  even though I know it.

13        MR. BENNETT:  Your Honor, Bruce Bennett of Jones Day

14  on behalf of equity holders.  So first of all, a couple of

15  things that I want to respond to.

16        If Your Honor's going to terminate exclusivity to

17  allow competing plans, what we would need are good constructive

18  alternatives.  And so, I think, what I'm going to spend most of

19  my time talking about is the -- is actually three -- only

20  three -- not detail -- three significant chunks of the plan

21  proposal by the bondholders and describe why each and every one

22  of them is enough to disqualify the plan from further

23  consideration.

24        And the only other point I want to make before --

25  well, two more points before saying that.  One is, is that

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    there's been a lot said about that somehow the filing of the

2    bondholder plan had the effect of speeding up the case.

3    Nothing could be further from the truth.  If you recall, they

4    sought termination of exclusivity before the legislation was

5    passed.  It is the legislation and the passage of the

6    legislation that cleared the decks to begin serious discussions

7    with the debtors concerning financing and plan terms.

8           Your Honor, we would have gone faster.  The debtors

9    wanted to be a little bit deliberate.  Instead of rushing into

10   this court and seeking to terminate exclusively, we decided to

11   work with them.

12          One more point --

13          THE COURT:  Well, wait a minute.  Now I don't

14   understand that.  You wouldn't have moved to terminate

15   exclusivity?

16          MR. BENNETT:  We did not move -- we were working with

17   the debtors at their pace.

18          THE COURT:  You were working with the debtor, yeah,

19   right.

20          MR. BENNETT:  We decided that was --

21          THE COURT:  No, I understand that.

22          MR. BENNETT:  -- the best approach to proceed.

23          THE COURT:  Right, okay.

24          MR. BENNETT:  I also want to say one other thing.

25   There was a notice about how broad the kind of -- the voluntary

PG&E Corp., Pacific Gas and Electric Co.

1   responses to copy commitments that were initiated by two of our

2   clients that became the 13B group, the 33 you mentioned.  I

3   think it's worth noting that this morning, one of Mr. Qureshi's

4   clients asked if it was okay if they would submit a commitment

5   to the debtors backing our approach.  So -- and it's actually

6   broadly appealing, not narrowly appealing.  And it was intended

7   to be that way.  It was designed to be that way.

8           Okay, let's talk about their plan.  Again, not

9   details, key provisions.  The first one I want to talk about is

10  the provision that grants all unsecured creditors, of both

11  debtors, post-petition interest at contract rates.  These

12  provisions, Your Honor, concede that the debtors are solvent,

13  not by a little, by a lot.  The cost of post-petition interest

14  at contract rates just on the bonds is 1,492,000,000 dollars,

15  if the plans go effective on June 30th, 2020.  If it goes

16  longer, it's even more.  Not small numbers; a big number.

17          Now because contract rates, at least as far as the

18  bonds are concerned, are higher than the federal judgment rate,

19  the bondholders' plan --

20          THE COURT:  Everything is higher than the federal

21  judgment rate, right?

22          MR. BENNETT:  Yes, right now that's true.

23          THE COURT:  Okay.

24          MR. BENNETT:  The bondholders' plan cannot be

25  confirmed unless junior classes including equity votes to

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    accept the plan.  Why do we know that?  Because in the Ninth

2    Circuit, unlike the Second, unlike the Third, where everyone

3    fights over what's the right rate for post-petition interest --

4            THE COURT:  We have a little case that tells us,

5    right?

6            MR. BENNETT:  You have a Ninth Circuit case that could

7    not be closer to absolutely on point.  And I'm of course

8    referring to In re Cardelucci.

9            THE COURT:  I believe Cardelucci came down during the

10   first PG&E case --

11           MR. BENNETT:  I think it did, too.

12           THE COURT:  -- and I think that's the way we did some

13   calculations on what that meant.  And it was some serious

14   numbers.

15           MR. BENNETT:  So given, Your Honor, how significantly

16   diluted equity is under the bondholders' plan, the chances that

17   equity is going to accept that plan is miniscule.  Accordingly,

18   the terms for contract rates just can't be confirmed.

19           THE COURT:  Well, but --

20           MR. BENNETT:  This is not a nit --

21           THE COURT:  -- but Mr. Bennett, that gets back to my

22   opening comment, that if the bond -- the tort claimants reach

23   agreement but we end up with an equity fight between the

24   proponent and your clients, we'll never get it done.

25           MR. BENNETT:  I think --

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  But whether it's -- whether it's the

2    interest rate or the basic cramdown consequences of a solvent

3    company, right --

4    MR. BENNETT:  Well, Your Honor --

5    THE COURT:  -- I mean, isn't that the big question?

6    MR. BENNETT:  The --

7    THE COURT:  It's the same issue.

8    MR. BENNETT:  The commitments that were generated and

9    are coming through are not intended to create a cramdown

10   circumstance for equity.  They were intended to create a

11   consensual plan.

12   THE COURT:  No, no.  I'm assuming if the

13   bondholders --

14   MR. BENNETT:  Right.  Bond --

15   THE COURT:  -- if you --

16   MR. BENNETT:  -- bond --

17   THE COURT:  -- if you and the equity and the debtors

18   are defending against the bondholders' committee proposal, then

19   we have the very costly, very uncertain cramdown fight there,

20   right?

21   MR. BENNETT:  Okay.  Well, costly, yes.

22   THE COURT:  Yeah.

23   MR. BENNETT:  My point is, uncertain, on this point,

24   given the Ninth Circuit law?

25   THE COURT:  No, I didn't --

PG&E Corp., Pacific Gas and Electric Co.

1          MR. BENNETT:  I'm not so sure.

2          THE COURT:  -- I wasn't talking about the interest.

3     I'm just talking about the whole --

4          MR. BENNETT:  Right.  Well, let's --

5          THE COURT:  -- the whole -- the bigger question of

6     diluting the equity.

7          MR. BENNETT:  I'm trying to focus on --

8          THE COURT:  Okay.

9          MR. BENNETT:  -- some key specific points where the

10    law is clear.

11         THE COURT:  Go ahead.

12         MR. BENNETT:  I narrowed the focus to big-ticket

13    items.  First one, right about 1.5 billion dollars.

14         THE COURT:  Okay.

15         MR. BENNETT:  Okay.  Second point -- and this was

16    alluded to in your opening comments.  It was also alluded to by

17    Mr. Karotkin:  the granting of senior liens on every single

18    bond in the case in exchange for a ten-basis-point interest

19    rate reduction.

20             It turns out, Your Honor, that even as unsecured

21    bonds, the unsecured bonds that are out there right now, many

22    of them are above market, because interest rates have gone down

23    over the years.  So taking those above-market bonds and then

24    collateralizing them, pushes their value up even more -- more

25    billions of dollars.  This creates overpayment.  A plan

PG&E Corp., Pacific Gas and Electric Co.

1    containing these provisions is just not confirmable.

2         But now I want to turn to what they called themselves

3    today the centerpiece of the bondholders' plan, the commitment

4    to purchase equity at a maximum price of six dollars per share.

5    Okay?  And by the way, the price can go down from there, in

6    accordance with their terms.

7         THE COURT:  Um-hum.

8         MR. BENNETT:  And it has the effect of diluting

9    existing equity to between five and fifteen percent of the

10   equity in the reorganized company.

11        THE COURT:  Right.  I understand.

12        MR. BENNETT:  Now, this should have been regarded as

13   questionable by every constituency advised by a reasonably

14   competent financial advisor, as even though, right after the

15   filing of their plan, the stock dropped a little bit, the

16   public price of the stock has stayed at about three times the

17   maximum price that they are willing to pay for shares.  That's

18   a little bit remarkable.

19        But today we have another compelling data point.  The

20   commitments that -- you have an example attached to the

21   supplemental filing by the debtors -- commit to purchase equity

22   at a minimum price -- so we talked 6 was the maximum price --

23   the minimum price is someplace in the vicinity of $17.80 a

24   share, a little less than 18 dollars a share.  It's based upon

25   an index, but that's the index value as of today.

PG&E Corp., Pacific Gas and Electric Co.

1    Okay.  So the value is three times the value that is

2  proposed by the bondholders.  How much money are we talking

3  about?  Roughly five billion dollars.  Okay?

4    The price of the commitments, Your Honor, is also

5  different.  The commitment fees in the bondholder -- in the

6  shareholder commitments for the equity portion is about one-

7  third the price demanded by the bondholders.

8    THE COURT:  Mr. Bennett --

9    MR. BENNETT:  Your Honor, the fact that the

10  bondholders --

11    THE COURT:  -- Mr. Bennett, if I let the bondholders'

12  plan go forward and the plan that the debtors and/or your group

13  support goes forward, and we go through all those horrible

14  steps of the disclosure, and estimation, and the voting, and it

15  comes down to both plans are accepted, don't you think I know

16  which would be the better one to pick?

17    MR. BENNETT:  Your Honor, I have no --

18    THE COURT:  I mean, isn't that pretty obvious?

19    MR. BENNETT:  Your Honor, I -- so --

20    THE COURT:  Well, no, no, I know you --

21    MR. BENNETT:  -- without waiving attorney-client

22  privilege --

23    THE COURT:  -- don't want to gamble on my decision.

24  My --

25    MR. BENNETT:  No, I -- it's not a matter of gambling.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT: -- no, my point to you is well, wouldn't

2 that -- wouldn't the marketplace itself answer the question?

3    MR. BENNETT: Well, I would say two things, Your

4 Honor. Number one, I am not concerned about ultimately which

5 of these two plans would succeed.

6    THE COURT: Okay.

7    MR. BENNETT: What I'm concerned about is you and

8 me -- about the extra work that will be necessary because there

9 will be parallel tracks of prosecuting plans and defending

10 plans, and what this is all going to cost.

11    THE COURT: Well, I --

12    MR. BENNETT: Not just for my clients but for --

13    THE COURT: -- I share that --

14    MR. BENNETT: -- every other ---

15    THE COURT: -- I share that concern.

16    MR. BENNETT: It will be a times two or times three.

17 That's just the way the world is, regrettably.

18    THE COURT: I --

19    MR. BENNETT: That's the process we have.

20    THE COURT: I don't get a --

21    MR. BENNETT: But Your Honor --

22    THE COURT: -- I don't get a pay increase.

23    MR. BENNETT: Okay.

24    THE COURT: I don't think --

25    MR. BENNETT: Your Honor, you asked -- you asked about

PG&E Corp., Pacific Gas and Electric Co.

1 whether a plan is credible.

2          THE COURT:  That's right.

3          MR. BENNETT:  Okay, can a plan possibly be credible

4 where the proposed equity price, the maximum equity price it

5 calls for, is a third of the minimum equity price of the plan

6 that the debtors expect to file by the --

7          THE COURT:  But Mr. Bennett --

8          MR. BENNETT:  -- 9th?

9          THE COURT:  -- I -- we're not supposed to -- I'm not

10 supposed to --

11          MR. BENNETT:  That's not credible.

12          THE COURT:  -- I'm not supposed to speculate on what's

13 going on out there in the marketplace, and I haven't figured

14 out, and somebody is going to get to a point where there will

15 be an estimation of the Tubbs fire and all the other

16 liabilities.  And a big number there could change all of that

17 in a split second, right?

18          MR. BENNETT:  Well, Your Honor, all of the -- the

19 prices of equity in both of the deals are based upon a clean

20 company.

21          THE COURT:  Right.

22          MR. BENNETT:  So it's where the -- it's where the

23 claims are parked --

24          THE COURT:  Right.

25          MR. BENNETT:  -- someplace else.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.  And so --

2          MR. BENNETT:  So --

3          THE COURT:  -- everything changes dramatically if that

4    number --

5          MR. BENNETT:  The --

6          THE COURT:  -- changes dramatically.

7          MR. BENNETT:  -- no, it doesn't.

8          THE COURT:  No?

9          MR. BENNETT:  I mean, the price of the equity

10   shouldn't change, because the reorganized business should be

11   the same, irrespective of what the claims are.

12         THE COURT:  If the estimated pot is triple what it is

13   in these current outlines?

14         MR. BENNETT:  Then it means that the money that's

15   raised goes to a different place.

16         THE COURT:  Okay.

17         MR. BENNETT:  But it does -- but the equity value of

18   the reorganized company in both of the commitments is based

19   upon the assumption that the company is clear of the past -- of

20   the past.

21         THE COURT:  Okay.

22         MR. BENNETT:  It's based upon the future, not the

23   past.

24         THE COURT:  Well, I mean --

25         MR. BENNETT:  So --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1       THE COURT:  -- I know that.  But in terms of

2  feasibility.  But go ahead, I don't want to --

3       MR. BENNETT:  So --

4       THE COURT:  -- take the rest of your time.

5       MR. BENNETT:  -- well, what I wanted to really focus

6  on is credibility.  They say in their brief, ultimately the

7  market will determine if the ad hoc committee is proposing to

8  pay fair-market value.  Your Honor, the market has already

9  spoken.  It's speak -- it started speaking two days ago, it

10  spoke a lot yesterday, and it is speaking -- continuing to

11  speak today.

12       The competing commitment, the shareholder commitment,

13  is a vastly -- not a little bit -- a vastly better proposal for

14  the company.  Don't take our word for it.  Look at it yourself.

15  Listen to the debtors.  If you want to conduct an evidentiary

16  hearing, it might be useful and informative.

17       But Your Honor, you talked about credible and

18  confirmable, and I think we've just talked about those factors.

19       THE COURT:  Right.

20       MR. BENNETT:  You know what the cases talk about?  The

21  only factor that I found that was actually instructive for this

22  case was the issue of intransigence and coercion.  You'll

23  remember those words from a number of the cases.

24       Were the debtors intransigent or coercive by refusing

25  to engage, to discuss a plan that includes paying bondholders

PG&E Corp., Pacific Gas and Electric Co.

1  post-petition interest at a rate higher than required by law;

2  secures all outstanding and future bonds, both elevating the

3  bond claims against all other creditor claims; as well as

4  giving them higher returns, because it's secured papers not

5  unsecured paper; and then reserve solely to the bondholders the

6  ability to buy stock at a deep discount price?

7          And that was another clue, by the way, Your Honor, as

8  to how the -- how low the price was, is because they made sure

9  that they could buy --

10         THE COURT:  At the discount.

11         MR. BENNETT:  -- virtually all of it.

12         THE COURT:  And that's clear in the papers.

13         MR. BENNETT:  Okay.  That the debtors did not embrace

14  this plan is not unreasonable intransigence.  That the

15  debtor -- what it was, was practical business judgment.

16         And you know something else, Your Honor?  One of the

17  things that happened here that was kind of curious is a number

18  of creditors that came up and said they thought exclusivity

19  should be terminated are not prepared to say that they support

20  this plan.

21         THE COURT:  I know.  I noted that.

22         MR. BENNETT:  I think that is -- you know what that

23  indicates to me?  It indicates that they did some math, too,

24  and recognize that if they embrace that plan, someday they

25  would be embarrassed.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  But Mr. Bennett, the shoe is on the other

2     foot, too, because the only people opposing exclusivity are

3     aligned with the debtor or the equity.

4          MR. BENNETT:  That's actually not true.

5          THE COURT:  Who would you mention -- who do you have

6     in mind?

7          MR. BENNETT:  The TCC.

8          THE COURT:  They didn't take a position.

9          MR. BENNETT:  They're about to.

10         THE COURT:  Well, they didn't file anything.

11         MR. BENNETT:  Okay, well --

12         THE COURT:  So we go on --

13         MR. BENNETT:  -- I'm going to let Ms. Dumas --

14         THE COURT:  -- what they filed --

15         MR. BENNETT:  -- speak.

16         THE COURT:  -- and they didn't file anything.

17         MR. BENNETT:  Okay.

18         THE COURT:  So anyway, we've got to go to their

19    counsel.

20         MR. BENNETT:  Okay.  My last point.  There is one last

21    note.  It's in our papers as well.  I'm sure you noticed it.

22    Is that the bondholders haven't -- I think their proposal for a

23    maximum price of six dollars a share could not possibly be the

24    good-faith basis of a plan; that's number one.

25         THE COURT:  Right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. BENNETT: But number two, the conduct in depriving

2  the debtors -- not depriving shareholders, but depriving the

3  debtors -- of financing opportunities by lobbying against them

4  because they thought -- I don't know why they thought this --

5  they thought that theirs was going to be the only equity-

6  financed plan, that's also bad-faith conduct.

7    Now, in there's papers, they're careful to say today

8  is not the day to figure that out. They don't really want to

9  know the answer yet. We promise you, you will get a chance to

10  figure it out. The discovery will be conducted at some point

11  in time.

12    THE COURT: Yeah, I understand.

13    MR. BENNETT: But I think --

14    THE COURT: Sure. I understand. There are ways to --

15  you know as well as I, there are ways to disqualify plan

16  proponents. We're only just talking --

17    MR. BENNETT: Right.

18    THE COURT: -- today about can they be a formal plan

19  proponent --

20    MR. BENNETT: Yeah.

21    THE COURT: -- and that's why I'm not taking you up on

22  your invitation to have an evidentiary hearing today.

23    MR. BENNETT: Okay. And then finally I would say that

24  the fact that they concede debtors' solvency is incredibly

25  significant, because this case is about how claims are going to

PG&E Corp., Pacific Gas and Electric Co.

1    be paid, not if claims are going to be paid.  And when it is --

2    when that is the fundamental issue in the case, the debtor is

3    the one that should be figuring it out --

4              THE COURT:  I understand.

5              MR. BENNETT:  -- in the first instance.  Thank you,

6    Your Honor.

7              THE COURT:  Okay, thank you.

8              So Ms. Dumas, you're next, I think -- no, one other

9    counsel?

10             MS. DUMAS:  Sure.

11             THE COURT:  And I've kind of lost track of the time,

12   but I think you've got about -- well --

13             MS. CATON:  Yeah, I'll try to take about three

14   minutes, Your Honor.

15             THE COURT:  Okay.  I need an appearance from you.

16             MS. CATON:  Good morning, Your Honor.  Amy Caton on

17   behalf of the PG&E Holdco lenders, from Kramer Levin.

18             Just to introduce myself, I represent approximately

19   six clients.  They hold the bank debt that is at the -- at the

20   company in between the debt at the Holdco -- at the operating

21   company level, and the utility, and the stock.  So in some

22   respects, we're a bit of a fulcrum creditor.  And my clients

23   primarily hold a mix of debt and equity, although four of my

24   clients hold no equity.

25             I've listened to the arguments today and two weeks

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  ago, and I just wanted to make three quick observations for

2  you.  The first one is is that I agree with Your Honor

3  wholeheartedly that the main issue in these cases is trying to

4  figure out what to do with respect to the 2017 and 2018 tort

5  claims.  And in some respects, that's the main event.  What

6  we're doing here in determining who's going to be able to file

7  a plan and when, it's a bit of a sideshow.

8            And what we're hoping, Your Honor, is that this

9  doesn't constitute a distraction away from what we need to do,

10 which is work on those claims and bringing the parties closer

11 together.

12           Secondly, as a representative of unsecured claimants,

13 we'd like to see competition just as much as the next person.

14 But what I would submit to you is that because of Mr. Qureshi's

15 motion and because of AB1054 having been passed, we're already

16 seeing some competition here.  And we don't want too much of a

17 good thing.

18           I don't think that we want to see settlements become

19 more difficult because the very parties who are negotiating on

20 behalf of themselves and trying to get to deals get hardened to

21 settlement through the idea that their plan is the best one,

22 which I think you do see sometimes.  And Mr. Qureshi talked

23 about putting all of your eggs into one basket.  What we're

24 worried about is people put their eggs in the basket of their

25 own plans and they don't work together to come to a consensual

PG&E Corp., Pacific Gas and Electric Co.

1 plan with the debtor.

2 THE COURT: But isn't that fundamental? Don't you

3 start -- any person who ever proposes a competing plan is

4 usually looking out after his own interest first.

5 MS. CATON: Yes.

6 THE COURT: So what's new? That's just life out

7 there. So therefore what? In other words --

8 MS CATON: To therefore, I think what Your Honor did

9 in the first PG&E bankruptcy, where the debtor actually filed

10 its plan first and then other parties were able to respond

11 after, with their own competing plans --

12 THE COURT: Only one competing plan. Only one.

13 MS. CATON: Exactly, Your Honor. There were other

14 conversations, I believe. And again --

15 THE COURT: Well, I'm sure there were endless

16 conversations.

17 MS. CATON: -- I wasn't here. Exactly.

18 THE COURT: But there wasn't billions of dollars of

19 wildfire claims. The tort claims in that case were important

20 to those claimants, but they were insignificant to the overall

21 reorganization of the company. And solvency --

22 MS. CATON: I agree, Your Honor.

23 THE COURT: -- if you think -- if Mr. Bennett wants to

24 say solvency is a sure thing here, it was triply a sure thing

25 there, because there were no meaningful tort-claim liabilities,

PG&E Corp., Pacific Gas and Electric Co.

1    except the discrete amounts that were dealt with separately.

2         MS. CATON:  Well, there certainly is a distinction

3    there --

4         THE COURT:  Yeah.

5         MS. CATON:  -- between -- on estimation and what

6    should happen with respect to the tort --

7         THE COURT:  Right.

8         MS. CATON:  -- claims, but I don't think that that

9    creates a difference between what should be really the pathway

10   that this Court should follow which is --

11        THE COURT:  No, but my question --

12        MS. CATON:  -- allow the debtors to file their plan

13   first, which hopefully will happen --

14        THE COURT:  -- was really --

15        MS. CATON:  -- in three weeks.

16        THE COURT:  -- to pin you down on what you mean, why

17   you concede that you don't want competition, but you don't want

18   somebody that's feathering its own nest.  Who else would

19   propose a plan but someone feathering their own nest?  I mean,

20   it would seem to me --

21        MS. CATON:  You're right.  We are all --

22        THE COURT:  -- it would seem to me, if you come in

23   unfeathered in your nest --

24        MS. CATON:  Sure.

25        THE COURT:  -- and propose a plan, they think you're

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  crazy.

2      MS. CATON:  But there's a difference -- I agree a

3  hundred percent.

4      THE COURT:  Okay.

5      MS. CATON:  And we're all economic stakeholders --

6      THE COURT:  Right.

7      MS. CATON:  -- other than -- other than the tort

8  claimants.

9      THE COURT:  Right.

10     MS. CATON:  But I will say that as people -- people

11  can look to feather their nests, and then they can look to make

12  a really plush, big nest.

13     THE COURT:  Yeah, we're taking our metaphor --

14     MS. CATON:  And we're trying to get people more into

15  settlement --

16     THE COURT:  Okay, gotcha.

17     MS. CATON:  -- a settlement mindset.

18     The last thing I'll have to say is that I -- while I

19  do not agree with the comments that Mr. Bennett made about

20  post-petition interest and how exactly that is calculated, and

21  I hope that Mr. Karotkin is not taking this to heart when he's

22  drafting his --

23     THE COURT:  But doesn't the Cardelucci case --

24     MS. CATON:  -- plan, but we'll see --

25     THE COURT:  -- doesn't Cardelucci tell us what the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    rule is?

2            MS. CATON:  I'll leave that for another day, Your

3    Honor.  But --

4            THE COURT:  Well, wait a minute.

5            MS. CATON:  -- what I would say --

6            THE COURT:  Wait, wait.

7            MS. CATON:  -- what I would say on that --

8            THE COURT:  Wait.

9            MS. CATON:  Yes.

10            THE COURT:  Is it good law in the Ninth Circuit?

11            MS. CATON:  I believe that there are cases -- I'm not

12    prepared to argue this today, Your Honor, but I believe that

13    there are --

14            THE COURT:  I happen to be a junior --

15            MS. CATON:  -- subsequent cases --

16            THE COURT:  -- officer in the Ninth Circuit, and I'm

17    bound to follow Ninth Circuit precedent.  So unless you think

18    that I can --

19            MS. CATON:  I will happily prepare papers on this and

20    submit it to Your Honor.

21            But what I would say is that we'll all have the

22    opportunity to see what the plan has, comment on it, and get

23    our own plans in.

24            THE COURT:  Okay.

25            MS. CATON:  Thank you, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Thank you.  Thank you, Ms. Caton.

2          So Ms. Dumas, are you the closing act here?

3          MR. SILVERSTEIN:  Your Honor --

4          THE COURT:  Oh.

5          MR. SILVERSTEIN -- Your Honor, it's Paul Silverstein

6   for Columbus Hill.  May I be heard very briefly?

7          THE COURT:  Yes.  Yes, sir.  Go ahead.

8          MR. SILVERSTEIN:  I appreciate that, Your Honor.  It's

9   Paul N. Silverstein from Hunton Andrews Kurth, cocounsel to

10  Columbus Hill Capital Management LP, which among other things,

11  owns a significant amount of shares -- of common shares of the

12  debtors.  I'll be very brief, as I said.

13         Columbus Hill filed objections to both motions to

14  terminate.  Columbus Hill also delivered to the debtors a

15  significant plan-funding commitment, which is among those

16  commitments discussed by Mr. Karotkin and Mr. Bennett.

17         The funding commitments would, we believe, provide

18  sufficient funding to confirm a Chapter 11 plan that pays and

19  reserves amounts sufficient to pay the wildfire victims'

20  allowed claims in full, as the plan must.

21         As the Court noted last Friday, and as discussed

22  today, the noteholders and all other claimants are unimpaired

23  and do not get to vote on a plan.  In fact --

24         THE COURT:  Well, they've got --

25         MR. SILVERSTEIN:  -- all creditor claims --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  -- wait a minute.

2          MR. SILVERSTEIN: -- should be --

3          THE COURT:  They get -- they don't get to vote, but

4   they are allowed to object.  Don't you agree?

5          MR. SILVERSTEIN:  They're allowed to object, but -- I

6   agree.

7          THE COURT:  Okay.

8          MR. SILVERSTEIN:  But they're unimpaired, they don't

9   have a vote.  And paramountly, Your Honor, the debtors are

10  solvent.  The present motions seek to terminate exclusivity for

11  alleged cause.  Movants have a burden of proof here and have

12  not established cause.  The two movants seek to purchase a

13  significant ownership stake in the reorganized debtors at very

14  material discounts to the detriment of existing stockholders,

15  yet those movants -- those unimpaired creditors will be paid in

16  full.

17          That's not what this process should be about.  And the

18  distractions are unnecessary and harmful.  The debtors'

19  existing stockholders are impaired and do get to vote to reject

20  a plan.  Moreover the debtors' stockholders have the right to

21  fund the debtors' Chapter 11 plan.

22          No one can seriously suggest, Your Honor, that the

23  debtors have not made progress -- material progress -- in these

24  cases, under these circumstances.  To state the obvious, these

25  are very large and very complex cases.  And again, the debtors

PG&E Corp., Pacific Gas and Electric Co.

1    are solvent.

2         The debtors are in a position to file, and subject to

3    a successful claims-estimation process and other conditions

4    precedent to any plan process here, to have the debtors' plan

5    confirmed.

6         THE COURT:  Okay, Mr. Silverstein, I've got to --

7         MR. SILVERSTEIN:  As we understand it --

8         THE COURT:  Mr. Silverstein, I have to move along.  So

9    go ahead and wrap up your position.

10        MR. SILVERSTEIN:  Yeah, let me -- let me wrap up.  My

11   point, Your Honor, is that the debtors have now said that

12   rather than September 26th, that September 9th -- that they

13   will file a plan before September 9th, and we believe that the

14   law is very clear and that Your Honor should respect the

15   debtors' exclusivity.  And I thank you for the time, Your

16   Honor.

17        THE COURT:  Okay, thank you, Mr. Silverstein.

18        Now, Ms. Dumas, are you going to speak as part of

19   the -- the time you've allocated or agreed with Mr. Karotkin,

20   right?

21        MS. DUMAS:  Yes, Your Honor, thank you.

22        THE COURT:  Good morning.

23        MS. DUMAS:  Good morning.  Cecily Dumas, Baker

24   Hostetler, on behalf of the official committee of tort

25   claimants.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    First, Your Honor, I want to acknowledge the comments

2    the Court made at the outset of the hearing.  I cannot -- I

3    cannot express adequately how much the constituents that my

4    firm represents appreciate the Court acknowledging their role

5    in these cases.

6    I come here, really -- although Mr. Karotkin was kind

7    enough to allow me time and the moving parties --

8    THE COURT:  I would have allowed you time --

9    MS. DUMAS:  -- did as well --

10   THE COURT:  -- I would have allowed it to you anyway.

11   Don't give him the credit.

12   MS. DUMAS:  Thank you, sir.  I mean, either side, for

13   or against the motions, would have offered the tort committee

14   time.

15   We come here more as a party seeking guidance from the

16   Court as opposed to taking a position.  With respect to --

17   THE COURT:  Well, that's what threw me off as I read

18   the papers.  And I'll let you answer, but I read:  don't break

19   exclusivity -- I mean, break exclusivity but don't go for this

20   one.  And I'm going, well, what do I do?  And I thought you

21   even indicated in your papers that you might be proposing a

22   plan.  But here we are.  So with that background --

23   MS. DUMAS:  But here we are, yes.

24   THE COURT:  -- what should I do?  What do you want me

25   to do for your client?

PG&E Corp., Pacific Gas and Electric Co.

1    MS. DUMAS:  Specifically, what we would like the Court

2    to do is ensure that whatever protocol gets adopted by the

3    Court takes into account the timing that may be associated with

4    what everyone has acknowledged are sort of the impediments to

5    finalizing a plan.

6    THE COURT:  No, but you -- your public filed position

7    is to oppose the motion by the bondholder.  Are you backing off

8    of that position or adhering to it?  Again, I'm not going to

9    make a decision --

10   MS. DUMAS:  No, no, no, Your Honor.  And --

11   THE COURT:  -- based upon your decision alone, but I'm

12   just trying to -- I want to make sure I go home and do my

13   homework, hearing for sure what your client wants.  So did I

14   read it wrong?  The opposition said don't let them do their

15   plan, open it up for everybody, and we might file one.  And

16   that didn't happen.  So what do you want me to do in terms of

17   today's motion?

18   MS. DUMAS:  In terms of today's motion, we believe

19   that the superseding, intervening event that caused the TCC to

20   consider that its position required refinement was the

21   enactment of AB1054.

22   THE COURT:  Okay.

23   MS. DUMAS:  I think none of the parties, when the

24   bondholders initially filed their motion, anticipated that the

25   legislature would give us a tight time frame.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      I said in court on the phone on Friday that that tight

2  time frame almost requires some sort of parallel process at

3  some point.

4           THE COURT:  Right.

5           MS. DUMAS:  How the Court designs is going to be a

6  challenging task, but we could suggest that there are two

7  points at which the parties may have more information that

8  would help any plan proponent propose a plan that's capable of

9  confirmation with respect to tort claims.  The first is October

10  21st, the bar date.

11          THE COURT:  Right.

12          MS. DUMAS:  All of the parties' current estimations or

13  current proposals are based on what we consider estimates by

14  advisors of what the aggregate claims may be, based on the

15  number of affected communities and neighborhoods.  That is

16  going to be different from the number of people who actually

17  file claims.

18          And the second gating event is what the Court will

19  consider tomorrow, and that is how and when is there an

20  estimate or determination of whether --

21          THE COURT:  Right.

22          MS. DUMAS:  -- Tubbs claims are included or not.  And

23  you've been told before that the -- there's a dramatic swing.

24  I think it's higher than fifty percent of the insurance claims,

25  and it's a little lower than fifty percent for victim claims --

PG&E Corp., Pacific Gas and Electric Co.

1    and my apologies to Mr. Feldman if I had that wrong -- but --

2            THE COURT:  And I don't need it precisely.

3            MS. DUMAS:  -- the idea is  --

4            THE COURT:  It's a huge swing.

5            MS. DUMAS:  It's a huge swing.

6            THE COURT:  It's a huge delta.  Okay.

7            MS. DUMAS:  So whereas we believe that in a normal

8    circumstance the TCC would like to give the debtor the first

9    opportunity to establish for the Court what it proposes to do

10   in its case, and I think none of the parties, right now, have

11   access to what the debtors' business plan going forward may

12   look like, and --

13           THE COURT:  Well, no, that's right.

14           MS. DUMAS:  -- when it's --

15           THE COURT:  We just saw it yesterday.  But --

16           MS. DUMAS:  With the underlying details, the

17   assumptions that -- so each party can extrapolate what their

18   advisors believe to be the total enterprise value at

19   confirmation.  There are a number of moving items.

20           Suffice to say, we believe the current bondholder

21   proposal on the table is infirm because of the cap-trust (ph.)

22   question that we addressed before.

23           We would like to make the point that if the Court is

24   inclined to give parties an equal head start at the gate, that

25   the ad hoc subrogation claimholders be included in that.

PG&E Corp., Pacific Gas and Electric Co.

1     What we are drawing from this process is that there

2  are a lot of hedge funds and private equity firms that would

3  like to own this company.  And that's all good news.

4          THE COURT:  Um-hum.

5          MS. DUMAS:  And obviously for being a ratepayer, a

6  member of the community, and a representative of tort

7  claimants, all of whom are also members of communities served

8  by PG&E, as well as victims of the fires, we would like to see

9  the strongest PG&E go forward.

10         We don't think that we're remotely in a position to

11 have the full, complete information, for the two reasons we've

12 described.

13         THE COURT:  Okay.  But I appreciate that you and your

14 clients and your advisors, everything is very, very fluid.

15 That's true for all of us.  But sticking with the traditional

16 rules, I have to prepare by what people file.

17         So if I counted votes before you started speaking, I

18 would say that the TCC didn't weigh in at all on the

19 subrogation plan.  So that says something.  They filed an

20 opposition to the bondholders' plan but said but let everybody

21 file.  So now again, I want to know what the committee's view,

22 speaking through you, is my choices?

23         So then let's review it.  Deny the motions, both

24 motions, and let the debtor go forward on the track that Mr.

25 Karotkin described; grant one or both motions, which means

PG&E Corp., Pacific Gas and Electric Co.

1   bondholder file or subrogation committee file or both.  Those

2   are my only choices at the moment.

3        So I have to make a decision based upon all the

4   factors.  But I want the best judgment you are willing to give

5   me or are able to give me as to what your clients want.  Not

6   that they'll make the call.  I have to make the call.  But can

7   you say it?  And if you're uncomfortable or unable to, I will

8   respect that too.  But tell me whether you -- whether you can

9   make a position:  choice one, choice two, choice three, or none

10  of the above?  And I'll deal with it.

11       MS. DUMAS:  Yes, Your Honor.  We believe that -- so to

12  put it bluntly, the tort committee believes that the Court's

13  guidance, which it will give tomorrow or shortly thereafter,

14  will present the first opportunity for all of the prospective

15  plan proponents, including the debtor, to understand what the

16  real landscape may look like.  So --

17       THE COURT:  Well, I don't -- I'll do my best.  But

18  okay, if you'd like to defer on that, I'll --

19       MS. DUMAS:  Yeah.

20       THE COURT:  -- respect that too.

21       MS. DUMAS:  We're --

22       THE COURT:  I mean, my hope was that I would absorb

23  everything we talked about today and everything we're talking

24  about tomorrow.  And whether I'm able to do it tomorrow or the

25  next day or the next day, as soon as I sort of can put it all

PG&E Corp., Pacific Gas and Electric Co.

1    together, give my best judgment -- it's only my judgment, but

2    that's my job right now.

3            So and if you believe that the tort committee -- and

4    the tort-committee victims are why we're here.  They don't make

5    the rules, but they're certainly important to my thinking and

6    yours.  And if you're better off sort of talking to your

7    clients and polling the committee and getting their view after,

8    at least, the discussions, then I will respect that.

9            I can't -- unfortunately, I don't think I can sort of

10   peel off my rulings, one at a time.  I mean, I don't think that

11   would be fair.  I mean, I think I owe it to the parties -- as

12   they say, you know and every experienced lawyer knows, worse

13   than a judge who makes the wrong decision is a judge who

14   doesn't make any decision.

15           So I will do my best to make a decision on all three

16   of those big questions as quickly as I can.

17           MS. DUMAS:  We understand --

18           THE COURT:  And I'll ask you --

19           MS. DUMAS:  --Your Honor.

20           THE COURT:  -- to give me your view on the --

21           MS. DUMAS:  So our --

22           THE COURT:  -- today's question after tomorrow.

23           MS. DUMAS:  -- our view on today's question is we are

24   balancing two competing interests.

25           THE COURT:  Right.

PG&E Corp., Pacific Gas and Electric Co.

1    MS. DUMAS:  One, as a practical matter, the tort

2 committee doesn't believe that any plan proponent can propose a

3 credible plan without more information, which is not going to

4 be forthcoming until the bar date, at the earliest, and more

5 importantly, how the Tubbs claim is estimated.

