RICHARD A. MARSHACK, SBN 107291
rmarshack@marshackhays.com
DAVID A. WOOD, SBN 272406
dwood@marshackhays.com
LAILA MASUD, SBN 311731
lmasud@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt, Irvine, CA 92620
Tel: 949-333-7777 -/- Fax: 949-333-7778

GERALD SINGLETON, SBN 208783
GARY LOCURTO, SBN 270372
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, CA 92101
Tel. (619) 771-3473
Email: gerald@slffirm.com
gary@slffirm.com

Attorneys for SLF Fire Victim Claimants

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION,<br><br>and,<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>Debtors.<br><br>Affects:<br><br>☐ PG&E Corporation<br><br>☐ Pacific Gas & Electric Company<br><br>☒ Both Debtors<br><br>* All papers shall be filed in Lead Case, No. 19-30088 (DM). | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case Jointly Administered)<br><br>JOINDER OF THE SLF FIRE VICTIMS CLAIMANTS TO THE STATEMENT OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS REGARDING AUGUST 27, 2019 STATUS CONFERENCE ON ESTIMATION; DECLARATION OF JOHN F. MCGUIRE, JR., IN SUPPORT<br><br>[Docket No. 3672]<br><br><u>Hearing:</u><br>Date: August 27, 2019<br>Time: 9:30 a.m.<br>Ctrm; 17, 16th Floor<br>Place: United States Bankruptcy Court<br>San Francisco, CA 94102 |

TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that the Singleton Law Firm ("SLF") and Marshack Hays LLP, together with several other firms, represent approximately 5,500 victims of the fires started by PG&E in 2015 ("Butte Fire"), 2017 (the twenty fires generally referred to as the "North Bay" and "Wind Complex Fires") and 2018 ("Camp Fire").[1]

The SLF Claimants join in the Statement of the Official Committee of Tort Claimants ("TCC") Regarding August 27, 2019 Status Conference on Estimation, filed on August 23, 2019, as Docket No. 3672 ("Statement"). Moreover, SLF Claimants would like to make the following supplemental comments[2]:

## I. Participants

First, and as previously mentioned, the SLF Claimants contend the following parties should be able to participate in any estimation proceeding:

1. Debtor;
2. Tort Claimants Committee – including corresponding State Court fire litigation counsel (we understand this to include the Leadership in the state court JCCP for the North Bay Fires, JCCP Number 4955);
3. SLF Claimants; and
4. Anyone else who requests to participate within the deadline set by court and who the court further decides should be allowed to participate.

SLF Claimants do not know if the Official Committee of Unsecured Creditors ("OCC"), or other creditors, intend to participate in the estimation proceeding. As such, SLF Claimants propose the Status Conference be continued for twenty (20) days so that during this time period other creditors may make a written request to participate if they wish to. Thereafter, the court can determine at the continued status conference whether to allow those creditors who filed request the opportunity to participate in the estimation proceedings.

---

[1] The claimants are jointly referred to as the "SLF Claimants."

[2] SLF Claimants previously filed an objection to the Debtor's Estimation Motion because we do not believe the estimation process can be done on the time table before the court without issues of due process. SLF Claimants maintain that position.

## II. Discovery

Second, SLF Claimants agree that Debtors' should expediently respond to the discovery noted in the TCC statement. Statement, p. 2, ¶1; p. 3, ¶3. That said, SLF Claimants note that we have not seen the letter requesting production of select documents by Debtors. As such, we are unaware of the scope and extent of the document production. To the extent it will aid the court, SLF Claimants have provided a detailed discovery outline as noted in the attached declaration of John McGuire, Jr.

Moreover, discovery needs to be produced for all fires immediately, not just the 5 noted in the TCC's Statement, with discovery for the others to follow at some unknown future date. In its Statement, TCC has emphasized the 5 fires (Tubbs, Camp, Atlas, Nuns Complex[3] and Redwood) because, as counsel stated in Court on August 14, the TCC estimates that these 5 fires account for 92% of the total wildfire damages at issue in this bankruptcy. Statement, p.4, ¶3. Whether not the 92% number is accurate, there is no doubt that these 5 fires account for the vast majority of the wildfire damages.

But, it is critical that the remaining fires not be ignored. SLF Claimants have over 2,000 fire victims from fires other than the 'Big 5' identified by the TCC. Two of these other fires, Cascade and Butte, involved multiple fatalities, and, together, the unpaid damages for these other fires – according to PG&E's own calculations – is somewhere between $1.1 and $2.4 billion dollars.[4] While SLF Claimants believe the actual amount of damages is substantially higher, there is no question that the victims of these other fires – which killed 6 people, left thousands homeless, and accounted for billions of dollars in damages – deserve to receive the same measure of due process as the victims of the 'Big 5' fires.[5]

---

[3] Although the TCC identifies the "Nuns Fire", it appears the TCC is actually referring to the "Nuns Complex" of fires, which encompasses 6 separate fires: Nuns, Adobe, Norrbom, Oakmont/Pythian, Partrick, and Pressley. This is common mistake given the unfortunate fact that "Nuns" can refer to both a single fire and a complex of 6 separate fires.

[4] PG&E's financial disclosure statements, and the testimony of their CFO during the creditors hearing on April 29, estimated that the total damages for wildfire losses were $14 billion to in excess of $30 billion. A true and correct portion of the excerpts of the Debtors' schedules wherein the range is listed is attached as Exhibit "1", pg. 22. [Dk. No. 903]. 8% of this range ($14-30 billion) is $1.1-2.4 billion.

[5] One troubling aspect of the TCC is that its membership is dominated by victims of the Camp,

All parties must be included in discovery. Given the tight timeline, it is counterproductive for SLF Claimants not to receive the discovery requests and responses between the TCC and Debtors. SLF Claimants want to avoid duplicative discovery, therefore discovery should include all parties.

In sum, SLF Claimants request:

(1) That a structure for discovery be set up that allows for production of documents for all of 22 fires. Even if one assumes that that 5 fires purportedly account for 92% of the damages, the balance of the damages created by the remaining 17 fires exceeds $1 billion; a sum in and of itself that justifies equal treatment to all other discovery issues in the case; and

(2) Further and, again, SLF Claimants request they be accorded equal access to participate in discovery including responding to PGE's appropriate requests) as its interests not only include but go far beyond the "Big 5" that tend to get most of the attention.

