Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:   628.208.6434
Facsimile:   310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:   310.820.8800
Facsimile:   310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>-and-<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>Debtors.<br>□ Affects PG& E Corporation<br>□ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**REPLY IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO COMPEL PRODUCTION OF THIRD-PARTY CONTRACTOR DOCUMENTS**<br><br>Date:   August 27, 2019<br>Time:   9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>           Courtroom 17, 16 Floor<br>           San Francisco, CA  94102 |

The Official Committee of Tort Claimants (the "**TCC**"), by and through its undersigned counsel, hereby submits this Reply in Support of Its Motion to Compel (the "**Reply**" to the

"**Motion**") PG&E Corporation and Pacific Gas & Electric Company (collectively, the "**Debtors**") to produce documents.[1] Debtors' Objection to the TCC's Motion reveals at least one of two fundamental issues: (1) Debtors have failed to produce all responsive documents; or (2) Debtors have failed to preserve responsive documents. In general and specific terms, this Reply will aid the Court in identifying what documents should exist, and why the TCC is seeking them. In support thereof, the TCC states as follows:

## I. ARGUMENT AND AUTHORITIES

**A. The TCC's Request and Debtors' Notable Production Gaps**

Debtors have represented to this Court that, after a reasonable search, they have produced all documents responsive to the request that forms the basis of the TCC's Motion to Compel—its Rule 2004 Request No. 25. *See* Docket No. 3371, at 6-8. They reiterate this claim in their Objection to the Motion. *See* Docket No. 3535. Unless Debtors have failed to preserve responsive documents on a substantial scale, then Debtors have not fulfilled their discovery obligations.

Part (e) of Request No. 25 requests "All documents that contain the analyses, findings, summaries, impressions, recommendations, and/or other work-product of each of the Third-Party Contractors" with respect to the Caribou-Palermo Line that caused the Camp Fire. As this Court is aware, the purpose of the TCC's investigation into third party contractors' work on that line is to evaluate potential liability of those contractors to increase the potential recovery for Camp Fire victims. Furthermore, as Debtors intend to contest legal liability for the Camp Fire, these documents will also be critical to determining whether PG&E was negligent in how it directed and controlled its contractors.

On its face, the TCC Request No. 25 contemplates all invoices, statements of work, written communications, and any other written document whatsoever detailing the work **actually performed** by third-party contractors on the Caribou-Palermo Line. Debtors have produced many

---

[1] This Reply was originally filed under seal on August 20, 2019. See Dockets # 3629-3630. Subsequent thereto, the TCC reached agreement with the Debtors to redact certain pricing terms from the exhibits, which Debtors had designated as confidential pursuant to the Confidentiality and Protective Order (Docket # 2807-1), and file the Reply publicly.

contracts for work that contractors were supposed to perform, but almost no third-party contractor-created documents detailing what they did.

Of note, Debtors have rigid invoicing requirements built into their contracts, which typically state that PG&E will notify their contractors of invoice deficiencies, and that the contractors are required to provide Debtors with documents and information to correct such deficiencies or resubmit corrected invoices. As a matter of logical and practical commercial reality, invoices from contractors contain analyses, findings, summaries, impressions, recommendations, and/or other work-product—exactly what Request No. 25 seeks—because contractors want to get paid for all of the work they perform. Debtors have detailed invoicing procedures because they do not want to pay for work that has not been performed. Thus, as a matter of course, invoices would be responsive to Request No. 25 the vast majority of the time even without Debtors' strict contractual requirements.

Despite the fact that Debtors spend hundreds of millions, if not billions, of dollars on third-party contractors, and dozens of contractors performed work on the Caribou-Palermo Line in the relevant time period, Debtors have not produced a single invoice. Debtors also do not appear to have produced any work orders or other comparable documents created by contractors to track their work and provide a description of the results to the Debtors. Many of the contracts that Debtors produced have terms that called for contractors to produce significant written work product—in most instances, no such contractually-required work product was produced.