6    On the other hand -- and this is your difficult -- on

7 the other hand, the legislature has said:  get this process

8 done, and competition is --

9    THE COURT:  Well --

10    MS. DUMAS:  -- and competition is something that may

11 accomplish that to move forward --

12    THE COURT:  Right.

13    MS. DUMAS:  -- more quickly.

14    THE COURT:  Right.

15    MS. DUMAS:  Having said that, we have -- from based on

16 what we've seen, none of the opening bids are ones that we

17 believe are ones with which the tort claimants can currently

18 engage in negotiations for those two --

19    THE COURT:  Okay.  Okay.

20    MS. DUMAS:  -- for those two --

21    THE COURT:  Well, I mean, if we could somehow

22 magically answer the question of the estimation in the Tubbs

23 fires issue -- whether it's favorable or unfavorable to your

24 client.  It seems to me, what you're telling me is that after

25 that decision is rendered by whomever renders it, you're and

(9277a75538afb3ba) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    your clients are in a better position to pick, to roll the dice

2    with whatever your choices are at the time.  And today, you

3    don't know what the choices are because you don't know what the

4    consequences are.  That's what we're all dealing with and --

5              MS. DUMAS:  That's fair enough.  I mean with respect

6    to --

7              THE COURT:  -- but in effect, you could do that if

8    there were three plans on the table or two or only one.

9              MS. DUMAS:  That's right.

10             THE COURT:  But I understand.  Let's not worry about

11   it, and you --

12             MS. DUMAS:  That's right, Your Honor.  I mean, we

13   could make progress on some of the other aspects of the

14   proposed plans that -- to which Mr. Bennett made an eloquent

15   argument.

16             THE COURT:  Right.

17             MS. DUMAS:  We haven't heard from the subrogation

18   claimholders as to what their planned contours are, and I

19   barely had a chance to study the debtors'.  But with respect to

20   my parochial part of the case, I think the tort-claimants

21   committee will not be in a position to have meaningful

22   negotiations with any planned proponent until some of these

23   threshold issues are --

24             THE COURT:  Okay.

25             MS. DUMAS:  -- at least telegraphed by ACRT.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  I got you.  Okay.  Thank you, Ms. Dumas.

2      MS. DUMAS:  Thank you, Your Honor.

3      THE COURT:  Let me make one brief announcement, I --

4  we're running late, but the time here -- the time is important,

5  and I promised the bondholder committee fifteen minutes to make

6  their closing arguments.  And I'd like to do that.  But then

7  I'll take a break for everyone's convenience.

8      I promised the subrogation group a similar time, and I

9  will stick to that.  But I also recognize that maybe the same

10  kinds of arguments are going to be made.  So I don't want to --

11  or as you plan what we're going to do coming up, think about

12  whether and avoid making the same arguments.

13      I think I got the point of the arguments from,

14  certainly from the debtor, and certainly from Mr. Bennett, and

15  the other equity-type people.  So when we hear from -- I mean,

16  when I take the break, and there's time to talk about the

17  subrogation bond committee -- I mean, excuse me, subrogation

18  plan proposal, maybe we can be more specific about how to focus

19  it.

20      So Mr. Qureshi, do you want to take your final fifteen

21  minutes, and then we'll take a break?

22      MR. QURESHI:  Thank you, Your Honor.  Yes.  I will

23  cede five minutes to Mr. Dunne.

24      Your Honor, I don't have time in my ten minutes to

25  respond to all of the points that have been raised, so I'll

PG&E Corp., Pacific Gas and Electric Co.

1    take the high ones, and let me take them in reverse order.

2         And start with I -- what I think, Your Honor, I

3    discerned from Ms. Dumas' comments.  And that is, they don't

4    like the opening bids which I take to mean they favor

5    competition, because when there is competition, those bids are

6    only going to go one place, and that is they're going to get

7    better.

8         Your Honor, on to Mr. Bennett's comments.  Post-

9    petition interest.  Your Honor, again, we believe that there is

10   case law, and of course we are aware of Cardelucci.  But we

11   believe that there are theories consistent with Cardelucci that

12   will, in a solvent debtor case, where the bondholders are

13   impaired and are not getting contract rate interest where they

14   are entitled to vote, that there can be an entitlement to post-

15   petition contract rate interest.  And Your Honor, Mr. Dunne is

16   going to address that point in more detail.

17        Mr. Bennett also raised the question about are the

18   bondholders under our proposal getting more than par plus

19   accrued as a result of a speculative argument as to how the new

20   secured notes might trade in the marketplace.  And that

21   argument is exactly that, Your Honor.  It is entirely

22   speculative.  We don't know how those notes might trade in the

23   marketplace following the debtor's emergence from Chapter 11.

24   What we do know is that there is actual impairment.

25        Last point, Your Honor, the valuation of the equity.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  Your Honor, the fundamental tenant of our process here and why

2  we're seeking to terminate again, is we think competition is a

3  good thing.  What we know is that this company needs at least

4  thirty billion dollars in capital to get out of bankruptcy.

5  And our group is prepared to provide that capital.  The exact

6  terms, Your Honor, under which that capital may ultimately be

7  provided will be dictated by the market, and will be dictated

8  by the market critically, Your Honor, if a competitive process

9  is allowed to unfold.  And what Your Honor did not hear from

10  Mr. Bennett is why competition would be a bad thing.

11          Your Honor, again, the court standard that was

12  articulated in the first case, credible and possibly

13  confirmable.  And we certainly think we need that.

14          Now, Your Honor, if I can go back to Mr. Karotkin's

15  points.  And the first is: three weeks, no big deal.  Why don't

16  we wait until September the 9th to see if the debtors can get

17  there?  Your Honor, it's just not fair to require that kind of

18  a delay.  And more importantly, I think it can cause critical

19  harm to the process.  Your Honor, we are presently prohibited

20  from soliciting support for our plan term sheet.  So it's

21  convenient for Mr. Karotkin to stand up and --

22          THE COURT:  Wait.  Say that again.  You're -- what

23  prevents you from what -- you're not prohibited from talking to

24  people.

25          MR. QURESHI:  No, not from talking to people.  But the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    debtors do still have --

2         THE COURT:  So what are you prohibited from doing?

3         MR. QURESHI:  -- exclusivity.  So there are some

4    limits on our ability to solicit support.  And therefore, it's

5    convenient for Mr. Karotkin to criticize us for not having

6    developed consensus ourselves.  Well, we have developed one

7    very important consensus, Your Honor, and that is a broad

8    agreement among everybody except the folks at that table, that

9    competition is a good thing and that there should be multiple

10   alternatives pursued here.

11        But Your Honor, letting the debtors be the only party

12   that -- even for the next three weeks -- are permitted to

13   negotiate with the fire victims here, we believe that is doing

14   a disservice to those victims.  The best treatment for them is,

15   again, going to result from a competitive process.  So

16   requiring us and our thirty-one billion dollars of capital to

17   stand down -- even for three weeks -- Your Honor, we think does

18   harm to the process.

19        Now, Your Honor, let me talk about progress that has

20   been made, and in particular, about Mr. Karotkin's touting of

21   the public entity settlement.  And Your Honor, I'll note in

22   that context that when Mr. Karotkin referred to the debtors as

23   an honest broker, Your Honor heard it, there was out-loud

24   laughter in this courtroom.  And that's for a reason.

25        THE COURT:  Well, the debtor has taken its share of

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    criticism --

2            MR. QURESHI:  Sure.

3            THE COURT:  -- and some of it, perhaps, justly earned.

4            MR. QURESHI:  Well, let's look at a provision of the

5    public entity settlement also related to Mr. Bennett's points.

6    Your Honor, that settlement, first of all, like everything in

7    this case, negotiated under a cloak of secrecy.  As far as we

8    are aware, none of the creditors knew about it until an 8-K was

9    filed.

10           THE COURT:  Well, did they -- was that improper?

11           MR. QURESHI:  Well, it depends.  It -- if --

12           THE COURT:  Doesn't seem improper to me.

13           MR. QURESHI:  -- the debtor -- if the debtor is trying

14   to build consensus to forge good relationships with its

15   creditors, so that it can make progress towards consensus, then

16   yes, that's not the way to get to consensus, Your Honor.  And

17   that's the problem.

18           THE COURT:  But I don't understand.  They got

19   consensus from one billion-dollar creditor.

20           MR. QURESHI:  So here's my point.  And in the

21   settlement agreement that Your Honor has not yet seen, because

22   it is yet presented for approval --

23           THE COURT:  I heard the element that I think you're

24   going to focus on, but --

25           MR. QURESHI:  Correct.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  -- say what you were going to say.

2        MR. QURESHI:  Binding the public entities to vote

3 against any other plan, even if -- like ours -- that other plan

4 is prepared to respect the settlement.

5        THE COURT:  What --

6        MR. QURESHI:  We have a billion dollars, and we'll

7 give it to them --

8        THE COURT:  And what are the consequences of a public

9 entity voting for another plan?

10       MR. QURESHI:  Well --

11       THE COURT:  They go to jail?  I mean, they lose the

12 benefit of the debtor's money, but what are the consequences?

13       MR. QURESHI:  The point, Your Honor, is that what the

14 debtor is trying to do is to prevent anybody else from making

15 progress towards a plan by inserting blatantly anticompetitive

16 provisions like that into settlement agreements.

17       How does it serve the estate to try to bind the public

18 entities to say, you can only take one billion dollars of our

19 money, but you have to oppose any other plan that's going to

20 give you that.  We don't think that that conduct is

21 appropriate.

22       So why are the debtors not an honest broker that

23 anybody in this courtroom -- on at least our side -- have

24 confidence in?  Your Honor, every party that filed a pleading,

25 whether for or against our motion to terminate exclusivity,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    they all said one thing:  the debtors won't talk to us.  That

2    is a common thread.

3             THE COURT:  Yeah, I hear what you're saying.

4             MR. QURESHI:  And that is very critical in this

5    context.  So three more weeks, Your Honor, of the debtor going

6    off on their own and doing whatever they want to do with the

7    equity holders that are in control of them, they should go and

8    do that.  But it should not be to the exclusion of the ad hoc

9    committee having the opportunity to go ahead with its own term

10   sheet and to try to forge consensus.  And --

11            THE COURT:  Okay.

12            MR. QURESHI:   -- with that, unless the Court has

13   other questions --

14            THE COURT:  No, no other questions.

15            MR. QURESHI:  -- I will turn it over to Mr. Dunne.

16            THE COURT:  Thank you, Mr. Qureshi.

17            Mr. Dunne, you're the closer on the morning act.

18            MR. DUNNE:  Yeah.  I don't know if my fastball still

19   has the requisite heat on it, but --

20            THE COURT:  Well, I can come up with another metaphor,

21   if you'd like.

22            MR. DUNNE:  The -- for the record, Dennis Dunne from

23   Milbank on behalf of the Official Creditors' Committee.

24            A few points, Your Honor.  I'm just going to address

25   the argument that you heard from Mr. Karotkin and Mr. Bennett.

PG&E Corp., Pacific Gas and Electric Co.

1   There was a lot of focus on whether or not the ad hoc

2   bondholder plan was patently unconfirmable, a couple points

3   there.

4          One is that's a disclosure statement objection, and we

5   can deal with those, because as I said before, I suspect you're

6   either going to find that the plan that's before you at that

7   time addresses those concerns, has been amended.  Or maybe

8   they'll convince Your Honor that it's not patently

9   unconfirmable.  But it's not an issue for today, and I'll come

10  back to how we see what we think the issue should be.

11         And plus, it's not asymmetrical.  There will be issues

12  on the other side of the fence with respect to the equity plan.

13  And I guess this is where I'm supposed to deal with Cardelucci

14  as an example of that where they said that they're bound to

15  provide us with a federal judgement rate.  I agree with Your

16  Honor that Cardelucci is binding.  It's completely irrelevant.

17         Why?  Because that dealt with two individual creditors

18  within a class who were impaired.  So let me deal with this

19  twice to get to why it's irrelevant.  They've said they're not

20  going to impair us.  They're going to unimpair us.  If you want

21  to impair us, the best interest test in a 1129(a)(7) doesn't

22  apply.  The lead in says, "with respect to impaired creditors".

23  If we're unimpaired, we deal with 1124, and what does it mean

24  to unpair you?

25         And we can debate that.  But you know what Cardelucci

PG&E Corp., Pacific Gas and Electric Co.

1    doesn't talk about -- is how you unimpair a creditor.

2         THE COURT:  I know, but Alan J. Anaheim (ph.) gives us

3    some guidance, too.  Doesn't he?

4         MR. DUNNE:  And then if --

5         THE COURT:  Right?

6         MR. DUNNE:  Yes.  And if they do impair us, to get

7    within Cardelucci, what's different there was a) they were

8    actually judgement creditors in Cardelucci, and they didn't

9    have the class, meaning if the entire bondholder class votes

10   down this plan, then there's another prong for how you get

11   post-petition interest which is 1129B, and the "fair and

12   equitable" test.

13        And there's lots of cases on that.  Cardelucci doesn't

14   get there.

15        THE COURT:  And I --

16        MR. DUNNE:  No, it's just an example.  It's never is

17   clear as people say -- that's all I'm saying.

18        THE COURT:  I know.

19        MR. DUNNE:  People want to make it clear and

20   categorical --

21        THE COURT:  And I don't want to turn this hearing on

22   that element of conflict --

23        MR. DUNNE:  Right.  And I don't either, Judge, I just

24   want to make the point that it's not that simple.  It's not

25   that simple.  And we know how to deal with the bankruptcy

of 190
(9774706290) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    issues; it's for another day.

2            So let's not say one party's suite of bankruptcy

3    issues condemn them to never getting out of the gates and the

4    other's allow them to move forward.  That's all I'm saying.

5            We heard Mr. Karotkin say that the case should be, I

6    think, quote, sequenced in a -- in the classic way.  I would

7    agree with that, but for the legislation in AB1054, I think,

8    upended the classic time line.  It just renders the conventions

9    and sequencing too risky.

10           To manage June 30th, the best way forward is multiple

11   plans.  Why?  The risk of having one plan fall down at

12   confirmation is mitigated, Your Honor, by having multiple plans

13   under consideration at confirmation.

14           When we -- the Official Committee -- have been

15   analyzing this issue, we've been less focused on whether in

16   order to allow a plan to go forward, it's patently

17   unconfirmable.  For as I said, we know how and when to deal

18   with those issues.  The UCC's been more focused on financial

19   wherewithal and whether the plan proponents have committed

20   financing that could potentially be within the range of

21   acceptable outcomes for the wildfire victims.  That's going to

22   be the ultimate key to raise that and estimate that.

23           The ad hoc has committed capital in their proposal of

24   thirty billion, the Equity Committee at thirteen and counting.

25   You'll hear my views on the subrogation after the break,

PG&E Corp., Pacific Gas and Electric Co.

1    because I think that is exactly the inflection point.  But

2    that's what we should be trying to solve for is maximizing

3    plans that have the potential for confirmability because

4    there's requisite financial wherewithal and capital behind

5    them.

6            THE COURT:  Okay.

7            MR. DUNNE:  The a --

8            THE COURT:  I mean, I'm not stopping you, but --

9            MR. DUNNE:  Okay, one last point, Your Honor.

10           THE COURT:  -- I'm almost stopping you.

11           MR. DUNNE:  Yeah.  Right.  Exactly.  One last point.

12   The debtors said, three weeks wouldn't prejudice anyone.  Two

13   points on that.  I'd view it more as six weeks, because we were

14   here on July 24th, and we had the delay for the protocol, and

15   now it's another three weeks.  So we're talking about a month-

16   and-a-half closer to the June 30th deadline.  And as you heard

17   from Mr. Kornberg, the CPUC believes that deadline in fact --

18   in practice -- is more like January to get something done.

19           THE COURT:  Well, I -- I heard that.

20           MR. DUNNE:  I think we need to get going, here, Your

21   Honor.  And my last point:  the question before the Court today

22   is not the validity of the bondholder's proposal; the question

23   is whether exclusivity should be terminated at this time.  And

24   we believe -- the Committee believes -- it's warranted because

25   it's in the interest of a timely, fair, and viable emergence by

(977) 406-1290 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    the legislatively imposed deadline.

2            Thank you.

3            THE COURT:  Okay.  Thank you, Mr. Dunne.

4            All right, the motion, the bondholder group motion for

5    exclusivity, re-exclusivity is submitted.  I need -- before we

6    take a break, I need to ask is Mr. Feldman here in court or on

7    the phone or --

8            MR. FELDMAN:  Yes, Your Honor.  I'm here.

9            THE COURT:  Yeah, and Mr. Karotkin and the Committee

10   counsel, can you -- do you think you need the whole allocation,

11   and if so do you want to take a longer break, shorter break?

12   Tell me what your preference is.

13           Mr. Feldman, let me start with you.  You're the

14   counsel for the moving party.  What do want to do as --

15           MR. FELDMAN:  Good morning, Your Honor.

16           THE COURT:  We're going to take a break in moments,

17   but what do you want to do after that?

18           MR. FELDMAN:  So for the record, though, Matthew

19   Feldman on behalf of the ad hoc group of subrogation claimants.

20           Your Honor, I don't believe that I will use the full

21   thirty minutes in opening.  I don't have anybody opening with

22   me, so I believe I need twenty minutes.

23           THE COURT:  Twenty minutes.

24           MR. FELDMAN:  I suspect that the responses -- they can

25   comment for themselves -- will be quicker since we're not going

PG&E Corp., Pacific Gas and Electric Co.

1   to just repeat everything.

2         THE COURT:  Yeah.  Well, I want them to be quicker.

3   Not that they're not important -- I don't need to hear it

4   twice.

5         MR. FELDMAN:  Yeah.  I'd like to have the full fifteen

6   minutes to respond, but I may not use it.

7         THE COURT:  Mr. Karotkin, how about you?  Do you need

8   more than a little bit -- I mean, I'm just trying to keep

9   people's schedules so I can make sure who can go and who stay.

10   What's your --

11         MR. KAROTKIN:  We will not need the entire time.

12         THE COURT:  You think -- you think fifteen or twenty

13   minutes is enough?

14         MR. KAROTKIN:  Yes, sir.

15         THE COURT:  And for the Committee, Mr. Dunne?

16         MR. DUNNE:  Two minutes.

17         THE COURT:  Two.  Ms. Dumas?

18         MS. DUMAS:  Two minutes, Your Honor.

19         THE COURT:  Okay.  All right.  Let's do this then, I'm

20   going to -- and I'm not cutting off any other counsel on the

21   phone or in the courtroom from speaking, but again, I will take

22   a "me, too" and I'll take the representation that, I said it

23   before and I'll say it again.

24         So what I'm going to do is take a break for about

25   fifteen or twenty minutes, and then we will resume the hearing

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    and I'll call the subrogation-group motion.  And I'll ask Mr.

2    Feldman to take twenty minutes or so and the other side.

3    Again, I'm not going to be precise about it.  My guess is we'll

4    take the whole thing in about forty to fifty minutes.  So

5    that'll be the plan.

6         All right.  Thank you for all your time.  Fifteen-

7    minute break.

8         (Recess from 11:31 a.m., until 11:50 a.m.)

9         THE CLERK:  All rise.

10        THE COURT:  Please remain seated.  Let me make one

11   announcement that I put in the written order for -- that I

12   issued yesterday about tomorrow.  We have no ability to control

13   the space, and so I expect we'll be fairly crowded tomorrow,

14   but we don't have the overflow courtroom tomorrow.  So I'll

15   just have to ask everybody to be cooperative.

16        I don't think we have many more chairs, but I don't

17   mind if lawyers come here and sit on the floor or do anything

18   else.  I want to accommodate everybody.  We just don't have the

19   ability to kind of deal with the overflow crowd if we don't

20   have Judge Blumenstiel's courtroom next door, and we don't

21   because she's got something going on in her courtroom.  So

22   sorry about the problem.

23        Okay.  So on the subrogation group's motion for

24   exclusivity, Mr. Feldman, I believe you're up, and I'll repeat

25   not for you, but for your opponents that to the extent that

PG&E Corp., Pacific Gas and Electric Co.

1   there are the same arguments that are -- been made in

2   connection with the bondholder group, I'll treat them as the

3   same.

4           MR. FELDMAN:  Your Honor, one correction from what I

5   said previously, Mr. Engle, who represents TCA, would like to

6   stand in support of our motion to terminate exclusivity.  So I

7   will cut my time down to eighteen minutes, and I will cede the

8   podium at the end for two minutes.

9           THE COURT:  He hasn't filed anything in support of

10  your motion, has he?

11          MR. FELDMAN:  Not that I'm --

12          MR. ENGLE:  Yes, he has, Your Honor.

13          THE COURT:  Only in the last twelve hours.

14          MR. ENGLE:  No, no, no.  Your Honor, we -- we --

15          THE COURT:  Okay.  All right.  I'll take you, Mr.

16  Engle.  You're a veteran, anyway.  I have to let you speak.

17          Okay, Mr. Feldman.

18          MR. FELDMAN:  Your Honor, for the record, again,

19  Matthew Feldman from Willkie Farr & Gallagher, here on behalf

20  of the ad hoc group of subrogation claims.

21          Your Honor, I think some of the Court's earlier

22  comments are worthy of noting.  We are one of the two classes

23  that will undoubtedly be impaired under a plan without having

24  to come up with a way to make us impaired.

25          Just so the Court is aware and for the record, the ad

PG&E Corp., Pacific Gas and Electric Co.

1   hoc group is comprised of more the 110 insurance carriers and

2   other holders of subrogation claims related to both the 2017

3   and 2018 wildfires.  And they hold somewhere between 98 and 100

4   percent of the total subrogation claims.

5         The only parties who have actually paid wildfire

6   victims are the insurance companies that are in my group, Your

7   Honor.  The ad hoc group is governed by a steering committee of

8   the eleven largest holders of subrogation claims who

9   collectively hold more than eighty-five percent of the total

10  subrogation claims.

11        There is, in addition to the eleven holders of claims,

12  an ex officio member which is the California Insurance

13  Guarantee Association which is charged with overseeing and

14  liquidating failed insurers, including at least one corporate

15  victim of PG&E's wildfire history.

16        Your Honor, there really are two goals in this case.

17  To receive a full and fair discovery -- I'm sorry -- recovery

18  on our claims; and to pay in full a fair amount to the wildfire

19  victims.  That has always been a driving force for the

20  insurance carriers on behalf of the subrogation claimants.

21        THE COURT:  Would you clarify something for me that's

22  probably more appropriate for tomorrow, but I should know this.

23  The subrogation claims only cover property damage and related

24  matters, right?

25        MR. FELDMAN:  That is correct, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  They do not cover any personal injury,

2  wrongful death, or emotional distress type stuff.  It's if you

3  lost a car, or house, or property, that's what your clients are

4  on the hook for.

5    MR. FELDMAN:  It is property.

6    THE COURT:  Yeah.

7    MR. FELDMAN:  I think there are arguments about how

8  broad the definition of property is.

9    THE COURT:  No.  I --

10    MR. FELDMAN:  I don't want to -- I don't want to go

11  down that path.

12    THE COURT:  I don't either.

13    MR. FELDMAN:  But it is property.

14    THE COURT:  And the other question is, what happens if

15  the Tubbs fire outcome comes out the way PG&E wants it?  What

16  happens to your claims?  I'm not -- I don't say they disappear,

17  but I -- just tell me what happens to them vis-a-vis the case

18  here.

19    MR. FELDMAN:  If the Court were to determine that PG&E

20  did not cause and had no liability with respect to Tubbs, there

21  would not be claims -- subrogation claims in connection with --

22    THE COURT:  And your clients just absorb the loss and

23  look for somebody else to pay them?

24    MR. FELDMAN:  We absorb the loss or look -- or look

25  for other people to sue.  That's correct, Your Honor.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Okay, that's what I thought, but I wanted

2   to clarify.

3      MR. FELDMAN:  I'm not sure, honestly, there are other

4   people, but I don't want to preclude that possibility.

5      THE COURT:  I -- again, I'm not -- I just want to make

6   sure I got the lay of the land correctly on it.

7      MR. FELDMAN:  Your Honor, as the Court's aware,

8   section 1121 which governs exclusivity provides a very broad

9   discretion to the Court.  And I am going to reference Dow

10  Corning, which I think is really the most important written

11  decision on the termination or modification of exclusivity.

12      The Dow Corning court, as this Court is aware,

13  considered nine factors, but the court was very clear in

14  saying, you don't total those factors up in making a

15  determination.

16      THE COURT:  It's not a baseball score.

17      MR. FELDMAN:  It's not a baseball score.  It's not a

18  five-four we win/we lose.  And in fact, what the court said,

19  and I'm going to quote the court, because I think it's exactly

20  what's before Your Honor today, "When the Court is determining

21  whether to terminate exclusivity, the primary consideration

22  should be whether or not doing so would facilitate moving these

23  cases forward."

24      I think Your Honor said it this morning in your own

25  words, how will it make the ball move forward?  How will

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    terminating exclusivity make the ball move forward?  I will

2    adopt to a degree, but from our perspective, something that the

3    bondholders said, and in my view, and I think in our view, and

4    I think, frankly, it's obvious to the Court, that the Court's

5    comments at the May 22nd, 2009, hearing to consider extending

6    the Court's -- the debtor's exclusive periods, where the Court

7    stated it would consider modifying exclusivity if a party came

8    forward with a plan that is credible and potentially

9    confirmable.  Which we view as financeable.

10        THE COURT:  Well, as I said this morning, those are

11   not terms of art as the way I used them.

12        MR. FELDMAN:  Understood.  Not terms of art.  In fact,

13   has spawned, not just what is before Your Honor and has

14   occurred in the courtroom, but it also -- what is happening

15   outside the courtroom.  Each of which is very, very important.

16        In response to the -- in response, on June 25th, the

17   bondholder group filed a terms sheet for its plan.  In response

18   to that terms sheet, on July 18th, my clients, the ad hoc group

19   of subrogation claims filed their terms sheet for a plan.  And

20   in response to these filings, Your Honor, the lines of

21   communication, unlike the bonds where they're waiting for the

22   phones to ring, my phone has been ringing off the hook.

23        We have been -- I'm not obviously going to get into

24   the substance, but the impetus and the risk of the loss of

25   exclusivity, in our opinion, has brought forth significant

PG&E Corp., Pacific Gas and Electric Co.

1   progress in the cases.  Both in conversations with the company

2   but also in conversations with the TCC, who we are working on a

3   very collaborative basis with as the Court will hear tomorrow

4   on the estimation --

5          THE COURT:  Well, I'd assume that that's -- I mean, I

6   assume that's true.  Anytime somebody suggests something might

7   happen, people react sometimes.

8          MR. FELDMAN:  But the opposite is true as well, Your

9   Honor.  If the Court were not to terminate exclusivity, and the

10  Court were to send everybody away, inevitably -- maybe in part

11  also because we're at the end of August -- but inevitably,

12  everybody would scurry back to their respective holes and hide

13  out while we're waiting for a debtor plan.

14         That cannot be good for what we need to happen in

15  these cases.  What has to happen in these cases is that the

16  dialogue needs to continue, consensual progress -- if

17  possible -- needs to be made, and ultimately, if consensual

18  progress can't be made, the cases need to be put on a time line

19  as I know the Court is undoubtedly aware.

20         THE COURT:  Well, you don't question what Mr. Karotkin

21  has told us about what's now on their time line, their

22  February -- I mean September 9 target.

23         MR. FELDMAN:  No, we're -- we welcome that

24  development, Your Honor.

25         THE COURT:  Of course.  Right.  Right.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. FELDMAN:  In fact, I didn't have a lot of time

2  last night to study what got filed --

3      THE COURT:  Neither did I.

4      MR. FELDMAN:  I suffered from your problem last night.

5  But in fairness, we have every intention of looking at that and

6  seeing whether there's not a way to marry what we want to

7  accomplish with what they want to accomplish.

8      THE COURT:  What do I make of the fact -- and you'll

9  tell me nothing -- but make of the fact that not a single party

10 filed a support for your position, unless I missed Mr. Engle's

11 filing on the subject?  Because I looked at the bondholder's

12 motion, and I kind of have a box score of how parties lined up.

13 And I've got everybody lined up against you.  And nobody on

14 your side.

15      Now again, that's not -- that's not going to govern

16 how I rule, but what do I make of it?

17      MR. FELDMAN:  Yeah, I think it's actually quite

18 straightforward.  Our plan, Your Honor, which I know the

19 Court's read, so I'm not going to go into too much detail with

20 it, you know, purports to set a claim value for our group --

21      THE COURT:  Right.

22      MR. FELDMAN:  -- provide value to the tort victims,

23 and it does it without needing that outside financing --

24      THE COURT:  No --

25      MR. FELDMAN:  -- largely.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT: -- I understand.

2    MR. FELDMAN: Because we're able to convert our debt

3 to equity.

4    THE COURT: Right.

5    MR. FELDMAN: So we can't attract the bondholders,

6 because they can't make money off us. We can't attract the

7 shareholders because -- although ultimately, I think we will

8 attract the shareholders because there is a small amount of

9 capital needed, and we'd be happy to get it from the --

10    THE COURT: Well, you gave them a --

11    MR. FELDMAN: -- shareholders.

12    THE COURT: -- right to opt in on some of it, right?

13    MR. FELDMAN: They do, as a matter of fact. That's

14 exactly right. But the reality is our claims are important

15 claims that need to be determined and liquidated, as do the

16 tort victims, and we are at levels, as are the tort victims,

17 that just make the company unattractive for other parties to

18 join in support.

19    THE COURT: But I mean, what do you think happens if,

20 one way or the other, the Tubbs fire or the terminating of the

21 Court, or a court determines that PG&E is culpable on Tubbs,

22 and the inverse condemnation rule stays written, what happens

23 to these plan proposals?

24    MR. FELDMAN: Yeah. I think one of two things

25 happens, Your Honor. In the first instance, depending on what

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    those claims actually look like, what the amounts are, which is

2    the second component.  Not just --

3             THE COURT:  Yeah.

4             MR. FELDMAN:  -- liability, but how much is actually

5    owed.

6             THE COURT:  Right.  Well, that's the --

7             MR. FELDMAN:  Yeah.

8             THE COURT:  -- critical question.

9             MR. FELDMAN:  If the company turns out to be solvent

10   at the end of that, which we believe it would be, then nothing

11   different happens.  Then the case goes forward, and those

12   claims get paid as they are supposed to be.  And unfortunately,

13   for Mr. Bennett's clients, the equity gets diluted and recovers

14   less.

15            THE COURT:  That's what you get for being equity,

16   right?

17            MR. FELDMAN:  That's the way the Bankruptcy Code

18   works; that's the way the capital markets work.

19            If in contrast, Your Honor, you were to come in, the

20   claims were to come in at a level that made the company

21   insolvent, then we're back to the drawing board in a way

22   because --

23            THE COURT:  Right.

24            MR. FELDMAN:  -- everything that Mr. Dunne has said,

25   and everything that the bonds have said, and everything that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  Mr. Karotkin and Mr. Bennett have said about solvency would

2  require the case to reset, and people would have to come to an

3  agreement again.

4         And I think, candidly, I think the Governor, and the

5  CPUC, and the legislature would have to take another look at

6  their deadlines.

7         THE COURT:  Yes.  I would think so, too.

8         MR. FELDMAN:  Your Honor, our plan does provide

9  significant benefits to all parties in the case.  It does

10 provide for the full and fair payment of allowed wildfire

11 claims out of a well-funded trust, and I want to comment on

12 some of the blanks on our term sheet in a moment.

13        THE COURT:  Yeah.  I think that's one of the most

14 impressive criticisms of your plan in the oppositions.  I think

15 the creditors' committee --

16        MR. FELDMAN:  Can I strongly disagree?  It's the most

17 unimpressive criticism, frankly, but I'll get to it in --

18        THE COURT:  Tell Mr. --

19        MR. FELDMAN:  -- a moment.

20        THE COURT:  -- Dunne that, but --

21        MR. FELDMAN:  I've told Mr. Dunne that privately about

22 twenty times, today.  I'm getting nowhere with him, by the way.

23        THE COURT:  Here's your chance to tell him --

24        MR. FELDMAN:  And I'm --

25        THE COURT:  -- publicly.

PG&E Corp., Pacific Gas and Electric Co.

1    MR. FELDMAN:  -- quite frustrated with him, after

2  all --

3    THE COURT:  You can tell him --

4    MR. FELDMAN:  -- these years --

5    THE COURT:  -- publicly, as long as --

6    MR. FELDMAN:  -- we've known each other.

7    THE COURT:  -- you don't use --

8    MR. FELDMAN:  I'm going to --

9    THE COURT:  -- any bad words.

10    MR. FELDMAN:  -- tell him publicly.  No, I'm going to

11  tell him publicly, and I'm going to try to use polite words.

12    THE COURT:  Well, some people use bad words on our

13  phone call conferences, but not --

14    MR. FELDMAN:  I was in the courtroom that day, Judge.

15  It wasn't me.  Just for the record.

16    THE COURT:  Maybe you're the one that said it.

17    MR. FELDMAN:  It wasn't me.  I was right here to hear

18  it, yes.

19    Obviously, it resolves the wildfire subrogation claims

20  without the need for estimation, at a reduced value.  It

21  converts a significant portion into equity, as we've talked

22  about.  It does provide for the funding of the new wildfire

23  fund in the amount of five million dollars.  It does maintain

24  rate neutrality, as required by the CPUC.  And it does protect

25  the existing rank and file workforce.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    We did leave blanks in our term sheet.  We thought

2    about filing an amended term sheet as late as last night.  We

3    did take into consideration Your Honor's dislike of last-minute

4    filings.

5         THE COURT:  Well, it's not that I just don't like

6    them; it's just that I can't process them.

7         MR. FELDMAN:  But there's a more important -- there

8    was a more important reason we didn't file it, and if the Court

9    conditions terminating exclusivity on us filing an updated term

10   sheet, we'd be happy to do it.

11        The reason we didn't do it is, as I mentioned earlier,

12   we are in active discussions, both with the company as to the

13   size of our claim, as well as with the tort committee about

14   their treatment.  And what we didn't want to do was put in

15   random numbers as the bondholders did.  And it's not even a

16   criticism of the bondholders; they don't have information to

17   come up with better numbers.  It's not a criticism of the

18   equity.  But we have a good sense of where these claims might

19   land, and we didn't want to put something in that would have

20   a -- could have a negative impact on those discussions.  And

21   our view is that had we updated our term sheet, it would have

22   absolutely had a negative impact.  It might have crystalized

23   the amount of capital we need to raise, and we would have been

24   able to demonstrate that that capital was easily available in

25   the market, but Mr. Bennett did that for me this morning as he

PG&E Corp., Pacific Gas and Electric Co.

1    came in, and has continued to come in, with more value, more

2    value, more value.  When we're equitizing the vast majority of

3    our claims, the idea that there wouldn't be capital available

4    to pay the delta is just non-compelling.  And the risk of

5    harming our negotiations was too strong.

6            But again, if the Court disagrees, we are happy to

7    file the amended term sheet.  I have it in the courtroom today.

8    It just seems like the bad way to proceed when a consensual

9    deal is way preferable to a litigated deal in these cases.

10           THE COURT:  Well, we all agree with that.  Or I agree

11   with that.

12           MR. FELDMAN:  Your Honor, just a couple more points I

13   do want to make.  I want to address very quickly some of the

14   objections, because I'm going to shorten my time on the other

15   side.

16           THE COURT:  Well, but I'm trying to keep it short for

17   personal, and everybody else's personal reasons, but I'm not

18   trying to cut you off.  If you have a point that you think

19   should be made, I want you to make it.

20           MR. FELDMAN:  Well, let me then finish, and then I

21   will cede the podium and deal with the objections and

22   responses --

23           THE COURT:  Okay.

24           MR. FELDMAN:  -- as they appear.  Your Honor, we have

25   a plan that meets the standard the Court set out, that we

(977) 765-2330   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  believe will continue to put pressure on all parties, including

2  my clients, to come to the table and hopefully reach

3  resolution.  We are very concerned that if the Court were to go

4  the other way, and not to modify exclusivity, that people would

5  be sitting, waiting for the company, waiting for Godot (ph.).

6  It just wouldn't --

7          THE COURT:  Well, but you did hear --

8          MR. FELDMAN:  -- move forward as quickly.

9          THE COURT:  -- Mr. Karotkin was pretty adamant about

10  just three weeks, just three weeks.  I mean, it's not -- three

11  weeks are a lot in the time frame between today and June 30th,

12  but you know --

13         MR. FELDMAN:  It depends on what, "just three weeks"

14  means.  If just three weeks means that nobody can file their

15  plan before September 9th --

16         THE COURT:  Well, that's what it means if I don't

17  break exclusivity, right?

18         MR. FELDMAN:  Well, but you could extend exclusivity

19  again.

20         THE COURT:  Well, I understand.  But my point is --

21  sure.  If I don't break it, and they file on the 9th, then the

22  statute tells all what happens, unless there's another request.