## III. Mediation

Third, SLF Claimants agree with the TCC that there should an agreed set of mediators. Statement, p. 4; ¶4. However, to be effective mediation must include all major stakeholders. The SLF Claimants comprise over 5,500 fire victims. They deserve a seat at the table and to have their voices heard. The SLF Claimants should also be a party with the ability to propose, and vote on the agreed set of mediators alongside those parties mentioned in the Statement.

To that end, a fire litigation specialist should be included in the set of mediators. In the Butte Fire, the parties (PG&E and the plaintiffs' lawyers, many of which are involved in this litigation) worked together to arrive at a mutually agreeable list of mediators. We believe this list should be the starting point for selecting mediators in this case, as these mediators have already been approved by PG&E in the context of mediating a wildfire case. Again, SLF Claimants would like to offer the idea of a type of binding mediation, as mentioned previous briefing with the Court. *See*,

---

Atlas, and Tubbs Fires. Between the 11 members of the TCC only 3 fires are represented: Camp (5 members); Atlas/Tubbs (4 members); Ghostship (2 members - which was not a utility fire and for which PG&E strongly disputes liability).The vast majority of the fires, including billion-dollar fires which resulted in fatalities (like Redwood, the Nuns Complex Fires and the Butte Fire) are not represented. *See*, Dk No. 530, Amended Appointment of the Official Committee of Tort Claimants, filed on February 21, 2019.

Docket No. 3451, pgs. 11-12 and 14-17. To reiterate, the SLF Claimants would like to offer the following example from the Butte Fire cases:

- In July 2017, the Singleton Butte Fire Plaintiffs reached an agreement with PG&E for a dispute resolution process that the parties termed "binding mediation." This process was built on a similar "binding mediation" model process that PG&E and the Singleton Firm developed for use in the 2007 San Diego Fires;
- While the precise terms of the process are subject to the mediation privilege, the general terms of the process included; (1) PG&E did not contest liability; (2) victims did not seek punitive damages; and (3) the parties agreed to a basic framework regarding compensatory damages;
- Thereafter, the counsel for PG&E, Quinn Emanuel, and SLF negotiated each case individually in an attempt to reach an informal resolution;
- If we were unsuccessful, we could attend a "binding mediation" in which both parties would present their damages evidence to the mediator and attempt to resolve the case;
- Prior to attending the "binding mediation" the parties would agree on a range of potential damages ("high-low agreement");
- If mediation was unsuccessful, then the mediator would become an arbitrator and decide on a final settlement amount within the high low agreement that would be binding on the parties.

## IV. Burden of Proof

Fourth, a primary concern of SLF Claimants is with which party the burden of proof lies with respect to the estimation proceedings. *In order for the estimation process to proceed smoothly and efficiently, the court should make it clear who has the burden of proof.* Because *Debtors are the movants, do they have the burden of proof? If, however, this were a state court trial, the plaintiffs would have the burden. SLF Claimants believe as specific hearing should be held after briefing to have these issues clearly resolved.* As noted by the TCC in the Statement, parties participating in the estimation proceeding need to know from Debtors: (1) what the factual and legal issues are; (2) what Debtors' specific theories are with respect to avoidance of liability; and (3) who needs to prove what with respect to which fire – e.g. do the Cal Fire Reports in fact play a burden shifting role or is

the law clear. Statement, p. 3, ln. 10-13. Without a clear of idea of what Debtors' specific defenses are, it is difficult for any party to properly prepare for an estimation proceeding-let alone in the given time frame. Only after the Court determines these preliminary issues can the fire victim claimants, represented by their respective counsel, have an ability to put on their case.

Lastly, to the extent that the general purpose of estimation is to determine the aggregate fire damage exposure of Debtors rather than estimation of individual claims, SLF would urge the Court that the starting point for estimation should be at the higher end of the fire damage range noted by Debtors' COO at the 341(a) meeting of creditors as well as in Debtors' schedules – $14 billion to $30 billion. Specifically, if all fire claimants are to be made whole, the starting point for estimation must be at the higher end of that range - $30 billion.

Dated: August 26, 2019

MARSHACK HAYS LLP

By:______________________________

RICHARD A. MARSHACK
DAVID A. WOOD
LAILA MASUD
Attorneys for SLF CLAIMANTS

Dated: August 26, 2019

SINGLETON LAW FIRM, APC

/s/ Gerald Singleton

By:______________________________

GERALD SINGLETON
GARY LOCURTO
Attorneys for SLF CLAIMANTS

DECLARATION OF JOHN F. MCGUIRE, JR.

I, John F. McGuire, Jr. declare:

1. I have personal knowledge of, and (if called as a witness) would competently testify to the following facts:

2. I am an attorney at law, licensed to practice before this Court. I have considerable experience representing plaintiffs in utility fire cases. I have been one of several trial counsel in wild fire cases, and I was selected to be co-lead trial counsel along with Terry Singleton (one of our co-counsel in this case) for the Witch/Guejito Fires in the SDG&E Fire case litigation, which ignited in 2007 in San Diego County. That case was ultimately resolved shortly before the final scheduled trial date for several million dollars.

3. Based on this experience, I am familiar with the discovery a plaintiff needs to prove utility fire case.

4. Plaintiffs will need to conduct the following discovery, all of which is necessary to plaintiffs' ability to prove that Pacific Gas & Electric (PG&E) is liable for the 2017 North Bay Fires.