Similar to the lack of invoices, work orders, and contractually-required work product documents, Debtors have not produced a single email responsive to the Request subject to the Motion to Compel—there is not a single piece of correspondence discussing a third-party contractor's work in their productions. This is a giant red flag in the context of modern discovery, as the vast majority of document production in all manner of cases comes from email correspondence and other electronic communications. It would be bizarrely anachronistic for Debtors to not have a single piece of email correspondence or other electronic communications with a third-party contractor who worked on the Caribou-Palermo Line, especially considering the massive scale of Debtors' expenditures on contractors.

- 3 -
Case: 19-30088    Doc# 3704    Filed: 08/26/19    Entered: 08/26/19 19:29:22    Page 3 of 10

If it is truly the case that Debtors do not have these large categories of documents, then Debtors have failed to preserve crucial evidence despite the fact that they have been under a constant cloud of litigation for many years and should have multiple safeguards in place to ensure such potentially significant documentation is preserved. This also calls into question Debtors' own negligence in managing the contractual relationships it has with its many contractors—if it does not maintain invoice records or even require its contractors to follow its invoicing procedure, does not retain contractually required work product, and does not keep records of communications with those contractors, then how is it capable of responsibly managing its transmission lines in light of its reliance on such contractors?

**B.    Specific Third-Party Contractor Documents**

Despite the TCC's inability to obtain a full picture of Debtors' universe of documents for the reasons stated above, the TCC has still been able to identify several key contractors below that both worked on the Caribou-Palermo Line and for which Debtors ought to possess the responsive documents sought by the TCC. These contractors include the following:

1.    Quanta Technology, LLC

Debtors have engaged Quanta Technology on numerous technical consulting services projects for over a decade. However, Debtors only produced the actual results of Quanta's work from the year 2010, comprised of a series of reports on various components of Debtors' electrical system. Since that time, Debtors entered into 21 contract work authorizations ("CWAs") for additional work from Quanta. Debtors have produced no documents reflecting any work product from Quanta after 2010. Of particular interest to the TCC is CWA Number C6068, dated 3/13/2018, by which Quanta agreed to assist PG&E in its Wildfire Risk Mitigation project. The Project Description is directly relevant to the TCC's analysis:

**Project Description**

**Proactive Deenergization**
Contractor shall provide support in developing the requirements and process for implementation of proactive deenergizing during high risk fire conditions. Requirements related to proactive de-energizing include:
- Identification of the critical at-risk areas
- Identification and implementation of technologies to accomplish the required risk reduction and minimize the customer impact
- Development of operational practices and requirements for implementation
- Identification of effective communication and collaboration processes with public agencies and the public, especially potentially impacted customers

**Design Standards**
Contractor shall provide support for the enhancement of construction standards related to fire risk mitigation, including infrastructure replacement standards. Design standards enhancements being evaluated include, but are not limited to:

- Exempt line equipment replacement
- Non-wood pole & cross-arm design and replacement
- Undergrounding and tree wire/covered conductor strategy
- Conductor ground return and increased protection sensitivity
- Pulse Reclosers

*See* Ex. A to the Declaration of Kody Kleber ("Kleber Decl."). Debtors have produced no documents pertaining to Quanta's work on this project, which would appear directly on point with the inquiry into the Camp Fire and ought to include an analysis of the Caribou-Palermo Line.

2.       Burns & McDonnell Engineering Company, Inc.

Debtors entered into several CWAs with Burns & McDonnell pursuant to a 2010 Master Service agreement that was not produced to the TCC. Debtors actually did produce several Light Detection and Ranging ("LIDAR") survey reports Burns & McDonnell conducted on the Caribou-Palermo Line back in 2011, 2012, and 2013. Using aerial LIDAR technology, Burns & McDonnell was able to develop a CADD model of the Line and determine minimum clearance violations, of which there were numerous, including at Tower 27/222—believed to be the inception point of the Camp Fire. Despite the fact that Burns & McDonnell contracted to perform significant additional work after the February 1, 2013 survey, Debtors have produced no documents apart from CWAs after that point. Through CWA No. 2500935325, dated January 8, 2014, Burns & McDonnell