23         MR. FELDMAN:  Well, correct.

24         THE COURT:  Okay.

25         MR. FELDMAN:  Because then they have the

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  solicitation --

2        THE COURT:  Yeah.

3        MR. FELDMAN:  -- period.

4        THE COURT:  right.

5        MR. FELDMAN:  I think if what you're saying -- if what

6  Mr. Karotkin is saying, which I don't believe he is, but let me

7  at least address what I hope he's saying, is that everybody

8  should wait for the debtors to catch up, and we all file plans

9  together in mid-September, whether it's the 9th --

10        THE COURT:  I didn't --

11        MR. FELDMAN:  -- or the 10th --

12        THE COURT:  -- hear him --

13        MR. FELDMAN:  -- or the 15th.

14        THE COURT:  -- say that.

15        MR. FELDMAN:  Correct.  We would have no problem --

16        THE COURT:  I bet you --

17        MR. FELDMAN:  -- with that.

18        THE COURT:  -- he'll agree -- he'll reaffirm that that

19  isn't what he agreed to.

20        MR. FELDMAN:  We would have no problem with that --

21        THE COURT:  Yeah.

22        MR. FELDMAN:  -- if what he's saying is, the debtor is

23  a fiduciary for all financial players, and I don't need to hear

24  the laughs when I say it, should be allowed to go forward with

25  their plan process, we disagree.  We think that we should be

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  able to file a plan.  We have no problems with the bonds filing

2  a plan.  Anybody else wants to come in and ask for authority --

3  THE COURT:  Mr. Feldman, I can --

4  MR. FELDMAN:  -- that is the way to create

5  competition.

6  THE COURT:  -- shortcut this.  If Mr. Karotkin, who's

7  now spent part of the last six months knowing me, and I know

8  him, if he intended to say, it's free for all, everybody can

9  file --

10  MR. FELDMAN:  He would have said it.

11  THE COURT:  -- by February (sic) 9th --

12  MR. FELDMAN:  I understand.

13  THE COURT:  -- he would have said it at 9:31 this

14  morning --

15  MR. FELDMAN:  Yeah.

16  THE COURT:  -- and we would have been doing something

17  else for the last three hours.

18  MR. FELDMAN:  But the reason his proposal does not

19  work, Your Honor, is because all of the good things that have

20  happened, based on what the Court said at the last exclusivity

21  hearing, will go away --

22  THE COURT:  Okay.

23  MR. FELDMAN:  -- if exclusivity is not modified.  And

24  we continue to believe that the best path forward here is a

25  path that forces the parties to the table to negotiate.  Not a

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    path that says, here's the debtors' plan, it's supported by the

2    equity.  Now, everybody take your guns out and start shooting

3    it.  That's not going to get a deal done here, and it's

4    certainly going to put the time line at risk.  And that is not

5    good for anybody in these cases, regardless of what position

6    you're in.

7             I'll cede --

8             THE COURT:  Okay.

9             MR. FELDMAN:  -- the podium, Your Honor, and reserve

10   everything else for response.

11            THE COURT:  Mr. Engel, you wanted to be heard?  And as

12   I say, I've read a number of things that you filed, but I

13   thought a number of things you've said in several of your

14   filings was you just wanted to reserve your position.  So

15   that's okay, you can reserve your position.

16            MR. ENGEL:  Well --

17            THE COURT:  But what's your specific position --

18            MR. ENGEL:  -- let me try it this way, Your Honor.

19            THE COURT:  -- on today's question?

20            MR. ENGEL:  Larry Engel for Sonoma Clean Power

21   Authority.  We did file on time on the 7th of August --

22            THE COURT:  Okay.

23            MR. ENGEL:  -- document number 3415, which is

24   entitled --

25            THE COURT:  No, that's okay.  You don't need to tell

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   me the title.

2           MR. ENGEL:  Okay.

3           THE COURT:  I have a tally, and if I missed it --

4           MR. ENGEL:  And it actually --

5           THE COURT:  -- I missed it.

6           MR. ENGEL:  -- speaks to all the motions for these two

7   days, and --

8           THE COURT:  Yes.  You know what I think you did --

9   yes.  I have it on my list, but I think what you did -- and

10  this is just an aside -- you put all your stuff together in one

11  paper, which is very efficient, but it's very hard to keep

12  track of.

13          MR. ENGEL:  I'm sorry.  Your Honor, I apologize.  When

14  we filed our opening day papers, I took one of your comments to

15  mean that we shouldn't spread them out, that we should put them

16  together.  So it's my misunderstanding of your position about

17  it.

18          THE COURT:  Don't worry about it.  Let's get to the

19  merits.  So you --

20          MR. ENGEL:  So I'm here, Your Honor, to agree with the

21  UCC that we need competition.  I echo their points, and I won't

22  repeat them.  I'm not here to speak for any particular plan,

23  although --

24          THE COURT:  But that's important.  Do you --

25          MR. ENGEL:  Well, but let me finish --

(972)406-2900  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Okay.

2        MR. ENGEL:  -- if I may.  The thing that's good about

3    the ad hoc subrogation group, which I want to speak to on your

4    point, is they at least listen to you.  They care about issues

5    that are not yet talked about widely in this courtroom, but

6    need to be.  And so good things can come from competition, even

7    if you're not supporting it, if they're talking to you.  And if

8    there is no competing plan, then the only person you could talk

9    to is PG&E, and they have a serious conflict on the issues that

10   we're concerned about regarding these PSPS blackouts.  So I

11   promise you, Your Honor, that you will find, by the end of the

12   fire season that, unless there are more fires that people are

13   talking about, the next most serious conversation that

14   everybody's going to be having is about the PSPS blackouts.

15       THE COURT:  Well, sure.  All of us who live in

16   Northern California are aware of that.  But what does that do

17   for -- what is that a bankruptcy issue for here?

18       MR. ENGEL:  Well, because they create administrative

19   claims for reasons we'll get into at the appropriate time in

20   the appropriate way, because, in effect, what's happening here

21   is that by shutting off the power, not only are they basically

22   shutting down the CCA operations, because we can't deliver the

23   power we've already bought to the customers that want it, but

24   you're basically shifting off to every local government in

25   Northern California.  The problem with dealing with people who

(9770 06-290) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   are without power for seven to nine days --

2          THE COURT:  But Mr. Engel --

3          MR. ENGEL:  -- repeatedly.

4          THE COURT:  -- I'm dumbfounded that you think this is

5   something that I have any authority to, or ability to, fix.

6          MR. ENGEL:  Administrative claims, Your Honor.

7          THE COURT:  Well, but the same happens if a PG&E truck

8   hits you on Fulton Street --

9          MR. ENGEL:  Right.

10         THE COURT:  -- on the way home today.  So what is the

11  bankruptcy solution, here, to your problem?

12         MR. ENGEL:  If you look at the list of things that a

13  competing plan was supposed to address that PG&E just filed,

14  item number 1 on their list was safety and operations.  This is

15  a safety and operation issue which translates into the whole

16  question of are there administrative claims, and how many are

17  there going to be, and what are we going to do about it?  And

18  there are things that can be done about it.

19         THE COURT:  What does the bankruptcy law and this

20  Court do about it?  Please answer that question.

21         MR. ENGEL:  Well, a reorganized debtor --

22         THE COURT:  And by the way, as part of the question

23  about whether we have competing plans.

24         MR. ENGEL:  Yes.  And a competing plan could, in fact,

25  solve a lot of this problem with a reorganized entity --

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  If the --

2          MR. ENGEL:  -- that had the right --

3          THE COURT:  -- control center --

4          MR. ENGEL:  -- mindset, so --

5          THE COURT:  -- wherever PG&E's control center is,

6    tomorrow decides they have to close the -- shut off the

7    power --

8          MR. ENGEL:  Right.

9          THE COURT:  -- in Contra Costa County, you think that

10   decision is influenced by whether there's a competing plan or

11   not?

12         MR. ENGEL:  Well, no.

13         THE COURT:  I'm having trouble with the --

14         MR. ENGEL:  Let me give you an example.

15         THE COURT:  -- argument, here.

16         MR. ENGEL:  Let me give an example.  As you may know,

17   I moved from San Francisco from forty years to Nevada City,

18   which is in the heart of --

19         THE COURT:  Yeah, know.  And you probably had your

20   power cut off.

21         MR. ENGEL:  Well, and I can see this hardening from my

22   driveway.  And I know that -- from a whole lot of sources we

23   can talk about -- that if they simply undergrounded, you

24   wouldn't have blackouts.

25         THE COURT:  Mr. Engel, please stick with the issue

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    today.

2            MR. ENGEL:  Yes.

3            THE COURT:  Do I allow one or the other of these

4    groups to file their plan or not?  What is your position and

5    your argument?

6            MR. ENGEL:  The same as the Uniform Commercial --

7            THE COURT:  UCC -- OCC.

8            MR. ENGEL:  UCC committee.  We think competition is

9    good.

10           THE COURT:  We can call them Uniform Commercial Code

11   Committee, but they support --

12           MR. ENGEL:  It's hard not to.

13           THE COURT:  But they support the bondholder, not the

14   subrogation.

15           MR. ENGEL:  And I support the ad hoc, not the -- I

16   think the ad hoc has a --

17           THE COURT:  What do you support?  What does your

18   client want me to do?  Same question I put to Ms. Dumas.

19           MR. ENGEL:  Grant exclusivity for the ad hoc

20   subrogation.

21           THE COURT:  You mean break exclusivity?

22           MR. ENGEL:  Yes.

23           THE COURT:  Terminate it.

24           MR. ENGEL:  Terminate it.

25           THE COURT:  Let the ad hoc bond, or subro?

PG&E Corp., Pacific Gas and Electric Co.

1          MR. ENGEL:  Subro.  Yes.

2          THE COURT:  Only?

3          MR. ENGEL:  Yes.

4          THE COURT:  Not the bond?

5          MR. ENGEL:  I don't have a position on the bond.

6          THE COURT:  Okay.

7          MR. ENGEL:  On the notes.

8          THE COURT:  Okay.  So now, what argument do you want

9     to make, if anymore, about whether I should or shouldn't do

10    that?  I mean, really, I can't --

11         MR. ENGEL:  All right.

12         THE COURT:  -- get bogged down on the blackout issue.

13         MR. ENGEL:  Your Honor, you have a lot to do, and I

14    don't want to take more than my -- I probably already have --

15    of my time.  I simply wanted to bring to your attention that

16    there are issues besides the financial issues that turn into

17    financial issues, and they need to be considered.

18         THE COURT:  But Mr. Engel, you're telling me basic

19    stuff.  And --

20         MR. ENGEL:  Yeah.

21         THE COURT:  -- I told you, if you get hit by a PG&E

22    truck, there's going to be an administrative claim, unless you

23    waive it.  So I mean, it's the same issue and --

24         MR. ENGEL:  The scale of --

25         THE COURT:  -- I can't solve the problem.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. ENGEL:  The scale of the problem, Your Honor, is

2    going to dwarf --

3          THE COURT:  Of course, of course, of course.

4          MR. ENGEL:  Yeah.

5          THE COURT:  But there's no bankruptcy fix.

6          MR. ENGEL:  A competing plan that works on this

7    problem is a fix.

8          THE COURT:  Okay.  That's your argument.

9          MR. ENGEL:  That's my argument.

10          THE COURT:  Okay.

11          MR. ENGEL:  Thank you.

12          THE COURT:  Mr. Karotkin?  I think you've said you'd

13    like to have twenty or so, or less, so whatever you want.

14          MR. KAROTKIN:  Yeah, thank you, Your Honor.  Again,

15    Stephen Karotkin, Weil, Gotshal & Manges, for the debtors.

16          I think Mr. Feldman indicated in his argument that if

17    you were to keep exclusivity in effect until the debtor at

18    least files its plan on September 9th, you said, I can assure

19    you that people are going into a hole between now and September

20    9th.

21          Your Honor, I will assure you that the economic

22    interest in these cases, these people are not going to go into

23    a hole if we are given that right to do that.  And in fact, I

24    would venture to say, Your Honor, that that will spur

25    negotiations because they will be very interested in giving us

PG&E Corp., Pacific Gas and Electric Co.

1   input into the plan we're going to file.  Negotiations will

2   continue.  The parties aren't going anywhere.  There is too

3   much at stake in these cases for these parties to take the rest

4   of the month off.

5           I think it's also important to note, and again, I

6   think that this came up this morning, that the reasons that the

7   negotiations have started to take place now in earnest is

8   because of what I said earlier.  We now have the legislation.

9   The time now is ripe.  There is always a ripe time in a Chapter

10  11 case for the planned negotiations to start, and that's the

11  reason they've started now, because now we have more clarity on

12  the economics that have to be addressed in the plan, with the

13  passage of the legislation.

14          And I think that it's very telling that Mr. Feldman

15  noted quite clearly about the ongoing, active negotiations that

16  we, the debtors, are having with him and his constituency.  And

17  those negotiations are moving forward, virtually on a daily

18  basis.

19          Now, Your Honor, I don't want to repeat everything I

20  said this morning.  I think those comments are equally

21  applicable.  I don't think that, in view of the circumstances

22  of this case, the recently enacted legislation, the estimation

23  motion that's going to be before Your Honor tomorrow, the Tubbs

24  stay motion --

25          And I think it's important, Your Honor, to note what

PG&E Corp., Pacific Gas and Electric Co.

1  Ms. Dumas said earlier today.  She said, until those issues are

2  addressed, and I believe I'm stating it accurately, until those

3  issues are addressed, the TCC is not even in a position to

4  negotiate a plan.  I think she said that quite clearly.  And

5  under those circumstances, there's no basis to terminate the

6  exclusive periods because they effectively, with Mr. Feldman's

7  group, are the fulcrum securities in this case --

8      THE COURT:  Right.

9      MR. KAROTKIN:  -- the fulcrum debt.  Everyone else --

10     THE COURT:  Well --

11     MR. KAROTKIN:  -- will be paid in full --

12     THE COURT:  -- that's obvious.

13     MR. KAROTKIN:  -- and that's how this case is going

14 to --

15     THE COURT:  Well --

16     MR. KAROTKIN:  -- unfold.

17     THE COURT:  -- it's interesting that -- of course, Ms.

18 Dumas speaks form the point of view of the victims who don't

19 have an insurance backup, or people who suffered personal

20 injury-type losses.  Mr. Feldman didn't say he can't continue

21 to negotiate with you.  He can negotiate with you today whether

22 I break exclusivity or not, and says he will, and you say he

23 will.

24     MR. KAROTKIN:  And he is.

25     THE COURT:  Yeah, and I'm agreeing with that.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. KAROTKIN:  Okay.

2      THE COURT:  So but I mean, it's hard for me to think

3   that the TCC would not open the door and have a conversation

4   with you.  But again, if that's what their position is, it's

5   their position.  I don't want to decide that.

6      MR. KAROTKIN:  No.  We of course are more than willing

7   to have conversations with them, but I think Ms. Dumas has made

8   it abundantly clear they're not ready for those discussions

9   yet.  And I think that's important to note in the context of

10  what's before Your Honor today.

11      And again, with respect to the subrogation claimants'

12  motion to terminate exclusivity, again, they say the same thing

13  that the other group said, that the debtors have not been able

14  to achieve a consensus with the creditor groups in these cases.

15  And again, we're talking about, with the subrogation group and

16  with the plaintiffs represented by Ms. Dumas.

17      But again, let's look at their planned proposal.  As

18  with the ad hoc noteholder group, the only consensus they have

19  is with themselves.  They've also adopted the settlement that

20  the debtors achieved with the public entities.  And in fact,

21  Your Honor, there's quite a remarkable statement in the

22  subrogation claimants' motion as to the consensus that they

23  tout, that's allegedly reflected in their plan.  And I'm

24  quoting from their motion, it says, "The ad hoc subrogation

25  group has designed a plan that the ad hoc subrogation group

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    will support".  What a wonderful revelation.  And all this

2    demonstrates is that, again --

3            THE COURT:  I've never heard of somebody voting

4    against his own plan.

5            MR. KAROTKIN:  That would be a first, Your Honor.  So

6    they've successfully negotiated with themselves, again, like

7    Mr. Qureshi's clients.  Very good, that's quite a thing to

8    accomplish in --

9            THE COURT:  But come on.

10           MR. KAROTKIN:  -- these cases.

11           THE COURT:  I told Ms. Caton that I expect proponents

12   to be feathering their nest, or they wouldn't be -- they're not

13   doing this for charity's sake.

14           MR. KAROTKIN:  Again, but the debtors --

15           THE COURT:  Yeah.

16           MR. KAROTKIN:  -- are not feathering anybody's nests,

17   and that's the difference here, Your Honor.  I think you just

18   put your finger on it.

19           THE COURT:  Well, no.  I understand your point.

20   That's clear.

21           MR. KAROTKIN:  And again, it's not hard to negotiate

22   with the UCC in these cases because again, as you noted, Your

23   Honor, their clients, their constituencies, are going to be

24   paid in full, as will happen under any plan.

25           So what else does the subrogation plan term sheet

PG&E Corp., Pacific Gas and Electric Co.

1    provide?  Mandatory, convertible stock distributed to

2    themselves, with an above market rate of interest, and the

3    conversion rate at a substantial discount; and I'm sure that

4    Mr. Bennett will go into that in more detail in a few minutes.

5    It also provides for a distribution to the subrogation group of

6    an excess of 15.8 billion dollars in value where, Your Honor,

7    7-1/2 billion dollars of their claims are related to the Tubbs

8    fire, which CAL FIRE has determined --

9             THE COURT:  But I think Mr. Feldman conceded that if

10   the Tubbs fire -- the issue is resolved favorable to PG&E, that

11   whole thing changes.  That whole analysis just goes out the

12   window.

13            MR. KAROTKIN:  But again, they're asking you to move

14   forward with that plan, which provides for that --

15            THE COURT:  Well --

16            MR. KAROTKIN:  -- treatment --

17            THE COURT:  -- I understand.  I understand, but --

18            MR. KAROTKIN:  -- that they have settled, Your Honor,

19   for themselves --

20            THE COURT:  Mr. Karotkin --

21            MR. KAROTKIN:  -- okay?

22            THE COURT:  -- I understand that.  But you are adamant

23   that your client and your side will win the Tubbs argument.

24   And if you do, then you've done what your client wants done,

25   and there are consequences that the Tubbs --

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  Right.

2          THE COURT:  -- victims particularly suffer from,

3   but -- or are stuck with -- but the point is it drives and

4   influences how any plan is going to look.

5          MR. KAROTKIN:  Exactly why --

6          THE COURT:  If you eliminate --

7          MR. KAROTKIN:  -- that plan should not go --

8          THE COURT:  -- tens of billions --

9          MR. KAROTKIN:  -- forward, Your Honor.

10          THE COURT:  -- of dollars of claimants in one fell

11   swoop, then it's easier to do their plan, right?

12          MR. KAROTKIN:  That plan is not conditioned on an

13   estimation hearing for the subrogation claimants as it is for

14   the plaintiffs.  What Mr. Feldman is asking you to do, Your

15   Honor, is for this plan, with this treatment, to go forward in

16   the absence of a determination of that issue.  That their

17   claims would be treated just as I described.

18          And in fact, Your Honor, the only particularly

19   relevant part of the subrogation claimants' motion is the quite

20   accurate discussion of the infirmities of the ad hoc

21   bondholders' plan.  I think they do quite well at pointing

22   those out, as have other parties and interests.

23          Again, I don't really want to repeat myself, but we

24   have committed to file the plan by September 9th.  I think

25   we've demonstrated that there will be ample financing for that

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    plan.  In fact, people will be clamoring to provide the

2    financing for that plan once Your Honor determines the extent

3    of the liability for the wildfire claims.

4         Again, the debtors, unlike any party in interest in

5    these cases, have fiduciary duties.  We've made the commitment

6    to file the plan.  Your Honor, we're talking about three weeks.

7    As I said, during those three weeks, these parties aren't going

8    anywhere --

9         THE COURT:  Well, no.  But --

10        MR. KAROTKIN:  -- believe me.

11        THE COURT:  -- come on.  I predicted, and so you can

12   tell me I got it right, you're not suggesting that come

13   September 9th, everybody can -- you can have three plans,

14   right?

15        MR. KAROTKIN:  That's correct.

16        THE COURT:  Okay.

17        MR. KAROTKIN:  But what I am saying, Your Honor,

18   again, to repeat what I said --

19        THE COURT:  Right.

20        MR. KAROTKIN:  -- this morning, if people feel that we

21   haven't complied, or are not moving these cases forward, or the

22   plan is DOA, I will consent right here, Your Honor.  They can

23   file a motion on expedited notice to terminate exclusivity.

24        THE COURT:  That's fine because I would let them do

25   it, anyway.  But what I want --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  But they wouldn't have to make a

2    motion.

3          THE COURT:  But what I want you to tell me is this:

4    Suppose it's September 9th.  You file your plan, and am I

5    right?  That triggers the second segment of the 1121's

6    extension, right?

7          MR. KAROTKIN:  It does.  However --

8          THE COURT:  So --

9          MR. KAROTKIN:  -- if I may?

10         THE COURT:  Hum?

11         MR. KAROTKIN:  If I may respond --

12         THE COURT:  Yeah.  Yeah, no.

13         MR. KAROTKIN:  -- because I know where you're going.

14         THE COURT:  No.  No, respond.  Answer.

15         MR. KAROTKIN:  Under the statute --

16         THE COURT:  I won't even ask the question.  Give me

17   the answer.

18         MR. KAROTKIN:  Under the statute, you have -- and the

19   parties here can file a motion for you to terminate that

20   immediately.

21         THE COURT:  Yes, and --

22         MR. KAROTKIN:  So it's the same remedy, Your Honor.

23         THE COURT:  Well, okay.

24         MR. KAROTKIN:  No one is being boxed in by that,

25   and --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  But my recollection, and I haven't had

2  occasion to go back and reread it again, but that starts in

3  motion the second segment that maintains exclusivity to get

4  to -- is it confirmation or acceptance?  I've forgotten which.

5      MR. KAROTKIN:  I believe it's confirmation.

6      THE COURT:  Confirmation?  Okay.

7      MR. KAROTKIN:  However --

8      THE COURT:  And realistically, that's not likely.  It

9  could happen under your time line, but maybe would have to be

10 extended in any event.  But that's okay.

11     MR. KAROTKIN:  If we're moving forward, but it --

12     THE COURT:  I'll worry about that later.

13     MR. KAROTKIN:  Okay.  But again, nothing precludes you

14 from terminating that --

15     THE COURT:  No, I know.

16     MR. KAROTKIN:  -- second period as well, if cause can

17 be demonstrated.

18     THE COURT:  No, I know that.  I just -- okay.

19     MR. KAROTKIN:  So there's no prejudice as a result of

20 the additional time built into the statute.

21     THE COURT:  That's the way I read it, too.

22     MR. KAROTKIN:  Okay.  Thank you, sir.

23     THE COURT:  So okay.  Mr. Bennett, were you going to

24 be heard again, or was someone else?

25     MR. BENNETT:  Yes, Your Honor.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Same request, that we not repeat what you

2     said before, but --

3          MR. BENNETT:  There will be no repetition.

4          So I just want to follow up on the colloquy you've

5     been having -- excuse me, Bruce Bennett, Jones Day, on behalf

6     of the equity holders.

7          I want to follow up on the colloquy you've been having

8     with Mr. Karotkin.  There is another advantage to allowing the

9     debtor to allowing the debtor to fully flesh out a plan and

10    file it on the 9th, because the plan that would be filed on the

11    9th -- and by the way, you said by the 9th; I'm hoping it would

12    be sooner.

13         THE COURT:  Do you want to negotiate?  Shall I make it

14    the 7th?

15         MR. BENNETT:  If that solves the problem, sure.

16         THE COURT:  I'm not negotiating.

17         MR. KAROTKIN:  Now he's speaking for me.

18         MR. BENNETT:  One of the things that the plan on the

19    9th will have clear, crisp, not arguable, you'll be able to see

20    it, every party interest will see it, will be plan value.  It

21    will be at least the plan value suggested by the commitments

22    that have been filed, that the commitments of form of which

23    have been filed, but have been submitted --

24         THE COURT:  You mean, that was filed yesterday, the --

25         MR. BENNETT:  Yes.  Yes.  And the debtors have

PG&E Corp., Pacific Gas and Electric Co.

1    indicated they want to have some negotiations with respect to

2    that document, so it's conceivable it could be different.  But

3    it will at least be a crisp plan value that has been

4    established by a plan document.

5         And then, returning a little bit to this morning, if

6    the bondholders want to match it or exceed it, that'd be great.

7    What we wouldn't be talking about, opening the gates to a plan

8    that values the company at a third of plan value, because that,

9    of course, would be a ridiculous thing to do.

10        So there's an advantage because you'll have a

11   benchmark, because other people will know what the benchmark

12   is.  They kind of already do.  It's a high number.  Let's see

13   if people beat it.

14        Okay.  I want to come back to, and just focus on, the

15   subrogation plan, as Mr. Karotkin foreshadowed I would.  First

16   your observations about blanks.  Blanks are a problem.  They

17   don't facilitate competition.  When you have a blank, what are

18   you competing against?

19        THE COURT:  Well, but Mr. Feldman did offer to fill in

20   if I asked him to.

21        MR. BENNETT:  What I'm saying is that, in this

22   context -- and frankly, they should have had them before.  And

23   if the effect of them was to change the reality of the cases in

24   their view, I mean, they're already -- their view is, we think,

25   very out of balance.

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. BENNETT:  But I will say, having blanks means it's

3     hard to see how to compete, or deal with it.  That's number 1.

4          Number 2, not going to repeat anything here, but their

5     plan also awards post-petition interest at a contract rate.  So

6     incorporate by reference here.  That may be okay if equity

7     approves the plan and votes to accept the plan.

8          THE COURT:  Well, of course.

9          MR. BENNETT:  It is not okay if equity doesn't --

10         THE COURT:  Right.

11         MR. BENNETT:  -- accept the plan.  And the plan that's

12    been proposed by the subrogation group has a significant

13    dilution to equity.

14         So what are the problems with the way they went about

15    it?  Well, first of all, as Mr. Karotkin said, they settled

16    with themselves.  And I have a different, important sentence

17    that I would quote from their own -- their papers, the

18    subrogation group papers.  And that sentence is, "If only

19    exclusivity is terminated, the subrogation plan proposes a

20    reasonable settlement of Tubbs liability that could be approved

21    through the plan confirmation process".

22         Well, as we said in the papers that we submitted to

23    Your Honor, that statement is just wrong.  The cases don't say,

24    someone's proposal gets subjected to lowest bounds of

25    reasonableness.  You have to have an agreement that's been

PG&E Corp., Pacific Gas and Electric Co.

1    negotiated on some arm's length basis, or some other reason to

2    believe that there was tension that resulted in an agreement

3    that is then to be examined, pursuant to what are, frankly,

4    sometimes relaxed circumstances.

5            But that didn't happen.  They just made up a number.

6    They said, we don't want to negotiate a number, we want to

7    announce the number.  And then we want to come to you and

8    judge -- we want to convince you, Judge, that it's reasonable.

9    That's not what approvement of settlement is like in a

10   bankruptcy case.  That's actually asking for the Court to do

11   something at a confirmation hearing that is beyond its power.

12   So in Your Honor's test about the potential confirmability or

13   credibility of the plan, this fails on that basis alone.  But

14   let's take another step.

15           They proposed a vehicle for settling their claims in

16   other than cash.  It is a mandatory convertible preferred

17   stock.

18           THE COURT:  Um-hum.

19           MR. BENNETT:  It's a little bit exotic, but not that

20   exotic because it was actually used, essentially the same

21   structure, in the American Airlines --

22           THE COURT:  Yeah, that's what --

23           MR. BENNETT:  -- bankruptcy case.

24           THE COURT:  -- they said.

25           MR. BENNETT:  Which they said.  But what they didn't

PG&E Corp., Pacific Gas and Electric Co.

1  say is what were the terms in the American Airlines case.  Two

2  terms that are relevant.

3         Most important one, in this case, what the subrogation

4  claimants want to do is that when they convert the mandatory,

5  convertible debt, or preferred stock -- it's really preferred

6  stock -- into equity, they want to do it at a fifteen percent

7  discount from the --

8         THE COURT:  They said a discount, and it's staged

9  upward, right?

10         MR. BENNETT:  -- from the then market price.

11         THE COURT:  Right.

12         MR. BENNETT:  And that's a market that will be an

13  established market, because there will be lots of equity.

14         THE COURT:  Right.

15         MR. BENNETT:  Fifteen percent discount.  And by the

16  way, this is a utility.  So utilities have relatively stable

17  market values, once they get past the trauma we have here.

18         THE COURT:  That's what I thought.

19         MR. BENNETT:  American Airlines, not quite a utility.

20  Airline stocks are much more value -- much more volatile.

21         THE COURT:  Volatile.

22         MR. BENNETT:  What was their discount?  3.5 percent.

23         So once again, people didn't miss kind of market marks

24  by a little; they missed them by a lot:  3.5 percent versus 15

25  percent.  The fifteen percent discount is smuggling more value.

PG&E Corp., Pacific Gas and Electric Co.

1   So when they say, we want a security that says, preferred stock

2   of 15.8 billion, but where it's going to get another fifteen

3   percent discount when it's mandatorily converted, that

4   increases its value an additional --

5               THE COURT:  Um-hum.

6               MR. BENNETT:  -- twelve, thirteen percent.

7               THE COURT:  No, I understand.

8               MR. BENNETT:  The next thing --

9               THE COURT:  Very simple math.

10              MR. BENNETT:  -- they did, pick rate.  The pick rate

11   that they chose was eight percent.  Again, utility, eight

12   percent rate, American Airlines, six percent.  In fact, if they

13   were trying to make a good faith proposal for this kind of

14   security in the context of a utility, both of those numbers,

15   both the discount and the pick rate would be inside, less than

16   the examples in American Airlines, not significantly greater.

17              If Your Honor was really wide awake last night, and

18   you were reading all the little details that are embedded in --

19              THE COURT:  Wait a minute.

20              MR. BENNETT:  -- the commitment --

21              THE COURT:  Why are you speculating on if?

22              MR. BENNETT:  Right.  So you were wide awake last

23   night, and you noticed that we actually picked up this security

24   idea, but basically used terms that are closer to the American

25   Airlines' terms and said, you know something?  This is one of

PG&E Corp., Pacific Gas and Electric Co.

1    the flexibility features that we thought the debtor might like,

2    and they do like.  We said, if you want a security like that,

3    we think that's okay, but these are the terms that would make

4    sense for it.  So to the extent that people worry about us

5    negotiating, we're paying attention to what people are saying.

6    We're trying to create things that are responsive to what

7    people are talking about.

8         But again, let's focus on this plan.  The plan they've

9    asked you to open the gates to be considered.  Apart from being

10   filled with blanks, it has a proposal for settling with

11   themselves and gives them a huge amount of money.  I estimate,

12   but you kind of have to break out figures that aren't broken

13   out, that it's more than 4.3 billion dollars.  It's probably

14   even more than that, but it's at least 4.3 billion dollars is

15   attributable to Tubbs claims.

16        And Your Honor, I don't think it's fair to just

17   describe the Tubbs claim as a disagreement as to whether or not

18   PG&E's liable, because, as I think Your Honor knows, because

19   you live here and because it's probably even mentioned before

20   in some of the papers that you read for preparing for tomorrow,

21   CAL FIRE took that one very seriously.  There was an 18-month

22   investigation, two investigative teams, and they have

23   concluded.  The only independent actor that's looked at this

24   fire that's worth paying attention to has concluded that PG&E

25   did not cause the fire.  That's where we are today.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          So on that set of facts, they chose to award

2     themselves at least 4.3 billion dollars to create a security

3     that gives them an additional leg up by at least twelve or

4     thirteen percent, plus an additional margin, to cover the fact

5     that the pick rate is a couple of points higher than at least

6     one comparable that was in another, major bankruptcy case.

7          So for these reasons, again, I go back to is the

8     debtor being obstinate or exercising coercive powers by saying,

9     we're not interested in doing this?  Of course not.  They're

10    interested in reaching a deal that makes sense in light of the

11    only findings on the field with respect to the Tubbs claim, and

12    this does it.  And so --

13          THE COURT:  Okay.  I need to wrap you up, here.  I

14    appreciate it.

15          MR. BENNETT:  -- for these reasons, Your Honor should

16    not --

17          THE COURT:  Okay.

18          MR. BENNETT:  -- terminate exclusivity --

19          THE COURT:  Thank you, Mr. Bennett.

20          MR. BENNETT:  -- to allow the (indiscernible).

21          THE COURT:  Appreciate it.  Appreciate your comments.

22          MR. BENNETT:  Thank you.

23          THE COURT:  Mr. Dunne?

24          MR. SILVERSTEIN:  Your Honor, Paul Silverstein for

25    Columbus Hill.  Three short sentences, if I may?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, only if you have anything else to

2     add, Mr. Silverstein.  I got your comment for --

3          MR. SILVERSTEIN:  I think I do.  You'll be the judge

4     of that, if I may.  Three short sentences.

5          One, efforts to reach a settlement on the aggregate of

6     wildfire claims and subrogation claims should, of course,

7     continue, and they will.  That has nothing whatsoever to do

8     with exclusivity under 1121.

9          Two, as I indicated before, we believe that all

10    creditors are (indiscernible) under section 1124 of the Code,

11    including subrogation claims because their liquidated, allowed

12    claims will be paid in full.

13         Three, terminating exclusivity here can only lead to a

14    litigated case here.  That is a very bad thing.  Time, money,

15    and paramountly distraction from what has to be done here.

16    Therefore, we respectfully request that you honor and respect

17    the debtors' request to continue -- or not to terminate

18    exclusivity because it has indicated it is filing a plan before

19    September 9th, or on September 9th.  And I thank you for the

20    time.

21         THE COURT:  Thank you, Mr. Silverstein.

22         Ms. Dunne?

23         MR. DUNNE:  For The record, Dennis Dunne for Milbank,

24    on behalf of the Official Committee of Unsecured Creditors.

25    I'll only take up a couple of minutes, Your Honor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        First let me start off with the colloquy that you had

2    both with Mr. Karotkin and Mr. Bennett.  Two quick points.

3        Mr. Karotkin's notion of independence, this is an

4    unusual case where the board was actually replaced during the

5    Chapter 11 by handpicked designees of Mr. Bennett's group; Mr.

6    Karotkin reports to that board.  What was filed, it's not

7    surprising to me that it looks like what equity would like to

8    have happen here, and that's just the reality that we're

9    dealing with.  But it goes to the notion that this case is

10   different in terms of the roles that the debtors may be

11   playing.

12       The second is this notion that we'll file a plan in

13   three weeks I think is a red herring, Your Honor.  Said this

14   way, we want the debtors to file a plan in three weeks.  It

15   doesn't change the fact that I think Your Honor has to rule on

16   the motion to terminate exclusivity, and it doesn't militate

17   denial of that motion --

18       THE COURT:  Right.

19       MR. DUNNE:  -- because the worst-case scenario would

20   be three weeks from now, we find that that plan is infirm or

21   DOA, and what Mr. Karotkin says is, let's do it all over again.

22       THE COURT:  Yeah.  I mean, that's the --

23       MR. DUNNE:  Let's come back here and litigate

24   exclusivity.

25       THE COURT:  I mean, that's the same point we discussed

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   earlier --

2           MR. DUNNE:  Right.

3           THE COURT:  -- isn't it?

4           MR. DUNNE:  So now let me -- more happy moment is that

5   I'm actually now aligned with Mr. Karotkin and Mr. Bennett with

6   respect to the motion of the ad hoc subrogation claimants.  But

7   unlike them, we're at a different perspective because we were

8   actually supporting the motion to terminate with respect to the

9   ad hoc bondholder group and opposing it with respect to the ad

10  hoc subrogation.  So I'd like to take just one minute to

11  explain --

12          THE COURT:  Yes, sir.

13          MR. DUNNE:  -- why.

14          THE COURT:  Please.

15          MR. DUNNE:  On the one hand this plan, and there's

16  been much comment about it has a number of blanks and also

17  proposes to settle their own claims at levels that don't look

18  like it's comparable to similar settlements.  That's not why we

19  are opposing the motion.  That's in the, it's not surprising to

20  see a plan proponent feather their nest category that Your

21  Honor had mentioned earlier.

22          Why?  We think the barrier to entry, the ticket to the

23  dance, Your Honor, is a natural limitation here on who can file

24  a plan and proceed to prosecute it.  What do I mean by that?  A

25  plan proponent must be able to raise billions of dollars to

(977) 406-2900 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    satisfy the tort claimants and there was no checkbook behind

2    this.  Other than their conversion of their own claims to

3    equity, where were the dollars to deal at some reasonable

4    amount with the wildfire victims?

5           And so where we would land, Your Honor, is the

6    official committee would deny the motion without prejudice to

7    returning at some point with the checkbook.

8           THE COURT:  Thank you.  Ms. Dumas, are you going to

9    speak?

10          MS. DUMAS:  Yes, sir.

11          THE COURT:  Do you wish?  Okay.  Well, I'm going to

12   let you speak, and then I'm going to let Mr. Feldman have the

13   closing comments.

14          MS. DUMAS:  Thank you, Your Honor.  Cecily Dumas,

15   BakerHostetler, on behalf of the official committee of tort

16   claimants.  During the break I was told that I was not forceful

17   enough with respect to what the TCC's committee is -- or

18   position is.  So let me just take a moment to clarify.