**Discovery Relevant to All Fires**

| Discovery Device | Specific Discovery Needed | Estimated Time to Complete |
|---|---|---|
| Requests for Production of Documents | 1. All SCADA data for each PG&E circuit involved in a fire two days prior to the ignition and two days after the ignition.<br>2. Circuit Maps for each relevant PG&E circuit in CAD format and which identify all equipment and protection.<br>3. PG&E system protection policies and corresponding documents.<br>4. PG&E vegetation management policies and corresponding documents.<br>5. PG&E pole inspection policies and corresponding documents.<br>6. PG&E vegetation management inspection | 4 – 5 months for requests, objections, production. |

| | | |
|---|---|---|
| | inventories, work requests, quality control records, quality assurance records for each fire's relevant circuit.<br>7. PG&E customer refusal locations by address and circuit number, along with reasons for refusals for each fire's relevant circuit.<br>8. PG&E Customer Restricted Access Locations by address and circuit map number, including reason for restricted access for each fire's relevant circuit.<br>9. PG&E first responder audio communications with dispatch. | |
| Depositions | PG&E Witnesses<br>1. PG&E Troublemen working on each circuit during the time that the fires ignited.<br>2. PG&E substation operators.<br>3. PG&E PMQ's on interpreting SCADA data for each circuit.<br>4. PG&E PMQ's on document and SCADA retention and custody.<br>5. PG&E PMQ on evidence collection.<br>6. PG&E PMQ on vegetation management.<br>7. PG&E PMQ on red flag warning operations, meteorology, and steps taken by PG&E to prepare for and react to weather conditions.<br>8. PG&E PMQ on pole inspections.<br>9. PG&E PMQ on quality assurance.<br>10. PG&E PMQ on quality control.<br>11. PG&E PMQ on system protection. | 2 – 3 months but contingent on the production of relevant documents listed above. |

| | | |
|---|---|---|
| | 12. PG&E first responders for each fire.<br><br>Plaintiff Witnesses<br>1. Vegetation Management Expert.<br>2. Pole Inspection Expert.<br>3. Metallurgist Expert.<br>4. Fire Origin and Cause Expert. | |
| Third Party Subpoenas | 1. All un-redacted CalFire reports with attachments. Plaintiffs currently have unredacted reports for the following fires: (1) Cascade, (2) Cherokee, (3) LaPorte and (4) Redwood Valley. Plaintiffs still need unredacted reports with attachments for: (1) Adobe, (2) Atlas, (3) Blue, (4) Lobo, (5) Maacama, (6) McCourtney, (7) Norrbom, (8) Nuns, (9) Oakmont/Pythian, (10) Partrick, (11) Pocket, (12) Point, (13) Pressley, (14) Sullivan, (15) Sulphur and (16) Tubbs; (17) Camp<br>2. Depositions of CalFire report investigators for each of the fires—including both the writer of the report and the CalFire investigators that collected<br>3. Depositions of percipient witnesses referenced in CalFire reports for each fire.<br>4. Depositions of third party contractors hired by PG&E on the following topics:<br>**a.** Vegetation Management; and<br>**b.** Pole Inspections.<br>5. Inspections of all physical evidence retained by CalFire from each fire's area of origin. | 4 – 5 months but contingent on the production of the unredacted CalFire reports and relevant PG&E documents describing the role of various contractors. |

5. The above generally outlines the discovery needed for all fires. However, some deviation from the outline may be needed. For example, the Sulphur fire did not involve vegetation management issues, so some of the vegetation management discovery will not be needed.

6. Given the scope of the discovery needed, estimation trials simply cannot be completed by [Judge suggested date]. Rather, the estimation trials should be set for [our suggested date] to ensure that Plaintiffs' have enough time to prepare for each case.

7. The 2017 North Bay Fires were unlike anything California has ever seen. Each fire has specific liability issues, separate percipient witnesses, and unique facts.

8. The "Estimated Time to Complete" does not take into account that Plaintiffs will need discovery on each and every fire in order to prove their case. An additional 3 – 4 months should be added to the above estimates to conduct discovery on factual and legal issues specific to each case.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct. Executed this 26th day of August 2019 at San Diego, California.

THORSNES BARTOLOTTA McGUIRE LLP

By: ______________________________

JOHN F. MCGUIRE, JR.

| Fill in this information to identify the case: | |
|---|---|
| Debtor Name: | Pacific Gas and Electric Company |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case Number (if known): | 19-30089 (DM) |

☐ Check if this is an amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

**12/15**

## Part 1: Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

1a. **Real property:**
Copy line 88 from Schedule A/B ........ $54,927,619,001

1b. **Total personal property:**
Copy line 91A from Schedule A/B ........ $6,074,329,725

+

1c. **Total of all property:**
Copy line 92 from Schedule A/B ........ $61,001,948,725

## Part 2: Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
Copy the total dollar amount listed in Column A, Amount of claim, from line 3 of Schedule D ........ $2,809,790

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

3a. **Total claim amounts of priority unsecured claims:**
Copy the total claims from Part 1 from line 6a of Schedule E/F ........ $0

3b. **Total amount of claims of nonpriority amount of unsecured claims:**
Copy the total of the amount of claims from Part 2 from line 6b of Schedule E/F ........ $24,699,616,096

+

4. **Total liabilities**
Lines 2 + 3a + 3b ........ $24,702,425,886

Case: 19-30088 Doc# 903 Filed: 03/14/19 Entered: 03/14/19 22:48:46 Page 1 of 1
Case: 19-30088 Doc# 3688 Filed: 08/26/19 Entered: 08/26/19 10:08:16 Page 11 of 25
EXHIBIT 1, PAGE 11

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>**- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>** All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**SCHEDULES OF ASSETS AND LIABILITIES FOR PACIFIC GAS AND ELECTRIC COMPANY** |

**GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND DISCLAIMERS REGARDING DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES**

On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Norther District of California, San Francisco Division (the "**Bankruptcy Court**"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the Lead Case No. 19-30088 (DM) (the "**Chapter 11 Cases**") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**OVERVIEW OF GLOBAL NOTES**

Each of the Debtors has herewith filed separate Schedules of Assets and Liabilities ("**Schedules**"). These *Global Notes and Statement of Limitations, Methodology, and Disclaimers Regarding Debtors' Schedules of Assets and Liabilities* (the "**Global Notes**") relate to each Debtor's Schedules and set forth the basis upon which the Schedules are presented. **These Global Notes pertain to, are incorporated by reference in, and comprise an integral part of, the Schedules and should be referred to and considered in connection with any review of the Schedules**. The Global Notes are in addition to any specific notes contained in either Debtor's Schedules. Except as otherwise expressly set forth herein, information in the Schedules is presented as of the Petition Date and on an individual Debtor-by-Debtor basis. Disclosure of information in one Schedule, exhibit, or continuation sheet, even if incorrectly placed, shall be deemed to be disclosed in the correct Schedule, exhibit, or continuation sheet.