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

agreed to serve as the project engineer and provide engineering assistance on tower raises, over-tension mitigation, and other NERC mitigation work for the Caribou-Palermo Line. This contract specifically called for substantial written work product—the deliverables for this project included:

- Preliminary Scope of Work document for affected spans
- Job Walkdown Notes
- Structure Data Sheets for affected structures
- CalTrans crossing permit support and exhibit drawings where applicable
- Bill of Material and Tower Punch List
- EMM for non-coded materials
- Design Review drawings at 60% and 95% complete to include Structure Data Sheets (SDS)
- Plans & Profile Drawings
- Tension Check Report for affected spans
- Issue complete design package – IFC drawings
- Issue construction design package including: Plan & Profile, Structure Data Sheets, and Job Walkdown Notes
- Responsible Engineer Construction Support
- As-built drawings

*See* Ex. B to Kleber Decl. In addition, PG&E required Burns & McDonnell to provide a monthly summary of the work they performed. Needless to say, Debtors produced none of these documents.

In October of 2015, a change order was issued to increase funds for over-tension mitigation for Caribou-Palermo. In September of 2017, Burns & McDonnell was still doing work for Debtors on this project—there is another change order increasing their project funding to cover Caribou-Palermo projects, among others. To reiterate, the TCC has no details on what work Burns & McDonnell actually undertook after February 1, 2013. The TCC seeks all documents pertaining to Burns & McDonnell's work in connection with the Caribou-Palermo Line, since they conducted critical LIDAR surveys that could have identified weaknesses in Tower 27/222 in addition to the

clearance violations, and appear to have provided extensive additional engineering services on the Caribou-Palermo Line to Debtors over the past six years.

3. Outback DVBE, Inc.

Debtors entered into multiple CWAs with Outback DVBE to perform work along the Caribou-Palermo Line from 2011-2016, including pouring concrete tower for foundations, drilling holes in the ground to install new H-frame transmission towers, digging anchor holes, setting anchors and poles, removing wood poles, and drilling and installing support for a temporary shoo-fly. The shoo-fly work, conducted in May 2013, is referred to in the contract documents as emergency work. Debtors produced no documents pertaining to Outback's work beyond the CWAs. Debtors also contracted with Outback DVBE on numerous other projects that do not specify the service area, including pole replacements and tower foundations. The TCC is entitled to all documents relating to Outback's work so that it can evaluate whether this contractor was in position to perform and/or recommend repairs to Tower 27/222 or the transmission line and did not do so.

4. PAR Environmental Services, Inc.

Debtors contracted with PAR Environmental Services ("PAR Environmental") in October of 2012 to replace Tower 35/282 on the Caribou-Palermo Line and to raise the height of the line. Debtors produced only a short form contract and no documents concerning the work performed by PAR Environmental. The TCC is entitled to all documents pertaining to PAR Environmental's work so that it can evaluate whether this contractor was in position to perform and/or recommend repairs to Tower 27/222 or the transmission line and did not do so.

5. PAR Electrical Contractors, Inc.

Debtors contracted with PAR Electrical Contractors in 2016 to provide engineering of micropile foundations for six H-frames along the Caribou-Palermo Line. Debtors produced only a contract and no documents concerning the work performed by PAR Electrical. Debtors also contracted with PAR Electrical on numerous other projects, such as transmission pole replacements, that do not specify the service area. The TCC is entitled to all documents pertaining to PAR Electrical work so that it can evaluate whether this contractor was in position to perform and/or recommend repairs to Tower 27/222 or the transmission line and did not do so.