19          Number one, neither the debtor, in any discussions

20   we've had, nor the two plan proponents have set forth proposals

21   that are remotely acceptable to the TCC.  Every one is a

22   nonstarter.  Why is every one a nonstarter?  Because all of the

23   parties start from the proposition that PG&E will be found not

24   liable for Tubbs, there is no value to be attributed to

25   personal injuries, and the other uninsured losses, which is

PG&E Corp., Pacific Gas and Electric Co.

1  primarily loss of vegetation, trees, et cetera, is a valueless

2  number.  So for purposes of the other parties coming in to give

3  you choice and competition, they are echoing the debtors'

4  position.  So that doesn't get us anywhere, to have competition

5  without better offers to the tort claimants.

6       In whatever way we can get more meaningful offers to

7  the tort claimants, that we can commence a dialogue that is

8  more realistic from our perspective, by all means, let's do

9  that.  If that means lifting exclusivity for all plans to get

10  everybody to talk to us in more meaningful terms -- and more

11  meaningful terms simply means assessment of the litigation risk

12  of losing, as opposed to every single plan proponent assuming

13  the victims lose on every issue.

14       Yes, we all know what the subrogation losses are

15  because they file with the department of insurance.  They have

16  actually made payments.

17       THE COURT:  Right.

18       MS. DUMAS:  So there's a question mark there only with

19  respect to the debtors' liability for Tubbs.  But everyone who

20  is approaching this process from a financial perspective is

21  assuming we cannot establish the billions of dollars of harm

22  caused by the emotional distress, the billions of dollars

23  caused by loss of vegetation, which is not covered by

24  homeowner's insurance, and Tubbs.  So we are far apart with

25  everybody.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    If anybody believes that lifting exclusivity will make

2    all plan proponents deal with a more fair and balanced risk

3    analysis with respect to the tort claimants, then we're all in

4    favor of lifting exclusivity.  It may not, however, do the

5    trick, which is why I said in my first presentation, we need to

6    understand the claims pool, we need to understand what the

7    Court is going to do with Tubbs liability.

8    So I hope that that satisfied my constituents that we

9    have a position.  We are not, however, optimistic that simply

10    lifting exclusivity will solve the problem of the intractable

11    gulf between the uninsured portion of the tort claims and all

12    plan proponents currently.

13    So I'm not splitting hairs like the Official Committee

14    of Unsecured Creditors.  Mr. Dunne indicated that, lift it to

15    the bondholders, but not the insurance companies, that is not

16    the TCC's position.  If it's lifted, it should be lifted as to

17    all plan proponents.  Mr. Dunne's constituent is, as I've said

18    in the past, a very small remaining pool of trade creditors, a

19    little over 5 billion in banks, and the bondholders, so --

20    THE COURT:  Okay.  Got you.

21    MS. DUMAS:  -- you understand that.

22    THE COURT:  Thank you very much, Ms. Dumas.

23    MS. DUMAS:  Thank you.

24    THE COURT:  Mr. Feldman, you're the closer.  I'm going

25    to let you wrap it up, and then we're going to adjourn for the

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    day.

2         MR. FELDMAN:  Thank you, Your Honor.  Just a few

3    points in response.

4         First of all, somewhat surprised I agreed with the

5    first eighty percent of what Mr. Dunne had to say.  It was only

6    that last twenty percent that was problematic.

7         But actually, Mr. Dunne's point is worth pausing on,

8    and it really ties back to what Ms. Dumas just said.  We could

9    put numbers into the term sheet.  We'll put numbers into a plan

10   if we have to file them, and we'll demonstrate we can raise the

11   capital.  But to do that takes a position on how much the tort

12   victims are owed and the likelihood of success on their claims.

13   We're not in a position to weigh in on that.

14        We've heard what Ms. Dumas and her colleagues have to

15   say about those claims.  This Court is going to have to give

16   guidance to people --

17        THE COURT:  I mean, look.

18        MR. FELDMAN:  -- to be able to do that.

19        THE COURT:  It's enormously vast, but parties can

20   negotiate to that resolution, so there never is a

21   determination.

22        MR. FELDMAN:  We have -- and again, I don't want to

23   sort of open the curtain.

24        THE COURT:  No.  I don't want you to.

25        MR. FELDMAN:  We do discuss -- we have regularly

PG&E Corp., Pacific Gas and Electric Co.

1  discussed that way.  Progress is a different issue --

2        THE COURT:  Okay.

3        MR. FELDMAN:  -- and we will continue to try to make

4  progress.

5        THE COURT:  Okay.  But I'm only thinking of it this

6  way:  I've heard several times, and a fly on the wall would

7  have heard today, why doesn't the judge make the estimation and

8  deal with this exclusivity stuff later?  Well, the answer is,

9  first of all, I can't deal with it so quickly, if I can deal

10 with it at all.  And secondly, though, you know, the obvious,

11 the victims, through their representatives, and the debtors'

12 representatives, or your clients, or the bondholders, they can

13 negotiate a resolution.  It might mean more money, but it's a

14 resolution without a debate.

15       MR. FELDMAN:  Correct.  But that's Ms. Dumas' point

16 that we adopt, which is if you modify exclusivity or terminate

17 exclusivity, it will foster those conversations.

18       THE COURT:  I know.  Okay.

19       MR. FELDMAN:  Two final points.

20       THE COURT:  Got it.

21       MR. FELDMAN:  One, I'd like to thank Mr. Bennett for

22 making the point that by putting out our version of equity,

23 that allowed him to adopt it on a more competitive basis.

24 That's exactly what multiple plans will provide in this case.

25 Had we never filed that term sheet, I don't know what their

PG&E Corp., Pacific Gas and Electric Co.

1    commitments would have looked like, but they certainly wouldn't

2    have been more competitive than our commitments.

3            Number two, Your Honor, I hear what Mr. Karotkin says

4    and I hear what Mr. Bennett says, but here we are, three weeks,

5    three and a half weeks from September 9th.  I haven't seen the

6    plan.  I don't know what it looks like.  I'm one of the two

7    impaired classes in the case.  I can guarantee Ms. Dumas has

8    not seen that plan, has not seen an outline of that plan.  So

9    the idea that them maintaining exclusivity -- and it's not to

10   September 9th; it's to September 9th and beyond -- is going to

11   take us into a negotiation over what that plan looks like, is a

12   fallacy.

13           Last point -- I know I said this was the last.  I have

14   one more I wanted to make.  We would be happy with cash.  If

15   people want to pay us cash, we don't need securities.  We tried

16   to come up with a proposal that would allow the company to

17   reorganize --

18           THE COURT:  Well --

19           MR. FELDMAN:  -- without having to --

20           THE COURT:  -- Mr. Bennett and Mr. Karotkin --

21           MR. FELDMAN:  -- pay us cash.

22           THE COURT:  -- will tell you, just pay yourself all

23   the cash you want, right?

24           MR. FELDMAN:  Well, no, no.  If Mr. Bennett's clients

25   want to raise the capital and pay us in cash, we're happy to

PG&E Corp., Pacific Gas and Electric Co.

1    take that cash; there's no arguments from us.

2          The last point, on the settling with ourselves, that

3    settlement still has to be reasonable.  And as things develop

4    and as more is learned, obviously --

5          THE COURT:  Anybody listening to me --

6          MR. FELDMAN:  -- that will have an impact on it.

7          THE COURT:  -- would know that I wasn't overwhelmed by

8    the argument that someone who proposed a plan shouldn't be

9    feathering his own nest.

10          Mr. Feldman, thank you.

11          MR. FELDMAN:  Thank you, Your Honor.

12          THE COURT:  I want to thank all the counsel and all

13    the parties for the long morning and, slightly, afternoon, and

14    tell you that today's arguments suggest to me that tomorrow is

15    going to be difficult, and maybe we won't be able to conclude

16    the presentation tomorrow.  I will stick with what I posted, at

17    least, as my anticipated allocations, but -- and I wish we had

18    a simpler problem for the next-door courtroom, but we don't.  I

19    will be as flexible as I can be about the motions tomorrow and

20    the time allocations and the importance of every position for

21    every party.

22          I have a bunch of questions for counsel tomorrow, and

23    if necessary I will adjourn to another day if necessary.  So

24    for those who have to travel and so one, I'll try to

25    accommodate everybody.  But just be flexible.  I'll be

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    flexible, and I'll see you all tomorrow morning.

2         Thank you for your time.

3         And the motions, the two motions for termination of

4    exclusivity are submitted now for decision.

5    (Whereupon these proceedings were concluded at 12:46 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1                    C E R T I F I C A T I O N

2

3    I, Clara Rubin, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8

9

10

11    _____

12    /s/ CLARA RUBIN

13

14    eScribers

15    7227 N. 16th Street, Suite #207

16    Phoenix, AZ 85020

17

18    Date:  August 13, 2019

19

20

21

22

23

24

25

**$**

**$17.80 (1)**
72:23

**A**

**AB (4)**
25:6;27:6;40:10;
55:7
**AB1054 (3)**
82:15;91:21;108:7
**Abid (1)**
14:3
**ability (6)**
41:15;78:6;102:4;
112:12,19;132:5
**able (18)**
8:19;19:23;22:6;
25:5;27:24;53:20;82:6;
83:10;95:5,24;120:2;
124:24;128:1;139:13;
146:19;156:25;160:18;
163:15
**above (3)**
71:22;95:10;141:2
**above-market (1)**
71:23
**absence (1)**
142:16
**absolutely (10)**
20:22;23:11;24:6,15,
21;25:6;37:17;50:19;
69:7;124:22
**absorb (3)**
95:22;115:22,24
**abundantly (3)**
49:5;62:7;139:8
**accept (4)**
69:1,17;148:7,11
**acceptable (1)**
13:4;17:4;108:21;
157:21
**acceptance (1)**
145:4
**accepted (1)**
73:15
**access (3)**
20:5;22:5;59:6;
93:11
**accommodate (2)**
112:18;163:25
**accomplish (4)**
97:11;119:7,7;140:8
**accomplished (1)**
54:11
**accordance (4)**
49:10,21;50:1;72:6
**Accordingly (1)**
69:17
**account (1)**
91:3

**accrued (1)**
100:19
**accurate (1)**
142:20
**accurately (1)**
138:2
**achieve (5)**
15:10;19:11;61:4;
62:20;139:14
**achieved (1)**
139:20
**achievements (1)**
10:15
**achieving (1)**
60:24
**acknowledge (1)**
90:1
**acknowledged (2)**
54:9;91:4
**acknowledging (1)**
90:4
**acquire (3)**
52:14;61:20;62:5
**across (4)**
32:25;33:19;46:11,
20
**ACRT (1)**
98:25
**act (2)**
87:2;105:17
**actions (1)**
42:22
**active (3)**
22:18;124:12;137:15
**activities (1)**
21:14
**actor (1)**
152:23
**actual (1)**
100:24
**actually (24)**
36:3;37:11;49:1;
60:24;66:19;68:5;
77:21;79:4;83:9;92:16;
107:8;114:5;119:17;
121:1,4;130:4;149:10,
20;151:23;155:4;
156:5,8;158:16;160:7
**ad (41)**
13:21;14:4,25;15:14,
22;16:8;19:14;22:2;
35:13,25;44:11;48:23,
24,25;49:7;58:22,25;
61:17;62:4;77:7;93:25;
105:8;106:1;108:23;
110:19;113:20,25;
114:7;117:18;131:3;
134:15,16,19,25;
139:18,24,25;142:20;
156:6,9,9
**adamant (1)**
126:9;141:22
**add (2)**

35:8;154:2
**addition (2)**
23:19;114:11
**additional (5)**
37:18;145:20;151:4;
153:3,4
**address (18)**
14:5;31:20;47:23;
48:19;50:25;51:11;
52:5;54:25;55:15;56:1;
58:7;60:11,19;100:16;
105:24;125:13;127:7;
132:13
**addressed (7)**
28:20,24;58:20;
93:22;137:12;138:2,3
**addresses (1)**
106:7
**adequately (1)**
90:3
**adhering (1)**
91:8
**ad-hoc- (1)**
20:8
**adjourn (2)**
159:25;163:23
**administrative (4)**
131:18;132:6,16;
135:22
**adopt (3)**
117:2;161:16,23
**adopted (2)**
91:2;139:19
**advance (4)**
10:13;15:1;18:18;
62:2
**advantage (3)**
61:11;146:8;147:10
**advised (1)**
72:13
**advisor (1)**
72:14
**advisors (3)**
92:14;93:18;94:14
**Advocates (3)**
39:6;40:12;43:5
**affected (1)**
92:15
**afford (1)**
19:8
**afternoon (1)**
163:13
**again (71)**
9:8,17,25;10:21;
11:7;12:5,13,19;13:4;
15:9;18:8;23:4;25:3;
26:24;28:25;29:6;51:8;
52:5;55:14,24;56:22;
58:9,17,18;62:19,22;
64:14;68:8;83:14;
88:25;91:8;94:21;
100:9;101:2,11,22;
102:15;111:21,23;

112:3;113:18;116:5;
119:15;122:3;125:6;
126:19;136:14;137:5;
139:4,11,12,15,17;
140:2,6,14,21,22;
141:13;142:23;143:4,
18;145:2,13,24;
150:23;151:11;152:8;
153:7;155:21;160:22
**against (9)**
70:18;78:3;80:3;
90:13;104:3,25;
119:13;140:4;147:18
**agenda (1)**
13:21
**aggregate (2)**
92:14;154:5
**agnostic (1)**
32:23
**ago (8)**
10:15;14:21;32:9;
35:24;44:18;55:7;77:9;
82:1
**agree (19)**
11:21;16:20;35:10,
23;39:19;40:1;54:19;
82:2;83:22;85:2,19;
88:4,6;106:15;108:7;
125:10,10;127:18;
130:20
**agreed (4)**
29:18;89:19;127:19;
160:4
**agreeing (1)**
138:25
**agreement (7)**
49:21;69:23;102:8;
103:21;122:3;148:25;
149:2
**agreements (1)**
104:16
**ahead (8)**
38:5;60:12;65:6;
71:11;77:2;87:7;89:9;
105:9
**Airline (1)**
150:20
**Airlines (5)**
149:21;150:1,19;
151:12,16
**Airlines' (1)**
151:25
**Akin (1)**
14:3
**Alan (1)**
107:2
**align (1)**
25:9
**aligned (2)**
79:3;156:5
**Alisa (1)**
39:3
**alive (1)**

36:14
**alleged (1)**
88:11
**allegedly (1)**
139:23
**allocated (1)**
89:19
**allocation (2)**
14:5;110:10
**allocations (2)**
163:17,20
**allow (9)**
28:18;66:17;84:12;
90:7;108:4,16;134:3;
153:20;162:16
**allowed (11)**
36:1;87:20;88:4,5;
90:8,10;101:9;122:10;
127:24;154:11;161:23
**allowing (4)**
20:8;45:11;146:8,9
**alluded (2)**
58:21;71:16,16
**almost (2)**
92:2;109:10
**alone (2)**
91:11;149:13
**along (1)**
89:8
**alternative (2)**
11:10;27:10
**alternatives (6)**
10:13;16:18;24:9,9;
66:18;102:10
**although (5)**
29:2;81:23;90:6;
120:7;130:23
**altruistic (3)**
52:13;62:3,5
**always (5)**
41:11;114:19;137:9
**amended (4)**
36:8;106:7;124:2;
125:7
**American (6)**
149:21;150:1,19;
151:12,16,24
**among (6)**
8:16;16:2;24:11;
87:10,15;102:8
**amount (25)**
23:20;28:17;34:1;
44:6;50:9,10,13;55:23;
87:11;114:18;120:8;
123:23;124:23;152:11;
157:4
**amounts (3)**
84:1;87:19;121:1
**ample (3)**
45:1;58:18;142:25
**Amy (1)**
81:16
**Anaheim (1)**

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 166
of 190

107:2
**analysis (2)**
141:11;159:3
**analyze (1)**
40:7
**analyzing (1)**
108:15
**ancient (1)**
31:14
**and/or (1)**
73:12
**and-a-half (1)**
109:16
**Andrews (1)**
87:9
**announce (1)**
149:7
**announcement (2)**
99:3;112:11
**announcements (1)**
13:19
**anticipate (1)**
14:10
**anticipated (2)**
91:24;163:17
**anticipation (1)**
9:20
**anticompetitive (1)**
104:15
**anymore (1)**
135:9
**Apart (2)**
152:9;158:24
**apologies (1)**
93:1
**apologize (1)**
130:13
**apparently (1)**
65:22
**appealing (2)**
68:6,6
**Appeals (1)**
25:14
**appear (1)**
125:24
**appearance (2)**
46:4;81:15
**appearing (1)**
39:2
**applicable (1)**
137:21
**apply (1)**
106:22
**appointment (1)**
54:15
**appreciate (7)**
37:12;87:8;90:4;
94:13;153:14,21,21
**approach (2)**
67:22;68:5
**approaching (1)**
158:20
**appropriate (7)**

28:1;56:15;62:20;
104:21;114:22;131:19,
20
**approval (2)**
14:23;103:22
**approve (1)**
41:23
**approved (1)**
148:20
**approvement (1)**
149:9
**approves (2)**
41:23;148:7
**approximately (3)**
27:5;44:7;81:18
**Arent (1)**
44:5
**arguable (1)**
146:19
**argue (3)**
12:15;40:19;86:12
**arguing (1)**
10:10
**argument (17)**
10:19;26:12;59:25;
60:6;63:14;98:15;
100:19,21;105:25;
133:15;134:5;135:8;
136:8,9,16;141:23;
163:8
**arguments (15)**
9:20;11:10,13,17;
13:8;63:14;81:25;99:6,
10,12,13;113:1;115:7;
163:1,14
**arm's (1)**
149:1
**around (2)**
15:10;28:11
**art (2)**
117:11,12
**articulated (1)**
101:12
**artificial (1)**
51:6
**aside (5)**
17:5;42:14,21;50:6;
130:10
**aspect (1)**
8:12
**aspects (2)**
9:15;98:13
**assessment (1)**
158:11
**associated (1)**
91:3
**Association (1)**
114:13
**assume (4)**
33:25;34:2;118:5,6
**assuming (4)**
59:20;70:12;158:12,
21

**assumption (1)**
76:19
**assumptions (1)**
93:17
**assure (2)**
136:18,21
**asymmetrical (1)**
106:11
**Atlas (1)**
7:20
**attached (1)**
72:20
**attempt (3)**
30:24;31:1;61:20
**attendant (2)**
23:17,22
**attention (3)**
135:15;152:5,24
**attorney-client (1)**
73:21
**attract (3)**
120:5,6,8
**attributable (1)**
152:15
**attributed (1)**
157:24
**AUGUST (4)**
7:1;19:3;118:11;
129:21
**authority (4)**
41:14;128:2;129:21;
132:5
**authorized (1)**
38:6
**available (3)**
50:14;124:24;125:3
**avoid (1)**
99:12
**awake (2)**
151:17,22
**award (1)**
153:1
**awards (1)**
148:5
**aware (8)**
28:23;100:10;103:8;
113:25;116:7,12;
118:19;131:16
**away (1)**
24:25;51:2;52:25;
54:3,5;59:10,18,20;
82:9;118:10;128:21
**awful (1)**
49:16

**B**

**back (18)**
14:19,19;22:25;
30:16;35:24;56:10;
59:11;63:19;69:21;
101:14;106:10;118:12;
121:21;145:2;147:14;

153:7;155:23;160:8
**background (2)**
15:13;90:22
**backing (1)**
68:5;91:7
**backup (1)**
138:19
**bad (5)**
101:10;123:9,12;
125:8;154:14
**bad-faith (1)**
80:6
**Baker (1)**
89:23
**BakerHostetler (1)**
157:15
**balance (1)**
147:25
**balanced (1)**
159:2
**balancing (1)**
96:24
**ball (6)**
9:13;10:14;13:5;
33:13;116:25;117:1
**bank (1)**
81:19
**bankruptcy (30)**
7:17;8:11,15,20;9:4,
6,14,25;23:16;25:19;
37:24;38:1;41:22,25;
44:16;49:14,16,17;
83:9;101:4;107:25;
108:2;121:17;131:17;
132:11,19;136:5;
149:10,23;153:6
**banks (2)**
15:25;159:19
**bar (2)**
92:10;97:4
**barely (1)**
98:19
**bargain (1)**
28:12
**bargain-basement (1)**
27:11
**barrier (1)**
156:22
**bars (1)**
10:6
**baseball (2)**
116:16,17
**based (12)**
12:14;44:12;72:24;
75:19;76:18,22;91:11;
92:13,14;95:3;97:15;
128:20
**basic (3)**
35:14;70:2;135:18
**basically (3)**
131:21,24;151:24
**basis (8)**
64:10;79:24;118:3;

137:18;138:5;149:1,
13;161:23
**basket (3)**
24:8;82:23,24
**battle (1)**
17:7
**Bay (1)**
8:3
**bear (2)**
23:16;29:2
**beat (1)**
147:13
**became (1)**
68:2
**become (1)**
82:18
**begin (1)**
67:6
**beginning (1)**
40:3
**behalf (17)**
14:3;16:1,22;30:13;
44:5;46:7;66:14;81:17;
82:20;89:24;105:23;
110:19;113:19;114:20;
146:5;154:24;157:15
**behest (1)**
17:23
**behind (2)**
109:4;157:1
**believes (4)**
95:12;109:17,24;
159:1
**benchmark (2)**
147:11,11
**beneficial (1)**
44:20
**benefit (5)**
12:12;30:19;52:18;
59:2;104:12
**benefits (2)**
53:10;122:9
**benign (2)**
7:20,23
**Bennet's (1)**
66:3
**Bennett (132)**
47:9;51:4;58:7;66:2,
8,10,13,13;67:16,20,
22,24;68:22,24;69:6,
11,15,20,21,25;70:4,6,
8,14,16,21,23;71:1,4,7,
9,12,15;72:8,12;73:8,9,
11,17,19,21,25;74:3,7,
12,14,16,19,21,23,25;
75:3,7,8,11,18,22,25;
76:2,5,7,9,14,17,22,25;
77:3,5,20;78:11,13,22;
79:1,4,7,9,11,13,15,17,
20;80:1,13,17,20,23;
81:5;83:23;85:19;
87:16;98:14;99:14;
100:17;101:10;105:25;

Min-U-Script®
Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 167
of 190
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(2) analysis - Bennett

122:1;124:25;141:4;
145:23,25;146:3,5,15,
18,25;147:21;148:2,9,
11;149:19,23,25;
150:10,12,15,19,22;
151:6,8,10,20,22;
153:15,18,19,20,22;
155:2;156:5;161:21;
162:4,20

**Bennett's (7)**
57:6;65:4;100:8;
103:5;121:13;155:5;
162:24

**besides (1)**
135:16

**best (14)**
9:14;10:19;30:24;
38:18;67:22;82:21;
95:4,17;96:1,15;
102:14;106:21;108:10;
128:24

**bet (1)**
127:16

**Beth (1)**
44:4

**better (10)**
27:24;33:14;34:24;
73:16;77:13;96:6;98:1;
100:7;124:17;158:5

**beyond (3)**
10:8;149:11;162:10

**bids (3)**
97:16;100:4,5

**big (7)**
59:13;68:16;70:5;
75:16;85:12;96:16;
101:15

**bigger (1)**
71:5

**big-ticket (3)**
28:9;10;71:12

**bill (1)**
49:15

**billion (26)**
15:18,24;22:6;24:25;
26:25;27:5,25;28:7;
44:7;57:9,21;58:12;
71:13;73:3;101:4;
102:16;104:6,18;
108:24;141:6,7;151:2;
152:13,14;153:2;
159:19

**billion-dollar (1)**
103:19

**billions (10)**
16:6;24:18;34:25;
42:23;71:25;83:18;
142:8;156:25;158:21,
22

**bind (1)**
104:17

**Binder (1)**
39:2

**binding (3)**
50:8;104:2;106:16

**bit (12)**
15:13;46:16,21;67:9;
72:15,18;77:13;81:22;
82:7;111:8;147:5;
149:19

**blackout (1)**
135:12

**blackouts (3)**
131:10,14;133:24

**blank (2)**
19:4;147:17

**blanks (7)**
122:12;124:1;
147:16,16;148:2;
152:10;156:16

**blatantly (1)**
104:15

**Blumenstiel's (1)**
112:20

**bluntly (1)**
95:12

**board (3)**
121:21;155:4,6

**bogged (1)**
135:12

**BOKF (4)**
14:12;44:5;45:15,20

**bond (9)**
69:22;70:14,16;
71:18;78:3;99:17;
134:25;135:4,5

**bondholder (15)**
35:25;62:4;67:2;
73:5;91:7;93:20;95:1;
99:5;106:2;107:9;
110:4;113:2;117:17;
134:13;156:9

**bondholders (21)**
16:17;35:13;66:21;
70:13;73:2,7,10;77:25;
78:5;79:22;91:24;
100:12,18;117:3;
120:5;124:15,16;
147:6;159:15,19;
161:12

**bondholders' (10)**
40:17;42:15;68:19,
24;69:16;70:18;72:3;
73:11;94:20;142:21

**bondholder's (2)**
109:22;119:11

**bonds (11)**
65:14,15;68:14,18;
71:21,21,23;78:2;
117:21;121:25;128:1

**both (29)**
11:3,6;12:7;14:6;
16:14;40:18;42:14;
43:23;44:21;45:13;
48:22;63:2,4;64:15;
68:10;73:15;75:19;

76:18;78:2;87:13;
94:23,25;95:1;114:2;
118:1;124:12;151:14,
15;155:2

**bought (1)**
131:23

**bound (2)**
86:17;106:14

**bounds (1)**
148:24

**box (3)**
25:21;41:25;119:12

**boxed (1)**
144:24

**bracket (1)**
57:11

**Brad (1)**
38:11

**break (21)**
31:21;33:19;59:23;
90:18,19;99:7,16,21;
108:25;110:6,11,11,16;
111:24;112:7;126:17,
21;134:21;138:22;
152:12;157:16

**bridge (2)**
10:24;43:21

**brief (9)**
14:15;44:7;46:2,5,6,
13;77:6;87:12;99:3

**briefly (1)**
87:6

**bring (2)**
8:12;135:15

**bringing (1)**
82:10

**broad (4)**
67:25;102:7;115:8;
116:8

**broadly (1)**
68:6

**broken (1)**
152:12

**broker (3)**
62:16;102:23;104:22

**Brotherhood (1)**
38:12

**brought (3)**
21:15;25:8;117:25

**BROWNSTEIN (4)**
44:4,5;45:22,23

**Bruce (2)**
66:13;146:5

**build (1)**
103:14

**built (1)**
145:20

**bullets (1)**
36:24

**bunch (3)**
18:2;33:10;163:22

**burden (1)**
88:11

**burn (1)**
34:5

**business (5)**
7:11;24:15;76:10;
78:15;93:11

**businesses (1)**
16:6

**buy (4)**
48:5,9;78:6,9

## C

**CAL (2)**
141:8;152:21

**calculated (1)**
85:20

**calculates (1)**
52:11

**calculation (1)**
45:24

**calculations (1)**
69:13

**CALIFORNIA (8)**
7:1;8:9;16:5,6,9;
114:12;131:16,25

**Call (11)**
7:3;22:25;28:8;38:8;
46:4;59:16;95:6,6;
112:1;123:13;134:10

**called (4)**
11:14;41:7,7;72:2

**calls (1)**
75:5

**came (7)**
58:11;64:25;69:9;
78:18;117:7;125:1;
137:6

**Camp (1)**
7:20

**can (80)**
8:3;9:14;10:19;19:8,
21;25:21;31:21;33:5;
36:15;38:3;40:14,21;
43:11,18;49:13,16;
55:22;58:3;59:12;
61:11;64:8;65:17;72:5;
75:3;80:18;85:11,11;
86:18;88:22;93:17;
95:6,8,25;96:9,16;97:2,
17;99:18;100:14;
101:14,16,18;103:15;
104:18;105:20;106:5,
25;110:10,24;111:9,9;
122:16;123:3;126:14;
128:3,8;129:15;131:6;
132:18;133:21,23;
134:10;136:18;138:21;
143:11,13,13,22;
144:19;145:16;154:13;
156:23;158:6,7;
160:10,19;161:9,12;
162:7;163:19

**candid (1)**

60:17

**candidly (1)**
122:4

**cap (1)**
27:25

**capability (4)**
40:7,11,12,13

**capable (3)**
8:25;9:9;92:8

**capital (18)**
22:5;58:18;59:6,8;
87:10;101:4,5,6;
102:16;108:23;109:4;
120:9;121:18;124:23,
24;125:3;160:11;
162:25

**cap-trust (1)**
93:21

**car (1)**
115:3

**Cardelucci (12)**
69:8,9;85:23,25;
100:10,11;106:13,16,
25;107:7,8,13

**care (2)**
37:2;131:4

**career (1)**
35:5

**careful (1)**
80:7

**carriers (2)**
114:1,20

**case (55)**
8:14;11:12,12,25;
13:12;15:17;20:23,25;
24:19;25:7,11,25;35:5,
8;42:23;47:25;48:10;
56:7;60:25;67:2;69:4,
6,10;71:18;77:22;
80:25;81:2;83:19;
85:23;93:10;98:20;
100:10,12;101:12;
103:7;108:5;114:16;
115:17;121:11;122:2,
9;137:10,22;138:7,13;
149:10,23;150:1,3;
153:6;154:14;155:4,9;
161:24;162:7

**cases (46)**
16:15;19:10;21:11,
14;24:17;25:1,15;26:4;
27:1;37:15;44:10;48:4;
52:20;53:3;54:9,22;
55:17,18;58:20;60:16;
61:9;77:20,23;82:3;
86:11,15;88:24,25;
90:5;107:13;116:23;
118:1,15,15,18;125:9;
129:5;136:22;137:3;
139:14;140:10,22;
143:5,21;147:23;
148:23

**cash (9)**

Min-U-Script®
Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 168
of 190
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(3) Bennett's - cash

26:25;27:4;149:16;
162:14,15,21,23,25;
163:1
**catch (1)**
127:8
**categorical (1)**
107:20
**Categorically (2)**
65:16,19
**categories (1)**
16:3
**category (1)**
156:20
**Caton (33)**
47:9;81:13,16,16;
83:5,8,13,17,22;84:2,5,
8,12,15,21,24;85:2,5,7,
10,14,17,24;86:2,5,7,9,
11,15,19,25;87:1;
140:11
**cause (7)**
10:14;88:11,12;
101:18;115:20;145:16;
152:25
**caused (3)**
91:19;158:22,23
**CCA (1)**
131:22
**Cecily (2)**
89:23;157:14
**cede (8)**
14:6,11;26:22;38:4;
99:23;113:7;125:21;
129:7
**center (2)**
133:3,5
**centerpiece (2)**
26:24;72:3
**cents (5)**
41:21;51:8;52:11,12,
13
**Certainly (11)**
11:19;12:16;21:4;
24:20;84:2;96:5;99:14,
14;101:13;129:4;162:1
**certainty (1)**
24:22
**cetera (1)**
158:1
**chairs (1)**
112:16
**challenging (1)**
92:6
**chance (5)**
33:5;61:4;80:9;
98:19;122:23
**chances (1)**
69:16
**change (7)**
13:24;35:19;43:18;
75:16;76:10;147:23;
155:15
**changed (1)**

8:14
**changes (4)**
29:3;76:3,6;141:11
**chaos (1)**
15:5
**chaotic (1)**
15:9
**Chapter (9)**
25:17;45:7;55:8,17;
87:18;88:21;100:23;
137:9;155:5
**characterized (1)**
16:18
**charged (1)**
114:13
**charity (1)**
58:5
**charity's (1)**
140:13
**check (1)**
25:21
**checkbook (2)**
157:1,7
**checked (1)**
41:25
**checks (1)**
35:1
**choice (4)**
95:9,9,9;158:3
**choices (4)**
94:22;95:2;98:2,3
**chop (3)**
30:3;33:6;37:10
**chopped (1)**
30:3
**chopping (1)**
30:6
**chose (2)**
151:11;153:1
**chunks (1)**
66:20
**Circuit (8)**
25:14;51:6;69:2,6;
70:24;86:10,16,17
**circumstance (2)**
70:10;93:8
**circumstances (7)**
8:12;44:19;61:23;
88:24;137:21;138:5;
149:4
**cite (1)**
25:15
**City (1)**
133:17
**claim (8)**
15:20;19:23;97:5;
119:20;124:13;135:22;
152:17;153:11
**claimants (27)**
32:2;33:6;34:2;
43:14;50:14;51:7;53:2,
3;69:22;82:12;83:20;
85:8;87:22;89:25;94:7;

97:17;110:19;114:20;
142:10,13;150:4;
156:6;157:1,16;158:5,
7;159:3
**claimants' (3)**
139:11,22;142:19
**claimholders (2)**
93:25;98:18
**claims (75)**
23:23,25;27:7;33:8;
42:21;49:9,20;51:10;
52:17;53:2,5,5,8;55:10,
11;61:20;62:7;75:23;
76:11;78:3,3;80:25;
81:1;82:5,10;83:19,19;
84:8;87:20,25;92:9,14,
17,22,24,25;113:20;
114:2,4,8,10,11,18,23;
115:16,21,21;117:19;
120:14,15;121:1,12,20;
122:11;123:19;124:18;
125:3;131:19;132:6,
16;141:7;142:17;
143:3;149:15;152:15;
154:6,6,11,12;156:17;
157:2;159:6,11;
160:12,15
**claims-estimation (1)**
89:3
**clamoring (1)**
143:1
**clarify (4)**
40:16;114:21;116:2;
157:18
**clarity (1)**
137:11
**class (5)**
43:14;49:14;106:18;
107:9,9
**classes (6)**
22:20;42:16;43:13;
68:25;113:22;162:7
**classic (3)**
54:22;108:6,8
**clean (2)**
75:19;129:20
**clear (19)**
13:12;16:13;27:22;
28:19;36:22;49:5;
60:15;62:7;64:22;
71:10;76:19;78:12;
89:14;107:17,19;
116:13;139:8;140:20;
146:19
**cleared (1)**
67:6
**clearer (2)**
64:18,18
**Clearly (5)**
48:10;55:17;60:14;
137:15;138:4
**CLERK (3)**
7:4,9;112:9

**client (7)**
64:5;90:25;91:13;
97:24;134:18;141:23,
24
**clients (23)**
37:6;49:6;57:6;68:2,
4;69:24;74:12;81:19,
22,24;94:14;95:5;96:7;
98:1;115:3,22;117:18;
121:13;126:2;140:7,
23;161:12;162:24
**cloak (1)**
103:7
**close (1)**
133:6
**closer (8)**
8:13;31:16;69:7;
82:10;105:17;109:16;
151:24;159:24
**closing (4)**
20:20;87:2;99:6;
157:13
**clue (1)**
78:7
**cobbled (1)**
21:18
**cocounsel (1)**
87:9
**Code (7)**
25:16;49:14;62:16,
18;121:17;134:10;
154:10
**coercion (1)**
77:22
**coercive (2)**
77:24;153:8
**collaborative (1)**
118:3
**collateral (1)**
51:10
**collateralizing (1)**
71:24
**colleagues (1)**
160:14
**collectively (2)**
15:23;114:9
**college (1)**
16:2
**colloquy (3)**
146:4,7;155:1
**Columbus (5)**
87:6,10,13,14;
153:25
**coming (5)**
43:23;57:8;70:9;
99:11;158:2
**commence (1)**
158:7
**commended (1)**
31:5
**comment (11)**
18:21;30:17;31:20;
41:8;64:14;69:22;

86:22;110:25;122:11;
154:2;156:16
**comments (15)**
13:18;31:23;46:24;
59:12;71:16;85:19;
90:1;100:3,8;113:22;
117:5;130:14;137:20;
152:21;157:13
**Commercial (2)**
134:6,10
**Commission (1)**
11:20
**commit (2)**
24:24;72:21
**commitment (10)**
24:1;27:3;68:4;72:3;
73:5;77:12,12;87:15;
143:5;151:20
**commitments (22)**
19:23;20:1,2;29:5;
57:8;58:22;59:1,5,10;
65:10;68:1;70:8;72:20;
73:4,6;76:18;87:16,17;
146:21,22;162:1,2
**committed (8)**
15:19;20:2;32:2;
34:23,25;108:19,23;
142:24
**committee (51)**
13:9;21:14;4,8,25;
15:4,9,15,22;16:8;
19:14,14;20:9;22:2,19,
19;30:14;32:23;35:13;
48:22,24,25;70:18;
77:7;89:24;90:13;95:1,
12;96:3,7;97:2;98:21;
99:5,17;105:9,23;
108:14,24;109:24;
110:9;111:15;114:7;
122:15;124:13;134:8,
11;154:24;157:6,15,
17;159:13
**committees (1)**
44:22
**committee's (3)**
29:24;44:12;94:21
**common (3)**
25:23;87:11;105:2
**communicate (1)**
45:5
**communication (1)**
117:21
**communications (1)**
45:14
**communities (2)**
92:15;94:7
**community (2)**
8:11;94:6
**companies (3)**
15:25;114:6;159:15
**company (27)**
10:24;16:1;24:8;
28:16;48:6;52:14;