The Schedules have been prepared by the Debtors' management with the assistance of their advisors and other professionals pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. The Schedules contain unaudited information, which is subject to further review and potential adjustment. Reasonable efforts have been made to provide accurate and complete information herein based upon information that was available at the time of preparation; however, subsequent information or discovery thereof may result in material changes to the Schedules and inadvertent errors or omissions may exist.

**The Schedules and Global Notes should not be relied upon by any persons for information relating to current or future financial conditions, events, or performance of either of the Debtors.**

The Debtors and their agents, attorneys, and financial advisors expressly do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtors or damages to business reputation, lost business, or lost profits), whether foreseeable or not and however cause, even if the Debtors or their agents, attorneys, and financial advisors are advised of the possibility of such damages.

The Debtors reserve all rights to amend, modify, or supplement the Schedules from time to time, in all respects, as may be necessary or appropriate, including, but not limited to, the right to dispute or otherwise assert offsets or defenses to any claim reflected on the Schedules as to amount, liability or classification, or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated." Furthermore, nothing contained in the Schedules shall constitute an admission of any claims or a waiver of either of the Debtor's rights with respect to the Chapter 11 Cases, including with respect to any issues involving causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and other relevant non-bankruptcy laws to recover assets or avoid transfers.

The Schedules for each Debtor have been signed by David Thomason, Chief Financial Officer for the Utility and Controller for PG&E Corp. In reviewing and signing the Schedules, Mr. Thomason necessarily relied upon the efforts, statements, and representations of various personnel employed by the Debtors and their advisors and other professionals. Mr. Thomason has not (and could not have) personally verified the accuracy of each such statement and representation, including, without limitation, statements and representations concerning amounts owed to creditors, classification of such amounts, and their addresses.

## Methodology and Limitations

1. **Basis of Presentation:** Information contained in the Schedules has been derived from the Debtors' books and records and historical financial statements. The Schedules do not purport to represent financial statements prepared in accordance with United States Generally Accepted Accounting Principles ("**GAAP**"), nor are they intended to fully reconcile with the financial statements of each Debtor.

2. **Cash Management System:** The Debtors use an integrated, centralized cash management system to streamline collection, transfer, and disbursement of funds generated by their business operations (the "**Cash Management System**"). Although the Utility and PG&E Corp. each maintain separate systems, the Cash Management System is an integrated system. The Debtors describe the Cash Management System in detail in their *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to (i) (a) Continue Using Existing Cash Management System, (b) Honor Certain Prepetition Obligations Related to the Use Thereof, (c) Continue Intercompany Arrangements, (d) Continue to Honor Obligations Related to Joint Infrastructure Projects, and (e) Maintain Existing Bank Accounts and Business Forms, and (ii) Waiving the Requirements of 11 U.S.C. § 345(b)* [Docket No. 7] (the "**Cash Management Motion**"). On March 14, 2019, the Court authorized the Debtors to continue using the Cash Management System on a final basis [Docket No. 881].

3. **Valuation:** The Debtors do not have current market valuations for all of their assets as it would be prohibitively expensive, unduly burdensome, and an inefficient use of estate assets and resources for the Debtors to obtain current market valuations of all their assets. Accordingly, unless otherwise indicated herein, assets in the Schedules reflect net book values as of January 31, 2019. Net book values may vary, sometimes materially, from market values. Certain other assets, such as investments in subsidiaries, are listed as "unknown" or "undetermined" amounts. Additionally, amounts ultimately realized may differ materially from net book value (or whatever value was ascribed). Certain depreciable assets with a net book value of zero ($0) may also be included for completeness.

4.  **Liabilities:**  The Debtors have sought to allocate liabilities between the prepetition and postpetition periods based on information and research that was conducted or available in connection with the preparation of the Schedules.  As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change.  The Debtors reserve all of the rights to amend, supplement, or otherwise modify the Schedules as they deem necessary or appropriate.

The liabilities listed on the Schedules do not reflect any analysis of claims under section 503(b)(9) of the Bankruptcy Code.  Accordingly, the Debtors reserve all rights to dispute or challenge the validity of any asserted claims under section 503(b)(9) of the Bankruptcy Code or the characterization of the structure of any such transaction or any document or instrument related to any creditor's claim.

5.  **Excluded Assets and Liabilities:**  The Debtors have excluded the following items from their Schedules, which may be included in their GAAP financial statements: certain accrued liabilities, including, without limitation, accrued salaries, employee benefit accruals, and certain other accruals, trusts, certain prepaid and other current assets considered to have no market value, certain contingent assets such as insurance recoveries, and deferred gains.

The Utility records a regulatory balancing account asset or liability for differences between incurred costs and customer billings or authorized revenue meant to recover those costs, to the extent that these differences are probable of recovery or refund.  The California Public Utilities Commission also has authorized the Utility to collect additional revenue requirements to recover costs that the Utility has been authorized to pass on to customers, including costs to purchase electricity and natural gas; and to fund public purpose, demand response, and customer energy efficiency programs. In general, the revenue recognition criteria for pass-through costs billed to customers are met at the time the costs are incurred. As these differences have no impact on net income, the Debtors have excluded balances with respect to regulatory balancing accounts and other accounts recognized for rate making purposes. Other immaterial assets and liabilities may also have been excluded.

Various electricity suppliers filed claims in the Utility's prior 2001 chapter 11 case (Case No. 01-30923 (DM)) seeking payment for energy supplied to the Utility's customers between May 2000 and June 2001. While proceedings are pending before the Federal Energy Regulatory Commission ("**FERC**") and other judicial forums, the Utility pursued settlements with electricity suppliers and entered into a number of settlement agreements with various electricity suppliers to resolve some of these disputed claims and to resolve the Utility's refund claims against these electricity suppliers. Under these settlement agreements, amounts payable by the parties, in some instances, would be subject to adjustment based on the outcome of the various refund offset and interest issues being considered by the FERC. Generally, any net refunds, claim offsets, or other credits that the Utility receives from electricity suppliers either through settlement or through the conclusion of the various FERC and judicial proceedings are refunded to customers through rates in future periods. Accordingly, such potential refund claims are not included in the Schedules.