### 6. Crux Subsurface, Inc.

Debtors contracted with Crux in 2016 to provide engineering of micropile foundations for six H-frames along the Caribou-Palermo Line. Debtors produced only a short form contract and no documents concerning the work performed by Crux. The TCC is entitled to all documents pertaining to Crux's work so that it can evaluate whether this contractor was in position to perform and/or recommend repairs to Tower 27/222 or the transmission line and did not do so.

### 7. Black & Veatch Construction, Inc.

Black & Veatch is an engineering, procurement, and construction firm that Debtors contracted with to improve the capacity, integrity and operating safety of PG&E's electric and natural gas transmission. In 2011, Black & Veatch contracted to perform engineering and technical services for the Caribou-Palermo Line where there were low wires on certain towers, and possibly to replace transmission lines. They were to provide final walkdown notes, job estimates and scopes, and final engineering estimates for this project. None of these documents were provided to the TCC.

Furthermore, because Black & Veatch's contract documents frequently reference "various" locations "throughout PG&E services territory," the TCC is unable to determine from the contract documents alone where Black & Veatch performed work. The TCC is entitled to all responsive documents relating to Black & Veatch's work in connection with the Caribou-Palermo Line.

### 8. McKinsey & Company

Debtors make several unsupported factual allegations concerning McKinsey & Company's supposed lack of involvement with the Caribou-Palermo Line "Risk Informed Budget Allocation" ("RIBA") scoring. Taken at face value, these claims do not stand up to scrutiny. Debtors state "McKinsey was certainly involved in developing the RIBA scoring model, but not in scoring the Caribou-Palermo line." *See* Docket No. 3535 at ___. If McKinsey assisted with development of the RIBA model, and it was not until "years later" that PG&E did its own risk analysis based on that model without any McKinsey assistance, why were McKinsey personnel still copied on email correspondence and referred to as members of the "team" with which PG&E wanted to "provide a status update and share some findings"? Based on the actual evidence before the Court, McKinsey

was still involved with PG&E's RIBA scoring at the time the Caribou-Palermo Line was given a low priority score, or their personnel would not be copied on such email correspondence.

Furthermore, even if McKinsey were only involved in developing the RIBA scoring model, if that model was flawed or otherwise failed to adequately score the Caribou-Palermo Line, then McKinsey-related documents are absolutely a legitimate target for discovery—it is not within Debtors' purview to weigh the potential evidence, find the TCC's hypothetical claims lacking, and therefore withhold responsive documents. The withheld McKinsey documents must also be produced.

### 9. Additional Contractors

The TCC cannot determine whether or not numerous additional contractors worked on the Caribou-Palermo Line, because the TCC only has contract documents that provide locations for their work such as "various" or "PG&E Service Territory."[2] Debtors' Objection suggests that they have identified 23 contractors who have performed work on the Caribou-Palermo Line. The responsive documents showing the work those contractors performed should also be produced.

## II. CONCLUSION

The most likely explanation for Debtors' extensive failures to produce the categories of responsive documents detailed in the Motion and this Reply is that they simply chose not to produce responsive documents despite the Court's prior Order that they do so. In the event Debtors' search did not turn up the documents referenced in the Motion and in this Reply, then Debtors should be ordered to report with particularly the search efforts undertaken to identify and review responsive documents. If Debtors have somehow failed to retain the incredible volume of responsive documents the TCC has been able to identify, despite the TCC's lack of access to the universe of potentially responsive documents in Debtors' possession, custody, and control, then Debtors have a serious preservation issue on their hands.

---

[2] For example, Quantum Spatial, Inc. (helicopter and LIDAR services), Ampirical Services, Inc. (engineering and technical services), and any unnamed helicopter contractors referenced in Debtors' Objection.

Based on the foregoing, the TCC respectfully requests that this Court enter an order requiring Debtors to produce all documents responsive to its 2004 Request No. 25 within fourteen (14) days.

Dated: August 26, 2019

                                           BAKER & HOSTETLER LLP

                                           By: */s/ Cecily A. Dumas*
                                                     Cecily A. Dumas

                                         *Attorneys for The Official Committee of Tort Claimant*