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 169
of 190

61:21;62:6;70:3;72:10;
75:20;76:18,19;77:14;
81:20,21;83:21;94:3;
101:3;118:1;120:17;
121:9,20;124:12;
126:5;147:8;162:16
**comparable (2)**
153:6;156:18
**compare (1)**
58:22
**compared (1)**
16:19
**compelling (1)**
72:19
**compensations (2)**
40:24;54:15
**compete (4)**
27:24;59:17;60:9;
148:3
**competent (1)**
72:14
**competing (27)**
9:22;10:10,11,22;
12:2;13:10;17:12;
34:17;53:20;59:10;
61:13,14;63:4;64:19;
66:17;77:12;83:3,11,
12;96:24;131:8;
132:13,23,24;133:10;
136:6;147:18
**competition (26)**
16:17;27:22;30:19,
23;31:2,4;44:19;46:16;
60:6;82:13,16;84:17;
97:8,10;100:5,5;101:2,
10;102:9;128:5;
130:21;131:6;134:8;
147:17;158:3,4
**competitive (13)**
15:8;16:15,23;21:11;
30:25;38:18;39:18;
44:23;45:11;101:8;
102:15;161:23;162:2
**competitor (1)**
45:12
**complete (1)**
94:11
**completely (1)**
106:16
**completing (1)**
34:18
**complex (1)**
88:25
**compliance (1)**
40:10
**complicated (2)**
8:21;56:23
**complied (1)**
143:21
**component (2)**
38:21;121:2
**comprehensive (1)**
10:17

**comprised (1)**
114:1
**concede (3)**
68:12;80:24;84:17
**conceded (1)**
141:9
**conceivable (1)**
147:2
**concern (1)**
74:15
**concerned (7)**
33:24;41:12;68:18;
74:4,7;126:3;131:10
**concerning (2)**
45:7;67:7
**concerns (1)**
106:7
**conclude (1)**
163:15
**concluded (3)**
152:23,24;164:5
**conclusion (1)**
23:24
**concrete (1)**
63:3
**condemn (1)**
108:3
**condemnation (1)**
120:22
**conditioned (3)**
65:11,11;142:12
**conditions (3)**
59:21;89:3;124:9
**conduct (4)**
77:15;80:1,6;104:20
**conducted (1)**
80:10
**conference (2)**
15:1;16:21
**conferences (1)**
123:13
**confidence (2)**
45:3;104:24
**confident (1)**
58:6
**confines (1)**
30:25
**confirm (1)**
87:18
**confirmability (2)**
109:3;149:12
**confirmable (9)**
9:19,24,25;10:6;
51:25;72:1;77:18;
101:13;117:9
**confirmation (21)**
17:7;18:14;19:15;
28:13,19;34:7,8,8;51:1,
2,16;55:22;92:9;93:19;
108:12,13;145:4,5,6;
148:21;149:11
**confirmed (5)**
36:3;51:19;68:25;

69:18;89:5
**conflict (2)**
107:22;131:9
**Congress (3)**
8:20,23;25:8
**connection (3)**
56:3;113:2;115:21
**consensual (11)**
11:18,23;12:6;61:1,
4,23;70:11;82:25;
118:16,17;125:8
**consensually (1)**
55:20
**consensus (19)**
15:10;45:2,13;52:24;
53:11,12,13,15;61:18;
102:6,7;103:14,15,16,
19;105:10;139:14,18,
22
**consent (1)**
143:22
**consequences (7)**
64:3,6;70:2;98:4;
104:8,12;141:25
**consider (5)**
91:20;92:13,19;
117:5,7
**consideration (6)**
25:23,24;66:23;
108:13;116:21;124:3
**considered (3)**
116:13;135:17;152:9
**considering (1)**
25:20
**consistent (2)**
13:23;100:11
**consists (1)**
15:22
**constituencies (2)**
33:19;140:23
**constituency (4)**
37:1;61:15;72:13;
137:16
**constituent (1)**
159:17
**constituents (4)**
32:25;45:6;90:3;
159:8
**constitute (1)**
82:9
**constructive (1)**
66:17
**constructs (1)**
45:7
**containing (2)**
36:3;72:1
**contemplate (1)**
62:18
**contemplated (1)**
27:6
**context (8)**
7:15;15:15;31:6;
102:22;105:5;139:9;

147:22;151:14
**continue (8)**
118:16;126:1;
128:24;137:2;138:20;
154:7,17;161:3
**continued (1)**
125:1
**continues (1)**
26:3
**continuing (1)**
77:10
**contours (1)**
98:18
**Contra (1)**
133:9
**contract (7)**
68:11,14,17;69:18;
100:13,15;148:5
**contracts (1)**
54:14
**contrary (1)**
21:9
**contrast (1)**
121:19
**contribute (2)**
22:6;27:4
**contribution (1)**
55:14
**control (7)**
18:5;10;62:15;105:7;
112:12;133:3,5
**convenience (1)**
99:7
**convenient (2)**
101:21;102:5
**conventions (1)**
108:8
**conversation (2)**
131:13;139:3
**conversations (6)**
83:14,16;118:1,2;
139:7;161:17
**conversion (2)**
141:3;157:2
**convert (2)**
120:2;150:4
**converted (1)**
151:3
**convertible (3)**
141:1;149:16;150:5
**converts (1)**
123:21
**convince (2)**
106:8;149:8
**cooperative (1)**
112:15
**copy (1)**
68:1
**corners (1)**
37:16
**Corning (2)**
116:10,12
**corporate (1)**

114:14
**Corporation (1)**
7:9
**correction (1)**
113:4
**correctly (1)**
116:6
**cost (2)**
68:13;74:10
**Costa (1)**
133:9
**costly (2)**
70:19,21
**costs (1)**
52:2
**counsel (18)**
11:9;12:15,18;13:7,
24;38:8;39:5;47:3;
54:10;60:5;64:14;
79:19;81:9;110:10,14;
111:20;163:12,22
**counted (1)**
94:17
**counting (1)**
108:24
**County (1)**
133:9
**couple (12)**
14:11;26:19;30:21;
35:24;39:25;47:10,23;
66:14;106:2;125:12;
153:5;154:25
**course (23)**
7:24;9:19,25;16:9;
20:10,14,24;26:21;
28:21;49:11;60:16;
69:7;100:10;118:25;
136:3,3,3;138:17;
139:6;147:9;148:8;
153:9;154:6
**Court (661)**
7:3,4,6,8;10:14;9:14,
16;15:2,7;17:1,11,15,
16,18,20;19:1,4,8,10,
13,15,20;19:1,3,6,17,
25;20:12,14,16,18,20,
24;21:5;22:10,14,17,
23;23:5,7,12,18;24:3,5;
25:8,12,14;26:7,9,11,
15,17,20,22;27:9,15;
28:2,11,18,21,23;29:9,
12,16,20,23,25;30:1,8,
12,15;31:3,12;32:4,7,9,
13,17,21;33:1,3,9,11,
17,21;34:4,10,12,14,
16,20;35:10,22;36:5,7,
11,13,16;37:4,17,22,
24;38:3,5,8,23;39:8,11,
13,15,20,23;40:8,14,
16;41:1,4,7,9,11,18,20,
22,25;42:4,9,13,19,25;
43:3,10,17,23,25;
44:24;45:10,22,24;

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 170
of 190

46:3,10,23;47:1,6,11,
15,17,20;48:18,20,24;
49:13,22,24;50:3,5,12,
15,17;51:14,16,21,23;
52:3,9;53:17,19,23;
54:1,4,6,8,20,23;55:3,
5,16,25;56:5,12;57:10,
14,16,20,22;58:1,5,11,
13,15;59:9,19,22;
60:12,14,18,21;61:3;
62:11,13,17,25;63:10,
12,18,23;64:1,4,11,21;
65:3,6,8,13,15,18,20,
24;66:2,6,8,11;67:10,
13,18,21,23;68:20,23;
69:4,9,12,19,21;70:1,5,
7,12,15,17,22,25;71:2,
5,8,11,14;72:7,11;73:8,
11,18,20,23;74:1,6,11,
13,15,18,20,22,24;
75:2,7,9,12,21,24;76:1,
3,6,8,12,16,21,24;77:1,
4,19;78:10,12,21;79:1,
5,8,10,12,14,16,18,25;
80:12,14,18,21;81:4,7,
11,15;83:2,6,12,15,18,
23;84:4,7,10,11,14,16,
22,25;85:4,6,9,13,16,
23,25;86:4,6,8,10,14,
16,24;87:1,4,7,21,24;
88:1,3,7;89:6,8,17,22;
90:2,4,8,10,16,17,24;
91:1,3,6,11,22;92:1,4,
5,11,18,21;93:2,4,6,9,
13,15,23;94:4,13;
95:17,20,22;96:18,20,
22,25;97:9,12,14,19,
21;98:7,10,16,24;99:1,
3;101:11,22;102:2,25;
103:3,10,12,18,23;
104:1,5,8,11;105:3,11,
12,14,16,20;107:2,5,
15,18,21;109:6,8,10,
19,21;110:3,6,9,16,23;
111:2,7,12,15,17,19;
112:10;113:9,13,15,25;
114:21;115:1,6,9,12,
14,19,22;116:1,5,9,12,
12,13,16,18,19,20;
117:4,6,10;118:3,5,9,
10,19,20,25;119:3,8,
21,24;120:1,4,10,12,
19,21,21;121:3,6,8,15,
23;122:7,13,18,20,23,
25;123:3,5,7,9,12,16;
124:5,8;125:6,10,16,
23,25;126:3,7,9,16,20,
24;127:2,4,10,12,14,
16,18,21;128:3,6,11,
13,16,20,22;129:8,11,
17,19,22,25;130:3,5,8,
18,24;131:1,15;132:2,
4,7,10,19,20,22;133:1,

3,5,9,13,15,19,25;
134:3,7,10,13,17,21,23,
25;135:2,4,6,8,12,18,
21,25;136:3,5,8,10,12;
138:8,10,12,15,17,25;
139:2;140:3,9,11,15,
19;141:9,15,17,20,22;
142:2,6,8,10;143:9,11,
16,19,24;144:3,8,10,
12,14,16,21,23;145:1,
6,8,12,15,18,21,23;
146:1,13,16,24;147:19;
148:1,8,10;149:10,18,
22,24;150:8,11,14,18,
21;151:5,7,9,19,21;
153:13,17,19,21,23;
154:1,21;155:18,22,25;
156:3,12,14;157:8,11;
158:17;159:7,20,22,24;
160:15,17,19,24;161:2,
5,18,20;162:18,20,22;
163:5,7,12
courthouse (2)
    55:21;57:24
courtroom (16)
    7:17;34:23;37:16;
    53:4;102:24;104:23;
    111:21;112:14,20,21;
    117:14,15;123:14;
    125:7;131:5;163:18
courts (1)
    25:19
Court's (6)
    95:12;113:21;116:7;
    117:4,6;119:19
cover (3)
    114:23;115:1;153:4
covered (1)
    158:23
CPUC (17)
    16:14,22;19:19;40:8;
    41:14,23;43:11;48:1,2,
    3;56:18;64:15,20,25;
    109:17;122:5;123:24
CPUC's (2)
    40:11;60:7
cramdown (5)
    17:7;62:12;70:2,9,19
crazy (1)
    85:1
create (7)
    45:14;70:9,10;128:4;
    131:18;152:6;153:2
creates (2)
    71:25;84:9
credibility (2)
    77:6;149:13
credible (15)
    9:19,24;10:1,4;
    21:18;24:24;44:12;
    63:14;75:1,3,11;77:17;
    97:3;101:12;117:8
credit (1)

90:11
creditor (9)
    48:4,4;61:8;78:3;
    81:22;87:25;103:19;
    107:1;139:14
creditors (21)
    10:4;11:5;25:17;
    30:14;42:7,10;46:19;
    48:22;52:18;68:10;
    78:18;88:15;103:8,15;
    106:17,22;107:8;
    154:10,24;159:14,18
creditors' (3)
    13:9;105:23;122:15
cries (1)
    60:25
crisp (2)
    146:19;147:3
criteria (1)
    20:23
critical (12)
    9:3;12:22;23:15,21;
    25:6;37:9;38:21,21;
    44:9;101:18;105:4;
    121:8
critically (1)
    101:8
criticism (6)
    22:23;42:15;103:1;
    122:17;124:16,17
criticisms (1)
    122:14
criticize (2)
    53:11;102:5
criticizing (1)
    64:24
cross (2)
    10:24;43:20
crowd (1)
    112:19
crowded (1)
    112:13
crystalize (1)
    49:17
crystalized (1)
    124:22
culpable (1)
    120:21
curious (1)
    78:17
current (4)
    76:13;92:12,13;
    93:20
currently (2)
    97:17;159:12
curtain (1)
    160:23
customers (1)
    131:23
cut (4)
    21:6;113:7;125:18;
    133:20
cutting (1)

111:20

D

daily (1)
    137:17
damage (1)
    114:23
Damocles (1)
    31:10
dance (1)
    156:23
data (1)
    72:19
date (7)
    18:11;35:11,11;
    60:24;64:2;92:10;97:4
dates (1)
    18:2
day (20)
    9:6;13:11,12,16;
    35:15;36:15;42:24;
    54:15;57:12;66:13;
    80:8;86:2;95:25,25;
    108:1;123:14;130:14;
    146:5;160:1;163:23
days (5)
    9:2;13:17;77:9;
    130:7;132:1
deadline (10)
    18:19;19:9;23:21;
    29:8;31:16;35:6;63:5;
    109:16,17;110:1
deadlines (1)
    122:6
deal (3)
    8:11,24;10:18;13:21;
    25:5;27:11,12,23;32:2;
    33:5;36:9;41:15;60:5;
    95:10;101:15;106:5,
    13,18,23;107:25;
    108:17;112:19;125:9,
    9,21;129:3;148:3;
    153:10;157:3;159:2;
    161:8,9,9
dealing (6)
    8:25;37:22;54:14;
    98:4;131:25;155:9
deals (2)
    75:19;82:20
dealt (2)
    84:1;106:17
death (1)
    115:2
debate (2)
    106:25;161:14
debt (8)
    15:24;27:17;81:19,
    20,23;120:2;138:9;
    150:5
debtor (34)
    10:16;12:10;20:9,21;
    23:14;26:6;35:13;

54:10;61:24;67:18;
78:15;79:3;81:2;83:1,
9;93:8;94:24;95:15;
99:14;100:12;102:25;
103:13,13;104:14;
105:5;118:13;127:22;
132:21;136:17;146:9,
9;152:1;153:8;157:19
debtor-in-possession (1)
    54:12
debtors (78)
    17:22,23;19:21;
    20:11;21:1,23;22:3,7;
    23:8;25:5,17,21;28:19;
    29:6;32:1;43:7;45:1,3,
    4,16;46:18;47:8;48:9;
    51:13;52:1,23,24;53:1;
    55:12;58:24;59:5,7;
    61:5,11;62:15,19;63:6;
    67:7,8,17;68:5,11,12;
    70:17;72:21;73:12;
    75:6;77:15,24;78:13;
    80:2,3;84:12;87:12,14;
    88:9,13,23,25;89:2,11;
    101:16;102:1,11,22;
    104:22;105:1;109:12;
    127:8;136:15;137:16;
    139:13,20;140:14;
    143:4;146:25;155:10,
    14
debtors' (27)
    10:20;12:15,18,25;
    17:4;21:10;22:17;24:1,
    22;25:9;29:2;35:7;
    40:2;17;80:24;88:18,
    20,21;89:4,15;93:11;
    98:19;129:1;154:17;
    158:3;19;161:11
debtor's (7)
    44:15;53:13;54:10;
    55:18;100:23;104:12;
    117:6
December (2)
    49:2;62:23
decide (1)
    13:4;139:5
decided (1)
    67:10,20
decides (1)
    28:18;133:6
decision (14)
    25:14;33:12,14;
    73:23;91:9,11;95:3;
    96:13,14,15;97:25;
    116:11;133:10;164:4
decisions (1)
    11:23
decision's (1)
    33:14
decks (1)
    67:6
deep (1)
    78:6

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**deeply (1)**
56:25
**defend (1)**
64:23
**defending (2)**
70:18;74:9
**defer (4)**
10:22;33:20;51:1;
95:18
**defined (1)**
9:24
**definition (1)**
115:8
**definitively (1)**
18:16
**degree (1)**
117:2
**delay (3)**
25:17;101:18;109:14
**delayed (1)**
44:11
**deliberate (1)**
67:9
**deliberately (1)**
25:7
**deliver (1)**
131:22
**delivered (1)**
87:14
**delta (2)**
93:6;125:4
**demanded (1)**
73:7
**demonstrate (2)**
124:24;160:10
**demonstrated (2)**
142:25;145:17
**demonstrates (3)**
21:10;44:19;140:2
**denial (1)**
155:17
**Dennis (4)**
7:5;30:10;105:22;
154:23
**deny (5)**
21:8;34:8,8;94:23;
157:6
**department (1)**
158:15
**dependent (1)**
55:18
**depending (1)**
120:25
**depends (2)**
103:11;126:13
**depriving (3)**
80:1,2,2
**describe (2)**
66:21;152:17
**described (3)**
94:12,25;142:17
**designed (2)**
68:7;139:25

**designees (1)**
155:5
**designs (1)**
92:5
**desired (1)**
40:14
**despite (1)**
45:1
**detail (9)**
13:8;14:22;35:25;
36:23;51:5;66:20;
100:16;119:19;141:4
**detailed (1)**
32:10
**details (4)**
26:5;68:9;93:16;
151:18
**determination (6)**
50:8;55:18;92:20;
116:15;142:16;160:21
**determinations (1)**
51:25
**determine (2)**
77:7;115:19
**determined (5)**
51:18;55:20;58:19;
120:15;141:8
**determines (2)**
120:21;143:2
**determining (2)**
82:6;116:20
**detriment (1)**
61:15;88:14
**detrimental (1)**
45:8
**develop (1)**
163:3
**developed (3)**
15:17;102:6,6
**development (2)**
14:20;118:24
**developments (2)**
13:20;37:20
**dialogue (5)**
11:18;12:1,5;45:4;
46:20;57:5;118:16;
158:7
**dice (1)**
98:1
**dictated (3)**
55:12;101:7,7
**dictates (1)**
55:10
**difference (3)**
84:9;85:2;140:17
**different (20)**
12:13,23;34:21,23;
43:20;48:2,7;49:4;
58:12;64:22;73:5;
76:15;92:16;107:7;
121:11;147:2;148:16;
155:10;156:7;161:1
**differing (1)**

43:3
**difficult (5)**
53:3;61:22;82:19;
97:6;163:15
**diligence (2)**
20:3,3
**diluted (2)**
69:16;121:13
**diluting (2)**
71:6;72:8
**dilution (2)**
28:5;148:13
**directly (1)**
56:17
**disadvantage (1)**
59:1
**disagree (4)**
12:3;60:2;122:16;
127:25
**disagreement (1)**
152:17
**disagrees (1)**
125:6
**disappear (1)**
115:16
**disapprove (1)**
41:23
**discerned (1)**
100:3
**disclosure (5)**
41:17;42:6,9;73:14;
106:4
**discount (17)**
17:6;27:18;48:9;
52:15;61:21;62:6,6;
78:6,10;141:3;150:7,8,
15,22,25;151:3,15
**discounts (1)**
88:14
**discovery (2)**
80:10;114:17
**discrete (1)**
84:1
**discretion (2)**
116:9
**discuss (3)**
25:20;77:25;160:25
**discussed (5)**
55:10;87:16,21;
155:25;161:1
**discussion (4)**
22:3;50:7;59:24;
142:20
**discussions (7)**
33:12;67:6;96:8;
124:12,20;139:8;
157:19
**dislike (1)**
124:3
**disqualifier (1)**
53:19
**disqualify (2)**
66:22;80:15

**disqualifying (1)**
53:22
**dissenting (1)**
49:14
**disservice (1)**
102:14
**distinction (1)**
84:2
**distinguished (1)**
9:21
**distraction (2)**
82:9;154:15
**distractions (1)**
88:18
**distress (2)**
115:2;158:22
**distributed (1)**
141:1
**distribution (1)**
141:5
**divide (1)**
47:4
**dividing (1)**
39:8
**DOA (2)**
143:22;155:21
**docket (1)**
22:9
**document (4)**
10:17;129:23;147:2,
4
**dollar (2)**
51:9;55:14
**dollars (40)**
15:18,24;16:6;22:6;
24:18,25;26:25;27:5,
25;28:16;34:25;41:13;
42:24;44:7;50:8;52:11;
57:9;68:14;71:13,25;
72:4,24;73:3;79:23;
83:18;101:4;102:16;
104:6,18;123:23;
141:6,7;142:10;
152:13,14;153:2;
156:25;157:3;158:21,
22
**dominates (1)**
16:19
**done (12)**
21:19;34:9;53:6,7;
69:24;97:8;109:18;
129:3;132:18;141:24,
24;154:15
**doom (1)**
61:16
**door (3)**
11:13;12:2;20:20;
112:20;139:3
**doubt (10)**
8:7;10:23;21:2;
25:18,25;32:8,14;
37:14;63:9,22
**Dow (2)**

116:9,12
**down (20)**
11:1;15:11;23:9;
33:23;35:16;40:25;
47:2,20;69:9;71:22;
72:5;73:15;84:16;
102:17;107:10;108:11;
113:7;115:11;131:22;
135:12
**draft (1)**
31:5
**drafted (1)**
31:8
**drafting (1)**
85:22
**dramatic (1)**
92:23
**dramatically (2)**
76:3,6
**drawing (2)**
94:1;121:21
**drill (1)**
33:23
**drive (3)**
45:2;58:5;59:14
**driven (1)**
38:15
**drives (1)**
142:3
**driveway (1)**
133:22
**driving (1)**
114:19
**dropped (1)**
72:15
**drying (1)**
37:20
**Dumas (65)**
47:13;65:6;66:3,7;
79:13;81:8,10;87:2;
89:18,21,23,23;90:9,
12,23;91:1,10,18,23;
92:5,12,22;93:3,5,7,14,
16;94:5;95:11,19,21;
96:17,19,21,23;97:1,
10,13,15,20;98:5,9,12,
17,25;99:1,2;111:17,
18;134:18;138:1,18;
139:7,16;157:8,10,14,
14;158:18;159:21,22,
23;160:8,14;162:7
**Dumas' (2)**
100:3;161:15
**dumb (1)**
22:10
**dumbfounded (1)**
132:4
**DUNNE (72)**
30:5,10,11,12,13,16;
31:13;32:6,8,12,14,18,
22,23;2,4,10,16,18,22;
34:5,11,13,15,18,21;
35:21,23;36:6,8,12,14,

Min-U-Script®

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 172
of 190

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(7) deeply - DUNNE

17;37:11,18,23,25;
38:4;7;99:23;100:15;
105:15,17,18,22,22;
107:4,6,16,19,23;
109:7,9,11,20;110:3;
111:15,16;121:24;
122:20,21;153:23;
154:22,23,23;155:19,
23;156:2,4,13,15;
159:14;160:5
**Dunne's (3)**
49:6;159:17;160:7
**during (5)**
57:23;69:9;143:7;
155:4;157:16
**duties (1)**
143:5
**dwarf (1)**
136:2

**E**

**earlier (13)**
26:1;31:16;32:16;
55:24;58:22;61:1;
62:12;113:21;124:11;
137:8;138:1;156:1,21
**earliest (1)**
97:4
**early (1)**
13:17
**earned (2)**
21:25;103:3
**earnest (1)**
137:7
**easier (1)**
142:11
**easily (1)**
124:24
**East (1)**
8:3
**easy (3)**
49:24;53:5;63:16
**echo (1)**
130:21
**echoing (2)**
7:12;158:3
**economic (7)**
48:3;52:19;61:6,9;
62:2;85:5;136:21
**economically (1)**
52:19
**economics (1)**
137:12
**effect (7)**
26:2;67:2;72:8;98:7;
131:20;136:17;147:23
**effective (2)**
37:8;68:15
**effectively (2)**
22:20;138:6
**efficient (3)**
46:14;59:6;130:11

**effort (1)**
61:16
**efforts (4)**
19:11,12;31:5;154:5
**eggs (3)**
24:7;82:23,24
**eight (2)**
151:11,11
**eighteen (1)**
113:7
**eighty (1)**
160:5
**eighty-five (1)**
114:9
**either (11)**
10:22;11:5;12:6;
35:18;37:1;49:20;63:3;
90:12;106:6;107:23;
115:12
**Electric (1)**
10:12
**Electrical (1)**
38:12
**element (2)**
103:23;107:22
**elements (2)**
35:14;36:3
**elevating (1)**
78:2
**eleven (2)**
114:8,11
**eliminate (1)**
142:6
**eloquent (1)**
98:14
**else (21)**
7:19;11:15;17:24;
31:4;41:25;53:16;60:7;
66:4;75:25;78:16;
84:18;104:14;112:18;
115:23;128:2,17;
129:10;138:9;140:25;
145:24;154:1
**else's (1)**
22:23;54:17;125:17
**eluded (1)**
65:9
**embarrassed (1)**
78:25
**embedded (1)**
151:18
**Emboldening (1)**
61:25
**embrace (2)**
78:13,24
**emerge (1)**
24:17
**emergence (3)**
44:15;100:23;109:25
**emerges (1)**
25:22
**emerging (1)**
25:4

**emotion (1)**
53:4
**emotional (3)**
8:24;115:2;158:22
**employ (1)**
16:5
**employees (1)**
27:8
**enable (1)**
27:4
**enabling (1)**
61:25
**enacted (2)**
49:9;137:22
**enactment (1)**
91:21
**encourage (1)**
45:15
**encouraged (1)**
31:5
**end (14)**
13:16,18;17:2;18:11;
34:2;35:8;36:15;37:21;
40:24;69:23;113:8;
118:11;121:10;131:11
**endless (1)**
83:15
**endlessly (1)**
8:7
**endowments (1)**
16:2
**enforced (1)**
47:2
**enforcement (1)**
42:22
**engage (6)**
19:19;22:11;39:18;
45:6;77:25;97:18
**engaged (2)**
39:24;56:25
**engaging (1)**
22:7
**Engel (51)**
129:11,16,18,20,20,
23;130:2,4,6,13,20,25;
131:2,18;132:2,3,6,9,
12,21,24;133:2,4,8,12,
14,16,21,25;134:2,6,8,
12,15,19,22,24;135:1,
3,5,7,11,13,18,20,24;
136:1,4,6,9,11
**Engle (4)**
113:5,12,14,16
**Engle's (1)**
119:10
**enhance (2)**
61:7;62:7
**enhanced (2)**
12:2;61:19
**enormously (1)**
160:19
**enough (9)**
26:16;28:16;34:9;

61:22;66:22;90:7;98:5;
111:13;157:17
**ensure (1)**
91:2
**enter (1)**
47:9
**enterprise (1)**
93:18
**entire (1)**
46:15;107:9;111:11
**entirely (1)**
100:21
**entities (7)**
11:3,3;53:14;55:2;
104:2,18;139:20
**entitled (4)**
9:15;27:12;100:14;
129:24
**entitlement (1)**
100:14
**entity (6)**
52:16,18;102:21;
103:5;104:9;132:25
**entry (1)**
156:22
**equal (1)**
93:24
**equally (1)**
137:20
**equation (1)**
16:19
**equitable (1)**
107:12
**equitizing (1)**
125:2
**equity (60)**
16:17;17:3,8,23;
20:4,13;27:18;28:5;
48:9;58:23,25;59:5;
61:21;62:12;65:11,12,
14,15;66:14;68:25;
69:16,17,23;70:10,17;
71:6;72:4,9,10,21;
73:6;75:4,4,5,19;76:9,
17;79:3;81:23,24;94:2;
100:25;105:7;106:12;
108:24;120:3;121:13,
15;123:21;124:18;
129:2;146:6;148:6,9,
13;150:6,13;155:7;
157:3;161:22
**equity- (1)**
80:5
**equity-type (1)**
99:15
**equivocal (1)**
64:22
**essence (1)**
44:10
**essential (1)**
40:9
**essentially (3)**
48:8;50:2;149:20

**establish (1)**
93:9;158:21
**established (2)**
88:12;147:4;150:13
**estate (2)**
52:1;104:17
**estates (1)**
23:22;45:12
**estimate (2)**
50:1;92:20;108:22;
152:11
**estimated (3)**
50:9;76:12;97:5
**estimates (1)**
92:13
**estimation (20)**
9:5;11:5;13:15;
23:22,24;33:7;34:6;
35:17;55:21;56:2;
59:14;73:14;75:15;
84:5;97:22;118:4;
123:20;137:22;142:13;
161:7
**estimations (1)**
92:12
**et (1)**
158:1
**even (28)**
22:8,20;24:13,16;
27:12;34:16;37:7;40:7;
41:12,14;56:19;59:6,
17;66:12;68:16;71:20,
24;72:14;90:21;
102:12,17;104:3;
124:15;131:6;138:3;
144:16;152:14,19
**event (4)**
82:5;91:19;92:18;
145:10
**events (2)**
16:11;18:4
**everybody (23)**
17:24;22:23;31:3;
34:25;54:9;55:16;60:7;
91:15;94:20;102:8;
112:15,18;118:10,12;
119:13;125:17;127:7;
128:8;129:2;143:13;
158:10,25;163:25
**everybody's (1)**
131:14
**everyone (7)**
7:6;13:12;59:12;
69:2;91:4;138:9;
158:19
**everyone's (1)**
99:7
**evidentiary (2)**
77:15;80:22
**ex (1)**
114:12
**exact (3)**
57:18;58:11;101:5

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 173
of 190

**exactly (16)**
31:14;32:12,15,19;
37:25;56:25;83:13,17;
85:20;100:21;109:1,
11;116:19;120:14;
142:5;161:24
**examined (1)**
149:3
**example (8)**
10:3;20:3;23:24;
72:20;106:14;107:16;
133:14,16
**examples (1)**
151:16
**exceed (1)**
147:6
**exceeding (1)**
40:13
**except (2)**
84:1;102:8
**excess (4)**
15:23;57:9;58:25;
141:6
**exchange (1)**
71:18
**exclusion (2)**
17:24;105:8
**exclusive (5)**
25:9;40:2;48:1;
117:6;138:6
**exclusively (1)**
67:10
**exclusivity (80)**
9:5;11:2;12:11,20;
13:15;16:24;20:24;
25:3,20,24;30:25;31:6,
19;34:15;38:22;40:5;
44:2;45:10;46:17;
48:11;52:25;53:13;
54:3;59:23,24;60:16;
64:7,9,16;66:16;67:4,
15;78:18;79:2;88:10;
89:15;90:19,19;102:3;
104:25;109:23;110:5;
112:24;113:6;116:8,
11,21;117:1,7,25;
118:9;124:9;126:4,17,
18;128:20,23;134:19,
21;136:17;138:22;
139:12;143:23;145:3;
148:19;153:18;154:8,
13,18;155:16,24;
158:9;159:1,4,10;
161:8,16,17;162:9;
164:4
**excuse (2)**
99:17;146:5
**execution (1)**
37:3
**exercising (1)**
153:8
**exist (2)**
14:20;24:10

**existing (5)**
28:5;72:9;88:14,19;
123:25
**exit (2)**
38:17,21
**exotic (2)**
149:19,20
**expect (5)**
13:7;46:4;75:6;
112:13;140:11
**expectation (1)**
13:13
**expected (1)**
45:25
**expecting (1)**
44:1
**expedited (3)**
45:14;64:10;143:23
**expense (1)**
52:19
**experience (1)**
36:2
**experienced (3)**
8:1,6;96:12
**explain (4)**
17:19;22:1;23:6;
156:11
**express (1)**
90:3
**expressed (1)**
44:22
**extend (1)**
126:18
**extended (1)**
145:10
**extending (2)**
59:24;117:5
**extension (1)**
144:6
**extent (5)**
23:8;33:9;112:25;
143:2;152:4
**extra (2)**
35:8;74:8
**extrapolate (1)**
93:17
**extreme (1)**
10:8
**extremely (1)**
59:3
**eye (2)**
9:13;15:17

**F**

**face (1)**
52:1
**faced (1)**
34:7
**facilitate (2)**
116:22;147:17
**fact (24)**
46:19;51:4;57:25;

60:4;64:17;65:9;73:9;
80:24;87:23;109:17;
116:18;117:12;119:1,
8,9;120:13;132:24;
136:23;139:20;142:18;
143:1;151:12;153:4;
155:15
**factions (1)**
17:3
**factor (3)**
21:14;40:23;77:21
**factors (7)**
25:19,22,22;77:18;
95:4;116:13,14
**facts (1)**
153:1
**fail (4)**
10:7;18:18,21,22
**failed (4)**
19:13;31:1;45:2;
114:14
**failing (1)**
25:2
**fails (2)**
35:7;149:13
**failure (1)**
61:16
**fair (14)**
15:19;18:7,9;24:19;
96:11;98:5;101:17;
107:11;109:25;114:17,
18;122:10;152:16;
159:2
**fairly (3)**
26:25;51:16;112:13
**fair-market (1)**
77:8
**fairness (2)**
51:14;119:5
**faith (2)**
51:6;151:13
**fall (3)**
8:4;31:15;108:11
**fallacy (1)**
162:12
**false (1)**
63:13
**familiar (1)**
40:11
**families (1)**
8:6
**far (4)**
41:12;68:17;103:7;
158:24
**Farr (1)**
113:19
**fashion (1)**
30:24
**fashioned (1)**
32:5
**fast (3)**
15:20;24:19;46:14
**fastball (1)**

105:18
**faster (1)**
67:8
**favor (4)**
13:3;39:25;100:4;
159:4
**favorable (2)**
97:23;141:10
**feasibility (1)**
37:2;77:2
**feasible (1)**
38:17
**feather (2)**
85:11;156:20
**feathering (5)**
84:18,19;140:12,16;
163:9
**feature (1)**
27:2
**features (1)**
152:1
**February (2)**
118:22;128:11
**federal (3)**
68:18,20;106:15
**feel (1)**
143:20
**feeling (1)**
44:17
**feelings (1)**
60:15
**fees (1)**
73:5
**Feld (1)**
14:3
**Feldman (103)**
93:1;110:6,8,13,15,
18,19,24;111:5;112:2,
24;113:4,11,17,18,19;
114:25;115:5,7,10,13,
19,24;116:3,7,17;
117:12;118:8,23;
119:1,4,17,22,25;
120:2,5,11,13,24;
121:4,7,9,17,24;122:8,
16,19,21,24;123:1,4,6,
8,10,14,17;124:7;
125:12,20,24;126:8,13,
18,23,25;127:3,5,11,
13,15,17,20,22;128:3,
4,10,12,15,18,23;
129:9;136:16;137:14;
138:20;141:9;142:14;
147:19;157:12;159:24;
160:2,18,22,25;161:3,
15,19,21;162:19,21,24;
163:6,10,11
**Feldman's (1)**
138:6
**fell (1)**
142:10
**fence (1)**
106:12

**fervently (1)**
11:11;30:23
**few (4)**
7:10;12:20;13:17;
105:24;141:4;160:2
**fiduciaries (1)**
61:5,6;62:19
**fiduciary (2)**
127:23;143:5
**field (1)**
153:11
**fifteen (11)**
47:9;72:9;99:5,20;
111:5,12,25;150:6,15,
25;151:2
**Fifteen- (1)**
112:6
**Fifth (1)**
25:13
**fifty (3)**
92:24,25;112:4
**fight (2)**
69:23;70:19
**fighting (1)**
17:8
**fights (1)**
69:3
**figure (5)**
57:11;63:7;80:8,10;
82:4
**figured (1)**
75:13
**figures (1)**
152:12
**figuring (2)**
35:1;81:3
**file (50)**
11:4;16:10;18:24;
44:25;48:14;49:4;
53:20;56:22;57:2,4;
63:4,5,7,25;64:7;75:6;
79:10,16;82:6;84:12;
89:2,13;91:15;92:17;
94:16,21;95:1,1;
123:25;124:8;125:7;
126:14,21;127:8;
128:1,9;129:21;134:4;
137:1;142:24;143:6,
23;144:4,19;146:10;
155:12,14;156:23;
158:15;160:10
**filed (52)**
8:15;10:17,24;12:11,
15;13:1;14:25;15:3;
21:4,6,12;22:8;26:8,
12;30:6,18;31:8,25;
32:1,18;42:22;43:7;
44:18;56:2,2;57:7,16;
62:8,10,63:20;79:14;
83:9;87:13;91:6,24;
94:19;103:9;104:24;
113:9;117:17,19;
119:2,10;129:12;