6.  **Guarantees and Other Secondary Liability Claims:**  The Debtors have used reasonable efforts to locate and identify guarantees and other secondary liability claims (collectively, the "**Guarantees**") in their executory contracts, unexpired leases, debt instruments, and other agreements.  Where Guarantees have been identified, they have been included in the relevant

Schedules D, E/F, G and H for the affected Debtor. It is possible that certain Guarantees embedded in the Debtors' executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements may have been inadvertently omitted. The Debtors reserve all of their rights to amend, supplement, or otherwise modify the Schedules to the extent additional Guarantees are identified.

7. **Leases:** The Debtors may lease furniture, fixtures, and equipment from certain third party lessors. Any such leases are set forth in the Schedules. The Debtors have not included in the Schedules the future obligations of any capital or operating leases. However, assets under any capital leases have been included in the Schedules. Nothing in the Schedules is, or should be construed, as an admission as to the determination of the legal status of any lease (including whether any lease is a true lease or financing arrangement), and the Debtors reserve all rights with respect thereto.

In February 2016, the Financial Accounting Standard Board (the "**FASB**") issued ASU No. 2016-02, Leases (Topic 842), which amends the existing guidance relating to the definition of a lease, recognition of lease assets and lease liabilities on the balance sheet, and the disclosure of key information about leasing arrangements. In November, 2017, the FASB tentatively decided to amend the new leasing guidance such that entities may elect not to restate their comparative periods in the period of adoption. Under the new standard, all lessees must recognize an asset and liability on the balance sheet. Operating leases were previously not recognized on the balance sheet. The ASU was effective for PG&E Corp. and the Utility on January 1, 2019, with early adoption permitted. PG&E Corp. and the Utility plan to adopt this guidance in the first quarter of 2019. Therefore, the Schedules of assets and liabilities reflected herein do not include the asset or liability of those operating leases.

8. **Intellectual Property Rights:** Exclusion of certain intellectual property shall not be construed to be an admission that those intellectual property rights have been sold, abandoned, terminated, assigned, transferred, or otherwise have expired by their terms. Conversely, inclusion of certain intellectual property shall not be construed to be an admission that those intellectual property rights have not been sold, abandoned, terminated, assigned, transferred, or otherwise have not expired by their terms. Accordingly, the Debtors reserve all of their rights as to the legal status of all intellectual property rights.

9. **Currency:** Unless otherwise indicated, all amounts are reflected in U.S. dollars.

10. **Property and Equipment:** Unless otherwise indicated, owned property and equipment are stated at net book value.

11. **Intercompany Payables and Receivables:** Prior to the Petition Date, the Debtors routinely engaged in intercompany transactions resulting in intercompany accounts payable and receivable. The intercompany transactions are described in the Cash Management Motion. The intercompany accounts payable and receivable are reported on each of the Debtor's respective Schedules A/B or E/F as the net due-to or due-from based on invoiced intercompany charges assessed pursuant to various continuing services agreements. All intercompany assets and liabilities on Schedule A/B and elsewhere (if applicable) are reported as of January 31, 2019.

The listing by the Debtors of any account between the Debtors or between a Debtor and a non-Debtor affiliate is a statement of what appears in a particular Debtor's books and records and does not reflect

any admission or conclusion of the Debtors regarding the allowance, classification, characterization, validity, or priority of such account. The Debtors take no position in these Schedules as to whether such accounts would be allowed as claims, interests, or not allowed at all.

12. **Causes of Action:** The Debtors have not yet listed any causes of action or potential causes of action against third parties as assets in their Schedules, including, without limitation, avoidance actions arising under chapter 5 of the Bankruptcy Code and actions under other relevant non-bankruptcy laws to recover assets. The Debtors reserve all of their rights for any claims, causes of action, or avoidance actions they may have, and neither these Global Notes nor the Schedules shall be deemed a waiver of any such claims, causes of actions, or avoidance actions or in any way prejudice or impair the assertion of such claims.

13. **Classification:** The Debtors have made reasonable efforts to correctly characterize, classify, categorize, and designate assets, liabilities, executory contracts, unexpired leases, and other items reported in the Schedules. However, due to the complexity and size of the Debtors' businesses and operations, the Debtors may have improperly characterized, classified, categorized, or designated certain items. The Debtors reserve all of their rights to re-characterize, reclassify, re-categorize, or re-designate items reported in the Schedules as necessary or appropriate as additional information becomes available.

14. **Claim Description:** Any failure to designate a claim in the Schedules as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtors that the claim or amount is not "contingent," "unliquidated," or "disputed." The Debtors reserve all of their rights to dispute, or to assert offsets or defenses to, any claim reflected on their Schedules on any grounds, including, without limitation, amount, liability, priority, status, or classification, or to otherwise subsequently designate any claim as "contingent," "unliquidated," or "disputed." Listing a claim on the Schedules as "secured" does not constitute an admission by the Debtors of the legal rights of the claimant, or a waiver of the Debtors' rights to reclassify such claim or contract. Moreover, although the Debtors may have scheduled claims of various creditors as secured claims for informational purposes, no current valuation of the Debtors' assets in which such creditors may have a lien has been undertaken. The Debtors reserve all of their rights to amend, supplement, or otherwise modify their Schedules as necessary and appropriate, including, modifying claim descriptions and designations.

15. **Executory Contracts and Unexpired Leases:** The placing of a contract or lease onto the Schedules shall not be deemed an admission that such contract is an executory contract or unexpired lease, or that it is necessarily a binding, valid, and enforceable agreement. The Debtors hereby expressly reserve the right to assert that any contract or lease listed on the Debtors' Schedules does not constitute an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code.

16. **Undetermined Amounts:** Claim amounts that could not readily be quantified by the Debtors are scheduled as "undetermined." The description of an amount as "undetermined" is not intended to reflect upon the materiality of the amount.