Min-U-Script®

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 174
of 190

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) exactly - filed

130:14;132:13;146:10,
22,23,24;155:6;161:25
**files (1)**
136:18
**filing (18)**
17:25;21:8,9;26:1;
27:9;29:3;30:20;49:1,
1;62:22;67:1;72:15,21;
119:11;124:2,9;128:1;
154:18
**filings (3)**
117:20;124:4;129:14
**fill (1)**
147:19
**filled (1)**
152:10
**final (4)**
64:14;65:7;99:20;
161:19
**finalizing (1)**
91:5
**finally (2)**
21:15;80:23
**finance (1)**
32:2
**financeable (1)**
117:9
**financed (1)**
80:6
**financial (11)**
8:22;9:1,15;59:1;
72:14;108:18;109:4;
127:23;135:16,17;
158:20
**financing (10)**
19:23;20:1,2;34:23;
67:7;80:3;108:20;
119:23;142:25;143:2
**find (4)**
10:4;106:6;131:11;
155:20
**findings (1)**
153:11
**fine (3)**
11:24;37:1;143:24
**finger (2)**
62:10;140:18
**finish (2)**
125:20;130:25
**finished (1)**
45:25
**fire (19)**
17:4;35:17;42:17;
43:13,13;46:7,9;50:14;
75:15;102:13;115:15;
120:20;131:12;141:8,
8,10;152:21,24,25
**fires (8)**
7:19,25;9:7;37:18;
46:11;94:8;97:23;
131:12
**firm (1)**
90:4

**firmly (1)**
12:3
**firms (1)**
94:2
**first (34)**
11:25;16:13;23:13;
27:21;35:4;47:25;
54:15;58:11;66:14;
68:9;69:10;71:13;81:5;
82:2;83:4,9,10;84:13;
90:1;92:9;93:8;95:14;
101:12,15;103:6;
120:25;140:5;147:15;
148:15;155:1;159:5;
160:4,5;161:9
**fits (1)**
44:13
**five (9)**
14:6,7;15:23;27:5;
38:2;72:9;73:3;99:23;
123:23
**five-four (1)**
116:18
**fix (4)**
63:16;132:5;136:5,7
**flesh (1)**
146:9
**flex (1)**
59:8
**flexibility (3)**
25:9;59:6;152:1
**flexible (3)**
163:19,25;164:1
**floodgates (1)**
11:14
**floor (1)**
112:17
**fluid (1)**
94:14
**fly (1)**
161:6
**focus (13)**
10:9,9,10,21;38:18;
71:7,12;77:5;99:18;
103:24;106:1;147:14;
152:8
**focused (6)**
18:12;37:2;38:1,21;
108:15,18
**focusing (1)**
9:3
**folks (1)**
102:8
**follow (5)**
13:20;84:10;86:17;
146:4,7
**followed (1)**
18:2
**following (2)**
13:13;100:23
**foot (1)**
79:2
**forbid (1)**

37:18
**force (1)**
114:19
**forceful (1)**
157:16
**forces (1)**
128:25
**foreclose (1)**
46:18
**foreshadowed (1)**
147:15
**forever (1)**
8:8
**forge (2)**
103:14;105:10
**forgotten (2)**
40:18;145:4
**form (3)**
56:13;138:18;146:22
**formal (1)**
80:18
**formulation (1)**
55:9
**forth (5)**
49:4;57:1;59:21;
117:25;157:20
**forthcoming (1)**
97:4
**forthright (1)**
45:16
**forty (2)**
112:4;133:17
**forty- (1)**
47:20
**forty-five (1)**
47:4
**forward (44)**
10:14;12:5;13:6;
20:9,9,15;25:1,25;
27:8;28:18;33:24;34:1;
37:13;40:4;44:14;
45:11,18;51:11;52:2,
15;57:8;73:12,13;
93:11;94:9,24;97:11;
108:4,10,16;116:23,25;
117:1,8;121:11;126:8;
127:24;128:24;137:17;
141:14;142:9,15;
143:21;145:11
**foster (3)**
11:18;12:5;161:17
**fostering (1)**
12:1
**found (2)**
77:21;157:23
**four (5)**
31:23;36:25;37:16;
47:21;81:23
**Fox (1)**
44:5
**frame (1)**
91:25;92:2;126:11
**framework (1)**

45:12
**Franciscan (1)**
8:2
**FRANCISCO (3)**
7:1,17;133:17
**frankly (6)**
21:18;24:23;117:4;
122:17;147:22;149:3
**fraught (1)**
37:13
**free (1)**
128:8
**Friday (6)**
31:1,3;56:19;64:19;
87:21;92:1
**Friday's (1)**
16:21
**front (1)**
36:25
**frustrated (1)**
123:1
**fulcrum (3)**
81:22;138:7,9
**full (6)**
27:6;36:20,22;49:25;
50:4;87:20;88:16;
94:11;110:20;111:5;
114:17,18;122:10;
138:11;140:24;154:12
**fully (2)**
32:1;146:9
**Fulton (1)**
132:8
**fund (7)**
24:4;25:5;26:24;
27:5;61:12;88:21;
123:23
**fundamental (1)**
25:15;51:5,7;55:8;
81:2;83:2;101:1
**funding (9)**
29:4;35:16;55:23;
57:6,7;58:10;87:17,18;
123:22
**funds (7)**
15:25;16:4;22:5;
24:21;27:7;61:12;94:2
**further (6)**
26:22;29:14;44:11;
58:7;66:22;67:3
**future (4)**
25:6;35:11;76:22;
78:2

**G**

**Gallagher (1)**
113:19
**galvanizing (1)**
21:14
**gamble (1)**
73:23
**gambling (1)**

73:25
**Gas (1)**
10:12
**gate (1)**
93:24
**gatekeeper (2)**
45:10;51:24
**gates (3)**
108:3;147:7;152:9
**gating (3)**
28:17,25;92:18
**gave (2)**
13:23;120:10
**general (1)**
27:6
**generally (1)**
17:4
**generated (1)**
70:8
**gets (5)**
56:22;69:21;91:2;
121:13;148:24
**Ghost (1)**
7:24
**given (6)**
8:16;22:23;45:8;
69:15;70:24;136:23
**gives (3)**
107:2;152:11;153:3
**giving (2)**
78:4;136:25
**glaring (1)**
44:25
**glossed (1)**
51:9
**goal (4)**
10:14,15;12:8;62:20
**goals (1)**
114:16
**God (1)**
8:8
**Godot (1)**
126:5
**goes (9)**
34:1;35:24;46:16;
68:15;73:13;76:15;
121:11;141:11;155:9
**go-forward (3)**
24:15;55:13;61:12
**Good (42)**
7:6,7;13:1;14:1,2;
15:7;16:18;21:15;26:9;
38:11,25;39:1,4;43:22;
44:3,4;46:6;47:6,7;
51:6;64:7;66:9,17;
81:16;82:17;86:10;
89:22,23;94:3;101:3;
102:9;103:14;110:15;
118:14;124:18;128:19;
129:5;131:2,6;134:9;
140:7;151:13
**good-faith (1)**
79:24

Min-U-Script®
Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 175
of 190
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) files - good-faith

**gotcha (1)**
85:16
**Gotshal (2)**
47:8;136:15
**govern (1)**
119:15
**governed (1)**
114:7
**government (1)**
131:24
**governor (7)**
11:19;16:16;31:3;
38:16;48:1;56:17;
122:4
**Governor's (5)**
16:14,20;44:21;60:6;
64:15
**governs (1)**
116:8
**grant (6)**
15:5;27:16;28:11;
45:20;94:25;134:19
**granting (1)**
71:17
**grants (2)**
51:10;68:10
**gratefully (1)**
40:3
**Great (3)**
14:14;30:2;147:6
**greater (1)**
151:16
**greatly (1)**
37:2
**group (39)**
17:6;20:4;22:4;
24:24;35:14;51:8;
52:13,18;59:1,2;61:19;
62:4,11;68:2;73:12;
99:8;101:5;110:4,19;
113:2,20;114:1,6,7;
117:17,18;119:20;
131:3;138:7;139:13,
15,18,25,25;141:15;
148:12,18;155:5;156:9
**groups (3)**
11:5;134:4;139:14
**group's (1)**
112:23
**Guarantee (2)**
114:13;162:7
**guess (5)**
31:13;47:16;63:6;
106:13;112:3
**guidance (4)**
90:15;95:13;107:3;
160:16
**gulf (1)**
159:11
**Gump (1)**
14:3
**guns (1)**
129:2

## H

**hairs (1)**
159:13
**half (1)**
162:5
**hallmarks (1)**
61:17
**hand (4)**
7:11;97:6,7;156:15
**handling (1)**
8:25
**handpicked (1)**
155:5
**hanging (1)**
31:10
**happen (17)**
24:11;32:15;34:12,
14,16;41:9;84:6,13;
86:14;91:16;118:7,14,
15;140:24;145:9;
149:5;155:8
**happened (5)**
30:19;32:16;59:9;
78:17;128:20
**happening (2)**
117:14;131:20
**happens (12)**
13:16;41:11;60:4;
115:14,16,17;120:19,
22,25;121:11;126:22;
132:7
**happily (1)**
86:19
**happy (7)**
26:21;120:9;124:10;
125:6;156:4;162:14,25
**hard (8)**
38:15;62:25;63:2;
130:11;134:12;139:2;
140:21;148:3
**hardened (1)**
82:20
**hardening (1)**
133:21
**harm (5)**
20:8;60:4;101:19;
102:18;158:21
**harmful (2)**
45:12;88:18
**harming (1)**
125:5
**Harris (25)**
38:24,25;39:1,2,5,16,
22,24;40:22;41:2,5,8,
10,16,19;42:2,5,12,18,
21;43:1,9,16,22,24
**Harvey (1)**
7:21
**Hauer (1)**
14:3
**Hays (1)**

46:7
**head (1)**
93:24
**heads (1)**
31:11
**health (1)**
23:15
**healthy (1)**
16:18
**hear (19)**
9:6,8;13:20;15:7;
25:18;33:10;36:18;
99:15;101:9;105:3;
108:25;111:3;118:3;
123:17;126:7;127:12,
23;162:3,4
**heard (24)**
9:7;16:22;19:18;
30:1,21;31:1;44:1;
46:1;64:9,16;87:6;
98:17;102:23;103:23;
105:25;108:5;109:16,
19;129:11;140:3;
145:24;160:14;161:6,7
**hearing (15)**
9:4;13:16;55:21;
56:3;64:7;77:16;80:22;
90:2;91:13;107:21;
111:25;117:5;128:21;
142:13;149:11
**hearings (2)**
13:13;30:21
**heart (2)**
85:21;133:18
**heat (1)**
105:19
**heaven (1)**
37:18
**hedge (1)**
94:2
**help (4)**
8:18;9:9;46:19;92:8
**helpful (3)**
12:3,7;45:12
**helps (1)**
16:24
**here's (3)**
103:20;122:23;129:1
**herring (1)**
155:13
**hiatus (1)**
14:18
**hide (1)**
118:12
**high (3)**
35:18;100:1;147:12
**higher (6)**
68:18,20;78:1,4;
92:24;153:5
**highly (1)**
33:20
**Hill (5)**
87:6,10,13,14;

153:25
**himself (1)**
64:23
**history (2)**
12:4;114:15
**hit (2)**
26:19;135:21
**hits (1)**
132:8
**hitting (1)**
23:21
**hoc (41)**
13:21;14:4,25;15:14,
22;16:8;19:14;22:2;
35:13,25;44:11;48:23,
24,25;49:7;58:22,25;
61:17;62:4;77:7;93:25;
105:8;106:1;108:23;
110:19;113:20;114:1,
7;117:18;131:3;
134:15,16,19,25;
139:18,24,25;142:20;
156:6,9,10
**hold (6)**
15:23;81:19,23,24;
114:3,9
**Holdco (2)**
81:17,20
**holders (12)**
16:17;17:23;20:4,13;
49:9;65:11;66:14;
105:7;114:2,8,11;
146:6
**holding (1)**
23:17
**hole (2)**
136:19,23
**holes (1)**
118:12
**home (2)**
91:12;132:10
**homeowner's (1)**
158:24
**homework (1)**
91:13
**honest (3)**
62:15;102:23;104:22
**honestly (1)**
116:3
**Honor (300)**
7:7,7;14:2,5,17,17,
20,22,24;15:6,12,16,
22;16:4,7,11,13,16,20,
21;17:21;18:9;19:7,13,
18,21,22;20:6,7,23;
21:7,9,12,17,22,25;
22:8;23:3,19,24;24:7,
12,16,22;25:2,7,13,18,
22;26:4,24;27:4,21,25;
28:13;29:1,7,14,22;
30:5,16,22;31:1,6,18,
20;32:22;33:16,25;
35:2,23,25;36:9,17;

38:1,11;39:1,4,7,10,16,
22;40:6,22;41:19;42:2,
12,24;43:16,22,24;
44:4,8;45:20;46:2,7,8;
47:7;48:3,8,12,15,19;
49:3,8,19;50:21;51:1,9,
20;52:6,10,21,23;53:1,
14,18,25;54:2,19,25;
55:2,7,12;56:2,9,24;
57:3,15,19;58:9,12,16,
19;59:4;60:25;61:6,13,
22;62:9,21;63:11,17,
21,24;64:19;66:10,13;
67:8;68:12;69:15;70:4;
71:20;73:4,9,17,19;
74:4,21,25;75:18;77:8,
17;78:7,16;81:6,14,16;
82:2,8;83:8,13,22;86:3,
12,20,25;87:3,5,8;88:9,
22;89:11,14,16,21;
90:1;91:10;95:11;
96:19;98:12;99:2,22,
24;100:2,8,9,15,21,25;
101:1,6,8,9,14,17,
19;102:7,11,17,19,21,
23;103:6,16,21;104:13,
24;105:5,24;106:8,16;
108:12;109:9,21;
110:8,15,20;111:18;
113:4,12,14,18,21;
114:7,16,25;115:25;
116:7,20,24;117:13,20;
118:9,24;119:18;
120:25;121:19;122:8;
125:12,24;128:19;
129:9,18;130:13,20;
131:11;132:6;135:13;
136:1,14,21,24;137:19,
23,25;139:10,21;140:5,
17,23;141:6,18;142:9,
15,18;143:2,6,17,22;
144:22;145:25;148:23;
151:17;152:16,18;
153:15,24;154:16,25;
155:13,15;156:21,23;
157:5,14;160:2;162:3;
163:11
**Honorable (1)**
7:5
**Honor's (6)**
25:11;33:8;34:7;
66:16;124:3;149:12
**hook (2)**
115:4;117:22
**hope (8)**
9:7;33:18;37:23;
59:19;85:21;95:22;
127:7;159:8
**hopeful (1)**
45:15
**hopefully (4)**
9:7;33:15;84:13;
126:2

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 176
of 190

**hoping (2)**
82:8;146:11
**horrible (2)**
7:19;73:13
**horrors (2)**
7:25;8:5
**hostages (1)**
25:17
**Hostetler (1)**
89:24
**hour (1)**
47:19
**hours (2)**
113:13;128:17
**house (1)**
115:3
**huge (5)**
22:4;93:4,5,6;152:11
**Hum (1)**
144:10
**hundred (2)**
51:8;85:3
**Hunton (1)**
87:9
**hurricanes (1)**
7:22
**hurt (1)**
31:23
**hypotheticals (1)**
10:9

**I**

**IBEW (2)**
14:12;38:20
**idea (6)**
15:5;82:21;93:3;
125:3;151:24;162:9
**ignore (1)**
55:7
**images (1)**
8:4
**imagine (1)**
63:2
**immediately (1)**
144:20
**impact (7)**
40:9,21;42:7;43:2;
124:20,22;163:6
**impacted (2)**
60:8,9
**impacts (1)**
44:17
**impair (3)**
106:20,21;107:6
**impaired (11)**
22:20;42:16;43:13,
14;88:19;100:13;
106:18,22;113:23,24;
162:7
**impairment (3)**
42:16;51:6;100:24
**impediments (1)**

91:4
**impetus (3)**
16:12;27:2;117:24
**implementation (1)**
41:17
**imply (1)**
31:6
**importance (1)**
163:20
**important (28)**
7:16;14:24,24;15:12,
15;21:22;37:6;54:16;
58:8,21;59:4;63:12;
83:19;96:5;99:4;102:7;
111:3;116:10;117:15;
120:14;124:7,8;
130:24;137:5,25;
139:9;148:16;150:3
**importantly (3)**
59:3;97:5;101:18
**imposed (4)**
19:9;45:8;49:18;
110:1
**impressive (1)**
122:14
**improper (2)**
103:10,12
**improve (2)**
45:14;48:5
**inability (1)**
45:5
**incentivize (1)**
45:13
**inclined (1)**
93:24
**include (1)**
15:25
**included (3)**
40:3;92:22;93:25
**includes (1)**
77:25
**including (7)**
44:21;49:6;68:25;
95:15;114:14;126:1;
154:11
**inconceivable (1)**
56:17
**incorporate (1)**
148:6
**increase (1)**
74:22
**increased (1)**
57:24
**increases (1)**
151:4
**increasing (1)**
27:17
**incredibly (1)**
80:24
**indeed (1)**
16:7
**indenture (2)**
14:12;44:5

**independence (1)**
155:3
**independent (1)**
152:23
**index (2)**
72:25,25
**indicated (8)**
57:7;64:14;90:21;
136:16;147:1;154:9,
18;159:14
**indicates (2)**
78:23,23
**indiscernible (2)**
153:20;154:10
**individual (1)**
106:17
**inevitably (2)**
118:10,11
**inextricably (1)**
56:7
**infirm (2)**
93:21;155:20
**infirmities (3)**
50:22,25;142:20
**inflection (1)**
109:1
**influence (2)**
10:17;28:17
**influenced (1)**
133:10
**influences (1)**
142:4
**information (5)**
20:5;92:7;94:11;
97:3;124:16
**informative (1)**
77:16
**initially (1)**
91:24
**initiated (1)**
68:1
**injuries (1)**
157:25
**injury (1)**
115:1
**injury-type (1)**
138:20
**input (2)**
45:16;137:1
**inserting (1)**
104:15
**inside (1)**
151:15
**insignificant (1)**
83:20
**insolvent (1)**
121:21
**instance (2)**
81:5;120:25
**instead (2)**
57:17;67:9
**institutions (1)**
15:23;24:24

**instructive (1)**
77:21
**insurance (10)**
16:1;92:24;114:1,6,
12,20;138:19;158:15,
24;159:15
**insurers (1)**
114:14
**intend (2)**
9:23,23
**intended (4)**
68:6;70:9,10;128:8
**intention (1)**
119:5
**interest (26)**
11:14;28:7,15;52:7;
61:6;68:11,13;69:3;
70:2;71:2,18,22;78:1;
83:4;85:20;100:9,13,
15;106:21;107:11;
109:25;136:22;141:2;
143:4;146:20;148:5
**interested (3)**
136:25;153:9,10
**interesting (2)**
50:21;138:17
**interests (4)**
61:15;62:2;96:24;
142:22
**interim (1)**
18:2
**International (1)**
38:12
**interrelated (2)**
11:7;13:14
**intervening (1)**
91:19
**into (28)**
14:22;26:5;42:23;
48:16;51:5;56:22;
58:11;67:9;82:23;
85:14;91:3;104:16;
117:23;119:19;123:21;
124:3;131:19;132:15;
135:16;136:19,22;
137:1;141:4;145:20;
150:6;160:9,9;162:11
**intractable (1)**
159:10
**intransigence (2)**
77:22;78:14
**intransigent (1)**
77:24
**introduce (1)**
81:18
**inverse (1)**
120:22
**invested (1)**
16:6
**investigation (1)**
152:22
**investigative (1)**
152:22

**investment (1)**
15:25;24:1,18
**investors (2)**
16:8;58:12
**invitation (1)**
80:22
**involved (3)**
52:2;55:16;57:5
**involves (1)**
17:22
**Inwood (1)**
25:14
**irrelevant (4)**
36:19;37:5;106:16,
19
**irrespective (1)**
76:11
**issue (27)**
10:20,21;11:8;28:25;
42:24;48:13;51:9,17;
56:1;62:11;70:7;77:22;
81:2;82:3;97:23;106:9,
10;108:15;131:17;
132:15;133:25;135:12,
23;141:10;142:16;
158:13;161:1
**issued (1)**
112:12
**issues (21)**
28:14,19;36:9;37:24;
38:1;51:1,5,7;52:5;
98:23;106:11;108:1,3,
18;131:4,9;135:16,16,
17;138:1,3
**item (1)**
132:14
**items (8)**
28:9,14,17,25;47:23;
59:13;71:13;93:19

**J**

**jail (1)**
104:11
**January (2)**
8:15;109:18
**jeopardize (1)**
37:15
**jiggering (1)**
42:16
**job (1)**
96:2
**join (4)**
38:9,22;39:14;
120:18
**joinder (2)**
38:15;39:17
**joins (1)**
39:16
**Jones (2)**
66:13;146:5
**Judge (10)**
37:11;96:13,13;

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 177
of 190

107:23;112:20;123:14;
149:8,8;154:3;161:7
**judgement (2)**
106:15;107:8
**judgment (6)**
68:18,21;78:15;95:4;
96:1,1
**July (3)**
31:17;109:14;117:18
**juncture (1)**
44:9
**June (15)**
18:18;23:21;25:4;
31:15,16,25;34:9;35:6;
60:24;61:10;68:15;
108:10;109:16;117:16;
126:11
**junior (2)**
68:25;86:14
**justly (1)**
103:3

**K**

**Karotkin (159)**
18:22;21:2;25:18;
43:7;47:3,5,7,8,13,16,
19,22;48:19,21,25;
49:19,23,25;50:4,11,
13,16,19;51:15,20,22,
24;52:4,10;53:18,22,
24;54:2,5,6,7,8,19,21,
24;55:4,6;56:1,6,14,19;
57:13,15,18,21,23;
58:3,6,14,16;59:18,20;
60:11,13,15,19,22;
61:4;62:14,18;63:9,11,
17,21,24;64:2,5,12;
65:2,5,7,9,14,16,19,22;
66:1,5,7;71:17;85:21;
87:16;89:19;90:6;
94:25;101:21;102:5,
22;105:25;108:5;
110:9;111:7,11,14;
118:20;122:1;126:9;
127:6;128:6;136:12,
14,15;138:9,11,13,16,
24;139:1,6;140:5,10,
14,16,21;141:13,16,18,
20,21;142:1,5,7,9,12;
143:10,15,17,20;144:1,
7,9,11,13,15,18,22,24;
145:5,7,11,13,16,19,
22;146:8,17;147:15;
148:15;155:2,6,21;
156:5;162:3,20
**Karotkin's (3)**
101:14;102:20;155:3
**Katrina (1)**
7:21
**keep (8)**
9:13;36:14;38:13;
46:12;111:8;125:16;

130:11;136:17
**keeping (1)**
27:7
**key (5)**
26:19;45:17;68:9;
71:9;108:22
**kilowatt (1)**
41:21
**kind (19)**
7:20,24;8:24;22:10;
32:4;33:23;59:25;
63:13;67:25;78:17;
81:11;90:6;101:17;
112:19;119:12;147:12;
150:23;151:13;152:12
**kinds (2)**
28:8;99:10
**Knapp (3)**
38:11,11,23
**knew (1)**
103:8
**knowing (3)**
19:22;32:19;128:7
**known (2)**
65:12;123:6
**knows (7)**
8:8;55:16,17,22;
56:2;96:12;152:18
**Kornberg (5)**
16:22;19:18;64:17,
21;109:17
**Kramer (1)**
81:17
**Kurth (1)**
87:9

**L**

**labor (1)**
16:2
**Lacey (5)**
39:3,4,10,12,14
**lack (1)**
45:3
**laid (2)**
19:13;47:2
**Laila (1)**
46:7
**land (5)**
34:7;35:1;116:6;
124:19;157:5
**landscape (1)**
95:16
**large (1)**
88:25
**largely (1)**
119:25
**largest (1)**
114:8
**Larry (1)**
129:20
**last (37)**
7:18;8:4,15;14:18;

15:1;16:21;26:8;29:3;
30:21;32:1;35:3;47:25;
48:10;49:9;64:18;
65:24;79:20,20;85:18;
87:21;100:25;109:9,
11,21;113:13;119:2,4;
124:2;128:7,17,20;
151:17,22;160:6;
162:13,13;163:2
**last-minute (1)**
124:3
**late (4)**
10:16,24;99:4;124:2
**later (4)**
12:14;22:25;145:12;
161:8
**laugh (1)**
62:17
**laughs (1)**
127:24
**laughter (1)**
102:24
**laundry (1)**
25:19
**law (14)**
10:7;18:6;20:18,23;
25:7,11;41:15;70:24;
71:10;78:1;86:10;
89:14;100:10;132:19
**lawyer (3)**
10:20;45:25;96:12
**lawyers (8)**
8:14,19;9:9,12;
10:10;11:16;63:7;
112:17
**lay (1)**
116:6
**lead (3)**
20:25;106:22;154:13
**leading (1)**
18:3
**learned (1)**
163:4
**least (23)**
12:2,14;13:13;35:12;
40:16;41:11;43:12;
68:17;96:8;98:25;
101:3;104:23;114:14;
127:7;131:4;136:18;
146:21;147:3;152:14;
153:2,3,5;163:17
**leave (5)**
17:5;22:11;23:1;
86:2;124:1
**leaves (2)**
18:17;37:7
**leaving (3)**
42:14,21;50:6
**left (2)**
36:18;44:1
**leg (1)**
153:3
**legal (1)**

9:24
**legislation (14)**
29:6,10,14;44:14;
51:13;55:11;65:11;
67:4,5,6;108:7;137:8,
13,22
**legislative (2)**
31:10;37:20
**legislatively (1)**
110:1
**legislator (1)**
38:16
**legislature (6)**
38:16;45:9;56:18;
91:25;97:7;122:5
**lenders (1)**
81:17
**length (2)**
25:9;149:1
**lengthy (1)**
10:17
**less (7)**
13:4;17:12;72:24;
108:15;121:14;136:13;
151:15
**letting (1)**
102:11
**level (3)**
23:25;81:21;121:20
**levels (2)**
120:16;156:17
**Levin (1)**
81:17
**liabilities (2)**
75:16;83:25
**liability (11)**
50:2;55:19;58:19;
61:2;115:20;121:4;
143:3;148:20;158:19;
159:7
**liable (2)**
152:18;157:24
**liens (1)**
71:17
**life (2)**
41:9;83:6
**lift (1)**
159:14
**lifted (2)**
159:16,16
**lifting (4)**
158:9;159:1,4,10
**light (2)**
15:13;153:10
**lightly (1)**
47:2
**likelihood (1)**
160:12
**likely (4)**
17:12,12;44:20;
145:8
**limit (1)**
25:16

**limitation (1)**
156:23
**limits (2)**
13:23;102:4
**line (10)**
12:22;17:24;19:8;
40:25;57:3;108:8;
118:18,21;129:4;145:9
**lined (2)**
119:12,13
**lines (2)**
45:8;117:20
**liquidated (2)**
120:15;154:11
**liquidating (1)**
114:14
**liquidity (1)**
37:19
**liquor (1)**
10:7
**list (7)**
7:23;21:5;25:19;
54:11;130:9;132:12,14
**Listen (2)**
77:15;131:4
**listened (1)**
81:25
**listening (1)**
163:5
**litigate (1)**
155:23
**litigated (2)**
125:9;154:14
**litigation (1)**
158:11
**little (20)**
15:13;39:8,11;46:16,
21;64:22;67:9;68:13;
69:4;72:15,18,24;
77:13;92:25;111:8;
147:5;149:19;150:24;
151:18;159:19
**live (2)**
131:15;152:19
**living (2)**
19:9;46:11
**LLP (2)**
30:13;38:13
**lobbying (1)**
80:3
**Local (2)**
38:12;131:24
**Locke (1)**
38:13
**long (7)**
21:5,19;24:20;56:21;
63:5;123:5;163:13
**longer (3)**
29:4;68:16;110:11
**long-term (3)**
16:8;23:15;38:19
**look (21)**
21:4,12;32:20;48:21;

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 178
of 190

53:6;77:14;85:11,11;
93:12;95:16;103:4;
115:23,24,24;121:1;
122:5;132:12;139:17;
142:4;156:17;160:17
**looked (3)**
119:11;152:23;162:1
**looking (7)**
46:14;48:5,5;52:17;
61:7;83:4;119:5
**looks (4)**
19:13;155:7;162:6,
11
**loosely (1)**
47:2
**Lord (1)**
38:13
**lose (4)**
19:10;104:11;
116:18;158:13
**losing (1)**
158:12
**loss (5)**
115:22,24;117:24;
158:1,23
**losses (3)**
138:20;157:25;
158:14
**lost (5)**
12:22;19:3,10;81:11;
85:12
**lot (16)**
25:11;36:23,24;
49:16;63:1;67:1;68:13;
77:10;94:2;106:1;
119:1;126:11;132:25;
133:22;135:13;150:24
**lots (3)**
22:14;107:13;150:13
**lottery (1)**
10:3
**loved (1)**
8:7
**low (3)**
34:2,7;78:8
**lower (2)**
52:7;92:25
**lowest (1)**
148:24
**LP (1)**
87:10
**luck (1)**
35:16

## M

**macroeconomic (1)**
37:19
**magically (1)**
97:22
**main (2)**
82:3,5
**maintain (1)**

123:23
**maintained (1)**
12:20
**maintaining (2)**
12:11;162:9
**maintains (1)**
145:3
**major (3)**
33:19;35:19;153:6
**majority (1)**
125:2
**makes (5)**
10:22;20:6;25:17;
96:13;153:10
**making (6)**
13:8;59:25;99:12;
104:14;116:14;161:22
**Malter (1)**
39:2
**manage (2)**
16:1;108:10
**Management (1)**
87:10
**mandatorily (1)**
151:3
**Mandatory (3)**
141:1;149:16;150:4
**Manges (2)**
47:8;136:15
**many (17)**
7:16;9:9;11:20;13:1;
16:2;7;22:9;24:10;
25:19;30:22;37:14;
47:17;54:8;65:17;
71:21;112:16;132:16
**March (3)**
18:3,14,21
**margin (1)**
153:4
**mark (1)**
158:18
**market (12)**
71:22;77:7,8;101:7,
8;124:25;141:2;
150:10,12,13,17,23
**marketplace (4)**
74:2;75:13;100:20,
23
**markets (2)**
59:8;121:18
**marks (1)**
150:23
**marry (1)**
119:6
**Marshack (1)**
46:7
**massive (3)**
22:5;24:18;33:7
**MASUD (5)**
46:2,6,7,11,25
**match (1)**
147:6
**material (2)**

88:14,23
**math (2)**
78:23;151:9
**Matter (8)**
7:9;10:7;12:4;41:15;
51:4;73:25;97:1;
120:13
**matters (2)**
10:23;114:24
**Matthew (2)**
110:18;113:19
**maximizing (1)**
109:2
**maximum (6)**
25:8;72:4,17,22;
75:4;79:23
**may (26)**
11:4,6;12:3;32:23;
33:25;36:24;56:10;
87:6;91:3;92:7,14;
93:11;95:16;97:10;
101:6;111:6;117:5;
131:2;133:16;144:9,
11;148:6;153:25;
154:4;155:10;159:4
**maybe (12)**
13:3;22:24;35:19;
36:21;50:9;99:9,18;
106:7;118:10;123:16;
145:9;163:15
**mean (52)**
17:6;18:21;20:18;
21:11;22:24;26:12;
28:6;36:22;41:4;49:13;
51:17;59:9;62:25;63:3,
13;70:5;73:18;76:9,24;
84:16,19;90:12,19;
95:22;96:10,11;97:21;
98:5,12;99:15,17;
100:4;104:11;106:23;
109:8;111:8;118:5,22;
120:19;126:10;130:15;
134:21;135:10,23;
139:2;146:24;147:24;
155:22,25;156:24;
160:17;161:13
**meaning (2)**
51:12;107:9
**meaningful (8)**
8:21;21:1,3;83:25;
98:21;158:6,10,11
**meaningfully (1)**
45:6
**means (13)**
24:13;43:10,10;
51:17;76:14;94:25;
126:14,14,16;148:2;
158:8,9,11
**meant (2)**
18:22;69:13
**meet (3)**
12:9;59:21;64:2
**meets (1)**

125:25
**member (2)**
94:6;114:12
**members (4)**
15:14,24;16:8;94:7
**mention (1)**
79:5
**mentioned (6)**
61:1,17;68:2;124:11;
152:19;156:21
**mentioning (1)**
29:2
**mere (1)**
26:1
**merits (1)**
130:19
**mess (1)**
8:21
**message (2)**
11:19;44:25
**metaphor (3)**
41:24;85:13;105:20
**meter (1)**
58:1
**meters (1)**
58:2
**mid-September (1)**
127:9
**might (15)**
10:17;24:11;32:20;
34:3;35:2;77:16;90:21;
91:15;100:20,22;
118:6;124:18,22;
152:1;161:13
**Milbank (3)**
30:13;105:23;154:23
**mileposts (1)**
9:3
**milestones (1)**
9:3
**militate (1)**
155:16
**million (3)**
28:16;52:10;123:23
**mind (3)**
51:17;79:6;112:17
**mindful (2)**
10:16;26:18
**mindset (2)**
85:17;133:4
**mine (1)**
30:4
**minimum (3)**
72:22,23;75:5
**miniscule (1)**
69:17
**minors (1)**
10:7
**minute (8)**
35:3;36:18;67:13;
86:4;88:1;112:7;
151:19;156:10
**minutes (29)**

14:6,7,11,11;38:2;
47:4,9,10,14,21;81:14;
99:5,21,23,24;110:21,
22,23;111:6,13,16,18,
25;112:2,4;113:7,8;
141:4;154:25
**miss (1)**
150:23
**missed (5)**
12:21;119:10;130:3,
5;150:24
**mission (1)**
40:6
**mistake (1)**
24:23
**misunderstanding (1)**
130:16
**mitigated (1)**
108:12
**mix (1)**
81:23
**modification (2)**
56:4;116:11
**modified (3)**
48:1,11;128:23
**modify (2)**
126:4;161:16
**modifying (1)**
117:7
**moment (11)**
7:14;10:11,15;11:12;
17:5;46:21;95:2;
122:12,19;156:4;
157:18
**moments (1)**
110:16
**money (10)**
16:1;35:20;73:2;
76:14;104:12,19;
120:6;152:11;154:14;
161:13
**Montali (1)**
7:5
**month (4)**
12:22;49:9;55:7;
137:4
**month- (1)**
109:15
**months (5)**
20:5;34:5,5;35:8;
128:7
**more (73)**
9:2;10:22;11:16;
17:11;19:10;20:7;
24:16;27:12,18;30:18;
33:13;34:23;35:12;
37:10;40:7;44:20;
45:16;46:20;51:5,8;
59:6;66:25;67:12;
68:16;71:24,24;82:19;
85:14;90:15;92:7;97:3,
4,13;99:18;100:16,18;
101:18;105:5;108:18;

109:13,18;111:8;
112:16;114:1,9,22;
124:7,8;125:1,1,2,12;
131:12;135:14;137:11;
139:6;141:4;150:20,
20,25;152:13,14;
156:4;158:6,8,10,10;
159:2;161:13,23;
162:2,14;163:4
**Moreover (1)**
88:20
**morning (32)**
7:6,7;14:1,2;38:11,
25;39:1,4;44:3,4;46:6;
47:6,7;56:20,20;66:9;
68:3;81:16;89:22,23;
105:17;110:15;116:24;
117:10;124:25;128:14;
137:6,20;143:20;
147:5;163:13;164:1
**most (7)**
54:11;66:18;116:10;
122:13,16;131:13;
150:3
**motion (48)**
13:22;15:5;16:10;
21:9,13;22:8;26:1;
27:16;30:6,20;31:18,
24;39:16;44:1,9,18;
45:19,21;56:2;82:15;
91:7,17,18,24;104:25;
110:4,4;112:1,23;
113:6,10;119:12;
137:23,24;139:12,22,
24;142:19;143:23;
144:2,19;145:3;
155:16,17;156:6,8,19;
157:6
**motions (14)**
12:11;43:6;54:15;
59:23;87:13;88:10;
90:13;94:23,24,25;
130:6;163:19;164:3,3
**motion's (1)**
30:15
**motives (2)**
52:13;62:3
**Movants (3)**
88:11,12,15
**move (17)**
10:14;12:5;13:2,5;
25:1,25;33:13;45:11,
18;67:16;89:8;97:11;
108:4;116:25;117:1;
126:8;141:13
**moved (2)**
67:14;133:17
**movement (2)**
44:18;60:1
**moves (1)**
57:12
**moving (11)**
12:7;52:15;59:23;

63:4;90:7;93:19;
110:14;116:22;137:17;
143:21;145:11
**much (23)**
8:4;15:17;34:24;
35:25;38:1;40:21;
45:14,23;46:23;48:7;
51:5;73:2;82:13,16;
90:3;119:19;121:4;
137:3;150:20,20;
156:16;159:22;160:11
**multiple (10)**
31:19;33:24;36:6;
40:15;58:10,10;102:9;
108:10,12;161:24
**municipalities (1)**
16:7
**must (4)**
50:11,13;87:20;
156:25
**muster (1)**
64:8
**mutual (1)**
15:25
**myself (3)**
12:1;81:18;142:23
**myth (1)**
31:14