17. **Payment of Prepetition Claims Pursuant to First Day Orders:** On or about January 31, 2019, the Bankruptcy Court entered orders (the "**First-Day Orders**") authorizing, but not directing, the Debtors to, among other things, pay certain prepetition claims relating to (a) certain safety,

reliability, outage, and nuclear facility suppliers; (b) shippers, warehousemen, and other lien claimants; (c) taxes; (d) employee wages, salaries, and other compensation and benefits; (e) customer programs, including public purpose programs; and (f) the continued use of the Debtors' Cash Management System. Where the Schedules list creditors and set forth the amounts attributable to such claims, such scheduled amounts reflect balances owed as of the Petition Date. To the extent any adjustments are necessary to reflect any payments made on account of such claims following the commencement of these Chapter 11 Cases pursuant to the authority granted to the Debtors by the Bankruptcy Court under the First Day Orders, such adjustments have been included in the Schedules unless otherwise noted on the applicable Schedule. The Debtors reserve the right to update the Schedules to reflect payments made pursuant to the First-Day Orders.

18. **Confidentiality:** There may be instances in the Schedules where the Debtors have deemed it necessary and appropriate to redact or withhold from the public record information such as names, addresses, or amounts. Typically, the Debtors have used this approach because of an agreement between the Debtors and a third party, concerns of confidentiality, or concerns for the privacy of an individual. In addition, certain agreements may not have been included on the Schedules because publicly disclosing such agreements may violate the terms set forth therein.

19. **Totals:** All totals that are included in the Schedules represent totals of all the known amounts included in the Schedules and exclude items identified as "unknown" or "undetermined." If there are unknown or undetermined amounts, the actual totals may be materially different from the listed totals.

**Specific Notes with Respect to the Debtors' Schedules**

a. **Schedule A/B – Real and Personal Property:**

(i) **Schedule A/B.3:** The bank account balances listed are as of the Petition Date.

(ii) **Schedule A/B.11:** Credit is regularly extended to customers for utility service and made in the ordinary course of business based upon the Debtors' assessment of creditworthiness. Accordingly, there is a significant amount of accounts receivable owed to the Debtors as of the Petition Date which will be recouped or reimbursed in the ordinary course of business. Receivables are reported as of January 31, 2019.

As part of the Debtors' normal accounting practices, PG&E Corp. and the Utility recognize an allowance for doubtful accounts to record uncollectable customer accounts receivable at estimated net realizable value, including customer credits. The allowance is determined based upon a variety of factors, including historical write-off experience, aging of receivables, current economic conditions, and assessment of customer collectability.

(iii) **Schedule A/B.15:** Equity interests in subsidiaries and affiliates primarily arise from common stock ownership or member or partnership and joint venture interests. The Debtors do not have current market valuations for all of their assets, including the equity interests of all their subsidiaries and affiliates, as it would be prohibitively expensive, unduly burdensome, and an inefficient use of estate assets and resources for the Debtors to obtain current market valuations of all their assets. Accordingly, for

purposes of these Schedules, the Debtors have listed the equity interests of all of their subsidiaries and affiliates as "unknown" or "undetermined" amounts.

(iv)     **Schedule A/B; Part 5**:  Inventories are carried at weighted-average cost and include natural gas stored underground, nuclear fuel as well as materials and supplies. Stored natural gas and nuclear fuel is recorded to inventory and then expensed as the gas is withdrawn for distribution to customers or to be used as fuel for electric generation. Materials and supplies are recorded to inventory when purchased and expensed or capitalized to plant, as appropriate, when consumed or installed.

(v)      **Schedule A/B; Part 7, 8 and 9:**  Property, plant, and equipment are reported at historical cost less accumulated depreciation. Historical costs include labor and materials, construction overhead, and AFUDC. AFUDC represents the estimated costs of debt (i.e., interest) and equity funds used to finance regulated plant additions before they go into service and is capitalized as part of the cost of construction. The Debtors depreciate property, plant, and equipment using the composite, or group, method of depreciation, in which a single depreciation rate is applied to the gross investment balance in a particular class of property. This method approximates the straight-line method of depreciation over the useful lives of property, plant, and equipment. Depreciation expense includes a component for the original cost of assets and a component for estimated cost of future removal, net of any salvage value at retirement. Upon retirement, the original cost of the retired assets, net of salvage value, is charged against accumulated depreciation. The cost of repairs and maintenance, including planned major maintenance activities and minor replacements of property, is charged to operating and maintenance expense as incurred.

The Schedules do not include asset retirement obligations ("**AROs**"). The Debtors account for an ARO at fair value in the period during which the legal obligation is incurred if a reasonable estimate of fair value and its settlement date can be made. At the time of recording an ARO, the associated asset retirement costs are capitalized as part of the carrying amount of the related long-lived asset. To estimate its liability, the Utility uses a discounted cash flow model based upon significant estimates and assumptions about future decommissioning costs, inflation rates, and the estimated date of decommissioning. The estimated future cash flows are discounted using a credit-adjusted risk-free rate that reflects the risk associated with the decommissioning obligation.

(vi)     **Schedule A/B.60, 61:** The Debtors have not attempted to assign values to all of their various intellectual property rights and licenses because doing so would be unduly burdensome, and as a result, they are not included in Schedules.

(vii)    **Schedule A/B.74**: Various electricity suppliers filed claims in the Utility's prior 2001 chapter 11 case (Case No. 01-30923 (DM)) seeking payment for energy supplied to the Utility's customers between May 2000 and June 2001. While proceedings are pending before FERC and other judicial forums, the Utility pursued settlements with electricity suppliers and entered into a number of settlement agreements with various electricity suppliers to resolve some of these disputed claims and to resolve the Utility's refund

claims against these electricity suppliers. Under these settlement agreements, amounts payable by the parties, in some instances, would be subject to adjustment based on the outcome of the various refund offset and interest issues being considered by the FERC. Generally, any net refunds, claim offsets, or other credits that the Utility receives from electricity suppliers either through settlement or through the conclusion of the various FERC and judicial proceedings are refunded to customers through rates in future periods. Accordingly, such potential refund claims are not included in the Schedules.