**N**

**name (4)**
7:23;30:8;38:10;
66:11
**names (1)**
7:20
**narrowed (1)**
71:12
**narrowly (1)**
68:6
**native (1)**
8:2
**natural (1)**
156:23
**nature (1)**
15:14
**necessary (4)**
45:19;74:8;163:23,
23
**need (34)**
10:9;13:20;22:11;
29:14;30:8;31:1;41:6;
66:17;81:15;82:9;93:2;
101:13;109:20;110:5,
6,10,22;111:3,7,11;
118:14,18;120:15;
123:20;124:23;127:23;
129:25;130:21;131:6;
135:17;153:13;159:5,
6;162:15
**needed (2)**
45:15;120:9
**needing (1)**

119:23
**needs (8)**
19:19;24:9,9,18;
25:10;101:3;118:16,17
**negative (4)**
60:8,9;124:20,22
**negligible (1)**
33:5
**negotiate (13)**
23:1;27:16;61:22;
102:13;128:25;138:4,
21,21;140:21;146:13;
149:6;160:20;161:13
**negotiated (3)**
103:7;140:6;149:1
**negotiating (3)**
82:19;146:16;152:5
**negotiation (1)**
162:11
**negotiations (12)**
45:14;46:18;97:18;
98:22;125:5;136:25;
137:1,7,10,15,17;147:1
**neighborhoods (1)**
92:15
**neighbors (1)**
8:9
**Neither (2)**
119:3;157:19
**nest (7)**
84:18,19,23;85:12;
140:12;156:20;163:9
**nests (2)**
85:11;140:16
**neutral (1)**
40:19
**neutrality (1)**
123:24
**Nevada (1)**
133:17
**new (4)**
29:6;83:6;100:19;
123:22
**news (1)**
94:3
**next (14)**
13:11,11,16;31:15;
57:2;61:10;81:8;82:13;
95:25,25;102:12;
112:20;131:13;151:8
**next-door (1)**
163:18
**nice (2)**
27:11;66:9
**night (9)**
26:8;29:3;32:1;
65:25;119:2,4;124:2;
151:17,23
**nightmare (2)**
46:12;64:20
**nightmares (1)**
8:5
**nine (3)**

35:8;116:13;132:1
**Ninth (7)**
51:6;69:1,6;70:24;
86:10,16,17
**nit (1)**
69:20
**nitpicking (1)**
10:20
**nitpicks (1)**
28:8
**Nobody (3)**
37:19;119:13;126:14
**non-compelling (1)**
125:4
**nonconfirmable (1)**
35:19
**none (5)**
91:23;93:10;95:9;
97:16;103:8
**nonpublic (2)**
20:5;40:2
**nonstarter (2)**
157:22,22
**nontransparent (1)**
40:2
**Nor (2)**
36:7;157:20
**normal (2)**
61:23;93:7
**north (3)**
22:6;23:25;24:25
**Northern (3)**
8:8;131:16,25
**note (9)**
58:8,21;59:4;64:13;
79:21;102:21;137:5,
25;139:9
**noted (6)**
16:16;48:8;78:21;
87:21;137:15;140:22
**noteholder (2)**
44:12;139:18
**noteholders (8)**
13:22;14:4;39:17,25;
48:25;49:7;58:25;
87:22
**noteholders' (1)**
58:23
**notes (6)**
23:17;44:6;52:6;
100:20,22;135:7
**notice (2)**
67:25;143:23
**noticed (2)**
79:21;151:23
**noting (2)**
68:3;113:22
**notion (4)**
63:15;155:3,9,12
**November (4)**
7:18;49:2;62:23;
63:15
**nowhere (1)**

122:22
**number (37)**
18:4;23:13;24:11;
32:24;34:8;35:2;36:9;
50:23;57:1,11,13,18;
58:11;68:16;74:4;
75:16;76:4;77:23;
78:17;79:24;80:1;
92:15,16;93:19;
129:12,13,23;132:14;
147:12;148:3,4;149:5,
6,7;156:16;157:19;
158:2;162:3
**numbers (8)**
34:22;68:16;69:14;
124:15,17;151:14;
160:9,9
**Numerous (1)**
44:20

**O**

**object (2)**
88:4,5
**objection (1)**
106:4
**objections (5)**
15:14;50:24;87:13;
125:14,21
**obligated (1)**
43:2
**obligation (1)**
51:24
**observations (2)**
82:1;147:16
**observe (1)**
25:15
**obstinate (1)**
153:8
**obvious (6)**
11:1;73:18;88:24;
117:4;138:12;161:10
**obviously (8)**
14:19;22:14;23:15;
50:7;94:5;117:23;
123:19;163:4
**OCC (3)**
30:2;37:5;134:7
**occasion (1)**
145:2
**OCC's (1)**
30:1
**occurred (3)**
7:19;21:12;117:14
**October (1)**
92:9
**off (17)**
15:4;21:6;90:17;
91:7;96:6,10;105:6;
111:20;117:22;120:6;
125:18;131:21,24;
133:6,20;137:4;155:1
**offer (2)**

Min-U-Script®

Case: 19-30088   Doc# 3540   Filed: 08/14/19   Entered: 08/14/19 07:58:40   Page 180
of 190

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(15) Moreover - offer

27:10;147:19
**offered (1)**
90:13
**offering (1)**
27:18
**offers (2)**
158:5,6
**Office (5)**
16:14;39:6;40:12;
44:21;64:15
**officer (1)**
86:16
**official (16)**
13:9;14:8;15:3,9;
19:14;29:23;30:13;
32:23;44:22;89:24;
105:23;108:14;154:24;
157:6,15;159:13
**officio (1)**
114:12
**old- (1)**
32:4
**once (4)**
58:18;143:2;150:17,
23
**one (117)**
7:11;8:11,16;9:12;
10:1;11:3;12:2,2,7,16,
18;13:5;14:20,25;15:3,
9;16:19,19;17:1;19:13;
21:11;24:8,17;25:14,
22,23;27:22;28:14;
31:24;32:10;33:14,24;
34:1;35:12;36:2;37:4;
39:20;40:7;44:25;
49:23;51:21;54:17;
55:3;58:2;59:1;61:15,
18,24;64:12,14;65:7;
66:21,25;67:12,24;
68:3,9;71:13;73:16;
74:4;78:16;79:20,24;
81:3,8;82:2,21,23;
83:12,12;88:22;90:20;
91:15;94:25;95:9;
96:10;97:1;98:8;99:3;
100:6;102:6;103:19;
104:18;105:1;106:4;
108:2,11;109:9,11;
112:10;113:4,22;
114:14;120:20,24;
122:13;123:16;130:10,
14;134:3;142:10;
144:24;146:18;150:3;
151:25;152:21;153:6;
154:5;156:10,15;
157:19,21,22;161:21;
162:6,14;163:24
**one- (1)**
73:6
**ones (6)**
8:7;9:11;42:19;
97:16,17;100:1
**ongoing (2)**

57:5;137:15
**only (51)**
7:22,23;13:5;22:19,
20;24:16;27:24;31:6;
33:4;35:4,5;36:17;
39:20;41:22;42:13,19;
43:12;47:20;53:12;
62:1;66:19,24;77:21;
79:2;80:5,16;83:12,12;
95:2;96:1;98:8;100:6;
102:11;104:18;113:13;
114:5,23;131:8,21;
135:2;139:18;142:18;
148:18;152:23;153:11;
154:1,13,25;158:18;
160:5;161:5
**onto (1)**
35:8
**oOo- (1)**
7:2
**open (9)**
10:6;11:13;17:11;
39:18;45:16;91:15;
139:3;152:9;160:23
**opening (16)**
7:10;12:2,6;13:18;
14:7;38:9;39:25;59:12;
69:22;71:16;97:16;
100:4;110:21,21;
130:14;147:7
**operating (1)**
81:20
**operation (1)**
132:15
**operations (2)**
131:22;132:14
**opinion (2)**
37:9;117:25
**opponents (1)**
112:25
**opportunities (1)**
80:3
**opportunity (7)**
14:19;45:1;61:24;
86:22;93:9;95:14;
105:9
**oppose (2)**
91:7;104:19
**opposed (3)**
27:9;90:16;158:12
**opposing (3)**
79:2;156:9,19
**opposite (1)**
118:8
**opposition (2)**
91:14;94:20
**oppositions (1)**
122:14
**opt (1)**
120:12
**optimal (1)**
37:15
**optimistic (1)**

159:9
**option (1)**
49:23
**options (1)**
12:17
**order (5)**
7:3;16:12;100:1;
108:16;112:11
**original (1)**
64:6
**originally (2)**
32:7,9
**others (6)**
8:16;12:3;28:20,22;
44:22;61:16
**other's (1)**
108:4
**Otherwise (1)**
35:6
**ours (1)**
104:3
**ourselves (2)**
102:6;163:2
**out (47)**
10:4;14:22;19:14;
20:3,3;23:16,23,25;
31:21;33:19;35:1,6,14,
16;38:2;43:25;48:12;
58:16;60:25;63:7;
64:25;71:20,21;75:13,
14;80:8,10;81:3;82:4;
83:4,6;101:4;108:3;
115:15;118:13;121:9;
122:11;125:25;129:2;
130:15;141:11;142:22;
146:9;147:25;152:12,
13;161:22
**outcome (4)**
34:3;37:15;59:14;
115:15
**outcomes (1)**
108:21
**outline (4)**
43:6;59:16;60:8;
162:8
**outlined (1)**
10:15
**outlines (1)**
76:13
**outlining (1)**
60:1
**out-loud (1)**
102:23
**outset (4)**
15:16;48:13;56:7;
90:2
**outside (3)**
39:5;117:15;119:23
**outstanding (1)**
78:2
**over (16)**
9:17,17;13:25;17:7;
30:21;31:11;51:9;

52:11;58:3;60:16;69:3;
71:23;105:15;155:21;
159:19;162:11
**overall (1)**
83:20
**overflow (2)**
112:14,19
**overpayment (1)**
71:25
**overseeing (1)**
114:13
**oversimplification (1)**
23:7
**oversubscribed (1)**
58:8
**overwhelmed (1)**
163:7
**owe (1)**
96:11
**owed (2)**
121:5;160:12
**own (17)**
9:18;62:2;82:25;
83:4,11;84:18,19;
86:23;94:3;105:6,9;
116:24;140:4;148:17;
156:17;157:2;163:9
**ownership (1)**
88:13
**owns (1)**
87:11

**P**

**pace (1)**
67:17
**Pacific (1)**
10:12
**paid (14)**
36:20;41:3;49:20,25,
25;52:17;81:1,1;88:15;
114:5;121:12;138:11;
140:24;154:12
**paper (3)**
65:20;78:5;130:11
**papers (12)**
78:4,12;79:21;80:7;
86:19;90:18,21;
130:14;148:17,18,22;
152:20
**par (1)**
100:18
**paradise (1)**
7:18
**parallel (2)**
74:9;92:2
**parameters (2)**
55:14;57:1
**paramountly (2)**
88:9;154:15
**parents (1)**
10:12
**parked (1)**

75:23
**parochial (2)**
61:15;98:20
**part (12)**
8:22;28:7,9;36:12;
41:16,17;89:18;98:20;
118:10;128:7;132:22;
142:19
**participate (2)**
25:5;55:12
**participating (1)**
61:11
**particular (7)**
16:12,16;25:10;37:1;
61:8;102:20;130:22
**particularly (4)**
9:18;61:13;142:2,18
**parties (49)**
12:7;15:10;24:1,2;
27:19,23,24;30:22;
36:10,19;38:19;40:1;
44:21;45:3,13;46:20;
48:15;50:23;53:12;
59:23;60:23;61:25;
62:1,20;63:4;82:10,19;
83:10;90:7;91:23;92:7;
93:10,24;96:11;114:5;
119:12;120:17;122:9;
126:1;128:25;137:2,3;
142:22;143:7;144:19;
157:23;158:2;160:19;
163:13
**parties' (1)**
92:12
**parties-in- (1)**
61:5
**parties-in-interest (1)**
62:19
**party (10)**
90:15;93:17;102:11;
104:24;110:14;117:7;
119:9;143:4;146:20;
163:21
**party-in-interest (1)**
48:3
**party's (1)**
108:2
**pass (1)**
64:8
**passage (2)**
67:5;137:13
**passed (4)**
44:13;55:8;67:5;
82:15
**past (5)**
76:19,20,23;150:17;
159:18
**patently (3)**
106:2,8;108:16
**path (11)**
15:11;17:24;19:15;
20:17;25:1;26:4;37:13;
115:11;128:24,25;

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 181
of 190

129:1
**pathway (1)**
84:9
**Paul (3)**
87:5,9;153:24
**pausing (1)**
160:7
**pay (13)**
10:3;50:9;72:17;
74:22;77:8;87:19;
114:18;115:23;125:4;
162:15,21,22,25
**paying (1)**
77:25;152:5,24
**payment (3)**
27:6;36:22;122:10
**payments (1)**
158:16
**pays (1)**
87:18
**peace (2)**
31:21;33:19
**peel (1)**
96:10
**pending (1)**
31:24
**pension (2)**
16:1;27:7
**pensioners (1)**
27:8
**people (42)**
7:13,21;13:4;16:5;
21:15;28:12;36:1,22;
52:22;79:2;82:24;
85:10,10,14;92:16;
94:16;99:15;101:24,
25;107:17,19;115:25;
116:4;118:7;122:2;
123:12;126:4;131:12,
25;136:19,22;138:19;
143:1,20;147:11,13;
150:23;152:4,5,7;
160:16;162:15
**people's (1)**
111:9
**per (4)**
41:21;52:12,12;72:4
**percent (20)**
72:9;85:3;92:24,25;
114:4,9;150:6,15,22,
24,25,25;151:3,6,11,
12,12;153:4;160:5,6
**perhaps (3)**
12:15;20:7;103:3
**peril (1)**
37:14
**perilous (1)**
29:7
**period (4)**
25:10;48:2;127:3;
145:16
**periods (2)**
117:6;138:6

**permitted (1)**
102:12
**person (4)**
37:4;82:13;83:3;
131:8
**personal (5)**
115:1;125:17,17;
138:19;157:25
**personally (1)**
8:13
**perspective (4)**
117:2;156:7;158:8,
20
**petition (2)**
100:9,15
**PG&E (26)**
7:9;8:15;11:25;
15:24;16:9;22:7;23:16;
24:17;27:4,8;38:20;
69:10;81:17;83:9;94:8,
9;115:15,19;120:21;
131:9;132:7,13;
135:21;141:10;152:24;
157:23
**PG&E's (3)**
114:15;133:5;152:18
**ph (4)**
28:5;93:21;107:2;
126:5
**phone (6)**
64:18;92:1;110:7;
111:21;117:22;123:13
**phones (1)**
117:22
**phrase (4)**
9:18,19,20;30:4
**physical (1)**
8:24
**pick (7)**
9:10;73:16;98:1;
151:10,10,15;153:5
**picked (1)**
151:23
**piece (3)**
8:21;39:8;41:2
**pin (1)**
84:16
**place (4)**
27:7;76:15;100:6;
137:7
**plaintiffs (2)**
139:16;142:14
**plan (256)**
10:6;11:19;12:2;
13:3,10;17:13,25;
18:17,18;20:9,9;22:3,
12,21;23:14;24:5;27:3;
28:18;30:24;31:25;
32:18,20;33:24;34:1,9,
17;35:7,12,13,19;36:1,
2,4,20;37:7,9;38:17;
39:9,21;41:2,12,17,20;
42:14,20;44:11,12,15;

48:8,14;49:4,5,8,11;
50:11,23;51:10,18,25;
52:4,15;53:7,9,12,21;
54:25;55:6,8,9,13,15,
17,19,20,21,22;56:8,
22;57:1,2,3,6;58:10,20,
23;59:10,17;60:9;61:4,
17,18,23;62:7,10;63:5,
7,15,25;64:7;66:3,20,
22;67:2,7;68:8,19,24;
69:1,16,17;70:11;
71:25;72:3,15;73:12,
12;75:1,3,5;77:25;
78:14,20,24;79:24;
80:6,15,18;82:7,21;
83:1,3,10,12;84:12,19,
25;85:24;86:22;87:18,
20,23;88:20,21;89:4,4,
13;90:22;91:5,15;92:8,
8;93:11;94:19,20;
95:15;97:2,3;99:11,18;
101:20;104:3,3,9,15,
19;106:2,6,12;107:10;
108:11,16,19;112:5;
113:23;117:8,17,19;
118:13;119:18;120:23;
122:8,14;125:25;
126:15;127:25;128:1,
2;129:1;130:22;131:8;
132:13,24;133:10;
134:4;136:6,18;137:1,
12;138:4;139:23,25;
140:4,24,25;141:14;
142:4,7,11,12,15,21,
24;143:1,2,6,22;144:4;
146:9,10,18,20,21;
147:3,4,7,8,15;148:5,7,
7,11,11,19,21;149:13;
152:8,8;154:18;
155:12,14,20;156:15,
20,24,25;157:20;
158:12;159:2,12,17;
160:9;162:6,8,8,11;
163:8
**plan-funding (1)**
87:15
**planned (4)**
98:18,22;137:10;
139:17
**planning (1)**
38:9
**plans (46)**
9:22;10:11,22;11:4,
10;16:2;31:19;32:24,
25;33:24;34:18,24;
36:8,21;40:8,15;42:14;
43:12;49:1,1;53:15;
54:13;61:13,14;62:1,
23;64:19;66:17;68:15;
73:15;74:5,9,10;82:25;
83:11;86:23;98:8,14;
108:11,12;109:3;
127:8;132:23;143:13;

158:9;161:24
**plan's (1)**
37:1
**play (2)**
37:6,6
**players (3)**
38:19;62:5;127:23
**playing (1)**
155:11
**pleading (4)**
57:3,7;58:9;104:24
**pleadings (5)**
44:25;49:4;52:23;
58:17;59:4
**please (7)**
24:25;46:3,5;112:10;
132:20;133:25;156:14
**plenty (1)**
29:20
**plus (3)**
100:18;106:11;153:4
**plush (1)**
85:12
**PM (1)**
164:5
**pocket (1)**
10:5
**podium (5)**
26:23;38:4;113:8;
125:21;129:9
**point (59)**
11:22;18:20;20:7;
21:17,23;24:16;26:15;
29:1,17;32:22;33:16,
22;37:13;42:2,5;48:12;
52:7;54:24,25;55:1;
58:16;65:7;66:24;
67:12;69:7;70:23,23;
71:15;72:19;74:1;
75:14;79:20;80:10;
89:11;92:3;93:23;
99:13;100:16,25;
103:20;104:13;107:24;
109:1,9,11,21;125:18;
126:20;131:4;138:18;
140:19;142:3;155:25;
157:7;160:7;161:15,
22;162:13;163:2
**pointed (2)**
14:22;25:11
**pointing (1)**
142:21
**points (17)**
26:19;36:20;66:25;
71:9;92:7;99:25;
101:15;103:5;105:24;
106:2;109:13;125:12;
130:21;153:5;155:2;
160:3;161:19
**polarize (1)**
62:1
**polite (1)**
123:11

**polling (1)**
96:7
**pool (2)**
159:6,18
**pop (1)**
42:23
**portion (3)**
73:6;123:21;159:11
**position (36)**
13:9;22:17;29:7;
35:20;48:5;59:7;61:8;
79:8;89:2,9;90:16;
91:6,8,20;94:10;95:9;
98:1,21;119:10;129:5,
14,15,17;130:16;
134:4;135:5;138:3;
139:4,5;157:18;158:4;
159:9,16;160:11,13;
163:20
**positions (1)**
64:23
**positive (2)**
26:4;44:17
**possibility (3)**
18:17;42:21;116:4
**possible (2)**
33:2;118:17
**possibly (3)**
75:3;79:23;101:12
**Post- (2)**
100:8,14
**posted (1)**
163:16
**post-petition (8)**
24:10;68:11,13;69:3;
78:1;85:20;107:11;
148:5
**pot (1)**
76:12
**potential (2)**
109:3;149:12
**potentially (2)**
108:20;117:8
**Power (7)**
129:20;131:21,23;
132:1;133:7,20;149:11
**powers (1)**
153:8
**practical (2)**
78:15;97:1
**practice (1)**
109:18
**precedent (2)**
86:17;89:4
**precise (2)**
10:1;112:3
**precisely (3)**
21:10;24:8;93:2
**preclude (1)**
116:4
**precludes (2)**
20:10;145:13
**pre-condition (1)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(17) pathway - pre-condition

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 182
of 190

29:4
**predicate (2)**
53:20,22
**predicted (1)**
143:11
**preferable (1)**
125:9
**preference (1)**
110:12
**preferred (4)**
149:16;150:5,5;
151:1
**prejudice (7)**
48:13,16;60:23,24;
109:12;145:19;157:6
**prejudiced (2)**
48:15;64:13
**premium (1)**
27:17
**prepare (2)**
86:19;94:16
**prepared (4)**
78:19;86:12;101:5;
104:4
**preparing (1)**
152:20
**presence (2)**
14:23;16:4
**present (2)**
88:10;95:14
**presentation (4)**
9:12;38:9;159:5;
163:16
**presented (1)**
103:22
**presently (1)**
101:19
**presents (1)**
21:8
**presiding (2)**
7:5;8:18
**pressure (2)**
33:25;126:1
**presumption (1)**
12:10
**pretend (1)**
63:13
**pretty (4)**
60:15,17;73:18;
126:9
**prevail (1)**
36:15
**prevent (1)**
104:14
**prevents (1)**
101:23
**previously (2)**
12:13;113:5
**price (17)**
72:4,5,16,17,22,22,
23;73:4,7;75:4,4,5;
76:9;78:6,8;79:23;
150:10

**prices (1)**
75:19
**primarily (3)**
38:15;81:23;158:1
**primary (5)**
25:23,24;27:2,2;
116:21
**principal (3)**
17:21;20:23;44:6
**principle (1)**
61:17
**priority (2)**
16:12;17:9
**private (1)**
94:2
**privately (1)**
122:21
**privilege (1)**
73:22
**probably (8)**
11:16;54:9;63:20;
114:22;133:19;135:14;
152:13,19
**problem (16)**
51:3;103:17;112:22;
119:4;127:15,20;
131:25;132:11,25;
135:25;136:1,7;
146:15;147:16;159:10;
163:18
**problematic (1)**
160:6
**problems (5)**
13:2;56:19,21;128:1;
148:14
**proceed (7)**
15:11;31:19;55:22;
61:25;67:22;125:8;
156:24
**proceedings (1)**
164:5
**process (52)**
8:17,22;9:14;11:5;
15:8;16:15,18,23,24;
17:22;19:19;20:8;
21:11,20,24;23:22,25;
30:25;36:12;38:19;
39:18;40:1,2;44:11,15,
23;45:2,11,18;46:15;
55:1,6,8;56:8;57:1;
62:15;74:19;88:17;
89:3,4;92:2;94:1;97:7;
101:1,8,19;102:15,18;
124:6;127:25;148:21;
158:20
**productive (1)**
44:14
**professionals (3)**
9:6;10:1;54:16
**progress (18)**
20:25;21:1,3;30:18;
52:24;54:7;55:4;88:23,
23;98:13;102:19;

103:15;104:15;118:1,
16,18;161:1,4
**prohibited (3)**
101:19,23;102:2
**promise (3)**
33:13;80:9;131:11
**promised (4)**
13:21;43:20;99:5,8
**promote (1)**
61:14
**promptly (1)**
9:11
**prong (1)**
107:10
**proof (1)**
88:11
**properly (1)**
9:11
**property (5)**
114:23;115:3,5,8,13
**proponent (8)**
69:24;80:19;92:8;
97:2;98:22;156:20,25;
158:12
**proponents (10)**
41:12;53:7;80:16;
95:15;108:19;140:11;
157:20;159:2,12,17
**proposal (32)**
15:16,21;17:3,4;
20:10;21:10,19;22:3;
24:22;26:19;28:9;29:9,
13;40:17;42:15;44:12;
59:15;66:21;70:18;
77:13;79:22;93:21;
99:18;100:18;108:23;
109:22;128:18;139:17;
148:24;151:13;152:10;
162:16
**proposals (5)**
48:8;58:24;92:13;
120:23;157:20
**propose (6)**
14:6;49:1;84:19,25;
92:8;97:2
**proposed (17)**
17:22;18:18;19:15;
27:3;34:1;42:14;48:17,
21;51:12;55:17;58:25;
73:2;75:4;98:14;
148:12;149:15;163:8
**proposes (4)**
83:3;93:9;148:19;
156:17
**proposing (5)**
10:12;27:23;34:24;
77:7;90:21
**proposition (1)**
157:23
**prosecute (1)**
156:24
**prosecuted (1)**
57:4

**prosecuting (1)**
74:9
**prospective (1)**
95:14
**prospects (1)**
25:4
**protect (1)**
123:24
**protected (1)**
27:8
**protocol (9)**
13:10;14:21;15:11;
19:11;31:5,8;37:25;
91:2;109:14
**protocols (6)**
14:25;15:4;19:15;
48:21;62:22;63:1
**proverbial (1)**
24:7
**provide (17)**
26:25;40:14;49:5,11;
50:11;59:5;62:22;
87:17;101:5;106:15;
119:22;122:8,10;
123:22;141:1;143:1;
161:24
**provided (2)**
8:20;101:7
**provides (3)**
116:8;141:5,14
**provision (2)**
68:10;103:4
**provisions (5)**
32:20;68:9,12;72:1;
104:16
**PSPS (2)**
131:10,14
**Public (14)**
11:20;39:5;40:12;
43:5;53:14;55:2;72:16;
91:6;102:21;103:5;
104:2,8,17;139:20
**publicly (4)**
122:25;123:5,10,11
**PUC (1)**
44:21
**purchase (3)**
72:4,21;88:12
**purports (1)**
119:20
**purpose (1)**
25:16
**purposes (3)**
12:8;55:20;158:2
**pursuant (1)**
55:21;149:3
**pursued (1)**
102:10
**pursuing (1)**
17:23;46:18
**pushes (1)**
71:24
**put (22)**

15:6;24:7;33:25;
35:2;46:8;58:3;62:9;
82:24;95:12,25;
112:11;118:18;124:14,
19;126:1;129:4;
130:10,15;134:18;
140:18;160:9,9
**puts (1)**
29:6
**putting (3)**
38:16;82:23;161:22

## Q

**questionable (1)**
72:13
**quick (3)**
11:25;82:1;155:2
**quicker (2)**
110:25;111:2
**quickly (6)**
47:16;96:16;97:13;
125:13;126:8;161:9
**quite (16)**
23:4;48:2;57:8;58:6;
59:3;63:14;64:24;
119:17;123:1;137:15;
138:4;139:21;140:7;
142:19,21;150:19
**quote (6)**
25:16;30:2,2;108:6;
116:19;148:17
**quoted (1)**
37:12
**quoting (2)**
56:16;139:24
**QURESHI (86)**
14:2,3,10,15,16,17;
15:3,8;17:10,14,16,19,
21;18:2,7,9,11,14,16,
25;19:2,5,7,18;20:1,13,
15,17,19,22,21;21:7;
22:13,16,22;23:3,6,8,
13,19;24:4,6;25:13;
26:8,10,14,16,18,21;
27:14,21;28:3,4,10,13,
22,24;29:11,13,19,22;
31:21;47:24;50:22;
62:3;63:19;65:9,23;
82:22;99:20,22;
101:25;102:3;103:2,4,
11,13,20,25;104:2,6,
10,13;105:4,12,15,16
**Qureshi's (2)**
68:3;82:14;140:7

## R

**raise (5)**
108:22;124:23;
156:25;160:10;162:25
**raised (11)**
27:19;28:22;29:1;

Case: 19-30088   Doc# 3540   Filed: 08/14/19   Entered: 08/14/19 07:58:40   Page 183
of 190

36:9,10;47:24;48:13;
50:23;76:15;99:25;
100:17
**random (1)**
124:15
**range (2)**
34:3;108:20
**rank (1)**
123:25
**rapidly (1)**
57:8
**rate (24)**
28:7,15;40:21;43:17,
18;52:7;68:18,21;69:3;
70:2;71:19;78:1;
100:13,15;106:15;
123:24;141:2,3;148:5;
151:10,10,12,15;153:5
**rate- (1)**
40:18
**rate-neutral (3)**
40:19,23;43:8
**ratepayer (2)**
52:12;94:5
**ratepayers (5)**
40:9;41:3;42:7,9;
43:2
**rates (7)**
41:13,21;68:11,14,
17;69:18;71:22
**rather (4)**
22:4;29:17;45:4;
89:12
**re (1)**
69:8
**reach (3)**
69:22;126:2;154:5
**reached (1)**
53:14
**reaching (4)**
10:14;52:24;53:11;
153:10
**react (1)**
118:7
**reaction (1)**
31:23
**read (9)**
9:17;65:24;90:17,18;
91:14;119:19;129:12;
145:21;152:20
**reading (1)**
151:18
**ready (2)**
22:5;139:8
**reaffirm (1)**
127:18
**real (1)**
95:16
**realistic (2)**
62:4;158:8
**realistically (2)**
55:22;145:8
**reality (3)**

120:14;147:23;155:8
**realize (1)**
27:15
**really (23)**
7:13;8:4;11:1;12:24;
15:17;19:20;31:7,23;
38:17;48:4;77:5;80:8;
84:9,14;85:12;90:6;
114:16;116:10;135:10;
142:23;150:5;151:17;
160:8
**reason (12)**
7:16;12:22;15:5;
21:8;33:20;49:8;
102:24;124:8,11;
128:18;137:11;149:1
**reasonable (4)**
148:20;149:8;157:3;
163:3
**reasonableness (1)**
148:25
**reasonably (1)**
72:13
**reasons (9)**
19:12;23:13;35:15;
94:11;125:17;131:19;
137:6;153:7,15
**rebuttal (1)**
14:7
**recall (1)**
67:3
**receive (1)**
114:17
**received (1)**
65:10
**receiving (2)**
51:7,8
**recent (1)**
44:18
**recently (2)**
44:13;137:22
**Recess (1)**
112:8
**recital (1)**
43:18
**recite (1)**
43:7
**recognize (3)**
44:10;78:24;99:9
**recollection (1)**
145:1
**record (11)**
14:3;30:10;32:15;
38:10;66:11;105:22;
110:18;113:18,25;
123:15;154:23
**recovers (1)**
121:13
**recovery (5)**
8:22;9:15;24:19;
27:1;114:17
**red (1)**
155:13

**reduced (1)**
123:20
**reduction (2)**
28:15;71:19
**re-exclusivity (1)**
110:5
**reference (2)**
116:9;148:6
**referred (1)**
102:22
**referring (1)**
69:8
**refinement (1)**
91:20
**reflect (1)**
7:15
**reflected (3)**
58:9;17;139:23
**reflects (1)**
53:15
**refusing (1)**
77:24
**regarded (1)**
72:12
**regarding (1)**
131:10
**regardless (1)**
129:5
**regrettably (1)**
74:17
**regularly (1)**
160:25
**reinstate (1)**
23:10
**reinstated (2)**
23:14;24:14
**reject (1)**
88:19
**rejected (1)**
40:1
**related (4)**
103:5;114:2,23;
141:7
**relationship (1)**
38:20
**relationships (1)**
103:14
**relatively (1)**
150:16
**relaxed (1)**
149:4
**relevant (2)**
142:19;150:2
**relief (4)**
9:5;11:6;13:15;
45:18
**relying (1)**
8:7
**remain (1)**
112:10
**remaining (1)**
159:18
**remains (2)**

13:17;31:2
**remarkable (3)**
22:4;72:18;139:21
**remarks (1)**
7:10
**remedy (2)**
64:12;144:22
**remember (3)**
8:3;56:12;77:23
**remind (4)**
7:13;12:1;56:9,10
**reminder (1)**
7:24
**remotely (2)**
94:10;157:21
**rendered (1)**
97:25
**renders (2)**
97:25;108:8
**reorganization (5)**
25:10;40:8;55:9;
58:10;83:21
**reorganize (1)**
162:17
**reorganized (10)**
27:4;48:9;58:24;
61:21;72:10;76:10,18;
88:13;132:21,25
**repeat (9)**
10:21;111:1;112:24;
130:22;137:19;142:23;
143:18;146:1;148:4
**repeated (1)**
16:13
**repeatedly (2)**
11:15;132:3
**repetition (1)**
146:3
**replaced (1)**
155:4
**replacement (1)**
52:6
**reply (1)**
28:24
**report (2)**
40:8;43:2
**reports (1)**
155:6
**represent (1)**
81:18
**representation (1)**
111:22
**representative (2)**
82:12;94:6
**representatives (2)**
161:11,12
**represented (1)**
139:16
**representing (1)**
46:8
**represents (2)**
90:4;113:5
**request (5)**

38:22;126:22;146:1;
154:16,17
**requested (1)**
45:19
**requests (1)**
45:20
**require (4)**
29:9,14;101:17;
122:2
**required (4)**
55:23;78:1;91:20;
123:24
**requires (3)**
29:5;49:20;92:2
**requiring (1)**
102:16
**requisite (2)**
105:19;109:4
**reread (1)**
145:2
**resembles (1)**
32:4
**reserve (5)**
65:3;78:5;129:9,14,
15
**reserved (1)**
47:17
**reserves (1)**
87:19
**reset (1)**
122:2
**resident (1)**
8:3
**resolution (10)**
11:23;12:6;15:20;
16:15;46:14;61:1;
126:3;160:20;161:13,
14
**resolved (7)**
53:2,5,7,8,9;59:13;
141:10
**resolves (1)**
123:19
**resonate (1)**
65:23
**respect (30)**
33:7;40:6;47:25;
48:10,14;57:6;82:4;
84:6;89:14;90:16;92:9;
95:8,20;96:8;98:5,19;
104:4;106:12,22;
115:20;139:11;147:1;
153:11;154:16;156:6,
8,9;157:17;158:19;
159:3
**respected (1)**
12:16
**respectfully (3)**
17:16;45:20;154:16
**respective (1)**
118:12
**respects (2)**
81:22;82:5

Min-U-Script®

Case: 19-30088   Doc# 3540   Filed: 08/14/19   Entered: 08/14/19 07:58:40   Page 184
of 190

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(19) random - respects

**respond (7)**
29:21;66:15;83:10;
99:25;111:6;144:11,14
**response (7)**
52:6;117:16,16,17,
20;129:10;160:3
**responses (3)**
68:1;110:24;125:22
**responsibility (1)**
54:16
**responsive (1)**
152:6
**rest (2)**
77:4;137:3
**restricted (1)**
20:4
**result (5)**
12:8;40:14;100:19;
102:15;145:19
**resulted (1)**
149:2
**results (2)**
44:20;52:8
**resume (1)**
111:25
**return (1)**
59:7
**returning (2)**
147:5;157:7
**returns (1)**
78:4
**revelation (1)**
140:1
**reverse (1)**
100:1
**review (1)**
94:23
**rhetorical (1)**
12:25
**ridiculous (1)**
147:9
**right (131)**
9:11;15:2;18:1,15;
19:6;20:19,22;21:11,
25;23:2,4;25:23;29:10;
32:17,21;33:1,3,15;
35:20;36:11;37:14;
41:11,15;42:1,17,20,
25;43:25;45:22,24;
46:3,10;47:1;52:9;
55:25;56:5;57:12;
59:17;60:18,22;61:9,
10,24;62:14;65:1;66:1;
67:19,23;68:21,22;
69:3,5;70:3,14,20;71:4,
13,21;72:11,14;75:2,
17,21,24;76:1;77:19;
79:25;80:17;84:7,21;
85:6,9;88:20;89:20;
92:4,11,21;93:10,13;
96:2,25;97:12,14;98:9,
12,16;107:5,23;
109:11;110:4;111:19;

112:6;113:15;114:24;
118:25,25;119:21;
120:4,12,12,14;121:6,
16,23;123:17;126:17;
127:4;132:9;133:2,8;
135:11;136:23;138:8;
142:1,11;143:12,14,19,
22;144:5,6;148:1,10;
150:9,11,14;151:22;
155:18;156:2;158:17;
162:23
**rights (1)**
27:18
**ring (1)**
117:22
**ringing (1)**
117:22
**ripe (1)**
137:9,9
**rise (2)**
7:4;112:9
**risk (13)**
17:1,21;20:7;23:17,
20,22;37:3;108:11;
117:24;125:4;129:4;
158:11;159:2
**risky (1)**
108:9
**road (1)**
35:18
**Robert (1)**
39:2
**rock (1)**
19:24
**role (4)**
8:17;37:6,9;90:4
**roles (1)**
155:10
**roll (1)**
98:1
**rolling (1)**
28:6
**room (3)**
34:25;37:5;59:13
**Rosa (1)**
7:18
**Roughly (1)**
73:3
**rule (5)**
31:18;86:1;119:16;
120:22;155:15
**rules (6)**
18:6;42:11;47:1;
49:17;94:16;96:5
**rules-based (1)**
15:11
**ruling (3)**
13:14;33:20;35:17
**rulings (1)**
96:10
**run (4)**
21:24;35:6;38:2;
42:23