(viii) **Schedule A/B.75**: In the ordinary course of business, the Debtors may have accrued, or may in the future accrue, certain rights to counter-claims, cross-claims, setoffs, and/or refunds with Debtors' customers and suppliers, or potential warranty claims against their suppliers. Additionally, either of the Debtors may be party to pending litigation in which the Debtors have asserted, or may assert, claims as a plaintiff or counter-claims and/or cross-claims as a defendant. Because such claims are unknown to the Debtors and not quantifiable as of the Petition Date, they are not listed on Schedule A/B.75.

(ix) **Schedule A/B.77**: The Utility uses both derivative and non-derivative contracts to manage volatility in customer rates due to fluctuating commodity prices. Derivatives include contracts, such as power purchase agreements, forwards, futures, swaps, options, and congestion revenue rights. Derivatives are recorded at fair value and on a net basis in accordance with master netting arrangements for each counterparty. The fair value of derivative instruments is further offset by cash collateral paid or received where the right of offset and the intention to offset exist. The Utility elects the normal purchase and sale exception for eligible derivatives. Eligible derivatives are those that require physical delivery in quantities that are expected to be used by the Utility over a reasonable period in the normal course of business, and do not contain pricing provisions unrelated to the commodity delivered. These items are not reflected in the assets or liabilities at fair value. Eligible derivatives are accounted for under the accrual method of accounting.

PG&E Corp. and the Utility record a receivable for insurance recoveries when it is deemed probable that recovery of a recorded loss will occur. Through December 31, 2018, PG&E Corp. and the Utility recorded $1.38 billion for probable insurance recoveries in connection with the 2018 Camp fire and $842 million for probable insurance recoveries in connection with the 2017 Northern California wildfires. The amount of the receivable is subject to change based on additional information.

b. **Schedule D – Creditors Holding Secured Claims:** The claims listed on Schedule D arose and were incurred on various dates; a determination of the date upon which each claim arose or was incurred would be unduly burdensome and cost prohibitive. Accordingly, not all such dates are included for each claim. Except as otherwise agreed pursuant to a stipulation, agreed order, or general order entered by the Bankruptcy Court, the Debtors reserve their right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a creditor listed on Schedule D of either Debtor. Moreover, although the Debtors may have scheduled claims of various creditors as secured claims, the Debtors reserve all rights to dispute or challenge the secured nature of any such claim or the

characterization of the structure of any such transaction or any document or instrument (including, without limitation, any intercompany agreement) related to such claim. The descriptions provided on Schedule D only are intended to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens.

In certain instances, a Debtor may be a co-obligor, co-mortgagor, or guarantor for a scheduled claim of another Debtor, and no claim on Schedule D of any Debtor is intended to acknowledge claims of creditors that are otherwise satisfied or discharged by other entities. Except as specifically stated herein, real property lessors, utility companies, and other parties that may hold security deposits have not been listed on Schedule D. Moreover, certain contracts listed on Schedule G may be secured by assets of the Debtors. The Debtors believe it would be unduly burdensome and costly to attempt to identify and list all such agreements on Schedule D.

c. **Schedule E/F – Creditors Holding Unsecured Claims:** Reasonable efforts have been made to list all liabilities on Schedule E/F for both Debtors. Claims listed on Schedule E/F arose or were incurred on various dates. Although reasonable efforts have been made to list the date that each claim arose, determination of each date upon which such claim in Schedule E/F was incurred or arose would be unduly burdensome and cost prohibitive and, therefore, the Debtors do not list a date for each claim listed on Schedule E/F.

As discussed above, the Bankruptcy Court entered a number of First-Day Orders granting authority to pay certain prepetition claims. Claims against the Debtors for prepetition amounts that have not been paid but for which authority has been received may be included in Schedule E/F. Accordingly, the Debtors reserve their rights to object to any listed claims on the ground that, among other things, they have already been satisfied. Listing a claim on Schedule E/F as priority does not constitute an admission by the Debtors of the claimant's legal rights or a waiver of the Debtors' right to recharacterize or reclassify the claim or contract.

The Debtors believe that most of the employee prepetition claims entitled to priority under the Bankruptcy Code have been or will be paid pursuant to certain First-Day Orders that authorized the payment of such claims. Accordingly, except as otherwise noted therein, employee claims have been scheduled as "Undetermined" on Schedule E/F for each Debtor; however, for the avoidance of doubt, the Debtors have used reasonable efforts to include all employees on Schedule E/F that had prepetition claims as of the Petition Date.

In the ordinary course of business, the Utility will require deposits from customers if they have had service discontinued in the past due to non-payment or if a customer has no previous service history with the Utility. The majority of these deposits would qualify as priority unsecured deposits under section 507(a)(7) of the Bankruptcy Code. The Debtors have received final authority pursuant to the order approving their *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a)(7) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (i) Authorizing Debtors to (a) Maintain and Administer Customer Programs, Including Public Purpose Programs, and (b) Honor any Prepetition Obligations Relating Thereto,; and (ii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 16] (the "**Customer Programs Motion**") to continue to refund or offer service credits to

customers with these deposits when the customer meets the appropriate credit worthiness criteria. Due to the number of customers with deposits, the relief granted in connection with the Customer Programs Motion, and the confidential nature of these deposits, the Debtors have not listed these customers on Schedule E/F – Priority Unsecured Claims.

Certain claims listed on Schedule E/F are claims owing to various taxing authorities to which the Debtors may potentially be liable. These claims may be the subject of ongoing audits and the Debtors may be unable to determine with certainty the amount of many, if not all, of the claims listed on Schedule E/F. Therefore, the Debtors listed all such claim amounts as "Undetermined" in amount, pending final resolution of ongoing audits or other outstanding issues.