**running (1)**
99:4
**rushing (1)**
67:9

**S**

**safety (2)**
132:14,15
**sake (1)**
140:13
**same (21)**
13:10;26:11,11,13;
32:25;63:5;70:7;76:11;
99:9,12;113:1,3;132:7;
134:6,18;135:23;
139:12;144:22;146:1;
149:20;155:25
**SAN (4)**
7:1,16;8:2;133:17
**Santa (1)**
7:18
**satisfied (3)**
49:10;50:4;159:8
**satisfy (1)**
157:1
**savings (2)**
28:15;52:8
**saw (1)**
93:15
**saying (22)**
21:23;23:9;36:25;
40:23;43:5;52:5;62:21;
63:11,24;66:25;105:3;
107:17;108:4;116:14;
127:5,6,7,22;143:17;
147:21;152:5;153:8
**scale (2)**
135:24;136:1
**scenario (1)**
155:19
**schedule (1)**
18:17
**schedules (2)**
19:13;111:9
**score (3)**
116:16,17;119:12
**script (1)**
37:12
**scurry (1)**
118:12
**season (1)**
131:12
**seated (2)**
7:8;112:10
**second (10)**
7:11;69:2;71:15;
75:17;92:18;121:2;
144:5;145:3,16;155:12
**Secondly (2)**
82:12;161:10
**secrecy (1)**
103:7

**Section (3)**
25:16;116:8;154:10
**secured (4)**
28:6,7;78:4;100:20
**secures (1)**
78:2
**securities (2)**
138:7;162:15
**securitization (3)**
29:1,4;51:12
**securitizing (1)**
27:17
**security (6)**
51:10;151:1,14,23;
152:2;153:2
**seeing (2)**
82:16;119:6
**seek (4)**
45:13;48:8;88:10,12
**seeking (6)**
45:16;51:13;53:12;
67:10;90:15;101:2
**seem (3)**
84:20,22;103:12
**seems (3)**
17:12;97:24;125:8
**segment (2)**
144:5;145:3
**sell (1)**
10:7
**send (1)**
118:10
**senior (9)**
13:22;14:4;35:13;
39:17,24;40:17;44:6;
58:23;71:17
**sense (6)**
10:22;20:6;24:7;
124:18;152:4;153:10
**sentence (2)**
148:16,18
**sentences (2)**
153:25;154:4
**sentiment (1)**
16:21
**separately (1)**
84:1
**September (31)**
12:14,21;17:25;18:5,
22;19:3,24;31:22;
48:14;59:16;62:21,23;
63:7,20,25;89:12,12,
13;101:16;118:22;
126:15;136:18,19;
142:24;143:13;144:4;
154:19,19;162:5,10,10
**sequenced (2)**
54:22;108:6
**sequencing (2)**
54:21;108:9
**seriatum (1)**
35:3
**serious (5)**

38:19;67:6;69:13;
131:9,13
**seriously (1)**
39:24;88:22;152:21
**serve (3)**
21:20;62:1;104:17
**served (3)**
16:11;38:18;94:7
**session (1)**
7:4
**set (8)**
25:5;49:4;57:1;
59:21;119:20;125:25;
153:1;157:20
**setback (1)**
25:3
**sets (2)**
34:1,2
**setting (1)**
55:14
**settle (3)**
41:13;55:2;156:17
**settled (2)**
141:18;148:15
**settlement (16)**
33:7;49:21;82:21;
85:15,17;102:21;
103:5,6,21;104:4,16;
139:19;148:20;149:9;
154:5;163:3
**settlements (2)**
82:18;156:18
**settling (3)**
149:15;152:10;163:2
**seven (3)**
31:24;44:18;132:1
**several (3)**
11:16;129:13;161:6
**Shall (1)**
146:13
**share (7)**
72:4,24,24;74:13,15;
79:23;102:25
**shareholder (3)**
61:8;73:6;77:12
**shareholders (4)**
80:2;120:7,8,11
**shares (3)**
72:17;87:11,11
**sheet (19)**
12:25;27:3;32:5,10;
36:2;101:20;105:10;
117:17,18,19;122:12;
124:1,2,10,21;125:7;
140:25;160:9;161:25
**sheets (2)**
43:5,12
**shifted (1)**
51:11
**shifting (1)**
131:24
**Ship (1)**
7:24

Case: 19-30088   Doc# 3540   Filed: 08/14/19   Entered: 08/14/19 07:58:40   Page 185
of 190

**shocks (1)**
37:19
**shoe (1)**
79:1
**shooting (1)**
129:2
**short (4)**
38:14;125:16;
153:25;154:4
**shortcut (1)**
128:6
**shorten (1)**
125:14
**shorter (1)**
110:11
**shortly (1)**
95:13
**shots (1)**
36:1
**show (2)**
56:12,14
**shut (2)**
23:9;133:6
**shutting (2)**
131:21,22
**sic (3)**
8:19;41:13;128:11
**side (8)**
16:19;90:12;104:23;
106:12;112:2;119:14;
125:15;141:23
**sideshow (1)**
82:7
**significant (15)**
16:4;24:23;25:3;
44:14;55:4;60:1;66:20;
80:25;87:11,15;88:13;
117:25;122:9;123:21;
148:12
**significantly (4)**
23:25;53:10;69:15;
151:16
**silence (1)**
45:4
**SILVERSTEIN (19)**
87:3,5,5,8,9,25;88:2,
5,8;89:6,7,8,10,17;
153:24,24;154:2,3,21
**similar (2)**
99:8;156:18
**similarly (1)**
16:22
**simple (3)**
107:24,25;151:9
**simpler (1)**
163:18
**simply (7)**
11:12;15:6;39:14;
133:23;135:15;158:11;
159:9
**single (4)**
37:7;71:17;119:9;
158:12

**sinister (1)**
7:24
**sit (2)**
23:9;112:17
**sitting (1)**
126:5
**situation (2)**
19:8;46:12
**six (6)**
72:4;79:23;81:19;
109:13;128:7;151:12
**size (1)**
124:13
**skirmish (1)**
17:2
**SLF (1)**
46:7
**slightly (1)**
163:13
**small (4)**
51:8;68:16;120:8;
159:18
**smells (1)**
8:3
**smoke (1)**
8:3
**smoothly (1)**
46:17
**smuggling (1)**
150:25
**so- (1)**
11:13
**sole (1)**
61:5
**solely (1)**
78:5
**solicit (1)**
102:4
**solicitation (1)**
127:1
**soliciting (1)**
101:20
**solid (1)**
19:24
**solution (1)**
132:11
**solve (7)**
33:11;51:3;56:18;
109:2;132:25;135:25;
159:10
**solved (1)**
56:21
**solvency (4)**
80:24;83:21,24;
122:1
**solvent (6)**
68:12;70:2;88:10;
89:1;100:12;121:9
**solves (2)**
13:1;146:15
**somebody (5)**
75:14;84:18;115:23;
118:6;140:3

**somebody's (1)**
41:20
**someday (1)**
78:24
**somehow (3)**
36:19;67:1;97:21
**someone (7)**
10:3,5;22:11;66:4;
84:19;145:24;163:8
**someone's (1)**
148:24
**someplace (2)**
72:23;75:25
**sometime (1)**
49:2
**sometimes (4)**
56:10;82:22;118:7;
149:4
**somewhat (5)**
10:1;18:5,6;47:2;
160:4
**somewhere (3)**
40:25;41:25;114:3
**Sonoma (1)**
129:20
**soon (2)**
32:23;95:25
**sooner (1)**
146:12
**sorry (9)**
7:12;30:8,10;40:4;
47:13;60:12;112:22;
114:17;130:13
**sort (9)**
18:5;42:15;51:9;
91:4;92:2;95:25;96:6,
9;160:23
**sorting (1)**
8:19
**sorts (1)**
21:13
**sought (1)**
67:4
**sounds (1)**
63:13
**sources (6)**
22:5;35:20;58:10,18;
59:6;133:22
**space (1)**
112:13
**spawned (1)**
117:13
**speak (12)**
39:12;65:4;66:3;
77:9,11;79:15;89:18;
113:16;130:22;131:3;
157:9,12
**Speaking (7)**
33:6;77:9,10;94:17,
22;111:21;146:17
**speaks (3)**
66:2;130:6;138:18
**specific (4)**

**somebody's (1)** 27:19;71:9;99:18;
129:17
**Specifically (1)**
91:1
**specifics (1)**
31:8
**speculate (1)**
75:12
**speculating (1)**
151:21
**speculative (2)**
100:19,22
**speeding (1)**
67:2
**spend (1)**
66:18
**spent (1)**
128:7
**split (1)**
75:17
**splitting (1)**
159:13
**spoke (1)**
77:10
**spoken (2)**
30:22;77:9
**spread (1)**
130:15
**spur (1)**
136:24
**stable (1)**
150:16
**staff (1)**
8:13
**stage (2)**
15:19;26:5
**staged (1)**
150:8
**stagnant (1)**
46:21
**stake (4)**
23:15;24:15;88:13;
137:3
**stakeholders (6)**
45:5,17;52:19;59:2;
61:7;85:5
**stand (3)**
101:21;102:17;113:6
**standard (2)**
101:11;125:25
**standing (1)**
32:19
**stands (1)**
18:23
**start (9)**
55:1;83:3;93:24;
100:2;110:13;129:2;
137:10;155:1;157:23
**started (4)**
77:9;94:17;137:7,11
**starts (1)**
145:2
**state (6)**

30:9;38:10;46:3;
49:17;66:11;88:24
**stated (3)**
13:9;30:23;117:7
**statement (8)**
16:13;42:6,10;60:6,
7;106:4;139:21;148:23
**statements (1)**
11:17
**stating (1)**
138:2
**status (2)**
15:1;16:21
**statute (10)**
12:10;49:8,10,19;
55:10,23;126:22;
144:15,18;145:20
**statutory (3)**
18:19;19:9;53:20
**stay (8)**
9:5;11:6;13:15,23;
37:10;56:4;111:9;
137:24
**stayed (1)**
72:16
**stays (1)**
120:22
**steering (1)**
114:7
**step (3)**
8:21;44:14;149:14
**Stephen (2)**
47:7;136:15
**steps (1)**
73:14
**steward (1)**
61:9
**stewards (1)**
21:24
**stick (4)**
29:17;99:9;133:25;
163:16
**sticking (2)**
11:7;94:15
**stifle (1)**
21:20
**still (10)**
12:25;22:9;28:8;
29:5;31:10;35:14;
59:16;102:1;105:18;
163:3
**stipulate (1)**
59:12
**stock (9)**
72:15,16;78:6;81:21;
141:1;149:17;150:5,6;
151:1
**stockholders (3)**
88:14,19,20
**stocks (1)**
150:20
**stopping (2)**
109:8,10

Min-U-Script®

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 186
of 190

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(21) shocks - stopping

**straightforward (1)**
119:18
**strategy (1)**
45:7
**Strauss (1)**
14:3
**Street (1)**
132:8
**strength (1)**
38:20
**stress (1)**
9:1
**string (1)**
25:23
**strong (1)**
125:5
**strongest (1)**
94:9
**strongly (1)**
122:16
**structure (2)**
44:13;149:21
**stuck (2)**
17:7;142:3
**studied (1)**
49:15
**study (3)**
62:25;98:19;119:2
**studying (2)**
49:16;63:1
**stuff (4)**
115:2;130:10;
135:19;161:8
**subject (3)**
13:10;89:2;119:11
**subjected (1)**
148:24
**submissions (1)**
11:21
**submit (4)**
48:15;68:4;82:14;
86:20
**submitted (6)**
48:22;53:12;110:5;
146:23;148:22;164:4
**subro (2)**
134:25;135:1
**subrogation (47)**
17:5;22:19;39:21;
43:13;53:3;93:25;
94:19;95:1;98:17;99:8,
17,17;108:25;110:19;
112:23;113:20;114:2,
4,8,10,20,23;115:21;
117:19;123:19;131:3;
134:14,20;139:11,15,
22,24,25;140:25;
141:5;142:13,19;
147:15;148:12,18,19;
150:3;154:6,11;156:6,
10;158:14
**subrogation-group (1)**
112:1

**subsequent (1)**
86:15
**substance (2)**
45:2;117:24
**substantial (4)**
52:14;61:21;62:6;
141:3
**substantially (1)**
58:24
**substantive (2)**
22:2;50:24
**succeed (1)**
74:5
**succeeds (1)**
35:7
**success (1)**
160:12
**successful (2)**
48:18;89:3
**successfully (2)**
24:17;140:6
**sudden (1)**
21:13
**suddenly (1)**
8:16
**sue (1)**
115:25
**suffer (4)**
52:1;64:3,5;142:2
**suffered (2)**
119:4;138:19
**Suffice (1)**
93:20
**sufficient (2)**
87:18,19
**suggest (4)**
35:11;88:22;92:6;
163:14
**suggested (2)**
65:10;146:21
**suggesting (1)**
143:12
**suggests (1)**
118:6
**suite (1)**
108:2
**superseding (1)**
91:19
**supervision (1)**
44:23
**supplemental (3)**
40:13;57:3;72:21
**support (19)**
16:23;31:4;38:17;
44:1,23;64:15;73:13;
78:19;101:20;102:4;
113:6,9;119:10;
120:18;134:11,13,15,
17;140:1
**supported (3)**
39:20,21;129:1
**supporting (2)**
131:7;156:8

**Suppose (1)**
144:4
**supposed (7)**
8:23;75:9,10,12;
106:13;121:12;132:13
**Sure (30)**
22:16;25:12;31:12;
41:1;46:16,19;50:18;
58:6;63:21;64:24;66:6;
71:1;78:8;79:21;80:14;
81:10;83:15,24,24;
84:24;91:12,13;103:2;
111:9;116:3,6;126:21;
131:15;141:3;146:15
**surprise (2)**
13:19;45:4
**surprised (2)**
57:23;160:4
**surprising (3)**
53:1;155:7;156:19
**suspect (5)**
12:23;36:18;63:3;
106:5;110:24
**swing (3)**
92:23;93:4,5
**swoop (1)**
142:11
**Sword (2)**
31:10,15

## T

**table (9)**
15:4;21:15;28:11;
59:17;93:21;98:8;
102:8;126:2;128:25
**tack (1)**
29:3
**talk (12)**
16:23;31:7;68:8,9;
77:20;99:16;102:19;
105:1;107:1;131:8;
133:23;158:10
**talked (8)**
55:24;72:22;77:17,
18;82:22;95:23;
123:21;131:5
**talking (18)**
49:2;56:8;66:19;
71:2,3;73:2;80:16;
95:23;96:6;101:23,25;
109:15;131:7,13;
139:15;143:6;147:7;
152:7
**talks (1)**
62:3
**tally (1)**
130:3
**target (3)**
12:20,21;118:22
**task (3)**
8:17;9:9;92:6
**TCA (1)**

113:5
**TCC (11)**
27:9;47:11,11;79:7;
91:19;93:8;94:18;
118:2;138:3;139:3;
157:21
**TCC's (2)**
157:17;159:16
**teams (1)**
152:22
**telegraphed (1)**
98:25
**telling (4)**
50:6;97:24;135:18;
137:14
**tells (2)**
69:4;126:22
**ten (8)**
15:24;28:6;47:14;
52:11,11,12,12;99:24
**tenant (1)**
101:1
**ten-basis-point (1)**
71:18
**tens (2)**
16:6;142:8
**tension (1)**
149:2
**tenth (1)**
52:7
**term (18)**
12:25;27:3;32:5,10;
36:2;43:5,12;101:20;
105:9;122:12;124:1,2,
9,21;125:7;140:25;
160:9;161:25
**terminate (35)**
13:22;16:10;20:24;
21:13;22:8;25:2,20;
31:18;38:22;40:5;44:2,
9;53:13;60:23;66:16;
67:10,14;87:14;88:10;
101:2;104:25;113:6;
116:21;118:9;134:23,
24;138:5;139:12;
143:23;144:19;153:18;
154:17;155:16;156:8;
161:16
**terminated (7)**
31:7;34:15;46:17;
64:9;78:19;109:23;
148:19
**terminating (9)**
16:24;20:25;26:3;
45:10;117:1;120:20;
124:9;145:14;154:13
**termination (5)**
25:24;64:16;67:4;
116:11;164:3
**terms (25)**
9:4,6,24;10:2;34:22;
67:7;69:18;72:6;77:1;
91:16,18;101:6;

117:11,12,17,18,19;
150:1,2;151:24,25;
152:3;155:10;158:10,
11
**territory (1)**
54:12
**test (3)**
106:21;107:12;
149:12
**that'd (1)**
147:6
**that'll (1)**
112:5
**theirs (1)**
80:5
**theoretically (1)**
24:14
**theories (1)**
100:11
**thereabouts (1)**
12:21
**thereafter (1)**
95:13
**there'd (1)**
57:16
**therefore (8)**
23:10;45:20;51:17;
52:25;83:7,8;102:4;
154:16
**there're (2)**
13:19;22:14
**thinking (6)**
7:22;10:18,18;12:12;
96:5;161:5
**Third (4)**
69:2;73:7;75:5;
147:8
**thirteen (4)**
57:9;108:24;151:6;
153:4
**thirty (6)**
14:11;22:6;24:25;
101:4;108:24;110:21
**thirty-one (1)**
102:16
**though (9)**
17:1;22:24;29:1;
31:14;33:4;66:12;
72:14;110:18;161:10
**thought (13)**
12:1;32:9;50:17;
78:18;80:4,4,5;90:20;
116:1;124:1;129:13;
150:18;152:1
**thousands (2)**
8:8;16:5
**thread (1)**
105:2
**three (50)**
13:14;14:21;16:11;
19:10,21;31:16,22,23;
33:6,18;36:21;49:3,3,
4;64:13;66:19,20,20;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 187
of 190

(22) straightforward - three

72:16;73:1;74:16;
81:13;82:1;84:15;95:9;
96:15;98:8;101:15;
102:12,17;105:5;
109:12,15;126:10,10,
10,13,14;128:17;143:6,
7,13;153:25;154:4,13;
155:13,14,20;162:4,5
**three-week (1)**
14:18
**threshold (1)**
98:23
**threw (1)**
90:17
**ticket (2)**
10:5;156:22
**tied (1)**
56:7
**ties (1)**
160:8
**tight (4)**
19:15,16;91:25;92:1
**till (3)**
36:21;62:21,23
**timely (4)**
26:25;44:15;45:19;
109:25
**times (9)**
39:25;54:8;65:17;
72:16;73:1;74:16,16;
122:22;161:6
**timetable (1)**
59:21
**timing (1)**
91:3
**title (1)**
130:1
**today (55)**
9:2,13,21;10:10,21,
23;12:4,12;13:4,8;
14:23;20:3;21:4;23:20;
27:23;31:8;40:4;43:6,
12;48:2,7;51:18;56:8,
15,24,25;59:11;60:3;
61:14;63:2;72:3,19,25;
77:11;80:7,18,22;
81:25;86:12;87:22;
95:23;98:2;106:9;
109:21;116:20;122:22;
125:7;126:11;132:10;
134:1;138:1,21;
139:10;152:25;161:7
**today's (9)**
11:2,8;42:14;91:17,
18;96:22,23;129:19;
163:14
**together (10)**
8:21;21:19;35:2;
38:17;82:11,25;96:1;
127:9;130:10,16
**told (11)**
31:3;60:2,2,3;63:8;
92:23;118:21;122:21;

135:21;140:11;157:16
**tomorrow (27)**
9:2,21;10:23;13:13;
33:20;56:3,17,20;63:2;
92:19;95:13,24,24;
96:22;112:12,13,14;
114:22;118:3;133:6;
137:23;152:20;163:14,
16,19,22;164:1
**tomorrow's (2)**
11:4;33:12
**took (3)**
35:17;130:14;152:21
**toolbox (1)**
8:19
**toolboxes (1)**
9:10
**tools (1)**
8:23
**topic (2)**
30:22;51:12
**tort (29)**
32:2;33:5,8;34:2,22;
69:22;82:4;83:19;84:6;
85:7;89:24;90:13;92:9;
94:6;95:12;96:3;97:1,
17;119:22;120:16,16;
124:13;157:1,15;
158:5,7;159:3,11;
160:11
**tort-claim (1)**
83:25
**tort-claimants (1)**
98:20
**tort-committee (1)**
96:4
**toss (1)**
51:18
**total (5)**
50:1;93:18;114:4,9;
116:14
**totally (1)**
54:19
**tough (2)**
11:22;54:9
**toughest (1)**
54:10
**tout (1)**
139:23
**touting (1)**
102:20
**towards (2)**
103:15;104:15
**track (3)**
81:11;94:24;130:12
**tracks (1)**
74:9
**trade (3)**
100:20,22;159:18
**tradeoffs (1)**
28:12
**traditional (3)**
54:22;59:7;94:15

**tragedy (1)**
8:12
**transcripts (1)**
56:11
**translates (1)**
132:15
**transparency (2)**
31:4;45:15
**trauma (1)**
150:17
**travel (1)**
163:24
**treat (2)**
53:9;113:2
**treated (2)**
55:11;142:17
**treatment (6)**
32:24;61:20;102:14;
124:14;141:16;142:15
**trees (1)**
158:1
**tremendous (1)**
23:20
**trials (1)**
56:6
**trick (1)**
159:5
**tried (1)**
162:15
**triggers (1)**
144:5
**triple (1)**
76:12
**triply (1)**
83:24
**trouble (1)**
133:13
**truck (2)**
132:7;135:22
**true (7)**
24:5;65:18;68:22;
79:4;94:15;118:6,8
**trust (2)**
26:24;122:11
**trustee (2)**
14:12;44:6
**truth (1)**
67:3
**try (13)**
8:17;9:11;13:14;
15:10;50:25;60:19;
81:13;104:17;105:10;
123:11;129:18;161:3;
163:24
**trying (18)**
12:8;30:7;52:14,18;
62:2;71:7;82:3,20;
85:14;91:12;103:13;
104:14;109:2;111:8;
125:16,18;151:13;
152:6
**Tubbs (25)**
7:20;35:17;56:4,6;

75:15;92:22;97:5,22;
115:15,20;120:20,21;
137:23;141:7,10,23,25;
148:20;152:15,17;
153:11;157:24;158:19,
24;159:7
**TUESDAY (1)**
7:1
**TURN (11)**
14:12;39:2,12,16;
40:6;43:4;60:7;72:2;
105:15;107:21;135:16
**turns (2)**
71:20;121:9
**TURN's (2)**
40:6,13
**TV (1)**
8:4
**twelve (3)**
113:13;151:6;153:3
**twenty (8)**
110:22,23;111:12,
25;112:2;122:22;
136:13;160:6
**twenty- (1)**
15:22
**twenty-five-page (1)**
32:10
**twice (2)**
106:19;111:4
**two (9)**
9:2;10:11,22;11:3,5;
12:11;14:25;36:20;
40:7;42:16,17;43:6,12;
48:8;59:23;61:16;
66:25;68:1;74:3,5,16;
77:9;80:1;81:25;88:12;
92:6;94:11;95:9;96:24;
97:18,20;98:8;106:17;
109:12;111:16,17,18;
113:8,22;114:16;
120:24;130:6;150:1;
152:22;154:9;155:2;
157:20;161:19;162:3,
6;164:3
**type (4)**
24:13;28:17;52:4;
115:2
**types (1)**
42:17
**typically (1)**
61:23

**U**

**UCC (4)**
130:21;134:7,8;
140:22
**UCC's (1)**
108:18
**ultimate (2)**
64:25;108:22
**ultimately (8)**

15:20;21:23;23:23;
74:4;77:6;101:6;
118:17;120:7
**Um-hum (8)**
18:13;23:18;26:20;
34:4;72:7;94:4;149:18;
151:5
**unable (1)**
95:7
**unaffiliated (1)**
15:23
**unattractive (1)**
120:17
**uncertain (2)**
70:19,23
**uncertainties (1)**
24:10
**uncertainty (1)**
24:13
**uncomfortable (1)**
95:7
**unconfirmable (4)**
35:15;106:2,9;
108:17
**under (33)**
18:5,6;22:12,20,20;
23:14;25:6,7;36:20;
42:13;44:19,23;45:13;
49:8;53:9;55:23;58:20,
24;61:23;69:16;88:24;
100:18;101:6;103:7;
108:13;113:23;138:5;
140:24;144:15,18;
145:9;154:8,10
**undergrounded (1)**
133:23
**underlying (1)**
93:16
**understands (1)**
59:13
**Understood (1)**
117:12
**underway (1)**
21:21
**undoubtedly (2)**
113:23;118:19
**unequivocally (1)**
16:23
**unfavorable (1)**
97:23
**unfeathered (1)**
84:23
**unfold (2)**
101:9;138:16
**Unfortunately (6)**
8:23;19:12;45:3;
46:21;96:9;121:12
**Uniform (2)**
134:6,10
**unimpair (3)**
62:11;106:20;107:1
**unimpaired (9)**
22:12;23:1;37:8,8;

49:6;87:22;88:8,15;
106:23
**unimpressive (1)**
122:17
**uninsured (2)**
157:25;159:11
**Union (2)**
38:13;44:22
**unions (1)**
16:2
**unique (1)**
44:19
**UNISON (1)**
7:7
**unless (12)**
13:19,24;29:16;
35:19;40:20;68:25;
86:17;105:12;119:10;
126:22;131:12;135:22
**unlike (6)**
31:14;69:2,2;117:21;
143:4;156:7
**unlikely (1)**
33:20
**unnecessary (1)**
88:18
**unpair (1)**
106:24
**unravel (1)**
8:20
**unreasonable (1)**
78:14
**unsecured (15)**
13:22;14:4;15:24;
27:7,17;28:6;30:14;
48:22;68:10;71:20,21;
78:5;82:12;154:24;
159:14
**unsustainable (1)**
45:8
**unusual (1)**
155:4
**unwillingness (1)**
45:6
**up (52)**
10:6;12:2,6;14:23;
17:2,11;18:23;21:2;
22:25;23:9;25:5;26:25;
27:25;37:20;38:9;39:8;
41:13,21;42:23;43:11;
47:4;52:22;56:19;
63:19;67:2;69:23;
71:24;78:18;80:21;
89:9,10;91:15;99:11;
101:21;105:20;112:24;
113:24;116:14;119:12,
13;124:17;127:8;
137:6;146:4,7;149:5;
151:23;153:3,13;
154:25;159:25;162:16
**updated (2)**
124:9,21
**upended (1)**

108:8
**upfront (3)**
14:5,10;47:23
**upon (9)**
12:14;19:10;49:18;
72:24;75:19;76:19,22;
91:11;95:3
**upping (1)**
28:7
**upward (1)**
150:9
**urgent (1)**
31:18
**use (10)**
8:23;9:4,11;38:10;
41:24;110:20;111:6;
123:7,11,12
**used (5)**
9:20;45:4;117:11;
149:20;151:24
**useful (3)**
7:14;12:8;77:16
**using (1)**
53:24
**usually (3)**
36:6;64:22;83:4
**Utilities (3)**
11:20;16:9;150:16
**utility (5)**
81:21;150:16,19;
151:11,14

---

**V**

**vague (1)**
10:2
**validity (1)**
109:22
**valuation (1)**
100:25
**value (23)**
58:23;71:24;72:25;
73:1,1;76:17;77:8;
93:18;119:20,22;
123:20;125:1,2,2;
141:6;146:20,21;
147:3,8;150:20,25;
151:4;157:24
**valueless (1)**
158:1
**values (2)**
147:8;150:17
**variation (1)**
37:7
**variations (1)**
50:8
**variety (2)**
19:12;25:21
**various (1)**
27:19
**vast (2)**
125:2;160:19
**vastly (2)**

77:13,13
**vegetation (2)**
158:1,23
**vehicle (1)**
149:15
**venture (1)**
136:24
**version (1)**
161:22
**versus (1)**
150:24
**vested (1)**
25:8
**veteran (1)**
113:16
**viable (1)**
109:25
**vicinity (1)**
72:23
**victim (2)**
92:25;114:15
**victims (31)**
7:25;8:6;9:7,15;
15:18,19;17:5;22:18;
24:20;27:1;28:1;42:17;
43:13;46:8,9;94:8;
96:4;102:13,14;
108:21;114:6,19;
119:22;120:16,16;
138:18;142:2;157:4;
158:13;160:12;161:11
**victims' (1)**
87:19
**view (17)**
11:22;25:21;33:4;
60:16;94:21;96:7,20,
23;109:13;117:3,3,9;
124:21;137:21;138:18;
147:24,24
**views (3)**
12:13,23;108:25
**virtually (2)**
78:11;137:17
**vis-a-vis (1)**
115:17
**voiceovers (1)**
36:24
**volatile (2)**
150:20,21
**voluntary (1)**
67:25
**vote (11)**
13:3,5;42:20;43:17,
19;87:23;88:3,9,19;
100:14;104:2
**voters (1)**
43:15
**votes (4)**
68:25;94:17;107:9;
148:7
**voting (3)**
73:14;104:9;140:3

---

**W**

**wait (11)**
33:18;67:13;86:4,6,
6,8;88:1;101:16,22;
127:8;151:19
**waiting (4)**
117:21;118:13;
126:5,5
**waive (1)**
135:23
**waiving (1)**
73:21
**wakes (1)**
56:19
**wall (1)**
161:6
**wants (6)**
37:19;83:23;91:13;
115:15;128:2;141:24
**warranted (2)**
45:19;109:24
**waste (3)**
10:19;11:9;19:20
**way (51)**
19:22;21:19;23:16;
24:17;32:14;35:17,18;
37:4;42:13;49:7;52:10;
53:9;54:22;55:2;60:8,
9;63:7;68:7,7;69:12;
72:5;74:17;78:7;
103:16;108:6,10;
113:24;115:15;117:11;
119:6;120:20;121:17,
18,21;122:22;125:8,9;
126:4;128:4;129:18;
131:20;132:10,22;
145:21;146:11;148:14;
150:16;155:14;158:6;
161:1,6
**ways (2)**
80:14,15
**week (1)**
15:1
**weeks (36)**
12:20;14:21;19:11,
21;22:9;31:16,22,25;
33:6,18;36:25;44:18;
49:3,3;64:13;81:25;
84:15;101:15;102:12,
17;105:5;109:12,13,
15;126:10,10,11,13,14;
143:6,7;155:13,14,20;
162:4,5
**weigh (3)**
13:8;94:18;160:13
**Weil (2)**
47:8;136:15
**welcome (5)**
14:19,20;16:14;25:1;
118:23
**well-funded (1)**

122:11
**well-represented (1)**
22:18
**well-respected (1)**
22:4
**weren't (1)**
32:19
**what's (12)**
62:18;65:12;69:3;
75:12;83:6;107:7;
111:10;116:20;118:21;
129:17;131:20;139:10
**whatsoever (1)**
154:7
**whereas (1)**
93:7
**Whereupon (1)**
164:5
**wherever (1)**
133:5
**wherewithal (2)**
108:19;109:4
**whole (3)**
33:10;50:7;71:3,5;
110:10;112:4;132:15;
133:22;141:11,11
**wholeheartedly (2)**
16:20;82:3
**whomever (1)**
97:25
**who's (7)**
45:25;64:17,21;82:6;
128:6
**who've (1)**
40:1
**wide (2)**
151:17,22
**widely (1)**
131:5
**wildfire (29)**
15:18;23:23;24:11,
20;27:1,5;28:1;49:9;
51:13;53:2;55:11,13,
19;58:19;61:2,12,12;
83:19;87:19;108:21;
114:5,15,18;122:10;
123:19,22;143:3;
154:6;157:4
**wildfires (2)**
25:6;114:3
**willing (6)**
22:6;24:4,24;72:17;
95:4;139:6
**Willkie (1)**
113:19
**win (5)**
10:3;30:24;141:23
**win/we (1)**
116:18
**window (1)**
141:12
**winning (1)**
10:5

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 189
of 190

**wish (4)**
32:16,18;157:11;
163:17
**wished (1)**
32:16
**within (6)**
30:25;37:16;44:13;
106:18;107:7;108:20
**without (10)**
73:21;97:3;113:23;
119:23;123:20;132:1;
157:6;158:5;161:14;
162:19
**woman (1)**
52:22
**wonderful (2)**
11:21;140:1
**wood (5)**
30:3,3,6;33:6;37:10
**woodpile (1)**
33:7
**wood-to-chop (1)**
30:17
**word (2)**
9:25;77:14
**words (13)**
9:18;17:3;22:12;
27:15;49:15;56:16;
59:11;77:23;83:7;
116:25;123:9,11,12
**work (10)**
9:14;15:10;34:6;
38:15;67:11;74:8;
82:10,25;121:18;
128:19
**worked (1)**
47:3
**Workers (1)**
38:12
**workforce (1)**
123:25
**working (5)**
8:10;9:10;67:16,18;
118:2
**works (3)**
58:15;121:18;136:6
**world (7)**
7:17;8:11,20;9:4;
13:3;24:14;74:17
**worried (1)**
82:24
**worry (5)**
23:11;98:10;130:18;
145:12;152:4
**worse (1)**
96:12
**worst-case (1)**
155:19
**worth (3)**
68:3;152:24;160:7
**worthy (1)**
113:22
**wrap (4)**

89:9,10;153:13;
159:25
**writing (1)**
34:25
**written (5)**
11:17;56:13;112:11;
116:10;120:22
**wrong (10)**
17:8,15,17;23:11;
35:17;62:13;91:14;
93:1;96:13;148:23
**wrongful (1)**
115:2

**Y**

**year (7)**
7:18;31:15;52:12,12,
12,13;61:11
**years (6)**
32:9;35:24;52:11;
71:23;123:4;133:17
**yesterday (15)**
10:16;12:15;13:1,9;
21:3,6,10;43:7;57:7;
60:3;65:21;77:10;
93:15;112:12;146:24
**yesterday's (1)**
21:8
**yield (1)**
44:20
**yields (1)**
28:15

**1**

**1 (2)**
132:14;148:3
**1,492,000,000 (1)**
68:14
**1.5 (1)**
71:13
**10.25 (1)**
57:17
**100 (1)**
114:3
**1054 (6)**
25:6;27:6;40:10;
49:13;50:9;55:7
**10th (4)**
18:22;31:22;63:20;
127:11
**11 (9)**
25:17;45:7;55:8,17;
87:18;88:21;100:23;
137:10;155:5
**11:31 (1)**
112:8
**11:50 (1)**
112:8
**110 (1)**
114:1
**1121 (4)**

25:7,16;116:8;154:8
**1121's (1)**
144:5
**1124 (2)**
106:23;154:10
**1129a7 (1)**
106:21
**1129B (1)**
107:11
**11th (2)**
18:22;31:22
**12:46 (1)**
164:5
**1245 (1)**
38:13
**12th (1)**
18:22
**13 (2)**
7:1;57:16
**13.19 (1)**
58:12
**13.2 (1)**
57:21
**13B (1)**
68:2
**13th (1)**
19:3
**15 (1)**
150:24
**15.8 (2)**
141:6;151:2
**15th (1)**
127:13
**17.5 (1)**
44:7
**18 (1)**
72:24
**18.4 (3)**
15:18;26:25;27:25
**18-month (1)**
152:21
**18th (1)**
117:18

**2**

**2 (1)**
148:4
**200 (2)**
28:16;52:10
**2009 (1)**
117:5
**200-million-dollar (1)**
52:8
**2017 (2)**
82:4;114:2
**2018 (2)**
82:4;114:3
**2019 (1)**
7:1
**2020 (2)**
25:4;68:15
**21st (1)**

92:10
**22nd (1)**
117:5
**24th (2)**
31:17;109:14
**25th (2)**
31:25;117:16
**26th (1)**
89:12
**29th (1)**
8:15

**3**

**3.5 (2)**
150:22,24
**30th (13)**
18:18;23:21;25:4;
31:15,16;34:9;35:6;
60:24;61:10;68:15;
108:10;109:16;126:11
**33 (2)**
58:12;68:2
**3415 (1)**
129:23

**4**

**4.3 (3)**
152:13,14;153:2
**4.8-billion- (1)**
55:13

**5**

**5 (1)**
159:19
**5,200 (1)**
46:8

**6**

**6 (1)**
72:22

**7**

**7-1/2 (1)**
141:7
**7th (2)**
129:21;146:14

**8**

**8-K (1)**
103:8

**9**

**9 (1)**
118:22
**9:31 (2)**
7:1;128:13

**98 (1)**
114:3
**9th (32)**
12:21;17:25;18:5;
19:24;48:14;59:16;
62:22,24;63:7,25;75:8;
89:12,13;101:16;
126:15,21;127:9;
128:11;136:18,20;
142:24;143:13;144:4;
146:10,11,11,19;
154:19,19;162:5,10,10

Case: 19-30088    Doc# 3540    Filed: 08/14/19    Entered: 08/14/19 07:58:40    Page 190
of 190