Schedule E/F contains information regarding pending litigation involving the Debtors. In certain instances, the identity of the Debtors that are the subject of the litigation is unclear or undetermined. However, if litigation involving a particular Debtor has been identified, that information is contained in the Schedule for that Debtor. The inclusion of any litigation in these Schedules does not constitute an admission by the Debtors of liability, the validity of any action, the availability of insurance coverage, or the amount or treatment of any claims, defenses, counterclaims, or cross-claims or the amount or treatment of any potential claim resulting from any current or future litigation. For the avoidance of doubt, the Debtors preserve all defenses with respect to any lawsuit listed on Schedule E/F, including, but not limited to, the right to dispute that any of the lawsuits listed were not properly filed or that Debtors were not properly served a complaint in accordance with applicable state or federal laws. The Debtors have generally excluded internal grievance claims to protect the privacy interests of the grieving party and because the majority of such claims generally will not result in actual litigation. In addition, certain litigation or claims covered by insurance policies maintained by the Debtors may be excluded from Schedule E/F.

As set forth in the Debtors' Form 10-K for the fiscal year ended December 31, 2018, PG&E Corp. and the Utility face several uncertainties in connection with the 2018 Camp fire and 2017 Northern California wildfires, related to: the amount of possible loss related to third-party claims (in 2018, the Utility recorded total charges of $13.4 billion, which reflects the low end of the range of reasonably estimated losses and is subject to change based on additional information), which aggregate possible losses, if the Utility were found liable for certain or all of the costs, expenses and other losses in connection with the 2018 Camp fire and 2017 Northern California wildfires (other than potential punitive damages, fines and penalties or damages related to future claims), could exceed $30 billion. The Debtors have not attributed these charges to the holder of any particular wildfire claim. Accordingly, the Debtors have listed the claim amounts as "Undetermined" in Schedule E/F.

In the ordinary course of business, the Debtors generally receive invoices for goods and services after the delivery of such goods or services. As of the filing of the Schedules, the Debtors had not received all invoices for payables, expenses, or liabilities that may have accrued before the Petition Date. Accordingly, the information contained in Schedules E/F may be incomplete. The Debtors reserve the right to amend, modify, or supplement Schedules E/F in the event they receive such invoices. The claims of individual creditors are generally listed at the amounts recorded on the Debtors' books and records and may not reflect credits or allowances due from the creditor. The Debtors reserve all of their rights concerning credits or allowances.

d. **<u>Schedule G – Executory Contracts:</u>** The business of the Debtors is large and complex. Although reasonable efforts have been made to ensure the accuracy of Schedule G, inadvertent errors, omissions, or overinclusion may have occurred. Nothing herein shall be construed as a concession or evidence that any of the contracts, agreements, and leases identified on Schedule G: (i) constitute an executory contract within the meaning of section 365 of the Bankruptcy Code and other applicable law; or (ii) have not expired or been terminated or otherwise are not currently in full force and effect. Moreover, omission of a contract or lease from Schedule G does not constitute an admission that the contract or lease is not an executory contract or unexpired lease. The Debtors reserve all of their rights, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization, or enforceability of any contract or lease in Schedule G.

Certain of these contracts or leases may have been modified, amended, or supplemented by various amendments, restatements, statement of works, waivers, estoppel certificates, letters, improvement initiatives, notices to proceed, field directives, side letters, commitment letters, and other documents, instruments, and agreements that may not be listed, but are nonetheless incorporated by this reference. Certain of the contracts and leases listed on Schedule G may have been entered into by more than one of the Debtors. In addition, certain of the contracts and leases listed on Schedule G may not have been memorialized or fully executed and could be subject to dispute.

In some cases, the same supplier or provider appears multiple times in Schedule G. This multiple listing may reflect distinct agreements between the applicable Debtor and the supplier or provider. Multiple purchase orders, repair orders, or agreements with the same supplier or provider may be summarized and may not be listed on Schedule G individually.

The Debtors may have entered into various agreements in the ordinary course of their business, such as easements, rights of way, subordinations, nondisturbance and attornment agreements, supplemental agreements, amendments/letter agreements, title agreements, non-disclosure agreements, confidentiality agreements, and similar such agreements. These documents also may not be listed on Schedule G.

Terms and conditions governing purchase orders, sales orders, and similar agreements may be referenced in an ancillary master services agreement ("**MSA**") or other governing document. Schedule G includes certain of such MSAs or other governing documents. By their inclusion in this Schedule, the Debtors do not submit that any MSA is an executory contract and such MSAs have been included in the Schedule out of an abundance of caution. The Debtors reserve all rights with respect to such master service agreements, including the right to argue that they are executory contracts.

e. **<u>Schedule H – Co-Debtors:</u>** Although the Debtors have made every effort to ensure the accuracy of Schedule H, inadvertent errors, omissions, or inclusions may have occurred. The Debtors hereby reserve all rights to dispute the validity, status, and enforceability of any obligations set forth on Schedule H and to further amend or supplement such Schedule as necessary.

The Debtors further reserve all rights, claims, and causes of action with respect to the obligations listed on Schedule H, including the right to dispute or challenge the characterization or the structure

of any transaction, document, or instrument related to a creditor's claim. The listing of a contract, guarantee, or other obligation on Schedule H shall not be deemed an admission that such obligation is binding, valid, or enforceable.

In the ordinary course of their business, the Debtors are involved in pending or threatened litigation, environmental matters and claims arising out of the conduct of their business. These matters may involve multiple plaintiffs and defendants, some or all of whom may assert cross-claims and counterclaims against other parties. Because such claims are listed elsewhere in the Statements and Schedules, they have not been set forth individually on Schedule H.

The Debtors may not have identified certain guarantees that are embedded in the Debtors' executory contracts, unexpired leases, debt instruments, and other such agreements. The Debtors reserve their right, but shall not be required, to amend the Schedules to the extent that additional guarantees are identified or such guarantees are discovered to have expired or are unenforceable.

| Fill in this information to identify the case and this filing: | |
|---|---|
| Debtor Name: | Pacific Gas and Electric Company |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case Number (if known): | 19-30089 (DM) |

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**Warning -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and Signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- [X] Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)
- [X] Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)
- [X] Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)
- [X] Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)
- [X] Schedule H: Codebtors (Official Form (206H)
- [X] Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)
- [ ] Amended Schedule ______________
- [ ] Other document that requires a declaration ______________________________

I declare under penalty of perjury that the foregoing is true and correct.

**Executed on:** 3/14/19 **Signature:** /s/ David Thomason

David Thomason Vice President & Controller
**Name and Title**